LATHAM & WATKINS LLP
   Peter A. Wald (SBN 85705)
505 Montgomery Street, Suite 2000
San Francisco, California 94111-2562
Telephone:  (415) 391-0600
Facsimile:  (415) 395-8095
E-mail: peter.wald@lw.com

Attorneys for Defendants ORACLE CORPORATION,
LAWRENCE J. ELLISON, JEFFREY O. HENLEY, and
EDWARD J. SANDERSON

ORACLE CORPORATION
   Dorian Daley (SBN 129049)
   James C. Maroulis (SBN 208316)
500 Oracle Parkway
Mailstop 5OP7
Redwood Shores, California 94065
Telephone:  (650) 506-5200
Facsimile:  (650) 506-7114
E-mail: jim.maroulis@oracle.com

Attorneys for Defendant ORACLE CORPORATION

LATHAM & WATKINS LLP
   Patrick E. Gibbs  (SBN 183174)
140 Scott Drive
Menlo Park, California 94025
Telephone:  (650) 328-4600
Facsimile:  (650) 463-2600
E-mail: patrick.gibbs@lw.com

LATHAM & WATKINS LLP
   Sean M. Berkowitz (*pro hac vice*)
233 South Wacker Drive, Suite 5800
Chicago, Illinois 60606
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
E-mail: sean.berkowitz@lw.com

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION

| In re ORACLE CORPORATION SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS. | **Master File No. C-01-0988 (SI) (Consolidated)**<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO EXCLUDE DECLARATIONS AND TESTIMONY OF BROOKS HILLIARD; MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT THEREOF**<br><br>Honorable Judge Susan Illston<br><br>Date:  January 9, 2009<br>Time: 9:00 a.m. |
| --- | --- |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

2             PLEASE TAKE NOTICE THAT Defendants Oracle Corporation, Lawrence J.

3    Ellison, Jeffrey O. Henley and Edward J. Sanderson (collectively, "Defendants") hereby move

4    the Court for an order precluding Plaintiffs from offering the expert declarations or testimony of

5    Brooks Hilliard at trial of this matter on grounds that Mr. Hilliard's declarations and testimony

6    are unreliable, irrelevant, and therefore inadmissible pursuant to Federal Rules of Evidence 403,

7    702, and 703 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).  This Motion

8    is based upon this Notice of Motion, the following Memorandum of Points and Authorities, the

9    files and records of this action, and such arguments and evidence as may be presented to the

10   Court at or prior to hearing.

11   Dated: October 20, 2008              LATHAM & WATKINS LLP

12                                        Peter A. Wald
                                          Patrick E. Gibbs
13                                        Sean M. Berkowitz

14

15                                        By _____/s/_____
                                          Patrick E. Gibbs
16                                        Attorneys for Defendants ORACLE
                                          CORPORATION, LAWRENCE J. ELLISON,
17                                        JEFFREY O. HENLEY, and EDWARD J.
                                          SANDERSON
18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-SI

# **TABLE OF CONTENTS**

**Pages**

I.      INTRODUCTION ........................................................................................................... 1

II.     BACKGROUND ........................................................................................................... 3

III.    LEGAL STANDARDS ................................................................................................. 4

IV.     ARGUMENT ................................................................................................................. 6

        A.     Mr. Hilliard's Methodology Is Not Reliable............................................... 6

               1.     Mr. Hilliard's Basic Methodology Is Fundamentally
                      Flawed And Will Not Support His Conclusions...................................... 6

                      a.     *Mr. Hilliard Did Not Perform A Technical Analysis
                             of Suite 11i* ................................................................................ 6

                      b.     *Mr. Hilliard Did Not Perform An Systematic Or
                             Comparative Analysis Of Suite 11i's Quality.* .............................. 7

                      c.     *Dr. Jensen Confirms That Mr. Hilliard's Analysis
                             Cannot Support Any Conclusion Regarding Suite
                             11i's Quality Or Stability.* ....................................................... 12

               2.     Mr. Hilliard's Methodology Suffers From A Variety of
                      Other Problems. ................................................................................. 13

                      a.     *Mr. Hilliard's Analysis Is Not Based On  Any
                             Objective Standard.* .................................................................. 13

                      b.     *Mr. Hilliard Employs Standards of Commercial
                             Quality that are Impossible to Determine, Let Alone
                             Meet.* ........................................................................................ 14

                      c.     *Mr. Hilliard's Analysis Cannot Be Recreated Or
                             Reproduced.* .............................................................................. 15

                      d.     *Mr. Hilliard Knowingly Used A Biased,
                             Unrepresentative Sample And Then Discounted
                             Evidence Inconsistent With His Thesis.* ..................................... 16

                      e.     *Mr. Hilliard Does Not Even Purport To Analyze
                             The Evidence From The Perspective Of An Expert.* ................... 17

                      f.     *The "Reliability" of Mr. Hilliard's Unspecified
                             Methodology Is Further Undermined By Assertions
                             That Are Plainly Incorrect.* ..................................................... 18

        B.     Mr. Hilliard's Opinions Are Based On Insufficient And Unreliable
               Data ............................................................................................................. 18

        C.     Many Of Mr. Hilliard's Primary Assertions Are Unsupported Or
               Contradicted By The Record ...................................................................... 20

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-SI

1

V.      CONCLUSION.................................................................................................... 22

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ii

# TABLE OF AUTHORITIES

Pages

## CASES

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993).................................................................................................. 18, 22

*Cavallo v. Star Enter.*,
892 F. Supp. 756 (E.D. Va. 1995), *aff'd in pertinent part*, 100 F.3d 1150 (4th
Cir. 1996) ................................................................................................................. 5, 8

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir.), *on
remand, cert. denied*, 516 U.S. 869 (1995).................................................................. 6, 14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993).................................................................................................... passim

*Democratic Party of Wash. State v. Reed*,
2002 WL 32925223 (W.D. Wash. 2002).................................................................... 5, 13

*General Elec. Co. v. Joiner*,
522 U.S. 136 (1997)................................................................................................... 5

*Goebel v. Denver & Rio Grande Western R.R.*,
346 F.3d 987 (10th Cir. 2003) ................................................................................... 5

*Guillory v. Domtar Industries, Inc.*,
95 F.3d 1320 (5th Cir. 1996) ..................................................................................... 23

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994).......................................................................................... 6

*In re Silicone Gel Breasts Implants*,
318 F. Supp. 2d 879 (C.D. Cal. 2004) ...................................................................... 13

*Israel v. Springs Indus.*,
2006 WL 3196956 (E.D.N.Y. 2006)........................................................................... 14

*Jones v. United States*,
933 F.Supp. 894 (N.D. Cal. 1996) ............................................................................ 5

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)................................................................................................... 6, 21

*Recreational Dev. of Phoenix, Inc. v. City of Phoenix*,
220 F.Supp.2d 1054 (D. Ariz. 2002) ........................................................................ 5, 7, 12

*Redfoot v. B.F. Ascher & Co.,*
  2007 WL 1593239 (N.D. Cal. 2007) .................................................................. 6

*Redman v. John D. Brush & Co.,*
  111 F.3d 1174 (4th Cir. 1997) ................................................................... 6, 19

*United States v. Finley,*
  301 F.3d 1000 (9th Cir. 2002) ................................................................. 16, 18

*United States v. Webb,*
  115 F.3d (9th Cir. 1997) ............................................................................... 4

*Weisgram v. Marley Company,*
  528 U.S. 440 (2000)...................................................................................... 7

## OTHER AUTHORITIES

4 *Weinstein's Federal Evidence* § 702.03................................................... 15, 16

## RULES

Fed. R. Civ. Proc. 26................................................................................... 13

Fed. R. Evid. 104 ......................................................................................... 5

Fed. R. Evid. 702 .................................................................................... 4, 15

Fed. R. Evid. 703 .............................................................................. 5, 18, 19

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-SI

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      INTRODUCTION

The opinions of Brooks Hilliard, one of Plaintiffs' designated witnesses on Suite 11i, are based on such a deficient evidentiary basis and unreliable methodology that they belie his role as an "expert" and risk misleading the fact-finder.  Accordingly, Defendants move for an order excluding his declarations and testimony for failure to meet the requirements for expert opinions under the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993).

