# EXHIBIT 2

**Confidential**

# Rebuttal Expert Report
# of Edward Yourdon

in the matter of Oracle Corporation Securities Litigation

Master File No. C-01-0988-MJJ

**June 22, 2007**



**Confidential**

# TABLE OF CONTENTS

I      MY ASSIGNMENT IN THIS MATTER.................................................................1

II     QUALIFICATIONS AND EXPERIENCE ........................................................2

III    SUMMARY OF MY OPINIONS .......................................................................2

IV    RESPONSE TO MR. HILLIARD'S METHODOLOGY .................................3

    IV.1    MR. HILLIARD'S CONCLUSIONS HAVE NOT BEEN VALIDATED BY ANY DETAILED EXAMINATION OF THE TECHNICAL ASPECTS OF ORACLE'S SUITE 11i PRODUCT.................5

    IV.2    MR. HILLIARD RELIES ON EVIDENCE ON WHICH IT PROFESSIONALS WOULD NOT NORMALLY RELY, AND HE DOES SO WITHOUT PUTTING SUCH INFORMATION IN ANY MEANINGFUL CONTEXT.........6

        *IV.2.1    Mr. Hilliard Fails To Establish That Alleged Problems Were Caused By Defects In Suite 11i    7*

        *IV.2.2    Mr. Hilliard Has Performed No Analysis To Determine Whether The Problems Certain Customers Complained Of Were Typical Or Anomalous .................................12*

    IV.3    MR. HILLIARD REFERS TO UNIDENTIFIED OR NONEXISTENT "STANDARDS" ..........13

        *IV.3.1    Mr. Hilliard's Definitions And Explanations Are So Vague, Ambiguous, And/Or Heavily Qualified That They Are Essentially Meaningless.................................14*

        *IV.3.2    Mr. Hilliard Has Done No Analysis To Determine Whether Oracle's Suite 11i Product Had Substantially More Bugs Than Any Other Comparable Enterprise Software Product In The Marketplace At The Time .................................14*

    IV.4    MUCH OF THE EVIDENCE MR. HILLIARD CITES IS INCOMPLETE, INACCURATE, MISLEADING, OR OUT OF CONTEXT .................................19

        *IV.4.1    Mr. Hilliard Misconstrues Various Statements Made By Defendants.................19*

        *IV.4.2    Many Of The Statements Are Demonstrably Incorrect.................20*

V     ALLEGEDLY FALSE STATEMENTS ADDRESSED BY MR. HILLIARD .................21

VI    RESPONSE TO MR. HILLIARD'S OPINION #1 REGARDING PUBLIC REPRESENTATIONS OF THE FUNCTIONALITY OF SUITE 11i.................22

    VI.1    FUNCTIONAL DEFECTS .................................................................22

        *VI.1.1    Order Management .................................26*

    VI.2    SUITE 11i'S SUPPORT FOR GLOBAL OPERATIONS .................27

    VI.3    RAPID IMPLEMENTATION .................................................................35

    VI.4    IMMEDIATE AVAILABILITY .................................................................41

    VI.5    SYSTEMS INTEGRATION .................................................................45

VII   MR. HILLIARD'S OPINION #2 REGARDING INTEGRATION MISCONSTRUES BOTH THE CONCEPT OF INTEGRATION AND ORACLE'S STATEMENTS REGARDING INTEGRATION.................48

    VII.1   HILLIARD'S "INTEGRATION" ANALYSIS IS FLAWED IN SEVERAL CRITICAL RESPECTS.................48

        *VII.1.1    Four Key Issues Regarding Mr. Hilliard's Integration Opinion.................49*

        *VII.1.2    Mr. Hilliard Does Not Contest That Suite 11i Was Designed To Be Integrated.................49*

        *VII.1.3    Mr. Hilliard's Analysis of Testing Is Flawed As Well .................50*

        *VII.1.4    The Hilliard Report Sets An Impossible Standard For Integration That Is Not Accepted By The Industry.................53*

        *VII.1.5    Oracle's Internal Assessment .................56*

    VII.2   CUSTOMERS' EXPERIENCE .................................................................60

VIII  MR. HILLIARD'S OPINION #3 ABOUT POOR QUALITY AND "INFERIOR" PERFORMANCE OF SUITE 11i IS INACCURATE, MISLEADING, AND UNREALISTIC .........61

    VIII.1  HILLIARD'S BASIC CLAIM.................................................................63

**Confidential**

*VIII.1.1     The Evidence Does Not Support The Conclusion That The Volume Of Complaints*
*Received Was Out Of The Ordinary For ERP/CRM Software* .............................................................. 63
*VIII.1.2     The Hilliard Report Ignores Many Suite 11i Success Stories* ............................................ 65
*VIII.1.3     Many Of The Complaints Cited Are From Customers Who Successfully Implemented Suite*
*11i And Were Satisfied With The Results* .......................................................................................... 66
*VIII.1.4     The Problems Cited In The Hilliard Report Are Neither Unexpected Nor Unusual For A*
*Major ERP Release* ......................................................................................................................... 73
*VIII.1.5     The Hilliard Report's Reliance On Statements By Persons Without Knowledge Of The*
*Underlying Facts Is Misplaced*........................................................................................................... 75
*VIII.1.6     Problems With The Demonstration Product For Suite 11i Are Not Indicative Of Problems*
*With the Software Itself* .................................................................................................................... 76
*VIII.1.7     Oracle Had An Appropriate Number Of Live Users* ..................................................... 78
VIII.2        ORACLE'S IMPLEMENTATION ............................................................................................ 79
VIII.3        CLAIMS ABOUT PERFORMANCE DEFICIENCIES ....................................................................... 83
VIII.4        CLAIMS ABOUT SUPPORT.................................................................................................... 85

IX      **LOST DEALS** ................................................................................................................................. 86

X       **DISCUSSION OF "SHOWSTOPPERS" RELATING TO HEWLETT PACKARD'S**
**PURCHASE OF ADDITIONAL SUITE 11I CRM LICENSES IN NOVEMBER 2000** ...................... 87

XI      **CONCLUSIONS** .............................................................................................................................. 89

**Confidential**

## I    MY ASSIGNMENT IN THIS MATTER

1.    I filed an initial Expert Report in this matter on May 25, 2007. In that Report, I discussed such topics as software development and ERP systems, generally; the development, integration, quality, and success of Oracle's Suite 11i product, specifically; certain statements made by Oracle regarding Suite 11i that Plaintiffs have alleged to be false; and what impact any problems with Suite 11i may have had on deals in Oracle's Q3 FY 2001 forecast or pipeline.

2.    Subsequently, I received and reviewed a Report by Brooks L. Hilliard, who was retained by Plaintiffs to provide opinions regarding the functionality, internal integration, and quality of Oracle's Suite 11i software during the period of December 14, 2000 to March 1, 2001.[1]

3.    Counsel for Oracle has asked me to respond to the issues raised by Mr. Hilliard's Report. Specifically, I will address the following topics in this Rebuttal Report:

   •    The reliability and suitability of Mr. Hilliard's methodology in reaching his opinions, including the manner in which Mr. Hilliard defined terminology used in his Report;

   •    Mr. Hilliard's assertions that Defendants made false statements regarding the functionality of Suite 11i[2];

   •    Mr. Hilliard's assertions that Defendants made false statements regarding the integration of Suite 11i[3]; and

   •    Mr. Hilliard's assertions that Suite 11i was not suitable for "normal commercial use."[4]

4.    I also received and reviewed Reports by D. Paul Regan and Bjorn J. Steinholt. Counsel for Oracle asked me to respond to limited issues in their Reports. Specifically, I will address Mr. Regan's discussion of "showstopper" bugs relating to Hewlett Packard's purchase of certain Suite 11i CRM licenses in November 2000 and portions of Mr. Steinholt's discussion of loss causation.

5.    To the extent that my opinion and conclusions are dependent on depositions, Expert Reports, and other evidence that may be produced after the submission of this Report, I naturally reserve the right to supplement or amend my opinions.

---

[1] *See* Declaration of Brooks L. Hilliard (May 25, 2007) (hereinafter, "Hilliard Report"), at Introduction.

[2] *See* Hilliard Report, at page 4, "Opinion #1."

[3] *Ibid*, at page 4, "Opinion #2."

[4] *Ibid*, at page 4, "Opinion #3."

**Confidential**

## II      QUALIFICATIONS AND EXPERIENCE

6.      My qualifications and experience are described in Section I of my May 25, 2007 Report, and have not changed in any material fashion since then.

## III     SUMMARY OF MY OPINIONS

7.      I continue to stand by all opinions discussed in my May 25, 2007 Report.

8.      In addition, as discussed in greater detail in the subsequent sections of this Report, I have reached several other main conclusions:

- Mr. Hilliard's methodology is unreliable, as he does not review or reference any direct evidence of Suite 11i's technical capabilities (*e.g.*, the software itself or the technical specification documents). He instead cites anecdotal evidence of customer complaints, which simply is not the kind of evidence an IT professional would rely on to identify the source of, or remedy to, a problem. In addition, Mr. Hilliard does not utilize any metrics or other comparative data in order to give context to the purported problems that arose with Suite 11i.

- Mr. Hilliard references "standards" without identifying the source of those standards or even comparing Suite 11i to comparable ERP software. Without such baselines, Mr. Hilliard's opinions are meaningless.

- Mr. Hilliard's terminology is vague and ambiguous, particularly his references to "normal commercial use" and "commercial acceptability," concepts that simply cannot be defined given the extraordinarily broad range of customers purchasing Suite 11i and the widely varied needs those customers purchased Suite 11i to fulfill.

- Mr. Hilliard's conclusion that Suite 11i was not suitable for "normal commercial use" and wasn't "commercially acceptable" is flatly inconsistent with the evidence that large numbers of customers successfully implemented Suite 11i during the class period.

- The Hilliard Report omits significant portions of the purportedly false statements made by Oracle; these omissions not only result in a misleading characterization of those statements themselves, but also mischaracterize the understanding shared by experienced IT professionals and the computer marketplace on the whole. When presented completely, the specific statements regarding the Suite 11i product that Mr. Hilliard identified as "false" were, in fact, accurate.

- The Hilliard Report specifically misconstrues Defendants' statements regarding the capability of Suite 11i to "work in every language." The market understood that Oracle's statement that Suite 11i "work[ed] in every language" referred to Suite 11i's ability to receive inputs in every major language via Unicode. Based on this understanding, Defendants' statements were accurate.

**Confidential**

- The Hilliard Report improperly conflates Oracle's demonstration version of Suite 11i with the Suite 11i product itself. The issues Mr. Hilliard identifies regarding the demonstration environment and the demonstration version of the software are not indicative of general problems with Suite 11i.

- The Hilliard Report has taken statements regarding the testing of Suite 11i out of context, and Mr. Hilliard's conclusion that "no integration testing" was performed prior to the initial release of the software is contradicted by the evidence in this case. In addition, any deficiencies in testing are irrelevant to whether the software itself was integrated.

- The evidence cited in the Hilliard Report regarding customer complaints or other issues with Suite 11i is insufficient to support the conclusion that Suite 11i had problems that were unusual or unexpected for new software of its size and complexity.

## IV      RESPONSE TO MR. HILLIARD'S METHODOLOGY

9.     Mr. Hilliard contends that he has used a "rigorous and standardized methodology ... [that] follows all industry-accepted guidelines,"[5] but he does not explain that methodology. Contrary to his assertion, in a number of key respects, Mr. Hilliard's methodology is not only unsupported, but contrary to accepted and typical practices in the software field. As a result, all of Mr. Hilliard's conclusions are undermined by the following methodological failings:

- Mr. Hilliard does not examine any direct evidence about the software he claims to be evaluating, even though a great deal of such material was available. Specifically, Mr. Hilliard did not attempt to operate any portion of the executable software, nor did he examine Suite 11's technical documentation, even though all of that information was available to him for nearly a year.[6]

- Because he dismissed the direct technical evidence available to him, Mr. Hilliard relies entirely on indirect (and largely anecdotal) evidence of Suite 11i's quality and performance; however, no expert in the software field would rely on such material to evaluate the quality or functionality of complex software of any kind, especially ERP software. Many of the complaints made by Oracle customers (and even internal Oracle end-users) can only be characterized as "trouble reports" and do not demonstrate that these problems were actually caused by bugs in Oracle's software rather than other likely causes. Compounding the unreliability and subjectivity of this evidence, Mr. Hilliard has made no effort to determine whether the few complaints he has cited represent a typical customer experience or an

---

[5] Hilliard Report, at Section 3.2.

