# EXHIBIT 2

-------------------------------------------------------------------------------

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

# CASE NO. C-01-0988-MJJ

| | |
|---|---|
| **In re ORACLE CORPORATION** | ) |
| **SECURITIES LITIGATION** | ) |
| | ) |
| **This Document Relates to:** | ) |
| | ) |
| **ALL ACTIONS.** | ) |

-------------------------------------------------------------------------------

## Rebuttal Expert Report of J. Duross O'Bryan, CPA

**Dated: June 22, 2007**

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION

II.     OVERVIEW OF MR. REGAN'S OPINIONS

III.    SUMMARY OF DEFICIENCIES IN MR. REGAN'S EXPERT REPORT

      A. MR. REGAN OFFERS NO OPINION ON THE FINANCIAL STATEMENT IMPACT OF THE 46,000-PLUS DEBIT MEMOS

      B. MR. REGAN OFFERS UNFOUNDED OPINIONS, THAT ARE UNSUPPORTED BY THE EVIDENCE, ON ISSUES THAT PLAINTIFFS DID NOT RAISE IN THE COMPLAINT

      C. MR. REGAN FAILS TO ESTABLISH THAT EITHER THE BAD DEBT TRANSFERS OR THE HP TRANSACTIONS – OR BOTH COMBINED – WERE MATERIAL TO ORACLE'S FINANCIAL STATEMENTS

      D. MR. REGAN DOES NOT ATTEMPT TO LINK THESE UNPLED ISSUES TO ORACLE'S THIRD QUARTER FINANCIAL RESULTS OR THE DECLINE IN ORACLE'S STOCK PRICE

IV.     MR. REGAN FAILS TO OFFER ANY OPINIONS ON THE ONLY ACCOUNTING CLAIM ALLEGED IN THE COMPLAINT

V.      MR. REGAN'S OPINIONS REGARDING ORACLE'S ACCOUNTING PRACTICES, WHICH UNDERPIN HIS OPINIONS RELATING TO THE BAD DEBT TRANSFERS, ARE FUNDAMENTALLY FLAWED

      A. MR. REGAN HAS MISCHARACTERIZED THE NATURE AND EXTENT OF UNAPPLIED CASH

      B. MR. REGAN HAS MISCHARACTERIZED ORACLE'S PRACTICES REGARDING CREDIT MEMOS AND REFUNDS

         1. CREDIT MEMOS

         2. REFUNDS

      C. THE DEBIT MEMOS DID NOT "CONCEAL" CUSTOMER OVERPAYMENTS

VI.     MR. REGAN'S OPINIONS REGARDING THE TRANSFERS OF UNAPPLIED CASH ARE UNSUPPORTED

      A. PLAINTIFFS' CLAIMS REGARDING THE BAD DEBT TRANSFERS WERE NOT ALLEGED IN THE COMPLAINT

      B. THE "ON ACCOUNT" DESIGNATION WAS NOT A "STEP IN THE PROCESS" TO MOVE UNAPPLIED CASH

      C. ORACLE'S REMEDIAL EFFORTS AIMED AT RESOLVING THE BAD DEBT TRANSFERS WERE APPROPRIATE

    D.  THE EFFECT ON THE SECOND QUARTER FINANCIAL STATEMENTS WAS NOT MATERIAL

VII.    MR. REGAN'S OPINIONS REGARDING THE HEWLETT-PACKARD TRANSACTIONS ARE BASELESS

    A.  THE HP TRANSACTIONS WERE NOT ALLEGED IN THE COMPLAINT AND WERE NOT A PROPER SUBJECT OF FACT DISCOVERY
    B.  BACKGROUND OF THE HP TRANSACTIONS
    C.  THE NOVEMBER 30 TRANSACTIONS WERE NOT IMPROPER "SWAPS"
        1.  ORACLE RECEIVED SUBSTANTIAL ECONOMIC BENEFITS AS A RESULT OF THE HP SERVER PURCHASE AGREEMENT
        2.  HP RECEIVED SUBSTANTIAL ECONOMIC BENEFITS AS A RESULT OF THE CRM LICENSE AGREEMENT
        3.  MR. REGAN INCORRECTLY ASSUMES THAT THE NOVEMBER 30 TRANSACTIONS WERE "NONMONETARY" TRANSACTIONS
    D.  ORACLE PROPERLY RECORDED REVENUE ON THE CRM LICENSE AGREEMENT IN ACCORDANCE WITH SOP 97-2
        1.  PERSUASIVE EVIDENCE OF AN ARRANGEMENT EXISTED
        2.  DELIVERY HAD OCCURRED
        3.  ORACLE'S FEES WERE FIXED OR DETERMINABLE, AND COLLECTIBILITY WAS PROBABLE
    E.  THE EFFECT ON THE SECOND QUARTER FINANCIAL STATEMENTS WAS NOT MATERIAL

VIII.    CONCLUSIONS

IX.    QUALIFICATION

## I.      <u>INTRODUCTION</u>

I have been asked to review and analyze the opinions offered by D. Paul Regan in his Expert Report dated May 25, 2007.  Although I have reviewed and respond below in detail to the opinions and assumptions Mr. Regan makes in his Expert Report, I note at the outset that Mr. Regan's opinions appear not to relate to the accounting claims raised by Plaintiffs in their Revised Second Amended Complaint dated December 9, 2002 (the "Complaint").  Plaintiffs' accounting allegations, as set forth in the Complaint, focus exclusively on the purported financial statement impact of Oracle's creation of more than 46,000 debit memos on November 17, 2000. In his Expert Report, however, Mr. Regan expressly refuses to offer an opinion "about the total financial statement impact of the transactions relating to all $692 million from the 46,881 debit memo transactions in Q2FY01."[1]  In fact, Mr. Regan acknowledges that he is "uncertain" about the financial statement impact of these debit memos.[2]  By failing to offer an opinion on this critical issue, Plaintiffs have abandoned the only accounting allegation pled in the Complaint. Accordingly, Mr. Regan's Expert Report is more significant for opinions that he does not provide, than for those that he does offer.

Instead of addressing Plaintiffs' debit memo allegations, Mr. Regan offers several opinions about accounting issues that were not alleged by Plaintiffs in the Complaint, but which I understand Plaintiffs detailed, to a certain extent, in their Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs dated January 31, 2007 (the "Supplemental Interrogatory Responses").  These issues concern certain transfers of unapplied cash to Oracle's bad debt reserve and transactions that Oracle entered into with Hewlett-Packard ("HP") in the

---

[1]  *See* Expert Report of D. Paul Regan ("Expert Report"), at p. 31.

[2]  *See id.,* at p. 34.

second quarter of fiscal year 2001.  As I noted in my Opening Report, the significance of Plaintiffs' failure to allege these issues in their Complaint – like their failure to offer any expert opinions on the only accounting issue pled in this case – is a legal matter.  However, I understand that discovery related to the HP transactions was not responsive under any of the discovery orders pertaining to the accounting issue in this case.  I further understand that the Special Master charged with refereeing discovery disputes ruled that evidence pertaining to Oracle's recognition of revenue from Oracle's sale of licenses to HP in the second quarter of fiscal year 2001 was not a proper subject of fact discovery.[3]  Nevertheless, Mr. Regan cites the lack of "evidence" surrounding Oracle's sale of licenses to HP as support for his opinion that Oracle improperly recognized revenue on the last day of the second quarter of fiscal year 2001.[4]

In any event, Mr. Regan's opinions concerning Plaintiffs' newly-styled accounting assertions are incorrect.  Even if the transfers of unapplied cash into the bad debt reserve and the HP transactions (i) were alleged in the Complaint, (ii) both were the proper subject of fact discovery, and (iii) required adjustment from an accounting perspective, I would not modify the opinions in my Opening Report.  Whether viewed individually or in the aggregate, these allegations do not give rise to a material misstatement in the financial statements for the second quarter of fiscal year 2001, and nothing in Mr. Regan's Expert Report proves otherwise.  Indeed, Mr. Regan barely addresses the concept of materiality in his Expert Report.[5]  Equally noteworthy, any accounting impact of the bad debt transfers or the HP transactions would be reflected in Oracle's financial statements for the second quarter of fiscal year 2001, and I have seen no evidence to suggest that they would have had any impact on Oracle's financial results in third quarter of fiscal year 2001.

---

[3] *See* Telephonic Conference at Hewlett Packard Deposition, June 30, 2006, 16:8-17:6.

[4] *See id.*, at pp. 43, 52-53 and 57.

[5] *See id.*, at pp. 21-22.

II.      **OVERVIEW OF MR. REGAN'S OPINIONS**

Mr. Regan opines that Oracle's financial statements for the second quarter of fiscal year 2001 were not presented in accordance with Generally Accepted Accounting Principles ("GAAP").[6] He then makes a series of other general opinions which he believes supports this primary opinion:

- Oracle "improperly utilized a series of debit memos to 'apply' unapplied cash," and "conceal(ed) Oracle's use of customer overpayments to overstate its Bad Debt Reserve by at least $20 million.  The overstatement of the Bad Debt Reserve was eliminated by improperly increasing revenue and pre-tax earnings in the same amount in 2QFY01."[7]

- Oracle "overstated its Customer Advances and Unearned Revenue by including customer overpayments and other unapplied cash in this balance."[8]

- Oracle "improperly recognized $19.9 million in revenue and pre-tax earnings on November 30, 2000 as a result of a transaction with HP that failed to meet the criteria needed for this revenue to be properly recognized by Oracle."[9]

- Oracle "overstated its reported earnings-per-share of $0.11," as a result of these two alleged accounting issues.[10]

---

[6]  *See id.,* at p. 1.
[7]  *See id.,* at p. 2.
[8]  *See id.*
[9]  *See id.*
[10]  *See id.*

### III.   SUMMARY OF DEFICIENCIES IN MR. REGAN'S EXPERT REPORT

### A.   MR. REGAN OFFERS NO OPINION ON THE FINANCIAL STATEMENT IMPACT OF THE 46,000-PLUS DEBIT MEMOS

Mr. Regan does not offer an opinion about the financial statement impact of the "transactions relating to all $692 million from the 46,881 debit memo transactions in Q2FY01." [11]   As Plaintiffs' accounting expert, his failure to opine on this issue is surprising, since there is clear, compelling and undisputed evidence (as detailed in my Opening Report) that the November 17, 2000 debit memos were created as part of a process that involved three simultaneous and offsetting debits and credits in the same amount to the same account.  As such, these debit memos did not, and could not, impact Oracle's second quarter financial statements.  By refusing to opine on the financial statement impact of the 46,000-plus debit memos, Mr. Regan fails to provide expert testimony on the *only* accounting allegation pled in the Complaint, *i.e.*, that Oracle erroneously recorded more than $228 million in revenue in the second quarter of fiscal year 2001 through the accounting for over 46,000 "phony invoice" debit memos.[12]

### B.   MR. REGAN OFFERS UNFOUNDED OPINIONS, THAT ARE UNSUPPORTED BY THE EVIDENCE, ON ISSUES THAT PLAINTIFFS DID NOT RAISE IN THE COMPLAINT

As noted above, the Complaint did not raise any accounting claims related to the transfers of unapplied cash to the bad debt reserve or Oracle's transactions with HP during the second quarter of fiscal year 2001.  I understand that Plaintiffs provided detail for these allegations in their Supplemental Interrogatory Responses earlier this year, well after discovery was substantially complete.  Nevertheless, Mr. Regan devotes almost all of his Expert Report to these issues.

---

[11] *See id.,* at p. 31.
[12] *See* Complaint, at paragraph 8.

4

Based upon my review of the evidence, I believe that Mr. Regan's opinions on these two previously-unpled issues lack any factual support.

## C.  MR. REGAN FAILS TO ESTABLISH THAT EITHER THE BAD DEBT TRANSFERS OR THE HP TRANSACTIONS – OR BOTH COMBINED – WERE MATERIAL TO ORACLE'S FINANCIAL STATEMENTS

Even if the entire $20 million in transfers to the bad debt reserve required adjustment from an accounting perspective (which, as discussed in my Opening Report, many transfers did not), any impact on Oracle's financial statements in the second quarter of fiscal year 2001 still would not be material from either a quantitative or qualitative standpoint.  Similarly, assuming for argument's sake that the entire $19.9 million in revenue recognized from Oracle's sale of Customer Relationship Management ("CRM") licenses to HP was recognized erroneously, any impact on Oracle's financial statements would not have been material.  Giving Plaintiffs the benefit of the doubt, and assuming that *both* the bad debt transfers and the decision to recognize revenue from the sale of licenses to HP in the second quarter were erroneous, the combined impact on Oracle's financial statements in the second quarter of fiscal year 2001 still would not give rise to a material misstatement of revenue, pre-tax earnings, net income or earnings per share.

As set forth below, under Staff Accounting Bulletin No. 99 ("SAB 99"), a matter is material if there is a "substantial likelihood that the...fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available…."[13]  Mr. Regan ignores entirely seven qualitative factors that are typically considered in evaluating materiality,[14] and he misapplies the other two factors.  Furthermore, Mr. Regan fails to consider the "total mix"

---

[13]  *See* Staff Accounting Bulletin No. 99 – Materiality (citing *TSC Industries v. Northway, Inc.,* 426 U.S. 438 (1976), and *Basic, Inc. v. Levinson*, 485 U.S. 224 (1998)).

[14]  *See id.*

of information, as SAB 99 recommends, and he provides no support for his belief that there would have been a "substantial likelihood" that the allegations (if true) would have "significantly altered the 'total mix' of information" as viewed by a reasonable investor.

### D.    MR. REGAN DOES NOT ATTEMPT TO LINK THESE UNPLED ISSUES TO ORACLE'S THIRD QUARTER FINANCIAL RESULTS OR THE DECLINE IN ORACLE'S STOCK PRICE

Even if these previously unpled accounting issues resulted in a material misstatement of revenue or net income, such misstatement would be reflected in Oracle's financial statements for the *second quarter* of fiscal year 2001.  Nowhere in his report does Mr. Regan attempt to link these events to Oracle's financial statements for the third quarter of fiscal year 2001, or the decline in the Company's stock price following the third quarter earnings miss – to which Plaintiffs attribute their damages.[15]  In other words, even if a restatement for the second quarter of fiscal year 2001 were required – which I do not believe to be the case – Mr. Regan offers no evidence suggesting that such restatement would have impacted Oracle's financial performance in subsequent reporting periods.

