1
COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
2
MARK SOLOMON (151949)
DOUGLAS R. BRITTON (188769)
3
655 West Broadway, Suite 1900
San Diego, CA 92101
4
Telephone: 619/231-1058
619/231-7423 (fax)
5
marks@csgrr.com
dougb@csgrr.com
6
    – and –
SHAWN A. WILLIAMS (213113)
7
WILLOW E. RADCLIFFE (200087)
ELI R. GREENSTEIN (217945)
8
DANIEL J. PFEFFERBAUM (248631)
100 Pine Street, Suite 2600
9
San Francisco, CA 94111
Telephone: 415/288-4545
10
415/288-4534 (fax)
shawnw@csgrr.com
11
willowr@csgrr.com
elig@csgrr.com
12
dpfefferbaum@csgrr.com

13
Lead Counsel for Plaintiffs

14
[Additional counsel appear on signature page.]

15
UNITED STATES DISTRICT COURT

16
NORTHERN DISTRICT OF CALIFORNIA

17

| In re ORACLE CORPORATION SECURITIES LITIGATION | ) ) ) | Master File No. C-01-0988-SI |
|---|---|---|
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) ) | PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AGAINST LAWRENCE ELLISON FOR TRADING ON THE BASIS OF MATERIAL NON-PUBLIC INFORMATION |
| ALL ACTIONS. | ) ) ) | |

18

19

20

21

22
DATE:     January 9, 2009
TIME:     9:00 a.m.
23
CTRM:    The Honorable Susan Illston

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................1

II.    STATEMENT OF UNDISPUTABLE FACTS ..........................................3

    A.    Ellison Traded on the Basis of Inside Information and He Knew that the Information Rendered Oracle's Internal and External Forecasts in 3Q01 Unreliable ........................................................................................................3

        1.    The Fact that the Major Macroeconomic Change Facing Oracle Rendered Its 3Q01 External Forecast Unreliable Was Material Inside Information Used by Ellison When He Traded...............................6

        2.    The Change in Oracle's Product Mix and Problems with Suite 11i Was Material Inside Information Used by Ellison When He Traded and It Rendered Oracle's 3Q01 Forecast Unreliable ...................................8

        3.    Oracle's Reliance on Falsified 2Q01 Earnings Was Material Inside Information Used by Ellison When He Traded and It Rendered Its 3Q01 External Forecast Unreliable..........................................................14

            a.    Ellison Secured a Fraudulent Swap Deal with HP and Inflated 2Q01 Application Growth ..................................14

            b.    Ellison and Defendants Manipulated Oracle's 2Q01 Results and Thereby Beat Expectations ......................................16

        4.    Ellison's Directive Just Before 3Q01 to Increase the Risk in Oracle's Forecast Was Material Inside Information Used by Ellison When He Traded and It Rendered the External Forecast Unreliable.......................................................................................18

        5.    The Fact that Minton Applied Her Inaccurate Conversion Ratio to a "Too Good to Be True" Pipeline Was Material Inside Information Used by Ellison When He Traded and It Rendered Oracle's External Forecast Unreliable .........................................20

    B.    When Ellison Suddenly Deviated from Plan and Decided to Trade His Stock in January 2001, the Internal Indicators that He Relied upon Painted a Bleak Picture for Oracle's Financial Prospects........................................20

        1.    Less than 36 Hours Before He Decided to Unload Early, Ellison Received Oracle's Dismal Actual Results for December 2000 .................21

        2.    When He Sold, Ellison Was Aware that Oracle's "Astounding" Pipeline Had Taken an Unprecedented Nosedive.....................................22

    C.    After Receiving Adverse Material Non-Public Information, Ellison Suddenly Decided to Unload 40 Million Shares of Oracle Stock to Fund His "Absolutely Excessive" Lifestyle.................................................................24

III.    ARGUMENT............................................................................................27

1

2                                                                                                     **Page**

3        A.     Standard of Review for Summary Judgment .......................................................27

4        B.     Insider Trading Qualifies as a Deceptive Device in Violation of §10(b)
                and Is Prohibited by §20A of the Exchange Act.............................................28

5
        C.     Ellison Traded on the Basis of Material Non-Public Information with an
6               Intent to Deceive, Manipulate and Defraud .......................................................31

7               1.     When Ellison Traded, He Knew that Oracle's U.S. License
                       Divisions Had Experienced Severe Negative Growth Rates ...................32

8
                2.     When Ellison Traded, He Knew that Oracle's Pipeline Had
9                      Collapsed.....................................................................................34

10              3.     When Ellison Traded, He Knew that Oracle's External Forecast
                       Was Unreliable Because of Significant Internal and External
11                     Changes ......................................................................................35

12              4.     When Ellison Traded, He Knew that Oracle's External Forecast of
                       Suite 11i Applications Growth Was Unreliable Because of the
13                     Problems with 11i ........................................................................38

14       D.     Ellison's Trades Were Suspicious in Timing and Amount..................................39

15              1.     Ellison's Sales Were Dramatically Out of Line with His Prior
                       Trading Practices and Were Timed to Maximize His Personal
16                     Benefit........................................................................................40

17              2.     The Amount and Percentage of Shares Sold by Ellison Was
                       Unusually Large...........................................................................42

18
                3.     Ellison's Use of Proceeds Establish that Ellison Acted with
19                     Scienter .......................................................................................43

20       E.     Ellison's Failure to Disclose Adverse Material Information Prior to
                Trading Proximately Caused Plaintiffs' Loss .......................................................44

21
         F.     Adverse Inferences as a Result of Ellison's Willful Destruction of
22              Evidence Further Compel Summary Judgment Against Ellison ..........................48

23   IV.    CONCLUSION..............................................................................................................50

24

25

26

27

28

# TABLE OF AUTHORITIES

Page

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................27, 28

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)..................................................................32, 38

*Beaven v. United States DOJ*,
    No. 03-84-JBC, 2007 U.S. Dist. LEXIS 24459
    (E.D. Ky. Mar. 30, 2007) ...............................................................49

*Brinson v. Linda Rose Joint Venture*,
    53 F.3d 1044 (9th Cir. 1995) ..........................................................28

*Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*,
    818 F.2d 1466 (9th Cir. 1987) ........................................................28

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..................................................................27, 28

*Chiarella v. United States*,
    445 U.S. 222 (1980)......................................................................31

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)......................................................................44

*Four Seasons Hotels & Resorts B.V. v. Consorcio Barr, S.A.*,
    267 F. Supp. 2d 1268 (S.D. Fla. 2003) ............................................49

*Gordon Partners v. Blumenthal*,
    No. 02 Civ. 7377 (LAK) (AJP), 2007 U.S. Dist. LEXIS 9110
    (S.D.N.Y. Feb. 9, 2007) .................................................................48

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    258 F. Supp. 2d 576 (S.D. Tex. 2003) .............................................29

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ........................................................44

*In re JDS Uniphase Corp. Sec. Litig.*,
    No. C 02-1486 CW, 2007 U.S. Dist. LEXIS 76936
    (N.D. Cal. Sept. 27, 2007) .............................................................30

*In re Monster Worldwide, Inc. Sec. Litig.*,
    549 F. Supp. 2d 578 (S.D.N.Y. 2008)..............................................29

1

2                                                                                                    **Page**

3   *In re Omnivision Techs.*,
         No. C-04-2297 SC, 2005 U.S. Dist. LEXIS 16009
4        (N.D. Cal. July 29, 2005) .................................................................................41

5   *In re Openwave Sys. Sec. Litig.*,
         528 F. Supp. 2d 236 (S.D.N.Y. 2007)...........................................................29
6

7   *In re Secure Computing Corp.*,
         184 F. Supp. 2d 980 (N.D. Cal. 2001) ...........................................................40

8
    *In re Silicon Graphics Sec. Litig.*,
9        183 F.3d 970 (9th Cir. 1999) .....................................................................39, 42

10  *In re Silicon Graphics Sec. Litig.*,
         970 F. Supp. 746 (N.D. Cal. 1997) ................................................................29
11

12  *In re Tableware Antitrust Litig.*,
         484 F. Supp. 2d 1059 (N.D. Cal. 2007) .........................................................50

13
    *In re Tyco Int'l, Ltd. Sec. Litig.*,
14       No. 00-MD-1335-B, 2000 U.S. Dist. LEXIS 13390
         (D.N.H. Aug. 17, 2000) .................................................................................30
15

16  *In re Vantive Corp. Sec. Litig.*,
         283 F.3d 1079 (9th Cir. 2002) .......................................................................42

17
    *In re Verifone Sec. Litig.*,
18       784 F. Supp. 1471 (N.D. Cal. 1992), *aff'd*,
         11 F.3d 865 (9th Cir. 1993) ...........................................................................29
19

20  *Johnson v. Aljian*,
         490 F.3d 778 (9th Cir. 2007), *cert. denied*,
21       _U.S._, 128 S. Ct. 1650 (2008)............................................................30, 31, 42

22  *Kaplan v. Rose*,
         49 F.3d 1363 (9th Cir. 1994) .........................................................................43
23

24  *Lehocky v. Tidel Techs., Inc.*,
         220 F.R.D. 491 (S.D. Tex. 2004)....................................................................30

25  *Leon v. IDX Sys. Corp.*,
         464 F.3d 951 (9th Cir. 2006) .........................................................................48
26

27  *Nation-Wide Check Corp. v. Forest Hills Distribs., Inc.*,
         692 F.2d 214 (1st Cir. Mass. 1982) ...............................................................49

28

Page

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v.*
    *Am. West Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) .......................................................28

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) .........................................39, 40, 42

*PSG Poker, L.L.C. v. DeRosa-Grund*,
    No. 06 Civ. 1104 (DLC), 2008 U.S. Dist. LEXIS 4225
    (S.D.N.Y. Jan. 22, 2008).............................................................49

*Robbins v. Koger Props.*,
    116 F.3d 1441 (11th Cir. 1997) ..................................................44

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ......................................................42

*SEC v. Adler*,
    137 F.3d 1325 (11th Cir. 1998) ............................................30, 31

*SEC v. Clark*,
    915 F.2d 439 (9th Cir. 1990) ......................................................29

*SEC v. Hahn Truong*,
    98 F. Supp. 2d 1086 (N.D. Cal. 2000) ........................................28

*SEC v. Sargent*,
    229 F.3d 68 (1st Cir. 2000).........................................................28

*SEC v. Texas Gulf Sulphur Co.*,
    401 F.2d 833 (2d Cir. 1968)........................................................32

*SEC v. Warde*,
    151 F.3d 42 (2d Cir. 1998)..........................................................28

*Shurkin v. Golden State Vintners, Inc.*,
    471 F. Supp. 2d 998 (N.D. Cal. 2006) ........................................29

*Smith v. United States*,
    128 F. Supp. 2d 1227 (E.D. Ark. 2000).......................................49

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    _U.S._, 127 S. Ct. 2499 (2007)....................................................30

*Tenet Healthsystem Desert, Inc. v. Fortis Ins. Co.*,
    520 F. Supp. 2d 1184 (C.D. Cal. 2007) .......................................49

1

2                                                                                              **Page**

3  *TSC Indus. v. Northway, Inc.*,
          426 U.S. 438 (1976)...............................................................................32, 38, 42
4

5  *United States v. Atul Bhagat*,
          436 F.3d 1140 (9th Cir. 2006) ......................................................................41
6

7  *United States v. O'Hagan*,
          521 U.S. 642 (1997)................................................................................29, 30

8  *United States v. Smith*,
          155 F.3d 1051 (9th Cir. 1998) ........................................................28, 30, 31
9

10 *United Steelworkers of Am. v. Phelps Dodge Corp.*,
          865 F.2d 1539 (9th Cir. 1989) ......................................................................28

11 **STATUTES, RULES AND REGULATIONS**

12 15 U.S.C.
          §78            ...................................................................................28, 29, 30
13        §78j(b).........................................................................28, 29, 30, 50
          §78t-1 ......................................................................................... *passim*
14        §78t-1(a)........................................................................................29
          §78t-l(b)(1).....................................................................................29
15
16 Federal Rules of Civil Procedure
          Rule 56(c)..................................................................................1, 27
17        Rule 56(e)......................................................................................28
18
   17 C.F.R.
19        §230.144(e) ...................................................................................43
          §240.10b-5 ..........................................................................28, 29, 30, 31
20        §240.10b-5(a)..................................................................................28
          §240.10b-5-1 ......................................................................28, 31, 41
21        §240.10b-5-1(b) .................................................................31, 41
          §240.10b-5-1(c) .....................................................................31
22
23 SEC Rule 144.................................................................................42, 43
24 Civ. L.R. 56....................................................................................1

25

26

27

28

1  NOTICE TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2       On January 9, 2009, at 9:00 a.m., in the Courtroom of the Honorable Susan Illston, plaintiffs

3  will and do hereby move, under to Fed. R. Civ. P. 56(c) and Civ. L.R. 56, for an order granting

4  summary judgment against Lawrence Ellison for trading on the basis of material non-public

5  information.  The motion is based upon this notice, the following Memorandum of Points and

6  Authorities, the Appendix of Exhibits in support of the motion, and any other information submitted

7  before or during the hearing on this matter.[1]

8                 **MEMORANDUM OF POINTS AND AUTHORITIES**

9  **I.**     **INTRODUCTION**

10       On January 19, 2001, within 36 hours of receiving Oracle's adverse December 2000 results,

11  Lawrence Ellison ("Ellison") first instructed Philip Simon ("Simon"), his financial advisor, to

12  immediately unload 40 million shares of Oracle Corporation ("Oracle") stock.  Prior to January 19,

13  2001, Ellison had not informed anyone of an intent to sell in January 2001.  To the contrary, before

14  January 19, 2001, every indication from Ellison, Simon, and Oracle was that Ellison planned to

15  exercise options and sell stock in April or August 2001.

16       Despite this plan, which had been discussed for months, on January 19, 2001, after receiving

17  dismal news regarding Oracle's financial condition and applications products, including an e-mailed

18  Flash Report on January 17, 2001 (less than 36 hours earlier) disclosing that all three of Oracle's

19  U.S. license divisions (which represented 50% of Oracle's license revenues) had experienced severe

20  negative growth trends in December 2000, Ellison decided to sell early.  Between January 22, 2001

21  and January 31, 2001, Ellison engaged in one of the largest insider trading binges in history,

22  dumping over $895 million worth of Oracle stock.  Ellison's timing was impeccable.  Just a short

23  month later, Oracle announced what Ellison had known for months and while he sold his stock – that

24  Oracle's financial condition had been severely and negatively affected by the declining economy and

25  problems with its applications Suite 11i.  Oracle's stock plummeted.  Seven days later, Ellison

26          ————————————————

27  [1]      All "Ex." or "Exs." references herein are to exhibits attached to the Appendix.

28

boasted of his spoils: "It's good to be a bit more liquid in light of the economic downturn."  More than seven years later, Oracle's stock price has yet to return to its 3Q01 levels.[2]  To this day, Ellison is one of the last persons to sell Oracle stock above $30.

Before he traded, Ellison knew (but did not disclose) a variety of material non-public information.  Ellison testified that he relies primarily on actual sales and pipeline data to evaluate Oracle's financial health.  Oracle Service Industries ("OSI") and North American Sales ("NAS"), Oracle's largest U.S. divisions, were responsible for Oracle's 3Q01 miss.  Thirty-six hours before he decided to trade, Ellison learned that the OSI and NAS divisions' December 2000 actual results reflected growth of **negative** 24% and **negative** 81%, respectively.  In addition, Ellison learned that, excluding the outlier deal with Covisint, Oracle had sold **less than $1.3 million in applications**, representing growth of **negative** 92%.  These negative growth trends contrasted strongly with Oracle's aggressive external forecast of growth.  Ellison also knew that Oracle's **pipeline had collapsed by $328 million** at the end of December 2000, with most of the collapse ($251 million) in applications.

Further, Ellison knew that Oracle's External Forecast had no reasonable basis because Oracle's 2Q01 results had been fraudulently inflated and because of problems with Oracle's forecasting process.  In particular, Ellison knew that prior to 3Q01 he had **demanded that more risk be added to the forecast**.  In addition, he admitted that Oracle's forecasting process "becomes inaccurate" in times of economic change.  Ellison knew that a major economic change was affecting Oracle.  Ellison also knew that Oracle's product mix had changed and that the sales force's inability to sell applications, combined with problems with its new applications product, Suite 11i – which included lack of integration, lack of references, inability to demonstrate 11i, and the sales force's reluctance to sell 11i because of the problems – were negatively impacting Oracle's ability to

---

[2]      Oracle's fiscal year begins on June 1 and ends on May 31.  Its third fiscal quarter in 2001 began on December 1, 2000 and ended on February 28, 2001.  The class period in this case begins on December 14, 2000 and ends on March 1, 2001 (the "Class Period").

1   convert its applications pipeline.  Ellison knew all of this material information before he sold.

