# EXHIBIT A

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         NORTHERN DISTRICT OF CALIFORNIA
 3
      In re ORACLE CORPORATION
 4    SECURITIES LITIGATION
               Master File No. C-01-0988-MJJ
 5    This Document Relates To:
 6       ALL ACTIONS.
      _____/
 7
 8
 9            ---oOo---
10        DEPOSITION OF JENNIFER MINTON
11          Thursday, April 21, 2005
12            ---oOo---
13
14        SHEILA CHASE & ASSOCIATES
               25 Otsego Avenue
15        San Francisco, California  94112
              Phone: (415) 333-7474
16             Fax:  (415) 333-7412
17
18
19
20    Reported by:
      SANDRA L. CARRANZA, CSR, RPR, CRR
21    CSR No. 7062
22
23
24
25
                                                1
```

```
 1              I N D E X
 2           INDEX OF EXAMINATION
 3                              PAGE
 4    MR. BRITTON            7
 5    AFTERNOON SESSION          103
 6            ---oOo---
 7          INDEX OF EXHIBITS
 8    DESCRIPTION            PAGE
 9    1   Plaintiffs' Notice of Deposition of
          Oracle Corporation Pursuant to Federal
10        Rule of Civil Procedure 30(b)(6)     11
11    2   Document entitled, "Week 2 of Budget
          Meetings, Bates stamped 028477 -
12        028480                     57
13    3   Document entitled, "Budget Growth Rate
          Comparison - License, Bates stamped
14        041949                     67
15    4   Document entitled, "Oracle Fiscal 2001
          Budget," Bates stamped 039895 -
16        039918                     69
17    5   String of e-mails; first is dated 6/19/00,
          from Lawrence Ellison to Jeff Henley,
18        Bates stamped 028499           82
19    6   7/28/00 e-mail from Jennifer Minto to
          Terry Ford, Bates stamped 041952     87
20
21    7   Document entitled, "License Revenue
          FOrecast Accuracy, Bates stamped
          040637                     91
22
23    8   1/18/01 e-mail from Jennifer Minton to
          Ivgen Guner, Bates stamped 039315     95
24    9   String of e-mails; first is dated 10/18/00
          from Jennifer Minton to Jeff Henley, Safra
25        Catz, Mark Barrenechea, Sukumar Rathnam   114
                                                1
```

```
 1    INDEX PAGE (continued)
 2
 3    10   11/29/00 e-mail from "forecast" to
           pateam, et al., Bates stamped 040601
 4         - 040602                   130
 5    11   Document entitled, "November Flash
           Report," from Ivgen Guner to Jeff
 6         Henley, Bates stamped 019803      132
 7    12   String of e-mails; first is dated
           12/11/00, from Jeff Henley to "saas,"
 8         Bates stamped 020731          134
 9    13   Document entitled, "Americas Cumulative
           Weekly License Pipeline Trends," Bates
10         stamped 008131             150
11    14   String of e-mails; first is dated
           9/15/00, from David Winton to George
12         Roberts, Bates stamped 040837     156
13    15   Document Bates stamped 024454,
           ending with 24464           161
14
15    16   Document entitled, "Oracle Corp. Pipeline
           Reporting Package, January 15, 2001,"
16         Bates stamped 00514 - 00523     161
17    17   Document entitled, "Large Deals in Q3,"
           Bates stamped 042297 - 042356    175
18
19    18   Document entitled, "Big Deal Update,
           November 17 Workday 8," Bates stamped
           025049 - 025067            181
20
21    19   Document entitled, "Sanderson-Q201
           Oracle Product Industries Q3 Week 7,"
22         Bates stamped 016213 - 016240    187
23    20   Document entitled, "Oracle Product
           Industries Q3 '01 and Q4 '01 Forecast
24         Package Week 10 - January 31, 2000,"
25         Bates stamped 036971 - 039178    196
                                                2
```

```
 1    INDEX PAGE (continued)
 2
 3    21   Document entitled, "Product Revenues,"
           Bates stamped 024411 - 024429    199
 4
 5    22   Document entitled, "Approvals/2000
           Forecast Report," Bates stamped
 6         041923                     200
 7    23   Document entitled, "Q3 FY '01 Week1,
           December 4, 2000," Bates stamped
 8         039448 - 039477            201
 9    24   Document entitled, "Total Company Q3
           FY01 Forecast," Bates stamped
10         039819 - 039850            204
11    25   Document entitled, "Total Company - 3
           Year Forecast," Bates stamped 03944
12         - 03956                    229
13    26   Document entitled, "Oracle Corporation
           Executive Committee Worldwide Forecast
14         FY01 Management Summary, January 22,
           2001, Week 6, Bates stamped 008755 -
15         008776                     231
16            ---oOo---
17
18
19
20
21
22
23
24
25
                                                3
```

1     BE IT REMEMBERED that on Thursday, April 21, 2005,
2  commencing at the hour of 9:26 A.M., thereof, at the
3  offices of Lerach, Coughlin, Stoia, Gellar, Rudman &
4  Robbins, LLP, 100 Pine Street, Suite 2600, San
5  Francisco, California, before me, SANDRA L. CARRANZA,
6  CSR, RPR, CRR, a Certified Shorthand Reporter for the
7  State of California, personally appeared
8          JENNIFER MINTON,
9  called as a witness by the Plaintiffs herein, who, being
10 by me first duly sworn/affirmed, was thereupon examined
11 and testified as hereinafter set forth.
12      ---oOo---
13 Appearing as counsel on behalf of Plaintiffs:
14     ELI GREENSTEIN, Esquire
       DOUG BRITTON, Esquire
15     JAMES FELDMAN, Forensic Accountant
       LERACH, COUGHLIN, STOIA, GELLAR, RUDMAN & ROBBINS
16     100 Pine Street, Suite 2600
       San Francisco, California 94111
17     (415) 288-4545
       E-mail: dougb@lerachlaw.com
18     E-mail: elig@lerachlaw.com
19 Appearing as counsel on behalf of Defendants:
20     JAVIER H. RUBINSTEIN, Esquire
       MAYER, BROWN, ROWE & MAW, LLP
21     190 S. LaSalle Street
       Chicago, IL 60603-3441
22     (312) 782-0600
       E-mail: jrubinstein@mayerbrownrowe.com
23
24 Also present: David Reddix, Videographer
              James C. Maroulis, Oracle Senior Corporate
25              Counsel

4

1          ---oOo---
2   P R O C E E D I N G S
3          ---oOo---
4     THE VIDEOGRAPHER:  Good morning.  My name is
5  David Reddix.  I'm a videographer employed by Advanced
6  Courtroom Technologies, located at 109 Second Street,
7  Sausalito, California, 94965.  Our phone number is
8  (415)331-3326.  We're videotaping for LiveNote World
9  Service today.
10    The court reporter today is Sandy Carranza of
11 Sheila Chase & Associates.  Today's date is April 21st,
12 2005, and the time on the videotape is 9:26.  Today
13 begins Tape 1 --
14    Have you been deposed before in this case?
15    -- Vol- - Volume I in the deposition of
16 Jennifer Minton, in the matter of Oracle Corporation
17 Securities Litigation, Case No. C-01-0988-MJJ, filed in
18 the United States District Court, Northern District of
19 California.
20    This deposition is being taken on behalf of the
21 plaintiff.  The location of this deposition is 100 Pine
22 Street, 26th floor, San Francisco, California.
23    Counsel, please voice identify yourself and
24 state whom you represent.
25    MR. BRITTON:  Doug Britton, with Lerach,

5

1  Coughlin, Stoia, Geller, Rudman & Robbins, on behalf of
2  plaintiffs.
3     MR. GREENSTEIN:  Eli Greenstein, with Lerach,
4  Coughlin, on behalf of plaintiffs.
5     MR. FELDMAN:  James Feldman, with Lerach,
6  Coughlin, on behalf of plaintiffs.
7     MR. RUBENSTEIN:  Javier Rubenstein, with Mayer,
8  Brown, Rowe & Maw, on behalf of the defendants.
9     MR. MAROULIS:  James Maroulis from Oracle
10 Corporation on behalf of defendant, Oracle Corporation.
11    THE VIDEOGRAPHER:  Are there any stipulations
12 for the record?
13    MR. BRITTON:  No.
14    MR. RUBENSTEIN:  No.
15    THE VIDEOGRAPHER:  Would the court reporter
16 please swear in the witness.
17       JENNIFER MINTON,
18    having been duly sworn, testified as follows:
19
20       EXAMINATION BY MR. BRITTON
21    MR. BRITTON:  Q.  Good morning, Ms. Minton.  My
22 name is Doug Britton.  We met earlier.  I'm with Lerach,
23 Coughlin, and I represent the plaintiffs in this class
24 action lawsuit against Oracle and other executives at
25 Oracle.

6

1     Can you state and spell your name for the
2  record, please.
3     A.  My name is Jennifer Minton, and the last name
4  is spelled M-I-N-T-O-N.
5     Q.  And can you give us your address, please.
6     A.  My home address?
7     Q.  Yeah.
8     A.  2105 Jeri Lane.  That's J-E-R-I, Lane, in
9  Hillsborough, California, 94010.
10    Q.  Have you ever had your deposition taken before?
11    A.  Yes, I have.
12    Q.  Okay.  Once in a derivative case in -- against
13 Oracle -- or on behalf of Oracle; is that correct?
14    A.  In a derivative case, yes.
15    Q.  Yes.
16    Anything other than that, have you had your
17 deposition taken before?
18    A.  Yes.
19    Q.  And on how many occasions?
20    A.  On at least -- including the derivative?
21    Q.  Yes.
22    A.  Including the derivative, four -- four times.
23    Q.  Four times.
24    And that was twice in the derivative case?
25    A.  It was a two-day.

7

1   Q.  Two -- two-day?

2   A.  Two-day deposition in the derivative case.

3   Q.  So when you say, "four times," you're saying --

4   is that four separate occasions, or does that include

5   the two days of the derivative testimony?

6   A.  It's three separate occasions that I can

7   recall.

8   Q.  Okay.  Other than the derivative, the Oracle

9   derivative case, what were the circumstances surrounding

10  the other depositions?

11  A.  One involved a litigation matter with regard to

12  PeopleSoft, and another related to an employment

13  litigation matter.

14  Q.  Were you a party in either of these cases, you,

15  yourself?

16  A.  Myself, personally?

17  Q.  Yes.

18  A.  No.

19  Q.  Okay.  So you're -- you're fairly familiar with

20  the deposition process, but I will give you a few of the

21  ground rules here today.

22      Do you understand you're under oath?

23  A.  Yes, I do.

24  Q.  And that your testimony today has the same

25  seriousness as if it were given in a court of law?

8

1   A.  Yes, I do.

2   Q.  The court reporter to your right is taking down

3   everything that we say, so it's important that you

4   answer audibly and that we try not to talk over one

5   another.

6      Do you understand that?

7   A.  Yes, I do.

8   Q.  Now, counsel to your left may object to some of

9   the questions that I pose to you today.  Do you

10  understand that you are obligated to answer those

11  questions unless your counsel specifically instructs you

12  not to?

13  A.  Yes, I do.

14  Q.  And if you don't understand a question that I

15  ask, will you let me know?

16  A.  Yes, I will.

17  Q.  Now, you are here today as -- withdraw.

18      Is it your understanding that you're here today

19  as a corporate designee on behalf of Oracle?

20  A.  Yes.

21  Q.  And you're here to talk about forecasting

22  issues; is that your understanding?

23  A.  My understanding is I'm to speak about the

24  forecasting process.

25      MR. BRITTON:  I'll take this opportunity to

9

1   mark the first exhibit.

2      You can just -- Minton 1.

3      THE REPORTER:  1?

4      (Whereupon, Plaintiffs' Exhibit 1 was marked

5      for identification.)

6      MR. BRITTON:  Q.  Okay.  I have placed in front

7   of you what's been marked as Minton Exhibit 1.

8      Will you take a moment to review this exhibit,

9   please.

10     MR. BRITTON:  For the record, Minton Exhibit 1

11  is the deposition notice for today entitled,

12  "Plaintiffs' Notice of Deposition of Oracle Corporation

13  Pursuant to Federal Rule of Civil Procedure 30(b)(6)."

14  Q.  And you don't have to read it in detail.  You

15  can just flip through it and let me know if you

16  recognize it.

17  A.  Yes, I do.

18  Q.  You've seen it before?

19  A.  Yes, I have.

20  Q.  Okay.  If you turn to the fifth page of the --

21  of Minton Exhibit 1, at the bottom, it says, "Deposition

22  Subject Matter."

23      Do you see where I'm reading?

24      -- page.

25  A.  Uhm-hum.

10

1   Q.  Okay.  If you will -- if you read No. 1 to

2   yourself for me and -- and let me know if you are

3   prepared to testify about the topics listed in item No.

4   1.

5   A.  Yes, I am.

6   Q.  Okay.  And for item No. 2, are you prepared to

7   testify about the items listed in that number?

8   A.  Yes, I am.

9   Q.  Okay.  And the same question for No. 3.

10  A.  Yes, I am.

11  Q.  Okay.  And then also for 4 and 5?

12  A.  Yes, I am.

13  Q.  Great.

14      We can put that exhibit aside.

15      Okay.  Can you tell me what you did to prepare

16  for your deposition today?

17  A.  I met with counsel yesterday.

18  Q.  Okay.  For how long?

19  A.  Between two and three hours.

20  Q.  And who was the counsel that you met with

21  yesterday?

22  A.  The counsel that are represented here.

23  Q.  That would be Mr. Rubinstein and Mr. Maroulis?

24  A.  Yes.

25  Q.  Anybody else?

11

1    A.  No.

2    Q.  Other than this meeting, did you do anything

3    else to prepare for your deposition today?

4    A.  No.

5    Q.  Talked to anybody else?

6    A.  Yes.

7    Q.  Who?

8    A.  I spoke with Ivgen Guner.

9        THE REPORTER:  I'm sorry --

10       THE WITNESS:  Ivgen, I-V-G-E-N, Guner, and

11   Lauren Mahon.

12       MR. BRITTON:  Q.  Okay.  And when did you speak

13   to Ivgen Guner?

14   A.  Yesterday.

15   Q.  For how long did you speak to Ivgen Guner?

16   A.  For approximately ten minutes.

17   Q.  And what did you say to Mr. -- is it a

18   Mr. Guner?

19   A.  No, it's Ms.

20   Q.  Ms.?

21       What did you say to Ms. Guner, and what did she

22   respond with?

23   A.  I asked her questions regarding when she began

24   to work for me, just trying to recollect when she

25   began -- became involved in the forecasting process.

12

1    Q.  What did she say?

2    A.  That she started to work for me around the

3    December 2000 time period.

4    Q.  Did you say anything else to Ms. Guner?

5    A.  We clarified what we believed were the process

6    that we employed with regards to the pipeline conversion

7    calculation.

8    Q.  Anything else that you talked to Ms. Guner

9    about?

10   A.  That's roughly about it.

11   Q.  And that was yesterday?

12   A.  Yes.

13   Q.  Now, Ms. Mahon, is that correct?  Am I saying

14   that right?

15   A.  Yes.

16   Q.  When did you speak to Ms. Mahon?

17   A.  Yesterday.

18   Q.  Yesterday.

19       And what did she say to her, and what did

20   she say to you?

21   A.  I asked her about a particular process that was

22   used to -- a -- a report that I saw that I asked her

23   about.

24   Q.  Okay.  And what report was that?

25   A.  It was an Approvals 2000 Report.

13

1    Q.  And what did she say to you?

2    A.  She confirmed that it is what I thought it was.

3    Q.  Okay.  How long was this conversation with

4    Ms. Mahon?

5    A.  Approximately five minutes.

6    Q.  And did you -- did you talk to Ms. Mahon about

7    anything else at yesterday's meeting?

8    A.  Yeah.  We talked about how the Approvals 2000 K

9    Report was created.

10   Q.  Did you do anything else, other than speak to

11   Ms. Guner and Ms. Mahon about your deposition today, in

12   preparation for your deposition today?

13   A.  No.

14   Q.  Okay.  And when you met with counsel, I believe

15   you said it was yesterday, did you review any documents?

16   A.  We reviewed the documents that were referred to

17   in this request.

18   Q.  Okay.  I don't want you to reveal any

19   communications with counsel.  I just want to know if

20   you -- if you did review the documents.

21   A.  Yeah.  We reviewed the documents that were

22   referred to in this request.

23   Q.  Okay.  Did any of those documents refresh your

24   recollection about events that happened back in the

25   December 2000, January 2001 time period?

14

1    A.  No.

2    Q.  Okay.  I want to ask you a few questions about

3    your educational background, if that's okay.

4        Can you give me a brief description of your

5    education, starting with college.

6    A.  I graduated U.C. Berkeley from the business

7    school in 19 -- December 1983.

8    Q.  And what was the degree that you --

9    A.  It was a --

10   Q.  -- you got?

11   A.  -- Bachelor's of Science degree in business.

12   Q.  Any postgraduate work?

13   A.  No.

14   Q.  Any continuing education --

15   A.  When I worked at Arthur Andersen, I had ongoing

16   continuing education.

17   Q.  You are an accountant?

18   A.  Yes.

19   Q.  CPA?

20   A.  Yes.

21   Q.  Do you still hold your CPA license?

22   A.  I don't have it -- have it active.

23   Q.  Was it active in the 2000, 2001 time period?

24   A.  I don't recall.

25   Q.  Okay.  Did you start with Arthur Andersen right

15

1   out of Berkeley?
2   A. Yes, I did.
3   Q. How long were you with Andersen?
4   A. Until May of 1989.
5   Q. So about six years?
6   A. Correct.
7   Q. And what was your position with Arthur
8   Andersen?
9   A. Well, I held several positions; but when I
10   left, I was a manager in the audit division.
11   Q. Were you in audit the entire time you were at
12   Andersen?
13   A. Yes.
14   Q. Okay. And after you left Arthur Andersen in
15   '89, where did you go?
16   A. Oracle.
17   Q. And when did you start with Oracle?
18   A. May of 1989.
19   Q. And what was the position that you held with
20   Oracle when you first started?
21   A. When I first started, I was responsible -- I
22   was an accounting manager.
23   Q. Okay. And for how long? I'm assuming you were
24   promoted.
25   A. Correct.

16

1   Q. That's correct.
2   How long were you an accounting manager for?
3   A. I was an accounting manager responsible for a
4   variety of different functions over a period of time. I
5   believe was promoted to vice president in about 1995.
6   Q. And what was your title in '95 when you were
7   promoted?
8   A. Vice president and possibly assistant corporate
9   controller. I don't exactly remember what the title
10   was.
11   Q. And did your title change at any time after
12   1995?
13   A. Yes, it did.
14   Q. When -- when did it change?
15   A. I know that I be -- became senior vice
16   president and corporate controller in 2000, and then
17   subsequent to that, my title changed from senior vice
18   president, corporate controller to senior vice
19   president, global finance and operations.
20   Q. And when did your title change from senior VP
21   controller to senior VP, global finance and operations?
22   A. I don't remember the precise year. It could
23   have been around 2001.
24   Q. Did your title change any time after that?
25   A. No. That is my title today.

17

1   Q. That's your title today, okay.
2   Let's start with the -- your duties and
3   responsibilities when you were an accounting manager.
4   What were your day-to-day responsibilities?
5   A. During the -- the first year, I was responsible
6   for coordinating the close process in interfacing with
7   the external auditors, which happened to be Arthur
8   Andersen. I oversaw the payroll and accounts -- sorry,
9   the payroll and the fixed assets functions.
10   In addition, I -- over a course of time, I also
11   took over responsibility for the collections process.
12   And then I became responsible for -- I became
13   essentially the accounts -- what -- what I would call
14   the assistant corporate controller.
15   Q. Okay.
16   A. But I wasn't a VP at that point.
17   Q. Okay.
18   A. And I was responsible for managing the overall
19   close process and the general ledger accounting.
20   I also started to assume responsibilities for
21   the financial planning, forecasting, and budgeting
22   process during that time period.
23   Q. So is it fair to say that when -- in your
24   position as accounting manager, you did not have any
25   responsibilities for forecasting and budgeting?

18

1   A. I believe that I was given those
2   responsibilities while I was still an accounting
3   manager. I essentially was rotated amongst a number of
4   different functional areas.
5   Q. So there wasn't a bright line?
6   A. No.
7   Q. You know --
8   A. No.
9   Q. -- Wednesday you are going to do this,
10   Thursday --
11   A. Absolutely not.
12   Q. Okay. So we have when you were assistant
13   corporate controller you were responsible for the close
14   process, general ledger, financial planning,
15   forecasting, budgeting. Anything else when you were --
16   A. I was also responsible for SEC reporting.
17   Q. Anything else?
18   A. Well, there's just a number of accounting
19   functions. I could list through some of the functions:
20   Accounts payable, fixed assets, general accounting.
21   Q. Is there an umbrella?
22   A. It was sort of an umbrella position, yes.
23   Q. Now, when you became senior VP and controller,
24   did your responsibilities change?
25   A. Yes.

19

1   Q.   And how did they change?

2   A.   Well, there was -- the former corporate

3   controller stepped down as the corporate controller and

4   chief accounting officer.  He stepped down to oversee

5   our Rocklin-shared service center, and so he began to --

6        THE REPORTER:  I'm sorry, "our Rocklin"?

7        THE WITNESS:  Rocklin-shared service center,

8   and so he then essentially began reporting to me.

9        MR. BRITTON:  Q.   He reported to you?

10  A.   Correct.

11  Q.   We talk about changing roles, kind of a switch,

12  you reported -- you reported to him, then he reported to

13  you?

14  A.   Yes, I --

15       MR. RUBENSTEIN:  Object to the form.

16       MR. BRITTON:  Q.   Okay.  Who was that

17  individual you're talking about?

18  A.   Thomas Williams.

19  Q.   Okay.  And how did your responsibilities change

20  from the assistant corporate controller to the senior VP

21  and controller?

22  A.   I became senior vice president and corporate

23  controller.

24  Q.   Right.

25       So how did your responsibilities change when

20

1   that happened?

2   A.   I became the chief accounting officer.

3   Q.   And what were your duties and responsibilities

4   as chief accounting officer at Oracle?

5   A.   I was responsible for ensuring the integrity of

6   our public filings with the Securities and Exchange

7   Commission and overseeing the overall accounting process

8   at Oracle.

9   Q.   Forecasting responsibilities were included in

10  that?

11  A.   Yes.

12  Q.   Budgeting responsibilities?

13  A.   Yes.

14  Q.   When -- at what point in time did you become

15  the chief accounting officer?  Was that 2000?

16  A.   Approximately.  I'm not exactly sure of the

17  year.

18  Q.   Let's talk about -- let me -- let me tell

19  you -- let me define a couple of things before we go

20  forward.  I may refer to the "class period" or the

21  "relevant period" during today's deposition.  And the

22  relevant period that we're talking about is June 2000 to

23  June 2001.

24  A.   Uh-huh.

25  Q.   And then the class period is December 11th, I

21

1   believe, 2000, to March 1st, 2001.

2        MR. MAROULIS:  December 14th.

3        MR. BRITTON:  December 14th?  Okay.  Thank you.

4   Q.   So December 14th, 2000, to March 1st, 2001, is

5   the class period.

6        So during the relevant period, what was your

7   title at Oracle?  June 2000 to June 2001.

8        MR. RUBENSTEIN:  Objection.  Asked and

9   answered.

10       THE WITNESS:  I believe it was in 2000 senior

11  vice president, global finance and operations.

12       MR. BRITTON:  Q.   Okay.  When you -- when your

13  title changed to senior VP of global finance and

14  operations, were you still considered the chief

15  accounting officer?

16  A.   Yes, I was.

17  Q.   Did your responsibilities change at all by

18  taking that title, as opposed to the senior VP and

19  corporate controller?

20  A.   Yes, it did.

21  Q.   And how did it change?

22  A.   During that time period, we were gradually

23  reorganizing the finance function such that finance

24  functions that previously reported into the business

25  units were being consolidated or globalized under my

22

1   organization.

2   Q.   Now, when you're -- when you referred to the

3   "business units," what were you referring to?

4   A.   As an example, William Plant, who is the vice

5   president of EMEA finance and operations, at that time

6   reported to I believe it was Pierre Carlo, and he was

7   moved under my organization structure, reporting

8   directly to me while still supporting Pierre Carlo.

9   Q.   And was that true for all business units at

10  Oracle?

11  A.   It was a gradual process.

12  Q.   Was there a beginning and completion date of

13  that process?

14  A.   Well, sure, but I don't remember the exact

15  dates, but it was a situation whereby it was difficult,

16  as you might imagine, for people to let go of their

17  finance person as a direct-report, so it didn't happen

18  all at once, all at the same time.  It was a gradual

19  process.

20  Q.   Was this process occurring during the relevant

21  period, June 2000 to June 2001?

22  A.   It -- I'm not sure if it was completed before

23  the beginning of the relevant period.

24  Q.   Okay.  Now, in your position as senior VP of

25  global finance and operations, what forecasting

23

Minton, Jennifer (30b6)  4/21/2005  9:00:00 AM

1  responsibilities did you have?
2  A.  I -- similar to the several years prior to
3  that, I was responsible for consolidating the forecasts
4  that were submitted from the field and analyzing the
5  forecasts and making adjustments as necessary.
6  Q.  Were you also responsible for financial
7  reporting during the relevant period?
8  MR. RUBENSTEIN:  Objection to the form.
9  MR. BRITTON:  Q.  You can answer.
10  A.  What -- what do you define as "financial
11  reporting"?
12  Q.  Reporting to the SEC --
13  A.  External reporting?
14  Q.  Yes.
15  A.  Yes, I was also involved in that process.
16  Q.  Did you have a staff that assisted you with the
17  forecasting process?
18  A.  Yes, I did.
19  Q.  And how many individuals were on that staff?
20  A.  I don't recall.
21  Q.  Give me an estimate.
22  A.  There was a corporate financial planning and
23  analysis group.  It could have been up to ten people.
24  Q.  Was there a different group that assisted you
25  with your external reporting responsibilities?

24

1  A.  Yes.
2  Q.  And what was that group?
3  A.  That would have been the accounting
4  organization or the assistant controller, corporate
5  controller.
6  Q.  And how many individuals were in that group?
7  A.  Those are individual people that were assisting
8  with that process.
9  Q.  Okay.  How -- how many of those -- how many
10  individuals were helping you assist with that process?
11  A.  Well, the -- the consolidations accounting team
12  may have helped to prepare footnotes, which would have
13  been a couple of people, but primarily speaking, the
14  10-Qs and the 10-Ks are prepared by one individual and
15  reviewed by an assistant controller or corporate
16  controller, as well as myself and a variety of other
17  folks.
18  Q.  When you say, "a variety of other folks," who
19  are you thinking about?
20  A.  External auditors, outside counsel, internal
21  counsel, chief financial officer, the president, CEO.
22  Q.  Okay.  So is it -- can we look at it as in
23  terms of, you know, a scale going up, that the
24  controllers assisted you and then the individuals that
25  reviewed it after you reviewed it are you referring to

25

1  as "the various other individuals"?
2  A.  Can you please repeat your question.
3  Q.  I'm trying to figure out who was involved in
4  this process.  And you -- and you mentioned that the
5  controller and one other individual assisted you with
6  the reporting process and you would review it and they
7  would review the 10-Qs and 10-Ks.
8  A.  Right.
9  Q.  And then you mentioned some other individuals.
10  And I'm wondering on a -- on a vertical scale, the other
11  individuals that you referenced, were those people that
12  you reported to?
13  A.  They would not -- I would not necessarily
14  report to them.  I would report to the CFO, but it was,
15  again, external counsel, internal counsel, the CFO,
16  auditors.
17  Q.  Okay.  Okay.  Can you tell me the -- the names
18  of the individuals during the relevant period that
19  assisted you with the external reporting?
20  A.  That would be June 2000 to June 2001?
21  Q.  Uhm-hum.
22  A.  In June 2000, I was not involved in the
23  preparation of the Form 10-K for the prior fiscal year
24  period because I was on medical leave.
25  Q.  Okay.

26

1  A.  So Tom Williams, who was the previous chief
2  accounting officer and my former boss, stepped in and
3  took over responsibility for that process.
4  Q.  Okay.
5  A.  So a -- a gentleman named Larry Garnick, who is
6  the assistant controller, I believe, at the time would
7  have been assisting in that process as well.
8  I should also say that Tom Williams always
9  reviewed, up until his departure from the company, the
10  10-Qs and the 10-Ks as well.
11  Q.  When did he leave?
12  A.  Approximately two years ago, two or three years
13  ago.
14  Q.  2001 to 2002?
15  A.  2002 to 2003, somewhere in there.
16  Q.  Okay.  And Larry Garnick, he is still with
17  Oracle?
18  A.  Yes, he is.
19  Q.  Okay.  Did he have a staff reporting to him?
20  A.  Yes, he did.
21  Q.  Okay.  Do you know how many?
22  A.  I don't recall.
23  Q.  On a percentage basis, in terms of your duties
24  and responsibilities, how much of your time was spent on
25  forecasting versus external reporting?

27

1    MR. MAROULIS:  Objection.  Time period.
2    MR. BRITTON:  Relevant, relevant period.
3    THE WITNESS:  Again, I was on medical leave for
4  a good portion of Q1, so June through July.  I would get
5  involved heavily in the forecasting process towards the
6  end of a quarter and whenever we published a forecast
7  report; and the SEC reporting comes after the quarter is
8  closed, and, you know, would take a couple of weeks
9  to -- during that time period to -- to produce and
10  finalize and file the documents with the SEC.
11    MR. BRITTON:  Q.  Okay.  So the bulk of the
12  forecasting responsibility came before the quarter ended
13  and then the bulk of the SEC reporting occurred after
14  the quarter?
15    A.  In the first month of the subsequent quarter.
16    Q.  When you were engaged in the SEC reporting
17  after the quarter had ended, were you also doing any
18  forecasting for the next quarter?
19    A.  We would prepare a forecast in advance of our
20  earnings call.
21    Q.  So, say, in the two weeks following a quarter,
22  how much of your time was spent on SEC reporting versus
23  forecasting?
24    A.  The first two weeks of a quarter were generally
25  spent closing the books, reviewing the numbers, and

28

1  ensuring that the numbers were accurate and getting
2  ready for the earnings release.
3    The time spent on the SEC reporting was
4  primarily after we released earnings.
5    Q.  Okay.
6    Going back to the corporate financial planning
7  and analysis group, you said there was about ten
8  individuals in that group?
9    A.  I think that that's an approximate number.
10    Q.  Okay.  Did that -- did you -- withdrawn.
11    Can you tell me if that number stayed
12  consistent during the relevant period, or did it grow or
13  decrease?
14    A.  I do not recall.
15    Q.  Can you tell me who you remember being in the
16  corporate financial planning and analysis group during
17  the relevant period?
18    A.  There are three names that come to mind; one is
19  Lia Burke, another is Ivgen Guner, and the third is
20  Roberta Ronsse.
21    Q.  You said Ronseg [sic]?
22    A.  Ronsse.  R-O-N-S-S-E, I believe.
23    Q.  Do you recall any other names?
24    A.  Those three individuals were part of the
25  corporate financial planning and analysis group that

29

1  worked, for the most part, on the forecasts, to the best
2  of my recollection.
3    Q.  Okay.
4    A.  Other individuals worked on other functions
5  that fell under the umbrella of the corporate financial
6  planning and analysis group.
7    Q.  Okay.  But not on forecasts?
8    A.  I believe those three were the ones that were
9  primarily involved in the forecasts during the relevant
10  period.
11    Q.  Okay.  Is the same true for the budgeting
12  process?
13    A.  That would be correct, to the best of my
14  recollection.
15    Q.  And what was Lia Burke's position?
16    A.  I'm -- I'm trying to recall her title.  I think
17  it was a director or senior manager.
18    Q.  And then Ivgen Guner?
19    A.  Ivgen Guner, when she joined my group, she was
20  also a vice president, I believe, but I do not recall
21  for certain.
22    Q.  And then Roberta Ronsse?
23    A.  I don't recall what her position -- her title
24  was.
25    Q.  Okay.  And then who did you report to during

30

1  the relevant period?
2    A.  During the relevant period, I reported to
3  Jeff Henley.
4    Q.  Did you also report to Larry Ellison?
5    A.  No.
6    Q.  Did you interact with Larry Ellison in your --
7  in the course of your business?
8    MR. RUBENSTEIN:  Object to the form.
9    MR. BRITTON:  Withdrawn.
10    Q.  When -- for job -- when performing your job
11  functions, did you interact with Larry Ellison at all?
12    A.  I had opportunities to interact with
13  Larry Ellison, yes.
14    Q.  Would you say whether it was frequent or
15  infrequent?
16    A.  During --
17    MR. RUBENSTEIN:  Object to the form.
18    MR. BRITTON:  Q.  During the relevant period.
19    MR. RUBENSTEIN:  Go ahead.
20    THE WITNESS:  I don't know.  How do you define
21  "frequent" versus "infrequent"?
22    MR. BRITTON:  Let's say daily contact.
23    A.  No, I did not have daily contact.
24    Q.  Okay.  How often would you say in a month you
25  dealt with Larry Ellison?

31

1    A.  I would attend the executive management
2    committee meetings on Mondays, so that was my primary
3    contact with Larry Ellison.
4    Q.  Okay.  Did you do any e-mail correspondence
5    with Mr. Ellison?
6    A.  There would be at times e-mail correspondence
7    with Mr. Ellison.
8        I should also state that during the budgeting
9    season, which falls in our -- in the April time frame, I
10   would be involved in the budget meetings when all of his
11   direct-reports would present their budgets to him for
12   the upcoming fiscal year.
13   Q.  How often did you interact with
14   Jeff Henley during the relevant period?
15   A.  I had frequent contact with Jeff.
16   Q.  Daily?
17   A.  Not necessarily.
18   Q.  Where was your office located?
19   A.  On the sixth floor of Oracle 500 Parkway.
20   Q.  And how about Mr. Henley?
21   A.  He was also located on the same floor.
22   Q.  Same floor, okay.
23       In terms of proximity, how close would you say
24   you are to Mr. Henley?
25   A.  I'm really bad at -- at --

32

1    Q.  Two doors down, three doors down?
2    A.  No, no.  If you look at the Oracle 500
3    building, my office is here, his office is there
4    (indicating).
5    Q.  Okay.
6    A.  It's a --
7    Q.  Circular kind of --
8    A.  Yes.
9    Q.  Okay.  Where was Mr. Ellison's office?
10   A.  He -- he was on the 11th floor.
11   Q.  Did the corporate financial planning and
12   analysis group interact with any of the other accounting
13   groups at Oracle during the relevant period?
14   A.  Sure.
15   Q.  And how did they interact?
16   A.  When evaluating the financial forecasts results
17   or budget results against actuals, they would interact
18   to evaluate any variances of actuals against forecast or
19   budget.
20   Q.  And who would do the -- the variance
21   evaluations?
22   A.  Well, it's not just the corporate financial
23   planning and analysis folks.  It would also be all of
24   the financial analysts around the globe that would
25   interact.  So finance directors, financial analysts all

33

1    around the globe would interact with their accounting
2    counterparts.
3    Q.  Can you describe for me the budgeting process
4    at Oracle during the relevant period?
5    A.  Generally speaking, the field organizations
6    would start to work on setting goals for their division
7    in the December time frame through February.  Forecasts
8    were -- sorry, not forecasts, but budgets were generally
9    submitted around the end of February or after February,
10   so that, you know, and I'm not sure in the timing of all
11   this, but -- because it's changed throughout the course
12   of the 16 years that I've worked at Oracle, but it's
13   always better to have three quarters behind your belt
14   and only one quarter left to forecast for the baseline
15   year.
16       But the budget meetings themselves -- so they
17   would submit their budgets into OFA around
18   February/March time frame, and then in late March/April
19   time frame there were budget meetings with
20   Larry Ellison.
21   Q.  So the budget meetings were in March --
22   A.  End of March --
23   Q.  -- end of March, into April.
24   A.  -- early April, into April, and sometimes into
25   May.

34

1    Q.  And when you said, "OFA," that's Oracle
2    Financial Analyzer?
3    A.  That is correct.
4    Q.  Can you describe for me or tell me how the
5    divisions prepared their budgets.
6    A.  No.
7    Q.  Do you have any knowledge whatsoever on how
8    they did that?
9    A.  I was not at the divisional level.
10   Q.  Okay.  So you pretty -- pretty much got
11   started, or your knowledge started with once the budgets
12   were entered into OFA; is that fair?
13   A.  Once the budgets were submitted into OFA, we
14   would consolidate the budgets.  So I collected the
15   budgets on a consolidated basis.  I was not involved in
16   the development of the divisional budgets.
17   Q.  Do you have any knowledge at all on how they
18   entered information or estimated revenues, expenses,
19   anything like that?
20   A.  Targets were often given.
21   Q.  Okay.  And targets were given by whom?
22   A.  Targets were often given by Larry and/or the
23   divisional heads of the business units.
24   Q.  Okay.  How many business units existed at
25   Oracle for budgeting purposes during the relevant time

35

1  period?
2  A.  I -- I can't quantify that.  I mean, there are
3  a number -- as an example, license is what I would view
4  as a business unit, but it's run on a geographic basis.
5  Q.  Okay.
6  A.  During that time period, the North America
7  organization or the Americas organization was actually
8  managed by four -- three or four individual people.
9  Q.  Now, I've seen references to OPI, OSI, and NAS.
10  Is that what you're referring to as Americas?
11  A.  That was what I referred to as North America.
12  Q.  North America.  Okay.
13  A.  LAD would be included to get to the Americas.
14  Q.  Okay.  And what does LAD stand for?
15  A.  Latin America Division.
16  Q.  So OPI, OSI, and NAS would be the North
17  Americas, and then if you add LAD, that's the Americas?
18  A.  That would be correct.
19  Q.  And which division did Canada fall into
20  this, or did it?
21  A.  It currently is -- let -- let me step back.
22  It may have at that time been segmented by
23  vertical businesses, and it could have been reporting
24  into both NAS and OSI.
25  Q.  Okay.  So when you spoke of business units

36

1  preparing their budgets and putting them into OFA, how
2  would you refer to the Americas?  Is that a -- is that a
3  separate business unit?
4  Let -- let me start over.
5  Tell me which business units you remember
6  during the relevant time period reporting into the OFA.
7  A.  During the relevant time period, we did not
8  have one individual overseeing the Americas.
9  Q.  All right.  I'm just -- right now I'm just
10  trying to get an idea of which divisions reported
11  into -- their budgets into the OFA.
12  A.  Well, OPI, OSI, NAS, LAD, EMEA, Japan.
13  THE REPORTER:  I'm sorry, MEA?
14  THE WITNESS:  EMEA, E-M-E-A.
15  So in -- night sales and consulting were run
16  geographically.
17  MR. BRITTON:  Q.  Okay.
18  A.  So sales and EMEA would be a business unit in
19  my definition.
20  Q.  Okay.
21  A.  OSI would be a business unit in my definition
22  because they were managed by EVPs, or SVPs that
23  participated in the -- meetings.
24  THE REPORTER:  In the what meetings?
25  THE WITNESS:  The executive management

37

1  committee meetings.
2  MR. BRITTON:  Q.  You refer to those meetings
3  as either EMC or EC?
4  A.  That is correct.
5  Q.  You mentioned sales and EMEA.
6  What is sales?
7  A.  License sales.
8  Q.  I think it's sales, correct?  Or are you saying
9  sells?
10  A.  Sales refers to license -- when I say "sales,"
11  I'm referring to license and sales.
12  Q.  Sales, S-A-L-E-S?
13  A.  S-A-L-E-S.
14  Q.  Okay.
15  A.  As distinguished from consulting, support, and
16  education.
17  Q.  Okay.  So let's take the OPI.  Who -- who was
18  the business head in OPI during the relevant period?
19  A.  If I recall correctly, it would have been
20  Frank Varsano, but I believe he reported to
21  Sandy Sanderson.
22  Q.  Did Nussbaum, John Nussbaum, ever take over?
23  A.  Jay Nussbaum.
24  Q.  Jay Nussbaum.
25  Did he ever take over OPI, or am I thinking

38

1  differently.  Withdrawn.
2  Which -- which division was Jay Nussbaum
3  responsible for?
4  A.  He was responsible for OSI.
5  Q.  OSI, okay.
6  And that was throughout the entire relevant
7  period, June to June?
8  A.  I believe so.
9  Q.  The same for Frank Varsano?
10  A.  I'm not certain.
11  Q.  And who is the business head for NAS?
12  A.  George Roberts.
13  Q.  And then LAD?
14  A.  Sandy Sanderson had responsibility for LAD.  He
15  had somebody running it for him.  I believe it was
16  Sebastian Gunningham, but I am not certain.  People come
17  and go.  And at the time I just don't remember.
18  Q.  I would say so.  Sixteen years.
19  Okay.  Did Mr. Sanderson have overall
20  management responsibility for these divisions?
21  A.  No, he did not.
22  Q.  For any of them?
23  A.  I believe he had responsibility for OPI, I
24  think -- during the relevant period, if I recall
25  correctly, and I may not have this correct.  I believe

39

1  Frank Varsano reported to Sandy, and
2  Sebastian Gunningham, who ran LAD, reported to Sandy.
3  Q.  Okay.  Okay.  Let's go back to the budgeting
4  process.
5      Once the budgets were entered into OFA, can you
6  tell me how that process happened; how were the budgets
7  entered into OFA?
8  A.  The field finance organization that reports up
9  ultimately through me would enter in the business units
10  budgets into OFA at the field level.
11  Q.  Okay.  So the field finance organization.
12  Who -- how many individuals are in the field finance
13  organization?
14  A.  Hundreds.
15  Q.  Hundreds.  I won't ask you to name them all.
16      Who -- who did you deal with in terms of a
17  direct-report in that organization, or was it -- was it
18  a separate organization that had direct-reports, similar
19  to O -- OPI and OSI and NAS?
20  A.  So I am going to start with -- with the easy
21  side.  So what we're referring to, global, okay.
22  Q.  Okay.
23  A.  EMEA, William Plant reported to me, so I would
24  interface with him.
25      Greg Davies, who ran Asia Pacific.  I would

1  interface with him.
2      Japan, the CFO of Oracle Japan, which is a
3  publicly traded company, I would interface with him.
4  Q.  And who is that?
5  A.  At the time it was Akira Minamono-San.
6  THE REPORTER:  I'm sorry, repeat that.
7  THE WITNESS:  Akira --
8  MR. BRITTON:  I knew that would get you all
9  upset.
10  THE WITNESS:  Akira Minamono-San.
11  MR. BRITTON:  Q.  Okay.  All right.  So that's
12  from Japan.
13  A.  And then for the Americas, within Latin America
14  it was Cheryl McDowell.  And then within the North
15  Americas it was divided up.  Sarah Kopp supported
16  Jay Nussbaum for OSI --
17  THE REPORTER:  I'm sorry, Sarah Kopp what?
18  THE WITNESS:  Supported Jay Nussbaum for OSI
19  Division.  David Winton supported George Roberts for the
20  NAS division, and Jim English supported Frank and/or
21  Sandy Sanderson, partly during the relevant period.  I
22  believe Ivgen Guner was supporting Frank and Sandy
23  during the first half of the relevant period, and then
24  she came over to corporate to work directly for me.
25  MR. BRITTON:  Q.  Okay.  Okay.  Now, the

1  individuals that you just listed for each of these
2  regions, are those the individuals that you -- you,
3  yourself, primarily interacted with?
4  A.  That would be correct.
5  Q.  Did you interact with anyone else at -- you
6  personally -- interact with anybody else at EMEA?
7  A.  I might have on occasion spoken to one of
8  Williams' direct-reports.
9  Q.  And do you remember who that was?
10  A.  If we're referring to sales only, it would have
11  been Nick Hooton.
12  Q.  What about expenses?
13  A.  During the forecasting process, the focus was
14  primarily on license revenues.
15  Q.  Was there any focus on expenses?
16  A.  Yes, but that was done at the consolidated
17  level.  We'd look at it.
18  Q.  So that was up above the OFA level; is that
19  right?
20  A.  Are we talking about budgets, or are we talking
21  about forecasts?
22  Q.  Budgets.
23  A.  Yeah, there was focus on expenses, but -- so
24  those individuals that I just named were responsible for
25  supporting the business units, both revenue expenses and

1  margin, as well as account.
2  Q.  Okay.  So when you -- when you qualified your
3  answer with, if we're talking about sales, you dealt
4  with Nick Hooton?
5  A.  No.  That is not what I said.
6  Q.  Okay.
7  A.  You asked me if I had spoken with anyone else
8  in EMEA other than William.
9  Q.  Right.
10  A.  And I said I may have on occasion spoken to
11  Nick Hooton.
12  Q.  Okay.
13  A.  And that would have been for license.
14  Q.  For license?
15  A.  License sales.
16  Q.  What about for consulting?
17  A.  I don't believe I had any contact directly at
18  the time.
19  Q.  Okay.  Okay.  And Asia Pacific, did you speak
20  to anyone other than the business head during the
21  budgeting process?
22  A.  I thought we were speaking about my
23  direct-reports.
24  Q.  I'm trying to get an idea of the budgeting
25  process and how information flowed up and who you

1   interacted with at each of the regions that you listed.

2       A.  I would interact with my finance

3   direct-reports --

4       Q.  Right.

5       A.  -- who supported the business unit leaders --

6       Q.  Right.

7       A.  -- across the geographies and the various

8   business -- lines of businesses, whether it be sales,

9   consulting, support, or education.

10      Q.  Okay.  So I think I -- I understood --

11      A.  And they would work directly with the business

12  unit leaders to help to develop a revenue and expense

13  budget for their area of responsibility.

14      Q.  Okay.  So who -- who in Asia Pacific did you

15  interface with again; who was the person, the name?

16      A.  Greg Davies.

17      Q.  Davies.  Okay.

18          And then anybody --

19      A.  And he supported Derek Williams.

20      Q.  Right.

21          And did you interface with anybody other than

22  Greg Davies in Asia Pacific during the budgeting

23  process?

24      A.  During the budget reviews that were held with

25  Larry, the business unit leader would attend that

44

1   meeting with their finance support individual.  So for

2   example, when Derek Williams had his budget review

3   meetings, he would come and he would bring Greg Davies

4   with him.

5       Q.  Okay.

6       A.  So during the budget review presentations, if I

7   was in presence at any of those meetings which, for the

8   most part, I would have been, unless there was a

9   conflict, I would have had contact with both.  The

10  direct-reports in finance reported to me, as well as the

11  business unit leaders that were responsible for their

12  respective organizations.

13      Q.  Okay.  That makes sense.

14          And then the individual that you named for

15  Japan.  I am not even going to attempt to re -- repeat

16  that.  Was that the financial support person?

17      A.  That was the CFO.  He -- supported the CEO

18  of Oracle Japan.

19      Q.  Okay.  Let's go to the Americas.

20          And Latin America LAD, did you speak to anyone

21  other than the business head and Cheryl McDowell?

22      A.  I would have spoken with Sandy Sanderson and

23  Sebastian Gunningham, if he was the individual that was

24  reporting to Sandy at the time, would have attended a

25  budget review session.

45

1       Q.  Okay.  Okay.  So is it fair to say that your --

2   your primary contact was with those at the top -- the --

3   the -- the financial support as well as the business

4   head, and you didn't really go down deeper into the

5   organization?

6       A.  That would be correct.  But, again, understand

7   that my contact was more frequent with the folks that

8   reported to me.  My contact with the business unit

9   leaders were primarily limited to the budget review

10  meetings --

11      Q.  Okay.

12      A.  -- when dealing with the preparation of the

13  budgets.

14      Q.  Were the -- three individuals that you

15  named in the financial planning department, were they

16  involved in this process as well?

17      A.  They were involved in the tactical aspects of

18  it, yes.

19      Q.  Okay.  What do you mean by "the tactical

20  aspects of it"?

21      A.  Managing OFA, submitting the budget, submission

22  calendar, reconciling budget in OFA to the control

23  reports given to us by the divisions, helping to define

24  budget assumptions that folks should be using for

25  developing their budgets, and communicating with the

46

1   broader global finance community.

2       Q.  Okay.  When you said "submitting the budget,"

3   what -- what were you referring to?  Can you give me an

4   example of how they submitted the budget, the

5   individuals in this group?

6       A.  Which individuals are you referring to?

7       Q.  The three individuals in the financial planning

8   and analysis department.

9       A.  They set the submission deadlines.

10      Q.  Okay.

11      A.  They didn't submit the budgets.  The field

12  finance organization submitted the budgets.  They would

13  reconcile the numbers in OFA to the control sheets that

14  were provided by the field finance organizations to

15  ensure that the budgets were submitted correctly.  There

16  was often reconciliation issues that we had to tie up

17  and resolve.

18      Q.  Okay.  And then "helping to define budget

19  assumptions," what did you mean by that?

20      A.  An example would be what salary raise pool

21  should be assumed for the upcoming fiscal year.

22      Q.  And where would those assumptions come from?

23      A.  Generally speaking, we would speak with HR and

24  get the relative CPI indexes of the individual countries

25  around the globe, and during that time I believe that

47

1  that was the primary basis for defining what the salary

2  budget assumptions would be.

3     Q.  Okay.

4     A.  We would also discuss it with the CFO and

5  assure the CFO -- you know, we'd get some clarity

6  on it because they were preliminary budgets.

7     Q.  Right.

8        Okay.  Were there any other budget assumptions

9  other than the salary raise pool?

10    A.  There may have been additional assumptions

11  regarding bonuses, as an example, what bonus rate

12  assumptions should be used.

13    Q.  Any others that you could recall?

14    A.  We may have given out revenue targets and

15  margin percent targets for the revenue producing lines

16  of business.

17    Q.  Okay.

18    A.  And there may have been even head count

19  assumptions, head count growth assumptions.

20    Q.  Now, was there a process at Oracle where these

21  assumptions would be developed or -- or set?

22    A.  During the relevant period, I do not recall

23  precisely the process that was employed.  Generally

24  speaking, you know, we would, as I mentioned before, get

25  the CPI rates for various countries to set the salary

48

1  budgets, and I would often get clarification from

2  Jeff Henley, who was the CFO, as to whether or not some

3  of the head count and bonus and salary rate assumptions

4  were appropriate for purposes of preliminary -- or

5  preparing the preliminary budgets.  Any revenue or

6  margin assumption targets generally would come from --

7  from Larry.

8     Q.  And how were those -- how were the revenue

9  target assumptions and the margin percentage assumptions

10  communicated to you?

11    A.  They could have been verbally communicated to

12  me.  They could have been communicated to me and in a

13  meeting.  I don't recall.

14    Q.  Were they communicated to you directly by

15  Mr. Ellison?

16    A.  I don't recall.

17       They could have also come from Safra Catz via

18  Larry.

19    Q.  Okay.  Who is Safra Catz?

20    A.  She is our -- one of our copresidents and our

21  interim chief financial officer.

22    Q.  Were there any processes at Oracle to ensure

23  that the information coming from the divisions, the

24  business units, was reliable?

25       MR. RUBENSTEIN:  Object to the form.

49

1       THE WITNESS:  I don't understand your question.

2       MR. BRITTON:  Q.  Were there any variance

3  testing or quality assurance processes to make sure that

4  the numbers that were being entered into the budgets by

5  the business units were, you know, legitimate or

6  reasonable or justified?

7       MR. RUBENSTEIN:  Same objection.

8       THE WITNESS:  The -- the business units owned

9  the budgets.  We were responsible for reconciling what

10  was in OFA to their control reports.

11       MR. BRITTON:  Q.  Okay.  Are you familiar

12  at all with the process in the business units where they

13  would make sure that potential deals being entered and

14  potential expenses being entered into the budgets were

15  reasonable and based upon legitimate business reasons?

16    A.  As I mentioned earlier, I was not involved in

17  the development of the divisional business unit budgets.

18  I would be involved in issuing targets if I was asked to

19  do so by Larry or Safra or Jeff.

20    Q.  Okay.  Are you familiar with any variance

21  testing that Oracle did to -- test the accuracy of

22  the divisional budgets?

23       MR. RUBENSTEIN:  Object to the form.

24       THE WITNESS:  I don't understand your question.

25       MR. BRITTON:  Q.  Okay.  I'm trying to

50

1  understand if there was any process at Oracle to test

2  the budgets that were coming in from the division to

3  make sure that they were as accurate as possible to

4  rect -- correct any problems to make sure they were more

5  accurate or reasonable.  Is there anything like that --

6       MR. RUBENSTEIN:  Same objection.

7       MR. BRITTON:  Q.  -- that you're familiar with.

8     A.  As I mentioned before, we reconciled the

9  budgets that were submitted to control reports that were

10  provided to us by the field finance organization.

11    Q.  Now, the control reports, what are those?

12    A.  Well, as an example, if EMEA was submitting

13  a -- a budget of license revenues of a hundred dollars

14  and expenses of $50, they would give us an Excel

15  spreadsheet or tell us what the total number should be;

16  and when we consolidated the data in OFA, we would

17  validate that what was in OFA equaled their control

18  reports.

19    Q.  So it was a -- it's a -- just a comparison?

20    A.  It's a reconciliation.

21    Q.  Right, okay.

22    A.  A tie out.

23       MR. RUBENSTEIN:  We can take a break whenever

24  you want.

25       MR. BRITTON:  Yeah, whenever you're -- we can

51

1    take a break.
2        MR. RUBENSTEIN:  We don't have to take a break
3    now, but I just wanted to let you know.
4        THE WITNESS:  Oh, sure.
5        MR. BRITTON:  Q.  Okay.  What happened after
6    the reconciliation of the OFI -- OFA to the control
7    sheet in the budgeting process?
8        A.  If any errors were detected, we would notify
9    the field finance organization, and they would make
10   their appropriate corrections in OFA.
11       Q.  Okay.  And then what happened next in the
12   budget process?  What was the next step?
13       A.  The next step was that each of Larry's
14   direct-reports would meet with him during the late
15   March/April time frame, and they would review their
16   budgets with him as well as go over issues,
17   opportunities, challenges, whatever they decided that
18   they wanted to present.
19       Q.  Were you involved in that process at all?
20       A.  I attended those meetings.
21       Q.  Okay.  Did you have any input in the process?
22       A.  I did not have the input into the divisional
23   preparations of their operation reviews.  My field
24   finance direct-reports that supported the various
25   business unit -- unit leaders would work with them to

52

1    develop their operations review, which is what we call
2    it.  We don't call it a budget review.  We call it an
3    operations review, and they would assist in that
4    PowerPoint presentation.
5        Q.  So would each business unit -- or the head of
6    each business unit would give a presentation on their
7    budget to Larry during these meetings?
8        A.  Right.
9        Q.  Okay.
10       A.  And -- and the one -- one part of the
11   involvement that I may have had was to make sure that
12   they used an appropriate template, because Larry was
13   very keen on wanting to see revenue growth, margin
14   growths, and margin percent.
15       Q.  And how many of these meetings which you --
16   would typically occur during a budgeting process,
17   presentations to Larry, the operations review meetings?
18       A.  Generally, each -- there would be one meeting,
19   for the most part, with each of his direct-reports.  If
20   there were any issues that Larry had or concerns that he
21   had, he may ask that they come back.
22       Q.  Okay.  Were there any manuals or sets of
23   instructions or anything in Oracle that described the
24   process of budgeting at Oracle?
25       A.  No, not that I'm aware of.

53

1        Q.  Okay.  So how were -- how were individuals
2    trained in how to do the budgeting process at Oracle?
3    Let's start with the field.  Are you aware?
4        A.  Well, over the course of several years, each
5    organization had developed their own Excel models to
6    help build a -- a budget, but those, during the relevant
7    period, varied amongst all of the various groups.  There
8    was no global standard.
9        Q.  Were you involved at all after the operations
10   review, the presentations to Larry?  Were you involved
11   at all in the interaction, the finaling of the
12   preliminary budget for each of those business units?
13       A.  I don't understand your question.
14       Q.  The way I'm envisioning the process working is
15   you'd have preliminary budget from each of the business
16   units that they would present to Larry, and then Larry
17   would see the presentation and give them feedback.  And
18   then there would be a final pre -- or a final budget
19   prepared based upon Larry's feedback.  Am I seeing that
20   correctly?
21       MR. RUBENSTEIN:  Object to the form.
22       THE WITNESS:  Generally speaking -- I want to
23   lower this.
24       Generally speaking, there were revenue growth
25   targets and margin percent targets that were agreed at

54

1    the budget review meetings for the revenue-producing
2    business units, and our process is to take the actuals
3    for the current fiscal year and apply those agreed
4    revenue and margin targets to the actual results to
5    define what the budget would be for the following year.
6        MR. BRITTON:  Q.  Okay.
7        A.  So the budgets were not essentially fully
8    determined until after we closed our books for the
9    current fiscal year so that we could apply those
10   agreed-upon revenue and margin targets to the
11   revenue-producing business units, and expense-target
12   growth rates were also applied to the actuals.
13       Q.  And that was done by year and by quarter?  Was
14   that -- that process that you just described, did they
15   do that --
16       A.  They were annual targets.
17       Q.  They were annual targets, okay.
18       Now, I want to talk a little bit about how the
19   revenue targets and the margin percentage targets were
20   agreed upon.
21       Can you describe that process for me.
22       A.  There was dialogue between Larry and his
23   business units as to what they felt that they could
24   achieve.
25       Q.  Did you witness that dialogue during the

55

1  relevant period or during the -- the budgeting process
2  for fiscal '01?
3      A.  For fiscal '01, I was not involved in the
4  majority of the budget reviews, if I recall correctly.
5      Q.  That's when you were out on sick leave?
6      A.  I was out in April through about July.
7      Q.  So that's right through the budgeting process,
8  okay.
9          MR. RUBENSTEIN:  Why don't we take a
10  five-minute break.
11         MR. BRITTON:  Sure.  Absolutely.  Let's take a
12  five-minute break.  Let's do that.
13         THE VIDEOGRAPHER:  Going off the record.  The
14  time is 9 -- or 10:45.
15             (Recess taken.)
16         THE VIDEOGRAPHER:  Going back on record.  The
17  time is 10:59.
18             (Whereupon, Plaintiffs' Exhibit 2 was marked
19             for identification.)
20         MR. BRITTON:  Q.  Okay.  The court reporter has
21  placed in front of you what's been marked as
22  Plaintiffs' -- or Minton Exhibit 2; and if you would
23  take a moment to look at that document and let me know
24  if you recognize it, I would appreciate it.
25         For the record, Minton 2 is -- starts with

56

1  Bates NDCAORCL 028477 through 80.
2          MR. RUBENSTEIN:  Doug, I am going to object to
3  the extent that the document is outside the relevant
4  period.
5          MR. BRITTON:  Yeah.
6          MR. RUBENSTEIN:  It's dated April of 2000.
7          MR. BRITTON:  Yeah.
8          MR. RUBENSTEIN:  So I don't know quite how you
9  intend to use it, but depending on how it goes --
10         MR. BRITTON:  Just understanding the budgeting
11  process.
12         MR. RUBENSTEIN:  All right.  As long as it's
13  clear that the budgeting process you're asking about is
14  the process for the relevant period.
15         MR. BRITTON:  It is.
16         MR. RUBENSTEIN:  All right.
17         MR. BRITTON:  I think it makes sense to omit
18  the prefix when we're describing these documents, so
19  everybody agrees, so --
20         MR. RUBENSTEIN:  That's fine.
21         MR. BRITTON:  -- when I reference a Bates
22  range, I am going to omit the prefix NDCAORCL, because
23  every document starts with that.
24         THE WITNESS:  I've read the document.
25         MR. BRITTON:  Q.  And do you recognize it?

57

1  to medical leave.
2      Q.  Okay.  Now, you mentioned Gary Bloom.  Who is
3  Gary Bloom?
4      A.  Gary Bloom was a -- a direct-report of
5  Larry Ellison.  He had originally responsibility for
6  various development organizations; platform technologies
7  is an example.  He took over education and support, I
8  think, sometime during the fiscal 2000 time period.
9      Q.  Okay.  Can you tell by looking at this document
10  what -- what business --
11     A.  I'm sorry, he also was responsible for
12  marketing.  He was -- they were globalizing marketing
13  under him as well.
14     Q.  Education, support, and marketing?
15     A.  That would be correct.
16         MR. RUBENSTEIN:  Doug, to confirm, are we
17  talking during the relevant period?
18         MR. BRITTON:  Yes.  And let me -- actually, let
19  me establish that.
20     Q.  Is this -- does this e-mail relate to the
21  budget process for fiscal year 2001?
22     A.  Yes.
23     Q.  Okay.  And let's -- I think it will be
24  easier -- helpful for me if we break down Oracle's
25  fiscal period.

59

1      A.  Vaguely.
2      Q.  Okay.  And it's -- it's an e-mail from
3  Peter Donnelly to you --
4      A.  Uhm-hum.
5      Q.  -- is that right?
6          Who is Peter Donnelly?
7      A.  Peter Donnelly, during this time period,
8  reported to Gary Bloom.  He was a finance person
9  supporting Gary Bloom.  So if you recall, earlier I told
10  you that we were globalizing the finance function under
11  me, Peter Donnelly was one of the last individuals to be
12  moved under my organization.
13     Q.  Okay.  So does this -- does this e-mail help
14  you place in time when the process of moving the
15  reporting over to you, when it started and when it
16  ended?
17     A.  No.  He did not report to me until -- until I
18  returned from medical leave.
19     Q.  Okay.
20     A.  If I may --
21     Q.  Sure.
22     A.  -- I think the -- the purpose of this note was
23  to make sure that there was agreement as to the
24  discussions and action items taken under various
25  budget-review meetings because I was just about to go on

58

1    It's not a calendar period, is it?

2    A.  Fiscal year end ends on May 31st.

3    Q.  It's May 31st.

4    So the first quarter begins June 1st and ends?

5    A.  August 31st.

6    Q.  August 31st.  Thank you.

7    And then the second quarter, September 1st to

8    November 30th?

9    A.  30th.

10   Q.  Third quarter, December 1st to February 28th?

11   A.  Or 29th, if it's leap year.

12   Q.  Whichever, okay.

13   And then the fourth quarter goes from

14   March 1st to May 31st.

15   A.  That would be correct.

16   Q.  Okay.  Can you tell by looking at this string

17   of e-mails which business unit this relates to?

18   A.  It relates to multiple business units as

19   outlined in the e-mail:  support, accurate development,

20   education --

21   Q.  All right.

22   A.  -- Global IT, alliances, business online,

23   Oracle Mobile, and marketing.

24   Q.  Okay.  And what is Thacker Development?

25   A.  Thacker Development was the translation group.

60

1    Q.  So this --

2    A.  Translation and localization.

3    Q.  So these businesses had no relation to license

4    sales, right?

5    A.  That would be correct.

6    Q.  Okay.  Can you describe where in the process

7    that we spoke about this is taking place?  Is this after

8    an executive -- or a meeting with an operations review

9    with Larry Ellison?

10   A.  As I mentioned before, we had budget reviews or

11   operation reviews, whatever you want to call them, late

12   March or April time frame.

13   Q.  Right.

14   And Peter, who was supporting Gary Bloom, took

15   these notes based on the meetings that were taking place

16   during this time frame.

17   Q.  Okay.  If you turn to the third page, and it's

18   the page Bates ending 28479 --

19   A.  Uhm-hum.

20   Q.  -- there is a heading "Business Online."

21   A.  Correct.

22   Q.  And the first reference says, "No budget was

23   agreed to during the budget session."

24   And I'm trying to get an idea of the -- the

25   process that goes into if a -- if a budget isn't agreed

61

1    upon in the meeting with Larry, what happens afterwards

2    and how do you get to a final agreed-upon budget?

3    A.  If you recall, when I testified earlier that

4    when we would have these budget meetings we either

5    agreed or Larry would ask them to come back.  So in this

6    particular instance, if there was no agreement as to the

7    budget, then Tim would have to come back and re-present

8    a budget based on whatever dialogue or direction he was

9    given by Larry during the course of their budget-review

10   meeting.

11   Q.  Okay.  And -- and what types of things would

12   cause a disagreement on -- on a budget?  What would

13   cause somebody to have to go back and redo it?

14   MR. RUBENSTEIN:  Object to the form.

15   You can answer.

16   THE WITNESS:  If somebody presented a budget

17   that was not realistic or achievable, then Larry would

18   ask them to go back and revisit their budget.

19   MR. BRITTON:  Q.  And when you say, "not

20   realistic," what would that be -- withdrawn.

21   How -- what factors would go into determining

22   whether a particular budget that's being presented was

23   not realistic?

24   A.  As an example, and I do not recall the

25   specifics on this one, but if they wanted to add more

62

1    capacity quicker than what Larry had envisioned -- and

2    when I say, "capacity," I mean adding heads, as an

3    example -- then Larry would ask them to go back and

4    recalibrate their budgets using different assumptions

5    based on guidance that was given.

6    Q.  Okay.  What would cause -- withdrawn.

7    Was there -- in your experience, was there ever

8    an occasion where there was a disagreement on a budget

9    in terms of sales, sales growth, the sales forecast for

10   the year, that was not realistic or somebody had to redo

11   that budget?

12   A.  If you recall, I described that for the

13   revenue-producing units, we generally agreed a revenue

14   growth rate and a margin target for the subsequent

15   following fiscal year.  If an organization overachieved

16   in the current fiscal period, in other words, if they

17   said that they -- in their -- in their presentation if

18   they had a forecast for fiscal 2000 of a hundred million

19   in license sales, and they said that they had agreed to

20   a 10 percent license sales growth rate for the following

21   fiscal year, if they actually came in with 120 million,

22   they may have had some concerns about being able to

23   achieve a 10 percent growth target on the 120 million

24   versus the 100 million.

25   Q.  So it would be -- be unrealistic to achieve a

63

1  certain revenue target because their numbers in the
2  prior year were so good?
3     A.  Well, they outperformed what was originally
4  presented as to what they would achieve in the current
5  fiscal year period during their operations review.
6     Q.  Okay.  How long did these operation-review
7  meetings take?
8     A.  It depended on the organization and -- and the
9  amount of material that each business unit leader wanted
10  to present.
11     Q.  And who were the attendees of these meetings?
12     A.  The business unit leader that was responsible
13  for presenting.  So as an example, in this case, these
14  could have been individual meetings for each of these
15  business -- lines of businesses that we're talking about
16  here.
17        So marketing, as an example, it would have been
18  Mark Jarvis who reported to Peter -- I'm sorry, who
19  reported to Gary Bloom.  So those two would have been in
20  attendance, as well as Peter Donnelly, since he was the
21  financial planning and analysis guy supporting
22  Gary Bloom, myself, Jeff Henley, Safra Catz,
23  Larry Ellison, and at times, Ivgen Guner may have
24  participated.
25        It's important to note that not everybody

64

1  always made each of these meetings, so the core -- the
2  core attendees, if you will, were Larry, Safra, Catz,
3  Jeff Henley, the CFO, myself, and sometimes Ivgen Guner.
4     Q.  Okay.  And only the -- withdrawn.
5        Only the business heads for the particular
6  units under review would be in attendance during these
7  meetings?
8     A.  Generally speaking.  The business unit leader
9  might invite somebody else to attend, or we may have had
10  two reviews done sequentially; and so it's possible that
11  when the marketing budget was done that the alliance
12  budget was done at the same -- you know, either right
13  before or right after, so they may have participated in
14  each other's sessions.  It would have been up to
15  Gary Bloom to decide who he wanted to attend the
16  sessions.
17     Q.  Okay.  But there wasn't a meeting where all of
18  the business heads attended?
19     A.  All at once?
20     Q.  Yeah, all --
21     A.  Oh, absolutely not.
22     Q.  Were there any meetings like that in the
23  budgeting process where all of the units participated?
24     A.  During the relevant period?
25     Q.  Yeah.

65

1     A.  Defined as June 1st, 2000 --
2     Q.  Well, we're talking about the budgeting
3  forecasts.  So we're talking about the budgeting process
4  for fiscal '01, so that would have necessarily occurred
5  prior to that relevant period.  So we are looking at
6  March/April time period, possibly May of 2000.
7     A.  There was a meeting, either in 2000 or 1999,
8  where it was a larger group of, you know, EVPs, and some
9  of their directs -- I'm not sure if that was in 1999 or
10  2000 --
11     Q.  Okay.
12     A.  -- where there was just general budget
13  discussions, but that was not a standard process.
14     Q.  So, generally speaking, it was the particular
15  units that were under review that would be there?
16     A.  That -- that would be correct.
17     Q.  Okay.  You can put that document aside.
18        (Whereupon, Plaintiffs' Exhibit 3 was marked
19        for identification.)
20     MR. BRITTON:  Q.  Okay.  The court reporter has
21  placed in front of you what's been marked as Minton
22  Exhibit 3; and if you could take a moment to take a look
23  at this and let me know if you recognize it, I'd
24  appreciate it.
25        The Bates -- it's a one-page document,

66

1  entitled, "Budget Growth Rate Comparison, hyphen,
2  License," and the Bates number is 041949.
3     A.  I don't recall seeing this document.
4     Q.  Okay.  Do you know what type of document this
5  is, or how it was used in the budget process?
6     MR. RUBENSTEIN:  Object to the form.
7     THE WITNESS:  I -- I don't recall seeing this
8  document.
9     MR. BRITTON:  Q.  So is it fair to conclude
10  from that this isn't a typical document used in the
11  budgeting process?
12     MR. RUBENSTEIN:  Object to the form.
13     THE WITNESS:  I don't recall this document.
14     MR. BRITTON:  If you look at the second
15  box, there is a reference to "LJE agreed-upon growth
16  rate."
17        Have you heard that term used in the budgeting
18  process in your experience, in particular to the
19  budgeting process for fiscal '01?
20     A.  Again, we would agree targets in the
21  budget-review meetings.
22     Q.  So is -- do you know if this is referring to
23  Larry J. Ellison --
24     A.  I --
25     Q.  -- "agreed-upon"?

67

1    A.  I did not create this document.  I -- I can
2    assume that it is.
3    Q.  Okay.  You can put that document aside.
4    A.  By the way, this document was created when I
5    was already on medical leave.
6    Q.  Uh-huh, okay.
7    Had you seen documents similar to this in prior
8    budget processes?
9    A.  Again, I do not recall seeing this document.
10   Q.  Or even its form?
11   A.  I don't recall seeing this document.
12   Q.  But I'm getting at the form, not the particular
13   document, the form of the document, the layout.
14   A.  We've had so many different layouts over the
15   course of the years.
16   Q.  Okay.
17   A.  I just -- just don't recall it.
18       (Whereupon, Plaintiffs' Exhibit 4 was marked
19        for identification.)
20   MR. BRITTON:  Q.  The court reporter has placed
21   in front of you what's been marked as Minton Exhibit 4.
22   If you take a moment to review this exhibit, please.
23       And for the record, Minton Exhibit 4 is
24   entitled, "Fiscal 2001 Budget," starts with Bates 039895
25   and ends at 039918.

                                                      68

1    Have you had an opportunity to review this
2    exhibit?
3    A.  Yes, I have.
4    Q.  And do you recognize it?
5    A.  I rec -- I recognize the format of it.
6    Q.  Okay.  And what is this document?
7    A.  This would be a budget package that was
8    provided to the board of directors.
9    Q.  And this board of directors' meeting was
10   July 17, 2000, at least that's what the document
11   indicates?
12   A.  That would be correct.
13   Q.  Okay.  Were you back from six -- sick leave by
14   this time?
15   A.  I'm not certain.  I -- I'm not really certain.
16   Q.  Is --
17   A.  I think I came back around July time frame, so
18   it could have been right before, right after.
19   Q.  Did you participate in board meetings --
20   A.  No.
21   Q.  -- typically?
22   A.  Never have.
23   Q.  Never have.
24       The -- withdrawn.
25       Was the board involved at all in approving the

                                                      69

1    budget at Oracle?
2    A.  Again, I was never at a board meeting, so I
3    don't know if they officially approved it or not.
4    Q.  Okay.  Was it your understanding, based upon
5    your experience there, that the budget would have to be
6    approved by the board before it would go forward?
7    A.  We presented it to the board.  Being
8    that I was not at the board meeting, I don't know if it
9    was ever formally approved.
10   Q.  Okay.  Did you ever hear that in
11   your -- withdrawn.
12       Did you ever hear, in your discussions with
13   anybody at Oracle, that the board of directors had to
14   approve a budget before Oracle would go forward with
15   that budget?
16   A.  Not that I recall.
17   Q.  Okay.  How long after -- withdrawn.
18       How long did the budget-review process take
19   before ultimately a budget was agreed upon?
20   A.  The budget would be essentially agreed upon by
21   management prior to submitting it to the board.  So,
22   again, as I testified earlier, we would agree in the
23   preliminary budget meetings revenue targets and margin
24   percent targets for the revenue producing lines of
25   business and expense targets for the expense-based

                                                      70

1    units.
2    Q.  Okay.
3    THE REPORTER:  Expense-based?
4    THE WITNESS:  Expense only business units.
5       We would apply those targets to the actuals; if
6    there was any disconnects, as the example that I gave
7    you earlier, if somebody had overly achieved, there may
8    have been an occasion agreement to reduce their overall
9    license or consulting or support or education targets.
10   And if that was agreed by Larry, we would have made that
11   change, and then produced the final budget for
12   submission to the board.
13   Q.  Okay.  Were you involved -- and we're talking
14   about fiscal year 2001.  Were you involved in setting
15   the growth targets for this fiscal year?
16   A.  I attended some of the meetings.  I don't
17   believe I attended all of them because I went on medical
18   leave and was busy going to doctor's appointments and
19   whatnot.  I don't set the targets.  I communicate the
20   targets.
21   Q.  Okay.  Are you -- do you have an understanding
22   at all of how the targets are set, the process that goes
23   into that?
24   A.  Larry would have -- Larry would either agree a
25   target -- the problem is I don't know what dialogue

                                                      71

Minton, Jennifer (30b6)  4/21/2005  9:00:00 AM

1   Larry may have had with the business unit leaders.
2       Q.   Right.
3       A.   So they could have either come up with their
4   own target or Larry would have asked them to achieve a
5   different target; but how they came to formal conclusion
6   on those targets, I was not privy to all of those
7   conversations and -- and/or meetings.
8       Q.   Okay.  Okay.  You can put this exhibit aside.
9   Actually, before you do that --
10      A.   Sure.
11      Q.   -- is a budget -- is this -- withdrawn.
12          Is this the budget for 2001?
13      A.   This would have been the budget for 2001.
14      Q.   Okay.  Now, can you turn to the -- the page
15  that ends with Bates 901.
16      A.   Uhm-hum.
17      Q.   There's the second column from the right going
18  to the left.  It says, "Growth Percentage," and then it
19  has bracket U and then F, or both -- actually both
20  columns to the right have it.
21          Do you know what that's referring to, the U?
22      A.   Yes, I do.
23      Q.   What is that?
24      A.   Unfavorable.
25      Q.   Unfavorable.  And the F would be favorable?

                                                            72

1       A.   You're on target.
2       Q.   Okay.  Now, if you go down into that column,
3   there is negative references, like minus 3 percent, and
4   going further down minus 16 percent.  I would assume --
5   is it fair to assume that that's an unfavorable growth
6   percentage?
7       A.   Which -- which line are you referring to,
8   please.
9       Q.   Let's go to the one to the second end from the
10  right, and go down to where the first -- it says "minus
11  9 percent."
12      A.   Minus nine --
13      Q.   Right
14      A.   -- right.
15      Q.   Is that -- the confusion or the question I'm
16  asking is, sometimes you'll see a negative number.  The
17  negative is indicated by brackets, but this -- the --
18  there is a bracket around the U, but there is no
19  brackets in the column.  I'm just wondering if a neg- --
20  a negative number is unfavorable, or is there no
21  unfavorable growth percentages in this column?
22      A.   A negative would be an unfavorable.
23      Q.   Okay.  So -- so instead of putting the brackets
24  around it, they put a minus sign?
25      A.   That would be correct.

                                                            73

1       Q.   All right.  Okay.  The budget at Oracle for
2   fiscal 2001, was it a rolling budget?
3           Are you familiar with what a rolling budget is?
4       A.   There was -- and I am not certain what time
5   period the concept of rolling the budgets, like having a
6   rolling budget, more or less, what I would call an
7   outlook versus the budget.  The budget was really the
8   budget that was set at the beginning of the year.  There
9   may have been agreements to revise a budget number
10  during the course of the year; and if so, when we made
11  changes, we would reflect those changes and provide a
12  revised analysis to the board at a subsequent board
13  meeting.
14      Q.   Okay.
15      A.   The term "rolling budget" for me means having
16  people continuously looking on a rolling of 12-month
17  basis on a go-forward basis.  So I would call that more
18  of an outlook.
19      Q.   Okay.  So there wasn't the outlook process at
20  Oracle?
21      A.   No, no.  Well, there is an outlook process.
22      Q.   But the budget wasn't on an outlook basis for
23  Oracle?
24      A.   No, no.
25      Q.   Did Oracle, during fiscal 2001, revise its

                                                            74

1   budget at all, to your knowledge?
2       A.   I don't recall.  It's possible.
3       Q.   And can you describe for me how that would
4   happen, what the process would be?
5           MR. RUBENSTEIN:  You mean if the process -- if
6   the budget was going to be revised?
7           MR. BRITTON:  Q.   Right.  If it was going to be
8   revised, how -- how would that come about and how would
9   that happen?
10      A.   If a business unit leader, as an example, felt
11  that their budgeted revenue or expense growth rate was
12  unattainable, they may have had some dialogue with Larry
13  and got approval to modify their budget.
14      Q.   Okay.
15      A.   We would then modify the budget in OFA and
16  produce a revised budget.
17      Q.   Okay.  You can put that document aside.
18          Now, we've been talking about sales and growth
19  percentages and revenue percentages.  The budgeting
20  process for expenses at Oracle, was it the same as it
21  was for the revenue side?
22      A.   The revenue-producing business units, or lines
23  of businesses, we would agree a revenue target, a
24  revenue growth target, and a margin target; so by
25  default, the expense budget would fall out.

                                                            75

1  Q.  Oh, okay, because when you have your margin
2  percentage, that gives you your expense?
3  A.  Well, A minus B equals C.
4  Q.  Right.  It's the --
5  A.  We did an agreed expense growth.  For any
6  revenue-producing unit, we never agreed to expense
7  growth targets; we agreed a margin percent target.
8  Q.  And that would ultimately lead to what the
9  expense budget was?
10  A.  That is correct.
11  Q.  What about for nonrevenue-producing units?
12  A.  We would agree on a growth target for the
13  nonrevenue-producing units.
14  Q.  Okay.
15  THE REPORTER:  I'm sorry.  We would agree on a?
16  THE WITNESS:  Expense growth target, which
17  could have been either a favorable target or an
18  unfavorable target, an increase or a decrease.
19  MR. BRITTON:  Q.  In 2001, was
20  there -- withdrawn.
21  What was the target set for 2001 in terms of
22  expenses?
23  A.  It was agreed on individual organizational
24  basis.  It was not agreed in totality.
25  Q.  So it wasn't a, you know, general we want

76

1  10 percent or -- withdrawn.
2  Let me -- we need to change the tape, so...
3  THE VIDEOGRAPHER:  In the deposition of
4  Jennifer Minton, this marks the end of Tape 1, Volume I.
5  Going off the record.  The time is 11:33.
6  (Discussion off the record.)
7  THE VIDEOGRAPHER:  In the deposition of
8  Jennifer Minton, this marks the beginning of Tape 2,
9  Volume I.  Going on the record.  The time is 11:38.
10  MR. BRITTON:  Q.  How does the budgeting
11  process at Oracle affect the forecasting process at
12  Oracle, if at all?
13  MR. RUBENSTEIN:  Okay.  Just to clarify, you're
14  talking about during the relevant period?
15  MR. BRITTON:  Yes.
16  MR. RUBENSTEIN:  All right.
17  THE WITNESS:  At the beginning of the fiscal
18  year, we would copy the budget into the forecast cube.
19  So at that one point in time, they would be identical;
20  but then, as the next forecast takes place, it would
21  then -- you know, and this would be like in the
22  June/July time frame.  You know, we would copy it over,
23  and then the forecast gets updated from there.  So
24  that's the only tie to the forecast and the budget.
25  MR. BRITTON:  Q.  Does the budget become

77

1  obsolete at some point because of the forecasting
2  process?
3  A.  I would say that we rely heavily on the
4  forecasting process.  The budget is at a point in
5  time --
6  Q.  Right.
7  A.  -- but we primarily focus on the forecast, not
8  the -- not the budget.
9  Q.  Okay.  Is it fair to say that the budget is a
10  starting point of the forecast?
11  A.  Again, when I -- when I said that we copied the
12  budget over, it was really to simplify the tactical data
13  entry for the field finance organization, so that they
14  wouldn't have to --
15  Q.  Right.
16  A.  -- retype in the -- you know -- you know, for
17  each month, each account, you know, so you have an -- an
18  income statement, salaries, bonus, commission, travel
19  and entertainment, you have all those lines by cost
20  center for 12 months.  So we would copy the -- the
21  budget into the forecast cube as a starting point to
22  simplify the forecasting process for the financial
23  analysts only.
24  Q.  Okay.  Is it fair to say that Larry Ellison was
25  the individual that set the growth targets at Oracle?

78

1  A.  Again, as I testified earlier, he may have had,
2  and it's likely that he did dialogue with the individual
3  business unit leaders, but the -- the final targets were
4  clearly agreed by Larry.  Whether or not he, you know,
5  set them 100 percent, I don't think is necessarily a
6  fair statement.
7  Q.  But he was -- he had a lot of influence in
8  setting the targets; is that fair?
9  A.  He had to agree the final targets.
10  Q.  Do you know how he came up in his mind on what
11  percentage targets he was looking for?
12  A.  You would have to ask Larry that question.
13  Q.  So you don't know, you have no idea?
14  A.  I'm sorry, I don't understand your question.
15  Q.  So you have no idea how he came out -- he came
16  about setting the growth targets for the year for
17  Oracle?
18  A.  He was looking for margin growth.
19  Q.  Right.
20  A.  But, again, it's not setting it for the entire
21  company.  He would -- it's done on an individual
22  organizational level, and then it's rolled up, and the
23  rolled up number is what it is.
24  Q.  But in the -- in the beginning, the starting
25  point for the budget, growth target is set by Larry or

79

1   Larry talking to others, so the rolling up part of the
2   budget has to be done to meet that forecast, doesn't it?
3   The target, I meant.
4       A.  I don't understand your question, I'm sorry.
5       Q.  If -- if Larry sets -- say, for example, Larry
6   sets a 30 percent growth target, how do the business
7   units adjust their forecast to meet that growth target?
8       MR. RUBENSTEIN:  Object to the form.
9       THE WITNESS:  The business units -- Larry may
10  have given them budget targets, and they obviously would
11  have signed up for the budget targets.  Their forecast
12  had nothing to do with the budget targets.  Their
13  forecast was their own thinking as to what they were
14  committing to during the course of a given quarter.
15      MR. BRITTON:  Q.  So how did the growth targets
16  that were set in the budget affect the forecasting that
17  was done by the business units going forward?
18      A.  They didn't.
19      Q.  They didn't at all?
20      A.  No.  The budget was a goal that was set at the
21  beginning of a year, and the forecast was developed by
22  each of the individual business unit leaders, and that's
23  what they were committing to during the course of the --
24  of any given quarter.
25  ///

80

1       (Whereupon, Plaintiffs' Exhibit 5 was marked
2       for identification.)
3       MR. BRITTON:  Q.  The court reporter has placed
4   in front of you what's been marked as Minton Exhibit 5.
5   Will you take a moment to review this exhibit.
6       A.  I've read it.
7       Q.  Have you -- do you recognize it?
8       A.  I don't recognize it.  It's an e-mail note that
9   doesn't have my name on it.
10      Q.  Okay.
11      I don't know if I identified this for the
12  record.  Did I?
13      THE REPORTER:  No.
14      MR. BRITTON:  Q.  Exhibit 5 is a one-page
15  string of e-mails or partial string of e-mails that has
16  Bates 028499.
17      This doesn't have your name on it.  It's an
18  e-mail exchange between Mr. Ellison and Mr. Henley.
19  It's discussing, apparently, Mr. Ellison's view that the
20  field budgets are a joke, and then it's referring to a
21  LJE budget --
22      THE REPORTER:  J what budget?  J
23      MR. BRITTON:  Q.  An LJE budget versus a field
24  budget.
25      Is that a fair characterization of what you're

81

1   reading here?
2       A.  Yes.
3       Q.  Do you know why there was -- he was talking
4   about two different budgets?
5       MR. RUBENSTEIN:  Object to the extent that if
6   you're asking about general process, I -- I -- that's
7   fine.
8       MR. BRITTON:  I am.  I want to know if there's,
9   you know, two different budgets and why; that's
10  essentially what I'm getting at.
11      THE WITNESS:  Generally speaking, there is not.
12      MR. BRITTON:  Q.  Do you know what he's
13  referring to, or have you ever heard of LJE budget?
14      A.  I think he felt that the field budgets were not
15  credible and wanted to, based on this e-mail note,
16  wanted to track what he thought we would achieve versus
17  what the field thought we would achieve.
18      Q.  Were there any discussions for the fiscal year
19  '01 budget about -- that you were a part of or that you
20  witnessed that were talking about the field budgets not
21  being credible?
22      A.  Not that I can recall offhand.
23      Q.  Were there any process -- withdraw.
24      Did Oracle implement any process to correct the
25  perceived lack of credibility in the field budgets?

82

1       A.  It's possible.  I -- I don't recall
2   specifically that we may have tracked for this fiscal
3   year his budget versus the field budgets, because if he
4   asked to do it in this e-mail note, we generally would
5   have followed on that instruction.
6       Q.  Right.
7       I'm wondering if, given the perception that the
8   field budgets were not credible, did Oracle do anything
9   during fiscal '01 to adjust and to make the field
10  budgets more credible?
11      A.  In -- in terms of what was presented to the
12  board?
13      Q.  No.  Just in terms of the general business, did
14  it go back and correct -- generally, if -- if the field
15  is -- is submitting a budget that's not credible, did
16  Oracle go -- go back and -- and correct that made the
17  field budgets not credible?
18      A.  It -- it's possible that we had two budget
19  cubes during this time period.  I really don't recall
20  specifically.  Or we may have just tracked Larry's
21  budget in an Excel spreadsheet --
22      Q.  Uh-huh.
23      A.  -- versus what the field submitted, but that is
24  not something that has ever happened more than once in
25  one fiscal year.  This was an unusual -- if -- if I can

83

1    help you out at bit.
2        Q.  Sure.
3        A.  If you look back to the prior fiscal year, we
4    probably -- we possibly exceeded the budgets that were
5    submitted.  The field had a tendency, particularly
6    during the forecasting process, to commit to numbers
7    that they consistently overachieved.  So when he refers
8    to the field budgets as -- if I can find it here -- as
9    being a joke, it's because they always overachieved what
10   they said that they were going to perform in any given
11   quarter.
12       Q.  Okay.  And -- and the question I have was
13   whether Oracle did anything to correct that disconnect
14   that -- that they changed the process at all or -- or
15   adjust the budgeting process or the forecasting process
16   to make the field budget closer to what they ultimately
17   ended up doing.
18       A.  I don't recall.
19       Q.  Now, the -- the growth target that you -- that
20   we were talking about before, that's only a goal, so
21   that's like the goal.  This was talking about 30 percent
22   growth; that's the goal for the --
23       A.  That -- that's the goal for the year, the
24   budget for the year.
25       Q.  Okay.

84

1        A.  But, again, we really primarily focused on the
2    forecast during the quarters.
3        Q.  Okay.
4        A.  It's a snapshot in time, is the best way to
5    look at it.
6        Q.  Okay.  You -- you reference the -- the LJE
7    budget occurring only once, and that this was an unusual
8    circumstance.
9            Do you know why it was an unusual circumstance?
10   What was unique to 2001 that gave rise to these two
11   separate budgets?
12       A.  As I just testified, my only conclusion is that
13   the field was continuously overachieving what they said
14   that they were going to be able to deliver.
15       Q.  Okay.
16       A.  It was a very high growth period in fiscal
17   2000.
18       Q.  And is that what made 2001 a unit year where
19   Larry prepared his own budget or had somebody track his
20   own budget compared to the field?
21       MR. RUBENSTEIN:  Object to the form.
22       THE WITNESS:  I'm not certain that we -- I -- I
23   don't recall that we actually did any -- I mean, we may
24   have done some analysis which -- which was, here is the
25   field budget and here is the -- the budget that Larry

85

1    had, but I don't really recall.
2        MR. BRITTON:  Q.  Okay.
3        A.  And, in fact, if I just may point out to you,
4    this number says the LJE budget should reflect 30
5    percent growth in license, 35 percent in support.  What
6    was in the budget package was 30 percent.  20 percent
7    growth in education.  And what was reflected in the
8    budget package was 10 percent.  And 10 percent growth in
9    consulting, which actually was what was reflected in the
10   budget package, so, you know, this was his view at the
11   time.  I'm not certain whether or not these numbers
12   represent the field targets or agreed-upon targets or --
13   or not.
14       Q.  Okay.
15           (Whereupon, Plaintiffs' Exhibit 6 was marked
16           for identification.)
17       MR. BRITTON:  Q.  The court reporter has placed
18   in front of you what's been marked as Minton Exhibit 6.
19   Will you take a moment to review this exhibit.
20           And for the record, Minton Exhibit 6 starts
21   with Bates 41952 and ends with Bates 41954.
22       Q.  Have you had a chance to review Minton Exhibit
23   6?
24       A.  Yes, I have.
25       Q.  Do you recognize it?

86

1        A.  Yes, I do.
2        Q.  And what is it?
3        A.  It's a -- an e-mail correspondence between
4    Terry Ford, who worked for Jay Nussbaum in a financial
5    support role -- Sarah Kopp actually worked underneath
6    him at one point, but he always -- he was more like an
7    operations guy.  And it's an e-mail debate regarding
8    budget target for the OSI sales and consulting
9    organization.
10       Q.  Okay.  And you sent this e-mail on July 28th,
11   2000?
12       A.  That would be correct.
13       MR. RUBENSTEIN:  Well, let me just object.
14   I -- I -- and I don't know exactly where you are going
15   to go, but in order to avoid possible debate over this,
16   this document obviously talks about the specifics of the
17   budget, and it seems to me that that's a topic that is
18   going to be more appropriately handled with Ms. Minton
19   in her individual capacity when she is deposed in that
20   capacity.  And I don't know whether you want to talk
21   about -- how you intend to use this, but I just have a
22   concern that to the extent we are going to begin talking
23   about the specifics of the budget for FY '01 and why it
24   was done the way it was done, I think that's -- that's
25   an inquiry that ought to be left for Ms. Minton when she

87

1    is deposed in an her individual capacity.
2          MR. BRITTON:  Okay.  I think once you hear my
3    questions --
4          MR. RUBENSTEIN:  All right.
5          MR. BRITTON:  -- I don't think you'll have an
6    objection.
7          MR. RUBENSTEIN:  Okay.
8          MR. BRITTON:  Q.  If you look at the second
9    paragraph of the first page of Minton Exhibit 6, the
10   second sentence -- or the first sentence says, "The
11   revised proposed budget below reflects a 10.9 percent
12   revenue growth and 11.4 percent expense growth.  This is
13   not consistent with LJE's directive."
14         And then the next page, top sentence says, "LJE
15   made it clear that the consulting margin must improve by
16   one point over fiscal year 2000 actuals."
17         And the question I have is whether the
18   directives that you're referring to in these e-mails
19   that I just referenced, were those directives that were
20   given by Mr. Ellison in the executive or the operational
21   review meetings?
22         A.  They would have been the targets, the revenue
23   and margin targets that were agreed to between
24   Jay Nussbaum and Larry Ellison in the budget-review
25   meetings.

                                                        88

1          Q.  Okay.  In the op- -- operation-review meetings,
2    can you describe for me a typical operations review
3    meeting, what would happen, who would speak, who
4    would -- what would Mr. Ellison say in response?
5          I'm -- because I'm just trying to get an idea
6    of what's happening.  Because I'm seeing documents that
7    says, Larry's directives, and I'm envisioning, you know,
8    Mr. Ellison, you know, giving orders at these meetings,
9    and I want to -- just to get a picture -- your picture
10   of how things transpired in those meetings.
11         So as to ask you a question, can you describe
12   what -- what would occur at the operations review
13   meetings for me?
14         A.  It would depend on the individual meeting with
15   the various business unit leaders.  So, you know, again,
16   the field -- Jay Nussbaum, as an example, is the
17   business unit leader for OSI sales and consulting.  He
18   would come in; he would present his numbers.  He may
19   also present additional information that talks about the
20   strategy, issues, competitive situations, and analyses,
21   you know, a variety of additional topics.
22         And at the end of the budget session or the
23   operations review, there was agreement that would be
24   obtained between the business unit leader and Larry as
25   to what the revenue growth target would be, as well as

                                                        89

1    the margin percent target for the revenue-producing
2    lines of business.  For the expense pro -- expense-only
3    businesses, there would be agreement achieved or reached
4    at the end of the budget meeting on what those expense
5    targets would be.
6          Q.  You can put that document aside.
7          (Whereupon, Plaintiffs' Exhibit 7 was marked
8                for identification.)
9          MR. BRITTON:  Q.  Okay.  The court reporter has
10   placed in front of you what's been marked as Minton
11   Exhibit 7.  Will you take a moment to look at this
12   exhibit, please.
13         A.  I've looked at it.  I think I need glasses,
14   though.
15         MR. RUBENSTEIN:  I'm with you.
16         MR. BRITTON:  Q.  What's that?
17         A.  I said I think I'm beginning to need glasses.
18         Q.  Yeah.  You should have seen us looking at these
19   documents in preparation.
20         A.  Yeah, but you at least could have a magnifying
21   glass.
22         MR. BRITTON:  Did I identify this for the
23   record?
24         THE REPORTER:  No.
25         MR. BRITTON:  Q.  Minton Exhibit 7 is a

                                                        90

1    one-page document that has Bates 040637, and its heading
2    is "License Revenue Forecast Accuracy."
3          A.  Uhm-hum.
4          Q.  Have you ever seen this document before?
5          A.  I don't recall if I've seen this exact
6    document, but I can talk to this topic.
7          Q.  Okay.  You recognize the format?
8          A.  I recognize --
9          Q.  Or the information?
10         A.  -- the analysis --
11         Q.  Okay.
12         A.  -- not necessarily the format.
13         Q.  Okay.  What is the purpose of this analysis?
14         A.  This analysis is showing you, essentially, that
15   if you look at the actuals for Q1 of fiscal '01 --
16         Q.  Uh-huh.
17         A.  -- the -- the grand total -- well, let's just
18   deal with the first line.  Let's deal with OSI Nussbaum.
19   His actual license revenues were $107 million.
20         Q.  Okay.
21         A.  His final forecast for the last forecast at the
22   end of the quarter was 70 -- oh, sorry, the first
23   forecast for month three in the quarter, so I'm just
24   going to step back for one second, if I may.
25         Q.  Sure.

                                                        91

Minton, Jennifer (30b6)  4/21/2005  9:00:00 AM

1   A.   Our forecasting process is, we would forecast
2   twice -- every other week in month one and month two,
3   and then we would forecast every week in month three,
4   okay.
5   Q.   Okay.
6   A.   And this is taking the first full quarter
7   forecast for month one, the first forecast for month two
8   and the first forecast for month three.
9   Q.   Okay.
10   A.   And then the final forecast, the last forecast
11   that was submitted by the field, in month three.
12   Q.   Okay.
13   A.   Okay.  So this would be like the last week of
14   the quarter, or it could even be the last few days of a
15   quarter, depending on which day the end of the quarter
16   ended, because we would prepare the forecasts on Friday
17   and submit them to EC on Monday mornings.
18        And if you see here, Jay submitted a forecast
19   of $77 million, even up to the very last few days of the
20   quarter.  Yet, his actuals were 107 million.
21   Q.   Okay.
22   A.   So he overachieved his forecast by 30 million.
23   Q.   Okay.
24   A.   And if you look at this in totality, if I read
25   the numbers correctly, the entire field organization

92

1   overachieved it by 122 million.
2   Q.   All right.
3   A.   So the last forecast of the quarter was 680 --
4   9 or 3.
5   Q.   Three, it looks like.
6   A.   And the actuals were 785.
7   Q.   Okay.
8   A.   Or something like that.
9   Q.   Okay.  So the --
10   A.   It's hard to read.
11   Q.   It is.
12        The forecast as percentage of actuals month
13   one, two, three, this is telling you how much of the
14   actuals the forecasted numbers were; is that right?
15   A.   No.  It's telling me how much the forecast was
16   as a percent of the actuals.
17   Q.   So it's a percent in the actuals.  So here --
18   A.   Because the field consistently committed to a
19   forecast that they overachieved.
20   Q.   Okay.  So if you are below 100 percent, you
21   overachieved.  If you're above 100 percent, you
22   underachieved; is that right?
23   A.   Right.
24   Q.   So the OPI, 128 percent --
25   A.   Right.  So if you --

93

1   Q.   -- it underachieved?
2   A.   No.  They -- yes, that's correct.  They
3   underachieved.
4   Q.   Okay.  That makes sense.
5   A.   Whereas George Roberts overachieved by
6   19.3 million.
7   Q.   Right.
8        And Germany Geeger [sic] hit it right on, or
9   thereabouts.
10   A.   Yager?
11   Q.   Yager.
12   A.   Yes.
13   Q.   It says a hundred percent.  Okay.
14   A.   But not at the very beginning of the quarter.
15   Q.   At the beginning of the quarter -- okay.  I
16   understand, okay.  Very good.
17        You can put that document aside.
18        (Whereupon, Plaintiffs' Exhibit 8 was marked
19        for identification.)
20        MR. BRITTON:  Q.  Have you had an opportunity
21   to read Minton Exhibit 8?
22   A.   Yes, I have.
23   Q.   Before I ask you any questions, I need to mark
24   this exhibit.
25        Minton Exhibit 8 is a one-page e-mail with

94

1   Bates 039315.
2        Do you recognize Minton Exhibit 8?
3   A.   I was copied on it.
4   Q.   Didn't -- I think you sent it.
5   A.   Oh, yeah, I sent it.  Yeah --
6   Q.   You sent it.  Okay.
7   A.   -- yeah.  I --
8   Q.   And --
9   A.   -- I recall it.
10   Q.   Okay.  And you sent it on January 18, 2001?
11   A.   That would be correct.
12   Q.   Okay.  And Ivgen Gunass [sic] --
13   A.   Ivgen Guner.
14   Q.   Ivgen Guner was in your planning department; is
15   that right?
16   A.   That is correct.
17   Q.   Okay.  If you go down to the budget.
18   A.   Uhm-hum.
19   Q.   It's talking -- it's January 18, 2001, and
20   you're discussing the budget.  And it says, "The
21   follow-up on my voice mail from last night, the field is
22   getting concerned about the targets."  Withdrawn.
23        Ivgen wrote, "To follow-up on my voice mail
24   from last night, the field is getting concerned about
25   the targets.  We must send them out as soon as possible.

95

Minton, Jennifer (30b6)  4/21/2005  9:00:00 AM

1  Any feedback from the EC?  Please let Larry and I know
2  how to proceed."
3     My question is -- is, how -- what was happening
4  in the budgeting process at this point in time where
5  Ivgen was -- was talking about sending out the targets
6  as soon as possible?
7     MR. RUBENSTEIN:  I -- I have to object to this
8  question.  I really think that now you are getting into
9  the details of what went on during Q3 as opposed to the
10  process.
11    MR. BRITTON:  What -- what I'm doing is I'm
12  trying to understand the process on -- we talked about
13  the budget starting in the beginning and then working
14  from forecasting.  And now we are talking about budgets
15  and sending things out to the field in terms of targets,
16  and I'm just trying to understand in the process, what's
17  going on here.
18    MR. RUBENSTEIN:  Well --
19    MR. BRITTON:  I don't want -- I don't want her
20  to testify in terms of why or anything like that.  I
21  just want to understand the process.
22    MR. RUBENSTEIN:  Well, that was actually why I
23  objected, is because I -- I thought that your last
24  question really was why is she saying this at this point
25  in time; and that, I think, is beyond the scope.  If you

96

1  want to ask about is there a process that is in place
2  generally about reevaluating budgets, which I think
3  you've covered, but that -- I'm okay with that, but I
4  think the -- the why and the wherefore of any document
5  on any given date, I think, really does go to something
6  that would be more, really, properly addressed in
7  Ms. Minton's individual capacity.
8     MR. BRITTON:  Q.  Okay.  The question I have
9  is, what is happening in the budget process as reflected
10  in the paragraph underneath the heading "Budget"?
11    A.  Okay.  If I may, if you recall earlier, I told
12  you that the field begins to work on their preliminary
13  budget in the December/January time frame.
14    Q.  Right.
15    A.  They often have asked in the past, is there any
16  top level guidance, so that they at least have a sense
17  of what is -- what Larry's thinking is, but that is not
18  the guidance that -- that they necessarily will come --
19  that is not necessarily what they will present at the
20  operation reviews and is not necessarily what is agreed
21  at the operation reviews in March.  So this is really
22  referring to the guidance for the fiscal 2002 budget
23  process.
24    Q.  Okay.  And the next paragraph where it talks
25  about an extension of the submission deadline, that's a

97

1  submission of the budget --
2     A.  Into OFA.
3     Q.  Okay.  Into OFA for the following fiscal year?
4     A.  That would be correct.
5     Q.  Okay.  Now, if you look at your -- the e-mail
6  that you wrote, "LJE made it clear to everyone at the
7  EMC this week that the license revenue growth target for
8  this year and next is 30 percent."
9     And the one I'm interested in is -- is the
10  30 percent target for this year.  How did that have
11  affect the forecast during this period of time?
12    A.  It didn't.  He's refer -- we're referring to
13  the budget targets.  The budgets are completely separate
14  from the forecasts.
15    Q.  Then why would he be talking about the
16  percentage growth at this period of time?
17    MR. RUBENSTEIN:  See, that -- that's where
18  again, I have to object.  I think that now you are
19  getting into the -- what was happening precisely at a
20  given point in time as opposed to the process.  You're
21  getting to the whys and the wherefores.
22    MR. BRITTON:  Unless you are going to instruct
23  her not to answer, I think it's fair.
24    MR. RUBENSTEIN:  Well --
25    MR. BRITTON:  I'm trying to understand the

98

1  process, and I'm seeing documents that show that there
2  may be some effect of Larry's target on the forecast,
3  because if you are talking about percentage, the target
4  percentage for this year, in January 2001, that leads me
5  to believe that there may be some effect on a forecast
6  by this percentage, and I think that's a fair question.
7     MR. RUBENSTEIN:  Well, again, if you want to
8  ask the witness -- and I think you have covered it --
9  the extent to which the budget affects the forecast,
10  that's fine.  But in terms of why would any one person
11  on a given date have said what they said, I think that
12  goes beyond the process issue; and if you -- you are
13  going to insist on that, then I will instruct, but,
14  hopefully, we can avoid that.
15    MR. BRITTON:  Right.
16    Q.  My question is, is -- and I think it's fair --
17  is, what about the target percentage is --
18    And I have to ask it this way, and if you are
19  going to instruct her not to answer, that's fine.
20    -- why -- why is -- why was Larry telling the
21  field about the target percent for this, for 2001 at
22  this meeting, in terms of how it affects their forecast?
23    MR. RUBENSTEIN:  I -- you can answer this
24  question.
25    And if -- if we go too far afield on this, I --

99

Minton, Jennifer (30b6)  4/21/2005  9:00:00 AM

1  I will have to instruct the witness not to answer.
2      MR. BRITTON:  Sure.
3      THE WITNESS:  Again, Larry is referring to
4  budget targets.  He is just reiterating what the budget
5  target was for fiscal 2001 and that he wanted to set the
6  same target for fiscal 2002.
7      As I testified earlier, the budget has nothing
8  to do with the forecasts.  The forecasts are developed
9  separately, and that is what we rely on each quarter
10  when evaluating our performance.
11      MR. BRITTON:  Q.  Okay.  You can put that
12  document aside.
13      Okay.  I am about to get into the forecasting
14  process.  So if you want to take a lunch break at this
15  point, it's probably a good time.
16      MR. RUBENSTEIN:  That would be fine.
17      MR. BRITTON:  Okay.
18      THE WITNESS:  Sure.
19      MR. BRITTON:  An hour?
20      MR. RUBENSTEIN:  I don't know that -- I mean,
21  it's up to you.
22      MR. BRITTON:  Whatever -- whatever you guys
23  want.
24      MR. MAROULIS:  Let's -- let's go off the
25  record.

100

1      MR. BRITTON:  Yeah, we can go off the record.
2  We don't have to have lunch on the record.
3      THE VIDEOGRAPHER:  Going off the record.  The
4  time is 12:24 -- 3.
5      (Whereupon, the proceedings were adjourned
6          for lunch at 12:23 P.M.)
7          --- oOo ---
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

101

1      AFTERNOON SESSION          1:06 P.M.
2
3      EXAMINATION BY MR. BRITTON (RESUMED)
4      THE VIDEOGRAPHER:  Back on record.  The time is
5  1:06.
6      MR. BRITTON:  Q.  Good afternoon.  Can you
7  describe the forecasting process for me at Oracle during
8  the relevant period?
9      A.  Sure.
10      As I testified earlier, we submit a forecast
11  every other week in month one and month two of the
12  quarter, and then weekly in month three of the quarter.
13  The various field finance analysts would submit the
14  forecasts on behalf of the business units.  Each
15  business unit -- when I say "business unit," for now I
16  am just going to refer to sales, license sales.
17      Generally speaking, each of the business units
18  would hold a forecast call on a weekly basis and review
19  the deals that were in the pipeline.  And then based on
20  those meetings, they would submit their forecasts in
21  to -- or the field finance people would submit the
22  forecasts to OFA on their behalf.
23      THE REPORTER:  To who?  I'm sorry.
24      THE WITNESS:  The field forecast would submit
25  the forecasts --

102

1      THE REPORTER:  Submit the forecasts to?
2      THE WITNESS:  In to OFA on their behalf.  OFA
3  being Oracle Financial Analyzer.
4      We would then consolidate the forecasts.  The
5  forecast was always submitted in local currency, and
6  then we would convert it into constant dollars using,
7  generally, the -- was the budget rate.  And we would
8  also convert it into U.S. dollars based on the most
9  recent exchange rate at that point in time.
10      But when evaluating the forecasts and
11  discussing the forecasts at ET calls, as an example, on
12  Mondays, we would always be talking about the constant
13  dollars -- or constant dollar forecast numbers.
14      MR. BRITTON:  Q.  When you said "the budget
15  rate," what are you referring to?
16      A.  At the beginning of every year, we have to take
17  the -- we have to translate the local currency amounts
18  into U.S. dollars, so we usually use the rate at the
19  beginning of the fiscal year; and that rate is used
20  throughout the entire fiscal year when translating the
21  local currency forecast amounts into U.S. dollars, so
22  that you have it -- that's why we call it the constant
23  dollar rate.
24      Q.  Okay.
25      A.  And the reason why we do that is that we want

103

Minton, Jennifer (30b6)  4/21/2005  9:00:00 AM

1  to be able to evaluate the underlying financial results,
2  excluding the effect of currency impact fluctuations.
3      Q.  Okay.  So once the field finance people put --
4  input the information into OFA, do you have the same
5  quality check -- forget what you referred to as,
6  what -- the budgeting process where you compare the
7  numbers?
8      A.  The tie-out?
9      Q.  The tie-out.
10     A.  Yes, I believe so.
11     Q.  Okay.
12     A.  It wasn't actually at that level of detail, but
13  I'm pretty certain that there's some tie-out that's
14  done.  I'm not sure if it's done every forecast period.
15     Q.  The individuals from the field, the field
16  finance people that would input the forecast information
17  into OFA, were those the same individuals that we
18  discussed earlier with respect to the budget?
19     A.  It -- it -- more likely or not, it would have
20  been their staff.
21     Q.  Their staff.  Okay.
22        Okay.  And once in OFA you would consolidate
23  the field's forecast into a single forecast,
24  consolidated forecast.
25     A.  That is correct.

104

1      Q.  Okay.  And then what would you do with it?
2      A.  Generate a report, which is an EC management --
3  sorry, a management summary forecast report.  And we
4  would then take that report and link it into an Excel
5  spreadsheet.  And that -- that is called the upside
6  report, which is really a misnomer.  It's really the
7  true forecast report.
8        So we would then take the sum of the field
9  forecasts, we would make adjustments to the forecasts to
10  come up with what the real company consolidated forecast
11  was.
12     Q.  Okay.  And then what would happen?  What would
13  you do with that report?
14     A.  The report would be distributed to certain
15  members of the executive management committee on
16  Mondays, but not all.
17     Q.  But not all Mondays or not all members?
18     A.  Not all members.
19     Q.  And who was on the executive management
20  committee during the relevant period?
21     A.  Another teaser question.
22        Okay.  Larry Ellison, Safra Catz, Gary Bloom,
23  but not for the entire relevant period, I don't believe.
24  Jeff Henley, Jay Nussbaum, Sandy Sanderson, either
25  Pierre Carlo or Sergio Giacoletto.  I'm not sure.

105

1      THE REPORTER:  I'm sorry.  Pierre?
2      THE WITNESS:  Either Pierre -- Pierre Carlo or
3  Sergio Giacoletto.  I'm not sure at what point Sergio
4  took over responsibilities for EMEA.  Derek Williams,
5  who ran Asia Pacific.
6        And on the development side, Ron Wohl.  I'm not
7  sure when Mark Barrenechea -- if he was on it or not.  I
8  don't recall.  And then Chuck Rozwat.
9        But, again, people have come and gone, but that
10  would generally be the cast of characters.
11     MR. BRITTON:  Q.  Okay.  When you said that not
12  all members would receive the upside report, which ones
13  were excluded?
14     A.  Why don't I answer it in just the reverse.
15     Q.  Okay.
16     A.  Larry Ellison, Safra Catz, and Jeff Henley, as
17  well as myself, would see the consolidated forecasts,
18  because it contained very sensitive financial
19  information that we wanted to keep under control.
20     Q.  Okay.  So Larry Ellison, Safra Catz,
21  Jeff Henley, and yourself, were those the only
22  individuals in Oracle that would review the upside
23  report?
24     A.  That wasn't the question.
25     Q.  I --

106

1      A.  The question was who received it.
2      MR. RUBENSTEIN:  On the executive committee.
3      MR. BRITTON:  Q.  Ah, right.  On the executive
4  committee, who received it?
5      A.  Right.
6        It's possible, I don't recall as to whether or
7  not Gary Bloom was given access at that point in time.
8      Q.  Was the problem with my question reviewing
9  it --
10     A.  Yes.
11     Q.  -- versus receiving it?
12     A.  That is correct.
13     Q.  Okay.  Who had an opportunity to review the
14  upside report?
15     A.  Members of my staff, so Ivgen Guner and/or
16  Lia Burke and Roberta Ronsse.
17     Q.  Anybody else on the executive management
18  committee that would review it as opposed to receiving
19  it?
20     A.  I don't understand your question.
21     Q.  All right.  Withdrawn.
22        Now, the executive management committee
23  meetings, those were every Monday?
24     A.  They were standing meetings scheduled for every
25  Monday, but there were times when the meetings would be

107

Minton, Jennifer (30b6)  4/21/2005  9:00:00 AM

```
 1   cancelled.
 2       Q.  Okay.  And what time of the day did these
 3   meetings occur?
 4       A.  They generally occurred somewhere between 11:30
 5   and 2:00 or 3:00 o'clock.
 6       Q.  Okay.  And how long do they usually last?
 7       A.  Depends on the number of items on the agenda.
 8       Q.  Was the upside report reviewed at the executive
 9   management committee meetings?
10       A.  I would say that Safra and Jeff would flip
11   through the review, the report.  The way that Larry
12   conducted the EC meetings, he didn't necessarily refer
13   to the report.  He liked to hear directly from each of
14   his direct-reports with regards to the forecasts.  He
15   would ask them to talk about their forecasts.
16       Q.  Okay.
17       A.  Every EC meeting starts off with the review of
18   the forecast, or I should say a discussion of the
19   forecast.
20       Q.  Okay.  Were there any other reports distributed
21   or reviewed at the EC meetings on Mondays, other than
22   the upside report?
23       A.  During the relevant period?
24       Q.  Yeah.
25       A.  Not that I prepared.
```

```
 1       Q.  Okay.  That you witnessed being distributed?
 2       A.  Are you referring to financial reports?
 3       Q.  Any kind of reports.  I'm just wondering, you
 4   have Larry and Safra and Jeff and possibly Gary Bloom.
 5   They have the upside reports.
 6           What reports do the other executive members
 7   have during those meetings, if any?
 8       MR. RUBENSTEIN:  I'm just going to object to
 9   the extent you're asking the witness about the kinds of
10   reports that would be generated with regard to matters
11   outside the scope of the financial forecasting process.
12   This witness is not tendered for that purpose.
13           And so my concern is that, to the extent you're
14   seeking to obtain binding testimony on behalf of Oracle
15   Corporation as to what documents, for instance, whether
16   they be product development or anything else, Ms. Minton
17   is not in a position to identify those.
18       MR. BRITTON:  Let me qualify.
19       Q.  What reports did the other executive committee
20   members have that related to the forecasting process?
21       A.  For those individuals that attended the
22   meetings physically -- because most of them dialed in
23   because they resided in different parts of the world --
24   we would distribute a subset of the executive
25   management -- I'm sorry, we would distribute a subset of
```

```
 1   the upside report, which would be the -- the license
 2   forecast in -- in total as well as by product line, so
 3   for example, technology and applications.
 4       Q.  So --
 5       A.  So they were limited to that information only.
 6       Q.  So they would have an upside report, but it was
 7   much more narrow than the complete?
 8       A.  They would have a couple of pages out of the
 9   upside report.
10       Q.  Out of the upside, okay.
11           Are you in a position today to testify about
12   how the field prepared their forecasts and what went
13   into their forecasts before they went put into the OFA?
14       A.  Can you give me the question again.
15       Q.  Are you in a position today to testify about
16   how the business units prepared their forecasts before
17   those forecasts were put into the OFA?
18       A.  I can speak in general terms.
19       Q.  Okay.  Can you describe that process for me,
20   please.
21       A.  Yes.
22           In -- each division had their own process
23   for -- for reviewing it, but essentially, they -- deals
24   were entered into a pipeline system that collected all
25   the deals that were being worked on or had an
```

```
 1   opportunity to close during the quarter.  And they would
 2   review, essentially, deals over a certain threshold with
 3   their sales management team to get a sense as to where
 4   those deals were in that -- in the sales process.  And
 5   based on discussions that they would have had with their
 6   sales management, they would define a process.
 7           Again, I was never at any of these divisional
 8   meetings when they met to come up with their own
 9   forecast.  And they generally had -- most of them had
10   them on Mondays, right before the EC meetings.
11       THE REPORTER:  Was that EC?  I'm sorry.
12       THE WITNESS:  EC or EMC.  EC meaning executive
13   committee --
14       THE REPORTER:  Oh, okay.
15       THE WITNESS:  -- EMC meaning executive
16   management committee.  I use them interchangeably.
17       THE REPORTER:  Okay.
18       MR. BRITTON:  Q.  Which pipeline system did the
19   business units use for their forecasting?
20       A.  Some used Excel spreadsheets, some used a
21   system called Oracle Sales Online, OSO.  And one unit
22   had their own system that they had developed.
23       Q.  Okay.  Which -- which one was that?
24       A.  Japan.
25       Q.  Japan.
```

1       And what was the system that they had
2   developed?
3       A.  I -- I don't know that -- that it had a name,
4   but I just know that they had their own.
5       Q.  Are you familiar with --
6       A.  I'm not sure if it was out of Excel, but --
7       Q.  Okay.
8       A.  -- they had their own system.
9       Q.  Are you familiar with Oasis?
10      A.  Yeah.  I'm familiar with the name.  I'm trying
11  to recall if that is -- I'm familiar with the name.
12      Q.  Did -- are you familiar with how that system
13  was used in Oracle in terms of its forecasting?
14      A.  I'm trying to recall.  I think Oasis may have
15  been used by the telesales division.  I'm not quite
16  certain.  I have to go back and -- and check some notes.
17      Q.  Now, Oracle Sales Online, that -- when did
18  Oracle start using OSO and its forecasting process?
19      A.  I don't remember when we started to implement
20  it internally.  I can tell you that it was implemented
21  gradually one sales organization at a time.
22      Q.  Is -- was OSO a part of 11i?
23      A.  It was part of the CRM suite.
24      Q.  Suite.  Okay.
25          And was Oracle using OSO in its forecasting

112

1   process before it upgraded to 11i, before it implemented
2   to 11i internally?
3       A.  I don't recall.  We may have been using it.
4   Generally speaking, we used product to help test it out
5   before we release to customers, as an example.
6       Q.  Right.
7       A.  So there may have been a sales organization
8   that was working with development before we rolled it
9   out --
10      Q.  Okay.
11      A.  -- to make sure that it had features and
12  functionality that the field would want.
13          (Whereupon, Plaintiffs' Exhibit 9 was marked
14          for identification.)
15          MR. BRITTON:  Q.  Okay.  I placed in front of
16  you what's been marked as Minton Exhibit 9.  Can you
17  take a moment and review this exhibit and let me know if
18  you recognize it.
19          And for the record, Minton Exhibit 9 is a
20  two-page chain of e-mails; first Bates is 28595, and it
21  ends in 28596.
22      A.  Okay.
23      Q.  Okay.  Do you recognize Exhibit 9?
24      A.  Uhm-hum.
25      Q.  And what is Exhibit 9?

113

1       A.  It's an e-mail note that I sent to Jeff Henley,
2   Safra Catz, and Mike Barrenechea, and Sukumar Rathman,
3   who worked for Mike Barrenechea.  They were responsible
4   for the development of the latter two, the development
5   of the CRM application.
6       Q.  Okay.  And you sent that on October 18, 2000?
7       A.  Uhm-hum.
8       Q.  Now, we were talking about OSO before, and I
9   was asking whether it's -- it was a part of 11i.  Does
10  this document help -- withdrawn.
11          Does this document refresh your recollection on
12  whether OSO was part of 11i or whether Oracle used OSO
13  even before it upgraded to 11i?
14      A.  It would be part of 11i, but it doesn't
15  necessarily mean that it would have been implemented.
16  So you can upgrade to 11i and not necessarily use a
17  module.
18      Q.  Right.
19          Was Oracle using the module prior to the 11i
20  upgrade, the OSO module?
21      A.  Again, as I mentioned before, I believe that
22  there was one sales organization that was working
23  closely with development, so they may have had a pre --
24  a prebeta version that they were working with to help
25  define features and functionality.

114

1       Q.  Okay.  Okay.
2       A.  But -- but, again, not all sales organizations
3   migrated to OSO at the same time.
4       Q.  What pipeline system did Oracle use prior to
5   OSO?
6       A.  Again, there were a variety of different
7   systems out there that were being used.  Some were Excel
8   based.  There was a developed system in Japan.  There
9   was another system, the name I just can't recall at
10  the -- at the moment.  It may have been Oasis.  That was
11  used to track the flow of deals.  Or I should say the
12  pipeline of deals.
13      Q.  Using the other programs, were the individual
14  business units able to see the entire pipeline?
15      A.  They were able to see their pipeline.
16      Q.  Their pipeline.
17          When Oracle upgraded to 11i, were the business
18  units that were using OSO, were they able to see the
19  entire pipeline for the entire company?
20      A.  They would have only had access to their
21  pipeline.
22      Q.  Their pipeline, okay.
23      A.  But, again, I want to stress that the migration
24  to using OSO was done over several quarters.
25      Q.  Okay.

115

1    A.  So we didn't have a global OSO system in place

2    for some time.

3    Q.  Okay.  Was the implementation of OSO

4    simultaneous -- in the divisions that -- that upgraded

5    or that moved to OSO, was that simultaneous with the 11i

6    upgrade?

7    MR. RUBENSTEIN:  Object to the form.

8    THE WITNESS:  I honestly don't -- I don't

9    recall.

10    MR. BRITTON:  Q.  The -- the first sentence of

11    this e-mail refers to OSO, and that's Oracle Sales

12    Online --

13    A.  Uhm-hum.

14    Q.  -- OSE and OTS.

15    What does OSE refer to?

16    A.  I think it's Oracle Sales Compensation, which

17    was now known as OIC.  I was struggling with that, too,

18    trying to recall what it was.  It's been a while.

19    Q.  And now it's OIC?

20    A.  If OSC is Oracle Sales Comp, then it's now

21    Oracle -- I'd say Oracle Incentive Comp.

22    Q.  Okay.

23    A.  And OTS is a similar version of OSO, I believe,

24    for the telesales organization.

25    Q.  Look at the second bullet point down.  It

116

1    refers to "ISD Organizations."

2    What is ISD?

3    A.  That's the telesales organization.

4    Q.  That's the telesales, okay.

5    What does that acronym stand for?

6    A.  Internet Sales Division.

7    Q.  Okay.  Back to the division of the business

8    unit forecasts, did you have any input into those

9    forecasts prior to the business units entering them into

10    OFA?

11    A.  No.

12    Q.  Did anybody from financial planning and

13    analysis have any involvement in the business unit

14    forecasts before they were put into OFA?

15    A.  The corporate financial planning and analysis

16    group did not have any involvement.  The financial

17    analysts group that reported up to my organization that

18    supported the business units would have involvement in

19    pulling together the forecasts for the business unit

20    leaders that they supported and for ensuring that the

21    forecasts were properly submitted into OFA.

22    Q.  Okay.  But in terms of developing the forecast,

23    creating the forecast, did -- did the division you just

24    referred to have any involvement in doing that for the

25    business units?

117

1    A.  Can you repeat your question, please.

2    Q.  In terms of the business assumptions, in terms

3    of the deals that are input into and -- and the

4    development of the forecasts by the business units, did

5    the finance -- financial analysis division that you just

6    referred to, did it have any input into the business

7    unit's forecasts?

8    A.  The financial analyst's role is to support the

9    business unit leader, so they would prepare analytics

10    for the business unit leader.  The business unit leader

11    owned the forecast.

12    Q.  Okay.

13    A.  They were there in a supporting function,

14    advising, doing analyses to help the business unit

15    leader determine what forecasts he wanted to commit to.

16    Q.  When you say that the business unit leader

17    owned the forecast, what do you mean by that?

18    A.  It was their commit number.

19    Q.  Okay.  I see.  I understand.

20    A.  So if I may.

21    Q.  Sure.  Elaborate.

22    A.  If -- if an analyst said, "Geez, I think you

23    can do 150 based on the analysis that I have and my

24    review of the big deals," the business unit leader may

25    not have taken the advice of the financial analyst

118

1    supporting them and may have said, "No, I want my

2    forecast to remain at 120."

3    Q.  Okay.  What reports were generated by the

4    business units in -- in the forecasting process?

5    A.  The -- financial analysts would prepare

6    reports that would summarize the deals in the pipeline

7    over a certain dollar threshold.  They would prepare

8    reports that would analyze historical license pipeline

9    conversion rates and whatnot.

10    But what they did at the divisional level, I

11    would not necessarily have a hundred percent access to.

12    We did similar types of analyses at the corporate level.

13    Q.  Can you think of any other reports that you are

14    familiar with that the business units would generate in

15    their forecasting process?

16    A.  I just need to reiterate, again, I was not

17    involved in any meetings that were held by the

18    divisions, you know, during their own individual --

19    Q.  Uh-huh.

20    A.  -- organizational meetings.  I was not involved

21    in developing any of those reports.  So I'm telling you

22    the types of reports that would likely be prepared, but

23    I was not involved in, you know, Jay Nussbaum's sales

24    forecasting call with his organization or with

25    Sandy Sanderson's forecasting call in their

119

1   organization.  They came up with their own forecasts and
2   had their own way of analyzing their forecast and
3   defining what number they wanted to commit to.
4       Q.   Okay.  Are you familiar with how the business
5   units would enter information into the pipeline for
6   their individual sales units?
7       A.   The license sales reps were responsible for
8   entering in the opportunity, "the opportunity" being
9   defined as a potential deal that had the opportunity to
10  close in the current quarter.
11      Q.   And how would you define "pipeline"?  What does
12  that word mean to you?
13      A.   The pipeline represents -- it's a -- it's a
14  comprehensive number -- let me -- it's a comprehensive
15  population of all potential deals that have an
16  opportunity to be closed in a given quarter.
17      Q.   And what system did -- withdrawn.
18          Did Oracle use one system for its pipeline in
19  terms of gauging at what stage of the sales process a
20  given deal was, how likely it was to close in the
21  current quarter?
22      A.   There were Excel spreadsheets, as an example,
23  and OSO had the capability as well.  When tracking large
24  deals, they would indicate whether it was one or
25  whether -- you know, what percentage of likelihood or

1   probability that a deal might close.
2       Q.   Okay.  And was there a -- a guide or any
3   specific parameters that the sales representatives would
4   use in terms of gauging how likely a deal was to close
5   in the current quarter?
6       A.   That was their best judgment.
7       Q.   Was there any type of regression analysis
8   performed at Oracle to predict the likelihood or -- or
9   the potential that deals in the pipeline would close?
10      A.   "Regression analysis"?  I don't understand what
11  you mean by that.
12      Q.   An analysis to predict, you know, using
13  information historically to predict what the information
14  was likely to close in the current quarter.
15      A.   At -- at corporate we performed a license
16  pipeline conversion analysis.
17      Q.   Okay.  So let's go back to the -- the
18  forecasting process again.
19          We were at the -- the business unit level, and
20  then it would get put into OFA, and then a consolidated
21  report would be prepared; and then you would make your
22  adjustments on the upside report, and then that would go
23  up to certain members of the executive management
24  committee.  I want to talk to you a little bit about how
25  you -- how you performed the upside adjustments.

120                                                     121

1   Can you describe that process for me, please.
2       A.   Sure.
3           The upside adjustments were based on a variety
4   of factors:  One was the license pipeline conversion
5   analysis.  We would take a look at the pipeline for the
6   same corresponding prior year period, and look at what
7   actually closed as a percentage of that pipeline to come
8   up with a historical pipeline conversion ratio.  And we
9   would apply that to the current pipeline in order to
10  predict what we thought would be the actual conversion
11  or the actual -- the actual conversion of that pipeline
12  for the current quarter.  And we broke it down by
13  geography or business unit.  And it was in totality a
14  fairly good -- had proven to be a fairly good predictor
15  of what our true forecast and actual reports would be.
16          And in addition to that, we held in the
17  Americas, we held meetings on Thursday afternoons, and
18  we would review the Americas' forecast, which was
19  inclusive of LAD; and we would talk about large deals,
20  what the opportunities were.  Various folks would attend
21  those forecast calls; Jeff Henley, myself, my staff,
22  the -- the four EVPs, Frank Varsano, Jay Nussbaum,
23  Sandy Sanderson.  And sometimes Larry would join and
24  Safra would join.
25          And those calls -- again, we reviewed in more

1   detail than we did in the EC meetings on Monday the
2   opportunities for the current quarter to determine what
3   the likelihood was that they were going to close.
4       Q.   And describe those calls for me.
5           What type -- what types of questions were being
6   asked and what types of answers were being given during
7   those calls?
8           MR. RUBENSTEIN:  Object to the form.
9           MR. BRITTON:  You can answer.
10          MR. RUBENSTEIN:  You can answer.
11          THE WITNESS:  Oh, okay.
12          MR. RUBENSTEIN:  I'm sorry.
13          THE WITNESS:  We would ask each business unit
14  leader whether -- what their forecast was.  They would
15  talk about their worst case, their best case, as well as
16  what their commit number was.
17          And, again, they would reveal -- or not reveal,
18  but they would review the status of certain large
19  transactions and at times would ask for executive
20  involvement to ensure that a deal progressed and -- and
21  closed during the course of a quarter.
22          MR. BRITTON:  Q.  How would the information
23  that you obtained on these Thursday calls affect the
24  upside adjustment in your upside reports?
25      A.   There were oftentimes large bi- -- large deals,

122                                                     123

Minton, Jennifer (30b6)  4/21/2005  9:00:00 AM

1 what I will refer to as a mega deal, that somebody may
2 not want to put in their forecast, because it was
3 binary, and they would talk about it on the call and --
4 and refer to it as likely to close, but they didn't want
5 to put it in their forecast yet, as an example.  So I
6 would take information like that.
7        I would also talk to the field finance folks
8 reporting to me, or eventually reporting to me, and get
9 their independent thinking as to whether -- whether or
10 not the forecast was a likely outcome or if there was
11 more upside to the forecast.
12        And based on all that input, including the
13 analysis of the historical conversion ratio, I would
14 make some upside adjustments to the submitted forecast
15 to come up with the company's consolidated forecast, and
16 that's the forecast that we always relied upon for
17 setting expectations.  That would be the potential
18 column in the upside reports.
19    Q.  Okay.  So this was for the Americas.
20        So let's -- what I'd like to do is -- is talk
21 about who the field finance folks that you were speaking
22 to for each of -- of the different units.  I know we
23 talked about at least one, the assistant, the one that
24 supported the business head.
25        Were there others that you would speak to for

124

1 OPI, OSI or NAS or LAD to get an indication about the
2 likelihood of potential deals closing?
3    A.  Again, I would speak to the key financial
4 person that was supporting the business unit leader.
5    Q.  So --
6    A.  So Sarah Kopp, David Winton, Jim English,
7 Cheryl McDowell, William Plant, Greg Davies, all the
8 names that I testified to earlier this morning.
9    Q.  And how would those individuals be in a
10 position to tell you the likelihood of a potential deal
11 or mega deal closing?  What was their knowledge source?
12    A.  They would participate in the weekly forecast
13 calls that the business unit leaders held with their
14 sales management, so they got to hear each of the sales
15 managers speak to all the deals in their pipeline.
16    Q.  Okay.
17    A.  These meetings could be like three-, four-hour
18 long meetings.
19    Q.  Okay.  And when you had your discussions with
20 the field finance individuals, were -- were your upside
21 adjustments based upon their opinion about the
22 likelihood of it closing, or would they describe where
23 that particular transaction was in the sales process?
24    A.  It wasn't necessarily on a transaction-by-
25 transaction basis.  It was based on their own

125

1 independent assessment based on their own, you know,
2 knowledge base from the meetings, from doing their own
3 conversion analyses, from hearing about the stages of
4 the deals, knowing the individuals who were forecasting,
5 because you would get to know the forecasting behaviors
6 of lots of individuals.
7        So, for example, Jay Nussbaum and
8 George Roberts both historically always exceeded their
9 forecast.  And so that's one of the reasons why we had
10 to put these upside adjustments in, so that we could get
11 to what we thought were the true forecasts for the
12 quarter before we set down these expectations and as we
13 evaluated where we were going -- you know, where we
14 thought we were going to end throughout the course of a
15 quarter.
16    Q.  Okay.  Did you have conversations with the
17 business unit heads about the upside adjustments for
18 their particular unit?
19    A.  I would talk to them about -- I would talk to
20 them directly about deals and -- and -- and come to my
21 conclusions.  I'm -- I'm certain that I had
22 conversations with regards to amounts that I might be
23 putting in on top of what their forecasts were, not all
24 the time, but on occasion.
25    Q.  Right.  Right.

126

1        How often were the conversion rates changed, or
2 were they changed at all in the pipeline from week to
3 week?  Was there any estimate of the conversion rate
4 change for the particular quarter for the deals that
5 were in the pipeline?
6    A.  The -- the conversion rate is an imputed
7 number.
8    Q.  Uh-huh.
9    A.  So each time we had a forecast, the forecast
10 was submitted and the pipeline was submitted, so it was
11 an imputed number based off of those two inputs.
12    Q.  Okay.  Can you describe for me the process that
13 the business units would go through to revise their
14 forecasts as the quarter would go along?  What would
15 cause them to revise their quarter forecasts versus not
16 revise their forecasts?
17    A.  If they got more information on the status of
18 the deals, their portfolio deals that they were working
19 on in the course of the quarter, they might feel more
20 secure in their forecast or they might feel less secure
21 in their forecast and would change it accordingly.
22    Q.  So if particular deals fell out of the
23 pipeline, that would cause them to adjust their
24 forecast?
25        MR. RUBENSTEIN:  Object to the form.

127

Oracle

Page  124 - 127

1    THE WITNESS:  Can you repeat the question,
2    please.
3        MR. BRITTON:  Q.  If a particular deal that was
4    in the pipeline fell out of the pipeline for whatever
5    reason, the customer cancels, went with somebody else,
6    would the business units necessarily change their
7    forecast to reflect the deals that were lost for that
8    potential quarter?
9    A.  No.
10   Q.  No.
11       Okay.  Going back to the definition of the
12   pipeline.  As deals that were in the pipeline closed
13   through the quarter --
14   A.  Uhm-hum.
15   Q.  -- would they be pulled out of the pipeline so
16   the pipeline number would go down?
17   A.  No.
18   Q.  No.
19       So even if the deals closed that quarter, they
20   would remain in the pipeline?
21   A.  That is correct.
22   Q.  Did you use flash reports at all in -- in your
23   forecasting process in terms of the upside adjustments?
24       MR. RUBENSTEIN:  Object to the form.
25       THE WITNESS:  I'm not certain what you're

128

1    asking me.
2        MR. BRITTON:  Q.  Okay.
3        (Off-the-record discussion between witness
4        and counsel.)
5        (Whereupon, Plaintiffs' Exhibit 10 was
6        marked for identification.)
7        MR. BRITTON:  Q.  I have placed in front of you
8    what's been marked as Minton Exhibit 9.  Would you take
9    a moment to take a look at it, please.
10       MR. RUBENSTEIN:  I believe that's 10.
11       MR. BRITTON:  Is it 10?
12       THE REPORTER:  Yes.
13       MR. BRITTON:  Q.  Minton Exhibit 10 is a
14   two-page e-mail.  Starts with 040601 and ends at 02.
15   Q.  Have you had an opportunity to review Minton
16   Exhibit 10?
17   A.  Yes.
18   Q.  Okay.  And do you recognize it?
19   A.  I've read it.  I'm not sure if I got it, but I
20   did -- I did get it.
21   Q.  Are you familiar with the -- the content of
22   this e-mail?
23   A.  Yes, I am.
24   Q.  You are.
25       And can you tell me why, at this point in time,

129

1    Oracle changed the process from going with one month
2    ahead to two months ahead, in terms of forecasts?
3        MR. RUBENSTEIN:  Object to the form.
4        MR. BRITTON:  Withdrawn.  Let me ask it a
5    different way.
6    Q.  If you look at the first page on No. 1, it
7    says, "Starting with next week's forecast, we are
8    requiring that a full Q3 and Q4 forecast be submitted by
9    all organizations into OFA."
10       The question is, was the process different than
11   this prior to the week of December 4th?
12   A.  Technically, no.  Every time a forecast is
13   submitted, you are supposed to submit a forecast for
14   every quarter in the current fiscal year unless that
15   quarter has already passed.  This request was going out
16   to remind people that we wanted them to focus not on
17   just the current forecast -- sorry, the current quarter
18   forecast but the following forecast as well.  We -- we
19   tend to go quarter to quarter, and we were just trying
20   to remind people that they should be looking at both,
21   the Q3 and the Q4.
22   Q.  Okay.  If you look at the -- the top, where it
23   says, "from forecast"?
24   A.  Right.
25   Q.  Whose e-mail is that?

130

1    A.  It is a -- it's a generic e-mail account.  So
2    this was sent from Roberta Ronsse, using the forecast
3    account so that people knew that it was coming from
4    corporate finance regarding the forecasting process.
5    Q.  And who had access to this generic e-mail
6    account?
7    A.  Well, obviously Roberta did, but I -- I don't
8    know who else.
9    Q.  Did you have access to it?
10   A.  No.
11   Q.  No, okay.
12       I referred earlier to a flash report.
13       MR. RUBENSTEIN:  Are you done with Exhibit 10?
14       MR. BRITTON:  Yeah.
15       (Whereupon, Plaintiffs' Exhibit 11 was
16       marked for identification.)
17       MR. BRITTON:  Okay.  For the record,
18   Exhibit 11, which has been placed in front of you,
19   starts with Bates 019803 through 019838.
20   Q.  Have you had an opportunity to look at
21   Exhibit 11?
22   A.  Yes, I have.
23   Q.  And do you recognize it?
24   A.  Yes, I do.
25   Q.  And what is Exhibit 11?

131

1    A.  It is a snapshot of how we performed for the
2    quarter.
3    Q.  Okay.
4    A.  Along with some historical trends and -- and
5    whatnot.
6    Q.  Okay.  Did you use any of these flash reports
7    in the forecasting process for the upside adjustments at
8    Oracle during the relevant period?
9    A.  No.
10    Q.  No, okay.
11        Did you look at historical results at all when
12    making the upside adjustments for the forecasts at
13    Oracle, other than the pipeline conversion that you've
14    already talked about?
15    A.  Well, the pipeline conversion was the primary
16    historical analysis that we would use.
17    Q.  Okay.  Any other historical analysis that you
18    would use, other than the pipeline analysis?
19    A.  Not that I recall, not that I recall.
20        We may have looked at sequential analyses, so
21    we may -- I know what we do today, but I don't know what
22    we did back then.
23    Q.  Right.
24    A.  So we may have looked at sequential analyses
25    like, you know, Q2 relative to Q3, because our Q3 was,

132

1    you know, pretty close to our Q2 results.
2    Q.  And that was historical, going back?
3    A.  Yeah, for -- going back.  I mean, Q2 -- Q2 and
4    Q3 tended to be pretty close to one -- one another, a
5    little bit better; Q3 would be just a little bit better.
6    Q.  And did you perform that analysis in the third
7    quarter of 2001 for your forecast?
8    A.  Not that I recall.
9    Q.  Okay.  You can put that document aside.
10        (Whereupon, Plaintiffs' Exhibit 12 was
11        marked for identification.)
12    THE REPORTER:  Was that 11?
13    THE WITNESS:  This is 11, so we should be on
14    12.
15    MR. BRITTON:  Q.  The court reporter has
16    placed in front of you what's been marked as Minton
17    Exhibit 12.  Would you take a moment to look at this
18    exhibit.
19        Why don't we go off the record while they
20    change the tape.
21    THE VIDEOGRAPHER:  In the deposition of
22    Jennifer Minton, this marks the end of Tape 2, Volume I.
23    Going off the record.  The time is 2:10.
24        (Discussion off the record.)
25    THE VIDEOGRAPHER:  In the deposition of

133

1    Jennifer Minton, this marks the beginning of Tape 3,
2    Volume I.  Going on the record.  The time is 12 -- 2:13,
3    excuse me.
4    MR. BRITTON:  Q.  Okay.  I placed in front of
5    you what's been marked as Minton Exhibit 12.
6        And for the record, it starts with Bates 20731
7    and ends at 32.
8        Do you recognize Exhibit 12?
9    A.  Yes, I do.
10    Q.  And what is Exhibit 12?
11    A.  It's an e-mail note that Larry Garnick
12    prepared, which he forwarded to me, and I subsequently
13    forwarded to Jeff, and he then subsequently responded
14    to, that itemized what our earnings per share were for
15    Q2 and Q3 for fiscal '98 through fiscal 2000.
16    Q.  And did this analysis affect your
17    forecast at all for the third quarter of 2001?
18    MR. RUBENSTEIN:  And, again, you are just
19    focusing on general process, right?
20    MR. BRITTON:  Process.  Yes.
21    THE WITNESS:  No.  This is not something that
22    we would generally have as a general process.
23    MR. BRITTON:  Q.  Did you use this process at
24    all for the third quarter of '01?
25    A.  For developing the -- the forecasts that I

134

1    developed is the upside report.
2    Q.  Right.
3    A.  And I did not use this to develop the upside
4    report.
5    Q.  The upside report, okay.  Okay.  Put that
6    aside.
7        Okay.  Now going back to the pipeline
8    calculation that you performed, or that you looked in
9    connection with the upside report, did you adjust that
10    conversion rate to take into account any external
11    factors that may cause one year's results to be
12    different than the prior year's results?
13    A.  No.
14    Q.  Any economic factors whatsoever?
15    A.  No.
16    Q.  No.  Okay.
17        So even though the market had changed
18    significantly in terms of like dot-com business, the
19    conversion rate, you didn't adjust for that at all when
20    you converted it over for purposes of making your upside
21    adjustments?
22    MR. RUBENSTEIN:  Object to the form.
23    THE WITNESS:  I did not consider any economic
24    factors when performing the license -- when we prepared
25    the license pipeline conversion package, it is solely

135

1  based on applying the historical conversion rates for
2  the same prior year corresponding period to the current
3  pipeline to determine what the upside would be.
4      MR. BRITTON:  Q.  Okay.  And then you would
5  make your adjustments upward based upon that conversion
6  rate, plus talking to the financial heads in other
7  conversations that you had with business heads; is that
8  fair?
9      A.  Yes.  I would use a variety of data inputs to
10  come up with what I felt was the appropriate single
11  number to get to the total consolidated forecast for the
12  quarter.
13      Q.  Did you ever adjust those numbers down based
14  upon the conversion rate and your conversations?  Did
15  you ever, in preparing the -- the consolidated upside
16  report, did you ever make adjustments downward to the
17  license revenues?
18      A.  Sure.
19      Q.  Okay.  And what circumstances would cause you
20  to make the adjustments down?
21      A.  In the event that the pipeline -- historical
22  pipeline conversion rate may have indicated a a -- a lower
23  license forecast than what was submitted, that would be
24  one reason.  Another reason is there could have been an
25  error in the forecast submission that came to my

136

1  attention, and, therefore, I needed to adjust the
2  forecast down.
3      So, you know, it -- it -- the upside column was
4  not just, you know, to make changes based on upside
5  reports or other additional information that I received.
6  It was also used to reflect any errors -- any
7  corrections to errors that were made in the underlying
8  forecast that was originally submitted in OFA.
9      Q.  Okay.  So if, say, for example, Jay Nussbaum
10  submitted his forecast that said a million dollars for
11  the quarter, and that analysis was based upon deals that
12  were in the pipeline that were likely to -- likely to
13  close, you would actually make an adjustment downward
14  for -- for the upside forecast if circumstances
15  warranted -- if circumstances warranted it?
16      A.  If -- if there was an error in the original
17  forecasts that were submitted, I would have adjusted it
18  downward.  If the historical pipeline conversion ratio
19  told me that his forecast did not seem achievable based
20  on his historical conversion trends for the like for
21  like periods, then I would adjust it down.
22      Q.  Now, did the business -- the individual
23  business units have access to their historical
24  conversion rates for them, those periods?
25      A.  Yes, they did.

137

1      Q.  And did they take those conversion rates into
2  consideration in preparing their forecasts?
3      A.  Again, I was not involved in developing their
4  forecasts.  That was done at my direct's level working
5  directly with the business unit, so -- everybody had
6  their own methodology for determining what their
7  forecast was going to be.
8      Q.  Okay.  I've read a lot about the term "hockey
9  stick," and I'm sure you are familiar with that term.
10      What does -- what does the hockey stick mean to
11  you?
12      A.  The hockey stick means that a large percentage
13  of the license revenues would be recorded at the end of
14  the last few days of a quarter rather than erratically
15  throughout the course of the quarter, if you are looking
16  at it on a quarterly basis.
17      Q.  Right.
18      A.  I would say the same would apply, even on an
19  annual basis.  We tend to record more license revenues
20  in the fourth quarter than any other prior quarter
21  because the sales comp plans during the relevant period
22  had accelerators, and so the sales force was more
23  incentive to close and increase their commission rates
24  in the fourth quarter.
25      Q.  Was the hockey stick effect also based upon the

138

1  fact that there were more discounts, better deals at the
2  end of a quarter or at the end of a year?
3      A.  I think it is fair to say that our customers
4  have been trained over the course of several decades
5  that they would be able to negotiate a better discount
6  in their favor if they held out closing the deal the day
7  of the -- the last day of the quarter or the day prior.
8      Q.  Customers love deals, don't they?
9      How did the -- withdrawn.
10      Did your forecast, your upside adjustments,
11  take into account the hockey stick effect?
12      A.  No.
13      Q.  No.
14      Did -- was the hockey stick effect accounted
15  for in the forecasts that either the division prepared
16  or that you consolidated and prepared?
17      A.  I don't understand how -- what you're asking
18  me.
19      Q.  Would the hockey stick effect -- would the
20  hockey stick sales effect impact your forecasting
21  process at all?
22      MR. RUBENSTEIN:  Objection.  Asked and
23  answered.
24      THE WITNESS:  I don't understand what your
25  question is.

139

1    MR. BRITTON: Q. The question is, how, if at
2  all, did the hockey stick effect impact your
3  forecasting?
4    MR. RUBENSTEIN: Same objection.
5    THE WITNESS: It did not impact my forecasting
6  process. The forecasting process was the same every
7  forecast period.
8    MR. BRITTON: Q. And why did it not impact
9  your forecasting process?
10   A. Because we would forecast for the full quarter.
11   Q. For the full quarter.
12     So the deals that you were looking at
13  forecasting, whether they happened on the first day or
14  the last day, were in the forecasts?
15   A. That's correct.
16   Q. Okay. Now, did you take into consideration any
17  discounts or any better terms that customers would get
18  at the end of the quarter into your upside adjustments?
19   A. Absolutely not.
20   Q. Okay. And why not?
21   A. Because I would not be privy to those types of
22  details. I'm not in that level of detail.
23   Q. So you didn't know the specifics of the deals?
24   A. I did not know the specifics of the deals.
25   Q. Okay. Did the margins from the sales that

140

1  would occur at the end of a quarter, did that impact
2  your forecasting process at all?
3    MR. RUBENSTEIN: Object to the form.
4    THE WITNESS: I don't -- I mean, I can tell you
5  that for the upside -- any upside adjustments that were
6  made to license revenue, we would make an adjustment for
7  sales commission expenses related to the incremental or
8  decremental revenues that were being forecasted on
9  license.
10   MR. BRITTON: Q. Okay.
11   A. Does that answer your question?
12   Q. Yeah, I think it does.
13     How -- how would you make those adjustments
14  to -- to the sales commissions? How would that impact
15  your -- your upside adjustments?
16   A. Well, now we're talking expenses. It was a
17  straight formula, 15 percent of the incremental or
18  decremental license revenue.
19   Q. Okay.
20   THE REPORTER: I'm sorry. That 15 percent of
21  the?
22   THE WITNESS: Incremental or decremental
23  license revenue upside adjustment.
24   MR. BRITTON: Q. So if --
25   A. It was a pure formula.

141

1   Q. So if the upside adjustment went up a dollar,
2  then the expenses would go up 15 cents?
3   A. You are on target.
4   Q. Okay. Good.
5     And it was a straight formula per sales
6  commissions, okay.
7     Did accounts receivables play any effect in
8  your forecasting at all?
9   A. In what regard?
10   Q. Customer's ability to pay or not to pay affect
11  the forecasting process?
12   A. It affected the upside analysis.
13   Q. And how did it affect the upside
14  analysis?
15   A. We would record each month a percentage of
16  revenues as -- as a -- as a contra sales expense to
17  increase our -- and at the end of every quarter --
18   THE REPORTER: To increase our what? I'm
19  sorry.
20   THE WITNESS: Our reserve for accounts
21  receivable.
22     And at the end of every quarter, we would
23  evaluate what our reserve requirements were based off of
24  a historical analysis that we always had in place where
25  we would review specific invoices over a certain dollar

142

1  threshold for collectability; and if we felt that they
2  weren't collectible, then we would specifically reserve
3  them. And any invoices that were not specifically
4  reviewed were -- we took an -- an estimate of
5  a -- of a reserve of uncollectible receivables in that
6  population of the receivables portfolio, and that would
7  determine our bad debt reserve requirements. And if our
8  bad debt reserve was -- if our bad debt reserve was
9  higher than what our requirement analysis told us that
10  we needed, then we would adjust -- we would reverse some
11  of the revenues that we had recorded against the reserve
12  during the current quarter.
13   MR. BRITTON: Q. Okay. And then how would
14  that impact your forecast?
15   A. I would include an estimate of what I thought
16  that returns reserve would be.
17   Q. Okay. And that would affect the overall --
18   A. In other words, we -- we -- we -- we --
19  we reduced revenue by too much on a monthly basis
20  throughout the course of the quarter; and then at the
21  end of the quarter, we did our reserve analysis, and
22  depending on what our requirements told us, we would
23  then turn back some of the revenue that we had
24  previously decremented, okay.
25     So I would always estimate a certain amount of

143

1    revenues that were coming back because we knew that our
2    returns -- our monthly returns provision was higher than
3    necessary, historically speaking.
4        Q.   Okay.  Did you generate any reports
5    during -- in doing that analysis during each of the
6    quarters in fiscal '01?
7        A.   Did I generate any reports --
8        Q.   Aging reports or how it affected the --
9        A.   I mean, every quarter there is a bad debt
10   reserve analysis --
11       Q.   Uh-huh.
12       A.   -- that's performed.  I would get estimates as
13   they were in the course of their preliminary preparation
14   of the reserve analysis.  The reserve analysis was
15   finalized after the end of the quarter, but during the
16   course of the last week or two of the quarter, the
17   accounting organization would be able to give me an
18   estimate of what they thought the revenue return would
19   be.  And so that would be the basis for me making an
20   adjustment in the upside analysis for that.
21       Q.   Okay.
22       A.   You guys have to become accountants, don't you?
23       Q.   My brain starts flying off.
24            Did you -- did you perform any variance testing
25   in connection with your forecasts during fiscal '01?

144

1            MR. RUBENSTEIN:  Object to the form.
2            THE WITNESS:  Your question is too vague for me
3    to answer.
4            MR. BRITTON:  Q.  Any -- any variance testings
5    in terms of -- of what -- what the first week was in
6    comparison to the first week of the prior year to try to
7    gauge any patterns for what the results were going to be
8    at the end of the year.
9        A.   There was never any weekly variance analysis
10   like that that I can recall.
11       Q.   Was there any variance analysis at all?
12       A.   Again, it's too vague of a question for me.  I
13   need you to be more specific, please.
14       Q.   If I could.
15            (Discussion off the record.)
16            MR. BRITTON:  Why don't we take a break.
17            THE VIDEOGRAPHER:  Going off record.  The time
18   is 2:30.
19            (Recess taken.)
20            THE VIDEOGRAPHER:  Going back on record.  The
21   time is 2:42.
22            MR. BRITTON:  Q.  Okay.  Before we broke, we
23   were talking about variance testing, and let me give you
24   an example.
25            If, in the second quarter you had forecasted

145

1    certain number in license revenues, say, a hundred
2    million, and at the end of the quarter you only achieved
3    90 million, is there any process for testing why there
4    was that variance, why -- why was there a miss?
5        A.   We would do, as you saw before, license
6    forecast accuracy analyses.
7        Q.   Right.
8        A.   But the -- the miss was not -- people will,
9    after the fact of the quarter, evaluate in that
10   situation; they would evaluate what deals were committed
11   and which deals did not close to better understand why
12   they missed their number.
13       Q.   Okay.
14       A.   Does that answer your question?
15       Q.   Yeah, I think it does.
16       A.   Good.
17       Q.   Now, would you do that every -- every quarter?
18   Would Oracle do that every quarter?
19       A.   Generally, that is done at the -- at the
20   business unit level.
21       Q.   Okay.  Now, at the corporate level, did -- was
22   there any variance testing done?
23       A.   Again, I wouldn't even refer to that as
24   variance testing.  It was an analysis.
25       Q.   What would you refer to -- right.  What was --

146

1        A.   It's an analysis of what deals were committed
2    to that did not close in the quarter that were
3    forecasted to close.
4        Q.   Okay.
5        A.   Alternatively, there would also be, you know,
6    deals that did close during the quarter that were not
7    forecasted, so it goes both ways.
8        Q.   Right.
9            Would corporate level do any analysis of why a
10   particular quarter didn't meet the original forecast?
11       A.   Again, the analysis was done at the divisional
12   level --
13       Q.   Right.
14       A.   -- business unit -- unit level, and they would
15   feed that information up.
16       Q.   They would report up.
17            Okay.  We talked about the definition of the
18   pipeline before.
19       A.   Uh-huh.
20       Q.   And so I'm clear, pipeline consists of deals
21   that are likely to close within that quarter?
22       A.   It consists of all the opportunities that are
23   being worked on that have the possibility of closing
24   during that quarter.
25       Q.   And then when particular opportunities that are

147

Minton, Jennifer (30b6)  4/21/2005  9:00:00 AM

1   within the pipeline close, they stay in the pipeline --
2       A.  That is correct.
3       Q.  -- for that period of time.  All right.
4           So if a pipeline is decreasing, what, in your
5   experience, is causing that decrease?
6       A.  The pipeline would historically decrease from
7   month one to month three as deals solidified, and the
8   sales process, you know, the sales process -- as they're
9   going through the -- quarter, the sales process is
10  going to tell you whether or not you are going to be
11  able to close the deal, depending at the stage of the --
12  the sales process, right.
13          So if you are in month -- the beginning of
14  month three and you realize that you are not far enough
15  along in the sales process to get it closed that
16  quarter, depending on the circumstances, then you would
17  take that deal and move it out of your pipeline and into
18  the following quarter.  If that deal had lost -- and if
19  you had lost that deal, then that deal would also, I
20  think, be moved out.
21      Q.  So that was going to be my question.  If -- if
22  a deal cancelled or -- or they lost the deal, that would
23  fall out of the pipeline as well?
24      A.  I believe so.
25      Q.  Okay.

1       A.  But I know if it was won, it definitely stayed
2   in.
3           THE REPORTER:  But I know if it what?  I'm
4   sorry.
5           THE WITNESS:  If it was a won deal, it
6   definitely stayed in.
7           (Whereupon, Plaintiffs' Exhibit 13 was
8           marked for identification.)
9           MR. BRITTON:  Q.  The court reporter has placed
10  in front of you what's been marked as Exhibit 13.
11          For the record, it's a one-page document with
12  Bates 008131.
13          Before we get to this doc- -- question, if a --
14  say you started out week one with a hundred dollars in
15  the pipeline, and then in week two, another opportunity
16  came up.  Would that be put into the pipeline at that
17  time?
18      A.  Yes.
19      Q.  So the pipeline would go up, okay.
20          All right.  Now to Exhibit 13.
21          Do you recognize this exhibit?
22      A.  Yes, I do.
23      Q.  And what is Exhibit 13?
24      A.  It is a historical snapshot of the pipeline
25  trends for fiscal -- for each week during Q1 and Q2 of

1   fiscal '01 for each of the business units that made up
2   the Americas geography.
3       Q.  Okay.  And what was the purpose of this
4   analysis?
5       A.  This analysis is to -- was to see if the change
6   in the pipeline trends, to see if it's going down.
7       Q.  Okay.  Now, how did you receive the pipeline
8   information when you were doing your analysis for the
9   upside adjustments, in what format did it come?
10      A.  So the field finance organizations were
11  responsible for putting the pipeline into OFA --
12      Q.  Right.
13      A.  -- okay, every time we had a forecast period.
14  So they would put the -- so that's how they -- that's
15  how I would get it.
16      Q.  Okay.  So you would see it in OFA, and then
17  that would tell you the information?
18      A.  Right.
19      Q.  Did you have access to OSO?
20      A.  I did have access to OSO.
21      Q.  Did you use it?
22      A.  I looked at OSO, but for purposes of
23  forecasting process, no.
24      Q.  Okay.  For what purposes would you use OSO?
25          MR. RUBENSTEIN:  Could we get a time frame on

1   this?
2           MR. BRITTON:  Relevant period.
3           THE WITNESS:  I'm -- I'm not sure if I looked
4   at that time during the relevant period, but I was
5   looking at it for features and functionality.
6           MR. BRITTON:  Q.  But not in connection with
7   your forecasting process?
8       A.  No.  I would use the fore -- the pipeline and
9   the forecast information that was entered into OFA by
10  the field finance organization.
11      Q.  Did -- did OFA generate a report that you would
12  look at, or would you look at OFA electronically?
13      A.  I would look at OFA based on reports that were
14  prepared for me.
15      Q.  So hard copy reports.
16          Did those reports have a title?
17      A.  Yes.
18      Q.  What were they called?
19      A.  Oh, there's a variety of titles, hundreds.
20      Q.  How would I know I'm looking at a report from
21  OFA?
22      A.  Well, some -- as I testified earlier today,
23  there was one report called the management summary --
24      Q.  Okay.
25      A.  -- report that came out of OFA, and that

Minton, Jennifer (30b6)  4/21/2005  9:00:00 AM

1  contained actuals forecast and budget data.
2      Q.  Okay.  If you look at the -- all of these
3  columns, essentially, you notice that the pipeline
4  decreases during each quarter for each division.
5      So this -- the information that you would glean
6  from the fact that this is decreasing is that deals have
7  either moved into the next quarter or deals have fallen
8  out of?
9      A.  Correct.
10     Q.  Okay.  Did you do any -- or did anybody at the
11  corporate level do any analysis on why there was a
12  decrease or the size of the decrease, any kind of
13  pipeline analysis like that?
14     A.  Not that I recall.
15     Again, the key issue is what your conversion
16  rate is of your pipeline.
17     Q.  Right.
18     A.  So it's not the overall pipeline.  It's how
19  much of that pipeline can you convert in a given quarter
20  that's important, and that's what we always relied on.
21     Q.  And how did Oracle calculate the value of its
22  pipeline, the dollar value of the pipeline?
23     A.  The dollar value was the summation of all the
24  individual opportunities that were entered into the
25  various pipeline systems that were in use at the time.

152

1      Q.  Do you know how -- and so if -- if the -- if
2  the deal is worth a hundred million dollars, did it
3  always convert one to one into the pipeline in terms of
4  a dollar value, or was there a calculation?
5      A.  I'm not a licensed sales rep, so I never
6  entered a deal into -- an opportunity into the pipeline.
7      Q.  Okay.
8      A.  So I do not know what their methodology was.
9      It is fair to say, though, that you never
10  really know what a deal is actually ever going to close
11  at; so it's all, for the most part, a guesstimate,
12  right.  And if it was a real large opportunity,
13  sometimes they might put it in at a lower value.
14     Q.  You mentioned earlier that there are
15  circumstances where you have a mega deal and the unit
16  head was reluctant to put that into their forecast.
17     Why was there that type of reluctance to do --
18  to put mega deals into the forecast?
19     THE WITNESS:  Is that a process question?
20     MR. RUBENSTEIN:  We'll assume that you're
21  intending that as a general matter.
22     MR. BRITTON:  Absolutely.
23     MR. RUBENSTEIN:  All right.
24     THE WITNESS:  Because they never wanted to miss
25  their commit number.

153

1      MR. BRITTON:  Q.  So the more deals you put in,
2  the better your results have to be, okay.
3      A.  No, that's not what I said.
4      MR. RUBENSTEIN:  You can -- you can clarify.
5      MR. BRITTON:  Yeah, go ahead and clarify.
6      A.  Sure.
7      There was, particularly within the North
8  America sales organization, a certain, what I would call
9  forecasting style or personality whereby nobody wanted
10  to miss their commit forecast and they wanted to exceed
11  it, and as -- so I refer to that as sandbagging --
12     Q.  Okay.
13     A.  -- and there was pretty consistent behavior
14  where the gentlemen in question in North America
15  consistently exceeded their forecast, and therefore,
16  that's why the upside analysis was -- why the upside
17  adjustments were made, so that we could get to what we
18  really thought we were going to do in a given quarter.
19     Q.  The conversion rate, do you understand how --
20  what the calculation was to get to the conversion rate
21  for any particular quarter?
22     A.  Well, the license conversion rate represents
23  the amount of actual license revenue recognized as a
24  percentage of the total pipeline at any point in the --
25  in the quarter.

154

1      Q.  Okay.  So for purposes of your forecasting for
2  third quarter of 2001 --
3      A.  Uh-huh.
4      Q.  -- which -- at what point in time were you
5  looking at for the calculation the conversion rate from
6  the prior year, the last day of the quarter, middle,
7  beginning?
8      A.  Again, we would have a forecast process whereby
9  a forecast was submitted every other week in month one,
10  month two, and month three it was done weekly.
11     The prior year conversion rate was taking the
12  prior year's actual license revenues for the quarter, so
13  that was a constant, as a percent of the total pipeline
14  during week two, week four, week six, week eight, nine,
15  ten, eleven, and twelve during a quarter.
16     Do you understand?
17     Q.  Yeah.
18     A.  So the historical conversion rates for the same
19  prior year corresponding period during the forecast, you
20  know, during the current year's forecast, were applied
21  to the pipeline in the current year to estimate what we
22  thought would be the actual license revenue results for
23  the quarter.
24     (Whereupon, Plaintiffs' Exhibit 14 was
25     marked for identification.)

155

1     MR. BRITTON:  Q.  I placed in front of you
2  what's been marked as Exhibit 14.  Will you take a
3  moment to look at this exhibit.
4     And for the record, Exhibit 14 starts at Bates
5  040837 and ends at Bates 040841.
6     Q.  Okay.  Have you had an opportunity to look at
7  Exhibit 14?
8     A.  Yes, I have.
9     Q.  And do you recognize it?
10    A.  No, I do not.
11    Q.  Okay.  If you look at the third page --
12    A.  But can I clarify?
13    Q.  Sure.
14    A.  Corporate did a different pipeline analysis,
15  but this is a license pipeline conversion analysis.
16  And --
17    THE REPORTER:  This is a what?  I'm sorry.
18    THE WITNESS:  A license pipeline conversion
19  analysis.
20    Again, prepared at the divisional level,
21  obviously, for George Roberts.
22    MR. BRITTON:  Q.  So looking at this document,
23  can you tell if the calculations that are going on in
24  this document are the same ones that we were talking
25  about before in terms of taking the actuals against the

156

1  pipeline in a given period of time?
2     MR. RUBENSTEIN:  Objection.  No foundation.
3     MR. BRITTON:  Q.  You can answer.
4     A.  If this is the pipeline, these are the actuals,
5  it doesn't state -- it's hard to -- to determine if this
6  is the prior year actuals.  I'm assuming it is.
7     Q.  Okay.
8     A.  Yeah.  This is the actuals for the -- yeah,
9  these are -- these are the conversion rates of the
10  pipeline --
11    Q.  Okay.  So --
12    A.  -- for the respective time periods that were
13  forecasted in those quarters.
14    Q.  Okay.  So in -- let's take, for example, Q1,
15  2000, if you were in Q1, 2001, let's say for NAS, how
16  would you -- how would you make your calculations to
17  come up with your upside forecasts?
18    I think, actually --
19    MR. RUBENSTEIN:  Object to the form.
20    MR. BRITTON:  -- withdrawn.
21    Q.  I think what would be helpful is if you could
22  use -- give us a -- an example using simple numbers on
23  how you get from, you know, the pipeline conversion all
24  the way to your adjustment.
25    MR. RUBENSTEIN:  Let me just -- my objection is

157

1  this is a divisional document, and the upside
2  adjustments are obviously done companywide.
3     MR. BRITTON:  Q.  We -- we don't have to look
4  at this document.  We can just -- if -- if you can walk
5  me through the -- from the beginning to the end using
6  simple numbers, that would be, I think, extremely
7  helpful.
8     A.  Okay.  If in Q1 of 2000 you had a pipeline at
9  the end of the first month of the quarter of
10  100 million, and assume that your revenues, your license
11  revenues for the -- for -- for the quarter ended up at
12  25 million, then your pipeline conversion ratio would be
13  25 percent for the first month, or the end of the first
14  month of that given quarter.
15    Q.  Okay.
16    A.  That pipeline conversion ratio of 25 percent,
17  we would use to apply to the pipeline in the following
18  corresponding prior -- or in the following corresponding
19  period, so fiscal 2001 --
20    Would that be correct?  Did I start with 2000?
21    MR. RUBENSTEIN:  Yes.
22    THE WITNESS:  And we would take the first --
23  the end of the first month's pipeline for that period
24  and multiply it by the historical, the conversion rate,
25  to estimate what we thought would be the license

158

1  revenues for the current quarter.
2     MR. BRITTON:  Q.  Okay.  So let's say the
3  pipeline in subsequent year is a hundred million dollars
4  again.  How would you get to your upside adjustment?
5  I'm kind of trying to go through the entire process.
6     A.  Well, if -- if the predicted license revenue
7  was 25 million, and the submitted or the commit forecast
8  that was submitted by the field was 20 million, then we
9  would adjust the upside analysis possibly by 5 million.
10    Q.  Okay.  And then you would go and talk to
11  the -- the finance people in those particular divisions
12  to see if there is any adjustments up or down?
13    A.  I would talk to them about specific deals that
14  were in the pipe, what upside deals were not reflected
15  in the forecast, what the likelihood that those deals
16  might actually close during the course of the quarter,
17  again, a -- a -- a number of data points.
18    Q.  Okay.  Okay.  Fair enough.
19    Okay.  You can put that document aside.
20    A.  But do you understand now how it's used?
21    Q.  Yes.  Yes.
22    A.  Okay.
23    Q.  Thank you.
24    What exhibit is this?
25    THE REPORTER:  15.

159

Minton, Jennifer (30b6)  4/21/2005  9:00:00 AM

1      MR. BRITTON: 15.
2         (Whereupon, Plaintiffs' Exhibits 15 and 16
3         were marked for identification.)
4      MR. BRITTON: Q.  Okay.  I have placed in front
5  of you two documents, Exhibit 15 and Exhibit 16.
6      Exhibit 15 starts with Bates 024454 and ends
7  with Bates 24464.
8      And Exhibit 16 starts with Bates 00514 and ends
9  at 00523.
10     Have you had a chance to look at both of these
11 exhibits?
12 A.  Yes.
13 Q.  And do you recognize them?
14 A.  Yes.
15 Q.  And what are they?
16 A.  These are the license pipeline conversion
17 analyses that are prepared by the corporate financial
18 planning group.
19 Q.  Was this out of OFA?
20 A.  The numbers were taken from OFA, but these are
21 actually Excel schedules.
22 Q.  Okay.  Were these the documents that you were
23 working for, these types of documents that you were
24 working with for purposes of doing your upside
25 adjustments?

160

1  A.  Yes.
2  Q.  Now, if you look -- let's start with
3  Exhibit 15.  If you look at the second page --
4  A.  Uhm-hum.
5  Q.  -- it has, in the far left column, "Pipeline
6  Growth," and then "Total Tech" and then "APS."
7      THE REPORTER:  Total what?  I'm sorry.
8      MR. BRITTON:  "Total Tech" and then "APS."
9      What does the "Tech" column represent?
10 A.  The technology pipeline growth.  We were --
11 they were segmenting their pipe between tech deals and
12 APS deals.
13 Q.  And -- and what type of products would fall
14 within the tech deals?
15 A.  Database.
16 Q.  Okay.
17 A.  Options.
18     THE REPORTER:  What was that?
19     THE WITNESS:  Database, options.  It's our --
20 it's our core technology products.
21     MR. BRITTON:  Q.  Okay.  And if you look to the
22 far left, the "Pipeline Growth" column, it says,
23 "Total."  What does that column represent?
24 A.  The one that ends with 52 percent?
25 Q.  Yes.

161

1  A.  That's the total pipeline growth year over
2  year.
3  Q.  Year over year.
4      So as of that particular day?
5  A.  As of that particular forecast period.
6  Q.  That forecast period, okay.
7      So at the -- as of December 11, 2000, the
8  pipeline is 52 percent larger than the pipeline a year
9  earlier?
10 A.  That is correct.
11 Q.  In terms of dollars?
12 A.  That is correct.
13 Q.  Now, the next column says, "Product Waitings,"
14 what does -- what is that referring to?
15 A.  It's just showing you the total pipeline
16 what percent represents technology opportunities versus
17 application opportunities.
18 Q.  Okay.  And then the "Revenue Growth" column,
19 what is this column representing?
20 A.  It is representing the forecasted license
21 revenue growth year over year.
22     THE REPORTER:  Year over year?
23     THE WITNESS:  Year over year for the same
24 forecast period.
25     MR. BRITTON:  Q.  For the same forecast period.

162

1      So you would take the -- did the forecast -- is
2  this the forecast before the upside or after the upside?
3  A.  This is the forecast before the upside.
4  Q.  Before the upside, so --
5  A.  This is the field forecast.
6  Q.  The field forecast.
7      So the field forecast for Nussbaum, he was
8  forecasting 19 percent more revenue this reporting
9  period than the prior year's reporting period --
10 A.  That is correct.
11 Q.  -- is that right?  Okay.  Good.
12     Okay.  If you turn to the next page, this page
13 is very difficult to read.  The -- the printout that you
14 were looking at, was -- was it similar in size, or
15 was -- was it much larger, or -- we're not sure if this
16 is a copy issue or if this is the way it printed out
17 or --
18 A.  Oh, I think it's the way it printed out.  A
19 copy issue.  I mean, I -- this is -- this is our
20 pipeline reporting package.
21 Q.  Really?  So -- so this was the size of what you
22 were looking at when you were -- whew.
23     MR. RUBENSTEIN:  They -- they have lots of --
24     MR. BRITTON:  Hard on the eyes.
25     MR. RUBENSTEIN:  -- magnifying glasses.

163

1       THE WITNESS:  My eyesight was a lot better five
2   years ago.
3       MR. BRITTON:  Q.  Which -- which page
4   represents the conversion ratio?
5       A.  Page one.  Well, it's your page three, I guess.
6       Q.  Page?
7       A.  So the -- the five -- the one that says "page
8   one."
9       Q.  Right.
10      A.  I know it's kind of not intuitive, being that
11  the first page isn't titled page one.
12      Q.  Okay.  So over on -- on the right-hand side,
13  there where it's "Forecast Conversion Ratio," where it
14  says "Actual Conversion Ratio"?
15      A.  Yeah.  Would you like me to walk you through
16  this?
17      Q.  Yeah, if you could, I'd -- I'd appreciate it.
18      A.  Okay.
19      So during week two of fiscal '01, or Q3 of
20  fiscal '01, we are show --
21      THE REPORTER:  I'm sorry?  Week?
22      THE WITNESS:  Week two -- sorry -- of the third
23  quarter of fiscal '01, we show in the first column what
24  the pipeline is as of that point in time.  And the total
25  pipeline is about 2.9.

164

1       MR. BRITTON:  Q.  Okay.
2       A.  In the next column, to the right -- to the
3   right of that is the pipeline for the same period but in
4   the prior year, so fiscal '00.  And the grand total of
5   that pipeline was 1.9.
6       Q.  Okay.
7       A.  You have your "Variance" column in dollars, and
8   you have your "Variance" column in percent, so you can
9   see that in totality the pipeline growth was 52 percent.
10      Q.  Okay.
11      A.  Okay.  And that's what ties to the page that we
12  spoke about just a few moments ago.
13      Then you have your current quarter forecast as
14  submitted by the field in the next column, which is a
15  total of -- I believe it's 1.2 million.
16      Q.  Yeah.
17      A.  And then you have your forecast for the same --
18  no, sorry, not your forecast, but your actuals for the
19  third quarter of fiscal 2000 with the total of about
20  1.0 million.
21      Q.  Okay.
22      A.  Okay.  So then we are showing what the total
23  forecast of growth is, which is 22 percent, and then
24  we're showing what the Q3, FY '01 forecast conversion
25  ratio was, so in totality it was 42 percent.  So you get

165

1   that number by taking the 1,029,196 which is the
2   actuals, as a percent of the 1,949,373.
3       Q.  Okay.
4       A.  Okay.  So that's your historical conversion
5   rate, 42 percent.
6       Q.  Okay.
7       A.  And then we're calculating -- oh, sorry, sorry.
8   I apologize.
9       That column, Q3 FY '01?
10      Q.  Uh-huh.
11      A.  That's your forecast conversion ratio, so it's
12  actually taking your forecast of 1,258-, the Q3 FY '01
13  forecast column --
14      Q.  Right.
15      A.  -- as a percent of the pipe for FY '01, which
16  is the 2.96 --
17      Q.  Okay.
18      A.  -- million.
19      Q.  Yes.  Okay.
20      A.  Okay.  So the current forecast conversion ratio
21  is 42 percent.
22      Q.  Okay.
23      A.  If you looked to the next column, that's
24  calculating your Q3 fiscal 2000 actual conversion ratio
25  which is taking your actuals for Q3, fiscal 2000 of

166

1   1 million, and dividing that by the pipeline for the
2   same period of 1.9.
3       Q.  Okay.
4       A.  And that gives you a forecast conversion ratio
5   of 53 percent.
6       So if you multiply the historical conversion
7   ratio of 53 percent by the current quarter's pipeline of
8   2.961, the -- estimated license revenues for the
9   current quarter would be 1.7 million.
10      Q.  Okay.
11      A.  If you take the 1.7 million versus the forecast
12  of 1.25 million --
13      Q.  Yeah.
14      A.  -- for Q3 FY '01, you come up with your
15  estimated upside of roughly 510 million.
16      Q.  Okay.  And that -- that upside is not the
17  upside you were talking about before, the -- the -- the
18  best estimate upside?  This isn't your upside
19  adjustment?
20      A.  This is -- this is our forecast pipeline
21  conversion ratio analysis.  I'm sure you are going to
22  show me shortly one of our upside reports.
23      Q.  Yes.
24      A.  And it's not necessarily a hundred percent
25  going to equal this number.

167

1    Q.  Okay.
2    A.  In fact, I would beg to differ that it ever
3  would.
4    Q.  Okay.
5    A.  Because, you know, they're -- they're round --
6  they're rounded.
7        The one -- the one thing that's really
8  interesting to note is that you could take -- you could
9  look at a geography, let's say Germany, and, you know,
10  if you were to apply their historical ratio, they may
11  come up with a number and they may not get that number.
12  They may not hit it at the end of the day.
13        But, you know, historically speaking, when you
14  looked at it in totality, we -- these were fairly
15  predictive tests of what the total consolidated license
16  revenue growth was going to be.
17    Q.  Okay.
18    A.  But we would not just throw this number in --
19  in the upside analysis --
20    Q.  Uh-huh.
21    A.  -- without also validating it by knowing that
22  there were large deals in the pipeline that weren't
23  forecasted by, you know, getting additional information
24  that made us comfortable with how we arrived at our
25  upside numbers.  It was more of an art than a science.

168

1    Q.  Okay.  Okay.  And then the last column,
2  "Potential Growth With Upside."
3    A.  Right.  That would say, assuming that the
4  historical conversion rate if applied to the current
5  pipeline, if that came true, that we would have a -- I
6  think that says 70 percent growth and -- is that 70, or
7  is that 30?
8    Q.  Looks like 70 to me.
9        MR. RUBENSTEIN:  Yeah, looks like 70.
10        THE WITNESS:  Doesn't quite look right to me.
11        MR. BRITTON:  Q.  Which two columns are giving
12  you this percentage here, whatever it is?
13    A.  This would be taking the one million seven.
14    Q.  Yeah.
15    A.  And it should be dividing it as a percent of
16  the one point -- of the actuals in the prior year, so it
17  is right.  Of 1 -- of 1,029,196 --
18    Q.  Oh, okay.
19    A.  -- to get to the 70 percent.
20    Q.  Very good.  Thank you.
21        Now, the -- the copy that you were working off
22  of that was this size, was it clearer to read than this;
23  so if we got a better copy machine, would we be able to
24  see these numbers better?
25    A.  I don't know if this is an issue as to how it

169

1  was printed out, but like this page I can tell you it
2  looked exactly like that.
3    Q.  Really?
4    A.  It really did.
5    Q.  Okay.  And then this footnote at the bottom,
6  one, what is that?
7    A.  Regional estimated upside based upon the sum of
8  the calculated upside for each component country.
9    Q.  So what does that mean?
10    A.  Well, as an example, EMEA would have different
11  regions, so the Nordics is an example.  We would take
12  the sum of -- we would -- instead of looking at it on a
13  country-by-country basis, we would look at it as a
14  regional basis.
15    Q.  That makes sense.
16        Okay.  If you take a look at page four of the
17  document itself, which I think is -- it's the page that
18  ends with 24459.
19    A.  Of -- of 15, of Exhibit 15?
20    Q.  Yeah, Exhibit 15.  It's the one with the graphs
21  and charts.
22        How would you use -- withdrawn.
23        What is this information depicting?
24    A.  This is only graphically showing the license
25  pipeline mix and total and what it is as a percent of

170

1  the total globe.
2    Q.  Okay.  Okay.  We'll put that document aside.
3        And I don't think -- actually think I have any
4  questions for Exhibit 16.
5        But I do have one before you put that away; I
6  have one question.
7    A.  For 16 or 15?
8    Q.  For 15.
9    A.  Okay.
10    Q.  The third to the last page, 462, can you tell
11  me what this says?
12        THE WITNESS:  I'm sorry, I don't know which
13  page he's referring to.
14        MR. BRITTON:  Q.  Ends with 462.
15        MR. RUBENSTEIN:  I knew you were going to go
16  there.
17        THE WITNESS:  Can I just see yours?
18        MR. RUBENSTEIN:  Okay.
19        THE WITNESS:  Yeah.  I know what this is.
20  Would you like me to tell you?
21        MR. BRITTON:  Q.  Yeah.  Can you explain what
22  it is?
23    A.  It's just the same license pipeline trending
24  that you saw for the Americas, but for the regions
25  within Europe, as well as for Japan and Asia Pacific and

171

1  the total company.
2  Q.  Okay.  Now, in OFA, to access this document
3  electronically --
4  A.  I need to correct you.
5  Q.  Okay.
6  A.  This document was prepared in Excel.
7  Q.  It was prepared in Excel, okay.  So if --
8  A.  The numbers were -- were --
9  Q.  Derived.
10  A.  -- obtained from OFA.
11  Q.  Okay.  So if we -- if we were to have this
12  document electronically, we would be able to see the
13  sale calculations like you would in a normal Excel
14  spreadsheet?
15  A.  That would be correct.
16  Q.  Very good.
17      Okay.  You can put those documents aside.
18  A.  If it helps you, I pretty much focused only on
19  page two of this document.
20  Q.  Page two?
21  A.  As numbered on the document.
22  Q.  All right.  Then take a look --
23  A.  That's my paperclip.  That's okay.
24  Q.  Now, the -- that invites another question.
25      What's the diff- -- what's the difference

172

1  between page one and page two?
2  A.  It's just looking at the tech versus APS.
3  Q.  Oh, okay.  And why were you focused on the tech
4  as opposed to the APS?
5  A.  I wasn't.  It was page one.
6  Q.  Oh, page one.  Okay.  As long as we're --
7  A.  Which is really page two.  See, the pages just
8  were not really numbered intuitively.
9  Q.  Okay.  Okay.
10  A.  Would you not agree?
11  Q.  Okay.  All right.
12      MR. RUBENSTEIN:  Just so the record is clear,
13  it's the page that ends -- it's 024456.
14      MR. BRITTON:  Q.  When -- when you were looking
15  at the conversion rates and the pipeline for your
16  forecasts, did you do any analysis of what deals were
17  closed in the pipeline versus what deals were still open
18  but could possibly close in the pipeline, or did you
19  just do a straight calculation?
20  A.  I'm sorry, I don't understand your question.
21  Q.  For example, say for example in the third
22  quarter --
23  A.  Right.
24  Q.  -- you had a hundred million dollars in
25  pipeline.

173

1  A.  Uhm-hum.
2  Q.  And your conversion ratio was 50 percent.  Did
3  you calculate the 50 percent of a hundred million and
4  come up with the 50 million?  Did you analyze closed
5  deals versus potentially closed deals?
6  A.  I looked at the total forecast and the total
7  pipeline, and I would apply historical conversion ratios
8  to the total pipeline, compare that to the forecast for
9  the full quarter, and derive an upside adjustment.
10  Q.  Okay.
11      (Whereupon, Plaintiffs' Exhibit 17 was
12      marked for identification.)
13      THE WITNESS:  I want to clarify my comment.
14      MR. BRITTON:  Sure.
15      THE WITNESS:  I would not necessarily derive an
16  upside adjustment, but I would have another data point
17  that would help me determine what my potential upside
18  would be.  These are not directly taken and then put
19  into the upside column in the upside reports.
20      MR. BRITTON:  Q.  Right, okay.
21      Okay.  The court reporter has placed in you --
22  in front of you what's been marked as Plaintiffs'
23  Exhibit 17.  Take a moment to look at this --
24      For the record, Exhibit 17 starts with Bates
25  42297 and ends at 42356.

174

1  Q.  Have you had an opportunity to look at
2  Exhibit 17?
3  A.  I have.
4  Q.  Do you recognize it?
5  A.  Yes, I do.
6  Q.  And what is Exhibit 17?
7  A.  It is a listing of large deals that are in the
8  pipeline, segmented by size --
9  Q.  Okay.
10  A.  -- segmented by commit versus upside, i.e., not
11  in the forecast, and segmented by NAS versus OSI versus
12  OPI.
13      THE REPORTER:  And submitted?
14      THE WITNESS:  And segmented by --
15      THE REPORTER:  Oh.
16      THE WITNESS:  -- NAS, OSI, OPI.
17      MR. RUBENSTEIN:  Again, let me object to the
18  extent that the document appears to be dated in 2002, at
19  the very bottom --
20      MR. BRITTON:  Yeah.
21      MR. RUBENSTEIN:  -- middle of the first page.
22  So I just want to make sure that --
23      MR. BRITTON:  Yeah, I'm just trying to find out
24  what the document is.
25      MR. RUBENSTEIN:  Okay.

175

1    MR. BRITTON:  Q.  When you said the upside is

2    not --

3    THE WITNESS:  Can I have a second, please.

4    MR. BRITTON:  Yes, yes.

5    (Off-the-record discussion between witness

6    and counsel.)

7    MR. BRITTON:  Q.  Okay.  Just one clarifying

8    point, I think, to your comment.

9    Up in the -- the left-hand column, it says,

10   "Q3, Week Six," but the -- it looks like this is dated

11   either June or August of 2002?

12   A.  Where do you find that?

13   Q.  All the way at the bottom where the dates --

14   A.  Oh, eight, August.  Is that eight, four.

15   Q.  It looks like 8/4 to me.  I was wondering,

16   since -- since Q3 is not in August, I'm wondering if

17   this is a printing issue as opposed to an actual --

18   A.  I actually don't believe that this report was

19   generated during the relevant period.

20   Q.  It was not?

21   A.  I don't believe so.

22   Q.  Okay.  Okay.  Were there any reports similar to

23   this generated during the relevant period?  And what I

24   mean by that is, deals broken down by size and by

25   customer and comment.

176

1    A.  There were -- there were reports that

2    generated -- that were generated that were maintained in

3    Excel that summarized the large deals, as well as the

4    upside deals that were not in the forecast.

5    Q.  Okay.  And did you have access to those

6    reports?

7    A.  Those were compiled and reviewed in connection

8    with the Americas forecast call.

9    Q.  Okay.  The Americas forecast call?

10   A.  On the Thursday.

11   Q.  On the Thursday, okay.

12   Did you have those documents in your hands on

13   those calls?

14   A.  Those documents were provided to us, yes.

15   Q.  Okay.

16   A.  So that we could look at them as we're going

17   through the forecast call.

18   Q.  Okay.  And see what deals were pending --

19   A.  Right.

20   Q.  Okay.  Did those forecasts have the comments

21   column like this one does here?

22   A.  Not -- not -- they may have had some comments,

23   so I believe that this is not a report that was

24   generated --

25   Q.  Right.

177

1    A.  -- during the relevant period, and the reason

2    why I'm stating that is that I believe that this was a

3    report that we started to generate that was downloaded

4    from OSO.

5    Q.  Okay.  Okay.

6    Now, the reports that were similar or had in --

7    information like this in them that were used on those

8    Thursday calls, how -- how would you use the information

9    in those documents in your forecasting of the upside?

10   A.  Those reports basically had -- we tried to get

11   the -- the three guys to sort of standardize so that we

12   didn't have three different types of reports, but

13   effectively what we were looking for was, give us a

14   listing of your -- your big deals and, you know, is it

15   in the forecast, is it not, and what is the likelihood,

16   you know, some comments or something with regards to it.

17   Q.  Uh-huh.  And then how would you use that

18   information?  Would you take that information and then

19   talk to your financial person, your financial analyst

20   and then make a decision based upon --

21   A.  Again, during the forecast calls, we would

22   review the large deals that were committed to, find out

23   the status of those, determine if there was any need for

24   executive help to help close a deal during a quarter.

25   We would also talk about the upside deals what

178

1    it would take in order to, you know, convert them into

2    revenue in the current quarter.  Again, what executive

3    sponsorship could be leveraged.  So, you know, they --

4    they are all trying to attempt to get to the same thing.

5    This just happened to have more detail.

6    Q.  Right.  Okay.

7    You can put that document aside.

8    The -- the mega deals that you referenced

9    earlier, what -- what dollar amounts were those?  Could

10   you categorize it as anything above X?

11   A.  My personal definition would be any deal that's

12   $10 million or greater.

13   Q.  $10 million, okay.

14   Was that a uniform definition, through --

15   throughout the division?

16   A.  No.

17   Q.  Can you bring back this exhibit, Exhibit 17.

18   To -- if you look three columns from the right,

19   three columns over, it says, "Status Code."

20   What is that column referring to?

21   A.  I honestly don't recall.

22   Q.  Did you use anything similar to that during the

23   relevant period?

24   A.  No.

25   Q.  No, okay.

179

1    A.  Not that I know of, because I don't know what
2    this is.
3        (Whereupon, Plaintiffs' Exhibit 18 was
4        marked for identification.)
5        MR. BRITTON:  Q.  The court reporter has placed
6    in front of you what's been marked as Exhibit 18.
7        For the record, Exhibit 18 starts with Bates
8    025049 and ends at 025067.
9        Can you take a quick look and let me know if
10   you recognize these documents.
11   A.  Yes, I do.
12   Q.  Okay.  It appears to me that this is and
13   accumulation of a number of different e-mails; is that
14   fair?
15   A.  It is up through 025054.  Which number am I
16   supposed to be going off, the MDCA or the CA?
17   Q.  Yes --
18   A.  So up to that point, it is.
19   Q.  Okay.
20   A.  And I don't know how this enters into this next
21   one, 02055.
22   Q.  Right.
23   A.  I don't know how it commits in this bucket
24   [sic].
25   Q.  Okay.

180

1    A.  But then the remaining are -- the remaining are
2    the same e-mails.  So these are the flash reports that
3    we get towards the end of the quarter from Lauren Mahon.
4    Q.  Okay.  Now, when you -- when you said the
5    remainder, if you look at 25058 through 061 --
6    A.  No, 25056.
7    Q.  I have more than --
8        What -- what page does yours end?
9    A.  So there's just one --
10       MR. RUBENSTEIN:  Mine ends with 67.
11       MR. BRITTON:  Right.
12       THE WITNESS:  So there's just one page, 025055.
13       MR. BRITTON:  Q.  Right.
14   A.  That is not the same --
15   Q.  Not the same.
16   A.  -- as 025056 through --
17       MR. RUBENSTEIN:  What about 58 and 59?
18       MR. BRITTON:  Look at 58 through 61.
19       MR. RUBENSTEIN:  Through 61, right.
20       THE WITNESS:  No, those aren't either.
21       MR. RUBENSTEIN:  Okay.
22       MR. BRITTON:  Q.  So these --
23   A.  Those -- those -- I have no idea why -- why
24   025058 would be in the stack, or 02059.
25       MR. BRITTON:  Q.  Okay.  So let's focus on

181

1    the -- on the pages --
2    A.  Or 025060 --
3    Q.  Or 61.
4    A.  -- or 025061.
5    Q.  Let's focus on the pages that talk about the
6    big deal status.  Do you recognize --
7    A.  Big deal updates, yes.
8    Q.  Big deal updates.  You recognize these?
9    A.  Absolutely.
10   Q.  You referred to this as a flash report?
11   A.  This is the big -- this is the big deal update
12   report.
13   Q.  Okay.  And how often were these prepared?
14   A.  They were prepared like in the last week or so
15   of the quarter.  I have it here, if you can give me just
16   a minute so I can get back.
17       They were prepared essentially starting
18   somewhere around the last week of the quarter.
19   Q.  They'd be prepared daily?
20   A.  Yes, that's correct.
21   Q.  Okay.  Now, this -- this top e-mail talks about
22   this report only dealing with deals above $500,000,
23   unlike OSO, which includes all deals.
24       Does this refresh your memory on whether Oracle
25   was using OSO prior to the upgrade to 11i in December?

182

1    A.  Again, I believe that OSO was used -- I don't
2    know when OSO was implemented.  I do believe that one of
3    the sales divisions used it first so that they could
4    help development to find additional features and
5    functionality.  This has nothing to do with OSO.
6    Q.  Right, right, right.  This was -- okay.
7        What -- what program did Ms. Maha -- Mahon use
8    to -- to create these flash reports?
9    A.  She used a report that was called Approvals
10   2000 Report.
11   Q.  Approvals 2000.
12       So is it fair to say that this is a subset of
13   the Approvals 2000 Report?
14   A.  It is a summary.
15   Q.  Summary of it, okay.
16       Who is Lauren Mahon?
17   A.  Lauren Mahon is currently my vice president
18   responsible for North America finance operations.
19   Q.  Okay.  And what was her position during the
20   relevant period?
21   A.  I do not recall what position.  She clearly had
22   responsibilities still, as she does today, for the
23   contract administration group.
24       So just to clarify, sometime between this
25   period in question, November 2000 and today, I have

183

1   moved additional folks underneath her, so Sarah Kopp,
2   who used to report directly to me, now reports to
3   Lauren.
4       Q.   Okay.  How would you use the information that
5   is contained in these big deal status reports in your
6   forecasting for the upside adjustments?
7       A.   I didn't.
8       Q.   You didn't use them at all?
9       A.   No.
10      Q.   Okay.  Then what was the purpose of receiving
11  this information?
12      A.   What this report shows is the number of -- so
13  pipeline deals are -- I want to clarify from pipeline
14  versus contracts pipeline.
15          This represents a summary of deals in the
16  license pipeline that are actually being worked on by
17  the contracts admin organization, okay.
18          So if you refer to the second page, it says,
19  "Pipeline deals are deals where contracts are received
20  in approval form, a quote, or a contract draft has been
21  prepared, and the sales rep has indicated that the deal
22  still may close in November."
23          Okay?
24      Q.   Okay.
25      A.   So these are what I would call live deals.

184

1   They're in the hopper.
2       Q.   Okay.  So there is a chance that it may not
3   close.
4       A.   There is a chance that it may not close, but
5   unlike, you know, unlike the sales pipeline that we have
6   been talking about before --
7       Q.   Uh-huh.
8       A.   -- these are deals where they've gotten so far
9   along in the sales process that they have actually begun
10  contract negotiations.
11      Q.   Okay.  So it's contract negotiations, not
12  contracts processing once a deal is signed; is that
13  right?  I'm trying to figure out at what point in time
14  they are still negotiating the contract, or the contract
15  has been negotiated, but there's still more left to be
16  done to get the deal closed.
17      A.   Well, closed deals are where they have received
18  the paperwork from the customer --
19      Q.   Uh-huh.
20      A.   -- and they are a hundred percent complete.
21      Q.   Okay.
22      A.   Whereas, the pipeline deals are contracts that
23  are still being worked on.
24      Q.   Okay.
25      A.   And I should also inform you that this is only

185

1   reporting on deals in the contracts queue for the
2   United States.
3       Q.   What do you mean by "contracts queue"?
4       A.   The contracts -- contracts that they're working
5   on.
6       Q.   Okay.
7       A.   She was America's revenue management
8   services -- he just pointed out -- at the time.  Lauren.
9       MR. RUBENSTEIN:  If you look on page two.
10      MR. BRITTON:  Oh, very nice.
11      THE WITNESS:  So she was in charge of contracts
12  OMS.
13      MR. BRITTON:  Q.  Okay.
14      A.   Order entry.
15          People move around a lot.
16      Q.   Okay.  Put that the aside.
17          (Whereupon, Plaintiffs' Exhibit 19 was
18          marked for identification.)
19      MR. BRITTON:  Q.  The court reporter has placed
20  in front of you what's been marked as Minton Exhibit 19.
21          For the record --
22      MR. RUBENSTEIN:  Ours is 20, I believe.
23      THE REPORTER:  Oh -- I have 19.
24      MR. BRITTON:  We have 19.
25      MR. RUBENSTEIN:  I stand corrected.

186

1       MR. BRITTON:  Q.  Okay.  Exhibit 19 starts with
2   Bates 016193 through 240.
3           Have you had a chance to look at Exhibit 19?
4       A.   Um.
5       Q.   Still looking?
6       A.   Yeah.
7       Q.   Have you had an opportunity to look at
8   Exhibit 19?
9       A.   Yes, I have.
10      Q.   And do you recognize it?
11      A.   I recognize what it is.
12      Q.   Okay.  And how do you recognize what it is?
13      A.   Well, remember I told you that there were three
14  divisions --
15      Q.   Uh-huh.
16      A.   -- within the North America, the three
17  different finance people supporting them?
18      Q.   Right.
19      A.   And they all had their own different types of
20  management reporting packages and forecast reporting
21  packages?
22          This appears to me to be the OPI reporting
23  package that would have been prepared, more likely than
24  not, by Jim English for Sandy Sanderson's benefit.
25      Q.   Did you -- do you recall receiving a report

187

1  like this during the relevant period?

2     A.  I don't recall receiving a report like this.  I

3  recall receiving subsets of information like deals,

4  summary of, you know, opportunities.

5     Q.  Okay.

6     A.  You know, these guys may have sent me their

7  packages, but it doesn't mean that I necessarily opened

8  them up.  Because we took their forecast and created our

9  own Americas reporting package, and that's what I would

10  primarily focus on.

11     Q.  Well, let me see if -- if you recognize some of

12  these pages.

13        Can you turn to the page that ends with 216.

14        Do you recognize this page?

15     A.  No.

16     Q.  No.

17        Have you ever seen a worst, most likely, best

18  category --

19        THE REPORTER:  I'm sorry.  A what?

20        MR. BRITTON:  Q.  Worst, most likely, best way

21  of categorizing or classifying deals?

22     A.  Forecasts, yes.

23     Q.  Okay.

24     A.  Yes.

25     Q.  One of those -- were those -- did -- did each

188

1  business unit OPI, OSI, and NAS, did each one break out

2  their deals in that way, worse, most likely, and best?

3     A.  Not their deals, but their forecasts.

4     Q.  Their forecasts, okay.

5        And they each did it the same way?

6     A.  No.

7     Q.  Or the same classification?

8     A.  There was the same categorization, but the

9  methodology that they used to get there, I'm sure

10  varied.

11     Q.  Okay.  Do you know the methodology that OPI

12  applied to get to the most or the worst, most likely,

13  and best forecasts?

14     A.  No, I do not.

15     Q.  If you look to the fifth column over, on the

16  far -- starting underneath the "Total License Revenue"?

17     A.  The "Forecast Excluding Judgment"?

18     Q.  Yeah.  What is that referring to, if you know?

19        MR. RUBENSTEIN:  I'll just object on foundation

20  grounds.

21        You can go ahead and answer, if you can.

22        THE WITNESS:  Mathematically, you can compute

23  what it is.  Their -- their forecast is 150.

24        MR. BRITTON:  Q.  Right.

25     A.  The management judgment is four, so the

189

1  forecast excluding management judgment is 146.

2     Q.  Okay.  So now for purposes of the process,

3  management judgment, does that refer to some sort of

4  judgment that was applied at the division level?

5     A.  It could have been at the division level, or it

6  could have been at the regional level that made up the

7  whole division.

8     Q.  Okay.

9     A.  And I state that because you can see that there

10  are different amounts within the east field, the east

11  ISD, the central field, the central ISD.

12        THE REPORTER:  I'm sorry.  You said "east

13  field"?

14        THE WITNESS:  The east field, the east ISD, the

15  central field, the central ISD.

16        MR. BRITTON:  Q.  And if you look over to the

17  far right, it talks about head count.

18     A.  Uh-huh.

19     Q.  And did head count have a definition in Oracle,

20  other than employees?

21        Is it a number of employees that were in the

22  division?

23     A.  That's what head count is.

24     Q.  How did this factor into your forecast for the

25  upside, if at all?

190

1     A.  The head count?

2     Q.  Yeah.

3     A.  It didn't factor into it at all.  That was on

4  the upside on revenue.

5        THE REPORTER:  I'm sorry?

6        THE WITNESS:  The upside on revenue, it did not

7  factor into it at all.  If there were any planned

8  reductions in force that I became aware of, then

9  obviously I would take that into consideration in an

10  expense forecast, if it was not already forecasted.

11        MR. BRITTON:  Q.  Okay.  And if you look at

12  page -- the page that ends with 221, if you look at "Q3

13  '01 Close Deals"?

14     A.  Uhm-hum.

15     Q.  Under "January," it has zeros down there.

16        Did you, in your -- in your forecasting

17  process, did you consider information such as this, no

18  deals closed in January, for purposes of making your

19  upside adjustments?

20     A.  No.  I always looked at the total quarter

21  forecast, not the monthly forecast.

22     Q.  Can you turn to the page that ends with 232.

23        Are you familiar with this page?

24     A.  Yes.  This is similar to the reports that I

25  told you before that would be submitted to corporate in

191

1  preparation of the Americas forecast call.

2      Q.  Okay.  So when you were talking about you would

3  receive pieces of information in this report, this is

4  one of the pages you were talking about?

5      A.  I'm not sure if it's exactly this page or

6  another page that's similar.

7      Q.  Okay.

8      A.  But it's -- it's similar in content, let's put

9  it that way.

10     Q.  Okay.  If you look at this page, about midway

11  over there is a "win-probability percentage"?

12     A.  Uhm-hum.

13     Q.  And then there is different numbers, 60, 110,

14  do you know what that column is referring to?

15     A.  Yeah.  They had a -- there would be a

16  win-probability percentage that was applied to the

17  deals, so some people had different forecasting

18  methodologies at the divisional business unit level.

19  Some would forecast deal by deal, and that would make up

20  their forecast.  Others would take the portfolio of the

21  opportunities based on a weighted average to come up

22  with their forecast.

23     Q.  Okay.  And that's what this is doing here?

24     A.  I think that these percentages here would have

25  been one way of looking at the forecast, yes.

192

1      Q.  Okay.  Do you know what these numbers represent

2  for OPI?

3      A.  The win-probability percentage.

4      Q.  And do you know how they -- they categorized

5  it, what -- what would fall within a 10 versus a 40

6  versus a 60?  Do you know how it broke down?

7      A.  I do not know if there were any line-item

8  categorizations associated with the percentages that

9  were picked.

10     Q.  Okay.

11     A.  I -- I would assume that a hundred percent

12  means that they were damn certain that they were going

13  to close the deal.

14     Q.  Right.

15     A.  10 percent didn't --

16     Q.  10 percent --

17     A.  -- give me too much comfort, yeah.

18     Q.  Okay.  Did OSI employ a similar win-probability

19  percentage system?

20     A.  I think that all of them would look at their

21  pipeline in both -- I shouldn't say that, because I know

22  that some of them never looked at it deal by deal, so

23  win probability was used amongst most of the

24  organizations, if not all, as one way of looking at it.

25  They could have also looked at it on a deal by deal

193

1  basis and sort of weighted the two together to come up

2  with what they thought was the right forecast commit

3  number.

4      Q.  Okay.  Now, if a -- let's take for example the

5  fourth line down, the ten, just because it's easy for my

6  math skills.

7      A.  Right.

8      Q.  If -- if I had a deal that I valued at

9  60 million, let's say $60 million, and I had the win

10  probability of ten, do you know how the OPI division,

11  that deal, would be reflected in the pipeline?

12     A.  The total opportunity would be reflected in the

13  pipeline.

14     Q.  In the pipeline.

15     So this -- the full 60 million would be

16  reflected in the pipeline?

17     A.  I thought it was a hundred million.

18     Q.  I thought I said 60-, but let's go with a

19  hundred million.

20     MR. RUBENSTEIN:  Actually, I think the question

21  was 60 million.  But do you want to rephrase the

22  question, just so --

23     MR. BRITTON:  Yeah, let's -- let's rephrase it.

24     MR. RUBENSTEIN:  -- we're sure?

25     MR. BRITTON:  Q.  If I had a deal, a possible

194

1  deal worth $60 million --

2      A.  Uh-huh.

3      Q.  -- and I assigned a win-probability percentage

4  to it of ten, how would the value of that deal be

5  reflected in the pipeline?

6      A.  At 60 million.

7      Q.  60 million.

8      Did you look at these win-probability

9  percentages for purposes of doing your upside

10  adjustment?

11     A.  No, I did not.

12     Q.  Was the -- was this document -- withdrawn.

13     Was the -- the page that we just looked at with

14  the customers and the win-probability percentages, was

15  that available online, to your knowledge, either

16  through --

17     A.  I don't --

18     Q.  -- OSO or any other...

19     A.  I don't know if OPI was using OSO at that time.

20     Q.  Okay.  You can put that document aside.

21     (Whereupon, Plaintiffs' Exhibit 20 was

22  marked for identification.)

23     MR. BRITTON:  Q.  Okay.  I placed in front of

24  you what's been marked as Minton Exhibit 20.  Will you

25  take a moment to look at this exhibit.

195

1      Minton Exhibit 20 starts with Bates 039153 and
2  ends with Bates 039178.
3      Q.  Have you had a chance to look at Exhibit 20?
4      A.  Uh-huh.  Yes.
5      Q.  Do you recognize it?
6      A.  Again, I'm not certain if I ever received
7  copies of this.  They -- they may have been sent to me,
8  but this is no different than the other one.  Looks to
9  be like their weekly forecast package for OPI.
10     Q.  Okay.
11     A.  And, again, this one would have been prepared
12  by Jim English.
13     Q.  Jim English.
14         Now, where would a packet like this be used, on
15  the Thursday call?
16     A.  No.
17     Q.  Then where would a packet -- this packet be
18  used?
19     A.  Do you remember I told you earlier this morning
20  that the divisions would have their own weekly forecast
21  calls?
22     Q.  Yes.
23     A.  Generally, they were held on Mondays?
24     Q.  On Mondays.
25     A.  Although some could have had them on Fridays.

196

1      And so this package would be distributed in
2  advance of those calls to the OPI area VPs, as an
3  example.
4      Q.  I may have asked you this, but I don't
5  remember.  Did you sit in on any of those meetings?
6      A.  No.  I sat in on the EC meetings and on the
7  Americas forecast call on Thursday afternoons.
8      Q.  Okay.  Okay.  You can put that aside.
9          THE REPORTER:  How did you say EC meetings,
10  ECE?
11         THE WITNESS:  EC -- or the EC meetings,
12  executive committee, or EMC, executive management
13  committee; they're -- I use them interchangeably.
14         THE REPORTER:  Oh.  And now my computer froze.
15  I just need -- can I take a second?
16         MR. BRITTON:  Why -- want to take a short
17  break?
18         MR. RUBENSTEIN:  Guess we have to.
19         THE VIDEOGRAPHER:  I'm almost at the end of the
20  tape, so I wanted to --
21         MR. BRITTON:  Change the tape, yeah.
22         THE VIDEOGRAPHER:  -- change tapes.
23         Okay.  In the deposition of Jennifer Minton,
24  this marks the end of Tape 3, Volume I.  Going off the
25  record.  The time is 4:14.

197

1          (Recess taken.)
2          (Whereupon, Plaintiffs' Exhibit 21 was
3          marked for identification.)
4          THE VIDEOGRAPHER:  In the dep-- -- deposition of
5  Jennifer Minton, this marks the beginning of Tape 4,
6  Volume I.  Going on the record.  The time is 4:27.
7          MR. BRITTON:  Q.  Okay.  The court reporter has
8  placed in front of you what's been marked as Plaintiffs'
9  Exhibit or Minton Exhibit 21.  Take a moment to flip
10  through this.
11         My only question is going to be whether you
12  recognize it; and if so, what is it.
13     A.  Yes, I do recognize it.  It's our product
14  revenue report, which --
15         THE VIDEOGRAPHER:  Excuse me, you don't have
16  your microphone on.  It's there, right there by the
17  water bottle.
18         THE WITNESS:  Sorry about that.
19         MR. BRITTON:  Q.  Before you start testifying,
20  Exhibit 21 starts with Bates 24411 and ends at 24429.
21  Okay.
22     A.  This is our product revenue report that we
23  produced on a quarterly basis.
24     Q.  Okay.  And is it used in connection with
25  forecasting?

198

1      A.  Absolutely not.
2      Q.  It isn't?
3      A.  Absolutely not.
4      Q.  Absolutely not, okay.
5          We'll put that document aside.
6          (Whereupon, Plaintiffs' Exhibit 22 was
7          marked for identification.)
8          MR. BRITTON:  Q.  Okay.  The court reporter has
9  placed in front of you what's been marked as Minton
10  Exhibit 22.  Take a moment to look at this exhibit.
11     A.  I am familiar with it.
12     Q.  What's that?
13     A.  I -- I understand what it is.
14     Q.  Do you?  Yeah, let me identify it real quick.
15         For the record, Exhibit 22 starts with Bates
16  41923 and ends at 41939.
17         What is this report?
18     A.  As I testified earlier, when we were talking
19  about the e-mail notes that Lauren Mahon would send out
20  in the last week or so of the quarter of the big deal
21  update reports --
22     Q.  Uh-huh.
23     A.  -- this report was used to generate those
24  e-mail notes.  This report essentially is used by the
25  contracts organization in the United States to track the

199

1  status of the contracts that they are working on during
2  the course of the quarter.
3      Q.  Okay.  You use this report for purposes of your
4  forecasting?
5      A.  Absolutely not.
6      Q.  Okay.  Put that document aside.
7          (Whereupon, Plaintiffs' Exhibit 23 was
8          marked for identification.)
9      MR. BRITTON:  Q.  Okay.  We have placed in
10  front of you what's been marked as Minton Exhibit 23.
11  Take a moment to review this exhibit.
12      And Exhibit 23 starts at 039448 and ends at
13  039477.
14      A.  Okay.
15      Q.  Do you recognize this exhibit?
16      A.  I may have seen a copy of this exhibit, but I
17  would not have used it.  This exhibit is the divisional
18  reporting package for OSI, similar to the divisional
19  reporting package that we talked about a few moments ago
20  for OPI.
21      Q.  Okay.  And where would this document be used in
22  the process?
23      A.  This document would be distributed to the area
24  VPs reporting to Jay Nussbaum so that they could discuss
25  the forecast, I am assuming, in their weekly forecast

200

1  calls.
2      Q.  On the Monday calls?  Or on Fridays?
3      A.  Or -- or whatever day they had them, yes.
4      Q.  Right.
5      A.  Some had them on Mondays; some had them on
6  Tuesdays; some had them, I think, on Fridays.
7      Q.  Okay.  Now, was there a -- a final version or
8  another version that OSI prepared after that that they
9  would use to put the information into OFA, or how did
10  that work -- from -- from the -- withdrawn.
11      From the Monday calls to the time that the
12  information went up into OFA, what happened at OSI?
13      A.  Let me step back for a moment, if I may.
14      The forecasts were due to be submitted into the
15  OFA system on, I believe, Wednesday evening.  And we
16  would solve the forecasts and prepare the upside report
17  for the EC meetings on Thursday.  It would take a while
18  to solve, since you are converting local currency into
19  constant U.S. dollars.
20      We would prepare the package.  I would look at
21  it on Friday, generally speaking; sometimes I would look
22  at it on Monday morning, make any adjustments to the
23  upside analysis before it was presented to Jeff Henley,
24  our CFO at the time, during the relevant period, and
25  before being presented to the executive management

201

1  committee.
2      So going back to your question, if you could
3  rephrase it, I would appreciate it.
4      Q.  I was wondering if there was a subsequent
5  report prepared by -- withdrawn -- a subsequent forecast
6  prepared by OSI between the time of their Monday call
7  and the time that the information finally made its way
8  into OFA?
9      A.  So, again, as I just described the process, the
10  forecast submissions needed to get in by Wednesday.
11      Q.  Right.
12      A.  Right?
13      Q.  Right.
14      A.  And then the following week comes along, they
15  have their forecast meeting, my forecast that I'm done
16  using to create my EC upside reports is still; and so if
17  their forecast changed, I would learn about it during
18  the course of the EC meeting or through notification by
19  one of my directs that the forecast was changing --
20      Q.  Okay.
21      A.  -- so that I could change my upside numbers to
22  reflect any changes that may have taken place in the
23  submitted forecasts by the field.
24      Q.  Okay.  All right.  You can put that document
25  aside.

202

1          (Whereupon, Plaintiffs' Exhibit 24 was
2          marked for identification.)
3      MR. BRITTON:  Q.  Okay.  I placed in front of
4  you what's been marked as Minton Exhibit 24.  Will you
5  take a moment to review this exhibit.
6      For the record, Exhibit 24 starts with 039819
7  and ends at 039850.
8      A.  I am familiar with this report.
9      Q.  You are?
10      And what is this report?
11      A.  This is the upside reports that I would be
12  involved in reviewing and providing input to the upside
13  amounts, and that was also presented to the EC's -- EC
14  meeting on Monday.
15      Q.  Monday.
16      A.  Or to certain members of the EC on Monday.
17      Q.  And you prepared this every other week the
18  first two months of the quarter, and then once a week --
19      A.  My staff would prepare the reports every
20  forecast period, which was every two -- every other week
21  in the first two months of the quarter and every week in
22  the third month of the quarter.  If we had an EC meeting
23  during a nonforecast week period, we would reissue the
24  prior report but reflect any changes in the upside
25  numbers if there were any changes brought to our

203

1  attention during that time period.

2      Q.  Okay.  The first page references constant

3  dollar growth, and you spoke about that earlier.  And my

4  question with relation to the constant dollar growth

5  is -- versus U.S. dollars, is what number was used, for

6  guidance purposes, to the market?

7      A.  U.S. dollar.

8      Q.  U.S. dollar, okay.

9      A.  However, we generally told them what we thought

10  the currency impact would be on the -- on total

11  revenues.

12      Q.  Okay.  And you prepared this report or your

13  staff prepared this report using what program?

14      A.  As I testified earlier this morning, there was

15  a report that was generated from OFA called the

16  "management summary report."

17      A.  Right.

18      A.  And they would use that report to prepare this

19  analysis.

20      Q.  And then would they prepare this analysis in an

21  Excel spreadsheet?

22      A.  That is correct.

23      Q.  Okay.  If you can turn to the second page, I'd

24  like to focus on the "Forecast" column.  The -- it's

25  right underneath, "Q3 Fiscal Year '01 Forecast," in this

204

1  "Forecast" column.

2      Is this the forecast as presented by the field?

3      A.  Yes, it is.

4      Q.  Okay.  So reading this, we can determine that

5  the license revenue forecast for this period is

6  1.2 billion, wouldn't it be, thereabouts?

7      A.  (Nods head.)

8      Q.  Is that a --

9      You've got to answer yes or no.

10      A.  Yes, sorry.

11      Q.  That's okay.

12      Okay.  And then if you go down the "Earnings

13  Per Share" column.

14      A.  Uhm-hum.

15      Q.  That's the converted number after you take out

16  the expenses and the other items that the field forecast

17  is determining, 10.7 cents per share?

18      A.  That is the forecast that has been submitted

19  into OFA.

20      Q.  Okay.  Now, if you look down below, there is as

21  "Memo" heading.

22      A.  Uhm-hum.

23      Q.  And then there is "Consulting, Support,

24  Education, and Other."

25      A.  Uhm-hum.

205

1      Q.  What is that referring to?

2      A.  That is deriving what our support -- or, sorry,

3  what our services revenues would be as externally

4  reported in our Form 10-Q or Form 10-K.

5      Q.  Can you say that one more time?  I -- I

6  didn't-- I didn't understand the answer.

7      A.  In our -- in our financial statements that we

8  filed with the SEC, we report -- during the relevant

9  period in question, we would report license revenues,

10  license and other revenues and services revenues.

11      Q.  Right.

12      A.  So we would sum up "Consulting Support" and

13  "Education" and "Other" down below so that we could see

14  what our, approximately, what our reported services

15  revenue growth rates would be.

16      Q.  Okay.  Okay.  Very good.

17      The second column here that says, "Upside,"

18  that's -- that's the column that -- that you worked on;

19  is that right?

20      A.  That is correct.

21      Q.  Right.

22      Now, in coming up with the upside, were you

23  assisted at all other with -- other than the financial

24  analysis people?  Were you assisted by anybody in -- in

25  the financial planning department with what should be a

206

1  particular upside for a particular period?

2      A.  Again, the upside amounts, you know, I would

3  look at a variety of data points, the pipeline

4  conversion ratio analysis, discussions from, you know,

5  the various forecast calls, whether it be through the EC

6  meetings or through the Americas forecast call on

7  Thursdays.

8      I would also take into consideration the number

9  of upside deals that were not in the forecast, and any

10  other input that I may have received from the field

11  regarding the -- the forecast.

12      Q.  And then, ultimately, you would make the

13  decision based on all those factors on what the upside

14  should be?

15      A.  I would make the decision, generally speaking,

16  in consultation with Ivgen Guner, who worked with me

17  closely during that time.  But also there were occasions

18  when I would consult with Jeff Henley.

19      Q.  And how did Ivgen Guner assist in the process

20  of determining the upside adjustment?

21      A.  She would often prepare the underlying

22  analyses, such as the pipeline conversion package, to

23  help derive the overall upside number.

24      Q.  And then how did Jeff Henley assist in

25  determining what the upside adjustment should be?

207

1    A. There may or may not have been dialogue as to
2  whether or not the upside amounts based on information
3  that we became aware of at the various forecast calls,
4  EC meetings, the conversion package, the pipeline
5  conversion package that we would prepare and show him,
6  you know, it was in collaboration with.
7    Q. Okay. If you --
8    A. I might also add, that, you know, it also
9  reflects changes to the forecast that were submitted, so
10 it's not necessarily input -- adjustments that I'm
11 making because I think that the numbers presented are
12 not going to reflect our actual results. It could be
13 that there was an error in the underlying OFA submission
14 that was brought to our attention, and therefore we
15 needed to correct for that error in the upside column as
16 well.
17    Q. Okay. Going back to the forecast column to the
18 left --
19    A. Uh-huh.
20    Q. -- "Division Forecast," now, this is one of the
21 earlier upside reports in the third quarter.
22      As time goes along, does the forecast column
23 reflect actual results as well as the forecasted
24 results?
25    A. Every -- every time we closed a month, we

208

1  copied the month's actuals into the forecast cube, and
2  so it would override the forecast that was in month one.
3  So, you know, at the end of month two, we -- or I should
4  say after month one is closed, we were beginning to
5  forecast, let's say the third fore -- the second
6  forecast in the second month of a quarter, it would
7  represent one months of actuals, two months of
8  forecasts. By the second forecast in the third quarter,
9  it would represent month one actuals, month two actuals,
10 and then the third quarter forecast.
11    Q. Okay.
12      MR. RUBENSTEIN: Third month.
13      THE WITNESS: Third -- third -- third month,
14 sorry.
15      Third month forecast to get to the total
16 quarter forecast.
17      MR. BRITTON: Q. And who would -- who would do
18 that calculation? Who would calculate what the actuals
19 were for those two periods and then add on the forecast?
20    A. Again, the -- we would backload into OFA from
21 our general ledger system the actual results, and then
22 the field finance organization would update the forecast
23 for the subsequent months, month two and month three.
24    Q. Okay. If you look to the two columns to the
25 right of the -- where it says, "Forecast Upside and

209

1  Potential," there is a "Q3 Forecast Versus PY Percent,"
2  and then a "Q3 Potential Growth Percent."
3      The Q3 Forecast Versus PY Percent, that is
4  the -- am -- am I right that that's the forecast
5  percentage over the prior year, so it's reflecting at
6  least for, say for the total revenues 15 percent?
7    A. That is correct.
8    Q. By the field?
9    A. That is correct.
10    Q. Okay. And then the "Potential Growth
11 Percentage" column, that's -- that's the potential
12 growth adding in your adjustments?
13    A. That is actually the company's forecast.
14 The company's forecast. Okay.
15    A. The "potential" is a misnomer.
16    Q. Okay. So the "Potential" column under the "Q3
17 FY '01 Forecast," that is the combination of the
18 forecast, plus the upside; is that right?
19    A. That is correct.
20    Q. I want to turn your attention to the page
21 ending with Bates 822.
22      What is this page?
23    A. This page, if I may refer you back to the front
24 page, page two, ending with your -- you call it Bates
25 No. 20.

210

1    Q. Yes.
2    A. In the -- in the other nondistribution, if I
3  had any adjustments that I made, it would flow up into
4  that line item there on the summary page.
5    Q. Okay.
6    A. As we discussed -- I don't think we did discuss
7  this.
8      So international revenue transfers in the
9  United States, we had, if we entered into a deal with a
10 multi-national corporation and half of the licenses were
11 going to be installed in France, as an example, then we
12 would transfer 50 percent of the license revenue to --
13 to France. And -- and vice versa France, you know,
14 could enter into a multi-national deal and have some
15 percentage of that deal be -- intended to be installed
16 in the United States, and therefore the United States
17 would get an international transfer from -- from France.
18      To ensure that we didn't have any forecast
19 errors, we had a -- a standing rule that nobody
20 was supposed to forecast international revenue
21 transfers. So if the transfer, you know, in month two,
22 if you had international revenue transfers reflected in
23 your month one actuals, then you could count it, right;
24 but if the month had not yet closed, then you could not
25 count any anticipated international revenue transfers.

211

1    Q.  And why was that?

2    A.  Because we didn't want people to double

3    forecast a deal twice --

4    Q.  Okay.

5    A.  -- and therefore have an error in our

6    forecasting process, because many, many, many years ago,

7    well before the relevant period, we had a -- a -- some

8    confusion in the forecasting process, so we defined that

9    as a standing operating rule.

10   Q.  Okay.

11   A.  And so in the United States, we were the

12   largest exporter of revenue, and so I would indicate in

13   one of these columns the amount of international revenue

14   transfers that we were anticipating in order to come up

15   with the complete forecast for the corporation.

16   Q.  Okay.  So that's -- that's dealing with the

17   first row of the "Corporate Adjustment."

18      And then we talked earlier about the "U.S. Bad

19   Debt Adjustment."

20   A.  That is correct.

21      THE REPORTER:  Talked about what?  I'm sorry.

22      MR. BRITTON:  "U.S. Bad Debt Adjustment."

23   Q.  And then below there is "Management Judgment."

24   What is that referring to?

25   A.  If there was something else that was not

212

1    forecasted in the field -- I'm trying think of an

2    example -- very rarely used, I would put it in there so

3    that it would get rolled up into the summary level

4    forecast.

5    Q.  Okay.  The -- underneath the box, it has,

6    "License by Product Technology ERPCR" --

7    A.  Sir, can I give you an example, actually?

8    Q.  Sure.

9    A.  So if there was a customer --

10   Q.  Let me -- let me stop you.

11      Are we talking about the Management Judgment

12   again?

13   A.  Yes, we are.

14   Q.  Okay.

15   A.  So if there was a -- a customer dispute, or I

16   should say a territorial dispute between Jay and Sandy

17   on a given customer, we may say that neither of them

18   should forecast that revenue, and I would forecast it

19   in the Management Judgment line.

20   Q.  Okay.

21   A.  Because there were often territorial disputes.

22   Q.  Keeps people happy, keeps providing.

23      Okay.  Now, underneath the "License by Product

24   Technology ERPCR Total," what is -- is this column

25   referring to?

213

1    A.  This column is just trying to come up with a

2    weighting so that if we were to have, let's say,

3    $10 million of license revenues on international revenue

4    transfers, we would allocate it to our product forecast

5    based on the relative mix of our product revenues.  I

6    don't recall if it was the current product forecast or

7    the historical previous quarter's forecast, but it was

8    essentially just to allocate that license revenue upside

9    by product.

10   Q.  Okay.  There wasn't a way to break down the

11   license revenue in the deal itself in the line transfer

12   to determine, say it's a hundred million dollars,

13   10 million is technology, 90 million --

14   A.  We didn't have that level of detail, no.

15   Q.  So the "Percentage" column to the right, that

16   represents the product distribution -- withdrawn.

17      What does the "Percentage" column represent?

18   A.  Well, the 78 percent represents 902,175 of

19   technology revenue as a percentage of the total revenue

20   of 1 million -- one -- is that 1 million, or it could be

21   1 billion.

22   Q.  1 billion.

23   A.  And so it's just a relative percentage of the

24   total.

25   Q.  And how is that -- how is the 902 assigned to

214

1    technology?  I think that's where I'm not clear.

2    A.  It could either be the current product revenue

3    forecast.  I'd have to check, or it could have been a

4    historical to prior quarter's product revenue forecast.

5    Q.  Okay.  Can you check in here, because --

6    A.  Sure, I'd be happy to.

7    Q.  -- please, please.

8    A.  I'm actually not seeing a product forecast in

9    this package.  So it may have just come from a separate

10   analysis.

11   Q.  Now, is this dealing just with --

12   A.  Excuse me -- try again.

13      Ah, it's actually the very next page.

14      So the Total License Revenues of 1,153,000 does

15   not tie-out to the Total License Revenues here, so these

16   may not have been updated numbers, since we did not have

17   at the moment any numbers that needed to be

18   allocated.  So this could have been a carryover from

19   like the previous quarter's, you know, forecast.

20   Q.  Right.

21   A.  But, generally speaking, I would have expected

22   it to have been a breakdown of the for -- currently

23   forecasted product revenues for license, and then we

24   would allocate any upside adjustment based on that

25   relative percentage.

215

1    MR. RUBENSTEIN:  Doug, let me note for the
2    record that beginning at page 39835, you actually have
3    attached an upside report for January, dated
4    January 12th.
5    MR. BRITTON:  Yes, you're right.  So let's go
6    to that page real quick.
7    Actually, let's -- let's -- I'll get to it
8    after --
9    MR. RUBENSTEIN:  I just wanted to make sure
10    that the record doesn't suggest that this is entirely a
11    report for December 8th.
12    MR. BRITTON:  Right.
13    Q.  Okay.  The -- talking about the -- the page
14    ending 9822, the "Bad Debt Give Back" column, what is --
15    what is this referring to?
16    A.  Again, as I talked, or testified earlier this
17    morning, we would accrue revenue at a certain percentage
18    throughout the -- the quarter, and we would -- to build
19    up our bad debt reserve.  We would make a -- do a bad
20    debt reserve requirements analysis; and if it turned out
21    that we had sufficient reserves based on our bad debt
22    reserve requirements analysis, which was the same way
23    that we'd reviewed the reserve for years, then the
24    revenue would be given back to the field, and we would
25    allocate it based on the relative revenues.  The license

1    was to total revenues, support to total revenues,
2    education to total revenues, consulting to total
3    revenues.
4    Q.  Okay.  The -- the "Bad Debt Adjustment" column,
5    there is a percentage to the right of "License Support,
6    Education, and Consulting."
7    What do those percentages represent?
8    A.  Those percentages represented, I believe it was
9    the trailing three months' license for -- trailing three
10    months' revenues for each of those business units.
11    Q.  Is -- is that analysis in the upside report
12    anywhere?
13    A.  What analysis?
14    Q.  The -- the calculation of the trailing three
15    months' revenue?
16    A.  No.  I would get that from the accounting
17    organization.
18    Q.  Okay.  Okay.  Let's go to the next page; it has
19    Bates that ends with 9823.  And if you can reference the
20    second page of the document at the same time.
21    The license on the second page of Exhibit 24,
22    the license revenues upside adjustment is 150,500,000?
23    A.  Uhm-hum.
24    Q.  Am I right?
25    A.  Uhm-hum.

1    MR. RUBENSTEIN:  You have to say yes or no.
2    THE WITNESS:  Sorry.  Yes.
3    MR. BRITTON:  Q.  If you turn back to page
4    9823, this is the product forecasts page, and it reflect
5    the upside adjustments.
6    A.  I'm sorry, I'm confused.  What -- What pages
7    are you on?
8    Q.  All right.  9823.
9    A.  Yes.
10    Q.  And 9820.
11    A.  9820, okay.
12    Q.  Okay.  The -- I'm looking at the breakdown.
13    Is -- is page 9823 -- is this the breakdown of
14    the upside adjustment for license revenues in the top
15    column here?
16    A.  Yes, it is.
17    Q.  Okay.  So you would have $25 million upside for
18    OSI, 50 million for NAS, so on and so forth?
19    A.  That is correct.
20    Q.  That adds up to 159 million.
21    Okay.  How did you determine -- let's start
22    with OSI.  How did you determine the $25 million figure?
23    Because all these numbers are round numbers.  And I'm
24    trying to get a clar- -- because we were talking about
25    deals, and I'm trying to get an idea, how did you come

1    up with a $25 million number?
2    MR. RUBENSTEIN:  I'll object on the grounds
3    that I think it's been asked and answered.  If -- if
4    you're talking about as a process as opposed to the
5    calculated number on a particular date.
6    MR. BRITTON:  Yes.
7    MR. RUBENSTEIN:  On that basis, asked and
8    answered.
9    MR. BRITTON:  Yeah, I'm just trying to -- I'm
10    just trying to figure out how -- how it came up with a
11    round number like this as opposed to, you know,
12    25,400,000, which may be a, you know, potential deals
13    that add up to a number that's not round.
14    Q.  All these numbers seem round, so I'm just
15    trying to get an idea of the process how you came up
16    with the round numbers.
17    A.  Again, it was an art, not a science, and it was
18    not a deal-by-deal makeup of that number.  It was
19    looking at historical conversion rates, relative to the
20    current pipeline.  It was looking at the deals that
21    weren't forecasted, you know, conversations with -- with
22    management and my finance team.  It was my best guess as
23    to what I thought that they were really going to do,
24    particularly considering their historical forecasting
25    patterns.

1    Q.  Okay.

2    A.  And if I may --

3    Q.  Sure.

4    A.  -- I really think that your -- your focus

5  should be on 824, not 823.  I just want to explain for

6  you --

7    Q.  Sure.

8    A.  -- so that we can move the process along a bit.

9       This is where I would actually enter in the

10  upside amounts.

11    Q.  Okay.

12    A.  And then on 823, what this is doing is it's

13  taking the upside amounts and it's allocating the upside

14  to technology and to application revenues based on the

15  relative product mix.

16    Q.  Okay.

17    A.  All right?

18    Q.  That makes sense.

19       Okay.  So let's go to 9824.  The "Expense"

20  column, the upside adjustments, are these a reflection

21  of that calculation we talked about earlier, 15 percent

22  upside adjustment and gives you so much expense?

23    A.  It could be a combination of the 15 percent, so

24  for example, just to help out with the math here, you

25  can see that we put in 10 million for APAC in upside, so

220

1  they had an additional commission expense of a million

2  five -- not a million five.  I don't know if these are

3  in dollars or thousands.

4    Q.  I -- I may not be following you.  I'm seeing --

5    A.  So --

6    Q.  -- APAC at 9 -- looks like 9,000 or 2,500.

7       MR. RUBENSTEIN:  I think you're looking at the

8  wrong column.

9       THE WITNESS:  If you look at "Q3 FY '01

10  Upside."

11       MR. BRITTON:  Q.  Right.

12    A.  It says under "Japan," 10,000 is the upside

13  amount.

14    Q.  10,000.  Okay, okay.  I thought you said APAC.

15    A.  I'm sorry.  I thought I said Japan.

16    Q.  Okay.  So Japan, 10,000.  Okay.  I'm following.

17    A.  And then If you look at Japan down below, there

18  is an incremental commission expense of 1,500, which

19  would be the 15 percent.

20    Q.  Okay.

21    A.  And, again, if there were any other corrections

22  to the forecast that we became aware of by the time --

23  you know, between the time it was submitted and the time

24  that we finalized the upside analysis, we would have

25  added any expense corrections in as well.

221

1    Q.  Okay.  Now, going down to the margin, how did

2  you determine the upside for the margins?

3    A.  Well, it's revenue minus expense is equal to

4  margin.

5    Q.  And so --

6    A.  It's a formula.

7    Q.  -- this was just a derivative of --

8    A.  That is correct.

9    Q.  If you turn to the next page, 9825, we talked

10  about -- earlier about actuals being combined with the

11  forecast to get the forecast column.  And this has a

12  separate column that says, "Year-to-date Q3 Fiscal Year

13  2000."

14       Now, that's the difference.  The year-to-date

15  is the actuals for the prior year, and the forecast is

16  for '01; is that right?

17    A.  The -- the first column represents the nine

18  months of actuals for fiscal '01.

19       The "Forecast" column represents two quarters

20  of actuals and the third quarter forecast for fiscal

21  '03, FY '01.

22    Q.  Okay.  So the left column refers to '01, but

23  has --

24    A.  Which column are you referring to?  Title,

25  please?

222

1    Q.  The "Year-to-date Q3 FY '00."

2    A.  That is nine months or three quarters of actual

3  results for fiscal 2000.

4    Q.  2000, okay.  Fair enough.

5       Okay.  If you go to the next page, 9826, we get

6  into the consulting side of it, and you have an upside

7  adjustment for OPI of, I think it's $2.5 million.

8       Did you employ the same process that you used

9  for license revenues to come to an upside -- withdrawn.

10       Did you apply the same process to consulting to

11  determine an upside that you applied to license

12  revenues?

13    A.  No, I did not.

14    Q.  Okay.  How did you determine upside for

15  consulting?

16    A.  This was generally provided to me by the field

17  finance organization, more likely than not represents a

18  correction to the forecast that they submitted.

19    Q.  Okay.  If you turn to 9828, this is referring

20  to support.  And there's some upside adjustments.

21       Did you employ the same process to support that

22  you applied to license revenues, to come up with -- come

23  up with these upside adjustments?

24    A.  No.  Again, on the support side, the global

25  support analyst would take a look at what they thought

223

1  the numbers were and provide us with input.

2      Q.  So your upside adjustments were primarily

3  focused on licensed revenues?

4      A.  That is correct, and making any corrections

5  that were necessary --

6      Q.  Okay.

7      A.  -- including expenses.

8      Q.  Can you -- can you turn to 9834.

9          What does this page represent?

10         And you can't read it, I know.  I'm just hoping

11  from your experience with these reports that you can

12  tell me what the page is about.

13     A.  This would represent the Q3 and Q4 forecast as

14  well -- so it's Q1 actuals, prior year, current year,

15  and growth; same for Q2; then it shows the Q3

16  forecast upside adjustments to get to the company's

17  consolidated forecast.  The forecast growth and

18  percentage growth.  And, similarly, we have the same for

19  Q4 --

20     Q.  Okay.

21     A.  -- to get to a full year number.

22     Q.  Okay.  Okay.  Turning to the next page, 39835,

23  this appears to be the upside report for January 12,

24  2001 --

25     A.  Uhm-hum.

224

1      Q.  -- am I right?

2      A.  Uhm-hum.

3      Q.  Okay.  All the way to the end of the document,

4  so 39835 through 39850 is the Upside Report dated

5  January 12th, 2001?

6      A.  It appears so.

7      Q.  And I don't think I asked you this question, so

8  I'll do it with this one.

9          If you go to the page that ends 9836, there's

10  the "Forecast Upside Potential" column?

11     A.  Uhm-hum.

12     Q.  If you go to the "Potential" column, and you go

13  all the way down to "Earnings Per Share" --

14     A.  Uhm-hum.

15     Q.  -- what does that number represent?

16     A.  That represents what we believe are EPS results

17  would be for the quarter.

18     Q.  Okay.  You can put that document --

19         I want to talk a little bit about the executive

20  management committee meetings.

21         How much of those meetings were dedicated to

22  forecasting?

23     A.  Larry Ellison would conduct the -- the

24  meetings, and he began every meeting by pulling the

25  sales VPs or EVPs by asking them to give us an update on

225

1  their forecast.

2      Q.  And how on a -- can you -- if you can give me

3  on a percentage basis how -- how much on a percentage

4  basis did forecasting occupy of the overall meeting?

5      A.  The -- forecast was a standing agenda item.

6  It primarily focused on the license forecast only.  And

7  as I testified earlier today, it depended on what agenda

8  items were on the agenda for any given EC meeting, so it

9  just depended on what was on the slate.

10     Q.  Okay.  And in terms of forecasting, what topics

11  were discussed during the executive committee meetings?

12     A.  Well, again, each EVP or SVP would talk about

13  their forecast in terms of the dollar value, the -- the

14  amount of growth, what margin attainment they were

15  anticipating on getting.  They would talk about

16  consulting as well.  And they would talk about large

17  deals, opportunities, or exciting opportunities if there

18  happen to be, let's say a deal that represented a

19  potential competitive win.

20     Q.  Okay.  Did they talk about the likelihood of

21  deals closing, percentage of closing -- withdrawn.

22         Did they talk about the likelihood of those

23  deals closing?

24     A.  In general, they, you know, always said what

25  the revenue number was, what the growth rate number, was

226

1  what the margin attainment was.  They would talk about

2  select deals within the forecast, as well as deals that

3  were not in their forecast upside deals.

4          And they would, you know, you know, depending

5  on the -- the flavor of the transaction, make various

6  comments with regards to those deals that they decided

7  to raise in the course of the meeting.

8      Q.  Did they talk about how comfortable they were

9  with the forecasts that they had at that -- at that

10  point in time?

11     A.  They would always indicate what their worst

12  case was, what their forecast commit was, and what their

13  upside was.

14     Q.  Okay.  And was there a discussion of where they

15  thought they were going to finish in terms of worst case

16  forecast or most likely?

17     A.  They would talk about --

18         MR. RUBENSTEIN:  Object to the form.

19         THE WITNESS:  They would talk about what their

20  forecast was and the fact that, you know, there would be

21  a portfolio of deals that were in the upside and not

22  forecasted; and, again, they would, you know, depending

23  on the nature of the deal, give an update as to the

24  status or the possibility of it closing in the quarter

25  or asking for, you know, maybe soliciting some executive

227

1  sponsorship from Jeff Henley, Safra Catz, or Larry to --
2  to ensure that certain deals got closed.
3      MR. BRITTON:  Q.  Did they talk about at all
4  how -- how firm they were in terms of meeting the
5  forecasted numbers?  I know we talked about the three
6  categories, but did anybody ever say, you know, "Larry,
7  I'm -- I'm sure I am going to meet my forecast number,"
8  or "Kind of sure I am going to meet my forecast number,"
9  any -- any feeling in terms of -- of the managers or the
10  VPs on what was really going to happen and how firm they
11  were with their forecasts?
12      A.  They weren't very sentimental.  You know,
13  they -- they were pretty matter of fact.  "This is worst
14  case.  This is my forecast.  This is upside.  If all the
15  stars align, you know, this is what I think I can do."
16      They never really -- you know, if they felt
17  that they weren't going to meet their forecast, they
18  would have changed their forecast at the meeting.
19      (Whereupon, Plaintiffs' Exhibit 25 was
20  marked for identification.)
21      MR. BRITTON:  Q.  Okay.  I'm placing in front
22  of you what's been marked as Exhibit 25.  Take a moment
23  to review this exhibit.
24      For the record, Exhibit 25 starts with Bates
25  3944 and ends at 3956.

1      Q.  Do you recognize Exhibit 25?
2      A.  Yes, I -- I recognize the -- the exhibit.
3      Q.  And what is it?
4      A.  Well, it's a three-year forecast.  Generally,
5  we did a five-year forecast.  I don't know why this was
6  limited to just three, but it was part of the modeling
7  that we liked to do at the corporate FPNA group.
8      Q.  Okay.  And were you involved in --
9      THE REPORTER:  At the corporate what?  I'm
10  sorry.
11      THE WITNESS:  FPNA group.
12      MR. BRITTON:  Q.  Were you involved in
13  preparing this document?
14      A.  I would have been involved in terms of
15  providing input to the -- to the -- to the assumptions
16  and whatnot.
17      Q.  Okay.  And what is the -- what was the purpose
18  of preparing a three-year or a five-year forecast?
19      A.  Just overall strategic financial planning.
20      Q.  Okay.  And how -- what was the process --
21  withdrawn.
22      What were the assumptions that were used to
23  prepare, you know, such a lengthy forecast?
24      A.  Well, I don't recall exactly the process that
25  we had employed at the time, but Ivgen and I would model

1  what we thought the growth rates would be.
2      Q.  And --
3      A.  And we would often talk to the various finance
4  individuals supporting the business units to get their
5  thoughts on what they thought about the growth rates and
6  the margin targets that we were using, and it's also
7  quite possible that we spoke with some of the business
8  unit leaders themselves.
9      Q.  Okay.  Did Mr. Henley or Mr. Ellison use this
10  three-year or five-year forecast -- withdrawn.
11      Did Mr. Henley or Mr. Ellison use this
12  three-year forecast for any purpose?
13      A.  I do not recall the purpose for generating this
14  package at this point in time.
15      Q.  Okay.
16      A.  We -- we -- we would generally -- I shouldn't
17  say generally.  We, in the past, have prepared, you
18  know, future year forecasts for presentations to the
19  board that Jeff would present to the board.
20      Q.  Okay.  You can put that document aside.
21      (Whereupon, Plaintiffs' Exhibit 26 was
22  marked for identification.)
23      MR. BRITTON:  Q.  Okay.  I placed in front of
24  you what's been marked as Exhibit 26.  Take a moment to
25  look at this one.

1      And the beginning Bates is 8755, and the ending
2  Bates is 8776.
3      Do you recognize Exhibit 26?
4      A.  Yes, I do.
5      Q.  Okay.  And this -- is this one of the documents
6  we were talking about earlier that came out of OFA?
7      A.  This is a report that would have been generated
8  out of OFA and was the basis for creating the upside
9  reports or the company's forecast reports.
10      Q.  And who at Oracle received these management
11  summaries?
12      A.  I don't believe they were distributed.  I
13  believe that they were used by the internal corporate
14  FPNA group to prepare the upside reports.
15      Q.  Going back to the executive committee meetings,
16  the -- the upside reports that were given to Mr. Henley
17  and Mr. Ellison and the others, were those reports
18  collected at the end of the meeting?
19      A.  Yes.
20      Q.  And why was that?
21      A.  Because we did not want anyone to leave a
22  forecast report, take it back to their office, leave it
23  on their desk, have their secretary walk in, or somebody
24  else walk into their office and see what the quarterly
25  forecast numbers and expected EPS numbers were,

1  et cetera.
2  Q. Okay. And who --
3  A. We were protecting them from themselves.
4  Q. Who was -- who was responsible for ensuring
5  that every report that was passed out was returned?
6  A. Yours truly.
7  Q. And you made sure every time that you had the
8  exact number of reports that were handed out?
9  A. Jeff would keep his, and Safra at times would
10  keep hers. Larry would never keep it.
11  Q. Okay. Okay. You can put that document aside.
12  I want to talk briefly about Oracle's earnings
13  releases and SEC filings.
14  Were you involved at all in that process?
15  A. Absolutely.
16  Q. Okay. Now, from a forecasting standpoint, can
17  you describe the process that Oracle employed to come up
18  with the guidance that Oracle gave to the street in
19  terms of earnings per share?
20  A. It was no different than the weekly forecast
21  process, the beginning of -- you know, we would close
22  our books, and during the second week of the first
23  quarterly -- sorry, of the first month of the subsequent
24  quarterly, the field would submit their forecasts. We
25  would review the pipeline conversion analyses. Jeff and

1  I would meet with my directs and find out about, you
2  know, how the results were for the quarter, talked a bit
3  about the forecast, get their thoughts on it, and we
4  would, you know, formulate a -- we would produce an
5  upside report that was used to set expectations for the
6  street.
7  Q. Okay. And how -- from the time that Jeff
8  received the upside report, how did -- how did you or
9  how did Mr. Henley determine what was the guidance that
10  was going to be given to the street?
11  A. Well, Jeff would have conversations and
12  dialogue again with my directs. I'm sure he also had
13  conversations with the other sales EVPs, but, you know,
14  ultimately, I'm sure he also spoke with Larry and/or
15  Safra to talk about how they should set expectations for
16  the quarter based on the forecast that was prepared by
17  my group.
18  Q. Okay. Were you involved in any discussions in
19  what issues or what -- or what topics they discussed to
20  determine what to give to the street versus what was in
21  the upside report?
22  A. I don't understand your question.
23  Q. You testified that -- that Mr. Henley would
24  talk to Mr. Ellison, who would talk to Safra about
25  determining exactly what guidance to give to the street.

232

233

1  Were you involved in any of those
2  conversations?
3  A. He would have conversations directly with them.
4  I was not necessarily involved in those conversations.
5  I may have been at one point, but generally speaking,
6  when he spoke to Larry, he spoke to Larry one on one.
7  Q. Can you explain the rounding process that
8  Oracle used for purposes of reporting to the street, his
9  expectations?
10  A. There was no, quote, rounding process for
11  purposes of reporting expectations to the street.
12  Q. Okay. If -- if your upside report said that
13  the results were going to be 11.25, what would be the
14  number that Oracle would discuss with analysts or with
15  the street?
16  MR. RUBENSTEIN: Object to the form.
17  MR. BRITTON: Q. You can answer.
18  A. Generally speaking, the forecast that we
19  produced was the basis for determining what EPS numbers
20  that we would set for the street.
21  Q. Okay.
22  A. So if it was 11.25, more likely than not, we
23  would have used 11 cents.
24  Q. You would have rounded down?
25  A. Absolutely.

1  Q. Okay. So it was --
2  A. We would have been more conservative.
3  Q. If it was 11.52, you would have rounded up?
4  A. Not necessarily. We may have been more
5  conservative.
6  Q. And rounded down?
7  A. That -- that's correct.
8  MR. BRITTON: Okay. Can we take a -- five
9  minutes real quick, and see if I have anything to follow
10  up with?
11  MR. RUBENSTEIN: All right. Yeah. Let's --
12  let's try to --
13  MR. BRITTON: -- let's not anybody go anywhere.
14  THE VIDEOGRAPHER: Going off the record. The
15  time is 5:27.
16  (Recess taken.)
17  THE VIDEOGRAPHER: Going back on record. The
18  time is 5:33.
19  MR. BRITTON: Q. When Oracle issues its
20  guidance to the street, it separates applications growth
21  from database growth; is that fair?
22  A. You know, I -- I --
23  MR. RUBENSTEIN: You are talking about during
24  the relevant period.
25  THE WITNESS: During the relevant period, we

234

235

Minton, Jennifer (30b6)  4/21/2005  9:00:00 AM

1   did.

2       MR. BRITTON:  Q.  Were you involved in the

3   process of giving the street guidance on allocations

4   growth versus database growth?

5       A.  Again, the -- those numbers would have been

6   predicated on the forecast package that I would prepare.

7       Q.  The upside report.

8       A.  The upside reports.

9       Q.  Okay.  And then the same process for

10  determining what to give the street would occur?  Jeff

11  would talk to you, would talk to -- to Larry and Safra

12  and make the decision on what to give to the street?

13      A.  Yes.

14      Q.  Okay.  And going back to the rounding question.

15      Did you -- did you ever discuss that issue with

16  Jeff Henley or Larry Ellison, rounding numbers to give

17  to the street?

18      MR. RUBENSTEIN:  Objection to the form.

19      THE WITNESS:  Whether -- can you repeat the

20  question, please.

21      MR. BRITTON:  Q.  Did you ever discuss the

22  issue of rounding Oracle's results with respect to the

23  guidance to give to the street?

24      MR. RUBENSTEIN:  Objection to the form.  You --

25  you talked both about the results and guidance.

236

1       MR. BRITTON:  All right.  Withdrawn.

2       Q.  Did you ever discuss the issue of rounding with

3   Larry Ellison or Jeff Henley?

4       A.  I don't believe I ever had a discussion with

5   Larry Ellison about rounding.

6       Q.  Okay.  Did you ever have a discussing with --

7   discussion with Mr. Henley?

8       A.  It's possible, but I don't recall.

9       Q.  You don't remember.

10      MR. BRITTON:  Okay.  I have no further

11  questions.

12      THE VIDEOGRAPHER:  Any questions on your side?

13      MR. RUBENSTEIN:  No, no questions.  And we'll

14  reserve signature.

15      THE VIDEOGRAPHER:  In the deposition of

16  Jennifer Minton, this marks the end of Tape 4, Volume I.

17  Going off the record.  The time is 5:35.

18      MR. BRITTON:  Thank you very much for your

19  time.  I appreciate it.

20          ---oOo---

21      (Whereupon, the deposition was concluded

22      at 5:35 P.M.

23

24

25  Dated:_____  Signed:_____

237

1           REPORTER'S CERTIFICATE

2       I hereby certify that the foregoing is a true

3   record of the testimony as reported to the best of my

4   ability by me, a duly certified shorthand reporter and a

5   disinterested person, and was tghereafter transcribed

6   under my direction into typewriting by computer.

7

8       I FURTHER CERTIFY that I am not interested in the

9   outcome of the said action and not connected with nor

10  related to any of the parties in said action or their

11  respective counsel.

12

13

14

15  Dated:  May 4, 2005

16

17      _____

        SANDRA L. CARRANZA, CSR No. 7062

18

19

20

21

22

23

24

25

238

1          REPORTER'S CERTIFICATE

2          I hereby certify that the foregoing is a true

3     record of the testimony as reported to the best of my

4     ability by me, a duly certified shorthand reporter and a

5     disinterested person, and was tghereafter transcribed

6     under my direction into typewriting by computer.

7

8          I FURTHER CERTIFY that I am not interested in the

9     outcome of the said action and not connected with nor

10    related to any of the parties in said action or their

11    respective counsel.

12

13

14

15    Dated:   May 4, 2005

16

17           SANDRA L. CARRANZA,  CSR No. 7062

18

19

20

21

22

23

24

25

239

# EXHIBIT B

Minton, Jennifer (30b6)  7/7/2006  9:01:00 AM

```
1        IN THE UNITED STATES DISTRICT COURT
2        NORTHERN DISTRICT OF CALIFORNIA
3                 ---oOo---
4
5
6    In re ORACLE CORPORATION
     SECURITIES LITIGATION
7            FILE NO. C-01-0988-MJJ
8    This Document Relates To:
     _____/
9
10
11            CONFIDENTIAL
12    DEPOSITION OF JENNIFER MINTON
13        Friday, July 7, 2006
14
15    SHEILA CHASE & ASSOCIATES
16        REPORTING FOR:
17      LiveNote World Service
18    221 Main Street, Suite 1250
19    San Francisco, California 94105
20     Phone: (415) 321-2311
21      Fax: (415) 321-2301
22
23
24   Reported by:
25   ANDREA M. IGNACIO HOWARD, RPR, CSR NO. 9830
```

1

```
1          I N D E X
2    DEPOSITION OF JENNIFER MINTON
3              PAGE
4    EXAMINATION BY MR. BRITTON        10
5             ---oOo---
6
7          E X H I B I T S
8
9    EXHIBIT    DESCRIPTION         PAGE
10   Exhibit 27  Affidavit of Jennifer Minton    23
11   Exhibit 28  Bates NDCA-ORCL 100911 - 12     57
12   Exhibit 29  Depo of Jennifer Minton Vols. I & II 74
13   Exhibit 30  Bates NDCA-ORCL 299724 - 831    92
14   Exhibit 31A Bates NDCA-ORCL 202815 - 821    102
15   Exhibit 31B Bates NDCA-ORCL 202995 - 998    102
16   Exhibit 32  Bates NDCA-ORCL 203681 - 83     107
17   Exhibit 33  Bates NDCA-ORCL 154450 - 51     120
18   Exhibit 34  Bates NDCA-ORCL 399742 - 752    127
19   Exhibit 35A Bates NDCA-ORCL 014028 - 30     136
20   exhibit 35B Bates NDCA-ORCL 014031 - 34     136
21   Exhibit 35C Bates NDCA-ORCL 014038 - 40     136
22   Exhibit 36  Bates NDCA-ORCL 041967 - 69     145
23   Exhibit 37  Bates NDCA-ORCL 061390 - 405    176
24   Exhibit 38  Bates NDCA-ORCL 119340 - 44     186
25   Exhibit 39  Ellison's Compendium of Exhibits 200
```

2

```
1          E X H I B I T S
2           (Continued.)
3    DEPOSITION OF JENNIFER MINTON
4
5    EXHIBIT    DESCRIPTION         PAGE
6
7    Exhibit 40  Bates NDCA-ORCL 611565 - 67       230
8    Exhibit 41  E-mail Bates NDCA-ORCL 03420      239
9    Exhibit 12  Financial Report ORCL 0001374 - 1385  96
10   Exhibit 21  Financial Report ORCL 0003003 - 17  197
11   Exhibit 22  Financial Report ORCL 0002986 - 3002 197
12   Exhibit 23  Financial Report ORCL 0003018 - 31  198
13   Exhibit 24  Financial Report ORCL 0003187 - 203 198
14   Exhibit 25  Financial Report ORCL 0003341 - 57  232
15   Exhibit 54B Financial Report ORCL 0009424 -     96
16      00094246 & 9548
17   Exhibit 60  Financial Report Q3 FY01         43
18   Exhibit Financial Report Index FR1 - FR34    268
19   Exhibit FR1  Financial Report ORCL 0122069 - 79  268
20   Exhibit FR2  Financial Report ORCL 0122080 - 90  268
21   Exhibit FR3  Financial Report ORCL 0122091 - 101 268
22   Exhibit FR4  Financial Report ORCL 0122102 - 12  268
23   Exhibit FR5  Financial Report ORCL 0122125 - 36  268
24   Exhibit FR6  Financial Report ORCL 0122149 - 60  268
25   Exhibit FR7  Financial Report ORCL 0122161 - 72  268
```

3

```
1          E X H I B I T S
2           (Continued.)
3    DEPOSITION OF JENNIFER MINTON
4
5    EXHIBIT    DESCRIPTION         PAGE
6    Exhibit FR8  Financial Report ORCL 0122186 - 99  268
7    Exhibit FR9  Financial Report ORCL 0122200 - 213 268
8    Exhibit FR10 Financial Report ORCL 0122228 - 41  268
9    Exhibit FR11 Financial Report ORCL 0122256 - 70  268
10   Exhibit FR12 Financial Report ORCL 0001374 - 85  268
11   Exhibit FR13 Financial Report ORCL 0001546 - 57  268
12   Exhibit FR14 Financial Report ORCL 0001649 - 63  268
13   Exhibit FR15 Financial Report ORCL 0001863 - 79  268
14   Exhibit FR16 Financial Report ORCL 0122302 - 16  268
15   Exhibit FR17 Financial Report ORCL 0122332 - 48  268
16   Exhibit FR18 Financial Report ORCL 0002529 - 45  268
17   Exhibit FR19 Financial Report ORCL 0002665 - 81  268
18   Exhibit FR20 Financial Report ORCL 0002810 - 26  268
19   Exhibit FR21 Financial Report ORCL 0003003 - 17  268
20   Exhibit FR22 Financial Report ORCL 0002986 - 3002 268
21   Exhibit FR23 Financial Report ORCL 0003018 - 31  268
22   Exhibit FR24 Financial Report ORCL 0003187 - 203 268
23   Exhibit FR25 Financial Report ORCL 0003341 - 57  268
24   Exhibit FR26 Financial Report ORCL 0003548 - 64  268
25   Exhibit FR27 Financial Report ORCL 0003608 - 24  268
```

4

Minton, Jennifer (30b6)  7/7/2006  9:01:00 AM

1            E X H I B I T S
2             (Continued.)
3         DEPOSITION OF JENNIFER MINTON
4
5      EXHIBIT    DESCRIPTION          PAGE
6   Exhibit FR28 Financial Report ORCL 0003746 - 77   268
7   Exhibit FR29 Financial Report ORCL 0003912 - 28   268
8   Exhibit FR30 Financial Report ORCL 0004120 - 32   268
9   Exhibit FR31 Financial Report ORCL 0004086 - 102   268
10  Exhibit FR32 Financial Report ORCL 0004258 - 74   268
11  Exhibit FR33 Financial Report ORCL 0108609 - 25   268
12  Exhibit FR34 Financial Report ORCL 0004410 - 26   268
13  Exhibit Financial Report Index FR35 - FR53       268
14  Exhibit FR35 Financial Report ORCL 0003086 - 95   268
15  Exhibit FR36 Financial Report ORCL 0003440 - 49   268
16  Exhibit FR37 Financial Report ORCL 0003829 - 37   268
17  Exhibit FR38 Financial Report ORCL 0020254 - 55   268
18  Exhibit FR39 Financial Report ORCL 0020260 - 62   268
19  Exhibit FR40 Financial Report ORCL 0020825 - 28   268
20  Exhibit FR41 Financial Report ORCL 0020831 - 33   268
21  Exhibit FR42 Financial Report ORCL 0020855 - 56   268
22  Exhibit FR43 Financial Report ORCL 0022145 - 46   268
23  Exhibit FR44 Financial Report ORCL 0022147 - 49   268
24  Exhibit FR45 Financial Report ORCL 0022150 - 51   268
25  Exhibit FR46 Financial Report ORCL 0022152 - 53   268

5

1            E X H I B I T S
2             (Continued.)
3         DEPOSITION OF JENNIFER MINTON
4
5      EXHIBIT    DESCRIPTION          PAGE
6   Exhibit FR47 Financial Report ORCL 0022154  - 55  268
7   Exhibit FR48 Financial Report ORCL 0022156       268
8   Exhibit FR49 Financial Report CA-ORCL 022373 - 471 268
9   Exhibit FR50 Financial Report CA-ORCL 022472 - 567 268
10  Exhibit FR51 Financial Report CA-ORCL 022568 - 75  268
11  Exhibit FR52 Financial Report ORCL 0009188  - 298 268
12  Exhibit FR53 Financial Report ORCL 0009301  - 415 268
13  Exhibit Financial Report Index FR54 - FR58       268
14  Exhibit FR54 Financial Report ORCL 0009424 - 548  268
15  Exhibit FR55 Financial Report ORCL 0009549 - 674  268
16  Exhibit FR56 Financial Report ORCL 0009675 - 800  268
17  Exhibit FR57 Financial Report ORCL 0009801 - 937  268
18  Exhibit FR58 Financial Report ORCL 0009938 - 10063 268
19  Exhibit Financial Report Index FR59 - FR63       268
20  Exhibit FR59 Financial Report ORCL 0010064 - 189  268
21  Exhibit FR60 Financial Report ORCL 0010190 - 308  268
22  Exhibit FR61 Financial Report ORCL 0010323 - 472  268
23  Exhibit FR62 Financial Report ORCL 0010473 - 631  268
24  Exhibit FR63 Financial Report ORCL 0010632 - 792  268
25  Exhibit Financial Report Index FR64 - FR76       268

6

1            E X H I B I T S
2             (Continued.)
3         DEPOSITION OF JENNIFER MINTON
4      EXHIBIT    DESCRIPTION          PAGE
5   Exhibit FR64 Financial Report ORCL 0023006 - 80   268
6   Exhibit FR65 Financial Report ORCL 0023081 - 156   268
7   Exhibit FR66 Financial Report ORCL 0023157 - 221   268
8   Exhibit FR67 Financial Report ORCL 0023222 - 298   268
9   Exhibit FR68 Financial Report ORCL 0003054 - 75   268
10  Exhibit FR69 Financial Report ORCL 0003204 - 225   268
11  Exhibit FR70 Financial Report ORCL 0003450 - 71   268
12  Exhibit FR71 Financial Report ORCL 0003669 - 90   268
13  Exhibit FR72 Financial Report ORCL 0018301 - 22   268
14  Exhibit FR73 Financial Report ORCL 0004006 - 27   268
15  Exhibit FR74 Financial Report ORCL 0004193 - 214  268
16  Exhibit FR75 Financial Report ORCL 0004291 - 312  268
17  Exhibit FR76 Financial Report ORCL 0004489 - 510  268
18
19           E X H I B I T S
20      (Previously marked and referenced.)
21  Exhibit Winton 39 NDCA-ORCL 131788 - 89
22  Exhibit Winton 43 NDCA-ORCL 512306 - 08
23  Exhibit Winton 49 NDCA-ORCL 03419
24  Exhibit Classik 3 Business (OPS) Review Q2FY01
25  Exhibit Nugent 28 NDCA-ORCL 096760 - 787

7

1   BE IT REMEMBERED that on Friday, July 7, 2006,
2   commencing at the hour of 9:01 a.m., thereof, at the
3   offices of Lerach, Coughlin, Stoia, Gellar, Rudman &
4   Robbins, LLP, 100 Pine Street, Suite 2600,
5   San Francisco, California, before me,
6   ANDREA M. IGNACIO HOWARD, CSR, RPR, a Certified
7   Shorthand Reporter for the State of California,
8   personally appeared
9        JENNIFER MINTON,
10  called as a witness by the Plaintiffs herein, who,
11  being by me first duly sworn, was thereupon examined
12  and testified as hereinafter set forth.
13           ---oOo---
14  Appearing as counsel on behalf of Plaintiffs:
15     LERACH, COUGHLIN, STOIA, GELLAR, RUDMAN &
        ROBBINS
16     BY:  DOUGLAS R. BRITTON, Esq.
            GAVIN M. BOWIE, Esq.
17     100 Pine Street, Suite 2600
        San Francisco, California  94111
18     (415)  288-4545
        dbritton@lerachlaw.com; gbowie@lerachlaw.com
19
20  Appearing as counsel on behalf of Defendants:
21     LATHAM & WATKINS, LLP
        BY:  PETER A. WALD, Esq.
22          MICHELE F. KYROUZ, Esq.
        505 Montgomery Street, Suite 2000
23     San Francisco, California 94025
        (415)  391-0600
24     peter.wald@lw.com; michele.kyrouz@lw.com
25
    Also present:  James Terrell, Videographer.

8

1    THE VIDEOGRAPHER:  This begins the videotaped
2    deposition of Jennifer Minton, tape one, Volume I, in
3    the matter entitled In Re Oracle Corporation
4    Securities Litigation.  Filed in the United States
5    District Court for the Northern District of
6    California.  Master File No. C-01-0988-MJJ.
7        Today's date is July 7, 2006.  The time on
8    the video monitor is 9:01.
9        The video operator today is James Terrell
10   representing LiveNote World Service, located at
11   221 Main Street, Suite 1250, in San Francisco,
12   California 94105.  The phone number is (415) 321-2300.
13       The court reporter is Andrea Howard of
14   Sheila Chase & Associates, reporting on behalf of
15   LiveNote World Service.
16       Today's deposition is being taken on behalf
17   of plaintiff.  It's taking place on 100 Pine Street,
18   San Francisco, California.
19       If counsel will now please introduce
20   yourselves and whom you represent.
21       MR. BRITTON:  Doug Britton with Lerach,
22   Coughlin on behalf of plaintiffs, and with me today is
23   Gavin Bowie.
24       MR. WALD:  Peter Wald and Michele Kyrouz from
25   Latham & Watkins on behalf of the defendants and the

9

1    witness.
2        THE VIDEOGRAPHER:  Thank you.
3        The reporter may now swear the witness.
4
5        JENNIFER MINTON,
6    having been sworn as a witness, testified as follows:
7
8        EXAMINATION
9        BY MR. BRITTON:  Q.  Good morning,
10   Ms. Minton.
11       A   Good morning.
12       Q   Can you tell me what you did to prepare for
13   your deposition today?
14       A   I met with the attorneys on Monday and on
15   Wednesday for three to four hours on each day.
16       Q   So a total of six to eight hours meeting with
17   your attorneys?
18       A   That would be approximately correct.
19       Q   Okay.  Outside of meeting with your
20   attorneys, did you do anything else to prepare for
21   your deposition today?
22       A   I reviewed my prior testimony.
23       Q   You've testified a number of times in
24   connection with the events surrounding this lawsuit
25   and the derivative lawsuit, so we'll go one by one.

10

1    Which testimony did you review?
2        A   I believe I reviewed both testimonies --
3        Q   Okay.
4        A   -- with the exception of -- in terms of the
5    derivative, there were two days of testimony, those
6    two.  I did not review the testimony related to the
7    first time I was here.
8        Q   Okay.
9        MR. WALD:  Let's refer to that as the
10   30(b)(6) deposition.
11       BY MR. BRITTON:  Yes.
12       Q   You understand that the testimony in this
13   case about a year ago, we'll refer to as the 30(b)(6)
14   testimony?  Do you understand that?
15       A   Do I understand that it's referred to as
16   30 (b)?
17       Q   Yes.
18       A   Yes, I do.
19       Q   Okay.  So if I say -- if I reference the
20   30(b)(6) testimony, you'll know that I'm talking about
21   the deposition that you gave in this case earlier last
22   year?
23       A   Yes.
24       Q   Okay.  Did you review anything else in
25   preparation for your deposition outside of your

11

1    meetings with your lawyers?
2        A   No.
3        Q   Okay.  Did you --
4        A   I take that back.  I did review some
5    additional data, some e-mails, and some
6    transaction-level details.
7        Q   Okay.  Take it one by one.
8        The e-mails, which e-mails did you review?
9        A   I reviewed an e-mail between Sarah Kopp and
10   myself.
11       Q   Any other e-mails?
12       A   Outside of meeting with counsel?
13       Q   Uh-huh.
14       A   No.
15       Q   Okay.  What -- what was it about that e-mail
16   that caused you to review it in preparation for your
17   deposition, outside of your meeting with your lawyers?
18       A   I was -- it wasn't that particular e-mail.  I
19   was just rummaging through and saw the e-mail, looked
20   at it, moved on.
21       Q   Okay.  What were you rummaging through?
22       A   Binders that they had prepared for my
23   deposition.
24       Q   When you say "they," you mean your lawyers?
25       A   That would be correct.

12

**Page 13**

1   Q   Any other e-mails that you can think of?
2   A   Nope.
3   Q   All right.
4       The transaction-level detail, what was that?
5   A   I believe they refer to it as a script.
6   Q   And can you describe that in more detail?
7   What's a "script"?
8   A   It was an example of a transaction.
9   Q   What transaction?
10  A   I do not recall.
11  Q   Okay.  Who prepared the script?
12  A   I'm not certain who prepared it.
13  Q   Okay.  What was the subject matter of the
14  script?  What was in it?
15  A   It was a transaction related to an invoice.
16  Q   Okay.  What was the discussion about any of
17  the script?  Do you have any recognition of
18  accounting, forecasting?  What were the subject
19  matters covered in the script?
20  A   It was -- there was no -- it wasn't a script,
21  per se.  It was an output --
22  Q   Okay.
23  A   -- of a program script.
24  Q   Oh, okay.  I understand.
25      Okay.  What types of information was in the

**Page 14**

1   program script?
2   A   I was reading an example of one of the
3   outputs.
4   Q   Okay.  I don't understand what the output is.
5   Can you describe it more?
6   A   It itemized the activity related to a
7   transaction.
8   Q   And what was the transaction about?  Is it a
9   sale of software?  Was it an accounting entry?  What
10  was the subject matter of the transaction?
11  A   It was a sale of support renewals, I believe.
12  Q   Okay.  And you don't remember the customer?
13  A   No, I do not.
14  Q   Was it for one customer?
15  A   Just one customer.
16  Q   All right.
17      Aside from the e-mails and the transaction
18  level detail, did you review any other documents
19  outside of the presence of your attorneys?
20  A   You failed to mention that I had looked at my
21  deposition.
22  Q   Okay.  Outside of that, did you --
23  A   No.
24  Q   -- review anything else?
25  A   No.

**Page 15**

1   Q   All right.
2       Did you review any documents in your meetings
3   with your lawyers?
4   A   Yes.
5   Q   Okay.  Before I go there, which lawyers were
6   present during the Monday meeting?
7   A   Michele, and, I'm sorry, I don't remember the
8   other guy's name,.
9   Q   Kyra?
10  A   That would be correct.
11  Q   Okay.  What about the Wednesday meeting?
12  A   The same two lawyers were present.
13  Q   All right.
14      Did any of the documents that you reviewed
15  with your lawyers refresh your recollection about
16  anything that happened back in the 2000, 2001 time
17  period?
18  A   It basically enabled me to recall the general
19  time frame.
20  Q   Okay.  Were there any specific documents that
21  you can think of that refreshed your memory about
22  specific events?
23  A   I looked at our upside reports for the
24  Q3 quarter, so it brought me back to that time period.
25  Q   Did you review any e-mails during any of

**Page 16**

1   these meetings?
2   A   Yes, I did.
3   Q   Okay.  Did any of those e-mails refresh your
4   memory about events that happened back in the 2000,
5   2001 time period?
6   A   Again, in general, just brought me back to
7   that time period.
8   Q   Okay.  Did any specific e-mail refresh your
9   recollection about anything in particular that enabled
10  you to remember what happened during that time period?
11  A   Can you be more specific?
12  Q   Yeah.
13      Did you take a look at an e-mail and say "Oh,
14  I remember that"?
15  A   It brought my recall back a bit, but I didn't
16  really actually remember.
17  Q   Okay.  In general, you --
18  A   It's been quite a while.
19      In general, you remembered what happened, but
20  the specific e-mails you didn't say, "Oh, I remember
21  that happening"?
22  A   That would be correct.
23  Q   Okay.  Did you speak to anybody, other than
24  your lawyers, about your deposition today?
25  A   I spoke to my boss and informed her that I

1  would be up here today.

2  Q  Safra Catz?

3  A  That would be correct, as well as notifying a

4  few of my directs that I would not be in the office,

5  as well as our outside auditors.

6  Q  You notified them the same thing, "I won't be

7  in the office"?

8  A  That is correct.

9  Q  How did you notify Safra Catz that you were

10  having your deposition taken?

11  A  We had an audit committee meeting after, and

12  I -- after the audit committee meeting, I informed her

13  that I would not be in the office today, as I was

14  going to be taking my deposition.

15  Q  Okay.  And did she say anything to you in

16  response?

17  A  Okay.

18  Q  Say anything substantive?

19  A  No.

20  Q  Okay.  First time we were together we talked

21  about the forecasting process at Oracle, I want to

22  kind of just generally go through that.  I don't want

23  to duplicate what we've already done, but you

24  mentioned upside reports, and I just want to get a

25  clear idea of what you mean by the upside reports.

17

1  Can you tell me what those are?

2  A  The upside reports represent the forecast for

3  the current quarter.

4  Q  And they -- am I right to say that they have

5  a forecast column, an upside column, and a potential

6  column?

7  A  That is correct.

8  Q  Okay.  And what is your understanding of what

9  the forecast column represents?

10  A  The forecast column represents the forecast

11  that was submitted by the field organizations.

12  Q  Have you ever heard of the term "commit --"

13  A  Yes.

14  Q  -- in connection with Oracle's forecasting?

15  A  Yes.

16  Q  Okay.  Is it fair to say that the forecast

17  column in the upside reports represented the commit

18  number for the field?

19  A  That would be one phrase that they would use.

20  Q  Okay.  And how did you understand that

21  phrase, or what did that phrase mean to you when they

22  used it?

23  A  That that was what their forecast was.

24  Q  Okay.

25  A  Effectively, they felt that they could

18

1  deliver that forecast at a minimum.

2  Q  The criteria -- let's get a little

3  preliminary.

4  I'll be talking primarily about the 2000,

5  2001 time period.  So most of my questions will,

6  unless I say otherwise, will cover or be during that

7  time period; is that okay?

8  A  Fiscal 2000 and fiscal 2001?

9  Q  Yes.

10  A  Okay.

11  Q  Okay.  And then when I use the term "class

12  period," I mean December 1st, 2000, to February 28,

13  2001; do you understand that?

14  A  Q3?

15  Q  Yes, Q3 of fiscal 2001; is that yes?

16  A  That's correct.

17  Q  Okay.  Did the criteria for the forecast

18  column ever change during the 2000, 2001 time period?

19  A  Not that I recall.

20  Q  Okay.  Then on the upside reports, you had an

21  upside column?

22  A  That is correct.

23  Q  Okay.  And is it fair to say that that

24  represented your management judgment or your judgment

25  on what to add on top of the field?

19

1  A  The upside column was used to make any

2  corrections to the forecast.  Those corrections could

3  represent more current information that was received

4  from the field organizations.

5  For example, if the field finance individual

6  responsible for submitting the forecast entered in a

7  wrong number, they would contact us and advise us that

8  the wrong number was in the system.

9  So we would use that column to make those

10  types of corrections.  Or if their forecast changed,

11  depending on more recent events, we would use it to

12  make those corrections.  And, in addition, it was used

13  to reflect management judgment.

14  Q  Okay.  You said if their forecast changed you

15  would use the upside column to reflect that change; is

16  that right?

17  A  That is correct.

18  Q  Under what circumstances would the forecast

19  change go into the upside versus the forecast column?

20  A  If the forecast was submitted on a Wednesday

21  and a deal that they did not have in their forecast

22  closed on a Friday, they might notify me -- and I am

23  giving you a hypothetical situation -- but they might

24  notify me that a deal closed, and therefore they were

25  going to bring up their forecast.

20

Page 21

1    Q  Okay.  So you would adjust that up in your
2  upside?
3    A  That would be correct.
4    Q  Okay.  And the subsequent forecasting period,
5  would it be reflected in the change in the forecast
6  number in your upside going down?
7    A  It would then -- logically, they would change
8  their submitted forecast, and I would have changed the
9  upside accordingly so as to not do double count.
10    Q  You mentioned that they might notify me that
11  a deal closed and they were going to bring up their
12  forecast.  Did deal closings affect the forecast
13  throughout the quarter?
14    A  Yes.
15    Q  How did it do so?
16    A  In a couple of different ways.  If the deal
17  was not in their forecast, then they might therefore
18  increase their forecast, because it was upside in
19  their mind that was now cemented.
20    Q  Okay.  That's fair.
21       The upside adjustments, can you tell me
22  during the 2000, 2001 time period how Mr. Henley was
23  involved in this those adjustments, if at all?
24    A  With the exception of when I was not -- when
25  I was -- I was out on medical leave during fiscal

Page 22

1  2000, and part of 2001, so I cannot speak to that time
2  period.  But generally speaking, I would look at
3  pipeline reports, upside reports.
4       Sorry, not upside, but pipeline reports that
5  would impute upside based on prior year historical
6  conversion ratios.  And using that data, as well as
7  other information that I had gathered, whether most
8  likely through conversations or forecast calls, I
9  would make adjustments to the upside report.  And, at
10  times, I would review my rationale for the upside
11  reports or for my upside amounts with Jeff prior to an
12  EC meeting.
13    Q  Did you do this frequently?
14    A  I can't say it was a consistent practice.
15    Q  Okay.  Did you review the upside adjustment
16  with Mr. Henley before finalizing the upside report,
17  or was it after you had already finalized the report?
18    A  If I had reviewed it with Henley and we had
19  concluded that -- jointly -- that maybe the upside was
20  not sensible based on the information that we had, I
21  would adjust it before finalizing it, but again that
22  was very infrequent.
23    Q  Can you tell me how many times that happened
24  in the fiscal 2000 and 2001 time period?
25    A  I can only vaguely recall one time period,

Page 23

1  one time.
2    Q  All right.
3       Can you tell me how Mr. Ellison was involved
4  in the upside adjustments during the fiscal 2000, 2001
5  time period, if at all?
6    A  He was not involved in preparing the upside
7  report.
8    Q  Okay.  Then finally the potential column in
9  the upside report, that was a combination of the
10  forecast column and the upside column which would get
11  you to the potential column; is that right?
12    A  That is correct.
13    Q  And would it be fair to characterize the
14  potential column as the company's forecast?
15    A  That is correct.
16    Q  Let's get the --
17       (Document marked Exhibit No. 27
18       for identification.)
19    BY MR. BRITTON:  For the record, I am marking
20  these exhibits consecutive order with the 30(b)(6)
21  deposition, because they marked the 30(b)(6) exhibits
22  as Minton 1 through 26.
23    Q  We've placed in front of you what's been
24  marked as Minton Exhibit 27.  Will you take a moment
25  to look at this exhibit.

Page 24

1       For the record, Exhibit 27 starts at Bates
2  NDCA-ORCL 611413 and ends at 428, and the title of the
3  document is "Affidavit of Jennifer Minton in Support
4  of Motion for Summary Judgment."
5    MS. KYROUZ:  Is that going to be marked --
6    MR. BRITTON:  Yeah.  It's the same document.
7  It looks like the one I prepared for this.
8    MR. WALD:  For the record, the document that
9  we have is A186 through A201.  Is that the --
10    MR. BRITTON:  Yes, that's the same copy.
11    MS. KYROUZ:  You can just refer to it by
12  paragraph number in the affidavit.
13    BY MR. BRITTON:  Of course.  Of course.
14    Q  Have you had a chance to look at Exhibit 27?
15    A  Yes.
16    Q  Do you recognize it?
17    A  Yes.
18    Q  And is it a -- well, let me ask it a
19  different way.  What is Exhibit 27?
20    A  An "Affidavit of Jennifer Minton in Support
21  of Motion for Summary Judgment."
22    Q  And you submitted this affidavit in support
23  of motion for summary judgment in the Delaware
24  derivative case, as well as San Mateo derivative case;
25  is that true?

1  A  I think it was in relation to the derivative
2  litigation.
3  Q  Right.
4  A  That's what it says here on the very first
5  page.
6  Q  Did you prepare this exhibit?
7  A  The attorneys drafted this exhibit.
8  Q  You reviewed it for accuracy?
9  A  Absolutely.
10  Q  Okay.  And then you signed it as a true
11  statement of facts?
12  A  That is correct.
13  Q  Okay.  Is it a true and correct copy of the
14  exhibit that you submitted in connection with the
15  Delaware litigation?
16  A  I'm sorry.  I'm not sure I have any basis to
17  know whether or not this was submitted in connection
18  with the Delaware litigation.
19  Q  Okay.  Let me say it a different way.
20  Is this a true and correct copy of an
21  affidavit that you signed some time in 2003?
22  A  Yes.
23  Q  Okay.  I want to focus your attention on
24  paragraph 23.  On page eight, this paragraph says,
25  "During these forecast calls, the participating senior

25

1  salesperson generally provides a forecast commitment,
2  a best case and the worst-case scenario.
3  "In looking at an Upside Report, the
4  'forecast' represents the amount of revenue that the
5  senior salesperson considered to achieve that
6  quarter."
7  Is that a correct statement?
8  A  Yes.
9  Q  Okay.  If you look at paragraph 24, that
10  paragraph says "The 'upside' column represents
11  positive or negative adjustments to the forecast
12  column based on updated information that became
13  available either during the forecast conference calls
14  or based on other sources of information such as:  (1)
15  deal status provided by my staff based upon
16  information received by the sales force, or (2)
17  Potential Pipeline Upside Reports (prepared by
18  Ivgen Guner)."
19  Is that a true statement?
20  A  Yes.
21  Q  And then paragraph 26 says "In determining
22  the 'upside' adjustment, Ivgen Guner and I would apply
23  our combined judgment based on our knowledge of the
24  various sales organization, sales forecasting
25  practices and historical conversion ratios to

26

1  determine what the realistic license revenue growth
2  (or contraction) might be."
3  Is that a true statement?
4  A  Yes.
5  Q  Now, the part of paragraph 26 that says that
6  you and Ivgen Guner would apply your combined and
7  informed judgment, where did you obtain the
8  information to apply that judgment?
9  A  We would review the pipeline reports.  I
10  believe we called them licensed pipeline upside
11  reports, and we would discuss any other forecast data
12  that we had available at the time.
13  Q  Okay.  And the forecast data that was
14  available at the time, you obtained that information
15  from the Thursday conference calls?
16  A  It would have been from Thursday conference
17  calls.  It would have been from analyzing the large
18  transactions that were in the pipeline for the
19  quarter, and again looking at historical forecast
20  conversion rates.
21  Q  Okay.  And Thursday forecast conference
22  calls, who were on those calls?
23  A  The Thursday forecast calls were generally
24  but not always attended by Jay Nussbaum, who was
25  responsible for the OSI sales and consulting

27

1  organization, as well as Sarah Kopp, who supported him
2  during the class period, as I believe you referred to
3  it, during Q3.
4  There was Sandy Sanderson, who was
5  responsible for the OPI organization, as well as
6  Jim English, who was the finance employee that was
7  dedicated to supporting Sandy Sanderson.
8  There was George Roberts and David Winton,
9  who George Roberts was responsible for the
10  North America sales organization, and David Winton was
11  the finance employee responsible for supporting him,
12  and other attendees would include Ivgen Guner.
13  At times, one of her staff, and myself,
14  Jeff Henley, Safra Catz, and very infrequently but
15  once in a while Larry Ellison.
16  Q  Okay.
17  A  And I should say that not everybody
18  participated on the calls every week.  It could be in
19  other meetings, customer presentations, or whatnot.
20  So it's not as if everybody was on every single call
21  at the same time.
22  Q  Was Jeff Henley a regular attendee?
23  A  When he could attend, he would attend.
24  Q  On a percentage basis during the fiscal 2000,
25  would you say --

28

1    A  I don't recall what number of meetings he
2    attended.
3    Q  Did anybody from the -- withdraw.
4       Did anybody outside of the Americas
5    participate in the Thursday conference calls?
6    A  I don't recall if we included Latin America
7    at the time, since Latin America reported up through
8    Sandy Sanderson, so I cannot be specific.
9    Q  Okay.  So it did not include the license
10   sales divisions overseas?
11   A  It definitely did not include Europe.  It
12   definitely did not include Japan or Asia Pacific.
13   Q  Did you have a separate forecasting call for
14   the overseas divisions?
15   A  No, we did not.
16   Q  Is there a reason why you focused on the
17   Americas versus the entire company?
18   A  It was a practice that was -- I believe that
19   had started when Ray Lane was with the company.  I
20   believe he had calls with his North America sales
21   organizations.  And when Ray left, we continued that
22   practice.  So I don't have any visibility into the
23   history as to why it was solely just with the U.S.
24   sales organizations.
25      And, again, I cannot recall whether or not we

29

1    actually had Latin America participation, but
2    Latin America was a fairly small slice of the
3    business.
4    Q  How did you -- withdrawn.
5       Did you obtain updated information about the
6    divisions outside of the Americas throughout the
7    quarter?
8    A  I would, at times, speak with my direct
9    reports, William Plant, who was responsible for
10   supporting Europe, Greg Davies, who was responsible
11   for supporting Asia Pacific, to see if there were any
12   notable changes within their forecast.
13   Q  Did any of the information that you learned
14   during the executive management committee meetings
15   influence your upside adjustments during the fiscal
16   2000, 2001 time period?
17   A  Influence, yes.
18   Q  You had those meetings, the executive
19   management committee meetings, on Mondays?
20   A  That is correct.
21   Q  Is that every week?
22   A  They were scheduled, for the most part, every
23   week, but they didn't necessarily get held every week.
24   Q  They were not on the forecast schedule; is
25   that right?

30

1    A  No.  These were Larry Ellison's staff
2    meetings, weekly staff meetings.
3    Q  You understand what I mean by "forecast
4    schedule"?
5    A  No.
6    Q  Did Oracle have a forecast schedule in place
7    during the 2000, 2001 time period?
8    A  We have a forecast schedule, yes.  Actually,
9    yes.
10   Q  Okay.  And it's every other week in months
11   one and two, and every week in month three?
12   A  That is correct.
13   Q  So when I say forecast schedule, that's the
14   schedule I'm talking about; is that fair?
15   A  The EC meetings were generally scheduled as
16   weekly meetings, but obviously vacations, other
17   commitments would result in meetings getting
18   postponed.  Not postponed but canceled, I should say.
19   Q  These meetings included the executive vice
20   presidents from the Americas; right?
21   A  At the time, they included Sandy Sanderson,
22   Jay Nussbaum, and George Roberts, yes.
23   Q  Did they also include the executive vice
24   presidents outside of the Americas?
25   A  They would have included Sergio Giacoletto,

31

1    who is responsible for Europe, and Derek Williams, who
2    is responsible for the Asia Pacific region on the
3    sales side.
4    Q  Did the finance support personnel for the
5    executive vice presidents attend the executive
6    management committee meetings?
7    A  No, they did not.
8    Q  Forecast was a topic on the agenda for the
9    executive management committee meeting?
10   A  Absolutely.
11   Q  Every week?
12   A  It was the first agenda item that we always
13   discussed.
14   Q  Okay.  Would you discuss -- during these
15   forecasting topics, would you discuss week-to-week
16   changes in the forecast, if there were any?
17   A  I can't recall the specifics, but each --
18   Larry would go around to each sales EVP and ask that
19   they provide him with an update with regard to their
20   forecast.
21   Q  Okay.  Did Larry ever inquire of you about
22   your upside adjustments?
23   A  Not that I recall.
24   Q  Did Mr. Henley ever inquire of you about your
25   upside adjustments during the executive management

32

Minton, Jennifer (30b6)  7/7/2006  9:01:00 AM

1   committee meetings?
2       A  During the meetings?
3       Q  Yes.
4       A  Not that I recall.
5       Q  Okay.  Ms. Guner -- am I saying her name
6   right, Ms. Guner?
7       A  Guner.
8       Q  Guner.  When did she start -- withdrawn.
9           What was her position during the fiscal 2000,
10  2001 time period?
11      A  I believe her position evolved.
12      Q  And how did it evolve?
13      A  I don't recall precisely what position she
14  held at the beginning of fiscal 2000.  She was in the
15  field finance organization, but I don't recall who she
16  was supporting.  There was a gentleman named
17  Russ Surmanek, who was supporting Ray Lane, and
18  actually now that I recall, she was supporting
19  Frank Varasano, who reported to Sandy Sanderson for
20  some time period.
21          Frank had responsibility for OPI, and then
22  she went -- I can't recall specifically, but she was
23  helping Ray out as well, and then she came to work
24  directly for me.
25      Q  Do you remember when that was?

33

1       A  I don't recall precisely when, no.
2       Q  When she started working for you, did she
3   immediately begin conferring with you about the upside
4   adjustments?
5       A  I don't recall when we started that practice.
6       Q  How long was Ivgen Guner with the company
7   before she started reporting to you, if you know?
8       A  I can only tell you that based on a very,
9   very recent meeting, I'm now aware that she's been
10  with the company for approximately ten years.
11      Q  Ten years from 2006?
12      A  Yes, from now.
13      Q  So roughly '96 was when she started?
14      A  That would be correct.
15      Q  Lia Burke, do you know who that is?
16      A  Yes, I do.
17      Q  And who is Lia Burke?
18      A  Lia Burke was a finance manager working in the
19  corporate financial planning and analysis group.
20      Q  And what was her role during the class
21  period?
22      A  During Q3 of fiscal '01?
23      Q  Yes.
24      A  I am not certain if she was still working on
25  preparing and consolidating forecast, but that was her

34

1   role certainly within -- I want to say within fiscal
2   2000, 2001 time period.
3       Q  Did Lia Burke report directly to you?
4       A  I don't recall.
5       Q  Do you know Roberta Ronsse?
6       A  Ronsse.
7       Q  Ronsse.
8          Who was Roberta Ronsse?
9       A  She was another analyst working in corporate
10  FPNA.
11      Q  And what were her responsibilities during the
12  class period?
13      A  Again, I cannot remember specifically what
14  she was doing during the class period or during fiscal
15  2001, but she also helped to support the forecast
16  preparation process working with Lia and Ivgen.
17      Q  The upside reports, those were distributed --
18  withdrawn.
19          The upside reports were used at every EMC
20  meeting; is that correct?
21      A  I would bring the upside reports to the EC
22  meetings.
23      Q  The EC meetings that did not occur during the
24  forecast schedule, how did you update the upside
25  reports, if at all, for those meetings?

35

1          MR. WALD:  Object to the form.
2          BY MR. BRITTON:  Q.  You can answer.
3       A  Can you rephrase the question, please?
4       Q  For the executive management committee
5   meetings that happened when there wasn't -- not on
6   the -- withdrawn.
7          For the executive management committee
8   meetings that occurred outside the forecast schedule,
9   did you update the upside reports at all for those
10  meetings?
11      A  I may have.
12      Q  Okay.  Was it a regular practice to update
13  those upside reports?
14      A  If I had new information that I felt was --
15  would change my judgment with regards to the upside,
16  then I would change the upside report.
17      Q  Okay.  Was there any other part of the upside
18  reports that were updated for the executive management
19  committee meetings that occurred outside of the
20  forecast schedule?
21      A  I'm sorry.  I don't understand your question.
22      Q  Pipeline information where an EMC meeting
23  that occurred, say, the third week of month one --
24      A  Okay.
25      Q  -- where it wasn't -- it wasn't the forecast

36

1   schedule.
2     A  Correct.
3     Q  Would the pipeline information be updated in
4   the upside report that you used during the executive
5   management committee meeting?
6     A  I don't recall.
7     Q  Okay. I want to talk to you a little bit
8   about the budgeting process. We talked a little bit
9   about that during the 30(b)(6) deposition.
10     Now, I want to ask you what the -- if you
11   know -- what were the benefits to the sales reps for
12   achieving the budget that was set during the beginning
13   of the year?
14     A  Sales reps or sales management?
15     Q  All right. Let's -- let's --
16     A  Sales rep is a --
17     Q  Let's go with --
18     A  -- person on the street --
19     Q  Right.
20     A  -- on a --
21     Q  Let's go with --
22     A  -- commission plan.
23     Q  Okay. Let's go with the sales management.
24   What are the benefits for sales management
25   for achieving the budget that was set at the beginning

37

1   of the year?
2     A  From a compensation perspective?
3     Q  Any perspective.
4     A  They met their budget.
5     Q  Was there any bonuses, or incentives, or
6   awards that were attended to meeting the budget?
7     A  I was not involved in the EVP's compensation
8   at that time.
9     Q  Did you have any understanding whether
10   achieving the budget would generate any specific
11   bonuses or awards?
12     A  I do not recall having the details of the
13   executive's compensation plans.
14     Q  Okay. Do you have an understanding at all of
15   what the downside would be of missing the budget?
16     A  I can say that it would be fair to presume
17   that if they did not meet their budget, then they
18   would likely not maximize or optimize their
19   commissions. Or not their commissions, I should say
20   their bonus. But at some point, and I don't recall
21   when, we divorced the compensation plans from budgets.
22     Q  And why is that?
23     A  Because the field organizations would always
24   put forth an extremely conservative budget. And as a
25   consequence, they would beat it, over perform, and

38

1   therefore their discretionary bonus potential was
2   optimized.
3     Q  Do you have any understanding of when the
4   commissions to these sales managers were paid
5   throughout the year?
6     A  You need to be more specific. Are you
7   referring to Frank Verasano?
8     Q  Let's just use as --
9     A  George Roberts.
10     Q  Let me use as an example George Roberts.
11     A  He would be on an annual plan.
12     Q  He would be on an annual plan.
13     Going down to the sales representative level,
14   do you have any understanding of when the commissions
15   to the sales reps would be paid?
16     A  They would be paid in the month, roughly,
17   30 to 45 days after their revenue was recognized.
18     Q  So if they closed a deal, they would get
19   paid --
20     A  It may be quarterly, actually. I'm not
21   certain if it's monthly, or if it's, you know,
22   quarterly.
23     Q  So they would get paid 30 to 45 days at a
24   minimum after the revenue was recognized; is that
25   correct?

39

1     A  At a minimum, after the quarter.
2     Q  After the quarter.
3     So if a deal had closed, but for some reason
4   Oracle didn't recognize the revenue on that particular
5   deal, would the sales commissions still be paid to the
6   sales representatives --
7     MR. WALD: Object.
8     BY MR. BRITTON: Q.  -- if you know?
9     MR. WALD: Object to the form. It calls for
10   a hypothetical; lacks foundation.
11     BY MR. BRITTON: Q.  You can answer.
12     A  Can you repeat the question, please.
13     Q  If a deal, particular deal had closed, but
14   for some reason Oracle did not recognize the revenue
15   from that deal, would Oracle still pay the sales
16   commission to the sales rep on the deal?
17     MR. WALD: Same objection.
18     THE WITNESS: Oracle's policy is only to pay
19   commissions based on revenue recognition. In order
20   for a sales rep to be paid on a deal for which there
21   was no revenue recognized, they would need an -- a
22   comp exception.
23     BY MR. BRITTON: Q.  Okay. Let's go back to
24   your affidavit, Exhibit 27.
25     If you could go to paragraph seven of

40

Minton, Jennifer (30b6)  7/7/2006  9:01:00 AM

1  Exhibit 27, page three.  This paragraph says "Oracle's
2  license business was its largest revenue source in
3  Fiscal Year 2001 (FY01).  See Chart 41 in the
4  Compendium of Charts."
5     Is that a true statement?
6  A  Yes.
7  Q  Would it be a true statement for fiscal year
8  2000?
9  A  I do not know.
10  Q  Okay.
11  A  I do not recall.
12  Q  Do you know roughly what percentage Oracle's
13  license business represented of the whole in fiscal
14  2000?
15  A  Unless it's in here, and I can refer to it,
16  knowing that this is factually correct, I would be
17  speculating.  I do not recall.
18  Q  Okay.  If you turn to paragraph 11.
19  A  I'm sorry?
20  Q  Paragraph 11, page four.
21     This paragraph says "roughly half of all of
22  Oracle's license revenues are generated by
23  North America, while the other half are generated by
24  Oracle's international subsidiaries outside of
25  North America."

41

1  A  Uh-huh.
2  Q  Is that a true statement?
3  A  Yes.
4  Q  Would that be a true statement for fiscal
5  year 2000?
6  A  I do not recall.
7  Q  Next sentence says "North America license
8  revenues in FY01 accounted for 21% of total FY01
9  revenues."
10     Is that a true statement?
11  A  Yes.
12  Q  And would it be a true statement for fiscal
13  year 2000?
14  A  I do not recall.
15  Q  Okay.  Do you know if North American Sales NS
16  was Oracle's largest license revenue generator in
17  fiscal 2000?
18  A  When you are referring to North America
19  Sales, are you referring to North America as a region,
20  or are you referring to the sales organization that
21  was managed by George Roberts?
22  Q  Sales organization managed by George Roberts.
23  A  Okay.  Can you reask your question, please?
24  Q  Yes.
25     Do you know if NAS was the -- do you know --

42

1  withdrawn
2     Do you know if the NAS division was Oracle's
3  largest license revenue generator in fiscal year 2000?
4  A  I don't recall.
5  Q  So you wouldn't recall for the quarters
6  within fiscal year 2000 either; is that fair?
7  A  Very fair.
8  MR. BRITTON:  Okay.  Can we go off record for
9  a second?
10  THE VIDEOGRAPHER:  Off record at 10:03.
11  (Short break taken.)
12  (Document marked Exhibit No. 60
13     for identification.)
14  THE VIDEOGRAPHER:  On record at 10:11.
15  BY MR. BRITTON:  All right.
16  Q  I've placed in front of you what's been
17  marked as Financial Report 60, and I'd like you to
18  flip through it.
19  MR. WALD:  While the witness is reviewing
20  the, Doug, Financial Report 60, how does that relate
21  to any of the other exhibit numbers in this?
22  MR. BRITTON:  If you see the binders behind
23  us --
24  MR. WALD:  Yes.
25  MR. BRITTON:  -- these are all of the

43

1  financial reports that were used in Ellison's motion
2  for summary judgment.
3  MR. WALD:  Okay.
4  MR. BRITTON:  So what I'm doing --
5  MR. WALD:  So that's --
6  MR. BRITTON:  -- right.  So there's an index
7  of 1 through 60.  So at the end of the deposition, I'm
8  going to ask her to authenticate and establish a
9  business records exceptions for all of the reports.
10  MR. WALD:  Okay.
11  MR. BRITTON:  Ones I'm using during the
12  examination, I'm kind of pulling it out and using it
13  some time.
14  MS. KYROUZ:  So you're going to mark it as an
15  exhibit for her deposition?
16  MR. BRITTON:  Yeah, it's Financial Report 60
17  for her deposition.
18  MS. KYROUZ:  Okay.
19  MR. BRITTON:  And the way we're doing it on
20  the tab it's it's called "Financial Report 60," and down
21  below it says "Minton," and then the day of the depo.
22  MS. KYROUZ:  Okay.
23  MR. WALD:  Thank you.
24  BY MR. BRITTON:  Q.  Do you recognize
25  Financial Report 60?

44

1    A   Yes, I do.
2    Q   And is -- well, let me ask it a different
3  way.
4        What is Financial Report 60?
5    A   At the end of the quarter, we would pull
6  together -- we would pull them together monthly,
7  income statements, both in a management summary
8  format, which means by organization, as well as by
9  summary income statements, the type of revenues, the
10  type of expenses, balance sheet, head count, and it
11  was effectively just a report of actuals, information
12  that, if anybody needed to refer to it, they had it
13  available.  So it was more of a reference book.
14    Q   Okay.  And these reference books would be
15  produced month one of a quarter, month two of a
16  quarter, and then at the end of the quarter for the
17  entire quarter?
18    A   That is correct.  And, in fact, I think we
19  referred -- it's been a long time -- but I think we
20  referred to month one and month two books as the gray
21  books, and then the maroon/red books were the end of
22  the quarter books.
23    Q   Is Financial Report 60 a true and correct
24  copy of the Q3 fiscal year 2001 quarterly financial
25  reference book?

45

1        MR. WALD:  If you know.
2        THE WITNESS:  Well, I don't have one in front
3  of me from my office to be able to compare and
4  contrast, so I can only presume that it is.
5        BY MR. BRITTON:  Q.  Okay.  Is there anything
6  that looks out of place in this exhibit that would
7  lead you to believe that it's not a true and authentic
8  copy of the original?
9    A   I mean, it would take me some time.
10    Q   Right.
11    A   Do you want me to go through the entire --
12    Q   You know what, I'll do that at the end.
13    A   I'm happy to do it, if you want me to.
14    Q   No, that's okay.  It would take too long.
15  We'd be here for three days, so....
16        All right.  I'm trying to get an idea of what
17  percentage of U.S. license that NAS represented in Q3
18  2000.  I take it you don't remember off the top of
19  your head?
20    A   That would be a fair assumption.
21    Q   Okay.  I'm going to direct your attention to
22  the page with Bates 0010208, the little number down in
23  the bottom.
24    A   0010?
25    Q   10208.

46

1    A   So you want me to go to 208?
2    Q   208.
3        MR. WALD:  Then get a magnifying glass.
4        BY MR. BRITTON:  Q.  Do you have that
5  magnifying glass?  Okay.
6    A   I'm sorry.  I can't read the numbers on this
7  report.
8    Q   These are the way they were produced to us.
9  Were they printed out in this size?
10    A   This looks to be about the right size, yes.
11    Q   Were they this hard to read in their original
12  form?
13    A   It must be due to the Xeroxing.
14    Q   Let me give you a magnifying glass and see if
15  that will help you.
16    A   NH.
17        MR. WALD:  Yeah, exactly.
18        THE WITNESS:  Yeah, some of the numbers look
19  melted together, so it's hard to distinguish.
20        You know, the other thing that's important to
21  recognize when looking at a report as of a given point
22  in time is that there were account ownership changes
23  between organizations, territories.
24        So sometimes the information or sometimes the
25  results may not be apples to apples because your

47

1  territory in one year could have grown or could have
2  gotten smaller than in the prior year.
3        You follow me?
4        BY MR. BRITTON:  Q.  Because of allocation
5  reasons?
6    A   No.  So, for example --
7    Q   Let's take NAS for example.
8    A   NAS.  NAS may have all accounts for
9  corporations that are, you know, $500 million in
10  revenue to $2 million in revenue.  That could be the
11  territory definition in one year.
12        The next year it could be, well, that same
13  territory definition, except -- unless it's a federal
14  government, a state and local government, et cetera,
15  et cetera.
16        So there were often, to be real blunt, turf
17  wars/territory wars over which territory would Jay own
18  versus George own, et cetera, et cetera.
19        So when looking at numbers year over year for
20  an organization, in total for the U.S. it would be
21  apples to apples, but it may not be as apples to
22  apples at an organizational level.
23        Do you understand that?
24    Q   I understand, yes.
25        Did you have any type of report or anything

48

1  that told you if there were any territorial changes

2  when comparing year-over-year figures?

3     A   Do I have a report?  No, I don't have a

4  report.

5     Q   Did you generate a report or did anybody

6  generate a report?

7     A   They would try to estimate the impact.

8     Q   Do you know if the NAS territory changed from

9  Q3 2000 to Q3 2001?

10     A   I don't know, but it's quite possible that it

11  did.

12     Q   Okay.

13     A   I don't recall is what I should say, but it's

14  quite possible that it did.

15     Q   Okay.  If you look to --

16     A   These guys were always fighting.

17     Q   Okay.  If you look to 208 with the magnifying

18  glass --

19     A   Uh-huh.

20     Q   -- is it fair to say that NAS, which is

21  Roberts's division, was the largest revenue generator

22  for the Americas?

23     A   He had, appeared to be, something like 230,

24  maybe.

25     Q   I'm talking -- withdrawn -- for Q3 2001, the

1  actuals prior year.

2     A   The actuals prior year?

3     Q   Yeah.  Is that column --

4     A   Yes.  It appears he's got -- I want to say

5  that's 300.  I can't really decipher it.

6     Q   It looks like 3.8 million to me, but they

7  blend in together.

8     A   Larger then Nussbaum, which is one-something

9  and definitely much smaller than Sanderson's, which is

10  43 million.

11     MR. WALD:  Sort of like an eye doctor test.

12     How far down the chart can you read?

13     BY MR. BRITTON:  Yes.

14     Q   The binders that you either had or have in

15  your possession, were they easier to read than this?

16     A   I'm certain that the reason why it's

17  difficult to read this is because it's a Xerox copy.

18     Q   So the originals -- do you guys still have

19  possession of the original upside reports in Q3 2000?

20     A   I personally do not have the originals.  They

21  would certainly be in files somewhere.

22     Q   Are these financial reference books, are they

23  kept in electronic form?

24     A   No.

25     Q   So the best we can get out of this is

1  George Roberts' division for Q3 2000 was the largest

2  of the U.S. license divisions; is that right?

3     A   As of Q3 2000 -- as of Q3 2000 on a

4  year-to-date basis.

5     Q   Okay.  And is it fair to say it looks like to

6  be a little more than half of the revenue for the

7  U.S. license divisions?

8     A   No.

9     MR. WALD:  I'm sorry.  Which year are you

10  talking now?

11     MR. BRITTON:  In Q3 2000.

12     THE WITNESS:  If what I'm reading here for

13  Nussbaum looks to be 188, and Sanderson looks to be

14  43, that would be over 200.

15     BY MR. BRITTON:  Right.

16     Q   So you got over 200 for the other two

17  divisions?

18     A   300.  So 200 divided by 300 is not quite 50.

19     MR. WALD:  Are you including the

20  Latin America Sanderson in that?

21     THE WITNESS:  No, I'm not.

22     MR. WALD:  Okay.

23     BY MR. BRITTON:  Q.  When you refer to "U.S.

24  license divisions," does that have a meaning within

25  Oracle?  Withdrawn.

1     Did U.S. license have a meaning within Oracle

2  during the 2000, 2001 time period?

3     A   U.S. is a country, and when we report

4  revenues on a geographic basis, we would, I believe,

5  at that time report domestic versus international.

6     Q   Okay.  And that would not have included

7  Latin America?

8     A   No.

9     Q   Just to be clear.

10     A   Although I do believe that Larry feels that

11  Canada is part of the United States, but we didn't win

12  that war, so...

13     Q   All right.

14     And in Q3 of 2000, can you tell how much NAS

15  represented of total license revenues?

16     A   Do you have a calculator?

17     So if we operate on the presumption that the

18  number here for Roberts is 30 -- what did you think it

19  was?  308?

20     Q   I think it's 308,833.

21     A   Okay.  I'm going to go 308 divided by what

22  appears to be 10, what do you think, 118 or 1,048.

23     Q   I think it's 1,048.

24     A   1,048?

25     Q   Yes.

Minton, Jennifer (30b6)  7/7/2006  9:01:00 AM

1    A   That would be 29 percent.
2    Q   Okay.  So given -- given the estimate of what
3    these numbers actually say, we can come to the
4    conclusion that NAS represented about 30 percent of
5    Oracle's total license revenues; is that fair?
6    A   On a quarter-to-date basis through Q3, on a
7    year-to-date basis through -- actually, this is on a
8    quarter to date.
9    Q   Correct.
10   A   On a quarter-to-date basis for Q3 of 2000.
11   Q   Okay.  Can we do the same calculation for
12   U.S. license, just so we get the number right?
13   A   No.
14   Q   No?
15   A   No.
16   Q   Why not?
17   A   Because included in Nussbaum and Roberts'
18   numbers are revenues related to Canada.
19   Q   Okay.  So if you include U.S. license as well
20   as Canada, let's do the calculation to see what
21   percentage NAS represented of that territory.
22   A   So we're looking for North America?
23   Q   North -- yes, North America license.
24   A   Okay.  So if you look at this report, I'm
25   going to assume that it's roughly 188 for Nussbaum,

53

1    unless you have a better read on your --
2    Q   No, I think we're looking at the same thing.
3    So 188.
4    A   All right.  So 188.
5        MR. WALD:  I'm sorry.  Just so the record is
6    clear, what year is that?
7        THE WITNESS:  This is Q3 of 2000.
8        MR. WALD:  Thank you.
9        THE WITNESS:  So 188, and then is it roughly,
10   what, 40 -- is that 83 --
11       MR. BRITTON:  Yeah.
12       THE WITNESS:  -- or 63?  May be 63 for
13   Sanderson.
14       MR. WALD:  You got the magnifying glass,
15   so....
16       MR. BRITTON:  Yeah, you're going to have a
17   better estimate than we have.
18       MS. KYROUZ:  You can't mark the document.
19       THE WITNESS:  Ooh.
20       MR. WALD:  That's okay.
21       THE WITNESS:  Do you have a piece of paper?
22       MR. WALD:  Sure.  You bet.
23       THE WITNESS:  I'm having a hard time reading
24   this.  Do you think it's 83?
25       MR. BRITTON:  Yeah, I thought it was 83.

54

1        THE WITNESS:  Okay.
2        MR. WALD:  I wonder if there is a way to
3    deduce what that is from any of the other columns,
4    like variance from prior year or something.
5        MR. BRITTON:  Variance from actual.
6        MR. WALD:  Or just....
7        THE WITNESS:  So assuming that the numbers
8    for Nussbaum are 188, and numbers for Roberts are 309,
9    and the number for Sanderson is 83, then the total
10   revenues for North America, which would include
11   Canada, would be 580 million of which Roberts
12   represents 53 percent of those numbers.
13       MR. WALD:  Again, for the record, that is
14   year-to-date through Q3 of 2000 or just quarterly?
15       THE WITNESS:  No, that is not.  That would be
16   quarter to date only.
17       MR. WALD:  For 2000.
18       THE WITNESS:  For 2000, correct.
19       BY MR. BRITTON:  Q.  So let me get the --
20   just so we have a clear record, so from this report,
21   and again taking the numbers as we're estimating them
22   to be, NAS -- withdrawn.
23       For Q3 2000, NAS represented 53 percent of
24   North America license revenue; is that correct?
25   A   North America, uh-huh.

55

1    Q   You got to answer yes.
2    A   Yes.  Sorry.
3    Q   And then for Q3 2000, North American -- the
4    North American Sales Division represented 29 percent
5    of total license revenue; is that correct?
6    A   Okay.  So if we're presuming that this number
7    is 1,048 --
8    Q   Yeah, I think you already did the
9    calculation.  I think we came up with 29 percent.
10   A   29.48 percent.
11   Q   So for Q3 2000, North American sales license
12   revenue represented 29 percent of total license
13   revenue for the company; is that correct?
14   A   Correct.
15   Q   Okay.  If we can put that -- leave that
16   document where it is, but I'm going to go back to
17   Exhibit 27.  I need to look at your affidavit
18   again.
19   A   I'm sorry.  Exhibit 27, page?
20   Q   Paragraph nine, page three.
21       Paragraph nine says "During FY01 Oracle's
22   license sales force in North America was structured
23   into three separate divisions:  North America Sales
24   ('NAS'), Oracle Service Industries ('OSI' ) and
25   Oracle Product Industries, ('OPI')."

56

1    Next sentence reads, "In 3Q01, NAS sold to
2    all of Oracle's North American customers not included
3    in OPI and OSI territories, including most of
4    Oracle's dot.com customers in the United States."
5    Are those true statements, the two sentences
6    I read?
7    A   Yes.
8    Q   Okay.  The second sentence the -- about the
9    "NAS included most of Oracle's dot.com customers in
10   the United States," is that a true statement in fiscal
11   year 2000?
12   A   I do not recall what the territories were in
13   fiscal 2000.
14   Q   Okay.
15   A   But I can tell you that, generally speaking,
16   George had the middle market.  So if they were small
17   companies, then they would be in the middle market
18   which George would have.
19   Q   Okay.  This will be Minton Exhibit 28.
20   (Document marked Exhibit No. 28
21   for identification.)
22   THE WITNESS:  Thank you.
23   BY MR. BRITTON:  Q.  I've placed in front of
24   you what's been marked as Minton Exhibit 28.  Will you
25   take a moment to look at this exhibit.

57

1    For the record, Minton Exhibit 28 starts with
2    NDCA-ORCL 100911 and ends at 912.
3    Have you had a chance to review --
4    A   Yes.
5    Q   -- Exhibit 28?
6    Do you recognize Exhibit 28?
7    A   Yes, I vaguely recall it.
8    Q   And what do you recall it to be?
9    A   It's an analysis of the impact of the dot.com
10   revenues on the Q3 financial results for fiscal '01
11   and the projected impact on the Q4 fiscal '01
12   forecast.
13   Q   Okay.  A couple of foundational questions.
14   This is an e-mail from you to Larry Ellison,
15   Safra Catz, Jeff Henley, Stephanie Aas, and Jennifer,
16   and to yourself --
17   A   Uh-huh.
18   Q   -- is that correct?
19   And you sent this on March 14, 2001?
20   A   That would be correct.
21   Q   Okay.  Is this a true and correct copy of the
22   original?
23   A   I presume that it is.
24   Q   Okay.  And did you prepare this e-mail in the
25   regular course of your business?

58

1    A   No, I did not.
2    Q   You did not.
3    Why not?  What I mean by "regular," it was
4    part of your job responsibilities to prepare an
5    analysis like this?
6    A   This analysis was done to better understand
7    why, believe it or not, meeting our revenue
8    expectations in the third quarter of fiscal year 2001.
9    Q   Okay.  So what you're saying is that, what,
10   you didn't regularly prepare this type of analysis; is
11   that correct?
12   A   I did not prepare this analysis --
13   Q   Okay.
14   A   -- nor did I regularly prepare this type of
15   analysis.
16   Q   Okay.  Who prepared this analysis for you?
17   A   David Winton would have prepared this
18   analysis.
19   Q   Okay.  And was it part of his job
20   responsibilities to prepare an analysis like this?
21   A   David Winton prepared this analysis upon a
22   request.  I do not believe that he necessarily -- I
23   don't know whether or not he regularly prepared this
24   analysis.
25   Q   Okay.  Did he prepare this analysis after the

59

1    close of Q3 2001?
2    A   That would be the implication.  Because as
3    you can see from the title where it says "Roberts
4    USA," it says "Q3 FY01" whereas below it says "Q4 01
5    Fcst," plus we would have had our financial results
6    determined by March 14th for Q3, so yes.
7    Q   Okay.  Now, this -- this analysis is
8    comparing year-over-year figures; is that right?
9    A   That is correct.
10   Q   Okay.  And the top is comparing Q3 2000 to Q3
11   2001; is that correct?
12   A   That is correct for the third quarter of both
13   fiscal years.
14   Q   Okay.  And the next box down is comparing
15   year-to-date numbers --
16   A   That is correct.
17   Q   -- year over year?
18   And just so we're clear, Q3 year-to-date 2000
19   means every day up through the end of Q thousand --
20   withdrawn -- every day up through the end of Q3 2000;
21   is that right?
22   A   Yes.  It represents the first three quarters
23   of fiscal 2000.
24   Q   Okay.  Next box down, this is a comparison of
25   fourth quarter 2000 actuals to the fourth quarter 2001

60

1   forecast; is that right?

2     A   The forecast for 2001, correct.

3     Q   And then the next box down is comparing Q4

4   2000 actuals year-to-date to the year-to-date forecast

5   for Q4 '01?

6     A   That is correct.

7     Q   All right.

8     So am I right that -- withdrawn.

9     This is -- is this an analysis of the

10  technology part of George Roberts' division?

11    A   This is an analysis of the dot.com business,

12  and the brick and mortar.  Whether or not there are

13  any applications/revenues incorporated in these

14  numbers, I am not certain.

15    Q   Okay.  Do you know what brick and mortar

16  means, or did you know what it meant in Q3 2000?

17    A   I would view that as all other businesses

18  that are in the mid market that are not attributed to

19  a dot.com business.

20    Q   So is it fair to say that in the third

21  quarter of 2000, George Roberts' dot.com business

22  represented roughly 40 percent of the total?

23    A   In the third quarter of what?

24    Q   2000.

25    A   The 111,000?  Is that what you're referring

61

1   to?

2     Q   Yes.

3     A   Yes, that would represent roughly one-third.

4     Q   Okay.

5     MR. WALD:  I'm sorry.

6     THE WITNESS:  Of his -- of his license

7   revenues in Q3 2000.

8     MR. BRITTON:  Okay.

9     MR. WALD:  Just so we're -- just so the

10  record is clear, the 111 is being compared to what?

11    BY MR. BRITTON:  Q.  What are you comparing

12  the 111 to?

13    A   I am comparing the 111 to the 309, which is

14  the number that we believe is appearing on this

15  management summary report for Q3 2000 for

16  George Roberts.

17    MR. WALD:  And just so I understand, the 309,

18  how does that compare to the 282 that's on Exhibit 28?

19    THE WITNESS:  This represents Roberts' USA

20  revenues only.  George also had responsibility for

21  Canada, so the differential would imply -- it's

22  implied to the Canadian revenues.

23    BY MR. BRITTON:  Q.  Could the differential

24  be the difference between database products versus

25  applications products?

62

1     A   I believe that the difference, because this

2  is USA only, represents the difference in U.S. versus

3  Canadian revenues.

4    Q   Okay.  So George Roberts' dot.com business

5  represented roughly one-third of NAS's total license

6  revenues in the third quarter of 2000; is that right?

7    A   That would be correct.

8    Q   Okay.  And if we compare the numbers that are

9  on this page, so it would be the U.S. license

10  revenues, the dot.com business represented roughly

11  40 percent of the whole; is that right?

12    A   You're asking me what 111 divided by 282 is?

13    That would be 39 percent.  I can't write on

14  that.

15    Q   And then I'd like to see if we can figure out

16  what the dot.com business in the third quarter of 2000

17  represented of Oracle's total license revenues in the

18  third quarter of 2000.

19    If you turn to Financial Report 60, same

20  page, I believe that gives you the total license

21  revenues on Bates 208.  Maybe you should grab the

22  report just so the record is clear?

23    A   Right here, 208, yeah.

24    Q   208.  So the column that says "Actuals Prior

25  Year," all the way down --

63

1     A   Yes.

2     Q   -- says "Total"?

3     A   Yes.

4     Q   What does that number represent?

5     A   Total license revenues --

6     Q   Okay.

7     A   -- for the sales organizations.

8     Q   For the sales organizations; right.

9     So if we compare the number that is on Minton

10  Exhibit 28 with the total license revenues for the

11  sales organization, we can figure out the percentage

12  that the dot.com business represented of the whole; is

13  that right?

14    A   Yes.

15    Q   And what's that percentage?

16    A   I divided the 111,000 by the 1 million 48,

17  and that's 10.59 percent.

18    MR. WALD:  For 2000?

19    THE WITNESS:  For Q3 2000.

20    BY MR. BRITTON:  Q.  So the record is clear,

21  for Q3 2000, George Roberts' dot.com business in the

22  U.S. represented 10.59 percent of total license

23  revenues in Q3 2000 for the sales organizations; is

24  that correct?

25    A   Uh-huh.

64

Minton, Jennifer (30b6)  7/7/2006  9:01:00 AM

1    Q  You have to answer yes.
2    A  Yes.  Sorry.
3    Q  We figured out the percentage what it
4  represented, the total North American -- you already
5  did that.  Withdrawn.
6       Okay.  You can put those documents aside.
7  Now, in the top column in the "Quarter" column --
8    A  Are we still looking at Exhibit 28?
9    Q  Yeah, we're still looking --
10    A  I thought we were putting them aside.  Sorry.
11    Q  We were, and I changed course.
12    MR. WALD:  He's tricky that way.
13    BY MR. BRITTON:  Uh-huh.
14    Q  Third quarter of 2001, the numbers in the
15  upper box on the left column, those represent the
16  actuals for the dot.com business for Q3 '01, brick and
17  mortar for Q3 '01, and then for George Roberts U.S.A.
18  division for Q3 '01; is that right?
19    A  That would be correct.
20    Q  Okay.  So can we do the same comparisons for
21  Q3 '01 that we did for Q3 2000?
22       So let's start with what percentage did the
23  dot.com business represent of George Roberts'
24  North American Sales?
25    A  So you would like for me to, once again,

65

1  calculate these numbers?
2    Q  Yes.
3    A  So I'm not sure your copy is any better than
4  mine.
5    Q  It is not.
6    A  But Q3 of '01, revenues for Jay Nussbaum
7  appears to be 154.
8    THE VIDEOGRAPHER:  Twenty minutes left on
9  tape, Counsel.
10    THE WITNESS:  George Roberts' appears to be
11  230.
12    BY MR. BRITTON:  Q.  Let's give it 239.
13    A  Well, mine looks more like 230.
14    Q  Does it?  Okay.  I was just erring on the
15  side of the higher number.  If yours looks like 230,
16  you have the magnifying glass.
17    A  Would you like to use it?
18    Q  No, no, no.  Go ahead.
19    A  And then 182 for Sandy Sanderson, which gives
20  a total for North America 566, and assuming you're
21  going to get there, the total license revenues appear
22  to be 1108, and the Q3 2001 number for dot.com is
23  37,000, and you wanted to know what that was as what?
24    Q  Take the dot.com business as a percentage of
25  George Roberts' license revenues, NAS license

66

1  revenues.
2    MR. WALD:  For Q3 of '01.
3    THE WITNESS:  So you want me to divide the
4  37.5 by the --
5    BY MR. BRITTON:  Q.  238.
6    A  You think it's the 238?
7    MR. WALD:  Yeah, I think it's a nine.
8    THE WITNESS:  Why don't I change my number
9  and make it a -- see, I can't tell.
10    MR. WALD:  If you go over to the -- yeah.
11    THE WITNESS:  Are you deducing it?
12    MR. WALD:  Yeah.  Your eyesight is probably
13  better than mine, Jennifer.
14    THE WITNESS:  All right.  So if I change that
15  number, the total North America revenues are
16  575 million.  So the dot.com business in the U.S. is
17  37.5 divided by the 575 or -- no.  You want it just.
18    BY MR. BRITTON:  Q.  Let's start with NAS.
19    A  You mean North America?
20    Q  North America.
21    A  Okay.  So 37 divided by the 575 would be
22  6.4 percent, so that's the percentage of
23  North America.
24    Q  So -- so just so the record is clear, the
25  dot.com business in the third quarter of 2001

67

1  represented 6.4 percent of the North America license
2  revenues; is that right?
3    A  6.4 percent of North America license which is
4  inclusive of OSI, OPI, and George Roberts.
5    Q  Correct; okay.
6       Now, if we look at George Roberts' division,
7  which is referred to as North American Sales; is that
8  right?
9    A  Right, which is why I'm trying to make sure
10  we're all clear.
11    Q  Right.  Let's do that percentage.
12    A  Okay.  So 37 divided by 239 is 15.48 percent.
13    Q  So the dot.com business represented -- the
14  third quarter of 2000 represented 15.48 percent of
15  George Roberts' license revenues; is that right?
16    A  So in Q3 of 2001, the dot.com was 15 percent,
17  yes.
18    Q  Okay.  And then of the total, Oracle's total
19  license revenue for the sales organizations, what
20  percentage did the dot.com business represent of the
21  whole?
22    A  That would be the 1108?
23    Q  Yes.
24    A  Three percent.
25    MR. WALD:  Just so the record is clear,

68

1  Jennifer, in looking at the 37,500 number --

2      THE WITNESS:  Uh-huh.

3      MR. WALD:  -- does that include Canada?

4      THE WITNESS:  No, it would not, because this

5  appears to state U.S.A only.

6      MR. WALD:  Right.  But the denominator that

7  you've been using from Exhibit FR60, those numbers do

8  include Canada; correct?

9      THE WITNESS:  Correct.

10      MR. WALD:  All right.  So it's not apples to

11  apples?

12      THE WITNESS:  It's North America.  Not George

13  Roberts U.S. only.

14      MR. WALD:  Right.

15  BY MR. BRITTON:  Right.

16      Q    Then if we wanted to get the George Roberts

17  U.S. only, then we would compare the numbers on

18  Exhibit 28?

19      A    Uh-huh.

20      Q    Perfect.

21      MR. WALD:  But if you wanted to get dot.com

22  U.S. plus Canada, George Roberts dot.com U.S. plus

23  Canada, is there any number that you're looking at in

24  any of these documents that gives you that number?

25      THE WITNESS:  No.  I am assuming that the 213

1  is a subset of the 239.

2      MR. WALD:  Right.  I'm just saying the

3  dot.com 375, that's George Roberts U.S. only dot.com

4  sales.  So if there were dot.com sales in Canada, it

5  wouldn't be picked up by that number?

6      THE WITNESS:  That is correct.

7      MR. WALD:  Okay.

8      MR. BRITTON:  And, Peter, I -- I know you're

9  helping, so -- but there's a fine line between

10  objection and --

11      MR. WALD:  Do you really think that on that

12  last question?

13      MR. BRITTON:  It's my examination.

14      MR. WALD:  No, I understand that, but you

15  want the record to be -- the facts are the facts.  I

16  mean, there is no reason for us not to know what they

17  are.

18      MR. BRITTON:  Of course.  Of course, but I'd

19  like to direct the deposition as I'd like to direct

20  it.

21      Okay.  We could put that document aside.

22      THE WITNESS:  So because I got notes

23  scribbled all around here, am I going to need to refer

24  to these percentages again?

25      BY MR. BRITTON:  Q.  No, no, we're done.

1      A    Because otherwise I'd like to get them in

2  order.

3      Q    No, I don't -- unless we -- well, why don't

4  we mark that as an exhibit.

5      A    Well --

6      Q    Maybe not.  Let's not.  Let's not; okay.

7      In Q -- let's see.  Withdrawn.

8      In fiscal year 2000, do you remember roughly

9  how much revenue it would take Oracle to generate

10  $0.01 earnings per share?

11      A    I don't recall.

12      Q    Okay.  Do you recall in fiscal year 2000 how

13  much revenue it would take Oracle to generate $0.01

14  earnings per share?

15      A    I don't recall.

16      Q    Okay.  Can you tell me for fiscal year --

17      A    You do understand that revenue would then

18  have to be deducted by incremental sales-related

19  expenses, and then there would be an income tax rate

20  also applied to that to get to the incremental net

21  income effect?

22      Q    Correct.  Right.

23      A    Okay.

24      Q    And did -- did anybody within Oracle in

25  fiscal year 2000 or 2001 ever talk in those terms, we

1  need so much revenue for $0.01 earnings per share?

2      A    I would say that we would say how much

3  operating income we would need.

4      Q    And do you --

5      A    So, for example, if we have $100 of revenue

6  that, you know, I would assume may be a 15 percent

7  commission, then I would assume whatever the effective

8  tax rate was to get to a number, and then you would

9  divide that by the weighted average shares to get to

10  any PS number, but I do not recall what that

11  incremental number is today.

12      Q    Okay.  Do you remember in fiscal year 2000

13  how much revenue -- withdrawn -- what the -- the

14  quarter allocations of revenue were for the whole

15  year?

16      A    No, I do not recall.

17      Q    Roughly how much came in Q1, Q2 through Q4?

18      A    I do not recall.

19      Q    Okay.  Same for fiscal year 2001?

20      A    I do not recall.

21      Q    Okay.  Was Q1 the smallest revenue generator

22  in those two fiscal years?

23      A    Generally speaking, Q1 is the smallest

24  quarter, and Q4 is the largest quarter.

25      Q    Okay.  And how about Q2 and Q3?

Minton, Jennifer (30b6)  7/7/2006  9:01:00 AM

1    A  Q2 and Q3, I would say, can be equivalent.
2  Size is not as much a distinction as you would say
3  between Q3 and Q4 or Q1 and Q2.
4    Q  Okay.
5       THE VIDEOGRAPHER:  Ten minutes of tape,
6  Counsel.
7       MR. BRITTON:  How much?
8       THE VIDEOGRAPHER:  Ten.
9       MR. BRITTON:  Ten; okay.
10    Q  Did you ever do a study on how much revenue
11  each month generated throughout the year?
12    A  I recall from a prior deposition being asked
13  a similar question and not being able to remember when
14  the question was asked and then being shown,
15  subsequent to that question, a report that was
16  prepared on a routine basis that itemized the monthly
17  revenue as a percent of the total revenues for the
18  quarter.
19    Q  Okay.  And do you know who did that analysis?
20    A  It would have been somebody on my staff.
21    Q  Okay.
22    A  I don't know precisely.
23    Q  And did you direct your staff to do that type
24  of analysis?
25    A  This particular analysis that I'm referring

73

1  to was generated many years prior to the years in
2  question at the direction of Jeff Henley, but I would
3  say that that analysis became, if you will, stale in
4  that when it was prepared I never really ever looked
5  at it.
6    Q  Okay.  All right.  Let's mark this one next
7  in order so it will be Minton 29.
8       (Document marked Exhibit No. 29
9        for identification.)
10       THE WITNESS:  Are we done with these?
11  BY MR. BRITTON:  Q.  Looks like our --
12  yeah -- looks like our....
13       All right.  I've placed in front of you
14  what's been marked as Minton Exhibit 29 and --
15    A  This entire?
16    Q  This entire thing is Minton Exhibit 29.  This
17  is Volumes I and II in the deposition that you gave in
18  the derivative case.
19       Now, you mentioned earlier that you reviewed
20  the deposition transcript.  Is this a copy of what you
21  reviewed?
22    A  Not all of this, no.
23    Q  Well, this includes the exhibits.  Can you
24  flip through this and tell me if this looks like the
25  deposition testimony that you gave in the derivative

74

1  case?
2    A  Actually, if this is the deposition, I did
3  review the first day of my deposition.  Did not
4  complete reviewing the second full day of my
5  deposition, but it was in a different format.  It
6  wasn't this voluminous.
7    Q  Right.
8    A  It was --
9       MR. WALD:  The mini scripts with four pages.
10       THE WITNESS:  Yeah, yeah.  There you go.
11  BY MR. BRITTON:  Q.  Okay.  It was much
12  smaller, but does this look like the derivative -- the
13  testimony that you gave in the derivative case?  If
14  you just flip through it and let me know if it looks
15  right.
16    A  I presume that it is correct, yes.
17    Q  Okay.  Now, if you take -- turn to page --
18  all right.  So if you turn to page 49, and on page 49
19  starting at line four -- you're not there yet --
20  okay -- starting at line four, it says,
21  "Mr. De Ghetaldi."  He was the questionnaire.  Do you
22  remember that?
23    A  I don't remember his name.
24    Q  Okay.  It says "Okay.  And my question was
25  did you then take the next step and look at historical

75

1  month one contributions per quarter to see whether
2  those numbers tend to be the same or tend to be
3  different year over year?"
4       And your answer was "I don't recall that I
5  myself have performed that analysis, but it may have
6  been an analysis that was performed.  So, for example,
7  it would not be unreasonable, if I may speculate, to
8  presume that we would look at what month one's results
9  were as a percentage of the total quarter for the
10  prior fiscal year and compare that to what the current
11  month's revenues were as a percentage of the current
12  quarter's forecast, if that's your question is."
13       Do you remember giving that testimony?
14    A  Yes, I do.
15    Q  Okay.  Is that an accurate statement as to
16  what you testified to?
17    A  Yes, it is.
18    Q  Okay.  And is it a true statement today?
19    A  Yes, it is.
20    Q  Okay.  The -- if you turn to page 51, start
21  at line 21, Mr. De Ghetaldi asked you "Did you ever
22  look at monthly contributions to the quarters revenue
23  over a period of time, a historical period of time
24  greater than one or two years, to determine whether
25  there was a pattern of similar contributions to the

76

1  total quarter's revenue made by the same month in
2  prior years?"
3      And there's an objection.  Your answer is,
4  "In the pipe, sorry, in the Flash reports that we
5  would issue in month one and month two, I'm referring
6  to the e-mail versions because I did not study any
7  hard copy versions, we would -- it would not be -- let
8  me see how I should phrase this -- it would not be
9  unreasonable to presume that we would look at month
10  one results as a percentage of the total forecast and
11  compare that to month one's results as a percentage of
12  the prior years actual quarterly results for that
13  given period."
14      Do you remember giving that testimony?
15  A  Yes, I do.
16  Q  Okay.  And is that an accurate statement of
17  that testimony?
18  A  Yes, it is.
19  Q  And is this testimony true today?
20  A  I'm sorry?
21  Q  Is the testimony true today?
22  A  Yes, it is.
23  Q  Okay.  His next question is, "I know that
24  what you've said before, and my follow-up question
25  that I've been trying to ask is whether you took a

77

1  deeper historical look past the one or two years that
2  were shown in the monthly e-mail Flash reports?"
3      You answer, "In fiscal 2001?"
4  Questioner, "Yes."  "Not that I recall."
5  Question, "Okay.  At any time did you do
6  that?"
7  Answer, "Are you speaking of -- speaking to
8  current day?"
9  "Yes."
10  "So as an example last quarter?"
11  "Yeah."
12  Answer, the next page, "We're talking month
13  one.  Sorry.  I'm confusing quarters versus months.  I
14  do not recall doing a historical analysis of month one
15  and month two as a percentage of the total quarter."
16      Do you remember giving that testimony?
17  A  Yes.
18  Q  And is this an accurate statement of that
19  testimony?
20  A  Yes.
21  Q  And is this true today?
22  A  Can I reread it?  Where are you reading from?
23  Q  Go from page 51, line 20, to page 53, line
24  four.
25      MR. WALD:  And just for the record, Doug, I'm

78

1  sure you know that the witness goes on to clarify that
2  statement later on, so she could also take a look at
3  the succeeding testimony as well.
4      MR. BRITTON:  Sure.  Let's go off the record.
5  We got to change the tape.
6      THE VIDEOGRAPHER:  This marks the end of tape
7  one, Volume I, in the deposition of Jennifer Minton.
8  At 11:03, going off the record.
9      (Short break taken.)
10      THE VIDEOGRAPHER:  On record at 11:11.  This
11  marks the beginning of tape two, Volume I, in the
12  deposition of Jennifer Minton.
13      BY MR. BRITTON:  Q.  Okay.  Ms. Minton,
14  before we broke, I was reading parts of the transcript
15  from the derivative testimony that you gave in that
16  case.
17      Have you had a chance to read from page 49
18  through page 54?
19  A  Yes, but I do not recall what page you
20  referred to, and I'd like to go back to that.
21      MR. WALD:  Page 51, line 20, to page 53, line
22  four.  Doug, is that --
23      BY MR. BRITTON:  Yes.  It's actually line 21.
24  That's right, so let's start over.
25  Q  Have you had a chance to read --

79

1  A  May I read that first?
2  Q  What's that?
3  A  May I read that first, the line that I was --
4  Q  Yes.
5  A  I'm ready.
6  Q  Have you had a chance to read the -- why
7  don't you tell me what pages you had an
8  opportunity to read since we broke?
9  A  Well, since we broke, I just read line 21 on
10  page 51 through line one on page 52.
11  Q  Line one on page 52?
12  A  Is that right?  Sorry.  There's a lot of
13  noise in between here; okay.
14  Q  Okay.  What pages have you had an opportunity
15  to review?
16  A  49, starting with line four, through, let's
17  say, line 12 on 52.
18  Q  Okay.  Is that -- do you remember giving that
19  testimony --
20  A  Uh-huh.
21  Q  -- in the derivative case?
22      Is that an accurate testimony of the
23  testimony you gave?
24  A  Yes, it is.
25  Q  And is it true today?

80

1    A   Yes, it is.

2    Q   Okay.  If you will read from the start of

3 page 52, line 13, and read through page 55, line one.

4    A   55, line one?

5    Q   Line one.

6    A   Okay.  So when I mentioned earlier that we

7 had, many years prior to the time in question,

8 prepared a historical analysis, that's what he was

9 referring to.

10    Q   Okay.

11    A   And again, that was a regularly prepared

12 analysis that I did not refer to frequently.

13    Q   Let me -- let me ask you questions.

14      You remember giving testimony on page 52,

15 line 13, and page 55, line one?

16    A   Yes.

17    Q   And is this an accurate reflection of that

18 testimony?

19    A   Yes.

20    Q   And is it true today?

21    A   The testimony that I gave?

22    Q   Uh-huh.

23    A   Yes.

24    Q   How far prior to Q3 2001 did you perform this

25 analysis of monthly contributions to the whole?

1    A   Can you repeat that?

2    Q   Yeah.  How far -- how far back prior to Q3

3 2001 did you perform this analysis of the monthly

4 contributions of revenue to the year as a whole?

5      MR. WALD:  I will object to the question,

6 because I think it misstates the witness's testimony

7 both in the deposition and -- both in the deposition

8 that you're reading from and today.

9      BY MR. BRITTON: Q.  Okay.  So why don't you

10 explain to me how is that not right?

11    A   That's not what I said.  Do you want to

12 repeat your question?

13    Q   Yeah.

14      How far -- let me start with how far back

15 does this analysis that you were referencing in your

16 testimony?

17    A   Which analysis?  You mean the one that I said

18 was stale?

19    Q   Yes.

20    A   I do not know how far back.  Many, many years

21 though.

22    Q   Okay.

23    A   That's why it was so stale.

24    Q   Okay.  And the analysis that you're talking

25 about, was that analysis of the monthly revenue

1 contributions to the year as a whole?

2    A   I do not recall precisely the way that the

3 report looks like at the moment, but we were looking

4 at the monthly contribution to a quarter, and I

5 believe that it also looked at the quarter

6 contribution to the year as a whole.

7      Today, when we prepare for our analyst

8 guidance, we are only looking at quarterly

9 contribution, which is why it's much more familiar to

10 me.

11    Q   All right.

12      If you go back to your affidavit, which is

13 Exhibit 27, I want to go through your -- the different

14 positions that you occupied pretty quickly.

15      If you look at paragraphs one and two --

16    A   Yes.

17    Q   -- okay.

18      Do these paragraphs accurately reflect the

19 various job titles that you held at Oracle?

20    A   Yes.

21    Q   So you joined Oracle in May 1989 as an

22 accounting manager?

23    A   I did.

24    Q   Okay.  And then some time after that you were

25 promoted to assistant corporate controller?

1    A   That is correct.

2    Q   Do you remember when?  This doesn't say.  It

3 says "subsequent."

4    A   I've been with Oracle 17 years.  I don't

5 remember specific dates of when I was promoted to

6 various positions.

7    Q   Okay.  Then in November 1998 you were

8 promoted to vice president and corporate controller?

9    A   That is correct.

10    Q   And at the same time chief accounting

11 officer?

12    A   If it's not stated in here, I could not

13 testify that that is correct.

14    Q   Look at paragraph one.

15    A   Since October 2001, I became the chief

16 accounting officer.

17    Q   This says "I am and have been senior vice

18 president, finance and operations, since October 2001,

19 and the chief accounting officer of Oracle since

20 November 1998."

21    A   That's correct.

22    Q   Okay.  So November 1998 you were appointed as

23 chief accounting officer; is that right?

24    A   That is correct.

25    Q   So there was a period of time that you were

1  the chief accounting officer but not yet the senior VP
2  of finance and operation; is that right?
3    A  That would be correct.
4    Q  Did you have forecasting responsibilities in
5  your position as chief financing officer?
6    A  Yes, I did.
7    Q  Okay.  If you look at paragraph two, you say
8  "My responsibilities have included corporate financial
9  planning analysis and financial forecasting for
10  approximately ten years," and the date you signed this
11  affidavit some time in 2003; is that right?
12    A  So this was in 2003.  So that would mean
13  since 1993, roughly, I had some form of
14  responsibilities over the financial planning and
15  forecasting function.
16    Q  Okay.  And when did you start participating
17  or making the upside adjustments that we see in the
18  upside reports?
19    A  I would say that that probably started after
20  Graham Smith left the corporation, which I don't
21  recall which year that was.  It was -- let me actually
22  go back and restate that.
23        Graham was responsible for working with
24  Ray Lane over that period of time for determining the
25  forecast adjustments prior to his departure and is

85

1  responsible for corporate financial planning and
2  analysis.  He would provide me with information that
3  would then be included in our forecast reports as
4  well.
5        So we worked very much close together.  But
6  at that point in time, when he was still with the
7  company, he provided me with additional financial
8  forecasting data.
9    Q  Okay.
10    A  I was not responsible for coming up with the
11  numbers.
12    Q  Okay.  And you don't recall when you were
13  responsible for coming up with the numbers?
14    A  I don't recall exactly, no.
15    Q  Okay.  Now, in your derivative testimony, you
16  estimated the time two years prior to Q3 2001 is when
17  you started doing the upside adjustments.
18        Do you remember giving that testimony?
19    A  I don't recall.
20    Q  Okay.  If you can turn -- it's on page 107.
21    MR. WALD:  I'm sorry, Doug, are you on
22  Volume I?
23    MR. BRITTON:  Yeah, page 107, line 15 through
24  21.
25    MR. WALD:  I'm sorry.  Volume I?

86

1    MR. BRITTON:  It is Volume I, yes.  Numbers
2  are consecutively -- pages are consecutively numbered
3  through the volumes.  You having a hard time?
4    MR. WALD:  My 107 of Volume I -- maybe I'm in
5  the wrong -- no.
6    MS. KYROUZ:  It is --
7    MR. WALD:  Yeah, at line 15.  It just doesn't
8  look like it's about the question when the witness
9  began --
10    THE WITNESS:  It says.  "All right."
11    MR. BRITTON:  It says "All right."
12    MR. WALD:  Okay.
13    MR. BRITTON:  I'll read the question.
14  "All right.  You said that your upside
15  reporting is more predictive of the actual quarter
16  results than summation in the field forecast.  Is that
17  true of those two years prior to the third quarter of
18  fiscal year 2001?
19  "Approximately the eight quarters prior to
20  that."
21  I see what you're saying.
22    MR. WALD:  Yeah, that -- that testimony
23  doesn't map on to your question.
24    BY MR. BRITTON:  Right.
25    Q  Okay.  Now, why don't I have you read page

87

1  106 and 107 from -- page 106, line eight, to page 107,
2  line 21.
3    A  106, line eight?
4    Q  Yes.
5    A  To 107?
6    Q  Line 21.
7    A  21.
8    Q  Have you had a chance to read pages 106 and
9  107?
10    A  I have.
11    Q  Okay.  And does this -- do you recall giving
12  this testimony in the derivative case?
13    A  Yes, I do.
14    Q  And is it an accurate reflection of your
15  testimony?
16    A  Yes, it is.
17    Q  And is it true today?
18    A  Yes, it is.
19    Q  Okay.  Now, does this refresh your
20  recollection about your estimate in the derivative
21  testimony about how far back you went in terms of your
22  experience with the upside adjustments?
23    MR. WALD:  Object.  I'm sorry.  Object to the
24  form of the question.
25    Go ahead.

88

Minton, Jennifer (30b6)  7/7/2006  9:01:00 AM

1    BY MR. BRITTON:  Q.  Go ahead.  You can

2    answer.

3       A   My involvement in the forecasting process, as

4    it pertains to -- let me step back.

5       While I was involved in the forecasting

6    process, I did not determine the upside adjustments

7    until approximately two years prior to the third

8    quarter of fiscal 2001.

9       Q   Okay.  Now, if you look to page 107,

10   lines 12, 13, and 14, you say "Because that's when I

11   became closer to the forecasting process and began to

12   understand more about how it worked."

13      What did you mean by that's when you became

14   closer to the forecasting process?

15      A   If you recall, I mentioned that there was a

16   gentleman named Graham Smith, who used to be the

17   finance support individual for Ray Lane, who used to

18   be the president and ran the sales organization.

19      He would work directly with Ray, and they

20   would, themselves, come up with their own, if you

21   will, upside adjustments at the time to the forecast

22   that were submitted by the field, because the field

23   had developed quite a historical experience of

24   committing to numbers that were far less than what

25   they would ultimately deliver.

89

1    And when Graham was present, he would share

2    that information with me in connection with my

3    preparation of the corporate-wide forecast.

4       After Graham left, another gentleman took his

5    role for a period of time.  I want to say

6    approximately a year, but probably not quite.  So it

7    wasn't until about 1999, somewhere in that fiscal 2000

8    time period or 1999 -- we have very strange

9    quarters -- so somewhere in the 1999 time period that

10   I began to get much closer to the sales organization

11   themselves and participate on forecast calls and

12   various discussions and work closer with the finance

13   personnel that supported the sales organizations.

14      So that is why I said that I began to learn

15   more about how it worked.

16      Q   Okay.

17      A   I became more intimately involved in the

18   process.

19      Q   How long after you became closer to the

20   forecasting process in approximately fiscal 2000 --

21   how long after that did you start being solely

22   responsible for the upside adjustments?

23      MR. WALD:  Object to the form of the

24   question; misstates prior testimony.

25      THE WITNESS:  Can you please repeat your

90

1    question?

2       BY MR. BRITTON:  Yeah.

3       Q   How long after you became closer to the

4    forecasting process did you start -- did you take

5    responsibility for the upside adjustment?

6       A   I don't recall precisely when.  It was

7    roughly within the eight quarters before.

8       Q   Okay.  Was there a learning period trying to

9    figure out how it worked before you were actually

10   doing the upside adjustment?

11      A   No.  There was a lot going on with the sales

12   organization, and responsibilities changing, and

13   personnel leaving the company.  And as personnel left

14   the company, and as responsibilities changed, I was

15   inserted deeper into the process than I had originally

16   had.

17      Q   Okay.  Do you remember giving an interview

18   with Oracle's special litigation committee?

19      A   Yes, I recall meeting with them.

20      Q   Okay.  You met with them on several different

21   occasions; is that right?

22      A   I do not recall how many times I met with

23   them.  I believe at least twice.

24      Q   Okay.  Minton -- what's the next Minton

25   exhibit?

91

1    THE REPORTER:  30.

2    MR. BRITTON:  30.

3    (Document marked Exhibit No. 30

4       for identification.)

5    BY MR. BRITTON:  Q.  Okay.  I've placed in

6    front of you what's been marked as Minton Exhibit 30.

7    Will you take a moment to look at Minton

8    Exhibit 30.  And, for the record, Minton Exhibit 30

9    starts at Bates NDCA-ORCL 299724 and ends at 831.

10   If you just flip through, it's pretty

11   voluminous.  I'll direct your attention to the parts

12   that I'm interested in.

13      A   Where would you like me to --

14      Q   First flip through it and see if you've

15   ever -- if you've seen this document before.

16      A   I've seen this document before.

17      Q   Yeah.

18      Did you review this document in preparation

19   for your deposition today?

20      A   I recall looking at it, but not reading it

21   deeply.

22      Q   Okay.  If you -- if you look at page three of

23   the first volume, which is Bates 299727, there is a

24   heading.  It says "Oracle's Forecasting Process," and

25   then it says "A, Her Experience."

92

1  It says "Minton has been responsible, at
2  least in part, for Oracle's internal forecasting for
3  approximately ten years.  However, Minton said that
4  she was not involved in the 'upside' decision until
5  June of 1999."
6  Is that -- do you recall telling the SLC --
7  A  I don't recall if I gave them that specific
8  date.
9  Q  Does that date look about right?
10  A  Again, I can tell you that Graham Smith left
11  the company, I want to say, some time in 1998.  There
12  was another individual who assumed his
13  responsibilities that left within a year.
14  So June 1999 would be roughly the time
15  period, yes, that I would have gotten involved in
16  making upside decisions.
17  Q  Okay.  In the beginning, when you first
18  starting making upside decisions, did you do that on
19  your own, or did you confer with anybody?
20  MR. WALD:  Object to the form of the
21  question.
22  BY MR. BRITTON:  Q.  You can answer.
23  A  I don't recall when I started conferring with
24  Ivgen Guner, but I would definitely speak with a sales
25  finance personnel.  I'd have the opportunity to hear

93

1  directly from the sales unit leaders.  That would be
2  George Roberts, Sandy Sanderson, Jay Nussbaum in EC
3  meetings.
4  Q  What I'm getting at is the process of coming
5  up with the specific upsides.  Should we add
6  10 million, 20 million, 30 million, whatever the
7  number is.
8  When you first started doing the upside
9  adjustments, did you work with anybody to make the
10  specific upside adjustments?
11  A  Again, I conferred with Ivgen Guner and other
12  sales finance individuals.  I do not recall at what
13  time period that I began working more closely with
14  Ivgen, but I most certainly did confer with
15  individuals either in sales or legal and sales
16  finance.
17  Q  What about Jeff Henley?  In the beginning,
18  was he more involved in the upside decision?
19  A  I don't recall.
20  Q  Okay.  Now, it's your testimony that the
21  upside reports and the potential forecasts was
22  historically more accurate than the field forecast; is
23  that right?
24  A  Once I became involved in the process,
25  absolutely.

94

1  Q  Okay.  Was that for every quarter that you
2  were involved?
3  A  I don't recall.
4  Q  Okay.  Do you recall any quarters that you
5  missed that your estimate was further off than the
6  field estimate?
7  A  I don't recall missing.  I don't recall my
8  forecast missing up until Q3 of fiscal 2001.
9  Q  Do you ever recall your forecast being much
10  higher than the actual results at any time between the
11  time you started in Q3 of 2001?
12  A  What I do recall, generally speaking, is that
13  my predictive forecast was much closer to what the
14  actual forecasts -- what the actual results would be
15  for a quarter.
16  Q  Whether it's higher or lower --
17  A  I don't recall --
18  Q  -- correct?
19  A  -- whether or not I was ever higher or lower.
20  I'm sure I wasn't spot on.  So I'm sure that I was
21  possibly a little over a little under, but for the
22  most part, pretty much on target.
23  Q  Okay.  Okay.  Five and six, this will be
24  Financial Report 12, and this one will be Financial
25  Report 13.  Excuse me.  The second one will be

95

1  Financial Report Exhibit 54.
2  (Document marked Exhibit No. 12 and 54B
3  for identification.)
4  BY MR. BRITTON:  Q.  Before we get to the
5  reports, was your forecast, the potential forecast in
6  your upside reports, your best estimate at the time of
7  where the quarter would come out?
8  A  Yes.
9  Q  You did the best job you could to figure out
10  where at the end you're going to -- Oracle was going
11  to come up?
12  A  That is correct.
13  Q  Okay.  Now, when you talk about your forecast
14  being more accurate than the field, are you referring
15  just in general, or is there any specific points in
16  time throughout the quarter that your forecast was
17  more accurate than the field's forecast?
18  A  Whenever I had prepared a forecast for the
19  quarter, my forecast for a quarter, irrespective of
20  the date within the quarter that I prepared them,
21  prior to Q3 of fiscal 2001 was much closer to our
22  actual results for the quarter than what was submitted
23  by the field -- the field sales organizations.
24  Q  Okay.  Take a look at Financial Report 12 and
25  Financial Report 54 for me.

96

1    MR. WALD: 54?
2    MR. BRITTON: Yeah.
3    MR. WALD: 54. Doug, which is which?
4    MR. BRITTON: Financial Report 12 is the Q1
5 '01 upside report.
6    MR. WALD: Okay.
7    MR. BRITTON: And it has Bates ORCL 0001374
8 through 1385.
9    MR. WALD: Thank you.
10    MR. BRITTON: And then Financial Report 54
11 starts at Bates ORCL 0009424 and ends at 9548.
12    MR. WALD: Doug, I'm --
13    THE WITNESS: Is this the same report?
14    MR. BRITTON: This looks like we have a copy
15 error here. Exhibit or Financial Report 54 does start
16 at 9424 and ends at 9548, but I haven't included all
17 of the pages in this exhibit. When we get to the
18 binders, every page will be in the binder.
19    MS. KYROUZ: Do you want this as a different
20 designation then?
21    MR. BRITTON: Well, I think it's fair to say
22 it's a different excerpt. Why don't we go 54A --
23    MR. WALD: A, B --
24    MR. BRITTON: Okay.
25    MR. WALD: Since it's not a big document,

97

1 Doug, can you read which excerpts it contains in the
2 record.
3    MR. BRITTON: Yes. It's 9424, 9425, 9440,
4 9441 through --
5    THE WITNESS: Bless you.
6    MR. WALD: Thank you.
7    MR. BRITTON: -- 9446 and then 9548.
8    MR. WALD: Thank you.
9    BY MR. BRITTON: Q. Okay. Have you had an
10 opportunity to look at Financial Report 12 and
11 Financial Report 54B?
12    A Yes.
13    Q And let's start with financial report
14 Exhibit 12. Do you recognize this exhibit?
15    A I recognize the fact that it's an upside
16 report, yes.
17    Q Okay. So if you turn to the second page,
18 this has the columns that we were talking about
19 earlier, "Forecast," "Upside" and "Potential."
20    A That would be correct.
21    Q And "Total License" is the top line?
22    A That would be correct.
23    Q So it looks like the forecast is 676,
24 676 million and some change. Your upside is
25 220 million, and your potential forecast is

98

1 896 million.
2    A That is correct.
3    Q Okay. Now, if you look at Financial Report
4 54B, and the page with Bates 9441, does this refresh
5 your recollection about whether your forecasts ever
6 exceeded the actual results for the quarter?
7    A Do you realize that I did not prepare this
8 upside report?
9    Q You didn't?
10    A No.
11    Q Who prepared this one?
12    A I don't know.
13    Q When did you leave?
14    A I was on medical leave.
15    Q When did you leave?
16    A I recall my surgery was April 15th, and I
17 didn't get back until some time in Q1 of fiscal 2001.
18    Q So you got back in July?
19    A I think that's about right.
20    Q Okay. So do you know who prepared the upside
21 report when you left?
22    A I did not have any involvement during that
23 time period. I was on medical leave.
24    Q Okay. You can put that document -- am I
25 right though? Am I looking at the right figures, the

99

1 upside potential forecast in 12 was over $100 million
2 higher than the actuals for Q1 '01?
3    A I'm sorry. Where are you looking now?
4    Q Comparing Financial Report 12 --
5    A Yes.
6    Q -- 1376, with Financial Report 54, 9441.
7    A Right. It looks to be like they added
8 220 million to the upside.
9    Q Right.
10    So the potential forecast in this report was
11 89 million, and the actual results were seven -- it's
12 very hard to read -- but in the 700-million range,
13 789, I think?
14    A That appears to be about correct.
15    Q Okay.
16    MR. WALD: What is the date, Doug, on FR12,
17 the date FR12 was prepared?
18    MR. BRITTON: June 19th.
19    THE WITNESS: It says June 28th on this.
20    MR. BRITTON: Yeah, if you look back to
21 page 12 of the document, 1385, there is a footer at
22 the bottom right. It says "6/19 upside."
23    MR. WALD: Okay.
24    BY MR. BRITTON: Q. And you don't know who
25 took over the responsibilities for preparing the

100

1  upside when you were gone?

2  A  There were a number of people that came to my

3  aide while I was gone.  So it could have been

4  Larry Garnick, could have been Lia Burke, it could

5  have been -- I'm not sure that Ivgen Guner was there

6  at the time, so I really cannot testify as to who

7  prepared this.

8  Q  Okay.  Now, you mentioned earlier that the

9  sales force "sandbagged."

10  A  That is correct.

11  Q  Okay.  What's your understanding of the --

12  that term, how it was used at Oracle?

13  A  That they would commit to numbers that were

14  significantly less than what they would actually

15  deliver.

16  Q  Okay.  Was this a source of contention with

17  Mr. Ellison?

18  A  Yes, it was.

19  Q  And you testified earlier you don't remember

20  him ever changing the parameters for the forecasts for

21  the commit numbers; is that right?

22  A  Excuse me?

23  Q  You don't remember Mr. Ellison changing the

24  parameters or the criteria for the forecast number for

25  the field?

101

1  A  I don't understand your question.

2  Q  All right.

3  Maybe I'll give you some documents to help

4  you.  Minton -- what's the next in order?

5  THE REPORTER:  31.

6  MR. BRITTON:  This will be 31A, and this one

7  will be 31B.

8  THE WITNESS:  Are we done with these

9  documents?

10  (Document marked Exhibit No. 31A - 31B

11  for identification.)

12  BY MR. BRITTON:  Q.  Okay.  The court

13  reporter has placed in front of you what's been marked

14  as Minton Exhibits 31A and 31B.

15  MR. WALD:  Which is which, Doug?

16  MR. BRITTON:  31A starts at Bates 202815 and

17  ends at 202998.  31B -- pardon me -- 31B starts with

18  NDCA-ORCL 202995 and ends with 998.

19  MR. WALD:  I think you just misspoke

20  yourself.  31A is 202815 through 821.

21  MR. BRITTON:  Through 821.

22  MR. WALD:  Okay.

23  MR. BRITTON:  And then 31B is 202995 through

24  202998.

25  MR. WALD:  Okay.  Yeah, you just misspoke

102

1  yourself on the first one.

2  BY MR. BRITTON:  Q.  Do you recognize

3  Exhibits 31A and B?

4  A  I recognize the license revenue forecast

5  analyses.  I just read this e-mail note.

6  Q  Okay.  Let's start with 31A.  Top page, this

7  appears to be an e-mail from you to several

8  individuals dated September 19th, 2001 --

9  A  That is correct.

10  Q  -- is that right?

11  Is this a true and accurate copy of an e-mail

12  you sent on that day?

13  A  I presume it is.

14  Q  Okay.  Is it part of your job

15  responsibilities to send this e-mail?

16  A  I was asked by Jeff to put together an

17  analysis of the accuracy of the field forecasts.

18  Q  All right.

19  A  I think that this document in itself supports

20  why I had to make upside adjustments to get to a

21  realistic forecast.

22  Q  Okay.  If you look at the last page of

23  Exhibit 31A --

24  A  Uh-huh.

25  Q  -- it says "FYI.  We need to work closely

103

1  with management to improve the accuracy of the

2  forecast.  Larry made it clear --"

3  A  I'm sorry.  Where are you at?

4  Q  Last page.

5  A  Okay.

6  Q  It says "FYI.  We need to work closely with

7  management to improve the accuracy of the forecast.

8  Larry made it clear that he wants everyone to submit

9  realistic forecasts - he is not interested in 'commit'

10  numbers."

11  Is that part of the e-mail that you wrote?

12  A  I'm assuming this is all part of the same

13  e-mail note.  There's two different pages of the text

14  which is somewhat confusing to me.

15  Q  Right, which is why I marked 31B.

16  If you look at 31B, if you look at 202997, in

17  the middle of the page it says "Jennifer Minton

18  wrote."

19  A  Right.  Now this is a much more intuitive

20  e-mail trail.

21  Q  Right.

22  The reason I marked this one instead of the

23  other one is because this one doesn't have the

24  analysis on it, 31B.

25  A  Right, but it also doesn't show the string of

104

1  who the e-mail is being --
2  Q  Right.
3  A  -- sent to.
4  Q  So the text that I read from 31A is the
5  e-mail that you wrote; is that right?
6  A  Yes.
7  Q  Okay.  Now, when you mention "Larry made it
8  clear," is that Larry Ellison?
9  A  Yes.
10  Q  Okay.  And did you implement any changes in
11  response to Mr. Ellison's frustrations with the commit
12  numbers?
13  A  I don't understand your question.  I'm so
14  sorry.
15  Q  Change parameters?  Change definitions of
16  forecast?  Did you do anything to adjust?
17  A  I asked my finance team to work closer with
18  the field to make sure that the --
19  Q  Okay.
20  A  -- field sales organizations were submitting
21  more realistic numbers.
22  Q  Okay.  And do you know how they did that?
23  A  No, I do not know how they did that.
24  Q  Weren't they doing that before?
25  A  If I can speak to the U.S. sales finance

105

1  individuals at the time versus the international
2  folks, they would submit effectively whatever they
3  were instructed to submit.  They would not have an
4  independent view of the forecasts.
5  So if, for example, Jay Nussbaum wanted to
6  submit a forecast, and he knew that he was -- had --
7  that he could easily overdeliver on that forecast,
8  they would still submit a lower forecast, in my
9  opinion.
10  Q  Okay.
11  A  They would not necessarily agree with me.
12  Q  Okay.  Now, were -- weren't you working with
13  the finance people for the divisions to determine what
14  your upside was?
15  A  I would confer with them, yes.
16  Q  Okay.  So how was that different than what
17  you instructed them to do in September of 2000 in
18  terms of working closer with the sales managers to get
19  a realistic forecast?
20  A  I'm not sure I understand your question.
21  Q  Well, my confusion is the -- the finance
22  assistance for the field would help you come up
23  with -- would talk with you and then you'd come up
24  with your upside number.
25  A  Uh-huh.

106

1  Q  Here you're asking them to work closer with
2  the field to get a realistic forecast.
3  A  Uh-huh.
4  Q  So what were they doing differently or what
5  did you have in mind for them to do differently based
6  on this directive that they were already doing when
7  they were talking with you with their upside numbers?
8  A  I wanted them to look at historical
9  conversion rates as an example and apply that to the
10  pipeline to validate whether or not the submitted
11  forecasts were too conservative.
12  Q  Okay.  And did they do that?
13  A  Some of them, some of them I tracked the U.S.
14  folks most.
15  (Document marked Exhibit No. 32
16  for identification.)
17  BY MR. BRITTON:  Q.  I'm placing in front of
18  you what's been marked as Minton Exhibit 32.  Will you
19  take a moment to look at this exhibit?
20  For the record, Exhibit 32 starts at
21  NDCA-ORCL 203681 and ends at 683.
22  Have you had an opportunity to look at
23  Exhibit 32?
24  A  Yes, I have.
25  Q  Do you recognize it?

107

1  A  I've read it.  I recall roughly what this is
2  in relation to.
3  Q  Okay.  Can you tell me what you recall about
4  this?
5  A  In -- yeah.  Most certainly.
6  In the early part of fiscal 2001, I believe,
7  although I'm not certain as to the time period, we
8  were rolling out Oracle sales online.  And whenever
9  you have three different sales organizations, we
10  actually had more than that if you count the
11  international folks, you had different practices with
12  regards to forecasting, and -- and one of the things
13  we were attempting to do was to roll out a new
14  application, was to develop a global standard process
15  for interpreting the data that's within the -- the
16  pipeline.
17  But prior to that we had, you know, deals on
18  Excel spreadsheets, and deals in one system.  I think
19  we called it -- well, I can't remember the one for
20  ISD, the telesales organizations.  So we didn't have
21  all of our forecasts at one point in one common
22  system.
23  So as we were moving towards getting all of
24  the deals, all the opportunities into one system, we
25  wanted everyone to adopt a global standard philosophy

108

1   for putting a probability and to forecasting a
2   particular opportunity
3       Q   Okay.  Now, this -- you're not on this
4   e-mail.  It's from Patricia McManus to James English
5   dated October 6, 2000; am I reading that right?
6       A   Yes, it is from Patty McManus to Jim in
7   October 2000.
8       Q   Right.
9       Now, the second paragraph of the e-mail body
10  which is on 203683 it says, "Recently Larry has
11  changed the way he is interpreting our forecast.  He
12  would like us to reflect our numbers as follows," and
13  then the first heading is "Worst - this is our bottom
14  threshold - minimum 80% probability for opportunity -
15  our old thinking of commit."
16      Do you remember -- withdrawn.
17      Do you know if that's referring to
18  Larry Ellison?
19      MR. WALD:  I'll object to the form of the
20  question.  It lacks foundation, unless you can
21  establish that this witness has read this document and
22  knows what it refers to, but I'll also point out for
23  the record the subject line says "Draft:  New
24  Terminology on Forecasting."
25      MR. BRITTON:  Peter, I think that was a

109

1   speaking objection, if I ever heard one.
2       MR. WALD:  I don't think so.
3       MR. BRITTON:  I think so.  I'd appreciate it
4   if you wouldn't do it.
5       MR. WALD:  Well, my objection stands, and I'd
6   appreciate it if you would be kind enough to put into
7   the record the titles of the e-mails that you're
8   asking the witness about and lay a foundation if you
9   want to ask her a question about the e-mail.
10      MR. BRITTON:  Peter, I -- this is a speaking
11  objection like I never seen before.  If you keep it
12  up, we'll get Fontaine on the phone.
13      MR. WALD:  I'd be happy to.
14      MR. BRITTON:  This is disrupting.  This is
15  disrupting this deposition.  If you want on
16  cross-examination -- let me speak -- so on
17  cross-examination you want to come back and do
18  whatever you think you need to do, feel free, but I'm
19  going to conduct this deposition the way I see fit.
20      MR. WALD:  And I'm going to object when you
21  ask questions that lack foundation.
22      MR. BRITTON:  All right.  You can say
23  "foundation," but if you keep talking like this, we'll
24  get Fontaine on the phone.
25      MR. WALD:  Well, you are talking.

110

1       BY MR. BRITTON:  Q.  Okay.  The question I
2   have for you is do you know if this is referring to
3   Larry Ellison?
4       A   I don't know precisely.  I could only assume
5   it's referring to Larry, but I have no idea.
6       Q   Okay.
7       A   I have no basis for --
8       Q   Does this refresh your recollection at all on
9   whether there was any changes made in response to
10  Larry Ellison being frustrated, if you will, about the
11  field's commit number?
12      MR. WALD:  Object to the form.
13      THE WITNESS:  No.  Again, what I recall
14  during this time frame was that we were rolling out a
15  new application, Oracle sales online, and we wanted to
16  have consistent definitions so that the field would be
17  using a new application in a consistent fashion.
18  Again, in part, due to the fact that we had three
19  different sales organizations in North America.
20      BY MR. BRITTON:  Q.  Do you remember, during
21  this period of time, Larry changing the way that he
22  was interpreting the forecasts from the field?
23      A   No.
24      Q   Okay.  Now, the fourth paragraph says "This
25  is a change from our current thinking in that our

111

1   forecasts is not usually had a significant amount of
2   judgment.  It was the amount that you believed you
3   could deliver at a minimum."
4       Do you remember whether the field forecast
5   beginning in Q2 of 2001 included more management
6   judgment than it had in the past?
7       A   I do not recall.
8       Q   Okay.  Before I get to the next topic, if you
9   go back to Financial Report 54 --
10      Q   Are we done with this one?
11      Q   Financial Report 54B, it's the document that
12  was so hard to read.  There.  It's the page with 9441.
13      MR. WALD:  Can we have the court reporter
14  mark the original as 54B, because it's right now just
15  54.
16      MR. BRITTON:  That should have been -- wait a
17  minute.  I'm on the wrong -- 54B.  So, yes, mark the
18  original as 54B.
19      Q   Okay.  If you turn to the page with Bates
20  9442, it's the spreadsheet.  Are we on the same page?
21      Now, I asked you earlier if this entire
22  document was kept in electronic form, and I believe
23  you testified that it wasn't.
24      Do you know if these spreadsheets were kept
25  in electronic form?

112

1   A   These aren't spreadsheets.
2   Q   What are these?
3   A   They are printouts.  They are reports.
4   Q   So this data, could we go back today and
5   retrieve this data in electronic form?
6   A   No.
7   Q   No; okay.
8       And do you know if --
9   A   Not that I'm aware of.  I mean, it may be
10  that legal has got a backup somewhere.
11  Q   Okay.  Now, in this -- this is the report for
12  Q1 '01.  In Q2 2001, would you have been able to go
13  back and retrieve this spreadsheet electronically if
14  you wanted?
15  A   Okay.  I'm going to --
16  Q   Withdrawn.  Let me ask the question a
17  different way.
18      In Q2 2001, could you have gone back and
19  located this information electronically?
20      MR. WALD:  Object to the form.
21      BY MR. BRITTON:  Q.  You can answer.
22  A   I believe the answer is no, and if I may take
23  a few minutes to explain.
24      This is what appears to be a report printed
25  off of OFA.  So if it was printed off of OFA and not

113

1   dumped into a spreadsheet, which I believe these
2   reports -- so if this an extract of a report from one
3   of these packages here, we were attempt --
4   Q   What exhibit are you referring to?
5   A   I am referring to Exhibit 60, which was the
6   financial reference books, the maroon or red books --
7   Q   Yes.
8   A   -- as we refer to it, and the only reason why
9   I'm able to make this distinction is that the title,
10  the way that the title prints out, it refreshes -- it
11  makes me recall that we were printing reports directly
12  out of Oracle Financial Analyzer and binding them
13  rather than having to export data into a spreadsheet,
14  printing them and binding them.
15      We were trying to leverage the reporting
16  capabilities off of this particular product and not
17  have to create lots of spreadsheets and whatnot.
18      Does that make sense to you?
19  Q   Uh-huh.
20  A   So these reports, because they're
21  organizational-based reports, they're -- an
22  organization is made up of many cost centers, and you
23  have what's called an organizational hierarchy, and so
24  cost center A, B, and C may roll up to organization
25  one, and cost center F, G, H may roll up to

114

1   organizational two.
2       If you have an organizational change and that
3   cost center becomes -- moves from one organization to
4   another, then you have a change in your organizational
5   hierarchy.  So the data would come -- the data that
6   these reports were based on were based, in part, on
7   the organizational hierarchy that was in existence at
8   the time that they were printed.
9       Does that make sense?
10  Q   Yes.
11  A   So while raw data may be -- and we don't keep
12  an OFA.  We only keep, I don't know, I think three
13  years of history.  I don't know honestly what they do
14  with the data, if we store it somewhere or whatnot,
15  but we only use a couple of years of data in OFA at
16  any point in time.
17      But if those organizational hierarchies
18  change, again, that could change the way that the
19  organizational revenue and expense results would be
20  presented.  So I believe that these were reports that
21  were generated directly off of OFA based on the
22  organizational hierarchy in place at the point in time
23  that they were printed.
24  Q   Okay.  And was data from OFA backed up, to
25  your knowledge?

115

1   A   Absolutely.
2   Q   Okay.  And is that what you're referring to
3   as you would keep it for two years, two or three years
4   of history?
5   A   No, and I really can't speak to this.
6   When -- when a new period -- a new fiscal period
7   starts, because of memory, and I'm not talking about
8   general ledger, I'm talking this particular product,
9   Oracle Financial Analyzer, we have all of the data in
10  our general ledger.
11      The data in our general ledger is summarized
12  and imported into Oracle Financial Analyzer which is a
13  tool that we would use for evaluating actuals, versus
14  forecasts, versus budget; okay.
15      So as a new fiscal year begins, due to memory
16  and solve -- you know, the length of time it would
17  take to solve all the data, we would drop off a year
18  as we begin a new fiscal year.
19  Q   Okay.  Now, are you --
20  A   Because for analytical purposes, we're really
21  only interested in comparing the current year versus
22  the prior year when we're doing our forecasts.
23      This is primarily used as a forecast.  OFA
24  was primarily used as a tool for looking at actuals
25  versus forecasts versus budget.

116

1    Q   Okay.  When you say you would drop off a

2   year, the data being saved, was it two years or three

3   years?

4    A   I really don't recall.

5    Q   You don't recall; okay.  You can put that

6   document aside.

7    Do you remember the guidance that Oracle gave

8   to the financial community for Q3 2001?

9    A   For Q3 2001, what I recall is a $0.12 -- let

10   me go back to this -- $0.12 EPS guidance with a

11   projected license revenue growth of 25 percent.

12    Q   Okay.

13    Q   I'm sorry.  Do I need this document anymore

14   then?

15    Q   No, you can put that document aside.

16    Do you remember the guidance that was given

17   for database growth and applications growth?

18    A   I do not recall.

19    Q   Okay.  The guidance to the street that was --

20   withdrawn.

21    Do you understand the difference between

22   actual dollars and constant dollars?

23    A   I do.

24    Q   You do.

25    A   Do you?

117

1    Q   Can you explain that for me?

2    A   Because we have a number of subsidiaries and

3   because the subsidiaries transact business in their

4   local currency, we translate their local currency

5   results into U.S. dollars based on the exchange rate

6   that's in effect towards the end of the month, and we

7   do that each month, and that's what represents our

8   U.S. dollar reported results.

9    Constant dollars, on the other hand, is when

10   we take the local currency financial results, and we

11   translate that into U.S. dollars using a constant

12   exchange rate.  We refer to it as our budget rate or

13   the constant dollar rate, and that enables us to

14   evaluate the results in constant dollar terms.

15    In other words, we're able to evaluate the

16   actual growth in revenues or expenses, excluding the

17   effect that currency rate fluctuations can have on our

18   U.S. dollar reported results.

19    Q   Okay.  And the guidance that Oracle gave to

20   the street in Q3 of 2001, that was in actual dollars?

21    A   Yes.  We always give guidance in U.S. dollar

22   results, and we tend to also inform analysts as to how

23   much currency effect is reflected in those U.S. dollar

24   results.

25    Q   Okay.  And do you remember how the currency

118

1   impacted the forecast in Q3 of 2001?

2    A   I believe during fiscal 2001 currency had a

3   negative effect.

4    Q   Okay.  Negative 5 percent sound familiar?

5    A   That sounds about right --

6    Q   Okay.

7    A   -- for Q3.

8    Q   So the license revenue growth rate that

9   Oracle gave to the community was 25 percent in actual

10   dollars; is that right?

11    A   That would be correct.

12    Q   And then the negative 5 percent currency

13   impact made the license revenue growth 30 percent; is

14   that right?

15    A   In constant dollar terms.

16    Q   In constant dollar terms.

17    So the guidance to the street was license

18   revenue growth of 25 percent of actual dollars and

19   30 percent license revenue growth in constant dollar

20   terms?

21    A   What we would tell -- yes.  At that point in

22   time, we would tell the analysts what the currency

23   negative or positive currency impact was on the U.S.

24   dollar growth guidance so that in their own models

25   they could revise their own estimates in the event

119

1   that we had huge currency fluctuations throughout the

2   course of the quarter.

3    So if the dollar strengthened significantly

4   or weakened significantly from the point in time in

5   which we gave our guidance, they would be able to back

6   into their models what impact that might have on the

7   quarterly results.

8    Q   Okay.

9    (Document marked Exhibit No. 33

10   for identification.)

11    MR. WALD:  How much time on the tape?

12    THE VIDEOGRAPHER:  We have about an hour yet

13   to go.

14    MR. WALD:  Whenever you want to take a break.

15    MR. BRITTON:  Okay.

16    THE WITNESS:  You guys do eat; right?

17    MR. WALD:  Yeah.

18    MR. BRITTON:  Yeah.  I'm trying to get to a

19   breaking point, so....

20    MR. WALD:  That's fine.

21    BY MR. BRITTON:  It will be soon.

22    Q   I've placed in front of you what's been

23   marked as Minton Exhibit 33.  Will you take a moment

24   to look at this exhibit?

25    For the record, Exhibit 33 starts at 15450

120

Minton, Jennifer (30b6)  7/7/2006  9:01:00 AM

1   and ends at 51.
2        Do you recognize Exhibit 33?
3    A   Yes.
4    Q   And what do you recognize it to be?
5    A   This is an e-mail note from Jeff Henley
6   to Larry with a copy to myself, Safra Catz, and
7   Stephanie Aas, who was in charge of investor relations
8   at the time, and he's basically typing in, as he calls
9   it, "soundbites," things that he plans to mention or
10   bring up on the analysts call that we have when we
11   release our earnings --
12    Q   Okay.
13    A   -- for the second quarter.
14    Q   Okay.  And this was two days before the
15   earnings release?
16    A   I don't know which day was the earnings
17   release.
18    Q   Does this document refresh your recollection
19   about what Mr. Henley told the market about APS growth
20   and database growth?
21    A   In this document, he says he was going to
22   give targets for applications and database.  75 APS
23   and 25 percent database.
24    Q   Okay.  And do you know if he actually gave
25   that guidance?

121

1        MR. WALD:  The question is whether it
2   refreshes your recollection as to what he actually
3   said?
4        THE WITNESS:  If he said it here, wrote it
5   here, I presume he said it in the actual call.  I
6   cannot recall if he did or did not.  I'd have to look
7   at an earnings transcript.
8        BY MR. BRITTON:  Q.  Did you participate on
9   the earnings calls?
10    A   At one point I joined the earnings calls.  I
11   was definitely on it when we preannounced in Q3.
12   There was a point when I joined the calls and a point
13   when I stopped joining the calls.
14    Q   Okay.
15    A   I don't recall.  It wasn't -- it wasn't very
16   routine until more recently.
17    Q   Okay.  Did you participate in the Q2 2001
18   earnings call?
19    A   I don't -- I may listen to the call.  I may
20   have been in the same room, but I would not have
21   participated in the call, if that helps to set the
22   record straight.
23    Q   Yes.
24        Paragraph five --
25    A   Yes.

122

1    Q   -- says "We've seen no slowdown in our
2   business to date.  Our current assumption is that
3   while the U.S. economy is slowing down and while there
4   are tech sectors like semiconductors, pc's, etc
5   showing slowing demand, ebusiness software (database
6   and apps) is a high priority for customers so this
7   explains why our pipeline isn't slowing down."
8        Did you have any conversations with
9   Mr. Henley during this period of time about whether
10   Oracle was seeing a slowdown in its business?
11    A   Not that I recall.
12    Q   Okay.  Okay.  You can put that document
13   aside.
14        And then before we break for lunch, I want to
15   get your understanding of -- if you have one -- of
16   Jeff Henley's process that he would go through to
17   determine what guidance to give the street.
18    A   So Jeff Henley would meet with investor
19   relations, and they would work on a model that
20   investor relations had maintained, which I think was
21   early, which I believe was very similar to the models
22   that the analysts would keep.  It was, if you will, in
23   our external income statement format.
24    Q   Okay.
25    A   And so they would work on a model.  At the

123

1   same time, I would prepare the forecast, and -- and I
2   either met, at times, with Jeff and the person who was
3   in charge of investor relations, or sometimes I would
4   meet with the person in charge of investor relations
5   independently before Jeff would meet with the IR
6   individual.  There was no set practice.
7    Q   Okay.  Who was the IR individual?
8    A   At this point in time, it was Stephanie Aas.
9    Q   Okay.  Was there anything else in his process
10   that you knew of in determining what number to give to
11   the street?
12    A   Again, Stephanie would come up with her
13   model.  I would come up with my model, and we would
14   reconcile the two of them.
15    Q   Okay.  Did he look at --
16    A   And my -- and my upside reports were
17   generally used.  But what Stephanie would do with her
18   models is try to recast them into an external income
19   statement format, because we budgeted based on a
20   management summary format that is by organization.
21        The street would develop their models based
22   on the external income statement format.  So we would
23   try and take the expenses based on management summary
24   format that were being forecasted for the quarter and
25   recast them in an external income statement format.

124

1      So it was primarily my model that we would
2  use to derive the ultimate numbers, but we had to
3  recast it such that it was in an external income
4  statement format for purposes of the IR model.
5      Does that make sense?
6  Q  Yes.
7  A  Okay.
8  Q  Did -- if you know, did Jeff Henley look at
9  quarter-over-quarter numbers, sequential numbers, or
10  year-over-year in deciding what type of guidance to
11  give to the street?
12  A  We would look at both our historical
13  year-over-year numbers, and we would also look at
14  historically what we did between Q3 -- sorry --
15  between Q2 and Q3.
16  Q  Okay.  Then the end decision on what guidance
17  to give to the street was Jeff Henley's?
18  A  Yes, but it was predicated off of my upside
19  reports.
20  Q  Right.  Okay.
21      If the guidance was predicated on your upside
22  reports, do you know why Jeff Henley would work with
23  the investor relations person to develop an IR model?
24  A  Yes.  I'm sorry.  I thought you understood.
25      So, if I may, our external income statement

125

1  has line items such as sales and marketing expenses,
2  services, R&D, G&A.
3      So when we gave guidance, at times we would,
4  or at least IR would, talk to the analysts and help
5  them understand where we thought the growth and
6  expenses or the decrease in expenses would come from,
7  whether it was sales and marketing, R&D, G&A or
8  services.
9      So her model was, again, a recast of the
10  management upside forecasts, the upside reports, but
11  in an external income statement format.
12      Do you understand?
13  Q  Yes.
14      And was she basing her numbers on the field
15  part of the upside report or the potential part of the
16  upside report?
17  A  I presume her model was in sync with my
18  potential in that we were always reconciling back
19  to -- to my forecast reports.
20      MR. BRITTON:  Okay.  Why don't we break for
21  lunch.
22      MR. WALD:  Okay.
23      THE VIDEOGRAPHER:  This marks the end of tape
24  two, Volume I, in the deposition of Jennifer Minton.
25      At 12:32, going off the record.

126

1      (Lunch break taken.)
2      (Document marked Exhibit No. 34
3      for identification.)
4      THE VIDEOGRAPHER:  On record at 1:24.
5      This marks the beginning of tape three in
6  Volume I in the deposition of Jennifer Minton.
7      BY MR. BRITTON:  Q.  Ms. Minton, we've placed
8  in front of you what's been marked as Minton
9  Exhibit 33.  Will you take a moment to look at this
10  exhibit?
11      For the record, Exhibit 33 starts at 399742
12  and ends at 752.
13      Have you had a chance to look at Exhibit 33?
14  A  I have.
15  Q  Do you recognize it?
16  A  I believe this is an example of the investor
17  relations model that I described earlier.
18  Q  Okay.  Great.
19      And this is dated December 8th, 2000; is that
20  correct?
21  A  That is correct.
22  Q  All right.
23      If you -- this has information dating back to
24  fiscal 1993; right?
25  A  Yes, it does.

127

1  Q  Okay.  If you look at the page with Bates
2  399746, are you there?
3  A  Uh-huh.
4  Q  The far right, there's fiscal 2001, and then
5  there's a highlighted column, and can you tell me what
6  that highlighted column represents?
7  A  It's fiscal 2001 Q3 estimate.
8  Q  Estimate.
9      So this is the estimate that the investor
10  relations department created?
11  A  I don't know if this is their preliminary or
12  their final version, but this would be something that
13  they would have worked on.
14  Q  Okay.  Now, the EPS line is another
15  horizontal, if you will --
16  A  Uh-huh.
17  Q  -- line, and then it has $0.10 earning per
18  share --
19  A  That's correct.
20  Q  -- am I reading that correct?
21  A  Uh-huh.
22  Q  Okay.  Do you know if the investor relations
23  department ever increased their earnings per share
24  estimate beyond $0.10?
25  A  I do not know.

128

Minton, Jennifer (30b6)  7/7/2006  9:01:00 AM

1    Q   Okay.  The number below says "consensus"; is
2  that the analyst --
3    A   I should say I do not recall.  But generally
4  speaking, she would sit down with me, and then she'd
5  go back and revise her models once she had a sense as
6  to what the forecast was.
7    Q   Okay.
8    A   So I would highly doubt that this was a final
9  analysis on her part.
10    Q   Okay.  The "Consensus" line right below the
11  "EPS" shaded area, does that represent the analyst
12  consensus?
13    A   Yes, it does.
14    Q   Okay.  Now, is that -- does that call or that
15  row there, the "Consensus," row, is that what the
16  analyst consensus is, or is that information about
17  what Oracle is going to give as guidance to the street
18  for its earnings?
19    A   This document calls it "Consensus," which
20  generally meant to be the consensus of analysts of the
21  EPS.
22    Q   Okay.
23    A   And I would note to you that this is also
24  before we released earnings.
25    Q   Right.  That was my question.

129

1    Q   Do you know -- were you aware if analysts had
2  reached a consensus estimate on Oracle's earnings
3  prior to the earnings release?
4    A   The analysts generally come up with an
5  estimate for earnings for all four quarters of a
6  fiscal year.
7    Q   Okay.
8    A   And at the end of each earnings release, they
9  would update or modify their consensus throughout the
10  year.
11    Q   If you look down to the bottom box, it starts
12  with the year-over-year growth.
13    A   Uh-huh.
14    Q   There is a total "Revenue" line, and then
15  there is a "License & Other."  Can you tell me what
16  goes into the "& Other" category?
17    A   We would have documentation revenues,
18  miscellaneous revenues.
19    Q   Okay.  So miscellaneous would go into that
20  "Other" column?
21    A   Uh-huh.
22    Q   Okay.  All right.  You can put that document
23  aside.
24    A   I'm sorry.
25    Q   You can put that document aside.

130

1    All right.  Do you remember when --
2  withdrawn.
3    Do you understand that Oracle's dot.com
4  business started to slow some time in fiscal year
5  2001?
6    A   It slowed in Q3 of fiscal 2001.
7    Q   Okay.
8    A   That's for certain.
9    Q   Okay.  Did you know at the time or any time
10  prior to Q3 2001 that Oracle's dot.com business was
11  slowing?
12    A   What do you mean by "prior to Q3"?
13    Q   Q2, Q1?
14    A   You mean prior to November 30th?
15    Q   Yes.
16    A   Not that I recall.
17    Q   Okay.  Did you have any discussions at the
18  executive management committee meetings prior to Q3
19  2001 about the dot.com business slowing?
20    A   I do not recall the specifics of any of the
21  discussions that took place at the executive
22  management committee meetings.
23    Q   Okay.  I'm not going to mark this as an
24  exhibit.
25    You -- go ahead.

131

1    A   Does she --
2    Q   She won't need it, yeah.
3    Okay.  I've placed in front of you what has
4  previously been marked as Classick Exhibit 3.  Will
5  you take a moment to look at this exhibit.  Just flip
6  through it and let me know if you recognize it.  You
7  probably don't.
8    A   Darn it.
9    Q   Do you recognize it?
10    A   Not at all.
11    Q   Okay.  The question I have is going to relate
12  to page ten of this exhibit.  This is a presentation
13  that Nic Classick gave at a Q2 fiscal year '01
14  business OPS review.  I'll testify that he testified
15  that he told George Roberts about the information
16  that's on page ten.
17    Do you remember during Q2 '01 whether there
18  was any discussion at the executive management
19  committee meeting about the slowdown in the dot.com
20  space?
21    A   I don't recall.
22    Q   Did George Roberts ever tell anybody that at
23  the executive management committee meetings in Q2 '01?
24    A   I don't recall.
25    Q   Okay.  Do you recall having any discussions

132

Minton, Jennifer (30b6)  7/7/2006  9:01:00 AM

1  with George Roberts outside of the executive
2  management committee meetings about a slowdown in the
3  dot.com space?
4     A  I don't recall.
5     Q  Do you recall anything about what was going
6  on with the dot.com segment of the economy during the
7  Q2, Q1 2001 time period?
8     A  Q2 2001 time period?
9     Q  Yes.
10    A  I don't recall.
11    Q  Okay.
12    A  Just so you know, I never participated in
13  this level of operations reviews.
14    Q  Right.
15    A  So I wouldn't have been that deep in the
16  organization.
17    Q  Right.  What I'm trying to find out is if it
18  made its way up to you.
19       So you don't recall anything about what's
20  happening in the dot.com economy during the calendar
21  year 2000?
22    A  Not that I recall.
23    Q  Okay.  Okay.  You can put that document
24  aside.
25    A  I mean clearly Q3 we had some problems.

133

1     Q  Right.  So I don't have to throw any paper at
2  you; okay.
3        I've placed in front of you what has
4  previously been marked as Winton Exhibit 39.  Would
5  you take a moment to look at this exhibit.
6        For the record, exhibit -- Winton Exhibit 39
7  starts with Bates NDCA-ORCL 131788 and ends at 789.
8  Okay.  Do you recognize Winton Exhibit 39?
9     A  Not at all.
10    Q  Okay.  The e-mail dated December 11th, 2000,
11  from Cynthia Rheins to Bill Roselli, Jody Terry, and
12  Ivgen Guner.
13       Ivgen Guner was -- she worked for you; is
14  that right?
15    A  I believe she worked with me at that time,
16  yes.
17    Q  Did you have any conversations with
18  Ivgen Guner at the beginning of 2001 about Oracle's
19  dot.com business?
20    A  Not that I recall.
21    Q  Okay.  All right.  Put that document aside.
22       Do you -- do you have an understanding of
23  what the term "database drag" means or meant at Oracle
24  in fiscal year 2001?
25    A  Yes, I understand what that means.

134

1     Q  What does that mean?
2     A  When you sell an application license,
3  generally you sell database licenses with it, so we
4  refer to that as the "database drag."
5     Q  Okay.  Did you have a study done of the
6  database drag going into the third quarter of 2001?
7     A  I don't recall when, but there was, at one
8  point in time, an analysis done to ascertain what the
9  database drag would be for application sales.
10    Q  Okay.  Do you have an understanding of
11  whether two analysis had been done in terms of the
12  applications drag?
13    A  Whether what?
14    Q  Whether they had been done a year before Q3
15  '01?
16    A  I don't recall that it was done.
17    Q  Okay.  Do you recall the applications drag
18  for technology revenue falling going into Q3 of 2001?
19    A  I don't recall.
20       MR. WALD:  I'm sorry.  Did you mean to switch
21  from applications drag to database drag?  I mean,
22  database drag to applications drag?
23       MR. BRITTON:  No, database drag.
24       MR. WALD:  I think if you look at your
25  questions --

135

1        MR. BRITTON:  Okay.  Can you hand me the --
2        MR. WALD:  124, line 11, Doug.
3     BY MR. BRITTON:  Okay.  All right.
4     Q  Do you recall the database drag falling going
5  into the third quarter of 2001?
6     A  I don't recall.
7     Q  Okay.  Leave that there.
8        What number are we on?
9        THE REPORTER:  35.
10       MR. BRITTON:  This will be 35A, 35B, 35C.
11       (Documents marked Exhibits 35A - 35C
12        for identification.)
13       MR. WALD:  Could you say which is which for
14  the record?
15       BY MR. BRITTON:  Yeah.
16    Q  We've placed in front of you three exhibits.
17  One marked 35A, next one 35B, the next one 35C.  Take
18  a moment to look at those, and let me know if you
19  recognize them.
20       For the record, Exhibit 35A starts at 14028
21  and ends at 030, 35B starts at 14031 and ends at 34,
22  and 35C starts at 14038 and ends at 040.
23       Do you recognize any of these exhibits?
24    A  I can see my e-mails, that they were sent to
25  me, but I don't recall them other than recognizing

136

1  they were sent to me.

2  Q  Okay.  If you look at Exhibit 35A --

3  A  Uh-huh.

4  Q  -- this -- the top e-mail is -- well, let me

5  ask it a different way.

6      Do you recognize Exhibit 35A?

7  A  Again, it was sent to me, so obviously it was

8  an e-mail that I received.

9  Q  Okay.  And it was an e-mail from Loren Mahon

10  to you?

11  A  Mahon, uh-huh.

12  Q  What was Loren Mahon's position?

13  A  Loren, at the time, was in charge of order

14  administration, contract administration type

15  functions --

16  Q  Okay.

17  A  -- for the Americas.

18  Q  And she sent this e-mail to you on

19  December 5th, 2000; is that right?

20  A  That would be correct.

21  Q  Is this a true and authentic copy of the

22  original?

23  A  I presume that it is.

24  Q  Okay.  Did you ask Loren Mahon to do an apps

25  deal summary in Q2 '01 for Q2 '01?

137

1  A  I must have, since she sent me this

2  analysis --

3  Q  Okay.

4  A  -- but I don't recall actually asking her.

5  Q  Okay.  Do you know why this analysis was done

6  at the beginning of Q3 '01?

7  A  I'm assuming that Jeff had asked me to have

8  somebody prepare the analysis.

9  Q  Okay.

10  A  I don't remember what predicated the request.

11  Q  Okay.  Do you know why he asked you to -- to

12  have that performed?

13      MR. WALD:  Object to the form.

14      THE WITNESS:  I just answered I thought that

15  I didn't -- I don't know.

16      BY MR. BRITTON:  Q.  Okay.

17  A  I don't recall.

18  Q  If you look to Exhibit 35B, this is an e-mail

19  from you to Jeff Henley; is that right?

20  A  That would be correct.

21  Q  Okay.  And you sent this on December 12,

22  2000?

23  A  That is correct.

24  Q  Okay.  And is this a true and authentic copy

25  of the original?

138

1  A  I presume that it is.

2  Q  Okay.  And can you tell me what this e-mail

3  is describing?

4  A  I can read it to you.

5  Q  Sure.

6  A  "The database drag for Q2 FY01 appears to be

7  about 23.5% for application deals greater than

8  $1 million.  Summarized below is the application drag

9  rates the last time this analysis was performed.  The

10  numbers represent how much non-apps revenue is booked

11  for every $1 of apps."

12  Q  Then let me stop you with that.

13      The chart below has average six quarters, 48

14  and .43 down at the bottom --

15  A  Yes, it does.

16  Q  -- is that right?

17      MR. WALD:  For a certain size deal.

18      THE WITNESS:  For -- for certain size

19  deals --

20      MR. BRITTON:  Correct.

21      THE WITNESS:  -- and for the fiscal 1998 time

22  period and the first half of fiscal 1999.

23      BY MR. BRITTON:  Q.  Okay.  The -- for the

24  period up above on the top it has greater than 25k and

25  greater than 50k.

139

1      What do those numbers represent?

2  A  I believe they represent the percentage of

3  non-apps revenue for contracts that were greater than

4  $25,000 but less than $58,000 on the left column, and

5  on the right column it would intuitively represent the

6  same, but for contracts that were $50,000 or greater.

7  Q  Okay.  And then in the analysis that you

8  attach, the analysis is for deals that are greater

9  than one million; is that right?

10  A  What attached?

11  Q  If you look --

12  A  On 35B?

13  Q  35B, right.  If you look at the second page,

14  attached is the e-mail that was forwarded to you.

15  A  So it was forwarded, yes.

16  Q  To you, and then you forwarded it to

17  Jeff Henley --

18  A  Yes.

19  Q  -- right?

20      So the top line that you read says that the

21  analysis that's attached is for deals that are greater

22  than $1 million.

23  A  That is correct.

24  Q  And I'm trying to get an understanding, why

25  was the analysis performed on dollar amounts that were

140

1  so much lower on the earlier periods versus -- versus
2  the analysis that's attached.
3      MR. WALD:  Object to the form.
4      THE WITNESS:  I don't recall.
5      BY MR. BRITTON:  Q.  Okay.  Now, you say that
6  the database drag has decreased; is that right?
7    A  That is correct.
8    Q  Okay.  How -- if you're comparing deals that
9  are greater than a million dollars for this analysis,
10 how can you compare them to dollar amounts that are
11 lower for deals that are smaller?
12     MR. WALD:  Object to the form.
13     THE WITNESS:  What do you mean?
14     BY MR. BRITTON:  Q.  I'm trying --
15   A  I'm sorry.
16   Q  -- to get, is it an apples-to-apples
17 comparison to look at $1 million transactions versus
18 transactions that are 25- to $50,000?
19   A  Not necessarily.  I believe that in the Q2
20 FY '01 we were probably trying to do a quick survey
21 and so looked at the larger deals.
22   Q  Okay.  And you prepared this e-mail?
23   A  I sent the e-mail, yes.
24   Q  And you sent it on December 12, 2000; is that
25 right?

141

1    A  Yes.
2    Q  Is this a true and authentic copy of the
3  original?
4    A  I presume that it is.
5    Q  Okay.  And was it your responsibility to send
6  this e-mail?
7    A  If asked, I would send an e-mail.
8    Q  Okay.  Now, if you --
9    A  Contains information requested.
10   Q  -- if you turn to 35C --
11   A  Yes.
12   Q  -- do you recognize this e-mail?
13   A  I recognize it was sent to me, but I don't
14 recall.
15   Q  You don't recall the document?
16      Do you remember that the database drag in
17 Q2 '01 was down to $0.30 on the dollar compared to
18 $0.50 several years earlier?  Do you remember that
19 analysis being done in Q2 '01?
20   A  Based on this e-mail note, it is -- it is
21 noting that it is now $0.30 on the dollar versus $0.50
22 on the dollar.  But again, I'd like to point out that
23 the analysis that was contained in -- that is referred
24 to in this e-mail is for application deals that are
25 over 500k, whereas the analysis that it's referring to

142

1  where it was roughly $0.50 on the dollar was for deals
2  that were much smaller in size.
3    Q  Okay.  And Jeff Henley says, "Assuming this
4  relationship is true for total ww apps sales, the
5  impact on our worldwide technology number is about 10%
6  of the total technology revenue."
7    A  That's what it states.
8    Q  Did I read that right?
9      Okay.  "Significant but certainly not huge."
10 Is that correct?  Am I reading that right?
11   A  You read it verbatim, yeah.
12   Q  Okay.  If -- if the comparison -- withdrawn.
13      If the dollar values are significant, do you
14 have an understanding on why Jeff Henley was analyzing
15 two studies together?
16     MR. WALD:  Object to the form; lacks
17 foundation; calls for speculation.
18     THE WITNESS:  I have no basis to comment.
19     BY MR. BRITTON:  Q.  Okay.  Okay.  Put that
20 document aside.  All right.
21      Did you have any involvement in the Covisint
22 transaction?
23   A  Covisint?
24   Q  Is that how it's pronounced, Covisint?
25   A  Uh-huh.

143

1    Q  Did you have any involvement in the Covisint
2  transaction?
3    A  No, I did not have any involvement in
4  Covisint transactions.
5    Q  Okay.  Did you have any -- any involvement at
6  all, not necessarily the closing transaction --
7  closing transaction, but any involvement at all?
8    A  Not that I recall.
9    Q  Okay.  Were you CCed on e-mails, kept
10 up-to-date on what was going on?
11   A  I may very well have been, but I don't recall
12 any specific e-mails.
13   Q  Okay.  Do you remember a concern about
14 collectability with the Covisint transaction?
15   A  Covisint.
16   Q  Covisint transaction.
17   A  What I do remember is the deal did not close
18 in Q2.  It closed in Q3, and when it closed, we
19 collected the cash at or about the same time that the
20 deal was consummated.
21   Q  Okay.
22   A  If I recall correctly, but I think that was
23 indeed the case.
24   Q  Okay.  And how long after the deal closed did
25 Oracle collect the cash?

144

Minton, Jennifer (30b6)  7/7/2006  9:01:00 AM

1     A   I don't recall.

2     Q   Okay.  What is your understanding of

3  Covisint?  Who -- who -- withdrawn.

4         What was your understanding at the time of

5  Covisint's business?

6     A   I don't recall.

7     Q   Okay.  Do you recall who the -- well, do you

8  recall that it involved the big three auto makers?

9     A   I think you are correct.

10    Q   Okay.  And do you know why Oracle collected

11  the cash shortly after recognizing the revenue in Q3

12  2001?

13    A   Because those were the terms of the

14  arrangement --

15    Q   Okay.

16    A   -- I suppose.

17    Q   But you don't know if there was any

18  collectability concerns --

19    A   Not that I recall.

20    Q   -- in closing?

21        Okay.

22        (Document marked Exhibit No. 36

23         for identification.)

24        MR. BRITTON:  Is that 36?

25        THE REPORTER:  Yes.

145

1     BY MR. BRITTON:  Q.  Placing in front of you

2  what's been marked as Minton Exhibit 36, would you

3  take a moment to look at this exhibit.  Have you had a

4  chance to look at Minton Exhibit 36?

5     A   Yes, I have.

6     Q   Do you recognize it?

7     A   Yes, I do.

8     Q   And what is Minton Exhibit 36?

9     A   It is an e-mail.

10    Q   And what is the e-mail about?

11    A   The e-mail is about the allocation of the

12  discount on the Covisint transaction across the

13  various products that were sold in the deal.

14    Q   Okay.  And this, at least the top e-mail, is

15  dated December 31st of 2000; is that right?

16    A   Yes, it is.

17    Q   Okay.  Do you know when the revenue was

18  recognized on the Covisint deal?

19    A   I believe it was in the month of December.

20    Q   Okay.  Now, if you go back to the last page

21  which is an e-mail from Mike Rosser to

22  Mark Barrenechea --

23    A   Mark Barrenechea.

24    Q   -- Mark Barrenechea, can you tell me what

25  this e-mail is describing?

146

1     A   Mark -- sorry -- Mike Rosser is sending a

2  note to Mark Barrenechea suggesting that the

3  allocation of the discount on the transaction be

4  revised and not predicated on the relative list price

5  of the underlying products that were contained in the

6  bundle.

7         Rather, he was suggesting a different

8  discount percentage be used which would have the

9  result of increasing the amount of revenue allocated

10  to both CRM and ERP application products.

11    Q   Which, in turn, would likely increase the

12    A   commissions that he might be able to earn on the

13  transaction.

14    Q   Okay.  He says here, "Clearly the Xchnge

15  pricing and associated database licenses drastically

16  skewed the total list price and therefore discount on

17  the deal.  It is inappropriate to spread those

18  discounts across all applications within the deal.

19  Obviously getting 128k in licenses for the CRM portion

20  and 75k in licenses for the normal ERP products, does

21  not make sense.  Our smallest GB customers pay more

22  than this."

23        Do you know whether it was inappropriate to

24  spread the discount across all the applications in the

25

147

1  deal?

2         MR. WALD:  Objection.

3         BY MR. BRITTON:  Q.  Or do you know if it was

4  inappropriate to spread the discount across all the

5  components in the deal?

6         MR. WALD:  Object to the form.

7         THE WITNESS:  The policy that we had adopted

8  and had stuck to was to allocate the discount based on

9  the relative list price of all of the products

10  contained within the transaction.

11        BY MR. BRITTON:  Q.  Other than --

12    A   It was suggesting a different methodology for

13  this particular transaction.

14    Q   Other than commissions, do you know why he

15  was concerned about the allocation?

16    A   Mike Rosser, a sales rep?

17    Q   Okay.

18    A   I can guarantee you his concern was

19  commissions.

20    Q   Okay.  Now, the next e-mail up is from

21  Mark Barrenechea to Sandy Sanderson, Safra Catz, and

22  Mike Rosser.  It looks like Mark Barrenechea is saying

23  "Thank you for agreeing to make this change, as long

24  as it is 'legally' do-able."

25        Do you know if Mark Barrenechea supported

148

Minton, Jennifer (30b6)  7/7/2006  9:01:00 AM

1    reallocating the percentages?
2      A   Absolutely.
3      Q   Same reason, commissions?
4      A   He was in charge of the CRM product line.
5      Q   So he wanted more value in the CRM
6    products --
7      A   (Witness nods head.)
8      Q   -- which would increase his commissions?
9      A   I don't know what his compensation plan on --
10   was predicated on, but he clearly would have an
11   interest in demonstrating that his products were doing
12   favorably within the market.
13     Q   Okay.  Do you know what deal Covisint agreed
14   to?  Is it the --
15     A   Covisint.
16     Q   Excuse me.
17         Covisint agreed to?  Is it the -- the
18   original allocation in the description on the back
19   page?
20     A   Customers are not involved in the allocation
21   of a discount across the products.  They purchase
22   products --
23     Q   Okay.
24     A   -- and make up the total deal, and they pay a
25   certain amount for that deal.

149

1      Q   Okay.  So the customer isn't concerned with
2    how Oracle allocates the purchase price for the
3    certain products?
4      A   No.
5      Q   Okay.  Do you know when Covisint signed the
6    deal?
7      A   I believe it was in December of 2000.
8      Q   December of 2000.
9          Okay.  Okay.  Then if you go to the top page
10   which is your e-mail, it says "Jennifer Minton wrote:
11   Tom -- you're closest to this transaction.  Please
12   advise if there was an error in recording the
13   underlying product revenue for this deal."
14         What were you concerned about -- withdrawn.
15         What in the e-mail strings below your e-mail
16   caused you to ask whether there was an error in
17   recording the underlying revenue?
18     A   Can you repeat your question?
19     Q   Yeah.
20         What in the e-mail -- in the information in
21   the e-mails below your e-mail caused you to ask
22   Tom Williams whether there was an error in recording
23   the underlying product revenue for this deal?
24     A   I was effectively asking Tom to confirm that
25   the actual product revenue allocation was done indeed

150

1    correctly in accordance with our policy.
2      Q   Okay.  And who was responsible for
3    determining the revenue recognition on the Covisint
4    deal?
5      A   The revenue recognition, Tom Williams was
6    responsible for determining whether or not revenue was
7    recognizable.
8      Q   Okay.  And he was responsible to determine
9    when to recognize the revenue?
10     A   He reviewed all of our large contracts and
11   made the revenue recognition call.
12     Q   Okay.  What about how to price the contract
13   with Covisint?  Who was responsible for doing that?
14     A   With Covisint, again, I'm not into details,
15   so I can't speak to you or give you any information
16   regarding that.
17     Q   Okay.  Do you know why the Covisint revenue
18   was not recognized in Q2?
19     A   I don't believe the transaction had
20   concluded --
21     Q   Okay.  Do you know --
22     A   -- but I could be wrong.
23     Q   Okay.  Do you know what remained to be
24   completed?
25     A   I don't recall.

151

1      Q   And who would know this information?
2      A   What information?
3      Q   Information about whether it was completed in
4    Q2, why it wasn't recognized in Q2?
5          MR. WALD:  Object to the form.
6          THE WITNESS:  I don't know if it was
7    completed or not completed in Q2.
8          BY MR. BRITTON:  Q.  Right.  Who would know
9    that information?
10     A   Well, we could go look up the contract and
11   find out when it was consummated.  We can look to the
12   actual underlying document.
13     Q   Okay.  Who was responsible for negotiating
14   the Covisint transaction?
15     A   The sales organization would get involved in
16   the negotiating.
17     Q   Okay.  Was there a senior executive that was
18   responsible for the Covisint transaction?
19     A   There would be, generally speaking, an
20   executive sponsor on very large transactions.  I do
21   know that Safra Catz was involved in the underlying
22   negotiations for this transaction.
23     Q   Okay.  Okay.  You can put that document
24   aside.
25         Were you aware, at any point in time, whether

152

Minton, Jennifer (30b6)  7/7/2006  9:01:00 AM

1   Oracle was subject to a permanent injunction by the
2   SEC?
3       A   A permanent injunction?
4       Q   Injunction.
5       A   You mean consent decree?
6       Q   Consent decree and final judgment.
7       A   We are under a consent decree and have been
8   since, I want to say, the very early 1990s.
9       Q   Okay.  And can you describe that consent
10  decree for me, please?
11      A   No, I cannot.
12      Q   Have you ever seen the consent decree or the
13  final judgment?
14      A   I don't recall.
15      Q   Were -- have you ever had any conversations
16  with anybody about the consent decree and what it
17  requires?
18      A   I may have, but I don't recall.
19      Q   Okay.  And did Oracle have a practice of
20  notifying people within its organization about the
21  consent decree?
22      A   I do not recall.  This was a very long time
23  ago.
24      Q   Okay.  It was a very long time ago, but it
25  was a permanent injunction; right?

153

1       A   Again, it's still in effect today.
2       Q   Okay.
3       A   So whether or not permanent is indefinite, I
4   don't know.
5       Q   Okay.  When is the last time you had a
6   conversation with anybody about the consent decree?
7       MR. WALD:  I'm going to assume you're not
8   asking for privileged information.
9       MR. BRITTON:  Right.
10      THE WITNESS:  I don't recall.
11      BY MR. BRITTON:  Q.  If somebody is hired
12  today in a position that would be impacted by the
13  consent decree, does Oracle have a process for
14  notifying that person of the consent decree and its
15  terms?
16      A   Not that I am aware of.
17      Q   Who would be aware of that, if there was one?
18      MR. WALD:  Object to the form.
19      THE WITNESS:  You can refer to our general
20  counsel.  When employees are hired, they are clearly
21  advised of our ethics, policies, and whatnot.  Whether
22  or not it has a reference in it that pertains to the
23  consent decree, I do not know --
24      MR. BRITTON:  Okay.
25      THE WITNESS:  -- or recall.

154

1       BY MR. BRITTON:  All right.
2       Q   I'd like you to -- okay.  I'd like you to
3   turn back to the SLC interview memo.  I didn't mark
4   the exhibit number down, so --
5       MR. WALD:  Which tab is that?
6       BY MR. BRITTON:  That, I don't know.
7       Q   Do you have -- did you reference what the
8   exhibit number was?  Is that on the front page there?
9   What's the exhibit number?
10      A   30.
11      Q   30; okay.  Turn to Exhibit 30 for me.
12      Okay.  And if you'll go to volume three,
13  which is at the very end.
14      A   At the end of this binder?
15      Q   Yes.  It is the page with Bates 299829.
16      A   29982?
17      Q   829.
18      A   Not 828?
19      Q   Well, that's the first page.  This is group
20  two, Exhibit 54.  If you'll read that for me.  Let me
21  know if you recognize it.
22      Can we take a quick break, five-minute break?
23      THE VIDEOGRAPHER:  Off record at 2:17.
24      (Short break taken.)
25      THE VIDEOGRAPHER:  On record at 2:26.

155

1       BY MR. BRITTON:  Q.  Okay, Ms. Minton, my
2   questions are going to be directed to the last pages
3   of this document which are 299830 and 831.  Starting
4   with the Oracle's bad debt reserve.
5       MR. WALD:  Doug, let me just take a running
6   objection to this line of question on relevance
7   grounds.
8       Obviously I'm not going to instruct the
9   witness.  But for all of the reasons that you know,
10  our view is that this is irrelevant and it has been
11  deemed to be so by Judge Spiro.
12      BY MR. BRITTON:  Obviously we disagree with
13  that position, but we'll take it up at a later time.
14      Q   Have you had an opportunity to look at the
15  last two pages of Exhibit 30?
16      A   Yes, I have.
17      Q   And do you recognize that?
18      A   No, I don't.
19      Q   Okay.  Do you remember having a meeting with
20  the lawyers for the special litigation committee about
21  allegations, about accounting allegations?
22      A   Vaguely.
23      Q   Okay.  The --
24      MR. WALD:  I'm sorry, Doug.  Just looking at
25  our exchange, you're give me my running objection?

156

1     MR. BRITTON:  I will give you your running
2   objection, yes.
3     MR. WALD:  Okay.  Thank you.
4   BY MR. BRITTON:  Q.  The last line of
5   page two, which is at 299830, says "She stated that in
6   October of 2002, in the process of investigating the
7   allegations in the SAC, which she characterized as
8   false and baseless, she and others at Oracle had
9   learned that certain persons in Oracle's Collections
10  Department would occasionally move certain items from
11  Oracle's unapplied cash account to its bad debt
12  reserve account."
13     Do you remember telling the Special
14  Litigation Committee that?
15  A  I can see it here.  I don't remember any
16  details of the conversation.
17  Q  Okay.  Is it a true statement?
18  A  Absolutely.
19  Q  Okay.  When did you start the investigation?
20  In October 2002?  Withdrawn.
21     Did you start the investigation in
22  October 2002?
23  A  I don't know when it was started.  I was not
24  involved in the actual investigation.
25  Q  Okay.  Who was involved in the actual

157

1   investigation?
2   A  Our in-house counsel.
3   Q  All right.
4     It says that "She and others at Oracle had
5   learned that certain persons in Oracle's collection
6   department would occasionally move items."
7   A  Excuse me.  I forgot to put this on.
8   Q  Do you remember giving -- well, withdrawn.
9     Is that a true statement?
10  A  I'm sorry.  Can you -- I was putting this on.
11  I got distracted.
12  Q  Where it says that you and others at Oracle
13  had learned that certain persons had moved items; is
14  that a true statement?
15     MR. WALD:  I'm sorry.  Would occasionally
16  move certain items?
17  BY MR. BRITTON:
18     No, that she and others at Oracle had
19  learned.
20  Q  You discovered that people were, in fact,
21  moving items from Oracle's unapplied cash account to
22  its bad debt reserve account; is that right?
23     MR. WALD:  For the record, it says "would
24  occasionally."  I'm just wondering if --
25  BY MR. BRITTON:

158

1   A  Is that right?
2   A  I learned that that did indeed happen on
3   occasion.
4   Q  Okay.  And who, other than you, at Oracle
5   learned of this movement?
6   A  I believe I learned of this in an audit
7   committee discussion that was heading up the
8   investigation of the allegations.
9   Q  And who was part of that committee?
10  A  The audit committee is comprised of, at the
11  time, Don Lucas, Dr. Boskin, and Joe Grunfest.
12  Q  Okay.  Where it says "certain persons," who
13  were those "certain persons"?
14  A  I'm sorry.  Where are you referring to?
15  Q  The second line on the last page of
16  Exhibit 30.
17  A  I do not know.
18  Q  Do you remember any of them?
19  A  Any persons in the collections department?
20  Q  Yeah, the certain persons in Oracle's
21  collections department.
22  A  I do not know which certain persons they
23  were.
24  Q  Okay.  So you have no idea who was doing the
25  movement?

159

1   A  I have absolutely no idea.
2   Q  Okay.  Do you know under whose authority the
3   people in the collections department were moving items
4   from the unapplied cash account to the bad debt
5   reserve account?
6     MR. WALD:  And, again, just for the record, I
7   would caution the witness that when Mr. Britton asks
8   you a question, you should testify about your
9   knowledge, except to the extent that the knowledge is
10  gained through a privileged conversation with counsel;
11  okay.
12     THE WITNESS:  Okay.
13     MR. WALD:  So I would instruct you to exclude
14  from the ambit of any answer you give information that
15  you learned as a result of a privileged conversation.
16     THE WITNESS:  Okay.
17  BY MR. BRITTON:  Q.  Okay.  Do you know under
18  whose authority the transactions were taking place?
19  A  I do not know.
20  Q  Now, this says that the -- that "Certain
21  persons in Oracle's Collections Department would
22  occasionally move certain items from Oracle's
23  unapplied cash account to its bad debt reserve
24  account."
25     Do you know how frequently those movements

160

1  occurred?

2   A  No.

3   Q  Okay.  Do you know how many transactions were

4  at issue that were discovered?

5   A  No.

6   Q  Do you know the transaction, the dollar value

7  of the transactions that went from the unapplied cash

8  account to the bad debt reserve account?

9   A  No.

10   Q  Okay.  What is Oracle's unapplied cash

11  account?

12   A  An unapplied cash account is where funds are

13  deposited until such time that the cash receipt is

14  applied to the appropriate invoice and/or other item

15  that it may pertain to.

16   Q  Is there a customer overpayment portion of

17  the unapplied cash account?

18   MR. WALD:  Object to the form.

19   THE WITNESS:  I am not in the detail of the

20  system in that regard, that level of detail.

21   BY MR. BRITTON:  Q.  Were you ever at that

22  level of detail?

23   A  No.

24   Q  The last line of the top paragraph says "She

25  further stated that the company is in the process in

161

1  investigating this past practice."

2   Is that a true statement?

3   A  All I can tell you is that when the

4  allegations were raised, legal undertook an

5  investigation to evaluate whether or not the

6  allegations had any merit.

7   Q  Okay.  The -- I'm taking from this sentence

8  is that the practice of moving certain items from

9  unapplied cash to bad debt reserve was the subject of

10  an investigation, and that's what I'm asking; is that

11  true?

12   MR. WALD:  Object to the form.

13   THE WITNESS:  I was not involved in the

14  actual investigation.

15   BY MR. BRITTON:  Q.  Do you know what the

16  results of that investigation were?

17   A  No, I do not.

18   MR. WALD:  Objection; form.

19   THE WITNESS:  Sorry.

20   BY MR. BRITTON:  Q.  Do you know if there

21  were any consequences to anybody as a result of moving

22  certain items from unapplied cash to bad debt?

23   A  I was not involved in the investigation.

24   Q  So you don't know anything about it?

25   A  (Witness shakes head.)

162

1   MR. WALD:  Can you answer audibly to the last

2  question, so you don't know anything about it?

3   THE WITNESS:  I do not know of any details of

4  the investigation.

5   MR. BRITTON:  Okay.

6   THE WITNESS:  Sorry.

7   BY MR. BRITTON:  Q.  Do you know who was

8  responsible for the investigation?

9   A  Again, I believe the investigation was

10  conducted by our in-house counsel.

11   Q  All right.

12   The next paragraph says "Mr. Krisman stated

13  that plaintiffs had further alleged that at the end of

14  every month, Oracle would run an auto adjustment that

15  would take money out of the unapplied cash account and

16  would transfer it to the bad debt reserve account.

17  Minton stated that, to her knowledge, this had not

18  occurred in fiscal year 2001."

19   Do you remember talking to the SLC about --

20  about this?

21   A  I don't recall it.

22   Q  Do you know if the auto adjustment

23  ever happened at Oracle?

24   A  I do not know that had ever happened.

25   Q  Okay.

163

1   A  I'm not sure what they're referring to.

2   Q  Would you know if an auto adjustment had been

3  made to take money from the unapplied cash account and

4  move it to the bad debt reserve?

5   MR. WALD:  Object to the form.

6   THE WITNESS:  No, I would not know.

7   BY MR. BRITTON:  Q.  Who would know the

8  information?

9   A  I'm just telling you that I was not in that

10  level of detail.

11   Q  Okay.

12   A  I was much further up in the organization and

13  did not have in-depth knowledge.

14   Q  Okay.  Do you know who at Oracle would be

15  responsible or would be in a position to know whether

16  this auto adjustment had been made?

17   A  I'm not sure how to answer your question.  I

18  know nothing of the auto adjustment.

19   Q  Okay.  So if today you wanted to find out if

20  Oracle, at the end of every month, ran an auto

21  adjustment to take money from the unapplied cash

22  account into the bad debt reserve account, how would

23  you find that out?

24   A  I would go talk to somebody who was managing

25  our accounts receivable function.

164

Minton, Jennifer (30b6)  7/7/2006  9:01:00 AM

1    Q  Okay.  And who was that in fiscal year 2001?
2    A  In fiscal year 2001, Mike Quinn had
3    responsibility for revenue operations.  Accounts
4    receivable is a function that fell underneath that
5    umbrella.
6    Q  Okay.  Did Oracle have any controls in place
7    in fiscal year 2001 that would have identified a
8    transaction valued in many millions of dollars moving
9    from the unapplied cash account to the bad debt
10   reserve account?
11       MR. WALD:  Object to the form; lacks
12   foundation.
13       THE WITNESS:  I need you to rephrase the
14   question.  Put some parameters around dollars and
15   whatnot.
16   BY MR. BRITTON:  Q.  Okay.  If, say, in Q3
17   2001 $20 million had moved -- had been moved from
18   Oracle's unapplied cash account to its bad debt
19   reserve account, did Oracle have any controls in place
20   that would alert management of that movement?
21       MR. WALD:  Same objection.
22       THE WITNESS:  I do not know.
23   BY MR. BRITTON:  Q.  Did you know in fiscal
24   2001?
25   A  I do not know.

165

1    Q  Did you know that Oracle's unapplied cash
2    account, the customer overpayment part of that
3    account, dropped more than $100 million in Q2 '01?
4        MR. WALD:  Object to the form of the
5    question; lacks foundation.
6        THE WITNESS:  I do not know.
7    BY MR. BRITTON:  Q.  Did Oracle have any
8    controls in place in fiscal year 2001 that would have
9    alerted management to the unapplied cash account
10   dropping by $100 million in one quarter?
11       MR. WALD:  Same objection.
12       THE WITNESS:  I do not know.
13   BY MR. BRITTON:  Q.  Okay.  Were you aware of
14   any reports that were generated about the -- either
15   the bad debt reserve or the unapplied cash account
16   during fiscal year 2001?
17   A  Not that I recall.
18   Q  Okay.  In Q3 2001, if you knew that
19   $20 million had moved from the unapplied cash account,
20   would you have had the ability to trace where it went?
21       MR. WALD:  Object to the form of the
22   question; it's hypothetical; lacks foundation.
23       THE WITNESS:  I don't know.
24   BY MR. BRITTON:  Q.  Who would know that?
25   A  I don't know.

166

1    Q  Did you ever have to trace any movement from
2    one general ledger account to another general ledger
3    account in your time as chief accounting officer at
4    Oracle?
5    A  Did I personally --
6    Q  Uh-huh.
7    A  -- have to trace amounts moving from one
8    account to another?
9    Q  Uh-huh.
10   A  No.
11   Q  Okay.  At any time in your -- while at
12   Oracle?
13   A  I perform -- I would have performed variation
14   analyses at a higher level.
15   Q  Okay.  If you wanted to -- if you wanted to
16   trace where amounts left the unapplied cash account
17   and moved to another account, could you do that if you
18   wanted to?
19   A  I'm certain that we could trace it back
20   electronically.
21   Q  Okay.
22   A  There would be an audit trail in the systems.
23   Q  Okay.  And what system were you using at the
24   time that would enable you to do -- to trace the audit
25   trail?

167

1    A  I'm referring to Oracle Financial Systems.
2    Q  Okay.  When you say you did variation
3    analysis, what do you mean?
4    A  I would explain, you know, different than an
5    auditor would differences.  Not at this time I would.
6    I would have personally.  I would review variation
7    analyses that were performed, but you would explain
8    large swings in accounts that were unusual.
9    Q  Okay.  Did you ever do that at Oracle?
10   A  Do you want to put a time frame on it?
11   Q  Let's start with ever.
12   A  When I joined Oracle in the early 1989, 1990
13   time period, for a few years after that I was very
14   much involved in doing a detailed financial review of
15   the U.S. amounts, or the U.S. ledger I should say.
16   Q  Okay.  And in fiscal year 2001, did you ever
17   perform that variance analysis?
18   A  On the U.S. ledger?
19   Q  Yes.
20   A  No.
21   Q  Did you instruct anybody to do a variance
22   analysis of the ledger in fiscal year 2001?
23   A  That would be a common review analysis that
24   would have been performed by members in the general
25   ledger accounting team.

168

**Page 169**

1  Q  And who were those people --

2  A  I don't recall.

3  Q  -- in 2000?

4  Okay.  In the second quarter of fiscal year

5  2001, Oracle's customer overpayment account declined

6  from 150 million to about $25 million.

7  Did Oracle ever investigate why that dropped?

8  MR. WALD:  Object to the form of the

9  question; lacks foundation.

10  THE WITNESS:  I do not know.

11  BY MR. BRITTON:  Q.  Okay.  Do you know if

12  there was any investigations into any adjustments in

13  the overpayment account during the second quarter of

14  2001?

15  A  Are you referring to the unapplied account?

16  Q  Yes.

17  A  Versus the -- so can you repeat your

18  question.

19  Q  Well, I'm -- yeah.  I'm focusing specifically

20  on the customer overpayment account.

21  Are you familiar with that account?

22  MR. WALD:  Object to the form of the

23  question.

24  THE WITNESS:  Is that not unapplied cash?

25  BY MR. BRITTON:  Q.  Isn't it a part of

**Page 170**

1  unapplied cash or is unapplied cash --

2  A  I'm asking you.

3  Q  Well, I'm asking you.  I don't know.  I'm

4  asking you.

5  A  I don't know, either --

6  Q  You don't know?

7  A  -- if it is.  I'm pretty certain it might be,

8  but I don't remember it being a specific general

9  ledger balance.

10  Q  Okay.

11  MR. WALD:  I guess, Doug, some of your

12  questions seem to make representations.  So did you

13  mean to make a representation about that last

14  question --

15  MR. BRITTON:  Yes.

16  MR. WALD:  -- or are you asking?

17  MR. BRITTON:  Yeah.  When I ask a question

18  that has a fact based in it, I'm making a

19  representation that that's a fact that we know about.

20  THE WITNESS:  And what fact would that be?

21  BY MR. BRITTON:  Q.  The customer overpayment

22  account declined from 150 million to 250 million in Q2

23  '01.

24  MR. WALD:  He's representing that to you.

25  BY MR. BRITTON:  Right.

**Page 171**

1  Q  I'm representing --

2  A  Oh, I see.

3  MR. WALD:  That doesn't mean you need to

4  accept it or know about it.

5  THE WITNESS:  I don't know.

6  BY MR. BRITTON:  Q.  You don't know.

7  Did the -- going back to Exhibit 30, the

8  investigation that we had talked about earlier --

9  A  Can I ask you a question off the record?

10  Q  Sure.  Why don't we go off the record.

11  THE VIDEOGRAPHER:  Off record at 2:46.

12  (Short break taken.)

13  THE VIDEOGRAPHER:  On record at 2:49.

14  MR. WALD:  Doug, the witness wanted to talk

15  to me, because in thinking about a prior question that

16  you had asked her, she believes that she does have

17  information that she thought she didn't recall

18  previously.

19  So we need to find the question and just make

20  sure we get the record straight about what the

21  question and what the answer was.

22  MR. BRITTON:  Why don't you tell me what you

23  remember, and maybe I can ask the question again.

24  MR. WALD:  It was a question about -- go

25  ahead.

**Page 172**

1  THE WITNESS:  It was a question about is

2  there somebody today who could answer whether or not

3  there were some controls in place.  Something along

4  those lines.

5  MR. BRITTON:  Okay.

6  MR. WALD:  So let's see if we can find the

7  exact question.

8  (Whereupon record read by Mr. Wald as

9  follows:

10  "Question:  Okay.  So if today you wanted to

11  find out if Oracle, at the end of every

12  month, ran an auto adjustment to take money

13  from the unapplied cash account into the bad

14  debt reserve account, how would you find

15  that out?

16  "Answer:  I would go talk to somebody who was

17  managing our accounts receivable function.

18  "Question:  Okay.  And who was that in fiscal

19  year 2001?

20  "Answer:  In fiscal year 2001, Mike Quinn had

21  responsibility for revenue operations.

22  Accounts receivable is a function that fell

23  underneath that umbrella."

24  THE WITNESS:  I still think it was a query

25  before that, but maybe I'm just recalling the question

1 incorrectly.
2     MR. WALD:  What were the -- okay.
3     THE WITNESS:  Is there anybody that you could
4 go to today who could answer these questions, I
5 thought, was more or less the question.
6     BY MR. BRITTON:  All right.  Let me -- let
7 me -- let me try asking it a different way, so
8 let's -- ready?
9   Q  If you wanted to find out today if items were
10 being moved from the unapplied cash account to the bad
11 debt reserve account, could you do that?
12     MR. WALD:  Okay.  Back in 2001 or today?
13     BY MR. BRITTON:  Let's start with today.
14   Q  If you wanted to find out whether somebody in
15 the last month had moved amounts from unapplied cash
16 to bad debt, could you do that?
17   A  Could I do that?  I could go to somebody.  I
18 could ask somebody to investigate it.
19   Q  Okay.  And who would you go to?
20   A  Greg Myers.
21   Q  Greg Myers.
22     And you know how he would investigate it?
23   A  Greg Myers is our global process owner for
24 order to cash, so he's got in-depth knowledge with
25 regards to the systems and the processes, so he is our

173

1 functional matter expert, if you will.
2   Q  Okay.  Now, if you wanted to find out today
3 whether items had been moved from unapplied cash to
4 bad debt back in 2001, could you do that?
5   A  Again, I would ask Greg Myers to investigate
6 it.
7   Q  Okay.  And was Greg Myers with Oracle in
8 fiscal year 2001?
9   A  I believe he was, yes.
10   Q  Okay.  If you look at the last page of
11 Exhibit 30, which was the SLC interview memo, the last
12 sentence of the top paragraph we looked at before says
13 "She further stated that the company is in the process
14 of investigating this practice."
15     Were the individuals that were being
16 investigated in your organization the organization you
17 were responsible for?
18     MR. WALD:  Object to the form of the
19 question; misstates the testimony.
20     BY MR. BRITTON:  Q.  You can answer.
21   A  I had responsibility for the global finance
22 organization of which collections fell underneath.
23   Q  Okay.  And if you had responsibility for
24 oversight of the -- withdrawn.
25     If you had responsibility for the global

174

1 finance organization of which collections was
2 underneath, did anybody give you the results of this
3 investigation?
4   A  No.
5   Q  Why not?
6   A  I don't know.
7   Q  Didn't you care?
8   A  I don't recall receiving the results of the
9 investigation.
10   Q  And my question was, were you interested in
11 the investigation?
12   A  Yes.
13   Q  If this stuff had happened, weren't you
14 interested in finding out the results?
15   A  Yes.
16   Q  But you didn't look for the results or ask
17 about the results?
18   A  I was told -- I think it was appropriate for
19 legal to keep me uninvolved in the investigation.
20   Q  Okay.  And why do you feel that way?
21     MR. WALD:  Well, to the extent that you were
22 informed by things that were said to you by counsel in
23 a privileged conversation, I would instruct you not to
24 answer.
25     THE WITNESS:  Okay.

175

1     BY MR. BRITTON:  Q.  You can answer the
2 question with the exception.
3     MR. WALD:  If you can, subject to my
4 instruction.
5     BY MR. BRITTON:  Q.  Right.
6   A  I cannot subject to his instruction.
7   Q  Okay.  Okay.  Put the SLC report aside.
8     (Document marked Exhibit No. 37
9      for identification.)
10     MR. WALD:  Thank you.
11     BY MR. BRITTON:  Q.  I've placed in front of
12 you what's been marked as Minton Exhibit 37.  Will you
13 take a moment to look at this exhibit.
14     For the record, Exhibit 37 starts at Bates
15 NDCA-ORCL 061391 and ends at 405.
16   Q  Have you had a chance to look at Exhibit 37?
17   A  Uh-huh.
18   Q  Do you recognize it?
19   A  No, I don't really remember this.
20     MR. BRITTON:  Okay.  Did I mark this for the
21 record already?
22     THE REPORTER:  Yes.
23     MR. WALD:  Is it Exhibit 37?
24     BY MR. BRITTON:  Yeah.
25   Q  This is a couple of e-mails, the top one of

176

1  which is from you to Ivgen Guner and several others;

2  is that right?

3      A  Yes, it is.

4      Q  Okay.  And it's dated May 30th, 2001; is that

5  right?

6      A  Yes, it is.

7      Q  And that would be in Oracle's fourth quarter

8  '01, fiscal '01?

9      A  That is correct.

10      Q  Okay.  Do you recognize the format of what's

11  attached to these e-mails?

12      A  I don't recognize it.

13      Q  Okay.  If you look at --

14      A  I can interpret it, but I --

15      Q  Okay.  Let's go through it.

16      A  I don't recall seeing it.

17      Q  If you look at the fourth page.

18      A  The one that says "Page Break"?

19      Q  No.  It says --

20      A  Is there a number?

21      Q  Oh, you know what, my copy doesn't have that.

22  It's a page that ends in Bates 393.

23      A  Okay.

24      Q  Are you there?

25      A  Uh-huh.

1      Q  What is this spreadsheet?

2      A  It is a spreadsheet that has a customer name,

3  an invoice number, an order number, balance due,

4  revenue backed out, the date that the revenue was

5  recognized, the line of business that it pertains to,

6  and the cost center.

7      Q  Okay.  Now, what is "BOL W20"?  Do you know?

8      A  "BOL" would refer to business online, I

9  believe.  "W20," I have no idea what that means.

10      Q  Okay.  And this --

11      A  Although it appears, if I look at -- I

12  believe it's Bates No. 016937, "Consulting" at the top

13  of the page --

14      Q  Yes.

15      A  -- W22, so it's possible, if I can carry on

16  here, to Bates No. 061401 where "Education" is at the

17  top of the page --

18      Q  Right.

19      A  -- it may be a hierarchy rollup.  So "BOL" or

20  sorry, "W20" would refer to license, possibly

21  education to W21, consulting W22.  I'm speculating.

22      Q  Okay.  Could that be like an entry somewhere,

23  like an account?

24      A  No, no, no, no.

25      Q  No?

1      A  No, no, no, no.  It's a hierarchy rollup of

2  cost centers.

3      Q  Okay.

4      A  When you sum it all up, you have a parent

5  rollup and you have children.

6      Q  Okay.

7      A  Does that make sense?

8      Q  Yes.  All right.

9      The column that says "Revenue backed up," do

10  you know what that represents?

11      A  I honestly don't recall what this represents.

12  I can possibly speculate, but that would be a

13  speculation on my part.

14      Q  Would it be an educated speculation or pure

15  speculation?

16      A  Obviously I don't recall.

17      Q  Okay.  Now, the -- the total revenue to be

18  backed out down below --

19      A  Uh-huh.

20      Q  -- it says 388,148.  Is that in -- is that

21  truly 388,000, or is it 388 million?  I would look at

22  some documents, but they're abbreviated.

23      MR. WALD:  For what it's worth, it says

24  388,148.08.

25      BY MR. BRITTON:  Q.  So it's 388,000?

1      A  Yes.

2      Q  All right.

3      The revenue recognition date --

4      A  Yes.

5      Q  -- over here there's dates for fiscal year

6  2000 and fiscal year 2001 --

7      A  Yes.

8      Q  -- is there any way to determine what quarter

9  the revenue was recognized in?

10      A  I'm sure if we went back to the actual

11  invoice number and order number in the system, we

12  could discern that information.

13      Q  Okay.  And if you wanted to do that today,

14  how would you do it?

15      A  I would contact Greg Myers.

16      Q  Greg Myers, okay.

17      Okay.  If you look to the end of the

18  consulting part of this spreadsheet, it ends in 400.

19      A  Yes.

20      Q  Looks like there's $25 million to be backed

21  out of revenue.  Do you recall in the fourth quarter

22  of 2001 $25 million in consulting revenue being backed

23  out?

24      A  I do not recall.

25      Q  Okay.  If you look at the very last page of

1   this exhibit, it's for support, and it has a number of
2   6.89 million to be backed out.
3       Do you recall 6.89 million being backed out
4   of revenue for support?
5       MR. WALD:  In what period?
6       MR. BRITTON:  In the fourth quarter of 2001.
7       MR. WALD:  Fourth fiscal -- fourth quarter of
8   fiscal year 2001?
9       MR. BRITTON:  Correct.
10      MR. WALD:  Object to the form.  The question
11  lacks foundation.
12      THE WITNESS:  I'm sorry.  What was the
13  question?
14      BY MR. BRITTON:  Q.  Do you recall
15  $6.89 million of revenue being backed out of support
16  in the fourth quarter of fiscal 2001?
17      A  No, I do not.
18      Q  Okay.  What are revenue back-outs?  Do you
19  know?
20      A  I honestly do not know what this document is.
21      Q  Okay.
22      A  I cannot recall.
23      Q  Okay.  The question -- the question I asked
24  was "What are revenue back-outs?"  And you answered I
25  don't recall what this document is.

181

1       Do you know -- separate and apart from this
2   document, do you know what a revenue back-out is?
3       MR. WALD:  Object to the form of the
4   question; lacks foundation.
5       Go ahead.
6       THE WITNESS:  It's implying that revenue is
7   being credit-mounted, and I presume.
8       BY MR. BRITTON:  Q.  And what circumstances
9   would revenue be backed out at Oracle?  Can you tell
10  me the reasons why you would do that?
11      A  There are a variety of reasons.  If a
12  customer failed to pay and we deemed it uncollectible,
13  customer went bankrupt.  There are a number of
14  different reasons that might give rise to revenue
15  being reversed.
16      Q  Okay.  Can you think of any others other than
17  failure to pay and bankruptcy?
18      A  Not that I can recall off the top of my head
19  at the moment.  Oh, you know, if for some reason there
20  was a customer satisfaction issue, that might be
21  another reason, and we decided to allow the customer
22  to not have to further pay the invoice.
23      Q  Okay.  All right.
24      You mentioned "credit memoed for revenue."
25  What does that mean?

182

1       A  Reverse the revenue.
2       Q  All right.
3       If you look at the first page of Exhibit 37,
4   it says "Summary of corporate adjustments."  Can you
5   tell me what "corporate adjustments" mean?
6       A  I do not know what they are referring to
7   here.
8       Q  And do you know who at Oracle was responsible
9   for tracking corporate adjustments?
10      A  I think corporate adjustments in this
11  particular report is a -- a bad name.  I have no idea
12  what it refers to.
13      Q  So you never heard of the term "corporate
14  adjustments" used at Oracle?
15      A  We -- I have.  Corporate adjustments is a
16  term that I use in the forecasting process.
17      Q  Okay.  Outside of forecast --
18      A  Not in -- not in terms of the accounting
19  process.
20      Q  Okay.
21      THE VIDEOGRAPHER:  20 minutes left of tape.
22      BY MR. BRITTON:  Q.  Okay.  You mentioned as
23  one of the reasons that revenue would be backed out is
24  that if the customer failed to pay or if it was
25  otherwise uncollectible.

183

1       Why would that result in a revenue reversal
2   instead of a write-off against a reserve?
3       A  The manner in which we provide for reserves,
4   bad debt reserves, or sales returns, returns and
5   allowances is we would, each month, take 1 percent --
6   at the time it may have been 2 -- 1 percent of revenue
7   and 1 percent for bad debt expense.  We estimated what
8   our bad debt expense was and the credit would go to
9   bad debt reserve.
10      Each quarter we would evaluate what our
11  returns reserve requirements were in connection with
12  that, and whenever we had a -- an invoice that was not
13  collectable, we always reversed it to the original
14  accounting so that if somebody got paid on that
15  invoice, that would then reverse it, and they would
16  get clod back for their commissions related to that.
17      Does that make sense?  So we always write off
18  everything against revenue rather than to the reserve,
19  because we want to get the commissions clod back for
20  the salesperson and/or individual that had
21  responsibility for that --
22      Q  Okay.
23      A  -- particular transaction.
24      Q  Under what circumstances would you write off
25  against a reserve as opposed to going back to the

184

Minton, Jennifer (30b6)  7/7/2006  9:01:00 AM

1  revenue and reversing?
2     A  We generally don't go against the reserve.
3  We go against revenue.  So we estimate what our
4  uncollectible account history is and provide for that
5  monthly.  But instead of going against the reserve, we
6  actually go against revenue.  We write off the actual
7  underlying invoice.
8     Q  And does that impact revenue in the quarter
9  in which it's reversed?
10    A  Yes, it would.
11    Q  The bottom e-mail is from Tammy Pinnick.  Who
12  is she?
13    A  Based on this e-mail note, she was the
14  revenue accounting manager.
15    Q  Okay.  And then your e-mail that you're
16  forwarding to Ivgen and others, you say "Here is the
17  breakdown by year of the adjustments for invoices in
18  legal."  What does that mean, "invoices in legal"?
19    A  Invoices that were sent to legal for
20  follow-up collection.
21    Q  Okay.  And if the revenue is being reversed,
22  does that mean it's been determined to be
23  uncollectible?
24    MR. WALD:  Object to the form.
25    BY MR. BRITTON:  Q.  Or for revenue to be

185

1  backed out, does it mean that there's been a
2  determination that that revenue is uncollectible?
3     MR. WALD:  Same objection.
4     BY MR. BRITTON:  Q.  You can answer.
5     A  Okay.  Basically, yes.  If we are not going
6  to follow-up on an invoice, we would reverse it.
7     Q  Okay.
8     A  That way the invoices are moved from our
9  accounts receivable trial balance.
10    Q  All right.
11    What happens when an invoice that is written
12  off is later collected?  Where does that money go?
13    A  I think that in that event they would have to
14  restore the original invoice and reverse the write-off
15  and then apply the cash to the invoice.
16    Q  The salesman gets his commission; is that
17  true?
18    A  Yes.
19    (Document marked Exhibit No. 38
20    for identification.)
21    THE WITNESS:  Do you have a question?
22    BY MR. BRITTON:  Q.  Go ahead and review that
23  for a second --
24    A  Okay.
25    Q  -- and tell me if you recognize it.

186

1     Okay.  I placed in front of you what's been
2  marked as Minton Exhibit 38.  Will you take a moment
3  to look at this exhibit.
4     For the record, Exhibit 38 starts at Bates
5  NDCA-ORCL 119340 to 344.
6     THE VIDEOGRAPHER:  Ten minutes.
7     MR. BRITTON:  Go ahead and change the tape.
8     THE VIDEOGRAPHER:  Okay.  This marks the end
9  of tape three in Volume I of the deposition of
10  Jennifer Minton.
11    At 3:20, going off the record.
12    (Short break taken.)
13    THE VIDEOGRAPHER:  Okay.  On record at 3:30.
14    This marks the beginning of tape four,
15  Volume I, in the deposition of Jennifer Minton.
16    MR. BRITTON:  Before we get to this
17  document, counsel and I just had a conversation off
18  the record that I'd like to put on the record.
19    We're at 3:30 right now, and it's five hours
20  of elapsed time.  I have, you know, another 30, 40
21  deposition exhibits left, in addition to a whole host
22  of authentication questions to ask, and there's no way
23  I'm going to get this completed in two hours.
24    So our position is we need more time.  And,
25  Peter, if you want to put your position on the record,

187

1  you're more than welcome to.
2     MR. WALD:  Thanks, Doug.
3     Yes we did have a colloquy about this and
4  agree to disagree.  Defendant's position is that the
5  plaintiffs have seven hours of deposition time with
6  this witness, and we intend to break the deposition
7  when that seven hours has elapsed.  Thank you.
8     BY MR. BRITTON:  Q.  Okay.  Ms. Minton, have
9  you had an opportunity to look at Exhibit 38?
10    A  Yes.
11    Q  Okay.  Do you recognize it?
12    A  Yeah, I recall this e-mail.
13    Q  Okay.  This is an e-mail dated June 1st,
14  2001; is that right?
15    A  June 1, 2001, yes.
16    Q  And it's from Larry Garnick to you?
17    A  That would be correct.
18    Q  Okay.  Larry Garnick worked for you; is that
19  right?
20    A  Yes, he did.
21    Q  Okay.  Is this a true and accurate copy of
22  the original e-mail?
23    A  I presume that it is.
24    Q  Okay.  And was it Mr. Garnick's
25  responsibility to send this e-mail?

188

1   A  I'm not sure what you mean by his
2   responsibility.  He sent the e-mail because he was
3   looking into an issue.
4   Q  Okay.  That was part of his job, to send --
5   to look into this issue?
6   A  This was not a recurring issue, so I'm not
7   sure if I asked him to look into it because he was
8   available or -- or what.
9   Q  Okay.  The top line says "Jennifer, the final
10  may support revenue recognition correction was
11  $7 million, most of which was recorded in Q3 in
12  error."
13     Do you recall $7 million of support revenue
14  being recognized in Q3 in error?
15     MR. WALD:  Object to the form.
16     THE WITNESS:  The correction that he's
17  referring to here actually spanned not just Q3 but
18  months in Q4.  So if you look back at the journal
19  entries for revenue recognition errors between January
20  and April of 2001.
21     BY MR. BRITTON:  Q.  Where are you referring
22  to?
23  A  The second page, "Justification."  This
24  journal entry is proposed to cumulatively correct
25  revenue recognition for support contracts from

189

1   January 2001 through 2001.
2   Q  Okay.  So obviously the ones after
3   February 28th would be in Q4?
4   A  That is correct.
5   Q  Do you recall why the revenue was recognized
6   in error?
7   A  I can tell you -- I forget all of the fine
8   details.  It's pretty complicated e-mail, but
9   essentially when the contracts were set up in OKS they
10  had the wrong service period attached to them.
11     So instead of being recognized over in the
12  service period, and generally our support contracts
13  are one-year contracts, some of the revenue was
14  accelerated, because it was not attached to in the
15  system for the correct service period.
16  Q  Okay.  What is OKS?
17  A  OKS is -- I forget.  I think it stands for
18  Oracle contract system.
19  Q  Okay.
20  A  It's an application that was used to renew
21  support contracts.
22  Q  Okay.  If you look at the second paragraph,
23  and it's the third sentence, it says "The support
24  renewals group encountered significant productivity
25  problems which have taken months to resolve and

190

1   revenue recognition errors simply cannot be repeated."
2      Do you remember what the significant
3   productivity problems were?
4   A  Yes, I do.
5   Q  What were they?
6   A  When we implemented OKS in -- I want to say
7   it was January of 2001 -- the system was a new system
8   that was replacing an existing system that was used to
9   track support contracts that would come up for
10  renewal, and the contracts from the old system were
11  migrated to this new application.  But unfortunately
12  this new application, at the time, did not have
13  adequate management reporting capabilities, and so it
14  was difficult to be able to track that all contracts
15  that were up for renewal were actually being worked by
16  the support sales renewal rep.
17     It was the primary problem that I recall.
18  Q  Was OKS an 11i module?
19  A  Yes, it was.
20  Q  Okay.  The last sentence there's a reference
21  to auto renewals.  Do you know what those are?
22  A  This was -- again, it was like a tickler file
23  that would identify contracts where the service period
24  was coming to conclusion, and therefore, if I recall
25  correctly, it was functionality that identified which

191

1   contracts were up for renewal so that the sales rep
2   could follow up on the -- with the customer to get the
3   contract renewed.
4   Q  Okay.  Okay.  We talked earlier about Oracle,
5   instead of writing off against reserves, you would
6   reverse revenue going back to the original deal.
7      Do you remember that testimony?
8   A  What we would do is we would reverse the
9   original invoice, and the revenue would get offset
10  against the cost center that originally enjoyed the
11  original revenue.
12  Q  Okay.  And then if a payment was actually
13  received after that, you would reinstate the original
14  contract; is that right?
15  A  Well, I'm not certain as to the mechanics.
16  But if you wanted to apply it to that invoice, you
17  would either have to reverse the credit memo or just
18  record it as other revenue.
19  Q  Okay.  And would that be recorded as other
20  revenue in the period in which it was paid?
21  A  I presume, yes.
22  Q  Okay.  You can put those documents aside.
23     Do you remember the NAS division,
24  George Roberts' group, starting out at the gate in Q3
25  2001 slow?

192

1     A  I don't recall.

2     Q  Okay.  Winton 43.  I've placed in front of

3   you what's been previously marked as Winton

4   Exhibit 43.

5       Will you take a moment to look at this

6   exhibit for me please.  And, for the record, Winton

7   Exhibit 43 starts at NDCA-ORCL 612306 and ends at 308.

8       Do you recognize Winton Exhibit 43?

9     A  I recognize the e-mail, yes.

10     Q  Okay.  And how do you recognize Exhibit 43?

11     A  I believe that this is an e-mail note that I

12   saw in preparation for this deposition.

13     Q  Okay.  Now, you're not a recipient on any of

14   these e-mails; right?

15     A  Not on this one.  This is going from David to

16   George, but I believe that based on the fact that it

17   says "George and I added," that he was sending this

18   e-mail to me.

19     Q  Okay.  Good.

20     A  This may have been a copy that he had sent

21   himself, or maybe he was preparing it to subsequently

22   send later.

23     Q  Okay.

24     A  Could have been a draft.

25     Q  But the question I have for you is whether

193

1   you remember receiving this e-mail?

2     A  I don't recall.

3     Q  Okay.  Do you recall discussing any of the

4   contents of this e-mail at the executive management

5   committee meeting in the early part of December?

6     A  I don't recall any specifics of the EC

7   meetings.

8     Q  Okay.  Is this the type of information that

9   would be discussed at the EC meetings?

10     A  We discussed forecasts.  It was a standing

11   agenda item at every EC meeting.

12     Q  Okay.  Now, if you look at the specific

13   contents of this e-mail, the first paragraph says

14   "Just to let you know, the review background and

15   discussions around our initial Q3 Forecast of

16   $346M.  "Our LOB's turned in $311M with $28M of

17   Judgment.  George and I added another $39M for this

18   submission."

19       You testified that forecast issues were on

20   the agenda, and my question is whether the information

21   that's contained in the first paragraph fall within

22   your definition of forecast issues?

23     A  I don't believe I said "forecast issues."  I

24   believe I said that we had the forecast as a standing

25   agenda item.

194

1     Q  Okay.  So then my question is, does the

2   information that is contained in the first paragraph

3   of this e-mail fall within the definition of forecast

4   that you're using to describe the EC meetings?

5     A  I'm sorry.  Can you rephrase your question?

6   I really don't understand what you're trying to ask

7   me.

8     Q  I'm trying to get an idea if this is the type

9   of forecasting information that you would discuss at

10   the EC meetings.

11     A  At the EC meetings, generally the EVPs that

12   were in charge of the sales units would talk about

13   pipeline growth, what their worst case was, their best

14   case, and what their commit numbers were.

15     Q  Okay.  Would they talk about the amount of

16   judgment that they're adding to the forecast?

17     A  I don't recall.

18     Q  Okay.  Now, the -- the paragraph that has the

19   number "2.  More Big deals this Q1&2.  As the schedule

20   shows, our results this year have been boosted by big

21   deals in both quarters.  Combined, these >$5M deals

22   contributed over $55M year to date.  Note that we only

23   have one deal above >$5M currently in the Q3 pipe.

24   Last year we had four deals that netted $28M."

25       Is this the type of information that would be

195

1   discussed at the EC meetings?

2     A  Again, I do not recall.

3     Q  Okay.  Do you recall the NAS pipeline having

4   fewer smaller deals in Q3 '01 than it did in Q3 2000?

5       MR. WALD:  As of the date of this e-mail?

6       MR. BRITTON:  Yes.

7       THE WITNESS:  I -- I do not recall.

8       BY MR. BRITTON:  Q.  Okay.  If you look to

9   paragraph number three, it says "NAS results took off

10   last year in Q3 and continued in Q4."

11     A  Uh-huh.

12     Q  Do you know what he's talking about there?

13     A  He's stating that his license revenue

14   results were strong in Q3 and in Q4.

15     Q  Do you know what created the strength in Q3

16   2000?

17     A  The economy was very strong.

18     Q  Dot.coms?

19     A  Dot.coms were one contributing factor.

20     Q  Okay.  And then paragraph four on the second

21   page, "Q3 Pipe not where it needs to be.  Based on the

22   conversion history, I think we need another $50M of

23   Apps and nearly $70M of Tech to feel statistically

24   comfortable to hit our Q3 budget."

25       Do you remember that information in the

196

beginning of Q3 2001?
A I don't recall receiving this at the beginning of Q3 2001.
Q Okay.
A I may have, but I just don't recall.
Q Do you know if this was discussed at the EC meeting?
A Not that I recall, and again he's referring to budget here, not forecast.
Q Okay. Okay. Did you take any information that is contained in Winton Exhibit 43 into consideration when preparing the upside adjustment in the potential forecast for Q3 2001 in the early part of December?
A I do not recall.
MR. BRITTON: This one is Financial Report Exhibit 21.
(Document marked Exhibit No. 21 for identification.)
MR. BRITTON: That's Financial Report Exhibit 22.
(Document marked Exhibit No. 22 for identification.)
MR. BRITTON: Financial Report Exhibit 23.
///

(Document marked Exhibit No. 23 for identification.)
MR. BRITTON: Financial Report Exhibit 24.
(Document marked Exhibit No. 24 for identification.)
MR. WALD: Can you identify these, Doug, for the record?
MR. BRITTON: Uh-huh.
THE WITNESS: Are these in sequential order?
MR. BRITTON: Yes, they are.
MR. WALD: I think he's going to identify them for the record. That will be helpful.
MR. BRITTON: Ready.
For the record, Financial Report Exhibit 21 is an upside report dated 12/8/2000. It starts at ORCL 0003003 and ends at 3017.
Financial Report Exhibit 22 starts at ORCL 0002986 and ends at 3002.
MR. WALD: Hold on, Doug. Yeah.
THE WITNESS: I have too many documents in front of here. Unless I can write on them, it's --
MR. WALD: Let's see. So that's Financial Report 21.
THE WITNESS: Right, but what is this report for? What period?

MR. WALD: He represented that it is the upside report dated 12/8/00.
THE WITNESS: Okay. Can I use a --
MR. WALD: Why don't you use this piece of paper that I gave you.
THE WITNESS: I can't use one of these and put it on there?
MR. WALD: Here. You can use one of mine.
THE WITNESS: Okay. This is 12/8; okay.
MR. WALD: Okay. I don't think Doug gave you a date for it.
MR. BRITTON: Right.
Q Next one is 22. It starts at 2986.
Do you have it? It ends at 3002, and that is the report for 12/11.
A 12/11?
Q 12/11.
The next report, Financial Report 23, starts at ORCL 0003018 and ends at 3031, and this is the upside report for December 13th, 2000.
A This top page is not an upside report.
Q Well, we'll get to that.
If you look to the second page, it has the --
A You say it's the upside report for what date?
Q 12/13/2000; okay.

Then the last one is Financial Report 24. It starts at 0003187 and ends at 3203, and this is the upside report for 12/25.
I think this would be a good time to -- it's 39. Let's mark this as Minton next in order.
(Document marked Exhibit No. 39 for identification.)
MR. WALD: What is this? 30-what? 30-what?
For the record, while the witness is looking through the document, let me just explain to you that when Mr. Britton represents to you this is what a document is, that's his understanding of what it is, but obviously he's interested in knowing whether you have an understanding which is the same or different; okay?
THE WITNESS: Okay.
MR. WALD: So he's doing his best to tell you what he believes it is, but obviously if you have a different understanding of a particular document, you're the witness, and I'm sure he's interested in knowing that.
THE WITNESS: Okay. Got it.
MR. WALD: Is that fair, Doug?
MR. BRITTON: That is fair.
Q Okay. Let's -- let's focus on Minton

Minton, Jennifer (30b6)  7/7/2006  9:01:00 AM

```
 1   Exhibit 39 first; okay.  Then also I'd like you to
 2   pull out Exhibit 27, which is your affidavit in the
 3   summary judgment or affidavit for summary judgment in
 4   the derivative case; okay.
 5       If you turn to your affidavit to paragraph
 6   three, do you have it in front of you?
 7       Okay.  In your affidavit, paragraph three, it
 8   says "The exhibits referenced in this affidavit are
 9   true and correct copies of the documents indicated and
10   were used by Oracle in the normal course of its
11   business.  The Oracle reports attached as exhibits to
12   the appendix of Exhibits e.g., Upside reports,
13   Pipeline reports, Flash reports, are true and correct
14   copies thereof and were used by Oracle in the normal
15   course of its business."
16       Okay.  Do you see where I'm reading?
17    A   (Witness nods head.)
18    Q   Okay.  Do you remember saying that in your
19   affidavit?
20    A   Yes.
21    Q   Okay.  Now, if you look to Minton 39, this is
22   the index?
23    A   To Minton what?
24    Q   39 here.
25       MR. WALD:  Which is?
```
                                                    201

```
 1       MR. BRITTON:  On top.
 2       MR. WALD:  Which is for --
 3       THE WITNESS:  Oh, this one here.
 4       BY MR. BRITTON:  Right.
 5    Q   Exhibit 39, for the record, is "Volume I of
 6   9," the index for the "Individual Defendant
 7   Lawrence J. Ellison's Compendium of Exhibits in
 8   Support of Motion for Summary Judgment."
 9       And if you look to page three of the
10   document, it has an index of the various upside
11   reports, and everything else that was contained in the
12   list of exhibits.
13       Do you see where I'm reading?
14    A   Is he referring to this?
15       MR. WALD:  Yeah, I think he's referring to
16   that.  It doesn't have a Bates number.
17       BY MR. BRITTON:  Q.  These don't have Bates
18   numbers.  So what do you have in your hand right now,
19   so I get it clear?
20    A   Exhibit 39, the third page.
21    Q   So that's the -- okay.
22       So if you turn to page two of the index,
23   which would be page four of the document.
24       MR. WALD:  There you go.
25       BY MR. BRITTON:  Q.  You see where I am?
```
                                                    202

```
 1    A   Page two?
 2    Q   Page two.  This has exhibits 21 through 34.
 3    A   Uh-huh.
 4    Q   And it has upside reports dated 12/8/2000
 5   through 2/28/2001; do you see that?
 6    A   I do.
 7    Q   Okay.  Were these the exhibits that you were
 8   referring to in paragraph three of your affidavit?
 9    A   In paragraph three of my affidavit, I was
10   referring to the exhibits that were contained --
11    Q   Right.
12    A   -- in this summary of upside reports.
13    Q   Okay.  Now, if you look to paragraph 31 of
14   your affidavit, it lists the reports that you're
15   referring to; right?
16    A   That is correct.
17    Q   And it has DX21 through DX34.  Do you see
18   where I'm looking in paragraph 31 of your affidavit?
19       MR. WALD:  Hold on.
20       THE WITNESS:  Yes.
21       BY MR. BRITTON:  Q.  Okay.  So the exhibit
22   references DX21 through DX34.  Compare with 21 through
23   34 on page two of Minton 39.  So, with that in mind --
24       MR. WALD:  I'm sorry.  The -- the DX numbers
25   on pages ten and 11 of the witness's affidavit, which
```
                                                    203

```
 1   is Exhibit 27, okay, what are you saying?  What are
 2   you representing do they compare with?
 3       MR. BRITTON:  Those correspond to the DX
 4   numbers on page two of this list of exhibits.
 5       MR. WALD:  And I don't see anything on
 6   page two of Mr. Ellison's compendium that has the
 7   abbreviation "DX" on the page.
 8       MR. BRITTON:  Turn the page to the page
 9   before up at the top.
10       MR. WALD:  Okay.
11       MR. BRITTON:  So that's the DX column.
12       MR. WALD:  So --
13       MR. BRITTON:  And I'll represent to you that
14   we pulled the same reports that Oracle used in
15   Larry Ellison's summary judgment.
16       So just to avoid any confusions and things, I
17   just wanted her to authenticate the same documents
18   that she authenticated in that case.
19       MR. WALD:  Okay.  On paragraph 31 of the
20   witness's affidavit, is that what you're looking at?
21       MR. BRITTON:  Yes.
22       MR. WALD:  Okay.  So DX23 in her -- on
23   page ten, it says, quote, "Only a partial report," end
24   quote.
25       MR. BRITTON:  Right.
```
                                                    204

Oracle

1    MR. WALD:  And you're saying that corresponds
2    to the DX23 designation on page two of Mr. Ellison's
3    compendium?
4    MR. BRITTON:  Correct.
5    MR. WALD:  Okay.
6    BY MR. BRITTON:  Q.  So, with that in mind,
7    were these -- the documents that are listed in
8    Exhibit 31, were those the documents that you were
9    authenticating in paragraph three?
10    Q  I'm assuming that your representation is
11    correct in that the documents that are listed in this
12    exhibit are the same documents that are contained as
13    an exhibit to my affidavit.
14    Q  They're -- they contain the exhibits to the
15    compendium of exhibits?
16    MR. WALD:  I think what the witness is saying
17    is she hasn't made that investigation, Doug.
18    You're representing that to her.
19    MR. BRITTON:  Right.
20    MR. WALD:  So she'll assume that for purposes
21    of responding to your questions.
22    BY MR. BRITTON:  Q.  So my question is, is
23    the paragraph three where you're referencing that the
24    exhibits referenced in this affidavit are true and
25    correct copies of the documents indicated, are those

205

1    the documents that are listed in paragraph 31 of your
2    affidavit?
3    A  Can you say that one more time?  Am I what?
4    Q  Are the documents that are listed in
5    paragraph 31 of your affidavit the documents that you
6    are referring to in paragraph three of your affidavit?
7    A  Yes.
8    Q  Okay.  So -- and these correspond with the
9    numbers that are listed on page two of Minton 39 --
10    MR. WALD:  Again, that's your representation.
11    BY MR. BRITTON:  Q.  -- is that correct?
12    Well, she can look at the exhibits I handed
13    her and see if they match up.
14    MR. WALD:  There are no Bates numbers.
15    MR. BRITTON:  Sure there is.  The Bates
16    numbers in the documents that I just handed out.
17    MR. WALD:  There isn't in Exhibit 39.
18    There's no Bates numbers in exhibit --
19    MR. BRITTON:  In her affidavit is what you're
20    saying?
21    MR. WALD:  Right, right.
22    MR. BRITTON:  Okay.
23    MR. WALD:  27.
24    THE WITNESS:  Can I ask -- you see this?
25    MR. WALD:  Yeah.  They're different.

206

1    THE WITNESS:  They're different.
2    MR. WALD:  Yeah.  I mean --
3    BY MR. BRITTON:  Q.  How are they different?
4    A  In the summary, in my affidavit -- affidavit
5    that itemizes the various upside reports, there is a
6    December 8th date, a December 11th date.  The report
7    that you're referring to --
8    MR. WALD:  Exhibit 39.
9    THE WITNESS:  -- Exhibit 39 contains a
10    December 13th date, which mine does not have in this
11    summary but is referred to in the text as a partial
12    report.
13    BY MR. BRITTON:  Q.  Okay.
14    A  Then we have December 25th, January 15th,
15    January 22nd, January 29th, February 5th,
16    February 12th.  I have February 19th in this schedule.
17    There is no reference to a date of February 16th which
18    is in Exhibit 39.
19    Q  Okay.
20    A  And then there's -- so we go back to
21    February 19th, February 26th, February 27th,
22    February 28th.
23    So the Exhibit 39 contains one more reference
24    to an upside report with a date of 2/16 that is not
25    referred to in my affidavit in the summary table, nor

207

1    in the paragraph above.
2    Q  Okay.  Do the exhibit references in your
3    affidavit, do those correspond correctly to the
4    exhibit references in Minton 39 by date?
5    A  I just said that they do not by the date of
6    February 16th.
7    Q  No, no.  Let me stop you here.
8    My question is, do the exhibit references in
9    your affidavit, the ones that are here, correspond
10    correctly to the ones that are listed here.  Not the
11    ones that are absent.  The ones that you listed.
12    MR. WALD:  I think you -- when you say
13    "exhibit references," Doug, it would be clearer, I
14    think, if you used the appellation "DX"; is that the
15    question?
16    MR. BRITTON:  That's correct.
17    MR. WALD:  In other words, to the witness's
18    knowledge, is the use of DX or DX designation in
19    Exhibit 27, which is her affidavit -- does that
20    correspond to the DX designation in Exhibit 39 which
21    is the compendium to Mr. Ellison's --
22    MR. BRITTON:  Correct.
23    MR. WALD:  -- statement?
24    THE WITNESS:  And as I stated before, it
25    corresponds with the exception of one date, 2/16/01 in

208

Minton, Jennifer (30b6)  7/7/2006  9:01:00 AM

1 Exhibit 39, and -- yeah, because that's the only one
2 that I can see that is missing.
3     BY MR. BRITTON:  Right.
4     Q  And if you look at your affidavit,
5 Exhibit 27, you'll notice that from February 12th,
6 2001, DX29 goes to -- the next one is February 19th,
7 2001 --
8     A  That is correct.
9     Q  -- in DX 31.  So it skips DX30 in your
10 affidavit; is that correct?
11     A  Oh, yes, it does.
12     Q  Right.
13     So the one that you've identified as not
14 being inclusive is the one that's missing; is that
15 correct?  Withdrawn.
16     The February 9th -- the February 16th, 2001,
17 exhibit DX -- Exhibit 30, is not included in the list
18 of exhibits in your affidavit paragraph 31; is that
19 correct?
20     A  That is correct.
21     Q  Okay.  So with that being said, my
22 representation to you is copies of the same exhibits,
23 the ones I've handed to you, are the ones that came
24 from the compendium of Exhibit --
25     MR. WALD:  Exhibit 39.

209

1     MR. BRITTON:  Q.  -- Exhibit 39, right.
2     Let's go through; okay.  With all that said,
3 did I identify all of the exhibits that I put in front
4 of her?
5     MR. WALD:  Yes, FR21 through 24.
6     MR. BRITTON:  Yes.
7     MR. WALD:  Yes, you did.
8     BY MR. BRITTON:  Q.  Okay.  So FR21 is the
9 upside report for December 8, 2000; is that correct,
10 Ms. Minton?
11     A  You tell me.
12     Q  Well, I'll ask you now.  I'm asking you to
13 look at the document.  If you look at page two, do you
14 recognize --
15     A  Yes.
16     Q  -- this exhibit?
17     A  December 8th.
18     Q  So you recognize this exhibit; okay.
19     So you -- this is what we talked about
20 earlier.  You have the forecast column, the upside
21 column, and a potential column; is that right?
22     A  That is correct.
23     Q  So for license revenues, the $1.233 billion
24 is the field forecast; is that right?
25     A  That is correct.

210

1     Q  Then you added $159.5 million in upside; is
2 that correct?
3     A  That would be correct.
4     Q  To come up with a 1.393 million potential?
5     A  In U.S. dollars, correct.
6     Q  In U.S. dollars, which is the company's
7 forecast for Q3 2001 as of December 8th, 2000?
8     A  That is correct.
9     Q  Okay.  Now, the next column over is the
10 forecast versus prior year, and it says 18 percent.
11     So that would be the field forecast above the
12 prior year actuals for Q3 2000?
13     A  That is correct.
14     Q  So the field was --
15     A  Stated in U.S. dollar terms.
16     Q  So the field was forecasting 18 percent
17 growth for license revenues --
18     A  In U.S. dollars.
19     Q  -- in U.S. dollars.
20     Okay.  And then your potential was
21 forecasting 33 percent; is that right?
22     A  That is correct.
23     Q  All right.
24     Down below there's the earnings -- earnings
25 per share.  So the field was forecasting earnings per

211

1 share of 10.7 cents per share; is that right?
2     A  Not just the field.  I mean, it was the
3 forecast for everybody, but yes, it was 10.7.
4     Q  Okay.  And then with your upsides, it came up
5 to 12.8 cents?
6     A  That is correct.
7     Q  And the market expectation was $0.12?
8     A  At that point in time.
9     Q  Now, does this market expectation row
10 represent the consensus that we looked at before, or
11 does that represent the guidance that Oracle gave the
12 street?
13     A  It represents the consensus at that point in
14 time.
15     Q  At this point in time?
16     A  Okay.  So this would be prior to the release
17 of our earnings.
18     Q  Okay.  Then if you turn to the page that ends
19 at 3007 --
20     A  Yes.
21     Q  -- this is a breakdown by product category;
22 is that right?
23     A  3007?
24     Q  Yes.
25     A  It has it by product between apps technology

212

1   and then a total by management.

2   Q Okay. And then the upside -- so we can tell

3   by looking at this report how much of your upside you

4   added on top of the North America license divisions,

5   as well as the others; is that correct?

6   A Correct.

7   Q Okay. So you added 25 million in upside for

8   OSI, 50 million in upside for NAS, and 35 million in

9   upside for OPI?

10   A 25, 50, and -- I'm going to go to the other

11   page behind it, because it's a little bit easier to

12   read.

13   Q Yes, it's a little clearer.

14   So 25 upside, 50 to NAS, that would be George

15   Roberts, and 35 for OPI.

16   Q Okay. You can put that document aside, and

17   if you look at Financial Report 22, you recognize this

18   exhibit?

19   A This is another upside report.

20   Q Yes. Well, let me ask you that.

21   Is this another upside report?

22   A I'm stating a fact. Exhibit 22?

23   Q 22.

24   A Is another upside report.

25   Q Okay. Is another upside report.

213

1   Is this the upside report for December 11,

2   2000?

3   A Upside 12/11, yes.

4   Q Okay. Now, if you look at the first page,

5   you have two columns. One is Q3 '01.

6   A I'm sorry. The first page of which?

7   Q Financial Report 22. It has Bates 2986.

8   A Okay.

9   Q You have two columns. You have a forecast

10   column, and you have a potential column; is that

11   right?

12   A That is correct.

13   Q Okay. So all the numbers on the left-hand

14   side represent the field numbers; is that correct?

15   A That is correct.

16   A And all the numbers on the right-hand side

17   represent your potential numbers; is that correct?

18   A In constant dollars.

19   Q In constant dollars?

20   A Not U.S. dollars.

21   Q Okay. So this would have the conversion

22   ratio from May of 2000?

23   A It would have it for our budget rate --

24   Q Budget rate.

25   A -- for fiscal 2001 year.

214

1   Q Okay.

2   MR. WALD: This is as a function of Q3 '00

3   actuals in both columns?

4   BY MR. BRITTON: Q. Is that correct?

5   A Yes.

6   Q Okay.

7   A This is expressed in constant dollar terms.

8   MR. WALD: Right.

9   BY MR. BRITTON: Okay. All right.

10   Q Now, the second row where it says "license,"

11   it has the various organizations down below.

12   A Yes.

13   Q Is there a ranking in terms of growth

14   percentages?

15   A It is so hard for me to read this summary

16   page.

17   Q Well, just your memory of what the columns

18   represent.

19   A I don't recall.

20   Q Okay.

21   MR. WALD: Again, for the record, we're on

22   Bates 2986?

23   BY MR. BRITTON: Yes, 2986.

24   Q So you don't recall what the -- the second

25   column represents?

215

1   A The second column?

2   Q Yeah. Excuse me. The second row right in

3   here.

4   A The second row just breaks down the license

5   revenue, margin, and growth rates --

6   Q Is this --

7   A -- for the individual organizations.

8   Q Right, and it's a ranking. So it goes --

9   A Well, you said it's a ranking. I'm not

10   testifying that it is. I don't recall.

11   Q You don't recall whether it's a ranking or

12   not?

13   A Well, I don't see why you're saying it's a

14   ranking.

15   Q Well, if you look to the revenue growth

16   column, it goes in sequential order.

17   A There's two revenue gross columns.

18   Which one are you referring to?

19   Q Both, but let's start with the forecast.

20   A So in the forecast, it's not in any

21   particular order?

22   Q Okay. Do you know why they're showing up in

23   the order that they're showing up?

24   A I don't recall.

25   Q Okay.

216

1    MR. WALD:  Doug, I'm sorry.  I'm confused.

2    When you say that it's in order, are we

3  looking at the same page?

4    MR. BRITTON:  Yes.  The second column.  I --

5  I was assuming this to be a ranking.  You know, OPI is

6  the highest growth rate, and then the next one is the

7  next highest, but it's not.  The witness has pointed

8  out that I am --

9    MR. WALD:  That the numbers don't go in that

10  order?

11    MR. BRITTON:  Right, right.

12    MR. WALD:  Okay.

13    BY MR. BRITTON:  Q.  Okay.  So if you turn to

14  page two, as of December 11th your upside has stayed

15  the same, is that right, as it was on December 8th?

16    A  I'd have to compare.

17    Q  Go ahead.

18    A  What precisely do you want me to compare?  I

19  mean, the dollar amounts are not --

20    Q  Your upside.

21    A  -- is an example the net income is different.

22    Q  I'm looking at your license upside

23  adjustment.

24    A  The upside adjustment for license is 159,500

25  on both schedules.

217

1    Q  Right.

2    So they haven't changed from 12/8 to 12/11;

3  is that right?

4    A  That is correct.

5    Q  Okay.

6    A  But there was a change in the consulting

7  line.

8    Q  Right.  I'm just focusing on license right

9  now.

10    If you turn to the page with Bates 2990.

11    A  Which upside report?

12    Q  It is Financial Report 22.

13    MR. WALD:  Further back in the same document.

14    THE WITNESS:  February 11th -- sorry --

15  December 11th?

16    MR. WALD:  December 11th?

17    BY MR. BRITTON:  Q.  Correct.

18    A  2988?

19    MR. WALD:  2990.

20    BY MR. BRITTON:  Q.  2990.

21    A  Yes.

22    Q  So your upside adjustments for the

23  North America Sales divisions have not changed; is

24  that right?

25    A  I'd have to compare it to -- I mean, in

218

1    A  159,500, yes.

2    Q  Okay.  And if you look at the page before,

3  the date look like 12/13/2000 below you there?

4    A  It might be.

5    Q  Okay.

6    A  It looks that way.

7    Q  Okay.  Now, the next exhibit, this is a

8  December 25, 2000, upside report; is that right?

9    A  Yes.

10    Q  Okay.  And if you look at page two --

11    A  Yes.

12    Q  -- which ends with Bates 0003188 --

13    A  Yes.

14    Q  -- it shows your upside adjustment for

15  license revenues remained the same; is that correct?

16    A  That is correct.

17    Q  And if you turn to the page with Bates 3191,

18  your upside adjustments for OSI, NAS, and OPI remain

19  the same; is that right?

20    A  159,500 for the whole organization.

21    Q  Right.

22    I'm going for individual lines of business

23  for OSI.

24    A  25, 50, 35?

25    Q  Right.  So they're the same, so they haven't

220

1  totality, I can tell you --

2    Q  I'm talking about --

3    A  -- that it's the same.

4    Q  Right.

5    I'm talking about specific line items.  So

6  your upside adjustment had not changed for OSI, NAS,

7  or OPI; is that correct?

8    A  25, 50 and 35.  That would be correct.

9    Q  Okay.  You go to the next Exhibit 23, the

10  first page is not an upside report; is that right?

11    A  That would be correct.

12    Q  Okay.

13    A  I'm not sure what it is.  I can't read it.

14    Q  Okay.  If you go to the second page, excuse

15  me, the third page.

16    A  Well, actually, it might be an upside report

17  for the full year, but it's out of order.

18    Q  Right.  This is out of order.  I think this

19  is the one that says "Incomplete pages."  I'm not

20  sure.

21    All right.  So anyway, if you go to the page

22  with Bates 3020 --

23    A  Yes.

24    Q  -- your upside adjustment for license revenue

25  stayed the same; is that right?

219

**Column 221**

1  changed.
2  Okay.  So what types of factors would you use
3  to reduce your upside?
4  A  Whether my upside was increased or decreased
5  depended on information that was made available to me.
6  For example, if the field organization
7  increased their forecast that they submitted, I might
8  decrease my upside if I felt that they were taking
9  into consideration some of the revenue that I thought
10  their original forecast should have included.
11  Q  Okay.  What about pipeline information?
12  Did you take that into account in adjusting
13  your upside adjustments?
14  A  I reviewed pipeline information, yes.
15  Q  Okay.  Okay.  Now, if you look at the first
16  page of Financial Report 24 --
17  A  Yes.
18  Q  -- it has a pipeline growth percentage of
19  34 percent; do you see that?
20  A  Yes.
21  Q  Okay.  If you compare that to 21, Financial
22  Report 21 -- you have Financial Report 21, first page?
23  A  First page, yes.
24  Q  You have a pipeline growth rate of
25  52 percent?

221

**Column 222**

1  A  That is correct.
2  Q  Do you remember the pipeline dropping in the
3  first month of Q3 2001 from 52 percent to 34 percent?
4  A  I -- I can see it here, but I don't remember
5  that actual -- that actual event.
6  Q  Okay.  Did you take that drop in the pipeline
7  in consideration in making your upside adjustments?
8  A  As of the 12/25 report?
9  Q  Right.
10  A  I may have.
11  Q  Okay.  Do you remember doing that?
12  A  I don't recall.
13  Q  Okay.  Okay.  But you didn't adjust it down;
14  is that right?
15  A  That is correct.
16  Q  Okay.  Do you remember discussions in the
17  early part of January 2001 about a slowdown in NAS --
18  NAS's business?
19  A  I don't recall any specific discussion.
20  Q  Okay.  I've placed in front of you what has
21  previously been marked as Nugent 28.  If you take a
22  moment to flip through this exhibit and let me know if
23  you recognize it.
24  For the record, Nugent 28 starts at Bates
25  NDCA-ORCL 096760 and ends at 787.

222

**Column 223**

1  A  I do not recognize this.
2  Q  Okay.  All right.
3  This, for the record, is a -- it's titled
4  "General business US Q3 OPS review.  John Nugent, SVP.
5  January 9, 2001"; do you know who John Nugent is?
6  A  John Nugent ran the business organization
7  reporting up through George Roberts.
8  Q  Okay.  If you look to the page that ended in
9  Bates 768 --
10  A  Yes.
11  Q  -- do -- the top slide says "Sluggish
12  Economic Outlook.  Focus on profits.  Reduce IT
13  costs.  Single digit growth and IT budgets."
14  Do you remember any discussions that you had
15  with anybody in the early part of January 2001 about a
16  sluggish economy?
17  A  I remember that the general macroeconomic
18  environment was suffering, but I don't -- did not have
19  any discussions with John Nugent with regards to his
20  market observations.
21  Q  Okay.  What about with George Roberts?
22  A  Not that I recall.
23  Q  Okay.  If you turn to page 12 of the
24  presentation, 771 is the Bates, the top slide there
25  says "DotCom Fishing Hole Drying Up.  VC Funding

223

**Column 224**

1  Nonexistent.  Development License Only.  41,515
2  Layoffs in CY2000," and "Survival mode for CY 2001."
3  Do you recall a -- any discussions with
4  George Roberts or anybody else about a slowdown in
5  Oracle's dot.com business?
6  A  I do not recall having a discussion --
7  Q  Okay.
8  A  -- at this point in time.
9  Q  Okay.  When's the first discussion you
10  remember having?
11  A  I certainly remember when George Roberts came
12  in to the EC meeting the last few days of the quarter.
13  He had sent an e-mail note the night prior reducing
14  his forecast.
15  Q  Okay.  So that's the --
16  A  And reduced it again that day of the EC
17  meeting which was two days or three days prior to the
18  end of the quarter.
19  Q  Okay.  And that's the first memory that you
20  have of the slowdown in George Roberts' business?
21  A  That is the best that I can recall at this
22  point.
23  Q  Okay.  Okay.  If you look to --
24  A  Just for your benefit, I never attended these
25  operation review meetings.

224

Minton, Jennifer (30b6)  7/7/2006  9:01:00 AM

1    Q  I'm trying to find out is if you had
2    discussions with George Roberts or anybody else about
3    what was presented at this meeting.  Not
4    necessarily -- I'm not saying that you were there
5    actually seeing this.
6         If you look to page 26, which ends at Bates
7    785, it has "Issues/Challenges/Recommendations" slide?
8    A  Uh-huh.
9    Q  If you turn the page to page 27, 786 is the
10   Bates, it says "Mid Teen Technology Growth Rate.  No
11   M$ DotCom Deals."  Action:  Alert Corporate."
12        Did anybody alert you that NAS was seeing
13   immediate teen technology growth rates during this
14   period of time?
15   A  That what was?
16   Q  NAS.
17   A  That they were seeing what?
18   Q  Mid teen technology growth rates?
19   A  Not that I recall.
20   Q  Okay.  The second slide, the first bullet
21   point says "Quality and Stability of 11i."
22        Do you remember any discussions in the early
23   part of January about the quality instability of 11i?
24   A  I do.
25   Q  What do you remember about that?

225

1    A  I remember that we had implemented 11i
2    internally in December or in January, and we were
3    having some implementation issues.
4    Q  Okay.  Can you tell me what those
5    implementation issues were?
6    A  Well, for example, we spoke about the OKS
7    product not having the appropriate -- not appropriate,
8    but not having the management reporting capability to
9    enable us to easily track contracts set for renewal in
10   the quarter.
11        That would be an example of some issues, but
12   I don't recall the details, but I do recall that it
13   was a very rocky implementation.
14   Q  Okay.  Now, the next bullet point down says
15   "Dramatic Decline in DotCom business.  30% of named
16   DotComs out of business.  40M DB Shortfall in the
17   West.  35 DotCom Reps at risk."
18        Do you remember conversations with anybody
19   about a dramatic decline in the dot.com business for
20   NAS in early January?
21   A  I don't recall any specific conversations.
22   Q  Is this information that you would have
23   wanted to know in the early part of January 2001?
24        MR. WALD:  Object to the form.
25        THE WITNESS:  What -- what information

226

1    precisely, please?
2         BY MR. BRITTON:  Q.  That there was a
3    dramatic decline in dot.com business in NAS?
4         MR. WALD:  This is a projection.
5         BY MR. BRITTON:  Q.  Were you expecting a
6    40-million database shortfall in the west?  Is that
7    information you would have wanted to know in early
8    January 2001?
9    A  Absolutely.
10   Q  Okay.  You don't remember anybody telling you
11   about it?
12   A  All I can recall is that it wasn't until the
13   very end of the quarter that we heard that they
14   weren't going to make their forecast.
15        MR. WALD:  Just for the record, I -- I don't
16   know that he's established that this refers to the
17   forecast as opposed to the budget, so....
18        BY MR. BRITTON:  Okay.  You can put that
19   document aside.
20        Okay.  Peter, it looks like you have two
21   copies of the same one.  Just pull off the top page.
22   All I need is the bottom one; okay.
23   Q  I've placed in front of you what's been
24   marked -- previously marked as Winton Exhibit 49.
25        Will you take a moment to look at this

227

1    exhibit.  For the record, Winton Exhibit 49 starts at
2    Bates NDCA-ORCL 03419 and ends at the same page.
3         It's a one-page e-mail.  I'm sorry.
4         Do you recognize exhibit -- Winton Exhibit
5    49?
6    A  Yes, I do.
7    Q  And how do you recognize Winton Exhibit 49?
8    A  It's an e-mail to me on January 11th
9    informing me that they are not changing their
10   forecast, but that they see that their pipe is
11   softening and the GB's dot.com bubble has burst.
12   Q  Okay.  Do you remember --
13   A  But at this point, he says he's still
14   tracking through his forecast.
15   Q  Okay.  Do you remember whether you took this
16   e-mail into consideration in adjusting your upside for
17   the period after the -- for the first period after
18   January 11, 2001?
19   A  So on the January 15th?
20   Q  Yeah.
21   A  May I take a look at the --
22   Q  I'm just asking you what you remember.
23   A  I don't remember how I came up with my upside
24   adjustments.
25   Q  Do you remember whether this e-mail impacted

228

1  your --

2    A  I don't recall.

3    Q  Okay.  Did you discuss -- do you remember

4  discussing any of the contents of this e-mail during

5  the Thursday forecasting call on January 15th, 2001?

6    A  I do not recall.

7    Q  Is the information that's contained in Winton

8  Exhibit 49 the type of information that would be

9  discussed during that call?

10    A  Generally we talked more about the larger

11  deals that were in play for the quarter.

12    Q  Okay.

13    A  Again, we talked about the forecast, if there

14  was any changes to the forecast numbers, and we would

15  go down and look at the large deals.

16    Q  Do you remember during the January 15th,

17  2001, conference call whether David Winton or

18  George Roberts discussed anything about the dot.com

19  part of their business?

20    A  I do not recall.

21    Q  Okay.

22    MR. WALD:  Do you want her to look at her

23  affidavit to try to refresh her recollection on the

24  1/15 upside, that's what she was starting to do.

25    MR. BRITTON:  I'll get to that.

1    MR. WALD:  Okay.

2    MR. BRITTON:  Yeah, I'll get to that.

3    MR. WALD:  That's fine.

4    MR. BRITTON:  Okay.

5    MR. WALD:  Thank you.

6    MR. BRITTON:  Okay.  I'm placing in front of

7  you what was marked -- you know, we should mark this

8  as an exhibit.

9    THE REPORTER:  It's 40.

10    MR. BRITTON:  Which number?

11    THE REPORTER:  40.

12    (Document marked Exhibit No. 40

13      for identification.)

14    BY MR. BRITTON:  Q.  Okay.  Ms. Minton, it's

15  to your right with the sticker on it.  Okay.  I've

16  placed in front of you what's been marked as Minton

17  Exhibit 40.  Will you take a moment to look at this

18  exhibit?

19    For the record, Minton Exhibit 40 starts at

20  NDCA-ORCL 1611565 and ends at 611567.

21    Do you recognize Exhibit 40?

22    A  This would be a -- some schedules from the

23  America's forecast report that would be referred to

24  during our Thursday forecast calls.

25    Q  Okay.  And do you recognize the handwriting?

1    A  I believe the handwriting is of

2  Roberta Ronsse.

3    Q  Okay.  Does this document refresh your

4  recollection at all about what was discussed about NAS

5  during the January 15th forecast call?

6    A  I don't really see any notes for -- there's

7  notes regarding OPI.

8    Q  If you look at the middle column of

9  handwritten notes, the first --

10    A  NAS 1444, I don't know what the --

11    Q  For upside it looks like.

12    A  No, I'm not seeing it.

13    Q  Okay.  It doesn't refresh --

14    A  U.S. 4?

15    Q  To me it looks like 14,400 for upside, but

16  that's my understanding.

17    A  I don't know what it says.

18    MR. WALD:  I think that there's three letters

19  that are definitely USP.

20    THE WITNESS:  It's USP or USF ORD.

21    MR. BRITTON:  Yes.  All right.

22    Q  If you look to the next page, there's some

23  handwriting on the right-hand side?

24    A  Correct.

25    Q  It says "Best" down arrow "from 398 to 360."

1    A  That's correct.

2    Q  "Majors 13% GB 2%."  Do you know what that is

3  referring to?

4    A  It sounds like they're moving their best

5  case.  Not their forecast, but their best case down

6  from 390 to 360.

7    Q  Okay.  And then do you have an understanding

8  of what the percentages they made from majors and GB?

9    A  I did not write those numbers, so no, I'm not

10  exactly certain as to what they are.

11    Q  Okay.  Put that document aside; okay.  This

12  is going to be Financial Report 25.

13    (Document marked Exhibit No. 25

14      for identification.)

15    MR. BRITTON:  Q.  Okay.  I've placed in front

16  of you what has been marked as Financial

17  Report 25.

18    Will you take a moment to look at this

19  exhibit.  And, for the record, this appears to be an

20  upside report for January 15th, 2001.  It starts at

21  Bates 0003341 and ends at 0003357.

22    A  I'm ready to respond to your --

23    Q  Okay.  Do you recognize exhibit -- or

24  Financial Report 25?

25    A  It is the upside report for January 15th.

Minton, Jennifer (30b6)  7/7/2006  9:01:00 AM

1    Q.  Okay.  And pipeline growth has stayed the
2    same; is that right?
3        MR. WALD:  Which page, Doug?
4        MR. BRITTON:  First page of the report.
5        THE WITNESS:  Stayed the same from what?
6    BY MR. BRITTON:
7        Q  From the last one we saw.
8        A  I'd have to go back to that one to validate
9    that.  So the one prior to that was 12/11.
10       Q  Financial Report --
11       MS. KYROUZ:  25.
12       BY MR. BRITTON:  Q. -- 24.
13       MR. WALD:  24.
14       BY MR. BRITTON:  Q.  Financial Report 25.
15       A  This is 12/08.  I'm not going by the numbers.
16   I'm going by the dates that I have on here.  It's
17   easier for me.  So the pipeline growth was 34 percent
18   on the 20 -- on the 12/25.  It is still 34 percent on
19   the 1/15.
20       MR. WALD:  Again, that's constant dollar
21   forecast?
22       THE WITNESS:  That's correct.
23       BY MR. BRITTON:  Right.  Okay.
24       Q  If you look to page two --
25       A  Yes.

233

1    Q  -- the upside adjustment that you made has
2    decreased from 159 to 94; is that correct?
3        A  To 94,910.
4        Q  Right.
5        Is that correct?
6        A  That is correct.
7        Q  Can you tell me why you reduced the upside
8    from 159 to 94?
9        A  I can't tell you specifically why, but I
10   can -- can deduce that -- sorry.  Year three -- so on
11   12/25 we had a forecast of 346, and I had upside of
12   50 million.
13       Q  159 or 50?  What are you looking at?
14       A  I'm sorry.  I'm trying to get it down on a
15   piece of paper so I can speak to it intelligently.
16       Q  Okay.
17       A  So on 12/25 --
18       Q  And that is, for the record --
19       A  December 25th.
20       Q  Right.  For the record, that's Financial
21   Report Exhibit 24.
22       A  That would be correct.  The NAS forecast is
23   346.
24       MR. WALD:  Million?
25       THE WITNESS:  There was 50 million of upside

234

1    to get to 396.  Do you see that?
2        BY MR. BRITTON:  Q.  Yes.  And you're on
3    page --
4        A  Which would have given it a growth rate of
5    28 percent.
6        Q  You're on page 3191?
7        A  3191, and --
8        Q  Look at OSI, because that's going to be
9    relevant, too.
10       A  Okay.  So 225 plus 25 to get 250.
11       Q  That's what it looks like to me.
12       A  On 12/25, and on 1/15 OSI's 225 with no
13   upside to get to 225, and that was from one month
14   later.
15       Q  Right.
16       And then --
17       A  And in between or about the same time as this
18   upside report was prepared was the Americas forecast
19   report, and if January 15th was a Thursday, I don't
20   know if it was or not --
21       Q  I don't know if it was, either.
22       A  -- but the comments on here would have been
23   predicated on the call after or on the same date that
24   this report was prepared.  They moved their best case
25   down from 390 to 360.

235

1    Q  That's NAS?
2    A  That's NAS.
3    Q  Okay.
4    A  So, you know, clearly there was, based on
5    information from that meeting, I brought my upside
6    down for NAS as well from 50 to -- from 50 million to
7    14 million, which got me to a forecast of 340 -- I'm
8    sorry -- 360, which was their best.
9        Q  Their best, and you also removed all the
10   upside?
11       A  Not their -- not their -- yes, their best as
12   indicated on this particular document.
13       Q  Okay.  And then you also removed the upside
14   for OSI?
15       A  That is correct.
16       Q  Okay.  Now, can you tell me why -- you
17   remember today why you reduced NAS's forecast like you
18   did?
19       A  Well, again, I don't recall specifically.
20       MR. WALD:  I think you misspoke.  I don't
21   think she said she reduced their forecast.  They had
22   their forecast.  I think she said she reduced their
23   upside.
24       THE WITNESS:  Their forecast remained the
25   same.

236

1    BY MR. BRITTON:  Correct.  Let me rephrase.
2    Q   Do you remember, sitting here today, you
3    reduced NAS's upside from 50 to 14 million?
4    A   I can presume that based on whatever
5    discussions took place, I felt it was necessary to
6    bring it down to what they were indicating as their
7    best case at the point in time -- at this point in
8    time.
9    Q   Okay.  And did David Winton's January 11th
10   e-mail impact your upside adjustment for NAS in any
11   way?
12   A   It may have been brought into consideration
13   and further elaborated on within the forecast call,
14   but I really do not recall.
15   Q   Okay.
16   A   I can just, sitting back here, tell you it
17   would not be unreasonable for me to bring it down
18   based on the information that was presented.
19   Q   Okay.  You can -- now, the fact that you
20   reduced upside from 159 to 94, was that discussed
21   at the executive committee meeting following this
22   report?
23   A   I do not know if we had an executive
24   committee meeting that date, nor do I recall the
25   specific details.

237

1    Q   Okay.  Is it the type of information that
2    would have been discussed at the executive committee
3    meetings reduction in your upside?
4    A   Again, we would discuss the forecast.  I
5    cannot recall the specifics of any of the EC meetings.
6    Q   Okay.  When you say you discussed the
7    forecast, would that include upside adjustments?
8    A   Generally not.  It was primarily focused on
9    large deals that were in play.
10   Q   Okay.
11   A   And, you know, asking -- you know, I think at
12   this point in time we were pushing these guys to find
13   out whether or not there was any changes in their
14   forecast which is a result of the macroeconomic
15   conditions that were prevalent in the news, but nobody
16   was moving off their forecast.
17   Q   Okay.
18   A   I'm not certain we had EC meetings every week
19   in January.
20   Q   Okay.  Do you know whether you skipped any EC
21   meetings in January?
22       MR. WALD:  When you say "you," you mean
23   whether Oracle skipped them or whether the witness was
24   not present?
25       BY MR. BRITTON:  Q.  Okay.  Do you know

238

1    whether --
2    A   I'm just advising you that I vaguely recall
3    that there was a meeting that was not held, but I may
4    not be correct.
5    Q   Okay.
6    A   Certainly if we go back to the diaries of
7    some of the individuals, you might be able to discern
8    that information.
9        (Document marked Exhibit No. 41
10        for identification.)
11       BY MR. BRITTON:  Q.  I've placed in front of
12   you what's been marked as Minton Exhibit 41.  Will you
13   take a moment to look at this exhibit?
14   A   So may I go back and point something out?
15   Q   Sure.
16   A   The Americas package was dated 12/15 which
17   would have been a Monday.
18       MS. KYROUZ:  You mean January 15th?
19       THE WITNESS:  Sorry.  January 15th.
20       MR. WALD:  Let's see if we can find that for
21   you.
22       THE WITNESS:  I'm just pointing out that that
23   day was actually a Monday.
24       MR. WALD:  There it is.
25       THE WITNESS:  So this date, January 15th, on

239

1    this package corresponded with the upside dates of
2    Monday, not the Thursday meetings.
3        BY MR. BRITTON:  Right.  Thursday.  Okay.
4    Q   And what does that tell you about the
5    forecast calls for the Americas?
6    A   I'm not certain if this -- if these comments
7    were made on the Thursday prior or the Thursday after
8    January 15th.
9    Q   Okay.
10   A   That's all.
11   Q   Okay.  I put in front of you 41.
12   A   Right.
13   Q   Have you had an opportunity to look at it?
14   A   Yes.
15   Q   Okay.  Do you recognize Exhibit 41?
16   A   Do I recognize what?
17   Q   Exhibit 41.
18   A   Yes.
19   Q   What do you recognize it to be?
20   A   It's an e-mail note from Jim English on
21   January 17th.
22   Q   Okay.  And did you take the information that
23   is contained in Mr. English's e-mail into
24   consideration in adjusting your upside?
25   A   Which upside?

240

1  Q  Any upside.

2  A  No, not in any upside.  Certainly potentially

3  in an upside after the 17th of January.

4  Q  Well, of course.  In any upside -- let me

5  rephrase.  In any upside -- withdrawn.

6      Did you take the information that was

7  presented to you by Jim English in this e-mail into

8  consideration in adjusting your upside at any time

9  after January 17th, 2001?

10  A  I don't know.  I'd have to refer to upside

11  reports after this date --

12  Q  Okay.

13  A  -- to validate whether or not it's a

14  possibility.

15  Q  Okay.  Is this a true and authentic copy of

16  the original e-mail?

17  A  I presume that it is.

18  Q  Okay.  Was it Jim English's responsibility to

19  update you on forecasting issues in his division?

20  A  Jim English was the finance manager

21  supporting the OPI organization.

22  Q  Okay.  So he was supposed to send you e-mails

23  like this?

24  A  This e-mail is in response to me, I believe,

25  chastising him for parroting what was told by the --

241

1  by Sandy Sanderson.

2  Q  Okay.

3  A  So I was constantly, during this time period,

4  challenging both Sarah Kopp, David Winton, and

5  Jim English to not tell me what the EVPs were saying

6  about the forecast, but to give their own opinion

7  about the forecast.

8      So his comment that says -- when you asked

9  for a forecast summary, I should have asked you what

10  you were looking for -- is in response to me saying,

11  "Look, I already heard what these guys had to say.

12  You tell me what you have to say."

13  Q  Okay.

14  A  I was trying to get these guys to utilize

15  their critical thinking skills and provide me with

16  their own input.

17  Q  That's what he was doing here?

18  A  It was his attempt.

19  Q  Okay.  Now, the second paragraph says "We

20  have a lot of pipe at challenging clients."

21      Do you remember what he meant by that?

22  A  I think that the comment sufficiently

23  represents what it says.  They've got opportunities of

24  clients with challenges.

25  Q  Okay.  Do you remember which clients?

242

1  A  He cites GE in here.  He cites General

2  Motors.  He cites Gateway.

3  Q  Okay.  And did you discuss or did anybody

4  discuss this information at the executive management

5  committee meeting after this e-mail?

6  A  Again, I don't remember the specifics today

7  of the conversations that were held over five years

8  ago.

9  Q  Okay.

10  A  But again, we did discuss large

11  opportunities.

12  Q  Okay.  Okay.  And if you -- you can put that

13  document aside.  The next -- 30, Gavin.

14      How much elapsed time?

15      THE VIDEOGRAPHER:  6:26.

16      MR. WALD:  I'm sorry?

17      MR. BRITTON:  6:26.

18      MR. WALD:  Okay.  Will you alert us when

19  it's, let's say, ten minutes left?

20      THE VIDEOGRAPHER:  Okay.

21      MR. BRITTON:  Doug, unless you want some other

22  alert.

23      MR. BRITTON:  Huh?

24      MR. WALD:  Unless you want some other alert.

25      MR. BRITTON:  No, that's fine.

243

1      You know what, can we take a quick break?

2      THE VIDEOGRAPHER:  Off record at 4:56.

3      (Short break taken.)

4      THE VIDEOGRAPHER:  On record at 5:06.

5      BY MR. BRITTON:  Q.  Okay.  I -- let me make

6  a statement for the record.

7      I am about middle way through January 4th,

8  which is the third quarter of 2001, which is the class

9  period, and I have all the way through the end of

10  January through February to cover still.  So if we can

11  agree to more time to cover that, then we will file

12  the necessary motion with Judge Fontaine.

13      But given the hour and given the

14  representations that I've heard here, we're going to

15  start with an authentication process of the exhibits

16  that were marked at Larry Ellison's motion for summary

17  judgment in the San Mateo case.

18      MR. WALD:  Okay.  For the record, obviously I

19  accept what you say, Doug.  And just respectfully we

20  disagree, and our position is that the deposition is

21  set for seven hours, and obviously it's up to you how

22  to spend those seven hours.

23      BY MR. BRITTON:  Correct.

24  Q  Okay.  So, Ms. Minton, I have handed you a

25  binder, and I'm going to ask you a series of questions

244

Minton, Jennifer (30b6)  7/7/2006  9:01:00 AM

1  for all of the documents that are in these binders,
2  and I think what may be helpful is if I can ask you
3  the questions and have you go through each document
4  and answer the questions that I ask; okay?
5      So what I'd like you to do is write down the
6  questions that I ask you.
7  A  Write down the questions?
8  Q  Yeah, write them down; okay.
9      The first question for each document is going
10  to be "Do you recognize it?"
11      So let's write the questions down, and then
12  you can go through it and it will make it much
13  quicker.
14  A  Recognize?
15  Q  The doc -- each exhibit.
16  A  Like the format or the --
17  Q  Right.
18  A  -- or the nature of the report?
19  Q  Right.
20  "Do you recognize the report?"
21  A  Okay.  Question number two?
22  Q  Question number two is, "Is it a genuine and
23  authentic copy of the original?"
24  A  So obviously I presume that it is.  Without
25  having the original at my disposal, I don't know how

245

1  I'm supposed to substantiate that question.
2      MR. BRITTON:  Okay.  You know, Peter, the way
3  we can do this, if you want to, is we can stipulate
4  that these are authentic and business records, because
5  they were used by Oracle on the summary judgment,
6  so --
7      MR. WALD:  I can't make that stipulation now.
8  You haven't asked me to do that.  I'm certainly
9  willing to consider that, Doug, and I'll talk to my
10  colleagues about whether we can make that stipulation.
11      MR. BRITTON:  Okay.
12      MR. WALD:  I think what you have to decide,
13  whether we can or can't make that stipulation, is
14  whether this witness is the right witness to try to
15  authenticate these.
16      BY MR. BRITTON:  Okay.  Okay.  Since we can't
17  stipulate, here we go.
18  Q  "Is it a genuine and authentic copy of the
19  original document?"
20  A  Okay.
21  Q  Okay.  And if you can't answer that question,
22  "Does anything look altered?"
23  A  I'm going to presume that if it's an upside
24  report, that it is genuine and authentic, unless I
25  should not do so, because I don't have the original

246

1  documents in front of me to validate.
2  Q  Okay.  Just your --
3  A  But I presume that it is.
4  Q  Right.  Just your experience with the upside
5  reports, can you tell if it's genuine or not?
6      MR. WALD:  The question is, looking at the
7  document that is in front of you --
8      THE WITNESS:  Right.  Is it an upside report?
9      MR. WALD:  -- can you confirm whether or not
10  it's genuine and authentic --
11      MR. BRITTON:  Right.
12      MR. WALD:  -- a true and correct copy of the
13  original based on the information you have in front of
14  you?
15      THE WITNESS:  Okay.
16      MR. WALD:  Okay.
17      BY MR. BRITTON:  Correct.  Okay.
18  Q  "And was it prepared by your finance
19  organization -- "
20  A  Were they prepared by my -- uh-huh.
21  Q  "-- in the regular course of their business?"
22  A  Uh-huh.
23  Q  "And was it your division's regular practice
24  to prepare these reports?"
25  A  I wasn't in a division.

247

1  Q  What's that?
2  A  I wasn't part of a division.
3  Q  Excuse me.
4      "Was it your organization's regular practice
5  to prepare these reports?"  And "Were they
6  prepared --" this is the last one "-- were they
7  prepared on or near the date that is in the document?"
8  A  Okay.
9  Q  And if there is no date, "Were they
10  prepared --"
11  A  You said that was the last.
12  Q  I know.
13      MR. WALD:  He's a lawyer.
14      BY MR. BRITTON:  Q.  And if there is no date
15  in the document, "Was it prepared in the quarter as
16  referenced in the document?"
17  A  It wouldn't necessarily be prepared within
18  the quarter.  It could have been prepared a couple of
19  days after the quarter and still relate to the
20  quarter.
21  Q  If you want to give that testimony, that's
22  fine too.  We're just trying to get an idea of when it
23  was prepared.
24  A  Okay.
25  Q  All right.

248

1    With that said, for the record, the first
2  binder is -- we'll call it Financial Report Exhibits 1
3  through 34, and on the front of the binder is the
4  summary judgment index which references the report,
5  and I'll represent to you that the Bates numbers that
6  are listed in the index correspond to the documents
7  that are contained in the binder, with the exception
8  of number one.
9    The index says 122069 to 70, and it's
10  actually a larger document with the Bates number that
11  ends at 79.
12  A   Okay.
13  Q   Okay.  So with that, if you can go through
14  and answer those questions for these documents.  I
15  think it's okay if you go through them all and say yes
16  to everything, or do you want to take it report by
17  report?
18    MR. WALD:  How about we take it report by
19  report and question by question, and the witness says
20  "Yes," "No," "I can't say," or "I don't know."
21    MR. BRITTON:  Okay.  We can do that.
22    MR. WALD:  All right.
23    THE WITNESS:  Do I recognize the report, yes.
24  I can confirm that these reports are prepared in the
25  ordinary course of business.  Yes, it was a regular

1  practice to prepare these reports.
2    Were they prepared on or near the date of the
3  document?  I'm not certain which date you're referring
4  to.  The date here is, I think, a printout date.  It's
5  August 2002.
6    MR. WALD:  Don't write.
7    THE WITNESS:  Oh, sorry.
8    MR. WALD:  That's okay.
9    THE WITNESS:  I'll put down the pen.  Whereas
10  this is actually for fiscal -- for the second quarter
11  of fiscal 2000.
12    So when referring to the date of the
13  document, I'm going to assume that you mean not the
14  date that it was printed, but the date that is
15  referred to in the title of the report --
16    MR. BRITTON:  Correct.
17    THE WITNESS:  -- and I can confirm that this
18  would have been prepared for the second quarter of
19  2000.
20    BY MR. BRITTON:  Great.  Thank you.
21  Q   And the one you missed was a true and
22  authentic copy.
23  A   Again, I presume that these are true and
24  authentic copies.
25    MR. WALD:  Let's not assume.  I think you

1  should say -- do you know?
2    MR. BRITTON:  Right.
3    THE WITNESS:  Well, I mean, I believe that
4  these are.
5    MR. WALD:  Okay.
6    THE WITNESS:  I mean, I don't know if he
7  inadvertently slipped in a wrong page somewhere.  I
8  mean, that's where I get black and white.  But, yes, I
9  can confirm that.
10    BY MR. BRITTON:  Q.  Okay.  Go to number two.
11  If you want to just say for question one through
12  whatever, "yes," "yes," "no," you know, that kind of
13  thing, it will speed it up.
14  A   I can confirm that this is an upside report.
15  It's a copy of the original.  It is prepared by the
16  finance organization in the regular course of
17  business.
18    They would have been prepared within the Q3
19  fiscal '00 time period.  Without knowing exactly what
20  week of the forecast, I don't know what time period.
21  It could have actually been a few days before or
22  after, and I think I answered them all.
23    Did I answer them all?
24  Q   The true and authentic copy.
25  A   I did.

1  Q   Is it fair to say that your testimony will be
2  the same for each report for the true and authentic
3  copy?
4  A   It will be.
5    MR. WALD:  You covered the upside reports in
6  that question, Doug?
7    MR. BRITTON:  Yeah, all the upside reports.
8    THE WITNESS:  I think it's fair to say I'm
9  going to say the same for all of them, if these are
10  the upside reports.
11    MR. BRITTON:  That's -- that's fine.  If I
12  can get a representation that I won't get an objection
13  because she hasn't gone through each report, that's
14  fine.
15    MR. WALD:  Yes.  Which -- I'm sorry -- Which
16  DX are you going through for these?
17    MR. BRITTON:  Just the first binder through
18  34.
19    MR. WALD:  Okay.  Yes.  Yeah, we'll give you
20  that stipulation.
21    MR. BRITTON:  Okay.
22    THE WITNESS:  What about that one that wasn't
23  a DX in here?
24    MR. BRITTON:  Why don't we look at that one.
25  What was that?

1    MS. KYROUZ:  It was 30.

2    THE WITNESS:  It was one that was partial,

3  and there was one that was not in here, and it was

4  skipped.  Yes, 30.

5    BY MR. BRITTON:  Q.  31, I think it was.  No,

6  30.

7    A  Tab 30?

8    Q  Tab 30.

9    A  And that is which one?  DX?

10   Q  DX30.  So that was not referenced in your

11  affidavit, but it is in the index which is Minton 39.

12   MR. WALD:  39.

13   THE WITNESS:  Oh, this is a full year upside

14  report.  This is not a quarterly upside report.  Maybe

15  that's the reason why it's not referred to.

16   BY MR. BRITTON:  Q.  If you look at the

17  second page of Exhibit 30, that gives you Q3

18  information.

19   A  Right.  But if you look at Q4, the third

20  page, it gives you Q4, and the very first page is the

21  compilation of the two.

22   Q  Okay.

23   A  And then the pages behind it represents the

24  quarterly breakdown of all those numbers.

25   Q  Okay.

1    A  And if you recall, again, this is at actual

2  rates, so....

3    Q  Can you go through and answer the questions

4  that we have listed for this particular document?

5    MR. WALD:  This is tab 30.

6    MR. BRITTON:  30.

7    MR. WALD:  Okay.

8    MR. BRITTON:  DX30.

9    MR. WALD:  Maybe she can identify the

10  document.

11   THE WITNESS:  It's a full-year forecast.

12  This one was not necessarily prepared on a regular

13  basis, but periodically.

14   THE VIDEOGRAPHER:  20 minutes of tape.

15   THE WITNESS:  The date again is for the

16  fiscal year 2001.

17   Being that it's got upside for Q3 and Q4, my

18  logical conclusion is that it was prepared during the

19  Q3 fiscal quarter as that quarter was not necessarily

20  completed if we're still doing a forecast.

21   BY MR. BRITTON:  Q.  2/16/2001 at the bottom

22  of page one, does that look about the right period of

23  time?

24   A  I don't know when this was actually prepared,

25  but it was definitely prepared in Q3.  Because if you

1  look at the back schedule, the quarterly breakout, you

2  can see that there was upside adjustments available,

3  those columns available for Q3 and Q4, whereas you

4  don't have them for the first two quarters, because

5  those quarters must have already been --

6    Q  Okay.

7    A  -- completed.

8    Q  Fair enough.

9    A  I'm sorry.  What other questions do you have

10  on this?

11   Q  Genuine and authentic copy of the original?

12   A  Yes.

13   Q  Okay.  Prepared by your group?

14   A  Yes.

15   Q  Was it their responsibility to prepare this

16  report?  It was their responsibility to prepare this

17  report?

18   A  They were prepared by the finance

19  organization.

20   Q  Okay.  And was their regular practice to

21  prepare this report?

22   A  It would be a periodic practice --

23   Q  Periodic practice.

24   A  -- because it's a full year forecast.

25   Q  Okay.  And --

1    A  Versus the upside reports that are prepared

2  every quarter.  That's more regular.

3    Q  Okay.  And it would have been prepared in Q3

4  2001?

5    A  Yeah.  For example, we don't have a full year

6  forecast schedule like we have a quarterly forecast

7  schedule --

8    Q  Okay.

9    A  -- if I may point out the distinction that

10  I'm trying to make.

11   Q  Okay.  Sure.  I think we've covered binder

12  one.

13   MR. WALD:  I think there was one other --

14   THE WITNESS:  Yes, there was.

15   MR. WALD:  -- report, which is the partial

16  report that the witness testified to earlier, which I

17  think is the December -- the February 13th -- I'm

18  sorry.  December 13th.

19   THE WITNESS:  Yeah, December 13th.

20   MR. WALD:  I don't know what the DX number

21  is.

22   THE WITNESS:  I don't, either.

23   MR. BRITTON:  23.

24   THE WITNESS:  Again, this represents the --

25  similar to the last report, a full year outlook.  So

this is not a quarterly upside report, but this is a report that reflects the full year outlook. So it's taking Q1 and Q2 actuals, plus Q3 and Q4 forecast, including upside.
BY MR. BRITTON: Q. Okay. And would your answers to the authentication questions 1 through, I guess there's five, would they be the same for this report as they were for --
A They'd be prepared in the regular -- yes, I recognize the report. Yes, it's genuine. Yes, they were prepared by my finance organization.
Was it the regular practice? Again, this is not a quarterly report. We did not have a, quote, "full year forecast schedule."
So it wasn't prepared, as I mentioned before, every other week for the first two months of the quarter, and then every quarter -- every week for the third quarter.
Q So it was a periodic practice?
A Yes, it was periodic.
Again, this was obviously prepared in Q3 --
Q 2001?
A -- of fiscal 2001.
Q That's it; okay.
A Okay.

257

Q You can put -- you can give the court reporter that binder.
Okay. Ms. Minton, I've placed in front of you the binder number two, which is Financial Report 35 through 53.
Take a moment to look at those, and I'm going to represent, for the record, that binder 35 through 53 corresponds to the index in Minton 39, which is also on the first page or the first report in each binder, and the Bates numbers correspond and the descriptions correspond, as well as the dates.
With the exception of Financial Report 37, which is missing Bates Nos. 38 and 39 and Financial Report 52 which is missing 9299 and 9300. So --
MR. WALD: I think the witness has said she needs --
THE WITNESS: That's what I'm doing, yeah.
BY MR. BRITTON: Q. Okay. So if you will go through Financial Reports 35 through 42 and --
A Actually, I'll go through 35 through 37, because they are all similar reports.
Q 35.
A The pipeline reports which we would -- which I recognize, they are genuine and authentic copies of the original. They were definitely prepared by my

258

finance organization. We prepared these reports, I believe, once a month on a routine basis. They would have been prepared on or near the date of the actual document itself, and they are all dated.
Q Okay. Great. Now 38 through 42.
A 38 is an e-mail note containing the results for July -- June and July on a quarter-to-date basis. The next one in -- under tab 39 is October quarter to date. So also two months' worth of quarter-to-date data; do you see that?
Q Uh-huh.
A So these two reports are similar in that they're quarter-to-date for two months. The third one under tab 40 is the results for December only, which would be quarter-to-date for Q2. The next tab 41 is for January on a quarter-to-date basis.
MR. WALD: You said --
THE WITNESS: Those are similar in that they are e-mail notes that I recognize that would have -- were broadcasted to the executive management team regarding our actual results.
So I recognize them, yes. They're genuine and authentic. They're prepared by my group in the regular course of business. It was a regular practice to prepare these reports for the first and second

259

month of the quarter, but not the third month of a quarter because we would not share the actual results for the entire quarter with this wide of an audience.
Yes, they were prepared on or about the date of the e-mail note in which they were distributed, and they all are dated.
MR. WALD: I'm sorry. Doug, I think the witness misspoke. Go to page 244, line eight and nine. It says "The third one under Tab 40 is the result for December only which would be quarter-to-date of Q2."
THE WITNESS: Oh, I meant to say Q3. Sorry. Thank you.
BY MR. BRITTON: Q. And this -- and you answered the questions for Exhibits 38 through 41 or 38 through 42?
A 38 through 41.
Q Okay.
THE VIDEOGRAPHER: Ten minutes, Counsel.
BY MR. BRITTON: Q. How about -- how about for 42?
A 42 is an e-mail note from Larry Garnick on February 12th saying that there was an error in the product revenue spreadsheet that affected the year-to-date numbers. He's attaching a revised

260

1  product revenue report.
2      Q  Which is illegible?
3      A  Which is what?
4      Q  Illegible.  The next page.
5      A  I have difficulty reading it.
6      Q  Okay.  I don't think even that would help.
7      A  This is -- again, I recognize what it is.
8  It's genuine and authentic.  It was prepared by Larry,
9  who reported to me.  It was a regular practice to
10  correct previously issued results, so this is what
11  this is, but it was not routine, and it was clearly
12  prepared on or near the date of the document.
13      Q  Okay.
14      A  Tab 43, Tab 44, Tab 45, 46, 47, 48, these
15  represent contract pipeline reports, and yes, I
16  recognize them.  They're genuine and authentic.  They
17  were prepared by Loren Mahon, who reported up to me.
18  I'm not sure if she reported directly to me at the
19  time.
20          It was a regular practice to prepare these
21  reports, and they were prepared on -- on the date of
22  the e-mail note that they were sent out, and all are
23  dated.
24      Q  Okay.
25      A  Tab 49, 50 -- Tab 49, 50, 51, 52 -- well,

261

1  March is a monthly financial reference book for March
2  of fiscal 2000.  So this would be a gray book.  I can
3  say yes to all of the questions that you had me write
4  down.
5      Q  Okay.  Now, is it currently -- stop here real
6  quick.
7          Am I right to say that these financial
8  reference books would be prepared monthly for month
9  one and month two, and then quarterly after month
10  three?
11      A  I'd have to look for month two to see if they
12  represented quarter-to-date results, and they were
13  actuals.  Let me look at the index.  They were
14  quarter-to-date actuals.
15      Q  Okay.  Okay.
16      A  Okay.
17      Q  Okay.
18      A  So that's what you have for Tab 50.
19          For the -- for April, and then Q4 -- I'm
20  sorry -- Tab 51 will represent -- we called it the
21  maroon book, because it was for the quarter rather
22  than interim month period.
23      Q  Okay.
24      A  So yes to all of the questions.  Same would
25  apply for number 52 and number 53.

262

1      Q  Okay.
2          MR. WALD:  52 is a fiscal year, and 53 is a
3  fiscal year?
4          THE WITNESS:  No.  It's a monthly.  It's a
5  monthly financial.  It's just a monthly for June
6  fiscal 2001.
7          MR. WALD:  Okay.
8          THE WITNESS:  And 53 would be quarter-to-date
9  as of July for fiscal 2001.
10          BY MR. BRITTON:  Q.  Okay.  I understand.
11  And yes to all the questions?
12      A  Yes, sir.
13      Q  Okay.  Next binder.  We've placed in front of
14  you the binder, the third binder that is Financial
15  Reports Exhibits 54 through 58, and I'll represent to
16  you that these reports correspond to the references to
17  DX Exhibits 54 through 58 in the compendium of
18  exhibits which is Minton 39.
19      A  So 54 being -- starting with Q1 of '01 which
20  would be quarter-to-date results for August.  Then we
21  go into Q2, so you have September, and you have
22  October on a quarter-to-date, and then we have
23  November -- well, I can't read that.  Hold on a sec.
24          I believe this is Q2.  It's hard to read
25  the -- but you're going in sequence, so yes, I

263

1  recognize that these are the monthly reference books.
2      Q  Right.  And the --
3      A  Genuine and authentic, prepared by my group
4  in the regular course of their business, prepared on
5  or near about the month in which they were referred
6  to, but subsequent to that month, because it usually
7  takes us a week to two to close books.
8      Q  Okay.
9      A  And Tab 58 is the same monthly financial
10  reference book for but the month of December.
11      Q  So yes to all of the questions --
12      A  Yes, sir.
13      Q  -- for this binder?
14          THE VIDEOGRAPHER:  Five minutes.
15          MR. BRITTON:  Okay.
16          MR. WALD:  I think we'll have time to go
17  through 59 through 63, which we'll do these reference
18  books, and that's fine, and then let's discuss on the
19  record if you -- you know, it may be that if you asked
20  us a stipulation -- ask us to stipulate to
21  authenticity with respect to a specific subset of
22  documents that you give us, and you give me, you know,
23  a list of that, I'll certainly consider a way we can
24  do that.
25          MR. BRITTON:  I think I'll do that with the

264

Minton, Jennifer (30b6)  7/7/2006  9:01:00 AM

1  binders that I'm putting in front of the witness.
2      MR. WALD:  Okay.  I'm just saying right now
3  we ought to be able to get through 59 through 63.
4      MR. BRITTON:  Well, there's one more binder
5  through 76.
6      MR. WALD:  Yeah.  Okay.
7      BY MR. BRITTON:  Q.  Okay.  If you could flip
8  through --
9      A  I did.
10     THE VIDEOGRAPHER:  I'm going to have to flip
11  tape.  We've got about four minutes.
12     MR. BRITTON:  Okay.  We should probably
13  change the tape.
14     MR. WALD:  Yeah, that's fine.
15     THE VIDEOGRAPHER:  This marks the end of tape
16  four in Volume I of the deposition of Jennifer Minton.
17     At 5:35, going off the record.
18     (Short break taken.)
19     THE VIDEOGRAPHER:  On record at 5:38.
20     This marks the beginning of tape five,
21  Volume I, in the deposition of Jennifer Minton.
22     BY MR. BRITTON:  Q.  Okay.  I've placed in
23  front of you the fourth binder which has Financial
24  Report Exhibits 59 through 63, and I'll represent to
25  you that Financial Reports 59 through 63 correspond

265

1  with the DX Exhibits 59 through 63 in Minton
2  Exhibit 39.  Okay.  So if you could answer.
3      A  I can answer yes to all five questions.  I've
4  already looked through all of these.
5      Q  Okay.  Perfect.  Put that aside.  The last
6  binder.  All right.
7      I've placed in front of you the fifth binder
8  which has Financial Report Exhibit 64 through 76, and
9  I'll represent to you that Financial Report Exhibit 64
10  through 76 correspond with DX Exhibit --
11     A  76?
12     Q  Yes.
13     MR. WALD:  Does your tab not go to 76?
14     THE WITNESS:  Oh, to 76.
15     MR. WALD:  Yes.
16     THE WITNESS:  Okay.  Got it, got it, got it.
17  Sorry.  I was seeing 67.
18     BY MR. BRITTON:  Q.  Okay.  So I'll represent
19  to you that Financial Report Exhibit 64 through 76
20  correspond with DX Exhibit 64 through 76 in Minton
21  Exhibit 39.
22     A  Exhibits 64, 65, 66, and 67 represent the --
23  oh, and -- and 67 represent the quarterly reporting
24  package that was provided to the board at the end of
25  each quarter for their following board meeting, and

266

1  68, 69, 70, 71, 73.
2      Q  What about 72?
3      MR. WALD:  How about 72?
4      THE WITNESS:  Oh, I'm sorry.  I have to --
5  the dates kind of confuse me.  December 11th,
6  December 25th, January 15th, January 22nd,
7  February 5th, February 12th, February 19th,
8  February 26th, February 28th.
9      Yes, these represent the forecast -- the
10  management summary forecast packages which were the
11  basis for preparing the upside reports that we
12  discussed today.
13     I recognize the reports.  They're genuine and
14  authentic.  They were prepared by my group.  It was
15  their regular practice to prepare these reports in
16  accordance with our forecast schedule.  They were
17  prepared on or near the date of the document.
18     BY MR. BRITTON:  Very good.
19     Q  So yes to all of the questions for this
20  binder?
21     A  That would be correct.
22     MR. BRITTON:  All right.  I have no further
23  questions today subject to the statements on the
24  record.
25     MR. WALD:  Understood.  Thank you.

267

1      MS. KYROUZ:  I would like to mark the
2  transcript as confidential, please.
3      THE VIDEOGRAPHER:  All right.
4      This marks the end of videotape number five,
5  Volume I, in the deposition of Jennifer Minton.  The
6  original videotapes will be retained by LiveNote World
7  Service.
8      Going off the record, the time on the monitor
9  is 5:42.
10     THE REPORTER:  Do you all need a copy?
11     MS. KYROUZ:  Yes, please.
12     MR. BRITTON:  Of course.
13     (Documents marked Financial Report Index &
14      FR1 - FR34 for identification.)
15     (Documents marked Financial Report Index &
16      FR35 - FR53 for identification.)
17     (Documents marked Financial Report Index &
18      FR54 - FR58 for identification.)
19     (Documents marked Financial Report Index &
20      FR59 - FR63 for identification.)
21     (Documents marked Financial Report Index &
22      FR64 - FR76 for identification.)
23     (WHEREUPON, the deposition ended at 5:42 p.m.)
24         ---oOo---
25

268

CERTIFICATE OF WITNESS

1
2
3      I, the undersigned witness, declare under
4  penalty of perjury that I have read the foregoing
5  transcript, and I have made any corrections, additions
6  or deletions I was desirous of making; that the
7  foregoing is a true and correct transcription of my
8  testimony contained therein.
9      EXECUTED this_____day of _____,2006,
10 at _____, _____
          (City)              (State)
11
12
13
          _____
14      JENNIFER MINTON
15
16
17
18
19
20
21
22
23
24
25

269

CERTIFICATE OF REPORTER

1
2
3      I, ANDREA M. IGNACIO HOWARD, hereby certify
4  that the witness in the foregoing deposition was by me
5  duly sworn to tell the truth, the whole truth, and
6  nothing but the truth in the within-entitled cause;
7
8      That said deposition was taken in shorthand
9  by me, a Certified Shorthand Reporter of the State of
10 California, and was thereafter transcribed into
11 typewriting, and that the foregoing transcript
12 constitutes a full, true and correct report of said
13 deposition and of the proceedings which took place;
14
15      That I am a disinterested person to the said
16 action.
17
18      IN WITNESS WHEREOF, I have hereunto set my
19 hand this 18th day of July 2006.
20
21      _____
22      ANDREA M. IGNACIO HOWARD RPR, CSR No. 9830
23
24
25

270

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

271

```
 1                    CERTIFICATE OF REPORTER
 2
 3              I, ANDREA M. IGNACIO HOWARD, hereby certify
 4    that the witness in the foregoing deposition was by me
 5    duly sworn to tell the truth, the whole truth, and
 6    nothing but the truth in the within-entitled cause;
 7
 8              That said deposition was taken in shorthand
 9    by me, a Certified Shorthand Reporter of the State of
10    California, and was thereafter transcribed into
11    typewriting, and that the foregoing transcript
12    constitutes a full, true and correct report of said
13    deposition and of the proceedings which took place;
14
15              That I am a disinterested person to the said
16    action.
17
18              IN WITNESS WHEREOF, I have hereunto set my
19    hand this      day of            2006.
20
21    _____
22             ANDREA M. IGNACIO HOWARD CSR No. 9830
23
24
25
```

EXHIBIT C

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

| | |
|---|---|
| 1  00221:01    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA | 1  00222:01   IN THE COURT OF CHANCERY OF THE STATE OF DELAW. |
| 2   02        IN AND FOR THE COUNTY OF SAN MATEO | 2   02         IN AND FOR NEW CASTLE COUNTY |
| 3   03          ---o0o--- | 3   03 |
| 4   04  COORDINATION PROCEEDING | 4   04  IN RE ORACLE CORPORATION |
| 5   05 | 5   05  DERIVATIVE LITIGATION |
| 6   06 | 6   06  _____/ |
| 7   07         JUDICIAL COUNCIL COORDINATION | 7   07 |
| 8   08 | 8   08 |
| 9   09 | 9   09 |
| 10   10  _____/ | 10   10 |
| 11   11 | 11   11 |
| 12   12 | 12   12 |
| 13   13      DEPOSITION OF LAWRENCE J. ELLISON | 13   13 |
| 14   14        FRIDAY, FEBRUARY 27, 2004 | 14   14 |
| 15   15       Volume II (Pages 222 - 428) | 15   15 |
| 16   16 | 16   16 |
| 17   17 | 17   17 |
| 18   18 | 18   18 |
| 19   19 | 19   19 |
| 20   20 | 20   20 |
| 21   21  CSR NO. 2792 | 21   21 |
| 22   22 | 22   22 |
| 23   23        ROBERT BARNES ASSOCIATES | 23   23 |
| 24   24       760 Market Street, Suite 844 | 24   24 |
| 25   25        Phone:  (415)788-7191 | 25   25 |
| 221 | 222 |
| 1  00223:01       A P P E A R A N C E S | 1  00224:01       A P P E A R A N C E S |
| 2   02 | 2   02           (Continued) |
| 3   03  FOR CALIFORNIA PLAINTIFFS: | 3   03 |
| 4   04     BERMAN, DEVALERIO, PEASE, TABACCO, BURT & PUCILLO | 4   04  FOR INDIVIDUAL DEFENDANTS ELLISON AND HENLEY: |
| 5   05        ELIZABETH GUARNIERI, ESQ. | 5   05  MAYER BROWN ROWE & MAW, LLP |
| 6   06     425 California Street, Suite 2025 | 6   06       JAVIER RUBINSTEIN, ESQ. |
| 7   07     (415)433-3200 | 7   07   Chicago, IL 60603-3441 |
| 8   08 | 8   08 |
| 9   09 | 9   09 |
| 10   10   BY:  DARIO DE GHETALDI, ESQ. | 10   10  ALSO PRESENT:  ANDREW MARTIN, Videographer |
| 11   11        AMANDA L. RIDDLE, ESQ. | 11   11 |
| 12   12   Millbrae, CA  94030 | 12   12 |
| 13   13 | 13   13 |
| 14   14 | 14   14  TAKEN AT: |
| 15   15  FOR DELAWARE PLAINTIFFS: | 15   15     BERMAN, DEVALERIO, PEASE, TABACCO, BURT & PUCILLO |
| 16   16 | 16   16   San Francisco, CA  94104 |
| 17   17 | 17   17 |
| 18   18   BY:  ROBERT WEISER, ESQ. | 18   18 |
| 19   19   Bala Cynwyd, PA  19004 | 19   19        ---o0o--- |
| 20   20 | 20   20 |
| 21   21 | 21   21 |
| 22   22  FOR ORACLE CORPORATION: | 22   22 |
| 23   23   MORRISON & FOERSTER | 23   23 |
| 24   24   425 Market Street | 24   24 |
| 25   25   (415)268-7126 | 25   25 |
| 223 | 224 |

Oracle Related Cases                                   Page  221 - 224

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

```
1   00225:01              I N D E X
2   02
3   03  DEPOSITION OF LAWRENCE J. ELLISON
4   04  VOLUME II
5   05  EXAMINATION BY:                       PAGE
6   06     MR. DE GHAFALDI                    232
7   07  AFTERNOON SESSION                     311
8   08
9   09  DC EXHIBITS
10  10  *104  3/1/01 conference call transcript, "ORACLE   248
11  11     ORCL 0081613-0081629, 17 pages
12  12   105  "Interview of Larry Ellison," 5/30/02, by    277
13  13
14  14     by SLC, no Bates numbers, 16 pages
15  15  *107  Affidavit of Lawrence J. Ellison in Support  295
16  16     Court, September 22, 2003, no Bates numbers,
17  17
18  18     others, Subject: December FY01 Revenue
19  19     CA-ORCL 009732-009735,
20  20   *109  1/17/01 Flash Report with attachments,      296
21  21     18 pages
22  22  *110  08 Feb 2001 e-mail, with attachments,        313
23  23     January FY01 QTD Revenue Results,
24  24
25  25  * DOCUMENTS DESIGNATED CONFIDENTIAL
```

225

```
1   00226:01           EXHIBITS (CONTINUED)
2   02  DC EXHIBITS                           PAGE
3   03  *111  12 Feb 2001 e-mail, with attachment, Garnick  341
4   04     FY01 QTD Product Revenue - Revised],
5   05
6   06     Package, ORCL 0003440-003449, 10 pages
7   07   113  Form 144, filed 1/24/2001, no Bates numbers,  356
8   08
9   09     3 pages
10  10   115  Form 144, filed 1/29/01, no Bates numbers,    356
11  11
12  12     no Bates numbers, 3 pages
13  13   117  Form 144, filed 1/30/01, (2,232,000 shares)  356
14  14
15  15     3 pages
16  16   119  Form 144, filed 2/5/01, no Bates numbers,     356
17  17
18  18     and others, Subject: Larry option exercise -
19  19
20  20     Subject: Option Exercise, CD-I 03232,
21  21     PROTECTIVE ORDER"
22  22  *122  24 Jan 2001 e-mail, Simon to Ellison,         367
23  23     2 pages
24  24
25  25
```

226

```
1   00227:01           EXHIBITS (CONTINUED)
2   02  DC EXHIBITS                           PAGE
3   03  *123  24 Jan 2001 e-mail, Simon to Balkenhol,       367
4   04
5   05     Ellison, Subject: Please Review; one from
6   06     CA-ORCL 032389-032391, 3 pages
7   07  *125  25 Jan 2001 e-mail, Catz to Glass, Subject:   370
8   08     CA-ORCL 032392, 1 page
9   09  *126  25 Jan 2001 e-mail, Catz to Glass, Subject:   370
10  10     1 page
11  11  *127  29 Jan 2001 e-mail, Simon to Ellison,         371
12  12     1 page
13  13  *128  31 Jan 2001 e-mail, Simon to Ellison,         373
14  14     2 pages
15  15  *129  08 Mar 2001 e-mail, Simon to Balkenhol,       373
16  16     and Cash Update, ORCLA 0023505-0023507,
17  17
18  18     Responses to Plaintiff Gary Collins' First
19  19     6 AND 11-27 DESIGNATED CONFIDENTIAL PURSUANT
20  20
21  21     Oracle, "Getting Through Q3 in Good Shape,"
22  22     6 pages
23  23  *132  Oracle "Total Company - Q3 FY01 Forecast,"     399
24  24     15 pages
25  25  * DOCUMENTS DESIGNATED CONFIDENTIAL
```

227

```
1   00228:01           EXHIBITS (CONTINUED)
2   02  DC EXHIBITS                           PAGE
3   03  *133  Oracle "Total Company - Q3 FY01 Forecast,"    399
4   04     ORCL 0003341-0003357, 17 pages
5   05  *134  Oracle "Total Company - Q3 FY01 Forecast,"    399
6   06     ORCL 003608-003624, 17 pages
7   07
8   08
9   09
10  10  * DOCUMENTS DESIGNATED CONFIDENTIAL
11  11
12  12
13  13
14  14
15  15
16  16
17  17
18  18
19  19
20  20
21  21
22  22
23  23
24  24
25  25
```

228

```
1   00229:01      BE IT REMEMBERED that, on Friday, February 27,
2   02 2004, commencing at the hour of 10:45 a.m, pursuant to
3   03 Notice of Taking Deposition and continued from Thursday,
4   04 February 26, 2004, before me, KAREN E. THOMPSON,
5   05 CSR No. 2792, a Certified Shorthand Reporter in the State
6   06 of California, there personally appeared
7   07
8   08          LAWRENCE J. ELLISON,
9   09
10  10 called as a witness by the plaintiffs, who, having been
11  11 previously sworn, was examined and testified further as
12  12 hereinafter set forth:
13  13
14  14
15  15
16  16          ---o0o---
17  17
18  18
19  19
20  20
21  21
22  22
23  23
24  24
25  25
```

229

```
1   00230:01 MORNING SESSION                    10:44 A.M.
2   02        THE VIDEOGRAPHER:  This marks the beginning of
3   03 Volume II, Videotape 1, in the continuing deposition of
4   04 Lawrence J. Ellison in the matters of Coordination
5   05 Proceedings Special Title (Rule 1550(b)), Oracle Cases,
6   06 and In Re Oracle Corporation Derivative Litigation.
7   07     Today's date is February 27, 2004.  The time
8   08 10:44 a.m.  The court reporter is Karen Thompson for
9   09 Robert Barnes Associates.
10  10     Would any counsel new to this deposition please
11  11 identify themselves and state whom they represent?
12  12        MR. DE GHETALDI:  Dario DeGhetaldi for the
13  13 California plaintiffs --
14  14        MR. SALPETER:  You're the same guy that was here
15  15 yesterday.
16  16        MR. WEISER:  Listen to the question.
17  17        THE VIDEOGRAPHER:  All other aspects as indicated
18  18 on Volume I, Tape 1, remain the same.  We are back on the
19  19 record.
20  20        MR. DE GHETALDI:  Thanks for the help.  You
21  21 should have been there earlier, though.
22  22        MR. SALPETER:  Before we start officially, I just
23  23 want to say on the record what both Mr. Ellison and I
24  24 said to you off the record, which is we're sorry for the
25  25 late start.  It was circumstances beyond our control.
```

230

```
1   00231:01      MR. DE GHETALDI:  Like I told you, it's
2   02 understandable, and no hard feelings at all.
3   03     THE WITNESS:  Okay.  Thank you.
4   04
5   05          LAWRENCE J. ELLISON
6   06 having been previously sworn, testified as follows:
7   07
8   08     EXAMINATION BY MR. DE GHETALDI (CONTINUED)
9   09     MR. DE GHETALDI:  Q.  All right.  Since I'm still
10  10 the same person I was yesterday, by unanimous
11  11 acclamation, I'm going to start off where we left off
12  12 yesterday, which was talking about the Covisint deal.
13  13 And the final purchase price was -- do you recall?
14  14     A. I think we booked $60 million, then I think the
15  15 total purchase was $70 million.
16  16     Q. Okay.  And so you booked 60 in Q3 '01?
17  17     A. Correct.
18  18     Q. And booked 10 sometime later?
19  19     A. I think ratably over the remainder of the year.
20  20     Q. All right.  The document that we were looking at
21  21 yesterday, which was the e-mail from mid June, had a
22  22 $225 million figure.  Was there a decrease in the amount
23  23 of product being sold or an increase in the discount
24  24 being given, or can you explain that difference?
25  25     A. Well, the 275 number was, I think, a fanciful
```

231

```
1   00232:01 number to start with.  So it might have been an opening
2   02 negotiating ploy.  The 275 million, as best I recall that
3   03 document, was 75 million per year for some series of
4   04 years.  So the answer is the price came -- the amount of
5   05 discount went up dramatically.
6   06     Q. All right.  What was Covisint purchasing?
7   07     A. Well, that's an interesting question.  They
8   08 purchased a lot of database software.  They imagined --
9   09 again, this was a brand new business, but they had a
10  10 grandiose business plan where they would be supplying all
11  11 sorts of computer -- computer services, purchasing
12  12 computer services to a variety of companies, not just the
13  13 big three auto makers in Detroit.  And they felt they
14  14 needed a lot of software to -- to support this business
15  15 that they were going to build over the coming years.  So
16  16 they bought a great deal of database software, and then
17  17 they bought our reverse auctioning software, which was
18  18 their fundamental business, which they had both from us
19  19 and from Commerce One.  And they bought a lot of
20  20 application software to actually run their business, to
21  21 do the accounting and human resources, payroll, just
22  22 mundane things like that.
23  23     Q. Okay.  Were they buying software from Oracle for
24  24 the purpose of reselling software?
25  25     A. Reselling and online service.  So they were going
```

232

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

1  00233:01  to use the software as the basis for an online service,
2  02  in the same sense that eBay uses Oracle to sell books.
3  03  They don't resell the Oracle database, but they have a
4  04  business that's based on -- based on the Oracle database.
5  05  Their book catalog.
6  06  Q. Okay.
7  07  A. I should have said Amazon. Sorry. I said eBay.
8  08  EBay also uses Oracle, which is the basis of their
9  09  business for, you know, auctioning off all sorts of
10  10  stuff. And when I said "their book catalog," I meant
11  11  Amazon. I misspoke.
12  12  Q. All right. Do you know when the software was
13  13  shipped in relation to when the money was received from
14  14  Covisint?
15  15  A. Again, not a simple question. I believe Covisint
16  16  had all of our software and was experimenting with it.
17  17  So they had it long before the contract was -- this is my
18  18  recollection. This is often the case. A large customer
19  19  will be experimenting with the software, so we'll ship
20  20  them software. They'll experiment with it before they
21  21  actually sign the license agreement. So I suspect that
22  22  they had it for some time.
23  23  Q. All right. Do you by any chance know the list
24  24  price for the software that Covisint purchased?
25  25  A. I'm sure it was gigantic.

233

1  00234:01  Q. Right.
2  02  A. Because they bought so much of it.
3  03  Q. Yeah.
4  04  A. And I think they bought basically more than they
5  05  could ever possibly use.
6  06  Q. All right. In fiscal year 2001 --
7  07  A. If I can explain -- amplify that just slightly.
8  08  Q. Sure.
9  09  A. Someone wants to buy, let's say, a million units
10  10  that -- they think they are going to need a half a
11  11  million units. They say, we'll buy a million units,
12  12  which is all they'll ever use. So if we say, we'll give
13  13  you 10 million units, it really doesn't make any -- it
14  14  doesn't cost us anything. It's just a line in a license
15  15  agreement. It gives them more comfort. So the idea that
16  16  they buy much more than they'd ever -- they don't have to
17  17  think about how much is more than they'd ever use. We
18  18  just make it a very large number. It's basically an
19  19  unlimited license that we apply a very high number to.
20  20  Q. All right.
21  21  A. The real substance of the agreement was "here's
22  22  all the software you'll ever need."
23  23  Q. All right. And when you're talking about
24  24  license, are you talking about license for a certain
25  25  number of users?

234

1  00235:01  A. It could be a certain number of users. There's a
2  02  variety of different license metrics, but -- license
3  03  metrics. Could be users. It could be -- a certain
4  04  number of computer processors is another license metric.
5  05  It could be size of your business, for a certain amount
6  06  of dollar revenue. We use a number of different metrics
7  07  for licensing.
8  08  Q. All right.
9  09  A. But users and processors are the two most common.
10  10  Q. Do you know when the initial $60 million from
11  11  Covisint was paid to Oracle?
12  12  A. I think it was in Q3.
13  13  Q. All right. Do you know when in Q3 it was?
14  14  A. I'm pretty sure it was very early in Q3 because
15  15  that was one of the -- the fact that we had the Covisint
16  16  deal -- I'm not sure if the signing or the money -- I
17  17  think the signing and the money was wire transferred
18  18  shortly thereafter, I think.
19  19  Q. Okay.
20  20  A. Because we were waiting for Covisint to get -- I
21  21  think the deal timing was triggered by the funding of
22  22  Covisint from the auto makers.
23  23  Q. Okay.
24  24  A. So I'm pretty sure the deal was signed, money --
25  25  you know, money transferred pretty quickly thereafter.

235

1  00236:01  Q. All right. Was there a support or consulting
2  02  component to the Covisint deal?
3  03  A. The deal was $70 million, of which we recognized
4  04  60 as the license component, and $10 million -- again,
5  05  these are approximate numbers. I think they're right,
6  06  but I'm not -- you know, wouldn't bet my life on it.
7  07  And $10 million to be recognized ratably over the
8  08  next 12 months. And that was the support component. So
9  09  the 10 of the 70 was annual support, first-year support.
10  10  Q. Okay. For the two percent equity share that --
11  11  in Covisint that Oracle got as a part of this, was a
12  12  valuation ever -- a valuation study ever done for that
13  13  two percent?
14  14  A. A study. You mean -- did -- I don't think so.
15  15  Well, there -- there actually were valuations
16  16  made by Morgan Stanley, but did we think of it -- did we
17  17  book it in any way or -- no. I think we valued it as
18  18  zero.
19  19  Q. All right. Did you have a fairness opinion in
20  20  the process of this -- reviewing this Covisint deal?
21  21  A. In terms of valuing it at zero?
22  22  Q. Yes.
23  23  A. Not booking it? I don't think we did.
24  24  Q. Okay.
25  25  A. Turns out that zero was the right number. I'm

236

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

1   00237:01 sure glad we didn't book it as something and then write
2   02 it down later.
3   03   Q. What type of entity was Covisint at -- in Q3 '01?
4   04   A. It was brand new.  It was this idea --
5   05   Q. I'm sorry.  What type of legal entity was it?
6   06   A. Oh, I think it was a corporation.
7   07   Q. Okay.  And so Oracle's ownership interest in
8   08 Covisint were securities, this two percent?
9   09   A. I think common stock.  But again, I didn't pay
10  10 much attention to that at all because I didn't think it
11  11 was worth very much.
12  12   Q. Any rights?  Were there any rights associated
13  13 with the two percent equity interest?
14  14   A. You mean could we force them to go public and --
15  15   Q. Yeah.
16  16   A. Registration rights?  Not that I know of.
17  17      Again, as I say, I didn't pay a lot of attention
18  18 to the details of the equity portion, so I don't really
19  19 remember -- remember at all.
20  20   Q. All right.  Did Oracle ever have a person on
21  21 Covisint's board of directors?
22  22   A. It's possible.
23  23   Q. For the software sold to Covisint, did that
24  24 include lifetime license upgrades?
25  25   A. I don't think so because that would create a

237

1   00238:01 serious revenue -- revenue recognition problem for us.
2   02 So we would have -- if we charged $70 million and it
3   03 included lifetime rev -- we'd have to rate that over some
4   04 useful lifetime, and we couldn't have recognized the
5   05 $60 million in the quarter.
6   06   Q. Okay.  Because I remember that June 2000 e-mail
7   07 talked about that as a possible --
8   08   A. Right.
9   09   Q. -- feature of the deal.  So you don't think that
10  10 that ever found its way into the final deal?
11  11   A. No.
12  12   Q. The -- assuming that the discount from the list
13  13 price was in the neighborhood of 99.5 percent, does that
14  14 sound like it's in the right neighborhood to you?
15  15   A. Yes.  But having said -- but remember what I said
16  16 before:  It's a little bit misleading.  It's -- it's as
17  17 if I said, I'll give you all the Coke you can drink for
18  18 the rest of your life, and I write it down 1 trillion
19  19 Cokes, and I'll do it for a thousand dollars.  What's
20  20 your discount level on the Cokes?  Well, if you believe
21  21 you can drink all trillion Cokes, it's a pretty fabulous
22  22 discount.  If, in fact, you only drink, you know, 20,000
23  23 Cokes, it's a substantially less discount.
24  24      And this was a license.  I don't know if I'm
25  25 being clear.

238

1   00239:01   Q. Yeah.
2   02   A. So it was really an all-you -- more of an
3   03 all-you-can-eat license, framed as, you know, so many
4   04 processors at -- so that discount at 99.5 percent is
5   05 quite misleading.
6   06      And then if you look at what's actually happened,
7   07 how much of -- how much of that license did Covisint
8   08 actually use, I think you'll find that the discount was
9   09 nonexistent.
10  10   Q. Okay.  Other than the payment of the $70 million
11  11 in the form that you've identified, and the delivery of
12  12 the license software and the two percent equity interest,
13  13 was there any other quid pro quo in this deal?
14  14   A. Well, you're asking me to recall.  There's so
15  15 many different proposals, so I'm going to give you my
16  16 best recollection.
17  17   Q. That's fine.
18  18   A. That we had a -- an Oracle Exchange online
19  19 service at Oracle Corporation at the time, and I believe
20  20 we gave them -- if we were to take that service public as
21  21 a separate company -- if -- they would get equity in that
22  22 company, should it go public.
23  23   Q. Okay.
24  24   A. I think.  But again, this deal took several
25  25 different forms, and I'm not sure quite what the final

239

1   00240:01 form was.  As I say, I didn't even remember the
2   02 two percent equity portion we got from Covisint.
3   03   Q. Right.  Okay.
4   04      Let's talk a little bit about Oracle's
5   05 discounting policy in general in fiscal year '01.  Was it
6   06 typical for Oracle to give discounts off of list price?
7   07   A. Yes.
8   08   Q. Was there actually a published discount?
9   09   A. There was published discount schedule.
10  10   Q. And what -- what was that discount?  Or was it
11  11 the same for all products?  Can you tell me about that?
12  12   A. It was the same for all products, and it was
13  13 based on the volume you purchased.  The more you bought,
14  14 the higher the discount.
15  15   Q. Okay.  And that was actually published?
16  16   A. That was published, but after a certain amount, I
17  17 don't know.  I think it was a $5 million amount or
18  18 $10 million amount.  It was, you know, to be negotiated.
19  19   Q. Okay.  And those amounts for deals higher than
20  20 whatever amount that was, who needed to approve discounts
21  21 at that level?
22  22      MR. SALPETER:  We're still in --
23  23      MR. DE GHETALDI:  Fiscal year '01.  Thanks.
24  24      THE WITNESS:  There were different -- different
25  25 levels of approval throughout the organization.  The

240

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

1  00241:01  individual salesperson could approve a certain level of
2  02  discount, first level sales manager a little bit more,
3  03  and it worked all the way up to Safra Catz, who
4  04  represented me, who could approve any level of discount.
5  05  MR. DE GHETALDI:  Q.  What was the highest level
6  06  of discount that anyone other than you, acting through
7  07  Safra Catz, could approve in fiscal year '01?
8  08  A.  I can't -- I think it was 85 percent, but I'm not
9  09  certain.
10  10  Q.  Were discounts in the 85 percent-plus range
11  11  common in fiscal year '01?
12  12  A.  For large deals?
13  13  Q.  Yes.  I would assume they would have to be for
14  14  large deals; right?
15  15  A.  No.  I mean, there -- there are situations where
16  16  you really want someone to use your database, and you
17  17  might give them the software.  You know, small startup,
18  18  and you want them to start with your technology rather
19  19  than someone -- Microsoft's technology, so we might give
20  20  them 100 percent discount to get them started.
21  21  So for large deals, it certainly was common to
22  22  have large discounts.  In fact, that was one of the major
23  23  triggers for large deals was offering large discounts.
24  24  So people would purchase not only what they needed today
25  25  but perhaps what they needed over the next three years.

241

1  00242:01  Q.  All right.  I was specifically asking about
2  02  discounts in the 85 percent-plus range and whether those
3  03  levels of discounts were common and --
4  04  A.  They were common for large deals.
5  05  Q.  All right.  When we were talking about budget
6  06  yesterday, and specifically, the budget for revenue and
7  07  the budget for expenses, and we were talking about which
8  08  drives which and what the relationship between those two
9  09  numbers is or should be, and I think that you were
10  10  talking hypothetically about a situation where revenues
11  11  would be X number of dollars budgeted, and expenses would
12  12  be 50 percent of that budgeted.
13  13  Do you recall those figures as being figures from
14  14  the -- fiscal year '01 budget, or were you just
15  15  actually speaking hypothetically when you were using that
16  16  two-to-one ratio?
17  17  A.  I'm not speaking hypothetically.  That's exactly
18  18  how we budget today for the field organization.  So the
19  19  field organization can increase their spending by
20  20  50 cents for every dollar they increase their sales
21  21  targets.
22  22  Whether that exact structure was in place -- I
23  23  shouldn't say that.  That's true in North America.
24  24  Q.  Right.
25  25  A.  In Latin America, I believe they're allowed to

242

1  00243:01  spend 60 cents out of every dollar.  So we expect smaller
2  02  margins in Latin America than we do in North America.
3  03  I think Europe is 45 percent, 45 cents -- excuse
4  04  me -- 55 cents.  They spend 55 cents out of every dollar.
5  05  So whether these budgeting ratios existed in '01 or not,
6  06  I don't recall.  I think they did.
7  07  Q.  Right.  So in any case, it's your recollection
8  08  that there would be different ratios for different
9  09  geographic locations; is that right?
10  10  A.  Correct.
11  11  Q.  Okay.  Now, what would happen if, during the
12  12  course of a quarter, you noticed that the forecast for a
13  13  particular region was coming in and that ratio was not
14  14  being met?
15  15  A.  Well, this is an annual ratio, so understand the
16  16  seasonality of our business.  We have a huge quarter in
17  17  Q4 where -- so, let's say you had a 50 percent ratio for
18  18  the year, keeping it simple.  You might -- in Q1, you
19  19  might make 35 percent profits, not 50.  In Q2 and Q3 you
20  20  might make 45 -- 45 percent profit, and then in Q4 you
21  21  might make 65 percent profit.  So -- so the whole year
22  22  averages out to 50 percent.  But it's not straight-line
23  23  50 -- you know, 50, 50.  So it depends on the year, on
24  24  the quarter that we're in.  That's what the ratio should
25  25  be because of seasonality.

243

1  00244:01  Q.  But you do budget those quarters, don't you?
2  02  A.  Kind -- kind of.  In other words, I mean, some
3  03  people get a little bit ahead -- the likelihood of --
4  04  back to what I was saying earlier, you know, the more
5  05  points you have, the less the -- more fluctuation around
6  06  the number you're going to have.  So you can be high in
7  07  Q1, low in Q2, high in Q3, and low in Q4, and still make
8  08  the year.
9  09  Q.  Sure.
10  10  A.  So the answer is yes, we budget individual
11  11  quarters but -- for individual regions -- and we have
12  12  expectations when compared with the same quarter last
13  13  year, for seasonality, but I don't think it's a
14  14  particular -- a little bit below or a little bit over --
15  15  you know, a little bit below in one quarter, let's say --
16  16  I can't look at Q3 in isolation -- take Europe.  I can't
17  17  look at Q3 in isolation in Europe.  If they had a really
18  18  great Q2 and little bit of weakness in Q3, that doesn't
19  19  mean that their business is deteriorating.  It just
20  20  means -- maybe they'll have a great Q4.  It just means
21  21  for whatever reason, they did very well in Q2 and very
22  22  well in Q4, and Q3 was a little bit weak.
23  23  In fact, it's related.  Sometimes these weak
24  24  deals that perhaps we thought were going to close in Q3
25  25  closed in Q2, and perhaps we got -- sometimes we say --

244

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

00245:01 we say we drained the pipeline.  We drained the pipeline
02 too thoroughly.  So we have a really good quarter in Q2,
03 that leaves a little bit of weakness in Q3.  Rebuild the
04 pipeline, strong again in Q4.
05     Q. So this is an instance, then -- that is, where
06 you're comparing intraquarter performance to budget
07 numbers -- where your tendency is to look both at
08 quarter-to-quarter -- that is, year-over-year, same
09 quarter, and also --
10     A. Year-to-date.
11     Q. Year-to-date.
12     A. Exactly.
13     Q. Exactly.  Okay.  All right.
14         And a combination of those two views gives you
15 some idea of how things are going in terms of the budget
16 ratios that you want; right?
17     A. Right.  Right.
18     Q. Okay.  Now, in a declining economy, in your
19 experience, do deals in a particular -- in a particular
20 type of product tend to fall out more quickly than other
21 types of products?
22     A. Large deals fall out more quickly.  So
23 applications -- there are more large deals --
24 applications is more large-deal driven than database.
25 There are large deals -- there are more large deals in

245

00246:01 database than there are in applications, but as a total
02 percentage, there's a higher percentage of application
03 deals are big.  Just the database business is four times
04 larger than the applications business, so there are still
05 more large deals in database.  But large deals in general
06 are the ones that are at risk because those are the ones
07 that go up to senior management, who are the people that
08 become much more sensitive to macroeconomic trends than
09 the people lower in the organization.  So when there's --
10 when there's economic softness, it's a deal that the CIO,
11 the chief information officer, approved and you think
12 you're going to get.  Often, as it goes up for approval
13 to the president of the company or the CEO of the
14 company, often that's where it gets stopped.
15     Q. What's a deal cycle?
16     A. It's -- cycle is from the time we have a
17 prospect -- I know that you're interested in buying a
18 million dollars' worth of database -- to the time you
19 actually either sign an order or tell me you're going to
20 sign an order with IBM instead.
21     Q. Okay.  Is a deal cycle something that expands or
22 contracts when the economy is expanding or contracting?
23     A. Yes.  Deals will take longer as companies will
24 put in more approvals as to who can sign, you know, sign
25 off the deals.  So in good times, sometimes the CIO can

246

00247:01 spend up to $5 million.  As times get tough and CEOs get
02 to, you know, be cautious about every dime that they
03 spend, they'll say, any deal more than $1 million has to
04 come to me to approve.
05         Okay?  More links are put in the approval chain
06 inside a company, and it slows the deal down or cancels
07 the deal altogether.
08     Q. Okay.  In a declining economy, you would expect
09 to see longer deal cycle, and in an expanding economy,
10 you would expect to see a shorter deal cycle?  Is that
11 fair?
12     A. Yes.
13         (Whereupon, DC Exhibit 104 was marked
14         for identification.)
15     MR. RUBENSTEIN:  What's the number of this?
16     MR. DE GHETALDI:  104.
17     THE WITNESS:  You don't want me to read the whole
18 thing, do you?
19     MR. DE GHETALDI:  Q.  Oh, no, no.  I was going to
20 ask --
21     Q. Okay.
22     Q. I did want you to look at it, and I was going to
23 ask you whether you have ever seen this document before.
24     A. I haven't seen the document, but I was certainly
25 part of the conference.

247

00248:01 Q. Okay.  What I'd like you to do is turn to page 5,
02 that has the Bates number 81617 at the bottom, and the --
03 in particular, the question at the top of the page from
04 Rick Sherlund, where he says:
05     "Larry, can you help me understand this?
06     I mean, clearly, everybody understands
07     that when the economy goes through a
08     period like this, visibility is lower.
09     You guys know how to scrub the pipeline,
10     talk to the salesmen, make sure those are
11     real deals, yet it turns out they're not
12     real deals.  How does that work?  How can
13     the sales people kind of not know that the
14     deals are going to slip at the end of the
15     quarter?  Is it the customer just not
16     aware that they're going to run into
17     resistance at the end of the quarter?"
18     And then you answer that you were actually
19     involved in a lot of the calls on some of these
20     transactions, and what really happened -- or really, what
21     happened is all -- a bunch of deals were already approved
22     at the mid-high level, at the vice president or senior
23     vice president level.  Once it got up to the CFO/CEO
24     level, they were pushed off.
25     I guess I'd like to know when you noticed that

248

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

00249:01  happening, you personally.
02     A. The last -- the last -- after George Roberts'
03  call on the 26th, all of us were making calls to -- on
04  large transactions. We still had a very large -- that's
05  on February 26.
06     Q. Sure.
07     A. And there was still a very, very large pipeline
08  of large deals, and we still felt we had a very good
09  chance of making the quarter. There certainly was plenty
10  of deals in the pipe to make the quarter. So we called
11  them and we found that, you know, that even though CIOs
12  had told our sales people, yeah, we're going to buy, this
13  deal is moving right ahead, the -- as it went up to a
14  higher level, either the chief financial officer or the
15  chief executive officer, they didn't approve the
16  transaction.
17        As I said, you know, our sales are awfully --
18  often part of -- a $5 million database sale might be part
19  of a $50 million IT project, so it's not just the
20  $5 million database sale they're looking at. They're
21  looking at the overall project. This is the first time
22  we saw our sales being substantially impacted by the
23  weakening economy.
24     Q. Well, hadn't -- hadn't you gotten any reports
25  from NAS that this was happening much earlier in the

249

00250:01  quarter?
02     A. No. If you look at the pipe -- if you look at
03  the pipelines, the pipelines, were, you know, very, very
04  strong. They were 50 percent -- I mean, the pipeline --
05  you know, the pipeline started out at 50 percent higher
06  than they were a year ago. We had just -- I mean -- I
07  think over 50 percent higher. The -- we had just
08  concluded two record quarters, one record after another.
09  Even though dot-coms had largely disappeared, we just
10  delivered two record quarters. So, no.
11        I mean, all the indicators we had -- pipeline's
12  huge, salespeople were forecasting a great quarter, the --
13  there was no indication at all. And plus, we had the
14  largest deal in our history that had just closed early on
15  in their quarter. So every indication -- we were off to
16  a great start in December. So every indication was we
17  were going to have a terrific quarter.
18     Q. Well, you say you never got a report from anyone
19  at NAS that they were seeing increase in their deal
20  cycles?
21     A. Oh, no, some people might have said they were
22  seeing increase in the deal cycles. I mean, I'm -- A, I
23  don't know -- I don't recall getting -- seeing that.
24  Maybe I did. I don't -- but I don't recall it.
25        But no -- but in terms of the overall feeling for

250

00251:01  the quarter, the overall -- all the information that we
02  had, you know, told us that we were the -- I should say
03  the sum of the information that we had told us that we
04  were going to have a very good quarter.
05     Q. Okay. But I was asking about a particular piece
06  of that sum. And the -- is it your testimony that you do
07  or you don't recall receiving a report from somebody at
08  NAS about seeing an increase in the deal cycle length?
09     A. I don't recall.
10     Q. All right. Do you recall discussing with anybody
11  from the Americas Divisions a pattern of intraquarter
12  deal slippage, that is, deals that were scheduled to
13  close early in the quarter slipping to closure late in
14  the quarter?
15     A. That's quite common.
16     Q. Okay.
17     A. So -- but I don't know -- I certainly could have
18  received deals like that, and that's not uncommon in our
19  business.
20     Q. All right.
21     A. But keep in mind we had a great December, and
22  then we had a great January. So if deals had slipped --
23  had slipped out, in a sense, that's good news because
24  that means even -- in spite of that slippage, we had a
25  very good December. In spite of that slippage, we had a

251

00252:01  very strong January. And they said they were slipping
02  out to February, which means we're going to have a very
03  strong February.
04     Q. Did you receive reports of slippage in the
05  pipeline during the first two months of Q3?
06     A. You mean did the pipeline go down from the
07  50 percent growth?
08     Q. Yeah.
09     A. Yeah, it did. But it was still well above the --
10  well above our forecast.
11     Q. When you say "well above," how far above do you
12  think it was?
13     A. I don't -- I don't remember how far above. But
14  it was sub -- you know, substantially above, 20 -- at
15  least 20 percent additional coverage. I'm guessing.
16  Twenty, 25 percent additional coverage.
17     Q. Okay.
18     A. So where the pipeline -- if the forecast was
19  25 percent growth, then the pipeline was at least
20  30 percent. That would be 20 -- you know, 20 percent
21  in -- 10 percent of 25 percent is two and a half percent.
22  Twenty percent of 25 percent is 5 percent. I just want
23  to be clear on the calculation.
24     Q. Okay. Good. I'm glad you clarified that.
25     A. Okay. Okay.

252

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

00253:01    Q. Because it -- it could have gone two ways.
02    A. Right.  Right.  I just wanted to make sure you
03 understood what I --
04    Q. Okay.  Was the pipeline in Q3 '01 behaving in the
05 same way that the pipeline behaved in Q3 '00?
06    A. I don't recall.
07    Q. Do you recall whether the pipeline in Q3 '00
08 started off and just dropped or whether it went up before
09 it dropped?
10    A. Don't recall.
11    Q. Okay.  Did you receive any reports from anyone in
12 NAS that the impact of the dot-com bubble bursting was
13 going to be more significant in Q3 than it had been in
14 the prior two quarters of fiscal year '01?
15    A. Not that I recall.
16    Q. You were -- you were following the pipeline
17 progress during the quarter; right?
18    A. Yes.
19    Q. If you turn back one page on Exhibit 104,
20 Mr. Sherlund, in the middle of the page with the Bates
21 No. 81616, says:
22         "Can you help us at all understand on the
23         database weakness if we have any more
24         granularity on whether that database for
25         internal developments or, you know, how

253

00254:01    much of that might be indicative of how
02         the applications business is doing more
03         broadly against -- across the market?"
04    And your reply is:
05         "Rick, I think the database business -- if
06         you really want to drill down, there are
07         two things we can say about it:  the
08         weakness was almost entirely in the United
09         States.  We had two -- we had a very
10         strong database quarter a year ago, driven
11         by the dot-coms, so that put us -- put a
12         lot of pressure on our database.  It was a
13         combination of the disappearance of the
14         dot-coms and just a general slowdown of
15         database across the board in the United
16         States."
17    Well, first of all, was that an accurate answer
18 that you gave to Mr. Sherlund?
19    A. I think so.
20    Q. Okay.  When did you -- you -- first notice this
21 combination effect of the disappearance of the dot-coms
22 and a general slowdown of database across the board in
23 the U.S.?
24    A. Well, this is me commenting on how the quarter
25 ended.

254

00255:01    Q. Yes.
02    A. So after the quarter was over -- so kind of
03 looked at the results in early -- the day after, you
04 know, the day after the quarter closed, or the day the
05 quarter did close, and I tried to analyze, you know, what
06 had happened.  A bunch of big deals didn't close, and an
07 awful lot of those big deals were in the database area.
08 We had already commented that the dot-coms -- the
09 dot-coms had disappeared, so it was -- people were --
10 weren't signing big database deals and -- and the
11 comparison a year ago, the strong database numbers we had
12 a year ago, was largely driven by -- I shouldn't say
13 "largely driven" -- was -- certainly had a important
14 dot-com component in it.  So when you compare one year to
15 another, you are doing just that:  You are comparing one
16 year to another.  So if you had a really strong dot-com
17 component in '00, and those dot-coms had disappeared,
18 that's certainly going to affect your -- you know, your
19 database business, you know.  The comparison is -- we had
20 a very strong year in 2000.
21    Q. Well, when you say "it put a lot of pressure on
22 our database," what did you mean by that when you said
23 that to Mr. Sherlund?
24    A. Where are you?  Let's see.
25    Q. The same answer I just read, in the middle of the

255

00256:01    page.  It's the fourth line.
02    A. Okay.  It's setting a very high bar.  If we have
03 a very -- the previous year, we sold so much dot-com
04 business, and then we have to grow the database business
05 again in the new year.  And it's -- you know, the bar has
06 been set -- it was set so high because of the bubble --
07 again, this is all in hindsight.  This is my analysis
08 after the quarter was over.  We had this very strong year
09 2000, as a lot of software companies did.  And we had a
10 lot of -- a lot of dot-com business and other business,
11 and we're comparing that year 2000 to the year 2001, and
12 the bar had been set very high.  We sold a lot of
13 database.  So, to show growth, we'd have to sell even
14 more database, even though now the dot-coms were gone.
15    And a second factor was the fact the economy was
16 weakening, and people weren't signing big software deals
17 of any kind -- I shouldn't say that.  People were less
18 inclined to sign big software deals, database deals and
19 application deals.  Any kind of big software deals.
20    Q. You knew that Oracle's dot-com business had
21 really sloughed off in Q1 and Q2 --
22    THE REPORTER:  I'm sorry.  Repeat your answer?
23    MR. DE GHETALDI:  You knew that the dot-com
24 business had really sloughed off in Q1 and Q2 of fiscal
25 year 1000 [sic], right?

256

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

```
 1  00257:01  A. Uh-huh.
 2    02    Q. And we talked about that yesterday.
 3    03    A. Right.
 4    04    Q. It was covered, you thought, by other database
 5    05  business --
 6    06    A. Right.
 7    07    Q. -- so that you didn't really feel the effect;
 8    08  right?
 9    09    A. Correct. And then -- and now we have this
10    10  combination. Now, it's still true that the dot-com
11    11  business has vanished, but now you have the additional
12    12  factor of weakening economy and large deals not closing,
13    13  and you combine those two effects with dot-com -- you
14    14  know, we were able to overcome those effects before the
15    15  economy weakened. And now the economy is weakening,
16    16  we're not able to overcome those effects.
17    17    Q. Did you see any indication in Q3 '01 that the
18    18  dot-com business was actually weakening more than it had
19    19  in Q1 and Q2?
20    20    A. I didn't.
21    21    Q. Was that something, to your knowledge, that
22    22  anybody at Oracle studied?
23    23    A. I don't know. I mean, in terms of weakening it
24    24  more? Again, weakening more -- our pipeline was very
25    25  strong. So looking -- looking -- I'm not sure we really
```
                                                    257

```
 1  00258:01  studied the dot-com impact. Maybe someone did. What I
 2    02  looked at was the overall business, the overall pipeline,
 3    03  which looked very, very strong. And as I say, it looked
 4    04  exceptionally strong, in spite of the dot -- you know,
 5    05  dot-coms disappearing.
 6    06    Q. I'm going to hand you a copy of a document that
 7    07  was previously marked as Exhibit 47. We don't have a
 8    08  copy of the marked exhibit, but this was used at
 9    09  David Winton's deposition.
10    10    MR. SALPETER: Forty-seven? Is that what you --
11    11    MR. DE GHETALDI: Forty-seven, yes.
12    12    Q. Two things. Before I ask any questions, let me
13    13  just tell you what we learned in Mr. Winton's deposition.
14    14  It might alleviate some confusion that we had at first.
15    15    The e-mail is -- that he forwards to Mr. Roberts
16    16  looks like an e-mail to himself. But he testified that
17    17  actually, it was a copy of a report that he regularly
18    18  gives to Jennifer Minton. And he also testified that the
19    19  Excel spreadsheet, which is the third page, has nothing
20    20  whatsoever to do with the e-mail, and he has no idea why
21    21  it was attached.
22    22    So with that in mind, have you ever seen
23    23  Exhibit 47 before today?
24    24    A. I've never seen it before today.
25    25    Q. All right. Did -- in December of 2000, did you
```
                                                    258

```
 1  00259:01  have a discussion with either Mr. Winton, Mr. Roberts, or
 2    02  Ms. Minton, about the initial December forecast for NAS?
 3    03    A. Not -- I -- I don't know Mr. Winton. I've
 4    04  never -- never met Mr. Winton. And other than the
 5    05  regular discussions we have in the Monday meetings about
 6    06  the forecast, I -- I don't know of any other discussions.
 7    07    Q. Right.
 8    08    A. And Mr. Roberts and Ms. Minton both participate
 9    09  in those Monday meetings.
10    10    Q. All right. The first paragraph indicates that
11    11  the LOBs turned in 311 million. What is it -- do you
12    12  understand what "LOB" referred to?
13    13    A. It's called lines of business. All they are --
14    14  it's just a group of salespeople.
15    15    Q. Okay.
16    16    A. It's a sales group. They just don't like to call
17    17  themselves a sales group. "Line of business" is so much
18    18  more romantic.
19    19    Q. I see. And to that, the LOBs added 28 million of
20    20  judgment, and apparently Mr. Roberts and Mr. Winton added
21    21  another 39, for a total of 67. Or -- in judgment.
22    22  Is that --
23    23    A. I don't think that's right, but...
24    24    Q. Well, it's -- it's -- the math is strange.
25    25    A. Yeah. Yeah. There's -- but okay.
```
                                                    259

```
 1  00260:01    Q. I understand. The math doesn't add up.
 2    02    A. No, it doesn't add up.
 3    03    Q. But assuming that we're talking about -- what is
 4    04  a usual figure for management judgment that -- if there
 5    05  is any -- that's added -- that you would like to see
 6    06  added on top of LOB submissions?
 7    07    MR. SALPETER: Objection to form. I mean, you're
 8    08  asking him about a document he says he didn't see.
 9    09    MR. DE GHETALDI: Well, I wasn't asking him about
10    10  the document. I was asking about what he would usually
11    11  like to see. Maybe I wasn't --
12    12    MR. SALPETER: Independent of the document.
13    13    MR. DE GHETALDI: Yeah. Maybe I wasn't clear
14    14  about that.
15    15    MR. SALPETER: You're just asking him a general
16    16  question.
17    17    MR. DE GHETALDI: Yes, yes.
18    18    THE WITNESS: Very early in a quarter, and this
19    19  is December 7 -- the feel -- the accuracy -- the
20    20  bottoms-up forecast, adding is often incomplete. They
21    21  just haven't finished the bottoms-up forecast. So
22    22  sometimes very early in a quarter, you get a lot of
23    23  management judgment in a forecast. You'd like to see
24    24  that management judgment disappear, you know, fairly
25    25  quickly as we get a more complete -- as they get a more
```
                                                    260

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

1   00261:01 complete forecast.  They just haven't -- they just
2   02 haven't finished -- the individual salespeople haven't
3   03 finished their forecasting process.
4   04   MR. DE GHETALDI:  Q.  All right.  So you would
5   05 tend to expect that management judgment at least should
6   06 be higher at the beginning of the quarter than what it is
7   07 towards the end of the quarter?
8   08   A.  Well, my personal preference is that we got the
9   09 forecast out, we finished the forecast early and we had a
10  10 good bottoms-up forecast, and then apply management
11  11 judgment to that.  That's often not the case.
12  12     If I just said that -- so, I'd rather there not
13  13 be much management -- we get management judgment in both
14  14 directions.  Sometimes the salespeople -- bottoms-up
15  15 salespeople are forecasting rather exuberantly, the
16  16 management judgment will go the other direction.  Typ --
17  17 but typically, the majority of the cases, the salespeople
18  18 are being very conservative.  They're not certain what
19  19 they're going to sell in the quarter yet.  They really
20  20 haven't analyzed the quarter.  They just finished the
21  21 previous quarter.  It's one -- it's a few days into the
22  22 new quarter, and they haven't done as thorough an
23  23 analysis and as thorough projection as you get after a
24  24 week or two into the quarter.  This is December 7, so
25  25 this is just literally after Q2 was closed.

261

1   00262:01   Q.  Okay.  I guess maybe I didn't understand.
2   02     But what I was asking was whether the -- you
3   03 would prefer to see, if there is going to be management
4   04 judgment added, that it be added at the beginning of the
5   05 quarter and then disappear as the quarter goes on.
6   06   A.  The first week of the quarter, often they haven't
7   07 done a forecast yet.
8   08   Q.  Yes.
9   09   A.  So this is getting -- I'm pushing this document
10  10 aside, just going to general practice --
11  11   Q.  Right.
12  12   A.  -- inside of Oracle.
13  13     The very first week of the quarter, we often
14  14 don't have a very good forecast for the entire quarter
15  15 because it just -- people just have not gone back to
16  16 Oracle sales online, filled out -- looked at their
17  17 prospects, looked at their pipeline, scrubbed -- if you
18  18 will, scrubbed their pipeline, and come up with a
19  19 forecast.  Yet we've asked the question, what does
20  20 the quarter -- you know, what does the quarter look like,
21  21 very early.
22  22     Because of the incompleteness of the process,
23  23 we'll often see management judgment in the first week.
24  24 As they finish the process, you would hope -- you would
25  25 expect, you would like a lot of that management judgment

262

1   00263:01 to disappear.  It doesn't disappear completely, but it
2   02 should be less substantial.
3   03   Q.  Right.  Okay.
4   04     Mr. Winton indicates that in -- in point number
5   05 two of his e-mail in Exhibit 47, that there were more big
6   06 deals to date in Q1 and Q2 than were currently in the Q3
7   07 pipe.  And in fact, he says there was only one greater
8   08 than $5 million.
9   09     Is that -- assuming that's a fact, was that
10  10 something that was discussed at the Monday meeting, that
11  11 you recall?
12  12   A.  The overall -- the big deal count -- and going
13  13 into the last couple of days of the quarter, our number
14  14 of big deals was way up for the company.  So from the
15  15 very beginning of the quarter to the very end of the
16  16 quarter, our big deals had increased substantially.
17  17     So keep in mind this is one group.
18  18   Q.  Yes.
19  19   A.  It's not a small group, but it's one group inside
20  20 of Oracle.  Early on in the quarter, all the data I had
21  21 was showing that big -- you know, overall pipeline was up
22  22 dramatically, up over 50 percent to start with, and that
23  23 we had lots and lots of big deal coverage and we had lots
24  24 of growth in big deals versus the same quarter the
25  25 previous year.  So...

263

1   00264:01   Q.  Okay.  When you say this group here, this is NAS,
2   02 right?
3   03   A.  Oh, it's a big -- it's one group.  But it's a big
4   04 group.  Yes, I said that.
5   05   Q.  Doesn't it account for about roughly 25 percent
6   06 of Oracle's license revenues, on average?
7   07   A.  Close enough, yeah.
8   08   Q.  Okay.  So --
9   09   A.  I'm not -- it's a substantial group.  I'm saying
10  10 it's one group, and it's early in the quarter.  But the
11  11 information I had was the overall company pipeline, which
12  12 is made up of the total, and the big deals.  So what I
13  13 was saying -- let me emphasize, I've never seen this
14  14 document before.
15  15   Q.  Yes, I understand.
16  16   A.  What I saw was a pipeline that had grown at
17  17 52 percent, I think -- again, I'm not sure, but -- that
18  18 could just be the number of weeks in the year; I don't
19  19 know.
20  20     But our pipeline had grown very substantially.
21  21 We had a greatly improved pipeline over the previous
22  22 year, and the number of big deals had grown very
23  23 substantially.  That was true throughout the quarter up
24  24 till, you know, the very end.
25  25   Q.  And the third point that Mr. Winton makes in this

264

00265:01 e-mail is that growth rates will slow in the second half.
02 Is -- is that something that you recall discussing or
03 hearing discussed in any of the Monday meetings during Q3
04 '01?
05    A. No.  Only -- only in the sense that the
06 comparisons were more difficult.  We had a very strong Q3
07 and Q4 the previous year, so when you -- again, when the
08 bar is set high, we know we have to clear a high bar.
09 So, you know, quarter -- I don't mean to be pedantic, but
10 the quarter, you know, Q3 this year is compared to Q3
11 last year.  If we had a good Q3 last year, that sets the
12 bar very high for us to clear for this year, and we know
13 we had -- so we knew -- certainly knew we had a strong Q3
14 and a strong Q4 the previous year.  And we're coming
15 off -- but nonetheless, we're coming off record Q1s and
16 Q2s.
17    Q. Yes.  Then finally, on the second page of
18 Exhibit 47, the fourth point that Mr. Winton makes is
19 that Q3 pipe is not where it needs to be.
20    Do you recall that point being discussed during
21 the Monday EMC meetings in Q3 '01?
22    A. No, no.  What I remember is the pipeline -- an
23 overall company pipeline that had grown 52 percent.
24    Q. This next document that I'm handing you is one
25 that was marked as Exhibit 47 -- or 48 at Mr. Winton's

265

00266:01 deposition.  And again, I'm sorry we don't have a copy of
02 the actual document with the exhibit stamp on.
03    So this was Exhibit 48.
04    A. Right.
05    Q. Have you ever seen Exhibit 48 before?
06    A. I've never seen this document before.
07    Q. Okay.  In the first line, Mr. Winton indicates
08 that there was an ops review that had just finished.
09    Are you familiar with that term?
10    A. Yes.  Operations review?
11    Q. Yes.
12    A. And I think it means a lot of different things.
13 I think it's just -- it's a meeting where they took a
14 quick look at the status -- the state of the business.
15    Q. Okay.
16    A. And it could last anyplace from a few hours to a
17 few days.
18    Q. Okay.  And that's essentially what Mr. Winton
19 said, was that there was a meeting on January 9th of the
20 NAS people, and he was reporting to Jennifer Minton on
21 what had been discussed at that meeting.
22    So again, he indicates now, a month into the
23 quarter, that the pipe had not grown as anticipated, and
24 it was actually slightly down from the end of December.
25    Do you recall any discussion in the Monday

266

00267:01 executive committee meetings about the -- an ops review
02 meeting that was held in NAS in January of 2001?
03    MR. SALPETER:  I want to object to the form of
04 the question.  The preamble to the question is
05 objectionable.
06    You may go ahead and answer.
07    THE WITNESS:  Okay.  The answer -- the answer is
08 no.  But what he says here in the note is he's not
09 changing his forecast.  The forecast is unchanged, and in
10 fact, he thinks he's going to beat the forecast.
11    So the substance is -- is there going to be any
12 change in forecast?  No.  But he doesn't think he's going
13 to beat the forecast by as much as he thought he was
14 going to beat the forecast before.  So that's at least
15 how I read this note.
16    MR. DE GHETALDI:  Q. Okay.  Did -- did you
17 understand at the -- in Q3 '01, that the information --
18 well, I'll get to that later.
19    Do you recall any discussions in Q3 '01, at these
20 executive meetings on Mondays in -- specifically in
21 January -- about discussions of the lack of big deals
22 continuing in NAS?
23    A. Again, I -- I tended to look at the company as a
24 whole, and my recollection is we had more big deals --
25 again, maybe I'm mistaken; I could look at the

267

00268:01 documents -- but we had more big deals in this Q3 than we
02 had in the Q3 before.  We had more big deals in the
03 pipeline, and we closed more big deals than the year
04 before.
05    Q. We've heard that it was your practice at these
06 Monday meetings to actually drill down -- that's the
07 phrase that we've heard -- with each of the division
08 heads as to what was going on in their divisions.
09    Is that accurate?  Did you do that?
10    A. I certainly, if there was an apparent problem, if
11 someone had radically lowered their forecast, where I
12 think there is a problem, I tended to drill down in areas
13 where there were problems, absolutely.
14    Q. Okay.
15    A. But again, let me emphasize, with this
16 document -- at least, if I'm reading this document
17 correctly, and I think I am -- he says our Q3 forecast of
18 $346 million has not changed, but the upside is revised
19 down.
20    So he thinks the most he can beat this by is
21 360 million.  So he's saying that you're not -- gee, our
22 best case is not as good as I thought it was going to be.
23 We're keeping our forecast -- and in fact, then he goes
24 on to say, "I think we're tracking to a Q3 of 354 to
25 355," which is better than is forecast.  And then he

268

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

1   00269:01  identifies a specific deal, AmeriCredit --
2   02      THE REPORTER:  I'm sorry, identified what?  He
3   03  cites...
4   04      THE WITNESS:  And then he cites a specific deal,
5   05  AmeriCredit, which would increase the result, the
6   06  forecast result to 360 million.
7   07      So, yeah, there is discussion of the pipeline
8   08  having not grown as much as he would have liked.  But
9   09  keep in mind, again, we had a pipeline grow -- we started
10  10  the quarter with what I think I characterized as
11  11  astonishing pipeline growth year-over-year.  We had very
12  12  good Q3 a year ago, and our pipeline was up over
13  13  50 percent.  Now, that pipeline was coming down a bit.
14  14  But still, it was way more than we needed to make our
15  15  quarter.
16  16      MR. DE GHETALDI:  Q.  Okay.  You mentioned -- you
17  17  used a phrase "radically lowered forecast."  That was
18  18  your phrase, I believe, "radically lowered forecast."
19  19      A.  I said that?
20  20      Q.  Yes.
21  21      A.  Could someone read it back to me?
22  22      MR. TABACCO:  You want the line and page?
23  23      MR. SALPETER:  If you want to start on page --
24  24      THE WITNESS:  Oh, I think I now recall.  So if
25  25  someone had -- if someone had come in with a rad -- would

269

1   00270:01  I drill -- would I drill down if there is a problem area,
2   02  if someone -- and then hypothetically, if someone had
3   03  given -- what could cause that, if someone had given a
4   04  radically lower forecast.  I would want to understand the
5   05  details of what was the cause of that.
6   06      MR. DE GHETALDI:  Q.  Yes.  Right.
7   07      A.  That was a hypothetical.
8   08      Q.  Yes.
9   09      A.  Okay.  I wasn't sure what --
10  10      Q.  No, no, no.  I was just trying to find out
11  11  what -- if you can quantify --
12  12      A.  Oh.
13  13      Q.  -- "radically altered forecast."
14  14      A.  If their forecast -- 15 percent, something like
15  15  that -- their forecast had dropped 15 percent, I would --
16  16  I would be -- I call that radically lower and want to
17  17  understand why.
18  18      Q.  Mr. Winton is indicating to Jennifer Minton that
19  19  the West expects to end the quarter 30 to 40 million behind
20  20  their original budget for technology.
21  21      Were there budgets for particular geographic
22  22  divisions of particular groups?
23  23      A.  If the -- if there were -- if the group was
24  24  partitioned.  In fact, if you had one group that was
25  25  selling technology and a separate group that was selling

270

1   00271:01  applications, sales -- sales groups forecasts are very
2   02  useful.  Where I -- so if you have one group that sells
3   03  technology, another group that sells applications, the
4   04  forecasting there is very, very -- is very useful, and I
5   05  think -- and that's what we had at this time.  In NAS,
6   06  the West.  So we had different sales groups.  Some were
7   07  just selling applications; some were just selling
8   08  database.
9   09      Q.  Okay.  And each of those groups would have an
10  10  individual budget, I think, was my actual question.
11  11      A.  Yeah.  Each -- each group would have, let's say,
12  12  25 salespeople in it, and those salespeople would have a
13  13  revenue target.  Each individual salesperson would have a
14  14  revenue target or quota.  Or said another way, a budget.
15  15      Q.  All right.  Mr. Winton is indicating that -- that
16  16  major sees a slowdown in spending, along with smaller
17  17  deal sizes.
18  18      Do you recall that being a topic of discussion at
19  19  any of the January executive management meetings?
20  20      A.  I don't recall.  I don't -- don't know.
21  21      Q.  Okay.  In the final paragraph, he says that for
22  22  the full year, technology looks to trail both original
23  23  budget and the replan targets.
24  24      What -- what's "replan"?
25  25      A.  Oh.  We go through a process of -- at the

271

1   00272:01  beginning of the year, we establish a budget.
2   02      Q.  Yes.
3   03      A.  And -- and we -- those budgets are subject to
4   04  constant revision based on external events, internal --
5   05  you know, internal opportunities.  So we might decide if
6   06  a particular product is doing very well, we'll add
7   07  sales -- let's say we plan to sell $100 million of this
8   08  product, and that group is doing extremely well, looks
9   09  like they can sell 150 million, we'll start adding
10  10  salespeople, and we'll replan that group.  We'll invest
11  11  more in salespeople and expect to get more revenue out of
12  12  it.  If a particular group is not doing well, we will
13  13  replan them down, cutting salespeople out of that group
14  14  and expect them to deliver less revenue.
15  15      Q.  Do you recall whether -- or which direction NAS's
16  16  replan went in Q3 '01?
17  17      A.  The technology -- I don't, but I can guess pretty
18  18  accurately.  Again, as the dot-com business had been so
19  19  strong in 2000 and been building up, and the dot -- most
20  20  of those dot-coms located on the West Coast --
21  21  specifically in Silicon Valley, an awful lot of them.
22  22  That was one geographic area for technology that slowed
23  23  down substantially.  So you would expect that particular
24  24  group to -- to shrink.  Which it did.
25  25      MR. DE GHETALDI:  Anyone want to take a break?

272

00273:01     Q. I'm handing you now a copy of a document that was
02  marked as Exhibit 49 in Mr. Winton's deposition.
03     A. Okay.
04     Q. Have you ever seen this document before?
05     A. The one on -- the 29th of January -- seems like
06  29th of January, David Winton to George Roberts?  No, I
07  have not.
08     Q. Okay.  Was the apparent fact that NAS was
09  projecting a negative 6 percent growth in technology by
10  the end of January ever discussed at one of the Monday
11  executive management meetings?
12     A. Not that -- not that I recall.  Not that I
13  recall.
14     Q. In December or January 2 -- in December 2000 or
15  January 2001, I've been asking you about conversations
16  within these executive management Monday meetings.
17  Outside of those meetings, did you ever have discussions
18  with anyone concerning NAS and a declining pipe?
19     A. I had regular conversations with George Roberts.
20  I had regular conversations with Jennifer Minton.  And
21  the forecast -- again, I relied -- the forecast numbers
22  and the pipeline didn't show any problems.  So I'm not
23  sure, you know -- as you say, the drill-down, you know,
24  having an extended conversation about the state of
25  technology in the West, you know, the drop-off in the ASP

273

00274:01  business and the dot-com business, I don't remember
02  having any specific discussions about that.  Again, what
03  I looked at was the pipeline for the entire company and
04  the forecast for the entire company.  I looked at the
05  forecast for NAS.  I think at this time, they were still
06  forecasting making their -- making their number or
07  exceeding their number.
08     Q. Were there discussions -- did you have
09  discussions with these people associated with NAS or
10  Jennifer Minton about trends in NAS other than declining
11  pipe or the constant forecast, as you --
12     MR. SALPETER:  Objection to the form of the
13  question.  I don't know what you mean by "these people."
14     MR. DE GHETALDI:  I'm sorry.  Thanks.
15     Q. Did you have discussions with Mr. Roberts or
16  Mr. Minton [sic] or any of the sales managers for NAS in
17  December 2000 or January 2001?
18     THE REPORTER:  I'm sorry.  Did you say
19  "Mr. Winton" or "Ms. Minton"?
20     MR. SALPETER:  You said "Mr. Minton."
21     THE WITNESS:  Mr. Winton and Ms. Minton.  It's
22  not easy.
23     MS. LAVALLEE:  Start over.
24     MR. DE GHETALDI:  Let me start over.
25     Q. Did you have discussions with Mr. Roberts in --

274

00275:01  at any time in December 2000 or January 2001 about
02  declining trends in NAS?
03     A. I don't think so.
04     Q. Did you have any discussions with Jennifer Minton
05  in December 2000 or January 2001 about declining trends
06  in NAS?
07     A. No.  The forecast -- the forecast was strong.
08  The pipeline was strong.  No.
09     Q. Did you have discussions with anyone in either
10  December 2000 or January 2001 about declining trends in
11  NAS?
12     A. Not that I recall, no.
13     MR. DE GHETALDI:  Why don't we take a break?
14     THE VIDEOGRAPHER:  Off the record, 12:00 p.m.
15     (Recess taken:  12:00 until 12:25 p.m.)
16     THE VIDEOGRAPHER:  On the record, 12:25 p.m.
17     MR. DE GHETALDI:  We've just had a discussion off
18  the record trying to clarify which reports were reviewed
19  by Mr. Ellison at the Monday executive management
20  committee meetings, and we've agreed to rely on
21  Jennifer Minton's recollection of precisely what those
22  were.  But our belief as of this time is that what was
23  distributed was what we know as upside reports, and those
24  are the reports that we'll be looking at later today.
25     Yesterday's discussion included the possibility

275

00276:01  that certain documents titled "Executive Committee
02  Worldwide Forecast" were actually distributed at that
03  meeting.  But it's our belief at this point that those
04  documents with those titles were internal to finance and
05  were not distributed at the Monday meetings.
06     Is that a fair summary?
07     MR. SALPETER:  I think that's a fair summary.  I
08  think Jennifer Minton will be the best person.  I think
09  when we were off the record, Mr. Ellison said that there
10  was one document there that looked very close to and may
11  have been the same thing as he actually saw at the Monday
12  meetings.
13     MR. DE GHETALDI:  Right.  And that was the --
14     MR. SALPETER:  Upside report.
15     MR. DE GHETALDI:  -- upside report.  Right.
16  This will be next in order.
17     THE REPORTER:  Marking No. 105.
18     (Whereupon, DC Exhibit 105 was marked
19     for identification.)
20     MR. DE GHETALDI:  Q.  Have you seen Exhibit 105
21  before today?
22     A. Yes, I have.
23     Q. Was this one of the documents that you reviewed
24  in preparation for your deposition?
25     A. Yes, it is.

276

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

00277:01    Q. When was the first time you saw Exhibit 105?
02    A. Forty-eight hours ago.
03    Q. In preparation for your deposition, did you have
04    an opportunity to read 105 in its entirety?
05    A. Yes.
06    Q. Did you notice any inaccuracies in the interview
07    summary?
08    MR. SALPETER: Objection to form. You know, it's
09    a 10-page document.
10    THE WITNESS: Not when I read it.
11    MR. DE GHETALDI: Okay.
12    Q. On the first page, there are three bullet points.
13    On the second bullet point -- I'm sorry -- the first
14    bullet point says that "Ellison reviewed on a monthly
15    basis information regarding closed transactions." And
16    then in parentheses, "(the flash reports)."
17    Do you recall -- or do you know which flash
18    reports that refers to?
19    A. I receive an e-mail as to the actual results on
20    the first and second month of each quarter.
21    Q. And that's a two- or three-page e-mail?
22    A. E-mail comes in two parts. The first -- the
23    first part is the analysis of sales and expenses by
24    geography, and then usually, 24 to 48 hours later,
25    there's an analysis by product.

277

00278:01    Q. Okay. Is -- how many pages is the first one?
02    A. It's very short. It's -- maybe it's -- maybe
03    it's two pages. Barely.
04    Q. And the second one, how long is that?
05    A. The same.
06    Q. The first point says, "He is also kept informed
07    of large transactions as they are completed."
08    Is that accurate throughout the quarter?
09    A. Yeah. If a large deal closes, I usually get an
10    e-mail note about it. Or if it's an extraordinary deal,
11    like Covisint, I'm told about it.
12    Q. All right. Then second point it says, on the
13    first page of Exhibit 105:
14    "Ellison also looks at forecasting data
15    such as that contained in the Oracle Sales
16    Online pipeline database. He
17    characterized this as a 'digital mood
18    ring.'"
19    And "mood ring" was in quotes.
20    Was that what you told the SLC?
21    A. The -- there's two pecans of data in our forecast
22    year -- well, the Monday upside reports. There's hard
23    data, actually what we did last year. That's hard --
24    that's hard fact. Pipeline, that's hard fact. Of
25    varying quality, all right? Varying quality.

278

00279:01    And then they're kind of a guess -- an estimate
02    as to what we're going to do in the future.
03    Q. Yes.
04    A. And -- and that judgment, you know, is
05    influenced -- that's a mental process where someone says,
06    well, I'm going to close this deal for a million dollars
07    this quarter. That's an interesting thing. But, you
08    know, it's a forecast about the future, and it has a lot
09    to do with -- there's a lot of factors that go into that
10    judgment, including mood of the person who's making the
11    judgment. So I sometimes will call it a mood ring.
12    Q. Okay.
13    A. And to characterize it, it's a prediction about
14    the future as opposed to hard facts about the past.
15    Q. All right. And the second point continues to say
16    that:
17    "Oracle sales forecasts are tracked online
18    and are kept reasonably up to date. The
19    data is designed to reflect how the
20    salespeople feel about their sales
21    opportunities" --
22    THE REPORTER: I'm sorry. Say the -- "reasonably
23    up to date..."
24    MR. DE GHETALDI: "The data is designed to
25    Reflect how the salespeople feel about

279

00280:01    their sales opportunities and likelihood
02    of closing those deals in a given
03    quarter."
04    THE WITNESS: Note the word "feel."
05    MR. DE GHETALDI: Yes. Okay. I did.
06    Now -- then the third point says:
07    "Ellison also keeps abreast of the
08    competitive position of Oracle by
09    reviewing public information sources such
10    as stories about his competitors and
11    customers and general economic trends as
12    reported in the media."
13    Q. Was that accurate as of Q3 '01?
14    A. Yes. Yes.
15    Q. Now, I'd ask you to turn to page 6, please, of
16    Exhibit 105.
17    A. Page 6?
18    Q. Page 6, which begins a discussion about Oracle's
19    Q3, fiscal year '01. In the first full paragraph which,
20    under the heading "Economic Climate," there's a sentence
21    that says, "Oracle's profit margin was increasing during
22    this time frame."
23    The phrase "profit margin" is something that may
24    have different meanings. Is that -- were those your
25    words to the SLC, and if so, what did you mean by that

280

1   00281:01  phrase?

2   02   A. That the ratio of expenses to total revenue was

3   03   improving.

4   04   Q. Okay.

5   05   A. So for every dollar that we sold, more of it was

6   06   falling into profit.  So it used to be not so long -- not

7   07   so long ago that in a good year, Oracle's profit -- for

8   08   every dollar that we brought in in revenue, we would

9   09   spend 80 cents to bring in that dollar.  We'd gotten to

10  10  the point now where for every dollar we brought in, we'd

11  11  spend 65 cents.  So we were becoming a much more

12  12  efficient, more profitable company, as reflected by our

13  13  profit margin improvement.

14  14  Q. Okay.  Profit margin can be either operating

15  15  margin or --

16  16  A. Sure.

17  17  Q. -- pretax margin.

18  18  A. Sure.

19  19  Q. Which one were you talking about?

20  20  A. At the 35, 36 percent, it's operating margin.

21  21  Q. All right.  The next sentence says:

22  22      "He also believed that Oracle's software

23  23      and application software were high up on

24  24      customers' buying priority because of the

25  25      high return on investment they provide to

                                                    281

1   00282:01      purchasers through enhanced efficiency and

2   02      lower operating costs."

3   03      Was that your belief in Q3 '01?

4   04  A. Yes, it was.

5   05  Q. And you held that belief despite the fact that

6   06  you had seen softening in the U.S. economy?

7   07  A. In spite of the softening, we had seen record

8   08  sales.  And so we had seen softening, yet we were

9   09  delivering record sales.  So I thought we would be able

10  10  to, you know, hold up quite well -- which I think we did,

11  11  by the way -- with the softening economy.

12  12  Q. Okay.  The next paragraph says that:

13  13      "Ellison noted that experience shows that

14  14      the field forecasts, that is, the

15  15      'forecast' number in the report,

16  16      historically start out small and then

17  17      build."

18  18      Is that accurate, in your experience?

19  19  A. Yeah.  I think I said earlier today that very

20  20  early on in the quarter, the forecast process might not

21  21  even be complete, and so an incomplete forecast would be

22  22  smaller, and then as things -- as you worked your way up

23  23  in the quarter, you know, it would -- it could -- should

24  24  build and get larger.  That was not necessarily -- that

25  25  wasn't always the case.  But normally, you know -- I

                                                    282

1   00283:01  mean, normally, the forecasts improved.  Normally, the

2   02  forecasts improved throughout the quarter.

3   03  Q. All right.  Did that phenomenon differ among

4   04  various divisions of North America?

5   05  A. Yeah.  That's back to the mood ring.  I mean,

6   06  different -- different people have different -- you know,

7   07  different personalities.  Some people are optimistic by

8   08  nature.  Some people are pessimistic by nature or

9   09  conservative by nature.  Some people who had a really

10  10  good quarter the quarter before will make them even more

11  11  optimistic.  Some people who had had a tough quarter the

12  12  quarter before will make them more cautious.

13  13      So whenever you're asking people to predict the

14  14  future, to make a sales forecast, it's subject to a lot

15  15  of factors.  Real hard data --

16  16  Q. Right.

17  17  A. -- plus their personality plus their recent

18  18  experience in forecasting.  It's a complicated

19  19  process.

20  20  Q. Yes.  Yes.  A lot of factors go into it.

21  21  A. A lot.  Absolutely.

22  22  Q. And to accurately forecast, you need to have a

23  23  grasp of many of those factors; right?

24  24  A. Yes, and including -- and things that are going

25  25  on inside of Oracle, how our products compare to our

                                                    283

1   00284:01  competition's, what's the state of the economy, what's

2   02  the state of the economy in the specific area you're

3   03  selling to.  If you're selling to dot-coms, it's very

4   04  different than if you're selling to General Electric.

5   05  Q. The next sentence says:

6   06      "In Q3 FY '01, the forecast remained

7   07      consistent, i.e., did not rise over the

8   08      course of the quarter, giving

9   09      Jennifer Minton a basis for her decreased

10  10      'upside.'"

11  11      Do you see that?

12  12  A. I'll find it.

13  13  Q. It's down there --

14  14  A. Paragraph B or --

15  15  Q. Yes.  Bottom of page 6.

16  16  A. Okay.  Okay.  Got it.

17  17  Q. Do you recall saying that to the SLC?

18  18  A. I don't, but I certainly believe I said it.

19  19  Q. Okay.  Did you view Jennifer Minton's decreased

20  20  upside as a reflection of softening in Oracle's business

21  21  in Q3 '01?

22  22  A. She didn't -- let's see.  A, I think you're

23  23  better off asking her why -- you know, why she did this.

24  24  My -- you know, my judgment was that the sales --

25  25  Jennifer did lower her upside during -- you know, during

                                                    284

00285:01 the quarter, and I'm not sure what she base -- quite
02 frankly, I'm not sure what she based that on.  She has
03 conversations with salespeople.  She has conversations
04 with finance people in the sales divisions.  So I'm not
05 exactly sure why she lowered her -- lowered the upside.
06     And I think she very well might have said --
07 again, in the meeting -- that the sales -- the sales
08 forecasts are not going up.  Therefore, I think there is
09 not as much upside.  There's not as much as she initially
10 thought in the quarter.
11     But again, I'm -- best I recall.
12   Q. Okay.  That's fair.
13     On the next page, on page 7, the second
14 paragraph, the third sentence says:
15       "In Ellison's opinion, the forecasts tend
16       toward the same number and understate the
17       upside as well as the downside."
18     Is that your opinion about --
19   A. Well, if you just -- where are you?
20   Q. I'm sorry.  I'm in the second full paragraph --
21   A. Second full paragraph.
22   Q. -- page 7.
23   A. Okay.
24   Q. The third sentence.
25   A. Okay.

285

00286:01   Q. Was that your opinion about the tendency of the
02 forecasts in fiscal year '01?  That is --
03   A. I think all I'm trying to say here is that people
04 are making judgments based on conversations with people.
05 The salespeople are making judgments.  Jennifer is making
06 judgments as well.  So what we're dealing with here are
07 people making judgments.
08   Q. Okay.
09   A. And -- and in my -- you know, my inclination is
10 to work off hard data rather than judgment -- it's very
11 valuable -- and hard data, to me, is Jennifer has been
12 more accurate in forecasting than the salespeople have.
13 That, to me, is hard data.  So I tend to listen to her
14 more carefully than I listen to the salespeople.
15     On the other hand, when I analyze the data
16 personally.  I look at the actual size of the pipe, the
17 size of the pipeline and how much has actually -- has
18 actually been sold.
19     So I -- my inclination, how I differ from
20 Jennifer in doing forecasts -- and we're all different --
21 is I tend to look at more hard data, where I think she --
22 you know, she talks to more people and exercises more
23 judgment.
24   Q. Uh-huh.  Okay.
25   A. But again, having said that, she does a pretty

286

00287:01 good job of forecasting.
02   Q. So going back, I think -- I'm not sure that my
03 question was really answered.  Going back to the page 6,
04 the sentence in paragraph B, that says:
05       "In Q3 '01, the forecasts remained
06       consistent, i.e., did not rise over the
07       course of the quarter, giving
08       Jennifer Minton a basis for her decreased
09       'upside.'"
10     And my question was whether the decreased upside
11 was a reflection of softening in Oracle's business, to
12 you.
13   A. Again, let me read this again carefully --
14   Q. Sure, sure.
15   A. Because I'm not sure whether I'm commenting on
16 Jennifer's methods or -- (reading document).
17     It would be helpful if I was on the right page.
18   Q. Page 6.
19   A. Paragraph A or B?
20   Q. B.
21   A. All right.  I'm there.
22   Q. Third sentence.
23   A. I think it's -- but I think it says exactly what
24 I said, is that the sales forecast, the field sales
25 forecast, did not grow during the quarter, and Jennifer

287

00288:01 thought our upside opportunity was therefore less than
02 she thought at the beginning of the quarter.
03   Q. Okay.  And my question was, did you view that as
04 a reflection of softening in Oracle's business in Q3 '01?
05   A. I -- we had such extraordinary pipelines in the
06 beginning, you know, in excess of 50 percent growth, that
07 I thought it might mean that we wouldn't beat the number
08 by as much as I thought we going to beat the number by.
09 So Jennifer is saying our ability to beat the number is
10 less than it was before.  So I think that's -- if you
11 want to call that a softening, sure.
12     MR. DE GHETALDI:  I don't think we have much time
13 on the tape, and this is a good stopping point, so --
14     THE VIDEOGRAPHER:  This is the end of Volume II,
15 Tape 1, in the deposition of Lawrence J. Ellison on
16 February 27, 2004.  The time 12:48 p.m.  We're off the
17 record.
18     (Discussion off the record.)
19     THE VIDEOGRAPHER:  This is the beginning of
20 Volume II, Tape 2, in the deposition of Lawrence J.
21 Ellison, on February 27, 2004.  The time, 12:53 p.m.  We
22 are on the record.
23     (Whereupon, DC Exhibit 106 was marked
24       for identification.)
25     MR. DE GHETALDI:  Q. Mr. Ellison, have you seen

288

```
1   00289:01  Exhibit 106 before today?
2   02   A. Yes.
3   03   Q. Was this one of the documents that you reviewed
4   04  in preparation for your deposition?
5   05   A. Yes.
6   06   Q. When was the first time that you saw Exhibit 106?
7   07   A. Two days ago.
8   08   Q. As with Exhibit 105, was there anything in 106
9   09  that you believed to be inaccurate when you reviewed it?
10  10   MR. SALPETER:  Objection to form.
11  11   THE WITNESS:  Not that I recall.
12  12   MR. DE GHETALDI:  Q.  All right.  Please turn to
13  13  page 4.  The first full paragraph under C, "Actual
14  14  Revenue Reports," says:
15  15   "Ellison was asked about his reliance on
16  16   the flash reports, which he previously
17  17   said were important during the SLC's prior
18  18   interview.  He said that the -- that he
19  19   reviews the flash reports to get actual
20  20   revenue numbers, as opposed to the
21  21   projected numbers but that the reports are
22  22   of limited value in evaluating the
23  23   company's prospects of meeting revenue and
24  24   earnings targets.  According to Ellison,
25  25   the company's revenue stream is so
```
289

```
1   00290:01  back-end loaded that the flash reports for
2   02   the first two months provide very little
3   03   information about quarterly earnings."
4   04   Is that an accurate reflection of your beliefs as
5   05  to the value of the flash reports?
6   06   A. The majority of our revenue happens in the last
7   07  month of the quarter.
8   08   Q. Yes.
9   09   A. In fact, the majority of that quarter [sic]
10  10  happens in the last week.
11  11   Q. Yes.
12  12   A. And the majority of the big deals happen in the
13  13  last few days.
14  14   Having said all that, it's much better to get off
15  15  to a good start in the quarter than a bad start.  So it's
16  16  good to get ahead.
17  17   In the specific example of Q3, we had signed a
18  18  very, very large deal, Covisint.
19  19   Q. Yes.
20  20   A. So -- and -- well, it's by no means a perfect
21  21  predictor, it's a useful predictor.  Being off to a good
22  22  start is better than being off to a bad start.  Being off
23  23  to a very good start is better than -- is better still.
24  24   Q. The second full paragraph -- in the second full
25  25  paragraph, the interview summary says:
```
290

```
1   00291:01  "Even absent Covisint, the company had a
2   02   solid start, in Ellison's view, given the
3   03   holidays are always slow sales in the
4   04   third quarter."
5   05   Is that -- does that accurately reflect what you
6   06  told the SLC?
7   07   A. Again, to amplify, we were -- we had a very, very
8   08  strong pipeline at the beginning of the quarter.  So we
9   09  started the quarter with an extremely strong pipeline.
10  10  Then we closed this very, very large deal.  So the
11  11  combination of having closed a very, very large deal and
12  12  very strong year-over-year pipeline growth led me to
13  13  believe we're off to a heck of a start.
14  14   Q. So was the sentence that I read an accurate
15  15  reflection of what you told the SLC?
16  16   A. Incomplete but accurate, yes.
17  17   Q. Okay.  What is your understanding of the relative
18  18  importance of the first month's revenues to the quarter's
19  19  revenues?
20  20   A. In general --
21  21   Q. Yes.
22  22   A. -- again, it's a reasonable -- I've never gone --
23  23  I have not gone back and looked at how often, when we get
24  24  off to a good start, that's a predictor of a good
25  25  quarter.  It's an interesting question.  I really -- I
```
291

```
1   00292:01  don't know the answer to.  My sense is if we're off to
2   02  a good start in the first month and second month, that
3   03  it's a reasonable predictor that we're going to have a
4   04  good quarter.  So it's not a hundred percent correlated.
5   05  Maybe it's only 60 percent correlated.  But it's
6   06  useful -- it's useful in predicting the quarter.  It is
7   07  not an accurate -- by no means an accurate predictor --
8   08  sometimes I think -- I think the quarter before this, in
9   09  Q2, we had a phenomenal number of big deals come in in
10  10  the last couple of days.  We were behind, well behind,
11  11  and made it up.  So there are certainly examples of being
12  12  behind and making it up and being ahead and falling --
13  13  and not making it up.
14  14   So there is some correlation to being off to a
15  15  good start.
16  16   Q. All right.  This -- the sentence that I read seems
17  17  to indicate that December is, in your view, usually not a
18  18  good month.
19  19   A. Oh, it's normally a terrible month.  So --
20  20  because of the holidays.  A, it's -- we just finished a
21  21  quarter in November, so the salespeople are scrubbing
22  22  their pipelines and trying to come up with a forecast for
23  23  the remaining -- for the next quarter.  They're taking
24  24  off, going -- so they're not doing a lot of selling in
25  25  the first couple of weeks of December.  They're -- then
```
292

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

00293:01 take off for holiday for a couple of weeks, over
02 Christmas-New Year's.  So it is not typically a good
03 month, and it's unusual for us to have a very strong
04 December.
05     We had a very strong December because of
06 Covisint.
07     Q. Does the fact that a number of your customers
08 have fiscal years that are the same as the calendar year
09 have an effect on Oracle's December revenues in
10 comparison to other months?
11     A. You would think so.  Nonetheless, December is
12 not -- typically, not a good month for us, compared
13 with -- I mean, it's much -- November is a much bigger
14 month than December.  So there's more of a correlation to
15 the end of our quarter than to the end of the customers'
16 fiscal year.
17     Q. What if you're just talking about first months of
18 quarters?  What's your sense of how --
19     A. How is December?
20     Q. How is December, yes.
21     A. Versus a June?
22     Q. Yes.
23     A. Which is also a first month of a quarter.
24     Q. Right.
25     A. Complicated answer.  If we had a number of big

293

00294:01 deals slip out of Q2, it is our practice -- if we had a
02 bunch of big deals slip out of November, we might work
03 very hard to close those early on in December.  So I'm
04 not sure -- and I'm not sure I'm able to generalize about
05 December is a better month than June, typically.  So
06 there is -- you know, there is seasonality.  But our
07 sales are much more correlated to the last month of our
08 quarter than to the fiscal close of our customers'
09 quarters.
10     Q. Okay.  Is there any correlation between December
11 revenues for Oracle and pushes being made by competitors
12 who have calendar-year fiscal years, to close out their
13 years?
14     A. Again, I'll just go back to our Decembers are --
15 December's not a big month for us, even though it's when
16 our competitors close a lot of their deals, and customers
17 are making decisions in December.  But nonetheless,
18 December is typically not a big month for us.
19         (Whereupon, DC Exhibit 107 was marked
20          for identification.)
21     MR. DE GHETALDI:  Q.  Have you had a chance to
22 review Exhibit 107?
23     A. Yes.
24     Q. Was Exhibit 107 one of the documents that you
25 reviewed in preparation for your deposition?

294

00295:01     A. Yes.
02     Q. I'd like to draw your attention to paragraph 4-C
03 on page 2.
04     A. Okay.
05     Q. And hang on one second.  We'll get another
06 exhibit here.
07     Let's mark two more exhibits now.
08         (Whereupon, DC Exhibit 108 was marked
09          for identification.)
10     MR. DE GHETALDI:  That's 108.  And 109's on its
11 way.
12         (Whereupon, DC Exhibit 109 was marked
13          for identification.)
14     THE WITNESS:  Okay.
15     MR. DE GHETALDI:  Q.  Okay.  Have you ever seen
16 Exhibit 108 before?  That's --
17     A. Which one's -- 108 here?
18     Q. Yes.
19     A. Yes. Yes.
20     Q. Was this Exhibit 108 one of the documents that
21 you reviewed in preparation for your deposition?
22     A. I don't recall.  Might have been.
23     Q. Did -- your name is listed as one of the
24 recipients.
25     A. Yes.

295

00296:01     Q. Do you believe that you received Exhibit 108 on
02 or about January 17th --
03     A. Yes.
04     Q. -- 2001?
05     A. Yes.
06     Q. Okay.  Now, how about Exhibit 109, where you were
07 not listed as one of the recipients?
08     A. Definitely didn't receive 109.
09     Q. Have you ever seen 109 before today?
10     A. No.  No.
11     Q. Well, let me draw your attention to the second
12 page of Exhibit 109, which is a spreadsheet with a title
13 "Product Revenue Flash."
14     Have you seen that document before?
15     A. No.  The flash reports, to the best of my
16 recollection -- because I -- I think of the flash reports
17 as they're currently constituted today -- look much more
18 like this little box up here than they do -- they're not
19 spreadsheets.  The monthly results that I get are much
20 shorter than this.  As I said, it's one and a half -- two
21 screens of data --
22     Q. All right.
23     A. -- are the monthly results that I receive, you
24 know.  Screen -- but certainly not -- it's not a package
25 of this kind of detailed information.

296

Case 3:01-cv-00988-SI   Document 1507-1   Filed 10/20/08   Page 153 of 366

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

00297:01    Q. Okay.  First of all, when you say "screen," are
02  you referring to a computer screen?
03      A. To a computer screen, right.  As opposed to a
04  page.
05      Q. So when you scroll down, you need to cycle
06  through the screen --
07      A. Right.  Two separate screen pages.
08      Q. Okay.  But my question was about specifically the
09  second page.
10      A. Okay.
11      Q. And you had talked about a follow-up flash
12  report --
13      A. Right.
14      Q. -- which you said was a product flash.
15      A. Right.
16      Q. And my question is whether the second page of
17  Exhibit 109 is the product flash that you were referring
18  to.
19      A. The product flash reports don't look like this
20  now.  Could they have looked like this in '01?  The
21  answer is sure.  But I don't recall.  I just don't
22  recall.
23      Q. All right.  That's fair.
24      A. But it's similar -- has similar data.  Has
25  similar information to what's in this spreadsheet.

297

00298:01    Q. All right.  Now that we've done this, let's go
02  back to 107.  In paragraph 4-C, which identifies, as part
03  of the generally received Oracle financial/business data,
04  something -- flash reports showing deals already closed
05  or in the pipeline.
06      A. The flash reports that I get are actually -- are
07  actuals.  I don't -- I don't think there's pipeline data
08  in the flash reports.  That's my recollection of the
09  flash reports, that it's actual.  It's not pipeline data.
10      Q. That's what was confusing me.  Because I've never
11  seen a flash report with pipeline data.
12      A. Right.
13      Q. So that's your understanding?
14      A. Yes.
15      Q. In paragraph 6, in the third sentence at the
16  bottom of page 2 of Exhibit 107, the affidavit says, "We
17  were coming off our best quarter ever.  Oracle's profit
18  margins were rising."
19          And that sentence is a little vague as to the
20  timing.  I'm not sure whether the timing refers to Q2 or
21  Q3 or --
22      A. Both.
23      Q. Both.
24      A. The profit margins were just trending up.
25      Q. Okay.

298

00299:01    A. So expenses were trending down.  So we were
02  spending -- our sales were going up while our expenses
03  were going down, which is an unusual thing for us.
04      Q. And it wasn't that your expenses weren't rising
05  as fast as your --
06      A. No.  Our expenses were actually going down.  So
07  our sales were rising, and our expenses were actually
08  going down.
09      Q. Okay.
10      A. I think.
11      Q. And then the sentence continues:
12          "I also believe that Oracle's products
13          were still a high purchasing priority for
14          our customers because of the high return
15          on investment they provide through
16          enhanced efficiency and lower operating
17          costs."
18          A phrase similar to one that --
19      A. Right.
20      Q. -- we reviewed in your interview.
21          But my question here as to this sentence in your
22  affidavit is, which products you are referring to?
23      A. Interesting question.  The application products
24  and the database products.  So the entire suite of
25  products.  But I suspect I was focusing on the

299

00300:01  application products because we had showed, I think
02  through our own internal use of our applications, that it
03  was a technology that could be used for cutting costs.
04  We were, in fact, growing our business, and as I just
05  stated earlier, our expenses were going down while our
06  revenue was going up.
07      Q. And you're saying that they -- these -- it was
08  your belief that these applications products were still a
09  high purchasing priority even with the risk of a
10  worsening economic climate?
11      A. Yes.  I was wrong, but -- but yes, that's what I
12  believed.
13      Q. All right.  If you'll turn, please, to page 4,
14  the -- you say in -- oh, three lines down, sentence "the
15  latest upside report internally forecasted."  And I
16  believe this is referring to an upside report just prior
17  to the December 14th conference call, and you say that:
18          "The latest upside report internally
19          forecasted that we would realize earnings
20          per share of 13 cents, one cent higher
21          than we were publicly forecasting."
22          Do you see that?
23      A. Yes.
24      Q. Now, isn't it true that a one-cent differential
25  in Q2 '01, was the equivalent of a four-cent differential

300

Oracle Related Cases

Page  297 - 300

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

00301:01  in EPS in Q2 '00?
02    A. Because of the two stock splits?
03    Q. Yes.
04    A. Yes.
05    Q. Okay.  So because of the two intervening
06  two-for-one stock splits --
07    A. Right.
08    Q. -- a one-cent increase in the EPS results in Q2
09  '01 would have been the equivalent of a four-cent
10  increase --
11    A. Right.
12    Q. -- in EPS increase for Q2 '00; right?
13    A. Yes.
14    Q. Okay.  If you'll look down further on the page,
15  to paragraph 11, where you say:
16       "I also reviewed the actual sales and
17       pipeline data and compared them against
18       the same quarter in the prior fiscal
19       year."
20    Do you see that sentence?
21    A. Yes, I do.
22    Q. Okay.  I'm wondering whether the actual sales
23  data came from the flash report that's been marked as
24  Exhibit 108 or some other place.
25    A. What's the -- I'm not sure of the context of

301

00302:01  this.  I reviewed on what -- on what day?  In reading
02  this, is this --
03    Q. Well, I'm not -- I -- okay.
04    A. So, let me just take a date on January 1st or
05  something like that.  Because I had -- I had no actual
06  sales data until the first flash report came out.  So it
07  must be after the first flash report, yes?
08    Q. I think if -- I'm not trying to confuse you or
09  anything like that.  I think if you look up at the end of
10  paragraph 10, the context is you're talking about the
11  first two months of Q3 '01?
12       MR. SALPETER:  You also ought to let him read the
13  next paragraph, too, the one after.
14       MR. DE GHETALDI:  That's fine.
15    Q. Why don't you read -- take a minute, read
16  paragraphs 10, 11, and 12.
17       MR. SALPETER:  I thinks that's fair.
18       MR. DE GHETALDI:  Yeah, sure.
19       MR. SALPETER:  Appreciate that.
20       (Witness reads document.)
21       THE WITNESS:  Okay.
22       MR. DE GHETALDI:  Q.  Okay.  Now, what I'm
23  wondering is what the source -- what you looked at or
24  what you reviewed to obtain the actual sales data that
25  you are discussing in paragraph 11.

302

00303:01     A. I received e-mail flash reports with actual --
02  actual sales in -- at the beginning of January for
03  December, and at the beginning of February for -- for
04  January.
05    Q. Right.  The -- where did you review the pipeline
06  data that you refer to in paragraph 11?
07    A. On a weekly basis, we get the management
08  committee reports, the upside reports, which would have
09  pipeline data --
10       THE REPORTER:  I'm sorry.  Repeat your answer.
11  "On a weekly basis..."
12       THE WITNESS:  On a weekly basis, we get
13  management -- executive management committee reports that
14  would have, amongst other things, the pipeline data in
15  it.
16       MR. DE GHETALDI:  Q.  And those executive
17  management committee reports are otherwise known as the
18  upside reports?
19    A. Yes.
20    Q. Were there any other sources of data that you
21  reviewed in the first two months of Q3 '01, to obtain
22  actual sales and pipeline data?
23    A. No, no.
24    Q. That first sentence in paragraph 11 says that
25  after obtaining the actual sales and pipeline data, you

303

00304:01  compared them against the same quarter in the prior
02  fiscal year.
03       Did you get the comparative figures from the same
04  sources as you got the current figures?
05    A. Sure.
06    Q. Okay.  And you say that nothing in this
07  comparison caused to you believe that Oracle's business
08  was softening in 3Q '01?
09    A. No.  That's correct.
10       To be very precise here, I think -- I think I
11  stated earlier that -- that I thought we were going to
12  blow the quarter out.  I think at one point, it looked
13  like we were going to do 16 cents a share because of the
14  huge -- the huge upside that we had, and the huge
15  pipeline growth that we had.  But that pipeline did come
16  down during the quarter.
17       I think you characterized that as a "softening,"
18  and I think I said that, well, I didn't think we'd beat
19  the number by as much as I originally thought we'd beat
20  the number by.  And you used the word "softening."  It's
21  kind of an interesting choice of words.
22       Early on, it looked like we might actually do a
23  16-cent quarter, looking at all the numbers.  It was
24  clear later on it wouldn't be 16 cents.  I thought we'd
25  still beat the number, but not by as much.

304

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

00305:01  I just want to be precise about the word.  The
02  word "softening" has been used.  I've used it two ways
03  now, saying it wasn't softening and -- you know, to just
04  move that word aside and look at the facts, I thought we
05  were going to beat a lot -- the number by a lot.
06  Later on in the quarter, I thought we'd beat the number
07  by less than I thought in the beginning.
08  Q.  Now that I'm thoroughly confused...
09  A.  Did I do that?
10  Q.  Yeah, you did.
11  Can you tell me what your two definitions of
12  "softening" are?
13  A.  Well, the -- as long as we still win the game, as
14  long as we still beat the number, as long as the business
15  is still good, and as long as it's still a record
16  quarter, I wouldn't call that a softening of the
17  business.  It's a little bit -- if you're playing a
18  football game, and you think you are going to win 35 to
19  nothing, and you only win 28 to nothing, that's not a
20  terrible thing.  "Gee, I thought we were going to win by
21  35 to nothing, but we only won by 28 to nothing."  But
22  does that mean the team -- what -- you can ask, what went
23  wrong?  We only won by 35 [sic] to nothing.
24  So it looked like we were going to have a
25  spectacular quarter.  I think my early statements in the

305

00306:01  quarter was to the effect that our pipelines were truly
02  astounding, something like that.  Initial call.  Our
03  pipeline growth was over 50 percent, which is astounding.
04  And I thought we had a potential to have just an
05  extraordinary quarter, absolutely extraordinary quarter.
06  And in fact, with historic conversion ratio
07  rates, that would have been earnings per share in excess
08  of 16 cents, which would have been, by any measure, an
09  extraordinary quarter.
10  Q.  Right.
11  A.  As the quarter progressed, I thought our ability
12  to deliver an extraordinary quarter, a 16-cent quarter --
13  I mean, that was moderated.  I still thought we were
14  going to beat the number.  Still thought we were going to
15  have a record quarter.
16  We did have a record quarter, actually.  We did
17  have a record quarter.  But our ability -- as the quarter
18  wore on, I thought we no longer had the chance of doing
19  that 16 cents, that extraordinary 16 cents.
20  Q.  Okay.
21  A.  So I'm not sure -- so, hopefully, that explains
22  what I meant by all of this.
23  Q.  Okay.
24  A.  I don't know if that's helpful.
25  So let me try again to get myself in more --

306

00307:01  still more trouble.
02  I never thought our business was getting soft.  I
03  thought we might -- you know, at the beginning of the
04  quarter, hoping for 16 cents; later on in the quarter, I
05  gave up the hope for 16 cents.
06  Q.  Uh-huh.
07  A.  So you want to compare that, saying, well, then,
08  it was getting softer, then I would have to say yes,
09  well, 15 cents isn't as good as 16 cents.  Therefore, you
10  know, you can characterize that as getting softer.
11  However, it's still a record quarter.  It's still
12  exceeding estimates and all of those things.  It's not --
13  so I'm distinguishing between the business not being --
14  you know, I thought we were going to do 16 cents or had a
15  chance at 16 cents.  I no longer thought we had a chance
16  at 16 cents.
17  What word do you want to apply to that?  You
18  applied the word "softening."  That was the word you
19  used.
20  Q.  Well --
21  A.  To which I said "sure," by the way.  I answered
22  "sure."
23  And same word here, trying to explain what I
24  meant here, because I said the business wasn't softening.
25  Trying to be precise.  What I really mean was the

307

00308:01  business was never getting soft, which is slightly
02  different.
03  I'm not trying to use Clintonian approaches to
04  mincing the words here.  But the business was still -- we
05  were still on track to beat the number.  We were still on
06  track to have a record quarter.
07  Q.  Okay.  So it wasn't my word.  It was your word,
08  and I was to determine how you were using it.  Came from
09  your interview summary.  It came from your affidavit.
10  And so that's -- I wasn't trying to put words in your
11  mouth.  I was just trying to use your words to see where
12  the parameters of that definition were.
13  A.  No accusations.
14  Q.  Okay.
15  A.  All I was trying to do is to clarify what's meant
16  in both --
17  Q.  Thank you.  I appreciate that.
18  Was there ever any indication that anyone at
19  Oracle was forecasting a 16-cent EPS quarter for Q3 '01?
20  A.  No.  I think -- no.  But if you looked at the
21  current size of the pipeline -- and I think there were
22  notes on this, just calculations, where if you applied
23  the traditional conversion rate to the pipeline as it
24  existed at the beginning of the quarter, I think we would
25  have done something like 16 cents.  I mean, that would --

308

00309:01  I think that's in excess of 16 -- 16 and a fraction
02  cents, I believe.
03      Q.  The traditional conversion rate?  You mean the
04  end-of-quarter conversion rate?
05      A.  Yeah, the normal -- the conversion rate we'd had
06  the previous two quarters.
07      Q.  At the end of the quarter?
08      A.  Right.  Right.
09      MR. DE GHETALDI:  It's about 1:30.  I think it's
10  about time for lunch.
11      THE VIDEOGRAPHER:  Off the record, 1:29 p.m.
12      (Whereupon, the luncheon recess was taken at
13  1:29 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

309

00310:01  AFTERNOON SESSION                    2:10 P.M.
02      THE VIDEOGRAPHER:  On the record, 2:00 p.m.
03      MR. DE GHETALDI:  Q.  Mr. Ellison, returning to
04  Exhibit 107, please turn to page 5.
05      A.  Okay.
06      Q.  At the top of the page, the sentence of your
07  affidavit reads:
08      "To the contrary, the pipeline data in Q3
09      '01 showed strong growth in Oracle's
10      pipeline as compared to the prior year."
11      Do you know what period of the quarter you are
12  referring to there?
13      A.  I think throughout the quarter -- I think it
14  started -- I think it started in -- started over
15  50 percent growth, and I think it declined to, you know,
16  35 percent growth or something like that.  But throughout
17  the quarter.  It certainly started -- you know, started
18  exceptionally strong but stayed strong throughout the
19  quarter, if I recall correctly.
20      Q.  And by "strong," what do you mean by that?
21      A.  Substantially above our forecast.
22      Q.  Did you look to see whether the pipeline was
23  behaving differently in Q3 '01 than it was behaving in Q3
24  '00?
25      A.  I didn't, except the fact that we get reports

310

00311:01  showing pipeline growth, year-over-year comparison
02  pipeline growth.  Except for looking at that, that
03  number, that it was growing.  Started out in excess of
04  50, and then was -- got as low as, I think, the mid 30s.
05  Those are the numbers I focused on.
06      Q.  So your analysis didn't go any farther than
07  looking at the fact that the pipeline growth percentage
08  was higher in -- or that is, the pipeline was higher in
09  Q3 '01 than it was in Q3 '00?
10      A.  A lot higher, yes.
11      Q.  Okay.  So were you looking at absolute numbers or
12  percentage growth or what?
13      A.  Percentage growth.
14      Q.  And did your analysis of the pipeline stop there,
15  that is, to see that percentage growth number and then
16  move on?
17      A.  No.  The comparison -- so the comparison
18  between -- so one of the numbers was how much -- how much
19  larger is the pipeline this year than the same quarter
20  last year.  That's part of it.  And then next question
21  would be, how much pipeline coverage do we have for our
22  forecast?  So assuming a certain conversion rate, are we
23  going to make our forecast, or are we not?
24      Q.  Okay.  In paragraph 12, your affidavit says, "I
25  was encouraged by the 40 percent pipeline growth, which

311

00312:01  was a strong rate of growth for December."
02      Do you recall the source of this 40 percent
03  figure?
04      A.  I think it was the -- the weekly reports.
05      Q.  The upside reports?
06      A.  The upside reports.
07      Q.  All right.
08      (Whereupon, DC Exhibit 110 was marked
09      for identification.)
10      MR. DE GHETALDI:  It's just been pointed out to
11  me that there's a missing page.  Why don't we put this
12  aside and see if we can find page 2.
13      Q.  Mr. Ellison, why don't we go back to page -- to
14  Exhibit 108 while we're waiting for the second page of
15  Exhibit 110.
16      A.  Okay.
17      Q.  I'd like to ask you a couple of questions about
18  the text.  The first bullet point says the license
19  revenues growth rate was 35 percent in U.S. dollars,
20  25 percent -- or 25 points better than the 10 percent
21  growth we experienced in December, fiscal year '00, over
22  December, fiscal year '99.  However, excluding the
23  $60 million Covisint deal -- Covisint license deal, the
24  U.S. dollar growth rate would have been only 6 percent.
25  Excluding Covisint, OPI license revenue growth would have

312

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

1  00313:01  been 85 percent.
2  02      Did those figures showing what Oracle's growth
3  03  rate was, excluding Covisint, cause any concern in your
4  04  mind, in January 2001?
5  05   A. No, because we had Covisint.
6  06   Q. Yes.
7  07   A. So with -- with Covisint, we were off to a very,
8  08  very strong start.
9  09   Q. Okay.  But in addition to Covisint, it appears
10  10  that Oracle was not doing very much at all, in terms of
11  11  license revenue growth.
12  12   A. We had a very, very strong pipeline -- again, as
13  13  we said earlier, you know, December and -- you know, is
14  14  not necessarily a good month for us anyway.  We had
15  15  extremely strong pipeline, and we were -- when we had the
16  16  largest deal in our history and were off to a very, very
17  17  strong start.
18  18      So the answer is no.
19  19   Q. Do you know why Mr. Garnick broke out the growth
20  20  rates for license revenues excluding Covisint?
21  21   A. To show license revenues without Covisint.
22  22   Q. Do you know why he might want to show that?
23  23   A. Sure.
24  24   Q. Why?
25  25   A. He's saying that with -- we would not have been

313

1  00314:01  off to a good start if we didn't -- if we did not have
2  02  Covisint, we would not be off to a good start.
3  03   Q. Is that an indicator to you of how well Oracle's
4  04  business was doing, if not considering this one big deal?
5  05   A. As I said earlier, December is not necessarily a
6  06  good indicator -- with or without Covisint, December is
7  07  not necessarily a good indicator of how we are going to
8  08  do in the quarter.  We had an extremely strong forecast,
9  09  and we had an extremely strong pipeline.
10  10   Q. Mr. Ellison, do you realize that December, out of
11  11  all of the four first months of quarters regularly takes
12  12  in the highest percentage of the total quarter revenue?
13  13   A. Of first quarters?
14  14   Q. Yes.
15  15   A. Yes, yes.
16  16   Q. So you knew that fact --
17  17   A. Yes.
18  18   Q. -- in December and January 2001?
19  19   A. Yes.
20  20   Q. Okay.  And so compared to other first quarters,
21  21  December was a better indicator?  Is that accurate?
22  22   A. It was still a very small percentage of the total
23  23  quarter.  But --
24  24   Q. Twenty percent?  Do you consider 20 percent as a
25  25  small percentage of the total quarter?

314

1  00315:01   A. I think it's less, but okay.
2  02   Q. Look at bullet point 3.
3  03   A. Okay.  Nineteen -- okay.  Nineteen percent.
4  04   Q. That's 19 percent of the forecast.
5  05   A. Yeah.
6  06   Q. And Mr. Garnick says in fiscal year '00 and
7  07  fiscal year '99, it represented between 16 and 19 percent
8  08  of the total quarter.
9  09      And if you go through the historical
10  10  percentage-of-quarter rates in Exhibit 109, you'll see
11  11  that the five-year total average is 21 percent.
12  12   A. Okay.
13  13   Q. So is that -- is that a small percentage of the
14  14  quarter, to you, any of those figures?
15  15   A. It's not -- it's not an absolute -- I'm not sure
16  16  you're saying is 20 -- it is what it is.  It's 20 percent
17  17  of the quarter.  We had Covisint in.  We were way -- we
18  18  had a huge pipeline.  Covisint was in.  I mean, it's
19  19  interesting to look at what the quarter would have been
20  20  without big deal -- he doesn't compare it to the previous
21  21  year's quarter without big deals.  I mean, the correct
22  22  comparison would be not how this quarter looks without
23  23  its biggest deal, without also taking the big deals out
24  24  of the previous quarter.  At least I don't think it's a
25  25  legitimate comparison.

315

1  00316:01   Q. Okay.  My -- my question was related to an answer
2  02  that you gave where you said, in response to my question
3  03  where I had asked, "And so compared to the other first
4  04  quarters, December was a better indicator; is that
5  05  accurate?"
6  06      You said, "It was still a very small percentage
7  07  of the total quarter."
8  08      My question was, following that, "Is 16 to
9  09  20 percent, in your mind, a very small percentage of the
10  10  total quarter?"
11  11   A. Yes.  And I don't think -- I don't think it's a
12  12  legitimate comparison to pull a large deal out of Q3 '01
13  13  with also -- without also looking at what large deals we
14  14  had included in Q3 '00 and also pulling those out.
15  15   Q. Well, isn't it true that Covisint was something
16  16  more than a simple, large deal?
17  17   A. Absolutely.  It was the largest deal in our
18  18  history.
19  19   Q. Was there anything comparable to Covisint, even
20  20  remotely comparable to Covisint in Q3 '00?
21  21   A. I'm sure we had large deals -- we had some number
22  22  of large deals in Q3 '00.  I don't know what they were,
23  23  but -- while a $60 million deal was unusual, a
24  24  $20 million deal was not unusual.  And if you pull the
25  25  $20 million deal out of that, then I think that's a more

316

00317:01 legitimate comparison.
02    Q. Do you know that there were $20 million deals in
03 Q3 '00?
04    A. I have no idea.  I'm just saying to me, if you
05 pull large deals out of one quarter, you should pull
06 large deals out of the other quarter if you want to make
07 a legitimate comparison.  That's my -- that's just my
08 opinion on how you do these things.
09    Q. That's fine.
10    A. Okay.
11    Q. You've -- did you believe in January of 2001 that
12 Covisint was masking the poor -- relatively poor results
13 shown by the rest of Oracle's license revenues?
14    A. Well, I don't think they're relatively poor
15 results.  You're looking at -- as I read this, we had
16 10 percent growth, you know, pulling Covisint out --
17    Q. Yes, that's what I'm asking.
18    A. -- which I don't think is legitimate.
19    Q. Well, I --
20    A. Having said that, even if do you pull Covisint
21 out, we had a 10 percent year-over-year growth in '00,
22 versus a 6 percent year-over-year growth.  So the
23 answer -- the answer is no, I don't think it's masking
24 poor growth.
25    Q. Well, is that how you read what Mr. Garnick says

317

00318:01 in the first bullet point?  Because it doesn't read like
02 that to me.
03    A. Yeah, what he's -- this is how I read it.  He
04 said, in year-over-year -- year 2000 versus year '99, our
05 year-over-year growth was 10 percent.
06    Q. Yes.
07    A. If you take Cov -- but our year-over-year growth
08 in '01 is 35 percent.
09    Q. Yes.
10    A. But if you take Covisint out, it's only
11 6 percent.  And by the way, you have to include -- this
12 is constant dollars.  You have to include currency in
13 this as well.  I believe.
14    Q. It says -- well, he does make --
15    A. This is not constant dollars.  This is U.S.
16 dollars, not constant dollars.
17    Q. You're right.  He does make a mistake in his
18 figures, and he uses constant dollar figures.  And if you
19 do the proper conversion, the U.S. dollar growth rate was
20 1 percent.
21    A. Yes.  So -- and having said all of that, Covisint
22 was in.  We were off to a very, very strong start, and we
23 had a massive pipeline, a massive pipeline growth.  So I
24 don't think it was masking anything.
25    Q. But the pipeline was shrinking dramatically by

318

00319:01 mid January, wasn't it?
02    MR. SALPETER:  Objection to form.
03    THE WITNESS:  Shrinking dramatically?
04    MR. DE GHETALDI: Q.  Yes.
05    A. It had gone from 52 percent to what?
06    Q. Thirty-two.
07    A. Which was still well ahead of our forecast.
08    Q. Had you ever seen such a massive shrinkage in
09 pipeline over a four-week period before in Oracle's
10 history?
11    MR. SALPETER:  Objection to form.
12    THE WITNESS:  The answer is I'm sure, you know,
13 we have -- pipelines fluctuate quite a bit.  But I don't
14 recall seeing -- it's been a long time since I've seen
15 52 percent growth.  It's a long time since I've seen
16 something like that.  Keep in mind, the pipeline was
17 still well above our forecast.
18    MR. DE GHETALDI:  Q.  But the 52 percent growth
19 came in the first forecast of the year, which you were
20 saying earlier today was not very reliable because it was
21 just an initial view of the quarter without much data
22 really to back it up; right?
23    A. Well, the pipeline -- the pipeline data should be
24 pretty clean at that point.  The forecast data was -- was
25 incomplete.

319

00320:01    Q. If -- if the pipeline data was -- was so clean,
02 what explains that 20-point drop?
03    A. Well, I'm sure people -- you know, people went in
04 and looked at deals and, in their judgment, pushed -- you
05 know, moved deals around, pushed deals out.  Reduced the
06 size of deals.
07    Q. And that didn't raise a red flag?
08    A. Well, keep in mind the 52 percent was such a huge
09 number, it goes from 52 percent to 32 percent is not --
10 is not a -- you know, to me, is not a red flag.  That
11 would still -- it still was huge pipeline growth,
12 indicating a record quarter, and still well above what we
13 were forecasting the street.
14    Q. Did you ask anybody about that pipeline drop in
15 Q3 '01?
16    A. I'm sure there were discussions of it.  I don't
17 remember specifically what the discussions were.  As I
18 say, the pipeline was well above -- well above what we
19 needed to make our forecast.
20    Q. In the fourth bullet point, it says,
21 "Applications product growth was 216 percent," and
22 divides the applications up into ERP and CRM, "while
23 database product growth was 17 percent."  And then it
24 divides the database up into server and tools.
25    Tools was showing a negative 26 percent growth.

320

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

| | |
|---|---|
| 1   00321:01  Am I reading it right? | 1   00322:01  MR. DE GHETALDI:  Did we ever find the other page |
| 2   02    A. That's correct. | 2   02  for -- second page for the other exhibit? |
| 3   03    Q. And CRM was showing a negative 58 percent growth. | 3   03    MS. LAVALLEE:  Yes. |
| 4   04    Am I reading that right? | 4   04    (Counsel confer off the record.) |
| 5   05    A. That's right. | 5   05    MR. DE GHETALDI:  Betsy -- |
| 6   06    Q. Were either of those indicators a matter of | 6   06  Why don't we go off the record for one second. |
| 7   07  concern to you? | 7   07    THE VIDEOGRAPHER:  Off the record, 2:31 p.m. |
| 8   08    A. No.  One month -- | 8   08    (Discussion off the record.) |
| 9   09    MR. WEISER:  Excuse me, everybody.  What exhibit | 9   09    THE VIDEOGRAPHER:  On the record, 2:35 p.m. |
| 10  10  are we on?  I got lost.  I apologize. | 10  10    MR. DE GHETALDI:  Q. All right.  Mr. Ellison, |
| 11  11    MR. DE GHETALDI:  108.  108. | 11  11  you've been given a complete -- hopefully -- version of |
| 12  12    THE WITNESS:  The massive growth in ERP or the | 12  12  Exhibit 110. |
| 13  13  mass -- the shrinkage of CRM over one month is just not | 13  13    Have you seen that document -- |
| 14  14  terribly indicative of much.  It's just too small a | 14  14    A. Yes, I have. |
| 15  15  sample of our business. | 15  15    Q. -- before today? |
| 16  16    MR. DE GHETALDI:  Q. Again, excluding Covisint, | 16  16    A. I don't recall.  But I'm on the distribution |
| 17  17  Mr. Garnick says applications product growth would have | 17  17  list, so I suspect I have. |
| 18  18  been negative 46 percent, and database product growth | 18  18    Q. All right.  Going back to page 5 of Exhibit 107, |
| 19  19  would have been 13 percent. | 19  19  your affidavit in the Delaware summary judgment matter, |
| 20  20    Was that fact something that concerned you in | 20  20  in paragraph 12, it says, "The flash report for |
| 21  21  fiscal -- in Q3 '01? | 21  21  December 2000" -- and then then in parenthesis, "DX40." |
| 22  22    A. Again, I could go back and say it over and over | 22  22    Do you see that? |
| 23  23  again, but we had -- Covisint was in.  It was a huge | 23  23    A. Yes. |
| 24  24  deal.  We had -- and we had a very, very large pipeline. | 24  24    Q. Do you know what the DX40 stands for? |
| 25  25  So the answer is no. | 25  25    A. I don't.  I assume it's a -- I don't know. |

| | |
|---|---|
| 1   00323:01    Q. All right.  When you signed this affidavit -- and | 1   00324:01    Q. The first bullet point says that: |
| 2   02  I assume that's your signature on page 12, but maybe I | 2   02    "The license revenue growth rate was |
| 3   03  shouldn't.  Why don't you tell me if it is. | 3   03    25 percent in USD, 12 points better than |
| 4   04    A. Yes, it is.  Yes, it is. | 4   04    the 13 percent growth we experienced in |
| 5   05    Q. All right.  And when you initially reviewed and | 5   05    January fiscal year '00 quarter-to-date |
| 6   06  signed this affidavit, were you also given copies of | 6   06    over January fiscal year '99 |
| 7   07  exhibits that were referred to in the affidavit -- | 7   07    quarter-to-date. |
| 8   08    A. Yes. | 8   08 |
| 9   09    Q. -- to review? | 9   09    "However, excluding the $60 million |
| 10  10    A. I believe so. | 10  10    Covisint deal, the U.S. dollar growth rate |
| 11  11    Q. Were the exhibits marked in any way? | 11  11    would have been only 8 percent.  Excluding |
| 12  12    A. They may have.  I just don't recall. | 12  12    Covisint, OPI quarter-to-date license |
| 13  13    Q. All right.  Now, in paragraph -- let's see.  No, | 13  13    revenue growth would have been negative |
| 14  14  let's go back to Exhibit 110. | 14  14    63 percent." |
| 15  15    And by the way, before you signed your affidavit | 15  15    First of all, in the -- what is QTD?  I read |
| 16  16  which is Exhibit 107, did you review those exhibits? | 16  16  it out as "quarter to date." |
| 17  17    A. Yes, I did. | 17  17    A. Quarter to date.  Quarter to date. |
| 18  18    Q. In Exhibit 110, this indicates that it's the | 18  18    Q. What does it mean? |
| 19  19  January quarter-to-date, January fiscal year '01 | 19  19    A. How much money we have in so far this quarter. |
| 20  20  quarter-to-date revenue results, and it's an e-mail dated | 20  20    Q. So is it your understanding that the results |
| 21  21  February 8, 2001; right? | 21  21  shown in Exhibit 110 are actually a combined results for |
| 22  22    A. Yes. | 22  22  December and January fiscal year -- of Q3 fiscal year |
| 23  23    Q. It's a similar document to Exhibit 108 that we've | 23  23  '01? |
| 24  24  been reviewing; right? | 24  24    A. That's correct. |
| 25  25    A. Yes. | 25  25    Q. Once again, Mr. Garnick breaks out the |

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

00325:01  $60 million Covisint license deal, and combined January
02  and December, in addition to Covisint -- or excluding
03  Covisint, as Mr. Garnick says, Oracle's license revenue
04  growth rate was only 8 percent.
05      A. In the United States.
06      Q. In the United States.
07          In the United States?  Is that what it says?
08      A. No.  I'm sorry.  In U.S -- in U.S. dollars.
09      Q. All right.  So this is total company license;
10  right?
11      A. Yes, yes.  In U.S. dollars.  Current U.S.
12  dollars.
13      Q. By February 8, 2001, was the fact that Oracle's
14  license revenue growth rate in U.S. dollars was only
15  8 percent, if you factored out Covisint?
16      A. Is that -- was that your question -- your
17  question was?
18      Q. The question was, was that a fact of concern to
19  you about Oracle's ability to meet its projections going
20  forward?
21      A. Again, given the fact that so much of our
22  business is done in the third month of a quarter, and
23  even the last week -- the last week of a quarter, we'd
24  just come off a record-breaking quarter where we were
25  behind up until the last three days, so was it -- was it

325

00326:01  a concern?  Did it make me believe that we weren't going
02  to make the quarter?  No, it didn't make me believe we
03  weren't going to make the quarter.  Our forecasts were
04  still that we were going to make our quarter, and our
05  pipeline was still very strong.
06          The fact is Covisint was in.  The transaction was
07  in.  We were way ahead.  We had a strong forecast, and we
08  had a strong pipeline.
09      Q. I asked about whether it was a fact of concern to
10  you, not whether it mattered to you that Oracle would or
11  would not make the quarter.
12      A. Well, again, I'm just -- the word "concern" -- to
13  me, I would be concerned if we weren't going to make the
14  quarter, so -- and I was not con -- you know, I thought
15  we were going to make -- again, the combination of the
16  forecast, which was still strong; the pipeline, which was
17  strong; and the fact that the actuals were actually very
18  strong -- because Covisint was part of the actuals -- I
19  know I'm repeating myself a lot -- but we were off to a
20  terrific start.  We had a strong pipeline, stronger than
21  we needed to make our forecast based on traditional
22  historic conversion ratios.  Factor that in with that the
23  bulk of our revenue is in the last week of the last month
24  of our quarter, I was not concerned that we were going to
25  miss our quarter.

326

00327:01      Q. When you say "make our forecast" -- you said this
02  several times over the last couple of days -- are you
03  referring only to the forecast of earnings per share?
04      A. Yes.
05      Q. Did the fact that the U.S. growth rate, excluding
06  Covisint, for license revenue give you any reason to
07  believe that Oracle might not meet its 25 percent license
08  revenue growth forecast?
09      A. Thank you very much.  I really mean EPS and
10  license growth rate.  Those are the two things that
11  people watch very closely, both EPS and license growth
12  rate.  So I really meant -- when I say "make our
13  forecast," I misspoke.  It really means make the license
14  revenue growth rate forecast and make the EPS forecast.
15      Q. Okay.  Aside from the Covisint deal, was -- or in
16  addition to the Covisint deal -- however you might want
17  to put it -- was Oracle's license revenue growing at a
18  rate by the end of January 2001 that would make up that
19  difference between the $60 million Covisint deal and the
20  $1.3 billion license revenue forecast at 25 percent
21  growth?
22      A. We had a strong enough -- again, our pipeline at
23  that time in the quarter was larger than our revenue --
24  our license revenue forecast, given historic conversion
25  rates, and, you know, I thought we were going to make the

327

00328:01  forecast.
02      Q. Okay.  Did you analyze whether that was a
03  reasonable belief, based on Oracle's historical results?
04      A. Absolutely.
05      Q. How did you do that?
06      A. I looked -- I looked at the pipeline, the size of
07  the pipeline, and I looked at the historical conversion
08  ratio of the pipeline.  So what are -- given a pipeline
09  of a certain size, what percentage of that pipeline --
10  you know, looking back, what percentage of that pipeline
11  would actually become hard book deals, and given our
12  historic conversion ratios, we were still -- had enough
13  pipeline to make or exceed our forecast.
14      Q. When you say "historic conversion ratios" -- I
15  just want to make sure that I remember and understand --
16  you were talking about end-of-quarter conversion ratios?
17      A. When you look at the size of the -- you know, the
18  size of the pipeline at any point in time --
19      Q. Yes.
20      A. -- at any point in time --
21      Q. Yes.
22      A. -- and what historically we've converted, I think
23  our historic conversion ratios are just south of
24  50 percent, historically.
25      Q. But is that the end of quarter?

328

```
1  00329:01     A. I think you can look at it at any point -- you
2     02  can look at that at any point -- at any point in time.
3     03  You can -- you can -- I mean, conversion ratio, you have
4     04  to take two numbers and make a calculation, yes.  So you
5     05  have to look at pipeline and look at how many deals are
6     06  in.  So it's -- I mean, you can -- there are a couple of
7     07  ways to do the calculation, including with simultaneous
8     08  equations.  But the easiest way to think about it is to
9     09  take a look at what's the pipeline at the beginning of
10    10  the quarter, and if that pipeline stays constant -- which
11    11  of course, it doesn't; it fluctuates -- but if our
12    12  pipeline stays constant, and we have a pipeline of $100
13    13  million and 50 percent conversion ratio, we should sell
14    14  $50 million worth of software.  As the pipeline
15    15  fluctuates, you still apply -- if the pipeline goes down
16    16  from $100 million to $80 million, and you have a
17    17  50 percent conversion ratio, and there's so much of the
18    18  quarter remaining -- all right.
19    19        Let me -- let me do this -- let me do this again.
20    20  Let me tell you where you're losing me.
21    21     A. Okay.
22    22     Q. Okay?
23    23     A. All right.
24    24     Q. I understand that pipeline rates vary, and
25    25  conversion rates vary through a quarter.
```

                                      329

```
1  00330:01     A. Right.
2     02     Q. Because isn't the conversion ratio simply a
3     03  math -- an algebraic formula, really, which is whatever
4     04  forecast number at a given time there is, divided by
5     05  whatever pipeline number at a given time there is?
6     06     A. I'm sorry.  This is -- this is the problem we had
7     07  yesterday.
8     08     Q. Yeah.
9     09     A. That's a -- a fore -- there's two things:
10    10  There's historic conversion ratios and forecast
11    11  conversion ratios.
12    12     Q. Okay.  Now, the historic conversion ratio is the
13    13  conversion ratio at the end of a -- derived at the end of
14    14  a quarter?
15    15     A. Correct.
16    16     Q. All right.  Now, isn't it true that as a quarter
17    17  goes along, pipelines tend historically to decrease?
18    18     A. Yes.  Well, not necessarily.  You know, when
19    19  we're a very young company -- just a second.  Sometimes,
20    20  even as the quarter goes on -- depends on the stage of
21    21  the company we're in, but recently -- there are two
22    22  things that cause the pipeline to decrease.  A few things
23    23  that cause the pipeline -- if a deal is won, if Covisint
24    24  is in the pipeline for $60 million or $70 million and
25    25  that deal is won, it's no longer in the pipeline.  It's
```

                                      330

```
1  00331:01  now won.  So the pipeline goes down when deals are won.
2     02        The pipeline goes down -- if you say, "Gee, I'm
3     03  not going to bring Covisint in in the second quarter.
4     04  It's going to slip to the third quarter," the pipeline
5     05  goes down.
6     06     Q. So -- so these historic conversion rates that
7     07  you're talking about --
8     08     A. Are actuals.
9     09     Q. -- are actuals from the end of a quarter --
10    10     A. Right.
11    11     Q. -- with the actual revenue divided by the
12    12  pipeline figure at the end of the quarter?
13    13     A. By the pipeline figure -- again, that this is
14    14  what -- you know, it could be the -- it could be the
15    15  beginning of the quarter.  I'm not sure -- I'm
16    16  actually -- the historic calculation that I look at is --
17    17  you know, is the average pipeline during the quarter and
18    18  the -- and the conversion ratio.
19    19        But there are several ways -- the trouble is
20    20  there are several ways to make this calculation.  So you
21    21  can look at average -- so you'd look at -- you know, the
22    22  actuals over average size of the pipeline is one of the
23    23  ways that the calculation has been made.  So you look at
24    24  the average size of the pipeline during the quarter.
25    25     Q. Okay.
```

                                      331

```
1  00332:01     A. And the actuals that were converted.
2     02     Q. Okay.  That's one way of doing it.
3     03     A. That's one way of doing it.  Unfortunately, there
4     04  has not been a uniform approach of doing this, but the
5     05  most -- the one that I find most accurate is the
6     06  average -- the average size of the pipeline over the
7     07  quarter --
8     08     Q. Uh-huh.
9     09     A. -- multiplied -- or excuse me -- divided into the
10    10  actual results.
11    11     Q. All right.  The -- the -- are there reports that
12    12  are generated, too, to show this calculation?
13    13     A. I'm sure Finance -- you know, Finance -- Finance
14    14  does the calculation.  So --
15    15     Q. Finance does the calculation --
16    16     A. Finance does the calculation and provides -- and
17    17  provides a number, you know, a -- a historic conversion
18    18  rate number.  So they publish a historic conversion rate
19    19  number.
20    20     Q. They do?
21    21     A. I believe so.
22    22     Q. Okay.  Do you know what document this historic
23    23  conversion rate number appears in?
24    24     A. No.
25    25     Q. Is it a document --
```

                                      332

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

```
00333:01    A. But we took -- we -- I don't recall the -- you
02  know, the name of the document, but I've -- but I've --
03  we certainly have talked about historic conversion rates
04  routinely in meetings and doc -- I've seen documents with
05  conversion-rate data on it, historic conversion-rate data
06  on it.
07    Q. Okay.  Did -- was that a document that you were
08  provided or shown or that you saw in Q3 '01?
09    A. I think there -- there are documents that are
10  provided kind of as an analysis looking backward on a
11  quarter.  So we look back over a series of quarters and
12  try to understand what our historic conversion ratio is.
13  So it's -- it's not -- I don't know if I'm being helpful
14  here.
15    Q. The reason I'm looking puzzled is because we've
16  never seen these documents.
17    A. Oh, you've --
18    Q. And we've certainly asked for them, and so
19  it's --
20    A. Again, yeah, I don't specifically remember what
21  documents they were in or whether they were in
22  presentations -- analytical presentations.  It's
23  possible.
24    Q. Even so, we certainly asked for them.  We haven't
25  seen them.
```

333

```
00334:01    A. But since they're historic, the numbers should be
02  reproduce -- reproducible; right?  So we should be able
03  to recalculate that number.  I'm -- you know.
04    And I think we talk about them in our analyst
05  calls.  Historic conversion rates.  I'm positive we talk
06  about this all the time.  So if you have transcriptions
07  from -- you wanted consultation, but if you have
08  transcriptions of our analyst calls, I'm quite certain
09  it's something we return to -- refer to commonly.
10    MR. SALPETER:  We have produced such documents.
11    THE WITNESS:  So I think we have.
12    MR. DE GHETALDI:  Do you have -- do you have
13  something that you can show me?
14    MR. RUBENSTEIN:  We've produced pipeline reports
15  in packages, and they talk about historic conversion
16  ratios.
17    MR. DE GHETALDI:  Well, I think that's something
18  completely different, and maybe we can find out.
19    MS. LAVALLEE:  Let's take a few minutes.
20    MR. DE GHETALDI:  Let's take a couple-minute
21  break.
22    THE VIDEOGRAPHER:  Off the record, 2:52 p.m.
23    (Recess taken:  2:52 p.m. until 3:11 p.m.)
24    THE VIDEOGRAPHER:  On the record, 3:11 p.m.
25    MR. DE GHETALDI:  Q.  Before we started talking
```

334

```
00335:01  about the historic conversion rates, we were talking
02  about -- or I was asking you about whether pipeline
03  numbers tended to decrease as the quarter goes along
04  and -- historically.
05    And you, I think, started to answer but didn't
06  quite finish.  And you said, "Well, if you go back to
07  when we were a very young company," and I think you were
08  starting to say that might be different than more current
09  or more modern version of Oracle
10    A. Even during the dot-com bubble, the pipeline
11  could just continue to grow rapidly during the middle of
12  a quarter even though deals were being converted and
13  being pulled out.  So it's hard to generalize.  There's
14  so many things that go into pipeline, it's very hard to
15  generalize.
16    Q. I was asking specifically about the end of the
17  quarter.
18    A. Oh, the end of the quarter where the pipeline
19  declines?
20    Q. Yeah.
21    A. At the end of the quarter, yes, the pipeline --
22  and it declines for two reasons.  Deals are closed and
23  pulled out of the pipeline.  Other deals, it becomes
24  clear they're not going to finish -- happen this quarter,
25  and they'll slip into the following quarter.
```

335

```
00336:01    Q. Okay.  All right.  That's --
02    A. So --
03    Q. That's helpful.  Okay.
04    Now, going back to Exhibit 107 --
05    MR. SALPETER:  It's the affidavit.
06    THE WITNESS:  Yeah.
07    MR. DE GHETALDI:  Q.  On page 5, you reference a
08  flash report for January 2001 which was sent on
09  February 12th.
10    MR. SALPETER:  Which paragraph?
11    MR. DE GHETALDI:  Paragraph 14.  Thank you.
12    Q. Do you see that?
13    A. Yes, I do.
14    Q. Is it your understanding that the flash report
15  you reference in that paragraph is the same as the flash
16  report which is Exhibit 110?  The one that's the e-mail.
17    And the reason I ask is because --
18    A. The answer -- the answer is I don't think so.
19  The real answer is I don't remember.
20    Q. Yes.
21    A. But the report I looked at had pipe -- again,
22  people use -- I have problems with the term "flash
23  report."
24    Q. Uh-huh.
25    A. I think it's been used multiple -- to refer to
```

336

Ellison, Lawrence J. (Vol. 02) - 02/27/2004   2/27/2004   2:33:00 PM

| | |
|---|---|
| 1  00337:01 different reports. | 1  00338:01      MR. DE GHETALDI:  Right. |
| 2  02      This has been described as a flash report.  It | 2  02      THE WITNESS:  However, I also get reports with |
| 3  03  has quite a bit of data in it.  Other things that -- have | 3  03  pipeline data in it.  I'm not sure what that -- that |
| 4  04  been described as flash reports that are one or two pages | 4  04  might also be called flash reports, these larger reports. |
| 5  05  on a screen.  So, I'm afraid we might be using the term | 5  05  So I don't know if I'm just creating -- the term "flash |
| 6  06  "flash report" to refer to a couple of different reports. | 6  06  report" is -- I think they're referring to two different |
| 7  07  I don't know.  I'm not trying to make things worse. | 7  07  things.  So these reports with the pipeline data, called |
| 8  08      MR. RUBENSTEIN:  Dario, is this Exhibit 42? | 8  08  December flash report, and I believe this has -- has |
| 9  09      MR. DE GHETALDI:  I believe it is.  We only | 9  09  pipeline data in it. |
| 10 10  really got one set of the exhibits. | 10 10      It does not? |
| 11 11      Do you -- (Counsel confer.) | 11 11      MR. DE GHETALDI:  No. |
| 12 12      That is, only the Delaware guys got a set of the | 12 12      THE WITNESS:  Okay.  Well -- this has no pipeline |
| 13 13  exhibits, and I can't -- I have no idea whether we got | 13 13  data in it.  I do get -- I do look at pipeline data in |
| 14 14  the same thing.  Nicole has a better idea. | 14 14  the weekly reports -- in the weekly reports, so that's |
| 15 15      THE WITNESS:  So some of these things called -- | 15 15  why I'm concerned when it says I received -- the data was |
| 16 16  A, I've never used the term "flash report." | 16 16  in this particular report.  It is true I received |
| 17 17      MR. DE GHETALDI:  Yes. | 17 17  actual -- actual information.  I receive pipeline -- I |
| 18 18      THE WITNESS:  So that's part of my problem. | 18 18  weekly receive -- every week, I receive pipeline |
| 19 19      MR. DE GHETALDI:  Okay. | 19 19  information. |
| 20 20      THE WITNESS:  So I get, via e-mail, reports that | 20 20      Okay.  All right.  I think -- I think I can |
| 21 21  have actual results at the end of the first two months, | 21 21  answer -- I think I can answer this.  This paragraph |
| 22 22  and I've described that. | 22 22  refers to more than the data -- let me try this. |
| 23 23      MR. DE GHETALDI:  Uh-huh. | 23 23      This paragraph refers to more than the data that |
| 24 24      THE WITNESS:  As best I recall, I -- you know, | 24 24  was in the, quote, flash report. |
| 25 25  that does not have pipeline data in it. | 25 25      MR. DE GHETALDI:  Yeah, I -- |

<div align="center">337</div>

<div align="center">338</div>

| | |
|---|---|
| 1  00339:01      THE WITNESS:  It refers to -- the thing -- yes, I | 1  00340:01  that copied? |
| 2  02  received the flash report, and after reviewing the report | 2  02      MR. DE GHETALDI:  Yes. |
| 3  03  and other reports, would be more precise.  After | 3  03      What's 40? |
| 4  04  reviewing the -- am I -- every -- reviewing the report | 4  04      And there's the confusion.  Exhibit 40, which is |
| 5  05  and other reports. | 5  05  referenced in paragraph 12, is the same as Exhibit 8 -- |
| 6  06      MR. DE GHETALDI:  Okay.  I -- | 6  06  or 108.  And that is the e-mail plus the Product Revenue |
| 7  07      THE WITNESS:  "The company's prospects still look | 7  07  Flash. |
| 8  08  solid, and the pipeline was strong." | 8  08      Exhibit 41 is the same as Exhibit 110. |
| 9  09      THE REPORTER:  I'm sorry, I didn't hear the end. | 9  09      MR. RUBENSTEIN:  Okay. |
| 10 10  "Prospects still look ..." | 10 10      MR. DE GHETALDI:  It does not have -- it has -- |
| 11 11      THE WITNESS:  "The company's prospects still look | 11 11  it does not have -- well, let's go off the record. |
| 12 12  solid, and the pipeline was strong." | 12 12      THE VIDEOGRAPHER:  Off the record -- |
| 13 13      MR. DE GHETALDI:  I think that was a conclusion | 13 13      You want me to go off the record, sir? |
| 14 14  similar to the one that we reached with respect to the | 14 14      MR. DE GHETALDI:  Yes. |
| 15 15  December pipeline report. | 15 15      THE VIDEOGRAPHER:  Off the record, 3:20 p.m. |
| 16 16      THE WITNESS:  Okay.  So... | 16 16      (Discussion off the record.) |
| 17 17      MR. DE GHETALDI:  Yeah. | 17 17      (Whereupon, DC Exhibit 111 was marked |
| 18 18      MR. RUBENSTEIN:  Is Exhibit 110 the same document | 18 18          for identification.) |
| 19 19  as what's contained in Exhibit 42 to the Summary Judgment | 19 19      THE VIDEOGRAPHER:  On the record, 3:22 p.m. |
| 20 20  Motion? | 20 20      MR. DE GHETALDI:  We've had an off-the-record |
| 21 21      MR. DE GHETALDI:  No, and we're getting that | 21 21  discussion during which we compared the exhibits from the |
| 22 22  copied now.  It appears that Exhibit 42 is an e-mail, | 22 22  Summary Judgment Motion and the exhibits from the |
| 23 23  short cover page with the second page of Exhibit 109 as | 23 23  deposition today, and we've determined that Exhibit 40 to |
| 24 24  an attachment. | 24 24  the Summary Judgment Motion is the same as Exhibit 108 |
| 25 25      MR. RUBENSTEIN:  Okay.  That's -- we're having | 25 25  here today. |

<div align="center">339</div>

<div align="center">340</div>

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

00341:01    Exhibit 42 to the Summary Judgment Motion is the
02    same as the document that's just been marked as
03    Exhibit 111.
04        And Exhibit 10 is the -- to the deposition -- I'm
05    sorry -- 110 to the deposition here today is the same as
06    Exhibit 41 to the Summary Judgment Motion.
07        All right.
08    Q. So getting back to the exhibits, Mr. Ellison,
09    have you ever seen Exhibit 111 before today?
10    A. Yes, I have.
11    Q. Do you recall receiving this document in -- or on
12    or about February 12, 2001?
13    A. I assume I did, but I don't recall.
14    Q. And returning, then, to paragraph 14 of your
15    Summary Judgment Affidavit, which has been marked as
16    Exhibit 107 here today, in that paragraph, you say that
17    after reviewing the report -- and the report that's
18    referenced was Exhibit 111 today, Exhibit 42 to the
19    Summary Judgment Motion -- you say that you still believe
20    that Oracle would meet its quarterly revenue and earnings
21    targets. The company's revenues still look solid, and
22    the pipeline is strong.
23    MR. SALPETER: You have that magnifying glass?
24    MR. DE GHETALDI: Yes.  You see why I bring it?
25    THE WITNESS: Okay.

341

00342:01    MR. RUBENSTEIN: Is there a question pending?
02    MR. DE GHETALDI: No.
03    THE WITNESS: I think I answered the question,
04    which was yes.
05        The question wasn't yes.  The answer was.
06    MR. DE GHETALDI: Q.  All right.  The -- what
07    about the company's prospects, as shown in Exhibit 111,
08    made you think that they were solid -- and I won't ask
09    about the pipeline because we've established that that
10    was from a different document or a different source.
11    A. The -- again, from a year-to-date standpoint, we
12    were still ahead of -- you know, we were showing good
13    growth over -- over the previous year.
14        And again, I think -- I think paragraph 14 of
15    my -- of my affidavit said that there was nothing in this
16    document that changed my view and that the company's
17    prospects were solid and the pipeline -- and the pipeline
18    was still strong.  I think that's what I said.  In other
19    words, I went -- before I looked at the document, I
20    believed we'd meet our targets.  After I looked at the
21    document, I believed we'd meet our targets.  I factored
22    the information in this document in with different
23    information with my -- with the weekly report, and in sum
24    total, with all the information that I had, I believed
25    that we would still meet our -- meet our license revenue

342

00343:01    forecast and our EPS forecast.
02    Q. Is there any document -- or is there any
03    information in Exhibit 111 that you thought would be
04    important to an investor when that investor was
05    considering the total mix of information that the
06    investor knew about Oracle?
07    A. Is there anything in here in particular that I
08    thought would be of interest to an investor?
09    Q. Right.  Either positive or negative.
10    A. I don't know how to answer that question.  This
11    is -- I get an awful lot of information on the -- I
12    suppose investors might like to see everything I see.
13    I'm not sure it's a good idea that they look at any one
14    document.
15        The answer is I don't know how to answer that
16    question.
17    Q. Well, do you think it would be important for an
18    investor to know that Oracle had only 12 percent growth
19    in its database revenues total as of the end of
20    January 2001, when Oracle had predicted a 25 percent
21    growth?
22    A. Of total license -- of total license sales?
23    Q. Right.
24    A. The 12 -- let me just look at the numbers.
25    Again, you're asking me what would be of interest to

343

00344:01    investors?
02    Q. Uh-huh.
03    A. And I'm just -- I'm just not sure what that --
04    exactly what that means.
05    Q. Okay.  Did -- did that analytical framework ever
06    factor into your thought process in Q3 '01, when
07    determining for yourself whether or not you had material
08    inside information about Oracle?  That is, what would be
09    what an investor would think is important?
10    A. Yeah.  I think there was nothing material, other
11    than I thought -- that was not public.  We had given
12    guidance for revenue -- revenue that I thought we were
13    going to meet.  We had given guidance for earnings per
14    share that I thought we were going to meet.  There was no
15    acquisition or any other material item that I knew of.  I
16    guess you're asking, so...
17    Q. Well, you're using the word "material."  And I
18    asked you --
19    A. You said "of interest."
20    Q. -- whether in making that determination --
21    A. Yeah.
22    Q. -- whether you considered the information that
23    you knew from an investor's point of view.
24    A. Right.
25    Q. Did you?

344

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

00345:01    A. Again, I'm not sure what you mean by "an
02  investor's point of view."  There's so many different
03  kind -- there's so many different investors.  But if I
04  was an investor -- and I am -- I'd want to know how they
05  were going to do in the quarter.  That's what I would
06  want to know, right?  That's what I would want to know.
07    There are two things that investors typically
08  look that affect our stock price -- look at.  One is our
09  license growth rate; the other is our earnings per share.
10  And by looking at the state of our pipeline and how the
11  revenue was already in, we were way ahead of where we
12  were the year before.  Our pipeline was stronger -- was
13  growing faster than our forecasted license growth.  Given
14  historic conversion ratios, we were going to easily
15  make -- we were going to make our earnings per share.  So
16  I thought, you know, those are all things that would be
17  of interest to investors.
18    Q. Okay.  Did you think Oracle's actual revenue
19  results for December and January would be important to an
20  investor to know?
21    A. Not in isolation of all of the other data.  I
22  mean, little -- I mean, looking at lots of little leaves
23  without looking at the trees I don't think is very
24  valuable and can be misleading.  So...
25    Q. Well, that's fair.

345

00346:01    In February -- or in early February 2001, based
02  on the actual results from December and January, did you
03  think the company's prospects looked as solid in the
04  first week of February as they had in mid January?
05    A. That's -- I certainly thought in both cases that
06  we were going to make -- we were going to make our
07  number.  So, did I believe we -- the potential upside was
08  as great?  I mean, again, I'm just -- I'm not sure what
09  you mean by as -- I'm just saying what does "as solid"
10  mean?
11    Q. Well, you say in paragraph 14 of Exhibit 107 --
12    A. Yeah.
13    Q. -- that "Oracle's prospects still looked solid."
14    A. Yes.  "Solid" means we won't -- and you said "as
15  solid."
16    Q. Fine.
17    A. Which is different.
18    Q. Yes.
19    A. I said they still looked solid.
20    Q. Yes.
21    A. And you asked did they look as solid.
22    Q. Yes.
23    A. And "solid," to me, means we're going to make our
24  numbers.
25    Q. Okay.

346

00347:01    A. "As solid" might mean do I think we'll exceed
02  them by as much as I thought we would exceed them by the
03  week before, and the answer is, I don't recall.
04    Q. All right.  If you'll turn, please, to page 9 of
05  Exhibit 107.  And please read paragraph 27 to yourself.
06  You don't have to read it out loud.
07    A. Okay.  Okay.
08    Q. You say, down towards the bottom of page 9,
09  "Moreover, business in Q3 was becoming more profitable
10  because our margins were increasing."
11    A. Yes.
12    Q. What was the source of your information for that
13  statement?
14    A. The weekly reports.
15    Q. Okay.
16    A. Our expenses -- our sales were going up, and
17  expenses were forecast to go down.
18    Q. And the weekly reports that were distributed at
19  the EMC meeting --
20    A. Correct.
21    Q. -- do you recall the degree of increase in the
22  margin that you were seeing in Q3 '01?
23    A. I don't.
24    Q. Do you recall at what period of the quarter you
25  were seeing these increased margins?

347

00348:01    A. Throughout the quarter.
02    Q. Okay.  Were these increases increases -- absolute
03  increases as the quarter went along, or were these
04  increases over Q3 '00?
05    A. Over Q3 '00.
06    Q. Do you recall how -- what the margins tended to
07  do -- that is, the forecasted margins -- tended to do as
08  Q3 '01 went along?
09    A. I'm not sure they moved around very much, but
10  I -- well, they might have fluctuated a little bit, but I
11  don't think a lot.  But that's at best I recall.
12    Q. Then you say, "Thus, even if there were some deal
13  slippage, I believe that margin increases driven by
14  expense reductions could overcome it."
15    Had you seen any deal slippage as of January 19,
16  2001, in Oracle's actual results?
17    A. No.
18    Q. Then is there a reason why that eventuality or
19  that possibility is included in this sentence of your
20  affidavit?
21    A. Just -- just margin for error.  I mean, there's
22  two ways to improve the quality of your business.  One is
23  to sell more software; the other is to reduce what you're
24  spending.  We were doing both simultaneously, so one gave
25  us cushion over the other.  So the two work in concert to

348

| | |
|---|---|
| 1  00349:01  improve your earnings. But it would only affect the one | 1  00350:01  February 27, 2004. The time, 3:38 p.m. We are off the |
| 2  02  thing. It would only help us make our earnings per share | 2  02  record. |
| 3  03  target. It would do nothing to help us make our license | 3  03      (Discussion off the record.) |
| 4  04  growth target. | 4  04      THE VIDEOGRAPHER: This is the beginning of |
| 5  05    Q. It's your -- now, what sources of information did | 5  05  Volume II, Tape 3, in the deposition of Lawrence J. |
| 6  06  you base this -- the belief that expenses were being | 6  06  Ellison on February 27, 2004. The time 3:41 p.m. We are |
| 7  07  reduced on? | 7  07  on the record. |
| 8  08    A. Oh, well, we'd been reducing expenses for a long | 8  08      MR. DE GHETALDI: Let's mark this document as |
| 9  09  time. So we had a program of expense reduction in place | 9  09  next in order. |
| 10  10  for some time, and every quarter, expenses were going | 10  10      (Whereupon, DC Exhibit 112 was marked |
| 11  11  down. | 11  11        for identification.) |
| 12  12    Q. Okay. And were the expenses being reduced, | 12  12    THE WITNESS: Okay. |
| 13  13  compared to Q3 '00, in Q3 '01? | 13  13    MR. DE GHETALDI: Q. Have you ever seen |
| 14  14    A. I think Q3 '00, and sequentially from Q2 '00 -- | 14  14  Exhibit 112 before today? |
| 15  15  Q2 '01. I'm sorry. | 15  15    A. I don't recall. |
| 16  16    Q. So in other words, every quarter, expenses went | 16  16    Q. Have you ever seen any documents like it before |
| 17  17  down? | 17  17  today? |
| 18  18    A. With the possible exception of Q4 because of a | 18  18    A. Yes. |
| 19  19  large commission expense in Q4. But if you factor out | 19  19    Q. When? |
| 20  20  commission expense, I think we had a pretty good track | 20  20    A. When. I don't -- do not recall. |
| 21  21  record of reducing expenses every quarter. | 21  21    Q. Okay. Do you recall where or -- |
| 22  22    MR. DE GHETALDI: Need to change the tape now? | 22  22    A. The -- the office. |
| 23  23  That would be fine. | 23  23    Q. Do you recall where you got them? |
| 24  24    THE VIDEOGRAPHER: This is the end of Volume II, | 24  24    A. In some meeting. Someone gave that to me. But I |
| 25  25  Tape 2, in the deposition of Lawrence J. Ellison on | 25  25  don't know -- I don't know when. |

<div align="center">349</div> <div align="right">350</div>

| | |
|---|---|
| 1  00351:01    Q. All right. Do you recall seeing them in Q3 '01? | 1  00352:01    Q. Okay. Do you recall the -- the amount of the |
| 2  02    A. No. | 2  02  debt that you wanted to pay down? |
| 3  03    Q. All right. Going back to your trades. The | 3  03    A. The original goal was to raise something like |
| 4  04  reasons, I think, that you've enumerated for your trades | 4  04  $800 million with the sales. We didn't raise that much, |
| 5  05  include creating taxable income, paying down debts, and | 5  05  but that was -- that was the goal before we started |
| 6  06  raising cash. Were those the reasons for your trades in | 6  06  selling. |
| 7  07  Q3 '01? | 7  07    Q. After tax, that is? |
| 8  08    A. Yes. | 8  08    A. After tax, right. |
| 9  09    Q. Did you have any other reasons? | 9  09    Q. And so do you -- did you want to pay down |
| 10  10    A. Again, I'm not sure what you mean by that. But | 10  10  $800 million worth of debt? |
| 11  11  my options were expiring, so I had to -- | 11  11    A. No. I wanted to pay down -- pay down some of the |
| 12  12    Q. I forgot that one. | 12  12  debt and then have -- have cash to continue to fund the |
| 13  13    A. That was an important one. I just... | 13  13  start-up companies that I owned. |
| 14  14    Q. With those four, any others that you can think | 14  14    Q. How much of the debt did you want to pay down? |
| 15  15  of? | 15  15    A. You'd have to ask Philip Simon. |
| 16  16    A. No. | 16  16    Q. Okay. Now, which companies are you talking |
| 17  17    Q. Okay. Which debts did you want to pay down with | 17  17  about? |
| 18  18  the proceeds from the sale of your stock? | 18  18    A. I own -- I own a company called nCube. I own a |
| 19  19    A. I own several -- several companies, and I -- you | 19  19  company called -- well, actually, I'm not sure exactly |
| 20  20  know, I bought the companies on margin, so I had margin | 20  20  how many companies I owned at the time, so -- right now, |
| 21  21  loans to buy the companies. And I paid down the margin. | 21  21  I own a company called nCube. I own a company called |
| 22  22  Margin debt. | 22  22  Pillar Data that's change -- a disk drive company. I |
| 23  23    Q. Is that everything, in terms of debt, that you | 23  23  owned a company called NET Suite, a software company. I |
| 24  24  wanted to pay down? | 24  24  have an investment in Knowledge Universe. That's being |
| 25  25    A. I think so. | 25  25  dissolved, but I have a 25 percent interest. I own a |

<div align="center">351</div> <div align="right">352</div>

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

00353:01 quarter of LeapFrog, which is now public.  But LeapFrog
02 was owned -- came out of my investment in Knowledge
03 Universe.
04     But I think the big ones at the time, the two big
05 ones at the time were Knowledge Universe and nCube.
06     Q. Okay.
07     A. But I'm sure there were others.
08     Q. Okay.  To -- to what institutions did you owe
09 this money?
10     A. I don't recall.
11     Q. Has --
12     A. There was -- there was a consortium of banks that
13 loaned the money.
14     Q. Would Mr. Simon know that?
15     A. Absolutely.
16     Q. All right.  In terms of the cash that you wanted
17 to raise over and above the debts that you wanted to pay
18 down, what was your goal in terms of raising cash before
19 you started exercising options in January 2001?
20     A. Again, the -- you'd have to check with Philip.
21 But I think pay down $600 million in debt and then keep
22 $200 million for -- to continue to fund those
23 investments, which required continuous funding.
24     Q. Okay.  Was some of the cash that you wanted for
25 your boat, the Americas Cup boat?

353

00354:01 A. I think -- oh, yeah, probably.  Probably.  For
02 Americas Cup, sure.
03     Q. And some of the cash that you wanted -- you
04 wanted some cash for your improvements to your house?
05     A. I was building a new house -- building a new
06 house, yes.  You're absolutely right.
07     Q. The one in Woodside?
08     A. Yes.
09     Q. Is it your recollection that in January 2001,
10 both nCube and Knowledge Universe were at a stage in
11 their corporate development where they required the
12 infusion of money on a regular basis or --
13     A. NCube did.  I'm -- Knowledge Universe required
14 less.  Knowledge Universe had an initial investment of, I
15 think, about $300 million, which I borrowed and then paid
16 off.  I think there were additional payments to Knowledge
17 Universe, but not large ones.
18     Q. Okay.  And the security for these loans was
19 Oracle stock?
20     A. Yes.
21     Q. Okay.  When you were not able to raise the
22 800 million, where did -- where did you end up -- what
23 did you end up doing with that money?
24     A. I'm guessing, but I think we kept about
25 $150 million in cash.  Philip Simon would know.  Kept

354

00355:01 about 150 million in cash and used the rest for debt
02 retirement.  But I'm -- I'm just guessing.
03     Q. Okay.  That's fine.  And I appreciate you telling
04 me when you don't really know, and I also appreciate you
05 telling me that Mr. Simon would be the best person to
06 ask.
07     A. Okay.
08     THE WITNESS:  Want to take a break now?
09     MR. DE GHETALDI:  Sure.  Thanks.  Just a little
10 trouble finding the next exhibit.
11     THE VIDEOGRAPHER:  Off the record, 3:53 p.m.
12     (Recess taken:  3:53 p.m. until 4:17 p.m.)
13     (Whereupon, DC Exhibits 113-119 were
14         marked for identification.)
15     THE VIDEOGRAPHER:  On the record, 4:17 p.m.
16     MR. DE GHETALDI:  Q.  Mr. Ellison, you've been
17 handed a group of documents which have been marked
18 Exhibits 113 through 118.  Have you seen any of these
19 documents before today?
20     A. No, I haven't.
21     Q. Okay.  Let's start with Exhibit 113, and I'm
22 going to ask you to turn to the last page of that
23 document.  In the lower right-hand corner there is a
24 signature.  Is that your signature?
25     A. No, it's not.

355

00356:01 Q. Do you know whose signature it is?
02     A. I do not.
03     Q. Do you recall authorizing anyone to sign a
04 Form 144 on your behalf in January of 2001?
05     A. Either Carolyn or Philip.
06     Q. Okay.  The form indicates that number of shares
07 to be sold as 5 million.  Do you know why that number
08 was used on this form?
09     A. No, I don't.
10     Q. Please turn to Exhibit 114 and, once again, to
11 the last page.  In the lower right-hand corner, do you
12 know whether that signature is yours or not?
13     A. It is not.
14     Q. Once again, do you know who signed it on your
15 behalf?
16     A. I do not.
17     Q. Would either Carolyn Balkenhol or Philip Simon
18 have been authorized to sign this Form 144 on your behalf
19 in December -- or -- I'm sorry -- in January 2001?
20     A. Yes.
21     Q. And once again, do you know why the number of
22 shares to be sold indicated on the form is 5 million?
23     A. I do not.
24     MR. DE GHETALDI:  All right.  These forms were
25 obtained from the SEC web site at a time when it was easy

356

00357:01  to do that.  I've just noticed that your Social Security
02  number is on them, and I'd ask that the court reporter
03  redact those numbers where they appear in the transcript.
04  Is that okay with everybody?
05  THE WITNESS:  Thank you.
06  MR. RUBENSTEIN:  Certainly.
07  MR. DE GHETALDI:  Q.  Now, please turn to
08  Exhibit 115.
09  A.  Okay.
10  Q.  And once again, to the last page, the signature
11  block.  Do you recognize that as your signature?
12  A.  It is not.
13  Q.  And were both Philip Simon and Carolyn Balkenhol
14  authorized to sign Form 144 on your behalf in
15  January 2001?
16  A.  Yes, they were.
17  Q.  What do you understand a Form 144 to be?
18  A.  An intent to sell stock.
19  Q.  Okay.  Anything -- anything other than that?
20  A.  No.
21  Q.  Do you understand it to be --
22  A.  Disclo -- disclosure, a public disclosure that
23  you're selling stock.
24  Q.  Okay.  Do you know why your intention to -- to
25  sell approximately 40 million shares was not disclosed in

357

00358:01  the Form 144?
02  MR. SALPETER:  Objection to form.
03  THE WITNESS:  I could guess.
04  MR. DE GHETALDI:  Q.  I don't want you to guess.
05  If you have any knowledge --
06  A.  No.
07  Q.  -- I'd like to know that, but I don't want you to
08  guess.
09  A.  No.
10  Q.  Thank you.
11  A.  Because we didn't sell 40 million -- I'll throw
12  it out anyway.  Because we didn't -- we didn't sell that
13  many shares, did we?
14  Q.  No.
15  A.  Right.  I think -- I think because of the
16  constraints, the price constraint and the volume
17  constraint, that it was released over time.  But -- but
18  the answer -- that's still yes.  I'm just guessing.  That
19  makes sense to me.
20  Q.  All right.  Please turn to Exhibit 116.
21  A.  Yes.
22  Q.  Do you recognize the signature in the signature
23  block on the third page of Exhibit 116?
24  A.  That's Philip's signature.
25  Well, I think it is.

358

00359:01  Q.  And next to the signature, there's typewritten
02  "Philip B. Simon, Attorney in Fact."
03  Is it your understanding that he was signing this
04  document under a power of attorney for you?
05  A.  It looks that way.
06  Q.  Is that your understanding?
07  A.  You mean as I look at this now, is that what I
08  understand to be the case?
09  Q.  Yes.
10  A.  Yes.
11  Q.  And please turn to the signatures page on
12  Exhibit 117.  Do you recognize the signature on that
13  page?
14  A.  Yes.
15  Q.  Do you recognize that as Mr. Simon's signature?
16  A.  Yes.
17  Q.  He's doing a little better here following the
18  California form for signing as attorney in fact.  Do you
19  understand him to be signing this Form 144 on your behalf
20  under his power of attorney?
21  A.  Yes.
22  Q.  Please turn to Exhibit 118, and the signature
23  page on the third page of 1 -- of Exhibit 118.
24  A.  Are these -- question:  Are these issued before
25  you sell or after you sell?

359

00360:01  Q.  Well --
02  A.  I'm just -- I don't -- I don't know.  I'm just --
03  another possibility, they were issued after -- after we
04  sold.  But I don't know.
05  I'll stop guessing.  I'm curious myself, but I
06  don't -- I'll stop asking you questions.  I'm not
07  supposed -- I'm not supposed to do that, am I?
08  Q.  Right.
09  A.  But under Delaware rules, my lawyer can't stop me
10  from -- so I'm --
11  Q.  Right.
12  A.  -- free to do whatever I want.
13  MR. DE GHETALDI:  You figure he can't talk to
14  you, maybe I can.
15  MR. RUBENSTEIN:  Just keep that in mind next time
16  we talk about which rules you'd like.
17  MR. DE GHETALDI:  Hey, it was your idea.
18  Q.  All right.  On the third page of Exhibit 118, in
19  the signature block, do you recognize that to be
20  Mr. Simon's signature there?
21  A.  Yes.
22  Q.  Now, this time he signed it as -- with an
23  indication "trustee" typed after his name.  Do you know
24  what trust he was executing this as trustee of?
25  A.  No.  I wasn't even certain he was a trustee until

360

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

```
 1   00361:01  earlier in the deposition.
 2      02    Q. Right.
 3      03    A. But it looks like he's a trustee of a living
 4      04  trust.
 5      05    Q. Okay.  Now, please turn to Exhibit 119 and the
 6      06  signature block on page 3.
 7      07    A. Philip Simon's signature.
 8      08    Q. Okay.  And once again, as trustee.  Do you know
 9      09  of which trust he's signing as trustee of?
10      10    A. I do not.
11      11    Q. But it's your understanding that Mr. Simon or
12      12  Carolyn Balkenhol were both authorized to sign these
13      13  Form 144s on your behalf in January 2001?  And I'm
14      14  speaking of Exhibits 113 through 119.
15      15    A. Yes.
16      16    Q. Did you have any discussions with Ms. Balkenhol
17      17  or Mr. Simon about the execution and filing of these
18      18  Forms 144 in January 2001?
19      19    A. Not that I recall.
20      20    Q. Who is Joe Lockhart?
21      21    A. Oh, he was Bill Clinton's press secretary for a
22      22  while.  He was my assistant.
23      23    Q. Okay.  When was he hired as your assistant?
24      24    A. I think after President Clinton left office.  But
25      25  I'm not -- I'm not certain.
```

361

```
 1   00362:01    Q. Okay.  Is he still employed as your assistant
 2      02  today?
 3      03    A. No, he's not.
 4      04    Q. When was he last employed by you?
 5      05    A. Some time ago, he went back and opened a PR
 6      06  agency in Washington, D.C.
 7      07    Q. All right.  All right.
 8      08    A. Couple years ago.
 9      09    Q. All right.  Do you recall efforts in January 2001
10      10  to deal with public reaction to the filing of your
11      11  initial Form 144 in January 2001?
12      12    A. I don't.
13      13    Q. What type of assistant was Mr. Lockhart for you?
14      14    A. He was responsible for managing press relations
15      15  for me personally.
16      16    Q. All right.
17      17    A. As opposed to for the company.
18      18    Q. Okay.  So he was a personal employee as opposed
19      19  to an employee of Oracle?
20      20    A. No, he was an employee of Oracle.
21      21    Q. All right.  But his job responsibilities were
22      22  only to handle your press relations?
23      23    A. Focus on my press relations.  Of course, that has
24      24  input -- impact on the company as a whole as well.  In
25      25  fact, I think he filled in for a while running PR for the
```

362

```
 1   00363:01  entire company.  So I think part of the time he was
 2      02  focused on me; part of the time he was focused on the
 3      03  company while he was here.  While he was at Oracle.
 4      04    Q. Okay.  What do you recall about the public
 5      05  disclosure of the sales of your stock in January 2001?
 6      06    A. I'm not sure of anything in particular, that they
 7      07  were -- as far as I know, they were disclosed properly,
 8      08  and that's all I know.
 9      09    Q. Do you recall any reaction, public reaction, to
10      10  the disclosure of your sales?  In January, that is.
11      11    A. It was a large sale.  I think people read about
12      12  it, but I don't -- I don't remember anything specific.
13      13    Q. Okay.
14      14       MR. DE GHETALDI:  This will be 120.
15      15           (Whereupon, DC Exhibit 120 was marked
16      16             for identification.)
17      17       THE WITNESS:  Okay.
18      18       MR. DE GHETALDI:  Q.  Do you recall receiving the
19      19  e-mail that's been marked as Exhibit 120 on or about
20      20  December 18th, 2000?
21      21    A. I don't recall it, but I'm sure I did.
22      22    Q. Okay.  Do you recall that as of December 18th,
23      23  you intended to exercise but not sell about $20 million
24      24  in options that were expiring in August 2001?
25      25    A. I don't recall it, but I'm sure that's what
```

363

```
 1   00364:01  happened.
 2      02    Q. Okay.  Do you know why you only intended to
 3      03  exercise but not sell $20 million in options in
 4      04  December 2000?
 5      05    A. Yes.
 6      06    Q. Why?
 7      07    A. It was part of a tax planning process.
 8      08       Sometimes I had losses during the year, and that
 9      09  allowed me to exercise and sell options -- excuse me --
10      10  exercise and hold options without having to pay taxes on
11      11  the options.  So at the end of every year, Philip would
12      12  review whether I was carrying a loss in that year, due do
13      13  my other investments, and if I should offset that loss
14      14  with a gain in Oracle stock by exercising an option and
15      15  holding.
16      16       MR. DE GHETALDI:  All right.  This will be
17      17  Exhibit 121.
18      18           (Whereupon, DC Exhibit 121 was marked
19      19             for identification.)
20      20       THE WITNESS:  Okay.
21      21       MR. DE GHETALDI:  Q.  Have you ever seen Exhibit
22      22  121 before today?
23      23    A. No.
24      24    Q. Do you recall discussions about the subject of PR
25      25  with respect to your option-exercise activity in
```

364

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

00365:01 January 2001?
02   A. Yeah.
03   Q. Okay.  What do you recall about that?
04   A. Just that it was a -- a large sale -- I had --
05 you know, I had -- I have a record of not selling Oracle
06 stock very often.  I don't sell a lot of stock.  I'm not
07 in the market very often.  So it was an unusual event for
08 me to actually be selling.
09      And the question was, you know, making sure
10 people -- somehow communicating this did not show a lack
11 of faith in the company.  I was selling, you know, a
12 couple of percent of what I owned.  I was holding onto
13 98 percent of what I owned.  Some of what I was going to
14 sell, the options -- namely, the options -- had to be
15 sold or they'd be -- or they'd expire.
16      So just communicating that clearly and accurately
17 to the press so that they didn't think somehow I was
18 losing faith in the company.  Because on -- clearly, on
19 the face of it, it -- you know, it's a very large dollar
20 amount.  But as a percentage of my overall holdings, it's
21 a very small percentage.
22   Q. Okay.  Did you have any discussions with
23 Carolyn Balkenhol or Philip Simon in January 2001 about
24 the need to resolve whether to refer to paying down
25 outstanding debt to justify the sales?

365

00366:01   A. I certainly may have, but I don't recall.  I have
02 no specific recollections.
03      (Whereupon, DC Exhibit 122 was marked
04      for identification.)
05   THE WITNESS:  Okay.
06   MR. DE GHETALDI:  Q.  Have you ever seen
07 Exhibit 122 before today?
08   A. I have.
09   Q. Is this one of the documents you reviewed to
10 prepare for your deposition?
11   A. No.
12   Q. Okay.  When did you first see this document?
13   A. I think -- looks like January 24th on -- 2001.
14   Q. To your knowledge -- or do you recall discussing
15 the contents of Exhibit 122 with Mr. Simon?
16   A. I certainly may have.  I don't recall.
17      (Whereupon, DC Exhibit 123 was marked
18      for identification.)
19   THE WITNESS:  Okay.
20   MR. DE GHETALDI:  All right.
21   Q. Have you ever seen Exhibit 123 before today?
22   A. Not that I recall.
23   Q. Exhibit 123 appears to be an e-mail from
24 Mr. Simon to Carolyn Balkenhol.  Do you -- and before he
25 types his name, he -- he says, "Carolyn, please update

366

00367:01 Larry."
02      Do you recall Carolyn Balkenhol updating you
03 about the -- the trading activities during the period
04 from January 22nd, 2001, to January 31st, 2001?
05   A. She probably did up, but I don't remember.
06      (Whereupon, DC Exhibit 124 was marked
07      for identification.)
08   THE WITNESS:  Okay.
09   MR. DE GHETALDI:  Q.  Do you recall receiving
10 Exhibit 124 on or about January 24th, 2001?
11   A. I'm sure I received it.  I don't recall receiving
12 it.
13   Q. Okay.  Do you recall reviewing a draft of a press
14 release recommended by Mr. Lockhart for release after
15 public -- the public became aware of your initial sales?
16   A. Yes, I do.
17   Q. Okay.  Did you approve the draft press release
18 that is shown on the first page of Exhibit 124?
19   A. I think I did.
20   Q. Okay.  Do you recall why the press release
21 only -- or why the press release states that the sale --
22 let's see.  "The sale of stock is for tax planning
23 purposes, the same circumstance as his last sale in May
24 of 1996."
25   A. Is this the press release we actually issued?

367

00368:01 I'm just -- this says "a press release."  You asked me if
02 I approved a press release.  And I think the answer is I
03 think I did.  But was this the press release?  This looks
04 like a press -- a recommended press release.
05   Q. This is a recommended press release.
06   A. Right.  This was not the press release issued?
07   Q. This is a recommended press release.
08   A. Okay.  Because I don't think I approved this
09 press release because -- at least I don't think I did.
10      So the answer is, I think I approved a press -- I
11 think I approved a press release on this.
12   Q. But a different one?
13   A. Not this one.  Not this press release.
14   Q. Okay.  Do you recall how the approved press
15 release differed from the press release that's shown on
16 the first page of Exhibit 124?
17   A. I don't.
18   Q. If you turn to the second page of Exhibit 124,
19 which is a copy of a -- an e-mail from Joe Lockhart to
20 Safra Catz, which contains a copy of an e-mail from Safra
21 Catz to Joe Lockhart.
22   A. Right.
23   Q. And the -- it shows that Safra Catz wrote that
24 she had "discussed the press release with Larry, and he
25 approved one to hit the moment the SEC publishes the

368

Oracle Related Cases                                    Page  365 - 368

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

```
1    00369:01 notice or the news leaks out anyway."
2    02      Do you recall the timing aspect of the release of
3    03 this press release?
4    04  A. I really don't.
5    05   Q. Okay.  Do you recall approving a press release
6    06 that contained the facts that are listed by Safra Catz as
7    07 the important facts on the second page of Exhibit 124?
8    08   A. I don't.
9    09        (Whereupon, DC Exhibit 125 was marked
10   10          for identification.)
11   11   THE WITNESS:  Okay.
12   12   MR. DE GHETALDI:  Q.  Have you ever seen
13   13 Exhibit 125 before today?
14   14   A. No, sir.
15   15   Q. Okay.
16   16        (Whereupon, DC Exhibit 126 was marked
17   17          for identification.)
18   18   MR. DE GHETALDI:  Q.  Have you seen Exhibit 126
19   19 before today?
20   20   A. No.
21   21   Q. Okay.  Do you recall having a discussion with
22   22 Safra Catz on or about January 25th, 2001, where there
23   23 was --
24   24   A. It's getting a little -- getting a little
25   25 clearer.  As I read these, my memory is slowly being
```

369

```
1    00370:01 refreshed.  I think it's my memory.  But vaguely --
2    02 vaguely, yes.
3    03      Did we ever issue a press release?
4    04   Q. I'm not sure.  That's what I'm trying to find
5    05 out.
6    06   A. Okay.  Because I think I -- I hate to say I'm
7    07 guessing.  I think I might have looked at this and said
8    08 that's -- no, we're not issuing that release.
9    09   Q. Okay.  Do you recall why?
10   10   A. I don't recall, but let me reproduce what I
11   11 think.  If I were to look at this now and analyze it,
12   12 it's not correct that we're releasing it for tax planning
13   13 purposes -- or selling it for tax planning purposes.
14   14 That's not -- whatever "tax planning purposes" means.
15   15 I'm not even sure -- it's very strange words.  But I
16   16 don't think that's -- I don't know what "tax planning
17   17 purposes" means.
18   18      But -- no, this -- if I were to write -- faced
19   19 with the same situation, if I was asked to rewrite this
20   20 press release, I would rewrite this press release.
21   21   Q. Okay.
22   22        (Whereupon, DC Exhibit 127 was marked
23   23          for identification.)
24   24   THE WITNESS:  Okay.
25   25   MR. DE GHETALDI:  Q.  Do you recall receiving
```

370

```
1    00371:01 Exhibit 127 on or about January 29th, 2001?
2    02   A. Again, I -- I don't recall it, but I'm sure I
3    03 received it.
4    04   Q. All right.  Do you recall conversations or
5    05 correspondence similar to the e-mail in Exhibit 127 where
6    06 you and Philip Simon discussed the tracking of when your
7    07 Rule 144 filings went public?
8    08   A. I'm sorry.  Ask the question again.
9    09   Q. The second paragraph of the e-mail says, "The
10   10 second 5 million share Rule 144 filing went public this
11   11 afternoon.  I expect one or more to be public
12   12 tomorrow."
13   13   A. I --
14   14   Q. You see that?
15   15   A. Yes.
16   16   Q. Do you recall having discussions with Mr. Simon
17   17 about these filings going public?
18   18   A. I think he told me when the sales would become
19   19 public.  I think -- he told me.  And I remember --
20   20 "discussion" sounds like it's back and forth.  I think he
21   21 just told me, this is when you filed 144s.  This is when
22   22 it becomes public knowledge.
23   23   Q. Okay.
24   24   A. So I think he just informed me.
25   25   Q. All right.
```

371

```
1    00372:01        (Whereupon, DC Exhibit 128 was marked
2    02          for identification.)
3    03   THE WITNESS:  Okay.  This one I actually do
4    04 remember.  The "P.S., The U.S. capital market is pretty
5    05 amazing, raising almost" --
6    06   THE REPORTER:  Are you reading something?  You're
7    07 reading awfully fast.
8    08   THE WITNESS:  Oh, I'm sorry.
9    09   "P.S., The U.S. capital markets are pretty
10   10 amazing, raising almost $1 billion in eight days."
11   11   That stuck with me.
12   12   MR. DE GHETALDI:  Q.  That was memorable?
13   13   A. It is memorable, yeah.
14   14        (Whereupon, DC Exhibit 129 was marked
15   15          for identification.)
16   16   THE WITNESS:  Okay.
17   17   MR. DE GHETALDI:  Q.  Have you ever -- or do you
18   18 recall receiving the e-mail that is being forwarded as a
19   19 part of Exhibit 129 on March 7, 2001, from Mr. Simon?
20   20   A. I do.
21   21   Q. Actually, Mr. Simon's e-mail might not have been
22   22 dated March 7th.  It appears your response to Mr. Simon's
23   23 e-mail was dated March 7th.
24   24   A. Yeah, I -- I recall receiving this e-mail.
25   25   Q. Okay.  Do you have any reason to believe that any
```

372

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

```
1   00373:01 of the financial information contained in Mr. Simon's
2   02 e-mail is inaccurate?
3   03     A. No.
4   04     Q. What did you mean when you said to him, "It's
5   05 good to be a bit more liquid in light of the economic
6   06 downturn"?
7   07     A. Oh, with the -- simply -- simply meant that I
8   08 was -- I was in debt and had no cash, and it was good to
9   09 have -- you know, it is good to have some cash with the
10  10 economy weakening.
11  11     Q. Okay. Mr. -- as of early March 2001, had you by
12  12 that time seen the effect of the economic downturn on
13  13 Oracle business?
14  14     A. By early March. I think we were -- we're now
15  15 analyzing the shortfall we had in Q3 and trying to
16  16 determine what the -- what the causes were. I don't
17  17 think I fully appreciated the -- the impact for another
18  18 quarter or so. I mean, it was -- you know, we were
19  19 trying to figure out how we missed -- keep in mind, Q3
20  20 was a record quarter. You know, it's kind of an
21  21 interesting situation. We had a very high -- very high
22  22 targets. We didn't quite make those targets.
23  23 Nonetheless, Q1 was a record quarter. Q2 was a record
24  24 quarter. Even Q3, where we missed our target, was still
25  25 a record quarter. And I didn't know whether Q3 was an
                                                    373
```

```
1   00374:01 anomaly or if Q3 was the beginning of a trend caused by a
2   02 macroeconomic change.
3   03        It turned out to be -- it took me a little while
4   04 longer, but in time, it certainly became obvious it was a
5   05 trend beginning as a result of a macroeconomic change.
6   06 But I'm not sure when I fully appreciated that. I don't
7   07 think it was -- it wasn't, certainly, right in early
8   08 March. It wasn't just looking back at this one quarter.
9   09     Q. Okay. So far, you've identified Philip Simon and
10  10 Safra Catz as persons with whom you discussed your
11  11 reasons for exercising Oracle options in fiscal year
12  12 2001; correct?
13  13     A. Yes.
14  14     Q. And you've also identified Philip Simon and Safra
15  15 Catz as persons with whom you discussed your reasons for
16  16 selling Oracle stock in fiscal year 2001?
17  17     A. Sure.
18  18           (Whereupon, DC Exhibit 130 was marked
19  19           for identification.)
20  20     MR. SALPETER: Why don't you direct him to a
21  21 specific --
22  22     MR. DE GHETALDI: I will.
23  23     MR. SALPETER: -- part of this.
24  24     MR. DE GHETALDI: Okay. I will.
25  25     Q. First of all, please turn to the verification
                                                    374
```

```
1   00375:01 page, which is three from the end. Is that your
2   02 signature on the verification page of Exhibit 130?
3   03     A. Yes, it is.
4   04     Q. Okay. It's not dated. The blank for the day of
5   05 September 2002 is not filled in. Do you recall what day
6   06 you signed this document on?
7   07     A. No.
8   08     Q. Okay. Did you sign a blank verification -- or a
9   09 verification page without seeing the responses that go
10  10 with it?
11  11     A. I have no re -- I have no recollection. I don't
12  12 recall.
13  13     Q. Do you recall reading the supplemental responses
14  14 that are being verified, prior to signing the
15  15 verification page?
16  16     A. I don't recall.
17  17     Q. Please turn to page 4.
18  18     A. Page numbered 4 or --
19  19     Q. Page No. 4, yes. Interrogatory No. 5 is:
20  20        "Identify each person with whom you
21  21        communicated any reasons for your
22  22        disposition of any Oracle securities
23  23        between January 1st, 1995 and
24  24        February 28th, 2001."
25  25        And in a parenthetical, there's a definition of
                                                    375
```

```
1   00376:01 "identify each person."
2   02        And the response to Interrogatory No. 5 says:
3   03        "Subject to and consistent with and
4   04        without waiving any of the objections,
5   05        defendant responds as follows:
6   06        Mr. Ellison did not discuss the reasons
7   07        for his stock sales in the third quarter
8   08        of fiscal year 2001 with anyone."
9   09        Is -- now, that statement is inconsistent with
10  10 your testimony in this deposition. And which is the
11  11 truth, the deposition testimony or the interrogatory
12  12 answer?
13  13     A. The deposition testimony.
14  14     Q. Why did you sign a verification to a set of
15  15 special interrogatories that contained a false answer?
16  16     A. I must have misread it.
17  17     Q. Okay. Interrogatory No. 6 -- well, Interrogatory
18  18 No. 10 says -- it's on page 6:
19  19        "Identify each person with whom you
20  20        communicated any reasons for your
21  21        acquisition of any Oracle securities
22  22        between January 1st, 1990 and
23  23        February 28th, 2001."
24  24     A. If I can back up on the previous one?
25  25     Q. Sure.
                                                    376
```

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

1  00377:01     A. I certainly discussed the reasons for selling my
2     02  stock with Philip Simon.  In fact, he was the one who
3     03  told me why I should sell the stock anyway.
4     04       I don't recall discussing the reasons I sold my
5     05  stock with Safra Catz or Carolyn Balkenhol or anybody
6     06  else.
7     07     Q. Okay.
8     08     A. So with the exception of Philip Simon -- that was
9     09  the only -- that was the only person I can recall.  I'm
10    10  pretty sure.  I'm not certain.
11    11       Safra Catz certainly know I was selling my stock.
12    12  I let her know she [sic] was selling my stock.  Lots of
13    13  people knew I was selling my stock.  But I didn't discuss
14    14  the reasons why with anyone but Phillip.  I think.
15    15     Q. Okay.
16    16     A. Okay.
17    17     Q. Interrogatory No. 10 on page 6 says:
18    18       "Identify each person with whom you
19    19       communicated any reasons for your
20    20       acquisition of any Oracle securities
21    21       between January 1st, 1990 and
22    22       February 28th, 2001."
23    23  The response to Interrogatory No. 10 says:
24    24       "Subject to, consistent with, and without
25    25       waiving any of the objections, defendant

1  00378:01     responds as follows:  Mr. Ellison did not
2     02       discuss the reasons for his stock sales in
3     03       the third quarter of fiscal year 2001 with
4     04       anyone."
5     05     Is that a false response?
6     06     A. Well, I certainly discussed it with Philip Simon.
7     07     Q. So is that a false response in your response to
8     08  interrogatory No. 10?
9     09     A. It's not correct.
10    10     Q. And do you know why, as you sit here today, you
11    11  verified a response that was -- that was false?
12    12     A. Well, again, I'm not sure -- other than with my
13    13  attorneys -- I'm not sure.  Again, I'm not sure.  I just
14    14  must have misread this.  It's a mistake.
15    15     MR. DE GHETALDI:  Want to take about a ten-minute
16    16  break, and then we'll probably be able to wrap up after
17    17  that.
18    18     MR. SALPETER:  How much more do you think --
19    19     THE VIDEOGRAPHER:  Off the record, 5:03:  p.m.
20    20     (Recess taken:  5:03 p.m. until 5:25 p.m.)
21    21     THE VIDEOGRAPHER:  On the record, 5:25 p.m.
22    22     MR. DE GHETALDI:  Did we get it or --
23    23     MS. LAVALLEE:  No.
24    24     MR. DE GHETALDI:  Okay.  How about, then, this
25    25  guy here.  It's already marked.  Exhibit 14.

1  00379:01     (Witness reading document.)
2     02     MR. DE GHETALDI:  Q.  Have you ever seen
3     03  Exhibit 14 before today?
4     04     A. Yes, I have.
5     05     MR. DE GHETALDI:  Okay.  Just so that you folks
6     06  know, the redacted stamp was placed on this by the court
7     07  reporter after Mr. Cooperman's deposition, when we
8     08  realized that it also had your complete Social Security
9     09  number on it.  Berman, DeValerio's fax header is on the
10    10  first page.  The court reporter apparently took the fax
11    11  that was sent to her after the deposition.  This isn't
12    12  actually the first page of the exhibit.  The exhibit did
13    13  not have that fax header on it.  If it makes a difference
14    14  in the future, we can always change it.  But just in case
15    15  there was any confusion about that, I wanted to make that
16    16  clear.
17    17     Q. Mr. Ellison, on the first page of Exhibit 14, is
18    18  that your signature there at the bottom?
19    19     A. Yes, it is.
20    20     Q. All right.  Did you print any of the information
21    21  on the first page of Exhibit 14?
22    22     A. No.
23    23     Q. Do you know who did?
24    24     A. Guessing Carolyn.
25    25     Q. Please turn to the second page -- that is, of

1  00380:01  Exhibit 14.
2     02       Did you print the -- your name there at the
3     03  bottom of the page?
4     04     A. I did not.
5     05     Q. All right.  Please turn to the third page of
6     06  Exhibit 14.  And is that your signature there at the top
7     07  of Exhibit 14, page 3?
8     08     A. Yes, it is.
9     09     Q. All right.  Please turn to page -- the last page
10    10  of Exhibit 14.  Is that your signature there at the top
11    11  of the last page of Exhibit 14?
12    12     A. Yes, it is.
13    13     Q. Okay.  Mr. Ellison, when you executed Exhibit 14,
14    14  did you intend to execute the most current form approved
15    15  by Oracle's board of directors for the stock option
16    16  exercise form?
17    17     A. Yes.
18    18     Q. And did you intend to execute the most current
19    19  form approved by Oracle's board of directors for the
20    20  stock option exercise notice and agreement?
21    21     A. Yes.
22    22       (Whereupon, DC Exhibit 131 was marked
23    23       for identification.)
24    24     MR. DE GHETALDI:  Q.  Have you ever seen
25    25  Exhibit 131 before today?

Ellison, Lawrence J. (Vol. 02) - 02/27/2004   2/27/2004   2:33:00 PM

00381:01      A. I don't think so.

02      Q. All right.  Do you recall speaking with Charles

03   Phillips --

04      A. His --

05      Q. -- about Oracle's intraquarter prospects in Q3,

06   fiscal year '01, sometime before February 9th, 2001?

07      A. I don't recall.

08      Q. Do you know anyone at Oracle who did speak to

09   Mr. Phillips about Oracle's intraquarter forecasts prior

10   to February 8 -- 9th, 2001?

11      A. No.

12      Q. On the first page of Exhibit 131, Mr. Phillips

13   reports says:  "The impact from dot-coms" -- he calls it

14   "Dot-com Candy" as the heading.

15         "The impact from dot-coms is probably a

16         database -- is primarily a database

17         comparison issue.  Start-ups tended to be

18         long on core database technology but

19         didn't get around to buying enterprise

20         applications."

21         Is that an accurate statement, Mr. Ellison?

22      A. Well, there's two different statements there,

23   so --

24      Q. Okay.  That's fair.

25      So the first one, the impact from dot-coms is

381

00382:01   primarily a database comparison issue, he's -- let me

02   see.  What is the date of this?  This is February 8th?

03      Q. Ninth, 2001.

04      A. February 9th?  This is when this came out?

05         This is -- so this is a February 9th document?

06      Q. Yes.

07      A. Okay.  I think what he's saying is that we sold a

08   lot of database to dot-coms, and insofar as you compare

09   this quarter to the previous quarter, that sets the bar

10   very high.  It's very hard -- you know, it's hard to --

11   when you've had a great quarter before, it's very hard to

12   have even a greater quarter again.  It's just -- so just

13   like if you have a weak quarter, it's relatively easy to

14   have a better quarter because what's --

15   quarter-over-quarter comparison is a relative measure.

16   So that's what he's saying.

17         "The impact of dot-coms is primarily a database

18   comparison issue."

19         So what I think he's saying there is the growth

20   of our database business might look slow because the

21   previous quarter was so good.  Therefore, the

22   comparison's a high bar -- high bar to hurdle.

23      Q. Okay.

24      A. He's saying that problem does not extend into our

25   applications business because while a lot of the dot-coms

382

00383:01   bought database, those dot-coms did not also buy the

02   applications.  So we might have had an artificially high

03   data -- bubble in our database sales.  There's no similar

04   artificially high bubble in our application sales.

05      Q. Okay.  On the second page of Exhibit 131, again,

06   under the heading "Dot-com Candy," in the second

07   paragraph of that section, on the right-hand side, about

08   the middle of the column, Mr. Phillips says:

09         "Consequently, the database license

10         comparison is even tougher than it looks

11         since a segment of the buyers that drove

12         last year's number are no longer around.

13         Oracle had about 30 sizable dot-com

14         customers last year that are no longer

15         around."

16         Do you -- does that seem like an accurate

17   statement to you as of February 9th, 2001?

18      A. Well, I'm not sure about the number 30.  But, you

19   know, Chuck is a -- is a very good analyst.  We hired

20   him.  He's now co-president of our company.  So we think

21   the world of him.  And he's a very diligent guy.  So I

22   have no reason to not believe that number.

23         But it's certainly true, exactly what I said:

24   That during the bubble, there were a lot of these

25   start-ups that vanished, and a lot of those start-ups --

383

00384:01   virtually all those start-ups -- bought our database, so

02   that created, you know, tremendous growth in the year

03   2000.  And to have a bigger database business, for the

04   database business to grow even on top of that, was a high

05   hurdle.

06      Q. Okay.  And then he says:

07         "The company protected itself on

08         receivables by demanding cash up front in

09         most cases."

10         Is that accurate?

11      A. Well, cash -- let me define what "cash up front"

12   means.

13         The dot-coms -- dot-coms did some very funny

14   deals.  They would sell database, as you heard, in

15   exchange of equity.  They'd trade stock for product.

16   They would have long-term payments, payment terms -- you

17   buy a million dollars' worth of software and you pay a

18   hundred thousand now, $500,000 next year, and $400,000 in

19   the final year.  So you have extended payment terms.

20         So "cash up front" doesn't mean before we'll give

21   you the database, you give us the cash.  We're trading.

22   That means normal, 30-day terms.  So we'll sell you the

23   software -- we'll sell you the software, give you a bill.

24   You pay us in 30 days.

25      Q. Okay.  As of February 9th, 2001, is it true

384

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

00385:01  that -- whether it was the number 30 or not -- that some
02  number near 30 of Oracle's sizable dot-com customers were
03  no longer around?
04      A. Oh, I think the number's probably high -- well,
05  the key word there is "sizable"; right?  So way more than
06  30.  So you can -- you know, I don't know whose opinion
07  is what "sizable" is.  But there were a lot more than 30
08  companies that vanished.
09      Q. Okay.
10      A. So there's no question -- readily, you know,
11  testify to in the year 2000, we had a lot of dot-com
12  companies -- in the year 1999, the year 2000, a lot of
13  companies buying database.  So a lot of those dot-coms
14  died, you know.  It's now legendary, that -- that
15  die-off.
16      So they bought a lot of database.  So if our
17  database business was to grow, it had to find replacement
18  for all the dot-coms and then still more.  So we -- it
19  was a very, very high hurdle.  So for the business to
20  grow, it meant we had to overcome the fact that a lot of
21  our dot-com companies -- customers, our ex-customers,
22  were gone.
23      Q. In the next section, on the second page of
24  Exhibit 131, under the title, "Lowering License Revenue a
25  Tad, EPS Unchanged" -- do you see that? -- Mr. Phillips

385

00386:01  says:
02      "The dot-com comparison problem should
03      translate to a temporary dip in database
04      license growth."
05      A. Yes.
06      Q. Is that consistent with your beliefs in -- in or
07  around February 9th, 2001?
08      A. Dip in database growth.
09      Q. Uh-huh.
10      A. No, we had -- at this point, we had two record
11  quarters.  You know, the dot-coms had died a while ago.
12  So we had gone through two quarters already, you know,
13  after the dot-com death, or the dot-com -- well, it
14  wasn't a sudden event at one point in time, but the
15  dot-coms were dying off.  So we were living through the
16  impact of the weakening economy and the dying dot-coms in
17  the previous two quarters.  So I thought, certainly, we
18  had to overcome the -- the disappearance of a lot of our
19  dot-com customers.  But I thought we would overcome it
20  and it wouldn't -- and it wouldn't prevent us from making
21  our license forecast and our earnings-per-share forecast.
22      Q. So do you disagree with what Mr. Phillips said?
23      A. Well, you'd have to show me -- let's see.  I
24  mean, I have to really compare his numbers -- "we're
25  estimating database licenses could grow and" --

386

00387:01      Q. Well, we aren't there yet.  We're at the sentence
02  before that, where he says, "The dot-com comparison
03  problem should translate to a temporary dip in database
04  license growth."
05      A. Well, I'd have to look at dip compared to what.
06  Dip compared to the previous quarter?  Dip compared to
07  the same quarter last year?  So I -- I need to know more
08  precisely what he's saying.  Dip compared to what he had
09  been forecasting before?
10      Q. Possible.
11      A. So I --
12      Q. Hard to tell.
13      A. So I just can't tell.  That's right.
14      Q. The next sentence there, he says:
15      "We're estimating database licenses should
16      grow in the 10-to-13 percent range
17      compared to a 32 percent last year and
18      19 percent last quarter."
19      Are those figures about where you saw the
20  database growth figures?
21      A. I'd have to look at the numbers.  I'd have to
22  look at our forecast numbers, what the database fore --
23  what the forecast was for database for Q3.  I don't have
24  that in my head.
25      Q. Did you have separate database numbers for

387

00388:01  forecast?
02      A. The answer is we did.  As I said, that those
03  numbers were less accurate than the total -- the number
04  total.  We talked about that before, and we said we had a
05  forecast for the database business, then the application
06  business that was separate, for license sales.
07      Q. Had Oracle disclosed to the market by the first
08  week of February 2001 that it had lost so many of its
09  database customers?
10      A. With the dot-coms that disappeared?
11      Q. Right.
12      A. It was public knowledge.  It was all over the
13  newspapers.  I mean, there was no secret that the
14  dot-coms were dying.
15      Q. But specific to Oracle's customers?
16      A. We certainly talked about it.  I think we -- I
17  think Jeff Henley talked -- we talked about it in
18  conference calls.  I think everyone knew that we were --
19  we were selling -- in fact, we were running ads that
20  ten -- nine out of ten dot-coms are Oracle dot-coms.
21  We'd been running a series of ads about it.  It was -- it
22  was well known that it was a huge portion of our
23  business.  The securities analysts wrote about it.
24      Q. Okay.  Now, getting back to the database license
25  growth forecast.  Do you recall where those forecasts

388

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

| | |
|---|---|
| 1 | 00389:01  appeared in Q3 '01? |
| 2 | 02     A. Say that one more time, please. |
| 3 | 03     Q. Do you recall where the database revenue or |
| 4 | 04 license growth forecasts appeared in Q3 '01? |
| 5 | 05     A. You mean in what documents? |
| 6 | 06     Q. Yeah. |
| 7 | 07     A. They were in the up -- they were in the upside |
| 8 | 08 documents.  They were in our actuals in the monthly |
| 9 | 09 reports. |
| 10 | 10     Q. Okay.  In the next-to-last paragraph on the |
| 11 | 11 right-hand column of the second page of Exhibit 131 -- |
| 12 | 12     A. Second page, numbered 15? |
| 13 | 13     Q. Yes.  Mr. Phillips says that: |
| 14 | 14        "Excluding the dot-com impact, an unusual |
| 15 | 15        phenomenon unlikely to be repeated anytime |
| 16 | 16        soon, database license revenue from |
| 17 | 17        remaining customers will still be up 17 to |
| 18 | 18        22 percent, in our estimation." |
| 19 | 19        Do you see that? |
| 20 | 20     A. I do. |
| 21 | 21     Q. Do you agree with that estimation? |
| 22 | 22     A. I would have to look at our -- our forecast data |
| 23 | 23 at the time and compare our forecast data to what he's |
| 24 | 24 saying.  He's factoring out two things, and I'm not |
| 25 | 25 sure -- he's factoring out the dot-com revenue and -- |

389

| | |
|---|---|
| 1 | 00390:01  he's looking at our database license revenue with and |
| 2 | 02 without dot-coms. |
| 3 | 03     Q. Uh-huh. |
| 4 | 04     A. And he's making some estimates to do that, and |
| 5 | 05 I'm not sure if I'm able to do that. |
| 6 | 06     Q. All right.  You need fairly detailed information |
| 7 | 07 to be able to do that; right? |
| 8 | 08     A. Yes.  And he's doing it with some -- he's using |
| 9 | 09 an estimating technique. |
| 10 | 10     Q. Okay.  Do you know what estimating technique he |
| 11 | 11 was using in February of 2001? |
| 12 | 12     A. Yeah, I -- probably figuring -- do I know the |
| 13 | 13 details of the technique?  No. |
| 14 | 14     Q. Well, what -- what do you know about the |
| 15 | 15 technique that he was using in February 2001? |
| 16 | 16     A. I'm -- I can only speculate as to what I would do |
| 17 | 17 if I was trying to -- without having specific knowledge |
| 18 | 18 of Oracle -- how much -- what percentage of Oracle's |
| 19 | 19 business was dot-com, I'd have to make an estimate as to |
| 20 | 20 what percentage of the database business I thought was |
| 21 | 21 dot-com and pull that out -- pull that out of the |
| 22 | 22 previous year, lowering -- lowering the previous year, |
| 23 | 23 and then seeing how much -- and then once I factored that |
| 24 | 24 out, I would, you know, recompute the growth rate.  So |
| 25 | 25 I've got two.  I've got how much database we sell this |

390

| | |
|---|---|
| 1 | 00391:01  year, how much database we sold last year, in total.  How |
| 2 | 02 much database we sold last year without dot-coms.  So I'd |
| 3 | 03 make some estimate as to what the dot-com revenue was |
| 4 | 04 last year.  I don't know what technique he used to make |
| 5 | 05 the estimate.  But I'm sure it was rational and pretty |
| 6 | 06 good. |
| 7 | 07     Q. All right. |
| 8 | 08     A. Because he was the best analyst in our industry. |
| 9 | 09     Q. Okay.  On the third page of Exhibit 131, which |
| 10 | 10 happens to be numbered 16, in the first full paragraph, |
| 11 | 11 Mr. Phillips says: |
| 12 | 12        "Our earnings number this quarter remains |
| 13 | 13        unchanged at 12 cents per share.  The |
| 14 | 14        $40 million in license revenue we took out |
| 15 | 15        of the quarter doesn't move the earnings |
| 16 | 16        needle, given the 5.8 billion shares |
| 17 | 17        outstanding, but the reduction probably |
| 18 | 18        takes away any earnings upside." |
| 19 | 19     Is -- is -- how close is Mr. Phillips there in |
| 20 | 20 his view of Oracle's third quarter of 2001 compared to |
| 21 | 21 your view at the same time? |
| 22 | 22     A. Well, my analysis was a little bit different.  I |
| 23 | 23 mean, I was looking -- I had different data than he had. |
| 24 | 24 We had an extremely -- I'm repeating myself.  We had an |
| 25 | 25 extremely -- he didn't know about the Covisint deal, so |

391

| | |
|---|---|
| 1 | 00392:01  he was -- |
| 2 | 02     Q. He didn't? |
| 3 | 03     A. Not the amount of it.  He probably knew the deal |
| 4 | 04 happened, but I don't think anyone knew the amount of |
| 5 | 05 it -- I think amount of it -- I'm not sure we ever announced |
| 6 | 06 the amount of that deal.  So he certainly didn't know the |
| 7 | 07 size of the deal, which more than offsets the |
| 8 | 08 $40 million, by the way, he has here. |
| 9 | 09     Right?  Isn't that correct? |
| 10 | 10     Q. If, in fact, he didn't know about it. |
| 11 | 11     A. Well, we didn't -- I don't think we ever |
| 12 | 12 published -- publicly stated the amount of the deal. |
| 13 | 13     Q. I -- well -- |
| 14 | 14     A. I'll -- |
| 15 | 15     Q. We can go look. |
| 16 | 16     A. I'll stand -- you know, my memory is -- |
| 17 | 17     MR. SALPETER:  Might as well show it to him. |
| 18 | 18     MR. DE GHETALDI:  Q.  It's -- I mean, I think it |
| 19 | 19 was announced in December -- |
| 20 | 20     A. We had -- we had -- |
| 21 | 21     Q. -- before the 14th? |
| 22 | 22     A. We had to announce it because of the materiality, |
| 23 | 23 because we were required to -- |
| 24 | 24     Q. I don't know why, but I think you did. |
| 25 | 25     A. Yeah. |

392

Ellison, Lawrence J. (Vol. 02) - 02/27/2004   2/27/2004   2:33:00 PM

```
00393:01      Q. And I think it's actually in this document
02   itself --
03      A. Okay.  There you go.
04      Q. -- that he knows about it, so --
05      A. So the next --
06      MR. SALPETER:  First page.
07      MR. DE GHETALDI:  Q.  Back one page.  Middle of
08   the left-hand column.
09      A. Because normally we do not announce the size of
10   our deals.  Could someone point --
11      Q. "The quarter started off well on the
12         Application side with the large Covisint
13         deal already booked around $60 million."
14      A. Sixty million dollars.
15         Did we announce it, or did he just know about it?
16   That's very interesting.  Because we don't -- we don't --
17   we rarely announce the size of our deals.
18         Okay.  Well, needless to say, I didn't see this
19   document before.  Most of our deals are confidential.  We
20   don't announce the size of the deals.  The only reason we
21   would announce a deal, I think, is if it was actually --
22   if it was material and we were required to by law.
23      Q. Okay.
24      A. But -- Jeff has very good sources.
25      Q. I guess he did.
```

393

```
00394:01      Going back to page 3 of Exhibit 131, which is
02   numbered page 16.
03      A. Okay.
04      Q. In the second full paragraph, Mr. Phillips says:
05         "Since Oracle provides more revenue detail
06         than most companies, product line by
07         geography and by platform, there's always
08         intense scrutiny on each bucket."
09         Would you agree that the market intensely
10   scrutinized Oracle's product line by geography and by
11   platform in terms of its forecasts and results?
12      A. That's -- we don't -- we don't forecast that way.
13   We do provide result information that way.  So we don't
14   forecast Germany -- so we provide very detailed results,
15   not nearly as detailed a forecast.  We do provide a much
16   more detailed forecast -- much more detailed results than
17   most of our competitors.
18         For example, PeopleSoft will not tell you how
19   much of its revenue came from J.D. Edwards and how much
20   of its revenue came from PeopleSoft.  They just give you
21   one number.
22      Q. Oh.
23      A. We give you lots and lots of numbers and lots of
24   lots of data to analyze.  And analysts love to plow
25   through that, and they'll ask us why Germany didn't look
```

394

```
00395:01   so good last quarter.  Everything else can be great, and
02   they just want to talk about the failure in Germany.
03         Anyway, so we do -- I think that's all Chuck is
04   saying.  We provide lots and lots of information so
05   people can dive deeper if into our business and ask --
06   you know, ask more informed questions.
07      Q. Okay.  The -- the next full paragraph of the
08   third page, numbered 16, of Exhibit 131, Mr. Phillips
09   says:
10         "Our license -- our total license revenue
11         estimate is now 1.27 billion, which is
12         18.5 percent year-to-year growth."
13         Which is, I assume, the $40 million that he said
14   he took out of the quarter from the $1.31 billion
15   guidance that was given on December 14th.
16      A. Right.
17      Q. You might check with him.  I'm not sure about his
18   math on this 18.5 percent growth does not equal
19   1.27 billion, and 1.27 billion -- vice versa.
20         But assuming that we're looking at the number and
21   not the growth rate percentage, is that number consistent
22   with where your estimate of Oracle's license revenue
23   forecast was as of the first week in February 2001?
24      A. No.  I thought we were going to at least make our
25   25 percent growth and probably beat it.  But let me make
```

395

```
00396:01   another comment about Chuck.  Having said he is the best
02   analyst in the industry, which he was -- and he was voted
03   that year after year -- he also had a habit of
04   underestimating our results.  If you look at his pattern
05   of estimate, he likes to estimate low and have us beat
06   his number.
07         So analysts don't like to disappoint their
08   investors; right?  So there's a pattern of really good
09   analysts setting really low expectation and saying, well,
10   they did even better than I thought.  So if you look at
11   Chuck -- if you could take a history of Chuck's estimates
12   of Oracle, you'll find that Chuck often will set the bar
13   low enough so we can beat it.
14      Q. Oh, okay.  Does he do that on purpose for you or
15   for himself?
16      A. Well, I -- I think -- it's an interesting
17   question.  We can talk about stock market analysts.  But
18   I think not -- not unlike the salespeople, they don't
19   like to disappoint.  So if I'm recommending to you to
20   buy the Oracle stock, and I'm going to say they're going
21   to deliver these kind of results and that should be good
22   for stock, and if they don't deliver those kind of
23   results, you're going to be mad at me as the analyst.  If
24   they exceed that, you're not going to be mad at me.
25   You're going to be happy.
```

396

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

```
00397:01      So chuck particularly had a track record of being
      02   cautious and conservative and providing estimates that we
      03   consistently beat.
      04      Q. Okay.  He continues by saying, "We look for total
      05   revenue of $2.8 billion, or 14.1 percent growth."
      06      Isn't that -- isn't that a pretty healthy bit
      07   below what Oracle had given guidance for in terms of
      08   total revenue?
      09      A. Yeah, you know, it's definitely less than I
      10   expected we would do, and certainly below our guidance.
      11      Q. All right.  He says:
      12         "Consulting and services should be up in
      13         the 10 percent range, but with fewer
      14         billable hours from the holidays and a
      15         general cutback by IT departments on
      16         outside consultants, consulting revenue
      17         should decline sequentially."
      18      Aside from the numbers that he gives, would you
      19   agree with his analysis of the effect of apparently the
      20   market on Oracle's consulting and services revenue?
      21      A. Well, I think he's talking about the seasonality
      22   right now because the third quarter -- now he's talking
      23   about sequential quarters rather than year-over-year.  So
      24   he's talking about Q2 to Q3 with Christmas-New Year's
      25   holidays.  The consultants go on vacation, too, and
```

397

```
00398:01   that's going to be, you know, fewer billable hours for
      02   consultants.
      03      Q. All right.
      04      MR. DE GHETALDI:  Three more exhibits.  Let's
      05   just mark these three, please.
      06      First things first.  See, I'm a married man, too.
      07         (Whereupon, DC Exhibits 132-134 were
      08         marked for identification.)
      09      MR. ETH:  So this was?
      10      THE REPORTER:  132 through 134.
      11      MR. ETH:  Thank you.
      12      MR. DE GHETALDI:  Q. Okay.  Mr. Ellison, do you
      13   recognize the documents that have been marked as
      14   Exhibits 132, 133, and 134?
      15      A. I do.
      16      Q. Are they upside reports from the Monday executive
      17   management committee meetings for December 8th, 2000,
      18   January 15th, 2001, and January 29th, 2001?
      19      A. I'm just looking at -- the answer is, I think,
      20   yes.  I'm just trying to find all the dates.  Where are
      21   you finding these dates?
      22      Q. There's a footer in the bottom center of 132 and
      23   the bottom right of 133 and 134.
      24      A. Okay.  1-15.xls, 1-29 -- okay.  Got it.  Thank
      25   you.
```

398

```
00399:01      Q. All right.  Now, before we start looking at some
      02   of these upside reports, did you understand in Q3 '01
      03   that the information contained in the upside reports was
      04   pretty much one week old?
      05      A. Not really.  I mean, one week --
      06      Q. That is --
      07      A. I knew that they extracted data out of Oracle
      08   Sales Online, put it into a Datamart, I believe, and then
      09   prepared these reports.  But I didn't know it was one --
      10   I mean, I knew it wasn't exactly up-to-date, but it was
      11   fairly close.
      12      Q. Okay.  At executive management committee meetings
      13   in Q3 '01, did you, as part of the things that you
      14   usually discussed, did you ask the persons who attended
      15   those meetings whether there were any differences between
      16   what they knew at the moment and what was in the
      17   documents?
      18      A. Sure.  Sure, absolutely.
      19      Q. Okay.
      20      A. If deals had closed, if forecast -- sometimes
      21   people had made a change to the forecast, and it's not
      22   reflected in this document.
      23      Q. Yes.
      24      A. Something material is -- a material deal has been
      25   won or lost, not reflected.  We'd go around and talk
```

399

```
00400:01   to -- everybody on this list has a chance to change
      02   what's in the report, verbally.
      03      Q. Okay.  All right.
      04      Now, you mentioned the term Datamart.  What was
      05   that again?
      06      A. Oh, they pulled the information out of one
      07   database, the Oracle Sales Online database, and they'll
      08   put it into a separate database for analysis.
      09      Q. And that database is called Datamart?
      10      A. Well, Datamart is a general term for something
      11   that's -- that's used -- a database that's extracted
      12   that's used purely for reporting, not for operational
      13   transactions.
      14      Q. I see.
      15      A. In other words, the contents never change.  You
      16   just extract a lot of data out -- for example, Oracle
      17   Sales Online, you've got salespeople constantly changing
      18   their forecast, salespeople constantly adding new
      19   opportunities, deleting opportunities.  It's a
      20   transactional system.  The data is constantly moving.
      21      People then extract that data -- at a point in
      22   time, extract that out into what's called either a Data
      23   Warehouse or Datamart.  That data does not change.  It's
      24   just -- it's static.
      25      Analysts will use that data to -- they'll
```

400

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

1  00401:01  analyze, they'll format reports and look at -- you know,
2      02   look at and scrutinize that data, albeit it's not
3      03   changing.
4      04      Q. Okay.  So, does that Datamart system then end up
5      05   containing discrete -- compilations of data from discrete
6      06   inquiries, or how does that work?
7      07      Q. Okay.  Let's say every week -- this is
8      08   hypothetically.
9      09      Q. Yes.
10     10      A. Every week, you wanted to know what the total
11     11   pipeline was.  Well, what the Oracle Sales Online
12     12   contains, as it was then built --
13     13      Q. Yes.
14     14      A. -- this is as opposed to now -- was the current
15     15   pipeline.  So if you want to know -- let's say you wanted
16     16   to track, over a five-year period, the pipeline.  So you
17     17   do a historical trend analysis of the pipeline.  That
18     18   means every day, every week, you're going to have to take
19     19   the information out of that database and store it in a
20     20   Datamart or Data Warehouse over here.
21     21      Q. Okay.
22     22      A. Because this data is constantly changing.  And if
23     23   you want to maintain trends, you take these snapshots, if
24     24   you will, of what the world looked like on Monday of this
25     25   week, what the world looks like on Monday of next week.

401

1  00402:01  So you do that.  So you have these databases that are
2      02   moving targets, and then you have this database that
3      03   maintains the historical record for the information.
4      04      Q. Okay.
5      05      A. And Finance would extract information out of the
6      06   operational data, the moving targets, into these
7      07   Datamarts or Data Warehouses for analysis that would
8      08   allow them to plot trends and be able to say our historic
9      09   factor -- where do we get that historical close rate
10     10   from.
11     11      Q. I see.
12     12      A. And we just -- well, we looked at this warehouse
13     13   and we looked at what the size of the pipeline was a year
14     14   ago, how much we actually closed a year ago, and do all
15     15   those calculations.
16     16      Q. Okay.  Did you have access to the data in these
17     17   Datamarts or Data Warehouse?
18     18      A. If I want -- if I wanted access, I could have had
19     19   it.  But no, I didn't.  I relied on others to prepare the
20     20   reports and just looked at the results.
21     21      Q. I see.  Okay.  Do you know who else would have
22     22   had access to that information in that form?
23     23      A. I think it was owned by -- I think all of that
24     24   stuff was owned by Jennifer Minton's team.
25     25      Q. All right.

402

1  00403:01      A. So her team.
2      02      Q. Okay.  Now, a couple other things.
3      03         Would you look at Exhibit 134, please, and please
4      04   turn about three pages in to the page with the --
5      05      A. 134.
6      06      Q. 134, right.
7      07      A. The last of the three.  Okay.
8      08      Q. Right.  The January 29th one.
9      09      A. Okay.  Okay.  Three pages in, which is --
10     10      Q. Three pages in.  And --
11     11      A. So am I looking at 3614?
12     12      Q. 3612.
13     13      A. 3612.  Okay.
14     14      Q. Do you see the footnotes there, 1, 2, 3?
15     15      A. Yes.
16     16      Q. There's an analysis of OPIs, total and technology
17     17   and applications forecast for revenue growth, pipeline
18     18   growth, and pipeline conversion ratio without Covisint.
19     19         Do you know why those footnotes are contained in
20     20   this upside report?
21     21      A. No.
22     22      Q. Do you recall discussing these footnotes at any
23     23   EMC meeting in January of 2001?
24     24      A. No.
25     25      Q. Similar footnotes also appeared in the

403

1  00404:01  January 22nd of 2001 upside report, which I haven't shown
2      02   you.  But you can check by looking later, if you want --
3      03      A. So we have an analysis with Covisint and without
4      04   Covisint?
5      05      Q. Yes.  Yeah.
6      06      A. Okay.
7      07      Q. So do you recall discussions about that subject
8      08   in late January 2001 --
9      09      A. No.
10     10      Q. -- at EMC meetings?
11     11      A. No.
12     12      Q. Let's change the tape --
13     13      MR. SALPETER:  How much more do we have?
14     14      MR. DE GHETALDI:  Ten minutes maybe.
15     15      THE VIDEOGRAPHER:  This is the end of Volume II,
16     16   Tape 3, in the deposition of Lawrence J. Ellison on
17     17   February 27, 2004.  The time 6:06 p.m.  We are off the
18     18   record.
19     19      (Discussion off the record.)
20     20      THE VIDEOGRAPHER:  This is the beginning of
21     21   Volume II, Tape 4, in the deposition of Lawrence J.
22     22   Ellison on February 27, 2004.  The time 6:09 p.m.  We're
23     23   on the record.
24     24      MR. DE GHETALDI:  Okay.  Mr. Ellison, if you
25     25   could please turn to the second page of each of the

404

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

| | |
|---|---|
| 1 | 00405:01  Exhibits 132 to 134.  And I don't know if this would |
| 2 | 02  help, but I have extra copies of them that you could |
| 3 | 03  write on. |
| 4 | 04     No?  Okay. |
| 5 | 05     A. Just give me an exercise.  Okay. |
| 6 | 06     MR. ETH:  Handwriting or something? |
| 7 | 07     MR. DE GHETALDI:  No.  You can even take them |
| 8 | 08  back with you; I don't care.  Just to follow along, I |
| 9 | 09  just thought it might help. |
| 10 | 10     Q. I'd like to follow, starting with the |
| 11 | 11  December 8th upside report, which is 132.  You can see |
| 12 | 12  the footer has the date. |
| 13 | 13     A. All right.  132. |
| 14 | 14     Q. The one with a footer in the center of the page. |
| 15 | 15  The date footer is in the center of the page. |
| 16 | 16     A. I've got a 1/29, I've got a 12/08, and I've got a |
| 17 | 17  1/15. |
| 18 | 18     Q. 12/08. |
| 19 | 19     A. 12/08.  Okay. |
| 20 | 20     Q. The upside number there is $175 million; is that |
| 21 | 21  right? |
| 22 | 22     A. I have to find where you are. |
| 23 | 23     Q. Upside for revenues, total revenues. |
| 24 | 24     A. Total revenues.  Correct. |
| 25 | 25     Q. Okay.  And the total -- |

405

| | |
|---|---|
| 1 | 00406:01     A. No, that's -- that's the upside. |
| 2 | 02     Q. Right.  That's what I said. |
| 3 | 03     A. The upside for the 12/08 -- |
| 4 | 04     Q. Total revenue? |
| 5 | 05     A. The upside, on top of the total revenue. |
| 6 | 06     Q. Correct.  The way I phrased it was the upside for |
| 7 | 07  total revenue.  Because there's upside for expenses as |
| 8 | 08  well. |
| 9 | 09     A. Got it. |
| 10 | 10     Q. Then the upside number for January 15th drops to |
| 11 | 11  about $105 million; right? |
| 12 | 12     A. Yes. |
| 13 | 13     Q. About a -- |
| 14 | 14     A. Yes -- |
| 15 | 15     Q. -- 50 million or $70 million drop; right? |
| 16 | 16     A. Yes. |
| 17 | 17     Q. There's a corresponding increase -- perhaps |
| 18 | 18  corresponding -- there is an increase in the forecast |
| 19 | 19  between the two weeks -- or the two reports, from |
| 20 | 20  $2.8 billion to -- or $2.827 billion to $2.882 billion. |
| 21 | 21     A. Okay.  Let me make sure I got the right reports |
| 22 | 22  here.  So you are on 1/15; right?  You're comparing 12/08 |
| 23 | 23  to 1/15? |
| 24 | 24     Q. Yes. |
| 25 | 25     A. And the forecast has gone up from 2.827 -- |

406

| | |
|---|---|
| 1 | 00407:01     Q. Yes. |
| 2 | 02     A. -- to 2.892. |
| 3 | 03     Q. To 2.882, I believe. |
| 4 | 04     MR. RUBENSTEIN:  Nine. |
| 5 | 05     THE WITNESS:  I've got a nine here (handing |
| 6 | 06  magnifying glass). |
| 7 | 07     MR. DE GHETALDI:  That's an 8. |
| 8 | 08     MR. SALPETER:  We have a 9 on ours. |
| 9 | 09     MR. RUBENSTEIN:  We have a 9 on ours. |
| 10 | 10     MR. DE GHETALDI:  Just want to make sure we've |
| 11 | 11  got the same one. |
| 12 | 12     MR. RUBENSTEIN:  It's a 9. |
| 13 | 13     MR. ETH:  Do the math. |
| 14 | 14     (Counsel confer.) |
| 15 | 15     MR. DE GHETALDI:  You can see why I use the |
| 16 | 16  thing. |
| 17 | 17     THE WITNESS:  Yeah.  Plus the Xerox copies are so |
| 18 | 18  bad. |
| 19 | 19     MR. DE GHETALDI:  This one right here. |
| 20 | 20     THE WITNESS:  You want to take a look at mine? |
| 21 | 21  Yeah, take a look at my copy.  It might be easier to |
| 22 | 22  read. |
| 23 | 23     MR. DE GHETALDI:  It is -- it is -- ah, you are |
| 24 | 24  looking at the budget rate, and I'm looking at the actual |
| 25 | 25  rate.  That explains it.  I meant the second page. |

407

| | |
|---|---|
| 1 | 00408:01     MR. RUBENSTEIN:  Identify the Bates number of the |
| 2 | 02  page that you wanted. |
| 3 | 03     MR. DE GHETALDI:  Yes.  Thank you.  3342. |
| 4 | 04     MR. RUBENSTEIN:  So -- wait -- |
| 5 | 05     MR. DE GHETALDI:  So now we're comparing actual |
| 6 | 06  rate page to actual rate pages. |
| 7 | 07     THE WITNESS:  Okay.  We're looking at -- this |
| 8 | 08  is -- okay.  Actual rates.  Right.  Because currency at |
| 9 | 09  this point was hurting us.  So -- right.  Right.  Right. |
| 10 | 10  So it's gone from -- let me just make sure I'm going from |
| 11 | 11  actuals to actuals.  Actual to actual, 827 to 882. |
| 12 | 12     So the forecast is rounded up -- the forecast has |
| 13 | 13  gone up $55 million. |
| 14 | 14     MR. DE GHETALDI:  Q. Right. |
| 15 | 15     A. And the upside has gone down $71 million, for a |
| 16 | 16  negative impact of $21 million. |
| 17 | 17     Q. Right.  Right. |
| 18 | 18     A. So the total upside has gone down $21 million. |
| 19 | 19     Q. So is that something that you see as upside |
| 20 | 20  translating to forecast? |
| 21 | 21     A. Yes.  So the forecast went up, so then Jennifer |
| 22 | 22  said, well, yes, they're getting close to where I think |
| 23 | 23  they're going to end up.  So she adjusted her upside |
| 24 | 24  down.  So she actually adjusted her upside down more than |
| 25 | 25  they adjusted their forecast up. |

408

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

1  00409:01    Q. Yes.
2    02    A. So the real upside total has come down about
3    03  $20 million.
4    04    Q. Yes.  Now, if you'll look at the corresponding
5    05  page on the January 29th upside, which is Bates No. 3609.
6    06    A. Okay.  Actually is right.  So here, the forecast
7    07  has -- let me just make sure I get these in the right
8    08  sequence, or I'm going to drive us all crazy.  Okay.
9    09      So now, comparing the 15th to the 29th, which is
10   10  in my staple fold -- okay.  The 29th -- on actuals, the
11   11  forecast has come down $12 million, and the upside has
12   12  come down $50 million.
13   13      Correct?
14   14    Q. Yes.
15   15    A. For a total reduction of $62 million.
16   16    Q. Right.
17   17    A. Right.
18   18    Q. Was -- was that a significant drop, in your view,
19   19  in January 2001?
20   20    A. Let me be very clear.  It was -- we still had
21   21  plenty of pipeline and plenty of forecast to make our
22   22  number, so -- but it definitely dropped.  It dropped
23   23  $70 million.
24   24    Q. Right.
25   25    A. But we started out with such a huge pipeline, so

409

1  00410:01  we had a 52 percent -- you know, we have this very, very
2    02  large pipeline --
3    03    Q. Right.
4    04    A. -- that I still -- I certainly believed at this
5    05  time, even after this report and after coming down the
6    06  $70 million, I certainly still believed that we were
7    07  going to make both our earnings per share guidance and
8    08  our -- our license growth guidance.
9    09    Q. All right.  If you could look at the expense
10   10  side --
11   11    A. Yes.
12   12    Q. -- on these three pages.
13   13    A. Yes.  Okay.
14   14    Q. It looks to me -- and tell me if I'm reading this
15   15  correctly.  It looks to me that -- like Oracle was
16   16  forecasting not a reduction in expenses but an actual
17   17  increase in expenses, virtually across the board for Q3
18   18  '01 over Q3 '00.
19   19      Am I reading that right?
20   20    A. I'd have to look at the actuals.  On expense
21   21  forecasting, we are notoriously bad at expense
22   22  forecasting in the sense that we don't pay enough
23   23  attention -- we don't pay a lot of attention to it, and
24   24  the expense forecast is usually high.  So I'd be very
25   25  interested to actually see where the expenses came out,

410

1  00411:01  because we have a terrible track record of not bothering
2    02  to keep the expense forecast up to date, knowing -- and
3    03  we almost -- as I say, we almost always beat expenses.
4    04  Just kind of routine thing within the management as well.
5    05  Expense are this?  That can't be right.  We just haven't
6    06  scrubbed the expenses.
7    07      But, yes, you're reading it correctly.
8    08    Q. All right.  So putting aside what actually
9    09  occurred at the end of the quarter, the forecasts are
10   10  showing increase in expenses over the actuals from Q3
11   11  '00; right?
12   12    A. Yes.
13   13    Q. Given that margin depends upon -- margin
14   14  forecasting depends upon expense forecasting, can you
15   15  explain the basis for your statement, then, that margins
16   16  were going to be improving based on decreasing expenses?
17   17    A. Our expense forecasting is not very good.  I -- I
18   18  think we can just -- should just go and look at what the
19   19  actual expenses were in the quarter, and my recollection
20   20  is they went down.  So we're just bad at -- we're just
21   21  bad at expense forecasting.
22   22    Q. Okay.
23   23    A. Easy enough to check.
24   24    Q. All right.  It went up.
25   25    A. It went up.  How much?

411

1  00412:01    Q. Seven percent.
2    02    A. Seven percent year-over-year?
3    03    Q. Yes.
4    04      In any case, the EPS numbers on these three
5    05  pages --
6    06    A. Slow down.
7    07      What were the -- what were the sequential -- on
8    08  the -- on the expense -- so they went up 7 percent a
9    09  year, every year?
10   10    Q. Yes.
11   11    A. And do you know what the sequential was,
12   12  sequential was, the sequential quarter was?
13   13    Q. What Q4 or Q2 was?
14   14    A. Q2 was, sequential quarter?
15   15    Q. No, I don't.
16   16    A. Because I think that was down.
17   17      While there's tremendous seasonality in our
18   18  license sales, there is not seasonality in our expenses;
19   19  right?  Because it's mainly employee expenses.  So when
20   20  I -- so I should be more precise.  So when I talk about
21   21  expenses going down, usually I mean -- I mean going down
22   22  sequentially.
23   23    Q. All right.
24   24    A. And so I should -- I would love to -- hate to be
25   25  wrong twice in a -- get a chance to be wrong twice in a

412

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

00413:01 row, you know, but -- but if someone would check that,
02 I'd appreciate it.
03    Q. All right.
04    THE WITNESS:  Can we check?
05    MR. SALPETER:  Sure.
06    THE WITNESS:  Can someone on our side check?
07    MR. WEISER:  We are on your side.
08    THE WITNESS:  Yes.
09    MR. WEISER:  In a manner of speaking.
10    MR. DE GHETALDI: Q.  Now, can we go back to the
11 EPS numbers on these three pages, please?
12    A. Sure.
13    Q. It is pretty clear that -- that the forecasted
14 EPS numbers were 10.6 and 10.7 cents per share; right?
15    A. Where are we?
16    Q. EPS numbers.
17    A. I'm sorry.  Which -- which page are you on?
18    Q. I'm on the same page for all three, and EPS is
19 down in this neck of the woods (indicating).  The Bates
20 number is 3004 for Exhibit 132, 3342 for Exhibit 133, and
21 3609 for Exhibit 134.
22    A. Okay.  So what -- what are you looking -- so
23 earnings per share --
24    Q. Forecasted earnings per share.
25    A. That's 12.8.

413

00414:01    Q. No.  Forecasted, not the potential.
02    A. Well, that's -- well, that's not including --
03 that's not including -- that's the field -- that's the
04 field forecast.
05    Q. Yes.
06    A. As opposed to the financial forecast.
07    Q. Yes.
08    A. So, right, the field forecast was 10.7, and
09 Jennifer Minton's number was 12.8.
10    Q. On January -- on December 8.
11    A. Correct.
12    Q. And then on December -- on January 15th, those
13 numbers were 10.6 cents for the field forecast.
14    A. Right.
15    Q. And 12.11 cents for the finance group forecast.
16    A. Correct.
17    Q. All right.  And then on January 29th, the field
18 forecast was 10.7 cents per share, and the finance group
19 forecast was 11.58 cents per share.
20    A. Right.  Rounding to 12 cents.
21    Q. Rounding up to 12 cents.
22    A. Right.
23    Q. But rounding up about a half a cent to get to the
24 12 cents?
25    A. Four point two cents, right.

414

00415:01    Q. And we talked earlier today about the comparative
02 value of a one-cent EPS change in fiscal year '0 -- in Q2
03 fiscal year '01 to a one-cent EPS change in Q2 '00.  Same
04 relationship applies between Q3 '01 and Q3 '00; right?
05    Q. Four to one?
06    A. Oh, no.  That's a -- I think when we're doing --
07 when we're doing comparisons -- oh, no, that's -- we've
08 already adjusted the previous numbers for that
09 four-to-one comparison -- four-to-one comparison.  I'm
10 not sure -- I'm not precisely sure what I'm -- what
11 you're asking.
12    Q. Well, the -- I'm saying -- I'm ask -- I'm saying
13 that the half-cent difference in Q3 '01 is equivalent to
14 a two-cent difference in Q3 '00; right?
15    A. Had we not -- let's be -- okay.  Had we not done
16 the splits when we -- once we do a split, we adjust -- we
17 redo our earnings for all the previous years, as you
18 know.
19    Q. Right, right.
20    A. As if we had split the stock.  So I'm really not
21 sure what the question is.
22    Q. Well --
23    A. Is the question -- are you asking the question,
24 is -- if we hadn't split the stock twice --
25    Q. Right.

415

00416:01    A. -- what would the earnings have been?
02    Q. Well, the differential there would have been a
03 two-cent differential; right?  Between 11 1/2 cents and
04 12 cents?
05    A. If I can just do this my --
06    Q. That's fine.
07    A. Our earnings would have been four times -- four
08 times larger in EPS had we not been in the splits.  So
09 our earnings would have been 46 cents.
10    Q. Right.
11    A. After -- after this, there would have been, you
12 know, 44 cents.
13    Q. Two-cent difference.
14    A. Right.
15    Q. And let me turn back to the first page.
16    A. First page of all of them?
17    Q. Yes.  I think earlier in the deposition, you said
18 that you -- one of the things that you did was you
19 compared revenue growth rates to pipeline growth rates to
20 see the difference between them.
21    A. Yes.
22    Q. And I think you can see that fairly clearly on
23 this first page, if you look at the revenue growth column
24 on the left-hand side and the pipeline growth column
25 towards the center.

416

Oracle Related Cases

Page  413 - 416

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

1   00417:01      You see that?
2      02   A. Yes.
3      03   Q. And the revenue growth on the 8th was 22 cents,
4      04 and the pipeline --
5      05   A. Twenty-one percent -- wait --
6      06   Q. I'm sorry.  For license?
7      07   A. For license was 22 percent.
8      08   Q. Right.  They don't -- there's not pipeline growth
9      09 for total revenue.
10     10   A. Right.
11     11   Q. Because it wouldn't make sense; right?
12     12   A. Absolutely.
13     13   Q. So the license revenue growth is 22 cents, and
14     14 the pipeline revenue --
15     15      MR. SALPETER:  Percent.
16     16      MR. DE GHETALDI:  I'm sorry.  Thank you.
17     17 Percent.
18     18   Q. And the pipeline revenue growth is 52 percent;
19     19 right?
20     20   A. Correct.  Now, just keep in mind, these are
21     21 constant dollars, not budget dollars, but that's okay.
22     22   Q. Yes, yes.
23     23   A. Okay.
24     24   Q. But the relationship would tend to cancel out
25     25 because they --

417

1   00418:01   A. It's close enough, yes.
2      02   Q. And then the -- the 15th, revenue growth, at
3      03 least as forecast by the field -- now, these are field
4      04 forecast numbers; right?
5      05   A. Right, right.
6      06   Q. -- is 23 percent, and the pipeline growth is
7      07 34 percent.
8      08   A. Yes.
9      09   Q. Narrowing gap; right?
10     10   A. Yes.
11     11   Q. And by the 29th, the revenue growth percent is --
12     12 for license is still at 23, and the pipeline growth has
13     13 shrunk to 31 percent --
14     14   A. Yes.
15     15   Q. -- right?
16     16   A. Yes.
17     17   Q. And then, if we compare the forecast revenue
18     18 growth to the pipeline growth --
19     19   A. Yes.
20     20   Q. -- it's -- revenue license growth is forecast at
21     21 38 percent on December 8th compared to 52 percent on --
22     22 of pipeline growth?
23     23   A. I -- I think you miss -- can you repeat that
24     24 sentence?
25     25   Q. Right.  On January -- I'm sorry.  On

418

1   00419:01 December 8th --
2      02   A. Yes.
3      03   Q. -- license revenue growth was forecast by the
4      04 finance group.
5      05   A. At?
6      06   Q. Thirty-eight percent.
7      07   A. And where are you getting that?  I'm just --
8      08   Q. The column over to the right-hand side.
9      09   A. Yes.  Got it.  Okay.
10     10   Q. Okay?  All right?
11     11      And the pipeline growth percent is 52 percent
12     12 still.
13     13   A. Correct.
14     14   Q. Because nobody does upside on pipeline; right?
15     15   A. That's right.
16     16   Q. And -- and then for the 15th, the -- the revenue
17     17 growth is 32 percent for the finance forecast, and the
18     18 pipeline growth is 34 percent?
19     19   A. Yes.
20     20   Q. Only a 2 percent difference there.
21     21   A. Yes.
22     22   Q. Pretty narrow; right?
23     23   A. Still more than enough to make the forecast.
24     24   Q. Okay.  And -- but it indicates -- the narrow --
25     25 the narrowing relationship indicates increased

419

1   00420:01 difficulty, doesn't it?  In meeting the forecast?
2      02   A. There was still -- again, it's a little bit of --
3      03 we had -- we had this huge pipeline to start with, with
4      04 52 percent, and the fact that it's come down is -- you
5      05 know, I'd much rather have a 52 percent pipeline and than
6      06 a 45 percent pipeline.
7      07   Q. Okay.  Well, here it's a 34 percent pipeline
8      08 growth.  But my point is that isn't it true that as the
9      09 gap between pipeline growth and revenue growth narrows,
10     10 that's an indication that it will be more difficult to
11     11 meet the revenue forecast?
12     12   A. I would say as long -- as long as the pipeline
13     13 growth is greater than -- than the revenue growth, you
14     14 should be able to meet your numbers.
15     15      As the pipeline -- as the pipeline growth -- as
16     16 it dropped -- let me be clear.  As it dropped from 52 to
17     17 34, our ability to exceed our numbers has been
18     18 diminished.  All right?  So we -- so the likelihood of,
19     19 you know, greatly exceeding the numbers has gone down.
20     20   Q. Okay.  All right.
21     21   A. But we still should have enough to make our
22     22 numbers.
23     23   Q. Okay.  Are you familiar with the term "backfill"?
24     24   A. I think I know what it means.
25     25   Q. I'm not talking about dirt; I'm talking about

420

00421:01  deals.
02      A. It means rebuilding the pipeline?  Actually, I'm
03  not -- people use funny terms, and I try to stay away
04  from them.
05      Q. Okay.  That's fine.
06      A. Backfill, I think, means rebuilding the pipeline.
07  Or if a deal is lost, to replace it with another deal.
08      Q. Okay.  Then let's look at the divisions, just
09  briefly, the license divisions for the Americas.
10      A. And which one -- which document are you looking
11  at?
12      Q. I'm back to December 8th.
13         Now, the forecast -- the field forecast for OPI
14  has a revenue growth of 80 percent?
15      A. Yes.
16      Q. And a pipeline growth of 76 percent.
17      A. Right.
18      Q. Now we've got a situation where the revenue
19  growth is higher than the pipeline growth; right?
20      A. But you know why.
21      Q. Why?
22      A. The Covisint deal came in.
23      Q. It came out?
24      A. No, it came in.
25      Q. Oh, it came in.

421

00422:01      A. The reason they're forecasting so high is they've
02  closed this huge deal already.
03      Q. Yes.
04      A. And they're -- 12/8, yeah.  I think they're --
05  yeah, I think they've --
06      Q. Probably?
07      A. Probably.  I think it's closed.  So they're very
08  confident of -- even the pipeline isn't growing as fast.
09         And by the way, that's not uncommon, either, that
10  the pipeline grows at one speed and the actual revenue
11  grows higher -- at a higher rate than pipeline.
12      Q. Or the revenue forecast?
13      A. If you're having a very good -- sure.  If there
14  are a couple of very large deals that you know are going
15  to come in -- well, here's simply an example; right?
16      Q. Sure.
17      A. So even if the pipeline didn't grow at all, they
18  were going to have a great quarter.
19      Q. Right.  Right.
20         And how about for January 15th?  Let's look at
21  OSI on that -- that date.
22      A. Okay.
23      Q. And there the field forecast revenue growth is
24  19 percent.
25      A. On OSI?

422

00423:01      Q. Yes.
02      A. Oh, OSI, I'm sorry.  Yes.  OSI.  Correct.
03      Q. And actually, that's the same as the finance
04  group forecast.
05      A. Okay.
06      Q. And the pipeline growth is 10 percent.  Is --
07  that's not a situation where you've got a Covisint;
08  right?
09      A. I don't -- I'd have to go back and look at how
10  many big deals -- how many deals there were in OSI and
11  see where they finished.  I know they had a tough
12  quarter.  But -- no, you can have -- you certainly can
13  have -- you know, convert more of your pipeline.  You can
14  have a very good, you know, quarter converting your
15  pipeline, not a very good quarter building your pipeline,
16  a very good quarter converting your pipeline.  It's not
17  axiomatic that the pipeline always grows faster than
18  the -- the forecast.
19         MR. DE GHETALDI: Okay.  All right.  Well, I
20  think that's it for today.  That's all the questions I
21  have.
22         I -- I think you realize that we've got some
23  issues with the production of documents, and we've
24  reserved our rights with respect to that.  And we talked
25  about that at other depositions, and I understand that

423

00424:01  you have a different position on it.
02         MR. SALPETER: Yeah.  We're not going to get into
03  a long discussion with you --
04         MR. DE GHETALDI: No, no.
05         MR. SALPETER: -- now about it.  But we consider
06  the deposition over.  We're going to reserve our right to
07  question the witness until time of trial, if there is a
08  trial.  And so I think we're leaving with the
09  understanding that the deposition is completed.
10         If there are document issues that have to be
11  dealt with, we'll deal with them, and if there's a
12  good-faith basis to have to ask him another question
13  about a document, we'll talk about that.
14         MR. DE GHETALDI: Okay.  Well, just -- you're
15  leaving with that understanding, and we -- my point was
16  we have a disagreement about whether the deposition is
17  actually completed or not, so --
18         MR. SALPETER: Well, let me ask you this: With
19  respect to all the documents you've given --
20         MR. DE GHETALDI: Yes.
21         MR. SALPETER: -- you don't have any other
22  questions --
23         MR. DE GHETALDI: No, no.
24         MR. SALPETER: -- with respect to those
25  documents; right?

424

Ellison, Lawrence J. (Vol. 02) - 02/27/2004  2/27/2004  2:33:00 PM

1   00425:01   MR. DE GHETALDI:  And this is what we've said
2   02  before, and I'm not trying to say anything other than
3   03  what we've said before.
4   04      MR. SALPETER:  Okay.  Okay.
5   05      THE WITNESS:  Thank you.
6   06      MR. DE GHETALDI:  Thank you very much.
7   07      THE VIDEOGRAPHER:  At the end of Volume II,
8   08  Videotape 4, this concludes today's deposition of
9   09  Lawrence J. Ellison.  The original videotapes will be
10  10  retained by Dan Mottaz Video Productions, LLC, at
11  11  182 Second Street, Suite 202, San Francisco, California
12  12  94105.  Telephone (415) 624-1300.
13  13      The time is 6:35 p.m.  We're off the record.
14  14      (Deposition concluded at 6:35 p.m.)
15  15
16  16              ---o0o---
17  17
18  18
19  19
20  20
21  21
22  22
23  23
24  24
25  25

425

1   00426:01           CERTIFICATE OF WITNESS
2   02
3   03
4   04
5   05      I, the undersigned, declare under
6   06  penalty of perjury that I have read the foregoing
7   07  transcript and I have made any corrections, additions or
8   08  deletions that I was desirous of making; that the
9   09  foregoing is a true and correct transcript of my
10  10  testimony contained therein.
11  11      EXECUTED this _____ day of
12  12  _____, 2004, at _____,
13  13  _____.
14  14
15  15
16  16
17  17
18  18
19  19      _____
20  20          LAWRENCE J. ELLISON
21  21
22  22
23  23
24  24
25  25

426

1   00427:01           REPORTER CERTIFICATE
2   02      I hereby certify that the foregoing deposition
3   03  was taken at the time and place herein named; that the
4   04  deposition is a true record of the witness's testimony as
5   05  reported to the best of my ability by me, a duly
6   06  certified shorthand reporter and a disinterested person,
7   07  and was thereafter transcribed under my direction by
8   08  typewriting by computer; that the witness was given an
9   09  opportunity to read and correct said deposition and to
10  10  subscribe the same.  Should the signature of the witness
11  11  not be affixed to the deposition, the witness shall not
12  12  have availed himself or herself of the opportunity to
13  13  sign or the signature has been waived.
14  14      I further certify that I am not interested in the
15  15  outcome of said action, nor connected with, nor related
16  16  to any of the parties in said action, nor to their
17  17  respective counsel.
18  18      IN WITNESS WHEREOF, I have hereunto set my hand
19  19  this 2nd day of March, 2004.
20  20
21  21
22  22
23  23      KAREN E. THOMPSON, CSR NO. 2792
24  24
25  25

427

# EXHIBIT D

Ellison, Lawrence  9/21/2006  10:57:00 AM

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | NORTHERN DISTRICT OF CALIFORNIA |
| 3 | |
| 4 | |
| 5 | In re ORACLE CORPORATION |
| 6 | SECURITIES LITIGATION. |
| 7 | Master File No. C-01-0988-MJJ |
| 8 | This Document Relates To: |
| 9 | |
| 10 | ALL ACTIONS. |
| 11 | _____ ____/ |
| 12 | |
| 13 | ---oOo--- |
| 14 | CONFIDENTIAL |
| 15 | VIDEOTAPED DEPOSITION OF LAWRENCE ELLISON |
| 16 | Volume II |
| 17 | Thursday, September 21, 2006 |
| 18 | ---oOo--- |
| 19 | SHEILA CHASE & ASSOCIATES |
| | REPORTING FOR: |
| 20 | LiveNote World Service |
| | 221 Main Street, Suite 1250 |
| 21 | San Francisco, California 94105 |
| | Phone: (415) 321-2300 |
| 22 | Fax: (415) 321-2301 |
| 23 | |
| 24 | Reported by: |
| | RACHEL FERRIER, CSR |
| 25 | CSR No. 6948 |

229

INDEX
INDEX OF EXAMINATION
PAGE
EXAMINATION BY MR. SOLOMON    241, 334

---oOo---
INDEX OF EXHIBITS
DESCRIPTION    PAGE
Exhibit 52    E-mail from Elizabeth Baker to Larry Ellison dated 1/2/01    243
Exhibit 53    E-mail from Lawrence Ellison to George Roberts, et al., dated 1/5/01    248
Exhibit 54    E-mail from Safra Catz to Lawrence Ellison dated 1/9/01    252
Exhibit 55    E-mail from Safra Catz to Mark Barrenechea dated 1/11/01    253
Exhibit 56    E-mail from Safra Catz to Lawrence Ellison dated 1/3/01    257
Exhibit 57    Cover page titled "Exhibit N" with attached e-mail from Sohaib Abbasi to Lawrence Ellison dated 2/1/01    258
Exhibit 58    Document entitled "CEO Roundtable-San Francisco Briefing Document 2/6/2001"    259

230

Exhibit 59    E-mail from Lawrence Ellison to Jennifer Minton dated 2/22/01    266
Exhibit 60    E-mail from Lawrence Ellison to Gary Reiner, et al., dated 2/26/01    268
Exhibit 61    E-mail from Gary Reiner to Larry Ellison dated 3/20/01    270
Exhibit 62    E-mail from Gayle Fitzpatrick to George Roberts dated 3/20/01    273
Exhibit 63    E-mail from Sergio Giacoletto to Mark Jarvis dated 3/23/01    274
Exhibit 64    E-mail from Kirsten Shaw to Ronal Wohl dated 3/26/01    275
Exhibit 65    E-mail from Mark Jarvis to George Roberts dated 3/29/01    284
Exhibit 66    E-mail from Mark Jarvis to Safra Catz dated 3/26/01    287
Exhibit 67    E-mail from Mark Barrenechea to Lawrence Ellison, et al., dated 4/9/01    293
Exhibit 68    E-mail from Stephen Smith to Lawrence Ellison dated 4/13/01    294
Exhibit 69    E-mail from George Roberts to Ken Hamel dated 4/19/01    295
Exhibit 70    E-mail from Mark Barrenechea to Lawrence Ellison dated 4/24/01    296

231

Exhibit 71    E-mail from Mark Barrenechea to Tom Victory dated 4/26/01    297
Exhibit 72    E-mail from Madhu Gowda to Kirsten Shaw dated 5/9/01    298
Exhibit 73    E-mail from Mike Runda to Larry Ellison, et al., dated 5/21/01    300
Exhibit 74    Part of an e-mail beginning "Safra A. Catz Wrote"    301
Exhibit 75    E-mail from Lawrence Ellison to Safra Catz, et al., dated 6/3/01    303
Exhibit 76    E-mail from Nadeem Syed to Stephanie Aas dated 6/6/01    305
Exhibit 77    E-mail from Sergio Giacoletto to Mark Barrenechea dated 6/7/01    306
Exhibit 78    E-mail from Mike Runda to Lawrence Ellison, et al., dated 6/11/01    308
Exhibit 79    E-mail from Mike Rund to Larry Ellison, et al., dated 6/18/01    308
Exhibit 80    E-mail from Mark Jarvis to Benny Souder dated 8/30/01    315
Exhibit 81    Document entitled "Summary Analysis of Oracle CRM Customers FY 1Q02 Earnings Call Announcement"    316
Exhibit 82    E-mail from Mark Jarvis to Julie Gibbs dated 10/23/01    321

232

Ellison, Lawrence  9/21/2006  10:57:00 AM

1   Exhibit 83    E-mail from Jennifer
          Minton to William Plant,
2         et al., dated 3/22/02        326
3   Exhibit 84    E-mail from Susan Marks
          to Lawrence Ellison dated
4         3/29/02              329
5   Exhibit 85    Cover page titled "Exhibit
          Y" with attached e-mail
6         from Eric Louttit to Lisa
          Pope dated 4/11/02        330
7
    Exhibit 86    E-mail from Mark Jarvis
8         to Lisa Arthur dated
          5/21/02              331
9
    Exhibit 87    Pages 182-183 from the
10        Softwar book           334
11  Exhibit 88    Page 191 from the Softwar
          book                341
12
    Exhibit 89    Page 192 from the Softwar
13        book                342
14  Exhibit 90    Page 196 from the Softwar
          book                345
15
    Exhibit 91    Pages 193-195 from the
16        Softwar book           351
17  Exhibit 92    Pages 199-201 from the
          Softwar book           358
18
    Exhibit 93    Page 202 from the Softwar
19        book                372
20  Exhibit 94    Page 210 from the Softwar
          book                373
21
    Exhibit 95    Page 213 from the Softwar
22        book                376
23  Exhibit 96    Page 221 from the Softwar
          book                377
24
    Exhibit 97    Page 226 from the Softwar
25        book                381

                                      233

1   Exhibit 98    Page of Chapter 12 from
          the Softwar book        385
2
    Exhibit 99    Page 229 from the Softwar
3         book                385
4   Exhibit 100   Page 141 from the Softwar
          book                388
5
    Exhibit 101   Pages 143-144 from the
6         Softwar book           395
7   Exhibit 102   Page 147 from the Softwar
          book                397
8
    Exhibit 103   Page 180 from the Softwar
9         book                402
10  Exhibit 104   Page 177 from the Softwar
          book                403
11
    Exhibit 105   Page 189 from the Softwar
12        book                409
13  Exhibit 106   Pages 156-157 from the
          Softwar book           413
14
    Exhibit 107   E-mail from mhagan to
15        Larry Ellison, et al.,
          dated 1/11/00          414
16
    Exhibit 108   E-mail from Jeff Henley
17        to Jennifer Minton
          dated 9/11/00          417
18
    Exhibit 109   E-mail from Lia Burke
19        to Lawrence Ellison,
          et al., dated 9/22/00     421
20
    Exhibit 110   E-mail from Patricia
21        McManus to James English
          dated 10/6/00          423
22
    Exhibit 111   E-mail from David Winton
23        to George Roberts dated
          12/7/00              426
24
25
                                      234

1   Exhibit 112   E-mail from David Winton
          to Jennifer Minton dated
2         1/11/01              429
3   Exhibit 113   Cover page titled "Exhibit
          M" with attached e-mail
4         from Jim English to
          Jennifer Minton dated
5         4/11/02              433
6   Exhibit 114   E-mail from Jennifer
          Minton to Ivgen Guner
7         dated 1/18/01          437
8   Exhibit 115   E-mail from Larry Garnick
          to Jennifer Minton,
9         et al., dated 1/17/01     440
10  Exhibit 116   Document entitled
          "Defendants' Response to
11        Plaintiffs' First Set of
          Requests for Admissions"  455
12
    Exhibit 117   E-mail from Jay Nussbaum
13        to Terrence Ford, et al.,
          dated 10/16/00          457
14
    Exhibit 118   Pages 286-287 from the
15        Softwar book           460
16  Exhibit 119   E-mail from George
          Roberts to nagvp, et al.,
17        dated 12/4/00          464
18  Exhibit 120   E-mail from Mike Rosser
          to Stephanie Aas dated
19        12/4/00              466
20  Exhibit 121   E-mail from Jennifer
          Minton to Ron Police,
21        et al., dated 12/6/00     469
22  Exhibit 122   E-mail from Ron Wohl to
          Jennifer Minton dated
23        12/9/00              470
24  Exhibit 123   Document entitled "Custom
          Calendar Report"        488
25
                                      235

1   Exhibit 124   E-mail from Deborah Lange
          to Jeff Henley dated
2         1/10/01              494
3   Exhibit 125   E-mail from Safra Catz
          to Dan Cooperman dated
4         1/19/01              496
5   Exhibit 126   E-mail from Safra Catz
          to Jonathan White dated
6         1/22/01              498
7   Exhibit 127   E-mail from Safra Catz
          to Larry Ellison dated
8         1/24/01              500
9   Exhibit 128   Memorandum from Daniel
          Cooperman            503
10
    Exhibit 129   E-mail from Lawrence
11        Ellison to Michael
          Rocha dated 10/12/00      505
12
    Exhibit 130   Letter from Larry
13        Ellison to Cary Fiorina
          dated 11/30/00          509
14
    Exhibit 131   Board of Directors
15        January 8, 2001 Meeting
          Minutes              511
16
    Exhibit 132   E-mail from Lawrence
17        Ellison to Jay Nussbaum
          dated 4/21/01          518
18
    Exhibit 133   E-mail from Safra Catz
19        to Scott Little dated
          1/29/01              521
20
    Exhibit 134   Bloomberg News report
21        dated 1/24/01          523
22  Exhibit 135   E-mail from Jeff Henley
          to Thomas Williams
23        dated 11/30/00          525
24
25
                                      236

Ellison, Lawrence  9/21/2006  10:57:00 AM

| | |
|---|---|
| 1 | Exhibit 136   Letter from Larry |
| | Ellison to Cary Fiorina |
| 2 | dated 11/30/00, with |
| | handwritten notes        526 |
| 3 | |
| | Exhibit 137   Document entitled |
| 4 | "E-Business Suite |
| | High Level Requirements |
| 5 | Document"                530 |
| 6 | Exhibit 138   E-mail from Jennifer |
| | Glass to Larry Ellison |
| 7 | dated 10/30/00           540 |
| 8 | Exhibit 139   Pages 205-206 from the |
| | The Difference Between |
| 9 | God and Larry Ellison |
| | book                     547 |
| 10 | |
| | Exhibit 140   Letter from Mark |
| 11 | Solomon to Peter Wald |
| | dated 8/29/06            556 |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

237

| | |
|---|---|
| 1 | BE IT REMEMBERED that on Thursday, |
| 2 | September 21, 2006, commencing at the hour of |
| 3 | 9:49 a.m., thereof, at the Law Offices of LERACH, |
| 4 | COUGHLIN, STOIA, GELLAR, RUDMAN & ROBBINS, LLP, |
| 5 | 100 Pine Street, Suite 2600, San Francisco, |
| 6 | California, before me, RACHEL FERRIER, a Certified |
| 7 | Shorthand Reporter and for the State of |
| 8 | California, personally appeared |
| 9 | LAWRENCE ELLISON, |
| 10 | called as a witness by the Plaintiffs herein, who, |
| 11 | being by me first duly resworn/affirmed, was |
| 12 | thereupon examined and testified further as |
| 13 | hereinafter set forth. |
| 14 | ---oOo--- |
| 15 | Appearing as counsel on behalf of Plaintiffs: |
| 16 | MARK SOLOMON, Esquire |
| | STACY KAPLAN, Esquire |
| 17 | LERACH, COUGHLIN, STOIA, GELLAR, RUDMAN & |
| | ROBBINS, LLP |
| 18 | 655 West Broadway, Suite 1900 |
| | San Diego, California 92101-3301 |
| 19 | (619) 231-1058 |
| | marks@lerachlaw.com |
| 20 | skaplan@lerachlaw.com |
| 21 | |
| | JENNIE LEE ANDERSON, Esquire |
| 22 | LERACH, COUGHLIN, STOIA, GELLAR, RUDMAN & |
| | ROBBINS, LLP |
| 23 | 100 Pine Street, Suite 2600 |
| | San Francisco, California 94111 |
| 24 | (415) 288-4545 |
| | jenniea@lerachlaw.com |
| 25 | |

238

| | |
|---|---|
| 1 | Appearing as counsel on behalf of the Defendants: |
| 2 | GREGORY P. LINDSTROM, Esquire |
| | LATHAM & WATKINS, LLP |
| 3 | 505 Montgomery Street, Suite 1900 |
| | San Francisco, California 94111-2562 |
| 4 | (415) 391-0600 |
| | gregory.lindstrom@lw.com |
| 5 | |
| 6 | PATRICK E. GIBBS, Esquire |
| | LATHAM & WATKINS, LLP |
| 7 | 140 Scott Drive |
| | Menlo Park, California 94025-1008 |
| 8 | (650) 328-4600 |
| | patrick.gibbs@lw.com |
| 9 | |
| 10 | JAMES C. MAROULIS, Esquire |
| | ORACLE CORPORATION |
| 11 | 500 Oracle Parkway, MS 5OP7 |
| | Redwood Shores, California 94065 |
| 12 | (650) 506-5200 |
| | jim.maroulis@oracle.com |
| 13 | |
| 14 | |
| 15 | Present via Internet:  Shawn Williams, Esq. |
| | Monique Winkler, Esq. |
| 16 | |
| 17 | Also present:   James Terrell, Videographer |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

239

| | |
|---|---|
| 1 | THE VIDEOGRAPHER:  This begins Tape 1, |
| 2 | Volume 2, in the videotaped deposition of Larry |
| 3 | Ellison in the matter In Re Oracle Corporation |
| 4 | Securities Litigation filed in the United States |
| 5 | District Court, Northern District of California, |
| 6 | number C-01-0988-MJJ. |
| 7 | Today's date is September 21, 2006.  The |
| 8 | time on the video monitor is 9:49. |
| 9 | The Video Operator today is James Terrell, |
| 10 | representing LiveNote World Service.  The Court |
| 11 | Reporter is Rachel Ferrier with Sheila Chase & |
| 12 | Associates reporting on behalf of LiveNote World |
| 13 | Service. |
| 14 | Today's deposition is taking place at 100 |
| 15 | Pine Street, San Francisco, California, for |
| 16 | plaintiffs' counsel. |
| 17 | You may continue. |
| 18 | MR. SOLOMON:  And just for the record, here |
| 19 | for plaintiffs today for the second day of |
| 20 | Mr. Ellison's deposition is myself, Mark Solomon; |
| 21 | Stacy Kaplan, and Jennie Anderson. |
| 22 | I don't know if you want to make an |
| 23 | introduction, Mr. Lindstrom. |
| 24 | MR. LINDSTROM:  Thank you, Mark. |
| 25 | I'm Greg Lindstrom, on behalf of the |

240

Ellison, Lawrence  9/21/2006  10:57:00 AM

1  witness and Oracle.
2      MR. GIBBS:  Patrick Gibbs, also on behalf
3  of the witness and defendants.
4      MR. MAROULIS:  James Maroulis from Oracle
5  Corporation for Oracle Corporation.
6          LAWRENCE ELLISON,
7  having been duly resworn, testified further as
8  follows:
9          EXAMINATION
10 BY MR. SOLOMON:
11     Q    Since you gave testimony in this matter in
12 July, have you had a chance to review the transcript
13 of that testimony?
14     A    I have.
15     Q    Okay.  And have you made any corrections?
16     A    I think a few.
17     Q    And do you have those corrections with you?
18     A    I -- counsel has the corrections.
19     Q    Okay.  And have you signed those
20 corrections?
21     A    I believe so.
22     MR. SOLOMON:  Okay.  Could I have those
23 corrections, Counsel?
24     MR. GIBBS:  The signed version is on its
25 way over.

                                                    241

1  BY MR. SOLOMON:
2      Q    Okay.  Did any of the documents refresh
3  your recollection as to issues concerning the 11i
4  suite?
5      A    No.
6      Q    Okay.  We are going to start -- we are
7  going to continue where we left off, pretty much, and
8  that was talking about 11i and showing you some
9  documents.
10     I want to have marked as the next exhibit a
11 document produced by the defendants in this
12 litigation with the control numbers 019153 through
13 155.
14     (Exhibit No. 52 was marked for
15          identification.)
16 BY MR. SOLOMON:
17     Q    And if you recall, Mr. Ellison, the drill
18 is to take a look at it, and then once you have had a
19 chance to review it, I'm going to ask you if you
20 recognize it.
21     A    I don't recognize the document
22 specifically, but I recognize the issue that the
23 document refers to.
24     Q    Okay.  And you will see on the first page
25 it's addressed to you.  It's dated 2nd of January

                                                    243

1      MR. SOLOMON:  Okay.  Thank you.
2      Q    And since your testimony in July, have you
3  now reviewed the complaint in this matter?
4      A    I have not.
5      Q    Okay.  Have you prepared in any way for
6  this session?
7      A    I met with counsel yesterday afternoon.
8      Q    Okay.  How long did you meet for?
9      A    Three hours.
10     Q    And did you review documents?
11     A    A few.
12     Q    Did they refresh your recollection as to
13 events in the past?
14     A    They did.
15     Q    What events did they refresh your
16 recollection regarding?  Go ahead.
17     A    Sorry.
18     The period around my stock sales between --
19 in late January.
20     Q    Okay.  Anything else?
21     MR. LINDSTROM:  As to which his
22 recollection was refreshed?
23     MR. SOLOMON:  Correct.
24     THE WITNESS:  Our results at the end of the
25 quarter, the quarter that ended in February.

                                                    242

1  2001 from Elizabeth Baker with a number of people
2  copied.
3      Do you see that?
4      A    I do.
5      Q    And it says, at the beginning, "Larry,
6  Happy New Year," and it goes on to say, "The
7  Oracle -- Sun R11i - JDK client certification process
8  is going very, very slow.  This is hindering our
9  ability to secure Oracle Compensation," then in
10 parens, "($4 million in license).  Our Competition is
11 Siebel and Siebel is making this a big issue."
12     Do you see that?
13     A    I do.
14     Q    Do you recall being aware at around the
15 date of this document that there was this issue with
16 the potential loss of $4 million in license?
17     A    Yes, I do.
18     Q    And do you know -- tell me what you
19 remember about it.
20     A    Well, Sun was an unusual customer.  They
21 wanted virtually every other customer that we have
22 for our applications, run those applications on
23 desktop personal computers, or they run the user
24 interface on desktop personal computers.  Sun had its
25 own device called the Sun Ray, and the Sun Ray was

                                                    244

1  again -- it's also called the Java Station.  It ran a
2  computer program called Java as opposed to Windows.
3      And what Sun asked, because Sun was a big
4  application customer of ours and a big customer of
5  ours, was that we make our applications work on the
6  Sun Ray desktop machine rather than Windows, because
7  they didn't want to use the Microsoft -- Sun and
8  Microsoft don't get along, so they didn't want to use
9  a Microsoft desktop computer; they wanted to use the
10  Sun computer.
11      And in order for us to do that, Sun had to
12  certify what's called the JDK.  Certify their Java,
13  the Java that they had implemented on the work -- on
14  their workstation to work with our applications.
15  And, in fact, it took years before Sun actually
16  completed that certification process.
17      So what we are waiting for here is not
18  really an Oracle -- Oracle engineering to be
19  completed; we are waiting for Sun certification of
20  their JDK to be completed.
21  Q   Okay.  And do you know what happened with
22  respect to the compensation referred to, the
23  $4 million in license?
24  A   Sun is completely standardized on -- I
25  mean, I can't tell you exactly --

245

1  Q   Okay.
2  A   -- you know, what happened on this
3  particular transaction, but Sun is now completely
4  standardized on all Oracle applications, but I
5  don't -- I know it took a very, very long time for
6  Sun to finish their engineering, and it was a point
7  of frustration for everybody.
8  Q   Okay.  And this document would have been in
9  your files as of January 2, 2001; is that correct?
10  A   I think so, yeah.
11  Q   And it -- I can represent to you that it
12  was not produced from your files.
13      Can you explain why?
14  A   I cannot.
15  Q   Did there come a time in the
16  December-2000-to-March-2001 time frame when you
17  adopted a practice of offering to pay customers or
18  allow them concessions if they would act as a
19  reference for 11i?
20  A   I don't recall.
21  Q   Do you understand what I mean --
22  A   Yes.
23  Q   -- when I say that?
24  A   Yes.
25  Q   Is it a practice at Oracle generally to pay

246

1  customers to be references for Oracle's products?
2  A   Well, characterize "pay."  If we have a
3  particularly important reference customer -- let's
4  say it's a brand-new banking customer, and we just
5  implemented a new version of our software at that
6  bank, and we pepper that customer with lots and lots
7  of references -- they are taking a lot of their time
8  and they are doing demonstrations for prospective
9  clients of ours -- we will often give them free
10  consulting or discounts on software or something to
11  compensate them for their efforts of being a
12  reference.
13  Q   Isn't it true that between December 2000
14  and March 2001 that you were so desperate for
15  references for the 11i that you engaged in the
16  practice of offering concessions or payments to
17  customers to be references?
18  A   I think -- I think we have done that
19  historically, yeah.  It depends on how much a
20  reference is used.
21  Q   Isn't it true that in 2000 -- between
22  December 2000 and March 2001 that you were desperate
23  for references for the Suite 11i custom -- Suite 11i
24  suite?  Excuse me.
25  A   No, I wouldn't characterize us as

247

1  desperate.
2      MR. SOLOMON:  So mark as the next exhibit
3  document produced by the defendants in this
4  litigation with the control numbers 017475 and 76.
5      (Exhibit No. 53 was marked for
6      identification.)
7  BY MR. SOLOMON:
8  Q   Take a look at the document, Mr. Ellison,
9  and let me know if you recognize it.
10  A   I do.
11  Q   All right.  And you will see that it's
12  dated January 5th, 2001, and on the first page, it's
13  from you to George Roberts and Carolyn Balkenhol.
14      Do you see that?
15  A   Yes, I do.
16  Q   And attached is a letter that has been
17  drafted for your signature.
18      You see that?
19  A   I do.
20  Q   Do you know who Mr. Murray Weiss is --
21  excuse me, Morry Weiss?
22  A   I've never met him, but he was, at the
23  time, chairman and CEO of American Greetings.
24  Q   And do you remember at around the time of
25  this communication learning that American Greetings

248

1   was having problems implementing your products?

2       A   Well, again, I'm not sure it was -- depends

3   how you define "problems," but they were certainly

4   having issues with the rate of order management, and

5   I can explain, if you like.

6       Q   Well, let's just -- before you explain,

7   let's just go into the body of the document a little

8   bit.

9       A   Okay.

10      Q   The second paragraph you write:  "So, let

11  me restate my offer to American Greetings related to

12  completing a successful benchmark of our 11i Order

13  Management Solution.  Oracle guarantees that our

14  Order Management solution will process four million

15  order lines within a" 24 hour "window by December of

16  2001."

17      A   "20 hour window," yes.

18      Q   Excuse me, "20 hour window by December of

19  2001.  By March 31, our team will be in a position to

20  demonstrate 2.5, 3.5 million order lines with current

21  releases of our software on a hardware configuration

22  that will be specified in writing shortly after the

23  completion of the benchmark."  And it goes on to say,

24  "In the unlikely event that this specified hardware

25  configuration proves not to be sufficient, then

249

1   Oracle will provide American Greetings with up to $10

2   million for additional hardware to reach the four

3   million order line throughput when you go production

4   on 11i."

5       You see all that?

6       A   I do.

7       Q   Do you have any idea how the transaction

8   that's discussed here was accounted for at Oracle?

9       A   What -- you mean did we make the sale to

10  American Greetings and --

11      Q   Do you know what the financial accounting

12  treatment was of any transaction with American

13  Greetings referred to here?

14      A   I'm not sure any transaction even occurred.

15      Q   Okay.  You go on to say, in the next

16  paragraphs -- next paragraph, "If the performance of

17  these servers does not increase by at least 200% and"

18  AGM -- excuse me, "AG.COM elects to keep the software

19  the only charge will be the first year support fees.

20  If the performance does increase by 200% or more,

21  Oracle will provide the software to AG.COM at a

22  50% discount in return for" AG's "agreement to become

23  an Oracle reference."

24      Do you see that?

25      A   I do.

250

1       Q   And do you remember at the time making a

2   financial offer to this customer that if they would

3   be a reference, you would allow them a 50 percent

4   discount?

5       A   Does it say there -- yes.  It says it right

6   here.

7       Q   Yes?

8       A   Yeah.

9       Q   And does that not reflect a effort on your

10  part to increase the number of Oracle customers who

11  would be a reference for the 11i suite?

12      MR. LINDSTROM:  For 11i?

13      MR. SOLOMON:  Excuse me?

14      MR. LINDSTROM:  For 11i?

15      MR. SOLOMON:  Yes.

16      THE WITNESS:  Yes, of course.

17  BY MR. SOLOMON:

18      Q   And this document would have been in your

19  files in January of 2001; is that right?

20      A   I believe so.

21      Q   And it wasn't produced from your files and

22  you don't know why; is that right?

23      A   That's correct.

24      Q   There's a reference at the end of the

25  document to a CEO roundtable.

251

1       Do you see that?

2       A   Yes.

3       Q   Do you recall whether the CEO roundtable

4   referred to here took place?

5       A   I believe it did.

6       Q   And do you recall who was present?

7       A   I do not.

8       MR. SOLOMON:  Have marked as the next

9   exhibit a document with the control numbers 610546 to

10  548.

11      (Exhibit No. 54 was marked for

12      identification.)

13      THE WITNESS:  Okay.

14  BY MR. SOLOMON:

15      Q   Do you recognize this?

16      A   I don't recognize it.  I certainly know

17  what issues it refers to.

18      Q   Okay.  And it's dated January 9th, 2001,

19  and it's an exchange involving yourself, Jeff Henley,

20  Larry Garnick, Jennifer Minton, and Safra Catz.

21      Do you see that?

22      A   Yes.

23      Q   And there is a copy of an e-mail that Larry

24  Garnick wrote which is -- says it's a summary of a

25  call.

252

1    Do you see that?

2    A    Yes.

3    Q    And then above that, it says, "This is very

4    helpful.  Please do this daily."

5    Do you see that?

6    A    Yes.

7    Q    And do you recall seeing this in January of

8    2001?

9    A    I don't recall seeing it.

10   It wasn't produced from your files, but it

11   would have been in your files in January of 2001; is

12   that right?

13   A    That's correct.

14   Q    And you can't tell me why it wasn't

15   produced in from your files?

16   A    That's correct.

17   Q    And there's a reference -- it mentions,

18   "This is very helpful.  Please do this daily."

19   Do you know if this was done daily?

20   A    I do not.

21   MR. SOLOMON:  I've marked as the next

22   exhibit a document produced by the defendants in this

23   litigation with the control numbers 035280 through

24   282.

25   (Exhibit No. 55 was marked for

1    identification.)

2    BY MR. SOLOMON:

3    Q    Take a look, and when you have had a chance

4    to view it, let me know, please.

5    A    Okay.

6    Q    Okay.  Have you seen this before,

7    Mr. Ellison?

8    A    Not that I recall.

9    Q    Okay.  You will see that it reflects

10   communications among Safra Catz, Ron Wohl, Mark

11   Barrenechea and yourself?

12   And I'm focusing in just on the first page.

13   A    I'm sorry.  I don't see where I was copied

14   on this.  Maybe I was.

15   Q    You see -- halfway down, you see Mark

16   Barrenechea, and to the right is says your name?

17   A    It says, "Larry, if it's okay with you."

18   Yeah, but I'm not on the distribution list on the

19   top.

20   Q    Got it.

21   MR. LINDSTROM:  I think counsel is

22   referring to the embedded e-mail below.

23   MR. SOLOMON:  That is what I'm referring

24   to.  Thank you.

25   MR. LINDSTROM:  So about halfway down the

1    first page, Larry.

2    THE WITNESS:  Oh, I'm sorry.  Okay.  Okay.

3    BY MR. SOLOMON:

4    Q    But you have no recollection of this?

5    A    No, I don't.

6    Q    Okay.  And you will see that Mark

7    Barrenechea writes, in part:  "Larry if it's okay

8    with you, I would like to defer this topic a week.  I

9    need to keep focused on the 11i internal install and

10   would prefer to you skip the meeting tomorrow.  It

11   also need" -- I'm not sure what that says, actually,

12   but something -- "also need key members of my

13   management team to stay similarly focused" --

14   A    I think that's Ron -- I think that's Ron --

15   Q    I must apologize.  It's Ron Wohl.

16   A    Yeah.

17   Q    Do you recall Ron Wohl expressing that

18   sentiment to you in January 2001?

19   A    I don't.

20   Q    And do you recall Mark Barrenechea making a

21   reference to Ron Wohl still coding?

22   MR. LINDSTROM:  Vague and ambiguous.

23   THE WITNESS:  Yeah, I don't remember -- I

24   don't remember this note.

25   BY MR. SOLOMON:

1    Q    Okay.  Where it says, "Mark Barrenechea

2    wrote:  Can you say," and in quotes, "I am still

3    coding."

4    Do you have an understanding what that

5    means?

6    A    That he's still working -- you know,

7    working on things.

8    Q    Okay.  And then there's a reference, and it

9    seems to be from Safra Catz which says, "I am so

10   pissed."

11   Do you see that?

12   A    I do.

13   Q    Do you recall being made aware by Safra

14   Catz that she was pissed, as she says here, with

15   respect to this?

16   A    No.

17   Q    You never had a conversation with her about

18   it?

19   A    No.

20   Q    Now, this would have been in your files in

21   January of 2001?

22   A    That's right.

23   Q    And you can't explain why it wasn't

24   produced from your files?

25   A    That's correct.

1     MR. LINDSTROM:  Mark, we may have done this
2  last time, but can we have an understanding that in
3  each of these questions, you are representing to the
4  witness that it has not been produced in the
5  litigation?
6     MR. SOLOMON:  From his files?
7     MR. LINDSTROM:  Correct.
8     MR. SOLOMON:  Correct.
9     And as I said last time, if I'm wrong and
10  you can demonstrate I'm wrong, I apologize.
11     MR. LINDSTROM:  I understand.  I'm just
12  concerned the question, as opposed, assumes a fact
13  about which there's no foundation that he has no
14  knowledge, so I just want to make sure the record
15  reflects that you are representing to him that that's
16  the case.
17     MR. SOLOMON:  Correct.  That's fine.
18     And I've marked as the next exhibit a
19  document with the control numbers 031405 through 407.
20     (Exhibit No. 56 was marked for
21     identification.)
22     THE WITNESS:  Okay.
23  BY MR. SOLOMON:
24  Q   Do you recognize this?
25  A   I don't recognize it.

257

1  Q   You do or don't.
2  A   I do not recognize this specific document.
3  Q   You don't dispute that it would have been
4  in your files in January of 2001?
5  A   I do not.
6  Q   And I'm going to represent to you it wasn't
7  produced from your files and you can't tell me why;
8  correct?
9  A   That's correct.
10     MR. SOLOMON:  Marked as the next exhibit a
11  document produced in this litigation with the control
12  numbers 297774 to 777.
13     (Exhibit No. 57 was marked for
14     identification.)
15     THE WITNESS:  Okay.
16  BY MR. SOLOMON:
17  Q   Okay.  Do you recognize this?
18  A   I do.
19  Q   And you remember seeing it around January
20  30th of 2000 -- excuse me, February 1st of 2001?
21  A   Again, not specifically, but I'm very
22  familiar with the issues involved.
23  Q   Okay.  And one of the issues is the
24  downward revision of the Q3 forecast revision; is
25  that right?

258

1  A   Yeah.  We had put in a custom system called
2  OTA.
3  Q   I just want to know if that was one of the
4  issues that you remember, downward revision?
5     MR. LINDSTROM:  Could we have the question
6  reread, please.
7     (Record read by the Reporter as follows:
8     "QUESTION:  Okay.  And one of the issues is
9     the downward revision of the Q3 forecast;
10     is that right?")
11     THE WITNESS:  Thank you.
12     MR. SOLOMON:  Thank you.
13  Q   And this would have been in your files on
14  February 1, 2001?
15  A   Yes.
16  Q   And you can't explain why it wasn't
17  produced from your files; is that right?
18  A   That's correct.
19     MR. SOLOMON:  So I've marked as the next
20  exhibit a document produced by the defendants in this
21  litigation with the control numbers 175224 and 245.
22     (Exhibit No. 58 was marked for
23     identification.)
24     THE WITNESS:  Okay.
25  BY MR. SOLOMON:

259

1  Q   Okay.  Do you recognize this?
2  A   I do.
3  Q   Okay.  And this represents a list
4  identifying the people who were to attend your CEO
5  roundtable dinner in February of 2001?
6  A   I'm not sure it was a dinner, but, yes.
7  Q   And do you remember whether the people
8  reflected on the first two pages attended the event?
9  A   I don't recall if all of them attended.
10  Q   Okay.  Do you -- if you go down the list,
11  could you tell me, just 1 through 13, who you
12  remember attending?
13  A   I really can't.  I would be guessing.
14  Q   Okay.  You will see that then after those
15  two pages for each company, there is a page of
16  information.
17     Do you see that?
18  A   I do.
19  Q   And the last question for each of them is,
20  "What results do we want to achieve from LJE?"  And
21  then there's a variety of answers to that.
22     Do you see that?
23  A   Yes.
24  Q   And did you review all of these pages in
25  order to address the topic of what these customers

260

1 wanted to achieve?

2   A   I read all the pages, yes.

3   Q   Now, you will see that there's a couple of

4 luminaries or poster boys for securities fraud

5 referenced here.

6   A   I sure do.

7   Q   And do you remember whether -- well, I

8 guess we will name two, shall we?  No. 8 and No. 12

9 are pretty notorious.

10   A   Yeah.

11   Q   Did they attend?

12   A   I think Richard Scrushy did.  I don't

13 remember Jeffrey Skilling attending.

14   Q   Okay.  And, in fact, you discuss with

15 Mr. Scrushy a deal with Health South; is that right?

16     MR. LINDSTROM:  On that occasion?

17     MR. SOLOMON:  On that occasion.

18     THE WITNESS:  Actually, I decided that

19 under no circumstances do we do business with Health

20 South after meeting Richard Scrushy.

21 BY MR. SOLOMON:

22   Q   It was that obvious?

23   A   It was pretty obvious, yes.  Not so with

24 Mr. Skilling, but with Scrushy it was.

25   Q   Okay.  He hadn't perfected his act.

261

1   A   It's extraordinary.

2   Q   And kind of interested.  You say

3 "extraordinary."

4     What was extraordinary about it?

5   A   Oh, I don't -- I think -- I visited Health

6 South, and they had more airplanes than United

7 Airlines, and they had airplanes and helicopters, and

8 it's just not that big a company, so they had an

9 incredible fleet of airplanes.  And then -- I mean,

10 this all sounds funny, but you arrive -- I don't know

11 how to describe it, but they had all of these women

12 dressed in white leather.  It was just a very strange

13 operation.  I've never seen an operation like this in

14 my life.

15     And Scrushy himself was a very smarmy guy.

16 He had committed to creating a digital hospital in

17 Alabama, and, in fact, you got to get per -- if you

18 are closing down a State-run hospital, you have to

19 get permission from the State to close that State-run

20 hospital down, and to get that permission, he

21 committed to get this digital hospital running in a

22 very, very short period of time, and he was now

23 trying to get Oracle to take responsibility for

24 building this digital hospital and all of its

25 liabilities, and in a year, which was technically

262

1 just impossible.  So became very, very clear that

2 this was not -- and it's rare to find someone we just

3 won't entertain getting into contract with at all.

4   Q   Okay.  Is it black leather at Oracle?

5   A   Not a lot of leather at Oracle in general.

6   Q   And Jeff Skilling, have you met Jeff

7 Skilling?

8   A   I don't -- I don't think so.

9   Q   Looking at the Control No. 175247, it says,

10 at the bottom, "What results do we want to achieve

11 from LJE?"  And then it says, "The results that I

12 would like to achieve from LJE is 1) leave Saied with

13 the message that if Oracle can save a billion

14 dollars, that he too can save costs during the

15 initial startup of his business.  2) have Saied's

16 support that purchasing the Oracle," and then there's

17 nothing else.

18   A   Yeah.

19   Q   By the way, who wrote this, do you know?

20   A   I think they are written by the sales

21 executives assigned to those accounts.

22   Q   Okay.  Do you recall having a conversation

23 with Saied, whoever this refers to, along those

24 lines?

25   A   Not specifically.

263

1   Q   Do you recall Saied Nadjafi being there?

2   A   I don't.

3   Q   And you will see, for Health South, "What

4 results do we want to achieve from LJE?"  And it

5 says, "Want Richard Scrushy to look at Oracle as a

6 partner for e-business transformation."

7     I assume after this, that wasn't a

8 possibility?

9   A   That wasn't a possibility, no.

10   Q   Go to Enron, which is the last page --

11   A   Second-to-last page.

12   Q   I apologize.  It is, yes.

13     And it says, "Again, what results do we

14 want to achieve from LJE?"  And it says "Closure to

15 an agenda that both Enron and Oracle's executives

16 support regarding efforts and process."

17     Do you see that?

18   A   I do.

19   Q   Do you know what -- first of all, do you

20 recall any conversation with anyone from Enron

21 Corporation along those lines?

22   A   I don't.  I think -- I think Enron was a

23 database customer, a large database customer, but --

24   Q   The last page, which is GE Power --

25   A   Yeah.

264

Ellison, Lawrence  9/21/2006  10:57:00 AM

1    Q    -- "What results do we want to achieve from
2    LJE?"  And it says, "We would like Larry to reinforce
3    Oracle commitment to both the Hungary project and
4    their overall digitalization effort and help close
5    our deal for $18 million."
6        Do you see that?
7    A    I do.
8    Q    And did you have conversation with John
9    Rice along those lines?
10   A    Yeah.  I was the corporate sponsor at GE,
11   and I spoke to John all the time.
12   Q    And did you engage in negotiating any
13   transactions with any of the representatives of these
14   customers?
15       MR. LINDSTROM:  Vague and ambiguous.
16   BY MR. SOLOMON:
17   Q    Go ahead.
18   A    I don't negotiate deals, business deals.  I
19   don't like doing it.
20   Q    Okay.  I guess -- and then the last
21   question is:  This would have been in your files in
22   February of 2001; is that correct?
23       MR. LINDSTROM:  No foundation.
24       THE WITNESS:  I think they hand me these
25   documents.  They usually give me a folder with these

265

1    documents.  Doesn't look like it was sent in e-mail,
2    so they usually give me a folder with these documents
3    in it --
4        MR. SOLOMON:  Okay.
5        THE WITNESS:  -- prior to me going into the
6    meeting.
7    BY MR. SOLOMON:
8    Q    Okay.  So this is slightly different, then.
9    This wasn't produced from your files.
10       Can you explain why this document would not
11   have been produced from your files?
12   A    I normally review these in preparation for
13   the meeting and then dispose of them.
14   Q    That's what you expected to do with this
15   one?
16   A    I really -- I just don't -- I don't know.
17   Yeah, I wouldn't have kept this document unless I
18   thought it would have been useful, of some use later
19   on.
20       MR. SOLOMON:  Gotcha.
21       Marked as the next exhibit document
22   produced by the defendants with control numbers
23   101468 through 470.
24       (Exhibit No. 59 was marked for
25       identification.)

266

1        THE WITNESS:  Okay.
2    BY MR. SOLOMON:
3    Q    Do you recognize this?
4    A    Again, I don't recognize the specific
5    document, but I'm familiar with the issues to which
6    it refers.
7    Q    Okay.  And one of the issues is the upgrade
8    to OKS; is that correct?
9    A    That's right.
10   Q    You write, on the first page -- and, for
11   the record, it's dated 22nd of February 2001 from you
12   to Jennifer Minton, copying a number of people.  You
13   say, "I do not understand why we did not hear about
14   all these systems problems until 10 days before
15   quarter close.  The system has to be fixed to be sure
16   but we should have" -- I think you meant to say
17   "had"?
18   A    Right.
19   Q    -- "more notice of the problems earlier in
20   the quarter.  Larry."
21       Do you see that?
22   A    I do.
23   Q    And do you recall expressing that concern
24   in February of 2001?
25   A    That's correct.

267

1    Q    And you say you should have heard about the
2    problems, but you didn't.
3        Why is it you would have expected to have
4    heard about the problems earlier?
5    A    Jennifer Minton, in charge of -- our
6    running our back office, was having -- had a list of
7    systems problems, and she was escalating those
8    problems, and I just wish when people are having
9    problems, they let us know early -- you know, not
10   wait -- you know, two weeks before the end of the
11   quarter is better than ten days, and a month is
12   better than two weeks, and the more notice we have to
13   fix the problems, the better off we all are.
14   Q    This would have been in your files at
15   around the date of this e-mail; right, February 22nd,
16   2001?
17   A    That's right.
18   Q    And it wasn't produced from your files and
19   you cannot explain why; is that right?
20   A    That's right.
21       MR. SOLOMON:  Marked as the next exhibit a
22   document with control number 052637.
23       (Exhibit No. 60 was marked for
24       identification.)
25       THE WITNESS:  Okay.

268

1  BY MR. SOLOMON:
2  Q   And let me know if you recognize this,
3  please.
4  A   I do.
5  Q   Okay.  It's dated the 26th of February
6  2001, and it's from you to Gary Reiner?
7  A   Yes.
8  Q   Who is Gary Reiner?
9  A   Gary Reiner is the executive vice president
10  and chief information officer of General Electric.
11  Q   Okay.  And it reflects, first of all, a
12  message to you from Gary.
13      Do you see that?
14  A   Yes.
15  Q   And it says -- first of all, it says,
16  "Thanks for what appears to be a great success so far
17  in the Hungary implementation.  On a different and
18  more difficult note, the Indirect Procurement
19  solution we are rolling out company-wide, where we
20  are upgrading to 11i, has had a number of P1 Tar's,
21  some of which are still outstanding.  It's causing
22  great frustration."
23      Do you see that?
24  A   I do.
25  Q   Okay.  And do you recall being made aware

1  of that around the date of this e-mail?
2  A   Again, I'm -- I can't pinpoint the date,
3  but I certainly remember the issues.
4  Q   Okay.  And, again, this would have been in
5  your file around the 26th of February 2001?
6  A   That's correct.
7  Q   And it was not produced from your file and
8  you cannot explain why; is that right?
9  A   That's right.
10      MR. SOLOMON:  Let's have marked as the next
11  exhibit a document produced by the defendants with a
12  control number 278006 to 009.
13      (Exhibit No. 61 was marked for
14      identification.)
15      THE WITNESS:  Okay.
16  BY MR. SOLOMON:
17  Q   Okay.  Do you recognize this?
18  A   I do not.
19  Q   Okay.  You will see that it's dated
20  March 20th, 2001 from Gary Reiner to you and Naren
21  Gursahaney.
22      Do you know who Naren Gursahaney is?
23  A   I do not.
24  Q   And you have no recollection of receiving
25  this around March 20th, 2001?

1  A   I don't.
2  Q   And there's a message to you from Gary
3  Reiner followed by a communication between Gary
4  Reiner and Naren Gursahaney, and there's, attached,
5  an article entitled "Oracle Simple Products Making
6  Life Tough."
7      Do you see that?
8  A   I do.
9  Q   Did you ever read the article?
10  A   I read part of it now.
11  Q   Before now?
12  A   No.
13  Q   Now, you recall that in -- at the beginning
14  of March 2000, Oracle announced to the market that it
15  wasn't going to meet its forecast?
16  A   Say that one more time.
17  Q   Do you recall that at the beginning of
18  March 2001, Oracle announced to the market that it
19  was not going to meet its three key forecasts?
20  A   That's correct.
21  Q   And when Oracle made that announcement, did
22  a securities fraud suit spring to mind?
23      MR. LINDSTROM:  Objection; vague and
24  ambiguous.
25  BY MR. SOLOMON:

1  Q   Did the potential for a securities fraud
2  suit spring to mind?
3  A   I don't recall.
4      MR. LINDSTROM:  Same objection.
5  BY MR. SOLOMON:
6  Q   All right.  Are you familiar that when
7  there are unexpected significant drops in the stock
8  price of publicly traded companies in America, there
9  often is a securities fraud lawsuit filed?
10  A   Yes.
11  Q   And you were familiar with that in 2001?
12  A   Yes.
13  Q   And do you recall, shortly after making
14  that announcement, getting an instruction from your
15  in-house lawyers not to destroy any documents?
16  A   Yes.
17  Q   And to preserve documents?
18  A   Yes.
19  Q   And this would have been in your file on
20  March 20th, 2001; is that right?
21  A   That's correct.
22  Q   And it wasn't produced from your file and
23  you can't explain why; is that right?
24  A   That's right.
25      MR. SOLOMON:  Mark as the next exhibit a

Ellison, Lawrence  9/21/2006  10:57:00 AM

1     document produced in the litigation with a control
2     number 618418 to 421.
3          (Exhibit No. 62 was marked for
4          identification.)
5          THE WITNESS:  Okay.
6     BY MR. SOLOMON:
7          Q.    Okay.  Have you ever seen this document
8     before?
9          A.    Not that I recall.
10         Q.    Okay.
11         A.    But I am very familiar with the issues to
12    which it refers.
13         Q.    Okay.  And you would have been familiar
14    with them around this date in March of 2001?
15         A.    I believe so.
16         Q.    And on the first page at the bottom, it
17    says, "This is excellent.  You should continue to
18    publish these every week until they get fixed.  When
19    you see all the names of prospects, it's really
20    sickening -- hopefully Larry will get sick as well
21    and put more pressure on getting this fixed."
22         Do you see that?
23         A.    Yes.
24         Q.    Have you ever seen this message before?
25         A.    Not that I recall.

273

1          Q.    Okay.  Do you recall having a conversation
2     with Jeff Henley discussing this list?
3          MR. LINDSTROM:  The list?
4          MR. SOLOMON:  Excuse me.
5          Q.    Discussing getting this document published
6     every week?
7          A.    No, I do not.
8          Q.    Do you know if it was?
9          A.    No.
10         MR. SOLOMON:  Okay.  Let's have marked as
11    the next exhibit a document produced by the
12    defendants with the control number 111294.
13         (Exhibit No. 63 was marked for
14         identification.)
15    BY MR. SOLOMON:
16         Q.    Let me know if you recognize it.
17         A.    I don't.
18         Q.    Okay.  You see that it's dated Friday,
19    March 23rd, 2001, and it's an e-mail communication
20    among Sergio Giacoletto, Mark Jarvis, yourself, Safra
21    Catz, Mark Barrenechea?
22         A.    Yes.
23         Q.    And there's a reference -- I'll just start
24    reading through the document.
25         "Mark," and then in parentheses, "(Jarvis),

274

1     we need your help to counter an increasing number of
2     negative comments on the quality of our applications
3     products.  The latest is the attached PUBLIC,"
4     capitals, "note from Forrester of March 19th."  But
5     "if this continues it will slow down our sales and
6     the migration of existing customers until 11.5.4 or
7     11.5.5."  This is just -- "This has just costed us
8     one loss at a client," exclamation mark,
9     "unfortunately many new prospects listen and believe
10    to" our "analysts."
11         Do you see that language?
12         A.    I do.
13         Q.    And do you have any idea what client is
14    being referred to as the one that's been lost?
15         A.    I do not.
16         Q.    And this would have been in your file as of
17    March 23rd, 2001?
18         A.    Yes.
19         Q.    And it wasn't produced from your files and
20    you cannot explain why; is that right?
21         A.    That's right.
22         MR. SOLOMON:  I've marked as the next
23    exhibit a document produced by the defendants with
24    the control numbers 054074 through 80.
25         (Exhibit No. 64 was marked for

275

1          identification.)
2          THE WITNESS:  Okay.
3     BY MR. SOLOMON:
4          Q.    Do you recognize these exchanges?
5          A.    I don't recognize them.  Again, I'm
6     familiar with the issues.
7          Q.    Starting on the first page, there's a
8     number of titles with different addressees with the
9     same title "Urgent Action Required."  And then at
10    bottom on the first page, it says, "Folks - Larry
11    seems to be getting very upset with all the
12    escalation's.  Please make sure we are focussed on
13    all our escalated customers."
14         Do you see that?
15         A.    Yes.
16         Q.    And do you recall in late March of 2001
17    being very upset with all the escalations?
18         A.    Well, I certainly recall us having
19    escalations and wanted to make sure those customers
20    were getting proper attention, and I asked -- you
21    know, I asked to get daily reports on -- you know,
22    for some of the customers until the problems were
23    fixed.
24         Q.    Did you get daily reports?
25         A.    I don't think so.

276

Ellison, Lawrence  9/21/2006  10:57:00 AM

1    Q   Why not?

2    A   Well, I think sometimes the status can

3    change from day to day, and I think that's -- some

4    time -- I usually got a report when any -- when there

5    was any progress made or any status change.

6    Q   Let me put it another way.

7        Did you get many escalation reports after

8    this e-mail was sent?

9        MR. LINDSTROM:  And are you referring to

10   which e-mail in this chain?

11       MR. SOLOMON:  The one that I just read.

12       MR. LINDSTROM:  March 26?

13       MR. SOLOMON:  Correct.

14       THE WITNESS:  It depends what you mean by

15   report.  I had regular meetings, regular telephone

16   conversations, e-mail exchanges, so the combination

17   of the above, yes, I got regular reports.

18   BY MR. SOLOMON:

19   Q   Okay.  You don't know if they have been

20   produced in this litigation; is that fair?

21   A   I do not know.

22   Q   Do you recall how many escalated customers

23   you were concerned about around this time?

24   A   A handful.  You know, less than ten.

25   Q   Now, that doesn't mean there are less than

277

1    ten escalated customers; it's just the ones you were

2    personally concerned about; is that right?

3    A   The ones I was personally -- yeah, there

4    was less than ten that I was personally tracking.

5    Q   And were those particularly big customers?

6    A   No.  For example, Papa John's, which is

7    referred to here, is a rather small customer.

8    Q   Don't you reserve your best treatment for

9    your largest customers?

10   A   We certainly pay more attention to

11   customers who give us a lot of money than smaller

12   customers.  But in the case of Papa John's, we were

13   delivering a brand-new product, so they were

14   getting -- they were one of the first users of a

15   brand-new product and behooves us to pay a lot of

16   attention to the status of that product.

17   Q   What formal documents, if you know, would

18   be created to deal with an escalation?

19       MR. LINDSTROM:  Objection; vague.

20   BY MR. SOLOMON:

21   Q   At this time, in March of 2001?

22       MR. LINDSTROM:  Vague and ambiguous as to

23   formal document.

24       THE WITNESS:  Again, we have a service

25   request system, you know, where people ask for

278

1    service using an Internet-based system that's -- so

2    everyone will ask for service, and we have lots and

3    lots of requests coming in for service, so we

4    maintain a database on that.  If the problem gets

5    very serious, customers are not shy about picking up

6    the telephone and calling.

7    BY MR. SOLOMON:

8    Q   Okay.  What's the database called?

9    A   The database is called Metal Link.

10   Q   And do you know whether the Metal Link

11   database was -- the information on the -- on that

12   database was preserved when this litigation

13   commenced?

14   A   I don't -- Metal Link was preserved.  I

15   don't know.

16   Q   You just don't remember.

17       If you look at the second page, at the very

18   bottom, there's a reference to "Support's ITS

19   system" -- second page of the document at the very

20   bottom just above where it says "6 TARS."

21   A   Right.

22   Q   What is Support's ITS system?

23   A   I think it stands for Incident Tracking

24   System, which is part -- it's also part of Metal

25   Link.

279

1    Q   Okay.  And that would track escalated

2    customers?

3    A   It would.

4    Q   And do you know if the information on --

5    contained within that system was preserved?

6    A   I do not.

7    Q   If you go to the page with the control

8    number 054077, do you recognize this exchange?  When

9    I say "this exchange," I'm talking to the -- talking

10   about the March 23rd, 2001 e-mail from you to George

11   Roberts, copying Mark Barrenechea?

12   A   I think I do.

13   Q   And with respect to Papa John, did you get

14   the daily reports that you requested?

15   A   I don't -- I really don't remember.

16   Q   Okay.  When you say, "I need a list of the

17   other escalated customers and I need it now," do you

18   see that?

19   A   Yes.

20   Q   Hard to believe you didn't get that list.

21       Did you get that list?

22       MR. LINDSTROM:  Objection; argumentative.

23       THE WITNESS:  I don't recall.  I assume I

24   did.  I don't recall.

25   BY MR. SOLOMON:

280

1    Q   When you say you want something and you
2    want it now, you typically get it?
3    A   Not always.  Not always.
4    Q   It goes on to say, "And I need support to
5    resurrect the reports grading whether products are
6    within the agreed quality parameters" --
7    A   Right.
8    Q   -- Mark -- sorry.  "Mike R. is responsible
9    for delivering the reports."
10   Was that instruction carried out?
11   A   Yeah.  Again, I believe so.  We routinely
12   grade our products for -- on quality, counting the
13   number of defects that are in the products.
14   Q   You then go on to say, "We will meet on
15   this on Wednesday to review every escalated customers
16   and every product quality rating."
17   Do you see that?
18   A   Yes.
19   Q   Do you know if that meeting took place?
20   A   Yeah.  There is a regularly scheduled
21   applications meeting every Wednesday which I chair.
22   Q   "Until further notice every Thursday
23   applications meeting will begin with a review of all
24   escalated customers and application product quality."
25   Do you see that?

281

1    A   Yes.  I think at that time --
2    MR. LINDSTROM:  The question is, "Do you
3    see that?"
4    Right?
5    MR. SOLOMON:  Yes, it is.
6    Q   And then you can go on to tell me why it's
7    Thursday and not Wednesday.
8    A   These meetings -- I do see it, and the
9    meetings moved around.  I think, at one point, we had
10   ERP applications on Wednesday and CRM applications on
11   Thursday before the two groups were merged.
12   Q   Okay.  You go on to say, "The only allowed
13   topics will be demo status and internal
14   implementation requirements."
15   Do you see that?
16   A   Yes.
17   Q   And were -- did -- is that what occurred?
18   A   I don't recall.  I believe so.
19   Q   Now, if I wanted to go into the ITS system
20   today to look back at what happened in March of 2001
21   or what was there in 2001, could I do that?
22   A   I don't know.
23   Q   Okay.  The same with Metal Link, generally?
24   A   I think ITS is a part of Metal Link.
25   Q   Okay.

282

1    A   And so I don't know.
2    Q   Okay.  And these exchanges would have been
3    in your file as of March 26, 2001 --
4    MR. LINDSTROM:  Objection; compound.
5    BY MR. SOLOMON:
6    Q   -- is that right?
7    Let's take them one by one, then.
8    The exchanges on the first page where --
9    MR. LINDSTROM:  Where he's not copied?
10   MR. SOLOMON:  Where you are not copied, I
11   guess they wouldn't have been in your file; right?
12   Let's go to the third page of the
13   document -- sorry, the fourth page of the document,
14   which is the control number 054077.
15   A   Yes.
16   Q   That e-mail exchange and that -- by "that"
17   I mean the one dated February -- March 23rd, 2001
18   would have been in your files as of that date?
19   A   Yes.
20   Q   And you can't explain why it wasn't
21   produced in your file?
22   A   That's correct.
23   MR. SOLOMON:  I've marked as the next
24   exhibit a document produced by the defendants in this
25   litigation with the control numbers 061815 to 818.

283

1    (Exhibit No. 65 was marked for
2    identification.)
3    THE WITNESS:  Okay.
4    BY MR. SOLOMON:
5    Q   And do you recognize these exchanges?
6    A   I do not.
7    Q   Okay.  You will see that at the top of the
8    first page you are copied.
9    Do you see that?
10   A   I do.
11   Q   The date is March 29, 2001 on that e-mail
12   exchange.
13   And it's fair to say this would have been
14   in your file as of March 29th, 2001?
15   A   Yes.
16   Q   And you can't explain why that particular
17   communication wasn't produced from your file?
18   A   That's correct.
19   Q   And then below, you will see that there's a
20   reference to a -- what's referred to as a "solid apps
21   opportunity."
22   Do you see that?
23   A   Yes.
24   Q   Okay.  If you go over to the second page,
25   you will see that there's an e-mail to Ron and Leslie

284

1    from Bill Bagshaw.

2        Do you see that?

3    A    I do.

4    Q    Do you know who Bill Bagshaw is?

5    A    I do not.

6    Q    And do you know who Ron and Leslie are?

7    A    I do not.

8    Q    Then in the middle of that paragraph, it

9    says, "I just want to make you aware that these

10    reports are starting to have a tangible negative

11    affect" (sic) "on our pipelines.  The customer who

12    wrote this note just got budget approval for ERP &

13    CRM.  They are focused 99% on Oracle.  This report

14    now has them second guessing."

15        Do you see that?

16    A    I do.

17    Q    Were you aware of that in late March 2001?

18        MR. LINDSTROM:  Aware of what?  Vague and

19    ambiguous.

20    BY MR. SOLOMON:

21    Q    Aware of the concern that the reports were

22    causing a potential customer to second-guess?

23    A    Not that I recall.

24    Q    Were you aware of a concern that it was

25    having a negative effect on your pipelines?

285

1    A    Not that I recall.

2    Q    And if you go to the bottom of that page,

3    there's an e-mail from Stephen DeFronzo to Philip

4    Carty.

5        Do you see that?

6    A    I do.

7    Q    Do you know either of those people?

8    A    I do not.

9    Q    Okay.  And if you go over the page, part of

10    the message that reads I don't -- "I also don't want

11    to be the first company to install major components

12    of the full CRM/ERP suite.  I want evidence the

13    components we will implement from 11i are rock

14    solid."

15        Do you see that?

16    A    I do.

17    Q    And, in fact, as of this time, you couldn't

18    cite one happy referenceable 11i suite customer; is

19    that right?

20    A    I don't believe so, no.  I don't think

21    that's right.

22    Q    You don't think that's right?

23    A    I don't think --

24    Q    You think I'm wrong?

25    A    I think you are wrong.

286

1    Q    What about the 5,000 patches; were you

2    aware at that time of the 5,000 patches?

3    A    Yeah.  Patches are often enhancements.

4    Q    Just talking about the number.

5        Were you aware that around 5,000 --

6    A    Not 5,000 specifically, no.

7    Q    This -- okay.  Thank you.

8        Do you know when you first found a happy

9    referenceable customer for the 11i suite?

10        MR. LINDSTROM:  Objection; argumentative,

11    vague and ambiguous as to "found."

12        THE WITNESS:  I don't know what the

13    first -- when the first referenceable customer was

14    live.

15        MR. SOLOMON:  Okay.  Marked as the next

16    exhibit a document with the control numbers --

17    produced by the defendants with the control numbers

18    063478 through 480.

19        (Exhibit No. 66 was marked for

20        identification.)

21        THE WITNESS:  Okay.

22    BY MR. SOLOMON:

23    Q    Have you seen this before?

24    A    Not that I recall.

25    Q    You will see that it's dated 26th of March

287

1    2001, and there are communications involving, among

2    others, Mark Jarvis, Safra Catz, Mark Barrenechea,

3    Ron Wohl, and Charles Phillips.

4    A    Yes.

5    Q    If we look at the first page, it begins:

6    "We are being hit on all sides by the press on 11i

7    quality - the bugs in the software (generally quoted

8    as more than 5000 bugs) have started a flurry of

9    press articles about how IBM's approach of

10    integration is better than our approach of soup to

11    nuts."

12        "I think there are several ways to deal

13    with this:

14        "1.  We get customers implemented faster.

15    This one's out of my hands.

16        "2.  We get the unhappy customers help

17    asap.  Larry's focus on this should help us along.

18        "3.  We find some happy, referenceable

19    customers.  I need considerable assistance from sales

20    account management for this.  We'll then use these

21    customers in ads, a la BellSouth."

22        Do you see that?

23    A    I do.

24    Q    Were you aware at the end of March 2001

25    that Mark Jarvis was making these recommendations?

288

Ellison, Lawrence  9/21/2006  10:57:00 AM

| | |
|---|---|
| 1 | MR. LINDSTROM:  The three you just read or |
| 2 | the four detailed in Exhibit 66? |
| 3 | MR. SOLOMON:  The three that I just read. |
| 4 | THE WITNESS:  Not specifically, no. |
| 5 | BY MR. SOLOMON: |
| 6 | Q    And wasn't it a fact that as of this date, |
| 7 | you had been unable to find any happy, referenceable |
| 8 | 11i suite customers? |
| 9 | A    Absolutely untrue. |
| 10 | Q    Okay.  And isn't it a fact that as of this |
| 11 | date, there were fundamental integration problems |
| 12 | between ERP and CRM? |
| 13 | A    There were certainly integration problems, |
| 14 | but I wouldn't call them fundamental.  They were |
| 15 | fixed.  If they were fundamental, they couldn't be |
| 16 | fixed. |
| 17 | Q    And although I note your objection to the |
| 18 | language, isn't it also true that there were |
| 19 | fundamental integration problems not just between ERP |
| 20 | and CRM, but within each? |
| 21 | A    I would say there were problems.  I mean, |
| 22 | connecting all these pieces together there definitely |
| 23 | were bugs; there were lots of new code.  But none of |
| 24 | the problems were fundamental; all the problems were |
| 25 | fixed. |

289

| | |
|---|---|
| 1 | Q    And when were all the problems fixed? |
| 2 | A    Let me be careful.  All the problems are |
| 3 | never fixed in software, so let me be cautious about |
| 4 | my language. |
| 5 | I think -- I think the software just gets |
| 6 | progressively more reliable and functionally richer, |
| 7 | so we still have integration issues today.  The -- we |
| 8 | are never -- yeah, we are never as good as we could |
| 9 | be, but we -- the software is working well for -- you |
| 10 | know, for a number of, you know, happy customers.  We |
| 11 | locate -- have plenty of, you know, happy customers. |
| 12 | Q    Okay.  Let me ask -- sorry, go on. |
| 13 | A    No, go ahead. |
| 14 | Q    I was going to say, When did the |
| 15 | fundamental problems go away? |
| 16 | A    There were no fundamental problems. |
| 17 | Q    Okay.  At the bottom, it says Safra Catz |
| 18 | wrote, and I don't see anything that Safra Catz |
| 19 | wrote. |
| 20 | Do you know -- can you shed any light on |
| 21 | that? |
| 22 | A    She could -- she could just forward a |
| 23 | document with no comments on the forwarding. |
| 24 | Q    Below that, it's a -- there's an e-mail |
| 25 | from Charles Phillips, and Charles Phillips is now |

290

| | |
|---|---|
| 1 | employed by you, your company; correct? |
| 2 | A    Yes, he is. |
| 3 | Q    And is he the No. 2 at the company; is that |
| 4 | how you would describe him? |
| 5 | A    He and Safra are co-presidents, so they are |
| 6 | the co-No. 2 people in the company. |
| 7 | Q    And he used to work for Morgan Stanley? |
| 8 | A    Yes. |
| 9 | Q    And he covered Oracle during this period? |
| 10 | A    He was the No. 1 technology analyst, I |
| 11 | think, for ten years. |
| 12 | Q    And did you have regular conversations with |
| 13 | him while he was the analyst? |
| 14 | MR. LINDSTROM:  And by "you," you mean |
| 15 | Mr. Ellison? |
| 16 | MR. SOLOMON:  Mr. Ellison, yeah. |
| 17 | THE WITNESS:  Regular.  I probably talked |
| 18 | to Charles couple times a year. |
| 19 | BY MR. SOLOMON: |
| 20 | Q    Okay.  Was there someone who was the |
| 21 | regular interface? |
| 22 | A    I think Charles made a point of talking to |
| 23 | lots of different people, so he got a broad |
| 24 | perspective. |
| 25 | Q    Okay.  Including Jeff Henley? |

291

| | |
|---|---|
| 1 | A    I'm sure including Jeff Henley. |
| 2 | Q    Charles Phillips writes, in part -- I'm on |
| 3 | the second page of the exhibit, and around halfway |
| 4 | through his message, he says:  But I'm hearing from |
| 5 | multiple sources including the user group members and |
| 6 | Oracle employees about the stability of the product. |
| 7 | I think it's improved since much of this was written |
| 8 | but not many people know that -- know that and all |
| 9 | the early adopters have plenty of horror stories they |
| 10 | are willing to share with whomever may call. |
| 11 | Did you know that around -- at the end of |
| 12 | March 2001 that it was Mr. Phillips' view that there |
| 13 | were plenty of horror stories being shared by the |
| 14 | early adopters? |
| 15 | A    What he said was the early adopters had |
| 16 | more problems and that the problems are largely |
| 17 | behind us, at least that's what he's saying.  But |
| 18 | people remember -- people remember the problems and |
| 19 | are talking about them.  That's what he said. |
| 20 | Q    But he does refer to horror stories, |
| 21 | doesn't he? |
| 22 | A    I think -- I think that's a metaphorical |
| 23 | reference to problems that they had. |
| 24 | MR. LINDSTROM:  The question was whether |
| 25 | you were aware that he was expressing this viewpoint |

292

Ellison, Lawrence  9/21/2006  10:57:00 AM

1   at the time.
2       Right?
3       MR. SOLOMON:  That's right.
4       THE WITNESS:  I don't recall.
5   BY MR. SOLOMON:
6       Q    Okay.  It goes on to say:  It's worth
7   deploying corporate level consulting resources to get
8   them happy ASAP to turn them into proponents instead
9   of critics.  A few of the reps I spoke with don't
10  have the condense to push CRM because of the quality
11  issues in the past.
12      Do you see that?
13      A    I do.
14      Q    And were you aware at the time that
15  Mr. Phillips was of the view that there were reps who
16  didn't have confidence in CRM and, therefore, weren't
17  purchasing?
18      A    I don't recall.
19      MR. SOLOMON:  Marked as the next exhibit a
20  document produced by Oracle with the control number
21  094109.
22      (Exhibit No. 67 was marked for
23          identification.)
24  BY MR. SOLOMON:
25      Q    Do you recognize this?

293

1       A    I don't.
2       Q    You see it's dated Monday, the 9th of April
3   2001, and it's to you and some others from Mark
4   Barrenechea?
5       A    Yes.
6       Q    And it would have been in your file as of
7   that date?
8       A    Yes.
9       Q    And it wasn't produced from your file and
10  you can't explain why?
11      A    That's correct.
12      Q    It refers to a very escalated situation
13  with Value Vision.
14      Do you see that?
15      A    I do.
16      Q    Are you familiar with that?
17      A    Not really.
18      MR. SOLOMON:  I've marked as the next
19  exhibit another document produced by defendants with
20  the control numbers 094110 to 111.
21      (Exhibit No. 68 was marked for
22          identification.)
23      THE WITNESS:  Okay.
24  BY MR. SOLOMON:
25      Q    Do you recognize this?

294

1       A    Again, I don't recognize it.  I remember
2   the issues that it refers to.
3       Q    And this would have been in your file
4   around April 13, 2001?
5       A    That's right.
6       Q    And it wasn't produced from your file and
7   you cannot explain why; is that right?
8       A    That's right.
9       Q    Did Mr. Rawlings make the call that's
10  referred to at the top of this message?
11      A    I don't recall.
12      MR. SOLOMON:  Okay.  I've marked as the
13  next exhibit a document produced by the defendants
14  with the control numbers 061370 to 372.
15      (Exhibit No. 69 was marked for
16          identification.)
17      THE WITNESS:  Okay.
18  BY MR. SOLOMON:
19      Q    Okay.  Do you recognize this?
20      A    I don't, but I'm very familiar with the
21  issues to which it refers.
22      Q    Okay.  And it would have been in your files
23  around April 19, 2001?
24      A    Yes.
25      Q    And it wasn't produced from your file and

295

1   you cannot explain why?
2       A    That's right.
3       MR. SOLOMON:  Okay.  Marked as the next
4   exhibit a document produced by the defendants with
5   the control number 062005.
6       (Exhibit No. 70 was marked for
7          identification.)
8       THE WITNESS:  Okay.
9   BY MR. SOLOMON:
10      Q    And do you recognize this?
11      A    I do not.
12      Q    Okay.  It would have been in your file
13  around April 24, 2001?
14      A    Yes.
15      Q    And it wasn't produced from your file and
16  you cannot explain why?
17      A    That's right.
18      Q    And you will see, it says, "We now have,"
19  and then it lists some customers, "Live with 11i -
20  Mark."
21      Do you see that?
22      A    I do.
23      Q    So, first of all, was HP live on 11i as of
24  this date?
25      A    I don't know.

296

Ellison, Lawrence  9/21/2006  10:57:00 AM

1    Q    Was BellSouth?

2    A    I don't know.

3    Q    Was Toshiba?

4    A    I don't know.

5    Q    Cut this short.

6         Do you know if any of them were?

7    A    No.

8    MR. SOLOMON:  Thank you.

9         Have marked as the next exhibit a document

10   produced by the defendants with a control number

11   619342.

12        (Exhibit No. 71 was marked for

13        identification.)

14   THE WITNESS:  Okay.

15   BY MR. SOLOMON:

16   Q    Do you recognize this?

17   A    I do not.

18   Q    Okay.  It would have been in your file as

19   of April 26, 2001?

20   A    Yes.

21   Q    And it wasn't produced from your file and

22   you cannot explain why?

23   A    That's right.

24   Q    Did you issue any instruction in the spring

25   of 2001 to the effect that exceptional discounting to

297

1    clients would only be approved if the client agreed

2    to be a reference?

3    A    I don't recall.

4    Q    Are you aware of anyone issuing that

5    instruction?

6    A    Don't recall.

7    MR. LINDSTROM:  In the same time frame?

8    MR. SOLOMON:  In the same time frame.

9    THE WITNESS:  Don't recall.

10   BY MR. SOLOMON:

11   Q    Did -- were you aware in the spring of 2001

12   that problems with 11i had prevented GE from closing

13   its April books?

14   MR. LINDSTROM:  Objection; assumes a fact.

15   THE WITNESS:  I don't believe that

16   happened.

17   MR. SOLOMON:  Let's have marked as the next

18   exhibit a document produced by the defendants with a

19   the control number 971508.

20        (Exhibit No. 72 was marked for

21        identification.)

22   THE WITNESS:  Okay.

23   BY MR. SOLOMON:

24   Q    Okay.  Do you recognize this?

25   A    I do not.

298

1    Q    Okay.  And do you see that there's a

2    reference at the bottom and a exchange between

3    Kirsten Shaw and Madhu and Anne that GE has not

4    closed the April books?  Do you see that?

5    A    I do.

6    Q    Am I mistaken in reading from this that

7    there was a problem with your product that caused

8    that?

9    A    GE closed their books in April.  There's no

10   way GE didn't close their books in April.

11   Q    Okay.  How is it you know that?

12   A    I think everyone would have known if GE

13   hadn't closed their books.

14   Q    Okay.

15   A    They are a public company.

16   Q    Okay.

17   A    I'm sure Gary Reiner would have called me

18   on the phone.

19   Q    So as far as you know, this is simply a

20   mistake?

21   A    Yeah.  I'm sure there were -- I believe

22   there were problems as described here, but I'm sure

23   General Electric found a way to close the books in

24   spite of the problems.

25   MR. SOLOMON:  Okay.  So marked as the next

299

1    exhibit a document produced by the defendants with

2    the control numbers 121542 through 580.

3         (Exhibit No. 73 was marked for

4         identification.)

5    MR. SOLOMON:  This is a rather lengthy

6    exhibit.  I don't intend going into detail, so what I

7    would like to know, when you get a chance to look at

8    it, is whether you recognize it before without

9    necessarily going into all the detail.

10   A    Okay.

11   MR. LINDSTROM:  And, Mark, the question is,

12   Does he recognize this particular exhibit that's been

13   marked as 73, or is he familiar with the form of the

14   report that's attached, or --

15   MR. SOLOMON:  Does he recognize having seen

16   this before.

17   MR. LINDSTROM:  The precise document that's

18   before him.

19   MR. SOLOMON:  Correct.

20   MR. LINDSTROM:  Thank you.

21   THE WITNESS:  I've seen reports like this

22   before, but I don't recall seeing this specific

23   report.

24   BY MR. SOLOMON:

25   Q    Okay.  It would have been in your files as

300

Ellison, Lawrence  9/21/2006  10:57:00 AM

1 of May 21, 2001; is that right?

2 A   Yes.

3 Q   Okay.  And it wasn't produced from your

4 files and you cannot explain why?

5 A   That's correct.

6 MR. SOLOMON:  Okay.  Let's go off the

7 record for two minutes while we change tapes.

8 THE VIDEOGRAPHER:  This marks the end of

9 Tape 1 in Volume 2 of the deposition of Larry

10 Ellison.

11 At 11:35, going off the record.

12 (Recess taken.)

13 THE VIDEOGRAPHER:  On record at 11:37.

14 This marks the beginning of Tape 2,

15 Volume 2, in the deposition of Larry Ellison.

16 MR. SOLOMON:  We have marked as the next

17 exhibit a document produced by the defendants with

18 the control numbers 184342 through 360.

19 (Exhibit No. 74 was marked for

20 identification.)

21 BY MR. SOLOMON:

22 Q   And I'm not going to go into much detail,

23 Mr. Ellison.  I just want you to take a look at it

24 and tell me if you recognize this document?

25 A   Okay.

301

1 Q   Okay.  Do you recognize this?

2 A   I do.

3 Q   Okay.  And it's a document that would have

4 been in your files?  "Yes" or "no"?

5 A   I don't see an e-mail associated with this,

6 so I can't -- okay.  There's one -- if there's not an

7 e-mail header on it --

8 Q   Okay.

9 A   -- so I can't really tell.  I mean, it

10 looks like it was sent to me and looks like I

11 responded, but looks like the header is missing.

12 Q   Okay.  And at the top, that's you saying,

13 "I don't want to do this unless GE agrees to us

14 publicly referencing them as a customer and

15 indicating how long the implementation took and how

16 much they saved.  Larry."

17 Do you see that?

18 A   That's what I said.

19 Q   And what happened?

20 A   GE wouldn't agree, and we approved the deal

21 anyway.  GE just never let's -- virtually never let's

22 themselves be used as references for any of their

23 vendors.

24 Q   This wasn't produced from your file.  You

25 don't know why; is that true?

302

1 A   I don't -- again, there's no e-mail header,

2 but, yeah, I don't know.

3 MR. SOLOMON:  I've marked as the next

4 exhibit a document produced by the defendants with

5 the control numbers 121355 through 359.

6 (Exhibit No. 75 was marked for

7 identification.)

8 THE WITNESS:  Okay.

9 BY MR. SOLOMON:

10 Q   Do you recognize this?

11 A   Again, I don't recognize the specific

12 document, but I'm very familiar with the issues it

13 discusses.

14 Q   Okay.  And this would have been in your

15 file on the 3rd of June 2001?

16 A   I guess I should be more precise.

17 The first exchange on the first page, at

18 the top of the page, would have been in your file as

19 of the 3rd of June of 2001?

20 A   I think I authored this, and I don't know

21 if I sent a copy to myself.

22 Q   Okay.

23 A   So perhaps not.

24 Q   Okay.  And it says that you want a detail

25 postmortem concerning Tropicana.

303

1 Do you see that?

2 A   Yes.

3 Q   And did that detailed postmortem take

4 place?

5 A   Yes, it did.

6 Q   And were any documents created concerning

7 that postmortem?

8 A   I don't recall.

9 Q   And in any event, you can't explain why

10 this particular exchange wasn't produced from your

11 files; is that right?

12 MR. LINDSTROM:  Objection --

13 THE WITNESS:  Well, again, as I --

14 MR. LINDSTROM:  -- mischaracterizes his

15 testimony.

16 THE WITNESS:  -- said earlier, the

17 header -- the header -- it's from me.  Clearly I'm

18 including other stuff.

19 BY MR. SOLOMON:

20 Q   Did you understand as of the 3rd of June

21 2001 that you were under an obligation to preserve

22 exchanges such as this one concerning Tropicana?

23 MR. LINDSTROM:  No foundation, assumes

24 facts.

25 THE WITNESS:  I don't know what date the

304

Ellison, Lawrence  9/21/2006  10:57:00 AM

1   document preservation order came out.
2   BY MR. SOLOMON:
3       Q    Okay.
4       A    And I'm just looking for my name --
5       Q    Okay.
6       A    -- on any of these other than as an author.
7       Q    I don't think -- I think you were only on
8   that first page as the author, as far as I can see.
9       A    And if I didn't send a copy to myself, then
10  it wouldn't be in my file.
11      MR. SOLOMON:  Okay.  Have marked as the
12  next exhibit a document produced by the defendants
13  with a control number 376443.
14      (Exhibit No. 76 was marked for
15      identification.)
16      THE WITNESS:  Okay.
17  BY MR. SOLOMON:
18      Q    Okay.  Do you recognize this?
19      A    I do not.
20      Q    Okay.  And you will see that, at the top,
21  it says, "Stephanie, GE, Honeywell, and Agere are not
22  live yet."
23      Do you see that?
24      A    Yes.
25      Q    Were you aware, as of beginning of June

305

1   2001, that those three customers were not live?
2       A    GE has lots and lots of systems.  I'm not
3   sure what their -- what they mean when they say GE
4   isn't live yet.
5       Q    And Honeywell?
6       A    I'm not familiar with Honeywell or Agere.
7       Q    Okay.
8       A    In fact, down below, it says GE Aircraft --
9       Q    Okay.
10      A    -- as opposed to GE Power or GE Medical.
11      Q    Okay.  Did you know at that time -- I'm
12  talking about June 2001 -- where Alcoa was with their
13  implementation?
14      A    I don't recall.
15      Q    Okay.  And did you know that UPS was live
16  but was experiencing issues and, hence, was not
17  referenceable?
18      MR. LINDSTROM:  Objection; assumes facts.
19      THE WITNESS:  I don't -- no, I did not.
20      MR. SOLOMON:  Okay.  So we have marked as
21  the next exhibit document produced by the defendants
22  with the control numbers 162213 through 16.
23      (Exhibit No. 77 was marked for
24      identification.)
25      THE WITNESS:  Okay.

306

1   BY MR. SOLOMON:
2       Q    Okay.  So this is dated 7th of June 2001
3   from Sergio Giacoletto to Mark Barrenechea, copied a
4   number of people, including yourself?
5       A    Yes.
6       Q    And subject is "CRM Business Update - my
7   feedback."
8       You see that on the first page?
9       A    Yes.
10      Q    And then skipping the second page onto the
11  third page, it begins, at the top, "Mark, I also
12  disappointed by the results," ellipsis, "but,"
13  ellipsis, "as you know, we had six to nine months of
14  product issues which caused loss of confidence by
15  sales, partners, analysts and customers.  Even as of
16  today, R11.5.4, which is the first stable release
17  is," and then in capitals, "NOT AVAILABLE in local
18  language and we will only get it between July and
19  October 2001.  This continued delay between the
20  American English release and the local language is
21  hurting us."
22      Do you see that?
23      A    I do.
24      Q    And were you aware, as of June 2001, that
25  local languages, other than the American English

307

1   release, still were not available?
2       A    Local languages were available; they just
3   weren't available for -- there's a delay -- they
4   weren't available for the latest release.
5       Q    Okay.  But it's your testimony that they
6   were -- they were available for all the prior
7   releases as of that date?
8       A    I don't know offhand about all the prior
9   releases, but there was a delay -- whenever a new
10  release comes out, like 11.5.4, it comes out first in
11  American English which then goes into translation.
12      Q    Okay.  And this would have been in your
13  files as of June 7, 2001?
14      A    Yes.
15      Q    And you cannot -- and it wasn't produced
16  from your file and you cannot explain why; is that
17  right?
18      A    That's correct.
19      MR. SOLOMON:  Have marked as the next two
20  exhibits, the first exhibit document produced by the
21  defendants with the control numbers 121067 through
22  095, and the second exhibit produced by the
23  defendants with the control numbers 121145 through
24  175.
25      (Exhibit Nos. 78 and 79 were marked for

308

```
1        identification.)
2   BY MR. SOLOMON:
3        Q   Again, Mr. Ellison, these are lengthy
4   exhibits, and I don't intend to examine you in detail
5   about them, but I would like to ask you first if you
6   recognize them.
7        A   Okay.
8        Q   And looking at the first exhibit, it's
9   dated Monday, the 11th of June 2001?
10       A   Yes.
11       Q   Do you see that?
12           And you will see that you are involved in
13  an exchange from you -- excuse me, from Mike Runda to
14  you and to others.
15           You see that?
16       A   I do.
17       Q   Do you know who Mike Runda is?
18       A   I don't.
19       Q   And do you recognize the document?
20       A   I do -- well, I recognize that the -- not
21  the specific instance of the document, but it's a
22  list of escalated customers.
23       Q   And you don't dispute this would have been
24  in your file in mid-June 2001?
25       A   I do not.
```

309

```
1        Q   Okay.  And it wasn't produced from your
2   file and you cannot explain why; is that right?
3        A   That's right.
4        Q   And with respect to the second similar
5   exhibit dated Monday, the 18th of June 2001, this
6   would have been in your file as of that date;
7   correct?
8        A   Yes.
9        Q   And it wasn't produced from your file and
10  you cannot explain why; is that correct?
11       A   That's correct.
12       Q   Going to the June 11th --
13           MR. LINDSTROM:  Is that Exhibit 78?
14  BY MR. SOLOMON:
15       Q   Is that June 11th?  Sorry, Mr. Ellison.
16       A   Yes, it is.
17       Q   Thank you very much.
18           You will see, at the bottom of the page,
19  121078.
20       A   Okay.
21       Q   Another reference to a customer not being
22  able to close its books.
23           Do you see that?
24       A   I do.  This time it's AT&T that can't close
25  its books.
```

310

```
1        Q   And were you aware of an issue as reflected
2   here concerning AT&T and their inability to close
3   several books?
4        A   I believe -- again, I'm sure -- I'm sure
5   there's a problem that's being logged here.  I'm also
6   quite certain that AT&T was able to close its books.
7        Q   At some stage?
8        A   Certainly in time for public reporting
9   and -- yes.
10       Q   It also says, if you look over the page,
11  that you are negotiating.  It says, "Mr. Larry
12  Ellison will be negotiating with AT&T over the next
13  few days on this matter."
14           Do you see that?
15       A   I do.
16       Q   Did you negotiate with AT&T?
17       A   Oracle is in the process of a $60 to 70
18  million CRM deal with AT&T.  I mean, that's -- we
19  never had a deal remotely like that with AT&T.
20       Q   So is it --
21       A   And I don't remember us ever negotiating a
22  deal remotely like that with AT&T, or anybody else
23  for that matter.
24       Q   Do you remember ever negotiating a deal
25  with AT&T?
```

311

```
1        A   I do, actually, but it was probably 30
2   years ago when Oracle was very small.
3        Q   Okay.  Is that what put you off
4   negotiating?
5        A   Not very good at it.
6        Q   Have you ever accessed the ECMS database?
7        A   I'm not even sure what -- what is the ECMS
8   database?
9        Q   It's for escalated customers.
10           MR. LINDSTROM:  Has he ever accessed it
11  himself?
12           THE WITNESS:  Directly, no.  No, I'm not
13  familiar with that term.
14  BY MR. SOLOMON:
15       Q   Okay.  If you look at the middle of the
16  first page on both exhibits, I believe --
17       A   Right.
18       Q   -- there's a reference to -- actually, I
19  apologize.  I'm looking at the one dated June 11th.
20           There's a reference to "Customer Care ECMS
21  System."
22           Do you see that in the middle of the page?
23  It starts:  "The URL for this report"?
24       A   Yes.
25       Q   And you are not familiar with Customer Care
```

312

Ellison, Lawrence  9/21/2006  10:57:00 AM

1  ECMS System?

2  A  I'm not familiar with that term.  Again, I

3  think it's all part of a database that's -- I think

4  they are all reports on a database called Metal Link.

5  Q  Okay.

6  A  I believe, but I'm --

7  Q  Okay.  Is it true that as of the end of

8  August 2001, Oracle was going through a rough patch

9  because the 11i had not been working?

10     MR. LINDSTROM:  Objection; vague and

11  ambiguous.

12     THE WITNESS:  No.  11i worked.  I mean, 11i

13  was a relatively new and very large, complicated

14  product, and we had a number of customers that were

15  experiencing issues.  It had lots of new features.

16     MR. SOLOMON:  Okay.

17     THE WITNESS:  And not lots of new

18  components.

19  BY MR. SOLOMON:

20  Q  Okay.  Would you agree with the following:

21  "We are going through a rough patch because 11i did

22  not work (but it does now), we missed two quarters

23  and we pissed off a lot of customers with the apps

24  upgrade to 11i"?

25  A  I mean, saying 11i does not work certainly

313

1  is not the case.  It certainly had bugs, but --

2  Q  Okay.  Who was Mark Jarvis?

3  A  Mark Jarvis was our head of marketing at

4  the time.

5  Q  Was he familiar with your products, with

6  Oracle's products?

7  A  I mean, he wasn't an engineer; he was --

8  again, he was a marketing guy.

9  Q  Okay.

10  A  So he didn't have the kind of detailed

11  knowledge an engineer might have, but he was familiar

12  in a marketing sense.

13  Q  Did he know if your products worked or not?

14  A  It's just -- I mean, I guess you -- I don't

15  want to go into this.  It's a complicated system --

16  it's a very large, complicated system.  The airplane

17  flew just fine.  Maybe the seat backs got stuck up,

18  but -- I'm sorry to use the metaphor, but the system

19  worked.  We had plenty of happy customers, plenty of

20  live customers.  That's not to say that we didn't

21  have bugs and unhappy customers.  We did happen to

22  have those too.

23     MR. SOLOMON:  Okay.  So marked as the next

24  exhibit a document produced by the defendants with

25  the control numbers 062223 and 24.

314

1     THE WITNESS:  Are we finished with these

2  two exhibits?

3     MR. SOLOMON:  Yes, we are.  Thank you.

4     (Exhibit No. 80 was marked for

5     identification.)

6     THE WITNESS:  Okay.

7  BY MR. SOLOMON:

8  Q  Do you recognize this?

9  A  I don't.

10  Q  And you will see that it's from Mark Jarvis

11  to Benny Souder, copying Andrew Mendelsohn, dated

12  August 30th, 2001?

13  A  Yes.

14  Q  Do you know who Andrew Mendelsohn is?

15  A  I do.

16  Q  Who is he?

17  A  He's head of our database department.

18  Q  And Benny Souder?

19  A  I believe he was an engineer in

20  applications, but I'm not -- he's moved into several

21  different -- I know who he is.  He's moved into

22  several different groups.  I'm not sure what job he

23  had at this time.

24  Q  Okay.  I'm looking at the second paragraph

25  of that e-mail.  It says, "We are going through a

315

1  rough patch because 11i did not work (but it does

2  now), we missed two quarters and we pissed off a lot

3  of customers with the apps upgrade to 11i.  That is

4  what the press like to cover."

5     Do you see that?

6  A  I do.

7  Q  Do you agree with those sentiments?

8  A  Well, no.  I think -- 11i did not work.

9  11i -- if he rewrote it and said, "11I had problems.

10  It has a lot fewer problems now," then I would agree

11  with it.

12     MR. SOLOMON:  Okay.  I'm going to have

13  marked as the next exhibit a document produced by the

14  defendants with the control numbers 397378 through

15  380.

16     (Exhibit No. 81 was marked for

17     identification.)

18     THE WITNESS:  Okay.

19  BY MR. SOLOMON:

20  Q  Have you ever seen this before?

21  A  Never.

22  Q  Do you recognize any of the handwriting?

23  A  No.  No.

24  Q  Okay.  And you have no idea who authored

25  this; is that true?

316

Ellison, Lawrence  9/21/2006  10:57:00 AM

1      MR. LINDSTROM:  I'm sorry.  Could we have
2  the question reread.
3  BY MR. SOLOMON:
4      Q   Who authored it?  Do you have any idea who
5  authored it?
6      A   Yeah, I do.
7      MR. LINDSTROM:  Let me just clarify the
8  question.
9          When you say "authored," you are talking
10  about the typewritten text that appears in
11  Exhibit 81?
12      MR. SOLOMON:  I'm going to ask both
13  questions.
14      MR. LINDSTROM:  All right.
15  BY MR. SOLOMON:
16      Q   The typewritten text, first of all.
17      A   Yeah, I think so.
18      Q   You know who authored it?
19      A   I don't know, but I can make a pretty good
20  guess.
21      Q   Okay.  Who?
22      A   Siebel Systems.
23      Q   And you don't know who authored the
24  handwritten notes?
25      A   No.

317

1      Q   Okay.  And it says --
2      A   Siebel Systems before we bought them.
3      Q   They wouldn't say that now.
4      A   They would not.
5      Q   So it says, at the top, "Oracle announced a
6  total of 12 new and/or live CRM customers following
7  its fiscal year '02 first quarter earnings call."
8      A   Right.
9      Q   "Upon further investigation, Oracle's CRM
10  customer claims fall into four categories," and the
11  first is "Complete Fabrication."
12      A   Right.
13      Q   The second is "Creative Reclassification of
14  Revenue."  The third is "Irrelevant," and the fourth
15  is "Verified."
16          Do you see that?
17      A   Yes.
18      Q   So the first one says, "Oracle CRM Claim:
19  Unisys."
20          Did Oracle claim that Unisys was a 11i
21  customer?
22      A   I don't -- I don't recall.
23      Q   Okay.  Do you recall selling any CRM
24  software to Unisys?
25      A   I do not.  I cannot recall the specifics of

318

1  what systems we sold Unisys.
2      Q   Okay.  How about the next one; "Oracle CRM
3  Claim: British Telecom"?
4      A   We sell a lot of stuff to Unisys and a lot
5  of stuff to British Telecom.
6      Q   Okay.
7      A   But I can't remember specifically what was
8  sold on what date.
9      Q   Okay.  And just for that reference to
10  British Telecom there, you don't know whether there
11  was a representation by Oracle prior to this document
12  being created that it had sold British Telecom CRM?
13      A   I don't know.
14      Q   Okay.  What about POSCO; it says "Oracle
15  CRM Claim:  POSCO."  Did POSCO purchase Oracle CRM?
16      A   I believe they have, but I just -- I can't
17  tell you what date they purchased CRM --
18      Q   Okay.  So you can't say that they --
19      A   No --
20      Q   -- purchased it as of the date of this
21  document?
22      A   No, I can't.
23      Q   What about the reclassification of revenue;
24  do you have any knowledge of any reclassification of
25  revenue with respect to Pitney Bowes?

319

1      A   Siebel has accused SAP and Oracle of
2  reclassifying revenue to make our CRM sales look
3  larger than they really are, and Oracle certainly
4  doesn't do that.
5      Q   And never did?
6      A   Not to my knowledge.
7      Q   Do you know anything about the "Oracle CRM
8  Claim: Kyocera"?
9      A   It's a Japanese copier company.  I don't --
10  again, we sell lots of -- lots of things, but I can't tell
11  you what we sold them and when we sold them.
12      Q   Okay.  The Oracle CRM claim relating to
13  Dell, do you know anything about that?
14      A   The same answer.  I just can't tell you.
15  Dell uses some of our CRM, and all of our -- yeah, a
16  lot of our ERP and a lot of our supply chain, but I
17  can't -- and the standardized in our database, but I
18  just can't tell you the dates they bought the stuff.
19      Q   Did you engage in swap transactions with
20  Dell?
21      MR. LINDSTROM:  Objection; calls for a
22  conclusion, vague and ambiguous.
23      THE WITNESS:  Not that I know of.
24  BY MR. SOLOMON:
25      Q   What about Oracle CRM claim with Toshiba

320

1 Medical; do you know anything about that?

2    A  It will be the same answer.  You know,

3 Toshiba is a big customer of ours.  They buy a lot of

4 applications in technology.

5    Q  Okay.

6    A  But I can't tell you the dates that they

7 bought it.

8    Q  Okay.  And would you say -- would it be the

9 same answer with respect to the next customer,

10 Cochlear Limited?

11    A  I'm unfamiliar with Cochlear.

12    Q  Unfamiliar?

13    A  I just don't know that company.

14    Q  And you will see, on the following page,

15 there is a "Verified" deal.

16       Do you know anything about that?

17    A  I'm not familiar -- I'm not familiar with

18 that company.

19       MR. SOLOMON:  Okay.  Thank you.

20       Have marked as next exhibit a document

21 produced by the defendants with the control numbers

22 062376 through 393.

23       (Exhibit No. 82 was marked for

24       identification.)

25       THE WITNESS:  Kind of hard to read.

321

1       MR. SOLOMON:  Okay.

2       THE WITNESS:  I'll stop.

3       MR. SOLOMON:  Okay.  I'll probably be able

4 to get to that bit --

5       THE WITNESS:  Yeah.

6       MR. SOLOMON:  -- but it's narrow.

7    Q  First of all, do you recognize this

8 document?

9    A  I do not.

10    Q  Okay.  It's dated October 23, 2001 on

11 the -- at the top of the first page, and there's an

12 exchange among Mark Jarvis, Julie Gibbs, and some

13 individuals who were copied.

14       And at the bottom, there's an e-mail dated

15 the 18th of September 2001, and it's an exchange from

16 Mark Jarvis to Paul Burrin.

17       Then over the page, there's another

18 exchange -- there are more exchanges, excuse me,

19 dated September 18, 2001.

20       Do you see those exchanges?

21    A  What page are you on?

22    Q  I'm just -- I'm looking at the first page,

23 the second page, and the first half of the third

24 page, pretty much.

25    A  Yes.

322

1    Q  Okay.  I'm on the third page of the

2 exhibit, looking halfway down where it says

3 "Val/Csaba."

4       Do you see that?

5    A  Third page of the exhibit?

6    Q  Third page, yeah.

7    A  Yeah.

8    Q  And it says, "Can you please let me know

9 who you are working with on the Press Releases at GE

10 Power?  I need to know the specific person in case GE

11 in the US brings this up.  There have been concerns

12 in the past that we have used their name without

13 proper approval.  We are in negotiations for a

14 significant deal and we need to be aware of the

15 account activity."

16       Do you see that?

17    A  I do.

18    Q  It said, "Thanks for your help, Keith."

19       Do you know who the Keith is?

20       MR. LINDSTROM:  Keith Garver?

21       THE WITNESS:  Looks like Keith Garver, but

22 I don't know who Keith Garver is.

23 BY MR. SOLOMON:

24    Q  And then further up the page, Val Russell

25 writes:  "Keith, we are cognizant of the restrictions

323

1 in using the GE name and Christine Englund and Corp

2 Pr are in the loop.  Please see my next note."

3       Do you see that?

4    A  I do.

5    Q  Do you know who Val Russell is?

6    A  I do not.

7    Q  And just, again, up to the top of the page,

8 it says, "Thank you for the response.  GE Power has

9 asked that we not use their name as a reference even

10 if we are using previously approved information, so

11 we need to be very careful.  I know you are aware of

12 this, but we cannot send" out -- "send our" -- I

13 think it means out -- "any press release without

14 their approval.  They have been very clear on this

15 issue."

16       Do you see that?

17    A  Yes.

18    Q  Okay.  And then on the second page, in the

19 middle, there's another reference to the reference

20 issue.  It says, "Paul, I continue to receive

21 messages from the GEPS Account Team with request to

22 remove GEPS as a reference from Oracle.com.  Mark

23 Jarvis requested that we retain the reference until

24 we receive a direct request from GEPS."

25       Do you see that?

324

Ellison, Lawrence  9/21/2006  10:57:00 AM

**325**

1　A　I do.

2　Q　Now I'm looking at the bottom of the first

3　page and the top of the second, and it says, "Larry's

4　directive was that we would not remove GE as a

5　reference until they stopped using our software."

6　　　Do you see that?

7　A　Yes.

8　Q　Is that accurate?  Did you issue a

9　directive not to remove GE as a reference until they

10　stopped using Oracle software?

11　A　I did.

12　Q　And was that directive adhered to?

13　A　I think so.

14　Q　Okay.  And why did you issue that

15　directive?

16　A　The -- again, I was the corporate sponsor

17　at GE.  They are a very important customer.  They are

18　arguably the most respected corporation in the United

19　States.

20　Q　Other than Microsoft; right?

21　A　Other than Microsoft.  Even more respected

22　than Microsoft, and Microsoft is not a very big

23　customer of ours.  And it was important -- it was

24　very important -- we made a huge effort in a variety

25　of GE divisions to help them be successful, and we

**326**

1　thought it was legitimate for us to disclose the fact

2　that we were, you know, the standard -- application

3　standard at GE.  So GE always -- you know, GE didn't

4　like being used as a reference.  Or more precisely,

5　GE would like some quid pro quo in exchange for being

6　used as a reference.

7　　　So they would say -- so I decided just to

8　put them on Oracle.com and leave them there even if

9　they weren't entirely happy with it.  And I told them

10　that.

11　MR. SOLOMON:  Thank you.

12　Have the next document marked as --

13　What exhibit number are we on, please?

14　THE REPORTER:  We are on Exhibit 83.

15　MR. SOLOMON:  Exhibit 83, and that was

16　produced by the defendants with the control numbers

17　059745 to 47.

18　(Exhibit No. 83 was marked for

19　identification.)

20　THE WITNESS:  Okay.

21　BY MR. SOLOMON:

22　Q　Okay.  Do you recognize this?

23　A　I do.

24　Q　And the second half of the first page

25　reflects an e-mail from you to Jeff Henley, Mark

**327**

1　Barrenechea, and copying Jeff Henley, Jennifer

2　Minton, and Safra Catz?

3　A　That's correct.

4　Q　And the subject is "RE: IT CRM"?

5　A　Yes.

6　Q　And then you wrote the message at the top

7　of the second page; is that right?

8　A　I did.

9　Q　Okay.  And you say, halfway down, "We

10　cannot remain in denial if we talk with our users

11　every day."

12　　　Had you been in denial?

13　A　Had I been in denial?  I don't think I had

14　been in denial.

15　Q　Had other people at Oracle been in denial?

16　A　I think some of the engineers were in a

17　competition with Siebel, and Siebel had features we

18　didn't have.  They had been in the business much

19　longer, and sometimes, you know, you love your baby,

20　and they -- you know, they were very proud of what

21　they had done, but they were still missing certain

22　features that our competitors had.

23　Q　And you say, at the top, "Our top priority

24　is to get Oracle users are 'delighted,'" in quotes,

25　"with the quality and functionality our CRM

**328**

1　products."

2　　　Do you see that?

3　A　Yes.

4　Q　And then you go on to say, "Until that

5　happens I doubt we will achieve success in the

6　market."

7　　　Do you see that?

8　A　Yes.

9　Q　And those were your -- that was your view

10　as of March 22nd, 2002; correct?

11　A　Yes.

12　Q　And this would have been in your file, or

13　not, as of March 2002?

14　A　Well, since I -- since I authored it and if

15　I didn't send myself a copy, it wouldn't be.

16　Q　Okay.  And at the time you wrote this, were

17　you aware of any obligation to preserve this document

18　for this litigation?

19　MR. LINDSTROM:  Objection; assumes facts.

20　THE WITNESS:  Yeah.  Again, I certainly --

21　you know, again, I don't know the where -- the date

22　of the document retention order, but I was aware at

23　some point in time that we had to preserve all

24　documents.

25　BY MR. SOLOMON:

1   Q   Including a document such as this?

2       MR. LINDSTROM:  Objection; no foundation,

3   calls for speculation.

4       THE WITNESS:  Yes.

5   BY MR. SOLOMON:

6   Q   Okay.  And this was not produced from your

7   files; you don't even know if it was in your files;

8   is that right?

9   A   Yeah.  Again, I think because I authored it

10  and didn't send myself a copy, it was never in my

11  file.

12      MR. SOLOMON:  Marked as the next exhibit a

13  document produced by the defendants with the control

14  number 100146.

15      (Exhibit No. 84 was marked for

16      identification.)

17      THE WITNESS:  Okay.

18  BY MR. SOLOMON:

19  Q   And this is -- first of all, do you

20  recognize it?

21  A   I don't.

22  Q   Okay.  It's from Susan Marks to you,

23  copying Joyce Higashi, dated the 29th of March 2002.

24      Do you see that?

25  A   I do.

329

1   Q   And are you familiar with the customer NCR?

2   A   Very.

3   Q   And were they implementing any 11i modules

4   in 2000 to 2001, do you know?

5       MR. LINDSTROM:  In 2000-2001?

6       MR. SOLOMON:  That's my question.

7       THE WITNESS:  I don't know.

8       MR. SOLOMON:  You don't know.  Okay.

9   Q   And this would have been in your files in

10  March of 2002; is that right?

11  A   Yes.

12  Q   And it wasn't produced from your files and

13  you don't know why?

14  A   That's correct.

15      MR. SOLOMON:  I've have marked as the next

16  document -- next exhibit, excuse me, the document

17  with the control numbers 297895 to 896.

18      (Exhibit No. 85 was marked for

19      identification.)

20      THE WITNESS:  Okay.

21  BY MR. SOLOMON:

22  Q   Do you recognize this?

23  A   I don't.

24  Q   Okay.  On the second page of the

25  Exhibit (sic) 297895, and it reflects, at the top,

330

1   two e-mail exchanges.  The second one I'm looking at

2   is dated March 5th, 2002 from Peter Piascik, I'm

3   going to guess, to Larry Ellison and others.

4       Do you see that?

5   A   I do.

6   Q   Do you know who the sender is?

7   A   I don't.

8   Q   Do you recognize the name of the company,

9   ADT?

10  A   I don't.  No, actually, I remember seeing

11  their advertising on television.

12  Q   Okay.  Were you aware around the date of

13  this e-mail that ADT was holding up payments to

14  Oracle because of concerns with the 11i

15  implementation?

16  A   That's what it says in the e-mail, but I

17  don't recall it.

18  Q   Okay.  And this would have been in your

19  file on March 5th, 2002?

20  A   That's right.

21  Q   And it wasn't produced from your files and

22  you can't explain why; correct?

23  A   That's right.

24      MR. SOLOMON:  We will have marked as the

25  next exhibit a document produced by the defendants

331

1   with the control numbers 062679 and 680.

2       (Exhibit No. 86 was marked for

3       identification.)

4       THE WITNESS:  Okay.

5   BY MR. SOLOMON:

6   Q   Okay.  Do you recognize this?

7   A   Again, not specifically.  I recall the

8   discussion.

9   Q   Okay.  And you will see, at the bottom of

10  the page, you are an addressee, a copy on an e-mail

11  from Safra Catz.

12      Do you see that?

13  A   Yes.

14  Q   And it says, "Let's kill the No. 1 in CRM

15  adv.  Let's discuss."

16      Do you see that?

17  A   I do.

18  Q   What does "adv" mean?

19  A   Advertisement.

20  Q   And over the -- under the second page, it

21  says, "Larry, I know you wanted to skip it.  Let's

22  skip it."

23      Do you see that?

24  A   I do.

25  Q   Do you know what she's referring to?

332

Ellison, Lawrence  9/21/2006  10:57:00 AM

1    A    Yeah.  I want to kill the ad.  I don't want

2    to advertise something.

3    Q    Okay.

4    A    That we are No. 1 in CRM.  Just not true.

5    Q    Okay.  And this would have been in your

6    file -- and I'm looking at that exchange, certainly

7    at the bottom.  This would have been in your file as

8    of Monday, May 20th, 2002, that exchange?

9    A    That's correct.

10   Q    And it wasn't produced from your files and

11   you cannot explain why?

12   A    That's correct.

13       MR. SOLOMON:  Okay.  Let's go off the

14   record.

15       THE VIDEOGRAPHER:  Off record at 12:30 p.m.

16       (Lunch recess taken.)

17

18

19

20

21

22

23

24

25

                                            333

1    the publication of that book?

2    A    I -- yes.  I was interviewed for the book,

3    extensively interviewed for the book, and I also

4    wrote footnotes where I -- if I disagreed or wanted

5    to clarify something the book said.

6    Q    Okay.  I'm looking at what is page 182 of

7    the book, and I'm looking at the bottom paragraph,

8    and it says, in part, "The final qualification about

9    Oracle's story of transforming its efficiency by

10   using its own E-Business Suite is that the claim is

11   only partly true, because the first billion dollars

12   of" saving "was pretty much in the bag before 11i was

13   finished."

14       Do you see that?

15   A    I do.

16   Q    Is that true?

17   A    Yeah.  Yeah.  Well, let me be clear.  The

18   second part is certainly true that we were well on

19   our way -- well on our way to saving a billion

20   dollars before 11i was finished.  That's true.  So

21   the qualification that -- you know, Oracle

22   transforming itself by using its only business suite,

23   I'm not sure I ever said that.  I mean, I don't know

24   how I use the term E-Business.  E-Business -- I

25   sometimes use the term "E-Business Suite" to mean all

                                            335

1    AFTERNOON SESSION                    1:10 P.M.

2

3        THE VIDEOGRAPHER:  On record at 1:10.

4    BY MR. SOLOMON:

5    Q    Okay.  You recall making a claim in the

6    2000-2001 time frame, Mr. Ellison, that by utilizing

7    Suite 11i, Oracle had saved a billion dollars?

8    A    No.  I think I said by using our own

9    applications, we had saved over a billion dollars.

10   Q    And is that the distinction you were

11   saying, just using applications and you weren't

12   limiting it to the 11i suite; is that right?

13   A    Yeah.  Yes.

14       MR. SOLOMON:  Okay.  We will have marked as

15   the next exhibit an excerpt from a book entitled

16   "Softwar."

17       (Exhibit No. 87 was marked for

18       identification.)

19   BY MR. SOLOMON:

20   Q    Mr. Ellison, I'm going to be asking you a

21   number of questions about the contents of that book,

22   and so before I start doing that, of course, you are

23   familiar with the book Softwar?

24   A    I am.

25   Q    And can you describe your involvement in

                                            334

1    of our applications, not our applications beginning

2    at 11i.

3        So I think sometimes I'm not terribly

4    clear, you know.  To me, when I say E-Business Suite,

5    I mean our applications.

6    Q    Okay.  So you are in agreement with that

7    first sentence; is that fair or not?

8        MR. LINDSTROM:  Objection; mischaracterizes

9    his testimony.

10       THE WITNESS:  Yeah.  I'm in agreement with

11   the second half of the sentence starting "because."

12   BY MR. SOLOMON:

13   Q    Okay.  And tell me where you disagree.

14   A    I don't believe I ever made the claim that

15   we transformed ourself with the 11i versions of our

16   applications only.

17   Q    Okay.

18   A    I believe I made the claim we had

19   transformed ourself with our applications and

20   sometimes -- and I sometimes described those

21   applications as E-Business Suite.

22   Q    Okay.

23   A    But that includes Version 11 as well as

24   11i.

25   Q    Okay.  You haven't clarified this, have

                                            336

Ellison, Lawrence  9/21/2006  10:57:00 AM

1  you?

2  A   No.

3  Q   And why not?

4  A   Well, one, I didn't notice it until you

5  just pointed it out.  But I didn't try to -- I didn't

6  try to rewrite the book.  You know, I thought I had a

7  limited number of footnotes that I could put in, and,

8  you know, I wanted to pick my spots, and I didn't

9  think it was a major issue.

10  Q   Was there an agreement there would be a

11  limited number of footnotes?

12  A   Was there an agreement.  I don't expect --

13  I don't believe you need the footnotes to be larger

14  than the book itself.  Plus it takes a long time to

15  write the footnotes, so I just didn't correct every

16  single thing.  I didn't parse every single paragraph

17  very carefully and write -- write down something I

18  thought, you know, was slightly off or, you know,

19  needed clarification.  I didn't do that every single

20  time.  That would have been --

21  Q   Okay.

22  A   -- that would have required a lot of

23  footnotes.

24  Q   Okay.  It goes on to say, "The software

25  that Oracle used to turn itself into an e-business

337

1  was, in fact, a combination of modules from Release

2  11.0, which shipped in late' 1988 -- "1998," excuse

3  me, "and a number of customized prototype

4  applications that were global, Internet-based

5  systems."

6      Do you agree with that sentence?

7  A   Yeah.

8  Q   Okay.  It goes on to say, "A key element of

9  the E-Business Suite, however, was missing: the

10  underlying information architecture, including the

11  vital shared data schema that were the basis for

12  Oracle's claims about the tight integration of all

13  the applications."

14      Is that true?

15      MR. LINDSTROM:  Objection; compound.

16      THE WITNESS:  Now, this is referring to in

17  the past, so they are saying the key element was

18  missing prior -- prior to the E-Business Suite.

19      MR. SOLOMON:  Okay.

20      THE WITNESS:  Just as I'm reading this,

21  prior to the E-Business Suite, the data-sharing

22  schema did not exist.  If that's what it's -- I

23  believe that's what I'm agreeing to.  Before the --

24  what the E-Business Suite brought -- excuse me.  Let

25  me stop using the term "E-Business Suite."

338

1      What Version 11i brought was a much more

2  tightly integrated data schema, and before 11i, we

3  didn't have that tightly integrated data schema.

4  BY MR. SOLOMON:

5  Q   Okay.  And that what is called "vital

6  schema" -- it says here that schema was the basis or

7  were the basis for your claims about the tight

8  integration of all the applications; right?

9  A   Yeah, and it existed in 11i, but did not

10  exist in 11o.

11  Q   Okay.  And then it goes on to say, "Ellison

12  says, 'That's absolutely right.  The software that

13  saved Oracle a billion dollars in the first year was

14  a combination of our standard applications product

15  plus prototype applications that had not yet been

16  integrated into the E-Business Suite. . . rewritten

17  and integrated into what would become the E-Business

18  Suite."

19      Do I read that right?

20  A   Yes.

21  Q   And do you agree with that?

22  A   Yes.

23  Q   Okay.  Now, if you go to the bottom of 183,

24  it reads as follows, in part:  "But in one sense, the

25  marketing claims were misleading.  The reassuring

339

1  message to prospective customers was that Oracle had

2  been successfully running the same E-Business Suite

3  that they would buy for at least a year."

4      Do you agree with that?

5  A   No.

6  Q   But you didn't clarify it, did you?

7  A   No.

8  Q   And you didn't correct it?

9  A   That's correct.

10  Q   That was -- reading on:  "That was very far

11  from the case.  Not for the first time in Oracle's

12  history, early guinea-pig customers would pay a price

13  for taking too much on trust."

14      Do you agree with that?

15  A   The price they paid was more than offset by

16  the benefits, so early adopters of any software

17  product discovered more bugs and had more problems

18  than people who wait.  The advantage of being an

19  early adopter -- and the reason there are early

20  adopters of software products -- is they get the

21  benefit sooner, so it's more costly, but you get the

22  benefits earlier.

23  Q   Okay.  But the question was --

24  A   And the net is you save.

25  Q   The question was:  Do you agree with that

340

Ellison, Lawrence  9/21/2006  10:57:00 AM

1  sentence?

2  A   Which sentence?

3  Q   Starting with, "Not for the first time,"

4  ending in "trust"?

5  A   No.

6  Q   Okay.  But you didn't clarify or correct

7  it, did you?

8  A   No.

9  MR. SOLOMON:  Have marked as the next

10  exhibit another excerpt from the book Softwar.

11  (Exhibit No. 88 was marked for

12  identification.)

13  BY MR. SOLOMON:

14  Q   And I'm going to draw your attention to --

15  toward the bottom of the page.

16  MR. LINDSTROM:  Which page?

17  THE WITNESS:  191?

18  MR. SOLOMON:  That's correct, 191.

19  Q   And I'm going to read the following

20  language:  "I had already delayed the 11i release

21  date, and that forced our customers to revise their

22  implementation plans.  There was tremendous pressure

23  not to delay again.  Our customers had their

24  resources all lined up and were ready to install our

25  software as soon as we released it.  It was a bit

341

1  like the beginning of World War I:  once the troop

2  mobilizations began, there was no turning back.'"

3  Do you see that?

4  A   I do.

5  Q   Is that your language?

6  A   Yes.

7  Q   Okay.  Would you agree now that it's -- the

8  more appropriate analogy would be with Don Kirk

9  (phonetic) in World War II?

10  A   No.

11  MR. SOLOMON:  Mark as the next exhibit

12  another excerpt from Softwar.

13  (Exhibit No. 89 was marked for

14  identification.)

15  BY MR. SOLOMON:

16  Q   And just while we are having the exhibit

17  marked, Mr. Ellison, the chapter is -- that we are

18  looking at is headed "Ready or Not."

19  Do you have an understanding what "Ready Or

20  Not" refers to?

21  A   I do.

22  Q   And is it 11i?

23  A   Yes.

24  Q   Okay.  I'm looking at page 192, and I'm

25  looking at the language quarter of the way down the

342

1  page where it says, "Ellison says, 'We had just

2  finished a complete rewrite of our order management

3  system.  It was a huge job.'"

4  Do you see -- do you see that?

5  A   I do.

6  Q   And then without going through it all, you

7  talk about five stages.

8  Do you see the reference to five stages?

9  Halfway in, you say, "There were five

10  stages to the order management decision.  Stage one:

11  We have time to put the new order system into the

12  suite; let's do it.  Stage two:  No, too risky; we

13  have to go with the old order system.  Stage three:

14  Let's put them both in; absolutely fantastic idea.

15  Stage four:  Fantastic idea, but we can't make it

16  work.  Stage five:  Well, then, let's put in the new

17  one.'"

18  You see all that?

19  A   I do.

20  Q   Okay.  And is that all accurate?

21  A   I think so.

22  Q   You go on to say, "'It was my

23  decision.  It's in my nature to go for the

24  highest-risk/highest-reward option.  That's my cross

25  to bear.'"

343

1  Did you say that?

2  A   I did.

3  Q   It goes on to say, "'We went from having an

4  average order management product to having the

5  premier order management program on the planet.  The

6  only problem was it was brand new and we hadn't done

7  enough testing.'"

8  Do you see that?

9  A   Yes, I do.

10  Q   Was it accurate?

11  A   Yes.

12  Q   And then further down the page, it says,

13  "Ellison had no illusions about how critical the

14  order management system was," and then he quotes you:

15  "'The order management system is the heart of the

16  sell side of our e-business suite.  Order management

17  is the funnel that captures the information about the

18  sale.  The better your order management system, the

19  more information it captures.  Our new system

20  captures. . . the details about the products sold,

21  contractual obligations, payment terms, everything.

22  It manages marketing, promotions, vendor rebates, and

23  tracks what salespeople should be compensated on the

24  deal.  The flexible pricing engine handles complex

25  and arbitrary rules -- like buy two and get the third

344

1  one free.  And the automatic configurator keeps
2  people from buying the wrong combination of
3  products -- like computer components that won't work
4  together.  It's a great system.  But when it first
5  came out, it had a lot of bugs.'"
6      Did I read that accurately?
7  A   Yes.
8  Q   And did you say all that?
9  A   I did.
10  MR. SOLOMON:  Marked as the next exhibit
11  another excerpt from the Softwar book.
12      (Exhibit No. 90 was marked for
13      identification.)
14  BY MR. SOLOMON:
15  Q   Okay.  Looking at -- looking at page 193 --
16  196?
17  A   I'm sorry.  Hold on one second.  We are
18  having a bit of document trouble.
19      Okay.  196.  Third of the way down the
20  page, you are quoted as saying, in part, "We should
21  have done two things:  installed it in-house first
22  and engaged with the early implementations at an
23  executive development level.  I think if either of
24  those things had happened, we would have rapidly
25  found out that it wasn't done.  As it was, it took us

345

1  until November to realize we had issues here and to
2  start to mobilize.'"
3      Do you see that?
4  A   I do.
5  Q   And is that accurate?
6  A   I didn't say it.
7  Q   Sorry?
8  A   I think -- I think they are quoting George
9  Roberts.
10  Q   Thank you very much.
11      Is the content accurate?  Do you agree, in
12  other words, with George Roberts?
13  MR. LINDSTROM:  Objection; compound.
14  BY MR. SOLOMON:
15  Q   Okay.  Let's start -- or break it down,
16  since the objection's been interposed.
17      Do you agree with the first sentence where
18  it says, "We should have done two things"?  Then
19  the first thing that he mentions is the installing it
20  in-house and engaging with early implementations at
21  an executive development level.
22      Do you agree with that?
23  A   We did install it in-house.
24  Q   Okay.  And did you engage with early
25  implementations at an executive development level?

346

1  A   I think we engaged in early implementations
2  with the teams of people that -- that our customers
3  responsible for that implementation, I think we
4  worked with the right people.
5  Q   Okay.  What about the last sentence -- "'As
6  it was, it took us until November to realize we had
7  issues here and to start to mobilize" -- do you know
8  what that refers to?
9  A   I'm not sure what -- no.
10  Q   Okay.  Now, looking further down the page,
11  two-thirds of the way down, it reads:  "The next
12  really big push was to get in contracting and order
13  management over New Year's.'"
14      Do you see that?
15  A   I do.
16  Q   And this is referencing Oracle's internal
17  implementation; is that right?
18  A   I don't know.  I would have to --
19  Q   Okay.
20  A   -- I can't really tell.  Give me a second.
21  Q   Okay.
22  A   Okay.
23  Q   Okay?
24  A   Yeah.
25  Q   So this reflects Mark Barrenechea

347

1  referencing the big push; correct?
2  A   Yes.
3  Q   Okay.  And then he goes on to say, "What
4  happened was one of the most dramatic moments I'd
5  seen during my five years at Oracle.  Everyone except
6  Ron knew that we could not place an order with the
7  new system.'"
8      And then there's an asterisk, and that's
9  because you entered a clarification; correct?
10  A   Yes.
11  Q   In fact, correction.  You say, "Nonsense.
12  Of course Ron knew about the problems with our
13  internal order management implementation.  He was
14  personally running the project to put it in and make
15  it work.  We planned to be down for a while, and we
16  were."
17      Is it accurate?
18  MR. LINDSTROM:  Have you read it
19  accurately, or are the statements in there accurate?
20  MR. SOLOMON:  Both.
21  Q   Have I read it accurately?
22  A   I was reading along as you read.
23  Q   Okay.
24  A   But the statements as written here is
25  accurate.

348

1    Q   Okay.  Then it goes on in the text:  "And
2  Larry, knowing we can't place an order, not knowing
3  when we would be able to place an order, and knowing
4  that once we turned off the old bespoke system that
5  there was no going back. . . 'We are going live
6  anyway.  I need a forcing function, so off we go.'
7  So we upgraded, and Oracle went down.  We were down
8  for fourteen days.  For fourteen days that January,
9  Oracle could not place a single order."
10      Is it true that for the 14 days he refers
11  to that Oracle could not place a single order?
12      A   I think I said "Nonsense," you know.  No.
13      Q   So your -- your clarification or your
14  asterisk and your "Nonsense" doesn't just refer to
15  the sentence where the asterisk is; it continues,
16  does it?
17      A   Well, I don't think -- I don't think we
18  were down for 14 -- I'm not sure.  I don't recall
19  exactly how many days we were down.  But even when we
20  were down, we had ways to work around the system and
21  place orders.
22      So the -- the sys -- there's no question
23  the system -- you know, when we put the new system
24  in, we were out, and that happens with almost every
25  release:  When you put in a new system, you are out

349

some number of days, and there were some number of
2  days we were definitely out of service, putting the
3  new system in.
4      But we solved the problems, got the system
5  up and running, and we were fine.
6      Q   Okay.  And when you were -- when you were
7  down, do you know if that was before you sold your
8  stock at the end of January?
9      A   I have no recollection.
10      Q   Okay.  It goes on to say, "It was
11  frightening.  But we got it to work.  Larry was
12  right.  It was a great forcing function.  At that
13  point I became acutely aware of the customer
14  dissatisfaction and immediately started drilling down
15  into the implementations we were doing."
16      Do you see that?
17      A   I do.
18      Q   Now, were you aware at that time that Mark
19  had become -- Mark Barrenechea had become acutely
20  aware of customer dissatisfaction?
21      A   I would have hoped he would have been aware
22  before then.  I mean, we were having -- you know, I
23  asked that we go over all of the dissatisfied
24  customers and keep -- you know, keep track of them.
25      Q   Were you acutely aware of customer

350

1  dissatisfaction at that time?
2      A   I think I've said before that we have -- we
3  had several customers that were having problems, and
4  we monitored them closely and made them successful.
5      MR. SOLOMON:  Okay.  We will have marked as
6  the next exhibit further excerpts from the book
7  Softwar.
8      (Exhibit No. 91 was marked for
9      identification.)
10  BY MR. SOLOMON:
11      Q   Okay.  On page 193, at the top, Ron Wohl,
12  referring, I believe, to the order management system,
13  is quoted as saying, "Technically, we really had to
14  include it to fulfill the objective of the E-Business
15  Suite.  If it had the flexibility to meet modern
16  e-business practices, you're in great shape; if it
17  doesn't, you don't really have an E-Business Suite.'"
18      Do you see that?
19      A   I do.
20      Q   Is that factually accurate?
21      A   No.
22      Q   And you didn't clarify or dispute it,
23  though, did you?
24      A   Well, I mean, initially, if you recall our
25  five steps, we were going to include the old version

351

of the order management system, so I think you had --
2  you know, certainly you are more competitive if you
3  have the most modern -- you know, even better version
4  of order management, you are more competitive than if
5  you have an older version -- you know, not as capable
6  version as order management.
7      But as long as all the pieces are
8  integrated together -- all E-Business Suite means,
9  you got all the major functions covered, and they are
10  all integrated out of the box by engineering.
11      Q   Okay.  Down at the bottom of the page, it
12  says, "Even with Oracle's vaunted rapid
13  implementation procedures for installing 11i, it
14  would be at least three or four months before any
15  significant 'go-lives' -- the moment when a business
16  switches its operations to new software."
17      Do you see that?
18      A   I do.
19      Q   And is that factually accurate?
20      A   I believe what it's saying is, from the
21  time someone buys the software, it will take us --
22  even though we have a rapid implementation technique,
23  rapid means we can't get them running in less than
24  three or four months, and that's how I read that, and
25  that's reason -- yeah, that's correct.  Four months

352

1    is very fast. Three months is very fast.
2       Q    And if you look at the bottom of the -- of
3    page 193 where you enter a footnote, you write: "Not
4    true. Ron explained the risks, and I understood the
5    uncertainty surrounding release of the new order
6    management system. And I made the decision to
7    release it."
8       A    That's referring to the quote in the middle
9    of the page.
10      Q    Okay.
11      A    You can see the asterisk.
12      Q    Correct.
13      A    That's referring to Mark Barrenechea. If
14   you read that section, it's about Mark Barrenechea
15   saying that Ron would just tell me what I wanted to
16   hear and I would just -- going to take it at face
17   value. So that footnote applies to that. I guess it
18   would be the end of the first paragraph on that page.
19      Q    And this is Ron and Mark's feud almost;
20   right?
21      A    Feud's a good term.
22      Q    And you are taking responsibility; correct?
23      A    Yeah. I don't think Ron deceived me, and I
24   don't think Ron was able to deceive me. I think I
25   gathered all the facts and I made the call.

353

1       Q    Okay. And then -- I'm on page 194, and
2    there's a reference -- about a third of the way down
3    the page, there's a sentence I want to read: "Just
4    as in 1990, he seemed to think that any economic
5    slowdown might pass Oracle by."
6       A    Yeah.
7       Q    That refers to you; right?
8       A    Yes.
9       Q    And is that true? Is that how you felt?
10      A    Well, it's -- no, and it's also hindsight.
11   But, no, I didn't think an economic slowdown, yeah,
12   would pass us by. It was certainly impossible to
13   tell when an economic slowdown would hit us and what
14   the impact might be, but I -- you know, I don't think
15   I believed that we were immune to macroeconomic
16   changes.
17      Q    Okay. But, again, you didn't clarify or
18   dispute that sentence, did you?
19      A    No. Again, I would like to say -- I mean,
20   if I thought it was important, I would clarify it.
21   If not, I would move on.
22      Q    I'm now on page 194 at the bottom. It
23   says, "If Ellison had known what was coming, he might
24   have restrained himself a little more. In October,
25   the first reports from the field described early 11i

354

1    implementations afflicted with more than usual
2    bugginess."
3            Do you agree with that sentence?
4       A    Well, "more than usual bugginess," I mean,
5    it was -- we didn't -- we certainly didn't think so
6    at the time. It was a huge product, and I don't know
7    what his basis for saying that is. It's a huge
8    product. It's a huge amount of code. We expected a
9    good deal of bugginess.
10      Q    But, again, you didn't clarify or dispute
11   that sentence; correct?
12      A    Yeah. I can't -- I would have written a
13   book as long as the book if I tried to --
14      Q    Okay.
15      A    -- you know, say how I would have said it
16   or everything I disagreed with.
17      Q    Okay.
18      A    This is his opinion.
19      Q    Okay. And then it goes on to say, "At the
20   Oracle Applications User Group conference in Honolulu
21   at the end of October, the complaints were legion.
22   Attendees griped about a lack of reliable information
23   concerning the status of applications, malfunctioning
24   modules -- especially CRM and order management. . ."
25           Do you see that?

355

1       A    I do.
2       Q    And do you agree that, first of all -- or
3    are you aware that the Oracle Applications Users
4    Group conference, the complaints were legion?
5       A    Well, Matthew is a very colorful journalist
6    and "legion" is an interesting word, but we certainly
7    had problems. The CRM products were new. The order
8    management module was new. We expected bugs. We had
9    bugs. I wouldn't describe them as legion.
10      Q    Okay. And the sentence, "Attendees griped
11   about a lack of reliable information," etc., do you
12   have any knowledge of that?
13      A    I don't recall. I don't recall them
14   asking, you know -- complaining about no reliable
15   information. I certainly, you know -- you know,
16   remember some of them saying that they were having
17   problems during implementation with CRM and order
18   management.
19      Q    Okay. And I'm now on page 195, halfway
20   down the page, and it says, "Over the next couple of
21   months," customers -- "customer complaints poured in.
22   Instead of working on the planned features and
23   functions to flush out the suite's capabilities as
24   planned, development was increasingly engaged in a
25   feverish attempt to produce patches that would fix

356

Ellison, Lawrence  9/21/2006  10:57:00 AM

1 the bugs that seemed to be flying at them from all
2 sides."
3      Do you agree with that?
4      MR. LINDSTROM:  Objection; compound.
5      MR. SOLOMON:  Okay.  Let's break it down.
6      THE WITNESS:  Well, no --
7      MR. SOLOMON:  Well, we have to, because,
8 otherwise, your lawyer is, perhaps, going to press
9 his objection so --
10      MR. LINDSTROM:  The reason why it's a good
11 objection is we won't understand a "yes" or "no"
12 answer.
13      MR. SOLOMON:  Hey, I've conceded.  I'm
14 going to rephrase it.  Don't worry.
15      Q    "Over the next couple months, customer
16 complaints poured in."
17      Do you agree with that?
18      A    No, I don't think they poured in.  We had
19 some of our customers -- some of our customers had
20 problems.
21      Q    Okay.  And you didn't correct or clarify
22 that sentence; correct?
23      A    That's correct.
24      Q    And then it goes on to say, "Instead of
25 working on the planned features and functions to

357

1 plush out the suite's capabilities as planned,
2 development was increasingly engaged in a feverish
3 attempt to produce patches that would fix the bugs
4 that seemed to be flying at them from all sides."
5      Do you agree with that?
6      A    No.  We certainly spent more time fixing
7 bugs, but we continued to develop new features and
8 functions simultaneously, and we would release a bug
9 fix and a new feature as a patch.  So patches
10 sometimes are bug fixes, and sometimes patches are
11 new features, but we did both simultaneously.
12      Q    Okay.  And then further down in that
13 paragraph, you are quoted as saying:  "I was way too
14 optimistic.  It just kind of got away from us, and
15 that became a very big problem.'"
16      Is that an accurate quote?
17      A    It certainly took -- and what I mean by
18 that, it took longer, you know, to fix the all -- the
19 bugs than I thought.
20      Q    And did you say, "It just kind of got away
21 from us, and that became a very big problem'"?
22      A    I said it, yeah.
23      MR. SOLOMON:  Okay.  Have marked as the
24 next exhibit another excerpt from the Softwar book.
25      (Exhibit No. 92 was marked for

358

1      identification.)
2 BY MR. SOLOMON:
3      Q    I'm looking at page 199 to start with.  I'm
4 looking at -- towards the bottom of the page, it's --
5 says, "As shareholders chewed over the
6 possibility. . ."
7      Do you see that --
8      A    I do.
9      Q    -- on the bottom?
10      It says, "As shareholders chewed over the
11 possibility that Ellison might have exaggerated the
12 extent of Oracle's immunity to the forces that were
13 blighting other tech companies, Oracle's stock price
14 plunged by 13 percent, to $23.56.  In response,
15 Oracle reiterated that it was standing by its bullish
16 forecast."
17      Do you see that?
18      A    Yes.
19      Q    Did you exaggerate the extent of Oracle's
20 immunity to the forces that were blighting other tech
21 companies?
22      A    I don't think so.
23      Q    Do you remember Oracle's stock price
24 plunging by 13 percent in February of 2001?
25      A    I mean, this refreshes my memory, yeah.

359

1      Q    And did that concern you when that
2 happened?
3      A    Sure.
4      Q    How did you respond?  Strike that.
5      Did you respond by issuing a statement that
6 the bullish forecast was -- was -- that you were
7 standing by your bullish forecast?
8      A    I don't think so.  Not that I recall.
9      Q    Did anybody respond that way?
10      A    Not that I recall.
11      Q    Okay.  Do you remember Chuck Phillips
12 issuing a report in February of 2001 in which doubt
13 was cast on the ability of Oracle to make its 3Q
14 numbers?
15      A    Again, not that I recall.
16      Q    Okay.  Looking at page 199 -- sorry, the
17 bottom of 199, the beginning of 200, and it says, in
18 part, "A few days later in Paris, Ellison seemed
19 unusually nervous and flustered."
20      Were you unusually nervous and flustered in
21 Paris?
22      A    Not that I recall.
23      Q    You remember going to Paris?
24      A    I might have been jet-lagged, but -- say
25 again?

360

1    Q   You remember going to Paris in February of
2   2001?
3    A   Not specifically.
4    Q   It goes on to say, "The main theme of his
5   speech was on the folly of customizing Oracle's
6   software and why it was better to buy a complete
7   suite from Oracle -- in Ellison's analogy, a finished
8   car that you knew would work -- rather than a bundle
9   of kit glued together by mechanics from IBM."
10       Do you see that?
11    A   I do.
12    Q   Is it accurate?
13       MR. LINDSTROM:  Is it accurate that he gave
14   that analysis?
15       MR. SOLOMON:  Correct.  Thank you.
16       THE WITNESS:  Yes, it is.
17   BY MR. SOLOMON:
18    Q   And did you also talk about the folly of
19   customizing Oracle's software?
20    A   I don't think I ever used the word "folly."
21    Q   Okay.  But did you talk about the mistake
22   customers would be making?
23    A   Well, I think I talked about customization
24   is expensive and it's risky, because we are in the
25   business of building software, and we make mistake --

361

1   plenty of mistakes when we are building software.
2   When customers write their own software, they are
3   even more likely to make mistakes when they write
4   their own custom software, so it's expensive, it's
5   time-consuming, and it negatively affects overall
6   quality of your systems.
7    Q   Okay.  Have you since talking in Paris
8   commented that you were imprecise and perhaps not
9   clear in your statements there?
10       MR. LINDSTROM:  Objection; vague and
11   ambiguous.
12       THE WITNESS:  I think I know what you are
13   referring to.
14       Yeah, in terms -- I tried to distinguish
15   customization, meaning changing the code, from
16   customization, if you will, extending the code,
17   adding your own -- you know, so don't -- there's a
18   difference between a module you write, a component
19   you write, and then you connect to Oracle versus
20   actually going into the Oracle written code and
21   changing it.
22       So I tried to clarify myself.  I didn't
23   mean that you shouldn't write -- if you have clever
24   ideas and you want to, you know, implement your own
25   systems and write those systems, that's all well and

362

1   good.  The mistake is usually going into our code,
2   the Oracle written code, and making changes to that.
3   BY MR. SOLOMON:
4    Q   Okay.  And then if you go a little bit
5   further down the page, it says, in your footnote,
6   "Worse than being overzealous in this presentation, I
7   was ambiguous, imprecise, and easily misunderstood.
8   The problem was that I failed to be clear as to what
9   I meant by 'customize.'  Of course customers can
10   tailor our applications to their business processes,
11   but they should never modify our software."
12       And you wrote that; right?
13    A   Yes.
14    Q   And then on page 201 -- let's see if I can
15   find it -- sorry, the bottom of 200 and beginning of
16   201, it says, "The other big," in quotes, "'take-out'
17   from the Paris speech was Ellison's frank recognition
18   that the E-Business Suite didn't yet do everything
19   its customers wanted and maybe never would but that
20   an '80 to 85 percent solution' that could be
21   implemented in five months was better than the
22   100 percent" still "promised by some vendors that"
23   will "take three years to put in and still wouldn't
24   work."
25       Do you see that?

363

1    A   I do.
2    Q   Okay.  Did you recognize at that conference
3   that Oracle was only offering an 80 to 85 percent
4   solution at that time?
5    A   No.  I think -- I think I knew all along
6   that the E-Business Suite would never do everything
7   every company wanted to do, but it would -- should do
8   all of your general ledger, all of your accounts
9   receivable, all of your accounts payable.  So it
10   would be a complete solution in the areas where we
11   had developed product.
12       We didn't, at the time, have product for --
13   if you are a bank, managing savings accounts, your
14   customer savings accounts; manage your customer's
15   checking account or Internet banking, so there were a
16   lot of pieces we didn't have that were industry
17   specific, but where we had pieces, it was a pretty
18   complete solution.
19    Q   Okay.  And it finishes -- the passage
20   finishes with, "Immediately, the chorus went up that
21   Ellison had claimed that the suite was complete and
22   now he was saying that it wasn't."
23       Do you remember that chorus going up?
24    A   No.
25    Q   Okay.  On page 201, I'm looking at the

364

Ellison, Lawrence  9/21/2006  10:57:00 AM

1  language that reads: "Although applications had
2  continued to grow strongly thanks to the buzz that
3  had been generated around 11i, database revenue
4  growth was flat to negative.  Ellison explained," and
5  now you are being quoted, "It's very disappointing.
6  A bunch of deals were approved at the senior vice
7  president level, but once they got to the CFO and CEO
8  level, they were pushed off.  We have a lot of
9  nervous executives looking at this economy and being
10  very cautious.  They want to wait thirty to sixty
11  days so they can get a better read on this economy.'"
12      Do you see that?
13  A   I do.
14  Q   Is that an accurate quote?
15  A   Yes.  I think it might be hindsight, but
16  it's an accurate quote.  I said it.
17  Q   Okay.  Do you know what deals you are
18  referring to when you are saying they are approved at
19  the senior vice president level?
20  A   We had -- we had a variety of large deals,
21  mainly database deals, that were going through --
22  that had been qualified.  And what I mean by
23  "qualified," the customers had said they are going to
24  buy the database.  They said they wanted price --
25  they had gone through a price negotiation.  We

365

1  completed the price negotiation.  We had delivered to
2  them a contract.  So it was really awaiting final
3  approval.  And in the last couple of days of the
4  quarter, we were having a hard time getting those --
5  you know, the final sign off from the CFO or the CEO
6  or whoever had that approval authority for those
7  larger deals.
8  Q   And can you name the customers involved in
9  those deals?
10  A   I cannot.
11      You mean from memory?
12  Q   Yes.
13  A   No, I cannot.
14      And how would that information be
15  retrieved?  Who has that information?
16  A   We had a system for tracking prospects in
17  pipeline, and I believe they are -- I believe it's
18  someplace around.
19  Q   And what's that system called?
20  A   We have a sales -- you know, we have a
21  sales automation -- I'm not sure what we had --
22  again, this was talking about 2001.
23  Q   Correct.
24  A   You know, I'm not sure what system was
25  available in -- you know, was available in 2001, but

366

1  we certainly kept track of our large deals, the
2  contracts we'd, you know -- most of those -- I would
3  think a lot of those deals would be in the form of
4  contracts and proposals at that point.
5  Q   Okay.  But back to the system that was
6  available to track these deals, are you talking about
7  Oracle Sales Online?
8  A   Yeah.  And I just don't remember its status
9  in early 2001.
10  Q   Do you know anything about Oracle Sales
11  Online being purged in July of 2001?
12  A   No.
13  Q   You never heard that?
14  A   No.
15  Q   Not aware that -- do you know who
16  Mr. Kirkby is?
17  A   No.
18  Q   He's a VP of IT at your company now.
19      Never heard of him?
20  A   Never heard of him.
21  Q   Have you ever read the Special Litigation
22  Committee Report?
23  A   It's very thick.  No.
24  Q   Mr. Kirkby, represent to you, indicates
25  that in July of 2001 that OSO was purged.

367

1      MR. LINDSTROM:  So you are making this
2  representation that that's true?
3      MR. SOLOMON:  I'm making the representation
4  that Mr. Kirkby made the representation in SLC -- to
5  the SLC.
6      MR. LINDSTROM:  And so what's the question?
7  BY MR. SOLOMON:
8  Q   Have you ever heard of that?
9  A   No.
10  Q   Would you be concerned that after this
11  litigation was commenced, Oracle sales had been
12  purged?
13      MR. LINDSTROM:  Objection; calls for
14  speculation, hypothetical.
15      THE WITNESS:  Sure.
16  BY MR. SOLOMON:
17  Q   And are you going to take any action to
18  follow up on that concern?
19      MR. LINDSTROM:  Objection; assumes facts.
20      THE WITNESS:  I assume that we have had a
21  Special Litigation Committee look into it, and I
22  guess our legal department already knows about it, so
23  I assume that action's already been taken.
24  BY MR. SOLOMON:
25  Q   You know that Delaware Court found

368

Ellison, Lawrence  9/21/2006  10:57:00 AM

1   Professor Grundfest to be nonindependent?
2      A   Yes.
3      Q   So without having OSO available to me, how
4   can I find out what deals you are referring to here?
5      MR. LINDSTROM:  Objection; assumes facts.
6      THE WITNESS:  I think Safra Catz approved a
7   lot of the deals.  I don't -- you know -- the
8   people -- the deals went through -- for final
9   approval went through Safra Catz and Keith Block and
10  George Roberts, and those were the executives that
11  handled them.  I think other people in the back
12  office, you know --
13     MR. SOLOMON:  Okay.
14     THE WITNESS:  -- were -- prepared
15  contracts.
16  BY MR. SOLOMON:
17     Q   And assuming they can't remember and
18  without OSO, is there any way I can get an answer to
19  this?
20     MR. LINDSTROM:  Doubly assumes facts.
21     THE WITNESS:  I can't think of any.
22  BY MR. SOLOMON:
23     Q   And why would you be concerned if it turns
24  out to be true that OSO was purged after this
25  litigation commenced?

369

1      MR. LINDSTROM:  Calls for speculation.
2      THE WITNESS:  Well, we tried -- you know,
3   we try to archive all of our information.  We try to
4   keep track of it so we can analyze it.  So it's -- I
5   believe it's our practice to keep -- to keep our
6   records for, you know, fairly long periods of time.
7   BY MR. SOLOMON:
8      Q   Does your concern -- aside from Oracle's
9   own desire to keep track of historical information,
10  is your concern related to the fact that it -- it's
11  not available in this litigation?
12     MR. LINDSTROM:  No foundation.
13     THE WITNESS:  Again, I rely on our counsel
14  to deal with that.  I'm not an expert.
15  BY MR. SOLOMON:
16     Q   You let them tell you whether you should be
17  concerned or not?
18     A   Yes, I do.  In this area, I do.
19     Q   Still on page 2001 (sic), looking at the
20  language that reads:  "The real figure had turned out
21  to be only 25 percent.  It didn't take a genius to
22  see that not everything that was going on could be
23  explained by the weakening economy and edgy CEOs
24  waiting for 'visibility' to return.  For anyone who
25  wanted to see, there was mounting evidence that it

370

1   wasn't only the economy that prospective Oracle
2   applications customers wanted to see stabilize."
3      Do you see that?
4      A   I do.
5      Q   Do you have an understanding what is meant
6   in that last sentence by it wasn't the only -- "it
7   wasn't only the economy that prospective Oracle
8   applications customers wanted to see stabilized"?
9      A   I do.
10     Q   And what's your understanding?
11     A   What does Matthew mean when he says that?
12     Q   Yes.
13     A   I think --
14     MR. LINDSTROM:  Objection; calls for
15  speculation.
16  BY MR. SOLOMON:
17     Q   What's your understanding?
18     A   That people -- you know, people are
19  concerned.  There have been articles written, and
20  people are concerned about the stability of 11i.
21     Q   And isn't it true that 11i had been sent
22  out to customers in an unfit state?
23     A   No.
24     MR. SOLOMON:  So have marked as the next
25  exhibit another excerpt from the book Softwar.

371

1      (Exhibit No. 93 was marked for
2      identification.)
3   BY MR. SOLOMON:
4      Q   If you look at page 202, up at the top,
5   there's a reference to a lawsuit, and it says, "The
6   suit, on behalf of a mall pension fund, accused
7   Ellison of concealing information about the cost of
8   the 'massive technical problems,'" in quotes, "of
9   11i."
10     Do you see that?
11     A   I do.
12     Q   Do you know what suit is being referred to?
13     A   I think this one.
14     Q   Okay.  And you are aware that this is a
15  class action?
16     A   I am.
17     Q   And it's not just on behalf of a small
18  pension fund; you are aware of that?
19     A   Yes, I am.
20     Q   And it goes on to say, Oracle says the suit
21  was entirely without merit and would defend it -- and
22  would be defended vigorously.
23     Do you see that?
24     A   I do.
25     Q   I can -- I know it's being defended

372

Oracle                                              Page  369 - 372

1    vigorously.

2        Do you still believe it's without merit?

3    A   I do.

4    Q   At the bottom of the page, it says, "The

5    mood at Oracle was bloody but unbowed.  There was an

6    embarrassed realization that it had fallen down badly

7    on execution in sending a hugely important new

8    product out to customers in an unfit state."

9        Do you see that?

10   A   Yes.

11   Q   Do you agree with that?

12   A   I do not.

13   Q   But you didn't qualify or correct it, did

14   you?

15   A   No.  That's Matthew's opinion.

16      MR. SOLOMON:  I have marked as another

17   exhibit another excerpt from the Softwar book.

18      (Exhibit No. 94 was marked for

19      identification.)

20      THE WITNESS:  Okay.

21   BY MR. SOLOMON:

22   Q   Okay.  On page 210, halfway down, looking

23   at the language that reads:  "What really happened

24   during the last few days in February at the end of

25   the quarter?  Was it a question of two or three big

1    deals falling through at the last moment, as Ellison

2    had earlier appeared to suggest, or was something

3    more fundamental going on?"

4        Do you see that?

5    A   I don't, actually.  Where are you?

6    Q   Let me get it for you.  It is halfway

7    down --

8    A   Page 210?

9    Q   -- page 210, and it starts halfway down on

10   the right-hand side of the page, "What really

11   happened."

12   A   Is it in the last paragraph?

13   Q   No.  It's in the --

14   A   I got it.  I got it.  "What really

15   happened."

16   Q   "What really happened," do you see that?

17   A   I do.

18   Q   Then it goes on.  It would appear to quote

19   you as follows:  "No.  It was a lot of deals --

20   dozens, I'd say.  Sometimes a deal was delayed.

21   Sometimes the size of the deal dropped from

22   $6 million to $2 million.  All of a sudden people

23   stopped buying in anticipation of their needs for the

24   next couple of years."

25        Do you see that?

1    A   I do.

2    Q   And is that an accurate quote of you?

3    A   I believe so.

4    Q   Okay.  And, again, you cannot identify

5    those deals, can you?

6    A   I think if you keep going, there's even

7    cases where companies that were already using our

8    software were trying to find ways not to pay for it.

9    I'm not going to mention any names, Sprint, but a

10   very large wireless company.  Oh, that's Sprint.

11   That one I remembered because that was particularly

12   annoying.

13   Q   Any others?

14   A   I wouldn't have remembered that either, but

15   this 15, 20 and -- this refreshed my memory.  That's

16   the only one I can think of.  They actually owed us

17   the money by calculation.  They had an annual payment

18   and they just refused to pay.

19   Q   Do you remember why?

20   A   You have to ask Safra.  Basically they

21   didn't like -- they didn't think they would sell that

22   much.  We had so much per wireless subscriber, we

23   were paid by number of wireless subscribers, and they

24   just didn't like the bill.

25   Q   When did you first learn that Sprint was

1    taking that position?

2    A   I think about -- I think we were still

3    fighting for the deal I think the last hour of the

4    quarter.  Safra thought we'd get the deal in the last

5    hour of the quarter.

6    Q   Okay.

7      MR. LINDSTROM:  So we are done with

8    Exhibit 94?

9      MR. SOLOMON:  We are.  Thank you.

10      Okay.  Let's have marked as the next

11   exhibit another excerpt from the Softwar book.

12      (Exhibit No. 95 was marked for

13      identification.)

14   BY MR. SOLOMON:

15   Q   Looking at page 213, I'm looking at the

16   language that reads:  "A big part of Ellison's 11i

17   campaign has been centered on the idea that systems

18   integration was to be avoided at all cost.  Yet the

19   assumption behind being able to install the software

20   was to manage a particular flow was that it was being

21   integrated at some point with legacy systems.  Didn't

22   that mean he was backtracking on something pretty

23   fundamental?"  And then you are quoted:  "'Yeah, the

24   'Just say no to systems integration' slogan was

25   poorly thought out on my part.  It wasn't systems

1  integration that had to be avoided; it was code
2  modifying that had to be avoided.  Of course, some
3  systems integration may be necessary.  So wake up!
4  Try a little harder!"
5       Is that an accurate quote?
6    A    Yes.
7       MR. SOLOMON:  Okay.  Let's go off the
8  record to change tapes.
9       THE VIDEOGRAPHER:  All right.  This marks
10  the end of Tape 2, Volume 2, in the deposition of
11  Larry Ellison.
12       At 2:12, going off the record.
13       (Recess taken.)
14       THE VIDEOGRAPHER:  On record at 2:19.
15       This marks the beginning of Tape 3,
16  Volume 2, in the deposition of Larry Ellison.
17       MR. SOLOMON:  Okay.  I've marked as the
18  next exhibit another excerpt from the book Softwar.
19       (Exhibit No. 96 was marked for
20       identification.)
21       MR. LINDSTROM:  Is this 96?
22       THE REPORTER:  Yes.
23  BY MR. SOLOMON:
24    Q    Okay.  You will see there's reference to
25  George Buckley of Brunswick Corporation --

377

1    A    Yes --
2    Q    -- do you know him?
3    A    -- say again?
4    Q    Do you know him?
5    A    I met him at that one afternoon,
6  roundtable.
7    Q    The meeting that's being referred to here?
8    A    Yes.
9    Q    And then he's quoted as saying, "Larry,
10  we've spent $250 million on systems in the last few
11  years," we got -- "and we've got jack shit.  I
12  feel like we were led down the primrose path by the
13  IT guys.  It was always jam tomorrow.  We have all
14  the best stuff in the candy store -- PeopleSoft, i2,
15  Oracle -- it's a real hodgepodge of systems.'"
16       Do you see that?
17    A    I do.
18    Q    And then your response is reported to be,
19  "There you are!" with a kind of smirk on your face.
20  "That's the absolute archetype of what not to do."
21       Is that an accurate quote?
22       MR. LINDSTROM:  Which quote?
23       MR. SOLOMON:  The second quote attributed
24  to Mr. Ellison.
25       MR. LINDSTROM:  The one that says, "'That's

378

1  the absolute archetype of what not to do'"?
2       MR. SOLOMON:  If you -- yes, if that's how
3  you want to pronounce it.
4       THE WITNESS:  "Archetype."
5       MR. LINDSTROM:  I would like a clear
6  record.
7       MR. SOLOMON:  On the pronunciation?
8       MR. LINDSTROM:  On the question.
9  BY MR. SOLOMON:
10    Q    So go ahead.
11    A    So is that quote accurate?
12    Q    Yeah.
13    A    I don't recall.
14    Q    Buckley -- it goes on, "Buckley looks
15  furiously across the table at him:  'Well, I've got
16  to tell you that it was Oracle consultants who, when
17  pressed by my IT people on a perceived deficiency in
18  your software, would say that maybe PeopleSoft or i2
19  might be better.  Well, I'm not going to throw in
20  another $200 million to fix it now.'"
21       Do you recall Mr. Buckley saying that?
22    A    I remember the gist of his commitments.  I
23  don't remember these specific words.
24    Q    And then it says, "IDT's Jim Courter chips
25  in, saying, 'We were fed all kinds of promises that

379

1  it will all work, and it doesn't.'"
2       Do you remember Mr. Courter saying that?
3    A    But keep in mind, they are not -- I don't
4  believe they are complaining about Oracle software.
5    Q    Okay.
6    A    I believe they are complaining kind of
7  about IT in general --
8    Q    Okay.
9    A    -- and I don't remember the specific
10  comments.
11    Q    Okay.  And, "Buckley adds, 'We're in so
12  deep now that spending money is not the way.  We're
13  spending $100 million a year . . . so how do we get
14  out of this mess?'"
15       Do you recall Mr. Buckley saying that?
16    A    Again, not specifically, but the general --
17  the general sense of what -- of their frustration
18  I've heard before.
19    Q    Okay.  And then your footnote, because you
20  do clarify with the footnote here, and you basically
21  say that CEO is getting incredibly pissed off about
22  how much they spend on the systems; right?
23    A    Right.
24       MR. SOLOMON:  Okay.  I've marked as the
25  next exhibit another excerpt from Softwar book.

380

1    (Exhibit No. 97 was marked for
2    identification.)
3    BY MR. SOLOMON:
4    Q    And I'm looking at page 226.
5    A    Okay.
6    Q    And I'm looking at, first of all, the
7    language reading:  "Jim Courter helpfully adds that
8    he's trying to do something like that now and 'it's a
9    complete nightmare.'"  And then you are quote:
10    "'Absolutely.  It might work a little bit some of the
11    time, just enough to tempt you to keep trying.  You
12    can put wings on a car, drive very fast, and it will
13    take off... landing safely is another matter.'"
14       Is that an accurate quote?
15    A    It's an accurate quote.
16       MR. LINDSTROM:  Well, it has ellipses in
17    it.
18       MR. SOLOMON:  Fair enough.
19       MR. LINDSTROM:  Which you left out of the
20    description.
21       MR. SOLOMON:  Fair enough.
22    Q    Do you know what these ellipses are
23    concealing?
24    A    I don't, and, again, let me emphasize, this
25    is not talking about Oracle software; it's talking

381

1    about big systems integration projects.
2    Q    Continuing from the previous page, the same
3    thing; right?
4    A    Right.
5    Q    Then it says, "The next question turns out
6    to be trickier.  The air force's Ron Orr wants to
7    know, reasonably enough, where Oracle has an example
8    of 11i up and running that has stood the test of
9    time.  Ellison points out that the suite has been out
10    for only a year but that a few customers had adopted
11    the 'no-modifications' model early on out of poverty.
12    One such is Techtronics in Oregon -- five years ago
13    its business," in quotes, "fell off a cliff,' so it
14    put in global systems because that was the cheapest
15    way to go.  It's an odd example to give.  Sensing it,
16    Oracle's Mark Jarvis adds that Cisco is a well-known
17    example using Oracle financials to achieve a daily,"
18    in quotes, "virtual close.'  Somebody points out
19    that it didn't help Cisco from making a hash of its
20    forecasting."
21       Do you see that?
22    A    Yes.
23    Q    First of all, do you know who -- do you
24    remember meeting Ron Orr?
25    A    Vaguely.

382

1    Q    Okay.  Do you remember him asking for an
2    example of an 11i implementation that had stood the
3    test of time?
4    A    I -- I don't.
5    Q    Do you -- did you point out the suite had
6    been only out a year but that a few customers had
7    adopted the no-modifications model out of poverty?
8    A    I certainly -- yes.  Yeah.  Techtronics
9    specifically, yeah.
10    Q    You don't recall Techtronics; is that
11    what --
12    A    No, I said I do vividly recall Techtronics.
13    Q    So is it accurate, then, that as of the
14    date of this -- of the meeting that's being referred
15    to here, the only examples offered by Oracle
16    personnel at the meeting of 11i up and running that
17    had stood the test of time was or were Techtronics
18    and Cisco?
19    A    No.
20    Q    Okay.  And what you are saying, then, is --
21    A    They were just specific examples.
22    Q    Right.
23       As Matthew Symonds -- in other words, has
24    Matthew Symonds omitted other examples that were
25    given at that meeting?

383

1    A    I believe so.
2    Q    That's very misleading if he has, isn't it?
3       MR. LINDSTROM:  Objection; argumentative.
4       THE WITNESS:  No, I don't think so, but --
5    BY MR. SOLOMON:
6    Q    Okay.  And then you enter a footnote or
7    clarification which reads:  "As I've said before, our
8    forecasting system is not clairvoyant.  Our
9    forecasting does statistical extrapolations based on
10    historical trends.  If something that's outside our
11    mathematical model of the business changes, like a
12    war in the Middle East, our forecasting becomes
13    inaccurate."
14       Do you see that?
15    A    Yes, I do.
16    Q    Okay.  And you stand by that?
17    A    Absolutely.
18    Q    Now, it wouldn't -- a war in the Middle
19    East is just one example.  There could be who knows
20    how many examples; right?
21    A    Price of oil goes over a hundred dollars a
22    barrel, lots of things.
23    Q    And the point you are making is that while
24    your forecasting system does extrapolations based on
25    historic trends, if something is happening that would

384

1  suggest that the historical trend is not necessarily
2  reliable, then your forecasting will not be reliable;
3  is that right?
4     A   Right.  Major macroeconomic change;
5  sudden -- sudden growth in the economy or sudden
6  shrinkage in the economy would cause -- you can't
7  extrapolate anymore.
8     MR. SOLOMON:  Okay.  Have marked as the
9  next exhibit another excerpt from the Softwar book.
10    (Exhibit No. 98 was marked for
11       identification.)
12 BY MR. SOLOMON:
13    Q   And you will see that this chapter is
14 called "Hungarian Lessons," and in chapter -- it says
15 Chapter 12, "Hungarian Lessons."  I'm looking at the
16 language, "But the bit of GE he's" -- and it's
17 referring to you -- "improbably declared a model 11i
18 customer is in a far-flung outpost of Jack Welch's
19 sprawling imperium."
20    Do you see that?
21    A   I do.
22    MR. SOLOMON:  Then I'm going to have marked
23 as the next exhibit another excerpt from the Softwar
24 book.
25    (Exhibit No. 99 was marked for

385

1       identification.)
2  BY MR. SOLOMON:
3     Q   When you referenced GE Power's
4  implementation of 11i, were you careful to say that
5  it was the Hungarian operation that was implemented?
6     A   Sometimes I mentioned Hungary specifically
7  as a green field; sometimes not.  It was more than
8  just Hungary, but the very first one we did was in
9  Hungary.
10    Q   And I'm looking at the paragraph on
11 page 229 at the bottom that begins with, "The
12 contract."
13    Do you see that?
14    A   Okay.
15    Q   It says, "The contract was signed in late
16 October with a clear understanding that if Oracle
17 delivered at" -- and I'm not going to try and
18 pronounce the name.
19    Can you pronounce the name of that place?
20    A   I can't.
21    Q   It's V-e-r-e-s-e-g-y-h-a-z with an accent
22 z.
23    I'll continue:  "GE would start rolling out
24 11i across its thirty or so other turbine plants.
25 Within a month, the project was in trouble."

386

1     Just stopping there, is it true that the
2  contract was signed in late October?
3     A   I don't recall.
4     Q   Was the -- was the project in trouble by
5  the end of November 2000?
6     A   I think -- I think the issue was there
7  weren't -- there weren't a lot of experienced
8  computer consultants available in rural Hungary.
9     Q   And then it actually goes on down the page,
10 "Within a week we had thirty to forty Oracle
11 consultants.  It was like a MASH unit arriving.'"
12    Do you see that?
13    A   Right.
14    Q   And that was in response --
15    A   Response to lack of experience of technical
16 people in that part of the world.
17    Q   Did you visit that site?
18    A   I have not.
19    Q   Do you know -- I'm sorry.  We are back on
20 that exhibit, Mr. Ellison.
21    Do you know what that local -- do you know
22 anything about that local consulting firm, Ejiva?
23    A   No.
24    Q   Do you know who paid for the consulting?
25 Was it GE or was it Oracle?

387

1     A   I assume it was GE.
2     MR. SOLOMON:  Okay.  I've marked as the
3  next exhibit another excerpt from the Softwar book.
4     (Exhibit No. 100 was marked for
5        identification.)
6  BY MR. SOLOMON:
7     Q   I'm looking halfway down the page, almost,
8  and at the language that reads:  "Even though Ellison
9  used the threat of Lane's departure to get another
10 1.5 million options for himself and 1 million for
11 Jeff Henley, he felt increasingly sick about what
12 he'd done," and then there's an ellipses, and I just
13 want to stop there.
14    Did you use the threat of Ray Lane's
15 departure to get another 1.5 million options for
16 yourself?
17    A   No.  We --
18    MR. LINDSTROM:  You have answered the
19 question.
20 BY MR. SOLOMON:
21    Q   And the answer's no, you did not,
22 apparently?
23    A   No.
24    Q   Do you have any idea why Symonds would have
25 said this?

388

Oracle                                    Page  385 - 388

1    A    Mr. Symonds?  His name is Matthew Symonds.

2    Q    I'm sorry.

3    A    For the record, most people pronounce it

4  "Simmons"; it's written "Symonds."  He's a Brit.

5        What happened -- what happened was, Ray had

6  an offer from Novell, and that offered him more

7  compensation than he thought he would get at Oracle,

8  so as part of the deal for him to stay with Oracle,

9  he got more stock.  And then the board of directors

10  felt that if they were going to give more stock to

11  one senior executive, that the entire management team

12  should get additional stock.

13    Q    Okay.

14    A    For purposes of equity.  So they gave Jeff

15  Henley more stock, and they gave me more stock.

16    Q    Okay.  And the two point -- which, in

17  aggregate, amounted to 2.5 million; right?

18    A    Yes.

19    Q    And it was 2.5 million that Mr. Lane was

20  awarded; is that right?

21    A    I don't recall.

22    Q    In fact, do you recall that Mr. Lane had

23  agreed that 2 million would be sufficient to induce

24  him to stay?

25    A    You have refreshed my memory, right.  Yeah,

389

1  I think that's right.  He asked for 2 million, and I

2  think I went to the board and asked for two and a

3  half.

4    Q    Okay.  Did you tell the board that he would

5  be happy with 2 million?

6    A    I don't recall.

7    Q    Would you expect you would have told the

8  board that?

9    A    I -- probably, but I don't -- but I just

10  don't remember.

11    Q    Okay.  And what's the equity involved in

12  you and Jeff Henley getting two and a half million

13  more options because Ray Lane did?

14    A    I think the board felt if Ray was going to

15  get a bump in compensation at not the usual time, you

16  know, in the middle of the year, that it wouldn't be

17  fair, you know, not to also review the other members

18  of the senior management team and see if an

19  adjustment there was also required for purposes of

20  equity.

21    Q    Have you ever fired anyone and timed the

22  firing to deprive them of being able to exercise

23  options?

24    A    No.  The -- we grant our options at the end

25  of the year.  We also fire people at the end of the

390

1  year as a rule.  We review their performance at the

2  end of the year.  So since -- since we give people

3  stock options and raises, performance -- performance

4  reviews and promotions around the end of the year,

5  there are promotions that are given around the end of

6  the year.  Options, raises and terminations all

7  happen about the same time of the year -- around the

8  same time of the year.

9    Q    Okay.

10    A    And that could mean that someone is let go

11  before options vest, but it's all done -- virtually

12  all of our stuff is done right or about May 31st.

13    Q    You fired Mr. Falotti?

14    A    Pier Carlo Falotti, yes.

15    Q    And you fired Randy Baker?

16    A    Yes.

17    Q    And is -- in those instances --

18    A    I was trying to remember if I fired Randy

19  Baker.

20    Q    Okay.

21    A    I really don't remember if I fired Randy

22  Baker or if he left.

23    Q    Okay.  Do you remember any issue with

24  respect to those two individuals, any issue

25  concerning their options and their ability to

391

1  exercise it?

2    A    I think there were lawsuits involved in

3  both cases.  I think both of them sued to get the

4  right to vest their options.

5    Q    And do you know what the outcome of those

6  lawsuits was?

7    A    I believe we settled the Baker case, and we

8  won the Falotti case.

9    Q    And Falotti is the Swiss -- he was in

10  Switzerland at the time?

11    A    Complicated, yeah.  He lived in

12  Switzerland.  He paid taxes in Italy, and he was paid

13  in the United States.

14    Q    Do you know what the terms of the Baker

15  settlement were?

16    A    I don't --

17        MR. LINDSTROM:  Objection.  Before I

18  consider whether or not to allow him to respond to

19  that question, can you tell me what the relevance

20  would be to the Baker settlement to this litigation?

21        MR. SOLOMON:  It doesn't matter because

22  Mr. Ellison doesn't know anyway, so I'll move on.

23        MR. LINDSTROM:  Yeah, and let me make a

24  statement for the record, if I could.  We have passed

25  100 exhibits now in this witness's deposition, which

392

1    is a milestone.  As you know, it's the second day of
2    his deposition.  It's now 2:30 of the second day of
3    his deposition, and as I've told you off the record,
4    we don't plan to make this witness available for
5    additional days of testimony, so I want to make sure
6    that you use the remaining time that you have to
7    cover the topics that you think you need to cover.
8        MR. SOLOMON:  Okay.
9    Q    You exercised stock options in the end of
10   January 2001; correct?
11   A    Yes.
12   Q    Were all of those options awarded in the
13   regular course of business?
14   A    Again, I'm recalling, but I believe they
15   were going to expire.  I believe I received them nine
16   and a half years ago, so the timing would be they
17   were going to expire something like June or July,
18   August of that year.  So, you know, I think all of
19   those options were in the normal course of business.
20   Q    Okay.
21   A    And about to expire.
22   Q    Okay.  And with respect to Mr. Baker and
23   Mr. Falotti, did you in any way irrigate to yourself
24   their options?
25       MR. LINDSTROM:  Objection; irrelevant.

393

1    A    -- for database.
2    Q    So let me rephrase it, then.
3        What about an application 10.7?
4    A    No.
5    Q    No?
6    A    No.
7        MR. SOLOMON:  Okay.  Let's have marked as
8    the next exhibit another excerpt from the Softwar
9    book.
10       (Exhibit No. 101 was marked for
11       identification.)
12       THE WITNESS:  Okay.
13   BY MR. SOLOMON:
14   Q    Okay.  And I'm looking at the language that
15   reads:  "The idea that there was a trade-off between
16   getting 10.7."
17       Do you see that language?
18   A    Are you looking at the bottom of the last
19   paragraph, bottom of the page, page 143?
20   Q    I'm on 144.  Sorry.
21   A    Okay.
22   Q    And I'm at the -- almost at the top of the
23   page where it says, on the right-hand side, "The idea
24   that there was a trade-off."
25   A    Top paragraph in 144, the last sentence or

395

1    THE WITNESS:  Again, there's no notion of
2    an option pool, a finite, you know -- that's not
3    quite accurate.  We submit -- every year, we submit
4    option recommendations to the board of directors, and
5    they create a pool based on our recommendations, but
6    there's no matter of -- until that pool is created --
7    that pool is then created and then divided,
8    completely divided and granted.  If someone leaves
9    for any reason, those options are then not -- are not
10   reapportioned to anybody else.
11       MR. SOLOMON:  Okay.  Thank you.
12   Q    Were there any similarities between the
13   roll-out of 11i and the 10 -- 10.7 database?
14   A    I think what you are -- 10.7 was an
15   application release.  I think what you are referring
16   to is Database Version 6.
17   Q    Could be.
18   A    The version -- there was --
19       MR. LINDSTROM:  The question is 10.7.
20   BY MR. SOLOMON:
21   Q    Go ahead.  Just tell me what your answer
22   is.
23   A    We've never had a 10.7 on the database.
24   There's no such thing as 10.7 --
25   Q    Okay.

394

1    the first full paragraph on 144?
2    Q    If you look at the first full paragraph --
3    A    Okay.
4    Q    -- just under halfway in?
5    A    Yeah.
6    Q    And then the sentence on the right-hand
7    side, "The idea that there was"?
8    A    Okay.
9    Q    That seems to be suggesting that Mr. Lane
10   is saying that this product had been rolled out and
11   represented no improvement on the prior product; is
12   that right?
13   A    I'm not -- can I just have a second --
14   Q    Sure.
15   A    -- I need a second to look at this
16   document.
17   Q    Absolutely.
18   A    Okay.
19   Q    Mr. Lane seems to be saying that the claims
20   with respect to the 10.7 NCA were misleading; is that
21   fair?
22       MR. LINDSTROM:  Objection; mischaracterizes
23   the document.
24       THE WITNESS:  Where do you have --
25   BY MR. SOLOMON:

396

1   Q   Okay.  Let me just read it into the record.

2   A   Okay.

3   Q   "The idea that there was a trade-off

4   between getting 10.7 Smart Client right and Oracle

5   being first to the Internet is not one that Lane has

6   much time for.  He claims that when the Internet

7   version of 10.7, known as 10.7 NCA," and in parens,

8   "(network computing architecture), came out in early

9   1998, it wasn't any better than the client/server

10   release that had been rolled out five months earlier.

11   He says, 'NCA wasn't what it was sold as.  We said it

12   was browser-based, but you had to have Java code

13   running on the client or it wouldn't work.'"

14       Do you see that?

15   A   I do.

16   Q   Okay.  Do you agree with what Mr. Lane is

17   saying there?

18       MR. LINDSTROM:  The quote?

19       MR. SOLOMON:  Yes.

20       THE WITNESS:  Complete nonsense.

21       MR. SOLOMON:  Okay.  Okay.  That's fine.

22       Mark another excerpt from the book marked

23   as an exhibit.

24       (Exhibit No. 102 was marked for

25       identification.)

397

1   BY MR. SOLOMON:

2   Q   And I'm looking halfway down the page, the

3   language that reads:  "Lane's version of the episode

4   is at odds with Ellison's.  He says that the issue of

5   moving away from client/server had not been that

6   important.  'It was the same old story that the

7   applications didn't work and they weren't competitive

8   and how Ron Wohl was a joke.'"

9       Do you see that?

10   A   I do.

11   Q   I assume that you are going to disagree,

12   but tell me if you will:  Do you agree or disagree

13   with the quotation it was the same old story that the

14   applications didn't work and they weren't

15   competitive?

16   A   It's just astonishing to me that people say

17   the applications don't work.  I mean, it's very glib

18   and easy to say -- we are the second-largest

19   applications company in the world.  We were at the

20   time, the second-largest applications company in the

21   world.  It didn't mean our applications were

22   flawless.  They certainly had a lot of bugs.  It's a

23   tough business.  They are complicated -- they are

24   very complicated pieces of engineering, but they did

25   work.  We had lots of happy customers.  The happy

398

1   customers outnumbered the unhappy customers by a huge

2   margin.  Ron Wohl had built those applications.  He

3   was not a joke.  He wasn't perfect.  You know, I

4   mean, but.

5   Q   You took exception to him being called a

6   joke; right?  You entered a footnote here?

7   A   Oh, I did.  There's a whole -- I should

8   just refer to my footnote.

9       MR. LINDSTROM:  You are remarkably

10   consistent.

11   BY MR. SOLOMON:

12   Q   And let me read you footnote --

13   A   But people do use language like that.  They

14   do use, you know, this doesn't work; that doesn't

15   work.  I mean, that kind of hyperbole, you know, is

16   just --

17   Q   And some people say it works; it's

18   integrated; just snap it together?

19   A   It is --

20       MR. LINDSTROM:  Argumentative.

21       THE WITNESS:  The -- that is a

22   simplification, certainly.

23   BY MR. SOLOMON:

24   Q   You say, "calling Ron Wohl a 'joke' is as

25   unprofessional and unfair as it is factually

399

1   inaccurate."

2   A   Yeah.

3   Q   "The applications that Ron Wohl built run

4   nearly fifteen thousand companies around the world,

5   second in success only to SAP."

6       Are you still second in success to SAP?

7   A   Unfortunately, yep.  Yep, after all these

8   years, still second.  But we are a lot closer to them

9   and -- and business is good.

10   Q   Okay.  The book describes -- I'll

11   paraphrase, but it seems to describe that you

12   orchestrated secretly, for quite some time, the

13   firing of Ray Lane; is that fair?

14   A   Well, it's not clear I had the authority to

15   fire Ray Lane, so when someone that senior in the

16   company is being fired -- one of my direct reports

17   is -- leaves -- I really have to go get support of

18   the board of directors or I can't do it.

19   Q   Okay.  But you talked about putting in

20   shadow management team sort of while he was still

21   there, but you had already decided he had to leave,

22   did you not?

23   A   I'm not sure shadow management team.  I

24   certainly started thinking about what it would mean

25   if -- what it would mean if Ray left, and how we

400

1 would organize the company after Ray left.  And I
2 started acquainting myself with some of the things
3 that he was doing.
4    Q    Okay.
5    A    And thought about replacing -- you know,
6 new jobs for other people if he were to leave,
7 because I was certainly lobbying the board for him
8 being dismissed, that's right.
9    Q    Okay.  And in the context of orchestrating
10 his departure, you described yourself as not
11 confron -- not confrontational but calculating; is
12 that fair, carefully calculating?
13    A    Yeah.  I certainly plan -- I certainly
14 think it's my responsibility to plan for what happens
15 after he leaves.
16    Q    Okay.
17    MR. LINDSTROM:  Counsel, are you going to
18 be on this topic much longer?  Because, again, I
19 don't see the relevance of this to the litigation.
20    MR. SOLOMON:  That's fine.  It will emerge.
21    Q    Would you describe yourself as carefully
22 calculating generally about business?
23    A    I think I plan in advance.
24    Q    Okay.  Would you describe yourself as a
25 hyperquant?

401

1    A    I think I'm rational.  I think I'm
2 quantitative.  I think I weigh risks and rewards.
3    We are done with this exhibit?
4    MR. SOLOMON:  Yes.
5    I've marked as an exhibit another excerpt
6 from Softwar.
7    (Exhibit No. 103 was marked for
8    identification.)
9 BY MR. SOLOMON:
10    Q    Okay.  I'm looking at page 180, the first
11 full paragraph, which reads: "Despite his enjoyment
12 of controversy, Ellison doesn't have a great appetite
13 for argument, at least not in a professional context.
14 While he's always prepared to listen to the views of
15 developers when they differ from his and is willing
16 to be persuaded if he's wrong, he doesn't enjoy
17 debates about business issues that depend on hunch
18 and feel."
19    Is that accurate?
20    A    Completely.
21    Q    "Ellison is a self-confessed 'hyperquant'
22 who feels fully in control only when he's processing
23 data."
24    Is that true?
25    A    I think -- I think it's a bit of an

402

1 exaggeration, but I -- yes.
2    Q    Okay.  And then it goes on to say, Even
3 when flying a plane or racing "Sayonara," he prefers
4 to be guided by the numbers coming out of the
5 computer systems, etc.
6    Is that accurate?
7    A    Well, no.  Again, it's -- it's a bit of an
8 exaggeration and simplification, but, you know,
9 clearly, I look at the computer system when I'm
10 racing the sailboat, but I also pay attention to, you
11 know, puffs on the water and clouds in the sky, so
12 I'm looking around at a lot of things, not just
13 numbers --
14    Q    Okay.
15    A    -- but I know what he's saying.
16    MR. SOLOMON:  Okay.  All right.  I'll have
17 this additional excerpt of Softwar marked as an
18 exhibit, please.
19    (Exhibit No. 104 was marked for
20    identification.)
21 BY MR. SOLOMON:
22    Q    Okay.  First, I'm looking at page 177 and
23 the language: "Remarkably, within not much more than
24 a year of Ellison's beginning his campaign to cut
25 costs by turning Oracle into an exemplary e-business,

403

1 the targeted first billion dollars of savings -- a
2 number pretty much plucked from the air to help
3 dramatize the project -- had been secured and
4 Oracle's profit margin had moved from a little under
5 20 percent to more than 30 percent."
6    Do you see that?
7    A    I do.
8    Q    Was the number pretty much plucked from the
9 air?
10    A    It wasn't calculated.  That's what's meant
11 by "plucked from the air."  It was seen as a -- it
12 was seen as a target.  We thought there was a -- we
13 thought there was a lot of efficiency that could be
14 gained, so we picked as a target a billion dollars.
15 It's a round number.  We are a big company, so we set
16 a goal of a billion dollars as something everyone
17 could remember.
18    Q    Okay.  And then further down the page --
19    A    We didn't -- what I meant by that, we
20 didn't know where it was all going to come from by
21 the time we started the project.
22    Q    Okay.  And then if you just go a few lines
23 down, it says, "Ellison decided that Oracle's own
24 Internet-derived efficiencies would be the first
25 reference.  Soon, Oracle's $300 million marketing

404

Ellison, Lawrence  9/21/2006  10:57:00 AM

1   budget was pumping out the insistent message," and
2   then, in quotes, "By using our own E-Business Suite,
3   Oracle saved $1 billion in one year.'"
4       Do you see that?
5   A   I do.
6   Q   And is that the representation that you and
7   Oracle were making, in quotes, By using our
8   E-Business Suite, Oracle saved $1 billion in one
9   year?
10  A   Again, I think I answered this earlier.  By
11  using our own applications, by more automation, by
12  using the Internet, by using, you know, modern -- you
13  know, modern systems, modern technologies, we can
14  become much more efficient, and so can other
15  companies.
16  Q   Okay.  And then a few lines down, it says,
17  "Partly because of Ellison's reputation for
18  stretching the truth when it suited him, critics were
19  keen to find explanations for the cost savings that
20  didn't depend on the performance of Oracle's
21  software."
22      Do you see that?
23  A   I do.
24  Q   Do you believe you have a reputation for
25  stretching the truth when it suits you?

405

1   A   I don't -- I don't know.
2   Q   Do you stretch the truth when it suits you?
3   A   No.  I think I'm sometimes guilty of
4   simplification, you know, in a marketing slogan, but,
5   no, I try to be very, very accurate.  In fact, even
6   our marketing campaigns are -- are
7   quantitative-based; try to be based on hard, hard
8   facts.  We have a hard marketing campaign against SAP
9   right now, and it's based on numbers, so we think
10  fact-based, hard, quantitative ads are more
11  effective.
12  Q   And just so the record's clear, do you
13  believe that you have a reputation for stretching the
14  truth when it suits you?
15  A   I don't -- you know, I don't know.
16  Q   Okay.  And then on page -- at the bottom of
17  page 177 -- then it goes on to page 178 -- it says,
18  "An article in the magazine 'InternetWeek' by Mitch
19  Wagner published in March 2001 and entitled 'Oracle
20  Savings Don't Add Up' was fairly representative."
21      Do you see that?
22  A   Yes.
23  Q   Did you ever read that article?
24  A   I didn't.
25  Q   And you will see that it says, in the

406

1   middle, "Much of the savings actually have come from
2   cost-cutting measures that could have been achieved
3   without the Internet, according to experts and an
4   analysis of Oracle's financial statements."
5       Do you agree with that?
6   A   I'm sure there are some -- you know, some
7   of the savings had to do with sometimes you just hire
8   better people or -- but, no, I think the bulk of the
9   savings -- and we saved a lot more than a billion
10  dollars in the end, but the bulk of the savings went
11  from moving to modern automated systems.
12  Q   Okay.  And then it goes on to say, "One
13  such expert, John Puricelli, an analyst with A.G.
14  Edwards & Sons, opined that most of these savings had
15  come from old-fashioned belt-tightening."
16      Do you agree with that?
17  A   What is -- what is old-fashioned
18  belt-tightening?  It's an interesting metaphor.  If
19  everyone can save -- I mean, how is it that we were
20  able to save a billion dollars in such a short period
21  of time and raise our margin so much.  We were able
22  to do more with fewer people.  The only way you can
23  do that is have better automation and better tools.
24  It's really dramatic productive improvement based on
25  computers.

407

1       I mean, old-fashioned -- I mean,
2   old-fashioned belt-tightening, can your -- can your
3   firms save, you know, a lot of money by old-fashioned
4   belt-tightening?  I'm not sure anyone can save -- I
5   don't even know what old-fashioned belt-tightening
6   is.
7   Q   What about the quote that's attributed to
8   Mr. Puricelli:  "'A lot of the cost savings that came
9   were changes in employee behavior, and software
10  doesn't do that'"?
11  A   That's ridiculous.  That's ridiculous.  Of
12  course software changes behavior.  You think the word
13  processor or Microsoft, you know, desktop computers
14  changed human behavior?  It's just idiocy.
15  Q   Let's go to page 178.  And I'm now looking
16  at the language:  "A review of both investigations by
17  the Economist Intelligence Unit concluded, 'These
18  studies provide impressive evidence of a company in
19  the midst of dramatic changes inspired by the
20  Internet -- although as Oracle's senior executives
21  freely concede, many of the efforts of transformation
22  derive as much from old-fashioned sound business
23  practices as they do from Internet-driven
24  innovation.'"
25      Do you agree with that?

408

Ellison, Lawrence  9/21/2006  10:57:00 AM

1    A    Well, not really.  I really think old -- I
2    don't think you want to have old-fashioned business
3    practices if you have -- if you have modern software.
4    I mean, everyone's business should change to take
5    advantage of technology.
6         So, I mean, it sounds interesting, but the
7    fact of the matter is modern tools has made -- you
8    know -- you know, changes our behavior and changes
9    our business practices.
10        MR. SOLOMON:  Okay.  So I've marked as the
11   next exhibit another excerpt from the Softwar book.
12        (Exhibit No. 105 was marked for
13        identification.)
14   BY MR. SOLOMON:
15   Q    Okay.  I'm looking at page 189, and I'm at
16   the bottom of the page.  I'm looking at the language
17   that reads:  "Their caveat was that Ellison's," in
18   quotes, "'change the game' strategy required
19   near-flawless execution."
20        Just stopping there, was it your view in
21   2000 that Oracle's strategy required near-flawless
22   execution?
23   A    If our strategy requires flawless
24   execution, we have no chance at all because we never
25   flawlessly execute.  Nobody ever flawlessly executes.

409

1    I think, you know, the strategy was a good
2    one.  It's paid off for us.  It's paid off for our
3    customers, and it's paid off for our shareholders,
4    but our execution wasn't flawless, but the good news
5    is nobody is -- nobody's is.
6    Q    Now, you say it's paid off for your
7    shareholders --
8    A    Yeah.
9    Q    -- but isn't it true that when you sold
10   your stock at the end of January 2001, the stock
11   price was $30 or more, and now it's under 20?
12   A    Absolutely, but I don't think that was to
13   do -- but our company has more than doubled in sales,
14   more than doubled in profits, more than doubled the
15   number of customers it has, and the fact is that --
16   you know, that we were in the midst now, in
17   hindsight -- we can all look back on those years and
18   say we were in the midst of a stock market bubble.
19   But were other companies in the face of that decline
20   in the bubble are not worth very much.  You know,
21   Oracle has come back very, very strong.
22   Q    It goes on to say, "Oracle was on a roll,
23   but if it became apparent that it had bitten off more
24   than it could chew, the company could expect little
25   mercy."

410

1    Was that an expectation that you had in
2    calendar 2000?
3    A    No.  Again, I think we had -- we had made
4    the right strategic decision, and I think history has
5    borne that out by building E-Business Suite; by going
6    to the Internet and building the E-Business Suite,
7    and it's been a bumpy road, but it's paid off for
8    everybody.
9    Q    But it's true you should have delayed
10   rolling out 11i; isn't that true?
11   A    The -- we did delay.  You know, we
12   delayed -- we probably delayed a couple times before
13   rolling it out.
14   Q    Then you should have delayed even longer?
15   A    Reasonable people can, you know, disagree
16   on that.
17   Q    What's your position?
18   A    I would have rolled it out at the same time
19   that I rolled it out.  I probably would have had our
20   existing customer base move -- migrate to the new
21   software more slowly so we could manage that process
22   a little bit better with -- within the support
23   organization.
24        So for new customers, it worked -- you
25   know, it worked pretty well.  We got it -- we got the

411

1    product out, but I would have -- would have kind of
2    narrowed the funnel so we could manage the process
3    better than we did.
4    Q    Don't you think you should have delayed the
5    release longer than you did?
6    A    No.
7         MR. LINDSTROM:  Objection; asked and
8    answered.
9         THE WITNESS:  No.  No.
10   BY MR. SOLOMON:
11   Q    Okay.  Looking at your footnote, it reads:
12   We are getting a lot of -- excuse me.  "We were
13   getting a lot of pressure from our customers to
14   deliver the 11i applications.  I made a lot of them
15   mad by delaying the release for several months.  I
16   should have delayed it even longer."
17        Is that your footnote?
18   A    Yeah.  Again, in more detail, let me repeat
19   what I said.  I would have released it exactly the
20   same time, but in terms of our existing customer
21   base, who were planning to migrate, I should have
22   slowed that process down.  It's just a little -- a
23   little more meat on the bones here.  Just slowed that
24   process down so we could have done a better job of
25   managing them through the early -- the early versions

412

Ellison, Lawrence  9/21/2006  10:57:00 AM

1  of 11i.
2      MR. SOLOMON:  I've marked as the next
3  exhibit another excerpt from the Softwar book.
4      (Exhibit No. 106 was marked for
5      identification.)
6  BY MR. SOLOMON:
7      Q    And I'm looking at page 157, and I'm
8  looking, actually, at your footnote, and it reads:
9  "He takes personal credit for our stock price run-up?
10  Amazing.  Oracle rode the Internet wave because our
11  database powered virtually every major Web site on
12  the Net.  If you plot the stock price of Cisco,
13  Oracle, and Sun, you will see that all three
14  companies rose and fell together in perfect
15  synchronization as sentiment about the Internet rose
16  and fell."
17      Did you write that footnote?
18  A    I did.
19      Q    Do you recall that in January of 2001,
20  Cisco preannounced that it wasn't going to make its
21  numbers?
22  A    I don't recall.
23      Q    You don't recall that event?
24  A    Well, you are refreshing my memory, so kind
25  of.

                                                413

1      Q    Okay.  At the time that Cisco preannounced,
2  do you recall being concerned that Oracle might not
3  make its numbers?
4  A    No, because we -- you know, we had signed
5  the largest -- you know, we had signed the largest
6  deal in our history, and we had a strong pipeline.
7  We were in good shape in the quarter.
8  Q    Okay.
9  A    This was written in hindsight, of course,
10  just looking at the graphs.
11      MR. SOLOMON:  Okay.  Let's go off the
12  record for a couple seconds to organize some
13  documents.
14      THE VIDEOGRAPHER:  Off the record at 3:16.
15      (Recess taken.)
16      THE VIDEOGRAPHER:  On record at 3:30.
17      MR. SOLOMON:  Have marked as the next
18  exhibit a document produced by the defendants in this
19  litigation with the control numbers 034669 and 670.
20      (Exhibit No. 107 was marked for
21      identification.)
22  BY MR. SOLOMON:
23      Q    When you have had a chance to view it, let
24  me know if you recognize it, please.
25  A    Okay.  I've read the whole thing.

                                                414

1      Q    Okay.
2  A    But still not quite sure what it's about.
3  Go ahead.
4      Q    Okay.  You will see that it's dated the
5  11th of January 2000 and that you are an addressee?
6  A    Yes.
7      Q    Okay.  And it's Larry -- to Larry, Jeff,
8  Ray and Safra.  "I wanted to let you know where we
9  are in analyzing the effect of the changes we made
10  yesterday to the conversion ratios and in analyzing
11  the effect of the pricing changes on the Q3
12  pipeline."
13      Do you see that?
14  A    I do.
15      Q    Do you have any idea what the reference is
16  to the changes being made to the conversion ratios?
17  A    A conversion ratio means the number of
18  the -- percentage of the deals in the pipeline that
19  will become sales.  That's conversion ratio.  And the
20  pricing changes are referring to changing in price in
21  our products.  So there are two things.
22  Q    Right.
23  A    -- that will change the forecast.  One is
24  if the -- product -- if we decrease the price of
25  the product, and the other would be if we increased

                                                415

1  or decreased the conversion ratio.
2  Q    Okay.
3  A    But I don't know what it's specifically
4  about.
5  Q    Okay.
6  A    I don't know what price changes they are
7  talking.
8      Q    And you don't know what prompted the
9  changes reflected here in the conversion ratios?
10  A    I would be guessing, but, no, I don't know.
11  Q    Okay.  And what is your guess?
12      MR. LINDSTROM:  Objection; calls for
13  speculation, no foundation.
14      THE WITNESS:  My guess is we were looking
15  at lowering prices.  We virtually never raise prices.
16  We were looking at lowering prices and how that would
17  affect -- we tend to test a price change against an
18  existing forecast, and we will take it out several
19  quarters.  And then sometimes there's an elasticity
20  change, so if the price goes down, people buy more.
21  So they buy more frequently, so the conversion ratio
22  might go up.  But, again, I don't know specifically
23  what this experiment was.
24      MR. SOLOMON:  Okay.  Have marked as the
25  next exhibit another document produced in the

                                                416

1   litigation with the control number 020724 and 725.
2      (Exhibit No. 108 was marked for
3      identification.)
4      THE WITNESS:  Okay.
5   BY MR. SOLOMON:
6      Q   Okay.  Do you recognize this?
7      A   I don't specifically recognize it.
8      Q   Okay.  It's dated the 11th of September
9   2000?
10      A   Right.
11      Q   And it's from Jeff Henley to Jennifer
12   Minton, and you are copied; is that right?
13      A   Yes.  Yes.
14      Q   And this would have been in your files in
15   or around September of 2000?
16      A   Yes.
17      Q   And it wasn't produced from your files and
18   you can't explain why; is that right?
19      A   That's correct.
20      Q   The first sentence reads:  "Thank god there
21   was a disproportionate amount that went to ERP.  Only
22   CRM now looks bad and total apps is at least
23   respectable."
24      Do you see that?
25      A   Yes.

417

1      Q   Do you recall being aware in September of
2   2000 that CRM was looking bad?
3      A   You mean the growth rate --
4      Q   Right.
5      A   -- the growth rate in that quarter --
6      Q   Correct.
7      A   -- most-recently-reported quarter?
8      Yeah, our CRM applications were new.  We
9   had a very formidable competitor that we were behind,
10   Siebel Corporation, and CRM was a new business for
11   us.
12      Q   In fact, it reflects a negative growth
13   rate; is that right?
14      A   Yes, it does.
15      Q   If you turn the page, it says, at the top,
16   "Jeff Henley wrote," and down the page a little bit,
17   it says, "The only apps groups that should" -- "that
18   should" -- I speculate that is meant to say "shows"
19   or "show" -- "showed," but anyway, "the only apps
20   group should strong growth rate were iProcurement,"
21   in parens, "(76%) and HR," in parens, "(110%).  In
22   CRM the huge HP deal ago was just a killer coupled
23   with slow closings on a number of deals or losses."
24      Do you see that?
25      A   I do.

418

1      Q   Do you know what the reference is to the HP
2   deal?
3      A   Yeah.  I think in the same quarter -- at
4   least this is refreshing my memory, so.  In the same
5   quarter last year, we concluded a very large purchase
6   of CRM by Hewlett-Packard.  They bought it.  So
7   growth rate is a comparison between what you did this
8   quarter and the quarter a year ago.  If you had a
9   really big deal, an out-of-the-ordinary big deal a
10   year ago, it makes your comparisons difficult, and
11   it's much harder to show growth if you had a really
12   great quarter a year ago, and that's what this is
13   referring to.
14      Q   Okay.  And is the reference here to an HP
15   deal that was contemplated to close in Q1 but didn't?
16      A   No.  I believe this is referring to an HP
17   deal that actually closed a year before.
18      Q   Got it.  Okay.
19      A   In '99.
20      Q   Okay.
21      A   So this is 2000; right?
22      Q   Yeah.
23      A   Yeah.  So HP deal closed in '99.  So
24   comparing the 2000 -- the results in 2000.  That's
25   what I think this is -- again, I don't know these

419

1   dates offhand.
2      Q   Okay.
3      A   So comparing these had made it hard to show
4   growth this year because the big deal --
5      Q   Okay.
6      A   -- last year.
7      Q   The slow closings on a number of deals or
8   losses, that would refer to the current quarter --
9      A   Current quarter in 2000, right, for CRM.
10      Q   Okay.
11      A   And tools is also down a lot.
12      Q   Okay.  Then it goes on to say, "We'll have
13   our work cut out to explain apps.  We rebounded
14   strongly on database as we promised but apps on the
15   surface looks terrible.  This will be the area of
16   focus on the call."
17      Do you recall Mr. Henley sharing with you
18   around this time that the apps numbers on the surface
19   looked terrible?
20      A   Again, I'd have to go back and look at what
21   growth rate we were expecting for applications,
22   because I think the 45 percent is -- well, actually,
23   he says -- it's kind of funny.  In one part of it, it
24   says "on the surface" -- people aren't always
25   consistent.  "On the surface looks terrible."  Then

420

1    back here, in the same note, he says the "total apps
2    is at least respectable."
3        Q    Right.
4        A    So the note itself is not consistent.
5        Q    Doesn't that reflect, though, that his
6    concern is with CRM more than with ERP?
7        A    No.  I think he was talking --
8        MR. LINDSTROM:  Calls for speculation.
9        THE WITNESS:  This will be -- let's see.  I
10   mean, just looking at the two paragraphs, it says,
11   "We'll have our work cut out to explain apps."  So I
12   think he's referring to all of applications.  It's --
13       MR. SOLOMON:  Okay.
14       THE WITNESS:  -- just not consistent.
15       MR. SOLOMON:  Okay.  I've marked as the
16   next exhibit a document produced in the litigation
17   with the control number 036423.
18       (Exhibit No. 109 was marked for
19       identification.)
20       THE WITNESS:  Okay.
21   BY MR. SOLOMON:
22       Q    Okay.  Do you recognize this?
23       A    I don't recall it specifically.
24       Q    Okay.  You see it's dated the 22nd of
25   September 2000, and it's from Lia Burke to you and

421

1    others?
2        A    Yes.
3        Q    Do you know who Lia Burke is?
4        A    I do not.
5        Q    And it says, "Larry, Jeff asked that we
6    provide you with a status on the use of OSO to
7    capture pipeline and forecast data.
8        "The pipeline data in OSO is in very good
9    shape, as the data in OSO is very dynamic, at the
10   time of the forecast submissions earlier this week
11   the pipeline data was in agreement with what is being
12   presented to the EC on Monday.  The forecast module
13   is newer and while most of the data is good we
14   continue to work with a few groups to ensure OSO is
15   being kept up to date."
16       Do you see that?
17       A    I do.
18       Q    Is that an issue that you were involved
19   in at that time --
20       A    Yeah.
21       Q    -- what was going into OSO?
22       A    Yeah.  Specifically, I wanted to not get
23   forecasts that weren't -- that didn't come out of the
24   system, so our old practice where people -- the sales
25   executives would come into the room and they would

422

1    have their forecasts on spreadsheets or in their
2    heads and you go around the room and get everyone's
3    forecast, and I thought -- and then we would go back
4    and look at OSO and the two might not necessarily
5    agree, so we were trying -- you know, I was trying to
6    get the system to be used at all times.
7        Q    Okay.  At around this time, did you want
8    more risk to be put into the forecasts?
9        MR. LINDSTROM:  Vague and ambiguous.
10       THE WITNESS:  No.  I've always wanted the
11   forecast to be accurate.  You know, I would say
12   slightly conservative but accurate.
13       MR. SOLOMON:  Okay.
14       THE WITNESS:  So sometimes -- sometimes
15   people would get so conservative, you get a culture
16   where everyone wants to beat their forecast every
17   time, and then you can get very -- you know,
18   misleadingly low forecasts.  So I've always -- I'll
19   stop there.
20       MR. SOLOMON:  Okay.  So we are having
21   marked as the next exhibit another document produced
22   by the defendants with the control numbers 203681
23   through 683.
24       (Exhibit No. 110 was marked for
25       identification.)

423

1        THE WITNESS:  Okay.
2    BY MR. SOLOMON:
3        Q    Do you recognize this?
4        A    I don't.
5        Q    You will see, on the third page of the
6    exhibit -- well, first, on the first page, the
7    subject is "Draft New terminology on Forecasting"?
8        A    Yeah.
9        Q    It's dated October the 6th, 2000; right?
10       A    Right.
11       Q    And then the third page has some text, and
12   it starts, "Hi, Jim, we can talk through the
13   recommendation, let me know your thoughts...
14       "Recently Larry has changed the way that he
15   is interpreting our forecast.  He would like us to
16   reflect our numbers as follows," and then there's a
17   "Worst," "Forecast," and a "Best" category.
18       Do you see that?
19       A    I do.
20       Q    Does this reflect the -- a change in
21   forecasting that you directed?
22       A    Yeah.  I was trying to accomplish two
23   things.  I wanted to -- you know, yeah.  Rather than
24   a single number -- rather than getting a single
25   number, I wanted to get three numbers:  Worst case,

424

Ellison, Lawrence  9/21/2006  10:57:00 AM

1    most likely case, and best case --
2         THE REPORTER:  Say it one more time.
3         THE WITNESS:  Rather than getting a single
4    forecast number from each of the sales executives, I
5    wanted to get three separate numbers reflecting a
6    worst case, guaranteed we will at least do that well;
7    a most likely case, what you thought you were
8    actually going to do; and a best case, if everything
9    goes really well, how high could it go.
10        And I was also trying to get -- in putting
11   in the new methodology, I was also trying to
12   synchronize the way Europe forecasts with the way
13   Latin America forecasts and Asia Pacific and
14   different groups would have different ways of doing
15   their forecast.  And I was trying to get as much of
16   that variability out of the system as possible.
17        Now, you can't get the personalities out of
18   the system.  I mean, if you have a conservative sales
19   executive, they are going to forecast conservatively.
20   If you have an optimistic sales executive, they are
21   going to forecast less conservatively.
22   BY MR. SOLOMON:
23   Q     What drove you to make this change?
24   A     The -- we were going to put the three
25   numbers in the computer system.  What I wanted to

425

1    see -- I've done -- to get more information, just
2    getting more -- you know, getting more data rather
3    than one number, which usually was someplace between
4    the best case and the most likely -- what they used
5    to call a commit forecast; one we could count on.  I
6    was trying to, you know, get a better idea of what,
7    you know -- get more data -- more data to work with.
8    Q     Okay.  And, at that stage -- and we are
9    talking about October 2000 -- how long had Oracle
10   internally been using OSO?
11   A     I don't recall.
12   Q     Years or months, could you tell me that?
13   A     I think a few years.
14        MR. SOLOMON:  Okay.  Mark as the next
15   exhibit a document produced by the defendants with
16   the control number 6123 -- 612306 and 307.
17        (Exhibit No. 111 was marked for
18        identification.)
19        THE WITNESS:  Okay.
20   BY MR. SOLOMON:
21   Q     Do you recognize having seen this before?
22   A     No, I don't.
23   Q     The e-mail exchange in the bottom half of
24   the page is from David Winton to David Winton, and it
25   appears that went up the chain to George Roberts.

426

1         Do you see that?
2    A     Yes.
3    Q     And it says that David Winton wrote, and
4    then there are a few paragraphs and some numbered
5    paragraphs starting with, "1.  Slow start in FY'00."
6         Just for the record, this is dated 7th of
7    December -- this is dated the 6th of December 2000.
8         "Slow start in FY'00 -- The growth
9    comparisons to last year have been relatively easy in
10   the first two quarters as we did not perform that
11   well a year ago.  The disruption over account moves
12   in Majors last year was the main factor."
13        Were you aware that, as stated here, the
14   growth comparisons for last year had been -- the last
15   year had been relatively easy in the first two
16   quarters because they -- Oracle did not perform well
17   in those quarters in the previous year?
18   A     Don't recall.
19   Q     You don't recall.  Okay.
20        And then No. 2, "More Big Deals this
21   Q1&2 -- As the schedule shows, our results this year
22   have been boosted by big deals in both quarters.
23   Combined, these greater than $5 million deals
24   contributed over $55 million year to date.  Note that
25   we only have one deal over $5 million currently in

427

1    the Q3 Pipe.  Last year we had four deals that netted
2    $28 million."
3         Do you see that?
4    A     I do.
5    Q     Did you know that in December of 2000?
6         MR. LINDSTROM:  Compound.
7         THE WITNESS:  This is -- this is in George
8    Roberts' sales unit.
9         MR. SOLOMON:  Correct.
10        THE WITNESS:  Because we have lots and lots
11   of sales units.
12        MR. SOLOMON:  Correct.
13        THE WITNESS:  But, no, I did not know
14   specifically know the details in his unit.
15   BY MR. SOLOMON:
16   Q     And "3.  Growth comparisons tougher in
17   Q3&4."  It says, "NAS results took off last year in
18   Q3 and continued into Q4.  Growth rates will slow in
19   the second half but we still feel that the annual 31%
20   target is achievable with some potential upside of 2
21   to 3 points if Q3 is strong."
22        Do you see that?
23   A     I do.
24   Q     Were you aware of those facts in December
25   of 2000?

428

1    A    Not specifically that I recall.

2    Q    And then 4 says, "Q3 Pipe not where it

3    needs to be."

4        Were you aware of that in December of 2000?

5    A    Again, I tend not to look at each

6    individual sales unit; I tend to look at the company

7    as a whole.  But, no.  No, I don't recall.

8        MR. SOLOMON:  All right.  I've marked as

9    the next exhibit another document produced by the

10   defendants in this litigation with a control number

11   040617.

12       (Exhibit No. 112 was marked for

13           identification.)

14   BY MR. SOLOMON:

15   Q    And when you have had a chance to review

16   it, let me know if you recognize this.

17   A    I don't recognize it, no.

18   Q    Okay.  And, again, it references a sales

19   unit in the company, sales division?

20   A    I believe this is all of North America,

21   but, again, I'm not -- so this is not a unit, but

22   this is --

23   Q    Okay.

24   A    -- all of North America.

25   Q    Okay.  And that's in contrast to the last

429

1    exhibit which was --

2    A    Which was just George -- yes, exactly

3    right.

4    Q    Is it right that NAS contributes about

5    25 -- at that time, contributed about 25 percent of

6    the company's revenues?

7    A    Over the previous 12 months?  I'm not --

8    that's close.

9    Q    Okay.

10   A    Close.

11   Q    Okay.  Back to this exhibit, it's dated

12   January 11th, 2001.  It's from David Winton to

13   Jennifer Minton, and it starts off saying, "We

14   finished the Ops Reviews this afternoon and I wanted

15   to give you a quick update on the current quarter and

16   full year look," and it says, "Our Q3 forecast of

17   $346 million has not changed but the upside or Best

18   is revised down by $16.8 million to $360 million."

19   A    Right.

20   Q    It says, "Main factors," and it says, "1.

21   The Pipe has not grown as we had anticipated.  We're

22   actually slightly down from December and reporting."

23       Do you see that?

24   A    I do.

25   Q    So you were aware as of December -- excuse

430

1    me, January 11, 2001 the pipe had not grown as

2    anticipated?

3    A    I don't recall.

4    Q    No. 2 says, "Lack of big deals" -- excuse

5    me.  "Lack of big deals.  Unlike Q1 & Q2, we have" a

6    "few big deals in Best case that could drive us past

7    the $360 million" -- "we have few," not "we have a

8    few."  "We have few big deals," excuse me.

9        Were you aware that unlike Q1 and Q2, there

10   were few big deals in Q3 that could drive you past

11   360?

12   A    No, I was not aware.

13   Q    "3," Drops in -- "Drop in Technology.  As

14   reflected in the softening Pipe, both GB and Majors

15   see a slow down in both Q3 and Q4.  GB's dot com

16   bubble has burst," and in parens, "(they expect the

17   West to end the year 30 to $40 million behind their

18   original Budget for Technology).  Majors sees a slow

19   down in spend along with smaller deal" size --

20   "sizes.  Also, the change in the ASP model for

21   Generic Tech hosting" 11i's -- lic's coupled with the

22   dot com crash is impacting projected Tech results in

23   that segment."

24       Do you see that?

25   A    I do.

431

1    Q    Were you aware of the issues raised in

2    Point No. 3 in January of 2000 -- January of 2001,

3    excuse me?

4    A    Yes, and I certainly don't agree with all

5    of them.  The ASP model for Generic Tech hosting

6    never happened.

7    Q    Okay.  Do you know why that reference is

8    made there, though?

9    A    At the time, people were talking about no

10   longer buying their own computers, no longer buying

11   their own software but rather renting time from --

12   from hosters, you know, kind of a whole new -- I'm

13   trying to remember the -- some of the names of some

14   of the businesses that were started at the time to do

15   this generic hosting, but they are all gone.

16   Q    Do you think in January 2001 a regular

17   Oracle investor would be interested in knowing that

18   the pipe hadn't grown as anticipated?

19       MR. LINDSTROM:  Objection; calls for

20   speculation, hypothetical, no foundation.

21       THE WITNESS:  I don't know.

22       MR. SOLOMON:  Have marked as the next

23   exhibit a document produced by the defendants in this

24   litigation with the control number 297773.  Actually,

25   it will be 297772 and 3.

432

1          (Exhibit No. 113 was marked for
2          identification.)
3    BY MR. SOLOMON:
4        Q    And let me know if you recognize this?
5        A    I don't.
6        Q    You see it's dated the 17th of January
7    2001, and it's from Jim English to Jennifer Minton.
8          Do you see that?
9        A    I do.
10       Q    It says, "When you asked for a forecast
11   summary I should have asked what you were looking
12   for.  I hope this helps.
13         "We are holding at $150 million but I'll be
14   a bit more aggressive and say a likely of 150 million
15   to $170 million.  If you pull Covisant" -- or
16   "Covisant" -- "from pipe, apply our week 7 FY00
17   coverage rate and then add Covisant back in you get
18   $170 million.  We have a lot of pipe at challenging
19   clients."
20         Do you see that?
21       A    I do.
22       Q    Were you aware as of the 17th of January
23   2001 that you had a lot of pipe at challenging
24   clients?
25       A    I was aware we had a lot of pipe.

433

1        Q    And what about the end bit of that?
2        A    I'm not -- I wouldn't know what he means by
3    "challenging clients."  If they are in the pipeline,
4    presumably there's -- you know, they have been
5    qualified.
6        Q    And what's the minimum to get into the
7    pipe?
8        A    The minimum likelihood of close?
9        Q    Correct.
10       A    At this time, I'm not sure.
11       Q    Then there's some bullet points.  The first
12   bullet point says, "nearly $30 million at GE.
13   Although they announce pending layoffs our biggest
14   deals are in Capital, Aircraft, Engines and Power
15   which were reported to be doing very well.  We will
16   see in coming weeks."
17         Do you see that?
18       A    I do.
19       Q    And it says, "GM with poor earnings and
20   announced poor 1st quarter.  They are reviewing all
21   budgets."
22         Do you see that?
23       A    Yes.
24       Q    And, "Gateway.  Again poor earnings but we
25   presented very strong ROI analysis."

434

1          Do you see that?
2        A    Yes.
3        Q    And then the next sentence says, "Our best
4    is at $220 million which is a real stretch as several
5    of these deals will be Q4.  One" ADP -- "AVP talked
6    of starting to see indications of client delays on
7    decisions."
8          Do you see that?
9        A    I do.
10       Q    Were you aware on or around January 17,
11   2001 of Oracle -- an Oracle AVP reporting indications
12   of client delays on decisions?
13       A    We have a lot of AVPs, and I was unaware of
14   it.
15       Q    Now, you will see, if you go all the way
16   down to the bottom of the page, it says, "Q3 Forecast
17   coverage is 246%."  340 -- "342% without Covisant,"
18   or "Covisant."
19         Do you see that, the very, very last entry
20   on the page?
21       A    Yes.
22       Q    Yeah.
23         Do you have an understanding what is meant
24   by 246 percent coverage for Q3, 342 percent without
25   Covisant?

435

1        A    I'm not sure how that -- I'm not sure how
2    they are calculating the pipeline --
3        Q    Okay.
4        A    -- with this.  What I think it means -- if
5    you want me to guess, then I'll tell you.
6          MR. LINDSTROM:  Objection; calls for
7    speculation.
8          THE WITNESS:  It means the size of the
9    weighted pipeline.  The pipeline times the
10   probability is roughly two and a half times the
11   forecast.
12   BY MR. SOLOMON:
13       Q    Okay.  Do you have an understanding why the
14   calculation was with Covisant and without Covisant?
15       A    "Covisant."
16       Q    "Covisant."
17       A    It doesn't exist anymore --
18       Q    Can just say "Covisant."
19       A    -- it doesn't exist.  It doesn't exist.
20         The -- it was such -- it was such a large
21   deal, it kind of throws the numbers off, and there's
22   a statistical technique called "exponential
23   smoothing" that takes it out.
24       Q    And why would you -- why is that being
25   employed?

436

1    A   Again, it was -- it was a -- it's a very

2   large -- it's a very, very, large deal.  It's a

3   standard statistical technique.

4       Q   The standard statistical technique being

5   take out something that is anomalous?

6       A   Just anything that's large.

7       MR. SOLOMON:  Okay.  Have marked as next

8   exhibit another document produced by the defendants

9   in this litigation with the control number 220022 to

10   24.

11       (Exhibit No. 114 was marked for

12       identification.)

13   BY MR. SOLOMON:

14       Q   And tell me if you recognize this, please?

15       A   I do not.

16       Q   Okay.  You see it's dated Thursday,

17   January 18, 2001, and it reflects e-mail exchanges

18   among Jennifer Minton, "Ivgen" or "Ivgen" --

19       A   Ivgen Guner.

20       Q   And copies a number of people.  And I'll

21   skip the middle page, and then the third page has

22   some text.

23       Do you see that?

24       A   I do.

25       Q   And a third of the way down, under

437

1   "Budget," it says, "To follow-up on my voice mail

2   from last night -- The field is getting concerned

3   about the targets."

4       Do you know what that refers to?

5       A   Where are you?

6       Q   Okay.  Under "Budget."

7       A   Under "Budget."  Yeah.  We were talking

8   about planning for next year, and I had, according to

9   this note, set a target of 30 percent growth for next

10   year; you know, pretty aggressive growth -- you know,

11   reasonably aggressive growth targets, and that means

12   we have to start hiring people, and I guess this

13   means that they thought perhaps that my 30 percent

14   growth for, you know, this year and next was too

15   aggressive.

16       Q   Okay.  Now, isn't it true, though, that if

17   you look at the context of this, what's being

18   expressed here, is concern about targets for the

19   current fiscal period?

20       MR. LINDSTROM:  Objection; argumentative.

21       THE WITNESS:  It's not how I read it.  I

22   mean, I read -- I read the top -- you know, the top

23   line --

24       MR. SOLOMON:  Okay.

25       THE WITNESS:  -- that Larry Ellison has

438

1   made it clear that this year and next year's targets

2   are 30 percent.  So we want to keep the same growth

3   rate not only for this year but for next year --

4       MR. SOLOMON:  Okay.

5       THE WITNESS:  -- and they were concerned

6   about that being too aggressive a growth target.

7   BY MR. SOLOMON:

8       Q   Okay.  It's fair to say -- right? -- that

9   this is half way through Q3, fiscal Q3 of '01; right?

10       A   Yes.

11       Q   And, at that point, this seems to reflect

12   that at a meeting around this time, you had made it

13   clear that the license revenue growth target for

14   fiscal '01 remained at 30 percent; right?

15       A   Again, I don't remember -- I'm just using

16   this -- you know, this document to refresh my memory.

17   I don't remember this document at all.

18       Q   Okay.

19       A   But -- I don't think I've ever seen this

20   document before, but it is our practice to plan; you

21   know, takes a long time to hire people, and when you

22   are growing that rapidly, and so we talk about our

23   targets for this -- the coming year.

24       Q   Okay.

25       A   So I was quite optimistic and thought we

439

1   would keep the growth rate up.

2       MR. SOLOMON:  Mark as the next exhibit a

3   document produced by the defendants in this

4   litigation with the control numbers 00540 to 543.

5       (Exhibit No. 115 was marked for

6       identification.)

7       THE WITNESS:  Okay.

8   BY MR. SOLOMON:

9       Q   Okay.  Do you recognize this document?

10       A   I don't recognize it, but I'm on the

11   distribution list.

12       Q   Okay.  Do you -- and when you say that, you

13   don't remember ever seeing this before?

14       A   I don't recall it.  Looks like -- I'm sure

15   it was sent to me, but I don't recall seeing it.

16       Q   Okay.  And it's dated Wednesday, January

17   17, 2001, and it is sent from Larry Garnick to you

18   and others?

19       A   Right.

20       Q   And this would have been in your file on or

21   around January 17, 2001?

22       A   That's right.

23       Q   And I'll represent to you it wasn't

24   produced from your file and you cannot explain why;

25   is that right?

440

1    A    That's right.

2    Q    Looking at the first bullet point on the

3  first page, it says, in part, "The license revenues

4  growth rate was 35% in USD, 25 points better than the

5  10% growth we experienced in December FY00 over

6  December FY99.  However, excluding the $60 million

7  Covisant" -- "Covisant" -- "license deal, the USD

8  growth rate would have been only 6%."

9        Do you see that?

10   A    I do.

11   Q    And it goes on to say, "Excluding Covisant,

12  OPI license revenue growth would have been" a

13  negative "(85%)."

14       Do you see that?

15   A    I do.

16       MR. LINDSTROM:  I think that

17  mischaracterizes the document, or at least maybe I'm

18  misreading it.  I don't see "a negative 85%."  Maybe

19  you misread it.

20       THE WITNESS:  I think that's what the

21  parentheses mean.

22  BY MR. SOLOMON:

23   Q    The parentheses mean negative, don't they?

24   A    Right.

25   Q    Thank you, Mr. Ellison.

441

1        Do you remember being aware of that at the

2  time?

3    A    Yes.

4    Q    I'm skipping a bullet point to the next --

5  to third bullet point.  "December license results

6  represents 19% of the total forecasts for Q3 FY01.

7  In FY00 and FY99, December represented 16% and 19%,

8  respectively, of the quarter total."

9        Do you see that?

10   A    I do.

11   Q    Were you aware of that at the time?

12   A    Yes.

13   Q    And then the next bullet point reads:

14  "Applications product growth was 216%," and then in

15  brackets, it says "[ERP equals 365%, CRM equals," in

16  parens, "(58%)]."

17       Do you understand that 58 percent to be a

18  negative?

19   A    I do.

20   Q    Yeah.

21       "While database product growth was 17%,

22  and, again, in parens, "[Server equals 21%" -- sorry,

23  in brackets, "[Server equals 21%, Tools equals," in

24  parens, so a negative 26 percent; is that correct?

25   A    That's correct.

442

1    Q    And then it says, "Excluding Covisant,

2  Applications product growth would have been" negative

3  "(46%) and database product growth would have been

4  13%."

5        Do you see that?

6    A    I do.

7    Q    And did you know that at the time?

8    A    Yes.

9    Q    Okay.  And then if you look at the

10  spreadsheet on the second page, you will see that

11  there's a heading "License Organization," and looking

12  at the line for "Nussbaum OSI"?

13   A    Yes.

14   Q    There's a reference to a negative 81

15  percent growth under U.S. dollars.

16       Do you see that?

17   A    I do.

18   Q    And a negative 81 percent growth under

19  constant dollars.

20       Do you see that?

21   A    I do.

22   Q    And did you know that at the time?

23   A    I did.

24   Q    And against NAS for Roberts, in constant --

25  excuse me, in U.S. dollars, it reflects a negative

443

1  growth rate of 24 percent.

2        Do you see that?

3    A    Yes.

4    Q    And in constant dollars, a negative growth

5  rate of 23 percent.

6        Do you see that?

7    A    I do.

8    Q    And you knew that at the time?

9    A    Yes.

10   Q    And have you ever experienced, halfway into

11  the fiscal quarter, negative growth rates in all U.S.

12  divisions?

13       MR. LINDSTROM:  Mischaracterizes the

14  document.

15       THE WITNESS:  We didn't have negative

16  growth rates in all U.S. divisions.

17  BY MR. SOLOMON:

18   Q    That's not what I said.  I said, "Have you

19  ever experienced?"

20   A    All three negative --

21   Q    Yes.

22   A    Well, this was not halfway through.  This

23  was one-third of the way through.

24   Q    Okay.  But --

25   A    So in -- we have no measures for halfway

444

1   through a quarter.  I'm not trying to be cute here.
2       Q    Okay.
3       A    We have -- you know, we have -- after Month
4   1, one-third; after Month 2, two-thirds, and a final,
5   so there's no halfway.
6       Q    Okay.
7       A    So have I seen negative growth in all
8   three -- we had three U.S. divisions here that are
9   listed:  OSI, NAS, and OPI.
10      Q    Correct.
11      A    Okay.  Two are negative; one is positive.
12           After the first month of the quarter, which
13   is what this is, you know, often, you know -- as I
14   say, the range is 15 to 20 percent of how much
15   business we do in a quarter is done in the first
16   month.  Sometimes even lower, you know, 14 percent,
17   13 percent.  So I have seen, after the first month,
18   the entire U.S. is negative.
19      Q    And what about in the third fiscal quarter?
20           MR. LINDSTROM:  After a --
21           THE WITNESS:  So going back historically,
22   you are asking --
23           MR. SOLOMON:  Yes.
24           THE WITNESS:  -- me, historically, have I
25   ever seen --

445

1       Q    Correct.
2       A    Yeah.
3            Keep in mind that December is a funny
4   month.  You know, December, there's a lot of
5   holidays.  It's the first month of our quarter.
6   People often are gone during -- during Chri-- the
7   Christmas and New Year holiday.  And, again, we just
8   started the quarter, so that's -- that's maybe -- you
9   know, one of our weakest months of the year.  So it
10   wouldn't be uncommon for us not to do much business
11   in December.
12      Q    Isn't it true that it's actually -- you got
13   it completely wrong and it's the best first month of
14   the year, typically?
15           MR. LINDSTROM:  Best first month of the
16   year?
17   BY MR. SOLOMON:
18      Q    Best first month in the quarter.
19      A    Is it the best first month of the year?
20   That's interesting, because it's the end of other
21   people's -- because it's the end of other people's
22   fiscal years?
23      Q    That could be the reason.  I'm just
24   asking --
25      A    Other fiscal years --

446

1       Q    -- objectively.
2       A    The truth of the matter is I'm not sure
3   which -- you know, which of our first months is worse
4   again.  Typically, our first month of any quarter is
5   not very strong for us.
6       Q    And if I tell you that the average
7   contribution of December to the third fiscal quarter
8   at Oracle has been 21 percent, would you have a
9   problem with that?
10      A    No.  I think -- I think I said 15 to 20, so
11   21 is not so far off.
12      Q    Now -- and, again, you note that, in this
13   document, there's Covisant in -- or Covisant in,
14   Covisant out.  Why?
15      A    Because it was a very -- because it was a
16   very, very large transaction.
17      Q    Did Oracle's public investors have any
18   information concerning what the growth rates were for
19   Oracle with and without the Covisant deal?
20      A    We don't announce our growth rates at the
21   end of every month, ever.
22      Q    And have you ever heard of a rule in
23   connection with stock transactions called "abstain or
24   disclose"?
25      A    No.

447

1       Q    Have you ever heard of a requirement that
2   if you are in possession of material inside
3   information when you trade stock, you must disclose
4   that information prior to your trade to make it fair
5   to all shareholders?
6       A    Well, I thought you couldn't trade.
7       Q    Okay.
8       A    If you have material insider information.
9   I didn't think you had the choice --
10      Q    You didn't know that it was --
11      A    I didn't know you had the choice to
12   disclose.
13      Q    You did not abstain, did you?
14      A    No.
15      Q    And you did not disclose, did you?
16      A    Disclose what?
17      Q    Disclose the Covisant-in and the
18   Covisant-out information in terms of the growth rates
19   with the company?
20      A    We had -- we had never -- we didn't
21   disclose our first -- are you asking me did we
22   disclose where we were after one month --
23      Q    In connection --
24      A    -- in the quarter.
25      Q    Before you traded.

448

1    A    We have never disclosed our first month's
2    results.
3    Q    So the answer is you didn't abstain and you
4    didn't disclose?
5        MR. LINDSTROM:  Covisant?
6        THE WITNESS:  Well, any -- well, any -- I
7    think he's saying did we report our -- you know, our
8    first month's results.  People trade a lot, you know,
9    in the middle of quarters.  We have never reported
10   our first month's results.
11   BY MR. SOLOMON:
12   Q    Okay.  What I'm trying to get at is --
13   partly, at least, is:  Do you think that the
14   investing public would have wanted to know what the
15   trends were at Oracle, both accounting for the
16   Covisant deal and without the Covisant deal?
17       MR. LINDSTROM:  Calls for speculation, no
18   foundation.
19       THE WITNESS:  Yeah, I don't -- I don't
20   know.  We don't disclose our first month's results.
21       MR. SOLOMON:  Okay.  Let's go off the
22   record and change the tape.
23       THE VIDEOGRAPHER:  This marks the end of
24   Tape 3, Volume 2, in the deposition of Larry Ellison.
25       At 4:22, going off the record.

449

1        (Recess taken.)
2        THE VIDEOGRAPHER:  On record at 4:32.
3        This marks the beginning of Tape 4,
4    Volume 2, in the deposition of Larry Ellison.
5    BY MR. SOLOMON:
6    Q    Was the Covisant deal an outlier?
7    A    It was the largest deal we have ever done
8    in our history.  It still is.
9    Q    Isn't it true that taking -- leaving
10   Covisant, or "Covisant," in the calculation in the
11   third quarter of '01 would be misleading in terms of
12   trends?
13       MR. LINDSTROM:  Vague and ambiguous.
14       THE WITNESS:  I'm not sure what you mean by
15   "trends."
16       MR. SOLOMON:  Okay.
17       THE WITNESS:  It certainly got us off to a
18   great head start in the quarter.
19   BY MR. SOLOMON:
20   Q    Okay.  But does an outlier deal like
21   Covisant give a good indication of what the trends
22   are generally in the business, or did it?
23   A    We are a fairly -- even though it's a very
24   large deal, we are a pretty large company, so it's
25   not going to -- it's not going to affect our results

450

1    wildly.  But I'm not sure what you mean by "trend."
2    It's a -- it will -- you know, it contributes
3    significantly to the current -- you know, to the
4    current quarter.
5        Do you mean can someone say -- you know,
6    does it mean -- again, I'm not sure what you mean by
7    "trend."
8    Q    Well, back to why Covisant was taken out of
9    the calculation and it was shown both ways.  You say
10   that's a statistical technique.
11   A    Yeah.
12   Q    Right?
13   A    Yeah.
14   Q    But you don't really explain why it's
15   utilized.
16       What's the purpose?
17   A    You mean why do people -- why do people do
18   that?
19   Q    Why was Covisant taken out and why were you
20   privy to information --
21   A    For the same reason -- for the same reason
22   you saw -- you had an earlier document and you saw
23   where HP -- we had an HP deal the previous year in
24   1999, and that made the comparison in the year 2000
25   difficult.

451

1        Remember?  You pointed out that our CRM
2    sales had dropped 2 to 3 percent.
3    Q    Yeah.
4    A    And it was useful to know a year before we
5    had a very large -- and I'm guessing.  I think about
6    $25 million CRM deal with Hewlett-Packard, so it was
7    useful to know that we had a particularly good
8    quarter because of the large HP deal in the previous
9    quarter, and that made the CRM growth rate a year
10   from then look different, look lower than it would
11   have been.
12   Q    Yeah.
13   A    Okay.  So it's useful to know -- you know,
14   to, you know, look at the quarter to know that
15   Covisant happened that quarter so that the next
16   quarter, let's say, or the previous -- or the
17   previous quarter, for that matter, that that large
18   deal contributed -- you know, contributed
19   substantially to the results in Q3; that Covisant
20   helped -- you know, when one deal contributes very
21   substantially to a quarter, helps a quarter, it makes
22   the next year's comparison more difficult.
23   Q    But the information that you received in
24   the January 17, 2001 Flash report that we just saw
25   tells you what the trend is in the current quarter

452

Ellison, Lawrence  9/21/2006  10:57:00 AM

1  without Covisant; is that true?
2      MR. LINDSTROM:  Mischaracterizes the
3  document.
4      THE WITNESS:  That's not true.  It's not a
5  trend.  It's not a trend.  It's the data -- sorry.
6  Just the way -- it's really telling us what our
7  growth rate is with Covisant and what it is without
8  Covisant.
9  BY MR. SOLOMON:
10     Q    And why in the quarter do you not want to
11  know what your growth rate is for that quarter
12  without Covisant?
13     A    Why -- you know, why did they show it?
14     Q    Yes.
15     A    As I said -- as I said before, it -- it
16  shows the -- it's going to make a big difference --
17  it's going to make a big difference to the quarter.
18      I'm not sure I understand your question.
19     Q    I think that's okay for the moment.
20      Did you disclose to the investing public
21  when you engaged in your securities transactions at
22  the end of January 2001 that Oracle's pipeline had
23  been reduced by around 20 percent?
24      MR. LINDSTROM:  Assumes facts.
25      THE WITNESS:  I don't know that fact to be

453

1  true.
2      MR. SOLOMON:  Okay.
3      THE WITNESS:  And we don't disclose
4  fluctuations.  When a deal closes, we don't tell them
5  the deal closes.  When a pipeline changes, we
6  don't -- when a forecast changes, we don't -- you
7  know, we don't --
8  BY MR. SOLOMON:
9     Q    But you would have -- okay.
10      In the third fiscal
11  quarter of 2001, you had realtime daily information
12  on what the state of the pipeline was; is that true
13  or false?
14     A    No.  I didn't look at the -- I didn't look
15  at the pipeline very much.  I tended to look at the
16  forecast.
17     Q    Okay.
18     A    So I reviewed the forecast once a week.
19     Q    Okay.  Now, when you say you didn't tend to
20  look at the pipeline very much, that means you looked
21  at it sometimes; you looked at it a little bit?
22     A    We would talk about coverage ratios in the
23  pipeline.  When people would give their forecasts, I
24  would sometimes ask questions, you know, what the
25  coverage was, but not always.

454

1     Q    Okay.  You told the investing public at the
2  beginning of fiscal Q301 that the pipeline was
3  astounding; is that true?
4     A    I think I told them it was very strong.  I
5  don't know what word I used, but I believe at the
6  beginning of the quarter it was a very strong
7  pipeline.
8     Q    Isn't it true that between December 11,
9  2000 and December 25, 2000, Oracle's best estimate of
10  its pipeline growth for 3Q as -- '01 as opposed to
11  3Q00 decreased from 52 percent to 34 percent?
12     A    34 percent still very, very strong growth.
13     Q    I understand, but I'm talking about the
14  decrease.
15     A    But I don't -- I don't recall those --
16  those numbers.
17     Q    Okay.
18     A    So you are -- go ahead.
19      MR. SOLOMON:  So we will have marked as the
20  next exhibit Defendants' Response To Plaintiffs'
21  First Set of Requests for Admissions in this
22  litigation.
23      (Exhibit No. 116 was marked for
24      identification.)
25      MR. LINDSTROM:  Is there a certain portion

455

1  of the document that you would like to direct the
2  witness's attention to?
3      MR. SOLOMON:  Yes.  Thank you.
4     Q    If you look at Request for Admission No. 1,
5  Mr. Ellison, you will see that we request that
6  defendants admit that between December 11, 2000 and
7  December 25, 2000 --
8     A    I'm sorry.  What page are you on?
9     Q    I'm on page 2 of the document.
10     A    Second page.
11     Q    Which is the third page in.
12     A    Oh, third page in --
13     Q    Numbered 2.
14     A    -- all right.
15     Q    Admit between December 11, 2000 and
16  December 25th, 2000, Oracle's best estimate of its
17  sales pipeline growth for 3Q01 as compared to 3Q00,
18  in parens, decreased from 52 percent to 34 percent.
19      Do you see that?
20     A    I do.
21     Q    And then there are a bunch of objections,
22  and then after the objections, it says, "Subject to
23  and without waiving these objections, Defendants
24  admit that on December 11, 2000, Oracle sales
25  pipeline growth for 3Q01 was 52% in constant dollars;

456

Ellison, Lawrence  9/21/2006  10:57:00 AM

1    and on December 25th, 2000, Oracle sales pipeline
2    growth at 3Q01 was 34% in constant dollars."
3         Do you see that?
4    A    I do.
5    Q    And you don't dispute that that admission
6    is accurate?
7    A    I do.
8    Q    And do you dispute that you had that
9    information in January of 2001?
10        MR. LINDSTROM:  No foundation.
11        THE WITNESS:  I don't recall.
12   BY MR. SOLOMON:
13   Q    Do you dispute that you had access to that
14   information?
15   A    I do not.
16   Q    In the third quarter of 2001?
17   A    I do not.
18        MR. SOLOMON:  You don't.  Okay.
19        Have marked as the next exhibit a document
20   produced by the defendants in the litigation with the
21   control numbers 040638 to 640.
22        (Exhibit No. 117 was marked for
23        identification.)
24        THE WITNESS:  Okay.
25   BY MR. SOLOMON:

457

1    Q    Okay.  Do you recognize this?
2    A    I don't.
3    Q    You see, on the first page, it's dated
4    October 13, 2000, and it is an e-mail, in the middle
5    of the page, from Mark Barrenechea, and you are one
6    of the recipients.  In fact, you are the recipient.
7         Do you see that?
8    A    Yes.
9    Q    And over the page, there's a message from
10   you.
11        Do you see that in the top third?
12   A    I do.
13   Q    And it says "'Lawrence J. Ellison' wrote:
14   We will not upgrade unless we are at the 90%
15   confidence level that the new OSO will work better
16   than the current one.  We do not want to discourage
17   the field the last month of the quarter.  Nor do we
18   want to lose a mission critical system.  Larry."
19        Do you see that?
20   A    I do.
21   Q    And do you remember writing that?
22   A    I don't remember writing it, but I'm sure I
23   read it.
24   Q    Okay.  And the mission critical system is
25   OSO?

458

1    A    That's right.
2    Q    And did you reach the 90 percent confidence
3    level that you referred to here?
4    A    I don't remember.
5    Q    And what is it about the OSO upgrade that
6    could lead to discourage the field in the last month
7    of the quarter?  Could you explain that to me?
8    A    Oh, the users of OSO are the sales people,
9    the field salespeople, and if we put in a system
10   that's problematic, that's causing a lot of problems,
11   they will spend more time just kind of getting -- you
12   know, figuring out how to get their forecast into the
13   system than selling.
14   Q    Okay.  Are you a user of OSO?
15   A    I am not.
16        Well, let me clarify that a little.  I
17   certainly hold meetings where we look at the output
18   of OSO, so, in that sense, I get information from
19   OSO, but I'm not a user in the sense I don't enter
20   any data into OSO; I just look at the forecast
21   results.
22        MR. SOLOMON:  Can you read that answer back
23   to me, please.
24        (Record read by the Reporter as follows;
25        "QUESTION:  Okay.  Are you a user of OSO?

459

1    ANSWER:  I am not.
2    Well, let me clarify that a little.  I
3    certainly hold meetings where we look at
4    the output of OSO, so, in that sense, I get
5    information from OSO, but I'm not a user in
6    the sense I don't enter any data into OSO;
7    I just look at the forecast results.")
8    MR. SOLOMON:  Thank you.
9    Marked as the next exhibit another excerpt
10   from the book Softwar.
11        (Exhibit No. 118 was marked for
12        identification.)
13   BY MR. SOLOMON:
14   Q    I'm looking at page 286, and at the bottom,
15   and it goes on to 287.  It reads:  "A typical day for
16   Ellison starts when he gets up at about seven o'clock
17   and checks his overnight e-mails.  Unlike many CEOs,
18   Ellison has only one e-mail address.  He gets more
19   than a hundred e-mails a day, most of which he
20   answers himself or forwards to the appropriate
21   person."
22        Just stopping there, is that accurate?
23        MR. LINDSTROM:  Objection; compound.
24        MR. SOLOMON:  Okay.  Let's break it down.
25   Q    Does a typical day start for you when you

460

1  get up at 7:00 o'clock and you check your overnight
2  e-mails?
3      A    Close enough.  Sometimes I'm up earlier;
4  sometimes I'm up later.
5      Q    Unlike -- on average.
6      A    Close enough.
7      Q    "Unlike many CEOs, Ellison has only one
8  e-mail address."
9          Is that true?
10     A    That's true.
11     Q    "He gets more than a hundred e-mails a day,
12  most of which he answers himself or forwards to the
13  appropriate person."
14         Is that true?
15         MR. LINDSTROM:  That's compound.
16  BY MR. SOLOMON:
17     Q    Do you get more than a hundred e-mails a
18  day?
19     A    I throw a lot of it away without answering
20  it.  A lot of it is spam --
21     Q    Okay.
22     A    -- and silly stuff.
23     Q    All right.  And then we will skip over the
24  scrambled eggs and bacon, and the paragraph
25  beginning:  "At about nine" -- go down a few lines.

461

1  It says, "Also part of the routine is a visit to
2  Oracle Sales Online, which might prompt him to leave
3  a message questioning the status of a particular
4  sales opportunity."
5          Is that true?
6      A    Not true.
7      Q    Okay.  Now, although you do enter a
8  footnote on this page, you do not clarify or correct
9  that statement, do you?
10     A    No, I don't.
11         We can prove it's not true.
12     Q    How can you prove it?
13     A    We have logs of everyone who's accessed OSO
14  and when they have accessed it.
15     Q    That's excellent.
16         So I can -- you can prove that you didn't
17  log on to OSO in Q301; right?
18     A    I don't know if we have them going back to
19  Q301.
20     Q    Because you destroyed the logons, logon
21  records, didn't you, or someone did at your company?
22         MR. LINDSTROM:  Assumes facts,
23  argumentative.
24  BY MR. SOLOMON:
25     Q    Do you know the SLC references the fact

462

1  that the login records have been destroyed?
2      A    No.
3      Q    So I can't tell whether you have logged
4  into OSO in Q301 or not, can you?
5          MR. LINDSTROM:  Argumentative.
6          THE WITNESS:  Would it be useful for you to
7  find out if I've logged on to OSO anytime in the last
8  three years?
9          MR. SOLOMON:  I'm interested.
10         THE WITNESS:  No, I know, but my practice
11  was never to log in to OSO, and you can show that --
12  I'm getting myself in trouble.  My lawyer is going to
13  smack me.  But -- but, yeah, I think it's fairly easy
14  to demonstrate our practice is just not to look at
15  OSO.
16  BY MR. SOLOMON:
17     Q    Okay.  Why did Mr. Symonds say that that
18  was part of your routine?
19         MR. LINDSTROM:  No foundation, calls for
20  speculation.
21  BY MR. SOLOMON:
22     Q    Do you have any idea?
23     A    I don't know.
24     Q    You did have a login, didn't you, in Q3 for
25  OSO?

463

1      A    I don't know.
2      Q    And you don't know if it's possible for me
3  to verify Q301 and whether or not you logged on;
4  right?
5      A    I do not know.
6      Q    Okay.  How often did you get reports from
7  the OSO system?
8          MR. LINDSTROM:  Objection; vague as to
9  time.
10  BY MR. SOLOMON:
11     Q    In Q301.
12     A    Typically, we would hold forecast meetings
13  on Mondays, so we would look at -- look at --
14  sometimes we put OSO results up on the screen and
15  talk about what was in OSO.
16     Q    So I'm sorry if that wasn't good.
17         What was the frequency?  Was it daily?
18  Once a week?
19     A    I'm sorry, on Mondays.
20         MR. SOLOMON:  Okay.  Marked as the next
21  exhibit another document produced by the defendants
22  in this litigation with the control numbers 028582
23  and 83.
24         (Exhibit No. 119 was marked for
25         identification.)

464

1  BY MR. SOLOMON:
2      Q    Take a look at it and let me know if you
3  have seen it before, please.
4      A    I don't specifically recall it.
5      Q    Okay.
6      A    But I'm on the distribution list.
7      Q    So you don't dispute receiving it?
8      A    No.
9      Q    And receiving the information here?
10     A    I do not.
11         MR. LINDSTROM:  Just so the record's clear,
12  Mark, I think both you and the witness were talking
13  about the embedded e-mail that talks -- that starts
14  halfway --
15         MR. SOLOMON:  Thank you.
16         MR. LINDSTROM:  -- down the page of
17  Exhibit 120.
18         MR. SOLOMON:  Thank you.
19     Q    And that's dated Friday, December the 1st,
20  2000, and it is from Mark Barrenechea to a number of
21  people, and you are copied; is that right?
22     A    That's right.
23     Q    And this would have been in your files in
24  December of 2000?
25     A    Yes.

                                            465

1      Q    And it wasn't produced from your files and
2  you cannot explain why; is that correct?
3      A    That's correct.
4         MR. SOLOMON:  Have marked as the next
5  exhibit a document produced in this litigation with
6  the control numbers 021388 through 390.
7         (Exhibit No. 120 was marked for
8          identification.)
9         (Discussion off the stenographic record.)
10  BY MR. SOLOMON:
11     Q    And let me know if you recognize it when
12  you have had a chance to review it, please.
13     A    I don't recall it.
14     Q    Okay.
15     A    I'm on the list.
16     Q    And, yes, on the first page, the bottom
17  half of that page --
18     A    Right.
19     Q    -- reflects that this was addressed to you?
20     A    Yes.
21     Q    And some others from Mark Barrenechea?
22     A    Yes.
23     Q    And on the second page, there are --
24  there's a reference to "Top 10 Wins" and "Top
25  Apologies."

                                            466

1      Do you see that?
2      A    Yes.
3      Q    And the "Top Apologies," it says "(pushed
4  to Q3)."
5      Do you see that?
6      A    Yes.
7      Q    Do you know what that means, "Top Apologies
8  (pushed to Q3)"?
9      A    I would be guessing.
10     Q    Okay.  Take a guess.
11         MR. LINDSTROM:  Objection; calls for
12  speculation.
13         THE WITNESS:  That he's forecasting that
14  these deals will close in Q3, but I don't know what
15  it means.
16         MR. SOLOMON:  I'm talking about the
17  apologize.
18     Q    What are the apologies and who are they to?
19     A    I don't know.
20     Q    Don't know?  Okay.
21         And it says "Special Highlights" at the
22  bottom.
23         Do you see that?
24     A    Yes.
25     Q    And against "OPI," it says "Without HP," it

                                            467

1  would have been different.  The East did not bring in
2  any business.  Steve M has large Q3 pipeline."
3      Do you see that?
4      A    Yes.
5      Q    What's the reference to "without HP"?  Do
6  you know?
7      A    I think that's what we just talked about.
8  I think -- again, this is right after our Q2 results.
9      Q    Okay.
10     A    It's right after our Q2 results.  And I
11  think what he's referring to is the negative -- you
12  showed me a document earlier of a negative 2 to 3
13  percent --
14     Q    Yeah.
15     A    -- CRM growth.  And I think he's referring
16  to the difficult comparison based on HP, but, again,
17  I don't have the documents in front of me, so I'm
18  speculating just a bit.
19     Q    Okay.  And this would have been in your
20  files around December 4th, 2000?
21     A    Yes.
22     Q    And it wasn't produced from your files and
23  you cannot explain why?
24     A    That's right.
25         MR. SOLOMON:  Have marked as the next

                                            468

1    exhibit a document produced by the defendants with
2    the control numbers 086728 and 729.
3        (Exhibit No. 121 was marked for
4        identification.)
5    BY MR. SOLOMON:
6    Q    If you look at it and let me know if you
7    recognize it, please.
8    A    I don't recognize it.
9    Q    Okay.  You will see that you are a
10   recipient and it's from Jennifer Minton, at the top,
11   and then --
12   A    Yes.
13   Q    -- at the bottom -- I'm on the first
14   page -- the exchanges are among Ron Police or
15   "Police" and Mark Barrenechea and others.
16       Do you see that?
17   A    Yes.
18   Q    And it refers, among other things, to the
19   "go-live" date for OSO; is that right?
20   A    Yes.
21   Q    And this would have been in your files
22   around December 6, 2000; is that right?
23   A    Yes.
24   Q    And it wasn't produced from your files and
25   you cannot explain why?

469

1    A    That's right.
2        MR. SOLOMON:  And then we will have another
3    document produced by the defendants marked as next
4    exhibit with the control number 012384.
5        (Exhibit No. 122 was marked for
6        identification.)
7        MR. SOLOMON:  And I guess -- let me give
8    you a different control number.  It's actually 012385
9    we're looking at.
10       THE WITNESS:  Okay.
11       (Exhibit No. 122 was remarked for
12       identification.)
13   BY MR. SOLOMON:
14   Q    Okay.  Let me know -- do you recognize
15   this?
16   A    I think I remember it.
17   Q    Okay.  And it reflects you saying they can
18   delay the internal implementation of OSO by two weeks
19   but only two weeks; is that right?
20   A    That's right.
21   Q    And it's from you and it's to Ron Wohl and
22   it also copies you?
23   A    Yes.
24   Q    And this would have been in your files as
25   of December 9, 2000?

470

1    A    Yes.
2    Q    And it wasn't produced from your files and
3    you can't explain why; is that right?
4    A    That's right.
5    Q    And just on that question -- because on
6    this occasion, it's from you, but you have copied
7    yourself, but even if you hadn't copied yourself,
8    wouldn't the document be in your outbox unless you
9    deleted it?
10   A    No.  It depends how your e-mail client is
11   set up.
12   Q    Okay.
13   A    Sometimes you can either keep all copies of
14   your e-mail or not.  It's just -- it's a setting on
15   your e-mail system.
16   Q    And do you know what your setting was in
17   2000 and early 2001.
18   A    I don't know what my setting was.
19   Q    And what -- and that would dictate whether
20   or not your outbox was containing outgoing messages
21   or not?
22   A    That's right.
23   Q    Is there any way of finding out?
24       MR. LINDSTROM:  What it was in that time
25   frame?

471

1        MR. SOLOMON:  Yeah.
2        THE WITNESS:  I think -- I don't know.
3        MR. SOLOMON:  Okay.
4        THE WITNESS:  I mean, I don't know if we
5    have retained -- I assume we have retained that
6    computer someplace, but I don't know where it is.
7    BY MR. SOLOMON:
8    Q    And which computer are you talking about?
9    A    My desktop.  Of course, I have several
10   computers.
11   Q    Right.
12       But you assume you have retained them all;
13   right?
14   A    I think we have retained them all.
15   Q    And they exist somewhere?
16   A    Someplace, yeah.  Some lawyer's office.
17   Q    Very hard to get into lawyers' offices.
18       Now, OSO is mission critical; right?
19   A    Yeah.
20   Q    Okay.
21   A    Yeah.
22   Q    You were upgrading OSO; this was an
23   important event?
24   A    Yes.
25   Q    You were given a login -- or you don't know

472

1  that?

2  A   No, I don't know that.

3  Q   But it's your testimony that after it was

4  implemented, you didn't access it in that first

5  quarter and take a look and see if it was working

6  properly?

7  A   Well, I was in meetings where we brought it

8  up.  And, again, keep in mind, remember I said, every

9  Monday it was my intention that they would bring up

10 the forecasts and make the forecasts using OSO

11 screens.  You know, we have a big display screen, so

12 rather than people telling us what the forecast was,

13 they would actually bring their personal computer to

14 the -- you know, to the conference room like this,

15 and they would log on and show the OSO forecast on

16 our display screen.

17 Q   Okay.  And that was the extent to which you

18 accessed the actual OSO database in that fiscal

19 quarter?

20 A   I believe so.

21 Q   And is that the extent to which you have

22 ever used -- utilized OSO?

23 A   I believe so.  I mean, I might have -- very

24 early on where they are designing the screens, I

25 might have looked at a user-interface design or

473

1  something like that, but that's right.

2  Q   Was it a major point of OSO that it was

3  realtime?

4  A   Well, it was -- it was realtime if everyone

5  put in the information.

6  Q   Okay.  But didn't you promote OSO to your

7  customer base as being realtime in enabling you to

8  know what the financial picture of Oracle was at any

9  one moment in time?

10 A   It was realtime in the sense that every

11 time someone put in a change, you saw it.  Anyplace

12 in the world, you know, that -- the change would get

13 registered.  So if someone at headquarters, Jennifer

14 Minton, someone who's monitoring all this, would be

15 able to see -- you know, be able to see the changes.

16 So, in that sense, it was realtime, if you will.

17 The flaw of the system is sometimes the

18 sales guys didn't want to put -- you know, wouldn't

19 even -- wouldn't themselves use OSO.  They would

20 delegate it to a sales assistant or something like

21 that, and only update it once a week rather than keep

22 it current.

23 But the computer system was realtime.  It

24 was global and realtime, but it only works well if

25 the human beings, you know, keep their forecast

474

1  current.

2  Q   Okay.  Did someone make a presentation of

3  OSO to you in the -- in December -- November or

4  December of 2000?

5  MR. LINDSTROM:  Objection; vague and

6  ambiguous.

7  THE WITNESS:  I had lots of presentations

8  on OSO and demonstrations of OSO, but I don't know.

9  BY MR. SOLOMON:

10 Q   Who was responsible -- who was in charge of

11 the upgrade, the OSO upgrade?

12 A   Combination of Mark Barrenechea and Ron --

13 it was distributed.  I mean, it would be -- the

14 people who own the system would be Mark Barrenechea

15 and Ron Wohl, and then all of the field executives

16 who were the users of the system, so Sergio

17 Giacoletto in Europe, and all the guys whose names

18 you have seen.

19 Q   Okay.  And would they -- would

20 Mr. Barrenechea and Mr. Police update you on the

21 progress at your Monday morning meetings?

22 MR. LINDSTROM:  Progress of what?

23 BY MR. SOLOMON:

24 Q   Of the OSO upgrade?

25 A   No.  No.  That would happen in the

475

1  applications meetings on Wednesday or Thursday.

2  Q   Okay.

3  A   Well, actually, we had Monday afternoon

4  meetings called PDMC meetings where all the product

5  division heads were -- so it's possible -- yeah, it's

6  possible it happened on Monday afternoon.

7  Q   Okay.  And would that -- would there be

8  forecasting presentations based on OSO in those

9  Monday afternoon meetings?

10 A   No.

11 MR. LINDSTROM:  PDMC meetings?

12 THE WITNESS:  No.  The forecasting -- the

13 forecasting meetings occurred with the sales

14 executives, the meetings starting at 11:00 a.m. --

15 MR. SOLOMON:  Okay.

16 THE WITNESS:  -- and technical meetings

17 started at 2:00 p.m.

18 MR. SOLOMON:  Thank you.  So --

19 THE WITNESS:  And we would not do

20 forecasting in the afternoon meeting.  The engineers

21 in the afternoon, salespeople in the morning.

22 BY MR. SOLOMON:

23 Q   And would the forecasting presentations on

24 the Monday mornings be based on OSO?

25 A   If OSO was working.

476

1   Q   And was that a big if?
2   A   Well, no.  I mean, if we are in a
3 transition with a system -- I'm not sure when we
4 started our presentations.  I said -- I think there
5 was an earlier memo where I wanted OSO used for --
6 you know, for the presentation.  I wanted the --
7 someplace in this stack there's someplace me asking
8 that the forecast come out of the system rather than
9 come from people in the spreadsheets.  I'm not sure
10 of the exact date when we started having the Monday
11 forecast meetings using OSO.
12   Q   Okay.  Were you showing slides at the
13 forecast meetings on Monday mornings?
14   MR. LINDSTROM:  Vague as to time.
15   THE WITNESS:  Slides?
16 BY MR. SOLOMON:
17   Q   Mm-hmm.  Screen shots or physical slides.
18 I mean, I'm interested in what the OSO presentation
19 was.
20   Did they print out from OSO?
21   A   What did it look like when you made an OSO
22 present -- when you presented your forecast on OSO?
23   Q   Yeah.
24   A   Yeah, they were screen shots.  So,
25 literally, you would see the same thing that was on

477

1 your laptop would be projected on the screen.
2   Q   Were they preserved?
3   A   They were on a computer, the screen.  You
4 know, all it is is a dumb television screen.
5   Q   Okay.  So wherever it is, it would be
6 within OSO?
7   A   It would be within OSO --
8   Q   In the database?
9   A   In the database.
10   MR. LINDSTROM:  Hey, now.  I recognize it's
11 getting late, but you guys are starting to talk --
12   MR. SOLOMON:  Thank you.
13   MR. LINDSTROM:  -- over the top of each
14 other, and you both need to make sure you don't do
15 that, or we won't have a clean record, and you will
16 drive our Reporter crazy.
17   THE WITNESS:  Okay.
18   MR. SOLOMON:  Thank you.
19   Okay.  Let's go off the record for a couple
20 minutes while I organize.
21   THE VIDEOGRAPHER:  Off record at 5:10.
22   (Recess taken.)
23   THE VIDEOGRAPHER:  On the record at 5:17.
24 BY MR. SOLOMON:
25   Q   Do you know who Joe Lockhart is?

478

1   A   I do.
2   Q   And who is Joe Lockhart?
3   A   He was Bill Clinton's press secretary when
4 Bill Clinton was president, and he worked for Oracle
5 for a short period of time.
6   Q   And --
7   A   And head of PR.
8   Q   Okay.  And how did he -- how did it come
9 about that he was employed at Oracle?
10   A   I hired him.
11   Q   Okay.  Did you know him before you hired
12 him?
13   A   A little bit.
14   Q   You knew him in a business sense or
15 socially?
16   A   Professionally, I thought he had done a
17 good job for the president.
18   Q   And because he had done a good job for the
19 president, you thought he would be a good employee
20 for you?
21   A   If he would do it.  I was always a little
22 bit skeptical that Joe could leave the excitement of
23 Washington for the boredom of Silicon Valley --
24 relative boredom of Silicon Valley.
25   Q   And so did you call him up and ask him?

479

1 How did it come about?
2   A   I don't recall how I first made contact
3 with Joe.
4   Q   Okay.  But at some stage you made contact,
5 and did you have a meeting with him?
6   A   Yes.
7   Q   And did you tell him that you were
8 interested in hiring him?
9   A   Yes.
10   Q   And did he express interest in being hired?
11   A   Yes.
12   Q   And by the end of that meeting, had you
13 hired him?
14   A   I don't think so.  I think it took a couple
15 of meetings.  He had to talk to his family.  He had
16 to think about it.  It was a big decision for him.
17   Q   Okay.  And what did you -- what did you
18 hire -- I know you said head of PR.
19   Was he head of PR for all of Oracle?
20   A   I believe so.
21   Q   Okay.  Did he have any special
22 responsibilities or duties owed to you?
23   A   None other than, you know, as head of PR.
24 I mean, at Oracle, I'm part of Oracle, so.
25   Q   And did you have any disputes with him

480

1    while he was employed at Oracle?

2    A    Not that I recall.

3    Q    Did you -- when he left Oracle, do you know

4    why he left?

5    A    I think he left to go back to Washington to

6    form his own -- his own firm, his own consulting

7    firm.

8    Q    And is it true that he was only at Oracle

9    for a few months?

10    A    I believe so.

11    Q    And were you disappointed when he left?

12    A    Well, yes and no.  I mean, I thought it was

13    a bit of a stretch from being the president's press

14    secretary to be -- and being so familiar with what --

15    you know, the business of Washington, D.C.  I think

16    it's a major career change and change in direction to

17    come out to -- to come out to California and work for

18    a company.  So I'm not surprised -- I'm not surprised

19    that that happened.  In fact, I think we decided that

20    he wouldn't relocate until he had worked at Oracle

21    for a bit and fully understood what the job was and

22    then decided whether to commit for a long period of

23    time or not.

24    Q    Okay.  Did you ever discuss your securities

25    transactions with Mr. Lockhart?

481

1    MR. LINDSTROM:  Objection; vague and

2    ambiguous.

3    THE WITNESS:  I don't recall.

4    BY MR. SOLOMON:

5    Q    Okay.  I'm now focusing on the January 2001

6    securities transactions.

7    Did he have any kind of role in providing

8    PR?

9    A    I don't recall.

10    Q    All right.  There came a time in January of

11    2001 when you decided to exercise stock options that

12    were due to expire in August of '01; correct?

13    A    Yes.

14    Q    When did you make that decision?

15    A    I think after we closed the Covisant deal

16    and we were off to a strong -- off to a strong

17    quarter, I decided that would be the safest time for

18    me to sell my stock, when it looked like we had an

19    assured good quarter.

20    Q    And the Covisant deal was closed in the

21    first couple weeks of December 2000; is that right?

22    A    Yes.

23    Q    Okay.  So it was around the middle of

24    December that you made that decision?

25    A    Again, I'm not sure if that's what

482

1    influenced my decision.  I don't know what -- you

2    know, exactly what day.

3    Q    Okay.

4    A    I think I might have also been on holiday

5    in the middle of December, so.

6    Q    Okay.  When you made the decision, who did

7    you communicate that you made the decision to?

8    A    Philip Simon.

9    Q    And what do you remember of that

10    communication?

11    A    That we would sell the options.  I'm

12    trying -- I think it was 22 million shares.  I'm

13    not -- I think that's the right number, 22 million

14    shares of stock.  It turns out the transaction was in

15    the last week of January, and so the transaction, I

16    think, was restricted to the stock had to be above

17    $30 a share.  The stock -- we had to have not more

18    than a certain volume per day and no trading after

19    January -- after the end of January.

20    Q    Okay.

21    A    Were the restrictions.

22    Q    Okay.  And was -- strike.

23    You made a decision after Covisant closed

24    in mid-December?

25    A    Sometime afterwards, yeah.

483

1    Q    You then communicated it to Mr. Simon?

2    A    Yes.

3    Q    And what time elapsed between you telling

4    Mr. Simon and then engaging in the stock sales?

5    A    I don't recall.

6    Q    If it was middle -- if it was the middle of

7    December, would you say it was four or five weeks?

8    A    I really -- I don't know if I told him in

9    the middle of December.

10    Q    So you don't know when you told him?

11    A    I don't know when I told him.

12    Q    Clueless?

13    A    Wouldn't say "clueless."  I said I don't

14    remember.

15    MR. LINDSTROM:  Objection; argumentative.

16    BY MR. SOLOMON:

17    Q    Who else did you communicate that decision

18    to?

19    A    I don't think anybody else.

20    Q    Okay.  And was there a reason why you

21    didn't communicate it to anybody else?

22    A    Philip's responsibilities was to clear it

23    with Dan Cooperman, our general counsel, and Jeff

24    Henley, our chief financial officer, and those were

25    the people that were told.

484

1    Q    Okay.  Did you delay -- after you made your
2    decision, do you remember delaying communicating that
3    decision to Mr. Simon?
4    A    I don't recall.
5    Q    Would it make any sense to delay informing
6    Mr. Simon?
7       MR. LINDSTROM:  Calls for speculation.
8       THE WITNESS:  I don't remember.
9    BY MR. SOLOMON:
10   Q    Do you remember the day that you started
11   exercising options and selling?
12   A    Again, I think it was the last week of
13   January.
14   Q    Okay.  And where were you, do you know,
15   when you started exercising and selling?
16   A    I think by then I was back in California,
17   but I don't know for certain.
18   Q    And were you in California for all of the
19   exercises in sales?
20   A    I think so, but I don't recall.
21   Q    Okay.  And if you were in California, were
22   you working?  Were you at the office?
23   A    I believe so.
24   Q    Okay.  And so is it your recollection that
25   while you were engaged in these stock transactions,

485

1    that, typically, you were in the office?
2    A    I really don't recall.
3    Q    Do you recall considering whether to
4    exercise and sell your stock in January or April or
5    thereafter?
6       MR. LINDSTROM:  Objection; vague and
7    ambiguous.
8       THE WITNESS:  Did I think about selling at
9    some other time?
10      MR. SOLOMON:  Correct.
11      THE WITNESS:  I knew I had to sell it
12   before August.
13      MR. SOLOMON:  Okay.
14      THE WITNESS:  Because they were -- the
15   options were expiring.
16      MR. SOLOMON:  Okay.
17      THE WITNESS:  We had a very strong, you
18   know, start to the quarter, so I thought that would
19   be the safest time to sell.
20   BY MR. SOLOMON:
21   Q    And were you very concerned about your debt
22   at that stage?
23   A    Very concerned.  I certainly wanted to pay
24   down my debt.
25   Q    And Mr. Simon had been calling you to do

486

1    that for some time?
2    A    Yes.
3    Q    Did you tell anybody within Oracle that you
4    had decided to exercise and sell your options in
5    April of 2001?
6    A    Not that I recall.
7    Q    Do you know who Deb Lange is, or "Lange"?
8    A    Yes, I do.
9    Q    Who is she?
10   A    She was our then head of tax, corporate
11   tax.
12   Q    Okay.  Did you tell her that it was your
13   intention of -- selling and exercising your stock in
14   April of 2001?
15   A    No.
16   Q    Did you discuss your exercise -- your
17   exercise of options and sale of stock with Ms. Lange
18   at any time?
19   A    I don't think I've ever had a private
20   conversation with Deb Lange in my life.
21   Q    What does Deb Lange do?
22   A    She was then head of tax for Oracle.
23   Q    Okay.
24   A    She worked for Jeff Henley.
25      MR. SOLOMON:  I've marked as next exhibit a

487

1    document produced by Oracle with a Bates range --
2    sorry, Control No. 042760 to 766.
3       (Exhibit No. 123 was marked for
4    identification.)
5    BY MR. SOLOMON:
6    Q    And just let me know if you have seen this
7    before, please.
8    A    I have not.
9    Q    You see that your name's at the top on the
10   first page, and it says "Custom Calendar Report"?
11   A    Yes.
12   Q    Do you recognize the handwriting in this
13   document?
14   A    I don't.
15   Q    If you look at the page with the control
16   number 042762, there's a series of references to
17   Mexico --
18   A    Okay.
19   Q    -- beginning on December 20th.
20      Do you see that?
21   A    I do.
22   Q    And it seems to reflect that you were in
23   Mexico on those days?
24   A    Okay.
25   Q    Do you know where you were in Mexico?

488

1    A    I would be guessing, but I was probably in
2    Ixtapa or Zihuatanejo.
3    Q    Okay.  Would you be -- were you in a house
4    or on your boat?
5    A    On my boat.
6    Q    And if you then skip through to Control
7    No. 042764, you see that for Monday, January the
8    25th, it seems to reflect you are in the office;
9    correct?
10    MR. LINDSTROM:  I'm having difficulty
11    reading this.
12    Is that entry on control page 764?
13    MR. SOLOMON:  764, if you look --
14    MR. LINDSTROM:  You said January 25?
15    MR. SOLOMON:  Does it say the 15th?  I
16    can't see it very clearly either.
17    THE WITNESS:  Yeah, I think that's 15th.
18    BY MR. SOLOMON:
19    Q    Okay.  Seems to reflect you are in the
20    office; is that right?
21    A    I think so.
22    Q    Okay.  And then going to the next page,
23    which is 65, Friday, January 19th, reflecting that
24    you are in California; correct, the top of the page?
25    A    Yes.

489

1    Q    And then Saturday, again, reflecting that
2    you are in the country but in Chicago; is that right?
3    A    Yes.
4    Q    And from Sunday, the 21st, it reflects
5    you are in Mexico again?
6    A    That's what it says.
7    Q    Is that accurate?
8    A    I guess so.
9    Q    Okay.
10    A    I don't recall.
11    Q    And then it was just for three days?
12    A    No.  I think I did the GE Power call
13    from -- I would be surprised if I would go to Mexico
14    for three days.  So, again, I'm guessing a little
15    bit, but I think -- I certainly do GE Power calls --
16    I do a lot of calls on the boat, so I could have done
17    that.
18    Q    Okay.  And then it says GE Power call for
19    what looks to be the 24th; right, Wednesday?
20    A    Wednesday, yes.
21    Q    And then Thursday, it says "personal
22    meeting," but you don't know where you were then;
23    right?
24    A    Yeah.  My guess is I was in Mexico all that
25    week.

490

1    Q    Okay.  And notwithstanding the fact that
2    you were in Mexico, you were on your boat attending
3    to Oracle business; is that right?
4    A    Well, I certainly -- looks like I made the
5    GE Power call.
6    Q    There's no reference to the Friday of that
7    week.
8    Do you know why?
9    A    No.
10    Q    Okay.
11    A    Or Saturday is gone also.
12    Q    You don't know why?
13    A    No.
14    Q    Do you know what those personal meetings
15    were?
16    A    Again, I -- I don't remember ever going
17    down to Mexico for three days.  I would -- looks like
18    I went to Chicago to pick up my family.
19    Q    Okay.
20    A    And then the family -- then we flew to
21    Mexico for the week.  That's my suspicion.
22    Q    And did you have business meetings with
23    anybody on your boat; do you recall?
24    A    In Mexico, no.
25    Q    Okay.  And you don't know what the personal

491

1    meetings there -- that are referred to there?
2    A    I assume that's just an extension of the
3    Mexico trip.
4    Q    Gotcha.
5    Then Monday you are back in -- does that
6    seem to reflect you are back in California?
7    A    Yes.
8    Q    Okay.  Now, you had to request clearance to
9    engage in your stock sales; correct?
10    A    Correct.
11    Q    And who did you request clearance from?
12    MR. LINDSTROM:  Well, when -- we need to be
13    a little bit careful, because I think he testified
14    that he had -- when you say "you," I want to make
15    sure there's no ambiguity as to whether it's him
16    personally or somebody acting on his behalf, because
17    I think -- I think he already told you that he had
18    that done by Philip Simon, but it was on his behalf,
19    so we just need to be careful in this part of the
20    transcript that we distinguish between what he's
21    doing and what's being done for him.
22    BY MR. SOLOMON:
23    Q    Did you request clearance to trade?
24    MR. LINDSTROM:  Vague and ambiguous.
25    THE WITNESS:  I told Philip to go ahead and

492

Ellison, Lawrence  9/21/2006  10:57:00 AM

1   sell the options.

2   MR. SOLOMON:  Okay.

3   THE WITNESS:  And I -- and it's his

4   practice -- it's required -- he has to talk to both

5   our general counsel and our chief financial officer

6   to get clearance before I can trade.

7   BY MR. SOLOMON:

8   Q.   Okay.  And did Mr. Simon ask you if you

9   were in possession of any material information?

10   A.   No.

11   Q.   And did you tell Mr. Simon that you weren't

12   in possession of any material information?

13   A.   No.

14   Q.   Do you know whether you were in possession

15   of material information?

16   A.   I don't believe I was.

17   Q.   Okay.  You had no conversations with

18   Mr. Simon, Mr. Coopman -- Mr. Cooperman or, in fact,

19   anybody else as to whether or not you were in

20   possession of inside information when you traded; is

21   that right?

22   A.   Not that I recall.

23   Q.   Do you recall when the issue of trading, of

24   exercising your options and selling stock with

25   respect to the 2001 expiring options, when that was

493

1   first raised?

2   MR. LINDSTROM:  Vague and ambiguous.

3   THE WITNESS:  Rephrase the question.

4   MR. SOLOMON:  Let me rephrase it.

5   Q.   In January of 2001, you exercise sale of

6   stock options that were due to expire in August of

7   2001?

8   A.   That's right.

9   Q.   Do you recall when the issue -- when the

10   fact they were due to expire in August 2001 was first

11   brought to your attention?

12   A.   18 months before.

13   Q.   Okay.  And had you constantly been

14   considering, during that time, when to sell, when to

15   exercise and sell?

16   A.   Not constantly.  No, not constantly, but

17   certainly from time to time, I thought about it.

18   MR. SOLOMON:  Okay.  Have marked as the

19   next exhibit a document produced by the defendants

20   with a control number 060974.

21   (Exhibit No. 124 was marked for

22   identification.)

23   THE WITNESS:  Okay.

24   BY MR. SOLOMON:

25   Q.   Do you recognize this?

494

1   A.   No.

2   Q.   You will see that it's an e-mail dated

3   January 10, 2001 from Deb Lange to Jeff Henley.

4   Do you see that?

5   A.   Yes.

6   Q.   The subject is Re:  LGA option -- LJE

7   option exercise?

8   A.   Right.

9   Q.   And Deborah Lange writes:  Jeff, we are

10   working with Larry's accountants re the timing of him

11   exercising his options which expire August of this

12   year.  Larry may be willing to exercise in April if

13   it is beneficial to the company."

14   Do you see that?

15   A.   I do.

16   Q.   Is it true that you were willing to

17   exercise in April if it were beneficial to the

18   company?

19   A.   No one ever asked me.

20   Q.   Do you know why she said that, though?

21   A.   She must have been talking to Philip or

22   someone, you know, about -- yeah, that -- sounds like

23   she wanted me to exercise my options in the current

24   fiscal year rather than waiting until August.

25   Q.   Okay.

495

1   A.   June, July, or August in the next fiscal

2   year.

3   Q.   Okay.  And then the second paragraph reads:

4   "The unknown factor is the relative stock price"

5   between "April versus August -- a lower stock price

6   means lower income to Larry but a lesser deduction

7   for the company."

8   Do you see that?

9   A.   Yes.

10   Q.   Go on to say, "My general recommendation is

11   to ask Larry to do as much as possible in April, but

12   to have the right to modify that advice in April when

13   we have more visibility to FY01 results and the stock

14   market."

15   Do you see that?

16   A.   Yeah.

17   Q.   And you don't recall hearing a

18   recommendation that you do as much as possible in

19   April of 2001?

20   A.   No one ever asked me.

21   MR. SOLOMON:  Okay.  Let's have marked as

22   the next exhibit another document produced by the

23   defendants with control number 039432.

24   (Exhibit No. 125 was marked for

25   identification.)

496

1     THE WITNESS:  Okay.
2  BY MR. SOLOMON:
3     Q    Do you recognize this?
4     A    No.
5     Q    And you will see that it's an e-mail dated
6  Friday, January 19, 2001 from Safra Catz to Dan
7  Cooperman.
8     Do you see that?
9     A    Yes.
10    Q    And there's a message from Dan Cooperman to
11  Safra Catz concerning her intention to engage in a
12  same-day exercise and sale.
13    Do you see that?
14    A    I do.
15    Q    And then you will see that there's a
16  message at the top:  "I just found out something so I
17  don't think I should trade."
18    Do you see that?
19    A    I do.  I do.
20    Q    Do you have an understanding what Safra
21  Catz is referring to?
22    A    I think she's referring to she found out
23  that I was trading.
24    Q    Okay.  Why would Ms. Catz not want to trade
25  if you were trading?

497

1     MR. LINDSTROM:  Objection; calls for
2  speculation, no foundation.
3     THE WITNESS:  I don't know.
4  BY MR. SOLOMON:
5     Q    Okay.  And why do you suspect that that's
6  what she found out?
7     A    I think that's what my lawyers told me.
8     Q    They are going to punch you now.
9     Now, Ms. Catz would have been a recipient
10  of the January 17 Flash report as well, wouldn't she?
11    A    Yes.
12    Q    Okay.  And she would have learned things in
13  that document, wouldn't she?
14    MR. LINDSTROM:  Objection; no foundation,
15  calls for speculation.
16  BY MR. SOLOMON:
17    Q    She would have learned the information --
18    A    She would have certainly looked at the
19  document, I guess, yeah.
20    MR. SOLOMON:  Marked as the next exhibit --
21  mark as the next exhibit another document produced by
22  the defendants with the control number 035359 and
23  360.
24    (Exhibit No. 126 was marked for
25     identification.)

498

1  BY MR. SOLOMON:
2     Q    Let me know if you recognize this.
3     A    No, I have not.
4     Q    Okay.  Now, this appears to reflect that
5  Safra Catz is saying that she has the forms for
6  exercising, selling her options and she will mail
7  them back.
8     Do you see that at the top?
9     A    Yes.
10    MR. LINDSTROM:  Objection; calls for
11  speculation.
12    THE WITNESS:  Yeah, but I'm not sure what
13  it means, "got them."  I don't know what "them" is.
14  BY MR. SOLOMON:
15    Q    You don't know why Ms. Catz was sending
16  these documents back, having said earlier that she
17  had learned something and she wouldn't trade?
18    MR. LINDSTROM:  Objection; calls for
19  speculation, no foundation.
20    THE WITNESS:  I don't know.
21    (Reporter clarification.)
22  BY MR. SOLOMON:
23    Q    Did you have a conversation with Ms. Catz
24  in which you informed her that you were trading?
25    A    I don't recall.

499

1     MR. SOLOMON:  Marked as the next exhibit a
2  document produced by the defendants with the control
3  number 035365.
4     (Exhibit No. 127 was marked for
5     identification.)
6     THE WITNESS:  Okay.
7  BY MR. SOLOMON:
8     Q    Okay.  Do you recognize this?
9     A    Vaguely.
10    Q    Okay.  And was it you that initiated a
11  request to Mr. Lockhart that he draft a press
12  release?
13    A    I don't recall.
14    Q    Do you recall reviewing the draft press
15  release?
16    A    I believe I did.
17    Q    Okay.  And were you -- did you approve the
18  press release as written by Mr. Lockhart, do you
19  know?
20    A    I don't think we issued the release.
21    Q    Okay.  And was that because in -- some of
22  the news leaked into the market?
23    A    I don't -- I just don't remember.
24    Q    Do you know why the release was being
25  contemplated?

500

1    A    To reassure people, again, that I was

2    selling -- what was a large dollar amount, it was a

3    very, very small percentage of my holdings.  I was

4    still -- whenever I sell stock, I worry that people

5    think I'm losing confidence in the company.  I think

6    it was important that they knew that I was, you

7    know -- 98.5 percent of my stock I was continuing to

8    hold.

9    Q    Okay.  It was your desire, I assume, to get

10   the highest price you could for your stock?

11   A    Sure.

12   Q    And whose idea was it to set a floor of $30

13   per share?

14   A    Mine.

15   Q    And who did you communicate that to?

16   A    Philip Simon.

17   Q    Anybody else?

18   A    Well, I think he talked to -- obviously the

19   people on the trading desk had to know.  So

20   indirectly -- indirectly, the people who were selling

21   the stock had to know what the floor price was.

22   Q    Okay.  Did you discuss it with Jeff Henley?

23   A    I didn't.  I didn't discuss it with Jeff

24   Henley or Dan Cooperman.  I don't know if Philip

25   Simon did.

501

1    Q    Were you aware at the time of your stock

2    sales that earlier that same month Mr. Henley had

3    exercised and sold Oracle securities?

4    A    No, did not know.

5    Q    Are you aware that he also set a floor of

6    $30 per share?

7    A    No.

8    Q    And that would be just a coincidence, as

9    far as you know, if that's true?

10   A    Yes.

11   Q    And after you had exercised the expiring

12   options and sold, isn't it true that you continued to

13   sell?

14   A    Yes.

15   Q    What prompted the decision to continue to

16   sell?

17   A    I don't want to go into the market very

18   often.  Again, whenever I go into the market and sell

19   stock, people begin to speculate that I'm losing

20   confidence in the company.  I own a very large

21   portion of the company.  So I only like to do it once

22   and then not sell again for a very, very long time.

23   I wanted to pay down more of my debt.  I thought, I

24   was in the market that week, I would keep selling

25   that week, you know, given -- you know, within the

502

1    limits of the volume restrictions and the price

2    restrictions, and at the end of that week, I would

3    then stay out of the market for as long as I could.

4    Q    Okay.  And, in total, you realized

5    proceeds -- aggregate proceeds of around $894

6    million; is that right?

7    A    I believe so.

8    Q    And what were the proceeds used for?

9    A    Some of it was used to pay down debt; some

10   of it was retained in cash, largely for investments;

11   other was retaining cash for -- to pay taxes.

12   Q    And is it true that you had a significant

13   multimillion-dollar payment due on the "Rising Sun"

14   in that fiscal quarter?

15   A    I don't recall, but it certainly could be

16   true.

17   Q    Do you know if you paid it?

18   A    If it was due, I paid it.

19   Q    Do you always pay on time?

20   A    Pretty much.

21   MR. SOLOMON:  Have marked as the next

22   exhibit another document produced by the defendants,

23   Control Nos. 005595 to 601.

24   (Exhibit No. 128 was marked for

25   identification.)

503

1    THE WITNESS:  Okay.

2    BY MR. SOLOMON:

3    Q    Okay.  Have you seen this before?

4    A    Yes.

5    Q    And it's Oracle's insider trading policy?

6    A    It's our stock trading policy, yes.

7    Q    And are you familiar with its contents?

8    A    Generally.

9    Q    Okay.  I'm looking at the second page, the

10   second full paragraph, beginning:  "Trading on inside

11   information."

12   Do you see that?

13   A    Second paragraph -- second full paragraph?

14   Q    Yes.

15   Says, "Trading on inside information can

16   include making a single purchase or sale, or engaging

17   in or facilitating a pattern of transactions, which

18   might appear to take advantage of inside information

19   possessed by others at Oracle.  You need not actually

20   use or rely on inside information, but simply possess

21   it at the time of the trade, to be considered trading

22   on inside information."

23   Were you aware of that?

24   A    Yes.

25   MR. SOLOMON:  Have marked as the next

504

Ellison, Lawrence  9/21/2006  10:57:00 AM

1  exhibit a document produced by the defendants in this
2  litigation with the control numbers 028735 and 736.
3  (Exhibit No. 129 was marked for
4  identification.)
5  THE WITNESS:  Okay.
6  BY MR. SOLOMON:
7  Q   And do you recognize this?
8  A   Yes.
9  Q   Okay.  It's dated the 12th of October 2000,
10  and it's from you -- at least part of the document's
11  from you -- to Michael Rocha.
12  Do you see that?
13  A   Yes.
14  Q   And you say, "Thanks for the update.  I
15  will let you know how it goes.  Larry."  Correct?
16  A   That's right.
17  Q   And that refers to a meeting you were
18  scheduled to have with Carly Fiorina the following
19  day?
20  A   Yes.
21  Q   Now, do you have a recollection of a deal
22  transacted with HP in the second fiscal quarter of
23  2001?
24  A   Second fiscal quarter in 2001.  I don't.
25  Q   Okay.  You weren't involved?

505

1  MR. LINDSTROM:  Objection; vague and
2  ambiguous as to "involved."
3  THE WITNESS:  Yeah.  Again, I don't -- I'm
4  not sure what you mean by "involved."  I'm certainly
5  part -- I certainly helped maintain our relationship
6  with Hewlett-Packard.
7  MR. SOLOMON:  Okay.
8  THE WITNESS:  But I'm not sure that we had
9  a -- I mean, I'm taking your word for it that we had
10  a transaction in the second fiscal quarter.
11  BY MR. SOLOMON:
12  Q   But you don't remember it?
13  A   I don't remember it.  In 1999 -- in other
14  words, in 1999.  Second fiscal quarter would be -- of
15  2000 will be in 1999.
16  Q   I'm sorry if I said 2000.  I meant second
17  fiscal quarter of 2001.
18  A   2001.
19  Q   Yes.
20  A   So in 2000?
21  Q   Correct.
22  A   I don't know.  I don't know when the big --
23  what quarter the big HP deal was in.
24  Q   Okay.  Do you recall what the deal was?
25  A   We sold them a lot of CRM software.  They

506

1  were going to standardize on our CRM products, or at
2  least make broad use of our CRM products, and we were
3  going to use HP hardware in our engineering
4  organization and our production -- and for our
5  production database servers for -- and in a number of
6  areas.
7  Q   Okay.  Was it a swap transaction?
8  MR. LINDSTROM:  Objection; asked and
9  answered, calls for a conclusion.
10  THE WITNESS:  "Swap transactions" is an
11  accounting term, and I don't know what's -- I don't
12  know -- we looked at -- you know, our accountants
13  looked at this transaction very, very carefully.
14  They were aware that they were -- you know, we were
15  buying hardware; HP was buying software, and we
16  believe we have accounted for it properly.
17  MR. SOLOMON:  I've marked as the next
18  exhibit a document produced by the defendants --
19  excuse me, produced by Hewlett-Packard with the
20  control numbers 00061263.
21  We will mark this a little later.
22  Q   Okay.  So you don't have any recollection
23  right now of the last day of being involved in an HP
24  transaction on the last day of the second fiscal
25  quarter of 2001?

507

1  A   I said I don't remember what day -- what
2  day the HP transaction was.
3  Q   Okay.
4  A   I didn't say I didn't have any recollection
5  of it; I just don't know when the date was.
6  Q   Okay.  Regardless of the date, were you
7  involved in closing that deal?
8  A   What do you mean by close?  Again, I'm not
9  trying to be cute here, but I certainly had
10  discussions with Hewlett-Packard.  You know, I'm the
11  one -- I'm the only one who can commit our company to
12  use Hewlett-Packard gear on the engineering side of
13  our business.  I run engineering directly at Oracle,
14  have from the beginning.
15  So in the sense that I said, yes, we would
16  use Hewlett-Packard gear underneath our -- our
17  main -- what's called global single systems, our main
18  production systems, and use it in our development
19  organization, I made those decisions, so certainly
20  involved in making those decisions, but actually, you
21  know, shaking hands, signing the contract, you know,
22  hammering out the terms and conditions, negotiating
23  the terms and conditions, I don't do.
24  Q   Okay.  Do you recall whether you felt
25  confident or not on the last day of the fiscal

508

Oracle                                                    Page  505 - 508

1 quarter of 2000 -- second fiscal quarter of 2001,
2 confident whether or not Oracle would make its
3 numbers?
4      MR. LINDSTROM:  For that quarter?
5      MR. SOLOMON:  For that quarter.
6      THE WITNESS:  I don't recall.
7      MR. SOLOMON:  So mark as the next exhibit a
8 document produced by the defendants with the control
9 number 021378 to 381.
10      (Exhibit No. 130 was marked for
11          identification.)
12      THE WITNESS:  Okay.
13 BY MR. SOLOMON:
14   Q   Okay.  Do you recognize this?
15   A   I do.
16   Q   And is that your signature on the last
17 page?
18   A   It is.
19   Q   And it's dated November 30, 2000?
20   A   Yes.
21   Q   And it's a letter from you to Carly
22 Fiorina?
23   A   Yes.
24   Q   And if you turn the document upside down,
25 you will see it says, "Sent By:  Atherton."

509

1      Do you see that?
2   A   Oh, yes.  Right.
3   Q   Does that reflect the fact that this was
4 sent from your house?
5   A   I guess so.
6   Q   Okay.  And if you turn it the right way up
7 again, then there's a fax line that says:  December
8 '01 00 10:43 Bardwick.
9      Do you see that?
10   A   I do.
11   Q   Do you know what that refers to?
12   A   I do not.
13   Q   And it says -- the letter starts, saying,
14 "Dear Carly:  As we discussed, it is my intention
15 that various Oracle computing environments will be
16 moved to HP as discussed in more detail below," and
17 then there's the detail.
18      Do you see that?
19   A   I do.
20   Q   And had you discussed that intention with
21 Carly as you say here?
22   A   I think we spoke in general terms of -- of
23 using Hewlett-Packard hardware more broadly
24 throughout Oracle.  We had never gone into this level
25 of detail between the two of us.

510

1   Q   Okay.  Now, was the HP deal referred to
2 here the subject of any meetings of the board of
3 directors of Oracle?
4   A   I have no idea.
5      MR. SOLOMON:  So mark as the next exhibit a
6 document produced by the defendants with the control
7 numbers 044428 through 505.
8      (Exhibit No. 131 was marked for
9          identification.)
10      THE WITNESS:  Could you read back his
11 previous question for me, please.
12      (Record read by the Reporter as follows:
13      "QUESTION:  Okay.  Now, was the HP deal
14      referred to here the subject of any
15      meetings of the board of directors of
16      Oracle?")
17      THE WITNESS:  The subject of any meetings.
18      Okay.  Was it ever -- by that do you mean
19 was it ever discussed in any board meetings, or was
20 there a special board meeting about the HP deal?
21 BY MR. SOLOMON:
22   Q   Was there a special board meeting.
23   Q   About the HP deal?
24   Q   Yes.
25   A   Not that I know of.

511

1   Q   If you go to the control-numbered page
2 044434 -- and, just for the record, while you are
3 going to that page, this is a document, as I say,
4 produced by the defendants, and it appears to be a
5 collection of board meeting minutes and associated
6 documentation.
7      And looking at that page, Mr. Ellison, you
8 will see that there's a special meeting, at the top
9 of the page, on November 30th, 2000, but that there's
10 a redaction stamp.
11      Do you see that?
12   A   Yes.
13   Q   Do you know what the special meeting on
14 November 30th was about?
15   A   I don't, but it was not a board meeting; it
16 was what's called an Executive Committee meeting.
17   Q   And is that a committee of the board?
18   A   It's a committee of the board, yes.
19   Q   And does your answer change, then, if I ask
20 you was there a special meeting of the Executive
21 Committee with respect to the HP transaction?
22   A   The answer goes to I don't know.
23   Q   Okay.  And you don't know what's redacted;
24 is that right?
25   A   No.

512

Ellison, Lawrence  9/21/2006  10:57:00 AM

1    Q   Okay.  What is the Independent Committee?
2    A   Independent Committee certifies potentially
3  conflicted -- conflicting transactions.  I own a
4  company -- I own a disk drive company called Pillar
5  Data.  If Pillar -- Pillar Data bought Oracle
6  software, so the Independent Committee had to approve
7  the pricing and terms and conditions when we are
8  selling because I own that.
9    Q   Do you know why information with respect to
10  the Independent Committees has been redacted?
11   A   I have no idea.
12   Q   Okay.  Now, if you go into the document
13  further to 044458, you will see there's a reference
14  to a November 30th, 2000 meeting -- special meeting
15  of the Executive Committee.
16       Do you see that?
17   A   Yes.
18   Q   Okay.  And it reflects the fact that you
19  and Mr. Henley were present and a quorum established
20  and Mr. Lucas, the third member of the committee, was
21  not in attendance; right?
22   A   Yes.
23   Q   And also there was Safra Catz and Daniel
24  Cooperman.
25       Do you see that?

513

1    A   I do.
2    Q   Okay.  And it says the meeting was called
3  to order, etc., and then under 2, it says, "Approval
4  of purchase of hardware and services from the," and
5  then we get no more information.
6       Do you see that?
7    A   I do.
8    Q   Do you have any idea what's there or what
9  should have been there, what would be there but for
10  the redaction?
11   A   Want me -- I could guess.
12   Q   If that's all you can do.
13       MR. LINDSTROM:  Objection; calls for
14  speculation.
15  BY MR. SOLOMON:
16   Q   I'll take the guess.
17   A   It's possible that the actual purchase of
18  HP hardware exceeded my purchasing authority, so it
19  was more money, more money than I was authorized to
20  spend, but, again, I'm just --
21   Q   Okay.
22   A   -- making a guess.
23   Q   Okay.  But you don't understand, if that
24  were the case, why the information would be redacted?
25       MR. LINDSTROM:  That calls for speculation,

514

1  no foundation.
2       THE WITNESS:  I have no idea what it's
3  about.  I'm guessing.
4  BY MR. SOLOMON:
5    Q   Do you have any understanding whether this
6  meeting addressed HP?
7    A   No idea.
8       MR. SOLOMON:  I would ask counsel to
9  produce unredacted copies of --
10       THE WITNESS:  Oh, let me -- let me refine
11  that.  Since it is hardware and services, there just
12  aren't that many companies we buy hardware and
13  services from.  It's a very small list.
14       MR. SOLOMON:  So it's probably HP.
15   Q   You think it's HP?
16       MR. LINDSTROM:  Objection; calls for
17  speculation.
18       THE WITNESS:  If you forced me to bet, yes,
19  I would bet it would be HP.
20  BY MR. SOLOMON:
21   Q   Fair to say you believe it's HP?
22   A   No.  I'm still -- I believe I'm making a
23  decent guess.
24   Q   Okay.  That's fair enough.
25       Again, Counsel, we want full production of

515

1  that document, please.
2       MR. LINDSTROM:  We will take your request
3  under advisement.
4       MR. SOLOMON:  Reserve the right to continue
5  questioning Mr. Oracle about the transaction --
6  Mr. Ellison about the transaction.
7       Did I say "Mr. Oracle"?
8       THE WITNESS:  You did.
9       MR. LINDSTROM:  I think that was a
10  compliment.
11  BY MR. SOLOMON:
12   Q   Do you recall receiving any legal advice
13  concerning the transaction with HP at the end of
14  2Q01?
15       MR. LINDSTROM:  You may answer that "yes"
16  or "no."
17       THE WITNESS:  No.
18       THE VIDEOGRAPHER:  20 minutes, Counsel.
19  BY MR. SOLOMON:
20   Q   Do you recall whether HP implemented the
21  software being sold to it by or licensed to it by
22  Oracle?
23   A   I believe they went through the process of
24  implementation.  I believe they had a project and
25  started to -- and started to implement.

516

Oracle                                                                Page  513 - 516

1    Q    And was it successful, do you know?
2    A    I don't believe so.
3         MR. SOLOMON:  Okay.  Let's go off the
4    record for a couple minutes.
5         THE VIDEOGRAPHER:  Off record at 6:15.
6         (Discussion off the record.)
7         THE VIDEOGRAPHER:  On record at 6:16.
8         This marks the end of Tape 4, Volume 2, in
9    the deposition of Larry Ellison.
10        At 6:16, going off the record.
11        (Recess taken.)
12        (Record read by the Reporter as follows:
13        "QUESTION:  Do you recall whether HP
14        implemented the software being sold to it
15        by or licensed to it by Oracle?
16        ANSWER:  I believe they went through the
17        process of implementation.  I believe they
18        had a project and started to -- and started
19        to implement.
20        QUESTION:  And was it successful, do you
21        know?
22        ANSWER:  I don't believe so.")
23        THE VIDEOGRAPHER:  And on record at 6:31.
24        This marks the beginning of Tape 5,
25        Volume 2, in the deposition of Larry Ellison.

517

1         MR. SOLOMON:  I've marked as the next
2    exhibit a document produced by the defendants with
3    the control number 034883.
4         (Exhibit No. 132 was marked for
5         identification.)
6    BY MR. SOLOMON:
7    Q    Now, the question is:  Do you recognize it?
8    A    I do.
9    Q    And this is an e-mail from you dated 21st
10   of April 2000 and it goes to Jay Nussbaum and copies
11   Safra Catz?
12   A    Yes.
13   Q    And it's concerning BellSouth, and at the
14   bottom, it says, "Jay Nussbaum wrote:  Safra/Larry, I
15   surrender.  I thought you verbally approved this.
16   Why is this becoming" so "painful.  This is a great
17   customer and we're quickly losing ground.  Please
18   help."
19        Do you see that?
20   A    I do.
21   Q    And do you know what the approval is that
22   Mr. Nussbaum is referring to?
23   A    Well, the one I -- the one I specifically
24   refer to and the one I found unacceptable is -- from
25   reading this note, which refreshes my memory, is

518

1    provision where they -- they want us to develop
2    modifications.  Specifically -- they want us to
3    basically enhance the software or change the software
4    so it works perfectly at BellSouth, put in whatever
5    they want us to put in, and then when we are done, we
6    will just make it -- turn it into a standard product.
7         So what's fine for a telephone company,
8    very specific stuff for telephone company, everyone
9    will receive:  hospitals, just -- it's just very --
10   it's crazy.
11   Q    And is the technical term for that
12   "wackfuck"?
13   A    That is the technical term.
14   Q    Did you make that one up yourself?  I
15   haven't heard of it.
16   A    I think it's British.  I think it's
17   British.
18   Q    I should know that.  I've been away too
19   long.
20        I'm interested in the e-mail address.  It
21   says lellison-vaio-katana.us.oracle.com.
22        Do you see that?
23   A    I'm looking for it.
24        MR. LINDSTROM:  At the top.
25        THE WITNESS:  See it from -- okay.  I don't

519

1    think that's an e-mail address.  I'm not sure what
2    that is.  That could be a router address.
3    BY MR. SOLOMON:
4    Q    Okay.  Would this --
5    A    That doesn't like an e-mail -- that is
6    not -- I'm pretty certain that's not an e-mail
7    address.
8    Q    Okay.  Does it indicate that you were on
9    the boat at the time you wrote the e-mail?
10   A    I think so.
11   Q    Okay.  And was -- were you on this same
12   boat on your Mexican trips in late 2000, early 2001?
13   A    No.
14   Q    What boat were you on then?
15   A    "Ronin," a boat called "Ronin."
16   Q    Okay.  And that would have -- would that
17   have -- well, you are saying it's not an e-mail
18   address.
19        Would it have a similar address, whatever
20   it is, or router address?
21   A    Router address?  Yeah.  It goes from my
22   e-mail address into a router and a switch, and it
23   passes across several different things before it
24   final gets to the e-mail server.
25   Q    Gotcha.

520

Ellison, Lawrence  9/21/2006  10:57:00 AM

1    So -- okay.  So to the extent you e-mailed
2    in late December 2000 and January 2001 from that
3    boat, those e-mails would disclose the name of the
4    boat as the name of the boat is disclosed here?
5        MR. LINDSTROM:  No foundation, calls for
6    speculation.
7        THE WITNESS:  I don't know.
8        MR. SOLOMON:  Okay.
9        THE WITNESS:  But it is -- from the -- you
10   can see the account, the account is
11   lellison@us.oracle.com, which is our old-fashioned
12   e-mail addresses.
13   BY MR. SOLOMON:
14   Q    Okay.  And, again, somewhere, the computer
15   that was both on the "Katana" and on "Ronin"?
16   A    "Ronin," yes.
17   Q    They still exist, but you don't know where?
18   A    They do still exist, yes.
19   Q    In lawyers' offices?
20   A    Yes.
21       MR. SOLOMON:  Have marked as the next
22   exhibit a document produced by defendants with the
23   control numbers 035682 to 685.
24       (Exhibit No. 133 was marked for
25       identification.)

521

1    BY MR. SOLOMON:
2    Q    When you have had a chance to review it,
3    let me know if you recognize it.
4    A    I don't recognize it.
5    Q    Okay.  You will see that it's dated Monday,
6    January 29, 2001, and it -- the front page, it's
7    an e-mail exchange from Safra Catz to Scott Little?
8    A    Yes.
9    Q    Do you know who Scott little is?
10   A    I do not.
11   Q    The title is "Forwarded:  Update for LJE's
12   meeting on BMC Software."
13       Do you see that?
14   A    I do.
15   Q    Do you remember having a meeting as
16   reflected here?
17   A    Say again.
18   Q    Did you have that meeting as reflected
19   here?
20   A    I don't recall.
21   Q    And then it says, "Larry ended up out sick
22   all last week."
23       Do you see that?
24   A    Yes.
25   Q    So were you out sick all of the week of

522

1    January 22?
2    A    I think this got -- the -- my calendar said
3    I was in Mexico.
4    Q    Correct.
5    A    Yeah.
6    Q    And so were you sick in Mexico or --
7    A    I don't think so.
8    Q    So you were vacationing in Mexico?
9    A    I think so.
10       MR. SOLOMON:  And we will have marked as
11   the next exhibit a Bloomberg News article dated
12   January 24th, 2001.
13       (Exhibit No. 134 was marked for
14       identification.)
15       THE WITNESS:  Maybe I was sick in Mexico.
16   I don't know.  I don't remember being in Mexico.  I
17   don't remember being sick.  I just don't recall.
18   BY MR. SOLOMON:
19   Q    So you will see that the headline is
20   "Oracle CEO Ellison Loses Voice, Misses 2 Public
21   Talks In A Week."
22       You see that?
23   A    Yeah.
24   Q    And you will see that Ms. Glass is quoted
25   as saying, "He does not have a voice, but he's

523

1    actively working by e-mail."
2        Do you see that?
3    A    Yes.
4    Q    Is it possible that this was a white lie
5    and you were vacationing and it was an excuse?
6    A    What's wrong with saying I'm on holiday --
7    Q    That's what --
8    A    -- on vacation?  So I have no -- maybe I
9    was sick.  I really don't remember.
10   Q    Okay.  And do you have any recollection of
11   the public appearances that you missed that you were
12   scheduled to appear at?
13   A    No.
14   Q    And was it a deliberate -- did you
15   deliberately go on vacation in order to be away from
16   work when you exercised your stock options?
17   A    No.
18       MR. LINDSTROM:  Objection.
19   BY MR. SOLOMON:
20   Q    No connection.
21   A    I'm not even sure I went away.  My calendar
22   said I was in Mexico, but, you know, I don't
23   remember.
24   Q    Okay.
25   A    I assume I was.  According to all this,

524

1  this is saying I'm sick, you know.

2  Q    Okay.

3  A    I don't know.

4  MR. SOLOMON:  Okay.  Let's have marked as

5  the next exhibit a document produced by Oracle with

6  control numbers 025020 and 021.

7  (Exhibit No. 135 was marked for

8  identification.)

9  THE WITNESS:  Okay.

10  BY MR. SOLOMON:

11  Q    Okay.  Do you recognize this?

12  A    Yes.

13  Q    And it's dated Thursday, November 30th,

14  2000, and it's from Gary Roberts to you, and it

15  copies others.

16  Do you see that?

17  A    That's correct.

18  Q    And it starts off saying, "Larry, I

19  believe" -- "Larry, I believe you'll be discussing

20  discounts with HP today.  Please keep these figures

21  in mind," and then there's a lot of detail.

22  Do you see that?

23  A    I do.

24  Q    Now, does this not reflect -- does this not

25  reflect your engaging in negotiating with HP

525

1  concerning the deal?

2  A    It reflects that Gary Roberts thinks I

3  engage in price negotiations with Carly Fiorina and

4  we're -- argue about how much we can get -- discount

5  we can get on each server.  I guess -- that's what he

6  does, and it's his job.  He was the then head of the

7  data center, and he would -- he and Maria Maskiewicz

8  would negotiate the best possible prices for our

9  hardware, and it's a very important job, but I don't

10  give him much help.

11  MR. SOLOMON:  Okay.  I've marked as the

12  next exhibit a document with the control numbers

13  020835 through 838.  It was produced by the

14  defendants.

15  (Exhibit No. 136 was marked for

16  identification.)

17  BY MR. SOLOMON:

18  Q    And I'm sorry, Mr. Ellison, just with that

19  last exhibit, this would have been in your files as

20  of November 30th, 2000; correct?

21  A    Yes.

22  Q    And it wasn't produced from your files and

23  you can't explain why; is that correct?

24  A    That's correct.

25  Q    I'm going to show you a document that has a

526

1  little bit -- just give that back to me.  That's

2  fine.  That has a little bit of highlight on it, but

3  it's going to ease -- it's going to save some time if

4  I do that.

5  So I just marked as the next exhibit --

6  thank you.

7  (Discussion off the stenographic record.)

8  BY MR. SOLOMON:

9  Q    And, Mr. Ellison, my question is going to

10  be:  Do you recognize the handwriting?

11  MR. LINDSTROM:  While he's looking at the

12  document, just for sake of the record, Mark, can you

13  identify the highlighting and any other marks that

14  are on here that came from your office?

15  MR. SOLOMON:  Sure.

16  Q    The highlight, I believe, Mr. Ellison, on

17  the document you are looking at is where it says,

18  "Dear Carly" on the front page and that first

19  sentence and the signature, "Best regards, Larry

20  Ellison."  I don't believe there's any other

21  highlighting.

22  Correct me if I'm wrong.

23  MR. LINDSTROM:  And then on the copy that

24  has been distributed to counsel, in the upper

25  right-hand corner, it says "Source to Sanderson" and

527

1  somebody else's handwriting.  Looks like a Post-it

2  that's been copied or something like that.

3  MR. SOLOMON:  You -- that is -- with that

4  waiver, I think that's ours.

5  MR. LINDSTROM:  Okay.

6  MR. SOLOMON:  In that corner.  Okay?

7  MR. LINDSTROM:  That's fine.  And it does

8  not appear, for the record, on the version that's

9  been marked as Exhibit 136.

10  MR. SOLOMON:  Correct.  Thank you.  Yeah.

11  MR. LINDSTROM:  Oh, Counsel points out --

12  MR. SOLOMON:  I should have just copied it,

13  shouldn't I?

14  MR. LINDSTROM:  No.  Counsel -- counsel

15  points out that the Post-it covered up a little bit

16  of the handwriting that appears on the -- beneath it,

17  starting from -- looks like "Where" -- that -- can

18  you read that first bullet point to us, if you are

19  able to?

20  MR. SOLOMON:  Yes.  Mr. Ellison has it.

21  MR. LINDSTROM:  So you are working with the

22  same copy I am?

23  MR. SOLOMON:  I'm afraid I am.

24  "Where is this the same as committed in

25  the" -- I don't know.

528

1   Q   Can you read that writing?

2   A   I'll try.

3   Q   I guess, is it your writing, is what --

4   A   No, it's not my writing.  I'd have a better

5   chance with my writing.

6   Q   You know, we don't need to dwell on it.  If

7   it's not your writing --

8   A   I think it's "Where in this is the same" --

9   "Where in this is the same as committed" -- sounds

10  like a lawyer, doesn't it?

11  Q   A bit.

12  A   Yeah, a little bit.

13  Q   It looks a little bit like your writing;

14  that's why I was asking --

15  A   No.

16  Q   -- if it's not, we can move on.

17  A   No, it's not my writing.

18  Q   Do you recall a dispute arising with HP

19  concerning the applications sale or lease that Oracle

20  engaged in with them?

21  A   Not offhand.  I know that they were -- they

22  had problems with the software.  They had problems

23  with the software, but -- is that what you were

24  referring to?

25  Q   Yes.

                                                    529

1   A   Yeah.

2   Q   And did the outcome cost Oracle money?

3   A   Did we pay HP some -- I think we probably

4   provided HP with some --

5       MR. LINDSTROM:  He doesn't -- don't

6   speculate.

7   BY MR. SOLOMON:

8   Q   You know I'm going to ask anyway, so you

9   may as well.

10      MR. LINDSTROM:  Or at least let's make it

11  be clear that you are speculating.

12      THE WITNESS:  Okay.  I recall we did some

13  pro bono consulting to help them with the

14  implementation.  But in the end, they decided to go

15  with Siebel.

16      MR. SOLOMON:  Gotcha.  Thanks.

17      Have marked as the next document a document

18  produced by the defendants in this litigation with

19  the control numbers 069907 to 939.

20      (Exhibit No. 137 was marked for

21      identification.)

22  BY MR. SOLOMON:

23  Q   And when you have had a chance to review

24  it, let me know if you recognize it.

25  A   I don't recognize seeing the document

                                                    530

1   before, but, again, I'm very familiar with the issues

2   that are discussed in the document.

3   Q   Okay.  And you will see that on the third

4   page of the document, you are on the distribution

5   list.

6       Do you see that in the distribution list

7   box, your name is the first name?

8   A   Yes.  Yes.

9   Q   And do you understand -- do you believe you

10  did receive this?

11  A   No, I believe I received it.

12  Q   And it's called, for the record,

13  "E-Business Suite High Level Requirements Document"?

14  A   Right.

15  Q   It's dated April 4th of 2002, is the

16  creation date.  It was last updated on June 6th,

17  2002.  It's Version 1.4, and it has the designation

18  "Oracle Internal & Confidential."

19  A   Yes.

20  Q   And then on the page that has the

21  distribution list, it says, in the middle, "Due to

22  the sensitive nature of the contents outlined, this

23  document is strictly confidential and strictly for

24  Oracle internal use only.  If you are not an Oracle

25  employee, please delete this document immediately."

                                                    531

1       Do you see that?

2   A   Yes.

3   Q   Do you have an understanding who created

4   this document?

5   A   Our field engineers -- the people who are

6   responsible for implementing our applications around

7   the world, and we are familiar with their strengths

8   and their weaknesses -- prepared the document.

9   Q   Okay.  If you go to page 7, which has the

10  control number 069913 --

11  A   Okay.

12  Q   -- you will see that there are -- there's

13  an introduction, and then almost halfway down the

14  page, there's a paragraph that says, "These

15  recommendations are not considered enhancements.  We

16  consider them fundamental gaps, inconsistencies or

17  duplication of effort within the E-Business Suite

18  architecture."

19      Do you see that?

20  A   I do.

21  Q   Then it goes on to say, "The competition

22  has been extremely aggressive in pointing out these

23  weaknesses within the R11i architecture.  Some of

24  these issues are so fundamental, that it exposes our

25  development environment as 'best of breed' rather

                                                    532

1 than one unified software vendor."
2     See that?
3 A   I do.
4 Q   Do you agree with that?
5 A   No.  No.  I mean, certainly all the pieces
6 did not fit together, you know, as perfectly as they
7 could, but they were engineered to fit together.
8 They were certainly -- you know, there's certainly
9 problems, but it's still a lot better fitting them
10 together than fitting products from several different
11 vendors, the best-of-breed approach.
12 Q   Go down to the next paragraph.  It says,
13 "We believe these 'fundamental gaps' are serious
14 enough and should be prioritized & addressed by
15 development accordingly."
16     Do you see that?
17 A   I do.
18 Q   And did you agree that they were as serious
19 as suggested here?
20 A   Well, I don't -- again, the first sentence
21 of the document said that Oracle embarked on probably
22 one of the greatest achievements in the history of
23 the software industry.  I mean, there's a lot of
24 strong language --
25 Q   Sure.

533

1 A   -- in this, so greatest achievement,
2 fundamental gaps, I'm not sure they go together.
3     It was a new product -- I've said this
4 before.  It was a new product.  There were -- not all
5 the pieces worked together as well as they could
6 have, and we had to constantly make improvements, and
7 we were constantly making improvements, and this
8 document helped us pinpoint some of the things we had
9 to work on.
10 Q   Then I'm now looking at what is control
11 number 069920.
12 A   Almost there.  Okay.
13 Q   And, at the top, it says, "Integration
14 Requirements," and, in quotes, "Best of Breed vs.
15 Suite."
16     Do you see that?
17 A   I do.
18 Q   And it starts off saying, "This section
19 contains all those requirements that are deemed
20 critical to overcome the lack of integration between
21 the E-Business Suite modules (ERP/CRM) as well as the
22 lack of integration within the individual groups of
23 modules."
24     Do you agree that there was the lack of
25 integration that's referred to here?

534

1 A   Well, the pieces were integrated.  I'm
2 not -- let me see if I can explain this.  The pieces
3 fit together, but there might be a function that was
4 present.  Some of the modules were more mature than
5 other modules.  Some of the modules we had been
6 working on for ten years.  Some of the modules we had
7 been working on for two years.  And the modules with
8 more capability, the more mature modules, did things
9 that were yet to be put into some of the other
10 modules.  I don't know if -- I hope I'm making some
11 sense.
12     So, if you will, you would have liked all
13 the modules to be the same level of maturity.  And
14 one of the reasons that -- one of the things they are
15 pointing out is an integration failing.  It's really
16 not an integration failing at all.  It's a -- the
17 fact that a feature is just missing.  Therefore,
18 using that plug analogy, you know, there would be the
19 receptacle but no prong in one of the plugs, just --
20 it was a pretty new product.  You know, the plug
21 wasn't complete.
22     I don't know if I'm making any sense.  It's
23 difficult to speak metaphorically about this.  I can
24 give you specific examples at some point.
25 Q   Let's just see if we can work through some

535

1 more of the document and we will see what comes up.
2     There are -- I'm now looking at Control
3 No. 069921.  There are a number of headings, "Back
4 to" -- the title, "Back to Integration Requirements."
5 A   Yeah.
6 Q   And those headings continue through Control
7 No. 069925.
8 A   Yeah.
9 Q   And I just want to take some examples
10 rather than necessarily going through every single
11 one.
12     For example, on page 069922, at the top,
13 under one of the "Back to Integration Requirements"
14 is a heading, "Cost Rollup For Contracts," and it
15 says, "This is a real business issue for prospects,
16 and damaging for Oracle Sales campaigns to
17 prospects," in parens, "(Unlike Oracle Manufacturing,
18 we cannot identify accrued costs against a Contract
19 over time.  Customers using Oracle Contracts cannot
20 answer simple questions such as:  Are we profitable?
21 unprofitable? should we try to renegotiate?"
22 A   Those are some of the least simple
23 questions there are on the planet.  Understanding
24 whether the profitability of a large consulting
25 engagement is one of the hardest -- is very -- can be

536

1   very, very difficult.

2   Q   Okay.

3   A   Trying to figure out the overhead costs

4   are -- those are not simple questions.

5   Q   Okay.  And then down the page, "Back to

6   Integration Requirements," and there's a reference to

7   "Demand Planner and CRM Integration," and there it

8   says, "The capabilities to perform an integrated

9   planning in the E-Business Suite is broken."

10   Do you agree with that?

11   A   I don't know what they mean by "integrated

12   plan."  We have been -- we certainly can do planning.

13   You know, demand planning is basically a little bit

14   like a sales forecast.  Tells you what people want to

15   buy and how much of it and when they want to buy it.

16   Then that gets set off into scheduling the factory,

17   if you have to manufacture something.  Did it -- how

18   gracefully the demand -- the demand from the CRM

19   system, you know, flowed into the -- into the demand

20   planning module was the subject of a lot of debate.

21   I mean, it wasn't -- you know, the automation wasn't

22   as complete as it could be.

23   Q   Okay.

24   A   These guys are out there selling and they

25   would like to make it perfect and were trying to make

537

1   it perfect.

2   Q   Okay.  That paragraph goes on to say, in

3   part, "For example, salespeople develop their

4   forecasts in sales online."

5   A   Yeah.

6   Q   "These are aggregated regionally and

7   nationally, yet are not able to be transmitted

8   to the forecasts used in demand planning, supply

9   chain planning, or manufacturing planning."

10   A   Enormously complex job.

11   Q   Okay.  And then it goes on to say, "This

12   implies that we cannot plan/produce according to

13   forecasts or that customers have to manually" relay

14   "the information entered in CRM into the Forecasting

15   modules of Oracle ERP."

16   MR. LINDSTROM:  I think it says "re-key."

17   (Reporter clarification.)

18   BY MR. SOLOMON:

19   Q   And do you agree with that?

20   A   I agree it's an enormously complicated

21   problem.  You have demand coming from all over the

22   world.  You are trying to figure out where to

23   manufacture based on that demand.  Where you

24   manufacture has to do with your labor costs in that

25   country, your shipping costs, available inventory in

538

1   that plant.

2   So let's say we know we have to produce a

3   million -- simple case:  All we make are widgets.  We

4   have to produce a million of them and then ship them

5   to all these different places.

6   Well, maybe you want to ship the -- if you

7   like to build the widget in Russia -- in Poland and

8   then ship it to Russia, could you save -- you save

9   transportation costs, but your inventory -- your

10   inventory happens to be in Italy, and you can't

11   really move the inventory, so it's actually cheaper

12   to make it in Italy because of inventory rather

13   than -- you know, rather than the labor costs.  These

14   are -- it's an -- ungodly difficult.  Sounds simple.

15   Well, we know what the demand is.  We know

16   where our plants are.  Why can't we simply

17   automatically press a button and figure out where to

18   make all the stuff and ship it and do it in optimal

19   fashion.  It's a really hard problem.

20   Q   Okay.  On Document No. 0699923, towards the

21   top, "Back to Integration Requirements," and then

22   halfway down that page -- or almost halfway down that

23   page, it says, "As there is no integration on the

24   Purchasing Side between a Procurement Contract in

25   Purchasing and a Procurement Contract in the

539

1   'Contracts for Procurement' module, negotiations are

2   only done for the transactionally relevant

3   information of a Procurement Contract and not the

4   extended terms and conditions in a Procurement

5   contract."

6   Do you agree with that?

7   MR. LINDSTROM:  Vague and ambiguous.

8   THE WITNESS:  I don't understand it.  I

9   don't understand what they are saying.

10   BY MR. SOLOMON:

11   Q   Okay.  Now, overall, this document appears

12   to reflect a documented lack of integration within

13   the E-Business Suite.

14   Do you agree with that?

15   A   No.  I think they certainly point out where

16   the integration is imperfect.

17   Q   Okay.

18   A   But they also point out where features are

19   missing.

20   MR. SOLOMON:  Okay.  Have marked as the

21   next exhibit a document produced by Oracle with the

22   control number 014110 to 122.

23   (Exhibit No. 138 was marked for

24   identification.)

25   BY MR. SOLOMON:

540

Ellison, Lawrence  9/21/2006  10:57:00 AM

1  Q  Do you recognize this, Mr. Ellison?
2  A  I sure do.
3  Q  And this is an article that is focused on
4  you?
5  A  Really nasty article that Mark Lebovich
6  wrote, right.
7  Q  And if you go to the second page under the
8  heading, "The Fog of Deceit," there's a lot of -- a
9  lot of information here, but I want to look at the
10 paragraph two-thirds of the way down, beginning:
11 "Deceit is a complicated notion."
12    Do you see that?
13 A  Yes.
14 Q  It says, "Deceit is a complicated notion
15 with Ellison.  He's being accused of practicing it in
16 many forms -- exaggerating the capabilities of Oracle
17 products, embellishing the meanness of his boyhood
18 neighborhood and misleading people about which
19 academic degrees he has earned."
20    Do you see that?
21 A  I do.
22 Q  Now, it's true, isn't it, that you have
23 admitted in the past that you lied about having a
24 degree; is that true?
25 A  In order to get a job in Silicon Valley, I

541

1  did, yeah.
2  Q  Okay.  And it's not true, though, is it,
3  that you have admitted exaggerating the capabilities
4  of Oracle's products?
5    Have you ever admitted that?
6  A  I don't think I have.
7  Q  Either exaggerated or admitted?
8  A  Well, maybe in the very early day -- you
9  know, in the early days, when there were, you know,
10 five or six people in the company, and we had just
11 come out with a product, maybe I exaggerated the
12 capabilities of our database early on, but I don't
13 think I've, you know, made a habit of it over the
14 years.
15 Q  And let's go further into the document.
16 I'm looking at page 00115 -- excuse me, I'm sorry,
17 116.  And there's a reference to one of your former
18 spouses, at the bottom.  And apparently she describes
19 you as being a serial liar.
20    Do you see that?
21    MR. LINDSTROM:  Can you be more specific
22 with the reference.
23    MR. SOLOMON:  Sure.
24 Q  Looking at towards the bottom of the page,
25 reads, in part:  "'I cared deeply about Larry,'" says

542

1  Karen Rutzky Back, now of Los Angeles, but he lied to
2  her serially, she says.  'I got tired of being a
3  detective about everything he said.'"
4  A  Speaking about Karen Rutzky?  I see that,
5  yes.
6  Q  Yes.
7  A  That's a girl I went out with in high
8  school.
9  Q  No.  I understand.  I understand.
10 A  I think you said my -- did you say my
11 ex-wife or something?
12    MR. LINDSTROM:  Yes, he did.
13    MR. SOLOMON:  I apologize.  I apologize.  I
14 apologize if she's your ex-wife.
15    THE WITNESS:  Okay.  I think -- she's
16 not -- she's not an ex-wife; she's someone I went out
17 with in high school.
18    MR. SOLOMON:  Okay.  That's fine.
19 Q  And, anyway, you say the notion that you
20 lied to her is really breathtaking.  In other words,
21 you deny that accusation; correct?
22    MR. LINDSTROM:  On the next page?
23    MR. SOLOMON:  Yes.
24    THE WITNESS:  I don't know what she's
25 talking about.

543

1  BY MR. SOLOMON:
2  Q  Okay.  Further down the page, there's a
3  reference to you supposedly lying about getting into
4  medical school.
5    Did you lie about getting into medical
6  school?
7  A  I did.
8  Q  Okay.  And then further at the bottom of
9  that page, there's a reference to you saying that you
10 graduated from an obscure college in Sheffield,
11 England.
12    Did you ever say that?
13 A  No.
14 Q  And then it goes on to say, "He told me
15 these big, whopping lies, and he stuck to them.  He
16 can follow these lies for years."
17    Is that accurate?
18 A  This is Karen Rutzky?
19 Q  Right.
20 A  No.
21    I didn't even -- I didn't even know her
22 after I left -- you know, very well after I left --
23 after my first year, second year college.
24 Q  What about Quinn; who is Quinn?
25 A  Adda Quinn, that's my first wife.

544

1    Q    Actually, I think that this is referring to
2  Ms. Quinn, and I think she's saying, "He told me that
3  he graduated from an obscure college in Sheffield,
4  England."
5        You see that?  "Quinn says"?
6    A    I do -- well, actually, I don't.
7        MR. LINDSTROM:  It's the very last two
8  lines of the page.
9  BY MR. SOLOMON:
10   Q    And there's -- now that I've told you it
11 was Ms. Quinn who said that, is that true?
12       MR. LINDSTROM:  Is what true?
13 BY MR. SOLOMON:
14   Q    Did you tell her that you graduated from a
15 college in Sheffield?
16   A    Not that I recall.
17   Q    And Ms. Quinn says, "He told me these big,
18 whopping lies, and he stuck to them.  He can follow
19 these lies for years."
20       Is she right?
21   A    Not that I recall.
22   Q    Okay.  And at the bottom of the page with
23 the control number 0141420, says, at bottom -- and it
24 quotes you -- "I used to practice what I jokingly
25 referred to as 'management by ridicule.'"

545

1        Do you see that?
2    A    I do.
3    Q    "People would be terrified to come into
4  meetings."
5        Do you see that?  Did you say that?
6    A    I don't.  Where are you?
7    Q    Okay.  It says, "I used to practice what I
8  jokingly refer to as 'management by ridicule,' he
9  says."
10   A    Right at the bottom of the page.
11   Q    Yeah.
12       "People would be terrified to come into
13 meetings."
14       Did you say that?
15   A    Yes.
16   Q    And as of the time of this article, you
17 changed that practice, had you?
18   A    Long before this article came out.  In the
19 first couple years of Oracle.
20   Q    Okay.
21       MR. SOLOMON:  Let's go off the record for
22 two minutes, please.
23       THE VIDEOGRAPHER:  Off record at 7:16.
24       (Recess taken.)
25       THE VIDEOGRAPHER:  On record at 7:20.

546

1        MR. SOLOMON:  Okay.  I'll have marked as
2  the next exhibit an excerpt from a book called "The
3  Difference Between God and Larry Ellison."
4        (Exhibit No. 139 was marked for
5           identification.)
6  BY MR. SOLOMON:
7    Q    Do you know what the difference is,
8  Mr. Ellison?
9    A    It's an old joke.  Started out as a golf
10 joke.
11   Q    Really.
12   A    God doesn't think he's Arnold Palmer.
13       You don't want to hear the joke.
14   Q    Go on.
15   A    Jack Nicklaus, Arnold Palmer.  It's an old
16 joke.  Old-time golfer and daughter are playing golf,
17 and God is playing about 170 -- I don't play golf, so
18 I probably got it wrong.  God's about 170 yards from
19 the green, and God turns to Jack and says, "What do
20 you think -- what do you think Arnold would --
21 would -- you know, would hit here?"
22       "Oh, you know, Arnold would probably hit a
23 seven iron from here."
24       And then God, you know, picks up -- anyway,
25 without going into it, the punch line, is:  God

547

1  doesn't think he's Arnold Palmer.
2    Q    Got it.
3        So a bit of plagiarism going on here.
4    A    Afraid so.
5    Q    All right.  So I want to draw your
6  attention to pages 2005 and 2006.
7    A    Okay.
8    Q    Now, first of all, I want to read the
9  language on page 2005 that says, "Oracle's meeting
10 for analysts yesterday was a very positive briefing
11 and it appears that the company's business has shown
12 no evidence of deterioration due to economic or
13 competitive issues.
14       "The company continues to feel that 60 to
15 70 percent growth in revenues and earnings is
16 achievable for the current fiscal year and" --
17       Do you see that?
18   A    I do.
19   Q    "And that longer term, 50 to 60 percent
20 growth is attainable."
21       Do you see that?
22   A    I do.
23   Q    And that's -- that reflects statements made
24 at January 1990 analyst meeting; correct?
25   A    I believe so.

548

Ellison, Lawrence  9/21/2006  10:57:00 AM

1   Q   Okay.  And then --
2   A   I don't fully trust this book, but, yes.
3   Q   Because unlike the other book, you didn't
4 comment and clarify, did you --
5   A   The other book is written by -- by one of
6 the -- an author -- someone who worked for the
7 "Economist."  This guy worked for a religious
8 newspaper in Florida.
9   Q   Okay.  So let's --
10   A   Big difference.
11   Q   You have a view as to which one is more
12 reliable, I take it?
13   A   I would go with the "Economist."
14   Q   Halfway down the page then says, "When
15 Oracle's predictions turned out to be" flat -- excuse
16 me, "turned out to be wrong, the stock did a half
17 gainer.  According to the lawsuit, the defendants
18 'knew or were reckless in not knowing' that the
19 projections were overly optimistic."
20     Do you see that?
21   A   I do.
22   Q   It goes on to say, "Then came the salacious
23 part."
24     Do you see that?
25   A   I do.

549

1   Q   Then it references some stock sales.
2     Do you see that?
3   A   I do.
4   Q   And then it says, "In other words, they
5 tried to jack up the stock price artificially so
6 their shares would be worth more."
7     Do you see that?
8   A   I do.
9   Q   Then it goes on, "Years later, in an
10 interview, Walker denied doing any such thing.  His
11 personal financial strategy at the time was to
12 diversify his holdings to 'make sure my family was
13 financially secure.'  He wanted to invest in
14 tax-exempt bonds but needed cash to do it.  He said
15 he sold stock only when Oracle's legal department
16 said he could and only when he would not have to pay
17 a huge capital gains tax for doing so.  According to
18 Walker, the fact was that 'I sold at every
19 opportunity.'"
20     Do you see that?
21   A   Yes.
22   Q   And then it goes on to say, "Still, it was
23 also true that Walker sold the stock soon after
24 Imbler started worrying about" -- "about Oracle's
25 finances.  Ellison believed that Walker dumped stock

550

1 at least partly," and then you are quoted, "because
2 he was concerned.  He expressed himself pretty
3 clearly with his financial decision.'"
4     Did you say that?
5   A   Not that I recall.
6   Q   So let's be clear about this.
7     You are not saying that you didn't; you
8 just don't recall one way or the other?
9   A   That's correct.
10   Q   Now, if -- if it were true that Mr. Walker
11 expressed himself clearly with his financial
12 decision, isn't it equally true or more true that you
13 expressed yourself clearly with your financial
14 decision in January of 2001?
15   A   No.  My options were expiring.
16   Q   Okay.
17   A   Quite different than Jeff Walker who was --
18 and most people, actually, who sell their options as
19 soon as they vest.  They sell them as soon as
20 possible.  I hold them for as long as possible.
21   Q   I'm glad you -- glad you mentioned that.
22     When did the expire -- August 2001 expiring
23 options initially vest?
24   A   They would have -- they would vest 25
25 percent annually after -- so 2001, it would be 1991,

551

1 you know, 1992 -- I guess 1992 for 25 percent; 1993,
2 1994, 1995.
3   Q   Okay.  And is it a dangerous strategy to
4 hold on to expiring options up to close to the date
5 of the expiration?
6   A   You know, I think most people -- my
7 financial advisors don't recommend that I hold my
8 know, that I hold my options for so long, but I
9 believe in the company and I just hold the options.
10   Q   One potential consequence would be that you
11 may be forced or feel forced into entering into a
12 transaction where you exercise and sell stock while
13 you are in possession of material adverse
14 information; isn't that true?
15   A   No.  No.  I wouldn't do that.
16   MR. SOLOMON:  Okay.  Let's have a time
17 check, if we may.
18   THE VIDEOGRAPHER:  We are -- from one hour,
19 we are about eight and a half minutes away.
20   MR. LINDSTROM:  For what it's worth, I show
21 four.
22   THE VIDEOGRAPHER:  Pardon?
23   MR. LINDSTROM:  I show four, but --
24   THE VIDEOGRAPHER:  Well, that's the tape
25 time.  Yeah, that's the tape time.

552

1    MR. LINDSTROM:  What's our run time today?
2    THE VIDEOGRAPHER:  Well, we're past seven
3    hours.  And I thought we were into the extra hour.
4    With that extra hour, we're, by my clock, about eight
5    minutes away now.
6    MR. SOLOMON:  And then if you total them
7    all up, how many hours?
8    THE VIDEOGRAPHER:  It would -- I have seven
9    hours, 50 minutes now.
10    MR. SOLOMON:  Okay.  In that case, I'm
11    going to take a one-minute break while I organize the
12    last couple of documents that I'll be able to use in
13    this session.
14    THE VIDEOGRAPHER:  Off record at 7:27.
15    (Recess taken.)
16    THE VIDEOGRAPHER:  On record at 7:29.
17    BY MR. SOLOMON:
18    Q    It's true, isn't it, Mr. Ellison that by
19    January 22, 2001, you were aware that the 11i
20    business suite was plagued with implementation
21    problems?
22    MR. LINDSTROM:  Objection; argumentative,
23    vague and ambiguous as to "plagued."
24    THE WITNESS:  I certainly knew that some of
25    our customers were successful and some of our

553

1    customers were less successful in implementing the
2    product, and there were bugs.
3    BY MR. SOLOMON:
4    Q    Okay.  And you knew as of January 22nd,
5    2001, that the pipeline growth for fiscal Q301 was
6    dropping?
7    A    I think it had dropped, showing 34 percent
8    growth, which was still robust growth and certainly
9    enough growth to make our -- make our numbers for the
10    quarter.
11    Q    You had information available to you as of
12    January 22nd, 2001 that demonstrated that using
13    converse -- historical conversion rates you couldn't
14    meet your quarter?
15    A    That is not true.
16    Q    No?
17    A    That is not true.
18    Q    You knew as of January 22, 2001, that the
19    historical use of the historical conversion rates was
20    unrealistic?
21    A    I'm not sure what you are saying.
22    Q    You knew as of January 22nd, 2001, that
23    using historical conversion ratios would yield an
24    inaccurate outcome?
25    A    That's not correct.

554

1    Q    You knew that as of January 22nd, 2001,
2    that NAS was experiencing a decline in its business
3    prospects?
4    A    I think we agreed that the pipeline -- the
5    pipeline had gone down from over 50 percent to 34
6    percent.
7    Q    You knew as of January 22, 2001, that
8    Oracle's internal implementation of the E-Business
9    Suite was resulting in lost revenue?
10    A    That's not correct.  We had a problem with
11    the customs system for education and that caused some
12    education bookings to be lost.  That's the only thing
13    I can recall.
14    Q    You knew as of January 22nd, 2001, that you
15    had engaged in an improper swap transaction with
16    Hewlett-Packard at the end of Q2?
17    A    Absolutely not.
18    Q    Who's paying for your defense costs in this
19    litigation, Mr. Ellison?
20    A    I believe the company is.
21    Q    Do you have insurance?
22    A    Yes, we do.
23    Q    And the insurer's not paying?
24    A    I believe the insurance is paying, paying
25    up to the limit on the policy.

555

1    MR. LINDSTROM:  But -- there's no
2    foundation, speculation.
3    THE WITNESS:  Right.
4    BY MR. SOLOMON:
5    Q    And do you understand that there is a claim
6    in this litigation for insider trading?
7    A    Yes.
8    Q    And do you understand that you are
9    personally liable for that, or do you believe the
10    company is accountable for that?
11    MR. LINDSTROM:  Objection; calls for a
12    legal conclusion, no foundation, speculation.
13    You may answer if you understand.
14    THE WITNESS:  My understanding is that I'm
15    personally liable.
16    MR. SOLOMON:  Okay.  Have marked as the
17    next exhibit a letter dated August 29, 2006 from
18    myself to Mr. Wald.
19    (Exhibit No. 140 was marked for
20    identification.)
21    MR. LINDSTROM:  So we are now down under
22    two minutes.  I assume you don't intend to ask him a
23    lot of questions about correspondence between counsel
24    and pending litigation.
25    BY MR. SOLOMON:

556

Ellison, Lawrence  9/21/2006  10:57:00 AM

1    Q    Have you seen this letter before,
2    Mr. Ellison?
3    A    I have not.
4    Q    Are you aware that we demanded at the end
5    of August of this year, in addition to discussions
6    concerning corporate governance enhancements, the sum
7    of $1,975,000,000 to resolve this litigation?
8    A    There was an e-mail, I think, that went out
9    to all -- certainly went out to me, you know,
10   summarizing that.
11   Q    Okay.  And you are aware that according to
12   the terms of this letter, the offer remains open
13   until November the 28th, unless it's either withdrawn
14   in writing prior to exception -- acceptance or unless
15   Judge Jenkins rules in our favor?
16       You understand that?
17   A    I do now.
18       MR. SOLOMON:  I guess you don't want to
19   write a check.
20       MR. LINDSTROM:  Argumentative.
21       We are done, aren't we?
22       MR. SOLOMON:  We are except for the
23   reservation that, first, I've had to speed through
24   many, many documents to finish, and there are many
25   documents that I would like the opportunity to

557

1    question you about that I haven't been able to, and I
2    reserve the right to ask the Court for more time.
3       In addition, there may be more documents
4    produced in the litigation.  To the extent they
5    implicate you, I'm going to ask for more time for
6    that as well, but thank you in the meantime for your
7    testimony.
8       MR. LINDSTROM:  Off the record.
9       THE VIDEOGRAPHER:  This is the end of
10   Videotape No. 5, Volume 2, in the deposition of Larry
11   Ellison.
12       The original videotapes will be retained by
13   LiveNote World Service.
14       We are going off the record; the time on
15   the monitor is 7:36.
16       (Deposition concluded at 7:36 p.m.)
17   //
18   //
19
20
21
22
23
24
25

558

1            CERTIFICATE OF WITNESS
2
3       I, the undersigned, declare under penalty of
4    perjury that I have read the foregoing transcript,
5    and I have made any corrections, additions, or
6    deletions that I was desirous of making; that the
7    foregoing is a true and correct transcript of my
8    testimony contained therein.
9
10   EXECUTED this _____ day of _____,
11   20___, at _____, _____.
             (City)          (State)
12
13
14
     _____
15            LAWRENCE ELLISON
16
17
18
19
20
21
22
23
24
25

559

1         CERTIFICATE OF DEPOSITION OFFICER
2       I, RACHEL FERRIER, CSR, CSR No. 6948, duly
3    authorized to administer oaths pursuant to Section
4    8211 of the California Code of Civil Procedure,
5    hereby certify that the witness in the foregoing
6    deposition was by me sworn to testify to the truth,
7    the whole truth and nothing but the truth in the
8    within-entitled cause; that said deposition was taken
9    at the time and place therein stated; that the
10   testimony of said witness was reported by me and was
11   thereafter transcribed by me or under my direction by
12   means of computer-aided transcription; that the
13   foregoing is a full, complete and true record of said
14   testimony; and that the witness was given an
15   opportunity to read and correct said deposition and
16   to subscribe same.
17       I further certify that I am not of counsel or
18   attorney for either or any of the parties in the
19   foregoing deposition and caption named, nor in any
20   way interested in the outcome of the cause named in
21   said caption.
22       IN WITNESS WHEREOF, I have hereunto subscribed
23   by my hand this 28th day of September, 2006.
24
25       RACHEL FERRIER, CSR No. 6948

560

1        CERTIFICATE OF DEPOSITION OFFICER

2        I, RACHEL FERRIER, CSR, CSR No. 6948, duly

3   authorized to administer oaths pursuant to Section

4   8211 of the California Code of Civil Procedure,

5   hereby certify that the witness in the foregoing

6   deposition was by me sworn to testify to the truth,

7   the whole truth and nothing but the truth in the

8   within-entitled cause; that said deposition was taken

9   at the time and place therein stated; that the

10  testimony of said witness was reported by me and was

11  thereafter transcribed by me or under my direction by

12  means of computer-aided transcription; that the

13  foregoing is a full, complete and true record of said

14  testimony; and that the witness was given an

15  opportunity to read and correct said deposition and

16  to subscribe same.

17       I further certify that I am not of counsel or

18  attorney for either or any of the parties in the

19  foregoing deposition and caption named, nor in any

20  way interested in the outcome of the cause named in

21  said caption.

22       IN WITNESS WHEREOF, I have hereunto subscribed

23  by my hand this 28th day of September, 2006.

24

25  _____
            RACHEL FERRIER, CSR No. 6948

560

EXHIBIT E

Nugent, John J.  5/19/2004  3:12:00 PM

1
2           IN THE COURT OF CHANCERY
3          OF THE STATE OF DELAWARE
           IN AND FOR NEW CASTLE COUNTY
3
               - - -
4
   IN RE:
5
      ORACLE CORPORATION  :  CONSOL. C.A.
6   DERIVATIVE LITIGATION :  No. 18751
7
   -----------------------------------
8
9      IN THE SUPERIOR COURT
      OF THE STATE OF CALIFORNIA
10     FOR THE COUNTY OF SAN MATEO
11          - - -
12
   COORDINATION PROCEEDINGS: Judicial Counsel
13   SPECIAL TITLE      : Coordination
      (Rule 1550(b))  : Proceeding
14              :  No. 4180
15
16          - - -
17   Wednesday, May 19, 2004
18          - - -
19   EXAMINATION OF JOHN J. NUGENT
20          - - -
21   ESQUIRE DEPOSITION SERVICES
           15th Floor
22     1880 John F. Kennedy Boulevard
      Philadelphia, Pennsylvania 19103
23       (215) `-9191
24

1

1
2
3
4        Videotape deposition of JOHN
5   J. NUGENT, taken pursuant to
6   notice, was held at the law
7   offices of SCHIFFRIN & BARROWAY,
8   LLP, Three Bala Plaza East, Suite
9   400, Bala Cynwyd, Pennsylvania,
10   beginning at 12:30 p.m., on the
11   above date, before MARIA NOELLE
12   DAMIANI, A Registered Merit
13   Reporter, Certified Shorthand
14   Reporter, and Notary Public.
15
16          - - -
17
18
19
20
21
22
23
24

2

1   A P P E A R A N C E S :
2
3      COREY, LUZAICH, PLISKA,
      de GHETALDI & NASTARI, LLP
4      BY: Dario de Ghetaldi, ESQUIRE
      700 El Camino Real
5      P.O. Box 669
      Millbrae, California 94030
6      (650) 871-5666
      Representing the Plaintiff
7      (California action)
8
      SCHIFFRIN & BARROWAY, LLP
9      BY: ROBERT B. WEISER, ESQUIRE
      Three Bala Plaza East
10      Suite 400
      Bala Cynwyd, Pennsylvania 19004
11      (610) 822-2236
      Representing the Plaintiff
12      (Delaware action)
13
      MORRISON & FOERSTER, LLP
14      BY: PAUL H. GOLDSTEIN, ESQUIRE
      755 Page Mill Road
15      Palo Alto, California 94304-1018
      (650) 813-5818
16      Representing the Defendant,
      Oracle Corporation
17
18      MAYER, BROWN, ROWE & MAW
      BY: GERMAIN LABAT, ESQUIRE
19      (via telephone)
      350 South Gerald Avenue
20      25th Floor
      Los Angeles, California 90071
21      (213) 229-9500
      Representing the Defendants,
22      Larry Ellison and Jeffrey Henley
23
   ALSO PRESENT:
24      Jason Hoffman, Videographer

3

1
2          - - -
3        I N D E X
4        - - -
5   Testimony of:     JOHN J. NUGENT
6              PAGE NO.
7   By Mr. De Ghetaldi.....8
8
9          - - -
10        E X H I B I T S
11   NO.     DESCRIPTION        PAGE
12   265   Q3YFY01 Revenue       107
      Forecast Summary, Q3FY1
13      General Business
14   266   General Business      115
      Performance Summary Q3FY00
15
267   General Business      115
16      Performance Summary Q400FY00
17   268   General Business      115
      Performance Summary Q101
18
19   269   General Business      115
      Performance Summary
20      Q2 & First Half FY01
21   270   Interview of John     123
      Nugent
22
23
24

4

```
1              - - -
2         DEPOSITION SUPPORT INDEX
3              - - -
4
5    Direction to Witness Not to Answer
6    Page Line    Page Line    Page Line
7    None
8
9
10   Request for Production of Documents
11   Page Line    Page Line    Page Line
12   None
13
14
15   Stipulations
16   Page Line    Page Line    Page Line
17   None
18
19
20   Question Marked
21   Page Line    Page Line    Page Line
22   None
23
24
```

5

```
1              - - -
     [Nugentv1_t1.MPG]
2         THE VIDEOGRAPHER:  Stand by.
3    Good afternoon.  Here begins
4    Videotape Number 1 in the
5    deposition of John Nugent.  In the
6    Court of Chancery in the State of
7    Delaware in and for New Castle
8    County, in re, Oracle Corporation,
9    Derivative Litigation, Consol, C.
10   A. No. 18751, and, also, in the
11   Superior Court of the State of
12   California for the County of San
13   Mateo, Coordination Proceeding,
14   Special Title (Rule 1550(b)),
15   Judicial Counsel Coordination
16   Proceeding No. 4180.
17        Today's date is May 19th,
18   2004.  The time is 1:33 p.m.
19        This deposition is being
20   taken at Three Bala Plaza on the
21   Fourth Floor, Bala Cynwyd,
22   Pennsylvania.
23        The videographer is Jason
24   Hoffman, here on behalf of Esquire
```

6

```
1    Deposition Services located in
2    Philadelphia, Pennsylvania.
3         All counsel present today
4    will be noted on the stenographic
5    record, and the court reporter
6    will now swear in the witness.
7             - - -
8         JOHN J. NUGENT, after having
9    been duly sworn, was examined and
10   testified as follows:
11        MR. De GHETALDI:  All right.
12   Good afternoon, Mr. Nugent.
13   My name is Dario de Ghetaldi and I
14   am going to be asking you
15   questions today on behalf of the
16   plaintiffs, yeah, so we are going
17   to do some appearances I -- I'm
18   told.  Might be a good idea.
19        I'm Dario de Ghetaldi on
20   behalf of the plaintiffs.
21        MR. LABAT:  I'm Robert
22   Weiser, Schiffrin & Barroway,
23   L.L.P., on behalf of the
24   plaintiffs.
```

7

```
1         MR. GOLDSTEIN:  Paul
2    Goldstein, for Oracle Corporation.
3         MR. LABAT:  This is Germain
4    Labat with Mayer, Brown, Rowe &
5    Shaw on behalf of the individual
6    defendants, Jeff Henley and Larry
7    Ellison.
8         MR. De GHETALDI:  Good work
9    on the mute button.
10            - - -
11        EXAMINATION
12            - - -
13   BY MR. De GHETALDI:
14        Q.   Mr. Nugent, have you ever
15   had your deposition taken before?
16        A.   No.
17        Q.   Okay.  Let me go over a few
18   ground rules and, uhm, try and
19   familiarize you a little bit with what we
20   are going to do today and some of the
21   better ways to do it.
22        First of all, it's important
23   that you answer my questions with words
24   instead of sounds.  Even though the
```

8

Nugent, John J.  5/19/2004  3:12:00 PM

1  deposition is being videotaped, uhm, it
2  will greatly help the court reporter.  Do
3  you understand that?
4      A.   Yes.
5      Q.   Secondly, uhm, the court
6  reporter will be preparing a transcript
7  of this deposition in a booklet form.
8  You'll be given the opportunity to review
9  that transcript and you will be given the
10  opportunity to make changes or
11  corrections to that.  What I want you to
12  understand is that if this matter does go
13  to trial, that the plaintiffs will have
14  the opportunity to comment on any changes
15  or corrections you make to the -- your
16  answers, your testimony.
17      Do you understand that?
18      A.   Yes.
19      Q.   Okay.  Next, if at any time
20  you do not understand one of my
21  questions, and that's highly likely to
22  happen today, given the fact that I came
23  in on the red-eye this morning, and I may
24  fall asleep in the middle of a question,

1  so, uhm, Rob will wake me up and just let
2  me know if you don't understand what I
3  have asked you and I would be happy to
4  try again.
5      MR. WEISER:  That depends on
6  how you're doing.  If you are not
7  doing that well, I will probably
8  let you sleep and then I
9  will start in.
10      MR. LABAT:  Before you
11  begin, I just want to offer, can
12  we get a stipulation that we will
13  join in Oracle's objections unless
14  otherwise noted just so we don't
15  have to be parenting each other?
16      MR. GOLDSTEIN:  Yes.
17      MR. WEISER:  Germain, can
18  you hear Dario at the level which
19  he was speaking right now?
20      MR. LABAT:  I can.  It
21  intermittently falls off, so if
22  you can keep your voice up or put
23  the phone a little closer, that
24  might be helpful.

9

10

1      MR. De GHETALDI:  Let's see
2  if we can do that because you're
3  at the other end of the room for
4  me.
5      MR. LABAT:  What happens is
6  the microphone sort of cuts in and
7  out sometimes where it's not
8  totally hearing you.
9      MR. WEISER:  I'm going to
10  see if I can't dig up a longer
11  extension cord so that we can get
12  better placement with this phone.
13      MR. De GHETALDI:  Why don't
14  we go off the record so that we
15  can get this technical stuff taken
16  care of.
17      THE VIDEOGRAPHER:  Off tape,
18  1:37.
19      (Whereupon, there was a
20  discussion held off the record at
21  this time.)
22      THE VIDEOGRAPHER:  Stand by.
23  Back on the record, 1:39.
24  BY MR. De GHETALDI:

1      Q.   The final thing I was going
2  to say was that we try and take breaks
3  every hour or so, but if at any time you
4  want to take a break, just let me know
5  and we can accommodate you.  Let's try
6  and make this is as pleasant an
7  experience as possible.
8      Okay.  Now, are you
9  represented by counsel here today?
10      A.   Yes.
11      Q.   And is that Mr. Goldstein?
12      A.   Yes.
13      Q.   Did you discuss your
14  deposition with anyone prior to today or
15  prior to right now?
16      A.   No.
17      Q.   And so you did not meet with
18  Mr. Goldstein to talk about your
19  deposition?
20      A.   Oh, with Mr. -- oh, yes.
21      Q.   Okay.
22      A.   Oh, yes, this morning.
23      Q.   This morning?
24      A.   Yes.

11

12

Nugent, John J.  5/19/2004  3:12:00 PM

| | |
|---|---|
| 1 | Q.   For about how long? |
| 2 | A.   Uhm, maybe about two hours. |
| 3 | Q.   All right.  Did you review |
| 4 | any documents in preparation for your |
| 5 | deposition? |
| 6 | A.   Uhm, yes. |
| 7 | Q.   What were those? |
| 8 | A.   Uhm, I had a compilation of |
| 9 | documents that came from his office and I |
| 10 | had an opportunity to this morning scan |
| 11 | through the opening statements, I guess |
| 12 | part of the discovery that was done, I |
| 13 | don't know, maybe about a year ago. |
| 14 | There's a description of that interview. |
| 15 | And looked at a -- at a presentation I |
| 16 | had written when I was with Oracle, I |
| 17 | guess several years ago, and there was a |
| 18 | document, uhm, a letter from David |
| 19 | Winton, an E-mail from David Winton, to |
| 20 | somebody regarding a particular quarter's |
| 21 | financial performance or forecast. |
| 22 | Q.   Okay.  Do you remember |
| 23 | anything else, any other documents? |
| 24 | A.   No, those are the documents |

13

| | |
|---|---|
| 1 | I looked at. |
| 2 | Q.   Where are you currently |
| 3 | employed? |
| 4 | A.   At SAP. |
| 5 | Q.   When did you start working |
| 6 | at SAP? |
| 7 | A.   I started working with them |
| 8 | the end of March of '03. |
| 9 | Q.   What is your position? |
| 10 | A.   I'm an executive |
| 11 | vice-president of sales for the United |
| 12 | States. |
| 13 | Q.   Before going to SAP, where |
| 14 | were you employed? |
| 15 | A.   At Oracle. |
| 16 | Q.   Okay.  When did you leave |
| 17 | Oracle? |
| 18 | A.   It must have been February |
| 19 | of '03, beginning of March, '03. |
| 20 | Q.   Did you leave Oracle because |
| 21 | you got a better job opportunity? |
| 22 | A.   Yes. |
| 23 | Q.   Okay.  How long had you been |
| 24 | at Oracle? |

14

| | |
|---|---|
| 1 | A.   17 years. |
| 2 | Q.   What was the last position |
| 3 | that you held at Oracle? |
| 4 | A.   Senior vice-president of |
| 5 | eastern sales.  I'm not sure of the exact |
| 6 | responsibility.  I had half -- I had |
| 7 | responsibility over half the U.S. |
| 8 | Q.   Do you recall what your |
| 9 | position at Oracle was in Oracle's fiscal |
| 10 | year of 2000? |
| 11 | A.   Yes, SVP General Business. |
| 12 | Q.   Was that also the position |
| 13 | that you held in Fiscal Year 2001? |
| 14 | A.   Yes. |
| 15 | Q.   What were your |
| 16 | responsibilities as senior vice-president |
| 17 | of General Business? |
| 18 | A.   I had responsibility for |
| 19 | technology sales and application sales |
| 20 | for the U.S., for, uhm, companies less |
| 21 | than, at that time, I believe, 500 |
| 22 | million. |
| 23 | Q.   When you say, "companies |
| 24 | less than 500 million," is that 500 |

15

| | |
|---|---|
| 1 | million dollars in market capitalization? |
| 2 | A.   That would be 500 million in |
| 3 | revenue sales. |
| 4 | Q.   In revenue sales. |
| 5 | One other thing I forgot to |
| 6 | mention, and we are doing okay so far, |
| 7 | but we came close there, I will try not |
| 8 | to talk over you by asking you a question |
| 9 | before you finish answering, and you -- |
| 10 | I'd ask that you also do the same, try to |
| 11 | let me finish my question before you |
| 12 | start answering. |
| 13 | A.   Yes. |
| 14 | Q.   Now, General Business was a |
| 15 | division of North America sales at that |
| 16 | time? |
| 17 | A.   Yes. |
| 18 | Q.   Do you recall who the |
| 19 | executive vice-president that you |
| 20 | reported to in NAS was? |
| 21 | A.   George Roberts. |
| 22 | Q.   Who were your direct reports |
| 23 | in Fiscal Year 2000 and 2001? |
| 24 | A.   Uhm, I don't recall them |

16

1 all.  I recall John Boucher, Nic
2 Classick, Joe DiBartolomeo.
3      Q.   Ted Bereswill?
4      A.   Ted Bereswill.
5      Q.   Ken Hamel?
6      A.   Ken Hamel, yes.
7      Q.   Mark Wood?
8      A.   Yes.
9      Q.   That's all I know.  Can you
10 think of any others?
11      A.   Uhm, I -- I don't recall any
12 others.  I'm going through the geography
13 of the country.  That's all -- that's --
14 that's who I recall.
15      Q.   And Mr. Boucher was the area
16 vice-president for Northeast; is that
17 correct?
18      A.   Yes.
19      Q.   And Mr. DiBartolomeo was the
20 area vice-president for Mid-Atlantic?
21      A.   Mid-Atlantic, yes.
22      Q.   And Mr. Bereswill was area
23 vice-president for Central?
24      A.   Yes.

17

1      Q.   And Mr. Classick was the
2 area vice-president for West?
3      A.   Yes.
4      Q.   Okay.  I had to do that the
5 hard way.  I only had one of these.
6           I'm going to hand you a
7 document that's been previously marked as
8 Exhibit 53.
9           MR. De GHETALDI:  You got
10      that, Germain?
11           MR. LABAT:  Yeah, was that
12      53?
13           MR. De GHETALDI:  53,
14      correct.
15           MR. LABAT:  Okay.  Thanks.
16 BY MR. De GHETALDI:
17      Q.   Have you ever seen Exhibit
18 53 before today?
19      A.   No -- I don't recall.  This
20 says General Business here.  I don't
21 recall seeing it.
22      Q.   Have you had a chance to
23 look through the whole thing?
24      A.   Have I had a chance to look

18

1 through this whole thing?
2      Q.   Yes.
3      A.   Not since today.  Let me
4 look through it.
5      Q.   I mean, I'm just hoping that
6 maybe looking at it might trigger some
7 memory.
8      A.   Uhm, is there a title?  It
9 -- it -- it looks like -- it appears to
10 be an FY01 planning document.  It's to
11 help put together the quotas for the
12 different regions for the upcoming year
13 and the -- it looks like a planning
14 document that was designed to discern the
15 quotas for each one of the regions based
16 upon last year and some growth numbers
17 and some other logic, and it looks like I
18 provided some metrics to my direct
19 reports to help show them the new numbers
20 that I was coming up with for '01 for
21 them that were going to be assigned to
22 them.
23      Q.   Does Exhibit 53 look like
24 the sort of document that you would have

19

1 prepared?
2      A.   Yes.
3      Q.   Now, you said at one point
4 that it was to help put together the
5 quotas for the different regions for the
6 upcoming year.  Would that be the
7 upcoming fiscal year of 2001?
8      A.   Uhm, yes.  '01 planning, so
9 I -- I'm surmising, yes.
10      Q.   What do you mean when you
11 use the phrase quotas?
12      A.   Coming up with the sales
13 quotas for each one of the regions.
14      Q.   Okay.  How do you define
15 quota?
16      A.   Quota would be last year's
17 actuals times a growth factor would equal
18 the next year's quota.
19      Q.   Would the quota be something
20 -- a goal that the various regions were
21 required to meet?
22      A.   It would be -- it was a
23 budget number for them that, yes, they
24 were assigned that number and they were

20

1  driven to hit that number and that also
2  dictated the level of expenses that they
3  would have and so that would also factor
4  into the number of hires that they could
5  have, how many sales reps they could
6  have.
7       Q.  Uh-huh.  What sort of
8  process did you use to come up with these
9  quotas?
10      MR. GOLDSTEIN:  Objection
11 to form.
12      THE WITNESS:  It was -- it
13 was primarily last year's actuals,
14 a growth rate that was passed down
15 from George Roberts, and then it
16 was up to me to discern how to
17 disseminate that across to the
18 different geographies.  The
19 primary factor was their actuals
20 of the previous year.
21 BY MR. De GHETALDI:
22      Q.  So, in other words, if I can
23 extrapolate from what you said, it looks
24 like on the first page of Exhibit 53

1  there on the far right-hand side --
2       A.  I sunk.  I don't know how
3  that happened.  I'd like to join the rest
4  of you, if I could.
5       Q.  I think you have to stand up
6  or something like that and then --
7       MR. GOLDSTEIN:  There you
8  go.
9       THE WITNESS:  Did it come
10 up?
11      MR. GOLDSTEIN:  Wrong
12 lever.
13      THE WITNESS:  There you go.
14 I'm back.
15      MR. GOLDSTEIN:  Okay.
16 That's good.
17      MR. De GHETALDI:  That's
18 good.  I don't want to lose you.
19 BY MR. De GHETALDI:
20      Q.  Let me try again here.
21      Over on the right-hand side
22 there's a column that says, growth FY00
23 slash 01?
24      A.  Yes.

21

22

1       Q.  Are those the growth figures
2  for the various divisions and for General
3  Business as a whole?
4       A.  Uhm, I would -- it's been --
5  I would say -- I would say, yes, a
6  qualified yes, I haven't gone through the
7  whole document, but I would say yes.
8       Q.  All right.  The 24 percent
9  figure doesn't say General Business, but
10 logically it -- I surmise that is
11 what that figure relates to.  Would that
12 -- if that's the case, would that have
13 been the figure that Mr. Roberts gave you
14 as the figure that he expected General
15 Business to meet?
16      MR. GOLDSTEIN:  Objection
17 to form.
18      THE WITNESS:  I can't -- I
19 can't recall whether that was the
20 exact number George gave me.
21 I don't know if I put an
22 overassignment in there or not,
23 but typically, my growth number
24 would be -- would come down from

1  George, but I can't say that was
2  the exact number that George gave
3  me.
4  BY MR. De GHETALDI:
5       Q.  The first page of Exhibit 53
6  has some handwriting on it.  Do you
7  recognize that handwriting right in the
8  middle?
9       A.  No, I don't.
10      Q.  How did you communicate the
11 quotas for each of the divisions to the
12 area vice-presidents for those divisions?
13      A.  I believe that this was the
14 planning document that we used and this
15 document here was disseminated out to
16 each one of the regional vice-presidents.
17      Q.  Were the -- the regional
18 vice-presidents involved in setting the
19 quotas for their own divisions in any
20 way, did they have input, in other words?
21      A.  They had -- they had some
22 input how the quota would be disseminated
23 down.
24      Q.  Okay.  Do you recall

23

24

1   conversations with any of the area
2   vice-presidents in or around the end of
3   Q4FY2000, which is about the time that
4   this document indicates it was prepared,
5   about the quotas that were -- that appear
6   in Exhibit 53?
7        MR. GOLDSTEIN:   Objection
8   to form.
9        MR. De GHETALDI:  Do you
10   follow me?
11        THE WITNESS:  No.
12   BY MR. De GHETALDI:
13        Q.   Do you recall any of the
14   conversations that you had about setting
15   these quotas?
16        A.   I -- I don't recall any
17   conversations.  I'm sure we had some
18   discussions about the quotas, but I don't
19   recall any specific conversation.
20        Q.   Do you recall any of the
21   area vice-presidents objecting to the
22   level of the quotas that you set?
23        A.   Uhm, as form, they all
24   object to quotas, but I don't think

25

1   anybody overly objected -- I don't recall
2   anybody overly objecting to their quota.
3        Q.   Do you recall any
4   conversations with Nic Classick in which
5   he told you that he thought that the
6   quota that you had set for General
7   Business West was too high?
8        A.   Uhm, no, not -- not in
9   particular, not with any of the guys.
10        Q.   Do you recall any
11   conversation with Nic Classick about the
12   quota for General Business West for
13   Fiscal Year 2001 in which he told you
14   that he thought the quota was too high
15   because General Business West dot com
16   business would not support it?
17        A.   I recall conversations --
18   similar conversations with all the guys
19   with Nic, I have a vague recollection of
20   that, but I can't recall any specific
21   conversation about it, but I have a vague
22   recollection of Nic with -- I could say
23   he could say something like that.
24        Q.   Uh-huh.  You said that you

26

1   recall similar conversations with all the
2   guys.  You mean the other three or all
3   four area vice-presidents?
4        A.   Yeah.  I think typically, as
5   you disseminate the quota down, even to
6   this day myself when I receive a quota I
7   make various arguments as to why it
8   should be less and negotiate and see if I
9   can't get my quota down a little bit, and
10   so no doubt that there was some of that
11   bantering going back and forth, various
12   reasonings on why he said, well, maybe
13   I should have a little less and somebody
14   might have a little more, because they
15   all received these documents, they can
16   see what the other folks had gotten for
17   quotas.
18        Q.   Do you recall those
19   conversations about the quotas that -- do
20   you recall whether those conversations
21   about the quotas in the fourth quarter of
22   Oracle's Fiscal Year 2000 included
23   justifications offered for lowering the
24   quotas based on a slow-down in the dot

27

1   com market?
2        A.   Again, I have a vague
3   recollection of that with Nic.
4        Q.   Do you have a recollection
5   of that with -- with the other three area
6   vice-presidents as well?
7        A.   No.  They were giving
8   different reasons why they thought their
9   quotas ought to be lower, primarily
10   because most of dot com was coming from
11   the West.
12        Q.   If you can turn to the page
13   that's Bates numbered ORCL 0128213.  It's
14   about five pages in.
15        A.   Okay.
16        Q.   That's the one.
17        A.   Okay.
18        Q.   I -- I would like to get an
19   understanding of some of the terminology
20   that's being used in the tables that
21   appear on that particular page.
22        Starting with the second
23   row, I'm sorry, the second column where
24   there's a title CA tech, do you see that?

28

Nugent, John J.  5/19/2004  3:12:00 PM

1    A.   Okay.  Right.  Uhm, I can --
2    this does not look familiar to me.  I
3    don't believe this is my document.
4    Q.   Okay.
5    A.   As I'm looking, I'm -- this
6    isn't familiar with me, and this would
7    not be familiar GB terminology, but I
8    would imagine CA is CA -- California
9    Tech.
10    Oh, all right.  Now I'm
11    recalling something.  I'm familiar with
12    this document.  CA Tech, I guess, must
13    have been the State of California
14    Technology.
15    Q.   And MT Tech, Mountain?
16    A.   Maybe -- I would surmise
17    that might have been it.
18    MR. GOLDSTEIN: Yeah, don't
19    speculate, John, but if you have
20    some knowledge, you certainly can
21    share it.
22    THE WITNESS: MT, I -- I
23    don't know.
24    BY MR. De GHETALDI:

29

1    Q.   All right.  B & M, the first
2    column?
3    A.   Brick & Mortar.
4    Q.   What is your understanding
5    of what that phrase means?
6    MR. GOLDSTEIN:  Objection to
7    form.
8    You're asking him in general
9    what Brick & Mortar means?
10    MR. De GHETALDI:  Well, in
11    -- specific to his job at Oracle.
12    MR. GOLDSTEIN:  Right, but
13    not necessarily specific to this
14    document?
15    MR. De GHETALDI:  No.
16    THE WITNESS:  Non-dot com
17    businesses.
18    MR. De GHETALDI:  Okay.
19    BY MR. De GHETALDI:
20    Q.   Then the next row in that
21    same first column says ISP/ASP, do you
22    know what that refers to?
23    A.   Right.  Those are -- uhm,
24    the ASP is the application serve --

30

1    service provider, I believe, and ISP is
2    something similar.  It's a service
3    provider.  I can't remember what the I
4    stands for.  Internet Service Provider, I
5    believe.
6    Q.   Okay.  And how about DMD?
7    A.   That's the telesales
8    organization.
9    Q.   Do you know what the
10    abbreviation stands for?
11    A.   Direct marketing division.
12    Q.   Good.  Then if you can, turn
13    to the very last page of Exhibit 53.
14    That's it.
15    A.   Okay.
16    Q.   There's some handwriting on
17    this page.  Do you recognize that
18    handwriting?
19    A.   No.
20    Q.   Now, I'm going to hand you a
21    set of three documents that had been
22    previously marked as Exhibits 33, 34, and
23    35.
24    MR. De GHETALDI: Did you

31

1    get that, Germain?
2    MR. LABAT:  Yeah, 34 and 35.
3    MR. WEISER:  33, 34 and 35,
4    previously marked at the Winton
5    depo.
6    MR. LABAT:  Okay.  Thanks.
7    BY MR. De GHETALDI:
8    Q.   Do you recognize these
9    documents, Mr. Nugent?
10    A.   Only by virtue of the fact
11    that it says Winton, I believe it's a
12    forecast or -- in the title of the report
13    it's a forecast document that was put
14    together by Winton.  It's not my forecast
15    documents.
16    Q.   Just so that you know, the
17    sticker that says Winton is a sticker
18    that is applied at a deposition --
19    A.   Okay.
20    Q.   -- and it was not on the
21    original document.
22    A.   I --
23    Q.   So do you -- was this the
24    type of document that you regularly

32

Nugent, John J.  5/19/2004  3:12:00 PM

|  |  |
|---|---|
| 1  received in Oracle's Fiscal Years 2000 | 1  A.  I have -- I saw it today. |
| 2  and 2001? | 2  Q.  For the first time? |
| 3       MR. GOLDSTEIN:  Objection to | 3  A.  Yeah. |
| 4  form. | 4  Q.  Okay.  Did it bring back any |
| 5       THE WITNESS:  Yeah.  I don't | 5  fond memories? |
| 6  -- I don't recall. | 6  A.  No, I never saw it before |
| 7  BY MR. De GHETALDI: | 7  then. |
| 8  Q.  Are Exhibits 33, 34 and 35 | 8  No.  No.  I mean, did it |
| 9  documents that you reviewed in | 9  bring back any memories about Oracle's |
| 10  preparation for your deposition today? | 10  Fiscal Year 2000 and 2001? |
| 11  A.  No. | 11  A.  Uhm, yes. |
| 12  Q.  Now, I'm going to hand you a | 12  Q.  Okay.  And what? |
| 13  document that was previously marked as | 13  A.  That it was a very difficult |
| 14  Exhibit 47. | 14  quarter. |
| 15  A.  Okay. | 15  Q.  Okay.  I was asking about |
| 16       MR. De GHETALDI:  Germain? | 16  fiscal years.  What quarter were you |
| 17       MR. LABAT:  Yeah, got it. | 17  referring to? |
| 18  BY MR. De GHETALDI: | 18  A.  Oh, fiscal -- uhm, from what |
| 19  Q.  Have you ever seen Exhibit | 19  would have been our Q3. |
| 20  47 before today? | 20  Q.  Of 2001? |
| 21  A.  Before today, no. | 21  A.  I believe so. |
| 22  Q.  Is this a document that you | 22  Q.  Okay.  Mr. Winton says in |
| 23  reviewed in preparation for your | 23  his point number one that the growth |
| 24  deposition? | 24  comparisons to last year have been |

<div align="center">33</div> <div align="right">34</div>

|  |  |
|---|---|
| 1  relatively easy in the first two quarters | 1  Okay.  It's hovering very close to |
| 2  as we did not perform that well a year | 2  the line. |
| 3  ago. | 3       THE WITNESS:  Well, I don't |
| 4       Do you recall that as being | 4  recall. |
| 5  the case with General Business? | 5       MR. De GHETALDI:  You don't |
| 6       MR. GOLDSTEIN:  I'm going to | 6  recall Q3 Fiscal Year 2001 being a |
| 7  object to form and remind the | 7  tough comparison to Q3, 2000? |
| 8  witness that you're not to | 8       MR. GOLDSTEIN:  Objection to |
| 9  speculate about what David Winton | 9  form. |
| 10  may have meant by this. | 10       THE WITNESS:  Multiple |
| 11       If you have an independent | 11  context. |
| 12  recollection, uhm, of what Mr. | 12       MR. GOLDSTEIN:  Wait. |
| 13  Winton seems to be talking there, | 13  Wait.  Wait.  Objection to form. |
| 14  you can talk about that, but this | 14  I mean, that's not even what it |
| 15  is getting very close to the sort | 15  looks like it might say. |
| 16  of thing that Judge Strine told | 16       MR. De GHETALDI:  I'm not |
| 17  you not to do. | 17  implying that it does. |
| 18       MR. De GHETALDI:  Well, that | 18       MR. GOLDSTEIN:  In that |
| 19  is exactly what I asked, Paul, and | 19  case, let's put the document aside |
| 20  the question was phrased | 20  and you can ask him a question. |
| 21  precisely.  I said, do you recall | 21       MR. De GHETALDI:  No, let me |
| 22  that being the case with General | 22  -- let me conduct the deposition |
| 23  Business. | 23  the way that I want to.  Please do |
| 24       MR. GOLDSTEIN:  Okay. | 24  not take documents away from the |

<div align="center">35</div> <div align="right">36</div>

Nugent, John J.  5/19/2004  3:12:00 PM

1   witness.
2        MR. GOLDSTEIN:  Within
3   reason, Dario, yes.
4        MR. De GHETALDI:  Please do
5   not do that.
6        MR. GOLDSTEIN:  Okay.  You
7   finish what you have to say and
8   then I'm going to say something.
9        MR. De GHETALDI:  And I'm
10  going to hand the document back to
11  the witness.
12       I'm going to ask again, do
13  you recall Q3 Fiscal Year 2001
14  being a tough comparison to Q3
15  Fiscal Year 2000?
16       MR. GOLDSTEIN:  Okay.  And I
17  am going to object to form and I
18  am going to inform the witness and
19  instruct the witness that that
20  question has nothing whatsoever to
21  do with this document.
22       If you feel like you know
23  what tough comparison means and
24  you can otherwise answer that

37

1   question, then by all means, go
2   right ahead.
3        THE WITNESS:  I can't answer
4   the question.
5        MR. De GHETALDI:  And, Paul,
6   I would ask you, please, to
7   refrain from speaking objections.
8        MR. GOLDSTEIN:  We are
9   going to contact the court if you
10  go any further in this regard,
11  Dario, because this is exactly why
12  I raised the issue with the court
13  and this is exactly what the court
14  commented on.
15       MR. De GHETALDI:  I have no
16  idea what you're talking about
17  because I was not there.
18       MR. GOLDSTEIN:  Let me read
19  it to you.
20       It sounds like you have not
21  read this transcript.  You need a
22  little bit of context to
23  understand this.
24       But I had explained to the

38

1   court during this hearing what Mr.
2   Weiser's tactics had been with Nic
3   Classick as part of our argument
4   for why you shouldn't get to take
5   Mr. Nugent's deposition, and the
6   court allowed the deposition over
7   that argument; however, he did
8   issue some cautions as to how the
9   deposition should go.
10       And in attempting to clarify
11  what Judge Strine meant by some of
12  his remarks, your colleague,
13  Nicole Lavallee, said, trying to
14  justify what had happened at Nic
15  Classick's deposition, she asked
16  for a quick point of
17  clarification, and I am on Page 44
18  now of the transcript, and she
19  goes on to say, my understanding
20  of what occurred at Mr. Classick's
21  deposition, I believe I sat in on
22  that one, I didn't take it, my
23  recollection was what was asked,
24  they were talking about the

39

1   pipeline has not grown.  Do you
2   know about that?  It was that type
3   of question.
4        And the court then says, in
5   trial, I find that sort of a
6   knowing way.  Why do you need the
7   document then?  Ask your question.
8   To put something before them, it's
9   putting a lay witness who is not
10  comfortable with testimony.  They
11  are seeing some documents like,
12  should I know about this, they
13  keep asking me all these
14  questions.  You know, ask him a
15  question.  Write it down.  You
16  don't need the document that they
17  have never seen before.  If the
18  witness says they have never seen
19  it before, unless you have some
20  real evidence that they have, ask
21  your questions.  I think it
22  creates a distraction.  You might
23  have to prove it out by another
24  means.

40

Nugent, John J.  5/19/2004  3:12:00 PM

```
 1        That, what you just did, is
 2    exactly what Judge Strine was
 3    instructing you not to do, and I
 4    am going to object and we will
 5    call Judge Strine if you persist.
 6        You showed him a document.
 7    The document is something that he
 8    has already said he has never seen
 9    before.  You then refer him to
10    some language and then you ask him
11    a question about whether something
12    that that language suggests to you
13    is something that he remembers.
14        That is exactly what Judge
15    Strine told you not to do.
16        MR. De GHETALDI:  Well, you
17    showed him the document in
18    preparation for his deposition.
19        MR. GOLDSTEIN:  Excuse me,
20    can I just interrupt you?
21        MR. De GHETALDI:  Yes.
22        MR. GOLDSTEIN:  The witness
23    is wrong about that.  I did not
24    show him this document.
```
41

```
 1        MR. De GHETALDI:  Well --
 2        MR. GOLDSTEIN:  I can tell
 3    you.
 4        MR. De GHETALDI:  That's his
 5    testimony.
 6        MR. GOLDSTEIN:  I understand
 7    that.
 8        MR. De GHETALDI:  That's his
 9    testimony, and I think that I am
10    allowed to ask questions on this
11    document.
12        MR. GOLDSTEIN:  We will take
13    this up with the court and he's
14    wrong about that.  It's a
15    different Winton E-mail that I
16    showed him.  He's understandably
17    confused about that.
18        That makes no difference,
19    though, Dario.  What Judge Strine
20    said squarely applies.  Whether I
21    have prepared the witness for your
22    invalid questions or not has
23    nothing to do with it.
24        THE WITNESS:  No.
```
42

```
 1        MR. De GHETALDI:  My
 2    question has not been answered.
 3    Mr. Nugent said he didn't
 4    understand it so I will try and
 5    help.
 6    BY MR. De GHETALDI:
 7        Q.  Going into the third quarter
 8    of Oracle's Fiscal Year 2001, did you
 9    believe that the revenue figures that
10    General Business had achieved in Q3 2000
11    would be -- that you would be able to
12    duplicate that level of sales?
13        A.  I don't recall.
14        Q.  All right.  Do you recall
15    whether at the beginning of Q3 2001 there
16    were -- whether there were more or less
17    big deals in your pipeline than there had
18    been in Q3 2000?
19        A.  No.  I don't recall that.
20        Q.  Okay.  Did you have any
21    discussions with Mr. Winton at the very
22    beginning of Q3 2001 about how you
23    expected General Business to perform in
24    that quarter?
```
43

```
 1        A.  Q1 of 2000?
 2        Q.  Q3, I'm sorry.  I tried to
 3    say Q3.  Going into the third quarter --
 4        A.  Oh, okay.
 5        Q.  -- of 2001.
 6        A.  I don't recall discussions
 7    with him.  It might have happened, but I
 8    don't recall discussions with -- with
 9    him.
10        Q.  Okay.  Was that something
11    that would have been unusual for you to
12    do?
13        A.  I would have submitted a
14    forecast to him, well, to George, and my
15    forecast for -- for -- for Q3 '01 and
16    certainly felt that I was going to do
17    that number.
18        Q.  What form would that
19    forecast take?
20        A.  We had biweekly and then the
21    last month of each quarter we had a
22    weekly forecast session and I would
23    discuss it with George, I'm sure, and
24    potentially Winton, being the finance
```
44

Nugent, John J.  5/19/2004  3:12:00 PM

**45**

1  individual, might have been on the phone
2  as well.
3      Q.   Did you have regular
4  meetings with Mr. Roberts, uhm, during
5  the -- the quarter?
6      A.   Other than the biweeklies
7  and the weeklies?
8      Q.   Well, I mean, I'm including
9  those in my question, if you had regular
10  weekly and biweekly meetings, yes.
11      A.   I had the regular biweeklies
12  and the weeklies, and the biweekly is the
13  first two months of the quarter, the
14  weekly is the last month of the quarter.
15      Q.   All right.  Who else
16  participated in those meetings?
17      A.   They -- they were conference
18  calls, and when it was my turn, I would
19  get on and George was there.  I'm
20  assuming David Winton was on the line.
21  And that's -- that's all I recall.
22      Q.   Mary Ann Gillespie?
23      A.   She would be waiting her
24  turn with everybody else, but not

**46**

1  necessarily on the call at that time.  We
2  had different times we would call in on.
3      Q.   So it wasn't a group call,
4  these were individual calls --
5      A.   Yes.
6      Q.   -- for each division head
7  with Mr. Roberts and Mr. Winton?
8      A.   Yes.
9      Q.   Okay.  Now I'm going to hand
10  you a document that's been previously
11  marked as Exhibit 48.
12      MR. De GHETALDI:  Germain?
13      MR. LABAT:  Yeah, I'm sorry,
14  can you say that again?
15      MR. De GHETALDI:  48.
16      MR. LABAT:  38?
17      MR. De GHETALDI:  48.
18      MR. LABAT:  48, okay.
19  Great.
20  BY MR. De GHETALDI:
21      Q.   Have you ever seen Exhibit
22  48 before today?
23      A.   Oh, this is where confusion
24  is.  I believe this is the one that I

**47**

1  saw.  I saw one single document from
2  David Winton, just a quick perusal.  This
3  looks more like the one I saw from David
4  Winton.
5      Q.   Today?
6      A.   Today, I saw one single one,
7  so the other one did not -- I only saw
8  one.
9      Q.   All right.  Mr. Winton says
10  in this E-mail that the pipe has not
11  grown as we had anticipated.
12      Was that true for General
13  Business as of January 11th, 2001?
14      MR. GOLDSTEIN:  Objection to
15  form, and -- and if that's the
16  only one you're going to do on
17  this document, Dario, I will let
18  it pass, but if there's any more
19  we will have to call the court.
20  This is exactly what Strine said
21  you may not do, and Rob Weiser was
22  there and he knows it.
23      MR. De GHETALDI:  Well --
24      MR. GOLDSTEIN:  It's not a

**48**

1  proper technique of questioning
2  and Judge Strine specifically
3  addressed it in the clearest
4  possible terms.
5  BY MR. De GHETALDI:
6      Q.   Mr. Nugent, did you attend
7  an operations review in early January
8  2001?
9      A.   Yes.
10      Q.   Okay.  And was Mr. Winton
11  present at that meeting?
12      A.   Yes.
13      Q.   And was Mr. Roberts present
14  at that meeting?
15      A.   Yes.
16      Q.   And was Mary Ann Gillespie
17  present at that meeting?
18      A.   Yes.
19      Q.   Okay.  Was the subject of
20  the pipeline growth addressed at that
21  meeting for NAS?
22      A.   I don't recall.
23      Q.   Okay.  Does reading point
24  number 1 from Mr. Winton's E-mail, which

Nugent, John J.  5/19/2004  3:12:00 PM

1  is Exhibit Number 48, refresh your
2  recollection as to whether that topic was
3  discussed?
4          MR. GOLDSTEIN:  Objection to
5      form.
6          THE WITNESS:  I don't recall
7      the specifics, whether we talked
8      about the pipeline.
9          MR. De GHETALDI:  Okay.
10  BY MR. De GHETALDI:
11      Q.  Do you recall what was
12  discussed at that meeting?
13      A.  The operations review
14  meeting.
15      Q.  In Q3 2001.
16      A.  Yes.
17      Q.  January 9, I believe it was.
18      A.  Yeah.  Based upon the
19  presentation that I had to give for that
20  meeting, I recall what I presented based
21  upon the presentation that I saw, and any
22  aspects with regard to Mary Anne's
23  presentation or conversations other than
24  what I gave, and I can only recollect

49

1  based upon the document that I saw is, I
2  said, oh, I remember that document, that
3  looks like the presentation that I gave,
4  I recall aspects of that presentation,
5  those aspects of the meeting.
6      Q.  Okay.  Do you recall whether
7  Mary Ann Gillespie gave a PowerPoint
8  Presentation at that meeting?
9      A.  I don't recall, but I'm
10  assuming she did.
11      Q.  All right.  Do you recall
12  any of the topics that Mary Ann Gillespie
13  covered during her presentation, whether
14  it was by Power Point or not?
15      A.  No.  No.
16      Q.  Okay.  In point number 3 Mr.
17  Winton says, majors as reflected in the
18  softening pipe both GB and majors see a
19  slow-down in both Q3 and Q4.  Do you see
20  that?
21      A.  In point number 3?
22      Q.  Yes.  It says, drop in
23  technology as reflected in the softening
24  pipe, both GB and majors see a slow-down

50

1  in both Q3 and Q4.
2      A.  Okay.
3      Q.  Okay?  Does that refresh
4  your recollection as to, uhm, whether the
5  topic of the softening pipe in technology
6  was discussed at the January 9th, 2001,
7  operations review?
8      A.  No.
9      Q.  Okay.  One sentence later,
10  Mr. Winton says, major sees a slow-down
11  in spending along with smaller deal
12  sizes.  Do you see that?
13      A.  Yes.
14      Q.  Okay.  Does that refresh
15  your recollection as to whether a
16  slow-down in spending along with smaller
17  deal sizes in majors was a topic of
18  discussion at the January 9th, 2001,
19  operations review meeting?
20      A.  No.  I -- I don't remember
21  those.  I -- I potentially could say it
22  potentially was discussed, but I don't
23  recall.
24      Q.  That's fine.  I think we

51

1  have been going for an hour, so why don't
2  we take a quick break.
3      A.  Sure.
4          THE VIDEOGRAPHER:  Off tape,
5      2:27.
6          (Whereupon, there was a
7      recess held at this time, 2:27 to
8      2:42 p.m.)
9          THE VIDEOGRAPHER:  Stand by.
10      Back on the record, 2:43.
11  BY MR. De GHETALDI:
12      Q.  Mr. Nugent, I have handed
13  you a document that was previously marked
14  as Exhibit 54, and can you tell me,
15  please, whether you recognize this
16  document?
17      A.  Yes.
18      Q.  Okay.  Is this a document
19  that you prepared?
20      A.  Yes.
21      Q.  And is this the PowerPoint
22  Presentation that you gave at the January
23  9th, 2001, ops review?
24      A.  Yes.

52

Nugent, John J.  5/19/2004  3:12:00 PM

1      Q.  How often did NAS hold ops
2  reviews?
3      A.  Uhm, I think -- I will go
4  ahead and speak.
5      Q.  Hang up.
6          MR. De GHETALDI:  Hey,
7  Germain.
8          MR. GOLDSTEIN:  Germain?
9          MR. De GHETALDI:  Germain?
10  He can't hear us, he's wrestling
11  papers so much.
12          MR. WEISER:  Let me turn
13  that down.
14          MR. GOLDSTEIN:  Yeah, maybe
15  turn it down a little bit.  He may
16  not have gotten back from his
17  little stroll down the hall or
18  something.
19          MR. De GHETALDI:  I think he
20  was shuffling papers right by the
21  phone.
22          MR. GOLDSTEIN:  That's
23  possible, too.
24          MR. De GHETALDI:  Okay.

53

1  BY MR. De GHETALDI:
2      Q.  Sorry for the interruption.
3  You were going to say?
4      A.  About -- about two times a
5  year, maybe -- maybe three times.
6      Q.  Was there a regular schedule
7  for these ops reviews?
8      A.  Uhm, there could have been.
9  I don't recall.  I know we did them
10  periodically.  I'm not sure if they were
11  -- if they were, uhm, built into the
12  schedule.
13      Q.  Do you recall having one in
14  Q2 2001?
15      A.  No, I don't recall.
16      Q.  If you can turn to the page
17  with the Bates number 0120238, please.
18  It's about four pages in.
19      Yes.  The slide on the top
20  half of the page has, uhm,
21  accomplishments that you spoke about that
22  General Business had achieved as of that
23  date in January of 2001; is that right?
24      A.  Yes.

54

1      Q.  Is that --
2      A.  Yes.
3      Q.  Okay.  The fourth point
4  there under customers, and you say,
5  worked with OCS and support to, quote,
6  weather the 11i storm, unquote.
7      First of all, what is OCS?
8      A.  Oracle Consulting Services.
9      Q.  All right.  What did you
10  mean by working with OCS in support to
11  weather the 11i storm?
12      A.  The 11i refers to Oracle's
13  applications at that time, version 11i.
14  It had numerous quality issues and we
15  were working with the consulting
16  organization and the sales organization
17  to help our customers fix their issues
18  with the software.
19      Q.  Were salespeople in General
20  Business actively selling 11i, the --
21  it's a suite of applications; is that
22  correct?
23      A.  Yes
24      Q.  Were salespersons in General

55

1  Business actively selling 11i in Q3 2001?
2          MR. GOLDSTEIN:  Objection to
3  form.
4          THE WITNESS:  Yes.
5  BY MR. De GHETALDI:
6      Q.  You say that 11i had
7  numerous quality issues.  What do you
8  mean by that?
9      A.  There were program bugs.
10      Q.  Well, what sort of bugs?
11          MR. GOLDSTEIN:  Objection to
12  form.
13          THE WITNESS:  Just code
14  bugs.  There was -- there was
15  quality issues with the -- with
16  the code.
17  BY MR. De GHETALDI:
18      Q.  Well, was this product, to
19  your knowledge, more buggy than -- than
20  normal?
21          MR. GOLDSTEIN:  Objection to
22  form.
23          THE WITNESS:  Uhm, more
24  buggy than normal?

56

1           All I can say is we had
2           issues with 11i.
3   BY MR. De GHETALDI:
4       Q.   Well, isn't it true that --
5   that, uhm, it would not even function for
6   a number of the customers who bought it?
7        MR. GOLDSTEIN:  Objection to
8   form.
9        THE WITNESS:  My -- my
10     recollection is we worked with our
11     -- with the OCS Group to go ahead
12     and fix these customer issues and
13     if there was -- if it was
14     determined that the customer did
15     not want to continue to proceed,
16     we negotiated a settlement
17     agreement with them.
18   BY MR. De GHETALDI:
19       Q.   Well, did what you describe
20   as customer issues arise more frequently
21   with sales of 11i than with sales of
22   other Oracle products in Fiscal Year
23   2001?
24       A.   Uhm, I would say if you

57

1   compared it against the database, for
2   example, the database that we sold and
3   the applications, the applications -- we
4   experienced more quality issues with the
5   applications than we did with the
6   technology, the database product.
7       Q.   Were portions of the 11i
8   suite not completed at the time the
9   product was sold to Oracle's customers in
10   Fiscal Year 2001?
11        MR. GOLDSTEIN:  Objection to
12   form.
13        THE WITNESS:  It was
14     production software that was
15     released.  It was completed.  By
16     definition, it was production
17     software, and, uhm, but by the
18     nature of software it had some
19     quality issues associated with it.
20     So we had plenty of
21     customers that were up and running
22     on the software.  We had many that
23     were struggling with the software
24     due to quality issues.

58

1   BY MR. De GHETALDI:
2       Q.   Do you recall Mr. Ellison
3   saying in February of 2001 that 85
4   percent of 11i worked?
5       A.   I don't recall that.
6       Q.   Okay.  Do you recall Mr.
7   Ellison saying in February 2001 that 11i
8   only did 85 percent of what the customers
9   expected it to do?
10       A.   I don't recall that.
11       Q.   Do you recall any customers
12   with whom a settlement agreement was
13   negotiated relating to 11i, their
14   purchase of 11i?
15       A.   I'm sorry, could you repeat
16   the question again?
17       Q.   Yeah.  Do you recall any
18   customers with whom a settlement
19   agreement was negotiated relating to
20   their purchase of 11i?
21       A.   Yes.
22        MR. LABAT:  Hello, is anyone
23   there?
24        MR. GOLDSTEIN:  We are here.

59

1        MR. WEISER:  Germain, we are
2   here, but we had a lot of paper
3   wrestling on your end so we turned
4   you down for a minute.
5     He just dropped off.  Why
6   don't we go off the record for a
7   second.
8        THE VIDEOGRAPHER:  Off tape,
9   2:53.
10       (Whereupon, there was a
11     discussion held off the record at
12     this time.)
13        THE VIDEOGRAPHER:  Stand by.
14   Back on the record, 2:54.
15        MR. GOLDSTEIN:  I think you
16   had a question pending.
17        MR. De GHETALDI:  I think
18   so, too.
19     Can the court reporter read
20   it back?
21       (Whereupon, the pertinent
22     portion of the record was read by
23     the court stenographer.)
24        THE WITNESS:  Yes.

60

Nugent, John J.  5/19/2004  3:12:00 PM

1    BY MR. De GHETALDI:
2        Q.   Who?
3        A.   I can't recall a specific
4    customer, but there were several
5    customers.
6        Q.   When you say "several," how
7    many are you -- can you give me an
8    estimate?
9        A.   It was probably -- I was
10   probably involved in maybe ten to
11   fifteen.
12       Q.   The third bullet point on
13   the page with Bates number 120238 of
14   Exhibit 54 says, negotiated numerous
15   settlement agreements.
16       A.   Uh-huh.
17       Q.   Is that the equivalent of
18   ten to fifteen?
19       A.   Well, ten to fifteen is
20   pretty -- pretty numerous, and my team
21   might have been also negotiating several
22   of these as well.  I was involved in
23   about ten to fifteen.  My team might have
24   been -- was involved in several and some

61

1    of the VPs were involved in several, so
2    if you aggregated them up, it was pretty
3    numerous.
4        Q.   All right.  Did the quality
5    issues with suite 11i affect sales in
6    General Business in Fiscal Year 2001?
7            MR. GOLDSTEIN:  Objection to
8    form.
9            THE WITNESS:  I can't really
10   say yes or no to that.  It -- I
11   would say no.  We were -- no.
12   BY MR. De GHETALDI:
13       Q.   Did you or anyone else at
14   Oracle, to your knowledge, undertake an
15   analysis to see whether the quality
16   issues with 11i affected sales of that
17   product?
18       A.   I don't -- I don't recall
19   any analysis.
20       Q.   If you could, turn, please,
21   to the page with Bates number 0120242.
22           MR. De GHETALDI:  We are on
23   Exhibit 54, Germain.
24           MR. LABAT:  Thanks.  I was

62

1    just about to ask.
2    BY MR. De GHETALDI:
3        Q.   Are these two slides --
4        A.   Yes.
5        Q.   -- meant to indicate that
6    you were about to talk about a general
7    topic of what you felt the outlook for
8    the second half of Fiscal Year 2001 would
9    be, and within that topic, what your
10   observations of the -- the market were?
11       A.   That's fair to say, yes.
12       Q.   So if you turn to the next
13   page, uhm, which has Bates number 120243,
14   under market observations, the first
15   point is sluggish economic outlook?
16       A.   Uh-huh.
17       Q.   What did you mean by that?
18       A.   Uhm, as I -- as I look at
19   this, this is -- I'm not an economist, so
20   I go to different documents and different
21   reports that I see and I share that -- I
22   share that with -- with the team at the
23   meeting, and this is what was -- not my
24   personal observation, but these are some

63

1    observations that various pundits had
2    written and I took them from those
3    various documents, different economic
4    reports, and said, hey, this is what they
5    are -- this is what they're seeing out in
6    the marketplace.
7        Q.   Do you recall what reports
8    of which pundits you relied on to make
9    these observations?
10       A.   We used to be -- I used to
11   be able to get a Morgan Stanley report.
12   I used to get that a lot.  It would come
13   online.  I'd take information off of
14   them.  Other -- other outlooks from
15   various other -- other pundits, so it
16   could be -- definitely Morgan Stanley, I
17   remember getting the Morgan Stanley
18   report and I am sure there was one or two
19   others.
20       Q.   You just, just below sluggish
21   economic outlook, focus in on profits.
22   What did you mean by that?
23       A.   The focus in on profits was
24   as opposed to most of the -- most of the

64

marketplace was looking towards growth, there was a shift towards focusing on profits instead.

Q. Then the two bullet points under that first one is reduce IT costs. What did you mean by that?

A. Uhm, reduce costs of doing business?

Q. No, the one right above that.

A. Yeah, reduce IT costs?

Q. Yes.

A. So the idea here is that the J.P. Morgans, et cetera, the pundits were saying, hey, companies now are going to be looking to reduce IT costs. That's something we ought to be -- we ought to be thinking about, how are we -- how are we going to address that.

Q. Okay. Then the -- the second major bullet point on that same slide says, entering post PC era. What did you mean by that?

A. Uh-huh. Well, the pundits

were saying that the companies were no longer going to be turning over their PCs once a year, they were going to be paying off -- living with their PCs -- typically the PCs would turn over once a year and now they were going to turn over their PCs every three to four years.

Q. How would that have an effect on Oracle's business?

A. I'm not sure it would have much of an effect at all. I was just pulling information from -- from a report.

Q. Okay. The second slide on that same page, the bullet point is shifting IT budgets from PC and MF, SW, to, and then you have five subpoints there, what do your abbreviations stand for there, specifically, PC, MF and SW?

A. PC, I would just imagine personal computers.

MF, I don't know. I can only surmise. Maybe that's main frame software. That doesn't make a lot of

sense.

SW might be software.

MF, I'm not sure.

Q. Okay. Now, as of January of 2001, you knew that the pundits were saying that the economic outlook was sluggish?

A. Uh-huh.

Q. Was that something that you had observed yourself?

A. Uhm, I mean, I don't recall being back then -- this was sort of looking forward a little bit, uhm, but certainly we could have -- we could have felt like that, but I don't remember this overwhelming thought that, oh, my gosh, there's an economy issue here. I didn't feel that way at all.

Q. Well, did you disagree that the economic outlook was sluggish?

A. No.

Q. Had you seen anything in the past three months in General Business that would lead you to believe that the

economic outlook was not sluggish?

MR. GOLDSTEIN: Objection to form.

THE WITNESS: At -- at that time, and -- I felt -- I felt -- I felt okay where we were. I felt fine where we were.

BY MR. De GHETALDI:

Q. You felt fine where you were, but you didn't disagree that the economic outlook was sluggish? Can you -- those statements seem to be somewhat contradictory. Can you help me understand what you mean?

A. Yeah, you can help me to --

MR. GOLDSTEIN: Wait. Wait. Let me just object to the form.

MR. De GHETALDI: Go ahead.

THE WITNESS: Uhm, what we have here was information that we got -- I got from various pundits, giving their observations of the marketplace.

As I was running the

1  business for that particular
2  quarter, I felt fine for that
3  quarter.  I felt fine for the --
4  our overall health of our -- of
5  our business.  Sure, there's
6  always lots of different areas,
7  but I felt -- I felt okay.
8  BY MR. De GHETALDI:
9      Q.  When you say "there's lots
10  of different areas," you made some hand
11  signs.  Can you explain what you meant by
12  -- by that?
13      MR. GOLDSTEIN:  Objection to
14  form.
15      THE WITNESS:  There's so
16  many -- so many different factors
17  that can -- that come in, whether
18  they are economic, whether they
19  are competitive, whether they are
20  -- all these different issues that
21  can come into play, and I felt --
22  I felt fine.
23  BY MR. De GHETALDI:
24      Q.  As of January 9, 2001, you

69

1  hadn't noticed any slowing in general --
2  in any area of General Business?
3      MR. GOLDSTEIN:  Objection to
4  form.
5      THE WITNESS:  In -- uhm, I
6  -- I don't recall.
7      In any area of General
8  Business?  I don't recall.  I just
9  know that the -- the numbers that
10  I was presenting at that time I
11  felt good about.
12  BY MR. De GHETALDI:
13      Q.  If you can turn to the next
14  page, please, which is -- has a Bates
15  number 120244.
16      A.  Yes.
17      Q.  The first slide has a bullet
18  point, reduced use of outside
19  consultants.  Do you see that?
20      A.  Uh-huh.
21      Q.  What did you mean by that
22  point?
23      A.  That the pundits were saying
24  that consult -- that, uhm, firms were

70

1  going to reduce their dependency on
2  outside consultants.
3      Q.  The second slide has a
4  bullet point that says, CIOs on shorter
5  leash.  What did you mean by that?
6      A.  The pundits were saying that
7  their CIOs would not have the same
8  freedom that they had in the past of
9  investing in technology and that the
10  technology that they invested in, they
11  better get a return on that technology.
12      Q.  Was that something that you
13  had observed in General Business over the
14  six months prior to January, 2001?
15      A.  Uhm, it's -- I can't recall.
16      Q.  As of January 9, 2001, did
17  you have any reason to doubt that CIOs
18  were on a shorter leash?
19      A.  Six months before?
20      Q.  No, as of January 9, 2001,
21  did you have any reason to doubt that
22  CIOs were on a shorter leash?
23      A.  No.
24      Q.  If you could, go back to

71

1  Bates number 120238.  The first subpoint
2  under customer says, met with numerous
3  customers' CEOs.  Are you -- are you
4  referring to meetings that you personally
5  had there?
6      A.  Uh-huh, yes.
7      Q.  Okay.  And approximately how
8  many CEOs had you met with in the first
9  six months of Fiscal Year 2001?
10      A.  I have no idea.
11      Q.  Can you give me any kind of
12  approximation?
13      A.  I would say, based upon the
14  settlement -- settlement agreements of
15  ten to fifteen, maybe some -- maybe
16  fifteen to twenty.
17      Q.  Okay.  Did anything that you
18  learned in those meetings with fifteen to
19  twenty customer CEOs indicate to you that
20  the economy was going to be sluggish
21  going forward?
22      A.  No.
23      Q.  Did any -- did you learn
24  anything in those meetings that indicated

72

Nugent, John J.  5/19/2004  3:12:00 PM

1  to you that the CIOs of those companies
2  would be on a shorter leash in the
3  future?
4  A.  Possibly.
5  Q.  Do you recall any specifics
6  about that topic coming up in any of
7  those meetings?
8  A.  I don't recall any
9  specifics, but a CEO mentioning that they
10  would have to prove the ROI of the
11  technology.  There would be more rigor
12  around proving the return on the
13  investment on the technology.
14  Q.  And was it your observation
15  that CEOs wanted to become more involved
16  in that process?
17  A.  They were now asking for the
18  ROI on technology sales, something that
19  -- that wasn't as pronounced before.  You
20  started to see a little bit more of that
21  happening.
22  Q.  When you say "ROI," can
23  you --
24  A.  Return on investment.

73

1  Q.  That's what I thought.  I
2  just wanted to make sure.
3  A.  Yeah.
4  Q.  Going back, or going
5  forward, to the page with the Bates
6  number 120245, the second bullet point on
7  the top slide says, best of breed versus
8  suite approach, then underneath that you
9  say, suite approach is preferable, but
10  market believes no one company can
11  deliver.
12  Can you tell me what you
13  meant by that statement?
14  A.  Well, the pundits at that
15  time were saying that though the suite is
16  a preferable option, they don't think
17  that the suite is going to be -- to be
18  able to answer all of your operational
19  issues.  There's still a need for a best
20  of breed solution.
21  Q.  And that is the -- according
22  to the pundits, that's something that the
23  market believed?
24  A.  Yeah, that's the way that --

74

1  yes.
2  Q.  Okay.  And at that time
3  Oracle was taking the suite approach as
4  opposed to the best-of-breed approach?
5  A.  Yes.
6  Q.  So was that an indication to
7  you that Oracle's suite approach would be
8  facing resistance in the market in the
9  coming months?
10  A.  No.  It was actually
11  preferable.  It was -- it was a
12  preferable option, but the pundits were
13  saying there's still room for the
14  best-of-breed players.
15  Q.  All right.  Well, what did
16  you mean when you said "the market
17  believes no one company can deliver,"
18  were you referring to the suite?
19  A.  Yes, that if you have -- the
20  idea here is we have the suite and -- but
21  there's still best-of-breed vendors at
22  that time.  This was the beginning of the
23  suite marketplace.  And the pundits were
24  saying that they didn't believe that the

75

1  best of breeds would be out of business,
2  there's still a play for the best of
3  breed here, so yes, preferable, most
4  companies would prefer to go with a
5  suite, no doubt about it, and we
6  certainly saw that the suite was a very
7  powerful, powerful message.  Companies
8  loved the suite, dealing with one -- with
9  one company, but sometimes they would
10  still buy niche products from some of the
11  best-of-breed vendors.
12  Q.  In -- when did 11i go on the
13  market?
14  A.  Not -- I don't recall.
15  Q.  Was it prior to Fiscal Year
16  2001?
17  A.  Yeah, it must have -- must
18  be.  Probably 2000 maybe.
19  Q.  Do you recall in Fiscal Year
20  2000 through Fiscal Year 2001 how long it
21  took on the average for an 11i suite to
22  be installed, debugged, and become
23  functional?
24  A.  Uhm, there -- it was across

76

1   the spectrum in terms of time, but
2   there's so many variables, how big the
3   company was, the complexity of the their
4   operation, the amount of transactions, so
5   we had some that were less than a year,
6   some less than six months, especially in
7   mid-market.  In others, certainly greater
8   than a year.
9      Q.  Going back to the page with
10  Bates number 120245, the second slide on
11  that page has a bullet point that says,
12  market concern with ASP model.  What did
13  you mean by that?
14     A.  The market was concerned --
15  there was some concern because of
16  security issues, vendor viability, et
17  cetera, giving your applications to a
18  third-party company who would house those
19  applications and run those applications
20  for you.
21     Q.  Were ASP companies a strong
22  customer base for General Business in
23  Fiscal Year 2001?
24      MR. GOLDSTEIN:  Objection to

77

1   form.
2      THE WITNESS:  I -- I don't
3   have the total number, but it
4   wasn't -- it wasn't a significant
5   piece of the overall business.
6  BY MR. De GHETALDI:
7     Q.  Where you say loss of,
8  quote, low hanging dot com, unquote,
9  fruit, do you see that towards the bottom
10  of Page 120245?
11     A.  Uh-huh.
12     Q.  What did you mean by that?
13     A.  I believe I meant by that
14  that the bigger dot coms had acquired the
15  Oracle database, that now were going
16  after second-tier, if you will,
17  third-tier, dot coms, to sell the
18  database technology.
19     Q.  You would pick the
20  easy-to-reach fruit off the tree?
21     A.  Yes.
22     Q.  Okay.  And -- and so that
23  meant that other sales were going to be
24  more difficult to dot com companies?

78

1     A.  Yes.
2     Q.  If you would turn to the
3  next page, please, with Bates number
4  120246, and this bullet point says, dot
5  com fishing hole drying up?
6     A.  Uh-huh.
7     Q.  Is that something that the
8  pundits were saying?
9     A.  Yes.  There's various VC
10  magazines, pundits might come out with VC
11  funding, the level of VC funding at that
12  time.
13     Q.  And were these pundits
14  saying that venture capital funding for
15  dot com companies was going to become
16  nonexistent?
17     A.  Uhm, there was VC funding at
18  that time, but I was just pulling that
19  off of the report.
20     Q.  Okay.  Do you know whether
21  VC funding was becoming more difficult
22  for dot com companies to get by January
23  2001 than it had been?
24     A.  Yeah.  Yes.  Yes.

79

1     Q.  Okay.  Uhm, you say,
2  development license only, what do you
3  mean by that?
4     A.  That a dot com would acquire
5  some development license -- a small
6  amount of licenses to begin the project,
7  to develop the application that they
8  needed, and once the application was
9  developed, then they would come back to
10  us to buy the production licenses,
11  whereas before, they would buy the
12  development and the production licenses
13  at the same time.
14     Q.  All right.  So that was a
15  phenomenon that you had observed by
16  January of 2001?
17     A.  We observed some of that.
18     Q.  Okay.  Then you say,
19  e-commerce and incubator companies listed
20  on endangered species list?
21     A.  I wish I could write this --
22  I wish I could write this well.
23     The idea here is that they
24  were saying that incubator companies are

80

1    companies that existed at that time that
2    would help incubate, start up, these new
3    start-ups.  They'd provide them with
4    legal help, accounting help, financial
5    help, et cetera, and incubate them.  Once
6    they become a company, they receive more
7    funding, they let them go.  And these
8    companies came up and then they went
9    down.
10        Q.   Were e-commerce and
11   incubator companies part of General
12   Business' market?
13        A.   We didn't sell much to
14   incubator companies.  We might have had a
15   few deals, but it wasn't a place where we
16   generated significant revenue.
17        Q.   Then you say, 41,515 layoffs
18   in Calendar Year 2000; am I reading that
19   correctly?
20        A.   It's amazing I can remember
21   this.  That was a number that the dot com
22   companies had laid off, I believe.
23        Q.   And then you say, survival
24   mode for calendar year 2001?

81

1        A.   Yes.
2        Q.   What did you mean by that?
3        A.   Well, they were talking
4    about how the dot com companies were,
5    quote/unquote, in survival mode, buying
6    development licenses, not as many
7    production licenses.
8        Q.   Okay.  By January of 2001,
9    had you observed any of General Business'
10   customers, dot com customers,
11   disappearing?
12        A.   Beginning of 2001?
13        Q.   Yeah, as of January of 2001.
14        A.   No.  We had a nice -- if I
15   recall, we had a nice Q1.  We had a very
16   nice Q2 in '01.  We were doing very, very
17   well, as we did the previous four, five,
18   six quarters before that.
19        Q.   You don't recall there being
20   a dramatic drop-off in the sales to dot
21   com companies in Q1 and Q2 of 2001?
22        A.   I don't recall that.
23        Q.   If you turn to -- well,
24   let's see, the slide -- don't turn yet,

82

1    uhm, the second slide on that same page,
2    120246, and it says, General Business
3    U.S. Second Half Financial Outlook.
4        A.   Uh-huh.
5        Q.   Is the section that comes
6    next what your view of what the second
7    half of Fiscal Year 2001 would -- was
8    going to be, or was this somebody else's
9    view?
10        A.   No, this would be -- this
11   would be my view.  This was a slide that
12   George would include in the -- in the
13   presentation.  This presentation was the
14   January 9th presentation I'm still
15   looking at, right?
16        Q.   Uh-huh.
17        A.   And so he would act -- he
18   would ask for, so what does the outlook
19   look like for the second half, and this
20   would be my outlook.
21        Q.   All right.  On the next
22   page, the one with Bates number 120247,
23   uhm, there are two tables, two slides
24   with tables on them --

83

1        A.   Uh-huh.
2        Q.   -- that both look similar, but
3    have somewhat different numbers.
4        A.   Okay.
5        Q.   The top one is called, Q3
6    and FY01 outlook versus budget, and the
7    bottom one is called Q3 and FY01 outlook
8    versus replan.
9             Can you tell me what the
10   difference between budget and replan is?
11        A.   I don't know.  I'm trying to
12   remember.  What was replan?
13             I can't see the numbers, but
14   what was --
15        Q.   And I didn't bring my
16   magnifying glass.
17        A.   Yeah.  The only thing I
18   can -- can think of on a replan, a replan
19   would mean something along the lines of a
20   -- of a change in the number.
21        Q.   Uh-huh.  Well, I can read
22   some of the numbers and it looks to me
23   like the replan chart numbers are
24   generally higher than the budget numbers.

84

Nugent, John J.  5/19/2004  3:12:00 PM

1    A.  Well, they went up, huh?

2    Q.  Yeah.

3    A.  Ouch.

4    Q.  Does that refresh your

5    recollection as to what happened with the

6    budget, whether it was replanned in a way

7    that might not be favorably viewed by the

8    salespeople?

9    A.  I don't know what -- I don't

10   know what replan is.  I don't recall

11   replan.

12   Q.  All right.  You could turn

13   to the next page, please, which has Bates

14   number 120248, and the top slide is

15   titled pipeline analysis.  Do you see

16   that?

17   A.  Yep.

18   Q.  What sort of pipeline is

19   that?

20   A.  Re -- pipeline.  Pipeline

21   analysis.  Well, I'm looking at a field

22   budget.  I'm looking at a pipeline.  So

23   it -- it -- it's a licensed pipeline.  I

24   will assume that it's applications and

85

1    database against budget.

2    Q.  Okay.  Do you know what the

3    source of these pipeline numbers would --

4    or was?

5    A.  No.

6    Q.  And you're assuming that

7    it's pipeline for license, including

8    technology and applications?

9    A.  Right, yes.

10   Q.  Okay.  If you could turn to

11   the next page, please, which has Bates

12   number 120249, uhm, and the top slide

13   says, General Business U.S. Second Half

14   Adjustments?

15   A.  Yes.

16   Q.  What do you mean by that?

17   A.  Looking at the slide below

18   it, I believe that has to do with some

19   adjustments and our go-to-market strategy

20   that we were considering making.

21   Q.  The first bullet point on

22   the lower slide says, consolidate dot com

23   territories.  What did you mean by that?

24   A.  That we were going to

86

1    consolidate some existing dot com

2    territories, turn two territories into

3    one, so we took -- we took a few of the

4    different territories and consolidated

5    them.

6    Q.  What results when you

7    consolidate territories in terms of sales

8    force?

9    A.  What results?

10   Q.  I mean, do --

11   A.  Uhm, it could be, A, higher

12   focus; uhm, B, I believe that we were

13   consolidating here based on, uhm, --

14   based on the plethora of dot com reps

15   that we had flooded that marketplace with

16   and that we were consolidating a few of

17   those to trim them down a little bit.

18   Q.  Okay.  So you're talking

19   about trimming the sales force for dot

20   coms?

21   A.  Yeah, we didn't -- I'm

22   trying to recall.  We were consolidating

23   -- we were -- we were consolidating the

24   number of territories that we had out

87

1    there for dot coms, because we had added

2    so many reps to that -- to that space,

3    and now it was we were consolidating

4    several of these territories.

5    Q.  Did that mean that you were

6    going to end up with fewer sales reps in

7    fewer territories or --

8    A.  I guess by definition it

9    would mean that, but I don't recall if we

10   ever laid anybody off or -- I think we

11   used them in other areas.

12   Q.  If you can turn to the next

13   page, please, 120250 Bates number.  The

14   top slide says, selling landscape has

15   changed, and then you have a number of

16   different descriptions of the selling

17   landscape for different periods of time?

18   A.  Uh-huh.

19   Q.  What do you mean by the --

20   the last one, 2000, transformation-basis

21   selling?

22   A.  As I recall, this line had

23   to do with applications and how we sold

24   our applications into companies.

88

Nugent, John J.  5/19/2004  3:12:00 PM

1    You could not just sell
2    product for product's sake, solution for
3    solution's sake.  You -- you sold and had
4    to help the customer see how the software
5    had actually transformed their business,
6    how they could improved ROIs and bring
7    down total cost of ownership and improve
8    the efficiency of their operation and the
9    ability to transform their business,
10   extend their business to customers and
11   extend their business to suppliers.  That
12   was the notion of transforming their
13   business, getting outside of themselves
14   to suppliers and customers, and that was
15   a go-to-market strategy that we started
16   to implement at that time.
17        Q.  And that strategy was
18   implemented in -- in response to the
19   changing market conditions that you had
20   observed?
21        A.  Yes, for -- you -- you --
22   again, just going in and selling a
23   product was a difficult sale.  You had to
24   be able to show how the product could

89

1    help transform their business --
2    business, get closer to their customers,
3    how they could get closer to their
4    suppliers, what would that mean to their
5    overall business model.
6        Q.  All right.  If you can turn
7    now, close to the end, the page with
8    Bates number 120260.  The first slide on
9    that page has a title, Issues,
10   Challenges, Recommendations.
11        Is this sort of your
12   summary?
13        MR. GOLDSTEIN:  Objection to
14   form.
15        THE WITNESS:  Issue --
16   uhm --
17        MR. De GHETALDI:  Some --
18        THE WITNESS:  I -- I'm not
19   sure if it's my summary as much as
20   it's issues and challenges that I
21   wanted to bring to George's
22   attention.
23        MR. De GHETALDI:  All right.
24   BY MR. De GHETALDI:

90

1        Q.  Uhm, the second slide on
2    that page says, Second Half and Fiscal
3    Year 2002.  You're referring there to the
4    second half, that is, the third and
5    fourth quarters of Fiscal Year 2001?
6        A.  Yes.
7        Q.  Okay.  The first bullet
8    point there says, disparity between
9    General Business and other sales
10   organizations.  What did you mean by
11   that?
12        A.  I don't know.  Let me look
13   at the bullets.  And I believe I was -- I
14   -- when I look at LS quota differential,
15   LS means license and support, and every
16   sales rep had a license and support
17   quota.
18        I can only infer that I
19   thought at that time my team was carrying
20   higher LS quotas than some of the other
21   sales organizations.  That's just an
22   inference that I am making.
23        Q.  Uh-huh.  How about comp.
24   plan inequity, the next point, what does

91

1    that refer to?
2        A.  First of all, it's a
3    spelling error.  Other than that, I
4    don't, uhm -- I think I was referring to,
5    I believe, the -- I believe some other --
6    some other divisions, their managers were
7    paid more than my team's managers.
8        Uhm, my team had smaller
9    overall quotas, and I would make the case
10   that it doesn't matter, if they have
11   eight people, they have eight people,
12   they should make the same.  And I think
13   at that time they were looking at the
14   amount of quota that they were carrying
15   and saying no, because they were only
16   carrying a smaller amount of quota, they
17   will make a little bit less.
18        Q.  Uh-huh.  The second bullet
19   point says, revenue share model, and
20   underneath that it says, 30 percent of
21   tech is revenue shared, loss of
22   transactional focus, bad behavior.  What
23   did that refer to?
24        A.  Revenue share model?  I

92

1  don't know.  Revenue share -- I don't
2  know.
3       Q.   I'm guessing, but are you
4  talking about sharing commissions, how
5  commissions are shared?
6       A.   No.  We must have been
7  splitting revenues with another division
8  and -- and because we were splitting
9  revenue with other divisions, some people
10  would try to hang on to the revenue
11  creating bad behavior, no, I am not going
12  to give up the revenue.
13       Q.   This -- these would be other
14  divisions within NAS?
15       A.   Yes.  Maybe it was between
16  myself and majors, for example.
17       Q.   If you could turn to the
18  next page, please, which has Bates number
19  120261, the first -- and the top slide
20  says, second half in fiscal year '02
21  again, and the bullet point there is, or
22  says, mid-teen technology growth rate.
23  What does that refer to?
24       A.   That -- I mean, I know what

93

1  mid-teen technology growth rate means.  I
2  don't know for what period, whether it
3  was for this year or for the second half
4  or for -- but the -- but the --
5  potentially here I was forecasting
6  mid-teen technology growth rates.
7       Q.   All right.  Underneath that
8  you say, no million dollar dot com deals;
9  am I reading that correctly?
10       A.   Right.
11       Q.   What did you mean by that?
12       A.   That we were doing -- that
13  we didn't have as many of these big
14  million dollar dot com deals.  We had --
15  I don't recall -- I don't know if we had
16  zero in the second half.  I just -- I'm
17  sure we didn't have as many as we had in
18  the -- in the first half.
19       Q.   You do say no million dollar
20  dot com deals?
21       A.   Uh-huh.
22       Q.   But you're not sure whether
23  that means only a few or none?
24       A.   Yeah.

94

1       Q.   Okay.  The next point I
2  think says, average transaction lower
3  than fiscal year 1999 average; am I
4  translating that correctly?
5       A.   Average transaction --
6       Q.   Or less or lower than?
7       A.   I don't know.  Average
8  transaction potentially could be lower
9  than.  I don't know whether there's an L
10  there, but -- for lower than, but, uhm,
11  the notion that our average transaction
12  wasn't as large, is not going to be as
13  large in the second half as it is in the
14  first half.
15       Q.   Going back to the point
16  about no million dollar dot com deals --
17       A.   Uh-huh.
18       Q.   -- what -- where would you
19  look to determine how many million dollar
20  dot com deals you had by that point in
21  General Business in early January 2001?
22       A.   I'm sure I could have looked
23  at, uhm, -- I don't recall, but I'm sure
24  I could have looked at a pipeline report

95

1  for Q3 and, uhm -- or, I'm sorry, that
2  was in Q3 -- oh, this was in January, so
3  beginning of Q3, I probably looked at
4  what I had going in Q3, saw fewer million
5  dollar deals there, and potentially I
6  could have looked at Q4, the pipeline,
7  and noticed fewer million dollar dot com
8  deals.
9       Q.   Then there are four action
10  items in the top slide on the second page
11  with Bates number 120261.  The first one
12  is, alert corporate.
13       A.   Okay.
14       Q.   What did you mean by that?
15       A.   The only thing I can surmise
16  is that mid-teen technology growth rates
17  is where we would be at.  I don't know,
18  but potentially maybe they were thinking
19  they were going to be higher, so I'm
20  saying, hey, we have mid-teen technology
21  growth rates planned.
22       Q.   Do you recall that Jeff
23  Henley and Larry Ellison gave guidance to
24  the market on December 14th, 2000, that

96

1  they expected Oracle to achieve 25
2  percent growth in license measured in
3  U.S. dollars?
4      A.  I don't recall that.
5      Q.  The second action item on
6  Page 120261 says, sell more options?
7      A.  Uh-huh, database options.
8  There were various optional products that
9  you could acquire with the database.
10      Q.  The third action item says,
11  E-bus infrastructure sale.
12      A.  What is an E-business
13  infrastructure sale?  Uhm, I -- I can
14  surmise that that was selling not only
15  our database, but selling our application
16  server, let's sell more application
17  servers at that time.  That's part of an
18  infrastructure, not just database, but
19  options, and let's also sell our
20  applications server product as well, all
21  add up to a technology infrastructure.
22      Q.  Okay.  Then the fourth --
23  fourth action item says, reduce tech
24  quota.  What did you mean by that?

97

1      A.  Uhm, probably asking for a
2  reduction in the technology quota.
3      Q.  And this would be something
4  that corporate would approve?
5      A.  No.  George, this would --
6  George.
7      Q.  George Roberts?
8      A.  Right.
9      Q.  Where you say, alert
10  corporate, is there a department or a
11  person that you were referring to?
12      A.  Uhm, no.  My conversations
13  are with George and so it would be, hey,
14  we are going to be doing mid-teens and
15  technologies.
16      Q.  You should tell someone?
17      A.  Uhm, alert corporate would
18  be, yeah, let them know.
19      Q.  Okay.  And am I right in --
20  in believing that the reason that they
21  should -- that corporate should be
22  alerted was because this mid-teen
23  technology growth rate was lower than
24  what was expected?

98

1      A.  I can only surmise that.  I
2  don't know what was expected.
3      Q.  All right.  In the second
4  slide on page with Bates number 120261
5  there are two bullet points.  The first
6  one says, quality and stability of 11i
7  action build 11i reference base.
8      What did you mean by quality
9  and stability of 11i?
10      A.  This refers back to my
11  comment about the overall quality and
12  stability of the code.  We had good
13  references at the time, and we wanted to
14  make sure that we were building up our
15  reference base of 11i to dispel the
16  competition from constantly going out to
17  the marketplace saying, hey, there's
18  issues with your 11i quality, so we had
19  plenty of references that were very happy
20  on 11i and we wanted to build up that
21  base.
22      Q.  The next bullet point says,
23  dramatic decline in dot com business.
24  Was that something that you had observed

99

1  as of January 9th, 2001?
2      A.  I'm not sure.  I don't
3  believe I had observed it at that time.
4  I think on January 9th I'm starting to
5  talk about how our dot com business,
6  which is the technology business, which
7  is the mid-teen business, uhm, that there
8  was going to be -- there was going to be
9  a decline in that business.
10      Q.  Well, the first subpoint
11  under that bullet says, 30 percent of
12  named dot coms out of business.  Were you
13  saying there that you had, as of January
14  9, 2001, observed that 30 percent of the
15  -- of some dot com businesses were out of
16  business?
17      A.  Yes.
18      Q.  What did you mean by named
19  dot coms?
20      A.  Named dot com would have
21  been an account that a sales rep had as
22  part of their quota, part of their
23  territory, I mean.
24      Q.  All right.  So as of January

100

Nugent, John J.  5/19/2004  3:12:00 PM

1   9, 2001, the dot com -- potential dot com
2   marketplace had shrunk by a third?
3       A.   No.
4           MR. GOLDSTEIN:  Objection to
5   form.
6           THE WITNESS:  The -- the
7   number of named accounts, focused
8   accounts, that we gave, I'm not
9   sure how large that list was, it
10  certainly wasn't the list of all
11  the dot coms out there, it was
12  just those that we wanted to focus
13  on.
14          MR. De GHETALDI:  All right.
15          THE WITNESS:  We created a
16  list of focused dot com accounts,
17  and what we are saying here, named
18  dot com accounts, what we are
19  saying is out of that focus list
20  that we assembled, 30 percent went
21  out of business, and what would
22  happen is we'd replace them with
23  other dot com accounts.
24  BY MR. De GHETALDI:

101

1       Q.   The second subpoint under
2   that bullet says, 21 million in first
3   half RMAs versus 4 million.  What did you
4   mean by that?
5       A.   RMAs are the settlements,
6   the returns, so when we would negotiate a
7   settlement agreement and they would
8   return the software, this would be the P
9   & L or revenue hit that we would have to
10  take on our P & L statement.
11      Q.   Uh-huh.  All right.  So
12  there was 21 million dollars worth of
13  returns in the first half of Fiscal Year
14  2001; is that what you're saying?
15      A.   21 million first half RMAs.
16          Yes, in the first 21
17  millions worth of RMAs versus 4.  Could
18  have been in the first half of the
19  previous fiscal year, doing a
20  year-over-year compare.
21      Q.   All right.  Then in the next
22  subpoint there you say, 40 million dollar
23  database shortfall in West.  What did you
24  mean by that?

102

1       A.   Probably looking at the West
2   forecast for the -- for the second half,
3   thinking that maybe he might be 40
4   million dollars under his number.
5       Q.   Because of the decline in
6   the dot com business?
7       A.   Yes.
8       Q.   And then the fourth subpoint
9   there is 35 dot com reps at risk.
10      A.   Well, they go hand in hand.
11      Q.   Okay.  That is, if the
12  market is not there or the potential
13  market is not there --
14      A.   The potential market is not
15  there.
16      Q.   -- there's no reason to have
17  the sales force to try and sell then to a
18  market that doesn't exist?
19      A.   Well, not a market that
20  doesn't exist, but it looks like we had
21  35 dot com reps in that space, and if the
22  business is -- if the business is
23  starting to shrink, there's 35 folks at
24  risk, hey, what do we -- you know, what

103

1   are we going to do with these folks?  We
2   need to give them more dot coms.  We need
3   to lower their numbers.  We need to do
4   something for them.
5       Q.   Then the action number there
6   is dot com only quota reduction?
7       A.   Yeah, so why don't we
8   potentially consider giving these folks a
9   quota reduction because that business is
10  -- is -- has been diminished a bit, let's
11  go ahead and give these guys a quota
12  reduction.
13      Q.   All right.  Then if you turn
14  to the final page of exhibit --
15          MR. De GHETALDI:  Okay.  We
16  need to change the tape
17          THE VIDEOGRAPHER:  That
18  concludes Videotape Number 1.  The
19  time is 3:51.
20          (Whereupon, there was a
21  discussion held off the record at
22  this time.)
23          (Whereupon, there was a
24  recess held at this time, 3:51 to

104

1          4:05 p.m.)

[Nugentv1_t2.MPG]

2                    THE VIDEOGRAPHER:  Stand by.

3          We are back on the record.  This

4          is the beginning of Tape Number 2.

5          The time is 4:06.

6     BY MR. De GHETALDI:

7          Q.   All right.  Mr. Nugent,

8     let's try again with the last page of

9     exhibit, what was it, 54, and --

10         A.   Wait a minute.  Okay, yes,

11    I'm there.  Okay.

12         Q.   And both the slides on this

13    page are titled, dot com quota reduction,

14    right?

15         A.   Yes.

16         Q.   Do these slides, uhm,

17    describe the quota reduction that you

18    were proposing to Mr. Roberts?

19         A.   Yes, I believe so.

20         Q.   All right.  On the bottom

21    slide, I just want to know whether or not

22    I'm reading this correctly, it looks like

23    you were talking about a reduction of

24    head count of 47?

                                        105

1          A.   Eligible -- no.  That's

2     eligible head count, those that were

3     eligible to receive the quota reduction.

4          Q.   I see.  And so 47 total were

5     eligible for the quota reduction; is that

6     right?

7          A.   Correct.

8          Q.   Okay.  And it looks like out

9     of the 47, 39 of them were from Mr.

10    Classick's division --

11         A.   Correct.

12         Q.   -- in the West?

13         A.   Correct.

14         Q.   And that's because that's

15    where most of the dot com companies were?

16         A.   Yes.  Yes.

17         Q.   All right.

18              MR. De GHETALDI:  I would

19         like this marked as next in order,

20         please.

21              Germain, I'm virtually

22         handing you a copy of the newly

23         marked Exhibit 265, which is a

24         copy of Exhibit B to the special

                                        106

1     litigation committee's interview

2     of Mr. Nugent, and it has pages

3     Bates numbered ORCL 0123717

4     through 0123495.  That doesn't --

5              MR. LABAT:  Okay.  Thank

6         you.

7              MR. De GHETALDI:  It's

8     actually a collection of about six

9     two-page reports, and that's why

10    it appears that they are not

11    really otherwise in sequential

12    order.

13              (Whereupon, Exhibit 265

14         marked for identification.)

15    BY MR. De GHETALDI:

16         Q.   Do you recognize the

17    documents that are compiled in Exhibit

18    265?

19         A.   Yes, I recognize the first

20    page.

21         Q.   All right.

22         A.   I recognize these.

23         Q.   Am I correct in believing

24    that what we have here is a group of

                                        107

1     two-page reports starting in December

2     18th, 2000, and running through February

3     18th, 2001?

4          A.   Yes.

5          Q.   February 19th, I'm sorry.

6          A.   Uh-huh.

7          Q.   Is this the type of report

8     that you regularly received in Fiscal

9     Year 2001?

10         A.   Yes.

11         Q.   And with what frequency?

12         A.   I believe every two weeks

13    the first two months of the quarter and

14    every week the last month of the quarter.

15         Q.   And who prepared these

16    reports?

17         A.   Uhm, somebody in finance.

18         Q.   Do you know who?

19         A.   Uhm, I can't remember who my

20    finance person was.

21         Q.   Now, drawing your attention

22    to the top of the first page of the

23    exhibit, there are several tables there

24    at the top of the page I'm marking --

                                        108

Nugent, John J.  5/19/2004  3:12:00 PM

| | |
|---|---|
| 1 | highlighting them to show you -- |
| 2 | A.  Yes.  Okay. |
| 3 | Q.  -- the ones that I am going |
| 4 | to ask you about. |
| 5 | The second box to the right |
| 6 | is titled, commit/worst, and the third |
| 7 | box over is titled, new |
| 8 | forecast/realistic, and the third box |
| 9 | over is titled best? |
| 10 | A.  Yes. |
| 11 | Q.  What do those boxes, the |
| 12 | data in those boxes, represent? |
| 13 | A.  As part of our forecasting |
| 14 | methodology, we had to give our commit, |
| 15 | which was in reference to our worst, what |
| 16 | was the worst you could do, what was the |
| 17 | commit that you were going to do for the |
| 18 | company. |
| 19 | And then realistic is, I see |
| 20 | your commit, what realistically do you |
| 21 | think you might be able to get to over |
| 22 | and above what you're committing. |
| 23 | And then best is, if |
| 24 | everything was to line up for you, what |

109

| | |
|---|---|
| 1 | do you think -- what's the absolute best |
| 2 | case you could do? |
| 3 | Q.  And -- and so these figures |
| 4 | in those boxes in these reports contained |
| 5 | in Exhibit 265 represent your judgment of |
| 6 | where the numbers should be within those |
| 7 | three categories? |
| 8 | A.  Yes. |
| 9 | Q.  Okay.  And I'm -- I'm saying |
| 10 | your judgment, and it's not anybody |
| 11 | else's judgment, right? |
| 12 | A.  That's correct. |
| 13 | Q.  Okay.  Now, if you can turn |
| 14 | to the second page -- I'm sorry, let's |
| 15 | stay -- let's stay with the first page. |
| 16 | I got a couple more questions there. |
| 17 | In the middle of the page, |
| 18 | there's a long box titled, GB Field Deals |
| 19 | Summary.  What does that box signify? |
| 20 | A.  It looks like a series of |
| 21 | current forecast statistics, number of |
| 22 | deals, just as it's said here, various |
| 23 | headings and various statistical |
| 24 | categories and the specified amounts per |

110

| | |
|---|---|
| 1 | category. |
| 2 | Q.  Okay.  Uhm, then on the next |
| 3 | page, the second page of Exhibit 265, in |
| 4 | the upper left-hand corner there is a box |
| 5 | titled, closed.  Do you see that? |
| 6 | A.  Yes. |
| 7 | Q.  Uhm, what do the -- do the |
| 8 | figures in that box represent? |
| 9 | A.  I'm assuming business closed |
| 10 | to date, quarter to date. |
| 11 | Q.  All right.  So if I am |
| 12 | reading this correctly, uhm, as of |
| 13 | December 18th, 2000, the total deals |
| 14 | closed would have been 1.977 million |
| 15 | dollars? |
| 16 | A.  Correct.  Correct. |
| 17 | Q.  It looks like these numbers |
| 18 | are expressed in thousands, right? |
| 19 | A.  Yes. |
| 20 | Q.  Okay.  All right.  And then |
| 21 | within that same box titled closed on the |
| 22 | second page of Exhibit 265, there are |
| 23 | three columns, one is entitled field and |
| 24 | one is entitled ISD. |

111

| | |
|---|---|
| 1 | Can you tell me what the -- |
| 2 | the difference between those two |
| 3 | categories is? |
| 4 | A.  Yes.  The -- difference |
| 5 | in the field were actually field reps. |
| 6 | ISD is the international sales division |
| 7 | or the telesales rep, the inside |
| 8 | telesales organization, previously |
| 9 | described as DMD.  They changed their |
| 10 | name. |
| 11 | Q.  Okay.  Then it looks like |
| 12 | there are similar boxes for commit/worst, |
| 13 | forecast/realistic, and best, but these |
| 14 | are titled or -- AVPs commit/worst and |
| 15 | AVP forecast/realistic and AVP best. |
| 16 | A.  Uh-huh. |
| 17 | Q.  Were -- were those the -- |
| 18 | the judgments of the area vice-presidents |
| 19 | as to where the numbers should be within |
| 20 | those categories or forecasts? |
| 21 | A.  Yes, and I -- and I might -- |
| 22 | I might either have subtracted or plussed |
| 23 | (ph) up. |
| 24 | Q.  To get to yours that are on |

112

Nugent, John J.  5/19/2004  3:12:00 PM

1    the first page or -- or do you --
2        A.  No, just from my
3    understanding of their business, where I
4    thought -- they would give me a number
5    and my understanding of their business, I
6    would plus that up or minus it.
7        Q.  I see.  Uhm, would that be
8    done here on the second page of this
9    report or would it be done on the first
10   page and these numbers I'm not sure if
11   it's coincidence or not but they look
12   like they are exactly the same.
13       A.  Yeah, it's -- it looks like
14   you have got the AVP numbers that I would
15   get, they would give me their numbers,
16   and then there's a potential that I might
17   have plussed up, minused down, come up
18   with a total, and then carried that
19   forward.
20       Q.  Okay.  Would that show up in
21   the management/headquarters row?
22       A.  Oh, that's interesting.
23   Management/headquarters?  I see.
24   Management headquarters.

113

1        So this could have been --
2    oh, no.  No.  Management headquarters,
3    that's two lines.  Management
4    headquarters and AVP.
5        It could have been I just
6    took their numbers and then put my own
7    judgment and then threw it into
8    management headquarters, so I took their
9    numbers that they gave me and then did a
10   management HQ judgment on it.
11       Q.  Okay.  The -- if you turn to
12   the third and fourth pages and compare
13   the SVP forecast row at the top with the
14   AVP forecast row at the top, the third
15   and fourth pages, it looks like now the
16   numbers are slightly different in the
17   best-case scenario.  I'm just drawing
18   your attention to that fact to try and
19   see if that refreshes your recollection
20   as to how these numbers were derived.
21       A.  Because of the management
22   headquarter column, I believe that they
23   were derived by taking the best number
24   that they gave me and then I plussed it

114

1    or minused it down and put that figure in
2    the management HQ column.
3        Q.  Uh-huh.  Okay.
4        Next I'm going to hand you a
5    document that was marked as Exhibit 49.
6        MR. GOLDSTEIN:  Thank you.
7        MR. De GHETALDI:  Did you
8    hear me, Germain?
9        MR. LABAT:  I did.  49?
10       MR. De GHETALDI:  Yep.
11   BY MR. De GHETALDI:
12       Q.  Have you ever seen Exhibit
13   49 before?
14       A.  No.
15       MR. De GHETALDI:  I would
16   like this one marked as -- four of
17   them at once, actually.  That will
18   save some time.
19       (Whereupon, Exhibits 266
20   through 269 were marked for
21   identification.)
22       MR. De GHETALDI:  Paul, this
23   is 266.
24       Germain, I will tell you

115

1    what I am doing here after I get
2    all done.  Okay?
3        MR. LABAT:  Okay.
4        MR. De GHETALDI:  Generally,
5    these are the first few pages from
6    four, uhm, General Business
7    performance summaries.
8        267, Paul.
9        Okay, Germain, what I have
10   done now is marked four exhibits
11   starting with 266, and it has
12   Bates numbers CA-ORCL 014515
13   through 518.
14       MR. LABAT:  Okay.
15       MR. De GHETALDI:  Exhibit
16   267 is CA-ORCL 035479 through 482.
17       The third one is Exhibit 268
18   and that has Bates numbers CA-ORCL
19   023776 through 778.
20       And then the fourth one is
21   Exhibit 269 with Bates numbers
22   CA-ORCL 035404 through 407.
23       MR. LABAT:  Great.  Thanks.
24       MR. De GHETALDI:  Okay.

116

Nugent, John J.  5/19/2004  3:12:00 PM

1    BY MR. De GHETALDI:
2        Q.    Now, Mr. Nugent, these are
3    just the first pages of -- of a report
4    that's considerably longer.  Uhm, do you
5    recall receiving this report as
6    exemplified by these four exhibits in
7    Fiscal Year 2001?
8        A.    Yes.
9        Q.    Okay.  Do you know who was
10   on the distribution list for this report?
11       A.    No.  I'm sure myself,
12   potentially my regional managers, my
13   regional vice-presidents, but other than
14   that, I can't say.  Probably George.
15       Q.    All right.  Now, if you
16   would turn to the second page of Exhibit
17   266, please, the third italicized heading
18   says, applications highlights.  Do you
19   see that?  The first bullet point there
20   says, apps and apps drag accounted for 28
21   percent in Q3.  What is apps drag?
22       A.    It is technology, licenses,
23   that are sold with the applications,
24   hence, dragged with the application.

117

1        Q.    Where a transaction included
2    both applications and technology, how is
3    that categorized in -- in -- in General
4    Business?  Was it categorized as -- as an
5    applications deal or were there
6    components separated?
7        A.    No.
8             MR. GOLDSTEIN:  Before you
9        answer, I'm going to object to
10       form.
11            THE WITNESS:  The components
12       were segmented.  We had
13       applications and technology.
14            MR. De GHETALDI:  Okay.
15   BY MR. De GHETALDI:
16       Q.    In your experience in
17   General Business, which quarter of
18   Oracle's fiscal year generally
19   contributed the lowest percentage of the
20   total year's revenue?
21            MR. GOLDSTEIN:  Objection to
22       form.
23            THE WITNESS:  I assume Q1,
24       because it was the smallest

118

1    percentage of our overall quota.
2             MR. De GHETALDI:  Okay.
3    BY MR. De GHETALDI:
4        Q.    Do you know which
5    contributed the largest percentage?
6             MR. GOLDSTEIN:  Same
7        objection.
8             THE WITNESS:  Q4.
9    BY MR. De GHETALDI:
10       Q.    In -- in your experience,
11   did Q2 and Q3 tend to contribute similar
12   amounts to the total year's revenue?
13            MR. GOLDSTEIN:  Objection to
14       form.
15            MR. De GHETALDI:  For
16       license business?
17            THE WITNESS:  Yes.
18            MR. De GHETALDI:  Okay.
19   BY MR. De GHETALDI:
20       Q.    Now, if you -- you keep open
21   Exhibit 266 to that second page, you
22   already have it, you're already there.
23       A.    Oh.
24       Q.    Don't -- just the second

119

1    page, not the third, and if you can turn
2    to the second page of Exhibit 269, I'd
3    like to compare the reported revenue for
4    dot com for Q3FY00 as reflected in
5    Exhibit 266 with reported revenue for dot
6    com for Q2FY01 as reported in Exhibit
7    269.  Do you see where that is, the
8    second bullet point under other
9    highlights?
10       A.    Yes.
11       Q.    Okay.  It looks like, and
12   tell me if I am reading this correctly,
13   the dot com revenue for Q3FY00 was 91.2
14   million dollars and for Q2FY01 it was 52
15   million dollars; am I reading that
16   correctly?
17            MR. GOLDSTEIN:  Objection to
18       form.
19            THE WITNESS:  Yes.
20   BY MR. De GHETALDI:
21       Q.    The, uhm, -- in Q3FY00, the
22   second page of Exhibit 266 says that dot
23   com revenue for Q3FY00 was 91.2 million
24   dollars or which equates to 79 percent of

120

1   technology revenue, and 111.4 million
2   dollars, which equates to 75 percent of
3   total revenue respectively.
4         Is the 20 million dollar
5   difference there, uhm, applications?
6         MR. GOLDSTEIN:  Objection
7   to form.
8         THE WITNESS:  Well, it
9   appears that the 111 was the total
10   technology of which 91 million was
11   dot com, hence, the 79 percent,
12   and, therefore, the 70 percent,
13   the 111, I believe, might be
14   referring to, again, the total
15   technology which was 75 percent of
16   a total revenue, which I would
17   guess would be the applications
18   piece.
19         MR. De GHETALDI:  I just
20   want to make sure I understood the
21   answer.
22         THE WITNESS:  So in other
23   words, 75 percent of the total
24   revenue was technology, leaving 25

121

1   percent for applications for the
2   quarter.
3         MR. De GHETALDI:  Okay.
4         THE WITNESS:  That sounds
5   about right.
6   BY MR. De GHETALDI:
7      Q.   Does your interpretation of
8   that sentence also apply if you look at
9   the similar sentence on the second page
10   of Exhibit 269?  I'm just not sure that
11   the -- the math works and that's why I am
12   asking.
13         MR. GOLDSTEIN:  Objection
14   to form.  I don't think you have
15   laid any foundation that -- to
16   indicate that he's doing anything
17   other than speculating about the
18   meaning of this memo.
19         MR. De GHETALDI:  Can you
20   still believe that -- that the way
21   you were reading the second page
22   of Q -- I'm sorry, of Exhibit 266,
23   uhm, also applies to the second
24   page of Exhibit 269?

122

1         THE WITNESS:  Again, I'm --
2   I can't interpret it for you.  I
3   didn't write the memo.
4         MR. De GHETALDI:  Right.
5         THE WITNESS:  Uhm, I'm
6   assuming that 51 percent
7   technology represented, for that
8   particular quarter, 51 percent of
9   the total revenue and, therefore,
10   49 percent was applications.
11         MR. De GHETALDI:  All right.
12   This will be Exhibit 270
13   and, Germain, this is a copy of
14   the SLC interview without the
15   attached exhibits.
16         MR. LABAT:  Is this 270?
17         MR. De GHETALDI:  Yes.
18         (Whereupon, Exhibit 270
19   marked for identification.)
20   BY MR. De GHETALDI:
21      Q.   Mr. Nugent, uhm, when --
22   when was the first time you saw Exhibit
23   270?
24      A.   I saw this when I received

123

1   my packet of information from the law
2   firm.
3      Q.   About how long ago?
4      A.   Uhm, I'm not sure when they
5   sent it.  Maybe -- maybe three weeks ago,
6   four weeks ago.
7      Q.   Okay.  Between the time you
8   received it and today, did you have a
9   chance to read the entire interview
10   summary?
11      A.   I didn't read it at the time
12   I received this morning.  I perused
13   it.
14      Q.   Okay.  And in your perusal,
15   did you notice anything that appeared to
16   be inaccurate?
17      A.   No.
18      Q.   All right.  If you'll turn
19   to Page 3, there's a long paragraph in
20   the middle under the heading impact of
21   emerging market sector on GB generally.
22   Do you see that?
23      A.   Yes.
24      Q.   Okay.  Towards the end of

124

Nugent, John J.  5/19/2004  3:12:00 PM

1  that paragraph, it reads, Nugent
2  indicated that at the height of the dot
3  com market approximately 70 percent of
4  General Business' business came from the
5  dot com or emerging market sector while
6  the remaining 30 percent was from
7  traditional bricks and mortar businesses.
8      Nugent stated that the dot
9  com market continued to grow through
10  2000.  Uhm, is that through the end of
11  2000?
12      MR. GOLDSTEIN:  Objection to
13  form.
14      THE WITNESS:  You can look
15      at the -- look at the numbers in
16      our fiscal 2000, the answer is
17      yes, we had a fabulous 2000.
18  BY MR. DE GHETALDI:
19      Q.  Okay.  So you're talking --
20  is it your recollection that when you
21  were speaking to the Special Litigation
22  Committee, you were speaking about --
23      A.  Fiscal years.
24      Q.  -- Fiscal Year 2000?

125

1      A.  Yes.
2      Q.  Not Calendar Year 2000?
3      A.  Correct.
4      Q.  Okay.  The next paragraph on
5  Page 3 of Exhibit 270 reads, Nugent noted
6  that GB not only sold to pure dot com
7  companies, but to a variety of companies
8  in what he referred to as emerging market
9  sector, which included dot coms, B to Bs,
10  and small telecommunications companies.
11      Nugent also stated that GB
12  West was the biggest component of GB's
13  business.  He added, quote, as GB West
14  went, so went GB, unquote.
15      He attributed the Q3 FY2001
16  miss not only to a dot com fall-off, but
17  also to a decline in the entire emerging
18  market sector.
19      Is that an accurate
20  statement?
21      A.  Yes.
22      Q.  Okay.  Uhm, you had noticed
23  the -- decline in the dot com
24  companies by January 9th, 2001?

126

1      A.  Uh-huh.
2      MR. GOLDSTEIN:  Objection to
3  form.  That's a question?
4      MR. De GHETALDI:  Is that
5  correct?
6      THE WITNESS:  Yes.
7      MR. De GHETALDI:  Okay.
8  BY MR. De GHETALDI:
9      Q.  Do you know when, uhm, you
10  noticed a decline for small
11  telecommunications companies?
12      MR. GOLDSTEIN:  Objection to
13  form.
14      THE WITNESS:  Uhm, I mean,
15      business to business would be in
16      the same category as the dot coms,
17      the small telecommunications
18      companies.  No, I don't.
19      MR. De GHETALDI:  Okay.
20  BY MR. De GHETALDI:
21      Q.  If you can turn to Page 6,
22  please.  The first full paragraph reads,
23  Nugent then stated that typically as GB's
24  likely performance becomes clearer during

127

1  the third month of a quarter, GB sales
2  representatives and managers typically
3  ratchet up their forecast.  He explained
4  that in applying his management judgment,
5  he would start with the 85 percent figure
6  in mind and then perform a variety of
7  statistical trending analyses and look at
8  historical conversion rates to ratchet up
9  his number.
10      Uhm, well, first of all, is
11  -- is that an accurate summary of what
12  you told the Special Litigation
13  Committee?
14      A.  Yes.
15      Q.  Okay.  And is that an
16  accurate statement?
17      A.  Yes.
18      Q.  All right.  What -- tell me
19  what the 85 percent figure represents.
20      A.  The 85 percent figure
21  represents my forecast, which I would
22  open up the start of each quarter 85
23  percent of my budget.
24      Q.  Okay.  Then the paragraph --

128

Nugent, John J.  5/19/2004  3:12:00 PM

1   the phrase in the paragraph, where it
2   says, you would then perform a variety of
3   statistical trending analyses --
4       A.  Yes.
5       Q.  -- can you tell me what
6   sort?
7       A.  Uhm, I would look at
8   conversion rates of prior quarters, of
9   year-over-year quarter, conversion rates.
10  Uhm, I would look at the ISD, or the
11  telesales business, was a pretty
12  significant piece of my business, and I
13  would also look at -- they did not report
14  to me, but we would look at their typical
15  conversion rates to figure out how they
16  might end a quarter.
17      Q.  All right.  I want to make
18  sure I understand your -- your use of the
19  phrase conversion rates because, believe
20  me, there have been several definitions.
21      Uhm, can you tell me what
22  you mean by historical conversion rate?
23      A.  Sure.  The actual closed
24  business to pipeline.

129

1       Q.  Okay.  Pipeline at what
2   point in time?
3       A.  Typically, the third week of
4   the first month of a quarter.
5       Q.  Did you -- did you compare
6   the actual closed business to the
7   pipeline at any other point during a
8   quarter to get a different conversion
9   rate?
10      A.  No.
11      Q.  Okay.  Uhm, Footnote 4, on
12  the same page, 6, says, Mr. Kreissman
13  during Nugent's supplemental interview
14  showed Nugent a presentation that Nugent
15  prepared for a January 9th, 2001,
16  operations review that he gave to George
17  Roberts, the executive in charge of NAS.
18      Do you see that?
19      A.  Yes.
20      Q.  Now, if we can go back,
21  please, to Exhibit 54, uhm, I want to try
22  and find that page, uhm, 13, which I
23  believe has the Bates number 120247, the
24  footnote continues on Page 13 of the

130

1   presentation, I skipped a sentence --
2   uhm, on Page 13 of the presentation,
3   Nugent provided Roberts with his, quote,
4   outlook, unquote, for Q3 of Fiscal Year
5   2001 as opposed to a more formal forecast
6   which reflected 85 percent of Nugent's
7   expectations for the quarter.  The
8   outlook provided Nugent's real
9   expectation for the quarter.
10      Nugent stated that he
11  provided his best estimate of GB's real
12  revenue number to Roberts because while
13  Roberts knew that he always underreported
14  his forecasts, he would have looked
15  foolish if he had not provided his best
16  estimate for the purposes of the
17  operations review.
18      The estimate Nugent provided
19  to Roberts on January 9th, 2001 was 208
20  million dollars, 40 million dollars
21  higher than GB's then current forecast of
22  168 million dollars and 74 million
23  dollars higher than GB's ultimate revenue
24  for the quarter of 134 million dollars.

131

1       Do you see that?
2       A.  Yes.
3       Q.  Okay.  Here's where I am
4   confused and, hopefully, you can help.
5       If we go back to Exhibit 265
6   and turn to -- turn to page -- well, it's
7   the third page, the one with the Bates
8   number 123674.  Do you see that?
9       A.  Yes.
10      MR. WEISER:  Excuse me, did
11  you say Exhibit 265?
12      MR. De GHETALDI:  Yes.
13      MR. WEISER:  What was the
14  Bates number?
15      MR. De GHETALDI:  It's
16  123674.
17      MR. WEISER:  674.
18      MR. De GHETALDI:  It's the
19  third page.
20      MR. WEISER:  I think ours
21  weren't numbered sequentially.
22      MR. De GHETALDI:  Yeah, they
23  are not.
24  BY MR. De GHETALDI:

132

1    Q.   Now we have got three pages

2  in front of us, unfortunately.

3    A.   That's okay.

4    Q.   The -- in Exhibit 265 it

5  looks like as of January 8th, 2001, your

6  forecast/realistic number was 168.8

7  million dollars, right?

8    A.   Yes.

9    Q.   And your best case, which I

10  thought you said was the -- what would

11  happen if everything went completely

12  right --

13    A.   Uh-huh.

14    Q.   -- was 203.7 million

15  dollars, right?

16    A.   Uh-huh.

17    Q.   You have to --

18    A.   Yeah, a hundred percent of

19  budget.

20    Q.   So --

21    A.   And --

22    MR. GOLDSTEIN:  Wait.  He

23  didn't ask you a question yet.

24    THE WITNESS:  Okay.

133

1    MR. De GHETALDI:  Am I

2  reading it correctly so far?

3    THE WITNESS:  Yes.  Yes.

4    MR. De GHETALDI:  All right.

5  BY MR. De GHETALDI:

6    Q.   My question is, which one of

7  those two numbers was your best estimate

8  of -- of what General Business should

9  expect to -- to achieve?

10    MR. GOLDSTEIN:  Objection to

11  form.

12    THE WITNESS:  The forecast

13  used the Classick 85 percent I

14  talked about earlier, opening up

15  with that forecast, and to George,

16  I said, I believe I will be

17  able to do my budget.  I will be

18  able to do my budget at a hundred

19  percent, hence, the 203.

20  BY MR. De GHETALDI:

21    Q.   But everything had to go

22  right in order to achieve that?

23    A.   Not everything had to go

24  right.  I would factor that down.  That

134

1  had a lot of the deals that the --

2  that -- many deals that the -- the VPs

3  had not forecasted at this point, but I

4  knew that they were good deals.

5    Q.   Okay.  If you could turn to

6  Page 7, please.

7    By the way, where did the

8  operations review, the January 9th, 2001,

9  operations review, take place?

10    A.   In Boston.

11    Q.   At the Ritz-Carlton?

12    A.   Yeah.

13    Q.   Okay.  The last paragraph on

14  Page 7, uhm, says, Nugent discussed a

15  meeting with Roberts that Nugent believes

16  took place in late January 2001.  Nugent

17  was not certain of the date of the

18  meeting, but recalled that it took place

19  after he returned to work from knee

20  surgery and, most likely, at the

21  Ritz-Carlton in Boston.

22    Are you talking about the

23  January 9th, 2001, operations review?

24    A.   Uhm, could have been, yes.

135

1    Q.   Well, was there -- was there

2  another meeting that you had with Mr.

3  Roberts in late January at the

4  Ritz-Carlton?

5    A.   At the Ritz-Carlton, Boston,

6  could have been.

7    Q.   So the only possibility

8  would have been --

9    A.   Yes.

10    Q.   So the only possibility

11  would be the January 9th, 2001,

12  operations review?

13    A.   Yes.  Yes.

14    MR. GOLDSTEIN:  It's good

15  that you can do that.

16  BY MR. De GHETALDI:

17    Q.   The interview summary

18  continues, at the meeting, Nugent

19  informed Roberts that he had a vague

20  sense that business was slowing down

21  slightly and that Nugent was hedging his

22  bets for the quarter.

23    Do you remember telling Mr.

24  Roberts that you were hedging your bets

136

Nugent, John J.  5/19/2004  3:12:00 PM

1   for the quarter at the January 9th, 2001,
2   operations review?
3       A.   No.  Per this, a vague
4   recollection of that, but I don't
5   remember that.  I see how it's written
6   here.
7       Q.   Yeah, it's -- I'm just
8   trying to figure out what got lost in
9   translation, because this is a summary of
10  what you told --
11      A.   I can only speculate.
12      Q.   Yeah.  Yeah.  I don't want
13  you to do that.
14      A.   Okay.
15      Q.   Uhm.  But I did want to know
16  whether you recalled telling Mr. Roberts
17  at the operations review that you were
18  hedging your bets for the quarter?
19      A.   No.
20      Q.   All right.  Uhm, the
21  interview summary then continues and
22  says, Nugent speculated that he might
23  have told Roberts that General Business'
24  14 -- I'm sorry, 172 million dollar

137

1   formal forecast based on 85 percent of
2   Nugent's best estimate of his performance
3   might be closer to General Business'
4   actual results than the 208 million
5   dollars Nugent provided to Roberts as his
6   outlook at the January 9th operations
7   review meeting.
8       Uhm, is this summary
9   incorrect in leading one to believe that
10  there were two meetings with Mr. Roberts
11  at the -- at the Ritz-Carlton in Boston?
12  Do you see my confusion?
13      A.   No, I -- I believe there's
14  only one meeting and, therefore, this is
15  referring to that same meeting.
16      Q.   Okay.  Do you recall telling
17  Mr. Roberts at the January 9th operations
18  review meeting that the 172 million
19  dollar forecast might be closer to
20  General Business' actual results than the
21  208 million dollar outlook?
22      MR. GOLDSTEIN:  Objection to
23  form.
24      THE WITNESS:  No.

138

1   BY MR. De GHETALDI:
2       Q.   If you can, turn, please, to
3   Page 14, and at the top of the page, the
4   first full sentence reads, however, he
5   stated that even with this happening,
6   Oracle's dot com sales remain strong
7   through Q2 of Fiscal Year 2001.
8       Do you recall saying that to
9   the Special Litigation Committee?
10      MR. GOLDSTEIN:  Objection to
11  form.
12      THE WITNESS:  I don't know
13  what context it is.
14      MR. De GHETALDI:  Yeah, I --
15  I didn't mean to take it out of
16  context.  The --
17      THE WITNESS:  Oh, yes, I
18  could have -- I mean, I don't
19  explicitly remember, but that
20  would -- that would be consistent
21  with what I was thinking about,
22  you know, we had a very good Q1,
23  very good Q2, and I thought for
24  sure we were going to have a very

139

1   good Q3.
2   BY MR. De GHETALDI:
3       Q.   Well, hadn't you seen the
4   decline in dot com sales as early as Q2
5   of Fiscal Year 2001?
6       MR. GOLDSTEIN:  Objection to
7   form.
8       THE WITNESS:  Nothing that I
9   had seen gave me cause to reduce
10  my forecast.
11  BY MR. De GHETALDI:
12      Q.   I think you might be
13  answering a -- a question that's
14  different than what I asked.
15      A.   Okay.
16      Q.   Uhm, my question was, had
17  you seen a decline in dot com sales as
18  early as Q2 of Fiscal Year 2001?
19      MR. GOLDSTEIN:  Objection to
20  form.
21      THE WITNESS:  Q1?
22      MR. De GHETALDI:  2.
23      THE WITNESS:  Q2?  I don't
24  believe so.  I believe we had a

140

Nugent, John J.  5/19/2004  3:12:00 PM

1    great quarter.
2    BY MR. De GHETALDI:
3        Q.   You recall that, uhm, and we
4    can go back to the -- to the exhibit, but
5    you recall that in Q2FY01 the dot com
6    sales were 52 million dollars?
7        A.   Okay.
8        Q.   Compared to 91 million
9    dollars in Q3 of 2000?
10       A.   Yes.
11       Q.   Is that indicative of a
12   great quarter in the dot com sector?
13       A.   You're comparing --
14           MR. GOLDSTEIN:  Objection
15   to form.  Excuse me.
16           THE WITNESS:  I can't answer
17   that, the context.  You are
18   comparing an apple and an orange,
19   one particular quarter in one
20   fiscal year and a different
21   quarter in another fiscal year.
22           MR. De GHETALDI:
23   Unfortunately, I don't have the
24   earlier periods, so I'm not trying

141

1    to --
2            THE WITNESS:  No problem.
3    No problem.
4    BY MR. De GHETALDI:
5        Q.   If you'll look at then the
6    last sentence on Page 14 of Exhibit 270
7    -- at the last sentence of the first full
8    paragraph on Page 14, where it says,
9    given that suite 11i had only been
10   released six months prior to Q3 Fiscal
11   Year 2001, together with the long
12   implementation period, Nugent believed
13   that none of General Business' suite 11i
14   customers were fully up and running
15   during Q3 Fiscal Year 2001.
16           Is that an accurate
17   statement?
18       A.   That would be an accurate
19   statement.  If the product had just come
20   out six months earlier, it takes longer
21   than six months to put up the product, to
22   go live on the product.
23       Q.   Okay.  If you could, to turn to
24   Page 19, please, and the first full

142

1    paragraph there, and it says, Nugent
2    recalled that he prepared a one-page
3    document after Q3 Fiscal Year 2001,
4    illustrating the effect of the dot com
5    fall-off on General Business.  A slide
6    included a bar graph and may have been
7    titled the Dot Com bust.  The Special
8    Litigation Committee has requested a copy
9    of this slide.
10           Do you recall whether or not
11   you gave a copy of that slide to the
12   Special Litigation Committee?
13       A.   I don't recall that.
14       Q.   Okay.  If you could turn to
15   Page 20, please, and the second paragraph
16   under Oracle or internal Oracle reports,
17   do you see that?
18       A.   Yes.
19       Q.   It says, Nugent reviewed the
20   business on-line pipe reports for
21   November and December of 2000.  He
22   indicated that he received these reports,
23   but did not use them.  Nugent stated that
24   for the purposes of managing his business

143

1    he uses only the GB forecast.
2            Now, your -- your interview
3    summary had a number of exhibits attached
4    to it, but none titled or indicated
5    within the text of the interview summary
6    as being business on-line pipe reports.
7            Do you know what -- what
8    sort of -- or did you receive business
9    on-line pipe reports?
10       A.   Not that I am aware of.  I
11   don't know what a business on-line pipe
12   report is.
13       Q.   Okay.  All right.
14           MR. De GHETALDI:  Let's go
15   off the record and take a couple
16   minutes with Rob and see if
17   there's anything else I want
18   to ask.
19           THE WITNESS:  Okay.
20           THE VIDEOGRAPHER:  Off tape,
21   5:02.
22           (Whereupon, there was a
23   discussion held off the record at
24   this time.)

144

Nugent, John J.  5/19/2004  3:12:00 PM

1    (Whereupon, there was a
2    recess held at this time, 5:02 to
3    5:08 p.m.)
4        THE VIDEOGRAPHER:  Stand by.
5    Back on the record, 5:10.
6        MR. De GHETALDI:  That's all
7    the questions that I have.
8        THE WITNESS:  Okay.
9        MR. GOLDSTEIN:  We have no
10   questions.
11       MR. De GHETALDI:  Germain,
12   you have no questions, right?
13       MR. LABAT:  No questions.
14       THE VIDEOGRAPHER:  That
15   concludes today's videotape
16   deposition.  The time is 5:10.
17       THE REPORTER:  Mr. Labat,
18   would you like a copy of the
19   transcript?
20       MR. LABAT:  Yes, please,
21   minuscript and also a rough disk
22   tonight would be great.
23       THE REPORTER:  I will E-mail
24   everyone a rough within a few

145

1    hours.
2        (Witness excused.)
3        (Deposition concluded at
4    approximately 5:11 p.m.)

146

1            CERTIFICATE
2
3
4
5        I HEREBY CERTIFY that the
     witness was duly sworn by me and that the
6    deposition is a true record of the
     testimony given by the witness.
7
         It was requested before
8    completion of the deposition that the
     witness, JOHN J. NUGENT, have the
9    opportunity to read and sign the
     deposition transcript.
10
11   _____
12   Maria N. Damiani,
     Registered Merit Reporter,
13   Certified Shorthand Reporter
     Dated:  May 29, 2004
14
15
16
17
18       (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24

147

1        INSTRUCTIONS TO WITNESS
2
3        Please read your deposition
4    over carefully and make any necessary
5    corrections.  You should state the reason
6    in the appropriate space on the errata
7    sheet for any corrections that are made.
8        After doing so, please sign
9    the errata sheet and date it.
10       You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14       It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24

148

Oracle Related Cases

Page  145 - 148

Nugent, John J.  5/19/2004  3:12:00 PM

```
 1        - - - - - -
          E R R A T A
 2        - - - - - -

 3     PAGE  LINE  CHANGE
 4     ____  ____  _____
 5     ____  ____  _____
 6     ____  ____  _____
 7     ____  ____  _____
 8     ____  ____  _____
 9     ____  ____  _____
10     ____  ____  _____
11     ____  ____  _____
12     ____  ____  _____
13     ____  ____  _____
14     ____  ____  _____
15     ____  ____  _____
16     ____  ____  _____
17     ____  ____  _____
18     ____  ____  _____
19     ____  ____  _____
20     ____  ____  _____
21     ____  ____  _____
22     ____  ____  _____
23     ____  ____  _____
24     ____  ____  _____
```

149

```
 1            ACKNOWLEDGMENT OF DEPONENT
 2
 3          I,_____, do
 4     hereby certify that I have read the
 5     foregoing pages,  1 - 145, and that the
 6     same is a correct transcription of the
 7     answers given by me to the questions
 8     therein propounded, except for the
 9     corrections or changes in form or
10     substance, if any, noted in the attached
11     Errata Sheet.
12
13
14     _____
15     WITNESS NAME            DATE
16
17
18
19     Subscribed and sworn
       to before me this
20     _____ day of _____, 20____.
21     My commission expires:_____
22
       _____
23     Notary Public
24
```

150

```
 1            LAWYER'S NOTES
 2     PAGE  LINE
 3     ____  ____  _____
 4     ____  ____  _____
 5     ____  ____  _____
 6     ____  ____  _____
 7     ____  ____  _____
 8     ____  ____  _____
 9     ____  ____  _____
10     ____  ____  _____
11     ____  ____  _____
12     ____  ____  _____
13     ____  ____  _____
14     ____  ____  _____
15     ____  ____  _____
16     ____  ____  _____
17     ____  ____  _____
18     ____  ____  _____
19     ____  ____  _____
20     ____  ____  _____
21     ____  ____  _____
22     ____  ____  _____
23     ____  ____  _____
24     ____  ____  _____
```

151

# EXHIBIT F

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

```
 1  00001:01  IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2      02       IN AND FOR THE COUNTY OF SAN MATEO
 3      03              ---o0o---
 4      04  COORDINATION PROCEEDING
 5      05
 6      06
 7      07          PROCEEDING NO. 4180
 8      08  THIS DOCUMENT RELATES TO:
 9      09  ALL ACTIONS
10      10
11      11
12      12     DEPOSITION OF LAWRENCE J. ELLISON
13      13       Thursday, February 26, 2004
14      14       Volume I (Pages 1 - 221)
15      15
16      16
17      17
18      18
19      19  REPORTED BY:
20      20  HOLLY MOOSE, RDR-CRR-CRP
21      21
22      22
23      23       Certified Shorthand Reporters
24      24       San Francisco, California  94102
25      25
                                                    1
```

```
 1  00002:01  IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
 2      02        IN AND FOR NEW CASTLE COUNTY
 3      03
 4      04  IN RE ORACLE CORPORATION
 5      05  DERIVATIVE LITIGATION
 6      06  _____/
 7      07
 8      08
 9      09
10      10
11      11
12      12
13      13
14      14
15      15
16      16
17      17
18      18
19      19
20      20
21      21
22      22
23      23
24      24
25      25
                                                    2
```

```
 1  00003:01       A P P E A R A N C E S
 2      02
 3      03  FOR CALIFORNIA PLAINTIFFS:
 4      04    BERMAN, DEVALERIO, PEASE, TABACCO, BURT & PUCILLO
 5      05      NICOLE LAVALLEE, ESQ.
 6      06    425 California Street, Suite 2025
 7      07    (415)433-3200
 8      08  AND
 9      09    COREY, LUZAICH, PLISKA, DE GHETALDI & NASTARI
10      10      JERRY E. NASTARI, ESQ.
11      11    Millbrae, CA  94030
12      12
13      13  FOR DELAWARE PLAINTIFFS:
14      14    SCHIFFRIN & BARROWAY
15      15    Three Bala Plaza East, Suite 400
16      16    (610)667-7706
17      17
18      18
19      19  BY:  JORDAN ETH, ESQ.
20      20    San Francisco, CA  94105
21      21
22      22
23      23  BY:  LAUREN SEGAL, MANAGING COUNSEL
24      24    Redwood Shores, CA  94065
25      25
                                                    3
```

```
 1  00004:01       A P P E A R A N C E S (continued)
 2      02
 3      03  FOR INDIVIDUAL DEFENDANTS ELLISON AND HENLEY:
 4      04    MAYER, BROWN, ROWE & MAW
 5      05      ALAN N. SALPETER, ESQ.
 6      06    Chicago, IL 60603
 7      07
 8      08
 9      09      (415)624-1300
10      10
11      11  TAKEN AT:
12      12    BERMAN, DEVALERIO, PEASE, TABACCO, BURT & PUCILLO
13      13    San Francisco, CA  94104
14      14
15      15
16      16
17      17            ---o0o---
18      18
19      19
20      20
21      21
22      22
23      23
24      24
25      25
                                                    4
```

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

1  00005:01           I N D E X

2  02

3  03 DEPOSITION OF LAWRENCE J. ELLISON, VOLUME I

4  04

5  05 EXAMINATION BY:                    PAGE

6  06   MR. DE GHETALDI                    9

7  07

8  08 DC EXHIBITS

9  09 100 Oracle Corporation Options Summary,

10  10

11  11

12  12      Committee Of The Board Of Directors

13  13      CD-I-1398-404, 7 pages              54

14  14 103 E-mails, CA-ORCL 023219-25, 7 pages      210

15  15

16  16

17  17           ---o0o---

18  18

19  19

20  20

21  21

22  22

23  23

24  24

25  25

5

1  00006:01      BE IT REMEMBERED that, pursuant to Notice and

2  02 on Thursday, February 26, 2004, commencing at the hour

3  03 of 10:12 a.m., before me, HOLLY MOOSE, CSR No. 6438, a

4  04 Certified Shorthand Reporter in the State of California,

5  05 there personally appeared

6  06

7  07           LAWRENCE J. ELLISON,

8  08

9  09 called as a witness by the Plaintiffs, who, having been

10  10 first duly sworn, was examined and testified as

11  11 hereinafter set forth:

12  12

13  13

14  14

15  15           ---o0o---

16  16

17  17

18  18

19  19

20  20

21  21

22  22

23  23

24  24

25  25

6

1  00007:01 PROCEEDINGS              10:12 A.M.

2  02

3  03      THE VIDEOGRAPHER:  This marks the beginning of

4  04 Volume I, videotape 1 in the deposition of Lawrence

5  05 Ellison in the matter of Coordination Proceeding Special

6  06 Title, paren, Rule 1550, paren B, end paren, end paren,

7  07 Oracle Cases, in the superior court of the state of

8  08 California, county of San Mateo, Judicial Council

9  09 Coordination Proceedings [sic] No. 4180, and In Re

10  10 Oracle Corporation Derivative Litigation, the court of

11  11 the Chancery of the state of Delaware, in and for New

12  12 Castle County, consolidated CA number 18751.

13  13      Today's date is February 26, 2004.  The time

14  14 10:12 a.m. the location of this deposition is the Law

15  15 Office of Berman, DeValerio, et al., 425 California

16  16 Street, San Francisco, California.

17  17      The deposition was noticed by Dario de

18  18 Ghetaldi of Corey, Luzaich, et al., and the videotape is

19  19 being produced on behalf of the plaintiff.

20  20      The video operator is Andrew Martin, a

21  21 California notary public for the county of Marin,

22  22 employed by Dan Mottaz Video Productions LLC, 182 Second

23  23 Street, Suite 202, San Francisco, California, 94105,

24  24 telephone 415-624-1300.  The court reporter is Holly

25  25 Moose of Holly Moose Certified Shorthand Reporters.

7

1  00008:01      Would counsel present please identify

2  02 themselves and state whom they represent.

3  03      MR. DE GHETALDI:  Dario de Ghetaldi, Corey,

4  04 Luzaich, Pliska, de Ghetaldi & Nastari, on behalf of

5  05 California plaintiffs.

6  06      MS. LAVALLEE:  Nicole Lavallee, Berman,

7  07 DeValerio, California plaintiffs.

8  08      MR. TABACCO:  Joseph Tabacco, Berman,

9  09 DeValerio, California plaintiffs.

10  10      MR. WEISER:  Robert Weiser, Schiffrin &

11  11 Barroway LLP, on behalf of Delaware plaintiffs.

12  12      MR. NASTARI:  Jerry Nastari with the Corey

13  13 firm.

14  14      MS. GUARNIERI:  Betsy Guarnieri, Berman,

15  15 DeValerio, on behalf of California plaintiffs.

16  16      MR. ETH:  Jordan Eth, Morrison & Foerster, on

17  17 behalf of Oracle Corporation.

18  18      MS. SEGAL:  Lauren Segal, Oracle Corporation,

19  19 on behalf of Oracle Corporation.

20  20      MR. RUBINSTEIN:  Javier Rubinstein, on behalf

21  21 of the defendants.

22  22      MR. SALPETER:  Alan Salpeter, Mayer, Brown, on

23  23 behalf of the defendants.

24  24      THE VIDEOGRAPHER:  If there are no

25  25 stipulations, the court reporter may administer the

8

1   00009:01  oath.
2        02       (Witness sworn).
3        03             LAWRENCE J. ELLISON,
4        04  having been first duly sworn, testified as follows:
5        05
6        06             EXAMINATION BY
7        07       MR. DE GHETALDI:  Q.  Good morning,
8   08  Mr. Ellison.
9        09   A.  Morning.
10       10   Q.  How many times have you had your deposition
11  11  taken in the past?
12       12   A.  Don't recall.
13       13   Q.  Okay.  But you have had your deposition taken
14  14  in the past?
15       15   A.  Many times.
16       16   Q.  Approximately how many?
17       17   A.  One to two dozen times.
18       18   Q.  All right.  Even though you probably
19  19  understand the procedure, I want to take some time at
20  20  first to just go over some ground rules with you to make
21  21  sure that I'm right.
22       22       First of all, I'd like to ask you to try not
23  23  to start answering any question before I've finished
24  24  asking it, and I'll try and do the same, so that the
25  25  court reporter will have a easier time with taking down
                                                        9

1   00010:01  the testimony here today.  Is that okay?
2        02   A.  Sure.
3        03   Q.  Okay.  And even though this deposition is
4   04  being videotaped, I'd like to ask you to make sure that
5   05  you answer my questions with actual words rather than
6   06  nods of the head or sounds indicating assents, or
7   07  something like that, okay?
8        08   A.  Okay.
9        09   Q.  The transcript is going to be prepared in a
10  10  booklet form, and you're going to be given the
11  11  opportunity to review it.  You can make changes or
12  12  corrections to it, but I want you to understand that if
13  13  you do make any such changes or corrections that we
14  14  would be able to comment on that fact at trial if this
15  15  matter goes to trial.  Do you understand?
16       16   A.  I do.
17       17   Q.  Okay.  The way that we've been doing this and
18  18  the way I plan to do this today is we'll try and take a
19  19  break approximately every hour.  If you want to take a
20  20  break at any time, let me know, and that's -- no problem
21  21  with that, all right?
22       22   A.  Okay.
23       23   Q.  Okay.  And please, if at any point today you
24  24  don't understand one of my questions -- because believe
25  25  me, there will come a time when a question will come out
                                                        10

1   00011:01  of my mouth and it'll just fall on the table and be
2        02  squirming there between us, nobody able to understand
3        03  what I said.  So if that happens, let me know and I'll
4        04  ask the question again.
5        05   A.  All right.
6        06   Q.  All right.  Did you meet with anybody in order
7        07  to prepare for this deposition today?
8        08   A.  Yes, I did.
9        09   Q.  Who was that?
10       10   A.  My attorneys.
11       11   Q.  Can you name them, please.
12       12   A.  Mr. Salpeter and Javier Rubinstein.
13       13   Q.  All right.  And how many occasions did you
14  14  meet with them in order to prepare for this deposition?
15       15   A.  Yesterday and briefly this morning.
16       16   Q.  How long was the meeting yesterday?
17       17   A.  Four or five hours.
18       18   Q.  How long was the meeting this morning?
19       19   A.  Five minutes.
20       20   Q.  What documents did you review to prepare for
21  21  your deposition?
22       22   A.  My sworn affidavit, two interviews with the
23  23  special litigation committee, and a handful of e-mails.
24       24   Q.  Is that all?
25       25   A.  I think there were some reproduced copies of
                                                        11

1   00012:01  our forecast reports.
2        02   Q.  Do you recall which forecast reports you
3        03  reviewed?
4        04   A.  For the third quarter '01, third fiscal
5        05  quarter '01, 2001.
6        06   Q.  Any other forecast reports that you reviewed?
7        07   A.  No.
8        08   Q.  Have you ever heard the phrase "think like a
9        09  stockholder"?
10       10   A.  No.
11       11   Q.  When Mr. Cooperman's deposition was taken here
12  12  on the 10th, he testified about your management style.
13  13  And I'm going to read you what he said about that.
14  14  Speaking of you, Mr. Cooperman said,
15       15       "He is someone who is quite close to
16       16       the business, well informed, and very
17       17       persistent in terms of assembling the
18       18       facts as to the matters in front of
19       19       him in which he needs to make
20       20       decisions.  So he will take the
21       21       initiative to make calls or obtain the
22       22       necessary information from a variety
23       23       of sources to be able to make
24       24       approvals or decide on policies.  He
25       25       is what I would call a very hands-on
                                                        12

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

```
1   00013:01  CEO."
2   02        Is that an accurate description of your
3   03  management style?
4   04      A.  I think it is.
5   05      Q.  Mr. Cooperman mentioned approvals.  What sort
6   06  of approvals did you generally handle in the third
7   07  quarter of fiscal year '01?
8   08      A.  Approvals.  Well, if someone was being hired
9   09  and they were being given stock options, I approved the
10  10  stock options.  I think if there was a particularly
11  11  large deal with an unusual set of terms and conditions,
12  12  Safra Catz would bring it to my attention for my
13  13  approval, or at least my opinion.
14  14        So I'm not sure what -- exactly what you mean
15  15  by "approval."  A formal process of approval where I was
16  16  in the chain of command and something could not be done
17  17  without my approval?
18  18      Q.  That would be fair.
19  19      A.  Okay, yeah, only the stock.
20  20      Q.  And the deals?
21  21      A.  Safra had the authority to, you know, sign
22  22  those deals on her own without talking with me.  But it
23  23  was her practice, if the deal was unusual, to discuss it
24  24  with me.
25  25      Q.  All right.  What was your job title in Q3 '01?
```

13

```
1   00014:01    A.  I was chairman and CEO.
2   02      Q.  What were your job duties in that quarter?
3   03      A.  I was -- my chairman's responsibility was to
4   04  run the board meetings and be responsible for organizing
5   05  presentations before the board of directors.  And my
6   06  CEO's duties were to run all aspects of the company.
7   07  Head of finance, the head of sales, the head of
8   08  engineering, head of marketing, all of them reported
9   09  directly to me.
10  10      Q.  All right.  Mr. Cooperman said that you
11  11  decided on policies.  Was that -- what sort of policies
12  12  did you decide on?
13  13      A.  Well, I was one person who decided on
14  14  policies.  I mean, clearly there were lots of policies.
15  15  Some were decided on by our auditor.  Some policies were
16  16  decided upon by our legal -- you know, our legal teams.
17  17        Policies.  What kind of policies would I
18  18  decide.  I didn't like the idea of paying multiple
19  19  salespeople for the same transaction without -- so that
20  20  was -- so I suppose that's an example of a policy that I
21  21  would create.
22  22      Q.  All right.  In --
23  23      A.  Without going through a special approval
24  24  process, to be precise.  So if multiple salespeople --
25  25  if one salesperson had helped the other salesperson to
```

14

```
1   00015:01  close the deal and someone wanted to pay both
2   02  salespeople, pay double commissions, that was something
3   03  we had a policy against without special approval
4   04  process.
5   05        But you can say -- was that a policy or was
6   06  that simply a process?  Again, I'm not quite sure what's
7   07  meant by "policy."
8   08      Q.  All right.
9   09      A.  I've always been vague about it.
10  10      Q.  All right.  In an interview by thestreet.com
11  11  in September of 2000, Mr. Henley reportedly said,
12  12  "I'm not sure anyone holds Larry in
13  13  check.  We all give Larry our counsel
14  14  and thoughts, but the main thing is
15  15  that Larry has gotten more engaged in
16  16  the day-to-day business.  He's much
17  17  more knowledgeable about it now in the
18  18  day-to-day because he's actually the
19  19  one managing it."
20  20        Is that an accurate description of the degree
21  21  of your involvement in Oracle's management in fiscal
22  22  year '01?
23  23      A.  Well, depends on the part of the business
24  24  you're talking about.  I've always been very engaged.
25  25  Was I deeply involved in our contracting process, which
```

15

```
1   00016:01  is the formal -- formal area where we state our
2   02  obligation to customers?  Absolutely not.  I had no part
3   03  of that at all.  So there's certain parts of the
4   04  business I relied on others for entirely.
5   05        Was I involved in the finance department?  I
6   06  mean, only insofar as I relied on them to provide me
7   07  with information.  I certainly didn't set our
8   08  accounting policies or our revenue recognition policies.
9   09  Those were set by auditors, lawyers and other people who
10  10  are experts in those areas.
11  11        The area where I felt I was an expert was in
12  12  the creation of our products, the software.  And I had
13  13  opinions as to how those products should be sold.  But,
14  14  you know -- so product creation, sales and marketing was
15  15  where I was engaged.
16  16        I certainly was not heavily engaged in Jeff
17  17  Henley's area, which is finance, accounting, legal.
18  18      Q.  Okay.
19  19      A.  So again, depends which area of the business
20  20  you're talking about.
21  21      Q.  Well, I guess I'm asking you what areas of the
22  22  day-to-day business of Oracle in fiscal year '01 you
23  23  were actually managing, to use Mr. Henley's words.
24  24      A.  Actually managing.  I'm not trying to split
25  25  hairs here, but as CEO I'm responsible for managing the
```

16

Ellison, Lawrence J. (Vol. 01) - 02/26/2004   2/26/2004   10:41:00 AM

00017:01 entire company.  So I'm responsible for managing Jeff
02 Henley, and Jeff Henley manages his group.  That's a
03 slightly different question.
04      So if you're asking what am I responsible for
05 managing, it's different than asking what was I deeply
06 engaged in.  So there are two separate questions here.
07      So let me answer formally, as CEO, I'm
08 responsible for managing every aspect of the company.
09 That's my responsibility.  How did I spend my time and
10 where did I have special competency to work in the area
11 of engineering.  I always run engineering, the creation
12 of our products.  And I had opinions about how those
13 products should be marketed, and then, to a lesser
14 degree, sold, and to a lesser degree still, contracted
15 for and accounted for.
16      Q.  Okay.
17      A.  So I'm -- my training -- I'm an engineer by
18 training.  I'm a experienced computer programmer.
19 That's what I know about.  That's where I get deeply
20 involved.
21          Marketing's kind of, you know, one order
22 removed from that.  One order removed from that is
23 sales.  And when you get down to accounting and legal,
24 you're getting really far away from my competencies.
25 And again, I tend to rely on others to do those things,

17

00018:01 though I am formally responsible for all of that.
02      Q.  All right.  Did you -- or were you less
03 involved in these activities that you've just described
04 at Oracle in Q3 '01 than you had been in the past?
05      A.  Less involved than I had been in the past.
06 I'd say my engagement has fluc -- I've been at Oracle
07 for a very long time, since 1977.  And I'd say my
08 engagement has fluctuated, depending upon the strength
09 of different individuals in different areas.  Sometimes
10 I'll delegate quite thoroughly to someone.  But I've
11 always been deeply engaged in engineering.  And I think
12 I was fairly deeply engaged at this time in both sales
13 and marketing as well.
14      Q.  Do you consider yourself a risk-taker?
15      A.  Depends --
16      MR. SALPETER:  Objection to form.
17      THE WITNESS:  Depends what you mean by
18 "risk-taker."  I think -- I started Oracle.  I left a
19 safe job, you know, working for a good company and went
20 off and started Oracle.  And I think most people would
21 think that was a risk.  So I -- you know, I took a risk.
22          I think my risks are highly calculated.  So,
23 you know, if the return -- you know, if the risk-reward
24 ratio is good, then I'll take the risk.  If the risk
25 ratio is bad, then I won't take the risk.

18

00019:01     So I'm willing to take risks if there is a
02 good opportunity for reward.  I'm not willing to take
03 risks carelessly and without making a calculation.
04      MR. DE GHETALDI:  Okay.
05      THE WITNESS:  But I think the answer is yeah,
06 sure.  I mean just in the general sense, yeah, I'm
07 willing to take a risk if there's a big upside for it.
08      MR. DE GHETALDI:  Q.  You've been with Oracle
09 27 years?
10      A.  I'm afraid so, yeah.
11      Q.  You've seen a lot of changes during that
12 period of time?
13      A.  Yeah.
14      Q.  Do you recall any time prior to Q3 '01 when
15 Oracle's stock price dropped mid quarter?
16      A.  Oh, I mean, I can't tell you what quarter it
17 was, but sure.  I mean, probably half the quarters our
18 stock price dropped.  Not to the extent where it
19 dropped -- I think it dropped from mid forties to 30.
20 So, you know, it dropped 30 -- you know, 35 percent.  So
21 that would be a very unusual event.
22      Q.  Do you recall when that happened?
23      A.  No, I don't.  I don't know if that ever
24 happened.
25      Q.  Okay.

19

00020:01     A.  You said do I recall any periods mid quarter
02 where the stock dropped.
03      Q.  Right.
04      A.  And of course, that would be almost every
05 quarter the stock dropped.
06      Q.  Okay.
07      A.  But the question is how much.  I'm
08 reinterpreting your question.
09      Q.  Oh, I see.  I see.
10      A.  You said every quarter the stock dropped.  But
11 I think what you're really asking is do I remember any
12 quarter where the stock dropped 30 to 35 percent.  Or is
13 it -- maybe -- I shouldn't be asking the questions for
14 you, so ... my own lawyer probably is having a heart
15 attack right now, so ...
16          I understood your question to be do I remember
17 any -- you know, you have two questions.  In every
18 quarter, our stock fluctuates.  It normally doesn't just
19 go up.  Even every day, our stock goes down, as well as
20 up.  I didn't think that was your question.
21      Q.  No.
22      A.  I think -- what I interpreted your question to
23 be -- which I know I'm not supposed to do in
24 deposition -- what I interpreted your question to be was
25 do I remember a quarter where we had a significant -- a

20

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

00021:01  stock drop as significant as we had this quarter.
02        And the answer is, I have never seen a run-up
03  on our stock like I saw in the dot-com bubble in my
04  life, or the subsequent drop of a stock.  So if you're
05  asking have I ever seen anything like the dot-com bubble
06  where stocks rocketed up and then tumbled down, no, I've
07  never seen anything in my life, and I hope I never see
08  anything like that in my life again.
09     Q.  Okay.  What I was trying to ask was whether
10  you ever -- or whether you recall Oracle's stock
11  dropping mid quarter over a short period of time by a
12  significant amount.  And by "a significant amount," I
13  mean maybe ten percent of the value; and "short period
14  of time," I mean one to two days.
15     A.  Mid quarter, you mean not near announced
16  results?
17     Q.  Exactly.
18     A.  Not near announced results.  I don't recall.
19  It very well may have happened.  Again, what happened in
20  that quarter was a residual event from the stock having
21  run up dramatically because of the dot-com bubble.  And
22  whatever rises like that is destined to fall, as we all
23  learned.
24     Q.  Do you recall a headline in the San Francisco
25  Chronicle's business section in October 2000 that said

21

00022:01  "Oracle's stock dives after sales warning"?
02     A.  What was the date of this?
03     Q.  October 2000.
04     A.  I don't remember it, but certainly I have no
05  reason to not believe what you're telling me.
06     Q.  Do you recall Oracle making -- issuing a sales
07  warning in October 2000?
08     A.  I don't recall it, but I'm sure -- if you say
09  we did it, and you've got the documents there, I guess
10  it did.
11     Q.  Okay.  Well, I'm not saying that there was.
12  And in fact, it's my understanding that there was
13  actually no warning given and that somebody had
14  interpreted Mr. Henley's body language.  Do you recall
15  this event?
16     A.  Yeah, now I do.  I was going to say I didn't
17  recall it before, but, yeah, I think -- I think there
18  was -- again, I vaguely recall it, that there was some
19  misinformation in the press.
20     Q.  Right.
21     A.  What a surprise.
22     Q.  Right, yeah.
23     A.  And I think we had to issue a corrective
24  statement.
25     Q.  Yeah, and I think that some analysts thought

22

00023:01  that Mr. Henley's presentation looked canned, and I
02  think that somebody said that he had cautious body
03  language.
04     A.  I think he had the flu.  I'm serious.  That's
05  what I recall, I think he had the flu, and they
06  interpreted that as that he was depressed or something.
07     Q.  Right.  And the stock dropped about 24 percent
08  in two days?
09     A.  I don't recall.
10     Q.  Do you consider yourself to be a truthful
11  person?
12     A.  Yes.
13     Q.  Do you consider yourself to be an exaggerator?
14     A.  I consider myself to be very enthusiastic and
15  exuberant.  So I don't think -- and I think some people
16  would interpret that as exaggeration.  But I'm very
17  enthusiastic; I'm very positive; I get very excited
18  about things.
19     Q.  Okay.  Have you ever admitted publicly to
20  having lied?
21     A.  Yes.
22     Q.  Okay.  When was that?
23     A.  I think most recently in a book called
24  Software.
25     Q.  Do you remember what you said then?

23

00024:01     A.  Yeah, I said I lied about having a degree to
02  get a job when I first came to California.
03     Q.  A job with IBM?
04     A.  No, it was some -- some Silicon Valley R&D job
05  as a computer programmer.
06     Q.  There was an article called "Dog Eats Dog
07  Food, And Damned If It Ain't Tasty" --
08     A.  I think I remember that.
09     Q.  -- in Business 2.0.  You remember that?
10     A.  Vaguely, yeah.
11     Q.  November 2000.  And the quote from the article
12  actually contains a quote from a Fortune reporter.  And
13  the article says,
14        "Ellison became known as a chronic
15        exaggerator.  Once when asked by a
16        Fortune reporter if he's a liar, he
17        replied, quote, 'Does anyone tell the
18        truth all of the time,'" end quote.
19        Is that quote by the Fortune reporter an
20  accurate quote?
21        MR. SALPETER:  Objection to form.
22        THE WITNESS:  I don't recall the quote.  I
23  don't recall the interview.
24        MR. DE GHETALDI:  Q.  Okay.  All right.  Have
25  you ever submitted an untruthful affidavit in the -- in

24

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

00025:01  either the California case or the Delaware case?
02   A.  No.
03   Q.  And so your statements in affidavits in the
04  Delaware case about the Ellison scholars program and the
05  timing of that program -- it's your testimony that those
06  were accurate statements?
07   A.  I think so, yeah.
08   Q.  And the same thing for the gift of your house
09  to Stanford as a bequest?
10   A.  Yeah.  You'd have to -- I'd like to reread the
11  statements.  But yes, far as I know.
12   Q.  Who are the members of Oracle's compensation
13  committee?
14       MR. SALPETER:  Objection.  Can you give us a
15  time frame, please.
16       MR. DE GHETALDI:  Q -- fiscal year 2001.
17       THE WITNESS:  I'm fairly certain, but I'm not
18  certain, it would be Don Lucas, Michael Boskin and Jeff
19  Berg.  But I'm wouldn't bet my life on it.
20       MR. DE GHETALDI:  Q.  All right.  Did Oracle's
21  board approve recommendation of the compensation
22  committee that altered your compensation package in July
23  of 2000?
24   A.  I don't recall.
25   Q.  Do you recall in the summer of 2000

25

00026:01  relinquishing $200,000 in annual salary through year
02  2003 in exchange for 20 million stock options?
03   A.  That doesn't sound right to me.  The $200,000
04  salary doesn't sound right to me, but I know I -- I know
05  I went -- whatever -- whatever salary and bonus I had --
06  combination of salary and bonus, which I think was more
07  than $200,000, the sum of that, I did go to a dollar a
08  year or half a dollar a year in exchange for stock.  But
09  I don't think the 200,000 is correct.
10   Q.  All right.  In Q3 '01, what percentage of your
11  wealth was in Oracle stock options?
12   A.  Oracle stock options.  In 2001?
13   Q.  Yeah.
14   A.  Two percent.  Less.  Less than two percent.
15   Q.  Okay.
16   A.  I think.  Again, I'm making estimates.
17   Q.  All right.  Prior to December 2000 --
18   A.  Might have been higher.  Might have been maybe
19  as high as three, four percent.  But again, I'm
20  estimating.  I don't know.
21   Q.  Okay, that's fine.  And please -- you know, if
22  you're not sure of an answer, please let me know --
23   A.  I will do that.
24   Q.  -- that it is an estimate.
25       Now, what percentage of your wealth in fiscal

26

00027:01  year '01 was in Oracle stock as opposed to Oracle
02  options?
03   A.  Probably 93 -- -2 percent, something like
04  that.
05   Q.  Something more than 90?
06   A.  Yes.
07   Q.  Prior to December 2000, when was the last time
08  you had exercised options to purchase Oracle stock?
09   A.  To purchase Oracle stock.  I think -- quite
10  often I'll exercise options in December, for tax
11  purposes, to purchase Oracle stock.  So I think I did
12  actually that December.  December -- December '99.
13   Q.  Okay.
14   A.  Or December 2000, I'm sorry.
15   Q.  I'm asking prior to December 2000.
16   A.  Prior to December 2000.
17   Q.  Yeah.
18   A.  I would imagine the previous December.  But
19  again, I'm not certain about.
20   Q.  All right.  And you say for tax reasons.  What
21  tax reasons were those?
22   A.  Sometimes my tax situation is such that I can
23  exercise options and hold them without paying -- having
24  to pay tax.  So it's -- Philip Simon, my tax accountant
25  and lawyer, will recommend that I exercise options and

27

00028:01  hold as part of tax planning.
02   Q.  Okay.  Prior to January 2001, when was the
03  last time you had sold shares of Oracle stock?
04   A.  I think -- I think 1996.  But again, I'm not a
05  hundred percent certain.
06   Q.  Do you recall how many shares you sold then?
07   A.  No, I don't.
08   Q.  Can you estimate for me?
09   A.  I have no idea.
10   Q.  You were saying that you have a notion that
11  you regularly exercise Oracle shares to -- on the advice
12  of Mr. Simon.  Do you have a regular pattern of selling
13  Oracle shares?
14   A.  No.
15   Q.  Is there a reason why you don't, or why you
16  have a regular pattern in one and not in the other?
17   A.  Sure.  I'm trying to do tax minimization,
18  trying to, you know, manage my taxes as best I can.  And
19  I've reached the end of a year and I'll have room to
20  recognize income.  And for -- you know, where that
21  income is sheltered and I don't have to pay tax on it.
22  So the way I recognize that income and don't pay tax on
23  it is to exercise an option --
24   Q.  Okay.
25   A.  -- and hold.  So that's there purely for tax

28

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

```
 1  00029:01  purposes.  The -- I don't raise any money obviously;
 2      02  it's just there to minimize taxes.  When I sell stock,
 3      03  it's usually to raise -- to raise cash.
 4      04      Q.  Okay.  And when you say "exercise and hold,"
 5      05  that means you exercise your options and --
 6      06      A.  I buy the options and I don't sell them.
 7      07      Q.  And don't sell the shares?
 8      08      A.  I, you know, buy the options, which means I
 9      09  have to recognize a gain, which is income.  And
10      10  presumably I have some offsetting loss in that same
11      11  year, which shelters the gain.
12      12      Q.  Okay.  In the third quarter of 2001 -- that
13      13  is, Oracle's fiscal year 2001 -- did you have a block of
14      14  options that were expiring?
15      15      A.  I had a large block of options that were going
16      16  to expire, I think, in August.
17      17      Q.  Of 2001?
18      18      A.  Of 2001, that's right.
19      19      Q.  Do you recall what -- how many shares were in
20      20  that block?
21      21      A.  I think it was 22 million shares.
22      22      Q.  Did -- what options -- what options did you
23      23  have with your options.  What alternative things could
24      24  you have done in fiscal year 2001 with those expiring
25      25  options?
```

29

```
 1  00030:01      A.  Practically or hypothetically?
 2      02      Q.  Practically speaking.
 3      03      A.  Okay.  I had three -- I held the options for
 4      04  nine and a half years.  When the options are granted,
 5      05  they're granted for a ten-year period, and then they
 6      06  just expire and become worthless.
 7      07      Q.  Right.
 8      08      A.  I had held the options for nine and a half
 9      09  years.  So I had three remaining windows to sell.  And
10      10  so I was getting down to the wire.  I had to sell those
11      11  options.
12      12          I could not sell and hold because the tax --
13      13  you know, I would have paid -- had a huge tax bill.  I
14      14  would have needed a huge amount of cash, which I didn't
15      15  have, you know, to pay that.  So practically, I could
16      16  not buy and hold.  So I had to buy and then resell the
17      17  options -- exercise and sell, you know, same day.
18      18          So I had three windows, either Q3, Q4 or Q1 of
19      19  the following year, in those windows.  I was enjoined
20      20  from selling except during a window which was after we
21      21  announced, usually from the 15th, 20th of the first
22      22  month -- I really had about 40-day -- of -- during the
23      23  quarter -- you know, we cannot sell in the last month of
24      24  the quarter, is our policy; we cannot sell before we
25      25  announce our results.  So practically, that gives you a
```

30

```
 1  00031:01  four- or five- -- five-week period where you're actually
 2      02  allowed to sell.
 3      03          Also, you can't sell if there's material
 4      04  inside information.  So it was getting very close.  If
 5      05  we were going to buy a company and we were contemplating
 6      06  buying a company, just contemplating buying a company, I
 7      07  would hold material inside information, and I wouldn't
 8      08  be able to sell my options.
 9      09          So as we got down to the short stroke -- I was
10      10  literally out of time -- you know, essentially out of
11      11  time, and I had to go ahead and sell my -- sell my
12      12  stock.
13      13      Q.  Okay.  So exercising and holding wasn't an
14      14  option for you?
15      15      A.  I didn't have the cash to do that.
16      16      Q.  All right.
17      17      A.  That required hundreds of millions of dollars
18      18  of cash to pay the taxes.
19      19      Q.  Which were due upon exercise?
20      20      A.  Which were due upon exercise, right.
21      21      Q.  Did you discuss with Mr. Simon this
22      22  decision --
23      23      A.  Yes.
24      24      Q.  -- on what to do?
25      25      A.  Yes.
```

31

```
 1  00032:01      Q.  Okay.  Did you consider trying to roll over
 2      02  the options or have Oracle's board extend them?
 3      03      A.  Never -- never considered it.
 4      04      Q.  Okay.
 5      05      A.  I don't -- we'd never done anything like that
 6      06  for anybody.  I think other people's options had
 7      07  expired.  We had not rolled them over.  So I had no
 8      08  reason to believe that the board -- I don't know if the
 9      09  board could do that, as a matter of fact.  It's very
10      10  possible that would have required a shareholder vote.
11      11      Q.  All right.
12      12      A.  So I have no idea.  In fact, I don't think we
13      13  can.  I don't think the board has the authority to alter
14      14  the option plan without the approval of the
15      15  shareholders.  So I believe -- again, it never occurred
16      16  to me till you just mentioned it now --
17      17      Q.  Yeah.
18      18      A.  -- we could alter the plan.  I don't know if
19      19  we could make it retroactively apply to existing
20      20  option -- existing option-holders.  I know they couldn't
21      21  do it just for me, exclusive of other option-holders.  I
22      22  don't know what the tax implications would be for doing
23      23  that.  It --
24      24          So again, it never dawned on me that I think
25      25  that's impractical; I don't think we can do it.  It
```

32

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

00033:01 never dawned on me to even ask.

02    Q.   Okay.  All right.  Did you consider exercising

03 your option -- this block of expiring options and then

04 just selling enough to cover the taxes?

05    A.   No.  No, I wanted to raise some cash.

06    Q.   Okay.  How did you know in Q3 '01 that these

07 options were expiring?

08    A.   Oh, I think -- I think I was told.  Philip

09 Simon, you know, where -- I have an accountant that

10 spends most of his time working just for me.  He's an

11 attorney and a tax accountant.  It's a lot of money, and

12 we certainly -- you know, I was aware for some time that

13 they were expiring.

14    Q.   Okay.

15    A.   Years.

16    Q.   Years?

17    A.   Years, yes.

18    Q.   Do you keep records yourself about your

19 expiring options --

20    A.   No.

21    Q.   -- or does Mr. Simon handle that?

22    A.   Mr. Simon does.

23    Q.   All right.  You said that Mr. Simon's an

24 attorney?

25    A.   He's an attorney and a CPA, all of those

33

00034:01 things.

02    Q.   Do you know where he's licensed to practice,

03 by any chance?

04    A.   Law?

05    Q.   Yeah.

06    A.   In California, I think, so ... I don't know.

07 You told me to say "I don't know" if I don't know.  So I

08 don't know.

09    Q.   That's right.  Do you know if Oracle keeps

10 records about your options?

11    A.   I certainly hope so.

12    MR. DE GHETALDI:  I think we're on Exhibit

13 100.

14    (DC Exhibit No. 100

15    marked for identification).

16    MR. DE GHETALDI:  Have you ever seen this

17 document that's been marked as Exhibit No. 100 before?

18    A.   Not that I recall.

19    Q.   Okay.  As best I can translate it -- and maybe

20 I'm wrong, but -- I just want to see what your

21 understanding is.  It looks like on the 29th of

22 December of 1999 you exercised options to purchase

23 1,426,000 shares.

24    It's down -- looking down at the very bottom

25 of the center of the first page.

34

00035:01    A.   Okay.

02    MR. SALPETER:  Can you repeat that question

03 for us, please.

04    (Record read as follows:

05    Q.   As best I can translate it -- and

06    maybe I'm wrong, but -- I just want to see

07    what your understanding is.  It looks like

08    on the 29th of December of 1999 you

09    exercised options to purchase 1,426,000

10    shares.

11    It's down -- looking down at the very

12    bottom of the center of the first page.)

13    THE WITNESS:  Okay.

14    MR. DE GHETALDI:  Q.  Does that look right to

15 you?

16    A.   I've never seen this document before, but it

17 looks like -- okay.  On December 29th, 1.4 million

18 shares at $53 a share.  Is that how you read it?

19    Q.   Yeah, that's how I read it.

20    A.   I think that's a reasonable interpretation,

21 but ...

22    Q.   All right.  And then the transaction

23 immediately above that looks like on December 23rd,

24 1998 you exercised options to purchase 780,000 shares.

25    A.   Right.

35

00036:01    Q.   And then the transaction right above that, it

02 looks like on December 22nd, 1995 you exercised

03 options to purchase 2,470,500 shares.

04    A.   Right.

05    Q.   There's a gap of a couple of years there.  Do

06 you recall that gap existing in the -- your regularly

07 exercising options at year-end?

08    A.   No, I don't.

09    Q.   You testified a little while ago, I think,

10 that Mr. Simon was, shall I say, reminding you --

11 started reminding you at some time -- or at some point

12 that you had these options that you needed to do

13 something with.  Do you recall when that was?

14    A.   No.  He -- every time we spoke.

15    Q.   Do you recall when he started reminding you?

16    A.   I think Mr. -- I think Philip, Mr. Simon,

17 wanted me to diversify for some time.  He's always

18 thought I was taking too much of a risk by holding on to

19 my Oracle -- you know, to just -- to not be diversified.

20    Q.   Okay.  Did -- did you talk with anyone else

21 besides Mr. Simon about possibly exercising this block

22 of expiring options prior to when you actually did it?

23    A.   I certainly may have talked to some of the

24 people who worked for me.  But I -- but I don't recall.

25    Q.   Well, did you talk to Safra Catz about this at

36

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

| | |
|---|---|
| 1 | 00037:01  any time? |
| 2 | 02    A.  I might have. |
| 3 | 03    Q.  Carolyn Balkenhol? |
| 4 | 04    A.  She talked to Philip a lot.  And in fact, if |
| 5 | 05  you talked to Philip, she talked to Safra.  So if I |
| 6 | 06  talked to Philip, you can assume that Carolyn knows, and |
| 7 | 07  if Carolyn knows, you can assume Safra knows.  Just the |
| 8 | 08  way my office works. |
| 9 | 09    Q.  So four heads in one, or something like that? |
| 10 | 10    A.  Yeah. |
| 11 | 11    Q.  Do you recall speaking with Mr. Henley about |
| 12 | 12  the exercise of these expiring options? |
| 13 | 13    A.  Not that I recall. |
| 14 | 14    Q.  And how about Mr. Cooperman? |
| 15 | 15    A.  Other than to -- you're talking about other |
| 16 | 16  than once I decided to sell and I was asking for |
| 17 | 17  clearance? |
| 18 | 18    Q.  Right. |
| 19 | 19    A.  You're talking before that? |
| 20 | 20    Q.  Right. |
| 21 | 21    A.  Just discuss the possibility.  Again, not that |
| 22 | 22  I recall, but I may have. |
| 23 | 23    Q.  All right.  Now, Mr. Simon was recommending |
| 24 | 24  that you sell these shares for diversification.  Did he |
| 25 | 25  have any other reasons why you should sell your shares? |

37

| | |
|---|---|
| 1 | 00038:01    A.  Debt reduction. |
| 2 | 02    Q.  Debt reduction.  Anything else? |
| 3 | 03    A.  I think that's it. |
| 4 | 04    MR. DE GHETALDI:  Okay. |
| 5 | 05    (DC Exhibit No. 101 |
| 6 | 06    marked for identification). |
| 7 | 07    THE WITNESS:  Okay. |
| 8 | 08    MR. DE GHETALDI:  Q.  Have you ever seen this |
| 9 | 09  string of e-mails that's contained in Exhibit 101 |
| 10 | 10  before? |
| 11 | 11    A.  Not that I recall. |
| 12 | 12    Q.  Okay.  Do you recall considering, in or around |
| 13 | 13  April of 2000, exercising -- or donating $1 billion to |
| 14 | 14  charity? |
| 15 | 15    A.  Well, I don't recall the dates.  But I |
| 16 | 16  certainly have looked at how I can endow both my medical |
| 17 | 17  foundation -- I've looked at charitable donations to |
| 18 | 18  Stanford; I've looked at a number of charity donations |
| 19 | 19  and the right mechanism for making a charitable |
| 20 | 20  donation. |
| 21 | 21    Q.  Donation to a charitable remainder trust? |
| 22 | 22    A.  Again, yeah, I think there were some |
| 23 | 23  discussions about a charitable remainder trust as well. |
| 24 | 24    Q.  Discussions with whom? |
| 25 | 25    A.  Philip Simon. |

38

| | |
|---|---|
| 1 | 00039:01    Q.  With anybody else? |
| 2 | 02    A.  No. |
| 3 | 03    Q.  Safra Catz? |
| 4 | 04    A.  No, not that I -- well, I shouldn't say no. |
| 5 | 05  Not that I recall. |
| 6 | 06    Q.  It appears as though on April 10th, 2000 at |
| 7 | 07  9:43 a.m. -- and I'm looking at the middle of the second |
| 8 | 08  page of Exhibit 101 -- Safra Catz wrote Philip Simon an |
| 9 | 09  e-mail saying, |
| 10 | 10    "Larry has a ton of options expiring |
| 11 | 11    and we need to figure out if he can |
| 12 | 12    give them to a foundation or |
| 13 | 13    something." |
| 14 | 14    A.  You mean it's from Philip Simon to Safra Catz? |
| 15 | 15    MR. DE GHETALDI:  Well -- |
| 16 | 16    MR. SALPETER:  He's on the second page. |
| 17 | 17    MR. DE GHETALDI:  I'm sorry, the middle of the |
| 18 | 18  second page where it says "you wrote." |
| 19 | 19    THE WITNESS:  Okay.  Okay. |
| 20 | 20    MR. DE GHETALDI:  Q.  Do you recall talking |
| 21 | 21  with Safra Catz in or around April of 2000 about this |
| 22 | 22  ton of options that you had expiring and the need to |
| 23 | 23  figure out if you can give them to a foundation or |
| 24 | 24  something? |
| 25 | 25    A.  Vaguely.  Vaguely. |

39

| | |
|---|---|
| 1 | 00040:01    Q.  What came of these discussions of using your |
| 2 | 02  expiring options to fund either a charity or a |
| 3 | 03  charitable remainder trust? |
| 4 | 04    A.  Again, I don't remember what the outcome was. |
| 5 | 05  I don't remember what the tax consequences were of doing |
| 6 | 06  it that way.  I really don't recall this, so ... in any |
| 7 | 07  detail. |
| 8 | 08    This refreshes my memory to the extent that I |
| 9 | 09  have this vague recollection of yeah, I probably |
| 10 | 10  had these.  I remember having discussions with Philip. |
| 11 | 11  I don't remember having the discussions with Safra.  But |
| 12 | 12  Philip might have had the discussions with Safra. |
| 13 | 13  Philip would discuss things with Carolyn; Carolyn then |
| 14 | 14  would consult with Safra on this. |
| 15 | 15    The conclusion was that the options should |
| 16 | 16  be -- should be sold and used for -- you know, for debt |
| 17 | 17  reduction and diversification.  That was the conclusion. |
| 18 | 18  So we did not fund a charitable remainder trust or fund |
| 19 | 19  my medical -- I have a large medical foundation, but I |
| 20 | 20  just make payments to that on a regular basis.  So |
| 21 | 21  nothing came of this. |
| 22 | 22    Q.  Okay.  What authority over your investments |
| 23 | 23  did Mr. Simon have in fiscal year '01? |
| 24 | 24    A.  He disbursed money -- I own several companies |
| 25 | 25  and have several investments.  And there are regular |

40

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

```
 1   00041:01  schedules for meeting payroll and funding those
 2   02  companies.  So insofar as those are committed
 3   03  investments, he has the authority to move funds to those
 4   04  investments.
 5   05       I think that's -- clearly he's responsible for
 6   06  advising me as to how -- you know, how best to deal with
 7   07  my -- you know, my financial situation.
 8   08    Q.   Okay.  Did he have discretionary authority to
 9   09  buy or sell assets on your behalf?
10   10    A.   Not really.  Not really.  It was his
11   11  practice -- if it was anything -- anything substantive,
12   12  he would check with me.  If it's a small deal, sure,
13   13  but ...
14   14    Q.   Did he have a power of attorney to sign on
15   15  your behalf in fiscal year '01?
16   16    A.   Probably.
17   17    Q.   Do you know what, if any, the limits on that
18   18  power were?
19   19    A.   No.
20   20    Q.   Do you recall whether the authority was
21   21  limited or not?
22   22    A.   I don't even know for a fact that he has a
23   23  power of attorney.
24   24    Q.   In Q3 '01 did Mr. Simon have authority to
25   25  trade Oracle stock on your behalf without first
```

41

```
 1   00042:01  consulting you?
 2   02    A.   No.
 3   03    Q.   In Q3 '01 was Mr. Simon a trustee of any of
 4   04  your trusts?
 5   05    A.   I don't know.
 6   06    Q.   To your knowledge, was Mr. Simon ever privy to
 7   07  nonpublic financial information about Oracle?
 8   08    MR. SALPETER:  Can we have a time frame?
 9   09    MR. DE GHETALDI:  I said "ever."
10   10    THE WITNESS:  It's certainly possible.  I
11   11  mean, I have regular discussions with Mr. Simon, and I
12   12  think -- I mean, for example, did I tell him we were
13   13  going to buy PeopleSoft before -- the answer's no.  But
14   14  had I had a conversation with him and said "Look, we're
15   15  going to be engaged -- I'm going to be in possession of
16   16  material inside information which is going to restrict
17   17  my ability to trade stocks, so if we're thinking of
18   18  trading, have a stock program set up."
19   19       You know, would I have let him know?  It's
20   20  certainly -- I'm mumbling here.  It's certainly possible
21   21  that I would have let him know that I was in possession
22   22  of material inside information that would restrict my
23   23  ability to sell stock.  But I can't think of any
24   24  specific case where I confided in Mr. Simon and passed
25   25  on material inside information about Oracle to him,
```

42

```
 1   00043:01  other than to have possibly said "I have this material
 2   02  inside information, and therefore I'm enjoined from
 3   03  selling stock."
 4   04       But I'm speculating.  And the correct answer
 5   05  is not that I -- you know, not that I really recall.
 6   06    MR. DE GHETALDI:  Q.  All right.  Do you
 7   07  recall any time where you told Mr. Simon that you
 8   08  believed that you had material inside information about
 9   09  Oracle that would prevent you from selling or trading in
10   10  Oracle stock?
11   11    A.   It's possible I did, but I don't recall.
12   12    Q.   According to your understanding, what sort of
13   13  inside information would prevent you from trading in
14   14  Oracle stock?
15   15    MR. SALPETER:  Objection to form.
16   16    MR. DE GHETALDI:  You can answer.
17   17    THE WITNESS:  Yeah, I'll give you an example.
18   18  I mean, if we were going to make a bid on PeopleSoft or
19   19  planned to make a bid on PeopleSoft and it was in a
20   20  trading window and I knew we were in that process,
21   21  certainly that's material information that would prevent
22   22  me from trading.
23   23    MR. DE GHETALDI:  Q.  And can you think of any
24   24  other examples?
25   25    A.   Sure.  There were some fundamental -- there
```

43

```
 1   00044:01  was a massive drop in our -- in our sales in Europe
 2   02  suddenly in the middle of a quarter -- or after the end
 3   03  of the first month.  Sales in Europe were zero, you
 4   04  know.  It was -- some -- some substantial material
 5   05  financial event occurred during the quarter.  That would
 6   06  have required me to not trade.
 7   07    Q.   All right.  Did -- do you recall Oracle ever
 8   08  declaring quiet periods other than the first two weeks
 9   09  of the first month of a quarter and the third month of a
10   10  quarter?
11   11    A.   Not that I recall.
12   12    Q.   Do you recall Oracle declaring a quiet period
13   13  during the time when you traded in your stock in
14   14  January 2001?
15   15    A.   No.
16   16    Q.   Did you ever have any discussions with Barbara
17   17  Wallace about your trading in Q3 '01?
18   18    A.   Who's Barbara -- I don't know who Barbara
19   19  Wallace is.
20   20    Q.   Okay.  How about Deborah Lange?
21   21    A.   I know Deborah Lange, but no, I didn't talk to
22   22  her.
23   23    Q.   How about Stephanie Aas?
24   24    A.   No.  I know who she is, but ...
25   25    Q.   But you didn't talk to her about your trading
```

44

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

1   00045:01  in Q3 '01?
2       02   A. No.
3       03   Q. How about Jennifer Glass?
4       04   A. No.
5       05   Q. Did you talk to Mr. Cooperman in Q3 '01 about
6       06  your trading?
7       07   A. No, I relied on Philip Simon to get the
8       08  clearance for me from -- from Dan.
9       09   Q. How about after he got the clearance; did you
10      10  have a discussion with Mr. Cooperman at all about your
11      11  trading?
12      12   A. Well, other than to mention that we're being
13      13  sued, you know, but no.
14      14       MR. TABACCO: At least he mentioned that.
15      15       THE WITNESS: That came up.
16      16       MR. DE GHETALDI: Q. You started exercising
17      17  and selling your expiring options on January 22nd,
18      18  2001. You had a window of how many business days there
19      19  before February? Eight, I think?
20      20   A. Yeah, something like that.
21      21   Q. Is there a reason why you waited so long into
22      22  January --
23      23   A. Yes.
24      24   Q. -- before you decided to start trading?
25      25   A. Yes.

45

1   00046:01   Q. What was that?
2       02   A. Philip -- Philip was on vacation. Philip
3       03  Simon was going to do the trading. I decided to do the
4       04  trading, I think, sometime in December. And Philip was
5       05  on holiday. So I waited till he got back to actually
6       06  start the trading.
7       07   Q. So you decided in December?
8       08   A. Vague -- vague recollection. It was sometime
9       09  when I was on holiday in December. It was over the
10      10  Christmas/New Year's holiday that I made the decision.
11      11  I think. Best I can recall.
12      12   Q. Do you think you made that decision to begin
13      13  trading in January?
14      14   A. It's --
15      15   Q. I'm --
16      16   A. Oh.
17      17   Q. That was a bad question. That is, when you
18      18  made the decision, whenever it was that you made it, was
19      19  it a decision to start trading in January or simply a
20      20  decision to start trading at some point before the
21      21  options expired?
22      22   A. To start trading -- no, to start trading in
23      23  the current window.
24      24   Q. All right.
25      25   A. So I made a decision "This is as good a time

46

1   00047:01  as any." We were off to a very, very good start in
2       02  December. We'd closed the largest deal in our history
3       03  and -- the trigger event, I suppose, was.
4       04       We had a very strong pipeline; we had closed
5       05  the largest deal in our history; I had no material
6       06  inside information. All those things are good. So this
7       07  seemed like a very safe time to go ahead and sell.
8       08   Q. For your trades in Q3 '01, did you set a floor
9       09  price?
10      10   A. Yes, I did.
11      11   Q. What was that floor price?
12      12   A. $30 a share.
13      13   Q. Did you ever have a floor price that was
14      14  higher than that, say $32 a share?
15      15   A. I don't think so. I might have. I mean, not
16      16  that I recall, but it's certainly possible.
17      17   Q. Whose idea was it to set a floor price?
18      18   A. It was my idea.
19      19   Q. To whom did you communicate that idea?
20      20   A. Philip Simon.
21      21   Q. Anybody else?
22      22   A. Not that I recall.
23      23   Q. Why $30 a share?
24      24   A. I thought that was a fair value. Anything
25      25  less than that I thought was not fair value for Oracle

47

1   00048:01  stock. And I didn't want my trading to push the stock
2       02  down.
3       03       So by setting a floor price, if I stopped
4       04  trading -- if my volume was pushing the stock down and I
5       05  got out of the market and stopped selling, theoretically
6       06  the natural dynamics of the market would let the stock
7       07  recover.
8       08   Q. What did you believe the fair market value of
9       09  Oracle shares was at the time of your trades in
10      10  January 2001?
11      11   A. Oh, that's a difficult question, but more than
12      12  $30 a share.
13      13   Q. And why?
14      14   A. We had been trading at -- the stock had been
15      15  as high as 46. We were -- had just had two record
16      16  quarters. Our business was extremely strong. And so --
17      17  you know, record quarter, record quarter.
18      18       Stock price had come down in the face of two
19      19  record quarters. So it seemed odd to me at the time --
20      20  it's more explainable now -- why the stock would come
21      21  down so much when we're doing so well and our business
22      22  is so strong and getting better.
23      23       And Q3 also looked incredibly strong. We had a
24      24  pipeline growth in excess of 50 percent. I mean, that's
25      25  just extraordinary for a company our size. So it looked

48

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

```
 1  00049:01  like -- and then we'd just closed the largest deal in
 2    02  our history.  So I thought anything less than $30 a
 3    03  share was -- I didn't want to sell.
 4    04      The other reason for $30 a share was I just
 5    05  didn't want -- you know, I didn't want my selling to
 6    06  push the stock price down.  Already the fact that it was
 7    07  public that I was selling wasn't a good thing for the
 8    08  Oracle stock price.
 9    09      I also asked that we limit the volume --
10    10  our -- the volume that we sold to ten or 15 percent.  So
11    11  I just didn't want to perturb the market.
12    12    Q.  You say the fact that it was public that you
13    13  were selling wasn't a good thing for the Oracle stock
14    14  price.  Why do you say that?
15    15    A.  Well, people interpret -- when executives --
16    16  there's all these insider trading reports.  And when an
17    17  insider is selling, people deem not to -- not
18    18  necessarily be good news.  Even though it's selling a
19    19  very small percentage of my holdings, I hadn't sold in
20    20  years, I tend not to sell, and people, you know, ask the
21    21  question, you know, "Why is he selling?"
22    22    Q.  And why is that not a good thing for Oracle's
23    23  stock price?
24    24    A.  You don't want people to think I don't have
25    25  confidence in the company.  I sold a couple percent of
```

49

```
 1  00050:01  my holdings, held 98 percent, sold two percent,
 2    02  something like that.  Nonetheless, people -- I try to
 3    03  stay out of the market.  I just don't -- I don't -- I
 4    04  sell every ten years or so.
 5    05    Q.  You were concerned that Oracle's stock price
 6    06  would drop if people learned that you were going to be
 7    07  selling $900 million worth of Oracle stock; is that
 8    08  right?
 9    09    A.  That people would interpret me selling,
10    10  whenever I sell -- you know, just like when Jeff Henley
11    11  sells or anyone else sells, they would interpret I'm
12    12  selling -- that people -- there are reports called
13    13  insider trading reports where people monitor what
14    14  executives are doing.  And when executives are buying
15    15  stock, you know, that's deemed better than when
16    16  executives are selling.
17    17    Q.  And you were concerned that Oracle's stock
18    18  price would drop if people -- if the market learned that
19    19  you were going to be selling $900 million worth of your
20    20  stock?
21    21    A.  The market was going to learn I was going to
22    22  sell the stock, so ... I know the market was going to
23    23  learn that I was going to sell the stock.  So there's
24    24  two separate things.  One is I have to disclose that I'm
25    25  selling the stock, so ... and I was going to sell the
```

50

```
 1  00051:01  stock, so ...
 2    02      I wanted to make sure that my trades intraday
 3    03  did not affect the market, so I minimized the number of
 4    04  shares we sold to a percentage of total volume, and I
 5    05  set a floor price at $30 a share, that we'd stop selling
 6    06  at $30 a share.
 7    07      That was for two reasons.  One, I didn't want
 8    08  to sell below $30 a share because I thought that wasn't
 9    09  fair value.  And the other was by not selling below $30
10    10  a share, I couldn't -- my sales would not push the
11    11  stock -- you know, me being in the market would not push
12    12  the stock down.
13    13    Q.  Now, you say -- you said a maximum number of
14    14  shares that could be traded in a single day?
15    15    A.  Based on the percentage of total volume.  So
16    16  it wasn't a maximum number of shares.  It's whatever the
17    17  total volume was for the day.  I didn't want to be more
18    18  than ten or 15 percent of the total volume.
19    19    Q.  Who set that?
20    20    A.  The broker -- or who set -- I set the amount.
21    21  Do you mean who executed the trades?
22    22    Q.  No, no, whose idea was it to set that limit?
23    23    A.  Oh.  I think it was a discussion between
24    24  Philip and I.
25    25    Q.  Okay.
```

51

```
 1  00052:01    A.  And maybe Merrill Lynch as well.  I think it
 2    02  was Merrill Lynch who did the trades.
 3    03    Q.  Do you recall who at Merrill Lynch it was?
 4    04    A.  I don't.
 5    05    Q.  Tom Blanchfield?
 6    06    A.  Sure.  I know that I vague -- I recall that
 7    07  name.
 8    08    Q.  But you don't have --
 9    09    A.  I couldn't point and say he was with Merrill
10    10  Lynch, but I do know the name.
11    11    Q.  Did you end up exercising in January 2001 more
12    12  or less options than you had intended?
13    13    A.  We had set a target to sell 40 million shares
14    14  of stock.
15    15    Q.  Okay.
16    16    A.  And we wanted to sell the options first.  And
17    17  there were 22 million options.  And we were able to sell
18    18  all of the options and 7 million additional shares
19    19  beyond that.  But we never got to the 40 million share
20    20  target.
21    21    MR. DE GHETALDI:  Okay.  It's about an hour.
22    22  You want to take a break?
23    23    THE WITNESS:  Sure.
24    24    THE VIDEOGRAPHER:  Off the record, 11:17 a.m.
25    25    (Recess taken).
```

52

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

1   00053:01        THE VIDEOGRAPHER:  On the record, 11:30 a.m.
2   02    MR. SALPETER:  I just meant to say at the
3   03  beginning of the deposition that I assume the deposition
4   04  is covered by the protective order.
5   05    MR. DE GHETALDI:  Oh, yes.
6   06    MR. SALPETER:  And we're all going to comply
7   07  with the protective order.
8   08    MR. DE GHETALDI:  Yes.
9   09    MR. SALPETER:  Okay.
10  10    MR. DE GHETALDI:  And we're doing it under
11  11  Delaware rules.
12  12    MR. SALPETER:  Yes, correct.
13  13    MR. DE GHETALDI:  Are we on?
14  14    THE REPORTER:  Yeah.
15  15    MR. DE GHETALDI:  Oh, good.  Okay.
16  16    Q.  Mr. Ellison, you were saying before the break
17  17  that you decided in -- you thought, maybe -- in December
18  18  to exercise in January.
19  19    A.  Right.
20  20    Q.  But you didn't do it earlier than
21  21  January 22nd because Mr. Simon was on vacation.  Did
22  22  you tell Mr. Simon in December about your decision?
23  23    A.  I don't recall.  I think he was on vacation,
24  24  so I don't think so.  But again, I don't recall.
25  25    Q.  If I told you that Mr. -- that the records

53

1   00054:01  that had been produced to us indicate that Mr. Simon
2   02  went on vacation on January 4th, does that help your
3   03  recollection as to whether you had a conversation with
4   04  him?
5   05    A.  No.
6   06    (DC Exhibit No. 102
7   07  marked for identification).
8   08    MR. DE GHETALDI:  Q.  Have you ever seen
9   09  Exhibit 102 before today?
10  10    A.  I may have.  I don't recall.
11  11    Q.  Do you recall who the members of Oracle
12  12  Corporation's board of directors compensation committee
13  13  were in June of 2000?
14  14    A.  I think I said it was Michael Boskin, Donald
15  15  Lucas and Jeffrey Berg.  But I -- again, that's just my
16  16  recollection.
17  17    Q.  The exhibit indicates that it is a written
18  18  consent of the compensation committee of the board of
19  19  directors of Oracle Corporation and appears to be signed
20  20  by Mr. Michael Boskin and Mr. Donald Lucas.
21  21    Do you recognize their signatures on the
22  22  second and third pages of Exhibit 102?
23  23    A.  I do.
24  24    Q.  Does that refresh your recollection as to who
25  25  members of the compensation committee were in the summer

54

1   00055:01  of 2000?
2   02    A.  As I say, I just don't recall.
3   03    Q.  All right.
4   04    A.  So you're saying -- you're saying these were
5   05  the only two members on the comp committee at the time?
6   06    Q.  Well, I'm not saying that.  I'm asking.
7   07    A.  I don't know.
8   08    Q.  All right.  In June of 2000, did the
9   09  compensation committee have the authority on behalf of
10  10  Oracle's board of directors to set the form of
11  11  nonqualified stock option grant agreements and stock
12  12  option exercise notices and agreements?
13  13    A.  I don't know the exact rules governing the
14  14  compensation committee versus the entire board versus
15  15  all of the shareholders.  I mean, there are strict rules
16  16  about that, and I'm not -- I'm not -- don't know the
17  17  rules.
18  18    Q.  Do you recall the compensation committee
19  19  approving a new form of stock option exercise notice and
20  20  agreement in June of 2000 such as that exemplified by
21  21  the last page of Exhibit 102?
22  22    A.  Again, I know we changed the details of the
23  23  grant a couple of times, but I don't -- but I don't
24  24  recall the dates.
25  25    Q.  This is already marked.  So I'm just going to

55

1   00056:01  hand over a copy of it.
2   02    A.  Okay.
3   03    Q.  Have you ever seen Plaintiff's Exhibit 13
4   04  before today?
5   05    A.  No.
6   06    Q.  Please turn to the second page of Exhibit 13
7   07  and tell me if that is your signature at the bottom of
8   08  that page.
9   09    A.  It is not.
10  10    Q.  Do you know whose signature it is?
11  11    A.  Probably Carolyn's, Carolyn Balkenhol.  But I
12  12  don't know.  You mean the person who signed my name?
13  13  You mean the signature that says "Lawrence J. Ellison"?
14  14    Q.  Yes.
15  15    A.  Yeah, I don't know.
16  16    Q.  Did Carolyn Balkenhol have authority to sign
17  17  your name on Oracle Corporation's stock exercise
18  18  agreements in December of 2000?
19  19    A.  By "authority," do you mean a power of
20  20  attorney or do you mean me just saying "Go ahead,
21  21  Carolyn, sign it for me"?
22  22    Q.  Either.
23  23    A.  Yes, she had authority from me.
24  24    Q.  Did she have power of attorney to sign your
25  25  name?

56

```
1   00057:01   A.  Not that I know of.
2   02     Q.  Do you recall authorizing her to sign your
3   03  name to the second page of Exhibit 13 on or about
4   04  December 27th, 2000?
5   05     A.  I don't -- I don't think I specifically
6   06  authorized her to sign page 1 or page 2 or page 3.  I
7   07  just think she said "Do you want to exercise -- Philip
8   08  said we should exercise the options.  Do you want me to
9   09  go ahead and sign the papers?"
10  10         Or she might have just gone -- without -- she
11  11  has general approval to do things like this, to sign my
12  12  name for a lot of documents, not all documents.  Some
13  13  documents I have to sign myself.  But she has the
14  14  authority to sign documents like this.  So she might not
15  15  have sought explicit approval, you know, for signing
16  16  this.  In fact, I suspect she didn't.
17  17     Q.  Okay.  Is it possible that someone other than
18  18  Carolyn Balkenhol signed your name to the second page of
19  19  Exhibit 13?
20  20     A.  It's possible but unlikely.
21  21     Q.  How about Mr. Simon?
22  22     A.  It's possible.
23  23     Q.  But unlikely?
24  24     A.  But unlikely.
25  25     Q.  If you'll turn to the third page of Exhibit
```

                                                     57

```
1   00058:01  13, which is titled "Oracle Corporation Stock Option
2   02  Exercise Notice And Agreement."  Do you see that?
3   03     A.  Yes, I do.
4   04     Q.  Is that your signature there at the bottom of
5   05  that page?
6   06     A.  No, it's not.
7   07     Q.  Do you know whose it is -- I mean who signed
8   08  it?
9   09     A.  Same answer as I gave before.  Same person who
10  10  signed the previous page.
11  11     Q.  Who you believe to be Carolyn Balkenhol?
12  12     A.  Yes.
13  13     Q.  Do you recall specifically authorizing
14  14  Ms. Balkenhol on or about December 27th, 2000 to sign
15  15  this Oracle Corporation stock option exercise notice and
16  16  agreement on your behalf?
17  17     A.  Only in the sense that I said we're -- you
18  18  know, Philip asked me -- you know, they informed me that
19  19  we need to exercise options before the end of the year
20  20  for tax planning purposes.  And I said "Sure, let's do
21  21  it."  And that set in motion the exercise of these
22  22  documents.
23  23     Q.  This is --
24  24     A.  I suspect I was out of town.
25  25     Q.  Okay.  Do you recall telling Mr. Simon -- at
```

                                                     58

```
1   00059:01  the same time you told him that you would go ahead and
2   02  exercise these 815,000 options at the end of December,
3   03  do you recall telling him at that time that you also
4   04  wanted to sell the rest of the expiring options and some
5   05  additional shares in January?
6   06     A.  This was a wholly different matter.  This was
7   07  a routine, in a sense, annual tax planning matter.  And
8   08  this might have been set in motion in November.  I have
9   09  no idea when this was set in motion.  It had to be done
10  10  before the end of the tax year.  But I have no idea when
11  11  this whole process was set in motion.
12  12     Q.  All right.  On the fourth page of Exhibit
13  13  13 --
14  14     A.  Fourth page -- page numbered 4?
15  15     Q.  Well --
16  16         There's two --
17  17     Q.  Yes, it's page number 5 --
18  18     A.  Okay.
19  19     Q.  -- but it's the fourth page of the exhibit.
20  20     A.  Okay, page numbered 5.  Got it.
21  21     Q.  With the Bates 7294 in the lower right-hand
22  22  corner.
23  23     A.  Yes.
24  24     Q.  Is that your signature on the fourth page of
25  25  Exhibit 13?
```

                                                     59

```
1   00060:01   A.  No, it's not.
2   02     Q.  And you believe that that was signed -- that
3   03  your name was signed by Carolyn Balkenhol as well?
4   04     A.  I believe so.
5   05     Q.  Up at the top, there's some instructions on
6   06  the delivery of stock certificates and the name that is
7   07  to appear as owner.  Do you see how that's filled in
8   08  there?  Seems to indicate that you and Mr. Simon were
9   09  cotrustees of the Lawrence J. Ellison revocable trust
10  10  under declaration dated 12/8/95, as amended.
11  11     A.  Okay.
12  12     Q.  Does that refresh your recollection as to
13  13  whether Mr. Simon was a trustee of any of your trusts?
14  14     A.  I guess he is.
15  15     Q.  Going back one page to the third page of
16  16  Exhibit 13, which is Bates-numbered 7293, this is
17  17  apparently an outdated form of the stock option exercise
18  18  notice and agreement that was modified in June 2000 by
19  19  the compensation committee.  Did -- in December --
20  20         MR. SALPETER:  I object to the form.  I object
21  21  to the preamble to the question.
22  22         MR. DE GHETALDI:  That's fine.
23  23     Q.  In December of 2000, was it your intent when
24  24  you signed Oracle documents relating to your stock
25  25  option exercises to sign the most recently approved form
```

                                                     60

```
1  00061:01 of those documents?
2  02    A. Was it my -- sure. It -- do I think -- can I
3  03 just rephrase it?  Do I think I should sign the most
4  04 recent versions of the documents?
5  05    Q. Yes.
6  06    A. Yes, of course.
7  07    Q. And just as a little bit of follow-up, then,
8  08 if Carolyn Balkenhol was signing documents on your
9  09 behalf, that she should also have signed the most recent
10 10 versions of those documents?
11 11    A. Sure.
12 12    Q. And if she signed an outdated version of this
13 13 stock option exercise notice and agreement on your
14 14 behalf, that was done by mistake?
15 15    A. I think so.
16 16    Q. Does Oracle have an insider trading policy?
17 17    A. Yes.
18 18    Q. Did it have an insider trading policy in the
19 19 third quarter of 2001?
20 20    A. Yes.
21 21    Q. Can you briefly summarize what that policy is.
22 22    A. You can't -- it's in our handbook, our ethics
23 23 handbook.  But it's you can't trade if you have material
24 24 inside information.
25 25    Q. Do you recall whether that policy is contained
```

```
1  00062:01 in any other document?
2  02    A. I'm sure it's all over the place, but I don't
3  03 know where.  Yeah, I'm sure it's all over the place.
4  04    Q. Did you ever discuss Oracle's insider trading
5  05 policy with Mr. Cooperman prior to your exercise and
6  06 sale of Oracle options in January of 2001?
7  07    A. Yeah, we've had several discussions at board
8  08 meetings as to what constitutes insider trading and what
9  09 the rules are and the formulation of the policy.
10 10    Q. All right.
11 11    A. And those discussions were led by our general
12 12 counsel.
13 13    Q. All right.  Was Mr. Henley present at those
14 14 discussions?
15 15    A. You bet.
16 16    Q. Okay.  Was Mr. Simon ever present when those
17 17 discussions were had?
18 18    A. No, but Mr. Simon certainly has been in
19 19 contact with Mr. Cooperman.  I suspect they've discussed
20 20 it. I haven't been on any, you know, three-party
21 21 discussions, but I suspect they've had conversations
22 22 about it.
23 23    Q. So you knew in fiscal year 2001 that you were
24 24 required to comply with Oracle's insider trading policy?
25 25    A. Oh, of course.
```

61

62

```
1  00063:01    Q. Did -- separate from the insider trading
2  02 policy, did Oracle have an executive trading policy in
3  03 fiscal year 2001?
4  04    A. Yeah, I think the executive windows were --
5  05 again, I'm not -- correct answer is I'm not certain.
6  06 But I believe the executive windows were different than
7  07 the windows for other employees.  But I don't -- again,
8  08 these are -- these are vague recollections --
9  09    Q. All right.
10 10    A. -- as to, you know, the dates these things
11 11 were implemented and the precise -- the precise
12 12 structure of the rules.
13 13    Q. All right.  Do you recall ever discussing
14 14 Oracle's executive trading policy with Mr. Cooperman
15 15 prior to your trades in January 2001?
16 16    A. I think -- there certainly were discussions in
17 17 board meetings, again, as to what the rules were for
18 18 executives.
19 19    Q. Okay.  Is it your understanding that your
20 20 trades in the third quarter of fiscal year 2001 were
21 21 approved in conformance with Oracle's insider trading
22 22 policy?
23 23    A. Yes. I went to Mr. Cooperman -- or Philip
24 24 Simon went to Mr. Cooperman to get approval for the
25 25 window trading, and I think we also consulted with Jeff
```

```
1  00064:01 Henley.
2  02    Q. Do you recall -- you say "we also consulted
3  03 with Jeff Henley."
4  04    A. We -- Philip, as my representative, discussed
5  05 it with Jeff as well.
6  06    Q. Do you recall when he discussed it with
7  07 Mr. Henley?
8  08    A. I don't.
9  09    Q. What is the basis for your understanding that
10 10 your trades -- other than the fact that Mr. Simon went
11 11 to Mr. Cooperman and Mr. Henley, what is the basis for
12 12 your understanding that those trades were conducted in
13 13 conformance with Oracle's insider trading policy?
14 14    A. Well, in my judgment, I had no insider --
15 15 inside -- material inside information that would lead me
16 16 to believe we should alter our guidance that was
17 17 currently outstanding to the street.  So that was my
18 18 judgment.  That was the judgment -- that was also the
19 19 judgment of Mr. Cooperman and Mr. Henley, was the same,
20 20 and that my trades would conform to the rules.  And
21 21 that's why they gave me the go-ahead.
22 22    Q. Is it your understanding that the phrase
23 23 "material inside information" is confined to information
24 24 that would lead Oracle to alter its outstanding guidance
25 25 to the street?
```

63

64

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

1   00065:01   A.  That -- certainly if it could cause us to alter our
2   02  guidance to the street, that's definitely material
3   03  inside information.
4   04  Q.  Okay.
5   05  A.  Material inside information.  But no, if it
6   06  was something like we were planning -- I'll give you
7   07  another example, which was an event like we had made a
8   08  fundamental decision that we're going to make a hostile
9   09  attempt to acquire IBM.  That would be material inside
10  10  information, even though it wouldn't change our guidance
11  11  whatsoever.
12  12  Q.  All right.  Is it your understanding that your
13  13  trades in Q3 '01 were approved according to Oracle's
14  14  executive trading policies?
15  15  A.  I think they would not -- yes.  Otherwise they
16  16  would not have been approved by Mr. Cooperman and
17  17  Mr. Henley.
18  18  Q.  Okay.  Now, it's your understanding that
19  19  Mr. Simon handled the approval process for you?
20  20  A.  Yes.
21  21  Q.  Did he communicate with you during that
22  22  process?
23  23  A.  Yes.
24  24  Q.  Do you know how long that process took?
25  25  A.  I don't.

65

1   00066:01   Q.  Within --
2   02  A.  Couple of days, I think.  Not a long time.
3   03  But again, I don't know.
4   04  Q.  Do you know whether written approval for the
5   05  trades is ever issued?
6   06  A.  No idea.
7   07  Q.  In January 2001, did you know any facts about
8   08  Oracle's finances that Mr. Cooperman did not know?
9   09  A.  Probably.
10  10  Q.  Did you know any facts in the third quarter of
11  11  2001 about Oracle's finances that Mr. Henley did not
12  12  know?
13  13  A.  Probably not.
14  14  Q.  In January 2001, did you have discussions with
15  15  anyone about Oracle's finances that Mr. Cooperman did
16  16  not participate in?
17  17  A.  I'm not sure what you mean by "Oracle
18  18  finances."  Did I -- did I have any discussions with
19  19  people about pending deals, any discussions about
20  20  forecasts, things like that?
21  21  Q.  You might add actual results to that list.
22  22  A.  Or actual results -- sure.
23  23  Q.  Did you have any discussions in January 2001
24  24  about Oracle's actual deals -- pending deals, forecasts,
25  25  actual results that Mr. Henley did not participate in?

66

1   00067:01   A.  Yes, but Mr. Henley was kept pretty much
2   02  abreast -- Mr. Henley and I had access to the same
3   03  reports and the same total information.  So I might
4   04  describe a particular sales transaction with a particular
5   05  sales executive, and Mr. Henley wasn't on the phone.
6   06  But as that information was aggregated into forecasts
7   07  and reports, he had access to the same information I had
8   08  access to.
9   09  Q.  Other than Mr. Simon, do you know of anyone
10  10  who communicated the fact that you intended to exercise
11  11  your options in January of 2001 with Mr. Henley?
12  12  A.  The question is did anyone other than Jeff
13  13  Henley -- did anyone other than Philip Simon tell Jeff
14  14  Henley that I was exercising options?
15  15  Q.  Right.
16  16  A.  I have no idea.
17  17  Q.  Okay.  All right.  Prior to exercising or
18  18  selling in Q3 2001, did you tell Mr. Cooperman that you
19  19  did not personally have material nonpublic information
20  20  about Oracle?
21  21  A.  I don't think so.
22  22  Q.  Is there a reason why you didn't?
23  23  A.  I didn't talk to him.
24  24  Q.  Okay.  Prior to exercising or selling in
25  25  January of 2001, did you tell Mr. Henley that you did

67

1   00068:01   not have material nonpublic information about Oracle?
2   02  A.  I'm trying to make sure I understand the
3   03  question.  Did I affirmatively walk up to Jeff and say
4   04  "Jeff, I just want you to know I don't have any material
5   05  inside information"?
6   06  Q.  That's right.
7   07  A.  No, I didn't say that.
8   08  Q.  Okay.  And you didn't say that to
9   09  Mr. Cooperman?
10  10  A.  I didn't say that to either one of them.
11  11  Q.  Do you know if anyone said that to them on
12  12  your behalf?
13  13  A.  I have -- I have no idea.  I don't know
14  14  what -- I don't know what Philip's -- Philip's
15  15  discussions were with -- with Jeff Henley at the time.
16  16  Q.  Okay.
17  17  A.  I just -- you know, I told Philip, you know,
18  18  that this was a good time to sell because, you know,
19  19  there was nothing going -- you know, things looked -- we
20  20  were off to a very strong start in the quarter; I don't
21  21  have any inside -- you know, material inside
22  22  information; so this is an excellent time to go ahead
23  23  and go to market with the stock, I told Philip.
24  24  But I don't think I ever spoke with Dan
25  25  Cooperman or Jeff Henley.

68

Ellison, Lawrence J. (Vol. 01) - 02/26/2004   2/26/2004   10:41:00 AM

| | |
|---|---|
| 1  00069:01   Q.   When you told Mr. Simon that you -- that it | 1  00070:01  on the 19th, then I spoke with him on the 19th.  He |
| 2  02  was a good time to go ahead and sell, was that the | 2  02  got clearance from Jeff and Dan to go ahead, and trades |
| 3  03  conversation in December or was that a conversation in | 3  03  commenced on the 22nd. |
| 4  04  January? | 4  04   Q.   Is it your understanding that -- |
| 5  05   A.   I think my conversation with Philip was in | 5  05   A.   But I don't recall that. |
| 6  06  January. | 6  06   Q.   Okay.  Is it your understanding that Mr. Simon |
| 7  07   Q.   Was that after he got back from New Zealand? | 7  07  got clearance from Mr. Henley on January 19th? |
| 8  08   A.   I think so. | 8  08   A.   I have no idea.  Again, I -- the dates -- I |
| 9  09   Q.   Okay. | 9  09  don't remember any of this.  I just -- I just know that |
| 10  10   A.   But I -- again, I don't -- I don't recall the | 10  10  the trading started on the 22nd.  Then I spoke with |
| 11  11  exact dates. | 11  11  Philip Simon, and Philip Simon got clearance from Dan |
| 12  12   Q.   All right.  If I told you that the records | 12  12  Cooperman.  I'm not even certain that Philip also talked |
| 13  13  that were produced to us indicate that Mr. Simon | 13  13  to Jeff Henley.  I don't know what the process was. |
| 14  14  returned from New Zealand on January 19th, does that | 14  14   Q.   Is it your recollection that you had this |
| 15  15  refresh your recollection? | 15  15  discussion with Mr. Simon after he returned from |
| 16  16   A.   That sounds right. | 16  16  vacation; that is, the discussion in which you told him |
| 17  17   Q.   It was a Friday; do you recall that? | 17  17  it was a good time to trade because you didn't have any |
| 18  18   A.   I don't. | 18  18  material inside information? |
| 19  19   Q.   The trades began on the following Monday, | 19  19   A.   You're asking me if I recall.  And the answer |
| 20  20  January 22nd; do you recall that? | 20  20  is I don't recall those dates.  I think that's what |
| 21  21   A.   I've looked at -- I've looked at the -- yeah, | 21  21  happened, but it's -- but I don't recall those dates. |
| 22  22  my notes -- my notes -- I've looked at my affidavit -- | 22  22   Q.   Okay.  But you -- without recalling the |
| 23  23  you know, my affidavit.  And that's what it says in my | 23  23  specific dates -- what I'm trying to find out is did you |
| 24  24  affidavit. | 24  24  tell him before he went on vacation and then some time |
| 25  25   So yeah, stands to reason that if he got back | 25  25  elapsed before the trades started occurring, or did you |
| | |
| 69 | 70 |
| | |
| 1  00071:01  tell him right after he came back from vacation, | 1  00072:01   Q.   Who has your phone bills? |
| 2  02  whenever that was, and that's when he started -- that's | 2  02   A.   I have no idea. |
| 3  03  when he authorized the trade? | 3  03   Q.   Do you recall whether you communicated with |
| 4  04   A.   I believe that's right.  I don't know if I | 4  04  Mr. Simon -- that is, you communicated the fact that you |
| 5  05  called him in New Zealand.  I don't -- I don't know.  I | 5  05  did not have inside material information about Oracle -- |
| 6  06  just don't know. | 6  06  in person or over the phone? |
| 7  07   Q.   Okay. | 7  07   A.   It was over the phone. |
| 8  08   A.   I might have spoken to him when he was in New | 8  08   Q.   But you don't recall whether -- or do you |
| 9  09  Zealand. | 9  09  recall whether that was after he returned from vacation |
| 10  10   Q.   But you -- | 10  10  or not? |
| 11  11   A.   I have no -- I just don't remember. | 11  11   A.   No recollection whatsoever. |
| 12  12   Q.   Before -- are there -- did you keep any notes | 12  12   Q.   Before you spoke to Mr. Simon and told him |
| 13  13  of this conversation with Mr. Simon? | 13  13  that you didn't have inside material information about |
| 14  14   A.   No. | 14  14  Oracle, did you make any special inquiry to find out if |
| 15  15   Q.   No memos? | 15  15  anything at the company was going on that would |
| 16  16   A.   Nothing. | 16  16  constitute inside material information? |
| 17  17   Q.   Do you have your phone bills? | 17  17   A.   Well, since we weren't buying any companies, |
| 18  18   A.   Do I have phone bills.  I assume I have phone | 18  18  there was no large -- large event, nor were we |
| 19  19  bills. | 19  19  contemplating making an offer for a company or had any |
| 20  20   Q.   Do you personally have the phone bills or | 20  20  made an offer to buy us, the only other thing that would |
| 21  21  does -- | 21  21  be material would be a significant change in our |
| 22  22   A.   Me personally? | 22  22  business that might cause us to alter guidance. |
| 23  23   Q.   -- Oracle have the phone bills? | 23  23   And in fact, we were off to a very good start |
| 24  24   A.   I don't personally have the phone bills.  I | 24  24  in the quarter, and it looked like we were -- you know, |
| 25  25  don't even know how many phones I have. | 25  25  that we were going to safely make our quarter. |
| | |
| 71 | 72 |

1  00073:01    Q.  You say the only other thing that would be
2    02  material would be a significant change in your business
3    03  that might cause you to alter guidance.  Is that your
4    04  understanding of the only other thing?
5    05    A.  No, of course not.
6    06    Q.  Okay.
7    07    A.  Nuclear attack on New York City would probably
8    08  change things.  If I knew there was going to be a
9    09  nuclear attack in New York City because I was, you know,
10    10  privy to this information somehow, I'm sure that would
11    11  also be material inside information.  If I knew I had
12    12  cancer and one week to live, that would be material
13    13  inside information.
14    14    So no, there are other things that would
15    15  constitute material inside information that would
16    16  preclude me from trading.
17    17    Q.  Okay.  Well, in terms of -- specifically in
18    18  terms of Oracle's finances, is it your understanding
19    19  that only the fact that Oracle's business had declined
20    20  to such an extent that it would require you to alter
21    21  guidance, that's the only sort of financial information
22    22  that would constitute material inside information?
23    23    MR. SALPETER:  Objection to form.
24    24    THE WITNESS:  I'm not -- again, I'm not sure
25    25  what you mean.  If there was -- you know, if there was a

73

1  00074:01  substantial change in our business, a very substantial
2    02  change in our business --
3    03    MR. DE GHETALDI:  Short of --
4    04    THE WITNESS:  I'm just -- I'm trying -- I'm
5    05  doing this -- I'm not sure I want us to sit around and
6    06  speculate.  You mean if suddenly someone -- we just
7    07  closed a billion-dollar deal, you know, and we're going
8    08  to wildly exceed expectations, yeah, that would be
9    09  material inside information.  And it would cause us --
10    10  if not -- you know, probably cause us -- we'd probably
11    11  have to announce it because of the size -- because of
12    12  the size of the deal, if there were some huge loss
13    13  reserve.
14    14    But yeah, basically if our financial result --
15    15  I can't offhand -- you know, I hate to -- you know,
16    16  never say never.  I can't think of another something
17    17  that's material that wouldn't affect guidance, as I sit
18    18  here today.  If you can think of something, bring it up
19    19  and I'm perfectly willing to reconsider my position.
20    20    MR. DE GHETALDI:  Okay.  All right.  We're
21    21  going to change the tape.
22    22    THE VIDEOGRAPHER:  This is the end of Volume
23    23  I, tape 1 in the deposition of Lawrence J. Ellison on
24    24  February 26, 2004.  The time is 12:04 p.m.  We're off
25    25  the record.

74

1  00075:01    (Recess taken).
2    02    THE VIDEOGRAPHER:  This marks the beginning of
3    03  Volume I, tape 2 in the deposition of Lawrence J.
4    04  Ellison on February 26, 2004.  The time 12:07 p.m.  We
5    05  are on the record.
6    06    MR. DE GHETALDI:  Q.  Mr. Ellison, what are
7    07  Oracle's revenue sources?
8    08    A.  We have a software business, which is divided
9    09  up into two groups: the technology business, where the
10    10  primary product is the database, and we have an
11    11  applications business, where the primary product is the
12    12  eBusiness Suite.  The database technology business is
13    13  about three, four times larger than the applications
14    14  business.
15    15    We have a consulting business and education
16    16  business.  And then we have something that's sometimes
17    17  called support, though it's not -- what it really is is
18    18  our license -- our software license renewal business.
19    19  So it's not really a support service at all; it is
20    20  people who buy our products -- let's say you spend a
21    21  million dollars to purchase an Oracle database.  You
22    22  give us $200,000 a year, 20 percent of the cost of
23    23  purchasing the software, to receive new versions of the
24    24  software.
25    25    So you -- if you will, it's a subscription

75

1  00076:01  right on your license that allows you to get the latest
2    02  version of the software without having to rebuy the
3    03  software.
4    04    And there's two models.  One is you buy
5    05  version 6 -- this is Microsoft's old model -- you buy
6    06  version 6; when version 6 is dead, you have to rebuy
7    07  version 7; you have to rebuy version 8.
8    08    We don't do that.  When you buy version 6,
9    09  then you get version 7 for free and version 8 for free
10    10  and version 9 for free, so long is "for free" is defined
11    11  as you're paying your subscription fees annually.  Maybe
12    12  for no additional charge, so long as you pay your annual
13    13  subscription fee.
14    14    So our software business has two -- there's
15    15  two orthogonal ways to look at our software business.
16    16  One is it's our application business and our database
17    17  business; the other one is new license sales and
18    18  subscriptions, people who bring new -- bought the year
19    19  before and the year before that, who are then
20    20  subscribing -- giving us our subscription fees and
21    21  paying that annual fee.
22    22    Right now -- it's a long answer.  Right now
23    23  our subscription business is actually larger than our
24    24  license business, but it's all software.
25    25    Q.  Going back just for a second, I think that one

76

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

00077:01  of the questions I asked you before the break, I'm not
02  sure if it was actually answered.  And that was the
03  question of whether you actually made an active inquiry
04  into Oracle's business prior to directing Mr. Simon to
05  begin trading.
06      A.  I received -- on a weekly basis, I received
07  forecast reports.  I stayed in contact with our
08  salespeople, albeit less so over the holiday, over the
09  Christmas holiday, but certainly starting early January.
10  The -- got -- I had actuals -- had the actual results
11  from December before we started trading.  So yeah, I
12  think I was up-to-date.
13      So you're saying before trading commenced on
14  the 22nd, was I pretty much up-to-date with all of the
15  information, all the financial information available,
16  then available?  And the answer's yes.
17      Q.  And you made no special inquiry other than
18  what you learned in the normal course of business?
19      A.  Which is made up of lots of special inquiries.
20      Q.  Yes.
21      A.  But yes.  Yes.  Normal course of business is
22  for me to keep pretty up-to-date as to the state of our
23  business.
24      Q.  Okay.  Now, going back to the revenue sources.
25  In some of the financial documents that have been

77

00078:01  provided to us, there's a category called tools.  What
02  are tools?
03      A.  We used to have a category called tools where
04  we -- it's our Java application development product, our
05  report writer.  It's a relatively small portion of our
06  technology business.  Used to be known as tools, and
07  then we took all of those tools and rolled them into a
08  product we called the application server.
09      So we really don't have a tools business at
10  all anymore.  We decided to create a number, take a
11  bunch of separate products and put them into the
12  application server.
13      Q.  But in Q3 '01 tools were reported as a
14  separate category?
15      A.  I think we were in the process at that time of
16  moving tools from separate to -- yeah, we were halfway
17  between moving all the tools from separate reported
18  items to being bundled in with the application server.
19      Q.  Okay.
20      A.  I think.  I have to go back and look, you
21  know.
22      Q.  Okay.
23      A.  Okay.
24      Q.  The application, you said, is essentially now
25  the eBusiness Suite.  Was applications divided up into

78

00079:01  other categories in Q3 '01?
02      A.  We have an a la carte version of the
03  applications where you can buy Oracle human resources,
04  you can buy Oracle financials, you can buy Oracle
05  manufacturing or you can say "I'm not going to buy the
06  components separately; I'm going to buy them all
07  together."  And that's called the eBusiness Suite.
08      So it's just a way to buy all of the separate
09  applications as a bundle, as a group.  So you'd say "I
10  have a hundred users, you know, and I don't" -- let's
11  say you wanted to buy 50 users for HR and 50 users for
12  financials, total of a hundred users.  But you'd say
13  specifically -- if you change your mind and later wanted
14  to have 60 users of HR and 40 users of financials, you
15  really couldn't do that because what you owned were 50
16  licenses for financials.
17      However, if you bought a hundred users for
18  eBusiness Suite, those eBusiness users were portable.
19  You know, that user could be an HR user or a financials
20  user.  So you didn't have to know exactly what -- you
21  know, how many users you had per component.
22      So it's more convenient for customers to buy
23  the entire suite and then figure out how many users, you
24  know, in one area and how many users in the other over
25  time.

79

00080:01      Q.  Okay.
02      A.  Rather than -- rather than at the point of
03  licensing.
04      Q.  Okay.  What's CRM?
05      A.  Customer relationship management.  It is
06  the -- sometimes called the front office application:
07  sales, marketing and service.  It's all of those
08  processes and organizations that have direct contact
09  with customers.
10      You market to customers; you sell to
11  customers; you service customers, as opposed to a back
12  office application, ERP, where you do the accounting.
13  You're not directly talking to customers.  You are --
14  you may occasionally in collections.  You're doing
15  manufacturing.  You're scheduling them, you know, the
16  plant floor, inventory, those kinds of things.
17      So we distinguish between front office
18  customer, you know, where you have direct contact with
19  customers, and the back office.
20      Q.  In Q3 '01 did Oracle report internally the
21  sales of those two versions of applications separately?
22      A.  At that time, we had two ways of -- yes and
23  no.
24      Q.  Okay.
25      A.  You could buy the bundle, the eBusiness Suite,

80

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

1  00081:01  where we didn't know if they were CRM users or ERP
2  02  users.  So you could license it that way, or you could
3  03  explicitly say "I want to buy the Oracle sales product"
4  04  or "I want to explicitly buy the Oracle HR product."
5  05      So some of the sales you could pinpoint as to
6  06  what the customer was going to use -- which product the
7  07  customer was going to use, CRM or ERP.  Some sales you
8  08  couldn't pinpoint because they were buying this basket
9  09  of products.
10  10    Q.  In Q3 '01, had Oracle itself begun using the
11  11  eBusiness Suite?
12  12    A.  We had just begun using it, yes.
13  13    Q.  Do you recall when it was -- when it went on
14  14  line?
15  15    A.  I think that quarter or the quarter before.
16  16  Pretty close to it, yeah.  Pretty much that quarter or
17  17  the quarter before.
18  18    Q.  In a number of the financial reports that
19  19  we've been given, there's a category called "pipeline."
20  20    A.  Yes.
21  21    Q.  Can you tell me what that is.
22  22    A.  Pipeline are all of the open opportunities.
23  23  The salespeople keep track of their open opportunities
24  24  in a system called Oracle Sales On-line.
25  25      So let's say I'm trying to sell you a million

81

1  00082:01  dollars' worth of database.  I'll enter the name of your
2  02  company, where I am in the sales process, who the
3  03  competition might be.  So I'll have all of that
4  04  information.
5  05      So there'll be -- that's deemed an opportunity
6  06  to sell -- you haven't purchased it yet, but we've given
7  07  you a demonstration and you're trying to decide between
8  08  us and IBM, our product and IBM's product.
9  09      So then we'd say we have a million dollars of
10  10  pipeline, a prospective sale, a prospective customer.
11  11  And then we add up all the different prospects and then
12  12  we trend those.  So is our pipeline growing, how does
13  13  our pipeline -- and we call that, you know, our
14  14  opportunity -- pipeline's also called opportunities.
15  15  They're synonymous.
16  16    Q.  Okay.
17  17    A.  And how does our pipeline this year compare to
18  18  our pipeline last year.  Said another way, how do our
19  19  opportunities to sell this year compare with our
20  20  opportunity to sell last year; is that pipeline growing.
21  21      And a growing pipeline or growing opportunity
22  22  base is indicative of a business that should also be
23  23  growing.
24  24    Q.  Okay.  Are -- is the pipeline made up only of
25  25  open opportunities?  In other words, does it contain

82

1  00083:01  closed deals?
2  02    A.  They would not really be in pipeline once they
3  03  were closed again.  If it's a closed deal, it should be
4  04  marked as won -- again, depends what you mean.  So if
5  05  it's a closed deal, it's marked as won, pulled out of
6  06  pipeline and put into won or booked.
7  07      Different systems do things differently.  Some
8  08  systems don't do a very good job of taking something out
9  09  of the pipeline.  Several things can happen.  A
10  10  salesperson would get an order and the salesperson might
11  11  not mark, you know, that order as closed.  So -- or that
12  12  order as won.  So it's possible that something would
13  13  erroneously appear in both booked and still in pipeline.
14  14  But it should not.
15  15    Q.  Okay.
16  16    A.  It's not a prospective -- it's not an
17  17  opportunity anymore.  It's not a prospective deal any
18  18  more.  It's a customer.  So it should move out of the
19  19  pipeline into -- you know, it's now out of the pipeline
20  20  into, you know, accounting, into order management.
21  21    Q.  Into revenue?
22  22    A.  Into -- well, theoretically into revenue,
23  23  sure.
24  24    Q.  Okay.  Some of the financial reports that
25  25  we've been given include a category called "forecast."

83

1  00084:01  Can you tell me what that is.
2  02    A.  Forecast is a judgment placed on top of
3  03  pipeline, so -- down to the individual, starting with
4  04  the individual salesperson.  Let's say I've got three of
5  05  these million-dollar opportunities.  And the question is
6  06  forecast.  "Well, how many do you think you'll close
7  07  this quarter?  Give me your judgment."  So it's a matter
8  08  of judgment.
9  09      So we ask every salesperson to look at their
10  10  pipeline and look at their opportunities that they're
11  11  working on and tell us, to the best of their ability,
12  12  what they think they will, in effect, close.  And that
13  13  is called a forecast.  That's called -- that's a
14  14  forecast down at the individual salesperson level.
15  15      Then other -- then as it rolls up, managers
16  16  have -- you know, managers apply factors to that till
17  17  you eventually get up to, you know, one person -- you
18  18  know, the head of sales for Europe, the head of sales
19  19  for Latin America, head of sales for North America, so
20  20  on, Asia Pacific, Japan.  They'll say "This is my
21  21  overall forecast."
22  22      So it's their judgment of how much of the
23  23  pipeline we will close this quarter, that will go into
24  24  revenue this quarter.
25  25    Q.  Okay.  And that's the pipeline without the

84

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

```
1   00085:01  closed deals?
2   02    A.  So the pipeline is the opportunity, okay.  So
3   03  let's say we got -- simple example.  We got -- you're --
4   04  I'm a sales guy and I'm trying to sell you three people
5   05  a million dollars' worth of database.
6   06    Q.  Right.
7   07    A.  And I think only -- I'm going to close one of
8   08  them.
9   09    Q.  Right.
10  10    A.  I don't know which one.  You know, I'm pretty
11  11  sure one of them's going to close this quarter.  So even
12  12  though I got $3 million of opportunity, $3 million of
13  13  pipeline, I'm going to say that I will close one of
14  14  those three deals.  So I will have a forecast of a
15  15  million dollars.
16  16    Q.  Okay.
17  17    A.  But during negotiation, you know, you might
18  18  be -- she might be very hard on me, you know.  I think
19  19  the software's a million dollars; she might get me down
20  20  to $700,000.  I'm going to have to give her more
21  21  discount than currently envisioned.  So our forecast is
22  22  $700,000 on top of my opportunity of -- opportunity
23  23  pipeline of $3 million.
24  24      So it's a matter of looking at the opportunity
25  25  flow and then exercising your judgment as to how much of
```

```
1   00086:01  that will come in.
2   02    Q.  Okay.
3   03    A.  So this is an example.  Now, you got lots
4   04  of -- you got thousands of salespeople.  So as you --
5   05  now you have to add all this stuff up.  We have a
6   06  computer system that adds all this stuff up.  And we
7   07  have statistics on how big the pipeline is and how big
8   08  the forecast is.
9   09      One of the things we'll try to do -- and I'll
10  10  stop here 'cause I'm -- I'll go on and on and on, and
11  11  I'm not supposed to do that.  One of the things that
12  12  we'll do is we'll compare our forecast growth -- say
13  13  okay, we're forecasting 25 percent growth.  Well, gee,
14  14  the pipeline's grown 50 percent.  That's pretty good.
15  15  It seemingly means that the forecast is -- you know,
16  16  we're being pretty conservative.  Looks like the pipe
17  17  has grown, lots of opportunities.  Opportunities are
18  18  growing very rapidly.  That's good news.  That
19  19  people are -- you know, it's grown 50 percent, but the
20  20  forecast is only 25 percent.
21  21      So one interpretation is that the sales force
22  22  is being conservative.  They're forecasting a lower
23  23  percentage growth than pipeline growth.
24  24      The converse of that would be let's say
25  25  they're forecasting 25 percent growth and the pipeline
```

```
1   00087:01  hasn't grown at all.  Well, gee, if the pipeline hasn't
2   02  grown at all, if we don't have any more opportunities
3   03  this year than last year, maybe we'd be, you know,
4   04  incautious to, you know, forecast sales growth without
5   05  underlying pipeline growth.
6   06      So it's a matter of looking at all of this
7   07  data, keeping in mind that pipeline data is, quote,
8   08  real -- you know, real data -- and the forecast is --
9   09  it's a sum of judgments of different people.
10  10    Q.  Okay.  Let's go back to your example just for
11  11  a second of three possible $1 million deals in the
12  12  pipeline and a forecast of $1 million.
13  13    A.  Sure.
14  14    Q.  What happens to those numbers if the
15  15  million-dollar deal actually closes?
16  16    A.  The pipeline -- what should happen is, as long
17  17  as the systems are linked and operating properly, that
18  18  that pipeline -- the $3 million pipeline will go from
19  19  3 million to 2 million.  It will drop as the other -- as
20  20  that one -- as that opportunity goes -- is no longer an
21  21  opportunity; it's now a sale.
22  22    Q.  Okay.
23  23    A.  Now, hopefully in the meantime, as it goes
24  24  from opportunity to sale, a good salesperson will be
25  25  finding other opportunities.  So leads are coming in.
```

```
1   00088:01  And so while I'm trying to close that million-dollar
2   02  deal, I'm also talking to prospective new customers and
3   03  I'm trying to grow my pipeline.
4   04      So hopefully one -- you know, that my
5   05  pipeline -- so the opportunity -- so it weren't really
6   06  just -- you know, in isolation it'll drop from 3 million
7   07  to 2 million, but hopefully I'll find two other good
8   08  companies to sell software to, also a million dollars.
9   09      So it will -- so -- yeah, a $2 million deal --
10  10  a $1 million deal will come out of the pipeline, but
11  11  I'll replace it with two other $1 million deals.  So
12  12  I'll end up with a pipeline of $4 million.
13  13      So that the organic process that's happening
14  14  is some of the opportunities are being converted into
15  15  sales, but we're getting new opportunities at a more
16  16  rapid rate than we're converting them.  That would mean
17  17  that pipeline growth was growing faster than sales.
18  18    Q.  Okay.
19  19    A.  I don't know if that's coherent.
20  20    Q.  No, it's coherent.
21  21    MR. DE GHETALDI:  Why don't we take -- why
22  22  don't we have lunch after that one.
23  23    THE VIDEOGRAPHER:  Off the record, 12:25 p.m.
24  24    (Lunch recess taken from 12:25 to 1:00).
25  25
```

85

86

87

88

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

1    00089:01  AFTERNOON SESSION                 1:09 P.M.
2    02         THE VIDEOGRAPHER:  On the record, 1:09 p.m.
3    03             EXAMINATION RESUMED BY
4    04      MR. DE GHETALDI:  Q.  Okay, Mr. Ellison.
5    05   Let's go back to the example of the $3 million in the
6    06   pipeline and the $1 million in forecast.  And I had
7    07   asked you before lunch what happens to those numbers if
8    08   the $1 million deal gets closed.  And you explained that
9    09   the pipeline goes down to 2 million.
10   10         Does the forecast number go down to zero at
11   11   that point, assuming that there are no other deals
12   12   coming in?
13   13      A.  No, the forecast -- the forecast is the sum of
14   14   the deals that are already closed and the deals that you
15   15   expect are going to close.
16   16      Q.  Okay.
17   17      A.  You sum those up.  So a deal either has to be
18   18   in the pipeline or -- or -- or -- well, it could drop
19   19   out of the pipeline.  It could be -- a deal could be
20   20   lost.  A deal could be in the pipeline, won or lost.
21   21      Q.  Okay.  All right.
22   22      A.  So the forecast is the sum of what's been won,
23   23   already in, what sales we've already made, and what
24   24   sales we expect to make this quarter.
25   25      Q.  So the -- in that example, 3 million in the

                                                    89

1    00091:01  where the financial people -- not the salespeople, but
2    02   the finance people -- will take a look at the sales
3    03   forecast and they'll come up with their own forecast,
4    04   their own judgment, which can be different than the
5    05   salespeople's judgment, as to what the quarter's going
6    06   to be like.
7    07         So the finance people might think the
8    08   salespeople are being too conservative in their
9    09   forecast.  They might increase the forecast.  The
10   10   finance people might think the sales people are being
11   11   too optimistic and they might decrease the forecast.
12   12      Q.  And the finance people that you're talking
13   13   about are ...
14   14      A.  They work for Jeff Henley.  They're Jennifer
15   15   Minton's group, working for Jeff Henley.
16   16      Q.  Okay.  Has it been your experience that some
17   17   sales managers or executives tend to overstate or
18   18   understate their forecast numbers?
19   19      A.  Most of our sales managers tend to be
20   20   conservative.
21   21      Q.  Do you know, is there a reason for that?
22   22      A.  They don't like to commit to things that they
23   23   don't deliver.  They'd rather exceed their forecast.
24   24   They think it's okay to exceed their forecast.  That's
25   25   not a bad thing.  So missing on the low side -- another

                                                    91

1    00090:01  pipeline, 1 million in forecast, if the $1 million deal
2    02   closes, the forecast drops to 2 million?
3    03      A.  No, no.
4    04      Q.  I'm sorry, the pipe --
5    05      A.  Pipeline drops to 2 million and the forecast
6    06   might be unchanged.  The deal -- just the certainty of
7    07   the forecast is up.
8    08      Q.  Right.  Okay.  Was that how those numbers were
9    09   reported in Q3 '01?
10   10      A.  Yes.
11   11      Q.  Now, another number that we've -- or another
12   12   description of numbers that we've seen in Oracle's
13   13   financial reports is something called potential.  Can
14   14   you tell me what that is.
15   15      A.  Potential upside or potential -- potential --
16   16   yeah, I think potential's actually more accurate, but,
17   17   you know ...
18   18         There is a judgment made -- there's a
19   19   pipeline, which is real hard data in a computer system,
20   20   all the prospects, all the people we're trying to sell
21   21   to.  There is a forecast, which is a judgment by the
22   22   salespeople as to how many of those deals will close
23   23   this quarter -- how many have already closed and how
24   24   many more will close in the quarter.
25   25         And then there's, finally, a finance review

                                                    90

1    00092:01  way of saying exceeding your forecast is you guess
2    02   you're going to sell a million, you sold 2 million.
3    03   That means that you'd be forecasting low.  And they
4    04   figure that's not a bad thing when you exceed your
5    05   forecast.
6    06         When they forecast a million and sell half a
7    07   million, when they miss on the downside, they think
8    08   missing their forecast is extremely bad.  And therefore,
9    09   they tend to be conservative and forecast numbers
10   10   they're pretty confident being able to make.
11   11      Q.  Okay.  In Q3 '01, who were the sales
12   12   executives who were the most accurate, if you can
13   13   recall?
14   14      A.  I --
15   15         MR. SALPETER:  I'm going to object to the form
16   16   of the question.
17   17         THE WITNESS:  I'm not sure that I can
18   18   characterize one executive as being conspicuously more
19   19   accurate or inaccurate than another.
20   20         MR. DE GHETALDI:  Q.  And I mean more accurate
21   21   in their forecast.
22   22      A.  That's what I meant.  I'm not sure I can
23   23   characterize certain sales -- you know, certain sales
24   24   executives as being -- some being materially more
25   25   accurate than the others.

                                                    92

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

1   00093:01    Q.  Okay.  Did you take any steps in Q3 '01 to try
2   02  and compensate for the tendency of sales executives to
3   03  underforecast?
4   04    A.  Nothing out of the ordinary.  We have two
5   05  forecasts.  We have the sales forecast and then we have
6   06  the finance forecast.  And the finance forecast is
7   07  sometimes referred to as upside or potential, or
8   08  whatever you'd like to call it.
9   09      And the finance forecasts historically have
10  10  been much more accurate than the sales forecasts.  Just
11  11  been my experience that the finance forecast was
12  12  better -- finance people did a better job of predicting
13  13  the future than the salespeople.
14  14    Q.  Did Oracle conduct any studies that would
15  15  support that -- that fact?
16  16    A.  We certainly looked at, last quarter, whose
17  17  forecast was more accurate.  And consistently it was the
18  18  finance people.  The finance people have been very
19  19  consistently more accurate than the salespeople.
20  20      It didn't require a study.  They were -- you
21  21  know, nine times out of ten, they were more accurate.
22  22    Q.  Is that true on a macro level as well as a
23  23  micro level; that is, division by division, as well as
24  24  companywide?
25  25      MR. SALPETER:  Objection to form.

93

1   00094:01    THE WITNESS:  It was certainly true on a macro
2   02  level, companywide.  That's true.  I'm not sure what the
3   03  results were at -- you know, in Latin -- at low-level --
4   04  in Brazil, for example, who was better at forecasting
5   05  Brazil.  The finance people tended to forecast at a
6   06  fairly high level, the people that were then my direct
7   07  reports.
8   08      MR. DE GHETALDI:  Q.  Was it your experience
9   09  that the finance people in Q3 '01 had historically
10  10  tended to overestimate where things came out?
11  11    A.  They weren't as conservative as the
12  12  salespeople, but they were more accurate than the
13  13  salespeople.  The salespeople were extremely
14  14  conservative and the finance people were more accurate.
15  15    Q.  Okay.  But I'm asking about -- I'm asking
16  16  whether the finance people tended to overestimate actual
17  17  results.  Did you ever notice that --
18  18    A.  No.
19  19    Q.  -- as a pattern?
20  20    A.  No.
21  21    Q.  Okay.  The dollar figures in a number of
22  22  Oracle's financial reports are reported in -- using
23  23  apparently different standards.  For example, one report
24  24  might indicate that the dollars are reported at actual
25  25  rates.

94

1   00095:01    A.  Constant rates versus actual rates.
2   02    Q.  Well --
3   03    A.  The exchange rates.
4   04    Q.  There are four that I've seen: actual rates,
5   05  budget rates, U.S. dollars and constant dollars.
6   06    A.  Okay.
7   07    Q.  Can you explain what the difference between
8   08  those rates are.
9   09    A.  Sure.  Let me start just with, you know,
10  10  budget rates.  Let's say we start the year, and one
11  11  euro -- a euro is equal to a hundred cents, a dollar.  A
12  12  euro and a dollar are equal.  And during the year, the
13  13  euro appreciates so that the euro is worth $1.20.
14  14      And we have a budget.  Let's say that Europe's
15  15  going to sell a hundred million euros.  And that's fine;
16  16  that's unchanged.  But we'd also say -- another way of
17  17  saying that is Europe's going to sell a hundred million
18  18  dollars.
19  19      Well, it's still true that Europe's going to
20  20  sell a hundred million euros, 'cause they sell in euros.
21  21  The dollars are now -- you know, the euro's appreciated
22  22  in value to $1.20.  So the budget rate -- we're
23  23  expecting a hundred million from Europe -- a hundred
24  24  million dollars from Europe.  Now, with the exchange
25  25  rate, 'cause of currency fluctuation, will actually be

95

1   00096:01  at $120 million from Europe because the currency values
2   02  have changed.
3   03      Nothing really to do with the dynamics or --
4   04  it wasn't a great sales success in Europe that we sold
5   05  $120 million rather than a hundred million dollars.
6   06  What happened was the currency exchange rate changed and
7   07  we got more dollars -- we got more money.  We got more
8   08  dollars.
9   09      Now, that's working in our favor these days.
10  10  But back in '01, the dollar was very, very strong and
11  11  the euro was going down.  So even though Europe might
12  12  have been meeting its targets, the dollar was getting
13  13  stronger; the euro was getting weaker.
14  14      So a hundred million euros might have only
15  15  been worth $80 million in '00.  These are not -- or
16  16  $85 million.  These are not bad -- these are fairly
17  17  accurate, by the way.  Hundred million euros was worth
18  18  $85 million to us in 2000.  A hundred million euros now
19  19  is worth $120 million to us.  That's a $35 million
20  20  swing.  That's a huge swing that has just to do with
21  21  exchange rates.
22  22    Q.  Are -- or is budget rate synonymous with
23  23  constant dollars?
24  24    A.  It is pretty close, yes.  It's the -- the
25  25  answer is yes.

96

00097:01   Q.  So budget rate -- there is -- well, for
02  constant dollar, there's some kind of -- I don't know
03  what you would call it -- a standard that's been set?
04      A.  Well, there's an adjustment.  So -- so we
05  would say -- so let's say, again, we budgeted one to
06  one; constant dollars are one to one.  We say for
07  purposes of budgeting, one euro is equal -- is equal to
08  one dollar; one dollar is equal to one euro.
09      But we report our revenue in dollars.  We're a
10  U.S. company and we report our revenue in dollars.  We
11  bring those euros back to the United States and we
12  exchange them at a market rate.  There's an exchange
13  rate when you're selling euros and buying -- trading
14  them for dollars.
15      So if we budgeted -- expected a hundred
16  million euros, we got a hundred million euros, so
17  exactly what we budgeted -- Europe did exactly what they
18  said they were going to do; they sold a hundred million
19  euros.  We should be very happy, right?  We hit our
20  budget exactly right.
21      Oh, but the euro is only worth 85 cents now.
22  Now, did Europe just miss by 15 percent or did they hit
23  their budget?  So we would argue that they actually --
24  that the -- Europe should be judged in local currency.
25  So we'd say they hit their budget.  But in fact, we're

97

00098:01  not bringing back a hundred million dollars; we're only
02  bringing back $85 million 'cause the exchange rate
03  changed.
04      So the -- you know, we have to look at our
05  business from several -- through several different
06  lenses.  We have to look at it from local currency,
07  which I think is correctly the forecast -- the health of
08  the business versus exchange rates, which still can have
09  huge impact on our sales results.  But it's really
10  our -- it's things beyond our control.
11      Q.  Constant dollars, as I understand it, are
12  calculated based on a baseline value for the dollar.
13      A.  Yeah, so in constant dollars, if we budgeted
14  at $1 per euro that hundred million dollars, that
15  hundred million euros would be reported as a hundred
16  million dollars in constant dollars.
17      So constant dollars, a hundred millions
18  euros -- even though the euro is now worth 85 cents, not
19  a dollar, in constant dollars, though, that hundred
20  million euros would be worth a hundred million dollars.
21  We're saying forget the current exchange rates.  Let's
22  go back to the time we created this budget, look at the
23  exchange rate then and hold that exchange rate constant.
24      And that's the notion.  Let's assume for 12
25  months this exchange rate does not change; it is a

98

00099:01  constant, not a variable.  And let's analyze our
02  business assuming that the exchange rates were exactly
03  as they were on the day we did the budget.  So let's
04  not -- let's ignore market exchange rates and let's talk
05  about budgeted exchange rates.
06      So back to the thing -- so when you're looking
07  at constant dollars -- this must sound real interesting.
08  So when you're analyzing your business -- but actually,
09  you know, it's really quite material because when
10  you're analyzing your business, you have to look at --
11  you have to see is the business healthy?  Yes.  But the
12  exchange rates are deteriorating.  And that can have
13  real impact on your business.
14      And we always will tell people in our calls,
15  for example, what the currency impact was on our results
16  because it is material.  So we'll say that had currency
17  not fluctuated, we would have done -- you know, our
18  earnings would have been this.  But currency did change,
19  so our earnings are that.  So we'll say currency helped
20  us in the quarter or currency hurt us in the quarter.
21      So always report -- so one of the reasons why
22  the U.S. right now -- the Europeans are very angry at us
23  right now because we -- the dollar's falling.  Why is
24  the dollar falling?  That's not good for tourists.  When
25  you go to Europe that means you buy -- you stay in the

99

00100:01  hotel in London, it's going to cost you more money.
02      So why is it good for business that the dollar
03  is falling?  Because when -- we report our earnings in
04  dollars.  So if euros are now worth $1.20, that's pretty
05  cool.  So we bring a hundred million euros, that's not a
06  hundred million dollars; it's $120 million.  Our revenue
07  in Europe just went up 20 percent.
08      Or did it?  Did anything really happen at all
09  in our business?  No, nothing really happened at all in
10  our business.  The exchange rate just changed.  The
11  dollar's gone down in value.  That's what -- so -- so a
12  weak U.S. currency, when U.S. dollar declines in value,
13  when the exchange rate goes down, it means that U.S.
14  corporations' profits and sales go up.
15      I mean, it's very interesting.  Is business
16  getting better?  You could argue no, nothing's changed
17  at all.  But we're reporting record profits and record
18  sales.  And that's what's actually been happening in the
19  last year, is the dollar's been going down.  That's
20  dramatically improved profitability of U.S.
21  corporations.
22      Corporations can deceive themselves, you know,
23  by looking at it just through saying "Oh, we're having a
24  great year."  No, you're not having a great year.  The
25  dollar is just decreasing in value; euros are increasing

100

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

```
1   00101:01 in value.  And it's just the currency fluctuations is
2       02  making you think you have a great year.
3       03      So if you're -- when you're analyzing your
4       04  business and when you're describing your business to
5       05  investors, you had better be forthcoming in terms of
6       06  explaining that some of these results, some of this
7       07  increase in sales, some of this increase in profits, is
8       08  due to a weak U.S. dollar.  And we do that.
9       09      And similarly, if you look at our quarterly
10      10  reports, we'll always say -- at the time that this was
11      11  going on, in fact, the U.S. dollar was strengthening.
12      12  Therefore, the euro was becoming less valuable.  Euro
13      13  went down as low as 85 cents.
14      14      Under those circumstances, it was weakening
15      15  our sales and weakening our profits.  So was our
16      16  business -- you know, was our business getting worse?
17      17  Theoretically, no, not that -- you know, the currency
18      18  was fluctuating.  And we'll say how -- and we'll say
19      19  exactly how much in a given quarter the currency
20      20  fluctuations altered our results.
21      21      So that's why we always -- we always announce
22      22  that.  Not everyone does, but we think it's very
23      23  important, both for internally analyzing our business
24      24  for us understanding what's going on and for investors
25      25  to understand what's going on, is to let people know
```

101

```
1   00102:01 what the currency impact is.
2       02      So we have two lenses.  We look at it -- we
3       03  look at it with fluctuating currency, which is the real
4       04  world.  That's what really comes in, real money at is
5       05  variable exchange rate.  But for budgetary purposes to
6       06  try to figure out what's -- what's -- you know, the
7       07  effectiveness of our selling organization, we use this
8       08  thing called constant dollars or budget rate.
9       09      So currency fluctuations don't unnecessarily
10      10  skew things.  Long answer.
11      11      Argentina, when Argentina devalued their
12      12  currency, their -- you know, the peso down there was
13      13  worth half or -- or, you know, 40 percent of what it was
14      14  worth before.  Now, that made our sales in Argentina go
15      15  down 60 percent.
16      16      Should we fire the sales manager 'cause sales
17      17  are off 60 percent?  No.  All that happened was the
18      18  currency exchange rate changed.  Sales didn't change --
19      19  sales in pesos are unchanged.
20      20      Now, when you convert those pesos back to
21      21  dollars, you know, you get 60 percent less.  But you
22      22  can't blame that on the team in Argentina.  Our sales
23      23  team in Argentina didn't miss their sales targets by
24      24  60 percent.  They met their sales targets in pesos.
25      25  It's just when we look at those sales results in
```

102

```
1   00103:01 dollars, not in pesos, and we make that conversion, we
2       02  got 60 percent less money than we thought we were going
3       03  to get because the peso collapsed.
4       04      So it's very important that we look at
5       05  things -- we factor out the currency fluctuations when
6       06  we analyze our business and analyze the performance of
7       07  our employees or we'll misjudge our employees.
8       08      On the same -- on the other hand, we are a
9       09  U.S. company and report in dollars and we do convert
10      10  pesos to dollars and convert euros to dollars, and we
11      11  report in dollars.  But we should let people know what
12      12  the impact of a fluctuating exchange rate is in our
13      13  business.
14      14      Last thing that my attorney told me is just
15      15  keep my answers short.  So I'm sure he's very happy at
16      16  how carefully I'm --
17      17  Q.  Was that a short answer?
18      18  A.  No, but it was as short as I could make it.
19      19  Q.  That's fine.  No, it's -- it ...
20      20      It appears that in Q3 '01 that the baseline
21      21  exchange rate for constant dollars was the value as of
22      22  May 1999.  Does that sound correct?
23      23  A.  Yeah.  Yeah, May 1999 was our budget period.
24      24  So we'll fix -- so when a year starts, June 1 -- when
25      25  the year starts, we'll say, okay, let's look at the
```

103

```
1   00104:01 exchange rates now, and let's be able to look at all of
2       02  our results in light of a fixed exchange rate, even
3       03  though we know the world doesn't have fixed exchange
4       04  rates.
5       05  Q.  Sure.
6       06  A.  But it would be totally unfair -- we would
7       07  completely mischaracterize Argentina, you know, God,
8       08  these guys are idiots there; they missed by 60 percent.
9       09  No, they're not idiots.  They're doing a very good job.
10      10  In fact, the peso was just devalued and has nothing to
11      11  do with them, has everything to do with exchange rates,
12      12  nothing to do with our sales team.
13      13  Q.  Okay.
14      14  A.  So we have two -- have the two different
15      15  lenses to look at our -- look at our business: statutory
16      16  requirements to report in dollars and the budget -- the
17      17  budget period.  And we start at the beginning of our
18      18  fiscal year, which is June 1.
19      19  Q.  Okay.  Well, I said it appears that for Q3 '01
20      20  constant dollars were adjusted according to the exchange
21      21  rate as of May 1999, which would be just before the
22      22  beginning of fiscal year 2000.
23      23  A.  Yeah, it's close enough.  There'd be some day
24      24  we picked --
25      25  Q.  So --
```

104

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

```
1   00105:01   A.  -- to budget -- I'm sorry.
2   02    Q.  So my question is, for fiscal year 2000 and
3   03   fiscal year 2001, were you using the same historic
4   04   baseline or does the baseline change year to year?
5   05    A.  Every year it changes.
6   06    Q.  Okay.
7   07    A.  So constant dollars means the constant dollars
8   08   as the budget period of that year.  So you're just
9   09   holding it constant for a one-year period so you can
10  10   analyze over a one-year period.
11  11    Q.  I see.  So you do not --
12  12    A.  You could do analysis of constant dollars over
13  13   a ten-year period.  And people do -- economists do that
14  14   all the time, say, you know -- you know, and they just
15  15   call that factoring out inflation or factoring out
16  16   exchange rate fluctuations.
17  17       They'll factor out exchange rate fluctuations.
18  18   They'll factor out inflation.  They'll do a variety of
19  19   things to what they would say -- mathematicians call
20  20   normalize the numbers.
21  21    Q.  Does Oracle's -- do Oracle's constant dollar
22  22   rates normalize for inflation as well as for currency
23  23   exchange rate fluctuation?
24  24    A.  No.
25  25    Q.  What are conversion rates?
```

105

```
1   00106:01   A.  Oh, a conversion rate is applied to the
2   02   pipeline.  So conversion rate -- let's say -- back to
3   03   the example of three $1 million deals in the pipeline
4   04   and one deal closed.  So that means we had a 33-percent
5   05   conversion rate.  We closed one third of the deals in
6   06   the pipe.
7   07       So it's very important -- if you're going to
8   08   use pipeline as a predictive measure, it's very
9   09   important that you know historically what percentage of
10  10   the pipeline you convert.  So if historically you
11  11   converted half your pipeline, and you have a $3 million
12  12   pipeline, then you'd say, well, normally we should
13  13   expect a million and a half pipeline.
14  14       If a person's forecasting $1 million, and they
15  15   got a pipeline of $3 million, and our historic -- you
16  16   know, looking backwards we historically we've converted
17  17   half the pipe to deals -- I mean, in other words, moved
18  18   things out of pipeline into sold, into won or sold, same
19  19   thing -- that means that we should be able to predict,
20  20   by looking at the pipeline, what our sales are going to
21  21   be.
22  22    Q.  Okay.
23  23    A.  So you multiply the sales -- the pipeline
24  24   times the conversion rate to get expected sales.  And
25  25   you establish conversion rate by going back several
```

106

```
1   00107:01   quarters and saying, well, the pipeline was a hundred
2   02   million dollars last year -- or last quarter and we sold
3   03   $55 million.  That means we had a 55-percent conversion
4   04   rate.  We converted 55 percent of the
5   05   hundred-million-dollar pipeline, or $55 million, into
6   06   transactions.
7   07    Q.  Now, is that the pipeline without the closed
8   08   deals?
9   09    A.  The pipeline never has closed deals in it.
10  10   But the pipeline -- you can't be -- you know, you can't
11  11   be -- like I said before, you cannot be both a potential
12  12   customer and a customer.  I suppose you could be, in
13  13   theory.  The customer could be buying more.
14  14    Q.  Two deals, same customer.
15  15    A.  But any one deal -- any one deal either might
16  16   happen in the future or has happened.  It can't both
17  17   have happened and might happen in the future.  So when
18  18   something is in the pipeline and it closes, it's sold.
19  19   You are no longer a potential customer; you are an
20  20   existing contracted customer, and you moved out of
21  21   pipeline into revenue.
22  22    Q.  Isn't the conversion rate simply the forecast
23  23   divided by the pipeline --
24  24    A.  No.
25  25    Q.  -- expressed as a percentage?
```

107

```
1   00108:01   A.  No, no.  The conversion rate is not --
2   02   forecast is a prediction of the future.  It's what you
3   03   think you're going to do next year -- next quarter, this
4   04   quarter.  A conversion rate is a calculated number.  It
5   05   is pipeline -- the ratio between pipeline and actual
6   06   last quarter.  So you only know what your conversion
7   07   rate is looking back.
8   08       So conversion rates are hard numbers.  And
9   09   it's a ratio, not a forecast.  You said forecast --
10  10   isn't conversion rate just forecast and actuals?
11  11   Forecast to pipeline --
12  12    Q.  Mm-hm.
13  13    A.  No, no.  Conversion rate is actuals -- actual
14  14   sales divided by pipeline.
15  15    Q.  But I'm sorry, I'm still not clear.  What
16  16   value does dividing actual sales by a pipeline number
17  17   from which sales have been subtracted -- isn't the
18  18   pipeline, then, the deals that just never closed?
19  19    A.  The pipeline -- you know, the pipeline --
20  20   there's an opening -- opening-day pipeline, how much is
21  21   in the pipe.  And then there is the actuals you had --
22  22   let's take a very simple case, because obviously the
23  23   pipeline fluctuates -- goes up and down.  And one of the
24  24   reasons why the pipeline goes down is because something
25  25   was sold --
```

108

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

```
1  00109:01   Q. Okay.
2  02      A. -- right, during quarter. Let's take a very
3  03  specific -- one point in time. On the first day of a
4  04  quarter, you have a pipeline -- pick a number -- a
5  05  hundred million dollars, on the first day of the
6  06  quarter. On the last -- when the quarter's over, you
7  07  sold $55 million. The ratio of that opening pipeline to
8  08  what you actually sold is 55 percent.
9  09      Q. Yes.
10  10      A. So let's take that snapshot. I think -- I
11  11  think I know the problem -- I think I know now what
12  12  you're -- what's at issue.
13  13      So we look at the pipeline at any one point in
14  14  time -- the opening pipeline, to be more precise, the
15  15  opening pipeline. How big was the pipe here --
16  16      Q. Yes.
17  17      A. -- then what did we eventually sell --
18  18      Q. Yes.
19  19      A. -- is a very good -- so when we talk about
20  20  conversion -- historic conversion rate, kind of look
21  21  at -- think of it in the simplest sense without having
22  22  in fact, these numbers move -- this one number -- the
23  23  pipeline actually moves around.
24  24      Q. Sure.
25  25      A. So look at opening pipeline and actual sales,
```

109

```
1  00110:01  and that's how you get -- that's how you get a
2  02  conversion rate. Now, as things -- as the pipeline
3  03  gets -- you know, as the quarter proceeds and things
4  04  move out of the pipeline into sold --
5  05      Q. Yes.
6  06      A. -- and more of the pipe -- more things enter
7  07  into the pipeline which might not be forecast -- you
8  08  know, might not come in -- might not be sold for six
9  09  months, you get a bunch of other ratios -- you get a
10  10  bunch of other numbers.
11  11      It gets interesting 'cause the pipeline will
12  12  fluctuate. The pipeline fluctuates for two reasons. It
13  13  fluctuates because, one reason, you just sold a
14  14  million-dollar deal. So it goes out of pipeline into
15  15  won. Pipeline goes down. I got two phone calls and
16  16  entered some new prospects into the pipeline. Pipeline
17  17  has gone up.
18  18      So the pipeline is constantly fluctuating
19  19  during the quarter. And deals are -- you know, for a
20  20  variety of reasons. Deals can be lost, people -- you
21  21  know, deals are sold; they're won; new prospects are
22  22  entered into the system. So -- but the simplest way to
23  23  think about the conversion rate is the -- on the opening
24  24  day of the quarter, how big was the pipe, and then in
25  25  the end, how much did you sell. It's an interesting
```

110

```
1  00111:01  number.
2  02      Okay. Started the quarter hundred million
3  03  dollars, sold 55 million; that's a 55-percent conversion
4  04  ratio. However, there are other numbers that are
5  05  interesting during the quarter. You'd like to know is
6  06  that pipeline -- how much have we sold. That's a good
7  07  number, right? Are we ahead of -- that's good. If
8  08  we're ahead -- if we sold more this quarter than we sold
9  09  last quarter, that's a good thing.
10  10      If the pipeline is growing rapidly, in spite
11  11  of the fact that we're selling a lot and things are
12  12  being pulled out of the pipeline into won, we're
13  13  refilling or rebuilding that pipeline at a rapid rate,
14  14  that's also a very positive sign.
15  15      So you'd look at -- so it's -- the dynamics of
16  16  the pipeline is also very important. Is the pipeline
17  17  continuing to build or not; is -- are our sales -- is
18  18  the pipeline ahead of where we were this time last
19  19  quarter; is the pipeline -- are sales ahead of where we
20  20  were last quarter.
21  21      So there are lots of different numbers that
22  22  are useful in trying to predict the future.
23  23      Q. Sure. For pipeline, does that include only
24  24  deals that are scheduled to close in the current
25  25  quarter, or does the ...
```

111

```
1  00112:01      A. Good question. Yeah, there are different --
2  02  different ways of filtering the pipeline. The pipe --
3  03  usually -- there are different -- there's total
4  04  pipeline, which is just everything. There's weighted
5  05  pipeline, which is everything multiplied times the
6  06  probability of close. There's weighted pipeline for --
7  07  there's pipeline for this quarter, which is what can
8  08  potentially close this quarter.
9  09      So there's the quarter pipe -- you know, the
10  10  quarter pipeline -- there are -- it's -- basically it's
11  11  all of our opportunities. And then we start filtering
12  12  it and qualifying it by probability of close and by
13  13  date.
14  14      Q. Okay. Okay. And just going back a second to
15  15  the constant dollar and the effect of the currency
16  16  rates. You were talking about how a currency rate
17  17  change might adversely affect revenue numbers. Does
18  18  that change also affect expense numbers?
19  19      A. Yes, of course.
20  20      Q. In a direct mirror image or ...
21  21      A. No, direct -- well, no -- if -- if revenue
22  22  goes up, expenses will also go up. So if the euro is getting
23  23  down, expenses will go down. So if the euro is getting
24  24  more valuable -- to give you another example, if I'm
25  25  paying you a hundred thousand euros a year and that euro
```

112

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

00113:01  is worth 85 cents, I'm paying you $85,000 -- $85,000
02  U.S. dollars a year.
03        If the euro's worth 1.20, I'm paying you
04  $120,000 a year.  As the euro becomes more valuable,
05  your salary effectively goes up.
06     Q.  But Oracle's cost of paying the salary, what
07  happens to that?
08     A.  Oracle's ability to pay the salary is based on
09  how much we sell, our revenue.  Our revenue also goes
10  up.  So as the euro -- so as we sell a million-euro
11  deal, we get 120 -- 1.2 million euros -- $1.2 million
12  for that.
13     Q.  Okay.
14     A.  So as European currency becomes more valuable,
15  our expenses go up and our sales go up correspondingly
16  because everything's denominated in euros.  If -- in
17  Argentina where the peso dropped 60 percent, salaries
18  dropped -- salaries denominated in U.S. dollars
19  dropped -- they didn't change at all in pesos.  Nothing
20  changed from the point of view in Argentina.  But once
21  it's converted to U.S. dollars, our Argentinian sales
22  went down 60 percent when we converted from pesos to
23  dollars.  And our Argentinian expense went down
24  60 percent when we converted from pesos to U.S. dollars.
25     Q.  Okay.  In Q3 '01, what information sources

113

00114:01  were available to you for these pipeline numbers?
02     A.  We got regular pipeline reports as part of our
03  weekly review.
04     Q.  Okay.  So you got -- so weekly pipeline
05  reports.  Did those weekly pipeline reports include
06  these weighted pipelines, the total pipeline and
07  quarterly pipeline and weighted according to likelihood
08  of deal closing?
09     A.  Yeah, I think when you see the pipeline
10  numbers, they're weighted -- that's a filtered pipe
11  that's weighted.  And it is -- it is weighted and -- for
12  point of view of probability and bounded in terms of
13  close date.
14        So that's not the total -- you're not looking
15  at the mass of deals, everyone at Oracle's been talking
16  to.  You're looking at the deals that potentially will
17  close this quarter, weighted by probability.
18     Q.  Okay.  And filtered for close date?
19     A.  And filtered for close date, that's correct.
20     Q.  So you got those weekly reports.  Was that
21  pipeline information available to you in electronic form
22  of any kind?
23     A.  It was.
24     Q.  Where?
25     A.  Oracle Sales On-line.

114

00115:01     Q.  How about the forecast numbers; what
02  information sources were available to you in Q3 '01 to
03  show you what the forecast numbers were?
04     A.  Everything was -- I shouldn't say everything.
05  The sales forecasts and the pipeline data was in Oracle
06  Sales On-line.  The upside reports -- the finance
07  forecasts were available only with the -- in the
08  finance -- in the reports I received weekly.  And in
09  fact, I didn't use Oracle Sales On-line at this time.
10     Q.  Okay.
11     A.  So I relied on the weekly reports I got from
12  finance.
13     Q.  How about expenses; what information sources
14  were available to you in Q3 '01 to show you what
15  expenses were?
16     A.  The same weekly reports.
17     Q.  Now, how about revenue as the quarter went on;
18  what -- what information sources were available to you
19  in Q3 '01?
20     A.  We got monthly results for the first and
21  second months of the quarter.  I think they called those
22  flash reports.
23     Q.  Did you get any other -- other than monthly
24  results, did you receive any other information about
25  actual revenues or expenses during Q3 '01?

115

00116:01     A.  Certainly not expenses, and except discussing
02  a deal here and there, no, that's primarily what I
03  received.
04     Q.  Did you receive any oral reports at any time
05  on a regular basis from anyone in Q3 '01 about the
06  status of closed deals?
07     A.  I would talk to people on the phone
08  periodically, but -- so -- about specific deals --
09     Q.  Okay.
10     A.  -- and the status of the quarter.
11     Q.  How about division level, the status on
12  division level for closed deals?
13     A.  All of -- no, we -- we had a monthly report.
14  Again, we have a centralized accounting system, global
15  accounting system.  And we get -- all the division
16  results come out at once.  So I get to see these -- you
17  know, our results for December and our results for
18  January, you know, a few days after they're -- after
19  they're -- you know, the month is over.
20     Q.  Okay.  Now, OSO, you said, I think, had
21  forecast and pipeline in it -- information in it as of
22  Q3 '01, correct?
23     A.  Yes.
24     Q.  And what was the source of that data?  Where
25  did -- how did that data enter that system?

116

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

00117:01    A.   Individual salespeople and sales managers
02   would enter -- enter the data directly.
03    Q.   All right.  Who at Oracle had access to
04   viewing that data in Q3 '01?
05    A.   Viewing all of the data?
06    Q.   In OSO.
07    A.   All of it?
08    Q.   Yeah.
09    A.   'Cause every salesperson could view their own
10   data.
11    Q.   Okay.
12    A.   But you're asking who could look at
13   everything --
14    Q.   Yeah.
15    A.   -- around the world --
16    Q.   Yeah.
17    A.   -- had a global view?  The people in finance,
18   Jennifer Minton's group.
19    Q.   Okay.  Anybody else?
20    A.   Well, I could look at it globally.
21    Q.   Okay.  Safra Catz?
22    A.   Sure.
23    Q.   And Jeff Henley?
24    A.   I'm sure.  I don't know if they used it, but
25   they certainly were authorized to.

117

00118:01    Q.   So there was some hierarchy or permission set
02   for what data people could access in OSO in Q3 '01,
03   right?
04    A.   Yes.
05    Q.   Now, I asked you about viewing the data.  Do
06   you know who at Oracle Corporation had permission set to
07   edit the data in OSO on a global level in Q3 '01?
08    A.   The individual salespeople could edit their
09   own data.  The sales managers could edit their data.  So
10   people could change their data; they couldn't change
11   anyone else's data.
12    Q.   Okay.  Well, for example, could Jennifer
13   Minton change a particular salesperson's data?
14    A.   No.
15    Q.   Have you ever heard of OFA?
16    A.   Yes.
17    Q.   What's that?
18    A.   Oracle Financial Analyzer.
19    Q.   Was that a system that was on line in Q3 '01?
20    A.   Yes.
21    Q.   What -- what sort of data resided in that
22   system?
23    A.   It was a separate database.  They would load
24   it up with a -- you know, they'd go to our transactional
25   systems and load it with historic information, you know,

118

00119:01   financial information under the general ledger, under
02   the sales ledgers, and use it for analysis and
03   forecasting.
04    Q.   So if one wanted to get actual results as the
05   quarter went on, would that be a source of that sort of
06   data?
07    A.   No.  The GL -- the general ledger -- if you
08   want to get actual financial results, like the monthly
09   financial results, that would come out of the general
10   ledger, I believe.
11       Now, it might then be loaded into Oracle
12   Financial Analyzer and then published in report form out
13   of Oracle Financial Analyzer.  I don't know how they
14   accomplish the flash reports, where that comes from.
15    Q.   Okay.
16    A.   But the source of that is our general ledger.
17    Q.   And do you know what the source of that data
18   was in OFA, who put it in?
19    A.   I don't know how the data gets out of our
20   general ledger and into OFA.
21    Q.   Okay.
22    A.   I don't know who does that.  But again, it's
23   in Jennifer Minton's group.
24    Q.   Did you -- in Q3 '01 did you have permissions
25   [sic] to view that data in OFA?

119

00120:01    A.   I've never looked at OFA in my life.
02    Q.   Did you have permissions to view it?
03    A.   I have no idea.
04    Q.   How about something called Rev Manager or
05   Revenue Manager; are you familiar with that system?
06    A.   Only vaguely.
07    Q.   Can you tell me what you know of it.
08    A.   It's -- it has something to do with our
09   order -- our order system.  It keeps track of the status
10   of orders.  Again, this is -- I have a very vague
11   notion.  I'm not sure Rev Manager -- what Rev Manager
12   is.
13    Q.   Okay.  How about the Americas Datamart; have
14   you ever heard of that?
15    A.   No.
16    Q.   Are there any other sources of -- that is,
17   electronic -- sources of data that were available in Q3
18   '01 that would either show forecasts or actual results?
19    A.   Not that I know of.
20    Q.   How about the Enterprise Data Warehouse; you
21   ever hear of that?
22    A.   No.
23    Q.   Something called Order Entry?
24    A.   Oh, sure, Order Entry's part of our eBusiness
25   Suite.  It's -- the system -- it is what it sounds like.

120

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

```
1  00121:01  It's where people type in the details of the order:
2     02  General Electric buys a million dollars' worth of
3     03  database software from Oracle to be delivered to this
4     04  address --
5     05     Q.  Okay.
6     06     A.  -- under these terms and conditions, and
7     07  here's the contract ID, that stuff.
8     08     Q.  Okay.  And did Order Entry have a mechanism
9     09  for summing up orders?
10    10     A.  It does now, but it did not then.  That I
11    11  could actually view -- I could actually watch orders as
12    12  they came in and ...
13    13     Q.  Or ask -- put in a query.
14    14     A.  I think that's what Rev Manager was.  I think
15    15  Rev Manager was a little application on top of Order
16    16  Entry that summed up the orders, but I'm guessing.
17    17     Q.  Okay.
18    18     A.  But I'm pretty -- that's a pretty good guess.
19    19     Q.  Okay.  And how about something called Project
20    20  Accounting?
21    21     A.  Project Accounting was used by our consulting
22    22  organization to keep track of complicated -- complicated
23    23  projects: how many people were billable, how many
24    24  people -- how much of the project was complete.  There
25    25  are different accounting rules for complex projects.
```

121

```
1  00122:01     Q.  Now, written reports -- what sort of written
2     02  reports did you regularly receive during a quarter in
3     03  fiscal year '01?
4     04     A.  I'll get a weekly status that we review at our
5     05  management committee meetings on Monday, and that
6     06  includes pipeline information, sale -- you know, actual
7     07  sales completed, expense information, forecast
8     08  information, both from the sales force and from the
9     09  finance group, currency -- you know, currency
10    10  fluctuations.  Anything that might affect our quarterly
11    11  financial results.  I shouldn't say anything.  Those
12    12  things --
13    13     Q.  Those things.
14    14     A.  -- all of which affect -- you know, could
15    15  affect our quarterly financial results.
16    16     Q.  All right.  And this was a report that you
17    17  received weekly in advance of these Monday meetings?
18    18     A.  No, I received them at the -- they're
19    19  distributed at the Monday meetings and they're collected
20    20  when the Monday meetings are over.
21    21     Q.  Okay.
22    22     A.  So no one leaves the room with those reports
23    23  but Jennifer.
24    24     Q.  These reports have a title?
25    25     A.  Forecast report maybe.
```

122

```
1  00123:01     Q.  Aside from this weekly forecast report, or
2     02  whatever it's called, what other written reports did you
3     03  regularly receive in fiscal year '01?
4     04     A.  Those are the only -- I'm not sure -- well, I
5     05  received audit reports.  Again, I'm not sure what you
6     06  mean.  That's a long list.  I receive 10Ks -- I mean
7     07  10Qs.  I receive reports from our auditors in regards to
8     08  a lot of our individual subsidiaries.  I receive lots of
9     09  reports.  I shouldn't say lots of reports.  In fact,
10    10  those are the only ones I can think of.  Sorry.
11    11     Q.  Oracle publishes -- I don't want to call them
12    12  coloring books, but they're identified by color.
13    13     A.  Yes, right.  Right.  Analyses of our different
14    14  businesses by product, analysis by product, analysis by
15    15  geographic region, analysis by industry.  So we have a
16    16  variety of ways of cutting our business and analyzing
17    17  it.
18    18     Q.  Different perspectives to take.  So there's
19    19  something called the oatmeal book?
20    20     A.  Yeah, sure is.  That's the color, not the
21    21  cereal.
22    22     Q.  Yeah, right.  Americas Consulting?
23    23     A.  Sure.
24    24     Q.  Is that what that book is?
25    25     A.  I'm not sure what the oatmeal -- I can't
```

123

```
1  00124:01  remember the colors.
2     02     Q.  Can't remember, okay.
3     03     A.  I don't know what the colors are.  People
4     04  refer to the colors with acronyms.  Even the flash
5     05  report, until I reviewed it, I never called it a flash
6     06  report.  I just called it monthly results, 'cause that's
7     07  easy for me to remember 'cause it's monthly results.
8     08  You know, I'm a simple person.  I don't understand the
9     09  flash report.  I have no idea what it means.
10    10     Q.  So --
11    11     A.  Those names drive me crazy.
12    12     Q.  Try learning them without ... so Americas
13    13  Consulting, was this a report that you --
14    14     A.  Yeah.
15    15     Q.  -- regularly received in fiscal year '01?
16    16     A.  Yeah.
17    17     Q.  How about something called Americas forecast
18    18  package?
19    19     A.  I probably received it.  I'm not sure I -- I'm
20    20  not sure I studied them, but I'm sure I received them.
21    21     Q.  Okay.
22    22     A.  I was on the distribution list.
23    23     Q.  Okay.  How about something called the Americas
24    24  performance packages, and the name apparently changed to
25    25  the quarterly financial results, North America.
```

124

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

00125:01   A.  I'm sure I received all those things.
02    Q.  Okay.  Big deal reports?
03    A.  Those I do pay close attention to, especially
04 in the last ten working days of our quarters because we
05 can see such huge swings in the last couple days of our
06 quarter.  It's something that definitely has my
07 attention.
08    Q.  Okay.  Now, I may be wrong, but it's my
09 understanding that there are two types of big deal
10 reports.  And maybe you can help me here.  There's
11 something called a big deal report which is
12 division-specific -- NAS, OPI, OSI -- that comes out
13 weekly through the quarter.  And then towards the end of
14 the quarter, there's something called the big deal
15 update.
16    A.  That's the one I pay attention to.
17    Q.  I see.
18    A.  I look at our weekly financial reports, and
19 that has the big deals in it already.  But where it's
20 critical is over the last -- not even the last ten days,
21 but over the last five days of the quarter, where our
22 quarter can move very substantially in the last 24, 48,
23 72 hours.  I've seen it do this time and time again.  So
24 we watch that very, very closely.
25    Q.  All right.  And there are the board packages,

125

00126:01 otherwise known as the white packages.
02    A.  I know them as board packages.
03    Q.  And that's something that you regularly
04 received in fiscal year '01?
05    A.  As often as we had board meetings, yes.
06    Q.  And how about something called an executive
07 committee worldwide forecast?
08    A.  I think that's my -- that that is the name of
09 my weekly report, what I'm referring to as the forecast
10 report.  The executive committee worldwide forecast, I
11 think.  My guess is what that means.  That's the weekly
12 report that I get -- I get and we review that Jennifer
13 Minton distributes in the Monday meetings and collects.
14    Q.  Okay.  Apparently there are five different
15 kinds of executive committee worldwide forecasts.  One
16 is for the entire flash report, one is for constant
17 dollar, one is for head count, one is for U.S. dollar,
18 and one is for product summary.  Does that sound
19 familiar?
20    A.  Yeah, and we get them -- we get them all,
21 though we tend to forecast -- we tend to focus in very
22 closely on actual dollars 'cause that's what we -- we're
23 interested in how we're going to do this quarter, so we
24 focus in pretty much on actual dollars and focus in on
25 the license business, which is the business that's

126

00127:01 subject to large fluctuations.
02    Q.  And when you say "actual dollars," is that
03 U.S. dollars?
04    A.  It's always U.S. dollars.  It's our reporting
05 currency.
06    Q.  Yeah, but it's not constant dollars?
07    A.  No, we look -- again, we look at -- the
08 reports have -- it's all there if you want to look.
09    Q.  Sure.
10    A.  What I'm most interested in is how we're going
11 to do in the quarter.  And how we're going to do in the
12 quarter is not constant dollar-based.
13    Q.  All right.
14    A.  It's actual -- actual exchange rates and what
15 are the actual exchange rates currently and how our
16 businesses look currently.
17    Q.  We talked about Mr. Garnick's flash reports.
18    A.  Larry Garnick.
19    Q.  Are those the flash reports that you're
20 talking about, or are you talking about something else?
21    A.  Again, I'm not sure who produces -- I'm not
22 sure what a flash report is.
23    Q.  Okay.
24    A.  I get -- I get -- at the end of every month --
25 the first two months of every quarter, we get our actual

127

00128:01 results.  I think that's what's called a flash report.
02    Q.  What form does that come in?
03    A.  E-mail.
04    Q.  E-mail, okay.
05    A.  I get an e-mail that shows me our license
06 sales.  There's a product analysis that follows it in 24
07 to 48 hours, but ... it shows me the different
08 geographic regions, what the license sales were, what
09 total sales were, and what expenses actually were.  So
10 if you actually want to look at our different
11 businesses --
12    THE REPORTER:  I'm going to have to slow you
13 down.  What total sales were ...
14    THE WITNESS:  What total sales were, what
15 expenses were in all of the different geographic regions
16 in which we do business.
17    MR. DE GHETALDI:  Q.  And then you said
18 something about a product revenue report following in a
19 day or two?
20    A.  And then there's a breakdown that shows up
21 that tells me the database business was so large and
22 then the application business was so large.
23    Q.  And the e-mail flash report, is that more
24 division- or geographic-oriented than product-oriented?
25    A.  The first -- it comes out both ways.  The

128

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

```
1   00129:01  first cut we get is by sales region or geography, which
2   02  is usually geographic, but not exactly, 'cause we have a
3   03  federal division in the United States.  So it's not
4   04  exact.  It's either.  And then we have the commercial
5   05  division in the United States.  But it's usually by
6   06  geography.
7   07       So we have -- we get our results by sales
8   08  unit: France, Germany, Brazil.  And then we get our
9   09  results by database.  So cut a couple different ways.
10  10  So two different ways of looking at the business: how
11  11  much database did we sell; how much software did we sell
12  12  in the United States.
13  13    Q.  Monthly financial reference books, is that
14  14  something that you regularly got?
15  15    A.  I'm sure.
16  16    Q.  North America license results, is that
17  17  something you regularly got?
18  18    A.  I guess.  I mean -- seriously, I'm on all
19  19  these distribution lists, and we produce -- we produce
20  20  vast amounts of paper, as you probably found out.
21  21  And -- but what I focused -- you know, what I -- I
22  22  did -- I did a certain amount of analysis looking back
23  23  insofar as to help me forecast the future.  Really most
24  24  of the data that I needed and relied on were in those
25  25  weekly reports.
```

129

```
1   00130:01    Q.  Okay.  Did you ever receive division-level
2   02  forecast packages in Q3 '01?
3   03    A.  I might have received them.  I don't think I
4   04  looked at them.
5   05    Q.  And how about pipeline reporting packages?
6   06    MR. SALPETER:  At a divisional level, you
7   07  mean?
8   08    MR. DE GHETALDI:  No, no, I'm sorry.  Thank
9   09  you.
10  10    Q.  Something that would be called a pipeline
11  11  reporting package at a -- companywide and broken down by
12  12  division.
13  13    A.  Those weekly reports did have pipeline data in
14  14  it.
15  15    Q.  Okay.
16  16    A.  So ...
17  17    Q.  Then product revenue reporting package, sound
18  18  familiar?  Yellow?
19  19    A.  I suspect if it's something called a reporting
20  20  package, they put me on the distribution list.
21  21    Q.  And upside?
22  22    MR. SALPETER:  Just to ask for clarification,
23  23  are you asking him if he got these reports --
24  24    MR. DE GHETALDI:  Yeah.
25  25    MR. SALPETER:  -- as opposed to got them and
```

130

```
1   00131:01  read them?
2   02    MR. DE GHETALDI:  Yeah, got them.
3   03    MR. SALPETER:  Okay.
4   04    MR. DE GHETALDI:  Q.  Upside reports?
5   05    A.  I'm sure they sent them to me.  No, the
6   06  upside -- the upside report -- keep in mind -- be
7   07  careful of this -- that the upside is -- the upside
8   08  forecast is in that weekly -- you know, all of the
9   09  information I -- you know, I deem particularly useful
10  10  for forecasting the quarter, we get in that weekly
11  11  report.
12  12    Q.  How thick is this weekly report that you get?
13  13    A.  Oh, 15 pages, small type.
14  14    Q.  Okay.
15  15    A.  You know, I'm on the verge of having to get
16  16  better glasses.  Yeah.
17  17    MR. DE GHETALDI:  All right.  Why don't we
18  18  take a break.
19  19    THE VIDEOGRAPHER:  Off the record, 2:04 p.m.
20  20  (Recess taken).
21  21    THE VIDEOGRAPHER:  On the record, 2:42 p.m.
22  22    MR. DE GHETALDI:  Q.  We were talking before
23  23  the break about the executive management committee
24  24  meeting packets.  I think you said that Jennifer Minton
25  25  collected them after the meeting.
```

131

```
1   00132:01    A.  Yes.
2   02    Q.  Do you know why?
3   03    A.  Absolutely.  The -- it's got a lot of
4   04  important information that we don't want just
5   05  everyone -- anyone to look at.  So we just want to keep
6   06  it confidential.  So no one -- so they're distributed in
7   07  the meeting and collected after the meeting.
8   08    Q.  Okay.
9   09    A.  So no one accidentally leaves them on their
10  10  desk or something like that.
11  11    Q.  Were those reports in the same format week
12  12  after week?
13  13    A.  Pretty much.
14  14    Q.  The monthly reports -- flash report, I think
15  15  you were talking about, that you said you got by
16  16  e-mail --
17  17    A.  Yes.
18  18    Q.  -- does your e-mail come to you only at one
19  19  location, or can you access your internal Oracle e-mail
20  20  from multiple locations?
21  21    A.  Anyplace.
22  22    Q.  Anyplace, okay.  And when you get an e-mail
23  23  such as these monthly forecast or monthly flash reports,
24  24  do you save them or do you delete them or what?
25  25    A.  I probably have no specific practice in terms
```

132

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

00133:01 of -- sometimes I delete them; sometimes I don't delete
02 them.  You know, I'll want to refer to them -- I'll read
03 them -- I'll study them for a little bit and then I'll
04 want to go back and study them some more, so I don't
05 delete them.  Then I don't go back and study them some
06 more, so they stay in the inbox until the inbox gets
07 cleaned out.
08      Q.  Do you use NetScape?
09      A.  I -- no, I use Microsoft Outlook.  I used to
10 use Netscape, but now I use Microsoft Outlook.  I'll use
11 Web interfaces.  Occasionally I'll use Netscape.  I'll
12 move back and forth through different e-mail interfaces
13 just to see what's going on in the industry.
14      Q.  In Q3 '01 did you regularly use Netscape or
15 Outlook?
16      A.  Don't remember.  Probably -- Q3 '01, probably
17 Netscape.
18      Q.  Did you set up your inbox with folders where
19 you would file particular e-mails?
20      A.  Well, I had a few things.  I had a few
21 personal things in folders.  But by and large, I kept
22 everything in this one big amorphous inbox.
23      Q.  In Q3 '01, how many computers did you have
24 where you could access your e-mail from?
25      A.  How many computers that I own -- how many

133

00134:01 Oracle computers were there around that -- where were
02 they?
03      Q.  Right.
04      A.  I had a computer at home.  I had a laptop --
05 home.  I had a computer in my house in Atherton, and a
06 laptop, which is my primary residence.  I have a
07 computer at my house in San Francisco.  I had a computer
08 on two big power boats.  One is called Katana; one is
09 called Ronin.  And I had computers on both of those.
10      Q.  Okay.
11      A.  So that's five in total.  And a computer in my
12 office, six.
13      Q.  Right.  Do each of those computers have
14 distinct e-mail accounts?
15      A.  All of our e-mail is stored on a server.
16      Q.  Yes.
17      A.  So -- so -- and these computers access that
18 server.  The computer -- these computers can be set up
19 to store the e-mail or not store the e-mail.  I don't
20 set up the computers myself.
21          And so sometimes copies can be made -- so
22 there can be -- there's always an e-mail in the server,
23 and there can be a copy of the e-mail on the desktop
24 machine, depending how the desktop machine has been set
25 up.

134

00135:01      Q.  Do you know whether the desktop machines are
02 set up to download e-mails from the server when an
03 e-mail is opened, or are they set up to leave a copy on
04 the server and download a copy to the machine?
05      A.  Again, when I was using Netscape, I believe --
06 it had two modes of operating.  And depending how you
07 opened your e-mail, you could open it two different
08 ways.  You could open it so that only the headers were
09 downloaded into the machine, and then every time you
10 accessed the body of an e-mail you went into the server,
11 or you could download all of the e-mail onto -- you
12 know, onto your computer.
13          And I -- and I used both -- depending on where
14 I was and the speed and reliability of the communication
15 link, I used both those techniques.
16      Q.  So in either case, is it your understanding
17 that in Q3 '01 a copy still remained on Oracle's e-mail
18 server?
19      A.  If I hadn't deleted the copy, the copy would
20 remain on Oracle's e-mail server.
21      Q.  But if you delete the copy on your machine,
22 it's your understanding that that also deletes the copy
23 on --
24      A.  Okay.  Not a simple answer, unfortunately.
25      Q.  Okay.

135

00136:01      A.  If I delete a copy --
02      Q.  Yes.
03      A.  -- then the copy disappears out of my inbox.
04 So it becomes -- it becomes invisible to me.
05      Q.  Yes.
06      A.  Depending on how my desktop machine has been
07 set up, there may be a copy there, there may not be a
08 copy there.  Depends on how the desktop machine is being
09 used.
10          You can even set up -- right now, for example,
11 at Oracle none of my e-mails ever get deleted, you know.
12 They go directly to the legal department.  Everything I
13 have goes to the legal department.  It's sealed.
14          So you can set up Oracle to audit so that it
15 makes it impossible to delete anything.
16      Q.  Was that true in Q3 '01?
17      A.  No.
18      Q.  Okay.  In Q3 '01, do you know whether your
19 e-mails were saved on Oracle's e-mail server or not?
20      A.  Once I deleted the e-mail, that e-mail should
21 be gone from the server.
22      Q.  Okay.  In Q3 '01 did you have any single
23 person who was sort of a go-to person that you would go
24 to to ask about specific issues relating to forecasting?
25      A.  No.  At that time, several different sales

136

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

```
 1   00137:01  executives reported to me.  So if I was interested in
 2      02  how George Roberts' group was doing, I'd talk to George
 3      03  Roberts.  If I was interested in how Jay Nussbaum's
 4      04  group was doing, I would talk to Jay.  If I was
 5      05  interested in how Derrick Williams' group in Asia
 6      06  Pacific was, I'd talk to Derrick.  So I'd talk to senior
 7      07  sales managers of those different territories.
 8      08     Q.  Okay.
 9      09     A.  Having said that, on the weekly meetings, when
10      10  I got a finance perspective -- so I did rely on
11      11  Jennifer, you know.  So I certainly talked to Jennifer.
12      12  But that was not out of band, if you will.  That was
13      13  just as a matter of the routine Monday mornings, I got
14      14  these reports.  I got the finance view and the rolled-up
15      15  sales view side by side, so I could look at them side by
16      16  side.
17      17     Q.  Do you believe that in Q3 '01 Oracle had the
18      18  best financial information system available in the
19      19  world?
20      20     A.  Interesting question.  I don't remember what I
21      21  believed -- I don't remember what I believed at that
22      22  time.  Are you saying did Oracle Corporation -- make
23      23  sure I understand the question.
24      24         Were we selling what I thought was the best
25      25  financial system in the world or had we implemented what
```

137

```
 1   00138:01  was the best?  In other words, Cisco uses our
 2      02  financials -- uses our technology.
 3      03     Q.  Right.
 4      04     A.  And Oracle uses the same technology.
 5      05     Q.  Right.
 6      06     A.  So do I think that the Oracle eBusiness Suite
 7      07  is better than SAP or PeopleSoft or something like that?
 8      08  That's one question.  Or do I believe that Oracle's use
 9      09  of Oracle is better than Cisco or Tektronics or anyone
10      10  else who uses our software?
11      11     Q.  Do you believe that Oracle's use of Oracle
12      12  resulted from Oracle having at its fingertips the best
13      13  financial information system available in the world?
14      14     MR. SALPETER:  As of that quarter?
15      15     MR. DE GHETALDI:  As of that quarter.
16      16     THE WITNESS:  No.
17      17     MR. DE GHETALDI:  Okay.
18      18     THE WITNESS:  No.
19      19     MR. DE GHETALDI:  All right.
20      20     Q.  Who -- what would have made it better?  I
21      21  mean, who had something that was better?
22      22     A.  Probably smaller -- you know, smaller
23      23  businesses, simpler businesses.  I mean, we're -- you
24      24  know, we're -- you know, in terms of -- again, I'm not
25      25  sure -- you know, this is a very difficult question.  I
```

138

```
 1   00139:01  mean, who do I think's the best athlete -- who's the --
 2      02  do you think that Joe Montana was the best athlete in
 3      03  the world?  I'm not even -- yeah, probably, at the time,
 4      04  maybe.  Was he better than Michael Jordan?  Just a very
 5      05  difficult question.
 6      06         Frito Lay has -- and PepsiCo has very good
 7      07  information about where their products are sold.  They
 8      08  know -- or 7-Eleven in Japan knows literally what they
 9      09  sold at a store within hours of having sold it.  It's
10      10  pretty cool.
11      11         We don't -- we don't know that, you know, what
12      12  we sold within hours.  Because they have to replenish --
13      13  because they sell sushi at stores, they have to
14      14  replenish.  Sushi doesn't have very long shelf life.  No
15      15  one wants to eat old sushi.  Not very popular.  And so
16      16  they have to -- and they have trucks running around in
17      17  Tokyo.  I know this 'cause it's our system.  So they
18      18  have to find out right away when someone buys these
19      19  things.
20      20         7-Eleven, by the way, in Japan is known as a
21      21  store that has incredibly fresh food and incredibly high
22      22  quality at great prices.  7-Eleven in the United States
23      23  does not have a similar reputation.  It's a fascinating
24      24  story.  7-Eleven Japan actually split off from 7-Eleven,
25      25  the parent, became worth more than -- then bought its
```

139

```
 1   00140:01  parent back.  But that's a tangent.
 2      02         So they have -- they have a phenomenal
 3      03  information system.  They keep these trucks rolling
 4      04  around.  They have radio frequency networks that track
 5      05  all of this stuff.  So I know quite a bit about
 6      06  different -- you know, different information systems.
 7      07         But if you narrow it down in the tech industry
 8      08  for a company our size ...
 9      09     Q.  Let's do that.
10      10     A.  You know, so ... you know, did we have a
11      11  pretty good system?  We had a pretty good system.  Was
12      12  it the best in the world?  Was it better than Cisco's?
13      13  I don't know.  But the system was pretty good.
14      14     Q.  All right.
15      15     A.  Far from perfect, but pretty good.
16      16     Q.  Can you quantify how accurate Oracle's deal
17      17  tracking system was in Q3 '01?
18      18     A.  Big deals or all deals?
19      19     Q.  All deals.
20      20     A.  Maybe reasonably accurate.  Again, I'm not
21      21  sure -- do you want to know -- you want me to quantify?
22      22     Q.  Yeah.
23      23     A.  Yeah reasonably.  Pretty accurate.
24      24     Q.  Can you quantify it numerically?
25      25     A.  Do you mean in terms of forecast accuracy or
```

140

Oracle Related Cases

Page  137 - 140

1  00141:01  do you mean in terms of an order?  Once it's entered,
2  02  how accurate is the order?  Once -- how many mistakes
3  03  were made on order entry?  How many mistakes were made
4  04  in the forecast?
5  05      Let me talk about forecast accuracy.  We hit
6  06  12 quarters in a row, so ... for three years, we had not
7  07  missed a quarter.  So that's a pretty good track record
8  08  in our industry in terms of forecast accuracy.
9  09    Q.  I was asking about deal tracking, once a --
10  10  how you track individual deals.  The deals that go --
11  11  that go into both the pipeline and the forecast, how
12  12  your system, I guess -- how comprehensive is it?  I
13  13  don't want to ask seven questions in a row, but just to
14  14  give you a sense of what I'm looking for.
15  15    A.  Again, I'm having trouble, so I'll keep trying
16  16  and probably not answer it again.  Insofar as the
17  17  salespeople enter opportunities, it does a pretty good
18  18  job of track being those opportunities.  If the
19  19  salespeople actually say that I'm trying to sell you
20  20  some software, then it's pretty accurate.  If the
21  21  salesperson doesn't bother to type it into the system,
22  22  not terribly accurate.
23  23      So we are subject to -- we can't force the
24  24  salespeople to type in those opportunities.
25  25    Q.  Right.

141

1  00142:01    A.  Some of them like to play things close to the
2  02  vest.  So individual -- so, you know, we're subject to
3  03  human behavior.  The system is -- you know, underlying
4  04  the system, and it only can add up what's -- you know,
5  05  what's been entered.
6  06      Some salespeople don't like to enter
7  07  opportunities.  Some salespeople will be very
8  08  conservative -- won't -- every time they talk to a
9  09  customer, they won't go back and update the opportunity
10  10  record saying "I just talked to Bob or Sally today, and
11  11  looks like they're going to do the deal next week."
12  12  They won't enter that -- they won't bother to type that
13  13  in into the system, so ...
14  14      The system can collect all that information,
15  15  but not all the salespeople are religious about entering
16  16  that information into the system.
17  17    Q.  Okay.  How did you -- or did Oracle try to
18  18  make improvements on that issue in fiscal year 2001?
19  19    A.  You try to do it several ways.  You try to do
20  20  it on making the system easier to use.  You try to do
21  21  it by looking at how much activity -- what salespeople are
22  22  using the system, what salespeople aren't.
23  23      For example, it would be very surprising if a
24  24  $2 million deal closed on Thursday when it wasn't
25  25  even -- it was only an opportunity on Wednesday.  That

142

1  00143:01  would be a heck of a -- gee, 24 hours.  It's a big deal
2  02  to close in 24 hours.
3  03      So we -- you know, so we try -- you know, we
4  04  had policies and practices, system improvements
5  05  encouraging people to increase their use of the system.
6  06  But these systems are -- you know, salespeople don't
7  07  love these systems.
8  08      Sales managers like them 'cause they want to
9  09  see what their salespeople are doing.  You know, the
10  10  salespeople aren't always happy about someone looking
11  11  over their shoulder.
12  12    Q.  Okay.  You said that the reports that you got
13  13  at the Monday executive committee meetings included
14  14  closed deal information.  Do you recall -- can you tell
15  15  me about what sort of information about closed deals
16  16  those reports contained.
17  17    A.  Yeah, well, we got actual -- as I've said
18  18  before, we got these things called flash reports, or how
19  19  we did -- how much was closed in the first month of the
20  20  quarter, how much was closed in the second month of the
21  21  quarter.
22  22      And then in the last two weeks of the quarter,
23  23  we got the big deals, how many big deals had actually
24  24  been closed.
25  25      So we routinely, you know, saw how much

143

1  00144:01  business -- how much business was already in.  There
2  02  were -- so we had a fairly good handle on how much
3  03  business had already been closed in the quarter.
4  04    Q.  Maybe we're not understanding each other.  I
5  05  was asking about the packet that you got for the
6  06  executive management meetings on Mondays.  Are you
7  07  saying that the flash reports were part of those
8  08  packets?
9  09    A.  We had -- yeah, information was duplicated --
10  10  again, this is a fairly large -- yeah, fairly large
11  11  packet of information.
12  12    Q.  Okay.
13  13    A.  And it would show you how much -- how much
14  14  business was already in on the first month, how much
15  15  business was already in on the second month.
16  16    Q.  But would they show the same information
17  17  weekly?
18  18    A.  The last two weeks of the quarter, yes.  Daily
19  19  the last two weeks of the quarter, but only for a large
20  20  deal.  Let me be precise here.  So no, we would not get
21  21  a daily or a weekly how much business we sold the
22  22  previous week, how much business we sold the previous
23  23  week.
24  24      We would -- we would -- the individual sales
25  25  managers would know approximately how much we had sold.

144

00145:01  So we'd have that information.  Was it in the packets?
02  No, it was not.
03    Q.  But it was something that was discussed at the
04  meeting?
05    A.  It was something -- how much we had -- how
06  much we had left to go, yes.
07    Q.  Okay.
08    A.  So every sale -- so we went around and talked
09  to the salespeople.  They would say "My forecast is
10  $300 million.  I've got 180 million in so far.  Two
11  weeks to go," like that.
12    Q.  Okay.  Were there any changes in the
13  definition of what goes into pipeline in the two years
14  preceding Q3 '01?
15    A.  Not really, but that's -- you know, constant
16  discussion at Oracle.  I mean, is pipeline being used
17  consistently?  If the system gets easier to use, what
18  does that mean?  Does it make, you know, the numbers
19  harder to compare?
20        So if the people are using -- you know, if we
21  have stronger policies insisting on using the system,
22  you know, what does that -- what does that mean?  Are we
23  really -- are these really apples-to-apples comparison?
24        But the fact is no, it was largely the same
25  system, you know, with the same policies.

145

00146:01    Q.  Okay.  Did the internal implementation of OSO
02  have any kind of quantitative effect on the pipeline
03  figures in Q3 '01?
04    A.  Internal implementation.  I'm not sure what
05  you mean.
06    Q.  Oracle started using OSO sometime in fiscal
07  year '01, right?
08    A.  Right.
09    Q.  And what I'm asking is did that system -- did
10  the use of that system result in pipeline figures that
11  were more complete, less complete, were the same as the
12  method that you used before for tracking by product?
13    A.  I don't know.
14    Q.  And as far as you know, that's something
15  that's never been studied or quantified at Oracle?
16    A.  We've thought about it, talked about it.
17  There's just -- it's very hard to know -- it's very hard
18  to get an answer to that question.
19    Q.  Okay.  In analyzing Oracle's financial
20  figures, whether they be forecast or pipeline or closed
21  deals, did Oracle, in fiscal year '01, compare those
22  figures from the current quarter to any prior historical
23  figures?
24    A.  We routinely compare it with the previous --
25  the same quarter of the previous year.

146

00147:01    Q.  Okay.
02    A.  So if it's Q3 '01, we're looking at Q3 '00 for
03  comparisons, because there is seasonality in our
04  business.
05    Q.  All right.  So it wouldn't really make sense,
06  then, to compare Q3 to Q2?
07    A.  Well, it makes some sense.  It's useful.  But
08  Q3, we have the holidays, the Christmas/New Year's
09  holidays.  It really skews things, especially for
10  consultants who are on breaks.  The consulting number
11  goes down; education number goes down.
12        So because of the seasonality, it is a more
13  accurate predictor to compare Q3 this year with Q3 the
14  previous year, rather than sequential quarters, Q3
15  versus Q2.
16    Q.  Okay.
17    A.  We do both, but the important one is year over
18  year.
19    Q.  All right.  Did you routinely compare
20  multi-year results in fiscal year '01, or did you just
21  tend to go back one year?
22    A.  I don't know -- occasionally we would compare
23  a multi-year.  And back in '01 did we compare a
24  multi-year?  I think we probably compared a multi-year.
25  We'd look at what was the growth -- what's the

147

00148:01  pipeline -- take pipeline, for example.  We've been
02  talking about that.  What's the pipeline growth this
03  year versus the same quarter last year?  What was the
04  pipeline growth from the same quarter last year to the
05  year before that?  So yeah, we looked at that.
06    Q.  Okay.  Do you recall reports where such
07  comparisons were made?
08    A.  Sure.
09    Q.  Do you recall which reports those were?
10    A.  I don't.  Sometimes -- at the time,
11  I don't think they were incorporated into our standard
12  package.  But now we routinely have reports that compare
13  multi -- look at multi-year trends.
14    MR. DE GHETALDI:  Want to change the tape?
15  That'd be fine.
16    THE VIDEOGRAPHER:  This is the end of Volume
17  I, tape 2 in the deposition of Lawrence J. Ellison on
18  February 26, 2004.  The time 3:05 p.m.  We are off the
19  record.
20        (Recess taken).
21    THE VIDEOGRAPHER:  This is the beginning of
22  Volume I, tape 3 in the deposition of Lawrence J.
23  Ellison on February 26, 2004.  The time, 3:07 p.m.  We
24  are on the record.
25    MR. DE GHETALDI:  Q.  Let's talk a little bit

148

```
00149:01 about budgeting.  In budgeting, or in preparing Oracle's
      02 yearly budget, was there somebody who was primarily
      03 responsible for that task in fiscal year '01?
      04    A.  Jeff Henley.
      05    Q.  Who else was involved with Mr. Henley in that
      06 process?
      07    A.  All of the senior management team.
      08    Q.  By "the senior management team," you mean the
      09 heads of the various geographic divisions?
      10    A.  Which are all the field divisions, all the
      11 different geographic divisions, the head of the
      12 development organizations, the head of marketing, the
      13 head of support -- the support organizations, and his
      14 own staff, head of legal department.  So everyone --
      15 every senior manager who was responsible for a group
      16 that had a budget had to submit a budget.
      17    Q.  Okay.  Were -- in fiscal year '01, was
      18 Oracle's budget a number that was imposed from the top
      19 down, or was it a consensual sort of process, or
      20 something else?
      21    A.  Yeah, a combination -- combination of the two,
      22 I think.  The -- an awful lot of it was top down.
      23 However, for example, sales division, a field division,
      24 would say "You're selling.  For every dollar you bring
      25 in, you can spend 50 cents.  If you think you're going
```

149

```
00150:01 to bring in a million dollars, your budget's half a
      02 million dollars.  If you think you can bring in
      03 $2 million, we'll double your budget to a million
      04 dollars."
      05       In that sense, you could spend a percentage of
      06 what you brought in.  We had margin requirements on the
      07 businesses.  And they -- as long as -- you know, they
      08 could spend more as long as they would bring in more.
      09       So in that sense, the margin requirements were
      10 top-down requirements.  But they would estimate how
      11 big -- how much their business would grow over the
      12 previous year.  And that growth would determine how big
      13 their budget was.
      14    Q.  Did Oracle's budgeting process in fiscal year
      15 '01 include a budget for revenue as well as expenses?
      16    A.  Of course.
      17    Q.  And was that part of the budgeting process one
      18 that was imposed from the top down, or was it
      19 consensual?
      20    A.  It was absolutely consensual.
      21    Q.  Okay.
      22    A.  And, you know, we were trying to grow the
      23 business.  And there was a lot of discussion.  But it
      24 was -- by "consensual," do you mean that the other
      25 people -- the people consented, or it was consensual,
```

150

```
00151:01 there was a consensus?
      02    Q.  A consensus.
      03    A.  There was a consensus on that because people
      04 would be expected not to spend more than they were
      05 bringing in, clearly, and not to spend such they would
      06 reduce their profit margins.
      07    Q.  Okay.  I think you slipped over into the
      08 spending part.  We were talking about the revenue part.
      09    A.  Totally -- absolutely related.
      10    Q.  Okay.
      11    A.  You're a salesperson.  You have a hundred
      12 salespeople working for you.  You say "I want to spend a
      13 hundred million dollars."  I say "God bless you.  Bring
      14 in 200 million."
      15       You say "I'm going to bring in 150 million."
      16       "only spend 75."
      17       So I'll let you spend 50 cents -- every dollar
      18 you commit to bring in, you can spend half of it.  So
      19 your spending budget was determined by your revenue
      20 forecast.
      21    Q.  I see.
      22    A.  So they're very closely related.  So you and I
      23 would agree on what a reasonable revenue forecast might
      24 be, but you'd have to say "Fine -- well, I want to spend
      25 a hundred million, but I only want to bring in
```

151

```
00152:01 150 million."
      02       Sorry, you can't do that.  If you're only
      03 going to bring in 150, only spend 75.  If you're going
      04 to bring in 200, you can spend a hundred.
      05    Q.  I see.  Was there some kind of 30-percent
      06 growth goal companywide set in fiscal year '01?
      07    A.  I don't recall.
      08    Q.  Were you involved in the budgeting process in
      09 fiscal year '01?
      10    A.  Yes.
      11    Q.  What was your involvement in that process?
      12    A.  We have budgeting meetings prior to setting an
      13 annual budget.  And we discuss the state of our products
      14 versus the products of the competition, our ability --
      15 our ability to add people, overall prospects, the state
      16 of the economy, and we try to come up with a reasonable
      17 amount we can grow the business.
      18    Q.  So you attended those meetings, the budgeting
      19 meetings?
      20    A.  I chaired those meetings.
      21    Q.  Okay.  Did you have agendas for those
      22 meetings?
      23    A.  Yeah, people made presentations.  I'm not --
      24 I'm not sure we had agendas, but we would go around --
      25 every group -- the product -- it was -- this is a
```

152

00153:01  routine process.  The product people would describe, you
02  know, the product improvements and the competitive
03  position of our products, so ...
04      We'd like to know that our database is getting
05  better.  And we think we're a lot better than IBM.  We
06  think we're a lot better than Microsoft.  That's good.
07  Our eBusiness Suite is getting better and our
08  competitive position's improving, so ... the economy's
09  in good shape.  Our brand is hot.  So we think we can
10  grow the business, say, 30 percent.
11      Then the guy up in Asia says, "Well, actually,
12  we've had real currency problems here in Asia.  We've
13  got some local conditions.  We think it's too risky to
14  try to go 30 percent, so we're going to try to go
15  20 percent in Asia."
16      Plus the eBusiness Suite won't --
17      THE REPORTER:  Slow down.
18      THE WITNESS:  The eBusiness Suite hasn't been
19  translated into Chinese yet.  It's a big part of our
20  market.  So the eBusiness Suite might work for most
21  European countries and in North America, but it's really
22  not -- it's hard for us to sell in Asia.  So we think
23  the 20-percent target's a better target for Asia.
24      So we go through a process whereby we look at
25  the state of our products, the state of our products in

153

00154:01  specific geographies, the state of the economies in
02  specific geographies, and we agree upon the -- you know,
03  we agree upon targets for each of the units:
04  Latin-American unit, Asia, Japan, Europe -- and eastern
05  Europe and western Europe are, you know, different in
06  the sense they're different economic states of growth
07  and different economic states.  And we put together
08  budgets on a country-by-country basis.
09      MR. DE GHETALDI:  Q.  Okay.  As you were
10  planning the budget for fiscal year '01, did you
11  consider any areas of Oracle's business to be weaker
12  than others, either geographically or by product or
13  service?
14      A.  Oh, again, I'm going to just make sure I
15  understand this.  Clearly Latin America was -- South
16  America is a weaker region than North America.  The size
17  of our economy is much bigger.
18      If there was a currency problem -- again, I
19  can't really recall the state of things in -- at the
20  time we were doing our budgets.  But certainly if there
21  was a currency crisis in Southeast Asia, an Asian
22  currency crisis, that would impact our ability to grow
23  in China -- actually, not in China, in Southeast Asia
24  where the currency problems were.
25      So we tried to consider macroeconomic issues

154

00155:01  in certain geographic locales, the state of our
02  products, the state -- the maturity of our managers and
03  their ability to add people.  How easy it was to hire
04  people?  It's hard to believe that back in 2000 it was
05  very difficult to hire people.  People were talking
06  about a shortage of engineers.  And there was also a
07  limited growth.
08      So yeah, I think we considered a lot of
09  different things.  And some geographic regions were
10  weaker -- back to your original question.  Some
11  geographic regions were certainly weaker than others.
12  Our database business is a much bigger and -- you know,
13  we're the number one database company in the world.  We
14  were, at the time, only the number two applications
15  company in the world.  So our database business was
16  stronger than our applications business.  Better to be
17  first than second.
18      Q.  It's true.  Were any -- were any aspects of
19  your license business facing particular challenges in
20  fiscal year '01?
21      A.  Not that I recall.
22      Q.  When does the budgeting process usually begin?
23      A.  March.
24      Q.  Okay.
25      A.  After Q3 has just been completed, but before

155

00156:01  Q4.
02      Q.  Okay.
03      A.  So we got three quarters of the year finished.
04      Q.  All right.  Let's go back to the Monday
05  meetings.  Was there a regular time set for those
06  meetings?
07      A.  11 a.m.
08      Q.  Were they held in a particular place?
09      A.  The boardroom.
10      Q.  Okay.  At Oracle?
11      A.  Yes.
12      Q.  Okay.  How long did they usually last?
13      A.  Three hours.
14      Q.  And were those meetings usually attended by
15  certain people?
16      A.  All of my direct reports.  Everyone who worked
17  directly for me.
18      Q.  And who would that be, please?
19      A.  Let's see.  Derrick Williams, who runs Asia
20  Pacific.  Let's see.  Oh, at the time, so --
21      Q.  Right.
22      A.  Jay Nussbaum, who ran OSI, Oracle Service
23  Industries.  George Roberts, who ran, you know, North
24  American commercial sales.  Oracle Service Industries
25  included federal.  So Sergio Giacoletto, who ran Europe,

156

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

| | |
|---|---|
| 1 00157:01 Middle East, Africa. And I think Sebastian Gunningham, | 1 00158:01      MR. DE GHETALDI: Q. Were there regular |
| 2    02 who ran Latin America. I think those are the sales | 2    02 agendas for these meetings? |
| 3    03 executives. And Safra Catz. Mike, who was our chief of | 3    03      A. There was -- there was a standing agenda which |
| 4    04 operations. | 4    04 was review the forecast and the condition of the |
| 5    05   Q. Mike who? | 5    05 business, and then there were specific additional agenda |
| 6    06   A. Mike Rocha. | 6    06 items that people could give -- fire an e-mail off to |
| 7    07   Q. Okay. | 7    07 Safra and say they want to discuss topic A, B or C. |
| 8    08   A. Who's head of customer support. Jeff Henley, | 8    08   Q. Did Safra Catz prepare a written agenda for |
| 9    09 who's our chief financial officer. His lieutenant, | 9    09 these meetings to include those specific topics? |
| 10   10 Jennifer Minton, would also attend. I'm sure I'm | 10   10   A. Sometimes she just walked in with a list of |
| 11   11 missing somebody. Our head of marketing then was Mark | 11   11 three things that -- but -- I believe these days we |
| 12   12 Jarvis. I think that's right. | 12   12 actually get a single sheet of paper with an agenda. |
| 13   13   Q. Somebody from OPI? | 13   13   Q. All right. In fiscal year '01, did you have |
| 14   14   A. I'm trying to remember who was running OPI at | 14   14 these Monday meetings every Monday? |
| 15   15 the time. Was Sebastian running OPI at the time? I | 15   15   A. 52 -- did we religiously, 52 times a year? |
| 16   16 can't remember. He was either Latin America -- I don't | 16   16   Q. Yeah. |
| 17   17 remember who was running OPI right then. | 17   17   A. No, didn't have them during the holidays, |
| 18   18   Q. Let's see. Who was it? | 18   18 during the Christmas/New Year holiday. I was gone, |
| 19   19   A. I don't know. You probably could -- | 19   19 probably missed four of them a year. |
| 20   20   Q. Verasano? | 20   20   Q. Okay, so -- |
| 21   21   A. Could have been. I have no idea. | 21   21   A. Four or five a year. |
| 22   22      MR. SALPETER: We can tell you. | 22   22   Q. Did they have the meetings when you were gone? |
| 23   23      MR. DE GHETALDI: Go ahead. | 23   23   A. Not as a rule. Sometimes I would call in, |
| 24   24      MR. SALPETER: Sanderson. | 24   24 so -- I've achieved my goal. If I'm out of town on a |
| 25   25      THE WITNESS: Oh, Sandy Sanderson, right. | 25   25 Monday, I still can attend by phone. |
| 157 | 158 |
| 1 00159:01   Q. Okay. | 1 00160:01 meetings -- so in March -- so if we're having a large |
| 2    02   A. But sometimes we'd have a budgeting meeting on | 2    02 budget -- three-day budgeting session for the new fiscal |
| 3    03 a Monday and then we'd just cancel that meeting. | 3    03 year, and we set it up for Sunday, Monday, Tuesday -- so |
| 4    04   Q. Okay. | 4    04 that's an example of when this management committee |
| 5    05   A. Everyone -- some people were traveling and | 5    05 meeting might just be cancelled. |
| 6    06 visiting customers; we'd just cancel meetings. I'm | 6    06   Q. I see. |
| 7    07 guessing 40 -- 43 -- 45, 46 times a year we had the | 7    07   A. When there's another meeting scheduled on top |
| 8    08 meetings. | 8    08 of it. |
| 9    09   Q. Okay. These meetings weren't held, then, | 9    09   Q. I see. Okay. In fiscal year '01 did you have |
| 10   10 twice a month in the first two months and weekly in the | 10   10 regular meetings on Tuesdays? |
| 11   11 last month -- | 11   11   A. Yes. |
| 12   12   A. No. | 12   12   Q. What were they? |
| 13   13   Q. -- of the quarter? | 13   13   A. It was a meeting with the engineering team |
| 14   14   A. No. They're scheduled every week. | 14   14 from the database technologies. |
| 15   15   Q. Every week, okay. Were minutes of these | 15   15   Q. Okay. Going back to the Monday meetings, did |
| 16   16 meetings prepared? | 16   16 they have a regular start time? |
| 17   17   A. No. | 17   17   A. 11 a.m. |
| 18   18   Q. Were these meetings your chief source of | 18   18   Q. They ran through lunch? |
| 19   19 current information on Oracle's finances in fiscal year | 19   19   A. Yes. |
| 20   20 '01? | 20   20   Q. People ate lunch during the meeting or after |
| 21   21   A. Yes. | 21   21 the meeting? |
| 22   22   Q. You mentioned budgeting meetings on Monday. | 22   22   A. During the meeting. |
| 23   23 Were those also a regular -- regularly-scheduled meeting | 23   23   Q. Okay. For the -- did you have any other |
| 24   24 for you in fiscal year '01? | 24   24 meetings on Mondays in fiscal year '01 that were |
| 25   25   A. Now, when we started our annual budget | 25   25 regularly scheduled? |
| 159 | 160 |

```
00161:01   A.  Yes.
02      Q.  What were those?
03      A.  A product division committee meeting or
04  engineering team, the heads of engineering, starting at
05  2:00.
06      Q.  Who usually attended those meetings?
07      A.  The respective heads of engineering, who were
08  Chuck Rozwat, who ran the database group, R-O-Z-W-A-T;
09  and Sohaib Abassi, who ran the tools group; Ron Wohl,
10  W-O-H-L, who ran the ERP group; and Mark Barrenechea,
11  who ran CRM, B-A-R-R-E-N-C-H-E-A.
12      MS. SEGAL:  Add another E.
13      THE WITNESS:  Add another E someplace.
14      MS. SEGAL:  E-N-E-C-H-E-A.
15      MR. DE GHETALDI:  Q.  How long did those
16  meetings last?
17      A.  Three hours.  Well, actually, they've been
18  known to go to 8:00 in the evening, but they're
19  scheduled to go from 2:00 to 5:00.
20      Q.  All right.  Were reports regularly prepared
21  for the engineering meetings?
22      A.  No, the engineering meetings were just, you
23  know, discussing the state of the products and what the
24  plans were.  Again, I remember saying earlier in the
25  deposition that I am very deeply involved in the
```

161

```
00162:01  creation of our new products.  So it really is the plans
02  and designs for next-generation versions of all of our
03  products.  And we just review that in great depth.
04      Q.  Do you also review -- or did you also review
05  the status of your current products at these meetings in
06  fiscal year '01 --
07      A.  Sure.
08      Q.  How well things are working, and things like
09  that?
10      A.  Yeah.
11      Q.  Do you recall whether any of these engineering
12  meetings went late, to 8:00, during Q3 '01?
13      A.  No recollection at all.
14      Q.  Any way of checking?
15      A.  No, not that I -- not that I can think of.
16      Q.  Okay.
17      A.  Carolyn wouldn't wait till the end to make a
18  note, that's for sure.  She would just leave.  "You're
19  on your own.  Lock up.  Turn off of the light," you
20  know.  "You guys get a life," you know.
21      Q.  So these were held in your executive suite?
22      A.  Yeah.
23      Q.  So we got two meetings on Monday, most of
24  Monday.  How about Tuesdays; did you have any
25  regularly-scheduled meetings on Tuesdays in Q3 '01?
```

162

```
00163:01   A.  Yes.
02      Q.  Okay.
03      A.  And that was the database technology group.
04      Q.  The engineering team?
05      A.  Right.
06      Q.  Right.  Okay.
07      A.  All the rest of my meetings were all
08  engineering teams for the rest of the week.
09      Q.  All right.  And when did those usually start?
10      A.  2:00.
11      Q.  2:00.  In your executive suite as well?
12      A.  Yes.
13      Q.  And who usually came to those?
14      A.  Chuck -- it was Chuck Rozwat and his direct
15  reports: Andy Mendelsohn ... anyway, he has a number of
16  people -- depending on what we were discussing, he would
17  bring an engineering team to discuss the latest -- the
18  indexing group that did the indexing, or the cashing, or
19  the Query Optimizer.  So the people who -- the
20  performance tuning group.  So he would bring a group of
21  people who were working on a particular problem they
22  were -- that was -- that was being discussed that day.
23      Q.  All right.  Were agendas prepared for that
24  meeting?
25      A.  Not really.
```

163

```
00164:01   Q.  Were minutes taken of that meeting?
02      A.  Definitely not minutes taken.
03      Q.  Okay.  Anybody --
04      A.  I would love to see someone try to take
05  minutes of that meeting.
06      Q.  Anybody ever tape-record any of these
07  meetings?
08      A.  Not that I know of.  Maybe only for comic
09  reasons.
10      Q.  So Mr. Rozwat and Mr. Mendelsohn.  Anybody
11  else that regularly came to these database meetings?
12      A.  Back -- back in '01, early '01.  Even Andy
13  didn't -- even Andy Mendelsohn didn't come regularly.
14  Chuck would just invite a group of people in the area
15  that's being discussed.
16      Most of the engineers don't like going to
17  meetings.  If it's not germane to exactly what they're
18  doing, they just won't go.  They don't care if I ask
19  them to go or not.  "Why should I go to this?"  You
20  know, "I'm not going."  That's the end of that.
21      Q.  Okay.
22      MR. TABACCO:  We have the same problem when
23  we're out here too.
24      MR. DE GHETALDI:  Bunch of prima donnas, huh.
25      THE WITNESS:  They're certainly not afraid of
```

164

Ellison, Lawrence J. (Vol. 01) - 02/26/2004   2/26/2004  10:41:00 AM

1  00165:01  losing their jobs, that's for sure.
2      02      MR. DE GHETALDI:  Q.  How long did those
3      03  meetings usually last?
4      04      A.  Again, they would go to 6:00, probably on
5      05  average, but sometimes later.  They could go quite late.
6      06      Q.  Any other meetings on Tuesdays that were
7      07  regularly held?
8      08      A.  No.
9      09      Q.  How about Wednesdays?
10     10      A.  Tools group.
11     11      Q.  What time was that meeting scheduled to start?
12     12      A.  They're all scheduled for 2:00.
13     13      Q.  2:00, okay.  The -- again in your executive
14     14  suite?
15     15      A.  Yes.
16     16      Q.  Okay.  Who usually attended those meetings?
17     17      A.  Sohaib Abassi and his -- then again, same --
18     18  same format, and whoever -- whoever's in charge of the
19     19  particular product that we're discussing that day.
20     20      Q.  I see.  Okay.  And again, no agendas, no
21     21  minutes, no tape recordings?
22     22      A.  No tape recordings.
23     23      Q.  Okay.
24     24      A.  I'm sure they had an idea -- I don't want to
25     25  say it was completely ad hoc.  They certainly knew

165

1  00166:01  exactly what they were going to discuss.  But it was,
2      02  you know, typically, you know, one or two things:  Let's
3      03  discuss the database Query Optimizer.
4      04      But the agenda would have two lines on
5      05  it, so I'm not sure you'd call that an agenda.  And it
6      06  was never -- it wasn't written down; it was just "Today
7      07  we're going to discuss" blah, blah, blah.  But there were
8      08  formal presentations made.  So it wasn't completely
9      09  informal.
10     10      Q.  Okay.  PowerPoint stuff?
11     11      A.  Lots of PowerPoint stuff.
12     12      Q.  Okay.
13     13      A.  Lots of demos.
14     14      Q.  Okay.  Any other regular Wednesday meetings?
15     15      A.  No, that's the only regular-scheduled
16     16  Wednesday meeting.  I took all my engineering meetings
17     17  and scheduled them Tuesday through Friday at 2:00.
18     18      Q.  I see.
19     19      A.  'Cause if they went on -- if people wanted to
20     20  keep talking about things till 8:00 in the evening, they
21     21  could, but it was on their time, so ... otherwise you
22     22  started them at 9 and they still would have gone to
23     23  8:00.
24     24      Q.  All right.  How about Thursday regular
25     25  meetings?

166

1  00167:01      A.  ERP, Ron Wohl.
2      02      Q.  Okay.  2:00, again, in your executive suite?
3      03      A.  Yes.
4      04      Q.  And whoever Ron Wohl wanted to invite to talk
5      05  about ERP, right?
6      06      A.  You bet.
7      07      Q.  And did you also regularly participate in any
8      08  conference calls on Thursday?
9      09      A.  Routine conference calls?
10     10      Q.  Right.
11     11      A.  No.
12     12      Q.  Forecasting conference calls?
13     13      A.  I -- sometimes I sat in on the forecast calls,
14     14  but as a rule I didn't.  I think Safra -- I think Safra
15     15  did.  Normally I didn't sit in on the calls.
16     16  Occasionally I did, if I wasn't doing anything else, you
17     17  know, and there was a conference call, Carol'd say "You
18     18  want to be on the conference call -- the forecast call,"
19     19  I'd be on it, but in general, no.
20     20      Q.  Tell me about the forecast calls.  What did
21     21  they involve?
22     22      A.  Well, sometimes the direct sales managers were
23     23  there and sometimes it was their finance person.  And
24     24  they would just kind of update people on where we were
25     25  in the quarter.  They'd give you the latest version of

167

1  00168:01  the forecast and their opinions as to how things were
2      02  going.
3      03      I preferred -- if I'm going to get intra --
4      04  intraweek reports, I'd rather talk directly to Sandy
5      05  Sanderson or Jay Nussbaum, call them on the phone where
6      06  there aren't 20 other people on a phone call that are
7      07  listening to his answer.  I would have gotten much
8      08  better information without all of the peer pressure and
9      09  without him having to share it across so many different
10     10  people.
11     11      Q.  I see.  Okay.  How long did those calls
12     12  usually last when you participated in them?
13     13      A.  You know, I don't -- I didn't -- I wasn't on
14     14  very many of them.  I'm not sure I ever started at the
15     15  beginning and ended at the end.  I don't think I've ever
16     16  done that, so I'm not sure.  Hour, less, 45 minutes,
17     17  something like that.
18     18      Q.  All right.
19     19      A.  I'm guessing.  I don't think I've ever been on
20     20  one from beginning to end.
21     21      Q.  All right.  Anything else on Thursday?
22     22      A.  Not regularly scheduled, no.
23     23      Q.  How about Friday?
24     24      A.  That was CRM and Mark Barrenechea.
25     25      Q.  Same sort of format, in your executive suite,

168

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

1  00169:01  you and Mr. Barrenechea and whoever he thinks should be

2    02  coming?

3    03    A.  Yes.

4    04    Q.  Scheduled from 2 to 5, but sometimes goes to

5    05  8?

6    06    A.  Yep, even on a Friday.

7    07    MR. DE GHETALDI:  Okay.  I think it's about

8    08  time for a break.

9    09    THE VIDEOGRAPHER:  Off the record, 3:34 p.m.

10    10  (Recess taken).

11    11    THE VIDEOGRAPHER:  On the record, 3:53 p.m.

12    12    MR. DE GHETALDI:  Q.  Earlier today we talked

13    13  briefly about your involvement in closing deals.  In

14    14  fiscal year '01, were you customarily involved in

15    15  closing certain kinds of deals?

16    16    A.  I really wasn't -- I don't think we discussed

17    17  my involvement in closing deals.  I think we discussed

18    18  my involvement in monitoring big deals being closed, but

19    19  I don't think we've discussed that so far.  But maybe

20    20  I'm -- maybe my memory's failing me.

21    21    But I didn't -- I don't really -- I'll say I

22    22  don't really enjoy selling that much, and I don't really

23    23  get that involved in closing -- in closing deals.  I

24    24  will make -- I will make calls -- well, let me see.

25    25  What is closing?  What does closing a deal mean?  So ...

169

1  00170:01    But I certainly call on customers.  I make

2    02  presentations in front of customers.  But the closing

3    03  process as defined as, you know, asking for the order,

4    04  actually getting the order, walking away with the order

5    05  in your hand, I really don't do.  I'm not -- I don't

6    06  know if I've ever asked a customer for an order in my

7    07  life.

8    08    Q.  Okay.  All right.  In fiscal year '01, how did

9    09  you generally keep apprised of macroeconomic trends

10    10  outside of Oracle?

11    11    A.  Read The Economist, Wall Street Journal,

12    12  looking at macroeconomic trends, you know, those two

13    13  publications.

14    14    Q.  Okay.

15    15    A.  The Financial Times.  But probably relied more

16    16  on The Economist than anything else.

17    17    Q.  All right.

18    18    A.  By the way, we also have some board members

19    19  who are expert in economics.  I'd get in trouble if I

20    20  didn't say that, you know, Dr. Michael Boskin was,

21    21  you know, head of the president's council on economic

22    22  advisors.  And Michael usually briefs the board on what

23    23  the current -- you know, what he thinks the current

24    24  state of the economy is.  And other people on the board

25    25  opine as well.

170

1  00171:01    Q.  Okay.

2    02    A.  And actually, I do have -- I really do have

3    03  tremendous respect for Michael.  He's an incredibly

4    04  bright guy that's a very useful source.

5    05    Q.  All right.  How about your methods, if you had

6    06  any, for monitoring business developments in Silicon

7    07  Valley that could have affected Oracle's business in

8    08  fiscal year '01?

9    09    A.  I think I stated we had our own -- we made

10    10  investments in venture capital.  We had a lot of people

11    11  in venture capital that brought us deals.  I think we

12    12  knew most of the major deals and most of the major

13    13  technologies that were being developed in Silicon Valley

14    14  and around the world.

15    15    We frequent competitors' Web sites.  We have

16    16  engineering presentations where we look very closely at

17    17  what IBM is doing, we look very closely at what

18    18  Microsoft is doing, we look very closely at what SAP is

19    19  doing, and other larger competitors.

20    20    We also look at small companies, which we try

21    21  to understand their technology --

22    22    THE REPORTER:  I've got to slow you down.

23    23    THE WITNESS:  We look at small companies and

24    24  try to understand their technology and even sometimes

25    25  consider them for acquisition.

171

1  00172:01    MR. DE GHETALDI:  Q.  All right.  In fiscal

2    02  year '01, did you talk to certain people in order to

3    03  find out information about what was going on in Silicon

4    04  Valley?

5    05    A.  People inside of Oracle, people outside of

6    06  Oracle?

7    07    Q.  People outside of Oracle.

8    08    A.  My best friend is Steve Jobs at Apple

9    09  Computer.  I talk to Steve a lot.

10    10    Q.  Sure.

11    11    A.  I talk to Scott McNeely a lot, who runs Sun

12    12  Computer.  We frequently have meetings with the senior

13    13  executives at Intel and Hewlett-Packard.  So we have an

14    14  ongoing, you know, dialogue with most of the major

15    15  technology developers in the valley.  Meet regularly

16    16  with Cisco and EMC, the big communications company and

17    17  disk drive manufacturer, so ...

18    18    Since my interest is in the product side of

19    19  the business, my primary interest is in the product side

20    20  of the business, that's where I spend most of my time

21    21  gathering -- gathering information and making decisions,

22    22  based on that information, of which product directions

23    23  we should take.

24    24    Q.  Okay.  I know that was a long answer, but did

25    25  you mean it to relate to events in fiscal year '01 in

172

00173:01  addition to currently?
02    A.  Since I started Oracle.
03    Q.  Okay.  How did you generally try to keep
04  apprised of economic developments that could affect
05  Oracle's customers?
06    A.  Macro developments.
07    Q.  Macro.
08    A.  Other than reading, you know, the financial
09  press.
10    Q.  Right.
11    A.  Financial Times, Wall Street Journal,
12  Economist.  We watched the financial results, clearly --
13  the financial results of other companies.  And we
14  certainly knew that the economy was weakening, in fact.
15  Jeff and I discussed it, that there seemed to be --
16  economy was really bubbling -- very bubbly, frothy, you
17  know, economy in 2000 -- '99, 2000, part of 2001.  And
18  it seemed we were -- you know, there was some weakness
19  in the economy, which we found was, in hindsight now,
20  was recession or headed for a recession.  Didn't know
21  that then.
22    Q.  Did Dr. Boskin make a presentation about the
23  economy in a January 2001 board meeting?
24    A.  Probably.  Probably.
25    Q.  But you don't have a specific recollection of
173

00174:01  that?
02    A.  I would say two out of every three board
03  meetings, he makes presentations.  He gets asked about
04  the state of the economy -- someone asks him about the
05  state of the economy.  Whether it's two minutes or 15
06  minutes discussion depends.
07    Q.  Were -- for Oracle's board meetings, were
08  minutes prepared for those meetings?
09    A.  Oh, absolutely.
10    Q.  In addition to board packages?
11    A.  Oh, there are definitely minutes that get
12  approved at the subsequent board meetings.  So there are
13  minutes.  For the formal portion of our meetings -- now,
14  we have two portions of the meeting.  We have the
15  formal -- the formal portion of the meeting, which is
16  governed by a certain set of, you know, rules and
17  statutory requirements, and there's an informal part of
18  the meeting where there's just general discussions.
19    Q.  Okay.
20    A.  I think Michael's discussion of the economy
21  would not be in the formal part of the board meeting.
22  It's most likely to fall in the informal portion of the
23  meeting.
24    Q.  And were -- I assume that minutes are prepared
25  for the formal portion.  Are minutes also prepared for
174

00175:01  the informal portion?
02    A.  I don't think so, no, 'cause the minutes --
03  the minutes, we approve.  You know, 'cause we approve --
04  we approve -- in board meeting 2, we approve the minutes
05  of board meeting 1.  Standard process.  I think that's
06  just the formal part of the meeting where there are
07  specific motions and certain processes we have to adhere
08  to.
09    Q.  Okay.  During your 27 years with Oracle -- and
10  I guess -- it's more than that.  Well, before Q3 '01,
11  then -- that might get it closer to 27 -- did -- had you
12  ever observed any time when a downturn in the U.S.
13  economy affected Oracle's business?
14    A.  Yes.
15    Q.  When was that?
16    A.  1990 -- the last recession.
17    Q.  Okay.  And what happened then?
18    A.  Our growth rate slowed dramatically.  In fact,
19  we got ourself into a lot of trouble.
20    Q.  Okay.
21    A.  We had our one and only loss quarter we've
22  ever had back in '9 -- back in -- I think it was 1991.
23    Q.  And what's your understanding of why Oracle
24  was affected by that economic downturn in 1990, '91?
25    A.  Well, if you have -- during a recession, you
175

00176:01  know, a major recession -- that was -- that was a pretty
02  good-sized recession we had then -- businesses get very
03  reluctant to spend a lot of money on large new capital
04  projects.  And a lot of our software sales were part of
05  an even larger IT development project.  So these were
06  large capital items, which are often deferred in times
07  of recession.
08    Q.  All right.  What do you recall of the economic
09  mood in the fall of 2000?
10    A.  In the fall of 2000.  So give me a month.
11  November, October?
12    Q.  September.
13    A.  September to October?
14    Q.  Yeah.
15    A.  I'm trying to remember when the market peaked
16  and started coming down.  I think the early warning was
17  the market had -- the market, which had -- seemingly was
18  going up forever, was starting to come down.
19        And I think -- but by September -- I'm having
20  a hard time, you know, placing this that near a window.
21  I think the market had already peaked, was headed down,
22  and I'm not sure if there'd already -- we'd seen the
23  first of the earnings disappointments from corporations.
24        But I know by -- by, say, November,
25  December -- we delivered a record quarter November,
176

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

| | |
|---|---|
| 1   00177:01 so ... the answer is, I think -- give me a minute to -- | 1   00178:01   O. It's understood. |
| 2   02 I'm just reconstructing. | 2   02   A. And I think we might have had -- but we were |
| 3   03   Q. Sure. | 3   03 delivering record quarters, you know. And that was what |
| 4   04   A. I think the economy had softened, it was a | 4   04 was -- what was a little bit interesting. Even though |
| 5   05 general sense the economy had softened, but we ourselves | 5   05 the economy was weakening, we had delivered two record |
| 6   06 had not yet been impacted. We delivered -- you know, as | 6   06 quarters in a row. Though the market was -- though the |
| 7   07 I said, we delivered a record quarter in November, an | 7   07 market was coming down. So I was still pretty |
| 8   08 all-time record quarter November, so ... so, you know, | 8   08 optimistic when we gave our guidance for Q3. |
| 9   09 it looked like the economy was weakening a little bit. | 9   09   Q. Hadn't you actually seen an effect of the |
| 10   10   'Cause I remember Jeff Henley saying that the | 10   10 downturn in the economy in Oracle's dot-com sales by Q3 |
| 11   11 economy, you know -- in my discussion with Jeff about | 11   11 '01? |
| 12   12 guidance was -- Jeff was concerned about the economy. | 12   12   A. Oh. I'm sure we had. I'm sure we had. But I |
| 13   13   Q. Right. March 16th, 2000 was the NASDAQ | 13   13 wouldn't really -- overall business was still very |
| 14   14 high. | 14   14 strong. |
| 15   15   A. March 16th? | 15   15   Q. But wasn't it fairly dramatic? I mean, |
| 16   16   Q. Does that help you -- | 16   16 weren't the sales figures to dot-com companies pretty |
| 17   17   A. Yeah, it does place it. I can't remember -- I | 17   17 bad starting in Q1 '01? |
| 18   18 thought it was June. Just picturing the graphs in my | 18   18   MR. SALPETER: Objection to form, use of the |
| 19   19 head. | 19   19 term "pretty bad." |
| 20   20   Q. Right. | 20   20   THE WITNESS: Yeah, they were certainly down |
| 21   21   A. So yeah, the market started coming down in | 21   21 from where they were, but our overall business was quite |
| 22   22 March. But I think we saw our first earnings | 22   22 strong. So like I said, we were still delivering |
| 23   23 disappointment probably around June, I think | 23   23 record-level results. |
| 24   24 corporations started missing. But again, I'm -- I'm | 24   24   But no, you're absolutely right that our |
| 25   25 kind of reconstructing as best I can from memory. | 25   25 dot-com business was certainly off by that point in |

177

178

| | |
|---|---|
| 1   00179:01 time. And in fact, I viewed that as encouraging because | 1   00180:01   Q. Okay. Did you track those forecast figures |
| 2   02 here our dot-com business had fallen off; in spite of | 2   02 week by week as well -- |
| 3   03 that, we were still delivering record results. So you | 3   03   A. Yes. |
| 4   04 can make a case that was encouraging. | 4   04   Q. To see how they're trending through the |
| 5   05   MR. DE GHETALDI: Okay. | 5   05 quarter, that is? |
| 6   06   Q. What are the key intraquarter forecasting | 6   06   A. Absolutely. |
| 7   07 indicators for Oracle? | 7   07   Q. Did you have any report that actually laid |
| 8   08   A. Early on, the pipeline -- year over year | 8   08 that out for you for the forecast numbers? |
| 9   09 pipeline growth, field sales forecast, financial -- | 9   09   A. That laid it out over a series of weeks? |
| 10   10 financial department forecast, sometimes called the | 10   10   Q. Yeah. |
| 11   11 upside report. Again, I'm trying to steer away from | 11   11   A. No. What you saw was the change versus last |
| 12   12 those funny names. | 12   12 week. |
| 13   13   I would say an actual results for the first | 13   13   Q. Okay. |
| 14   14 and second months of the quarter and then going into the | 14   14   A. So there was no report that I've seen -- |
| 15   15 last ten business days of the quarter, the big deal | 15   15 there's no report at that time -- we've certainly |
| 16   16 report, the size of the pipeline, if you will, | 16   16 compiled these trend reports -- trend graphs and trend |
| 17   17 or the size -- the number -- the number and size of the | 17   17 reports. But at the time, what we had was difference |
| 18   18 big deals that are potentially going to close this | 18   18 between this week and last week. |
| 19   19 quarter. I think that's a pretty complete list. | 19   19   Q. I see. Okay. Now, in fiscal year '01, did |
| 20   20   Q. Okay. For the forecast -- from the field | 20   20 you yourself personally track these forecast numbers on |
| 21   21 forecast number, you -- you've said that you looked at | 21   21 a companywide basis and on a divisionwide basis? |
| 22   22 those numbers generally on a comparative basis -- that | 22   22   A. Both. |
| 23   23 is, year over year -- in terms of percentage growth; is | 23   23   Q. And how about for line of business; did you |
| 24   24 that right? | 24   24 have a way of tracking that for forecast? |
| 25   25   A. Yes. | 25   25   A. What -- |

179

180

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

```
 1   00181:01   Q.  That is, for license and applications?
 2   02      A.  Oh, for different products?
 3   03      Q.  Yeah.
 4   04      A.  Okay.  I was less attentive to that than the
 5   05   total, again.  Our commitment to our -- to Wall Street
 6   06   is, you know, this is what the -- I pay more attention
 7   07   to the entire company result than I do to how any -- how
 8   08   any individual product is doing in a quarter.
 9   09         There can be fluctuations, you know, from
10   10   quarter to quarter in individual products that are
11   11   greater than the fluctuation the company will have.
12   12      Q.  How about for divisions?
13   13      A.  I track -- certainly track the division sales,
14   14   how EMEA is doing, how Asia Pacific's doing, how North
15   15   America's doing.
16   16      MR. DE GHETALDI:  (To the reporter) E-M-E-A.
17   17      THE WITNESS:  Europe, Middle East, Africa.
18   18   Terrible term.
19   19      MR. DE GHETALDI:  Q.  For pipeline, did you
20   20   track the trends in pipeline through a quarter in fiscal
21   21   year '01?
22   22      A.  I looked at the year over year pipeline data,
23   23   but I don't think at that time I did very good trend --
24   24   you know, we didn't have a trend graph that showed the
25   25   fluctuation of the pipeline growth versus last year as a
```

181

```
 1   00182:01   trend graph; in other words, the first week the growth
 2   02   was 50 percent, the second week was 37, the third week
 3   03   was 45, the fourth week was 42.  There was no such trend
 4   04   graph that I ever received.  So we just looked -- I got
 5   05   a single number that said that the pipeline growth was
 6   06   50-percent greater this quarter than the same quarter
 7   07   last year.
 8   08      Q.  All right.  Did you review -- were pipeline
 9   09   numbers available to you for geographic divisions and --
10   10   or I'm sorry -- for divisions and for certain products?
11   11      A.  I tended not to rely a lot on product
12   12   pipelines, but certainly for geographic areas I paid
13   13   more attention to it than products.  The geographic
14   14   numbers tend to be more accurate than the product
15   15   numbers.
16   16      Q.  Why is that?
17   17      A.  The salespeople didn't do as good a job -- you
18   18   know, once you said that's a million-dollar sale, now
19   19   they're going to say it was 200,000 database, 800,000
20   20   applications.  The million dollars was closer to
21   21   accurate than the split between 200,000 database,
22   22   800,000 applications.
23   23         So just -- for whatever reason, the more
24   24   detail you asked for, the less accurate the information
25   25   got.  So as you drill down -- it's just a fact.  You ask
```

182

```
 1   00183:01   people to type in more and more information, they
 2   02   tend -- they -- they don't like to do it.  They don't
 3   03   like to supply that information.  Or they guess too
 4   04   much.
 5   05      Q.  In fiscal year '01, were applications deals
 6   06   classified as applications deals even if they had a
 7   07   database component to them?
 8   08      A.  Depends.  If the salesperson said a million
 9   09   dollars application -- you're talking about pipeline
10   10   now, not a deal that's closed?  Are you talking --
11   11      Q.  No, forecast.
12   12      A.  Forecast.
13   13      Q.  Forecast.
14   14      A.  Oh, forecast.  So that's the underlying
15   15   opportunity.  So I could enter a million-dollar
16   16   application deal, just type it in Oracle Sales
17   17   On-line, or I could split it up and say 800,000 in
18   18   application, 200,000 in database.  That was additional
19   19   effort for me to describe the opportunity in that level
20   20   of detail.
21   21         So sometimes in the opportunity side of things
22   22   people might classify something entirely as an
23   23   application even though there was a database component
24   24   in it.  They just wouldn't bother to separate it out.
25   25   And that's why they weren't terribly accurate.
```

183

```
 1   00184:01   Q.  Well, wasn't there a system in place that
 2   02   actually classified a deal as an applications deal if
 3   03   the applications -- in a deal that would include both
 4   04   applications and database, if the applications component
 5   05   was greater than a certain number?
 6   06      A.  Not that I know of.
 7   07      Q.  Okay.
 8   08      A.  As I say, let me emphasize, I didn't pay a lot
 9   09   of attention to product forecasts 'cause I didn't think
10   10   the information was accurate.  What you say may very
11   11   well be true, but I would never -- you know, if there's
12   12   some computer system that automatically classifies
13   13   something as an application deal because so much -- it
14   14   would be all the more reason I wouldn't pay any
15   15   attention to it.  It's -- I don't know how those
16   16   algorithms work, so ...
17   17         I didn't -- I did not look at that data very
18   18   carefully 'cause it was never accurate.
19   19      Q.  All right.  Did -- knowing in fiscal year '01
20   20   that that data was not accurate, did you make any
21   21   efforts to make the data more accurate?
22   22      A.  Well, the number -- the total -- the total
23   23   sales number was pretty accurate.  What was not accurate
24   24   was what percentage of this was database and what
25   25   percentage of this is applications.  In the forecast
```

184

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

1  00185:01 phase, once we actually took an order, the information
2  02 was exactly accurate.
3  03     So what was inaccurate was -- yes, it's a
4  04 million-dollar deal.  That's accurate for a forecast.
5  05 What's inaccurate, it's a million-dollar applications
6  06 deal.  No, it's not a million-dollar applications deal.
7  07 In fact, it's a $800,000 applications deal and a
8  08 $200,000 database deal, is the way it should have been
9  09 entered.
10  10     Did I think it was a high priority to get --
11  11 you know, to get a product forecast?  No.
12  12  Q.  Well, I didn't ask you if you thought it was a
13  13 high priority; I asked you if you did anything in fiscal
14  14 year '01 to try and correct what you perceived as a
15  15 inaccuracy in your system.
16  16  A.  It was not -- I did not consider that a high
17  17 priority.  That was not an inaccuracy from the point of
18  18 view of financial results.  That was an inaccuracy in
19  19 terms of, you know, looking at a million-dollar deal and
20  20 saying we really don't know how much is database and how
21  21 much is applications.  All we really know it's a
22  22 million-dollar deal.  And that's accurate.
23  23     How important -- how much should we ask our
24  24 salespeople to do -- 'cause the question was, you're
25  25 asking your salespeople to go through additional effort

185

1  00186:01 to spend their time to estimate what percentage of their
2  02 opportunities are going to be database.  You can get
3  03 more detailed than that.  Where do you stop?  How much
4  04 of that -- how much is applications, how much is human
5  05 resources versus financials?  You can estimate that as
6  06 well.
7  07     So there were a bunch of people at Oracle
8  08 thought we should ask the salespeople to give us very
9  09 detailed descriptions of every opportunity, saying okay,
10  10 this is a million-dollar deal with $64,000 of human
11  11 resources, $105,000 of financials, 26,000 of CRM, of
12  12 which 13,000 was sales and 13,000 was service, so much
13  13 application server, so much database.  I mean, it's a
14  14 very elaborate -- it's very complicated to do.
15  15     I didn't think that kind of information was
16  16 necessary.  I didn't use it myself, so I -- is it
17  17 product forecasting -- financial forecasting -- is it
18  18 important to get a very accurate financial forecast?
19  19 Yes.  Was it very important to know how much of that
20  20 forecast was our HR database?  No.  I didn't think -- I
21  21 don't think that's important to know.
22  22     It's very important to know, when we actually
23  23 sell deals, how much was HR.  But do I want the
24  24 salespeople -- A, they won't do it.  The salespeople
25  25 will not be able to type in -- it's wildly inaccurate,

186

1  00187:01 to start with.  So it's a lot of effort for a lot of
2  02 inaccurate information.
3  03     So product forecasting, which has nothing to
4  04 do with financial forecasting, I would argue, you know,
5  05 is something that -- you know, sure, I'd like to know,
6  06 if you could tell me.  But I'm not going to, you know,
7  07 spend a lot of effort to try to get it.  Why?  Why do I
8  08 want it?
9  09  Q.  Well, did certain areas of the economy buy
10  10 certain -- have a tendency to buy certain of Oracle's
11  11 products?
12  12  A.  That's different.  So, for example,
13  13 telecommunications -- what you asked -- so let me be
14  14 clear.  I'd be very interested in how our sales were
15  15 going in Southeast Asia after a currency crisis.  I'd
16  16 expect they'd go down.  So that's something -- I want
17  17 to, you know, monitor that in a macroeconomic sense.
18  18     When the telecom's bubble got burst or the
19  19 dot-com bubble burst, I would expect that sales to those
20  20 industries would decline.  And that, we need to know for
21  21 modeling reasons and allocating salespeople and all this
22  22 other stuff.
23  23     What I don't need to know or don't think it's
24  24 all that important to know is, if we have a specific
25  25 deal with, let's say -- pick a company -- General

187

1  00188:01 Electric, GE Medical, and that deal's going to be a
2  02 $5 million deal, is it really important for me to know
3  03 that 4 million of that 5 million is financials and
4  04 1 million is human resources?  Is that really important
5  05 for me to know that that's what that deal is?  Before
6  06 the deal's booked.  This is on the forecast.  And do I
7  07 think I can get the salespeople to enter such
8  08 detailed -- such detailed information about their
9  09 opportunities?
10  10     The answer is I haven't been able to figure
11  11 out how to get the salespeople to enter such detailed
12  12 information.  I haven't found the information accurate.
13  13 I haven't found it important or useful in forecasting
14  14 the quarter.  So we just haven't spent a lot of effort
15  15 in trying to get it.  But I guess I don't know where
16  16 you're getting --
17  17  Q.  Well, I guess -- isn't it true that OSO was
18  18 set up to require the salespeople to, when they have a
19  19 potential deal, to split it up into ERP, CRM, database
20  20 and tools?
21  21  A.  Absolutely.
22  22  Q.  Okay.  So that was done for a purpose, I
23  23 assume.
24  24  A.  Yeah, we -- we -- some managers would like to
25  25 know exactly what the split would be, absolutely.  Some

188

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

```
1   00189:01  people want to know that.
2   02    Q.  All right.  And I guess what I don't
3   03  understand is why you think that geographic forecasts
4   04  are significant trends to watch, but you don't think
5   05  that product forecasts are significant trends to watch.
6   06    A.  Geographic forecasts are easy trends to watch.
7   07  They're easy to get.  Product forecasts are extremely
8   08  difficult to get.  So it's relatively easy for me to
9   09  look at a forecast for Germany.  It's relatively hard
10  10  for me to look at a forecast for human resources, though
11  11  we're getting better at it, you know, for HR.  It's very
12  12  hard for me to look at -- you know, for HR -- again, I
13  13  don't know why this is important -- looking for HR for
14  14  Japan.
15  15       The system is the salesperson, if they enter a
16  16  million-dollar deal and they're a German salesperson,
17  17  it's a million-dollar deal in Germany.  If they're
18  18  selling only to telecom companies, I know I can watch
19  19  the telecom forecast.  So I can just look at a
20  20  salesperson's deal -- they're assigned to that vertical
21  21  industry or that geographic territory, and all I have to
22  22  do is add up their numbers and I'll get a pretty
23  23  accurate financial forecast.
24  24       What requires additional effort on the part of
25  25  the salesperson is -- "Okay, I'd like to know
```

189

```
1   00190:01  exactly" -- people want to know a lot of things --
2   02  "exactly where the sales deal is.  Describe every
3   03  conversation you've ever had with the customer and what
4   04  they've said.  Every time you call the customer on the
5   05  telephone, you know, give me notes about the
6   06  conversation," 'cause you want to know how you're
7   07  progressing through the deal, right?  I mean, you'd
8   08  like -- people's sales managers want to know how well
9   09  they're progressing through the deal.
10  10       But we don't ask the salespeople to give us
11  11  notes about every time they talk to the customer.  You
12  12  know, we'd like them to do that if that's convenient for
13  13  them to do.  We -- you know, we'd like the salespeople
14  14  to enter the detailed product information in their
15  15  forecast, but it's a lot of additional effort.  They
16  16  don't like to do it.  They don't take a lot of time
17  17  making the estimates.
18  18       So what happens is, someone says "Okay,
19  19  you're going to require me -- okay, Larry, you want me
20  20  to enter CRM versus ERP versus database.  All right.
21  21  It's a million-dollar deal; it's all database."
22  22       Well, then it comes in 50 percent -- half with
23  23  CRM.  "Oh, yeah, I was wrong."
24  24       They -- you know, there's no -- the deal
25  25  changes.  They don't want -- you know, people don't like
```

190

```
1   00191:01  to spend a lot of time in front of a computer, you know,
2   02  typing in that information.  Did I -- so I just don't
3   03  rely on -- you know, on the product forecast.  The
4   04  product forecasts have not been nearly as accurate as
5   05  the financial forecasts.
6   06       So just looking back on it and trying to
7   07  explain -- you know, explain why is people don't take --
8   08  people take pretty great care in entering their
9   09  financial forecasts.  People do not take great care in
10  10  entering their product forecasts.
11  11    Q.  When you say "financial forecast," can you
12  12  define what you mean.
13  13    A.  Looking at one opportunity, as we discussed
14  14  before --
15  15    Q.  Right.
16  16    A.  -- this is a million-dollar opportunity.  That
17  17  million dollars are pretty -- they've really thought
18  18  about that number, the million dollars' worth of
19  19  software I'm going to sell.  That's a pretty accurate
20  20  number.
21  21    Q.  That's the financial forecast?
22  22    A.  That's the financial forecast.  So we can
23  23  pretty much rely -- that's a relatively reliable number.
24  24    Q.  All right.
25  25    A.  Then they go to the next stage and say "Well,
```

191

```
1   00192:01  half of that's going to be applications and half of
2   02  that's going to be database."
3   03       That is a much -- much less thought has gone
4   04  into that -- that assessment.  And that tends to be a
5   05  much less reliable number.  It could be 80 percent
6   06  applications; it could be all database.  We really don't
7   07  know.
8   08       Just saying from historic analysis, our
9   09  product forecasts have not been as accurate as our
10  10  financial forecasts.
11  11    Q.  All right.
12  12    A.  And we think it's because salespeople either
13  13  don't know or, you know, have difficulty or don't want
14  14  to enter that information in some detail.
15  15    Q.  If the product forecasting information was
16  16  accurate, do you think it would be useful?
17  17    A.  Oh, sure.  Sure.
18  18    Q.  Okay.
19  19    A.  But what's really useful are the product
20  20  actuals.  And the reason I don't feel so strongly
21  21  about -- I don't have a very high priority in the
22  22  product -- you know, the product forecasting --
23  23  financial forecasting's very important.  When you miss a
24  24  financial forecast, people get upset.  If we miss a
25  25  product forecast, no one really much cares.  It's much
```

192

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

```
 1   00193:01  less -- much less of an issue.
 2   02          We don't make product forecasts, as a general
 3   03   rule.  We do provide -- we do provide tremendous -- you
 4   04   know, a lot of information on what we've actually sold.
 5   05   So we have very accurate information what's actually
 6   06   been selling.  I don't -- when we're looking at a
 7   07   product trend, these tend to be rather long-term trends.
 8   08          Maybe I'd understand this better if I knew
 9   09   where we're going with all this.
10   10    Q.   Well --
11   11    A.   But if you're asking me would I like to have
12   12   more -- more -- more -- more information, the answer is
13   13   sure.  Do I think I can reasonably well get it?  Haven't
14   14   been able to yet.
15   15    Q.   You said you don't make product forecasts.  I
16   16   mean, that's -- that's not -- that's not actually true,
17   17   is it?
18   18    A.   Well, we make general forecasts in huge
19   19   groups --
20   20    Q.   Okay.
21   21    A.   -- of database and applications --
22   22    Q.   Okay.
23   23    A.   -- which is not -- I'm sorry.  Maybe I was
24   24   using the word -- I wasn't using the word "product"
25   25   clearly.  We have two huge technology -- software
```
                                                    193

```
 1   00194:01  business -- so we have the application business and we
 2   02   have the database business.
 3   03    Q.   Right.
 4   04    A.   And we certainly forecast those two
 5   05   businesses.
 6   06    Q.   Okay, that's the --
 7   07    A.   So maybe the word "product" -- maybe the word
 8   08   "product" -- so there's two huge areas --
 9   09    Q.   Right.
10   10    A.   -- database and applications.  We certainly
11   11   forecast that.  We watch that.  But at a product
12   12   level -- maybe this is where all the confusion is.
13   13    Q.   Right.
14   14    A.   Where we're looking at human resources as a
15   15   portion of applications, would we like -- you know,
16   16   would we like to have better forecast information on
17   17   that?  Sure.  The fact that we have historical trends,
18   18   we can look at growth and human resources over the last
19   19   few years, is knowing how we're going to do this quarter
20   20   really important to our assessment of the quality of our
21   21   human resources product?  Probably not.
22   22    Q.   I think you --
23   23    A.   I'm not sure.
24   24    Q.   I think we were using "product" from different
25   25   ends of the spectrum.
```
                                                    194

```
 1   00195:01  A.   Okay.
 2   02    Q.   And I was -- and I apologize.  I was actually
 3   03   talking about product in the technology and applications
 4   04   level and not on --
 5   05    A.   Good.
 6   06    Q.   -- specifically product --
 7   07    A.   The two different businesses.
 8   08    Q.   Yeah, the business level.
 9   09    A.   Right.
10   10    Q.   Okay, so -- as opposed to product forecasting,
11   11   how about business forecasting?
12   12    A.   Yeah.
13   13    Q.   Was that something that was important?
14   14    A.   Yes.  And even that's harder to get.  But
15   15   it -- but it's much easier to get than product
16   16   forecasting.  But even that's less accurate.  So even --
17   17   so -- the more detailed you get, the greater chance for
18   18   error.  And this is just standard statistics, right.
19   19          So if you have one financial number and you
20   20   estimate that, that's going to be more accurate than if
21   21   you say "Well, I'm going to give you two numbers.  I'm
22   22   going to give you applications and database."
23   23          Then if I break up applications into six
24   24   subgroups and give you six numbers, getting -- you know,
25   25   that is substantially harder to get right than getting
```
                                                    195

```
 1   00196:01  the top line right.
 2   02    Q.   Okay.
 3   03    A.   So that's -- I'm sorry.  Maybe -- that's all I
 4   04   was saying.
 5   05    Q.   Okay.
 6   06    A.   The more data you gather, the greater chance
 7   07   of human error.  The more -- the more separate forecasts
 8   08   you make, the more chance of error.
 9   09    Q.   All right.  Earlier today I asked you about
10   10   something called conversion rate.
11   11    A.   Yes.
12   12    Q.   I didn't ask you about something that's called
13   13   coverage rate.  Do you understand -- what do you
14   14   understand by that term?
15   15    A.   Okay.  So conversion rate is the ratio between
16   16   actuals -- actuals to pipeline.
17   17    Q.   Yes.
18   18    A.   How many of those potential deals became
19   19   contracts.
20   20    Q.   Yes.
21   21    A.   Coverage is based on the forecast -- based on
22   22   the forecast, how much bigger -- in terms of
23   23   percentages, how much bigger is the pipeline -- the
24   24   potential pipeline for this quarter versus the forecast.
25   25   What's our coverage.
```
                                                    196

00197:01   Q.  One's the inverse of the other?
02   A.  It's -- it's -- it's just -- it's just a
03   ratio.  So if forecast -- if -- it's really pipeline
04   over -- pipeline over -- over forecast.  So if you have
05   a $3 million pipeline and a $1 million forecast, you
06   have a three-to-one or a 300-percent coverage.
07   Q.  And the inverse of that is the conversion
08   ratio, right?
09   A.  No, conversion ratio doesn't use forecast.
10   Conversion ratio -- so the two ratios -- both ratios use
11   pipelines.
12   Q.  Okay.
13   A.  Coverage is -- is forecast divided into
14   pipeline.  I'll give you a couple of examples.
15   Q.  Okay.
16   A.  All right.  So let's say we got a $3 million
17   pipeline and we got a $1 million forecast.  Okay.  So
18   that will give us a 300-percent coverage, three to one.
19   Let's say we have a traditional conversion rate of
20   50 percent.  And -- conversion ratio.  And that is --
21   let's say historically for the last ten quarters, we've
22   had a $3 million pipeline.  Every quarter, for some
23   reason, we've got a $3 million pipeline.  And every
24   quarter we close exactly one and a half million dollars
25   of that.

197

00198:01   That means our conversion rate is half.  Take
02   the pipeline, divide it by two, and that's how many may
03   become deals, okay.
04   So now you got a pipeline -- so we got a
05   conversion ratio.  So our conversion ratio, if it's
06   50 percent -- so we're sitting there -- let's look at
07   the forecast we just had here.  So we have coverage of
08   300 percent, or three-to-one coverage.  And we have a
09   conversion -- let's apply the standard -- the historic
10   conversion ratio to that pipeline.
11   The historic conversion ratio is 50 percent,
12   but a $3 million pipeline.  So we should sell a million
13   and a half dollars.  What's the forecast?  A million
14   dollars.  Oh, that's good.  Should be a conservative
15   forecast.  All right.  The forecast is less -- is
16   less -- assumes a lower conversion rate than our
17   historic trends, all right.  So if you use -- so we --
18   so if you look at -- am I ...
19   Q.  I'm following you, trust me.
20   A.  Okay, all right.  Okay.  Don't stop.
21   Q.  Okay.  Isn't it true that Oracle used -- or
22   tracked both end-of-quarter conversion rates and
23   intraquarter conversion rates in fiscal year '01?  Two
24   different numbers, arrived at essentially the same way.
25   A.  Well, I think at -- well, again, we looked at

198

00199:01   a lot of different conversion ratios, so we have -- we
02   have lots of numbers, one of which is on big deals.  We
03   looked at conversion ratio on big deals, all right, just
04   the last -- the last ten days of the quarter.
05   Q.  I'm talking about on your --
06   A.  Total pipeline.
07   Q.  In your total pipeline, in your Monday reports
08   that you got weekly --
09   A.  Right.
10   Q.  -- didn't those weekly reports track the
11   forecast against the pipeline and arrive at a conversion
12   ratio intraquarter that's separate and different,
13   although maybe the mathematical formula is the same,
14   separate and different from the end-of-the-quarter
15   conversion ratio that you've been describing?
16   A.  That would be -- that would be a forecast
17   conversion ratio.  So that would be -- okay.  Now I understand.  Sometimes
18   it's just communication.  I'm not really trying -- okay.
19   So that is -- 'cause the number we're really
20   interested in -- so let's go back to our previous
21   example.  So the coverage -- the coverage of three to
22   one.  Said another way, another term, which is, that
23   means we're forecasting a conversion ratio of
24   33 percent --
25   Q.  Right.

199

00200:01   A.  -- that's a --
02   Q.  The inverse?
03   A.  Right.  Exactly.  We're forecasting a
04   conversion ratio of 33 percent.  We're forecasting,
05   looking forward, a conversion ratio of
06   33 percent.
07   Q.  Yes.
08   A.  Historically looking backwards, we have a
09   conversion ratio of 50 percent.
10   Q.  An actual.
11   A.  An actual conversion ratio of 50 percent.  So
12   the fact that we're forecasting a conversion ratio of
13   33 percent should give us some comfort --
14   THE REPORTER:  Hold on.
15   THE WITNESS:  -- should give us some comfort
16   that we're forecasting a conversion ratio less than
17   we've historically been getting.
18   So as you compare those two -- the forecast
19   conversion ratio with a historic conversion ratio, you
20   should feel good if the forecast is lower because it
21   means that we -- even if we don't perform as well as we
22   have historically, we're still going to make our
23   forecast.
24   MR. DE GHETALDI:  Q.  Okay.  Now,
25   intraquarter --

200

```
1  00201:01   A.  Yes.
2  02    Q.  -- this forecast conversion ratio, that is the
3  03 forecast divided by the pipeline --
4  04    A.  Yes.
5  05    Q.  -- did you compare those intraquarter forecast
6  06 conversion ratios to the intraquarter conversion ratios
7  07 in the same quarter of the prior year?
8  08    A.  I don't think so.  I'm not -- I don't think
9  09 so.
10 10    Q.  Okay.  One of the things that we talked about
11 11 earlier today was the comparison of various growth rates
12 12 to other growth rates.  I think one of the examples that
13 13 you gave was a comparison of the pipeline growth rate to
14 14 the forecast growth rate, right?
15 15    A.  Yes.
16 16    Q.  Was that something that you regularly looked
17 17 at in fiscal year '01?
18 18    A.  Yeah.  All the -- all these things are pretty
19 19 much the same thing.  Whether you turn them into the
20 20 ratio or you just look at growth rates, they're all the
21 21 same thing.  Is the pipeline -- you know, at what rate
22 22 is the pipeline growing, at what rate is the forecast
23 23 growing.
24 24       Back to the coverage notion, you'd like your
25 25 opportunities to be growing more rapidly than your
```

201

```
1  00202:01 forecast.  That automatically builds in a certain degree
2  02 of conservatism into your forecast, and comfort.
3  03    Q.  Okay.  And to the extent that those numbers
4  04 tend to converge -- that is, to the extent that your
5  05 pipeline is growing only a little bit faster than your
6  06 forecast -- that might be an area for concern, right?
7  07    A.  Well, it -- I mean, I'd have to look at the
8  08 numbers.  It depends on how much -- how much -- how much
9  09 room you had.  So if your pipeline was very, very large
10 10 and you still had what we call -- hate to use these
11 11 terms -- have adequate coverage, it might not be an area
12 12 for concern.  But it might be.  I'd have to see the
13 13 numbers.
14 14    Q.  Okay.  Were margin growth rates a useful
15 15 forecasting indicator?
16 16    A.  Margins which were related to expenses?
17 17    Q.  Yes.
18 18    A.  Yeah, if expenses were going down again, that
19 19 should give you some comfort that -- there are two ways
20 20 to make more money.  You know, sell more, spend less.
21 21 So I'm a simple guy.
22 22       And so we try to do both simultaneously.  And
23 23 if our expenses were trending down -- our expenses were
24 24 trending down, our sales were trending up.  And those
25 25 are both good things, and both of them contribute to
```

202

```
1  00203:01 having a good quarter.
2  02    Q.  All right.  Is it "Covisint" or "Covisint"?
3  03    A.  I sure don't know.  I'd say "Covisint."
4  04    Q.  What was -- when did Oracle first become aware
5  05 of a Covisint opportunity?
6  06    A.  This is not a simple question.  Covisint was
7  07 the marriage -- the unlikely marriage between the
8  08 purchasing department of General Motors and the
9  09 purchasing department of Ford Motor Company, the two --
10 10 you know, the then two largest industrial corporations
11 11 in North America.  The world?  Close.
12 12       And there was -- during the dot-com bubble,
13 13 there was the interesting idea that if General Motors or
14 14 Ford took their purchasing department -- you know, spun
15 15 off their purchasing department as a Internet --
16 16 separate Internet company, then that purchasing
17 17 department would in fact be worth more than the car
18 18 company.  Interesting.
19 19       And one of our competitors, Commerce One,
20 20 signed a deal with General Motors, and we then proceeded
21 21 to sign a separate deal with Ford Motor Company.  This
22 22 is before they got together, so ... so we had Internet
23 23 procurement software -- selling procurement software in
24 24 what's called a reverse auction.
25 25       So rather than buying -- General Motors or
```

203

```
1  00204:01 Ford motors buying tires from Bridgestone, buying by
2  02 conventional bid process, they would do it a la eBay and
3  03 have a reverse auction.  And the tire manufacturers
4  04 would bid and bid and bid until the bidding was closed
5  05 and this would allow them to save a lot of money because
6  06 this reverse auction process would allow them to buy car
7  07 parts and services much cheaper than they could through
8  08 the conventional bidding process.
9  09       So we had reverse auction software.  One of
10 10 our competitors, Commerce One, was a specialist in
11 11 reverse auction software.  Once Commerce One signed up
12 12 General Motors, we went off and signed a deal with Ford.
13 13       Subsequent to us signing that deal with Ford
14 14 Motor Company, Ford Motor Company and General Motors got
15 15 together, I think mediated by Morgan Stanley, said "Gee,
16 16 if you guys combine this reverse auction venture into
17 17 one and bring in Chrysler, we think this company would
18 18 be worth a fortune.  And we'll take it -- you know,
19 19 we'll get it started, we'll take a public, and it'll be
20 20 worth a lot of money."
21 21       And GM and Ford did indeed create a joint
22 22 venture called "Covisint," "Covisint."  And included two
23 23 software suppliers, at least, us on the Ford -- from the
24 24 Ford side and Commerce One from the General Motors side.
25 25       The original structure of the deals were that
```

204

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

```
 1  00205:01  Commerce One would give General Motors ten percent of
 2      02  their company in exchange for Commerce One getting this
 3      03  contract.  We were unwilling to give up any of Oracle
 4      04  Corporation to Ford for this.  We don't do business like
 5      05  that.  Instead of being paid for our software, I believe
 6      06  the original deal envisioned was that we would get two
 7      07  and a half percent of the company.  Anyway, we thought
 8      08  that was a really bad idea.  Over time -- we're in
 9      09  business to sell software in exchange for money.  We
10      10  don't really want to own percent -- you know, companies.
11      11        And again, this dragged out.  So this was a
12      12  long, drawn-out process.  So we had a variety of
13      13  negotiating teams.  I mean, this went on for probably 18
14      14  months.  And eventually we wanted a very conventional
15      15  software deal where you give us so much money, we give
16      16  you so much software, and -- it was a little more
17      17  complicated than that, actually.  But that -- but the
18      18  material part of it was we have software, you have
19      19  money, we'll make a trade.  And we'll -- and we'll do
20      20  the deal.
21      21        But again, this was an extremely long,
22      22  drawn-out process where initially we had a deal with
23      23  Ford.  Ford had -- you know, there was a new venture
24      24  created.  The new venture had to be funded by the
25      25  parents.  They brought in Chrysler.  There were lots of
```

                                        205

```
 1  00206:01  moving parts to this deal.
 2      02   Q.  Toyota was brought in at some point, or ...
 3      03   A.  I think they tried to bring in Toyota.  I
 4      04  don't think they successfully brought in Toyota.  They
 5      05  might have brought in one Japanese manufacturer, but I'm
 6      06  almost positive it wasn't Toyota.
 7      07   Q.  Okay.  Okay.
 8      08   A.  But I think they did -- they did
 9      09  theoretically -- I think they brought in Daimler
10      10  Chrysler.
11      11   Q.  Daimler Chrysler.  And it's your understanding
12      12  that it didn't start out as a pure sale of Oracle
13      13  product to this new company?
14      14   A.  No, it started out as a -- as a sale -- a sale
15      15  to Ford Motor Company of software, and then Ford created
16      16  this joint venture with General Motors.
17      17   Q.  A sale to Ford of software?
18      18   A.  Procurement software.
19      19   Q.  Right.  But it didn't originally include any
20      20  equity interest --
21      21   A.  In Ford?
22      22   Q.  -- in Ford?
23      23   A.  No.
24      24   Q.  And it didn't include --
25      25   A.  I mean, the same period of the transaction.
```

                                        206

```
 1  00207:01  Originally it was the sale of our procurement software
 2      02  to Ford.  But during the dot-com bubble, there was -- a
 3      03  number of interesting ideas showed up.  Not all of them
 4      04  were very good.  This was one that hasn't been very
 5      05  good.
 6      06        And so Ford and GM decided to get together in
 7      07  this buying consortium and share -- create this new
 8      08  company called Covisint and then bring in Daimler
 9      09  Chrysler and other auto manufacturers.  And then they
10      10  would -- you know, then they would hopefully bring in
11      11  all the suppliers.  And this would be -- this
12      12  purchasing -- this company would do all the buying for
13      13  the auto companies and then take one percent or two
14      14  percent for themselves as profit, or something like
15      15  that, was the general idea.
16      16   Q.  Okay.  How big was the original sale of Oracle
17      17  software to Ford?
18      18   A.  I'm guessing, but I don't think I'll be far
19      19  off, $10 million.
20      20   Q.  Okay.
21      21   A.  $5 million?  I don't know.  You know, a
22      22  moderate deal.  Moderate-size deal.
23      23   Q.  Initially who was primarily responsible for
24      24  these negotiations?
25      25   A.  We had a number of different teams of people.
```

                                        207

```
 1  00208:01  I think Safra Catz, and Safra Catz ran everything.
 2      02   Q.  In the end.  But initially who was running it;
 3      03  do you remember?
 4      04   A.  One of our automobile sales guys.
 5      05   Q.  Okay.  Did it ever get too big for one of your
 6      06  automobile sales guys?
 7      07   A.  Well, Ray Lane was involved in the deal.  I
 8      08  mean, Ray actually came to me with the idea of shouldn't
 9      09  we give Ford ten percent of Oracle to get this deal,
10      10  which was -- seemed like a bad idea to me.  So Ray was
11      11  the one bouncing back and forth between General Motors
12      12  and Ford to actually get this initial deal.
13      13   Q.  Did you have any personal involvement in the
14      14  negotiations of this deal between January 2000 and
15      15  June 2000?
16      16   A.  I don't think so.  I mean, I might have made a
17      17  technology -- a technical presentation on our auctioning
18      18  software, or something like that, but nothing -- nothing
19      19  to do with the financial -- nothing to do with the terms
20      20  and conditions of the contract or the business
21      21  relationship.  Perhaps something about the technology.
22      22   Q.  All right.  Mr. Lane was terminated at some
23      23  time, right?
24      24   A.  He was.
25      25   Q.  Okay.  When was that?
```

                                        208

00209:01    A.  I'd have to go back and look it up.  Don't
02 know.
03    Q.  Sometime in the summer of 2000?
04    A.  Yeah.  Don't recall.
05    Q.  And it's your understanding that Safra Catz
06 sort of stepped in in Mr. Lane's shoes?  With the
07 Covisint deal, that is.
08    A.  She certainly ran the Covisint deal, yes.
09    Q.  Okay.
10    A.  But I think -- yes.
11    Q.  Was George Roberts ever involved in the
12 Covisint deal?
13    A.  I think a lot of people were involved, but the
14 actual signing of the -- if you're talking about the
15 Covisint contract, not the earlier Ford contract -- if
16 you're talking about the Covisint contract -- and
17 actually, I'm not a hundred percent certain we actually
18 signed a Ford contract.
19        To be -- again -- we could have been in
20 negotiation with the Ford -- for the Ford contract for X
21 millions of dollars, you know, and exchange of equity,
22 and all these other weird things, and then that got
23 merged into Covisint.  So the Ford contract might have
24 evolved into Covisint.  I don't really -- I don't
25 remember where we were with the papers, and did we --

209

00210:01  did we sign a separate procurement deal with Ford.  I
02 think we did, but I'm not completely certain.
03        But yes, Safra Catz took over the negotiation
04 and did the entire Covisint negotiation herself.
05    Q.  All right.  Was Sandy Sanderson ever involved
06 in the Covisint negotiations?
07    A.  He could have been.  But again, in terms of
08 the definitive terms and conditions, it was Safra.  I
09 mean, a lot of people talked to Ford Motor Company and
10 GM.
11        MR. DE GHETALDI:  Let's mark this one next,
12 please.
13        (DC Exhibit No. 103
14        marked for identification.)
15        MR. DE GHETALDI:  Q.  Do you recall reading
16 any of the e-mails that are being forwarded in Exhibit
17 103 in the summer of 2000?
18    A.  I certainly remember some of it, yes.
19    Q.  Okay.  At the bottom of the first page of 103,
20 Mr. Sanderson says that he'll get engaged on this ASAP,
21 including assuming Ray's role on Covisint's advisory
22 board.  Do you see that?
23    A.  Yes.
24    Q.  What was Covisint's advisory board?
25    A.  I'm not entirely certain.  The management

210

00211:01  team, I guess, had a series of -- it's not uncommon -- I
02 know what an advisory board is, so I assume Covisint's
03 was no different than anyone else's.
04        It's a series of outside executives who advise
05 the managers of the company.  They're not on your board;
06 they're not -- you know, they're not board members; they
07 don't represent the shareholders.  These are people who
08 have business -- specific business or technical
09 knowledge as to your business and they provide advice.
10    Q.  On the fourth page of Exhibit 103, the Bates
11 number down at the bottom right is 23222, and a
12 handwritten note in the upper left quarter of the page
13 that says "the deal."
14    A.  Yep.
15    Q.  Says "License fees as follow:
16    $225 million paid over three years,
17    75 million each year."
18        The deal had grown substantially from
19 10 million to 225?
20    A.  Well, this is a deal with a new company called
21 Covisint.  And the deal we originally envisioned with
22 Ford was just a procurement deal inside of Ford, which I
23 thought was a small deal.  But again, there were a lot
24 of -- there were a lot of strange things going on at
25 this time, you know: the idea of spinning stuff out,

211

00212:01  forming separate companies, taking them public, equity
02 sharing, all this other stuff, so ...
03        I know we've done a procurement deal with
04 Ford.  Maybe I'm getting it confused with other things,
05 but I know we've done a procurement deal with Ford, 5-
06 to $10 million.  When exactly we did that, I'm not sure.
07 But, you know, this -- this particular deal
08 was with a joint venture between Ford and GM.  This is
09 quite a bit down the road from --
10    Q.  Right.
11    A.  -- from the initial deal.  And maybe I was
12 mistaken in my 5- to $10 million thing with Ford.
13 Memory -- may have made a mistake.  But at this point,
14 we're negotiating with the joint venture and proposing
15 to sell them an awful lot of software.
16    Q.  Right.  So it's your understanding that this
17 $225 million over three years is Oracle's proposal?
18    A.  I think it was something we were considering
19 proposing.
20    Q.  Okay.  Do you know if that proposal was ever
21 made?
22    A.  I don't know.  Considering that the Covisint
23 deal was eventually signed, I think, at $70 million and
24 it was by far the largest deal we'd ever done in our
25 history, and this is a lot larger, it's been a hell of a

212

Ellison, Lawrence J. (Vol. 01) - 02/26/2004   2/26/2004   10:41:00 AM

```
 1  00213:01  deal.  So it just seems a little extreme to me.
 2     02      Q.  That same paragraph talks about giving
 3     03   Covisint an unlimited irrevocable fully-paid perpetual
 4     04   license to the software, along with an entitlement to
 5     05   all upgrades.  Was that something that Oracle had ever
 6     06   done in the past?
 7     07      A.  No, but we'd do it every day for $225 million.
 8     08      Q.  Did you give an approval to Mr. Sanderson to
 9     09   make this proposal?
10     10      A.  If memory serves me, what I wanted to do, was
11     11   important to me, was to get away from this ridiculous
12     12   revenue sharing -- shouldn't say ridiculous -- this
13     13   alternative proposal that had been on the table of we
14     14   would own a certain percentage of Covisint and we get so
15     15   much of their revenue and so much of their profits, and
16     16   they would own little pieces of an Oracle -- special
17     17   company we were creating out of Oracle, which was an
18     18   enormously complicated transaction which assumes that
19     19   Covisint's going to go public and be worth billions and
20     20   we're going to take our own Oracle exchange company
21     21   public and it's going to be worth billions.  It was this
22     22   dot-com fantasy.
23     23         And I wanted -- you know, which I didn't
24     24   really believe in.  And I wanted to have a very -- a
25     25   much simpler deal.  We're in the business of selling
```

213

```
 1  00214:01  software, you know, not trading equity, not sharing in
 2     02   profits.  We're in the business of selling software, and
 3     03   I wanted to have a very simple deal.
 4     04         What Ray had crafted was a very -- was a very
 5     05   Silicon Valley-esque dot-com-esque kind of transaction.
 6     06   And it's just kind of something I thought was a mistake.
 7     07      Q.  Okay.
 8     08      A.  So I wanted to recraft the deal as software in
 9     09   exchange for money.  What a concept.  That's our
10     10   business.
11     11      Q.  So it ended up actually, are you saying, along
12     12   those lines, more just a straight sale of software?
13     13      A.  That's all I've been -- yeah.  Yeah.
14     14      Q.  Did Oracle acquire any equity interest in
15     15   Covisint as part of the deal?
16     16      A.  You know, we might have ended up with a half a
17     17   percent or something like that.  But I don't think so.
18     18   Again, I have to -- you know, I'm not sure.
19     19         I certainly didn't want any.  But I think we
20     20   might have had to have some so it wouldn't hurt their
21     21   feelings.  And I'm not kidding.  If we didn't take some
22     22   of their company, they might have felt we didn't believe
23     23   in them.
24     24      Q.  All right.  Didn't you get two percent?
25     25      A.  Did we get two percent in the end?
```

214

```
 1  00215:01  Q.  Yeah.
 2     02      A.  We might have.  The reason I paid no attention
 3     03   to it is I thought it was going to be worthless.
 4     04      Q.  Okay.
 5     05      A.  And ...
 6     06      Q.  Did you get a share of the revenue?
 7     07      A.  Don't recall that either.  I didn't believe --
 8     08   trust -- I didn't think equity and revenue would have --
 9     09   would play any part, though I think the judgment of
10     10   negotiating team was --
11     11         So the answer is I don't remember, but the
12     12   judgment of the negotiating team was if we didn't ask
13     13   for some revenue and for some equity, they -- they would
14     14   have thought that they weren't a believer -- we weren't
15     15   true believers.
16     16      Q.  Okay.
17     17      Q.  Did Commerce One end up supplying software to
18     18   Covisint as well as Oracle?
19     19      A.  Yeah.
20     20      Q.  What did Commerce One -- what type of software
21     21   did Commerce One supply?
22     22      A.  Commerce One had only one kind of software,
23     23   and they were -- they had a reverse auction software and
24     24   we had reverse auction software and lots of other
25     25   software.
```

215

```
 1  00216:01  Q.  Right.
 2     02      A.  So -- but the strange thing about this was --
 3     03   and this is sealed, right?
 4     04      MR. SALPETER:  Yes.
 5     05         THE WITNESS:  Strange thing about this was the
 6     06   companies merged -- I mean GM and Ford -- but Ford was
 7     07   running our exchange software side by side.  And Commerce
 8     08   One was running General Motors' exchange software.  So
 9     09   the companies really weren't talking to each other.  So
10     10   none of this stuff was really -- very surreal
11     11   experience.
12     12         That's why let's just sell our software.  I'm
13     13   not sure we want to own any of this.  But it was an
14     14   unnatural act.
15     15         There were a lot of peculiar things going on
16     16   in 2000.  I think we all -- the fact that GM and Ford
17     17   Motor Company, two companies that really don't like each
18     18   other, they're sworn enemies, right, they're -- you
19     19   know, compete daily, you know, were suddenly forming
20     20   this joint venture was an unnatural act.
21     21         And then the teams would come together.
22     22   Commerce -- you know, and there was no way to make a
23     23   decision.  And so Ford kind of had its half of the
24     24   building.  You know, it was a very strange school, you
25     25   know.  All my guys were over here; all your guys were
```

216

Ellison, Lawrence J. (Vol. 01) - 02/26/2004  2/26/2004  10:41:00 AM

| | |
|---|---|
| 1 | 00217:01  over there.  Didn't talk very much. |
| 2 | 02       I mean, if you want anecdotes, I've got some |
| 3 | 03  fantastic anecdotes. |
| 4 | 04       MR. DE GHETALDI:  Okay.  I think we're close |
| 5 | 05  to the end of the tape. |
| 6 | 06       MR. SALPETER:  Before we do that, is there any |
| 7 | 07  chance we could finish the deposition tonight? |
| 8 | 08       MR. DE GHETALDI:  Today, no. |
| 9 | 09       MR. SALPETER:  And what is your best guess for |
| 10 | 10  tomorrow? |
| 11 | 11       MR. DE GHETALDI:  Half a day. |
| 12 | 12       MR. SALPETER:  Well, I think you wanted to |
| 13 | 13  stop around 5 if we weren't going to finish. |
| 14 | 14       THE WITNESS:  Could we do that? |
| 15 | 15       MR. DE GHETALDI:  Fine with me.  That's what I |
| 16 | 16  was sort of planning. |
| 17 | 17       THE WITNESS:  It's up to you guys. |
| 18 | 18       MR. DE GHETALDI:  I was actually planning on |
| 19 | 19  stopping at 5, which I think is -- |
| 20 | 20       THE WITNESS:  I'll go to midnight if you want |
| 21 | 21  to finish today. |
| 22 | 22       MR. DE GHETALDI:  No. |
| 23 | 23       MR. SALPETER:  So is it 5:00 now? |
| 24 | 24       MR. DE GHETALDI:  It's 5:00 now. |
| 25 | 25       MR. SALPETER:  You want to stop now? |

217

| | |
|---|---|
| 1 | 00218:01       THE WITNESS:  Is that all right for everybody? |
| 2 | 02       MR. DE GHETALDI:  Yeah. |
| 3 | 03       MR. SALPETER:  Okay, very good.  I think we're |
| 4 | 04  going to stop now. |
| 5 | 05       THE VIDEOGRAPHER:  At the end of Volume I, |
| 6 | 06  tape 3, this concludes today's deposition of Lawrence J. |
| 7 | 07  Ellison. |
| 8 | 08       The original videotapes will be retained by |
| 9 | 09  Dan Mottaz Video Productions LLC, 182 Second Street, |
| 10 | 10  Suite 202, San Francisco, California, 94105, telephone |
| 11 | 11  415-624-1300.  The time is 5:03 p.m.  We are off the |
| 12 | 12  record. |
| 13 | 13       (Deposition adjourned at 5:03 p.m.) |
| 14 | 14 |
| 15 | 15            ---o0o--- |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |

218

| | |
|---|---|
| 1 | 00219:01            CERTIFICATE OF WITNESS |
| 2 | 02 |
| 3 | 03 |
| 4 | 04 |
| 5 | 05       I, the undersigned, declare under penalty of |
| 6 | 06  perjury that I have read the foregoing transcript and I |
| 7 | 07  have made any corrections, additions or deletions that I |
| 8 | 08  was desirous of making; that the foregoing is a true and |
| 9 | 09  correct transcript of my testimony contained therein. |
| 10 | 10       EXECUTED this _____ day of _____, |
| 11 | 11  200_, at _____, _____. |
| 12 | 12 |
| 13 | 13 |
| 14 | 14 |
| 15 | 15 |
| 16 | 16 |
| 17 | 17       _____ |
| 18 | 18       Signature of Witness |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |

219

| | |
|---|---|
| 1 | 00220:01            REPORTER CERTIFICATE |
| 2 | 02       I hereby certify that the witness in the |
| 3 | 03  foregoing deposition was by me duly sworn to testify to |
| 4 | 04  the truth, the whole truth and nothing but the truth in |
| 5 | 05  the within-entitled cause; that said deposition was |
| 6 | 06  taken at the time and place herein named; that the |
| 7 | 07  deposition is a true record of the witness's testimony |
| 8 | 08  as reported to the best of my ability by me, a duly |
| 9 | 09  certified shorthand reporter and a disinterested person, |
| 10 | 10  and was thereafter transcribed under my direction into |
| 11 | 11  typewriting by computer; that the witness was given an |
| 12 | 12  opportunity to read and correct said deposition and to |
| 13 | 13  subscribe the same.  Should the signature of the witness |
| 14 | 14  not be affixed to the deposition, the witness shall not |
| 15 | 15  have availed himself or herself of the opportunity to |
| 16 | 16  sign or the signature has been waived. |
| 17 | 17       I further certify that I am not interested in |
| 18 | 18  the outcome of said action, nor connected with, nor |
| 19 | 19  related to any of the parties in said action, nor to |
| 20 | 20  their respective counsel. |
| 21 | 21       IN WITNESS WHEREOF, I have hereunto set my |
| 22 | 22  hand this 1st day of March, 2004. |
| 23 | 23 |
| 24 | 24       _____ |
| 25 | 25 |

220

```
 1    00221:01        ROBERT BARNES ASSOCIATES
 2    02        San Francisco, California  94102
 3    03
 4    04              Date:  3/1/04
 5    05 TO:  LAWRENCE J. ELLISON
 6    06    ALAN N. SALPETER, ESQ.
 7    07    Chicago, IL 60603
 8    08
 9    09 RE:  COORDINATION PROCEEDING
10    10    Deposition taken February 26, 2004
11    11 Dear LAWRENCE J. ELLISON:
12    12 The original transcript of your deposition taken in the
13    13 at this office for your reading, correcting and signing.
14    14 copy.  Please notify this office and all counsel in
15    15 deposition transcript.
16    16 Your rights regarding signature of this deposition are
17    17 original deposition transcript will be sealed in
18    18
19    19 transcript of your deposition, please contact this
20    20 Friday, to make an appointment.
21    21
22    22              Sincerely,
23    23
24    24              CSR No. 6438
25    25 cc:  All counsel
```

221