Mr. Hilliard's opinions are Plaintiffs' primary support for their allegations that various "product"-related statements made by Defendants were false.  But Mr. Hilliard does not take on the actual statements.  For example, Mr. Hilliard contends that Oracle's statements comparing the pre-existing integration of Suite 11i with the systems integration work needed to implement "best-of-breed" alternatives were false.  However, he does not dispute the essential facts underlying those comparisons:  he does not dispute that Suite 11i was built to "work together" in a way that the "best-of-breed" products were not, or that the architecture of Suite 11i was engineered to be integrated around a single data model for the full suite of applications.  Mr. Hilliard freely admits that he ignored these issues and did not study the software itself or its technical documentation.  Similarly, while Mr. Hilliard opines that Defendants lied in announcing that Suite 11i was "available" for sale, he does not dispute that thousands of customers licensed and used Suite 11i during the Class Period.  Instead, Mr. Hilliard limits himself to an indirect method of proof – arguing that the quality of Suite 11i was so poor that it necessarily rendered these and other "product"-related statements false.

But Mr. Hilliard fails entirely to provide a reliable basis to support any conclusion about Suite 11i's quality.  He performed no systematic or comparative analysis of Suite 11i against any meaningful benchmark or standard.  Nor did he compare the quality of Suite 11i with the quality of competing products or other similarly complex software.  Instead, Mr. Hilliard's conclusion that Suite 11i was not of "commercial quality" – the basis for his derivative conclusions that Defendants' statements were false – relies solely on anecdotal evidence from a small number of

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-SI

1    Oracle employees and customers regarding problems they encountered with Suite 11i.  He

2    assumes that these complaints, which are nearly all untested hearsay, accurately reflected the

3    facts (an assumption that is contrary to the process Mr. Hilliard follows in his own non-litigation

4    work), then further assumes without basis that the problems described in the complaints were

5    experienced by Oracle's thousands of other customers (even those that did not complain).  All

6    the while, Mr. Hilliard ignores both the context of the evidence upon which he relies, as well as

7    significant contrary evidence demonstrating that many customers (including many he cites as

8    examples of alleged problems) used Suite 11i with great success.

9          The reasons that Mr. Hilliard's analysis cannot support the sweeping conclusions he

10   offers are confirmed by Dr. Randall Jensen, Plaintiffs' other software expert.  Dr. Jensen

11   conceded each of the following points during his deposition:

12   - Mr. Hilliard's report presents no basis or analysis sufficient to determine the ***actual***
         number of software defects (or "bugs") present in Suite 11i;

13

14   - Mr. Hilliard's report presents no basis or analysis sufficient to support any conclusion
         as to whether Suite 11i had a high, average, or low number of bugs compared to
         similarly sized software or other Enterprise Resource Planning ("ERP") systems;

15

16   - Mr. Hilliard's report presents no basis or analysis sufficient to support any conclusion
         about the size of Suite 11i (other than that is was "very large"), and without knowing
         the size of the software, one cannot determine the ***expected*** or normal number of bugs
         present upon release;

17

18   - The type of evidence relied upon by Mr. Hilliard (isolated anecdotal complaints from
         customers and "error" reports) is inherently unreliable and is not relied upon by
         professionals in the field to determine whether an error exists in software, much less
         to make overall judgments about the software's quality; and

19

20

21   - In order to determine the level of Suite 11i's quality and "stability," one would need
         to perform a much broader, more even-handed analysis than the one Mr. Hilliard
         performed, investigate complaints to determine if they were credible or sustained, and
         consider a larger set of information, including the type of positive information
         discounted by Mr. Hilliard from his analysis.

22

23

24         These failings are of particular concern here given that most jurors are not likely to be

25   familiar with enterprise software of the scale and complexity of Suite 11i or the disconnect

26   between Mr. Hilliard's testimony and the statements Plaintiffs' claim were false and misleading,

27   none of which specifically addressed quality.  As a result, Mr. Hilliard's opinions run a serious

28   risk of creating the misleading impression that that Suite 11i's quality was poor compared to

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-SI

other large software releases (and particularly other ERP systems) – even though his analysis cannot support this proposition.  Defendants therefore respectfully request an order excluding Mr. Hilliard's declarations from evidence and precluding Mr. Hilliard from testifying at trial.

## II.  BACKGROUND

Mr. Hilliard offers Plaintiffs' main expert report in support of their claims that various "product"-related statements made by Defendants were false.  Although Mr. Hilliard articulates three separate opinions (with six categories of challenged statements[1]), his analysis reveals that these opinions all boil down to a claim about quality:  Mr. Hilliard opines that all of Defendants' statements about Suite 11i – from whether it was "integrated" to whether it was even "available" for sale – must have been false because customers were experiencing too many bugs.  *See generally* Declaration of Rees Morgan[2] ("Morgan Decl.") at Exh. 1, Declaration of Brooks L. Hilliard ("Hilliard Report") at §§ 5.1.6, 5.2.3, 5.3.4, "Summing Up" (Suite 11i "never achieved minimally acceptable standards for commercial business software.").

Although only Mr. Hilliard's "Opinion #3" expressly purports to address "the quality of the Oracle 11i E-Business Suite," Mr. Hilliard's focus on quality runs through his other opinions as well, as he relies almost exclusively on anecdotal accounts of quality problems in the software (mostly bugs) to support all his opinions.  For example, to support his "Opinion #1" – that Defendants made false statements "about the functionality of the Oracle 11i E-Business Suite" – Mr. Hilliard includes a laundry list of "functional defects," based principally on customer complaints.  *See*, *e.g.*, *id.* at 46-48.  Mr. Hilliard does not contest that Suite 11i was designed to

---

[1] In his report, Mr. Hilliard identified for the first time several statements that had never been included in any of Plaintiffs' complaints or in their responses to contention interrogatories. *Compare* Exh. 1, Hilliard Report at § 4 *with* Exhs. 8-9, Revised Second Amended Complaint, Responses to Contention Interrogatories at 8-15.  The only Suite 11i-related statements Plaintiffs identified in discovery involved Defendants' comparing Suite 11i's level of pre-integration and necessary systems integration to "best-of-breed" alternatives. *See*, *e.g.*, Exh. 9, Responses to Contention Interrogatories at 8-15.  Notably, however, Mr. Hilliard does not dispute that Suite 11i was substantially more integrated than "best-of-breed" software packages. *See* Exh. 2, Excerpts from Deposition of Brooks Hilliard ("Hilliard Tr.") at 144:1-11.  Accordingly, he effectively concedes these statements are true, and his remaining testimony is not relevant to any of the statements properly at issue here.

[2] Unless otherwise specified, the exhibits referenced herein are attached to the Declaration of Rees Morgan in support of Defendants' Motion To Exclude Declarations And Testimony Of Brooks Hilliard, Docket No. 1228, filed October 9, 2007.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-SI

1    include all the "functionality" that Defendants represented; he merely contends based on isolated

2    reports of trouble that the software "did not work."  *See id.* at 62.  Likewise, his "Opinion #2" –

3    that Defendants made false statements "about the pre-integration of the components of the

4    Oracle 11i E-Business Suite" – focuses on "integration defects" but does not contest that Suite

5    11i's architecture (its design and engineering) was integrated.  *Compare* Exh. 1, Hilliard Report

6    at 63 *with* Exh. 2, Hilliard Tr. at 157:9-22.