[6] This is particularly surprising since I understand that the software was produced *so that* Plaintiffs' expert could test it.

**Confidential**

anomaly. Mr. Hilliard also fails to make any effort to compare the relative satisfaction of Suite 11i customers to that of customers of Oracle's previous ERP offerings or customers of the ERP offerings made by other vendors.

- Mr. Hilliard's conclusions are not based on any defensible metric or standard:

    - The definitions of technical terms and explanations of analyses provided by Mr. Hilliard is couched in language so vague and ambiguous, and/or so heavily qualified, as to be essentially meaningless;

    - Mr. Hilliard refers to "standards" that he does not identify and, to the best of my knowledge, do not exist; and

    - *If* Mr. Hilliard were to use typical ERP implementations as his "standard" – assuming it were possible to describe a "typical" implementation, given the complexity of the software and the diversity of the market for ERP software – he still has not performed any analysis to determine whether Oracle's Suite 11i product had substantially more bugs than any other comparable enterprise software product in the marketplace at the time. Absent such a baseline, his conclusions about product quality are also meaningless. In fact, it follows from Mr. Hilliard's analysis that Suite 11i could be considered lacking in functionality and not "commercially acceptable" *even if it were the best performing software of its kind in the market.*

- Many of the propositions upon which Mr. Hilliard bases his conclusions are demonstrably incorrect:

    - Many of the statements attributed to Oracle employees (including the named Defendants in this case) are incomplete, inaccurate, misleading, and/or taken out of context. When considered in context, it is plain that Mr. Hilliard's understanding of them is unsupportable; and

    - Other factual assumptions on which Mr. Hilliard relies are simply not true – and he offers no basis to support them. For instance, Mr. Hilliard appears to base his claim that Oracle's Suite 11i product was not "available" on the assertion that "the software fails every time a customer receives delivery and tries to implement some normal type of function." This factual presumption is plainly false; Mr. Hilliard's reliance on it, as well as a number of other presumptions made in his report, undermines his conclusions at the most basic level.

Confidential

### IV.1  Mr. Hilliard's Conclusions Have Not Been Validated By Any Detailed Examination Of The Technical Aspects Of Oracle's Suite 11i Product

10.  The essence of Mr. Hilliard's Report is an analysis and critique of Oracle's Suite 11i Enterprise Resource Planning (ERP) product – yet he does not attempt to support his analysis and critique with any examination of the technical aspects of Oracle's Suite 11i product – nor for that matter, a technical analysis of *any* other software product of a comparable nature.

11.  In Section 3.1 of Mr. Hilliard's Report, he acknowledges that he has access to a copy of the actual Oracle Suite 11i software for versions 11i.1 through 11i.3. In spite of this, he "elected not to attempt to install and test the software because [he] determined that such a test would not be practical and would have no significant value in reaching [his] opinions."[7] Mr. Hilliard's explanation for why he chose not to install the software is not persuasive, particularly as he bases his opinion regarding the software on its performance. It is nonsensical to suggest that firsthand observation of the software's performance would have "no significant value" over hearsay communications between vendor and customer about isolated instances of performance. In addition, Mr. Hilliard was retained by Plaintiffs' Counsel more than a year before his Report was produced,[8] ample time to install the software or to seek help from someone more technologically savvy. While such an installation might have proved difficult or time-consuming for Mr. Hilliard, I see no reason why Plaintiffs could not have provided additional technical experts and/or any other resources required to fully inform his opinions – particularly given the importance of having a technical understanding of the software before opining on its design and functionality. Mr. Hilliard's apparently made no effort to contact any customer who operated versions 11i.1 through 11i.3 of Oracle's ERP product discuss their experiences.

12.  Mr. Hilliard's analyses and conclusions about Oracle's Suite 11i product are based on nothing more than emails and witnesses' memories of complex installations carried out more than five years earlier. Even though the software is admittedly available to Mr. Hilliard and in use around the world, he can provide no independent corroboration for his opinions based on firsthand experience with the product.

13.  Also, regardless of whether he *installed* and *operated* the Suite 11i software, Mr. Hilliard shows no evidence in his Report of having examined, analyzed, or drawn conclusions from the technical design documents associated with Suite 11i, which also were produced as evidence in the case and therefore made available to him. In particular, the technical design documents included extensive and detailed documentation about the *data model* for Suite 11i. Since Suite 11i's single data model represented one of the primary ways in which the software was integrated,

---

[7] Hilliard Report, at Section 3.1, page 6.

[8] *Ibid*, at "Introduction."

Mr. Hilliard might have referenced the design documents to offer specific comments about the weaknesses or deficiencies he alleges to have existed with regard to the *integration* of components with Suite 11i.

14. Even more fundamental than the data model, which provides the underlying foundation for the integration in Oracle's Suite 11i, Mr. Hilliard's failure to review the technical documentation for Suite 11i makes it impossible for him to render any valid opinions about the presence or absence of *bugs* in the resulting product. After all, the difference between a TAR and a bug is, fundamentally: (a) a TAR is a customer's request for technical assistance for any reason; and (b) a "bug" is when the Suite 11i software does not function *in the manner described in Oracle's technical documentation for the product*. Since Mr. Hilliard acknowledges that he hasn't read the documents that describe how the software is *supposed* to work, he really doesn't know whether any customer-reported problem is actually a "bug." At best, he knows that someone else has described some aspect of Suite 11's behavior as a bug, but as will be discussed in detail below, there is considerable testimony in this case to show that customers commonly refer to such behaviors as "bugs" when they are ultimately something else entirely.

15. Indeed, anyone can speculate about problems with Suite 11i's technical features based on whatever stories they may have heard from others; Plaintiffs' attorneys have already done so in their Complaint. The onus on a technical expert – such as Mr. Hilliard – is instead to investigate and explicate the technical aspects of Oracle's Suite 11i, including the software itself (or at least its underlying technical documentation), and to offer specific commentary, analysis, and conclusions based on such investigation. Mr. Hilliard has failed to do that. This failure is particularly troubling because, as discussed more fully below, much of the material that Mr. Hilliard relies on instead is inherently unreliable for the very purposes for which he uses it.

## IV.2  Mr. Hilliard Relies On Evidence On Which IT Professionals Would Not Normally Rely, And He Does So Without Putting Such Information In Any Meaningful Context

16. Since Mr. Hilliard does not rely on direct evidence of the software and its capabilities, he instead cites anecdotal evidence from customers and Oracle employees regarding their experiences with Suite 11i. This is not the kind of information technical professionals would rely on in making determinations about the design, capabilities, or functionality of software. A customer complaint normally does not provide enough information to draw conclusions whether the problem can even be replicated, let alone whether it was caused by a bug in the software or any number of other issues, such as user error, hardware limitations, customer requests for enhancements, or incorrect configurations. *Thus, this evidence does not provide a meaningful assessment of problems with Suite 11i itself.* In addition, Mr. Hilliard does not put this evidence in context, such as by exploring whether the complaints were actually typical of Suite 11i customers rather than isolated occurrences, or somehow different from normal bumps in the

road for such large-scale implementations of complex software. Ultimately, this amounts to an inherently unreliable basis for his technical conclusions about Suite 11i.

### IV.2.1 Mr. Hilliard Fails To Establish That Alleged Problems Were Caused By Defects In Suite 11i

17. In my May 25, 2007 Report, I noted that many problems observed by end-users and non-technical personnel in a large computer system may be misconstrued as software "bugs" and reported as such, and that those who make such observations may be sincerely convinced that they *are* software bugs; however, when subsequently analyzed by experienced programmers, testers, and other QA personnel, those "problems" are often discovered to be something *other* than software bugs.[9]

18. Sometimes, the problem is caused by incorrect data entry or operational behavior by the end-user, even though he or she doesn't recognize those errors. Sometimes *that* behavior is caused by inadequate training, or because a new system exhibits traits different from an old system, with which the end-user was familiar. The problem may eventually be traced to hardware issues, third-party software problems (*e.g.*, problems with the Unix or Windows operating system), network errors, configuration errors (*e.g.*, the Suite 11i software may have been improperly configured and installed by consultants or systems integrators), or corrupt "legacy" data that was imported into the new system.

19. This "fact of life" often comes as a surprise to non-technical personnel. Nevertheless, the evidence in this case clearly demonstrates that Oracle's QA and technical support department found that less than one-third of all "trouble reports" from customers and end-users were actually associated with software bugs.[10] Mr. Hilliard presumably had access to that evidence; even aside from the specifics of

---

[9] In footnote 75, Mr. Hilliard admits that Technical Assistance Requests (TARs) at Oracle were not created just for bugs or defects in the code of Oracle's software products (Hilliard Report, at page 39) ("[N]ot every "TAR" is related to an underlying software defect."). Indeed, Ron Wohl testified that "the significant majority of TAR reports did not result in bugs." Deposition of Ron Wohl (March 23, 2006), at 141:21-23). Despite all of this, Mr. Hilliard confuses the concept of a TAR throughout his Report, assuming that a TAR necessarily indicated some defect in Suite 11i's code. For instance, Mr. Hilliard describes one "customer with particularly severe Order Management defects," and then cites for support a letter from that customer reporting, "100 TARs have been logged, and most of them OM related" (Hilliard Report, at pages 35-36). But as Mr. Hilliard just acknowledged, TARs are not necessarily defects in the Suite 11i code, and in fact are more likely to be some other issue. *See, e.g.*, Deposition of Ron Wohl (March 23, 2006), at 142:7-14 (In explaining the cause of most TARs, Mr. Wohl testified that "they could be misunderstandings, they could be configuration issues. Same kind of things we went over before. It could be that the support analyst had not uncovered enough detail behind the issue, and that the individual developer looking at it in more detail, you know, one studying the problem at a greater level of depth was able to uncover a more correct nature of the problem.").

[10] May 25, 2007 Report, at Section X.1.2; *see also* Deposition of Richard Sellers (February 28, 2006), at 38:3-15; *see also* Deposition of Kirsten Shaw (September 19, 2006), at 239:3-7.

this case, Mr. Hilliard's previous experience with large, complex ERP installations (which, according to his Report, included litigation-support activities involving ERP products from SAP, PeopleSoft, and J.D. Edwards) should have been sufficient to remind him that a customer's complaints about software bugs are often inaccurate or exaggerated.

20.   In a similar fashion, Mr. Hilliard refers to "patches" and "fixes" in his Report, making a strong implication that any such modifications were necessitated by bugs in the existing software. As the evidence and deposition testimony in this case clearly indicate – and as Mr. Hilliard must surely know, based on his background and experience in the software field – there are *many* reasons for making "patches" and "fixes" to existing software. Such modifications may reflect new or enhanced functionality; in other cases, they may reflect alterations mandated by changing laws or regulatory requirements. In still other cases, they may reflect changes necessitated by new versions of hardware or third-party software (*e.g.*, new versions of Microsoft Windows operating systems); or they may reflect changes to improve the performance of existing software, even in the absence of complaints or requests from customers. And, yes, some of the patches and fixes may be necessitated by bugs encountered after the product is released; but customers and industry analysts do not always distinguish between these many different forms and origins of patches and fixes.[11]

21.   As several witnesses have testified in this case, and as experienced software professionals well know, a "trouble report," or "customer complaint" – known as a "Technical Assistance Request," or TAR, in Oracle's parlance – is nothing more than an indication that a customer (or, perhaps, a consultant, or an Oracle representative in the field) has encountered a problem that he or she is unable to solve on his or her own.[12]

22.   In the highly charged atmosphere of an ERP implementation, a non-technical customer may well assume that *every* TAR is associated with a bug in the vendor's software – but a surprising number of the TARs are resolved by referring the customer to the appropriate user manual, in order to use the system in the proper manner, or by informing the customer that the problem had *already* been fixed, with an available patch that the customer could download and install. In some cases, the TAR may refer to a problem that had already been reported by some other customer; so the "new" TAR is simply cross-referenced to the "old" TAR.