### IV.    MR. REGAN FAILS TO OFFER ANY OPINIONS ON THE ONLY ACCOUNTING CLAIM ALLEGED IN THE COMPLAINT

In order to justify his failure to offer an opinion on the sole accounting issue pled in this case – whether the debit memos had any financial statement impact – Mr. Regan asserts that Oracle produced script output for only 926 of the 46,000-plus debit memos (which, as I understand, was so limited by the Special Master), and that "Oracle did not provide the full audit trail and source

---

[15] *See* Complaint, paragraphs 17 and 74.

evidence concerning the other $157 million in debit memo transactions."[16]  Mr. Regan also claims that the evidence produced in connection with the script output for the 926 debit memos "appears incomplete."[17]  These excuses are untenable.

Mr. Regan does not need script output for all 46,000-plus debit memos to ascertain their financial statement impact (or, more accurately, lack thereof).  Nor does Mr. Regan need any additional source documents to form an opinion on this issue.  As set forth in my Opening Report, the debit memos were generated by an SQL script that involved simultaneous and offsetting debits and credits in the same amount, to the same account.  These offsetting transactions are consistently displayed in the script output for all 926 debit memos on which discovery has focused in this case.[18]  The 926 debit memos total $534 million of the $692 million sum – *i.e.*, 77% of the total – of the 46,000-plus debit memos.[19]  There is no evidence suggesting that the debit memos that are *not* included in the script output were accounted for any differently, especially considering that all of the debit memos were generated by the same computer script.  Furthermore, the Account Analysis Report with Payable's Detail illustrates that the entire $692 million was both debited and credited to the same account on November 17, 2000.[20]  Moreover, the Sales Journal by GL Account Report establishes that Oracle only recognized approximately $10 million on November 17, 2000.[21]  Thus, as stated in my Opening Report, the evidence is clear and uncontroverted that the November 17, 2000 debit memos had no financial statement impact.

---

[16]  *See* Expert Report, at p. 31.  The 926 debit memos consist of 776 debit memos, for which the Court ordered discovery, and an additional 150 debit memos which Plaintiffs themselves selected for purposes of additional discovery.  *See* Order Granting Plaintiffs' Motion to Compel Production of Documents, at 1; Order Granting in Part and Denying in Part Plaintiffs' Motion to Compel Defendants' Production of Accounting Documents, at 17.

[17]  *See id.*

[18]  *See* NDCA-ORCL 1058909.

[19]  *See id.*

[20]  *See* NDCA-ORCL 050356-60.

[21]  *See* NDCA-ORCL 048989–9207.

In sum, Mr. Regan's refusal to opine on the lack of financial statement impact of the 46,000-plus debit memos on the second quarter of fiscal year 2001 is neither the result of the completeness of the script output nor the adequacy of accounting discovery in this case.  I view Mr. Regan's refusal to opine on this particular issue as an acknowledgement that the creation of and accounting for the 46,000-plus debit memos had no financial statement impact.

## V.      MR. REGAN'S OPINIONS REGARDING ORACLE'S ACCOUNTING PRACTICES, WHICH UNDERPIN HIS OPINIONS RELATING TO THE BAD DEBT TRANSFERS, ARE FUNDAMENTALLY FLAWED

Mr. Regan makes a number of broad, conclusory and incorrect assertions regarding Oracle's purported "policies" concerning unapplied cash, customer overpayments and refunds.  Specifically, based upon an incomplete understanding of the evidence and Oracle's internal accounting practices, he suggests that Oracle purposefully withheld customer overpayments, refused to issue refunds to its customers and "concealed" these overpayments through the creation of the debit memos.[22]  Based upon my review of the evidence Mr. Regan cited, and other documents and deposition testimony in this matter, I believe that these accusations are unfounded.

### A.      MR. REGAN HAS MISCHARACTERIZED THE NATURE AND EXTENT OF UNAPPLIED CASH

Mr. Regan claims that at the beginning of the second quarter of fiscal year 2001, Oracle "had accumulated at least $144 million of cash receipts from its customers that it was unable to apply to an invoice."[23]  In reaching this figure, Mr. Regan appears to have simply added three account

---

[22] *See* Expert Report, at pp. 6 and 15.

[23] *See id.*, at p. 5.

balances at the beginning of the second quarter (Accounts 12018, 12601 and 25005),[24] and then he assumes that the sum represented payments that Oracle was "unable to apply" to open invoices. This analysis grossly mischaracterizes the nature of the amounts reflected in these accounts, and greatly exaggerates the extent to which these amounts could not be applied to open invoices.

For instance, Account 12018, "Unapplied Cash," represents amounts that Oracle believes are likely to be applied to the appropriate accounts in a short period of time.[25]   There is no evidence that the entire balance of Account 12018 at the beginning of the second quarter of fiscal year 2001 consisted of cash receipts that Oracle was unable to apply to open invoices.   In fact, the evidence I have reviewed demonstrates that Oracle was able to (and did) apply significant amounts of unapplied cash to open and unpaid invoices.[26]

Mr. Regan also includes the balance of Account 12601, "Bad Debt Write Offs," in his total of the amount of cash that Oracle allegedly could not apply to open invoices as of the beginning of the second quarter of fiscal year 2001.   However, this account principally represents amounts written off as uncollectible.[27]   Mr. Regan makes no attempt to differentiate between amounts that were properly written off as uncollectible, and any items of unapplied cash in this account. Furthermore, there is no evidence to suggest that the entire balance of Account 12601 consisted of cash receipts that Oracle was unable to apply to open invoices.

Mr. Regan also includes Account 25005, "Customer Overpayments."   This account represents amounts which Oracle still is researching, of which most are expected to be applied against

---

[24]  *See id.*, at p. 9.

[25]  *See* AA 000005 and AA 000021.

[26]  *See* NDCA-ORCL 050356-60 [Oracle Account Analysis Report].

[27]  *See* AA 000012.

9

outstanding invoices in the future.[28,29]  Although this account may have contained some cash receipts that Oracle ultimately could not apply to open invoices during the relevant time period, there is no evidence indicating that the entire balance, as of the beginning of the second quarter of fiscal year 2001, consisted of cash receipts that Oracle was unable to apply.

Thus, by taking the sum of the balances of these three accounts, and treating the sum as unapplied cash that Oracle could not apply to open invoices, Mr. Regan grossly overstates the amount of unapplied cash that Oracle was unable to apply at the time.[30]  Furthermore, Mr. Regan fails to consider the fact that the amount of unapplied cash that Oracle had fluctuated on a daily basis, because even as cash receipts were being applied to open invoices, substantial amounts of new cash payments were being received from Oracle's customers.[31]  By failing to consider these facts, and by assuming that the entire balance of three different accounts consisted of cash that Oracle could not apply to open invoices, Mr. Regan premises his subsequent opinions regarding Oracle's treatment of unapplied cash on an unsupportable foundation.

## B.  MR. REGAN HAS MISCHARACTERIZED ORACLE'S PRACTICES REGARDING CREDIT MEMOS AND REFUNDS

Mr. Regan claims that a "significant cause of the balance of unapplied cash was overpayments made by Oracle's customers."[32]  Mr. Regan describes Oracle's internal policies and "systematic practices" regarding credit memos and the issuance of refunds as the "cause" of these customer

---

[28]  *See* Deposition of Gregory Myers, dated April 12, 2005 ("Myers Dep."), at 244:9-11 ("Now, the balance that's sitting in unapplied that we're researching for our customers, that unapplied balance sits in 25005.").

[29]  *See* AA 000688 (describing Account 25005 as a "'catch-all' account for all cash receipts company-wide.…  The balance of this account consists of items not yet identified to a particular area.").

[30]  *See* Expert Report, at pp. 8-9.

[31]  *See* NDCA-ORCL 1727982.

[32]  *See* Expert Report, at p. 6.

overpayments.[33]   However, he does not quantify the amount of unapplied cash that consisted of customer "overpayments."   Thus, Mr. Regan cannot substantiate his contention that customer overpayments were a "significant cause" of the balance of unapplied cash.[34]

## 1.   CREDIT MEMOS

Mr. Regan claims that Oracle's practice of not sending credit memos to its customers resulted in overpayments because he assumes that Oracle's customers were unaware that the outstanding balance of their invoices had been offset, in full or in part, by credit memos.[35]   However, the very evidence Mr. Regan cites in support of this argument demonstrates that Oracle, in fact, did notify its customers of credits being made to their respective accounts.[36]   Indeed, this same evidence illustrates that Oracle's practices with respect to credit memos were not part of a scheme to induce customer overpayments, but, rather, to reduce customer confusion regarding the meaning of credit memos and their availability for use against other open invoices.[37,38]

---

[33]   *See id.,* at pp. 6-7.

[34]   Mr. Regan also blames Oracle's practice of sending account statements only to those customers that requested such statements, but he does not describe how such a practice is unusual or contrary to normal business practices of other companies in the industry.   *See id.,* at p. 6.   In addition, Mr. Regan does not explain how such a practice "caused" customer overpayments.

[35]   *See id.*

[36]   *See* PLF-ORC 000135 ("Since it is not Oracle's practice to send out Credit Memos to our customers, we often tell them to short pay their original invoice by the amount we credit them.").

[37]   *See* PLF-ORC 000132 ("One big problem with sending the clients copies of the credit memo's [*sic*] is that they then end up short paying an invoice, from any l.o.b. and when we get to the root of the problem they refer to the 'credit' they were given.").

[38]   Mr. Regan also cites an email from Molly Littlefield, *see* NDCA-ORCL 1895745-7, in support of his claim that Oracle's practice of not sending credit memos to customers "caused customers to often be unaware of outstanding credits, resulting in overpayments."   *See* Expert Report, at p. 6.   This email, however, has *nothing* to do with credit memos – in fact, the term "credit memo" does not even appear in the document.   Based upon my review, it appears that the unapplied cash being discussed in that email relates to an order that was paid, but for which an invoice apparently never was booked.

*2.*     *REFUNDS*

Mr. Regan also claims that Oracle's unapplied cash balances resulted from internal policies that "inhibited the refund process."[39]   In so doing, however, he misrepresents Oracle's internal accounting policies.   During the relevant time period, Oracle issued refunds to customers upon request.[40]  This practice, like Oracle's policy of not sending credit memos to customers, appears to have been implemented in an effort to reduce customer confusion that resulted when Oracle sent refunds to customers who did not request them.   The evidence suggests that in some instances where Oracle issued a refund to customers who did not specifically request one, customers had no idea why they had received a check from Oracle.[41]   Mr. Regan offers no evidence to suggest that this policy was unusual, that it deviated from the practices of other companies in the industry, or that it was inappropriate under GAAP.[42]

In addition, Mr. Regan overlooks a large body of evidence in rendering his opinions about Oracle's unapplied cash practices.   Multiple Oracle employees have testified that when confronted with a situation where they had a cash receipt that they could not apply, among the first things they would do was contact the customer and solicit the customer's input on whether the payment should be refunded or applied to open invoices.[43]  In fact, of the 926 debit memos

---

[39]  *See* Expert Report, at p. 7.

[40]  *See* Myers Dep., at 56:5-13 ("How would one determine whether it was going to be a refund once the payment was received?  A.   Based upon someone's research that somebody had completed.  So, for example, somebody had called the customer, and the customer requested that the money that they had paid us that was open on their – on the record needed to go back to them, they would submit the request to have that refund processed.").

[41]   *See* Deposition of Ian Hatada, October 5, 2006 ("Hatada Dep."), at 214:22-215:6 ("Q:  Did any customers ever - contact Oracle regarding these refunds and ask, 'Why is this being refunded?' A: Yes.  Q: And did you ever talk to any of these customers? A: I answered the phone a couple of times as to 'Hey, we just received this check, and we have no idea why,' and I had to get off the phone and research as to when it was refunded or - why they received it.").

[42]  *See* Expert Report, at pp. 6-7.

[43]  *See* EY 000250; Deposition of Alexander Bender, dated September 21, 2006, at 224:16-17 ("[T]hey make every effort to contact the customer."); Myers Dep., at 169:22-24 ("[W]e would contact customers

upon which discovery has focused in this case, 277 contained refunds in their accounting histories that predated November 17, 2000, totaling more than $103 million.[44]  This evidence – which Mr. Regan ignores – demonstrates that Oracle readily refunded customer payments where appropriate.

Indeed, one of the very transactions upon which Mr. Regan focuses in his Expert Report establishes that Oracle appropriately refunded money, long before the creation of the 46,000-plus debit memos.  Mr. Regan points out that Household made a payment to Oracle on November 17, 1994.[45]  That same day, Household returned the product and cancelled the order.  However, despite the fact that Mr. Regan has seen the screenshot demonstrating that the money had been refunded to Household by a check that cleared on May 4, 1995,[46] Mr. Regan ignores this refund.  Instead, Mr. Regan states that Oracle did not refund the money to Household until a second, erroneous refund occurred on May 23, 2002.[47,48]  As Mike Quinn observed in a contemporaneous email, the May 23, 2002 refund was issued by mistake and should not have been made.[49,50]

---

and let them know that we had some sort of overpayment….”); Deposition of Michael Quinn, dated April 18, 2006 (“Quinn Dep.”), at 130:17-20 (“Generally speaking, you would call the customer and ask them how they wanted – how they wanted the disposition of that overpayment.”); Deposition of Molly Venkataramana, dated April 13, 2006 (“Venkataraman Dep.”), at 177:15-18 (Q. “So in researching an item of unapplied cash, the only thing you would do would be to pull the check copy and then contact the customer?”  A.  “And review the history on the item.”).

[44]  *See* NDCA-ORCL 1058909.

[45]  *See* Expert Report, at p. 29.

[46]  *See* NDCA-ORCL 603894.

[47]  *See* HI000001-02.

[48]  *See* Expert Report, at p. 30.

[49]   *See* NDCA-ORCL 614018-614023 [Email from Greg Myers, dated October 31, 2002, containing undated email from Michael Quinn (“Raul and Adam misinterpreted what the 550… [d]ebit memos were for.  This should not have been refunded.”)].