2   Investors did not.

3          Finally, in the days surrounding Oracle's announcements of its earnings miss, Ellison's

4   friend, journalist Matthew Symonds ("Symonds"), began traveling with him and interviewing him

5   for his biography, *Softwar*.  Over the next two years, Symonds conducted over a hundred hours of

6   interviews with Ellison, many of them on topics relevant to this litigation.  The book itself contains

7   many damaging admissions by Ellison.  After the filing of this lawsuit, Ellison willfully spoliated the

8   underlying interview tapes and transcripts.  Ellison, who has admitted "virtually everything that I do

9   is in e-mail," also destroyed almost all of his emails – thousands in number – from the relevant time

10  period.  As a result of Ellison's willful spoliation, the Court has held that "it is appropriate to infer

11  that the emails and *Softwar* materials would demonstrate Ellison's knowledge of, among other

12  things, problems with Suite 11i, the effects of the economy on Oracle's business, and problems with

13  defendants' forecasting model."  And the impact is even more telling at the broader level.  The

14  discovery abuses that justify these inferences are also evidence that Ellison acted throughout with an

15  intent to deceive and then cover-up his misdeeds.

16         The undisputed and undisputable facts proving that Ellison traded on the basis of material

17  non-public information and the adverse inferences arising from his spoliation compel the granting of

18  this motion.

19  **II.       STATEMENT OF UNDISPUTABLE FACTS**

20         **A.    Ellison Traded on the Basis of Inside Information and He Knew that
               the Information Rendered Oracle's Internal and External Forecasts
21             in 3Q01 Unreliable**

22         On December 14, 2000, Oracle announced its purported 2Q01 financial results for the quarter

23  ended November 30, 2000 and issued an external forecast for 3Q01 (the "External Forecast").  Ex. 1

24  at 03217, 03221-22.  Oracle projected license revenue growth of 25%, database revenue growth of

25  15%-20%, applications revenue growth of 75%, and 12 cents earnings per share.  *Id*. at 003221-22.

26  This External Forecast was very aggressive; growth rates were defined year-over-year, and in 3Q00

27  Oracle had achieved stellar results at the apex of a heated economy.  Ex. 2 at 005609.  Oracle also

28  informed analysts and investors that it was seeing "no impact or slowing in [its] business" as a result

1    of the economic downturn that was being discussed widely in the press and within Oracle.  Ex. 1 at

2    03218.  *See also* Ex. 3 at Ex. B ("***The economic slowdown isn't hurting Oracle, said [Ellison],***

3    ***because the company has spent the past three years updating its product line to focus on software***

4    ***that helps companies use the Internet to cut costs*** . . . .").[3]  Oracle reiterated its External Forecast

5    throughout 3Q01, while continuing to emphasize the strengths of its pipelines and products.  Ex. 4 at

6    091536; Ex. 5 at 091532.  *See also* Ex. 6 at 141677 ("Our pipelines are strong, and we're well-

7    positioned from a products perspective, so it's all about execution.").  *See also* Ex. 3 at Exs. C & D;

8    Ex. 7 at 2, 5; Ex. 8 at WBC 0012-13; Ex. 9 at 069388-90; Ex. 10 at 091429; Ex. 11 at 091448.

9         Oracle's External Forecast was based on its Potential Forecast.  Oracle's forecasting process

10   consisted of two main parts.  First, sales opportunities were placed into Oracle's pipeline and were

11   forecasted by Oracle's field sales units (the "Field") based on their likelihood of closing in the

12   quarter.  Ex. A at 110:22-111:10.  Those forecasts were rolled up into an overall "Field Forecast."

13   Ex. A at 104:15-105:11.  According to Jennifer Minton ("Minton"), the head of Oracle's Corporate

14   Finance Department, the Field historically "sandbagged," or forecasted "numbers that were

15   significantly less than what they would actually deliver," which was a source of contention with

16   Ellison.  Ex. B at 101:8-18.  As a result, Minton added an "upside" adjustment, or management

17   judgment, to the Field Forecast to adjust for "sandbagging."  Ex. B at 123:14-125:4.  The resulting

18   Potential Forecast formed the basis for Oracle's External Forecast.  Ex. A at 126:7-15.  Ellison

19   testified, however, that he did not rely on the Potential Forecast and preferred to look to actual intra-

20   quarter results and pipeline data.  Ex. C at 279:1-11, 286:9-23.

21        Ellison explained why he was reluctant to rely on the Potential Forecast – in times of change

22   Oracle's forecasting process became inaccurate.  He wrote, "[a]s I've said before, our forecasting

23   system is not clairvoyant.  Our forecasting does statistical extrapolations based on historic trends.  If

24   something that's outside our mathematical model of business changes . . . our forecasting becomes

25

26   _____

27   [3]      All emphasis is added and citations are omitted throughout unless otherwise stated.

28

inaccurate." Ex. 12 at 226; Ex. D at 384:6-385:7. Specifically, Ellison testified that a major economic change would cause Oracle's forecasting process to be inaccurate:

> Q. And the point you are making is that while your forecasting system does extrapolations based on historic trends, if something is happening that would suggest that the historical trend is not necessarily reliable, then your forecasting will not be reliable; is that right?
>
> A. Right. Major macroeconomic change; sudden . . . growth in the economy or sudden shrinkage in the economy would cause – you can't extrapolate anymore.

*Id.* at 384:23-385:7. The reason for the inaccuracy and unreliability was that Minton's "upside adjustment" was based on a year-over-year extrapolation – she applied the prior year's historical conversion ratio (percentage of the pipeline that closed in the same quarter of the prior fiscal year) to the current year's quarterly pipeline to estimate Oracle's license revenues for the quarter. Ex. A at 122:1-24, 132:11-136:3, 157:14-159:17; *see also* Ex. 12 at 211 (Ellison: "Our sales forecasting system tells us how many deals are in the pipeline and multiplies their value by a historic close rate."). Ex. 13 at 132078-79; Ex. 14 at 609541. This calculation assumed that Oracle would close deals at the same rate that it had in the prior year. In times of change, however, this led to unreliable and unreasonable forecasts. Ex. D at 384:6-385:7.

In 3Q01, Oracle's Potential Forecast was based on the application of the 3Q00 conversion rate to Oracle's 3Q01 pipeline. Ex. A at 122:1-24. Ellison knew that this was how Minton estimated Oracle's revenues and that it led to a forecast with no reasonable basis in 3Q01 for several reasons, including: (1) a major economic change had occurred between 3Q00 and 3Q01 that was affecting Oracle's business; (2) Oracle's pipeline contained a higher mix of applications deals (which had a lower conversion rate and which Oracle had problems selling because of 11i problems) than it had in the past; (3) Oracle's 2Q01 results, which provided an additional basis for its 3Q01 External Forecast, had been fraudulently overstated; and (4) in 2Q01, Ellison changed the forecast process by directing the Field to add more risk to its forecasts, thereby undermining and eliminating the need for Minton's upside adjustment. Ex. 3 at Ex. B; Ex. D at 384:6-385:7; Ex. 15 at 2-65 & Exs. 6-7; Ex. 16 at 4-8; Ex. 17 at 203683. As a result, Ellison knew that Oracle's forecasting process was inaccurate and its External Forecast had no reasonable basis.

1. **The Fact that the Major Macroeconomic Change Facing Oracle Rendered Its 3Q01 External Forecast Unreliable Was Material Inside Information Used by Ellison When He Traded**

In Oracle's 3Q00, the economy was extraordinary. The NASDAQ was at its highest level in history and Minton characterized the period as "a very high growth period." Ex. 16 at 4-8; Ex. A at 85:16-17. Oracle took advantage of the frenzied technology spending and increased its sales to unprecedented levels. *See* Ex. 12 at 185 ("Fueled by the prevailing Internet fever, never before in history had there been such an appetite by businesses to buy the latest in computing technology, and Oracle was one of the leading beneficiaries."). One benefit to Oracle was new dot.com companies to which it could sell its highly saturated database product. Sales to dot.com companies represented nearly 11% of Oracle's license revenues in 3Q00, compared to just 3.1% in 3Q99 and just 0.7% in 1Q99. Ex. 16 at Ex. 5. The technology spending boom was so beneficial that Oracle exceeded its 3Q00 expectations substantially. Ex. 18; Ex. 19 at ORCL 0122080; Ex. 20 at 1914019. This strong quarter led to difficult comparisons, making revenue growth the following year very difficult. Ex. 21.

A year later, by Oracle's 3Q01, however, the NASDAQ had collapsed and the dot.com bubble had burst. Ex. 16 at Ex. 6. By November 2000, technology spending was down considerably and companies had problems acquiring financing. *Id*. at 4-8. The deteriorating economy is well-documented in an article entitled "The Rewards of Recklessness," which Ellison and his co-author, Matthew Symonds used in January 2001, to promote their book, *Softwar*:

> The Nasdaq index, one-time proud symbol of America's high-tech boom, has more than halved since March [2000]. All around, the dot.coms lie dead and dying. Amazon and Yahoo, the names that launched a thousand business magazine covers in the late 1990s survive, but now exist in some sad Internet twilight zone, their shares worth little more than a tenth of their value a year ago. Even the mighty Lords of Wintel – Microsoft and Intel – have lost two-thirds of their value in the last 12 months as PC growth has slumped. Shares in WorldCom, so recently the very model of next-generation telecoms, are down to $14 compared with $55 at the beginning of 2000. Wherever you look, whether at once-fashionable Internet business software firms such as Ariba, Commerce One and i2 or those paragons of New Economy management cool, Cisco and Dell, the rule is the same: lowered expectations, and investors stampeding for the exit.

Ex. 22 at 1053564. The economy facing Oracle in 3Q01 had deteriorated so dramatically that the Federal Reserve reduced the Federal Funds rate twice in one month (which it had not done in ten

1    years) and noted a "sizable decline in business spending on equipment and software." Ex. 15 at 9-

2    20; Ex. 23 at 2-3; Ex. 24 at 13.[4]  Minton testified that she knew in early January 2001 that "the

3    general macroeconomic environment was suffering." Ex. B at 223:14-18.  And defendant Henley

4    told Oracle's audit committee on January 4, 2001 (the same day he sold one million Oracle shares

5    for proceeds of $32.3 million) that "all data since the [December 14, 2000 earnings] call point to

6    more economic softening so there is risk of slippage in deals." Exs. 27-28.  Ellison, a daily reader of

7    financial publications (Ex. 12 at 287), was aware that Oracle was facing a major economic change

8    between 3Q00 and 3Q01 and that it could not expect to convert as large a percentage of its pipeline

9    in 3Q01 as it had in the boom economy of 3Q00.  This economic downturn was the exact sort of

10   change that Ellison testified would cause Oracle's forecasting process to become inaccurate and

11   unreliable.  Ex. D at 384:6-385:7.[5]

12        Ellison knew that Oracle was converting significantly fewer opportunities into sales in FY01

13   than it had in FY00.  Oracle's conversion rate had declined year-over-year in 1Q01 and 2Q01 by

14   11% and 8%, respectively.  Ex. 29.  Thus, when defendants applied 3Q00 conversion rates to

15   Oracle's $3 billion 3Q01 pipeline (a 10% conversion rate decrease meant a loss of $300 million in

16   revenue), the resulting forecast lacked any reasonable basis.  Ex. 16 at Ex. 10.

17        Ellison also knew that far from just experiencing "some slowdown" in dot.com business,

18   Oracle's dot.com business had collapsed.  After reaching $172 million in 4Q00, dot.com sales fell to

19   6.01%, or just $66 million, in 2Q01.  Ex. 16 at Ex. 5.  By the end of December 2000, NAS, the

20   division that sold primarily to Oracle's dot.com customers, reported that its "dot.com bubble [had]

21   _____

22   [4]      This contrasted sharply with the economy that Oracle faced in its 3Q00.  The Federal

23   Reserve explained in Oracle's 3Q00 that "opportunities to enhance profits by using new technology
     were likely to lead to robust further growth in business fixed investment, based mainly on spending

24   for equipment and software over the year ahead." Ex. 25 at 14.  It raised interest rates three times
     between February 2000 and May 2000 to cool an overheated economy where purchases of

25   equipment and software "registered extraordinary gains in the first half of the year." Ex. 23 at 2;
     Ex. 26 at 2.

26   [5]      Ellison testified that during an economic downturn, Oracle's deal cycle is longer because

27   companies require more approvals, resulting in slowdowns or cancelled deals.  Ex. C at 245:18-
     247:12.

28

1  burst." Ex. 30. NAS also reported that Oracle had already sold to the larger dot.com companies a

2  year earlier so any new sales would have to be to smaller dot.com companies, which were quickly

3  disappearing. Ex. E at 78:7-79:1. In addition, AVPs in NAS "began to voice concern" in December,

4  and in January "were reluctant to raise their forecast" as "deals began to shrink and get delayed."

5  Ex. 31 at 179337. By January 29, 2001, Oracle forecasted only $41 million in dot.com sales (3.17%

6  of total sales), compared to $111.5 million (11% of total revenues) a year earlier. *See* Ex. 16 at

7  Ex. 5.

8         Ellison was aware of this negative effect on Oracle's business. He testified, "you're

9  absolutely right that our dot-com business was certainly off by that point in time," and that this

10 collapse put a "'lot of pressure on [Oracle's] database'" for 3Q01. Ex. F at 178:9-179:1; Ex. C at

11 255:21-257:1. And he said that Oracle had a "very, very high hurdle. So for the business to grow, it

12 meant we had to overcome the fact that a lot of our dot-com companies – customers, our ex-

13 customers, were gone." Ex. C at 385:10-22. When he traded, Ellison was aware of the economy's

14 negative effect on Oracle. He was aware that Oracle's forecast was based on the assumption that

15 Oracle would convert as many deals in 3Q01 as it had in the extraordinary economy the year before.

16 He was aware that this made Oracle's forecasting process inaccurate and its External Forecast

17 unreasonable. Investors were not. In addition, the Court has held that it is appropriate to infer that

18 the spoliated materials would have contained adverse information regarding, "among other things,"

19 "the effects of the economy on Oracle's business" and "problems with defendants' forecasting

20 model." Order Denying Plaintiffs' Motion for Partial Summary Judgment and Granting in Part

21 Plaintiffs' Request for Sanctions ("Opinion") at 12. This adverse inference further supports the

22 conclusion that Ellison knew that Oracle was being adversely affected by the economy in 3Q01 and

23 that its External Forecast lacked any reasonable basis.

24             **2.     The Change in Oracle's Product Mix and Problems with Suite
                        11i Was Material Inside Information Used by Ellison When He
25                      Traded and It Rendered Oracle's 3Q01 Forecast Unreliable**

26        Defendants' application of the 3Q00 conversion rate to the 3Q01 pipeline also led to an

27 External Forecast with no reasonable basis because Oracle's product mix had changed dramatically.

28 Ex. 15 at 85-87. Prior to May 2000, Oracle's applications sales were almost exclusively Enterprise

1    Resource Planning ("ERP") products.  Ex. G at 100:24-101:7.  In May 2000, Oracle released its new

2    applications Suite 11i, which included not only a new and untested rewrite of its ERP software, but

3    also an entirely new and untested Customer Relationship Management ("CRM") product.  *Id*.  In

4    3Q00, applications products comprised 18.6% of Oracle's license sales.  Ex. 16 at 85 & Ex. 7.  In

5    3Q01, however, Oracle forecasted that because the Suite 11i was completed and ready for mass

6    implementation by customers, applications would increase to 31.5% of license sales.  *Id*.  The

7    change in Oracle's product mix rendered its External Forecast unreasonable for several reasons.[6]

8         When defendants issued Oracle's 3Q01 External Forecast, Oracle's pipeline contained a

9    higher percentage of applications deals than it had in 3Q00.  Ex. 15 at 85 & Ex. 6.  In 3Q01, Oracle's

10   pipeline contained 42% applications deals and 58% technology deals in contrast to 29% applications

11   and 71% technology deals in 3Q00.  Ex. 15 at 86 & Ex. 6.  Historically, applications deals had a

12   much lower conversion ratio (on average, 38.7%) than technology deals (63.3%).  Ex. 15 at 86 &

13   Ex. 7.  Ellison knew that applying the 3Q00 conversation ratio to the more heavily applications-

14   weighted 3Q01 pipeline rendered Oracle's forecasting process inaccurate and its External Forecast

15   unreasonable.  *Id*. at 7, 86.

16        Ellison also knew that Oracle's historical applications conversion rate was not a reasonable

17   barometer for projecting growth in 3Q01.  Ellison himself admitted that Oracle's sales force was

18   much better at selling database products than it was at selling applications.  *See* Ex. 12 at 114

19   (Ellison states: "Ray and I both agreed that [Oracle's] database sales force was not very good at

20   selling applications"); Ex. 12 at 173 ("Ellison recognizes that applications can't be sold the same

21   way as database technology.").  And the Field was further handicapped in 3Q01 because the 11i

22

23

24   ───────────────

25   [6]    With the release of 11i, Oracle sought to convince investors that Suite 11i sales would drive
     its future revenue and earnings growth and more directly drive FY01 and 3Q01 revenue forecasts
26   (including applications growth of 75% year over year).  Oracle described Suite 11i's purported
     "integration" of CRM and ERP as the feature that separated Oracle from other software vendors and
27   high tech industry vendors and that would insulate Oracle from any potential economic downturn.
     Ex. 32.