7         Plaintiffs have designated two software experts, however, and when it comes to assessing

8    the quality of software such as Suite 11i, Plaintiffs' second expert, Dr. Randall Jensen, has

9    superior qualifications:  Dr. Jensen has over 48 years of experience in the design, analysis,

10   application, and testing of sophisticated software systems.  *See* Exh. 6, Rebuttal Declaration of

11   Randall Jensen ("Jensen Rebuttal") at Résumé.  Dr. Jensen's extensive programming experience

12   provides him with significantly more insight than Mr. Hilliard into overall quality issues

13   associated with the release of major software like Suite 11i, and how to evaluate them.  Mr.

14   Hilliard, in contrast, is a management consultant who "does not do software development [or]

15   implement computer software or systems" (Exh. 1, Hilliard Report at Exh. 3) and who has never

16   opined on the overall quality or integration of a product like Suite 11i (*see* Exh. 2, Hilliard Tr. at

17   21:19-24, 24:13-17).  Accordingly, Dr. Jensen's Report and deposition testimony are of

18   significant value in understanding why Mr. Hilliard's methodology is fundamentally flawed.

19   **III.   LEGAL STANDARDS**

20        Federal Rule of Evidence 702, permits the use of expert opinion testimony *only* if it "will

21   assist the trier of fact to understand the evidence or to determine a fact in issue" *and* if "(1) the

22   testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable

23   principles and methods, and (3) the witness has applied the principles and methods reliably to the

24   facts of the case."  Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 594.

25        Before expert testimony may be admitted, *Daubert* "demands a searching inquiry as to

26   method."  *United States v. Webb*, 115 F.3d 711, 716 (9th Cir. 1997).  "[A]ny step that renders the

27   analysis unreliable . . . renders the expert's testimony inadmissible."  *Goebel v. Denver & Rio*

28   *Grande Western R.R.*, 346 F.3d 987, 992 (10th Cir. 2003) (citations and internal quotations

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-SI

omitted).  Testimony that requires "too great an analytical gap between the data and the opinion offered" is also impermissible.  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The same concerns limit the types of evidence considered sufficient to support reliable conclusions.  Experts generally may not rely upon anecdotal reports because they are not derived through the scientific method and "fall short of the proven, cause and effect relationship that is necessary to satisfy the *Daubert* standard."  *Jones v. United States*, 933 F.Supp. 894, 898-900 (N.D. Cal. 1996), *aff'd* 127 F.3d 1154 (9th Cir. 1997), *cert. denied* 524 U.S. 946 (1998).  As one court noted:

> The danger here is that rather than the factual underpinnings consisting of empirical data, the witnesses' conclusions are supported by their experience (an amorphous matter in most cases), isolated anecdotal evidence, or belief.  This kind of evidence going to critical aspects of this case does not make for proper opinion testimony – lay or expert – and it must be excluded.

*Democratic Party of Wash. State v. Reed*, 2002 WL 32925223 at *15 (W.D. Wash. 2002). Anecdotal evidence is "by definition, non-systematic and non-generalizable." *Recreational Dev. of Phoenix, Inc. v. City of Phoenix*, 220 F.Supp.2d 1054, 1061 (D. Ariz. 2002); *see also Cavallo v. Star Enter.*, 892 F.Supp. 756, 765 (E.D. Va. 1995), *aff'd in pertinent part*, 100 F.3d 1150 (4th Cir. 1996) (finding anecdotal reports unreliable "because they simply describe reported phenomena without comparison to the rate at which the phenomena occur in the general population or in a defined control group.").

Rule 703 also forbids reliance on hearsay or other inadmissible evidence if experts would not normally rely on such materials to reach similar conclusions outside litigation.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  In light of this restriction, opinions based on such evidence must be excluded unless Plaintiffs can show by a preponderance of the evidence that the inadmissible evidence is of a type normally relied on by experts in the field.  *See* Fed. R. Evid. 104(a); *see also Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1179 (4th Cir. 1997).

Finally, because of its disproportionate impact on and potential to mislead the jury, expert testimony must satisfy a significantly higher standard of relevance than does typical fact testimony.  It must "logically advance[] a material aspect of the proposing party's case" and

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

5

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-SI

1  "speak[] clearly and directly to an issue in dispute in the case" in a manner that will "not mislead

2  the jury." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1321 & n.17 (9th Cir.),

3  *on remand, cert. denied,* 516 U.S. 869 (1995); *see also In re Paoli R.R. Yard PCB Litig.,* 35 F.3d

4  717, 745 (3d Cir. 1994) ("[T]he standard for fit is higher than bare relevance."); *Redfoot v. B.F.*

5  *Ascher & Co.,* No. C 05-2045 PJH, 2007 WL 1593239, at *4 (N.D. Cal. June 1, 2007); *Amaral,*

6  488 F.2d at 1152.

7  **IV.    ARGUMENT**

8      **A.    Mr. Hilliard's Methodology Is Not Reliable**

9      Mr. Hilliard's methods fall far short of the "exacting standards of reliability" required by

10  the Supreme Court. *Weisgram v. Marley Company*, 528 U.S. 440, 455 (2000).  Mr. Hilliard's

11  opinions are fatally unreliable because he did not conduct any technical, systematic, or

12  comparative analysis of the quality of Suite 11i, instead relying on anecdotal evidence that courts

13  (and experts in the industry) routinely find unreliable. *See, e.g., City of Phoenix*, 220 F.Supp.2d

14  at 1061.  Mr. Hilliard's approach also suffers from a host of other disqualifying failures,

15  including his inability or refusal to identify objective standards, his reliance on a biased

16  evidentiary sample, and his admitted abandonment of his expert role by evaluating the statements

17  from the perspective of a lay person.  Quite simply, he has no basis to offer any opinion on the

18  quality of Suite 11i, let alone expert testimony.

19      1.    Mr. Hilliard's Basic Methodology Is Fundamentally Flawed And Will Not
20          Support His Conclusions

21          a.    *Mr. Hilliard Did Not Perform A Technical Analysis of Suite 11i.*

22      Though Mr. Hilliard's opinions rely on whether Suite 11i was "too buggy," he failed to

23  perform the technical analysis necessary to determine what "bugs" were present in the software.

24  The term "bug" is used to describe a deviation or failure of a computer program to behave or

25  perform in the manner described by its functional specification; thus, a bug is *not* a failure of a

26  computer program to behave in a manner that one or more users wish that it could, or would, or

27  should perform – particularly if those wishes were not incorporated into the functional

28  specifications that serve as the "contract" by which the programmers design and develop the

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

6

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-SI

1  appropriate software logic.  Mr. Hilliard freely admits that he did not perform any technical

2  analysis whatsoever of Suite 11i:  he never used or observed the software and performed only a

3  cursory review of the technical reference manuals before dismissing them as irrelevant.  *See* Exh.

4  1, Hilliard Report at § 3.1 (installing and testing the software "would have no significant value in

5  reaching my opinions"); *see also* Exh. 2, Hilliard Tr. at 149:17-20 (technical resource manuals

6  "weren't relevant to the specific issues on – that my opinions where directed toward").

7  Consistent with his failure to analyze this material, Mr. Hilliard does not dispute that Suite 11i's

8  architecture was integrated.  *See* Exh. 2, Hilliard Tr. at 157:9-22.  He also does not contest that

9  Suite 11i was substantially more integrated than the "best-of-breed" software packages to which

10  Defendants compared Suite 11i in the allegedly false statements.  *See id.* at 144:1-11.[3]

11       Rather, having avoided any technical analysis, Mr. Hilliard launches a collateral attack on

12  various statements made by Defendants based primarily on anecdotal evidence about the quality

13  of Suite 11i.  He then uses these anecdotes to draw sweeping conclusions that Suite 11i was of

14  such poor quality generally that the representations could not have been true.  *See, e.g.,* Exh. 1,

15  Hilliard Report at 74 (citing a single customer complaint for the claim that "many" 11i customers

16  thought Suite 11i was not integrated).  As discussed below, without some more systematic

17  analysis, Mr. Hilliard's anecdotal evidence does not support such sweeping conclusions.  *See*

18  *Cavallo*, 892 F. Supp. at 765 (finding that anecdotal reports are not reliable "because they simply

19  describe reported phenomena without comparison to the rate at which the phenomena occur in

20  the general population or in a defined control group").