23.   As Donald Klaiss testified[13]:

> Q. Okay. And just to make the record clear, I referred
> to "TARs," but what's your understanding of a TAR?

---

[11] May 25, 2007 Report, at V.2.4.

[12] This point was also discussed in paragraph 190 of my May 25, 2007 Report.

[13] Deposition of Donald Klaiss (June 20, 2006), at 228:1-6.

**Confidential**

> A. A TAR is a - that's important to get that defined.
> So it's a - it's an issue raised from a customer to
> the support organization. It - these issues can
> include questions about the software that they would
> like to have answers, questions on how to set it up.
> It could include, you know, documentation issues. It
> could include software defects. And it can include
> requests for enhancements in the software. So it
> includes all those different categories.

24.   Other problems *do* require further investigation and analysis, and the TAR system
      is merely a way for Oracle's support and QA personnel to keep track of the
      ongoing investigation and resolution of the problems. As Joel Summers testified:[14]

> Q. Okay. Now, are you familiar with the term or
> acronym TAR as it's used at Oracle?
>
> A. Yes, I am.
>
> Q. And what is a TAR?
>
> A. A TAR is a technical assistance request, that's
> what it stands for, and it is a - it is - it is when
> an external customer has any question, query, concern,
> incident, they log a TAR.
>
> Q. Okay.
>
> A. In other words, I have seen TARs that say when's
> the next users conference.
>
> Q. And how does a customer log a TAR?
>
> A. Either - okay, again, indirectly by calling
> customer support, a customer support representative
> would take the information from the customer and key
> in that information, okay.
>
> Q. And key it into what?
>
> A. Into the TAR tracking system. Again, I don't know
> the name of it, per se.
>
> Q. Okay. All right, and could customers access that
> TAR tracking system on their own as well?
>
> A. There was a period of time when Oracle put out -
> and I don't know the date, when Oracle put out a
> direct customer access to the TAR system so that a
> customer could log a TAR interactively versus call a
> support person and/or review the status.
>
> Q. And did you have access to the TAR tracking system
> used at Oracle?
>
> A. I could have access to it, sure.

---

[14] Deposition of Joel Summers (March 21, 2006), at 121:25 – 123:13.

> Q. Did all Oracle employees have access to that tracking system?
>
> A. I have no idea.
>
> Q. Okay. Did individuals at your management level have access to the TAR tracking system?
>
> A. Yes.
>
> Q. And what about individuals who were above you in the hierarchy like Ron Wohl and Larry Ellison?
>
> A. Speculation. I assume that Ron could - but, yeah.

25.  In some cases, the Oracle personnel may find that the customer-reported problem cannot be replicated within Oracle's environment, and thus can't be pursued in any methodical fashion. In other cases, the ongoing analysis may eventually prove that the problem was caused by defective hardware, "noisy" telecommunications networks, incorrect configuration, "corrupted" data imported into the system from a legacy database, buggy interfaces with other "best-of-breed" components with which the system was interfaced, or other such causes.

26.  If these other causes are eliminated – *i.e.*, if it appears that the customer's problem was actually caused by a software problem in Suite 11i itself – then the TAR is assigned to the appropriate development group within the ERP or CRM organizations for further analysis and resolution. From the perspective of the development group, the TAR is simply a "tracking number" that functions as the developer's work queue, and does not reflect judgment of what caused the reported issue. As Joel Summer testified in his deposition:[15]

> Q. Okay. And where would you look at Oracle to find out if those critical fixes and changes in code did occur?
>
> A. Okay, so what I would look at is this - probably the best place to look is within the customer support system, okay.
>
> I talked earlier about the TAR, incident tracking system, that TARs would be issued by the customers, technical assistance requests would be issued by the customers. Some of those would be general questions, some of those would potentially point to implementation issues, some of them configuration issues, and some of them could point to software bugs.
>
> Q. Okay.
>
> A. And if a bug number was assigned, that doesn't necessarily mean it was a bug. That meant that somebody in support felt it was a bug, okay.

---

[15] Deposition of Joel Summers (March 21, 2006), at 240:4 – 241:1.

Page 11                                                              **Confidential**

> Our development organization would then get the –
> understand the bugs, would research those, would say,
> yeah, this is a bug, no, it is not a bug, it's a
> implementation or a configuration issue. Go back and
> tell the customer to set this flag or set that if it
> is an implementation issue.

27.     Thus, TARs, by themselves, are not reliable diagnostic tools; software experts and experienced testing/QA personnel in the software field understand that they cannot rely on them as credible evidence of "trouble" with the quality or functionality of the software at issue. They may use this information to confirm there had been trouble, but no credible technical consultant would rely on such evidence to establish the true *nature* of a problem.

28.     It is troubling that Mr. Hilliard would place such great emphasis on TARs and critical emails from customers without seeking some form of independent corroboration of the technical issues involved. Taking into consideration the politics and financial negotiations that may have surfaced in communications between Oracle and its customers, the customer complaints about bugs and missing and/or non-working features cannot be accepted as accurate and relevant commentary unless they have been confirmed by some technically credible authority (*e.g.*, Oracle's technical support or QA department).

29.     By refusing to address this issue in a forthright and accurate manner, Mr. Hilliard encourages non-technical readers of his Report to assume that *all* problems, complaints, and "trouble reports" – as well as "patches" and "fixes" – did, in fact, represent actual bugs in the Suite 11i software. This is an inexcusable oversight for a software professional. In any event, it is not consistent with common practice in the software field.

30.     Experienced IT professionals and software experts know, for example, that there are well-established methodologies and procedures for analyzing customer-reported problems, determining whether they are capable of replication,[16] and then trouble-shooting the cause of the problem. Virtually every large software-product company – from IBM to Microsoft, and from Apple to Oracle (and SAP, and Baan, and PeopleSoft, and J.D. Edwards) – has a detailed, formal methodology for analyzing and investigating the causes of problems reported through a TAR mechanism.

---

[16] This can involve such subtle issues as "heisenbugs" – *i.e.*, bugs whose visible manifestations vanish when debugging tools are used, because (in a fashion analogous to the Heisenberg Uncertainty Principle), the act of *observing* the software system (*via* debugging tools) changes the *behavior* of the system. For more details about heisenbugs, *see* <http://en.wikipedia.org/wiki/Heisenbug#Heisenbugs>, last visited on June 19, 2007 at 10:30 AM.

### IV.2.2  Mr. Hilliard Has Performed No Analysis To Determine Whether The Problems Certain Customers Complained Of Were Typical Or Anomalous

31.  By presenting only an analysis and set of conclusions based on the comments and complaints of a few Oracle customers, Mr. Hilliard implies that these comments and complaints represent the opinions and experiences of *all* users.

32.  In fact, several witnesses – including confidential witnesses[17] – have testified that Oracle 11i was no buggier than any other comparable software, and that customers encountered no more than the usual number of problems.[18] More importantly, there are a large number of "silent" customers – silent, in any case, with regard to this dispute – who may have experienced occasional problems, and who may have registered occasional complaints to their sales or service representatives, but who successfully implemented Suite 11i to run some or all of their business.

33.  The evidence in this case shows that, during most (if not all) of the "Class Period," only a fraction of the thousands of Suite 11i installations underway were "escalated" customers receiving special attention.[19] In any case, Mr. Hilliard has made no attempt to analyze the ratio of "happy" to "unhappy" customers; nor has he provided any objective evidence to credibly claim that Suite 11i resulted in more unhappy customers than did Oracle's earlier ERP products[20]; nor does he analyze the ratio of "happy" to "unhappy" customers with comparable ERP products developed by Oracle's competitors.

34.  Even with reasonably reliable and familiar appliances, there will always be those who complain about their dishwasher, complain about their television, complain about their cell-phone, and complain about their MP3 music player. With more complex and sophisticated products and systems, there are that many more opportunities to complain; and when those products and systems must be

---

[17] It is noteworthy that Mr. Hilliard did not cite any of Plaintiffs' confidential witnesses to support his opinions, despite the fact that 35 of the 49 confidential witnesses testified regarding Suite 11i.

[18] *See*, for example, Deposition Transcript of Lawrence Grace (August 14, 2006), at 60:16 - 61:14 ("Just about every piece of software that I've ever worked with at Oracle or any other software company at one point in time has errors – has software errors....I don't think it had any more than any other products that I've worked with before, but, yes, obviously, you know, all of these have bugs in them, problems that need to be resolved.").

[19] *Compare, e.g.,* May 29, 2001 Escalated Customer Management Report (NDCA-ORCL 121581-610) (showing approximately 130 escalated customers, 32 of which are listed as "cool," meaning any severe, outstanding implementation issues have been resolved) with *Oracle: The State of E-Business is Strong*, Oracle Press Release, February 20, 2001 (NDCA-ORCL 102009-12), at 102009 (stating that 2,500 Oracle customers were implementing Suite 11i). *See also* Jeff Henley FY 2001 Review Presentation, June 2001 (JPM 00691-701), at 00699 (showing more than 3,500 customers implementing Suite 11i).

[20] In fact, evidence in this case indicates that customers – including ViewSonic – were happier with Suite 11i than previous Oracle ERP releases. *See* Key Customer Profiles (NDCA-ORCL 068725-977), at 068761 ("I've had experience with Oracle implementations including 10.6, 10.7, 11.0, 11.03 and now 11i. In my experience, this was the smoothest and most bug-free implementation I have done. Our Superusers agree.' - Robert Moon, VP Information Services, ViewSonic.").

integrated with a customer's existing "legacy" environment, the opportunities become greater, still. The question Mr. Hilliard has not answered, in any specific and/or quantifiable fashion, is whether there were substantially more complaints made about Suite 11i than there were made about other comparable products.

35.    As described more fully below, talk of customer satisfaction is particularly meaningless when not combined with reliable comparative information because, rightly or wrongly, customers of large complex software have historically had high rates of dissatisfaction with these products.[21] Sometimes this is because of the software, but often is it the result of unrealistic or even internally inconsistent expectations from the customers.

36.    As I discussed in paragraph 93 of my May 25, 2007 Report, a single customer experiencing problems with a particular component or module of a large software system doesn't necessarily mean that *all* customers will experience the same problems, particularly given the breadth and diversity of Oracle's customer base.[22] Even if the problems *are* caused by a vendor software bug, the circumstances that "exposed" that bug – *i.e.,* the unique combination of hardware, third-party software, and operational data – may not occur in any other customer environment. Thus, even if one assumes that a problem reported by GE was a problem with Oracle's Suite 11i software (a conclusion which cannot be credibly drawn from the evidence cited by Mr. Hilliard), that does not mean any other customer would have trouble executing the very same function in their own environment.

## IV.3   Mr. Hilliard Refers To Unidentified Or Nonexistent "Standards"

37.    Throughout his Report, Mr. Hilliard refers to *standards*, usually as the basis for an assertion that Oracle failed to follow or adhere to a particular criterion; however, his argument reflects a sloppy application of the term and concept of "standards." Standards are developed, published, promulgated, and sometimes enforced by either government agencies, regulatory bodies, or professional scientific/engineering organizations. In the United States, for example, standards are created and enforced by such diverse agencies as the FAA, FDA, FDIC, FTC, SEC, and NRC. In the computer field, standards are created and published by such

---

[21] Even when reliably compared it is not a useful measure of the technical quality or functionality of the product. Many technically elegant products have failed to satisfy customers and many technically inferior products have succeeded with and satisfied customers. This is yet another reason why "customer satisfaction" (even if defined more meaningfully and rigorously than Mr. Hilliard has attempted here) is not a useful measure of product quality in this context.

[22] *See* Deposition of Ron Wohl (March 23, 2006) at 134:1-11 ("You know, you can have two different customers using the same products, that because they have configured the products differently, one of them will think the software runs perfectly and there are no problems whatsoever, another one of them could hit some bug that they consider an egregious bug.... There is a near infinite number of configurations, so it's not possible to test every possible permutation of the software."); Deposition of Mark Barrenechea (July 11, 2006), at 262:7-11 ("We're talking about a piece of software now that is automating everything from the world's most successful software company, to DSL, to self-service pizza orders in one software package.").