[50]  Mr. Regan cites the Household transaction throughout his Expert Report in support of the proposition that “the November Debit Memos concealed and misrepresented the balance of unapplied cash and customer overpayments improperly withheld by Oracle from its customers” and that “[O]racle’s conduct related to its debit memo overpayments from Household…demonstrates the impropriety of its retention of, and accounting for, cash receipts from customer overpayments.”  *See* Expert Report, at pp. 17 and 27.  His opinions in this regard, however, all are premised upon the incorrect assumption that Oracle did not refund Household’s money until after November 17, 2000.  Because there appears to be sufficient evidence that Oracle, in fact, did issue this refund to Household long before the creation of the 46,000-plus debit memos, all of Mr. Regan’s arguments relating to this particular transaction are unsupported and incorrect.

Mr. Regan's contention that "[e]ven if the customer made such a [refund] request, Oracle would often deny the customer a refund if the customer had any other receivables outstanding or if Oracle had previously written off amounts as bad debt," is not supported by the evidence upon which Mr. Regan relies.[51]  For instance, although Mr. Hatada testified that, during late 2002, Oracle temporarily suspended the practice of issuing refunds,[52] Mr. Hatada conceded that he could not identify a single refund, customer or dollar amount that Oracle allegedly improperly withheld.[53]  Furthermore, there is no evidence, including the testimony of Mr. Hatada, to suggest that Oracle improperly withheld customer refunds prior to November 17, 2000, or at any point during the second quarter of fiscal year 2001.  Accordingly, because Mr. Hatada's testimony does not support Mr. Regan's assumptions regarding Oracle's treatment of customer refunds prior to and including the second quarter of fiscal year 2001, I placed no weight on it.

In the end, to the extent that Oracle had a significant balance of unapplied cash on any given day, there is no evidence indicating that the cause was the accumulation of customer overpayments resulting from Oracle's credit memo or refund policies.  The more likely cause is the sheer volume of cash receipts that Oracle receives on a daily basis.  Oracle recognized $2.6 billion in revenue globally during the second quarter of fiscal year 2001.[54]  As such, Oracle received millions of dollars in cash receipts from customers on a daily basis.  The fact that Oracle could not immediately apply all of these payments upon receipt does not mean that Oracle's policies

---

[51]  *See id.*, at pp. 6-7.

[52]  *See* Hatada Dep., at 64:25-65:11.

[53]  *See id.*, at 501:22-502:4, ("Q. You can't think of a specific instance of customer or dollar amount on the Oracle system that says should be refunded, but, in fact, wasn't refunded; is that correct?  A. Correct.").

[54]  *See* Oracle's 10-Q Report, dated January 16, 2001.

were in any way improper, that they caused or contributed to customer overpayments, or that they deviated from industry norms.[55]

## C.   THE   DEBIT   MEMOS   DID   NOT   "CONCEAL"   CUSTOMER OVERPAYMENTS

Mr. Regan claims that Oracle "concealed" customer overpayments by "applying" unapplied cash to a series of debit memo invoices.[56]  Mr. Regan's opinions are incorrect and contradicted by the evidence.

As set forth in my Opening Report, Oracle created the 46,000-plus debit memos to remove vestigial "On Account" flags.  All of the items that had been placed "On Account" as of November 17, 2000 already had been resolved, primarily through refunds, expense reimbursements, customer stop payments, transfers to lease receivables or transfers into the bad debt reserve.  The "On Account" flag was used as a signal to the Accounts Receivable and Collections Departments to "not touch" the flagged receipt.[57]  Thus, unless a collector misunderstood the meaning of the "On Account" flag, he or she would not have viewed the flagged receipt as an overpayment or credit to a customer's account.  The flaw in Mr. Regan's reasoning is that he assumes that Oracle's collections personnel understood the "On Account" flag to mean that Oracle was withholding customer overpayments.  Therefore, the creation of the

---

[55]  Mr. Regan also opines that unapplied cash receipts held in Accounts 12601 and 25005 should be reported with Accounts Payable.  *See* Expert Report, at p. 11.  However, reporting cash receipts as Accounts Payable, which typically consists of amounts owed to vendors, would result in an overstatement of the balance of Accounts Payable under GAAP.  Most of the cash Oracle received from customers is eventually applied to outstanding invoices or open receivables.  Furthermore, much of the remaining balance of unapplied cash receipts relates either to unearned advance payments, or amounts which appropriately can be applied to royalty revenue not yet invoiced, expense reimbursements and other items, none of which should be included in Accounts Payable.

[56]  *See id,.* at p. 15.

[57]  *See* Myers Dep., at 83:1-4 ("So putting it On Account was an indefinite flag that [*sic*] do not touch this receipt, another transaction has taken place, therefore, this money should not be taken to an open invoice….").

46,000-plus debit memos – which were generated as part of the process through which Oracle removed the "On Account" flags – could not have "concealed" customer overpayments or credits.

Nor did Oracle "conceal" the fact that it eliminated the "On Account" flags through the creation of the debit memos. Within a day of the creation of the 46,000-plus debit memos, Greg Myers sent an email to various accounting managers explaining the nature and purpose of the debit memos.[58] The debit memos, by design, were visible and readily identifiable to Oracle's Collections Department. The debit memos were run on the same day and were given unique, sequential identifying numbers (*i.e.*, the specially-designed prefix of "55").[59,60] To this day, the debit memos appear throughout Oracle's accounts receivable subledger ("A/R Subledger").[61] For instance, the standard "7-Bucket Aging By Customer" report shows both the debit memos and the "On Account" receipts for each Oracle customer.[62] In addition, the standard "Billing History" report identifies each November 17, 2000 debit memo.[63] In fact, it is precisely because the debit memos appear in Oracle's "Billing History" reports that CW46 and Plaintiffs became aware of the debit memos in the first place.[64]

---

[58] *See* NDCA-ORCL 623787 [Email from Greg Myers to Pam Janakes, Kim McMurdo, Sam Yohannes, John Badovinac, Jean De Luzuriaga, Kathleen Edwards, Julie Chan, Michael Quinn, Adam Hahn and Sanjay Kumar, November 18, 2000].

[59] *See* Myers Dep., at 109:9-11 ("Prior to November 17th…. we really didn't use debit memos at all."), 189:12-14 ("[T]hey were not normal course of business, they were not, you know, invoices charging customers of any kind, so we wanted to make sure we were able to isolate these."), and 270:1-6 ("Q. And how do you know that it's a debit memo?  A. It's based upon the invoice number, that it has a 5 series number, 55, which was the sequence we used for the debit memos.  Also using the description on the line item, it says On Account cleanup for U.S.A. date, would be two indicators that this is a debit memo.").

[60] *See* NDCA-ORCL 049208-050060.

[61] *See* NDCA-ORCL 1058909.

[62] *See* NDCA-ORCL 1198884-1208895.

[63] *See* ORR 000789-803.

[64] *See id.*

Notably, as discussed in my Opening Report, there were a number of debit memos that related to cash receipts that previously had been refunded or for which a customer had placed a stop payment on the check.[65]  Indeed, as noted above, of the 926 debit memos upon which discovery has focused, 277 contained refunds in their accounting histories that predated November 17, 2000, totaling more than $103 million.[66]  Mr. Regan fails to explain how the application of the "On Account" flag against the November 17, 2000 debit memos "concealed" overpayments or amounts that "should have been" refunded to Oracle's customers considering that there was no money associated with these flagged receipts because the cash had been refunded long before the debit memos were created.

All of these facts are inconsistent with Mr. Regan's apparent belief that Oracle "concealed" overpayments or amounts that should have been refunded to its customers through the creation of the debit memos.  I have seen no evidence to support Mr. Regan's theory that the creation of and accounting for the debit memos "concealed" amounts belonging to Oracle's customers.

## VI.   MR. REGAN'S OPINIONS REGARDING THE TRANSFERS OF UNAPPLIED CASH ARE UNSUPPORTED

Mr. Regan also makes a number of unfounded assertions and unsupportable conclusions regarding certain transfers of unapplied cash into the bad debt reserve during the second quarter of fiscal year 2001.  Although I will respond briefly to some of Mr. Regan's points in this regard, his contentions regarding both the cause and effect of the bad debt transfers ultimately are irrelevant.  Even if one were to assume that the entire $20 million in transfers into the bad debt

---

[65]  For instance, in the Texas Instruments transaction described in my Opening Report, the customer placed a stop payment on the check such that there was no money associated with the "On Account" receipt as of November 17, 2000.  Similarly, in the Sprint transaction described in my Opening Report, Oracle had refunded the underlying payment in 1998, such that there was no money associated with the "On Account" receipt as of November 17, 2000.

[66]  *See* NDCA-ORCL 1058909.

reserve were reclassified erroneously (which, as discussed in my Opening Report, they were not), the impact of these transfers on Oracle's revenue, net income and earnings per share in the second quarter would not be material, either from a quantitative or qualitative standpoint.

## A.     PLAINTIFFS' CLAIMS REGARDING THE BAD DEBT TRANSFERS WERE NOT ALLEGED IN THE COMPLAINT

Plaintiffs did not make any allegations in the Complaint about bad debt transfers in the second quarter of fiscal year 2001.  Instead, Plaintiffs' sole accounting allegation pled in the Complaint relates to the creation of and accounting for the 46,000-plus debit memos.  As noted above, Mr. Regan refused to offer any opinions on the financial statement impact (or lack thereof), of the 46,000-plus debit memos.

## B.     THE "ON ACCOUNT" DESIGNATION WAS NOT A "STEP IN THE PROCESS" TO MOVE UNAPPLIED CASH

Mr. Regan claims that "[t]he On Account designation in the accounting system was a step in the process to move unapplied cash to the 12601 Account…."[67]  This statement is demonstrably incorrect.  The vast majority of items that were flagged as "On Account," as of November 30, 2000, had nothing to do with Account 12601.  Indeed, of the 926 debit memos encompassed within the script output, only 121 transactions – consisting of $10.6 million of the $534 million total of the 926 debit memos – involved transfers into the bad debt reserve in the second quarter of fiscal year 2001.[68]  For instance, the transaction with Household Finance, which Mr. Regan features throughout the Expert Report, does not contain any transfers of unapplied cash into (or

---

[67]  *See* Expert Report, at p. 15.  The evidence Mr. Regan cites as support for this contention illustrates that Oracle did not begin using the "On Account" functionality to transfer money into the bad debt reserve until months after the 46,00-plus debit memos were created.  *Id*. (Citing NDCA-ORCL 1609375-76).

[68]  *See* NDCA-ORCL 1058909.

out of) the bad debt reserve, notwithstanding the fact that Household's payment was placed "On Account."[69]  Mr. Regan simply fails to explain how the "On Account" designation "was a step in the process to move unapplied cash to the 12601 Account" considering that the vast majority of the receipts that were flagged "On Account" never touched the bad debt reserve.

Furthermore, the small subset of transactions that *do* contain transfers into the bad debt reserve in their accounting histories also undermine Mr. Regan's conclusion that the "On Account" flag was a "step in the process" to move unapplied cash into the bad debt reserve.  For the vast majority of receipts that were transferred to Account 12601, the corresponding flag in the A/R Subledger was not changed to "On Account" until *after* the transfer had taken place.[70]  For instance, Mr. Regan analyzes the accounting history for a transaction involving Ameritrade in his Expert Report.[71]  According to Mr. Regan's own analysis of that transaction, the transfer to the bad debt reserve occurred on August 5, 2000, while the "On Account" flag was not raised until nearly three weeks later (*i.e.*, August 25, 2000).  Thus, there is no way that the "On Account" flag could have been a "step in the process" to move unapplied cash into the bad debt reserve because the transfer already had taken place.

## C.     ORACLE'S REMEDIAL EFFORTS AIMED AT RESOLVING THE BAD DEBT TRANSFERS WERE APPROPRIATE

Mr. Regan attacks the procedures through which Oracle later investigated and resolved transfers of unapplied cash.[72]  As discussed in my Opening Report, in October 2002, Oracle identified a potential issue with some of the transfers into its bad debt reserve.  At the direction of Oracle's

---

[69] *See* Expert Report, at pp. 7, 16-17 and 27-31.

[70] *See* NDCA-ORCL 1058909.

[71] *See* Expert Report, at pp. 25-26.

[72] *See id.*, at p. 22.

Audit Committee, the accounting and collections groups investigated these transfers and attempted to identify the appropriate treatment of these receipts, to the extent that these payments did not properly belong in the bad debt reserve in the first place.[73]  I have not seen any evidence, nor has Mr. Regan identified any evidence, suggesting that the transfers into the bad debt reserve or Oracle's subsequent remedial measures were part of a deliberate effort to manufacture revenue or artificially inflate net income or earnings per share.

Mr. Regan states that the unapplied cash receipts were removed from the bad debt reserve and "properly restored" to the unapplied cash account.[74]  This mischaracterizes the nature of the unapplied cash project.  Oracle initially took a conservative approach and transferred the money back to Account 25005 as a way to isolate the transferred amounts, *i.e.*, reducing the bad debt reserve and showing the amounts as "Unapplied."[75]  Mr. Regan points out that some of the money ultimately was refunded, and some was escheated to the state.[76]  What Mr. Regan fails to point out, however, is that at least some of the money properly belonged in the bad debt reserve, and subsequently was returned to the reserve.  Moreover, as I pointed out in my Opening Report, I found evidence that at least $2 million of the approximately $10 million in transfers that I analyzed represented an appropriate recognition of earnings as of the second quarter of fiscal year 2001.

---

[73] *See* Declaration of Gregory Myers, dated Nov. 14, 2002, at paragraph 4,  ("Earlier this year, I was also involved in an investigation into the disposition of unassigned cash receipts that Oracle's collections staff had, over time, assigned to an accounts receivable reserve known as Account 12601.").  *See also* Declaration of Michael Quinn, dated Nov. 14, 2002, paragraph 5, ("Earlier this year, I was personally assigned by Tom Williams to manage an investigation into the proper disposition of unassigned cash receipts that Oracle's collections staff had, over time, assigned to an accounts receivable reserve account known as Account 12601.").

[74] *See* Expert Report, at p. 23.