28

1    applications that it was selling did not work.[7]  Multiple Oracle executives, including Ellison, have

2    had to admit that 11i was released too early and that it caused what Mark Jarvis, head of Oracle

3    marketing, called "eighteen months of Hell."  Ex. 12 at 424:

4           •      George Roberts, Executive Vice President ("EVP") of NAS: "We should have done
                  two things: installed it in-house first and engaged with the early implementations at
5                 an executive development level.  I think if either of those things had happened, we
                  would have rapidly found out that it wasn't done.  As it was, it took us until
6                 November to realize we had issues here and to start to mobilize."  *Id*. at 196.

7           •      "The mood at Oracle was bloody but unbowed.  There was an embarrassing
                  realization that it had fallen down badly on execution in sending a hugely important
8                 new product out to customers in an unfit state."  *Id*. at 202.

9           •      Ron Wohl, EVP in charge of ERP Applications Development: "We would have been
                  better off as a company if we had deferred the release by three or four months. . . .
10                Customers who started on one of the early versions [released prior to February 2001]
                  weren't happy, and they had a right to be upset with us."  *Id*. at 203.

11          •      "Mark Barrenechea [SVP in charge of CRM Applications Development] thanks God
12                for the recession: 'We actually got a little lucky that the economy turned down.  It
                  gave us more time to deal with the [11i product] problems.'"  *Id*. at 203.

13          •      Jay Nussbaum ("Nussbaum"), EVP of OSI, testified that there were so many
14                problems with the CRM product during 3Q01 that the sales force was reluctant to sell
                  it until it was more stable.  Ex. H at 68:7-74:13.  Nussbaum compared buying the
15                CRM product to purchasing a BMW, but receiving one without a steering wheel, an
                  engine or tires and being told it would take more time and money to receive these
16                items.  *Id*.

17          •      "LE [Larry Ellison] writes: We were getting a lot of pressure from our customers to
                  deliver the 11i applications.  I made a lot of them mad by delaying the release for
18                several months.  I should have delayed it even longer."  Ex. 12 at 189.

19          Ellison was well aware of the 11i problems and that they were far from resolved before and

20   as he sold his stock.  It was he who made the decision to risk the early release of unfinished and

21   untested products.  For example, Ellison decided to release in late 2000 and early 2001, a "too risky"

22   version of Oracle's Order Management, the most critical part of Oracle's ERP product which he

23   referred to as "the heart of the sell side of our e-business suite."  Ex. 12 at 192.  Ellison admitted that

24   Order Management "hadn't been tested yet, so we thought it was much too risky to put it into the

25   suite."  *Id*.  He also admitted that:

26   _____

27   [7]      Ellison also admits that the sales force's difficulties in selling applications were not remedied
     until after the Class Period.  Ex. 12 at 114-16, 173, 484-85.

28

"It was my decision [to put in the 'much too risky' new order management module]. It's in my nature to go for the highest-risk/highest-reward option. That's my cross to bear. We went from having an average order management product to having the premier order management product on the planet. ***The only problem was that it was brand new and we hadn't done enough testing***."

*Id*. *See also* Ex. I at 640:12-21 ("And we had – I had made the decision – it was run the cusp, whether we should put in a brand-new order management system or kind of upgrade our existing system. And I decided to completely replace the order management system knowing it was an enormously complicated piece of new code, the most complicated piece of the whole system.").

The early release of the untested 11i products caused huge problems for Oracle and its customers, which further undermined defendants' use of historical conversion rates to project applications growth. *See* Ex. 33 at 037143 (December 27, 2000 email to Ellison: "As you know some of our earliest 11i clients (especially CRM and Order Management) are exhausted from the effort of implementing the products."); Ex. 34 at 018734-35 (November 7, 2000 Liberty Mutual to Ellison: "To put it bluntly, we have encountered multiple software quality problems and we have struggled to get appropriate support and response to our issues. . . . [T]he bottom line is that we have a product that does not work. . . ."); Ex. 35 at 028799 (December 15, 2000 Pepsi to Ellison: "Our Oracle [11i] project has been an unmitigated disaster for us from both a cost and employee and relationship perspective. We have spent a fortune (to us) on consultants trying merely to get your product to work and months later we still do not have even [sic] a system to test. How can you release software that does not work is simply beyond my comprehension."); Ex. 36 (January 9, 2001 Appstech.com to Ellison: "we ordered R11i Financials for our internal use. . . . We have never been able to implement it and have decided to return it.").

Because of 11i quality issues, Oracle had virtually no 11i customer references by November 2000 (the month before the Class Period) and only nine 11i CRM customer references by June 2001 (three months after the end of the Class Period). Ex. 37 at 153367; Ex. 38. This severely affected Oracle's ability to convert its applications pipeline because, as Ellison put it, "***The first year of selling the 11i suite was the hardest year. It's difficult to sell without customer references***." Ex. 12 at 249. In fact, Ellison admits that customer references, which were virtually non-existent in Oracle's 3Q01, "are the key to selling software." According to Ellison (in 2002):

1

2

3

"***All we need are more references. References are the key to selling software****. . . .*
***So until we have a significant number of references, including people who threw***
***Siebel out, it will be slow going. So for now we're just going to take it hill by hill,***
***deal by deal, until we have a strong enough foothold for our sales force to do what***
***it does best, reference selling***."

4   Ex. 12 at 239. During the Class Period, Ellison knew that Oracle was so desperate for 11i references

5   that it offered concessions or payments to customers to be references. *See* Ex. D at 251:1-16.

6          Ellison also knew that Oracle's inability to demonstrate 11i caused it to lose deals and further

7   negatively impacted its conversion ratio. Ex. 39 ("Simply put, all of our demo issues have to do with

8   our key marketed strength, INTEGRATION. . . . We cannot show what the customer wants to see

9   when it comes to the combination of CRM and ERP. Not only have we lost deals in which we were

10  the new player, many deals have been lost with installed base customers."); Ex. 40 at 063432

11  ("Another deal lost primarily due to demo system performance."). In fact, Ellison knew that the

12  field was reluctant to even try to sell the product because of the problems. *See* Ex. 41 at 013402

13  ("CRM: we are loosing [sic] a bit of momentum; sales people are reluctant to engage to the product

14  problems, lack of references and local language issues."); Ex. 42 (March 20, 2001: noting that if

15  Oracle's inability to demonstrate 11i did not improve, "it will continue to impact our conversion

16  rate" and that "when you see all of the names of prospects [being affected by Oracle's inability to

17  demonstrate 11i] it's really sickening. Hopefully Larry will get sick as well and put more pressure

18  on getting this fixed."). Indeed, even after March 1, 2001, Oracle still could not demonstrate 11i.

19  On April 19, 2001, a "frustrated" Jeffrey Henley ("Henley") summed up the situation: "Absolutely

20  incredible. We're blowing the opportunity of a lifetime with 11i." Ex. 43. Ellison was "very

21  familiar" with the demo problems. Ex. D at 273:3-12. *See also* Ex. G at 105:7-8 ("I was certainly

22  aware that we had problems with our demonstration system."). There was, in fact, an "internal" only

23  appreciation of the problems facing Oracle that resulted from the immaturity and deficiencies

24  plaguing 11i. Ex. 44 ("I have a simple, internal only, explanation. Give the R11i problems in

25  Q1/Q2, many of our sales people decided to focus on technology to make their quota and wait for the

26  product to be stable."); Ex. 45 at 162215 ("as you know, we had six-nine months of product issues

27  which caused loss of confidence by sales, partners, analysts and customers."); Ex. 46 (August 30,

28

1    2001: We are going through a rough patch because 11i did not work (but it does now), we missed

2    two quarters and we pissed off a lot of customers with the apps upgrade to 11i.").

3         Despite its failure to test 11i in-house prior to its release, in an attempt to manufacture an 11i

4    reference, Ellison and Oracle reassured customers and the market that Oracle itself had already saved

5    a billion dollars in one year using its E-Business Suite. Ex. 47 at 015757. Ellison has now conceded

6    that his statements were "only partly true":

7         ***The final qualification about Oracle's story of transforming its efficiency
          by using its own E-Business Suite is that the claim is only partly true, because the
8         first billion dollars of savings was pretty much in the bag before 11i was
          finished. . . . Ellison says, "That's absolutely right***. The software that saved Oracle
9         a billion dollars in the first year was a combination of our standard applications
          products plus prototype applications that had not yet been integrated into the E-
10        Business Suite.". . . [I]n one sense, the marketing claims were ***misleading. The
          reassuring message to prospective customers was that Oracle had been successfully
11        running the same E-Business Suite that they would buy for at least a year. That
          was very far from the case***. Not for the first time in Oracle's history, early guinea-
12        pig customers would pay a price for taking too much on trust. Not, however, as great
          as Oracle and Ellison would pay.

13   Ex. 12 at 182-83.

14        Investors were not aware that Oracle's claims regarding its own use of 11i were, by Ellison's

15   own admission, true "only partly." They were not aware that the message sent by Oracle was "very

16   far from the case" and "misleading." They were unaware in 3Q01 that product problems, lack of

17   references and inability to demonstrate 11i, combined with an inexperienced sales force, made 11i

18   difficult to sell and negatively impacted Oracle's applications conversion rate. They could not know

19   that these problems rendered misleading Oracle's (and Ellison's) statements that 11i would allow

20   Oracle to escape the economic slowdown. Nor were they aware that the higher mix of applications

21   deals in the pipeline rendered Oracle's forecasting process inaccurate and its External Forecast

22   unreasonable. Ellison was aware of all of these hidden facts.

23        Moreover, from Ellison's destruction of the mountain of emails and recordings of private

24   interviews with his biographer, the Court has held that it is appropriate to infer that the willfully

25   spoliated materials would have contained adverse evidence regarding, among other things,

26   "problems with Suite 11i" and "problems with defendants' forecasting model." Opinion at 12. This

27   adverse inference further compels the conclusion that when Ellison traded, he knew that problems

28

1  with 11i and Oracle's sales force were impacting Oracle's ability to convert its already lower

2  applications pipeline and that its External Forecast had no reasonable basis.

### 3.   Oracle's Reliance on Falsified 2Q01 Earnings Was Material Inside Information Used by Ellison When He Traded and It Rendered Its 3Q01 External Forecast Unreliable

#### a.   Ellison Secured a Fraudulent Swap Deal with HP and Inflated 2Q01 Application Growth

Ellison knew going in to 3Q01 that to convince the market that 11i had turned the corner,

Oracle needed compelling 2Q01 applications growth and major corporations as references.  After

11i's May 2000 release, Oracle had begun receiving negative publicity regarding problems in the

software, and Oracle's 1Q01 applications growth was characterized by analysts as "disappointing."

Ex. 48.  Ellison knew and analysts made clear that the value of Oracle's stock depended heavily on

the success of 11i.  Ex. 12 at 239 (Ellison: "in the long run what really determines our success and

our stock price is how good our products are"); Ex. 49 (October 10, 2000 First Union Securities Inc.

report: "Oracle's premium multiple is driven in large part by the potential growth in its e-business

applications . . . ."); Ex. 50 at 8 (November 6, 2000 Salomon Smith Barney report: "Oracle's current

valuation reflects the realization of the projected revenues associated with its new e-business

Suite.").  And in the fall of 2000, Oracle executives were concerned with declines in Oracle's stock

price – Henley was "sputtering mad."  Ex. 51 at 6.

Within a few weeks of Henley's expression of fury at the decline of Oracle's stock price,

defendants advanced the illusion of robust 11i sales and of Oracle's ability to "beat the street," by

fraudulently manufacturing a $20 million "swap" or "round trip" transaction with Hewlett Packard

("HP") at the end of 2Q01, which allowed it both to report applications growth of 66% and to

provide the market with a large corporation as a CRM reference.  Ex. 1 at 03217, 03223.

Undisputed evidence shows that Ellison was heavily involved in negotiating the HP deal with his

friend, former HP CEO Carly Fiorina, and that he knew that the $20 million HP deal was entirely

contingent on Oracle's promise to purchase $30 million of HP hardware.  Ex. 52 (November 30,

2000: "I understand Larry [Ellison] and Carly [Fiorina] are discussing their purchase of our products

this quarter *if we commit* to purchase $20M-$30M of their product over the next 18-24 months.");

1   Ex. 53 at 055957 (November 9, 2000: "HP confirmed today that they will try and pull the CRM

2   portion of the order off providing we deliver what we have outlined. . . . ***Since they don't need ALL***

3   ***the license users right now they are hedging*** on how big an order they will do until they see how

4   much production hardware Oracle comes back with. ***If this turns out to be a large number*** we

5   could get the entire order."); Ex. 54 at 020844 ("Consistent with Larrys [sic] conversations with

6   Carly, HP will expect a purchase order to be binding and commit Oracle to using the full amounts by

7   the dates we promise."); Ex. 55 at HP00020 ("These licenses were bought as an 'incentive' for

8   Oracle to help us increase HP's revenue.").  Defendant Sanderson questioned internally the integrity

9   of the phony deal, asking in a handwritten notation to one of the deal documents:  "***THE REAL***

10   ***STORY . . .  Is this the way we are going to do deals.  Each has to buy something [from the***

11   ***other]!***"  Ex. 56 at 020839; Ex. W at 521:10-524:21.  Ellison and Henley approved the deal in a

12   "Special Meeting" between just the two of them on the last day of 2Q01 and improperly recognized

13   the revenue in 2Q01 even though the deal was not signed and executed until after the end of 2Q01.

14   Ex. 57 at 044458.  After the quarter closed, on December 4, 2000, EVP Mark Barrenechea

15   (responsible for CRM) reported to Ellison and Henley that "***[w]ithout HP***, [2Q01 results] ***would***

16   ***have been different.  The East did not bring in any business***."  Ex. 116 at 020730.

17        The fictionalized HP revenue allowed Oracle to beat analyst expectations for applications

18   growth, reporting 66% instead of 54%, which, according to analysts, "validat[ed] the notion that

19   many corporate IT decision makers really do prefer an integrated, comprehensive solution," and

20   allayed concerns about early reports of bugs in the software.  Ex. 48 (Thomas Wiesel: "Oracle made

21   up for disappointing applications license sales in Q1 by posting 66% growth in Q2.  Notable wins at

22   . . . Hewlett Packard . . . highlighted solid demand for the company's 11i e-business suite."); Ex. 58

23   at 308932 (Salomon Smith Barney: "We are under the impression that the first version had

24   considerable bugs and the most recent version is really gaining traction."); Ex. 59 at 308884.[8]  This

25

26   [8]   *See also* Ex. 60 at 308891 (Merrill Lynch: "Oracle began to show traction again in its

27   applications business and the company spoke confidently about improving its growth in applications through the remainder of FY01 . . . . [N]ew wins with HP (thought to be a $20 mil deal)."); Ex. 61 at

28   420588 (Deutsche Bank: "Applications license growth of 66% solidly outpaced Street expectations

misperception in the market (purposefully fostered by Ellison and Oracle) that 11i was stable and gaining traction, allowed Oracle to credibly project 75% 3Q01 applications growth.  Ex. 1 at 03217, 03221.

### b. Ellison and Defendants Manipulated Oracle's 2Q01 Results and Thereby Beat Expectations

The fraudulently recognized HP revenue was not, however, enough to allow Oracle to beat analyst EPS expectations for 2Q01.  Leading up to 2Q01, Oracle had "beat" the street for four quarters in a row, including nine of the previous ten quarters.  Ex. J at 290:12-19.  During the single quarter in which Oracle merely "met" expectations, Oracle's stock dropped 6% the next trading day. *Id*. at 290:16-291:1.  Ellison has stated more than once that "***the only thing that would make any difference*** was a quarter that beats expectations."  Ex. 12 at 204, 431 ("Ellison had previously said that ***the only thing that would make a difference*** was a quarter that beat expectations.  'Most analysts try to foretell the future by understanding and explaining the recent past . . . .  It's as simple as that – they just look at the numbers.'").

After the close of 2Q01, Ellison was informed through the receipt of Upside Reports that Oracle was still $20 million in revenue shy of "beating the street."  On December 1, 2000, the day after 2Q01 closed, Ellison received a 2Q01 Upside Report that reported a Potential EPS Forecast of 10.3 cents per share.  Ex. 62 at 440830.  Thus, by December 1, 2000, Ellison knew that Oracle could not beat 2Q01 analyst expectations unless it additionally inflated earnings by approximately $20 million (or 0.02 cents) to push its EPS result to 10.5 cents or more.

By December 8, 2000, Ellison and Oracle found a way to further inflate Oracle's revenues. By 2Q01, Oracle had accumulated over $100 million of cash receipts from customers that had not been applied to an invoice ("customer unapplied cash").  Much of this cash was sitting in an account aptly entitled "Customer Overpayments."

---

in the 50-60% range.  The outperformance should also allay concerns about the viability of Oracle's applications business and the relative immaturity of release 11i, following last quarter's decent, but slightly disappointing . . . growth.").

1    During 2Q01, Oracle transferred at least $20 million of the customer overpayments to a

2  secret fund contained in one of Oracle's reserve accounts, dubbed "Account 12601" which was used

3  to manipulate Oracle's revenue and earnings.  Ex. 120 at 104764.  To cover up its misuse of

4  customer cash, Oracle engaged in a "clean up" of the money whereby Oracle created fictitious

5  invoices or "debit memos" and applied the customer cash to those fake "debit memo" invoices to

6  make it appear as if the money was paid by customers for legitimate Oracle sales.  Exs. 121-123.1.