21            b.    *Mr. Hilliard Did Not Perform A Systematic Or Comparative*
22                 *Analysis Of Suite 11i's Quality.*

23       In the absence of any technical analysis, "quality" becomes the linchpin of Mr. Hilliard's

24  opinions.  As Dr. Jensen noted, however, "[q]uality is a strange word.  It means a lot of different

25  things to different people."  Exh. 3, Excerpts from Deposition of Randall Jensen ("Jensen Tr.") at

26  8:6-17.  It is thus critical that any opinions offered regarding (or based on an assessment of) Suite

---

27  [3] Nor does he contest that it was actually "available" for sale, in light of the hundreds of
   customers who purchased Suite 11i during the Class Period.  *See* October 20, 2008 Declaration
28  of Edward Yourdon at Exh. 2, Rebuttal Expert Report of Edward Yourdon ("Yourdon Rebuttal")
   at ¶ 205.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

7

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-SI

1  11i's quality put bug levels in appropriate context so that jurors can render meaningful

2  conclusions – particularly since large, complex business software is an unusual product whose

3  essential characteristics are outside of most lay person's experiences.  A *Computerworld* article

4  explains that the business software market is unusual:

> 5  There are very few markets where "buyers are willing to accept
> 6  products that they know are going to malfunction," said Gregory
>   Tassey, the [National Institute of Standards and Technology]
> 7  senior economist who headed the study. "But software is at the
>   extreme end in terms of errors or bugs that are in the typical
> 8  product when it is sold."

9  Exh. 10, "Study: Buggy software costs users, vendors nearly $60B annually," *Computerworld*,

10  June 25, 2002.  Mr. Hilliard fails to consider this context when evaluating Suite 11i.

11                    (1)      Background Regarding ERP Software.

12          Suite 11i includes an ERP system as well as other software – basically, a comprehensive

13  system of computer software that automates and coordinates a range of business functions, such

14  as payroll, general ledgers, human resources management, inventory management, call centers,

15  and many others.  ERP systems are among the largest and most complex types of software ever

16  sold.  *See* October 20,  2008 Declaration of Edward Yourdon ("Yourdon Decl.") at Exh. 1,

17  Expert Report of Edward Yourdon ("Yourdon Report") at ¶ 121; *see also* Morgan Decl. at Exh.

18  3, Jensen Tr. at 70:2-3.  There is no dispute here that all commercial software, including ERP

19  systems, has defects or bugs when released.  *See* Exh. 3, Jensen Tr. at 30:25-31:13 ("Q: [T]here

20  is some level of defects that would be normal and expected for various kinds of software;

21  correct?  A:   Always."); Exh. 2, Hilliard Tr. at 129:1-2 ("As we said, all software has bugs.").

22  These errors would necessarily include some amount of "high severity" or "show stopper" bugs.

23  Exh. 3, Jensen Tr. at 93:10-14 ("All software has show stoppers.").[4]  There is also no dispute

24  that generally, the bigger software is, the more bugs it will have.  *See id.* at 29:20-29:18 ("Q:

25  And so holding everything else constant, if the software gets bigger you could expect to see more

26

27  [4] These features of ERP systems were no secret to customers or the market.  *See* Exh. 3, Jensen
28  Tr. at 115:3-7  ("Q.   Is it fair to say, then, that the customers buying a newly released ERP
    system would expect at least some level of instability? … THE WITNESS:  It is software,
    yep.").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
8
DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-SI

1    errors even after release; correct?  A: That's true."); *see also* Exh. 2, Hilliard Tr. at 84:23-25.

2    Thus, in order to determine the expected number of errors in a piece of released software, one

3    would want to know its size, as well as industry norms for pre-release defect removal rates.  *See*

4    *generally* Exh. 3, Jensen Tr. at 32:13-35:1.

5         Both Mr. Hilliard and Dr. Jensen admit they do not know how large Suite 11i is but

6    concede "it is very large."  *See* Jensen Rebuttal at Conclusion #1 (estimating the size of Suite 11i

7    as between 76,000 and 556,000 function points); *see also* Exh. 2, Hilliard Tr. at 85:20-22.  Given

8    their size and complexity, ERP systems historically have experienced many defects and troubled

9    implementations.  *See* Exh. 11, *Supply Chain: Hershey's Bittersweet Lesson*, CIO Magazine,

10   Nov. 15, 2002 (discussing failed SAP and Seibel implementation at Hershey's);[5] *see also* Exh.

11   26, *Making The World Safe For Software*, Business 2.0, June 1, 2003 (noting that "the

12   underlying problem – big software's inconceivable complexity – isn't going away").

13        Even with extensive pre-release testing, the expected number of errors in such a system

14   **upon release** is significant, as explained in a textbook by Capers Jones, who Plaintiffs' expert

15   admits is "is a leading authority in the world of software estimating, measurement, metrics,

16   productivity and quality" (Exh. 3, Jensen Tr. at 16:19-17:1):

17         ERP packages, like all other large software applications, contain
18         defects or bugs. Typically, ERP packages start with defect potentials
           of about 6.0 per function point due to their large sizes. Defect-
19         removal efficiency before their initial release is about 90 percent.
           Thus, for an ERP package of 250,000 function points the total defect
20         volume would be 1,500,000 defects. At first deployment, as many as
           150,000 defects would still be present. About 1000 would be high-
21

22   _____

23   [5] As discussed in Mr. Yourdon's Report, ERP software is known for troubled implementations–
     even those involving SAP, the leading ERP vendor at the time.  *See, e.g.,* Exh. 21, L. Mearian,
     *Retailers Hit Installation Bumps With SAP Software*, Computerworld, Feb. 19, 2001 ("SAP AG's
24   applications for retailers continue to be stung by a series of high-profile installation problems
     that many say illustrate the complexity of trying to fit an integrated suite of enterprise resource
25   planning software into a retail operation … 'I can't point to a single happy SAP Retail account in
     North America,' said [Greg Girard, an analyst at AMR Research Inc.]."); Exh. 22, J. Bailey,
26   *Trash Haulers Are Taking Fancy Software to the Dump – Allied Waste, Following Waste
     Management, to Shed SAP's Costly R/3*, The Wall Street Journal, June 9, 1999 ("Allied Waste
27   Industries Inc.… plans to pull the plug on a brand-new $130 million computer system that uses
     the complex software known as SAP R/3. The planned move, previously undisclosed, follows a
28   similar cancellation of a major SAP R/3 installation, one that would have cost about $250
     million, at Waste Management Inc."); *see also* Yourdon Decl. at Exh. 1, Yourdon Report at ¶ 98.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-SI

severity defects, 20,000 would be medium-severity defects, and 129,000 would be low-severity defects.

Exh. 13, Excerpt from Capers Jones, *Estimating Software Costs: Bringing Realism to Estimating* (Second Edition, McGraw-Hill, 2007) at 151.  The available data suggest that roughly 40 percent of these bugs are normally found and addressed per year.  *See id.*  ERP systems typically take a year or two to stabilize following their release.  *See id.*  ("[A]fter several years of deployment and usage, the ERP packages achieve reasonable levels of stability.").