**Confidential**

organizations as the International Standards Organization (ISO), and the Institute of Electrical and Electronic Engineers (IEEE).

38.    If Mr. Hilliard means to claim that Oracle should have followed a particular standard during the development, marketing, installation, and/or support of its Suite 11i software, there is an obligation to *cite* the standard, and demonstrate why and how it is applicable to the situation being discussed. Mr. Hilliard has not done that.

39.    None of these well-known and widely-accepted notions of "standards" applies to the references Mr. Hilliard makes to "standards" in his Report. Rather, his Report refers to *common practice* in the computer field, or what he refers to as "industry accepted guidelines," regarding such issues as testing, integration, bugs, *etc.* Following "common practice" or "industry accepted guidelines" for certain activities and development processes in the software field may or may not be a good idea; and following "best practices" (a notion also described in only the vaguest of terms by Mr. Hilliard) may also be a good idea – but is rarely a *requirement* for a vendor. Indeed, Mr. Hilliard doesn't even provide any credible information about *how common* these "common practices" are, or what authority determined that certain software development practices have been named as "best practices." Mr. Hilliard's qualifications do not appear to reference any experience with implementations of ERP software in the last twenty years.

### IV.3.1  Mr. Hilliard's Definitions And Explanations Are So Vague, Ambiguous, And/Or Heavily Qualified That They Are Essentially Meaningless

40.    Mr. Hilliard professes to be a technical expert, with considerable experience in the field of computer software; thus, his definitions, analyses and opinions should be technically precise and unambiguous. In many cases, they are not. For instance, as described below, his definitions of "commercial quality" and "integration" are vague – and if consistently applied as he does here, would exclude nearly all commercial software of any size that claims either to be integrated or of commercial quality.

### IV.3.2  Mr. Hilliard Has Done No Analysis To Determine Whether Oracle's Suite 11i Product Had Substantially More Bugs Than Any Other Comparable Enterprise Software Product In The Marketplace At The Time

41.    If Mr. Hilliard meant to demonstrate that Oracle's actions were contrary to "standards" comprised of the expectations of either vendors or customers in the software industry, he could have drawn comparisons to the number of bugs in Oracle's Suite 11i product, versus the number of bugs in comparable products from such vendors as SAP, PeopleSoft, J.D. Edwards, and Baan. He has not done so; indeed, he has not even compared the number of Oracle bugs with industry figures (*e.g.,* figures available from sources such as *Estimating Software Costs,*

cited in my May 25, 2007 Report[23]), or with figures from Oracle's *previous* ERP product (*i.e.*, version 10.7 of its software).

42.    Instead, Mr. Hilliard has provided a flawed and misleading analysis of the TARs and bugs in Suite 11i at a particular point in time, and uses it to draw the conclusion that "the quality of the Oracle 11*i* E-Business Suite ... never achieved minimally acceptable standards for commercial business software."[24] Aside from the fact that the analysis does not compare Suite 11i to other comparable ERP products, or previous Oracle products, the evidence supports the conclusion that Suite 11i's quality was high. For example:

- Mr. Hilliard claims that, as of June 2001, Suite 11i was experiencing an average of 54 bugs per customer, by dividing 19,000 bugs by 352 customers.[25] The basis of this calculation is incorrect, however. Mr. Hilliard is obviously basing his calculation on *live* customers, whereas TARs were submitted by *all* customers who were in the process of implementing Suite 11i, *or* actually operating Suite 11i in a production environment. The same document cited by Mr. Hilliard for his calculation states "Over 3,500 Customers are currently implementing 11i"[26]; and that figure is supported by a presentation by Oracle's CFO, Jeff Henley.[27]

- Also, Mr. Hilliard's calculation of 19,000 bugs is based on a June 8, 2001 email message from Oracle's Charles Kendig that states, *inter alia*, that "60,225 ERP TARs have been logged," and "32% of TARs are bugged."[28] Assuming that the figures cited by Mr. Kendig are accurate, the phrase "32% of TARs are bugged" does not mean that 32% of the TARs *are* software bugs; it simply means that they have been forwarded on to the appropriate development group as *potential* bugs. Subsequent analysis by the development group typically eliminated several of these TARs as duplicates, or as situations where Suite 11i's behavior and functionality was correct, even though the customer objected to it – *e.g.*, situations where the customer might have said, "I don't care what the Oracle manual says; I think the software *should* be doing X, Y, and Z." This scenario was addressed in Greg Seiden's deposition[29]:

    Q. Sure. What other types of things would be logged in the bug database?

---

[23] *See* Capers Jones, *Estimating Software Costs: Bringing Realism to Estimating* (Second Edition, McGraw-Hill, 2007), page 151.

[24] Hilliard Report, at page 109.

[25] *Ibid*, at page 108, footnote 241.

[26] *Ibid*.

[27] *See* Jeff Henley FY 2001 Review Presentation, June 2001 (JPM 00691-701), at 00699 (showing more than 3,500 customers implementing 11i).

[28] *See* NDCA-ORCL 121507.

[29] Deposition of Greg Seiden (May 16, 2006) at 87:3-24.

A. As I said, it becomes sort of a work queue for the development team, so there might be a request in the bug database to refresh a database or to - to add a new enhancement, a new feature to the product.

Also, even of the bugs that are logged, they aren't necessarily code defects. Basically it's just a request for development to get involved. So a large percentage of what gets logged in the bug database gets closed out to a status that says that it's not a bug.

(Interruption)

THE WITNESS: I'm sorry. A large percentage of what gets entered into the bug database turns out to not be a code defect and not result in a code fix.

- And the same concept was confirmed in Cliff Godwin's deposition[30]:

Q What is the - what do the various status applied to the bugs mean? And by that I'm referring to for example 10, 11, 30, 40?

. . .

A Status 11 means that the bug is open to development, meaning that the - generally that means that the bug is sufficiently well characterized to be worked on by the people that actually own the code in that area. Status 13 is generally a documentation issue that is open to a writing group to improve the documentation. Status 40 means that this particular bug is waiting for the resolution of another underlying bug.

. . .

Q So were status 11 bugs viewed as product defects?

A Status 11 bugs were open to the development team to work on with the view that they might be product defects. They - ultimately status 11 bugs can be resolved by turning out to be a configuration issue, some issue in another area, not a bug at all, because there is some misuse of the software or the feature, something like that. So status 11 just means it's open to development to work on.

- It also was addressed in the Mary Ann Anthony's deposition[31]:

Q. The first bullet point you write, "Consulting expressed concern that 68 percent of OM TARs are bugged." Is that Order Management TARs?

---

[30] Deposition of Cliff Godwin, 278:7 – 280:6.

[31] Deposition of Mary Ann Anthony, 136:10-20.

Confidential

A. That's correct.

Q. And do you know why Consulting expressed a concern about that?

A. Uhm, don't remember. I could speculate that just a percentage - the percentage of Order Management TARs had bugs that Development had to look at. But, again, that could have been just things that Development needed to review that might not have been an error in the software.

- Ron Wohl also testified that not all "bugged TARs" actually do represent bugs in the software:[32]

  Q. What does it mean when a TAR is bugged? Do you know what that means?

  A. I believe what it means is - the TAR is the technical assistance request, is judged or determined by a support analyst to be a likely product defect, and that that support analyst then logged a bug report.

  Q. Okay. So a TAR doesn't always mean a bug?

  A. That's correct.

- Even if all 19,000 "bugged TARs" *were* software bugs, this would mean that the 3,500 "active" Suite 11i customers had encountered an average of 5.4 bugs as of May 19, 2001 (the date cited in Mr. Kendig's email).[33] By itself, this figure does not allow us to draw any meaningful conclusions about Suite 11i's quality; among other things, we have no way of knowing how many of these 5.4 bugs per customer were high-severity P1 or P2 bugs, and how many were less-severe P3 or P4 bugs.

- Based on Mr. Kendig's June 8, 2001 email, Mr. Hilliard claims that "1,300 new TARs per week is more than three and a half times as high as the average for the year."[34] A footnote attached to this sentence states that "19,000 bugs divided by 52 weeks is approximately 365 bugs per week,

---

[32] Deposition of Ron Wohl (March 23, 2006), at 267:14-268:6.

[33] This is close to, and consistent with, the bugs-per-customer figure presented to Alcoa Corporation in a "Quality Overview" presentation on February 21, 2002 (NDCA-ORCL 118225-239, at 118228), which also showed that the "bug rate" had stabilized at approximately three bugs per customer in the fall of 2001. It is also consistent with a PowerPoint slide titled "E-Business Suite 11i Bugs per Customer Declining," contained within a presentation titled "Oracle-business" (NDCA-ORCL 073396-458, at 073397), which showed that that the number of bugs per customer declined from 8.3 in Suite 11i.3 to 5.2 in 11i.4.

[34] Hilliard Report, at page 108.

compared to more than 1,280 bugs per week in May 2001."[35] What Mr. Hilliard fails to incorporate into his explanation is that *far* more Oracle customers were actively involved in implementing Suite 11i in May 2001 than had been the case for an "average" week throughout the one-year period from May 2000 to May 2001.[36] So, *of course* there would be more TARs logged, especially during this first year of Suite 11i's use in the marketplace.

43.   Finally, it should be noted that even if Mr. Hilliard's calculations were all reasonably accurate, and all 19,000 "bugged TARs" really were software defects, this number pales in comparison to the industry-wide ERP defect figures reported by Capers Jones: at first deployment of a typical ERP product, as many as 150,000 defects would still be present, of which 1,000 would be high-severity defects, 20,000 would be medium-severity defects, and 129,000 would be low-severity defects. Unless Mr. Hilliard is trying to suggest that *no* ERP product is of "commercial quality," it would seem that he should be praising Oracle's quality, not criticizing it.[37]

44.   Mr. Hilliard, while opining on Suite 11i's quality (and he repeatedly makes this same point when he discusses "functional defects," "integration," "availability," and "commercially acceptable"), always discusses the errors in a vacuum, without addressing the fact that all commercially available software has bugs, or attempting to compare Suite 11i to other large, complex software and ERP systems. Absent an analysis of the true frequency of errors in Suite 11i, and absent a meaningful comparison to other ERP offerings, there is no way of knowing whether Suite 11i was better, worse, or the same as other offerings, much less whether it was so far grossly divergent that it could be viewed as commercially "unacceptable."

45.   While both vendors and users would prefer as few defects as practicable, Oracle's situation was by no means unique. Bugs are not only an unavoidable consequence of the complexity of today's software systems – they are also part of a deliberate trade-off that all software product vendors must make between schedule (*i.e.,* time

---

[35] Though not stated explicitly, it appears that Mr. Hilliard calculated his figure of "1,280 bugs per week in May 2001" by multiplying the 4,000 TARs that were being generated in May 2001 by the figure of 32% of TARs that were "bugged." As explained above, this is inaccurate: not all "bugged TARs" *are* bugs.

[36] A rough idea of the growth in implementation activity can be obtained by observing the growth of "live" customers, discussed in paragraph 113, below.

[37] After all, as discussed at length in my May 25, 2007 Report, *all* commercially available software has bugs. There may be isolated exceptions, in the case of "safety-critical" systems such missile-guidance systems, and flight control systems, where the customer is willing to spend substantially greater amounts of time and money to ensure the absence, or near-absence, of bugs. But even the FAA's air-traffic control system, which has been operational for decades, and which is subjected to rigorous testing and QA processes, occasionally has problems. *See, e.g.,* "LaGuardia, JFK passengers stranded for hours after FAA glitch," *Newsday.com,* June 8, 2007, at <http://www.newsday.com/news/local/wire/ newyork/ny-bc-ny--flightdelays-metr0608jun08,0,5846682.story?coll=ny-region-apnewyork>, visited June 9, 2007 at 11:00 AM.

to market), functionality (*i.e.,* the "features" and functions built into the product), and quality (which includes not only bugs, but also flexibility, portability, maintainability, user-friendliness, and other characteristics). Given the same set of data about the status of a software development effort for a new product, different executives and product managers will make different decisions about how best to balance those trade-offs. With the benefit of 20-20 hindsight, even the *same* executives will acknowledge that they could have, and perhaps should have, struck a different balance.