[75] *See* NDCA-ORCL 1914199-1914286 [Journal Entries Report for account 25005 from November 1, 2002 to November 30, 2002] and NDCA-ORCL 1534024-1534169 [Journal Entries Report for account 12601 from November 1, 2002 to November 30, 2002].

[76] *See* Expert Report, at pp. 23-24.

Mr. Regan also takes issue with the practice of "adjusting up" invoices, claiming that "Oracle did not have an adequate basis to conclude, in late 2002 or thereafter, that the original credit memo had been issued in error."[77]  There is no evidence to support Mr. Regan's opinion.  The personnel who performed the investigation had the Oracle accounting system at their disposal, and were instructed to arrive at a fair resolution of the transfers.[78]  Every witness who has testified about the practice of "adjusting up" invoices has stated, unequivocally, that Oracle would only "adjust up" an invoice where a credit memo had been previously applied against the underlying invoice in error.[79,80]  Although Mr. Regan opines that the employees performing the investigation "adjusted up" invoices without adequate support,[81] he does not identify a single invoice that was improperly "adjusted up."[82]

---

[77]  *See id.*, at p. 24.

[78]  *See* NDCA-ORCL 1609379 [Email from Michael Quinn to Ryan Roberts and Greg Myers, "For items in the Miscellaneous Offset Report, August-00 Through September-02, we need to continue to work through each item >$10,000 to determine 1) what should have happened to the cash receipt and 2) make the correction to put it in the right place."].  *See also* Quinn Dep., at 167:18-21 ("[Y]ou told people in the collections department to determine the proper resolution of Oracle's unapplied cash?  A. Yes.").

[79]  *See* Venkataramana Dep., at 260:23-261-3 ("Q. Okay. And what do you recall about those discussions? A. That if the credit memos were found to be erroneous credit memos and should not – the invoices should not have been credit memo'd, to adjust up the invoice."); and 261:21-25 ("Q. And what do you mean when you say they weren't valid? A. We would credit memo it as bad debt.  It was aged to some degree and this many days outstanding, so therefore, we want to credit memo it as bad debt."); Hatada Dep., at 282:11-15 ("[I]f we found a credit memo that was due for bad information given to us, then, therefore, the credit memo was done in error and should be adjusted up in an effort to apply the unapplied cash.").

[80] Mr. Regan's assumption that Oracle personnel "adjusted up" invoices, simply because a credit memo had been issued in an amount equal to or greater than the amount that was transferred to Oracle's bad debt reserve, is also unfounded.  *See* Expert Report, at pp. 12 and 24.  I found evidence that a number of credit memos issued in amounts equal to or greater than the amounts transferred to Oracle's bad debt reserve, were refunded as part of the unapplied cash project.  This evidence demonstrates that Oracle evaluated the propriety of the original credit memo.  *See* NDCA-ORCA 1058909  [examples include credit memo 7100288 (refund of $55,010.22 to HRB Management Inc., after credit memo for terminated support), credit memo 7100927 (refund of $52,250 to Smithfield Foods Inc., after credit memo for customer concession) and credit memo 7111910 (refund of $64,000 to City of Seattle, after credit memo for terminated support)].

[81]  *See* Expert Report, at p. 24.

[82] Mr. Regan also opines that Oracle's actions during the "Unapplied Cash Clean-up acknowledge its improper accounting…including the transfers of customer overpayments into the Bad Debt Reserve, which generated $20 million in revenue in Q2FY01."  *See id.* at p. 25.  As I stated in my Opening Report, to the extent that any money that was transferred to the bad debt reserve could not be matched to a previously written off invoice, such a transfer represented an erroneous reclassification.  However, even if the entire $20 million in transfers were erroneous reclassifications (which they were not), this would not have resulted in a material misstatement in Oracle's second quarter financial statements.

Mr. Regan further opines that the unapplied cash project that commenced in 2002 was an "acknowledgement" of the inappropriate "use of debit memos to conceal the customer overpayments in the Bad Debt Reserve."[83]  As discussed above, however, the debit memos did not and could not conceal anything.  This is evidenced by the fact that Oracle was able to locate the transfers into the bad debt reserve and resolve them as part of the 2002 unapplied cash project.  Moreover, as noted above, the vast majority of the debit memos I have analyzed do not contain transfers into the bad debt reserve in their accounting histories.  Thus, it is unclear how the unapplied cash project could serve as an "acknowledgement" of anything improper relating to the creation of and accounting for the debit memos.  In my opinion, the 2002 unapplied cash project reflects an effort by Oracle to address and appropriately resolve potential accounting issues immediately after these transfers came to light.[84]

## D.   THE EFFECT ON THE SECOND QUARTER FINANCIAL STATEMENTS WAS NOT MATERIAL

Mr. Regan claims that Oracle's transfers of customer overpayments to the bad debt reserve ultimately resulted in a material overstatement of earnings in the second quarter of fiscal year 2001.[85]  Mr. Regan concludes that the alleged earnings overstatement was material "because it enabled Oracle to beat consensus earnings expectations of $0.10, and demonstrate a 'strong' trend of earnings."[86]  Mr. Regan's conclusion is incorrect.  As I noted in my Opening Report, even if one assumed that the entire $20 million in bad debt transfers in the second quarter were erroneous

---

[83] *See id.*

[84] Mr. Regan also opines that the unapplied cash project "acknowledges" the lack of an appropriate process to refund money.  *See id.*  As discussed above, I have not seen any evidence to suggest that Oracle's refund policies during the second quarter of fiscal year 2001, or any other period, were inappropriate in any way. To the extent that Oracle issued additional refunds as part of the 2002 unapplied cash project, that may have resulted from earlier erroneous reclassifications of unapplied cash into the bad debt reserve, but that does not undermine the propriety of Oracle's refund practices.

[85] *See id.,* at p. 4.

[86] *See id.*, at p. 22.

reclassifications (which they were not), any resulting misstatement in Oracle's second quarter financial statements would not be material, either from a quantitative or qualitative standpoint under SAB 99.  Significantly, Oracle never has restated its second quarter financial statements.

As an initial matter, Mr. Regan does not attempt to establish that any purported misstatement resulting from the bad debt transfers was material to Oracle's financial statements in the second quarter from a quantitative standpoint.  Instead, Mr. Regan premises his entire theory of materiality on the idea that the bad debt transfers in the second quarter resulted in a misstatement in Oracle's financial statements that was qualitatively material.  Mr. Regan, however, has failed to provide any basis for concluding that the bad debt transfers resulted in a material misstatement from a qualitative perspective.

Mr. Regan attempts to establish qualitative materiality by citing a September 1998 speech by then-Securities and Exchange Commission ("SEC") Chairman Arthur Levitt, in which Mr. Levitt recalled an instance where a company's stock price fell sharply in one day following an earnings miss of one penny.[87]  Mr. Regan attempts to bolster his position by referencing one of the qualitative materiality considerations under SAB 99, which is implicated if the "misstatement hides a failure to meet analysts' consensus expectations for the enterprise."[88]   Mr. Regan mischaracterizes, or misunderstands, both Mr. Levitt's speech, as well as the SAB 99 materiality consideration cited in his Expert Report.  Both Mr. Levitt's comments and SAB 99 address a situation where a company *failed to meet* analysts' consensus expectations.  That is not the case here.  As I noted in my Opening Report, Oracle still would have met analysts' consensus expectations even if all of the transfers of unapplied cash to the bad debt reserve in the second quarter of fiscal year 2001 were reversed.  Put differently, had the bad debt transfers never taken

---

[87]  *See* "The 'Numbers Game'" – Remarks by Chairman Arthur Levitt, SEC, September 28, 1998.
[88]  *See* Expert Report, at p. 21.

place, such that no corresponding increase in revenue would have occurred in the second quarter, Oracle still would have met consensus expectations of $0.10 earnings per share.  Mr. Regan does not provide any authority, under SAB 99 or any other professional guidance, that supports his opinion that a failure to *beat* analysts' consensus expectations would be material from a qualitative perspective.

In addition, as support for his position, Mr. Regan references another materiality consideration from SAB 99, in which a "quantitatively small misstatement of a financial statement item may be material if it 'masks a change in earnings or other trends.'"[89,90]  Once again, Mr. Regan has misapplied SAB 99.  First, Mr. Regan fails to explain why he used earnings per share as his comparative benchmark, as opposed to earnings, as discussed in SAB 99.  Moreover, Mr. Regan fails to explain how the reported earnings per share of $0.11 represented any sort of trend, much less a "strong" trend of earnings, and how it could have "mask[ed] a change in earnings or other trends."  Based on my review, in the previous nine fiscal quarters (*i.e.*, from the first quarter of fiscal year 1999 through the first quarter of fiscal year 2001), Oracle either met or beat analysts' consensus expectations.  Thus, regardless of whether Oracle reported earnings per share of $0.11 or $0.10 in the second quarter, Oracle's reported earnings per share were consistent with historical trends.  Accordingly, Mr. Regan has not demonstrated that the reported $0.11 earnings per share in the second quarter of fiscal year 2001 "mask[ed]" anything.

In sum, Mr. Regan has failed completely to establish that the bad debt transfers in the second quarter resulted in a misstatement in Oracle's financial statements that was material from a qualitative standpoint.  Even assuming that the bad debt transfers and the subsequent adjustment

---

[89]  *See id.*

[90]  Mr. Regan fails to mention the seven other qualitative materiality considerations recommended in SAB 99.

to Oracle's reserve accounts never occurred, and Oracle reported earnings per share of $0.10, rather than $0.11, Oracle still would have met consensus expectations, consistent with prior trends.  Accordingly, the impact of the bad debt transfers on Oracle's second quarter financial statements was not material.

## VII.   MR. REGAN'S OPINIONS REGARDING THE HEWLETT-PACKARD TRANSACTIONS ARE BASELESS

### A.   THE HP TRANSACTIONS WERE NOT ALLEGED IN THE COMPLAINT AND WERE NOT A PROPER SUBJECT OF FACT DISCOVERY

Mr. Regan devotes nearly half of his Expert Report to challenging Oracle's recognition of $19.9 million in revenue from Oracle's sale of additional CRM licenses to HP on November 30, 2000.[91] As noted above, the alleged revenue recognition issues pertaining to the license agreement were not alleged in the Complaint.  I also understand that the Special Master in this case ruled during the deposition of HP's 30(b)(6) witness that the issue of whether Oracle should have recognized revenue in the second quarter based upon an alleged "barter" or "sham" transaction with HP did not fall within the scope of fact discovery in this case.[92]

---

[91] *See* Expert Report, at pp. 34-63.

[92] *See* Telephonic Conference at Hewlett Packard Deposition, June 30, 2006, 16:8-17:6.  As explained below, the transactions that Oracle entered into with HP on November 30, 2000 actually consisted of three different agreements:  (1) Oracle's sale of approximately $21 million in additional CRM licenses and additional support to HP; (2) Oracle Credit Corporation's agreement to finance HP's purchase of the additional CRM licenses and support; and (3) Oracle's purchase of approximately $30 million in HP Unix servers.  Although Mr. Regan attacks the validity of each of these agreements, and even suggests that Oracle's revenue on the sale of the CRM licenses should be offset, or "netted," against the purchase of the HP servers, the evidence is clear that these are different agreements, and that each provided independent economic benefits for both parties.

Mr. Regan claims that because he "sees no evidence" pertaining to Oracle's decision to recognize this revenue, Oracle must have failed to properly conduct the required analysis under GAAP.[93] However, the fact that Mr. Regan "sees" no such evidence is a function of the limits that the Court placed on discovery, and not because the evidence does not exist. The sale of additional CRM licenses to HP was one of the largest license deals in the second quarter and, as such, it was closely analyzed by Oracle's revenue recognition group and was specifically tested by Oracle's independent auditor, Arthur Andersen LLP ("AA"). Both concluded that it was proper for Oracle to recognize approximately $19.9 million in the second quarter of fiscal year 2001.[94] For the reasons discussed below, I agree with that conclusion.

## B.  BACKGROUND OF THE HP TRANSACTIONS

In order to understand the nature of and the reasons behind the November 30, 2000 transactions, it is important to understand the business history between the two companies. Although, the relationship between Oracle and HP goes back many years, one of the more significant events leading up to the November 30, 2000 transactions occurred in August 1999.

On August 30, 1999, the parties entered into the following agreements:

---

[93]  *See* Expert Report, at p. 52.

[94]  *See* AA 001339-40; NDCA-ORCL 3043085-109; Deposition of Lawrence Ellison, dated September 21, 2006 ("Ellison Dep."), at 508:12-16 ("[O]ur accountants looked at this transaction very, very carefully. They were aware that they were … we were buying hardware; HP was buying software, and we believe we have accounted for it properly."); Deposition of Edward Sanderson, dated July 26, 2000 ("Sanderson Dep."), at 500:4-8 ("Any deal goes through revenue recognition. It was a group in finance that looked at the deal. And if there was any questions, they went to our accountants, outside accountants, to verify it."); Deposition of Gary Matuszak, dated August 1, 2006 ("Matuszak Dep."), at 169:17-21 ("[M]anagement concluded that it was appropriate to recognize revenue under that license arrangement. And Andersen, after reviewing all the – the evidence that was provided to us, concurred with management's agreement.").

- First, as part of Amendment Three to the 1994 Software License and Services Agreement, HP purchased CRM software licenses from Oracle for approximately $20.1 million.[95]

- Second, HP and Oracle entered into three memoranda of understanding ("MOUs"). The first non-binding MOU established a strategic alliance to "purchase and deploy each others [*sic*] technology within the respective companies" such that there was a "go-to-market plan for HP and Oracle to deliver CRM solutions to the marketplace." The second non-binding MOU detailed a "go-to-market plan for sales and marketing." The third MOU, which is most important for present purposes, required Oracle to move 50% of its production computing environment to HP servers, and provided that "HP would receive orders at a rate of 2-1 over Sun until this is complete."[96]

- Third, Oracle and HP entered into a "Time and Materials Engagement Contract" (the "Engagement Contract") whereby Oracle agreed to assist HP in the implementation of the CRM software. The Engagement Contract was negotiated and bid on separately (earlier in August 1999), and it explicitly stated that (i) the contemplated consulting services were proposed separately from the sale of any program licenses, and (ii) the licenses could be purchased without acquiring any consulting services.[97]

By Fall of 2000, the August 1999 agreements no longer were sufficient. Oracle needed additional servers, and HP believed that Oracle was not making adequate progress in achieving parity with Sun Microsystems ("Sun") servers in the production computing environment.[98] Moreover, HP wanted additional CRM licenses at a larger discount as part of its strategic plan to roll out CRM

---

[95] *See* NDCA-ORCL 3043017-24.
[96] *See* NDCA-ORCL 3043025-39.
[97] *See* NDCA-ORCL 3043052-55.
[98] *See* NDCA-ORCL 014004.

on a global basis.[99]  Because both parties needed something from the other – HP needed the additional licenses and support, and Oracle needed additional servers – the parties negotiated a new set of transactions, leveraging one against the other.