7  Then, when Ellison received executive committee reports on December 1, 4 and 5, 2000, showing

8  that Oracle was not going to beat Wall Street expectations (Ex. 62 at 440830, 440832; Ex. 124 at

9  1532805; Ex. 125), Oracle improperly "adjusted" its reserve account and converted the $20 million

10  in customer overpayments to fictitious revenue and earnings.  Ex. 63 at 1610987; Ex. J at 70:10-14;

11  Ex. 64 at 20.  This fraudulent $20 million adjustment went directly to Oracle's revenue and earnings

12  and allowed it to inflate its EPS to over 10.5 cents, and to 11 cents when rounded.  Ex. J at 146:19-

13  147:1; Ex. 64 at 38.  Oracle's own expert conceded that the transfers "went right into income,

14  actually went into reserve that went into income."  Ex. J at 146:19-147:1.

15    Immediately following plaintiffs' filing of their amended complaint in October 2002, which

16  contained the new debit memo allegations, Oracle engaged in another "clean up" to conceal its 2Q01

17  accounting fraud by reversing, refunding and escheating over $50 million in improperly held

18  customer overpayments, including the $20 million debit memo transfer in 2Q01.  Oracle's expert

19  admitted to reversal of the $20 million in improper transfers.  *Id*. at 154:7-11 ("So, if in the second Q

20  they were applying the 25005 [Customer Overpayments] to the 12601, *that's recording income*.  If

21  – then remember during October/November [2002] time frame *they reversed all of that.  It all went*

22  *out of reserve.  It reduced revenue, basically, by that $20 million*.").  Thus, through the fraudulent

23  HP transaction and bad debt transfers, Oracle was able to "beat the street," "the only thing that

24  makes a difference," in Ellison's words.[9]  Ex. 12 at 204, 431.

25

26  _____

27  [9]    The Court's September 2, 2008 order noted that "[i]t . . . appears that plaintiffs have
   abandoned their claim regarding debit memos."  Opinion at 12.  As this discussion makes clear,

28  plaintiffs have not abandoned their debit memo claims.  Indeed, the debit memo claims are an

1    Despite knowing that Oracle had fraudulently reported 2Q01 EPS of 11 cents and that 3Q01

2    comparisons were much more difficult than 2Q01's, Oracle used 2Q01 results as a basis for its 3Q01

3    External Forecast:

> [Henley:] In the area of per share, we think it would be 12 cents. . . . And also, just
> historically, the third quarter is slightly better than the second quarter. That's the
> way, sequentially, it's worked here. And if you look back at the last three years,
> sequentially, the third quarter, split-adjusted, has been one cent a share better than the
> second quarter. So we did 11 cents in the second quarter. So I would assume, 12
> cents would be a reasonable number at this point. I don't think history is going to be
> a lot different here.

8    Ex. 1 at 03222; Ex. 21. As a result, through its fraudulent 2Q01 revenue recognition, Oracle and

9    Ellison were able to convince analysts and investors that Oracle's 11i problems were behind it, that it

10   was poised for applications growth, that it was not being affected by the economy, and that its 3Q01

11   12 cents EPS projection was reasonable. Ellison knew that Oracle's 2Q01 results were fraudulent

12   and that the true figures showed that there was no reasonable basis for Oracle's External Forecast.

13   Investors did not.

14       Evidence proves that Ellison was heavily involved in the fraudulent HP transaction. It also

15   proves that Ellison knew that Oracle improperly recognized revenue through improper transfers from

16   customer overpayments and was able, thereby, to "beat the street" – "the only thing that matters"

17   according to Ellison. Ex. 12 at 204, 431. Because "virtually everything" Ellison did was over email,

18   and because he clearly discussed the importance of "beating the street" with Symonds on "more than

19   one occasion," it should be inferred that the spoliated materials contained adverse evidence on these

20   topics. *Id.*; Ex. G at 93:4-5.

21           **4.    Ellison's Directive Just Before 3Q01 to Increase the Risk in
                     Oracle's Forecast Was Material Inside Information Used by
22                   Ellison When He Traded and It Rendered the External
                     Forecast Unreliable**
23

24       When Oracle issued its 3Q01 External Forecast, Ellison knew that Minton's $160 million

25   3Q01 upside adjustment was no longer necessary because he had instructed the Field in late 2Q01 to

26   _____

27   important part of plaintiffs' case to prove that Oracle fraudulently reported 11 cents EPS in 2Q01,
     which formed a false basis for Oracle's 3Q01 forecast.

28

1  add more risk (and amount) to its forecast.  Ex. 17 at 203683.  Ellison's directive, designed to

2  eliminate sandbagging, rendered Minton's upside adjustment (historically applied to eliminate the

3  same problem) obsolete.

4         According to Minton's email regarding Ellison's directive, which was sent to executives and

5  finance personnel in the field units, "Larry [Ellison] made it clear that he wants everyone to submit

6  realistic forecasts – he is not interested in 'commit' numbers."  Ex. 65 at 151962; Ex. B at 105:10-

7  21.  Numerous executives forwarded Minton's email, and executives and finance personnel in the

8  field divisions discussed methods for implementing Ellison's directive:

9           "Recently Larry has changed the way he is interpreting our forecast. . . .  This is a
            change from our current thinking in that our forecast has not usually had a significant
10          amount of judgment.  It was the amount that you believed you could deliver at a
            minimum.  That emphasis has shifted . . . *and now our forecast is a number that*
11          *includes more risk than in the past*."

12  Ex. 17.  Ellison confirmed that "Larry" in this email was him.  Ex. D at 423:24-425:1.  Oracle

13  documents show that this directive went into effect before Oracle's 3Q01 – "[w]e will incorporate

14  this [change] in our OSO 11i training that is tentatively scheduled the week of 10/23."  Ex. 17.

15  Despite the added risk, the Field Forecast still informed Ellison throughout 3Q01 that Oracle was

16  projecting to miss its External Forecast.  Ex. 16 at Ex. 12.

17         Minton testified that she did not take the directive into account when adding this upside to

18  the Field Forecast in 3Q01.  Ex. B at 19:17-19.  Ellison was aware that Minton's upside was no

19  longer necessary but that, despite his directive, Minton added $160 million in upside in 3Q01.  He

20  was also aware that this rendered Oracle's forecasting process inaccurate and its resulting External

21  Forecast unreasonable.  Investors were not.  As a result of Ellison's willful destruction of his emails

22  and tapes and transcripts of interviews for *Softwar*, the Court has held that it is appropriate to infer

23  that the spoliated materials would have contained adverse evidence regarding, "among other things,"

24  "problems with defendants' forecasting model."  Opinion at 12.  The adverse inference that the

25  destroyed materials contained evidence harmful to defendants and Ellison on this topic further

26  supports the conclusion that Ellison knew that his directive rendered Oracle's forecast so unreliable

27  that its External Forecast had no reasonable basis.

28

1

> **5.      The Fact that Minton Applied Her Inaccurate Conversion Ratio to a "Too Good to Be True" Pipeline Was Material Inside Information Used by Ellison When He Traded and It Rendered Oracle's External Forecast Unreliable**

Ellison was aware that the major economic change, the change in Oracle's product mix, and the myriad problems with Suite 11i rendered Minton's conversion analysis inaccurate.  Ellison was also aware that in 3Q01, Minton was applying this inaccurate conversion analysis to a pipeline that Henley testified was overstated. Ex. K at 354:15-355:3.  This "too good to be true" pipeline, which Oracle touted to analysts in December 2000 as a reason for its belief in the strength of its financial prospects, was in reality caused by Oracle's move in early December 2000 to 11i Oracle Sales Online ("OSO").  Ex. 66; Ex. L at 270:2-14.  The move to OSO increased Oracle's 3Q01 pipeline by adding deals that the Field would previously not have felt comfortable enough to include.  Henley testified that this overstated pipeline was the reason that Oracle issued an External Forecast of 12 cents EPS instead of the 12.8 cents that Minton was forecasting at the time.  Ex. K at 354:5-14 ("[W]e were skeptical of the strength of the pipeline to start the quarter, so we did not make all that into our forecast for the third quarter.").   In issuing its External Forecast, however, Oracle completely failed to take into account the variety of other changes, including the economic change, the change in Oracle's product mix, and Ellison's directive, that made Oracle's forecast inaccurate.

Ellison testified that these sorts of changes rendered Oracle's forecasting process inaccurate and therefore knew that Oracle's External Forecast lacked a reasonable basis.  Investors did not.

> **B.      When Ellison Suddenly Deviated from Plan and Decided to Trade His Stock in January 2001, the Internal Indicators that He Relied upon Painted a Bleak Picture for Oracle's Financial Prospects**

In addition to knowing that Oracle's External Forecast lacked a reasonable basis, Ellison was also informed by internal forecasting indicators that Oracle was being adversely affected by the declining economy and 11i problems, and Ellison testified that he relies primarily on actual sales and pipeline data, rather than the Potential Forecast.  Ex. C at 279:1-11.  Both the actual sales data and the pipeline data available to Ellison when he traded indicated that Oracle was being adversely affected by the economy and 11i problems.  Ellison knew all of this information.  Ex. F at 77:13-16

("*So you're saying before trading commenced on the 22nd, was I pretty much up-to-date with all of the information available, then available?  And the answer's yes*.").

### 1.  Less than 36 Hours Before He Decided to Unload Early, Ellison Received Oracle's Dismal Actual Results for December 2000

Actual results for December 2000 informed Ellison that Oracle was being adversely affected by the economy and 11i quality.  On January 17, 2001, Ellison received and read the Larry Garnick Flash Report ("January 17 Flash Report") containing Oracle's actual results for December 2000.  Ex. 67.  The January 17 Flash Report disclosed that the NAS and OSI lines of business (the divisions responsible for Oracle's 3Q01 miss) had growth of *negative* 24% and *negative* 81%, respectively, and that Oracle Product Industries ("OPI") had revenue growth of *negative* 85% after adjusting for Covisint.[10]  *Id.*  Accordingly, as of January 17, Ellison knew that all three U.S. divisions (50% of Oracle's license revenues) had negative growth trends.[11]

The Flash Report also informed Ellison that Oracle's U.S. divisions had sold virtually no applications (11i), excluding Covisint.  Ex. 67.  Although its U.S. divisions were *forecasting $323*

---

[10]    Covisint was a $60 million applications deal that was the largest transaction in Oracle's history.  Larry Garnick removed Covisint from his Flash Report analysis because the size and one-time nature of the transaction skewed Oracle's trends.  Ex. M at 312:2-313:4; Ex. N at 216:25-218:23.  Ellison himself testified that removing Covisint was proper in analyzing December 2000 results.  Ex. D at 436:13-437:6.

[11]    Ellison was aware of the problems in NAS and OSI even earlier.  On his copy of the December 8, 2000 Upside Report, Henley noted that: (i) NAS had no big deals in the pipeline; and (ii) the tech pipeline for OSI was down a lot since the latest report.  Ex. 68 at 610124.  Henley testified that he must have been concerned about the fact that the tech pipeline for OSI was down "a lot."  Ex. N at 214:2-19.  Over the next few weeks (by 12/25/00), OSI's applications pipeline would also plummet by almost $200 million.  Ex. 18; Exs. 69-70.  *See also* Ex. 30 (Jan. 11, 2001: "Drop in Technology.  As reflected in the softening Pipe, both GB and Majors see a slow down in both Q3 and Q4.  GB's dot.com bubble has burst (they expect the West to end the year $30 to $40 million behind their original Budget for Technology.  Majors sees a slow down in spend along with smaller deal sizes.").  Ellison testified that he was aware of these issues in January 2001.  Ex. D at 431:13-432:6.  In addition, defendants knew that OSI would only make its forecast and guidance if "none" of its very large deals fell out, many of which were with companies in the troubled telecommunications industry.  Exs. 71-72.  When Ellison traded he knew that many of these deals had disappeared or were "not likely to close."  Ex. 68 at 610124; Ex. 71; Ex. 73; Ex. 74 at 293931; Ex. 75 at 090542; Exs. 76-80; Ex. 81 at 252257; Ex. 82 at 156558.0001; Exs. 83-86; Ex. 87 at 081828; Ex. D at 214:2-215:16; Ex. H at 58:1-7, 66:13-69:2, 77:19-78:2; Ex. O at 118:10-119:3, 150:14-153:24; Ex. P at 153:24-154:2; Ex. Q at 153:18-154:4; Ex. R at 44:25-45:6.

1    *million* (excluding Covisint) in 3Q01 applications sales, in December 2000, Oracle's U.S. divisions

2    *sold less than $1.3 million* in applications ($805,000 of CRM and $458,000 of ERP, excluding

3    Covisint).  *Id*.  *This represented year-over-year applications license growth of negative 92%*.  *Id*.

4    The U.S. divisions did not fare much better in database.  In December 2000, Oracle's U.S. divisions

5    had *negative* 33% growth in database sales, even including Covisint.  *Id*.  Excluding Covisint, U.S.

6    database sales had *negative* 44% growth.  *Id*.  Thus, by January 17, just 36 hours prior to unloading,

7    Ellison was aware of the negative trends in the U.S. divisions that accounted for Oracle's 3Q01

8    shortfall.  *Id*.

9         The Flash Report disclosed further adverse information.  Excluding Covisint, total company

10   license growth was just 1% (compared to an external forecast of 25%) and total company

11   applications growth was *negative 46%* compared to an external forecast of 75%.  *Id*.   Henley

12   testified that the Flash Report disclosed that Oracle was "off to a slow start irrespect [sic] – you

13   know, excluding Covisint."  Ex. N at 226:6-7.  And given the negative trends in every U.S. division,

14   Oracle was unlikely to make up for that slow start.  Ellison received this information just before

15   midnight on January 17.  Ex. 67.  On January 19 (less than 36 hours later), without any prior

16   indication of an intention to trade in January 2001, Ellison instructed Simon to dump 40 million

17   shares of Oracle stock.  Ex. F at 69:1-70:3; Ex. S at 59:15-60:6; Ex. 88 at 300606.

18           **2.      When He Sold, Ellison Was Aware that Oracle's "Astounding"
                       Pipeline Had Taken an Unprecedented Nosedive**

19

20       Oracle's pipeline also informed Ellison that Oracle was being adversely impacted by the

21   economy and 11i problems.  At Oracle, "pipeline" referred to "all the deals that were being worked

22   on or had an opportunity to close during the quarter" and included deals that had already closed.

23   Ex. A at 110:22-111:1, 128:11-21.  Year-over-year pipeline growth, while as high as 52% in Week 1

24   of 3Q01, dropped precipitously in the next few weeks and continued to fall throughout the quarter.

25   Exs. 69-70; Ex. 16 at Ex. 20.  Total company pipeline growth dropped to 34% by December 25.

26   Exs. 69-70.  As this was an indicator Ellison relied on, the pipeline informed him no later than

27   December 25 that Oracle's business was being negatively impacted.

28

1   The pipeline collapse continued throughout 3Q01.  In addition to the $328 million drop in

2   December, Oracle's pipeline collapsed $544 million by February 5.  Ex. 16 at Ex. 20.  In contrast,

3   the pipeline for the same months of the prior year ***increased*** by $69 million.  *Id.*  Historically,

4   Oracle's pipeline tended to increase in the quarter before declining at the end.  Ex. 16 at Ex. 21.  The

5   size of the pipeline declines in the previous quarters were also nowhere near the size of the declines

6   in 3Q01.  *Id.*  The rapid and uncharacteristic decline in 3Q01 indicated that more deals were being

7   lost.  Ellison was aware of this when he traded.  Investors were not.

8   Ellison also relied on the "comfort gap," the difference between forecasted revenue growth

9   and pipeline growth.  Ex. F at 86:3-87:5; Ex. C at 420:12-14.  Ellison stated, "as long as the pipeline

10  growth is greater than – than the revenue growth, you should be able to meet your numbers."  Ex. C

11  at 420:12-14.  With the opposite true during significant parts of December and January, Ellison's

12  own measure indicated that Oracle's business was faltering.  Ex. 16 at Ex. 13.

13  Unlike the prior four quarters, the comfort gap was extremely narrow in 3Q01.  Between

14  December 25 and January 29, the gap was never higher than 4% and was negative half the time.

15  Ex. 16 at Ex. 13.  This was out of line with Oracle's experience, which showed a negative gap only

16  once prior to 3Q01, and an average gap of 13.4%.  *Id.*  A negative gap is important because it

17  indicates that the forecast is less likely to be met.  As Ellison noted, it would be "incautious to

18  . . . forecast sales growth without underlying pipeline growth."  Ex. F at 86:21-87:5.  Yet, when

19  Ellison began trading, the growth gap was ***negative*** 1%.  Ex. 16 at Ex. 13.  Ellison was aware of this

20  adverse information.  Exs. 18; Exs. 69-70; Exs. 89-91.  Investors were not.