These data are consistent with commentary by market and industry analysts at the time Suite 11i was released, warning potential users that, as a huge new ERP system (perhaps the largest ever), users should expect that it would take time for the software to stabilize.  *See, e.g.*, Exh. 14, Steve Hamm, *Oracle: Why It's Cool Again*, Business Week, April 28, 2000 (NDCA-ORCL 307328-35).  It is also consistent with the enormous body of literature describing the commonplace problems of large software projects and systems, and ERP in particular. *See generally* Yourdon Decl. at Exh. 1, Yourdon Report at §§ V.3 ("Things That Go Wrong In Software Development Efforts And Other Large-Scale Software Projects"), VI.5 ("Historical Difficulties With ERP Implementations").   And it is consistent with Dr. Jensen's observation that purchasers of an ERP system like Suite 11i would expect instability early in its lifecycle. *See* Exh. 3, Jensen Tr. at 115:3-7.

(2)     Mr. Hilliard Fails To Consider The ERP Context.

As a result, if Mr. Hilliard hopes to opine that Oracle's statements about Suite 11i were "false" because it had an inappropriate number of bugs during the Class Period, Mr. Hilliard's analysis must provide a reasonable basis to establish that Suite 11i's defects were abnormal for a massive new release of ERP software.  As described at length by Defendants' Suite 11i expert, Edward Yourdon, in order to analyze software quality in a reliable and principled way, it is necessary to understand several factors, including (1) the size of the software, (2) the actual quantity and type of errors experienced by the users of the software as a class (3) the performance (including actual quantity and type of errors) of software of a similar class and size.

1  *See* Yourdon Decl. at Exh. 1, Yourdon Report at § VI.5, *see also* Morgan Decl. at Exh. 3, Jensen

2  Tr. at 32:13-23, 33:12-25.

3        Plaintiffs offer no basis to contest the analytical framework put forward in Mr. Jones'

4  books and described by Mr. Yourdon.  Dr. Jensen in fact indicates that the potential counts for

5  ERP errors at release compiled by Mr. Jones and quoted above may be ***too low***.  *See* Exh. 3,

6  Jensen Tr. at 49:13-50:2 ("I could go through the calculations to show that we're talking like

7  much – ***almost an order of magnitude larger***."); 93:14-17 ("All software has show stoppers….

8  When it gets old and dies, there are probably still things nobody has managed to trip over.").

9        Yet Mr. Hilliard fails entirely to take these issues into account, or to systematically

10  evaluate Suite 11i's quality against any objective benchmark.  He frankly admits that he has no

11  real understanding of Suite 11i's size.  *See* Exh. 2, Hilliard Tr. at 85:12-15 ("Q.  Do you know

12  how large Suite 11i is measured by any metric? A.  No.").  He did not review any statistical data

13  regarding bug expectancies, either by size or product class.  *See* Exh. 1, Hilliard Report at § 3.2.

14  Nor did he address the total number of bugs actually present in Suite 11i.  *See* Exh. 2, Hilliard

15  Tr. at  88:1-3.  He did not attempt to compare any data relating to Suite 11i to any data (either

16  general or specific) regarding other large software, including other ERP suites.  *See id.* at 87:6-7

17  ("I didn't look at it on a relative basis.").  Mr. Hilliard did not even know how many customers

18  were implementing Suite 11i during the relevant period, and makes no effort to apply any

19  systematic analysis.  *See id.* at 77:7-8 ("I don't know what number were in the process of

20  implementing, no.").

21        Given that he does not identify anything close to the number of errors that Mr. Jones'

22  published data suggest would be expected (much less high severity "P1" bugs), and his

23  admission that he has no idea of the number of actual users implementing the software, it is not

24  at all clear how Mr. Hilliard supports his conclusion that Suite 11i's quality was poor.  This is

25  precisely the problem with Mr. Hilliard's anecdotal approach:  expert witnesses are not permitted

26  to generalize from evidence that is, "by definition, non-systematic and non-generalizable."  *See*

27  *City of Phoenix*, 220 F.Supp.2d at 1061.  As a result, Mr. Hilliard has no reliable basis to say

28  whether Suite 11i is better or worse than other software of its size and class.

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-SI

c.   *Dr. Jensen Confirms That Mr. Hilliard's Analysis Cannot Support Any Conclusion Regarding Suite 11i's Quality Or Stability.*

Dr. Jensen, Plaintiffs' second software expert, confirms the inadequacy of Mr. Hilliard's anecdotal methodology.  He admits it would be important to know software's size to opine on its quality.  *See* Exh. 3, Jensen Tr. at 29:12-14.  He also admits one would need to evaluate the error rates typical for the relevant class of software and the performance of other similar products.  *See id.* at 33:22-34:1 ("[T]o understand what level of defects you would expect to see for a particular software product you would want to look at other products in the same category.").  Dr. Jensen further admits that the error removal rate identified by Mr. Jones for ERP software (and thus the number of errors at release) is, if anything, conservative.  *See id.* at 47:9-14 ("That would be very good.  It would be a very good number, 90 percent.  Most commercial software goes out about 99 percent when it's finally released.  I would think 85 percent wouldn't be bad for some of these systems.").  Finally, Dr. Jensen admits that it would not be surprising to find complex software that did not "work" even a year after release.  *See id.* at 114:21-24.

As a result, even Dr. Jensen – ***Plaintiffs' expert*** – concluded that Mr. Hilliard did not have a sufficient basis from which to estimate the number of defects in Suite 11i or whether that number was out of the ordinary:

> Q.  You can't tell from Mr. Hilliard's report?
> A.  I don't think from any of the reports anyone can form a definition of what a defect is or how many there were.
> Q.  And whether the defect rate was high, low or normal?
> A.  Yeah.  Yes.  That's true.

Exh. 3, Jensen Tr. at 38:10-16.[6]  Dr. Jensen also testified that a far more wide-ranging and even-handed investigation than Mr. Hilliard's would be required to determine if Suite 11i was "stable":

---

[6] In their rebuttals, both Mr. Hilliard and Dr. Jensen initially claimed Suite 11i had 5,000 high-severity bugs (also known as "priority one" or "P1" bugs).  *See* Exh. 5, Hilliard Rebuttal at 2; Exh. 6, Jensen Rebuttal at Conclusion #4. However, both admitted in deposition that they did not have any basis for that conclusion.  *See* Exh. 3, Jensen Tr. at 83:7-14 ("Q. Do you have any basis for concluding that every one of the 5,000 was a high severity defect?...[A.] That requires something that nobody really knows.  Q. Well, you don't know it.  A. I don't know.  I don't think anyone else does, either."); *see also* Exh. 2, Hilliard Tr. at 91:17-21 ("Q. Do you know how many P1 bugs Suite 11i users experienced during the class period? . . . [A.] I don't have any numbers specifically for the class period.").  Both of Plaintiffs' experts claimed to derive their figures from a sentence in Mr. Yourdon's report that does not support such a conclusion on its

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-SI

Q.   BY MR. GIBBS:   Okay.   And my question is: Well, you mentioned that you hadn't talked to anybody.   Who would you want to talk to if you wanted to reach a broader conclusion as to whether Suite 11i was stable?

….

THE WITNESS:  Oh, boy**.   *That's a whole new – wow, what a task that would be, literally to do that***, to go through and talk to all the friends and foes of 11i to determine if it was stable or not.

Q.  BY MR. GIBBS:  You'd have to talk to a large cross section of users?

A.  I'd have to.

Q.   Okay.   And you'd have to factor in the degree to which different customers customize the software?

A.  That's true.

Q.   Because without knowing that, you can't tell whether the instability has been introduced by the  customization or was there to begin with; correct?

….

THE WITNESS:  That's true.