46. Oracle's executives are on record as having acknowledged that they wished they had conducted more testing before releasing Suite 11i – but that doesn't mean their initial decision, based on data available to them at the time, was wrong. It certainly doesn't suggest that good-faith trade-off decisions were made with specific awareness of, and conscious indifference to the consequences of those decisions. And their hindsight beliefs that more could have been done to eliminate bugs certainly does not amount to the violation of any "standard."[38]

## IV.4 Much Of The Evidence Mr. Hilliard Cites Is Incomplete, Inaccurate, Misleading, Or Out Of Context

### IV.4.1 Mr. Hilliard Misconstrues Various Statements Made By Defendants

47. In my May 25, 2007 Report, I noted that several statements made by Plaintiffs in their Complaint were incomplete, inaccurate, misleading, or out of context. For example, as discussed below at paragraph 128, Mr. Hilliard's discussion of Edward Sanderson's comments regarding integration at a February 2001 investor conference at Goldman Sachs fails to explain that his comments compare the integration of Suite 11i to that of best-of-breed alternatives – and that he uses an ellipsis to stand in place of *three pages of commentary* in which Mr. Sanderson discusses best-of-breed alternatives and compares Suite 11i to them.[39]

48. Similarly, Mr. Hilliard takes Mr. Sanderson's statement regarding Release 3 of Suite 11i unfairly out of context.[40] Mr. Hilliard completely changes the meaning of the statement to suggest that Mr. Sanderson admitted that Oracle's third release of 11i was the first "integrated" release and that it was a significant challenge to make 11i.3 integrated as compared to the previous releases.[41] Mr. Sanderson's actual

---

[38] Deposition of Ronald Wohl (March 23, 2006) at 116:2-7 ("Clearly we learned a lot through the experience, and our testing methodologies got a lot more sophisticated, a lot more – a lot more controlled. And we in retrospect obviously would have liked to have had that full degree of knowledge and discipline earlier in the cycle.").

[39] Hilliard Report, at pages 13-14 (*citing* NDCA-ORCL 03286-92).

[40] Hilliard Report, at page 26, footnote 44.

[41] *Ibid.* Hilliard's conjured quotation is as follows: "...our third release of 11i shipped in January [which was] a significant challenge building a completely integrated E-Business Suite...".

statement was unambiguous and plainly refers to the entire multiyear process of bringing Suite 11i :

> And then our version - our third release of 11i shipped in January. We found in launching 11i that it was a significant challenge building a completely integrated E-Business suite, leveraging common architecture, common technology, single-customer schema, so that you can truly get this single view from around the world in whatever business that - aspect of the business that you want to look at, was a significant effort.

49.    I will discuss these and other inaccuracies in greater detail in subsequent sections of this Report.

### IV.4.2 Many Of The Statements Are Demonstrably Incorrect

50.    Mr. Hilliard also relies on several key factual assumptions that are plainly incorrect and that, as a result, undermine the credibility of his broader conclusions. For instance, Mr. Hilliard claims that Oracle essentially did no integration testing or regression testing before releasing Suite 11i.[42] The evidence in the case (which Mr. Hilliard does not dispute, but merely ignores) flatly contradicts his assertions.[43] As discussed in Section VII.1.3, there is ample evidence that Oracle performed extensive testing on Suite 11i, including both integration testing and regression testing.

51.    In the same vein, Mr. Hilliard bases his opinion that Suite 11i was not "available" on the claim that "the software fails every time a customer receives delivery and tries to implement some normal type of function."[44] But there is no support for this claim, whereas there does exist a host of references to live customers that had quick and relatively easy implementations. The suggestion that the software (or even any significant portion of the software) "failed every time" a customer tried to implement it is unsupportable as is the conclusion that Mr. Hilliard bases on this assumption.

*Is following*

---

[42] Hilliard Report, at pages 27, 32-33, 88.

[43] Question & Answer Document for OAUG Conference Honolulu, Hawaii, October 22 - 26, 2000 (NDCA-ORCL 094603-58 ("Release 11i follows the Oracle Product Release Process…[which] includes a prerelease sign-off by senior management, who review quality criteria for the release, including open bug counts, and the breadth and depth of the functional, system, integration, performance, and regression testing that was performed."); *see also* Deposition of Alan Fletcher (April 6, 2005) at 164:23-165:3 ("Oracle was doing testing at many levels both manually and leveraging regression test capabilities, automated regression test capabilities. "); Deposition of Sukumar Rathnam (May 18, 2006) at 180:9-182:15; CRM Business Intelligence Test Plan, (NDCA-ORCL 67801-08) at 67804.

[44] Hilliard Report, at page 57.

## V   ALLEGEDLY FALSE STATEMENTS ADDRESSED BY MR. HILLIARD

52.   In Section 4 of his Report, Mr. Hilliard identifies a series of statements made by Oracle executives before,[45] during, and after Oracle's Q3 FY 2001 regarding the capabilities of Suite 11i. Mr. Hilliard organizes the statements into the following six categories: (i) statements regarding integration; (ii) statements regarding support for global operations; (iii) statements regarding globally accessible real-time data[46]; (iv) statements regarding extremely rapid implementation; (v) statements regarding comprehensive functionality[47]; and (vi) statements regarding immediate availability.[48] Based on my review of the evidence and my knowledge of business software and large software projects, I believe that the statements identified by Mr. Hilliard as false are, in fact, true for the reasons described throughout my May 25, 2007 Report, and particularly in Section IX of that Report.

53.   Most of these statements Mr. Hilliard lists are the same as those identified in Section IX.1 of my May 25, 2007 Report. Although Mr. Hilliard has included some new statements (such as those addressing rapid implementation and immediate availability), all of Mr. Hilliard's opinions boil down to an opinion about Suite 11i's quality – even though he does not provides any meaningful evidence that would suggests Suite 11i's quality fell outside the mainstream (or even that it was not relatively good). Most critically, I believe Mr. Hilliard errs by

---

[45] Mr. Hilliard contends that the statements that predated the Class Period "were reiterated by [the Defendants] in various forms numerous times over the course of the next 12 months" (Hilliard Report, at page 12 ); however, he fails to explain when or how they were reiterated. It is far from clear, for example, that Mr. Sanderson's statement that "I think our applications work in 23 languages" "reiterates" the pre-Class Period statement that "[Suite 11i] works in every country and in every language."

[46] Although Mr. Hilliard claims in Section 4.2.3 of his Report that Oracle made a false statement regarding "globally accessible real-time data," he does not address that statement in his Opinion sections, nor does he otherwise explain why the identified statement is allegedly false. Although Mr. Hilliard does not explain what he means by "globally accessible real-time data" (and Defendants did not use that phrase), it appears that the statement he has quoted refers to Suite 11i's integrated data module. As discussed in my May 25, 2007 Report, at Section VIII.1, Suite 11i was data integrated; Mr. Hilliard offers neither evidence nor opinions to the contrary.

[47] Mr. Hilliard also fails to follow up on his claim in Section 4.2.5 that Oracle made false statements regarding Suite 11i's "comprehensive functionality." As noted in my May 25, 2007 Report, at paragraph 147, Oracle's statements regarding Suite 11i's "complete" offerings were accurate when viewed in context. *See* Deposition of Mark Jarvis (May 30, 2006), at 173:24-174:8 ("The marketing terms [regarding Suite 11i] were *complete*, as in all of the pieces of software necessary to run your generic business. And *integrated*, which is single scheme or all of the applications interact with it" [emphasis added].); *see also* L. Lederman, *Report From Oracle's Analyst Day: Maintain Buy Rating*, Blair, William & Co. Analyst Report (NDCA-ORCL 308696-99), at 308696 ("With the release, the company has a full e-business applications suite, including marketing software, electronic store, salesforce [sic] automation, call center, supply chain, e-procurement and back-end ERP (including accounting, manufacturing, and human resources).").

[48] Hilliard Report, at pages 12-20. Some of these statements are identified in the RSAC; others are identified in Plaintiffs' Contention Interrogatory Responses; and some have never been specifically identified by Plaintiffs in this litigation. I do not opine about any legal significance that may arise from this distinction.

concluding that the mere existence of bugs – which are indisputably par for the course in a major software release – render software non-functional or unsuitable for commercial use.

54.     In addition, as discussed above, I believe Mr. Hilliard has taken many of these statements out of context. Based on my review of the documents and/or transcripts containing the allegedly false statements, it does not appear that the various speakers intended to convey the meaning that Mr. Hilliard attributes to them. In my experience, IT professionals, including market analysts and IT professionals at Oracle's customers, would have understood the speaker's true meaning.

55.     As a result, Mr. Hilliard's opinions fail for the same reasons described in my May 25, 2007 Report. Nevertheless, I will address the specific issues raised by Mr. Hilliard in greater detail in the sections below.

## VI     RESPONSE TO MR. HILLIARD'S OPINION #1 REGARDING PUBLIC REPRESENTATIONS OF THE FUNCTIONALITY OF SUITE 11i

56.     The first opinion in Mr. Hilliard's Report alleges that "Oracle and the individual defendants made public representations about the functionality of the Oracle 11i E-Business Suite (and the component modules comprising it) that they knew or should have known were false at the time." Mr. Hilliard's basic point in this Section, as throughout his Report, is to complain that Suite 11i fell below some standard of quality that it should have met, though he never defines the standard in any meaningful sense. As discussed in detail in my May 25, 2007 Report, however, a piece of software as large and complex as Suite 11i (*i.e.*, larger than 250,000 function points) would be expected to ship to customers with a significant number of unknown bugs – and that as many as 1,000 of these bugs would be "showstoppers," or "P1" bugs.

57.     Mr. Hilliard's Report does not challenge that basic point, nor does he identify any evidence to support the conclusion that Suite 11i had more bugs than would be expected based on this well-established framework. Given Mr. Hilliard's background, he should be well aware of this industry data (as least as it applies to large software products generally). His failure to consider it in reaching his conclusions is surprising, to say the least.

58.     Though this basic point alone undermines all of Mr. Hilliard's claims in this Section, I will continue to address his specific points below.

### VI.1   Functional Defects

59.     The first area of functionality addressed by Mr. Hilliard has to do with defects: he complains that Suite 11i "did not work [as represented], and it still suffered from

severe deficiencies with respect to its integration and its quality."[49] As evidence, Mr. Hilliard relies on a handful of internal Oracle emails citing certain problems that the sales force and customers were experiencing, as well as a report from GE noting incorrect accounting results from a particular workflow[50]; but Mr. Hilliard misconstrues the evidence, particularly the issues supposedly experienced at GE.[51] The authors make clear that the problem is that of an enhancement request by this customer, *not* a bug or defect in the Suite 11i software.[52] This evidence is far from sufficient to suggest that Suite 11i was missing functionality.

60.     Mr. Hilliard takes this anecdotal evidence of problems experienced during implementation and draws a conclusion about "customer satisfaction" (or lack thereof); however, there is no evidence that the problems described were actually experienced by all, or even several, customers. For instance, throughout his entire Report, Mr. Hilliard identifies fewer than 40 different customers who expressed dissatisfaction out of hundreds (and eventually thousands) implementing Suite 11i. He provides no basis for inflating this fraction of the whole to thus expound upon the overall quality of Oracle's product, or the functionality it delivered.

61.     Moreover, customer satisfaction is a subjective quality. Customers often attempt to satisfy incompatible goals – such as achieving maximum functionality, with an extremely short turnaround, and at a bargain basement price. Ultimately, tradeoffs must be made, and satisfaction may diminish – even if there is nothing fundamentally wrong with the product.

---

[49] Hilliard Report, at page 25.

[50] *Ibid*, at page 30-31.