After weeks of negotiations, the parties executed several agreements on November 30, 2000. Specifically, the parties agreed to the following:

- Oracle agreed to purchase $30 million in HP Unix servers, and increased its commitment to move 100% of its production data and CRM development servers to HP servers by November 1, 2001 (the "HP Server Purchase Agreement").[100]

- HP agreed to purchase approximately $21 million in additional "Application User" licenses at a 60% discount, as well as additional support (the "CRM License Agreement").[101]

- HP financed the CRM License Agreement through Oracle Credit Corporation, pursuant to an agreement that obligated HP to make three payments totaling $29.8 million over 11 months and a final, optional $2.1 million payment, due December 1, 2001, to convert the 11-month term of the licenses to perpetual in duration (the "OCC Finance Agreement").[102]

These transactions collectively are referred to herein as the "November 30 Transactions."

---

[99]  *See* Deposition of Safra Catz, July 20, 2006 ("Catz Dep."), at 19:20-20:1 ("HP had already bought and was implementing Oracle CRM, but hadn't done their global rollout; and to do it they would have had to buy more software."); Deposition of Thomas Rathjens, 30(b)(6) Hewlett Packard, June 30, 2006 ("Rathjens Dep."), at 37:4-9 ("[D]o you know why HP was considering purchasing these Oracle CRM products? … I believe HP wanted to consolidate some of their software applications on a global basis.").

[100]  *See* NDCA-ORCL 021378-021381; HP 00001-03; and NDCA-ORCL 3043118.

[101]  In addition, the parties agreed to incorporate – or migrate – certain licenses and support services relating to the August 30, 1999 agreement into the CRM License Agreement.  *See* HP 00030-35.

[102]  *See* HP00050.

## C.   THE NOVEMBER 30 TRANSACTIONS WERE NOT IMPROPER "SWAPS"

Mr. Regan claims that the November 30 Transactions were improper "swap" or "round trip" transactions.[103]  Mr. Regan also cites accounting guidance relating to nonmonetary transactions to support his opinion that the financial impact of these transactions should be offset, thus preventing Oracle from recognizing any revenue on the CRM License Agreement.  Mr. Regan's conclusions regarding the nature of these transactions, however, are incorrect.[104]

Noticeably absent from Mr. Regan's Expert Report is any definition of the term "round trip" transaction.[105,106]  Thus, I obtained two examples of transactions from the relevant time period that the SEC considered to be "round trip" transactions:

---

[103]  *See* Expert Report, at p. 35.

[104]  Mr. Regan cites Training Practice Aid ("TPA") 5100.39 in support of his opinion that the November 30 Transactions should be accounted for as a single arrangement.  Mr. Regan's reliance on TPA 5100.39 is misplaced.  Based upon my review of TPA 5100.39, this guidance relates to one company making more than one sale to another company, such as selling the same product to two separate business units.  The November 30 Transactions are not contemplated by TPA 5100.39, and thus, I do not believe that this accounting guidance applies to these transactions.

[105]  Mr. Regan's failure to define "round trip" in this context is peculiar, considering that he wrote an article entitled "Revenue Recognition," published in California CPA, on September 1, 2003, in which he described a "round trip" transaction.  In that article Mr. Regan states:

> Some companies have recognized revenue for the sale of a product or services in "round-trip" transactions.  These involve two companies that exchange advertising for advertising or when inventory is exchanged for barter credits between the parties.  Such transactions may lack substance and fair value may not be determinable.  For example, companies A and B exchange rights to advertise on each other's websites and both exchange $1 million in cash.  Should both entities record an equal amount of revenue…EITF 99-17 provides the answer.  Recognize $1 million of revenue if the fair value of advertising surrendered is $1 million based on the entity's historical practice of receiving cash, marketable securities or other consideration readily convertible to cash with other unrelated parties.

The November 30 Transactions obviously do not involve "advertising for advertising" or "inventory for barter credits," as described in Mr. Regan's article.  More importantly, the November 30 Transactions are not "round trip" transactions, even under Mr. Regan's definition, because each agreement had economic substance and the fair values were determinable because each party paid cash for the respective products.

- *QuadraMed*[107] – During 1998 and 1999, QuadraMed fraudulently inflated its revenue by essentially paying for the purchase of its own products, in transactions with another software developer that had no independent means of paying for QuadraMed's products. As result of these sales, QuadraMed recorded revenue but never obtained any economic benefit from the transactions, which violated GAAP.   QuadraMed's recognition of revenue further violated GAAP because the collectibility for the transactions was not probable absent financial assistance from QuadraMed.

- *Arsin*[108] – In January 2000, Arsin agreed to purchase software licenses from Unify Corporation ("Unify").   However, Arsin did not have the funds to pay for the software licenses.   Arsin and Unify agreed to amend an earlier Funded Development Agreement (the "FDA"), to provide funds to Arsin, which Arsin used to pay for the software licenses.  However, the amended FDA was a sham transaction, because no technical work was performed under the agreement.   In April 2000, Arsin separately agreed to purchase additional products from Unify, but it did not have sufficient funds to pay for these products.   Unify wired Arsin the funds, which Arsin used to pay for the additional products.  The SEC concluded that Unify violated GAAP by recording revenue for these transactions, because Unify received no economic benefit from the transaction, and Arsin could not have paid for Unify's software absent financial assistance from Unify.

---

[106] Although Mr. Regan references a speech released by the SEC in 2001 as support for his opinion that the November 30 Transactions should be viewed as a single transaction, he fails to explain how a speech dated in 2001 could impact or provide guidance with respect to the proper accounting for a transaction in November 2000.  *See* Expert Report, at p. 51, "Speech by SEC Staff: Revenue Recognition," Remarks by Lynn E. Turner, May 31, 2001, USC SEC and Financial Reporting Institute.

[107] *See* SEC Administrative Proceeding in Re:  Quadramed Corporation, File No. 3-11472, April 30, 2004.

[108] *See* SEC Administrative Proceeding in Re:  Arsin Corporation and Danis Yadegar-Mooshiabadi, File No. 3-11188, July 17, 2003; Litigation Release No. 17522, *SEC v. Reza Mikailli, Gary F. Pado and Unify Corporation*, No. C022426 RS, May 20, 2002.

The underlying theme in both of these SEC enforcement actions is that reciprocal transactions are considered "round-trip" or "swap" transactions if they involve one company essentially paying for its revenue, and not receiving any economic benefit in return.  Under these circumstances, the SEC views the recognition of revenue to be a violation of GAAP.

1.    ORACLE RECEIVED SUBSTANTIAL ECONOMIC BENEFITS AS A RESULT OF THE HP SERVER PURCHASE AGREEMENT

The HP Server Purchase Agreement allowed Oracle to build upon an important and profitable strategic business alliance with HP, through which both companies realized benefits.[109]  As part of this strategic business alliance, Oracle committed to move its production data and CRM development environments to HP Unix servers.  This, in turn, allowed both Oracle and HP to better market their products to other companies using HP servers.[110]

---

[109]  *See* Ellison Dep., at 115:9-13 ("I certainly knew about a general expectation.  HP certainly would like to sell us hardware.  In a general sense, they are always trying to sell us more hardware and we were always trying to sell the software."); Catz Dep., at 19:16-23 ("Oracle was already buying a lot of products, and Oracle wanted HP to be the big CRM reference….  And Oracle was already very much trying to have an alternative to Sun, which was our entire platform."); Deposition of Michael DeCesare, February 16, 2006 ("DeCesare Dep."), at 66:14-21 ("All of the engineers that built the CRM products would build it on HP.  They – they would log in, like you're on a PC here, to an HP server instead of a Sun server, which is a very desirable thing for a hardware company because that means the first release comes out on their hardware.  It doesn't have to be ported.  And then it would get ported to Sun and all the other hardware platforms that were out there."), 75:9-17 ("[T]his was a deal that wasn't just as simple as them buying software from us.  There was…heavy involvement from the alliance team that managed the relationship….  Getting HP to use the – to get Oracle to use HP's products was very attractive to both alliance teams as well, because it furthered the partnership."), and 118:5-7 ("Q. Do you know whether or not the intent was to use HP…as a reference?  A. Oh, yeah.  Most definitely.  When a customer implements software, if they have a good experience, they'll say good things, and if they have a bad experience, they will sometimes say bad.").

[110]  *See* Rathjens Dep., at 165:24-166:9 ("Q. And was – was this reference selling part of the Oracle-HP agreement to run Oracle software on HP servers?  A. They were different in nature.  And some were related to CRM – some were, you know, where CRM had a one hour slot to talk to a customer that is there all day.  But in general, it was to – with Oracle it was to show HP and Oracle's partnership in that the Oracle software worked very well on HP hardware."), and 134:18-135:9 ("Q. If you could look to the second bullet point there.  The second – it says 'focus on '99 licenses only.  This is due to Oracle's belief that the '2000' licenses were part of a larger win-win business deal.'  Do you know what they are referring to here?  A. I think the larger win-win business was to sell more HP hardware, where other CRM customers would be putting their – the Oracle CRM software and other Oracle software on HP hardware.  So I think the larger win-win business is jointly selling HP hardware and Oracle software."); *see also* "Oracle and HP Celebrate Successful CRM Relationship" press release, February 21, 2001, ("Oracle…and Hewlett-Packard…today announced that their joint CRM sales efforts have resulted in more than 40 leading global

Moreover, the evidence demonstrates that Oracle needed additional servers at the time,[111] and Oracle believed that HP built superior servers compared to alternative suppliers.[112]  Oracle also received discounts of 50% and 55% off the list price for the HP Unix servers.[113]  Oracle's independent auditor discussed Oracle's decision to purchase the servers from HP with Tom Williams, who was in charge of Oracle's revenue recognition group at the time.[114]  Mr. Williams explained that Oracle needed this equipment for its development and production departments. Oracle's Executive Committee met and specifically discussed the HP Server Purchase Agreement, and concluded that the purchase of the additional servers was in the best interests of Oracle and its shareholders.[115]  The purchase of the HP servers also represented a step forward in terms of Oracle's desire to reduce its dependence upon Sun servers.  Indeed, Oracle had purchased $70 million in Sun servers in the previous five quarters alone.[116]  Thus, based upon this evidence, I believe that Oracle received substantial economic benefits from the HP Server Purchase Agreement.

---

customers.  In addition to these customer successes, the relationship has also resulted in HP and Oracle both successfully implementing these joint solutions internally and realizing significant cost savings and customer satisfaction.").

[111] *See* Deposition of Michael Rocha, April 7, 2006 ("Rocha Dep."), at 206:10-23 ("I'm referring to the fact that we – to build the products – again, I was responsible at this time for porting and joint development and testing, and all that stuff, on the various hardware platforms.  One of those platforms was HP.  And I'm saying here that we need hardware to do our job, and HP wants us to buy the hardware.  And so it's kind of – I'm basically saying it's your call as to whether we pay for it – you know, we pay for it, or we essentially try to go back to them and say this is part of a partnership.  And a partnership organized around sort of building products together.  So the statement, "We need it," is essentially in reference to the hardware."), and Deposition of Jason Sevier, June 28, 2006, at 113:10-25 ("[H]ypothetically, if Oracle would purchase the hardware and we, through audit testing, believed that the purchase was valid, meaning Oracle has a specific plan, they have identified the hardware that's being replaced, that needs to be replaced, and they have specifically earmarked it in the budget, then hypothetically, based on that fact set, you would look at that and say it's a valid business purpose, so there is no revenue implication.  But if it was just extra stuff that was going to sit around in some supply room because they really didn't need it, it would call into question the revenue."); *see* NDCA-ORCL 028735-736 [Email from Michael Rocha to Larry Ellison, about October 12, 2000 ("[Y]ou may want to agree that we'll purchase the hardware.  We need it.")].

[112] *See* NDCA-ORCL 3043132-33.

[113] *See* HP 00001-2.

[114] *See* AA 001339-40.

[115] *See* NDCA-ORCL 3043132-33.

[116] *See* AA 001339-40.

2.      *HP RECEIVED SUBSTANTIAL ECONOMIC BENEFITS AS A RESULT OF THE*
        *CRM LICENSE AGREEMENT*

The evidence also demonstrates that HP received substantial economic benefits from the CRM

License Agreement.  A contemporaneous press release suggests that HP was satisfied overall with

the CRM software.[117]  Moreover, HP negotiated a steeper discount (*i.e.*, 60%) off the fees it

traditionally paid for CRM licenses, which resulted in overall savings of $11.5 million.[118]  HP

also extended for two years an option to exchange any migrated licenses for any other existing

licenses for a set fee.[119]  In addition, HP obtained the services of two onsite support analysts,

which were included in the support costs.[120]  Although Mr. Regan claims that HP did not need all

of the licenses it acquired on November 30, it is not unusual for software companies to purchase

additional software or licenses based upon anticipated need.[121]   In fact, it was precisely because

HP purchased the additional licenses, which HP planned on using in connection with a scheduled

global roll out of CRM,[122] that HP was able to obtain the steeper discount.[123]  In addition, HP was

able to use its purchase of additional CRM licenses as leverage to broker a simultaneous

agreement through which Oracle committed to move 100% of its production data and its CRM

development environments to HP servers.  This was a significant development for HP because it

---

[117]  *See* NDCA-ORCL 3043152-55; *see also* "Oracle Q2 Customer Additions Drive Growth in Applications
and Database Software" press release, December 14, 2000 ("Having experienced success with its current
implementation of Oracle Sales Online, HP…is extending its use of the customer relationship management
applications of the Oracle E-Business suite.  'Oracle Sales Online is helping us achieve greater efficiencies
in our sales management process,' said Philip May, General Manager of the Oracle business unit at HP.
'The initial implementation has given us a consolidated view of customer interactions across the company
and helped to improve contact management.'").