21  Ellison also knew that Oracle's problems were deep seated and likely to continue into the

22  future.  Throughout 3Q01, Ellison knew that the Field was forecasting 4Q01 revenue growth far

23  below Oracle's targets.  On January 15, 2001, OSI and OPI were forecasting 4Q01 revenue growth

24  of negative 7% and negative 16%, respectively.  Ex. 92 at 099014.  Only NAS was forecasting

25  positive growth (19%), but its 4Q01 forecast had just been decreased by $65 million.  *Id.*  In total,

26  the U.S. divisions were forecasting just 3% growth for 4Q01, compared to a budget target of 30%.

27  *Id.*

28

1    In isolation, many of these facts indicate that Oracle's license revenues were being impacted

2  by the economic downturn and 11i problems.  When viewed collectively, they paint a dismal picture.

3  Ellison was aware of these facts when he traded.  Investors were not.[12]  And the adverse inference,

4  that the emails and recordings destroyed by Ellison would have contained adverse evidence

5  informing Ellison of, among other things, "the effects of the economy on Oracle's business" and

6  "problems with Suite 11i" further compels this conclusion.

**C.    After Receiving Adverse Material Non-Public Information, Ellison
Suddenly Decided to Unload 40 Million Shares of Oracle Stock to
Fund His "Absolutely Excessive" Lifestyle**

9    Ellison had a track record of holding on to his Oracle options, despite Simon's constant

10  advice to diversify and pay down debt.  In the spring of 2000, Ellison was under the mistaken

11  impression that his options were expiring in August 2000.  Ex. 88 at 300606; Ex. 94.  Having held

12  his options until what he believed were the final two trading windows, Ellison, Simon and Oracle

13  discussed the tax consequences for Oracle of his selling in April 2000.  Ex. 95.  When Simon

14  correctly informed Ellison that his options were actually expiring in August 2001, Ellison decided

15  again to delay his trading until the last minute.  Ex. 88 at 300606; Ex. 94.

16    In October 2000, Oracle's tax department personnel again discussed with Ellison's advisors

17  whether it would be most beneficial to Oracle to have Ellison exercise his options and sell Oracle

18  shares in FY01 or FY02 (after May 2001).  Ex. 96.  After stating that Ellison's decision on when to

19  exercise would "of course depend on Oracle's stock price and Larry's mood," Ellison's tax advisor

20  concluded that Ellison would be willing to exercise in either FY01 ("before the May 2001 quiet

21  period") or FY02 (August 2001) so long as it would be tax neutral for Ellison.  *Id.*

---

[12]    Ellison also watched the performance of other companies as a gauge of Oracle's business.
*See* Ex. 12 at 157 ("LE writes [regarding Ray Lane]: He takes personal credit for our stock price run-up?  Amazing.  Oracle rode the Internet wave because our database powered virtually every major Web site on the Net.  If you plot the stock price of Cisco, Oracle, and Sun, you will see that all three companies rose and fell together in perfect synchronization as sentiment about the Internet rose and fell.").  On January 19, 2001, the very day that Ellison decided to trade, Sun pre-announced.  Ex. 93. Cisco had pre-announced even earlier.  Ex. 12 at 157.  Ellison, whose daily routine includes checking the websites of rivals, was aware of these facts.  Ex. 12 at 287.

On January 10, 2001, Deborah Lange, a Senior Vice President in Oracle's Tax Department, emailed Henley that Oracle's tax department would prefer that Ellison sell in April 2001 instead of August 2001. Ex. 97. She wrote:

> "Larry may be willing to exercise in April if it is beneficial to the company. . . . The unknown factor is the relative stock price April versus August. . . . My general recommendation is to ask Larry to do as much as possible in April, but to modify that advice in April when we have more visibility to FY01 results and the stock market."

*Id*. No mention was made of any possibility that Ellison might sell in January 2001. On January 22, 2001, still under the impression that Ellison was going to exercise options and sell Oracle stock either in April 2001 or August 2001 (despite the fact that Ellison had already begun his selling spree), Lange wrote to Simon: "It is obviously Larry's call but there is a possible benefit to the company of exercising in FY01 (April) rather than FY02." Ex. 98.

As of January 19, neither Simon nor anyone else had heard of any plan by Ellison to exercise his options and sell in January 2001. Ex. 88 at 300606. That day, however, less than 36 hours after receiving Oracle's dismal December 2000 actual results, Ellison suddenly decided to unload. Ex. 67; Ex. 88 at 300606. In addition to the 22 million expiring options that he had been planning to sell later in the year, Ellison instructed Simon to sell an additional 18 million shares of Oracle stock. Ex. 88 at 300609. *See* Ex. F at 33:2-5 ("Q. Okay. . . . Did you consider exercising your option – this block of expiring options and then just selling enough to cover taxes? A. No. No, I wanted to raise some cash."). With the exception of gifts and some small trades conducted for tax planning purposes, Ellison had not sold any Oracle shares since 1996. Ex. F at 28:2-4.

Between January 22, 2001 (the next available trading day) and January 31, 2001, Ellison unloaded an unprecedented $895 million worth of Oracle stock. Ex. 99 at 300656. The trades were carefully executed by Merrill Lynch and Simon to ensure that the shares could be sold without driving down the stock price. Because of this limitation, Ellison was only able to sell 29 million shares in January 2001 (as opposed to the 40 million that he had instructed Simon to sell). Ex. 99 at 300656; Ex. S at 65:4-67:19; Ex. F at 50:5-52:20; Ex. T at 185:18-186:7. Ellison also traded his shares in violation of Oracle's insider trading policy, which required him to first obtain clearance from both the legal department and the finance department heads. Ex. 100 at 005595. Although

1   Ellison obtained clearance from the legal department (which failed to conduct any independent

2   investigation into whether Ellison held material non-public information), Ellison made no attempt at

3   all to obtain clearance from Henley, the head of Oracle finance.[13]  Ex. F at 134:10-12.

4         Ellison's "story" regarding his sales has "evolved" throughout both the derivative litigation

5   and this litigation.  Ellison has verified that he spoke to no one regarding the reason for his sales.

6   Ex. 101 at 609922.  Ellison has also testified that he discussed these reasons with Simon.  Ex. C at

7   378:1-14.  Ellison has testified that he took Simon's advice to pay down debt and diversify when he

8   sold.  Ex. 102 at 609765.  Yet Ellison has used a large portion of the sale proceeds not on any debt

9   payment or diversification strategy, but instead to fund his "excessive" lifestyle.  Ex. 103 at 323.

10         According to *Softwar*, Ellison "derives straightforward pleasure from owning hugely

11   expensive material status symbols."  Ex. 12 at 485-86.  It is not surprising, then, that much of the

12   cash from Ellison's insider trading was used to pay for hugely expensive material status symbols,

13   including: (1) his new yacht, Rising Sun, the longest privately-owned boat in the world (Ex. 103 at

14   318) – at a cost of $250 million; and (2) his Japanese village "home" in Woodside which is,

15   according to *Softwar* "at well over $100 million, probably the costliest American home built for a

16   private individual since William Randolph Hearst's grandiloquent San Simeon."  Ex. 12 at 369-70;

17   Ex. 103 at 323 ("Pressure because Ellison had come under personal attack after vesting more than

18   $700 million worth of Oracle stock shortly before its price tanked following a profits warning –

19   ***money that had been put to use funding the construction both at Woodside and of Rising Sun***.");

20   *see also* Ex. C at 353:24-354:8.

21         Whatever Ellison's final "story" turns out to be, one thing is clear – until January 19, 2001,

22   every indication from Simon, Ellison and Oracle was that Ellison would exercise options and sell

23   stock in April 2001 or thereafter.  It was only upon the receipt of a plethora of negative information

24   regarding Oracle's products and financial prospects that Ellison suddenly decided to unload early.

25   Ex. 67.  While Ellison was able to reap the benefits of his conveniently timed trades, all of which

26   

27   [13]   "Q.  In January 2001, did you know any facts about Oracle's finances that Mr. Cooperman
did not know?  A.  Probably."  Ex. F at 66:7-9.

28

were over $30, most of Oracle's investors were not so fortunate.  Just a short month after Ellison's insider trading spree, on March 1, 2001, Oracle pre-announced its revenue and earnings shortfall.  Ex. 104.  On March 15, 2001, Oracle fully disclosed major shortfalls in its U.S. divisions and conceded that the "U.S. economic downturn over the past several months clearly affected our revenue and profit growth."  Ex. 105 at 038232.  Oracle stock plummeted to nearly half the price that Ellison was able to cash in at.  It has never recovered.

The inference that the e-mails and *Softwar* materials willfully spoliated by Ellison contained adverse information should extend to Ellison's trading.  Ellison communicated with Simon regarding the details and reasons for his sales.  Ex. D at 501:12-16.  Simon testified that his communication with Ellison was almost entirely over e-mail.  Ex. T at 63:10-12.  Deb Lange was involved in discussions as to whether Ellison would exercise his options and sell his shares in April 2001 or August 2001 – Ellison testified that he never had private conversations with Lange.  Ex. D at 487:16-20.  This is not surprising, since Ellison has testified that "virtually everything I do is in e-mail."  Ex. G at 93:5.  According to *Softwar*, Ellison receives "more than a hundred emails a day, most of which he answers himself or forwards to the appropriate person."  Ex. 12 at 286.  In addition, Ellison discussed his selling and the reason for his sales in *Softwar*.  Ex. 12 at 201, 202.  Since the destroyed emails and *Softwar* materials would likely have contained evidence relevant to Ellison's trading, and since, as the Court has already reasoned, Ellison's spoliation has made it impossible to know what materials would have existed and what they would have contained, the adverse inferences arising from the spoliation should apply to Ellison's trading.

## III.   ARGUMENT

### A.   Standard of Review for Summary Judgment

Summary judgment must be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  There is a genuine issue of material fact only if the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A scintilla of evidence, however, that is merely colorable or not significantly probative does not present a genuine issue of

1   material fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir.

2   1989).[14]

3          The moving party's burden is one of persuasion (rather than proof) to show the absence of a

4   genuine issue of material fact.  *See Anderson*, 477 U.S. at 249.  Once a party has met that burden, the

5   burden shifts to the non-moving party to show that a genuine issue of one or more material facts

6   exist as to each element of that claim for relief.  *See id.*  The non-moving party – here Ellison – may

7   not rest on allegations or denials.  *Celotex*, 477 U.S. at 324; *Brinson v. Linda Rose Joint Venture*, 53

8   F.3d 1044, 1049 (9th Cir. 1995).  Instead, he must present admissible evidence showing that there is

9   indeed a genuine issue of material fact.  Fed. R. Civ. P. 56(e).[15]

## B.   Insider Trading Qualifies as a Deceptive Device in Violation of §10(b) and Is Prohibited by §20A of the Exchange Act

11          Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") makes it unlawful

12   for any person to "use or employ, in connection with the purchase or sale of any security . . . any

13   manipulative or deceptive device or contrivance" in violation of SEC rules and regulations.   15

14   U.S.C. §78j(b).   Rule 10b-5 prohibits the employment of any "device, scheme, or artifice to

15   defraud."  17 C.F.R. §240.10b-5(a).   Trading on material non-public information qualifies as a

16   deceptive device under §10(b) and Rule 10b-5.  *No. 84 Employer-Teamster Joint Council Pension*

17   *Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 927 (9th Cir. 2003); 17 C.F.R. §240.10b-5-1.

---

19  [14]       Where a non-moving party's claims are factually implausible, that party must produce more
20   persuasive evidence than would otherwise be required.  *Cal. Architectural Bldg. Prods., Inc. v.*
    *Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1470 (9th Cir. 1987).

21  [15]       The moving party can satisfy its burden without introducing direct evidence.  *See SEC v.*
22   *Hahn Truong*, 98 F. Supp. 2d 1086, 1095 (N.D. Cal. 2000) ("*Smith* recognized that causation or use
    may be inferred from circumstantial evidence.  ('Any number of types of circumstantial evidence
23   might be relevant to the causation issue.'")) (quoting *United States v. Smith*, 155 F.3d 1051, 1069
    (9th Cir. 1998)); *SEC v. Sargent*, 229 F.3d 68, 75 (1st Cir. 2000) (direct evidence not required where
24   circumstantial evidence is "just as appropriate").   In fact, most insider trading cases rely upon
    circumstantial evidence because few individuals admit to liability.  *SEC v. Warde*, 151 F.3d 42, 49
25   (2d Cir. 1998) (SEC presented sufficient evidence, though circumstantial, to support jury finding that
    defendant traded on inside information).   And courts have routinely looked to circumstantial
26   evidence in determining whether a defendant possessed inside information at the time of the trade.
    *SEC v. Downe*, 969 F. Supp. 149, 153-56 (S.D.N.Y. 1997) (finding that circumstantial evidence was
27   sufficient to support jury finding defendant guilty of insider trading through knowledge of major
    merger developments), *aff'd sub nom.*, *SEC v. Warde*, 151 F.3d 42 (2d Cir. 1998).

28

1    "'[A] person violates Rule 10b-5 by buying or selling securities on the basis of material nonpublic

2    information if . . . he is an insider of the corporation in whose shares he trades, and thus owes a

3    fiduciary duty to the corporation's shareholders . . . .'"  *SEC v. Clark*, 915 F.2d 439, 443 (9th Cir.

4    1990).  Insider trading constitutes a "'deceptive device'" under §10(b) because "'a relationship of

5    trust and confidence [exists] between the shareholders of a corporation and those insiders who have

6    obtained confidential information by reason of their position with that corporation.'"  *United States

7    v. O'Hagan*, 521 U.S. 642, 652 (1997).   The relationship between corporate insiders and

8    shareholders "'gives rise to a duty to disclose [or to abstain from trading] because of the "necessity

9    of preventing a corporate insider from . . . taking unfair advantage of . . . uninformed . . .

10   stockholders."'"  *Id.*

11          Section 20A also imposes liability on insiders for damages suffered by persons who trade

12   contemporaneously with the insider.   According to the statute, "[a]ny person who violates any

13   provision of this title . . . or the rules and regulations thereunder by purchasing or selling a security

14   while in possession of material, nonpublic information shall be liable . . . to any person who,

15   contemporaneously with the purchase or sale of securities that is the subject of such violation, has

16   purchased . . . or sold . . . securities of the same class."  15 U.S.C. §78t-1(a).  Section 20A requires

17   the insiders to disgorge all illegal profit gained from the sales.  15 U.S.C. §78t-l(b)(1).  To establish

18   summary judgment on a §20A claim, plaintiffs must prove: (1) a predicate violation of the Exchange

19   Act or its rules and regulations;  (2) that the defendant traded the security at issue

20   "contemporaneously" with the plaintiff; and (3) that the defendant was "'in possession of material,

21   nonpublic information'" at the time of the trade.  *In re Monster Worldwide, Inc. Sec. Litig.*, 549 F.

22   Supp. 2d 578, 584 (S.D.N.Y. 2008); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 255

23   (S.D.N.Y. 2007); *Shurkin v. Golden State Vintners, Inc.*, 471 F. Supp. 2d 998, 1026 (N.D. Cal.

24   2006); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 599 (S.D. Tex.

25   2003).  To demonstrate contemporaneous trades, courts within the Ninth Circuit have held that a

26   plaintiff must show that it purchased within six to fourteen days of the illegal trade.  *See In re Silicon

27   Graphics Sec. Litig.*, 970 F. Supp. 746, 761 (N.D. Cal. 1997) ("only purchases within six days of

28   insider sales are truly contemporaneous"); *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1489 (N.D.

1   Cal. 1992) (plaintiffs must show trades within fourteen days of each other to establish

2   contemporaneousness), *aff'd*, 11 F.3d 865 (9th Cir. 1993).[16]

3         To prove scienter under §20A, plaintiffs must satisfy the scienter standard for the underlying

4   violation, Rule 10b-5 insider trading.[17]   Courts have recognized that Rule 10b-5 and §20A share a

5   close legal relationship, contain overlapping elements, and may be proved by the same scienter.

6   *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 499 (S.D. Tex. 2004); *In re Tyco Int'l, Ltd. Sec. Litig.*,

7   No. 00-MD-1335-B, 2000 U.S. Dist. LEXIS 13390, at *28 (D.N.H. Aug. 17, 2000).  "To establish

8   liability under §10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with

9   scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'"   *Tellabs, Inc. v.*

10   *Makor Issues & Rights, Ltd.*, _U.S._, 127 S. Ct. 2499, 2507 (2007).  Insider trading that is suspicious

11   in timing and amount is a classic example of evidence tending to prove a defendant's scienter.

12   *O'Hagan*, 521 U.S. at 651-52.  In fact, the Supreme Court noted in *Tellabs* that "personal financial

13   gain may weigh heavily in favor of a scienter inference."  *Tellabs*, 127 S. Ct. at 2511.