Jensen Tr. at 111:8-112:2 (emphasis added).  In sum, Mr. Hilliard impermissibly asks this court to "simply tak[e] [his] word for it" when even Plaintiffs' other expert will not.  *In re Silicone Gel Breasts Implants*, 318 F. Supp. 2d 879, 890 (C.D. Cal. 2004).  His broad conclusions cannot be supported merely by anecdotal evidence filtered through his (not terribly relevant) experience:

The danger here is that rather than the factual underpinnings consisting of empirical data, the witnesses' conclusion are supported by their experience (an amorphous matter in most cases), isolated anecdotal evidence, or belief.   This kind of evidence going to critical aspects of this case does not make for proper opinion testimony – lay or expert – and it must be excluded.

*Democratic Party of Washington*, 2002 WL 32925223 at *15.

2.      Mr. Hilliard's Methodology Suffers From A Variety of Other Problems.

Mr. Hilliard's methodology also suffers from a host of other disqualifying shortcomings.

a.      *Mr. Hilliard's Analysis Is Not Based On  Any Objective Standard.*

Mr. Hilliard's initial report asserted that he engaged in a "rigorous and standardized methodology," that "follow[ed] all industry-accepted guidelines," (Exh. 1, Hilliard Report at 9), but his deposition testimony flatly contradicts these characterizations:

face (*see* Exh. 4, Yourdon Report at 14) and that Mr. Yourdon testified they misinterpreted.  *See* Exh. 12, Excerpts from Deposition of Edward Yourdon at 240:2-15.

- Mr. Hilliard admits that he cannot identify his so-called "industry-accepted guidelines." Exh. 2, Hilliard Tr. at 43:10-44:20 ("There isn't an industry of expert analysis of software.... I don't know that there is a reference source that you could go to. There may well be.").[7]

- Mr. Hilliard admits that he cannot point to *any standard for software quality*. *See* Exh. 2, Hilliard Tr. at 192:7-12 ("Because each submarket, each vertical market is so different from one another that the standards vary for each one, and that's why there is no common standard that's published for all, and each one is so individualized I don't know of specific published standards for any one of them....") .

In other words, Hilliard's "methodology" consists of precisely the sort of "unadorned assertions that the methodology…employed comports with standard [specialized] procedures" rejected by the Ninth Circuit. *Daubert*, 43 F.3d at 1319. As that rejection indicates, an "expert's bald assurance of validity is not enough." *Daubert*, 509 U.S. at 594. Rather, reliability requires "the existence of standards controlling the technique's operation." *Israel v. Springs Indus.*, 2006 WL 3196956, at *2 (E.D.N.Y. 2006). These standards are missing from Mr. Hilliard's analysis.

b.   *Mr. Hilliard Employs Standards Of Commercial Quality That Are Impossible To Determine, Let Alone Meet.*

Mr. Hilliard's standard for commercial quality relies heavily on the satisfaction of individual "customer expectations." Exh. 1, Hilliard Report at 77. But this standard is so subjective that it is impossible to articulate (let alone test), and whether it has been attained is unknowable. Mr. Hilliard defines pertinent expectations so broadly that he admits it would be necessary to know all representations made by Oracle employees to *each* customer. *See* Exh. 2, Hilliard Tr. at 195:25-196:3. And beyond that, "you may need to know things that wouldn't be part of a representation because they're at such a detailed level that they just wouldn't be included." *Id.* at 196:25-197:3. Mr. Hilliard's amorphous standard is compounded by the transitory and unpredictable nature of customer satisfaction and expectations – and his failure to account for such factors. For example, customers who have not before experienced implementations of similarly comprehensive and sophisticated software might be more likely to have unrealistic expectations because they have no prior benchmarks to establish a "typical"

---

[7] In fact, there *are* such reference sources, including the books by Capers Jones discussed at length by both Defendants' expert Mr. Yourdon and Plaintiffs' other expert, Dr. Jensen. *See, e.g.,* Capers Jones, *Estimating Software Costs: Bringing Realism to Estimating*; Capers Jones (Second Edition, McGraw-Hill, 2007), *Applied Software Measurement* (McGraw-Hill 1996). Mr. Hilliard simply did not consider them.

1  experience and thus have correspondingly lower satisfaction rates.  Thus, as Mr. Hilliard admits,

2  "[b]ecause of the differences between the needs of different types of business software

3  customers, there is no formal and universally accepted standard or reference authority that

4  provides metrics to measure such quality."  *Id.*

5       In spite of this, Mr. Hilliard has opined that Suite 11i failed to meet customer

6  expectations so pervasively that it did not meet minimal levels of commercial quality – ***without***

7  ***ever talking to a single customer***.  *See* Exh. 2, Hilliard Tr. at 198:9-13.  Mr. Hilliard's definition

8  of "commercial quality" is thus inherently unreliable and clearly is not the market's test for

9  commercial acceptability.[8]  *See Daubert*, 509 U.S. at 593-94 (holding that the methodology must

10  be subject to testing and reproduction).  Moreover, Mr. Hilliard's proposed standard would lead

11  to absurd results.  Under his definition, a business application software product might be of the

12  highest quality when measured by all objective standards, but some unknown number of unmet

13  "customer expectations" would render that software not "of commercial quality."

14            c.     *Mr. Hilliard's Analysis Cannot Be Recreated Or Reproduced.*

15       A basic requirement of expert testimony is that the analysis forming the basis of the

16  opinion can be recreated.  *See Daubert*, 509 U.S. at 593-94.  Here, Mr. Hilliard cannot explain

17  the basis for key aspects of his analysis, such as his conclusion that 2,500 customers Oracle

18  identified as implementing Suite 11i during the Class Period were not doing so and therefore

19  should not be considered in evaluating the quality of the software.  *See* Exh. 2, Hilliard Tr. at 23-

20  24. ("I can't tell you where I got that understanding.").  Nor can he identify the documents he

21  relied upon or the role they played in his analysis.[9]  *See id.* at 53:1-21.  He cannot even recreate

22  his analysis with respect to the examples in his Report or meaningfully articulate what role they

23  _____

24  [8] As noted in Oracle's motion for summary judgment, Oracle sold roughly $383 million in Suite
    11i licenses in the quarter following the revelation, according to Plaintiffs, that Suite 11i was not

25  of commercial quality.  Mr. Hilliard offers no reason to believe that this definition provides
    better evidence of "commercial quality" than his selective review and interpretation of customer

26  complaints and trouble reports.

    [9] Mr. Hilliard testified that he "took into consideration" various documents that were not cited in

27  his Reports and that he could not identify.  Hilliard Tr. at 53:1-21.  Not only does this violate the
    requirements of Federal Rule of Civil Procedure 26(a)(2) *and* the Discovery Plan that experts

28  identify *all such* documents, it renders it impossible for Mr. Hilliard's methods to be recreated or
    tested by Defendants.

1    played in his conclusions.  *See id*. at 167:23-169:3.

2            The significance of these failures is magnified by the subjective and unspecified

3    standards Mr. Hilliard applies.  For instance, when pressed to reveal the specific "quality"

4    standard that he applied,  Mr. Hilliard indicated that it would be impossible, because a separate

5    standard of acceptability applied to each "submarket."  *Id*. at 191:8-19.  Mr. Hilliard further

6    explained:  "[b]ecause each submarket, each vertical market is so different from one another that

7    the standards vary for each one, and that's why there is no common standard that's published for

8    all, and each one is so individualized I don't know of specific published standards for any one of

9    them."  *Id*. at 192:7-12.  In light of this subjectivity, Mr. Hilliard admits he had no basis to

10   believe other experts with similar experience would agree with key aspects of his analysis.  *See*

11   *id*. at 75:6-9.