[51] With respect to GE, Mr. Hilliard wrote that Mr. Ellison "had heavily promoted GE for its success at the AppsWorld conference" (Hilliard Report, at page 31, footnote 55). In his footnote, Mr. Hilliard notes that, at AppsWorld, Ellison referred to "a different GE specifically, but also the whole of GE generally" (*ibid*). Mr. Hilliard unfairly suggests that Mr. Ellison was promoting all of GE at AppsWorld; in reality, Ellison clearly singled out one division of GE in his presentation:

    But perhaps the single most interesting company is General Electric. General Electric in many ways is a very, very unusual company. It's got many different divisions. They're in the finance business. They've got GE Capital … They make jet engines … And actually, they've got a division called GE Power where they make power generating equipment, and it's a $22 billion business. And it turns out we signed a contract for the eBusiness suite with General Electric Power in November … [They will] bring a new plant live in 5 months. They will have completed a complete re-engineering of all 20 plants around the world in 18 months.

    Larry Ellison AppsWorld Keynote (NDCA-ORCL 141544-602), at 141544-45.

[52] Hilliard Report, at page 31, footnote 56 (*citing* NDCA-ORCL 056364-5, July 19, 2001 email from Alvin Law to Don Klaiss, *et al.*), at NDCA-ORCL 056364 ("[P]lease take a look at this issue to see if it is a bug or an enhancement." Oracle development responds by saying "[w]e are working with the consulting team responsible for developing this solution to … accelerate the development *of this enhancement*.").

**Confidential**

62.    Customer satisfaction is also often transitory, both when it is good and when it is
       bad. As Mr. Hilliard admits, the implementation of an ERP system is typically a
       long process, lasting many months, and any given implementation typically has its
       ups and downs. A sample of a single moment (or even a few weeks) cannot show,
       in any meaningful sense, the overall satisfaction of even a single customer, much
       less general satisfaction with the product of the entire marketplace.

63.    Customer satisfaction is also very context-specific. In my experience, customers
       who are new to ERP implementations have lower satisfaction rates than
       experienced customers, in large part because they usually underestimate the
       magnitude of the project, and the subsequent impact on their business practices –
       no matter how well they were warned. Similarly, satisfaction is often lower with
       larger-scale implementations than smaller-scale implementations, because the
       greater scope of the project means there are more moving parts, more stakeholders
       to satisfy, and more things that can go wrong.

64.    Mr. Hilliard has made no effort to account for these variables in assessing
       customer satisfaction; worse, he has proceeded to extrapolate conclusions
       regarding Suite 11i's quality from limited evidence regarding customer
       satisfaction.

65.    Mr. Hilliard's attempt to address more general evidence is no more illuminating.
       He suggests that Oracle issued "three major software revisions ... to address the
       thousands of user-reported software defects,"[53] in reference to the updated versions
       of Suite 11i that Oracle periodically issued as development, testing, and customer
       experience progressed, and suggests that this demonstrates functional problems
       with the software. As explained in Section VI.7.4 of my May 25, 2007 Report,
       updated versions – such as these – are a normal part of the software development
       and release process for any software, particularly software as complicated as Suite
       11i. These releases added new functionality and fixed bugs that had been
       previously identified. It is simply incorrect to state that these releases were
       "necessitated" by the problems that Mr. Hilliard conjures, or that they were
       unusual or unexpected in this context. PeopleSoft had at least eight releases in only
       18 months of its CRM modules alone between the release of PeopleSoft CRM 8 in
       June 2001 and PeopleSoft CRM 8.8 in December 2002.[54] Even Apple's iTunes – a
       dramatically simpler program – has had 17 interim releases since it was introduced
       in 2001.[55]

---

[53] Hilliard Report, at page 26.

[54] PeopleSoft Launches Next Generation Customer Relationship Management, PeopleSoft Press Release,
*Business Wire*, June 4, 2001; PeopleSoft CRM 8.8 Delivers Fast Implementations, PeopleSoft Press Release,
*Business Wire*, December 9, 2002.

[55] *See* iTunes Version History, <http://en.wikipedia.org/wiki/ITunes_version_history>, visited June 11, 2007
at 6:20 PM.

**Confidential**

66.    Another well-known example illustrates the principle even more clearly[56]:

> Microsoft released Windows XP on Oct. 25, 2001. That
> same day, in what may be a record, the company posted
> *18 megabytes* of patches on its Web site: bug fixes,
> compatibility updates, and enhancements. Two patches
> fixed important security holes. Or rather, one of them
> did; the other patch didn't work. Microsoft advised
> (and still advises) users to back up critical files
> before installing the patches. Buyers of the home
> version of Windows XP, however, discovered that the
> system provided no way to restore these backup files
> if things went awry.

67.    As this example illustrates, any suggestion that the release of updates or patches
was somehow unusual, or that Oracle's three releases within a single year was
somehow atypical (particularly for software as complex as Suite 11i), ignores the
reality of the industry and that of a customer's typical experience.

68.    This also illustrates another error by Mr. Hilliard, this time with respect to bug
fixes: he comments in his Report that "some of the fixes, while designed to address
specific problems, created new problems themselves."[57] As discussed in my May
25, 2007 Report (and as illustrated in the Microsoft example, above), it is well
known in the software industry that the installation of fixes is a tedious and error-
prone process that often creates additional problems.[58] There is a "bad fix error
rate" that has been well known for years.[59] Mr. Hilliard's suggestion that
regression testing could have prevented this problem from occurring is simply not
true. Although regression testing is commonly used to confirm that previously-
working features still function correctly after changes have been made (either to
fix bugs or to add new features), bad-fix injections still occur *even with regression
testing*.[60] Oracle did, in fact, performed regression testing on Suite 11i[61] – but it is
not surprising, nor unexpected, that some bugs still remained.

---

[56] "Why Software Is So Bad," June 23, 2002, *Technology Review*, at <http://www.technologyreview.com/printer_friendly_article.aspx?id=12887>, visited June 8, 2007 at 12:05 PM (emphasis in original).

[57] *See* Hilliard Report, at page 27.

[58] *See* May 25, 2007 Report, at Section V.2.4; *see also* Deposition of Valerie Borthwick (April 11, 2006), at 166:2-15 ("In the 12 years I was with Oracle ... and in all of the product releases, there were always, you know, with a new release, an occasion – there was frequently an occasion where a patch deck would go out, and it – as I said, it hadn't been tested against every permutation and combination. It might have caused a problem that wasn't tested until it went to a customer's site. That created another problem that was fixed and then rolled back out to a client. I think that' the nature of – of software development and new software rollouts. Those things happen.").

[59] *Estimating Software Costs: Bringing Realism to Estimating* (Second Edition, McGraw-Hill, 2007), by Capers Jones, is based on an earlier edition with the same title.

[60] *See* May 25, 2007 Report, Table 1, in Section V.3.3, for quantification of "bad-fix" defects.

**Confidential**

### VI.1.1  Order Management

69.    In an effort to bolster his claim that Suite 11i had "functional defects," Mr. Hilliard focuses on alleged functional defects experienced with Order Management, a new module in Suite 11i that had never previously been included in Oracle's ERP software.

70.    Mr. Hilliard's discussion of Order Management is undermined by the same flaws addressed above. His conclusions are drawn from the subjective experiences of a few customers, and he presents no evidence that the problems described were experienced by all, or even several, customers.

71.    Nor does Mr. Hilliard offer any basis his conclusion that the issues Order Management experienced were more severe than those other software product vendors experienced with similar programs. In fact, Mr. Hilliard offers no evidence about the overall error rate in the Order Management module, the overall severity of such errors, or how such an error rate compares to the expected level, either as to frequency or severity. Mr. Hilliard also does not consider whether the alternative – a system comprised of a customized solution that combined software components from two different vendors – would have been "better" from any relevant perspective, such as cost, time, or ultimate error rate.

72.    Mr. Hilliard also fails to acknowledge that some of the complaints Oracle received regarding Order Management resulted from factors unrelated to the software itself. For example, although he cites a February 1, 2001 email from Oracle Sales Consulting Vice President Julie Cullivan to Edward Sanderson noting that Order Management is "buggy and slow,"[62] he fails to note that the email discussed the functionality of Order Management in the *demonstration environment*, only. At his deposition, Mr. Sanderson explained that at least some of the problems experienced with Order Management were caused by the fact that the demonstrations were being run through a single phone line at that time.[63] In addition – as discussed in my May 25, 2007 Report, at Section X.1.5, and in this

---

[61] *See, e.g.*, Question & Answer Document for OAUG Conference Honolulu, Hawaii, October 22 - 26, 2000 (NDCA-ORCL 094603-58 ("Release 11i follows the Oracle Product Release Process...[which] includes a prerelease sign-offby senior management, who review quality criteria for the release, including open bug counts, and the breadth and depth of the functional, system, integration, performance, and regression testing that was performed."); *see also* Deposition of Alan Fletcher (April 6, 2005) at 164:23-165:3 ("Oracle was doing testing at many levels both manually and leveraging regression test capabilities, automated regression test capabilities. "); Deposition of Sukumar Rathnam (May 18, 2006) at 180:9-182:15; CRM Business Intelligence Test Plan, (NDCA-ORCL 67801-08) at 67804..

[62] February 1, 2001 email from J. Cullivan to E. Sanderson) (NDCA-ORCL 061313-15).

[63] *See* Deposition of Edward Sanderson (July 25, 2006), at 227:6-17 ("One comment I'd make on 'slow' ... it at least was in part due to trying to do demos via the phone line for a pretty comprehensive application."). Recall that during the 2000-2001 timeframe, high-speed broadband Internet access was *not* widely available; in most cases, business professionals were forced to use relatively slow, low-speed dial-up modems to access the Internet when they were away from their own office environment.

**Confidential**

Report, at Section VIII.1.6 – problems experienced in the demonstration version of the software were not reliable indicators of problems experienced in the delivered software.

73.   Mr. Hilliard's primary evidence of Order Management's alleged flaws is his reference to Mark Barrenechea's testimony about the downtime Oracle experienced after implementing the software within its own organization; however, as discussed more fully in Section VIII.2, below, Oracle's own implementation experience, including its experience with the Order Management module, does not support Mr. Hilliard's broad conclusions. Indeed, even the portions of *Softwar* that Mr. Hilliard references note that "the new order management system was dramatically better than the old one."[64] Given that basic fact – which Mr. Hilliard does not dispute in his characterization – his use of Order Management as an example that the software functioned poorly is odd, and hardly suggests that Oracle erred in releasing Order Management when it did.

## VI.2  Suite 11i's Support For Global Operations

74.   Mr. Hilliard takes issue with Oracle's statements about Suite 11i's ability to "support global operations,"[65] contending that in order to "support global operations," software must have the following features: (i) "translation for the screens, messages, prompts and documentation into all user-country languages," (ii) "software development needed to handle domestic and foreign currencies appropriately throughout all the Oracle 11i applications," (iii) "software development needed to handle multi-currency conversion as required for customers with global operations," (iv) "development of software logic needed to handle localized laws and regulations," and (v) "testing and quality control for global capabilities."[66] Without ever reviewing the software or its technical documentation, Mr. Hilliard discusses anecdotal evidence of a small number of difficulties customers experienced with languages and concludes that whatever Suite 11i *was* engineered to do, it was incapable of supporting global operations.[67]

75.   Again, Mr. Hilliard has misconstrued Oracle's statements and imposed an unrealistic and inaccurate construction on the phrase "support global operations." Oracle's statements regarding such support were, in fact, true. Unlike earlier Oracle applications releases, Suite 11i was designed and engineered to: (i) run any combination of languages on a single, global instance, rather than only one base language with custom consulting solutions for additional languages; (ii) merge all localizations, including the statutory, legal, and cultural practices of different countries, into a single database instance without overwriting or conflicting with

---

[64] Hilliard Report, at page 32 (citing *Softwar*, at page 192).

[65] Hilliard Report, at pages 15, 37-42.

[66] *See ibid*, at page 41.

[67] *Ibid*, at pages 37-42.

each other; (iii) provide customer-facing external documents, such as customer invoices and packing slips, in the installed language of choice; (iv) allow dates to be entered and viewed in the user's preferred format instead of in the single format previously supported; (v) allow users to enter and view numbers in the radix format appropriate to the country of operation, and (vi) define multiple organizations and the relationship among them in a single installation; and (vii) report and maintain accounting records at the transaction level in more than one functional currency.[68] *These features* provided Suite 11i's capability to support the global operations of Oracle's multi-national customers.