[118]  *See* HP 00015-16.  The fact that the parties negotiated for larger discounts is counterintuitive with a
round trip transaction.  If the transaction truly were a "round trip" transaction, with no economic benefit,
the parties simply would have recorded the transaction at full value.

[119]  *See id.*

[120]  *See id.*

[121]  *See id.*; *see also* DeCesare Dep., at 63:4-7 ("Every software company tries to go out and license
customers for what they look like, not for what they will be using in the first month or year."); and
Sanderson Dep., at 499:12-15 ("And so, companies would look at not only what their current needs are but
their projected needs, and so, sometimes companies would buy on that base.").

[122]  *See* "HP Boosts CRM With Oracle," by DSstar, August 1, 2000, Vol.4 No. 31.

[123]  *See* HP 00016.

allowed HP to market its servers as the environment in which CRM was developed.[124] Indeed, HP suggests that, as a result of these transactions with Oracle, its market share would increase by 5%, which it valued at approximately $325 million in incremental sales *in the first year*, not including related services revenue.[125]

Mr. Regan contends that HP "never implemented certain significant modules of the software."[126] This allegation, even if true, is irrelevant. On September 3, 2001, HP and Compaq announced a definitive merger agreement.[127] Compaq was in process of implementing Seibel's CRM solution.[128] After the merger was completed, Compaq's Chief Technology Officer assumed an equivalent position at HP, and decided to implement Seibel's CRM at the merged company.[129] In any event, whether HP opted to implement some or all of the licenses as of September 2001 has nothing to do with whether HP received an economic benefit from the CRM License Agreement as of November 30, 2000.[130]

---

[124] *See* DeCesare Dep., at 66:6-20 ("There was a second commit, which was to move the entire CRM development platform to HP as well… people would now develop on HP instead of Sun. Q. And what do you mean when you say "develop on HP"? A. All of the engineers that built the CRM products would build it on HP…which is a very desirable thing for a hardware company because that means the first release comes out on their hardware. It doesn't have to be ported.").

[125] *See* HP 00015-16.

[126] *See* Expert Report, at pp. 47-48.

[127] *See* Hewlett-Packard Press Release, "Hewlett-Packard and Compaq agree to merge, creating $87 billion global technology leader," September 3, 2001.

[128] *See* Rathjens Dep., at 77:17-20 ("[W]e merged with Compaq, who was using Seibel software in the CRM space; and a decision was made to consolidate on the Seibel software rather than the Oracle software.").

[129] *See* Compaq Annual Report 2000, p. 68, and Hewlett-Packard Annual Report 2002, p. 177. Shane V. Robison, Compaq's Senior Vice President, Technology and Chief Technology Officer in 2000, became HP Chief Technology and Strategy Officer in 2002.

[130] As a practical matter, whether HP received an economic benefit from the purchase of the additional CRM licenses ultimately is beside the point. The real issue is whether Oracle received an economic benefit from the purchase of the HP servers. Mr. Regan's references to emails in which HP employees speculate about HP's purported motivations for purchasing the additional CRM licenses – months after the agreement was executed by HP – do not undermine Oracle's decision to recognize revenue on the sale of the additional licenses in the second quarter of fiscal year 2001. *See* Expert Report, at p. 47.

Thus, the November 30 Transactions – which, as discussed above, involved intensive negotiations and steep discounts – clearly are distinguishable from the transactions discussed in *Quadramed* and *Arsin*.  Furthermore, while each party effectively used its willingness to enter into one agreement as negotiating leverage for the other agreement, this does not mean that the transactions were improper "swaps," or that Oracle did not receive an economic benefit from the HP Server Purchase Agreement.  Mr. Regan's opinions, to the extent they suggest otherwise, are incorrect.

3. *MR. REGAN INCORRECTLY ASSUMES THAT THE NOVEMBER 30 TRANSACTIONS WERE "NONMONETARY" TRANSACTIONS*

Mr. Regan attempts to bolster his argument that the November 30 Transactions constituted "round trip" or "swap" transactions by describing the two agreements as a single "non-monetary transaction."  Citing APB 29,[131] EITF 86-29[132] and TPA 5100.47,[133] Mr. Regan states that the HP Server Purchase Agreement and the CRM License Agreement should be netted and recorded at a $0 value and, thus, that Oracle should not have recognized any revenue on the sale of the additional CRM licenses.[134]  The literature upon which Mr. Regan relies in making this argument, however, is inapplicable:

- APB 29 applies to exchanges of nonmonetary assets, where nonmonetary is defined as "assets and liabilities other than monetary ones" and monetary assets are defined as "amounts…fixed in terms of units of currency…examples are cash."  The HP Server Purchase Agreement and the CRM License Agreement both required the payment of cash.[135]

---

[131]  *See* Accounting Principles Board ("APB") Opinion 29:  Accounting for Nonmonetary Transactions.

[132]  *See* Emerging Issues Task Force ("EITF") 86-29:  Nonmonetary Transactions:  Magnitude of Boot and the Exceptions to the Use of Fair Value.

[133]  *See* TPA 5100.47, Nonmonetary Exchanges of Software (Part II).

[134]  *See* Expert Report, at pp. 38, 52-53.

[135]  *See* NDCA-ORCL 3043110-115 and HP 00001-02.

- EITF 86-29 applies to nonmonetary exchanges where the products being exchanged are in the same line of business and the product being received (in this case, by Oracle) will be resold in the marketplace.  Here, the licenses and the servers were not in the same line of business, and there is no evidence that Oracle intended to resell the HP servers.  Indeed, the HP Server Purchase Agreement specifically provides that "[p]roducts ordered under the blanket purchase order are for Oracle's internal use only and are not for resale."[136]

- TPA 5100.47 applies to nonmonetary exchanges of software licenses.  The November 2000 Transactions, as discussed above, did not involve the exchange of software licenses.

Notably, Mr. Regan does not cite EITF 99-19,[137] which represents the appropriate method for determining whether a transaction should be recorded on a gross versus net basis.  As Mr. Regan explained in an article he published on September 1, 2003,[138] sales may be recorded on a gross basis if a party satisfies the following seven "indicators:"  (i) the party is responsible to the customer for satisfaction, (ii) the party maintains general inventory risk, (iii) the party has reasonable latitude in establishing price, (iv) the party exercises discretion in selecting suppliers, (v) the party is involved in the determination of product or service specifications, (vi) the party has physical loss inventory risk, and (vii) the party has credit risk in the event of nonpayment.  I have reviewed each of these considerations and, to the extent these indicators apply to the CRM License Agreement (not every indicator is applicable), Oracle satisfied these requirements.  Thus, I have found no support for Mr. Regan's conclusion that the agreements should have been recorded on a net basis.

---

[136]   *See* HP 00001.

[137]   *See* EITF 99-19, Reporting Revenue Gross as a Principal versus Net as an Agent.

[138]   *See* Regan, "Revenue Recognition," California CPA, September 1, 2003.

## D.      ORACLE PROPERLY RECORDED REVENUE ON THE CRM LICENSE AGREEMENT IN ACCORDANCE WITH SOP 97-2

Mr. Regan claims that Oracle "substantially failed to meet any of the revenue GAAP recognition criteria," which, for the CRM License Agreement, is provided by SOP 97-2.[139,140]  SOP 97-2 sets forth a detailed protocol for recognizing revenue in software license transactions.  This guidance provides that revenue for a sale of software licenses should not be recognized until the following criteria are met:

- Persuasive evidence of an arrangement exists;

- Delivery has occurred;

- Fees are fixed or determinable; and

- Collectibility is probable.

Although I will discuss each of the elements of SOP 97-2 below, I note that SOP 97-2 allows companies to exercise a certain degree of business judgment in how the elements ultimately are analyzed and applied.  As such, reasonable minds may differ.  That said, Oracle's decision to recognize $19.9 million in revenue on November 30, 2000 was reviewed and approved by Oracle's revenue recognition group,[141] specifically tested by AA[142] and featured in a presentation that AA gave to Oracle's Audit Committee.[143]  Each of these entities concluded that it was

---

[139]  *See* AICPA Statement of Position 97-2, "Software Revenue Recognition."  The guidance provided by SOP 97-2 is consistent with that provided by SAB 101, "Revenue Recognition in Financial Statements."

[140]  *See* Expert Report, at p. 38.

[141]  *See* NDCA-ORCL 3043085-109 [USA Revenue Accounting Contract Review Checklist for Order 6346665]; Ellison Dep., at 508:12-16 ("[O]ur accountants looked at this transaction very, very carefully.  They were aware that…we were buying hardware; HP was buying software, and we believe that we accounted for it properly.")

[142]  *See* AA 001339-40; Matuszak Dep., at 169:17-21 ("[M]anagement concluded that it was appropriate to recognize revenue under that license arrangement.  And Anderson, after reviewing all the…evidence that was provided to us, concurred with management's agreement.")

[143]  *See* NDCA-ORCL 261911 and NDCA-ORCL 081755.

appropriate under SOP 97-2 for Oracle to recognize this revenue on the CRM License Agreement in the second quarter.  As explained below, I agree with that conclusion.

## 1.    PERSUASIVE EVIDENCE OF AN ARRANGEMENT EXISTED

Paragraph 17 of SOP 97-2 states that revenue should not be recognized on any element of an arrangement unless persuasive evidence of an arrangement exists.[144]  In this case, there is a clear, complete and executed software license agreement, dated November 30, 2000.[145]  Thus, to the extent that Mr. Regan does not see persuasive evidence of an arrangement, it is because Plaintiffs did not get discovery on this issue.

Mr. Regan challenges whether the agreement was executed in the second quarter based upon a series of facsimile header date and time stamps.[146]  According to Mr. Regan, some of these date and time stamps appear to suggest that at least some copies of certain deal documents may have been faxed after midnight, on December 1, 2000, and therefore in the third quarter.  Other facsimile header stamps, however, suggest that the agreement was executed at 11:53 p.m. on November 30, 2000.[147]

Mr. Regan is not the first person to raise concerns about the date and time stamps on the facsimile header.  Oracle's independent auditor also noted this anomaly and asked Shelley Curtis – then

---

[144] Generally, for two companies which have conducted business in the past, one looks at how these arrangements were formalized in the past to determine whether persuasive evidence of an arrangement exists.  With respect to Oracle and HP, the parties' prior arrangements have been formalized in a variety of ways, including contracts and binding and non-binding MOUs.  SOP 97-2 states that in situations where the vendor does not always rely upon signed contracts, "the vendor should have other forms of evidence to document the transaction."

[145] *See* HP 00034.

[146] *See* Expert Report, at pp. 49-51.

[147] *See* NDCA-ORCL 260113.

Assistant General Counsel at Oracle – about the precise time when she executed this agreement.[148]  In response to this inquiry, Mrs. Curtis stated:[149]

1) Loren Mahon witnessed that signatures of both parties were obtained before midnight as she was present in the area where David Jinnett was working and he took the documents to her.  I am advised that other members of Sales Support also witnessed that – either Loren of [*sic*] David can provide those names to you, if needed.

2) David Jinnett faxed the HP signed signature pages to me, which I then countersigned and faxed back to him and the fax machine date stamped on the signature pages faxed by Commercial Legal was before midnight – it was 11:53.  Legal Assistant Mark Hong watched me sign, then he handled faxing back to David Jinnett, so he is also a witness.

3) If needed, I'm sure that Mr. May and his people at HP would also be happy to testify as to when he signed and faxed.

4) My husband can testify as well, since I left my Oracle office immediately after midnight and drove home, reaching my home in Sunnyvale at approximately 12:35, so I was neither negotiating nor signing after midnight.

Notably, Ms. Curtis stated that HP already had signed the agreement when she received the fax, and that she signed and faxed the fully-executed agreement to HP at 11:53 p.m.  Thus, I have

---

[148]  *See* AA 001339-40.
[149]  *See* NDCA-ORCL 3043126-128.

found persuasive evidence that an arrangement existed as of November 30, 2000.  Accordingly, the decision to recognize revenue satisfies the first prong of SOP 97-2.[150]

## 2        DELIVERY HAD OCCURRED

Paragraph 18 of SOP 97-2 states that revenue should not be recognized on a transaction until the product has been delivered.  Mr. Regan generally asserts three bases for contending that the delivery element of SOP 97-2 was not satisfied by the end of the second quarter of fiscal year 2001.[151]  First, Mr. Regan cites the existence of a 15-day acceptance period in the 1994 Software License Service Agreement ("SLSA").  Second, Mr. Regan claims that Oracle failed to obtain vendor specific objective evidence ("VSOE") of fair value for the elements of the HP transaction.  Third, Mr. Regan cites the existence of 14 "show stoppers," and he argues that the software was not "fully functional."[152]  As discussed in greater detail below, each of these arguments fails.[153]

HP accepted the software upon delivery.  Mr. Regan claims that it was improper for Oracle to recognize revenue on November 30, 2000, because HP had a 15-day acceptance period during which it could have rejected the software.[154]  Notably, the CRM License Agreement does not

---

[150]  The timing of the execution of the CRM License Agreement is consistent with an email sent by Michael DeCesare, one of the Oracle employees who negotiated the sale of the additional CRM licenses.  At 7:59 a.m., on November 30, 2000, Mr. DeCesare sent an email to Larry Ellison, Safra Catz and others, stating: "HP is in!!  [F]or over 21M in CRM license.  Thanks to everyone, Mike."  The timing of this email suggests that the parties may actually have reached an agreement in principle much earlier in the day.  *See* NDCA-ORCL 3043084.

[151]  *See* Expert Report, at p. 38.

[152]  *See id.,* at p. 57.

[153]  There is no question that physical delivery of the software occurred on November 30, 2000, as required by GAAP.  According to Paragraph 21 of SOP 97-2, revenue for an arrangement to use multiple copies of a software product should be recognized upon delivery of the first copy or product master.  According to documents from Oracle's shipping and manufacturing division, the physical CD Pack, which contained the software for which HP was purchasing additional licenses, was shipped from Oracle's warehouse before 8:43 p.m., on November 30, 2000.  The terms of shipment were "FOB Shipping."  *See* NDCA-ORCL 3043129-131 [Computer screen shots of shipping details for Waybill 1Z8668200224636442].