14         To establish scienter for criminal §10b-5 insider trading liability, the Ninth Circuit held in

15   *Smith*, 155 F.3d 1051, that the U.S. was required to prove that a defendant used material inside

16   information in consummating the transaction.  *Id.* at 1069.  The Ninth Circuit explicitly declined,

17   however, to rule on whether or not it would apply the same "use" standard in the context of a civil

18   case.  *Id.*  The *Smith* court did cite with approval the 11th Circuit case of *SEC v. Adler*, 137 F.3d

19   1325, 1337-39 (11th Cir. 1998), which held in a civil case that when an insider trades while in

20   possession of material inside information, a strong inference arises that such information was used

---

16       Plaintiffs Dzung Chu and Ryan Kuehmichel purchased Oracle shares on the same day that Ellison sold his and therefore satisfy §20A's contemporaneous trading requirement.  Plaintiff Chu purchased 10,000 shares on 1/26/01 when Ellison sold 4.225 million shares.  Ex. 106 at MORSTAN 0101; Ex. 88 at 300612.  Plaintiff Ryan Kuehmichel purchased 2,000 shares on 1/23/01 when Ellison sold 5.1 million shares.  Ex. 107.1 at BARD0014; Ex. 88 at 300610.

17       Plaintiffs establish a predicate violation of the Exchange Act and SEC Rule 10b-5 through their showing that Ellison traded on the basis of material non-public information as discussed in this motion.  *In re JDS Uniphase Corp. Sec. Litig.*, No. C 02-1486 CW, 2007 U.S. Dist. LEXIS 76936, at *13 (N.D. Cal. Sept. 27, 2007) (plaintiffs' "§10(b) insider trading claims . . . are sufficient to serve as the predicate violation" for §20A liability) (citing *Johnson v. Aljian*, 490 F.3d 778, 781-82 (9th Cir. 2007), *cert. denied*, _U.S._, 128 S. Ct. 1650 (2008)).

by the insider in trading. *Id.* While the Ninth Circuit in *Smith* declined to apply the *Adler* presumption in a criminal case, it explicitly reserved the question of whether the presumption should be applied in a civil case. *Id.* Since that time, the *Adler* presumption has been applied in this Circuit as the scienter standard for civil insider trading claims under Rule 10b-5. *See Johnson v. Aljian*, 394 F. Supp. 2d 1184, 1198-99 (C.D. Cal. 2004) ("The Court will apply the presumptions of *Adler* in the present civil case [for purposes of scienter]. Although application of the heightened 'actual use' standard in a criminal case may be necessary to protect the constitutional rights of the accused, the same is not true for a defendant in a civil case."), *aff'd*, 490 F.3d 778 (9th Cir. 2007).[18]

Thus, in order to satisfy the scienter requirement for a Rule 10b-5 insider trading violation (both as an independent violation and as the required predicate violation for §20A liability), plaintiff need only prove that Ellison possessed (and failed to disclose) material inside information before trading, which creates a strong presumption that Ellison cannot rebut given the undisputed facts in the case and the adverse inference to which plaintiffs are entitled from Ellison's spoliation of evidence. The suspicious timing, nature and amount of Ellison's trades, combined with his spoliation of evidence (and his actions surrounding that spoliation) further compel the conclusion that Ellison acted with scienter in violation of Rule 10b-5 insider trading prohibitions.

C.     **Ellison Traded on the Basis of Material Non-Public Information with an Intent to Deceive, Manipulate and Defraud**

"The 'disclose or abstain' rule states that a corporate insider has a traditional, affirmative duty to 'abstain from trading in the shares of his corporation unless he has first disclosed all material nonpublic information known to him.'" *Johnson*, 394 F. Supp. 2d at 1197 n.8 (quoting *Chiarella v. United States*, 445 U.S. 222, 227 (1980)). As the Supreme Court has noted, information is material under the securities laws if there is "a substantial likelihood that a reasonable shareholder would

---

[18]     In addition, SEC Rule 10b-5-1 specifically defines when an insider trades "'on the basis of'" material non-public information. 17 C.F.R. §240.10b-5-1(b). It states that "a purchase or sale of a security of an issuer is 'on the basis of' material nonpublic information about that security or issuer if the person making the purchase or sale was aware of the material nonpublic information when the person made the purchase or sale." *Id.* Rule 10b-5-1 thus creates a presumption similar to that found in *Adler*. In addition, under Rule 10b-5-1, the presumption may only be rebutted with specific affirmative defenses, which Ellison cannot satisfy in this case. 17 C.F.R. §240.10b-5-1(c).

consider it important." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  The movant need only show that the information would significantly alter the total mix of information available to shareholders to establish materiality.  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).  In the context of an insider trading case, the time at which insiders began to trade is **strong** circumstantial evidence of materiality.  *See SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 853 (2d Cir. 1968).

There is no question but that Ellison possessed all of Oracle's internal forecasting indications, including actual sales and pipeline data.  As Ellison testified: "***So you're saying before trading commenced on the 22nd, was I pretty much up-to-date with all of the information available, then available?  And the answer's yes***."  Ex. F at 77:13-16.

### 1. When Ellison Traded, He Knew that Oracle's U.S. License Divisions Had Experienced Severe Negative Growth Rates

Undisputed facts show that when Ellison traded, he knew that Oracle's U.S. license divisions (representing 50% of Oracle's license revenues) had experienced severe negative growth rates and that Oracle's total revenue growth rate was flat year-over-year (compared to 25% license growth that Ellison projected for investors).  Ex. 67.  On January 17, 2001, Garnick e-mailed Ellison, informing him that through December 2000, license growth was **negative** 24% in NAS and **negative** 81% in OSI (the two U.S. divisions responsible for Oracle's 3Q01 miss, and which account for, on average, 40% of Oracle's total license revenues).  *Id*.  Additionally, license growth in OPI was **negative** 85% after adjusting for Covisint.  *Id*.  The emailed Flash Report also informed Ellison that through the first month of 3Q01, OPI had sold only $3 million worth of product (after adjusting for Covisint), NAS had sold only $30 million, and OSI had sold only $2.5 million, which was less than 5% of their combined forecast of $770 million for the quarter, excluding Covisint.  *Id.*  Given the size of the U.S. license divisions (NAS, OSI and OPI represented 25%, 15% and 10% of total license revenues, respectively), these negative results caused Oracle's total company license revenue growth rate to be only 1% year over year (compared to an external forecast of 25%).  *Id.*

Garnick's January 17 email also explained to Ellison that after adjusting for Covisint (because of its size and one-time nature), Oracle's total company applications products growth was a dismal **negative** 46% compared to the 75% license growth that Ellison projected for investors.  *Id*.

1    The emailed Flash Report also disclosed to Ellison that growth trends in both applications and

2    database were even more dismal in Oracle's U.S. divisions (where its miss in 3Q01 occurred);

3    through December 2000, excluding Covisint, Oracle's U.S. license divisions had sold *less than $1.3*

4    *million in applications product* (compared to a forecast of $323 million without Covisint), which

5    amounted to *negative* 92% applications license growth in the U.S. divisions.  *Id*.  The database

6    growth in the U.S. divisions was *negative* 34% even with Covisint and *negative* 44% without.  *Id*.

7    Ellison received and read all of this adverse information within 36 hours of his sudden decision to

8    unload stock.  *Id*.; Ex. 88 at 300606; Ex. F at 76:25-77:12; *supra* at 20-22.

9         Ellison knew that this information was material and precluded him from trading.  When

10   asked in deposition "what sort of inside information would prevent you from trading in Oracle

11   stock," Ellison testified directly that adverse results in one of Oracle's major license divisions "*after*

12   *the end of the first month*" would be the type of information that would preclude him from trading:

13        There were some fundamental – there was a *massive drop in our – in our sales* in
         Europe suddenly in the middle of a quarter *– or after the end of the first month*.

14        Sales in Europe were zero, you know.  It was – some – some substantial material
         financial event occurred during the quarter.  *That would have required me not to*

15        *trade*.

16   Ex. F at 43:12-44:6.  Sales in Europe contributed less to Oracle's license revenues than did its NAS

17   and OSI license divisions, the two divisions directly responsible for Oracle's 3Q01 miss.  When

18   Ellison decided to trade, he had just learned that, after the end of the first month of 3Q01, both of

19   these divisions had experienced massive drops in sales as evidenced by their severe, negative year-

20   over-year growth trends.  In addition, after the end of the first month of 3Q01, NAS and OSI

21   combined had generated just 5% of the revenue they were forecasting for the quarter.  Ex. 67.  This

22   information was not only material under Ellison's own definition, but it is also material information

23   that investors would consider important under the securities laws.  The information was material

24   even under Oracle's internal definition.  Ex. 107.2 at 032690 ("Material means . . . any deals, any

25   forecasts or outlook on the market or our performance in a product area or product line or

26   geography.").  This conclusion is further compelled by the adverse inference that the emails and

27   *Softwar* materials willfully spoliated by Ellison would have contained adverse evidence regarding,

28

"among other things," "the effects of the economy on Oracle's business" and "problems with Suite 11i."  Opinion at 12.

### 2.    When Ellison Traded, He Knew that Oracle's Pipeline Had Collapsed

Undisputed facts also establish that on the day that Ellison started to trade, he knew that Oracle's sales pipeline had collapsed by $311 million and that nearly the entire collapse ($277 million) had come from lost applications deals, which Oracle intended to have drive its database sales and which accounted for 31.5% of Oracle's External Forecast.  Exs. 18, 69, 91; Ex. 15 at Ex. 7; Ex. 16 at Ex. 20.  In fact, Oracle's sales pipeline had collapsed by $328 million in the last two weeks of December (down from 52% growth to 34% growth) and by $544 million by February 5.  Ex. 16 at Ex. 20.  This pipeline collapse contrasted with significant increases in the pipeline in 3Q00 – the quarter that Oracle used for comparison.  *Id.*; *supra* at 22.  The collapse also belied Ellison and Oracle's assurances to investors that Oracle's "astounding" pipeline would support its aggressive External Forecast.  Ex. 1 at 03224.  In addition, the "comfort gap" that Ellison relied on to gauge the health of Oracle's financial prospects (and which was directly affected by movements in the pipeline) was much smaller than usual and had been negative for weeks before he started trading. Ex. 16 at Ex. 13.  As reflected on the first page of the Upside Report that Ellison received every Monday during the Class Period, Oracle was forecasting revenue growth to grow faster than its pipeline – *i.e.*, its opportunities to sell – for half of December and January.  Ex. 16 at Ex. 13.  Under these circumstances, Ellison knew that it was "incautious to . . . forecast sales growth without underlying pipeline growth."  Ex. F at 86:21-87:5.  When Ellison was trading, Oracle was doing just that.  Ex. 16 at Ex. 13; *supra* at 22-23.

The status of Oracle's pipeline (especially the collapse in the very troubled product that was supposed to drive Oracle's growth) was material given defendants' repeated representations that Oracle was not being adversely affected by the economic downturn because of Oracle's "astounding pipeline."  Ex. 1 at 003224; Ex. 7; Ex. 6 at 141677; Ex. 108 at 003309.  Given defendants' repeated reference to the pipeline, there is a substantial likelihood (if not a certainty) that a reasonable investor would consider the pipeline collapse (especially the applications pipeline collapse)

1   important and that it would have significantly altered the total mix of information available.  *Id*.

2   This is especially true when the pipeline collapse is considered "in concert" with Ellison's

3   knowledge that Oracle's U.S. license divisions had reported severe negative growth rates in both

4   database and applications sales and with the adverse inferences arising from Ellison's willful

5   spoliation of relevant evidence.

> **3.    When Ellison Traded, He Knew that Oracle's External
> Forecast Was Unreliable Because of Significant Internal and
> External Changes**

8        Undisputed facts also show that Ellison knew that Oracle's External Forecast lacked any

9   reasonable basis from the beginning of the Class Period.  He testified that in times of changing

10  conditions, Oracle's forecasting process becomes inaccurate due to its basis in historical trends –

11  "'Our forecasting does statistical extrapolations based on historical trends.  ***If something that's***

12  ***outside our mathematical model of business changes***, . . . ***our forecasting becomes inaccurate***.'"

13  Ex. D at 384:6-385:7.  By the start of 3Q01, Ellison knew that Oracle was facing significant changes

14  (both inside and outside the company) that rendered Oracle's forecasting process inaccurate and its

15  External Forecast unreasonable.

16       As Ellison testified in deposition, he knew that Oracle's forecasting process would become

17  inaccurate in the face of a major economic change.  *Id.*  Between 3Q00 and 3Q01, as Ellison knew,

18  Oracle was facing just that.  In fact, he told investors at the beginning of the quarter that there was an

19  "economic slowdown," but added that it wasn't "hurting Oracle."  Ex. 3 at Ex. B.  But at the very

20  time that he made this statement, Ellison knew that the NASDAQ had collapsed and that Oracle's

21  dot.com business had rapidly evaporated as a result.  Ex. 16 at 4-8.  In fact, Oracle's dot.com sales

22  were projected to be $70 million less than they were in 3Q00 because many dot.coms had

23  disappeared and Oracle had already sold its technology to the top-tier dot.coms.  Ex. E at 78:7-18.

24  Repeated statements by Ellison and Henley acknowledge the economic slowdown in 3Q01, and

25  Ellison admitted in deposition that he knew about the dot.com collapse at the beginning of the

26  quarter: "Q.  Hadn't you actually seen an effect of the downturn in the economy in Oracle's dot.com

27  sales by Q3'01?  A.  Oh, I'm sure we had, I'm sure we had."  Ex. F at 178:9-179:1.  This is in direct

28  contrast with 3Q00, when the NASDAQ was at its height, sales to top-tier dot.com companies were

1    booming, and Oracle exceeded its forecast by so much that it made for very difficult comparisons in

2    3Q01.  Ex. 16 at 4-8; Ex. 20 at 1914019; Ex. 21; Ex. 12 at 185.  In fact, Ellison also knew that

3    Oracle's forecasting process was inaccurate because it was based on the assumption that Oracle

4    would close as high a percentage of deals in 3Q01 as it had in the boom economy of 3Q00 (despite

5    the fact that conversion ratios had been lower throughout FY01).  The impact that the economic

6    slowdown had on Oracle's forecasting process and External Forecast was material adverse

7    information that a reasonable investor would consider important when deciding to trade.  Ex. 48;

8    *supra* at 3-8.

9         Ellison also knew that he personally changed Oracle's forecasting process immediately

10   before Oracle issued its External Forecast to investors.  Ex. 17 at 203683; Ex. 65 at 151962.

11   Undisputed facts show that Ellison directed the Field to increase the amount of their forecast to

12   include deals with less likelihood of closure (necessarily adding more risk).  The Field followed this

13   directive – "we will incorporate [Ellison's directive] in our OSO 11i training that is tentatively

14   scheduled for the week of 10/23."  Ex. 17.  The purpose of Ellison's directive was to eliminate the

15   practice in the Field of "sandbagging" their forecasts. Ex. 8 at 101:8-18; Ex. 17; Ex. 65 at 151962.

16   As a result of Ellison's directive, executives in the Filed noted that "***now our forecast is a number***

17   ***that includes more risk than in the past***."  Ex. 17; *supra* at 18-19.  Even with the addition of risk,

18   Oracle's sales divisions told Ellison each and every week before he traded that Oracle would achieve

19   no more than 10.7 cents per share for the quarter, even though Ellison had projected to investors that

20   Oracle would earn 12 cents per share.  Ex. 16 at Ex. 12; Ex. 1 at 003222.  Ellison was in possession

21   of this information when he traded and it was material information that investors would consider

22   important.

23        Moreover, when Ellison traded he knew that Oracle had fraudulently and materially

24   overstated its 2Q01 results.  Ellison personally negotiated and approved the HP deal.  Ex. 52; Ex. 54

25   at 020844; Ex. 57 at 044458; Ex. 109 at 021381.  And undisputed facts prove that Ellison knew that

26   the deal was an improper swap transaction (and, in fact, negotiated those terms) – "Larry [Ellison]

27   and Carly [Fiorina] are discussing their purchase of our product this quarter ***if we commit to***

28   ***purchase $20M-$30M of their product*** over the next 18-24 months."  Ex. 52; Ex. 53 at 055957; Ex.

54 at 020844; Ex. 55 at HP00020; Ex. 56 at 020839; *supra* at 14-15.  Additionally, Ellison knew that Oracle had improperly transferred at least $20 million in customer unapplied cash to revenue and earnings.  Ex. 62 at 440830, 440832; Ex. 63 at 1610987; *supra* at 16-17.  This fraudulent transfer went directly to revenue and earnings and allowed Oracle to "beat the street," which, according to Ellison, is "the only thing that matters."  Ex. 12 at 204, 431; Ex. 64 at 20, 38; Ex. J at 146:19-147:1.  Ellison's belief is a clear admission that the improper revenue recognitions were material.  Ellison also knew that Oracle's 3Q01 external forecasts of EPS and applications growth were unreasonably based on its fraudulent 2Q01 results.  Ex. 1 at 03222.  Ellison knew, but did not disclose, this material non-public information prior to trading.[19]

Finally, Ellison knew (based both on the major economic change and the change in Oracle's product mix) that the basis for Minton's Potential Forecast, the historical conversion ratio, was no longer a reliable metric with which to extrapolate, and that the forecasting process was therefore unreliable.  Undisputed facts show that Oracle's sales pipeline in 3Q01 contained a higher percentage (over 30%) of applications deals (and thus a lower percentage of technology deals) than it had in 3Q00 (18%), and that applications opportunities converted at a much lower rate than Oracle's technology opportunities.  Ex. 15 at Exs. 6, 7.  The differences, as Ellison knew, were dramatic – applications converted at a historical rate of 38.7% while technology converted at a historical rate of 63.3%.  Ex. 15 at Ex. 7.  Despite this change, Ellison knew that Minton extrapolated using the historical conversion ratio achieved in the prior year to add upside to the riskier Field Forecast and that Minton was predicting that Oracle would convert practically the same percentage of the pipeline as it did in 3Q00.  Ex. D at 384:6-385:7; Ex. 12 at 211.  This was true even though defendant Henley believed that the pipeline was "too good to be true" (Ex. K at 354:15-355:3) and *even though Oracle's applications pipeline had collapsed by $277 million when Ellison started to trade*.  Ex. 15 at Ex. 7; Ex. 16 at Ex. 20.  Indeed, defendants' expert George Foster cited evidence showing that the sales cycle is much longer for applications deals than for database deals and Ellison admitted in

---

[19]     Of course, that Ellison traded knowing that Oracle had falsified its 2Q01 results and thereby inflated Oracle's stock price is, in and of itself, illegal insider trading.