12           d.      *Mr. Hilliard Knowingly Used A Biased, Unrepresentative Sample*
                     *And Then Discounted Evidence Inconsistent With His Thesis.*
13

14           Mr. Hilliard's Report cites approximately 40 customers who purportedly had difficult 11i

15   implementations – a small fraction of the more than 2,500 customers implementing 11i during

16   the Class Period.  *See* Exh. 19, February 20, 2001 Oracle Press Release.  This necessarily skews

17   his analysis by limiting it to a biased sample of the most troubled implementations among

18   Oracle's customers.  Mr. Hilliard concedes he made no effort to determine if these problems

19   were experienced consistently by other customers.  *See* Exh. 2, Hilliard Tr. at 78:4-79:2 ("I

20   didn't look to see whether there might have been – whether that was represented –

21   representative, because that wasn't relevant.").  Within his already biased sample, Mr. Hilliard

22   admits that he uniformly credited negative assessments of the Suite 11i product (*i.e.*, assessments

23   that support Plaintiffs' theory of the case) while discounting Suite 11i success stories (*i.e.*,

24   assessments that support the defense).[10]  *See* Exh. 2, Hilliard Tr. at 57:7-59:8.

25           As an initial matter, Mr. Hilliard's selective approach violates the well-established rule

26   that experts are not permitted to testify regarding credibility determinations.  *United States v.*

27   [10] As discussed more fully below (*see* Section III.B) Mr. Hilliard's decision to give such credit to
     negative appraisals is particularly puzzling because every expert involved in this matter,
28   including Mr. Hilliard, agrees that customer trouble reports are not reliable indicia of the
     existence or nature of problems with the underlying software.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-SI

1   *Finle*y, 301 F.3d 1000, 1009 (9th Cir. 2002) ("Expert testimony which does nothing but vouch

2   for the credibility of another witness encroaches upon the jury's vital and exclusive function to

3   make credibility determinations, and therefore does not 'assist the trier of fact' as required by

4   Rule 702.").  Moreover, by ignoring positive information, Mr. Hilliard creates a misleading

5   snapshot of particularly challenging periods of time in a process that takes months to complete.

6   Just how misleading is reflected by two facts:  first, nearly all of the customers cited by Mr.

7   Hilliard for his claim that Suite 11i fell outside the bounds of "commercial acceptability"

8   successfully implemented Suite 11i, and second, nearly half later agreed to serve as reference

9   customers for Suite 11i. *See* Yourdon Decl. at Exh. 2, Yourdon Rebuttal Report at §§ VIII.1.2,

10  VIII.1.3 (*citing*, *e.g.*, Morgan Decl. at Exh. 20, 11i Key Customer References as of October 9,

11  2001).  When considered in the context of an industry in which ERP implementations often fail

12  altogether, the full picture does not support the inference that there were unusual problems ***even***

13  ***for these specific customers***, much less the broader customer base.

14              e.      *Mr. Hilliard Does Not Even Purport To Analyze The Evidence*
                        *From The Perspective Of An Expert.*

15              Mr. Hilliard's "methodology" is further undermined by his claim that he evaluated the

16  evidence not as a technical expert, but as *a person with no expertise in the software field*:

17              So I was looking at it not from the perspective of someone in the
                IT industry or from a customer, but from the perspective to those

18              people to whom that statement was made who are people who
                don't have that knowledge, and who I think without that

19              knowledge would have every reason to take that literally.

20  Exh. 2, Hilliard Tr. at 228:10-231:11.  This is inconsistent with the role of an expert.  It is well-

21  settled that experts may not opine on matters of general lay knowledge.  *See, e.g., United States*

22  *v. Finley*, 301 F.3d 1000, 1009 (9th Cir. 2002); 4 *Weinstein's Federal Evidence* § 702.03.

23  Further, because he claims that Defendants' statements were false based on Suite 11i's lack of

24  quality and commercial acceptability, his attempt to apply his lay understanding in one sense (the

25  meaning of the statements) but his "expert" understanding in another (to claim the statements are

26  false based on his expert opinion of the software quality) is worse than unreliable – it is

27  incoherent.  Mr. Hilliard does not suggest how to apply such a dual approach, what standards

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-SI

govern it or even how Mr. Hilliard, a software expert, could apply a layperson's perspective.

f.   *The "Reliability" of Mr. Hilliard's Unspecified Methodology Is Further Undermined By Assertions That Are Plainly Incorrect.*

Mr. Hilliard's position is further undercut by his offering opinions that squarely contradict firmly established principles in the software industry, as evidenced by the record in this case.  For instance, Mr. Hilliard indicates that because some "fixes, while designed to address specific problems, created new problems themselves," Suite 11i's quality must have been unusually poor.  Exh. 1, Hilliard Report at 27.  It is a well-known law of software design, however, that a certain number of bugs are introduced as a result of fixing other bugs.  As with all types of bugs, a number escape detection, even with extensive testing.  *See* Yourdon Decl. at Exh. 2, Yourdon Rebuttal Report at ¶ 86; Morgan Decl. at Exh. 13, Capers Jones, *Estimating Software Costs: Bringing Realism to Estimating*, at 290.  Dr. Jensen acknowledged this "bad fix" phenomenon, and even suggested that Mr. Jones' estimate for the average rate of bug injection was conservative:

> For every error you fix, there's two other errors.  One is believing you fixed the error, and the other is the new error you injected.  I mean, it's kind of a light rule of thumb, but errors get put in, and 7 percent seems a little light. . . . I write a lot of software, and there's always one more error.

Exh. 3, Jensen Tr. at 100:5-22; *see also id.* at 97:9-21.  If Mr. Hilliard is willing to misconstrue this fundamental principle of software design, it necessarily casts doubt on the other parts of his methods, particularly given his admission that he cannot articulate the standards he applied.

\*      \*      \*

For the foregoing reasons, Mr. Hilliard's methodology cannot support his conclusions and are manifestly unreliable.  His Report and testimony should be excluded on that basis alone.

## B.   Mr. Hilliard's Opinions Are Based On Insufficient And Unreliable Data

The vast majority of the data on which Mr. Hilliard relies to conclude that Suite 11i had excessive software defects are "customer trouble reports"  *See*, *e.g.*, Exh. 1, Hilliard Report at § 5.3.4; Exh. 2, Hilliard Tr. at 87:19-25, 91:25-92:14.  This material is clearly hearsay, and much of it is double hearsay.  The Rules of Evidence provide for limited circumstances in which an expert may rely on otherwise inadmissible information, but this exception is extremely narrow.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-SI

1  For instance, because doctors in the field typically rely on tests by nurses and others in making

2  diagnostic decisions, medical experts are permitted to rely on such tests in reaching their own

3  conclusions.  *See* Fed. R. Evid. 703, Advisory Committee Notes.  If, however, an expert takes

4  into account inadmissible information that other experts in the field would not normally rely

5  upon, the opinion is subject to exclusion under the Rule. *See, e.g., Redman*, 111 F.3d at 1179.

6        For several reasons, it is clear that his material does not meet this standard:

7        *First,* there is extensive testimony from fact witnesses that customer trouble reports are

8  unreliable.  *See*, *e.g.*, Exh. 16, Excerpts from Deposition of Ron Wohl at 141:21-23 ("[T]he

9  significant majority of TAR reports did not result in bugs."); *id.* at 142:7-14; Exh. 17, Excerpts

10  from Deposition of Richard Sellers at 38:3-15; Exh. 18, Excerpts from Deposition of Kirsten

11  Shaw at 239:3-7.  Often, something that is initially reported as a bug turns out to be the result of

12  user error, hardware limitations, improper configurations, or other mistakes unrelated to the

13  software code.  *Id.*  Undisputed evidence from Oracle's witnesses indicate that that less than a

14  third of the trouble reports resulted in any change in the software, and documentation regarding

15  the TAR resolution process also confirms this number.  *Id.*

16        *Second*, Mr. Yourdon and Dr. Jensen both confirm that Oracle's experience is typical:

17  customer reports of trouble with the software (many of which originate with users who are not

18  technically proficient) are unreliable.  As Mr. Yourdon explains in his report (*see* Yourdon Decl.