76.     Mr. Hilliard insistently focuses on the issue of user-interface translations, claiming that they were late and/or problematic, and does not discuss any other features of Suite 11i's support for global operations. His focus is misplaced: when Oracle stated that Suite 11i "works in every country and every language," this was not meant to convey that Suite 11i's user interface was *translated into every language as of that date*. Instead, Oracle meant that, unlike prior releases, Suite 11i was capable of running any number of supported languages in a single instance because it maintained all of the characters in common use in all of the world's modern languages.[69]

77.     In Suite 11i, Oracle redesigned the software architecture to accept information in "Unicode" – a standard character set designed to allow text and symbols from all languages to be represented within, and used by, the software – as a replacement for the older ASCII character set, which allows text and symbols from only Western languages.[70] As a result, even if some of the display screens were not yet translated, users could input information in any language and Suite 11i would allow it. Without Unicode, the software would have to be customized to accept different language text and symbols.

78.     In addition, Suite 11i could run multiple languages for its applications on a single, global instance, instead of setting up multiple, separate instances in different

---

[68] *See* Oracle Applications Documentation Library, Release 1, Oracle Applications Concepts (NDCA-ORCL 050972), at page 25-32; Summary of New Features and Enhancements, Oracle Applications From Release 10.7 to Release 11 and Release 11i (NDCA-ORCL 617464-656), at 617477-656617464; *Evaluation: Oracle – Oracle Applications: Ovum Evaluates: Corporate Financial Systems: Evaluation: Oracle – Oracle Applications*, January 18, 2000 (NDCA-ORCL 061424061427-59), at 061447.

[69] *See* Oracle Applications Documentation Library, Release 1, Oracle Applications Concepts (NDCA-ORCL 050972), at page 25.

[70] *See* <http://www.wikipedia.com/wiki/Unicode>, visited June 6, 2007, at 12:00 PM; *see also* Deposition of Clifford Godwin (March 3, 2006) at 130:12-131:3 ("[A version of Unicode called] UTF8 is a character encoding that will support all of the languages that are spoken in the world, and so one of the goals of 11i was to allow all of these geographic regions to run in a common system ... And that was the state of the world before we got to this common system in support of UTF8, so now you can run Russian and Korean and Arabic and English all in a common system with 11i.").

languages.[71] This represented a major improvement over versions 10.7 and 11: while both 10.7 and 11 were available in multiple languages, only Suite 11i could run multiple languages in a single instance of the software.[72] In effect, Unicode was the human-language version of "data integration"; and, as such, it was a major part of Oracle's strategy for an integrated system that would allow a company to run all of its business operations from a single instance.

79.     Consistent with this functionality, Oracle's product literature described Suite 11i as a single system that was capable of accepting and processing data in all languages, *without* requiring any customization or set-up for individual languages. From the initial Suite 11i press release, Oracle explained that "[t]he Oracle E-Business Suite also supports global operations, multiple languages, multiple currencies and Internet business practices, *all from a single global system*" [emphasis added].[73]

80.     This concept was explained in the documentation for Suite 11i, including the following excerpt from the Suite 11i.1 release library[74]:

> In Release 10.7 you could run Oracle Applications in one language, referred to as the base language. If you needed to run Oracle Applications in more than one language, Oracle Consulting provided a customized solution. With Release 11 you could run Oracle Applications in more than one language, but the set of languages you could run was limited to the languages supported by your character set. Textual parts of Oracle Applications, such as Forms, Reports, messages, help text, menu prompts, and lists of report names were available in the all active languages, but most data at the product level was still available only in the base language. This meant, for example, you could enter payment terms only in the base language, even

---

[71] *See* Summary of New Features and Enhancements, Oracle Applications From Release 10.7 to Release 11 and Release 11i (NDCA-ORCL 617464-656), at 617634 (noting under the title of "Global Operation Support" that "Unicode support uses the Oracle UTF-8 character set. You can run any combination of languages in an Oracle Applications UTF-8 installation instead of being restricted to the smaller set of languages supported by any other character set."); Undated Presentation by Ron Wohl Re: 11i.1 (NDCA-ORCL 114965-85), at 114968 (noting under the heading "11i" Meeting Global Requirements" the fact that "[a]ll localizations in one code base," and "[a]ll languages supported by unicode [sic]").

[72] Deposition of Clifford Godwin (March 3, 2006), at 109:11-23 ("Because historically the applications before 11i, you actually had to, if you were going to run multiple languages, for example, you actually had to have like a – you could set up the system in French or set up the system in Spanish, but you couldn't set up in both French and Spanish. So you had to set up a French system and you had to set up a Spanish system. So we had all these systems around for that reason. And we were beginning, because 11i enables the consolidation of these things all into one place, we were beginning the project to do that consolidation ... ").

[73] *See Oracle Ships 11i, Industry's First Integrated E-Business Suite*, Oracle Press Release, May 24, 2000 (NDCA-ORCL 012501-03014906-8), at 14907.

[74] 11i.1 Release Library, Concepts, NDCA-ORCL 050972.

**Confidential**

> though Forms would come up in a non-base language. For additional multilingual support in the products, Oracle Consulting provided a customized solution.
>
> In Release 11i, support for the Unicode UTF8 character set removes the limitation on the number of supported languages that can be run in a single instance. The Unicode character set supports all characters in common use in all of the world's modern languages. The majority of Oracle Applications products (but not all) have been restructured in Release 11i to provide multilingual support at the data level. The additional multilingual support features available in earlier releases from Oracle Consulting are incorporated in Release 11i.

81.   Internal Oracle documents discussing "Global Operation Support" highlight the difference between "translations" and the ability of Suite 11i to "run" in every language through Unicode. Under headings entitled Enhanced Multilingual Support and Unicode Character Set Support, Oracle explains that[75]:

> You can run any combination of languages in an Oracle Applications UTF-8 installation instead of being restricted to the smaller set of languages supported by any other character set.

82.   Oracle freely disclosed to the public that Suite 11i had only been translated into a set – though substantial – number of languages at release. For instance, Oracle's FY 2000 10-K, published in August of 2000, stated that 11i was "[a]vailable in approximately 30 languages."[76] Even earlier, in March of 2000, Oracle informed the Oracle Applications Users Group (OAUG) that Oracle's applications "currently support 29 languages [though Oracle would] continue to add more languages in future releases."[77] Oracle specifically explained at that time that, "[f]or some of the languages, not all modules are translated. Your Oracle account representative can help you determine translation availability for your language and release."[78]

83.   Moreover, the public – at least the segment that follows the business application software industry – was undoubtedly aware of Unicode's role in facilitating translations. Even before the release of Suite 11i in May 2000, a Morgan Stanley industry analyst had already explained how Oracle planned to accomplish continuing translations in Suite 11i when he wrote that the release "pulls all

---

[75]*See* Summary of New Features and Enhancements, Oracle Applications From Release 10.7 to Release 11 and Release 11i (NDCA-ORCL 617477617464-656), at 617634

[76] Oracle's SEC Form 10-K for the fiscal year ended May 31, 2000 (NDCA-ORCL 143829-909), at 143834.

[77] *See* March 19-22, 2000 OAUG Question & Answer (NDCA-ORCL 094367-419), at 094390.

[78] *Ibid.*

**Confidential**

country localizations and languages into a single Unicode to eliminate separate, regional versions."[79] Most importantly, Oracle executives repeatedly explained the difference between Unicode and potential translations of the Suite 11i software at OAUG Question & Answer sessions. For example, on February 2, 2000, Oracle responded to an OAUG question as follows[80]:

> OAUG Question: Release 11i is the first release with the Unicode code set. Are all languages supported out of box?
>
> Answer: Translated language support is different than Unicode supt. When 11i ships, it will have Unicode, but not a complete set of all possible permutations. Oracle will post on Metalink a fully tested matrix, warnings, and conversion issues.

84.   Oracle executives further discussed using Unicode to support translations at the OAUG Fall 2000 Conference: "In Release 11i, we support the Unicode character set which can represent the characters of all languages, so it is possible to install translations of multiple languages into the same Unicode database."[81] Oracle customers and investors – indeed, anyone who followed the business applications software industry at the time – would have understood these statements to mean what Oracle executives intended: that Suite 11i could support any language through its Unicode character set, that the software was, in fact, translated into numerous languages already, and that Suite 11i would be translated into more languages in the future. Far from hiding Suite 11i's supposed language limitations, Oracle executives openly discussed the current state of translations and heavily marketed Suite 11i's great language enabler, Unicode. Mr. Hilliard's assertion to the contrary simply does not comport with the record.

85.   In any event, even the evidence Mr. Hilliard references to support his claim that Oracle's translations in Suite 11i doomed its ability to support global operations is weak and overblown. At best, he has shown that there were some bugs in translations,[82] and that there was some lag time between the release dates for

[79] *See* February 16, 2000 Morgan Stanley industry report by Charles E. Phillips entitled "Oracle: Still Rolling P1" (NDCA-ORCL 009248-51), at 009250.

[80] February 2, 2000 OAUG Question & Answer (OAUG 0038931-41), at 0038934.

[81] October 22-26, 2000 OAUG Question & Answer Session (OAUG 0041565-670), at 0041602.

[82] *See, e.g.,* Deposition of Gregory Seiden (May 16, 2006), at 207:14-208:12 ("Well, this customer is using the languages, so it's not a question of language availability for TMP. They've got bugs in the languages … But they have the translations. And the issue is that on any given form where there might be a hundred words they're finding some of those words were in English."); Deposition of Michael Cochran (June 16, 2006), at 229:24-230:3 ("In financial roll outs, there's always localization issues. Like United States has FASB rules for accounting, and France has probably similar accounting rules, so everybody has what they call localization issues.").

**Confidential**

American English and other translations.[83] This is ordinary and expected in the software industry; it certainly does not render Suite 11i incapable of supporting operations, particularly in light of Suite 11i's use of the Unicode set to accept inputs in every language and consolidate multinational data in a single system.

86.  It should also be noted that Mr. Hilliard mischaracterizes statements made by Mr. Ellison explaining that Oracle 11i was "engineered to" support global operations. Calling Mr. Ellison's statements regarding Suite 11i's design "an endemic explanation used by Oracle … to justify all manner of failures," Mr. Hilliard complains that:[84]

> There is a difference between **being engineered such that—at some future time—a product could be further developed to provide** [emphasis in original] some functionality or level of performance and actually **delivering a product that does provide** [emphasis in original] that functionality or level of performance.

87.  There is nothing to support Mr. Hilliard's claim that Mr. Ellison – or any other Oracle representative – testified that Suite 11i was engineered to do something "at some future time." Rather, Mr. Ellison and others have testified regarding functionality that Suite 11i was designed to support global operations, but that bugs or other issues may have interfered with functionality at various times. In mischaracterizing the testimony this way, Mr. Hilliard ignores a basic reality: *a bug in a software system that was _designed_ to accomplish a particular feature, function, or capability does not mean the system _lacks_ that feature; it simply means that the system has a bug that (temporarily) prevents the feature from working.*

88.  In support of his position that Suite 11i could not handle global operations, Mr. Hilliard identifies a few international Oracle customers that were dealing with bugs and other issues with their implementations.[85] As an initial matter, Mr. Hilliard's "evidence" here actually demonstrates that numerous multinational customers were implementing and using Suite 11i to run their businesses abroad. Mr. Hilliard identifies one document that lists 45 "critical customers in EMEA" (Oracle's Europe – Middle East – Africa division) that were currently

---

[83] *See* Deposition of Larry Ellison (September 21, 2006), at 308:24-309:11 ("Q And were you aware, as of June 2001, that local languages, other than the American English release, still were not available? A Local languages were available; they just weren't available for – there's a delay – they weren't available for the latest release … [W]henever a new release comes out, like 11.5.4, it comes out first in American English which then goes into translation."); Deposition of Edward Sanderson (July 25, 2006), at 191:5-191:7 ("It was not unusual that when you released a new product that other languages for other countries would come at a later date."); Deposition of Ron Wohl (March 23, 2006), at 223:8-223:15 ("Basically in this note Sergio was trying to exaggerate a point, he was trying to argue for faster translation, so he was trying to pick not the release date of English and compare it to the release date of translations … ").