[154]  *See* Expert Report, at p. 42-43.

contain a 15-day acceptance period. It does, however, reference the original SLSA, which included a 15-day acceptance window.[155] In making this argument, Mr. Regan failed to recognize that the 15-day acceptance period was eliminated in Amendment Three to the SLSA, which Oracle and HP executed in August 1999, as part of HP's initial purchase of CRM licenses. Paragraph B.5 of Amendment Three to the SLSA provides that "[t]he Programs shall be deemed to be accepted by Customer on delivery."[156] There is no corresponding 15-day acceptance period in Amendment Three to the SLSA or, as noted above, in the CRM License Agreement. Thus, HP was deemed to have accepted the software when it was delivered on November 30, 2000.[157]

Oracle established a reasonable fair value of the elements of the CRM License Agreement.
Mr. Regan challenges Oracle's recognition of revenue on the grounds that he "sees no evidence" that Oracle established the fair value of the elements of the software license agreement.[158] However, I have seen sufficient evidence that Oracle, in fact, did reasonably establish the fair value for (i) the new software licenses, (ii) the undelivered support services related to the new licenses, (iii) the migrated support, and (iv) the onsite technical support services, as follows:

> (1) *New License User Fees* ($21,331,122) – Based upon the evidence, it appears
> that HP received a 60% discount on the new license fees.[159] Using that 60%
> discount, the Oracle E-Business Global Price List, dated November 10, 2000 (the

---

[155] *See* NDCA-ORCL 258186-258218.

[156] *See* NDCA-ORCL 3043017-3043024 [Amendment Three to the SLSA, August 30, 1999].

[157] Even if the 15-day acceptance period applied, however, this provision still did not prevent Oracle from recognizing revenue on the sale of the licenses on November 30, 2000. According to TPA 5100.67, if uncertainty exists about a customer's acceptance of software, license revenue should not be recognized until acceptance occurs. However, a software vendor can recognize revenue before formal customer acceptance occurs where, among other things, the length of the acceptance period is short and the individual customer never has invoked the acceptance provision or revoked delivery in prior dealings. In this case, there is no evidence that HP ever invoked the 15-day acceptance period or rejected past deliveries. Thus, even if the 15-day acceptance period applied, it was appropriate under GAAP for Oracle to recognize revenue on November 30, 2000, based upon Oracle's historical experience with HP.

[158] *See* Expert Report, at pp. 57-58.

[159] *See* NDCA-ORCL 3043085-109.

"Price List"),[160] and the number of user licenses purchased in the CRM License Agreement, [161] I was able to recalculate the $21.3 million fee that Oracle recognized as revenue at the end of the second quarter. This establishes that the user licenses were assigned an appropriate fair value.

(2)   *Product Support related to New Licenses* ($4,692,847) – Based upon the Price List and the evidence pertaining to the CRM License Agreement, the product support and upgrade subscription rights should have been valued at 22% of the newly-purchased license fees.[162] Using these figures, I was able to recalculate the $4.69 million in product support. Again, this verifies that the product support on new licenses was assigned an appropriate fair value.

(3)   *Product Support related to Migrated Licenses* ($3,250,300) – Certain product support was transferred from the August 1999 purchase agreement to the November 30, 2000 agreement.[163] This product support covered the period from September 1, 2000 to August 31, 2001. I have studied the evidence and considered both the annual support fee increases, as well as any subsequent concessions. [164] Taking all of this information into consideration, I have estimated that a fair value of the product support for the migrated licenses is $3,121,000, which should have been deferred.[165] Oracle assigned a fair value of the migrated license support of $2,979,000, which was deferred. The $142,000 difference between the fair value I estimated for the support for the migrated

---

[160]   *See* NDCA-ORCL 3043134-51.

[161]   *See* NDCA-ORCL 260109-10.

[162]   *See* NDCA-ORCL 3043134-51.

[163]   *See* HP 00030-35.

[164]   *See* NDCA-ORCL 020845-46.

[165]   *See* NDCA-ORCL 3043103.

licenses and the amount Oracle actually deferred is immaterial.  In any event, it is clear that Oracle, in fact, did assign fair value to the support for the migrated licenses.

(4)  *OnSite Technical Support Services* ($549,700) – According to the OnSite Support Services Exhibit, Oracle agreed to provide 3,200 hours of technical support, for a fee of $549,700,[166] which represented a weighted average fee of $170 per hour.  Oracle's revenue recognition group reviewed these fees and concluded that the fees were consistent with Oracle's support services standard pricing.[167,168]  As such, there is sufficient evidence that Oracle assigned a fair value to the onsite technical support services.

Thus, I have found sufficient evidence that Oracle reasonably allocated the fair value, to the various elements of the CRM License Agreement, based upon vendor specific objective evidence.[169,170,171,172]

---

[166]  *See* HP 00045-49.

[167]  *See* NDCA-ORCL 3043085-109 [USA Revenue Accounting Contract Review Checklist for Order 6346665].  *See also* AA 001339.

[168]  *See* NDCA-ORCL 234898 [email chain which included request for onsite services for McGraw Hill, with a proposed valued of $137,500 for 100 days of onsite support, which represented a weighted average fee of $170 per hour.]

[169]  *See id.*

[170]  *See* Matuszak Dep., at 150:20-151:8 ("Would you look at whether the contracts, the revenue…license contracts met the requirements of SOP 97-2?  A. Yes."), and 150:24-151:8 ("Q. So, you would go through the process of the four elements: Whether arrangement existed, delivery, the fee was fixed and determinable, and whether collectability [*sic*] was reasonably assured?  You'd go through that with respect to whatever amount of deals that you deemed proper during the quarter; right?  A. We – we would review or conclude each of those four requirements under SOP 97-2.").

[171]  In addition, Mr. Regan states that fair value for support cannot be measured for a contract with terms of one year of less.  *See* Expert Report, at p. 58.  Mr. Regan states that under TPA 5100.53, "it is not possible to measure VSOE for term licenses with a duration of one year or less."  This literature, however, was issued in response to a situation where a short-term license featured a post-license support service renewal option.  The November 30, 2000 license agreement does not contain any support service renewal option.  Thus, the guidance cited by Mr. Regan is not applicable.

<u>There is no evidence that the software required "significant production, modification or customization" as of November 30, 2000.</u>  Mr. Regan challenges the CRM software that Oracle previously licensed to HP in August 1999 as not being "fully functional."[173]  The accounting literature, however, does not require software to be "fully functional" before revenue can be recognized on a license agreement.   Pursuant to Paragraph 7 of SOP 97-2, revenue on an arrangement should be deferred, and accounted for as a long-term construction contract, if the product requires "significant production, modification, or customization of software."  Thus, the accounting literature does not require a vendor to defer revenue simply because a product might contain "bugs."[174,175]  The issue, therefore, is whether there is any evidence to suggest that the software licensed under the August 1999 agreements required significant production, modification or customization as of November 30, 2000.  Mr. Regan has provided no such evidence.

During the relevant time period, Oracle's revenue recognition group adhered to an internal policy that software that was included on the Price List did not require significant production,

---

[172]  Mr. Regan also states that Oracle should have established fair value for various parts of the HP Server Purchase Agreement.  *See* Expert Report, at p. 41.  As discussed above, the HP Server Purchase Agreement is a separate agreement from the CRM License Agreement.  As such, I believe it would be inappropriate to assess fair value for the various pieces of a separate agreement that is not a part of the arrangement being evaluated under SOP 97-2.

[173]  *See id.*, at p. 38.

[174]  *See* SOP 97-2, the Glossary defines Post Customer Support as including "correction of errors (bug fixing or debugging)."  Thus, GAAP anticipates that software will be sold with some "bugs," which will be resolved later.

[175]  Based upon the evidence I have reviewed, it appears that "bugs" are inherent in virtually all new software releases.  *See* Deposition of Mark Jarvis, May 30, 2006, at 168:10 ("Every product has bugs."); Deposition of Keith Block, May 3, 2006, at 74:21-23 ("You know, with any new release of software there is always going to be challenges around the product, new features, functions, so."); Rocha Dep., 212:14-16 ("I have a general recollection, and the general recollection was there was bugs just like every software that's ever gone out of a software lab.").  Thus, if technology companies were required to defer revenue until all "bugs" are resolved – as Mr. Regan seems to suggest – these companies may never be able to recognize revenue on new product releases.

modification and customization for purposes of SOP 97-2.[176]  Oracle considered a product to be sufficiently market ready for revenue recognition purposes when it was included on the Price List.[177]  At that point, the software already had been through beta testing and quality control checks.[178]  Oracle's independent auditors accepted this benchmark as an appropriate indication of the product's functionality for purposes of SOP 97-2.  As noted above, all of the software contemplated by the CRM License Agreement was included on the Price List.

The crux of Mr. Regan's argument appears to be that Oracle should have deferred all or some portion of the revenue recognized on November 30, 2000 because of the existence of 14 so-called "show stoppers."[179]  Notably, I have seen no evidence that anyone, other than Mr. Regan, has suggested that these 14 show stoppers impacted product sales or revenue recognition.  Although Mr. Regan claims that "the existence of even a single showstopper indicates significant functionality did not exist in the product," he fails to articulate the extent to which these show stoppers required additional production, modification or customization of the software.[180]  In fact, 1,800 HP sales representatives had gone "live" with at least some modules of CRM software by early November 2000, and the implementation was ongoing.[181]  Thus, the existence of the 14 show stoppers did not prevent HP from using the software by November 2000.

---

[176] *See* Matuszak Dep., at 171:19-172:15, ("[P]art of our procedures on the quarterly revenue would be to look at the products that were licensed and shipped under the agreement and to see if they were part of the currently available list of products…. Q. What if they weren't part of the currently available list of products?  A. If a product is not available, it can't be shipped.  If a product cannot be shipped, it cannot be recorded as revenue."; and 184:24-185:5, "[W]e looked to see whether the product was on the currently available product list, which meant that it went through the company's normal QA testing, including beta testing and other testing with customers before it was released in final version.").

[177] *See* NDCA-ORCL 3043134-51.

[178] *See* Matuszak Dep., at 184:24-185:5; *see also* DeCesare Dep., at 224:23-225:5 ("Q:  Do you know whether and what sorts of testing Oracle did before it released a product?  …A:  So it went through, you know, development.  Then the code was frozen.  It went through regression testing.  Then it went through porting.  It was a very rigorous – fairly arduous process.").

[179] *See* Expert Report, at p. 57.

[180] *See id.*

[181] *See* NDCA-ORCL 020850-51.

Relying upon these so-called show stoppers, Mr. Regan makes a number of unsupported assumptions based upon very limited data.  The only documents cited in Mr. Regan's Expert Report that contain any detail of the show stoppers – or any other implementation issues HP apparently experienced – are dated months after November 30, 2000.[182]  Thus, even assuming the CRM software required "significant production, modification or customization," as Mr. Regan suggests, he has not cited any evidence indicating that Oracle was aware this fact prior at the time it recognized revenue on the CRM License Agreement.

Moreover, Mr. Regan's assumes that when Michael DeCesare testified that a show stopper is "functionality that the customer requires," this meant functionality that was agreed to and included in the core product, as opposed to additional products or features customers may want in the future.[183,184]  Mr. Regan's assumption in this regard, however, is undercut by the deposition testimony of Thomas Rathjens, HP's 30(b)(6) witness.  When asked whether the 14 show

---

[182]  Mr. Regan cites only one document dated before November 30, 2000, that even mentions the 14 show stoppers.  See NDCA-ORCL 020844.  That document, however, does not describe the show stoppers, nor does it state that the CRM software required "significant production, modification or customization."  Moreover, that document specifically states that the 14 show stoppers had "nothing to do" with the CRM License Agreement, and that the HP project manager was using the leverage of the CRM License Agreement "to get more attention from Oracle development."  Id.

[183]  Based upon my review of the deposition testimony in this case, it appears that the term "show stopper" can mean a variety of different things.  See Deposition of Alan Fletcher, April 6, 2005, at 110:21-22 ("Show stopper was not a scientifically captured term.  It was purely anecdotal."); Deposition of Sukumar Rathnam, May 18, 2006, at 126:2-8 ("Again, show stopper used by different software teams, different companies could be used in slightly different ways.  There's no sort of formal precise definition that, you know, everyone in software development would agree on what a show stopper is, but I have a general notion of what a show stopper is, could be.").  See also Rebuttal Expert Report of Edward Yourdon, dated June 22, 2007, at pp. 93-94.

[184]  Later in his deposition, Mr. DeCesare provided a very different explanation of the 14 "show stoppers."  Mr. DeCesare describes the 14 show stoppers in connection with a transaction purportedly involving The Gap.  Given his reference to 14 show stoppers, however, it appears that his reference to The Gap may have been in error, and he may have intended to say HP.  Either way, Mr. DeCesare's own testimony illustrates the variety of meanings attributable to the term "show stopper."  See DeCesare Dep., at 233:1-15 ("Well, in the context of the Gap – I mean the Gap was saying there's 14 showstoppers – they hadn't – they hadn't bought the software yet.  . . .  [W]hat they meant was that there were showstoppers, meaning there were things that they felt as requirements that in their analysis of the tool it didn't do.  Nothing to do with a P1, P2, or P3.  They wouldn't have discovered that until they thought it did something and tried to implement it and realizes that it didn't.  . . .  Very different things.  One's presales.  One's post sales.").