1   *Softwar* that "our database sales force was not very good at selling applications."  Ex. 110 at ¶¶38-

2   39; Ex. 12 at 114.  At the time he traded, Ellison knew that the significant change in product mix

3   rendered Oracle's forecasting process inaccurate and its External Forecast unreasonable.  Ex. 15 at

4   Exs. 6 & 7; *supra* at 8-10.  He was therefore in possession of material adverse information at the

5   time he sold.  *TSC Indus.*, 426 U.S. at 449; *Basic*, 485 U.S. at 231-32.  This conclusion is further

6   supported by the adverse inference that the materials willfully spoliated by Ellison would have

7   contained adverse evidence regarding, "among other things, problems with Suite 11i, the effects of

8   the economy on Oracle's business, and problems with defendants' forecasting model."  Opinion at

9   12.

10          **4.    When Ellison Traded, He Knew that Oracle's External**
                    **Forecast of Suite 11i Applications Growth Was Unreliable**
11                  **Because of the Problems with 11i**

12          Undisputed facts also establish that Ellison knew that problems with Oracle's Suite 11i

13   adversely affected Oracle's customers and its ability to convert its artificially inflated applications

14   pipeline.  Ellison admitted that he knew that 11i was released too early and that he personally

15   decided to include untested critical modules despite knowing that "it was much too risky to put in the

16   suite."  Ex. 12 at 192.  Ellison admitted that "the first year of selling the 11i suite [including while he

17   was trading] was the hardest year" because Oracle did not have customer references – "It's difficult

18   to sell without customer references."  Ex. 12 at 249.  Oracle had virtually no 11i customer references

19   as of November 2000 (only two months before Ellison traded), and during the Class Period Ellison's

20   executives told him that sales representatives were reluctant to sell the 11i CRM applications

21   because of the quality issues – "we are loosing [sic] a bit of momentum [with CRM]; sales people

22   are reluctant to engage [due] to the product problems, lack of references, and local language issues."

23   Ex. H at 68:7-74:1; Ex. 41 at 013402; Ex. 44; *supra* at 11-13.[20]

24

25   _____

26   [20]    In fact, Oracle was so desperate for references that it facilitated a fraudulent transaction with
         HP to secure a CRM reference, misleadingly told the market that it had already, itself, saved a billion
27   dollars using 11i, and engaged in the practice of bribing customers to act as references.  Ex. D at
         251:1-16; Ex. 47 at 015757; Ex. 12 at 182-83; §II.A.3.a., *infra*.

28

Ellison also knew that Oracle's inability to effectively demonstrate 11i cost Oracle sales. *Supra* at 12-13. Defendants admitted after 3Q01 that if demonstrations "do not improve it will **continue to** impact our conversion rate." Ex. 42. Ellison admitted in deposition that he knew about the problems with 11i demonstrations during 3Q01. Ex. G at 105:7-8; Ex. D at 273:4-13. And he knew that through December these problems were, in fact, preventing Oracle from converting its applications pipeline – Oracle's U.S. license divisions had sold less than $1.3 million worth of applications product without Covisint (compared to a forecast of $323 million without Covisint) and that the U.S. divisions had experienced negative 92% growth in applications without that one-time transaction (compared to forecasted growth of 66%). Ex. 67. He was therefore in possession of material adverse information when he sold his stock.

Given Oracle's focus on applications in 3Q01 and the adverse effect that problems with 11i were having on Oracle's applications conversion rate, Ellison knew that its 75% projection lacked any reasonable basis. This was especially true when combined with Ellison's knowledge about the collapsing pipeline, the fact that, excluding Covisint, in December 2000 Oracle sold less than $1.3 million in applications (compared to a forecast of $323 million, excluding Covisint) and its applications growth rate for the U.S. divisions was **negative** 92%. Ex. 16 at Ex. 20; Ex. 67.

These undisputed facts establish that Ellison was in possession of and used material adverse information when he sold his stock. The inference that the materials willfully spoliated by Ellison would have contained adverse evidence of known problems with 11i further compels this conclusion.

### D. Ellison's Trades Were Suspicious in Timing and Amount

The Ninth Circuit has already held that Ellison's stock sales support an inference of scienter in this case. *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004). The Court acknowledged that "[s]tock trades are only suspicious when 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed information.'" *Id.* (quoting *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)). And it noted that "[t]o evaluate suspiciousness of stock sales, we consider, *inter alia*,

1   three factors: (1) the amount and percentage of shares sold [by insiders]; (2) the timing of the sales;

2   and (3) consistency with [the insider's] prior trading history." *Id*.

3          The Court specifically analyzed Ellison's sales using these factors. It explained that "[i]n the

4   past, we have given great weight to the percentage of stock sold." *Id*. But it added that "where, as

5   here, stock sales result in a truly astronomical figure, less weight should be given to the fact that they

6   may represent a small portion of the defendant's holdings." *Id*. Not only did the Court hold that the

7   size of Ellison's trades "present[ed] a novel situation," but it also found that the timing was

8   suspicious because, as the Court explained, "Ellison sold his shares between January 22 and

9   January 31, 2001, approximately one month prior to the March 1 report of lower-then-expected

10  sales." *Id*. It also added that "Ellison's January 2001 trades [were] highly inconsistent with his prior

11  trading history" because he "had not sold any of his Oracle stock for five years." *Id*. Under these

12  circumstances, the Court held that Ellison's sales "support a strong inference of scienter." *Id*.

13         The facts have not changed nor have they become disputed. In fact, as discussed below, at

14  the time Ellison traded he used materially adverse information that he undisputedly possessed in

15  deciding to sell 29 million shares of his stock in violation of the federal securities laws. And now

16  that evidence is further supported by the adverse inference that the evidence willfully spoliated by

17  Ellison would have contained adverse information regarding "among other things, problems with

18  Suite 11i, the effect of the economy on Oracle's business, and problems with defendants' forecasting

19  model." Opinion at 12.

20         **1.    Ellison's Sales Were Dramatically Out of Line with His Prior
              Trading Practices and Were Timed to Maximize His Personal**

21            **Benefit**

22         Ellison's trades were dramatically out of line with his prior trading practices and were timed

23  to maximize his personal benefit. Defendants do not (and cannot) dispute that Ellison had not sold

24  stock for five years prior to unloading 29 million shares on investors. Ex. F at 28:2-4. Ellison's

25  historical trading practices and the dramatic change from that practice during the Class Period

26  support a finding that Ellison traded on the basis of inside information and acted with scienter.

27  *Oracle*, 380 F.3d at 1232; *see also In re Secure Computing Corp.*, 184 F. Supp. 2d 980 (N.D. Cal.

28  2001) (sales found suspicious where insider had never previously sold from his company holdings);

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST ELLISON - C-01-0988-SI        - 40 -

1   *In re Omnivision Techs.*, No. C-04-2297 SC, 2005 U.S. Dist. LEXIS 16009, at *15 (N.D. Cal. July

2   29, 2005) (trading found suspicious where traders "more than doubled the relative proportion of their

3   shares they sold during the class period").

4       Ellison's trades were also suspicious in timing and were designed to maximize his personal

5   benefit from material non-public information.  Not only did Ellison sell "one month prior to the

6   March 1 report of lower-than-expected sales" as the Ninth Circuit found compelling, but he also sold

7   ***less than 36 hours*** after Larry Garnick informed him that Oracle's U.S. license sales had

8   experienced severe negative growth rates, that its applications revenues without Covisint were

9   ***negative*** 92%, and that its NAS and OSI license divisions had sold only $33 million (5% of their

10  $645 million forecast) in product through the first month of the quarter and had growth rates of

11  ***negative*** 24% and ***negative*** 81%, respectively.  Ex. 67; *supra* at 20-23.  These undisputed facts

12  establish Ellison's scienter and that he traded "'on the basis of'" material non-public information

13  within the meaning of Rule 10b-5-1.  17 C.F.R. §240.10b-5-1(b); *United States v. Atul Bhagat*, 436

14  F.3d 1140, 1148 (9th Cir. 2006) (insider traded on the basis of material non-public information

15  where he received adverse information by e-mail and had an opportunity to read the e-mail before

16  making the suspicious stock trade).

17      Undisputed evidence also establishes that Ellison used the information in trading.  Not only

18  did Ellison know that Oracle's U.S. license divisions had reported adverse results, but his actions

19  after he learned of those results also show that he used that non-public information to maximize his

20  personal benefit.  Ex. 67.  Internal correspondence show that prior to January 19, 2001, Ellison had

21  planned to sell stock in April or August of 2001, and had preliminarily decided to trade in April 2001

22  because of the tax benefits to Oracle from doing so.  Exs. 97-98.  Prior to Ellison's sudden decision

23  on January 19, there was absolutely no discussion either inside or outside Oracle that Ellison planned

24  to sell in January 2001.  Ex. 88 at 300606; Ex. 101 at 609922.  It was only after Ellison received the

25  dismal results from the Flash Report that he unexpectedly instructed his financial advisor to start

26  unloading 40 million shares immediately.  *Id.*; Ex. 67; *supra* at 24, 25.  Doing so put Ellison in the

27  enviable position of having been one of the last investors to sell Oracle stock above $30 per share.

28  The timing of his sales, which occurred at the peak of Oracle's stock price, establish Ellison's

1   scienter and that he traded on the basis of material non-public information.[21]  *TSC Indus.*, 426 U.S. at

2   449.  This conclusion is further compelled by the adverse inference that the evidence willfully

3   spoliated by Ellison would have contained adverse information regarding, "among other things,

4   problems with Suite 11i, the effect of the economy on Oracle's business, and problems with

5   defendants' forecasting model."  Opinion at 12.

6               **2.      The Amount and Percentage of Shares Sold by Ellison Was**
                         **Unusually Large**

7

8           The Ninth Circuit in this case also has held that "where, as here, stock sales result in a truly

9   astronomical figure, less weight should be given to the fact that they may represent a small portion

10  of the defendant's holdings."  *Oracle*, 380 F.3d at 1232.  District Courts have since followed this

11  "astronomical figure" analysis.  In *Johnson v. Aljian*, the court distinguished earlier cases on the

12  grounds that "there is no indication that any of the above-cited cases involved amounts – in terms of

13  shares sold or proceeds received – nearing the over 7.5 million shares or over $660 million in

14  proceeds" at issue in that case, and found the huge value of the proceeds of the sale showed

15  "significant evidence of scienter."  394 F. Supp. 2d at 1199-200 & n.10 (distinguishing *In re Vantive

16  Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002); *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th

17  Cir. 2001); *Silicon Graphics*, 183 F.3d at 987-88); *Johnson*, 394 F. Supp. 2d at 1199 (finding that

18  "[e]ven to a multi-billion dollar corporation, [$661.6 million in net proceeds] is a significant

19  amount").  The same is true here.  Between January 22, 2001 and January 31, 2001, Ellison sold

20  29,084,576 shares at an average price of $30.5697 per share, realizing gross proceeds of

21  $894,786,576.  Ex. 99.  This astronomical figure makes Ellison's stock sales suspicious in amount.

22  *Oracle*, 380 F.3d at 1232.

23          Ellison's massive trading must also be viewed in light of market limitations and SEC rules.

24  SEC Rule 144 provides that within any three-month period, an "affiliate" may not sell more than the

25  greater of "[o]ne percent of the shares . . . of the class outstanding" or "[t]he average weekly reported

26  _____

27  [21]      Defendants' use of Oracle's repurchase program to dull the market impact of Ellison's sales
            is further evidence of the suspicious nature of the sales.  Exs. 111, 112.

28

1  volume of trading." 17 C.F.R. §230.144(e).  Pursuant to Rule 144, Ellison could have sold only up

2  to 178,013,050 shares.  *Id.*  He was also limited by the effect his trading had on the market.  He

3  directed his trader to take up no more than 10%-15% of a day's trading; otherwise, he would have

4  affected the share price.  Ex. S at 65:4-67:19; Ex. 88 at 300608; Ex. F at 50:5-52:20.  He authorized

5  traders to trade up to 40 million shares of stock if they could sell at or above $30 per share.  Ex. F at

6  50:5-52:20; Ex. 88 at 300608.  Thus, Ellison authorized trading of up to 22.47% of the amount he

7  was allowed to sell by SEC Rule 144 during that period.  Ex. 88 at 300609; 17 C.F.R. §230.144(e).

8  The fact that he was able to sell 16.34% of the maximum allowed by the SEC rule supports a finding

9  of scienter and that Ellison traded on the basis of inside information.  Ex. 7; 17 C.F.R. §230.144(e).

10  Ellison sold as much stock as he could possibly sell without adversely affecting the price of Oracle's

11  stock and his overall holdings.

### 3.   Ellison's Use of Proceeds Establish that Ellison Acted with Scienter

12  Ellison's use of proceeds also compels a finding that he sold to maximize his personal benefit

13  and acted with scienter.  In *Kaplan v. Rose*, 49 F.3d 1363 (9th Cir. 1994), the Ninth Circuit

14  recognized that an insiders' reasons for selling – "that they wanted to reap financial benefits for

15  personal reasons" – supported a finding of scienter.  *Id.* at 1380.  The court noted that the desire to

16  sell stock to fund retirement "would give substance to the contention that the alleged

17  misrepresentations and omissions were deliberate."  *Id.*  In other words, explanations by insiders for

18  why they sold their stock can serve to support an inference of scienter.  *Id.*

19  In this case, Ellison's explanations paint a more compelling picture of scienter than in

20  *Kaplan* – he told inconsistent stories about who he spoke to about his sales and why he sold.

21  Ellison's initial explanations in response to discovery in the derivative case were that he spoke to no

22  one regarding his sales.  Ex. 101 at 609922.  Then, he changed his story and testified in deposition

23  that he spoke to Simon.  Ex. C at 378:1-14.  But Simon explained that he did not learn about

24  Ellison's desire to trade until January 19, 2001, when he received Ellison's instruction.  Ex. 88 at

25  300606.  Next, Ellison testified that he took Simon's advice to pay down debt and diversify.  Ex. 102

26  at 609765.  Then an article titled "Absolutely Excessive" revealed that Ellison used much of the

27

28

proceeds from his sales to fund the construction of the longest privately-owned yacht in the world ($250 million) and to pay for the "costliest American home built for a private individual since William Randolph Hearst's grandiloquent San Simeon."  Ex. 103 at 318, 323; Ex. 12 at 369-70; *supra* at 25-27.[22]  His Woodside Japanese village home came in at well over $100 million.  *Id.*

If the desire to sell stock to fund retirement can give substance to a finding that the alleged misrepresentations and omissions are deliberate, Ellison's changing story supports a finding at summary judgment that Ellison sold at sensitive times to maximize his personal benefit.  This is especially true since he was supposed to use the proceeds to pay down debt and diversify, but instead funded his lavish and "absolutely excessive" lifestyle.  The suspicious timing, amount, and use of proceeds warrants a finding that Oracle violated the federal securities laws by trading on the basis of material non-public information.  The adverse inference further supports this finding.

### E.   Ellison's Failure to Disclose Adverse Material Information Prior to Trading Proximately Caused Plaintiffs' Loss

To prove loss causation, plaintiffs must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiffs.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005).  A plaintiff is not required to show that a misrepresentation or omission "was the **sole** reason for the investment's decline in value" in order to establish loss causation.  *See Robbins v. Koger Props.*, 116 F.3d 1441, 1447 n.5 (11th Cir. 1997).  As long as the misrepresentation or omission "is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement" but will play a role "in determining recoverable damages."  *Id.*; *see also In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055-56 (9th Cir. 2008).

On March 1, 2001, Oracle pre-announced that it would miss its 3Q01 External Forecast, including EPS, applications, and database growth.  Defendants reported estimated EPS of 10 cents (compared to the 12 cents that defendants were representing throughout the quarter), flat to slightly

---

[22]    Ellison had two $45 million payments due on his new yacht – one each in March and October 2001.  Ex. 99 at 300657.

1  negative database growth (compared to its forecast of 15%-20%), and applications growth of only

2  50% (compared to its original 75% forecast).  Ex. 1 at 3221; Ex. 114 at 1.  Oracle attributed the miss,

3  which occurred in its U.S. divisions (NAS and OSI), generically to the uncertain U.S. economy and,

4  specifically, to lost dot.com customers and other lost deals.  Ex. 104 at 92601, 92603.  Oracle's stock

5  plummeted as a result.  Exs. 117, 118.