19  at Exh. 2, Yourdon Rebuttal at § VIII.1.3), and as Dr. Jensen confirmed during deposition,

20  software professionals do not rely on such reports to diagnose problems or to conclude that that a

21  software error exists.  *See* Exh. 3, Jensen Tr. at 84:21-22 ("Q. Is the user's error report by itself

22  typically enough to know whether there is in fact a defect in the software? A.   Not initially,

23  no.").  Even ***Mr. Hilliard admits that all trouble reports are not necessarily bugs***, but he then

24  fails to apply this professional skepticism when he analyzes and evaluates particular customer

25  complaints.  *See* Exh. 2, Hilliard Tr. at 91:25-92:3.

26        *Third*, though Mr. Hilliard claims that he uses the "same basic methodology" in his

27  technical consulting as he does in litigation (Exh. 1, Hilliard Report at 9), it is clear from his

28  deposition testimony that this is not the case, at least as it applies to the question of crediting

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

19

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-SI

1    customer descriptions of purported bugs.  In his typical consulting projects, he uses "first person"

2    accounts of the alleged software issues, as well as a variety of other cross-checks to determine

3    the real sources of customer problems.  *See* Exh. 2, Hilliard Tr. at 36:4-8.  In this case, however,

4    he based his opinions on unverified documents without using his usual cross-checks to confirm

5    those accounts.  *See id.* at 36:9-22.  In other words, Mr. Hilliard not only improperly assumes

6    that a small number of individual instances represent the experience of all Suite 11i users (but

7    not of users of other ERP systems), he also ***assumes the anecdotes*** accurately depict the

8    underlying facts even though doing so violates his own practices when consulting outside

9    litigation.

10            Since software experts – including Mr. Hilliard – do not rely on such data when

11   evaluating the quality or functionality of ERP software in the field, it is not proper to rely on this

12   inadmissible hearsay in litigation.  Because of the nature of Mr. Hilliard's analysis, this evidence

13   forms the vast majority of evidence he has considered, and its exclusion necessarily requires

14   preclusion of Mr. Hilliard's testimony and conclusions.  *See* Fed. R. Evid. 703.

15           **C.      Many Of Mr. Hilliard's Primary Assertions Are Unsupported Or
                      Contradicted By The Record**

16           In addition to the foregoing problems, Mr. Hilliard fails to cite any evidence to support a

17   number of significant conclusions.  For instance, Mr. Hilliard offers the blanket assertion that

18   Oracle shipped "Oracle 11i to customers without having done any integration testing," as a

19   primary basis for his opinion that Defendants' statements about integration were false.  Exh. 1,

20   Hilliard Report at 64.  When pressed to identify evidence supporting this position, Mr. Hilliard

21   testified that he had based his opinion on the absence of evidence in the record.  *See* Exh. 2,

22   Hilliard Tr. at 160 ("I saw no evidence at all of any substantive testing that anyone

23   knowledgeable about testing would consider to be a real test regarding integration.").[11]  But

24

---

25   [11] In fact, Mr. Hilliard himself cites evidence that Oracle *did* perform integration testing of Suite
26   11i prior to release.  *See, e.g.,* Exh. 1, Hilliard Report at 65-66 ("Objective of this email is…to
     get an environment to *system test* ERP and CRM…This testing will be beyond integration testing
27   which may be a rifle shot through the system.").  The limited "contrary" evidence Mr. Hilliard
     cites pertains only to issues with integration testing on certain patches developed *after* Suite 11i
28   was released and/or within the demonstration environment.  *See* Exh. 1, Hilliard Report at 65,
     68; *see also* Yourdon Decl. at Exh. 1, Yourdon Report at 50-53.

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

20

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-SI

1    Courts have frowned at an expert's reliance on the purported absence of evidence to support the

2    expert's opinion.  *See Kumho*, 526 U.S. at 154.  This admonition is particularly appropriate here,

3    since neither the Discovery Plan nor any other order required production of documents regarding

4    integration testing.  *See, e.g.,* Exh. 15, March 10, 2005 Amended Order Setting a Discovery Plan

5    ("Discovery Plan") at I.C.2 (listing Suite 11i categories within the scope of discovery).  As a

6    result, Mr. Hilliard's assumption that such documents do not exist is fundamentally flawed.  To

7    the contrary, extensive integration testing was performed on Suite 11i prior to release.  *See* Exhs.

8    23-25, Excerpts from Deposition of Alan Fletcher at 66:7-67:24; Excerpts from Deposition of

9    Gregory Seiden at 67:17-69:6; Declaration of Alan Fletcher at ¶¶ 8-12.  Thus, a significant

10   premise on which Mr. Hilliard based his opinions is simply wrong.[12]  *See* Exh. 1, Hilliard Report

11   at 45. Expert opinions should be excluded "when indisputable record facts contradict or

12   otherwise render the opinion unreasonable."  *Brooke Group Ltd. v. Brown & Williamson*

13   *Tobacco Corp.*, 509 U.S. 209, 242 (1993).

14         Even more tellingly, Mr. Hilliard's Rebuttal Report assumes its conclusion with its claim

15   that it "is known as well that Oracle 11i continued to experience very high defect (*i.e.*, bug)

16   levels from the release of the first version through the end of the Class Period and beyond."  Exh.

17   5, Hilliard Rebuttal at 2.  Mr. Hilliard cites nothing in support of this statement and never

18   attempts to defend it on the merits.  *See id.*  As discussed above, Dr. Jensen confirmed at his

19   deposition that Mr. Hilliard has provided no basis that could support this conclusion.  *See* Exh. 3,

20   Jensen Tr. at 38:10-16.   Similarly, Mr. Hilliard declares – without support – that "two of the

21   most critical functionalities represented by Oracle – Suite-wide integration and Order

22   Management – were among those experiencing the most failures."  *Id.* at 3.  Never in his Reports

23   or testimony does he provide any evidence supporting these assertions – which are foundational

24

---

[12]  Mr. Hilliard again relies primarily on the absence of evidence contrary to his opinions,
25   claiming that "there is no substantive evidence to show the [rapid implementation] representation
to be true." Exh. 1, Hilliard Report at 42-49.  Putting aside his misinterpretation of those
26   statements (*see* Yourdon Decl. at Exh. 2, Yourdon Rebuttal at 35-37), Plaintiffs did not raise any
issues with statements "rapid implementation" in their complaints or during fact discovery, so
27   they were not part of the Discovery Plan. *See, e.g.,* Exh. 15, Discovery Plan at I.C.2.  Thus, it is
not surprising that there is limited discovery on this issue. In any event, the record actually
28   indicates that customers were, in fact, implementing Suite 11i more rapidly than other ERP or
CRM systems. *See* Exh. 7, Yourdon Rebuttal at § VI.3.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-SI

1   to his opinions.  An expert opinion should be excluded when it is "not based upon the facts in the

2   record but on…speculation designed to bolster" the expert's position.  *Guillory v. Domtar*

3   *Industries, Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996).  These statements lack any basis in the

4   record whatsoever, and should be excluded.

5   **V.       CONCLUSION**

6           For the foregoing reasons, Defendants respectfully request that the Court exclude the

7   Reports and testimony of Brooks Hilliard at trial in this matter.

8   Dated:  October 20, 2008                              Respectfully submitted,
                                                          LATHAM & WATKINS LLP
9                                                             Peter A. Wald
                                                              Patrick E. Gibbs
10                                                            Sean M. Berkowitz

11

12                                                                    /S/

13                                                        By:_____
                                                              Patrick E. Gibbs
14                                                            Attorneys for Defendants ORACLE
                                                              CORPORATION, LAWRENCE J.
15                                                            ELLISON, JEFFREY O. HENLEY,
                                                              and EDWARD J. SANDERSON
16

17   SF\675476.1

18

19

20

21

22

23

24

25

26

27

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD
Master File No. C-01-0988-SI