[84] *See* Hilliard Report, at page 38.

[85] Hilliard Report at 42, footnote 79.

implementing Suite 11i.[86] It stands to reason that these customers – among the largest and most sophisticated companies in Europe, the Middle East and Africa – would not spend millions of dollars to implement a business applications product without concluding that it could function in their respective languages or meet their various localization needs. Moreover, Mr. Hilliard's critical customers list shows that many of even these "critical" customers had on-track and successful implementations, presumably including language and localization support. For instance, seven customers' implementations had apparently so improved that they were removed from the "critical" list, including global companies operating in countries like Germany (Touristik Union International), Denmark (Maersk Sealand), Belgium (Bombadier Eurorail), and the United Arab Emirates (Musafi Mineral Water).[87] Finally, the customers listed on this spreadsheet include only *critical* customers in EMEA, a small subset of the more than 500 customers actually implementing Suite 11i in that geographic area during January of 2001.[88] Accordingly, Mr. Hilliard ignores the more than 455 customers *from EMEA alone* enjoying successful Suite 11i implementations in this time period.[89]

89.     Mr. Hilliard also ignores numerous other examples in the record of international companies that successfully deployed Suite 11i. Many of Oracle's best reference customers were international companies. By May of 2001, one half of the customers enrolled in Oracle's E-Leaders programs were foreign companies.[90] In September of 2001, at least sixteen of Oracle's 52 Key Customer References for Suite 11i were foreign companies.[91] Many customers that were successfully using Suite 11i to run their businesses were enormous international corporations managing global operations. For instance, Inventec, a Malaysian electronics manufacturer, purchased Oracle's full ERP suite to tie together its far-flung

---

[86] *See* NDCA-ORCL 063711-28.

[87] *See* NDCA-ORCL 063711.

[88] *See, e.g.,* Oracle EMEA Doubles Its Applications Business for the Second Straight Quarter (December 14, 2000) (NDCA-ORCL 011968-74) at 011968 ("Now, more than 500 customers in EMEA have chosen to run their businesses using Oracle's E-Business Suite.") It is worth noting that many of these customers were implementing Suite 11i's CRM offerings. *See* PR Newswire (April 18, 2001), *Oracle EMEA Gains 189 New CRM Customers in Nine Months; European, African and Middle Eastern Companies Reap Benefits of an Integrated Suite.*

[89] Hundreds of customers in Oracle's APAC (Asia – Pacific) division were also implementing Suite 11i in this time period. *See* Asia Pacific Q2 FY01 PRP Summary (NDCA-ORCL 012348-18) at 012349 (stating that 190 customers had purchased and/or were implementing R11i by the end of Q2 FY01). At the conclusion of the third quarter of Oracle's fiscal year, "more than 300 businesses across 12 countries in the Asia Pacific rim" had selected Suite 11i. *See* PR Newswire (March 21, 2001), *Oracle E-Business SuiteTakes Off in Asia Pacific.* And in October of 2001, APAC could boast of 139 customers that were live on 11i, with another 575 implementing the Suite. *See* Asia Pacific Q1 FY02 PRP Summary (NDCA-ORCL 052258-70) at 052258. Like the EMEA customers discussed above, presumably these APAC customers would not buy an expensive, complex software system that lacked necessary localizations.

[90] *See* R11i Reference Report (NDCA-ORCL 419023-9) (showing 16 foreign companies among the 32 live, referenceable 11i customers enrolled in the E-Leaders program).

[91] *See* 11i Key Customer References (NDCA-ORCL 419000-21).

**Page 34**                                                    **Confidential**

operations in Taiwan, mainland China, Malaysia, the U.S., Scotland, Singapore, Japan and South Korea.[92] Ametek, another manufacturer, implemented Suite 11i's Financials, Manufacturing and iProcurement to link its 45 manufacturing facilities and 8,000 employees in North America, Europe, Asia and South America.[93] Westpac, the oldest financial services institution in Australia with 33,000 employees worldwide, implemented Suite 11i's Financials for all of its global operations, resulting in the largest single instance of Suite 11i's General Ledger anywhere in the world.[94] Finally, McDATA, a "global leader in open storage networking solutions," implemented the "Oracle E-Business Suite to centrally manage its multi-currency and multi-organizational operations."[95] As McDATA's CIO, Don Wenninger, stated, "McDATA's challenge of growing business operations in Europe, Asia and the United States can only be met with a flexible open system like Oracle's E-Business Suite."[96] Mr. Hilliard simply ignores this evidence (including even the evidence he cites), which clearly indicates that Suite 11i not only could but did support global operations.

90.   Similarly, the four documents cited by Mr. Hilliard at the end of this Section of his Report as proof of Suite 11i's inability to support global operations, at the end of this section of his Report, are also meaningless.[97] Several of these documents reflect nothing more than bugs that arose in certain foreign implementations, many of which have nothing to do with languages.[98] Others have nothing to do with the issue of "support for global operations."[99] The claim that these documents prove that Suite 11i was incapable of "supporting global operations" is exaggerated, to say the least.

91.   Thus, once again, Mr. Hilliard's opinion about the presence or absence of a feature or capability of Suite 11i – and thus Oracle's allegedly false representations about those features and capabilities – can be reduced to a refusal to acknowledge the

---

[92] *Ibid*, at NDCA-ORCL 419003.

[93] *Ibid*, at NDCA-ORCL 419004.

[94] *See* PR Newswire (February 20, 2001), *Westpac Taps Oracle E-Business Suite for Financial Overhaul; Oracle Financials Streamline Leading Australian Bank's Business Processes. See also* NDCA-ORCL 419000-21 at 419008.

[95] *See* PR Newswire (April 2, 2001), *McDATA Selects Oracle E-Business Suite to Manage Global Operations.*

[96] *See* Key Customer Profiles (NDCA-ORCL 068725-977) at 068749.

[97] *See* Hilliard Report at page 42, footnote 79.

[98] *See* Critical Accounts Operation Team Conference Call, March 1, 2001 (NDCA-ORCL 063711-28) (listing all escalated, foreign Suite 11i customers and bugs causing problems, only a handful of which cite translation issues).

[99] *See, e.g.,* May 2, 2001 Email From C. Wiklund to I. Gunder Re: Global Implementation Status Report (NDCA-ORCL 131672-76) (discussing status of Suite 11i internal implementation at Oracle's EMEA division); E-Business Suite Agenda, NAS Executive Dialogs, November 2, 2001 (NDCA-ORCL 617454-59) at 617458-59 (noting only that translations of online help – not actual Suite 11i applications – into Canadian French slipped to version 11i.2).

number of bugs in virtually every major ERP product in the marketplace, and his vague and unacceptable definition of "commercial quality." For this fundamental reason, and for the other reasons discussed above, I believe that his opinion about Oracle's lack of support for global operations must be rejected.

## VI.3  Rapid Implementation

92.   The Hilliard Report asserts that Oracle's representation that Suite 11i could be "rapidly implemented" was false because, according to Mr. Hilliard, Oracle executives knew or should have known that Suite 11i customers experienced implementation difficulties and lacked rapid implementation methodologies, which resulted in prolonged implementations.[100] Mr. Hilliard's contention is incorrect for a number of reasons.

93.   Mr. Hilliard takes statements by Oracle executives regarding the speed with which a company could implement Suite 11i out of context. First, he cites the May 24, 2000 Oracle Press Release, which states that "[c]ompanies can adopt Oracle E-Business Suite 11i in a matter of days rather than months."[101] He then omits the remainder of this statement, which reads, " ... by deploying either the modular, integrated offerings, bundled solutions or Oracle's hosting services."[102] Given this context, Oracle clearly was not saying that customers could implement the *entire* E-Business suite in a few days. Even Mr. Hilliard acknowledged that no rational customer of complex business applications software would have understood Oracle's press release to mean that a major implementation could be completed in a matter of days.[103]

94.   The second statement Mr. Hilliard cites, ostensibly made by Oracle's Larry Ellison, is actually a paragraph from Oracle's CRM White Paper.[104] Mr. Hilliard's incorrect attribution is important: the fact that this statement appeared in the CRM White Paper provides necessary context. First, since the CRM White Paper is the source of this statement, it obviously applies only to the CRM suite within Oracle's E-Business Suite 11i, contrary to Mr. Hilliard's assertion that this statement applied to all of Suite 11i.[105] Moreover, as discussed in my May 25,

---

[100] *Ibid,* at pages 42-49.

[101] *See* Hilliard Report, at page 11.

[102] *See* May 24, 2000 Oracle Press Release entitled "Oracle Ships 11i, Industry's First Integrated E-Business Suite (NDCA-ORCL 014906-08), at NDCA-ORCL 014907.

[103] *See* Hilliard Report, at page 16 ("[I]t would not be reasonable to interpret [Oracle's statement] as meaning 30 days or less.").

[104] *See* Hilliard Report, at page 17, footnote 24 (*citing* NDCA-ORCL 061874).

[105] *Ibid.*

**Confidential**

2007 Report, the CRM White Paper most likely was not published until after the third quarter of Oracle's fiscal year, in April of 2001, if it was published at all.[106]

95.    Mr. Hilliard also cites Mr. Ellison's statement at the January 2001 AppsWorld conference as a third purportedly false statement regarding Suite 11i's ability to be rapidly implemented.[107] As will be shown in greater detail below, Mr. Ellison stated at AppsWorld that Suite 11i could be installed in a matter of months, which was true. Mr. Hilliard omitted a crucial contextual point, which is that Mr. Ellison was discussing the speed of implementing Suite 11i *versus implementing a comparable, complete, best-of-breed solution.* When describing Suite 11i to customers at AppsWorld, Mr. Ellison explained that Oracle did not "kind of take one part and glue it onto another … All the pieces fit together. And we can install it in a matter of months … and give you benefits in a matter of months, in a short period of time."[108] Any person with experience in the enterprise application software industry – which would include nearly all of the AppsWorld attendees – would have understood Mr. Ellison was referring to the time saved during a major implementation by not having to integrate a series of separate vendors' applications. Since Suite 11i was pre-integrated, customers could implement the Oracle software faster than a comparable best-of-breed system that would require extensive systems integration in order to make the entire ERP system work together.

96.    Putting aside Mr. Hilliard's incorrect interpretation, the record indicates that these statements were, in fact, true, even under Mr. Hilliard's characterization. Mr. Hilliard wrote that "[e]nterprise-type software – including such software categories as Enterprise Resource Planning (ERP) and Customer Relationship Management (CRM) software – has historically taken customers *a year or more to implement; six months would be extremely fast*" [emphasis added].[109] Even more specifically, Mr. Hilliard acknowledged that it is customary in the business applications industry for smaller implementation projects to take 295 days to complete, with very large implementations requiring 379 days or more.[110]

---

[106] Former EVP of CRM Development, Mark Barrenechea, the primary author of the white paper, testified that he does not believe this document was ever published. *See* Deposition of Mark Barrenechea (July 11, 2006), at 161:12-24; *see also* April 3, 2001 email from Mark Barrenechea to Larry Ellison, *et al.* re CRM White Paper (NDCA-ORCL 061840) (indicating that the document had not been published yet and that edits were expected over the next few months).

[107] *See* Hilliard Report, at page 17.

[108] *See* Larry Ellison AppsWorld Keynote (NDCA-ORCL 141544-602), at NDCA-ORCL 141553-4.

[109] *Ibid*, at page 16.

[110] *Ibid*, at page 47, footnote 90 (*citing* NDCA-ORCL 061340). The study Mr. Hilliard cites with approval here was a survey of Oracle Suite 11i customers conducted by the Oracle Applications User Group (OAUG). John Schindler, President of the OAUG at the time of this survey, testified that, "based on size and complexity, nine months might be an acceptable timeframe [for an implementation]. It just depends on what it is you are doing. I think every – every customer is going to have a unique situation that you'd have to look at." Deposition of John Schindler (Eaton Corp.) (June 8, 2006), at 145:18-22.