46

stoppers represented functionality that was promised as part of the CRM licenses purchased on November 30, 2000, Mr. Rathjens responded:  "I don't believe so because in November of 2000 we did not have the detail as to what was in the software and what was not." [185,186]

The 14 show stoppers cited by Mr. Regan may relate to additional product or features HP wanted Oracle to develop in the future.  Based upon my review of the Rebuttal Expert Report of Edward Yourdon, I understand that it is common for large customers to pressure software vendors to develop specific features and functions and include them in future releases. [187]  In fact, Mr. Rathjens testified that HP had lobbied Oracle to include specific features and functionality in future releases. [188]  However, whatever the nature of the 14 show stoppers, it does not appear from the evidence I have reviewed that they were necessary for the CRM software to function as agreed upon.  The CRM License Agreement itself makes no mention of the show stoppers, nor is there any evidence indicating that the agreement was contingent upon Oracle addressing or resolving these issues.  To the contrary, internal correspondence from Oracle employees who participated in the negotiations leading up to the CRM License Agreement described the show

---

[185]  *See* Rathjens Dep., at 91:4-6; *see also id.* at  91:23-92:4 ("Q. [W]ith respect to the software that was purchased in November of 2000, … was there functionality that HP thought would be part of the software that wasn't?  A. I think different people within HP had different expectations.")

[186]  The fact that HP may have had some difficulty implementing certain modules of the CRM software does not mean the software required additional production, modification or customization.  Indeed, Mr. Rathjens testified that it was very difficult to deploy software in HP's environment, that part of the delay was due to making the software function to meet HP stakeholder's acceptance criteria, and that "HP was aware that the software was being developed and some modules of the Oracle CRM software – some modules were more developed than others."  *Id.*, 72:22-24.  Indeed, Mr. Rathjens stated that HP purchased the CRM software with the understanding that additional functionality would be added later.  *Id.*, at 75:1-19 and 93:3-7.

[187]  *See* Rebuttal Report of Edward Yourdon, dated June 22, 2007, at pp. 93-94.

[188]  *See* Rathjens Dep., at 75:15-23 ("We had lots of dialogue, discussion, and process to get our requested changes into the Oracle software done by Oracle development that we expected to see in the software products at a further point in time….   And that was a big premise on which we purchased the software. That Oracle would continue to develop it to meet HP's needs.").

stoppers – much like HP's 30(b)(6) witness – as having "nothing to do" with HP's purchase of additional CRM licenses.[189,190]

Thus, I have seen no evidence that the software associated with the licenses sold as part of the CRM License Agreement required additional production, modification or customization as of November 30, 2000.  Nor is there evidence that the CRM License Agreement was contingent upon Oracle addressing or resolving the 14 show stoppers.  Because the evidence demonstrates that the show stoppers had nothing to do with the CRM License Agreement, I believe that Mr. Regan's arguments are unfounded.

3.      *ORACLE'S FEES WERE FIXED OR DETERMINABLE, AND COLLECTIBILITY WAS PROBABLE*

Paragraph 26 of SOP 97-2 requires that a vendor's fee be fixed and determinable, and that collectibility be probable, before revenue can be recognized on a software license arrangement. Mr. Regan contends that this requirement for revenue recognition was not satisfied for two reasons.[191]  First, Mr. Regan claims that the fees due under the agreement were not fixed and determinable because the final payment was not due until a year later.[192]  Second, Mr. Regan claims that the fees due under the agreement were not fixed and determinable because the

---

[189]   *See* NDCA-ORCL 020844.

[190]   As noted above, in attacking the functionality of Oracle's CRM software, Mr. Regan relies heavily upon internal HP correspondence generated nearly a year after the CRM License Agreement was executed, *see* Expert Report, at pp. 54-57.  Tellingly, these documents were created as part of HP's efforts to develop a negotiation strategy to obtain additional consulting services.  Considering the adversarial context in which these documents were created, there is some question whether they represent a fair portrayal of CRM's functionality as of November 30, 2000.  Regardless, they do not suggest that the CRM software for which HP purchased additional licenses in November 2000 required significant production, modification or customization, as described within SOP 97-2.  It is clear that Oracle did not view the software as requiring such upgrades prior to recognizing revenue on the sale of CRM licenses, considering that at the time Oracle entered into the CRM License Agreement, a number of customers – including HP – already had gone "live" with CRM software or various CRM modules.  *See* NDCA-ORCL 020728-020730.

[191]   *See* Expert Report, at pp. 58-59.

[192]   *See id.,* at p. 59.

48

payments due under the license agreement purportedly were subject to forfeiture, refund or other concession.[193]   As discussed below, I believe that Mr. Regan's opinions in this regard are incorrect.

 The fees due under the CRM License Agreement were fixed and determinable.  HP financed the CRM License Agreement through the OCC Finance Agreement, an 11-month lease agreement that gave HP the option of converting the term licenses into perpetual licenses for an additional payment of $2.1 million, due on December 1, 2001.[194]  Notwithstanding the fact that the final payment was optional, and due a year and one day after the agreement was executed, Oracle's fees nonetheless were fixed and determinable as of November 30, 2000.  Oracle and its external auditors considered the possibility that HP would exercise its option on December 1, 2001 to convert the term licenses into perpetual licenses a virtual certainty.[195]  Over 90% of the total lease payments were due within the first 11 months.  In other words, HP could have paid $29.8 million for an 11-month software license, or HP could have opted to make the final payment under the lease agreement and obtained a perpetual license for an additional $2.1 million.  Given the circumstances, Oracle and its external auditors viewed the final payment as a bargain purchase option and, thus, treated the license agreement as perpetual in nature as of November 30, 2000.  Because Oracle and its external auditors viewed the HP transaction as a perpetual license agreement, it was appropriate for Oracle to recognize the license fees on November 30, 2000.

The fees due under the CRM License Agreement were not subject to "forfeiture, refund or other concession."  As an initial matter, there is nothing in the CRM License Agreement which grants HP any forfeiture, refund or other concession rights.   To the contrary, the CRM License

---

[193]  *See id.*
[194]  *See* HP 00050-51.
[195]  *See* AA 001339-40.

Agreement expressly provides that "[a]ll fees due under this Ordering Document shall be non-cancellable and the sums paid nonrefundable, except as provided in the Agreement."[196]

Mr. Regan cites an email that references certain concessions that Oracle previously granted to HP relating to consulting and support services covered by the August 1999 agreements.[197]  The fact that Oracle granted HP a concession on one occasion in the past is insufficient, standing alone, to require Oracle to defer the recognition of revenue based upon the potential risk for future concessions.  More importantly, the prior concession involved (i) consulting, which, as discussed above, was part of a separate contract, and (ii) services, which were deferred under the CRM License Agreement anyway.  Thus, this prior concession does not establish that the license payments due under the OCC Finance Agreement were subject to forfeiture, refund or other concession.[198]

Thus, I have seen sufficient evidence that Oracle's fees were fixed or determinable, and collectibility was probable as of November 30, 2000.

## E.    THE EFFECT ON THE SECOND QUARTER FINANCIAL STATEMENTS WAS NOT MATERIAL

For all of the reasons discussed above, I believe Oracle's decision to recognize revenue for the licenses it sold to HP on November 30, 2000 was appropriate under GAAP.  However, even

---

[196]  *See* HP 00032.  The "Agreement" referenced in the CRM License Agreement is the SLSA.  As discussed above, the Third Amendment to the SLSA eliminated the 15-day acceptance period, and provided that programs shall be deemed to be accepted by customer on delivery.  Moreover, Amendment Three to the SLSA also provided that "[a]ll fees due under this Amendment Three shall be due and payable net 30 days from date of invoice, and shall be non-cancelable and the subs paid nonrefundable."

[197]  *See* Expert Report, at p. 61.

[198]  Mr. Regan also claims that Oracle's fees were cancellable pursuant to the 15-day acceptance period under the 1994 SLSA.  *See* Expert Report, at pp. 59-60.  As discussed above, however, this provision was eliminated as part of the Amendment Three to the SLSA.

assuming that Oracle's decision to recognize revenue on this transaction during the second quarter of fiscal year 2001 was incorrect, any resulting misstatement in Oracle's financial statements would be immaterial, from either a quantitative and qualitative standpoint.  Had Oracle deferred the entire license fee due under the CRM License Agreement, Oracle still would have reported earnings per share of $0.10, consistent with analysts' consensus expectations.  Mr. Regan has identified no support to suggest that meeting consensus expectations, versus exceeding such expectations, renders any such misstatement in Oracle's reported earnings per share material.

Furthermore, even assuming that both the transfers to the bad debt reserve *and* the revenue recognized on the CRM License Agreement required adjustment, any corresponding misstatement in Oracle's second quarter financial statements would not be material  from either a quantitative or qualitative perspective.  In other words, even if Oracle's second quarter revenue was reduced by $40 million (representing the approximately $20 million adjustment to the bad debt reserve and the approximately $20 million in revenue recognized on the HP transaction), Oracle would have reported earnings per share of $0.10, consistent with analysts' consensus expectations.  This $40 million represents only 1.5% of Oracle's total revenue, and 4% of Oracle's net income after taxes, in the second quarter of fiscal year 2001.  Thus, giving Plaintiffs every benefit of the doubt, I have seen no evidence to suggest that Oracle's financial statements for the second quarter of fiscal year 2001 were materially misstated.

## VIII.   <u>CONCLUSIONS</u>

I have seen no evidence indicating that Oracle's financial statements in the second quarter of fiscal year 2001 were materially misstated.  I have seen no evidence to suggest that any of the issues raised in Mr. Regan's Expert Report, even if true, had any impact on Oracle's financial

performance in the third quarter of fiscal year 2001, or that they caused or contributed to the third quarter earnings miss. To the extent that Mr. Regan suggests otherwise, his opinions are unfounded, incorrect and should not be relied upon.

## IX. <u>QUALIFICATION</u>

I reserve the right to supplement and/or amend my opinions as necessary as additional documents or information is made available for my review. I may independently, or be asked by counsel to create exhibits after the issuance of this report. These exhibits may then be used as demonstratives during trial. I will be available for further comment on my opinions contained herein at my deposition at some point in the future. Further, in support of my opinions, I may also use any of the previously produced documents referred to in the body of this report or in any Exhibit hereto.

Very truly yours,

*This report has been prepared by:*

J. Duross O'Bryan, Managing Director

**APPENDIX**

**In re Oracle Corporation Securities Litigation**
**Documents Relied Upon**
**Rebuttal Expert Report of J. Duross O'Bryan**

In addition to the documents relied upon for my Original Report, I have relied on the following documents in preparation of my Rebuttal Expert Report:

- Expert Report of D. Paul Regan, CPA, dated May 25, 2007
- Depositions
  - Michael DeCesare, dated February 16, 2006
  - Lawrence Ellison, dated September 21, 2006
  - Alan Fletcher, dated April 6, 2006
  - Ian Hatada, dated October 5, 2006
  - Mark Jarvis, dated May 30, 2006
  - Thomas Rathjens, dated June 30, 2006
  - Sukumar Rathnam, dated May 18, 2006
  - Michael Rocha, dated April 7, 2006
  - Edward Sanderson, dated July 26, 2006
- Telephonic Conference at Hewlett-Packard Deposition, June 30, 2006
- Order Granting Plaintiffs' Motion to Compel Production of Documents
- Order Granting in Part and Denying in Part Plaintiffs' Motion to Compel Defendants' Production of Accounting Documents
- Produced Documents:
  - AA00005, 00012, 00021, 00688, 01339-40
  - HI000001-2
  - HP00015-16, 00045-51
  - ORR000789-803
  - NDCA-ORCL:

| | | | | | |
|---|---|---|---|---|---|
| 014004 | | | 775604 | - | 775609 |
| 020728 | - | 020730 | 775657 | | |
| 020850 | - | 020851 | 776219 | - | 776228 |
| 021378 | - | 021381 | 776276 | | |
| 028735 | - | 028736 | 1198884 | - | 1208895 |
| 048989 | - | 049207 | 1534024 | - | 1534169 |
| 049208 | - | 050060 | 1609375 | - | 1609376 |
| 081755 | | | 1609379 | | |
| 243898 | | | 1727982 | | |
| 258186 | - | 258218 | 1895745 | - | 1895747 |
| 260109 | - | 260110 | 1914199 | - | 1914286 |
| 260113 | | | 3043017 | - | 3043039 |
| 603894 | | | 3043052 | - | 3043055 |
| 614018 | - | 614023 | 3043084 | - | 3043115 |
| 623787 | | | 3043118 | | |
| 769230 | - | 769238 | 3043126 | - | 3043155 |
| 769261 | | | | | |
| 769394 | - | 769361 | | | |

  - PLF-ORC000132, 000135

- Accounting Principles Board Opinion No. 29
- American Institute of Certified Public Accountants Statement of Position No. 97-2
- Emerging Issues Task Force Abstract Nos. 86-29, 99-19
- Training Practice Aids 5100.39, 5100.47, 5100.53, 5100.67
- SEC Administrative Proceeding in Re: Quadramed Corporation, dated April 30, 2004
- SEC Administrative Proceeding in Re: Arsin Corporation, *et.al.*, dated July 17, 2003
- SEC Litigation Release in Re: SEC v. Unify Corporation, *et.al.*, dated May 20, 2002
- Oracle's 10-Q Report, dated January 16, 2001
- Compaq Fiscal Year 2000 Annual Report
- Hewlett-Packard Fiscal Year 2002 Annual Report
- D. Paul Regan, "Revenue Recognition," California CPA, dated September 1, 2003
- "The 'Numbers Game'" – Remarks by Chairman Arthur Levitt, SEC, dated September 28, 1998
- "Speech by SEC Staff: Revenue Recognition," Remarks by Lynn E. Turner, USC SEC and Financial Reporting Institute, dated May 31, 2001
- "HP Boosts CRM With Oracle," by DSstar, dated August 1, 2000
- Press Releases
  - "Oracle and HP Celebrate Successful CRM Relationship," dated February 21, 2001
  - "Oracle Q2 Customer Additions Drive Growth in Applications and Database Software," dated December 14, 2000
  - Hewlett-Packard and Compaq agree to merge, creating $87 billion global technology leader," dated September 3, 2001
- Analysts Reports
  - Hambrecht & Quist, dated September 11, 1998
  - CIBC Oppenheimer, dated December 11, 1998
  - CIBC Oppenheimer, dated March 10, 1999
  - CIBC World Markets, dated June 10, 1999
  - CIBC World Markets, dated September 13, 1999
  - Hambrecht & Quist, dated December 15, 1999
  - Robertson Stephens, dated March 15, 2000
  - CIBC World Markets, dated June 19, 2000
  - CIBC World Markets, dated September 15, 2000
- Rebuttal Expert Report of Edward Yourdon, dated June 22, 2007