6  　　　The causal connection between Ellison's omissions and plaintiffs' loss is undisputable –

7  defendants generally attributed the collapse to the uncertain economy, which had been adversely

8  impacting Oracle throughout the Class Period.  Before he traded, Ellison failed to disclose that

9  Oracle was being severely impacted by the collapse rather than "slowdown" of its dot.com

10  customers and revenues, that huge and unprecedented pipeline declines indicated, early in the 3Q01,

11  that deals were falling out, and that Oracle's conversion ratios throughout FY01 were declining.  *See*

12  §II.A.1.; §III.C.2., C.3.  In fact, Oracle's monthly results prove that the economy was taking its toll

13  early on (and when Ellison was trading) – OSI and NAS, the two U.S. license divisions that caused

14  Oracle's 3Q01 miss, had extremely negative growth and had made virtually no sales in the first

15  month of the quarter.  *See* §III.C.1.  Oracle's announcement directly connects plaintiffs' losses to

16  Ellison's omissions.

17  　　　Oracle's announcement also ties plaintiffs' losses to Ellison's baseless External Forecast.

18  When he sold, Ellison did not disclose that Oracle's internal and external forecasts had no reasonable

19  basis due to: (1) major macroeconomic changes, which Ellison has admitted caused Oracle's forecast

20  to become unreliable, and their negative effect on Oracle; (2) major changes in Oracle's product mix

21  and 11i product problems that severely and negatively impacted Oracle's applications conversion

22  ratio; (3) 2Q01 accounting manipulations that Oracle used to hide the negative impact of problems

23  with 11i and the economy and then used as a basis for its 3Q01 External Forecast; and (4) Ellison's

24  directive to the Field, in 2Q01, to add more risk to its forecast.  *See* §II.A.1.-5.; §III.C.3.  The true

25  reasons why Ellison's External Forecast lacked a reasonable basis necessarily are tied directly to

26  defendants' ***ultimate confession*** that the forecast had been missed.

27  　　　The same is true of Ellison's omissions concerning 11i.  Going into 3Q01, analysts and

28  investors recognized that the future growth of Oracle's earnings and revenue and, as a result, the

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST ELLISON - C-01-0988-SI　　- 45 -

value of its stock, depended on the success of 11i.  Ex. 49 (October 10, 2000 First Union Securities Inc. report: "Oracle's premium multiple is driven in large part by the potential growth in its e-business applications"); Ex. 50 at 8 (November 6, 2000 Salomon Smith Barney report: "Oracle's current valuation reflects the realization of the projected revenues associated with its new e-business Suite.").  Ellison and Oracle also described 11i's "integration" as the feature that separated Oracle from other software vendors and high tech industry vendors and which would insulate Oracle from any potential economic downturn.  In November and December 2000, by fraudulently reporting 2Q01 applications growth of 66% and by representing that 11i's problems were behind it and that it had become a success, Ellison and Oracle convinced the market that 11i would drive earnings growth in 3Q01.  *See* §II.A.3.  The market touted references, demos and Oracle's sales force as the catalysts for 11i growth: "The combination of referenceable customers from the newest version of the eBusiness Suite, functional product demos and a sales force trained on the eBusiness Suite should propel growth . . . ."  Ex 58.  When Oracle announced an enormous miss of its applications forecast, analysts specifically attributed the miss to problems with 11i – the same problems that Ellison knew but failed to disclose before he traded.  *See* Ex. 113 at BOA 02710 (Banc of America Securities, March 16, 2001: "On the applications side, especially in light of Oracle's weaker than expected Q3 applications growth, we believe ***the economy may only explain 20-30% of the weakness*. *The rest, in our view, is a result of the product set not yet reaching a competitive level of functionality***, relative to best-of-breed vendors."); Ex. 12 at 201 ("It didn't take a genius to see that not everything that was going on could be explained by the weakening economy and edgy CEOs waiting for "visibility" to return.  ***For anyone who wanted to see, there was mounting evidence that it wasn't only the economy that prospective Oracle applications customers wanted to see stabilize***.").  Thus, plaintiffs have established a causal connection between Ellison's omissions regarding Oracle's 11i problems and plaintiffs' loss.

There is also a direct connection between Oracle's fraudulent 2Q01 results and plaintiffs' loss.  The truth concealed by fraudulent statements regarding the HP transaction and Oracle's 2Q01 applications growth and EPS result was that 11i was not stable, had not gained traction, and would not drive future earnings growth as represented and that Oracle was, in fact, being affected adversely

1   by the declining economy.  *See* §II.A.3.  As discussed above, when Oracle announced its 3Q01

2   results, the revelation of these hidden truths is exactly what caused Oracle's stock to decline.  §II.C.

3   Moreover, Oracle's 3Q01 forecast was justified by defendants on the basis of their supposed success

4   in beating the street in 2Q01.  There is a clear causal connection between the scheme to hide

5   Oracle's problems at the end of 2Q01 and their manifestation at the end of 3Q.

6        Plaintiffs respectfully submit that the materials willfully spoliated by Ellison also would have

7   contained evidence relevant to loss causation.  Ellison has admitted that he was "involved in an

8   awful lot of [the] deals" that did not close.  Ex. 115 at 050656.  And he has testified that "virtually

9   everything I do is in e-mail."  Ex. G at 92:24-93:5.  As a result, his willfully spoliated emails were

10  likely to contain evidence regarding when and why these lost deals did not close.[23]  This evidence is

11  directly relevant to loss causation and, because Ellison destroyed the evidence, it should be

12  presumed that that evidence was adverse to him.  In addition, *Softwar* contains a variety of evidence

13  relevant to loss causation.  *Softwar* contains evidence regarding the reasons why Oracle had trouble

14  selling 11i in 3Q01, including problems with the product, a sales force that was not good at selling

15  applications, and Oracle's lack of references as a result of the product problems.  Ex. 12 at 114, 189,

16  202-203, 239, 424.  Indeed, Symonds specifically wrote that: "It didn't take a genius to see that not

17  everything that was going on could be explained by the weakening economy and edgy CEOs waiting

18  for 'visibility' to return.  For anyone who wanted to see, there was mounting evidence that it wasn't

19  only the economy that prospective Oracle applications customers wanted to see stabilize."  Ex. 12 at

20  201.  Because Ellison willfully spoliated his emails and the *Softwar* interview tapes and transcripts

21  that would have contained evidence relevant to loss causation, it should be presumed that that

22  evidence was adverse to Ellison on loss causation.

23

24

_____

25  [23]       In fact, defendants contend that 182 large deals were lost in February 2001 and have

26  purported to give plaintiffs a list of these deals.  Ex. 119 at 4-13.  As a result of defendants' failure to
    preserve evidence, however, they are only able to tell plaintiffs why eight of those 182 deals did not

27  close.  *Id*. at 24.  Of those eight deals, one did not close because of Oracle's inability to demonstrate
    11i and another because of economic conditions, facts bearing directly on loss causation.  *Id*.

28

**F.   Adverse Inferences as a Result of Ellison's Willful Destruction of Evidence Further Compel Summary Judgment Against Ellison**

The Court has ruled that defendants have willfully spoliated Ellison's email files and interview tapes and transcripts created in preparation for *Softwar* and that, as a result of the spoliation, "it is appropriate to infer that the emails and Softwar materials would demonstrate Ellison's knowledge of, among other things, problems with Suite 11i, the effects of the economy on Oracle's business, and problems with defendants' forecasting model."  Opinion at 12.

The inferences relating to Ellison's knowledge of adverse evidence should go to both whether he made material omissions and whether he acted with scienter.  *Gordon Partners v. Blumenthal*, No. 02 Civ. 7377 (LAK) (AJP), 2007 U.S. Dist. LEXIS 9110, at *47 n.8 (S.D.N.Y. Feb. 9, 2007) ("Here, the adverse inference relates to defendants' knowledge about the company's financial and business operation . . . .   The adverse inference thus goes to issues of whether defendants made material misstatements or omissions and if so whether they acted with scienter."). The adverse inference for Ellison's willful spoliation must assume that evidence destroyed would have been unfavorable to him.  To the extent he received or sent additional damaging adverse information over email, that information would be relevant both to whether he made material omissions and to whether he acted with scienter.  As this Court noted, "emails that plaintiffs may never have received at all may also have been relevant, although it is impossible to know."  Opinion at 9, 10 ("'Moreover, because the relevance of . . . [destroyed] documents cannot be clearly ascertained because the documents no longer exist, a party can hardly assert a presumption of irrelevance as to the destroyed documents.'") (quoting *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006)).  For example, when Ellison received an email (which was never produced from his files) just 36 hours before he traded informing him that in December Oracle's NAS and OSI divisions both had severe negative revenue growth and Oracle had sold less than $1.3 million in applications excluding Covisint, that information is necessarily relevant both to what he knew (and failed to disclose), and to whether that information was material.  Likewise, Ellison made numerous admissions in *Softwar* and, if it is inferred that the willfully spoliated underlying tapes and transcripts contained additional adverse information, that information would be relevant both to

1    whether he made material omissions and to whether he acted with scienter.  For example, when

2    Ellison admitted in *Softwar* that "I was way too optimistic [about 11i].  ***It just kind of got away from***

3    ***us, and that became a very big problem***," that admission is necessarily relevant both to what Ellison

4    knew and to whether he failed to disclose material information.  Ex. 12 at 194-95.  In addition, as

5    discussed above, the adverse inferences should also bear on Ellison's trading and loss causation.

6        Adverse inferences may serve as a basis for summary judgment or for a finding that claims

7    have been conclusively established.  *See Tenet Healthsystem Desert, Inc. v. Fortis Ins. Co.*, 520 F.

8    Supp. 2d 1184, 1198 (C.D. Cal. 2007) (granting summary judgment for non-spoliating party after

9    finding that "drawing an adverse inference from the loss of the records,  i.e., that the records from

10   Mr. Wyatt's May, 2002 hospital visit are unfavorable to Plaintiff and, therefore, suggest Mr. Wyatt

11   had a pre-existing condition during the October and December, 2002 medical treatment, is an

12   appropriate sanction due to the prejudice their loss has caused Defendant in this action"); *Nation-*

13   *Wide Check Corp. v. Forest Hills Distribs., Inc*., 692 F.2d 214, 219-20 (1st Cir. Mass. 1982) (First

14   Circuit affirmed decision of district court which, despite finding no bad faith in destruction, allowed

15   adverse inference to bridge the "evidentiary gap" and establish element of claim); *PSG Poker, L.L.C.*

16   *v. DeRosa-Grund*, No. 06 Civ. 1104 (DLC), 2008 U.S. Dist. LEXIS 4225, at 42-43 (S.D.N.Y.

17   Jan. 22, 2008) (holding adverse inference as a result of document destruction, combined with other

18   evidence, sufficient for summary judgment against spoliator).[24]

19

20   _____

21   [24]    *See also Beaven v. United States DOJ*, No. 03-84-JBC, 2007 U.S. Dist. LEXIS 24459, at
22   *49-*50 (E.D. Ky. Mar. 30, 2007) (court "infer[red] that the appearance of the file folder would have
     been unfavorable to the defendants, in that its inspection would have provided proof that disclosure
23   to an inmate actually occurred" and, because the inference was "conclusive as to disclosure" a
     violation of the Privacy Act was established.); *Smith v. United States*, 128 F. Supp. 2d 1227, 1234-35
24   (E.D. Ark. 2000) (because defendant doctor failed to dictate surgery notes (and thus could not
     produce them), the court granted an adverse inference that defendant "failed to act in accordance
25   with the degree of skill and learning ordinarily possessed and used by members of his profession
     engaged in the same type of practice or specialty in the locality in which he practices," and "thereby
26   conclude[d] that plaintiff has met his burden of proof in establishing his claim of negligence"); *Four
     Seasons Hotels & Resorts B.V. v. Consorcio Barr, S.A.*, 267 F. Supp. 2d 1268, 1324 (S.D. Fla. 2003)
27   ("Based on the adverse inference this Court has drawn against [defendant] in light of its spoliation of
     evidence in this case, the Court concludes that [defendant] has violated the ECPA . . . .").

28

1    Plaintiffs have provided undisputed evidence that Ellison traded on the basis of material,

2    non-public information regarding Oracle's financial conditions and problems with 11i.  In particular,

3    in addition to already possessing material non-public information that Oracle had falsified its 2Q01

4    earnings, that its 3Q01 internal and external forecasts had no reasonable basis, and that the

5    deteriorating economy and problems with 11i were negatively affecting Oracle, Ellison traded less

6    than 36 hours after receiving the Flash Report detailing severe negative trends in Oracle's U.S.

7    license divisions that were responsible for Oracle's 3Q01 earnings miss.  On its own, the evidence

8    discussed herein compels the granting of this motion.  When combined with an adverse inference

9    that the spoliated emails and interview tapes and transcripts willfully spoliated by Ellison contained

10   information harmful to him in the categories discussed above, this conclusion is inescapable.[25]

## IV.    CONCLUSION

12   Because there are no genuine issues of material fact related to plaintiffs' §§10(b) and 20A

13   claims that defendant Ellison traded on the basis of material non-public information, plaintiffs'

14   Motion for Summary Judgment should be GRANTED.

15   DATED:  October 20, 2008                    Respectfully submitted,

16                                              COUGHLIN STOIA GELLER
                                                  RUDMAN & ROBBINS LLP
17                                              MARK SOLOMON
                                                DOUGLAS R. BRITTON

19                                              _____
                                                        s/ MARK SOLOMON
20                                                       MARK SOLOMON

21                                              655 West Broadway, Suite 1900
                                                San Diego, CA  92101
22                                              Telephone:  619/231-1058
                                                619/231-7423 (fax)

---

24   [25]    Ellison's friend and biographer, Matthew Symonds, invoked the Fifth Amendment, *ad
25   nauseam*, when deposed in this litigation about his conversations and interactions with Ellison and
     the destruction of *Softwar* materials.  *See* Exs. V, W.  Plaintiffs respectfully submit that Symonds'
26   invocation of the Fifth Amendment itself warrants an adverse inference that Symonds' testimony
     about Ellison and the *Softwar* materials would have been adverse to Ellison with respect to all of the
     claims in this litigation.  *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1059, 1077 (N.D. Cal.
27   2007).

1

2                              COUGHLIN STOIA GELLER
                                  RUDMAN & ROBBINS LLP

3                              SHAWN A. WILLIAMS
                              WILLOW E. RADCLIFFE

4                              ELI R. GREENSTEIN
                              DANIEL J. PFEFFERBAUM

5                              100 Pine Street, Suite 2600
                              San Francisco, CA  94111

6                              Telephone:  415/288-4545
                              415/288-4534 (fax)

7                              COUGHLIN STOIA GELLER
                                RUDMAN & ROBBINS LLP

8                              STACEY M. KAPLAN
                              9601 Wilshire Blvd., Suite 510

9                              Los Angeles, CA  90210
                              Telephone:  310/859-3100

10                           310/278-2148 (fax)

11                           Lead Counsel for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28    S:\CasesSD\Oracle3\BRF00054788_SJ.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 20, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I further certify that I caused this document to be forwarded to the following designated Internet site at:  http://securities.csgrr.com/.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 20, 2008.

                                          s/ MARK SOLOMON
                                         MARK SOLOMON

                                         COUGHLIN STOIA GELLER
                                             RUDMAN & ROBBINS LLP
                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101-3301
                                         Telephone:  619/231-1058
                                         619/231-7423 (fax)

                                         E-mail:  MarkS@csgrr.com

## Mailing Information for a Case 3:01-cv-00988-SI

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jennie@libertylaw.com

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Doug Britton**
  dougb@csgrr.com,jillk@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Joy Ann Bull**
  JOYB@csgrr.com

- **Dorian Estelle Daley**
  dorian.daley@oracle.com

- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,svdocket@lw.com,zoila.aurora@lw.com

- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com

- **Tera Marie Heintz**
  theintz@morganlewis.com,eeberline@morganlewis.com

- **Stacey Marie Kaplan**
  SKaplan@csgrr.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com,sf_filings@hbsslaw.com

- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com,#sfdocket@lw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **William S. Lerach**
  e_file_sd@lerachlaw.com

- **James C. Maroulis**
  jim.maroulis@oracle.com

- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com

- **Brian P Murray**
  bmurray@murrayfrank.com

- **Shinyung Oh**
  shinyungoh@paulhastings.com

- **Dawn S. Pittman**
  dpittman@morganlewis.com

- **Willow E. Radcliffe**
  willowr@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Mark Solomon**
  marks@csgrr.com,e_file_sf@csgrr.com,sholloway@csgrr.com,e_file_sd@csgrr.com

- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com,aelishb@csgrr.com

- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Corey D. Holzer**
Holzer Holzer & Cannon LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

**Raymond Lane**
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

**PRG-Schultz USA, Inc.**
Paul Hastings Janofsky & Walker LLP
55 Second Street
24th Floor
San Francisco, CA 94105

**Darren Jay Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

**Sanna Rachel Singer**
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111

**Monique C. Winkler**
Coughlin Stoia Geller Rudman & Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111