# EXHIBIT G

1       IN THE UNITED STATES DISTRICT COURT

2       NORTHERN DISTRICT OF CALIFORNIA

3       SAN FRANCISCO DIVISION

4

5 In re ORACLE CORPORATION

6 SECURITIES LITIGATION.

7       Master File No. C-01-0988-MJJ

8 This Document Relates To:

9

10   ALL ACTIONS.

11 _____/

12

13       ---o0o---

14       CONFIDENTIAL

15 DEPOSITION OF LAWRENCE ELLISON

16       VOLUME I

17   THURSDAY, JULY 13, 2006

18       ---o0o---

19

20 SHEILA CHASE & ASSOCIATES

      REPORTING FOR:

21   LiveNote World Service

     221 Main Street, Suite 1250

22 San Francisco, California 94105

     Phone: (415) 321-2311

23     Fax: (415) 321-2301

24 Reported by:

  DIANA NOBRIGA, CSR, CRR

25 LICENSE NO. 7071

1

I N D E X

INDEX OF EXAMINATION

      PAGE

EXAMINATION BY MR. SOLOMON     12

---o0o---

INDEX OF EXHIBITS

EXHIBIT    DESCRIPTION     PAGE

Exhibit 1  E-mail from Stephanie Aas,
    dated March 31, 2000 to Jeff
    Henley    17

Exhibit 2  E-mail from Ka Wai Leung,
    dated May 24, 2000 to
    snaroff@apple.com    20

Exhibit 3  E-mail from Jay Nussbaum, sent
    July 20, 2000 to John Wheeler    22

Exhibit 4  E-mail from Sandy Sanderson,
    dated July 30, 2000 to George
    Roberts    26

Exhibit 5  E-mail dated August 11, 2000 to
    Sandy Sanderson from Vincent
    Bodsworth    32

2

Exhibit 6  One-page document, first line
    indicating in part:  In
    August of 1998 we signed a $10
    million dollar agreement    40

Exhibit 7  Two-page document, first line
    indicating in part:  In August
    of 1998 we signed a $10 million
    dollar agreement    42

Exhibit 8  One-page document, first line
    indicating:  See keith
    block's comments re:  11i
    training and product quality.    43

Exhibit 9  E-mail from Frank Varasano,
    dated October 11, 2000 to
    ron.wohl@oracle.com    45

Exhibit 10  Two-page document, Subject:
    BellSouth    56

Exhibit 11  E-mail from John Fikany, sent
    October 19, 2000 to Tom, Frank
    Varasano, Sandy Sanderson...    60

Exhibit 12  One-page document, first line
    indicating:  For tomorrow with
    Karen    66

3

Exhibit 13  E-mail from Safra A. Catz,
    dated November 30, 2000
    to Thomas Williams    67

Exhibit 14  E-mail from Ron Wohl, dated
    December 12, 2000 to
    Kevin Miller    69

Exhibit 15  E-mail from Safra A. Catz,
    dated January 2, 2001 to
    Wohl,Ronald    73

Exhibit 16  E-mail from Cliff Godwin,
    dated January 3, 2001 to
    Sanders,Roger    77

Exhibit 17  E-mail from Safra A. Catz, sent
    January 5, 2001 to Carolyn
    Balkenhol    79

Exhibit 18  E-mail from Cliff Godwin, dated
    January 10, 2001 to
    Huda,Andrew  `    83

Exhibit 19  E-mail from Gayle Fitzpatrick,
    sent January 12, 2001 to James
    McHugh    85

Exhibit 20  E-mail from Lawrence Ellison,
    dated August 5, 2000 to Safra A.
    Catz    89

4

Ellison, Lawrence (Confidential)  7/13/2006  9:33:00 AM

1   Exhibit 21  E-mail from Jeff Henley, dated
2        September 6, 2000 to
3        saas@us.oracle.com                99
4   Exhibit 22  E-mail from Jeff Henley, dated
5        September 14, 2000 to jminton      102
6   Exhibit 23  E-mail from Jay Nussbaum,
7        dated October 10, 2000 to
8        Police                            102
9   Exhibit 24  E-mail from Michael Rocha,
10       dated October 12, 2000 to
11       larry.ellison@oracle.com          112
12  Exhibit 25  E-mail from Sandy Sanderson,
13       dated October 12, 2000 to
14       Larry Ellison                     116
15  Exhibit 26  FY 02 Consulting Budget Review
16       April 3, 2001                     118
17  Exhibit 27  E-mail from Joel Summers,
18       dated November 8, 2000 to
19       Larsen,Kurt                       121
20  Exhibit 28  E-mail from Jennifer Minton,
21       dated November 16, 2000 to
22       Williams,Thomas                   126
23  Exhibit 29  2000 Annual Report entitled:
24       Oracle Software Powers the Internet 129
25

                    5

1   Exhibit 30  E-mail from Ron Wohl, dated
2        December 4, 2000 to Kirsten,Shaw    134
3   Exhibit 31  E-mail from Jay Nussbaum,
4        sent December 7, 2000 to
5        dafreedman@bellsouthips.com       138
6   Exhibit 32  E-mail from Sergio Giacoletto,
7        dated December 9, 2000 to
8        Lawrence J. Ellison               141
9   Exhibit 33  E-mail from Ron Wohl, dated
10       December 16, 2000 to
11       Kshaw@oracle.com                  144
12  Exhibit 34  E-mail from Ami Vora, dated
13       January 5, 2001 to Lowry Fenton   149
14  Exhibit 35  E-mail from Safra A. Catz, dated
15       January 9, 2001, cc to
16       Ellison,Lawrence                  156
17  Exhibit 36  E-mail from Ron Wohl, dated
18       January 9, 2001 to
19       Shaw.Kirsten                      159
20  Exhibit 37  E-mail from Safra A. Catz,
21       dated January 9, 2001 to
22       Ellison,Lawrence                  163
23  Exhibit 38  E-mail from Rebecca Enonchong,
24       dated January 11, 2001 to
25       Kirsten Shaw                      166

                    6

1   Exhibit 39  E-mail from Safra A. Catz,
2        dated January 16, 2001 to
3        Ellison,Lawrence                  168
4   Exhibit 40  E-mail from Safra A. Catz,
5        dated January 23, 2001 to
6        HQAPP                             169
7   Exhibit 41  E-mail from Ron Wohl, dated
8        January 21, 2001 to
9        Sergio Giacoletto                 171
10  Exhibit 42  E-mail from Lawrence J. Ellison,
11       dated January 27, 2001 to
12       Lawrence J. Ellison               177
13  Exhibit 43  E-mail from Safra A. Catz,
14       dated January 29, 2001 to
15       Ellison,Lawrence                  182
16  Exhibit 44  E-mail from Safra A. Catz,
17       dated January 30, 2001 to
18       Ellison,Lawrence                  186
19  Exhibit 45  E-mail from Ron Wohl, dated
20       January 31, 2001 to
21       Ellison,Lawrence                  192
22  Exhibit 46  E-mail from Michael DeCesare,
23       dated November 28, 2000 to
24       Ellison,Lawrence                  195
25

                    7

1   Exhibit 47  E-mail from Ron Wohl, dated
2        February 6, 2001 to
3        Ellison,Lawrence                  208
4   Exhibit 48  E-mail from Jeff Henley,
5        sent February 7, 2001 to
6        Renee Knee                        211
7   Exhibit 49  Two-page document, second page
8        being an e-mail from Ron
9        Wohl, dated February 8, 2001
10       to Ellison,Lawrence               214
11  Exhibit 50  E-mail from Jeff Henley,
12       dated February 19, 2001 to
13       Jennifer Minton                   219
14  Exhibit 51  E-mail from Lawrence J. Ellison,
15       dated March 8, 2001 to
16       Catz.Safra                        223
17
18
19
20
21
22
23
24
25

                    8

1    BE IT REMEMBERED that on Thursday, July 13,
2  2006, commencing at the hour of 9:33 a.m., thereof, at
3  the LAW OFFICES OF LERACH, COUGHLIN, STOIA, GELLAR,
4  RUDMAN & ROBBINS, LLP, 100 Pine Street, Suite 2600,
5  San Francisco, California, before me, DIANA NOBRIGA, a
6  Certified Shorthand Reporter in and for the State of
7  California, personally appeared
8    LAWRENCE ELLISON,
9  as a witness by the plaintiffs herein, who, being by me
10  first duly sworn, was thereupon examined and testified
11  as hereinafter set forth.
12
13    ---oOo---
14
15  Appearing as counsel on behalf of the Plaintiffs:
16    MARK SOLOMON, ESQUIRE
    STACY KAPLAN, ESQUIRE
17    VALERIE McLAUGHLIN, ESQUIRE
    LERACH, COUGHLIN, STOIA, GELLAR,
18    RUDMAN & ROBBINS
    655 West Broadway, Suite 1900
19    San Diego, CA 92101-3301
    marks@lerachlaw.com
20
    SHAWN A. WILLIAMS, ESQUIRE
21    ELI GREENSTEIN, ESQUIRE
    JENNIE LEE ANDERSON, ESQUIRE
22    LERACH, COUGHLIN, STOIA, GELLAR,
    RUDMAN & ROBBINS
23    100 Pine Street, Suite 2600
    San Francisco, CA 94111
24    Shawnw@lerachlaw.com
25

*Page 9*

1  Appearing as counsel on behalf of Defendants:
2    GREGORY P. LINDSTROM, ESQUIRE
    LATHAM & WATKINS
3    505 Montgomery Street, Suite 2000
    San Francisco, CA 94111-2562
4    gregory.lindstrom@lw.com
5    PATRICK E. GIBBS, ESQUIRE
    LATHAM & WATKINS
6    140 Scott Drive
    Menlo Park, CA 94025-1008
7    patrick.gibbs@lw.com
8
9  Present via Internet:  Keith Mautner, Esq.;  Doug
10  Lerach, Esq.; Doug Britton, Esq.; John Mayer, Esq.;
11  Monique Winkler, Esq.
12
13  Also Present:  Dorian Daley, Esq., Oracle;
14  James Terrell, Videographer
15
16
17
18
19
20
21
22
23
24
25

*Page 10*

1    VIDEOGRAPHER:  This begins the videotaped
2  deposition of Larry Ellison, tape one, Volume I, in the
3  matter entitled:  In Re Oracle Corporation Securities
4  Litigation, as filed in the United States District Court
5  for the Northern District of California, Master File
6  No. C-01-0988-MJJ, today's date is July 13, 2006.  The
7  time on the video monitor is 9:33.  The video operator
8  today is James Terrell representing LiveNote World
9  Service, located at 221 Main Street, Suite 1250 in
10  San Francisco, California 94105.  The phone number is
11  415 321-2300.  The court reporter is Diana Nobriga of
12  Sheila Chase and Associates, reporting on behalf of
13  LiveNote World Service.
14    Today's deposition is being taken on behalf of
15  plaintiffs and is taking place at 100 Pine Street in
16  San Francisco, California.  Would counsel now please
17  introduce yourselves and whom you represent.
18    MR. SOLOMON:  Mark Solomon of Lerach,
19  Coughlin, representing plaintiffs.
20    MS. KAPLAN:  Stacy Kaplan of Lerach, Coughlin,
21  representing plaintiffs.
22    MS. McLAUGHLIN:  Valerie McLaughlin, Lerach,
23  Coughlin, representing plaintiffs.
24    MR. WILLIAMS:  Shawn Williams, Lerach,
25  Coughlin, representing plaintiffs.

*Page 11*

1    MS. ANDERSON:  Jennie Lee Anderson, Lerach,
2  Coughlin, representing plaintiffs.
3    MR. GREENSTEIN:  Eli Greenstein, Lerach,
4  Coughlin, representing plaintiffs.
5    MR. LINDSTROM:  Greg Lindstrom, Latham and
6  Watkins, representing the defendants and the witness.
7    MR. GIBBS:  Patrick Gibbs, Latham and Watkins,
8  representing the defendants and witness.
9    MS. DALEY:  Dorian Daley, Oracle, representing
10  the witness.
11    VIDEOGRAPHER:  You may swear in the witness.
12    LAWRENCE ELLISON,
13  having been duly sworn, testified as follows:
14    EXAMINATION BY MR. SOLOMON
15    MR. SOLOMON:  Q.  Good morning, Mr. Ellison.
16    A.  Good morning.
17    Q.  You know you're here to give your deposition
18  today in a securities class action?
19    A.  I do.
20    Q.  And you've had your deposition taken many
21  times in the past?
22    A.  I have.
23    Q.  And you've actually given testimony at trial
24  on occasion in the past, too; is that correct?
25    A.  I have.

*Page 12*

Ellison, Lawrence (Confidential)  7/13/2006  9:33:00 AM

**Page 13**

1   Q. So you're familiar with these proceedings?
2   A. I am.
3   Q. Okay.  Are you prepared for your deposition
4   today?
5   A. I think so.
6   Q. Did you -- first of all I want to break down
7   the preparation.  In terms of preparation not involving
8   your lawyers, how did you prepare?
9   A. I didn't.
10  Q. Okay.  And in terms of preparation involving
11  your lawyers, did you meet with your lawyers?
12  A. I did.
13  Q. When did you meet with them?
14  A. Yesterday.
15  Q. How long did you meet with them for?
16  A. Pardon me?
17  Q. How long did you meet with them for?
18  A. Four or five hours.
19  Q. Okay.  And did you review some documents?
20  A. I did.
21  Q. Did those documents help refresh your
22  recollection?
23  A. They did.
24  Q. And as to what topics did they help you
25  refresh your recollection?

**Page 14**

1   A. The topics around the time period in late
2   2000, earlier 2001.
3   Q. Did you read the -- have you ever read the
4   complaint in this matter?
5   A. I have not.
6   Q. Do you have an understanding what this action
7   is about?
8   A. A general understanding, yes.
9   Q. What is that understanding?
10  A. That we missed our quarter in Q3 of fiscal
11  2001, and people -- the complaint was we -- I think the
12  complaint said we knew we were going to miss it.
13  Q. Do you have any understanding of any other
14  allegations other than missing Q3?
15  A. No.
16  Q. You met with your lawyers yesterday for four
17  or five hours.  And did you meet with them this morning
18  as well?
19  A. Just when I stepped out this moment.
20  Q. Okay.  And I guess just before we start, just
21  for the record, I know you came in a little bit late,
22  and it is understandable given the traffic.  We're
23  entitled to 14 hours of deposition time, I'm not sure if
24  we need it all.  We're certainly entitled to it.  We're
25  going to finish at 5:00 today.  To the extent that I

**Page 15**

1   need the extra time I lost this morning, that will
2   happen on some subsequent occasion.  Do you understand
3   that?
4   A. I do.
5   MR. LINDSTROM: That's fine, counsel.  And
6   also I offered to Shawn, and I will offer to you, we'll
7   try and take a shorter lunch break than we would
8   otherwise to try and make up the half hour we lost.
9   MR. SOLOMON: Totally appreciate that.
10  Q. Now, is it part of your understanding of this
11  case that your sales of Oracle stock are involved?
12  A. Yes, generally.
13  Q. Because in the last week of January 2001, it's
14  true that you exercised options and sold stock to the
15  tune of around $894 million?
16  A. That is not correct.
17  Q. Tell me what's correct.
18  A. Throughout the month of January.  I believe I
19  sold throughout the month of January.  Wasn't a one-week
20  period.
21  Q. You started at the beginning of January and
22  ended at the end?
23  A. I believe so.
24  Q. And you're aware, are you not, that there is a
25  prohibition on trading stock as an executive of a

**Page 16**

1   publicly traded corporation if you have in your
2   possession material knowledge that's not available to
3   the general public?  Are you aware of that?
4   MR. LINDSTROM: Objection to the extent it
5   calls for a legal conclusion.  He may answer according
6   to his lay understanding.
7   MR. SOLOMON: Q. Go ahead.
8   A. Yes.
9   Q. And it's your defense, is it, or is it part of
10  your defense that when you traded your stock throughout
11  the month of January, you didn't have in your possession
12  material facts that the investing public didn't have?
13  MR. LINDSTROM: Same objection.
14  You may answer according to your understanding
15  of material and the other legal aspects that were
16  inherent in that question.
17  THE WITNESS: I thought we were in a very
18  strong position to make our number.
19  MR. SOLOMON: Q. So is the answer to the
20  question, yes, you know you were not in possession of
21  material information the investing public didn't have,
22  or you were?
23  MR. LINDSTROM: Same objection.
24  THE WITNESS: I wasn't in possession of any
25  material information that would make it seem like we

**Page 17**

1  would miss our quarter.  We had signed the largest deal
2  in our history early in the quarter.  I don't think that
3  was generally available.  So the information I had was
4  that we were off to a very, very strong start.
5      MR. SOLOMON:  Q.  So you would say you weren't
6  in possession of any material adverse information?
7      A.  That's correct.
8      Q.  Is that fair?
9      A.  That's correct.
10     MR. SOLOMON:  I want to take you through some
11 documents, Mr. Ellison.  Have marked as Ellison
12 Exhibit 1 a document produced by defendants in this
13 action, with a Bates range NDCA-ORCL -- I won't mention
14 the pretext in the future, I'll just mention the
15 numbers -- 031608 though 09.
16         (Exhibit 1 marked for
17          identification.)
18     MR. SOLOMON:  Q.  And if you take a chance to
19 look at it, it is dated Friday, March 31st, 2000, and it
20 is an e-mail exchange involving Stephanie Aas and Jeff
21 Henley.  Once you've had a chance to look at it, just
22 let me know.
23     A.  Okay.
24     Q.  First, have you seen this e-mail exchange
25 before?

**Page 18**

1      A.  I don't recall.
2      Q.  Okay.  On the first page, almost halfway down
3  where it says, "Jeff Henley wrote:  Larry now says that
4  Mark was wrong and that all of CRM will be available end
5  of May," do you see that?
6      A.  I do.
7      Q.  Do you know if that refers to you, Larry
8  Ellison?
9      A.  I would be guessing, but I'm guessing, yes.
10     Q.  And do you know who the Mark is referenced
11 there?
12     A.  Again, I assume it is Mark Barrenechea.
13     Q.  And do you recall an incident that's reflected
14 here where you were saying that Mark was wrong, as
15 stated in that sentence?
16     A.  I don't recall.
17     Q.  Okay.  If we go to the first sentence, it
18 reads -- the first two sentences, "Yesterday I worked
19 with marketing and Gary to provide Larry with all the
20 facts before he made that decision.  It is unfortunate
21 because all the major audiences, industry analysts,
22 financial analysts/investors, partners, OAUG board,
23 already know about the delay."
24         Do you see that?
25     A.  I do.

**Page 19**

1      Q.  Does that reference the delay in bringing the
2  suite 11i to market?
3      MR. LINDSTROM:  Objection; no foundation,
4  calls for speculation.
5      MR. SOLOMON:  Q.  If you know.
6      A.  I don't know.
7      Q.  Okay.  And where it says, "We will lose even
8  more credibility if we go back on what is already out on
9  the market," do you have an understanding what that
10 refers to?
11     A.  In a general sense, yes.
12     Q.  What is your general sense?
13     A.  Well, when you say one thing and something
14 else happens, you lose credibility.
15     Q.  Okay.  Did you experience a loss of
16 credibility in this situation, do you know?
17     MR. LINDSTROM:  Objection; no foundation.
18     THE WITNESS:  Again, I'm not -- I'm not quite
19 sure what she's referring to, so ...
20     MR. SOLOMON:  Okay.
21     THE WITNESS:  She's --
22     MR. LINDSTROM:  Don't speculate.
23     THE WITNESS:  I'm just saying she's an
24 investor relations analyst.
25     MR. SOLOMON:  Q.  When you say she?

**Page 20**

1      A.  Stephanie Aas.
2      Q.  Do you work closely with her?
3      A.  No.
4      Q.  In those days did you?
5      A.  No.
6      MR. SOLOMON:  I'll have marked as Ellison 2
7  another document produced in this litigation with the
8  Bates number 019152, dated Wednesday, May 24th, 2000.
9          (Exhibit 2 marked for
10          identification.)
11     MR. SOLOMON:  Q.  And again, if you just take
12 a chance to look at it.  And while you're looking at it,
13 this is an e-mail from Ka, K-a, Wai, W-a-i, Leung,
14 L-e-u-n-g, to S-n-a-r-o-f-f and to Joe Bishop, and it
15 copies Peri Frantz.  Have you seen this before?
16     A.  I have not.
17     Q.  It starts with, "Hi, Sohaib updated Larry on
18 the latest status.  He is glad that things are
19 progressing well and wants to be informed on program
20 status.  He expressed concerns about the performance
21 issue as expected and its impact on customer perception
22 of Apps 11i on Apple."
23         Do you see that?
24     A.  I do.
25     Q.  Do you recall -- first of all, do you believe

Ellison, Lawrence (Confidential)  7/13/2006  9:33:00 AM

1  this refers to you, Larry Ellison?
2    A.  I believe so.
3    Q.  And do you recall being concerned about the
4  performance issues reflected here?
5    A.  On the Apple Computer?
6    Q.  With respect to Apps 11i on Apple, yes.
7    A.  Apple is a very, very small market, and to
8  make -- our software is primarily designed to work on
9  PCs.  And to make it work on Apple, we had to have a
10  Java virtual machine that performed on Apple
11  effectively, approximately the same performance that it
12  performs on a PC.
13      The Java virtual machine is not built by us,
14  it is built by Sun Computer or other companies.  And we
15  had gone back to Sun and asked for several performance
16  fixes and several fixes to make it work on Apple.
17      And the general concern was us getting that
18  Java virtual machine to work on Apple and getting the
19  Sun fixes in a reasonable time frame.
20    Q.  Second paragraph goes on to say, "The big risk
21  is" -- in part, I should say, "The big risk is that we
22  do a big public splash and the performance fix does not
23  appear in July.  We hope this scenario does not happen,
24  but we're also dealing with future code that hasn't been
25  verified yet."

21

1      Do you see that?
2    A.  I do.
3    Q.  Do you understand what that's referring to?
4    A.  Again, about less than one percent of our
5  customers or users are on Apple machines.  However, a
6  few universities and Apple themselves, who was a
7  prospect at the time, are important customers.  So we
8  were concerned that if the Java virtual machine bugs
9  were not fixed, there was nothing we could do within our
10  power to make our application perform adequately on
11  Apple, and we were concerned.
12    Q.  Was this an issue that would have an impact on
13  Oracle's credibility, in your view?
14    A.  Among Apple customers, among those industries
15  that used Apple computers, sure.
16    MR. SOLOMON:  I've marked as the next
17  exhibit documents produced by defendants, Bates range
18  150893 to 895.
19      (Exhibit 3 marked for
20      identification.)
21    MR. SOLOMON:  Q.  While you are looking at it,
22  this is another e-mail exchange, and involved in these
23  exchanges are, apparently, John Wheeler, Kevin Summers,
24  Izecher, Mark Barrenechea, and Jay Nussbaum.
25  And when you've had a chance to look at it, the question

22

1  will be have you seen it before?
2    MR. LINDSTROM:  Take your time to review the
3  entire document.
4    THE WITNESS:  I will.
5    Okay.
6    MR. SOLOMON:  Q.  Have you seen it before?
7    A.  I have not.
8    Q.  Are you familiar with BellSouth?
9    A.  Yes, I am.
10    Q.  And are you familiar with the BellSouth
11  implementation of 11i in 2000/2001?
12    A.  Yes.
13    Q.  And if you go to the second page of the
14  document, you'll see that down towards the bottom of the
15  page there is a subject line, "Testing," dated Friday,
16  7th of July.  The first line saying, "The testing is not
17  going well at this time, which is a disappointment to
18  everyone involved."
19      Do you see that?
20    A.  I do.
21    Q.  Do you have an understanding what the testing
22  is referring to?
23    A.  Yes.  There was a large project, huge
24  consulting effort combined with some new software from
25  Oracle Corporation to automate a system at BellSouth.

23

1  And there was a huge amount of custom code combined with
2  a brand new product from Oracle, and it wasn't
3  delivering the functionality that BellSouth had
4  expected.
5    Q.  Were you aware around Friday, 7th of July, I
6  say around, that the testing was not going well at
7  BellSouth?
8    A.  I certainly came to be aware that things did
9  not go well at BellSouth.  There were lots of meetings,
10  but I can't pinpoint the date of when I first became
11  aware of the problems.
12    Q.  Okay.  And if you go to the first page of the
13  document, you'll see that a third of the way, nearly
14  half the way down in the e-mail exchange it says, "Will
15  let you know if Friday is in jeopardy, if so, you will
16  need to get Ellison involved to fly cover."
17      Do you see that?
18    A.  I do.
19    Q.  Do you have an understanding what that means,
20  "You need to get Ellison involved to fly cover"?
21    A.  I'm not sure.  I would be guessing.
22    Q.  Okay.  Did you get involved in response to
23  this e-mail, do you know?
24    A.  I don't think in response to this e-mail.  I
25  subsequently -- I met with BellSouth about this project.

24

1   But I have no idea if it was in response to this e-mail
2   or the exact date I met with them.
3   Q.  Okay.  Do you know if it was in July of 2000?
4   A.  I do not.
5   Q.  And then just ahead of that, the first line of
6   that e-mail, "The pressure is building, we are due to
7   turn over the system this Friday for the system testing
8   to start."
9   Do you know what system testing is being
10  referred to there?
11  A.  Yes.
12  Q.  What is that?
13  A.  It was the combination -- again we had large
14  consulting projects, the consultants had written a great
15  deal of code, and we had a new Oracle software product.
16  And the combination of those, the consulting code and
17  the Oracle product, they began to run the BellSouth data
18  through that code.
19  Q.  In preparing for this deposition, did you see
20  any documents relating to BellSouth that refreshed your
21  recollection?
22  A.  I don't recall.
23  MR. LINDSTROM:  You've answered the question.
24  MR. SOLOMON:  Q.  If I just measure on the
25  desk, how many documents did you look at?

25

1   A.  An inch.
2   MR. SOLOMON:  Have marked as the next exhibit
3   a document produced by Oracle with the Bates numbers
4   101654 to 656.
5   (Exhibit 4 marked for
6   identification.)
7   MR. SOLOMON:  Q.  Again, once you had a chance
8   to look at it, the question is going to be, have you
9   seen it before?
10  A.  I have not seen it before.
11  Q.  I want to go to the second page, first of all.
12  And you'll see there is an e-mail exchange there at the
13  top, it's to Safra Catz, Edward Sanderson, Ron Wohl and
14  Mark Barrenechea from George Roberts.  And it says, "We
15  are having challenges with the 11i demo system that is
16  costing us Q1 business."  I think it is supposed to say
17  "are," but it seems to say, "Ro are aware."  Do you know
18  what that means, by the way?
19  A.  The R-o?
20  Q.  Yes.
21  A.  No.
22  Q.  "-- are aware of this and working the issues
23  but I believe we should have calls weekly/b to track the
24  progress on this like we do forecasts because of how
25  crucial it is to" -- then it says "s" -- I think we

26

1   missed some lines here -- "e-Business suite story."
2   Do you see that?
3   A.  Yes.
4   Q.  Were you aware around July of 2000 of
5   challenges with the 11i demo system that was costing you
6   Q1 business?
7   A.  I was certainly aware that the demonstration
8   system was sometimes months behind the actual product,
9   and because 11i was relatively new, we didn't have as
10  comprehensive set of demos for it as we did some of the
11  older products.  That is not an uncommon situation, when
12  we come up with a new product it takes a while to
13  actually build the sales-oriented demonstrations for
14  that product.
15  Q.  Do you know whether there were the calls
16  weekly or biweekly to track the progress as suggested
17  here?
18  A.  I assume there were.  I don't know it to be a
19  fact.
20  Q.  You weren't involved, as far as you know?
21  A.  I was not.
22  Q.  And then under the first page, it's an e-mail
23  from Kevin Glynn to Sandy Sanderson.  Do you know who
24  Kevin Glynn is?
25  A.  I do not.

27

1   Q.  You do know who Sandy Sanderson is?
2   A.  Yes.
3   Q.  It starts off saying, "Yes, we have several
4   demo challenges.  ADS does not complete their build out
5   of" -- this is a little bit frustrating, because I think
6   we're missing some of the print.  Do you think it is
7   possible -- is this the way it was produced?
8   We'll sort of muddle our way through a little
9   bit, but, counsel, apparently this is how this was
10  produced.  If it is possible to produce a legible copy
11  with more detail on the right-hand side, that would be
12  helpful.
13  MR. LINDSTROM:  We'll take your request under
14  advisement.
15  MR. SOLOMON:  Q.  So it says, "Yes, we have
16  several demo challenges.  ADS does not complete their
17  build out of new -- something -- after product is
18  released or close to release.  This means they are
19  always behind."
20  Then it goes on to say, "Specifically, Order
21  Management performance has been poor.  ADS believes this
22  has been resolved in -- something -- week."
23  Then 2 is, "Lack of data in CRM."  Then
24  language about that.
25  And 3 is, "Lack of stable integrated

28

1  instance."
2      It goes on to say, "To the best of my
3  knowledge we have only one" -- I think that would say
4  "instance," I don't know -- "development that is an
5  integrated version of CRM and ERP," and more language.
6  "4 - Lack of data in emerging modules such as APS."
7      Goes on to say, "This is also causing us
8  delivery problems. Clients install Vision first to
9  learn," then there is some more language.
10     Just with respect to those sort of bullet type
11  points, were you aware of those issues around July of
12  2000?
13     MR. LINDSTROM:  Objection; compound.
14     MR. SOLOMON:  Q.  Just because of that
15  objection, let's take it one at a time.
16     A.  Okay.
17     Q.  So, were you aware, first of all, of several
18  demo challenges in the first line?
19     A.  I'll probably get in trouble for doing this,
20  but I can help you interpret the second page.
21     The "RO" was Ron Wohl, and probably Mark
22  Barrenechea you're probably missing, that was Ron was
23  aware of it.
24     The first paragraph on the front page was
25  referring to the fact that the demo system was not

29

1  keeping up to date with the actual production code.  So
2  the development teams released production code.  That
3  code has to be taken into the demo system, then data has
4  to be supplied in the demonstration system to complete
5  the demo.  Sometimes the demonstration system was months
6  behind the actual product release.
7      Q.  Okay.
8      A.  Which was a problem, because we're demoing one
9  thing, we're demoing older code, which is not something
10  we really wanted to do.  Because we wanted to show them
11  our latest and best stuff.  So the salespeople weren't
12  happy about that.
13     And the rest -- the rest of the memo is
14  referring to the problems associated not with the
15  product, but the problems associated with demoing and
16  selling the product.
17     So the demo systems, we have a bunch of
18  servers that are available to the sales force to show
19  prospective clients what our product can do.  And if it
20  doesn't have the latest version of the software, if it
21  doesn't have what we refer to as a Vision database,
22  doesn't have example data or demonstration data, it is
23  that much harder to sell the product, to demonstrate and
24  sell the product.  And the general -- there is that
25  general concern.

30

1      And the final concern was sometimes in an
2  implementation customers who had then decided to buy the
3  product would begin to familiarize themselves, train
4  themselves on the product by using the demonstration
5  system with the synthetic data.
6      So all of those issues are raised in this
7  memo.  Also, that there aren't enough servers, there
8  aren't enough what are called instances to do
9  demonstrations.  So if I'm -- if I'm one of the
10  salespeople and I'm doing a demonstration, I reserve a
11  server for myself, and we literally have thousands of
12  salespeople, and if we don't have enough what are called
13  demo instances or servers, they end up having to queue
14  up and take turns or wait to be able to do a demo.
15  Again, all of these things are --
16     Q.  Okay.  So in reaction to these demo issues,
17  what, if anything, did you do?
18     A.  I believe, you know, I asked our people -- you
19  know, again, there is not a lot I could do directly.  I
20  mean, indirectly our development organization worked
21  hard at finishing the demos.  But it's a project.  First
22  thing -- it is a linear process.  The first thing you
23  have to do is build the production code, you have to
24  move it over to the demonstration system.  You had to go
25  ahead and build -- create the synthetic data, test the

31

1  demonstration, build it.  So it is a separate
2  development process in itself.  It is building the code
3  and then building the demo.  So one was likely to trail
4  the other by some amount of time.
5      Q.  Is your testimony that, in fact, the 11i
6  product or modules that you were developing at this time
7  were, in fact, superior to what was being tested?
8      MR. LINDSTROM:  Demoed?
9      MR. SOLOMON:  Q.  Yes.
10     A.  They were -- absolutely.  It was newer, it was
11  later.  Later code, right.
12     Q.  You were demoing the wrong product?
13     A.  They were demoing an older version, demoing an
14  older version.
15     MR. SOLOMON:  Mark as the next exhibit a
16  document produced by Oracle, Bates number 013665 to 668.
17         (Exhibit 5 marked for
18          identification.)
19     MR. SOLOMON:  Q.  And while you're looking at
20  it, this is an e-mail exchange or e-mail exchanges
21  involving Vincent Bodsworth, Sandy Sanderson and Ron
22  Wohl -- Wohl, excuse me.  Dated August 11, 2000.  And
23  attached at the third page is a letter from Kyeong-Ryul,
24  Ryoo, K-y-e-o-n-g-R-y-u-l, R-y-o-o, to Larry Ellison.
25  And attached to that is a schedule, it would appear,

32

1  entitled, "POSCO Critical Issues List."

2       Have you seen -- first of all, have you seen

3  each of these e-mails before?  When I say each, I'm

4  looking at the first page.  The second page doesn't seem

5  to be containing any real information.  So the first

6  e-mail exchange followed by the next two pages.

7       A.  I think, again, I'm not certain, I think these

8  are attachments to the same e-mail.  So these are

9  documents that were attached to the e-mail.

10       Q.  Have you seen them before?

11       A.  I don't believe so.

12       MR. LINDSTROM:  Objection; compound.  Are you

13  referring to the collection that's been marked Exhibit 5

14  or some subset?

15       MR. SOLOMON:  I'm now asking about these four

16  pages, has he seen them before.

17       MR. LINDSTROM:  Together?

18       MR. SOLOMON:  Yes.

19       THE WITNESS:  I don't recall.

20       MR. SOLOMON:  Q.  Let's go to the second two

21  pages, 13667 and 68.

22       So we're looking at the letter from Ryoo to

23  you.  Have you seen that before?  I'm looking at 13667.

24       A.  I don't recall.

25       Q.  Okay.  Do you know what POSCO, P-O-S-C-O, is?

33

1       A.  I certainly do.

2       Q.  And what is it?

3       A.  They are one of the world's largest and most

4  profitable steel companies located in Korea.

5       Q.  He starts off, "Dear Mr. Ellison, I am the CIO

6  of POSCO, the world's largest steel producer based in

7  Korea, and we are actively engaged in implementing

8  Oracle Applications Release 11i."

9       He then references that he's writing to you

10  because Ray Lane has left.

11       Then goes on in the third paragraph to say,

12  "Ray was the Executive Sponsor for our Release 11i

13  implementation project and his departure has left a gap

14  which is now having an impact on this project."

15       Stopping there, do you recall around August of

16  2000 the fact Mr. Lane had left had created a gap with

17  respect to POSCO?

18       A.  Ray was the executive sponsor for POSCO, our

19  senior contact, and that contact was then transitioned

20  to a combination of Ron Wohl and me.

21       Q.  And so were you aware in August there was a

22  gap, as referred to here?

23       A.  That the transition --

24       Q.  Yes.

25       A.  I'm not sure there was a gap.  When Ray left,

34

1  we decided to -- you know, I decided to become an

2  executive sponsor to POSCO, combined with Ron Wohl.  I'm

3  not sure we had gone through the formal process that is

4  required in the Korean culture to make that transition.

5       Q.  All right.  I'm looking at the fourth

6  paragraph.  "In this project we are implementing over 50

7  modules of Oracle Applications Release 11i in an 18

8  month time frame with a go live date of July 2001.  The

9  project is the largest one in POSCO's 30-year history,

10  involving over 1,170 people in this development stage

11  alone.  At present we are in the stage of building a

12  complete enterprise prototype with a target completion

13  date of September this year.  Unfortunately the number

14  of issues we have encountered with the product and the

15  time to clear them has seriously affected our progress,

16  putting this target date at risk."

17       Were you aware as of August 2000, POSCO was

18  expressing the concern that they had encountered a

19  number of issues that was putting the target date at

20  risk?

21       A.  Absolutely.  In fact, I monitored this all the

22  way through to staying up all night during the day they

23  turned the system on live.

24       Q.  Do you know when that was?

25       A.  On schedule, July of 2001.

35

1       Q.  Okay.  What about the target completion date

2  of September this year for the complete enterprise

3  prototype?

4       A.  Again, I can't tell you exactly all the

5  intermediate milestones on the POSCO project.  But they

6  are one of our largest and most successful

7  implementations in the world.  And I remember vividly --

8  you didn't ask the question.

9       Q.  You shouldn't answer.

10       A.  I'll get in trouble, my lawyers will get mad

11  at me and will punch me, and I probably won't get a good

12  lunch.

13       Q.  It is going to be a short one, anyway.

14       A.  You can tell me to stop, if you want me to.

15  But if the system doesn't work at POSCO, if it is a

16  steel rolling mill -- if you shut down a digital

17  factory, it is actually fairly easy, the assembly line

18  just stops.  If you shut down the steel rolling mill,

19  the steel cools and the factory has to be rebuilt.

20       Q.  I am asking you to stop.

21       A.  Okay.

22       Q.  Next page.

23       A.  Okay.

24       Q.  "POSCO Critical Issues List, August 2000,"

25  1st of August 2000.

36

1    A.  Okay.

2    Q.  There is a list of eight issues.  Looking at

3  issue number 1, "Activity Based Activa still not on

4  production release, no firm date."

5       Were you aware in August of 2000 of that

6  issue?

7    A.  I was aware there were a variety of issues

8  that POSCO had raised of things that had to work in a

9  certain way to meet their needs, and that we met them

10  all.

11    Q.  Let me put it another way.  Looking at this,

12  is there any issue reflected 1 to 8 that in August 2000

13  you believe you were unaware of?

14    MR. LINDSTROM:  The specific enumerated items

15  on this page Bates stamped 668?

16    MR. SOLOMON:  You got it.

17    THE WITNESS:  Again, I didn't know -- I don't

18  recall every single issue POSCO had.  They had a variety

19  of issues.  Again, I think they said they had 50 issues,

20  and new issues kept coming up.

21    I do know we met our dates, went live, and

22  they are one of our happiest and most successful

23  customers in the world.

24    MR. SOLOMON:  Q.  I heard that.  I heard that.

25  You don't dispute that you received this in around

37

1  August of 2000, do you?

2    A.  No, I do not.

3    Q.  On to the first page.  You'll see that there

4  is an e-mail from Vincent Bodsworth.  Do you know who

5  Vincent Bodsworth is?

6    A.  No.

7    Q.  It says, "I had another conversation with

8  Mr. Ryoo about his visit to RWS and Larry Ellison's

9  non-availability.  I explained to Mr. Ryoo that Larry

10  would not be available until 1th September and is presently

11  not accessible."  It is "1th September."

12    "Nevertheless, he still wants to have a

13  meeting with Larry after 14th September.  Mr. Ryoo will

14  travel to wherever is necessary to do this."

15    And down the page, the last paragraph says,

16  "Also no response has been received from Larry's office

17  to Mr. Ryoo's fax and e-mail.  I think this will be

18  viewed as discourteous at the very least.  Even if there

19  is no reply from Larry, can his office send at least an

20  acknowledgment of receipt or tell me if nothing was

21  received."  And it goes on.

22    Do you recall there being a concern that you

23  weren't being responsive to Mr. Ryoo at around this

24  time?

25    A.  Again, my office -- if someone -- a senior

38

1  executive contacts my office, it is our practice to get

2  back to them very quickly.  So I'm not sure what they

3  are referring to.

4    Q.  Okay.  And at the top of the page, it says in

5  the second paragraph, "In terms of actual bugs, I told

6  Mr. Ryoo that all the critical bugs (i.e. those actually

7  holding the project up) have been cleared this week.  We

8  have still outstanding some 30 or so further TARs (not

9  all bugs) on which good progress is being made (i.e.

10  we're closing them at a faster rate than opening them at

11  the moment).  The issues that are substantive and on

12  which I'm not able to provide any satisfactory reply are

13  those concerning the availability of the production

14  version of ABM, the TRM for ABM and the HP (middle tier)

15  port for ARM."

16    Do you see that?

17    A.  I do.

18    Q.  Do you understand the references to the

19  concern concerning the production versions of ABM?

20    A.  Again, the Oracle e-business suite is an

21  enormously complex product.  There are bugs, and

22  sometimes there are functions that don't operate exactly

23  as a given customer wants them to operate.  And in the

24  process of an implementation, we go through, you know,

25  again, go through a process of fixing those bugs and

39

1  addressing the functional gaps.  That's what was going

2  on in this project.

3    MR. SOLOMON:  Okay.  Mark as the next exhibit

4  a document produced by defendants with the Bates number

5  275637.

6       (Exhibit 6 marked for

7       identification.)

8    MR. SOLOMON:  Q.  And the question, once

9  you've had a chance to look at it, will be, have you

10  seen it before?

11    A.  I don't believe so.  This is it, the one page?

12    Q.  This is what we've got, yeah.

13    MR. LINDSTROM:  Can I ask just for sake of

14  clarity of the record that the exhibits that are being

15  handed to Mr. Ellison for his review be the actual ones

16  being marked by the reporter for attachment to the

17  transcript, so we don't need to be concerned that the

18  copies don't match what --

19    MR. SOLOMON:  That's fine.

20    MR. LINDSTROM:  Make that change, Larry.  And

21  from now on you may look at the versions given to you

22  earlier by counsel, but your testimony ought to run off

23  the one that bears the stamped exhibit number.

24    THE WITNESS:  Okay.

25    MR. LINDSTROM:  Thank you, counsel.

40

1    MR. SOLOMON:  Q.  Do you know, in the first
2  line, do you know what GEAE refers to?
3    A.  General Electric Aircraft Engines.
4    Q.  And MRO?
5    A.  It is a maintenance system to maintain large,
6  complicated equipment.  Maintenance and repair, MR.
7    Q.  Now, there is some asterisks, then a third
8  asterisk and some bolded language, "Oracle has missed
9  every date and commitment made for MRO."
10    Do you see that?
11    A.  I do.
12    Q.  Do you know what that refers to?
13    A.  MRO was a specialty product we were building
14  pretty much just for GE.  GE is our largest commercial
15  customer.  We do unusual things for GE.  Building this
16  MRO product for GE was something they asked us to do and
17  we endeavored to do.  It wasn't ever a product we made
18  generally available to the public.
19    Q.  And did you know -- since this isn't
20  dated, it is hard to be precise.  But it refers to,
21  above that, you see, "Final delivery of the software in
22  second calendar quarter of 2000."
23    Do you see that?  Above the bolded language
24  that I just read to you.
25    A.  Yes.

41

1    Q.  Were you aware at any time of Oracle missing
2  every date and commitment made for MRO?
3    A.  I'm not sure we missed every date and
4  commitment, but we certainly failed to deliver on MRO.
5    MR. SOLOMON:  Mark as the next exhibit a
6  document produced by Oracle bearing the Bates numbers
7  377275 and 276.
8    (Exhibit 7 marked for
9    identification.)
10    MR. SOLOMON:  Q.  When you've had a chance to
11  look at it, the question is, have you seen it before?
12    A.  Not that I recall.
13    Q.  You'll see that the very last sentence reads,
14  "Safra, I hope this background is informative.  I will
15  contact you today to answer any subsequent questions."
16  Obviously, that would refer to Safra Catz.  But does
17  that help you identify who this is from?  First of all,
18  did you write this?
19    A.  No.
20    Q.  Do you know who wrote it?
21    A.  I do not.
22    Q.  Do you remember talking to Safra about this
23  e-mail, or this message?
24    A.  No.
25    Q.  I'm halfway down the page, looking at the

42

1  following language, "In order for the relationship to
2  continue, we need to deliver MRO.  The potential revenue
3  impact to Oracle from aircrafts for FY '01 is $12 to $14
4  million in lost revenue, $4 million in MRO license
5  revenue, $8 to $10 million in APS, ERP, CRM and Exchange
6  revenue that will be difficult to bring in without
7  delivering on MRO."
8    Do you see that?
9    A.  I do.
10    Q.  Do you recall having a concern that there may
11  be lost revenue as a result of being unable to timely
12  deliver MRO?
13    A.  I was convinced, you know, that we -- there
14  would be lost revenue because we couldn't deliver MRO.
15    Q.  Do you know when MRO ultimately was delivered?
16    A.  Never.
17    Q.  Never?
18    A.  (Nodding.)
19    MR. SOLOMON:  Let's have marked as the next
20  exhibit a document produced by defendants bearing Bates
21  number 023076.
22    (Exhibit 8 marked for
23    identification.)
24    MR. SOLOMON:  Q.  Once you've taken a look at
25  it, the question will be, have you seen it before?

43

1    A.  I don't recall.
2    Q.  You see it says the following, and I'm not
3  sure if it is part of a larger document, but this is
4  what we have, it says, "See Keith Block's comments re:
5  11i training and product quality.  Clients are deciding
6  and in some cases consulting is recommending based on
7  experience to delay 11i implementations.  Product
8  quality in Q1 alone impacted profitability by $3
9  million.  Is Larry getting routine updates on product
10  training and quality?  Sandy."
11    Do you recall having any discussions in which
12  the concerns here were the topic?
13    A.  Yes.
14    Q.  And who did you have those discussions with?
15    A.  The entire management team.
16    Q.  And when were you having those discussions?
17    A.  Again, in the general -- on the general issues
18  of product quality, we have them constantly.  I should
19  say routinely.
20    Q.  And do you know, there is a reference to
21  "delay 11i implementations," in calendar 2000 and early
22  2001, were 11i implementations delayed?
23    A.  We certainly had no policy to delay
24  implementations.
25    Q.  And to the extent this reflects someone

44

1  suggesting that there be such a policy, are you saying
2  that that was rejected?
3     A.  Whenever we deliver a new product, typically
4  it takes a larger consulting effort to implement the new
5  product.  The consultants themselves have to be trained.
6  The product -- the early versions of the product are
7  never as stable as the later versions of the product.
8  And that usually means that the consulting
9  implementation is -- can be delayed.
10    It is just much more problematic than later
11 implementations.  We just have to go through the
12 learning curve.  It happens on virtually every product
13 we deliver.
14    MR. SOLOMON:  Have marked as the next exhibit
15 a document produced by defendants, Bates range 039547
16 through 551.
17        (Exhibit 9 marked for
18         identification.)
19    MR. SOLOMON:  Q.  And if you take a chance to
20 look at these, and again the question is going to be,
21 have you seen them before?
22    A.  Not that I recall.
23    Q.  I want to start with the second from the last
24 page, which has the number 039550.
25    MR. LINDSTROM:  Larry, do you need to read the

45

1  entire document to have the context?  Or have you had a
2  chance to do so?
3     THE WITNESS:  I think -- I think I know what's
4  going on.
5     MR. SOLOMON:  Q.  Okay.  Do you know, first of
6  all, who Steve Carrington at Ingersoll-Rand is?
7     A.  I do not.
8     Q.  And I think there is names at the top,
9  Walrath, Johnson.  Do you have any idea who those people
10 are?
11    A.  I do not.
12    Q.  See at the top it appears to be forwarded, it
13 says, "Ingersoll-Rand Critical Situation."
14    Do you see that?  Very top of the page.
15    A.  You're on the second to the last page?
16    Q.  Yes.
17    MR. LINDSTROM:  What page are you on, counsel?
18    MR. SOLOMON:  039550.
19    THE WITNESS:  I can't find where it says
20 critical situation.
21    MR. SOLOMON:  Q.  Top left hand below the fax
22 reference it says, "Fwd, Fwd, Ingersoll-Rand, Critical
23 Situation."
24    A.  I've got it now.  I was looking at the body of
25 the text.

46

1     Q.  And then it appears to be dated 10/10/00.  Do
2  you see that?
3     A.  I do.
4     Q.  Good.  It says, "Topics for discussion.  We
5  made the decision to move to 11i for the G2 project for
6  two reasons.  A.  The functionality in 11i was needed."
7  And it goes on with some more language.  And then it
8  says, "B.  We were assured this version was of a quality
9  level that we would have no major issues relating to the
10 new release."
11    Do you see that?
12    A.  I do.
13    Q.  Point 3 says, "The system is running in an
14 Oracle center managed by Oracle DBAs and Oracle Unix
15 people and supported by onsite Oracle consultants, yet
16 we cannot get the software to function.  We have little
17 confidence in Oracle's ability to provide us a stable
18 working environment in a time frame we need.  Our onsite
19 consultants are spending valuable time debugging
20 software instead of working on the project activities."
21    Do you see that?
22    A.  I do.
23    Q.  Were you aware at around October of 2000 that
24 these issues were being raised by Ingersoll-Rand?
25    A.  I was certainly aware that a small percentage

47

1  of our customers that were implementing release 11i were
2  having problems, and one of them was Ingersoll-Rand.
3     Q.  Point 4, "We are in fact a full month delayed
4  on the CRP and we expect the CRP could not begin until
5  the week after next at the earliest.  This assumes all
6  the issues are resolved.  We have little confidence in
7  any dates given to us at this point.  While we feel the
8  onsite people are good, we feel Oracle as an
9  organization has let us down."
10    Were you aware of this sentiment from
11 Ingersoll-Rand in October of 2000?
12    A.  There were several customers who were
13 implementing 11i, a small percentage of our total
14 customers.  We have 30,000 application customers.  A
15 small percentage that were implementing 11i were having
16 problems.  The vast majority of those that had problems
17 are successful, happy customers now, like POSCO and
18 Ingersoll-Rand.
19    Doesn't mean they didn't have problems during
20 the implementation.  These are very complicated
21 engineering projects.
22    Q.  Point 5, "We need the same level of guarantee
23 that Larry gave GE when it looks like SSP would not
24 work."  Do you understand that?
25    A.  I'm not sure what SSP is.  But I am the

48

1   corporate sponsor to General Electric.

2       Q.  What sort of guarantee is being referred to,

3   do you know?

4       A.  I don't know.  I am -- I spend a lot of time

5   with General Electric.  As I say, I'm the corporate

6   sponsor for GE, I attend their management meeting.

7       MR. LINDSTROM:  He doesn't want you to

8   speculate.  He's asking if you know with respect to this

9   specific reference.

10      THE WITNESS:  I don't know.

11      MR. SOLOMON:  Q.  Was it, "Don't worry, you

12  don't have to pay," or, "Don't worry, you'll get your

13  money back"?

14      A.  No.

15      Q.  But you don't know what it was?

16      A.  If you want me to guess, I will guess.

17      MR. LINDSTROM:  He doesn't want you to guess.

18  And I don't either.

19      MR. SOLOMON:  You don't want him to guess.  I

20  may want you to.

21      THE WITNESS:  Okay.

22      MR. SOLOMON:  Q.  What is your guess?

23      MR. LINDSTROM:  Objection; calls for

24  speculation.

25      THE WITNESS:  What I normally -- normally tell

49

1   anybody is that we will work as hard as we can to make

2   this work.  And the vast majority -- we have 300,000

3   customers around the world.  You know, 99.99 percent of

4   those customers, the software is working successfully.

5       When you're doing a company and building a big

6   engineering project, what these guys do is they

7   interface 11i, it is not just 11i, but they are

8   connecting it to a lot of other systems, there is a lot

9   of consulting and engineering going on, these businesses

10  are changing their business processes, often going from

11  a local to global systems.  There is a lot -- these are

12  huge engineering projects when you put in all new

13  systems.

14      And all we can guarantee is that we'll work as

15  hard as we can to make this successful in your company.

16      Again, the vast majority of our customers were

17  successful.  And Ingersoll-Rand was very successful with

18  the implementation.

19      MR. SOLOMON:  Q.  Again, when you are talking

20  about level of guarantee then, it is your guess that it

21  was basically -- that it is you saying, "We'll do it"?

22      A.  "We'll do everything in our power to make you

23  successful."

24      Q.  Do you recall giving, issuing that guarantee

25  to GE?

50

1       MR. LINDSTROM:  The one he just described as

2   his guess?

3       MR. SOLOMON:  Correct.

4       THE WITNESS:  It is a routine thing that I

5   say, that we will work as hard as we can to make our

6   customers successful.

7       MR. SOLOMON:  Q.  Okay.  The last sentence of

8   that point 5 says, "The issues we are facing make it

9   difficult to support our Oracle position."

10      Do you see that?

11      A.  Yes.

12      Q.  Do you know what the Oracle position is that's

13  being referred to here?

14      A.  Yes.  It means that there are a number of

15  people inside of Ingersoll-Rand that are champions for

16  Oracle, that they pick the Oracle product, they were

17  enthusiastic about the implementation.  And now there

18  are some bumps along the road and they are concerned.

19      But we did work closely with them, and

20  Ingersoll-Rand again is now implemented successfully and

21  is very happy.

22      Q.  I just want to jump back up to 1.B where it

23  says, "We were ensured" -- and I believe it probably

24  means "assured," but, "We were ensured that this version

25  of a quality -- this version was of a quality level

51

1   that we would have no major issues related to the new

2   release."

3       Do you know of any such assurance emanating

4   from Oracle?

5       A.  I do not.

6       Q.  And can you take a guess as to who wrote this?

7       MR. LINDSTROM:  Objection; calls for

8   speculation.

9       MR. SOLOMON:  Excuse me.  Strike that.  Not

10  who wrote it.

11      Q.  Can you take a guess as to who was interfacing

12  with Ingersoll-Rand from Oracle?

13      MR. LINDSTROM:  Same objection.

14      THE WITNESS:  You want me to guess?

15      MR. SOLOMON:  Q.  Yes.

16      A.  Our accountants, the people at Oracle

17  responsible for selling and consulting to

18  Ingersoll-Rand.

19      Q.  You wouldn't know the names of the people?

20      A.  Not offhand.

21      Q.  I'm looking now at the next page back, which

22  is 039548.  Two pages back, excuse me.  You'll see again

23  it refers to "Subject:  Ingersoll-Rand Critical

24  Situation."  And it is addressed to Mark and Ron.  It

25  says, "I am the account manager for Ingersoll-Rand."

52

Ellison, Lawrence (Confidential)  7/13/2006  9:33:00 AM

1  Then it mentions Frank Varasano.  Do you know who Frank
2  Varasano is?
3  A.  Yes.
4  Q.  Who is he?
5  A.  A sales executive.
6  Q.  It says, "Frank Varasano and I met today with
7  Mary Walrath, CIO for Ingersoll-Rand.  It was not a
8  pleasant meeting.  Given the urgency of the situation,
9  Frank asked that I generate this e-mail to you both."
10  And it goes on to say, "As indicated in Steve
11  McLaughlin's e-mail of 9/28, we are failing with our
12  attempts to install 11i CRM and ORM Applications in a
13  Conference Room Pilot (CRP) at IR's G2 sector.  As a
14  result, we are missing a related opportunity for $10 to
15  $20 million in CRM, OM and manufacturing incremental
16  revenue.  We are trying to offer a deal two times as
17  larger but can't get the customer to listen until we get
18  existing applications up and running.  This account is
19  eager to become a reference, but we are not giving them
20  a chance to do so."
21  Do you see that?
22  A.  I do.
23  Q.  And do you understand -- excuse me.  Do you
24  recall being aware of this particular exchange in and
25  around September/October of 2000?

53

1  A.  No.
2  Q.  Are you aware, or were you aware around that
3  time of the suggestion that Ingersoll-Rand stood to lose
4  a revenue opportunity of $10 to $20 million?
5  A.  I was not.
6  Q.  Goes on to say, "Situation.  We are in a
7  crisis situation."
8  Were you aware in or around September or
9  October of 2000 that Ingersoll-Rand was in a crisis
10  situation?
11  A.  Again, that is someone's characterization of
12  it.
13  I was aware of what was going on at
14  Ingersoll-Rand.  It was a complicated implementation.
15  They had run into some problems.  This is not uncommon.
16  It was happening at a small number of our customers, but
17  it was happening.  We put in the necessary resources,
18  fixed the problems.
19  Q.  Okay.  It goes on to say, "IR believes 11i CRM
20  and OM are not ready for deployment."
21  Do you recall that being a sentiment expressed
22  from Ingersoll-Rand in or around September/October 2000?
23  A.  Not specifically, no.
24  Q.  Was it your view that 11i CRM and OM was ready
25  for deployment?

54

1  A.  Absolutely.
2  MR. LINDSTROM:  In this time frame of this
3  e-mail?
4  MR. SOLOMON:  Correct.
5  THE WITNESS:  Absolutely, yes.
6  MR. SOLOMON:  Q.  It goes on to say, "They are
7  considering replacement strategies for Oracle at the G2
8  implementation that includes Siebel (see e-mail below)."
9  Were you aware of that at the time?
10  A.  No.
11  Q.  "There appears to be little 11i
12  documentation."
13  Were you aware of that at the time?
14  A.  I don't think it's true.
15  Q.  "There appears to be little 11i training."
16  Were you aware of that at the time?
17  A.  I don't believe that's true either.
18  Q.  Are you aware that some of your former
19  consultants have testified in this case that there was
20  little 11i training?
21  A.  No.
22  Q.  Goes on to say, "Since we are trying to bring
23  the CRP up together with the IR project team, they are
24  seeing firsthand our daily failures and shortcomings."
25  Were you aware of that at the time?

55

1  A.  No.
2  Q.  And then on to the first page, which bears the
3  number 039547, and you'll see that it's from Frank
4  Varasano at the top to Ron Wohl, copying Sandy
5  Sanderson, and it says, "I believe your personal
6  involvement in fixing this would be time well spent.
7  This could be a critical reference for us, but the
8  management team is very frustrated.  We are about to
9  lose the CRM opportunity and a lot of additional ERP
10  business because of the situation that Dan summarized in
11  his e-mail."
12  Do you see that?
13  A.  I do.
14  Q.  And were you aware of these risks being
15  expressed at the time?
16  A.  I was not.
17  Q.  And the time now we see is October 2000.
18  A.  Right.
19  MR. SOLOMON:  Have marked as the next exhibit
20  a document produced by defendants, Bates numbers 144262
21  and 263.
22  (Exhibit 10 marked for
23  identification.)
24  MR. SOLOMON:  Q.  The question is, have you
25  seen it before?

56

1    A. Not that I recall.

2        MR. SOLOMON: And, counsel, this is a document

3    that appears to not have been produced completely. It

4    says 2 of 3 and 3 of 3. I don't believe we have 1 of 3.

5    I ask that be produced.

6        MR. LINDSTROM: It is my understanding that

7    you do. And if we are able to get you it, could we have

8    the full document substituted as an exhibit.

9        MR. SOLOMON: Absolutely.

10       MR. LINDSTROM: Thank you.

11       MR. SOLOMON: Q. Now, I'm looking at -- you

12   are familiar with the BellSouth implementation; correct?

13   A. Yes.

14   Q. Were you personally involved in that?

15   A. Yes.

16   Q. In what way?

17   A. I met with the project teams and I met with

18   the customer.

19   Q. And did you meet with them in the fall of

20   2000?

21   A. I don't recall.

22   Q. You see under "Big Issues," there are a number

23   of items.

24       "17 product defects that need to be fixed,"

25   and some more language.

57

1        "23 product defects by October 23rd."

2        It says, "115" -- I'm leaving out some

3    language, but, "115 consulting enhancements. We have

4    only tested 80 percent of the solution. Go live plan is

5    Big Bang, all users at once. Far too little time for

6    system and integration testing. No out of the box

7    environment at BS. Performance and a performance plan

8    are big unknown. Onsite environments need better

9    management."

10       Do you see all those big issues?

11   A. I do.

12   Q. Were you aware of those big issues in October

13   or November -- September, October or November of 2000?

14       MR. LINDSTROM: Objection; compound.

15       THE WITNESS: I was aware of the fundamental

16   issue at BellSouth, which was that it wasn't really a

17   product implementation, it was really a big consulting

18   project, that BellSouth wanted a lot of features and

19   functions that were not in the product nor did we have

20   plans to put them in the product, so they were

21   implemented through consulting. It was a huge project.

22   Because it was all custom, it had an enormous amount of

23   risk associated with it.

24       MR. SOLOMON: Q. Do you believe that you

25   promised BellSouth something that you didn't deliver?

58

1    A. When you say me, you mean me or anyone in the

2    company?

3    Q. Correct.

4    A. I can't speak for anyone in the company. I

5    certainly didn't promise BellSouth something we couldn't

6    deliver. In fact, my comments to BellSouth was -- my

7    comments were, "This is a huge consulting project. We

8    cannot make our product do everything BellSouth wants it

9    to do."

10       This is not uncommon that the product does 80

11   percent of the functions, then there is some amount of

12   customization that is needed on top of it.

13       In this case it wasn't 80 percent. The

14   product probably did -- as it says here in this memo,

15   does half of what the customer needs. That means half

16   the features and functions are going to have to be a

17   huge custom consulting project. Given the time frames

18   and the size of project, I always thought it was an

19   enormously risky project.

20   Q. Which takes me to the bottom of the page where

21   it says, "Extremely Risky"?

22   A. Yes.

23   Q. Were you aware of that at the time?

24   A. Absolutely.

25   Q. Are you aware of executives from Oracle

59

1    stating that, in fact, they believed that BellSouth was

2    promised something that they didn't get and couldn't

3    get?

4        MR. LINDSTROM: You're asking him about

5    statements apart from this document?

6        MR. SOLOMON: Correct.

7        MR. LINDSTROM: Do you have the question in

8    mind?

9        THE WITNESS: You're asking me to state --

10       MR. SOLOMON: I'm asking if you are aware

11   of other Oracle executives --

12   A. I don't know what other Oracle executives

13   represented to BellSouth.

14   Q. Okay. You know Jay Nussbaum?

15   A. I do.

16   Q. Do you know what he said about BellSouth in

17   the derivative case related somewhat to this case?

18   A. I do not.

19       MR. SOLOMON: Have marked as the next exhibit

20   a document produced by the defendants with the numbers

21   169718 to 720.

22       (Exhibit 11 marked for

23        identification.)

24       MR. SOLOMON: Q. Question is, once you've had

25   a chance to look at it, have you seen this document

60

1 before?

2    A. I have not.

3    Q. Okay, I -- first of all, I guess, it's from

4 John Fikany, F-i-k-a-n-y. Do you know who that is?

5    A. Yes.

6    Q. Who is he?

7    A. A sales rep.

8    Q. And it is dated October 19, 2000. And it is

9 to a number of addressees that I won't list now. But it

10 begins with Frank Varasano and Sandy Sanderson. And the

11 subject is "Ford Supply Chain Status."

12      And I'm looking two-thirds of the way down the

13 first page and it says, "Todd Allen wrote."

14      Do you know who Todd Allen is?

15    A. I do not know.

16    Q. And it says, "Mike, we have been on the calls,

17 we've expressed our concerns during the calls. The

18 problem we are dealing with is that we're getting

19 inconsistent information on a daily basis regarding

20 11.5.2 release and patches. At this time we have put in

21 every available patch for CRM up to 10/17 (this is over

22 100 CRM patches in the last two and a half weeks!) We

23 still can't get contracts to work. We have no idea what

24 awaits us as we implement the rest of CRM! The products

25 do not integrate to the back office, they don't work

1 period. The customer knows what we have been going

2 through and is wondering, as we are, when will the

3 system be stable?"

4      Do you see that?

5    A. I do.

6    Q. Are you aware of these concerns being raised

7 in or around October 2000?

8    A. Not these specific concerns. I'm aware of the

9 general concern that our products sometimes have bugs in

10 them and those bugs have to be fixed.

11    Q. Okay. It goes on to say, "The CRM

12 organization needs to step up and provide its

13 development resources on site in Webster, New York. We

14 know that Mark's organization has done this for

15 Ingersoll-Rand and BellSouth. We need the same

16 attention! Xerox is threatening to write a letter to

17 Larry and will be asking for their money back." Just

18 stopping there.

19      Did you ever receive a letter from Xerox, do

20 you know?

21    A. Not that I know of.

22    Q. Were you aware of an intention to escalate it

23 to you in the way that was suggested?

24    A. Again, this was a problem we had in an

25 implementation. We fixed the problem. Xerox is now

1 successful and buying more software from us.

2    Q. The next sentence reads, "They have also used

3 words like 'your company is two steps away from

4 fraudulent.'"

5      Do you see that?

6    A. I do.

7    Q. Were you aware that some people thought your

8 company was as far away as two steps away from

9 fraudulent at the time?

10    A. I mean, clearly they were very upset with a

11 problem. What I can say is they are a happy customer

12 buying more software. If they thought we were

13 fraudulent, I don't think they would be buying more

14 software from us.

15    Q. Okay. But we're talking about the time frame,

16 as you know, of October 2000.

17    A. At any point in time we have large

18 implementations ongoing, 2000, 2001, today. There are

19 customers who are doing these enormously complicated

20 engineering projects, and they have problems. This is

21 just not an uncommon occurrence.

22      You do this enormous engineering project,

23 you're connecting our software to a lot of existing

24 systems, you're changing business processes. These are

25 hard engineering projects, and people, you know, get

1 frustrated.

2    Q. And you don't dispute, though, if you upset

3 too many customers in a particular time frame, it could

4 affect your financial results, do you?

5    A. Absolutely.

6    Q. And those customers may ultimately end up

7 happy, but that doesn't necessarily mean that the impact

8 on your financial results was entirely innocent, does

9 it?

10      MR. LINDSTROM: Objection; calls for

11 speculation, argumentative.

12      THE WITNESS: Sure.

13      MR. SOLOMON: The last sentence says, "If

14 that can't get us some help, I don't know what can."

15      Do you see that on the second page at the top?

16    A. Yep.

17    Q. Okay. And then further down it says, "Do I

18 need to take this to Mark? We have a BellSouth

19 situation at Xerox and I need you guys to step up!"

20      Do you see that?

21    A. Yes.

22    Q. Do you recall this situation being like at

23 around this time to the BellSouth situation?

24    A. Just incorrect, fundamentally incorrect. We

25 had a small -- at this point in time we had a small

1   number of customers that were having problems.  Very
2   similar to pretty much at any time in our history.  And
3   where the BellSouth project was an enormous consulting
4   project, Xerox was implementing fairly standard
5   software.  So it was erroneous to compare the two.
6       Q.  Okay.
7       A.  Again, Xerox was implemented successfully,
8   very close to on schedule.
9       Q.  And down to the bottom of that page, it starts
10  with, "Bruce."
11      Do you know who Bruce is?
12      A.  I do not.
13      Q.  It says, "You might recall when we were in the
14  final stages of the Xerox OTC contract, we discussed the
15  occasional need for development triage support.  With
16  the 11.5.2 release our consultants are requesting this
17  resource based on significant customer escalations due
18  to the code quality of the current release of 11i.  We
19  have struggled with both code quality and patch issues
20  and we are reaching a critical point with Xerox."
21      Do you recall at around that time, October of
22  2000, these concerns concerning code quality and the
23  patch issues being raised by Xerox?
24      A.  Whenever we come up with a new version of our
25  product, we have to patch bugs, we have to fix bugs.

1   Again, this is a routine thing that happens in our
2   business.
3       Q.  I understand that you want to say that, and
4   there is probably a better time to say it.
5       My question is, were you aware at the time
6   that Xerox was raising these issues?
7       A.  I was not aware there were specific problems
8   at Xerox.
9       MR. SOLOMON:  Have marked as the next exhibit
10  a document produced by defendants with a Bates number
11  620842.
12      (Exhibit 12 marked for
13      identification.)
14      MR. SOLOMON:  Q.  And the question will be,
15  have you seen this document before?
16      A.  No.
17      Q.  And do you have an understanding who the Karen
18  is at the top of the page, "For tomorrow with Karen"?
19      A.  No.
20      Q.  You see it references Hewlett-Packard?
21      A.  Yes.
22      Q.  The third bullet point, "Premium Support
23  Order.  Oracle has handled this very poorly.  Internally
24  we have been told the quality of the individuals is poor
25  and that HP put these folks on site at their own risk."

1   Do you see that?
2       A.  Yes.
3       Q.  Were you aware of this issue of HP being
4   handled poorly by Oracle and individuals being put on
5   site at their own risk?
6       MR. LINDSTROM:  Objection; compound.
7       THE WITNESS:  HP is one of our largest
8   customers.
9       MR. SOLOMON:  Q.  I'm talking about at the
10  time.
11      A.  Has been one of our largest customers for a
12  very, very long period of time, and I wasn't aware of
13  any problems at HP.
14      MR. SOLOMON:  Okay.  Have marked as the next
15  exhibit a document with Bates number 025018 to 019.
16      (Exhibit 13 marked for
17      identification.)
18      MR. SOLOMON:  Q.  The question will be, have
19  you seen this before?
20      A.  No.
21      Q.  It is dated Thursday, November 30th, 2000.
22  And it is from Safra Catz to Tom Williams and Jennifer
23  Minton.  That's the top addressee line.  Then below that
24  from Gary Roberts to Safra Catz.
25      Reads, "Safra, I understand Larry and Carly

1   are discussing their purchase of our products this
2   quarter if we commit to purchase $20 to $30 million of
3   their product over the next 18 to 24 months."
4       Do you see that?
5       A.  I do.
6       Q.  Do you recall this -- do you recall having any
7   discussion with Carly?  Who is Carly?
8       A.  Carly Fiorina, the event CEO of Hewlett
9   Packard.
10      Q.  Do you recall the conversation or the
11  discussion reflected here?
12      A.  I don't believe I had that discussion with
13  her.
14      Q.  No?  So Gary Roberts is wrong, is what you're
15  saying?
16      A.  I didn't discuss the sale of our products to
17  Carly, no.
18      Q.  Do you know if anybody did?
19      A.  I'm sure our sales teams did.
20      Q.  But to your knowledge, it wasn't you.  Was it
21  Safra?
22      A.  I don't know.
23      Q.  Did you discuss with anybody at HP the deal
24  reflected here?
25      A.  No.

1  Q.  You were very heavily involved with the GE
2  transaction in the fall of 2000, or a GE transaction?
3  A.  Which one.
4  Q.  GE Power?
5  A.  Yes, GE Power.  I shouldn't say I was very
6  heavily involved with the transaction.  I attend GE
7  Power management meetings.  But I actually am not
8  involved with sales transactions.
9  Q.  Was GE Power complaining about problems with
10  the 11i in around the fall of 2000?
11  A.  I don't think they were complaining.  They
12  were listing issues, and we were working through the
13  issues.  I wouldn't characterize that as complaining.
14  MR. SOLOMON:  Mark as the next exhibit a
15  document with the numbers 063405 to 407.
16  (Exhibit 14 marked for
17  identification.)
18  MR. SOLOMON:  Q.  And the question will be
19  when you've had a chance to look at it, have you seen it
20  before?
21  A.  Not that I recall.
22  Q.  Front page, it is dated Tuesday,
23  December 12th, 2000.  It's to Kevin Miller and Shawn
24  Kirsten from Ron Wohl.  And it says, "Who can supply a
25  list of upgrade issues they have encountered?  I would

69

1  like to understand them better before the call.
2  Thanks."
3  And below that it says, "Kevin Miller wrote:
4  This is likely going to be a rough call with the upgrade
5  issues they've encountered," signed "Kevin."
6  First of all, are you aware -- were you aware
7  in or around December of 2000 of GE having upgrade
8  issues?
9  A.  Routine --
10  MR. LINDSTROM:  Vague and ambiguous.
11  THE WITNESS:  The answer is, yes.  But they
12  are routine.
13  MR. SOLOMON:  Q.  That's fine.  The answer is
14  yes?
15  A.  Yes.
16  Q.  And it says it was going to be a rough call.
17  Now, you say they are not complaining, but it
18  is going to be a rough call.  What does that mean, if
19  you know?
20  MR. LINDSTROM:  Objection; calls for
21  speculation, vague and ambiguous.
22  THE WITNESS:  I don't know what he meant by
23  the word rough.  The calls with GE are disciplined and
24  organized, and they expect results.  And that's how it
25  works.

70

1  MR. SOLOMON:  Q.  Would that be rough?
2  A.  I guess some people might find that rough.
3  MR. LINDSTROM:  You've answered the question.
4  MR. SOLOMON:  Q.  If you go on to the second
5  page, you will see it says, "Reminder message:
6  Everyone, the following conference call has been
7  scheduled for Friday, December 15th, GE Oracle monthly
8  call," and a list of people headed by you.
9  Do you see that?
10  A.  I do.
11  Q.  Did you participate in that call as scheduled?
12  A.  I did.
13  Q.  Do you recall it being rough?
14  A.  I wouldn't characterize it as rough.  We go
15  through a list of issues and we attach resources to get
16  issues fixed.  And the issues are normally on the GE
17  side and on the Oracle side.  And we fix our problems,
18  and, again, we delivered on time, successfully, to
19  GE.
20  Q.  And do you know who, on the first page, do you
21  know who Kevin is who was talking about the rough call?
22  A.  He is one of our engineering managers.
23  Q.  Okay.
24  A.  I'd like to recharacterize what I just said.
25  I said we delivered on time successfully.  I'm not sure

71

1  we delivered every single component on time, that would
2  be an exaggeration.  But we were in the end successful.
3  MR. LINDSTROM:  While counsel is selecting the
4  next exhibit, we've been going about an hour and a half,
5  and if you need a break at any time, let us know.
6  MR. SOLOMON:  That might be a signal.
7  MR. LINDSTROM:  It is not a signal from me.  I
8  just wanted to make sure you understand that you have
9  that option.
10  MR. SOLOMON:  Let me tell you something that
11  your counsel is going to tell you when you take a break.
12  Counsel is going to tell you you weren't selling
13  throughout the month of January.
14  THE WITNESS:  Say again.
15  MR. SOLOMON:  Q.  Your counsel will tell you
16  when you take your break that you were not selling your
17  stock throughout the month of January.  You testified to
18  that when you first moved in -- when you first arrived
19  here today.  That, in fact, is wrong.
20  Do you want to reflect on that?
21  MR. LINDSTROM:  Let me first interpose an
22  objection.  You have no idea what I'm going to talk to
23  him about, if anything.
24  If you want to pose a question to him, do so.
25  Do not lecture him about what you believe the evidence

72

1  to be.

2       He's giving you the best of his testimony

3  according to his recollection today.  If you have

4  documents that suggest otherwise, show them to him.

5       MR. SOLOMON:  Fine.

6       I'm giving you a chance here to try and test

7  your memory a little bit better.

8       MR. LINDSTROM:  Pose the question.

9       MR. SOLOMON:  Q.  Is it still your testimony

10 that you sold your stock throughout the month of January

11 2001?

12      A.  I believe so.  That's my recollection.

13      MR. SOLOMON:  Have marked as the next exhibit

14 a document with the Bates range 035243 to 35264.

15           (Exhibit 15 marked for

16           identification.)

17      MR. SOLOMON:  Q.  And if you could take a look

18 at it and tell me if you've seen it before.

19      MR. LINDSTROM:  Again, counsel, this document

20 is many, many pages.  I assume you're talking about the

21 entire collection as it's been placed before him?

22      MR. SOLOMON:  Correct.

23      THE WITNESS:  Okay.

24      MR. SOLOMON:  Q.  Have you seen it before?

25      A.  I don't believe so.  Even though there was a

73

1  letter written to me at the end, I don't recall seeing

2  it.

3       Q.  You see the letter at the end is from a

4  William Grebe?

5       A.  Yes.

6       Q.  Is that name familiar to you?

7       A.  No.

8       Q.  Letter aside, if you look at the letter, are

9  you -- do you have a recollection of the issues

10 reflected in the letter?

11      A.  Not really.  Only in the general sense.

12      Q.  Okay.  On the first page, I'm looking at the

13 message from Renee Knee.  Do you know who that is?

14      A.  Renee Knee, yes.

15      Q.  Who is she?

16      A.  I believe she ran our partner programs, our

17 independent software vendor reseller programs.

18      Q.  It is Ron Wohl, Donald Klaiss, and copies to

19 Ian Thacker, Safra Catz, Mike Rocha.

20      A.  Rocha.

21      Q.  And starts off saying, "Ron Don and Drew, I

22 cannot answer these questions for this partner and as

23 you can see it is a very poor reflection on the partner

24 program and Oracle overall, but we're not able to

25 address the quality issues we are facing with 11i OM

74

1  right now across all of our partners."

2       Do you see that?

3       A.  Um-hum.

4       Q.  And "across all of our partners" is

5  underlined.

6       Do you see that?

7       A.  Yes.

8       Q.  Were you aware of that concern being raised

9  internally at Oracle in or around -- on or around

10 Tuesday, December the 19th, 2000?

11      A.  No.

12      Q.  And if you go to the next paragraph, she says,

13 "Rebecca represents a small implementation firm but one

14 whose business is only successful when we support her

15 with our products.  She is a squeaky wheel and I have

16 had many conversations with her over the last several

17 months on her views of our product quality, support and

18 partner program.  However, her views are the same as all

19 of our partners implementing 11i OM."

20      Do you see that?

21      A.  I do.

22      Q.  Then goes on to say, "They all have

23 significant backlogs of implementation service.  They

24 are trying to deliver and cannot either install our

25 products successfully in a reasonable amount of time,

75

1  manage their customers' orders processing with our OM

2  due to outstanding and answered Tars/Bugs, nor stabilize

3  their customers' environments with our patches.  I need

4  to know what we in Alliances can do to help you set the

5  partner's expectations about OM and the 11i product

6  quality.  If you cannot give me honest and accurate

7  information as to when 11i product quality will improve,

8  I am not going to be able to keep the partners from

9  stopping their implementations in the marketplace."

10      Do you see all that?

11      A.  I do.

12      Q.  Were you aware of these concerns being raised

13 internally at Oracle in December of 2000?

14      MR. LINDSTROM:  Objection; compound.

15      THE WITNESS:  I can give you a general answer,

16 but not specifically, in response to this letter.

17      MR. SOLOMON:  Q.  Okay.  So were you aware in

18 2000 that there was a concern among all of your partners

19 that 11i product qualities were impeding their business?

20      A.  I don't believe that to be the case.

21      Q.  Okay.

22      MR. SOLOMON:  Would you like to take a break

23 now?

24      MR. LINDSTROM:  The witness hasn't requested

25 one, so if you would like to take a break, that's fine.

76

1    MR. SOLOMON:  Would you like to take a break,

2  Mr. Ellison?  Either way; I don't mind.

3    THE WITNESS:  Let's go on.

4    MR. LINDSTROM:  I would like to break for

5  lunch within an hour.

6    MR. SOLOMON:  Okay.  Let's have marked as the

7  next exhibit a document with the Bates numbers 058291 to

8  293.

9    (Exhibit 16 marked for

10    identification.)

11    MR. SOLOMON:  Q.  The question, after you've

12  had a chance to look at it, will be have you seen it

13  before?

14    A.  I have not seen it before.

15    Q.  And looking halfway down the page, it appears

16  to be an e-mail from Joel Summers.

17    A.  Yes.

18    Q.  To Clifford Godwin and a number of other

19  people.

20    Do you know who Clifford Godwin is?

21    A.  Yes.

22    Q.  And who is he?

23    A.  He's the chief architect of the applications.

24    Q.  And do you know who Joel Summers is?

25    A.  Yes.

77

1    Q.  And who is he?

2    A.  He's in charge of our human resources -- he

3  was in charge then of our human resources payroll

4  products.

5    Q.  And it says, "Cliff, per our conversation, we

6  are working with a critical R11i HR/Payroll customer in

7  the US, Liberty Mutual, who received a commitment from

8  Larry that Development would ensure their ability to go

9  live on January 1.  They did in fact make that date,

10  however, in our daily call today they indicated that

11  both forms and self-service performance is atrocious,

12  degrading over the course of the day as the number of

13  concurrent users increase.  (Performance is good under

14  limited load conditions.)"

15    Do you see that?

16    A.  Yes.

17    Q.  And then it goes on to say, "I am asking for

18  assistance in analyzing the issues and proposing

19  resolution," then miss some language.  Go to the end of

20  the paragraph on the second page, and you'll see it

21  says, "As usual, this is a critical issue, and we are

22  asking for this to be worked on an escalated basis."

23    My question is, are you aware of these issues

24  being raised by Liberty Mutual in or around the date of

25  this e-mail, which is January 3rd, 2001?

78

1    A.  Yes.  I recall the Liberty Mutual issues.

2    Q.  Okay.  And were you involved in responding to

3  the issues raised?

4    A.  I was certainly briefed on their problems, and

5  we fixed the problems.

6    Q.  And do you know when you were briefed?  Was it

7  sometime after this e-mail?

8    A.  I can't tell you the date I was briefed.

9    Q.  And do you remember how you addressed the

10  problem?  What did you do?

11    A.  Again, this is -- pretty standard operating

12  procedure.  They had done an implementation, they were

13  having performance problems.  We have a team of people

14  that do performance tuning.  The performance tuning

15  group went to work and fixed the problem.

16    MR. SOLOMON:  Have marked as the next exhibit

17  a document produced by defendants with the Bates numbers

18  219294 to 296.

19    (Exhibit 17 marked for

20    identification.)

21    MR. SOLOMON:  Q.  When you've had a chance to

22  look at it, I'll ask you if you've seen it before.  In

23  the meantime, it is dated January 5, 2001, e-mail

24  exchanges involving Safra Catz, Carolyn Balkenhol,

25  Sergio Giacoletto, Andrew Derrer, Michele Delvaux and

79

1  Juan Rada, R-a-d-a.

2    Have you seen this before?

3    A.  Not that I recall.

4    Q.  Okay.  Do you know who Alison Hutchinson is?

5    A.  Senior executive at Barclays, I believe.

6    Q.  Have you communicated with her in the past?

7    A.  I don't think I've ever communicated with her,

8  no.

9    Q.  And the reference to "Please find the

10  suggested updated letter from Larry to Alison

11  Hutchinson," do you believe "Larry" refers to you?

12    A.  I do.  I do.

13    Q.  Just go back to you saying you never

14  communicated with her, is that because neither this

15  draft letter ever went out in final signed by you, and

16  there was no other letter?

17    A.  It is possible a letter went out under my name

18  but was drafted by someone in European or UK operations.

19  But I can't ever remember speaking to her or drafting a

20  letter myself.

21    Q.  Okay.  You'll see in the second paragraph it

22  says, "It is important that Larry's letter reach them

23  this week.  If this is not possible a short note stating

24  that it's coming will be helpful.  A meeting around the

25  15, 16 of January is critical as Barclays wants to

80

1  review the situation on January 19th, the next board
2  meeting, and they might decide to revisit alternative
3  software providers.  This is even more critical as
4  yesterday we informed them that our 'get well plan' has
5  slipped significantly."
6       Do you see that?
7    A.  I do.
8    Q.  Do you know what the reference is to the get
9  well plan?
10   A.  It is just a project to usually fix bugs in
11  the software or resolve consulting problems or whatever
12  it is.  If a customer is not happy about something and
13  we're putting a project in place to make them happy.
14   Q.  So this is bad news heaped on bad news then,
15  right?  There is a problem and a get well plan to fix
16  the problem?
17       MR. LINDSTROM:  Objection; mischaracterizes
18  the document.
19       THE WITNESS:  Again, I'm not familiar with the
20  Barclays problems.
21       MR. SOLOMON:  Q.  When we look at the draft
22  letter on the second page, and this would, had you
23  signed it, apparently have you saying -- not saying you
24  said it, because we don't know if you signed it, but you
25  would have, had you signed it, you would have said, "We

81

1  are aware that our UK support and technical operations
2  are inadequate.  We are addressing this in the migration
3  to an improved call handling process, will streamline
4  support for many operational problems and reduce the
5  likelihood of internal communication and escalation
6  problems."
7       Were you aware of those issues as described in
8  this draft?
9    A.  I'm aware in the general sense sometimes our
10  overseas customers prefer communicating directly with
11  California rather than the people in the UK, because the
12  California support teams are closer to the engineering
13  organization.  So again, it is not an uncommon
14  situation.
15   Q.  Okay.
16   A.  I'm not aware specifically what was going on
17  at Barclays.
18       MR. SOLOMON:  Let's go off the record and take
19  a ten-minute break.
20       VIDEOGRAPHER:  This marks the end of tape one,
21  Volume I, in the deposition of Larry Ellison at 11:21.
22  Going off the record.
23       (Recess, 11:21 a.m. - 11:38 a.m.)
24       VIDEOGRAPHER:  On record at 11:38.  This marks
25  the beginning of tape two, Volume I, in the deposition

82

1  of Larry Ellison.
2       MR. SOLOMON:  I suggest we go for an hour and
3  have lunch.
4       MR. LINDSTROM:  That's fine.
5       MR. SOLOMON:  Does that suit you?
6       MR. LINDSTROM:  That's fine.
7       MR. SOLOMON:  Mark the next document produced
8  by defendants 058335 to 338.
9       (Exhibit 18 marked for
10  identification.)
11       MR. SOLOMON:  Q.  While you're looking at it,
12  it's dated Wednesday, January 10th, 2001.  Reflects
13  e-mail exchanges including Cliff Godwin, Phil Tate,
14  eburshti, B-u-r-s-h-t-i.  And copying some other people.
15  And the reference is, "Liberty Mutual Escalation."
16   A.  Okay.
17   Q.  Have you seen this before?
18   A.  Not that I recall.
19   Q.  You see on the first page, there is a
20  reference to you being involved.  It says, "I need your
21  help with getting an on-site to assist with Liberty
22  Mutual.  Liberty Mutual is our fifth largest HR/Payroll
23  customer and went live early this January.  Prior to
24  going live they escalated their situation with 11i to
25  Larry.  Even though they are now live, they have

83

1  considerable performance problems and will not be
2  satisfied until they are resolved due to the negative
3  impact to their business."
4       Do you see that?
5    A.  I do.
6    Q.  And there is reference, as I mentioned, to it
7  being escalated to you.  Do you recall that escalation?
8    A.  Not specifically the event of an escalation.
9  I certainly remember the Liberty Mutual issue.
10   Q.  And in terms of the use of the phrase
11  escalation, escalation means going through various
12  levels as a problem was sought to be resolved?
13   A.  Yes.
14   Q.  And the top escalation would be to you; is
15  that right?
16   A.  That's right.
17   Q.  Then on the second page, you'll see that in
18  the middle of that e-mail exchange involving -- from
19  Joel Summers to Mike Murphy, and other people copied, in
20  the middle of that message it says, "Nevertheless,
21  Liberty is not satisfied that the implementation is
22  complete until the performance issues are resolved."
23       Do you recall being aware around January 9,
24  2001 that Liberty was not satisfied that the
25  implementation of 11i was complete?

84

1    A.  Well, I can't tell -- I don't recall the exact
2    date, but I remember we had performance problems at
3    Liberty Mutual, which we fixed.  That's all I recall.
4        Q.  Do you know when they were fixed?
5        A.  I don't.  But I think it was pretty
6    expeditiously.  Because, as I say, they were live and we
7    did put our best people on it.  And they are a very
8    large customer.
9        MR. SOLOMON:  I've marked as the next exhibit
10   a document with the control numbers 618166 to 169.
11       (Exhibit 19 marked for
12            identification.)
13       MR. SOLOMON: Q.  And while you're looking at
14   it, this is dated Friday, January 12th, 2001.  And it is
15   from James McHugh -- excuse me, from Gayle Fitzpatrick
16   to James McHugh.
17       Have you seen this before?
18       A.  Not that I recall.
19       Q.  See on the first page, James McHugh wrote to
20   Gayle, and there is some language followed by a heading,
21   "Production Demonstration Difficulties," and it goes
22   through six itemized difficulties.
23       Do you see that?
24       A.  I do.
25       Q.  Okay.  Were you aware around January 2001 of

85

1    the product demonstration difficulties as itemized here?
2        MR. LINDSTROM:  Objection; compound.
3        THE WITNESS:  I was aware of some of the
4    specific issues, but not all of them.
5        MR. SOLOMON: Q.  Let's go through number 1.
6    Were you aware of the sales comp difficulty?
7        A.  Not specifically, no.
8        Q.  What about the number 2, mobile field
9    sales, "We are getting our clocks cleaned by Siebel."
10   Do you see that?
11       A.  Yes.
12       Q.  Were you aware of that?
13       A.  Again, not the specific details.  I certainly
14   know that Siebel routinely sold more CRM than we did.
15   They were the number one player in that market.
16       Q.  Number 3, "Certain applications have
17   performance issues during demonstration cycles."  And
18   the reference is to "Planner's Workbench, Self Service
19   Expenses, Web Discoverer."
20       Were you aware of that in January 2001?
21       A.  Again, not those specific details.
22       Q.  And number 4, "BIS."
23       Do you know what that stands for?
24       A.  I think it is Business Intelligence.
25       Q.  And it says, "BIS depending on the type is

86

1    either inconsistent or not available to demonstrate."
2        Were you aware of that issue in January 2001?
3        A.  Not specifically.
4        Q.  And number 5 says, "Although the ADS demo
5    dashboard is good, accessing CRM and ERP requires two
6    separate demonstrations from the dashboard.  Prospects
7    have picked up on this and questioned why?  Are they
8    different systems?  Then they see the different
9    interfaces."
10       Do you know what that refers to?
11       A.  The CRM products were somewhat newer, using
12   somewhat newer technology than the ERP products;
13   therefore, the user interface cosmetically was
14   different.
15       Q.  Were you aware of that issue in January of
16   2001?
17       A.  Yes.
18       Q.  And number 6, it says, "In existing clients
19   who are currently implementing 11i, heavy patching due
20   to product instability is impacting our ability to
21   engage them in additional sales cycles."
22       Were you aware of that in January 2001?
23       A.  I was certainly aware in the early version of
24   11i and all of our products we do a lot of patching and
25   bug fixing, yes.

87

1        Q.  "There are currently four Northeast accounts
2    that are on an implementation triage plan."
3        Do you know what those accounts were?
4        A.  I do not.
5        Q.  "Areas receiving heavy TIR activity thus far
6    are OSO, OSC, Advanced Benefits."
7        Do you see that?
8        A.  I do.
9        Q.  Were you aware of that in January 2001?
10       A.  Not specifically.
11       Q.  And again, we talked earlier about product
12   demonstration issues in earlier 2000.  Are these the
13   same sort of demonstration issues that were confronting
14   you in 2000?
15       A.  Yes.
16       MR. LINDSTROM:  Which?
17       THE WITNESS:  Some of them.  I have to read
18   them one at a time.  Certainly the biggest issue I
19   recall -- again, I wasn't aware of all of them
20   specifically.  This mentions performance issues, that's
21   different than the previous memo.  Some of the things I
22   certainly recall, that is that the demo system did not
23   have the latest production software, which was the
24   biggest complaint.  But, again, so it is back to knew
25   about some of them, not all of them.

88

1    MR. SOLOMON:  Let's have marked as the next
2  exhibit a document produced by the defendants with the
3  Bates range 035038 to 39.
4    (Exhibit 20 marked for
5    identification.)
6    MR. SOLOMON:  Q.  The question will be, once
7  you've had a chance to look at it, do you recognize it?
8    A.  Okay.
9    Q.  Do you recognize it?
10    A.  I don't.
11    Q.  You see that at the top on the first page
12  there is a reference to an e-mail from you to Safra
13  Catz.
14    A.  Yes.
15    Q.  Right?  And it simply says, "Approved, Larry"?
16    A.  Right.
17    Q.  You have no recollection of that?
18    A.  I do not.
19    Q.  You don't dispute though that this is, in
20  fact, a document that you wrote?
21    A.  Well --
22    Q.  To that extent?
23    A.  I wrote "Approved, Larry," yes.  And I read
24  that I'm -- I read the document at the time, I'm sure.
25    Q.  Okay.  And after "Approved, Larry," it says,

89

1  "Safra Catz wrote:  Spoke to Sandy about this.  This is
2  a company in tough financial condition.  Clearly some of
3  our software didn't help."
4    Do you see that?
5    A.  Yes.
6    Q.  Do you recall Safra Catz or anybody else
7  talking to you around this time of Oracle's software not
8  helping this customer?
9    A.  All I know is what I just read in the
10  document.
11    Q.  And then below that there is a reference to
12  "National Pen/Modern Mold."  And I want to skip a few
13  lines to start with, "National Pen is making the
14  following claims:  1.  They were shown features in the
15  software demonstrations that were not available for
16  implementation.  2.  The orders entry software is not
17  suitable for a high-volume order entry environment like
18  theirs.  3.  The software performance and flow causes
19  them extreme difficulty in processing orders.  In their
20  minds they are worse off now than before the
21  implementation.  4.  They claim that the implementation
22  was flawed in some way.  They also claim that they were
23  'unaware' of and did not agree to certain consulting
24  engagement decisions that were made."
25    Do you see that?

90

1    A.  I do.
2    Q.  Were you aware around August of 2000 that
3  National Pen was making the following claims with
4  respect to Oracle's software?
5    A.  I really don't recall anything about National
6  Pen, other than what I learned in this document.
7    Q.  But, again, as I think you testified, you
8  don't dispute you would have read this around the time?
9    A.  That's correct.
10    Q.  And then on the second page, I'm looking at
11  where it has a heading, "Justification."  And it says,
12  "National Pen (Modern Mold) is a privately held general
13  business account located in San Diego.  The customer is
14  extremely upset with the gap between their expectations
15  and actual business results of the software
16  implementation performed by Oracle.  National Pen is
17  also in extreme financial difficulty.  They have lost
18  their financial backing and are running the business
19  with cash from operations.  They claim the
20  implementation of the Oracle Applications has been a
21  major factor in their business decline."
22    Do you see that?
23    A.  I do.
24    Q.  Do you have any current recollection of those
25  facts?

91

1    A.  No, not at all.
2    Q.  And you don't know what, if anything, was ever
3  done to resolve the concerns?
4    A.  I have no idea.
5    Q.  Back to the first page.  This is an e-mail
6  from you.
7    Are you aware that in this litigation there
8  are some documents that are sourced to you?  Do you
9  understand what I'm saying when I say that?
10    A.  No, I don't.
11    Q.  Do you have an understanding what your files
12  are?
13    A.  My files?
14    Q.  Right.
15    MR. LINDSTROM:  As they've been produced in
16  the litigation?
17    MR. SOLOMON:  Correct.
18    THE WITNESS:  Yes.
19    MR. SOLOMON:  Q.  And what's your
20  understanding?
21    A.  Copies of my e-mails and other documents
22  that -- hard copy, hard drive documents that I was asked
23  to retain at the time the suit was initiated.
24    Q.  And who asked you to retain documents when the
25  suit was initiated?

92

1   A.  Our legal department.
2   Q.  And what did you do to comply with that
3   request?
4   A.  I stopped deleting all e-mails and all other
5   files; though, virtually everything I do is in e-mail.
6   Q.  And did you do that immediately when you got
7   the instruction?
8   A.  I stopped deleting all business e-mails
9   immediately, yes.
10   Q.  And aside from stopping deleting business
11   e-mails, what else did you do?
12   A.  I didn't throw away any other files.
13   Q.  Aside from not throwing away files and not
14   deleting e-mail, did you affirmatively retrieve any
15   information yourself?
16   MR. LINDSTROM:  Objection; vague and
17   ambiguous.
18   THE WITNESS:  I can't answer?
19   MR. LINDSTROM:  You may answer if you
20   understand.
21   MR. SOLOMON:  Lawyers often don't understand
22   what the witness clearly does understand.
23   THE WITNESS:  I relied on the legal department
24   to go through my -- I was asked to look for documents.
25   I really wasn't exactly certain what was relevant, what

93

1   wasn't relevant.  I thought the safest thing for me to
2   do was turn everything over to the legal department and
3   let them decide what was relevant or not.
4   MR. SOLOMON:  Q.  And when you say turning
5   everything over, what did you literally turn over?
6   A.  All of my -- they got access to all of my
7   e-mail, I believe they got access to all of my
8   computers, and looked at the hard drive, had experts
9   come out.
10   But I'm not exactly -- I'm not 100 percent
11   sure of what they did.  In general that's what they did.
12   Q.  Now, I know that, for example, that you have
13   computers on your boats.
14   A.  Yes, I do.
15   Q.  Were those actually taken by legal and
16   preserved?
17   A.  I don't know.  If I change -- I can tell you
18   my practice today is if a computer is upgraded, that
19   computer then goes to the legal department for storage.
20   I'm not sure they took the computers, in other
21   words, took them, because -- but they made periodic
22   visits to those computers and searched the hard drive
23   for information.
24   Q.  So people from your legal department went onto
25   your boats and looked at your computers and did

94

1   something, whatever it was, to preserve what was on
2   those computers on your boats?
3   A.  I believe so.  I'm not sure if they were from
4   the legal department.  They were either a technical
5   representative working on behalf of the legal
6   department, or someone from the legal department did
7   that, yes.
8   Q.  Do you know when that happened?
9   A.  I don't know when they did that.
10   Q.  Is there a record of that happening?
11   A.  I don't know.
12   Q.  If I wanted to know, as obviously I do, when
13   that happened, how would I find out?
14   A.  I would ask one of our lawyers, I guess.
15   Dorian is not here.  But I believe Dorian was in charge
16   of all that.
17   Q.  Now, apart from the computers on your boat,
18   you had computers at your homes?
19   A.  Yes.
20   Q.  Is it the same answer with respect to the
21   computers at your homes?
22   A.  Yes.  As of getting the instruction, do you know how
23   many e-mails you had in your computer or computers?
24   A.  No.  No idea.
25   A.  No.  No idea.

95

1   Q.  Did you have a practice in 2000, first of all,
2   did you have a practice in 2000 of purging or deleting
3   e-mail?
4   A.  Periodically -- I would keep everything but
5   spam, pretty much everything for long periods of time.
6   And then I would spend several hours -- you know, once a
7   year, again, a generalization, I'm not sure, once a year
8   I go through and do a cleanup.
9   Q.  And do you know if you did that in 2000?
10   A.  I don't.
11   Q.  And do you know if you did that in 2001?
12   A.  Certainly after the instruction, I stopped all
13   cleanup activity.
14   Q.  All right.  Now, this first e-mail is dated
15   August 5th, 2000, and it is from you.
16   MR. LINDSTROM:  Referring to Exhibit 19 again?
17   MR. SOLOMON:  Correct, yes.
18   Q.  And it is from you.  And it was not produced
19   from your files.  It was produced from somewhere else.
20   Can you tell me why this e-mail was not
21   produced from your files?
22   A.  I cannot.
23   Q.  Let me ask you another question about this
24   e-mail.  If I wanted to somehow access this e-mail from
25   your file, is there any disaster recovery tape or backup

96

1  tape at Oracle that would permit me to do so?
2      A.  I'm not sure what our -- what our document
3  retention tapes, being documents, what our backup tape
4  retention cycle is for those documents.  I do know now,
5  though I don't know when it was initiated, literally
6  none of my e-mails are deleted.  All of my e-mails go
7  into a special server that the legal department keeps.
8  So I'm unable to delete anything.  That's been true for
9  several years.
10         MR. LINDSTROM:  He's asking a different
11  question.
12         THE WITNESS:  Okay.
13         MR. SOLOMON:  Q.  You don't believe that was
14  the case in 2000 or 2001; do you?
15      A.  No.  I'm pretty sure it was not.  It was
16  subsequent to me receiving that retention -- that
17  retention notice.  And I'm also saying -- I answered too
18  many things with that one answer.  You're saying is
19  there a backup tape where you could find this in my
20  e-mail.  And the answer is, I don't know, because I
21  don't know what our -- how old our backup tape, our
22  e-mail backup tapes are.
23      Q.  Okay.  Have you made any attempt to retrieve
24  through backup tapes any information for production in
25  this lawsuit?

97

1      A.  Me personally?
2      Q.  Yes.
3      A.  No.  I've relied on our legal department to do
4  all the production.  They've had the access to our
5  technical people.
6      Q.  In 2000, if you deleted an e-mail and did no
7  more, would that stay on a server somewhere?
8         MR. LINDSTROM:  No foundation.  Calls for
9  speculation.
10         You may answer, if you know.
11         THE WITNESS:  Okay.  There are different kinds
12  of deletes.  There is a delete to get it off the Window
13  on your screen, but it is still actually in your file,
14  desktop files and on the server.  There is another
15  delete that will actually purge it from your desk top
16  files, but it will still be on the server and backup
17  tapes.
18         Eventually if you do the more complete delete,
19  I think it is called a purge, it will still be on the
20  backup tapes for some period of time.  It depends on how
21  long those backup tapes are retained.
22         MR. SOLOMON:  Q.  What if you don't do the
23  purge, but you just do the delete, how long would it
24  simply sit on the server?
25      A.  Forever.

98

1      Q.  Did you often purge as opposed to just delete?
2      A.  Every time I do my cleanup, I did deletes plus
3  purges, to free up the disk space.
4      Q.  Is there any way of identifying when you did
5  those cleanups?
6      A.  It would depend on the availability of the
7  backup tapes, which I'm not aware of.
8      Q.  There wouldn't be a notation anywhere, as far
9  as you know, that I cleaned it out today or whatever?
10      A.  No.
11         MR. SOLOMON:  I marked as the next exhibit a
12  document produced by the defendants with the numbers
13  02544 to 547.
14             (Exhibit 21 marked for
15             identification.)
16         MR. SOLOMON:  Q.  And when you've had a chance
17  to look at it, let me know whether you recall seeing
18  these exchanges before.
19      A.  Okay.
20      Q.  Have you seen this before?
21      A.  I believe I have, though I don't recall it
22  specifically.
23      Q.  You'll see on the first page, the first e-mail
24  exchange is dated Wednesday, September 6, 2000.  It is
25  from Ron Wohl to you and others.  And the first message

99

1  is, "This past weekend we had three more 11i go lives,
2  bringing us up to 15."
3         Do you see that?
4      A.  I do.
5      Q.  And on the next page, there is another
6  exchange dated, I believe, 28th of August 2000.  And if
7  you go to the bottom, it says, "Ron, I would like to
8  know precisely which modules are running in each
9  customer.  We have a hard time to believe they have ERP
10  and CRM running together."
11         Do you see that?
12      A.  Yes.
13      Q.  And then the response appears to be from Ron
14  Wohl, "Mary Ann has the detail.  I believe the first ten
15  customers are running various parts of ERP.  I'm not
16  sure if any are running CRM components yet."
17         Do you see that?
18      A.  Yes.
19      Q.  And then above that, a message from Mary Ann,
20  "I'm not aware of any customers who are live on CRM at
21  this time."
22         Do you see that?
23      A.  I do.
24      Q.  Were you aware as of August 2000 that there
25  were no live customers on CRM?

100

1    A.   Again, I don't specifically recall, but I
2    certainly knew in general that CRM was a new business
3    for us.  So we had been in ERP for a decade, and CRM was
4    brand-new.  Not only was 11i a new version of our ERP
5    products, it was also an all-new -- it was our
6    introduction into the CRM business largely, and that we
7    had a lot more ERP customers than we had CRM customers.
8    Q.   And again, this is -- these exchanges involve
9    you and your e-mail address.  But this document, again,
10   has not been produced.  The document pertaining to your
11   e-mail address has not been produced from your files.
12        Is it your testimony that you don't know why
13   that's the case?
14   A.   That's correct.
15   Q.   And you think Ms. Gray is probably the only
16   person who can tell me; is that right?
17        MR. LINDSTROM:  Objection; calls for
18   speculation, mischaracterizes his testimony.
19        THE WITNESS:  As I say, the document retrieval
20   and production was done by our legal department, so they
21   know a lot more about it than I do.
22        MR. SOLOMON:  I meant Ms. Daley.
23        Have marked as the next exhibit a document
24   produced by defendants with the Bates numbers 020631
25   through 634.

101

1        (Exhibit 22 marked for
2           identification.)
3        MR. SOLOMON:  Q.  And let me know if you've
4    seen this before, when you've had a chance to look at
5    it.
6    A.   Again, I believe I have.  I'm on the
7    distribution list, although I don't recall it
8    specifically.
9    Q.   And with respect to the fact that this didn't
10   come from your files, again, you would have no knowledge
11   as to why?
12   A.   No.
13        MR. LINDSTROM:  Again, you're making that
14   representation to him?
15        MR. SOLOMON:  I'm making that representation.
16        Let's have marked as the next exhibit a
17   document with a Bates range 013717 through 720.
18        (Exhibit 23 marked for
19           identification.)
20        THE WITNESS:  Okay.
21        MR. SOLOMON:  Q.  Do you recognize this?
22   A.   No, I do not.
23   Q.   Do you dispute receiving this in or around
24   October of 2000?
25   A.   No.

102

1    Q.   It is -- well, at the very top of the first
2    page there is a communication from Jay Nussbaum to
3    Police, RPOLICE or Police.
4        It says, "Ron, fyi.  Didn't know who should
5    see this."
6        Do you see that?
7    A.   I do.
8    Q.   And below that there's a message from George
9    Roberts to Gayle Fitzpatrick, and it cc's a number of
10   people including you?
11   A.   Yes.
12   Q.   Do you see that?
13   A.   I do.
14   Q.   The first message below that is, "I've asked
15   the team to get more specific on our ADS systems issues.
16   Below is the Majors detail.  I know it goes against our
17   message, but do we need to stop doing demos at the
18   clients' site wherever possible and pull them into the
19   offices for better integrity?  As we stated in our
20   meeting last week, these difficulties are now common
21   knowledge by our competition, and they position our
22   inability to competently pull these off as 'proof' that
23   the e-Business suite is not a reality."
24        Do you see that?
25   A.   I do.

103

1    Q.   Were you aware of that sentiment being
2    expressed internally at Oracle in or around October of
3    2000?
4    A.   Well, I am aware that we had a new demo system
5    where we demonstrated the product not in our offices,
6    but at the client offices.  That's what this is
7    referring to.
8        And when you demo at the client offices you're
9    going across the public Internet on a client computer.
10   And making that network connection -- we were the only
11   ones to actually do this kind of demonstration where we
12   went to the client office directly, they connected to
13   our servers via a network.  And this is a new way of
14   demoing our products, it was a new approach.  And we
15   were always kind of pushing that we were a modern
16   Internet company.
17        And we were having a good deal of difficulty
18   making the demonstrations work across the Internet.  I
19   think if you read the specific examples in here, the
20   bulk of the problem doesn't have so much to do with our
21   software, it has to do with the fact that working in
22   client offices and getting it to work across the public
23   Internet was very, very challenging.  And when the
24   customer saw bad performance, they didn't know it was
25   really a network issue, as opposed to a software issue.

104

1  I think that is the bulk of what is said in here.

2     Q.  I understand.  But, again, if you could just

3  focus on the question.

4        And the question was, were you aware of those

5  concerns being expressed internally at Oracle at the

6  time?

7     A.  I was certainly aware that we had problems

8  with our demonstration system.

9     Q.  Then let's go on to page 2.  And at the top of

10  the page it says, "The problems fall into three

11  categories:  1) system stability and performance, 2)

12  product integration and stability, and 3) deviation from

13  the ADS scripts.  The system stability and performance

14  issues and our inability to show an integrated demo

15  leaves doubt in our customers' minds that Oracle can

16  show or deliver the e-Business solution."

17        And the question is, were you aware of those

18  concerns being raised internally at Oracle in 2000?

19     MR. LINDSTROM:  Objection; compound.

20     THE WITNESS:  I certainly was aware we had a

21  new demonstration system.

22     MR. SOLOMON:  Q.  That's not what I'm asking.

23     And there were problems with it.

24     Q.  Okay.  And with respect to the problems

25  identified here, system stability and performance,

105

1  product integration and stability, and the deviation

2  from the ADS scripts, were you aware of each of those

3  issues being expressed internally at Oracle in October

4  of 2000?

5     A.  If you read this memo in its entirety, you

6  read the different examples, you will see that the bulk

7  of these examples have to do with the fact that we're

8  doing it a client site rather than in our office, and

9  they are network related issues.

10        However, I certainly knew that 11i was a new

11  product, and the first version of a new product will

12  have more bugs than later versions.

13     Q.  I understand that.  And as we get shorter in

14  time, I'm going to have to cut you off more and more.

15     A.  Sure.

16     Q.  Because I need answers to my questions.

17     A.  Okay.

18     Q.  If you skip a paragraph, and I'm talking now

19  about the paragraph beginning with "Detail below."

20     A.  Okay.

21     Q.  And I'm halfway through that paragraph, the

22  "The ADS support team has done a great job in trying to

23  resolve some of these issues with us, but I'm not sure

24  they are equipped to deal with the complexity of the

25  solutions we need to show the customer.  The end result

106

1  is a poor showing in front of the customer and we need

2  to be able to demonstrate that our e-Business solution

3  and architecture are better performing than our

4  competitors, particularly those who bring in their own

5  servers."

6        Were you aware of that being expressed in

7  October of 2000?

8     A.  I was aware of it being expressed.  I didn't

9  agree with the approach, the solution they proposed.

10     Q.  Okay.  Then there is reference to a

11  demonstration at Pier One, a demonstration at Litton, a

12  demonstration at Clopay, at Warner Brothers and

13  McGraw-Hill, J&J, Schreiber Foods.

14        Were you aware of demonstrations being

15  attempted at those clients in and around the fall of

16  2000?

17     MR. LINDSTROM:  Objection; compound.

18     THE WITNESS:  Not specifically.

19     MR. SOLOMON:  Q.  What about Pier One, were

20  you aware of that?

21     A.  Not specifically.

22     Q.  What about Litton?

23     A.  Not specifically.

24     Q.  Clopay?

25     A.  Not specifically.

107

1     Q.  Warner Brothers?

2     A.  No.

3     Q.  McGraw-Hill?

4     A.  Nope.

5     Q.  J&J?

6     A.  Nope.

7     Q.  Schreiber Foods?

8     A.  No.

9     Q.  If you go to Clopay, it says, "The first

10  Clopay demo was held in the Oracle office in Cincinnati

11  with our internal web connection."

12        Do you see that?

13     A.  Yes.

14     Q.  "Response time was awful.  Mike Metcalf

15  described it as worse than 2400 baud."

16        Do you know what that means?

17     A.  Yes.

18     Q.  What does that mean?

19     A.  It is an old-fashioned, very slow teletype

20  connection.

21        It's just his way of emphasizing how slow the

22  connection was.

23     Q.  "In addition, drop ship functionality was not

24  working and fake data was required."

25        Do you know what that means?

108

1   A.  I do not.

2   Q.  And you don't recall around the fall of 2000

3   being made aware of that as a result of getting this

4   e-mail?

5   A.  Not specifically, no.

6   Q.  If you look at J&J on page 13719, you'll see

7   it says, "Presented financials to J&J at the Oracle

8   Iselin office."

9       Do you see that?

10   A.  I do.

11   Q.  "With an audience in attendance of over 20,

12   one hour into the demo we experienced extreme

13   performance degradation (latency was well over 250ms).

14   Jim McHugh immediately called the ADS hotline.  ADS said

15   the issue was not with the data center and referred him

16   to the Corporate Help Desk.  Upon calling the Corporate

17   Help Disk, Jim was immediately placed on hold for

18   several minutes before the call was handled.  Both ADS

19   and the Corporate Help Desk said there was nothing they

20   could do.  Meanwhile, the prospect, J&J, was asking if

21   the demo performance was illustrative of expected post

22   implementation performance.  After several additional

23   minutes the Corporate Help Desk issued a P1.  Issues

24   were resolved after one hour of SC dancing/powerpoints

25   waiting for the situation to improve."

109

1       Do you recall those issues being raised with

2   you in the fall of 2000?

3       MR. LINDSTROM:  In conjunction with the J&J

4   presentation?

5       MR. SOLOMON:  Correct, yes.

6       THE WITNESS:  No.

7       MR. SOLOMON:  Q.  Let's go over to the last

8   page, which is 013720.  There is a summary.  You see

9   that?

10   A.  I do.

11   Q.  Okay.  It says, "Our demo

12   deployment/methodology strategy is the right one,

13   however, the lead time between the release of our

14   products to the market and our ability to show these to

15   our customers is hurting the business.  The

16   uncontrollable elements between the data center and demo

17   site need to be addressed.  These elements, equipment,

18   demo laptops, connection method, port restrictions, poor

19   modem speeds and Oracle's own internal network and

20   office performance need to be performing controllable

21   and quantifiable elements to ensure a favorable customer

22   perception of our architecture and applications

23   performance.  The need for an integrated demo is high.

24   I know that it's coming soon, but we'd have to stall our

25   scheduled demos to customers so that we can show them

110

1   their business requirements in the demo.  Our

2   competitors know that we're struggling with this and do

3   an outstanding job of setting up customers to see a

4   'live integrated demo' from Oracle.  Once the integrated

5   demo environment is available, we have to be able to

6   customize the demos to meet our customers' requirements.

7   This is key to our success in Majors.  We can't keep

8   going back to the customers to ask for a 'do-over' when

9   it comes to demos.  This has been the norm rather than

10   the exception of late."

11       Do you see that?

12   A.  Yes.

13   Q.  In the fall of 2000, were you aware of the

14   issues as expressed in that summary?

15       MR. LINDSTROM:  Objection; compound.

16       THE WITNESS:  Again, in a general sense, I was

17   certainly aware as we went to this global demo system

18   across the network, whenever you introduce a new piece

19   of technology, there are problems.  And there were

20   specific problems in network performance.  So, in a

21   general sense I was aware we had problems bringing up

22   our global demo system.

23       MR. SOLOMON:  Q.  And, again, this is an

24   e-mail with your address on it.  You can't tell me why

25   it was not produced from your files, can you?

111

1   A.  I cannot.

2       MR. SOLOMON:  I've marked as the next exhibit

3   a document produced by the defendants, Bates number

4   014244 and 45.

5       (Exhibit 24 marked for

6           identification.)

7       MR. SOLOMON:  Q.  If you take a look at it,

8   please, then let me know if you've seen it before.  Do

9   you recognize this?

10   A.  Yes.

11   Q.  And it's a memo to you from Mike Rocha?

12   A.  Yes.

13   Q.  Copying some other people, dated October 12th,

14   2000?

15   A.  Yes.

16   Q.  And there is a reference to Carly Fiorina?

17   A.  Yes.

18   Q.  You testified earlier, I thought, that you

19   didn't negotiate with Carly --

20       MR. LINDSTROM:  Objection.

21       MR. SOLOMON:  Q.  -- in the fall of 2000; is

22   that right?

23       MR. LINDSTROM:  Objection; mischaracterizes

24   his testimony.

25       THE WITNESS:  I have never negotiated a

112

1      transaction with Carly Fiorina.

2          MR. SOLOMON: Q.  All right.  It says here

3      there is an understanding you were meeting with her the

4      next day.

5          A.  Yes.

6          Q.  Did you meet with her?

7          A.  Yes.

8          Q.  And it wasn't to negotiate any transaction?

9          A.  No.

10         Q.  What was the meeting about?

11         A.  Just general, you know, general climate --

12     general climate of business for both Oracle and HP and

13     how we might better work together.

14         Q.  But not to the level of a transaction?

15         A.  No.

16         Q.  So just general macro type things?

17         A.  It is my practice not to negotiate business

18     transactions with any of our customers.

19         Q.  Okay.  Just looking at point 1, it says, "HP

20     isn't happy with the quality of the CRM products.  While

21     the lead sharing system is operational, HP believes that

22     they received an uninstallable product and were asked to

23     pay consulting fees to make it work.  They have withheld

24     payment of consulting fees.  Mark is directly involved

25     in the account.  HP will ask that you get involved."

113

1          Do you see that?

2          A.  Yes.

3          Q.  Do you recall being made aware of that around

4      the time of this e-mail?

5          A.  Yes.

6          Q.  Okay.  And did HP ask that you get involved?

7          A.  No.

8          Q.  So that was a prediction that just didn't come

9      true?

10         A.  That's correct.

11         Q.  Okay.  Did you discuss the quality of the CRM

12     products with Carly Fiorina when you met her the

13     following day?

14         A.  No.

15         Q.  If you go to point 4, it says, "HP expects

16     that we will purchase the hardware required to make our

17     build and integration environments comparable to Sun,

18     (power unit equivalent).  I'm sitting on a $1.7 million

19     request for the 9i line (complete with OPS).  My opinion

20     is based on the Wall Street Journal article Bill Russell

21     feels that he was screwed by us, therefore, he isn't

22     willing to be reasonable on the development

23     environments.  Given the size of our software sales

24     opportunity, you may want to agree that we'll purchase

25     the hardware.  We need it."

114

1          Do you see that?

2          A.  I do.

3          Q.  Do you recall being made aware of that as a

4      result of getting this e-mail in October of 2000?

5          A.  Yes.

6          Q.  Were you aware of that outside of receiving

7      this e-mail, or is this the vehicle by which you became

8      aware?

9          A.  No.  I certainly knew about a general

10     expectation.  HP certainly would like to sell us

11     hardware.  In a general sense, they are always trying to

12     sell us more hardware and we were always trying to sell

13     them software.

14         Q.  And did you hear, other than from this e-mail,

15     of the concerns HP had with the CRM?

16         MR. LINDSTROM:  We're back to item 1 now?

17         MR. SOLOMON:  Back to item 1, yes.

18         THE WITNESS:  I could just tell you in a

19     general sense that -- you know, I can't say this

20     specific document made me aware exactly at this time.

21     But HP is a big Siebel customer, and we were trying to

22     get our CRM in, you know, to displace Siebel, and it was

23     just a hard road.

24         Siebel is the market leader in this.  Their

25     products are quite good.  And we had a hard time

115

1      competing with them at HP and other places in CRM.

2          MR. SOLOMON: Q.  And, again, this would have

3      been in your e-mail file, and you can't explain why it

4      wasn't produced from your source in this litigation?

5          MR. LINDSTROM:  Objection; mischaracterizes

6      the testimony as to what would or would not have been in

7      his e-mail file at this time.

8          MR. SOLOMON: Q.  Let's back up.

9          This would have been in your e-mail in October

10     of 2000; true?

11         A.  True.

12         Q.  And you can't explain why it was not

13     retrievable and retrieved in March of 2001 and produced

14     in this litigation from your file?

15         A.  I cannot.

16         MR. SOLOMON:  Have marked as the next exhibit

17     a document produced by Oracle with the Bates number

18     039546.

19         (Exhibit 25 marked for

20         identification.)

21         MR. SOLOMON: Q.  Let me know if you've seen

22     it before when you've had a chance to look at it,

23     please.

24         A.  Okay.

25         Q.  Have you seen this before?

116

1    A.  Yes.  Yes, I have.

2    Q.  And you recognize it as an e-mail you received

3  on or around October 12th, 2000?

4    A.  Yes.

5    Q.  And from Sandy Sanderson?

6    A.  Yes.

7    Q.  And it says "Larry, please see the e-mail

8  below from our account team and the client.

9  Ingersoll-Rand has been a big supporter of Oracle, this

10  should have been an easy sale.  We have $2.5 million in

11  forecasts with $5 million in upside for IR.  The $2.5

12  million is for db, upside is apps.  They are now

13  seriously considering holding off on the db this quarter

14  because of the apps issues."

15      Do you see that?

16    A.  I do.

17    Q.  Were you aware of that being a, I won't say

18  threat, but a suggestion, at least, from Ingersoll-Rand

19  in or around October of 2000?

20    A.  I don't -- clearly I was made aware of it in

21  this e-mail note, but I don't recall it.

22    Q.  But you don't dispute you were aware of it

23  then?

24    A.  No.

25    Q.  And then you testified earlier that

117

1  Ingersoll-Rand is now a happy customer?

2    A.  Yes.

3    Q.  Is that right?  And isn't it true that you had

4  to pay Ingersoll-Rand $2 million to placate it with

5  respect to its apps issues?

6    A.  I don't recall.

7    Q.  You don't dispute that?

8    A.  I don't.  I have no idea.

9      MR. SOLOMON:  Have marked as the next exhibit

10  a document produced by Oracle with a Bates range 159545

11  through 575.

12      (Exhibit 26 marked for

13       identification.)

14      MR. SOLOMON:  Q.  You see this is entitled,

15  "FY 02 Consulting Budget Review," and is dated April 3,

16  2001?  And just so you know, by all means flip through

17  it, I'm only going to be asking you questions at least

18  right now about page 169568.

19      MR. LINDSTROM:  So that would be page 24 of

20  the PowerPoint?

21      MR. SOLOMON:  That's correct.

22      MR. LINDSTROM:  Thank you.

23      THE WITNESS:  What is the date of this

24  document again?

25      MR. SOLOMON:  Q.  On the front it says --

118

1    A.  April 13th, 2001.

2    Q.  Yes.

3    A.  Okay.

4    Q.  And this is just for the consulting

5  organization; correct?

6    A.  I believe so, yes.

7    Q.  Looking at 159568, which is page 24 of the

8  presentation, and it talks about, "R11i Product Issues

9  have resulted in a 2 point deterioration in fiscal year

10  01 Margin Percentage."

11      Do you see that?

12    A.  I do.

13    Q.  Then there is some figures then an asterisk,

14  then it talks about -- it says the following, "Largest

15  customers include Paxar ($2M), Ingersoll-Rand ($2M),

16  Xerox ($1M), Greenway Medical ($1M), Honeywell ($1M),

17  and Franklin Covey ($1M).

18      Do you see all that?

19    A.  No, I don't.  Page 25 -- are we on the same

20  page?

21    Q.  Maybe not.

22    A.  We're not on the same page.  That's page 24 of

23  the presentation.

24    Q.  Did I say 25?  I apologize.

25      MR. LINDSTROM:  And I think counsel -- go

119

1  ahead.  If you will, I think he's referring to the

2  asterisk at the bottom of the page.

3      THE WITNESS:  Because that's not consistent

4  with the next page of the presentation.

5      MR. LINDSTROM:  Now that we have the right

6  page, why don't you repose the question.

7      THE WITNESS:  It is interesting that the

8  document, page 24, says, "$2M Ingersoll-Rand," and here

9  it says Ingersoll-Rand is less than a million.

10      MR. LINDSTROM:  There is no pending question.

11      THE WITNESS:  Okay.  I just noticed they are

12  not consistent.

13      MR. SOLOMON:  This is your document.

14      THE WITNESS:  Not mine personally.  Someone at

15  Oracle wrote this document.  Okay.

16      MR. SOLOMON:  Q.  So, anyway, I was looking at

17  page 24 of the presentation and I was -- I referenced

18  the 2 point deterioration in margin as a result of R11i

19  product issues.  Then I was going to the asterisk where

20  it says, "Largest customers include," then we went

21  through the dollar amounts.

22      This appears, does it not, to reflect the fact

23  that Oracle had to make concessions to those customers

24  with respect to the implementation of 11i; is that fair?

25    A.  Go on.  But it was a new product.  New product

120

1    takes more consulting to deliver.  The customers
2    sometimes get upset if the size of the consulting bill
3    is too big, because the consultants are learning about
4    the products as they go, and it is not uncommon for it
5    to have to make concessions under those circumstances.
6        Q.  Okay.  So you agree?
7        A.  Yes.
8        MR. SOLOMON:  I've marked as the next exhibit
9    a document produced by defendants with a Bates range
10   018737 to 742.
11           (Exhibit 27 marked for
12            identification.)
13       MR. SOLOMON:  Q.  Take a chance to look at it,
14   then tell me if you recognize it, please.
15       A.  Okay.
16       Q.  Do you recognize it?
17       A.  I do.
18       Q.  And you received it on or around November 8th
19   of 2000?
20       A.  Parts of it, yes.
21       Q.  If you go to the third page of the document,
22   which is 018379, it is addressed to you, Larry Ellison?
23       A.  Yes.
24       Q.  And it is signed Terry Conner, Senior Vice
25   President and CIO, President of Information Systems.  Do

121

1    you see that?
2        A.  I do.
3        Q.  The last page.
4        It appears it was also perhaps signed by Helen
5    Sayles, Senior Vice President of Human Resources.
6        Do you see that on the right bottom?
7        A.  I do.
8        Q.  Do you know those individuals?
9        A.  I do not.
10       Q.  Did you read this e-mail when it was sent to
11   you?
12       A.  I did.
13       Q.  And you'll see that after identifying the
14   company, the writers say -- I'm on page 018739 --  "We
15   are writing this to bring to your attention what we
16   consider a major breach of promise from Oracle and in
17   the hope that we can yet recover to a mutually
18   acceptable outcome."
19       Do you see that?
20       A.  I do.
21       Q.  It goes on to say, "Having gone through
22   extensive review of alternatives, we purchased the
23   Oracle 11i Human Resources Management System in late
24   1999.  Our decision was based on your team's explicit
25   commitment to delivery of a product that would perform

122

1    as intended in a time frame that would allow for smooth
2    implementation - including all of the essential testing
3    required.  We believed that purchase of the HRMS would
4    not only allow us to fulfill a critical internal need,
5    but would also allow us to evaluate the technology
6    platform, technical capabilities, service delivery and
7    support as we look to the future technology platforms
8    required to support our multiple business units.
9    Unfortunately, based on our most recent project review
10   with our team today, our confidence in both the quality
11   of the product and in Oracle's ability to support us in
12   meeting those objectives is so low that we feel that
13   without a major change on your part, the project has
14   very little chance of success.  To put it bluntly, we
15   have encountered multiple software quality problems and
16   we have struggled to get appropriate support and
17   response to our issues.  The situation is dire, and
18   absent a concerted effort on your part, we now stand in
19   great jeopardy on this implementation.  The success of
20   this project is crucial to Liberty Mutual's business
21   plans for 2001 and represents a significant investment
22   with Oracle."  And it goes on.
23       Do you remember reading that in or around
24   November 2000?
25       A.  I sure do

123

1        Q.  Then on the next page they take you through
2    problems they've been experiencing.  And they say, "The
3    base system was promised by 3/31/00 - it was delivered
4    on 6/2/00.  We were unable to run a first test payroll
5    until 7/26/00.  We have continually faced serious issues
6    with your technical assistance request process, with
7    multiple TARs remaining dormant while we have tried to
8    tried to escalate the issues within your organization.
9    When escalated, the issues appear to get a flurry of
10   action, but the number of issues do not appear to
11   diminish, and your customer support process has not been
12   effective in resolving flaws in what would appear to be
13   basic functionality.  We have been working with people
14   over 9 different time zones - testing multiple potential
15   solutions suggested by Oracle, only to find the
16   solutions do not work."  It goes on to detail their
17   problems.
18       Do you recall reading this in November of
19   2000?
20       A.  Yes.
21       Q.  What was your reaction?
22       A.  This is an escalation that we had to make sure
23   our best people in development and engineering were
24   aware of it and worked to fix the problem.
25       Q.  On the first page now, it says, "As you can

124

1  see from the attached, Liberty Mutual has escalated
2  their significant dissatisfaction with Oracle HRMS to
3  Larry.  This will be a topic of discussion tomorrow."
4      Do you know what meeting is being referenced
5  when it says, "topic for discussion tomorrow"?
6    A.  I think I called for a meeting.  We have
7  regular -- I chair regularly scheduled engineering
8  meetings both for applications and database technology,
9  and I think it was the regularly scheduled -- I wanted
10  to put it on the agenda.  When I said "Joel, let's
11  review this tomorrow," my comment was to put it on the
12  agenda of our regularly scheduled applications meeting.
13      MR. SOLOMON:  Okay.  Let's take a five-minute
14  break.  Actually, you know what, let's go for lunch.
15      MR. LINDSTROM:  That's fine.
16      VIDEOGRAPHER:  This marks the end of tape two,
17  Volume I, in the deposition of Larry Ellison.  At 12:50
18  going off the record.
19      (Lunch recess - 12:50 p.m. - 1:36 p.m.)
20      VIDEOGRAPHER:  On record at 1:36.  This marks
21  the beginning of tape three, Volume I, in the deposition
22  of Larry Ellison.
23      MR. SOLOMON:  I want to have marked as the
24  next exhibit a document produced by defendants with
25  control number 024862 through 864.

125

1      (Exhibit 28 marked for
2        identification.)
3      MR. SOLOMON:  Q.  And if you just let me know
4  when you've had a chance to look at it, if you recognize
5  it, please.
6    A.  Okay.
7    Q.  Do you recognize it?
8    A.  Not really.
9    Q.  Okay.
10    A.  Not specifically.  I recognize the general
11  dispute between the two parties, but --
12    Q.  Okay.  Who are the two parties you're
13  referring to?
14    A.  Ron Wohl and Mark Barrenecha.
15    Q.  And one was responsible for ERP and the other
16  for CRM; is that right?
17    A.  That's correct.
18    Q.  You don't dispute receiving this around the
19  date of the document where you were an addressee, which
20  is 15th of November 2000?
21    A.  I do not.
22    Q.  And what was the dispute?
23    A.  Ron was complaining about Mark, you know,
24  Mark's code, and Mark was complaining about Ron's code.
25    Q.  Is that a problem, or was that a problem that

126

1  confronted Oracle?
2    A.  Still to some degree confronts Oracle, that
3  groups are interdependent upon one another.  They will
4  say:  I'm late because the database team didn't -- it
5  wasn't my fault, it was his fault that I was late.
6      So a lot of our software is interdependent, so
7  our applications, for example are built on top of our
8  database and on top of our middleware, and sometimes
9  there will be finger pointing to some people.  Sometimes
10  people prefer to assign blame to someone other than
11  themselves or their own group.
12    Q.  This -- when I say "this" I'm looking at the
13  e-mail dated November 15th, 2000, second -- two-thirds
14  of the first page, this refers to the internal roll-out
15  of 11.5.2?
16    A.  It does.
17    Q.  And then on Thursday, November 16th, 2000,
18  there is an e-mail from Jeff Henley to Jennifer Minton
19  where it says, "FYI, I actually like this exchange with
20  copies to Larry, it escalates the pressure to get to the
21  bottom of what is really happening here.  I took my shot
22  at EC on Monday, so this is supplemental ammo."
23      Do you recall seeing that?
24    A.  Not specifically.  But I certainly remember
25  the climate at the time this was all occurring.

127

1    Q.  EC refers to executive committee?
2    A.  That's correct.
3    Q.  Do you recall the meeting that's referred to
4  there on the Monday?
5    A.  Again, not specifically.  But in general, yes,
6  absolutely.
7    Q.  And were there heated exchanges in these
8  meetings between Ron Wohl and Mark Barrenechea?
9    A.  Mark would be heated; Ron would be
10  quantitative and analytical.
11    Q.  Who would be at these meetings?
12    A.  The senior -- the senior managers in the
13  company.
14    Q.  And that would be Sandy Sanderson, George
15  Roberts?
16    A.  Yes, they were there.
17      MR. LINDSTROM:  We're talking about the EC
18  meetings referred to in this document?
19      MR. SOLOMON:  Yes.
20      MR. SOLOMON:  Q.  Jay Nussbaum?
21    A.  Yes.
22    Q.  And Wohl and Barrenechea and you, and who else
23  other than that group?
24    A.  Safra Catz, Jeff Henley.
25    Q.  Okay.

128

1    A.  Chuck Rozwat.

2    Q.  And what was his position?

3    A.  He ran database engineering.

4    Q.  Anybody else?

5    A.  Mike Rocha, who at the time ran support.

6    Q.  The reference is, "Get to the bottom of what

7    is really happening."

8        Do you recall ever getting to the bottom of

9    what was really happening?

10    A.  I wonder if I ever get to the bottom of what's

11    really happening.  No.  It was a normal -- it was kind

12    of a normal development process.  We had a new product,

13    there was problems with Ron's code, there were problems

14    with the CRM code.  They were both under tremendous

15    pressure to fix those problems as quickly as they could.

16    And they were just feeling the pressure.

17    MR. SOLOMON:  Okay.  Have marked as the next

18    exhibit a document not produced by Oracle, at least in

19    this version.

20        (Exhibit 29 marked for

21        identification.)

22    MR. SOLOMON:  Q.  You see this is the Oracle

23    2000 Annual Report, as referenced on the front page?

24    A.  Yes.

25    Q.  I'm going to focus on the fifth page of the

1    document which has your photograph on the right.

2    A.  Okay.

3    Q.  And this is part of a letter that you wrote to

4    the shareholders; is that right?

5    A.  Yes.

6    Q.  And I'm looking on that page with your

7    photograph on it, at the bottom of the page, and it says

8    the following, "We also developed several new

9    applications so that the E-Business Suite would be

10    complete.  Today the suite includes every application

11    you need to run your business, marketing, sales, supply

12    chain, manufacturing, customer service, accounting,

13    human resources - everything.  It works in every country

14    and in every language.  The E-Business Suite is the

15    first and only complete set of applications ever to have

16    been built."

17        Do you see that?

18    A.  I do.

19    Q.  That wasn't true when you wrote it, was it?

20    A.  Yes, it was.

21    Q.  Are you saying that it worked at that time in

22    every country, in every language?

23    A.  I didn't say it worked perfectly.  But with

24    the engineering -- it was engineered to do all of those

25    things, it had all of those components.  It had

1    marketing, it had sales, it had supply chain, it had

2    manufacturing, customer service, human resources.  It

3    had all of those things.  And it had the ability -- it

4    had virtually the ability to put it in every language.

5    It doesn't mean that every feature, every feature you

6    could possibly want for your business was in there, but

7    ever major functional area was covered.

8    Q.  You see it says, back to the page with your

9    picture on it, it says, "Today," not yesterday, not

10    tomorrow, it says, "Today the suite includes every

11    application you need to run your business," and it goes

12    through that.  And you say "everything," and you say,

13    "it works in every country."

14        You don't agree that gives the impression that

15    everything was there, everything was ready and it

16    worked?

17    A.  I mean, I suppose, to make it very precise, it

18    should say every major country, probably it would work

19    in Afghanistan, with the tax laws in Afghanistan.  So

20    you can take exception that it was general rather

21    than -- general and imprecise, and it didn't work -- if

22    you were a bank, it didn't have every application a bank

23    would use.  But that's why I enumerated the applications

24    that we had.

25        So what I mean by everything, it's everything

1    that's common across businesses.  Everyone has

2    marketing, everyone has sales.  I shouldn't say

3    everyone.  The legal business doesn't have marketing.

4    Most businesses have marketing, most businesses have

5    sales, most businesses have supply chain, customer

6    service, accounting, human resources.  All those things

7    were there, all engineered to work together.  And it was

8    designed and engineered to support every language.

9    Q.  Now, you say that, but isn't it true that you

10    were engineering them, perhaps, to go together, but to

11    suggest that it was complete and ready, as this

12    suggests, is not accurate?

13    MR. LINDSTROM:  Objection; argumentative.

14    THE WITNESS:  What was the date of this

15    document?

16    MR. SOLOMON:  Q.  I believe it was October of

17    2000.

18    A.  I believe we delivered the e-business suite in

19    May of 2000.  So we were in the midst of our first

20    deliveries.  If you mean by finish and ready that all

21    the bugs were fixed and all those things -- it was

22    certainly a new product.  I concede to you it was a new

23    product and as a new product it had a lot of bugs that

24    needed to be fixed.

25    Q.  You say it was already delivered.  Who was it

1  delivered to?

2      MR. LINDSTROM:  As of what point in time?

3      MR. SOLOMON:  I think -- let's go back.  Can

4  you read back the question before this question and the

5  answer.

6      (Record read as follows:  QUESTION:  Now, you

7      say that, but isn't it true that you were

8      engineering them, perhaps, to go together, but

9      to suggest that it was complete and ready, as

10     this suggests, is not accurate?  THE WITNESS:

11     What was the date of this document?

12     QUESTION:  I believe it was October of 2000.

13     THE WITNESS:  I believe we delivered the

14     e-business suite in May of 2000.  So we were in

15     the midst of our first deliveries.)

16     MR. SOLOMON:  Q.  What did you deliver in May

17  of 2000?

18     A.  The basic -- marketing, sales, supply chain,

19  manufacturing, customer service, accounting and human

20  resources, I think.  I think those things.

21     Q.  So is it fair to say that in May of 2000, you

22  delivered CRM and ERP to a customer; is that what you're

23  saying?

24     A.  I'm not sure that all of -- I mean, customer

25  service is a portion of CRM.  I'm not certain exactly

133

1  what dates the different customer service -- for

2  example, I did not -- so I'm not exactly certain what

3  dates the first CRM components came out.  But I believe

4  all the pieces were in the May release, that's my

5  recollection.

6     Q.  Do you reference in this document any of the

7  problems that your customers were having with

8  implementations?

9     A.  No, I don't think so.

10     MR. SOLOMON:  Mark as the next exhibit a

11  document produced by Oracle with the numbers 012381

12  through 83.

13     (Exhibit 30 marked for

14      identification.)

15     MR. SOLOMON:  Q.  Take a while to look at it,

16  then let me know if you recognize it, please.

17     A.  Okay.

18     MR. LINDSTROM:  Again, counsel, this document

19  consists of a number of e-mails, plus I see there's what

20  appears to be an analyst statement or article that's

21  embedded in here.  I assume you are asking whether he's

22  seen all these together in the way they are presented to

23  him as Exhibit 30?

24     MR. SOLOMON:  Thank you for that.  It will be

25  two-part.  If he hasn't seen it all, then I will get

134

1  into what appears to be a separate message.

2     MR. LINDSTROM:  Thank you for that

3  clarification.

4     THE WITNESS:  The first piece I have not seen.

5     MR. SOLOMON:  Q.  The first page?

6     A.  The first -- I think the first messages, the

7  first three pages, the first e-mails, the first three

8  pages.

9     MR. SOLOMON:  Can you pull off the others,

10  because I've got just the first three pages.

11     MR. LINDSTROM:  So, for the record, which --

12     MR. SOLOMON:  You should hang on to 012381

13  through 383.

14     THE WITNESS:  Okay.

15     MR. SOLOMON:  And the others, pass back to me.

16     THE WITNESS:  I have not seen this document

17  before.

18     MR. SOLOMON:  Q.  You see your name is

19  referenced on the first page against "Escalation Level,"

20  "LELLISON"?  You see that?

21     A.  Right.

22     Q.  And do you recall the escalation that's

23  referred to here, regardless of whether you saw the

24  document?

25     A.  Again, GE is a funny case, because I am the

135

1  account manager for GE, so theoretically I'm involved in

2  everything that goes on with GE.

3     Q.  I want to look at some language at the bottom

4  of the page where it starts with, "Problem Summary."

5  And it reads, "As I understand, the CIO of GE Corp has

6  biweekly calls with LJE."

7     That's you; right?

8     A.  Yep.

9     Q.  "LJE recommended that GE upgrade to 11.5.2

10  from 11.0.3."

11     Then over the page, "GE began the upgrade on

12  11.6 and has not been able to completely upgrade a

13  single instance after almost four weeks of trying.  The

14  upgrade should have been completed on 12/1.  Tactically,

15  GE Corp is now behind in their project plans which

16  seriously jeopardizes their 2/5/01 go-live.  Further,

17  they have had to work around or bypass many steps in the

18  upgrade process, which is of their -- which in their

19  opinion has left them with an 'unreproducible' upgrade

20  path from 10.0.3 to 11.5.2.  Additionally, GE is

21  expressing strong concern regarding the maintainability

22  of 11.5.2, for example, the time it takes to build

23  search indexes, the amount of disk space required (2GB

24  per language)."  And I'll stop there.

25     Were you aware around this time, which is

136

1   December, beginning of December 2000, that GE was

2   expressing its concerns as reflected in that e-mail?

3   A.  Again, GE is such a large company with so many

4   divisions and there is so much going on at General

5   Electric, again, I don't specifically remember this

6   e-mail or this set of problems.

7   But there is always, I mean, literally, the

8   last ten years I worked at GE, there is always a set of

9   problems that we're focused on.

10   Q.  As a sponsor, would you have expected to have

11   received this e-mail in the normal course of business?

12   A.  I would certainly expect to be made aware of

13   what was going on at GE.  I don't expect to be copied on

14   every single e-mail regarding GE.

15   Q.  And then at the top of that first page, it

16   says, "I'm confused about what is going wrong in the

17   11i.2 upgrade here."  And that's from Ron Wohl, it would

18   appear.

19   A.  Right.

20   Q.  Do you recall having any conversations with

21   Ron Wohl about that?

22   A.  I mean, not specifically related to this

23   document.

24   MR. SOLOMON:  Next document is a document

25   dated December 7, 2000, with the Bates number 154023.

137

1   (Exhibit 31 marked for

2   identification.)

3   THE WITNESS:  Okay.

4   MR. SOLOMON:  Q.  Do you remember this

5   exchange?

6   A.  Vaguely, yeah.

7   Q.  Do you know who Fran Dram is?

8   A.  Senior executive, IT executive at BellSouth.

9   Q.  And he says, "Larry, I have been told that

10   you're aware of this ut" -- I imagine that meant "but,"

11   don't you?

12   Anyway, "Larry, I have been told that you're

13   aware of this ut.  We may not be able to cut over the

14   Oracle CRM system this weekend for BellSouth because of

15   performance problems in scripting."

16   Do you see that?

17   A.  I do.

18   Q.  Is ut some kind of techno thing or --

19   A.  I don't know what UT is.

20   Q.  "I would appreciate any help you can give" --

21   A.  I don't think it's techno.

22   Q.  Okay.  "I would appreciate any help you can

23   give.  This potential cancellation will be highly

24   visible."

25   Do you see that?

138

1   A.  I do.

2   Q.  What is the cancellation being referred to, do

3   you know?

4   A.  I think the cancellation of the upgrade or the

5   cutover.  When they are turning one system off and

6   turning another system on, they had a specific date and

7   plans, and had to postpone, cancel.  That's what they

8   mean by cancellation.

9   Q.  When they say visible, do you understand what

10   the visibility is they are concerned about?

11   A.  There will be a lot of people inside of

12   BellSouth that would be aware that the upgrade was

13   postponed.

14   Q.  Then your response was to Fran; is that right?

15   A.  Yes.

16   Q.  Is that your response?

17   A.  Yes.

18   Q.  You say you were involved every third, but I

19   think you mean every 30 minutes?

20   A.  I think I was getting updates -- I think this

21   was one of those situations like POSCO we discussed

22   earlier where they are in the verge of a cutover, I

23   really do monitor it almost constantly.  And I was in

24   constant contact with our support people.  They were

25   actually logged on to the BellSouth system.

139

1   Q.  How were you communicating then every 30

2   minutes?  What mode of communication?

3   A.  It varies.  Sometimes we'll actually have a

4   conference call that is continuously ongoing, just a

5   line that is open, as well as e-mail messages and other

6   things.  But normally for that it is a conference call

7   or something that looks like a little chat room.

8   Q.  Okay.  The top says, "Debbie/Linda, I just

9   wanted to share this information with you.  Larry and

10   Fran are communicating.  Let's keep our fingers crossed

11   that this will work out.  We are all on it."

12   Do you recall a resolution to that particular

13   issue?

14   A.  You know, I'm not certain what happened in the

15   end with BellSouth.  I don't, you know.  I've said POSCO

16   is a happy customer, GE is a happy customer,

17   Ingersoll-Rand.  I'm not sure if we ever got the system

18   at BellSouth working.  Again, it was a huge consulting

19   project.  It was a very, very complicated

20   implementation.  And this was a long time -- I should

21   remember, but I just don't remember what the ultimate

22   resolution was.

23   Q.  Do you recall that you had to give away $20

24   million worth of consulting in connection with the

25   BellSouth deal?

140

1    A.  You're refreshing my memory.  I don't know
2  exactly if it was $20 million, but that number doesn't
3  surprise me.
4    Q.  This again is an e-mail that comes from your
5  files, but was not produced from your files.  We got it
6  through some other file.
7    You can't tell me why it is that this wasn't
8  in your file at the time of the litigation?
9    A.  I cannot.
10   MR. SOLOMON:  I've marked as the next document
11  a document produced by the defendants with the Bates
12  numbers 013401 and 402.
13        (Exhibit 32 marked for
14         identification.)
15   THE WITNESS:  Okay.
16   MR. SOLOMON:  Okay, do you recognize it?
17   A.  I mean, not specifically.
18   Q.  Okay.  But you don't dispute that you would
19  have received it and read it around Saturday,
20  December 9th, 2000?
21   A.  That's right.
22   Q.  Looking at page 2 to start with, I guess I
23  should first of all say this appears to be an e-mail
24  exchange between you and Sergio Giacoletto; is that
25  right?

141

1    A.  That's correct.  I don't think it's an
2  exchange.  I think it is Sergio can't attend the Monday
3  EC meeting, and he's giving a forecast report via e-mail
4  in lieu of that.
5    Q.  So on that second page under "CRM,"
6  Mr. Giacoletto is saying, "We're losing a bit of
7  momentum.  Salespeople are reluctant to engage to the
8  product problems, lack of references and local language
9  issues.  We are also losing" -- it says "loosing," I
10  think he means "losing many people to Siebel still, and
11  we are short of 50 sales consultants across EMEA.
12  Hopefully the situation will turn in January once we get
13  11.5.3 running in local language."
14   Do you see that?
15   A.  I do.
16   Q.  Mr. Giacoletto wasn't an Oracle executive in
17  Afghanistan, was he?
18   A.  Yes, he actually has -- is responsible for
19  Afghanistan?  He does.  He's got all of Europe, Middle
20  East Africa, which includes Afghanistan.
21   Q.  Is he referring to Afghanistan when he's
22  talking about local language issues?
23   A.  I think he's referring to some of the CRM
24  components.
25   Q.  Do you think he's referring in terms of the

142

1  language issues to Afghanistan?
2    A.  No, I don't think he is.
3    Q.  More like European language, do you think?
4    MR. LINDSTROM:  Objection; calls for
5  speculation.
6    THE WITNESS:  I don't know.  I don't know
7  which languages he's referring to.
8    MR. SOLOMON:  Q.  Do you recall being aware of
9  these issues when they were raised by Mr. Giacoletto?
10   MR. LINDSTROM:  Which issues?
11   MR. SOLOMON:  Q.  The issues under "CRM"?
12   A.  Again, the note gives me a very strong -- it
13  is a note of very strong forecasts, and CRM is a very
14  small business.  Understand, it is a brand new business
15  for Oracle and it is tiny, so he's raising the fact
16  we've got this brand new, tiny business, and there is
17  risk associated with it.
18   Until we bought Siebel, it's always been a
19  very, very tiny business for us.
20   Q.  Weren't you saying at the time applications
21  were going to drive database sales?
22   A.  Applications do some degree drive database
23  sales, but only to some degree.
24   We have 30,000 application customers, and we
25  have almost 300,000 database customers.

143

1    Q.  Put another way, were you not saying at the
2  time that the e-business suite was complete, working and
3  in such a state that it was going to drive database
4  sales in the third quarter of 2001?
5    A.  No.  I mean, again, the application
6  contribution of database sales even today is still a
7  very small number, versus the total software revenue.
8  But it doesn't mean it doesn't contribute.  It does
9  contribute.  But it just doesn't contribute a very large
10  amount.
11   MR. SOLOMON:  Okay.  Have marked as the next
12  exhibit document with Bates range 297892, 893.
13        (Exhibit 33 marked for
14         identification.)
15   MR. SOLOMON:  Q.  And if you take a look at
16  this and let me know if you recall seeing this before.
17   A.  Okay.
18   Q.  Do you recall seeing this before?
19   A.  Not specifically.  But once again, I received
20  it and I'm sure you got it.
21   Q.  Do you know John Rourke?
22   A.  I don't.
23   Q.  Excuse me, John Bourke?
24   A.  No.
25   Q.  He wrote to you on or around the 15th of

144

1    December 2000.
2        Do you dispute that you would have read this
3    around that date?
4    A.   No, I don't.
5    Q.   He says, and I'll read some of it, "I'm a
6    director of finance at the Pepsi Cola concentrate plant
7    in Cork, Ireland.  I've been an admirer of yours for a
8    number of years and have noted with interest, although
9    not necessarily agreeing with, some of your
10   pronouncements on technology developments.  This e-mail
11   to you is in some respects an appeal for help, as well
12   as a way of venting my frustration which is caused by
13   one of your product.  By the way, I've been around long
14   enough to know my appeal will almost certainly be
15   ignored."  It goes on to say, "JD Edwards financial have
16   performed very well for us for a number of years, but
17   the Pepsico corporation decided that Oracle was to be
18   the standard software for the future.  So rather than go
19   with a necessary upgrade of JDE, we decided to transfer
20   to Oracle because we were sold on the increased
21   functionality of Oracle 11i.  Our Oracle project has
22   been an unmitigated disaster for us from both a cost,
23   employee and relationship perspective.  We have spent a
24   fortune (to us) on consultants trying merely to get your
25   product to work, and months later we still do not have

145

1    even a system to test.  How can you release software
2    that does not work is simply beyond my comprehension.
3    Is it only businesses that buy totally defective
4    products?  If you were selling me groceries, your
5    organization would have been out of business long ago.
6    We have had a small number of employees fully focused on
7    the project and they are totally demoralized.  They are
8    some of our most dedicated and best individuals and it
9    annoys me to witness their frustration.  One of our
10   goals is to make Cork an outstanding place to work,
11   visit and do business with.  The team are having a bad
12   time putting in very long hours trying to play catch-up.
13   They are viewing the failure of the project to date as a
14   reflection on themselves.  They are all young
15   professionals trying to forge their own careers.  No
16   matter how often I repeat the delay in the project is
17   due to faulty software, they still feel presently at
18   fault."
19       Are you blaming them, by the way?
20   A.   Blaming?
21   Q.   Do you blame the young professionals for what
22   they have been experiencing here?
23   A.   I have no firsthand knowledge of what happened
24   in Cork.
25       MR. LINDSTROM:  Objection.  No foundation.

146

1        MR. SOLOMON:  Q.  It goes on to say, "Our
2    reputation will now be tarnished as we will have to
3    announce shortly the delay, and worse still we have to
4    admit we do not know how long the delay will be.  A
5    number of world-wide best practice initiatives, e.g.,
6    marketing effectiveness, T&E, et cetera, are on hold
7    pending implementation of Oracle.  I am not looking
8    forward to the reaction to our announcement.  I thought
9    I would be feel better after writing down my thoughts.
10   Unfortunately, I think I feel worse.  I also did not
11   think I would write so much."
12       Do you recall now reading this around that
13   time?
14   A.   Not specifically.
15   Q.   You then reply on December 15th, is that
16   right, and you say, "Well, we'll look into this
17   immediately.  Have you modified the 11i software?  What
18   version are you using?  Ron, please follow up.  Larry."
19       Is that right?
20   A.   Yes.
21   Q.   Do you recall writing that?
22   A.   Not specifically.
23   Q.   And then the response to that message is,
24   "Thank you for showing an interest.  Our intention is to
25   go as much as possible with the vanilla Oracle software

147

1    and to avoid modifications.  As we cannot load 11i, no
2    modifications have been made."
3        Do you recall receiving that response?
4    A.   No, I don't.
5    Q.   Okay.  And then it looks like John Bourke then
6    writes to Ron Wohl saying, "This e-mail does not appear
7    to have got through to you."
8        Then a message from Ron Wohl saying, "Thank
9    you for resending it, John.  Courtney, Bill, can you
10   review the situation below and figure out what action is
11   needed and close the loop with John.  Please update me
12   on status regularly until resolved."
13       Do you see that?
14   A.   I do.
15   Q.   Do you recall getting Wohl involved?
16   A.   Not specifically.
17   Q.   Do you recall any resolution to this?
18   A.   I do not.
19   Q.   Okay.  This, at least part of these documents,
20   if not all of them, were in your file apparently as an
21   addressee, yet none of them were produced in this
22   litigation from your file.
23       You can't tell me or explain why that's the
24   case; is that right?
25   A.   I cannot.

148

1    MR. SOLOMON:  I've marked as the next exhibit
2   a document produced by defendants with control numbers
3   039324 to 328.
4       (Exhibit 34 marked for
5       identification.)
6   THE WITNESS:  Okay.
7   MR. SOLOMON:  Q.  Have you seen this before?
8   A.  Not that I recall.
9   Q.  Okay.  You'll see that on the second page you
10  are an addressee.  Do you see that?
11  A.  Yes.
12  Q.  And there is a message, a forwarding message
13  saying essentially that you should be aware of what
14  follows.  Do you see that?
15  A.  Yes.
16  Q.  And then on the next page there is an e-mail
17  exchange from Michael Cochran to George Roberts, Jeff
18  Henley and a number of others.  Do you see that?
19  A.  I do.
20  Q.  Do you know, are you familiar with Paxar?
21  A.  Not really.
22  Q.  Okay.  It starts, "Victor Heschaft,"
23  H-e-s-c-h-a-f-t, "Paxar's vice-chairman has been dealing
24  with an extremely critical 11i implementation.  By all
25  accounts from those involved, this has been very ugly

149

1   and we've put the customer through extreme hardship."
2       Do you see that?
3   A.  I do.
4   Q.  Do you recall being made aware of that with
5   respect to Paxar in December of 2000?
6   A.  I do not.
7   Q.  If you go to the forth paragraph it says,
8   "Paxar's Oracle History - Paxar's marketing system
9   division in Ohio had implemented 10.7 in the 1997 time
10  frame.  The implementation was painful, late and over
11  budget, but Paxar decided that they needed one global
12  system for all their businesses, and since Oracle was
13  already implemented at one of their divisions, it made
14  sense to implement Oracle apps globally in their Apparel
15  Division.  Paxar's 11i Product History - After a 6 month
16  sales cycle and reassurances from Drew Campbell and Ron
17  Wohl that 11i (specifically Order Management) would be a
18  tested and stable release, they decided to go forward
19  with Oracle."
20      Stopping there, were you aware that Ron Wohl
21  and Drew Campbell had made a representation to Paxar
22  that Order Management was a tested and stable release?
23  A.  I'm really not familiar with Paxar.
24  Q.  Are you aware that around December of 2000,
25  Drew Campbell and Ron Wohl were representing or had

150

1   represented that Order Management was a stable and
2   tested release?
3   MR. LINDSTROM:  To Paxar?
4   MR. SOLOMON:  Q.  At all.  At all, to anyone.
5   A.  Yeah.  I think we were selling the components
6   that -- Order Management is a central portion of ERP,
7   and we were delivering it to customers.  We certainly
8   knew it was brand new, and it had bugs.  But we thought
9   we would be able to fix those bugs in the process -- in
10  the period of an implementation and get customers live
11  and running.  And almost -- and in almost all cases we
12  did.
13  Q.  And to get back to the question so we have a
14  good record, were you aware that those two gentlemen
15  were making -- were stating to anybody at that time that
16  Order Management was a tested and stable release?
17  A.  I have no firsthand knowledge of the
18  representations that they were making.
19  Q.  Did you make such a representation to anyone
20  around that time?
21  MR. LINDSTROM:  You're referring to the
22  specific representation that is attributed to those two
23  gentlemen here?
24  MR. SOLOMON:  Q.  That Order Management was a
25  tested and stable --

151

1   A.  I don't think I commented about Order
2   Management specifically.
3   MR. LINDSTROM:  Thank you for the
4   clarification.
5   MR. SOLOMON:  Q.  If you look down a little
6   bit in that same paragraph, it says, "Paxar was one of
7   the EARLIEST" -- in capitals -- "customer to commit to a
8   large scale, single instance implementation of 11i."
9       Do you see that?
10  A.  I do.
11  Q.  That would make them a particularly important
12  customer to you at that time, would it not?
13  A.  I'm not sure what you mean by particularly
14  important.
15  Q.  I just saw the language that they were one of
16  the earliest customers to commit to a large scale,
17  single instance implementation of 11i.
18  A.  Nothing against Paxar, but Liberty Mutual or
19  General Electric -- I mean, Paxar is a medium size
20  company, and the customers that we take the best care of
21  are our largest customers.
22  Q.  Okay.
23  A.  Or -- yeah.
24  Q.  I'm on the second page now.  Heading at the
25  top, "Order Management" -- I don't know if it is a

152

1    heading.  "Order Management Functionality only in 11i."
2    Then the paragraph has some language, and I'm reading
3    now from the second half of that paragraph, which says,
4    "The 11/2000 date was moved out to 12/2000, then 1/2001,
5    and is now projected for 3/15/01 because of the
6    necessity for more significant parallel testing due to
7    the lack of confidence in the integrity of the 11i
8    release."
9        Do you see that?
10    A.  I do.
11    Q.  And then it goes on to say, "In the late
12    summer time frame, Paxar's vice-chairman first expressed
13    his dissatisfaction with the 11i quality and stability.
14    A conference call with Ron Wohl was arranged and Bill
15    Bounds from the development triage team was assigned to
16    assist.  The situation has been improving slowly, but
17    after hundreds of patches and a significant number of
18    severity 1 bugs which prevented conference room pilots
19    and user acceptance testing.  OCS has logged over 1,700
20    hours on non-billable time on such issues."
21        Do you see that?
22    A.  I do.
23    Q.  Were you aware around December 2000 that OCS
24    had been logging over 1,700 hours of nonbillable time in
25    connection with this project?

1    A.  I really was not that familiar with the
2    situation at Paxar.
3    Q.  Skipping down to -- two-thirds of the way down
4    the page, there is a paragraph that says, "Paxar has
5    been contacting other 11i customers to assess their
6    experience with 11i.  They've also made some veiled
7    threats about public disclosure of their challenges, so
8    we need to act quickly."
9        Do you see that?
10    A.  I do.
11    Q.  Were you aware of the threat or suggestion
12    that they would go public if their problems weren't
13    resolved?
14    A.  I really wasn't familiar with Paxar.
15    Q.  Okay.  And if you go back to the first page,
16    third paragraph, it says, "Paxar Corporation
17    Background - Paxar is a $700 million publicly traded,
18    worldwide enterprise," et cetera.
19        MR. LINDSTROM:  Where are you, counsel?
20        THE WITNESS:  Right here.
21        MR. SOLOMON:  Third paragraph.
22        MR. LINDSTROM:  Third; thank you.
23        MR. SOLOMON:  Q.  Does that refresh your
24    recollection as to what Paxar is?
25    A.  Until I saw this document, I had no

1    recollection of anything about Paxar.
2    Q.  Now, on the second page where you are the
3    addressee, that would suggest that this was in your file
4    at some stage; correct?
5    A.  Yes.
6    Q.  And it was not produced from your file in this
7    litigation.  Can you explain why?
8    A.  I cannot.
9    Q.  Second page of the document.  Looking at the
10    message, "Larry," it says, "Larry, you should be aware
11    of this one in case it continues to escalate.  It may
12    make sense to discuss this one and any additional
13    critical situations at their next EC.  As you know, some
14    of our earliest 11i customers (especially CRM and Order
15    Management) are exhausted from the effort of
16    implementing the products."
17        Do you see that?
18    A.  I do.
19    Q.  Were you aware of the earliest clients being
20    exhausted, especially those with respect to CRM and
21    Order Management?
22    A.  I certainly knew that CRM and Order Management
23    had more bugs in them than some of the other more mature
24    products.  CRM and Order Management were, if you will,
25    rewrites, it was all fresh code, it was all new code,

1    and there's usually a longer period of debugging when
2    the product is all new.
3    Q.  And do you recall getting that message to the
4    effect that the customers were exhausted with those
5    efforts?
6    A.  Not specifically.
7    Q.  But you don't dispute you got that message at
8    the time?
9    A.  No.  No, I don't.
10    MR. LINDSTROM:  When you say the message, you
11    mean the e-mail that's been marked as Exhibit 34?
12    MR. SOLOMON:  That's correct.
13    Have marked as the next exhibit a document
14    produced by the defendants, 035275.
15        (Exhibit 35 marked for
16        identification.)
17    MR. SOLOMON:  Q.  This is dated January 9th,
18    2001.
19    A.  Got it.
20    Q.  Seen it before?
21    A.  Yes.
22    Q.  Do you recall Mark Barrenechea expressing, "Do
23    not burn me"?
24    A.  Not specifically, no.
25    Q.  And you'll see at the top it is entitled, "Re:

1  Do not forward, BellSouth."

2      Do you see that?

3  A.  Yes.  I think that means by "Don't burn me;

4  "don't forward it to the people I'm raising issues

5  about."

6  Q.  And it's a document that copies you from Safra

7  Catz.  And it says, "Wheeler and OSI consulting not a

8  pretty picture."

9      That appears to be from Safra Catz; is that

10  right, that message that I just read?

11  A.  Yes.

12  Q.  Then she has then forwarded to you, perhaps,

13  the Barrenechea note; is that right?

14  A.  That's right.

15  Q.  And it says, "Mark Barrenechea wrote:  Do not

16  forward, do not burn me.  1.  This OSI consulting team

17  is whacked, Larry, and is wasting our F-N time.

18  2.  I have dispatched Andrew Holsworth to being on site,

19  best ST Kernel person to be on site, best CRM

20  performance person to be on site.  OSI has enormous bind

21  variable problems in their custom code, needs to be

22  fixed.  They are running file system and not raw

23  devices.  No use of jprobe.  They do not know the

24  difference between library cache pin or lock.  I will be

25  on call every hour for the next 48 hours to personally

1  manage this.  This is a real waste and I'm getting

2  pissed.  Do not forward, do not burn me."

3      Hard to forget this, hum?

4  A.  It is.

5  Q.  So you were aware around January 9, 2001 of

6  these issues that Barrenechea is raising; is that right?

7  A.  It doesn't say here; this is a BellSouth

8  issue.  This is a big consulting project where they

9  wrote a huge amount of code, of custom code, and as a

10  result they were having tremendous performance problems.

11  So I'm very familiar with the situation.

12  Q.  Okay.  And again, this would have -- go ahead.

13  A.  So because it was a combination of the

14  consulting project plus Mark Barrenechea's CRM code,

15  Mark was pulled into it.  Where the consulting group was

16  saying, "It's Mark's problem," Mark was saying, "It's

17  the consulting group's problem."

18  Q.  Okay.  This again was in your files in or

19  around January of 2001.  It wasn't produced from your

20  files.

21      Can you explain why?

22  A.  I cannot.

23      MR. SOLOMON:  Have marked as the next exhibit

24  a document produced by defendants, the control number

25  012414 through 417.

                    157                                      158

1      (Exhibit 36 marked for

2          identification.)

3      THE WITNESS:  I think the body -- most of this

4  you gave me in a previous document.

5      MR. SOLOMON:  Q.  Is that right?

6  A.  They are attachments.  The first page is new,

7  then the other stuff is connected --

8  Q.  That's correct.  Thank you.

9      Have you seen this first page before?

10  A.  I was certainly copied on it.  I assume I read

11  it, but I don't recall specifically reading this

12  document.

13  Q.  Okay.  Look at the second page of the

14  document, I guess, to start.  And I'm looking at, "Hi,

15  my name is Rebecca."

16  A.  I believe this is the part you asked me about

17  before.

18  Q.  Correct.

19      MR. LINDSTROM:  15, Exhibit 15.

20      MR. SOLOMON:  Thank you.

21  Q.  Now, are you familiar were Brock Tools?

22  A.  I'm not.

23  Q.  And you don't recall prior to today knowing

24  about Brock Tools?

25  A.  No.

1  Q.  And if you look at the first page there is

2  expressed -- I could read it all, I guess, but there

3  seems to be expressed frustration that the Order

4  Management issues were not being addressed.  Is that

5  fair?

6  A.  Give me a second.

7      MR. LINDSTROM:  Can you direct the witness to

8  some specific language?

9      MR. SOLOMON:  Sure.

10      MR. LINDSTROM:  Other than simply on the first

11  page.

12      MR. SOLOMON:  Q.  If you look to "Renee and

13  Ron, I still have not received any reply."

14  A.  Okay.

15  Q.  Do you see that?

16  A.  Okay.

17  Q.  Just the first few lines.

18  A.  Okay.

19  Q.  Okay.  Were you aware at the time that issues

20  concerning Order Management were being raised by Oracle

21  customers?

22  A.  Yes.

23  Q.  Was the resolution of any of those problems

24  costing Oracle money?

25      MR. LINDSTROM:  Does your question go beyond

                    159                                      160

1   Brock Tools?
2        MR. SOLOMON:  Yes.
3        THE WITNESS:  The development of -- I'm not
4   sure I understand your question.  I'm not trying to be
5   cute.
6        But clearly, to develop the software, to debug
7   the software, to test the software, to deliver the
8   software, always costs us money.
9        MR. SOLOMON:  Q.  I'm getting at either legal
10  settlements or free consulting or free implementation.
11       A.  I think there were certainly cases where we
12  couldn't bill for consulting.  Not very many cases.  But
13  again -- but there were certainly some cases of not
14  being able to charge for consulting.  And I'm sure there
15  are a few cases of legal settlements, but not very many.
16       Q.  Okay.  I don't know if I asked you the
17  question, but in case I didn't, this would have been in
18  your file in January, it wasn't produced from your file.
19  You don't know why?
20       A.  I do not know why.
21       MR. LINDSTROM:  Well, again, when you say
22  wouldn't it have been in his file January 2001, that
23  mischaracterizes his testimony, or would have been in
24  his file.  So I'll object to the question on that
25  ground.  The answer may stand.

161

1        MR. SOLOMON:  I'm not sure I followed that,
2   but that's fine.
3        MR. LINDSTROM:  Well, he told you that prior
4   to the institution of the litigation that he had a
5   practice of periodically cleaning up his e-mails, and so
6   when you preface your statement by saying, "This would
7   have been in his files as of January 2001," we don't
8   know that.  We don't know whether that might have been
9   cleaned up as one of his periodic --
10       MR. SOLOMON:  It is dated January.  Do you
11  think he deleted it before he got it?
12       MR. LINDSTROM:  I'm missing the point.
13       MR. SOLOMON:  It is dated January.  I'm just
14  saying it was in his file at some stage.
15       MR. LINDSTROM:  No, no.  What you're saying is
16  it would have been in his file.
17       MR. SOLOMON:  Of course it would have been.
18       MR. LINDSTROM:  I see.  What you're saying it
19  was in his file initially.
20       MR. SOLOMON:  Yeah.
21       MR. LINDSTROM:  I was taking your question as
22  you stated it to mean that it was in his file when the
23  litigation commenced.  I apologize.
24       MR. SOLOMON:  That's not what I said.
25       So let's look at the next exhibit, which is

162

1   610546 through 548.
2        THE WITNESS:  I have been answering that
3   question understanding that if it showed up -- if it has
4   this date, on that date it should have been in my file,
5   on the date it was sent.
6        MR. SOLOMON:  Q.  At least?
7        A.  Exactly.  That is my understanding.
8        MR. SOLOMON:  Appreciate it.
9        THE WITNESS:  All right.
10       MR. SOLOMON:  Actually, I'm going to withdraw
11  this.  Sorry.
12       And we'll have marked as the next exhibit a
13  document produced by the defendants with control number
14  035276 through 279.
15       (Exhibit 37 marked for
16       identification.)
17       THE WITNESS:  Okay.
18       MR. SOLOMON:  Q.  Do you recognize this?
19       A.  I recognize the issues being discussed in the
20  document.  But I don't recognize the specific document.
21       Q.  You don't dispute that you received it on or
22  around Tuesday, January 9th, 2001?
23       A.  I do not.
24       Q.  I'm going to the second page of the document.
25  And just for the record, this is a January 9th, 2001

163

1   e-mail from Mark Barrenechea to Mark Barrenechea, which
2   then gets forwarded to Larry Ellison on the same date.
3        And on the second page towards the bottom it
4   says, "Mark Barrenechea wrote:  I been been advised that
5   GEAC is not interested in ASO."
6        Do you know what GEAC is?
7        A.  GE Aircraft -- I think it means GEAE.  It is
8   GEAE up above.  I think it's just a typo.  That's GE
9   Aircraft Engines.
10       Q.  ASO?
11       A.  It's a successor product to MRO.  We discussed
12  MRO earlier.
13       Q.  It says, "Further, they have not signed a new
14  agreement and I have been told they have no interest in
15  doing so.  We presented over three months ago and we
16  were told they are no longer interested.  There are
17  three developers finishing maintenance on the 10.7
18  baseline."
19       Do you see that?
20       A.  I do.
21       Q.  Were you aware of those facts in January of
22  2001?
23       A.  I was -- I think I followed the entire MRO ASO
24  saga at GE Aircraft Engines from beginning to end.
25       Q.  And they said they were no longer interested.

164

1   Did they ever become interested?

2       MR. LINDSTROM:  In what?

3       MR. SOLOMON:  Q.  In ASO.

4       A.  As we discussed briefly earlier, that MRO was

5   a custom project, a maintenance repair project for GE

6   Aircraft Engines to maintain and repair aircraft

7   engines, jet engines, and it was custom built for GE.

8   GE was not happy with the work that we did and decided

9   not to proceed with the product.

10      We then decided to take the MRO work and

11  productize, make it a major general product.  Rather

12  than specifically for GE Engines, we decided to make it

13  a more generally applicable maintenance and repair

14  product, and released something called ASO.  And the

15  first customer for ASO is mentioned on the top of this,

16  that's the Israeli Air Force.  But GE Aircraft Engines

17  wasn't interested in ASO.

18      Q.  Thank you.  The message at the top of that

19  page reads in part, "Steve McLaughlin wrote:  Mark, what

20  GEAE told Oracle is the upgrade to MRO 11i without the

21  work benches did not offer any incremental functionality

22  to justify the consulting cost to upgrade.  GE's

23  hesitation was also based on incremental slide in the

24  project deliverables which effectively eliminated ROI

25  for 2002."

165

1       Do you see that?

2       A.  I do.

3       Q.  And were you aware of that sentiment coming

4   from GE Aircraft Engines in January of 2001?

5       A.  Again, I can't recall the specifics.  Along

6   the way I know we built this custom project for GE.

7   Aircraft Engines was not happy with it; in the end they

8   cancelled.

9       Q.  And this document, let's be clear this time,

10  shall we, at least on Tuesday the 9th of January 2001

11  would have been in your e-mail file?

12      A.  Yes.

13      Q.  And it wasn't produced from your file in this

14  litigation and you can't explain why; is that right?

15      A.  That's correct.

16      MR. SOLOMON:  Have marked as the next document

17  a document produced -- next exhibit, a document produced

18  by defendants, Bates range is 013041 through 47.

19      (Exhibit 38 marked for

20      identification.)

21      MR. SOLOMON:  Q.  You will see it is dated

22  Thursday, 11th of January 2001.

23      A.  Yes.

24      Q.  And I think you will recognize the topics,

25  since we've been looking at different exhibits relating

166

1   to this.

2       A.  Yes.

3       Q.  I'm looking halfway down the page where it

4   says, "The problem is with the product which was far

5   from ready to be shipped.  Just because a TAR is not

6   considered to be a 'showstopper' does not mean it is

7   less important.  We will end up delivering a solution to

8   the customer -- for the customer, excuse me, that will

9   be less than satisfactory.  After all the efforts we

10  have made to make this a success, we will not have a

11  referenceable site for our 11i Oracle Order Management

12  experience.  You can imagine what this means to a small

13  organization like ours.  Bill Grebe, Brock's CEO, has

14  resigned himself to be unimportant to Oracle."

15      Do you see that?

16      A.  I do.

17      Q.  Was that an appropriate resignation?

18      MR. LINDSTROM:  No foundation, calls for

19  speculation, vague and ambiguous.

20      THE WITNESS:  No.  I mean, I think we value

21  all of our customers.

22      MR. SOLOMON:  Q.  So did Brock become

23  important or it was important at the time to you?

24      A.  I think all -- all of our customers are

25  important.

167

1       Q.  This again has a copy of the e-mail going into

2   your e-mail file.  So at least as of January 11, 2001,

3   it would have been in your file; correct?

4       A.  That's correct.

5       Q.  It wasn't produced from your files and you

6   can't explain why; is that correct?

7       A.  That's correct.

8       MR. SOLOMON:  Have marked as the next exhibit

9   a document with the control number 035298 through 300.

10      (Exhibit 39 marked for

11      identification.)

12      MR. SOLOMON:  Q.  Do you recognize it?

13      A.  Again, not this specific document, but I'm

14  very familiar with the contents.

15      Q.  And again, it relates to GE?

16      A.  Yes, it does.

17      Q.  On the second page there is a message from

18  Sandy Sanderson.  And it reads, "Because they are making

19  a huge commitment to Oracle, we have been anything but

20  stellar on MRO.  When we did the deal, we said we would

21  step up to this kind of commitment.  They expect us to

22  stand by our word.  Finally, if we don't do this, our

23  relationship will go south big time.  They are asking

24  that we give guarantees that we don't cancel the

25  project.  They are not asking that we commit to

168

1  delivering functionality jointly documented with Mark
2  and his team.  Sandy."
3      Do you see that?
4  A.  I do.
5  Q.  Do you recall seeing that before?
6  A.  Again, I'm very familiar with the negotiation
7  around this deal, the product, everything to do with it.
8  I just don't remember the specific document.
9  Q.  The reference to Oracle being anything but
10 stellar on MRO, do you understand that?
11 A.  Oh, yeah.  As I said, the MRO project failed
12 at GE.  So when -- I can stop there?
13     MR. LINDSTROM:  Yes, you've answered the
14 question.
15     THE WITNESS:  Okay.
16     MR. SOLOMON:  Have marked as the next exhibit
17 the document with the Bates range 035362 to 64.
18         (Exhibit 40 marked for
19             identification.)
20     THE WITNESS:  Same document?
21     MR. SOLOMON:  Q.  That's right.  I think there
22 may be just a little bit more information on the first
23 page, and a little bit more perhaps on the second page.
24 I just have a couple questions on it.
25 A.  Okay.

169

1  Q.  First, do you recognize the first page, the
2  exchanges?
3  A.  Again, I'm very familiar with the exchanges, I
4  just don't recognize this specific document.
5  Q.  Okay.  I'm looking at the second page, going
6  up to the first page.  And it says, "Mark Barrenechea
7  wrote:  Why are we not asking for these commitments in
8  other areas?"  Then there is some language.
9      And above that, "Sandy Sanderson wrote:  Are
10 you still committed to delivering asset leasing?"
11     And if you go to the first page, the response
12 to that is, "100 percent."
13     Then above that, "It is a strange request, but
14 it is fine with me if we end up signing it.  Larry."
15     The reference, "It is a strange request, but
16 it is fine with me," that's you?  That's you making that
17 reference on the first page?
18 A.  Yes.
19 Q.  What request is strange?
20 A.  Well, as best I recall, GE wanted us to -- as
21 we had attempted to build an MRO system for GE Aircraft
22 Engines, which is a relatively small portion of GE, now
23 their largest division, which is GE Capital, was asking
24 us to build a lease management system.  They were very
25 concerned, because we failed with this one project.  We

170

1  had lots of success with GE, but we had failed in this
2  custom MRO system.
3      Now we're going to build again a custom lease
4  system that we're going to turn into a product, a huge
5  project for them.  Multiple years, lots and lots of
6  money for them, lots and lots of money for us.  So they
7  wanted us to sign up for penalties if we cancelled, if
8  we decided to walk away from this.
9      So I believe that we signed up for penalties
10 in the tens of millions of dollars if we walked away
11 from it.  We didn't.  It is now a huge success at GE
12 Capital.  But it was a risky project, and this one
13 worked.
14 Q.  And again, at least as of Wednesday, 17th of
15 January 2001, these documents would have been in your
16 e-mail file?
17 A.  Yes, sir.
18 Q.  They weren't produced from your file and you
19 cannot explain why; is that right?
20 A.  That's correct.
21     MR. SOLOMON:  Have marked as the next exhibit
22 a document produced by defendants with the control
23 numbers 035356 through 358.
24         (Exhibit 41 marked for
25             identification.)

171

1      THE WITNESS:  Okay.
2      MR. SOLOMON:  Q.  Do you recognize this?
3  A.  Same answer I usually give.  I'm very familiar
4  with the issues raised in this, but I don't recall the
5  specific document.
6  Q.  But you don't dispute you would have received
7  this and read the contents around the time it was sent?
8  A.  I'm sure I did.
9  Q.  And I'm looking at an exchange between Sergio
10 Giacoletto and a number of people, including yourself;
11 correct?
12 A.  Yes.
13 Q.  And he says that he has some good and some bad
14 news.  I'm looking at the second page, a few lines down.
15 "I'm sure some of those problems also exist in the USA."
16 He's referencing problems that he's just identified.
17 "But there we have no language issue and we have
18 critical mass and more help from development.  In order
19 for us to achieve 30 percent growth overall, we need to
20 grow applications at least 65 percent each quarter and
21 we need to fix those issues."
22     Do you see that?
23 A.  I do.
24 Q.  Do you remember being made aware of that at
25 the time?

172

1    A.  Yes.  And I would like to clarify what, you
2    know, what, quote, the language issues are, if I may.
3    Q.  What are the language issues?
4    A.  Okay, so -- well, the applications work in all
5    languages, what I mean by that is you can store a
6    service request in Chinese or even the Afghanistan
7    language, all of it.  So we could accept data from any
8    language.
9        That does not mean that every manual that we
10   publish, like how to install the software, is also --
11   that manual is also available in Chinese, or specific
12   error messages that come out of the system is also going
13   to translate into Chinese.
14       So even though the systems work with all these
15   different languages doesn't mean we finished every
16   document that we have related to those products, we've
17   translated all of those.
18       That's what he's referring to.  Often in the
19   sales process one of the things you show them is you
20   show them the documentation.  That's how they learn to
21   install the system.  If they are Chinese engineers, most
22   aren't familiar with English, but if they are not,
23   that's a problem.
24       So, again, the systems work in all languages,
25   but not all the documentation was available in all

1    languages.
2    Q.  Okay.  Then going down, he says he expands
3    each point, and he talks about issues with gaps between
4    code freeze, and he talks about patches and he talks
5    about new functionality.
6        Were you aware of these issues prior to him
7    outlining these to you?
8    A.  You're talking about "Let me explain these
9    points," that section there?
10   Q.  I just really want to know if there is
11   anything here that is new to you, that's news, or is it
12   stuff that you knew before he outlined it to you?
13   A.  I'm sure there is -- some of the details were
14   new.  But I certainly knew that our translations were
15   lagging, some of the languages were lagging English.  It
16   is a matter of we have priority, we do five to eight
17   languages first, we do English first, we translate to
18   five to eight languages, then eventually we had a couple
19   of dozen different languages.
20   Q.  Let's look at point 1.  It says, "The gap
21   between code freeze NLS availability is growing again.
22   For example 11.5.3 NLS will not be fully translated
23   including help until May 2001 for the first languages
24   and August 2001 for the last language.  The code was
25   frozen (I believe) in October 2000.  So from a field

1    point of view we have a minimum gap of four months and a
2    maximum of ten!  This is due to translation workload and
3    lack of full automation."
4        Do you see that?
5    A.  Yes.
6    Q.  Were you aware of that prior to it being
7    disclosed to you in this e-mail?
8    A.  I'm not sure I was aware of four months and
9    ten months, those specific gaps.  I certainly knew that
10   there were gaps in translation.
11   Q.  Next, "We just completed the testing of the
12   translation of 11.5.1 NLS and we found almost 5,000
13   translation issues to be fixed.  This is a problem for
14   our mid market strategy where NLS is critical."
15       The question is, were you aware of that prior
16   to it being outlined to you here?
17   A.  Certainly not the number 5,000.
18   Q.  Number 2, "Due to the gap between code freeze
19   and CD, we have to do a lot of patching at each customer
20   site.  Platinum is helping a lot, but is only available
21   in English and we still need to apply manually
22   translation patches, assuming they exist.  Mark is
23   looking to provide Platinum in four to five languages.
24   This would be good."
25       Do you see that?

1    A.  I do.
2    Q.  Were you aware of that before this was
3    outlined to you?
4    A.  No.
5    Q.  Continuing, "The patching process is prone to
6    errors.  There is no central patch log database and
7    automation could be improved.  Ron has this as a top
8    priority.  This will help us to improve customer
9    satisfaction and consulting margin."
10       Do you see that?
11   A.  I do.
12   Q.  Then it goes on to 3.  "New functionality is
13   being added to each new release.  The training material
14   is not kept up to date and there is too much information
15   to use traditional methods of teaching in any case, so
16   we need to use web training and to have more support in
17   the field for development.  As discussed at the EC, we
18   should have a few experts from development in new
19   products deployed in EMEA."
20       Do you see that?
21   A.  I do.
22   Q.  Were you aware of these suggestions prior to
23   them being suggested to you in January of 2000?
24   A.  I mean, not this specific question about the
25   experts from development in each new product deployed.

1    Q.  And EMEA, Europe, Middle East and Africa?

2    A.  That's right.

3    Q.  And Afghanistan is in the Middle East?

4    A.  It is.

5    Q.  Again, this would have been in your files on

6  or around Sunday, January 21, 2001?

7    A.  Yes.

8    Q.  And it has not been produced from your files

9  in this litigation, and you cannot explain why; right?

10    A.  That's correct.

11    MR. SOLOMON:  Have marked as the next exhibit

12  a document with the control numbers 035381 through 383.

13       (Exhibit 42 marked for

14            identification.)

15    MR. SOLOMON:  Q.  Once you had a chance to

16  look at it, let me know if you recognize it.

17    A.  Yes, I do.

18    Q.  The first sheet suggests that it's from you to

19  you, and to Safra Catz and Mark Barrenechea; is that

20  right?

21    A.  Yes.

22    Q.  And there's an article or a statement headed

23  "Oracle's eCRM Suite in 90 Days."

24       Do you see that?

25    A.  That's right.  Yes.

177

1    Q.  And that first sentence, "Oracle guarantees it

2  can do a worldwide installation of our eCRM suite at

3  your company in just 90 days."

4       Do you see that?

5    A.  Yes.

6    Q.  And then there is a question mark.  Is that

7  your question mark?

8    A.  No.  Don't know where that came from.

9    Q.  Okay.

10    A.  Truth is, I have no idea.

11    Q.  Now, this document I'm going to represent to

12  you, was not -- this particular document wasn't sourced

13  to your files, but we actually do have this document

14  produced from your files as well.

15    MR. LINDSTROM:  Which document?  The second

16  page?

17    MR. SOLOMON:  The second page, yeah.

18    Q.  So can you explain to me how it is that at

19  least the second page of this document was produced from

20  your files, and yet we haven't been able to get the

21  other documents that I've referred to, haven't been able

22  to establish that they were in your files?

23    A.  (Shaking head.)

24    Q.  Don't know?

25    A.  No.

178

1    Q.  I guess what I'm trying to say is that we've

2  been through a series of e-mails going from the summer

3  of 2000 into January, and I've represented to you even

4  though you're an addressee, they weren't produced from

5  your files.

6       And what I'm also representing to you now is

7  that this second page, a version of it has been produced

8  from your files.

9       My question is, do you know what permitted

10  that to be in your files but not the other documents?

11    A.  I can guess.  But I assume you don't want me

12  to do that.

13    MR. LINDSTROM:  I don't want you to do that.

14  As he's asked you before for speculation, he can do so

15  again, but I'll object.

16    MR. SOLOMON:  Q.  What's your guess?

17    MR. LINDSTROM:  Objection; calls for

18  speculation.

19       You may answer according to your guess.

20    THE WITNESS:  Well, I made a point of not

21  throwing away things.  During a cleanup period I

22  wouldn't throw away things that I would need later on,

23  that would be useful later on.

24    MR. SOLOMON:  Got you.

25    MR. LINDSTROM:  Counsel, just for sake of

179

1  clarification, you said the second page had been

2  produced from Mr. Ellison's files.  Is it actually the

3  second and third pages or just the second page?

4    MR. SOLOMON:  I can tell you now, it is

5  actually the first and second page.

6    MR. LINDSTROM:  But not the third?

7    MR. SOLOMON:  And I'm not going to represent

8  one way or the other whether it was the third.

9    MR. LINDSTROM:  For clarification, the e-mail

10  was produced in this instance with the attachment?  Is

11  that what you're saying?

12    MR. SOLOMON:  I believe it may well have been.

13  But this isn't the one from his source.

14    MR. LINDSTROM:  I see.

15    MR. SOLOMON:  Do you understand?

16    MR. LINDSTROM:  Yes.  The one marked as

17  Exhibit 42 is not the one from his source file.

18    MR. SOLOMON:  Right.  My representation is

19  this is a very similar if not exactly the same copy in

20  his source file.

21    MR. LINDSTROM:  Thank you.

22    MR. SOLOMON:  Q.  I want to go into the body

23  of the "Oracle eCRM Suite in 90 Days" document.  Looking

24  where it says, "Siebel CRM suite is neither complete nor

25  integrated.  Complete.  They resell products."  It goes

180

1  on to say, "Siebel product acquisition and product
2  resale strategy enabled them to deliver the world's
3  first CRM suite, but that suite is not complete, not
4  integrated, not global.  It is very difficult and
5  expensive to install.  Once installed you have multiple
6  systems with multiple customers and product databases.
7  The data fragmentation caused by the multiple databases
8  makes it more difficult to get information out of a
9  Siebel system."
10  Do you see that?
11  A.  I do.
12  Q.  Is that true?
13  A.  This is a draft of a marketing promotion, a
14  special offer we were going to make to sell CRM.  I
15  don't know what state the draft was in at this stage.
16  We did actually come up with the CRM in 90 Days program
17  and -- but I don't think this is a finished document.
18  That's one thing I would like to say.
19  The next -- in answer to your question, is
20  the -- Siebel implementations generally were done a
21  country at a time.  So France would have their own
22  version, Japan would have their own version, that's the
23  way Siebel was typically implemented.  One of the unique
24  things about our system is it did work in multiple
25  languages and could co-exist in a single system with all

181

1  these different character sets, with Japanese, Chinese,
2  English and Russian all in the same database.  It was a
3  unique advantage we had over Siebel, being global in a
4  single database, I hope that's responsive.
5  Q.  Is that paragraph true?
6  MR. LINDSTROM:  Again, for sake of the record,
7  can you identify the paragraph?
8  MR. SOLOMON:  It starts with the sentence,
9  "Siebel CRM suite is neither complete," that sentence,
10  then the paragraph below beginning, "Siebel products"
11  and ending "Siebel system."
12  MR. LINDSTROM:  Those two paragraphs together
13  you're asking him about?
14  MR. SOLOMON:  Yes.
15  THE WITNESS:  I really don't remember the
16  state of Siebel when I drafted this.  I'm just not --
17  I'm just not sure I can answer that question.
18  MR. SOLOMON:  Okay.  I marked as the next
19  exhibit a document produced by defendants with the Bates
20  range 035384, 385, 386.
21  (Exhibit 43 marked for
22  identification.)
23  MR. SOLOMON:  Q.  Do you recognize this?
24  A.  Pretty much, yeah.
25  Q.  Do you know who Scott Stoll is?

182

1  A.  No.
2  Q.  How about Sohaib Abbasi?
3  A.  Yes.
4  Q.  Who is Sohaib Abbasi?
5  A.  He was one of our engineering managers, but he
6  also ran education for a while.
7  Q.  And looking at the second page of the
8  document, dated Friday, January 26, 2001, and you are an
9  addressee, do you see that?
10  A.  Yes.
11  Q.  The good news, if you look down to the bottom
12  of the page, was "Everybody used the new application and
13  didn't resort to the web queue for a crutch at all."
14  Do you see that?
15  A.  Yes.
16  Q.  Then the bad news is reported as "The
17  application performance was fair, (total time to create
18  and book an order) in the morning, (8 to 9 minutes) and
19  waned as the day progressed, (15 to 30 minutes).  The
20  application was very unstable, one minute certain
21  functionality worked, the next minute it doesn't
22  (Feedback from reps and managers)."  It goes on to say,
23  "The telesales reps also recorded close to 5 new
24  major and/or minor bugs an hour.  They've been so busy
25  with upset customers, we have little time to log them

183

1  all.  Our call statistics suffered to a point where we
2  can't process calls in a timely fashion nor help most of
3  our customers."
4  Do you see all that?
5  A.  I do.
6  Q.  Were you made aware of these issues as a
7  result of this e-mail, or did you know about them
8  beforehand?
9  A.  I don't know.  I was only aware of the issues.
10  Q.  Okay.  And you will see on the front page
11  there is reference to "Serious trouble for education.
12  JLH."
13  Is that Mr. Hall, John Hall?
14  A.  Yes.
15  Q.  Did you consider what is contained here as
16  serious trouble for education?
17  MR. LINDSTROM:  Are you asking him that as of
18  the time --
19  MR. SOLOMON:  When he received this, yes.
20  THE WITNESS:  Would I characterize it that
21  way?
22  MR. SOLOMON:  Q.  Yes.
23  A.  No.  We put in all new order entry system
24  for education, and the reps had to be trained and the
25  system had to be tuned.

184

1   Whenever you cut over from one system to
2   another, it is a difficult process whether it is
3   internal or with one of our customers.
4        Q.  But what I'm asking you is, do you agree
5   with -- maybe you did answer.  Let me ask you again.  Do
6   you agree with Mr. Hall's characterization that there
7   was serious trouble for education?
8        A.  No.  I don't think it had significant impacts
9   on our business.  It certainly made -- it was difficult
10  for the reps to make the transition from one system to a
11  new system.
12       Q.  Do you recall receiving the message from
13  Mr. Hall?
14       A.  Again, not specifically.  But I'm -- I recall
15  very clearly what was going on at the time.
16       Q.  Do you recall doing anything in response to
17  this?
18       A.  I think we reviewed it periodically in
19  meetings, looking at reports not unlike the one that's
20  on page 3, looking at how long it was taking to process
21  orders and how many calls were dropped and the usual
22  statistics until we got comfortable that the new system
23  was working at least as well as the old one.
24       Q.  On the bottom of page 3, there is an
25  interesting quote, you may not be interested in it, but

185

1   it says, "Prefer a loss to a dishonest gain.  One brings
2   pain for the moment, the other for the remainder of
3   time."
4        Do you see that?
5        A.  I do.
6        Q.  How did that find its way on here?
7        A.  I think a lot of people have -- they attach --
8   have little -- have quotes attached to their e-mails
9   automatically.  One of the things e-mail systems will do
10  for you automatically, it will attach your quotes.
11       MR. SOLOMON:  Let's take a ten-minute break.
12       VIDEOGRAPHER:  This marks the end of tape
13  three in the deposition of Larry Ellison.  At 3:23,
14  going off the record.
15       (Recess, 3:23 p.m. - 3:48 p.m.)
16       VIDEOGRAPHER:  On record at 3:48.  This marks
17  the beginning of tape four in the deposition of Larry
18  Ellison.
19       MR. SOLOMON:  I've marked as the next exhibit
20  a document produced by defendants with a Bates range
21  035425 through 428.
22       (Exhibit 44 marked for
23        identification.)
24       MR. SOLOMON:  Q.  And, as usual, just take a
25  look at it, please, then let me know if you recognize

186

1   it.
2        A.  Okay.
3        Q.  Okay, do you recognize it?
4        A.  No.  I remember the issue, but I don't
5   recognize this specific document.
6        Q.  But you don't dispute that you received it and
7   read it around the time, the time being January 30th,
8   2001?
9        A.  No, I don't.
10       Q.  I should be more precise.
11       A.  I do not dispute that I read this document.
12       Q.  Around the time --
13       A.  Yes.
14       Q.  -- of the e-mails?  And the e-mails are dated
15  the 30th of January 2001 and the 25th of January 2001.
16       Going to the second page of the exhibit, and
17  I'm looking under the heading, "The facts."  And in the
18  middle of the first paragraph, or the paragraph under
19  "The Facts," it says, "They're experiencing major
20  performance problems with 11i, as well as there still
21  are some features/function gaps.  The performance
22  problem could be network issues, DB/app tuning, 11i
23  product issues or combinations of all three.  BOL and
24  Oracle support have been working with the customer to
25  resolve the issues for the past week."

187

1   And the business in question is Chipotle.  Do
2   you see that?
3        A.  Yes.
4        Q.  And were you aware of the issues referenced
5   here prior to receiving this e-mail?
6        A.  Again, I don't know.  I certainly was aware of
7   the issues, which are multi.
8        Q.  The next paragraph under "The Problem," it
9   reads in part, "We are getting very bad press from the
10  Columbus Accounting Group based on the poor performance
11  of 11i.  In fact, the CIO of McDs and the worldwide
12  controller called my yesterday to express their concern
13  over our apps performance.  Both of these execs are
14  Oracle advocates, and in the CIO's words, 'Oracle is not
15  doing themselves any favors with our inability to
16  quickly address these performance issues.'  The 11i
17  performance issues need to be fixed at Chipotle or BOL,
18  or lose one of their strongest references, and Oracle
19  will be in a poor position to be McDonald's global
20  applications provider."
21       Do you see that?
22       A.  I do.
23       Q.  And McDonald's was a big enough company for
24  you to be concerned about?
25       A.  Yes.

188

1    Q.  And do you remember being concerned about
2    McDonald having issues, performance issues with 11i at
3    around this time?
4    A.  They weren't -- to be precise, this was an
5    unusual situation in that not only were they running
6    11i, they were running 11i in our data center.  BOL is
7    Oracle Business Online or on demand.  It's a method of
8    delivering your applications over the Internet.  Not
9    unlike our demo systems, we would actually host the
10   Chipotle application in our data center in Austin,
11   Texas, and deliver their application across the
12   Internet.
13       And we were having -- and they were one of our
14   earlier customers for Business Online, a new service,
15   and they were having what turned out to be network
16   performance problems, and it was a problem.
17       Q.  Then the next heading is, "How Oracle turns a
18   negative into a positive."  And it says, "Oracle (sales
19   BOL, Support and OCS) needs to respond and fix this
20   performance problem quickly.  Right now we appear to be
21   very reactive with no real plan for resolution."
22       Do you see that?
23       A.  I do.
24       Q.  You were aware at the time of there being a
25   perception within Oracle that Oracle was being reactive

189

1    with respect to McDonald's and had no real plan for
2    resolution?
3    A.  Again, I just don't agree with that
4    characterization.  We were aware of the problem, we were
5    trying to fix the problem.  There was some -- there was
6    some uncertainty what exactly was causing the problem.
7    So we put our people on it, and it turned out to be a
8    network performance issue, and we fixed the problem.
9    Q.  Okay.  And, again, this was a document that
10   would have been in your files in or around late January
11   2001?
12   A.  Yes, I believe I received this specific
13   document as a result of Safra Catz forwarding it to me
14   on the, what, on the 30th of January.
15   Q.  Okay.
16   A.  Okay.
17   Q.  Yet, it was not produced or sourced to you
18   from your files in this litigation and you cannot
19   explain why; is that right?
20   A.  That's right.
21   Q.  Page 2, there is a message, it says, "Keith,
22   Can you make sure we get a top resource to lead this.
23   Funding will get covered by the appropriate
24   organizations which will be decided later.  McDonald's
25   may be in danger of missing their close of books for the

190

1    end of the year.  We obviously can't allow that to occur
2    if at all possible."
3    Do you see that?
4    A.  I do.
5    Q.  Do you recall being aware at the time that
6    owing to 11i issues that McDonald's was in danger of not
7    being able to close its year?
8    A.  There was no 11i issues with regard to
9    Chipotle.  It was a network performance issue from
10   business from the Austin data center to McDonald's
11   accounting headquarters.  It was a network issue, not
12   11i issue.  There was never any danger in McDonald's not
13   being able to close their books.  That's just a
14   hyperbolic statement.
15   Q.  Okay.  Do you know who wrote that?
16   A.  George Roberts.
17   Q.  And is he prone to hyperbole?
18   A.  Not very often.  But that was --
19   Q.  That was his moment?
20   A.  Yeah, that was his moment.  That was the
21   moment.  Needless to say, a large public company like
22   McDonald's not being able to close their books would
23   have gotten enormous attention.
24   MR. SOLOMON:  Have marked as next exhibit a
25   document produced by Oracle with the control number

191

1    012439 through 41.
2    (Exhibit 45 marked for
3    identification.)
4    MR. SOLOMON:  Q.  And do you recognize seeing
5    this before?
6    A.  I don't.  Don't recall seeing it.  I'm sure I
7    did, but don't recall.
8    Q.  You don't dispute you would have seen it and
9    read it around the date it was sent, which appears to be
10   January 31, 2001?
11   A.  It looks like 30 January.  But, no, I don't
12   dispute that.
13   Q.  I'm looking at the top one that says 31.  But
14   you're right, the one below that says the 30th.  So
15   those two days.
16   A.  Right.
17   Q.  And the bottom of the page, the subject is
18   "Critical AOL/J bugs."  And the message on the second
19   page at the top reads, "Skees, please let us know the
20   moment this patch," then there is a number, "is
21   released.  It's still 'checkin in Progress' as of 11:35
22   p.m.  This issue is hurting ADS and two external
23   customers."
24   Do you see that?
25   A.  I do.

192

1    Q.  First of all, do you recall becoming aware of
2    that on January 30th of 2001?
3    A.  I don't recall.
4    Q.  Okay.  Where it says, "The issue is hurting
5    ADS two external customers," do you know what that
6    is referring to?
7    A.  ADS is the demonstration system, the network
8    demonstration system.  And what he's saying is there is
9    a bug in our software that's -- that AOL is a layer of
10   tools beneath the applications that is shared by both
11   CRM and ERP.  And he is saying -- and that group was
12   managed by Ron Wohl, and there is a bug that he'd like
13   to get fixed --
14   Q.  Okay.
15   A.  -- in AOL.
16   Q.  Do you know who the two external customers are
17   referenced there?
18   A.  I do not.
19   Q.  On the first page it says from Ron Wohl to
20   you, at the top, with no message.  And then below that
21   it is from Mark Barrenecheca to you, and to some others
22   including Safra Catz and Ron Wohl.
23       And it says, "Ron, we have blown AppsWorld
24   Paris for CRM html demos.  We've been blocked for days.
25   I can say there is not enough time left to complete."

193

1    Do you see that?
2    A.  I do.
3    Q.  Do you recall hearing that information around
4    this time?
5    A.  I don't, but I'm certainly familiar with the
6    issue.
7    Q.  Okay.  Again, this is a document that would
8    have been in your files, or each of these e-mails would
9    have been in your files in late January 2001?
10   A.  Yes.
11   Q.  And they were not produced from your files,
12   and you can't explain why they weren't in your files at
13   the time of documents being produced in this litigation;
14   correct?
15   A.  That's correct.
16   Q.  Now, regardless of when you traded stock in
17   January, this is dated January 31, 2001, do you recall
18   when you stopped trading stock in 2001?
19   A.  I don't.
20   Q.  Is it fair to say by this date you had
21   accomplished a lot of your sales?
22   A.  I remember clearly I did not trade in
23   February.  So the 31st, if it was a weekday, would have
24   been the last day I could have traded.  I don't know if
25   I traded on the 31st or the 30th.  I just don't know.

194

1    MR. LINDSTROM:  Are we finished with
2    Exhibit 45?
3    MR. SOLOMON:  Yes, we have.
4    Have marked as the next exhibit a document
5    produced by Oracle, bearing the Bates numbers 020844
6    through 849.
7    (Exhibit 46 marked for
8    identification.)
9    MR. SOLOMON:  Q.  I want you to take a look at
10   this document and let me know if you recognize it.
11   A.  Okay.
12   Q.  And if you go to page 1, you testified earlier
13   that you never engaged in a transaction -- negotiated a
14   transaction with Carly Fiorina?
15   A.  That's correct.
16   Q.  And you look at the first bullet point, and it
17   reads, "Production Spend - Consistent with Larry's
18   conversations with Carly, HP will expect a purchase
19   order for the following amounts.  They will expect this
20   purchase order to be binding and commit Oracle to using
21   the full amounts by the dates we promise.  10 million by
22   December 31.  (I asked for this to give us time to scope
23   out the configurations we currently need) 10 million by
24   May 31."
25   Do you see that?

195

1    A.  I do.
2    Q.  Is that just simply completely and utterly
3    inaccurate?
4    A.  That's correct.  It is completely and utterly
5    inaccurate.  I just don't negotiate business terms, it
6    is just not my practice to do so.  I just never do it.
7    I should say, hold up; "never" is a bit extreme.
8    I didn't do it in this case, and I haven't
9    done it for a very long time.
10   Q.  Now, you are on this e-mail, it is addressed
11   to you.  Do you see that?
12   A.  I am.
13   Q.  Did you respond to this?
14   A.  Not that I recall.  This is from the sales
15   rep, the sales -- the HP sales rep.
16   Q.  Did you fire him for telling a bunch of lies?
17   A.  No.  He wasn't with my -- in my meeting with
18   Carly Fiorina.  We just don't go in -- we don't sit
19   there and negotiate contracts between the two of us.  It
20   just doesn't happen.  It is not what we talk about.
21   The sales, that's the responsibility of the
22   sales rep and the purchasing people at HP.
23   Q.  The second bullet point says, "CRM
24   Development - As a follow-up to Larry's conversation
25   with Carly, Mark Barrenecheca will be sending me a note

196

1  tonight which will spell out exactly what Oracle will do
2  within our CRM development environment to move to HP."
3      Again, complete nonsense?
4      A.  No.  It was complete nonsense that it is
5  following my -- well, I certainly spoke to Carly, I had
6  meetings with Carly.  We just didn't discuss the details
7  of individual transactions at any of those meetings.
8  The -- those transactions were negotiated by people
9  lower down in the organization.
10     Q.  Who is Michael DeCesare?
11     A.  He's a sales -- you know, he was the sales
12  manager in charge of HP.
13     Q.  What was his official title?
14     A.  I don't know.  It would be director,
15  vice-president.  I'm not sure.
16        MR. LINDSTROM:  Don't speculate.
17        THE WITNESS:  I don't know.
18        MR. SOLOMON:  Q.  Area vice-president,
19  perhaps.
20     A.  He could have been an AVP, right.
21     Q.  I'm looking now at the third page of the
22  document, which has the number 20846.
23     A.  Yes.
24     Q.  And it says, among other things, with a bullet
25  point against it, "Documents - We are currently working

197

1  on a document that will be given to HP tomorrow that
2  explicitly spells out what Oracle will do within our CRM
3  environment.  We are prepared to make this binding, but
4  should this cause problems from a timing perspective
5  with HP legal, then we will get 'executive sign off'
6  from Larry."
7      Do you see that?
8      A.  I do.
9      Q.  Do you agree that most likely references Larry
10  Ellison?
11     A.  Yes.
12     Q.  And you don't have any knowledge of this; is
13  that right?
14     A.  What do you mean, any knowledge of what?
15     Q.  Any knowledge of the potential for an
16  executive sign-off from you in connection with this
17  proposed transaction?
18     A.  The only thing I would typically sign off -- I
19  approve a lot of the large purchases.  So if it is -- I
20  don't get involved in selling, practically I don't get
21  involved in selling and negotiating the terms of our
22  selling activity.  I do get directly involved in
23  approving our hardware purchases.  So if it is a large
24  purchase, I do approve those things.
25     Q.  So this could be accurate?

198

1      A.  Again, I'm not quite sure it's -- if they are
2  asking for a large purchase to be executed with
3  Hewlett-Packard, they would have to get my approval,
4  yes.
5        MR. LINDSTROM:  Again, we're talking about the
6  top of Bates stamp page 20846?
7        MR. SOLOMON:  Correct.
8        MR. LINDSTROM:  The third bullet point down
9  entitled "Documents" in italics?
10        MR. SOLOMON:  Correct.
11        MR. LINDSTROM:  Right?
12        MR. SOLOMON:  Correct.
13        THE WITNESS:  So as a business practice if
14  they are going to buy a bunch of HP machines, I would
15  have to approve it.
16        MR. SOLOMON:  Q.  Now, there is a few more
17  bullet points below, under the heading "Hardware Spend
18  Document."  And among those points, it says, "Instead of
19  allowing each owner within Oracle to purchase HP when
20  the machines they are currently using need to be
21  upgraded, this is a corporate wide commitment to move
22  everything to HP according to the schedule we've
23  discussed.  This will result in more money and a more
24  rapid sales process than HP would ever be able to
25  achieve, selling business unit by business unit."

199

1      Do you see that?
2      A.  It is --
3        MR. LINDSTROM:  The question is, do you see
4  it?
5        THE WITNESS:  I see it.
6        MR. SOLOMON:  Q.  And then skip a bullet
7  point, "Larry Ellison will issue an internal note to
8  Oracle confirming the commitment to HP (CRM development,
9  production)."
10     Do you see that?
11     A.  I do.
12     Q.  Does that make sense?
13     A.  The things you just read me?
14     Q.  That Larry Ellison will issue an internal
15  note.
16     A.  None of this makes sense.
17     Q.  Okay.
18     A.  In fact, may I explain, or not?  I would be
19  happy not to.
20     Q.  You may in a second.
21     A.  Okay.
22     Q.  Do you often get e-mails from people in your
23  organization suggesting that you've had conversations
24  with other senior executives that you're doing a
25  transaction that's absolutely inaccurate and wrong that

200

1 you do nothing about, that you take no action on?

2     MR. LINDSTROM:  Mischaracterizes his

3 testimony, argumentative.

4     THE WITNESS:  Do I see people write things

5 that are incorrect and me not correct them?

6     MR. SOLOMON:  Q.  When an e-mail within your

7 organization is directed to you that contains complete

8 and utter inaccuracies and falsehoods concerning you and

9 your relationship with other executives, do you not take

10 any action?

11     A.  If it's -- if clarifying what really happened

12 wouldn't change our behavior very much, no.

13     There are other patently inaccurate statements

14 in this document which I also didn't correct.

15     Q.  You didn't correct any statement in this

16 document?

17     A.  I don't think so.

18     Q.  So now at 020849, last page.

19     My first question is, do you recognize the

20 writing?

21     A.  No.

22     Q.  Halfway down there is a bullet point which

23 reads, "Our end goal is to generate a document which

24 Larry and Carly can agree to as the game plan both

25 companies will execute against.  It will contain what

201

1 Oracle will do, metrics for measuring success against

2 these goals and an escalation path if either company

3 feels the other is not delivering.  Currently this has

4 been reviewed by Jim Clark and Mike Rocha."

5     Do you see that?

6     A.  I do.

7     Q.  Do you have a recollection of reading this

8 around the time of end of November 2000?

9     MR. LINDSTROM:  The sentence you just quoted?

10     MR. SOLOMON:  Yes.

11     THE WITNESS:  No.

12     MR. SOLOMON:  Q.  The it goes on below that,

13 "Hardware Requirements to get to 100% database servers

14 on HP."  And it says, "In August 1999 Oracle committed

15 to 50% of all production servers on HP.  Since then

16 Larry confirmed to Carly that Oracle would now move 100%

17 of our production database servers to HP."

18     Do you see that?

19     A.  I do.

20     Q.  Did you say that to Carly?

21     A.  I don't think so.

22     Q.  At the end of this document, "Q2 CRM Order to

23 HP.  HP will not require the additional licenses until

24 January 2001 to June 2000 (sic) but is willing to commit

25 to these licenses in exchange for the above points.  The

202

1 list price on these new licenses is 46M and we are

2 currently in front of them at a 50% discount for net

3 license deal of 23M."

4     Do you see that?

5     A.  I do.

6     Q.  Do you recall reading that in late November

7 2000?

8     A.  I do not.

9     Q.  Do you recall reading any of this in late

10 November 2000?

11     MR. LINDSTROM:  Now, when you say any of this,

12 you mean anything contained within Exhibit 46?

13     MR. SOLOMON:  You got it.

14     THE WITNESS:  I do not.

15     MR. SOLOMON:  Q.  Did you ever discuss with

16 anybody the concept of you and Carly doing business

17 together?

18     MR. LINDSTROM:  I'm not sure what you mean by

19 doing business.

20     THE WITNESS:  I met with Carly Fiorina many

21 times.  We discussed business every time we met.

22     MR. SOLOMON:  Q.  You have no idea why Michael

23 DeCesare is saying these things?

24     A.  No.  I know exactly why he's saying these

25 things.

203

1     Q.  You know exactly why he's saying these things?

2     A.  I think so.

3     Q.  What's the exact reason why he's telling these

4 lies?

5     MR. LINDSTROM:  Objection; argumentative.

6     THE WITNESS:  He's not telling lies.  I think

7 a lot of people believe they know when two CEOs of large

8 companies get together what they talk about.  And they

9 think what we talk about is what is most important to

10 them as a sales rep.  So they think when we get together

11 -- and that's also true of people inside of Oracle, they

12 think we get together and are just going to go down all

13 of the issues that are important to them.  But there are

14 a lot of issues between the two companies besides us

15 buying their hardware and their buying some of our

16 software.  It's particularly important to Mike DeCesare,

17 not necessarily the most important thing on our list to

18 discuss.

19     MR. SOLOMON:  Q.  Okay.

20     A.  But it is what Mike would like us to discuss.

21     Q.  He sort of knows a lot of -- seems to know --

22 if you look at page 1, "Production Spend" and "CRM

23 Development."  He seems to know a lot of this

24 non-occurring conversation, hum?

25     MR. LINDSTROM:  Objection; mischaracterizes

204

1   the document, argumentative.

2         THE WITNESS:  He's trying to get a deal done,

3   and he's putting together a deal between Oracle and HP

4   and that's his job.

5         MR. SOLOMON:  Q.  Didn't he oddly address it

6   to you?

7   A.  No.  There is another document you showed me

8   from Mike Rocha who gave me a list of things that Carly

9   would want to discuss.  It was from the Oracle side.  I

10  think it was a preparatory document that said, "Before

11  you go into your meeting with Carly Fiorina, I'm sure

12  she'll mention all of these things."

13        I guess we can go back and plow through it and

14  try to find that.  She mentioned none of them.

15        This is exactly the same situation from the

16  other side.

17  Q.  Okay.  Has this ever happened before?

18  A.  It happens all the -- well --

19  Q.  Really?

20  A.  Well --

21  Q.  Sorry.  You were going to say it happens all

22  the time.

23  A.  It happens whenever I have a meeting with a

24  senior executive of another company.  Let's say we have

25  business pending with Sun, I'll get a note saying, "I'm

205

1   sure Scott McNealy will" -- Scott is no longer the CEO

2   there -- "I'm sure Scott McNealy will want to discuss A,

3   B and C."

4         What they're really saying is, "Larry, when

5   you see Scott, please mention our deal and try to help

6   move the deal along."

7   Q.  That perhaps is understandable.

8         What about, though, not, "I'm sure they're

9   going to ask you this," what about, "These are the

10  conversations Larry had with Carly" and then detailing

11  them?

12        MR. LINDSTROM:  Objection; argumentative, and

13  it also mischaracterizes the document.  You've been over

14  this ground with him two or three times now.

15        MR. SOLOMON:  We're almost done.  It's a

16  little bit different.

17        THE WITNESS:  Ask the question again.

18        MR. SOLOMON:  Q.  That's a little bit

19  different.  Speculating what someone might ask you is a

20  little bit different from recording a conversation that

21  you supposedly had; do you agree?

22        MR. LINDSTROM:  Mischaracterizes the document.

23  This document doesn't record a conversation.

24        MR. SOLOMON:  Why don't you go ahead and

25  answer Mr. Ellison.

206

1   A.  Yes.  There are documents that are

2   prospective, "She'll want to talk about this."  It is

3   different than documents that are retrospective, "She

4   has talked about this."

5   Q.  Did Safra Catz meet with Carly Fiorina around

6   that time?

7   A.  I don't think so.

8         COURT REPORTER:  Could we go off the record?

9         MR. SOLOMON:  Sure.

10        VIDEOGRAPHER:  Off record at 4:22.

11           (Off the record.)

12        VIDEOGRAPHER:  On record at 4:24.

13        THE WITNESS:  I can volunteer one more

14  explanation why I believe I did not discuss the terms of

15  this deal with Carly Fiorina.

16        MR. SOLOMON:  Good.

17        THE WITNESS:  I don't like discussing terms

18  and conditions with other customers and prospective

19  customers.  I don't like the negotiating process, and

20  I've avoided it for years and years and years.  So it's

21  very unlikely I would have made an exception for Carly.

22        MR. SOLOMON:  I thought for a second you were

23  going to say, "I don't like Carly."

24        THE WITNESS:  I would never say that.

25        MR. SOLOMON:  Q.  On the last page, I want to

207

1   go back, because I think I read something wrongly into

2   the record.  On the very last page, I may have got the

3   date wrong.

4         So what I should have read into the record was

5   the last page, "Q2 CRM Order to HP," this is how it

6   should read, "HP will not require the additional

7   licenses until late 2001 to June 2002, but is willing to

8   commit to these licenses in exchange for the above

9   points.  The list price on these new licenses is 46M and

10  we are currently in front of them at a 50 percent

11  discount for net license deal of 23M."

12        I believe that's now accurate.  No question,

13  Mr. Ellison.

14        I marked as the next exhibit a document

15  produced by the defendants with the control number

16  063429.

17           (Exhibit 47 marked for

18            identification.)

19        MR. SOLOMON:  Q.  And, Mr. Ellison, before you

20  go to 47, just if you look at 46 again, I don't think

21  I went through it with you, but this would have been a

22  document that would have been in your e-mail file on or

23  around Tuesday, 28th of November 2000 at least; correct?

24  A.  That's correct.

25  Q.  And it wasn't produced from your source file

208

1  and you can't tell us why?

2  A.  That's correct.

3  Q.  Thank you.  Then we'll go on to 47.  For the

4  record, this is an e-mail dated Tuesday, 6th of February

5  2001, from Ron Wohl to Larry Ellison and others.

6  A.  Yes.

7  Q.  Question is, do you recognize seeing this

8  before?

9  A.  Yes.

10  Q.  It says, "All, let me give you a heads up on

11  some serious quality complaints we will get at the

12  Appsworld over the next two weeks.  For several months

13  we've had persistent problems with your NT version of

14  our product.  These problems stem from issues in the 8.0

15  NT Pro C code.  Despite the best efforts of Chuck's

16  team, these problems persist and we are still in the

17  position where it is very difficult to predict a

18  resolution.  For a long period of time the development

19  team has hoped that we were within two weeks resolution

20  of the problem.  We need to be prepared for both

21  customer and press criticism on this issue.  Some

22  customers may ask us why we didn't withdraw the product

23  from the market once we became aware of the problems.

24  At least one customer has returned the product and is in

25  legal discussions with us."

209

1  Do you see that?

2  A.  Yes.

3  Q.  Do you remember receiving this information at

4  around this date?

5  MR. LINDSTROM:  The information or the e-mail?

6  MR. SOLOMON:  The information.

7  THE WITNESS:  Yes.

8  MR. SOLOMON:  Q.  And did you get the

9  information via the e-mail or by some other source?

10  A.  I don't recall.

11  Q.  And there is a reference to the customer

12  having returned the product and having legal

13  discussions.

14  Do you know what customer that refers to?

15  A.  I do not.

16  Q.  Do you know if there was any litigation

17  concerning this?

18  A.  I do not.

19  Q.  And did you take any action in response to

20  this e-mail?

21  A.  This is a problem with our database.

22  Q.  Yes.

23  A.  So it's -- that affects the version of our

24  applications that run on the Windows operating system.

25  So we -- the action I took is I escalated the problem

210

1  and we fixed it.

2  Q.  Do you know when it was fixed?

3  A.  I don't know when it was fixed.

4  Q.  Are you sure it was fixed?

5  A.  Oh, yes.

6  Q.  And again, this came from your -- excuse me.

7  This would have been in your files at least on or around

8  the 6th of February 2001?

9  A.  That's correct.

10  Q.  And it wasn't produced from your files in this

11  litigation and you can't explain why; correct?

12  A.  Correct.

13  MR. SOLOMON:  Have marked as the next exhibit

14  a document produced by the defendants with Bates range

15  175158 to 161.

16  (Exhibit 48 marked for

17  identification.)

18  MR. SOLOMON:  Q.  Do you recognize having seen

19  this before?

20  A.  Again, not this specific document, but I'm

21  aware of the issue.

22  Q.  You don't dispute that you would have received

23  the document and read the contents around the 7th of

24  February 2001?

25  A.  No, I do not.

211

1  Q.  I'm looking on the second page where it says,

2  "Renee Knee wrote:" and she says, "We are facing a

3  serious threat in our partner base, not only by IBM and

4  Siebel and the highly competitive go to market

5  commitments and partner programs they offer to the major

6  customer influencing partners, but with our local

7  (country level) partners who are finding they can no

8  longer do profitable business with Oracle when we limit

9  the training, support and implementation method/tools we

10  offer them."

11  Do you see that?

12  A.  I do.

13  Q.  Do you recall receiving this information in

14  February of 2001?

15  A.  I don't.

16  Q.  Okay.  So it is fair to say you don't dispute

17  that you received it and read it, but you don't

18  remember?

19  A.  Not specifically this paragraph you just read.

20  Q.  Okay.

21  A.  Again, once again, I'm very familiar with the

22  issues that she's raising in this e-mail note.  I just

23  don't remember that specific paragraph.

24  Q.  Okay.  Did you perceive a serious threat to

25  your partner base in February of 2001?

212

1    A.  The way I read this note is she's concerned
2  that IBM and Siebel are partnering, and that's a very
3  formidable partnership.  And it's true, I mean, IBM is a
4  large company, and Siebel is number one in CRM.  And the
5  combination of those two is a very formidable opponent
6  in the marketplace.  I think she's just raising that
7  issue.
8    Q.  It is something she raised earlier?
9    A.  Renee was in charge of our partner programs,
10  and there aren't many partners of the size of IBM.  And
11  when IBM decides to partner with Siebel and CRM, it
12  means we're terribly disadvantaged.
13    It's true.  I'm not exactly sure what we do
14  about it.  I mean, there are only two class A partners
15  in our business, one is IBM, the other is Accenture.
16    Q.  This represents bad news, but not bad news we
17  can do much about?
18    A.  It's not bad news.  IBM has been partnering
19  with Siebel for a very long time.  We knew about this.
20    I think she's just emphasizing that.  IBM was --
21  I'm not sure that is true.  Accenture partners were
22  early investors in Siebel, and IBM is Siebel's largest
23  customer.
24    The combination of those two things meant that
25  the largest partners we might work together with in the

213

1  CRM marketplace were gone and were wedded to Siebel.
2    MR. SOLOMON:  Okay.  Have marked as the next
3  exhibit a document produced by defendant with the
4  control numbers 297837, and 838.
5    (Exhibit 49 marked for
6    identification.)
7    THE WITNESS:  Okay.
8    MR. SOLOMON:  Q.  Do you recall seeing this
9  before?
10    A.  Yes.  Yes, I do.
11    Q.  And did you receive it around the 8th of
12  February 2001?
13    A.  Yes.
14    Q.  And it is from Ron Wohl to you.  And it says,
15  "I've confirmed that CRM has not turned in any minipacks
16  yet."
17    Do you see that?
18    A.  Yes.
19    Q.  What is a minipack?
20    A.  It is a series of patches or bug fixes or
21  enhancements.  A patch is either an enhancement or a bug
22  fix.  It could be several different things.
23    Q.  When it says, "Has not turned in," what does
24  that mean?
25    A.  Hasn't delivered.

214

1    Q.  Then it goes on to say, "At this point though
2  I would ask that you not slam Mark hard to deliver fast.
3  I'm concerned that all that would do is cause Mark to
4  get his teams to deliver code before testing is
5  complete, causing more work for everyone all around.  I
6  think we're just stuck with the delay.  In the meantime
7  Greg's group continues to do the initial build work with
8  the ERP code and is finding and fixing the first wave of
9  build errors.  What pisses me off about this is that had
10  we known in advance, we would have used the time more
11  effectively.  It's hard trying to have an e-Business
12  suite with someone who lies."
13    Do you know who is the liar being referred to
14  there?
15    A.  Ron is calling Mark Barrenechea a liar.
16    Q.  Okay.  And did you agree with that?  Is Mark
17  Barrenechea a liar?
18    A.  No, I don't think so.
19    Q.  He's not the first person who has called Mark
20  Barrenechea a liar, is he?
21    A.  Probably not.  But during his whole life?  I'm
22  not sure what you're referring to.
23    Q.  At Oracle.
24    MR. LINDSTROM:  Objection; no foundation.
25    MR. SOLOMON:  Q.  Other Oracle executives have

215

1  called Mark Barrenechea a liar?
2    MR. LINDSTROM:  No foundation.
3    THE WITNESS:  I can't recall offhand.  You
4  could be right.  I don't recall.
5    MR. SOLOMON:  Q.  Would it surprise you to
6  learn that Jay Nussbaum called Mark Barrenechea a liar?
7    A.  Not really.
8    Q.  Just so we're sure, you don't subscribe to him
9  being a liar, but you don't know if he's not a liar?
10  You don't know either way?
11    A.  I would not characterize him as a liar, no.
12    Q.  Okay.  Did it upset you that Ron Wohl was
13  calling Barrenechea a liar?
14    A.  I think they were both under -- when you're
15  delivering a new product, whether it is Microsoft,
16  Oracle, IBM, doesn't really matter, which are a huge
17  piece of code, you're under tremendous pressure to get
18  that code out and then to fix bugs when it is first
19  delivered.  It is -- their people are working 16, 17, 18
20  hours a day.  They are under a lot of pressure, working
21  very, very hard.  The teams are working hard.  They get
22  frustrated, they get upset.  So I look at Ron as being
23  extremely frustrated and upset with Mark, who he is
24  partially dependent upon to get his work done.
25    Q.  Symbiotic relationship, the two of them?

216

1   A.  I think they worked extremely well together in
2  the past.  And as pressure dials up, people, you know,
3  get upset.
4   Q.  Did you fire Jay Nussbaum?
5   A.  Jay Nussbaum resigned.
6   Q.  Did you fire Ray Lane?
7   A.  Yes.  Well, hold it, slow down, slow down.  I
8  think technically -- I think fired is -- might be a
9  legal term of art.  I'm not sure exactly what you mean.
10  I think technically Ray resigned, but I asked him to
11  resign.
12   Q.  Is that different?
13   A.  Ray Lane wrote -- there's a book.  Ray
14  Lane -- let me -- Ray Lane wrote me an e-mail note
15  saying I fired -- you know, the term fired came from
16  him, not from me.  And he wrote me an e-mail note saying
17  I fired my best guy.  And that e-mail note subsequently
18  found its way into a book.
19   Q.  Is that different -- was it a different sort
20  of a circumstance than Jay Nussbaum?  Did you ask Jay
21  Nussbaum to resign?
22   A.  We were reviewing different business practices
23  in Jay's organization.  And it wasn't me, it was Jeff
24  Henley and other people were reviewing different
25  business practices in Jay's organization, and Jay

217

1  decided under the circumstances that it would be better
2  if he left.  But it was quite different than the Ray
3  Lane situation.
4   Q.  Okay.  With this exhibit, again, it's dated
5  February 8th, 2001.  And it is -- would have been in
6  your file around that date; correct?
7   A.  Yes.
8   Q.  And this was not produced from your files, and
9  you can't explain to me why it was not; is that right?
10   A.  That's right.
11   MR. LINDSTROM:  Counsel, in each case in these
12  questions the preface is that the document hasn't been
13  produced in the litigation.  And I assume in each case
14  you're making a representation to the witness that
15  that's true; that correct?
16   MR. SOLOMON:  Yes, I am.
17   MR. LINDSTROM:  Thank you.
18   MR. SOLOMON:  And if you demonstrate to me I'm
19  wrong, I will acknowledge it and apologize.
20   MR. LINDSTROM:  My concern is the way the
21  question is posed, I think the witness has no idea
22  what's been produced in the litigation or not, and one
23  could look at the question as having been posed in a way
24  that requires him to adopt the preface in order to
25  respond.  I don't think that's what you intend.

218

1   MR. SOLOMON:  I think it is all clear.
2   MR. LINDSTROM:  Thank you.
3   MR. SOLOMON:  Q.  I want to go back to the
4  prior exhibit, which I think would have been 48, maybe.
5   I'm not sure we went through the line of
6  questioning about your file.  This would have been in
7  your file around February 7th, 2001; correct?
8   A.  Correct.
9   Q.  And you can't -- and I want to represent it
10  wasn't produced from your source files.  And you can't
11  explain why; correct?
12   A.  I cannot.
13   MR. SOLOMON:  Have marked as the next exhibit
14  a document produced by Oracle with the Bates numbers
15  097883 and 884.
16   (Exhibit 50 marked for
17   identification.)
18   THE WITNESS:  Okay.
19   MR. SOLOMON:  Q.  Do you recognize having seen
20  this before?
21   A.  Again, I'm familiar with the issues.  I don't
22  remember seeing this specific document.
23   Q.  But you don't dispute that you received and
24  read it on or around Monday, February 19th, 2001?
25   A.  That's correct.

219

1   Q.  It is from Jeff Henley, at least at the top,
2  to Jennifer Minton, and you're copied.
3   Do you see that?
4   A.  Yes.
5   Q.  First paragraph, "Seems like a disaster based
6  on the large drop in support revenue growth for Q3.  For
7  the past several quarters we've been falling behind, and
8  for Q3 it seems like it's getting worse rather than
9  better.  We'll need extraordinary effort until we get
10  caught up.  I doubt we can catch up in time for Q3.  If
11  there are lots of transactions involved we should focus
12  on the large dollar items first.  We need operations, IT
13  and finance to be all activity involved.  I suggest
14  daily meetings for a while to make sure we're doing all
15  we can do."
16   Do you see that?
17   A.  I do.
18   Q.  Do you recall being aware of this described
19  disaster at around this time?
20   A.  I knew we had fallen behind in support
21  renewals.  It is not that customers weren't renewing,
22  it's just that we weren't getting the documents done in
23  time.
24   Q.  All right.  Then below it says, "Jennifer
25  Minton wrote:  Jeff, please call me to discuss the

220

1  status.  I have not been able to prove the shortfall in
2  support revenue is due to a systems issue.  I have had a
3  PI focus on this issue from ERP IT to ensure that there
4  was not a conversion issue.  Unfortunately, we have not
5  found any problems as of tonight."
6      Do you see that?
7  A.  I do.
8  Q.  And then I just wanted to skip the next
9  paragraph.  It says, "If the support renewals rate is
10  decreased significantly, I suspect it is attributed to
11  the following:  Lack of management reporting for the new
12  system, OKS, which has crippled management's ability to
13  detect an underlying problem in the renewal rate in a
14  timely fashion."
15  A.  Of course, that's not what happened.
16  Q.  You see that; right?
17  A.  I see it.
18  Q.  And then there is a bunch of other bullet
19  points.  And let's focus in on what you were just about
20  to say.  And you were about to say that OKS wasn't the
21  problem; is that right?
22  A.  No.  I was about to say that -- no.  I was
23  about to say our renewal hadn't declined.  So customers
24  were still renewing at the same rates they had been
25  renewing before.

221

1  Q.  What about OKS?
2  A.  It was a new system and, as I say, whenever
3  you put in a new system, there are problems.
4  Q.  How long had you been aware of the drop in
5  support revenue growth?
6  A.  I think -- I think at the time of this note,
7  it was near the end of the quarter, because that's when
8  accounting is making its forecasts.  We tend not to -- I
9  shouldn't say that.  We tend to refine the forecast for
10  support revenue right at the end of the quarter, and
11  this issue came up the 19th, so.
12  Q.  Okay.
13  A.  A week before the quarter closed.
14  Q.  You didn't know about it before then, is that
15  what you're saying?
16  A.  Not -- not this specific set of system issues.
17  It turned out to be they were system issues, not renewal
18  rate issues.
19  Q.  And, again, this is dated Monday,
20  February 19th.  And at least on that date it would have
21  been in your files; correct?
22  A.  That's correct.
23  Q.  And I want to represent to you it wasn't
24  produced from your files.  And you can't explain to me
25  why it was not; correct?

222

1  A.  That's correct.
2      MR. SOLOMON:  Have marked as the next exhibit
3  a document produced by the defendants with control
4  number 053228 through 229.
5      (Exhibit 51 marked for
6      identification.)
7      MR. SOLOMON:  Q.  And just take a look and
8  tell me if you've seen it before, please.
9  A.  I'm sure I have.  I don't recall it
10  specifically, but I'm sure I have.
11  Q.  Okay.  And it's dated March 8th, 2001, and on
12  the first page it is from you to Safra Catz.
13      Do you see that?
14  A.  Yes.
15  Q.  And it says, "One more time"; right?
16  A.  Yes.
17  Q.  What does that mean?
18  A.  It means GE is a very demanding customer, so,
19  you know, we got to get our routine -- if GE doesn't ask
20  us to do something special for them every two weeks, we
21  feel like they don't love us anymore.
22  Q.  And two-thirds of the way down the page it
23  says, "Larry, we are still having very significant
24  problems with the 11i roll out of indirect procurement.
25  Here are the top five issues.  They have caused us to

223

1  halt the continuation of the roll out until they are
2  fixed.  I'm having a difficult time keeping the
3  businesses motivated to go forward.  Anything you could
4  do to accelerate progress would be enormously
5  appreciated.  Thanks very much.  Gary."
6  A.  Yes.
7  Q.  Who is Gary?
8  A.  Gary Rohner is executive vice-president and
9  chief information officer of General Electric.
10  Q.  The next page, see a chart?
11  A.  I do.
12  Q.  Have you seen this before?  Do you remember
13  seeing this before?
14  A.  I don't remember seeing it before.  But I've
15  seen so many charts from GE in my lifetime.
16  Q.  That was what I was going to actually say.
17  This appears to be a GE document; is that right?
18  A.  Yes, it is.
19  Q.  And the bottom it says, "Oracle deliverable
20  quality is poor.  We feel as though we are their QA
21  department.  We sent three different copies of our
22  database to Oracle in an effort to have Oracle get
23  'ahead of the curve' and test patches/fixes in our
24  environment so that the end product is solid.  To date
25  this has yielded no benefit."

224

1    Do you see that?

2    A.  I do.

3    Q.  Was that a concern to you in March of 2001?

4    A.  Absolutely.  But we got their database, we

5    fixed the problems, made them successful, and they're

6    our largest customer in the world -- largest commercial

7    customer in the world, largest standardized Oracle top

8    to bottom.

9    Q.  But at the time they were having significant

10   problems; is that fair?

11   A.  Yeah.  Again, when 11i came out and people

12   were doing these new implementations, these -- I know

13   I'm repeating myself -- these are enormously complicated

14   engineering projects, and there is a lot involved in

15   both the customer side and our side, and there are

16   always a long list of problems that have to be solved

17   before we make one of these implementations successful.

18   And GE still is the largest -- it is just a huge

19   company, a huge and complicated company.  It is even

20   harder there.

21   Q.  It is fair to say there is huge risks on both

22   sides; is that right?

23   A.  Yes.  Here.  Let me take that back.  I'm not

24   sure, huge risks, if risk is the right word.  There is a

25   huge amount of effort on both sides required to make it

225

1    successful.  Not necessarily risk.

2        MR. SOLOMON:  I think we just about hit 5:00.

3    And we look forward to reconvening most likely in a date

4    in late September.

5        We've had a bit of trouble scheduling this,

6    Mr. Ellison.  What I want to do is try to schedule a

7    second a day in late September.  Do you know of anything

8    that would prevent you from being able to meet a date in

9    late September?

10       THE WITNESS:  I don't have a calendar in front

11   of me.  But I can't think of anything offhand.  But

12   again --

13       MR. SOLOMON:  Try to work it out with your

14   counsel?

15       MR. LINDSTROM:  So, counsel, according to my

16   watch, we're at six hours.

17       MR. SOLOMON:  Yes.

18       MR. LINDSTROM:  And the witness is here and

19   available to continue his deposition for the seven hours

20   that we had committed to you for today.  So do you want

21   to continue?

22       MR. SOLOMON:  No, no, I don't.  I'm not upset.

23   I understand there were traffic issues; but you guys

24   were late today, and I want to catch up with that time.

25   Not now, it will have to be in the future.

226

1        MR. LINDSTROM:  For the record, we started 33

2    minutes late.

3        MR. SOLOMON:  Okay.

4        MR. LINDSTROM:  And you're --

5        MR. SOLOMON:  We don't need to do it now.

6    There is a clock, we counted it up.  We know what the

7    issue is.  We can either resolve it among ourselves or

8    go to Magistrate Judge Infante.

9        MR. LINDSTROM:  Fine.

10       MR. SOLOMON:  Is that okay?

11       The other thing I want to do is let you know

12   that we're going to want to meet and confer again, to

13   the extent you think it is necessary we're going to

14   renew our spoliation motion.  Okay, thanks.  Off the

15   record.

16       VIDEOGRAPHER:  This marks the end of videotape

17   number four, Volume I, in the deposition of Larry

18   Ellison.  The original videotapes will be retained by

19   LiveNote World Service.  At 4:58, going off the record.

20

21       (Deposition adjourned at 4:58 p.m.)

22

23

24

25

227

1        CERTIFICATE OF WITNESS

2

3        I, the undersigned, declare under

4    penalty of perjury that I have read the foregoing

5    transcript, and I have made any corrections,

6    additions, or deletions that I was desirous of

7    making; that the foregoing is a true and correct

8    transcript of my testimony contained therein.

9

10   EXECUTED this _____ day of _____,

11

12   2006, at _____, _____.

13       (City)        (State)

14

15

16

17       _____

18       LAWRENCE ELLISON

19

20

21

22

23

24

25

228

1           CERTIFICATE OF DEPOSITION OFFICER

2           I, DIANA NOBRIGA, hereby certify that the

3    witness in the foregoing deposition was by me duly sworn

4    to testify to the truth, the whole truth, and nothing

5    but the truth in the within-entitled cause; that said

6    deposition was taken at the time and place therein

7    stated; that the testimony of said witness was reported

8    by me, a Certified Shorthand Reporter and disinterested

9    person, and was thereafter transcribed into typewriting,

10   and that the pertinent provisions of the applicable code

11   or rules of civil procedure relating to the notification

12   of the witness and counsel for the parties hereto of the

13   availability of the original transcript of the

14   deposition for reading, correcting and signing have been

15   met.

16          I further certify that I am not of counsel or

17   attorney for either or any of the parties to said

18   deposition, nor in any way interested in the outcome of

19   the cause named in said action.

20          In WITNESS WHEREOF, I have hereunto

21   subscribed by my hand this 19th day of July 2006.

22

23

24          _____

25          DIANA NOBRIGA, CSR NO. 7071

                                    229

1           CERTIFICATE OF DEPOSITION OFFICER

2           I, DIANA NOBRIGA, hereby certify that the

3    witness in the foregoing deposition was by me duly sworn

4    to testify to the truth, the whole truth, and nothing

5    but the truth in the within-entitled cause; that said

6    deposition was taken at the time and place therein

7    stated; that the testimony of said witness was reported

8    by me, a Certified Shorthand Reporter and disinterested

9    person, and was thereafter transcribed into typewriting,

10   and that the pertinent provisions of the applicable code

11   or rules of civil procedure relating to the notification

12   of the witness and counsel for the parties hereto of the

13   availability of the original transcript of the

14   deposition for reading, correcting and signing have been

15   met.

16           I further certify that I am not of counsel or

17   attorney for either or any of the parties to said

18   deposition, nor in any way interested in the outcome of

19   the cause named in said action.

20           In WITNESS WHEREOF, I have hereunto

21   subscribed by my hand this 19th day of July 2006.

22

23

24

25                    DIANA NOBRIGA, CSR NO. 7071

EXHIBIT H

NUSSBAUM, JAY  3/23/2004  12:00:00 AM

1       IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2            IN AND FOR NEW CASTLE COUNTY

3       * * * * * * * * * * * * * * * * * *

4       IN RE ORACLE CORP.        :  CONSOLIDATED

5       DERIVATIVE LITIGATION        :  C.A. No. 18751

6       * * * * * * * * * * * * * * * * * *

7       SUPERIOR COURT OF THE STATE OF CALIFORNIA

8            COUNTY OF SAN MATEO

9       * * * * * * * * * * * * * * * * *

10      COORDINATION PROCEEDING      :  JUDICIAL COUNCIL

11      SPECIAL TITLE (RULE 1550 (b))   :  COORDINATION

12      ORACLE CASES            :  PROCEEDING

13                      :  NO. 4180

14      * * * * * * * * * * * * * * * * *

15         Videotaped Deposition of JAY NUSSBAUM

16            McLean, Virginia

17           Tuesday, March 23, 2004

18              9:45 a.m.

19      Job No.: 1-32319

20      Pages: 1 through 106

21      Reported by:  Cynthia R. Simmons, RMR, CCR

22      Virginia CCR No. 0313189

1

1       Deposition of JAY NUSSBAUM, held at the

2       offices of:

3

4            MORRISON & FOERSTER, LLP

5            1650 Tysons Boulevard, Suite 300

6            McLean, Virginia  22102

7            (703) 760-7700

8

9        Pursuant to agreement, before Cynthia R. Simmons,

10      Registered Merit Reporter, Certified Court Reporter

11      and Notary Public of the Commonwealth of Virginia.

12

13

14

15

16

17

18

19

20

21

22

2

1          A P P E A R A N C E S

2       ON BEHALF OF PLAINTIFFS:

3          DARIO DE GHETALDI, ESQUIRE

4          COREY, LUZAICH, PLISKA,

5          DE GHETALDI & NASTARI, LLP.

6          700 El Camino Real

7          Millbrae, California  94030

8          (650) 871-5666

9

10

11      ON BEHALF OF DEFENDANT ORACLE:

12          PAUL H. GOLDSTEIN, ESQUIRE

13          MORRISON & FOERSTER, LLP.

14          755 Page Mill Road

15          Palo Alto, California  94304-1018

16          (650) 813-5818

17

18

19

20

21

22

3

1          A P P E A R A N C E S   C O N T I N U E D

2       ON BEHALF OF INDIVIDUAL DEFENDANTS:

3          KENNETH J. NACHBAR, ESQUIRE

4          MORRIS, NICHOLS, ARSHT & TUNNELL

5          1201 North Market Street

6          Suite 1800

7          Wilmington, Delaware  19801

8          (302) 575-7294

9

10

11      ALSO PRESENT:

12          SCOTT FORMAN, VIDEOGRAPHER

13

14

15

16

17

18

19

20

21

22

4

C O N T E N T S

1

2  EXAMINATION OF JAY NUSSBAUM          PAGE

3  By Mr. de Ghetaldi              7

4

5            E X H I B I T S

6        (Attached to the Transcript)

7  DEPOSITION EXHIBIT              PAGE

8    64  E-mail regarding Bell South Deal     71

9    65  Summary of Testimony To Special     100

10         Litigation Committee

11

12

13

14

15

16

17

18

19

20

21

22

5

P R O C E E D I N G S

1

2        THE VIDEOGRAPHER:  Here begins tape number

3  one in the deposition of Jay Harris Nussbaum, in the

4  matter of the Oracle cases, pending in the Superior

5  Court of the State of California, Case number 4180,

6  and all related cases.  Today's date is March 23rd,

7  2004.  The time is 9:45 a.m.

8        The video operator is Scott Forman of

9  Visual Connections, contracted by L.A.D. Reporting.

10  This video deposition is taking place at the office

11  of Morrison & Foerster, 1650 Tysons Boulevard,

12  McLean, Virginia, and was noticed by Dario de

13  Ghetaldi.  Would the counsel please identify

14  themselves and state whom they represent.

15        MR. DE GHETALDI:  Dario de Ghetaldi for

16  the plaintiffs.

17        MR. GOLDSTEIN:  Paul Goldstein, Morrison &

18  Foerster, for Oracle Corporation.

19        THE VIDEOGRAPHER:  The court reporter

20  today is Cynthia Simmons of L.A.D. Reporting.  Would

21  the reporter please swear in the witness.

22        JAY NUSSBAUM

6

1  having been duly sworn, testified as follows:

2        EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

3  BY MR. DE GHETALDI:

4      Q   Good morning, Mr. Nussbaum.

5      A   Good morning.

6      Q   Have you ever had your deposition taken

7  before?

8      A   Yes.

9      Q   And when was the last time?

10      A   Last time, 15 or so years ago.

11      Q   Okay.  Let me go over a couple ground

12  rules, make sure things come out as well as they can.

13  First of all, please try and wait until I finish

14  asking a question before you try and answer, because

15  even though this deposition is being videotaped, it

16  will make it much easier for the court reporter to

17  only have to take down one person talking at a time.

18  Do you understand?

19      A   Uh-huh.

20      Q   I'll also try and do the same thing and

21  not talk over your answer.  Also, it is important

22  that you use words to respond to my questions,

7

1  instead of nods of the head or sounds like uh-huh, so

2  that makes a better record.  Do you understand?

3      A   Uh-huh.

4      Q   Okay.  Let's see, the deposition is going

5  to be prepared in a booklet form.  You'll be given

6  the opportunity to review that, that transcript.  And

7  you'll also have the opportunity to make changes or

8  corrections to that deposition.

9        But, if you do make any changes or

10  corrections to the deposition, and if this case does

11  go to trial, then I want you to understand that we

12  would have the opportunity to comment on those

13  changes or corrections at the time of trial.  Do you

14  understand that?

15      A   Yes.

16      Q   Okay.  Also, please, if at any time today

17  you don't understand a question that I'm asking,

18  please let me know and I'll try and ask it again in

19  English, so that you understand what I'm saying.  And

20  if you do answer a question that I ask, I'm going to

21  assume that you've understood it, okay?

22      A   Sure.

8

1    Q   All right.  Now, also, we've been trying

2    to take breaks about every hour in these depositions,

3    but if you want to take a break at any time, just let

4    me know, and I'll accommodate you on that.  All

5    right?

6         Now, when did you first start working at

7    Oracle Corporation?

8    A   I believe it was February of 2002.  Excuse

9    me, excuse me, of '92.

10   Q   Yeah.

11   A   I'm sorry.

12   Q   That's okay.  I actually understood what

13   you meant.

14   A   I just spoke the wrong date.

15   Q   What was your first job there?

16   A   At Oracle?

17   Q   Yeah.

18   A   I was the senior vice president for the

19   federal government and systems integration.

20   Q   All right.  What was your position at

21   Oracle in Oracle's third quarter of its 2001 fiscal

22   year?

9

1    A   I was the executive vice president of OSI.

2    Q   And OSI stands for?

3    A   Oracle Service Industries.

4    Q   All right.  Can you give me a brief

5    summary of the positions that you held between 1992

6    and the third quarter of fiscal year 2001?

7    A   Well, it actually is rather simple.  I

8    started out running the federal government, and then

9    they asked me to include state and local government.

10   And then they asked us to include telecommunications,

11   health care, financial services made up of banks,

12   brokerage and insurance companies.  And we broke off

13   the higher education market, as well as utilities.

14        And so that's what made up, if you would,

15   the entire OSI marketplace.

16   Q   And so as these different --

17   A   So my -- I'm sorry.

18   Q   Go ahead.

19   A   So my job that I started with just

20   expanded, it wasn't really -- it was incremental

21   responsibility, as opposed to switch to a different

22   kind of world.  I always kept the federal and then

10

1    they added state and local then they added the

2    telecommunication, and health care, the ones that I

3    just read off to you.

4    Q   Okay.  And when did you leave Oracle?

5    A   I left Oracle January 1 of 2000.  Yeah,

6    January 1 of 2002.  Sorry, I'm slow today.

7    Q   That's all right.

8    A   Just wanted to see if you were paying

9    attention.

10        MR. GOLDSTEIN:  You have our attention.

11   Q   Can you describe for me your

12   responsibilities as the executive vice president of

13   OSI?

14   A   Yes.  I had responsibility for the markets

15   that I had mentioned, for all of the product sales

16   and consulting.

17   Q   Who were your direct reports in fiscal

18   year 2001?

19   A   Direct reports in 2001.  Jim O'Neil had

20   telecommunications, a fellow named Lee Ramsayer,

21   that's R-a-m-s-a-y-e-r, had higher education.  Jose

22   Garcia had state and local.  Tony Fernocola had

11

1    financial services, I think it's F-e-r-n-o-c-o-l-a.

2    And I'm not sure who had federal government.  I think

3    federal government was either Mark Johnson, but I do

4    believe there was somebody else, in between Mark and

5    I.  Could have been Kevin -- it might have been Kevin

6    Fitzgerald, but I'm not -- I'd have to be refreshed

7    to see the org chart.

8    Q   Did you have an org chart?

9    A   At the time, I'm sure I did, yeah.

10        MR. DE GHETALDI:  Ken, we just got started

11   so --

12        MR. NACHBAR:  Yeah, sorry I'm late, it was

13   Amtrak's fault.

14   BY MR. DE GHETALDI:

15   Q   Did you meet with anyone in preparation

16   for your deposition today?

17   A   Yes.

18   Q   And who was that?

19   A   Paul.

20   Q   When was that?

21   A   Yesterday.

22   Q   Was anyone else there?

12

1    A  No.

2    Q  All right.  How long was the meeting?

3    A  45 minutes.

4    Q  Did you review any documents in

5    preparation for your deposition?

6    A  I had looked at some documents, yes.

7    Q  Do you recall what they were?

8    A  It was the -- what was it, the forecast,

9    it was a forecast sheet, and a note that I had

10   written, and that was it.

11   Q  A note that you had written?

12   A  A memo, e-mail.

13   Q  What was the e-mail about?

14   A  It was a request from me to Larry for a

15   promotion.

16   Q  All right.  What was the date of that

17   e-mail?

18   A  I don't know.

19   Q  Approximately.

20   A  I have no idea, January or something.  I'm

21   sure you have a copy somewhere.

22       MR. GOLDSTEIN:  You do.  You do.

13

1        MR. DE GHETALDI:  I do, okay.

2    BY MR. DE GHETALDI:

3    Q  All right.  Anything else other than the

4    forecast sheet and the e-mail about a promotion?

5    A  Just said to tell the truth and --

6        MR. GOLDSTEIN:  He's not asking you what

7    we talked about.

8        THE WITNESS:  Oh, I'm sorry.

9        MR. GOLDSTEIN:  He's asking what documents

10   you looked at.

11       THE WITNESS:  I think that's about it.

12   BY MR. DE GHETALDI:

13   Q  All right.  I was assuming you were going

14   to tell the truth so --

15   A  That's a big leap of faith.

16   Q  During --

17       MR. GOLDSTEIN:  Oh, this is for me, I'm

18   sorry.  You're getting a fax I think too.  Sorry for

19   the interruption.

20   BY MR. DE GHETALDI:

21   Q  That's all right.  During fiscal year

22   2001, did you -- what kind of financial reports did

14

1    you regularly receive?

2    A  From who?

3    Q  From anyone.

4    A  From anyone.  Well, we generated our own.

5    Q  Okay.

6    A  Sarah Kopp would do that for me.  And we

7    had a sales forecasting program, which is the -- each

8    industry would give us their pipeline.

9    Q  So, and both of these are internal,

10   internally generated reports within OSI?

11   A  Yes.

12   Q  All right.  What sort of reports did Sarah

13   Kopp generate in 2001?

14   A  Well, as my finance person, she would give

15   us the performance of the operating group for the

16   full year, and by the quarter, how we were

17   forecasting our performance and seeing the reality of

18   it.  So if it was the first month, it wouldn't be as

19   accurate as it would be in the third month, because

20   we would track the business that was booked to date

21   and that which we'd have to still do to make our plan

22   or forecast.

15

1    Q  All right.  How often would she generate

2    those performance reports?

3    A  Well, she had a second boss in a way.  She

4    redid it for Jennifer Minton, who was really her

5    boss, although I was her partner.  So I don't know

6    how often Jennifer required it, but we looked at it

7    once a week.

8        And we made sure that our submittal was

9    discussed.  She could send in any number she thought

10   was right and she always wanted to make sure if I

11   believed that it was correct, or I could give her a

12   little bit more data on the actual facts of what is

13   the status of some of the opportunities so she could

14   learn to guess a little bit smarter.

15   Q  Just so I understand, this report would

16   contain historical information as -- how far back?

17   A  Well, we always compared the full year, so

18   it would be a year to date, and then we always looked

19   at the previous quarter from the past year, just to

20   see if we were improving.

21   Q  All right.  And it -- the report included

22   forecast information for each category of business

16

1  within OSI?

2      A   Yes.

3      Q   And it included actual revenue to date

4  within the quarter for each category of business

5  within OSI?

6      A   What it had was, if it was February, and

7  month 1 was already finished of that quarter, we

8  would see exactly how much revenue we booked by line

9  of business for the month of January.  And we would

10  know how much we needed to do to complete our

11  forecast.

12      Q   All right.

13      A   Can you hold on just a second?

14      Q   Sure.

15      THE VIDEOGRAPHER:  We are going off the

16  record.  The time is 10:01 a.m.

17      (Recess.)

18      THE VIDEOGRAPHER:  We are back on the

19  record.  The time is 10:02 a.m.

20  BY MR. DE GHETALDI:

21      Q   Did the weekly performance report that

22  Sarah Kopp generated contain any other information

17

1  other than what we've discussed?

2      A   I don't recall.

3      Q   All right.  You spoke of a sales

4  forecasting program, did the program have a name?

5      A   I don't think it had an official name

6  because we were getting ready to come out with our

7  CRM product.  But there was an old name that we used

8  to refer to it, because we generated it ourselves,

9  but someone would have to refresh my memory.

10      Q   Okay.  Now, this was a program that you

11  could access online?

12      A   Is that the question?

13      Q   Yeah.

14      A   Yes.

15      Q   All right.  Did it give you realtime sort

16  of data?

17      MR. GOLDSTEIN:  Objection to the form.

18      Q   Do you understand what I mean?

19      A   Realtime data, no, it did not.

20      Q   Okay.  What was -- how dated was the

21  material that you were able to view through this

22  program?

18

1      A   Well, I think to answer that you'd have

2  to -- I have to explain to you how orders got booked.

3      Q   Okay.

4      A   If I signed an order today with the

5  Department of Defense for 5 million dollars of

6  software, it would not -- and it was signed, the

7  paperwork was submitted.  We would not note that yet

8  because it has to pass an approval test.  So it would

9  go out to California, I don't know his name, Larry,

10  we always called him Dr. No, Larry Garnick I think it

11  is.

12      And so Dr. No would look at things and

13  say, gee, where's the I on the T and the T is this,

14  and the that is that.  We always had the great

15  fortune of them not understanding federal government

16  business's paperwork.  And they'd want to have the

17  arrogance of telling the government how to change the

18  document, and we'd have these occasional debates.

19  So it went on and on and on.

20      My point being, until we got it stamped

21  and approved, which could be an hour or two weeks,

22  once it got stamped and approved, we knew it was

19

1  submitted.  And at that point we would check off that

2  5 million dollars is now in the plan.

3      What we did was a reality check.  We knew

4  there was no problem with the creditworthiness of the

5  United States Government, although occasionally they

6  thought there might be.  So we would just wait until

7  we got that approval, but we knew we had that 5 but

8  we didn't put it in the report, because we were

9  waiting for it.  So it would stay in a status of

10  something, waiting for approval.

11      So to answer your question, realtime,

12  realtime to me is you send in an order, you book it.

13  This was not realtime.

14      Q   Okay.  But -- well, could you see the

15  status of given deals by looking --

16      A   Oh, we knew every deal that we sent in,

17  sure, but it was irrelevant.  Because it's like going

18  to a shredder.  You don't know what's going to get

19  approved, or put on, put in reserve, because the

20  terms and conditions were attached to some

21  consulting.  And so there were different rules which

22  we had to abide by, and were gladly willing to abide

20

1  by, but it was a lot more complicated than selling a
2  box and recording a box, let me put it to you that
3  way.
4      Q  All right.  My question was whether you
5  could see the status of given deals by looking at
6  this forecasting program?
7      A  Well, again, I say, yes, that which were
8  booked.
9      Q  Okay, just --
10      A  But there's a big difference between what
11  is booked and what's in float.
12      Q  All right.
13      A  What I described to you is the float.  So
14  when it got out of float, out of the land of Oz and
15  into it's been booked and ready to ship, we then took
16  care of it.
17      Q  All right, so this sales forecasting
18  program then showed you booked deals.  How did you
19  keep track, or were you able to electronically keep
20  track through this sales forecasting program of the
21  deals that were in float?
22      A  Oh, sure.

21

1  Q  All right.
2  A  Sure.
3  Q  So you could see the whole spectrum of
4  deals then?
5      A  Let me just -- maybe it's too much
6  information for you, but if it was the last day of
7  the quarter, and I submitted a hundred million
8  dollars worth of paperwork made up of 50 different
9  deals, I wouldn't know for three days how much of
10  those deals were completed.
11          They've got to get shipped, therefore it
12  has to be an inventory, it has to be done at a
13  certain time.  So we were real sticklers about
14  following the revenue recognition rules.  Revenue
15  recognition rules could be, I'd say more bureaucratic
16  than most obvious ways of running a business.  But it
17  was so critical that we all followed it, therefore we
18  were never sure of what we actually brought in.
19          So we used to say to ourselves, look,
20  it'll go up, we called it the taxation system.  So if
21  you put a dollar in you might get 80 cents, so we
22  factored in 80 cents.  And if it came in at greater

22

1  value then we said, fine, because it could be one
2  that got factored at 60.
3          So we used to laugh about it in our own
4  mind, but we were thrilled that we got the business
5  and it was moving towards target.  And in that day
6  or two later, we would know if we made the actual
7  number that we thought we had submitted without the
8  shredder.
9      Q  Okay.
10      A  Shredder being what you actually get the
11  value of.
12      Q  All right.
13      A  So it made the complexity a bit hard, but
14  after doing it for so many quarters, we didn't find
15  it to be difficult at all.
16      Q  All right.  Now, we've talked about
17  reports and information that were generated
18  internally within OSI.  In fiscal year 2001, did you
19  receive financial reports from outside of OSI?
20      A  From where?
21      Q  Outside of OSI?
22      A  Where, from OSI?

23

1  Q  Within Oracle, but not from within OSI.
2  A  Well, the only place that would give us --
3  so a lot of divisions, they didn't send us any
4  reports.  So occasionally on a -- Sarah would get the
5  reporting information that was required for us to
6  look at from headquarters, from Jennifer Minton.
7      Q  What sort of reporting information was
8  that?
9      A  Well, Jennifer would do the forecasting
10  for the company, and she would try to validate if our
11  numbers were holding, if we were being overly
12  conservative or too optimistic.
13          So they ran some sort of financial
14  statistical program to see exactly how we were doing,
15  what they -- how they did that kept a few analysts
16  busy, but it was looking at previous years and
17  bookings and where you are.  And it was a good
18  analytical view, but in software one deal can change
19  all the analytics if it's big enough.
20      Q  Okay.  You said Sarah Kopp got these
21  reports?
22      A  Yes, Sarah got them and therefore it was

24

1  more for Jennifer and Sarah to stay on the forecast
2  information, because they had a whole process in
3  administration that they used to use to try to
4  validate the doability of the forecast.
5  Q.  Okay.  Did you get these reports as well?
6  A.  I had privilege to them, if I asked.  They
7  were just such useless things for me to look at that
8  I didn't care.
9  Q.  All right.  Any other reports that you got
10  from headquarters or Jennifer Minton on a regular
11  basis?
12  A.  Well, we got -- at the end of the quarter,
13  the final numbers would come back in, and therefore
14  we would know how we did, so that we could give out
15  the appropriate recognition for the sales force and
16  the consulting people.  So, yes, it was a package
17  that we used to get just closing down the quarter,
18  and validating our performance year to date against
19  plan.
20  Q.  When you say plan, what do you mean?
21  A.  Well, we had a quota or a plan.  People
22  refer to it three ways, you could have a budget, a

1  plan or a quota.  I just referred to it as a plan.
2  Q.  All right.
3  A.  So it could be any of those three.  So you
4  had a plan to do X hundreds of millions of dollars
5  for the year, and you would see how you were doing
6  against those numbers.  So in the time period we're
7  talking about, the first six months had already gone
8  by, we're now talking about the second six months.
9  And in that second six months, you were
10  trying to figure out how you were going to make the
11  full year in that last six months, were you plus or
12  minus to your quota, plan, budget.  And from that,
13  commissions would flow for all your sales people and
14  your managers.
15  Q.  All right.  How about -- let's talk about
16  meetings.  Did you have any meetings during a given
17  week that were always on your schedule?
18  A.  Once a -- every Monday, we had an
19  executive team meeting, yeah.
20  Q.  Were those something that you attended?
21  A.  I worked out of Washington and the
22  meetings were held in California.

25

26

1  Q.  Yes.
2  A.  So I did some by phone and then some I
3  went out.
4  Q.  All right.  Were -- did you receive
5  agendas for those meetings?
6  A.  Is this your first one that you've done?
7  Q.  Huh?
8  A.  This must be your first one.
9  Q.  It's not.
10  A.  I'm just teasing.  It didn't matter
11  because the agenda was whatever time Larry would show
12  up and whatever he wanted to talk about.
13  Q.  All right.
14  A.  So if someone attempted to put an agenda
15  together, we paid little or no attention to it,
16  because it was rarely ever followed, with the
17  exception of a few things that he had on his mind
18  which were the constant things, how's it going kind
19  of stuff.
20  Q.  All right.
21  A.  But we never knew what time it would
22  start, not that it wasn't scheduled.

1  Q.  But it didn't really start until he showed
2  up?
3  A.  Yeah.
4  Q.  All right.  What were the constant things,
5  as you call them, the things that he always wanted to
6  talk about at these meetings?
7  A.  Wanted to know the status of the business.
8  I think Jeff Henley and Jennifer consistently put
9  that on, especially as we got closer and closer to
10  the end of the quarter, of our forecast.  And then
11  wanted to talk about morale of the people.  Wanted to
12  talk about any and all new product launches, and some
13  feedback on how is the product being received,
14  whatever that might have been for the time.
15  And, oh, maybe an advertising campaign
16  that came up with -- but we're now in the
17  miscellaneous, because what I just said up to the
18  advertising is about the consistency of the way it
19  went.
20  Q.  All right.  Now, going back to the topic
21  of the status of the business, did that, did his
22  questions about the status include both forecast

27

28

1  numbers and actual revenue numbers as the quarter
2  went on?
3      A  Well, as smart a person as he is, and he's
4  plenty smart, he had his approach to listening.  And
5  his approach to listening was different than what
6  Jennifer Minton and team would want to conduct it,
7  but they couldn't control what he wanted to say.
8      So he did it in his fashion, which was
9  probably more reasonable, took on the facts, the
10  facts were how are we doing to date.  Looked at the
11  big deals that were still out there, and tried to
12  look us in the eye and find out the probability of
13  those happening.  And wanted to know the size of the
14  pipeline.
15      Then like any good CEO, he would say,
16  what's your commitment.  And we would tell him, and
17  occasionally we could have some healthy debate that
18  would go both ways.  Stop holding back, you
19  bullshitter, you're going to get there, you're
20  already there, dah, dah, dah, dah, dah, dah, or you
21  got a long way to go to make that number, are you
22  really sure you can make that number.  And that was

29

1  So we had to put some judgment.  And the
2  judgment factors were placed in there.  So we would
3  look at the entire pipeline, which was the volume of
4  deals, and we would come up with a core baseline
5  number for that.  And then from that we would
6  extrapolate the -- not including that core number,
7  what we would call the opportunity accounts that
8  would really help us make or exceed that number.
9      If you didn't have enough of those, then
10  the number might be in jeopardy.  If you had an
11  abundance of them, then you probably had a chance to
12  overachieve.  If you had in there a few, but they
13  were massive deals, well, then you were still
14  concerned because massive deals don't seem to close
15  when you wish that they do.
16      So we would take a look at that and go
17  through the cycle of the sale, and ask the questions
18  of the owner of that opportunity, CIO in a good mood
19  these days, are they going to help us get it through
20  the system, do they have a sense of urgency to get
21  this done, have they done all the paperwork, is the
22  selection process over, are we doing it with

31

1  it.
2      Q  All right.  Did you have a weekly meeting
3  with the OSI folks?
4      A  We had a monthly staff meeting, and then
5  we had one-on-ones with my direct reports, more
6  informal than formal.  Just to see, you know, the
7  status of how things were going and get a sense and a
8  feel for the reality of what's in their forecast.
9      Q  All right.  Were you responsible for OSI's
10  forecast number?
11      A  Yes.
12      Q  All right.  Can you describe to me how you
13  would arrive at that number, and I'm talking about
14  fiscal year 2001, if it was any different than the
15  past.  Otherwise, just in general.
16      A  Well, actually, I've been doing it for --
17  2001, I guess nine years or so.  And came up with a
18  pretty consistent approach of how to do that.  It's a
19  science in the minds of the finance people, it's an
20  art form in the minds of the sales people who have
21  to -- you know, if life was so simple, why don't you
22  just mail in the orders.

30

1  partners, without partners.  So you'd have a slew of
2  questions that you'd want to ask just to validate
3  that there is a reality that it would happen.
4      So from that you would pull out some deals
5  and put it into the following quarter.  And that
6  which was left was how you would make a judgment.
7  You also can make a judgment based upon what you did
8  the year before, because in our business you can tell
9  if the government's going to spend more or less.
10  Assuming it's less, then we'd say, well, on the
11  government side, last year they had a bonanza of a
12  spending opportunity, and this year there's a
13  continued resolution -- do you know what a continued
14  resolution is?
15      Q  No.
16      A  That's when Congress hasn't signed the
17  bill.
18      Q  Okay.
19      A  And therefore, all funds are frozen with
20  the exception of those things that are in that
21  critical category.  And you could have purchase
22  orders sitting on the desks and people can't sign

32

1  them.

2      So if you take out any of those anomalies

3  and you would now have the experienced person like

4  myself and Sarah Kopp a couple of these vertical

5  guys that report to me, we would be able to take our

6  finger out, put it up into the wind and say this is

7  how the wind is blowing, and we believe we'll do a

8  hundred million, 40 million, 80 million, add it all

9  up, try to always factor out a number that could give

10  us a little more upside, because we weren't in the

11  game of making corporate too excited.

12      We didn't want them to over, get overly

13  zealous about what could happen, because during the

14  course of that 90 day stretch, unexpected things

15  could still occur that we didn't know about.  And so

16  we always tried to err on the side of being a little

17  more conservative.

18      Q  All right.

19      A  So that is the art form of the process

20  that I installed.  And it worked, and it worked quite

21  well.  I would say, how many times did I do it, 9,

22  10, 10, 20, 40 some odd times doing this, I believe

33

1      Q  All right.

2      A  The pipeline is that which has not closed,

3  so it would be close to a moron who would include

4  that which has closed in the pipeline.  Because you

5  do it this way, you say, this is what's in, booked,

6  and we don't need to do it again.  And this is what

7  we need to go.  In to go, to go is the pipeline.

8      Q  Okay.

9      A  Now, the pipeline has numbers on it from

10  one, which means it's not even a suspect, as it flies

11  through the system it's ready to close.  And the

12  status of those are pretty important because once

13  they get above seven or eight, that means majority of

14  the work, if not all, has been done to satisfy the

15  need to close.

16      That's the pipeline.  So if anyone told

17  you that deals that they had already closed were in

18  their pipeline, you better hope that, you know --  I

19  would just, personally, I would never allow them to

20  do it, because that's counting it twice.

21      Q  All right.

22      MR. GOLDSTEIN:  Glad we cleared that up.

35

1  we've only had probably three to five times when I

2  said, oops, error here in judgment, the deal didn't

3  come in, the deal was half the size, the company was

4  acquired.  Things that we couldn't predict.

5      But most times we were, I'd say 80 to 85

6  percent of the time, we were as solid as anyone.  And

7  they, in headquarters, referred to us as Jay Inc. and

8  Jay Inc. was -- always delivered that or more than

9  what they had anticipated.

10      Q  Okay.  You mentioned pipeline as the total

11  volume of deals, did that include deals that had

12  already been closed?

13      A  Oh, no.  Do you understand what the

14  pipeline is?

15      Q  No.

16      A  Okay.

17      Q  Let me put it this way, I've gotten

18  different definitions and so I'm wondering what yours

19  is?

20      A  Well, just remember one.

21      Q  Okay.

22      A  What I'm going to tell you.

34

1      MR. DE GHETALDI:  Yeah.

2      THE WITNESS:  It's so simple, the pipeline

3  isn't a complex thing, it simply is the pipeline of

4  business that's hopeful to close.  And if you close

5  30 to 40 percent of your pipeline, you're in good

6  shape.

7  BY MR. DE GHETALDI:

8      Q  All right.

9      A  Sorry for being so exact.

10      Q  That's all right.  Well, it's been about

11  an hour, want to take a break?

12      A  I'm fine, I can continue.

13      Q  All right.  We'll go for a while.  I'm

14  just going to hand you some reports and see if you

15  recognize them and talk about a couple things in

16  them.

17      A  Okay.

18      Q  This is a document that was already marked

19  as Exhibit 133.  Have you ever seen a report like

20  Exhibit 133 before?

21      A  Yes.

22      Q  Okay.  Were these, was this sort of report

36

1  something that you were a regular recipient of?

2      A  Yes.

3      Q  Okay.  Under what circumstances would you

4  get the type of report like Exhibit 133?

5      A  We'd get these at the end of the quarters,

6  just as I said, to see how you were doing on a year

7  to date basis.

8      Q  Okay.  During the Monday executive

9  committee meetings, were reports handed out and then

10  collected again after the meeting was over?

11      A  Jennifer handed out, I'm not sure -- the

12  answer is I can definitely tell you, yes, the reports

13  were handed out, and reports were collected.  But I

14  don't know if this was one of them or not.

15      Q  All right.  This has been described

16  previously as an upside report, and you can see in

17  the footer, down in the lower right hand corner that

18  it's dated January 15th.

19      A  Uh-huh.

20      Q  All right.  I'll come back to that in a

21  minute, but, first -- and I apologize, I didn't bring

22  my magnifying glass, it's been a tool of mine in some

37

1  of these depositions.

2      A  I can see it.

3      Q  That's good.  Do you recognize the type of

4  report that's exemplified by Exhibit -- I'm sorry,

5  Exhibit 86?

6      A  Yes.

7      Q  Is this one of the weekly financial

8  packages that Sarah Kopp prepared for you?

9      A  I don't recall it being a weekly.  It

10  looks more like a summary of the end of the quarter.

11      Q  All right.

12      A  Because I don't see anything here -- this

13  particular one has all the numbers in, right?

14      Q  Yeah.

15      A  I mean, it's the full year.

16      Q  Yeah.

17      A  So what it is, if it was the -- the year

18  was going on, you would get Q1 completed, you would

19  get Q2, the forecast against whatever actual and

20  depends on the time of the year.

21      Q  Right.

22      A  This particular one has the whole year

38

1  done.

2      Q  Right.

3      A  So you would not get this particular one

4  on a weekly basis.

5      Q  Okay.  Let me hand you a copy of Exhibit

6  87.

7      A  Okay.

8      Q  This one I think is -- Exhibit 87 is dated

9  January 9th, 2001, Exhibit 86 is dated December 5th,

10  2001.

11          These weren't weekly reports, were they

12  monthly reports?

13      A  I don't know if they were weekly or not.

14  How could I recall that the reporting -- when I look

15  at the document, I could tell you how I would use

16  them.

17      Q  Right.

18      A  So I don't know, if you just picked up a

19  weekly report that has full year numbers in it or

20  not, I don't know.

21      Q  Well, I'm just showing you what we were

22  given, and trying to figure out what they are.  These

39

1  are --

2      A  Okay, well -- so if you look at these with

3  me then maybe we both could discover.

4      Q  Right, yeah.

5      A  In the first quarter, you have actual,

6  right?

7      Q  Yes.

8      A  So that's what the division must have

9  done, 224 million against a budget of 199.9, right?

10  So I see nothing to tell me that I'll see that on a

11  weekly basis.  However, and we go to week two,

12  quarter 2.

13      Q  Yes.

14      A  I see the same thing, right?

15      Q  Yep.

16      A  So now the forecast is in there.

17      Q  Right.

18      A  I'm sorry?

19      Q  Well, you've got September has --

20      A  September has actual numbers.

21      Q  Right.

22      A  And October's forecast and November has a

40

1   forecast.  So this would be a report that with four
2   months over, you know, that's what we talked about
3   earlier today.
4        And any time you see forecast, forecast,
5   forecast, you can come back and pin down about when
6   we're talking about it.  So if you say this is a
7   January report, I'd say that's unusual because it
8   doesn't look like we even zeroed in on October or
9   November or December's actual yet.
10       Q   Yeah.  Well, the one -- the total license
11  number for Q2.
12       A   Yeah.
13       Q   153.3, it looks like it's pretty darn
14  close to what you guys actually did.
15       A   Well, that's because we're good at
16  forecasting.  But that's a forecast, that's not
17  actual.
18       Q   Okay.  Is it possible that that column
19  just didn't get renamed, in that?
20       A   Well, I don't know, you'd have to ask the
21  author of it, because if you look back on this
22  report, it says actual, actual, actual, actual in Q1,

41

1   right?
2        Q   Yep.
3        A   And then you have actual in September.
4   And then the rest runs out as forecast.  So it seems
5   to me, what little knowledge I would have of reading
6   reports, that this report is accurate for actual
7   performance through the month of September.  And
8   after that, we're in a forecasting mode for October,
9   November, and then third quarter and fourth quarter.
10       Q   All right.
11       A   You see it the same way?
12       Q   Well, I see what it says, and I'm just not
13  sure that I have the same trust in the accuracy of
14  the column headings.
15       A   I can only go by --
16       Q   I mean, for one thing, October and
17  November numbers don't change at all.  And wouldn't
18  you expect to know what was done in Q2 by the
19  beginning of January, what was actually done?
20       A   Sure, but you've given me a report and I'm
21  responding to how you read reports.
22       Q   Okay.

42

1   A   If we were sitting there at the time, I
2   could have said, well, gee, why isn't that the
3   actual.
4        Q   Yeah.
5        A   But I have no idea what you're talking
6   about in terms of how this report is being used.
7        Q   Right.  If you can turn to the last page
8   of Exhibit 87.
9        A   Okay, very last page.
10       Q   Yeah, very last page.  You can see the
11  title a little more clearly than you can on the first
12  page, the first page says something similar, it says
13  FY01 weekly forecast.
14       A   Right.
15       Q   And the first page says, Oracle Service
16  Industries, FY01 weekly forecast summary.
17       A   Uh-huh.
18       Q   And that's -- that's why a similar title
19  appears on all of the pages.  And that's why I asked
20  you if this was the weekly report that we were
21  talking about earlier that Sarah Kopp prepared?
22       A   This might have been a weekly report that

43

1   Sarah Kopp did for Jennifer Minton.
2        Q   Okay.
3        A   But this is as useless a thing as I've
4   seen.
5        Q   And you get a different weekly report?
6        A   Not different -- what do I care about
7   forecasts in a quarter that I'm not even talking
8   about yet?  In other words, you have a forecast there
9   for March, April and May, and you had mentioned that
10  this is a January time frame?
11       Q   Yes.
12       A   Well, what do I care?  I only care about
13  the quarter that we're living and that which we've
14  completed.  And even on this report, if it's indeed
15  what you're talking about January, we have November
16  as a forecast not actual, right?  You have December
17  as a forecast.  So if this is January, then this is,
18  someone has to explain to me what the practicality of
19  this is.
20       Q   All right.
21       A   And this seems like, this is titled head
22  count.

44

1  Q  Yes.

2  A  So the only reason I care about head count

3  is for consulting.

4  Q  Yes.

5  A  So I don't know, is this a consulting

6  report or is this a license report?

7  Q  It's mixed.  It appears to be mixed.  I

8  mean, the first page shows --

9  A  I don't know.  See, I'm a man of few

10  reports.  Give me reports that I could think of what

11  the heck I'm reading, and understand what I have to

12  do.

13  Q  Right.

14  A  This is good information, but analysts at

15  times have nothing to do but to spend a lot more time

16  creating reports.  People in the field want the

17  reports, want the facts, just give me the facts, tell

18  me where we are and I'm ready to go.

19  But I can't clearly answer anything,

20  because this leaves a lot open in my mind, other than

21  the fact that the actual has occurred and that's

22  factual, and the forecast for the quarter that is

45

1  remaining should be pretty good information.  Doesn't

2  have to be accurate, but it's that pipeline and all

3  that other stuff.  And after that, the other

4  quarters, nobody knows.

5  Q  Okay.  So 86 and 87 weren't reports that

6  you received, is that right?

7  A  Let me say it in my words.

8  Q  Yeah.

9  A  I might have received them, but I did

10  nothing with them, because in this condition without

11  understanding, you know, maybe an attachment to it,

12  they're useless.

13  Q  All right.  The weekly forecasting reports

14  that you did get from Sarah Kopp, do you remember

15  when you got those in relation to the Monday

16  executive committee meeting?

17  A  Well, because the monthly executive

18  committee meeting --

19  Q  I'm sorry, the weekly executive committee.

20  A  Well, the Monday weekly.

21  Q  Yeah.

22  A  Should have started around 1:00, and so we

46

1  in the morning, because living on the East Coast,

2  Sarah would give me an update, that which she had

3  given to Jennifer Minton, so we'd at least have the

4  same set of numbers.

5  Q  Was that update different from the weekly

6  forecasting report that you got from Sarah Kopp?

7  A  No, it would probably be the same.

8  Q  All right.  I'm going to hand you a copy

9  of something that was previously marked as Exhibit

10  74.

11  A  Now we got something.

12  Q  Hey.

13  A  That we're looking at.

14  Q  Finally.  So you recognize the type of

15  report that's --

16  A  Yes.

17  Q  -- shown in Exhibit 74?

18  A  Yes.

19  Q  What can you tell me about this, this

20  report?

21  A  It's a working document, telling us what

22  we have done to date basically would have been

47

1  included, and then what has to happen.  This is an

2  extraction out of, extrapolation of the pipeline with

3  the deals that are most important.  And it gives you

4  a status check of what's going on.  So as you can

5  read, "Customer visits USCG to see an actual

6  implementation.  Final stage before purchase."  See

7  that one?

8  Q  Yes.

9  A  Point 800,000.

10  Q  Yes.

11  A  And if you go down and try to go blind and

12  read every one of them, you will find out the

13  comment.

14  Q  All right.  Is this a partial report?  You

15  said something about actuals and I don't see them on

16  here?

17  A  Well, we would know the actuals -- there

18  would be -- so if it was sitting on my desk, here's

19  what we have actually done to date, and this is now

20  the stuff in the pipe, so this is a pipeline report

21  validating what we think will happen because you can

22  see all the different comments.

48

1    Q  All right.  And these are, looks like, are

2  these all of the deals over $500,000 that are in the

3  pipe?

4    A  I'd say it is the majority of the deals.

5  I'd have to look at the pipe to answer that

6  correctly, but it's usually those that we think are

7  most active and that could close.  There could be

8  other $500,000 or greater in there, but they don't

9  appear to close in this quarter.

10    Q  All right.  And there are, let's see,

11  first page has -- looks like it has forecast numbers

12  and the second page looks like it has worst case,

13  most likely forecast scenario, and best case scenario

14  numbers.  Am I reading it correctly?

15    A  I see the word worst case scenario.

16    Q  Yeah.

17    A  But, yes, I see, yes.

18    Q  In 2001, who was it at OSI that put deals

19  into those three categories?

20    A  Sarah.

21    Q  All right.  And so the forecast, most

22  likely forecast scenario number on the second page

49

1  which is 200.9 million is a little bit different than

2  the total forecast number on the first page which is

3  210 million?

4    A  Correct.

5    Q  Is that 210 million your forecast number?

6    A  Yes.

7    Q  Okay.  Now, this is dated January 29th,

8  which was a Monday in 2001.  Would you get these

9  reports before the Monday executive committee

10  meeting?

11    A  Absolutely.

12    Q  So you had this information?

13    A  That's what you had to discuss assuming

14  the meeting went on.  And if it did, this would be a

15  subject that Jeff and Jennifer would want to take you

16  through.

17    Q  All right.

18    A  And they had the same information.

19    MR. GOLDSTEIN:  Dario, I wouldn't mind

20  taking a break now.  If that's all right with you.

21    MR. DE GHETALDI:  Okay.  Yeah, sure.

22    THE VIDEOGRAPHER:  We're going off the

50

1  record.  The time is 10:49 a.m.

2    (Recess.)

3    THE VIDEOGRAPHER:  We are back on the

4  record.  The time is 11:03 a.m.

5  BY MR. DE GHETALDI:

6    Q  I'm going to hand you a copy of a document

7  that was marked as Exhibit 72.  Have you ever seen

8  Exhibit 72 before today?

9    A  Yes.

10    Q  When was that, I mean, was it --

11    A  January 18th, Thursday, at 17:29:09.

12    Q  Well, I'm not trying to be a jerk about

13  it.  I was just wondering really whether this was one

14  of the documents that you reviewed in preparation for

15  your deposition, maybe I should have asked it like

16  that.

17    A  Oh, I'm sorry, no, I didn't see this one.

18    Q  And it's not addressed to you, so I wasn't

19  sure that you had actually ever seen it?

20    A  Well, this is what I was trying -- this is

21  a good document.

22    Q  Yes.

51

1    A  Because it explains to you how Sarah and I

2  have conversations, and she then relays it up to

3  Jennifer.  And then on occasions, I even would sit in

4  on a call to Jennifer because Sarah can't -- Sarah

5  was a little new, but Sarah can't exactly explain the

6  level of detail behind each one as I'm working them.

7  So when she needs help or I think she does,

8  occasionally I'll even explain it to Jennifer.

9    Q  All right.  Now, can you tell me what,

10  what the column SVP commit means?

11    A  Those are my direct reports.

12    Q  All right.  So those are the -- is that

13  senior vice president, is that what that is?

14    A  Yes.

15    Q  And the -- so that shows the numbers that

16  they were actually willing to commit to in terms of

17  their forecast?

18    A  No.  This is where you get into semantics.

19    Q  Okay.

20    A  I want to just clear it up, not that you

21  are.

22    Q  Good.

52

1    A   We go in, talk to each of these people and
2    they say, well, what is the safety net number,
3    therefore that is the commit.  And in doing that, a
4    lot of this 134 million that's in this number is
5    already done.  And then we say, okay, now if we added
6    the big deals to this number, what are we really
7    talking about.  And it can get to a best case number
8    as you see to the right.
9         Now, that doesn't mean in the best case
10   that we said every one of your big deals will close.
11   So if they really -- if you shot them with truth
12   serum, they would probably say my number is something
13   greater than a rollup of 185, up into 300 million,
14   but each one is a deal by deal that I have to figure
15   out if I'm going to get it or not.
16        So if you take higher education, they
17   don't get taxes, they're screwed, okay.  If you take
18   coms, they don't get Lucent, they're screwed.  So
19   that's the kind of variation that these two things
20   are.
21        The commit is like that safety net number
22   that you know you're going to get.  And then you take

53

1    these trophy deals or these big deals, and if you
2    have 10 of them and they add up to some greater
3    number, let's say 10 of them could add up to an
4    additional 150 million dollars, well, you're not
5    going to get 10 for 10, but you should get six out of
6    the 10.
7         Now, it's even trickier because you could
8    get two out of the 10, if they're the right two.  So
9    that's when you have to know really what the nuances
10   of all these are about.
11        So that's how we would look at this.  So
12   then Sarah would say her projection is 205, but Jay's
13   forecast is 225, so we would stop there.
14    Q   All right.  Do you, do you know what the
15   75 percent confidence level handwritten notation
16   under your forecast number refers to?
17    A   Well, that's Sarah.
18    Q   That's Sarah.  So is she 75 percent
19   confident in that or were you 75 percent confident?
20    A   I was 100 percent confident.  Sarah said
21   maybe it's not coming in fast enough, so I'm 75
22   percent confident we'll do that.

54

1    Q   All right.  This second, second sentence
2    of the first paragraph, Sarah says that she's
3    including her projection based upon discussions with,
4    I guess your directs.  Was that something that she
5    did, actually went and talked to your direct reports
6    to work up her own forecast or projection number?
7    A   Her projection is based on a little bit
8    more statistics of, oh, my God, we have -- I'm not
9    going on this date because it's the 18th because we
10   still have an entire month of February.
11        But it just looks really bleak that the
12   business that has been booked to date isn't high
13   enough.  And so it's all pushing out into a huge
14   bonanza of revenues are going to have to flow in
15   February.
16    Q   Okay.
17    A   So that's what she would hopefully do.
18    Q   The second paragraph, first sentence
19   refers to a call from the road, and you going over
20   numbers with Larry.  Do you by any chance have any
21   recollection about that call?
22    A   I can only assume what was said.  He asked

55

1    me, are we holding -- now, this is, this is not, this
2    is just Jay coming up with what the script probably
3    was like.
4    Q   Sure.
5    A   How are the numbers holding, is there
6    anything I could do for you.  Are there any big deals
7    there that we think we'll get.  What do I need to do
8    if anything at Lucent, because that was the make or
9    break deal in this whole thing.
10        And I don't know if he even mentioned that
11   but I'm just saying so those would be the kinds of
12   things.  And are you still confident that your 225 or
13   210, whatever the number that he had in front of him,
14   is doable.
15    Q   Okay.
16    A   And I said, by all means.
17    Q   All right.  Would Lucent show up in -- I
18   don't remember seeing, I don't think I see it in
19   here.  And it might be just because the print's so
20   small, but is that, is Lucent in the Exhibit 74?
21    A   Sure, sure.  Lucent.  It's like an eye
22   test.

56

1  Q  I know.
2  A  Yeah, see the bottom and the handwriting?
3  Q  Yes.
4  A  It looks to me, although blurry, looks
5  like Lucent and then I can't read, 39 to -- 35
6  million.
7  Q  Something like that.  What I actually
8  meant in the, in the typed, Lucent Technologies, it
9  shows as the most likely forecast at 10 on the second
10  page.
11  A  Yeah.
12  Q  Right in the middle.
13  A  Yeah, I see that.  So what we do at these
14  big deals, because you never know what's going to
15  happen, this is just a little bit of trickery, maybe
16  we trick ourselves.  Instead of putting it in for 35
17  million, there's a chance that they might say, look,
18  why don't we do it in two or three bites instead of
19  the whole thing.
20  And so we say, worse case is that you come
21  in for 10 million, if it's going to happen.  Best
22  case they'll do the whole thing.  And so what we do

57

1  is go down and say, okay, let's not be greedy and say
2  Lucent is clear enough of mind to do -- because this
3  place is spinning down the sink.
4  I mean this -- at this time, Lucent is
5  totally out of control.  Their CEO was fired, acting
6  CEO was the guy on the board, 67 years old, Henry
7  something or other, who sleeps at his desk.  Working
8  late.
9  Q  Right.
10  A  He's working these unbearable hours trying
11  to put it back together.
12  Q  Yeah.
13  A  And it was not naive of us to think we
14  could do this, because this would have saved them
15  hundreds of millions of dollars, because the Lucent
16  deal which was something that I thought under no
17  circumstance any company with any financial problems
18  would ever not do, basically they were doing a --
19  maybe this is more information than you need, just
20  tell me.
21  Q  No, it's good.
22  A  They were doing, Lucent was doing an SAP

58

1  update and they were going to have to spend somewhere
2  on SAP, 150 to 200 million dollars, after the
3  geniuses already spent 700 million that didn't work.
4  So if you want to look at, inside of the
5  telecom madness, spend 700 million to implement SAP,
6  it doesn't work, they can't find their inventories,
7  their auditors are all over them, they got red audit
8  reviews.  They can't find about a billion, five to 2
9  billion of inventory.
10  One would think, now call me crazy, that
11  if you went in with a fixed price and said we'll do
12  all this for, I think it was 85 or 90 million
13  dollars, that would be the license and consulting,
14  that they might consider that as opposed to spending
15  almost double that on the same stuff that never
16  worked the first time.
17  Q  Right.
18  A  So we were pretty optimistic.  CIO says,
19  yeah, I'd love to do it.  Ooh, that's interesting.
20  The CEO said, of course I'd like to do that.  The CFO
21  was in the midst of leaving , unbeknownst to us,
22  because she either was terminating or being

59

1  terminated, didn't know that.
2  So we went there, February, I don't
3  know the date, 26th, 27th-ish, still thought that we
4  had it because the CEO said come on up.  The CIO
5  said, it's done.  What we forgot to do was get the
6  cook, and the chauffeur didn't sign off on, so we
7  went up there maybe to get the chauffeur and the cook
8  to sign, because Lucent is whacked, only to find out
9  that nobody can sign other than the bankers, because
10  it's in covenance, am I saying it right, when a bank
11  owns -- that they won't allow you to sign up for more
12  debt or to take on any project over a certain size.
13  I don't know the expression, if it's --
14  the bank has a covenance on this, that any deals of
15  any size will come to us, you have no authority to
16  sign anything, so you're just custodians, we run
17  Lucent.  Gee, what a great surprise.
18  Q  Yeah.
19  A  And so we can't get the deal signed.
20  Q  Right.
21  A  Now, it took a lot of wind out of our
22  sails, myself, Jim O'Neil and I went back on the

60

1   train, called Ellison and Safra Catz and said, I

2   guess you're not going to believe this one.  The CEO

3   said yes, the CIO said yes, the division president

4   said yes, the CFO, although missing, said yes.  As I

5   said the chauffeur couldn't, you know, get there in

6   time for his signature nor the chef.  But other than

7   that, it's a fine go.  Larry said I don't like the

8   sarcasm in your voice.

9        I said, well, problem is we've got to go

10   to the banks.  And he said, oh, shit, and we crossed

11   it off the list.  I think was the day to go and it

12   was in there for anywhere between 10 and 35 million

13   dollars.  So that turned out to be ugly.  Now, the

14   following quarter we got Lucent's business, but we

15   didn't get it in the third quarter.  Long story, but

16   one that I remember unfortunately all too well.

17        Q   Right.  Okay.  This is a document that was

18   marked as Exhibit 75.  Do you remember seeing Exhibit

19   75 before?

20        A   Oh, absolutely, it's the same as -- this

21   is that format that we talked about.

22        Q   Right.  She mentions a senior staff

61

1        A   Yes.

2        Q   Okay.  Had that been put in place

3   relatively recently in comparison to the date of this

4   e-mail in Exhibit 75?

5        A   Actually no, we had this, we called it

6   something else and then we made it sound like OSO,

7   because I think they were trying to get this inept

8   CRM system of theirs up.  And they were running into

9   terrible problems with it.  So we kept on a system

10   that worked, and then I'm not sure when we had to

11   convert over to Oracle CRM system.  I don't know the

12   time frames of it, but I'll bet you even today it's

13   not too hot.

14        Q   Okay.  Is that, is that the same as 11I or

15   something different?

16        A   It would be in the 11I suite, yeah, sure.

17   So what's the -- what would you like to know about

18   this?

19        Q   Well, I guess I want to know whether it --

20   what Sarah says here is accurate, that the reps

21   weren't putting --

22        A   Yes, it was accurate.

63

1   meeting, would have been on a Tuesday, and there's

2   a -- looks like a PowerPoint attached to the e-mail.

3        A   Okay.

4        Q   Do you recall who made that PowerPoint

5   presentation at that --

6        A   I believe it was Sarah.

7        Q   All right.  She mentions in the first

8   paragraph on the first page of Exhibit 75, one of the

9   key issues continues to be that reps are just not

10   reflecting deals accurately in OSO, or not reflecting

11   the large ones at all, believing the visibility will

12   somehow commit the deal if it is a long shot or large

13   swing.  There was a fairly lively discussion on the

14   matter but Jay was adamant that the reps be held

15   accountable for putting accurate information in the

16   system.

17        Do you recall that discussion at this

18   February meeting?

19        A   Sure, yeah.

20        Q   OSO, Oracle Sales Online, is that right?

21        A   OSO?

22        Q   Yeah.

62

1        Q   -- deals in?

2        A   Yes.  Do you want to know why?

3        Q   Yeah.  If you know.

4        A   Of course.  They were beginning to panic

5   to know if you had a 40 million dollar deal in there

6   that it would take your commit and make it be a

7   little bit more relevant to what your potential was.

8   So they were getting a little gun-shy of putting in

9   these big deals, because it would make their pipeline

10   look so much bigger and therefore, from the managers

11   down, it wasn't just the reps, the managers

12   themselves were trying to keep these things not a

13   secret because we all knew of them, because you can't

14   hide big deals.  But trying not to make it look like

15   it was going to happen until it happened.  All right?

16        Q   All right.

17        A   So they were a little unsure of how to put

18   it into the system, and then at what number, i.e. do

19   I put Lucent in at 35 million, do I put it in at 10

20   million.  Do I put AT&T in at 10 million or 5

21   million.  We had a big deal at the time with Sprint.

22   Do we put Sprint in or not.  Well, they were very

64

1   nervous about doing these things, because each one of
2   them was a little more difficult to get done than the
3   next.  These were not just lay-ups.
4       So that was what we had the conversation
5   about.  And I said what difference does it make?  If
6   it doesn't close in the quarter and it's a real deal,
7   it'll close in Q4, let's track -- let's track it.
8   And so they eventually started to listen.
9       Q   All right.  The columns aren't the same as
10  with the other one that we looked at.  Or at least
11  they don't have the same titles.  The column that's
12  titled "commit" in Exhibit 75?
13      A   Yes.
14      Q   Is that the senior vice president "commit"
15  or your "commit"?
16      A   I couldn't guess.  You know, we have so
17  many words around these things.  Let's just say,
18  whether it's SVP commit or it's my commit, I'm
19  responsible, so it's our commit, the SVPs go along
20  with what I commit.
21      Q   All right.
22      A   I don't know why it's not on there.  But

65

1   so is -- best cases isn't on there either, my
2   projection -- you know, it's a different -- you know,
3   it's getting closer in, you've got two weeks to go.
4   I think Sarah, who was very competent, is trying to
5   do her very best to keep it more and more simple.
6   And so why do you want to have five different ways
7   you could say the number.  I commit if the sun's up.
8   I commit if the sun's down.  This is my people's --
9   so we just said, heck, this is our commit, this is
10  our upside.
11      And 180 was our commit, 210 -- excuse me,
12  our upside was 240, and I think at that time the
13  number might have been anywhere between 210 or 225, I
14  don't remember.  See, Sarah even says we'll come in
15  between 210 and 220, and she's always a pessimist.
16      Q   In the paragraph just below the chart on
17  the first page of Exhibit 75, she says that there's
18  only 34 million booked as of today.  Those were --
19  when she says booked, is that the same thing as what
20  we were talking about earlier today, the deals are
21  closed, closed, closed, the contract's been signed
22  and the stuff's gone out in shipment?

66

1   I won't pay you for teaching you this.
2   The answer's yes.
3       Q   Okay.
4       A   34 million is what has been done so we
5   wouldn't put 34 million back in the pipeline because
6   it's already shipped, booked, billed and what have
7   you, which oh, by the way, is a very low number
8   because obviously we're shooting for 200 and some odd
9   million.
10      Q   Right.
11      A   Which is why everybody has great anxiety.
12      Q   Okay.  When did that anxiety start here in
13  this quarter?
14      A   In February?
15      Q   No, not in February but in the quarter.
16      A   February.
17      Q   It started in February?
18      A   Sure.
19      Q   Okay.  First of the month or --
20      A   Let me say for me.
21      Q   Yeah.
22      A   I would say it probably started after the

67

1   first week in February.
2       Q   After you got the January numbers?
3       A   Yeah.
4       Q   Okay.  If you could turn, oh, it's second
5   to last page of Exhibit 75.
6       A   Sure.  Okay.
7       Q   Could you explain the comment on the
8   bottom of that page underneath the chart where it
9   says, "margin dollars and percent falling behind plan
10  in prior year due to investment in Bell South."
11      A   Yeah.  Do you want the answer?
12      Q   Yes, please.
13      A   Bell South was a pioneer in the CRM
14  product.  And what we delivered to them was more of
15  an erector set that hadn't been put together.
16  Because they were so good and generous to us to be an
17  early adopter, we tried to get development, along
18  with our consultants, to try and fix what they had
19  been shipped.  To do that, we found ourselves in an
20  embarrassing situation because we couldn't charge
21  them -- it would be as if I shipped you, if you
22  bought a brand new BMW and you got in the car and

68

1    there was no steering wheel.
2        Q   That bad?
3        A   Oh, it's worse.  But if you had a steering
4    wheel that would be -- sounds like me.  One second.
5        MR. DE GHETALDI:  Go off the record.
6        THE VIDEOGRAPHER:  We are going off the
7    record.  The time is 11:30 a.m.
8        (Recess.)
9        THE VIDEOGRAPHER:  We are back on the
10   record.  The time is 11:30 a.m.
11       THE WITNESS:  So if you had your BMW and
12   the steering wheel was missing, you might be a little
13   concerned.  But if you opened up and you didn't have
14   an engine, you'd say whoa, this is getting
15   interesting.  And tires are going to eventually be
16   shipped.  And you'd like to drive the car.
17   BY MR. DE GHETALDI:
18       Q   Yeah.
19       A   And so you get a little bit upset and you
20   say to BMW, I want the mechanics at my house, I want
21   them to fix it.  They say fine, we need to send 17
22   mechanics at $200 an hour.  And you say, I don't get

69

1    it, I bought the car, didn't I expect to have all
2    this working?  And the answer is yes.  Well, why are
3    you charging me for the repair on my, at my house.
4        So maybe I'm trying to make a little humor
5    of it, that's basically what Bell South was telling
6    us.  Well, how do you take a wonderful account like
7    Bell South and burden them with that problem?  In all
8    good faith they bought what we told them what it was.
9    What we told them was, wasn't.
10       And so we had to do that by building it on
11   site with the good help of the developers and my
12   consultants.  Well, that little effort cost me, of
13   unbillable labor, 21 or 22 million dollars, which we
14   didn't get any relief for.  But which really --
15   that's why the comment here is, you could look at
16   these numbers all you want, but if you had had shipped us
17   the right product and we didn't have to do this, we
18   would not have had to spend unbillable dollars in the
19   tune of 20 some odd million dollars.
20       Now, we had permission to do it because
21   that's a large amount of money that I wouldn't have
22   done on my own, so we got approval to do it.

70

1        Q   Approval from whom?
2        A   Larry Ellison, his eminence.
3        MR. DE GHETALDI:  Let's mark this one as
4    Exhibit 64, please.
5        (Deposition Exhibit Number 64 was marked
6    for identification and attached to the transcript.)
7        MR. NACHBAR:  Dario, you say it's 64?
8        MR. DE GHETALDI:  64, yeah.
9        THE WITNESS:  Okay.
10   BY MR. DE GHETALDI:
11       Q   Have you seen this before?
12       A   No, but it's typical of the lies of Mark
13   Barrenechea.
14       Q   Okay.
15       A   What?
16       Q   This is about the Bell South deal?
17       A   That is correct.
18       Q   And what in here is not true?
19       A   Everything that Barrenechea wrote is not
20   true.  It's true what he said, Andrew Holsworth is on
21   site, so this is the support that he gave us.  But
22   he's crying a plea, don't burn me.  Don't burn you?

71

1    Barrenechea, you're incompetent because you told us
2    it worked.  So don't burn you?  No problem, why burn
3    you, burn 20 million, it's easier.
4        Q   Right.  Okay.  Did you have problems with
5    the CRM module with other customers other than Bell
6    South?
7        A   Could you rephrase the question and say
8    what customers didn't I have problems with.
9        Q   What customers didn't you have problems
10   with?
11       A   None.
12       Q   That was creating a problem for you
13   selling the thing, was --
14       A   No -- I'm being sarcastic now.  So the
15   answer's, no, it's great to sell what doesn't work.
16       Q   By December 2000, January 2001, had people
17   figured out that the thing didn't work or --
18       A   No, it depended on what they bought.
19       Q   Right.
20       A   Some of it worked.
21       Q   Okay.
22       A   So if you wanted the -- let's take the

72

Oracle Related Cases

Page  69 - 72

1  car.  If you wanted to drive it 20 miles an hour, we
2  can get you on the road.  But if you're going to go
3  cross country, it's a long-ass ride, but the car's
4  specs say you should go 80, 100.  That was not
5  working.
6        And it's no different than Siebel.  I'm
7  not trying -- in software, everybody tells you when
8  it works and when it doesn't and it gets out a little
9  bit before it's time, customers get too aggressive
10  with what they want.  You know, it's like you try to
11  tell them, why don't you start with this that works
12  and then the next thing you know all the crazy
13  developers inside want all the whistles and bells.
14        And so next thing you know you've got
15  yourself a whistles-and-bell project where only the
16  basics work.  And that was the bind that we were in.
17  And it happened at AT&T as well.
18        Q  Okay.  Back at Exhibit 75, which is that
19  one.  You mentioned AT&T.  There's a notation in the
20  bottom right hand corner of the chart on the first
21  page, it says "20 million, upside on AT&T" and
22  then --

73

1        A  I'm sorry.
2        Q  Was that a CRM deal?
3        A  No.
4        Q  That's a different --
5        A  None of these are CRM deals.
6        Q  Okay.
7        A  If these were CRM deals, I wouldn't have
8  forecasted them.
9        Q  Why not?
10        A  Well, I think at this point in time people
11  would have wanted to see a little bit more stability
12  and sales reps weren't anxious to sell until they saw
13  a little bit more stability.
14        Q  All right.  So these are either database
15  or --
16        A  Applications mainly or database naturally.
17        Q  All right.
18        A  Or financials, applications, or HR
19  applications, or supply chain applications, but not
20  CRM.
21        Q  All right.  Under health care --
22        A  Hail Mary.

74

1        Q  The hail Mary remark?
2        A  Yeah.
3        Q  Is that you?
4        A  Yeah.
5        Q  Sounds like you.
6        A  Yes.
7        Q  It says that one is not in the pipeline,
8  is that just because it was so remote?
9        A  Well, it was 23 million dollars that we
10  didn't want to skew, and it's at Health South.  The
11  people at Health South -- I don't mean this because
12  of what's happened today, they're pretty squirrelly
13  people.  And you don't know if they're bullshitting
14  you and yeah, we're going to do it or for whatever
15  their pride was or they really wanted to do it.  So
16  we just said, let's keep it going, keep on seeing
17  what will happen here.  And it was in our forecast.
18  It was in our upside on the forecast side.
19        Q  Then the long-shot at Worldcom, what can
20  you tell me about that?
21        A  Oh, yeah, that's easy.  Worldcom owed us,
22  I think it was 10 or 15 million dollars, I'm not sure

75

1  exactly how much, for support maintenance that they
2  hadn't paid in over 18 months.  And I had, and I had
3  asked that we not shut off their support, I would go
4  pay them a visit because they're right here and see
5  if we could talk some sense into them.
6        And I went over there, met their CIO, his
7  name is Fred Briggs.  He was taken back a lot by the
8  fact that we're now supposedly strong arming him into
9  getting paid, or the threat is we're closing off the
10  support.
11        I said, well, Fred, this is interesting.
12  But do you think 18 months is enough patience, well,
13  this is the first time it came to me.  Liar.  His
14  people who we spoke to prior to getting to see him
15  told him five quarters in a row, Fred, we've got to
16  pay this, Fred we've got to pay it.  The only
17  difference is these poor people were getting fired,
18  they were never the same people because they were
19  getting terminated, so we'd have to start all over
20  again.
21        Hey, I know you're new in your job, I know
22  you don't want to piss off Fred, but would someone at

76

1   least tell him that this support is a problem.  Well,
2   it turned out that finally we got through to him and
3   finally we told him and he didn't like it.  And
4   therefore, the deal that we were going to propose for
5   him to save a lot of money, which I think Worldcom
6   would have liked, was an opportunity for us.
7       And we'd been so good to them by keeping
8   the support going, we actually thought we had an
9   opportunity, even though a long shot, for something
10  around 20 million dollars.
11      So I made the call myself and went over
12  there and Briggs was, unbeknownst to me and I'm not
13  smart -- I think I'm pretty smart, but I wasn't smart
14  enough to start to see the picture of
15  telecommunications unwinding in front of my very
16  eyes.  I told you the Lucent story, and I could tell
17  you the same Worldcom story, but I didn't know it at
18  the time.
19      That he wasn't going to buy anything, he
20  just wanted these 15 million dollars of software
21  support to go away.  I told him, either you pay or
22  I'm leaving and telling them to shut it off.  That 's

77

1   not a real nice way to then open up an, oh, by the
2   way, would you like to buy this.
3       So he was still miffed by that and the
4   deal died because he wasn't -- he wanted to have it
5   go away.  You can't recognize 20 million dollars and
6   make 15 disappear, seems kind of foolhardy.  So we
7   stayed our course and as you speak today, I spoke to
8   Mike Capellas, who's actually a friend of mine, who
9   runs the place, and they're in the midst of a
10  lawsuit.
11      He thinks it's kind of crazy but -- so
12  that's where, so the deal died.  I guess that's a
13  long way to tell you because these things
14  unfortunately, if I ever wrote my memoirs, all these
15  have such stories to them, I'm trying not to be too
16  crazy by telling you every one of them in
17  excruciating detail, but the Worldcom meeting was one
18  of those.
19      Q  All right.
20      A  So if you notice just here in the telecom
21  space on 75 that you gave me, there's like, what, 50,
22  70.

78

1       Q  85?
2       A  85 million dollars of opportunities that
3   we should get some portion of, right?  And we were 0
4   for.  That's never happened to me before.  Only
5   because I could tell you the detail of every one of
6   those deals.  So that's why we were still so
7   optimistic.  As I said, the Lucent deal didn't end
8   until maybe the day before the end of the quarter or
9   two days before the end of the quarter, how could
10  they have said no to that offer that I shared with
11  you before, how could Worldcom not think about doing
12  what they did.  Qwest, Nachio, promised us the deal
13  and then probably got into problems we didn't know
14  about.
15      And so all of a sudden they stalled and at
16  AT&T we got them in Q4, they wanted us to commit to
17  give them more network business before they would
18  entertain the 20 million.
19      Q  A little tit for tat?
20      A  Oh, yeah, guns for whiskey.
21      Q  All right.
22      A  I'm just trying to show you the picture

79

1   that I'm dealing with here.
2       Q  Yeah.
3       A  How could I not have 85 million dollars.
4   I know that everyone's saying 160 to 190 is a range
5   moving around.  If I get 40 million of this, which
6   could have been any deal, any two deals, right, plus
7   Lucent, even at a smaller deal, I'm basically home
8   free, in the final.
9       Now, the hail Mary, this is how nuts this
10  quarter was, the quarter from hell, of all the deals
11  if you said to me which one will not happen, it was
12  Hell South, and Hell South happened.
13      So I've never -- I've been at this a long,
14  long time and have done a reasonably good job at it.
15  And it would be as if we went to the racetrack and
16  for the first 10 races I couldn't pick one if the
17  jockeys were telling me this was the one.  And in the
18  11th one I just closed my eyes and threw a dart and
19  picked Hell South and it won.  Because I thought that
20  was the longest of all long shots.  So it was that
21  kind of a quarter.  There was so much going on and
22  the time was running out so much.

80

1  Q  Okay.  Let's talk about Dr. No for a

2  little bit.

3  A  Sounds like Larry Garnick.

4  Q  This is Exhibit 108.

5  A  And the question is?

6  Q  Well, I'm looking for your name, I thought

7  it was on here.

8  A  I've never seen this document.

9  Q  Really?  Okay.  Let's go to 110 then.

10  A  All right.

11  Q  That was fast.

12  A  Thank you, Larry.  And?

13  Q  Do you remember seeing Exhibit 110 before?

14  A  When I -- I'm familiarizing myself with

15  it, yes.

16  Q  Okay.  This, I believe, shows the actual

17  revenue results for December and January combined, is

18  that your understanding?

19  A  It says January actuals in dollars, and I

20  don't see where it says February.  Now, I mean --

21  where do you see February, am I missing something?

22  Q  No, I said December and January.

81

1  A  I'm sorry, yes, December and January, yes.

2  Q  Okay.  I see that on the second page that

3  both OSI and NAS had negative, negative growth for

4  those two months?

5  A  Correct.  Correct.

6  Q  Was that a subject of discussion at the

7  Monday executive committee meetings?

8  A  They don't necessary -- this document

9  probably would provoke a good conversation about,

10  hey, guys, what's going on, we're lagging behind

11  pretty badly, when are we going to get going.  And

12  then we flipped to, don't panic, here's a backlog of

13  opportunities, the pipeline, George Roberts, tell

14  them your story, Sandy, Jay, tell them your story.

15  And how comfortable or uncomfortable are you that

16  that backlog will yield blank.

17  In my case, I was unfortunately too

18  comfortable to think that it was going to yield that

19  number that I was shooting for, even though we only

20  had in at that moment that small amount of revenue.

21  Q  About a tenth of what you needed, right?

22  A  Yeah, we needed another 200 million.  But,

82

1  you know, it's amazing not to take anything -- I'm

2  just rambling.

3  MR. GOLDSTEIN:  Wait until he asks you

4  another question.

5  Q  Well, what were you going to say.

6  A  No, that's all right.

7  Q  Do you recall asking Larry Ellison to

8  authorize a special sales incentive in the third

9  quarter of 2001?

10  A  I did, yes.

11  Q  What, what incentive did you propose?

12  A  Well, I don't recall the exact incentive

13  but let me tell you, we were sitting in a good

14  position for the first six months.  And the second

15  six months is the real push to make your quota or

16  plan or what have you.

17  So I thought that with all the deals that

18  I had out there, if I could incent the sales reps for

19  trying a tad bit harder and getting a little bit more

20  out of them, that I would guarantee a strong Q3,

21  potentially, and then put 4 without as much anxiety,

22  because I would have had more revenue booked earlier.

83

1  So that the ramp in Q4 wouldn't have been as great.

2  So I suggested for all of us that maybe a promotion

3  of some sort would be a wise thing.

4  Q  Was that in part because there were

5  problems with the CRM module and sales with that?

6  A  No, no.  The CRM module was irrelevant to

7  these numbers because we weren't selling -- if you go

8  through the deals again, few if any were CRM-ish

9  deals.  So, no, that wasn't for that reason.

10  Q  Okay.  Was that incentive approved by

11  Larry?

12  A  No.

13  Q  Did he say why?

14  A  He didn't think we needed it.

15  Q  Okay.  I'm going to hand you a copy of a

16  document that was marked as Exhibit 44, I don't have

17  numbers on the bottoms of these but -- and as you're

18  going through this, let me just tell you what this

19  is.  This is a certain page from four upside reports

20  from December 2000 and January 2001.  And since

21  there's only five minutes left on the videotape, why

22  don't we go off the record and change tape.

84

1     A   Sure.

2         THE VIDEOGRAPHER:  This marks the end of

3     tape one in the deposition of Mr. Nussbaum.  We're

4     going off the record.  The time is 11:52 a.m.

5         (Recess.)

6         THE VIDEOGRAPHER:  This marks the

7     beginning of tape two in the deposition of

8     Mr. Nussbaum.  We're back on the record.  The time is

9     11:54 a.m.

10    BY MR. DE GHETALDI:

11        Q   As I was saying, these are pages from

12    upside reports, the same page from a report dated

13    December 11th, 2000, which is the first page and

14    January 15th, 2001, the second page, January 29th,

15    2001, and February 5th of 2001.

16        And I'd like to ask you a couple of

17    questions about some of the numbers and the columns

18    on these pages.  Just to the right of the center of

19    the page, there's a column that's called, or titled,

20    "Q3 targeted 30 percent growth."  Do you see that?

21    A   Yes.

22    Q   What --

85

1     A   I'm sorry.

2         MR. DE GHETALDI:  Let's go off the record.

3         THE VIDEOGRAPHER:  We're going off the

4     record, the time is 11:55 a.m.

5         (Recess.)

6         THE VIDEOGRAPHER:  We're back on the

7     record.  The time is 11:56 a.m.

8         THE WITNESS:  Targeted 30 percent.

9     BY MR. DE GHETALDI:

10        Q   Yeah.

11        A   What's the question?

12        Q   What was that?  I mean, what was this

13    target?  Who set the target?

14        A   I have no idea who set it, but, you know,

15    you're thinking of a number beyond what you've done

16    in the previous year.  So 30 percent growth would be

17    a number that is doable.  I guess if I had been able

18    to do 245, I could have done 30 percent growth.

19        Q   Right.

20        A   I was only predicting to do 19 percent

21    growth with the 225.  Why they did that, find the

22    author and -- I mean, he could have made it 50

86

1     percent growth, too, I don't know.  I know there was

2     no magic about it.

3     Q   On December 14th, 2000, Oracle gave

4     guidance during the earnings conference call that it

5     expected to make 30 percent growth in its license

6     business.  Does that fact refresh your memory as to

7     where this targeted 30 percent growth came from?

8     A   No.  Because I was just looking at my own

9     operation and I thought maybe we can get it to 20.

10    Now, I did think that we could perhaps do -- this

11    might sound bizarre, but there was an outside chance

12    I can get to 275, you know, if the deals really start

13    to fall as they have in the past.

14        But at that point in time, I didn't -- I

15    was just more concerned, let me get to my 225 and

16    then if things start to really work, I could call in

17    happiness of each time another deal beyond 225 came.

18    So I never worried about to get to the 30 percent

19    growth.  But then there were others out there who

20    were doing pretty well at the time, which I was

21    unaware of.  And so I figured that was just a

22    corporate goal and I knew I was under it by about 11

87

1     percent.

2     Q   All right.  The -- there is a column

3     called forecast towards the left, where it looks

4     like, that's 225 million?

5     A   Right.

6     Q   Was that your forecast number?

7     A   Yes.

8     Q   Okay.  Then the next column over is

9     upside, is that an additional amount that Jennifer

10    Minton was putting on top of your forecast?

11    A   You'd have to ask Jennifer that.

12    Q   All right.

13    A   I was pretty consistent.  225 was the

14    number for quite a while, because the pipeline was so

15    rich, although days were beginning to run out.  But

16    we still were very optimistic that 225 would occur.

17    Q   At 225, according to this January 18th

18    e-mail from Sarah Kopp, she said you had $91 million

19    in judgment to get to that $225 million number.  Was

20    that a comparatively high or low amount of judgment?

21        MR. GOLDSTEIN:  Objection to form.

22    Q   You can answer.

88

NUSSBAUM, JAY  3/23/2004  12:00:00 AM

1    A   Oh, with the enormity of our backlog, it

2    was not an unusually large judgment.  It was relative

3    to what the deals that were out there, and if you

4    added them all up, and you got your 30 percent of

5    them and you didn't even get the big ones, you just

6    got 30 percent of the total, that there was so much

7    out there that that was not an undoable event.

8        Q   All right.

9        A   And again, if you would, just remember,

10   I'm very confident during the period of this time

11   because of the words coming back from Lucent and the

12   State of New York that those are deals that we're

13   going to do.  So there's 50 million.  So it makes it

14   look a little bit less concerning.

15       Q   All right.  And that 50 million then, that

16   was 50 million that was not included in the senior

17   vice president commit number?

18       A   That's correct.

19       Q   That was part of your management judgment?

20       A   That is correct.

21       Q   All right.  If you would turn to the

22   second page of Exhibit 44, the -- I'm seeing two

                                                    89

1    changes there for OSI total, and that is --

2        A   Well, you're seeing the upside went away

3    and the potential went down.

4        Q   Well, I counted those as one.

5        A   Oh, I'm sorry.

6        Q   Because they go together, but I see the

7    pipeline going down by over a hundred, 110 million?

8        A   Right.

9        Q   Was that a normal way for the pipeline to

10   behave?

11           MR. GOLDSTEIN:  Objection to form.

12       A   Pipeline is a very unusual event, so they

13   don't act and behave the same way quarter after

14   quarter after quarter.  But it was nothing to be

15   concerned about, because the deals were being moved

16   to the fourth quarter and that's why it gets cleansed

17   because you know it's not going to happen.  So as the

18   months go on the pipeline naturally goes down,

19   because the pipeline is that which we think we're

20   going to do in Q4 -- Q3.

21       Q   Okay.

22       A   But 400 was quite a large number if you

                                                    90

1    stay with that.  And if we could do our 40 percent,

2    we were still home free.

3        Q   Well, how about the difference in the

4    forecast growth, as opposed to the pipeline growth.

5            MR. GOLDSTEIN:  Objection to form.

6        A   I don't know what you just asked me.

7        Q   Well, on the second page of Exhibit 44,

8    the forecast growth was 19 percent?

9        A   Yes.

10       Q   And the pipeline growth was 10 percent

11   over the prior year, same quarter?

12       A   One's not really relative to the other.

13       Q   It's not?  How, why not?

14       A   Well, let me say this, the quarter that

15   we're working in, if we deliver the 225, we'd hit 19

16   percent, year over year performance, right?

17       Q   Yes.

18       A   And in the pipeline year over year, we

19   were up, if I reading this correctly -- well,

20   that's even better, right?  In other words, you see

21   '00 pipeline was 397, '01 is 436.

22       Q   Yes.

                                                    91

1        A   That's good.

2        Q   Yes.

3        A   Oh, okay.

4        Q   By itself.

5        A   Yeah.

6        Q   But what I was asking about was the

7    relationship between the forecast growth percentage,

8    19 percent, and the pipeline growth percentage, 10

9    percent?

10       A   I've done this for 30 years, no one ever

11   thought that that was relevant.  So I would have to

12   say I don't know the relevance of that.  The only

13   relevance is that the pipeline year over year is

14   greater.  To me the concern would have been if that

15   pipeline was 200 million against the year before at

16   three something.

17       Q   Right.

18       A   But percentages, you know, you could, you

19   could drive yourself crazy on all little percentages,

20   unless they mean something.  What you described to me

21   doesn't register with me.

22       Q   Okay.  Then turning to the third page,

                                                    92

1   there we're at January 29th.  And that shows a
2   decline in the upside of 35 million dollars.  Do you
3   recall why that occurred?
4        MR. GOLDSTEIN:  Objection to form.
5        A  I don't even know who did it.
6        Q  All right.  Now, if you turn to the last
7   page which is February 5th.  And that's showing the
8   forecast has declined to 210, do you see that?
9        A  Right.
10       Q  Back at Exhibit 74, we also saw the
11  forecast at 210 on January 29th.  And I'm just
12  wondering why, or if you know, why it took a week for
13  that change to appear in the upside report?
14       MR. GOLDSTEIN:  Objection to form.
15       A  I couldn't guess.
16       Q  Okay.  Do you recall during the executive
17  committee meetings discussions about Jennifer
18  Minton's potential numbers?
19       A  Say -- oh, Jennifer's -- yeah, she would
20  talk about what she thought.
21       Q  Yeah.
22       A  Okay.

93

1        Q  Okay.  How -- do you recall there being
2   any kind of working assumption that Jennifer Minton
3   had a better forecasting ability than the executive
4   vice presidents?
5        MR. GOLDSTEIN:  Objection to form.  I just
6   do that every so often.
7        A  No, I find that an interesting question.
8   Jennifer Minton is a finance person who's doing it
9   with a finance mentality.  And so the concern was
10  getting in her that, my goodness, we haven't booked a
11  lot of business.  And last year at this same time we
12  must have booked more business, how are we going to
13  get to the same number, the days are running out.
14       A veteran of having to have lived through
15  those would say, well, we better just run the table
16  with at least these six or seven deals, you are
17  correct.  She was getting nervous whether that was
18  doable or not.  She always used to find my number a
19  little bit more interesting because we've been
20  conservative most times.  And therefore, we would
21  always surprise them with an extra one or two at the
22  end of the day that were in that run the table list.

94

1   And so she was getting nervous because mine had gone
2   down quite a bit.
3        So she had a little bit dimmer view of the
4   number than I still did and George and Sandy at the
5   time.  And then anyone else that was on the call.
6   And that's good because you've got to hear it both
7   ways.  But remember, what was the date you just
8   mentioned?
9        Q  Well, I was talking, let's see --
10       A  February 5th, I think you said.
11       Q  Well, when I asked the question I didn't
12  use a particular date.  I was asking in general.
13       A  Well, in general, it's an irrelevant
14  question, because if it's the first day of the new
15  quarter, she wouldn't even say anything.
16       Q  All right.
17       A  If it's December 2nd, the subject doesn't
18  come up.  On December 15th, she has no data to say
19  anything.  By January 15th, a picture's being played
20  that you can now go back and use statistical data.
21  By February 5th, I just threw that out.
22       Q  Right.

95

1        A  You can come back and it could be more
2   relevant than it was on January 5th.  So it's all a
3   matter of timing when Jennifer is asked these
4   questions or brings these up.
5        Q  Okay.  So --
6        MR. GOLDSTEIN:  I'm going to move to
7   strike that, the answer is not responsive to the
8   question.  Just to note that in the record.  I think
9   we can still do that in Delaware.
10       MR. DE GHETALDI:  That's fine.
11  BY MR. DE GHETALDI:
12       Q  So I understand, one of the themes, if you
13  will, of Jennifer Minton's comments during the
14  executive committee meetings was how well the
15  different divisions were doing based on prior years'
16  actual revenues, is that --
17       MR. GOLDSTEIN:  Objection to form.
18       Q  Is that accurate?
19       A  I can't -- it depended on the quarter.  It
20  wasn't as consistent a behavior.
21       Q  Do you recall those discussions occurring
22  in January 2001?

96

1    A  I think January was an interesting quarter

2    because of the degree of business we had not yet

3    booked.  And therefore her information was more

4    relevant.

5    Q  All right.  I think you said January was

6    an interesting quarter, did you mean January --

7    A  I meant, excuse me, the third quarter.

8    Q  Right.  And so do you recall discussions

9    about the degree of business you had not booked

10   occurring during the January 2001 executive committee

11   meetings?

12   MR. GOLDSTEIN:  I'm sorry, could I just --

13   I need to -- I need to look over your shoulder for a

14   second.  It's a do you recall question.

15   MR. DE GHETALDI:  Yes.

16   MR. GOLDSTEIN:  Okay.  Go ahead.

17   THE WITNESS:  I don't recall anything in

18   January as much as I would recall February.

19   BY MR. DE GHETALDI:

20   Q  Okay.  Do you recall anything in January?

21   MR. GOLDSTEIN:  Objection to form.

22   Q  About that subject?

97

1    A  About that subject.  No,

2    nothing -- January we were still optimistic things

3    were going good.

4    Q  All right.

5    A  So January we were in good stead with

6    deals, the pipe, everything was strong, it was not a

7    problem.

8    Q  If you go back to Exhibit 108, I know you

9    didn't see that, but that's the Dr. No's January

10   2001.

11   A  Right.

12   Q  Report for December.

13   A  Yes, what about it?

14   Q  On the second page, like the combined

15   January/December report that came out in early

16   February, this one looks like it's just December

17   dollars.  And it also shows both OSI and NAS being

18   behind the prior year, actual revenues.  Does this

19   refresh your memory as to whether there were

20   discussions about the state of the actual revenues

21   compared to the prior year during the January --

22   during the January executive committee meetings?

98

1    MR. GOLDSTEIN:  Objection to form.

2    A  Let me just say the following:  This

3    quarter in December and January was not in jeopardy,

4    in my mind.  Nor was it in jeopardy in the first two

5    weeks of February.  I had an unusually fine record of

6    being able to forecast business.  And I had intimate

7    knowledge of the large deals that would swing it our

8    way to that 200 plus forecast.

9    And had it took its normal course, not any

10   luck, its normal course, we would have done 225, and

11   we would have done it all in February.  So I was

12   never concerned one bit -- I'm sorry, I'm just

13   waiting for my wife.

14   MR. DE GHETALDI:  Okay.  Go off the

15   record.

16   THE VIDEOGRAPHER:  We're going off the

17   record.  The time is 12:15 p.m.

18   (Recess.)

19   THE VIDEOGRAPHER:  We're back on the

20   record.  The time is 12:16 p.m.

21   MR. GOLDSTEIN:  I think we need a new

22   question.  I think.  Unless maybe he wasn't finished

99

1    with an answer.

2    BY MR. DE GHETALDI:

3    Q  Were you finished?

4    A  Yeah.

5    Q  Okay.

6    A  We do need a new question.

7    Q  All right.  I'm happy to supply that,

8    along with a new exhibit.  And this is going to be

9    65.

10   (Deposition Exhibit Number 65 was marked

11   for identification and attached to the transcript.)

12   MR. DE GHETALDI:  Write on mine, so I

13   don't get confused.

14   MR. GOLDSTEIN:  Get one for the court

15   reporter.

16   MR. DE GHETALDI:  And get one for the

17   court reporter.  Okay.

18   THE WITNESS:  What page?

19   BY MR. DE GHETALDI:

20   Q  Have you ever seen this document before?

21   A  Yes.

22   Q  And when did you first see this?

100

NUSSBAUM, JAY  3/23/2004  12:00:00 AM

1      A  I got a copy of it, I guess, maybe a week

2  or so ago.

3      Q  Okay.  Did you read it?

4      A  Yeah.

5      Q  Okay.  Was it accurate in terms of being

6  an accurate summary of what you told the special

7  litigation committee of lawyers about a year and a

8  half ago?

9      A  I thought it was, yes.

10      Q  All right.  That's it.

11      MR. GOLDSTEIN:  I have no questions.

12      MR. NACHBAR:  No questions.

13      MR. DE GHETALDI:  And we have the same --

14      MR. GOLDSTEIN:  Yes.

15      MR. DE GHETALDI:  -- issue with this

16  deposition as we have had with the others about the

17  documents.

18      MR. GOLDSTEIN:  We will agree to disagree

19  once again.

20      MR. DE GHETALDI:  Yeah, that's right.

21      THE VIDEOGRAPHER:  This marks the end of

22  the deposition of Jay Nussbaum.  The number of tapes

101

1  used was two.  We are going off the record.  The time

2  is 12:20 p.m.

3      (Signature having been not waived, the

4  deposition of JAY NUSSBAUM was concluded at

5  12:20 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

102

1      ACKNOWLEDGMENT OF DEPONENT

2      I, JAY NUSSBAUM, do hereby acknowledge

3  that I read and examined the foregoing testimony,

4  and the same is a true, correct, and complete

5  transcription of the testimony given by me and any

6  corrections appear on the attached Errata sheet

7  signed by me.

8

9  _____   _____

10  (DATE)        (SIGNATURE)

11

12

13

14

15

16

17

18

19

20

21

22

103

1      CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2      I, Cynthia R. Simmons, Registered

3  Merit Reporter, Certified Realtime Reporter,

4  the officer before whom the foregoing deposition was

5  taken, do hereby certify that the foregoing

6  transcript is a true and correct record of the

7  testimony given; that said testimony was taken by me

8  stenographically and thereafter reduced to

9  typewriting under my supervision; and that I am

10  neither counsel for or related to, nor employed by

11  any of the parties to this case and have no interest,

12  financial or otherwise, in its outcome.

13      IN WITNESS WHEREOF, I have hereunto

14  set my hand and affixed my notarial seal this

15  31st day of March 2004.

16  My commission expires:

17  November 30, 2004

18  _____

19  NOTARY PUBLIC IN AND FOR

20  THE COMMONWEALTH OF VIRGINIA

21

22

104

NUSSBAUM, JAY  3/23/2004  12:00:00 AM

| | | |
|---|---|---|
| 1 | E R R A T A  S H E E T | |
| 2 | IN RE:  ORACLE CORP. DERIVATIVE LITIGATION | |
| 3 | RETURN BY:_____ | |
| 4 | PAGE   LINE       CORRECTION AND REASON | |
| 5 | ____  ____  _____ | |
| 6 | ____  ____  _____ | |
| 7 | ____  ____  _____ | |
| 8 | ____  ____  _____ | |
| 9 | ____  ____  _____ | |
| 10 | ____  ____  _____ | |
| 11 | ____  ____  _____ | |
| 12 | ____  ____  _____ | |
| 13 | ____  ____  _____ | |
| 14 | ____  ____  _____ | |
| 15 | ____  ____  _____ | |
| 16 | ____  ____  _____ | |
| 17 | ____  ____  _____ | |
| 18 | ____  ____  _____ | |
| 19 | ____  ____  _____ | |
| 20 | ____  ____  _____ | |
| 21 | _____  _____ | |
| 22 | (DATE)            (SIGNATURE) | |

105

| | | |
|---|---|---|
| 1 | E R R A T A  S H E E T (CONTINUED) | |
| 2 | IN RE:  ORACLE CORP. DERIVATIVE LITIGATION | |
| 3 | RETURN BY:_____ | |
| 4 | PAGE   LINE       CORRECTION AND REASON | |
| 5 | ____  ____  _____ | |
| 6 | ____  ____  _____ | |
| 7 | ____  ____  _____ | |
| 8 | ____  ____  _____ | |
| 9 | ____  ____  _____ | |
| 10 | ____  ____  _____ | |
| 11 | ____  ____  _____ | |
| 12 | ____  ____  _____ | |
| 13 | ____  ____  _____ | |
| 14 | ____  ____  _____ | |
| 15 | ____  ____  _____ | |
| 16 | ____  ____  _____ | |
| 17 | ____  ____  _____ | |
| 18 | ____  ____  _____ | |
| 19 | ____  ____  _____ | |
| 20 | ____  ____  _____ | |
| 21 | _____  _____ | |
| 22 | (DATE)            (SIGNATURE) | |

106

# EXHIBIT I

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | NORTHERN DISTRICT OF CALIFORNIA |
| 3 | SAN FRANCISCO DIVISION |
| 4 | |
| 5 | IN RE ORACLE CORPORATION |
| | SECURITIES LITIGATION. |
| 6 | CASE NO. C-01-0988-MJJ |
| 7 | THIS DOCUMENT RELATES TO: |
| 8 | ALL ACTIONS. |
| 9 | --------------------------------/ |
| 10 | |
| 11 | ---oOo--- |
| 12 | CONFIDENTIAL |
| 13 | DEPOSITION OF LAWRENCE ELLISON |
| 14 | VOLUME III |
| 15 | Friday, March 30, 2007 |
| 16 | (Pages 561 - 744) |
| 17 | ---oOo--- |
| 18 | |
| 19 | SHEILA CHASE & ASSOCIATES |
| | REPORTING FOR: |
| 19 | LiveNote World Service |
| 20 | 221 Main Street, Suite 1250 |
| | San Francisco, California  94105 |
| 21 | Phone: (415) 321-2311 |
| | Fax: (415) 321-2301 |
| 22 | |
| 23 | |
| 24 | Reported by: |
| | KATHLEEN A. WILKINS, CSR, RPR, CRR |
| 25 | CSR No. 10068 |

561

| | INDEX | |
|---|---|---|
| 1 | INDEX | |
| 2 | INDEX OF EXAMINATIONS | |
| 3 | PAGE | |
| 4 | RESUMED EXAMINATION BY MR. SOLOMON | 570 |
| 5 | INDEX OF EXHIBITS | |
| 6 | Ellison     Description      Page | |
| 7 | Exhibit 141  Letter to Matthew Symonds from | 582 |
| 8 | Larry Ellison, dated January | |
| 9 | 10, 2007 - 1 page | |
| 10 | Exhibit 142  Document entitled, "Matthew | 587 |
| 11 | Symonds Interview with Larry | |
| 12 | Ellison:  Oracle," Bates | |
| 13 | stamped 1529283 through 1529322 | |
| 14 | - 40 pages | |
| 15 | Exhibit 143  Document entitled, "#21 | 600 |
| 16 | Interview Memorandum of | |
| 17 | Lawrence Ellison (Interview 2) | |
| 18 | 09/20/02," Bates stamped 297543 | |
| 19 | through 297559 - 17 pages | |
| 20 | Exhibit 144  E-mail from Martha Cavanna to | 602 |
| 21 | Stacey Torman, dated March 16, | |
| 22 | 2001, Bates stamped 178069 | |
| 23 | through 178073 - 5 pages | |
| 24 | | |
| 25 | | |

562

| | INDEX OF EXHIBITS (Continued) | |
|---|---|---|
| 1 | INDEX OF EXHIBITS (Continued) | |
| 2 | Ellison      Description      Page | |
| 3 | Exhibit 145  Document entitled, "Transcript | 604 |
| 4 | from LJE keynote at Oracle Apps | |
| 5 | World, New Orleans, February | |
| 6 | 20, 2001," Bates stamped 099883 | |
| 7 | through 099928 - 46 pages | |
| 8 | Exhibit 146  Forbes magazine article dated | 615 |
| 9 | August 14, 2006 - 8 pages | |
| 10 | Exhibit 147  Web page from the Oracle | 618 |
| 11 | Education Foundation - 2 pages | |
| 12 | Exhibit 148  Web pages from High Tech Mag - | 620 |
| 13 | 5 pages | |
| 14 | Exhibit 149  Web page article from | 621 |
| 15 | Forbes.com - 4 pages | |
| 16 | Exhibit 150  Article entitled, "Oracle's | 622 |
| 17 | Catz, Ellison Heir, Gets Credit | |
| 18 | for Growth Strategy" - 4 pages | |
| 19 | Exhibit 151  Document entitled, "Matthew | 636 |
| 20 | Symonds Interviews, Oracle, | |
| 21 | Interview with Larry Ellison on | |
| 22 | January 18th, 2002," Bates | |
| 23 | stamped 1529157 to 1529180 - 24 | |
| 24 | pages | |
| 25 | | |

563

| | INDEX OF EXHIBITS (Continued) | |
|---|---|---|
| 1 | INDEX OF EXHIBITS (Continued) | |
| 2 | Ellison      Description      Page | |
| 3 | Exhibit 152  Excerpts from Softwar - 18 | 671 |
| 4 | pages | |
| 5 | Exhibit 153  Excerpt from Softwar - 4 pages | 675 |
| 6 | Exhibit 154  Document entitled, "InterLogix | 677 |
| 7 | Inc. - Customer Satisfaction | |
| 8 | Issue," Bates stamped 1056850 | |
| 9 | and 1056851 - 2 pages | |
| 10 | Exhibit 155  Document entitled, "Softwar, | 691 |
| 11 | The Rewards of Recklessness: A | |
| 12 | Portrait of Larry Ellison and | |
| 13 | Oracle Corporation at War, By | |
| 14 | Matthew Symonds," Bates stamped | |
| 15 | 1053564 to 1053577 - 14 pages | |
| 16 | Exhibit 156  Fortune Magazine article dated | 698 |
| 17 | November 13th, 2000, Bates | |
| 18 | stamped - 8 pages | |
| 19 | Exhibit 157  E-mail from Dan Cooperman to | 703 |
| 20 | Dorian Daley; Lauren Segal, | |
| 21 | dated March 29, 2001, Bates | |
| 22 | stamped 1914926 through 1914934 | |
| 23 | - 9 pages | |
| 24 | Exhibit 158  Excerpt from Softwar - 4 pages | 709 |
| 25 | | |

564

Ellison, Lawrence  3/30/2007  12:00:00 AM

INDEX OF EXHIBITS (Continued)

| Ellison | Description | Page |
|---------|-------------|------|
| Exhibit 159 | Document entitled, "Matthew Symonds Interviews, Oracle, Interview with Larry Ellison," Bates stamped 1529262 through 1529282 - 21 pages | 712 |
| Exhibit 160 | Document entitled, "Oracle Update," Bates stamped 1529215 through 15299233 - 19 pages | 718 |
| Exhibit 161 | Copy of a Wall Street Journal article dated August 6th, 2001 - 4 pages | 721 |
| Exhibit 162 | E-mail from Kirsten Shaw dated December 1, 2000, Bates stamped 1027516 through 1027521 - 6 pages | 728 |
| Exhibit 163 | E-mail Bates stamped 1026720 through 1026721 - 2 pages | 733 |
| Exhibit 164 | String of e-mails beginning with an e-mail from Salima Ceret to Joyce Boland, dated March 23, 2001, Bates stamped 061785 through 061790 - 6 pages | 734 |

INDEX OF EXHIBITS (Continued)

| Ellison | Description | Page |
|---------|-------------|------|
| Exhibit 165 | Article from Vanity Fair called "Absolutely Excessive" - 7 pages | 736 |

EXHIBITS PREVIOUSLY MARKED AND REFERRED TO IN THIS DEPOSITION

| EXHIBIT | PAGE |
|---------|------|
| Exhibit 10 | 619 |
| Exhibit 57 | 668 |

QUESTION WITNESS INSTRUCTED NOT TO ANSWER

| PAGE | LINE |
|------|------|
| 574 | 10 |
| 634 | 11 |
| 635 | 8 |

---oOo---

1    BE IT REMEMBERED that on Friday, March 30,
2   2007, commencing at the hour of 1:01 p.m. thereof,
3   at 100 Pine Street, Suite 2600, San Francisco,
4   California, before me, KATHLEEN A. WILKINS, RPR,
5   CRR, a Certified Shorthand Reporter in and for the
6   State of California, personally appeared
7         LAWRENCE ELLISON,
8   called as a witness by the Plaintiffs herein, who,
9   being by me first duly sworn, was thereupon examined
10  and testified as hereinafter set forth.
11             ---oOo---
12  Appearing as counsel on behalf of Plaintiffs:
13      MARK SOLOMON, Esquire
        STACEY M. KAPLAN, Esquire
14      RYAN GUIBOA, Esquire
        MONIQUE WINKLER, Esquire
15      LERACH, COUGHLIN, STOIA, GELLER,
        RUDMAN & ROBBINS, LLP
16      655 West Broadway, Suite 1900
        San Diego, California  92101-3301
17      marks@lerachlaw.com
18  Appearing as counsel on behalf of Defendants:
19      GREGORY P. LINDSTROM, Esquire
        LATHAM & WATKINS, LLP
20      505 Montgomery Street, Suite 1900
        San Francisco, California  94111-2562
21      gregory.lindstrom@lw.com
22      PATRICK E. GIBBS, Esquire
        LATHAM & WATKINS, LLP
23      140 Scott Drive
        Menlo Park, California  94025-1008
24      patrick.gibbs@lw.com
25

1   DORIAN DALEY, Esquire
    ORACLE CORPORATION
2   VICE PRESIDENT, LEGAL; ASSOCIATE GENERAL
    COUNSEL
3   LITIGATION, TRADEMARK & COPYRIGHT GROUP
    500 Oracle Parkway, M/S 5op762
4   Redwood Shores, California  94065
    Dorian.daley@oracle.com
5
    Present via Internet:  Keith Mautner, Esq.; Doug
6   Lerach, Esq.; John Mayer
7   Also Present:  Gary Brewer, videographer
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1        P R O C E E D I N G S

2        THE VIDEOGRAPHER:  Good afternoon.  We are

3    going on the record.  Here marks the beginning of

4    Videotape No. 1, Volume 3, in the deposition of

5    Lawrence Ellison, in the matter In Re Oracle

6    Corporation Securities Litigation, in the United

7    States District Court, Northern District of

8    California, San Francisco Division, Case Number

9    C-01-0988-MJJ.

10        The video operator today is Gary Brewer,

11    representing LiveNote World Service, located at 221

12    Main Street, Suite 1250, San Francisco, California,

13    94105.  Telephone number (415) 321-2300.

14        The court reporter is Kathleen Wilkins,

15    reporting on behalf of LiveNote World Service.

16        Today's deposition is being taken on

17    behalf of the Plaintiff and is taking place at 100

18    Pine Street, San Francisco, California.

19        Counsel, will you please introduce

20    yourselves and state whom you represent.

21        MR. SOLOMON:  Mark Solomon representing

22    plaintiffs.

23        MS. KAPLAN:  Stacey Kaplan representing

24    plaintiffs.

25        MS. WINKLER:  Monique Winkler representing

569

1    plaintiffs.

2        MR. GUIBOA:  Ryan Guiboa representing

3    plaintiffs.

4        MR. LINDSTROM:  Greg Lindstrom for

5    defendants.

6        MR. GIBBS:  Patrick Gibbs for defendants.

7        MS. DALEY:  Dorian Daley for defendants.

8        THE VIDEOGRAPHER:  Would the court

9    reporter please swear in the witness.

10        LAWRENCE ELLISON,

11        having been duly sworn,

12        was examined and testified as follows:

13            --oOo--

14        THE VIDEOGRAPHER:  Please begin.

15        RESUMED EXAMINATION BY MR. SOLOMON

16        MR. SOLOMON:  Q.  Good afternoon,

17    Mr. Ellison.

18        A.  Good afternoon.

19        Q.  Have you reviewed the transcript of your

20    second day of testimony in this litigation?

21        A.  I have not.

22        Q.  And have you reviewed the complaint in

23    this matter yet?

24        A.  I have not.

25        Q.  You know Mr. Matthew Symonds?

570

1        A.  I do.

2        Q.  When was the last time you spoke with him?

3        A.  Near the end of February this year.

4        Q.  And can you describe for me the

5    conversation?

6        A.  The last -- the last conversation?

7        Q.  Mh-hmm.

8        A.  I think the last conversation was --

9    again, I'm not completely certain, but I think the

10    last conversation was about a charity we're working

11    on together called -- used to be called the Doorstep

12    Educational Trust, and it's now -- it's being

13    renamed Reach and Teach.

14        Q.  And that was the only subject of the

15    conversation?

16        A.  On the last call, I think so.  Again --

17        Q.  Okay.  And when did you call him prior to

18    that?

19        MR. LINDSTROM:  Assumes facts.

20        THE WITNESS:  I didn't -- I didn't call

21    him.  Well, the normal way I -- I communicate with

22    Mr. Symonds by phone is he calls me, and I return

23    his call.

24        MR. SOLOMON:  Q.  Okay.  Well, let's --

25        A.  So he -- in that case, he called me, and I

571

1    returned his call.

2        Q.  I'll just set the context a little bit

3    differently.

4        Did you become aware at any time last year

5    that plaintiffs were moving in this litigation for

6    the production of certain audiotapes and transcripts

7    connected with the book Softwar?

8        A.  I did.

9        Q.  When did you first become aware of that?

10        A.  I think sometime in November.

11        Q.  Okay.  And how did you learn about that?

12        MR. LINDSTROM:  Well, do you mean to

13    exclude conversations with counsel?

14        MR. SOLOMON:  I just want to know how he

15    learned about it.

16        THE WITNESS:  I think my attorneys told

17    me.

18        MR. SOLOMON:  Q.  Okay.  And did you take

19    any action after your attorneys told you?

20        A.  No.

21        Q.  Okay.  Did Mr. Symonds call you at all in

22    November?

23        A.  Yes.

24        Q.  Do you know when?

25        A.  Sometime in November.

572

1    Q.  Okay.  And can you describe that
2  conversation, please.
3    A.  He was upset that plaintiffs were pursuing
4  what he described as his personal notes and files,
5  said he was a journalist and it bothered him.
6    Q.  And what did you say?
7    A.  There's -- again, I'm not certain of the
8  exact words, either mine or his, but I can tell you
9  the gist of it.
10    Q.  Please.
11    A.  There's nothing I can do about it.
12    Q.  And did you make any request of him?
13    A.  No.
14    Q.  Did you give him any instructions?
15    A.  No.
16    Q.  And how did he conclude -- how did the
17  call conclude?
18    A.  I think that was -- that was the gist of
19  it.
20    Q.  That was it?
21    A.  That was the gist of the call.
22    Q.  Okay.  And then when was the next time you
23  heard from Mr. Symonds?
24    A.  It was early January he called.
25    Q.  Okay.  And --

573

1    A.  Oh, no.  Excuse me, I'm mistaken.  I'm
2  mistaken.  Early January, I called him.
3    Q.  Okay.  What date?  Do you know?
4    A.  I don't.
5    Q.  And why did you call him?
6    A.  I was -- I was told that the court had
7  ordered the production of all of the Softwar
8  documents, and I was supposed to tell Mr. Symonds to
9  produce the documents.
10    Q.  Okay.  And you were told by your lawyers?
11    MR. LINDSTROM:  I'm going to object to
12  that as invading the attorney-client privilege.
13  Instruct the witness not to answer.
14    MR. SOLOMON:  Q.  Okay.  So did you reach
15  him?
16    A.  Yes.
17    Q.  What did you say to him?
18    A.  I said I had received a court order and
19  that -- I asked him to produce -- to produce the
20  documents.  I said I had a court order, I have to
21  ask you to produce the documents, and I was going to
22  be sending you a follow-up letter asking that the
23  documents be produced.
24    Q.  Okay.  And what call did you make -- what
25  phone did you make this call from?

574

1    A.  It was my home phone.  But I think my home
2  phone is -- I think there are office lines in my
3  home phone.  So I'm not sure where the -- where the
4  bills go and all that.  But it was --
5    Q.  Okay.  Did you call his home?
6    A.  I -- yeah.  Well, actually, I'm not sure.
7  If I made it in the morning -- if I made the call in
8  the morning, I would have called his home.  If I
9  made the -- made the call late in the evening, I
10  would have called his office.  I'm not sure.
11    Q.  Okay.  And what did he say in response to
12  your request?
13    A.  I think he said -- again, I think he
14  repeated, that, you know, he was a journalist, that
15  these were his private notes and files, he was upset
16  that he had to produce them.  And he said -- again,
17  these are not his exact words.  This is the gist of
18  the conversation.
19    I think he said, I don't know why they
20  want them.  There is -- there is nothing in there
21  that's going to help them.
22    Q.  What did you say?
23    A.  I said, Well, that may be true, Matthew,
24  but they don't know that.
25    Q.  And then what did he say?

575

1    A.  What do you think they're going to do with
2  them?
3    Again, this is not his -- this is not word
4  for word.  This is general.
5    And I said, Well, they'll probably take
6  some of the personal items and try to use them to
7  attack my character.
8    Q.  Did you discuss whether we'd use the
9  substance at all of the materials?
10    A.  No.  The substance --
11    MR. LINDSTROM:  The question -- keep the
12  question in mind in responding.
13    THE WITNESS:  No.
14    MR. SOLOMON:  Q.  Do you take this
15  litigation seriously, Mr. Ellison?
16    A.  Yes, of course.
17    Q.  So after telling Mr. Symonds that we'd
18  probably use it to attack your character and use
19  personal stuff, what did he then say?
20    A.  I'm not sure.
21    Q.  How did the conversation conclude?
22    A.  Again, I think -- I think we discussed --
23  I think he said, What -- you know, What personal
24  stuff?  We kind of went into what the personal stuff
25  was.  I think there were two things that were --

576

1  that were mentioned.
2      Again, I'm not -- I'm not 100 percent
3  certain of this. The two things that were mentioned
4  were a comment I had made about Ray Lane, after a
5  meeting with Ray Lane and senior sales management,
6  and another was a story -- a story that I had told
7  him when I was -- something happened at a party when
8  I was in my early 20s.
9      Q. You were concerned that we'd use something
10  that happened at a party when you were in your early
11  20s in this litigation?
12     A. You already asked me questions about my
13  relationship with my high school girlfriend 46 years
14  ago.
15     Q. Do you recall that that was because she
16  had suggested you were dishonest?
17     MR. LINDSTROM: Assumes facts.
18     THE WITNESS: Yes.
19     MR. SOLOMON: Q. Don't you think that's
20  relevant to this lawsuit?
21     A. My conversations with my high school
22  girlfriend?
23     Q. No. Your honesty.
24     A. Yes, I think my honesty is relevant.
25     Q. So did Mr. Symonds tell you what he was

577

1  going to do at the end of the conversation?
2      A. No.
3      Q. Okay. And then after that call, did
4  you -- when did you next speak with Mr. Symonds?
5      A. At some point he called me back, and it
6  was a brief call. And he said again, Larry, you
7  have to understand, I'm a journalist, and these are
8  my private notes and files.
9      And that call lasted about a minute or
10  less.
11     Q. And when was that?
12     A. It was shortly after the first phone call
13  when I asked him to produce the documents. It might
14  have been hours later; it might have been the next
15  day. I'm not certain.
16     Q. And did he indicate one way or another
17  whether he produced them or not?
18     A. No, he did not.
19     Q. And what did you do?
20     A. Said, Okay, thank you for calling,
21  Matthew.
22     Q. You said, I think, that you told
23  Mr. Symonds that you'd be writing a letter; is that
24  right?
25     A. Yes.

578

1      Q. And did you write a letter?
2      A. I signed a letter that was sent to him,
3  yes.
4      Q. And do you have that letter with you here?
5      A. Do I?
6      MR. LINDSTROM: We -- we have it.
7      MR. SOLOMON: Are you going to produce it?
8      MR. LINDSTROM: If you want it.
9      MR. SOLOMON: Thank you. I do want it.
10     Q. When you became aware in November that the
11  plaintiffs were seeking the materials, did you make
12  any efforts, other than calling Mr. Symonds and
13  having a conversation you described with him, to
14  retrieve the materials, the Softwar materials?
15     MR. LINDSTROM: In responding, I want you
16  to exclude any conversations you may have had with
17  your lawyers in that regard.
18     THE WITNESS: Are you referring to my --
19  the call that occurred in November, or the call that
20  occurred in January?
21     MR. SOLOMON: Q. November.
22     A. He called -- he called me in November. I
23  didn't call him. Yeah, I might have called him
24  back, but he called me in November.
25     I think the only call -- of the calls

579

1  we'll be talking about, the only call where I
2  originated the call was on the -- you know, that
3  call in January --
4      Q. Got you.
5      A. -- when I asked him to produce the
6  documents.
7      Q. Okay. So let's just go back so we can be
8  clear.
9      In November he called you. Why did he
10  call you?
11     MR. LINDSTROM: No foundation.
12     MR. SOLOMON: Q. Didn't you just tell me
13  he called you in November?
14     A. Yes.
15     MR. LINDSTROM: The question was why
16  did -- the question to which I objected was, "Why
17  did he call you?"
18     MR. SOLOMON: Q. Did he tell you why he
19  called you?
20     A. Yes.
21     Q. Okay. What did he say?
22     A. He said that the plaintiffs were pursuing
23  the Softwar documents.
24     Q. How did he know that?
25     MR. LINDSTROM: No foundation.

580

1    THE WITNESS:  I assume someone told him.
2    MR. SOLOMON:  Q.  Do you know who told
3    him?
4    A.  I'd be guessing.
5    Q.  Give me your best guess, please.
6    MR. LINDSTROM:  Objection.  Calls for
7    speculation.  No foundation.
8    THE WITNESS:  I'm supposed to answer?
9    MR. SOLOMON:  Q.  Mh-hmm.
10   A.  Okay.  I believe my lawyers have been in
11   contact with Mr. Symonds throughout this entire
12   process.
13   Q.  Okay.  And do you know which particular
14   lawyers?
15   A.  I do not.
16   Q.  Have you seen any correspondence from your
17   lawyers to Mr. Symonds concerning the Softwar
18   materials?
19   A.  I have not.
20   MR. LINDSTROM:  The record should reflect
21   that we have now handed to Mr. Solomon a copy of
22   Mr. Ellison's January 10th, 2007 letter.
23   MR. SOLOMON:  Who drafted this letter?
24   First of all, let's mark it as an exhibit.
25   And then you can tell me who drafted it,

581

1    Mr. Ellison.
2    (Whereupon, Deposition Exhibit 141
3    was marked for identification.)
4    MR. LINDSTROM:  What number?
5    THE REPORTER:  141.
6    MR. LINDSTROM:  Thank you.
7    THE WITNESS:  Can I read it?
8    MR. SOLOMON:  Sure.
9    THE WITNESS:  Okay.
10   MR. SOLOMON:  Okay.  Who drafted this?
11   A.  Again, I'm not certain.
12   Q.  Okay.  Did your lawyers draft this?
13   A.  You're asking my best guess?
14   Q.  Yes.
15   A.  Yes.
16   Q.  Okay.  Had you, prior to signing this
17   letter, seen plaintiffs' motion to compel the
18   materials?
19   A.  No.
20   Q.  Had you seen your opposition to the
21   motion?
22   A.  No.
23   Q.  Were you aware of the contents of the
24   opposition?
25   A.  No.

582

1    Q.  Were you aware that Mr. Symonds submitted
2    a declaration in connection with your opposition?
3    A.  No.
4    Q.  And you, to this day, have no knowledge of
5    that declaration?
6    A.  That's correct.
7    Q.  Now, do you know what day the judge
8    ordered that the documents, the Softwar-related
9    documents, be produced?
10   A.  No.
11   Q.  I'll represent to you that he served the
12   order on the lawyers on January 2nd of 2007.
13   And with that in mind, can you explain why
14   it took eight days for you to write this letter --
15   to sign this letter, I should say?
16   A.  No.
17   Q.  Did you, in connection with the interviews
18   that Mr. Symonds conducted with you for Softwar,
19   tell any lies to Mr. Symonds?
20   A.  I don't think so.
21   Q.  Have you seen any of the transcripts of
22   your interviews?
23   MR. LINDSTROM:  At any point in time?
24   MR. SOLOMON:  Q.  At any point in time.
25   A.  No.

583

1    Q.  Are you aware that a few -- from
2    interviews with you in 2002, a few transcripts have
3    been produced?
4    MR. LINDSTROM:  Assumes facts.
5    Mischaracterizes.
6    THE WITNESS:  Say it again, please.
7    MR. SOLOMON:  Q.  Are you aware that a few
8    transcripts of interviews conducted with you in 2002
9    have been produced?  Are you aware of that?
10   A.  I knew -- I knew transcripts had been
11   produced.  I didn't know which ones.
12   Q.  Now, are you aware that Mr. Symonds
13   apparently has told your lawyers that the computer
14   on which the audio was stored has been destroyed --
15   MR. LINDSTROM:  I'm --
16   MR. SOLOMON:  Q.  -- or disposed of?
17   MR. LINDSTROM:  Let me make a statement
18   for the record.
19   Counsel is not entitled to examine you
20   about things that were told to you by your lawyers
21   or things you said to your lawyers.  He is obviously
22   entitled to know if you have an independent basis
23   for knowing anything about what happened with this
24   particular computer.
25   So as he's framed this question, it would

584

1  require you to -- it might require you to divulge
2  attorney-client privileged communications.  So in
3  responding, I want you to exclude those and answer
4  as to your independent knowledge.
5      Do you understand?
6      THE WITNESS:  I do.
7      I have no independent knowledge of what
8  happened to the computer.
9      MR. SOLOMON:  Q.  Are you aware that
10  Mr. Symonds appeared in London last week, on the
11  19th and the 20th, for his deposition?
12     A.  Yes.
13     Q.  And are you aware that Mr. Symonds has
14  invoked the Fifth Amendment to almost all the
15  questions I've asked him?
16     MR. LINDSTROM:  Same instruction.
17     THE WITNESS:  No independent knowledge of
18  what happened at the deposition.
19     MR. SOLOMON:  Q.  Is that your way of
20  saying whatever knowledge you have came through your
21  lawyers?
22     A.  Yes.
23     Q.  I'll represent to you that he took -- he
24  invoked the Fifth Amendment and some journalist
25  privilege -- privileges to most of my questions.

585

1  Have you spoken to Mr. Symonds since his
2  deposition in London?
3      A.  No.
4      Q.  Are you going to?
5      A.  I don't think so, no.
6      Q.  Is Mr. Symonds a close friend of yours?
7      A.  We became friends when he was writing the
8  book.
9      Q.  And is he a close friend of yours?
10     A.  He's a friend.
11     Q.  Is he a close friend?
12     A.  I'm not sure what you mean by that.
13     Q.  Do you know that he describes his
14  friendship with you as a close -- as a close one?
15     MR. LINDSTROM:  Assumes facts.
16     THE WITNESS:  That's -- okay.
17     MR. SOLOMON:  Q.  You're not saying he's
18  lying when he says that?
19     A.  No.
20     Q.  Do you plan on talking with him again
21  after this litigation is concluded?
22     MR. LINDSTROM:  Calls for speculation.
23     THE WITNESS:  I don't know.
24     MR. SOLOMON:  Q.  Did you review any
25  documents in preparation for this deposition

586

1  session?
2      A.  I did not.
3      Q.  Do you remember what you told Mr. Symonds
4  about your option exercises and sales in January of
5  2001?
6      MR. LINDSTROM:  So let me -- let me
7  understand.  So you're talking about during the
8  course of the interviews for the book?
9      MR. SOLOMON:  Correct.
10     THE WITNESS:  No.
11     MR. SOLOMON:  Let's have marked as the
12  next exhibit an interview transcript produced in
13  this litigation with the control numbers 1529283
14  through -322.
15     (Whereupon, Deposition Exhibit 142
16     was marked for identification.)
17     THE WITNESS:  I assume you don't want me
18  to read this whole thing?
19     MR. SOLOMON:  Q.  No, I don't.
20     First of all, this is dated, at least
21  there's a handwritten notation on the first page, of
22  June 2002.
23     You don't recognize that handwriting, do
24  you?
25     A.  I do not.

587

1      Q.  So it starts off saying, "This is Matthew
2  Symonds talking to Larry Ellison.  It's June 24th."
3      Do you see that?
4      A.  Yes.
5      Q.  Can you just describe how Mr. Symonds
6  recorded the conversations?
7      A.  He had a digital -- a digital recorder.  I
8  think it was a Sony digital recorder.  It's kind of
9  small.  It's not a tape.  I think it had solid state
10  memory.  So there was a table microphone about this
11  size.  The recorder was about this size but thinner.
12     And he put -- you know, put the recorder
13  down and the microphone down and he'd start -- he'd
14  have some notes, I guess, with pre-prepared
15  questions, and he'd start asking me questions.
16     Q.  Could you estimate how many hours of
17  recordings he made of interviews with you?
18     A.  I mean, I could.  It would be a pretty
19  gross estimate, but ... 30 to 100.  Probably 30
20  hours -- I don't -- again, I'm just trying to
21     Q.  Thirty hours to 100 hours --
22     A.  Yeah.
23     Q.  -- is your range?
24     A.  I think.  One hundred hours is a lot,
25  but ...

588

1    Q.  And is it fair to say that this --

2    A.  30 to -- let me refine.  30 to 60.  100

3    hours sounds crazy to me.

4    Q.  Was it over a couple of years, the

5    interview process?

6    A.  It was over nearly two years.  And then

7    there -- yeah.  Yeah.  I think it was more than 18

8    months, less than two years, I think.

9    Q.  Okay.  So if you go to the third page of

10   this document, and it has the control number

11   1529285 --

12   A.  Okay.

13   Q.  -- you'll see that it starts at the top

14   with the word "Right."  And then it goes on to say,

15   "Of course, when Oracle stock started to slide last

16   year and around that sort of time you also cashed in

17   those options invested, you were kind of hit ..."

18       Did you see that?

19   A.  Yes.

20   Q.  All right.  And then this apparently is

21   your language.  And you say, "Well, actually, the

22   options were invested, long, long ago.  I got those

23   options ten years ago.  They were expiring.  They

24   were months from expiring."

25       Do you see that?

589

1    A.  Yeah.  There's a transcription error in

2    it, but yes.

3    Q.  What's the error?

4    A.  I think the options were not "invested"

5    but "vested," the word "vested."

6    Q.  Got it.

7       And then it goes on to say, "So it was

8    actually the last moment that you could sell them."

9       And then you say, "right."

10      Do you see that?

11   A.  Yes.

12   Q.  Is that an accurate transcription, in your

13   recollection?

14   A.  You mean the word "moment"?

15   Q.  The word "right."

16   MR. LINDSTROM:  The question is whether

17   that's an accurate transcription?

18   MR. SOLOMON:  Mh-hmm.

19   THE WITNESS:  Probably.

20   MR. SOLOMON:  Q.  Okay.  And what about,

21   "So it was actually the last moment you could sell

22   them"?  Do you think that's --

23   A.  Well, it's not precise.

24   Q.  What do you mean, it's not precise?

25   A.  Well, I suppose the last moment would be

590

1    the last minute of the last trading day before the

2    options expired, or even the last moment would be

3    the last fraction of a second in the last trading

4    day.  I don't know how -- how big a moment is.

5    Q.  Okay.  Well, do you think that the moment

6    was basically January 22nd through January 31?

7    A.  No.  I think the options expired -- I

8    don't remember -- August?  Were the options expired

9    in August?

10   Q.  (Nods head.)

11   A.  So I suppose I had up until August to sell

12   them.  So in a ten-year period, I was in my last six

13   months.

14   Q.  All right.  And, in fact, you weren't even

15   in the last trading window, were you?

16   A.  No.

17   Q.  Because there were two more trading

18   windows, weren't there?

19   A.  Well, again, I was in the last six

20   months -- yes.

21   Q.  And so to the extent he says, "So it was

22   actually the last moment you could sell them," let's

23   say he said "window" and you said "right," that

24   would be inaccurate, wouldn't it?

25   A.  I would say it's imprecise.  It should

591

1    have been -- it was nearly -- you were almost -- the

2    question is I was almost out of time.  But I wasn't

3    out of time.

4    Q.  And you know that in his writings he's

5    actually explained your stock sale as saying that it

6    was -- you had to, you had no choice, the options

7    would have expired otherwise?

8       Are you aware of that's what Mr. Symonds

9    had written?

10   MR. LINDSTROM:  Assumes facts.

11   Mischaracterizes his writings.

12   THE WITNESS:  Can I read -- is it here?

13   MR. SOLOMON:  I'll try to find it a

14   little bit later on.  I just want to know if you

15   recall that that's what he's written.

16   A.  No.

17   Q.  And, in fact, at the moment, because all

18   of this is sealed and confidential, no one knows --

19   the public certainly doesn't know that, in fact, you

20   had additional trading windows, do they?

21   MR. LINDSTROM:  Assumes facts.  No

22   foundation.  Calls for speculation.

23   THE WITNESS:  I don't know how much -- in

24   terms of my options, I think everyone knows my

25   option dates.  So I think whenever I receive an

592

1  option, we're obliged to disclose it in the 10Q or

2  the 10K.  So everyone knows that it is a ten-year

3  option period, because that's -- that's publicly

4  available.

5      Everyone knows what my option date is

6  because that was publicly disclosed also.  You just

7  add ten years to that date.  So anyone who cares to

8  look at the documents would know exactly how much

9  time I had.

10     So when you say the public doesn't know,

11 they could -- anyone could know by looking at the

12 publicly available documents.

13     MR. SOLOMON:  Q.  Okay.  And if they

14 simply took you at your word, or Mr. Symonds at his

15 word, they would have thought that your stock

16 options needed to be exercised in January of 2001;

17 otherwise you'd lose them.

18     Do you think that's fair?

19     MR. LINDSTROM:  No foundation.

20 Argumentative.

21     THE WITNESS:  Again, I don't think that's

22 a fair characterization.  I agree with you, this is

23 imprecise, saying it was the last moment, but it

24 was -- I was nearly out of time is more accurate.

25     MR. SOLOMON:  Q.  And then it goes on to

593

1  say -- I'm going to skip a couple of lines -- "Sure,

2  but there were quite a lot of shareholder actions to

3  do with that.  Are any of those ongoing still?"

4      And your answer as transcribed here is,

5  "Yes, I think the judges ruled against them,

6  dismissed them a couple of times and they filed

7  amended complaints.  And they've been dismissed and

8  complaints have come in.  We've won one set of

9  complaints and we're" -- there seems to be a gap --

10 "and we're the last set."

11     Do you see that?

12     MR. LINDSTROM:  I think the record should

13 reflect, Mark, that there's some brackets there that

14 suggests whoever transcribed this couldn't -- at

15 least they suggest to me that they couldn't

16 accurately hear what was being said in that portion

17 of the sentence.

18     MR. SOLOMON:  Okay.

19     MR. LINDSTROM:  Your question?

20     MR. SOLOMON:  Q.  And just in terms of the

21 gist, do you remember saying to Mr. Symonds around

22 the date of this interview that some of the

23 complaints had been dismissed, but you were on the

24 last set of complaints?

25     MR. LINDSTROM:  That mischaracterizes the

594

1  document.  Compound.

2      THE WITNESS:  Do I remember it

3  specifically?

4      MR. SOLOMON:  Q.  Yes.  Do you remember

5  the gist of this answer that you gave Mr. Symonds?

6      A.  Ignoring that this is refreshing my

7  memory?  So do I remember --

8      Q.  I'll allow your memory to be refreshed.

9      A.  Well, I mean, I believe these transcripts

10 are accurate --

11     Q.  Okay.

12     A.  -- so I -- again, insofar as the

13 transcripts are accurate, I believe this is what I

14 said.

15     MR. LINDSTROM:  Well, this is a little bit

16 different.  His question is whether you remember

17 this.

18     THE WITNESS:  Well, I said -- I said I

19 didn't remember this.  I said I specifically -- I'm

20 sorry.  Sorry.  I didn't -- I don't specifically

21 remember this --

22     MR. SOLOMON:  Q.  Okay.

23     A.  -- if that's the question.  But -- okay.

24 I'll stop there.

25     Q.  And do you have any concern that there was

595

1  a document preservation or instruction in place

2  while you were collaborating with him concerning

3  this book?

4      MR. LINDSTROM:  That's vague as to time.

5  I assume you're asking him did he have a concern at

6  the time --

7      MR. SOLOMON:  Correct.

8      MR. LINDSTROM:  -- that the tape was

9  made --

10     MR. SOLOMON:  Correct.

11     MR. LINDSTROM:  -- by Symonds.

12     MR. SOLOMON:  Correct.

13     THE WITNESS:  Didn't even think about it.

14     MR. SOLOMON:  Q.  Even while you were

15 talking about the lawsuits?

16     MR. LINDSTROM:  It's argumentative.

17     THE WITNESS:  Didn't -- didn't occur to

18 me.

19     MR. SOLOMON:  Q.  And can you explain why,

20 after March of 2001, you didn't preserve e-mails

21 that you sent that concerned the facts in this

22 lawsuit?

23     MR. LINDSTROM:  Assumes facts.

24     THE WITNESS:  Say that again.  In

25 March 2001, I didn't preserve e-mails.

596

1     MR. LINDSTROM:  Can we have the question

2   reread?

3          (Record read by the reporter as follows:

4          QUESTION:  And can you explain why,

5   after March of 2001, you didn't preserve

6   e-mails that you sent that concerned the

7   facts in this lawsuit?)

8          THE WITNESS:  The answer is, I don't know

9   if I did or didn't preserve e-mails in March 2001.

10         MR. SOLOMON:  Q.  And how is it that you

11  don't know that?

12         MR. LINDSTROM:  Argumentative.

13         THE WITNESS:  It was a long time ago.  I

14  just don't remember what -- March 2001.

15         MR. SOLOMON:  Q.  Do you know why the

16  letter that you sent to Mr. Symonds on January the

17  10th of this year wasn't produced until now to the

18  plaintiffs?

19   A.  I do not.

20   Q.  What's the status of Larryellison.com?

21   A.  I -- sorry.  I think it's -- I haven't

22  looked at it for years.

23   Q.  When was the last time you looked at it?

24   A.  Five years ago.  More.  I don't know.

25   Q.  And why -- why do you not use it anymore?

597

1   A.  I don't think I ever used it.

2   Q.  Okay.  What was it for?

3   A.  You mean what were my various ideas?  Why

4   did I get Larryellison.com?

5   Q.  Yes.

6   A.  I wanted to reserve the Internet -- I

7   wanted to reserve the Internet name.  People were --

8   those were the days everyone was grabbing Internet

9   names.  I wanted to make sure I had it.  I don't

10  think I've ever used it for anything.

11   Q.  So it was just a bare name?  Nothing

12  there?

13   A.  I don't know.  I haven't been to it for

14  years.  I don't know what's there.

15   Q.  Did you use it for e-mail?

16   A.  No.

17   Q.  So when you told the audience at Apps

18  World in February 2001 that they could e-mail you at

19  Larryellison.com, that wasn't true?

20   A.  I don't believe I ever said that.

21   Q.  Okay.  And when the special litigation

22  committee says that you used Larryellison.com to

23  store transcripts of your speeches and public

24  statements, that's inaccurate, is it?

25         MR. LINDSTROM:  Assumes facts.

598

1   Argumentative.

2          THE WITNESS:  I believe so.

3          MR. SOLOMON:  Q.  The special litigation

4   committee lawyers just made that up?

5          MR. LINDSTROM:  Argumentative.  Assumes

6   facts.

7          THE WITNESS:  No.  I think -- I'm happy to

8   discuss this if you want to discuss it.

9          At one point I thought it would be an

10  interesting idea, because with the advent of the

11  Internet -- and I'm quoted a lot in the press, and

12  the quotes aren't always accurate.  So I thought it

13  would be very interesting, with the advent of the

14  Internet, that I could take my actual speeches that

15  I gave and exactly what I said, and recordings of my

16  speeches that I gave, and put them up on the

17  Internet.

18          And then if the press quoted me out of

19  context or misquoted me, I would have an actual

20  record of all of my speeches.  It was kind of when I

21  thought it was an interesting idea to do that, but I

22  never did it.

23         MR. SOLOMON:  Okay.  Okay.  Marked as the

24  next exhibit --

25         THE WITNESS:  I'm sorry, we're done with

599

1   this one?

2          MR. SOLOMON:  For the moment.  We'll be

3   looking at it again in a minute, so you might as

4   well keep it close.

5          THE WITNESS:  Okay, I'll just keep it out.

6          MR. SOLOMON:  Marked as the next exhibit,

7   an interview memorandum dated 9/20/02.

8          (Whereupon, Deposition Exhibit 143 was

9          marked for identification.)

10         THE REPORTER:  143.

11         MR. LINDSTROM:  Thank you.

12         MR. SOLOMON:  The control range is

13  297559 -- excuse me.  297543 through -559.

14   Q.  I'm looking at the last page, Mr. Ellison.

15   A.  Okay.  -559?

16   Q.  Yeah.  If you could just read that

17  paragraph.

18   A.  Okay.

19          Okay.

20   Q.  Is that not accurate?

21          Let me focus on the last sentence.

22  "According to Ellison, Q3 FY01, the web site would

23  have consisted of transcripts of his interviews."

24          Is that not true?

25   A.  Well, I think this says it became -- it

600

1  says I had the idea, exactly as I described before,
2  if you read the whole paragraph.  The idea behind
3  the web site was to post transcripts of my
4  interviews.
5       And -- it says, "became too time
6  consuming to maintain the site," which is not quite
7  accurate.  It was too time consuming to do at all,
8  and I never did it at all.  So this is not
9  completely accurate.
10      Q.  Okay.  And that last sentence again, is
11  that accurate?
12      A.  I'm not even sure what it means.  "Q3 FY01
13  the web site would have consisted of transcripts of
14  his interviews."
15      I'm -- I'm having a hard time
16  understanding what that's saying.
17      Q.  Okay.
18      A.  The web site would have consisted of
19  transcripts of ...
20      Q.  You don't think -- you don't even
21  understand it, so you can't say --
22      A.  Well, I don't understand it.  But I can
23  tell you what is true.  What is true is I had the
24  idea to put my interviews up on that web site, on
25  Larryellison.com, for the very reasons stated here.

601

1  And I just never did.  I don't think there's a
2  single interview that's ever gone onto that web
3  site.
4      Q.  So it's kind of odd, though, isn't it,
5  that the four people who apparently were present
6  interviewing appear to have signed off on the
7  sentence, "According to Ellison, Q3 FY01, the web
8  site would have consisted of transcripts of his
9  interviews"?
10      MR. LINDSTROM:  Argumentative.  Vague and
11  ambiguous as to "odd."
12      THE WITNESS:  I think I was clear about --
13  I think they must have misunderstood that I
14  didn't -- you know, I never put any interviews on
15  there, at least I don't think I did.
16      MR. SOLOMON:  Okay.  Let's have marked as
17  the next exhibit a document produced by the
18  defendants with the control numbers 178069
19  through -073.
20      (Whereupon, Deposition Exhibit 144
21      was marked for identification.)
22      MR. SOLOMON:  Q.  And if you just look at
23  that first -- the first two paragraphs under
24  "Jennifer and Stacey."
25      A.  Okay.

602

1      Q.  Okay.  So now it certainly appears that
2  Martha Cavanna believes that your Larryellison.com
3  web site had content, doesn't it?
4      A.  I think -- I think at some point, the
5  people in the marketing department at Oracle --
6  people in the marketing department at Oracle were
7  involved with this site.  I think Oracle obtained
8  the Larryellison.com web address, and I think the
9  marketing people had ideas of what to do with it.
10  But I don't -- frankly, I don't remember what they
11  did.
12      Q.  You don't dispute the accuracy of this
13  note though, do you, this message?
14      A.  I don't even know who Jennifer and Stacey
15  are, or Martha Cavanna.  But let me just read --
16  give me another second to read it.
17      Yeah.  Okay.
18      Q.  You don't dispute the accuracy of that
19  message, do you?
20      A.  No.
21      Q.  You know who Jennifer Glass is, don't you?
22      A.  Oh, Jennifer.  I'm sorry.  Yes, I do.
23      Q.  Do you know who Stacey Torman is?  You
24  don't know?
25      A.  I don't.

603

1      MR. SOLOMON:  Marked as the next exhibit,
2  a document produced by the defendants in this
3  litigation with the control numbers 099883 through
4  099928.
5      (Whereupon, Deposition Exhibit 145
6      was marked for identification.)
7      MR. SOLOMON:  Q.  Without looking at the
8  whole document, you'll see that this purports to be
9  a transcript from LJE keynote to Oracle Apps World,
10  New Orleans, February 20th, 2001.
11      A.  Yes.
12      Q.  Have you seen this before?
13      A.  No.
14      Q.  This transcript?
15      A.  No.
16      MR. LINDSTROM:  Why don't you take a
17  moment to familiarize yourself with the document
18  before counsel asks you questions --
19      THE WITNESS:  Okay.
20      MR. LINDSTROM:  -- since you haven't seen
21  it before.
22      MR. SOLOMON:  Q.  I'm only going to be
23  asking you about one page, so when you think you are
24  sufficiently familiar, I'll direct you to the page.
25      MR. LINDSTROM:  If you want to give him

604

1    the page, maybe he can read that page and what's
2    just before it or behind it.  But I leave that to
3    you.
4          MR. SOLOMON:  That's fine.
5          Q.  Go to page 42 of the document,
6    Mr. Ellison, which has the control number 099924.
7          A.  -9924?
8          A.  Yeah.
9          A.  Okay.
10         Q.  I'm looking at the second box which
11   begins, "In order."  I'm looking at the last two
12   sentences in that second box.
13         MR. LINDSTROM:  So why don't you read
14   what's in the box and then as much before it or
15   after as you feel is necessary to get the context.
16         THE WITNESS:  I've read it.  I've read it.
17   It's wrong.  My -- my --
18         MR. LINDSTROM:  There's no question
19   pending.
20         THE WITNESS:  Oh.
21         MR. SOLOMON:  Q.  So you weren't telling
22   the truth?
23         A.  No.  The transcription is wrong.
24         Q.  Ah.  Wow, that's sort of quite a big
25   error, isn't it?

605

1          MR. LINDSTROM:  Argumentative.
2          THE WITNESS:  My e-mail address is
3    Larry.ellison@oracle.com.  I think "e-mail me at
4    Larryellison.com," is -- I don't think that's a huge
5    transcription error.
6          MR. SOLOMON:  Q.  It says, "I will look
7    into it, and if you e-mail me at Larryellison.com, I
8    will actually have an answer for you by tomorrow."
9          A.  I never said that.
10         Q.  Do you have a copy of the audio of this
11   anywhere?
12         A.  My guess is we have a copy of the video of
13   this.
14         Q.  Can you explain why that hasn't been
15   produced to us in this litigation?
16         A.  Was it asked for?
17         Q.  Sure it was.
18         A.  Okay.  No, I don't.
19         MR. LINDSTROM:  Assumes facts.
20         THE WITNESS:  Again --
21         MR. LINDSTROM:  No foundation.
22         THE WITNESS:  I'm guessing we have a copy
23   of the audio.  I'd like to think they keep all of my
24   speeches.
25         MR. SOLOMON:  Q.  Will you produce it?

606

1          A.  If we have it, you can have it.  But I
2    frequently say -- I frequently give my e-mail
3    address during speeches.  And my e-mail address is
4    Larry.ellison@oracle.com.
5          Q.  Right.  And if you -- if we got the audio,
6    we'd know, wouldn't we, what you actually said?
7          MR. LINDSTROM:  The witness has told
8    you --
9          THE WITNESS:  And I -- and I said
10   Larry.ellison@oracle.com.  I didn't say
11   Larryellison.com.
12         MR. SOLOMON:  Q.  Okay.  Okay.  I'm now
13   going back to the transcript of Mr. Symonds'
14   interview of you.
15         MR. LINDSTROM:  So this is Exhibit 142?
16         MR. SOLOMON:  Correct.
17         MR. LINDSTROM:  From June 2002?
18         MR. SOLOMON:  Correct.
19         Q.  If you go to control number 1529287.  And
20   at the bottom of that page it reads, "And you were
21   telling me about that, about the reasons for that
22   yesterday, that the technical problems with the
23   glass but that turns out to be quite fortuitous in a
24   way from what you were saying about your move and
25   how the world might react to this kind of thing

607

1    being launched ..."
2          Then the following page says "Laughing."
3    And then, "Yes!"
4          And then it says, "Oh, what's this coming
5    down here?  I'll just have to hide it!  Is this a
6    recession boat?"
7          Just focusing on that sentence, "Oh,
8    what's this coming down here," and the rest of that
9    line, who said that?
10         MR. LINDSTROM:  Well, again, if you need
11   to look at more of the document in order to answer
12   counsel's questions or to familiarize yourself with
13   the context, feel free to do that.
14         THE WITNESS:  Can I have a couple seconds
15   to look at the document?
16         MR. SOLOMON:  Sure.
17         THE WITNESS:  Okay.
18         MR. SOLOMON:  Q.  Okay.  So do you know
19   who said that?
20         A.  Well, I don't know -- it doesn't --
21         MR. LINDSTROM:  Again, for the record,
22   this is, "Oh, what's this coming down here?"
23         THE WITNESS:  "... down here?  I'll just
24   have to hide it.  Is this a recession boat?"
25         MR. SOLOMON:  Q.  Right.

608

1    A.  I think it's supposed to be Matthew
2    Symonds, but I don't know if it's an accurate
3    transcription.
4        Q.  Then skipping a few lines, I'll read the
5    language into the record.  "Are there any feelings
6    you have as a consequence of the kind of pain that
7    Oracle stockholders or kind of Oracle employees with
8    options feeding as well ..."
9        Now, aside from whether or not that's an
10   accurate transcription, that appears to be
11   Mr. Symonds talking?
12       A.  That's correct.
13       Q.  All right.  And then the seven or eight
14   lines below, that's your response; is that right?
15       A.  Well, I mean, I think Mr. Symonds is in
16   the boldface.
17       Q.  Yeah, okay.
18       A.  Then I'm in the normal type, is the
19   convention.
20       Q.  Okay.  And does -- do those lines, those
21   seven lines accurately reflect your answer?
22       A.  You're referring to?
23       Q.  Beginning "Oh, yes."
24       A.  Beginning "Oh, yes."  Let me just read the
25   question.

609

1        Q.  Sure.
2        A.  So this was discussing the feelings of
3    people after the stock market crash.
4        Q.  Right.
5        A.  And so I'm responding to the -- how people
6    at Oracle felt after the stock market crash.  And --
7        Q.  Okay.
8        A.  Yeah, I think it's pretty accurate.  Yeah.
9        Q.  All right.  Did anybody at the company
10   make any remarks to you about your ability to
11   sell -- exercise and sell the options in January of
12   2001 prior to the stock declining in March?
13       A.  No.  Not that I recall.
14       Q.  And is it true that you used some of the
15   proceeds of your sales in January 2001 to buy a
16   large yacht?
17       A.  No.
18       Q.  No?  Small yacht?  Any yacht?
19       A.  No.  I believe I used the proceeds to pay
20   down my loan.
21       Q.  Which loan?
22       A.  I had a stock margin loan.
23       Well, let me -- let me -- let me correct
24   that.  I think some of the proceeds were used to pay
25   down the loan, and some of the proceeds went into

610

1    cash, and I'm not exactly sure how it was disbursed.
2        Q.  So, in fact, it could be that some of it
3    went to pay for the boat; is that right?
4        A.  It's -- yes.
5        Q.  Have you spoken with Safra Catz about this
6    litigation?
7        A.  About the existence of the litigation,
8    or ...
9        Q.  About the litigation at all.
10       MR. LINDSTROM:  Vague as to time.
11       THE WITNESS:  I mean, I knew she was out
12   last week being deposed.  So ...
13       MR. SOLOMON:  Q.  Have you spoken with her
14   about her deposition?
15       A.  Other than the fact that she had one?
16       Q.  Yes.
17       A.  You mean the context of the deposition?
18       Q.  Yes.
19       A.  No.
20       Q.  And have you discussed the contents of
21   your deposition testimony thus far with Ms. Catz?
22       A.  No.
23       Q.  And have you discussed the litigation
24   generally with Ms. Catz?
25       MR. LINDSTROM:  Vague and ambiguous.

611

1        THE WITNESS:  Yeah, at a high level.
2        MR. SOLOMON:  Q.  And when have you --
3    tell me when you've had those conversations.
4        A.  I told her today that I was -- couldn't go
5    to a meeting because I was on my way to -- I was
6    going to be deposed today.
7        Q.  Okay.  Apart from -- apart from telling
8    her that you were going to be deposed today, have
9    you spoken with her about the substance of the
10   litigation ever?
11       MR. LINDSTROM:  When he says "ever," that
12   means ever.  So all the way back to the point in
13   time when it was first filed.
14       THE WITNESS:  Yes.
15       MR. SOLOMON:  Q.  Okay.  And how many
16   conversations have you had with her about the
17   substance of this litigation?
18       A.  I don't know.
19       Q.  Okay.  What -- describe the conversations
20   you've had with her about the substance of this
21   litigation.
22       MR. LINDSTROM:  All right.  Let me again
23   interpose an objection based on the attorney-client
24   privilege.
25       To the extent that you had conversations

612

1  with Ms. Catz in the presence of your lawyers, I
2  don't want you to divulge that.  If you had
3  independent conversations, for example, you and
4  Ms. Catz talking alone, he's entitled to know about
5  that.
6        THE WITNESS:  Could you repeat the
7  question?
8        MR. SOLOMON:  Yeah.
9        Q.  Please describe the conversations you've
10  had with her about the substance of this litigation.
11        MR. LINDSTROM:  Excluding any in the
12  presence of counsel.
13        THE WITNESS:  That -- again, I can give
14  you a high -- I can't tell you the content.  I can't
15  give you the word for word or, you know, the
16  contents.  But I can tell kind of the gist.  And I
17  can't tell you how many conversations there were,
18  but I can tell you the gist.
19        MR. SOLOMON:  Okay.
20        THE WITNESS:  That the litigation is
21  about -- is about a -- is about an earnings miss in
22  a quarter, and that the plaintiffs allege that
23  problems with the 11i suite caused the earnings
24  miss.  And as far as we can tell, that's just not
25  the case.

613

1        MR. SOLOMON:  Q.  And that's something
2  that you've said to Ms. Catz or something Ms. Catz
3  said to you?
4        A.  Going -- going back and forth.
5        Q.  Okay.  And your insider sales haven't
6  cropped up in your conversations?
7        A.  I'm not sure.  I mean, she -- I mean,
8  she's -- I'm not sure if we discussed that
9  specifically.
10        Q.  In your estimation, does Ms. Catz have a
11  good memory?
12        A.  Yes.
13        Q.  You didn't discuss your sales of stock in
14  January 2001 with Ms. Catz prior to engaging in the
15  sales, did you?
16        MR. LINDSTROM:  So we're now -- we're not
17  talking about conversations at that time?  Not since
18  the litigation?
19        THE WITNESS:  In 2001, I don't recall.
20        MR. SOLOMON:  Okay.  I'll have marked as
21  the next exhibit a Forbes magazine article dated
22  August 14, 2006.
23        THE WITNESS:  Mr. Solomon, are we going to
24  use this transcription document again?
25        MR. SOLOMON:  Yes, we are.

614

1        THE WITNESS:  The others?
2        MR. SOLOMON:  Probably not.
3        THE WITNESS:  Okay.
4        (Whereupon, Deposition Exhibit 146
5        was marked for identification.)
6        MR. SOLOMON:  Q.  Did you read this
7  article, Mr. Ellison, around the time it was
8  published?
9        A.  I think I did.
10        Q.  And looking at what is page 87 -- excuse
11  me.  I'm mistaken.  I may be wrong about that.
12        A.  Page 86, an unnumbered page, then page 91.
13        Q.  Right.  So if you go past 86 to the next
14  page which has, "Interesting Conflicts" in a box, do
15  you see that?
16        A.  Yes.  It's difficult to read, but yes.
17        Q.  I'm looking at the paragraph -- the last
18  paragraph in the body of that.
19        MR. LINDSTROM:  In the body of the box or
20  the article?
21        MR. SOLOMON:  In the body of the article.
22        Q.  And it says, "By the time Lane and Bloom
23  had quit in 2000 Safra Catz had taken control.  A
24  dealmaker at the brokerage Donaldson, Lufkin &
25  Jenrette, she had covered the software industry

615

1  since 1986 and was a close friend of Ellison.  He
2  was enchanted by her intellect," and then in
3  parentheses, "(Larry likes to say she graduated in
4  the top of her class at Harvard Law," close parens,
5  "and 13 years later he brought her to Oracle."
6        Do you see that?
7        A.  I do.
8        Q.  Now, did you used to -- did you like to
9  say that Ms. Catz graduated top of her class at
10  Harvard Law?
11        A.  I don't recall ever saying that.
12        Q.  So do you have any idea why that's said
13  here?
14        MR. LINDSTROM:  No foundation.  Calls for
15  speculation.
16        THE WITNESS:  I think she went to Harvard,
17  but -- Harvard Law, but I don't think I ever said
18  she graduated top of her class.
19        MR. SOLOMON:  Q.  And why do you think she
20  went to Harvard?
21        A.  I think she said she went to Harvard.
22        Q.  Do you know she never graduated from
23  Harvard?  Do you know that?
24        A.  No.
25        Q.  Is this the first time you've heard that?

616

Ellison, Lawrence  3/30/2007  12:00:00 AM

1    A.  No.  I think -- I think I knew that.  She
2  graduated from Penn?
3    Q.  She did.
4    A.  Yeah.
5    MR. LINDSTROM:  That's what she testified
6  to.
7    THE WITNESS:  Yeah.
8    MR. LINDSTROM:  Also --
9    MR. SOLOMON:  Q.  Are you aware that all
10 over the web it appears that she graduated from
11 Harvard?
12   MR. LINDSTROM:  Assumes facts.  Calls for
13 a conclusion.  Argumentative.
14   THE WITNESS:  No.
15   MR. SOLOMON:  Q.  Are you aware that alone
16 among the board of directors of Oracle, Safra Catz
17 doesn't list her education?
18   MR. LINDSTROM:  Assumes facts.
19   THE WITNESS:  Do I list mine?  I
20 don't know --
21   MR. SOLOMON:  Q.  You're smiling.  I'm
22 smiling --
23   A.  No, I don't know if I -- I don't know if I
24 list mine.  I don't think I list my education, and
25 I'm on the board.

617

1    Q.  I'm talking about Safra Catz.
2    MR. LINDSTROM:  But I think you said
3  "alone on the board" --
4    THE WITNESS:  You said "alone" --
5    MR. SOLOMON:  Oh, I'm sorry.
6    THE WITNESS:  You said alone amongst the
7  members of the board of directors, she doesn't list
8  her education.  And I just said I don't think I list
9  my education.
10   MR. LINDSTROM:  So, Mark, could you repose
11 the question?
12   MR. SOLOMON:  Q.  So other than you, then,
13 alone among the board of directors.  Let's get this
14 as an exhibit.  Let's mark this, and then we'll have
15 some context.
16   Actually, let me be more accurate.  Alone
17 among the directors of Oracle Education Foundation.
18   THE WITNESS:  Okay.
19   MR. SOLOMON:  Q.  Okay?
20   A.  Okay.
21   MR. SOLOMON:  Let's mark these pages
22 describing the board of directors of Oracle
23 Education Foundation as the next exhibit.
24   (Whereupon, Deposition Exhibit 147
25   was marked for identification.)

618

1    MR. SOLOMON:  Q.  We don't have to dwell
2  on this very long, Mr. Ellison.  I just want to
3  know, do you know why she doesn't list her
4  education?
5    A.  No.
6    MR. SOLOMON:  I'll have marked as the --
7  actually, this is already Exhibit 10 to the
8  deposition of Ms. Catz, so I'll just pass it
9  straight over to you, Mr. Ellison.
10   THE WITNESS:  Okay.  Thank you.
11   MR. LINDSTROM:  Is this 148?
12   THE REPORTER:  Previously marked.
13   MR. SOLOMON:  Exhibit 10.
14   MR. LINDSTROM:  Thank you, Counsel.
15   MR. SOLOMON:  Q.  I just wanted you to
16 look at the second page into the document.
17   A.  Including the cover page?
18   Q.  So the cover page, I want you to look at
19 the next page which just says, "Catz's Background."
20 I just want to point out to you that there,
21 apparently, the special litigation committee was led
22 to believe somehow that she graduated from Harvard
23 Law School with a JD.
24   Do you see that?
25   MR. LINDSTROM:  Is there a question -- I'm

619

1  going to object to the preface of the question as
2  being argumentative, lacking foundation.
3    Do you see that?  You may respond.
4    THE WITNESS:  Do I see it?
5    MR. SOLOMON:  Q.  Yeah.
6    A.  I see it.
7    Q.  And you don't know what would have led the
8  special litigation committee to believe she went to
9  Harvard Law School, do you?
10   A.  I think she did go to Harvard Law School.
11   Q.  Sorry, that she graduated from Harvard Law
12 School.
13   A.  No.
14   MR. SOLOMON:  Let's go off the record for
15 a couple minutes.
16   THE VIDEOGRAPHER:  Off the record.  The
17 time is 2:07 p.m.
18   (Whereupon, a recess was taken.)
19   THE VIDEOGRAPHER:  We are back on the
20 record.  The time is 2:08 p.m.
21   MR. SOLOMON:  I've marked as the next
22 exhibit -- sorry -- a document describing Ms. Catz
23 and her education.
24   (Whereupon, Deposition Exhibit 148
25   was marked for identification.)

620

1    MR. SOLOMON:  Q.  If you look at the third
2    page of the exhibit, Mr. Ellison, you'll see that
3    there's a reference to Ms. Catz having a BS from
4    Wharton School and a JD from Harvard Law School.
5        Do you see that?
6    A.  I do.
7    Q.  You don't know how that got there?
8    A.  No.
9        MR. LINDSTROM:  No foundation.
10        THE WITNESS:  Are we done with --
11        MR. SOLOMON:  Yes.  Thank you.
12        We'll have marked as the next exhibit a
13    document that contains a correction concerning
14    Ms. Catz.
15        (Whereupon, Deposition Exhibit 149
16        was marked for identification.)
17        MR. SOLOMON:  Q.  If you go to the second
18    page, Mr. Ellison, you'll see halfway down that page
19    it says, "Our cover story on Oracle," and then it
20    references the article, "Chief Executive Larry
21    Ellison," in quotes, "'Irreplaceable',' in parens,
22    "(August 14), repeated an Ellison claim that Oracle
23    co-president Safra Catz graduated from the Harvard
24    Law School; her law degree is from the University of
25    Pennsylvania."

1        Do you see that?
2    A.  I do.
3    Q.  But, again, it's your testimony you've
4    never claimed that she went to Harvard Law School;
5    is that right?
6        THE WITNESS:  No --
7        MR. LINDSTROM:  Assumes facts.
8    Mischaracterizes his testimony.
9        MR. SOLOMON:  Q.  Sorry.  Start again.
10        It's your testimony that you've never
11    claimed that Ms. Catz graduated top in her class at
12    Harvard Law School?
13    A.  I've never -- I've never said that.
14    Q.  And have you, in the past, said that she
15    graduated from Harvard Law School?
16    A.  I think at one point I thought she had
17    graduated from Harvard Law School.
18        MR. SOLOMON:  Okay.  And we'll have marked
19    as the next exhibit an article entitled, "Oracle's
20    Catz, Ellison Heir, Gets Credit for Growth
21    Strategy."
22        (Whereupon, Deposition Exhibit 150
23        was marked for identification.)
24        MR. SOLOMON:  Q.  I'm looking at the third
25    page of this document.  You'll see halfway down on

1    that third page it says, "Catz received her
2    bachelor's degree in business from the Wharton
3    School of the University of Pennsylvania in 1983,
4    earning her law degree from Harvard Law School in
5    1986."
6        Do you see that?
7    A.  I do.
8    Q.  You didn't provide that information for
9    this article, did you?
10    A.  No.  I'm not sure -- what is this article?
11    I can't even tell where it came from.
12    Q.  If you go to the last page, you'll see
13    that there's a reference to the reporter being
14    Rochelle Garner in San Francisco.
15        Do you know who Rochelle Garner is?
16    A.  I don't.  Do you know --
17    Q.  Have you ever heard of the San Jose
18    Mercury News?
19    A.  Of course.  Is this a San Jose Mercury
20    News article?
21    Q.  I believe it is.
22    A.  I don't see where it ...
23    Q.  We'll double-check later on, Mr. Ellison,
24    but I believe this is an article that was published
25    in December of last year in the San Jose Mercury

1    News.  And I'll let you know if I'm -- when I find
2    another version of this, whether that's right or
3    wrong.
4        But in any event, have you ever had a
5    discussion with Ms. Catz about her being reported to
6    have earned her law degree from Harvard Law School?
7    A.  No.  I don't think she ever told me --
8        MR. LINDSTROM:  The answer is yes or no.
9        THE WITNESS:  Sorry.
10        MR. LINDSTROM:  And you've answered.
11        MR. SOLOMON:  Q.  Do you know why there's
12    no correction -- there's been no correction of this
13    information?
14        MR. LINDSTROM:  No foundation.
15        THE WITNESS:  No.
16        MR. SOLOMON:  Q.  Are you aware that every
17    document that discusses your exercise of your
18    options in January 2001, to the extent -- prior to
19    your exercising those options, to the extent there
20    was -- there were ever any dates projected for when
21    you would be exercising, they were April 2001 or
22    thereafter?  Are you aware of that?
23        MR. LINDSTROM:  Assumes facts.
24    Mischaracterizes the documents.
25        THE WITNESS:  I'm not -- I'm not sure I

1   understood what you just said.

2       MR. SOLOMON:  Q.  Okay.  Prior to your

3   exercising your options in January 2001, there are

4   some e-mails that I'll share with you in a few

5   minutes involving Deborah Lange.

6       Do you know who Deborah Lange is?

7   A.  Yes.

8   Q.  And some of those discuss when you would

9   be exercising your options.  Are you aware of that?

10      MR. LINDSTROM:  Assumes facts.

11      THE WITNESS:  No.

12      MR. SOLOMON:  Q.  And there's never any

13  mention of you exercising in January of 2001; only

14  of exercising in April or thereafter.  Are you aware

15  of that?

16      MR. LINDSTROM:  Assumes facts.

17  Mischaracterizes the document.  Documents.

18      THE WITNESS:  No.

19      MR. SOLOMON:  Q.  After we filed our

20  lawsuit in March of 2001, did you ever have any

21  discussion with anybody at Oracle concerning

22  Ms. Lange --

23      A.  Now I know what you're talking about --

24      Q.  -- stating that --

25      Okay.  What am I talking about?

625

1       MR. LINDSTROM:  Why don't you let him

2   finish the question.

3       MR. SOLOMON:  Q.  I did.  What am I

4   talking about?

5       MR. LINDSTROM:  Calls for speculation.

6   We'll see how good you can read what's in his head.

7       THE WITNESS:  I think -- I think I've

8   heard somewhere that Deborah Lange wrote something

9   about the tax treatment of my options and the ideal

10  time for me to exercise as far as Oracle was

11  concerned.

12      MR. SOLOMON:  Okay.

13      MR. LINDSTROM:  So, Mark, was he right?

14  Was that what you were thinking?

15      MR. SOLOMON:  Somewhat.  Absolutely.

16      Q.  I was also thinking that when we discussed

17  this with your financial adviser, Mr. Simon, he got

18  very upset when I showed him documents that suggest

19  that you were planning on exercising in April.

20      Are you aware of that?

21      MR. LINDSTROM:  Assumes facts.

22  Mischaracterizes his testimony.

23      THE WITNESS:  That he got very upset?  No,

24  I don't know anything about that.

25      MR. SOLOMON:  Q.  Have you spoken to

626

1   Mr. Symonds about his testimony?

2       A.  I didn't even know he had been deposed

3   until now -- no.

4       Q.  Have you referred in the past to "software

5   swaps," transactions described as "software swaps"?

6       MR. LINDSTROM:  In those exact words?

7       MR. SOLOMON:  (Nods head.)

8       THE WITNESS:  I don't think I've ever said

9   "software swaps."  I know what a swap is, a swap

10  transaction.  I don't think I've ever said "software

11  swaps."

12      MR. SOLOMON:  Q.  Okay.  And what is a

13  software swap?

14      MR. LINDSTROM:  What is a software --

15      MR. SOLOMON:  Sorry.  You're right.

16      Q.  What is a swap transaction?

17      A.  It would be where -- in case of a software

18  swap, it would be where -- hypothetically, where we

19  supplied our database technology to Microsoft in

20  exchange for Microsoft Office, and we -- kind of

21  simultaneously, the transactions have passed in the

22  air.

23      Q.  Okay.  Does that raise any concern in your

24  mind as to the propriety of that sort of

25  transaction?

627

1       MR. LINDSTROM:  The hypothetical he

2   described?

3       MR. SOLOMON:  Yeah.

4       THE WITNESS:  It depends -- it's all

5   contextual.  So if Microsoft had a real need for the

6   database, a legitimate need for the database, and

7   they were going to buy it anyway, and we had a

8   legitimate need for Microsoft Office and we were

9   going to buy it anyway, and those needs had been

10  well established, then the fact that we were

11  buying -- you know, kind of simultaneously buying

12  something of theirs and they were simultaneously

13  buying something of ours is okay in terms of you can

14  actually record the revenue.  It was a legitimate

15  sale of technology from us to Microsoft and from

16  Microsoft to us.

17      So as long as it is, if you will,

18  coincidental with their occurring at the same time,

19  then it's legitimate and both companies can record

20  the transaction as revenue, as legitimate sales and

21  legitimate revenue.

22      If they were contrived and there's no

23  legitimate need, then the transaction should not be

24  recorded as revenue.

25      MR. SOLOMON:  Q.  Okay.  And does that --

628

1  where you're talking about contrived, does that
2  accurately describe the deal that you entered into
3  with HP at the end of 2Q01?
4      MR. LINDSTROM: Was it contrived?
5      THE WITNESS: No. It was absolutely not
6  contrived. It was a legitimate need of HP's and a
7  legitimate need of ours.
8      MR. SOLOMON: Q. And do you recall
9  signing a document late on November 30th, 2000 with
10  respect to the HP deal?
11      A. Not specifically.
12      Q. Do you recall that it was unclear until
13  the last minute whether or not Oracle would meet
14  guidance for the second fiscal quarter of 2001?
15      MR. LINDSTROM: Assumes facts.
16      THE WITNESS: Q2 2001?
17      MR. SOLOMON: Q. Q2 -- which is --
18      A. Fiscal -- yes. November of 2000. I don't
19  specifically recall.
20      Q. Did you discuss the second fiscal quarter
21  of 2001 with Mr. Symonds at all when he was
22  interviewing you for the book?
23      A. I don't recall.
24      Q. Back to 142.
25      I'm looking at page 1529302.

629

1      A. Last three numbers again?
2      Q. -302?
3      A. -302.
4      Q. And then I'm looking at the paragraph
5  beginning exactly halfway down the page. And I'm
6  looking at, in that paragraph, where it says, "This
7  is hard stuff."
8      If you just read that, I'll ask you a
9  couple of questions about it.
10      A. -302? Page -302?
11      Q. Yes.
12      While you're reading it, I'll read to you.
13      "This is hard stuff, you know, a lot of
14  smart people" --
15      A. Slow down. I can't find, "This is hard
16  stuff."
17      MR. LINDSTROM: I can't either.
18      MR. SOLOMON: -302 at the bottom.
19      THE WITNESS: -302. I can't find it.
20      MR. LINDSTROM: There's handwriting on the
21  left-hand side.
22      MR. LINDSTROM: Why don't you --
23      MR. SOLOMON: Wrong document.
24      THE WITNESS: Oh, 142. Sorry. Are we
25  done with this one?

630

1      MR. SOLOMON: Yes.
2      THE WITNESS: Sorry. Accumulating too
3  many of these things.
4      Okay. -302.
5      MR. LINDSTROM: Why don't you find that
6  page and then take a moment to familiarize yourself
7  with the passage that counsel's directed your
8  attention to.
9      THE WITNESS: Okay. There are a lot of
10  transcription errors in this. It's hard to read.
11      MR. SOLOMON: Too bad we don't have the
12  audio.
13      MR. LINDSTROM: Is that a question?
14      MR. SOLOMON: Q. Don't you agree,
15  Mr. Ellison?
16      A. I do.
17      Q. Halfway -- well, the last sentence of the
18  paragraph that I'm focusing on says, "There was no
19  reason I should have believed we could do that in
20  the timeframe but I thought we could other than
21  denial."
22      Do you see that?
23      A. Okay, the last sentence?
24      Q. Yeah.
25      A. I do. But give me a second to read the

631

1  whole thing.
2      Okay.
3      Q. Okay. So that last sentence, did you say
4  that?
5      A. I think so.
6      Q. Okay. And you were in denial in terms of
7  the E-Business Suite and how long it would take; is
8  that right?
9      A. No. If you read the entire paragraph, I
10  was more optimistic about us getting it done in a
11  certain timeframe than I should have been.
12  Experience -- experience tells us in the software
13  business that big projects are enormously complex
14  and they often slip. I mean, we've had big projects
15  slip in the past. Microsoft has huge projects that
16  slip. Still, we put together dates that are
17  aggressive and goals that are aggressive. It's not
18  uncommon to miss those dates.
19      Q. Do you stand by that sentence where you
20  say, "there was no reason I should have believed we
21  could do that in the timeframe"?
22      MR. LINDSTROM: The entire sentence,
23  right?
24      THE WITNESS: The -- I still manage
25  engineering today at Oracle, and we still have

632

1  aggressive delivery dates.  And I still think it's a
2  good management technique to have aggressive
3  delivery dates.
4      MR. SOLOMON:  Okay.  Let's take a -- let's
5  take a ten-minute break, if that's okay.
6      THE VIDEOGRAPHER:  We are going off the
7  record.  Here marks the end of Videotape No. 1,
8  Volume 3, in the deposition of Lawrence Ellison.  We
9  are going off the record.  The time is 2:28 p.m.
10     (Whereupon, a recess was taken.)
11     THE VIDEOGRAPHER:  Good afternoon.  We are
12  back on the record.  Here marks the beginning of
13  Videotape No. 2, Volume 3, in the deposition of
14  Larry Ellison.  The time is 2:42 p.m.
15     MR. SOLOMON:  Q.  Mr. Ellison, have you
16  heard it remarked that you have a problem with
17  tenses?
18     A.  Verb tenses?
19     Q.  Tenses.
20     MR. LINDSTROM:  Verb tenses.
21     THE WITNESS:  Have I heard that remark?  I
22  think I made that remark.
23     MR. SOLOMON:  Q.  Okay.  And who did you
24  make that remark to?
25     A.  I'm not sure exactly.

633

1      Q.  Okay.  And why did you say that?
2      A.  I think there was some point in my career
3  where I did not make it plain whether a product was
4  finished or about to be finished.
5      Q.  Okay.  Do you still have a problem with
6  tenses?
7      A.  No.
8      Q.  When did you stop having a problem with
9  tenses?
10     A.  Long time ago.
11     Q.  Would you be willing to submit to a lie
12  detector test for the purposes of this litigation?
13     MR. LINDSTROM:  I'm going to object to
14  that question as being argumentative and beyond the
15  requirements of the Federal Rules of Civil
16  Procedure, and I'm going to instruct him not to
17  respond to that question, unless you can give me
18  some justification for why you have authority to
19  pose that kind of question.
20     MR. SOLOMON:  I think --
21     Q.  Did you respond already by nodding your
22  head yes?
23     A.  Yes.
24     Q.  And --
25     MR. LINDSTROM:  Well, he may be willing to

634

1  do it, but I don't think you can ask that question.
2  You have limited time with this witness.  And, you
3  know, I suggest you move on to things that are
4  properly the subject of discovery.
5      MR. SOLOMON:  So just -- I will withdraw
6  the question for the second, but let's just finish
7  this off.
8      Q.  So after this deposition, you would be
9  willing to enter into an agreement whereby if
10  questions were agreed, you would submit to a lie
11  detector test; is that right?
12     MR. LINDSTROM:  Asked and answered.  It's
13  argumentative.  It's irrelevant.  Improper
14  discovery.  He's told you what he would do, and I'm
15  going to instruct him not to answer any further.
16     MR. SOLOMON:  Q.  And you're going to
17  accept the instruction, I take it?
18     A.  (Nods head.)
19     Yes.
20     MR. LINDSTROM:  Thank you.
21     MR. SOLOMON:  Q.  That's yes, you --
22     A.  Yes, I accept the instruction.
23     Q.  Got you.
24     Let's have marked as the next exhibit
25  another interview transcript with the Bates range

635

1  1529157 to 1529180.
2      (Whereupon, Deposition Exhibit 151
3  was marked for identification.)
4      THE WITNESS:  Are we finished with this
5  transcript?
6      MR. SOLOMON:  Yes, we are.  We're finished
7  with it, yes.
8      Q.  And this is an interview transcript.  It's
9  dated January 18, 2002, and the control range is
10  1529157 -- I may have said this already --
11  through -180.
12     You'll see on the first page in the second
13  paragraph a reference to the phrase "brand damage."
14     Do you see that?
15     A.  I do.
16     Q.  And that's a phrase you say you invented;
17  is that right?
18     A.  Can I have a second just to read the
19  context?
20     MR. LINDSTROM:  While Mr. Ellison is
21  reviewing the document, is this 151 for
22  identification?
23     THE REPORTER:  (Nods head.)
24     MR. LINDSTROM:  Thank you.
25     THE WITNESS:  Are we talking about the

636

1  very first page?

2      MR. SOLOMON:  Yes.

3      THE WITNESS:  Because this is reverse --

4  this is Mr. Symonds in regular type and me in

5  boldface?

6      MR. SOLOMON:  Q.  Appears to be.

7      A.  Just reverse of the other one.

8      Okay.  Go ahead.

9      Q.  Okay.  You coined the phrase "brand

10  damage"?

11     A.  I don't think I coined the phrase "brand

12  damage."  I used the phrase "brand damage" in

13  regards to some of the problems some customers were

14  having with release 11i.  I don't think it had ever

15  been used in Oracle before.

16     Q.  Then if you go to the third page of the

17  document, 1529159, just looking in the middle there

18  at what appears to be your language, "So you have

19  delivered a product that doesn't work very well and

20  you can't support very well, so all I care about is

21  service requests and that's all I measure so that

22  that was a key point in saying by the way service

23  requests must go down 5 percent a month."

24     Do you see that?

25     A.  I do.

1      Q.  Are you talking about 11i there?

2      A.  Can I just have a second to look at this?

3      Q.  Sure.

4      A.  No.  I think if you look at the previous

5  paragraph, I think what I'm talking about is the

6  general notion of what you should measure when

7  you're trying to ascertain product quality.

8      And the engine and -- what I had become

9  convinced of was that measuring bugs was a mistake.

10  The programmer says here's a bug.  Instead what you

11  want to measure is customer -- customers reporting

12  problems.  And there's a fundamental -- a

13  fundamental difference.

14     One bug might produce zero or very few

15  customer-reported problems.  There might be a

16  legitimate bug in their product, but either no one

17  cares or it doesn't occur.  One bug might cause very

18  serious problems that hundreds of customers might

19  then come up with service requests.

20     So the impact of that bug is much greater

21  if you measure service requests.  So counting bugs

22  simply was not a very good way of measuring product

23  quality.  The right way to measure product quality

24  was service requests.  And then I had set a goal --

25  and that was true of all of our products, not just

1  11i -- the way to measure product quality was

2  measure service requests.  And then she said

3  targets, to reduce -- constantly reduce those number

4  of service requests coming in.

5      It used to be -- it used to be that

6  engineering would measure bugs as their measure of

7  quality, and reducing bugs was showing improved

8  quality.  The support organization would measure

9  service requests.  And they weren't synchronized.

10  They didn't agree what the right measures were.

11     So I was pushing the notion of let's all

12  agree it's just service requests and just get them

13  down.

14     Q.  Was this after March 2001 that you

15  developed this view, or was it something you already

16  held, a view you already held as of March 2001?

17     A.  I'm not sure exactly when I decided we

18  should have a single measure of the quality.

19     Q.  Okay.  If you go to pages 1529167

20  and -168 -- in fact, I'm looking at -168.

21     A.  You're on -168?

22     Q.  Yeah.  Sorry.

23     And I'm just looking at a couple of the

24  lines on that page.  A third of the way down, "So

25  when did you first realize that it wasn't really

1  working very well?"

2      And your response appears to be, "Oh, I

3  knew there was a huge risk up front, so I kind of

4  walked into this.  I can't plead ignorance on this,

5  but it took much longer."

6      Do you see that?

7      A.  I do.  Can I have a moment to read around

8  it?  Because I'm not sure what this is about.

9      Q.  Yeah.

10     A.  Okay.  Now I know what it's about.

11     Q.  Okay.  And what is it about?

12     A.  It's about the most complicated component

13  of an ERP system or the application system, which is

14  the order management system.  And we had -- I had

15  made the decision -- it was run on the cusp, whether

16  we should put in a brand-new order management system

17  or kind of upgrade our existing system.

18     And I decided to completely replace the

19  order management system knowing it was an enormously

20  complicated piece of new code, the most complicated

21  piece of the whole system.

22     Q.  Just keep that in front of you for a

23  second.  I just want to touch on some other areas

24  and then come back to this.  I want to go back for a

25  second to Mr. Symonds and the issue of Softwar.

1    Do you know what spoliation means?

2    A.  Yes.

3    Q.  What's your understanding of spoliation?

4    A.  It's documents that should have been

5    preserved that weren't.

6    Q.  Are you aware that spoliation has become

7    an issue in this case?

8    A.  I understand you've raised it as an issue,

9    yes.

10    Q.  Okay.  And you're aware that the special

11    master magistrate in charge of discovery had

12    indicated this is an issue in this case?

13    MR. LINDSTROM:  I'm going to instruct you

14    not to divulge any communications you may have had

15    with your counsel.  In other words, as before, you

16    need to be answering these questions independent of

17    communications for your counsel.  So, for example,

18    if you've read an order or a transcript or something

19    where the special master made a statement of the

20    type that Mr. Solomon just mentioned, then fine.

21    But I don't want you telling him information that

22    may or may not have been given to you through your

23    lawyers.

24    THE WITNESS:  No.  Excuse me.  No.

25    MR. SOLOMON:  Q.  Okay.  I asked you last

641

1    time if you knew of a person called Mr. Kirkby and

2    you said you didn't.

3    Do you recall that?

4    A.  Kirkby?

5    Q.  Mh-hmm.

6    MR. LINDSTROM:  Do you recall the

7    testimony; is that the question?

8    MR. SOLOMON:  Yes.

9    THE WITNESS:  I don't recall the

10    testimony.

11    MR. SOLOMON:  Q.  Okay.  Do you know the

12    name Kirkby?

13    A.  No.

14    Q.  Okay.  You said that you wrote to

15    Mr. Symonds on January the 10th of this year.

16    Can you tell me, between January the 10th

17    and the conversation you had with him concerning a

18    charity, did you have any communications with him?

19    A.  I did.  There were -- there were several

20    phone calls.

21    Q.  Okay.  Who initiated the phone calls?

22    A.  In all cases, Mr. Symonds did.

23    Q.  Okay.

24    A.  And, again, the practice was, he would

25    call me, get one of my assistants, and my assistant

642

1    would locate me and I would call him back.

2    Q.  Did you ever have a discussion with him as

3    to what his story should be?

4    MR. LINDSTROM:  As to what his story

5    should be?

6    MR. SOLOMON:  (Nods head.)

7    THE WITNESS:  What -- what do you mean?

8    MR. SOLOMON:  Q.  Okay.  Do you -- have

9    you heard -- strike that.

10    At one point we -- I'll represent this to

11    you -- we were told by your counsel that Mr. Symonds

12    had told them that he had tried to access the audio.

13    He couldn't.  He took it to a computer repair shop.

14    Apparently, there was a virus, and he just left it

15    at the repair shop and it disappeared forever.

16    Have you ever heard that?

17    MR. LINDSTROM:  All right.  Again, I think

18    it's important -- he can conduct discovery about

19    what you may have heard from Mr. Symonds or anybody

20    else, but not the lawyers.

21    Do you understand?

22    THE WITNESS:  Yes.

23    MR. SOLOMON:  Q.  Have you ever heard that

24    from Mr. Symonds?

25    A.  He told me that he couldn't recover the

643

1    electronic files, and he -- he had tried to recover

2    the electronic files.  He had taken -- taken it to a

3    store, and he had written transcripts and he could

4    produce -- he had a written transcript but not the

5    electronic files.  He did tell me that.

6    MR. SOLOMON:  Q.  Okay.  And did he tell

7    you why he had left it at the store?

8    A.  He didn't tell me he had left it at the

9    store.

10    Q.  What did he tell you?

11    A.  He just told me he couldn't recover the

12    electronic files because there was a virus.  He

13    tried to get the computer fixed.

14    Q.  When did he tell you that?

15    A.  I think some number of days after my --

16    after my January phone call with him.

17    Q.  Okay.  And what did you say?

18    A.  I said, "Please produce what you have."

19    Q.  Okay.  And what about the computer being

20    at the store; did you say anything to him about

21    that?

22    A.  He didn't say the computer was at the

23    store.

24    Q.  Okay.

25    A.  All he -- all he said was the computer had

644

1  a virus and he couldn't recover the electronic
2  files.
3      Q.  Did you ask him to send you the computer,
4  or at least keep the computer?
5      MR. LINDSTROM:  Compound.
6      THE WITNESS:  No.
7      MR. SOLOMON:  Q.  Okay.  And then after he
8  told you that he couldn't access the audio and told
9  you about the transcripts, what did you say then?
10     A.  Please produce -- please produce whatever
11  documentation you have.
12     Q.  And was that the end of the call?
13     A.  Yes.
14     Q.  Okay.  And what about the next call?  When
15  was that?
16     A.  The next call I think was mid February.
17     Q.  Okay.  And describe the conversation,
18  please.
19     A.  He said that a private investigator hired
20  by the plaintiffs had located a -- an ex-employee of
21  the transcription service, a Mr. Wright, and that
22  they had located all of the electronic files on a
23  server.
24     Q.  Okay.  And what did you say?
25     A.  Great.  Give him the files.

645

1      Q.  What -- you said to Mr. Symonds, Great,
2  give him the files?  Mr. Symonds.
3      A.  Mr. Symonds, yes.  You know, Give the
4  investigator the files.  That's fine.
5      Q.  Okay.  And what did he say?
6      A.  Again -- again, I'm not -- all of these
7  things I'm relating I'm not sure word for word.  I'm
8  giving you the gist -- you know, the gist of the
9  conversation.  I'm not sure if he said okay or not.
10     I'm really not sure -- I'm not sure what he said.
11     Q.  Okay.  And how long was that conversation?
12     A.  I don't know.
13     Q.  Were any of these conversations more than
14  a couple of minutes in length?
15     A.  Yeah.  Some of the conversations included,
16  you know, other topics.  There were -- there were --
17  there was a conversation -- in fact, I think I was
18  wrong when you asked me the next time I talked to
19  Mr. Symonds, because I took that as the next time I
20  talked to Mr. Symonds about this litigation.  I
21  think you just asked me what the next time was.
22     Q.  Sure.
23     A.  I think there was a call after -- another
24  call in January where he was trying to synchronize,
25  or get some dates to come to Spain to watch the

646

1  America's Cup sailing.  And, again, I think there
2  other calls about -- there might have been calls
3  about the charity.  And we might have spoken about
4  the charity in this call.  But I think in terms of
5  discussion about the litigation, it was, you know,
6  plaintiff's -- plaintiff's investigator has
7  located -- located the employee.  The employee has
8  found all -- all the files do exist, and they're on
9  a server computer, which I thought was good news,
10  and said, Go ahead and please give everything to the
11  plaintiff.
12     Q.  Okay.
13     A.  I then, by the way, called him back --
14  sorry.
15     MR. LINDSTROM:  If he wants to ask you --
16  I'm sure he will, but it's important we have a clear
17  record here and keep these conversations as distinct
18  as we can.  So counsel will ask you about the next
19  conversation, I'm sure, in a moment.
20     MR. SOLOMON:  Q.  Carry on, please.
21     MR. LINDSTROM:  With the next
22  conversation?
23     MR. SOLOMON:  Q.  You were about to say "I
24  then" -- I think you were about to say you then
25  called him back; is that right?

647

1      A.  Yeah, I think I called him, and I thought
2  that I had -- and said -- it might have been the
3  next day, or might have been two days.  Could have
4  been a few hours later, a day later.  It occurred to
5  me that -- that the documents should have been
6  produced to my lawyers as opposed to the
7  investigator.
8      So I said, Matthew, please, you
9  know -- get the documents from this employee and
10  give them to -- give them to my lawyers.
11     Q.  Okay.
12     A.  And I think he said too late, I had
13  already sent an e-mail to the investigator -- or to
14  Mr. Wright saying that the -- that the investigator
15  could have the files.
16     Q.  So -- just hard to follow.
17     So you're telling me Mr. Symonds told you
18  that the investigator had already got the audio?
19     A.  No.  No.  Mr. Symonds told me that
20  plaintiffs had hired an investigator.  The
21  investigator had located a former employee of -- I
22  think it's called Typing.com -- not certain about
23  that -- the transcription service, the people that
24  produce these documents from the audio files -- that
25  they had located this ex-employee, that the

648

1  ex-employee had located a computer server from
2  Typing.com that had all of the audio files and all
3  of the transcriptions on it.
4      Q.  Okay.
5      A.  And that employee had called Matthew
6  Symonds and asked Matthew what he wanted to do with
7  those documents.
8      Q.  Okay.  Can you explain to me why your
9  lawyers never told us that?
10     MR. LINDSTROM:  No foundation.  Assumes
11  facts.
12     THE WITNESS:  No.
13     MR. SOLOMON:  Q.  Can you explain why your
14  lawyers apparently have done nothing to try and get
15  these materials?
16     MR. LINDSTROM:  Argumentative.  Assumes
17  facts contrary to the record.  No foundation that he
18  knows what the lawyers have done or not done.
19     THE WITNESS:  My understanding is my
20  lawyers have been in continuous contact with Matthew
21  Symonds in trying to recover the documents.
22     MR. SOLOMON:  Q.  Okay.  Did you hire an
23  investigator like plaintiffs did?
24     MR. LINDSTROM:  Assumes facts.  By "you,"
25  you mean him personally?

649

1      MR. SOLOMON:  Q.  You or anybody on your
2  behalf.
3      A.  I don't know.
4      MR. LINDSTROM:  No foundation.
5      THE WITNESS:  I don't know.  I didn't
6  personally.  I don't know.
7      MR. SOLOMON:  Q.  You know that the order
8  of the court is that you produce these materials?
9  You're aware of that?
10     MR. LINDSTROM:  Are you representing that
11  to him?
12     MR. SOLOMON:  Q.  Are you aware of that?
13     MR. LINDSTROM:  No foundation.
14     THE WITNESS:  Other than -- again --
15     MR. LINDSTROM:  I don't think --
16     THE WITNESS:  If it came from my
17  lawyers --
18     MR. LINDSTROM:  Then you're not to divulge
19  it.
20     THE WITNESS:  I have no independent
21  knowledge of what exactly -- what precisely my
22  obligations are, or were, or are.  Both.
23     MR. SOLOMON:  Q.  Have you seen
24  correspondence between your lawyers and Mr. Symonds?
25     MR. LINDSTROM:  You may answer that

650

1  question.
2      THE WITNESS:  No.
3      MR. SOLOMON:  Q.  Do you know if there is
4  any?
5      MR. LINDSTROM:  You -- again, you can't --
6  you have to exclude any communications that you've
7  had with your lawyers from that response.
8      THE WITNESS:  I don't know.
9      MR. SOLOMON:  Did Mr. Symonds tell you
10  what your lawyers had been saying to him?
11     A.  No.
12     Q.  Did you ask him?
13     A.  No.
14     Q.  Do you know what your lawyers were saying
15  to Mr. Symonds?
16     MR. LINDSTROM:  Again, you -- you can't
17  respond on the basis of anything that the lawyers
18  told you.  If you know independently, you're free to
19  respond.
20     THE WITNESS:  I have no independent
21  knowledge.
22     MR. SOLOMON:  Q.  Okay.  And it's true,
23  isn't it, that you have not, until today, seen any
24  of the transcripts that have been produced?
25     A.  That's correct.

651

1      Q.  Okay.  Does it appear to you so far that
2  these transcripts, to a large extent, touched upon
3  events in this litigation?
4      MR. LINDSTROM:  Calls for a conclusion.
5  Vague and ambiguous.
6      THE WITNESS:  It certainly discusses 11 --
7  yeah, 11i and the products, yes.
8      MR. SOLOMON:  Q.  Do you -- do you believe
9  there's any conflict between you in this litigation
10  and Oracle?
11     A.  No.
12     Q.  Okay.  So after you had the conversation
13  with Mr. Symonds wherein he told you that the
14  investigator had found someone who had the files,
15  did you have another conversation with him about
16  this matter?
17     A.  Yes.  I think some number of days later,
18  he evidently -- he e-mailed Mr. Wright to turn -- to
19  turn the documents over to the investigator.  And
20  then Mr. Wright had vanished.  And Mr. Symonds was
21  very upset.  He said it was entrapment, and the
22  plaintiff was trying to entrap him and all of -- all
23  of this stuff.
24     And I said, Matthew -- again, none of this
25  is word for word.  This is the gist of the

652

Ellison, Lawrence  3/30/2007  12:00:00 AM

1    conversation.  I said, Matthew, did you send -- did
2    you send a note saying they could have all the
3    documents?  And I said yes -- he said yes.  And I
4    said, Well, entrapment failure.  Not a problem.
5        Q.  Okay.  And do you remember anything else
6    about that conversation?
7        A.  No.  I think that was it.
8        Q.  Now, you mentioned earlier that you
9    believed -- I think you may have testified that you
10   told Mr. Symonds that we would try and use personal
11   stuff in the transcripts to get at you, basically,
12   right?
13       MR. LINDSTROM:  Mischaracterizes his
14   testimony.
15       MR. SOLOMON:  Q.  Is that fair?
16       A.  Yes.
17       Q.  And you mentioned a couple of events.  And
18   I will tell you that that isn't my -- our
19   practice, except to the extent there is an issue of
20   honesty or dishonesty.
21       So I want to ask you, when you talk about
22   your party when you were in your 20s, has that got
23   anything to do with your honesty?
24       A.  No.
25       Q.  And is there -- did you believe there's

653

1    anything in the transcripts that go to the issue of
2    your honesty?
3        MR. LINDSTROM:  No -- no foundation.
4    Calls for speculation and a conclusion.
5        THE WITNESS:  You mean was there
6    anything -- yeah.  I think there was a story, a
7    comment I think I made in a meeting, based on a
8    meeting with Ray Lane and his -- his sales
9    management team.
10       MR. SOLOMON:  Q.  Okay.
11       A.  I made a glib comment which I probably
12   shouldn't have made.
13       Q.  And what was that comment?
14       A.  Should I tell you the whole story, or do
15   you --
16       Q.  I'd like to know the comment, and then
17   I'll tell you if I need to know the whole story.
18       A.  It was contextual.  It was a very peculiar
19   situation where I ended up having to say something
20   to the sales management team that I knew was not
21   true.  And it was a very bizarre -- I thought it was
22   a very bizarre situation that I should be standing
23   in front of my own people and having -- having -- at
24   the end of an hour and a half of discussion, having
25   to reassure them about something, that I was going

654

1    to do something which I didn't think I was going to
2    do.
3        Q.  Okay.  And now you tell me --
4        A.  And I said -- and I said under these
5    circumstances, I didn't have any problem lying to
6    them about it.
7        Q.  Okay.  And what was the lie?
8        A.  Well, the discussion was about -- it was,
9    you know, a while ago, before 11i.  It was about a
10   version of our applications immediately preceding
11   called 11o.  And there was a huge debate of
12   whether -- well, I wanted -- for release 11o to only
13   work with Internet architecture.  I wanted it to be
14   Internet architecture only.
15       The then current computer architecture
16   that was considered the standard architecture was
17   called client/server.  I'm not going to go into all
18   of the details.  The application program that ends
19   up running on these desktop machines.  And the data
20   is on a server.  So the app- -- it's called
21   client -- the desktop machine talks -- gets the data
22   off the server.  It's called client/server.
23       It was the state of the art prior to the
24   Internet.  And our applications version 10, 10.7 of
25   the applications had run in two modes; they would

655

1    run in Internet mode and also run in client/server
2    mode.  They had both approaches.  And I wanted to
3    drop the client/server version and only do an
4    Internet version.
5        And I was called -- Ray actually called me
6    to -- kind of surprised me, have me stop doing what
7    I was doing, come down and meet with his whole sales
8    management team, because he and the team felt I was
9    making a terrible mistake.  That by pushing -- by
10   only doing Internet and not doing client/server, I
11   was going to force our customers to take untried
12   technology, force them to move to a new technology
13   they might not be willing to move to, that I was
14   taking a huge risk by, you know, depending only on
15   this Internet technology as opposed to
16   client/server.  They spent several hours trying to
17   convince me that we should do both client/server and
18   Internet technology.
19       I did the best -- I did as good a job as I
20   could trying to persuade them that client/server --
21   by the time we finished 11o, client/server is going
22   to be dead.  It's going to be obvious dead.  It's
23   obviously going to be dead.  We're going to waste
24   all of this time, all of this effort building this
25   client/server system and no one is going to want it.

656

1    We should take 100 percent of our effort
2  and put it behind this Internet architecture.  And I
3  was unable to convince them after several hours of
4  trying.
5    So I was confronted with either saying,
6  Look, I -- I'm right, all of you guys are wrong.  I
7  know.  You don't.  We're doing it my way or -- which
8  I thought would be demoralizing to them.
9    And so what I ended up saying was, at the
10  end of all of this, All right, we'll do Internet
11  first, and if customers really want client/server,
12  we'll then implement client/server afterwards.  And
13  I really had -- I thought that was not going to
14  happen.  I really had no intention of doing
15  client/server.
16    So -- so it struck me -- and the reason it
17  went in the book, it just struck me very odd that
18  here I was saying something to my own people that
19  wasn't true.
20    Q.  Okay.  And the concern you expressed to
21  Mr. Symonds was that with the audio and/or the
22  transcripts, we would seek to take advantage of
23  that; is that right?
24    A.  Well, I'm telling you the story now,
25  so ...

657

1    Q.  I know you are, because you have to.
2    A.  Right.
3    MR. LINDSTROM:  But he's telling you --
4    THE WITNESS:  Also, you know, had to
5  produce -- produce the documents.  I wanted to
6  produce the documents.  I'm -- I'm telling you the
7  story, you know, the story now.
8    MR. LINDSTROM:  But I don't want there to
9  be any confusion in the record.  Mark, you can clear
10  this up if you want.  But whether this long story he
11  just told you was in the conversation with
12  Mr. Symonds or whether it was in a tape-recorded
13  interview earlier.
14    MR. SOLOMON:  Well, I think it's -- I will
15  clear that up.
16    Q.  You're talking about what would have been
17  in the audio or in the transcript, not a
18  conversation you just had with Mr. Symonds a few
19  weeks ago, right?
20    A.  Yes.  Yes.  Yes.
21    Q.  Have you looked at the e-mails that you've
22  been talking about involving Mr. Wright?
23    A.  No.
24    Q.  Are you aware that plaintiffs managed to
25  get copies of them?

658

1    MR. LINDSTROM:  I'm going to ask you again
2  to exclude in your response anything that you may
3  have learned from your lawyers.
4    THE WITNESS:  No.
5    MR. SOLOMON:  Q.  Okay.  Are you aware
6  that on February the 14th, Mr. Symonds e-mailed to
7  Mr. Wright and copied your lawyer, Mr. Gibbs,
8  indicating that Mr. Wright would be hearing from
9  Mr. Gibbs, who would be seeking to retrieve the
10  audio files and transcripts?
11    MR. LINDSTROM:  Again, same instructions.
12  If you have an independent basis, for example, from
13  one of your conversations with Mr. Symonds, then you
14  can respond.  You can't divulge communications with
15  your lawyers.
16    THE WITNESS:  No.
17    MR. SOLOMON:  Q.  Okay.  Are you aware,
18  then, for three weeks, notwithstanding that e-mail
19  exchange, Mr. Gibbs made no effort to retrieve the
20  materials from Mr. Wright?
21    MR. LINDSTROM:  No foundation.  Same
22  instruction.
23    THE WITNESS:  No independent knowledge.
24    MR. LINDSTROM:  Also assumes facts.
25    MR. SOLOMON:  Q.  Do you know what the

659

1  damages are in this litigation, the claimed damages?
2    MR. LINDSTROM:  No foundation.  Calls for
3  speculation.  Oh, claimed damages.  I'm sorry.  I'll
4  withdraw that.
5    Again, other than from counsel, do you
6  know what the claimed damages are?
7    THE WITNESS:  I think so.
8    MR. SOLOMON:  Q.  What do you think they
9  are?
10    A.  The only number I remember is $2 billion.
11    Q.  Right.
12    And that's from the demand letter that
13  plaintiffs sent; is that right?
14    MR. LINDSTROM:  I think you showed it to
15  him in a prior version of --
16    MR. SOLOMON:  Yes.  Yes.  Right.
17    Q.  Do you know that demand has been
18  withdrawn?  We've withdrawn that demand.  Are you
19  aware of that?
20    A.  No.
21    Q.  Do you know that your lawyers represented
22  to a court in Denmark in a deposition that was taken
23  there that the damages may reach $10 billion?
24  $10 billion?
25    MR. LINDSTROM:  No foundation.  Same

660

1    instruction as to independent knowledge.

2        THE WITNESS:  No.

3        MR. LINDSTROM:  Again, assumes facts.

4        MR. SOLOMON:  Q.  I'll represent to you,

5    your lawyers in Denmark told the judge in Denmark

6    that.

7        MR. LINDSTROM:  That's actually fine.  I

8    don't mind you representing stuff to him if that's

9    the way you want to present.  I'm just objecting to

10   the form of the question as previously posed.

11       MR. SOLOMON:  Q.  So after speaking with

12   Mr. Symonds about Mr. Wright, did you have another

13   conversation with him?

14       A.  There were two conversations about

15   Mr. Wright.  When he first appeared, and then some

16   number of days later when he -- when he disappeared.

17       Q.  Okay.

18       A.  I think that's where we are, so ...

19       Q.  When you say he disappeared, what makes

20   you think he disappeared?

21       A.  I think Mr. Symonds says he wasn't -- he

22   wasn't responding to Mr. Symonds e-mails.

23       Q.  Did you ask Mr. Symonds for Mr. Wright's

24   e-mail details?

25       A.  No.

661

1        Q.  Telephone number?

2        A.  No.

3        Q.  Other than talking to Mr. Symonds, have

4    you ever made any effort to retrieve the audio or

5    transcripts?

6        MR. LINDSTROM:  And, again, "you" means

7    him personally as opposed to through his lawyers or

8    other employees?

9        MR. SOLOMON:  Personally, first of all.

10       THE WITNESS:  Personally, no.

11       MR. SOLOMON:  Through your lawyers?

12       A.  I believe they've been involved from the

13   very beginning trying to obtain the documents.

14       Q.  What steps do you understand they took?

15       MR. LINDSTROM:  I'm going to -- as framed,

16   again, if you have an understanding from some source

17   other than your lawyers, you can testify, but you

18   can't divulge privileged communications that you may

19   have had with counsel.

20       THE WITNESS:  I have no independent

21   knowledge of what they have done.

22       MR. SOLOMON:  Q.  Have you ever heard of

23   the crime fraud exception to privilege?

24       A.  Have I ever heard of it?

25       Q.  Yes.

662

1        A.  Yes.

2        Q.  What's your understanding of it?

3        A.  It's used -- I heard about it in context

4    of drug dealers and their lawyers.

5        Q.  Okay.  But you are aware that it doesn't

6    just apply to drug dealers?

7        A.  The only -- the only time I've ever heard

8    of it was, you know, in that context.

9        Q.  Okay.  Are you aware that Mr. Symonds'

10   lawyers in England have cited a criminal statute

11   with respect to the loss of the audio and

12   transcripts that they are concerned he may have

13   violated?

14       MR. LINDSTROM:  No -- no foundation.

15   Assumes facts.  And the same instruction regarding

16   divulging communications with your counsel.

17       THE WITNESS:  No independent knowledge of

18   that.

19       MR. SOLOMON:  Q.  And just for the record,

20   we'll be moving on the basis that the privilege

21   doesn't apply because of the crime fraud exception,

22   and I'll be reserving my rights to asking more

23   questions at the end in any event, but that would

24   include those questions.

25       MR. LINDSTROM:  You've made your

663

1    statement.  Proceed with the deposition.

2        MR. SOLOMON:  Q.  So after the two

3    conversations concerning -- with Mr. Symonds

4    concerning Mr. Wright, was there another

5    conversation?

6        A.  Yes.  Yes, there was.

7        Q.  Okay.  Tell me about that one.

8        A.  Mr. Symonds called me, said he was going

9    to be deposed.  And to which I said -- he'd never

10   been deposed before.  And I said I'd been deposed a

11   number of times.  All you have to do is listen to

12   the questions and answer truthfully.

13       And he said, Well -- he then said he

14   actually had never taken the computer to the store

15   to have it fixed.

16       Q.  Okay.

17       A.  And I became very concerned and said,

18   Matthew, I don't think we should be discussing this

19   any more.  And that was the end of the conversation,

20   and I called my lawyers.

21       Q.  Okay.  And did he tell you before you

22   ended the conversation what had happened to the

23   computer?

24       A.  No.

25       Q.  And you didn't ask?

664

1   A.  No.

2   Q.  And when was that conversation?

3   A.  Late, late February.

4   Q.  And did you have a conversation with him

5   after that?

6   A.  We might have had another conversation

7   about the charity, but I would not -- at that point,

8   I would not talk about this litigation with him

9   whatsoever.

10   Q.  And without going off too much of a -- on

11   too much of a tangent, are you and Mr. Symonds

12   collaborating on some kind of charitable donation,

13   or what's -- what's it about?

14   A.  What is the charity?

15   Q.  Yeah.

16   A.  The charity is an education -- an

17   educational trust to educate kids in rural India.

18   So it was -- it used to be -- it was a small --

19   small education -- again, a doorstep educational

20   trust, and they would send buses into rural India to

21   educate kids where there were no schools.

22   Q.  Okay.  But --

23   MR. LINDSTROM:  Is that --

24   MR. SOLOMON:  Q.  That's interesting, but

25   what I really want to know is, why were you and

665

1   Mr. Symonds talking about it?  What's his

2   involvement, what's your involvement in it?

3   A.  He's on the board of the trust, and I --

4   after I decided not to make $100 million donation to

5   Harvard, you know, I was looking for other -- and

6   most of my -- most of my charitable work has been in

7   healthcare.  I was looking for another -- another

8   place to make donations, decided education was an

9   interesting area.

10   And because we have a huge employee

11   population in India, it seemed this was very

12   interesting.  So for the last year or so, the head

13   of my -- my family -- my family foundation has been

14   visiting India and looking at this.  And we're going

15   through a process of seeing -- you know, kind of

16   restructuring, restructuring this and trying to come

17   up with a -- still educating kids in rural India,

18   but maybe without the buses.

19   Q.  And are you both trustees?

20   A.  I'm not -- I'm not a trustee.  Frankly, I

21   don't know if he's a trustee.

22   Q.  Okay.  Are you going to continue to deal

23   with him in the sense that you're going to continue

24   to work with him on that charity?

25   MR. LINDSTROM:  Calls for speculation.

666

1   THE WITNESS:  I think I'm not going to

2   have any more contact with Mr. Symonds for a while.

3   MR. SOLOMON:  Q.  Until the storm has

4   blown over?

5   MR. LINDSTROM:  Argumentative.  Calls for

6   speculation.

7   THE WITNESS:  I'm not going to have any

8   more contact with Mr. Symonds for a while.

9   MR. SOLOMON:  Q.  When you say "a while,"

10   what do you mean?

11   A.  Well, certainly until this litigation is

12   over.

13   Q.  Have you said something like, with respect

14   to software, that last year is like another country?

15   Are you familiar with that expression?

16   A.  Last year is like another country?

17   Q.  Yeah.  Have you ever heard that

18   expression?

19   MR. LINDSTROM:  Has he heard it or has he

20   used it?

21   MR. SOLOMON:  Q.  First of all, have you

22   ever heard it?

23   A.  Last year -- I don't think I've ever heard

24   it.

25   Q.  It's true, isn't it, that in the software

667

1   industry, the pace of development means that events

2   just relatively recently may actually be irrelevant;

3   is that -- is that fair?

4   MR. LINDSTROM:  Vague and ambiguous.

5   THE WITNESS:  Recent events can be

6   irrelevant?

7   MR. SOLOMON:  Q.  Let me give you some

8   context, because I'm not doing very well there.

9   I'll find a document.

10   A.  Okay.

11   Q.  We'll come back to it.  I'm not going to

12   waste time.  Excuse me a second.

13   Okay.  I'll show you what was previously

14   marked Exhibit 57 in your deposition, Mr. Ellison.

15   And I noticed we haven't actually got an answer to a

16   question that I asked about that document.  So if

17   you could please take a look at it.

18   MR. LINDSTROM:  So are you saying,

19   Counsel, that when you posed the question last time,

20   the transcript doesn't reflect an answer?

21   MR. SOLOMON:  Yeah.  Nothing improper.  I

22   just want to get a -- answer to a question that I

23   posed but somehow got lost.

24   MR. LINDSTROM:  That's fine.  I just

25   wanted to understand the context.

668

1     MR. SOLOMON:  Sure.
2     Q.  Okay.  As I say, it was marked as
3   Exhibit 57 in your last session.  And I asked you,
4   at page --
5     A.  Okay.
6     Q.  I asked you if you recognized it, and your
7   answer was -- well, I'll read the question and
8   answer.  Question,
9        "And do you remember seeing it around
10   January 30th of 2000 -- excuse me --
11   February 1st of 2001?"
12        Your answer was,
13   "Again, not specifically, but I'm very
14   familiar with the issues involved."
15        Then I ask,
16        "Okay.  And one of the issues is a
17   downward revision of the Q3 forecast
18   revision; is that right?"
19        And you answer,
20   "Yeah.  We had put in a custom system,
21   OTA."
22        And then I say, question,
23        "I just want to know if that was one
24   of the issues that you remembered, downward
25   revision."

1        And somehow we didn't get that answered.
2   So my question is, is that one of the issues you
3   remember, downward revision?
4     A.  Do I remember because of the order -- that
5   the education order entry -- this is about our
6   education business.
7     Q.  Sure.
8     A.  And we had put a new order entry system
9   for people -- basically, a registration system for
10   taking classes.  And that was a custom --
11   custom-made system called OTA.  And because it was a
12   new system, they were having -- they were having
13   difficulties registering for classes, and,
14   therefore, in North America they were -- they had
15   lowered the forecast.
16     Q.  Okay.  And, again, my question was, and
17   that's -- all I want to know is yes or no:  Do you
18   remember that downward revision?
19     A.  Do I remember it specifically at the time
20   as opposed to refreshed by this --
21     MR. SOLOMON:  Yes.  Correct.
22     THE WITNESS:  I don't remember it
23   specifically.
24     MR. SOLOMON:  Q.  Okay.  But you were
25   aware of it around the time of this document; is

1   that right?
2     MR. LINDSTROM:  No foundation.
3   Mischaracterizes his testimony.
4     THE WITNESS:  I think in the overall
5   scheme of Oracle, the North American sales education
6   is a relatively small number.
7     MR. SOLOMON:  Q.  I'm not arguing about --
8     A.  No.  I understand that.  I understand
9   that.  All I'm saying is I'm not sure around this
10   time I was paying a lot of attention to this.
11     Q.  Okay.
12     A.  That's the only --
13     MR. SOLOMON:  Okay.  Let's go off the
14   record for a couple of minutes.
15     THE VIDEOGRAPHER:  Off the record.  The
16   time is 3:33 p.m.
17     (Whereupon, a recess was taken.)
18     THE VIDEOGRAPHER:  We are back on the
19   record.  The time is the 2:36 p.m. -- I'm sorry,
20   make that 3:36 p.m.
21     MR. SOLOMON:  We'll have marked as the
22   next exhibit excerpts from the book Softwar.
23     (Whereupon, Deposition Exhibit 152
24   was marked for identification.)
25     MR. SOLOMON:  Q.  If you go to page 226,

1   I'm looking at the paragraph that starts the next
2   question.  And I'll just read it into the record.
3        It reads, "The next question turns out to
4   be trickier.  The air force's Ron Orr wants to know,
5   reasonably enough, where Oracle has an example of
6   11i up and running that has stood the test of time.
7   Ellison points out that the suite has been out for
8   only a year but there are a few customers had
9   adopted the 'no-modifications' model early on out of
10   poverty.  One such is Techtronics in Oregon - five
11   years ago its business 'fell off a cliff,' so it
12   puts in global systems because that was the cheapest
13   way to go.  It's an odd example to give.  Sensing
14   it, Oracle's Mark Jarvis adds that Cisco is a
15   well-known example using Oracle financials to
16   achieve a daily 'virtual close.'  Somebody points
17   out that we didn't help Cisco from making a hash of
18   its forecasting."
19        Do you see that?
20     A.  Yes.
21     Q.  Is it true that after we filed the lawsuit
22   in March 2001, that you were unable to identify any
23   companies, other than Techtronics and Cisco here, as
24   being customers that have had 11i up and running
25   that stood the test of time?

1    MR. LINDSTROM:  Through what point in
2    time?  So after the filing of the lawsuit through to
3    today?
4    MR. SOLOMON:  Q.  When -- when you had the
5    conversation with Mr. Symonds.
6    A.  Again, it takes a good deal of time to
7    implement an ERP system.
8    Q.  Yeah.  But I'm just asking, is it true
9    that you could only identify, or there was only an
10    attempt to identify those two companies?
11    MR. LINDSTROM:  It's vague and ambiguous
12    as to the timeframe at which you're asking him,
13    whether it's the time of the quote to Ron -- the
14    purported quote to Ron Orr or whether it was the
15    time of the statement.
16    MR. SOLOMON:  Okay.  The time of the
17    purported quote to Ron Orr.
18    THE WITNESS:  I don't recall.  You're
19    asking me at the time Ron Orr asked me the question,
20    was I able, don't I have in my memory a number of
21    companies that were running 11i that have stood the
22    test of time.
23    MR. SOLOMON:  Q.  Right.
24    A.  And I think it was very -- since the
25    product had only been out for a short period of

673

1    time, it takes awhile to implement the product.  How
2    long could it have been running to have stood the
3    test of time.
4    So the question, it was -- there weren't a
5    lot of customers -- am I interpreting that
6    correctly -- correctly, Mr. Solomon?
7    Q.  Yeah.
8    A.  Okay.  So -- but, again, I don't know how
9    many companies at that point were running -- were
10    live on 11i.
11    Q.  All right.  The reason I'm asking is, of
12    course, we don't have all the tapes and transcripts
13    of the audio.  So I'm sort of trying to dig in to
14    see whether you agree with some more of the
15    statements that are made in Softwar.
16    Now, you make a footnote, and I want to
17    ask you about your footnotes.  How did you write --
18    what was the process by which you wrote these
19    footnotes?
20    MR. LINDSTROM:  Asked and answered.
21    MR. SOLOMON:  Q.  Did you type them into a
22    computer?
23    A.  Yes.  Yes.
24    Q.  Which computer?
25    A.  My computer.

674

1    Q.  Okay.  And where is that computer now?
2    A.  2001, I have no idea.
3    Q.  So it's gone?
4    A.  I --
5    MR. LINDSTROM:  Assumes facts.  No
6    foundation.  He's told you he has no idea.
7    THE WITNESS:  I have no idea.
8    MR. LINDSTROM:  Doesn't mean it's gone.
9    MR. SOLOMON:  Q.  Have you a copy of your
10    footnotes, other than the printed version in the
11    book?
12    A.  Not that I know of.
13    Q.  And it didn't occur to you as you were
14    writing that you ought to preserve your writings
15    because of this litigation?
16    MR. LINDSTROM:  Assumes facts.
17    THE WITNESS:  Did not occur to me.
18    MR. SOLOMON:  Marked as the next exhibit,
19    another excerpt from the book Softwar.
20    (Whereupon, Deposition Exhibit 153
21    was marked for identification.)
22    THE WITNESS:  Are we done with this one?
23    MR. SOLOMON:  Yes.  Thank you.
24    THE WITNESS:  Okay.
25    MR. SOLOMON:  Q.  If you go to page 248 --

675

1    sorry.  249.  I'm looking in the -- at the fifth or
2    sixth line where it says, "It's difficult to sell
3    without customer references."
4    Do you see that?
5    A.  Yes.
6    Q.  Okay.  So do you recall that as of
7    March 2001, Oracle had great difficulty getting
8    customers to act as references for 11i?
9    MR. LINDSTROM:  As of March 2001?
10    MR. SOLOMON:  Correct.
11    THE WITNESS:  Can I have -- can I have a
12    second to look at this?
13    MR. SOLOMON:  Sure.
14    Q.  Again, without -- I don't need an
15    explanation.  I just want to know if you recall
16    whether or not, as of March 2001, Oracle had great
17    difficulty getting customers to act as references
18    for 11i.
19    A.  I don't recall.
20    Q.  We talked a little bit last time I think
21    about the practice of not servicing clients'
22    software unless they would agree to act as
23    references.
24    Do you recall --
25    A.  No --

676

Ellison, Lawrence  3/30/2007  12:00:00 AM

1      MR. LINDSTROM:  Assumes facts.
2  Mischaracterizes his testimony.
3      MR. SOLOMON:  Q.  Do you recall that
4  testimony?
5      A.  It's just not true.  We have never refused
6  to service clients unless they acted as references.
7      Q.  Okay.  And you've never seen any documents
8  then that suggested that was your practice?
9      A.  That we would refuse service unless they'd
10  act as a reference?
11      Q.  Yes.
12      A.  No.
13      MR. SOLOMON:  Okay.  Let's go off the
14  record for a while.
15      THE VIDEOGRAPHER:  Off the record.  The
16  time is 3:46 p.m.
17      (Whereupon, a recess was taken.)
18      THE VIDEOGRAPHER:  We are back on the
19  record.  The time is 4:01 p.m.
20      MR. SOLOMON:  Q.  Yes.  I've marked as the
21  next exhibit a document produced by the defendants
22  with the control numbers 1056850 and -51.
23      (Whereupon, Deposition Exhibit 154
24  was marked for identification.)
25      MR. SOLOMON:  Q.  Let me know, when you've

677

1  had a chance to familiarize yourself with this, if
2  you recognize this document.
3      A.  I don't.  If you'd just give me a moment.
4      Excuse me.
5      Q.  Sure.
6      A.  Okay.
7      Q.  Okay?
8      A.  Yes.
9      Q.  Do you recognize this?
10      A.  I do not.
11      Q.  Do you recognize the name InterLogix,
12  Inc.?
13      A.  I do not.
14      Q.  It says, "Approved by LJE."
15      That would be you, correct?
16      A.  Yes.
17      Q.  And I'm looking at the bottom of the page.
18  Well, first of all, excuse me.  Let's go to halfway
19  down the page where the sentence begins, "The
20  project."
21      It says, "The project has lost the
22  confidence of the InterLogix Steering Committee and
23  their CEO, Brian McCarthy."
24      Do you know Brian McCarthy?
25      A.  I don't.

678

1      Q.  "Mr. McCarthy told me his company lost 2.4
2  million in cost overruns associated with excessive
3  bug fixes, poorly documented upgrade scripts and
4  scripts that didn't take into consideration
5  integration with other modules.  Mr. McCarthy also
6  mentioned his firm has had to implement costly
7  interim solutions while his business waits for the
8  upgrades to be fully tested and implemented."
9      Do you see that?
10      A.  I do.
11      Q.  And then skipping a few lines, it says,
12  "Note that InterLogix has acquired $2.3 million in
13  Oracle product, $1.3 [sic] million in Oracle
14  services in FY01."
15      A.  "1.1 million in Oracle services."
16      Q.  Yes.
17      "They are a great Oracle customer that is
18  living through an extremely burdensome upgrade that
19  is affecting employee moral [sic] and the firm's
20  financial health."
21      Do you see that?
22      A.  I do.
23      Q.  Then the recommendation says, "Approve
24  with George's requirement that they sign an [sic]
25  release and agree to be a reference.  Dorian is

679

1  involved."
2      Do you see that?
3      A.  Yes.
4      Q.  Do you see that?
5      A.  I do.
6      Q.  Dorian is Dorian Daley, who is here today?
7      A.  I believe so, yes.
8      Q.  Doesn't this represent Oracle bribing a
9  customer to be a reference?
10      MR. LINDSTROM:  Let me object to the
11  question as argumentative.  Calls for a conclusion.
12      You may respond.
13      THE WITNESS:  Bribing, no.
14      MR. LINDSTROM:  You've answered the
15  question.
16      MR. SOLOMON:  Q.  Do you think that this
17  is an appropriate business practice of only
18  approving if they agree to be a reference?
19      MR. LINDSTROM:  Mischaracterizes the
20  document.
21      THE WITNESS:  The document is -- we have
22  decided to give them a lot of free consulting.  So
23  we said -- I'm not sure -- I think it was $350,000
24  worth of free consulting.
25      MR. SOLOMON:  Q.  So --

680

1    A.   And, I mean, there are a number of quid
2    pro quos.  They'd had -- they've had problems
3    implementing the 11i suite, bugs, that's at least
4    partially our responsibility.  And they've had some
5    cost overruns on their project.  And I think they
6    owed us, what, $1.1 million in consulting fees.
7        And I think we decided to lower their
8    consulting -- their consulting fees by $350,000,
9    which is kind of acknowledging that, yeah, that some
10   of the problems that they had during the
11   implementation of 11i were caused by us, and we're
12   taking that into account.
13       But we will get these problems fixed.
14   We're going to get everything fixed.  We're going to
15   make you a happy customer.  And we're going to pay
16   for the consulting.  Some of the consulting is going
17   to be on our nickel.  We're going to pay for it.
18   But we'd like you -- once you have a successful
19   implementation, we'd like you to be a reference.  I
20   think that's a legitimate quid pro quo, not a -- not
21   a bribe.
22       Q.   So -- but isn't it true you're insisting
23   that a customer that's had an unhappy experience
24   with your product acts as a reference for that
25   product if it wants the concessions?

                                            681

1       MR. LINDSTROM:  Mischaracterizes the
2    document.  Argumentative.
3       MR. SOLOMON:  Q.  Isn't that what this is
4    all about?
5       MR. LINDSTROM:  Same objections.
6       THE WITNESS:  No.  The customer -- it is,
7    again -- it's a quid pro quo.  We are making -- we
8    are making concessions.  I mean, we are
9    definitely -- I just -- I just don't agree with your
10   use of the word "bribe."  So we -- but we are -- you
11   know, we're making concessions.
12       We have a longstanding and good
13   relationship with this customer.  They're
14   implementing one of our products.  The product had
15   bugs in it, no question.  They had problem -- you
16   know, the project took longer than they had
17   intended.  You know, they had some budget overruns.
18   We're taking responsibility for that.
19       You know, we're going to give them -- you
20   know, we're going to reduce their consulting bill.
21   And presumably, if -- you know, they're doing
22   better, if you read the entire document.  They had
23   problems with 11.5.1.  They're now on 11.5.3 and
24   things are going better.  So it's on -- we think
25   we're on our way to a success.

                                            682

1    So that's what it says right here.  The
2    current -- the current attempt to go directly --
3    they said, "Attempt to upgrade to 11.5.1 was a
4    disaster."  Not a great word.  "But things are going
5    better with 11.5.3."  Again, I'll take that as we're
6    on our way to success with 11.5.3.
7        But the fact is there were real costs.
8    They incurred real costs with the 11.5.1 upgrade,
9    and it was partially our responsibility.  So we'll
10   pay for part of that.  We'll reduce your consulting
11   bill.
12       But if things are going well in 11.5.3 --
13   and that's what I take this to mean, things are
14   going well with 11.5.3 -- we'd like you to be a
15   reference.  So I think it's a perfectly legitimate
16   exchange.
17       Q.   Okay.  Let me read this into the record.
18       "The current attempt to go directly from
19   10.7 to 11.5.3 is going better," and this is what
20   you didn't read into the record, "but is slow and is
21   met with extreme difficulties as well.  They have
22   missed several different go-live dates, forcing them
23   to entrench and spend significantly more money each
24   time our consulting services add internal costs."
25   And it goes on to say, "The project has lost the

                                            683

1    confidence."
2        How can you -- how can you spin that as
3    good news?
4       MR. LINDSTROM:  Argumentative.  Vague and
5    ambiguous.
6       THE WITNESS:  It is a significant
7    improvement from 11.5.1, and they say it's going
8    better.  The implementation is going slowly, and
9    they're having difficulties.
10      MR. SOLOMON:  Q.  Extreme difficulties.
11      MR. LINDSTROM:  Argumentative.
12      THE WITNESS:  Again, my take is that
13   things are going better.  And if they're agreeable
14   to be -- and I don't think they would agree to be a
15   reference if they weren't on their way to a success.
16   How can you be a reference?  What can you say as a
17   reference if you can't say you had a good -- you
18   know, that it's up and running.
19      MR. SOLOMON:  Q.  Well, it looks like
20   there's some mutual back scratching being suggested
21   which doesn't lead to any accurate portrayal of the
22   product.
23      MR. LINDSTROM:  Argumentative.
24   Mischaracterizes the document.  Assumes facts.
25   Vague and ambiguous.

                                            684

1      MR. SOLOMON: Let the jury decide.

2      MR. LINDSTROM: Why don't you pose another

3   question.

4      MR. SOLOMON: I will in a second.

5      Q. Okay. Now, when you first got the call

6   from Mr. Symonds in November 2006, did you tell

7   anyone -- I'm not asking who -- did you tell anyone

8   that you'd received that call?

9      THE WITNESS: I don't think so.

10      MR. SOLOMON: Q. Okay. And when you had

11   your next call with him, whenever that was, did you

12   tell anyone?

13      MR. LINDSTROM: This is -- let me make

14   sure -- I want to make sure that you don't --

15      MR. SOLOMON: I'm not asking who; I'm just

16   asking if he told anyone. Your concern may become

17   ripe down the road, but it's not ripe right now.

18      MR. LINDSTROM: I agree, as framed.

19      You may respond.

20      THE WITNESS: I don't recall.

21      MR. SOLOMON: Q. Okay. What about the

22   third call; did you tell anyone about the third

23   call?

24      A. I don't recall telling anybody, no.

25      Q. What about the fourth call?

685

1      A. I don't know.

2      Q. What about the fifth call?

3      A. I'm not sure which call we're on now.

4      A. I think were in February.

5      A. The first time I vividly remember telling

6   somebody about a call with Matthew Symonds was when

7   he told me that he had not, in fact, taken the

8   computer to a computer store to have it fixed.

9      Q. Okay.

10      A. When he changed his story as to what had

11   happened.

12      Q. Okay.

13      A. I may have told someone before that, but I

14   don't remember.

15      Q. Why didn't you tell anyone?

16      MR. LINDSTROM: Wait. Why didn't he tell

17   anyone --

18      MR. SOLOMON: Q. That you were having

19   calls with Mr. Symonds prior to him saying that the

20   computer had a virus or whatever. Sorry, prior to

21   him changing his story.

22      MR. LINDSTROM: It mischaracterizes his

23   testimony. Assumes facts.

24      THE WITNESS: Mr. -- I believe my lawyers

25   were in continuous contact with Mr. Symonds during

686

1   this entire process.

2      MR. SOLOMON: Q. Right. But why didn't

3   you tell anyone that you were in contact with

4   Mr. Symonds?

5      MR. LINDSTROM: Assumes facts. I mean,

6   he's told you he doesn't remember whether he told

7   anybody, other than the one vivid conversation that

8   stands out in his mind. You've translated --

9      MR. SOLOMON: Let's -- this is very

10   important. So let's be very careful now. We'll go

11   back over it all again.

12      Q. The first call, you never told anyone?

13      A. Not -- the first call, not that I recall.

14      Q. Okay.

15      A. I don't know if I told anybody or not.

16      Q. Okay. So you may have been telling

17   people, but you just don't remember?

18      A. I don't recall -- I don't -- I don't think

19   I did, but I may have.

20      Q. Okay. Do you know your lawyers have

21   represented to the court that you weren't involved

22   in this at all; you weren't in contact with

23   Mr. Symonds? Do you know that's a representation

24   that's been made to the court?

25      MR. LINDSTROM: All right. Assumes facts.

687

1   Argumentative. No foundation.

2      You may respond based on your independent

3   knowledge, if you have any.

4      THE WITNESS: I have no independent

5   knowledge of that.

6      MR. SOLOMON: Q. Does it concern you?

7      MR. LINDSTROM: Assumes facts.

8      MR. SOLOMON: Q. Would it concern you if

9   your lawyers are making representations to the court

10   that are flat false?

11      MR. LINDSTROM: Assumes facts. It's

12   argumentative. Mischaracterizes the record.

13      THE WITNESS: I have no opinion.

14      MR. SOLOMON: Q. What telephone number --

15   when you made calls to Mr. Symonds, what telephone

16   number did you use?

17      MR. LINDSTROM: Are you talking about the

18   number that he called to reach Mr. Symonds?

19      MR. SOLOMON: Correct.

20      THE WITNESS: I think -- I think

21   virtually -- my assistants connected me with

22   Mr. Symonds, so I didn't call him directly.

23      MR. SOLOMON: Q. Ms. Balkenhol?

24      A. No.

25      Q. Who?

688

1     A.  I have two assistants, Andrea Nordman and

2  Joyce Hagashi.

3     Q.  And which one of those was contacting or

4  calling -- placing the calls to Mr. Symonds?

5        MR. LINDSTROM:  Compound.  Vague and

6  ambiguous as to time.

7        THE WITNESS:  Probably both.

8        MR. SOLOMON:  Q.  Did they speak to

9  Mr. Symonds at all?

10        MR. LINDSTROM:  No foundation.

11        THE WITNESS:  Yes.

12        MR. SOLOMON:  Q.  And do you know the

13  content of conversations they had with Mr. Symonds?

14     A.  I do not.  I think they just said,

15  Mr. Symonds called them and -- oh, I'm guessing.

16        MR. LINDSTROM:  He doesn't -- you've

17  answered the question.  You don't know the content.

18        MR. SOLOMON:  Q.  So your assistants told

19  you that Mr. Symonds had called them and spoken to

20  them?

21     A.  My assistants told me that Mr. Symonds had

22  called and -- and wanted me to call him back.

23     Q.  Do your assistants know anything about the

24  stories that he supposedly has told about the

25  computer and the materials?

689

1     A.  I don't --

2        MR. LINDSTROM:  No foundation.

3        THE WITNESS:  Doubt it.

4        MR. SOLOMON:  Q.  And in the calls that

5  you've had with Mr. Symonds, have they taken

6  place -- have you been at both the office and at

7  your home when you've had conversations?

8        MR. LINDSTROM:  Vague as to time.

9  Compound.

10        MR. SOLOMON:  Q.  I'm talking about the

11  calls from November to date, 2006 to date.

12     A.  I think -- I think I was at home for most

13  of them.  I think there was one in the car.  There

14  might have been a couple in the car.  I'm not -- I'm

15  not entirely certain.

16     Q.  When was the last time you saw

17  Mr. Symonds, physically?

18     A.  I don't recall.

19     Q.  Have you seen him since October of last

20  year?

21     A.  Since October?  I don't think so.

22     Q.  Where -- where was the last time you

23  saw -- saw him?  Here, in England, or somewhere

24  else?

25     A.  I think in London.

690

1     Q.  Okay.  And when were you last in London?

2        MR. LINDSTROM:  Well, are you asking him

3  when he was in London --

4        MR. SOLOMON:  Just asking when he was last

5  in London.

6        THE WITNESS:  The answer is I'm not sure

7  the last time I saw Mr. Symonds.  But -- and I'm

8  guessing that it was in London.

9        MR. SOLOMON:  Q.  When were you last in

10  London?

11     A.  Eighteen months -- again, these are all

12  kind of wild guesses.  18 months ago, two years ago.

13     Q.  So your testimony is it would be probably

14  18 months to two years ago that you last saw

15  Mr. Symonds.

16     A.  Again, I'm not sure of this, but yes.  I

17  haven't seen him for a long time.

18        MR. SOLOMON:  I'll have marked as the next

19  exhibit a document produced in this litigation with

20  the control numbers 1053564 to 1053577.

21        (Whereupon, Deposition Exhibit 155

22  was marked for identification.)

23        MR. SOLOMON:  Q.  And just let me know if

24  you recognize this document.

25        And for the record, it's called, "Softwar,

691

1  The Rewards of Recklessness, A Portrait of Larry

2  Ellison and Oracle Corporation at War."

3     A.  I've never seen it before.

4     Q.  No.

5        Have you ever spoken to Mr. Symonds about

6  it?

7     A.  No --

8        MR. LINDSTROM:  About Exhibit 155?

9        MR. SOLOMON:  Correct.

10        THE WITNESS:  No.

11        MR. SOLOMON:  Okay.  Going to page 12.

12        MR. LINDSTROM:  What's the Bates stamp

13  number?

14        MR. SOLOMON:  1053575.  The heading is,

15  "The Collaboration."

16     Q.  And I just want to ask you a few questions

17  about some of the contents.  To start with, it says

18  at the beginning, "I have known Ellison for over

19  three years, since becoming Technology and

20  Communications editor of The Economist."

21        Is that true, that he's known you three

22  years, as of the beginning of 2001?

23     A.  I believe so.

24     Q.  And then the next paragraph starts off

25  saying, "During the writing of the book, I will

692

1  spend at least ten days each month with Ellison and
2  record up to 200 hours of one-to-one interviews."
3       Do you know whether Mr. Symonds spent
4  around ten days each month with you?
5       A.  I don't think so.
6       Q.  It was less?
7       A.  Yes.  Much less.
8       Q.  Says, "I will have office space at Oracle
9  on the same floor as Ellison and will sit in on
10  every kind of business meeting."
11       Did that happen?
12       MR. LINDSTROM:  Compound.
13       MR. SOLOMON:  Q.  Did he share an office
14  on your floor?
15       MR. LINDSTROM:  Mischaracterizes the --
16       THE WITNESS:  Share an office?  He
17  certainly didn't share an office.
18       MR. SOLOMON:  Q.  I didn't mean share with
19  you.  Did he have office space on your floor?
20       A.  I don't know.  I don't think so.
21       Q.  Did he attend business meetings with you?
22       A.  Some -- some meetings, yes.
23       Q.  And he traveled with you?
24       A.  A few times.
25       Q.  It goes on a few lines down, "Wherever

693

1  possible and appropriate, Ellison will help me gain
2  the access I require."
3       Did you help Mr. Symonds gain access, as
4  he states here?
5       MR. LINDSTROM:  In the context he states
6  it?
7       MR. SOLOMON:  Yes.
8       THE WITNESS:  Access to whom?  Or to what?
9  Tell me -- maybe I should just find out.  Where are
10  you reading?
11       MR. SOLOMON:  Q.  It says, "I will
12  seek" -- just over halfway down that second
13  paragraph.  "I will seek meetings with others who
14  may take a different and less positive view, such as
15  business rivals and colleagues whom Ellison fired.
16  Wherever possible and appropriate, Ellison will help
17  me gain the access I require."
18       A.  Okay.
19       MR. LINDSTROM:  What's the question?
20       MR. SOLOMON:  Q.  The question is, did you
21  assist Mr. Symonds with gaining access where he
22  desired it?
23       A.  A few times, yes.
24       Q.  "And Ellison will make available" --
25  excuse me -- "personal documents and photographs as

694

1  well as previously confidential company memoranda
2  and e-mail."
3       Do you see that?
4       A.  I do.
5       Q.  Did you do that?
6       A.  I certainly made available photographs.
7  In terms of personal documents, I can't think of
8  any.
9       Q.  Okay.
10       A.  And company confidential memoranda and
11  e-mail?  Absolutely not.
12       Q.  Okay.  Is there any reason why documents
13  dated 2000/2001 concerning Oracle's business remain
14  confidential today?
15       MR. LINDSTROM:  Objection.  Compound.
16  Calls for speculation.
17       THE WITNESS:  General -- yeah.  I think a
18  lot of -- pertaining to our business?  What aspect
19  of our business?  If one of our businesses would be
20  the health records of one of our employees, that
21  would certainly remain -- that's our business.  That
22  would certainly remain confidential.
23       MR. SOLOMON:  Sure.
24       A.  That would certainly remain confidential.
25  I mean, it's a very --

695

1       Q.  What if it's --
2       A.  It's a very broad, hypothetical question.
3       Q.  What if it's an e-mail describing the
4  status of an 11i implementation in 2000?  Why would
5  that be confidential now?
6       MR. LINDSTROM:  Calls for speculation.
7  It's hypothetical.
8       THE WITNESS:  I mean, you'd have to tell
9  me more.  What was in the e-mail?  Who it was from?
10  What it revealed, confidential information about a
11  customer?  There are certain -- certain of our
12  customers, we can't even say who they are.  So, I
13  mean, it's a complicated question.
14       MR. SOLOMON:  Q.  Okay.  Let's think of
15  another category of documents.  What about e-mails
16  concerning your trading and plans to trade in that
17  timeframe; why would they be confidential now?
18       MR. LINDSTROM:  Assumes facts.  Calls for
19  speculation.  Compound.
20       THE WITNESS:  I don't think they would be.
21       MR. SOLOMON:  Q.  Okay.  Do you know why
22  your lawyers have stamped such documents
23  confidential?
24       MR. LINDSTROM:  Assumes facts.  No
25  foundation.

696

1    THE WITNESS:  No idea.

2    MR. SOLOMON:  Q.  Your lawyers took the

3    position with respect to the Softwar materials we've

4    been discussing that they are irrelevant to this

5    litigation.

6        Do you have any idea why?

7    MR. LINDSTROM:  No foundation.

8    Mischaracterizes the record.

9        And you can answer if you've got an

10    independent basis for knowing what your lawyers did

11    or did not do.

12    THE WITNESS:  No independent knowledge.

13    MR. SOLOMON:  Q.  And is it your testimony

14    that you didn't know until you saw this document

15    today that Mr. Symonds had drafted an article

16    entitled, "The Rewards of Recklessness"?

17    A.  I did not know.

18    Q.  Did you know that in November of 2000,

19    Jeff Henley was extremely angry about the fact that

20    Oracle's stock price had declined?

21    MR. LINDSTROM:  Objection.  Assumes facts.

22    Also calls for a conclusion as vague and ambiguous

23    as to "extremely angry."

24    THE WITNESS:  That's what I was going to

25    say.  I'm not sure what you mean by "extremely

1    angry."  No one was happy about the stock market

2    collapsing.

3    MR. SOLOMON:  Okay.  Let's have marked as

4    the next exhibit a magazine --

5    THE WITNESS:  I'm sorry, are we done with

6    this one?

7    MR. SOLOMON:  Q.  Yes, we are for the

8    moment.

9        -- a magazine -- Fortune magazine article

10    dated November 13th, 2000.

11    (Whereupon, Deposition Exhibit 156

12        was marked for identification.)

13    MR. SOLOMON:  Q.  And if you go to -- by

14    the way, have you ever read this article, do you

15    know?

16    MR. LINDSTROM:  Why don't you give him a

17    minute to look at it.

18    THE WITNESS:  The answer is, I think I

19    have.

20    MR. SOLOMON:  Q.  Okay.  And I'm going to

21    be focusing on some language on page 6.

22        I'll read it into the record.  "It's an

23    early October morning at the Emerald City and Jeff

24    Henley is sputtering mad."

25        Do you see that?

1    A.  Yes.

2    MR. LINDSTROM:  The question is "Do you

3    see that?"

4    THE WITNESS:  Yes, I do see it.

5    MR. SOLOMON:  Q.  So when I say "extremely

6    angry," I mean sputtering mad.

7        Did you know he was sputtering mad at the

8    time?

9    MR. LINDSTROM:  Assumes facts.

10    THE WITNESS:  Can I have a moment to just

11    read this?  I don't remember this part of the

12    article, so ...

13    Okay.

14    MR. SOLOMON:  Q.  Okay.  Does that refresh

15    your recollection as to whether or not you remember

16    Jeff Henley being sputtering mad?

17    A.  Partially.  Again, I don't remember this

18    specific incident.  I know, in general, Jeff was not

19    completely convinced that the stock market analysts

20    understood everything he said.  So I think it's

21    common frustration CFOs have with stock market

22    analysts.

23    Q.  Okay.  Did you know that Mr. Henley was

24    planning, at some stage at least before he sold his

25    stock in January, $30 million worth of stock --

1    Wait a second.

2        -- did you know that he was planning on

3    selling some stock at the time he was sputtering mad

4    about this stock price decline?

5    MR. LINDSTROM:  Assumes facts.

6    Mischaracterizes his testimony.

7    THE WITNESS:  No.

8    MR. SOLOMON:  Q.  And you and he, in

9    January, neither of you knew the other was trading;

10    is that right?

11    MR. LINDSTROM:  Objection.  No foundation,

12    other than as to this witness.

13    THE WITNESS:  I didn't know he was

14    trading.

15    MR. SOLOMON:  Q.  Okay.  Were you aware of

16    the details in January of 2001 of Oracle's stock

17    repurchase program?

18    MR. LINDSTROM:  Vague and ambiguous as to

19    "details."

20    THE WITNESS:  I mean, I knew we had a

21    stock repurchase program, but you mean the exact

22    timing --

23    MR. SOLOMON:  Q.  Yes.  Correct.

24    A.  The timing of it?

25    No.  I didn't know what the exact timing

1  was.  Actually, I don't know if I didn't know.  I
2  don't remember.
3     Q.  Okay.  Do you know if any stock
4  repurchases were timed in order to coincide with the
5  dates you were selling stock?
6     A.  They certainly weren't intentionally
7  timed, you know.  I mean, I knew I was selling
8  stocks we were going to buy back at the same time.
9  Kind of a single decision, I'm going to sell?  No,
10  that did not happen.
11     Q.  Okay.  If I told you that the repurchases
12  in January 2001 clustered around your stock sales
13  were statistically unlikely to have happened but for
14  coordination, would you be surprised?
15     MR. LINDSTROM:  No -- no foundation.
16  Assumes facts.  Vague and ambiguous.
17     THE WITNESS:  I have no idea what -- what
18  we were -- what -- if we were --
19     MR. LINDSTROM:  The question is whether
20  you would be surprised.
21     THE WITNESS:  I don't know.
22     MR. SOLOMON:  Q.  For example, if it was
23  like a one in a hundred chance that the sales would
24  be timed around your transactions, would that be --
25  would that surprise you?

701

1     MR. LINDSTROM:  Assumes facts.
2     THE WITNESS:  Without getting cute,
3  it's -- you know, it's very unlikely -- almost --
4  statistics are interesting.
5     MR. SOLOMON:  Q.  I understand that.
6     A.  So it depends how you calculate it.
7     Q.  Okay.  So you can't really answer --
8     A.  No.
9     Q.  -- with just that information?
10     A.  No.
11     Q.  Or one in 500, still couldn't answer?
12     MR. LINDSTROM:  Yeah.
13     THE WITNESS:  Yeah, no.
14     MR. SOLOMON:  Q.  One in a thousand?
15     A.  What were the odds of my son being 6'2"
16  and my daughter being 5'9"?  The odds are very, very
17  unlikely, but they are.
18     Q.  Okay.  So really what you're saying is it
19  really is up to an expert to determine that; is that
20  right?
21     MR. LINDSTROM:  Objection.
22  Mischaracterizes his testimony.
23     THE WITNESS:  No.  I'm just saying there's
24  lots of different ways to calculate likelihoods.
25  Plus, I'd like to add, I had no authority to

702

1  initiate buybacks on my own anyway.  I had to go
2  through a board process to do it.
3     MR. SOLOMON:  Q.  That's a useful -- a
4  useful comment.
5     What was the process and who was involved?
6  First of all, who was involved?
7     A.  Well, a purchase like that is, you know,
8  it requires -- it's a lot of money.  It exceeds my
9  authority.  I don't have the authority to purchase
10  it.  I believe it requires the approval -- I'm not
11  sure.  We're back at a different time.  So I believe
12  it requires at least the approval of the executive
13  committee of the board of directors, the audit
14  committee of the board of directors, or the full
15  board, one of the three, or multiples thereof.
16     MR. SOLOMON:  Let's have marked as the
17  next exhibit a document produced in this litigation
18  with the control numbers 1914926 through -934.
19     (Whereupon, Deposition Exhibit 157
20  was marked for identification.)
21     THE WITNESS:  Thank you.
22     MR. SOLOMON:  And while you're looking for
23  it, for the record, this is dated Thursday,
24  March 29th, 2001.  And there are some e-mail
25  exchanges among Dan Cooperman, Dorian Daley, Lauren

703

1  Segal concerning LGE option exercise.  The first two
2  pages have a redacted stamp.  The third page seems
3  to have information concerning Dan Cooperman, and
4  the fourth page.  The fifth page is an e-mail from a
5  Deb Lange to Jeff Henley.  And the remainder of the
6  exhibit appear to have information concerning --
7  containing information concerning Deborah Lange.
8     Have you seen any of this before?
9     MR. LINDSTROM:  Well, when you say "any of
10  this," are you referring specifically to the Deborah
11  Lange, Jeff Henley e-mail or literally any --
12     MR. SOLOMON:  It's okay.  I'll break it
13  down.
14     Q.  First page, have you seen this first page
15  before?
16     A.  I don't know.
17     Q.  Sorry?
18     A.  I'm sorry, I don't know.  I don't know if
19  I've seen it before.  I've heard of the topic that's
20  discussed.
21     Q.  Okay.  Now, on the first page it says
22  "Redacted."
23     Do you know why it says "Redacted"?
24     A.  It means stuff has been removed.
25     Q.  Do you know what's been removed?

704

1    A.  I have no idea.

2    Q.  And same with the second page.  If you

3  look at the first page, it says 18:40 in terms of

4  the time.

5    Do you see that?

6    A.  I do.

7    Q.  Then the second page says 17:27, and then

8  it says "redacted" again.

9    Again, you don't know what's been

10  redacted; is that right?

11    A.  I do not.

12    Q.  And then if you go to the Deb Lange

13  e-mail, have you seen that before?

14    A.  I may have.  I'm not sure.

15    MR. SOLOMON:  Okay.  Okay.  We're going to

16  change tapes in a minute, so let's go off the record

17  to allow that to happen.

18    THE VIDEOGRAPHER:  I'm sorry.  We are

19  going off the record.  The time is 4:39 p.m.  Here

20  marks the end of Videotape No. 2, Volume 3, in the

21  deposition of Lawrence Ellison.

22    (Whereupon, a recess was taken.)

23    THE VIDEOGRAPHER:  We are back on the

24  record.  The time is 4:48 p.m.  Here marks the

25  beginning of Videotape No. 3, Volume 3, in the

705

1  deposition of Lawrence Ellison.

2    MR. SOLOMON:  Q.  You testified earlier,

3  Mr. Ellison, that it would make no sense, or you

4  didn't know why you would want as a reference a

5  customer that wasn't happy.

6    Do you recall that?

7    MR. LINDSTROM:  Mischaracterizes his

8  testimony.

9    THE WITNESS:  No.  What I said was if

10  someone called on the phone, a customer that wasn't

11  happy, who said we'll be a reference, that would be

12  a negative reference.

13    MR. SOLOMON:  Q.  Right.

14    A.  So if you call someone on the phone, you

15  want them to be a reasonably happy customer.  So I

16  said, it made no sense for someone who is unhappy

17  to -- you know.

18    Q.  So why did you insist then on citing GE as

19  a reference when they were unhappy and told you not

20  to do that?

21    MR. LINDSTROM:  Assumes facts.

22  Mischaracterizes his prior testimony.

23    THE WITNESS:  I don't think I did that.

24    MR. SOLOMON:  Q.  Okay.

25    A.  And I don't think -- give me -- first of

706

1  all, GE is a huge company.  There are a lot of

2  people in GE.  I want to know who was unhappy and

3  who told me not to do it.

4    Q.  And is it your testimony that you don't

5  remember being told not to do it but going ahead and

6  doing it anyway?

7    MR. LINDSTROM:  Mischaracterizes -- this

8  is all asked and answered and previously gone over.

9    THE WITNESS:  I think G -- again, I'm

10  doing this from memory.  But I was the GE corporate

11  sponsor.  There certainly were people -- I think GE

12  had a policy -- well, want me to just launch into

13  this?

14    MR. LINDSTROM:  No.  No.  Why don't we go

15  by question and answer.

16    MR. SOLOMON:  Q.  It's okay.  I think we

17  actually did cover that fairly well last time, but I

18  just wanted to see if you were going to give the

19  same testimony you gave last time.

20    What about HostCentric; were they a

21  reference that were unhappy, HostCentric?

22    A.  HostCentric, I don't know who they are.

23    Q.  Now, if you go back to the exhibit in

24  front of you, The Rewards of Recklessness, if you go

25  to page 1053566.

707

1    A.  -566.  Okay.

2    Q.  Okay.  It says -- it says in part,

3  "Ellison says he's only happy when everyone else

4  thinks he's wrong when he's," in quotes, "walking

5  way out to the end of the limb and then jumping up

6  and down.'"

7    A.  Yes.

8    Q.  Is that true -- is that an accurate

9  statement of yours -- excuse me.  Is that -- did you

10  say that to Mr. Symonds?

11    A.  I have to explain what I meant -- mean by

12  that.

13    Q.  I don't want an explanation.  I don't have

14  much time.  I want to know, did you say that?

15    MR. LINDSTROM:  The exact words in the

16  sentence that counsel read into the record?

17    THE WITNESS:  I'm not sure.  But something

18  like -- something like that, sure.

19    MR. SOLOMON:  Q.  Okay.  And then the

20  second quote in that paragraph that's attributed to

21  you, "Without reckless" -- "Without recklessness,

22  you can't innovate.  The rewards of recklessness are

23  enormous."

24    Did you say that?

25    A.  I'm not sure I used the word

708

1    "recklessness."  I think I've said that
2    innovation -- what is innovation?  Innovation is
3    when other people say -- when you're the first
4    person to figure something out.  So everyone
5    believes the world is flat, and you believe it's
6    round.  So everyone thinks you're wrong and you
7    think you're right, and you turn out to be right.
8         And all great discoveries, all great
9    innovation is actually done by people who believe
10   that conventional wisdom is wrong.  The world isn't
11   flat, it's round.
12        That's what I mean by all of this.  And
13   you have to be -- I'll use the word "reckless,"
14   "brave," whatever you want to use.  If everyone is
15   saying, "The world is flat," and you're saying, "No,
16   it's round," you're going to be ridiculed and have
17   to deal with that.  You have to have a personality
18   that's willing to deal with that.
19        MR. SOLOMON:  Okay.  Let's have marked as
20   the next exhibit another excerpt from Softwar.
21        (Whereupon, Deposition Exhibit 158
22        was marked for identification.)
23        MR. LINDSTROM:  Is this 158?
24        THE REPORTER:  Yes.
25        MR. LINDSTROM:  Thank you.

709

1    MR. SOLOMON:  Q.  So then I'd like you to
2    just look at the bottom of page 142 and the top of
3    page 143 where it says, "Everything they were
4    reading said that Microsoft and client/server would
5    go on forever.  I got the same looks that Galileo
6    got when he told people the earth revolved around
7    the sun.  Sure.  Whatever you say, boss."
8    Right?  See that?
9    A.  No, I don't actually.
10   Q.  The bottom of 142.
11   A.  Can I have a second?
12   Q.  Sure.
13   A.  Thanks.
14        Okay.
15   Q.  Okay.
16   A.  Yeah.  Got the context.
17   Q.  Did you say that?  And when I say "that,"
18   did you say, "Everything they were reading said that
19   Microsoft and client/server would go on forever.  I
20   got the same looks Galileo got when he told people
21   the earth revolved around the sun.  Sure.  Whatever
22   you say, boss."
23   A.  Did I say this?
24   Q.  Yes.
25   A.  In this context of me killing a

710

1    client/server project?
2    Q.  Right.
3    A.  I was in the process of saying we're not
4    going to do any more client/server.  We're killing
5    an existing project.  And people were very mad at me
6    for killing the project, because they thought that
7    client/server would go on forever, and they were
8    wrong.
9    Q.  And you've likened yourself to Galileo on
10   more than one occasion; is that right?
11   A.  No.  No.  In terms of likened myself to
12   Galileo, no.  Galileo is one of the great scientists
13   in history.  I'm saying that all -- every time you
14   have an innovative idea, even a small one, I
15   innovated -- his idea was planetary; mine was a
16   little tiny piece of software.  But every time you
17   challenge conventional wisdom, and you're the
18   first -- and you're in a group of people that
19   believe one thing is true, and you say, "No, I think
20   you're all wrong.  I think this is what's" -- "I
21   think this is true," you find yourself in this very
22   funny situation where you're challenging
23   conventional wisdom and it just makes people --
24   sometimes it makes people angry.
25   Q.  Okay.

711

1    A.  So I was using Galileo as that on a grand
2    scale and me on a very, very small scale, or anyone
3    who does any kind of innovation, or innovative
4    thinking.
5    Q.  Have you ever heard of Icarus?
6    A.  Of course.
7    Q.  Have you ever likened yourself to Icarus?
8    A.  No.
9    Q.  Don't you think that's more appropriate in
10   the context of this litigation?
11        MR. LINDSTROM:  Objection.  Argumentative.
12        MR. SOLOMON:  I've marked as the next
13   exhibit more transcripts of interviews with --
14   another transcript of an interview with Mr. Symonds.
15   And the control numbers is 1529262 through -282.
16        (Whereupon, Deposition Exhibit 159
17        was marked for identification.)
18        THE WITNESS:  Excuse me.
19        MR. SOLOMON:  Q.  And if you turn to page
20   1529276.
21   A.  Okay.
22   Q.  And looking at the top of the page where
23   it says, "Early this year there were a lot of people
24   coming up with this kind of" --
25   A.  Slow down.  -9276?

712

1    Q.  Yes.

2    A.  "Early this year."

3    Q.  Yes.

4    MR. LINDSTROM:  It's at the top of the

5    page.

6    THE WITNESS:  Got it.  Got it.

7    MR. SOLOMON:  Q.  "Early this year there

8    were a lot of people coming up with this kind of

9    accusation if you like that the claim of saving

10   $1 billion through using the E-Business Suite was

11   kind of nonsense, that it was mainly about kind of

12   old fashioned process, re-engineering and old

13   fashioned cost production measures."  I know what

14   the response to that is, but I'd just like to get it

15   on the record from you."

16   Do you see that?

17   A.  Yes.

18   Q.  And isn't it true that in 2001, you cited

19   a Harvard publication saying that that provided

20   support for your claim that the E-Business Suite had

21   saved $1 billion?

22   MR. LINDSTROM:  What point in time?

23   MR. SOLOMON:  In 2001.

24   THE WITNESS:  First of all, I'm not sure I

25   ever claimed the E-Business Suite saved $1 billion.

713

1    I said, using our technology, a combination of the

2    Internet, our applications, a variety of things.

3    But it wasn't just the E-Business Suite.  By using

4    modern Internet technology, including our E-Business

5    Suite, including our applications, we were able to

6    reengineer our business and save a billion dollars.

7    MR. SOLOMON:  Q.  Okay.  And to the extent

8    people thought that you were saying that Oracle had

9    saved $1 billion via the utilization of the

10   E-Business Suite, they were misunderstanding you; is

11   that right?

12   A.  I don't know if they were -- I don't think

13   I ever said that.

14   Q.  I said, to the extent people thought you

15   were saying that.

16   MR. LINDSTROM:  Assumes facts.

17   THE WITNESS:  Yes.

18   MR. SOLOMON:  Q.  And Ray Lane, in fact,

19   has said that your claim was untrue in that respect;

20   is that right?

21   MR. LINDSTROM:  Assumes facts.

22   Mischaracterizes the --

23   THE WITNESS:  Absolutely.  Yes.

24   MR. LINDSTROM:  -- the record.

25   MR. SOLOMON:  Q.  And you presumably think

714

1    that Mr. Lane is lying when he says that?

2    A.  No, not that he's lying.  I just think

3    that his judgement is wrong.  I think he said

4    that -- I think he said a little bit what Matthew

5    framed it, it had -- old fashioned reengineering and

6    cost cutting.

7    And if that were true -- I'll stick with

8    my answer -- why didn't we -- why didn't we save

9    that billion dollars five years ago.  It was as

10   simple as just doing some -- just good management,

11   good management, we should have saved a billion a

12   long time ago.

13   I think it was really modern -- it was

14   modern technology.  We were able to put our

15   support -- just an example, we were able to put our

16   support center in India.  Prior to the Int- -- prior

17   to the Internet, we couldn't offshore some of our

18   human resources.  We could do programming in India.

19   You need to rethink your entire business in view of

20   modern global technology.

21   Q.  Have you ever heard Safra Catz lie, tell a

22   lie?

23   A.  Not that I know of.

24   Q.  Were you friends with Ms. Catz before she

25   became an employee of Oracle?

715

1    A.  Yes.  Yes.  She was on the --

2    MR. LINDSTROM:  You've answered the

3    question.

4    MR. SOLOMON:  Q.  Tell me the background

5    of the friendship.

6    A.  She was on the team of people from -- on

7    Donaldson, Lufkin & Jenrette that took us public.

8    Q.  Your relationship with him has been purely

9    professional?

10   MR. LINDSTROM:  Him?

11   MR. SOLOMON:  With her.  I'm sorry if I

12   said "him."

13   THE WITNESS:  No.  We were -- we were

14   friends.

15   MR. SOLOMON:  Q.  Platonic?

16   A.  Platonic.

17   Q.  Was she involved in the stock repurchase

18   program in January 2001?

19   MR. LINDSTROM:  No foundation.

20   THE WITNESS:  Trying to say -- was she on

21   the board then?

22   MR. LINDSTROM:  The question is

23   whether she was involved.

24   THE WITNESS:  I'm sorry, I just don't

25   remember it.  I think everyone on the board was --

716

Ellison, Lawrence  3/30/2007  12:00:00 AM

1  you know, in a sense was involved.  But, you know --
2  Jeff Henley was our CFO.  I'm not sure when Safra
3  joined the board.
4      MR. SOLOMON:  Q.  Okay.  Did you know that
5  she had planned a stock sale in January 2001 but
6  then changed her mind?
7      A.  No.
8      MR. LINDSTROM:  Vague as to time.  Did he
9  know when?
10     MR. SOLOMON:  Q.  Is the first time you
11 heard that today?
12     A.  Yes.
13     Q.  Did you and Ms. Catz discuss with each
14 other a litigation update you received six weeks to
15 two months ago?
16     MR. LINDSTROM:  Vague and ambiguous.
17     THE WITNESS:  By "litigation update," you
18 mean -- I think the legal department prepares an
19 e-mail -- actually, the answer is I don't think so.
20     MR. SOLOMON:  Q.  Did you have a
21 discussion with Ms. Catz wherein you decided to ask
22 for a litigation update?
23     MR. LINDSTROM:  This is pertaining to this
24 litigation?
25     MR. SOLOMON:  Correct.

717

1      MR. LINDSTROM:  What timeframe?
2      THE WITNESS:  I don't think so.
3      MR. SOLOMON:  Q.  Within the last two
4  months.
5      A.  Not that I recall.
6      MR. SOLOMON:  Okay.  Let's have marked as
7  the next exhibit another interview transcript.  This
8  bears the date April 18th, 2002.
9      (Whereupon, Deposition Exhibit 160
10     was marked for identification.)
11     MR. SOLOMON:  And the control numbers are
12 1529215 through 1529233.
13     Q.  And if you could turn, Mr. Ellison, to
14 1529225.
15     A.  -225.
16     Q.  Looking at the top of the page on the
17 language, "I think the ERP stuff is in really good
18 shape.  We kind of survey our customers.  We tend to
19 focus on the customers who are having problems.  We
20 find almost wherever Oracle consulting ... one of
21 the reasons we advertise server so much in this last
22 meeting is wherever consulting has been involved, we
23 tended not to have problems.  So we have a terrible
24 irony of some of the most complicated
25 implementations, GE Power or Poscoe, where we are

718

1  just all sweating bullets," in brackets,
2  "[Nagilient] worrying" -- sorry -- "[Nagilient] and
3  worrying, and it is going very smoothly and that's a
4  company we've never heard of is blowing up."
5      Do you see that language?
6      A.  Yes, I do.
7      Q.  Where you reference sweating bullets, why
8  were you sweating bullets?
9      A.  Okay.  I believe what this is saying is
10 that the GE power and the Poscoe implementations
11 were very, very complex, but actually went very
12 well.  By sweating bullets, people were working very
13 hard.  Poscoe is a steel company.  They were, at the
14 time, the largest steel company in the world.
15 They're located in Korea.  And literally, they were
16 doing a big bang switchover to the E-Business Suite.
17     The problem is if you're a steel mill and
18 your system shuts down, the steel cools in the plant
19 and you have to rebuild the plant.  So it was the
20 worst -- it was one of the more stressful moments in
21 terms of putting E-Business Suite in because if it
22 shut the plant down, we were -- it was going to
23 cause a huge number of problems.  So -- so I think
24 that's what it's saying.
25     Q.  What does -- sorry.  I was going to ask

719

1  you, what do you mean by "terrible irony"?
2      A.  Oh, that the complicated -- that the
3  really complicated, big projects were going well,
4  but then we'd have some small company with a fairly
5  simple implementation.  And it would go badly often
6  because the people who were implementing the
7  product, the service people who were putting it in
8  did something wrong.
9      Q.  And given this is 2002, what business did
10 Jeff Henley have saying in early 2001 that 11i had
11 stabilized?
12     A.  Well, again, this had -- again, I'm not
13 sure what we're talking -- this -- what I'm saying
14 here is, 11i is stable.  The proof is it's working
15 at GE, it's working at Poscoe, but it still has to
16 be implemented properly.
17     And if you read the entire -- I think if
18 you read the entire thing, what it's saying is this
19 has nothing to do with the product; this has to do
20 with if consulting is involved.
21     In other words, if you have good people,
22 what it says, "wherever consulting has been
23 involved, we tend not to have problems."
24     So when we have the right service people
25 putting it in, even in a complicated implementation

720

1   it is going well.  When we have the wrong people,
2   it's not going well.  So this was not product
3   related; it was service related.  We didn't have
4   enough trained -- the answer is we didn't have
5   enough trained people doing the implementations.
6       MR. SOLOMON:  Have marked as the next
7   exhibit a copy of a Wall Street Journal article
8   dated August 6th, 2001.
9       (Whereupon, Deposition Exhibit 161
10      was marked for identification.)
11      MR. SOLOMON:  Q.  And have you read this
12  article before?  Do you know --
13      MR. LINDSTROM:  Why don't you give him a
14  moment to look at it.
15      THE WITNESS:  Can I have a second to look
16  at it?
17      Okay.
18      MR. SOLOMON:  Q.  Okay?
19      A.  Okay.
20      Q.  Have you read this before?
21      A.  I believe so, yes.
22      Q.  Okay.  I'm looking at the first page.
23      And starting with, "'In this last 12
24  months,' Mr. Ellison said, 'we've gotten over 450
25  customers, big customers, General Electric, Ford,

                                                721

1   Alcoa, Hewlett-Packard, live and running their
2   businesses on 11i.'"
3       Do you see that?
4       A.  Yes.
5       Q.  Did you say that?
6       MR. LINDSTROM:  Well --
7       THE WITNESS:  Yes.
8       MR. LINDSTROM:  Did he say the part in the
9   quotes --
10      THE WITNESS:  I think so.
11      MR. LINDSTROM:  -- or the whole -- the
12  whole thing?
13      MR. SOLOMON:  The part that's in the
14  quotes.
15      MR. LINDSTROM:  Okay.
16      THE WITNESS:  Something -- I don't know if
17  I said exactly that, but something fairly close.
18      MR. SOLOMON:  Q.  Okay.  And it goes on to
19  say, "It was a welcome disclosure.  In the year
20  since its introduction, 11i -- which handles
21  everything from inventory tracking to payroll
22  processing -- has been plagued by reports of slow
23  sales.  There was just one problem:  It wasn't
24  entirely true.  All four companies Mr. Ellison named
25  told a far more restrained version of the story,

                                                722

1   including General Electric Company's power division,
2   which Mr. Ellison made a point of singling out.  GE
3   Power said it was using the product only at a small
4   plant in Hungary.  'We are not running our business
5   on 11i,' said a spokesman for the GE unit.
6   Likewise, Alcoa said that it was using 11i at just
7   one overseas location."
8       So is the journalist writing this correct
9   in saying that what you had said was not entirely
10  true?
11      A.  I --
12      MR. LINDSTROM:  Compound.  Calls for
13  speculation.  No foundation.
14      THE WITNESS:  I didn't say GE is running
15  its entire business on Oracle.  I said they are
16  running their business on Oracle, meaning part of
17  their business.  GE, four -- these are gigantic
18  corporations.  They use products from lots and lots
19  of people.  Ford will never run their business
20  entirely on Oracle products.
21      So all I was saying is that GE, we got --
22  you know, a part of their business is live and
23  running.  Maybe I can make it clearer by saying "a
24  part."  But I didn't say their entire business or
25  all their business.  The journalist is assuming I

                                                723

1   mean everything in GE in one year is running on
2   Oracle, which is just -- it's impossible.
3       MR. SOLOMON:  Q.  Okay.
4       A.  Every year more and more of GE runs on
5   Oracle, but even today, many years later, 100
6   percent of GE is not running on Oracle.  Never will.
7       Q.  Do you know Jeff Henley has described you
8   as a person who runs ahead of reality?
9       MR. LINDSTROM:  Mischaracterizes his
10  testimony.  Assumes facts.
11      THE WITNESS:  I don't know what that
12  means.  The answer is no, and I'm not sure what it
13  means.
14      MR. SOLOMON:  Q.  And if you go to the
15  next page of this article, I'm looking almost
16  halfway down, the language that begins, "Still, it's
17  been hard for Oracle to attract big name," in
18  quotes, "'reference accounts' for 11i.  Companies
19  that would testify to the new product's virtues" --
20      A.  I'm sorry, how far down the page?  Same
21  page?
22      Q.  Almost, yes.
23      MR. LINDSTROM:  No, he's on the next page.
24      MR. SOLOMON:  I'm sorry.  On the second
25  page.

                                                724

1    THE WITNESS:  Next page.  Sorry.

2    MR. SOLOMON:  Q.  It's the sentence

3    starting, "Still, it's been hard."

4    A.  Okay.  Got it.

5    Q.  Okay.  Then it goes on to say -- after

6    "product virtues," it goes on to say, "So Oracle

7    decided to provide its own references.  Last year it

8    began buying TV and newspaper ads saying it had

9    saved $1 billion by using the software.  Most

10    analysts scoffed at the claim, attributing any such

11    savings to low-tech methods such as layoffs and site

12    closings."

13    Do you see that?

14    A.  Yes.

15    Q.  Then it goes on to say, "Oracle struck

16    back.  At a company-sponsored conference for users

17    in New Orleans in February, it distributed hundreds

18    of copies of a Harvard Business School case study

19    that Oracle said proved saved money the way it said

20    it had.  In a related news release, the company said

21    the Harvard study, written by Professor Francis

22    Frei," F-R-E-I, "chronicled how Oracle had achieved

23    the savings by using its new software to put," in

24    quotes, "'every aspect of its business,'" end

25    quotes, "on one global network on the Internet,"

725

1    close quotes.

2    Goes on to say, "But Professor Frei, in an

3    interview, says the study did no such thing.

4    Instead, she says, it simply described how a once

5    fast-growing company was being forced to pay more

6    attention to costs."

7    Do you see all that?

8    A.  I do.

9    Q.  Do you remember in February at New Orleans

10    discussing or mentioning the Harvard study?

11    A.  I've never read it.  Never -- I don't

12    think I've ever mentioned it.

13    Q.  Okay.  Do you recall ever telling Matthew

14    Symonds that Siebel Systems had just finished a

15    quarter in which it engaged in software swaps on a

16    big deal, but that couldn't continue and that they

17    were going to crash because you can't do that two

18    quarters in a row?  Does that ring a bell?

19    MR. LINDSTROM:  Assumes facts.  Compound.

20    The question is did he tell Matthew Symonds all of

21    that?

22    THE WITNESS:  Again, I'm not -- again, I'm

23    not sure, but sounds vaguely close.

24    MR. SOLOMON:  Q.  Okay.  And wouldn't that

25    same comparison be applicable to Oracle in 2Q '01

726

1    and 3Q '01?

2    A.  No.

3    MR. SOLOMON:  Have marked as the next

4    exhibit a document produced in this litigation with

5    the control numbers 1027517 through -521.

6    (Whereupon, Deposition Exhibit 162

7    was marked for identification.)

8    MR. SOLOMON:  Q.  Once you've had a chance

9    to look at it, the question will be, do you

10    recognize it?

11    A.  Give me -- give me a second.

12    Q.  Okay.

13    A.  So far I do not.  I don't know what this

14    is about.

15    MR. LINDSTROM:  Counsel, is there a first

16    page to this?  This looks to be an e-mail exchange

17    that starts partway through the exchange with the

18    word "Okay."

19    MR. SOLOMON:  Right.

20    MR. LINDSTROM:  It's hard to recognize.

21    MR. SOLOMON:  We'll ask -- let's see if we

22    can get the page, control number before that.

23    Could you do that, Brian, do you think?

24    Let's go off the record for a few minutes

25    then, please.

727

1    THE VIDEOGRAPHER:  Off the record.  The

2    time is 5:20 p.m.

3    (Whereupon, a recess was taken.)

4    THE VIDEOGRAPHER:  We are back on the

5    record.  The time is 5:38 p.m.

6    MR. SOLOMON:  Q.  Okay.  So we marked the

7    last exhibit -- we did find the first page.  And so

8    what exhibit was it, please?

9    THE REPORTER:  The last exhibit was 162.

10    MR. SOLOMON:  So 162 now is going to be

11    1027516 through -7521.

12    THE WITNESS:  Throw this one away?

13    MR. SOLOMON:  Please.

14    (Whereupon, Deposition Exhibit 162 was

15    remarked for identification.)

16    MR. SOLOMON:  Q.  And do you recognize

17    this document?

18    A.  I don't.

19    Q.  And I notice that you're not -- you're not

20    on the addressee list, but you were the GE corporate

21    sponsor, correct?

22    A.  Still am.

23    Q.  But that wouldn't mean -- would that mean

24    that you would have probably have seen this at the

25    time, or not?

728

1    A.  Probably not.

2    Q.  I want to go back again to Mr. Symonds.

3        Have you had any e-mail exchanges with

4   Mr. Symonds?

5    A.  As far as I know -- about this litigation,

6   or just a general e-mail?

7    Q.  About this litigation.

8    A.  As far as I know, I haven't had any e-mail

9   about this litigation with Mr. Symonds.

10    Q.  Now, we marked as 141 the letter dated

11   January 10, 2007.

12        How was this transmitted to Mr. -- to

13   Mr. Symonds?

14        MR. LINDSTROM:  No foundation.

15        MR. SOLOMON:  Let me back up.

16    Q.  Was this transmitted to Mr. Symonds?

17    A.  I assume it was.  We're talking about the

18   letter --

19    Q.  Yes.

20    A.  -- my attorneys drafted and I signed?

21    Q.  Yes.

22        MR. LINDSTROM:  And you have it before

23   you?

24        THE WITNESS:  I don't -- I'm sure --

25        MR. SOLOMON:  Q.  It's 141.  It's probably

1   at the bottom of your pile somewhere.

2        MR. LINDSTROM:  I think the reporter has

3   the other ones.  You can borrow mine.

4        MR. SOLOMON:  Q.  Well, it says -- first

5   of all, it says it went via e-mail.

6        Do you have e-mail confirmation of that

7   that you can produce?

8    A.  It didn't go via my e-mail.

9    Q.  Okay.  Whose e-mail did it go via?

10    A.  I have no idea.

11    Q.  Okay.  So do you have any objection to

12   finding out and producing the actual e-mail?

13    A.  No.

14    Q.  So you'll do that?

15    A.  Well --

16        MR. LINDSTROM:  We'll take your request

17   under advisement.  I don't see a problem with it.

18        MR. SOLOMON:  Q.  It says "first class

19   mail."

20        You were aware if you send a document to

21   England from the US first class mail, it probably

22   won't get there?

23    A.  No.  No.

24        MR. LINDSTROM:  Assumes facts.

25        MR. SOLOMON:  Q.  No?  You think a first

1   class stamp would get it to --

2    A.  Oh, I have no idea.  I haven't mailed

3   anything in a long time.

4    Q.  Now, you say at the bottom here, "Although

5   I understand that my lawyers will be sending you a

6   more formal letter, I wanted to write to you

7   separately to request that you cooperate with my

8   counsel and forward these materials as quickly as

9   you can."

10        Do you see that?

11    A.  I do.

12    Q.  Have you seen any such formal letters from

13   your lawyers to Mr. Symonds?

14    A.  No.

15    Q.  Then halfway through the second paragraph

16   it says, "We oppose this motion because, quite

17   frankly, we believe those materials were yours, not

18   Oracle's or mine."

19        Do you see that?

20    A.  I do.

21    Q.  Have you looked within -- since October of

22   2006 at the agreement between you and Mr. Symonds?

23    A.  No.

24    Q.  No?

25    A.  No.

1    Q.  Do you recall its contents?

2    A.  No, I do not.

3    Q.  And you say, "We opposed" -- at least you

4   signed the letter where it says, "We oppose this

5   motion because, quite frankly, we believe those

6   materials were yours."

7        Are you aware that in the brief that was

8   filed, you also contended, or your lawyers

9   contended, that they were simply irrelevant?

10        MR. LINDSTROM:  No foundation.  Asked and

11   answered.

12        THE WITNESS:  No.

13        MR. LINDSTROM:  Calls for speculation.

14        MR. SOLOMON:  Q.  Did you discuss this

15   letter with Daniel Cooperman?

16        MR. LINDSTROM:  I'm going -- I'll permit

17   him.  I think that's generic enough that he can

18   respond to that.

19        THE WITNESS:  No, I did not.

20        MR. SOLOMON:  Q.  Have you discussed it

21   with anyone?

22        MR. LINDSTROM:  When you say "discussed

23   the letter," can you be -- I mean, that's vague.

24        THE WITNESS:  Other than my attorneys?

25        MR. SOLOMON:  Q.  Anyone.  Have you

1   discussed it with your attorneys?

2      A.  No.

3      Q.  How did the language in this letter get

4   into your hands?

5      MR. LINDSTROM:  Vague and ambiguous.

6      THE WITNESS:  The letter was written by

7   one of my lawyers.  I signed it.  I signed the

8   letter.

9      MR. SOLOMON:  Q.  When you say one of your

10  lawyers, do you mean one of your in-house or outside

11  counsel?

12     A.  I'm not sure -- I'm not sure who drafted

13  the letter.

14     Q.  Who gave you the letter to sign it?

15     A.  I don't recall.

16     MR. SOLOMON:  I'll have marked as the next

17  exhibit a document produced in this litigation with

18  the control numbers 1026720, -721.

19        (Whereupon, Deposition Exhibit 163

20        was marked for identification.)

21     THE WITNESS:  Thank you.

22     MR. SOLOMON:  Q.  And let me know if you

23  recognize this.

24     A.  Give me -- give me a second.

25        Vaguely.  I knew about the Barclays

733

1   exchange, but I'm not sure I ever saw this.  If it

2   was sent to me, I probably saw the note.

3      Q.  Okay.  And this would have been in your

4   files around December 15th, 2000?

5      A.  Yes.

6      Q.  And it wasn't produced from your files in

7   this litigation, and you cannot explain why; is that

8   right?

9      MR. LINDSTROM:  No foundation.  Assumes

10  facts.

11     THE WITNESS:  Yes.

12     MR. SOLOMON:  Q.  You can't explain why,

13  right?

14     A.  Correct.

15     MR. SOLOMON:  I'll have marked as the next

16  exhibit another document produced in this litigation

17  with the control numbers 061785 through -790.

18        (Whereupon, Deposition Exhibit 164

19        was marked for identification.)

20     MR. SOLOMON:  Q.  Let me know when you've

21  had a chance to look at it, if you recognize any of

22  the exchanges.  Just so you know, I'm just going to

23  focus on the first page.

24     A.  Okay.  Just give me one more second.

25        Okay.  But the context -- it's in reverse

734

1   chronological order.

2      Q.  Okay.  That's fine.

3      A.  So just give me ...

4      MR. LINDSTROM:  Also, Counsel, maybe you

5   can expedite things.  Do you know, is he anywhere in

6   this chain?  Is there an e-mail to him?

7      MR. SOLOMON:  I do not believe so, no.

8      MR. LINDSTROM:  Okay.

9      THE WITNESS:  Okay.

10     MR. SOLOMON:  Q.  Recognize this at all?

11     A.  I do not.

12     Q.  Okay.  And then on the first page, I'm

13  looking just under halfway down where it says,

14  "Yes."

15        It says, "Yes, we plan to have two

16  customers during the April Gartner executive

17  briefing."  And then in parentheses, "(we are

18  approaching HP and Veritas - not sure.)"

19        Just focusing on the language "approaching

20  HP," were you involved in approaching HP with

21  respect to -- to asking that they'd be a reference

22  around this time?

23     MR. LINDSTROM:  At the April Gartner

24  executive briefing?

25     MR. SOLOMON:  Correct.  Correct.

735

1      THE WITNESS:  I'm sure I wasn't.

2      MR. SOLOMON:  Q.  Okay.  So you wouldn't

3   have wanted to -- you wouldn't have been exploiting

4   your relationship with Carly Fiorina to try and do

5   that?

6      MR. LINDSTROM:  Assumes facts.

7   Mischaracterizes the testimony.

8      THE WITNESS:  I don't think I'd ask her,

9   at her level, to be a reference.  We'd have to ask

10  someone who was really running the CRM system.

11     MR. SOLOMON:  Q.  So you don't know

12  anything about this?

13     A.  No, I don't.

14     MR. SOLOMON:  Okay.  Let's have marked as

15  the next exhibit an article from Vanity Fair called

16  "Absolutely Excessive."

17        (Whereupon, Deposition Exhibit 165

18        was marked for identification.)

19     THE WITNESS:  Okay.

20     MR. SOLOMON:  Q.  Okay.  Have you read

21  this before?

22     A.  I have.

23     Q.  And who wrote this, do you know?

24     A.  Matthew Symonds.

25     Q.  And that's your modest boat on the front

736

1  page?
2      A.  It's -- I own half of it now.
3      Q.  Okay.  Who owns the other half?
4      A.  David Geffen.
5      Q.  And is it true that this boat was
6  purchased, at least in part, with the proceeds of
7  your sales in January 2001?
8          MR. LINDSTROM:  Asked and answered.
9          THE WITNESS:  Again, the sales went
10  partially to pay down my loans and partially went to
11  cash, and I'm not sure how the cash -- where the
12  cash distributions went.
13          MR. SOLOMON:  Q.  Is there a swimming pool
14  on your boat?
15      A.  No, there's not.  Though there have been
16  numerous newspapers articles talking about swimming
17  pools, chandeliers.  All news to me.  No swimming
18  pool.  No chandeliers.
19      Q.  And there never has been, right?
20      A.  No.
21      Q.  Okay.  That's a lot of money to pay for a
22  boat without a swimming pool, isn't it?
23      A.  Certainly is.
24      Q.  I'm looking at page -- trying to look at,
25  but my eyesight is failing me.  What number is that?

737

1  328, where you're sitting in the cockpit of a
2  fighter jet.
3      A.  Yes.
4      Q.  Okay.  And then on the right-hand side,
5  almost halfway down, there's the following
6  language -- well, excuse me.
7      A.  Don't feel too bad.  It's hard for me to
8  read too, and I've got my glasses on.
9      Q.  In any event, it seems to confirm there,
10  does it not, that some of the proceeds were used --
11      A.  Where are you reading?  Which paragraph?
12      Q.  Hold on one second, Mr. Ellison.  I'm
13  sorry.
14      A.  Okay.  No problem.
15      Q.  It seems to, almost halfway down, say that
16  money that had been put to use funding the
17  construction of the boat.
18          Do you see that reference?
19      A.  I don't.  First, second, third -- give me
20  a paragraph number.
21      Q.  It's in the second full paragraph?
22      A.  Second full paragraph.
23      Q.  Yeah.
24      A.  Okay.  And the sentence begins, "For
25  months he had been under pressure," is this the

738

1  paragraph -- "For months he had been under pressure
2  because of problems" --
3      Q.  Yes.  Exactly.
4      A.  Okay.
5          Okay.  I read the full paragraph.
6          MR. LINDSTROM:  Is there a pending
7  question?
8          MR. SOLOMON:  Yes.  There will be in a
9  second, as soon as I can focus my eyes a little bit
10  more.
11      Q.  Okay.  Do you see it says, "if he hadn't
12  vested the options then, he would have lost them."
13          Do you see that?
14      A.  Yes.
15      Q.  That's not true, is it?
16      A.  Well, the options had already been vested,
17  so it was -- the sentence makes no sense whatsoever.
18      Q.  Right.
19          And let's assume he meant if you hadn't
20  exercised.
21      A.  Exercised.
22      Q.  That still would be wrong, wouldn't it?
23      A.  No.  If I hadn't exercised -- I had to
24  exercise.  I could have exercised and held or
25  something like that.  But I had to exercise, because

739

1  after ten years, you do lose them.
2      Q.  What I'm saying is you didn't to have
3  exercise in January, did you?
4          MR. LINDSTROM:  But it doesn't say that.
5          THE WITNESS:  It doesn't have a date.
6          MR. SOLOMON:  Right.
7          THE WITNESS:  It says -- if I just reread
8  this, "If he hadn't exercised the options then, he
9  would have lost them."
10          MR. SOLOMON:  Q.  Right.  That's not true,
11  is it?
12      A.  Well, depends what you mean -- I don't
13  mean to be cute, but depends what you mean by
14  "then," "approximately then."
15          Okay.  But no, not that day.  Certainly
16  not that day.  As we said, if I hadn't exercised
17  them at least by August, I would have lost them.
18      Q.  Right.
19      A.  Right.
20          MR. LINDSTROM:  Where are we in time?  We
21  should be -- according to my watch, we're just about
22  done.
23          THE VIDEOGRAPHER:  We have one minute and
24  45 seconds to go.
25          MR. LINDSTROM:  What do you think, Mark?

740

1  This is probably a fitting place to end, don't you
2  think?
3      MR. SOLOMON:  Well, as long as when I ask
4  for more time, you won't say that I didn't use my
5  last minute and a half and, therefore, I've waived
6  it.
7      MR. LINDSTROM:  I will tell you we will
8  not -- we will not take that position.
9      MR. SOLOMON:  In that case, it's very hot
10  in here and I'm ready to go.
11      THE WITNESS:  By the way, the newspapers
12  also reported that I crashed my fighter jet and died
13  when my fighter jet crashed into the Oracle parking
14  lot.  That was also a story that hit the press.  You
15  just reminded me.  It was the single most bizarre --
16  there have been a lot of bizarres, but reading about
17  your own death --
18      MR. LINDSTROM:  Are we still on the
19  record?
20      THE VIDEOGRAPHER:  We are.
21      MR. LINDSTROM:  Off the record and you can
22  finish the story.
23      MR. SOLOMON:  Wait a second.  Before we go
24  off the record, I just want to make sure.  We are
25  reserving our rights.  There are issues of

741

1  privilege.  There are many more materials to go
2  through.  There's the fact that I'm going back,
3  hopefully to take Mr. Symonds' deposition and get
4  some real answers from him.  And so I reserve my
5  rights to talk to you again, Mr. Ellison.  Thank you
6  for your testimony.
7      THE VIDEOGRAPHER:  This adjourns the
8  deposition of Lawrence Ellison.  The number of tapes
9  used today is three.  This is the end of Videotape
10  No. 3, Volume 3.  The original videotapes will be
11  retained by LiveNote World Service.  Going off the
12  record.  The time on the monitor is 5:59 p.m.
13      (Deposition adjourned at 5:59 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

742

1          CERTIFICATE OF WITNESS
2
3      I, the undersigned, declare under penalty of
4  perjury that I have read the foregoing transcript,
5  and I have made any corrections, additions, or
6  deletions that I was desirous of making; that the
7  foregoing is a true and correct transcript of my
8  testimony contained therein.
9
10  EXECUTED this _____ day of _____,
11  20____, at _____, _____.
            (CITY)          (STATE)
12
13
14
15          _____
16      LAWRENCE ELLISON
17
18
19
20
21
22
23
24
25

743

1      CERTIFICATE OF DEPOSITION OFFICER
2      I, KATHLEEN A. WILKINS, RPR, CSR NO. 10068,
3  duly authorized to administer oaths pursuant to
4  Section 8211 of the California Code of Civil
5  Procedure, hereby certify that the witness in the
6  foregoing deposition was by me sworn to testify to
7  the truth, the whole truth and nothing but the truth
8  in the within-entitled cause; that said deposition
9  was taken at the time and place therein stated; that
10  the testimony of said witness was reported by me and
11  was thereafter transcribed by me or under my
12  direction by means of computer-aided
13  transcription; that the foregoing is a full,
14  complete and true record of said testimony; and that
15  the witness was given an opportunity to read and
16  correct said deposition and to subscribe same.
17      I further certify that I am not of counsel or
18  attorney for either or any of the parties in the
19  foregoing deposition and caption named, nor in any
20  way interested in the outcome of the cause named in
21  said caption.
22      IN WITNESS WHEREOF, I have hereunto subscribed
23  by my hand this 2nd day of April, 2007.
24
25          _____

744

CERTIFICATE OF DEPOSITION OFFICER

1

2          I, KATHLEEN A. WILKINS, RPR, CSR NO. 10068,

3    duly authorized to administer oaths pursuant to

4    Section 8211 of the California Code of Civil

5    Procedure, hereby certify that the witness in the

6    foregoing deposition was by me sworn to testify to

7    the truth, the whole truth and nothing but the truth

8    in the within-entitled cause; that said deposition

9    was taken at the time and place therein stated; that

10   the testimony of said witness was reported by me and

11   was thereafter transcribed by me or under my

12   direction by means of computer-aided

13   transcription; that the foregoing is a full,

14   complete and true record of said testimony; and that

15   the witness was given an opportunity to read and

16   correct said deposition and to subscribe same.

17          I further certify that I am not of counsel or

18   attorney for either or any of the parties in the

19   foregoing deposition and caption named, nor in any

20   way interested in the outcome of the cause named in

21   said caption.

22          IN WITNESS WHEREOF, I have hereunto subscribed

23   by my hand this 2nd day of April, 2007.

24

25          *Kathleen A. Wilkins*
     _____
     KATHLEEN A. WILKINS, RPR, CSR NO. 10068
                                          744

EXHIBIT J

1       IN THE UNITED STATES DISTRICT COURT
2        NORTHERN DISTRICT OF CALIFORNIA
3          SAN FRANCISCO DIVISION
4
5   In re ORACLE CORPORATION
6   SECURITIES LITIGATION.
7          Master File No. C-01-0988-MJJ
8   This Document Relates To:
9
10   ALL ACTIONS.
11   _____/
12
13          ---o0o---
14          CONFIDENTIAL
15   VIDEOTAPED DEPOSITION OF JOHN DUROSS O'BRYAN
16         THURSDAY, JULY 12, 2007
17
          ---o0o---
18
19        SHEILA CHASE & ASSOCIATES
          REPORTING FOR:
          LiveNote World Service
20      221 Main Street, Suite 1250
        San Francisco, California 94105
21      Phone: (415) 321-2311
          Fax: (415) 321-2301
22
23
     Reported by:
24   DIANA NOBRIGA, CSR, CRR
     LICENSE NO. 7071
25

1

1                    I N D E X
2            INDEX OF EXAMINATION
3                          PAGE
4   EXAMINATION BY MR. GREENSTEIN        6
5            ---o0o---
6       INDEX OF CONFIDENTIAL EXHIBITS
7   DESCRIPTION                   PAGE
8   Exhibit 1  J. Duross O'Bryan, CPA Expert
9       Witness Report          10
10  Exhibit 2  Rebuttal Expert Report of J.
11       Duross O'Bryan, CPA       10
12  Exhibit 3  J. Duross O'Bryan Expert Witness
13       Report in Accordance with Rule 26   35
14  Exhibit 4   Transaction Registers       60
15  Exhibit 5   Account Analysis Reports     73
16  Exhibit 6   Sales Journal by GL Account Report  89
17  Exhibit 7   Presentation to the SEC Staff On
18       Behalf Of Oracle Corporation   94
19  Exhibit 8   E-mail from Molly Littlefield,
20       sent 26 Aug 2004 to Greg Myers    99
21  Exhibit 9   Oracle Receivables User's Guide  118
22  Exhibit 10  Lexis case printout, Donald W.
23       Farnham v. William Rehwald, Inc.    129
24  Exhibit 11  #4 Interview Memorandum of John
25       Banker, 11/13/02           220

2

1   Exhibit 12  Audit File, Client File
2       No. 60020382          227
3   Exhibit 13  Q2 FY 2001 Accounting Allegations   227
4   Exhibit 14  Oracle Corporation Variation
5       Analysis, Unearned Revenue as of
6       November 30, 2000          249
7   Exhibit 15  Oracle Corporation Variation
8       Analysis, Accounts Receivable as of
9       November 30, 2000          252
10  Exhibit 16  One-page document Bates
11       stamped NDCA-ORCL 603894        261
12  Exhibit 17  Oracle check to Household Finance
13       dated 5/23/02           269
14  Exhibit 18  E-mail from greg.myers, sent
15       31 Oct 2002 to Michael Quinn     269
16  Exhibit 19  Amendment Three to the Software
17       License and Services Agreement
18       Between Oracle Corporation and
19       the Hewlett-Packard Company     316
20  Exhibit 20  Purchase Order No. 47B08440 with
21       attachments           316
22
23
24
25

3

1        BE IT REMEMBERED that on Thursday, July 12,
2   2007, commencing at the hour of 9:29 a.m., thereof, at
3   the LAW OFFICES OF LERACH, COUGHLIN, STOIA, GELLAR,
4   RUDMAN & ROBBINS, LLP, 100 Pine Street, Suite 3200,
5   San Francisco, California, before me, DIANA NOBRIGA, a
6   Certified Shorthand Reporter in and for the State of
7   California, personally appeared
8        JOHN DUROSS O'BRYAN
9   as a witness by the plaintiffs herein, who, being by me
10  first duly sworn, was thereupon examined and testified
11  as hereinafter set forth.
12        ---o0o---
13  Appearing as counsel on behalf of the Plaintiffs:
14      ELI GREENSTEIN, ESQUIRE
        SHAWN WILLIAMS, ESQUIRE
15      KEITH MAUTNER, CPA, CMA
        LERACH, COUGHLIN, STOIA, GELLAR,
16      RUDMAN & ROBBINS
        100 Pine Street, Suite 2600
17      San Francisco, CA 94111
        Egreenstein@lerachlaw.com
18
19  Appearing as counsel on behalf of Defendants:
20      BRIAN GLENNON, ESQUIRE
        LATHAM & WATKINS
21      633 West Fifth Street, Suite 400
        Los Angeles, CA 90071
22      brian.glennon@lw.com
23  Also Present:  Gerry Fujimoto, Deloitte; Dorian Daley,
24  Oracle; James Terrell, Videographer
25

4

**Page 5**

1    VIDEOGRAPHER:  This begins the videotaped
2  deposition of J. Duross O'Bryan, tape one, Volume I, in
3  the matter In Re Oracle Corporation Securities
4  Litigation, as filed in the United States District Court
5  for the Northern District of Northern California,
6  San Francisco Division, Case No. C-01-0988-MJJ.  Today's
7  date is July 12th, 2007.  The time on the video monitor
8  is 9:29.
9    The video operator is James Terrell,
10  representing LiveNote World Service, located at 221 Main
11  Street, Suite 1250, San Francisco, California 94105.
12  The phone number is 415 321-2300.
13    The court reporter is Diana Nobriga, with
14  Sheila Chase and Associates, reporting on behalf of
15  LiveNote World Service.
16    Today's deposition is being taken on behalf of
17  plaintiffs and is taking place at 100 Pine Street in
18  San Francisco, California.  If the parties present would
19  please introduce themselves and state whom they
20  represent.
21    MR. GREENSTEIN:  Good morning, Eli Greenstein
22  Lerach, Coughlin, Stoia, Geller, Rudman and Robbins,
23  representing plaintiffs.
24    MR. MAUTNER:  Keith Mautner Lerach, not
25  representing anybody, because I'm an accountant.

**Page 6**

1    MR. WILLIAMS:  Shawn Williams, Lerach,
2  Coughlin on behalf of the plaintiffs.
3    THE WITNESS:  I'm J. Duross O'Bryan, deponent.
4    MR. GLENNON:  Brian Glennon of Latham and
5  Watkins on behalf of the witness and the defendants.
6    MR. FUJIMOTO:  Gerry Fujimoto, Deloitte,
7  consultants for defense counsel.
8    MS. DALEY:  Dorian Daley for Oracle
9  Corporation.
10    VIDEOGRAPHER:  Thank you.  Can we swear the
11  witness and begin.
12    JOHN DUROSS O'BRYAN
13  having been duly sworn, testified as follows:
14    EXAMINATION BY MR. GREENSTEIN
15    MR. GREENSTEIN:  Q.  Good morning,
16  Mr. O'Bryan.
17    A.  Good morning.
18    Q.  Thank you for being here.  Can you please
19  state your full name and current addresses for the
20  record.
21    A.  John Duross O'Bryan, Jr.  J-o-h-n,
22  D-u-r-o-s-s, O'B-r-y-a-n, Jr.  Address, you want
23  business address?
24    Q.  Current home address, please?
25    A.  6320 Cavalleri Road, C-a-v-a-l-l-e-r-i,

**Page 7**

1  Malibu, California 90265.
2    Q.  And your current business address, please?
3    A.  515 South Flower Street, Suite 3050, Los
4  Angeles, California.
5    Q.  Thank you.  And who retained you in this case?
6    A.  Oracle Corporation.
7    Q.  Okay.  So you're here as a testifying expert
8  on behalf of individual defendants Larry Ellison, Edward
9  Sanderson, Jeff Henley and Oracle Corporation; is that
10  correct?
11    A.  I believe so, yes.
12    Q.  When were you first retained by Oracle?
13    A.  I have a draft engagement letter somewhere in
14  my file.  As I recall, that retention was the end of
15  2006, beginning of 2007.
16    Q.  And you have a draft engagement letter?
17    A.  I do.
18    Q.  Was that the final engagement letter?
19    A.  As I recall, yes.
20    Q.  Do you know when the initial complaint was
21  filed in this case?
22    A.  I don't recall that date.
23    Q.  Do you know approximately the year it was
24  filed?
25    A.  No.

**Page 8**

1    Q.  Have you looked at the complaint in this case?
2    A.  Second amended complaint.
3    Q.  Second amended?
4    A.  Yes.
5    Q.  Proposed revised second amended.
6    A.  It is in my document.  Second amended I don't
7  recall what it says.
8    Q.  You've reviewed one complaint in this action?
9    A.  I believe so, yes.
10    Q.  Do you know the date of the complaint?
11    A.  I don't recall the date.
12    Q.  Okay.  So prior to your retention in late
13  2006/2007, did you ever talk to anybody about this case?
14    A.  No.
15    Q.  And after you were retained in late 2006,
16  early 2007, did you talk to anybody besides counsel for
17  the defendants about this case?
18    MR. GLENNON:  I'm just going to insert an
19  objection to the extent it calls for communications that
20  are protected by the stip.
21    MR. GREENSTEIN:  Q.  Right.
22    A.  I have had communications with counsel and
23  consultants to counsel on this matter, would be the two
24  groups that I've spoken with.
25    Q.  When you refer to counsel, do you mean Latham

1  and Watkins?

2     A.  Yes.

3     Q.  And consultants for counsel, do you mean --

4  who do you mean?

5     A.  Deloitte and Touche.

6     Q.  Is that the only consultant that you've spoken

7  with after you've been retained?

8     A.  Yes, I believe that's true.

9     Q.  Okay.  So the only people besides Oracle's

10  lawyers that you've talked to after you were retained

11  were consultants for Deloitte and Touche; is that

12  correct?

13     A.  Other than counsel for Oracle, right, the

14  individual defendants, that's correct.

15     Q.  Did you talk to anybody, any employees of

16  Oracle after you were retained?

17     A.  No, I did not.

18     Q.  Have you ever talked to Greg Myers after you

19  were retained?

20     A.  I have not.

21     MR. GREENSTEIN:  I want to mark this as

22  Exhibit 1, which is the expert report, opening expert

23  report filed on, or exchanged on May 25th, 2007.

24  Actually, No. 2 will be Mr. O'Bryan's rebuttal report

25  filed on June 22nd, 2007.

9

1              (Exhibit 1 marked for

2        identification.)

3              (Exhibit 2 marked for

4        identification.)

5     MR. GREENSTEIN:  Q.  Mr. O'Bryan, what's

6  placed before you is what has been marked as Exhibit 1

7  and 2.  Exhibit 1, as you can see, is your opening

8  report; is that correct?

9     A.  It looks to be, yes.

10     Q.  Why don't you thumb through it and make sure

11  that it is all there.

12     A.  You certainly don't want me to go page by

13  page, do you?

14     Q.  No.  You see all the exhibits are attach

15  thereto.

16     A.  Yes.  Appears to be a copy of my original

17  report dated May 25th, 2007.

18     Q.  Did you draft Exhibit 1?

19     A.  Yes, I did.

20     Q.  Did anyone help you draft Exhibit 1?

21     A.  Yes.

22     Q.  And who helped you draft it?

23     A.  My engagement team.

24     Q.  And how many individuals are on your team?

25     A.  There are three other individuals on this

10

1  engagement with me.

2     Q.  What are their names?

3     A.  Ben Sheppard, S-h-e-p-p-a-r-d, a CPA in our

4  office in Los Angeles.

5     Q.  That's Alix Partners?

6     A.  A-l-i-x, P-a-r-t-n-e-r-s.  Next individual is

7  Chris Simons, S-i-m-o-n-s, CPA in our Los Angeles

8  office.  And lastly Shannon Zavoda, Z-v-o-d-a --

9  Z-a-v-o-d-a, excuse me, who is also a CPA in our Los

10  Angeles office.

11     Q.  You currently work for Alix Partners in Los

12  Angeles; correct?

13     A.  I do, yes.

14     Q.  Besides those three individuals, did you work

15  with anyone outside your company in drafting the report,

16  besides Oracle's lawyers?

17     A.  No.

18     Q.  Did you talk to anybody outside your company

19  besides Oracle's lawyers and Deloitte and Touche about

20  your report?

21     A.  No.

22     Q.  When is the last time you looked at your

23  report?

24     A.  This morning.

25     Q.  Before that, when was the last time?

11

1     A.  Last night.

2     Q.  When was the first draft of your report

3  completed?

4     A.  The Exhibit 1?

5     Q.  Yes.

6     A.  The first draft was probably 10th to the 15th

7  of May.

8     Q.  So approximately ten days before it was filed?

9     A.  Ten to 15 days before.

10     Q.  And it took you 138 hours to draft the report;

11  correct?

12     A.  I don't recall the exact time.

13     Q.  Okay.  If you turn to Exhibit -- the last page

14  of Exhibit 1.  Do you see that?  I think that states

15  that as of April 30th, 2007 you had billed 138 hours;

16  right?

17     A.  That was through April 30th, so, between the

18  end of April and the beginning of May there was a

19  significant amount of time spent by me on this report.

20  So my guess is it is significantly higher than that.

21     Q.  Do you have a total amount that you've spent

22  drafting Exhibit 1?

23     A.  No.  I don't know that exact amount.  But it

24  is well in excess of 200 hours.

25     Q.  Could you provide that information?

12

1   A.  I can provide bills if you'd like.
2       MR. GREENSTEIN:  Well, we just want to know
3   the total number of hours and the amount billed as of
4   May 25th, 2007 on the opening report.
5       Is that okay with you?
6       MR. GLENNON:  We can provide that.  We, of
7   course, will want the same thing from plaintiff's
8   accounting expert.
9       MR. GREENSTEIN:  Sure.
10  Q.  And those three individuals you mentioned that
11  helped you working -- helped you draft the opening
12  report, did they help you draft the rebuttal report?
13  A.  They did, yes.
14  Q.  How many hours approximately did you spend
15  drafting the rebuttal report?
16  A.  The rebuttal report, this is an educated
17  guesstimate, if you will, it is in excess probably of 60
18  to 80 hours.  Me personally.
19  Q.  Okay.  And would you also be able to confirm
20  the total number of hours billed by you and/or your
21  staff on the report?
22  A.  Certainly.  Yeah, there is bills by day, as I
23  recall, or hours by day.
24  Q.  So is it fair to say you spent more hours on
25  the opening report than the rebuttal?

13

1   A.  Yes.
2   Q.  Significantly more?
3   A.  No.  The entire team probably spent more time
4   on the original report, because it is just that, an
5   original report.  But as far as the entire team on the
6   rebuttal report, I don't know those numbers.
7   Q.  As you sit here today is there anything you
8   want to change in your opening report?
9   A.  No.  There is a number of references we make
10  into footnotes that we've cleaned up.  We may say
11  something like id that follows the prior footnote, that
12  really follows the prior page.  And there is footnote
13  cleanup items that I'm happy to go through with you if
14  you'd like.
15  Q.  Are those all clerical -- in other words, when
16  you say an id, it shouldn't refer to the prior
17  reference, it should refer to the prior page?
18  A.  Correct.
19  Q.  So id at footnote, prior footnote?
20  A.  Exactly.
21  Q.  Okay.
22  A.  And there were some Bates numbers that were
23  wrong in the cites, which we've fixed.  But there is
24  nothing in the report that I've changed.
25  Q.  Substantively, you mean?

14

1   A.  No.  I think I saw two "thats" together.  So I
2   struck one of the "thats."  There is nothing substantive
3   in the report.
4   Q.  When you say Bates numbers changed, can you
5   point out which Bates numbers changed.
6   A.  There is a number of them; for example, on
7   page 13 of my report, under footnote 36, you will see
8   the reference to NDCA-ORCL 005006.
9   Q.  Right.
10  A.  That should be 050060.
11  Q.  050060?
12  A.  Correct.  Down below you will see an Oracle
13  document, '01 23157.  That should be 05036 -- excuse me.
14  050356 through 60.  Also on that page --
15  Q.  I'm sorry, can you repeat that last one?
16  A.  050356 through 60.  Also on that page at the
17  very -- second to the last line says NDCA-ORCL 012799,
18  do you see that one?  That should be 0926 -- excuse me.
19  096264 through 68.
20  Q.  So just to be clear, we're looking at footnote
21  37 on page 13; correct?
22  A.  Correct.
23  Q.  Looking at the last "see also" document?
24  A.  Yes.
25  Q.  And there are two documents?

15

1   A.  There is a range there.
2   Q.  There is a range and then a single sheet;
3   right?
4   A.  Yes.
5   Q.  Which one are you changing?
6   A.  The top line, 0127994.
7   Q.  That document is now what?
8   A.  That range changes for two, 096264 - 68.
9   Q.  Let me ask about these changes.  Why were
10  those changes made to different documents?
11  A.  When we went back and checked those documents,
12  we found there to be an error in the cite references.
13  Q.  Are they the same documents though?
14  A.  I believe so, yes.
15  Q.  The same type of document?
16  A.  It is not a different document that's being
17  referenced.  And that's it.
18  Q.  Okay.
19  A.  We just had a bad Bates range.
20  Q.  So it is still an account analysis report with
21  payables detail?
22  A.  That's correct.
23  Q.  Okay.  And any other changes in Bates numbers?
24  A.  That's it.
25  Q.  That's it?  But you don't want to change

16

1 anything substantively in the report today?
2     A. No, I do not.
3     Q. Have you ever changed, substantively changed
4 your expert report the day of a deposition?
5     A. Have I ever changed it?
6     Q. Yes, in the deposition?
7     A. No.
8     Q. You never have?
9     A. No.
10     Q. I just want to talk a little bit about your
11 work history.  Is it fair to say you joined Price --
12 Coopers and Lybrand in 1985?
13     A. That's correct.
14     Q. Then, when did you -- and that became PWC?
15     A. Correct.  On July 1st, 1998.
16     Q. And from 1995 through 1999, you were the
17 partner in charge of the New York Metro region FAS
18 practice?
19     A. No.  I was the partner in charge of the FAS
20 practice for Coopers and Lybrand for the western region.
21     Q. And what does FAS stand for?
22     A. Financial advisory services.
23     Q. And what does that mean to be partner in
24 charge?
25     A. I was the senior partner of that practice for

17

1 the entire western region, meaning I had not only client
2 responsibilities, but also administrative
3 responsibilities in administering the practice.
4     Q. And financial advisory you said?
5     A. Correct.
6     Q. Does that have anything to do with auditing,
7 or is that more consulting side?
8     A. Both.  There were -- during my tenure as the
9 partner in charge, I continued to do audits of
10 companies, all the way up to 2000, 2001.  Also in my
11 client responsibilities, I continued to work on the
12 auditing side as well as advising clients in auditing
13 and/or accounting issues.
14     Q. So you actually conducted audits of clients
15 during that time?
16     A. I did, yes.
17     Q. Did you sign any audit opinions during that
18 time?
19     A. I did, yes, several.
20     Q. More than five?
21     A. Yes.
22     Q. Okay.  During that time did you ever work for
23 Oracle?
24     A. I did not, no.
25     Q. Have you ever had an engagement with Oracle

18

1 prior to this retention?
2     A. I have not.
3     Q. Ever worked for any of the individual
4 defendants prior to being retained?
5     A. I have not.
6     Q. And so when did you -- when was your next
7 promotion after you were, let's say, 2000?
8     A. I don't know if you would call it promotion,
9 but I was asked to go run the FAS practice as partner in
10 charge for the New York Metro practice.  I might
11 consider that a demotion, but.  Anyway, July 1st, 1998 I
12 left California and went to New York and ran that
13 practice for two-and-a-half years.
14     Q. What is the time frame of that?
15     A. 1998 through mid 2000, July 1st, 1998,
16 through about mid 2000 I was the partner in charge of
17 the financial advisory service practices for New York.
18     Q. Okay.  And what was your next position after
19 that?
20     A. Then was a promotion, I came back to
21 California and was the financial advisory services
22 partner in charge for the western region again from 2000
23 until my departure from PWC, which was January 31st,
24 2003.
25     Q. So you left PWC January 31st, 2003?

19

1     A. Correct.
2     Q. And you joined Alix Partners at that time?
3     A. On February 1st, 2003.
4     Q. Okay.  And you were partner in charge of the
5 FAS practice for the LA office during that time; right?
6     A. That time being July 1st?
7     Q. 2000 through 2003.
8     A. That's correct.  I came back mid -- beginning
9 to mid of 2000 and left in January of 2003.  And I was
10 the FAS partner in charge as well as the partner in
11 charge of the dispute analysis and investigation
12 practice for the western region.
13     Q. So what does dispute analysis investigations
14 unit do or department?
15     A. It is a subset of the financial advisory
16 services practice.  And it deals principally with
17 forensic accounting issues, any other types of disputes
18 or potential disputes involving either litigants or
19 potential litigants.  It can involve expert testimony.
20 It can involve fraud investigation.  It can involve
21 internal corporate investigations.  A number of
22 different things that they have basically those three
23 items in the title, dispute, analysis, and/or
24 investigation.
25     Q. And when you said fraud investigations, are

20

1  you hired by a company that's being investigated for
2  fraud, or are you hired by some sort of prosecuting
3  body?
4      A.  Most of my retention has been by companies,
5  whether it be the audit committee of the company or the
6  board of the company or the company itself to
7  investigate an alleged fraud.  And that can be simply an
8  internal investigation, or it can also be investigation
9  that is being reviewed by the enforcement division of
10  the SEC.
11      Q.  Okay.  During that time did you ever have any
12  engagements involving Oracle or the individual
13  defendants?
14      A.  No.  As I said, I have not worked for Oracle
15  in the past.
16      Q.  Did you ever work on any engagement involving
17  Ernst and Young?
18      A.  Ernst and Young, yes.
19      Q.  Approximately how many?
20      A.  I have worked on behalf of Ernst and Young on
21  several occasions.
22      Q.  More than five?
23      A.  Yes.
24      Q.  More than ten?
25      A.  Probably slightly more than ten.

21

1      Q.  And are these cases in which you are hired to
2  do an investigation or testify on their behalf or both?
3      A.  Typically testify as to whether or not they
4  breached the standard of care relating to general
5  accepted auditing standards.
6      Q.  Okay.  And have you ever been retained by
7  Arthur Andersen in that capacity?
8      A.  I don't believe so.
9      Q.  Have you ever worked on any engagement with
10  Arthur Andersen?
11      A.  I don't believe so.
12      Q.  Since you left PriceWaterhouse, have you done
13  any work for them?
14      A.  For PriceWaterhouseCoopers?
15      Q.  Yes.
16      A.  No.
17      Q.  You said you left PriceWaterhouse February of
18  2003?
19      A.  January of 2003.
20      Q.  January of 2003; okay.  You're aware there is
21  an issue in this case involving an unapplied cash
22  cleanup that began in October 2002; correct?
23      A.  I am, yes.
24      Q.  And are you aware that PWC was involved in
25  part of that project?

22

1      A.  I have seen their name throughout documents.
2  I don't know exactly what their involvement was.
3      Q.  Do you know when they got involved in that
4  project?
5      A.  I don't.
6      Q.  So it is only what you've seen in documents?
7      A.  Correct.
8      Q.  When you were at PWC, did you talk to anybody
9  that worked on the unapplied cash project?
10      A.  No.  I never heard of the unapplied cash
11  project until I was engaged on this matter.
12      Q.  Okay.  And you haven't talked to anybody since
13  you were retained, anybody from PCW that worked on any
14  part of the unapplied cash project?
15      A.  No.  As I said the only individuals I spoke to
16  in this engagement were the ones we talked about
17  earlier.
18      Q.  Okay.  If you could turn to Exhibit B.  It is
19  Appendix B or Exhibit B to Exhibit 1, your opening
20  report.  It is a list of prior cases in which you've
21  testified.  Appendix B.
22      A.  I'm there.
23      Q.  Okay.  It says, "Testimony at Deposition,
24  Trial and/or Arbitration from May 1st, 2003"; correct?
25      A.  That is correct.

23

1      Q.  And it lists 27 cases; correct?
2      A.  That's correct.
3      Q.  Of these cases did any of them involve
4  securities fraud allegations pursuant to the federal
5  securities laws?
6          MR. GLENNON:  I'd object only to the extent it
7  calls for a legal conclusion.
8          THE WITNESS:  I believe number 19, the FCC v.
9  Weitzen, et al. was under the federal securities laws.
10          MR. GREENSTEIN:  Q.  Do you know, was that a
11  10b-5 case.
12      A.  That's more of a legal issue.  I don't recall.
13      Q.  Do you know what rule 10b-5 is?
14      A.  Yes, I do.
15      Q.  Did that involve rule 10b-5?
16      A.  I don't remember.
17      Q.  Do you remember just the general nature of
18  that case?
19      A.  Well, the CEO, CFO and CAO of Gateway Computer
20  were alleged to have committed fraud and/or negligence
21  in their accounting for certain transactions at Gateway.
22      Q.  Gateway Computer company?
23      A.  Gateway Computer company, yes.
24      Q.  And you testified on behalf of Gateway?
25      A.  I testified on behalf of the three individual

24

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

1  defendants.
2      Q.  One of which was Weitzen?
3      A.  Jeffrey Weitzen.
4      Q.  And he was the CEO?
5      A.  He was the CEO, yes.
6      Q.  And you submitted a report in that case?
7      A.  I did, yes.
8      Q.  And did you find that they -- strike that.
9  What was the conclusion of your report in that case,
10  generally?
11      MR. GLENNON:  I'd object only to the extent it
12  calls for confidential information.  But otherwise you
13  can answer.
14      THE WITNESS:  With respect to Mr. Weitzen, he
15  was removed from the case after we filed our report.
16  And our report concluded that Mr. Weitzen, Mr. Todd, and
17  I can't think of the third individual's name, at Gateway
18  had acted properly with respect to their accounting for
19  certain transactions.
20      MR. GREENSTEIN:  Q.  If you look at that list,
21  are there any other cases that you can see that were
22  securities fraud related?
23      A.  I don't see any others that are securities
24  fraud related.
25      Q.  Have you ever provided expert testimony,

25

1  finding that an accounting transaction or transactions
2  was improper?
3      A.  Yes.
4      Q.  Are those cases listed here?
5      A.  Karpetian v. Gazbiean, the first one, was
6  involving an individual suing a CPA relating to some
7  accounting issues, as I recall.
8      Q.  Okay.  Was that -- have you ever found in a
9  securities fraud case that transactions were improper,
10  any transactions were improper?
11      MR. GLENNON:  Object to the extent it calls
12  for a legal conclusion.
13      THE WITNESS:  I don't recall having done that,
14  no.
15      MR. GREENSTEIN:  Q.  Have you ever provided
16  expert testimony regarding the materiality of financial
17  misstatements?
18      A.  Yes.
19      Q.  And what cases did you do that in?
20      A.  Number 1 would have involved materiality.
21  Number 5 would involve materiality.
22      Q.  Clark versus Ernst and Young?
23      A.  Yes.
24      Q.  And you were retained by Ernst and Young?
25      A.  I was, yes.  Number 9 would have involved

26

1  materiality.
2      Q.  Let me back up.  So number 5, Clark versus
3  Ernst and Young, you were retained on behalf of Ernst
4  and Young, the defendant?
5      A.  That's correct.
6      Q.  And you opined on the materiality of financial
7  misstatements; correct?
8      A.  Any time there is an alleged misstatement,
9  materiality is a factor, so it is by nature a part of
10  the assignment.
11      Q.  So that it is -- that's always the case, if it
12  is a financial misstatement, necessarily it has a
13  materiality component?
14      A.  Well, it has to, yeah, because APB 20, which
15  defines accounting errors, only requires they be treated
16  as a prior period adjustment under GAAP if they are
17  material.
18      Q.  So Clark versus Ernst and Young, you were
19  retained on behalf of Ernst and Young, and did you find
20  that they materially misstated their financials?
21      A.  No.  I found that Ernst and Young's accounting
22  practices and the accounting by which they opined on the
23  assertions of management were appropriate.
24      Q.  And number 9, Thayer v. Ernst and Young, I
25  think you mentioned that involved financial

27

1  misstatements; correct?
2      A.  It did, yes.
3      Q.  And you were retained on behalf of the
4  defendant Ernst and Young; correct?
5      A.  That is correct.
6      Q.  And what was the general opinion that you
7  submitted in that case?
8      A.  Whether or not Ernst and Young had properly
9  complied with GAAS in opining on the GAAP financial
10  statements of Thayer.
11      Q.  Did you find they properly complied with GAAS?
12      A.  I did, yes.
13      Q.  Did you also opine on whether the -- did you
14  just opine on whether Ernst and Young complied with
15  GAAS, or did you also opine whether certain transactions
16  complied with GAAP?
17      A.  Both.
18      Q.  Did you find the transactions that were at
19  issue complied with GAAP?
20      A.  No, they did not comply with GAAP, because
21  they were a fraud.
22      Q.  And what was -- just explain generally what
23  those transactions -- well, strike that.
24      So you found that there were certain financial
25  transactions that violated GAAP but Ernst and Young did

28

1   not violate GAAS in connection with those transactions;
2   is that correct?
3       A.  That's correct.
4       Q.  Do you remember the general nature of the
5   fraud in that case?
6       A.  It was a collusive fraud by management,
7   whereby they were changing bank statements and changing
8   sales invoices.
9       Q.  And you found that Ernst and Young complied
10  with GAAS?
11      A.  I found that Ernst and Young in performing
12  their auditing had complied with GAAS, yes.
13      Q.  Now, let's go down a line.  Any other
14  securities fraud related cases -- I see number 11
15  involves Ernst and Young also?
16      A.  That is correct.
17      Q.  Was that a securities fraud case?
18      A.  You know, I don't remember.  I'm sorry, was
19  that a securities fraud case, was your question?
20      Q.  Correct.
21      A.  I don't know if it was a securities case.  It
22  was a case that involved fraud.
23      Q.  Was it fraud allegations against Ernst and
24  Young?
25      A.  No.  It was allegations that Ernst and Young

29

1   had not performed a GAAS audit.
2       Q.  And you represented Ernst and Young?
3       A.  I did, yes.
4       Q.  What was your conclusion?
5       A.  That they had adhered to GAAS.
6       Q.  Okay.  So just going down the list, any others
7   besides number 19?
8       A.  Sorry, you're looking for --
9       Q.  Securities fraud related accounting fraud
10  cases.
11      A.  Oh.  Well, we talked about 19, that certainly
12  had those issues.
13      Q.  All right.
14      A.  Clear Channel versus City of Mountain View.
15      Q.  Number 20?
16      A.  Yes.  Involved a lease between Clear Channel
17  and the City of Mountain View where there was, I
18  believe, fraud involved.
19      Q.  And you were retained on behalf of the City of
20  Mountain View?
21      A.  That's correct.
22      Q.  What was your conclusion in that case
23  generally?
24      A.  That, in fact, Clear Channel or their
25  subsidiaries had, in fact, misreported certain financial

30

1   information to the city.
2       Q.  But Clear Channel was suing the city; correct?
3       A.  It was.  But the city counter-sued Clear
4   Channel.
5       Q.  Got it.  What was the outcome of that case?
6   Do you remember generally?
7       A.  The City of Mountain View was successful in
8   their case.
9       Q.  Okay.  Have you ever testified regarding
10  revenue recognition issues related to SOP 97-2?
11      A.  Yes.
12      Q.  How many cases, approximately?
13      A.  Dozens of times.
14      Q.  Any on here that jump out at you?
15      A.  The SEC v. Weitzen case involved SOP 97-2, as
16  I recall.
17      Q.  Okay.
18      A.  Thayer v. Ernst and Young involved 97-2.
19      Q.  Okay.
20      A.  Clark v. Ernst and Young involved 97-2.
21  Number 11, Otter Creek versus Ernst and Young involved
22  97-2.  Those would be the ones that come to mind on this
23  list.
24      Q.  Is it fair to say in all of those cases your
25  conclusion was that 97-2 was not violated?

31

1       A.  No, because to the extent there was a fraud,
2   and the earnings process was not complete based on 97-2,
3   the financial statements would have been misstated.
4       Q.  So, of these cases that involved 97-2, did you
5   ever issue an opinion or testify at trial that a
6   particular transaction violated SOP 97-2?
7       A.  On the number 11, I believe there was
8   testimony that because of fraud that certain
9   transactions, certain revenue was recognized
10  inappropriately and it would have been recognized under
11  97-2.  I don't remember if I specifically said 97-2 is
12  violated.
13      Q.  Was it software revenue recognition?
14      A.  It was, yes.  Software and hardware.
15      Q.  In other words, there were software
16  transactions -- you found that there were software
17  revenue transactions that were improperly booked,
18  regardless of whether they were under 97-2 or whatever
19  applicable rules; correct?
20      A.  That's correct.
21      Q.  Okay.  And that was at trial you testified
22  about that?  Or did you issue a report on that?
23      A.  Both.
24      Q.  Both; okay.  Do you have that report from that
25  case?

32

1    A.  Do I?

2    Q.  Yeah.

3    A.  I don't know if I still have that report or

4  not.

5    Q.  Okay.  Do you have a deposition transcript in

6  that case?

7    A.  I wouldn't have that.  I don't save those.

8    Q.  You don't save those?

9    A.  No.

10    Q.  Any?

11    A.  I don't save deposition transcripts.

12    Q.  Okay.  Do you save your reports?

13    A.  Typically I don't.  Whether or not this one

14  has been saved, I have no idea.

15    Q.  Do you save trial transcripts of testimony at

16  trial?

17    A.  I don't even get that.

18    Q.  You don't get that; okay.

19       And so were any of these other four cases that

20  you mentioned involving SOP 97-2, did you issue any type

21  of opinion or testify at trial that any transactions

22  were improper under 97-2?

23    A.  I believe Clark V. Ernst and Young had those

24  issues.  I believe number 9, Thayer V. Ernst and Young

25  had those issues.  Number 11 had those issues.

33

1    Q.  Let me stop you there.  Are you saying in

2  those cases you found -- you either testified or

3  proffered expert -- an expert report finding that a

4  transaction was improper under SOP 97-2?

5    A.  Maybe I need to explain this a little bit.  SOP

6  97-2 is used quite a bit by software and high-tech

7  companies, but it really, if you look at SAB 101, issued

8  by the SEC, the four criteria within SOP 97-2 are the

9  exact criteria, that is evidence of a transaction, fixed

10  or determinable price, that the delivery has taken place

11  and the collectibility is assured.  So that bit of GAAP

12  is really pervasive throughout most revenue recognition,

13  whether it be software or whether it be construction.

14    Q.  Right, okay.  So what I'm trying to get at, in

15  any of those cases did you find a transaction was

16  improper under those rules, a revenue transaction was

17  improper?

18    A.  Yes.  And, that's what I was trying to answer,

19  I'm sorry, on the last question.  As I said, number 5 is

20  that way.

21    Q.  Okay.

22    A.  Do you want me to go down the list again?

23    Q.  You said 5, 9, 11?

24    A.  5, 9, 11, 19.  Those are the ones I can think

25  of as I sit here right now.

34

1    Q.  Do you have the reports in those cases?

2    A.  No.  I don't know if the actual -- some of

3  these I don't know if a report was issued.  And if it

4  was issued, I don't know if I would have it or not.  I

5  would have to check.

6    Q.  Can you do that?  Just make a note, if you're

7  willing to produce those, we would like them.

8    A.  So, so far I'm doing bills and reports.

9    Q.  Correct.

10    A.  So the list is complete.

11    Q.  We don't need the bills in the other cases.

12    A.  Understand.

13    Q.  So 5, 9, 11, 19, 20.

14    A.  Okay.

15    Q.  Has your testimony in any case in the past

16  five years ever been excluded by the court?

17    A.  No.

18    Q.  Never?

19    A.  No.

20       MR. GREENSTEIN:  Okay.  I'd like to mark this

21  as No. 3.

22       (Exhibit 3 marked for

23            identification.)

24       MR. GREENSTEIN:  Q.  For the record, this is

25  an expert witness report dated September 20th, 2004 from

35

1  J. Duross O'Bryan in the case GMG Stone, Inc.  Do you

2  recognize this document, Mr. O'Bryan?

3    A.  I do.

4    Q.  And was this a report that you produced in

5  connection with your report in this case?

6    A.  I'm sorry, what?

7    Q.  Do you recognize this document in front of

8  you?

9    A.  I do, yes.

10    Q.  And did you produce this in connection with

11  this case?

12    A.  Did I produce this in connection with this

13  case?

14    Q.  Yeah.

15    A.  I think it is on the list on Appendix B.

16    Q.  Well, I will represent to you it was produced

17  to us in connection with your opening report.  Did you

18  know that?

19    A.  I did not know that.

20    Q.  You didn't know that?

21    A.  No.

22    Q.  Okay.  If you look at -- what was this case

23  about, generally?  Actually, strike that.  If you turn

24  to Appendix B in the document.

25    A.  I'm there, yes.

36

1    Q.  And this is -- so this is a report dated
2  September 20th, 2004.  And it says it is a list of
3  testimony at deposition, trial and arbitration for
4  period January 1st, 1994 through September 20th, 2004.
5  Do you see that?
6    A.  I do, yes.
7    Q.  And then it's two pages.  And it looks like it
8  goes all the way back to 1994; correct?
9    A.  That's correct.  This produced a much greater
10  number because of the dates.
11    Q.  Right.  So this is ten years of testimony or
12  expert testimony at trial or in deposition; correct?
13    A.  I believe that's true, yes.
14    Q.  Okay.  Do you know if this is accurate?
15    A.  I believe it is, yes.
16    Q.  If you turn to page 2.
17    A.  I'm there.
18    Q.  And well, do you remember a case called Parnes
19  V. Harris involving a company called Puris Technologies?
20    A.  I do.
21    Q.  You do?
22    A.  Yes.
23    Q.  Do you remember when that deposition took
24  place?
25    A.  I don't.

37

1    Q.  Do you remember what that case was about?
2    A.  As I recall, it was about accounting issues,
3  and it seemed to me it was about bad debt, bad debt
4  issues or something like that involved.
5    Q.  Bad debt reserve?
6    A.  I don't recall if it was reserve, or there was
7  warranty issues.  I don't recall the details of that
8  case.
9    Q.  And do you remember who you were retained by
10  on that case?
11    A.  As I recall it was Brobeck.
12    Q.  Brobeck is a law firm?
13    A.  Correct.
14    Q.  Were you retained by Brobeck to testify on
15  behalf of a party in that case?
16    A.  Yes.
17    Q.  Who was the party?
18    A.  I don't recall who the party was.  It may have
19  been Puris, the company.
20    Q.  Was it KPMG Marwick, perhaps?
21    A.  No.  No, I wasn't -- I was not retained on
22  that for KPMG.  I can't recall.  It was for the company.
23  KPMG was involved, I believe.
24    Q.  For Puris you were retained?
25    A.  I believe that's true, yes.

38

1    Q.  Do you remember the approximate date of that
2  deposition?
3    A.  I don't.
4    Q.  You were deposed in that; correct?
5    A.  As I recall, I was, yes.
6    Q.  And you submitted a report in that case;
7  right?
8    A.  I don't recall whether or not a report was
9  submitted.
10    Q.  But if it was -- if it was, say, in 2002, it
11  would be on this list here, page 2, Appendix B of
12  Exhibit 3 that you're looking at; right?
13    A.  It would be an page 1 or 2, yes.
14    Q.  Do you see it on this list?
15    A.  I don't.  But I don't know the timing of it,
16  number one.  And number two, sometimes, obviously, the
17  names are different than Puris or the obvious ones.
18    Q.  Do you remember a case called Parnes v.
19  Harris?  I will represent to you that's the case
20  involving Puris.
21    A.  Yeah, I didn't know that was the case name.
22    Q.  Okay.  Okay.  And do you remember ever being
23  involved in a case involving Stroock, Stroock and Lavan,
24  which is a law firm?
25    A.  I do, yes.

39

1    Q.  And do you remember who retained you in that
2  case?
3    A.  The case I'm thinking of was just in the last
4  couple of years.  And as I recall, I was retained by the
5  firm Stroock, Stroock and Lavan.
6    Q.  You provided expert testimony on behalf of the
7  law firm Stroock, Stroock and Lavan; correct?
8    A.  No.  The case settled before I testified, as I
9  recall.
10    Q.  If you turn to Appendix B of Exhibit 1 now,
11  which is your opening report in this case.
12    A.  Appendix B, I'm there.
13    Q.  You see number 8, Stroock, Stroock and Lavan
14  versus Houston RCW?
15    A.  I see that, yes.
16    Q.  The deposition date was May '04 it looks like;
17  correct?
18    A.  Yes.
19    Q.  Is there a reason that that case is not on
20  Appendix B to Exhibit 3 that we just looked at?
21    A.  Well, this was an American Arbitration
22  Association.  We say deposition.  I don't recall
23  testifying in a case for Stroock, Stroock and Lavan.
24    Q.  Okay.  Let's turn to Exhibit 3 now, Appendix
25  B.  You see it says, "Testimony at Deposition, Trial

40

1  and/or Arbitration for Period January 1st, '94 through
2  September 20th, 2004"?
3      A.  I'm sorry, you're on Exhibit 3 now, page --
4      Q.  I know this is confusing.  Appendix B of
5  Exhibit 3.
6      A.  I'm there, yeah.
7      Q.  And you see how it says, "and/or Arbitration"
8  at the top?
9      A.  I do, yes.
10      Q.  Is there a reason that that Stroock case is
11  not listed on there?
12      A.  I don't know.  Unless we realized I didn't
13  testify on that and there was a mistake made in the
14  original report.  Because I don't remember testifying on
15  a case for Stroock.  I know I was named on a case for
16  Stroock.  As I recall it was a Houston case.  But as I
17  recall, that case settled before I testified.
18      Q.  So, were you deposed?
19      A.  I don't recall being deposed.  It says I was
20  in May of '04, but I don't recall that.
21      Q.  Okay.  You said you reviewed the second
22  amended complaint in this case; correct?
23      A.  I believe that's true, yes.
24      Q.  Now, you may not know the distinction, but do
25  you know if it is the second amended complaint or the

41

1  revised proposed second amended complaint?
2      A.  If you let me get to my documents.
3      Q.  Sure, no problem.
4      A.  It says here, "Revised Second Amended
5  Complaint."  I'm referring to tab 2 within my binder.
6      Q.  Tab 2, is that a footnote to your opening
7  report?
8      A.  It is footnote 1 to my opening report.
9      Q.  Okay.  Great.
10      A.  There is an annotated version of this report
11  that has references, read references, that tie to the
12  documents in the three binders I have for the rebuttal,
13  two binders for the original report.  So the sections
14  may not exactly match up with the footnotes because they
15  are just different.
16      Q.  But if I were -- the report I have if I were
17  to look at the footnotes that refer to documents, would
18  those be accurate references?
19      A.  Absolutely.  They may just have a different
20  section within my support binder.
21      Q.  Got it; okay.  So after reading the complaint,
22  what is -- strike that.
23          What is your understanding of which quarters'
24  financial reports are alleged to be false and misleading
25  in this case?

42

1      A.  The second quarter of fiscal '01.
2      Q.  You're not here to testify or you don't intend
3  to testify on the falsity of Oracle's third quarter 2001
4  results; right?
5      A.  I am not testifying on the accuracy of the
6  third quarter of 2001.  I am testifying, however, that I
7  don't believe that any either alleged or potential
8  misstatements affected the second quarter, and they did
9  not affect the third quarter.
10      Q.  So you are not -- in this case you do not
11  intend to provide any testimony as to the accuracy of
12  Oracle's third quarter financial results; right?
13      A.  Only to the extent that my opinion is that any
14  accounting alleged errors or alleged misclassifications
15  affected the second quarter, and not the third quarter.
16  But I'm not going to opine about what those numbers were
17  in the third quarter or what they should have been.
18      Q.  So is it fair to say that to the extent
19  that -- strike that.
20          Are you saying that to the extent that the
21  second quarter results are inaccurate, you're not
22  opining on whether or not the third quarter was
23  inaccurate by nature of the second quarter being
24  accurate?  Is that fair to say?  Is that what you mean?
25          MR. GLENNON:  I object on vagueness grounds.

43

1          MR. GREENSTEIN:  Q.  I don't understand what
2  you mean in your last statement.
3      A.  Maybe I can simplify it.  All I'm suggesting
4  is that the second quarter alleged misstatements affect
5  the second quarter only, they do not affect any other
6  quarter of Oracle.  So they don't affect the third, they
7  don't affect the fourth.  They affect the second quarter
8  only.  They are isolated to the second quarter.
9      Q.  Okay.  Well, to the extent revenue was
10  improperly recognized in the second quarter and should
11  never have been recognized, wouldn't that have an impact
12  on the third quarter results?
13      A.  No.  It would be a second quarter issue.
14      Q.  Right.  But if a transaction was booked, for
15  example, $20 million improperly in the second quarter,
16  and it should never have been booked in any quarter?
17      A.  That would affect the second quarter only.
18      Q.  Wouldn't that revenue be part of Oracle's
19  financial statements in the third quarter?
20      A.  No.  Because it was booked in the second
21  quarter.
22      Q.  But -- so, your testimony in this case is only
23  on the accuracy or -- the accuracy of the second quarter
24  results; is that correct?
25      A.  Yes.  And just to clarify, only that it

44

1  involves the second quarter.  It doesn't affect any
2  other quarter.
3       So, in other words, my opinion is that whether
4  it is $$20 million that affected the second quarter or
5  $40 million, $20 million with the bad debt reserve
6  transfers allegedly done improperly, $20 million for the
7  HP transaction allegedly done improperly, those affect
8  the second quarter.  There is no rollover effect into
9  the third quarter because of those issues.
10  Q.  Why is that?  Why do you believe that to be
11  the case?
12  A.  Because they were booked in the second
13  quarter.  And if they are found to be not second quarter
14  transactions, they come out of the second quarter.
15  Q.  Okay.  So in the case of a misstatement of a
16  particular quarter in general, is it always the case
17  that that misstatement can't impact the next quarter's
18  results?
19  A.  No.  There could be issuances -- there can be
20  instances where you may move from one quarter to the
21  next.
22  Q.  To the extent something was improperly put --
23  improperly reflected in Oracle's balance sheet in the
24  second quarter and remained -- and that was improper,
25  wouldn't it remain on the balance sheet in the third

45

1  quarter?
2  A.  No.  Because the third quarter would be
3  trued-up for actual results.
4  Q.  What if they didn't reverse whatever was
5  improper in the second quarter in the third quarter?
6  A.  Well, you wouldn't reverse.  What we're
7  talking about here, I think you're talking about is the
8  reserve itself.
9  Q.  No.  I'm talking about in general, whether a
10  misstatement in one particular quarter can impact the
11  next quarter.
12  A.  It can if it should have been moved to that
13  next quarter.  But in this case, the issues we're
14  talking about just affect the second quarter, not the
15  third quarter.
16  Q.  If you could turn to page 21 in your opening
17  report, which is Exhibit 1, please.
18  A.  I'm there.
19  Q.  See how it says, "Reviewed various accounting
20  reports and documents"?
21  A.  I'm there.
22  Q.  And the first paragraph is, "Review of Summary
23  Reports."
24  A.  I'm there.
25  Q.  On this paragraph it appears that you say in

46

1  the second sentence, "The first report I reviewed was a
2  transaction register"; correct?
3  A.  Correct.
4  Q.  "Which listed all debit memos generated for
5  that day."  Do you see that?
6  A.  I do.
7  Q.  Okay.  And then the next sentence says, "I
8  inspected the account analysis report."  Do you see
9  that?
10  A.  Two sentences down you mean?
11  Q.  The one after the transaction -- yes, yes.
12  A.  "I inspected the account"; I'm there, yeah.
13  Q.  You looked at the transaction register and the
14  account analysis report; correct?
15  A.  I did look at those two reports, yes.
16  Q.  Okay.  And then in the next full paragraph it
17  says, "I also reviewed a sales journal by GL account
18  report."  Do you see that?
19  A.  I do, yes.
20  Q.  So, the next section says, "Review of Sample
21  On-Account Transactions."  You see that?
22  A.  I do, yes.
23  Q.  In those two paragraphs it appears that you
24  say you reviewed three reports, the transaction
25  register, the account analysis report and sales journal

47

1  by GL account report; is that fair to say?
2  A.  Correct, yes.
3  Q.  Now, are those the only reports you relied on
4  in rendering your opinion in this case?
5  A.  No.  I've seen dozens of reports.
6  Q.  Okay.  So with respect to these particular
7  reports, why did you cite them in this section?
8  A.  Because they have to do with understanding
9  whether or not there was any financial impact of the
10  debit memos booked on November 17th, 2000.
11  Q.  Okay.  And so let's take the first one, the
12  transaction register.  Do you see that?
13  A.  Yes.
14  Q.  And it says it listed all debit memos
15  generated for that day.  Do you see that?
16  A.  I do.
17  Q.  And how does that tell you what the financial
18  statement impact of the debit memo says?
19  A.  You can see both a debit and credit in the
20  account for the debit memos.  So you see both debits and
21  credit, which would mean the same amount, $692 million,
22  which would mean there would be no financial statement
23  impact.
24  Q.  Let me back up a little bit.  In proffering
25  your expert report, you have a list, Exhibit C, that

48

1  provides all of the documents that you relied upon in
2  rendering your opinion; is that correct?
3  A. That's correct.
4  Q. If you could turn to that Exhibit C for me.
5  A. I'm there.
6  Q. Okay. And see how it has a list of
7  depositions?
8  A. It does, yes.
9  Q. I'm going to list some names and ask you if
10 you've relied upon those depositions. Is that okay with
11 you?
12 A. Certainly.
13 Q. Do you know who Terry Elam is?
14 A. Terry Elam. I don't recall that name.
15 Q. Did you read his deposition?
16 A. I don't recall reading that deposition.
17 Q. Do you know who Julie Chan --
18 A. I'm sorry, are you talking about with respect
19 to the original report or either?
20 Q. Just talking about the original, the opening
21 report.
22 A. Yes. Julie Chan, yes, I know that name.
23 Q. Back to Terry Elam, did you read the
24 deposition in connection with your rebuttal report?
25 A. I have to look at that.

49

1  Q. Let me ask you this. If there is not a
2  deposition listed here, is it fair to say that you
3  didn't review that deposition transcript?
4  A. No, that's not fair to say.
5  Q. So there is some depositions you reviewed that
6  are not on this list?
7  A. Yes.
8  Q. Well, did you read the deposition of Terry
9  Elam at any time?
10 A. I can't recall that deposition.
11 Q. Okay. Now, back to Appendix C with the
12 opening report. It doesn't indicate that you relied
13 upon Julie Chan's deposition. Did you read it before
14 you submitted the report?
15 A. I did read Julie Chan's deposition.
16 Q. But you didn't rely on anything in her
17 deposition?
18 A. I did, actually, where she talked about the
19 transferring from the unapplied -- 25005 unapplied into
20 the 12018.
21 Q. So you relied on Julie Chan's testimony in
22 your opening report?
23 A. It may be in the rebuttal report.
24 Q. What I'm asking, did you -- I'm going to focus
25 on this opening report.

50

1  A. Okay.
2  Q. Probably for a couple hours.
3  A. Okay.
4  Q. So I'm just asking you what you relied upon in
5  your opening report.
6  A. Well, it would be -- I'm sorry, yes.
7  Q. Do you understand that?
8  A. I do, yes.
9  Q. So what I'm asking is if you reviewed --
10 strike that. What I'm asking is if you relied upon
11 anything in Julie Chan's testimony in this opening
12 report.
13 A. I did. I was aware of her testimony. I read
14 her testimony specifically about the transfers from the
15 25005 account into the 12018 account.
16 Q. So, you rely upon her testimony in this
17 opening report?
18 A. I believe I do, yes.
19 Q. So why isn't it listed there?
20 A. There may also be references in the footnotes
21 within the report itself to different testimony. I
22 don't recall if that's in here or not.
23 Q. Well, to the extent that Julie Chan is not
24 specifically cited in the opening report, is there a
25 reason why you wouldn't list it if you relied upon her?

51

1  A. No. It may be that I was aware of that
2  information, it was something that I considered, it was
3  consistent with what I had seen from other testimony.
4  And I didn't see it necessary to include that.
5  Q. So you didn't rely upon any testimony of Julie
6  Chan in this opening report, to the extent it is not
7  cited?
8  A. Well, I mean, I looked at a number of
9  different things. And some of this testimony I had
10 heard and/or seen from other sources, with respect
11 to that transfer in the Arthur Andersen document,
12 specifically. And then if I saw testimony from Julie
13 Chan that corroborated that, I considered that.
14 Q. So you considered the testimony of Julie Chan
15 in rendering your opening report, but you didn't rely
16 upon it?
17 A. I think that's a fair statement.
18 Q. Okay. The only reason I'm saying this,
19 because it says documents relied upon and you have depo
20 transcripts. I'm trying to find out if there are any
21 depo transcripts that you relied upon that aren't in
22 here.
23 A. I can't think of anything that I excluded.
24 Q. I'm just going to list some names, and let me
25 know if you've read those.

52

1    Ian Hitada?

2    A.  I have reviewed some of Ian Hitada's

3    deposition testimony.

4    Q.  Did you review his deposition before you filed

5    your opening report?

6    A.  I don't recall that he's referenced in my

7    opening report.

8    Q.  Okay.  So is it fair to say you did not rely

9    on -- or you did not read Ian Hitada's testimony prior

10   to issuing your opening report?

11   A.  I think I had read it.  I just don't know that

12   I had relied upon it.

13   Q.  How about, do you know who Michelle Davidson

14   is?

15   A.  I don't know that name.

16   Q.  So you probably never read her depo?

17   A.  I may have.  I just don't recall the name as I

18   sit here.

19   Q.  I'll represent to you she was a 30(b)(6)

20   witness that testified on behalf of Household

21   Corporation.

22   A.  Okay.

23   Q.  Did you read that deposition before you

24   submitted your opening report?

25   A.  I don't recall reading that deposition.

53

1    Q.  Okay.  But you opine in your opening report --

2    you opine on the Household transaction; correct?

3    A.  I do, yes.

4    Q.  But you hadn't read Michelle Davidson's

5    testimony in reaching that conclusion?

6    A.  I don't recall reading her deposition, nor do

7    I think it was required to come to the opinion that I

8    did.

9    Q.  Okay.  But I'm just asking if you read it in

10   forming your opinion on Household.

11   A.  I don't recall reading her opinion -- her

12   deposition, excuse me.

13   Q.  Okay.  Was there a reason you didn't?

14   A.  No.

15   Q.  Okay.  Ryan Roberts?

16   A.  I don't recall the name.

17   Q.  Okay.  Sanjay Kumar?

18   A.  I do recall that name.

19   Q.  Do you know who Sanjay Kumar is?

20   A.  I forget who that individual is.

21   Q.  Well, it is not listed in here.  And I'll

22   represent to you that all these names I'm listing aren't

23   cited specifically in your opening report.  So I just

24   want to make it clear, I'm going to establish whether or

25   not you relied upon them, despite the fact it is not

54

1    cited.  Does that make sense?

2    A.  Yeah.  Yeah.  If it is not cited and it is not

3    on Appendix B, it wasn't something I relied on.

4    Q.  So, did you read the deposition of Ryan

5    Roberts prior to issuing your opening report?

6    A.  I don't recall.

7    Q.  Is that a no, or you just don't remember?

8    A.  I don't recall if I read that or not.

9    Q.  Do you know who Ryan Roberts is?

10   A.  No.

11   Q.  Sanjay Kumar, did you read his deposition

12   before you submitted your opening report?

13   A.  I don't recall reading his before my original

14   report, no.

15   Q.  You don't know who he is?

16   A.  I don't recall exactly his title.

17   Q.  Do you know anything about Sanjay Kumar?

18   A.  Not as I sit here right now.

19   Q.  Do you know who Raul Campos is?

20   A.  I do, yes.

21   Q.  Did you read his deposition before you

22   submitted your opening report?

23   A.  I thought I had reviewed through Mr. Campos'

24   deposition before my opening report, yes.

25   Q.  And -- but you didn't rely upon it, obviously,

55

1    right, because it is not listed in Appendix C?

2    A.  Correct.

3    Q.  How about Tom Rathjens?

4    A.  I know who Tom Rathjens is.

5    Q.  He's not listed in Appendix C to your opening

6    report.  Is it fair to say you didn't rely upon his

7    testimony in issuing your opening report?

8    A.  Mr. Rathjens is with HP, and, as you know, our

9    opening report was light on HP testimony, not knowing

10   what Mr. Rathjens might say about that.  So, there was

11   no reference to Mr. Rathjens.

12   Q.  You didn't read Mr. Rathjens' deposition

13   before opining on the HP transaction in your opening

14   report; correct?

15   A.  The original one; that's correct.

16   Q.  You said it was light on HP.  What do you mean

17   by that?

18   A.  If you refer to my opening report, the HP

19   transaction is discussed in page 41.  And when I say

20   light, it's simply a paragraph.  So that's what I mean

21   by light, when the rebuttal report speaks for almost 20

22   pages on the HP transaction.

23   Q.  And what's the reason why in your opening

24   report the HP transaction was, quote, unquote, light?

25   A.  Because that wasn't something that was pled

56

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

1  that I saw in the revised second amended complaint.  The
2  only accounting issue that I knew was in the revised
3  second amended complaint was the debit memos.
4      Q.  But you provide an expert opinion on page 41
5  of your opening report in which you say, "I do not
6  believe there is anything improper in Oracle's
7  recognition of revenue from the HP transaction."  Do you
8  see that?
9      A.  I do, yes.
10     Q.  So you proffered an expert opinion on the
11  propriety of that deal in this report; correct?
12     A.  I did, yes.
13     Q.  But you didn't read the deposition of HP's
14  witness before providing this testimony; correct?
15     A.  That's correct.
16     Q.  Okay.  So how did you go about determining
17  which depositions to read in connection with your
18  opening report?
19     A.  Ones that were relevant to my opinions.
20     Q.  Okay.  And how did you determine who was
21  relevant to your opinions?
22     A.  I looked through all the depositions that had
23  been taken and decided which ones were relevant or not
24  to me.
25     Q.  So you didn't think Raul Campos was relevant

57

1  to your opinion?
2      A.  As I said, I reviewed Mr. Campos' original
3  deposition in my original report, I just didn't rely on
4  it.
5      Q.  Okay.  How about Mike DeCesare, did you review
6  his deposition prior to rendering your opinion on
7  Hewlett-Packard?
8      A.  I did, yes.
9      Q.  You did?
10     A.  I did.
11     Q.  Did you rely on it?
12     A.  Prior to the original report?
13     Q.  Right.
14     A.  No.  I read Mr. DeCesare's deposition, as I
15  recall, but did not rely on it.
16     Q.  Okay.  So is it fair to say that in rendering
17  your expert opinion on page 41 and 42 of your opening
18  report on the HP transaction, you hadn't read the
19  depositions of either Tom Rathjens or Mike DeCesare; is
20  that correct?
21     A.  I don't think I had read -- I don't recall
22  about Mr. DeCesare's depo.  I don't recall reading
23  Mr. Rathjens' before that initial opinion.
24     Q.  So you don't -- so is that a no?
25     A.  I don't recall reading either one before my

58

1  initial opinion.
2      Q.  Okay.  Do you know who Mike DeCesare was?
3      A.  I do.
4      Q.  Who is he?
5      A.  An individual, as I recall, with HP, having to
6  do with -- excuse me, with Oracle, having to do with
7  some of the products that HP purchased from Oracle.
8      Q.  And you didn't -- you didn't think that was an
9  important deposition to read prior to issuing an expert
10  opinion on the HP transaction?
11     A.  No.  Because when you look at the HP
12  transaction, this was a transaction that was booked by
13  Oracle in the second quarter of 2001 for $19.9 million,
14  approximately.  It was reviewed by the audit committee
15  of Oracle, it was reviewed by Arthur Andersen, the
16  outside auditors, reviewed by the revenue recognition
17  group of Oracle.  That's where my initial opinion really
18  came from.
19        So what others said with respect to that was
20  really, quite frankly, irrelevant, and only additive to
21  my opinion that that transaction was booked properly,
22  which I still believe it is today.
23     MR. GLENNON:  Eli, we've been going for about
24  an hour and 15 minutes.  Can we take a short break?
25     MR. GREENSTEIN:  Sure.

59

1      VIDEOGRAPHER:  Off record at 10:42.
2        (Recess, 10:42 a.m. - 11:05 a.m.)
3      VIDEOGRAPHER:  On record at 11:05.
4      MR. GREENSTEIN:  Q.  Mr. O'Bryan, if you can
5  turn to page 21 of your opening report, which is
6  Exhibit 1.
7      A.  I'm there.
8      Q.  Okay.  And earlier we were talking about the
9  reviewed summary reports, and in these two paragraphs
10  you list out three reports, transaction register,
11  account analysis report and sales journal by GL account
12  report; is that correct?
13     A.  That is correct.
14     MR. GREENSTEIN:  I'm going to mark for the
15  record Exhibit 4, which is a transaction register.
16        (Exhibit 4 marked for
17         identification.)
18     MR. GREENSTEIN:  Q.  For the record, this is a
19  transaction register previously marked at the deposition
20  of Greg Myers as Exhibit 4.
21        Mr. O'Bryan, if you could just take a look at
22  it and let me know when you're done, please.
23     MR. GLENNON:  I object only to the extent it
24  appears this is an expert.
25     MR. GREENSTEIN:  That's true.  For the record

60

1   this is an 800-page document.  What we've done here,
2   which is the same thing we did in Mr. Myers' deposition,
3   was to produce the first ten odd pages and the last
4   pages, because it is a large document.
5       Q.  Do you have a problem with that, Mr. O'Bryan?
6       A.  I don't.
7       Q.  Have you seen this document before?
8       A.  I have, yes.
9       Q.  And what is it?
10      A.  This is a transaction register which reflects
11  the debit memos that were run on November 17th, 2000.
12      Q.  Now, were the debit memos run on November
13  17th, 2000, or another day?
14      A.  I thought they were right around there.  I
15  thought they were on the 17th.  They might have been
16  right around there.
17      Q.  Around the 17th.  But are you sure they were
18  run on the 17th?
19      A.  I'm not exactly sure exactly what day.  That's
20  the transaction date.  The invoice date shown on the
21  transaction register, that's always the date I've
22  referred to as being the debit memo date.
23      Q.  Right.  I'm just asking if you have formed an
24  opinion based on all the evidence you reviewed as to
25  when the debit memos actually were run.

61

1       MR. GLENNON:  Objection; asked and answered.
2       THE WITNESS:  I don't recall.
3       MR. GREENSTEIN:  Q.  So it might not have been
4   November 17th?
5       MR. GLENNON:  Objection; vague and ambiguous.
6       THE WITNESS:  I just don't recall what date
7   specifically.  I've always referred to it as the
8   November 17th, 2000 date.
9       MR. GREENSTEIN:  Q.  Right.  And why do you
10  refer to it as November 17th?  Because that's what was
11  in the complaint?
12      MR. GLENNON:  Same objection.
13      THE WITNESS:  No.  Because that's what the
14  document shows.  If you take a look at the transaction
15  register, it shows invoice date November 17th.  I don't
16  recall that I addressed that specific date in my report,
17  but I may.
18      MR. GREENSTEIN:  Q.  I think you said on or
19  about November 17th.
20      A.  There you go.
21      Q.  In any event, is this the transaction register
22  that you're referring to in the -- on page 21 of your
23  opening report in the first full paragraph under section
24  A?
25      A.  I believe it is, yes.

62

1       Q.  Okay.  And what does this document purport to
2   say?
3       MR. GLENNON:  Objection; the document speaks
4   for itself.  Vague and ambiguous.
5       THE WITNESS:  I'm sorry, what do you mean,
6   what does it say?
7       MR. GREENSTEIN:  Q.  "Relied on this
8   document," quoting your report, "for the purpose of
9   understanding the total impact of the November 17th,
10  2000 accounting entries."  This is the first report you
11  relied on in forming that opinion; correct?
12      MR. GLENNON:  Same objection.
13      THE WITNESS:  I relied on this report.
14      MR. GREENSTEIN:  Q.  Okay.  Well, I'm just
15  reading.  It says, "I reviewed various accounting system
16  reports produced by Oracle for the purpose of
17  understanding the total impact of the November 17, 2000
18  accounting entries."  Do you see that?
19      A.  I do.
20      Q.  Then it says, "The first report I reviewed is
21  the transaction register" --
22      A.  Right.
23      Q.  -- "which listed all debit memos generated for
24  that day."  Do you see that?
25      A.  Yes.

63

1       Q.  Is this that transaction register that you're
2   referring to in there?
3       A.  Is this Exhibit 4?
4       MR. GLENNON:  Objection; vague and ambiguous.
5       MR. GREENSTEIN:  Q.  Is that the document
6   you're referring to there?
7       A.  There is an excerpt document.  I've seen the
8   entire 800 pages.
9       Q.  Assuming that the rest of the pages -- but
10  this is the same document; correct?
11      MR. GLENNON:  Objection; vague and ambiguous.
12      THE WITNESS:  I believe this is the same
13  document.
14      MR. GREENSTEIN:  Q.  Well, just take a look at
15  it.  I'm just wondering, this is the same document that
16  you relied upon?
17      MR. GLENNON:  Objection; vague and ambiguous.
18      THE WITNESS:  I am sorry, I don't mean to be
19  difficult.  I think I testified I think this is an
20  excerpt version of the same document I relied on.
21      MR. GREENSTEIN:  Q.  Okay, but it looks the
22  same as the transaction register that you relied on,
23  right, the 800-page document?
24      A.  Yes.
25      Q.  It reflects the same information; is that

64

1  right?
2        MR. GLENNON:  Same objection.
3        THE WITNESS:  As best I can tell.  It is only
4  ten pages of it.
5        MR. GREENSTEIN:  Q.  Well, what is a
6  transaction register?
7        A.  It is an accounting report that basically
8  summarizes, depending on what the queries are of the
9  individuals running it, summarizes different
10  transactions either by account or by type or by day or
11  by GL number.
12        Q.  You said it depends on what the queries are of
13  the individuals running it; correct?
14        A.  Right.
15        Q.  So, do you know who the individuals were that
16  ran this?
17        MR. GLENNON:  Objection; vague and ambiguous.
18        THE WITNESS:  I don't know who pushed the
19  button to have this report run.
20        MR. GREENSTEIN:  Q.  But this report reflects
21  a query of whatever particular individual ran this
22  transaction register report; correct?
23        MR. GLENNON:  The document speaks for itself.
24        THE WITNESS:  That's correct.
25        MR. GREENSTEIN:  Q.  Do you know when this

                                        65

1  document was run?
2        A.  I don't.  There's a date at the top,
3  November 5, 2002.  That may just be a print date.  So,
4  it looks to me like this document was printed on
5  November 5th, 2002.
6        Q.  And you're aware that there is an unapplied
7  cash project at issue in this case that began in October
8  2002; correct?
9        MR. GLENNON:  Objection; foundation.
10        THE WITNESS:  And you mean project -- I'm
11  aware that the collections department of Oracle went
12  about the process of trying to clean up the transfers to
13  the reserve that occurred in the second quarter of 2001,
14  in October/November of 2002.
15        MR. GREENSTEIN:  Q.  Okay.  And so you said to
16  clean up the transfers to the reserve that occurred in
17  the second quarter of 2001; right?
18        A.  And I only mean -- cleanup, that's the term
19  everyone has used, it is a cleanup process.  And I put
20  that in quotes.
21        Q.  What is your understanding of what the
22  unapplied cash -- strike that.
23        From here on after I'm going to refer to it as
24  the 2002 cleanup.  Is that okay with you?
25        MR. GLENNON:  Objection.  You're going to

                                        66

1  refer to what as the 2002 cleanup?
2        MR. GREENSTEIN:  Q.  The unapplied cash
3  project beginning in October 2002.  You understand what
4  that is; right?
5        A.  I do, yes.
6        Q.  Because you opine on it in your report; right?
7        A.  I do, yes.
8        Q.  Okay.  I'm going to refer to that as the 2002
9  cleanup.  Is that okay with you?
10        MR. GLENNON:  Just point of clarification.
11  You're talking about all components of that, start date,
12  end date?  Anything and everything?  I think you need to
13  clarify exactly what it is you're talking about.
14        MR. GREENSTEIN:  Q.  The project that started
15  October 2002 involving the cleanup, as you call it, of
16  unapplied cash.  Is that fair to say?
17        MR. GLENNON:  Objection; vague and ambiguous.
18        THE WITNESS:  Is that a question?
19        MR. GREENSTEIN:  Q.  What is your
20  understanding of the unapplied cash project that began
21  in October 2002?
22        A.  My understanding is that the accounting
23  department of the company, Oracle, became aware of the
24  fact that there may have been transfers from 25005 into
25  12601 during the second quarter of 2001, sometime in

                                        67

1  2002.  And they went about a process of trying to make
2  sure that those transfers were appropriate.
3        And that's what I've referred to as the
4  unapplied cash project.  People call it cleanup.  I'm
5  not sure that's a great name for it.  But that's what my
6  understanding of that unapplied cash project was
7  starting in approximately October of 2002.
8        Q.  Okay.  So, is it your understanding that that
9  project was only focusing on addressing items of
10  unapplied cash that had been transferred from 25005 to
11  12601 during the second quarter?
12        A.  Yes.
13        Q.  And is that the extent of the project?
14        MR. GLENNON:  Objection; vague and ambiguous.
15        THE WITNESS:  I don't know.  I wasn't there at
16  the time they were doing it.  For all I know there were
17  other issues going on.  I do know that that was the
18  project that I understand that started the attempts to
19  make sure and understand the transfers or better
20  understand the transfers from 25005 to 12601.
21        MR. GREENSTEIN:  Q.  Okay.  So it is not your
22  opinion that the -- that the unapplied cash project that
23  began in approximately October 2002 was only focused on
24  the transfers from 25005 to 12601 in the second quarter
25  of '01; correct?

                                        68

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

1    MR. GLENNON:  Objection; vague and ambiguous.
2    THE WITNESS:  Well, I think that was the
3  primary objective of the exercise.  Whether or not there
4  were other components to it or someone else had to do
5  something during that time frame, I don't know, I wasn't
6  there.
7    MR. GREENSTEIN:  Q.  But you looked at all the
8  evidence in this case that you relied on in your report?
9    A.  I have, yes.
10    Q.  How did you get an understanding what happened
11  during that unapplied cash project?
12    A.  Based on my review in the depositions and also
13  seeing some of the work that was generated from that.
14    Q.  When you say the work generated from that,
15  what do you mean?
16    MR. GLENNON:  Objection; vague and ambiguous.
17    THE WITNESS:  If you look at -- there is a
18  summarized document that really looks at the cash -- the
19  transfers from 25005 into 12601 that was summarized over
20  a long period of time, and where some of the outcome of
21  that project, where that went.  There is a summary page
22  that I've referred to in my report and also relied on.
23    MR. GREENSTEIN:  Q.  And your opinion is that
24  $20.1 million in unapplied cash from 25005 was
25  transferred to 12601 in connection with the second

69

1  quarter in fiscal year '01; correct?
2    A.  In connection with?
3    MR. GLENNON:  Objection; vague and ambiguous.
4    THE WITNESS:  I don't know what you mean, in
5  connection with.
6    MR. GREENSTEIN:  Q.  You say you relied on a
7  document that kind of summarizes the outcome of the 2002
8  unapplied cash project; correct?
9    A.  Correct.
10    Q.  What was the total amount transferred from
11  25005 to 12601 during the second quarter?
12    A.  I think approximately $20 million.
13    Q.  That's reflected in your report; right?
14    A.  Correct.
15    Q.  And I think you said that Oracle learned of
16  these transfers around that time, 2002; correct?
17    MR. GLENNON:  Objection; vague and ambiguous,
18  mischaracterizes the testimony.
19    THE WITNESS:  I think that Oracle was in the
20  process of investigating the allegations made on the
21  debit memos, and that sometime during that process they
22  understood -- they came to find out there may have been
23  transfers between 25005 and 12601.  And that then
24  started a project, which is the unapplied cash project,
25  which started in about October of '02.

70

1    MR. GREENSTEIN:  Q.  It was the result of
2  plaintiffs filing their complaint in October 2002;
3  correct?
4    MR. GLENNON:  Objection; mischaracterizes the
5  testimony, calls for speculation.
6    THE WITNESS:  I don't know if that is the
7  genesis of it, or if -- I have no idea.
8    MR. GREENSTEIN:  Q.  But you mentioned
9  allegations regarding the debit memos; correct?
10    A.  That's correct.
11    Q.  So is it your -- strike that.
12    So are you testifying that Oracle learned of
13  these transfers from 25005 to 12601 in connection with
14  the investigation of the debit memo allegation?
15    MR. GLENNON:  Objection; vague and ambiguous.
16    THE WITNESS:  I don't know exactly how they
17  found out.  My understanding is that it was part of that
18  process.  But there could have been other reasons they
19  found out about it and investigated it.
20    I don't know exactly how they found out.  My
21  assumption it had to do with part of the investigation
22  into the debit memos.
23    MR. GREENSTEIN:  Q.  Okay.  Looking at what's
24  been marked as Exhibit 4, the transaction register for
25  November 17th, 2000.

71

1    A.  Yes.
2    Q.  If you look at the last page, appears to have
3  a total of $692,415,514.97.  Do you see that?
4    A.  I do, yes.
5    Q.  And what does that mean to you?
6    MR. GLENNON:  Objection; vague and ambiguous.
7  The document speaks for itself.
8    THE WITNESS:  What does this mean to me?
9    MR. GREENSTEIN:  Q.  You said of this
10  document, saying that this -- the, quote, "purpose
11  of understanding the total impact of the November 17th,
12  2000 accounting entries"; right?
13    A.  Yes.
14    Q.  So how does this document help you make that
15  determination?
16    MR. GLENNON:  Objection; vague and ambiguous.
17    THE WITNESS:  This just tells me the total
18  population of $692 million.  There was allegations in
19  the revised complaint that went about a process of
20  trying to extrapolate based on some script outputs of
21  some 926 that alleged that potentially in excess of $228
22  million was erroneously booked into revenue because of
23  the debit memos.  I found some of that -- those
24  calculations by the statistical individual -- I can't
25  think of his name, Mr. Laurentius or something like

72

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

1   that.
2        MR. GREENSTEIN: Q.  Marais.
3        A.  Marais.
4        Q.  Yes.  Laurentius, I think it is.
5        A.  Thank you.  -- rather interesting.  Because,
6   the fact is, we've been able to quantify this and it is
7   $692 million.
8        So this just starts out to say that was the
9   amount of the debit memos run on November 17th or on or
10  around November 17th for a total amount of $692 million.
11       Q.  So does this document show you what the
12  financial impact of the debit memos are on Oracle's
13  financial statements?
14       MR. GLENNON:  Objection; vague.
15       THE WITNESS:  No.
16       MR. GREENSTEIN: Q.  It doesn't?
17       A.  No.
18       Q.  Why is that?
19       MR. GLENNON:  Same objection.
20       THE WITNESS:  Because it just totals up to
21  $692 million.
22       MR. GREENSTEIN:  Okay.  Put that aside.  I'm
23  going to mark this as No. 5.
24       (Exhibit 5 marked for
25       identification.)

73

1        MR. GREENSTEIN:  For the record this, is a
2   document Bates stamped NDCA-ORCL 050356 through 360.
3   And it is entitled, "Account Analysis Report."
4        So, have you seen this document before?
5        A.  I have, yes.
6        Q.  And if you turn to page 7 of your rebuttal
7   report for me.
8        A.  7 of rebuttal now?
9        Q.  Yeah.
10       A.  I'm there.
11       Q.  Okay.  And you see that this document is cited
12  in footnote 20; correct?
13       A.  That's correct.
14       Q.  And I'm going to refer you to this sentence
15  that precedes footnote 20, it says, "Furthermore, the
16  account analysis report with payables detail illustrates
17  that the entire $692 million was both debited and
18  credited to the same account on November 17th, 2000."
19  Do you see that?
20       A.  I do.
21       Q.  You refer to this document that's been marked
22  as Exhibit 5; correct?
23       MR. GLENNON:  Objection; vague and ambiguous.
24       THE WITNESS:  I'm referring to Exhibit 5, yes.
25       MR. GREENSTEIN: Q.  Okay.  Now, what does

74

1   this document purport to be?
2        MR. GLENNON:  Same objection.
3        THE WITNESS:  This document is an account
4   analysis report, which basically looks at, again,
5   accounts, specifically in this case 25005 account.  And
6   it gives a summary of transactions that went on through
7   that for a period of time.
8        MR. GREENSTEIN: Q.  Okay.  And you say that
9   this document, quote, "illustrates that the entire $692
10  million was both debited and credited to the same
11  account on November 17th, 2000."  Do you see that?
12       A.  That's correct.
13       Q.  Where in this document does it reflect that
14  the entire $692 million was both debited and credited to
15  the same account on November 17th, 2000?
16       A.  On 050357.
17       Q.  Okay.  You're referring to the line where it
18  has a debit of approximately $692 million and a credit
19  of $692 million; right?
20       A.  Yeah.
21       Q.  If you look at the report cited on page 7 of
22  your rebuttal, it says, "The Account Analysis Report
23  with Payables Detail."  Do you see that?
24       A.  Right.
25       Q.  If you look at this document it just says,

75

1   "Account Analysis Report."  It doesn't say, "With
2   Payables Detail."
3        A.  Well, if you look down in the batch name, see
4   where it says payables?
5        Q.  I'm sorry, where?
6        A.  If you look down -- in all the pages, the
7   first two pages, and really throughout the document, if
8   you look, you will see where there is actually payables
9   detail as well.  This is just what's going on in the
10  25005 account.
11       Q.  Okay.
12       A.  And there is payable issues with respect to
13  that.  Payables is probably a refund.
14       Q.  Okay.
15       A.  So that's where we're talking about payables
16  detail there.  You see that referenced to the right of
17  batch name on 050356.
18       Q.  Okay.  So, but in your report it says the
19  account analysis report with payables detail.
20       Now, are you aware of a specific report that's
21  called the account analysis report with payables detail?
22       A.  I'm not suggesting that's the name of the
23  report.  I'm just saying it has payables detail on it,
24  which you can see under batch name.
25       Q.  And I'm asking, do you have an understanding

76

1   there is another report called account analysis report
2   with payables detail that's different than this?
3       MR. GLENNON:  Objection; incomplete
4   hypothetical, assumes facts not in evidence.
5       THE WITNESS:  I've never seen such a report
6   like that.
7       MR. GREENSTEIN:  Q.  So you're saying this is
8   an account analysis report that has payables detail in
9   it?
10      A.  Correct.
11      Q.  Okay.  So, again, how does this document
12   illustrate -- this is from your report, you say, "It
13   illustrates the entire $692 million is both debited and
14   credited to the same account on November 17th."
15      MR. GLENNON:  Objection as to form.
16      THE WITNESS:  If you refer back to Exhibit 4,
17   which is the transaction register, which in my opinion
18   is the summary of the debit memos run on or about
19   November 17th, you will see a number $692,415,514.97.
20   That exact same number is on Exhibit 5, and it shows in
21   this account as being both a debit and credit in the
22   account.  Debit memo, it is about ten lines up from the
23   bottom, it is the exact same number.  It is both a debit
24   and a credit, which would mean it has zero financial
25   statement impact.

77

1       Q.  Okay.  If you turn to page 12 in your opening
2   report, which is Exhibit 1.
3       A.  I'm there.
4       Q.  You see how there is some T accounts and
5   there's three steps, debits and credits?
6       A.  Pretty good, T accounts.
7       Q.  They are.
8           So, your opinion in your opening report is
9   that there were three offsetting debits and credits to
10   account 25005 on or around November 17; right?
11      A.  Correct.
12      Q.  If you look at the document that's Exhibit 5,
13   the account analysis report, you see there appears to be
14   one debit and one credit on November 17th reflecting
15   $692 million; do you see that?
16      A.  I do.
17      Q.  And if you look at page 7 of your rebuttal
18   report.
19      A.  Page 7.
20      Q.  7 of your rebuttal.  You're on it.  And you
21   say, "The account analysis report with payables detail
22   illustrates that the entire $692 million was both
23   debited and credited to the same account, November
24   17th."  Do you see that?
25      A.  I do.

78

1       Q.  Okay, so, where in this document does it show
2   that there were three offsetting debits and credits to
3   account 25005 of $692 million?
4       A.  Well, in two places.  With respect to the
5   debit memos, it is on page 050537.  That is showing the
6   debit memos going in and out.  Then the total impact,
7   25005, is on the very last page, excuse me, the second
8   to the last page, 050358.  And if you look there it is
9   about $2.06 billion.  If you multiply the 692 times 3,
10   that's the number you will get approximately.
11      Q.  I'm sorry, what page are you looking at?
12      A.  050358.
13      Q.  And you're looking at what number?
14      A.  Just look at the biggest number, $2 billion.
15      Q.  There's two numbers there, $2.923 billion on
16   debits and $2.826 billion on credits.
17      A.  Yeah.
18      Q.  Do you see that?
19      A.  If you add those two together, the bottom
20   ones, it is about the same number.  I think that's where
21   the three kind of were accumulated.
22      Q.  Okay.  But this document only shows one debit
23   and one credit to account 25005 in the amount of $692
24   million; right?
25      MR. GLENNON:  Objection; foundation.  The

79

1   document speaks for itself.  Vague and ambiguous.
2       THE WITNESS:  The document -- this document
3   shows that in that account, for debit memos, just debit
4   memos, there was $692 million going through as a debit
5   and credit.  That's on page 2.
6       MR. GREENSTEIN:  Q.  Right.
7       A.  And that's exactly what was debited and
8   credited to the account.
9       Q.  So turning you back to page 12 of your opening
10   report, the T accounts.
11      A.  Yes.
12      Q.  You see how it has three steps, and there is a
13   debit and credit to 25005.  Do you see that?
14      A.  I do.
15      Q.  You cite the testimony of Greg Myers for those
16   opinions; correct?
17      A.  Correct.
18      Q.  So what I'm asking is where in this document
19   does it show that there were three debits and credits to
20   25005?
21      A.  The other would net out.  But as I said, I
22   think I looked at this a little bit, just to kind of
23   think about that same issue.  On 050358, the
24   miscellaneous receipts, or receivables, miscellaneous
25   receipts under -- second one down, $2.063 billion.  So I

80

1  think that's where it actually gets -- all three are

2  shown in summary.

3  But the bottom line is, that it was -- the

4  debit memos went in and went out of the same account for

5  the same amount.

6  Q.  And you're saying -- on page 12 you say it

7  went in and out of the same account three times;

8  correct?

9  A.  Right.

10  Q.  And I'm asking you where on this document does

11  it indicate that that occurred?

12  MR. GLENNON:  Objection; vague and ambiguous,

13  asked and answered.

14  THE WITNESS:  Yeah, I think I've answered

15  that.  It is on page 2, which is the 692, okay.

16  MR. GREENSTEIN:  Q.  Um-hum.

17  A.  That's the sum of the debit memos, the sum net

18  effect of the debit memos, $692 million, which is

19  basically summarized as well on Exhibit 4.

20  Then if you wanted to try and summarize all

21  three, I think that's a component within 050358, which

22  is simply multiply those three by three and seeing that

23  number of about $2.063 billion.

24  Q.  But this report reflects all the debits and

25  credits going in and out of 25005 for this time period?

81

1  A.  Correct.

2  MR. GLENNON:  Objection; lack of foundation.

3  MR. GREENSTEIN:  Q.  So you look at page 2 of

4  this document, it shows one debit of $692 million and

5  one credit.  Do you see that?

6  A.  That's the one summarized amount that's been

7  summarized.

8  Q.  It's been summarized?

9  A.  Right.

10  Q.  So each of these numbers is a summary of --

11  I'm not sure I understand.

12  MR. GLENNON:  Objection; vague and ambiguous.

13  THE WITNESS:  That's the summary of Exhibit 4.

14  That was the debit memos run that put them into 25005 so

15  that they can then change the flag.

16  MR. GREENSTEIN:  Q.  What I'm asking is, this

17  report reflects all movements, or all debits and credits

18  in and out of 25005 for this time period, November 2000;

19  correct?

20  MR. GLENNON:  Objection; lack of foundation.

21  THE WITNESS:  You mean -- what document are

22  you talking about?

23  MR. GREENSTEIN:  Q.  Exhibit 5.

24  A.  Well, I don't know exactly what period -- this

25  says period October '00 to December '00.

82

1  Q.  But you said -- this is a document cited in

2  footnote 20 of your rebuttal report; right?

3  A.  Correct.

4  Q.  And you said that this report illustrates that

5  the entire 692 million was both debited and credited to

6  the same account; right?

7  A.  That's correct.  And it is on page 2.

8  Q.  Now, on page 12 of your opening report you say

9  there are three debits and credits to 25005 that occur

10  on that date; right?

11  A.  What I'm saying --

12  MR. GLENNON:  Let me assert an objection.

13  Vague and ambiguous.

14  THE WITNESS:  What I'm saying is that the

15  accounting process took three different steps, changing

16  from on-account to unapplied, going -- then issuing a

17  debit memo, which is transaction number two, or step two

18  of it, then applying those, then just changing the flag

19  back.

20  So the debit memos recorded in 25005 is step

21  two, and that shows -- the other ones are just changing

22  a flag.

23  MR. GREENSTEIN:  Q.  So, when you look at each

24  of these three T accounts, it says 25005; right?

25  A.  Right.

83

1  Q.  And there is a debit and a credit; correct?

2  A.  Correct.

3  Q.  And there's three debits and credits, or two

4  for each step; correct?

5  A.  Correct.

6  MR. GLENNON:  Object; vague and ambiguous.

7  MR. GREENSTEIN:  Q.  And I'm asking you where

8  that's reflected on this account analysis report, which

9  you said purports to show all the debits and credits

10  that occurred in 25005 during November 2000.

11  MR. GLENNON:  Objection; mischaracterizes the

12  testimony.  It's been asked and answered.

13  THE WITNESS:  Yeah, I think it is on page 2,

14  which is the $692 million.

15  MR. GREENSTEIN:  Q.  That's one debit and

16  credit; right?

17  A.  Right.

18  Q.  Where are the other two?

19  A.  Twofold.  One, it is just a changing of the

20  flag is the first and the third step.  And, two, I

21  believe that on page 05035 -- 60 -- excuse me, 050358,

22  you'll see a total of $2.063 billion.  I think that has

23  something to do with all three of them summarized.

24  Q.  Is it your expert opinion that that is the

25  three summarized?

84

1    MR. GLENNON:  Objection; vague and ambiguous,

2    lack of foundation.

3    THE WITNESS:  I haven't really researched it

4    in detail.  It is irrelevant.  $692 million went in and

5    $692 million came out.  That's the net impact.

6    MR. GREENSTEIN:  Q.  And I'm just wondering if

7    you can point me to somewhere on this document that

8    shows the three debits and credits to 25005 that you

9    conclude occurred on page 12 of your opening report.

10    MR. GLENNON:  Objection; vague and ambiguous,

11    asked and answered.

12    THE WITNESS:  Well, I'm not so sure you would

13    see it on there, because it was just a changing of the

14    flag, which wouldn't necessarily be reflected.  It may

15    be, as I mentioned, in the 050358, if that's where it is

16    completely summarized, which I think it might be.  I

17    haven't done that analysis.

18    Page 2 tells you exactly the total number of

19    debit memos that were run, and then used to apply and

20    change the flag.  That's the monetary impact to 25005.

21    The others are simply a changing of flags.

22    MR. GREENSTEIN:  Q.  Right.  But I'm asking if

23    your testimony is that there were three different debits

24    and credits to 25005 during November 2000?

25    A.  As summarized on page 12 of my initial report,

85

1    that's correct.

2    Q.  And those T accounts, your support for that is

3    the deposition of Greg Myers; correct?

4    A.  That is correct.  Well, yes, that's correct.

5    Plus I've seen these entries on output.

6    Q.  But -- besides script output, did you see

7    these three entries on any other document?

8    MR. GLENNON:  Objection; vague and ambiguous.

9    THE WITNESS:  A summary of those three

10    transactions?

11    MR. GREENSTEIN:  Q.  I'm talking about on

12    page 12 you indicate there are three offsetting debits

13    and credits to 25005; correct?

14    A.  That's correct.

15    Q.  And you cite Greg Myers' testimony for that;

16    right?

17    A.  That's one of the issues I cite, yes.

18    Q.  That's the only thing you cite on page 12;

19    correct?

20    A.  I've seen other things to tell me those

21    transactions occurred.

22    Q.  What other things have you seen?

23    A.  The script output.

24    Q.  Is that it?

25    MR. GLENNON:  Objection; vague and ambiguous.

86

1    THE WITNESS:  Also Mr. Williams testifies, on

2    page 13 of my report it says, "I knew that when they

3    processed those debit memos one of the first things that

4    Greg Myers told me is they booked equal and offsetting

5    debit and credit through 25005.  So by definition it did

6    not affect the balance sheet and could not have affected

7    the income statement."  So Williams also talks about it

8    as well.

9    MR. GREENSTEIN:  Q.  And it says Greg Myers

10    told him that, right?

11    A.  Yes.  But that's another individual that

12    understands it that way.

13    So, I don't remember if there is other

14    testimony people have talked about specifically those

15    offsetting.

16    Q.  I'm asking you besides Greg Myers' testimony,

17    besides Tom Williams' testimony based on what Greg Myers

18    told him, and besides the script output, is there any

19    document that reflects three offsetting debits and

20    credits to 25005 during this time?

21    A.  As I recall, the SEC presentation there was

22    also a discussion of the transactions.

23    Q.  Okay.  And that reflected three offsetting

24    debits and credits to 25005?

25    A.  I don't recall the specifics.  But I know it

87

1    talked about the process.  I don't remember if it said

2    three offsetting.

3    Q.  Okay.  Are there any internal Oracle documents

4    that reflect that that actually occurred in the general

5    ledger?

6    MR. GLENNON:  Objection; vague and ambiguous.

7    THE WITNESS:  Yes.

8    MR. GREENSTEIN:  Q.  What documents are those?

9    A.  Exhibit 4.  Exhibit 5.

10    Q.  But there's only one debit and credit in there

11    for 692?

12    A.  That was the sum effect of the debit memo,

13    $692 million.  That's what went into 25005 and was used

14    then to apply the unapplied and change the flag.

15    Q.  Okay.  But you don't see three offsetting

16    debits and credits to this account for $692 million; do

17    you?

18    MR. GLENNON:  Objection; vague and ambiguous,

19    lack of foundation.

20    THE WITNESS:  As I said, it may be part of

21    that last entry on that last page.

22    MR. GREENSTEIN:  Q.  It may be?

23    A.  I haven't done that, the math.  I think it is,

24    but I haven't done that.

25    But you wouldn't necessarily see that, because

88

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

1  it is the net effect of the credit memos, as I've said
2  before, which is the second entry is booking the debit
3  memo to then use to change the flag.
4      MR. GREENSTEIN:  Okay.  I'd like to mark this
5  as No. 6, please.
6      (Exhibit 6 marked for
7      identification.)
8      VIDEOGRAPHER:  This marks the end of tape one,
9  Volume I, in the deposition of J. Duross O'Bryan at
10  11:49.  Going off the record.
11      (Recess, 11:41 a.m. - 11:54 a.m.)
12      VIDEOGRAPHER:  On record at 11:54.  This marks
13  the beginning of tape two in Volume I in the deposition
14  of J. Duross O'Bryan.
15      MR. GREENSTEIN:  Q.  Mr. O'Bryan, referring
16  you to page 21 of your report under "Review of Summary
17  Reports," in the second full paragraph under the heading
18  A, it says, "I also reviewed a sales journal by GL
19  account report which listed all revenue recorded in the
20  general ledger in November 17th, 2000."  Do you see
21  that?
22      A.  I do, yes.
23      Q.  And I just marked what as Exhibit 6, for the
24  record is NDCA-ORCL 048989 through 049207.
25      And it is a Sales Journal by GL Account

89

1  Report, GL date November 17th, 2000.
2      Mr. O'Bryan, have you seen this document
3  before?
4      A.  I have, yes.  It is referred to in footnote 21
5  of my report, page 7.
6      Q.  Of your rebuttal report?
7      A.  Yes.
8      Q.  And so in your rebuttal report on page 7 you
9  say, "The sales journal by GL account report establishes
10  that Oracle only recognized approximately $10 million on
11  November 17th, 2000."  Correct?
12      A.  Correct.
13      Q.  And you got that -- how did you come to that
14  number?
15      MR. GLENNON:  Objection; vague and ambiguous.
16      THE WITNESS:  Just go to the very last page.
17      MR. GREENSTEIN:  Q.  So, you're referring to
18  the last page where it has a total of $10,111,399.34?
19      A.  Right.
20      Q.  What does that number represent?
21      A.  Revenue booked on that day by Oracle.
22      Q.  Okay.  You didn't do any other calculation to
23  support that number, it is just what is reflected on
24  this document; right?
25      MR. GLENNON:  Objection; vague and ambiguous.

90

1      THE WITNESS:  I don't understand the question.
2      MR. GREENSTEIN:  Q.  In other words, you
3  didn't do any calculations as to how much revenue was
4  actually booked at Oracle on that day; did you?
5      MR. GLENNON:  Same objection.
6      THE WITNESS:  This is the amount of revenue
7  booked on that day by Oracle.
8      MR. GREENSTEIN:  Q.  Okay.
9      A.  Speaking of calculations as well, I was
10  thinking about the three entries that we talked about a
11  moment ago on Exhibit --
12      MR. GREENSTEIN:  Q.  5?
13      A.  5.  And so what I want to do at the break was
14  see if I could do the math really quick and show to you
15  all three entries on this.
16      And as I thought and mentioned, it is, in
17  fact, on page 050358.  And the way you do the math is if
18  you take the first $692 million of debit memos, which I
19  talked about is the important piece of it, is on page
20  050357.  Then if you go to 05036 -- excuse me, 58, you
21  will see 2.063 billion and 2.095 billion.  The other
22  two transactions, step 1 and step 3 are in that, which
23  would then total $1,384,000,000.  So simply take step 1
24  and step 3 of page 12 of my report, and then the
25  difference between that and the 2.063 billion would

91

1  simply be the cash that was recognized during the month
2  of November.  And as you know, all cash goes through
3  25005.
4      And you can prove that by looking on page
5  050356 for October.  You will see they brought in during
6  that month $597 million.  And then if you go as well on
7  page 050360, you will see -- that's December, you will
8  see they brought in $662 million, or $635 million.
9      So the November piece is simply the plug that
10  would get you to 2.063.  So I just proved the math to
11  myself based on your earlier questioning.
12      Q.  Do you have any other support for that
13  calculation, any document?
14      MR. GLENNON:  Objection; vague and ambiguous.
15      THE WITNESS:  I have this document here.  You
16  can add it up if you like.  I just did the math here, is
17  my point.
18      MR. GREENSTEIN:  Q.  But on 050357, it only
19  shows one debit and credit to 25005; right?
20      A.  That's step number two, the actual formation
21  of the debit credit -- debit memo.
22      As I told you earlier, I thought it was in
23  05036 -- or 58, and that's, in fact, where it is.  The
24  other step 1 and step 3.
25      Q.  But on the face of this document, there aren't

92

1  three separate debits and credits to account 25005 in
2  the amount of $692 million?
3      MR. GLENNON:  Objection; vague and ambiguous.
4      THE WITNESS:  There are.
5      MR. GREENSTEIN:  Q.  Where?
6  A.  On page --
7  Q.  I'm asking if you can show me three separate
8  debits and credits to account 25005 in the amount of
9  $692 million?
10  A.  Yes.
11  Q.  Okay, where?
12  A.  On page 050537 is one.
13  Q.  That's one.
14  A.  And then on page 050358, those 692 are a part
15  of the $2.063 billion.
16  Q.  Where does it say 692 on that page?
17  A.  It won't say.  It is a combined entry.  And
18  the combination is entry one for 692, entry two for 692,
19  which comes to $1.384 billion, then the difference is
20  the cash that was received during the month of November,
21  which was both applied to -- in and out of 25005 to
22  either applied or to some other account.
23  Q.  Okay.
24  A.  So, anyway, I thought you might want to know
25  that I did do that math.

93

1  Q.  Thank you.
2  A.  You're welcome.
3  Q.  Back to the document that's been marked as
4  Exhibit 6.
5  A.  Yes.
6  Q.  And that's the sales journal by GL account
7  report that your opinion is that reflects $10
8  million approximately in revenue booked by Oracle on
9  that date; correct?
10  A.  That is correct.
11  Q.  And what is the date of this document?
12  A.  Well, it looks like it was run November the
13  5th, 2002.  But GL date, November 17th.
14  Q.  So this report was run on November 5th, 2002;
15  right?
16      MR. GLENNON:  Objection; calls for
17  speculation, lacks foundation.
18      THE WITNESS:  I don't know when it was run.
19  I'm just saying it says report date.  But what you have
20  to look at is the GL date, which is November 17th.
21      MR. GREENSTEIN:  Mark the next as No. 7,
22  please.
23      (Exhibit 7 marked for
24      identification.)
25      MR. GREENSTEIN:  Q.  For the record, this is

94

1  NDCA-ORCL 971461 through 971507.  It says, "Presentation
2  to the SEC Staff On Behalf Of Oracle Corporation," dated
3  October 29th, 2003.  Have you ever seen this before?
4  A.  I have, yes.
5  Q.  If you turn to page 31, which is NDCA-ORCL
6  971491, it has a slide that says, "Revenue By Day For 2Q
7  2001."
8      By the way, for the record, when I refer to
9  2Q, or 2Q '01, what I mean is Oracle's fiscal 2Q '01.
10  Do you understand that?
11      MR. GLENNON:  Objection; are you trying to
12  define a term?
13      MR. GREENSTEIN:  Yeah.
14      MR. GLENNON:  What term are you trying to
15  define, and with which defined term?
16      MR. GREENSTEIN:  When I am talking about
17  Oracle's second quarter fiscal year 2001, I'm going to
18  refer to it as 2Q '01.
19  Q.  Is that okay with you?
20      MR. GLENNON:  Do you understand?  He's saying
21  if he says the phrase 2Q '01, he's referring to second
22  quarter of fiscal year 2001.
23      THE WITNESS:  Yes, I understand.  I'm sorry, I
24  wasn't listening.
25      MR. GREENSTEIN:  Q.  Oracle is not on a

95

1  calendar year, they are on a fiscal year.
2  A.  That's correct.
3  Q.  So if you look at page 31, which is SEC
4  presentation.  And have you ever looked at this slide
5  before?
6  A.  I have, yes.
7  Q.  And if you look at 11/17/00?
8  A.  Yes, I'm there.
9  Q.  And it appears that total revenue, it says
10  $9,354,677.48; correct?
11  A.  That's correct.
12  Q.  And if you look back at the previous document
13  we looked at, I think you testified that the total
14  amount of revenue booked by Oracle in 2Q '01 was $10.1
15  million approximately; correct?
16  A.  That's correct.
17  Q.  Okay.  Can you explain why this document is
18  inconsistent with Exhibit 6?
19  A.  I don't know the exact reconciliation, I've
20  never done that.  But I certainly understand that this
21  was a report run in November of '02, it looks like.  And
22  potentially there were additional adjustments that may
23  have passed through that, $800,000, which is completely
24  immaterial to Oracle.  So why it changes, I just don't know.
25  But I did notice that.

96

1    Q.   Okay, so let me see if I understand this
2    correctly.
3         So you're saying that in November 2002 or
4    after November 2002 when that sales report was run,
5    there may have been adjustments to Oracle's second
6    quarter results that were issued two years before?
7         MR. GLENNON:  Objection; mischaracterizes the
8    testimony, lack of foundation.
9         THE WITNESS:  No, I'm not saying that at all.
10        MR. GREENSTEIN:  Q.  I'm just trying to
11   understand the inconsistency between page 31 of
12   Exhibit 6 and the total on Exhibit 5.
13   A.   I don't, as I said, I don't know what the
14   difference is made up of.  I don't know the source of
15   971491.  I don't know where that information came from,
16   nor do I know what document was used, if it was even the
17   same run that was used in Exhibit 6.
18        I can understand why there might be
19   differences, was my point.  But I don't know what they
20   are, and I don't know what the reconciliation of that
21   $800,000 is.
22   Q.   But Oracle's second quarter '01 ended on
23   November 30th; correct?
24   A.   Correct.
25   Q.   So as an auditor, when would -- when would

97

1    somebody make an adjustment two years later to its
2    revenue numbers, such that this would occur?
3         MR. GLENNON:  Objection; lack of foundation,
4    vague and ambiguous, incomplete hypothetical.
5         THE WITNESS:  Well, this could have been a
6    report that was run at the time for 11/17, and there
7    could have been what are called topside adjustments,
8    meaning that someone decided that there was an $800,000
9    reduction in revenue that was appropriate for that day
10   because of subsequent information.
11        So topside adjustments could have very easily
12   been made off of that GL run to that summarized run.
13   There is a lot of reasons it could happen.  I don't know
14   what they are, but there is a lot of accounting reasons
15   that could occur.
16        MR. GREENSTEIN:  Q.  In your opinion, what was
17   the amount of revenue booked at Oracle on November 17th,
18   2000?
19   A.   The document I relied to, I chose the larger
20   of the two just to be conservative.  This shows 10.1.
21   This is actually a lower amount.  I chose to be
22   conservative in my report, and used 10.1.
23   Q.   Do you know what Oracle's total revenue for 2Q
24   '01 was?
25   A.   It was $2.6 billion.

98

1    Q.   Do you know what amount it was for the U.S.?
2    A.   For the U.S.?  No, I didn't break out that
3    component.
4         MR. GREENSTEIN:  Mark this as No. 8.
5             (Exhibit 8 marked for
6              identification.)
7         MR. GREENSTEIN:  For the record, NDCA-ORCL
8    1895918 through 1895922, it is an August 26th, 2004
9    e-mail from Molly Littlefield to Greg Myers and Lilly
10   Hao, H-a-o.
11   Q.   Let me know when you're finished reviewing it.
12   A.   I'm there, thank you.
13   Q.   Have you seen this document before?
14   A.   I have, yes.
15   Q.   Did you rely on this document in either your
16   report or your rebuttal report?
17   A.   No.  Considered it; didn't rely on.
18   Q.   Page 2, 1895919.  In the middle of the page it
19   is an e-mail from Molly Littlefield to a number of
20   individuals dated August 4th, 2004.  Do you see that?
21   A.   I do.
22   Q.   And it says in the first sentence, "Debit
23   memos can be very tricky, especially all the ones
24   created on November 18th, 2000."  Do you see that?
25   A.   I do.

99

1    Q.   Is your opinion the debit memos were run on
2    November 17th or November 18th, 2000?
3         MR. GLENNON:  Objection; asked and answered.
4         THE WITNESS:  I think I answered that.  I said
5    on or around November 17th.
6         MR. GREENSTEIN:  Q.  Okay.  So it could have
7    been on November 18th; right?
8         MR. GLENNON:  Objection; vague and ambiguous.
9         THE WITNESS:  The documentation I've seen says
10   11/17.  Whether it is the 17th or the 18th really
11   doesn't make a difference.
12        MR. GREENSTEIN:  Q.  But this document written
13   in 2004 says that it was -- they were created on
14   November 18th; right?
15        MR. GLENNON:  Objection; vague and ambiguous.
16   The document speaks for itself.
17        THE WITNESS:  Well, Molly Littlefield thinks
18   it was run on the 18th.  Whether or not she really knew
19   or whether or not she was in a position to know the
20   exact date, or she may have gotten the date wrong, who
21   knows.
22        MR. GREENSTEIN:  Q.  Do you know who Molly
23   Littlefield is?
24   A.   Yes.
25   Q.   Who is she?

100

1    A.  Collections individual within Oracle.

2    Q.  Do you know if she helped create the script

3    output?

4    A.  She did not.

5    Q.  She didn't?

6    A.  I don't believe so.

7    Q.  Who did?

8    MR. GLENNON:  Objection; vague and ambiguous.

9    THE WITNESS:  I think it is Sanjay Kumar.

10   MR. GREENSTEIN:  Q.  I'm sorry.  I said the

11   script output.  I want to make a distinction between the

12   script output and debit memo script, the SQL script.  Is

13   that what you're referring to?

14   A.  I was referring to the SQL.  You asked me

15   earlier, Kumar, and I just remembered who that was.

16   Q.  I'm asking if you know -- you know what the

17   script output is; right?

18   A.  Yes.

19   Q.  What is it?

20   A.  It was done as part of this litigation, as you

21   well know.  There was about 926 produced, and it really

22   gives a transaction summary for any of the accounts

23   typically -- well, to start with, 776, over $100,000

24   that had on-account flags.  And then it -- there was an

25   additional sample 150 chosen by plaintiffs at random.

101

1    They were below potentially 150.  So, I'm sorry, it is a

2    transaction history of those transactions through a

3    period of time.

4    Q.  So a transaction history of all the

5    transactions related to the 926 debit memos; correct?

6    A.  That's correct.

7    Q.  So do you know if Molly Littlefield was

8    involved in creating the script output?

9    A.  I don't know.

10   Q.  Do you know who created the script output?

11   A.  I thought it was a combination of the

12   accounting department and the IT department of Oracle.

13   Q.  Do you know any -- well, let's turn to page 18

14   of your report.

15   A.  Original or rebuttal?

16   Q.  Original.

17   A.  I'm there.

18   Q.  And you see section D it says, "Subset of

19   Debit Memos Ordered for Discovery Purposes."  Do you see

20   that?

21   A.  I do, yes.

22   Q.  Then in the last sentence of that page it

23   says, "This production was a script output which

24   was designed by Oracle's IT department to compile a

25   step-by-step audit trail for each transaction which

102

1    contained a debit memo using data from Oracle's

2    accounting system."  Do you see that?

3    A.  I do, yes.

4    Q.  And what -- and you cite to footnote 54;

5    correct?

6    A.  That's correct.

7    Q.  And that's the Myers' declaration?

8    A.  That's correct.

9    Q.  What other evidence, if any, did you consider

10   in making the statement that the script output was

11   designed by Oracle's IT department to compile a

12   step-by-step audit trail for each transaction which

13   contained a debit memo?

14   MR. GLENNON:  Objection; vague and ambiguous.

15   THE WITNESS:  Well, that was my understanding

16   of what the discovery was all about on the debit memos.

17   So, my understanding that that was what the court

18   ordered, that detail be given for those debit memos, and

19   that that was the byproduct of that, was the script

20   output.

21   MR. GREENSTEIN:  Q.  So other than what you --

22   other than what you cite here, which is the Myers

23   declaration, did you rely upon anything else in making

24   that statement?

25   A.  You know, other than my understanding of what

103

1    the discovery orders were with respect to the scripts.

2    Q.  Okay.  But what I'm asking is, what did you

3    consider or rely upon in stating that the script output

4    was designed by Oracle to be a step-by-step audit trail

5    for each of the 926 debit memos?

6    MR. GLENNON:  Objection; compound and asked

7    and answered.

8    THE WITNESS:  I referred to Mr. Myers'

9    declaration.  I referred to I think now what I

10   understand the discovery orders were, and plus it just

11   makes logical sense to me that, who else is going to

12   design the step-by-step audit trail but Oracle?  I mean,

13   they are the ones that understand the numbers.  So, no

14   one else is going to do that.

15   MR. GREENSTEIN:  Q.  Do you know who designed

16   the script output?

17   MR. GLENNON:  Objection; asked and answered.

18   THE WITNESS:  The individual?

19   MR. GREENSTEIN:  Q.  Right.

20   A.  I think I answered that.  I do not know.

21   Q.  And you rely on the script output in your

22   report; correct?

23   A.  I do, yes.

24   Q.  Okay.  Did you do any assessment to verify the

25   accuracy of the script output?

104

1  A.  No.  I mean, I saw -- as you well know in my
2  original report, my rebuttal report, we talk about $2
3  million, where we've gone and looked at source
4  documents.
5      And I've also looked at, as you saw in my
6  report, a sample of 60, where we actually got source
7  documents and tied them back.
8      So I have seen support for those, yes.  But I
9  didn't go back and audit all 926.
10  Q.  Right.  So of the 926, you've looked at source
11  documentation for 60 of them; right?
12  A.  Just with respect to the three transactions,
13  the 11/17 debit memos.
14  Q.  There are 46,000 plus 11/17 debit memos;
15  correct?
16  A.  That's correct.
17  Q.  And out of that -- well, how many of those
18  debit memos did you look at in connection with your
19  reports?
20      MR. GLENNON:  Objection; vague and ambiguous.
21      THE WITNESS:  I looked at each and every one
22  of the 926.  And then I took a subset of the 926, 60, to
23  go back and see the individual debit memos to see that
24  they tied.
25      MR. GREENSTEIN:  Q.  So you looked at -- so in

105

1  looking at the 926, did you look at the source documents
2  for all 926?
3  A.  No.  60.
4  Q.  Sixty.  So, setting aside the 60 you looked at
5  the source documents for, the other debit memos of the
6  926 you relied on the script output for that
7  information; right?
8      MR. GLENNON:  Objection; vague and ambiguous,
9  lack of foundation.
10      THE WITNESS:  I looked at the script and saw
11  that there were three offsetting entries on 11/17/2000.
12      MR. GREENSTEIN:  Q.  Is that all you looked at
13  for those 926?
14  A.  No.  Some of them there has been allegations
15  about refunds, allegations about the failure to refund,
16  there's been allegations about royalties.  I looked at
17  those in a number different ways.
18      But my purpose for the original complaint or
19  the revised second amended complaint had to do with just
20  the debit memos.
21      So my first step in the 926 was to see that
22  all three of those transactions were offsetting in each
23  one of those 926.
24  Q.  Okay.  So, for the 926, you relied upon the
25  script output; correct?

106

1      MR. GLENNON:  Objection; vague and ambiguous.
2      THE WITNESS:  I relied on the script output,
3  plus I took 60 of those and tied them back to source
4  documents.
5      MR. GREENSTEIN:  Q.  So of the 46,000 debit
6  memos, you looked at source documents for 60 of them;
7  correct?
8      MR. GLENNON:  Objection; vague and ambiguous,
9  lack of foundation.
10      THE WITNESS:  As it relates to the debit
11  memos, that's correct.
12      MR. GREENSTEIN:  Q.  So back to the script
13  output.  So, you didn't verify or test the script output
14  to determine whether it was accurately reflecting those
15  926 debit memos; did you?
16      MR. GLENNON:  Objection; vague and ambiguous.
17      THE WITNESS:  No.  I did.  I looked at each
18  one of the three entries on the 926 script outputs, and
19  I saw there were three corresponding entries into 25005,
20  in and out.
21      MR. GREENSTEIN:  Q.  What I'm saying, did you
22  do any sort of testing or verification that the data in
23  the script output was accurate?
24      MR. GLENNON:  Same objection; asked and
25  answered.

107

1      THE WITNESS:  Yeah, as I said, I took a
2  subset -- first of all, I'm going to move into an audit
3  perspective here, inquiry and observation is evidence
4  from an auditor's perspective.  So I put on an auditor's
5  hat in looking at that.  And observing there were three
6  offsetting entries into the 926 script outputs helped me
7  understand that those were three offsetting transactions
8  that occurred.  I then decided, using professional
9  skepticism, to then test 60 individually and see the
10  individual source documents.
11      MR. GREENSTEIN:  Q.  I understand.
12  A.  The actual debit memos.
13  Q.  Well, the script output has additional entries
14  other than the three offsetting entries to 25005;
15  correct?
16  A.  Absolutely.
17  Q.  So what I'm asking is, did you perform any
18  independent testing to verify the accuracy of all the
19  data that was contained in the script output?
20      MR. GLENNON:  Objection; asked and answered.
21      THE WITNESS:  No.
22      MR. GREENSTEIN:  Q.  Okay.  So to the extent
23  you rely upon the script output in your reports, you're
24  assuming that the data within that is accurate; right?
25      MR. GLENNON:  Objection; vague and ambiguous.

108

1    THE WITNESS: I'm assuming that the data
2  within what? I'm sorry.
3    MR. GREENSTEIN: Q.  Within the script output.
4  A.  I believe the script output is accurate.
5  Q.  And what do you base that on?
6  A.  Well, based on, A, my review of the three
7  transactions that we talked about, which had to do with
8  the only issue that I thought originally was in this
9  case at the time of my original report, which was the
10  debit memos, then I tested 60 separately.
11    And as I mentioned as part of the $2 million
12  that I believe were properly booked into revenue during
13  the second Q, we've also seen other supporting
14  documentation for that. But I have not gone back and
15  audited the 926 script outputs.
16  Q.  That's fine. In performing your review of the
17  926 debit memos -- strike that.
18    So, did you do any review at all of the debit
19  memo -- the 45,000 plus debit memos that were not
20  provided in the script output?
21    MR. GLENNON: Objection; vague and ambiguous.
22    THE WITNESS: No.
23    MR. GREENSTEIN: Q.  So your focus was on --
24  A.  Other than seeing them on the overall debit
25  memo run, that 800 plus pages.

1  Q.  Right. But you didn't look at -- you didn't
2  look at any of the 45,000 plus -- strike that.
3    So your review based on the script output and
4  individual debit memos was confined to the 926; correct?
5    MR. GLENNON: Objection; vague and ambiguous.
6    THE WITNESS: Would you repeat that?
7    MR. GREENSTEIN: Q.  Your review of the debit
8  memos, the individual debit memos and the individual
9  transactions was confined to the 926 that appeared in
10  the script output; correct?
11    MR. GLENNON: Same objection.
12    THE WITNESS: That's correct.
13    MR. GREENSTEIN: Q.  Okay. Do you know when
14  the script output was created?
15  A.  I don't know the exact date.
16  Q.  Okay. It was created for this litigation;
17  right?
18  A.  That's my understanding, yes.
19  Q.  Was the script output available on
20  November 17th?
21    MR. GLENNON: Objection; vague and ambiguous.
22    THE WITNESS: It certainly could have. All
23  the script output is, is a dump of the accounting
24  information that's in the system. So, yes, that
25  information was available on 11/17.

1    MR. GREENSTEIN: Q.  But the script output
2  wasn't available, obviously, on November 17th?
3  A.  That exact document?
4  Q.  Right.
5  A.  No. That was created after that. But the
6  data that makes up the script output was all available
7  as of 11/17.
8  Q.  And how do you know that?
9  A.  Because it is just a core dump of the
10  accounting system. So it is -- it was there as of
11  11/17, it was there as of 11/15, 19, any day thereafter.
12  Q.  What do you mean by core dump?
13  A.  They just took the data and dumped it into an
14  SQL, which basically becomes a database and a spread
15  sheet. So all that information -- I'm sorry, repeat
16  your question.
17  Q.  What is an SQL?
18  A.  It is defined in my report. Structured Query
19  Language.
20  Q.  And what does that mean?
21    MR. GLENNON: Objection; vague and ambiguous.
22    THE WITNESS: That was the software program,
23  that was the name of the software program designed by
24  Oracle's IT department to dump that information out of
25  the accounting records into script outputs.

1    MR. GREENSTEIN: Q.  Just to be clear, are you
2  talking about the debit memo script that was run on or
3  around November 17th, or talking about the script output
4  that was created for this litigation?
5  A.  I'm talking about the debit memo run that was
6  done on November 17th, 2000.
7  Q.  So that's the core dump of data you're talking
8  about?
9  A.  That was the creation of the three entries
10  that then became the 11/17/2000 debit memos.
11  Q.  Okay. So from now on I'm going to refer to
12  that as the debit memo script. Is that okay with you,
13  just so we can clarify that's not the script output?
14  A.  That's confusing to me. I've already confused
15  it once before. Let's call one the debit memos on
16  11/17 -- call them what you want.
17  Q.  I just want to make sure we're talking about
18  the SQL script. Would that be easier for you?
19    MR. GLENNON: I don't mean to be difficult,
20  but I would object to a definition as between the two,
21  because I do think there is a real potential for getting
22  confused on those two. So maybe you want to identify
23  them by dates?
24    MR. GREENSTEIN: Sure.
25  Q.  Well, how would you want to define them? What

1  would be easiest for you?

2  A.  One would be the 11/17 --

3  Q.  Script?

4  A.  No.  11/17 debit memos, and the next would be

5  the script output.

6  Q.  So how about I just say the 11/17 script, and

7  then the script output.  Is that confusing to you?

8  A.  Yes, it is.  You call it what you want,

9  but I may have to have you explain it ten times.

10  MR. GLENNON:  I may have to object.

11  THE WITNESS:  It is confusing to me, because

12  they are both script.  You say script in both of them.

13  I apologize.

14  MR. GREENSTEIN:  Q.  Okay.  So were you

15  involved in creating the script output?

16  MR. GLENNON:  Objection; vague and ambiguous.

17  THE WITNESS:  Was I personally?

18  MR. GREENSTEIN:  Q.  Right.

19  A.  No.

20  Q.  Was any one of your staff involved?

21  MR. GLENNON:  Objection; vague and ambiguous.

22  THE WITNESS:  And I'm sorry to do this, but by

23  script output, you mean the 926?

24  MR. GREENSTEIN:  Q.  How about the 926 script?

25  A.  There you go.

113

1  Q.  Okay.

2  A.  No.  No one within Alix Partners or anyone I

3  know of was involved in the development of that program

4  to dump that data.

5  Q.  Looking at the script for the 926 debit memos,

6  do you find any errors or inaccuracies in that?

7  A.  I thought I remembered seeing one issue I had

8  a question about.  But I don't recall as I sit here

9  right now having any significant problems with the

10  script output.

11  Q.  What issue are you referring to?

12  A.  I know that, for example, one of the debit

13  memos didn't show up on the overall run of 46,000 debit

14  memo projects.  The debit memo run, one didn't show up.

15  And I don't remember specifically any, as I said,

16  significant problems with the script.

17  Q.  And just so we're clear, I'm talking about the

18  script for the 926 debit memos?

19  A.  I'm sorry.  We got confused again.  For the

20  926, I don't remember -- I don't recall having any

21  problems with the accuracy of those reports.

22  Q.  So, for the November 17th debit memo script

23  that was created in November 2000, you said there was an

24  issue with one debit memo that didn't show up; correct?

25  MR. GLENNON:  Objection; mischaracterizes the

114

1  testimony.

2  THE WITNESS:  I thought, as I recall, possibly

3  one of the entries or something didn't show up on the

4  overall run.

5  MR. GREENSTEIN:  Q.  And what -- is there a

6  way to identify that debit memo?

7  A.  Yeah, I have that.  55041671.

8  Q.  I see you are looking at a report.  Are you

9  looking at a particular page?

10  A.  I'm looking at my report.  I have a note on

11  the side.

12  Q.  Do you know what customer that debit memo was

13  for?

14  A.  I don't.

15  Q.  How did you determine that debit memo didn't

16  appear?

17  A.  I think one of my team told me about that.  I

18  think Mr. Sheppard told me about that.

19  Q.  Do you know why it didn't appear on the

20  November 17th script?

21  A.  I don't recall where it was and where it

22  wasn't.  I just heard that may have been the only one

23  that maybe didn't have the three offsetting entries or

24  something like that.

25  Q.  What entries did it have?

115

1  A.  I don't recall.  It wasn't material enough.

2  Q.  You don't know what customer it was for?

3  A.  No.

4  Q.  How did you find it?

5  MR. GLENNON:  Objection; asked and answered.

6  THE WITNESS:  I think one of my team members

7  told me about that, Mr. Sheppard.

8  MR. GREENSTEIN:  Q.  Did he tell you anything

9  else --

10  A.  No.

11  Q.  -- about how he found it?

12  A.  No.  It doesn't surprise me.  Out of 46,000 --

13  MR. GLENNON:  Just put an objection to the

14  extent that the communications between Mr. Duross and

15  his team are protected under the stip.

16  MR. GREENSTEIN:  Okay.

17  THE WITNESS:  Sorry.

18  MR. GLENNON:  That's all right.

19  MR. GREENSTEIN:  Q.  What is your

20  understanding of what a debit memo is?

21  A.  Debit memo is something that would increase an

22  amount owed to a company because of a transaction.  It

23  could be a new invoice, could be an adjustment to an

24  invoice.  But it is an increase to an account

25  receivable, basically.

116

1  Q.  So were the 46,000 debit memos an increase to
2  the accounts receivable?
3  MR. GLENNON:  Objection; vague and ambiguous.
4  THE WITNESS:  No.  They were an increase and a
5  decrease to an account.
6  MR. GREENSTEIN:  Q.  So is that -- that's
7  inconsistent with what you believe to be the purpose of
8  a debit memo; correct?
9  MR. GLENNON:  Objection; vague and ambiguous.
10  Mischaracterizes the testimony.
11  THE WITNESS:  The debit memo was just a
12  process to clear a flag, that's it.  And because of
13  Oracle's accounting system, they had to create a debit
14  to relieve the on-account.  But there was no impact to
15  an individual account or to the overall financial
16  statements.  They were debits in and credits out.
17  MR. GREENSTEIN:  Q.  But the use of debit
18  memos on November 17th was different from the definition
19  that you described; correct?
20  A.  There can be a number -- I mean, I gave you
21  one definition.
22  Another definition would be to use it to clear
23  an on-account flag.
24  MR. GREENSTEIN:  Okay, let's mark this next,
25  9.

117

1  (Exhibit 9 marked for
2  identification.)
3  MR. GREENSTEIN:  For the record, this is
4  NDCA-ORCL 047279 through 048683.  It says, "Oracle
5  Receivables User's Guide."  This was previously marked
6  at Tom Williams' deposition as Exhibit 4.
7  Q.  O'Bryan, if you could turn your attention
8  to page 048665.
9  A.  I'm there.
10  Q.  You see it has a definition of debit memos?
11  A.  I see that.
12  Q.  Have you seen this document before?
13  A.  I have, yes.
14  Q.  And what is it?
15  A.  This is Oracle Receivables User's Guide, dated
16  March 1997, Volume I, Release 10SC.
17  Q.  Okay.  Did you rely on this document in
18  issuing your report?
19  A.  I certainly considered it.  I don't know that
20  I relied on it.
21  Q.  And the definition of debit memo there, it
22  says, "Debit that you assign to your customer for
23  additional charges that you want to collect."  Do you
24  see that?
25  A.  I do.

118

1  Q.  Is that your understanding what a debit memo
2  is?
3  A.  No.
4  Q.  That definition is inconsistent with what you
5  believe to -- what a debit memo is?
6  A.  There are many definitions of a debit memo as
7  I mentioned.  That certainly is one, which I think I
8  mentioned previously.  But there can be many definitions
9  of a debit memo.
10  Anything to do with increasing a receivable is
11  a debit memo.  Anything to do with increasing any asset
12  is a debit memo.
13  Q.  But that definition is not -- the definition
14  you just described is not in this document; is it?
15  MR. GLENNON:  Objection; vague and ambiguous.
16  THE WITNESS:  No, it doesn't say it.  You can
17  see what it says.
18  MR. GREENSTEIN:  Q.  If you turn to 048672,
19  you see the entry, it says, "On-account"?
20  A.  I do, yes.
21  Q.  And it says, "Payments where you intentionally
22  apply all or part of the payment amount to a customer
23  without reference to a debit item."  Do you see that?
24  A.  I do.
25  Q.  Is that consistent with what you believe to be

119

1  the meaning of on-account?
2  A.  Not the only meaning of on-account.  I mean,
3  we know on-account at Oracle meant something completely
4  different.
5  Q.  But this is Oracle's user's guide; correct?
6  A.  Well, this is a guide that's used in
7  receivables.  The collection department had something
8  completely different when they were thinking of
9  on-account.
10  So on-account, because it said there in a
11  user's guide, does not restrict that's the only
12  definition a company can have to a debit memo or an
13  on-account.  It would morph into exactly what the
14  company is specifically using it for.  And the debit
15  memo was used to clear an on-account.  It is an
16  appropriate use of a debit memo.
17  An on-account at Oracle meant that it was a
18  receipt that had been dealt with.  It had been done,
19  dealt with, and accordingly applied to an invoice,
20  transferred into revenues, written off against bad debt,
21  whatever they did.  There were flags sitting, 46,000
22  that were sitting as of November 2000.
23  Q.  So you say on-account at Oracle meant it was a
24  reset that had been dealt with; right?
25  A.  That's correct.

120

1   Q.  And as of November 17th, how many on-account
2  items were there at Oracle?
3   A.  46,881.
4   Q.  So for all 46,000 of those, the receipt had
5  been dealt with; right?
6   A.  That's correct.
7   Q.  Okay.  And what do you mean by dealt with?
8   MR. GLENNON:  Objection; vague and ambiguous.
9   THE WITNESS:  That typically the collection
10  department had previously applied that receipt to
11  something, whether it be a refund, whether it be a
12  royalty that they figured out needed to be booked,
13  whether it be to an invoice.  It had been applied and it
14  was on-account.  It was simply a flag, there was no cash
15  sitting there, it was just a flag.
16   MR. GREENSTEIN:  Q.  No cash sitting there.
17  So were there any -- of the 46,000 receipts, were any of
18  them customer overpayments?
19   A.  No.  They could have been at some point in
20  time.  But as of the date they ran those debit memos,
21  those had all been cleared and put into some other
22  account.
23   Q.  And what accounts could those receipts have
24  been put into?
25   MR. GLENNON:  Objection; vague and ambiguous.

121

1   THE WITNESS:  They could have gone into a
2  refund, they could have gone into royalties, they could
3  have gone into any income account.  They could have gone
4  into accounts receivables, they could have gone against
5  a contra-account to an expense, to a tax rebate.  They
6  could have gone to a number of different places.  But
7  they had all been cleared and were just flagged sitting
8  there.  There wasn't 46,000 amounts of cash sitting
9  there to apply to something.
10   MR. GREENSTEIN:  Q.  Were any of those 46,000
11  on-account items refunded as part of the 2002 cleanup?
12   A.  They were, yes.
13   Q.  Okay.  How many?  Do you know?
14   MR. GLENNON:  Objection; vague and ambiguous,
15  lack of foundation.
16   THE WITNESS:  I couldn't have an exact number
17  of that.  As I referred to earlier, there is a summary
18  of that cleanup, what's called the unapplied or the
19  reserve process or the transfer to reserve process,
20  which was done in October, November of 2002.
21   And I have a page that summarizes it, it is
22  about $49 million.  And it split into different buckets
23  as to when it hit, those 25005s went into the reserve.
24  And the timing is such that you can't specifically say
25  what was in the quarter.  You can look for, I think it

122

1  is August of '00 through about December of '01.  So you
2  don't get an exact match.  So I can't tell you exactly
3  what was refunded out of those 46,881 debit memos.
4   MR. GREENSTEIN:  Q.  Of the 926 debit memos
5  that you reviewed, how many of those were refunded as
6  part of the 2002 cleanup?
7   MR. GLENNON:  Objection; vague and ambiguous.
8   THE WITNESS:  I don't know that number either.
9  I don't recall that number.
10   MR. GREENSTEIN:  Q.  But some of them were;
11  right?
12   A.  Certainly.
13   Q.  And why would they be refunded in 2002 if they
14  were sitting on-account as of November 17th, 2000?
15   MR. GLENNON:  Objection; calls for
16  speculation, lack of foundation.
17   THE WITNESS:  Because of the original transfer
18  that took place in, say, October or November of '00,
19  before the debit memos were run to clear the on-account,
20  if they had been put into the reserve account
21  inappropriately they would need to be fixed at some
22  point in and some further research done.
23   MR. GREENSTEIN:  Q.  So the refunds reflect an
24  inappropriate transfer from 25005 to 12601; correct?
25   MR. GLENNON:  Objection; mischaracterizes the

123

1  testimony, lack of foundation.
2   THE WITNESS:  Way too broad of a question.
3  Sorry.
4   MR. GREENSTEIN:  Q.  What did you mean when
5  you said -- strike that.
6   So, if an on-account -- one of the on-account
7  items that were part of the debit memos transactions on
8  November 17th was refunded as part of the 2002 cleanup,
9  why was that?
10   MR. GLENNON:  Objection; vague and ambiguous,
11  lack of foundation.
12   THE WITNESS:  Because when the cash, the
13  unapplied cash was transferred into the 12601 account,
14  the 25005 account, into the 12601 account, which
15  happened for the most part in October/November of '00,
16  subsequent to that, at least six weeks later on the
17  October transfers, the debit memos were run to clear the
18  on-account.
19   So if, in fact, when those transfers were made
20  from 25005 to 12601 in October/November, if they were
21  done inappropriately, when the unapplied cash project
22  was done in November, if they researched that and saw
23  they were done inappropriately, there would be a refund.
24  Having nothing to do with the debit memos, having
25  everything to do with what was done in October and

124

1  November when there was a decision made to move it from
2  25005 into the 12601 account.
3  MR. GREENSTEIN: Q.  Let's take a
4  hypothetical.  So an item that was transferred, let's
5  say, in October 2000 from -- a receipt was transferred
6  from 25005 to 12601.  You follow me?
7  MR. GLENNON: Objection.  Is there a question?
8  Are you setting out a foundation for a hypo, is that
9  what you're doing?
10  MR. GREENSTEIN: Yes.
11  THE WITNESS: I understand that.
12  MR. GREENSTEIN: Q.  And that occurred;
13  correct?
14  A.  This is not a hypothetical?
15  Q.  No.  That occurred.
16  MR. GLENNON: Objection; vague and ambiguous.
17  MR. GREENSTEIN: Q.  There were items of
18  unapplied cash from 25005 that were transferred to 12601
19  in October 2000; correct?
20  MR. GLENNON: Same objection.
21  THE WITNESS: There were, yes.
22  MR. GREENSTEIN: Q.  Do you know how much
23  there were?
24  A.  I have the number somewhere.
25  Q.  Around 15 million?

125

1  MR. GLENNON: Objection; vague and ambiguous.
2  THE WITNESS: I don't remember the specific
3  number.
4  MR. GREENSTEIN: Q.  So those items were
5  marked account as of November 17th; correct?
6  THE WITNESS: Were marked what?
7  MR. GREENSTEIN: Q.  On-account.
8  MR. GLENNON: Objection; vague and ambiguous.
9  THE WITNESS: No.  They had previously been
10  on-account, and that flag needed to go away.
11  MR. GREENSTEIN: Q.  But, so they were
12  designated on-account as of November 17th; correct?
13  MR. GLENNON: Objection; vague and ambiguous
14  as to they.
15  THE WITNESS: I'm sorry, would you remind
16  repeating that?  I lost your question.
17  MR. GREENSTEIN: Q.  There was 46,000
18  on-account receipts as of November 17th; correct?
19  MR. GLENNON: Same objection; lack of
20  foundation.
21  THE WITNESS: Yeah, you got to start over.
22  MR. GREENSTEIN: Q.  You don't understand that
23  question?
24  A.  46,000 on-account receipts as of
25  November 17th; correct?  I don't even know that's a

126

1  question.
2  MR. GREENSTEIN: Q.  Let me ask it this way.
3  So, earlier you stated there were 46,000 receipts
4  designated on-account as of November 17th; correct?
5  MR. GLENNON: Objection; mischaracterizes the
6  testimony, lack of foundation.
7  THE WITNESS: We can't use the word receipt.
8  There were 46,881 accounts that had an on-account flag
9  on them.
10  MR. GREENSTEIN: Q.  Okay.  And that -- okay.
11  And some of those items reflected a receipt being
12  transferred from 25005 to 12601; correct?
13  MR. GLENNON: Objection; vague and ambiguous.
14  THE WITNESS: And some of those reflected a
15  receipt being transferred -- I don't know what you mean.
16  MR. GREENSTEIN: Q.  Well, why don't you
17  explain to me what you think the process is on
18  November 17th -- actually, scratch that.
19  So, the 46,000 items that existed as of
20  November 17th, 2000, were all those designated
21  on-account?
22  MR. GLENNON: Objection; vague and ambiguous,
23  lack of foundation.
24  THE WITNESS: All of the 46,881 debit memos
25  run, were run to clear an on-account flag on those

127

1  items.
2  MR. GREENSTEIN: Q.  So all those items had an
3  on-account flag?
4  MR. GLENNON: Same objections.
5  THE WITNESS: That is correct.
6  MR. GREENSTEIN: Q.  Okay.  Meaning they had
7  previously been dealt with before; correct?
8  MR. GLENNON: Objection; vague and ambiguous.
9  THE WITNESS: Meaning that they had previously
10  been dealt with by transferring them against an invoice,
11  by applying them to royalties, income, expense, whatever
12  they decided to do.  And some of them had moved from
13  12005 to 12601.
14  MR. GREENSTEIN: Q.  You mean 25005 to 12601?
15  A.  Yes.  Did I misspeak?
16  Q.  Yes.
17  MR. GLENNON: I don't want to interrupt.  It
18  is quarter to 1:00.  Can we take our lunch break?
19  MR. GREENSTEIN: Sure.
20  VIDEOGRAPHER: Off record at 12:43.
21  (Recess, 12:43 p.m. - 1:36 p.m.)
22  VIDEOGRAPHER: On the record at 1:36.
23  MR. GREENSTEIN: Q.  Good afternoon,
24  Mr. O'Bryan.
25  A.  Good afternoon.

128

1   Q.  Earlier you testified your testimony has never
2   been excluded from a case.  Do you remember that?
3   A.  I do, yes.
4   MR. GREENSTEIN:  I'm going to mark this next
5   as Exhibit 10.
6   (Exhibit 10 marked for
7   identification.)
8   MR. GREENSTEIN: Q.  For the record, this is a
9   Lexis case printed out, dated April 5th, 2005.  Farnham,
10  F-a-r-n-h-a-m, v. Rehwald, R-e-h-w-a-l-d.  Mr. O'Bryan,
11  let me know when you're finished reviewing it.
12  A.  I have.
13  Q.  I would like to direct your attention to
14  page 5 of the document.  It is on the right-hand column,
15  sub point 2.  It says, "The court did not abuse its
16  discretion in excluding the testimony of J. Duross
17  O'Bryan."  Do you see that?
18  A.  I do.
19  Q.  That's you; right?
20  A.  That's correct.
21  Q.  And if you go down to right after the
22  underlined case cites, it says, "In the present case
23  Farnham attempted to prove the collectibility of an
24  enhanced settlement or judgment entirely through the
25  expert testimony of J. Duross O'Bryan, who had given

129

1   deposition testimony as to the value of certain assets
2   purportedly owned by the individual defendants in the
3   underlying action.  The trial court excluded this
4   evidence as unduly speculative and, therefore,
5   insufficient to prove collectibility."  Do you see that?
6   A.  I do, yes.
7   Q.  Is there a reason you didn't disclose this
8   earlier when I asked you if your testimony had been
9   excluded before?
10  A.  Yeah, because I never testified in court.  I
11  gave a deposition, and apparently the judge was not --
12  the judge made this ruling without even hearing my
13  testimony, other than my deposition.  I never testified
14  in court.
15  Q.  But you testified in a deposition; right?
16  A.  Yeah.  No.  When I heard your question this
17  morning, has any of my testimony ever been excluded, I
18  thought you meant as far as trial testimony.  I'm aware
19  of the fact I gave a deposition, and this court decided
20  it did not want to hear my testimony.
21  Q.  Do you know the reasons?
22  A.  What was described to me was that -- it was a
23  legal malpractice case, as I recall.  And one of the
24  issues with respect to the legal malpractice case was
25  whether or not the defendants -- or whether or not the

130

1   original cased defendants, the underlying cased
2   defendants would have had the wherewithal to pay any of
3   the damages.  And so I was asked to comment on some of
4   the values of their underlying assets in the underlying
5   case, which was part of my testimony.  Not all of my
6   testimony.  Just a part of it.  And the judge apparently
7   decided I should not give that testimony that was given
8   in deposition, not trial.
9   Q.  It was deposition testimony?
10  A.  I gave a deposition, yes.
11  Q.  So are there any other cases in which you --
12  your testimony, either deposition or at trial, has been
13  excluded?
14  MR. GLENNON:  Objection; vague and ambiguous.
15  THE WITNESS:  I am not -- this is the only
16  case I'm aware of where I gave deposition testimony that
17  was not admitted in a court.  And I'm not aware of any
18  testimony I've given in court that that has been
19  excluded.
20  MR. GREENSTEIN: Q.  Okay.
21  A.  And that's what I was referring to this
22  morning.
23  Q.  And I think earlier we talked about a case,
24  Parnes V. Harris, involving Puris.  Do you remember
25  that?

131

1   A.  Yes.
2   Q.  I think earlier you testified you never
3   changed your testimony during a deposition?
4   A.  That's correct.
5   Q.  Do you remember being deposed on June 26, 2002
6   in the Puris case?
7   A.  I don't, no.  I recall a deposition on Puris.
8   I don't recall that specific deposition.
9   Q.  Did you change your testimony in that
10  deposition?
11  A.  Not that I know of.
12  Q.  I want to direct your attention to page 32 of
13  your opening report, which is Exhibit 1, the section
14  entitled, "Review of Subset of Unapplied Cash
15  Transfers."
16  A.  32?
17  Q.  Yeah.
18  A.  Yeah, I'm there.
19  Q.  Okay.  The second sentence you say, "I've
20  reviewed the script output for the 926 debit memos to
21  determine which of the transactions that had debit memos
22  in their accounting histories also had a transfer to the
23  bad debt reserve within their audit trail."  Do you see
24  that?
25  A.  I do, yes.

132

1    Q.  You say, "Within the accounting histories of

2  the transactions relating to the 926 debit memos, I

3  found 121 transfers to the bad debt reserve during the

4  second quarter of fiscal year 2001."  Do you see that?

5    A.  I do, yes.

6    Q.  Then it says, "These 121 transfers accounted

7  for approximately $10.6 million of the $20.1 million

8  transferred to the bad debt reserve during the quarter."

9  Do you see that?

10    A.  I do, yes.

11    Q.  So you -- looking at the 926 that you

12  reviewed of the script output, you found that

13  approximately $10.6 million had been transferred to the

14  bad debt reserve in 2Q?

15    A.  Correct.

16    MR. GLENNON:  Objection; vague and ambiguous.

17    MR. GREENSTEIN:  Q.  Did you do any analysis

18  of the other 9.5 million of the 20.1 total that was

19  transferred in the second quarter?

20    MR. GLENNON:  Same objection.

21    THE WITNESS:  Well, only to review a document

22  prepared by Oracle.

23    I'm sorry, your question is what period of

24  time?

25    MR. GREENSTEIN:  Q.  I'm asking if you did any

133

1  analysis of the $9.5 million in transfers during 2Q that

2  made up the rest of the $20.1 million.

3    MR. GLENNON:  Same objection.

4    THE WITNESS:  Well, as I referred to earlier,

5  there is a document, NDCA-ORCL 1646567.

6    MR. GREENSTEIN:  Q.  Can you repeat that?

7    A.  NDCA-ORCL 1646567.  I don't recall the name of

8  this document.  It's basically a summary, I believe, of

9  some of the reserve work that was done in

10  October/November of 2002 and on.  And it summarized kind

11  of the results of some of the work that was done in that

12  time frame.

13    And as I mentioned earlier, the miscellaneous

14  receipts column, which is column F, approximates $20

15  million.  The time frame is about the same, it's within

16  a month.  And the amount transferred into the bad debt

17  reserve is $18.9 million.  So fairly close to $20

18  million.

19    You can see a summary here of what was

20  resolved and how it was resolved in that regard.  So I

21  have also looked at that in addition to the specific 121

22  script outputs for the 926 subsection of total debit

23  memos.

24    Q.  So other than looking at that document that

25  was created by Oracle, did you perform any independent

134

1  analysis of the remaining $9.5 million in transfers to

2  the bad debt reserve in 2Q '01?

3    MR. GLENNON:  Objection; vague and ambiguous,

4  compound.

5    THE WITNESS:  No.

6    MR. GREENSTEIN:  Q.  With respect to the $10.6

7  million you looked at, the 121 transfers, can you just

8  describe the methodology you used in determining whether

9  those transfers were appropriate?

10    A.  The $10.6 million?

11    Q.  Right.

12    A.  There is a binder I brought with me today that

13  basically summarizes -- what we did was we ran a

14  database that pulled out of the 926 scripts all of those

15  that went from 25005 to 12601.

16    As I said, there was 121, totalling $6.10

17  million.

18    We then printed out script reports, script

19  output reports on each one of those and went through

20  each one of those in detail, and summarized this binder,

21  and as best summarized in a two-page document in front

22  of that binder is really the findings I've laid out with

23  respect to what I believe were appropriately, at least

24  some indication it was appropriate to include those in

25  the second Q '01 as being transferred from 25005 to

135

1  12601.

2    Q.  You're talking about -- you found that $2

3  million was appropriate?

4    A.  Approximately $2 million.  What I did was I

5  then matched that.  I found about $2 million, which I

6  could find some support for in script output, any kind

7  of notes that were taken from the collectors during that

8  time frame on the miscellaneous receipts section of

9  their report.

10    And I then matched that to the document we

11  just talked about, which summarizes the cash transfer

12  project.  And, you know, ours was $2 million.  When I

13  look at the report, it looks like it is at least $5.5

14  million that Oracle had decided was appropriately

15  recognized based into revenue based on that project.  I

16  felt like my number was conservative.

17    Q.  What was the total amount of bad debt

18  transfers that occurred, that Oracle tried to resolve

19  during the 2002 cleanup for all periods?

20    MR. GLENNON:  Objection; vague and ambiguous.

21    THE WITNESS:  I think it was approximately $50

22  million.

23    MR. GREENSTEIN:  Q.  $50 million?

24    A.  Something to that effect.

25    Q.  Could you calculate of that $50 million how

136

1  many items were refunded during the 2002 cleanup?

2      MR. GLENNON:  Same objection.

3      THE WITNESS:  No.  Because -- I did with

4  respect to the second Q.  But, again, the results are a

5  little bit skewed, because you're about a month off on

6  one side, maybe a couple months off on the other.

7      MR. GREENSTEIN:  Q.  So you didn't do any

8  calculations with respect to -- putting 2Q aside, the

9  rest of the, what did you say, $50 million?

10     A.  Might have been $49 million.

11     Q.  So you didn't do any independent analysis of

12  those other transfers, did you?

13     MR. GLENNON:  Objection; vague and ambiguous.

14     THE WITNESS:  What other transfers?

15     MR. GREENSTEIN:  Q.  The transfers in other

16  quarters besides 2Q '01 that were resolved in the 2000

17  cleanup.

18     MR. GLENNON:  Same objection.

19     THE WITNESS:  I didn't look at other Qs other

20  than the second Q.

21     MR. GREENSTEIN:  Q.  Okay.  So going back to

22  that binder, that is something obviously you relied upon

23  in doing your calculations in your opening report;

24  correct?

25     A.  I did, yes.

137

1      Q.  Are you aware there is a stipulation in place

2  in this case that requires you to produce to plaintiffs

3  any spreadsheets, calculations, any documents you relied

4  upon, that you were supposed to produce that to us at

5  the time of your report?

6      A.  Well, I think for the most part, other than

7  maybe a summary schedule that lays out the different

8  buckets, the three different buckets that we talked

9  about in my report, it is either a script output, which

10  you have all of, or there is also some supporting

11  documentation.  Maybe there is credit memos or debit

12  memos, which I think have all been produced, as far as I

13  know.

14     Q.  But that binder, you said you have summaries

15  on there of the $2 million that you deem to be

16  appropriate transfers; correct?

17     A.  Well, one could go and look through each one

18  of the individual sheets and get that information as

19  well.  All we did was summarize the sheet.

20     Q.  But you prepared a summary of that information

21  that you relied upon; correct?

22     A.  That is correct.  Well, did I rely on it?  Not

23  really.  I mean, you could go through each one of these

24  schedules and get that same information out of it.

25     Q.  What schedules are you referring to?

138

1      A.  The script output, or a summary of the script

2  output that we prepared here.

3      Q.  That document that you're pointing to there,

4  did you rely upon that?

5      A.  No.  All this was was just a summary for me

6  when I go through and review all the different

7  individual script outputs or the notes.

8      Q.  So let me get this straight.  You prepared

9  summaries of the $2 million that you felt were

10  appropriate transfers in the second quarter of '01, and

11  you relied upon those summaries in order to come to your

12  conclusions written in your report?

13     MR. GLENNON:  Objection; mischaracterizes the

14  testimony, and asked and answered.

15     THE WITNESS:  Yeah.  No.  What we did was we

16  got the script output for those 121, we reviewed through

17  each one of them individually.

18     We also got the notes, the collectors' notes

19  that were attached to the miscellaneous receipts

20  section, which was that period that best approximated

21  the second Q.  And we looked at those notes.

22     We then got copies of either credit memos or

23  any other notes and data that we could find that had

24  been produced, as far as I know, and summarized that.

25     And basically we came to a conclusion whether

139

1  or not it could be either in the royalty bucket or the

2  credit memo bucket or in a bucket that was one of the

3  two but we just didn't see support for.  And that's all

4  in this binder.

5      So if you took -- and then what we did is in

6  front of each one of those sections, which there is 35

7  of them, we simply put a single page, which summarizes

8  what the script says.  And then we simply then

9  summarized those summaries on two pages in front.

10     If you didn't have those summaries or the

11  summary of the summary, if you will, you can still get

12  that information right out of this binder.

13     MR. GREENSTEIN:  Q.  But you used those to

14  calculate the total amounts, and you put those in

15  summary documents that you rely upon; right?

16     MR. GLENNON:  Objection; mischaracterizes the

17  testimony, asked and answered.

18     THE WITNESS:  The calculation is done in the

19  individual scripts.  All that was is to summarize for

20  one place to go and look to see the number and tie it

21  back to the report.

22     MR. GREENSTEIN:  Q.  So you didn't rely on

23  that binder that's in front of you?

24     A.  I did rely on the binder.

25     Q.  You did?

140

1    MR. GLENNON:  Objection; mischaracterizes the

2    testimony.

3        MR. GREENSTEIN:  Q.  Did you rely on that

4    binder in front of you?

5        MR. GLENNON:  Same objection.

6        THE WITNESS:  I did rely on this binder in

7    front of me.

8        MR. GREENSTEIN:  Q.  And that binder contains

9    summaries of data that was pulled from the script

10   output; correct?

11       MR. GLENNON:  Same objection.

12       THE WITNESS:  As I said, the script outputs

13   were reviewed by us, and the information comes off of

14   that.  You can get all of the numbers that you see in my

15   report as to the $2 million right off of the script

16   outputs or the notes, the miscellaneous receipts.

17       All we did, for ease of summarization, was

18   prepare just that, a summary, which then ties to these

19   numbers.

20       So I certainly looked at it.  But the data

21   that I relied on was the source data, i.e., the script

22   outputs or the underlying source data.

23       MR. GREENSTEIN:  Q.  Turning to page 32 of

24   your report, of your opening report.  See the bullet at

25   the bottom, and it discusses, "Of the $10.6 million,

141

1    subject to my review, almost $700,000 of unapplied cash

2    transferred to the bad debt reserve during the second

3    quarter of fiscal year 2001 related to certain royalties

4    paid to Oracle."  Do you see that?

5        A.  Yes, I do.

6        Q.  How did you come up with that 700,000 number?

7        MR. GLENNON:  Objection; vague and ambiguous.

8        THE WITNESS:  By going through the script

9    outputs and the notes of the collectors as they went

10   through their cash project in October/November of 2002.

11       MR. GREENSTEIN:  Q.  So that $700,000, was

12   that related to one debit memo or multiple debit memos?

13       A.  Multiple.

14       Q.  Multiple.  How many, do you any?

15       MR. GLENNON:  Objection; vague and ambiguous.

16       MR. GREENSTEIN:  For the record the witness is

17   looking in the binder that is in front of him that he

18   said he didn't rely upon.

19       MR. GLENNON:  It is a videotaped deposition.

20       THE WITNESS:  Well, I want to clarify.  When I

21   said I didn't rely on -- when I said I did rely, I

22   relied on the script outputs and the notes.  The

23   summaries I don't need to rely on.  If you want to take

24   those out, that's fine.

25       MR. GREENSTEIN:  Q.  Can you tell me --

142

1    without looking at that binder, can you tell me how many

2    debit memos made up that $700,000 in royalties?

3        A.  Without looking at this binder?

4        Q.  Right.

5        A.  No.

6        Q.  Looking at the binder, can you tell me?

7        MR. GLENNON:  Same objection; vague and

8    ambiguous.

9        THE WITNESS:  Five.

10       MR. GREENSTEIN:  Q.  And can you tell me the

11   debit memo numbers of those five, please?

12       A.  3616, 3655, 7377, 13514, and 33069.

13       Q.  And can you tell me the customers that are

14   associated with those five?

15       A.  Yes.

16       MR. GLENNON:  Same objection; vague and

17   ambiguous.

18       THE WITNESS:  Dell Computer, Dell Computer,

19   Open Market, Structural Dynamic Research, Primavera

20   Systems, respectively.

21       MR. GREENSTEIN:  Q.  And those -- the debit

22   memo numbers that you just testified to, why aren't

23   those 550 numbers?

24       A.  We just truncated the 550.

25       Q.  So it is 550, and then the number?

143

1        A.  All the debit memos are 550.

2        Q.  Right.  And with respect to those five debit

3    memos, why don't you take me through the process of,

4    say, the Dell debit memo, and tell me what you saw in

5    the script output that led you to believe that that

6    royalty for that Dell debit memo was appropriately

7    transferred in the second quarter of '01.

8        A.  If you look at the script output on 10/1/2000,

9    the Dell Computer amount of $40,303 was transferred into

10   account 12601.  So there is the transfer.

11       Q.  On what date?

12       A.  10/1/00.  On November 17th, the debit memos

13   took place.  On 11/13/02, there was a reversal of the

14   debit memos, as the reserve project began.

15       On 5/14 of '04, they actually applied that

16   40,303 to an invoice.

17       Then if you look at the notes, the actual

18   collectors' notes, you will see that there were actually

19   royalties involved, and it was royalties that had not

20   been booked in the past, that went back all the way to

21   like May of 2000.

22       Q.  What was the invoice date of that debit memo?

23       A.  I don't see the actual date of the invoice,

24   the original invoice.  And there wasn't an invoice on

25   this one.  It was royalty that had never been booked

144

1  into revenue.  That's what happened a lot of times on
2  royalties, they would get checks in from people who were
3  paying them royalties, and they hadn't issued an
4  invoice, so there was no invoice to apply it to.  So
5  when they went and did the research, they realized that
6  they had a royalty relationship with these individuals
7  and that amount should have been applied to a royalty
8  income, but there was no invoice to apply it to.
9      Q.  Why wouldn't there be an invoice for a royalty
10  payment?
11      A.  Because sometimes Oracle wouldn't know,
12  specifically on royalty issues -- if they are --
13  basically if some of their computer people are licensing
14  some of their software and they are loading it onto
15  their computer, they paid them a royalty based on how
16  many of those they might sell, how many are loaded on
17  their computer.  Oracle doesn't know how much they
18  loaded.  So they don't know until they get the
19  information from the licensee as to what they loaded.
20  And at that point then they can book the revenue.
21      Some companies have different systems.
22  Apparently Oracle's is not where they can book it based
23  on knowledge of what the end-user loaded onto a
24  computer.
25      Q.  So when did Oracle learn that that $700,000 in

145

1  purported royalties were actually -- should have been
2  booked as revenue?
3      MR. GLENNON:  Objection; vague and ambiguous.
4      THE WITNESS:  You don't know that.  It could
5  have been known when they booked the original transfer
6  from 25005 to 12601.
7      MR. GREENSTEIN:  Q.  Well, you just said they
8  applied it to an invoice in 2004; correct?
9      A.  Right.  But there could have been knowledge of
10  that back in the second Q of '00/'01, and they simply
11  didn't book the invoice, they just booked it right to
12  income, which went through the reserve account.
13      Q.  If they knew that the royalty payment was a
14  royalty payment and they could book it as revenue, why
15  would it need to be applied to an invoice in 2004?
16      MR. GLENNON:  Objection; assumes facts not in
17  evidence, lacks foundation.
18      THE WITNESS:  Because that's when -- there are
19  really two -- in my opinion there were really two
20  investigations that went on with respect to how to apply
21  25005 cash to 12601.  Some of them are in October and
22  November of '00 when individuals made decisions to
23  transfer from 25005 to 12601.  That went right into
24  income, actually went into reserve that went into
25  income.  That was investigation number one in my

146

1  opinion.
2      Investigation number two is when the
3  collectors went back and specifically tested to see if
4  those were properly transferred to 12601 in the
5  second Q.  And if they then found information that told
6  them it was properly booked, they, in fact, did that.
7      MR. GREENSTEIN:  Q.  And you're saying that
8  with respect to -- well, with respect to the Dell
9  royalty payment, that they learned that, according to
10  you, that it was proper, they learned that in 2004;
11  right?
12      A.  No.
13      MR. GLENNON:  Objection; compound, vague and
14  ambiguous.
15      THE WITNESS:  I'm not saying -- I'm saying I
16  do know they knew that in 2004.  I don't know that they
17  didn't know that in 2000.
18      MR. GREENSTEIN:  Q.  Wouldn't you -- you said
19  you looked at some notes, collectors' notes?
20      A.  Correct.
21      Q.  Didn't the collector note tell you when they
22  learned of this?  Isn't it dated?
23      MR. GLENNON:  Same objections.
24      THE WITNESS:  The collectors' notes would all
25  be during the cash receipts project or the cash transfer

147

1  project -- cash reserve project in October/November of
2  2002.  Those notes are from that time frame.
3      My point is, for all I know, that information
4  was known when they made the original transfer from
5  25005 to the 12601 account.  They made that transfer.
6      MR. GREENSTEIN:  Q.  What evidence can you
7  cite that shows they knew at the time of the transfer
8  that it was a royalty payment?
9      MR. GLENNON:  Objection.  Calls for -- let me
10  withdraw that objection and insert a new one.  Vague and
11  ambiguous.
12      THE WITNESS:  Because they made the transfer.
13      MR. GREENSTEIN:  Q.  Because they made the
14  transfer in 2Q, that meant that they knew it was a
15  royalty payment?
16      MR. GLENNON:  Same objection.
17      THE WITNESS:  No.  At that point all they may
18  have known was it was income.
19      MR. GREENSTEIN:  Q.  But if they knew it was a
20  royalty payment, wouldn't they just account for it as
21  any royalty payment?  In other words, book it as
22  revenue?
23      MR. GLENNON:  Same objection; calls for
24  speculation, lack of foundation.
25      THE WITNESS:  That's what they did in

148

1  October/November of 2002 -- or 2000, they booked it as
2  income.
3       MR. GREENSTEIN:  Q.  True.  But what I'm
4  saying is -- well, let me put it this way.  In a normal
5  situation where Oracle receives a royalty payment, what
6  is the debit and credit?
7       MR. GLENNON:  Same objection.  Incomplete
8  hypothetical, lacks foundation, vague and ambiguous.
9       THE WITNESS:  At what point?  When they
10  booked the --
11       MR. GREENSTEIN:  Q.  No.  If a royalty payment
12  such as Dell comes into Oracle, no invoice like you
13  described, and they know it, how do they recognize that?
14  What are the debits and credits?
15       MR. GLENNON:  Same objections.  Lack of
16  foundation, incomplete hypothetical and vague and
17  ambiguous.
18       Do you understand the question?
19       THE WITNESS:  Yeah, I do.  They debit cash,
20  credit 25005 unidentified or unapplied.
21       MR. GREENSTEIN:  Q.  Right.  But if they knew
22  that it was legitimate royalty revenue, how would they
23  book that as revenue?
24       MR. GLENNON:  Same objection.
25       THE WITNESS:  Everything goes through 25005

149

1  when it comes in.
2       MR. GREENSTEIN:  Q.  No, but how would they
3  book -- that means it is unidentified; right?
4       A.  Everything initially goes into 25005.
5       Q.  I understand that.  What I'm saying is if it
6  goes into 25005, it is unidentified and they can't apply
7  it to an invoice; right?
8       A.  It all goes to 25005.  And then it either
9  immediately gets applied by the system to an invoice or
10  it goes into unidentified or it goes into unapplied or
11  it goes into applied.
12       Q.  Right.  But if they figure out where it could
13  be applied, they apply it; right?
14       MR. GLENNON:  Objection; vague and ambiguous.
15       THE WITNESS:  Correct.
16       MR. GREENSTEIN:  Q.  And then it wouldn't be
17  in 25005 anymore; right?
18       A.  Correct.
19       MR. GLENNON:  Same objection.
20       MR. GREENSTEIN:  Q.  So what I'm saying is, if
21  a royalty payment came in in 2Q and Oracle knew that it
22  was a royalty payment and they wanted to book it as
23  revenue, you're saying that they would debit cash,
24  credit 25005?
25       A.  That would be --

150

1  make sure that it is clear.
2       So if a legitimate royalty payment was made
3  during the second quarter of '01, and Oracle knew that
4  it was a royalty payment that should be booked as
5  revenue, the way they would do that is by crediting
6  cash, debiting 25005 --
7       A.  No.
8       Q.  Just take me through the debits and credits of
9  a royalty payment that Oracle knew in 2Q should be
10  booked as revenue.
11       THE WITNESS:  There are a number of ways they
12  could do that.
13       MR. GLENNON:  Let me assert a "vague and
14  ambiguous" objection to the form of the question.
15       MR. GREENSTEIN:  Q.  So just give me the way
16  they could do it.
17       MR. GLENNON:  Same objection.
18       THE WITNESS:  They would debit cash, credit
19  25005.  There would be no invoice to apply it to,
20  because in this hypothetical they don't know there is an
21  invoice out there.
22       They then identify this is a royalty payment
23  of some sort, so they could debit accounts receivable
24  and credit the sales revenues, then apply that cash to
25  the receivable.

152

1       MR. GLENNON:  Objection; vague and ambiguous,
2  incomplete hypothetical.
3       THE WITNESS:  The initial transaction would be
4  a debit cash, credit 25005.
5       MR. GREENSTEIN:  Q.  What would be the next
6  transaction?
7       MR. GLENNON:  Same objections.
8       THE WITNESS:  The next transaction could be
9  that they take it as a debit to a receivable.  And a
10  credit to income, royalty income.
11       MR. GREENSTEIN:  Q.  And so that would be --
12  if Oracle knew that it was a royalty, a legitimate
13  royalty payment that could be booked as revenue and they
14  knew that during 2Q, there would be those two debits and
15  credits; right?
16       MR. GLENNON:  Objection; vague and ambiguous
17  and compound.
18       THE WITNESS:  Well, you could also do it --
19  that's one way of doing it.  There is another way of
20  doing it, which is just taking it against the reserve,
21  the 12601, and saying I recognize that 12601 will create
22  income, and book it there.  It is an immaterial amount
23  of money on a quarterly basis, so it wouldn't matter, as
24  long as it gets to income one way, one how.
25       MR. GREENSTEIN:  Q.  Okay.  So I just want to

151

1      Or they also could debit the 25005 and credit
2  12601. It has the same impact of going to revenue.
3      MR. GREENSTEIN:  Q.  That's true.  Okay.  So
4  what evidence do you have that Oracle knew during 2Q '01
5  that the Dell royalty payment was legitimate?
6      MR. GLENNON:  Objection; vague and ambiguous
7  as to legitimate.
8      THE WITNESS:  That it took that second entry,
9  debited 25005 and credited 12601.  It was put into
10  income in the second Q.
11      MR. GREENSTEIN:  Q.  So with respect to --
12  what was the amount of the Dell debit memo?
13      A.  $40,000.
14      Q.  So with respect to the other $660,000 in
15  royalty items that were transferred to the bad debt
16  reserve in 2Q, is it your opinion that Oracle knew at
17  the time that those were royalty payments?
18      MR. GLENNON:  Objection; vague and ambiguous,
19  compound.
20      THE WITNESS:  I have to take you through a
21  little bit of Accounting and Auditing 101.  Sorry.
22      MR. GREENSTEIN:  Q.  That's fine.
23      A.  Based on APB 20, which is correction of an
24  error, if somebody finds out in an accounting department
25  or a company finds out they have incorrectly accounted

153

1  for something, they need to consider whether that's
2  material.  If it wasn't material, you would leave it
3  where you found it.  But if somebody thinks it was
4  material at the time, then you fix it when you find it.
5  In other words, you make that correction when you find
6  it.
7      So, if in the second Q they were applying the
8  25005 to the 12601, that's recording income.  If -- then
9  remember during October/November time frame they
10  reversed all of that.  It all went out of reserve.  It
11  reduced revenue, basically, by that $20 million.
12      So now what they are doing, they are now
13  trying to go back and redo what somebody potentially did
14  in the second Q.  And in some of these instances I'm
15  finding and they are finding that the way it was booked,
16  at least as a credit to revenue, was appropriate.
17      So if it was done then in the second Q, based
18  on APB 20 and prior period adjustment GAAP accounting,
19  that's when you book it, is the second Q.
20      Q.  But you're saying that they realized that in
21  2004; correct?
22      A.  They may well have known that in 2000, the
23  second Q of 2000.
24      Somebody booked revenue on the Dell, in this
25  Dell example of $40,000 in income, it was booked income,

154

1  we know that, it was then reversed as part of this,
2  quote, unquote, cleanup process.
3      Then somebody went and researched this and
4  said, wait a minute, it was appropriately revenued in
5  the second Q, so it should be revenued in the second Q,
6  that's where you leave it.
7      Q.  Why didn't they reverse it before that?
8      MR. GLENNON:  Objection; vague and ambiguous.
9      MR. GREENSTEIN:  Q.  Before the 2002 cleanup,
10  why didn't they reverse those transactions?
11      MR. GLENNON:  Same question; same objection.
12      THE WITNESS:  There was no reason to reverse
13  them, because they thought they were properly in income.
14      MR. GREENSTEIN:  Q.  So what was the reason
15  why they did it during 2002 cleanup?
16      A.  Because they were trying to be conservative.
17  I think you've seen plenty of testimony on this, that
18  when they thought there were transfers from 25005 to
19  12601, not fully understanding the impact, they decided
20  to be conservative and reverse everything and
21  re-research it.  They, being Oracle.
22      Q.  So why did they do that -- why didn't they do
23  that in 2001?
24      MR. GLENNON:  Objection; vague and ambiguous,
25  incomplete hypothetical.

155

1      THE WITNESS:  Because at that point in time
2  they didn't know necessarily the magnitude or that there
3  had been 25005 transfers into 12601.
4      MR. GREENSTEIN:  Q.  So in looking -- in
5  determining that $700,000 of unapplied cash transferred
6  bad debt reserve in Q2 was appropriate with respect to
7  royalties, did you look at remittance information?
8      A.  We saw some remittance information.
9      Q.  For all five debit memos?
10      MR. GLENNON:  Objection; vague and ambiguous.
11      THE WITNESS:  I don't think it was all five.
12      MR. GREENSTEIN:  Q.  Was that physical copies
13  of remittance information?
14      A.  To the extent we had it, I think we would
15  have.
16      Q.  Did you cite that in your report?
17      A.  Let's go to the specifics.  You're talking
18  about the five?
19      Q.  Just focused on the $700,000 royalty payments.
20      A.  I'm just going through each one of the
21  documents to see if there is any remittance information.
22      Here I see, this is on Open Market, which is
23  number -- the fourth one I mentioned to you,
24  NDCA-ORCL 515892.  NDCA-ORCL 515892.
25      I see a copy of a remittance advice, a copy of

156

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

1    a check to Oracle from Open Market.
2       Q.  And is there a reason you didn't cite that in
3    your report, that document?
4          MR. GLENNON:  Objection; vague and ambiguous.
5          THE WITNESS:  You mean cite on page 20 --
6          MR. GREENSTEIN:  Q.  32.
7       A.  32?
8       Q.  Yeah.
9       A.  No.
10      Q.  Why not?
11      A.  I didn't see a reason.
12         MR. GLENNON:  Objection; vague and ambiguous.
13         MR. GREENSTEIN:  Q.  I'm sorry?
14      A.  I didn't cite every single document in the
15   report.  I may have relied on it, which would be back in
16   Appendix C, but I didn't cite each and every document we
17   saw in the report.
18      Q.  I understand.  So that document is cited in
19   Appendix C; correct?
20      A.  I believe so.
21      Q.  So what other -- did you look at source
22   documents for the $700,000 royalty payments?
23      A.  To the extent that we had them.  For example,
24   on -- well, some of the Dell information we had some
25   invoices.  On Open Market we talked about, we actually

157

1    have a royalty report that demonstrates to one of the
2    researchers that this was a royalty relationship.  And
3    I'm referring there to NDCA-ORCL 515892, which appears
4    to be attached to remittance advice.  So to the extent
5    we had source documents, we attached those.
6       Q.  So you didn't have some source documents for
7    some of those five debit memos?
8          MR. GLENNON:  Objection; vague and ambiguous.
9          THE WITNESS:  I would have to go through each
10   and every one -- we did have source documents.  I don't
11   know if they were absolutely complete.  But what made it
12   complete was the reviewing of the notes and seeing that
13   there was a royalty relationship based on the notes.
14         MR. GREENSTEIN:  Q.  When you say the notes,
15   you mean collector notes?
16      A.  That's right
17         MR. GLENNON:  Same objection.
18         MR. GREENSTEIN:  Q.  You're referring to the
19   ones in the script output; correct?
20      A.  That's correct.
21      Q.  Okay.  And was there one note for each
22   transaction?
23         MR. GLENNON:  Same objection.
24         MR. GREENSTEIN:  Q.  Strike that.
25         Was there one note for each of the five debit

158

1    memos?
2       A.  There are a number of notes.
3       Q.  So for the Dell debit memo, for example, how
4    many notes were there?
5       A.  For the Dell royalty item, there is one
6    note -- actually, there is, yeah, one note.  "No royalty
7    reports, use cash apps, per Jake, Dell is a full use
8    reseller.  They go through our partner resource network,
9    work directly with OA."
10      Q.  What date is that note?
11      A.  I don't know the exact date.
12      Q.  Okay.  Why not?
13         MR. GLENNON:  Objection; vague and ambiguous.
14         THE WITNESS:  Why not?
15         MR. GREENSTEIN:  Q.  Right.
16      A.  Because I don't see that exact date right
17   here.
18      Q.  Do you know when the note was written that you
19   just read?
20      A.  No, it doesn't matter when the date -- when it
21   was written, to me.
22      Q.  Why not?
23         MR. GLENNON:  Vague and ambiguous.
24         THE WITNESS:  I'm sorry, I thought I described
25   that, and I'll do it again.

159

1    I believe that there was work done in October
2    and November of '00 to transfer money from the 25005
3    into the 12601, and that created revenue, either
4    through -- principally through increasing the reserve.
5         Then because of the part this cleanup
6    process, cleanup of the reserve process, that was all
7    reversed on a conservative approach by Oracle, and
8    completely re-researched.
9         And in the re-research, as far as I can tell,
10   and I will even take the later date, there is a note
11   here that Dell should be reported as a royalty.
12         So, if it was figured out in '02 or '03 or '04
13   as a royalty, that it should have been applied back at
14   the time, back into the second Q, or at the time that
15   original transfer was made it's appropriately recorded
16   as revenue then under GAAP.
17         MR. GREENSTEIN:  Q.  What do they do in 2004
18   once they learned that it was appropriate?
19         MR. GLENNON:  Objection; vague and ambiguous.
20         THE WITNESS:  They --
21         MR. GLENNON:  Incomplete hypothetical.
22         THE WITNESS:  They rebooked it to income,
23   which they had done in the second Q of '01.
24         MR. GREENSTEIN:  Q.  Do you know the date they
25   did that?

160

```
 1    A.  The original?
 2        MR. GLENNON:  Objection; vague and ambiguous.
 3        MR. GREENSTEIN:  Q.  No.  The date in which
 4    they booked it to revenue?
 5    A.  Yes.
 6        MR. GLENNON:  Same objection.
 7        THE WITNESS:  On 5/11/04.
 8        MR. GREENSTEIN:  Q.  And what document are you
 9    referring to, the document you just looked at?
10    A.  I'm referring to the script.
11    Q.  The summary of that transaction; right?
12    A.  The script.
13        MR. GLENNON:  Objection; misstates the
14    testimony.
15        MR. GREENSTEIN:  Q.  What's the Bates number
16    of the document you're looking at?
17    A.  This is simply a printout of -- there is no
18    Bates on this.  It is just a printout of the script for
19    Dell.
20    Q.  So there is no Bates number, so I can't go
21    look at that information in a Bates numbered document;
22    right?
23        MR. GLENNON:  I object.  Plaintiffs know the
24    Bates number for the access database are all script
25    outputs.
```

```
 1        MR. GREENSTEIN:  Q.  So you can't identify a
 2    Bates number where that information is; correct?
 3    A.  There is no Bates on this.  We simply printed
 4    it off a database.
 5    Q.  That's part of the summaries you were talking
 6    about earlier?
 7        MR. GLENNON:  Objection; mischaracterizes the
 8    testimony.
 9        THE WITNESS:  This is the script output, and
10    it is, as I said, debit memo 3616 for Dell.  And you can
11    see the application of the invoice on May 11, 2004.
12        MR. GLENNON:  We're happy to provide
13    plaintiffs with a Bates number for the script output if
14    you would like it.
15        MR. GREENSTEIN:  We're going to be requesting
16    any compilations or summaries or spreadsheets that
17    Mr. O'Bryan relied upon in coming to these conclusions,
18    which it is obvious he did, because he keeps looking at
19    them and he can't give me a Bates number.  So we're
20    going to request it, because under the stip we're
21    entitled to those documents.
22        MR. GLENNON:  I don't think you met your
23    foundation, because he's got to rely on them, and he
24    specifically said probably eight times that he relied on
25    the source documents in the script output.  And that's
```

```
 1    what he was just referring to.
 2        If you want to keep pressing him on what it
 3    was he relied on, be my guest.  But I don't think you
 4    met your foundation yet.
 5        MR. GREENSTEIN:  Q.  Can you cite a Bates
 6    number for the Dell debit memo that shows when the
 7    royalty was booked?
 8        MR. GLENNON:  Objection; vague and ambiguous.
 9    Are you talking about the script output?
10        MR. GREENSTEIN:  Q.  Do you understand the
11    question?
12    A.  The script output, is that what you're talking
13    about?
14    Q.  No.  I'm asking if you can cite Bates numbers
15    for the source documents that you relied upon in doing
16    the calculations for the Dell debit memo.
17        MR. GLENNON:  I'm going to object again,
18    because, as you know, and as you guys printed out and
19    produced to our witnesses, when you print out specific
20    components of script output, the Bates number doesn't
21    appear on the script output.  We can provide it to you.
22    And the script output is certainly cited in the
23    appendix.
24        MR. GREENSTEIN:  Q.  So you're not willing to
25    turn over those summaries of those debit memos?
```

```
 1    A.  I'm happy to give you the whole binder.
 2    Q.  You are?
 3        MR. GLENNON:  I'm not.  I don't think you've
 4    met your foundation.
 5        He said he relied on the underlying source
 6    documents, and was reviewing and referring to the script
 7    output, which plaintiffs have.
 8        MR. GREENSTEIN:  Q.  So, Mr. O'Bryan, you just
 9    said that you're willing to give us that binder of
10    summaries so we can figure out what you did in order to
11    calculate these amounts and how you did it; right?
12    A.  You don't need the summaries.  The two-page
13    summary that was done and the 35 individual summaries,
14    you don't need that to figure out what I've done.  All
15    you need is the 121 debit memos that had a transfer from
16    25005 to 12601.  That's all you need.  And then look at
17    the script output.  And then also have the notes from
18    the collectors with respect to the script output.
19    Q.  Why did you compile that information in
20    summary form?
21    A.  It is just easier to review.
22    Q.  Right.
23    A.  But the source of that information is the
24    script output, the notes, and any other documentation we
25    gather.
```

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

1    Q.  I understand that.  What I'm asking is if
2  you're willing to produce your summaries of your
3  calculations, which we believe we're entitled to anyway,
4  but if you're willing to produce those to plaintiffs?
5    MR. GLENNON:  I object.  It's outside the
6  scope of the stipulation.  He's got to rely on the
7  summaries, and he didn't rely on the summaries, he
8  hasn't relied on the summaries.  In fact, you haven't
9  identified a single piece of information that's in the
10  summaries that's not in the source documents.  He's
11  walked you through this.
12    MR. GREENSTEIN:  Q.  Are you willing to do
13  that?
14    A.  What I'm willing to do with respect to turning
15  over, I'm not the one that makes that decision.
16    MR. GLENNON:  He's not.
17    MR. GREENSTEIN:  Q.  But you're willing to do
18  it?
19    MR. GLENNON:  No, he's not.  It is not covered
20  by the stip.
21    THE WITNESS:  There is nothing in this
22  document to hide.  This is all -- except for the
23  summaries --
24    MR. GREENSTEIN:  I agree.  I agree.
25    THE WITNESS:  -- information I got that we

165

1  pulled out of the script.  So the documents are the
2  documents, the summaries are not necessary.  It is
3  simply for easier review on my part.  Whether or not it
4  is produced is certainly not my decision.
5    MR. GLENNON:  We're not going to be producing
6  anything we're not obligated to produce under the
7  stipulation, and that's the end.  That's just it.  And I
8  think we've produced everything that we were required
9  to.
10    MR. GREENSTEIN:  I understand that.
11    Why don't we take five minutes.
12    VIDEOGRAPHER:  This marks the end of tape two
13  in Volume I in the deposition of J. Duross O'Bryan.  At
14  2:21, going off the record.
15    (Recess, 2:21 p.m. - 2:34 p.m.)
16    VIDEOGRAPHER:  On record at 2:34.  This marks
17  the beginning of tape three in Volume I of the
18  deposition of J. Duross O'Bryan.
19    MR. GREENSTEIN:  Q.  Mr. O'Bryan, if we could
20  turn your attention to page 32 of your opening report,
21  same section we were talking about earlier.  In the
22  first paragraph you talk about the 121 transfers to the
23  bad debt reserve that you found of the 926?  Do you see
24  that?
25    A.  I do, yes.

166

1    Q.  Do you have a list of the 121 debit memo
2  items?
3    A.  I do.
4    Q.  And rather than ask you to tell me all of them
5  on the record, is there a list you can provide to
6  plaintiffs of those items?
7    MR. GLENNON:  Why don't we have this
8  discussion at the end.  I don't know if he relied on
9  that list.  Like I said on the record shortly before our
10  break, I don't want him to turn over anything that we're
11  not obligated to turn over.
12    MR. GREENSTEIN:  Okay.  I understand your
13  position, Brian.  What I'm saying is we believe we're at
14  least entitled to a list, if nothing else, a list of
15  these 121 transfers.  He would have had to rely on the
16  names of the customers in the debit memos.
17    MR. GLENNON:  Well, sure.  My point is simply
18  this, he's got to rely on the document or the summary in
19  order for it to be discoverable, and you haven't
20  established that he relied on this list.  In fact, he
21  couldn't have relied on this list, because he would have
22  had to generate the list in the first instance.  So you
23  don't know what he relied upon in order to determine
24  there was 121 transfers in the bad debt reserve in the
25  second quarter of fiscal year 2001.  If you want to ask

167

1  him that question, you can.
2    MR. GREENSTEIN:  Q.  This 121 transfers, can
3  you tell me right now what the names of those -- what
4  customers and debit memos they are?
5    A.  Yes.
6    Q.  And is there a document that I could -- a
7  Bates numbered document I could look at just to find out
8  what debit memo numbers they are?
9    A.  Well, it is in the script.
10    Q.  Right.  But I don't know which ones they are.
11  There is 926 in the script output; correct?
12    A.  Correct.
13    Q.  You found 121 of them that you're relying upon
14  in drawing conclusions about the appropriateness of
15  them; correct?
16    MR. GLENNON:  I object to the extent it
17  mischaracterizes the testimony and to the extent you're
18  trying to get our expert to do work that you guys can
19  easily do on your own with the materials you have.
20    MR. GREENSTEIN:  How can we find out what the
21  121 debit memos are, Brian?
22    MR. GLENNON:  Are you asking me a question?
23    MR. GREENSTEIN:  Q.  I'm asking you.
24  Mr. O'Bryan, is there any way sitting here if I go back
25  to the script output I could determine the debit memo

168

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

1  numbers for these 121 transfers?

2  A.  Yes.

3  Q.  Okay.  How would I do that?

4  A.  You just go into the script and run a sort in

5  the database that has the credit amount 12601, then it

6  prints all the information about that.  That's all we

7  did.

8  Q.  So if I did that, and then whatever came up as

9  crediting 12601, there would 121 transfer items?

10  MR. GLENNON:  Objection; vague and ambiguous.

11  THE WITNESS:  It would be 121 debit memos or

12  transfers from 25005 into 12601, totaling

13  $10,586,182.02.

14  MR. GREENSTEIN:  Q.  What document are you

15  looking at when you just made that calculation?

16  MR. GLENNON:  Objection; vague and ambiguous,

17  mischaracterizes the testimony.

18  THE WITNESS:  This is a summary of that query

19  that we ran off the script.

20  MR. GREENSTEIN:  Q.  And you're relying on

21  that document as we sit here right now to tell me the

22  total number; correct?

23  MR. GLENNON:  Objection; mischaracterizes the

24  testimony.

25  THE WITNESS:  Again, the basis of this is just

169

1  the script.  I didn't go through the script, all 926 of

2  them, and look to see the credited 12601 and add those

3  all up.

4  My engagement team at my request ran a query

5  on the database simply summarizing all the 12601s and

6  totaled those.  And that's 121 scripts, and $10.6

7  million.

8  MR. GREENSTEIN:  Q.  Okay.  Back to debit memo

9  55003616, it is one of the royalties that you mentioned

10  earlier.

11  A.  Yes.

12  Q.  Do you know which one that is?  The Dell, I

13  believe.

14  A.  I do.

15  Q.  Is it the Dell debit memo?

16  A.  3616?

17  Q.  Yes.

18  A.  Yes, I believe that's Dell.

19  Q.  I think you said it was reversed at some point

20  in November 2002 out of the reserve?

21  A.  Correct.

22  Q.  So there was a debit to 12601 in November

23  2002?

24  A.  Yes.

25  Q.  And is that in the script output?

170

1  A.  Yes.

2  Q.  And what is your basis for saying that there

3  was a debit to 12601 --

4  MR. GLENNON:  Objection; vague and ambiguous.

5  MR. GREENSTEIN:  Q.  -- for that debit memo in

6  November 2002?

7  MR. GLENNON:  Same objection.

8  THE WITNESS:  I'm sorry, what was your

9  question?

10  MR. GREENSTEIN:  Q.  My question is, can you

11  tell me the date that that debit memo, 55003616, was

12  reversed out of the bad debt reserve?

13  A.  I misspoke.  There is no reversal of it into

14  the 12601 account.  What I meant to say is a reversal of

15  the debit memo transaction.

16  Q.  But that item was transferred to 12601 in Q2;

17  correct?

18  A.  Correct.

19  Q.  Then during November 2002, you said it was

20  reversed out; correct?

21  MR. GLENNON:  Objection; vague and ambiguous.

22  THE WITNESS:  I misspoke on that.  It was not

23  reversed out.

24  MR. GREENSTEIN:  Q.  So it's still sitting in

25  the reserve then?

171

1  MR. GLENNON:  Objection; calls for

2  speculation, lack of foundation.

3  THE WITNESS:  No.  It was simply applied, it

4  was simply then applied to the appropriate revenue

5  account, which is a royalty, in '04.

6  MR. GREENSTEIN:  Q.  What were the debits and

7  credits in '04 to do that transaction?

8  MR. GLENNON:  Objection; vague and ambiguous.

9  THE WITNESS:  It was a debit to unapplied cash

10  and a credit to receivables.

11  MR. GREENSTEIN:  Q.  So it was never -- the

12  12601 was never debited; right?

13  MR. GLENNON:  Objection; vague and ambiguous.

14  THE WITNESS:  The 12601 was debited -- the

15  12601 was credited in October of '00.

16  MR. GREENSTEIN:  Q.  Right.  That's when it

17  was transferred to the bad debt reserve; correct?

18  A.  Correct.

19  MR. GLENNON:  Objection; vague and ambiguous.

20  MR. GREENSTEIN:  Q.  I think you testified it

21  was in November 2002 they reversed that transfer as part

22  of the cleanup; correct?

23  MR. GLENNON:  Same objection.

24  THE WITNESS:  As I said, I misspoke.  They did

25  not.

172

1    MR. GREENSTEIN:  Q.  So they didn't reverse

2    that transaction out of the reserve?

3    A.  No.

4    MR. GLENNON:  Same objection.

5    MR. GREENSTEIN:  Q.  So that credit of that

6    Dell debit memo is still sitting in 12601?

7    MR. GLENNON:  Calls for speculation, lack of

8    foundation.

9    THE WITNESS:  No.  It is now in -- they put it

10    into the receivable, and then they took it out of the

11    receivable on the 12601.

12    MR. GREENSTEIN:  Q.  Well, help me understand

13    this, because I'm not an accountant.  But if there was a

14    credit to -- there is a debit and credit for every

15    transaction; right?

16    A.  Yes.

17    Q.  And that's an accounting principle; correct?

18    A.  That is, yes.

19    Q.  So if there was a credit in October 2000 of

20    that debit memo to 12601, and then in 2002, November,

21    what you're telling me, there is no debit to 12601;

22    right?

23    MR. GLENNON:  Objection; vague and ambiguous,

24    compound, incomplete hypothetical.

25    THE WITNESS:  Your question was?

1    MR. GREENSTEIN:  Q.  The question -- I'm just

2    wondering, the item was transferred, credited to 12601

3    in October 2000.  I'm wondering when Oracle reversed

4    that transfer, if at all.

5    MR. GLENNON:  Same objection.  Lacks

6    foundation, vague and ambiguous.

7    THE WITNESS:  Well, they reversed it by virtue

8    of taking it against the receivable when they realized

9    it was a royalty.  Then they applied the royalty to

10    that.  So effectively what you have is it coming out of

11    12601 and netting with the revenue.  So it was a zero

12    impact.

13    MR. GREENSTEIN:  Q.  Well, but there was a

14    credit in 12601.  In order to get that out of there, you

15    have to debit it; correct?

16    MR. GLENNON:  Objection; incomplete

17    hypothetical.

18    THE WITNESS:  Or that's just increasing

19    income.  Right?  I'm sorry, I didn't mean to say right.

20    MR. GREENSTEIN:  Q.  I'm asking, there was a

21    credit to 12601, and I'm wondering if ever there was --

22    how it got out of 12601 in November 2002.

23    MR. GLENNON:  Objection; vague and ambiguous.

24    THE WITNESS:  Out of 12601?  It didn't come

25    out of 12601.  I got recorded as a revenue applied

1    against an invoice in November of '02.

2    MR. GREENSTEIN:  Q.  And you said --

3    A.  Excuse me, March of '04.

4    Q.  March of '04 or November '02?

5    A.  March of '04.

6    Q.  So you said it was applied to a receivable.

7    A.  It was actually applied to an invoice.

8    Q.  An invoice dated what?  What was the date of

9    the invoice?

10    MR. GLENNON:  Objection; vague and ambiguous.

11    THE WITNESS:  All this occurred on May 4th --

12    May 11, 2004.

13    MR. GREENSTEIN:  Q.  Right.  But when was the

14    original royalty payment?

15    MR. GLENNON:  Objection; vague and ambiguous.

16    THE WITNESS:  I don't know when the original

17    royalty payment was.

18    MR. GREENSTEIN:  Q.  Wait, but didn't you say

19    earlier that the royalty -- if a royalty comes in, there

20    is no invoice?

21    MR. GLENNON:  Objection; mischaracterizes the

22    testimony, incomplete.

23    MR. GREENSTEIN:  Q.  Right?

24    A.  That's my testimony.  That's why I didn't know

25    the date of invoice, because there is no invoice,

1    because the royalties don't have invoices.

2    Q.  So in 2004 you just said that they applied

3    that to an invoice; right?

4    A.  They would have created an invoice and credit

5    memoed it up, because -- or adjusted it up, because

6    there was no invoice that existed, so you would have to

7    create the invoice, which was done in May of '04.

8    Q.  So they created an invoice for a payment that

9    was made prior to November 2000; correct?

10    MR. GLENNON:  Objection; vague and ambiguous.

11    THE WITNESS:  Correct.  You would have to,

12    because you have to apply that somewhere.

13    MR. GREENSTEIN:  Q.  Do you know the date they

14    created the invoice?

15    MR. GLENNON:  Same objection.

16    THE WITNESS:  May 2004.

17    MR. GREENSTEIN:  Q.  A specific date?

18    A.  May 11th, 2004.

19    Q.  Page 33, the bullet, "In addition, over

20    $800,000 of over transfers to the bad debt reserve

21    during this period were appropriate."  Do you see that?

22    A.  Where are you?

23    Q.  Page 33.

24    A.  Yes.

25    Q.  The bullet at the top of the page, the

1  $800,000?

2  A.  Yes.

3  Q.  It says, "In addition, over $800,000 other

4  transfers to the bad debt reserve during this period

5  were appropriate."  Do you see that?

6  A.  I do.

7  Q.  You mean 2Q '01?

8  A.  Correct.

9  Q.  Then you say, "It's appropriate in that Oracle

10  had already reduced its revenues for certain open and

11  unpaid invoices either all or in part through the use of

12  credit memos and/or inclusion in Oracle's general bad

13  debt reserve as of the second quarter of fiscal year

14  2001."  Do you see that?

15  A.  That's correct.

16  Q.  So can you explain what you mean there?

17  A.  That when the collections department was

18  researching the applied cash project, during the applied

19  cash project in October/November of '02 time frame, they

20  researched individually all these that came -- all these

21  debit memos that got reversed.

22  And in certain instances, we have one, two,

23  three, four, five, six, seven -- twelve instances where

24  the evidence is that they are effectively adjusting up

25  an invoice because they had inappropriately issued a

177

1  credit memo back in the 2000 time frame.

2  Q.  You said 12 items.  Is that 12 debit memos?

3  A.  That's correct.

4  Q.  So 12 debit memos made up the $800,000;

5  correct?

6  A.  That's correct.

7  Q.  Can you tell me -- can you just tell me the

8  debit memo numbers --

9  A.  Certainly.

10  Q.  -- of those?

11  A.  10200, 29695, 33442, 41212 -- actually, let me

12  go back.

13  These are the numbers that relate to a credit

14  memo that are in the $800,000 or that are part of

15  that component.  And that would be, again --

16  Q.  Let me stop you there.  So are there debit

17  memos associated with those 12 items?

18  A.  You mean credit memos?

19  Q.  I mean debit memos.

20  A.  Oh, yes.

21  Q.  So can you tell me the debit memos -- the

22  debit memo numbers?

23  A.  I am sorry.  10200, 29695, 33442, 41212, 54 --

24  excuse me -- 42380, 43304, 45164, 45180, 45240, 45311,

25  45948, and 46151.  Those total up about $727,000.

178

1  Q.  Okay.  So you just rounded up to 800,000?

2  A.  Correct.

3  Q.  Why didn't you round down to 700,000?

4  A.  Because on the -- one of the other amounts, I

5  think it is 368,000, we rounded down.

6  Q.  Okay.

7  A.  So there is another category.

8  Q.  So there is $700,000 in royalties on page 32

9  of your report; right?

10  A.  Correct.

11  Q.  And $800,000 of what you call these adjusted

12  up items, to $800,000; correct?

13  MR. GLENNON:  Objection; mischaracterizes the

14  testimony.  Vague and ambiguous.

15  THE WITNESS:  I'm sorry.

16  MR. GREENSTEIN:  Q.  I'm trying to determine

17  what you mean by the 368,000 that you rounded down.

18  A.  It is a separate column.  I probably confused

19  you.  I apologize.

20  Q.  I just want to make sure there is -- that

21  we're looking at the items; right?

22  A.  Correct.

23  Q.  Well, so, my question is -- what was the total

24  of those 12 debit memos?

25  A.  $726,581.

179

1  Q.  My question was, why did you round that up to

2  800,000 instead of rounding down to 700,000?

3  A.  Because there is other items that make up the

4  $800,000 that are not part of the credit memo piece.

5  Q.  How many debit memos are those?

6  A.  Those are one, two, three, four --

7  MR. GLENNON:  Objection; vague and ambiguous.

8  THE WITNESS:  Those are five.

9  MR. GREENSTEIN:  Q.  And what -- that makes up

10  the part of the 800,000; correct?

11  A.  Yes.  When you include those five, it would be

12  $875,000, or to be exact $874,808.  That is my rounding

13  down.

14  Q.  Were those items that were resolved in the

15  same manner as the other items that had been adjusted

16  up?

17  MR. GLENNON:  Objection; vague and ambiguous.

18  THE WITNESS:  No.

19  MR. GREENSTEIN:  Q.  Can you please explain

20  why you think those are appropriate?

21  A.  Yeah.  These are very unusual ones.  These are

22  ones where there was cash that existed, obviously, in

23  the October/November time frame, where these amounts

24  were moved from 25005 into 12601.  So the cash existed

25  and it was written into the reserve.

180

1    However, upon further review of the invoices,
2  these were invoices that were very old, and given
3  Oracle's internal policy of reserving -- they have an
4  internal policy that over x number of days 50 percent
5  automatically goes to the reserve, over x number of days
6  20 percent goes to reserve -- those would have been
7  reserved anyway given the age of the invoice.  So this
8  is a case where you literally are taking into income
9  amounts which have previously been written off, when you
10 shouldn't have written them off because you had the
11 cash.
12    Q.  Okay.  What is the total of those items?
13    A.  Those only total $150,000.
14    Q.  And how many debit memos?
15    A.  One, two, three, four -- five.
16    Q.  Can you list out the --
17    A.  7412, 38577, 41310, 42059, and 5 -- 45 --
18 45161.
19    Q.  So I'm going to break it into two parts.  I'm
20 going to first focus on the 12 debit memos that you said
21 were applied to previously written off invoices.  Is
22 that fair to say?
23    MR. GLENNON:  Objection; mischaracterizes the
24 testimony.
25    THE WITNESS:  No.  The 12 have to do with,

181

1  really, credit memos.
2    MR. GREENSTEIN:  Q.  Okay.  For those 12, why
3  don't you just take me through the debits and credits
4  that occurred during the 2002 cleanup to resolve those
5  items.
6    A.  Yeah, for all 12?
7    Q.  No, no.  Just -- they all were resolved in the
8  same manner; correct?
9    A.  Yeah --
10    MR. GLENNON:  Objection; lack of foundation.
11    THE WITNESS:  They all were resolved basically
12 in the same manner, which was based on the research done
13 by the collection department during the October/November
14 of 2002 time frame, it was discovered that a credit memo
15 had been inappropriately recorded on those amounts that
16 should not have been.  And if you recorded a credit memo
17 that should not have been recorded, then you should be
18 recording income once you discover that.
19    MR. GREENSTEIN:  Q.  So in each of those cases
20 for those 12 debit memos, your testimony is that Oracle
21 discovered in 2002 that there had been an erroneous
22 credit memo issued with respect to that debit memo;
23 correct?
24    MR. GLENNON:  Objection; mischaracterizes his
25 testimony.

182

1    THE WITNESS:  Well, yeah, those are all credit
2  memos.
3    MR. GREENSTEIN:  Q.  So why don't you take me
4  through the debits and credits that occurred in 2002
5  with respect to these 12 items, an example.
6    A.  Okay.  Before we -- I drank too much water.
7  Can I take a bathroom break?
8    MR. GREENSTEIN:  Sure.
9    VIDEOGRAPHER:  Off record at 2:56.
10    (Recess, 2:56  p.m. - 3:11 p.m.)
11    VIDEOGRAPHER:  On the record at
12    MR. GREENSTEIN:  Q.  Back to page 3 of your
13 opening report.
14    A.  Yes.
15    Q.  We were talking about the first bullet point
16 on the top of the page that says, "There was $800,000
17 of other transfers to the bad debt reserve during the
18 period that were appropriate."  And I think you
19 testified they were appropriate because Oracle had found
20 that there was an erroneous credit memo issued previous.
21 Is that correct?
22    MR. GLENNON:  Objection; mischaracterizes the
23 testimony.
24    THE WITNESS:  No.  It was either an
25 inappropriately applied credit memo, or you also have

183

1  the situation where there was items that were written
2  off, but then they had the cash for it, so they had been
3  inappropriately written off.  Those are the two I can
4  think of in that bucket right now.
5    MR. GREENSTEIN:  Q.  For the $800,000 -- I
6  just want to make sure I'm getting this straight.  For
7  the $800,000 you said there were 12 debit memos that
8  were transferred that related to the erroneous credit
9  memo issue; correct?
10    MR. GLENNON:  Objection; mischaracterizes the
11 testimony, vague and ambiguous.
12    THE WITNESS:  I think for the most part, I
13 haven't gone through them in detail with you, which I
14 can, but I think for the most part those are credit
15 memos.
16    MR. GREENSTEIN:  Q.  Okay.  What was the total
17 amount of those debit memos again?  $728,000?
18    MR. GLENNON:  Objection; vague and ambiguous.
19 Debit memos?
20    MR. GREENSTEIN:  Q.  The 12 debit memos we
21 were just talking about, what was the total amount?
22    A.  The 12 debit memos that had inappropriately
23 applied credit memos were $726,581.
24    Q.  Then you said there were five other debit
25 memos that related to what you called the unique issue;

184

1 correct?

2     A.  Yes.

3     Q.  What was the total of those amounts, or,

4 sorry, those five debit memos?

5     A.  About $148,000, it looks like.

6     Q.  So approximately $874,000; correct?

7     A.  Correct.

8     Q.  So is that the $800,000 you're talking about

9 there?

10     A.  Yes.

11     Q.  So first focusing on the 12 debit memos that

12 were related to erroneous, purportedly erroneous --

13 strike that.

14     Earlier you were talking about a number,

15 368,000.  I just want to clarify that's not part of this

16 800,000?

17     A.  It is not.

18     Q.  You just misspoke?

19     A.  No.  No.  What I said is -- you asked about me

20 rounding.

21     Q.  Okay.  And there was no -- I asked you why you

22 rounded 727 up to eight, remember?

23     A.  Well, I didn't mean -- I didn't round -- what

24 I had not included in the original numbers to you is the

25 five of the unusual or unique issues, which they

185

1 actually total 874.

2     Q.  Got it.

3     A.  And the last bucket, as you can see in my

4 report, is 500,000, which we really don't see all the

5 supporting documentation, but there is some evidence

6 that they were properly booked in or about the second Q

7 of '01.  That totals $482,000.

8     Q.  We'll get to that in a little bit.  So I want

9 to focus on the 12 debit memos that relate to erroneous

10 credit memos.

11     Can you explain the debits and credits that

12 occurred as part of the 2002 cleanup for those

13 transactions.  You can just use an example.

14     A.  Yeah.  Do you have -- do you want me to pick

15 the biggest one?

16     Q.  Sure.

17     A.  The biggest one is General Electric Plastics,

18 credit memo 46151.

19     MR. GLENNON:  Credit memo or debit memo?

20     THE WITNESS:  That's the debit memo number.

21     On October the 1st --

22     MR. GREENSTEIN:  Q.  Actually, why don't you

23 take me through that transaction from the transfer to

24 the bed debt reserve in 2Q and the subsequent

25 resolution.

186

1     A.  All right.  The actual transfer to 2Q to 26 --

2 getting late.

3     The actual transfer to 12601 in the second Q

4 of '00 occurred on October the 1st and October the 5th,

5 2000.  And it was for basically $184,000, where the

6 actual transfer took place, with an eventual credit to

7 12601, and a debit to 25005.

8     So they took it out of the 25005 account and

9 put it into the 12601 account.

10     Then, just to follow all the transactions, on

11 November 17th the debit memo transactions were run,

12 which were three simultaneous debits in and credits out

13 of 25005.

14     Then on November the 8th, 2002, the debit

15 memos were reversed, just reversing the 25005 account,

16 three simultaneous entries.

17     Then on the 24th of November, during the

18 unapplied -- the applied cash project, the reversal of

19 the bad debt transfer took place.  The way that has to

20 happen, you have to first debit and credit cash, because

21 the system doesn't think you have any cash there, it's

22 gone.  So it is a debit and credit to cash.  And then

23 you have a debit to 25005 and a credit to 12601.

24     So all that is doing is just reversing the

25 transfer that occurred back in October of '00.

187

1     Q.  But in order to reverse a credit to 12601

2 which occurred in 2Q, wouldn't you have to debit 12601?

3     A.  It is debited.

4     Q.  I thought you said credit?

5     A.  No, debit 12601, credit to 25005.

6     Q.  Okay, so let me back up.  So in November, you

7 said there was a debit and credit to cash; correct?

8     A.  In November when?

9     Q.  2002.

10     A.  Correct.

11     Q.  Then you said November 14th, 2002 there was a

12 debit to 12601 and a credit to 25005?

13     A.  It was November the 14th, same day.  All it is

14 doing is just reversing the October '02 transaction.

15 And it debits 12601 and it credits 25005, puts it back

16 into customer overpayments unapplied.

17     Q.  So debit 12601, credit 25005?

18     A.  Correct.

19     Q.  Okay.

20     A.  Which would have the result of reducing

21 income.  All right?

22     Then the next day on October -- excuse me,

23 November -- excuse me, a year later, November the 25th,

24 2003, after the research had been done on this

25 transaction, which is, by the way, General Electric

188

1  Plastics, they actually realized that there had been
2  credit memos that were inappropriately issued, and they
3  then booked the receivables and booked the sales.  And
4  they unbooked the 25005 account.
5      Q.  Okay.
6      A.  So, and that information was obtained through
7  looking at the notes, the collectors' notes, for this
8  account in the '03 time frame.
9      Q.  So when you say that was reflected in the
10  note, what was reflected in the notes?
11     A.  The credit memo discussion.
12     Q.  So, for these 12 transactions, how do you know
13  that those items were -- had erroneous credit memos?
14     MR. GLENNON:  Objection; vague and ambiguous.
15     THE WITNESS:  From the notes of the --
16     MR. GREENSTEIN:  Q.  Other than the notes, is
17  there any evidence that those 12 debit memos had
18  erroneous credit memos?
19     MR. GLENNON:  Same objection.
20     THE WITNESS:  In some cases you can actually
21  see credit memos.  But for the most part it was the
22  notes the collectors had done contemporaneous.
23     MR. GREENSTEIN:  Q.  Right.  You could see the
24  credit memos, but that doesn't tell you that they are
25  proper or improper; correct?

189

1      A.  Well, no.  The notes say, "Receipt notes were
2  incorrect; wrong PA; do not show sufficient credit
3  memos; erroneous notes; and credit memo 722616."
4      So you can see, you can trace that back and
5  see there was an inappropriate credit memo on -- at some
6  point in time in the history.
7      Q.  Okay, so other than the notes, is there any
8  evidence that those 12 transactions had erroneous credit
9  memos?
10     A.  That's the summary of what we considered.  As
11  I said, we have a number of different documents here,
12  which is actual invoices, and appears to be documents
13  which were put together by collectors, et cetera, to
14  support that.  I haven't gone through and reconciled
15  those specifically.
16     Q.  So what source documents would tell you that
17  the credit memo is issued erroneously?
18     A.  Well, as I said, for the most part for me I'm
19  using the notes.  Those are the contemporaneous
20  documents I'm using.
21     Q.  I just want to make sure.  You said for the
22  most part.
23     So is there any other document that you're
24  relying upon in making the determination that those 12
25  transactions had erroneous credit memos?

190

1      MR. GLENNON:  Objection; asked and answered.
2      THE WITNESS:  I know that one on this one
3  would be the summary of what I looked at, the vast
4  majority of the support.
5      MR. GREENSTEIN:  Q.  So there are no other
6  documents?
7      A.  There are other credit memos, but I haven't
8  reconciled those to that number.  They appear to be
9  documents, invoices, et cetera, that support that based
10  on the credit of the collectors' notes.
11     Q.  In other words, the 12 debit memos in which
12  you have concluded had erroneous credit memos in their
13  history, you determined that those credit memos were
14  erroneous by looking at the notes; correct?
15     MR. GLENNON:  Objection; mischaracterizes the
16  testimony.
17     THE WITNESS:  For the most part that's
18  correct.
19     MR. GREENSTEIN:  Q.  Well, is there any other
20  piece of evidence that you relied upon?
21     MR. GLENNON:  Objection; vague and ambiguous.
22     THE WITNESS:  There are other documents,
23  invoices and other support.  I just didn't go back and
24  reconcile them.  They seemed to be support for me.  I
25  didn't reconcile them individually to see that they tied

191

1  exactly back to that.
2      I felt it sufficient to see the collectors'
3  notes done contemporaneous, see that they were talking
4  about credit memos that had been inappropriately
5  applied, and use that in my analysis.
6      MR. GREENSTEIN:  Q.  When you saw the note
7  that said erroneous credit memo in it, you didn't go
8  back to check to see if there was any document that said
9  the credit memo was erroneous; correct?
10     MR. GLENNON:  Objection; vague and ambiguous.
11     THE WITNESS:  Other than reviewing the notes,
12  no.
13     MR. GREENSTEIN:  Q.  Okay.  So for that one
14  debit memo for General Electric Plastics, there is one
15  note for that that indicates it is an erroneous credit
16  memo, or multiple?
17     A.  It is one note.
18     Q.  What does it say?
19     A.  It talks about credit memo, the credit memo
20  actually being 7227616 for -- for the amount of money
21  we're talking about.
22     Q.  Can you just read that note into the record,
23  please?
24     A.  Certainly.  "Receipt notes are incorrect,
25  wrong PA number, and three PRO projects that may

192

1    associate with this reserve amount do not show
2    sufficient credit memos.  Erroneous notes.  See
3    supplemental SO 4814239 and credit memo 7227616 for
4    $181,158.40," which is the amount.  "Makes more sense."
5    And then it talks about a 12/15/96 wire, references
6    text.
7        Q.  How does that note tell you there was an
8    erroneous credit memo?
9        A.  Because it talks about credit memo and talks
10   about credit memo 722616, whatever it was.
11       Q.  It doesn't say it was erroneous, does it?
12       A.  It is using a credit memo and that's -- if it
13   is a credit memo, to me that is an inappropriate
14   application of a credit memo.
15       Q.  So -- but couldn't it have been a proper
16   credit memo that was issued, for example, for customer
17   concessions?
18       MR. GLENNON:  Objection; incomplete
19   hypothetical, vague and ambiguous.
20       THE WITNESS:  No.  Because they eventually
21   booked it back to revenue.  So that means the credit
22   memo was inappropriately booked.
23       MR. GREENSTEIN:  Q.  So the fact they booked
24   it as revenue indicates to you that the previously
25   issued credit memo was erroneous?

193

1        A.  And the notes.
2        Q.  And the notes?
3        A.  Correct.
4        Q.  But the note doesn't say that there was an
5    erroneous credit memo; does it?
6        MR. GLENNON:  Objection; calls for
7    speculation.
8        THE WITNESS:  No.  It talks about the credit
9    memos.
10       MR. GREENSTEIN:  Q.  Okay.  And why don't you
11   take me through the next transaction of the 12, the next
12   highest one in the same way you did with the General
13   Electric Plastics, please.
14       A.  The next one is Structural Dynamics Research,
15   which I think I referred to in my report.
16       Cash was received in May of 2000.  In October
17   of 2001 the amount was transferred to 12601.  On the
18   17th of November, the debit memos took place.  On the
19   7th of November, there was a reversal of the
20   November 17th memos.  On 11/2 of '02 there was a
21   reversal of the transfer to 12601.  And -- I'm sorry, I
22   beg your pardon, I was in the wrong bucket.
23       Q.  I was wondering.
24       A.  Somebody could have stopped me before I got
25   there.

194

1        Q.  One quick question about the last transaction,
2    the GE Plastics.  What was the date of the note that you
3    relied upon?
4        A.  I think you asked me that before.  I don't
5    know the date of the note.
6        Q.  Okay.
7        A.  Okay.  Caltrans on November the 5th, 2000,
8    $91,254 was transferred into the 12601 account.  On
9    November 17th, the debit memos were run.  On
10   November 11th, 2002 there was a reversal of the debit
11   memos.  On November 24th there was a reversal of the
12   transfer.  And on 2/3/03 there was an application to
13   invoices.
14       Q.  Actually, is that this transaction that's
15   listed on 35 and 36 of your report?
16       A.  Exactly.
17       Q.  Do you know the date of the note?
18       A.  No.
19       Q.  Okay.  Did you do any analysis, other than
20   looking at the note, of whether the concessions for the
21   amount in reserve -- that there was too much of a
22   concession that was given to the customer due to the
23   customer sending in a payment for 91K?
24       MR. GLENNON:  Objection; vague and ambiguous,
25   assumes facts.

195

1        THE WITNESS:  Well, I think on that one if you
2    look through the script, you can see where there is --
3    the actual credit memo.
4        MR. GREENSTEIN:  Q.  Overpayment?
5        A.  Yeah.
6        Q.  So it was a credit memo, an invoice was memoed
7    reducing the invoice.  The customer made a payment for
8    the full invoice and so overpaid the amount of credit
9    memo; correct?
10       A.  Correct.  And it was later realized that the
11   credit memo should not have been issued because there
12   actually were services being performed.
13       Q.  Were there ever any instances where
14   overpayments occurred and the credit memo was
15   legitimate?
16       MR. GLENNON:  Objection; vague and ambiguous.
17       THE WITNESS:  I'm sorry, I don't understand
18   your question.
19       MR. GREENSTEIN:  Q.  Well, we just talked
20   about an invoice being reduced if you had a credit memo.
21   And somebody overpaid -- paid the full amount of the
22   invoice which resulted in overpayment; correct?
23       MR. GLENNON:  Objection; mischaracterizes the
24   testimony.
25       MR. GREENSTEIN:  Q.  You don't recall that we

196

1    just talked about that?

2       A. Would you mind just repeating that one more

3    time.

4       Q. Okay. I will ask a different question.

5       With respect to those two debit memos that you

6    just went through, the erroneous credit memos, those

7    involved overpayments of invoices; correct?

8       MR. GLENNON: Objection; vague and ambiguous.

9       THE WITNESS: I don't recall Caltrans was

10   necessarily an overpayment. It was just they paid, and

11   then erroneously, Oracle issued a credit memo, not an

12   overpayment, just issued a credit memo thinking they

13   weren't due the money. And then later realized they

14   were due the money because there were services

15   performed.

16      MR. GREENSTEIN: Q. Okay. So going back to

17   page 33, I want to focus on the five debit memos for

18   $148,000, where you describe a process where cash was

19   moved from 25005 to 12601 during 2Q. Correct?

20      A. Yes.

21      Q. Can you just describe the process from the

22   transfer then how it was resolved during the 2002

23   cleanup?

24      A. Yeah, a little different than the other ones.

25   But in this situation what it really is, is a situation

197

1    where you are writing off an invoice that you have cash

2    for, and that's an inappropriate -- in that regard, you

3    should be reporting income. So, in other words, you

4    have set up a reserve, but you have the cash.

5       So in this situation what happened was, for

6    these five instances, amounts were transferred in

7    October/November of '00 into the 12601 account.

8    However, at the same time you have invoices -- so they

9    are basically recording the income, okay. However, at

10   the same time -- you actually have that cash that you're

11   taking against it. At the same time, however, you have

12   reserved for that invoice, because it got too old, it

13   got to five months, six months, whatever the days were.

14   So you're simultaneously recording a reserve which you

15   should not be recording. You're reducing income, and

16   you shouldn't.

17      So that is a situation where you literally

18   have written off a portion of the invoice, and, in fact,

19   you shouldn't have, because you had the cash.

20      Q. And then how was that resolved during the 2002

21   cleanup?

22      A. Well, to the extent that you had reserved it,

23   you should not have reserved for that much, so it should

24   have been taken back into income.

25      Q. So what are the debits and credits that

198

1    occurred during the 2002 cleanup? Why don't you take us

2    through the largest of those transactions.

3       A. Let's just take -- take railroad reserve,

4    $65,901.

5       Q. What's the debit memo?

6       A. 42059. So in that transaction, in May, cash

7    was received.

8       Q. What year?

9       A. '00. I'm sorry.

10      Q. Okay.

11      A. In October the amount was transferred into the

12   12601 account. So they had the cash, they took it into

13   the reserve account. On November 17th the debit memos

14   occur. On November 12, '02 they reverse the debit memo

15   transactions. And on November 24 they reverse the bad

16   debt transfers.

17      So what happens there is you effectively --

18   you have reserved too much, because you have an invoice

19   that you had the cash for, but you're recording a

20   reserve because of the age. So you have to take that

21   into income. It should be taken into income.

22      Q. So the invoice that -- the payment was coming

23   in for an invoice that had previously been written off;

24   right?

25      A. Right.

199

1       MR. GLENNON: Objection; mischaracterizes the

2    testimony.

3       MR. GREENSTEIN: Q. Is that right?

4       A. Payment comes in, gets written off or gets

5    transferred from 25005 into 12601 account, as if it was

6    into the income account. However, at the same time you

7    have actually then reserved the invoice because it got

8    too old, but you had the cash. So you got to reverse

9    that transfer into the reserve out.

10      Q. How do you reverse that?

11      A. You take it from 12601.

12      Q. So it is a debit to 12601 and credit to --

13      A. Be in income.

14      Q. What date was that for the particular

15   transaction you were citing?

16      A. 11/24/02.

17      Q. Was that the only transaction, debits and

18   credits, that occurred during 2002 with respect to that

19   transaction?

20      A. Yes.

21      Q. And how do you know that the invoice was

22   previously written off?

23      A. Because we actually have the invoice and look

24   at the date of the invoice and apply it to the

25   percentages that Oracle would automatically reserve it

200

1  for.

2      Q.  But do you have actual evidence that the

3  invoice was written off?

4      A.  Well, it would be automatically -- you

5  wouldn't see that in the detail we have.  But you would

6  know that happened because of the date of the invoice.

7      Q.  So what you're saying is after a certain

8  amount of days where an invoice hasn't been paid, it

9  will automatically be written off?

10     A.  There are percentages that are written off, 20

11  percent, 50 percent and 85 percent.

12     Q.  So what was the date of that payment, or,

13  sorry, that invoice?

14         MR. GLENNON:  Objection; vague and ambiguous.

15         MR. GREENSTEIN:  Q.  For the railroad

16  transaction.

17     A.  May of '00.

18     Q.  And so when do you -- when did it get written

19  off?

20     A.  Well, a portion of it would have been written

21  off by 11/30/00, at the six month, 180 days.

22     Q.  Why only a portion of it?

23     A.  Because they don't write the whole thing off.

24  You just write a portion of it off.  Which is typical in

25  companies, you say, look, it is automatic at a certain

201

1  day we're going to write off this much automatically,

2  because there is a presumption it can't be collected.

3      Q.  But don't they presume the other portion can

4  be collected?

5      A.  At a later point in time, if they haven't

6  collected it, the remainder of it will be written off.

7  I have seen a number of companies do that.  They say,

8  180 days, automatically 50 percent gets written off no

9  matter what.

10     Q.  Turning to page 33 again, underneath the

11  $800,000 discussion, there is a discussion of at least

12  another $500,000.

13         And you state that, "These transfers were

14  appropriate, although the evidence relating to these

15  transfers is not as complete as the evidence I reviewed

16  in connection with the $1.5 million in transfers noted

17  above."  Do you see that?

18     A.  Yeah.  Yes.

19     Q.  So can you just explain what those

20  transactions are and why you found them appropriate?

21     A.  Well, again, they were originally transferred

22  from 25005 into 12601.  They were reversed in November,

23  November 24th, '02, all these were reversed for the most

24  part.  And when the unapplied cash project was performed

25  at that time, there is some evidence that it looks like

202

1  it was either an unapplied, or a credit memo that was

2  bad or a royalty that was appropriate.  The notes were

3  not necessarily conclusive, or we didn't see any other

4  type of support for that.

5         So that appears to be one that should have

6  been reported, given there is some evidence of a credit

7  memo or there was some evidence of a royalty or some

8  other type of revenue that should have been booked.  But

9  the notes were not conclusive for me, nor did I see any

10  other type of support.  We put that into a bucket of

11  could be.

12     Q.  Could be.  So you can't definitively say that

13  $500,000 of transfers was proper; correct?

14     A.  That's correct.

15     Q.  And how many debit memos made up the $500,000

16  that you're talking about?

17     A.  Twelve.

18     Q.  I hate to do this, but can you just go ahead

19  and list them into the record, please?

20     A.  Certainly.  3503, 3569, 5165, 7992, 10691,

21  40196, 44860, 2601, 5516, 43176, 44788, and 42 -- excuse

22  me, 45238.

23     Q.  Mr. O'Bryan, in your report you state that of

24  the 926 debit memos there are 277 that were refunded

25  prior to November 17th, 2000 for $103 million; is that

203

1  accurate?

2      A.  That is correct.

3      Q.  If I wanted to go into the script output and

4  figure out those 277 debit memos, what would I do?

5      A.  You just go in and run a query on accounts

6  payable to see where there was a refund.

7      Q.  How would a refund show up?  Would it say

8  refund?

9      A.  The best place to go is accounts payable.

10     Q.  So if I just ran a query by accounts payable,

11  277 items would pop up?

12     A.  Yes.

13     Q.  Is there anything else I would need to do to

14  figure out these 277?

15     A.  Let me get to the report and make sure that's

16  right.

17         Do you have the page of my report so I can

18  turn right to it?  I can find it, if you want.

19         Counsel, do you have the page of my report

20  that says that?  I can find it; I just want --

21     Q.  Oh, no, I don't.

22     A.  It is on page 13 of my rebuttal.  Yeah, it is

23  AP payment details.

24     Q.  AP payment details?

25     A.  AP payment details.

204

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

1    Q.  So if I ran a query in the script output for
2  that column pre November 17th, then 277 items would come
3  up?
4    A.  That is correct, 277 items totaling --
5    Q.  $103 million?
6    A.  $102,906,609, which we rounded up.
7    Q.  So is it fair to say that the other 649 of the
8  926 were not refunded prior to November 17th, 2000?
9    MR. GLENNON:  Objection; assumes facts, lacks
10  foundation.
11    THE WITNESS:  I believe that to be true, yes.
12    MR. GREENSTEIN:  Q.  That's $431 million in
13  debit memos; correct?
14    A.  Correct.
15    Q.  Okay.  So in deriving your calculation of the
16  $20.1 million that was transferred from 25005 to 12601
17  in the second quarter '01, which months did you include
18  in that calculation?
19    MR. GLENNON:  Objection; vague and ambiguous.
20    THE WITNESS:  Which months did I include?
21    MR. GREENSTEIN:  Q.  Yes.
22    A.  Well, what I should include is what's in the
23  quarter, which is September, October, November.
24    Q.  And why did you choose those months?
25    A.  Those are the months in the quarter.

205

1    Q.  Well, are you aware that Oracle had a practice
2  of calculating based on the second month of the quarter?
3  In other words, so for the second quarter, it would be
4  August, September and October?
5    MR. GLENNON:  Objection; lack of foundation,
6  assumes facts, incomplete hypothetical.
7    THE WITNESS:  Yeah, I think you're
8  misunderstanding the way that process works.
9    MR. GREENSTEIN:  Q.  So you didn't see any
10  evidence that that's the way they calculated the 12601
11  transfers for 2Q?
12    A.  Well, the reserve, the actual reserve, the
13  12601 reserve is calculated, looked at on a specific
14  account, on account-by-account basis, at the second
15  month of a Q.  And in the third month of a Q it is then
16  trued up.
17    Q.  Okay.
18    A.  In other words, you then look to see -- I know
19  that the specific items that are going to go bad or are
20  bad in the reserve.  But in the last month I know I
21  booked this much revenue on a historical basis, I
22  typically put 1, 2, 3 percent, whatever it is, then
23  gets trued up.  So a quarter is a quarter.
24    Q.  So, in other words, you calculated September,
25  October and November transfers from 25005 to 12601 in

206

1  order to come up with the $20.1 million; correct?
2    A.  That's correct.
3    Q.  Mr. O'Bryan, previously you said that in order
4  to find out the 277 refunds of the 926, you would run a
5  query on AP payment --
6    A.  Correct.
7    Q.  -- column; correct?  Are you sure that's in
8  the script output?
9    MR. GLENNON:  I'm going to object.  Lack of
10  foundation, vague and ambiguous.
11    THE WITNESS:  It is on the query we ran.
12    MR. GREENSTEIN:  Q.  Okay.  Can you think of a
13  reason why if we looked at the script output we wouldn't
14  see that column there?
15    MR. GLENNON:  Objection; calls for
16  speculation, lack of foundation.
17    THE WITNESS:  I didn't personally run the
18  filter or the run.  It was one of my team.  The thing I
19  see consistent is AP payment detail.  If it was another
20  column that then pulls that up, pulls that in, that may
21  be.
22    But what is consistent on that run, which is
23  in my work papers, is AP payment detail.
24    MR. GREENSTEIN:  Q.  Do you have a list of
25  those 277 in one place?

207

1    A.  I do, yes.
2    Q.  Are you willing to produce those?
3    A.  That's not up to me.
4    MR. GLENNON:  To the extent that you can
5  establish the foundation for requiring production, we'll
6  certainly entertain that discussion.  But I don't think
7  you've done that.
8    MR. GREENSTEIN:  Q.  So you're not willing to
9  do it?
10    MR. GLENNON:  This is counsel's decision, as
11  you know.
12    But what Mr. O'Bryan has said is that
13  everything that he has gleaned and everything he's
14  relied upon is from the script output, which is actually
15  listed in the appendix to his expert report, which I'm
16  happy to point out to you, if you'd like.
17    MR. GREENSTEIN:  Q.  Mr. O'Bryan, do you think
18  it is helpful -- was it helpful for you to have a list
19  of those 277 items?
20    A.  For me personally?
21    Q.  Yeah.
22    A.  Well, certainly it summarized what they were
23  and how much they were.  But they come right out of the
24  script output.
25    Q.  If you could turn -- strike that.

208

Oracle

Page  205 - 208

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

1      Mr. O'Bryan, is it your testimony, your expert
2  testimony, that Ernst and Young analyzed the 2Q '01 bad
3  debt transfers, the transfers from 25005 to 12601 in the
4  second quarter?
5      A.   Yes.
6      Q.   They did review it?
7      A.   Yes.
8      Q.   What evidence can you provide that supports
9  your conclusion?
10     A.   As I recall, it was a deposition of Jennifer
11  Minton and also deposition of Mr. Henley.
12     Q.   Is there anything else you relied upon in
13  order to determine, to conclude that Ernst and Young
14  reviewed the $20.1 million in bad debt transfers in the
15  second quarter of '01?
16     A.   Well, just my experience as an auditor, and
17  knowing what auditors would be aware of and would talk
18  to clients about.
19         When you have the chief financial officer,
20  Mr. Henley, saying, "I've talked to them about that, or
21  would have talked to them about it," I think that's
22  pretty good evidence that they would have been spoken
23  to.
24         Then you also have Ms. Minton, who is also in
25  the accounting department, mentioning that they had been

209

1  talked to about it.  To me they would know that.
2         In addition to that, it would be an item that
3  an auditor would be interested in, given the amount, and
4  specifically given the fact that the client is telling
5  you this is something I want you to look at.
6      Q.   When you say an auditor would look at it, it
7  is not your testimony that Ernst and Young audited
8  Oracle's second quarter '01, is it?
9      A.   No.  I'm sure they performed the SAF 71
10  review.
11     Q.   Just so it is clear, Ernst and Young did not
12  audit Oracle's second quarter '01 bad debt transfers?
13     MR. GLENNON:  Objection; vague as to time.  Do
14  you want to clarify?
15     MR. GREENSTEIN:  Q.  At any time.  Is it your
16  testimony that Ernst and Young audited Oracle's second
17  quarter '01 financials?
18     A.   Well, no.  Arthur Andersen was the auditor.
19  But Ernst and Young was made aware of this in the
20  October/November of '02 time frame when this unapplied
21  cash project took place.  And I base that on testimony
22  that I've seen, as well as just my own experience as an
23  auditor that that would be something you'd see, and it
24  would be something you'd look at.
25         And as soon as you see it and as soon as you

210

1  look at it, you have to immediately look at it with
2  respect to the materiality back to the quarter it was
3  appropriately booked.
4      Q.   Why would you have to immediately look at it?
5      A.   Because it is something the clients brought up
6  to you and said, "Hey, will you take a look at this and
7  tell me" -- worst case scenario, hypothetically, which
8  we play out in our report, is the entire $20 million is
9  something that should be taken back to the second
10  quarter and reduce revenues by that.
11         The auditor would immediately say, "Look, I'm
12  not going to go do a bunch of analysis how this
13  happened.  That's the company's internal policy and
14  internal operations.  However, I do want to know if
15  that's something that has to be looked at and
16  investigated for me, the auditor, to know if it was
17  material in the second Q of '01 to potentially have to
18  restate the Q."
19         Even though they didn't audit the second Q of
20  '01, they being Ernst and Young, they certainly would
21  have had to consider materiality to go back and restate
22  that Q.  They would have responsibility for restating
23  that Q even though they did not report on it at the time
24  it was prepared.
25     Q.   So, just to be clear, your testimony is that

211

1  Ernst and Young did a review of the transfers from 25005
2  to 12601 in the second quarter '01, and issued an
3  opinion on that amount?
4      MR. GLENNON:  Objection; mischaracterizes the
5  testimony.  It is also vague and ambiguous as to time.
6      THE WITNESS:  No.  Auditors don't issue
7  opinions on individual transactions and/or accounts
8  within a set of financial statements.
9      MR. GREENSTEIN:  Q.  Let me rephrase.  So
10  you're saying they did review it though; right?
11     MR. GLENNON:  Objection; mischaracterizes the
12  testimony, it's vague and ambiguous.
13     THE WITNESS:  I believe that Ernst and Young
14  was made aware of the transfers and considered,
15  immediately upon being aware of, they would need to
16  consider whether or not it was material to that quarter.
17     MR. GREENSTEIN:  Q.  So do you -- do you know
18  if they considered it or not?
19     MR. GLENNON:  Objection; vague and ambiguous,
20  asked and answered.
21     THE WITNESS:  I do.  And they were.
22     MR. GREENSTEIN:  Q.  So your expert opinion is
23  that Ernst and Young reviewed the $20.1 million in
24  transfers from 25005 to 12601 in the second quarter?
25     MR. GLENNON:  Objection; vague and ambiguous

212

1   as to time, and asked and answered.

2         THE WITNESS: I'm sorry, I think you are

3   changing that question.

4         My position is that they -- I believe that

5   they were aware of it, of the transfers, and I believe

6   given the fact they were aware of it, they considered

7   the materiality of that into the second Q of '01,

8   Oracle's financial statements.

9         MR. GREENSTEIN: Q. Okay.

10     A. Did they perform audit procedures? I don't

11   know what procedures they performed. But I know having

12   been told about it, they would have had to consider the

13   materiality of it to the second Q.

14     Q. They would have had to consider it; right?

15     A. They would have, yes.

16     Q. But do you know if they did consider it?

17         MR. GLENNON: Objection; vague and ambiguous,

18   asked and answered.

19         THE WITNESS: If they were told about it, they

20   would have considered it, and considered materiality.

21   Auditors do that.

22         MR. GREENSTEIN: Q. And you said the

23   evidence -- the only evidence that you have to support

24   your opinion is testimony from Jennifer Minton and

25   testimony from Jeff Henley, and what you know about what

213

1   auditors look at in general; correct?

2         MR. GLENNON: Objection; mischaracterizes the

3   testimony.

4         THE WITNESS: There is also the audit

5   committee minutes. As I recall, the transactions, the

6   project, the unapplied cash project, was discussed in an

7   audit committee meeting. And auditors have to, by GAAS

8   requirements, basically should, look at audit committee

9   minutes.

10         So when -- I don't know if they were at that

11   meeting that it was discussed or not; I don't know that.

12   But even if they weren't, they would look at the minutes

13   of those meetings. It is a required step in audits or a

14   step all auditors perform in audits. It is actually

15   represented to the auditors that the company has made

16   available to them all the minutes.

17         So the auditor would have seen -- it's

18   Mr. Henley's testimony, Ms. Minton's testimony, it's my

19   understanding what auditors do. And, lastly, I

20   understand that it was discussed in the audit committee

21   meeting, and Ernst and Young certainly would have seen

22   those minutes and researched what that meant when they

23   were talking about the unapplied cash project or

24   whatever was discussed.

25         MR. GREENSTEIN: Q. But you don't know if

214

1   they did that or not, do you?

2         MR. GLENNON: Objection; vague and ambiguous,

3   mischaracterizes testimony.

4         THE WITNESS: I have not seen Ernst and

5   Young's work papers or talked to Ernst and Young

6   auditors that may have done that. I believe the name is

7   Mr. Banker, Mr. Caruso, or something to that effect.

8         But, I know in my 27, 29 years as being an

9   accountant, auditor, that's something that if the CFO

10   told you about it, it would be something you would

11   consider with respect to materiality.

12         MR. GREENSTEIN: Q. Can you point me to the

13   Henley testimony that you're talking about?

14         THE WITNESS: Yeah. Do you want to take a

15   two-minute break?

16         MR. GREENSTEIN: Yeah. I'm going to be asking

17   for the Minton testimony and the Henley testimony.

18         VIDEOGRAPHER: Off record at 3:55.

19         (Recess, 3:55 p.m. - 4:05 p.m.)

20         VIDEOGRAPHER: On record at 4:05.

21         MR. GREENSTEIN: Q. Mr. O'Bryan, during the

22   break you said you were going to try to find the

23   testimony of Jennifer Minton and Jeff Henley. Did you

24   do that?

25     A. I did, yes.

215

1     Q. Okay.

2     A. And the reference in my report, I'm sorry, I

3   should have asked you this in the first place, would

4   have expedited things, on page 41 of my original

5   report, section D, where it talks about review of work

6   performed.

7         And the two cites that we go to, first to

8   Jennifer Minton, Jennifer Minton was the chief

9   accounting officer, CAO, of Oracle by 2001. And her

10   testimony when asked, "Was this analysis" -- the

11   analysis talked about was the unapplied cash analysis --

12   "shared with the outside auditors?"

13         "Answer: Yes."

14         Question, over on page 285 --

15     Q. Actually let me stop you there.

16         MR. GLENNON: Hold on. Are you finished with

17   your answer?

18         MR. GREENSTEIN: Q. I was going to say, if

19   this is the testimony that you're talking about, we

20   don't need to go through it.

21     A. There is more testimony.

22     Q. The one that said -- the stuff you cited on

23   page 41.

24         MR. GLENNON: If you want to complete your

25   answer, you can. But it is up to you.

216

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

1   THE WITNESS:  Well, yeah, I do want to
2   complete the answer, if you don't mind.
3        MR. GREENSTEIN:  Q.  Okay.
4   A.   Then on the next page they are talking about
5   Mr. Wald asked -- there is discussion on 284 if it was
6   discussed at the audit committee meeting.  And the
7   answer was, yes.  Didn't recall if the auditors were at
8   the audit committee.
9        And then also saying Tom Williams would have
10  discussed this with the auditors.
11       So you have Ms. Minton saying it was discussed
12  with the auditors, that it was discussed at the audit
13  committee, doesn't know if auditors were at the
14  audit committee, and also the fact Tom Williams would
15  have discussed this with the auditors.  Also, given the
16  fact that, again, as I mentioned the auditors would have
17  to look at the audit committee minutes and see that
18  discussion, would have certainly considered this as to
19  materiality in the second Q.
20  Q.   They are talking about auditors there; right?
21  A.   Talking about auditors.
22  Q.   E&Y was not Oracle's auditor at the time were
23  they?
24  A.   This is talking about the auditors at the time
25  when this project was done, which was Ernst and Young.

217

1   Q.   So, okay, so is it fair to say that your --
2   the evidence that you rely on in forming the opinion
3   that Ernst and Young looked at the 2Q '01 transfers of
4   $20.1 million is reflected on page 41 in footnote 106
5   and 107; is that correct?
6        MR. GLENNON:  Objection; mischaracterizes the
7   testimony.
8        THE WITNESS:  Well, the second one is
9   Mr. Henley's testimony, which is, I believe, referred
10  to.  Let me just read it to you.  And that was asked
11  again about the, I think there they called it cleanup.
12  And here it was that the -- "I got Jennifer and asked
13  all the way down.  We get the people in the department
14  itself as well as the others, including the internal
15  audit, external audit, to really get an understanding of
16  what did or didn't happen."
17       Question was:  "Okay, so you've answered
18  at least the question partially.  You got Ms. Minton
19  involved, you got external auditors involved.  Which
20  external auditors?
21       "Whoever our public auditors are at the time.
22       "Okay.
23       "Either Arthur Andersen or Ernst and Young, as
24  I testified earlier.  I can't remember when we
25  switched."

218

1        So it is clearly talking about '02, because
2   they did switch from Andersen, which no longer existed.
3        (Discussion off the record.)
4        (Record read as follows:  ANSWER:  It is
5        clearly talking about '02 because they did
6        switch from Andersen, which no longer existed.)
7        MR. GREENSTEIN:  Q.  Is that a fair
8   characterization of your testimony?
9   A.   Yes.
10  Q.   So, other than this deposition testimony of
11  Jennifer Minton and Jeff Henley, and I think you said
12  there is audit committee meeting notes, other than that
13  evidence, is there any other evidence that you believe
14  supports your conclusion that Ernst and Young looked at
15  the $20.1 million in transfers from 25005 to 12601
16  during 2Q '01?
17       MR. GLENNON:  Objection; mischaracterizes the
18  testimony, asked and answered.
19       THE WITNESS:  The only thing I would add would
20  be my understanding of how auditors work and what they
21  would look at and what they would consider.
22       MR. GREENSTEIN:  Q.  Okay.
23  A.   Which clearly would have been looking as to
24  materiality in the second Q.
25  Q.   Did you review the --

219

1   A.   I'm sorry to do this to you, but if you
2   recall, one of the later audit committee minutes states
3   that Ernst and Young was done with their review and they
4   were proposing no adjustments, nor did they adjust the
5   second Q of '01.  So that tells you that it was not
6   material in their mind.
7   Q.   Okay, what audit committee meeting was that?
8   A.   There was a subsequent audit committee meeting
9   where Ernst and Young presented to the audit committee
10  they completed their review of one of the Qs and there
11  were no adjustments.
12  Q.   That was third quarter '01, wasn't it?
13  A.   Exactly right.  The point is that when they
14  say that there is no adjustments, it really goes all the
15  way back.  If you find adjustments at any point in time,
16  you have to go back if it is material.
17  Q.   Okay.
18  A.   Under APB 20.
19  Q.   Did you review the SLC interview memo of John
20  Banker, who is the senior audit partner for E&Y at the
21  time?
22  A.   I haven't seen that, I don't think.
23       MR. GREENSTEIN:  Why don't I mark that.
24       (Exhibit 11 marked for
25        identification.)

220

1    MR. GREENSTEIN:  Q.  For the record, this is
2 NDCA-ORCL 296428 through 296434.  Actually, Mr. O'Bryan,
3 I'm going to focus your attention on a particular
4 portion of this.  So just let me know when you've
5 reviewed it.
6    A.  Yes, I read through that.
7    Q.  Have you seen this document before?
8    A.  I don't recall.
9    Q.  So you didn't -- did you consider it in either
10 your opening report or your rebuttal report?
11    MR. GLENNON:  Objection; vague and ambiguous.
12    THE WITNESS:  If I saw it, I considered it.  I
13 have not referred to it, so I have not relied on it.
14    MR. GREENSTEIN:  Q.  Okay.  So have you read
15 it before?
16    MR. GLENNON:  Objection; asked and answered.
17    THE WITNESS:  Yeah, I just don't recall.
18    MR. GREENSTEIN:  Q.  Okay.  If you turn to the
19 second to the last page.
20    A.  I'm there.
21    Q.  Actually, strike that.
22    Did you review the SLC final report regarding
23 the accounting allegations?
24    MR. GLENNON:  Objection; vague and ambiguous.
25    THE WITNESS:  I don't recall if I reviewed

1 that or not.
2    MR. GREENSTEIN:  Q.  Turning to the second to
3 the last page of this document.  You see how the heading
4 begins with, "Accounting Fraud Allegations Regarding
5 Unapplied Cash and Bad Debt Reserve."  Do you see that?
6    A.  I do, yes.
7    Q.  Why don't you go ahead and read the whole
8 thing.
9    A.  I've read that.
10    Q.  Okay.  So you read it just now.  But you're
11 not saying you read it before?
12    A.  I don't recall if I read it before.  I read a
13 lot of things.  I don't remember it.
14    Q.  You see how it says that the committee --
15 second sentence, "The committee discussed with Banker
16 that certain transfers from unapplied cash to the bad
17 debt reserve had occurred in Q3 of fiscal 2001, but that
18 the maximum amount of cash moved to the bad debt reserve
19 in Q3 was approximately $5 million."  Do you see that?
20    A.  Yes, I do.
21    Q.  Okay.  Do you see any evidence here that E&Y
22 looked at the second quarter of 2001?
23    MR. GLENNON:  Objection; document speaks for
24 itself.
25    THE WITNESS:  No.  The second quarter isn't

1 discussed.  But certainly Ernst and Young -- this is
2 almost a perfect example of the fact that they knew.
3 Having known -- and it says this process is ongoing.
4 Continuing its investigation of the claims regarding the
5 bad debt reserve, believe me, Ernst and Young would have
6 been all over this and looked back once the information
7 was known, which it was eventually later.
8    This was dated, I believe, November 13th.  So
9 this was before the transfer of all the bad debt, the
10 $20 million in bad debt reserves back to the 25005
11 account, which happened on November 24th.
12    So this is apparently what they knew at the
13 time, was 3Q, apparently not 2Q.  However, knowing that
14 there was ongoing investigation, Ernst and Young would
15 have been all over that.
16    Q.  You said that the reversal of the $20.1
17 million in transfer to the bad debt reserve in Q2
18 occurred on what date?
19    A.  November 24th, 2002.
20    Q.  All that $20.1 million was reversed on that
21 date?
22    A.  That's correct.
23    Q.  Okay.  So you will see this is an interview
24 memorandum from the SLC.
25    Do you know what the SLC ultimately put in

1 their final report?
2    MR. GLENNON:  Objection; the document speaks
3 for itself, lacks foundation.
4    THE WITNESS:  I don't recall what that report
5 says as I sit here right now.
6    MR. GREENSTEIN:  Q.  But you didn't rely upon
7 the SLC report in forming your opinion on whether E&Y
8 looked at that issue; right?
9    MR. GLENNON:  Objection; asked and answered.
10    THE WITNESS:  I don't rely on it in my report.
11 I could have read it at one point or considered it, but
12 apparently haven't relied upon it.
13    MR. GREENSTEIN:  Q.  Mr. O'Bryan, did you --
14 in forming your opinion on Ernst and Young -- on Ernst
15 and Young's purported knowledge of the bad debt
16 transfers in 2Q '01, did you rely upon the deposition of
17 Alex Bender?
18    A.  I did see Mr. Bender's deposition where he
19 stated he didn't know anything about the second Q
20 reviews -- second Q transfers.
21    Q.  And wasn't --
22    A.  I just saved you an exhibit.
23    Q.  And are you aware that Alex Bender was the
24 person -- the witness designated by Ernst and Young as
25 the, quote, person most knowledgeable regarding these

1    issues pertaining to Oracle?
2         MR. GLENNON:  Objection; lack of foundation,
3    vague and ambiguous.
4         THE WITNESS:  I don't know if he was the PMK
5    or not.  He was the senior manager on the engagement,
6    Mr. Banker was the partner, but I think Mr. Banker had
7    retired, so was not necessarily available to be deposed.
8    It would probably make sense that the senior manager may
9    have been the PMK.
10        MR. GREENSTEIN:  Q.  So --
11        MR. GLENNON:  It is vague and ambiguous as to
12   these issues pertaining to Oracle as well.  Do you want
13   to clarify what they were designated as PMK for?
14        MR. GREENSTEIN:  No.  He answered.
15        Q.  So, given that you just said that you read
16   Mr. Bender's deposition, you said he didn't know about
17   the 2Q transfers, why do you still -- how do you still
18   form an opinion that they did know?
19        A.  Because --
20        MR. GLENNON:  Objection; vague and ambiguous,
21   asked and answered.
22        THE WITNESS:  You mean they knew, you mean
23   Ernst and Young knew?
24        MR. GREENSTEIN:  Q.  Correct.
25        A.  About the second Q transfers?

225

1         Q.  Right.
2         A.  Because of Ms. Minton's testimony,
3    Mr. Henley's testimony.  And then also my understanding
4    of how an engagement team works.  Not everybody on the
5    team knows everything about what is going on in the
6    engagement.  So it is very likely Mr. Banker could have
7    known about it and gave consideration to it, and
8    somebody else did, but Mr. Bender did not.  That's not
9    untypical at all.
10        Q.  But --
11        A.  An engagement team of an audit doesn't know
12   everything about the entire client, especially a client
13   the size of Oracle, on an ongoing basis.  That's why
14   there is a team.
15        Q.  So you think that it is more reliable to rely
16   on testimony of Jennifer Minton and Jeff Henley rather
17   than the testimony of Mr. Bender, who was designated by
18   Ernst and Young as its person most knowledgeable?
19        MR. GLENNON:  Objection; lack of foundation,
20   argumentative, mischaracterizes the testimony.
21        THE WITNESS:  Yeah, I don't think -- I've
22   considered all that testimony.  And all I'm saying is
23   given all the information that I've seen, I believe that
24   Ernst and Young did review that and did consider it with
25   respect to materiality.  And it is based on Ms. Minton's

226

1    testimony, Mr. Bender's testimony, Mr. Henley's
2    testimony, the audit committee information, my
3    understanding of how an engagement team works, and my
4    understanding of what auditors would be interested in
5    with respect to materiality.
6         MR. GREENSTEIN:  Q.  But you agree with me
7    that Mr. Bender says that he wasn't aware that Ernst and
8    Young looked at the 2Q transfer from 25005 to 12601;
9    correct?
10        MR. GLENNON:  Objection; lacks foundation,
11   document speaks for itself.
12        THE WITNESS:  I recall Mr. Bender saying
13   something to the effect he wasn't aware or didn't know
14   of any second Q transfers to the bad debt reserve,
15   something to that effect.
16        MR. GREENSTEIN:  Okay.  Mark two exhibits, 12
17   and 13.
18             (Exhibit 12 marked for
19              identification.)
20             (Exhibit 13 marked for
21              identification.)
22        MR. GREENSTEIN:  Let's mark 12 first.  For the
23   record, 12 is Bates stamped EY 000001 through EY 000012.
24   And Exhibit 13, for the record, Exhibit 13 is a portion
25   of the SLC report Bates stamped NDCA-ORCL 295517 through

227

1    295591.
2         Q.  Mr. O'Bryan, why don't you let me know when
3    you're finished looking.  Let's start with Exhibit 12.
4         A.  Okay.
5         Q.  Have you seen Exhibit 12 before?
6         A.  I don't recall seeing this document.
7         Q.  But you didn't rely upon it; correct?
8         A.  That's correct.
9         Q.  You see the first page is -- it's a copy of an
10   audit file that says, "Agreed upon procedures with
11   respect to debit memos to account 25005 in November
12   2000."  Do you see that?
13        MR. GLENNON:  Objection; the documents speaks
14   for itself.
15        THE WITNESS:  I do see that it says that, yes.
16        MR. GREENSTEIN:  Q.  What does this appear to
17   be?
18        A.  This is a binder cover from Ernst and Young's
19   work papers for the period 5/31/03.  It appears to be
20   the binder cover for the agreed upon procedure of the
21   work done on the debit memos.
22        Q.  If you turn to EY -- page EY 3.
23        A.  I'm there.
24        Q.  It is an e-mail from John Banker to
25   hfrahn@slblaw.com.  And it says, "Subject:  Re:  Draft

228

1  Insert For Your Review."  And it has a date of
2  11/19/2002.  Do you see that?
3      A.  I do, yes.
4      Q.  And the text of the e-mail says, "Buzz, here
5  is a draft marked for suggested changes by counsel and
6  me.  Please call to discuss.  Thanks.  JB."  Do you see
7  that?
8      A.  I do, yes.
9      Q.  Is it fair to say this appears to be an e-mail
10  from John Banker to an hfrahn, 11/19, enclosing some
11  changes to a document?
12      MR. GLENNON:  I'm going to just briefly object
13  just on the basis -- Eli, can you give me the background
14  on this particular document?  Has this been logged?  Is
15  this privileged?  This looks like it could be
16  privileged.
17      MR. GREENSTEIN:  Well, it was produced by
18  Ernst and Young.
19      MR. GLENNON:  All right, can we take a
20  couple-minute break so I can look into this?  I don't
21  want to shut you down on your questioning, but I can
22  just make a couple phone calls.
23      MR. GREENSTEIN:  Okay.
24      VIDEOGRAPHER:  This marks the end of tape
25  three in Volume I in the deposition of J. Duross O'Bryan

1  at 4:26, going off the record.
2      (Recess, 4:26 p.m. - 4:41 p.m.)
3      VIDEOGRAPHER:  On record at 4:41.  This marks
4  the beginning of tape four in the deposition of J.
5  Duross O'Bryan.
6      MR. GREENSTEIN:  Q.  Mr. O'Bryan, you have
7  before you what has been marked as Exhibits 12 and 13.
8  Exhibit 12 was the audit file, couple pages from the
9  audit file, and Exhibit 13 was a portion of the SLC
10  report.  Do you see that?
11      MR. GLENNON:  Objection; foundation.
12      THE WITNESS:  I see 12, which appears to be
13  Ernst and Young Bates stamped documents, and 13,
14  whatever Bates they are.
15      MR. GREENSTEIN:  Q.  If you turn to page EY --
16  on Exhibit 12, EY 3.
17      A.  Yes.
18      Q.  Sorry, EY 6.
19      A.  I'm there.
20      Q.  And it appears to be an e-mail from John
21  Banker to Joel Bonner, dated 3/11/2003.  It looks like
22  it includes the previous e-mail that we looked at dated
23  11/19/2002 from John Banker to Harrison Frahn.  Do you
24  see that?
25      A.  I do, yes.

1      Q.  It says, "Buzz, here is the draft marked for
2  suggested changes by counsel and me.  Please call to
3  discuss."  Do you see that?  "Thanks.  JB."
4      A.  I do, yes.
5      Q.  And if you turn to page 10, it appears to be a
6  red-lined Word or Word Perfect, word processing
7  document; correct?
8      A.  Appears to be, yes.
9      Q.  And see at the top it says, "On November 13th,
10  2002 the committee's counsel met with John Banker," and
11  the word "senior" is crossed out, it says, "Audit
12  Partner at EY."  Do you see that?
13      A.  I do, yes.
14      Q.  Look at Exhibit 13, and turn to page 295565.
15      A.  I'm there.
16      Q.  And you see how right under the heading:
17  "E&Y's review of the debit memos was consistent with the
18  committee's conclusions."  Do you see that?
19      A.  I do, yes.
20      Q.  Look at the first sentence at least.  It
21  appears that this language on 295565 is -- matches the
22  language on EY 10, except for the items that have been
23  underlined; correct?
24      MR. GLENNON:  I object to the extent the
25  document speaks for itself.

1      THE WITNESS:  I see that it looks a lot less
2  alike than it does alike.
3      Turn to 295566, it says, "Banker," and then,
4  "and Professor Grundfest," which isn't on the EY memo at
5  all.  The next sentence -- the next sentence in the EY
6  memo says it is on 556 -- I don't see -- I mean, are
7  there similar words and sentences?  Possibly.  But I
8  have not matched that up.
9      MR. GREENSTEIN:  Q.  Okay, well, let's just
10  look at it sentence by sentence.
11      So, if you look at the third sentence of both
12  documents.
13      A.  The third sentence.
14      Q.  The one that starts with, "The purpose of
15  these discussions."
16      MR. GLENNON:  Just for the record, it is not
17  the third sentence of Exhibit 13.
18      MR. GREENSTEIN:  Q.  Right.  The third
19  sentence in EY 10, and if you could find that same
20  sentence in 295566.  Do you see that?
21      A.  I see it in Exhibit 12.  And I'm now
22  looking -- I see it also in Exhibit 13.  I just see "The
23  purpose."
24      Are you asking me to do something with that?
25  I'm sorry.

1    Q.  Yeah.  I just want to -- it appears to me that
2  the language in EY 10 is the same as the language in
3  295566, in that what was red-lined -- what was red-lined
4  in Exhibit 12 was removed from the final version.  Does
5  that appear to be correct?
6      MR. GLENNON:  Objection; foundation.  The
7  document speaks for itself.
8      THE WITNESS:  Are you just asking me if that
9  sentence matches?
10     MR. GREENSTEIN:  Q.  Yes.
11     A.  If you take out the edited portions of that?
12     Q.  Right.
13     A.  It appears to.
14     Q.  It says, "The purpose of these discussions was
15 to consider both the committee's analysis and
16 conclusions regarding the accounting fraud allegations
17 and procedures performed by EY."  Then you see how it
18 crosses out "analysis"?
19     A.  Yes.
20     Q.  Okay.  So it appears that Mr. Banker removed
21 that word "analysis" and added the words "at the request
22 of Oracle's management with respect to those same
23 allegations."  Do you see that?
24     A.  I don't know who made that change.  I don't
25 know if it was Mr. Banker or Mr. Bonner who made that.

233

1    Q.  But that change was made?
2    A.  Yeah.
3      MR. GLENNON:  Objection; the document speaks
4  for itself.
5      THE WITNESS:  As it should be.
6      MR. GREENSTEIN:  Q.  Why is that?
7    A.  Because this is an agreed-upon procedure
8  report, procedures agreed upon by E&Y and the SLC.
9    Q.  E&Y didn't do its own analysis with respect to
10 the allegations; correct?
11     MR. GLENNON:  Objection; lack of foundation,
12 assumes facts.
13     THE WITNESS:  Are you speaking now about the
14 debit memos or the --
15     MR. GREENSTEIN:  Q.  I'm looking at this
16 document, and the word "analysis" is crossed out.  You
17 said that made sense to you; right?
18     MR. GLENNON:  Objection; mischaracterizes the
19 testimony.  The document speaks for itself, lack of
20 foundation.
21     THE WITNESS:  Well, I believe this becomes
22 part of the agreed-upon procedures report.
23     MR. GREENSTEIN:  Q.  But I'm wondering why --
24 it appears based on this document that somebody removed
25 the word analysis, such that it said, "The

234

1  procedures performed by EY at the request of Oracle's
2  management," so instead of saying "procedures performed
3  by EY's analysis," they crossed out "analysis" and added
4  "At the request of Oracle's management."  Do you see
5  that?
6      MR. GLENNON:  Objection; the document speaks
7  for itself, lack of foundation.
8      THE WITNESS:  I do see that, yes.
9      MR. GREENSTEIN:  Q.  So doesn't that indicate
10 that EY performed procedures at the request of Oracle's
11 management, but did not perform its own analysis?
12     MR. GLENNON:  Objection; calls for
13 speculation.
14     MR. GREENSTEIN:  Q.  At least according to
15 this document?
16     MR. GLENNON:  Objection; calls for
17 speculation, lack of foundation, document speaks for
18 itself.
19     THE WITNESS:  Well, as part of -- agreed upon
20 procedures are exactly that, they are agreed upon
21 between the two parties, the auditor and whoever is
22 asking the auditor to do that.
23     But as part of the agreed-upon procedures, the
24 auditors perform analysis.  So if you ask me to, agreed
25 upon procedures, to go match up every word in this

235

1  document to this document and I agree to that, that's an
2  agreed-upon procedure between the two of us.  And I then
3  perform an analysis to see if that's true.
4      MR. GREENSTEIN:  Q.  Based on your extensive
5  experience working at audit firms, do you know why E&Y
6  would cross out the word "analysis" and add "at the
7  request of Oracle's management"?
8      MR. GLENNON:  Objection; lack of foundation.
9      THE WITNESS:  Because it looks like it's
10 saying "analysis."  If you look at the rest of the
11 edits, it looks like it would have said, "and procedures
12 performed by E&Y's analysis of those same allegations."
13     E&Y wouldn't make an analysis of the
14 investigations, that's not what they are being asked to
15 do.
16     MR. GREENSTEIN:  Q.  But doesn't it appear --
17 there are two underlying parts of that sentence,
18 correct, which it looks like it was added in, then there
19 is one word that was taken out.  Is that fair to say?
20     MR. GLENNON:  Objection; document speaks for
21 itself, lack of foundation.  The witness didn't author
22 the document.
23     THE WITNESS:  I'm not sure what you're asking
24 me.
25     MR. GREENSTEIN:  Q.  You have seen a red-lined

236

1  document before; right?
2  A.  I have, yes.
3  Q.  Based on what you know, it appears that "the
4  procedures performed by" was added, and then "at the
5  request of Oracle's management with respect to" was
6  added; right?
7  MR. GLENNON:  Objection; the document speaks
8  for itself, lack of foundation.
9  THE WITNESS:  Well, what it appears to have
10  said in the first instance was, "The purpose of these
11  discussions was to consider both the committee's
12  analysis and conclusions regarding the accounting fraud
13  allegations and E&Y's analysis of those same
14  allegations."
15  Well, E&Y wouldn't perform an analysis of the
16  investigations.
17  MR. GREENSTEIN:  Q.  It says allegations.
18  Where does it say investigations?
19  A.  Excuse me, would not perform an analysis of
20  the allegations.  E&Y would consider the allegations and
21  agree to do procedures that were agreed upon between
22  itself and the committee.  And then in applying those
23  procedures would perform analysis.
24  So, to me it makes sense that the change was
25  made.  It doesn't say they are not doing an analysis.

237

1  They are simply not doing an analysis with respect to
2  the allegations.
3  Q.  They are saying they didn't do an analysis of
4  allegations; right?
5  MR. GLENNON:  Objection; asked and answered,
6  document speaks for itself, calls for speculation.
7  THE WITNESS:  I think it is just saying E&Y is
8  not trying to analyze what the allegations are, it is
9  simply performing procedures with respect to the
10  allegations.
11  It wouldn't be Ernst and Young's job to
12  analyze the allegations, what the document says and what
13  the allegations are.  It would be their job to analyze
14  and perform procedures on the specific allegations.
15  MR. GREENSTEIN:  Q.  Okay.  If you look down
16  to the last paragraph, you see -- why don't you just
17  read that sentence into the record as it was before
18  these red-lines were made.
19  MR. GLENNON:  Objection to the extent that's
20  even possible.
21  MR. GREENSTEIN:  Mr. O'Bryan, you're familiar
22  with red-lined documents; correct?
23  A.  I am, yes.
24  Q.  And do you feel capable -- that you're capable
25  of reading the sentence as it existed before the

238

1  red-lines were made?
2  MR. GLENNON:  Are you representing both the
3  edits were made simultaneously?
4  MR. GREENSTEIN:  Q.  I'm just saying can you
5  read that sentence without the edits in there?
6  A.  I can read the sentence excluding the
7  underlines and including the line-outs.
8  Q.  Perfect.
9  A.  Does that work?
10  Q.  Yeah.
11  A.  "Banker informed the committee that E&Y had
12  performed its own examination of the accounting fraud
13  allegations in its review pursuant to principles that
14  E&Y agreed to with Oracle's -- with Oracle's the
15  November 17th debit memos."
16  Q.  Okay.  And then you see how if you turn back
17  to page 10, EY 10, it appears that somebody crossed out
18  the portion that says -- when it says "EY had performed
19  its own examination of the accounting fraud
20  allegations," somebody crossed out "its own examination
21  of the accounting fraud allegations."  Do you see that?
22  A.  I do, yes.
23  Q.  So it appears that EY did not perform its own
24  examination of the accounting fraud allegations; is that
25  right?

239

1  MR. GLENNON:  Objection; lack of foundation,
2  calls for speculation.
3  THE WITNESS:  Well, we know what E&Y did,
4  because it is in their agreed-upon procedures.  And it
5  wouldn't surprise me that they -- I mean, examination in
6  auditing means something.  So to strike the words
7  "examination of the accounting fraud allegations" makes
8  all the sense in the world to me.
9  MR. GREENSTEIN:  Q.  So in the agreed-upon
10  procedures that you just referenced, was there anything
11  in there that indicated to you that EY was supposed to look at
12  the bad debt transfers from 25005 to 12601 in the second
13  quarter '01?
14  MR. GLENNON:  Objection; lack of foundation,
15  vague and ambiguous.
16  THE WITNESS:  No.  The agreed-upon procedures
17  did not deal with the transfers from 25005 to 12601.
18  MR. GREENSTEIN:  Q.  Okay.  If you look at the
19  sentence that starts, "Banker informed the committee."
20  Do you see that?
21  A.  On which exhibit?
22  Q.  Exhibit 12, EY 10.
23  A.  I see "Banker informed the committee," yes.
24  Q.  Then if you look at Exhibit 13, it is the last
25  paragraph on 295566.

240

1   A.  I see that, yes.

2   Q.  And if you just read that sentence and then

3   read the Exhibit 12, and let me know if it looks like

4   the changes were made.

5       MR. GLENNON:  I'm just going to object.  The

6   documents speak for themselves.  Do we have dates with

7   these respective documents?

8       MR. GREENSTEIN:  Q.  I'm just asking if it

9   appears those changes in Exhibit 12 EY page 10 were made

10  such that this document Exhibit 13, 295566, reads as if

11  the changes were made.

12      MR. GLENNON:  Same objections.

13      THE WITNESS:  Yeah, the changes on Exhibit 12

14  at pages EY 10 and 11, assuming that I'm interpreting

15  the cross-outs and underlines as being adds and deletes

16  properly, is then written on Exhibit 13, page 295566.

17  Does that answer your question?

18      MR. GREENSTEIN:  Q.  Yeah.  So if you look at

19  Exhibit 12, EY 11, and you go down to the sixth line, it

20  is the sentence that reads, "E&Y observed."  Do you see

21  that?

22  A.  You're on Exhibit 12?

23  Q.  12, yeah.  EY, page 11.

24  A.  "EY observed"?

25  Q.  "E&Y observed," in the sixth line down on the

241

1   right-hand side.

2   A.  Yes.

3   Q.  And it says -- I'm just going to read it, and

4   let me know if you disagree that this is what the

5   sentence says without the red-lines.

6       MR. GLENNON:  I just object to the extent

7   there is no foundation, no way you can determine whether

8   these deletions and additions happened simultaneously or

9   at different times, or how you can possibly determine

10  what the document looked like without the edits.

11      MR. GREENSTEIN:  Q.  So it says, "E&Y observed

12  that the debit memos had no effect upon Oracle's

13  revenues.  In addition, E&Y examined the transfers from

14  account 25005 to see whether there was a single large

15  entry that would be consistent with the accounting fraud

16  allegations claimed that account 25005 was the source of

17  $228 million in revenue on November 17th, 2000."  Do you

18  see that?

19  A.  I see that you've read that and edited it

20  based on line-outs and underlines.

21  Q.  Right.  But was that consistent with how you

22  would read this red-lined document if the edits hadn't

23  been made?

24      MR. GLENNON:  I object on foundation grounds.

25  The document speaks for itself.

242

1   THE WITNESS:  I have no idea who wrote this or

2   what was intended by the underlines -- underlines or the

3   line-outs.  I see the way you read it.

4       MR. GREENSTEIN:  Q.  And do you agree that

5   that would be the way that the sentence would read but

6   for the red-lines?

7       MR. GLENNON:  Objection; lack of foundation.

8       THE WITNESS:  What I agreed to is if you

9   exclude the words that have been lined through and you

10  include the words that have been underlined, that's the

11  way it reads.

12      MR. GREENSTEIN:  Q.  And you see how it says,

13  "E&Y observed that the debit memos had no effect upon

14  Oracle's revenues," and you see how somebody crossed out

15  "effect upon" and added "debits or credits to Oracle's

16  revenue"?  Do you see that?

17  A.  I do.

18      MR. GLENNON:  I make a standing objection as

19  to foundation on the edited document.

20      MR. GREENSTEIN:  Q.  Do you know someone

21  would -- someone at E&Y would cross out the words

22  "effect upon Oracle's revenues" an instead insert so

23  that it says, "E&Y observed that the debit memos had no

24  debits or credits to Oracle's revenue"?

25      MR. GLENNON:  Objection; foundation.  There is

243

1   no foundation for who made this edit.

2       THE WITNESS:  Do I know why they would do

3   that?

4       MR. GREENSTEIN:  Q.  Right.

5   A.  I have no idea who was editing this or who

6   made the edit, if it was one of the attorneys or

7   Mr. Banker.  I have no idea.

8   Q.  Is it your expert opinion that E&Y observed

9   that the debit memos had no effect upon Oracle's

10  revenue?

11  A.  Well, I would have to -- I would have to look

12  at their agreed-upon procedures report to validate that

13  back to their report.

14  Q.  Right.  But you didn't say that in your

15  opinion that they observed that the debit memos had no

16  effect upon Oracle's revenues; did you?

17      MR. GLENNON:  Objection; vague and ambiguous.

18  The report speaks for itself.

19      THE WITNESS:  I don't see that it says --

20  talking about my report on page 17?

21      MR. GREENSTEIN:  Q.  There is two places in

22  your report I believe that you talk about E&Y.

23  A.  One is about the debit memos and one is about

24  the bad debt transfer.

25  Q.  Right.  So 17?

244

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

1     A.  Page 17 talks about the bad debt -- or the
2  debt memos.
3     Q.  Okay.
4     A.  So what is your question?
5     Q.  So you're not opining on page 17 that E&Y
6  observed that the debit memos had no impact on Oracle's
7  revenues, are you?
8     MR. GLENNON:  Objection; the document speaks
9  for itself.
10     THE WITNESS:  If I look at the fourth bullet
11  point down, it says, "E&Y reviewed the details relating
12  to the 145 debit memos greater than $500,000 and 55
13  arbitrarily-chosen debit memos.  E&Y found no financial
14  statement impact from these selected debit memos."
15     Next line down, "E&Y created three test
16  transactions with the same accounting distribution,
17  noting that no amount was recorded to revenue."
18     Next bullet point down says, "and found no
19  amounts recorded to revenue related to the debit memos,
20  as well as no unusual reconciling items."
21     And then my last conclusion is, "As noted
22  above, E&Y found no evidence that any revenue, or any
23  other financial statement impact was recorded as a
24  result of the November 17, 2000 debit memo project."
25     MR. GREENSTEIN:  Q.  Right.  So if you look at

245

1  the sentence that we just read where it says, "E&Y
2  observed that the debit memos had no debits or credits
3  to Oracle's revenue," you see how they removed the words
4  "effect upon Oracle's revenue"?  Do you see that?
5     MR. GLENNON:  Where are you?
6     MR. GREENSTEIN:  On EY 11, Exhibit 12.
7     MR. GLENNON:  Yeah.  Where about?
8     MR. GREENSTEIN:  The sixth line down.
9     MR. GLENNON:  Okay.
10     MR. GREENSTEIN:  Q.  Do you see that,
11  Mr. O'Bryan?
12     A.  I do.
13     Q.  So, is it still your expert testimony after
14  seeing this document that E&Y found no evidence that any
15  revenue or any other financial statement impact was
16  recorded as a result of the November 17, 2000 debit memo
17  project?
18     A.  Yes.
19     Q.  And your opinion doesn't change in looking at
20  what EY removed from this memo?
21     A.  No.
22     MR. GLENNON:  Objection; lack of foundation.
23  There has been no foundation E&Y was responsible for
24  removing what purports to have lines through it in the
25  text.

246

1     THE WITNESS:  No.  I mean, if you look at
2  this, "effect upon," the only way you can effect a
3  revenue at Oracle is to debit it or credit it.  That's
4  accounting.  That's Accounting 101.
5     So, if it didn't have any -- had no debits or
6  credits, that means it had no effect on revenue.  Why
7  those words were changed, I have no idea.  The
8  conclusion is still the same.  If you don't debit or
9  credit a revenue account, it has no effect on it.
10     MR. GREENSTEIN:  Q.  If you look at EY 11
11  again, it is right above the last paragraph, it is four
12  lines crossed out.  Do you see that?
13     A.  I do.  Starting with "Banker stated"?
14     MR. GLENNON:  Five lines?
15     MR. GREENSTEIN:  Q.  Do you see that?
16     A.  I do.
17     Q.  Okay.  And it appears that that portion was
18  removed from this memo; correct?
19     MR. GLENNON:  Objection; lack of foundation,
20  document speaks for itself.
21     THE WITNESS:  I see those lines crossed out,
22  yes.
23     MR. GREENSTEIN:  Q.  Do you know why somebody
24  at E&Y would remove the language that says, "Banker also
25  stated there was nothing in the materials that EY had

247

1  reviewed that indicated to EY that plaintiff's claims
2  about the November 17, 2000 debit memos had any
3  veracity"?  Do you see that?
4     MR. GLENNON:  Objection; lack of foundation,
5  assumes facts.
6     THE WITNESS:  Do I know why they would make
7  the change?
8     MR. GREENSTEIN:  Q.  Right.
9     A.  Well, I don't know who made the change, so I
10  don't know -- I have no idea why they would cross that
11  out.
12     You would have to look at the agreed-upon
13  procedures report and see if that was discussed.  Which
14  the veracity of the claim is really not something an
15  auditor would necessarily do.
16     Q.  So, do you have any evidence that E&Y reviewed
17  the veracity of plaintiff's claims regarding the
18  November 17, 2000 debit memos?
19     MR. GLENNON:  Objection; vague and ambiguous.
20     THE WITNESS:  I think what Ernst and Young
21  did, as laid out in my report on page 17 and 18, and
22  also included in their EY 000143 through 6, which is
23  their agreed-upon procedures memo -- and when I read
24  that memo and I also consider the testimony of
25  Mr. Bender, it appears to me as E&Y concluded there was

248

1  no financial statement impact from the debit memo
2  project.
3      MR. GREENSTEIN:  Q.  And EY 11 doesn't change
4  your opinion one way or the other?
5      A.  Not at all.
6      Q.  Okay.
7      A.  No.
8      Q.  Mr. O'Bryan, did you in connection with your
9  issuing your opinion in your rebuttal report, did you
10  ever calculate the amount of account balance of account
11  25005 as of 11/30 -- November 30th, 2000?
12      MR. GLENNON:  Objection; vague and ambiguous.
13      THE WITNESS:  Did I ever calculate the account
14  balance?  You mean do I know what the account balance
15  was in 25005 at 11/30?
16      MR. GREENSTEIN:  Q.  Correct?
17      A.  I don't know that my report states that.
18      MR. GREENSTEIN:  I want to mark this as
19  No. 14.
20          (Exhibit 14 marked for
21           identification.)
22      MR. GREENSTEIN:  Q.  Have you seen this
23  document before?
24      A.  I have, yes.
25      Q.  Did you rely upon it in issuing your report or

249

1  rebuttal?
2      A.  I considered it, and I think my rebuttal
3  report talks about some of the issues in this document.
4      Q.  What is your opinion as to what the balance of
5  account 25005 was as of November 30th, 2000?
6      MR. GLENNON:  Objection; the document speaks
7  for itself.
8      THE WITNESS:  $125,377,173.
9      MR. GREENSTEIN:  Q.  That's the account
10  balance in -- strike that.
11      What does that $125 million represent to you,
12  knowing what you know about that account, 25005?
13      A.  At that point in time, that is just all the
14  cash that has come in to Oracle that is either in the
15  process of being applied to invoices or has not been
16  applied to invoices at that point in time.
17      Q.  So that 125 million represents unapplied cash
18  that has not yet, as of November 30th, 2000, been
19  applied to an invoice; correct?
20      A.  That's correct.  But that can represent cash
21  that came in that day or the day before that the system
22  just hasn't had the time to make the application.
23      Q.  Right.
24      A.  It doesn't mean, as Mr. Regan would suggest,
25  that they were unable to apply that to an invoice.  I

250

1  believe that's completely irresponsible of Mr. Regan to
2  suggest that.
3      Q.  You just said the $125 million was unapplied
4  cash in that account that had not yet been applied to an
5  invoice; is that right?
6      A.  Yes.  But you have to --
7      MR. GLENNON:  I would also like to insert an
8  objection to the fact that there is handwritten edits
9  throughout this document that I don't think there has
10  been any foundation set for.  I also believe this
11  document has a second page that hasn't been provided.
12      MR. GREENSTEIN:  Q.  Mr. O'Bryan, have you
13  looked at the handwritten notes?
14      A.  Yes.
15      Q.  Does that change your opinion of the balance
16  of 25005 as of November 30th, 2000?
17      MR. GLENNON:  Hold on.  Have you read all the
18  handwritten notes?
19      THE WITNESS:  I'm just in the process of
20  reading them right now.
21      I've read the notes.  Your question was what?
22      MR. GREENSTEIN:  Q.  Do the notes change your
23  opinion as to what you believe the balance was in 25005
24  as of November 30th, 2000?
25      A.  I believe it's that amount.  But my point is

251

1  that this represents cash that could have come in the
2  day before, could have come in two days before.  It
3  simply has not had an opportunity to be applied yet,
4  because the system hasn't matched it up.
5      It is not, as Mr. Regan would suggest, this
6  amount of money that's sitting there that cannot --
7  cannot and has not is different.
8      Q.  Did Mr. Regan say cannot?
9      A.  I believe his report says cannot.
10      Q.  Are you sure about that?
11      A.  Not positive, but I believe it is something
12  like that.
13      So the fact is that Oracle is collecting a
14  significant amount of money every day, and this is an
15  amount that simply the system has not matched up as yet.
16      And I can't read all of footnote D, but it
17  looks like it says something about there is increased
18  consulting activity in Q2, which would explain a higher
19  amount, being that more cash would come in, and has
20  not had the opportunity to apply to any invoices yet.
21      MR. GREENSTEIN:  Mark this as Exhibit 15,
22  please.
23          (Exhibit 15 marked for
24           identification.)
25      MR. GREENSTEIN:  Q.  For the record, this is

252

1  Bates stamped AA 000035.  Have you seen this document
2  before?
3      MR. GLENNON:  I'm going to insert the same
4  objection as the last document.  I don't know if this is
5  the complete document, and there is handwritten
6  notations on the document for which no foundation has
7  been set.
8      MR. GREENSTEIN:  Q.  Did you rely upon this
9  document in your report?
10     A.  I considered this document, yes.
11     Q.  Did you rely upon it?
12     A.  I don't think I reference this document.
13  Probably not.
14     Q.  Can you -- in looking at this document, can
15  you determine what the balance of account 12018, called
16  unapplied cash, was as of November 30th, 2000?
17     A.  12018?
18     Q.  Um-hum.
19     A.  Unapplied cash is $64,594,692.
20     MR. GREENSTEIN:  Okay.  Thank you.  Let's take
21  five minutes.
22     VIDEOGRAPHER:  Off record at 5:14.
23         (Recess, 5:14 p.m. - 5:33 p.m.)
24     VIDEOGRAPHER:  On record at 5:33.
25     MR. GREENSTEIN:  Q.  Mr. O'Bryan, do you know

253

1  what an aging seven buckets report is?
2      A.  I do.
3         I'm sorry to interrupt.  I would like to
4  clarify an earlier answer.  You asked me on Exhibit 14
5  what my belief of the balance of the customer
6  overpayments account was.  I said $125 million.  That
7  number is actually $25 million, $25.4 million.  Sorry,
8  my mic isn't on.
9         And that's the number your own expert, Mr.
10  Regan, shows as $25.4 million in his report.
11        The $125 million, if you look at footnote A,
12  which I didn't have a chance to fully read when you
13  handed me this document, is continued down at the bottom
14  of the page that notes that there is a $100 million loan
15  or advance and should not be classified as unearned
16  revenues.  So you got to debit unearned revenue and
17  credit, looks like, intercompany receivable.
18        So the $125 million should be taken out.
19  Which, just so you know, the reason I went to this, I
20  somewhat remembered in Mr. Regan's report, if you look
21  at its 25005 balance at 11/30, it is $25.4 million.  So
22  the amount of money in the 25005 account at 11/30/00 was
23  $25.4 million.
24     Q.  Okay.
25     A.  Okay.  I apologize for that.

254

1      Q.  So you are familiar with the seven aging
2  buckets report at Oracle; correct?
3      A.  I am, yes.
4      Q.  And what is that document or what is it used
5  for at Oracle?
6      A.  I don't know exactly what they used it for.  I
7  thought it was more of an internal document that appears
8  to show billing history and account history for a
9  certain client.  By nature of its title, it must
10  categorize things into seven buckets.
11     Q.  Did Oracle ever send those reports to their
12  customers?
13     A.  I don't think they typically did.  I think on
14  occasion some may have requested -- I believe there was
15  one on -- I don't remember the client, started with a D,
16  as I recall, that maybe Ms. Orr requested or something
17  and got ahold of.  It had gone out to clients on an
18  occasional basis.
19     Q.  When the 46,000 debit memos were created on or
20  about November 17th, 2000, did those transactions have
21  any impact on what you could see on the seven aging
22  buckets report?
23     MR. GLENNON:  Objection; calls for
24  speculation, lack of foundation.
25     THE WITNESS:  I'm sorry, I don't understand

255

1  your question.
2      MR. GREENSTEIN:  Q.  Well, the seven aging
3  buckets report, what is it -- what information does it
4  show about a particular customer?
5      A.  Invoices, issued invoices paid.  And if you're
6  going to show me the one I think you're going to show
7  me, it shows down below, it shows on-account or
8  debit memo, or something like that down at the bottom of
9  it.
10     Q.  And so when the debit memos were created, did
11  it have any impact on the information that was in the
12  aging seven buckets report?
13     MR. GLENNON:  Objection; vague and ambiguous.
14     THE WITNESS:  Once the debit memos would have
15  been run, the on-account amounts would go away.
16     MR. GREENSTEIN:  Q.  Okay.  So they
17  wouldn't -- so any amounts on-account on the aging seven
18  buckets report that were related to debit memos created
19  on November 17th would not show up on the aging seven
20  buckets report the day after those debit memos were run;
21  correct?
22     MR. GLENNON:  Objection; calls for
23  speculation, lack of foundation.
24     THE WITNESS:  That's correct.  Because the
25  debit memo project got rid of the on-account flag.

256

1  Those weren't amounts of money to be applied to any
2  invoice.  They weren't on-account, as you've shown me in
3  Oracle's user guide.  Those were simply amounts that had
4  been previously dealt with by Oracle's collection
5  department and just had a flag sitting on them.
6       MR. GREENSTEIN:  Q.  But weren't some of those
7  on-account items eventually refunded?
8     A.  They were.
9     Q.  And why was that?
10    A.  Simply because --
11       MR. GLENNON:  Objection; lack of foundation,
12  calls for speculation.
13       You can answer, if you know.
14       THE WITNESS:  You mean why were they
15  eventually refunded?
16       MR. GREENSTEIN:  Q.  Right.
17    A.  Because after the unapplied cash project in
18  October/November of 2002, additional research was done
19  whereby it was discovered that they had made an
20  erroneous transfer to 12601, in October/November of '00,
21  and they refunded the money.
22    Q.  Were there any on-account items that were not
23  transferred to 12601 that were on-account, and that
24  eventually were refunded as part of the 2002 cleanup?
25       MR. GLENNON:  Objection; vague and ambiguous.

257

1       THE WITNESS:  I don't understand the question.
2       MR. GLENNON:  Lack of foundation.
3       MR. GREENSTEIN:  Q.  There were 46,000
4  on-account items on November 17th, 2000; correct?
5     A.  Correct.
6     Q.  And of those, not all of them were items that
7  had been transferred to 12601; correct?
8     A.  That's correct.  There was only 120 -- well --
9     Q.  Of 926, there was 121; right?
10    A.  926 scripts.  There was 121 transfers from
11  25005 to 12601.
12    Q.  So those other items that weren't transferred,
13  were any -- of the 926, were any of those items refunded
14  as part of the 2002 cleanup?
15       MR. GLENNON:  Objection; lack of foundation,
16  calls for speculation.
17       THE WITNESS:  I don't know that.
18       MR. GREENSTEIN:  Q.  Did you make that
19  determination in issuing your expert opinion?
20       THE WITNESS:  I'm sorry, the question again,
21  please.
22       MR. GREENSTEIN:  Q.  You would agree you
23  reviewed 926 of the 46,000 debit memos in looking at the
24  script output; correct?
25    A.  Yes.

258

1     Q.  And of those, you said 121 of the 926 were
2  transferred to 12601 in 2Q; correct?
3       MR. GLENNON:  I'm just going to object, it
4  mischaracterizes the evidence.
5       THE WITNESS:  121 were transfers, included
6  transfers from 25005 to 12601.
7       MR. GREENSTEIN:  Q.  For $10.6 million?
8     A.  Yeah, totaling $10.6 million.
9     Q.  Setting those items aside, those 121 items,
10  and looking at the rest of the population of the 926
11  debit memos, were any of those items refunded as part of
12  the 2002 cleanup?
13       MR. GLENNON:  Objection; vague and ambiguous,
14  lacks foundation.
15       THE WITNESS:  I think there were, I think I've
16  seen some of those that were.  I don't recall the
17  number.  There may have been.
18       MR. GREENSTEIN:  Q.  Why would those items be
19  refunded two years later?
20       MR. GLENNON:  Objection; calls for
21  speculation.
22       THE WITNESS:  As I've described before, the
23  on-account simply meant that the collections department
24  had classified that receipt, which was -- for this
25  purpose was in the second Q of '00, totaling about $20

259

1  million.
2       And once the company found out there were
3  those transfers, it went about the process of reversing
4  those, all of those, and reinvestigated where they
5  should go.
6       So, I -- so some of those may have been
7  refunded.
8       MR. GREENSTEIN:  Q.  My question is, setting
9  aside the 121 items that were transferred to the bad
10  debt reserve in 2Q '01, setting those aside, the other
11  debit memos, the other population that made up the 926,
12  why were some of those items refunded during the 2002
13  cleanup?
14       MR. GLENNON:  Objection; lack of foundation.
15       THE WITNESS:  I beg your pardon.  I understand
16  your question now.
17       MR. GREENSTEIN:  Q.  Okay.
18    A.  I don't know if those were or not.  I don't
19  recall specifically any details about that.
20    Q.  So did you -- in issuing your expert report,
21  did you do any calculation of the number of those debit
22  memos that were not transferred to 12601 in the second
23  quarter that were ultimately refunded as part of the
24  2002 cleanup?
25    A.  No.

260

1      MR. GREENSTEIN:  Okay.  I want to mark this as
2  16.
3          (Exhibit 16 marked for
4          identification.)
5      MR. GREENSTEIN:  Q.  For the record, this is
6  NDCA-ORCL 603894.  And it -- well, Mr. O'Bryan, do you
7  recognize this document?
8      A.  I do, yes.
9      Q.  And if you turn to page 13 of your rebuttal
10  report it appears that you proffer an analysis of a
11  debit memo relating to Household that was opined on in
12  Mr. Regan's report; correct?
13      A.  Yes.
14      MR. GLENNON:  Objection; the document speaks
15  for itself, and vague and ambiguous.
16      MR. GREENSTEIN:  Q.  And you recall that
17  Mr. Regan -- that the issue involved a debit memo for
18  $76,000 -- approximately $76,000?
19      A.  That's correct.
20      Q.  Do you recall that transaction?
21      A.  I do, yes.
22      Q.  And you did an analysis of that debit memo?
23      A.  I did, yes.
24      Q.  And you see it says here, you say, "One of the
25  very transactions upon which Mr. Regan focuses in his

                                                        261

1  expert report establishes that Oracle appropriately
2  refunded money long before the creation of the 46,000
3  plus debit memos.  Mr. Regan points out that Household
4  made a payment to Oracle on November 17th, 1994."  Do
5  you see that?
6      A.  I do, yes.
7      Q.  Then if you go down -- I'll just keep reading.
8      "That same day, Household returned the product
9  and cancelled the order.  However, despite the fact that
10  Mr. Regan has seen a screen shot demonstrating that the
11  money had been refunded to Household by a check that
12  cleared on May 4th, 1995, Mr. Regan ignores this
13  refund."  Do you see that?
14      A.  Yes, I do.
15      Q.  Is this the document in footnote 46?
16      A.  Yes, it is.
17      Q.  Do you rely on this document for the
18  proposition that their debit memo item for $76,000
19  plus --
20      MR. GLENNON:  Eli, can I pause you really
21  quickly.  You said footnote 46?
22      MR. GREENSTEIN:  Yeah.  603894.
23      MR. GLENNON:  Got you.
24      MR. GREENSTEIN:  Q.  Mr. O'Bryan, your opinion
25  is that this debit memo item was refunded by Oracle by a

                                                        262

1  check that cleared on May 4th, 1995; correct?
2      A.  That is correct.
3      Q.  And your support for that proposition is the
4  screen shot NDCA-ORCL 603894; is that correct?
5      A.  That is correct.
6      Q.  And did you rely on anything else to support
7  your opinion that this $76,000 plus debit memo was
8  refunded on May 4th, 1995?
9      MR. GLENNON:  Objection; vague and ambiguous.
10      THE WITNESS:  Did I rely on anything else?
11      MR. GREENSTEIN:  Yeah.
12      MR. GLENNON:  Lacks foundation.
13      THE WITNESS:  Well, yeah.  Yes, I did.
14      MR. GREENSTEIN:  Q.  What did you rely on?
15      A.  Well, if you follow this transaction all the
16  way through, this was actually refunded by Oracle.
17  By the way, this was a transaction that did not go
18  through the bad debt transfers.  This was just research
19  being done by the company.
20      Anyway, when the applied cash project
21  occurred, this was actually refunded again for about
22  $178,000, at which point in time, I think it was
23  Mr. Campos realized it was done in error.  Which would
24  tell me that if they refunded -- and it was two
25  different checks.  It was $100,000 and then this

                                                        263

1  $74,000.
2      If they refunded it in error and realized that
3  and made notes saying we refunded this in error during
4  the applied cash project, it tells me --
5      MR. GLENNON:  You mean unapplied cash project?
6  You're talking about two different things.  You said it
7  twice.  I just want to make sure the record is clear.
8      THE WITNESS:  Thank you.
9      MR. GREENSTEIN:  Q.  You're talking about the
10  unapplied cash project in 2002?
11      A.  Yes.  Beg your pardon.  Then that tells me it
12  had been refunded before, as well.  So I use that as
13  anecdotal evidence, because I have seen evidence of the
14  $100,000, as well now as the $76,000.
15      Q.  Okay.  So, you're aware that Oracle refunded
16  Household a $178,000 check in May 2002, and that
17  included the amount for this debit memo, the $76,000?
18      MR. GLENNON:  Objection; lacks foundation.
19      THE WITNESS:  I am.  I believe that was done
20  in error.
21      MR. GREENSTEIN:  Q.  What evidence do you have
22  that it was done in error?  Well, let me stop you there.
23  Looking at this document --
24      MR. GLENNON:  Did you want to answer?
25      THE WITNESS:  Go ahead.

                                                        264

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

1    MR. GREENSTEIN:  Q.  Looking at this document,
2  this is a screen shot; is that fair to say?
3    A.  This is a copy of a screen, yes.
4    Q.  Okay.  And you say, before citing this
5  document, you say that -- you call it a screen shot
6  demonstrating that "money had been refunded to Household
7  by a check that cleared on May 4th, 1995."  Do you see
8  that?
9    A.  Yes.
10    Q.  What in this document indicates to you that
11  this money was refunded by a check that cleared on
12  May 4th, 1995?
13    A.  Well, it is the entire document.  If you look
14  at it, the bank is Wells Fargo Bank, the account, and
15  then the status says cleared.  The cleared amount was
16  $76,000, and the clear date was May 4, 1995.
17    So to me, this is very clear audit evidence
18  that that amount was paid to Household and cleared by
19  May 4th, 1995.
20    Q.  Okay.  Do you have any evidence of a check
21  that actually was paid to Household besides this screen
22  shot?
23    MR. GLENNON:  Objection -- withdrawn.
24    THE WITNESS:  You mean on that date?
25    MR. GREENSTEIN:  Q.  Is there any other

265

1  evidence that this refund was made to Household for this
2  amount on May 4th, 1995?
3    MR. GLENNON:  Objection; lack of foundation,
4  asked and answered.
5    THE WITNESS:  I've not seen a copy of a check,
6  if that's what you're asking me.
7    MR. GREENSTEIN:  Q.  I'm just wondering,
8  besides this screen shot, did you rely upon any evidence
9  indicating that a check was issued to Household on
10  May 4th, 1995 for $76,645.04 for this debit memo?
11    MR. GLENNON:  Objection; asked and answered,
12  lacks foundation.
13    THE WITNESS:  I think I already answered that.
14  I saw evidence that the eventual refund after the
15  unapplied cash project in October/November was a refund
16  of 176 or $178,000 that was done in error, which would
17  tell me that it had been previously refunded.
18    MR. GREENSTEIN:  Q.  So the fact that they
19  refunded it again in May 2002 indicates to you that the
20  refund was issued on May 4th, 1995?
21    MR. GLENNON:  Objection; mischaracterizes the
22  testimony.
23    THE WITNESS:  Yeah.  If you've refunded it
24  once, the $100,000 that was refunded, and then the
25  $76,000, which I believe was done in '95, and in the

266

1  unapplied cash project you refund it again and say, wait
2  a minute, that is not appropriate, this is a duplicate
3  refund, that tells me it was refunded initially.
4    MR. GREENSTEIN:  Q.  So, other than that, that
5  evidence and the screen shot, do you have any -- do you
6  rely upon any evidence indicating that a check was
7  issued for a refund to Household from Oracle on May 4th,
8  1995 for $76,645.04?
9    MR. GLENNON:  Objection; asked and answered.
10    THE WITNESS:  I can't think of any other
11  evidence that was adequate for me, given the
12  documentation.
13    MR. GREENSTEIN:  But you never saw the
14  actual check; right?
15    A.  No.
16    MR. GLENNON:  Objection; asked and answered.
17    MR. GREENSTEIN:  Q.  Now, did you see this --
18  so, this is one of the 926 debit memos that you reviewed
19  on the script output; correct?
20    A.  Correct.
21    MR. GLENNON:  Objection; lack of foundation.
22    MR. GREENSTEIN:  Q.  So this May 4th, 1995
23  refund should show up in the script output; correct?
24    MR. GLENNON:  Same objection.
25    THE WITNESS:  Yeah, it should.  But as I

267

1  recall, it doesn't show up.
2    MR. GREENSTEIN:  Q.  Do you know why that is?
3    A.  No.
4    Q.  Okay.  But if there was a refund in the
5  accounting history of the 926 debit memos, you would
6  expect to see that in the script output; correct?
7    MR. GLENNON:  Objection; lack of foundation.
8    THE WITNESS:  Well, yeah.  I mean, assuming --
9  as I recall, that was one of the script outputs the
10  plaintiffs requested because it was below the $100,000
11  limit.
12    MR. GREENSTEIN:  Q.  Right.
13    A.  So I expected to see it.  I did not see it.  I
14  saw evidence it was, in fact, paid.
15    Q.  The evidence is what you cited earlier?
16    A.  That's correct.
17    Q.  If you look at the next sentence on page 13 of
18  your rebuttal, it says, "Instead, Mr. Regan states that
19  Oracle did not refund the money to Household until a
20  second erroneous refund occurred on May 23rd, 2002."  Do
21  you see that?
22    A.  I do, yes.
23    Q.  And you cite to Household 1 and 2; correct?
24    A.  I cite to what, I'm sorry?
25    Q.  You cite, in footnote 47, you cite to HI 1 and

268

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

1   2; right?

2       A.  That is correct.

3       MR. GREENSTEIN:  Let me mark for the record

4   the next exhibit, which is HI 1 and 2.  A check from

5   Oracle to Household in the amount of $178,346.77.

6       MR. GLENNON:  I object to on two grounds.

7   One, I actually think this is part of a larger document

8   that hasn't been provided here.  Second, there is

9   handwritten notes on the document for which there has

10  been no foundation.

11      (Exhibit 17 marked for

12          identification.)

13      MR. GREENSTEIN:  I don't want to go off the

14  record.

15      MR. GLENNON:  It will only take a minute.

16      THE WITNESS:  I don't want to mix these up.

17  Sorry.

18      MR. GREENSTEIN:  Mark this next in line.

19      (Exhibit 18 marked for

20          identification.)

21      MR. GREENSTEIN:  Q.  So you have two exhibits

22  in front of you, one is 17, which is Bates labeled HI 1

23  and 2, and the second, Exhibit 18, is NDCA-ORCL 614018

24  through 614023.  Do you have both of those?

25      A.  I do, yes.

269

1       Q.  Have you seen these before?

2       A.  I do, yes.  These are both in my report.

3       Q.  So this appears to be -- this is the document

4   you cite on page 13 of your rebuttal, where you say --

5   or footnote 47 is Exhibit 17; correct?

6       A.  Footnote 47 is what?

7       Q.  In your rebuttal report is Exhibit 17, the

8   Household check; correct?

9       A.  That is correct.

10      Q.  And Exhibit 49 is Exhibit 18; correct?

11      A.  That is correct.

12      Q.  Okay.  Taking Exhibit 17, did you rely upon

13  this document in your rebuttal report in issuing your

14  opinion on the Household debit memo transaction?

15      MR. GLENNON:  Objection; vague and ambiguous.

16      THE WITNESS:  Did I rely on it?

17      MR. GREENSTEIN:  Q.  Yes.

18      A.  It's in my report, so I certainly relied on

19  it.

20      Q.  And is this the check that you claim was an

21  erroneous refund to Household?

22      A.  Yes.

23      Q.  And what evidence do you rely on in forming

24  your opinion that this was an erroneous refund to

25  Household?

270

1       A.  I then refer to Exhibit 18, which is an e-mail

2   chain from Mike Quinn, and you can see down below on

3   614019, it talks about refund Household Finance

4   $178,346.77, in the subject line.

5       Q.  Right.

6       A.  Then up above Mr. Quinn says, "Ami, Got it.

7   Raul and Adam misinterpreted the 550 debit memos.  This

8   should not have been refunded."

9       Q.  So, is that --

10      A.  Then it goes on to say, "Let's see how we can

11  avoid making these types of mistakes in the future."

12      Q.  Okay.  So, is this the only -- or, strike

13  that.

14      Other than this e-mail, which is Exhibit 18,

15  did you -- what other evidence did you rely upon in

16  forming your opinion that this check, this refund,

17  Exhibit 17, was in error?

18      MR. GLENNON:  Objection; asked and answered.

19      THE WITNESS:  The original refunds on

20  Household of $100,000 and the $74,000, or whatever it

21  was, $76,000.

22      MR. GREENSTEIN:  Q.  Are you referring to the

23  screen shot marked as Exhibit 16?

24      A.  As one of them, plus the $100,000 that was

25  refunded as well.

271

1       Q.  Isn't it your opinion that the $76,000 debit

2   memo item was refunded by a check that was different

3   than the $100,000 item?

4       A.  Yes.  So if you take the 100,000 and add it to

5   the 74,000, you get the approximately 176 or 178 you see

6   here.

7       Q.  You're not aware of the check for $178,346

8   involves more than two debit memos?

9       A.  I'm not aware of what?

10      MR. GLENNON:  Objection; vague and ambiguous.

11      MR. GREENSTEIN:  Q.  That this $178,000 check

12  involves all the debit memos referred to on 614021 in

13  Exhibit 18?

14      A.  Yes.  You can see the 45, the 25 and the 76

15  are some of the ones we've referenced to and are part of

16  the $100,000 refund, plus the $76,000 refund, as

17  evidenced on Exhibit 16.

18      Q.  Okay.  Mr. O'Bryan, did you read Michelle

19  Davidson's deposition before forming your opinion on the

20  Household transaction?

21      MR. GLENNON:  Objection; asked and answered.

22      THE WITNESS:  I think you asked me that this

23  morning.  I don't recall reading that.

24      MR. GREENSTEIN:  Q.  Why didn't you read her

25  deposition transcript?

272

1   A.   I didn't think it necessary.

2   Q.   Are you aware she was the PMK for Household?

3       MR. GLENNON:  Objection; asked and answered.

4       THE WITNESS:  I believe so, yes.

5       MR. GREENSTEIN:  Q.  Okay.  Are you aware that

6   this $178,000 check was uploaded into Household's

7   general ledger after they received it?

8   A.   What do you mean uploaded?

9       MR. GLENNON:  Vague and ambiguous.

10      MR. GREENSTEIN:  Q.  Are you aware Household

11  cashed this check, a copy of which is on Exhibit 17?

12      MR. GLENNON:  Objection; assumes facts, lack

13  of foundation.

14      THE WITNESS:  I don't know what they did with

15  the check after it was sent by Oracle.

16      MR. GREENSTEIN:  Q.  Did you consider the fact

17  whether this check was cashed or not in forming your

18  opinion?

19  A.   No.

20  Q.   Okay.  Did you see any evidence that this

21  $178,000 refund made to Household was ever given back to

22  Oracle?

23  A.   I don't --

24      MR. GLENNON:  Objection; vague and ambiguous,

25  lacks foundation.

273

1       THE WITNESS:  I don't recall what the eventual

2   disposition of this was.

3       MR. GREENSTEIN:  Q.  Okay.  So you don't know

4   if this $178,000 check was cashed, and you don't know

5   whether it was given back to Oracle, but your opinion is

6   that it was refunded in error; correct?

7       MR. GLENNON:  Objection; asked and answered.

8       THE WITNESS:  That's what the documents say.

9   If Household cashed it or applied it to other invoices,

10  I don't know what they did.

11      MR. GREENSTEIN:  Q.  Okay.

12  A.   But it is very clear to me that the documents

13  show that it was refunded in the '90s, and then refunded

14  in error in the 2000 time frame.

15  Q.   Okay.  So on page 13 of your rebuttal, last

16  sentence, you say, "As Mike Quinn observed in a

17  contemporaneous e-mail, the May 23rd, 2002 refund was

18  issued by mistake and should not have been made."

19      Do you see that?

20  A.   Yes.

21  Q.   And you cite to what has been marked -- the

22  e-mail marked as Exhibit 18; correct?

23  A.   Yes.

24  Q.   So is it your opinion Mike Quinn wrote an

25  e-mail contemporaneous with the May 23rd, 2002 refund

274

1   that indicated it was a mistake?

2   A.   I'm not suggesting it was contemporaneous with

3   the exact refund.  I'm just suggesting it was

4   contemporaneous with the time, i.e., the 2002/2003 time

5   frame.  So, when it was written -- all I'm saying, it

6   wasn't written last week and it wasn't written back in

7   1995.

8   Q.   Right.  Because the e-mail you're referring to

9   was written after October 25th, 2002; isn't that right?

10      MR. GLENNON:  Objection; lack of foundation.

11  The document speaks for itself.

12      THE WITNESS:  I don't really know.  I mean, I

13  see the date is Friday, October the 25th, 2002.  When

14  the top part of this e-mail was written by Mr. Quinn, I

15  don't know.

16      MR. GREENSTEIN:  Q.  Well, this top e-mail was

17  written by Mr. Myers; wasn't it?

18      MR. GLENNON:  Objection; lack of foundation.

19  The document speaks for itself.

20      THE WITNESS:  Well, I'm talking about "Mike

21  Quinn wrote."

22      MR. GREENSTEIN:  Q.  Right.  So that

23  particular e-mail doesn't have a date?

24  A.   Correct.

25  Q.   But it is in a string of other e-mails, so the

275

1   e-mail below it is October 25th, 2002; correct?

2   A.   The date that I see below the "Mike Quinn

3   wrote," says October 25th, 2002.

4   Q.   Right.  So that e-mail that Mike Quinn wrote

5   appears to have taken place after October 25th, 2002;

6   correct?

7       MR. GLENNON:  Objection; document speaks for

8   itself, lack of foundation.

9       THE WITNESS:  I have no idea when it was

10  written.  It was above the October 25th, so whether it

11  was the same day, same time, I don't know.

12      MR. GREENSTEIN:  Q.  Right.  But, I mean,

13  based on what you know about e-mail strings like this,

14  it appears this e-mail was written either on

15  October 25th, 2002 or after; right?

16      MR. GLENNON:  Objection; lack of foundation,

17  asked and answered.

18      THE WITNESS:  I really don't know.

19      MR. GREENSTEIN:  Q.  So seeing that above an

20  e-mail in a string that goes in chronological order

21  doesn't indicate to you that this e-mail was written on

22  or after October 25th, 2002?

23      MR. GLENNON:  Objection; lack of foundation,

24  asked and answered three times.

25      THE WITNESS:  It would seem to me that given

276

1  the form, it was written on or after October 25th.  But
2  I don't know that for sure.
3      MR. GREENSTEIN:  Q.  Well, is it possible that
4  e-mail could have been written before October 25th?
5      MR. GLENNON:  Objection; lack of foundation,
6  calls for speculation.
7      THE WITNESS:  Is it possible?
8      MR. GREENSTEIN:  Q.  Yeah.
9      A.  Well, anything is possible.
10     Q.  Looking at this e-mail, your testimony is that
11  it is possible that that e-mail that occurs after in
12  time to an October 25th, 2002 e-mail could possibly have
13  been written before it?
14     MR. GLENNON:  Objection; mischaracterizes the
15  testimony, asked and answered, lacks foundation.
16     THE WITNESS:  I didn't write this e-mail, so I
17  don't know when it was written.  But have I ever seen
18  circumstances where an e-mail above another e-mail was
19  written before?  Certainly.  You can say I said this and
20  then attach something different.  You can attach it.
21     I don't know how it was attached, I don't know
22  if it was a string.  I don't know if it was pieced
23  together.  I have no idea.
24     MR. GREENSTEIN:  Q.  On page 13 you're not
25  saying that your opinion is that that was a

277

1  contemporaneous e-mail or that that e-mail marked as
2  Exhibit 18 was contemporaneous with the May 23rd, 2002
3  refund; right?
4      MR. GLENNON:  Objection; mischaracterizes the
5  testimony.
6      THE WITNESS:  I think I explained that.  I
7  said it is contemporaneous to the time.  It is not right
8  in the middle of all this litigation.  It was
9  contemporaneous to that time.
10     MR. GREENSTEIN:  Let me take five minutes,
11  then wrap up.
12     VIDEOGRAPHER:  Off record at 6:05.
13     (Recess, 6:05 p.m. - 6:23 p.m.)
14     VIDEOGRAPHER:  On record at 6:23.
15     MR. GREENSTEIN:  Q.  Mr. O'Bryan is it your
16  opinion there is no material difference between meeting
17  and beating Wall Street expectations in the mind of a
18  reasonable investor?
19     A.  There can be.  It can be material, it may not
20  be material.
21     Q.  In what cases would it be material?
22     A.  If in the total mix of the information it was
23  thought to be informative or more material to a reader.
24     Q.  Okay.  So, in some cases it may be material to
25  a reasonable investor whether a company meets or beats

278

1  expectations; correct?
2      MR. GLENNON:  Objection; asked and answered.
3      THE WITNESS:  No.  What I'm saying, you have
4  to look at the total mix of the information of that
5  company and historically of that company as to whether
6  or not that meet or beat is material, as well as a
7  multitude of other things you have to consider based on
8  SAB 99.
9      MR. GREENSTEIN:  Q.  Right.  I understand that
10  you have to analyze it company by company; correct?
11     A.  That is correct.
12     Q.  But there could be a material difference
13  between meeting and beating expectations depending on
14  particular facts and circumstances involved in a
15  particular quarter; right?
16     MR. GLENNON:  Objection; vague and ambiguous,
17  mischaracterizes testimony.
18     THE WITNESS:  Are you speaking hypothetically
19  here, or are you speaking about Oracle?
20     MR. GREENSTEIN:  Q.  No.  Just in general.
21     A.  So it is a hypothetical?
22     Q.  Yeah.
23     THE WITNESS:  I'm sorry.  You need to repeat
24  the question.
25     MR. GREENSTEIN:  Can you read it back?

279

1      (Record read as follows:  QUESTION:  But there
2  could be a material difference between meeting
3  and beating expectations depending on
4  particular facts and circumstances involved in
5  a particular quarter; right?)
6      MR. GLENNON:  I object on the grounds of
7  incomplete hypothetical and vague and ambiguous.
8      THE WITNESS:  I'm sorry, there could be a
9  material difference between meeting and beating
10  expectations?
11     MR. GREENSTEIN:  Q.  Um-hum.
12     A.  Well, materiality is not about whether there
13  is a material difference between the meet or the beat.
14  It is taken as a whole, all of the mix of information
15  whether it is considered material by the company and
16  their auditors.
17     Q.  Whether it is material to the company or its
18  auditors?
19     A.  Two different analyses are done.  The company
20  performs their own analysis, these are the financial
21  statements of the company.  Then separately the auditors
22  have to come up with that same conclusion.
23     Q.  That's determining whether a misstatement
24  internally is material; correct?
25     MR. GLENNON:  Objection.

280

1    THE WITNESS:  Why do you say internally?

2    MR. GLENNON:  Object for the record; vague and

3  ambiguous.

4    MR. GREENSTEIN:  Q.  Well, let's look at your

5  report, page 38 of your opening report.

6    A.  I'm there.

7    Q.  You state that -- you're talking about the

8  $20.1 million of unapplied cash was transferred to the

9  bad debt reserve during 2Q '01; correct?

10   A.  That is correct.

11   Q.  And you say, "If we make the most conservative

12  assumption, that the entire amount of transfer

13  represents an accounting error, this would represent

14  roughly a $13 million overstatement in net income";

15  correct?

16   A.  That is correct.

17   Q.  Then you calculate earnings per share which

18  indicates that if that amount was an overstatement, that

19  the EPS would be adjusted to 10 cents from the reported

20  11; is that correct?

21   MR. GLENNON:  Objection; mischaracterizes the

22  document and the testimony.  Lack of foundation.

23   THE WITNESS:  Well, I think it adjusts to

24  10.38 or .1038 cents.

25   MR. GREENSTEIN:  Q.  Which would be rounded

281

1  down to 10; right?

2    A.  That's correct.

3    Q.  And you say that even if that happened and

4  Oracle reported 10 cents per share in the second quarter

5  '01, that wouldn't be material in the mind of a

6  reasonable investor; correct?

7    MR. GLENNON:  Objection; vague and ambiguous,

8  lacks foundation, mischaracterizes the testimony.

9    THE WITNESS:  My testimony is laid out in the

10  report, that I don't think in the entire mix of

11  information that that adjustment was material by any

12  stretch of the imagination.

13   MR. GREENSTEIN:  Q.  So is it your expert

14  testimony that if Oracle in the second quarter '01 had

15  reported 10 cents a share instead of 11 cents a share in

16  net expectations, that would not have been material in

17  the mind of a reasonable investor?

18   MR. GLENNON:  Clarification.  Second quarter

19  fiscal year '01?

20   MR. GREENSTEIN:  Didn't we define that

21  earlier?

22   MR. GLENNON:  I don't know if we did or we

23  didn't.  I'm just asking.

24   MR. GREENSTEIN:  Q.  Do you know what I'm

25  talking about?

282

1    MR. GLENNON:  You defined Q2 '01, which is why

2  second quarter caught me off guard.  Sorry.

3    THE WITNESS:  I don't think the difference

4  between 11 cents or 10 cents, given the entire mix of

5  information that was available to the public investor,

6  that that was a material change.

7    MR. GREENSTEIN:  Q.  And what standard did you

8  use to determine what a reasonable investor was?

9    A.  What standard did I use?

10   MR. GLENNON:  Objection; vague and ambiguous.

11   MR. GREENSTEIN:  Q.  Yeah.

12   A.  I just used the SAB 99, which defines that

13  exact topic.

14   Q.  Okay.  So why don't you take me through your

15  methodology of how you determined that if Oracle had

16  reported 10 cents rather than 11 cents and met investor

17  expectations -- analyst expectations that would not be

18  material?

19   MR. GLENNON:  Objection; mischaracterizes the

20  testimony, lacks foundation.

21   THE WITNESS:  You want me to take you through

22  my report?

23   MR. GREENSTEIN:  Q.  I'm wondering what

24  methodology you used to come to that conclusion.

25   A.  I applied SAB 99.

283

1    Q.  Did you take into account the macroeconomic

2  environment during 2Q '01?

3    MR. GLENNON:  Objection; lack of foundation.

4    THE WITNESS:  Sure.

5    MR. GREENSTEIN:  Q.  What was the

6  macroeconomic environment during that time?

7    A.  It was a tech sector, which was probably a bad

8  time, as I recall it experienced a bit of a downturn.

9    Q.  Do you know what the dot com bust is?

10   A.  I do, yes.

11   Q.  Wasn't that around March 2000?

12   A.  I think I just said experiencing a downturn.

13   Q.  You said a slight downturn.

14   A.  I said a bit of a downturn.  I didn't say

15  slight.

16   Q.  You don't think the dot com bust was more than

17  a bit of a downturn?

18   A.  It was a downturn.

19   MR. GLENNON:  Objection; lack of foundation,

20  mischaracterizes the testimony.

21   THE WITNESS:  That was the macroeconomics that

22  was going on.

23   MR. GREENSTEIN:  Q.  So how would you

24  characterize the macroeconomic environment as of the

25  date Oracle reported its earnings for second quarter

284

1  '01?

2      A.  Well --

3          MR. GLENNON:  I'm still going to object on

4  vague and ambiguous as to time.

5          THE WITNESS:  The macroeconomic conditions

6  were that there was a downturn in the tech sector.

7          MR. GREENSTEIN:  Q.  Okay.  Did you do any

8  analysis of what was happening to other companies in the

9  software industry during that time, if they met rather

10  than beat expectations?

11      A.  No.

12      Q.  Did you do any analysis of any companies

13  during that time, what happened when they met rather

14  than beat expectations?

15          MR. GLENNON:  Objection; vague and ambiguous.

16          THE WITNESS:  No.  The issue here is Oracle,

17  not other companies.

18          MR. GREENSTEIN:  Q.  Did you do any analysis

19  of Oracle's previous history of earnings reports to see

20  what happened to Oracle's stock when they met or beat

21  expectations?

22          MR. GLENNON:  Same objection.

23          THE WITNESS:  I did, yes.

24          MR. GREENSTEIN:  Q.  And why don't you take me

25  through what your methodology was in doing that

285

1  determination?

2      A.  Let me just find that analysis.

3          I have to go to the rest room anyway.  Do you

4  want to take a two-minute break while I find that?

5          MR. GREENSTEIN:  Sure.

6          VIDEOGRAPHER:  Off record.  6:32.

7          (Recess, 6:32 p.m. - 6:38 p.m.)

8          VIDEOGRAPHER:  On record at 6:38.

9          MR. GREENSTEIN:  Q.  So, Mr. O'Bryan, when we

10  left off, I think you were going to look at your

11  methodology in looking at the trends, the historical

12  trends prior to 2Q '01 to determine whether there was a

13  difference whether Oracle met or beat Wall Street

14  expectations; correct?

15      A.  That is correct.

16      Q.  What methodology did you use?

17      A.  I think you actually asked me a different

18  question, which was did I do an analysis of Oracle's

19  previous history of meeting or beating expectation

20  consensus.  And my answer was yes.  And I was looking

21  for that exhibit.  And that's in my work papers.

22          And I did do that analysis.  So, it is right

23  here in front of me, if you would like to talk about it.

24      Q.  You said you did it in your work papers.  Is

25  that something that you relied upon?

286

1      A.  Yes.

2      Q.  And is that -- did you produce that to

3  plaintiffs?

4      A.  I'm not aware that it was or was not.

5      Q.  Okay.

6          MR. GLENNON:  Did you rely on your work

7  papers, or did you rely on the analyst reports?

8          THE WITNESS:  This is a summary of the analyst

9  reports.

10          MR. GREENSTEIN:  Q.  A compilation?

11      A.  A compilation?  It's just a summary.

12      Q.  Similar to what you did with the script

13  output?

14      A.  Yeah.

15      Q.  So why don't you go through that and what you

16  did to determine that meeting versus beating in the

17  second quarter of '01 would not be material to a

18  reasonable investor.

19      A.  Again, that's a broader question.  I didn't

20  look at just the meet or beat being materiality.

21  That was one of the considerations.  So do you just want

22  that component of it or an overview?

23      Q.  You did some analysis of prior tends; correct?

24      A.  Correct.

25      Q.  What was that analysis?

287

1      A.  We looked on a quarter basis for first Q '99

2  all the way through second Q of '01 the actual

3  consensus, analyst expectation, versus the actual

4  reported amounts.  Then we looked at the stock price as

5  it relates to the day that earnings was released,

6  and the day plus one, day plus three, and day plus five.

7  We basically looked at five different days after Oracle

8  had released its earnings.

9          And what you find is there is absolutely no

10  correlation between beating and any kind of an increase

11  or decrease in the stock.  Which would lead you to

12  believe as an individual applying SAB 99, that's not

13  necessarily the only measurement of materiality.  Which

14  it is a total mix.

15          But, clearly, you have a situation here where

16  the stock went up -- excuse me, the reported was 4 cents

17  over expected in 2Q '99, the stock dropped 5 percent the

18  day of the release, dropped another 6 percent the day

19  after.

20      Q.  Did you do any statistical analysis to

21  determine why the stock price dropped in that quarter?

22          MR. GLENNON:  Were you finished?

23          THE WITNESS:  I wasn't finished.

24          MR. GREENSTEIN:  Q.  Okay.

25      A.  You see here a situation where they beat

288

1     expectations by 4 cents in 2Q '00 and it went down 3.6
2     percent.  You see where they beat expectations by 4
3     cents in Q4 '99, went down 5 percent.  One day later it
4     went up 31 percent.  First Q of '01 they beat it 4 cents
5     and it goes up by 3.83 percent.
6          There is absolutely no correlation in my mind
7     from an auditor's perspective and one that looks at and
8     considers materiality almost on a daily basis that the
9     meet or beat measurement within Oracle is at all
10    material.
11         Q.  And you don't think the difference between
12    meeting and beating in a macroeconomic environment, a
13    tech downturn, as was the case in 2Q '01, would be
14    important to a reasonable investor?
15         MR. GLENNON:  Objection; asked and answered,
16    lacks foundation, mischaracterizes the testimony.
17         THE WITNESS:  Again, given my analysis and
18    knowledge of how materiality is measured, the meet or
19    beat issue was not a material enough issue that in the
20    total mix it would have caused the company or its
21    auditors to restate any financial statements.
22         MR. GREENSTEIN:  Q.  But meeting and beating
23    could be important to a reasonable investor; right?
24         A.  In your hypothetical, certainly it could,
25    depending on the entire mix of information.

289

1          Q.  Can you remember -- strike that.  So you said
2     you looked at the prior nine quarters; is that correct?
3          A.  It was ten quarters, including the existing 2Q
4     '01.
5          Q.  How did you determine what the consensus
6     analyst expectation was?
7          A.  We went off of -- I forget what we used, if it
8     was first call, or what number we used.
9          Q.  So out of those ten quarters, in which
10    quarters did Oracle -- how many quarters did Oracle beat
11    expectations?
12         A.  In how many quarters did they beat
13    expectations?
14         Q.  Um-hum.
15         A.  In nine of those ten.
16         Q.  Okay.  And leading up to the second quarter
17    and working backwards, how many quarters in a row had
18    Oracle beat expectations?
19         A.  Four.
20         Q.  The one instance in which they met
21    expectations, what happened to the stock price the day
22    following?
23         MR. GLENNON:  Objection; vague and ambiguous.
24         THE WITNESS:  The day following?
25         MR. GREENSTEIN:  Q.  Um-hum.

290

1          A.  Went down 6 percent.
2          Q.  Okay.  Now, how did you determine -- or strike
3     that.
4          How did you decide to use, I think you said
5     the first -- the stock price on the day following, the
6     third day and the fifth day; is that right?
7          A.  That's an analysis typically done by auditors
8     as it relates to looking at materiality, particularly
9     about stock movement, looking at those first few days.
10         Q.  Is there any accounting principle or rule that
11    outlines that procedure?
12         A.  No.
13         MR. GLENNON:  Objection; vague and ambiguous.
14         MR. GREENSTEIN:  Q.  When you say it is
15    typically done by auditors, can you cite any
16    literature that says that that's the analysis that
17    should be conducted?
18         MR. GLENNON:  Same objection.
19         THE WITNESS:  It would be professional
20    standards, due to professional care and auditor's
21    judgment.
22         MR. GREENSTEIN:  Q.  Any article or literature
23    you could point to that suggests using that standard?
24         A.  With respect to one day, three days, five
25    days?

291

1          Q.  Yeah.
2          A.  No.  That's up to the auditor's judgment.
3          Q.  You're not a statistician, are you?
4          A.  I'm actually a computer audit specialist.
5          Q.  Computer audit specialist, okay.
6          Did you run a regression analysis of any stock
7     price movement?
8          A.  I was not asked to, nor did I.
9          Q.  Do you know how to run a regression analysis?
10         A.  I do, yes.  Do you want to know about
11    R-squared?
12         Q.  I know a little bit about that.  Do you know
13    what the term vestigial means?
14         A.  Vestigial.  As I sit rear right now, no.
15         Q.  You don't have a definition of the word
16    vestigial?
17         A.  Not as I sit here now.
18         Q.  You use it in your report?
19         A.  I do.  I don't remember the context I use it
20    in.
21         Q.  The word is not part of your vocabulary as you
22    sit here today?
23         A.  Not right now.
24         MR. GLENNON:  Objection; mischaracterizes the
25    testimony.

292

1     Do you want to show it to him in the report to

2 show the context?

3     MR. GREENSTEIN:  Q.  I'm just asking if you

4 know the definition of vestigial.

5     A.  As I sit here now, I don't.

6     Q.  Did you write that word in your report?

7     A.  Mr. Sheppard may have put that word in there.

8 Mr. Sheppard has a better vocabulary than I.

9     Q.  Back to your analysis of the ten prior

10 quarters leading up to 2Q '01.

11     Did you do any sort of statistical analysis to

12 determine which part of the stock price movement

13 following an earnings disclosure was attributed to

14 company-specific information?

15     MR. GLENNON:  Objection; compound, vague and

16 ambiguous.

17     THE WITNESS:  I did not do a statistical

18 analysis of the correlation between meeting or beating

19 and by how much and the resultant stock movement.

20     MR. GREENSTEIN:  Q.  Okay.  So you just looked

21 at what the stock price did the first day following a

22 disclosure, the third day and the fifth day to see if it

23 went up or down; correct?

24     A.  No.  Actually four days.

25     MR. GLENNON:  Plus I want to object,

293

1 mischaracterizes the testimony.

2     THE WITNESS:  We looked at the day of release,

3 the day plus one, day plus three, and day plus five.

4     MR. GREENSTEIN:  Q.  The day of release?

5 Okay.

6     Well, during that time, didn't Oracle issue

7 its earnings releases after hours?

8     A.  I don't know when they issued it.

9     Q.  How would you determine the stock price

10 movement the day of release?

11     A.  You look at the stock price the day they

12 released the earnings.  If it was after hours, you do it

13 the next day.

14     Q.  Okay.  So you don't know if Oracle released

15 earnings after the market closed or before, during those

16 ten quarters?

17     MR. GLENNON:  Objection; mischaracterizes.

18     THE WITNESS:  I don't know.

19     MR. GREENSTEIN:  Q.  You didn't look at that?

20     A.  No.  It is not relevant to my analysis.

21     Q.  Is the stock price movement on the day of an

22 earnings release important in the materiality analysis

23 if Oracle issued its earnings after market hours that

24 day?

25     MR. GLENNON:  Objection; incomplete

294

1 hypothetical.

2     THE WITNESS:  No.  You look -- you don't look

3 at one day, you don't look at one moment.  You look at a

4 number of different data points, which we have here.

5 When they release doesn't matter.  It is not just the

6 meet or beat.  It is an overall mix.

7     MR. GREENSTEIN:  Q.  I understand what SAB 99

8 says.

9     MR. GLENNON:  Are you finished?

10     THE WITNESS:  Yes.

11     MR. GREENSTEIN:  Q.  What I'm asking -- I

12 think you said in your analysis you looked at the stock

13 price movement in the prior ten quarters, the stock

14 price movement that occurred on the day of the earnings

15 release; correct?

16     A.  Correct.

17     Q.  So, assuming that Oracle -- let's take first

18 quarter 2001.  Okay?

19     A.  First quarter 2001.  Certainly.

20     Q.  What was the consensus, Wall Street

21 expectation?

22     A.  Thirteen cents.

23     Q.  And what was the actual?

24     A.  Seventeen cents.

25     Q.  Okay.  And so did you look -- did you look at

295

1 the stock price -- do you know the date of that?

2     A.  I do not.

3     Q.  Did you look --

4     A.  The information is in here.  Actually, you

5 know, I do have that information in here.  It was

6 released on 9/14/2000 at 11:19 a.m.

7     So I think your representation that it was

8 after the market closed may be inappropriate.

9     Q.  You're saying that that quarter's earnings was

10 issued at 11:00 in the morning?

11     A.  Correct.  11:19.

12     Q.  Do you have the time on all of those?

13     A.  I do, yes.

14     Q.  What time was it released in the one quarter

15 that it -- actually, strike that.

16     To the extent that the earnings were released

17 after hours, you wouldn't look at the stock price

18 movement before the release, you always would look at

19 the movement after the release; correct?

20     MR. GLENNON:  Objection; mischaracterizes the

21 testimony, compound, vague and ambiguous.

22     THE WITNESS:  It is after -- the day of the

23 release is after the release.

24     MR. GREENSTEIN:  Q.  Any analysis you do of

25 stock price movement, is it fair to say you would look

296

1  at it after the release?

2       MR. GLENNON:  Mischaracterizes the testimony.

3       THE WITNESS:  We looked at the stock price the

4  day of the release, day plus one, day plus three, and

5  day plus five.

6       MR. GREENSTEIN:  Q.  Okay.  But you didn't do

7  any statistical analysis of why the stock price may have

8  gone up or down on those four various days following the

9  earnings release; right?

10       MR. GLENNON:  Objection; asked and answered.

11       THE WITNESS:  I did not perform a statistical

12  analysis as to the correlation between stock price and

13  meet or beat.  I can simply see that information on this

14  chart.

15       MR. GREENSTEIN:  Q.  Okay.  If Oracle in the

16  second quarter issued earnings of 12 cents, would you

17  think that would be material in the mind of a reasonable

18  investor?

19       MR. GLENNON:  Objection; incomplete

20  hypothetical.

21       THE WITNESS:  I haven't been asked to make

22  that determination.  It would have to again be the total

23  mix of all the information with respect to Oracle's

24  operations of what they disclosed, their applications

25  income, net income, revenues, a multitude of things.

297

1       MR. GREENSTEIN:  Q.  Why was applications

2  revenue important?

3       A.  It was one of the many things --

4       MR. GLENNON:  Insert an objection.

5       THE WITNESS:  It was one of the many things

6  being looked at by the street.

7       MR. GREENSTEIN:  Q.  But it was an important

8  factor to investors?

9       A.  Not necessarily.  It was one of the many

10  factors that the street was looking at.  Does that mean

11  it was important to an investor?  That would depend on

12  the individual investor.

13       Q.  Okay, so, let me ask you again.  Is it your

14  opinion that applications growth in the second quarter

15  of '01 was important to investors in Oracle stock?

16       MR. GLENNON:  Objection; incomplete

17  hypothetical, asked and answered, vague and ambiguous.

18       THE WITNESS:  Not necessarily.  I mean, most

19  of the analysts' reports looked at and/or gave a range

20  or expectation of application income, application

21  revenues.  And there were ranges that were suggested by

22  Deutsche Bank, by Smith Barney, Salomon Smith Barney, et

23  cetera.  So it is certainly one of the many things that

24  the street was looking at.

25       MR. GREENSTEIN:  Q.  Looking at analysts'

298

1  reports, do you look at every analyst report for the

2  analysts that cover Oracle during each quarter?

3       MR. GLENNON:  Objection; vague and ambiguous

4  as to time.

5       THE WITNESS:  I'm sure I didn't look at every

6  one.

7       MR. GREENSTEIN:  Q.  How did you determine how

8  many to look at before you were able to issue your

9  opinion?

10       A.  Until I felt like I had sufficient and

11  competent evidence in the matter.

12       Q.  Did you look at the same analyst each quarter?

13       MR. GLENNON:  Objection; vague and ambiguous.

14       THE WITNESS:  I don't recall looking at the

15  exact same one.

16       MR. GREENSTEIN:  Q.  How did you determine

17  which analyst's report to look at in that particular

18  quarter?

19       A.  Whichever one I thought was judgmentally

20  appropriate to look at.

21       Q.  What standard did you use in applying your

22  judgment?

23       MR. GLENNON:  Objection; vague and ambiguous.

24       THE WITNESS:  My 29 years of being an auditor.

25       MR. GREENSTEIN:  Q.  Okay.  Could reasonable

299

1  minds differ as to whether a misstatement is material or

2  not?

3       MR. GLENNON:  Objection; incomplete

4  hypothetical.

5       THE WITNESS:  You mean just in this situation

6  or in --

7       MR. GREENSTEIN:  Q.  Yeah.

8       A.  Well, I don't see how someone can say this was

9  material given the facts and circumstances in the mix.

10  I don't see how someone could say it was material given

11  the number of people that looked at this, the scrutiny

12  that this was under, and the overall mix of information,

13  I don't see how someone can conclude it was material.

14  So I don't think reasonable minds in this situation

15  would differ.

16       Q.  In looking at the analyst reports following

17  the second quarter '01 earnings results, did you find

18  any analysts that cited to the fact that Oracle beat

19  Wall Street expectations by a penny?

20       MR. GLENNON:  Objection; vague and ambiguous.

21       THE WITNESS:  I'm sorry, what?

22       MR. GREENSTEIN:  Q.  In looking at the

23  analysts' reports after Oracle released its second

24  quarter '01 earnings of 11 cents, did you see any

25  analysts discuss the fact that Oracle beat their

300

1    expectations?
2        A.  I think most of them I saw talked about the
3    fact they beat expectations.  Eleven cents versus ten
4    cents would be beating, and it would automatically be
5    talked about.
6        Q.  And why is that?
7        MR. GLENNON:  Objection; vague and ambiguous.
8        THE WITNESS:  Because it is a fact.  Consensus
9    was 10 cents, they got to 11 cents.  So the reader --
10   the analyst doesn't have to say it.  The reader can see
11   that.
12       MR. GREENSTEIN:  Q.  But the analyst said it;
13   right?
14       MR. GLENNON:  Objection; vague and ambiguous.
15       THE WITNESS:  I recall analysts saying that.
16       MR. GREENSTEIN:  Q.  So they thought it was
17   important to put in their reports; right?
18       MR. GLENNON:  Objection; calls for
19   speculation, lacks foundation.
20       THE WITNESS:  You have to talk to them about
21   what they thought was important.
22       MR. GREENSTEIN:  Q.  So you're aware that SAB
23   99 suggests that you look at surrounding circumstances
24   in making a materiality analysis; correct?
25       A.  Of course I am.

301

1        Q.  Did you -- what surrounding circumstances did
2    you look at in finding that meeting expectations in the
3    second quarter would not be material?
4        MR. GLENNON:  Objection; mischaracterizes the
5    testimony.
6        THE WITNESS:  Would you mind restating the
7    question?
8        MR. GREENSTEIN:  Q.  Did you do an analysis of
9    the surrounding circumstances in your materiality
10   analysis?
11       A.  Absolutely.
12       Q.  What were the surrounding circumstances that
13   you looked at?
14       A.  All of the information that was talked about
15   in analyst reports, all of the information looked at
16   with respect to meeting or beating in the stock price,
17   four or five data points after that, the issue with
18   respect to what's being restated, the percentage change
19   in that potential restatement.  There was a multitude of
20   things I looked at in the surrounding circumstances as
21   SAB 99 suggests.
22       Q.  Anything in particular you found important?
23       MR. GLENNON:  Objection; vague and ambiguous.
24       THE WITNESS:  It is all important.
25       MR. GREENSTEIN:  Q.  Anything in particular

302

1    you looked at?
2        A.  I looked at all of that.
3        Q.  You said in looking at the stock reaction
4    after each of the ten quarters that you analyzed -- you
5    looked at the stock price five days after the earnings
6    release; correct?
7        MR. GLENNON:  Objection; mischaracterizes the
8    testimony.
9        THE WITNESS:  I looked at the stock movement
10   five days after the earnings release, yes, as one of
11   four data points, in each one of the ten quarters.
12       MR. GREENSTEIN:  Q.  Is it your opinion that
13   the stock price movement five days after an earnings
14   release is somehow correlated to what the company
15   reports?
16       MR. GLENNON:  Objection; vague and ambiguous.
17       THE WITNESS:  I don't understand your
18   question.
19       MR. GREENSTEIN:  Q.  Why did you look at the
20   fifth day following an earnings release in your
21   materiality analysis?
22       A.  More information is better in the materiality
23   calculations.  So if you want to look at one day, if an
24   auditor decides to do that, or a company does, you can
25   look at two days, you can look at three days.  I thought

303

1    four days was adequate.
2        Q.  Are you aware of a standard, looking at stock
3    price movements, that looks at the stock price from one
4    to three days following the earnings disclosure?
5        MR. GLENNON:  Objection; lack of foundation,
6    vague and ambiguous.
7        THE WITNESS:  Am I aware of a standard?
8        MR. GREENSTEIN:  Q.  Yeah.
9        A.  I'm not aware of any standard that suggests
10   that, no.
11       Q.  So, is it your opinion if you looked at the
12   stock price movement seven days following an earnings
13   result, that would be a factor to look at in a
14   materiality analysis?
15       MR. GLENNON:  Objection; vague and ambiguous,
16   incomplete hypothetical.
17       THE WITNESS:  I'm sorry, you mean seven days
18   after the date of release?
19       MR. GREENSTEIN:  Q.  Right.
20       A.  Do I think that's something to consider?
21       Q.  Um-hum.
22       A.  If an auditor or company decides to do that,
23   yes.  That's up to their judgment.
24       Q.  Why did you decide to stop at five days?
25       A.  Because I thought it was adequate.  And it is

304

1  adequate based on the information that I saw and based
2  on my significant number of years of experience.
3      Q.  On page 38 of your report you state that --
4      A.  My original report?
5      Q.  Yeah, your original report.
6      A.  I'm there.
7      Q.  You state, "I do not believe it would have
8  influenced the users of Oracle's financial statements."
9  Do you see that?
10     A.  I see that.
11     Q.  How did you determine who the users of
12 Oracle's financial statements were?
13     A.  Anyone looking at Oracle's financial
14 statements.
15     Q.  So it -- is the same standard applied to
16 any -- is the same standard applied to any user
17 regardless of their background?
18         MR. GLENNON:  Objection; vague and ambiguous,
19 incomplete hypothetical, lack of foundation.
20         THE WITNESS:  Well, that is really -- that's
21 more of a definition within SAB 99 of what they call a
22 reasonable investor or something to that effect.  So I
23 haven't made a determination about who all the users
24 were.  I just said whoever the user is, in general.
25         MR. GREENSTEIN:  Q.  Is there any difference

1  in your mind between an ordinary investor versus what
2  would be reasonable to, say, a hedge fund manager?
3          MR. GLENNON:  Objection; vague and ambiguous,
4  incomplete hypothetical.
5          THE WITNESS:  Well, their sophistication
6  certainly can be different, but they are still users of
7  the financial, which one needs to consider as it relates
8  to materiality.
9          MR. GREENSTEIN:  Q.  Right.  But would you
10 apply the same standard to determining whether something
11 was material to a user any differently depending on what
12 type of investor the person was?
13         MR. GLENNON:  Objection; incomplete
14 hypothetical, lacks foundation.
15         THE WITNESS:  Yeah.  No.  A company and/or
16 auditor don't determine materiality based on whether it
17 is known as a hedge fund or a mom and pop's retirement
18 fund.  It is the total mix and the overall financial
19 statement taken as a whole.
20         MR. GREENSTEIN:  Q.  Do you agree SAB 99 --
21 strike that.
22         What qualitative factor did you look at doing
23 your materiality analysis?
24     A.  Qualitative --
25     Q.  Yeah.

1      A.  I looked at the ones we talked about on page
2  39, and anything else that was mentioned in SAB 99.  And
3  you can see those laid out on pages 39 and 40 of my
4  report.
5      Q.  Let's take the first factor, whether a
6  statement arises from an item capable of precise
7  measurement or whether it arises from an estimate, and,
8  if so, the degree of imprecision in that.  Do you see
9  that?
10     A.  I do.
11     Q.  So is it your expert opinion that the
12 transfers from -- the $20.1 million in transfers from
13 25005 to 12601 in the second quarter '01 was an
14 estimate?
15     A.  Yes.
16         MR. GLENNON:  Objection; lack of foundation,
17 vague and ambiguous.
18         THE WITNESS:  It was based on an estimate of a
19 reserve account.
20         MR. GREENSTEIN:  Q.  But the actual transfer
21 from 25005 to 12601 can be accurately calculated, can't
22 it?
23         MR. GLENNON:  Objection; vague and ambiguous,
24 lack of foundation.
25         THE WITNESS:  The amount can be calculated,

1  but the resultant account that is being adjusted is the
2  reserve.  And that is one of the most volatile estimates
3  a company has.
4          MR. GREENSTEIN:  Q.  But actual transfers from
5  25005 to 12601 can be accurately measured; right?
6          MR. GLENNON:  Objection; asked and answered.
7          THE WITNESS:  Yes, it can be.  But that's not
8  the way you measure materiality.  Any adjustment can be
9  accurately measured.  The issue becomes would a reader
10 of a financial statement be interested in whether or not
11 an adjustment took place in cash that can be accounted,
12 or, for example, in a reserve account for bad debt that
13 they would expect to have a significant amount of
14 estimated and a significant amount of judgment placed on
15 it?
16         MR. GREENSTEIN:  Q.  Looking at the second
17 factor, whether the misstatement masks a change in
18 earnings or other trends.  Do you see that?
19     A.  Yes.
20     Q.  You stated you found, quote, "No evidence of
21 this issue"?
22     A.  That's right.
23     Q.  Have you ever found -- in conducting
24 materiality analysis, have you ever found evidence that
25 a misstatement masked a change in earnings?

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

1     MR. GLENNON:  Objection; vague and ambiguous.
2     THE WITNESS:  Certainly.
3     MR. GREENSTEIN:  Q.  What factors would allow
4  you to draw a conclusion that a misstatement masks a
5  change in earnings or other trends?
6     A.  Well, if it changes from a loss to income.
7     Q.  That's a different factor though; right?
8     A.  It also can be subsumed into that one.  Mask a
9  change in earnings, well, if you're changing the
10  earnings, that's masking a change in earnings.
11     Q.  Okay.
12     A.  So, or other trends.  Have I ever found that?
13  Is that your question?  I'm sorry.
14     Q.  I think you answered my question.
15     Take the next factor, "Whether the
16  misstatement concerns a segment or other portion of the
17  registrant's business that has been identified as
18  playing a significant role in the registrant's
19  operations or profitability."  Do you see that?
20     A.  You skipped down quite a few.
21     Q.  I'm focusing on certain ones.
22     A.  I thought you said the next one.  I'm sorry I
23  do see that one, yes.
24     Q.  And you -- your opinion is that if Oracle had
25  not been able to book the HP transaction second quarter

309

1  of '01, that that would not have been material to a
2  reasonable investor; is that correct?
3     MR. GLENNON:  Objection; incomplete
4  hypothetical, lack of foundation.
5     THE WITNESS:  Now, we're on HP?
6     MR. GREENSTEIN:  Q.  Yeah.
7     A.  My opinion is that had Oracle not booked the
8  HP transaction in the second Q would not have been
9  material; that's correct.
10     MR. GREENSTEIN:  Q.  Did you analyze what
11  Oracle's applications growth would have been in 2Q '01
12  if they did not recognize the HP deal?
13     MR. GLENNON:  Same objections.
14     THE WITNESS:  I did.
15     MR. GREENSTEIN:  Q.  You did?
16     A.  I did, yes.
17     Q.  And what would it be if they didn't recognize
18  it?
19     A.  Fifty-four percent.
20     Q.  What was it -- what was it -- strike that.
21     They did recognize the HP transaction;
22  correct?
23     MR. GLENNON:  Objection; vague and ambiguous.
24     THE WITNESS:  They did.
25     MR. GREENSTEIN:  Q.  What was the applications

310

1  growth rate in the second quarter?
2     MR. GLENNON:  Same objection; lack of
3  foundation.
4     THE WITNESS:  Sixty-six percent.
5     MR. GREENSTEIN:  Q.  So if Oracle had not
6  booked the HP deal in 2Q '01, its applications growth
7  would have been 55 percent?
8     MR. GLENNON:  Objection; asked and answered.
9     MR. GREENSTEIN:  Q.  Sorry, 54 percent?
10     A.  Fifty-four percent.
11     Q.  Fifty-four percent, okay.  Do you know what
12  analysts' expectations were for 2Q '01 in terms of
13  applications growth?
14     A.  I do.
15     MR. GLENNON:  Objection; lack of foundation.
16     MR. GREENSTEIN:  Q.  What was the consensus
17  growth expectation?
18     A.  I don't know what the consensus was.  I looked
19  at it individually.  I don't know if there really was a
20  consensus per se.
21     Smith Barney was 54 percent and Deutsche Bank
22  was 50 to 60 percent, the two that I looked at.
23     Q.  You don't think a reasonable investor would
24  have found it important that Oracle's applications
25  growth would have been more than ten percent lower if

311

1  they hadn't booked that HP deal?
2     MR. GLENNON:  Objection; mischaracterizes the
3  testimony.  Lack of foundation.
4     THE WITNESS:  I don't think in the total mix
5  of information that a reasonable investor would have
6  considered it would have been material to a reasonable
7  investor, no.
8     MR. GREENSTEIN:  Q.  You say in your report
9  that it was the largest deal in that quarter; is that
10  correct?
11     MR. GLENNON:  Objection; mischaracterizes
12  testimony.  Lack of foundation.
13     THE WITNESS:  I think I said third.  One of
14  the largest.
15     MR. GREENSTEIN:  Q.  It was the third largest
16  deals?
17     A.  I believe so, yes.
18     Q.  You don't think -- if the third largest deal
19  in a quarter was improperly booked, you don't think that
20  would be important to a reasonable investor?
21     MR. GLENNON:  Objection; lack of foundation,
22  incomplete hypothetical.
23     THE WITNESS:  The size of the deal only
24  matters with respect to whether or not in the total mix
25  of information it is considered material by the auditor

312

Oracle                                              Page  309 - 312

1   or by the company.

2       MR. GREENSTEIN:  Q.  Okay.

3       A.  What level it was on the ranking of size of

4   deal makes no difference at all.

5       Q.  Okay.  Do you agree that the HP deal in 2Q '01

6   was the largest applications deal Oracle had that

7   quarter?

8       MR. GLENNON:  Objection; lack of foundation,

9   incomplete hypothetical.

10      THE WITNESS:  I don't recall that information.

11      MR. GREENSTEIN:  Q.  You don't know if it was

12  or it was not?

13      A.  I don't recall that.

14      Q.  I know you don't recall it.  Sitting here

15  today, do you know it?

16      MR. GLENNON:  Objection; asked and answered.

17      THE WITNESS:  I said I don't recall.

18      MR. GREENSTEIN:  Q.  Well, assuming it was the

19  largest applications deal in that quarter, is it your

20  opinion that if that deal was improper, that wouldn't

21  have been important to a reasonable investor?

22      MR. GLENNON:  Objection; lack of foundation,

23  calls for speculation, and vague and ambiguous.

24      THE WITNESS:  What do you mean by improper?

25      MR. GREENSTEIN:  Q.  If that deal hadn't been

313

1   booked, assuming it was the largest applications deal in

2   the second quarter '01, would that have been important

3   to an investor?

4       MR. GLENNON:  Same objections.

5       THE WITNESS:  I don't think, given the entire

6   mix of information, that would have been important to a

7   reasonable investor.

8       MR. GREENSTEIN:  Q.  How many analysts did you

9   look at in determining what Oracle's applications growth

10  estimates -- strike that.

11      How many analysts did you look at in

12  determining what analysts expected Oracle to report in

13  terms of applications growth?

14      MR. GLENNON:  Objection; asked and answered.

15      THE WITNESS:  There were a number.  I don't

16  remember.  I just remember those two numbers

17  specifically, SSB and Deutsche Bank.  But there were a

18  number that I looked at and considered.

19      MR. GREENSTEIN:  Q.  Did you -- so do you

20  recall which ones you looked at?

21      A.  No.

22      MR. GLENNON:  Objection; asked and answered.

23      THE WITNESS:  I could go to the binders and

24  look, if you'd like.

25      MR. GREENSTEIN:  Sure.

314

1       THE WITNESS:  We need to take --

2       MR. GLENNON:  Well, okay.

3       THE WITNESS:  Take a short break?

4       MR. GREENSTEIN:  Q.  You don't remember?  I'm

5   asking if you remember the numbers.

6       A.  I don't remember without looking.

7       Q.  Do you remember a range?

8       MR. GLENNON:  Objection; asked and answered.

9       THE WITNESS:  Smith Barney was 54 percent,

10  Deutsche Bank was 50 to 60 percent.

11      MR. GREENSTEIN:  Q.  Okay.  Looking at the

12  factor of SAB 99 that looks at whether the misstatements

13  affects the registrant's compliance with regulatory

14  requirements, are you aware of that factor?

15      A.  I am.

16      Q.  Did you look at that in connection with the 2Q

17  '01 bad debt transfers?

18      A.  Yes.

19      Q.  Did you consider whether or not those bad debt

20  transfers violated any regulatory requirements?

21      MR. GLENNON:  Objection; vague and ambiguous.

22      THE WITNESS:  They didn't violate any

23  regulatory requirements.  If they were inappropriately

24  transferred, they violated GAAP, which is not a

25  regulatory requirement, it is mentioned or contemplated

315

1   in SAB 99.

2       MR. GREENSTEIN:  Q.  Did you analyze any

3   escheatment laws in doing your materiality analysis of

4   the 2Q '01 bad debt transfer?

5       MR. GLENNON:  Objection; vague and ambiguous,

6   lacks foundation.

7       THE WITNESS:  I know of escheatment laws, I

8   have dealt with them for years.  But I don't recall

9   analyzing any of those as it relates to those transfers.

10      MR. GREENSTEIN:  Okay.  Let's go off the

11  record.

12      VIDEOGRAPHER:  This marks the end of tape four

13  in Volume I in the deposition of J. Duross O'Bryan.  At

14  7:10, going off the record.

15      (Recess, 7:10 p.m. - 7:22 p.m.)

16      (Exhibit 19 marked for

17          identification.)

18      (Exhibit 20 marked for

19          identification.)

20      VIDEOGRAPHER:  On record at 7:22.  This marks

21  the beginning of tape five in Volume I in the deposition

22  of J. Duross O'Bryan.

23      MR. GREENSTEIN:  Q.  Mr. O'Bryan, what's been

24  placed before you are the last two exhibits, 19 and 20.

25      MR. GLENNON:  I just put an objection on the

316

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

1  record as far as Exhibit 19 is concerned, it looks like
2  what plaintiffs have done is affixed a variety of
3  different documents together and marked them as a single
4  exhibit.
5      So to the extent these represent different
6  documents, I just wanted to note that for the record.
7      MR. GREENSTEIN:  Q.  Mr. O'Bryan, what's been
8  placed before you are Exhibits 19 and 20.  And these are
9  the documents produced as part of your rebuttal report
10  on June 22nd.
11      Do you recognize the documents?
12      A.  I do, yes.  I mean, the ones I've just very
13  quickly looked at.  I recognize the top portion of these
14  two documents, yes.
15      Q.  Okay.  Your opening expert report was issued
16  on May 25th; correct?
17      A.  I believe that date is correct.  Let me just
18  verify that for you.
19      May 25th; that's correct.
20      Q.  And Exhibit 19 and 20, did you have those
21  documents at the time you wrote -- that you issued your
22  report on May 25th?
23      MR. GLENNON:  Objection; vague and ambiguous,
24  lacks foundation.
25      THE WITNESS:  I don't recall if these were

317

1  part of the original production.
2      MR. GREENSTEIN:  Q.  I didn't ask that.  I
3  asked did you have these documents at the time you
4  submitted your May 25th, 2007 report?
5      MR. GLENNON:  Objection; asked and answered.
6      THE WITNESS:  I haven't looked through all of
7  19, so I can't say specific, unless you want me to look
8  through all of them.
9      MR. GREENSTEIN:  Q.  The first document, did
10  you have that at the time you issued your May 25th
11  report?
12      A.  I don't recall having the SLSA.
13      Q.  So is that a no?
14      MR. GLENNON:  Objection; mischaracterizes the
15  testimony.
16      THE WITNESS:  I just don't recall.
17      MR. GREENSTEIN:  Q.  Do you recall having
18  Exhibit 20 at the time you issued your May 25th report?
19      Let me ask you, are you aware of an e-mail
20  from --
21      A.  I just want to answer your question here.
22      Q.  Okay.
23      A.  I did have -- I beg your pardon.
24      I'm not ready to answer.  I don't have the
25  answer I thought I had.  Sorry.

318

1      Q.  So you don't know if you had the documents
2  that are marked as Exhibit 19 or 20 at the time that you
3  issued your May 25th report?
4      A.  Let me just --
5      Q.  You are looking for it?
6      A.  Yeah.
7      Q.  Sorry.
8      A.  I don't think I had those.  I don't recall,
9  but I don't think that I did.
10      Q.  Do you know when you received those documents?
11      A.  Well, when Mr. Regan issued his original --
12  his report where he spoke in detail about the HP
13  transaction, so maybe his rebuttal report, at that point
14  in time it became clear to at least me what the
15  plaintiff's position was with respect to HP.
16      And at that point in time documents were
17  gathered to show that, in my opinion, Mr. Regan is wrong
18  as it relates to the recognition of revenues.
19      So it was sometime after my original report
20  and prior to my rebuttal report.  I just don't recall
21  the date.
22      Q.  Are the documents in front of you, are those
23  the documents that were gathered?
24      MR. GLENNON:  Objection; assumes facts, lack
25  of foundation.

319

1      THE WITNESS:  Again, Exhibit 19 is 75 pages, a
2  bunch of different things stapled together, and I have
3  not been through those to cross-check those with all the
4  ones we got with respect to the secondary production.
5      MR. GREENSTEIN:  Q.  Is that Exhibit 20, or
6  the smaller one?  You relied on that in your rebuttal
7  report.  So do you recall if you had that, that was one
8  of the documents gathered after you submitted your
9  May 25th report?
10      MR. GLENNON:  Objection; asked and answered.
11      THE WITNESS:  As I said, I don't recall if I
12  saw this prior to the issuance of my original report.  I
13  don't think so, but I just don't recall as I sit here
14  right now.  It's been a long time.
15      MR. GREENSTEIN:  Q.  Let me ask you this.  Are
16  you aware of an e-mail from Shelly Curtis where she
17  purports to describe events surrounding the signing of
18  the HP deal late on November 30th?  Do you recall that
19  e-mail?
20      MR. GLENNON:  Objection; lack of foundation,
21  vague and ambiguous.
22      THE WITNESS:  I am aware of an e-mail that has
23  Shelly Curtis' comments about certifying that the
24  transaction with HP was completed prior to midnight on
25  11/30/2000.

320

1  MR. GREENSTEIN:  Q.  You recall in that e-mail
2  that she references Arthur Andersen wanted some evidence
3  that the deal was booked on November 30th; correct?
4  MR. GLENNON:  Objection; document speaks for
5  itself, lack of foundation.
6  THE WITNESS:  Well, somewhere in that e-mail
7  chain is a reference to:  Could you give some
8  clarification here, Andersen has asked about that.
9  Which you can see in Andersen's report or Andersen's
10  analysis on 1340.
11  MR. GREENSTEIN:  Q.  Why would Arthur Andersen
12  as Oracle's auditor, want to know if the deal was signed
13  on November 30th, 2000?
14  MR. GLENNON:  Objection; calls for
15  speculation, lacks foundations.
16  THE WITNESS:  It is part of a revenue
17  recognition test.
18  MR. GREENSTEIN:  Q.  Okay.  Do you recall
19  having that e-mail from Shelly Curtis prior to issuing
20  your May 25th report?
21  MR. GLENNON:  Objection; vague and ambiguous.
22  THE WITNESS:  You know, I don't recall having
23  that.  I just don't recall as I sit here if I had it or
24  not.
25  MR. GREENSTEIN:  Q.  If you had it, you would

321

1  have put it on the Appendix C of your opening report and
2  you would have relied on that document?
3  MR. GLENNON:  Objection; lack of foundation.
4  THE WITNESS:  Had I seen that document, I
5  certainly would have considered it.  Whether I relied on
6  it would remain to be seen.
7  MR. GREENSTEIN:  Q.  If you turn to page 41 of
8  your opening report.
9  A.  Sorry, back to the opening report?
10  Q.  Yeah.  The section on review of
11  Hewlett-Packard transactions.  Do you see that?
12  A.  I do, yes.
13  Q.  It says, "In supplemental interrogatory
14  responses, plaintiffs suggest that the HP
15  transaction..." Do you see that?
16  A.  I do.
17  Q.  Is it fair to say you read plaintiff's
18  interrogatory responses -- strike that.
19  So you were aware of plaintiff's allegations
20  concerning the HP transaction prior to issuing this
21  report, from their interrogatory responses; correct?
22  MR. GLENNON:  Objection; lack of foundation.
23  THE WITNESS:  I have seen the supplemental
24  interrogatory responses.  And I did see in those, prior
25  to the issuance of this report this allegation that HP

322

1  should not have been booked.
2  MR. GREENSTEIN:  Q.  And you issued this
3  opinion; correct?
4  A.  I issued this opinion?
5  Q.  You issued this opinion after learning of
6  plaintiff's allegations about the HP transaction in the
7  supplemental interrogatory responses; correct?
8  MR. GLENNON:  Objection; vague and ambiguous
9  as to this opinion.
10  THE WITNESS:  I issued opinion number 7 on
11  page 41.  And at the time I issued that, I had seen the
12  supplemental interrogatory responses that alleged that
13  HP's transaction had not been properly booked.
14  MR. GREENSTEIN:  Q.  If you look at page 42,
15  the third to last sentence, it starts with, "I note that
16  AA." Do you see that?
17  A.  Yes.
18  Q.  You note that "AA, Oracle's prior financial
19  statement auditors, specifically looked at the HP
20  transaction from a revenue recognition perspective and
21  even discussed it with Oracle's audit committee on
22  January 5th." Do you see that?
23  A.  I do.
24  Q.  You said, "AA did not recommend that any
25  adjustment be made to the accounting for the HP

323

1  transaction." Do you see that?
2  A.  Correct.
3  Q.  Is it required for an auditor to make an
4  adjustment in order for a revenue recognition deal to be
5  material?
6  MR. GLENNON:  Objection; vague and ambiguous,
7  incomplete hypothetical.
8  THE WITNESS:  I don't understand your
9  question.
10  MR. GREENSTEIN:  Q.  If you turn to Appendix C
11  of your opening report.
12  A.  I'm there.  I'm there.
13  Q.  And do you see the depositions that you relied
14  upon there?
15  A.  I do, yes.
16  Q.  You will see that Tom Rathjens' isn't in
17  there?
18  A.  That's correct.
19  Q.  Is it fair to say you didn't rely on the
20  deposition of Tom Rathjens in issuing this May 25th
21  opinion on the HP transaction?
22  MR. GLENNON:  Objection; vague and ambiguous,
23  lacks foundation.
24  THE WITNESS:  Yeah, I don't think I looked at
25  Mr. Rathjens' deposition prior to the issuance of this

324

1  initial report.

2      MR. GREENSTEIN:  Q.  And why not?

3      MR. GLENNON:  Objection; vague and ambiguous.

4      THE WITNESS:  Because, as I state in my

5  report, I don't see any evidence, in considering what

6  went on with this transaction, that this was improperly

7  booked at this point in time when I wrote this report.

8      With all due respect to Mr. Regan, he's the

9  only individual, at least accounting professional that

10  I've seen that seven years later suggests the HP deal

11  was not booked properly.

12      This deal was looked at by the company, by the

13  audit committee, by the revenue recognition group of the

14  company and by the auditors.  Every single one of them

15  have looked at this transaction and suggested it was

16  properly stated.

17      Seven years later Mr. Regan comes along and

18  says that that was inappropriate, which I find

19  troubling.

20      So, that was the information I was considering

21  at the time.  And there was no reason for me to look at

22  Mr. Rathjens, who was HP's individual PMK or whatever he

23  was designated as, because this thing had been fully

24  vetted.

25      What HP thought about and thinks about Oracle

325

1  booking their deal is completely irrelevant.  It is how

2  Oracle decides to book this deal.  And it was

3  appropriate to book, and it was appropriate to book

4  given all of the professionals that have looked at this.

5  And I think it is silly, quite frankly, that Mr. Regan

6  suggests otherwise.

7      MR. GREENSTEIN:  Q.  So, is it fair to say

8  that what you just said in that long answer is what you

9  considered before submitting your May 25th report?

10      MR. GLENNON:  Objection; mischaracterizes the

11  testimony, lack of foundation.

12      THE WITNESS:  Well, it is any of the footnotes

13  that I have here or references to documents or

14  depositions.  Mr. Matuszak's deposition, Arthur

15  Andersen's consideration, the audit committee.

16      MR. GREENSTEIN:  Q.  Okay.  So you didn't

17  consider Tom Rathjens' deposition in forming your expert

18  opinion on the propriety of the HP transaction on

19  May 25th?

20      MR. GLENNON:  Objection; asked and answered.

21      THE WITNESS:  In my opinion there would be no

22  need to, given the date of the original report.

23      MR. GREENSTEIN:  Okay, I'm done.

24      MR. GLENNON:  I don't have any redirect.

25      VIDEOGRAPHER:  The number of tapes used for

326

1  this deposition is five.  This is the end of videotape

2  number five in Volume I in the deposition of J. Duross

3  O'Bryan.  The original videotapes will be retained by

4  LiveNote World Service.  We're going off the record.

5  The time on the monitor is 7:37.

6      (Discussion off the record.)

7      MR. GREENSTEIN:  We just had a discussion off

8  the record.  Both parties agree that the deposition and

9  the exhibits should be designated as confidential.

10      MR. GLENNON:  And it is going to get shipped

11  to us for our review in 30 days to review and sign?

12      MR. GREENSTEIN:  Right.

13      (Whereupon, at 7:38 p.m. the deposition of

14  JOHN DUROSS O'BRYAN was adjourned.)

15

16      I declare under penalty of perjury that the

17  foregoing is true and correct.

18

19  Dated:_____  _____

                     JOHN DUROSS O'BRYAN

20

21

22

23

24

25

327

1  STATE OF CALIFORNIA      )

2                           )

3  COUNTY OF ALAMEDA        )

4      I, DIANA NOBRIGA, hereby certify that the

5  witness in the foregoing deposition was by me duly sworn

6  to testify to the truth, the whole truth, and nothing

7  but the truth in the within-entitled cause; that said

8  deposition was taken at the time and place therein

9  stated; that the testimony of said witness was reported

10  by me, a Certified Shorthand Reporter and disinterested

11  person, and was thereafter transcribed into typewriting,

12  and that the pertinent provisions of the applicable code

13  or rules of civil procedure relating to the notification

14  of the witness and counsel for the parties hereto of the

15  availability of the original transcript of the

16  deposition for reading, correcting and signing have been

17  met.

18      And I further certify that I am not of counsel

19  or attorney for either or any of the parties to said

20  deposition, nor in any way interested in the outcome of

21  the cause named in said action.

22      DATED:  _____

23

24      _____

25      DIANA  NOBRIGA, CSR NO. 7071

328

1   STATE OF CALIFORNIA         )

2                               )

3   COUNTY OF ALAMEDA           )

4           I, DIANA NOBRIGA, hereby certify that the

5   witness in the foregoing deposition was by me duly sworn

6   to testify to the truth, the whole truth, and nothing

7   but the truth in the within-entitled cause; that said

8   deposition was taken at the time and place therein

9   stated; that the testimony of said witness was reported

10  by me, a Certified Shorthand Reporter and disinterested

11  person, and was thereafter transcribed into typewriting,

12  and that the pertinent provisions of the applicable code

13  or rules of civil procedure relating to the notification

14  of the witness and counsel for the parties hereto of the

15  availability of the original transcript of the

16  deposition for reading, correcting and signing have been

17  met.

18          And I further certify that I am not of counsel

19  or attorney for either or any of the parties to said

20  deposition, nor in any way interested in the outcome of

21  the cause named in said action.

22          DATED: _____7/16/07_____

23

24                        _____

25                        DIANA  NOBRIGA, CSR NO. 7071

# EXHIBIT K

```
1        IN THE UNITED STATES DISTRICT COURT
2        NORTHERN DISTRICT OF CALIFORNIA
3
4    In re ORACLE CORPORATION
     SECURITIES LITIGATION,
5
6    vs.              Master File No.: C-01-0988-MJJ
7    This Document Relates To:,
8    ALL ACTIONS.
9    _____/
10
11        ---o0o---
12        CONFIDENTIAL
13    DEPOSITION OF JEFFREY HENLEY
14    Thursday, November 16, 2006
15    VOLUME II, Pages 228 - 494
16        ---o0o---
17
18    SHEILA CHASE & ASSOCIATES
         REPORTING FOR
19    LiveNote World Service
     221 Main Street, Suite 1250
20   San Francisco, California 94105
     Phone: (415) 321-2311
21   Fax: (415) 321-2301
22
23   Reported by
     APRIL DAWN HEVEROH, CSR
24   CSR No. 8759
25
                                         228
```

```
1              I N D E X
2        INDEX OF EXAMINATION
                                    PAGE
3    EXAMINATION BY MR. SOLOMON         236
4        ---o0o---
5
6        INDEX OF EXHIBITS
7    DESCRIPTION                    PAGE
8    Exhibit 48  Deposition transcript of Jeffrey      238
              Henley taken July 27, 2006, 227 pages
9
     Exhibit 49  News article dated October 4, 2000,   239
10            2 pages
11   Exhibit 50  Analyst report dated October 4, 2000, 246
              Bates stamped NDCA-ORCL 006112 to
12            006115, 4 pages
13   Exhibit 51  News article dated November 30, 2000, 249
              2 pages
14
     Exhibit 52  Document entitled "Highlights of      257
15            AppsWorld Conference, Bates stamped
              WBC 0012 to 0013, 2 pages
16
     Exhibit 53  Document entitled "Highlights From    279
17            Oracle Non-Deal Roadshow, Bates
              stamped NDCA-ORCL 109482 to 109484,
18            3 pages
19   Exhibit 54  Oracle Corporation Finance and Audit  297
              Committee Meeting report, Bates stamped
20            NDCA-ORCL 102701 to 102820, 169 pages
21   Exhibit 55  Oracle Corporation Finance and Audit  299
              Committee Meeting report, Bates stamped
22            NDCA-ORCL 420976 to 421002, 27 pages
23   Exhibit 56  Document entitled "Oracle Speaker     303
              Biography, Bates stamped NDCA-ORCL
24            195262 to 195269, 8 pages
25   /////
                                         229
```

```
1        INDEX OF EXHIBITS (Continued)
2    DESCRIPTION                    PAGE
3    Exhibit 57  E-mail dated November 30, 2000, Bates  306
              stamped NDCA-ORCL 025020 to 025021,
4            2 pages
5    Exhibit 58  Document entitled Oracle, January 8,   311
              2001, Board of Directors, Bates stamped
6            NDCA-ORCL 044428 to 044505, 78 pages
7    Exhibit 59  E-mail string with attachments, Bates  326
              stamped NDCA-ORCL 055957 to 055962,
8            6 pages
9    Exhibit 60  E-mail dated November 30, 2000, Bates  330
              stamped NDCA-ORCL 025018, one page
10
     Exhibit 61  Document entitled "December Flash      338
11            Report dated January 17, 2001, Bates
              stamped NDCA-ORCL 088715 to 088732,
12            18 pages
13   Exhibit 62  Oracle Corp. Pipeline Reporting        341
              Package dated December 11, 2000,
14            Bates stamped NDCA-ORCL 398302 to
              398311, 10 pages
15
     Exhibit 63  E-mail string Bates stamped NDCA-ORCL  342
16            609550 to 609551, 2 pages
17   Exhibit 64  E-mail dated January 11, 2001, Bates   347
              stamped NDCA-ORCL 040617, one page
18
     Exhibit 65  E-mail dated December 11, 2000, Bates  350
19            stamped NDCA-ORCL 039420, one page
20   Exhibit 66  E-mail dated January 18, 2001, Bates   351
              stamped NDCA-ORCL 039430, one page
21
     Exhibit 67  Document entitled "Exhibit M"          359
22            consisting of an e-mail dated January
              17, 2001, Bates stamped NDCA-ORCL
23            297772 to 297773, 2 pages
24   Exhibit 68  E-mail with attachments dated January  362
              17, 2001, Bates stamped NDCA-ORCL
25            013415 to 013418, 4 pages
                                         230
```

```
1        INDEX OF EXHIBITS (Continued)
2    DESCRIPTION                    PAGE
3    Exhibit 69  E-mail dated October 4, 2000, Bates    368
              stamped NDCA-ORCL 014044, one page
4
     Exhibit 70  Document entitled "Total Company       370
5            Q3 FY01 Forecast, Bates stamped
              ORCL-DER 003447 to 003463, 17 pages
6
     Exhibit 71  Deposition transcript of Jeffrey O.    371
7            Henley taken March 2, 2004, Bates
              stamped NDCA-ORCL 606383 to 606688,
8            306 pages
9    Exhibit 72  Document entitled "Oracle              381
              Presentation", Bates stamped NDCA-ORCL
10            03281 to 03311, 31 pages
11   Exhibit 73  Document entitled "TheStreet.Com",     385
              Bates stamped NDCA-ORCL 141794 to
12            141795, 2 pages
13   Exhibit 74  E-mail string Bates stamped NDCA-ORCL  388
              061311 to 061315, 5 pages
14
     Exhibit 75  E-mail dated January 12, 2001, Bates   396
15            stamped NDCA-ORCL 618166 to 618169,
              4 pages
16
     Exhibit 76  E-mail dated January 31, 2001, Bates   399
17            stamped NDCA-ORCL 012439 to NDCA-ORCL
              012441, 3 pages
18
     Exhibit 77  E-mail string Bates stamped NDCA-ORCL  401
19            061369 to 061373, 5 pages
20   Exhibit 78  E-mail dated December 4, 2000, Bates   404
              stamped NDCA-ORCL 052474, one page
21
     Exhibit 79  Summary Analysis of Oracle CRM         405
22            Customers FY 1Q02 Earnings Call
              Announcement, Bates stamped NDCA-ORCL
23            397378 to 397380, 3 pages
24   /////
25   /////
                                         231
```

```
1           INDEX OF EXHIBITS (Continued)
2       DESCRIPTION                  PAGE
3   Exhibit 80  Memo from Rick Pierce to Mark Keever,  406
            et al., dated January 26, 2001, Bates
4           stamped NDCA-ORCL 1029900 to 1029905,
            6 pages
5
    Exhibit 81   Letter to Drew and Chris from Greg,   407
6           Bates stamped NDCA-ORCL 1032070,
            one page
7
    Exhibit 82   E-mail string Bates stamped NDCA-ORCL  413
8           061297 to 061298, 2 pages
9   Exhibit 83   E-mail string Bates stamped NDCA-ORCL  416
            063478 to 063480, 3 pages
10
    Exhibit 84   E-mail dated March 25, 2002, Bates    422
11          stamped NDCA-ORCL 061300 to 061301,
            2 pages
12
    Exhibit 85   E-mail dated October 6, 2000, Bates   425
13          stamped NDCA-ORCL 203681 to 203683,
            3 pages
14
    Exhibit 86   E-mail string Bates stamped NDCA-ORCL  426
15          612306 to 612307, 2 pages
16  Exhibit 87   Presentation to the SEC Staff On      439
            Behalf of Oracle Corporation, Bates
17          stamped NDCA-ORCL 050209 to 050255,
            47 pages
18
    Exhibit 88   E-mail string Bates stamped NDCA-ORCL  445
19          130128 to 120140, 3 pages
20  Exhibit 89   E-mail dated May 2, 2001, Bates       446
            stamped NDCA-ORCL 120192 to 120194,
21          3 pages
22  Exhibit 90   E-mail string Bates stamped NDCA-ORCL  448
            119340 to 119344, 5 pages
23
    Exhibit 91   Memo Bates stamped PLF-ORC 000006,    458
24          one page
25  /////
                                                    232
```

```
1           INDEX OF EXHIBITS (Continued)
2       DESCRIPTION                  PAGE
3   Exhibit 92   Billing and Receipt History Bates    459
            stamped NDCA-ORCL 050364 to 050390,
4           11 pages
5   Exhibit 93   E-mail dated October 21, 2002 from    463
            Michael Quinn to Ryan Roberts, et al.,
6           2 pages
7   Exhibit 94   Document entitled "Unapplied Auto     469
            Adjustments", Bates stamped PFL-ORC
8           000214, 10 pages
9   Exhibit 95   Photocopy of Oracle check No. 1509347 470
            dated 5/23/02, Bates stamped HSBC
10          000001, one page
11  Exhibit 96   E-mail dated April 20, 2001, Bates    472
            stamped NDCA-ORCL 120113 to 120114,
12          2 pages
13  Exhibit 97   E-mail string Bates stamped NDCA-ORCL  474
            101525 to 101530, 6 pages
14
    Exhibit 98   Memo stamped NDCA-ORCL 623514,        476
15          one page
16  Exhibit 99   E-mail dated November 30, 2000, Bates  476
            stamped NDCA-ORCL 025066 to 025067,
17          2 pages
18  Exhibit 100  Document entitled "Q3 of FY 2001",    482
            Bates stamped NDCA-ORCL 297300,
19          one page
20  Exhibit 101  Document entitled "Q3FY01 USA Support  487
            Revenue Model", Bates stamped NDCA-ORCL
21          147106 to 147107, 2 pages
22  Exhibit 102  Excerpt from "Softwar", 3 pages       490
23
24           ---o0o---
25
                                                    233
```

```
1           BE IT REMEMBERED that on Thursday, July 27,
2   2006, commencing at the hour of 9:20 A.M. thereof, at
3   the offices of Lerach, Coughlin, Stoia, Geller, Rudman &
4   Robbins, LLP, 100 Pine Street, Suite 2600, San
5   Francisco, California, before me, APRIL DAWN HEVEROH,
6   CSR, a Certified Shorthand Reporter for the State of
7   California, personally appeared
8           JEFFREY HENLEY,
9   called as a witness by the Plaintiffs herein, who, being
10  by me first duly sworn, was thereupon examined and
11  testified as hereinafter set forth.
12          ---o0o---
13  Appearing as counsel on behalf of Plaintiff:
14      MARK SOLOMON, Esquire
        STACEY KAPLAN, Esquire
15      LERACH, COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS
        655 West Broadway, Suite 1900
16      San Diego, California  92101
        (619) 231-1058
17      marks@lerachlaw.com
18  Appearing as counsel on behalf of Defendant:
19      GREGORY LINDSTROM, Esquire
        MICHELE KYROUZ, Esquire
20      LATHAM & WATKINS
        505 Montgomery Street, Suite 1900
21      San Francisco, California  94111-2562
        (415) 391-0600
22      michele.kyrouz@lw.com
23
24  Also present:  Keith Mautner, Sarah Holloway,
            James Maroulis and James Terrell,
25          Videographer
                                                    234
```

```
1           ---o0o---
2       P R O C E E D I N G S
3           ---o0o---
4           THE VIDEOGRAPHER:  This begins the videotaped
5   deposition of Jeffrey Henley, Tape 1, Volume 2 in the
6   matter entitled In Re Oracle corporation Securities
7   Litigation filed in the United States District Court for
8   the Northern District of California, case
9   No. C-01-0988-MJJ.
10          Today's date is November 16, 2006.  The time
11  on the video monitor is 9:20.  The video operator today
12  is James Terrell representing LiveNote World Service
13  located at 221 Main Street, Suite 1250, San Francisco,
14  California, 94105.  The phone number is (415) 321-2300.
15  The court reporter is April Heveroh with Sheila Chase &
16  Associates reporting on behalf of LiveNote World
17  Service.  Today's deposition is being taken on behalf of
18  plaintiff and is taking place at 100 Pine Street,
19  San Francisco, California.
20          And if counsel will now please introduce
21  yourselves and state whom you represent.
22          MR. SOLOMON:  Mark Solomon representing
23  Plaintiffs.  I'm here with Stacey Kaplan and with Keith
24  Mautner, our branch accountant, and with Sarah Holloway,
25  law student and clerk who was with us at the first
                                                    235
```

1    session.

2        MR. LINDSTROM:  Greg Lindstrom for Mr. Henley

3    and the other defendants.

4        MS. KYROUZ:  Michele Kyrouz from Latham, also

5    for Mr. Henley and defendants.

6        MR. MAROULIS:  James Maroulis of Oracle

7    Corporation for Defendant Oracle Corporation.

8        THE VIDEOGRAPHER:  Thank you.

9        And the reporter may swear in the witness.

10        (Whereupon, the witness was sworn by the

11        Certified Shorthand Reporter.)

12            ---o0o---

13        EXAMINATION BY MR. SOLOMON

14            ---o0o---

15        MR. SOLOMON:  Q.  Good morning, Mr. Henley.

16    A.  Good morning.

17    Q.  Since the last session of this deposition,

18    have you spoken with anybody about that session?

19        MR. LINDSTROM:  About his past session?

20        MR. SOLOMON:  Yes.

21        THE WITNESS:  Spoken to anyone about my past

22    session.  What do you mean by "spoken to"?

23        MR. SOLOMON:  Q.  Used your mouth and

24    articulated words.

25    A.  No, I haven't spoken to anyone.  I came

236

1    yesterday afternoon and we had a briefing with my

2    lawyers, but excluding that, I didn't speak with anybody

3    about the session that we did several months ago.

4    Q.  Okay.  And have you looked at any documents in

5    preparation for this session?

6    A.  Yesterday afternoon I looked at several, and I

7    got familiarized again with some of the time lines and

8    that sort of thing.

9    Q.  Refreshed your recollection?

10    A.  Yeah, about the general time lines and

11    sequences and things.

12    Q.  Okay.  And let's break that down.  Can you

13    tell me what you mean when you say that, time line --

14    A.  Well, it was a long time ago, so I just

15    remembered that -- when fiscal Q2 was and fiscal Q3 and

16    that sort of thing; what calendar years those were and

17    so forth, things like that.

18    Q.  Okay.  What about as to issues in the

19    litigation, itself?  Did it refresh your recollection as

20    to any of the issues?

21    A.  I don't know about that.  I think I remember

22    what the issues were.

23    Q.  What's your recollection of the issues?

24    A.  Again, as I answered, I think the last time I

25    was deposed, the plaintiffs are asserting that myself

237

1    and Larry and others, I guess, somehow knew that we were

2    going to miss our quarter and we were trading stock and

3    knowing what the market did.  So I think that's the

4    central issue.

5    Q.  And your understanding of the issues, then,

6    hasn't changed at all since we first began speaking the

7    first session; is that right?

8    A.  That's right.

9        MR. SOLOMON:  Let's have in front of you the

10    transcript of the first session.  I guess we may as well

11    mark it as Exhibit 48.

12        (Whereupon, Plaintiff's Exhibit 48 was marked

13        for identification.)

14        MR. SOLOMON:  Q.  And just to be clear, you

15    didn't, after the first session, have any conversations

16    with Mr. Ellison about --

17    A.  No, I've never had any conversations with him

18    about this.

19    Q.  Or, in fact, with anybody other than your

20    lawyers; is that your testimony?

21    A.  That's correct.

22    Q.  And have you reviewed your deposition

23    transcript since the first session?

24    A.  Yes.

25    Q.  And were there any errors in there that you

238

1    noticed?

2    A.  I think we noted a few minor things and that

3    sort of thing, but for the most part, I think it was

4    reflective of what we said.

5    Q.  Turn to page 143 of the transcript.  You'll

6    see that, if you look at line 10 onwards, you say,

7    "Well, gee, this is what I had,' but I've always been,

8    as I testified earlier, very careful not to talk about

9    the quarter when people come in to see me.  I have no

10    interest in getting into the details of the quarter."

11        Do you see that?

12    A.  Yes.

13    Q.  And you stick by that testimony today, do you?

14    A.  That's correct.

15    Q.  And it's your testimony still that you didn't

16    reaffirm guidance intra-quarter; is that your testimony?

17    A.  Yes.  My policy was always to not get into

18    reiterating guidance because I had no more information

19    than what I did on the earnings call at any quarter.

20        MR. SOLOMON:  Okay.  I'll have marked as the

21    next exhibit a news article dated October 4, 2000.

22        (Whereupon, Plaintiff's Exhibit 49 was marked

23        for identification.)

24        MR. SOLOMON:  Q.  Do you recognize this?

25    A.  I don't, but I'm sure I must have said it.

239

1  I'm sure it must have been published, apparently, by
2  Oracle.
3      Q.  And what is this if it's not you reiterating
4  guidance intra-quarter?
5      A.  I don't -- I don't view this as reiterating
6  guidance.  I think this is a -- this was done,
7  apparently, at one of our conventions.  This is our
8  annual trade show Open World, and our PR people were --
9  I don't know if I said this at the conference or whether
10  they put this out, but, you know, I don't consider this
11  reiterating guidance.  My position was always that I --
12  we gave everybody everything we do at our quarterly
13  earnings call, and unless there was a material change
14  that I could be sure of that there was no benefit to me
15  to, you know, reiterate guidance, there was nothing more
16  for me to tell people.  My obligation was to tell people
17  if something changed.
18      Q.  Here's what it says in the second paragraph in
19  part in quotes.  "There has been no change in the
20  outlook for Oracle's financial results in the current
21  fiscal quarter and its full fiscal year,' said Oracle
22  Chief Financial Officer Jeff Henley."
23      What is that if it's not reiterating guidance?
24      A.  I don't know.  All I know is this was --
25      Again, what was the date?  October 4th?

240

1      Q.  That's what it says at the top, October 4,
2  2000.
3      A.  So this would have been a couple of weeks
4  after we had our earnings call, I think, 'cause
5  typically, we would have -- we would end our quarter.
6  That quarter would have been August.  We would have done
7  an earnings call two or three weeks into September.  So
8  this would have been, I guess, a couple of weeks after
9  the September call.  So it's -- you know, I don't
10  remember it, but maybe I did say it.  But it was
11  basically just reiterating what I basically told the
12  analysts a couple weeks before.
13      Q.  This is an Oracle document.  Do you know that?
14      A.  It -- apparently, it says it's coming from PR
15  Newswire, which is put out by Oracle, yes.
16      Q.  And you know you never produced this in
17  litigation to us.  We had to get this ourselves.  Did
18  you know that?
19      A.  I did not know that.
20      Q.  And isn't it remarkable that you lied about
21  not reaffirming guidance and we find it in a document
22  you didn't produce?
23      MR. LINDSTROM:  Objection, argumentative.
24  Assumes facts.
25      THE WITNESS:  I didn't lie about anything.

241

1  I'm telling you what my position has been when I was CFO
2  for Oracle for 13 years.  It was always to basically
3  tell people, "Look, I've given you the quarter in the
4  earnings call.  I've told you everything I know, and
5  unless something changes, there's nothing more I can
6  tell you."  And I really spent most of my time
7  historically, whenever I talked to analysts, talking
8  about the big picture of where things were going.  So I
9  don't find this inconsistent.
10      MR. SOLOMON:  Q.  I want you to look at page
11  144.
12      MR. LINDSTROM:  Of his deposition, Exhibit 48?
13      THE WITNESS:  The next page here?
14      MR. SOLOMON:  Q.  Start at line 17.  And it
15  reads, "And it says, 'Mr. Henley reiterated that the
16  company's outlook and guidance were unchanged for F3Q
17  '01.'"
18      And your testimony is that that is not true,
19  and your answer was, "My stock line is always that I'm
20  not going to get into the quarter.  If we have something
21  to report to you, we'll do it publicly.  I'm not going
22  to get into the quarter.  So a lot of these guys
23  interpret that, I guess, to mean that there's no change.
24  I don't use those words; never have, never will.  I just
25  don't get into talking about the quarter."

242

1      A.  That's correct.  And again --
2      MR. LINDSTROM:  There's no pending question.
3  He's just reading from your prior transcript.  If he
4  wishes to ask you a question, he'll do so.
5      MR. SOLOMON:  Q.  The pending question now is:
6  What did you want to add?
7      A.  I don't think I have any more to add than what
8  I said in the deposition last time.  I think that
9  summarized the positions I always had.
10      Q.  And your position is you would only give
11  guidance at the beginning of the quarter, and you would
12  never reiterate guidance within the quarter; is that
13  right?
14      MR. LINDSTROM:  Objection.  Mischaracterizes
15  his testimony.
16      MR. SOLOMON:  Q.  Is that your testimony?
17      A.  My testimony, again, is that we gave a lot of
18  thought into what happened in the previous quarter at
19  our earnings call and what the outlook was for the
20  current quarter, and that I -- my stock answer, whenever
21  I went to conferences during that quarter, was, "Look,
22  I've told you all I know about the quarter.  There's no
23  sense getting into the quarter at this point.  That's
24  not why I'm here to talk to you."
25      Q.  Okay.  And you did not use these words, then;

243

1  is that right?
2      A.  I never used -- to the best of my
3  recollection, I have never used the words "I reiterate
4  guidance.  I reiterate that our guidance is the same."
5  I don't believe I've ever used those words.
6      Q.  But you may have used the word that there has
7  been no change in the outlook for Oracle's financial
8  results in the current fiscal quarter.  Is that your
9  testimony?
10     MR. LINDSTROM:  Objection.  Argumentative,
11  mischaracterizes his testimony.
12     THE WITNESS:  You've showed me a document
13  where, apparently, I was quoted saying something, so
14  it's quite conceivable this is what I said.  And it may
15  have -- I may have occasionally done something in a
16  public format like this a couple weeks after, but I
17  don't consider that reiteration guidance when something
18  comes out of our PR department at Open World two weeks
19  after I just made all the statements to the public.
20     MR. SOLOMON:  Q.  Okay.  And was this an
21  unusual event, by the way, for you to do this?
22     MR. LINDSTROM:  To do what?
23     MR. SOLOMON:  Q.  Sorry.  For Oracle to issue
24  a statement in the middle of the quarter, almost in the
25  middle of the quarter saying there's been no change in

244

1  the outlook for Oracle's financial results.
2      MR. LINDSTROM:  Assumes facts, vague and
3  ambiguous.
4      THE WITNESS:  Yeah, I don't know.  I don't
5  know what's --
6      MR. SOLOMON:  Q.  Well, was it usual or not
7  usual?
8      A.  I think, generally, we issued a news release
9  and did an earnings call, and that was it.  But trying
10  to remember the facts sometimes if we had a trade show
11  or something that fell after that, then we might have
12  done something else.
13     Q.  So the answer is it's possible that on a
14  regular basis you gave intra-quarter earnings guidance
15  or confirmed earnings guidance at least publicly?
16     MR. LINDSTROM:  Mischaracterizes his
17  testimony, vague and ambiguous, compound.
18     You may answer if you understand what
19  counsel's asking.
20     THE WITNESS:  I don't think we -- this was a
21  regular occurrence.  Typically, I think what happened
22  was that because we had just put out the numbers a
23  couple weeks before and we were having a trade show, the
24  PR people came and wanted to say something to promote
25  the show and that sort of thing.  But we just did an

245

1  Open World.  I don't recollect that we did something
2  like this at our recent Open World, so I think it was
3  sporadic.  Sometimes they would want to do certain
4  things from a marketing standpoint and a flurry of press
5  releases get generated in these various events.
6      MR. SOLOMON:  Q.  Okay.  And it's true, isn't
7  it, that shortly after this date of October 4, 2000, you
8  were expressing internally at Oracle that you were
9  concerned of the low stock price?  True or false?
10     A.  I was expressing internally --
11     I don't remember.  I really don't remember.
12  This was -- this was October or something in 2000?
13     Q.  Correct.
14     A.  I don't recall.
15     Q.  So you deny that you were expressing concern?
16     A.  I said I don't recall what I was expressing
17  about the stock price.
18     MR. SOLOMON:  We'll have marked as the next
19  exhibit an analyst report dated October 4, 2000.
20     (Whereupon, Plaintiff's Exhibit 50 was marked
21     for identification.)
22     THE WITNESS:  So this is the same date as this
23  PR news wire?
24     MR. SOLOMON:  Q.  Correct.
25     MR. LINDSTROM:  Why don't you take a few

246

1  minutes to read the document.
2      MR. SOLOMON:  Q.  Let me know if you have seen
3  this before.
4      MR. LINDSTROM:  Have you completed reviewing
5  the document?
6      THE WITNESS:  No.
7      MR. SOLOMON:  Q.  And I have no objection to
8  you reading the whole document.  I would just rather not
9  hear from your counsel in written pleadings that you'll
10  be spending too much time allowing you people to read
11  the documents.
12     MR. LINDSTROM:  Well, if you want to direct
13  his attention to some portion of the document, that's
14  fine.  But as things now stand, you put the document
15  before him, asked him if he's recognized it.  He needs
16  to read it in order to answer the question.
17     MR. SOLOMON:  Q.  If you need to read it to
18  the very end, go ahead, before you can answer the
19  question if you recognize it.  If that's what you need
20  to do, go ahead.
21     A.  I actually don't recognize the document.
22  There's tons of these documents.  This is not --
23     MR. LINDSTROM:  You've answered the question.
24     MR. SOLOMON:  Q.  Go to the second page.  It
25  says, two thirds of the way down the page, "Jeff Henley

247

Henley, Jeffrey  11/16/2006  9:20:00 AM

1    gave an overview of Oracle's financial performance over
2    the past year.  The key point stress was that
3    application license growth was accelerating as services
4    and tools were growing slowly and declining
5    respectively."
6        Do you see that?
7    A.  Yes.
8    Q.  Did you say that?
9    A.  I'm guessing I did, sure.
10   Q.  So this is you at an analyst conference in
11   October of 2000, correct?
12   A.  This was this Open World conference, yes.
13   Q.  Excuse me.  It was sponsored by Oracle; is
14   that right?
15   A.  Yes.
16   Q.  And this information that is reflected here,
17   is that reflected in the press release where you -- I'm
18   sorry.  You don't say you want to confirm guidance, but
19   where, apparently, you are quoted as saying there has
20   been no change in the outlook for Oracle's financial
21   results in the current fiscal quarter?
22       MR. LINDSTROM:  Objection.  The document
23   speaks for itself.
24       THE WITNESS:  So again, what was the question?
25       MR. SOLOMON:  Q.  Is that -- I'm looking now

248

1    where -- reports that you gave an overview of Oracle's
2    financial performance over the past year.  Do you see
3    that?
4    A.  Yes.
5        MR. LINDSTROM:  In Exhibit 50, correct?
6        MR. SOLOMON:  Q.  And then you talk about
7    application license growth accelerating.  Do you see
8    that?
9    A.  Yes.
10   Q.  What I'm asking you is:  Is that information
11   reflected in the press release that I've shown you,
12   which is Exhibit 49?
13       MR. LINDSTROM:  Objection.  The press release
14   speaks for itself.
15       THE WITNESS:  The press release is like
16   one line, one sentence or something.  So I think it was
17   a very short sentence.  In an analyst day, there will be
18   lots of slides, there will be lots of information.
19       MR. SOLOMON:  Q.  Then let's have marked as
20   the next exhibit a document dated November 30, 2000.
21       (Whereupon, Plaintiff's Exhibit 51 was marked
22       for identification.)
23       MR. SOLOMON:  Q.  Do you recognize this?
24   A.  No.
25   Q.  Did you attend a meeting sponsored by Credit

249

1    Suisse First Boston at the end of November 2000?
2    A.  Apparently.
3    Q.  Do you remember?
4    A.  I don't.  I really -- I go to many, many
5    meetings, but I have no doubt I must have been there.
6    Q.  And since you don't remember, I guess you
7    don't remember making any presentations.
8    A.  No, but -- no.
9    Q.  And it says, in the fourth paragraph -- sorry.
10   The fifth paragraph, "Henley reiterated the company's
11   previous guidance for quarterly results."
12       Do you see that?
13   A.  Yes, I see that.
14   Q.  Is that true?
15   A.  Again, what I did at these conferences was
16   show them slides and said, "Here is what we did last
17   quarter, and here's what we disclosed on our analyst
18   call about how the quarter looks."  I never said, "I'm
19   reiterating our guidance."
20   Q.  In fact, it's true, isn't it, you went so far
21   as to have dinner with analysts on occasion and confirm
22   guidance; isn't that true?
23       MR. LINDSTROM:  Argumentative.
24       THE WITNESS:  Sometimes I have had dinner with
25   analysts.

250

1        MR. LINDSTROM:  The question said "and
2    confirmed guidance".
3        THE WITNESS:  But no, did not say, "I'm
4    reiterating guidance" or something like that.
5        MR. SOLOMON:  Q.  Well, let's get away from
6    direct quotes.  What I'm trying to ask you and get you
7    to tell me the truth about is whether, when you spoke to
8    analysts intra-quarter, you ever basically told them,
9    "Things are on track.  We're going to make it"?
10       MR. LINDSTROM:  All right.  I'm going to
11   object to that first as argumentative, Counsel.  I mean,
12   you have no basis for that kind of argumentative comment
13   about getting him to tell you the truth.  He is telling
14   you the truth; you just don't like what he's saying.
15   That's my first objection.
16       The second objection is the question, as
17   stated, is hopelessly vague and ambiguous.
18       MR. SOLOMON:  Q.  Don't worry; I do like what
19   you're saying, Mr. Henley.  So don't feel offended.
20   A.  Any time that I have met with analysts,
21   whether it was in a public forum or dinner -- 'cause I
22   have done that occasionally -- my standard thing is to
23   say, "Look, you guys follow this industry.  You know
24   better than I that everything happens at the end of the
25   quarter.  There's nothing I can really tell you.  I've

251

1   done my best to tell you how things looked at the start
2   of the quarter," and that's really been the thing. I
3   would be foolish to ever suggest that we're going to
4   make our quarter because no one knows. For the most
5   part, we've always made them, but we've had a few misses
6   over the years because it's difficult to project.
7       Q. Well, what about -- what about telling the
8   analysts, "We're on track"? You wouldn't even do that?
9   You wouldn't even say that, right?
10      MR. LINDSTROM: Objection. Argumentative.
11      MR. SOLOMON: Q. Or words to that effect.
12  You wouldn't even say that?
13      A. I think over the years I may have said that
14  once or twice, that it's too early in the quarter to
15  know for sure, but so far so good, that sort of thing.
16  But never, "Therefore, we're going to make the quarter."
17  No, I've never said that. To my knowledge, I've never
18  said that, "Guaranteed, we're going to make the
19  quarter." That would be a foolish statement to make
20  because there are no guarantees.
21      Q. You're not suggesting that when I'm asking you
22  if, in general terms, you've reiterated guidance, that
23  I'm asking you if you issued a guarantee, are you?
24      MR. LINDSTROM: Objection. Vague and
25  ambiguous, calls for a conclusion.

252

1   THE WITNESS: No. I was responding to the
2   one thing about I will make the quarter, something like
3   that. But, no, I agree. I don't think reiterating
4   guidance is a guarantee. I agree with that.
5       MR. SOLOMON: Q. And didn't you, in the third
6   fiscal quarter of '01, in order to accommodate the
7   insider sales engaged in by you and Mr. Ellison and
8   others, isn't it true that throughout that quarter,
9   almost to the bitter end, you were telling analysts,
10  publicly and privately, that you were going to make
11      MR. LINDSTROM: Assumes facts, argumentative,
12  vague and ambiguous.
13      THE WITNESS: Well, and of course it's
14  preposterous if you're suggesting, by the way you said
15  that statement, that I was doing something because Larry
16  and I were selling stock. I was doing unusual things or
17  whatever out of the ordinary. Of course that's untrue.
18      MR. SOLOMON: Q. Well, is it or is it not out
19  of the ordinary for you to meet with an analyst
20  privately at dinner and tell the analyst what sort of
21  growth to expect in that quarter with respect to
22  particular product lines? Would that be unusual?
23      MR. LINDSTROM: Vague and ambiguous, compound.
24      THE WITNESS: From time to time, people have
25  asked me questions about, "What do you think the

253

1   database business is going to do?" Not for the quarter,
2   necessarily, but what's the sort of outlook for the
3   database growth or the applications growth? And I've
4   made statements about that, but I've tried to avoid
5   pinning myself down to any particular quarter, if you
6   will.
7       MR. SOLOMON: Q. So your testimony is,
8   basically, that from time to time, and maybe within the
9   third fiscal quarter of '01, you sat down privately at
10  dinner and told analysts how the company was performing;
11  is that fair?
12      MR. LINDSTROM: Mischaracterizes his
13  testimony.
14      THE WITNESS: Again, yes. The purpose of
15  sitting down with any analyst, whether it's at dinner or
16  in my office or in a group or whatever, was always to
17  make sure that they had an understanding of what we were
18  saying so that they really could not misinterpret our
19  business or statements we had made or -- so it was
20  really trying to answer questions about the financial
21  statements and give them a sense for our business.
22      MR. SOLOMON: Q. I want to draw your
23  attention back to page 143.
24      MR. LINDSTROM: Of his deposition?
25      MR. SOLOMON: Of his deposition.

254

1       Q. I'm looking at line 10, starting at line 10 on
2   that page. And it says, "Well, gee," and we read this
3   before, "Well, gee, this is what I had,' but I have
4   always been, as I testified earlier, very careful not to
5   talk about the quarter when people come in to see me."
6       Do you see that?
7       A. Yes.
8       Q. Now, we seem to have moved a long way from
9   that testimony, haven't we?
10      MR. LINDSTROM: Objection. Mischaracterizes
11  his testimony, calls for a conclusion, argumentative.
12      THE WITNESS: Yeah, I disagree. I think this
13  has been my policy, and it's the way I've conducted
14  myself. I have not --
15      MR. SOLOMON: Q. Except when we catch you in
16  a lie?
17      MR. LINDSTROM: Would you let the witness
18  finish his response, please, Counsel, and not interject
19  your argumentative, editorial comments?
20      MR. SOLOMON: Go ahead.
21      MR. LINDSTROM: You're too professional for
22  this, Mark.
23      MR. SOLOMON: Go ahead.
24      MR. LINDSTROM: Or should be.
25      THE WITNESS: Right. So I have --

255

1     MR. SOLOMON:  Or used to be, right?

2     MR. LINDSTROM:  I don't know whether you were

3   in the past.

4     MR. SOLOMON:  I'm putting up with a lot of

5   lies, Greg.

6     Carry on.

7     THE WITNESS:  I resent the fact that you're

8   suggesting that I have ever lied, okay?  What I have

9   tried to do is consistently tell you the way I have

10   tried to operate and conduct myself.  We have had

11   hundreds and hundreds of meetings.  I can't recollect

12   everything I ever did or said, but my general philosophy

13   and principle was to not get into the details or

14   changing things about a quarter because there was --

15   things don't change that much.  I did my level best to

16   tell people what I thought was going to happen for the

17   quarter on a public earnings call, and that was it.  But

18   people want to understand our business, they want to

19   understand the directions of things, and sure, I've

20   answered lots of questions over the years trying to help

21   people understand our business.

22     MR. SOLOMON:  Q.  Including getting into the

23   details of the business intra-quarter with analysts,

24   right?

25     MR. LINDSTROM:  Argumentative, vague and

256

1   ambiguous as to "details of the business".  And it's

2   asked and answered.  You've gone over this same ground

3   with him multiple times already this morning.

4     MR. SOLOMON:  Let's have marked as the next

5   exhibit a William Blair and Company report dated

6   February 21, 2001.

7     (Whereupon, Plaintiff's Exhibit 52 was marked

8     for identification.)

9     THE WITNESS:  Okay.

10     MR. SOLOMON:  Q.  Okay.  So have you seen this

11   before?

12     A.  I don't recollect.  I certainly know Laura

13   Letterman.

14     Q.  And that's the author of this?

15     A.  Yes.

16     Q.  And how do you know her?

17     A.  She's one of the sale site analysts that

18   followed Oracle.  Still does, I believe.

19     Q.  And do you recall having dinner with her at

20   the APSWorld Conference?

21     A.  We had an analyst day that she's reporting on

22   here, and then we had a dinner for, I think, most of the

23   sale site analysts that evening, is my recollection.

24     Q.  Okay.  And it says, in part at the bottom,

25   "According to Mr. Henley, business looks good.  He was

257

1   very bullish in the sessions."

2     Do you see that?

3     A.  I do see that.

4     Q.  Okay.  Now, did you say that business looks

5   good, or words to that effect, at the conference?

6     A.  I don't recollect what I said.  I honestly

7   don't.

8     MR. LINDSTROM:  You've answered the question.

9     MR. SOLOMON:  Q.  Were you very bullish in the

10   sessions that are referred to here?

11     A.  I don't know what "very bullish" means.  I was

12   certainly positive on our business prospects.  It was an

13   Open World applications day, and at that point we were

14   still in the early stages of an 11i rollout.  And as she

15   reported, we had different partners, different people

16   trying to help the analysts get a sense for how things

17   were going, and we were -- Larry Ellison and myself, we

18   were all very positive on the outlook for the future for

19   our applications business.  I do recall that.

20     Q.  Do you know what "bullish" means?

21     A.  I know the term "bullish," sure.  I think it's

22   a matter of degrees.  That's what I'm saying,

23   one person's bullishness may not be somebody else's.

24   But, I mean, I think it means -- to me, it means

25   positive.

258

1     Q.  And it goes on to say, "We want to quote a few

2   of the things he said," and then it goes on to say, "In

3   regard to applications growth, he said that the second

4   half growth will be as good or better than the

5   69 percent growth placed in the first half."

6     Do you see that?

7     A.  Yeah, I see that.

8     Q.  Did you say that?

9     A.  I don't recall.  I'm not going to dispute it;

10   I just don't recall what I said.

11     Q.  "As for the economy, he commented that Oracle

12   is not seeing any impact."

13     Did you say that?

14     A.  Yes, I did.  And it goes on to say, which I

15   remember saying, that -- because we put that in our deck

16   of slides, that we had seen concerns from various people

17   about the economy in general, and we started saying it's

18   a wild card.  We haven't seen it in our business, and

19   our business looks good, but there are certainly reports

20   out there that the economy is weakening.

21     Q.  Now, by the time you said that, was pipeline

22   growth at Oracle growing or shrinking?

23     A.  Was the year-over-year change in our pipeline

24   growing or shrinking?

25     Q.  No, was pipeline growth within the quarter

259

1  growing or shrinking?

2    A.  I don't know what you mean by that.  I just

3  tried to define it and you said something else.

4    Q.  Correct.

5    A.  My definition of growth is if the pipeline, in

6  this case a third quarter of 2001, is larger than the

7  year before that same quarter.  If that's what you mean,

8  then I believe our pipeline was growing.

9    Q.  And the question I asked and I tried to

10  clarify it, since it perhaps wasn't clear in the first

11  place, was at the time you made this statement, was

12  pipeline growth within the third fiscal quarter of 2001

13  growing or shrinking?

14    MR. LINDSTROM:  No foundation.

15    THE WITNESS:  I just don't -- I've tried to

16  answer your question.  I don't understand -- you have a

17  different way of thinking about this, I guess.

18    MR. SOLOMON:  Q.  Well, for example, if, at

19  the beginning of December, you reported pipeline growth

20  year over year, say, over 50 percent, and by the end of

21  January pipeline growth was down to 30 percent, that

22  would be a reduction in pipeline growth within the

23  quarter; would it not?

24    A.  Oh, that's a different answer.  That's a

25  different point.

1    Q.  That's the question I'm trying to ask.

2    MR. LINDSTROM:  Can you restate the question?

3    THE WITNESS:  I don't believe that's what you

4  asked, but now --

5    MR. SOLOMON:  Q.  Do you need me to restate it

6  again?

7    A.  Yeah, why don't you restate it again because I

8  think the latest one is different than what you first

9  asked me.

10    Q.  I'll try again.  At the time you made these

11  statements, had pipeline growth within the third fiscal

12  quarter of 2001 declined from the growth at the

13  beginning to the growth at the time you made this

14  statement?

15    A.  I believe it had, yes.

16    Q.  Okay.  We got there.

17    What about conversion rates; were they

18  improving within the quarter or declining?

19    A.  I don't recall.  I really don't recall that.

20    Q.  Would that have been important to you at the

21  time?

22    A.  Well, I think that conversion rates were

23  one of the factors we always looked at in terms of

24  making forecasts, and we did a lot of historical work

25  and so forth.  So certainly, that's something to factor

1  in.  But you can't really figure out a conversion rate

2  until the quarter is over.  So you look at a lot of

3  previous quarters to try to get a sense for your

4  forecast to assume a reasonable conversion rate.

5    Q.  And did Oracle have the tools available to

6  look at conversion rates and trends within a particular

7  quarter?

8    MR. LINDSTROM:  Objection.  Vague and

9  ambiguous.

10    THE WITNESS:  Did we have the tools?  We could

11  certainly make the calculations.  I don't think that

12  they made any sense.  I don't recall paying attention to

13  conversion rates until our quarter was over.  That was a

14  very fundamental bit of information.

15    MR. SOLOMON:  Q.  Why would performance

16  intra-quarter not be important to you?

17    A.  Because so much of our business happens in the

18  last week of the quarter.

19    Q.  Oh, that's the hockey stick effect that you

20  guys use as a defense, right?

21    A.  It's not our defense; it's a reality.

22    MR. LINDSTROM:  Argumentative.

23    THE WITNESS:  For not just our company, but

24  all of the software companies that sell enterprise

25  software.

1    MR. SOLOMON:  Q.  Basically, all forecasts are

2  reckless until the last week of the quarter; is that

3  right?

4    MR. LINDSTROM:  Argumentative.  Calls for a

5  conclusion as to "reckless", vague and ambiguous.

6    THE WITNESS:  I think that's an unbelievably

7  terrible way to characterize forecasting.  Certainly our

8  forecasting was not reckless, but there is -- we always

9  know, based on history, there's a large amount of

10  business that has to happen last week.

11    MR. SOLOMON:  Q.  So basically, you're saying

12  take little notice of this until the last week of the

13  quarter?  Is that what you're telling the investing

14  partners?

15    MR. LINDSTROM:  Argumentative.

16    THE WITNESS:  On a conversion rate, your

17  question was conversion rates, did I look at conversion

18  rates intra-quarter?  I don't recall ever doing that

19  because it doesn't mean anything.  The conversion rate

20  was very important at the end of a quarter to see how

21  much business we converted compared to what we

22  forecasted, absolutely.  But not intra-quarter.

23    MR. SOLOMON:  Q.  But you're saying day over

24  day, week over week, month over month, no importance to

25  you?

1    A.  Conversion rates?  No, not important to me.

2    Q.  What about conversion ratios, are they

3  important to you?

4    A.  I think they're one and the same.  As I

5  testified just earlier, it's very important to

6  understand, when you're forecasting, what of your

7  pipeline you think you will convert in the quarter.  So

8  that's very important.  But I don't spend a lot of

9  time -- didn't spend a lot of time intra-quarter kind of

10  rethinking conversion rates, okay, because they -- what

11  really mattered was how we ended up for the quarter and

12  then plug that information into our history bank and

13  continued to do forecasting.

14    Q.  And what about forecasted conversion ratios;

15  would they have been important to you intra-quarter?

16    MR. LINDSTROM:  Vague and ambiguous.

17    THE WITNESS:  Again, would they have been

18  important?  As I testified earlier, conversion rates are

19  important.  If you have no pipeline, then obviously you

20  have to have an infinite conversion rate.  So you're

21  always interested.  If your pipeline changed

22  dramatically, you know, then you would have to have our

23  conversion rate.  So you obviously consider these

24  things.  But the most important thing in terms of our

25  forecasting is understanding historical conversion rates

264

1  for a full quarter.

2    MR. SOLOMON:  Q.  What about trends in upside;

3  do you know what the upside report is at Oracle?

4    A.  Yes.

5    Q.  Do you know what it was in fiscal 3 '01?

6    A.  Yes.  I know of one, at least, the one that

7  Jennifer Minton and corporate finance puts out.  There

8  may be other regional people that have upside reports,

9  but I assume that's the one you're referring to.  I'm

10  familiar with the corporate one, yes, the one that

11  Jennifer Minton publishes.

12    Q.  And at the time you were making these

13  statements at APSWorld, were you aware of any trend

14  one way or another within the quarter with respect to

15  upside numbers?

16    A.  I don't recall exactly what upside numbers

17  were.

18    Q.  Is it something you paid attention to in

19  fiscal 3 '01?

20    A.  Sometimes on calls with different regions, you

21  know, I've always listened to the range of things that

22  they're thinking they can do and so forth, sure.  And

23  Jennifer Minton's people take all of that into account

24  when they would try to forecast what they thought we

25  would do for the quarter.

265

1    Q.  And at the time of your statements at

2  APSWorld, were you aware that the upside forecasts were

3  heading in a downward direction at Oracle?

4    MR. LINDSTROM:  No foundation, assumes facts.

5    THE WITNESS:  Again, I don't recall that

6  particular --

7    MR. SOLOMON:  Q.  Before you traded your stock

8  on January 4, 2001, did you take a very close look at

9  the financial metrics for December?

10    MR. LINDSTROM:  Vague and ambiguous as to

11  "close look" and "metrics".

12    THE WITNESS:  I don't believe so.  I'm not

13  sure they were available.  Usually our December results

14  wouldn't be out for a number of days, so I don't recall

15  if they were available or not.

16    MR. SOLOMON:  Q.  When, in January, did they

17  become available; do you know?  January of 2001.

18    A.  Again, I don't know.  Typically, it might be

19  like five business days, something like that, I think,

20  that the numbers came out.

21    Q.  Okay.

22    A.  But I don't recall whether they were out or

23  not out.

24    Q.  And when you say "out", you mean out

25  internally at Oracle, correct?

266

1    A.  Correct, published to myself and other people.

2    Q.  Now, notwithstanding the fact that they

3  weren't out, is it true that as of early January, you

4  had the ability on a realtime basis to look to see what

5  the results were; is that true or false?

6    A.  It's false.  That I had the ability is false.

7    Q.  And what would you need to be able to do that?

8  Strike that.

9    Was it possible at Oracle on a realtime basis,

10  as of January 4, 2001, to see how the December month had

11  fared?

12    A.  It was not possible for me, because I was not

13  trained in using any of our financial products.  I was

14  not a detail user, and we would have been going through

15  the global consolidation of that process at that point,

16  so I never, ever got into any of that.  I waited for the

17  final numbers to be published.

18    Q.  Okay.  Now, at the time you were the Chief

19  Financial Officer.

20    A.  That's correct.

21    Q.  Are you a CPA?

22    A.  No.

23    Q.  What are your qualifications to be a Chief

24  Financial Officer?

25    A.  Having worked in financial organizations,

267

1    understanding forecasting and planning and tax and all
2    these kinds of things.  So I had, with a large company
3    like Oracle, specialists in all those functions; large
4    departments in accounting, tax, other areas who had
5    people much more technical, much more knowledgeable than
6    I about doing these things.
7        Q.  When you talked about not being trained in
8    using Oracle's financial products, what financial
9    products are you talking about?
10       A.  The Oracle financial application.  General
11   ledger, accounts receivable, accounts payable.  There's
12   a suite of products that we and our customers use to
13   keep subsidiary records and then ultimately consolidate
14   those all into our general ledger and then consolidate
15   all of the various countries together to create a
16   consolidated income statement, balance sheet and so
17   forth.  And that has always been done monthly at Oracle,
18   but there's no realtime way to assess what these final
19   results are until the final consolidation is done.  And
20   again, I don't use these tools, so I just simply waited
21   until the reports came out.
22       Q.  In January of 2001, would utilization of
23   Oracle Sales Online have allowed you to gain any
24   information concerning the performance by Oracle in
25   December 2000?

268

1        MR. LINDSTROM:  No foundation, calls for
2    speculation.
3        Could we have that question reread, please?
4        THE REPORTER:  "Question:  In January of 2001,
5        would utilization of Oracle Sales Online have
6        allowed you to gain any information concerning
7        the performance by Oracle in December 2000?"
8        THE WITNESS:  I don't think they're related.
9    I mean, the Oracle Sales Online is a system used by the
10   sales force that is summarized by the finance department
11   that talks about pipeline and the quarter and that sort
12   of thing.  You asked me about financial -- actual
13   results in one month, the month of December.  So I don't
14   think there's much of a correlation there.
15       MR. SOLOMON:  Q.  But I want to focus on the
16   question that I asked you, and I'll ask it again.  In
17   January of 2001, would utilization of Oracle Sales
18   Online have allowed you to gain any information
19   concerning the performance by Oracle in December 2000?
20       MR. LINDSTROM:  No foundation, calls for
21   speculation.
22       THE WITNESS:  Again, I don't know how there's
23   any correlation there.  That -- December is a very small
24   month.  As I testified earlier, the last month, the last
25   week of the month is always huge.  So January is

269

1    always -- December is always a very low month, and so I
2    don't think it has much to do with what the sales online
3    information is talking about the quarter.
4        MR. SOLOMON:  Q.  Why do you say December is
5    always a very slow month?
6        A.  Because it is.  Typically at Oracle, in any
7    quarter, the first month of the quarter is a smaller
8    amount of revenue than the subsequent quarters,
9    particularly the third month of the quarter.  Excuse me,
10   months, particularly the third month of any quarter.  So
11   December was no exception in that regard.
12       Q.  Okay.  And you say that a lot of the sales, I
13   think you were saying, is in the last week of December,
14   which is a low month, and therefore -- just tell me if
15   I'm right or wrong -- and therefore, Oracle Sales Online
16   wouldn't have given you any information on the
17   performance in December 2000 as of around January 4,
18   2001?
19       A.  There's -- as I testified earlier, the large
20   amount of activity is in the last week of the last month
21   of the quarter.  December was the first month of the
22   quarter.  So --
23       MR. LINDSTROM:  I think he may have misspoken
24   before when he said it's the last week of December.
25       THE WITNESS:  I would have meant the last week

270

1    of February, the last week of the third month.  That's
2    where all the activity is.
3        MR. SOLOMON:  Q.  I know that that's something
4    that you believe.
5        A.  No, I don't believe it; I know it.  It's a
6    fact.
7        Q.  And I'm not -- not necessarily disputing it,
8    at least not now.  But that's not what I'm focusing on.
9        A.  Okay.
10       Q.  What I'm focusing on is what information you
11   would have had as of when you decided to sell stock, or
12   what information was available to you when you decided
13   to sell stock on January 4, 2001, okay?  Do you
14   understand that?
15       A.  I do understand that.
16       Q.  And what I'm trying to find out is what Oracle
17   Sales Online was capable of providing you as of early
18   January 2001 with respect to December trends.  Just to
19   put it, trends.
20       A.  See, where you're getting off, you're talking
21   about a month, December, and that's why I'm saying --
22   Sales Online is useful, as you found out, as you've
23   discovered things.  It's something that tells us about
24   pipelines and that sort of thing, but it reflects a
25   quarter, it reflects how things look for the quarter.

271

1  It doesn't necessarily correlate to what you did in the
2  first month of the quarter.  That's all I'm trying to
3  say here.  You keep going back to December.  If you're
4  talking about what it would have indicated for the
5  quarter, then that's a different question, I think.
6      Q.  Are you saying that even a few days later when
7  December results were published internally in the
8  company, they were meaningless?
9      MR. LINDSTROM:  Mischaracterizes his
10  testimony.  And it's vague and ambiguous as to
11  "meaningless".  For what purpose?
12      MR. SOLOMON:  Q.  Go ahead, Mr. Henley.
13      A.  We -- you know, I've always looked at every
14  month throughout a quarter.  So to say it's meaningless
15  is not true.  However, it is of small value.  It is not
16  a clear indicator of how you'll do for the quarter.  We,
17  over the years, have learned that, right?  But certainly
18  it's another data point, it's information about level of
19  spending, revenues, all sorts of things.  So it's
20  important to look at it.  But in terms of whether or not
21  you're going to make your quarter based upon a
22  relatively small part of the quarter being done, no,
23  it's not a particularly helpful -- you certainly can't
24  go to the bank with it; that's for sure.
25      Q.  Now, if I were to shift to February, and

272

1  looking back on January results in February, as you look
2  on December results in January, is your answer the same;
3  January results are of no particular help in discerning
4  what direction the company's going in?
5      A.  Again, it would be somewhat more helpful
6  because now you've got two months, rather than three,
7  although the bulk of the license revenue is still to
8  come in the third month.  So it is another data point,
9  it's another indication, not just of revenue, but
10  expense levels and so forth.  So for a variety of
11  reasons, it's somewhat more meaningful because you're
12  deeper into the quarter.  But again, because so much
13  rides on the last month, it has historically not been
14  the best indicator of how well you do.  Sometimes we
15  have done better than the first two months in terms of
16  growth rate; sometimes we have done worse.  So it's
17  information; it's somewhat better than December, but
18  it's certainly not a guarantee of how you'll end up the
19  quarter, that's for sure.
20      Q.  There are never guarantees; isn't that true?
21      A.  There are never guarantees.
22      Q.  That's not what we're talking about, right?
23      A.  No.
24      Q.  Have you ever used the expression that the --
25  the quarter and the potential for making the fiscal

273

1  quarter '01 -- third fiscal quarter in '01 is a horse
2  race?
3      A.  I don't recall.
4      Q.  Is that an expression you use, typically?
5      A.  It's not typical, but it doesn't mean I didn't
6  use it.  I don't recall.
7      Q.  Do you have an understanding what I mean when
8  I use that expression?
9      A.  No.
10      Q.  I'm still looking at the exhibit, the William
11  Blair exhibit.
12      MR. LINDSTROM:  Is that Exhibit 52, for the
13  record?
14      THE WITNESS:  Yes.
15      MR. SOLOMON:  Q.  It says, in that first
16  paragraph, "He also stated that we are in spaces that
17  are high ROI, and it's not clear if we'll see much of an
18  impact in our business due to the economy."
19  Did you say that?
20      A.  In which -- is this the very start of the
21  paragraph?
22      MR. LINDSTROM:  He's on page 2.
23      MR. SOLOMON:  Q.  Page 2 in the top.
24      A.  This is -- yes, I see it.
25  Yes, and I think this is what I basically said

274

1  at the earnings call in December.  So --
2      Q.  And as far as you are concerned, nothing had
3  changed; is that right?
4      A.  That's correct.  Other than we did start
5  saying that we kept hearing about economic issues, and
6  so I did say, as you read later, that the economy's a
7  wild card, but unless there's a serious recession, we're
8  not sure we'll see much of an impact, because we felt,
9  at the time, that people would still want to do good ROI
10  projects, even if their business was a little soft.
11      Q.  And at this stage, would you have
12  characterized Oracle's potential to make the quarter as
13  a horse race?
14      MR. LINDSTROM:  Objection.  Vague and
15  ambiguous.
16      THE WITNESS:  You'll have to define "horse
17  race" for me.
18      MR. SOLOMON:  Q.  And then a wild card, what
19  is a wild card?
20      A.  Well, what I meant by a wild card was that
21  if -- as I said in this thing, if the economy turned
22  down very sharply and became -- we went into recession,
23  then we felt, based on history, that there would be a --
24  there could be a slowdown in our business.  But unless
25  if it were was a more modest slowdown in the economy,

275

1  that people would still keep spending on high ROI
2  projects.  And so at this point, there was no clear
3  indication that customers were telling us they were
4  cutting off spending.  They were still saying all of our
5  sales force and all of the checking was still -- things
6  are a little soft, but the customers are committed to
7  buying the software.  So that was kind of what -- but we
8  kept reading about statements of other people about
9  their business was getting worse, the economy was
10  getting worse, so I said it's a wild card.  And it all
11  depends on how bad the economy does, ultimately.
12      Q.  When did you start reading statements of other
13  people or hearing statements of other people about their
14  business getting worse?
15      A.  I think we were asked the question in our
16  earnings call in the second quarter.  So in that
17  December 2000 call, we were -- we commented on why did
18  certain companies seem to be softer and we had such a
19  good quarter, which we did.  And our answer was, well,
20  our theory was that we had higher ROI kind of stuff, and
21  so people were maybe starting to ration their budgets a
22  bit, but they were still using our stuff because it had
23  a higher ROI.
24      Q.  Did you take any steps to look at the
25  performance of Oracle any closer than you normally would

1  in light of the fact that you were hearing that other
2  companies were being adversely affected?
3          MR. LINDSTROM:  Vague and ambiguous.
4          THE WITNESS:  I sat through all of the weekly
5  sales calls, and I recall definitely pushing a little
6  harder on the sales force to sort of say, "Look, I'm
7  hearing that some of the other companies out there and
8  other certain segments are softening.  What are you guys
9  seeing?  Are you seeing your customers starting to back
10  off?"  Whatever.  And I really kind of pressed hard to
11  be sure that there wasn't something that I was missing
12  for the numbers.
13          And the guys were pretty aggressive and
14  standing up and saying, "No, we have gone back to our
15  sales guys.  We're pretty convinced we'll get a normal
16  conversion rate of the business we've got here, and we
17  think things are okay."  For all the reasons I just told
18  you.  I mean, I didn't make up this high ROI thing.
19  This is what I was hearing from customers and from our
20  sales force.
21      Q.  Now, as of the start of the third fiscal
22  quarter, fiscal quarter of '01, was more risk put into
23  the forecast than had been in the forecasts in prior
24  quarters?
25          MR. LINDSTROM:  Vague and ambiguous.

1          THE WITNESS:  I don't know.  I mean, Jennifer
2  Minton did the forecast.  And so I -- I don't recall
3  whether we tried to factor in additional risks or
4  whatever.  I think we had a long history of making our
5  quarters, we had a pretty good sense of how things
6  converted, and as I testified earlier, I kept pressing
7  the sales guys to be confident that they thought we
8  would have sort of normal success rates and so forth.
9  So that's how we developed the forecast.  And Jennifer
10  Minton regularly made these calls, she regularly tried
11  to assess what everybody was saying and all the numbers
12  and did regular updates to reflect her best thinking of
13  where she thought things stood.
14          MR. SOLOMON:  Q.  So you don't know if more
15  risk was in the forecast in fiscal 3 '01 than earlier,
16  correct?
17      A.  I don't recall her methodology or her thought
18  processes or how she was assigning these things, no.
19      Q.  And what about interactions with Mr. Ellison
20  concerning this; did you talk at all with Mr. Ellison
21  about how much should be -- excuse me.
22          Did you talk with Mr. Ellison about whether or
23  not more risk ought to be placed into the forecast for
24  fiscal 3 '01 than previously?
25      A.  Well, the weekly sales calls that our

1  executive committee, Mr. Ellison, was typically there.
2  So when I was pressing the salespeople, he was
3  interested in hearing what their response; always, any
4  quarter, as with Safra Catz and other people.  So I
5  think everyone's job is to listen and try to understand
6  what's going on with the business and, you know, try to
7  figure out whether the forecast is right or wrong, or
8  whatever.
9      Q.  But again, as to whether or not there was more
10  risk in the fiscal 3 '01 forecast and whether you were
11  aware of it at the time, you don't recall --
12      A.  I don't recall.  Again --
13          MR. LINDSTROM:  You've answered, twice.  You
14  don't recall.
15          THE WITNESS:  Okay.
16          (Recess taken from 10:23 to 10:36 A.M.)
17          MR. SOLOMON:  I'll have marked as the next
18  exhibit a document produced by the defendants with the
19  control numbers 109482 through 484.
20          (Whereupon, Plaintiff's Exhibit 53 was marked
21          for identification.)
22          MR. SOLOMON:  Q.  You can take as long as you
23  need to take, Mr. Henley, and tell me whether you
24  recognize this.
25      A.  I remember doing a road show.

1    Q.  Okay.

2    A.  With Jim Moore, so this perhaps is a writeup

3 from that road show.  I'm not sure I remember this

4 specific document, but I definitely remember meeting

5 with a number of investors in New York with him.

6    Q.  Okay.  And you'll see this is dated

7 October 25th, 2001.

8    A.  Yes.

9    Q.  And it talks on the highlights of them hosting

10 Oracle CFO Jeff Henley.  Do you see that?

11    A.  Yes.

12    Q.  And the next bullet point below that says,

13 "Henley reiterated visibility is very weak and that

14 business is likely to worsen in the U.S. and Europe over

15 the near term.  However, the company expects to see a

16 pickup in the domestic economy by spring 2002 and does

17 not believe that Europe will contract as sharply as the

18 U.S."

19    Do you see that?

20    A.  I do see that.

21    Q.  And then if you go over the page to page --

22 with the control No. 109483, page 2 of 3 at the top, and

23 you'll see under "Near term remains cautious," there's

24 an attribution to you.  Halfway down, "Henley stated."

25 Do you see that?  And there's a discussion about

280

1 pipeline and conversion rates.  Do you see that?

2    A.  Yes.

3    Q.  And then under the heading "Comparisons will

4 get easier", there's more attribution to you.  "Henley

5 indicated that license comparisons should get easier by

6 F3Q," et cetera.

7    Do you see that?

8    A.  Uh-huh.

9    Q.  So how is that consistent with your testimony

10 in the earlier session of this deposition where you say

11 you're "very careful not to talk about the quarter when

12 people come in to see me.  I have no interest in getting

13 into details of the quarter"?

14    A.  All these things you've pointed out I don't

15 think relate to the quarter.  They tend to be trends,

16 all of which I'm sure I covered on our earnings calls.

17 So when I went out and did these calls, oftentimes

18 investors didn't listen to the earnings call, and so

19 basically -- went to our semi-annual analyst day.  So

20 it's really to make sure the investors understand the

21 big picture of what's going on, and by this stage, it's

22 a year later from the stuff we were talking about

23 earlier, the economy is clearly -- had a significant

24 reversal in -- so I'm just kind of giving them things

25 that I had talked about to large audiences of people.  I

281

1 don't believe these were quarter, sort of, related

2 things, from what you've pointed out to me here so far.

3    Q.  Well, if you look under --

4    A.  Current quarter.

5    Q.  Yes, if you look under "Near term remains

6 cautious," that paragraph, it says, "However, EPS of

7 $0.09 beat expectations due to solid cost controls."

8 And then it goes on to say, "Management reiterated its

9 guidance of a 15 percent year-over-year decline in

10 license revenue in the current quarter, but noted

11 visibility was weak."

12    Now, how is that not getting into the details

13 of the quarter that you testified you didn't do?

14    A.  I agree.  I testified -- I don't say -- I

15 don't go out and say, "I'm reiterating guidance."  I

16 just don't do that.  So Jim may interpret showing them a

17 slide deck, which is what we showed at the earnings

18 call, as reiterating guidance, but I don't go out and

19 say, "I'm reiterating that that's our number."  That's

20 just not the way I operate.

21    But most of these things -- you pointed out a

22 whole bunch of things here, you read to me -- were more

23 than the quarter.  But that particular statement I don't

24 believe I made.  I don't believe I went out and said I

25 reiterated guidance.  That's just not what I did.

282

1    Q.  And so all of the people that say that you did

2 are either, by coincidence, mistaken or just a bunch of

3 liars; is that --

4    MR. LINDSTROM:  Argumentative.  Assumes facts.

5    MR. SOLOMON:  Q.  Is that right?

6    A.  I believe that the sale site analyst tried to

7 tell investors that, you know, if things change or not.

8 And so using that term "management reiterated guidance"

9 is a term they all like to use, but it's not a term that

10 I used.

11    Q.  Why is it not a term that you used?

12    A.  Because, as I've testified earlier, I always

13 tell people, once I put a forecast together, unless

14 something changes materially -- and it never has since

15 I've been here -- I don't know at the end of the

16 quarter.  There's nothing new for me to tell people.

17 And if there is, and if I'm sure that I going to miss

18 a quarter, I'll be the first person to tell you all.

19 That's always been my thing.  So the fact that I go out

20 and they want to know what we said on our earnings call

21 our quarter would be, that, to me, is not reiterating

22 guidance.  That is simply saying, "Here's what we said

23 on the call."

24    Q.  So if there's a difference between what you

25 said and reiterating guidance, presumably, you would

283

1  want that corrected.

2    A.  If some -- are you saying if somebody writes

3  something like this report, or what are you saying?

4    MR. LINDSTROM:  The question's vague and

5  ambiguous.

6    MR. SOLOMON:  Q.  I would say that if someone

7  says that you reiterated guidance and you believe that

8  what you said was different, in substance, than

9  reiterating guidance, presumably you would want it

10  corrected.

11    MR. LINDSTROM:  And then -- that's the

12  question.  Is that true?

13    MR. SOLOMON:  Q.  Is that true?

14    MR. LINDSTROM:  Thank you.

15    THE WITNESS:  No, I don't think it's

16  necessary, because I haven't changed anything.  I have

17  not gone out and changed our numbers.  So they're saying

18  it a different way than I would say it.  They're

19  basically saying he hasn't changed his numbers.  And so

20  it doesn't bother me that they choose to use that term,

21  but it's not factually correct that I go out and say I'm

22  reiterating guidance.  It's just not.  But at the end of

23  the day, it's still the same result.  I mean, we

24  routinely never changed our current quarter numbers

25  because there was no basis to do it.

284

1    MR. SOLOMON:  Q.  So did you -- instead of

2  saying "I reiterate guidance," was your practice to say

3  "Our numbers haven't changed"?  Is that what you would

4  say?

5    MR. LINDSTROM:  Objection.  Mischaracterizes

6  his testimony.  He's told you this a dozen times, or a

7  half dozen times.

8    THE WITNESS:  I don't know how many more times

9  I can say it to you.  I testified last time, I think we

10  testified this time.  I don't know what more I can say.

11    MR. SOLOMON:  Q.  Well, what I'm trying to

12  find out is why you testified last time that you avoided

13  getting into talking about how the quarter was going,

14  that you avoided the term "confirming guidance",

15  basically, that all you did was say -- and this is what

16  I'm trying to get at -- basically, all you would do

17  would be to say, "Our numbers haven't changed."

18    MR. LINDSTROM:  Mischaracterizes his

19  testimony.

20    MR. SOLOMON:  Q.  Are you saying you would say

21  that?

22    A.  No, again, I don't think I did that.

23    What I would typically do is say, "Look, here

24  is a deck," and typically they don't want to look at the

25  deck, you know; they want to just ask you questions

285

1  about the business, you know.  But the deck would

2  usually be, "Here's last quarter's financial

3  performance, all of this stuff in recent years has been

4  posted on the Internet," and that sort of thing.  But,

5  you know -- and, "Here's what we said regarding the

6  current quarter," right?

7    And I would -- I can't swear I said it every

8  time, but I would typically say, "Look," you know,

9  "we're in the quarter now.  I'm not going to talk about

10  the quarter.  There's nothing else to talk about," you

11  know?  "Nothing's changed that I know of, and so I'm

12  happy to talk about these things.  What's the general

13  economic environment?  When do we think it's going to

14  change?  We have no idea, but we think things will start

15  to pick up X", and that sort of thing.  So that's

16  generally what I try to do.

17    "What about your data bases?  What about 9i?"

18  I explain that to them, so as investors, they get a

19  better sense of Oracle.  And talking about the current

20  quarter is not -- I know they want to talk about it, but

21  I've always tried to stay away from that.  That's not

22  what I'm there to talk about.  I don't have any better

23  information.

24    Q.  And you say that notwithstanding that I am

25  showing you documents in which it appears you are

286

1  talking about the quarter to analysts.

2    MR. LINDSTROM:  Objection.  Mischaracterizes

3  the documents and his testimony.

4    MR. SOLOMON:  Q.  I'm just trying to square

5  your testimony.  Maybe it's impossible to square it.  I

6  don't know.

7    A.  I think it's impossible to square it, I guess,

8  maybe because they write in a way that's different than

9  the way we operate, okay?  And they have a code they

10  talk about with investors.  When they say, "He

11  reiterated guidance, reiterated guidance," I just don't

12  believe I did that.  Now, maybe that's their read.

13    Q.  Okay.  Did the facts that analysts, whether

14  you said it or not, would, on occasion, say you

15  reiterated guidance, did that, in your view, have any

16  effect on Oracle's stock price?

17    A.  If they said I reiterated guidance.  I don't

18  know.  I really don't know.

19    Q.  Is that something that you would want to know

20  as then-CFO of Oracle?

21    A.  I think -- what I want to know?  I think that

22  I've gotten to know investors a lot.  I think a lot of

23  investors hear me, talk to me, they're on my quarterly

24  calls.  Many of them, you know, aren't interested in

25  what analysts have to say, they're more interested in

287

1  what we have to say.  They take a lot of stock, and
2  we've been reasonably accurate over the years.  So,
3  whether or not that affects it --
4       Now, if I went out and changed our forecast in
5  our quarter, lowered our guidance or something, that
6  would definitely impact our stock.  That I'm pretty
7  positive of.
8       Q.  Okay.  Oracle was involved in a stock
9  repurchase plan in fiscal 3 '01, correct?
10      A.  Yes, we had an annual plan for 10 years or
11  more.
12      Q.  Right.  And you're out there spending the
13  company's money on its stock, correct?
14      A.  That's correct.  We've been doing that for
15  more than 10 years.
16      Q.  And as a result, at least, of that, you would
17  want to know whether your statements, or statements
18  attributed to you, were having an effect on the stock
19  price, wouldn't you?
20      A.  You know, the -- again, I'm not sure what
21  those reiteration statements that you're referring to,
22  again, have to do with the stock.  That's speculation.
23  I don't know.  But our approach has been long-term.  Our
24  approach has been we were generating excess cash, we
25  didn't have, at least in those days, a lot of

1  acquisition, so either we're going to pay dividends or
2  buy back stock.  The board, the audit committee, in
3  particular, routinely reviewed this stuff and routinely
4  decided it would be more tax efficient to buy stock
5  back.  So we had an ongoing program for many years, this
6  quarter included, typically always have been in the
7  market, to some degree, of buying stock back for years.
8  And so it's not, "Gee, what's the price this month?
9  Should we buy stock or not?"  It's been kind of an
10  averaging process over the years.
11      Q.  What role did you play in fiscal 3 '01 in the
12  stock repurchase plan?
13      A.  I don't think there was anything different in
14  that quarter than what the role I ever played.
15      Q.  And what was that role?
16      A.  I didn't handle repurchases.  Our repurchases
17  were done by our treasurer, and typically, we met with
18  the audit committee, the finance and audit committee,
19  and set a budget for the year, typically; talked about
20  how much we wanted to buy over the course of the year.
21  Every quarter had an audit committee, decided do we want
22  to change anything; basically got an agreement with our
23  audit committee about how much our treasurer should be
24  buying back for the year, for the quarter, that sort of
25  thing.  They pretty well decided how much to do.  They

1  would ask my opinion and I would give them my opinion.
2  Sometimes they agreed with my opinion about the amounts,
3  and sometimes they wouldn't.  I did not play an active
4  role.  Our committee was very strong in terms of
5  deciding how much we should be buying back.  And
6  typically, it was an annual number, and then they broke
7  it down into quarters.
8       Q.  Were you consulted in Q3 '01 concerning the
9  stock repurchase plan?
10      A.  I don't remember.
11      Q.  Who would be involved in the decision in Q3
12  '01 as to how much stock to repurchase and when to
13  repurchase it?
14      MR. LINDSTROM:  You're talking about the
15  mechanics?
16      MR. SOLOMON:  Q.  Yes.
17      A.  Again, typically, we would try to get, as I
18  testified earlier, an amount agreed to for the year.  If
19  half the year was over, maybe how much now do we want to
20  get for the second half, that sort of thing.  And that
21  was done at the finance and audit committee meeting,
22  okay?  And then once we agreed upon a number, our
23  treasurer would go out and execute that.  And if he had
24  questions about things, he would come to me, I would go
25  to Safra Catz in those days and continue.  Safra

1  continued to be pretty active in this.  So he might seek
2  direction from us, but we were basically interpreting, I
3  believe, what had been agreed to by the finance and
4  audit committee.
5       Q.  And am I correct that the finance and audit
6  committee was chaired at that time by someone who didn't
7  even bother to get clearance for the stock sales in
8  January '01?
9       MR. LINDSTROM:  Objection.  No foundation,
10  calls for speculation.
11      THE WITNESS:  I don't know any of that.  I
12  know who was the chairman of the audit committee, but I
13  don't know --
14      MR. SOLOMON:  Q.  Who was that?
15      A.  Don Lucas.
16      Q.  And you know, don't you, Mr. Henley, that he
17  traded stock without asking for clearance?
18      A.  I don't know that.  I actually don't.
19      MR. LINDSTROM:  You've answered the question.
20      MR. SOLOMON:  Q.  So you still haven't told me
21  who was involved in Q3 '01 with the decisions as to how
22  much stock to repurchase within that quarter and on what
23  date.
24      MR. LINDSTROM:  That's compound.  I think he
25  told you the first part.  I agree that he didn't get

1 around to answering the second part.
2     MR. SOLOMON: All right. I agree. So let's
3 go with the second part.
4     THE WITNESS: So what is the second part,
5 again?
6     MR. SOLOMON: Q. The second part is what
7 dates did you agree to engage in the repurchases?
8     A. Again, I don't recall the details of my
9 involvement in Q3, or any other quarter.
10     MR. LINDSTROM: He wants to know who handled
11 the execution, as you described it.
12     THE WITNESS: Bruce Lang, at that time, was
13 our treasurer.
14     MR. SOLOMON: Q. Okay. And who guided
15 Mr. Lang as to what dates on which to trade?
16     A. Again, typically, he would trade in those days
17 in the non-quiet periods, and he would, as I testified
18 earlier, get direction for amounts at our audit
19 committee meetings, and then he would go out and figure
20 out how to spread that out over the course of a quarter.
21     Q. Oh. Now, would he consult with anybody when
22 he was figuring out how to spread that out over the
23 course of a quarter?
24     A. Occasionally, over the years he might ask me,
25 you know, what I thought about something. I don't think

292

1 I ever picked the broker. He always picked the broker,
2 and usually he did all the execution. But from time to
3 time he might ask me or ask Safra, "Do you think this is
4 what the audit committee intended?" or something like
5 that.
6     But I didn't get into, "Gee, go do this this
7 day, wait till next Monday." I never got into that
8 level of detail. These were sort of policy decisions or
9 questions he might ask me from time to time, really
10 trying to interpret what the audit committee. I never
11 took it upon myself to try to figure out how much we
12 should be buying back. I think that was our board's
13 responsibility, and I never got involved in daily
14 execution; never, ever. But I did respond from time to
15 time that he might have a question about something, what
16 did I think about something?
17     Q. When -- what dates did Oracle repurchase stock
18 in Q3 '01?
19     MR. LINDSTROM: No foundation.
20     THE WITNESS: I don't know. I really don't
21 know the details of what we did, or remember the details
22 of what we did.
23     MR. SOLOMON: Q. Did Oracle repurchase stock
24 the day you traded?
25     A. Again, I don't know.

293

1     Q. Did Oracle trade stock during the time that
2 Mr. Ellison traded?
3     A. Again, repurchase stock when -- I don't know,
4 again.
5     Q. Did you ever know?
6     A. There were times when I might see a daily
7 report, but I didn't routinely get into that mode over
8 the years. I basically focused on how much the board
9 wanted Bruce to do. We would talk about that, and once
10 that was done, Bruce kind of worked on the details of
11 how to get that done. And one of the guiding principles
12 he had was to spread it out so that there was not any
13 large percentage of the float or the transactions that
14 were done in the market that day that he was doing so as
15 to not affect the price of the stock.
16     Q. And what are those daily reports? What are
17 they called?
18     A. I don't know. I mean, I don't -- if you go
19 back over the years, I don't think I got that many of
20 them. But there were times when I might see how much he
21 had done, not so much a day, but maybe a week or
22 something like that.
23     Q. And did you get such reports in January of
24 2001?
25     A. I don't remember. I don't remember.

294

1     Q. Do they still exist if they --
2     MR. LINDSTROM: No foundation, calls for
3 speculation.
4     THE WITNESS: I have no idea.
5     MR. SOLOMON: Q. Did you take any steps to
6 preserve any such reports?
7     MR. LINDSTROM: Assumes facts.
8     THE WITNESS: Again, to the extent I got any
9 of the reports and it fell into periods where I was
10 asked to retain e-mails and stuff like that, I retained
11 all of my e-mails, to the best of my knowledge.
12     MR. SOLOMON: Q. Are you aware that your
13 counsel is refusing to give us any documents that give
14 us the details of the repurchases in Q3 '01?
15     MR. LINDSTROM: No foundation, assumes facts,
16 calls for speculation.
17     THE WITNESS: I'm not aware.
18     MR. SOLOMON: Q. Can you think of any reason
19 why we shouldn't see those reports?
20     MR. LINDSTROM: Objection. Assumes facts.
21     THE WITNESS: I really haven't thought about
22 it. I'm not a lawyer. I would leave it to my counsel
23 to make decisions like that.
24     MR. SOLOMON: Q. But at the moment, can you
25 think of any reason?

295

1    MR. LINDSTROM:  Calls for speculation, no
2    foundation.
3        THE WITNESS:  Yeah, again, I'm not going
4    there.  I'm not trained to know whether you should or
5    not, so I just -- it's not of a concern to me.
6        MR. SOLOMON:  Q.  Is it possible that the
7    reason the documents aren't being produced is because
8    there were repurchases at the time that either you or
9    Mr. Ellison traded stock?
10       MR. LINDSTROM:  No foundation, calls for
11   speculation.  Argumentative.
12       THE WITNESS:  I have no idea, again, why our
13   counsel would make decisions on what should be given to
14   you or not be given to you.
15       MR. SOLOMON:  Q.  Are you aware of any
16   deliberate effort on the part of defendants to actually
17   conceal that information?
18       A.  Again, I don't know how that squares with what
19   you asked earlier.  You stated that, apparently, our
20   counsel has not revealed that.  That's your statement.
21   So if that were true, they're representing the
22   defendants, I think.  So I --
23       Q.  That's fair.  Let's break it down.  Are you
24   aware of any deliberate effort on the part of the
25   defendants themselves, yourselves, to conceal that

296

1    information?
2        MR. LINDSTROM:  Compound, no foundation, calls
3    for speculation.
4        THE WITNESS:  Again, I've had no contact with
5    discovery counsel on your side, so I have no -- I just
6    kept everything that I've been asked to keep, and our
7    counsels are taking care of all of that.
8        MR. SOLOMON:  Q.  I'll have marked as the next
9    exhibit a document produced by the defendants with the
10   control numbers 102701 through 820.
11       (Whereupon, Plaintiff's Exhibit 54 was marked
12       for identification.)
13       MR. SOLOMON:  Q.  I'm hoping, Mr. Henley, you
14   don't have to read it all to tell me if you recognize
15   it, but take as long as you need to.
16       A.  Well, I recognize it without reading it all.
17   It is a quarterly package we put together for the -- our
18   finance and audit committee meeting, and this one was
19   dated April 20th, 2001.
20       Q.  Okay.  Bear with me a second.  I'll draw your
21   attention to the document I'm looking for.
22       If you go to the control No. 102754.
23       A.  Yes.
24       Q.  Okay.  You'll see that it's a page that lists
25   share repurchases.  Do you see that information?

297

1        A.  Yes.
2        Q.  And you'll note that at the top it says "Q4
3    year-to-date summary."  Do you see that?
4        A.  Let's see here.
5        Q.  Or Q4 something summary.
6        MR. LINDSTROM:  I think it's --
7        MR. SOLOMON:  '01, maybe.
8        MR. LINDSTROM:  Correct.
9        THE WITNESS:  That's the title, Q4 '01.
10       MR. SOLOMON:  Q.  Right.  And then in the
11   larger box there are dates that appear to be March and
12   April, and they appear to reflect repurchases.
13       Do you see that?
14       A.  This is the second sort of box down there.
15       Q.  Correct.
16       A.  There's some annual data, and then there's
17   a -- some daily data within the current fourth quarter
18   that this meeting's being --
19       Q.  Right.  Right.  Do you see that?
20       A.  Yes.
21       Q.  Okay.  And the daily data seems to refer to
22   the fourth fiscal quarter of '01; is that fair?
23       A.  Yes, that's what it says, "Q4 Fiscal '01
24   purchase detail."
25       Q.  Okay.  So if this appears in the April 20th,

298

1    2001 finance and audit committee meeting package, can
2    you tell me where I can expect to find the same detail
3    for the repurchases in Q3 '01?
4        A.  I don't know whether that detail.  My
5    recollection is we always had information about share
6    purchase history, but I'm not sure we always had daily
7    details.  So whether or not we had daily detail for the
8    previous quarter, I just don't know.
9        Q.  Okay.  Let's go off the record for a few
10   minutes.
11       (Recess taken from 11:05 to 11:20 A.M.)
12       MR. SOLOMON:  I'm going to have marked as the
13   next exhibit a document produced by Oracle with the
14   control numbers 420976 through 421002.
15       (Whereupon, Plaintiff's Exhibit 55 was marked
16       for identification.)
17       MR. SOLOMON:  Q.  When you've had a chance,
18   let me know if you recognize it, please.
19       A.  Again, this is a finance and audit committee
20   meeting approximately three months earlier than the last
21   one I saw.
22       Q.  Okay.  And if you go to control No. 420996,
23   which is --
24       A.  Okay.
25       Q.  Do you see that?  You'll see that that

299

1  purports to be a Q2 FY01 summary.  Do you see that?
2  A.  The top of the summary title, the title.
3  Q.  Yes.
4  A.  Yes.
5  Q.  And then in the large box it appears to be
6  dates on which Oracle engaged in stock repurchases.  Do
7  you see that?  Dates and amounts?
8  A.  Yes, it appears to be -- correct.
9  Q.  So this meeting was held in January of 2001,
10  correct?  That's what it says at front.
11  A.  That's what it says in the front, yes, uh-huh.
12  Q.  And it has the prior quarter's repurchase
13  detail, as I've just shown you.  Do you see?
14  A.  Yes, I see it right here.
15  Q.  And then the exhibit I showed you previously,
16  which was April 20th, 2001 finance and audit committee
17  meeting, did not have the prior quarter; in other words,
18  fiscal 3 '01 detail; it had, for some reason, fiscal 4
19  '01 detail.  Do you recognize that?
20  A.  I do recognize that.
21  Q.  Can you tell me where I'll find the fiscal 3
22  '01 detail?
23  A.  Perhaps it was never done.  I think, unless
24  there was some sort of special meeting in between these
25  two meetings, we occasionally have -- but I think these

300

1  seem to be the routine quarterly meetings.  For whatever
2  reason, maybe it wasn't produced.  I don't know.
3  Q.  And are you aware that for every finance and
4  audit committee meeting package that we have that has
5  been produced by defendants, the stock repurchase detail
6  for a quarter is, in fact, reflected in the audit
7  committee meeting in the subsequent quarter, in the
8  package concerning the audit committee meeting in the
9  subsequent quarter?
10  MR. LINDSTROM:  Vague and ambiguous.
11  THE WITNESS:  Again, I don't know what periods
12  of time, and I honestly, as I testified earlier, I don't
13  remember, you know, all the details of what we put in.
14  But we typically did some kind of information about
15  stock option repurchase, but my recollection over the
16  years was that we always showed something about share
17  price repurchase, but that I don't recall if we always
18  showed daily. I really just don't.  It's not something
19  I focused on.  I was typically interested in the broader
20  trends of the year and all that sort of thing.
21  MR. SOLOMON:  Q.  And you don't find it at all
22  remarkable that we have this sort of information for the
23  second fiscal quarter of '01.  We apparently have it for
24  the fourth fiscal quarter of '01, at least through the
25  date of the audit committee meeting on April 20th, 2001,

301

1  but we have no detail for fiscal 3 '01.  Do you find
2  that surprising?
3  A.  I don't know about surprising or not.  It
4  apparently wasn't in the package.  I don't know.  I have
5  nothing to do with preparing these packages.
6  Q.  Okay.  Who was responsible for putting these
7  packages together, or who was at the time?  I'm looking
8  now -- let's break it down -- at the April 20th, 2001
9  package.
10  A.  The April one, and are you speaking about a
11  particular section?  Because the sections were produced
12  by different individuals.
13  Q.  Yes, I'm talking about the section that
14  includes the detail of the stock option repurchase.
15  A.  I believe that came from our treasurer at the
16  time, at the time was Bruce Lang.  Whether he prepared
17  it or one of his staff prepared it, but he was
18  ultimately the guy responsible to talk about it with the
19  audit committee.
20  Q.  And he would have been responsible also for
21  the January 5th, 2001 package; is that right?
22  A.  Yes.
23  Q.  Okay.  Did you ever have a discussion with him
24  after March 1, 2001 concerning the stock repurchases
25  within fiscal 3 '01?

302

1  A.  I don't believe so. I certainly don't recall
2  it.
3  MR. SOLOMON:  I'll have marked as the next
4  exhibit a document produced by defendants with the
5  control numbers 195262 to 269.
6  (Whereupon, Plaintiff's Exhibit 56 was marked
7  for identification.)
8  MR. SOLOMON:  Q.  And once you've had a
9  chance, just let me know if you recognize it, once
10  you've had a chance to look at it.
11  A.  Do you want me to read this whole thing or --
12  Q.  No, I just want to know if you recognize it.
13  A.  I don't.  Again, I gave -- I've given a number
14  of interviews over the years to the press; I would
15  describe these guys as the media type. So it looks like
16  some media interview I granted.
17  Q.  Okay.  If you look at the second page of the
18  exhibit, 195263, under TheStreet.Com July 10, 2002
19  header, it says, "Oracle reaffirms guidance."  Do you
20  see that?  "Aims a new product at Microsoft."
21  Do you see that?
22  A.  Yes, I see that.
23  Q.  And is it your testimony that if anyone at
24  Oracle reaffirmed guidance, it wasn't you?
25  MR. LINDSTROM:  That's a question, correct?

303

1    MR. SOLOMON:  Uh-huh.  Yes, it's a question.

2    THE WITNESS:  I've testified earlier that I

3    didn't use the term "reaffirmed guidance", yes.  I

4    repeatedly testified to that.

5    MR. SOLOMON:  Q.  Let me ask you this:  Did

6    analysts say, "Do you reaffirm guidance?" and you would

7    answer yes or no?  Did that happen?

8    A.  I don't believe that even they used the term,

9    "Do you reaffirm guidance?"  If that's -- you know, I'm

10   not saying somebody never -- but even that's not normal.

11   Q.  Okay.  And do you recall the interview here

12   that's being referred to?

13   A.  I don't.  But I certainly remember

14   interviewing these people over the years once or twice.

15   This may have been the one I recall, but I don't

16   remember reading this.

17   Q.  Okay.  Did you make any effort to not go into

18   any detail about the current quarter during that

19   interview?

20   MR. LINDSTROM:  There's a couple articles

21   here.  Which one are you talking about, Counsel?

22   MR. SOLOMON:  I'm sorry.  I'm talking about

23   TheStreet.Com still.

24   MR. LINDSTROM:  Thank you.

25   THE WITNESS:  Okay.  So we're talking about

304

1    street.com.  And again, the approach was, again,

2    educational, whether it was with analysts or the media

3    or whatever, to talk about broader trends, what's going

4    on with our products, our competitors, that sort of

5    thing.  It was not to get into the details of the

6    current quarter.

7    MR. SOLOMON:  Q.  Now, we talked in the last

8    session about a second quarter '01 deal with Hewlett

9    Packard.  Do you recall that?

10   MR. LINDSTROM:  Do you recall the deal or the

11   prior testimony?

12   MR. SOLOMON:  The prior testimony.

13   THE WITNESS:  I don't remember.  I do remember

14   the vague bits of the deal.  Whether I remember it in

15   the testimony or before that, I don't know.

16   MR. SOLOMON:  Q.  All right.  If you go to the

17   transcript that's an exhibit, I believe it's Exhibit 48.

18   MR. LINDSTROM:  48.

19   THE WITNESS:  48.

20   MR. LINDSTROM:  What page would you like him

21   to look at?

22   THE WITNESS:  Back to the transcript.  Sorry.

23   MR. SOLOMON:  Q.  Page 37.

24   A.  37.  Okay.

25   Q.  And you'll see, at line 8, I say, "Okay.  Just

305

1    going back to the second page in that reference to HP,

2    do you recall being involved in any transaction with

3    Hewlett Packard late 2000?"  And the answer was "I was

4    not involved, no."

5    Do you see that?

6    A.  Yes.

7    Q.  And is that true testimony?

8    A.  Yes.

9    MR. SOLOMON:  Let's have marked as the next

10   exhibit a document produced by Oracle with control

11   numbers 025020 to 021.

12   (Whereupon, Plaintiff's Exhibit 57 was marked

13   for identification.)

14   THE WITNESS:  Okay.

15   MR. SOLOMON:  Q.  Have you seen this before?

16   A.  Yes.

17   Q.  And when did you last see it?

18   A.  I don't know.

19   Q.  Years ago, or more recently?

20   A.  That's what I'm saying; I don't know.  But I

21   definitely remember because it was a large transaction

22   that quarter.  So --

23   Q.  Okay.  And you'll see that there are two sets

24   of addressee information.

25   A.  Uh-huh.

306

1    Q.  The first, going bottom to top, is dated

2    November 30th, 2000, and it's from Gary Roberts to Larry

3    Ellison, and it copies a number of people, including

4    you.  Do you see that?

5    A.  Yes.

6    Q.  And then the above -- above that there's a

7    transmission from you to Tom Williams.  Do you see that?

8    A.  Yes.

9    Q.  First, going to the body of the e-mail, it

10   says, "Larry, I believe you'll be discussing discounts

11   with HP today.  Please keep these figures in mind."

12   Do you see that?

13   A.  Yes.

14   Q.  Now, just focusing on, "Larry, I believe

15   you'll be discussing discounts with HP today," do you

16   know what that refers to?

17   A.  Apparently, he said Larry's going to be

18   talking to HP.  That's all -- all I know is what I read.

19   Q.  Okay.  You don't know of any discussions that

20   Mr. Ellison had with HP?

21   A.  No.

22   Q.  Do you know who Mr. Ellison's contact person

23   was at HP?

24   A.  No.

25   MR. LINDSTROM:  Assumes facts.

307

1          MR. SOLOMON:  Q.  If anyone.  You don't know?
2     A.  No.
3     Q.  In fact, you know nothing about Larry Ellison
4  at HP; is that fair?
5     A.  Well, no.  Are you talking about in general,
6  or on this particular --
7     Q.  Larry Ellison's relationship with HP.
8     A.  Oh, sure.  I think Larry's met a number of
9  people over the years that have been -- senior people at
10  HP over the years.  From time to time, he's met people.
11  I know that.  Just like he's met people from Sun and
12  some of our large hardware partners.
13     Q.  And has he met them socially or in the context
14  of business?
15     A.  Certainly, I'm speaking of business.  I have
16  no idea what he does socially.
17     Q.  And when he did business with Hewlett Packard,
18  what was his role in doing business with Hewlett
19  Packard?
20          MR. LINDSTROM:  Compound, assumes facts, no
21  foundation.
22          THE WITNESS:  Again, over the years, they --
23  Sun, IBM, others -- had been important partners.  They
24  sell our database on their hardware.  So he's had
25  relational meetings with them, talked about working

308

1  together, you know, going to market together, things
2  like that.  But beyond that, I really have typically not
3  been in the meetings.  I have no idea the kinds of
4  things he's gotten into with them.
5          MR. SOLOMON:  Q.  Okay.  Gary Roberts, do you
6  know him to be an honest man?
7     A.  Yes.
8     Q.  And if he says, "Larry, I believe you'll be
9  discussing discounts with Hewlett Packard today," you've
10  got no reason to believe that that's not true?
11     A.  I believe he said what he said.  He said, "I
12  believe you'll be discussing."  He's speculating, I
13  guess.  I don't know.
14     Q.  All right.  Now, why did you forward this on
15  to Tom Williams?
16     A.  Because they -- we were trying to sell them
17  software, and based on what Gary said, we have a process
18  that if we ever have a situation where we're both trying
19  to sell each other something, I want to make sure the
20  revenue recognition people are right front and center.
21  So Tom Williams ran revenue recognition for us for many
22  years and is a very able guy, so I immediately forwarded
23  it to him, so he was aware of it and could weigh in in
24  with Gary or anybody else to be confident that this was
25  separate transactions, arms length, et cetera.

309

1     Q.  Okay.  Did you get involved with assessing the
2  propriety of this deal?
3     A.  I don't believe so.  Again, that's why I said
4  before, I wasn't involved.  I was aware of this and
5  other things over time.  But my approach was to send it
6  to the experts in this case.  If it's a rev rec issue,
7  let Tom Williams get involved and make those calls.
8     Q.  Okay.  So when you testified -- excuse me.
9  Let me just go back to it.
10          When you testified that you weren't involved,
11  you meant to say you weren't involved beyond forwarding
12  this --
13     A.  Yes.  That's informational stuff, but my
14  involvement is if I'm good at making calls on revenue
15  recognition, or I'm involved in negotiating, that, to
16  me, is involvement.  I think I did testify I was aware
17  of it, heard about it and so forth.
18     Q.  How did you hear about it?
19     A.  Again, I knew we were talking to them, and at
20  the end of the quarter we published quarters of all of
21  the larger transactions.  So I'm always made aware of
22  all of our larger transactions at the end of the
23  quarter.  Again, informational, typically never -- many
24  of them I have never heard of.  This one I had heard of
25  because of this information that I got that I forwarded

310

1  to Tom Williams.
2          MR. SOLOMON:  I'll have marked as the next
3  exhibit a document produced by the defendants in this
4  litigation with the control numbers 044428 through 505.
5          (Whereupon, Plaintiff's Exhibit 58 was marked
6          for identification.)
7          THE WITNESS:  Again, you don't want me to read
8  all of this?
9          MR. SOLOMON:  Q.  No, I want to know if you
10  recognize it, though.
11     A.  Again, this looks like a typical quarterly
12  package that's sent to our directors in advance of our
13  quarterly board meeting.
14     Q.  Okay.  I'm looking at the second page of the
15  document.  It lists you as being a recipient.
16          Do you see that?
17     A.  Yes, on the -- it says, "The notice of the
18  regular meeting."
19     Q.  Yeah.
20     A.  Yes.
21     Q.  And as far as you know, you did receive this,
22  right?
23     A.  Yes.  Sure.  I always get the quarterly
24  package.
25     Q.  And on the next page, control No. 044430,

311

1  you'll see there's an agenda, list of the agenda.

2      Do you see that?

3      A.  Yes.

4      Q.  And there's a D, it says "Redacted".  Do you

5  know what's concealed by that redacted stamp?

6      A.  I don't remember.

7      Q.  Do you know why it's redacted?

8      A.  I don't know.

9      Q.  And then if you -- if you go to control

10  No. 044434, you'll see at the top it says "Executive

11  Committee, special meeting November 30th, 2000," and

12  then there's information redacted.

13      Do you know what's being concealed?

14      A.  No.

15      Q.  Do you know why it was redacted?

16      A.  I don't know.

17      Q.  And do you get the same answer with respect to

18  redactions, other redactions on that page?

19      A.  Again, this answer is the same.  I don't know

20  why certain things were redacted.

21      Q.  Okay.  If you now go to control No. 044458.

22      A.  Okay.

23      Q.  You'll see that there's a reference to an

24  executive meeting of the executive committee of the

25  board of directors.

312

1      Do you see that?

2      A.  Yes.

3      Q.  Who was on the executive committee as of

4  November 30th, 2000?

5      A.  I believe it's been the same since I've been

6  there.  Don Lucas, myself and Larry Ellison.  In fact --

7  and apparently, we were all present.

8      No, it says Don Lucas was not in attendance.

9  So Larry and I were present.

10      Q.  And it's the same executive committee now, is

11  it?

12      A.  Yeah, I believe so.  I don't believe it's

13  changed.

14      Q.  It says, "Also present was Safra Catz and

15  Daniel Cooperman."

16      Do you remember them being present?

17      A.  I don't remember if they were present.  Must

18  have been.

19      Q.  Okay.  And then it says, under 2, "Approval of

20  purchase of hardware and services from the" -- and then

21  we don't know what else it says.  Can you see that?

22      A.  Uh-huh.

23      Q.  Can you tell us me what else it says?

24      A.  I don't know.  I would only be speculating.

25      Q.  And what's your speculation?

313

1      MR. LINDSTROM:  Objection.  No foundation,

2  calls for speculation.

3      You may answer, nonetheless.

4      THE WITNESS:  Is the question -- what degree

5  of speculation?  I mean, I'm really not sure I can be

6  certain what it was.

7      MR. SOLOMON:  Q.  I know you can't be, but

8  I'll take your uncertain speculation.

9      MR. LINDSTROM:  Same objections.

10      THE WITNESS:  I have no idea.  You -- you

11  showed me this Hewlett Packard deal, which -- so

12  possibly it's that, but it's clearly speculation.

13  Typically, the executive committee has to approve large

14  purchases that fall beyond Larry's individual spending

15  authority.  So it's possible it was that.  I honestly

16  don't remember.

17      MR. SOLOMON:  Q.  So you don't remember having

18  a recollection of having a meeting on November 30th,

19  2000 discussing the HP deal?

20      A.  I don't, but I certainly remember we did the

21  deal.  I do remember that.  But I don't recall the

22  meeting, per se.  We've had many meetings and written

23  consents over the years about certain executive

24  committee things, but I honestly don't remember,

25  specifically, this, but I do remember we did a

314

1  transaction with HP.

2      Q.  Was it a particularly important deal for that

3  quarter?

4      A.  I can't -- I mean, every large transaction is

5  always important, and we do a number of them every

6  quarter, typically.  So, I mean --

7      Q.  So you have no recollection either of

8  discussing the deal or whether the deal was particularly

9  important for that quarter?

10      MR. LINDSTROM:  Now, I mean, are you --

11      MR. SOLOMON:  Q.  You don't recall either of

12  those?

13      A.  I testified earlier I do remember the HP

14  transaction.  I remembered that I forwarded something to

15  Tom Williams that we were very clear that we had to work

16  both sides, 'cause we wanted to buy some hardware, they

17  wanted to sell us some software.  We wanted to be sure

18  that that was set off separately.  And I remember

19  reading about the transaction being finished or hearing

20  about it, certainly reading about it in the final

21  reports.  So yes, I'm definitely aware of the

22  transaction.

23      Q.  Okay.  But you testified in the last session

24  you had no role.  You've now testified that your role

25  was limited to forwarding on the document that you've

315

1    exhibited to Tom Williams, and now it appears your role
2    included also discussing the deal in an executive
3    session in the board of directors; is that right?
4        MR. LINDSTROM:  No, no.  He said his role was
5    talking about the expense side.  In other words, the
6    purchase of equipment from HP.  I mean, there's -- it
7    mischaracterizes his testimony.
8        MR. SOLOMON:  Q.  Hard to know how you were
9    involved or not involved.  Were you involved or not?
10       A.  Let's try it again, be very clear.
11       When I talk about involvement, that's when I'm
12   personally involved in the original context of this
13   whole thing was negotiating the transaction, I believe.
14   So I clearly wasn't involved in negotiating either side
15   of this transaction.  But I was involved to make sure
16   that Tom would get involved in passing on information to
17   make sure that our rev rec guys were involved and we got
18   it right, okay?  And then for formality purposes, since
19   Larry had agreed to do this deal with the IT guys and
20   pricing that we thought was reasonable and so forth, as
21   a formality, Don Lucas and I have to approve it.
22       So, I mean, you know -- but, I mean, that, to
23   me, is not -- that is not involvement in the details or
24   whatever.  Sure, technically I've got to approve it, but
25   I don't call that involvement in negotiating the deal.

316

1    And that was really the whole spirit, I think, when you
2    first started your line of questioning the last time.
3        Q.  It says Don Lucas wasn't present.  How was he
4    involved in the approval?
5        A.  Just like me.  There's three of us that have
6    to go -- if something goes beyond Larry Ellison's
7    spending authority, then it goes to the executive
8    committee.  And then if it goes beyond the spending
9    authority of the executive committee, the full board has
10   to approve it.
11       Q.  Who approved this deal, this HP deal?  Who
12   approved it?
13       MR. LINDSTROM:  Objection.  No foundation,
14   calls for speculation.  It's also ambiguous as to what
15   deal you're talking about, whether it's the purchase of
16   hardware from HP or the purchase by HP of product from
17   Oracle.  You just referred to "deal".
18       THE WITNESS:  I agree.  So if you could --
19       MR. SOLOMON:  Q.  Who approved the purchase
20   from HP?
21       A.  Well, it started with Gary Roberts negotiating
22   it, probably, who ran IT and some of his guys.  Then
23   clearly, the chain of command is Larry Ellison had to
24   then approve it because Gary didn't have the spending
25   authority, and Larry himself had to send it up to Don

317

1    and me because it was beyond his -- so technically, the
2    final approval was the three of us.  But all the work
3    was done way below my level.
4        Q.  How did Don Lucas indicate his approval?
5        A.  I don't know.
6        Q.  What has been redacted?
7        MR. LINDSTROM:  He's already answered you.
8        THE WITNESS:  I told you earlier, I have no
9    idea what's been redacted.
10       MR. SOLOMON:  Q.  Do you know the purpose of
11   the redaction?
12       A.  I told you earlier, I have no idea.
13       Q.  What do you mean when you say that you wanted
14   to be sure the HP deal was offset separately?
15       MR. LINDSTROM:  Mischaracterizes his
16   testimony.
17       THE WITNESS:  We've had a rule for a long time
18   that we don't do what is referred to in the industry and
19   what I've read about in some companies doing called
20   barter transactions, all right?  So we will only buy
21   things from vendors when we need them and at arms length
22   prices.  And a way to make sure that -- and our auditors
23   are very concerned about this, as well.  So we've had a
24   process that any time something like this came up --
25   there have been several situations like this over the

318

1    years, that Tom Williams got involved, our auditors
2    looked at it, 'cause we wanted to be absolutely certain
3    that this was a legitimate, independent transaction from
4    what was being sold to the customer.
5        MR. SOLOMON:  Q.  And how did you satisfy
6    yourself when giving approval that you were looking at
7    independent transactions?
8        MR. LINDSTROM:  Assumes facts.
9    Mischaracterizes his testimony.
10       THE WITNESS:  I -- certainly there was a
11   presentation made to us to give us the assurance that it
12   was a -- each side stood on its own and so forth, and
13   Tom Williams had looked at it.  So I have great
14   confidence that if he would buy off on it, it met all
15   the tests from an accounting standpoint.  And certainly
16   from a business standpoint, Larry, as well as Gary
17   Roberts, were well aware of the concern that we had that
18   we had to make sure that these things were, you know,
19   legitimate business purposes and not done just to sort
20   of generate revenue.
21       Q.  And who made the presentation?
22       A.  I don't remember.
23       Q.  Do you know whether, under GAAP, the
24   transaction with HP on November 30th, 2000 would be
25   characterized as a barter deal?

319

1    MR. LINDSTROM:  Objection.  No foundation,

2  calls for expert conclusion beyond his expertise.

3    THE WITNESS:  Yeah, ask me the question again.

4    MR. SOLOMON:  Q.  Do you know whether, under

5  GAAP, the transaction with HP on November 30th, 2000

6  would be characterized as a barter deal?

7    MR. LINDSTROM:  Same objections.

8    THE WITNESS:  I don't know the answer to that.

9  I know that Tom Williams looked at it very carefully,

10  and however we recognized revenue, booked the cost into

11  our fixed assets records, I'm confident was done

12  properly according to GAAP.  Whether the barter -- I'm

13  not sure what that means.

14    MR. SOLOMON:  Q.  Now, you were the Chief

15  Financial Officer at the time, correct?

16    A.  That's correct.

17    Q.  And Tom Williams reported to you; is that

18  right?

19    A.  He did for a number of years.  He was our

20  Chief Accounting Officer, and then he moved to Rocklin

21  and took on a role as the head of shared services and

22  revenue recognition.  So I honestly don't remember

23  whether Tom was in his former role or his latter role,

24  but in either role, he always got involved with revenue

25  recognition issues of large transactions.  So he may not

320

1  have reported to me when -- he didn't when he was in

2  Rocklin, but he still had the same functional

3  responsibility for revenue recognition.

4    Q.  Now, if you look at the minutes under

5  attendants and quorum, it doesn't appear that

6  Mr. Williams was invited to attend that meeting.

7    Is that fair?

8    A.  Where is this, again?

9    MR. LINDSTROM:  Objection.  The document

10  speaks for itself.

11    MR. SOLOMON:  Q.  044458.

12    A.  He's not listed.

13    Q.  Okay.  Now, why would he not be there if this

14  meeting was to assess whether or not to approve the

15  deal?

16    MR. LINDSTROM:  Which deal?

17    MR. SOLOMON:  Q.  The Hewlett Packard deal or

18  deals.

19    A.  Well, we don't know.  I mean, it was

20  something, apparently, but I don't think we always have

21  every expert at every meeting.  Safra and Dan, myself,

22  all know what Tom does, and if Tom looked at something

23  and told us, "Okay.  It doesn't necessarily need to be

24  there."  Certainly if anybody had a question, they could

25  phone him.  I don't recollect whether we did that or

321

1  not.

2    Q.  Okay.  Now, if you look at the e-mail exchange

3  involving Gary Roberts, yourself and Mr. Ellison and

4  others, which is the --

5    A.  Previous one.

6    Q.  -- previous exhibit, yes.

7    MR. LINDSTROM:  Exhibit 57.

8    MR. SOLOMON:  Thank you very much.

9    MR. LINDSTROM:  Is there a pending question?

10    THE WITNESS:  The same one, 57?

11    MR. SOLOMON:  Q.  Yes.

12  You'll see that that's dated 1259 -- sorry.

13  It's time at 12:59 on the 30th of November.

14  Do you see that?

15    A.  Yes.

16    Q.  And then the minutes of the meeting reflect

17  that your executive committee meeting took place at

18  11:45 A.M.

19  Do you see that?

20    A.  Let's see.  Let me go back -- which page was

21  the --

22    Q.  044458.

23    A.  So I can see that -- the time of this e-mail,

24  right?

25    Q.  Yeah.

322

1    A.  And this meeting was held 11:45.  Okay.  I see

2  those dates and times, yeah.

3    Q.  Now, does that not indicate that the deals --

4  deal or deals had already been approved before you

5  forwarded the e-mail to Mr. Williams?

6    MR. LINDSTROM:  Objection.  No foundation,

7  calls for speculation.  He's told you he doesn't even

8  know what the meeting concerns, and your question is

9  predicated on an assumption on your part that the

10  meeting involved an approval of both aspects of the HP

11  deal, and so you're just piling speculation on

12  speculation.

13    MR. SOLOMON:  Q.  And by the way, Mr. Henley,

14  when we get these documents unredacted, as we hope the

15  court will instruct your lawyers to do, we will want to

16  talk to you again and reserve our rights to do so.

17  But yes, it's true that I can't tell you too

18  much about what was -- information's been redacted, but

19  my question is:  Does this indicate to you that the deal

20  or deals had already been approved by the time you

21  forwarded the e-mail between Roberts and Ellison to

22  Mr. Williams?

23    MR. LINDSTROM:  Objection.  No foundation.

24  Calls for speculation.

25    THE WITNESS:  It's totally speculative.  There

323

1    may have been other heads-ups I gave Tom Williams
2    before this, and this was another FYI. Here's some more
3    on it. So I have no idea when Tom first became aware of
4    it. Many times people would go to Tom and not even get
5    me involved, so I have no idea when Tom first got
6    involved in the HP transaction, and I have no idea
7    whether this related to HP, as I previously testified.
8        Q. Do you recall any concern on November 30th of
9    2000 that you needed the HP deal to get to where you
10   wanted EPS to end up at Q2 01?
11       A. I don't recall. But again, I will --
12       MR. LINDSTROM: You've answered the question.
13       THE WITNESS: Yes, I don't recall.
14       MR. SOLOMON: Q. Was there an executive
15   committee meeting on November 30th, 2000, subsequent to
16   the one that we are looking at now and reflected in the
17   minutes?
18       A. Was there a meeting --
19       Q. In other words, we look at the minutes that
20   suggest that there was a meeting of the executive
21   committee at 11:45 A.M. on November 30th, 2000.
22       A. Yes.
23       Q. And my question is: Was there another meeting
24   that day thereafter?
25       A. I don't know. I don't recall.

324

1        Q. If there was, you would expect it to be
2    reflected in minutes; is that fair?
3        A. If it was an executive committee meeting that
4    required approvals, yes sure. I mean,
5    sometimes there's informational meetings; sometimes
6    there's meetings that require, you know, approvals.
7        Q. You'll see that other pages of this document
8    have been redacted, and I don't want to spend too much
9    time if your uniform answer is going to be that you
10   don't know anything about the information that's been
11   redacted, but let's just take a few pages and see what
12   you say.
13       044460, you'll see there's a redacted stamp.
14       A. 4460?
15       Q. Yes. Do you know what information is being
16   concealed there?
17       A. No.
18       Q. And if you go to 044465 -- sorry -- 64 and 65,
19   is your answer the same?
20       A. Yes. I don't know.
21       Q. And for 66, as well?
22       A. Yes.
23       Q. Okay. Let's go off the record for
24   five minutes and I'll get some documents.
25       (Recess taken from 12:01 to 12:13 P.M.

325

1        MR. SOLOMON: Q. I'll have marked as the next
2    exhibit a document produced by defendants with the
3    control numbers 055957 through 962.
4        (Whereupon, Plaintiff's Exhibit 59 was marked
5        for identification.)
6        MR. SOLOMON: Q. And Mr. Henley, just so you
7    know, I'm going to ask you about the first page of the
8    document, but I'll let you take a look at the rest. If
9    you've seen any of it before, let me know.
10       A. I don't recall seeing it.
11       Q. Now, looking at the first page at the top,
12   there's an e-mail exchange from Michael Decesare to
13   Sandy Sanderson, Frank Varasano and Kurt Speck.
14       Do you see that?
15       A. Yes.
16       Q. And then it says, "Sandy/Frank, HP confirmed
17   today," and just -- I should interrupt. This is dated
18   November 9th, 2000. "HP confirmed today that they will
19   try and pull the CRM portion of the order off providing
20   we have delivered what we have outlined in development
21   and production systems. Since they don't need", in
22   caps, "ALL the license users right now, they are hedging
23   on how big an order they will do until they see how much
24   production hardware Oracle comes back with. If this
25   turns out to be a large number, we could get the entire

326

1    order."
2        Do you see that?
3        A. I do.
4        Q. Now, does that language raise any concerns in
5    your mind as former CFO, CFO at this time of the
6    company, with respect to the propriety of the proposed
7    transaction?
8        A. No, it's just like any of these kind of
9    situations, they're trying to use leverage on us. So
10   the key is that our IT people, rev rec people are
11   comfortable that whatever we ended up buying is needed.
12   It's -- we're not just buying something that isn't
13   needed. So we're sensitive of these issues, we work
14   very hard on them and, you know, so -- on the surface,
15   it's just something that we need to be careful about
16   that we are doing a proper transaction.
17       Q. Okay. And do you see that, implicit in this
18   language, that HP was waiting to see how much hardware
19   Oracle would buy before they committed to purchasing
20   from Oracle?
21       MR. LINDSTROM: The document speaks for
22   itself, calls for speculation.
23       THE WITNESS: I read what I read.
24       MR. SOLOMON: Q. Okay. Go to page 2 which is
25   055958, and at the top of the page, the third full

327

1  paragraph beginning, "According."  Do you see that?  It
2  says, "According to Phil May, HP is willing to buy as
3  much CRM from Oracle as we buy in HW, support and other
4  requirements from HP."
5      Do you see that?
6  A.  I do see that.
7      Q.  Does that raise any concerns in your mind, as
8  the CFO at the time, as of the propriety of the
9  transaction proposed?
10  A.  Again, my only concern is that the IT people
11  are buying stuff they're going to really need and use,
12  and that the prices are arm's length, and that our rev
13  rec people are aware of the transaction so they can get
14  involved and make sure that everything is, you know,
15  proper from accounting business sense and so forth.
16  Q.  Well, it would be a surprising coincidence,
17  would it not, that it just happened that HP needed as
18  much CRM from Oracle as Oracle needed hardware from HP?
19      MR. LINDSTROM:  Objection.  Argumentative,
20  mischaracterizes the document.
21      THE WITNESS:  HP's a huge company, and I'm
22  sure, like many customers, it's just a question of how
23  much they want to buy at one point in time.
24      MR. SOLOMON:  Q.  If you knew, at the time of
25  the HP transaction or transactions, that HP didn't

328

1  intend to use all of the software that Oracle was
2  selling, would that have raised a concern in your mind
3  as CFO of the company?
4      MR. LINDSTROM:  Assumes facts, calls for
5  speculation and a conclusion beyond his expertise.
6      THE WITNESS:  Yeah, I mean, I have no idea
7  what their intentions are.  It's a large sophisticated
8  company.  I can't imagine they wouldn't buy something
9  they didn't need.
10      MR. SOLOMON:  Q.  Okay.  But if you did have
11  an idea in this hypothetical world, would that affect
12  how you assess the propriety of the transaction?
13      MR. LINDSTROM:  Assumes facts, no foundation,
14  calls for speculation and a conclusion beyond his
15  expertise.
16      THE WITNESS:  Yeah, I mean, I think
17  respectfully, everything I've ever known about HP, it's
18  a very high quality company.  My concern is that we're
19  getting the accounting right, that there's a business
20  need from Oracle standpoint to buy the right amount of
21  IT equipment from Hewlett Packard.
22      MR. SOLOMON:  Q.  Would you agree that the
23  appearance from these exchanges was that a swap
24  transaction or a barter deal was being contemplated?
25      MR. LINDSTROM:  Objection.  The documents

329

1  speak for themselves, calls for a conclusion,
2  speculation.
3      MR. SOLOMON:  Q.  Go ahead.
4  A.  I think that we were regular buyers of
5  equipment from Hewlett Packard.  I assume we still are.
6  I haven't looked in recent years.  I haven't been
7  involved in that, but -- so to me, there's a distinction
8  between conjuring up a deal that there's really no
9  reason for you to buy something, as opposed to deciding
10  that they want CRM, we're going to need some more
11  equipment, and so trying to figure out -- them putting
12  pressure on us to sort of make a hard commitment.  That
13  is not a swap.  We don't say, "Look, we'll trade you 20
14  separate purchase orders, separate negotiated business
15  terms."  They happened to fall in the same time frame.
16  That's why we're very sensitive to making sure there's
17  real business purpose on both sides.
18      MR. SOLOMON:  Let's have marked as the next
19  exhibit another document produced by the defendants with
20  the control No. 025018.
21      (Whereupon, Plaintiff's Exhibit 60 was marked
22  for identification.)
23      THE WITNESS:  I've read it.
24      MR. SOLOMON:  Q.  Have you seen this before?
25  A.  I don't recall seeing it.

330

1      Q.  And you'll see that it's timed 13:22 on the
2  30th of November 30th, 2000, which would have been after
3  the executive committee meeting that you attended; is
4  that right?
5  A.  Again, there was an executive committee with a
6  date that, as I've said, I don't know what was redacted,
7  I don't know what was discussed.
8  Q.  And you'll see that it says that, "Safra, I
9  understand that Larry and Carly are discussing their
10  purchase of our products this quarter if we commit to
11  purchase 20 to $30 million of their products over the
12  next 18 to 24 months."
13      Do you see that?
14  A.  Yes.
15      MR. LINDSTROM:  You're not talking about the
16  7:00 A.M. e-mail that's --
17      MR. SOLOMON:  Thank you very much.  I am.
18  7:13 A.M. dated November 30th.
19      THE WITNESS:  I see that.
20      MR. SOLOMON:  Q.  Does that raise any concern
21  in your mind, as a former CFO, as to the propriety of
22  the transaction being proposed?
23  A.  Again, so long as -- and our auditors looked
24  at all these things.  So long as we need the commitment
25  and we're paying commercial prices, and some of that

331

1    relates to this -- apparently, this note, that's the
2    issue. We do not want to be buying stuff we don't need
3    just to generate software sales. So it was clear to me
4    that we had a long history, we were going to continue to
5    buy from HP, we were happy with their products. So it
6    doesn't necessarily concern me.
7        What concerns me is we just be sure that
8    enough people have been involved that will vouch
9    internally that they really do need this stuff.
10       Q. Now, your auditors were Arthur Anderson at the
11   time; is that right?
12       A. I don't recall. I just don't recall when we
13   switched.
14       Q. Do you recall what the ratio was between
15   Oracle's payment for audit services from Arthur Anderson
16   compared to the payment for consulting services?
17       A. I don't recall.
18       Q. Were you aware at the time you were paying
19   Arthur Anderson far more for consulting services than
20   you were for their audit services?
21       A. What do you define as consulting services?
22       Q. Non-audit services?
23       MR. LINDSTROM: Objection. Assumes facts.
24       THE WITNESS: You're speaking to tax, other
25   kinds of things?

332

1        MR. LINDSTROM: Are you making a
2    representation to him?
3        MR. SOLOMON: Q. Everything other than audit
4    services.
5        A. No, I don't recall.
6        Q. Were you ever concerned about that ratio?
7        A. No.
8        Q. Okay.
9        A. We never bought services from Arthur Anderson
10   or any other lawyer or accounting firm unless there was
11   a need and we thought they would do the best job with
12   it.
13       Q. Okay. And when did your auditors look at the
14   HP transaction for the first time?
15       A. I don't know the answer to that.
16       Q. Do you recall discussing the transaction with
17   the auditors at any time?
18       A. I don't recall. I don't recall. Many times
19   they --
20       MR. LINDSTROM: You've answered the question.
21       THE WITNESS: Okay.
22       MR. SOLOMON: Q. Do you know who Ivgen Guner
23   is, I-V-G-E-N?
24       A. Yes.
25       Q. Who is that?

333

1        A. She works in our forecasting and planning
2    department in our corporate office.
3        Q. Did she, in the years 2000 and 2001, prepare
4    monthly flash reports?
5        A. She and her staff, yes.
6        Q. And did you get a copy of the monthly flash
7    reports in that time frame?
8        MR. LINDSTROM: 2000/2001?
9        MR. SOLOMON: Q. Yeah.
10       A. I got different reports from her. Whether I
11   got every report she generated, I don't know. But I
12   certainly was a regular receiver of reports from her
13   about forecasts and actuals and all of that sort of
14   thing.
15       Q. Would you receive them electronically or in
16   hard form?
17       A. It varied. Many times just electronically.
18   Sometimes I might ask for a hard copy.
19       Q. Did you have a practice of keeping and
20   organizing the monthly flash reports?
21       A. Keeping -- you're talking about if they were
22   electronic, you mean organizing them in a special folder
23   or something, or --
24       Q. Either way. In other words, did you have a
25   practice, in 2000 or 2001, of ensuring that you had

334

1    ready access to the monthly flash reports?
2        MR. LINDSTROM: For the entire period, those
3    two years?
4        MR. SOLOMON: Q. Nods head.)
5        A. No, I usually didn't concern myself about
6    that. I just might keep one for a few weeks or
7    something like that. But I knew she was the originator.
8    If I ever wanted to go back in history, I could talk to
9    her. But I don't typically keep stuff for long periods
10   of time.
11       Q. Would you have expected the flash report for
12   December of 2000 to have been in your files as of
13   March 2001?
14       A. It -- I just don't know. Sometimes I kept
15   things for a couple of months; sometimes I didn't.
16   Sometimes I didn't keep them at all because they came
17   up, you know, routinely.
18       Q. What about for January of 2001, will you
19   expect a January 2001 flash report to be in your files
20   in March --
21       A. Again, I just don't know.
22       Q. And what about for February of 2001, same
23   answer?
24       A. Same answer.
25       Q. Okay. Would you expect Oracle, itself, to

335

1   have retained, one way or another, the December 2000 and
2   January and February 2001 flash reports as of
3   March 2001?
4       MR. LINDSTROM:  Objection.  Vague and
5   ambiguous as to "Oracle".
6       MR. SOLOMON:  Q.  Let me put it another way.
7   Would it surprise you if, as of March 2001, the January
8   and February flash reports no longer existed in the
9   files of senior executives or management at Oracle?
10      MR. LINDSTROM:  Objection.  Assumes facts.
11      THE WITNESS:  Senior executives like myself,
12  you mean?  Or Larry Ellison or --
13      MR. LINDSTROM:  It's compound also.
14      MR. SOLOMON:  Q.  I'm going to say -- let me
15  say I would say senior executives like yourself and
16  Larry Ellison.  First of all, let's go with that.  Would
17  it surprise you if senior executives like yourself and
18  Larry Ellison wouldn't have had, as of March in 2001, in
19  any of your files the flash reports for December 2000,
20  first of all?
21      MR. LINDSTROM:  Assumes facts.
22      THE WITNESS:  Again, it wouldn't surprise me.
23      MR. SOLOMON:  Q.  Okay.
24   A.  I was sporadic in what I --
25      MR. LINDSTROM:  You've answered the question.

336

1       MR. SOLOMON:  Q.  Now, what about all of the
2   direct reports to you and Mr. Ellison?  Would it
3   surprise you if none of they, those people, had in their
4   files, as of March 2001, the January 2001 flash report?
5       MR. LINDSTROM:  Assumes facts.
6       THE WITNESS:  My direct reports.  They
7   wouldn't all, but there might be someone that would have
8   it, sure.
9    Q.  And the same answer for February 2001.
10      MR. LINDSTROM:  Assumes facts.
11      THE WITNESS:  These reports weren't
12  distributed to all my direct reports, first of all.  But
13  there's one or two of them that were on distribution,
14  so --
15      MR. SOLOMON:  Q.  Same answer?
16      MR. LINDSTROM:  Assumes facts.
17      MR. SOLOMON:  Q.  Would it surprise you that
18  of all the files that were searched in order to retrieve
19  documents for this litigation, none of those files,
20  apparently, contained any flash report for January 2001
21  or February 2001?
22      MR. LINDSTROM:  Assumes facts.
23      THE WITNESS:  Again, let's go back to your
24  definition of the flash report.  What is that?  What is
25  the flash report?

337

1       MR. SOLOMON:  Let's have marked as the next
2   exhibit a document produced by the defendants with the
3   control numbers 088715 to 732.
4       (Whereupon, Plaintiff's Exhibit 61 was marked
5            for identification.)
6       THE WITNESS:  Ah, this is the monthly actuals.
7   This is not a forecast.  This is the monthly actual
8   results.  So in this case, this is December.
9       MR. SOLOMON:  Q.  Ms. Guner has authored a
10  document, you're included as a recipient, and it's
11  called the December flash report, correct?
12   A.  Yes.  And I'm just telling you that it -- it
13  now rings a bell, but this was the actual historic
14  December.
15      MR. LINDSTROM:  Can you stop asking questions
16  until we can get a copy of the document?
17      MR. SOLOMON:  Calm down.  It's fine.
18      MR. LINDSTROM:  There seems to be some
19  confusion as to whether you and the witness are talking
20  about the same thing.
21      THE WITNESS:  Okay.  So I'm definitely --
22      MR. LINDSTROM:  Wait.  We're not going to
23  proceed until Counsel has a copy of the document.  And
24  this is Exhibit 61, which we have now.
25      Thank you, Counsel.

338

1       MR. SOLOMON:  You're welcome.
2       MR. LINDSTROM:  You may proceed.
3       MR. SOLOMON:  Q.  Okay.  So you have in front
4   of you what's called a December flash report, it's dated
5   January 17, 2001, and it's to you.  It copies Ms. Catz,
6   Ms. Minton and Larry Garnick, and it's from Ivgen Guner,
7   correct?
8    A.  Yes.
9    Q.  And my questions -- my question -- the
10  question -- one of my questions was:  Would it surprise
11  you to learn that the corresponding document for
12  January 2001 and February 2001 wasn't produced, because,
13  apparently, it doesn't exist in any of the files that
14  were searched for documents in this litigation?
15      MR. LINDSTROM:  Assumes facts.
16      THE WITNESS:  So are you asking me am I
17  surprised that it wasn't produced, or that you couldn't
18  find a copy of it?
19      MR. LINDSTROM:  That's a very good distinction.
20      MR. LINDSTROM:  He's talking about -- I think
21  you're raising a good point, which is produced in this
22  context maybe vague and ambiguous.  I think he's talking
23  about produced in the litigation.  You may be talking
24  about produced at all; in other words, created.
25      MR. SOLOMON:  Q.  Two things:  No. 1, would it

339

1 surprise you if it didn't exist as of March 2001 -- when
2 I say "it", I mean they, the January flash report --
3     A.  If I went over to accounting department at the
4 end of March or the end of April or something and said,
5 "Could you give me the previous two months, February and
6 January," or something, yeah, I would think they
7 probably would have those.  I can't be sure.
8     Q.  All right.  Well, I appreciate that.
9     A.  Yeah.
10     Q.  I appreciate that.
11         For whatever reason, it appears that we don't
12 have those documents, and we would request they be
13 produced by counsel, and we'll leave it at that for the
14 moment.
15     MR. LINDSTROM:  We'll take your request under
16 advisement.
17     MR. SOLOMON:  I will also add for the record,
18 so there's no one being misled, Ms. Kyrouz earlier
19 identified Exhibit -- I think it was 48, which is a
20 press release, that I had said did not appear to have
21 been produced by Defendants.  Apparently, that has been
22 produced, and Ms. Kyrouz has given me a Bates number for
23 that document.
24     MR. LINDSTROM:  I think you're referring to
25 49, Counsel.  I assume 48 is the depo transcript.

340

1     MR. SOLOMON:  It's 49.  I'm sorry.  It's 49.
2 However -- and I appreciate that.  However, it does
3 appear that we don't have those flash reports, and I do
4 want those produced.
5     MR. LINDSTROM:  Well, I don't know that they
6 even exist, but in any event, we'll take your request
7 under advisement and look into it.
8     Thank you.
9     MR. SOLOMON:  We'll have marked as next
10 exhibit a document produced by the defendants with the
11 control numbers 398302 to 311.
12     (Whereupon, Plaintiff's Exhibit 62 was marked
13     for identification.)
14     MR. SOLOMON:  Q.  Do you recognize this?
15     A.  Yes.
16     Q.  Okay.  And have you seen it before?
17     A.  I can't be certain, but certainly this is a
18 regular report we used to do.
19     Q.  And you say "we".  Who would have created this
20 report?
21     A.  Again, probably Ivgen Guner and her people, at
22 the time, were doing that.
23     Q.  And it's called a pipeline report for
24 reporting package.  Can you tell me what frequency this
25 package was created?

341

1     A.  I don't recall.  I don't recall.  Either --
2 whether it was weekly or biweekly.  It was more than
3 once a month.
4     Q.  Okay.  And you'll see that the pipeline growth
5 is the left-hand column, second from left at the bottom?
6     A.  Yes.
7     Q.  Now, did you have any understanding, as of
8 around the date of this document, December 11, 2000,
9 that deals were being entered into the pipeline under
10 different -- any different criteria than was in place
11 for the prior quarter -- for the prior quarter?
12     A.  I don't recall.
13     MR. SOLOMON:  Okay.  I'm going to have marked
14 as the next exhibit another document produced by the
15 defendants with the control No. 609550 and 51.
16     (Whereupon, Plaintiff's Exhibit 63 was marked
17     for identification.)
18     MR. SOLOMON:  Q.  Do you recognize this?
19     A.  I'm not sure if I can -- if I remember this.
20     Q.  Okay.  You don't dispute, though, that you
21 wrote it, the first string?
22     A.  Correct.  And factually, it is correct.  The
23 fact is that, historically, Q2 and Q3 were very similar
24 on EPS.
25     Q.  And you're referring to your language where

342

1 you say, "I think we should position the folks at the
2 call that historically, Q3 isn't a lot more EPS than
3 Q2... So a penny more per share would seem right."  Is
4 that right?
5     A.  Uh-huh.
6     Q.  And do you know what the EPS was for Q2 that
7 fiscal year?
8     A.  I don't recall.  I'm looking at the second
9 page.  I can read that if you want.  It says 11 cents,
10 but I --
11     Q.  Okay.
12     A.  I don't recall.
13     Q.  Okay.
14     A.  Presumably, this is correct, I guess.
15     Q.  And so, therefore, consistent with your
16 assessment, if it was 11 cents in Q2, 12 cents in Q3
17 would appear reasonable to you; is that right?
18     A.  That's correct.  Historically, we either were
19 flat or up a penny or so.  So the results that came up
20 from the bottom seemed to make sense.
21     Q.  And, in fact, the true results for Q2 were 10
22 cents and not 11, then you would have inserted 11 cents,
23 rather than 12 cents for --
24     A.  Well, I certainly would have asked myself why
25 is it up more than a penny.  So that's for sure.  It

343

1  would definitely send out signals to me of, "Gee," you
2  know, "it's 2 cents too much."
3      Q.  And are you aware that if the accounting rules
4  had been followed for Q2 01, that Oracle would have
5  reported less than 11 cents per share?
6      MR. LINDSTROM:  Assumes facts, argumentative.
7      THE WITNESS:  Again, I think Oracle, to the
8  best of my knowledge, always followed the accounting
9  rules when I was CFO.  So I have no reason to believe
10  our quarter wasn't what it was.
11      MR. SOLOMON:  Q.  Okay.  If -- if Oracle's
12  pipeline was showing signs of softening in January of
13  2001, do you believe that would be information that any
14  reasonable investor at Oracle would want to know about?
15      MR. LINDSTROM:  Objection.  Calls for
16  speculation, no foundation.
17      THE WITNESS:  It depends on, you know, all the
18  interpretations of what's going on.  So we started, I
19  recall, with a pipeline that you presented to me that
20  was very, very high.  In fact, we didn't believe it
21  totally, so we went with a forecast that contemplated
22  that probably there would be some slowdown in the
23  pipeline growth as we went through the quarter.  So, you
24  know, if we positioned a growth target based on the
25  original pipeline, then that would be relevant,

344

1  absolutely.  It might indicate we would miss our
2  quarter.  But that wasn't the case.
3      MR. SOLOMON:  Q.  If, in January of 2001, the
4  Majors in your NAS division were seeing a slowdown,
5  would that be information that Oracle investors would
6  reasonably want to know?
7      MR. LINDSTROM:  Objection.  Calls for
8  speculation, no foundation.
9      THE WITNESS:  Again, I don't know what seeing
10  a slowdown means.  I really don't know what that means.
11  As I testified earlier, I routinely sat in the weekly
12  calls with George Roberts, who ran NAS, and the other
13  individuals, and we talked about the forecast.  Jennifer
14  Minton was there and Larry was there, 'cause I had been
15  concerned about the economy.  But they were steadfast in
16  their ability to deliver the quarter.
17      MR. SOLOMON:  Q.  If, as of January 2001, both
18  general business and Majors in your NAS division were
19  seeing a slowdown for both Q3 and Q4, do you believe
20  that would be information that a reasonable investor in
21  Oracle might want to know?
22      MR. LINDSTROM:  No foundation, calls for
23  speculation.  Assumes facts.
24      THE WITNESS:  Everything is relative to what
25  their expectations are already, what we've said.  So

345

1  it's not clear at all to me, you know, what -- without
2  seeing the information, without putting in context of
3  what their expectations were and so forth.  So --
4      MR. SOLOMON:  Q.  Their expectations would be
5  guided, do you agree, by the public statements and
6  statements you made to other analysts?
7      A.  We set out guidance, as I've testified
8  earlier, in that December call, earnings call for the
9  quarter.  So I agree that they had an expectation based
10  upon what we had said there.
11      Q.  And didn't you talk about no slowing in the
12  pipe and astounding pipeline and that sort of stuff?  Is
13  that how you recall describing the state of Oracle's
14  pipeline in December of 2000?
15      A.  Yes.  My recollection was we had come off with
16  a very strong November, and that things still looked
17  very good, and so we felt very bullish, despite the
18  economic signs that were out there.  And we talked about
19  that, as I testified earlier at length, about why we
20  thought our business and our pipeline still looked good.
21      Q.  And as of January, if the pipeline hadn't
22  grown as you had anticipated, would that be information
23  that a reasonable investor in Oracle might want to know?
24      MR. LINDSTROM:  Asked and answered, assumes
25  facts.

346

1      THE WITNESS:  I think I have answered that.
2      MR. SOLOMON:  Q.  Did you know, in January of
3  2001, that the pipeline for NAS was softening?
4      A.  I don't recall.  My recollection, as I've
5  testified earlier, was I was concerned about external
6  reports that were talking about a softening economy and
7  potentially affecting things, and as I said earlier, I
8  kept asking our guys, looking at reports, but I don't
9  remember what I -- you know, what the pipeline thing was
10  showing.  But I do know that after intense grilling, we
11  continued to, you know, believe that we could make our
12  quarter.
13      Q.  Did you know that general business and Majors
14  in NAS were seeing a slowdown for Q3 and Q4 in January
15  of 2001?
16      MR. LINDSTROM:  Assumes facts.
17      THE WITNESS:  Again, everything's relative.
18  Slowdown from what?  From what they saw at the start of
19  the quarter, from what they expected and we put out
20  publicly?  I mean, it's all -- it's a complicated
21  question that you're oversimplifying, I believe.
22      MR. SOLOMON:  I'll have marked as the next
23  exhibit a document produced by the defendants with the
24  control numbers 040617.
25      (Whereupon, Plaintiff's Exhibit 64 was marked

347

1    for identification.)
2         THE WITNESS:  Okay.  I've read it.
3         MR. SOLOMON:  Q.  Okay.  Have you seen this
4    before?
5    A.  I don't believe so.
6    Q.  Do you know who David Winton is?
7    A.  He was a financial manager or analyst in the
8    North American business.
9    Q.  Did he work for you?
10   A.  He worked in the organization.  He didn't work
11   directly for me, but I can't remember if he worked for
12   Jennifer Minton or through somebody else to Jennifer
13   Minton.
14   Q.  So he reported indirectly to you; is that --
15   A.  He was in the finance organization, so he --
16   but he just didn't -- he was several levels below me.
17   Q.  Okay.  Now, you testified, in the last
18   session, that you did not, in Q3 of 2001, issue trading
19   clearances.  Do you remember that?
20   A.  Yes.
21        MR. LINDSTROM:  Do you want to show him his
22   testimony?
23        MR. SOLOMON:  Q.  Do you remember that, first
24   of all?
25   A.  I remember asking about Larry Ellison.  I

348

1    don't remember about the broad thing 'cause I don't
2    recall.  But if you want to show it to me, I'll take a
3    look at what I testified to.
4    Q.  Okay.  If you go to page 134 and 135.
5    A.  Okay.
6    Q.  And I'm just going to read into the record the
7    exchange.
8         MR. LINDSTROM:  What line are you starting at?
9         MR. SOLOMON:  Q.  Line 20 on page 134.
10   "Sir, did you ever issue approvals to
11   trading?"
12   "Answer:  I may have in the early days, yes.
13   In the early days of my tenure at Oracle,
14   before Dan's time, Dan Cooperman, general
15   counsel, I think I did get -- was a little
16   more involved where the general counsel and I
17   were on these e-mails, and I reached a point
18   years before this period, I think, where I
19   concluded that I wasn't adding any value.  My
20   real value is just not the administration
21   side; it's if I know something, I will get
22   with the general counsel and we'll discuss it,
23   and if we agree, we'll stop trading."
24   "Question:  So it's your testimony that in 3Q
25   '01 you were not involved in issuing approvals

349

1    for stock sales by insiders?"
2    "Answer:  I don't believe I was.  It's not my
3    recollection.  There was a point where I was,
4    but I think by then I wasn't routinely in this
5    approval cycle."
6    Do you see that?
7    A.  Yes, I do.
8    Q.  Okay.  Is that true?
9    A.  I think that was accurate testimony.  I don't
10   have any different recollection.
11   Q.  Okay.  Give me a second.
12   I'll have marked as the next exhibit a
13   document produced by the defendants with the control
14   numbers 039420.
15        (Whereupon, Plaintiff's Exhibit 65 was marked
16        for identification.)
17        MR. SOLOMON:  Q.  Do you recognize this?
18   A.  Yes, I see it.
19   Q.  Okay.  And this reflects your involvement in
20   the approval process, yes?
21   A.  Yes.  In this case, one of our executives that
22   has to get approvals elected to send it to me and to Dan
23   Cooperman.  I responded, but, I mean, the fact of the
24   matter is I don't think everyone routinely went through
25   me.  But if somebody sent me a note, you know, I would

350

1    use that as a basis to sort of re -- you know, reaffirm
2    to Dan that I didn't know of any reason.  But I don't
3    believe everyone, even in the -- they used to years ago.
4    I think by then, as I said in the testimony, I believe
5    they weren't all sent to me, and I...
6         MR. SOLOMON:  Let's have marked as the next
7    exhibit another document produced by the defendants with
8    the control numbers 039430.
9         (Whereupon, Plaintiff's Exhibit 66 was marked
10        for identification.)
11        MR. SOLOMON:  Q.  Do you recognize this?
12   A.  Yes.
13   Q.  And this also reflects that you were involved
14   in the approval process.
15   A.  Yes.
16   Q.  Correct?
17   A.  Yes.
18   Q.  So, in fact, your testimony before was
19   inaccurate; isn't that true?
20        MR. LINDSTROM:  He said "routinely".  You
21   mischaracterized his testimony.
22        THE WITNESS:  I said "I believe".  I honestly
23   don't remember -- I guarantee you for the last number of
24   years I haven't been involved at all.  There was a
25   period, as I testified previously, where I literally --

351

1  I and the general counsel did everything.  And then when
2  Cooperman came in, at some point we transitioned to the
3  point that my job was to tell him if there was a reason
4  to stop trading because of financial issues, right?  And
5  so I phased out of that.  I don't recall exactly when I
6  did, but I think there was a period there in transition
7  where some people still thought I needed to approve it.
8  So they would send it to me and -- you know.  But that's
9  the best of my recollection.
10  MR. SOLOMON:  Q.  Okay.  If you look at -- and
11  I'm sorry.  I don't have the exhibit number at hand, but
12  if you look at the e-mail from David Winton to Jennifer
13  Minton that we spoke about a few moments ago.
14  MR. LINDSTROM:  64.
15  MR. SOLOMON:  Thank you, Greg.
16  THE WITNESS:  Yes.
17  MR. SOLOMON:  Q.  You'll see that under
18  heading 1 it says, "The pipe has not grown as we had
19  anticipated.  We are actually slightly down from
20  December and reporting."
21  Do you see that?
22  A.  Yes.
23  Q.  Now, today is the first time you're seeing
24  that; is that right?
25  A.  I think so.  I don't recall seeing this.

352

1  Q.  Okay.
2  A.  I wasn't shown as a copy, but --
3  Q.  So in -- is it fair to say, in granting your
4  approval for Mr. Nussbaum, you are unaware of what's
5  detailed against No. 1 here?
6  A.  I think that's right.  But even if I saw this,
7  it wouldn't have changed my position.
8  Q.  I'm sure that's going to be your position.
9  Under 2, it says, "Lack of big deals.  Unlike
10  Q1 and 2, we have a few big deals in best case" --
11  sorry.  "We have few big deals in best case that could
12  drive us past the 360 line."
13  Do you see that?  The $360 line.
14  A.  Uh-huh.
15  Q.  Now, were you aware of that at the time you
16  granted approval to Mr. Nussbaum?
17  A.  Again, I don't recall this note, and I don't
18  recall all the details of comments that George Roberts
19  or other people made.  I really don't.
20  Q.  Okay.  Under 3 it says, "Drop in technology."
21  It says, "As reflected in the softening pipe, both GB
22  and Majors see a slowdown in both Q3 and Q4.  GB's dot
23  bubble have burst," and parens, "(They expect the west
24  to end the year 30 to $40 million behind their original
25  budget for technology.)"

353

1  Do you see that?
2  A.  Yes.
3  Q.  Does that part of 3, were you aware of those
4  facts at the time you allowed Mr. Nussbaum to trade?
5  A.  I don't recall, other than I did, as I
6  testified earlier, get occasional pipeline reports which
7  had their numbers as part of the global numbers.  As I
8  testified earlier, we were skeptical of the strength of
9  the pipeline to start the quarter, so we did not make
10  all that into our forecast for the third quarter.  So
11  the fact that some of that pipeline growth slowed down
12  was not a big surprise.  We didn't expect it.  We would
13  have never forecasted 52 percent growth in license
14  revenue even if the pipeline said it.
15  Q.  And just in terms of your skepticism, what
16  drove your skepticism as to the strength of the
17  pipeline?
18  A.  It was just too good to be true.  In other
19  words, the pipeline is somewhat unscientific.  It
20  doesn't have perfect correlation.  We've looked at it
21  over the years, and it just -- it sounded great, but we
22  weren't going to get out there and set an expectation
23  based on a number that just seemed high.  We couldn't
24  get a good read from people, and so we just decided to
25  be more conservative, and sure enough, fairly quickly my

354

1  recollection was that the pipeline growth was still
2  good, but it slowed down a bit from what the original
3  numbers that you showed me here.
4  Q.  Carrying on in point 3, "Majors sees a
5  slowdown in spend along with smaller deal sizes."
6  Were you aware of that at the time of the
7  Nussbaum trade?
8  A.  I don't recall.  I had thorough conversations
9  at our executive committee with all the executives,
10  so -- I don't recall exactly all the details of what was
11  said.
12  Q.  And then it goes on to say, "Also, the change
13  in the ASP model for generic tech hosting, 11 C's," it
14  looks like, but you can tell me what that means, if you
15  know, "coupled with the dot-com crash is impacting
16  projected tech results in that segment."
17  Do you see that?
18  MR. LINDSTROM: I don't think it's 11 Cs.
19  MR. SOLOMON:  What does it say, 11 --
20  MS. KYROUZ:  L-I-C.
21  MR. SOLOMON:  Thank you very much.
22  Q.  So I assume that's short for licenses?
23  A.  Licenses, I believe, sure.
24  Q.  So were you aware of those facts at the time
25  you allowed Mr. Nussbaum to trade?

355

Henley, Jeffrey  11/16/2006  9:20:00 AM

1    A.  I believe that we knew that the dot-com growth
2    was starting to change, absolutely.  Again, I don't see
3    this -- but George Roberts is a very honest guy.  I
4    think he represented a lot of detail about what he did
5    in his meetings with all of his people.  David, I think,
6    worked for him.  So I don't remember exactly all the
7    things that were done, other than we grilled all of our
8    executives intensively trying to be sure we had a good
9    sense of how we were going to do for the quarter and
10   whether we were going to make the quarter.
11       Q.  It's fair to say, is it not, that the
12   information here, with respect to the softening of the
13   pipe and the slowdown in GB and Majors, was non-public
14   information at the time; is that true?
15       A.  We did not publish interim pipeline data
16   publicly.  We didn't publish any pipeline data publicly,
17   never have.  And again, you're -- you're talking about a
18   relative change in growth rate.  It was still a very
19   healthy growth rate.  It just wasn't as strong as the
20   initial report, which we had discounted when we made our
21   forecast.
22       Q.  Because that was too good to be true?
23       A.  Yeah, it just didn't make sense, so we
24   decided, "Look, let's -- it's early.  A lot of times
25   there's cleanup that goes on in pipelines, and so let's

356

1    be more conservative based on trends, and we'll see how
2    it comes out."
3        Q.  Wouldn't another element of the conservative
4    approach and prudent approach have been to not allow
5    people to trade while in possession of this non-public
6    information?
7        MR. LINDSTROM:  Can we have that question
8    reread, please?
9        THE REPORTER:  I'm struggling with it myself.
10   I was going to ask him to say it again.
11       MR. SOLOMON:  Q.  Wouldn't another element of
12   the conservative approach you're talking about have been
13   to not allow people inside the company to trade while
14   the investing public didn't have this information?
15       MR. LINDSTROM:  Objection.  Argumentative.
16       THE WITNESS:  Well, then we would never trade
17   because we never give out that information.  So I don't
18   understand your point.  We never give out pipeline data.
19   We routinely generate it.  It was factored into our
20   forecast.
21       MR. SOLOMON:  Q.  Well, maybe you should never
22   trade if you're in possession of non-public information
23   that would affect the public's --
24       MR. LINDSTROM:  Objection, argumentative.
25       MR. SOLOMON:  Q.  Well, is that funny?

357

1        A.  It is funny.
2        Q.  Why is that funny?
3        A.  It is funny.  No company can take a position
4    that they can never trade stock because they know
5    information.  Our professional responsibility is to
6    interpret all this information and create guidance for
7    the investing public that we think, based on our history
8    and knowledge, is a good proxy for what's going to
9    happen and put all the appropriate caveats around it.
10   That, we did.  And again, I testified that we were
11   conservative because we were skeptical that that
12   pipeline would do as well as it did, and sure enough, it
13   slowed down a bit.  It still exhibited very good growth,
14   but not as good as originally.
15       So what I always used to tell people they want
16   to -- can't trade from a financial standpoint is if I
17   know that we're going to miss our quarter, cause I know
18   that will upset the market, right?  So this data on OSO
19   had nothing to do -- wasn't in conflict with the
20   forecast that we had been using or continued to use
21   throughout that quarter.
22       MR. LINDSTROM:  All right.  Why don't we -- if
23   this is a good time, why don't we take a break for
24   lunch.
25       MR. SOLOMON:  Certainly.

358

1        (Recess taken from 1:07 to 1:44 P.M.)
2        MR. SOLOMON:  Okay.  I'll have marked as the
3    next exhibit a document produced by the defendants with
4    the control numbers 297772 through 73.
5        (Whereupon, Plaintiff's Exhibit 67 was marked
6        for identification.)
7        MR. SOLOMON:  Q.  Have you seen this before?
8        A.  I don't believe so.
9        Q.  I'm sorry?
10       A.  I don't believe so.
11       Q.  Do you know who Jim English is?
12       A.  Yes.
13       Q.  Who is he?
14       A.  He's a person that works in the finance
15   organization.  Again, I don't know if he worked directly
16   for Jennifer or one level below her.
17       Q.  And did he work within any particular division
18   at Oracle?
19       A.  At this time, based on the accounts he's
20   talking about, I believe he worked in the strategic
21   accounts in North America.
22       Q.  And you'll see that in the second full
23   paragraph, the last sentence says, "We have a lot of
24   pipe at challenging clients."  Do you see that?
25       A.  No, I'm trying to figure out where --

359

1    Q.  Second paragraph.  The last sentence of that

2  paragraph.  Okay.  The first paragraph begins, "When you

3  asked for a forecast."

4    A.  Yes.

5    Q.  Second one begins, "We are holding at" --

6    A.  Yes, I got it.  I got it.  "We have a lot of

7  pipe at challenging clients."  Right.

8    Q.  Do you know what that means?

9    MR. LINDSTROM:  Objection.  Calls for

10  speculation, no foundation.

11    THE WITNESS:  I would only be speculating.

12    MR. SOLOMON:  Q.  Okay.  And what do you

13  speculate it means?

14    MR. LINDSTROM:  Same objections.

15    THE WITNESS:  Well, again, these are typically

16  our larger, more complicated accounts.  The sales cycle

17  is just more complicated and complex.

18    MR. SOLOMON:  Q.  That's what "We have a lot

19  of pipe at challenging clients" means to you?

20    A.  What it means to me is that we have a lot of

21  pipeline, but we've got to work through complicated

22  sales cycle to get home, get it done.

23    Q.  Okay.

24    A.  It's my speculation, again.  I didn't write

25  this.

360

1    Q.  And as of January 17th, 2001, were you aware

2  of a sentiment within Oracle that there was a lot of

3  pipe at challenging clients?

4    A.  Again, I don't think I got the note, and I'm

5  only speculating what that even means.  So no, I don't

6  think I was aware of this.

7    Q.  If you skip below the first three bullet

8  points to the next sentence, it reads, "Our best is at

9  220 million, which is a real stretch as several of these

10  deals will be Q4."  Do you see that?

11    A.  Yes.

12    Q.  And do you know what the "real stretch" means?

13    MR. LINDSTROM:  Objection.  No foundation,

14  calls for speculation.

15    THE WITNESS:  Typically, there's a range of

16  possibilities that they talk about within the sales

17  teams, kind of high, low, medium, that sort of thing.

18  It sounded like that was the high side of where they

19  probably thought they could land.

20    MR. SOLOMON:  Q.  Okay.  And then you'll see

21  the next sentence reads, "One AVP talked of starting to

22  see indications of client delays on decisions."

23    Do you see that?

24    A.  Again -- yes.

25    Q.  And were you aware, as of this date, the 17th

361

1  of January, 2001, that one of your AVPs was talking

2  about indications of client delays on decisions?

3    A.  No, again, I'm not aware of that.

4    Q.  Now, were you concerned in January that

5  analysts may rock the boat for Oracle?  January 2001.

6    MR. LINDSTROM:  Objection.  Vague and

7  ambiguous.

8    THE WITNESS:  I don't recall, you know, being

9  concerned about what analysts did.  Our job is to go out

10  and deliver the numbers.  But I can't influence

11  analysts.  They're going to write what they're going to

12  write.  So, no, I don't recall being concerned.

13    MR. SOLOMON:  Okay.  I'll have marked as the

14  next exhibit a document produced by the defendants with

15  the control No. 014044 through -- excuse me.  That's the

16  only number.  014044.

17    We'll move on to another exhibit and get

18  copies of this for you.  So if you can just hold off.

19    While we're waiting for that other exhibit,

20  we'll mark another document produced by Defendants with

21  the control No. 013415 to 418.

22    MR. LINDSTROM:  So will this be 68?

23    MR. SOLOMON:  Let's make this 68, and we'll

24  make the other one 69 when it arrives.

25    (Whereupon, Plaintiff's Exhibit 68 was marked

362

1  for identification.)

2    MR. SOLOMON:  Q.  While you're looking at it,

3  you'll see it's dated the 17th of January, 2001, and

4  it's from Larry Garnick to a number of people, including

5  yourself.

6    A.  Yes.

7    Q.  Have you seen this before?

8    A.  Again, I don't recall, but typically, I was --

9  I'm shown on here.  Typically, I got these every month.

10  Usually, I got them and looked at them.

11    Q.  Okay.  When was the last time you looked at

12  this document?

13    A.  This document?  I don't recall.

14    Q.  You'll see, if you turn over to the second

15  page of the document, that there is -- there are a

16  number of columns, and in the middle of the columns on

17  the second page there's a column entitled "Percent

18  Growth in U.S. Dollars."  Do you see that?

19    A.  Yes.

20    Q.  And do you see, under license organization,

21  there's a reference to Nussbaum and OSI.  Do you see

22  that?

23    A.  Yes.

24    Q.  And do you see that in the percentage growth

25  in U.S. dollars, there's a negative 81 percent there?

363

1   Do you see that?

2       A.  Yes.

3       Q.  Okay.  And were you aware, at or around the

4   date of this report, of OSI reporting a negative growth

5   rate in U.S. dollars of 81 percent?

6       A.  I don't recall.  But as I've previously

7   testified, the first month of any quarter is not

8   particularly meaningful.  It tends to be very small.

9       Q.  But regardless of that comment, you don't

10  recall --

11      A.  I don't recall whether I saw 81 or plus

12  or minus 81, or plus 82 later in the column.  I don't

13  recall any of this.

14      Q.  Okay.  Now, it's fair to say, isn't it, that

15  the investing public, as of January 17, 2001, would not

16  know of this negative 81 percent trend reflected here?

17      A.  That's correct.

18      Q.  And the same for Roberts and NAS.  You see

19  there's a negative 24 percent there.  Do you see that?

20      A.  Yes.

21      Q.  And do you see that -- sorry.  You agree that

22  the investing public wouldn't have that information as

23  of the middle of January 2001?

24      A.  That's correct.

25      Q.  And do you remember whether you had that

1   information?

2       A.  Again, I don't recall whether I went through

3   every line of detail on this report.

4       Q.  Okay.

5       A.  So I just don't recall.

6       Q.  And then under Sanderson and OPI, you see a

7   positive there of 243 percent.  Do you see that?

8       A.  Uh-huh.

9       Q.  And were you aware of that in the middle of

10  January of 2001?

11      A.  I was aware of the Covisint transaction having

12  been concluded.  So I was aware that that created, you

13  know, a big effect for him in that month.

14      Q.  Okay.

15      A.  I don't remember the precise number.

16      Q.  Okay.  Do you know what the -- what that

17  figure would have been if you backed Covisint out?

18      A.  No.  I would have to go look at the document.

19  Offhand, I don't know.

20      Q.  Would it surprise you to learn that it would

21  be in the negative 80 percent or more?

22      A.  It's positive, it's possible, just like

23  252 percent positive in Smith.  I mean, there's all

24  sorts of things in first months of quarters.  You

25  just -- it's not particularly indicative of how your

1   quarter will do, as I testified earlier.

2       Q.  Okay.  It gets more indicative as the quarter

3   goes, is your testimony; is that right?

4       A.  I said it's somewhat more indicative after

5   two quarters, but I said at the end of the day, the real

6   numbers happen in the third month, and particularly in

7   the last week of the quarter.  That's what I said

8   earlier.

9       Q.  Okay.  Now, if you'll go to the first page,

10  you'll see that there's a reference to, in the first

11  bullet point, to license revenue growth.  Do you see

12  that?

13      A.  Yes.  The first bullet?  Yes.

14      Q.  Yes.  And you'll see the last sentence says,

15  "Excluding Covisint, OPI license revenue growth would

16  have been negative 85 percent."  Do you see that?

17      A.  Yes, I do.

18      Q.  Okay.  Now, did you have anything to do with

19  the creation of this document?

20      A.  No.

21      Q.  Did you discuss this document with anybody

22  around the time you received it?

23      A.  I don't recall.

24      Q.  And did you discuss with anybody, either

25  before the creation of this document or afterwards, the

1   exclusion of Covisint to show what rates would have been

2   applicable without the Covisint deal?

3           MR. LINDSTROM:  Vague and ambiguous.

4           THE WITNESS:  Ask the question again.

5           MR. SOLOMON:  Q.  I guess what I'm trying to

6   get at is:  Did you talk about why Mr. Garnick backed

7   out of Covisint to show you that negative 85 percent?

8       A.  I don't recall, but --

9           MR. LINDSTROM:  You've answered the question.

10          THE WITNESS:  I don't recall.

11          MR. SOLOMON:  Q.  And do you have an idea as

12  to why he would have done that?

13      A.  I can speculate.

14      Q.  Go ahead.

15      A.  Standard financial analysis at Oracle was to

16  do all kinds of supplemental analysis to try to look at

17  different trends.  So we all knew Covisint was very

18  large, and so I think it's not the only time in our

19  history where we've kind of taken things out and said,

20  "Well, it would have been with and without," and that

21  sort of thing.  So that was the purpose of it.  I think

22  he did it on his own.  It's not something I instructed

23  him to do, but it was a typical analytic technique that

24  we use from time to time.

25      Q.  And you said, just to quote your language, you

Henley, Jeffrey  11/16/2006  9:20:00 AM

1  do the analysis to try and look at different trends.
2  And why would you want to look at different trends?
3      A.  Particularly in the first month of a quarter,
4  which I've already testified is small, that was a large
5  transaction.  So that would distort the growth.  So we
6  wanted to make sure we understood that without that,
7  what the trend would be.  He wanted to show -- make sure
8  we understood that.  Nevertheless, it is in the
9  forecast, it is now an actual and it was clearly going
10  to happen for the quarter.  So --
11      Q.  Okay.  And then -- okay.  We'll leave it at
12  that for the moment.  Thank you.
13         And now we'll have marked as 69 the document
14  that I mentioned earlier with the control No. 014044.
15         (Whereupon, Plaintiff's Exhibit 69 was marked
16         for identification.)
17      THE WITNESS:  Okay.
18      MR. SOLOMON:  Q.  Okay.  Do you recognize
19  this?
20      A.  Again, no, I don't recall it, but --
21      Q.  Okay.  It's from Sandy Sanderson to Tom Thimot
22  and others, but I don't see that you're a recipient.
23  But it does refer to you.
24         Do you see the reference to you?
25      A.  Yes, I did.  I did read that.

368

1      Q.  And it says, "The quarter looks good.  I spoke
2  to Jeff Henley about this.  He said the market is so
3  tenuous right now, and one analyst can rock the boat."
4         Do you see that?
5      A.  I do see that.
6      Q.  Did you say those things?
7      A.  I have no idea how I characterized what he
8  told me.  This is merely what his take on it was.
9      Q.  Did you have a view, in the fall of 2000, that
10  the market was tenuous?
11      A.  Again, I have no idea what I told Sandy or
12  what I thought, but any -- so that's the answer.
13      MR. LINDSTROM:  Correct.
14      THE WITNESS:  I'm not supposed to keep
15  speculating more and more.
16      MR. SOLOMON:  Q.  Okay.  What about having the
17  belief that one analyst could rock the boat, did you
18  have that belief in the fall of 2000?
19      A.  Again, I don't remember what I told him, but
20  any time, particularly when an influential analyst
21  writes something negative or something, it can influence
22  adjusters.  So -- but I have no idea what I told him.
23      Q.  Okay.  And then you'll see below that it says,
24  "Tom Thimot wrote:  Our tech numbers should be stronger,
25  not weaker.  Is there an overall weakness in some other

369

1  part of Oracle?"
2         Do you see that?
3      A.  Yes.
4      Q.  Do you recall that question being asked in the
5  fall of 2000?
6      A.  Again, I don't recall any of this being asked
7  of me.  So --
8      MR. SOLOMON:  I'll have marked as the next
9  exhibit a document produced by the defendants with the
10  control range 003447 through 463.
11         (Whereupon, Plaintiff's Exhibit 70 was marked
12         for identification.)
13      MR. SOLOMON:  Q.  If you'll just take a look
14  and let me know if you recognize it, Mr. Henley.
15      A.  I recognize the format, sure.  It's a -- I
16  don't know if I -- I'm looking for a date, even.  I'm
17  not sure.
18      Q.  If you go to control No. 003463, you'll see
19  there's a --
20      A.  It says it was Q3 fiscal '01.  So that we
21  know.  I certainly recognize the format.  It's a
22  standard report put out, again, by Jennifer Minton.  But
23  whether I remember this specific version of it or
24  something, I don't recall.
25      Q.  Okay.  Let's have marked -- hold on a second.

370

1         Okay.  Marked as the next exhibit a document
2  produced in litigation by the defendants with the
3  control numbers 606383 through 606688.
4         (Whereupon, Plaintiff's Exhibit 71 was marked
5         for identification.)
6      MR. LINDSTROM:  This appears to be a couple
7  hundred pages.  What do you want him to do with that?
8      MR. SOLOMON:  Q.  Yes, this is the first
9  transcript of your deposition in a derivative case,
10  Mr. Henley, and I want you to just have that in front of
11  you for a moment because I'm going to talk to you about
12  that, and I'm going to talk to you about the previous
13  exhibit, which is the upside report.  Now, you'll see
14  that on page 003459 where it says "upside" at the
15  bottom, there's a reference to 29.  Do you see that?
16      A.  459?
17      Q.  Yes.  459.
18      A.  Yes, I see at the bottom.
19      Q.  Okay.  Now, is it -- am I right in saying that
20  this appears to be the upside report for January 29th,
21  2001?
22      MR. LINDSTROM:  No foundation, calls for
23  speculation.
24      THE WITNESS:  Yeah, I have no idea.  I see
25  that it says 1 underscore 29 something, but I don't know

371

1  if that's what it means or --

2      MR. SOLOMON:  Q.  Okay.  If you go to page 265

3  of the deposition transcript --

4      A.  265?

5      MR. LINDSTROM:  And again, for identification,

6  this is Exhibit 71, the derivative deposition, not

7  Exhibit 48, right?

8      MR. SOLOMON:  Yes.

9      THE WITNESS:  265?

10     MR. SOLOMON:  Q.  Yes, please.

11     A.  Okay.

12     Q.  Okay.  You'll see that at line 19 there's the

13  following question.  It reads, "Okay.  And if we look at

14  the January -- the December 8th report, the figure for

15  total revenues is 175,000 for upside.  If we look for

16  December," then it says, "January 15th, that number has

17  dropped to 104,910."

18     Do you see that?

19     A.  I do see that.

20     Q.  And you say that's correct?

21     A.  I see that.

22     Q.  Now, if you go to the next page, 266 of that

23  transcript --

24     A.  Yes.

25     Q.  -- you'll see there's a reference at line 17,

372

1      question, "And if we look now to the January 29th upside

2  report, Exhibit 134, the number -- Ms. Minton's judgment

3  has dropped here to 54,940, I believe."

4      Do you see that?

5      A.  Yes.

6      Q.  Now, if you go to the flash report that's next

7  to you there, and look at page No. 0 --

8      A.  I don't think it's -- it's not the flash

9  report.

10     Q.  I'm sorry.  The upside report.  Excuse me.

11     A.  Exhibit 70, right?

12     Q.  Yeah, go to page 003448.

13     A.  448.  Yep.

14     Q.  If you look in the revenue column to the last

15  line at the top, you'll see "Year to date FY01 upside"

16  towards the right-hand side of the document, and a

17  figure of 54,940.  Do you see that?

18     A.  For total revenue.  Yes, I do see that.  It

19  says, actually, 9 -- I think 54,945, I think, is what it

20  says.

21     Q.  Okay.  And then if you look at the next page,

22  there's another reference -- and you're quite right.

23  It's more clear on the next page, 003449.

24     A.  449, uh-huh.

25     Q.  Do you see that?

373

1      A.  Yes.

2      Q.  Now, at that stage, then, when -- on

3  January 29th, 2001, Ms. Minton is reporting that upside

4  reduction to 54,945.  Did you, then, believe that Oracle

5  was now in a horse race as to whether or not it could

6  make its Q3 forecast?

7      MR. LINDSTROM:  Objection.  Vague and

8  ambiguous.

9      THE WITNESS:  Again, I don't recall whether

10  using the word "horse race", but clearly, we're now down

11  kind of tight to what we had indicated when we had our

12  earnings call.  So now there's no margin for safety, if

13  you will, but we've been in this situation before.

14     MR. SOLOMON:  Q.  Was it a horse race?

15     MR. LINDSTROM:  Objection.  Vague and

16  ambiguous.

17     THE WITNESS:  I don't know.  I don't know what

18  a horse race means, or if I said it, you know.  I can

19  try to describe to you, you know, what I think it meant,

20  I guess, but I don't know.  I don't recall using the

21  word.

22     MR. SOLOMON:  Q.  Okay.  So if you're looking

23  at -- we're still looking at page 266, and let's read

24  your answer.  "Well -- " you say at the very bottom of

25  the page, "Well, yeah, now you're getting down to the

374

1      point where she's forecasting, in this case, 24 percent

2  growth."

3      Do you see that?

4      A.  Uh-huh.

5      Q.  Then over the page you start another answer at

6  line 4, and you say, "So I mean now we've had many

7  quarters where we're forecasting virtually what we've

8  ended up doing.  Sometimes a little bit less, we end up

9  doing a little bit less, a little bit more.  But surely,

10  I have less.  She's now forecast numbers much closer so

11  that when you get equal now, that's why I say the last

12  month of the quarter you start thinking, "Wow," you

13  know, "this is more of a horse race."

14     A.  Okay.  Again, I have no idea --

15     MR. LINDSTROM:  There's no pending question.

16     MR. SOLOMON:  Q.  Okay.  What did you mean?

17     A.  Again, I said -- as I testified earlier, I'm

18  not sure what I meant, but I can speculate.

19     Q.  I don't need you to speculate on what you

20  meant, sir.

21     A.  Fine.  So I can't tell you what I meant.

22     Q.  If you can only speculate what you meant and

23  you can't tell me what you meant, then I think we're in

24  trouble, aren't we?

25     MR. LINDSTROM:  Objection.  Argumentative.

375

1  He's already answered the question.

2      MR. SOLOMON: Q.  So after this upside report

3  on January 29th of 2001, what did you do, if anything,

4  to ensure that Mr. Ellison was complying with the

5  federal securities laws concerning insider trading?

6      A.  I didn't do anything.  If I --

7      MR. LINDSTROM: You've answered the question.

8  If he wants to ask a follow-up question, he will.

9      MR. SOLOMON: Q.  And that's because it was

10  okay -- even though you thought it was a horse race, it

11  was okay for Mr. Ellison to continue trading; is that

12  right?

13      MR. LINDSTROM: Objection.  No foundation,

14  mischaracterizes his testimony.

15      MR. SOLOMON: Q.  Your answer?

16      A.  My answer?

17      Q.  Uh-huh.

18      A.  Again, there was no basis for me to believe,

19  definitively, that we would miss the quarter.  It would

20  be tight.  We've been through this, as I testified in

21  that deposition in the past; we've had tight forecasts,

22  and it could be up a little bit, up/down a little bit,

23  but I saw no reason to think we were going to have any

24  material miss to the quarter at that point in time.

25  Therefore, I didn't say anything to Dan Cooperman or

376

1      Larry Ellison or anybody else.

2      Q.  Now, the investing public didn't know, on

3  January the 29th of 2001, that one of Oracle's most

4  senior executives was characterizing Oracle's ability to

5  make the quarter as a horse race?

6      MR. LINDSTROM: Objection.  Mischaracterizes

7  the testimony given later.

8      THE WITNESS: Again, I'm reading what I said.

9  I said many quarters we ended up very close to where we

10  were forecasting.  So to use, you know -- it was now

11  down to, you know, precisely how we would end up, but

12  that's a far cry from saying we would miss the quarter.

13      MR. SOLOMON: Q.  But the investing public

14  didn't know that that's what you were down to, did it?

15      A.  We never get into what our forecasts are

16  when -- many quarters when we were right on our number

17  that we ended up doing.

18      Q.  The investing public was still going on your

19  statements that the pipeline was astounding and had

20  never been stronger, right?

21      MR. LINDSTROM: Objection.  Argumentative, no

22  foundation, calls for speculation.

23      THE WITNESS: I think the investing public

24  relied on what we said in that quarterly call, and I

25  changed and added the wild card a few weeks later in the

377

1  later things to say, you know, we heard things about the

2  economy, we still -- you know, we still think things are

3  okay, but it's a wild card.  So I think that's the only

4  new piece of news that I added after the earnings call

5  that we did in December.

6      MR. SOLOMON: Q.  But with a softening

7  pipeline and the decreasing upside and requirement that

8  you -- your conversion ratio be better than ever to make

9  the quarter, all of those together represent information

10  that was in your possession and not in the possession of

11  the investing public in January of 2001; isn't that

12  right?

13      MR. LINDSTROM: Assumes facts.  And also calls

14  for speculation as to the knowledge of the investing

15  public.

16      THE WITNESS: I think I've answered your

17  question several times.  So I don't know what you want

18  me to do with the question.

19      MR. SOLOMON: Q.  Well, you say that the

20  economy was a wild card, and that's what you were saying

21  at the time.  But it's true, isn't it, that as of

22  January 29, 2001, you knew of -- that the pipeline

23  growth was reducing?

24      A.  Was growing at a lesser rate than I thought

25  was probably overstated when we started the quarter.

378

1  That's correct.

2      Q.  You knew there were negative trends and NAS,

3  OSI and OPI?

4      A.  I didn't testify I knew there was negative

5  trends.  I said I didn't see all those e-mails.  I

6  grilled George Roberts and Sandy Sanderson and everybody

7  else about how things were, and they continually came

8  back that they weren't seeing the softness.  They read

9  the economic report just like I did, but customers were

10  still going to do these high ROI projects.  They felt

11  good about making their quarter.

12      Q.  Okay.  You say you didn't see those e-mails.

13  You know Mr. Ellison saw those e-mails.

14      MR. LINDSTROM: No foundation.  Calls for

15  speculation.

16      MR. SOLOMON: Q.  Do you know if

17  Mr. Ellison saw them?

18      A.  I don't know what Mr. Ellison saw, no.

19      Q.  So as far as you know --

20      A.  But I know that Mr. Ellison sat through the

21  executive committee meetings, and he heard my questions,

22  he would ask questions.  There was a lot of back and

23  forth around all the executives in these weekly meetings

24  to try to get a sense for how the quarter was doing, and

25  that's typical a lot of times, but particularly because

379

1  we heard about these concerns of the economy, we kept
2  pressing the management, the sales management to see if
3  things were still looking good.
4      Q.  When you say you didn't see all these e-mails,
5  what e-mails are you particularly referring to?
6      A.  The ones you presented to me earlier and asked
7  me had I seen them, I wasn't copied, and I said I didn't
8  recall seeing them.
9      Q.  Okay.  So you saw the Garnick January 17th,
10  2001 e-mail, right?
11      MR. LINDSTROM:  Can we have a reference to the
12  specific exhibit?
13      THE WITNESS:  The flash report?
14      MR. SOLOMON:  Q.  Correct.
15      A.  Again, I'm certain I received it.  I don't
16  recall looking at it, but I'm certain I received it.
17  That was kind of routine.
18      Q.  So you were aware of the negative trends
19  reflected in there?
20      A.  In the actuals for December?
21      Q.  Correct.
22      MR. LINDSTROM:  Assumes facts.
23      THE WITNESS:  Again --
24      MR. LINDSTROM:  Mischaracterizes the
25  testimony.

380

1      THE WITNESS:  I don't know how many more times
2  you want me to say the same thing.  I've said this so
3  many times about the first month of a quarter and what
4  it means or doesn't mean.
5      MR. SOLOMON:  Q.  Let's go to -- I'll have
6  marked as the next exhibit a document produced by the
7  defendants with the control numbers NDCA-ORCL 03281 --
8  excuse me -- yeah, 03281 through 2977.
9      (Whereupon, Plaintiff's Exhibit 72 was marked
10      for identification.)
11      MR. SOLOMON:  So it's through 03311.
12      Q.  I'm going to represent to you that this is a
13  transcript of a Goldman Sacks conference attended by
14  Sandy Sanderson.  I don't necessarily expect you've seen
15  this before.
16      Do you recall seeing it before?
17      A.  I don't recall seeing it.
18      Q.  And then if I can direct you to control
19  No. 03309, which is page 29 of the document.
20      A.  0 --
21      Q.  3309, or the original page No. 29.
22      A.  29.  Let me try that.  03309.  Okay.  Yes.
23      Q.  Now, I want to read an answer, or at least
24  part of an answer given by Mr. Sanderson.  It says,
25  "We're actually -- I guess I'd start out by saying that

381

1  our pipelines are -- at application and database have
2  never been stronger.  And that continues to be the
3  case."
4      Do you see that?
5      A.  Where in this --
6      Q.  I'm sorry.  I started at line 18 on the
7  original page 29 of the document.
8      A.  Yes, I see that.
9      MR. LINDSTROM:  He's read part of that answer.
10      THE WITNESS:  I just read that particular
11  thing starting on 18.
12      MR. SOLOMON:  Correct.
13      MR. LINDSTROM:  And he wants to know if you
14  see that.
15      THE WITNESS:  Yes, I do see that.
16      MR. SOLOMON:  Q.  Okay.  Now, "Pipelines at
17  application and database never been stronger, that
18  continues to be the case," was that a true statement in
19  December of 2000?
20      A.  December of 2000.  I believe that our
21  pipelines were, for that point of time, the highest they
22  had been.  Absolutely.
23      Q.  Was that a true statement in January 2001?
24      A.  January 2001?
25      MR. LINDSTROM:  No foundation.

382

1      THE WITNESS:  I would have to look at the
2  data, but -- again, I would be speculating.  I remember
3  when you showed me a report here for December, I would
4  have to go back and look at January to be certain, I
5  guess.
6      MR. SOLOMON:  Q.  Was your pipeline as strong
7  in January as it was in -- 2001 as it was in
8  December 2000?
9      A.  Well, that's a question of what "stronger"
10  means.  So the issue, what does "stronger" mean?  Does
11  it mean larger than it was the year before in January?
12      Q.  All right.  So let's go back to the line of
13  questioning.  You think it's true, as of December 2000,
14  you can't, without more information, tell me if it was
15  true for January 2001; is that right?
16      A.  Right, 'cause we've already reminded myself,
17  looking at the September -- excuse me -- the December
18  report, that we had 52 percent in total and higher ups,
19  whatever.  So, you know, without being sure and looking
20  at January.
21      Q.  Okay.  Let's put it this way:  If there had
22  been a decline in pipeline growth --
23      A.  If the growth rate were somewhat lower than
24  the 52 percent?
25      Q.  Yes.  Correct.  Would that statement still be

383

1  true?

2      MR. LINDSTROM:  Calls for speculation, no

3  foundation.

4      THE WITNESS:  Yeah, it could well be,

5  absolutely.

6      MR. SOLOMON:  Q.  Tell me how.

7      A.  Because, again, everything is relative.

8  Everything is relative to where you are in the course of

9  a quarter, historically how much your -- the absolute

10  size of the pipeline at that point in time.  So the

11  pipelines typically come down over the course of a

12  quarter because deals slip and so forth.  So you

13  wouldn't expect the pipeline to be as large at the end

14  of January as it is at the end of -- as it is starting

15  out in December, for instance.  I mean, so it's a

16  very -- but I think his statement is accurate in that we

17  were still seeing a very strong pipeline.  Things looked

18  very good.

19      Q.  Okay.  Now --

20      MR. LINDSTROM:  Counsel, can you make a

21  representation as to when this conference occurred, or

22  when the statement was made?

23      MR. SOLOMON:  I can't right now, but I will

24  endeavor to.

25      Q.  Now, as of -- let's ask the question for

384

1  February now.  Would this be true in February of 2001?

2      A.  And again, we're assuming he's making these

3  statements in that period of time, right?  Again, I

4  would have to go see the information to be sure.

5      Q.  You don't know is the answer?

6      A.  I don't know.  I don't know without going back

7  and looking at the data.

8      MR. SOLOMON:  Okay.  Let's have marked as the

9  next exhibit a document produced by the defendants with

10  the control numbers 141794 and 95.

11      (Whereupon, Plaintiff's Exhibit 73 was marked

12      for identification.)

13      THE WITNESS:  Okay.

14      MR. SOLOMON:  Q.  Okay.  Have you seen this

15  before?

16      A.  I don't recall seeing it.

17      Q.  Okay.  And you see it's by TheStreet.com and

18  it's entitled "Goldman Conference:  Its Stock Weak,

19  Oracle Talks of Strong Business."

20      Do you see that?

21      A.  Yes.

22      Q.  And you'll see that there's a reference in the

23  top third left-hand portion of the first page to

24  "Conference Coverage Goldman Sachs."  Do you see that?

25      A.  Yes.

385

1      Q.  It seems to indicate the conference took place

2  February 12 to 15.

3      MR. LINDSTROM:  It speaks for itself, the

4  document.

5      MR. SOLOMON:  Q.  Do you see that?  And you'll

6  see that three quarters of the way down the page there's

7  language that says -- quoting Sanderson saying,

8  "Actually, our pipelines around applications and

9  database have never been stronger."

10      Do you see that?

11      A.  Yes.

12      Q.  And this appears to be the same language that

13  we just read from the previous exhibit.  Do you see

14  that?  So as of February 12 to 15, it's simply not true,

15  is it, Mr. Henley, that the pipelines at Oracle around

16  applications and database had never been stronger?

17      A.  I simply, as I answered earlier, I don't

18  recall what the pipelines were.  So I don't know.

19      Q.  You'll see, if you go to the second page, the

20  first full paragraph beginning "Insider", it says,

21  "Insider selling by Ellison has also hung on Oracle's

22  stock lately.  But Sanderson said the CEO had to sell

23  shares recently because they were tied to options that

24  would expire if he didn't."

25      Do you see that?

386

1      A.  Yes.

2      Q.  That's not true, is it?

3      MR. LINDSTROM:  Objection.  No foundation.

4      THE WITNESS:  Which isn't true?

5      MR. SOLOMON:  Q.  The options weren't going to

6  expire in January 2001 if Mr. Ellison didn't sell, were

7  they?

8      MR. LINDSTROM:  Mischaracterizes the document.

9      THE WITNESS:  Yeah, again, I don't know what

10  he said specifically and, you know, what these guys say.

11  So I don't know exactly what he said.

12      MR. SOLOMON:  Q.  And then it goes on to say,

13  "But Sanderson couldn't address the subsequent

14  scuttlebutt in the market that Ellison, who has a

15  penchant for jets and sailing yachts, was selling the

16  shares to buy a new boat."

17      Do you see that?

18      A.  I do see that.

19      Q.  Do you know why Mr. Ellison sold his shares in

20  January of 2001?

21      A.  I have no idea why he picked a specific point

22  in time to sell shares, no.

23      Q.  Okay.  And do you know what the purpose of the

24  sale was?

25      A.  No, absolutely not.

387

1    Q.  And then it goes on to say, "You know, we
2   don't talk about that stuff,' Sanderson said.  'It's
3   amazing, when you're with Larry, all he does is work.'"
4       Do you see that?
5    A.  Yes.
6    Q.  Is that a fair reflection; when you're with
7   Larry, all he does is work?
8    A.  Is that -- is that Sandy's perception,
9   or what?
10   Q.  No, is that consistent with your perception in
11  the 2000/2001 time frame?
12   A.  It's no different than me or anybody else.  He
13  clearly has another life than just working.
14      MR. SOLOMON:  Okay.  Okay.  Let's go off the
15  record for five minutes.
16      (Recess taken from 2:33 to 2:41 P.M.)
17      MR. SOLOMON:  We'll mark as the next exhibit a
18  document produced by the defendants with the control
19  numbers 061311 through 315.
20      (Whereupon, Plaintiff's Exhibit 74 was marked
21      for identification.)
22      MR. SOLOMON:  Q.  You'll see that you are
23  apparently involved in at least some of these exchanges,
24  so once you've had a chance to look at the document, let
25  me know if you recognize any of the exchanges, please.

388

1    A.  Yes, I remember not all the details, but I do
2   remember receiving this from Julie and sending it on to
3   Larry.
4    Q.  Okay.  And on that first page you make
5   reference to comments at an EC meeting.  Do you see
6   that?
7    A.  Yes.
8    Q.  What were the comments you were referring to?
9    A.  "Per your comments at the EC meeting that you
10  wanted to know everything I'm passing along."  So I
11  think Larry was -- you know, gets feedback from the
12  sales force, and he said if there's any issues, let me
13  know.  So I think that was the spirit of me passing this
14  along to him.
15   Q.  And was that any issues with respect to
16  anything in particular, or just generally, any issues?
17   A.  I think this had to do with the 11i release,
18  which was new at that point.
19   Q.  Okay.  And then if you go to the third page of
20  the document, it has your name at the top and it says,
21  "Oracle, Jeff Henley," and then it says, "From Sandy
22  Sanderson to Julie Cullivan."  Do you see that?
23   A.  I see that.  I don't know why it says "Oracle
24  Jeff Henley" at the top.  She sent a note to me, I
25  think.  The previous page is kind of like what I would

389

1       expect, so I'm not sure why it says "Oracle Jeff Henley"
2   at the top.  Other than that, I mean, I think she sent
3   this long note to me from the previous, and then I
4   forwarded it on to Larry.
5    Q.  And the note that we're looking at now, the
6   page with the control No. 061313 starts off with Sandy
7   Sanderson apparently saying, "Wow.  I have sent this to
8   Ron and Mark.  I know this may cause some pain, but they
9   need to hear this.  I am sure they're not indicating
10  these issues to their management.  Let's hope this gets
11  them motivated to fix these issues."
12      Do you see that?
13   A.  Yes.
14   Q.  And the issues that are being referred to are
15  the issues listed by Julie Cullivan in the e-mail below;
16  is that right?
17      MR. LINDSTROM:  The document speaks for
18  itself.
19      THE WITNESS:  Yeah, I think the document is
20  what it is.
21      MR. SOLOMON:  Q.  And Julie Cullivan had
22  written, in part, "Sandy, per your request, the
23  consistent themes continue to be poor performance,
24  inability to prove our EBusiness Suite integration
25  story, and product stability/quality issues."

390

1       Do you see that?
2    A.  Yes.
3    Q.  Were you aware that those were consistent
4   themes at the very beginning of February 2001?
5    A.  Consistent themes.  I was certainly aware that
6   we were still in the early shakeout stage of 11i, and I
7   heard comments from a variety of people inside the
8   company that, you know -- but whether those were
9   characterized by everyone as the consistent themes, I
10  don't know.
11   Q.  If you -- if you look at the itemization under
12  Order Management and Configuration, the itemization
13  there of problems, were you aware of those as of the
14  beginning of February 2001?
15      MR. LINDSTROM:  We're talking about in the
16  demonstration environment, or generally with the
17  product?
18      MR. SOLOMON:  Q.  Just as reflected in this
19  e-mail.
20   A.  These apparently reflect the OPI demonstration
21  environment.  I was certainly -- I can't remember when
22  she forwarded this to me.  February 22.  So I don't know
23  if I was aware of this on February 21.  I doubt it.
24  But, I mean, certainly when she forwarded it to me, I
25  became aware of her position of -- and she was one of

391

1  our sales consultants that did demos.

2      Q.  If you look at CRM, go over to the next page,

3  in capital letters it says "Cannot show a complete

4  integrated CRM demo, let alone a complete EBiz Suite,

5  (CRM/ERP) integrated demo.

6          Do you see that?

7      A.  Uh-huh.

8      Q.  Were you aware of that as of the beginning of

9  February 2001?

10     A.  Again, I can't remember if I heard about it

11  before I got her note later in February.

12     Q.  Now, do you agree that an inability to

13  demonstrate a product would result in a -- would result

14  in more difficulty in selling the product?

15     A.  It can't be helpful.

16     Q.  And all of these problems itemized here as of

17  the beginning of February 2001, with the demonstration

18  of the E Business Suite, were not disclosed to the

19  investing public at the time, were they?

20     A.  I can't remember what we told the investment

21  public, but I know that when we launched the product, I

22  think the people who follow the company clearly

23  understand there is a shakeout period, when you do new

24  releases, of getting initial trials and shaking out bugs

25  and all that sort of thing.  And we did say this is a

392

1  very comprehensive major new release and so forth.  So I

2  think what we were experiencing at that point was

3  clearly some of the growth pains that you go through

4  with major new releases like this.  We haven't done many

5  in the history of Oracle this comprehensive.

6      Q.  Okay.  You started off answering, "I can't

7  remember what we told the investing public."  And is

8  your answer, then, you don't know whether these problems

9  were disclosed at the time to investing public or not?

10     A.  Well, I'm sure we never got into --

11         THE REPORTER:  I'm sorry.  You guys are

12  talking over each other.

13         MR. SOLOMON:  Q.  You started out saying that

14  you can't remember whether you told the investing

15  public.  Is your testimony that you simply don't know if

16  the investing public was told of these problems as

17  reflected in this e-mail at around the time of the

18  e-mail?

19     A.  Oh, I don't know, but I can almost be certain

20  that we would never go through this level of detail

21  just -- it wouldn't occur to me to --

22     Q.  What about, "Hey, we can't demonstrate our

23  product very well without problems"?  Was that

24  disclosed?

25     A.  I can't remember.  But I think we were clear,

393

1  when we started, it was an ambitious project and it

2  would take a few quarters to shake down and get it

3  stabilized and so forth.

4      Q.  In fact, around the time these problems were

5  being discussed internally at Oracle, the message to the

6  investing public was that the product was stable, and it

7  pre-integrated and interoperable out of the box and it

8  snapped together, wasn't it?

9          MR. LINDSTROM:  Assumes facts,

10  mischaracterizes the document.

11         MR. SOLOMON:  Q.  Is that funny?

12     A.  I think she is -- well, I think you're trying

13  to, again, put words in -- you know, oversimplify

14  things.  I think that we were able to demo the product,

15  but as Julie pointed out, it was not fully shaken out

16  yet.  We still had problems.  We were still getting all

17  the pieces to work well together, and some of the

18  functionality, as she points out, didn't work as well as

19  it would ultimately work as we shook out the product.

20         So we've gone through several issues like this

21  over the years, and you never get into bearing all of

22  this out to the investing public, let alone our

23  customers.  We don't get into detailed discussions of

24  what works or what doesn't work.  But clearly, we were

25  very clear that it was a very complex major new

394

1  revolutionary kind of release that we were very

2  confident would be successful, but there was a shakeout

3  period.

4      Q.  Does Mr. Ellison believe that being reckless

5  is a key to success?

6          MR. LINDSTROM:  No foundation, calls for

7  speculation.

8          THE WITNESS:  Again, I have no idea.

9          MR. SOLOMON:  Q.  Have you ever heard him say

10  anything to that effect?

11     A.  No, I've never heard him say that being

12  reckless was an ingredient to success.

13     Q.  Would you be surprised to hear that he said

14  that?

15     A.  Again, everything is out of context.  I have

16  no idea if he ever said it.  So I would have to hear the

17  whole context and everything else to figure out whether

18  I'm surprised or not.

19     Q.  Was the release of 11i, in May of 2000,

20  reckless?

21     A.  Was it reckless?  I think it was aggressive.

22  I think we very much wanted to get it out, and I think

23  that there was more optimism on the part of the

24  development teams and Larry, in terms of how long it

25  would take to shake it out.  But I will not characterize

395

1 that as reckless because we knew it was a big
2 complicated release and there would be some amount of
3 bugs and problems.
4    Q.  And you knew that it wouldn't be a revenue
5 driver for at least a couple of years; is that true?
6    A.  That's not true.
7    MR. SOLOMON:  Let's have marked as the next
8 exhibit a document produced by the defendants with the
9 control No. 618166 to 169.
10    (Whereupon, Plaintiff's Exhibit 75 was marked
11        for identification.)
12    MR. SOLOMON:  Q.  Once you've had a chance to
13 look at it, please let me know if you recognize it.
14    A.  Again, I can't recall whether I saw this or
15 not.  But again, this is a long list of -- long e-mail
16 describing for, in this case, I guess -- hmm.  James
17 McHugh.  Is that to James McHugh from, again, a person
18 involved in demos?  Her assessment of the state of demos
19 and some of the issues and so forth.
20    Q.  The previous document was concerning Sandy
21 Sanderson and OPI; is that right?
22    A.  Yes.  Yes, she was in Sandy's organization.
23    Q.  And this one appears to be NAS; is that right?
24    A.  I'm not sure.
25    Q.  When it says "Demo update for George," does

396

1 that indicate --
2    A.  Well, it is, but I think -- my recollection
3 was Gayle also did some work with Sandy.  So I -- but I
4 just -- it definitely says "Demo update for George,"
5 who, I think, would be George Roberts.
6    Q.  Okay.  Now, the -- I'm now going into the
7 third page of the document, and you'll see that there's
8 an e-mail exchange at the top, "Subject:  Urgent, demo
9 update for George."
10    Do you see that?
11    A.  Yes.
12    Q.  It's dated the 10th of January, 2001, and it's
13 to Antony Cioletti, Lee Paulino, Grant Franjione and
14 Mary Delaney.
15    Do you see that?
16    A.  Yes.
17    Q.  Do you know any of those people?
18    A.  I think the only person I met occasionally was
19 Grant.  And the other ones don't ring a bell.
20    Q.  And where did he work within --
21    A.  He was in sales.
22    Q.  For what division?
23    A.  I think in George Roberts' sales division.
24    Q.  Okay.  And it starts off saying, "At the OPS
25 review today, the demo environment came up again.  I owe

397

1 George by Friday a current writeup on our issues so he
2 can discuss with Larry at next week's EC meeting."
3    Do you see that?
4    A.  Yes.
5    Q.  Now, do you recall an executive committee
6 meeting the week after this, the week after the 10th of
7 January 2001, involving Larry Ellison?
8    A.  I don't recall a specific meeting, but I do
9 recall, from time to time over the years, different
10 people commenting on our products, including demo
11 environment, and I definitely remember people
12 complaining about issues with the early demos of 11i.
13    Q.  Okay.  And then back to the first page of the
14 document, there are six itemized product demonstration
15 difficulties.  Do you see those?
16    A.  Uh-huh.
17    Q.  Were you aware of those difficulties as of
18 January 12, 2001?
19    A.  Again, I can't remember -- recollect whether I
20 got this, and I can't recollect what details were
21 discussed, but I certainly was aware that the field had
22 issues with the demos, and it had been talking to Larry
23 about it and the development heads and so forth.
24    Q.  And again, these difficulties were not items
25 that the investing public was alerted to?

398

1    MR. LINDSTROM:  No foundation.
2    THE WITNESS:  Again, certainly I didn't
3 communicate that.  We've had --
4    MR. LINDSTROM:  You've answered the question.
5    MR. SOLOMON:  Q.  I'll have marked as the next
6 exhibit a document produced by the defendants with the
7 control numbers 012439 to 441.
8    (Whereupon, Plaintiff's Exhibit 76 was marked
9        for identification.)
10    MR. SOLOMON:  Q.  Tell me if you recognize
11 this.
12    A.  I don't believe so.
13    Q.  And were you aware, around the end of
14 January 2001, beginning of February, that there was a
15 sentiment that Oracle had blown APSWorld with respect to
16 its demos?
17    MR. LINDSTROM:  Objection.  Mischaracterizes
18 the document.
19    MR. SOLOMON:  Q.  Go ahead.
20    A.  I don't recall hearing anything about the
21 demos for AppsWorld Paris.
22    Q.  Were you concerned that because of these
23 difficulties, as reflected in the various e-mails in
24 demonstrating the product, that Oracle was blowing a
25 huge opportunity?

399

1      A.  Let's see.  I was certainly concerned that not
2 having optimum demos was not helpful, and that it would
3 suboptimize, you know, our revenue opportunity.  So
4 certainly, like all of management anxious to see these
5 problems, you know, work themselves out and get
6 resolved, 'cause that could only make things better for
7 us.
8      Q.  And, in fact, even in April of 2001, you were
9 of the view that Oracle was risking blowing the
10 opportunity of a lifetime because of demo problems with
11 11i; is that right?
12      MR. LINDSTROM:  Vague and ambiguous.
13      THE WITNESS:  Again, I would have to go back
14 and look at what I said, but I think that it's true that
15 it took us longer with each passing month to kind of get
16 everything stabilized, certainly longer than I ever
17 thought it would take.
18      MR. SOLOMON:  Q.  You said you were blowing
19 the opportunity of a lifetime, didn't you?
20      A.  Don't know.  You would have to refresh my
21 memory and see it.  But I certainly got frustrated, as
22 time went on, that we didn't seem to get all the pieces
23 really working optimally, and that was -- if it
24 continued for a long period of time, it would definitely
25 be a very serious problem for us.

400

1      MR. SOLOMON:  I'll have marked as the next
2 exhibit a document produced by Defendants with the
3 control numbers 061369 through 373.
4      (Whereupon, Plaintiff's Exhibit 77 was marked
5      for identification.)
6      MR. SOLOMON:  Q.  Do you recognize this?
7      A.  Again, not particularly.  But I -- the format,
8 I mean, for a while George was forwarding, I think at
9 Larry's request, these weekly reports so that, you
10 know -- so everybody could see whether we were making
11 progress or not.  And clearly, after looking at this for
12 a few weeks, I got frustrated because, as I testified
13 earlier, if this were to continue, just carry forward,
14 not making progress, this is not good.
15      Q.  And that's your language, "Absolutely
16 incredible.  We're blowing the opportunity of a
17 lifetime."  This is your language, right?
18      A.  It's what I wrote.
19      Q.  So that's your language?
20      A.  Absolutely.
21      Q.  All right.
22      A.  But I tried to put it in a little bit more
23 context as to why I would say something like that in my
24 earlier testimony.
25      Q.  This is just more of the same.  This is the

401

1 story in May of 2000, June, July, August, September,
2 October, November, December, January 2001, February,
3 March, April.  That's the story, isn't it, with the 11i?
4 This isn't new.
5      MR. LINDSTROM:  Compound, argumentative, vague
6 and ambiguous.
7      THE WITNESS:  I don't know that we -- I don't
8 know when we launched 11i, but I think it was the summer
9 of 2000 when we launched it, and we -- I remember
10 distinctly we all saying, "This is going to take a few
11 quarters to sort itself out.  It's a big release," and
12 so forth.
13      What got frustrating was here in April, you
14 know, still struggling with some of these issues.  So I
15 was not surprised, in the first few quarters, to see the
16 initial sort of teething problems, if you will.  The
17 level of frustration for all of us, I think, got more in
18 this time frame now where we're starting to see, you
19 know -- still having problems.  So this period was a
20 very acute period where we were really honing in on why
21 haven't these things started to stabilize?  Here we are
22 in April, and we don't seem to make enough progress now.
23 You would expect by now that things would have
24 stabilized better.
25      So that was the frustration.  And if you don't

402

1 fix these things, clearly, we're going to blow this
2 opportunity, so we've got to get on with it.  And I said
3 that to Larry; we were all frustrated, as was Larry.  We
4 were working hard to resolve these problems.
5      MR. SOLOMON:  Q.  It's fair to say that when
6 you and Mr. Ellison traded your stock in January of
7 2001, that you and Mr. Ellison were aware of all of
8 those sorts of problems, but the investing public was
9 not.
10      MR. LINDSTROM:  Compound, no foundation.
11 Argumentative.  Actually, it also calls for speculation
12 as to what the investing public knew about 11i.
13      THE WITNESS:  I'll stipulate that I certainly
14 knew more about 11i than the public did.  I think that's
15 quite natural, of course.
16      MR. SOLOMON:  Q.  And you knew information
17 that was adverse?
18      A.  Yes, but as I said earlier, at that stage, it
19 wasn't that shocking to still be having a lot of
20 problems stabilizing all this code and getting these
21 demos right.  It was really more in the spring.  By the
22 time the spring came around, it just seemed like we were
23 still fighting with issues that should have been
24 resolved several months before.
25      Q.  Okay.  Let's have marked as the next exhibit

403

1　another document produced by the defendants in the
2　litigation with the control No. 052474.
3　　　(Whereupon, Plaintiff's Exhibit 78 was marked
4　　　for identification.)
5　　　MR. SOLOMON:  Q.  Just let me know if you
6　recognize that.
7　　　A.  No, not particularly.  I don't think I'm
8　copied on it.
9　　　Q.  Did you have any discussions with
10　Ms. Balkenhol concerning her frustration with this
11　product?
12　　　A.  I don't recall, no.  I don't know what product
13　it is.  WEBREQS, apparently.
14　　　Q.  You don't know what module that is?
15　　　A.  Yes, I think I know what it is.  I think she's
16　referring to a self-service product that was called
17　WEBREQS.
18　　　Q.  And is that part of 11i?
19　　　A.  Yes.
20　　　Q.  And were you aware that she was encountering
21　problems?
22　　　A.  I can't recall.
23　　　Q.  Let's have marked as the next exhibit a
24　document produced in the litigation with the control
25　numbers 397378 through 397380.

404

1　　　(Whereupon, Plaintiff's Exhibit 79 was marked
2　　　for identification.)
3　　　MR. SOLOMON:  Q.  Let me know, when you've had
4　a chance to look at it, if you've seen this before.
5　　　A.  I don't recall ever seeing this, no.
6　　　Q.  Do you have any idea where it comes from?
7　　　A.  Again, I would only be speculating.  It's not
8　clear.
9　　　Q.  What's your speculation?
10　　　MR. LINDSTROM:  Objection.  Calls for
11　speculation, no foundation.
12　　　THE WITNESS:  It doesn't look like something
13　Oracle generated, no.
14　　　MR. SOLOMON:  Q.  Do you think it came from
15　Siebel?
16　　　A.  It seems like it.  The person keeps talking
17　about Siebel, so...
18　　　Q.  And do you recognize any of the handwriting
19　throughout this document?
20　　　A.  No.
21　　　Q.  Have you looked at each page just so you're
22　sure you don't recognize any?
23　　　A.  Again, I'm not a handwriting expert, so no,
24　I -- I don't believe I recognize anybody's handwriting
25　here, no.

405

1　　　Q.  Okay.  And without -- I accept that you say
2　you haven't seen the document before.
3　　　Have you discussed, with anybody, Siebel
4　making accusations that Oracle lied or misrepresented
5　the condition of its products?
6　　　MR. LINDSTROM:  In the way it's suggested in
7　Exhibit 78?
8　　　MR. SOLOMON:  Q.  In the way it's suggested,
9　Correct.  Yes, thank you.
10　　　A.  No, I didn't listen to Siebel earnings calls,
11　or whatever, but I am aware that they frequently said
12　they never saw Oracle in their deals.  Those things
13　were reported -- and I never listened to one of their
14　calls, but it was reported to me that they always
15　pooh-poo'd the degree of competition we were creating,
16　and analysts would say that to us.  But I don't recall
17　any of these specific examples.
18　　　MR. SOLOMON:  I'll have marked as the next
19　exhibit a document with the control numbers 1029900 to
20　32070.
21　　　(Whereupon, Plaintiff's Exhibit 80 was marked
22　　　for identification.)
23　　　MR. SOLOMON:  Q.  When you've had a chance to
24　look at it, let me know if you recognize these
25　exchanges, or any of them.

406

1　　　A.  Again, I don't remember the e-mail, but I
2　definitely remember calling on Zone Technologies, which
3　is in the Bay Area, with the sales representative for
4　Baker, and I think that's why I was probably copied on
5　this.  It shows me as a copy.
6　　　Q.  Did you have a particular role with respect to
7　Zone Technologies?
8　　　A.  Just a sort of executive relationship going
9　out and getting to know them and trying to figure out
10　what we could be helpful and that sort of thing.
11　　　Q.  That would be the executive sponsor?
12　　　A.  Yeah, that's the term we use inside the
13　company.
14　　　MR. LINDSTROM:  So Mark, before you proceed
15　further, let me just get some clarification from you.
16　　　The last page, this may not be intended to be
17　part of this Exhibit 79, but there's a big jump in the
18　Bates stamp numbers.
19　　　MR. SOLOMON:  Thank you.  Thank you for that.
20　What we'll do is just take off that last page and make
21　it Exhibit 81.  So if you can make the document with the
22　control No. 1032070 the Exhibit 81, and Exhibit 80 is
23　now comprised of control numbers 1029900 through 9905.
24　　　(Whereupon, Plaintiff's Exhibit 81 was marked
25　　　for identification.)

407

1    THE WITNESS:  And also, this looks like a
2  duplication.  Is that what this is?  It looks like --
3  it's a different type, but it looks like the fourth page
4  on is a repeat of the first three.  If it is, I don't
5  have to read it.
6        MR. SOLOMON:  It looks like it.  I agree.
7    Q.  So the first iteration of the document is on
8  control numbers 1029901 and 02, and then the -- what
9  appears to be a copy of the same language is 1029903 and
10  04; is that right?
11    A.  Yes.
12    Q.  Okay.
13    A.  That's what it looks like to me.
14    Q.  And then if you look at what is now
15  Exhibit 81, you'll see in there there's a reference to
16  you as Zone's executive sponsor.  Do you see that?
17    A.  Yes.
18    Q.  Okay.  Now, I know this isn't dated, but maybe
19  we can deduce a date, maybe we can't, but it says
20  that --
21        Well, let's read the first part of it into the
22  record.  "Drew and Chris, not sure if you've been
23  involved with Zone Technologies to date.  Jeff Henley,
24  Zone's executive sponsor, is meeting with Zone's CFO to
25  discuss a number of issues associated with their

                                                   408

1  to win the account.  And in reading this, I don't recall
2  the sequence, but in reading it, it sounds like
3  Elizabeth wanted me to go back out and meet with them to
4  help, you know, sort out their concerns, I guess.  So
5  I'm not sure until I saw this note from her that I was
6  aware that there were some issues.  And then reading it,
7  I said I would be happy to go out and talk to them, but
8  we needed to get the development guys, Mark Berrenechea
9  and so forth, to tell me what's going on.  I don't know
10  what to represent.  I don't know what our position is.
11    Q.  Now, do you recall the time frame in which you
12  had the meeting in which the functional deficiencies was
13  raised?
14    A.  Pardon me?
15    Q.  I know your counsel's trying to draw your
16  attention to something in the document.  I don't know
17  what it is.
18        MR. LINDSTROM:  I'm wondering why you're
19  asking him questions about 11.03 and not 11i.  In other
20  words, I don't understand what the point of this is.
21        THE WITNESS:  That's true.  I didn't read
22  that.  Hmm.
23        MR. LINDSTROM:  They're different products.
24        MR. SOLOMON:  I'm listening.
25        THE WITNESS:  Apparently, this particular

                                                   410

1  implementation of Oracle applications.  At the top of
2  Zone's list of concerns is their belief that there are
3  functional deficiencies in our application software."
4    Q.  Do you see that?
5    A.  Yes.
6    Q.  Now, do you recall discussing with someone at
7  Zone their concern that the application software
8  suffered from functional deficiencies?
9        MR. LINDSTROM:  I assume you're talking about
10  11i, right?
11        MR. SOLOMON:  Correct.
12        MR. LINDSTROM:  As opposed to other
13  applications, such as the ones referenced in the
14  previous exhibit?
15        THE WITNESS:  And apparently, these particular
16  two modules were management and Oracle Service.
17        MR. SOLOMON:  Q.  Say it again.
18    A.  Apparently, it related to these two
19  application modules, Oracle management and Oracle
20  Service.
21    Q.  And are you saying that that's not part of
22  11i?
23    A.  No, but I'm just saying there's a whole
24  variety of modules, these particular two, apparently,
25  and I don't recall.  I met them when we were going out

                                                   409

1  situation was 11.0.  So that was the earlier product,
2  and we were replacing that now with 11i.
3        MR. SOLOMON:  Q.  That's right.  This was part
4  of an implementation of 11i to replace 1103.  Is that
5  not right?
6    A.  I don't know.  I would to have read this whole
7  thing.
8        MR. LINDSTROM:  Why don't you read the whole
9  thing because I know counsel wants your most accurate
10  testimony.
11        MR. SOLOMON:  Q.  When you get to the point
12  where you disagree, if you disagree with your counsel,
13  let me know, Mr. Henley.
14        MR. LINDSTROM:  Well, he's going to have to
15  read the whole document before he can answer that
16  question, Counsel.
17        THE WITNESS:  Fortunately, it's two pages, I
18  guess, so I'm on the second page.
19        Okay.  So my fast read of two pages.
20        MR. SOLOMON:  Q.  Yeah.
21    A.  I don't read in here that the talk is about
22  they want to go to 11i.  Clearly, at some point they
23  would, but it seemed like this related to some issues
24  they were having with 1103.  That seems to be what this
25  relates to.  I mean, there is one thing in here about

                                                   411

1    11i, expectations of improvements, and then anticipation
2    of 11i is further.  But I don't think there's any
3    mention of when that was planned to happen or be
4    implemented.
5        Q.  So you don't know if it was happening at the
6    time of this e-mail or not; is that true?
7        A.  It certainly doesn't sound like it.  It
8    certainly sounds like they were on 1103 and still not
9    happy, and they were trying to get some escalation in
10   development to deal with these issues.
11       Q.  Okay.  Did Zone purchase, from Oracle 11i,
12   modules?
13       A.  Again, I read it fairly quickly, but it
14   seemed -- she said that they had implemented the ERP
15   stuff in record time.
16       Q.  And were those 11i?
17       A.  It doesn't say.  So my assumption was probably
18   1103, and under your -- when you buy 1103 11.0, you have
19   the right to upgrade.  So I'm guessing that probably
20   they were still on 11.0 for financials.
21       Q.  But you can't -- you don't know unless I can
22   show you something else?
23       A.  I don't know, but if they bought 1103, that
24   would give them the right to upgrade at no charge under
25   their support agreement for like modules in 11i.

                                                412

1        Q.  Okay.  There's a reference on what is control
2    No. 1029901 to the special report section of the daily
3    CRM manage go live report.
4        A.  Okay.
5        Q.  Do you know what that is?
6        A.  No.
7        Q.  Do you recall what happened with your business
8    relationship with Zone?
9        A.  No.
10       MR. LINDSTROM:  Objection.  Vague and
11   ambiguous.
12       THE WITNESS:  I have no recollection.
13       MR. SOLOMON:  Okay.  I'm going to have marked
14   as the next exhibit a document produced by the
15   defendants in this litigation with the control numbers
16   061297 and 298.
17       (Whereupon, Plaintiff's Exhibit 82 was marked
18   for identification.)
19       MR. SOLOMON:  Q.  And once you've had a chance
20   to look at it, I want to know, first of all, if you
21   recognize it.
22       A.  Again, I don't recall it.  There's one from
23   William Plant where I'm copied, and I'm copied down here
24   on the second part of this, so I must have received it.
25       Q.  Okay.  I'm just going to focus, at least

                                                413

1    initially, on the first page of the document, and if you
2    look at the bottom on the first page, there's an
3    exchange from Larry Garnick to Jennifer Minton and to
4    you.
5        Do you see that?
6        A.  Yes.
7        Q.  And it says, in part, "The oddity is Europe
8    where server is way up and apps are way down.  Trending,
9    you would expect 55 to $60 million in apps revenue in
10   Europe, but actual was CD 38 million.  The apps forecast
11   was 45 million.  We compared actuals to forecast by
12   country and found that all countries except the UK and
13   Emerging Territories came in under forecast for apps.
14   Conversely, server actuals were above forecast in
15   75 percent of the EMEA countries.  It does not appear to
16   be an error coming from one or two countries, but does
17   need explaining.  Thoughts, William."
18       Do you see that?
19       A.  Yes.
20       Q.  Then above, Sergio Giacoletto writes, "I have
21   a simple, internal only, explanation.  Given the R11i
22   problems in Q1/Q2, many of our salespeople decide to
23   focus on technology to make their quota and wait for the
24   product to be stable.  Ciao."
25       Do you see that?

                                                414

1        A.  Yes.
2        Q.  Now, were you aware, in Q3 '01, that
3    salespeople in Europe were holding back on 11i because
4    it was not stable?
5        A.  Again, I don't recall this note or whatever.
6    Sergio has been with us a long time, and I'm sure that's
7    a theory he put out there.
8        Q.  Do you know why he said "internal only" as to
9    the explanation?
10       A.  No.
11       Q.  And did you tell the investing public that
12   Oracle had missed its apps revenue numbers in Europe in
13   Q3 '01?
14       A.  I don't recall.  This note -- this note would
15   have been after Q3, so as you know, 'cause you looked at
16   all these documents, we had a pre-announcement call,
17   then we had a long call after that at the quarterly
18   call, and I honestly don't remember what we said, but we
19   typically broke out applications and technology by
20   geography.  So there at least would have been actual
21   results.  Whether we commented on how that compared to
22   our forecast, I doubt it.  But we always showed actuals
23   by geography and so forth.
24       Q.  But not by product line?
25       A.  No.  Applications versus technology, database,

                                                415

1  we've had that format for many years.  I believe we were
2  doing it by then in our public quarterly earnings call
3  where we comment on the most recent quarter.
4      MR. SOLOMON:  Okay.  And I'd like to have
5  marked as the next exhibit another document produced by
6  the defendants in this litigation with the control
7  numbers 063478 through 063480.
8      (Whereupon, Plaintiff's Exhibit 83 was marked
9          for identification.)
10     MR. SOLOMON:  Q.  Let me know if you recognize
11  this.
12     A.  No, I don't recall it.  I think I'm copied on
13  it.
14     Q.  Were you aware, during Q3 of '01, that Oracle
15  was having great difficulty finding any happy
16  referenceable customers for the 11i?
17     MR. LINDSTROM:  You're asking him during Q3
18  '01?
19     MR. SOLOMON:  Q.  Correct.
20     A.  I'm not aware of the status.  We didn't have a
21  lot of live accounts, but that was growing each quarter,
22  and we were reporting that each quarter, how many new
23  live accounts we had.  But how many of them were
24  referenceable or not, I don't recall on that.
25     Q.  Now, who is Mark Jarvis?

416

1      A.  He, at that time, I believe, was running
2  marketing, worldwide marketing for Oracle.
3      Q.  Okay.  I'm looking at No. 4 on the 1st page
4  and it reads as follows: "We brief some financial and
5  industry analysts on the status under", in quotes,
6  "'nondisclosure' on the basis that their inside
7  knowledge of how focused we are on this may help pour a
8  little water on the fire.  At least the press will have
9  less negative to quote."
10     Do you see that?
11     A.  Uh-huh.
12     Q.  What do you think of that suggestion?
13     MR. LINDSTROM:  Objection, irrelevant.  Calls
14  for a conclusion.
15     THE WITNESS:  I believe he said that and was
16  doing that, apparently.
17     MR. SOLOMON:  Q.  Did you approve?
18     A.  I had nothing to do with Mark's part of the
19  business.  He doesn't report to me.  I don't get
20  involved in marketing, per se, but --
21     Q.  Were you senior to Mark Jarvis at the time?
22     A.  I think at that stage Mark reported to Larry.
23  So I'm older.
24     Q.  That didn't mean senior, in essence.
25     A.  But I think we both reported to Larry at that

417

1  time.
2      Q.  So you think you were laterals?
3      A.  I believe so.  I believe we both reported to
4  Larry at the time.
5      MR. LINDSTROM:  And the time you're talking
6  about is March 26, 2001?
7      MR. SOLOMON:  Right.
8      THE WITNESS:  And I'm guessing, 'cause I don't
9  remember, but at one point I believe that Mark reported
10  to Larry.  So if he did, that meant that we both
11  reported to Larry and we were both peers, if you will,
12  in terms of we both reported to the same boss.
13     MR. SOLOMON:  Q.  Now, just help me with this.
14  You testified that you didn't get into discussions with
15  analysts intra-quarter about what was going on at the
16  company because I believe you didn't think it
17  appropriate; is that right?
18     MR. LINDSTROM:  Mischaracterizes his
19  testimony.
20     MR. SOLOMON:  Q.  Is that right or wrong?
21     A.  Ask me the question again.
22     MR. LINDSTROM:  Do you want to reread it?
23     MR. SOLOMON:  Q.  No, just help me with this.
24  You testified that you didn't get into discussions with
25  analysts intra-quarter about what was going on at the

418

1  company because I believe you didn't think it
2  appropriate; is that right?
3      A.  Yeah, I didn't get into financial discussions
4  with customers after we did arrange call for the current
5  quarter.  I testified that at ad nauseam, yes.
6      As I read this, this is something different.
7  He does say financial analysts, but my understanding of
8  market is they mostly worked with industry analysts, the
9  Gartners and these people.
10     Q.  Yes, but he's talking about both.
11     A.  I know he is.  I understand what I read.  I'm
12  just telling you my understanding of their function.  I
13  had investor relations reporting to him, he had industry
14  relations reporting to him.  So I don't know.  Perhaps
15  he did talk to some -- unbeknownst to me, talked to some
16  financial analysts, or got reports from them, or
17  whatever.
18     Q.  What I'm getting at is when I read this to you
19  and asked you what you thought about the suggestion, you
20  basically seemed to say, "Nothing to do with me, he's my
21  lateral, I don't tell him what to do, it's fine."  Isn't
22  that, in summation, what you were trying to tell me?
23     MR. LINDSTROM:  Mischaracterizes his testimony
24  and the document.
25     THE WITNESS:  Right.  So again, try it again

419

1  of what you want me to say.
2      MR. SOLOMON:  Q.  Is this not inconsistent
3  with your testimony earlier today that, as far as you're
4  concerned, when you talk to financial analysts
5  intra-quarter, it's inappropriate to talk about what's
6  going on at the company.
7      A.  I think if the -- I think if the industry
8  analysts group that reported to Mark and/or Mark himself
9  met with Gartner or IDC or all these various industry
10  analysts who have nothing to do with financial
11  projections, right, and they talked to big user bases
12  and they're reporting to Mark that customers are up in
13  arms, they're mad about this or mad about that, that's
14  Mark's job.  It has nothing to do with quarterly
15  financial reports or anything like that.  And so at
16  least on the industry analyst, you know, and if he's
17  friends with or knows a few financial analysts that pass
18  on information and there's a document here from Charles
19  Phillips who was at Morgan Stanley at the time, that,
20  apparently, Mark got or something, then, you know, for
21  him to say, you know, "Gee, here's some financial
22  analysts saying some of the same things."  This had
23  anything to do with the quarterly financials; it was
24  feedback from what they were hearing from customers.
25  And so, apparently, reading what he said, he went out

420

1  and tried to, you know, explain to them what we were
2  doing, the attack plan on stabilizing the product and so
3  forth.  I wasn't involved in that; it doesn't seem like
4  a bad thing to do, to get out and try to explain what we
5  were doing.
6      Q.  Have you ever heard of reg FD?
7      A.  Yes.
8      Q.  What does that say?
9      MR. LINDSTROM:  Are you asking for his
10  understanding?
11      MR. SOLOMON:  Yeah.
12      THE WITNESS:  My understanding of reg FD,
13  again, is that you're not supposed to go out and give
14  material -- non-public information to selected people or
15  something.  In other words, the market, if there's
16  something material to be known, you should tell the
17  whole market so that nobody has unique material inside
18  information.
19      MR. SOLOMON:  Q.  And does not No. 4 ring a
20  reg FD alarm bell in your head?
21      MR. LINDSTROM:  Calls for speculation on his
22  part, mischaracterizes the document.
23      THE WITNESS:  Again, I tried to give you my
24  perspective on what I read here.  It does not
25  necessarily ring a reg FD bell in my head, no.

421

1      MR. SOLOMON:  Q.  That's because when you read
2  this, you like to exclude the word "financial",
3  notwithstanding the fact that he includes it.
4      MR. LINDSTROM:  Argumentative.
5      THE WITNESS:  No, I told you what his
6  responsibility is, and I know for sure his group talked
7  to the so-called industry analysts.  There's a reference
8  to a note from Charles Phillips who, at the time, was a
9  financial analyst.  Now, I don't know if he talked to
10  him or he just said, "Look, this is the same thing I'm
11  hearing from the industry analyst," right?
12      MR. SOLOMON:  Q.  Chuck Phillips is now the
13  president of Oracle, right?
14      A.  Yes.
15      MR. SOLOMON:  Let's go off the record to
16  change tape.
17      (Recess taken from 3:43 to 3:55 P.M.)
18      MR. SOLOMON:  I've marked as the next exhibit
19  a document produced by the defendants with the control
20  numbers 061300 to 301.
21      (Whereupon, Plaintiff's Exhibit 84 was marked
22      for identification.)
23      MR. SOLOMON:  Q.  And once you've had a chance
24  to look sufficiently, let me know if you recognize this.
25      A.  Again, I don't recall.  It's directed to me,

422

1  so I must have received it, I'm assuming.
2      Q.  Okay.  And you see it's March 25th, 2002.
3      A.  Uh-huh.
4      Q.  From Charles Phillips, who is still at Morgan
5  Stanley then, apparently.  Do you see that?
6      A.  Yes.
7      Q.  To you.
8      Under overview -- excuse me.  It appears that
9  Charles Phillips has forwarded to you the AMR research
10  Oracle 11i quality article; is that right?
11      A.  Charles is forwarding --
12      Q.  Yes.  Is that right?
13      A.  -- some extract or something, it looks like.
14      Q.  And then it says "Overview" in that e-mail
15  from Jeff Freyermuth.
16      Do you know who that is, by the way?
17      A.  I don't.
18      Q.  It says "Overview:  Since its release in
19  May 2000, many customers have expressed concerns about
20  the quality of Oracle's E-Business Suite 11i.  AMR
21  Research recently interviewed more than 50 large
22  companies implementing or upgrading to 11i and found
23  that these problems still persist."
24      Do you see that?
25      A.  Yes.

423

Henley, Jeffrey  11/16/2006  9:20:00 AM

1   Q.  Do you agree that the problems referred to
2   there still persisted in March of 2002?
3       MR. LINDSTROM:  Calls for speculation, vague
4   and ambiguous.
5       THE WITNESS:  Again, I think it stands, based
6   upon interviews they did.
7       MR. SOLOMON:  Q.  Were you aware, in 2002,
8   that these problems were persisting?
9   A.  I was aware that there were still complaints
10  and some degree of problems.  I think there was progress
11  being made, but I think that, as I testified earlier,
12  even a year earlier, by that spring, things weren't
13  getting resolved quite as quick as I originally thought
14  they would have been.  And this is apparently, what, a
15  year later, March 2002.
16  Q.  Right.
17      Do you know how it came about that
18  Mr. Phillips started working for Oracle?
19  A.  Vaguely, 'cause I talked to him in the
20  interview process, so I have a pretty good sense of why
21  he decided to join Oracle.
22  Q.  How did he -- okay.  Tell me why.
23  A.  So I can tell you what he told me, and so
24  forth.
25  Q.  Please do.

424

1   A.  He was tired of being a financial analyst and
2   had followed Oracle for many years, and thought if he
3   was going to leave the industry, we would be a great
4   company to work for because he believed in Larry,
5   believed in the company.  So he had a conversation with
6   Larry, and Larry was thinking about getting more
7   executive cover, thinking about M&A, some other things
8   where he thought Charles could be a good addition to the
9   team.
10  Q.  But was it Mr. Phillips who applied for a
11  position, as opposed to someone in the company offering
12  him a job?
13  A.  I can't remember how the first things got
14  started.
15      MR. SOLOMON:  I'll have marked as the next
16  exhibit a document produced by the defendants with the
17  control numbers 203681 to 683.
18      (Whereupon, Plaintiff's Exhibit 85 was marked
19      for identification.)
20      MR. SOLOMON:  Q.  And when you've had a chance
21  to look at it, just let me know if you've seen this
22  before.
23  A.  I don't believe I have.  I'm just reading it
24  since it's reasonably short.
25  Q.  Okay.  When you're done, just let me know.

425

1   A.  Okay.  Yes, I've read it now.
2   Q.  Were these changes implemented at Oracle?
3   A.  I don't know.
4   Q.  Okay.  Did you discuss the, as it's described,
5   at least, new terminology on forecasting with anyone?
6   A.  Did I discuss it with anyone?  I don't believe
7   so.  I think -- I do think -- I have been in EC meetings
8   before where Larry has tried to get people to give him
9   forecasts who can understand, and he's talked about,
10  "Look, don't give me a forecast that's so conservative
11  that you'll never miss it."  So some of the stuff that's
12  in here sounds Larry-like, to be honest with you, but
13  exactly what he said and exactly how these people
14  interpret it, I don't know.
15      MR. SOLOMON:  Okay.  So I'll have marked as
16  the next exhibit a document produced in this litigation
17  with the control numbers 612306 and 307.
18      (Whereupon, Plaintiff's Exhibit 86 was marked
19      for identification.)
20      MR. SOLOMON:  Q.  Do you recognize this?
21  A.  No, I don't.
22  Q.  Okay.  And you haven't seen any of these
23  exchanges before, correct?
24  A.  Again, I don't believe so.
25  Q.  Okay.  And you'll see that the bottom half of

426

1   the first page is dated the 6th of December, 2000, it's
2   from David Winton to David Winton, and then the line
3   above appears to transmit the e-mail below, and it's
4   from David Winton to George Roberts.
5   A.  Yes.
6   Q.  Is that right?
7   A.  And it's entitled "First Q3 Forecast
8   Thinking."
9   Q.  Right.  You'll see that there are
10  four itemized points starting with, "1:  Slow start in
11  FY '00."  Do you see that?  And Mr. Minton makes the
12  point that, "The growth comparisons to last year have
13  been relatively easy in the first two quarters as we did
14  not perform that well a year ago."
15      Do you see that?
16  A.  Yes.
17  Q.  Were you aware of that going into the third
18  fiscal quarter of '01, that that -- that the growth
19  comparisons for NAS were relatively easy for the first
20  two quarters?
21  A.  I can't remember.  We have all the same
22  analysis at corporate, so I look at all this
23  information, but I don't remember exactly what I
24  remembered or observed at the time.
25  Q.  You're not disputing that, though; is that

427

Henley, Jeffrey  11/16/2006  9:20:00 AM

1  fair?

2       MR. LINDSTROM:  Not disputing what?

3       MR. SOLOMON:  Q.  Disputing that the growth

4  comparisons for Q1 and Q2 in FY '01 were relatively easy

5  because of the poor performance in those corresponding

6  quarters in fiscal '00.

7       MR. LINDSTROM:  For NAS.

8       MR. SOLOMON:  Q.  For NAS.

9    A.  I'm neither disputing it or affirming it.

10  Again, I just don't have access to data.  This is a

11  statement he made, so he may well be right.

12    Q.  And No. 2, he says, "More big deals this Q1

13  and 2.  As the schedule shows, our results this year

14  have been boosted by big deals in both quarters.

15  Combined, these over $5 million deals contributed over

16  $55 million year to date.  Note that we only have

17  one over $5 million currently in the Q3 pipe.  Last year

18  we had four deals that netted $28 million."

19    Do you see that?

20    A.  Yes.

21    Q.  Were you aware of that at the beginning of the

22  this fiscal quarter of '01?

23    A.  Again, I don't recall.

24    Q.  No. 3, "Growth comparisons tougher in Q3 and

25  4.  NAS results took off last year in Q3 and continued

                                                      428

1  into Q4.  Growth rates will slow in the second half, but

2  we still feel that the annual 31 percent target is

3  achievable with some potential upside of two to

4  three points if Q3 is strong."

5    Do you see that?

6    A.  Yes, I do.

7    Q.  And were you aware of that going into the

8  third fiscal quarter of '01?

9    A.  Again, I don't remember this document.  I may

10  well have been aware of it because of analysis we do at

11  corporate.

12    Q.  And then over to page 4, it says, "Q3 pipe,

13  not where it needs to be.  Based on the conversion

14  history, I think we need another 50 million of Apps and

15  nearly 70 million of tech to feel statistically

16  comfortable to hit our Q3 budget.  Given the past

17  trends, GB and Majors should add incremental pipe during

18  the next three weeks.  If so, we move up."

19    Do you see that?

20    A.  I do see that.

21    Q.  Were you aware of that going into the third

22  fiscal quarter of '01?

23    A.  Again, no.  I don't -- not from this document,

24  'cause I don't recall seeing this document.

25    Q.  Okay.

                                                      429

1    A.  Okay?  And this refers to budget, not

2  forecast.  So their different terminologies mean

3  different things.

4    Q.  Were you of the view that for NAS, going into

5  fiscal -- third fiscal quarter of '01, that the pipe was

6  not where it needed to be?

7    A.  I don't recall.

8    Q.  Okay.

9    A.  And again, reading this note, that relates to

10  hit his Q3 budget.  It's a different number, different

11  concept than forecast.

12    Q.  I hear what you're saying, but I'm --

13    A.  I'm just making sure --

14    Q.  Wait a second.  I'm just asking you whether,

15  in your view, going into fiscal -- the third fiscal

16  quarter of '01, the NAS pipe is where it needed to be.

17    A.  And again, I told you I don't know.

18    Q.  Okay.

19    A.  But I'm pointing out to you, since you may not

20  be aware of the differences between forecast and budget,

21  that he was referring to budget.

22    Q.  Okay.  I appreciate that.  Thank you.

23    A.  Which is not what I use to create guidance for

24  the street.  It's an interesting concept, but we talk

25  about forecast, and we do not disclose our budgets to

                                                      430

1  the street.

2    Q.  Why do you think Mr. Minton was making these

3  points?

4    A.  Giving George Roberts perspective.  This is

5  very common to analyze quarters versus previous quarters

6  and that sort of thing.  Doing his job as the financial

7  person, you give George perspective.

8       MS. KYROUZ:  You said Mr. Minton, but I think

9  you meant Mr. Winton.  Is that fair?

10       MR. SOLOMON:  Yes.  Thank you.

11    Q.  Now, are you familiar, Mr. Henley, with

12  allegations in this case concerning debit memo

13  transactions in November of 2000?

14    A.  Yes.

15    Q.  And what do you understand those allegations

16  to be?

17    A.  That somehow the accounting department

18  manufactured hundreds of millions of dollars of

19  fictitious revenue, is the way I would boil it down.

20    Q.  And were you involved, in November of 2000,

21  with any of the debit memo transactions that are alleged

22  in our complaint?

23    A.  Again, I'm mindful of the earlier day

24  conversation about defining involvement, okay?

25    Q.  Okay.

                                                      431

1   A.   Since this was in my shop, I was a little more
2   involved at a high level, when the allegations were
3   made, in making sure that we checked it out, but I was
4   never involved in creating any of these debits and using
5   the Oracle systems and so forth.  But I surely heard
6   about it, and we certainly launched an investigation to
7   make sure that these claims were hopefully not true, and
8   they proved to be not true.
9   Q.   Did you -- well, the jury hasn't determined
10   that yet, has it?
11   A.   Auditors, our internal auditors, we have a
12   variety of experts that did determine that there was no
13   fictitious revenue created.
14   Q.   And were you involved as a result of reviewing
15   what happened, or were you involved in November of 2000
16   with any activity concerning the debit memo
17   transactions --
18   A.   As reviewed in former, but once these
19   allegations were stated, I clearly was -- wanted to know
20   what was going on and, you know, got people involved all
21   the way down the level to -- and then we brought in
22   auditors and so forth.  So -- but I was never involved
23   in creating any of these transactions.  It was all news
24   to me that this stuff was going -- supposedly going on,
25   if you will.

432

1   Q.   Were you aware of a so-called cleanup at the
2   time?
3   MR. LINDSTROM:  At the time?
4   THE WITNESS:  At the time, no.  Again, it was
5   way down below me, and I was far removed in this stage
6   of my career at Oracle of getting involved in, you know,
7   accounts payable, accounts receivable, thousands of
8   people in my organization.  So, no, I was not aware.
9   MR. SOLOMON:  Q.  Do you have an understanding
10   now what was going on in November 2000 with respect to
11   the debit memos?
12   A.   At a high level.
13   Q.   What is your understanding?
14   A.   Again, it was awhile ago, so I can't tell you
15   precisely every last detail that went on.
16   Q.   Give me your understanding, please.
17   A.   Again, my understanding was that we were going
18   through a change in our system, and that debits and
19   credits weren't being applied to the right individual
20   accounts, but in total, at the end of the day, once you
21   got all the stuff cleaned up, there was no effect on
22   revenue.  I mean, these were not sort of one-sided
23   entities that create phantom revenues as these
24   allegations were being made.  And we ultimately had our
25   auditors look at it, internal auditors, we made a full

433

1   report to the audit committee.  This was a very serious
2   allegation.  I wanted to be certain that there was no
3   basis for it, but I, like everybody else, sat and
4   listened to all the information and so forth.
5   Q.   And is it your belief that there was zero
6   financial statement impact as a result of the November
7   2000 cleanup?
8   A.   Again, zero is a fairly precise number.  It's
9   my belief there was no significant or material impact.
10   Q.   Okay.  Which suggests that you may think that
11   there was some impact, but it was not material.
12   A.   It would be hard to know, you know -- when you
13   get involved in lots of entries, if there might be
14   something, but it was -- it could have been zero, it
15   could have been 10, I don't know.  But we were assured
16   by the auditors and everybody else that there was no
17   significant impact here.  So, yeah, I think it was -- it
18   was a misunderstanding, I guess, by people who
19   thought -- who didn't understand the way the system
20   worked, that somehow there was revenue being created
21   that wasn't real.
22   Q.   If, but for that cleanup, Oracle would have
23   only reported, for example, 11 cents EPS for the second
24   quarter of fiscal '01, rather than 12 cents for that
25   quarter, would you have considered that to be material?

434

1   MR. LINDSTROM:  Calls for speculation,
2   hypothetical, no foundation.
3   THE WITNESS:  And this was Q what?
4   MR. SOLOMON:  Q.  Q2.
5   A.   Q2.
6   MR. LINDSTROM:  So you're asking him to assume
7   if the debit memo issue had a 1-cent impact on the EPS?
8   MR. SOLOMON:  Essentially.
9   MR. LINDSTROM:  Would he view that as
10   material?
11   MR. SOLOMON:  Correct.
12   MR. LINDSTROM:  Do you understand the
13   question?
14   THE WITNESS:  I understand the question.
15   It -- certainly, if there was a significant amount of
16   revenue that I knew we were doing, or something, we may
17   well disclose that and say, "Look, here's the numbers
18   for the quarter."  From time to time we would do that.
19   If there was something unusual, positive or negative, we
20   may well say, you know, "Gee, there was," to use your
21   example, "a penny of favorable," or whatever.  We would
22   be obliged to do something like that.  Again, I was not
23   aware of -- that anything was going on, first, and
24   second point, from the work that was done after these
25   allegations were raised, I don't believe there was any

435

1    material impact.

2        Q.  But again, you're careful to say "material".

3    You won't say that you don't believe there was no

4    impact.

5        A.  Because I can't remember, and I didn't go

6    through and do all the detail.  But I know the entire

7    committee was very satisfied that there wasn't any

8    significant impact.  And again, my recollection was it

9    wasn't related to -- it was a cumulative set of issues

10   that took place over several quarters.  This was not

11   something that happened just in Q2, if you will.

12       Q.  Who, in your view, is best placed to assess

13   whether or not any impact would have been material or

14   not?

15       MR. LINDSTROM:  I'm confused by the question.

16   Are you focusing on the materiality, or the precise

17   amount of any impact that may have occurred?  The

18   judgment that it was material, or the calculation of any

19   impact?

20       MR. SOLOMON:  Q.  The judgment, which I assume

21   will be preceded by some kind of calculation.

22       MR. LINDSTROM:  Did you understand the

23   question?

24       THE WITNESS:  Yeah, I think I understand the

25   question.

                                                    436

1        MR. LINDSTROM:  So this is broader than the

2    debit memos?

3        THE WITNESS:  Broader than the debit memos.

4        MR. LINDSTROM:  Vague and ambiguous as to

5    "events," but you may answer.

6        THE WITNESS:  I don't recall them.  We've had

7    several, you know, reviews over the years that are

8    typical of every company, you know?  So I can remember a

9    couple of times when they came in and reviewed with our

10   accounting staff, our 10 Ks and Qs and all that sort of

11   thing, but I don't recall there was a special process

12   and review, and all that sort of thing, as specifically

13   around Q3.

14       MR. SOLOMON:  Q.  How about the justice

15   department; have they investigated Oracle or any of its

16   executives with respect to events in Q2 or Q3 in fiscal

17   '01?

18       A.  Again, I can't remember if they did or not.

19       Q.  Okay.  Have you ever testified, formally or

20   informally, to either the SEC or the justice department

21   concerning events that transpired in fiscal -- in the

22   second or third fiscal quarter of 2001?

23       MR. LINDSTROM:  So you're talking about the

24   events that form the basis of the lawsuit?

25       MR. SOLOMON:  Q.  That's fair, yes.

                                                    438

1    I think the people that, first of all, got

2    into more of the detail and reviewed it were our

3    corporate controller, Jennifer Minton, and the previous

4    corporate controller, Tom Williams.  So those two people

5    are CPAs, they're quite knowledgeable and way more into

6    the details than I was.

7        MR. SOLOMON:  Q.  Were you involved in making

8    a presentation to the SEC with respect to any of the

9    debit memo transactions?

10       A.  A presentation to the SEC.  On this issue?

11       MR. LINDSTROM:  That's the question.

12       MR. SOLOMON:  Q.  Yes.

13       A.  I don't recall making a presentation

14   personally to the SEC on this issue.

15       Q.  Do you know if a presentation was made to the

16   SEC?

17       A.  I honestly can't recall.  I don't know.

18       Q.  Is the SEC investigating Oracle in any manner

19   right now that you're aware of?

20       A.  I'm not aware.  I haven't been the CFO for

21   several years, so I have no idea what they may or may

22   not be doing.  Nothing I'm aware of.

23       Q.  Did the SEC ever become involved in any kind

24   of investigation, formal or otherwise, concerning the

25   events of the third fiscal quarter of 2001?

                                                    437

1        A.  I don't recall.  I've certainly been deposed a

2    few times by plaintiff lawyers, but I don't recall

3    testifying on that -- we testified in the justice

4    department antitrust suit, but no, I don't believe I

5    ever -- either the SEC or the justice department.  Me

6    personally, no.

7        MR. SOLOMON:  Let's have marked as the next

8    exhibit a document produced in this litigation with the

9    control numbers 050209 through 255.

10       (Whereupon, Plaintiff's Exhibit 87 was marked

11       for identification.)

12       MR. SOLOMON:  Q.  Let me know if you recognize

13   this document at all.

14       A.  Okay.  No, I don't.  I don't recall seeing

15   this.

16       Q.  Now, this was -- this is dated October 29,

17   2003.  Do you see that?  On the front page.

18       A.  Yes.

19       Q.  What was your position at the company on that

20   date?

21       A.  I still would have been Chief Financial

22   Officer at that date.

23       Q.  Okay.  And as a result, you were responsible

24   for all of the financial department that you preside

25   over; is that right?

                                                    439

1    A.   Yeah, ultimately, they all report to me, and
2    as I indicated earlier, it's a big company.  I have lots
3    of experts in all these departments, but ultimately,
4    they report to me.
5        Q.   Now, can you tell me why you weren't involved
6    in this, at least to the extent that you reviewed it;
7    why you were not involved at least to that extent?
8        MR. LINDSTROM:  Vague and ambiguous, no
9    foundation, calls for speculation.
10       THE WITNESS:  Would you like me to speculate?
11       MR. SOLOMON:  Q.  Sure.
12       MR. LINDSTROM:  Well, let's start with if he
13   knows.
14       THE WITNESS:  Again, I testified earlier, I
15   don't think I saw this.  I don't think I testified.  I
16   don't think I did.  So now -- I think I testified
17   earlier that either -- you asked me the SEC or the
18   justice department, and I said -- we were talking about
19   the quarter.  This actually relates, I guess, to the
20   so-called phony debit memos.  So this is a specific
21   particular item in this case.
22       MR. SOLOMON:  Q.  Do you believe that --
23       A.   So you're asking me that -- again, so you're
24   asking me, now, what, why didn't I or --
25       Q.   Well, first of all, have you ever seen this

440

1    before now?
2        A.   Again, as I testified earlier, I don't believe
3    I have.
4        Q.   Okay.  And can you explain why it is, as CFO
5    of the company at the time this was created, and as a
6    defendant in this lawsuit, you have never seen this
7    before?
8        MR. LINDSTROM:  Lacks foundation, calls for
9    speculation.
10       THE WITNESS:  Again, you want me to speculate?
11       MR. SOLOMON:  Q.  Sure.
12       A.   My assumption is this is now almost two years
13   later.  I think this is long after we have already done
14   a very voluminous internal investigation, which I told
15   you about, had our external internal auditors look at
16   it, and reported to the audit committee and concluded
17   that there weren't a bunch of phony invoices, and this
18   had no material effect.  So if this was something as
19   serious as that and was real, sure, I would probably be
20   there front and center with our general counsel and
21   everybody else talking to the SEC, but since it didn't
22   prove to be anything, I didn't think it was a good use
23   of my time to do it.  Not that we disrespect the SEC,
24   but I thought our experts could just take them through
25   all the details and it would be pretty straightforward.

441

1    That's my guess of why I never got involved at this
2    level.  But as I reported earlier, I definitely was
3    quite interested, until we got to the bottom of this, to
4    make sure there wasn't a real problem here.
5        Q.   Okay.  If you go to the third page of the
6    document, the first bullet point is "Complaint is being
7    dismissed with prejudice."
8        Do you see that?
9        A.   Yes.
10       Q.   Now, at the time, you didn't think that this
11   case was going to proceed; is that right?
12       MR. LINDSTROM:  Objection.  No foundation,
13   mischaracterizes the document, calls for speculation.
14       THE WITNESS:  I think at the time, based on
15   all the work that we did, we thought that there -- these
16   allegations were baseless.  Whether that -- something
17   would proceed, I have no idea.
18       MR. SOLOMON:  Q.  If you go to page 5 of the
19   document, which is 050213, it says, "These customers
20   allegedly overpaid, but Oracle never refunded."
21       Do you see that?
22       A.   I see that.
23       Q.   And then if you look at the page beforehand,
24   the customers they're referring to are Eli Lilly,
25   Household and an unidentified customer.  Do you see that

442

1    on the preceding page?
2        A.   I do see that.
3        Q.   Okay.  I'm now at page 13 of the document,
4    which is 050221.
5        A.   Pardon me?  Go to what page?
6        Q.   Page 050221, which is page 13, original page
7    13, and it's entitled "Household".
8        A.   Okay.  And you want me to skip over all these
9    other pages that --
10       Q.   I just don't have time to go through them all,
11   unfortunately.  If you look at Household, it says,
12   "Oracle supposedly applied three overpayments by
13   Household to invoices created November 17th, 2000," and
14   then you'll see that the alleged overpayments are
15   itemized.  And at the bottom it says, "In fact, all
16   refunded years ago."
17       Do you see that?
18       A.   I see that.
19       Q.   Now, are you aware that, in fact, subsequent
20   to the cleanup, so-called cleanup, that Oracle sent a
21   refund check to Household?
22       A.   No, I'm not.
23       Q.   Would it surprise you to learn that they, in
24   fact, did that?
25       MR. LINDSTROM:  Assumes facts not in evidence.

443

1      THE WITNESS:  Again, I have no idea what the
2  history or anything it related to.  So I --
3      MR. SOLOMON:  Q.  Okay.
4      A.  It's a lot of context.  I have no idea how to
5  be surprised or not surprised.
6      Q.  How about the fact that no one's told the
7  SEC that, contrary to the presentation made here, a
8  refund was made to Household subsequent to
9  November 2000?
10     MR. LINDSTROM:  Assumes facts, no foundation,
11  calls for speculation.
12     The question, again, is whether he would be
13  surprised?
14     MR. SOLOMON:  Q.  Yeah.
15     Let me ask you another question.  Would you be
16  concerned if people at your company misled the SEC?
17     A.  I would be concerned if people at my company
18  knowingly misled anybody, including the SEC, of course.
19     Q.  So you're not concerned if they unknowingly
20  misled them, apparently.
21     A.  Well, of course.  I mean, you don't want to
22  make mistakes.
23     Q.  So period.  You would be concerned if they
24  misled --
25     A.  I would be more concerned if we knowingly did

444

1  something, 'cause that's really not right.  Sometimes we
2  can make honest mistakes and tell somebody to the best
3  of our knowledge, and we just got it wrong.
4      MR. SOLOMON:  I'll have marked as the next
5  exhibit a document produced by the defendant in this
6  litigation with the control numbers 120138 through 140.
7      (Whereupon, Plaintiff's Exhibit 88 was marked
8      for identification.)
9      MR. SOLOMON:  Q.  And once you've had a chance
10  to read it, just let me know if you've seen it before.
11     A.  Okay.
12     Q.  Okay.  Are you familiar with the issues
13  reflected on the first page of the document concerning
14  the -- and I'm looking halfway down the page -- "back
15  dated revenue in Feb"?  Do you see that?
16     A.  This is in the second paragraph?
17     Q.  Yes, it is.  If you look at the last sentence
18  beginning "Interestingly enough" --
19     MR. LINDSTROM:  And the question is whether
20  he's familiar personally with --
21     MR. SOLOMON:  Yes.
22     MR. LINDSTROM:  -- the subject matter
23  identified in that sentence.
24     MR. SOLOMON:  Correct.
25     THE WITNESS:  I'm not.  I don't think so.

445

1  I've never heard of back dating of support revenue.
2      MR. SOLOMON:  Q.  Okay.  We haven't got an
3  answer yet.
4      Have you seen this before?
5      A.  No, I don't believe so.  I'm not shown on this
6  thing.
7      Q.  Okay.  And you don't know what that refers to,
8  then?  You have no understanding of what the back dating
9  revenue is referring to?
10     A.  Back dating?  No, I am not familiar with that.
11     MR. SOLOMON:  Okay.  Let's have marked as the
12  next exhibit a document produced in this litigation with
13  the control numbers 120192 to 194.
14     (Whereupon, Plaintiff's Exhibit 89 was marked
15      for identification.)
16     MR. SOLOMON:  Q.  And once you've had a chance
17  to look at it, let me know if you've seen this exchange
18  before.
19     A.  Again, I don't believe I recall.  I'm not
20  shown as a copy, apparently.
21     Q.  I'm looking at the second bullet point on the
22  first page it says, "Support renewals, prior
23  periods.  Bill has identified a population of contracts
24  in entered status with date problems that appear to be
25  overstating the backdated revenue potential.  Will try

446

1  to finalize the analysis tomorrow."
2      Do you know what that refers to?
3      A.  No, I don't.
4      Q.  And you haven't seen any reference to this
5  issue before now?
6      A.  Again, I don't recall.
7      Q.  Okay.  And then I'm skipping a bullet point to
8  the fourth bullet point, it says, "Prior period Rev/Rec
9  corrections.  We know there is revenue that has already
10  been booked that will have to come out but we don't know
11  the amount yet.  I put a $10 million slug in for it."
12     Do you see that?
13     A.  Uh-huh.
14     Q.  Before today, have you heard of that?
15     A.  Again, I don't recall it.
16     Q.  And then the last bullet point, "Credit Memos,
17  all unpaid invoices that have been turned over to Legal
18  but not resolved are being written off at the LOB level
19  this month.  I suspect to get the support number in the
20  morning and evaluate whether the $15 million slug for
21  credit memos is large enough to cover this."
22     Do you see that?
23     A.  Yes.
24     Q.  Do you know what the $15 million slug refers
25  to?

447

1    A.  No.

2    Q.  The first time you've seen reference to --

3    A.  Again, yes, I think -- again, I've testified I

4    don't remember this e-mail.

5        MR. SOLOMON:  I'll have marked as the next

6    exhibit a document with the control numbers 119340 to

7    344.

8        (Whereupon, Plaintiff's Exhibit 90 was marked

9            for identification.)

10       THE WITNESS:  Do you want me to read it all

11   or --

12       MR. SOLOMON:  Q.  No.  You haven't seen this

13   before; is that right?

14   A.  Again, I don't recollect.  I'm aware that,

15   again, we switched to a new system called OKS or Off

16   OKS.  One or the other.  But no, I don't recollect

17   seeing this e-mail.

18   Q.  And you see at the beginning it says,

19   "Jennifer, the final may support revenue recognition

20   correction was 7 million, most of which was recorded in

21   Q3 in error."

22       Do you see that?

23   A.  Uh-huh.

24   Q.  And this is the first time today you've been

25   aware of a suggestion of that $7 million being recorded

448

1    in error in Q3?

2    A.  I don't remember hearing there was a

3    $7 million error, but I was aware we were going through

4    implementation issues with OKS.  I do recollect that.

5    Q.  If you go to the second page of the exhibit,

6    you'll see that under "Justification" it says, "This

7    journal entry is proposed to cumulatively correct

8    revenue recognition for support contracts booked from

9    January 2001 to April 2001.  This is a net correction

10   for two problems that occurred."

11       Do you see that?

12   A.  Uh-huh.

13   Q.  This is the first time you're seeing this?

14       MR. LINDSTROM:  The document?

15       THE WITNESS:  This document?

16       MR. SOLOMON:  Q.  Yes.

17   A.  Again, I think -- I don't think I got this

18   document, because I've testified just a few minutes ago,

19   I was aware that we had implementation as to issues with

20   OKS.

21   Q.  Okay.  And if you go to the next page of the

22   document, you see, under "Accounting Impact", it says,

23   "The majority of this adjustment relates to revenue

24   recorded in Q3 FY01.  The problems were identified and

25   averted midway through Q4 FY01 before most Q4 bookings

449

1    were done."

2        Do you see that?

3    A.  Yes.

4    Q.  And do you recall reversing -- having revenue

5    reversed out of Q3 '01 because it was recorded

6    incorrectly?

7        MR. LINDSTROM:  You're asking him whether he

8    recalls?

9        MR. SOLOMON:  Yes.

10       THE WITNESS:  Again, I said that I didn't

11   recollect the numbers, anything that happened in the

12   accounting organization.

13       MR. SOLOMON:  Q.  Okay.

14       Okay.  Let's go off the record for a few

15   minutes.

16       (Recess taken from 4:43 to 5:06 P.M.)

17       MR. SOLOMON:  Q.  Were you aware, Mr. Henley,

18   that throughout fiscal 2001, tens of millions of dollars

19   were transferred from Oracle's customer overpayments

20   account to Oracle's bad debt reserve?

21   A.  Customer overpayments to bad debts.  Again,

22   does this relate to this matter we talked about earlier

23   where there were accounting -- things were being debited

24   and credited to wrong accounts, and we had to go clean

25   that up?  Is this what you're referring to?

450

1    Q.  I'm trying to ask you that question, actually,

2    without necessarily tying it to the cleanup.  I just

3    want to know if you're aware that throughout fiscal

4    2001, tens of millions of dollars was taken out of the

5    customer overpayment account at Oracle and applied to

6    the bad debt reserve.

7    A.  Again, as I said earlier, I was not aware of

8    all the ins and outs of what people were doing in the

9    departments.

10   Q.  Who at Oracle, in fiscal 2001, would have been

11   responsible for making adjustments to Oracle's bad debt

12   reserve?

13   A.  Certainly the review was done by Jennifer

14   Minton, and then there were typically people in the

15   geographic areas, like the Americas in this case.  I

16   think you're speaking to like Tom Williams and his group

17   would go through that review, sure.

18   Q.  So assuming it's true, that tens of millions

19   of dollars in fiscal 2001 were taken from the customer

20   overpayment account and applied to the bad debt reserve,

21   assuming that's true, would you expect Ms. Minton to

22   have been aware of it?

23   A.  I don't know.  I mean, the original

24   assertions, allegations that were made, I remember she

25   was like me.  We didn't -- it was over in Rocklin, and

451

1   both of us thought it was a fantasy, but it was a
2   concern.  "My goodness, we need to look into this."  So
3   I have no idea what she knew or didn't know.  But I know
4   specifically she did a review with the folks over there,
5   and did this for years, on the bad debt reserve.
6       Q.   And she would do that intra-quarter; is that
7   right?
8       A.   Typically, we would do it before the quarter
9   ended, yes.
10      Q.   Right.
11      A.   Towards the end of the quarter.
12      Q.   Okay.  And you said, earlier on, that with
13  respect to the -- what we're going to call, or what I
14  think Oracle has called the cleanup, with respect to the
15  debit memos in November of 2000, after we made our
16  allegations, you got people involved; is that right?
17      A.   That's correct.
18          MR. LINDSTROM:  Vague and ambiguous.
19          THE WITNESS:  I asked Jennifer and then all
20  the way down, and we got people in the -- the department
21  itself, as well as others, including the internal audit,
22  external auditors, to really get in and understand what
23  did or didn't happen.
24          MR. SOLOMON:  Q.   Okay.  And so you've
25  answered at least the question partially.  You got

452

1   Ms. Minton involved, you got external auditors involved.
2   Which external auditors?
3       A.   Whoever were our public auditors at the time.
4       Q.   Okay.
5       A.   Either Arthur Anderson or Ernst and Young.
6   And I testified earlier, I can't remember when we
7   switched auditors.
8       Q.   And you got Tom Williams involved?
9       A.   Tom Williams worked for Jennifer Minton, and
10  he clearly was involved because the credit collections
11  department and billing and those things all reported to
12  him, I think.
13      Q.   Are you aware that after allegations had been
14  made with respect to the debit memos, that thereafter,
15  hundreds of refunds were then made to Oracle customers?
16          MR. LINDSTROM:  Assumes facts.
17          THE WITNESS:  I can't remember, but I was
18  aware of the cleanup, and part of the cleanup was kind
19  of getting caught up on duplicate payments or things
20  like that.  So whether it was hundreds or not, I don't
21  know the specifics.
22          MR. SOLOMON:  Q.   Okay.  And have you ever
23  made an effort to ascertain the total dollar amount of
24  refunds that were made after our allegations were filed?
25      A.   These are refunds to customers?  No, I have

453

1   not done that.
2       Q.   Okay.  Did Oracle have a practice, in fiscal
3   2001, of not alerting customers who had overpaid Oracle
4   that Oracle was holding their money?
5       A.   I don't know.  I don't know what the
6   individuals over in Rocklin were doing because I was far
7   removed from it.  When I first came into the company, I
8   was much closer to that stuff.  I certainly didn't have
9   a practice of it.  That was not the practice I set up
10  when I joined the company, but I don't know what they
11  were doing over there.
12      Q.   Are you familiar with the legality or
13  illegality of holding on to customer payments when you
14  know they don't belong to the corporation?
15      A.   I don't know if you're referring to escheat
16  laws or --
17      Q.   That's one.
18      A.   Certainly, that's one form.  I'm well aware of
19  escheat laws, and again, our policy has been to abide by
20  the laws.  If payroll checks, for instance, don't come
21  back and give them to the state and so forth, and that
22  sort of thing.  So sure.
23      Q.   And with respect to customer overpayments, did
24  you ever give customer overpayments to the state in
25  compliance with escheatment laws?

454

1           MR. LINDSTROM:  Now, you're saying ever,
2   literally?
3           MR. SOLOMON:  Ever, yes.
4           THE WITNESS:  As far as I know, I believe our
5   tax department got involved with our accounting
6   department and payroll departments, and I believe there
7   periodically were escheats made.  Money was escheated,
8   if you will, to the states and so forth.  As far as I
9   know, there was.  Again, I didn't get involved in that,
10  but we were all clear at the top that there was a
11  requirement, and I was always led to believe we were
12  doing that.
13          MR. SOLOMON:  Q.   And one place, clearly, to
14  look for funds that would need to be returned or paid to
15  the state under the escheatment laws would be the
16  customer overpayments account, wouldn't it?
17      A.   Again, I don't know that customer payments are
18  covered under escheat laws.  I don't really technically
19  know that.  But my policy, and again, when I joined the
20  company, we had a backlog, if you will, and we worked
21  very hard in trying to clean up that backlog in my first
22  couple of years at Oracle, and I was crystal clear with
23  people that when we had an overpayment, we knew it was
24  an overpayment, duplicate payment, we should return the
25  money to the customer.

455

1    Q.  Because then, escheatment wouldn't come into
2  place because you know who the money belongs to, right?
3  Is that the point you're making?
4    A.  More importantly, I just think it's the right
5  thing to do.
6    Q.  Because otherwise, it's theft, right?
7    A.  It's the right thing to do.  There are --
8  being on the other side of it, I'm well aware that
9  there's many customers that don't tell you if you've
10  double paid them.  But I don't think that's right.
11  Whether it's legal or whatever, I don't know.  In other
12  words, they wait till you tell them.
13    My policy, when I came into Oracle, is let's
14  not wait.  If we're crystal clear that there's money
15  owed to a customer that's been duplicate payment, let's
16  pay it.  So that was my policy, and in the first few
17  years, we kind of cleaned up things and got caught up
18  and were doing that.
19    Q.  Okay.  But you didn't say whether you agreed
20  with me, to hold on to a customer's money, knowing that
21  it didn't belong to you, would be -- would amount to
22  theft, wouldn't it?
23    MR. LINDSTROM:  He told you he didn't have the
24  legal expertise to say.
25    MR. SOLOMON:  I don't see that in his answer.

456

1    MR. LINDSTROM:  Well, I heard him say it,
2  so --
3    MR. SOLOMON:  I think he said it's the right
4  thing to do.
5    MS. KYROUZ:  "Whether it was legal or
6  whatever, I don't know."  Line 7.
7    THE WITNESS:  And again, the presumption is
8  that you're taking the money and never giving it back,
9  or something like that.  But my position was rather than
10  wait for customers to tell us something, that we owed
11  them money, just get it approved and send it back to the
12  customer.
13    MR. SOLOMON:  Q.  Have you heard of the civil
14  tort of conversion?
15    A.  No.  I have not, actually.  I have heard of
16  escheat laws, but I have not heard of that particular
17  one.
18    MR. SOLOMON:  Let's have marked as the next
19  exhibit a document that's been exhibited in a prior
20  deposition but was not provided to us by Oracle.  We're
21  going to have to wait and clean up the document before
22  we do that, since there's some work product in the
23  margins.
24    Instead, let's have marked as the next exhibit
25  the document produced by the plaintiffs in this

457

1  litigation with the control No. 000006.
2    (Whereupon, Plaintiff's Exhibit 91 was marked
3    for identification.)
4    MR. SOLOMON:  Q.  When you've had a chance to
5  look through it, let me know -- or look at it, let me
6  know if you've seen it before.
7    A.  I don't believe so.
8    Q.  Okay.
9    A.  Just one page, right?
10    Q.  Right.
11    A.  Thank you.
12    Q.  And you'll see at the top it says, "Greg,
13  please confirm" in caps -- I'm sorry.  "Please confirm
14  that", in caps, "ALL ability to move anything to 12601
15  via On Account or creating a Misc receipt write off has
16  been turned off."
17    Do you see that?
18    A.  I do see that.
19    Q.  Do you know what that means?
20    A.  No.
21    Q.  Okay.  Do you know what 12601 is at Oracle, or
22  what it was at the time?
23    A.  No.
24    Q.  When did you stop being CFO?
25    A.  July of 2004, I believe.  Almost

458

1  two and-a-half years ago.
2    Q.  Okay.  And what was your reason for ceasing?
3    A.  'Cause I didn't want to be a CFO.  I had done
4  it too many years.  I was ready to move on and do
5  something else.
6    Q.  And do you have an executive role still with
7  Oracle, other than your position as Chairman of the
8  Board?
9    A.  I don't have anybody reporting to me.  I'm
10  sort of a customer advocate.  So I still do a lot of
11  work with customers, as well as run the board meetings.
12    Q.  Is Oracle still your full-time occupation?
13    A.  I don't -- I wouldn't say I work as hard or as
14  many hours, but yeah, it's still -- I still spend a lot
15  of time with Oracle.  I haven't taken another job with
16  another company or something like that.
17    MR. SOLOMON:  I'll have marked as the next
18  exhibit a document produced by the defendants in the
19  litigation with the control No. 050365 to 390.
20    Excuse me.  It's 050364 through 390.
21    (Whereupon, Plaintiff's Exhibit 92 was marked
22    for identification.)
23    MR. LINDSTROM:  It's one exhibit, right?
24    MR. SOLOMON:  Q.  Then just let me know if
25  you've seen this before.

459

1    A. Do you want me to go through each page?

2    Q. Only for the purpose, initially, of telling me

3    whether you recognize any of this. I don't intend to

4    spend very long on the document.

5    A. I don't believe I've seen this.

6    Q. Are you familiar with this format for billing

7    and receipt histories at Oracle?

8    A. No.

9    Q. And that's because you didn't get involved?

10   A. In the detail customer account level with all

11   the accounting and so forth.

12   Q. If you look at the pagination after the first

13   page, so I'm on to the second page of the exhibit, and

14   there's a reference to January '89 to December '93.

15      Do you see that?

16   A. Yes.

17   Q. Do you have any idea what that refers to?

18      MR. LINDSTROM: Other than --

19      THE WITNESS: Other than the period that it

20   says it refers to, I can see that it's, apparently, for

21   a period of four years or so, five years, but I don't

22   know anything about it.

23      MR. SOLOMON: Q. Then go to the next page,

24   and you'll see at the top it says "1 of 11".

25   A. 3 of 11.

460

1    Q. That's the problem. You just identified it.

2    It goes from 1 of 11 to 3 of 11, and we're missing 2 of

3    11.

4    A. Okay.

5    Q. Any idea where 2 of 11 is?

6       MR. LINDSTROM: Objection. No foundation.

7       THE WITNESS: Are you asking me?

8       MR. SOLOMON: Q. Well, I guess it could have

9    just jumped from 1 to 3, but it seems sort of

10   remarkable. So I'm asking you, do you know --

11   A. I have no idea. I had nothing to do with

12   producing documents, I am not familiar with the report,

13   so I really have no knowledge.

14   Q. Okay.

15      Counsel, I would like that page produced if it

16   exists, and if it doesn't exist, we would like an

17   explanation as to why it doesn't exist.

18      MR. MAROULIS: The Bates numbers are

19   non-sequential.

20      MR. SOLOMON: Is that your explanation?

21      MR. MAROULIS: Well, I'm just noting for the

22   record that the Bates numbers are non-sequential.

23      MR. SOLOMON: Q. So what Mr. Maroulis is

24   saying, Mr. Henley, just so you know what's going on, is

25   the first three pages -- the first page says 11 of 11,

461

1    right? This is what we've been given to work with, so

2    I'm not trying to torture you with this.

3    A. I see 1 of 11, 3 of 11.

4    Q. Yeah, so the first page says 11 of 11, and

5    it's -- and it says 050364. Okay? The very first page

6    of the exhibit, it says 050364.

7    A. Yes.

8    Q. Okay. And that says, in the top right-hand

9    side, 11 of 11.

10   A. Yes.

11   Q. And then the next number is 365, and the next

12   is 366.

13   A. Yes.

14   Q. And that takes us to page 1 of 11, right?

15   A. Yes.

16   Q. And then, as Mr. Maroulis has pointed out, the

17   Bates range then starts at 050383 and goes through to

18   390. Do you see that?

19   A. Yes.

20   Q. And so that starts, then, with page 3 of 11.

21   A. Yes. I see all that.

22   Q. And you have no idea where 2 of 11 is?

23   A. I have the same answer as before.

24   Q. Okay. We'll have the same request of Counsel.

25      Okay. Let's have marked as the next exhibit a

462

1    document produced -- excuse me -- a document not

2    produced by defendants, but marked in a previous

3    deposition in this case.

4       (Whereupon, Plaintiff's Exhibit 93 was marked

5       for identification.)

6       MR. SOLOMON: Q. Let me know if you recognize

7    it.

8    A. Again, on my copy, I don't believe I'm

9    familiar with this particular document.

10   Q. Okay. And it's called the Unapplied Cash

11   Project. And if you look on the first page, it's dated

12   October 21, 2002, it's from Michael Quinn to Ryan

13   Roberts, Greg Myers and copies Tom Williams and Michael

14   Quinn.

15      Do you see that?

16   A. Yes.

17   Q. And it says, "There are three deliverables.

18   We need to provide an update to the audit committee," in

19   parens, "(a subcommittee of Oracle's Board of Directors)

20   in regards to what revenue impact this process of taking

21   unapplied cash receipts to the reserve will have on our

22   financial statements."

23      Do you see that?

24   A. Yes.

25   Q. Do you know what reserve is being discussed

463

1  there?

2  A.  I'm not sure.

3  Q.  Okay.  And then it goes on to say, "In

4  addition, we need to provide what impact this process

5  has had on revenue in each of the last 8 quarters.  The

6  update will be provided to the audit committee", in

7  capitols, "THIS WEDNESDAY."

8  The next bullet point, "We need to clean up

9  the ENTIRE", capitals, "problem prior to the end of

10  October by moving cash receipts to the proper buckets",

11  in parens, "(unapplied, customary overpayments, or on

12  account) as appropriate."

13  And the last bullet point, "We need to

14  establish new policies and procedures to ensure this

15  never happens again."

16  Do you see all that?

17  A.  Yes.

18  Q.  These requirements, are these the requirements

19  that you imposed when you had people look into this?

20  A.  I don't recall what requirements that started

21  with, as we talked about earlier, this allegation that

22  there was all of this manufactured or false revenue, or

23  whatever.  So out of that, we discovered that accounts

24  were not being applied to the right accounts, and things

25  like that.  So there was a lot of analysis and work and

464

1  ultimate cleanup.  But I don't remember exactly what we

2  agreed were the deliverables or whatever, but certainly

3  myself, the audit committee, everybody wanted to be sure

4  that we got things corrected and right and that,

5  hopefully, we weren't going to repeat some of the same

6  problems.

7  Q.  And what was the cause of those problems?

8  A.  Again, my recollection, as best I can tell, I

9  think, was that the group over there that was in that

10  department started falling behind and was not -- were

11  not staying up on top of the work, and it had -- there

12  was a similar problem when I joined the company many

13  years ago, which we cleaned up.  And so I was

14  disappointed when I found out about it because here we

15  were repeating sins of the past many years later.

16  Q.  And were there no internal controls in place

17  to ensure that that didn't happen again?

18  A.  Again, there were a lot more controls in the

19  company over the years, but -- and certainly in the

20  revenue recognition area, a number of controls.  But in

21  this case, there was a collections department, there was

22  a manager, and I don't think there was adequate

23  supervision.  So there was some that -- while there were

24  controls, they fell behind.  It didn't necessarily

25  create a material accounting problem, but it was

465

1  sloppiness and it was not thorough, and so we devoted a

2  lot of effort, my recollection was, to get on top of

3  this again and get it clean, get it right.

4  Q.  Okay.  If you go to the last bullet point on

5  the first page, beginning "For items in the

6  Miscellaneous Offset", do you see that?

7  A.  Yes.

8  Q.  The last sentence of that bullet point says,

9  "I do not have the full report", and then the parens,

10  "(Greg, please send to this group), closed parens,

11  "however, based upon looking at the August, October and

12  November reports in the 12601 detail spreadsheet, this

13  should cover over 80 percent of the total."

14  Do you see that?

15  A.  Yes.

16  Q.  You don't know what the 12601 detail

17  spreadsheet refers to, do you?

18  A.  Again, I'm not familiar with that, no.

19  Q.  Would you be concerned were you to learn that,

20  in fact, amounts that were in the customer overpayment

21  account were utilized, at least in part, to add to the

22  bad debt reserve?

23  MR. LINDSTROM:  Assumes facts, calls for

24  speculation.

25  THE WITNESS:  Again, in the process of

466

1  cleaning up, they did all kinds of nettting and so

2  forth, so I have no idea what -- the right context to

3  that -- your comment into.

4  MR. SOLOMON:  Q.  If, at the end of a quarter,

5  Oracle reported, for example -- had calculated, for

6  example, 10.6 pennies EPS for the quarter, how would

7  that ultimately get reported in the financial statements

8  as 10.6 EPS?

9  A.  Usually, we did simple rounding.  An analyst

10  could calculate it, and some actually, I think, did,

11  probably, and put it in their own spreadsheets, but --

12  'cause they can make the calculation.  But for

13  simplicity, we typically rounded to whole pennies.

14  Q.  And you rounded up from 5 and down from 5; is

15  that right?

16  A.  Yes.

17  MR. LINDSTROM:  Mark, if I may, I notice, in

18  looking at the LiveNote, that the reporter, in his last

19  response prior to this exchange that you've now engaged

20  in, where I believe the witness said that there was

21  netting, he was talking about netting, it got recorded

22  as "neglect".

23  THE REPORTER:  If you look down, though, I put

24  parentheses.  I corrected it.

25  MS. KYROUZ:  Ah, I just saw that.

467

Henley, Jeffrey  11/16/2006  9:20:00 AM

1    MR. LINDSTROM:  Okay.  Great.  Thank you.

2    MR. SOLOMON:  Q.  Well, there was both, wasn't

3  there?

4    MR. LINDSTROM:  That's argumentative.

5    He's very witty, especially late in the day.

6    MR. SOLOMON:  Q.  Okay.  Now, looking at the

7  second page of the exhibit --

8    It's okay.  I think we already saw that

9  language in a different document.

10    A.  That was in that one page that you gave me

11  already.

12    Q.  That's fine.  Thank you.

13    On to the first page.  Another question.

14    MR. LINDSTROM:  So we're back, still, on 93?

15    MR. SOLOMON:  Yes, we are.

16    Q.  At the bottom of the document it says, "Greg,

17  for the Miscellaneous Offset Report, I need you to add

18  the date the item was moved to 12601.  We need to be

19  able to accumulate the error by quarter."

20    Do you see that?

21    A.  Yes.

22    Q.  And do you know what error is being referred

23  to there?

24    A.  No.

25    MR. SOLOMON:  We'll have marked as the next

468

1  exhibit a document produced by the plaintiffs in this

2  litigation with the control No. 000214 to 223.

3    (Whereupon, Plaintiff's Exhibit 94 was marked

4    for identification.)

5    MR. SOLOMON:  Q.  Have you seen this before?

6    A.  No.

7    Q.  And you'll see that there's a heading

8  "Unapplied Auto Adjustments."  Have you ever heard of

9  that title at Oracle?

10    A.  I don't believe so.

11    Q.  And do you have an understanding of what this

12  document reflects?

13    A.  I can speculate.

14    Q.  Okay.  What's your speculation?

15    MR. LINDSTROM:  Objection.  No foundation,

16  calls for speculation.

17    MR. SOLOMON:  Q.  You can speculate.

18    A.  Just looking at the format, it appears to be a

19  list of customers where there are amounts with notations

20  that say "unapplied amount."

21    Q.  Okay.

22    A.  For a variety of reasons.

23    Q.  But beyond that, you don't have an

24  understanding?

25    A.  No.

469

1    Q.  And if I were to tell you that these are

2  amounts that automatically got switched to the bad debt

3  reserve, that wouldn't help you?

4    MR. LINDSTROM:  Assumes facts.

5    THE WITNESS:  Again, no, I don't know the

6  disposition of all these things.

7    MR. SOLOMON:  So I'll have marked as the next

8  exhibit a document produced by HSBC in this litigation

9  with the HSBC control number of 000001.

10    (Whereupon, Plaintiff's Exhibit 95 was marked

11    for identification.)

12    MR. SOLOMON:  Q.  You'll see that this is a

13  copy of a check dated May 23rd, 2002, and let me know if

14  you've seen this before.

15    A.  No, I don't recall seeing this before.

16    Q.  Do you know whether or not Oracle has told the

17  SEC that it issued this check to Household in 2002?

18    A.  I don't know.

19    Q.  Are you aware that Oracle did not tell the SEC

20  that when it made its presentation to the SEC?

21    MR. LINDSTROM:  Assumes facts, no foundation,

22  calls for speculation.

23    THE WITNESS:  Again, I don't know what was

24  presented.  As I said earlier, it was not the

25  presentation, to the best of my knowledge, and so I

470

1  don't know what was said --

2    MR. SOLOMON:  Q.  Do you have a concern as

3  Chairman of the Board at Oracle that the SEC be given

4  complete and honest information by Oracle?

5    MR. LINDSTROM:  A concern?

6    MR. SOLOMON:  Q.  A desire.

7    A.  Certainly.  As I said earlier, hopefully,

8  we -- you know, to the best of our knowledge, presented

9  factual information to them.  We wouldn't want to

10  withhold information or not be truthful and so forth, so

11  sure.

12    Q.  And if it turns out that I'm right, and that

13  this was never told to the SEC, will you take steps to

14  ensure the SEC is informed?

15    MR. LINDSTROM:  Assumes facts, calls for

16  speculation.

17    THE WITNESS:  I would have to go talk to lots

18  of people to try to figure out what really happened, and

19  whether it was material or something that was --

20  something we should do.  So I don't have enough

21  information to make a judgment yet.

22    MR. SOLOMON:  Q.  But with billions of dollars

23  on the line, you are going to make that judgment --

24    MR. LINDSTROM:  Assumes facts, no foundation,

25  argumentative.

471

1    THE WITNESS:  Again, I'm -- I believe our

2    people spent a lot of time, worked with auditors,

3    counsel, so forth, and I believe we did the best job we

4    could.  You know, we didn't knowingly withhold any

5    information, or stuff like that.

6         MR. SOLOMON:  I'll have marked as the next

7    exhibit a document produced by the defendants in this

8    litigation with control numbers 120113 to 114.

9         (Whereupon, Plaintiff's Exhibit 96 was marked

10        for identification.)

11        THE WITNESS:  Okay.  I've seen it.

12        MR. SOLOMON:  Q.  Okay.  Have you seen this

13   before?

14   A.  I don't believe so.

15   Q.  Okay.  And you'll see that it's from Jennifer

16   Minton to Michael Rocha and copying Larry Garnick dated

17   April the 20th, 2001.

18        Do you see that?

19   A.  Yes.

20   Q.  Towards the bottom of the page there's an

21   exchange between Larry Garnick and Mike Rocha starting,

22   "Chris' team is responsible for getting the renewals

23   done."

24        Do you see that?

25   A.  Yes.

472

1    Q.  Then the next paragraph, the last sentence

2    says, "Also, why was there 24 million in backdated

3    revenue recognized in Feb?" question mark.

4         Do you see that?

5    A.  Yes.

6    Q.  Do you know anything about that?

7    A.  Again, no.  You showed me earlier documents

8    that I think superseded this from Larry Garnick that --

9    because this, I think, related to those other --

10   Q.  Do you know for sure if it does?

11   A.  I certainly assume so.  Larry Garnick, after

12   reading those other documents, they sounded like there

13   was work being done after this to continue to work on

14   these issues with the OKS conversion.

15   Q.  And when did you first become aware of the

16   backdated revenue issue?

17   A.  Again, I don't -- as I testified, I don't

18   recall being aware of the so-called backdated revenue,

19   but I was definitely aware that we were having issues

20   with the conversion.  Jennifer reported that to me, and

21   they were working with the support people and trying to

22   get this thing smoothed out and working properly.

23        MR. SOLOMON:  Let's have marked as the next

24   exhibit a document with control No. 147106.

25        All right, we're going to have to defer that

473

1    document because it has some work product in the

2    margins.

3         So we'll have marked as the next exhibit a

4    document with the control numbers 101525 to 530.

5         (Whereupon, Plaintiff's Exhibit 97 was marked

6         for identification.)

7         THE WITNESS:  Do you want me to go through

8    this whole --

9         MR. SOLOMON:  Q.  Tell me if you recognize the

10   document.

11   A.  I don't.

12   Q.  Let's look at the first page.  There's a

13   reference to support revenues softening for Q4 and

14   perhaps even Q3.

15        Do you see that?

16   A.  This is the second note down here.

17   Q.  Yes.

18   A.  A note to Jennifer.

19   Q.  Yes.

20   A.  Yes, I see that.

21   Q.  Okay.  Now, were you aware, at the beginning

22   of February 2001, that support revenues might be

23   softening for Q4 and perhaps even Q3 at Oracle?

24   A.  I don't recall that.

25   Q.  If you go to the second page, you'll see

474

1    there's a -- an exchange between a Cecile and Roberto.

2         Do you see that?

3    A.  It starts on the bottom of the first page and

4    then carries over?

5    Q.  Correct.

6    A.  Right.

7    Q.  Actually, I'm looking at the top of that

8    second page where it begins saying, "I see risk in the

9    Q4 numbers".

10   A.  Yes, I see that.

11   Q.  And were you aware of the risk being reported

12   here as of the beginning of February 2001?

13   A.  Again, I don't.  I don't recall what comments

14   Mike Rocha would have made at the EC meetings or what.

15   Q.  Okay.  Now, Covisint, do you recall the

16   Covisint deal?

17   A.  Yes.

18   Q.  That was scheduled for Q2, was it not,

19   internally at Oracle?  Was it forecast for Q2 '01

20   originally?

21   A.  I can't remember.  I do remember it being

22   worked very hard in the second quarter.  But I can't

23   remember if it was in the official forecast or not.  It

24   might have shown up as upside.  I just don't recall.

25        MR. SOLOMON:  I'll have marked as the next

475

1    exhibit a document produced by the defendants with the
2    control No. 623514.
3        (Whereupon, Plaintiff's Exhibit 98 was marked
4        for identification.)
5        MR. SOLOMON:  Q.  And just let me know if
6    you've seen this document before, please.
7        A.  Again, I -- I don't recall.
8        Q.  Okay.  You'll see that it appears to suggest,
9    halfway down, that Covisint was an upside deal for Q2
10   that was not likely to close.
11       Do you see that?
12       A.  I see that it's shown under upside deals not
13   likely to close.  I don't see a date.  So I don't know
14   what --
15       Q.  Okay.  That's fair enough.
16       A.  -- period this related to for sure.
17       MR. SOLOMON:  I'll have marked as the next
18   exhibit a document produced by Defendants with the
19   control numbers 025066 and 67.
20       (Whereupon, Plaintiff's Exhibit 99 was marked
21       for identification.)
22       MR. SOLOMON:  Q.  Once you've had a chance to
23   look at it, let me know if you've seen it before.
24       A.  Again, I'm quite familiar with the report.
25   Whether I looked at this particular report that

476

1    particular day, but I'm very aware of the report.
2        Q.  You see you are a recipient?
3        A.  Yes, so I'm sure I got it.  Whether I looked
4    at it that particular day, I don't know.
5        Q.  And it seems to suggest at the top, doesn't
6    it, that Covisint and BAE fell off, JDS Uniface, Kaiser
7    and Teradyne are in.
8        Do you see that?
9        A.  I do see that.
10       Q.  And then on the next page there are some
11   asterisked sentences, one referring to closed deals, the
12   other referring to pipeline deals.
13       Do you see that?
14       A.  The double asterisks?  Yes.
15       Q.  And then under the double asterisk, or against
16   it it says, "Pipeline deals are deals where contracts
17   has received an approval form, a quote or contract draft
18   has been prepared, and the sales rep has indicated the
19   deal may still close in November."
20       Do you see that?
21       A.  Yes.
22       Q.  Is that your understanding of what a pipeline
23   deal was at Oracle at the time?
24       A.  Well, let me see if I can think about what you
25   asked again.

477

1        MR. LINDSTROM:  You mean -- are you saying for
2    purposes of this document, Exhibit 99, or in general,
3    when people use the term "pipeline" or in other reports,
4    is this how it's used?
5        MR. SOLOMON:  Q.  It may be that there are
6    different meanings.  I don't know --
7        A.  There may be different meanings.  I think for
8    her purposes, she was trying to make sure that people
9    understand how she was defining what deals that are
10   still open for that quarter.  So she's saying, in this
11   case, this is day minus 1, I think it's right towards
12   the end, she's including things that reps have not told
13   her are going to slip, right?  So as long as reps still
14   think there's a chance to close over there, she's going
15   to show them the pipeline.
16       Q.  What did it take in Q2 of fiscal '01 to get a
17   potential deal into the pipeline?
18       MR. LINDSTROM:  So you're saying as of this
19   date, the last day of the quarter, or at any point in
20   the quarter?
21       MR. SOLOMON:  Q.  If it changed at Q2 '01,
22   tell me.  But otherwise, just tell me what it was.
23       A.  You're talking about what it took to get into
24   her report?
25       Q.  Into Oracle's pipeline.

478

1        A.  Again, we have --
2        Q.  I'm talking about the astounding pipeline,
3    Mr. Henley.
4        A.  Yeah, the OSO report you talked about earlier
5    and so forth.
6        Sales reps put, in their manager's review of
7    the stuff, deals they're working on, different stages,
8    expected amounts, hoped for closed dates, and et cetera,
9    so there's all that data out there.  And then financial
10   people try to put all this into quarterly forecast.  And
11   for her purposes, coming down to the end, the sales reps
12   may not have changed their OSO reports.  So she's
13   working -- her contracts people are working quite
14   closely with the field.  So the field says, "Dead, it's
15   not going to happen this quarter."  She's indicating
16   here, "I'm not going to include that in the pipeline.
17   Even if OSO says it's there, I know it's not going to
18   happen.  I want you guys to know the latest view with
19   the date of go of what's still active, what still being
20   worked.  It won't necessarily all close, but there's a
21   chance it will happen."
22       Q.  Have you heard of -- well, strike that.
23   Excuse me.
24       Would it be inappropriate, in your view, if a
25   customer was dissatisfied with Oracle's product, to say,

479

1  "We will fix it for free if you give us -- if you become
2  a reference for that product"?  Would that be
3  appropriate in your view?
4       MR. LINDSTROM:  Calls for speculation.  No
5  foundation.
6       THE WITNESS:  There is -- we're dealing with
7  large, sophisticated customers.  There's all kinds of
8  negotiations that go on during the life cycle of
9  relationships with customers.  So customers ask for all
10  sorts of things, and we end up doing some things they
11  want and some things they don't want and so forth.
12       MR. SOLOMON:  Q.  Right.  But if a customer is
13  unhappy with Oracle's product, would it be appropriate
14  for Oracle to say, "You ain't going to get that fixed by
15  us for free unless you become a reference for the
16  product"?
17       MR. LINDSTROM:  Same concern; hypothetical.
18  Calls for speculation.
19       THE WITNESS:  It's a hypothetical thing.  It
20  depends on the facts and circumstances of whether it's
21  appropriate or not.  But, I mean --
22       MR. SOLOMON:  Q.  Let me ask you another
23  question.  Would it be appropriate at Oracle to proclaim
24  to the world that a customer was a reference customer
25  when the customer had instructed Oracle not to use it as

480

1  a reference customer?
2       A.  Yes.  I mean, I think that would not be right,
3  and, again, we shouldn't knowingly go out and do
4  something like that.
5       Q.  All right.
6       A.  And typically, we didn't offer -- we always
7  checked with customers to see if they were willing to
8  let us use their name in a press release, or something
9  like that.
10       Q.  Okay.  Now, do you know why Covisint slipped
11  from Q2 to Q3?
12       A.  Again, my recollection was that it was a rev
13  rec call, that ultimately we couldn't get all the
14  details sorted out the way we needed, and so came
15  midnight, we couldn't -- Tom Williams, to my
16  recollection, was involved in it and so forth.  But I
17  don't remember exactly why it slipped, to use your
18  words.
19       Q.  Do you know -- so I think you've already
20  testified, so let's just be clear.  You don't know which
21  rev rec criteria was not met in Q2?
22       A.  I don't recall all the details of what
23  happened.
24       Q.  Okay.  I'll have marked as the next exhibit a
25  document produced in this litigation with control

481

1  No. 297300.
2       (Whereupon, Plaintiff's Exhibit 100 was marked
3       for identification.)
4       MR. SOLOMON:  Q.  And while the reporter is
5  marking this, this is one page of an interview memoranda
6  prepared in the SLC -- by the SLC, and the interviewee
7  was Ms. Safra Catz.
8       MR. LINDSTROM:  And is this Exhibit 100?
9       THE REPORTER:  Yes.
10       MR. SOLOMON:  Q.  And if you look at the third
11  paragraph starting, "Catz was heavily involved," do you
12  see that?
13       A.  Yes.
14       Q.  Okay.  "When asked why it slipped from Q2
15  '01 -- FY01 into Q3 FY01, Catz explained that she had
16  insisted the customer pay cash because it was a huge
17  deal with a large discount.  The deal slipped into the
18  third quarter because Covisint was working on getting
19  enough cash.  The cash did not hit Oracle's account in
20  time to be logged as a second quarter deal."
21       Do you see that?
22       A.  Yes.
23       Q.  Do you know what revenue recognition criteria
24  Ms. Catz had in mind when she decided that the deal
25  should not be recognized in Q2?

482

1       MR. LINDSTROM:  No foundation.
2       THE WITNESS:  Again, I don't believe she made
3  the determination.  I believe the determination on
4  revenue recognition was made by Tom Williams; that he
5  would typically be the person -- Safra Catz, like
6  myself, is not a trained public accountant and doesn't
7  know all the vaguaries of revenue recognition.  So I
8  think she's portraying what happened, but she's relying
9  on Mr. Williams to make the call.
10       MR. SOLOMON:  Q.  Do you agree that it's not a
11  revenue recognition criterion that the customer pay cash
12  prior to revenue recognition?
13       MR. LINDSTROM:  No foundation.  He just told
14  you he's not a rev rec expert.
15       MR. SOLOMON:  Q.  As a CFO, I thought you may
16  just have some vague knowledge about it.
17       A.  I think the main -- again, the keg is at a
18  very high level.  The main issue about revenue
19  recognition is there can be no uncertainties, signed
20  contracts and all that, no uncertainties.  And there is
21  a variety of things that come to play that could create
22  uncertainties.  So if there is an uncertainty about
23  getting cash or something, then that would potentially
24  be a reason this could be deferred.  And you said, just
25  earlier, that apparently, all the cash wasn't in the

483

1    company.  Covisint was a separately formed venture at
2    the time, so --
3        Q.  And who were the ventured partners in that
4    venture?
5        A.  It was several of the big auto companies.  I
6    don't know if it was all the big three, but I remember
7    Ford was involved and they were trying to enlist, and I
8    can't remember, ultimately, who ultimately joined it.
9    But Ford was kind of leading the charge, is my
10   recollection originally.
11       Q.  And would you normally require cash in a bag
12   from entities like Ford before you would recognize
13   revenue?
14       A.  Again, I think you would have to go back and
15   look at the circumstances, but this was a highly unusual
16   new venture, and it was a lot of money.  So it was a
17   separate entity, and so there was uncertainty.
18       Q.  You weren't involved in the decision one way
19   or another?
20       A.  No, I never made rev rec calls, and Safra was
21   actively involved in negotiating the deal.
22       MR. SOLOMON:  Okay.  Let's go off the record a
23   second.
24       (Recess taken from 6:11 to 6:19 P.M.)
25       MR. SOLOMON:  Mr. Lindstrom, I have a -- just

484

1    a question about a document that's been designated as
2    highly confidential, attorneys eyes only by HP.  My
3    understanding is that -- it certainly doesn't look like
4    it should be highly confidential, but my understanding
5    is that HP has not necessarily withdrawn that
6    designation yet.
7        Are you aware of any withdrawal by HP of that
8    designation on any of the documents?
9        MS. KYROUZ:  No.
10       MR. SOLOMON:  Okay.  And it's fair to say,
11   then, that with respect to documents produced by HP with
12   that designation, Mr. Henley won't have seen them.  You
13   wouldn't have shown him.
14       MR. LINDSTROM:  I can't hear you.
15       MR. SOLOMON:  Is it fair to say -- and I'm not
16   trying to get into attorney/client privilege, but I just
17   want to see if I can use a document that's marked
18   attorneys' eyes only or not.
19       MR. LINDSTROM:  So your question to me is
20   would we have shown it to HP.
21       MR. SOLOMON:  Under any agreement with HP.
22   I'm not saying improperly.  Has that happened?
23       MR. LINDSTROM:  I'm not aware of any document
24   designated highly confidential by HP that's been shown
25   to this witness.

485

1        MR. SOLOMON:  Okay.  I appreciate it.  Thanks
2    for your help.
3        Q.  Mr. Henley, are you aware that HP expressed
4    dissatisfaction with the transaction in which Oracle
5    provided software to HP on November 30th, 2000?
6        MR. LINDSTROM:  So you're saying aware of his
7    own personal knowledge, independent of whatever document
8    you're holding?
9        MR. SOLOMON:  Correct.
10       THE WITNESS:  So you're saying am I aware that
11   on that date, they were dissatisfied or something?
12       MR. SOLOMON:  Q.  Thereafter.  Let me back up.
13   There was a deal or deals on November 30th,
14   2000, okay?  Are you aware of HP expressing, thereafter,
15   dissatisfaction with the deal or deals?
16       A.  The only thing I'm aware of is I was aware
17   that, a number of months later, they reconsidered
18   whether they wanted to use our CRM or somebody else's,
19   and that was a number of months later.
20       Q.  Okay.  And are you aware that HP went so far
21   as to complain that they had been misled by Oracle?
22       A.  No.
23       MR. SOLOMON:  Okay.  Let's have marked as the
24   next exhibit a document produced by the defendants.
25   We've had to reformat it because it otherwise wasn't

486

1    usable.  The control numbers are 147106 and 147106.  I
2    guess it was one document we've had to split into
3    two pages.  One page.
4        (Whereupon, Plaintiff's Exhibit 101 was marked
5        for identification.)
6        MR. SOLOMON:  Q.  And once you've had a chance
7    to review it, let me know if you've seen this before.
8        A.  I can't recollect if I saw this or not.
9        Q.  Okay.  And you'll see in the columns toward
10   the left-hand side of the page there are references to
11   backdated revenue.
12       Do you see the references?
13       A.  Again, I do see something starting the prior
14   month.  Backdated revenue, is that what you're talking
15   about?
16       Q.  Below "Prior Month" there's a reference to
17   prior month backdated revenue, and under "Current Month"
18   there's a reference to current month backdated revenue.
19       Do you see that?
20       A.  Yes, down at the bottom of that second
21   category?  Yes.
22       Q.  Do you know what that refers to?
23       A.  Again, no.  Is there a date on this report?
24       Q.  It's dated the 16th of November, if you look
25   at the top.  It doesn't have the year, though.

487

1    A. It doesn't have the year. Okay. I can see
2  the 16 November.
3    Q. And I don't know if that's necessarily the
4  date that this document was created or not. I can't
5  tell you.
6    A. Nor can I. We're just both reading the
7  report, I guess, the corner.
8    Q. I'm finished with the document if you're not
9  familiar with it.
10   A. Okay.
11   Q. Were you aware, in November of 2000, that the
12  internal audit function at Oracle, or the internal audit
13  department of Oracle, was revising the internal audit
14  procedures at the company?
15   A. I don't recollect that.
16   Q. Would you have been involved in that at all?
17   A. Um, from time to time, if they decided to
18  audit a different scope of things or do something, they
19  might come to me, or certainly come to me and the audit
20  committee and talk about, you know, how they wanted to
21  proceed, what they thought was high priority to be
22  looking into and so forth. And that happened -- it was
23  kind of evolutionary over the years. But I don't recall
24  whether they were doing that at that particular time.
25   Q. Okay. Did you ever read a book called Soft

488

1  War?
2    A. This was the one that was written by the
3  English guy?
4    Q. Yes.
5    A. I read a fair amount of it after it came out,
6  and as you know, if you read it, I guess, I was
7  interviewed by him.
8    Q. How long were you interviewed by him for?
9    A. I think we had a couple of sessions.
10   Q. Did he record the interview?
11   A. I don't know.
12   Q. Was there a tape recorder in the room that you
13  remember?
14   A. I just don't remember. But I definitely think
15  I met him at least two times. I don't think it was just
16  one interview.
17   Q. And do you know how long the interviews, in
18  aggregate, were?
19   A. I don't remember exactly. I mean, they
20  weren't all day, or something like that, if that's what
21  you're saying, but, I mean, they were probably an hour
22  or so, my recollection.
23   MR. SOLOMON:  I'll have marked as the next
24  exhibit an excerpt from Soft War.
25   Did you discuss with Mr. Ellison whether or

489

1  not the book ought to be written or published?
2    A. I don't recall. I remember he told me that he
3  was working with him, and would I interview with him,
4  and felt he was an able, fair guy coming out of the
5  economist's side, and he would give a balanced view and
6  he wouldn't take one particular point of view. He
7  thought he would be objective.
8    Q. Okay.
9    A. He seemed comfortable that it was a good idea.
10   MR. SOLOMON:  Okay.
11   (Whereupon, Plaintiff's Exhibit 102 was marked
12   for identification.)
13   MR. SOLOMON:  Q. I'm looking at page 221 of
14  the book, and I'm looking towards the top of the page,
15  and it says, "Ellison" -- let me start the sentence.
16  "However, even at Oracle, with its much-trumpeted
17  $1 billion of savings and the boast of being able to
18  extract as much again this year," and parens, "(recently
19  slightly moderated because of the economy)", closed
20  quotes, "Ellison was, according to his own CFO, Jeff
21  Henley, running slightly ahead of reality. But for
22  customers, including some of the ones around the table
23  on Broadway, what might be galling was the fact that
24  until very recently, Oracle had enthusiastically been
25  selling the very approach, namely customized

490

1  best-of-breed solutions, that Ellison was now describing
2  as madness."
3    Do you see that?
4    A. I do see that.
5    Q. And did you describe Mr. Ellison as running
6  slightly ahead of reality?
7    A. I don't remember what I said. I don't know if
8  I used those words, or whether that was his way of
9  describing something I said in several interviews or
10  something.
11   Q. Are you disputing that you would have conveyed
12  that to Mr. Symonds?
13   MR. LINDSTROM:  Conveyed the precise words
14  used here?
15   MR. SOLOMON:  Q. That Mr. Ellison was running
16  slightly ahead of reality.
17   A. I really have no idea whether I would have
18  used those exact words or not. I really don't recall.
19   MR. LINDSTROM:  So I think we're done, aren't
20  we?
21   We're out of time.
22   MR. SOLOMON:  How much time are we at?
23   THE VIDEOGRAPHER:  Zero.
24   MR. SOLOMON:  All right. I have many more
25  questions, but I'm going to have to move the court to

491

Henley, Jeffrey  11/16/2006  9:20:00 AM

1   get permission to ask you some more.  Thank you very

2   much.

3        MS. KYROUZ:  We would like to designate the

4   transcript as confidential.

5        --o0o--

6        (Whereupon, the deposition was

7        concluded at 6:29 P.M.)

8

9   Dated: _____ Signed: _____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

492

1        CERTIFICATE OF WITNESS

2

3

4

5        I, the undersigned, declare under penalty of

6   perjury that I have read the foregoing transcript, and I

7   have made any corrections, additions, or deletions that

8   I was desirous of making; that the foregoing is a true

9   and correct transcript of my testimony contained

10   therein.

11        EXECUTED this _____ day of _____,

12   2006, at _____, _____.

13

14

15

16

17

18        _____

19        Signature of Witness

20

21

22

23

24

25

493

1        REPORTER'S CERTIFICATE

2

3        I hereby certify that the foregoing is a true

4   record of the testimony as reported to the best of my

5   ability by me, a Certified Shorthand Reporter and a

6   disinterested person, and was thereafter transcribed

7   under my direction into typewriting by computer.

8

9        I FURTHER CERTIFY that I am not interested in

10   the outcome of the said action and not connected with

11   nor related to any of the parties in said action or

12   their respective counsel.

13   Dated: _____ _____

        APRIL DAWN HEVEROH, CSR

14        CSR NO. 8759

15

16

17

18

19

20

21

22

23

24

25

494

```
 1                    REPORTER'S CERTIFICATE

 2

 3            I hereby certify that the foregoing is a true

 4    record of the testimony as reported to the best of my

 5    ability by me, a Certified Shorthand Reporter and a

 6    disinterested person, and was thereafter transcribed

 7    under my direction into typewriting by computer.

 8

 9            I FURTHER CERTIFY that I am not interested in

10    the outcome of the said action and not connected with

11    nor related to any of the parties in said action or

12    their respective counsel.

13    Dated: 11-21-06

14                         APRIL DAWN HEVEROH, CSR
                                CSR NO.  8759
15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT L

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

)
In re ORACLE CORPORATION       )
SECURITIES LITIGATION          ) Master File No.

_____)
                               ) C-01-0988-MJJ
THIS DOCUMENT RELATES TO:      )
                               )
    ALL ACTIONS.               )
_____)

CONFIDENTIAL

VOLUME I

VIDEOTAPED DEPOSITION OF EDWARD J. SANDERSON, JR.

Tuesday, July 25, 2006

VIDEOTRACKT LLC

Reporting For:

LiveNote World Service
221 Main Street, Suite 1250
San Francisco, California  94105
Phone: (415) 321-2300
Fax: (415) 321-2301

REPORTED BY: KAE F. GERNANDT
CSR No. 5342

1

---

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

)
In re ORACLE CORPORATION       )
SECURITIES LITIGATION          ) Master File No.

_____)
                               ) C-01-0988-MJJ
THIS DOCUMENT RELATES TO:      )
                               )
    ALL ACTIONS.               )
_____)

CONFIDENTIAL VIDEOTAPED DEPOSITION of EDWARD J. SANDERSON, JR., Volume I, defendant herein, taken by plaintiff pursuant to the applicable rules of the Federal Rules of Civil Procedure on TUESDAY, JULY 25, 2006, before me, Kae F. Gernandt, CSR No. 5342, beginning at 9:05 a.m. and ending at 5:57 p.m. at 655 West Broadway, Suite 1900, in the City of San Diego, County of San Diego, State of California.

2

---

APPEARANCES
For the Plaintiffs:
LERACH, COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS
    BY:  SHAWN A. WILLIAMS
         JENNIFER IRVINE
         MONIQUE C. WINKLER  (afternoon session)
    100 Pine Street, Suite 2600
    San Francisco, California  94111
    (415) 288-4545
    swilliams@lerachlaw.com   moniquew@lerachlaw.com

LERACH, COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS
    BY:  STACEY KAPLAN
         655 West Broadway, Suite 1900
         San Diego, California  92101-3301
         (619) 231-1058

For Oracle Corporation and the individual defendants:
LATHAM & WATKINS
    BY:  PATRICK E. GIBBS
         140 Scott Drive
         Menlo Park, California  94025-1008
         (650) 328-4600
         patrick.gibbs@lw.com

LATHAM & WATKINS
    BY:  KYRA G. BUSBY
         505 Montgomery Street, Suite 2000
         San Francisco, California  94111-2562
         (415) 391-0600
         kyra.busby@lw.com
JAMES C. MAROULIS
    Oracle Corporation
    500 Oracle Parkway, M/S 5OP7
    Redwood Shores, California  94065
    (650) 506-4517
Also in Attendance:
    DEBORAH L. BURK, CLVS, Videographer, VideoTrack LLC
    401 West "A" Street, Suite 135
    San Diego, California  92101
    (619) 234-1990
    Sara Holloway

3

---

I N D E X

WITNESS
EDWARD J. SANDERSON, JR.

EXAMINATION BY                          PAGE
Mr. Williams ...................   10

EXHIBITS MARKED FOR IDENTIFICATION

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | E-mail string dated 10/4/00 between Sandy Sanderson, Don Klaiss and Valerie Borthwick (NDCA-ORCL 056045-056048) | 60 |
| Exhibit 2 | E-mail string dated 10/12/00 with information re Ingersoll-Rand (NDCA-ORCL 039546-039551) | 64 |
| Exhibit 3 | E-mail string dated 10/2000 re Ford supply chain status (NDCA-ORCL 169718-169720) | 83 |
| Exhibit 4 | E-mail dated 10/21/00 re 11.5.1 vs. 11.5.2 confusion (NDCA-ORCL 056049-056050) | 90 |
| Exhibit 5 | E-mail dated 10/13/00 re Field Project Feedback Needed on 11i Training & New Apps (NDCA-ORCL 056051-056054) | 99 |
| Exhibit 6 | E-mail dated 2/6/01 re GE strategy (NDCA-ORCL 143064) | 142 |
| Exhibit 7 | E-mail dated 3/11/01 re Consulting - Food for Thought (NDCA-ORCL 099861) | 149 |

4

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

| | | |
|---|---|---|
| 1 | EXHIBITS MARKED FOR IDENTIFICATION | |
| 2 | EXHIBIT NO.    DESCRIPTION | PAGE |
| 3 | Exhibit 8    E-mail string dated 3/01 re | 152 |
| | Beckman Update (NDCA-ORCL | |
| 4 | 101535-101537) | |
| 5 | Exhibit 9    E-mail string dated 3/01 re | 167 |
| | Daily CRM Escalated and | |
| 6 | Strategic Implementations | |
| | report (NDCA-ORCL | |
| 7 | 054235-054244) | |
| 8 | Exhibit 10    E-mail string dated 7/01 re GE | 196 |
| | Aircraft APS Status/Background | |
| 9 | (NDCA-ORCL 056341-056347) | |
| 10 | Exhibit 11    E-mail string dated 7/00 re SC | 207 |
| | CEO Desk Call (NDCA-ORCL | |
| 11 | 101654-101656) | |
| 12 | Exhibit 12    E-mail string dated 8/00 re CRM | 212 |
| | Demos (NDCA-ORCL 620365-620371) | |
| 13 | | |
| | Exhibit 13    E-mail string dated 2/1/01 re | 230 |
| 14 | OPI Demonstration | |
| | Environment/Product Issues | |
| 15 | (NDCA-ORCL 061313-061315) | |
| 16 | Exhibit 14    E-mail string dated 11/00 re | 264 |
| | CRM Rollout Date (NDCA-ORCL | |
| 17 | 020704-020706) | |
| 18 | Exhibit 15    E-mail string dated 12/00 re | 266 |
| | First Q3 Forecast Data | |
| 19 | (NDCA-ORCL 028582-028583) | |
| 20 | | |
| 21 | EXHIBITS REFERRED TO | |
| 22 | EXHIBIT NO.    DESCRIPTION | PAGE |
| 23 | Exhibit 1    (DeCesare) E-mail string dated | 223 |
| | 2/01 re OPI Demonstration | |
| 24 | Environment/Product Issues | |
| | (NDCA-ORCL 296485-296486) | |
| 25 | | |

5

| | | |
|---|---|---|
| 1 | EXHIBITS REFERRED TO, Continued | |
| 2 | EXHIBIT NO.    DESCRIPTION | PAGE |
| 3 | Exhibit 2    (Block) E-mail string between | 73 |
| | Sandy Sanderson and Keith Block | |
| 4 | (NDCA-ORCL | |
| | 152033.0001-152033.0002) | |
| 5 | | |
| | Exhibit 4    (Cochran) E-mail string dated | 112 |
| 6 | 11/00 re Successful Customer | |
| | Implementation Announcements | |
| 7 | (NDCA-ORCL 101671-101673) | |
| 8 | Exhibit 5    (Roberts) E-mail string dated | 121 |
| | 12/00 re Critical Account | |
| 9 | Concession Request for Paxar | |
| | Corporation (NDCA-ORCL | |
| 10 | 039330-039332) | |
| 11 | Exhibit 6    (Wohl) E-mail dated 12/4/00 re | 279 |
| | WEBREQS is Flaky (NDCA-ORCL | |
| 12 | 052474) | |
| 13 | Exhibit 6    (Scott) E-mail string dated | 281 |
| | 1/01 re Agenda for Exec ISD | |
| 14 | Checkpoint Call (NDCA-ORCL | |
| | 219741-219746) | |
| 15 | | |
| | Exhibit 7    (Block) E-mail string dated | 125 |
| 16 | 1/01 re Go Live with Confidence | |
| | (NDCA-ORCL 026981-026982) | |
| 17 | | |
| | Exhibit 8    (Klaiss) E-mail string dated | 242 |
| 18 | 7/01 re ERP CRM Integration | |
| | Testing (NDCA-ORCL | |
| 19 | 056440-056442) | |
| 20 | Exhibit 8    (Godwin) E-mail string dated | 281 |
| | 1/01 re Oracle Internal | |
| 21 | Upgrading to R11i this Weekend | |
| | (NDCA-ORCL 078388-078390) | |
| 22 | | |
| | Exhibit 9    (Cullivan) E-mail string dated | 107 |
| 23 | 20/26/00 re Issues report for | |
| | the Dialogs with attachments | |
| 24 | (NDCA-ORCL 617453-617462) | |
| 25 | | |

6

| | | |
|---|---|---|
| 1 | EXHIBITS REFERRED TO, Continued | |
| 2 | EXHIBIT NO.    DESCRIPTION | PAGE |
| 3 | | |
| 4 | Exhibit 10    (Klaiss) E-mail string dated | 54 |
| | 10/4/00 between Sandy | |
| 5 | Sanderson, Don Klaiss and | |
| | Valerie Borthwick (NDCA-ORCL | |
| 6 | 056045) | |
| 7 | Exhibit 10    (Borthwick) E-mail string dated | 284 |
| | 1/01 re 11i Migration Update | |
| 8 | 18-Jan-01 (NDCA-ORCL | |
| | 056213-056214) | |
| 9 | | |
| | Exhibit 11    (Wohl) E-mail dated 12/9/00 re | 278 |
| 10 | Internal Upgrade Decision | |
| | (NDCA-ORCL 012385) | |
| 11 | | |
| | Exhibit 12    (Hamel) E-mail dated | 240 |
| 12 | 3/01 re ADS Demo Stats - Q3 | |
| | General Business US (NDCA-ORCL | |
| 13 | 063462-063464) | |
| 14 | Exhibit 14    (Roberts) E-mail string dated | 129 |
| | 1/01 re Hudson's Bay Escalation | |
| 15 | (NDCA-ORCL 052475-052478) | |
| 16 | Exhibit 15    (Jarvis) E-mail string dated | 159 |
| | 3/01 re Papa Johns Information | |
| 17 | (NDCA-ORCL 121704-121707) | |
| 18 | Exhibit 15    (Fitzpatrick) E-mail string | 218 |
| | dated 1/01 re Majors | |
| 19 | Application Demo Update | |
| | (NDCA-ORCL 063415-063416) | |
| 20 | | |
| | Exhibit 15    (Hamel) E-mail string dated | 241 |
| 21 | 4/01 re ADS Demo Feedback for | |
| | Week Ending April 13 | |
| 22 | (NDCA-ORCL 061370-061373) | |
| 23 | Exhibit 17    (Unknown) FY 02 Consulting | 181 |
| | Budget Review dated 4/3/01 | |
| 24 | (NDCA-ORCL 159545-159575) | |
| 25 | | |

7

| | | |
|---|---|---|
| 1 | EXHIBITS REFERRED TO, Continued | |
| 2 | EXHIBIT NO.    DESCRIPTION | PAGE |
| 3 | Exhibit 17    (Borthwick) E-mail dated | 191 |
| | 6/11/01 re Board Meeting Input | |
| 4 | with attachments (NDCA-ORCL | |
| | 131696-131702) | |
| 5 | | |
| | Exhibit 18    (Kendig) Package titled | 199 |
| 6 | "E-Business Suite 11i" | |
| | (NDCA-ORCL 621416-621449) | |
| 7 | | |
| | Exhibit 18    (Block) E-mail string dated | 286 |
| 8 | 1/01 re Projects 11i Upgrade | |
| | Status 29-Jan-01 (NDCA-ORCL | |
| 9 | 034382-034383) | |
| 10 | Exhibit 20    (Hamel) E-mail dated 3/28/01 re | 173 |
| | BG 11i Escalations (NDCA-ORCL | |
| 11 | 094069-094070) | |
| 12 | Exhibit 21    (Roberts) E-mail string dated | 236 |
| | 3/01 re Majors Demo Update | |
| 13 | | |
| | Exhibit 22    (Fitzpatrick) E-mail string | 233 |
| 14 | dated 2/1/01 re OPI | |
| | Demonstration | |
| 15 | Environment/Product Issues | |
| | (NDCA-ORCL 0617970-617974) | |
| 16 | | |
| | Exhibit 23    (Block) E-mail string dated | 165 |
| 17 | 3/23/01 re Paxar (NDCA-ORCL | |
| | 278125-178127) | |
| 18 | | |
| | Exhibit 25    (Roberts) E-mail string dated | 187 |
| 19 | 6/01 re CRM Business Update - | |
| | My Feedback (NDCA-ORCL 162213, | |
| 20 | 162215-162216) | |
| 21 | Exhibit 30    (Wohl) E-mail string dated 3/01 | 175 |
| | re Forrester: Negative on 11i | |
| 22 | (NDCA-ORCL 063478-063480) | |
| 23 | Exhibit 39    (Wohl) E-mail string dated 2/01 | 147 |
| | GE Payroll & Benefits Update | |
| 24 | (NDCA-ORCL 063438-063439) | |
| 25 | | |

8

Oracle

1    SAN DIEGO, CALIFORNIA, TUESDAY, JULY 25, 2006
2         9:05 A.M.
3
4         THE VIDEOGRAPHER:  Here begins the videotaped
5    deposition of Edward Sanderson, Tape 1, Volume I in
6    the matter of in re Oracle securities litigation in
7    the United States District Court, Northern District
8    of California, Case No. C-01-0988-MJJ.
9         Today's date is July 25th, 2006, and
10   it is now 9:05 a.m.  The video operator today is
11   Deborah L. Burk of VideoTrack, representing LiveNote
12   World Service, located at 221 Main Street,
13   Suite 1250, San Francisco, California, 94105.
14   Telephone number, area code (415) 321-2300.  The
15   court reporter is Kae Gernandt, reporting on behalf
16   of LiveNote World Service.
17        Today's deposition is being taken at
18   Lerach, Coughlin, Stoia & Geller, located at
19   655 West Broadway, Suite 1900, San Diego,
20   California.
21        Please be aware that the video and audio
22   recording will take place at all times throughout
23   this deposition unless all counsel agree to go off
24   the record, at which time, I will announce the time
25   that we're going off the record, and the recording

9

1    devices will then be stopped.
2         Would counsel please introduce
3    yourselves and state who you represent.
4         MR. WILLIAMS:  Shawn Williams, Lerach,
5    Coughlin, Stoia, Geller, Rudman & Robbins.  I also
6    have with me Stacey Caplan and Jennifer Irvine, also
7    of Lerach Coughlin, and Sara Holloway, a summer law
8    clerk with Lerach Coughlin.
9         MR. GIBBS:  Patrick Gibbs from Latham &
10   Watkins on behalf of all defendants.
11        MS. BUSBY:  Kyra Busby, Latham & Watkins, on
12   behalf of the defendants.
13        MR. MAROULIS:  James Maroulis from Oracle
14   Corporation for defendant Oracle Corporation.
15        THE VIDEOGRAPHER:  Would the court reporter
16   please swear in the deponent.
17
18        EDWARD J. SANDERSON, JR.,
19   defendant herein, being first duly sworn, testifies
20   as follows:
21
22   EXAMINATION BY MR. WILLIAMS:
23        Q.  Good morning, Mr. Sanderson.
24        A.  Good morning.
25        Q.  Can you just state your full and

10

1    complete name for the record, please?
2         A.  Edward Jennings Sanderson, Jr.
3         Q.  People call you Sandy?
4         A.  Yes, that's right.
5         Q.  How long have they called you Sandy?
6         A.  Since college.
7         Q.  You've had your deposition taken before?
8         A.  Yes, I have.
9         Q.  So, you kind of have a general
10   understanding of how this process is going to work
11   today?
12        A.  I do, but it would be helpful, Shawn, if
13   there are any, quote, rules that you'd like to make
14   sure we follow, I'd love to hear them.
15        Q.  Okay.  The court reporter, sitting to
16   your right, is going to take down everything that's
17   said in this room today.  Unfortunately, she can't
18   record head nods and hand gestures.  So, if I ask
19   you a question, I'm going to ask you to respond
20   audibly.  Okay?
21        A.  Right.
22        Q.  All right.  She's also going to take
23   down counsel's objections, my comments.  So, I'm
24   going to ask you to try not to speak over me or
25   anyone else in the room.

11

1         A.  Right.
2         Q.  Sometimes --
3         A.  I'll do my best.
4         Q.  -- it becomes somewhat conversational,
5    and we want to try to avoid talking over one
6    another.  Okay?  You understand that?
7         A.  I do.
8         Q.  Okay.  You understand you're under oath,
9    and even though we're in a relatively informal
10   setting, the oath that you have taken is the same
11   oath you would take in a court of law.  Do you --
12        A.  Absolutely.
13        Q.  -- understand that?
14        We'll take several breaks today.  My
15   expectation is that we'll take one around every hour
16   or so, but at any time, if you'd like to take a
17   break, just let me know, and we can take a break.
18        A.  Great.
19        Q.  One caveat to that, if I'm in the middle
20   of a question or in the middle of a line of
21   questioning, I may want to complete that --
22        A.  Sure.
23        Q.  -- question or line before we take a
24   break.  You understand?
25        A.  Sure.  I do.

12

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

| | |
|---|---|
| 1   Q.  I'm going to ask you several questions | 1   and make any minor corrections if you think that's |
| 2   today.  I'll try to be as clear as possible. | 2   necessary.  So, you don't have to be absolutely |
| 3   There's no doubt that sometimes I won't be as clear | 3   perfect today, but you won't be able to make big, |
| 4   as I want to be, but if you don't understand a | 4   substantive changes.  You understand that? |
| 5   question, just ask me to repeat it or clarify, and | 5   A.  I understand. |
| 6   I'll be glad to do so.  You understand? | 6   Q.  You said you've had your deposition |
| 7   A.  Will do. | 7   taken before.  I assume that's more than once. |
| 8   Q.  Okay.  Throughout the deposition, | 8   A.  Yes, correct. |
| 9   Mr. Gibbs will very likely object to several, many | 9   Q.  Okay.  How many times? |
| 10  or all of my questions.  Okay.  He's allowed to do | 10  A.  Three times. |
| 11  that.  However, if he objects to any of my | 11  Q.  And were you a party in any of the |
| 12  questions, you still have to answer the | 12  depositions that you sat for? |
| 13  question unless he specifically instructs you not to | 13  A.  No. |
| 14  answer the question.  You understand that? | 14  Q.  Okay.  When was the last time you had |
| 15  A.  I understand. | 15  your deposition taken? |
| 16  Q.  Okay.  Is there any reason why you can't | 16  A.  March 2004. |
| 17  give your full and complete testimony today? | 17  Q.  Okay.  And that was related to Oracle? |
| 18  A.  No. | 18  A.  Yes, correct. |
| 19  Q.  Are you on any medication that would | 19  Q.  Prior to March of '04, do you recall |
| 20  impact your ability to recall facts in 2000, 2001? | 20  when -- the time before that you sat for a |
| 21  A.  No medication.  Obviously, there's a | 21  deposition? |
| 22  five-year time lapse. | 22  A.  I don't, but I would say it was probably |
| 23  Q.  Sure.  I understand that. | 23  within a year of that. |
| 24      At the end of your testimony, you'll | 24  Q.  Okay.  And was that in relationship to |
| 25  have an opportunity to review what we talked about | 25  Oracle Corporation? |
| 13 | 14 |

| | |
|---|---|
| 1   A.  It did relate to Oracle, yes, correct. | 1   Mr. Maroulis? |
| 2   Q.  Okay.  And there was at least one more | 2   A.  Correct. |
| 3   time before that? | 3   Q.  And what was the name of the other |
| 4   A.  Correct. | 4   attorney? |
| 5   Q.  And when was that? | 5   A.  It was Michele Kyrouz. |
| 6   A.  Probably about 1997. | 6   Q.  And was that here in San Diego? |
| 7   Q.  '97.  Related to Oracle? | 7   A.  Correct. |
| 8   A.  No. | 8   Q.  Where was that? |
| 9   Q.  But you weren't a party to that action? | 9   A.  At the Latham & Watkins office in |
| 10  A.  No. | 10  Del Mar area. |
| 11  Q.  How long have you known that you would | 11  Q.  Okay.  And that was for about four |
| 12  testify in this action? | 12  hours? |
| 13  A.  This specific date? | 13  A.  Correct. |
| 14  Q.  Not this specific date.  This action. | 14  Q.  Okay.  Prior to yesterday, did you do |
| 15  A.  I don't recall. | 15  anything to prepare for your deposition? |
| 16  Q.  Okay. | 16  A.  No. |
| 17  A.  I would say a year maybe. | 17  Q.  And so, during the time -- well, you |
| 18  Q.  Okay.  Have you done anything to prepare | 18  learned maybe a year ago that you'd have to testify |
| 19  for your deposition today? | 19  in this case and didn't do anything until |
| 20  A.  Yes. | 20  yesterday -- |
| 21  Q.  What have you done? | 21  A.  Correct. |
| 22  A.  I met yesterday for about four hours | 22  Q.  -- right? |
| 23  with the attorneys to my left and one other attorney | 23      Did you have conversations with your |
| 24  from Latham & Watkins. | 24  attorneys about the substance of the deposition |
| 25  Q.  Okay.  So, Mr. Gibbs, Miss Busby and | 25  before yesterday? |
| 15 | 16 |

1    A.  No.

2    Q.  Okay.  So, yesterday did you review any

3  documents in preparation for your deposition?

4    A.  Yes.

5    Q.  Okay.  And what would you say the volume

6  of documents that you reviewed was?

7    A.  Do you mean number?

8    Q.  Sure.

9    A.  Maybe ten.

10   Q.  Ten documents, okay.  And appreciating

11  that there is a significant time lag between the

12  events we're going to talk about today, did any of

13  the documents that you reviewed yesterday refresh

14  your recollection about events in 2000 or 2001?

15   A.  Not events, no.

16   Q.  Did the review of those documents

17  refresh your recollection about any occurrences or

18  subject matters occurring during 2000 and 2001?

19   MR. GIBBS:  Objection.  Vague, compound.

20   THE WITNESS:  Yeah, I remember seeing some

21  performance numbers --

22   MR. WILLIAMS:  Uh-huh.

23   THE WITNESS:  -- that Oracle achieved that I

24  achieved.

25  / / /

17

1  BY MR. WILLIAMS:

2    Q.  Helped you remember things happening

3  back then?

4    A.  No.  No, it was more a question -- I

5  remember a specific question, what was my revenue in

6  the previous year for the third quarter.

7    Q.  Okay.  And what was that recollection?

8    A.  That I didn't recall.  That's why I

9  asked to see the numbers.

10   Q.  Right.  And that's what I'm -- that's

11  what I'm getting at.  Once you saw the documents,

12  did they refresh your recollection about those facts

13  that you've just indicated to me?

14   A.  No.

15   Q.  No.  Okay.

16   So, you started working at Oracle

17  somewhere in '94, '95?

18   A.  July of 1995.

19   Q.  Okay.  And you started as a senior vice

20  president?

21   A.  Correct.

22   Q.  Of Consulting?

23   A.  Correct.

24   Q.  And what was the geographic area of your

25  responsibilities at that time?

18

1    A.  I had consulting for the Americas, which

2  entailed U.S., Canada and Latin America.

3    Q.  Okay.  And just generally, can you

4  describe what the consulting organization did in

5  that period?

6    A.  Oracle Consulting focused on the -- on

7  projects related to Oracle products.  And the reason

8  I differentiate that, other consulting firms might

9  do other kind of products, SAP, PeopleSoft, that

10  kind of thing.  But we focused exclusively on Oracle

11  products, applications and database.  And it would

12  be, Shawn, anywhere from the planning or feasibility

13  in using the products to the implementation of those

14  products.

15   Q.  And as -- well, as the years went by,

16  say, into 1999, did the scope of what the consulting

17  organization did at Oracle change from what you've

18  just described to me?

19   A.  As I recall, only slightly, and we did

20  more front-end feasibility work as time went on as

21  opposed to strict implementation.

22   Q.  Okay.  Just quickly describe for me what

23  you mean by "feasibility work."

24   A.  We would meet with a client, various

25  members of the client, and understand what their

19

1  business issues were in a particular area.  And then

2  we would use their input to help assess the fit for

3  our product or how best to implement our products.

4  That would be an example of feasibility --

5    Q.  Okay.

6    A.  -- I guess.

7    Q.  I'm sorry.  Over that same period of

8  time, between 1995 and say, 2000, your

9  responsibilities changed, though, right?

10   A.  Correct.

11   Q.  And can you describe how your

12  responsibilities changed?

13   A.  It --

14   Q.  Let me withdraw that.  That's a little

15  broad.  Okay.

16   Were you promoted from senior vice

17  president after 1995?

18   A.  Correct.

19   Q.  To what?

20   A.  Executive vice president.

21   Q.  And when did that happen?

22   A.  I don't recall.

23   Q.  Okay.  It was before 2000, right?

24   A.  My recollection would have been that it

25  happened sometime in 2000.

20

1    Q.  Okay.  And so, between '95 and 2000, you
2    remained a senior vice president?
3    A.  As I recall.
4    Q.  All right.  And you were responsible for
5    the Americas throughout that entire period, at least
6    for consulting?
7    A.  For consulting.
8    Q.  Okay.  And in that period prior to you
9    being promoted to an executive vice president,
10   were -- did your responsibilities change?
11   A.  Yes.  They changed in two ways.  One is
12   after I'd been with Oracle for a couple of years, we
13   started to verticalize some of our consulting,
14   meaning becoming more and more industry focused.
15   And as we did that, some of those
16   practices were removed from my responsibility and
17   given to others.  That was relatively minor impact
18   as far as a P&L, managing a P&L.  And then I also
19   took over responsibility for all of Latin America,
20   which would be sales and consulting.
21   Q.  When you say "sales," are you talking
22   about license sales?
23   A.  Correct, for Latin America.
24   Q.  All right.  I'm going to do the best
25   that I can to make the differentiation between

1    license sales and consulting sales throughout the
2    day.
3    A.  Great.
4    Q.  But if it looks like I've ever kind of
5    meshing the two, just correct me.  Okay?
6    A.  I will.
7    Q.  Okay.  So, at some point between 1995
8    and 2000, you had license responsibility or --
9    license sales responsibility?
10   A.  Correct.
11   Q.  And do you have an idea when that
12   occurred?
13   A.  I believe it was around 1998 that I took
14   on Latin America sales.
15   Q.  Okay.  Between 1995 and 1998, who were
16   you reporting to as the senior vice president?
17   A.  I initially reported to Robert Shaw.
18   Q.  All right.
19   And then we made some organizational
20   changes in the company, and I reported to a
21   gentleman by the name of Barry Ariko, A-r-i-k-o.
22   And then I reported to Ray Lane, who was
23   the president of the company during that -- and I
24   believe it was about that time period, Shawn, that
25   I -- and it -- and it moved through those three in

1    the order that I gave you.
2    Q.  Okay.  And so, moving up to, say, the
3    summer of 2000 --
4    A.  Uh-huh.
5    Q.  -- that's when Ray Lane left, correct?
6    A.  Correct.
7    Q.  And your responsibilities broadened --
8    A.  Correct.
9    Q.  -- somewhat then?
10   A.  Correct.
11   Q.  And is that approximately the time you
12   were promoted to an executive vice president?
13   A.  I don't recall.  It may have been
14   slightly earlier than that.
15   Q.  Okay.  And you took on -- well,
16   withdrawn.
17   What is Oracle Product Industries, as
18   you know it?
19   A.  I'm not sure that it exists today.  It
20   may.  What it was when I assumed responsibility for
21   Oracle Product Industries, or OPI, if I can use that
22   acronym, in the summer of 2000, it was part of our
23   industry-focus effort.
24   And it focused on a subset of industries
25   in the marketplace, and it was largely around

1    discrete and process manufacturing.  So, it would be
2    industries such as automotive, aerospace and
3    defense, packaged goods, consumer packaged goods
4    companies, examples like that.
5    Q.  And you took over OPI from Ray Lane?
6    A.  No.  I took it over from Frank Varasano.
7    Q.  Well, when Ray Lane left, did you have
8    any additional responsibilities upon his departure?
9    A.  Yes.  And just for clarification,
10   Shawn -- I think I understand your question -- Frank
11   reported in to Ray, running OPI.  When Ray left,
12   Larry asked me to take on responsibilities for OPI,
13   so Frank reported in to me at that point.
14   Q.  Okay.  So, you took on Ray's
15   responsibilities of OPI?
16   A.  Correct.
17   Q.  All right.  And -- okay.  And you were
18   an executive vice president around that time?
19   A.  Correct.
20   Q.  And you reported directly to Larry
21   Ellison once you became an executive vice president;
22   is that fair?
23   A.  I reported to Larry as an executive vice
24   president.  I don't recall whether I was made EVP
25   for a period of time, reporting in to Ray first.  I

1  don't remember if it was coincident when I reported
2  to Larry.
3      Q.  Okay.  Well, let's talk about, after Ray
4  left, you were reporting directly to Larry
5  Ellison --
6      A.  Correct.
7      Q.  -- right?
8          And Frank Varasano was reporting up to
9  you?
10     A.  Yes.
11     Q.  And he was a senior vice president?
12     A.  I don't recall whether he was a senior
13  vice president or an executive vice president.
14     Q.  Okay.  And during that period, were you
15  attending weekly executive committee meetings?
16     A.  The period -- you say "that period,"
17  which period are you talking about?
18     Q.  Let me clarify for you.  Right now I'm
19  talking about once Ray Lane left --
20     A.  Uh-huh.
21     Q.  -- and you took over OPI.
22     A.  Yes.
23     Q.  So, summer of 2000?
24     A.  Yes.
25     Q.  And you were attending weekly executive

25

1  committee meetings?
2      A.  Yes.  They tended to be weekly -- I
3  mean, scheduled weekly.  That didn't mean they
4  always happened.  We may have had some event going
5  on in the company, trade show or something like
6  that, or Larry may have been traveling and
7  unavailable, something like that.  And we wouldn't
8  have an executive committee meeting at those
9  points --
10     Q.  Sure.  I understand.
11     A.  -- in time.
12     Q.  But generally -- well, you would attend
13  those meetings?
14     A.  Yes.
15     Q.  Where was your office in the summer and
16  fall of 2000?
17     A.  In Redwood Shores, Oracle headquarters.
18     Q.  Okay.  And did -- well, withdrawn.
19         So, you attended those executive
20  committee meetings live when you could?
21     A.  Correct.
22     Q.  Okay.  And when -- if you were
23  traveling, you would attend them by phone?
24     A.  Correct.
25     Q.  Did you have videoconference back then?

26

1      A.  I smile because it sounds like it was a
2  long time ago.  I believe we had those facilities,
3  but I never participated in videoconferencing.  It
4  was always by phone, as you suggest.
5      Q.  And during the summer and fall of 2000,
6  how did you -- well, withdrawn.
7          How many people were reporting directly
8  to you after July of 2000, after Ray Lane left and
9  you took over OPI?
10     A.  As I recall, it was about 6- to 7,000
11  people.
12     Q.  Reporting directly to you?
13     A.  Oh, I'm sorry.  Total in -- I'm talking
14  about total in my businesses.  Direct to me -- and
15  tell me the time frame again.
16     Q.  I'm talking about after July of 2001,
17  once you took over Ray Lane's position.
18     MR. GIBBS:  Objection.  Misstates his
19  testimony.
20     THE WITNESS:  Probably about five.
21  BY MR. WILLIAMS:
22     Q.  Five people.  And why don't you just
23  tell me who those people were at the time.
24     A.  Keith Block, who was running consulting
25  for U.S. and Canada; Frank Varasano, who was running

27

1  OPI sales and consulting; Sebastian Gunningham --
2  it's like Cunningham but with a "G," Gunningham --
3  who ran Latin America.  And I had an operations
4  manager or vice president, Rich Blotner,
5  B-l-o-t-n-e-r, and I probably had one more person in
6  some sort of staff role, as I recall.
7      Q.  Okay.
8      A.  That's to my best of my recollection.
9      Q.  Okay.  Richard Blotner, he was an
10  operations guy?
11     A.  Correct.
12     Q.  And was he responsible for all the
13  operations under you, or did he have a geographic
14  responsibility?
15     A.  When you say "operations," how do you
16  define "operations"?
17     Q.  Did you use the word "operations"?
18     A.  I didn't.
19     Q.  No?  Okay.  Well, let me withdraw the
20  question.  And why don't you describe Richard
21  Blotner's responsibilities for me.
22     A.  He was my VP of operations, but it
23  was -- sometimes operations -- the reason I asked or
24  the clarification, operations can mean somebody
25  who's truly in a P&L responsibility, and they've got

28

1  responsibility for the operations of the business.
2       The operations in our case meant it was
3  a staff role, and he reviewed contracts that were
4  being proposed.  For example, if we submitted a
5  proposal or wanted to submit a proposal to a client
6  for product, Rich would review that proposal for me
7  to make sure that -- to his best ability that we
8  were complying with Oracle practices, revenue
9  recognition standards, good deal business sense,
10  those kinds of things.
11       Q.  Okay.  So, he didn't have any P&L
12  finance responsibilities?
13       A.  No.
14       Q.  Okay.  Did you have someone in your
15  organization that did that for you?
16       A.  I had somebody do it for me, Shawn.  But
17  they did not report to me.
18       Q.  Okay.
19       A.  I did have a director of finance, and
20  that was Jim English.
21       Q.  Okay.
22       A.  But Jim reported solid line up through
23  the finance organization.
24       Q.  Okay.  All right.  Did -- I always
25  mispronounce this person's name -- Ivgen Guner ever

29

1  work for you in that same position?
2       A.  As a point of clarification, she never
3  worked for me --
4       Q.  Okay.
5       A.  -- but she did, as I recall, when I
6  first took over OPI, she was the finance director
7  that was assigned to my organization.
8       Q.  Okay.  That's fine.  So, with respect to
9  Mr. Blotner, again, I don't know if you answered my
10  question as to whether or not he had a geographic
11  responsibility.
12       A.  I did.  And the answer was no.
13       Q.  No.  Okay.
14       A.  Let me take a step back, Shawn.  I'm
15  sorry.  When you say did he have a geographic
16  responsibility, he didn't have any kind of P&L
17  geographic responsibility in that regard.  The fact
18  that he worked for me, he covered the same territory
19  that I had responsibility for, which was U.S., it
20  was OPI sales and Latin America sales.
21       So, he -- I just want to be clear on
22  what you mean by -- or what I mean by "geography."
23  He didn't have any P&L responsibility, but he
24  basically overlapped, helping me in the areas that I
25  had responsibility for.

30

1       Q.  Okay.  At some point, did you have
2  worldwide consulting responsibilities?
3       A.  I hesitate in answering and not because
4  I don't recall.  I did have responsibility for a
5  worldwide organization in consulting called Service
6  Lines, and this would be methodology, training.
7  Service lines might be like, for example, financial
8  applications to help make sure that we were driving
9  competence, lessons learned, knowledge capital,
10  throughout the world.  And I did that largely in a
11  facilitating basis.  I didn't have direct
12  responsibility, for example -- I did not have direct
13  responsibility for EMEA Consulting.
14       Q.  Well, the clarification that you've made
15  for me, when you -- back then when you described
16  your responsibilities at Oracle, did you describe it
17  as the person in charge of worldwide consulting?
18       A.  No.
19       Q.  Okay.  So, if you can recall, do you
20  know how you may have described it?
21       A.  I had consulting for Canada, U.S. and
22  Latin America.
23       Q.  Okay.  So --
24       A.  I'm sorry, Shawn.  Just to be clear on
25  that, and later on, I took OPI on.  So, when I took

31

1  OPI on, I took on OPI consulting, and I did not have
2  responsibility for consulting within what we called
3  Oracle Services Industries, OSI.  It was run by Jay
4  Nussbaum.  And Jay had his own consulting
5  organization that addressed the financial services
6  market, utilities and the federal government, as I
7  recall.  That was probably the bulk -- and
8  telecommunications.
9       Q.  Now, when you say you were responsible
10  for service lines, methodology, training, what are
11  you referring to specifically?
12       A.  That's -- I can give you some examples.
13  In methodology, there are different ways to
14  implement an application so that a customer gets
15  business value out of it.  Over time there's become
16  an industry practice on the right way to do it.
17       An example, you plan the engagement,
18  engagement being the actual implementation, for
19  example.  You do the design work where you marry the
20  client's requirements to the actual software.  And
21  then the implementation, where you actually do the
22  coding and setting parameters in the software.
23       Also, in that implementation phase is
24  where you test, where you train and where you
25  convert the client's existing data, as appropriate,

32

1  over to the new application.  And so, that process I
2  just described, there is a methodology.
3        And we had a methodology at Oracle on
4  how to do that that adhered to generally
5  practiced -- or complied with -- generally with
6  industry practices.  But because we only did Oracle,
7  we were able to tailor it even more specifically to
8  Oracle products to help the teams that were
9  implementing which oftentimes consisted of Oracle
10  Consulting, it might be third parties, it would --
11  the client -- so that they get the best benefit of
12  the methodology as it relates to our practice.
13      Q.  Okay.
14      A.  So, that's what I mean by "methodology."
15      Q.  All right.
16      A.  In service lines, we -- how you
17  structure a general ledger, the chart of accounts,
18  is a very specific thing.  Chart of accounts
19  meaning, like, debits and credits and the different
20  expense categories that you'd have, that kind of
21  thing.
22        Over time you would learn -- I mean, a
23  team would learn how best to do that.  And so, we
24  put a lot of emphasis on capturing that knowledge so
25  that -- and extracting it from that team, as long as

33

1  it wasn't confidential/proprietary to a specific
2  client -- and so that the next consulting team can
3  use that information.
4        And so, that would be the kind of thing
5  that Service Lines would do.  And we might do it
6  around the different applications.  The example I
7  gave would be around financial applications.  It
8  could also be around database.  There's such things
9  as backup and recovery.  So that if the lights dim,
10  then all of a sudden your computer took a hit,
11  that -- and data was lost, you'd have the ability to
12  make sure that you recovered the data.
13        So, there were practices such as that
14  that we would capture and codify and so that other
15  teams could use it.  So, that's examples of what
16  Service Lines would do.
17        In training, that it might be training
18  around our software, how it works.  It might be
19  training on the methodology that we use at Oracle
20  that I just described earlier to implement.
21      Q.  So -- and you had primary
22  responsibilities for all those three areas, at least
23  within the geographic scope of what you described to
24  me?
25      MR. GIBBS:  Objection.  Vague.

34

1  THE WITNESS:  Yes, in the sense that I had
2  somebody reporting to me that had that
3  responsibility.  I didn't do that myself --
4  MR. WILLIAMS:  I understand.
5  THE WITNESS:  -- by any means.
6  MR. WILLIAMS:  I understand.
7  BY MR. WILLIAMS:
8      Q.  You described your organization in or
9  around the summer of 2000 to be approximately 7,000
10  people?
11      A.  I -- that's my recollection, but it's
12  something we could clearly verify.
13      Q.  Something like that.  And the vast
14  majority of those people, were they consultants or
15  salespeople?
16      MR. GIBBS:  Objection.  Compound.
17      THE WITNESS:  My recollection is that my
18  consulting organization was larger.
19  BY MR. WILLIAMS:
20      Q.  Okay.  And the members of the consulting
21  organization, those people were the people who did
22  implementations?
23      A.  Correct.
24      Q.  Okay.  And they would do the feasibility
25  portion of -- early portion of an implementation

35

1  and then the ultimate installation and
2  implementation of software?
3      A.  They could.  Somebody else, the client,
4  may have done the feasibility study and asked Oracle
5  Consulting to come and do the implementation, or a
6  third party such as Bearing Point may have done
7  the -- I mean, the feasibility, and then Consulting
8  was brought in -- Oracle Consulting was brought in.
9  But we did have the capability in Consulting to do
10  the whole process --
11      Q.  Okay.
12      A.  -- including feasibility.
13      Q.  All right.  And so, those consultants
14  doing implementations of Oracle software would
15  follow the standardizations that you just described
16  to me in training, methodology and -- what was the
17  third one of?
18      A.  Service lines.
19      Q.  And service lines, right?
20      A.  Yeah.  Yeah, did they follow?  That was
21  the intent.
22      Q.  Okay.
23      A.  To my -- we encourage that.  You know,
24  with that number of people, some consultant could
25  decide to do something different.  But generally,

36

1   yes, consultants use the methodology and service

2   lines --

3       Q.   Sure, that was the expectation.

4       A.   -- I just described.  Yes.

5       Q.   I'm sorry.  I didn't mean to talk over

6   you.

7           The expectation was that they would

8   follow those general parameters that were set by at

9   least people reporting to you, service lines,

10  training and methodology, correct?

11      A.   Correct.

12      Q.   All right.  In the summer of 2000, do

13  you recall -- or withdrawn.

14          In the summer of 2000, who was doing --

15  who was reporting up to you for service lines,

16  methodology and training?

17      A.   As I recall, it was -- it clearly was

18  Valerie Borthwick.

19      Q.   Sure.

20      A.   Valerie, I believe, as I recall, was now

21  reporting in to Keith Block.  There was a time that

22  I had Valerie reporting to me as well.  But, for

23  example, when I took over OPI, at some point, in

24  order to provide the right kind of management focus

25  and structure, I asked Valerie to report in to

37

1   Keith.

2       Q.   And so, Valerie Borthwick would have the

3   responsibility for all three of those areas?

4       A.   As I recall, yes.

5       Q.   Okay.  And reporting in to Keith Block,

6   and Keith Block reported to you?

7       A.   Correct.

8       Q.   And did you meet with that -- well,

9   withdrawn.

10          How did you communicate with members of

11  your staff in the summer and fall of 2000?  And I'm

12  not talking about the sales consult -- withdrawn.

13          I'm not talking about the consultants on

14  the ground.  I'm talking about your direct reports

15  and maybe their reports under them.

16      MR. GIBBS:  Objection.  Vague, compound.

17      THE WITNESS:  It could be in various forms.

18  And it depends on the topic.  You know, if it was

19  forecasting, then -- I chunk it up this way.  If it

20  was around forecasting -- and I'm talking about

21  sales right now.

22  BY MR. WILLIAMS:

23      Q.   License sales?

24      A.   License sales.

25      Q.   Okay.

38

1       A.   Yeah, and, in fact, any time I use the

2   word "sales," I'll mean license sales --

3       Q.   Okay.

4       A.   -- if that's helpful.

5           In consulting, there is a selling

6   function, you're right, but we tend to use the

7   informal term "sales" meaning license sales.

8           In OPI, as an example, I would have a --

9   it depends on the time of the quarter, but I would

10  have either biweekly or weekly conference calls with

11  folks in sales to tell me what was going on with

12  specific clients, specific deals, and what their

13  forecast was.

14          I might have e-mails with any of my

15  directs and others around specific client

16  opportunities as an example, or giving me background

17  around a GE opportunity as an example.

18          And, certainly, the other two categories

19  would be by phone, and the last category where I'd

20  actually be out visiting with sales or with clients

21  or both around a particular opportunity.

22      Q.   Okay.  And same question with respect to

23  Larry Ellison:  How did you communicate with him in

24  terms of how business was going, at least in your

25  organization?

39

1       MR. GIBBS:  Objection.  Vague.

2       THE WITNESS:  Chunk it up again different

3   ways.  We would certainly have the executive

4   committee meetings, which were generally weekly, as

5   you've pointed out.  And I would oftentimes attend

6   those in person.  I usually tried to work my

7   schedule so that I would do that.  As I recall,

8   those meetings were on Mondays, and so, it was

9   helpful in my workweek -- in planning my workweek,

10  as opposed to being in the middle of the week.

11          I would sometimes communicate via

12  e-mail.  I would sometimes talk with Larry.

13  Oftentimes, if I communicate with Larry on the

14  phone, it was him calling me.  He was calling me as

15  opposed to the other way around.  He was a busy guy.

16          And I only would do that if it was

17  something that I felt was important enough or the

18  situation was such that I should talk to him

19  personally.  A lot of my communication was through

20  Safra.

21  BY MR. WILLIAMS:

22      Q.   Okay.  And with Safra, did you

23  communicate via e-mail or telephone?

24      A.   Sometimes via e-mail, but a lot of times

25  via telephone.  She was always accessible to me and,

40

1  you know, she was at headquarters as well.  And so,
2  a lot of times, it would be by phone.
3      Q.  And your e-mail address in the summer
4  and fall of 2000, do you recall what it was?
5      A.  I don't.
6      Q.  Okay.  Was it Sandy.Sanderson?
7      A.  I was going to say, if I had to guess,
8  it would be Sandy.Sanderson.
9      Q.  Did you have any other e-mail addresses
10  during that period?
11      A.  As I -- I think when -- this was a
12  period of time when e-mail was becoming more
13  fundamental to the business.  And in other words, we
14  were -- e-mail evolved over that time.  And I
15  believe when I first went there, my e-mail address
16  was Edward.Sanderson.
17      Q.  I want to direct your attention to May
18  of 2000.  You're familiar with 11i, right?
19      A.  Yes.
20      Q.  All right.  And what was your --
21  withdrawn.
22          What were your responsibilities at
23  Oracle in or around May of 2000?
24      A.  As I recall, in May of 2000, I had
25  responsibility for consulting, as I've described,

41

1  and Latin America.  I didn't have OPI at that point.
2      Q.  Okay.  And still had responsibility at
3  least -- withdrawn.
4          Someone in your organization still had
5  responsibility for methodology, training and service
6  lines, right?
7      A.  Correct.
8      Q.  And during May of 2000 and the release
9  of 11i, someone in your organization would have
10  those responsibilities as it related to 11i, right?
11      A.  Correct.
12      Q.  And was it still Valerie Borthwick or
13  someone else?
14      A.  It would be Valerie.  Again, she had a
15  pretty large organization, so she had people
16  underneath her who had responsibility for that
17  specifically.
18      Q.  Well, if you can recall, do you remember
19  any of the people that reported directly up to
20  Valerie Borthwick during that time?
21      A.  One would be Brad Scott --
22      Q.  Brad Scott.  Okay.
23      A.  -- in the CRM area.  There was a guy
24  named Tony -- I don't remember his last name -- that
25  used to review consulting bids, I believe, reported

42

1  in to Valerie.  Right now, I don't recall the other
2  people.
3      Q.  Okay.  But during that time, is it fair
4  to say that the consulting organization, at least
5  the consultants that were doing implementations,
6  were going to be trained or were trained on 11i?
7      A.  Correct.
8      Q.  And do you know whether that training
9  took place out in the field, or was it at Redwood
10  Shores?
11      A.  I think the answer is yes.  Both --
12      Q.  Okay.
13      A.  -- at headquarters and out in the field.
14      Q.  All right.  And did you participate in
15  the organization of the training of your
16  consultants?
17      A.  No.
18      Q.  Okay.  And who was responsible for that?
19      A.  Somebody in Valerie's organization.
20      Q.  Okay.  Now, would that also be part of
21  Keith Block's organization at that time?
22      A.  I believe by that time I had asked
23  Valerie to report under -- to go and report under
24  Keith --
25      Q.  Okay.

43

1      A.  -- report to Keith.
2      Q.  Okay.  Before coming to Oracle, you were
3  a consultant for a long time, right?
4      A.  Yes.
5      Q.  Did you ever do software implementations
6  yourself?
7      A.  Yes -- yes.
8      Q.  Okay.  Was that while you were at
9  McKenzie or -- well, did you do it while you were at
10  McKenzie?
11      A.  No.
12      Q.  Okay.  How about when you were with --
13  where did you go after McKenzie?  I don't remember
14  now -- Unisys.
15      A.  I ran an organization that did
16  implementations in a similar kind of role.  I was --
17  I started out at Unisys as a -- as I recall, as a
18  senior vice president and then I became president
19  for a short period of time of the worldwide
20  information services division.
21      Q.  Tell me when it was that you actually
22  did software implementation yourself.
23      A.  After I got out of the Navy which was in
24  1976, I went to work for Arthur Andersen, and I
25  specifically went to work for what is now Accenture.

44

1  So, it was that part of that division of Arthur
2  Andersen.  And when I first started at Arthur
3  Andersen, you actually start out as a programmer.
4  And so, I started programming in the basic assembly
5  language, very basic language in 19 -- late 1976,
6  and I stayed there 'til 1988.
7       And during my time, I started out as a
8  programmer, and then I became an analyst, and then I
9  became a project leader.  Then I became a project
10  manager, and then I became a manager that oversaw a
11  lot of projects, and then I became a partner at the
12  firm.
13     Q.  Okay.  So, you weren't doing any
14  implementations of applications back then, were you?
15     A.  Yes.
16     Q.  Okay.  Complex applications like 11i?
17     A.  I personally take the -- exception to
18  the word "complex."  Whether it was robust,
19  comprehensive, integrated is how I would describe
20  it.  Because of --
21     Q.  When you say "it," what are you talking
22  about?
23     A.  "It" being 11i.
24     Q.  Okay.
25     A.  And given that context, by the shear

45

1  fact that it does all that, there's certain
2  complexity with it than a basic application package
3  by VisiCalc was that preceded Excel.
4     Q.  Okay.
5     A.  So, the packages that I implemented back
6  then, by nature, were not integrated.  They might be
7  an accounts payable package or an accounts
8  receivable package or something like that.  And
9  that's the kind of stuff I did at Andersen --
10     Q.  Okay.
11     A.  -- in my early days --
12     Q.  Okay.
13     A.  -- in my early days.
14     Q.  You talked about two different things
15  there.  You said you personally take exception to
16  the term "complex" as it relates to 11i, right?
17     A.  Yeah.  The tag line that you gave to
18  11i --
19     Q.  Okay.
20     A.  -- was complex.
21     Q.  That's fine.
22     A.  I just said, since that's the
23  introduction of 11i, I wouldn't introduce it as
24  complex.
25     Q.  I understand.  That's fine.  But that's

46

1  your personal opinion, not necessarily what Oracle's
2  perception of the application was back then.
3     MR. GIBBS:  Objection.  Lack of foundation.
4     THE WITNESS:  I can't speak for --
5     MR. WILLIAMS:  Right.
6     THE WITNESS:  -- Oracle.
7     MR. WILLIAMS:  I understand.
8     THE WITNESS:  I speak for myself.
9     MR. WILLIAMS:  Right, exactly.
10  BY MR. WILLIAMS:
11     Q.  So, back to May of 2000, the release of
12  11i --
13     A.  Uh-huh.
14     Q.  -- Valerie Borthwick, at least her,
15  responsible for making sure the consultants in your
16  organization were trained on 11i --
17     A.  Correct.
18     Q.  -- right?
19       And do you know if they were given
20  implementation manuals?
21     A.  I don't recall.
22     Q.  Okay.
23     A.  I do know that they were given
24  guidelines and materials to facilitate their ability
25  to implement 11i.

47

1     Q.  Right.  As far as you knew, they
2  followed them?
3     A.  Yes.
4     Q.  Did you have an opinion as to whether or
5  not they were adequately trained back then?
6     A.  I thought the training was very good.
7  One of the challenges that we had with 11i, as any
8  software company has when they launch a significant
9  new release, is -- is having training in the product
10  perfectly coordinated and just in the number of
11  people that you can get trained.  So, the first day
12  11i was released, we had some number of people
13  trained, and then over time, more and more people
14  got trained.
15     Q.  Well, you guys weren't waiting until the
16  product was released to train people on it, were
17  you?
18     A.  No, not at all.
19     Q.  Okay.
20     A.  In fact, we had consultants working with
21  Development actually helping test the software.  So,
22  Development organization, under Ron Wohl, got the
23  benefit of that.  And then our consultants got the
24  benefit of seeing the product firsthand.  So, it was
25  a, quote, win-win.  And then those are the

48

1   consultants that we used to go out and do the

2   initial implementations.

3        Q.  So, your -- so -- well, withdraw.

4        There are a lot of documents that I want

5   to show you today, and hopefully you can help me

6   understand what was going on at the time.  Maybe

7   it's a good time to start with that.  Would probably

8   put some context around some of the things that

9   we're talking about.

10        Actually, before I do that, there's some

11   individuals that you've already mentioned.  You told

12   me a little bit about frank Varasano and

13   Miss Borthwick.  There are a few other individuals,

14   I'm hoping you can kind of describe what their

15   responsibilities were before we look at some of the

16   documents.

17        A.  I'd be glad to.

18        Q.  Okay.  Mr. Fikany, what was his first

19   name?

20        A.  John Fikany, F-i-k-a-n-y.  John ran -- I

21   think when I initially took over responsibility for

22   OPI, he was responsible for the Ford account and

23   Covisint.

24        Q.  He was a salesman?

25        A.  Yes, yes.

49

1        Q.  Vice president, area vice president,

2   regional manager?

3        A.  He was either a regional manager or a

4   vice president.

5        Q.  Okay.  Reporting directly to you?

6        A.  He initially reported to Frank Varasano.

7   And then when Frank left, he, as I recall, reported

8   in to me.

9        Q.  Tom Thimot.

10        A.  I'm sorry.  One other thing on John

11   Fikany.  And then over time, I gave him

12   responsibility for all of automotive in Detroit.

13   So, he took on -- John took on responsibilities for

14   GM and DaimlerChrysler, Delphi, and other

15   automotive-related companies.

16        Q.  Okay.  Tom Thimot?

17        A.  Tom Thimot, T-h-i-m-o-t, he ran central

18   for a period of time.  I believe he was running

19   central when I took over OPI sales, central sales,

20   and then he left, my guess is, either late 2000 or

21   early 2001.

22        Q.  Area vice president, regional manager?

23        A.  Area vice president.

24        Q.  Area vice president.  How about Michael

25   DeCesare?

50

1        A.  Michael DeCesare, Mike DeCesare,

2   C-e-s-a-r-e, he was AVP for the west --

3        Q.  Steve --

4        A.  -- west sales.

5        Q.  License sales?

6        A.  License sales.

7        Q.  Okay.  Frank -- I'm sorry.  Steve

8   McLaughlin.

9        A.  Steve was the area vice president for

10   east sales for OPI.

11        Q.  Now, did the area vice presidents report

12   directly up to you, or was there a layer in between

13   them and you?

14        A.  Yeah, initially, they reported to Frank.

15   When Frank left, I had them report up to me.  And

16   then at some point, I moved Sebastian Gunningham

17   from running Latin America to take over OPI sales,

18   and at that point, they reported up to Sebastian.

19        Q.  Okay.  So, you had Steve in the west,

20   Mike in the east?

21        A.  Just the opposite.

22        Q.  The opposite, right.  And --

23        A.  And then Tom Thimot.

24        Q.  -- Tom in central.

25        A.  (The witness nodded his head.)

51

1        Q.  Were there any other area vice

2   presidents reporting up to you in that period?

3        A.  After Tom left, I had -- I had John

4   Fikany -- I think that's when I had John Fikany

5   report to me directly.  And then -- and I don't

6   recall now precisely -- I don't recall how I handled

7   organization when Tom left.

8        I believe I took one or two folks in

9   central that Tom had responsibility for and asked

10   them to report up to me at least for some period of

11   time.

12        Q.  Now, who -- earlier we talked about

13   License having a P&L and Consulting being a little

14   bit different.  Who had responsibility for

15   Consulting P&L in the fall and early winter of

16   2000 -- well, fall 2000, early 2001?

17        A.  And what --

18        MR. GIBBS:  Objection.  Vague.

19        THE WITNESS:  What consulting organization do

20   you mean?

21   BY MR. WILLIAMS:

22        Q.  Well, whatever consulting -- whatever

23   you were responsible for during that period.

24        A.  I -- then the answer would be for

25   consulting for North America, which would be U.S.

52

1  and Canada; and OP -- after Frank left --
2  Varasano left, OPI Consulting.  So, those three
3  things:  U.S., Canada and OPI Consulting reported in
4  to Keith Block.
5      Q.  Okay.
6      A.  Latin America Consulting reported in to
7  Sebastian Gunningham when he was running Latin
8  America.
9      Q.  Was Keith Block's office in Redwood
10  Shores as well?
11     A.  No.
12     Q.  Where was it?
13     A.  Boston.
14     Q.  In Boston, okay.
15         So, you communicated with him by
16  telephone and e-mail?
17     A.  Yes, correct.
18     Q.  As we go through the documents, I'll
19  probably jump around between topics, so just let me
20  know --
21     A.  Okay.
22     Q.  -- if it gets confusing, but I'm sure
23  you probably know this stuff better than I do.
24         I'm going to ask the reporter to mark
25  this document -- I'm sorry.  Withdrawn.

53

1      I'm going to show you what's been
2  previously marked as Klaiss No. 10.
3         Do you know Don Klaiss?
4      A.  Yes, I do.
5      Q.  Okay.  And was he a member of your
6  organization during the period we've been talking
7  about, say, in the summer 2000 into the spring of
8  2001?
9      A.  He did not report to me.
10     Q.  Was he in your organization?
11     A.  No.
12     Q.  Okay.  I'm going to ask you to take a
13  look at what's been previously marked as Klaiss
14  No. 10.  Let me know when you've had a chance to
15  take a look at it.
16     MR. GIBBS:  Just for the record, I want to
17  object.  I don't think the exhibit is complete.
18     MR. WILLIAMS:  Okay.
19     THE WITNESS:  Are there any other documents
20  that go with this?
21     MR. WILLIAMS:  There may or may not be.
22  Well, what's been put in front of you is Bates
23  numbered NDCA-ORCL 056045.
24         If there is another page to it, that's
25  not in front of you right now, but I'm going to ask

54

1  you to take a look at this page and let me know when
2  you're done.
3      THE WITNESS:  Okay.
4  BY MR. WILLIAMS:
5      Q.  Okay.  Do you recognize at least this
6  page of Klaiss No. 10?
7      A.  I don't recall sending this.  I don't
8  recall the e-mail.
9      Q.  But it's an e-mail written by you,
10  right?
11     A.  Correct.
12     Q.  No reason to believe it wasn't written
13  by you, is there?
14     A.  No.
15     Q.  And it's -- at least on the bottom half,
16  it's an e-mail from you to Don Klaiss and Ron Wohl?
17     A.  Yes.
18     Q.  All right.  And do you know what Don
19  Klaiss' responsibilities were in or around October
20  of 2000?
21     A.  As I recall, he had responsibility for
22  development of manufacturing applications.
23     Q.  Okay.  Now, I direct your attention down
24  to the text of your e-mail at the bottom.  See that?
25     A.  Uh-huh.

55

1      Q.  See where it says, "Don and Ron, as I
2  indicated in another e-mail, I will talk to Don
3  about this tomorrow, but I'm very frustrated about
4  this."  You see that?
5      A.  Uh-huh.
6      Q.  And if you go down to the -- well,
7  withdrawn.
8         See in the middle of that paragraph, you
9  write, "The gratitude given was no coverage of costs
10  for the consulting work and now a product APS that
11  does not work very well.  Why can't we deliver
12  product that works?"  What's APS?
13     A.  APS is advanced planning system, I
14  believe.  It's a manufacturing product, and it's the
15  planning module for a manufacturer.
16     Q.  And that module was part of 11i, wasn't
17  it?
18     A.  Yes.
19     Q.  And you go on to say, "This will require
20  another super human effort from consulting."  What
21  do you mean by that?
22     A.  One of the things that Development --
23  they really value consultants participating with
24  them to test the product, anywhere from bringing in
25  real-life experience of people who implement the

56

1 product in real-life to -- it just gives them more
2 arms and legs to test the product.  And I was always
3 on Ron Wohl to compensate Consulting for this
4 service.  And I was uniformly unsuccessful.
5      Q.   All right.
6      A.   But I always was trying to get him to
7 pay for consulting.
8      Q.   Is that what you were referring to when
9 you said it would require another super human
10 effort --
11      A.   Right.
12      Q.   -- trying to get him to pay?
13      A.   Yes.
14      Q.   All right.  And to make things -- you go
15 on to say, "To make things worse, there's no
16 training for a product that was released in May,
17 five months ago."  You see that?
18      A.   Uh-huh.
19      Q.   Wasn't training part of your
20 responsibility, or people in your organization?
21      A.   The training -- the initial training
22 that was -- for a product was built by the
23 Development organization.
24      Q.   What do you mean, it was "built" by
25 them?

57

1      A.   They -- the actual training materials
2 initially when prepared for -- prepared by the
3 development organization.
4      Q.   So, you're talking about the materials
5 that would be used to train consultants?
6      A.   Yeah, it would be -- to some degree.
7 The training that you might get out of Development
8 would be how the product worked, what the parameters
9 that are in the new software and how you set those
10 parameters in different situations, that kind of
11 thing.
12           And then in Consulting, we would take
13 that training material and think about, from an
14 implementation phase, when would you set those
15 parameters?  Would you do it in the planning phase
16 or would you do it in the implementation?  So, we
17 would build on the training they would provide.
18      Q.   So, what you're saying is that, at least
19 here, you're saying in October there was no training
20 materials for this specific application within 11i?
21      MR. GIBBS:  Objection.  Misstates his
22 testimony.
23      THE WITNESS:  That's what the e-mail says,
24 with -- and I give one clarification.  You say
25 "application."  APS was a very specific module.

58

1      MR. WILLIAMS:  Okay.  Module.
2      THE WITNESS:  Yeah, very specific module.
3      MR. WILLIAMS:  That's fine.
4      THE WITNESS:  And what it says here is that
5 we didn't have the training we needed.
6 BY MR. WILLIAMS:
7      Q.   Okay.  And then you sent this up to
8 Valerie Borthwick?
9      A.   Right.
10      Q.   Do you recall whether or not she
11 responded to this e-mail?
12      A.   No, I don't.
13      MR. WILLIAMS:  All right.  Why don't we take
14 a short break.  I think we've been going about an
15 hour.
16      THE WITNESS:  Okay.
17      MR. WILLIAMS:  Let's take five or seven
18 minutes.
19      THE WITNESS:  Do you want this back?
20      MR. WILLIAMS:  No.
21      THE VIDEOGRAPHER:  Off the record at
22 10:40 [sic] a.m.
23      (A brief recess was taken.)
24      THE VIDEOGRAPHER:  We are back on the record
25 at 10:17 a.m.

59

1      MR. WILLIAMS:  I'm going to ask the reporter
2 to mark this document as Sanderson No. 1.  It's the
3 complete e-mail that you have in front of you now
4 which was previously marked as Klaiss No. 10.  Bates
5 numbers are NDCA-ORCL 056045 through 048.  When she
6 marks that, she'll give you an opportunity to review
7 it.
8      THE WITNESS:  What should I do with this
9 document?
10      MR. WILLIAMS:  Nothing.  Just put it to the
11 side.
12      (E-mail string dated 10/4/00 between
13 Sandy Sanderson, Don Klaiss and Valerie Borthwick
14 marked Exhibit 1 for identification.)
15      THE WITNESS:  Did you want me to read --
16      MR. WILLIAMS:  Yeah.  Why don't you go ahead
17 and review, I guess, the second and third pages of
18 that.  It kind of completes the series.
19      THE WITNESS:  Okay.
20 BY MR. WILLIAMS:
21      Q.   Okay.  Now, does what's been marked as
22 Sanderson No. 1 appear to be the complete series of
23 e-mails relating to this topic on October 4th of
24 2000?
25      A.   Shawn, I can say they're related.  I

60

1 don't have any basis for saying it's complete.

2     Q.  Okay.  That's fine.  I'm going to ask

3 you to direct your attention to Bates ending 047.

4     A.  Uh-huh.

5     Q.  And there appears to be an e-mail

6 written by you on the bottom of that page, right?

7     A.  I see it.  That's correct.

8     Q.  And it's directed to a person named Ron.

9 That would appear to be Ron Wohl?

10     A.  Correct.

11     Q.  Okay.  And you write that -- you write

12 to Ron, "I've been sitting through OPI ops reviews

13 the last two days."  You see that?

14     A.  Uh-huh.

15     Q.  Why don't you just quickly describe for

16 me what an ops review is.

17     A.  An ops review would typically be done on

18 an area or regional basis, so it could be an area

19 like the East or it could be regional like Texas.

20     And you review the -- the organization,

21 you review -- the organizational structure that you

22 have for the area under review.  You would review

23 the -- their financial performance.

24     You would review sales programs that

25 they have ongoing within that area.  You would look

61

1 at -- have some sense of their pipeline or who their

2 major customers are that they're pursuing and what

3 kind of deals are they or where do they need help.

4 Do they need help from Development or from me or

5 from some other part of the company.

6     So, the ops reviews, there are your

7 direct reports and maybe additional people just kind

8 of telling you what's happening in their region --

9     A.  Yes.

10     Q.  -- in the organization of the country,

11 right?

12     A.  Yes.

13     Q.  And so, somewhere around October 4th

14 or a couple days before that, you were doing the ops

15 reviews for your organization?

16     A.  One of my organizations --

17     Q.  One of them.

18     A.  -- yeah.  At least one of them, yeah.

19     Q.  And you write, "One issue that's come up

20 is APS references.  We all acknowledge that it was

21 only released in May, but I'm not aware of any APS

22 references.  Do we have any implemented," which is

23 underlined, "APS reference?"

24     Here, what are you referring to by

25 "implemented"?

62

1     A.  Implemented, that it means it's up and

2 running at the customer.

3     Q.  Okay.  And so, as of sometime early

4 October, you weren't aware of any implemented APS

5 references?

6     A.  According to this note, no.

7     Q.  Okay.  And you further write, "I know

8 about the install problems we've had at Cummins.  Is

9 the product ready for prime time?"

10     Are you referring to APS only, or are

11 you referring to 11i as a suite there?

12     A.  I can't imagine I was talking about 11i.

13 I'm talking about APS.

14     Q.  Okay.  All right.  APS was supposed to

15 be integrated with other modules of 11i, right?

16     A.  Correct.

17     Q.  So, APS is not working, the other

18 modules couldn't work with APS at the time, right?

19     MR. GIBBS:  Objection.  Lack of foundation.

20     THE WITNESS:  There would be certain modules

21 that wouldn't work well without APS, but a lot of

22 11i didn't depend on APS at all.

23     MR. WILLIAMS:  Okay.

24     THE WITNESS:  May I provide some point on

25 "reference"?

63

1     MR. WILLIAMS:  If you'd like to say

2 something, go ahead.

3     THE WITNESS:  "Reference" means that we've

4 got a customer that gives you a thumbs-up.  And one

5 of the issues that you have in implementation is,

6 oftentimes, they take -- can take six months to a

7 year or so to implement.  And I think that's why I

8 underscored the word "implemented."

9 BY MR. WILLIAMS:

10     Q.  Okay.  Meaning up and running?

11     A.  Up and running.

12     Q.  Meaning that -- fine.

13     I'm going to ask the reporter to mark

14 this document as Sanderson No. 2.  It's Bates No.

15 NDCA-ORCL 039546 through 551.

16     (E-mail string dated 10/12/00 with

17 information re Ingersoll-Rand marked Exhibit 2 for

18 identification.)

19     THE WITNESS:  Thank you.

20 BY MR. WILLIAMS:

21     Q.  I'm going to ask you to just take a look

22 at --

23     A.  Sure.

24     Q.  -- Sanderson 2.  Let me know when you've

25 had a chance to review it.

64

1    A. Will do.  Okay.

2    Q. I don't intend to ask you about the

3  entire document --

4    A. Yeah.

5    Q. -- but if you'd like me to direct your

6  attention to what I'm interested in, I'll do that.

7  Otherwise, read the whole thing.

8    A. I just need another minute.

9    Q. Okay.

10    A. Okay.  Ready.

11    Q. Okay.  Do you recognize Sanderson No. 2?

12    A. No.  I do recall Ingersoll-Rand just a

13  little bit, but I don't recall the e-mail.

14    Q. Okay.  It wasn't one of the documents

15  you reviewed yesterday, right?

16    A. No.

17    Q. All right.  And it appears to be a

18  series of e-mails between members of your staff,

19  then Safra Catz and Larry Ellison, right?

20    A. Yeah, Safra was copied on the last

21  e-mail.

22    Q. Okay.  Just directing your attention to,

23  I guess, the bottom of Bates ending 547 over to 548,

24  that is an e-mail from Dan Ackley to several

25  individuals including you, right?

65

1    A. Correct.

2    Q. Do you know who Dan Ackley is?

3    A. No, I don't recall him.

4    Q. Okay.  But a lot of the cc's in here are

5  members of your organization, like Frank Varasano,

6  Steve McLaughlin and then you?

7    MR. GIBBS:  Objection to the term "a lot."

8    THE WITNESS:  Yeah, I can't say "a lot."

9    MR. WILLIAMS:  I'll withdraw that part of the

10  question.

11    THE WITNESS:  The people that you named:

12  Chuck Linn -- Charles Linn was -- also worked for

13  me.

14    MR. WILLIAMS:  Okay.

15    THE WITNESS:  Okay.

16  BY MR. WILLIAMS:

17    Q. All right.  And you indicated you don't

18  know who Dan Ackley is, correct?

19    A. Correct.

20    Q. Is it possible that he was a consultant

21  in your organization?

22    A. The fact that I don't recall who he is

23  means he could be in any organization, including

24  mine.

25    Q. Okay.  Going to the next page, as he

66

1  indicates that he's the account manager for

2  Ingersoll-Rand?

3    A. Okay.

4    Q. You see that?

5    A. Yes.

6    Q. And going down a little further, he

7  appears to describe the quote, unquote, "situation

8  at Ingersoll-Rand"?

9    A. Uh-huh.

10    Q. You see that?  It says, "We're in crisis

11  situation."

12    A. Uh-huh.

13    Q. "Ingersoll-Rand believes 11i, CRM and

14  CROM," which is order management, right --

15    A. Correct.

16    Q. -- "are not ready for deployment."  See

17  that?

18    A. I do.

19    Q. You indicated earlier that you

20  remembered some of the Ingersoll-Rand situation; is

21  that fair?

22    A. That's correct.

23    Q. Do you recall them believing that the

24  CRM and order management weren't ready for

25  deployment?

67

1    A. No, I do not.

2    Q. I'm going to direct your attention

3  further down the page -- well, in the same section,

4  still describing the situation.  See where it says,

5  "There appears to be little 11i documentation"?

6    A. Uh-huh.

7    Q. Okay.  And below that --

8    A. Yes.

9    Q. -- Mr. Ackley writes, "There appears to

10  be little 11i training"?

11    A. Yes, I do.

12    Q. And the 11i training portion, that was

13  part of what your organization was responsible for,

14  right?

15    A. Now just as a clarification, Shawn, what

16  I said earlier, and it, the previous e-mail, helped

17  remind me, the initial training was built by

18  Development --

19    Q. Okay.

20    A. -- about the product, and then the other

21  part of the training built by Consulting is how to

22  implement the product.  So, it's two pieces of

23  training that go together.

24    Q. Okay.  Are you able to determine by

25  looking at this e-mail which piece Mr. Ackley is

68

1  referring to?

2     A.  I can't.  I do not know.

3     Q.  But he sends it to you and a couple

4  people in your organization.

5     A.  Correct.

6     Q.  All right.

7     A.  As a point of clarification, he copied

8  me on it.  He copied me on it.  And one other point,

9  you can -- clearly, Dan Ackley is in sales, because

10  when he starts out, he's the account manager for

11  Ingersoll-Rand.  And so, he was providing his

12  perspective on the issue here.

13     Q.  Okay.  And you think he's in license

14  sales?

15     A.  Yes.

16     Q.  Frank Varasano was a license sales

17  person, right?

18     A.  Correct.

19     Q.  It appears that -- withdrawn.

20        If you look at the third line down on

21  Bates ending 48, he writes, "Frank Varasano and I

22  met today with Marv Walrath, CIO of Ingersoll-Rand.

23  It was not a pleasant meeting.  Given the urgency of

24  the situation, Frank asked that I generate this

25  e-mail to you both."  See that?

69

1     A.  Yes, I do.

2     Q.  And Frank was someone who was reporting

3  up to you in October of 2000, right?

4     A.  Correct.

5     Q.  Directing your attention to the previous

6  page, ending 547, top of the page looks like Frank

7  sends an e-mail to Ron Wohl and to you.  At least

8  he's cc'ing you.

9     A.  Correct.

10     Q.  Do you know why he was cc'ing you?

11     A.  Because I was his boss.

12     Q.  Right.  He wanted to make sure you knew

13  what was going on --

14     A.  Uh-huh.

15     Q.  -- right?  And he writes, "I believe

16  your personal involvement in fixing this would be

17  time well spent.  This could be a critical reference

18  for us, but the management team is very frustrated.

19  We're about to lose the CRM opportunity and a lot of

20  additional ERP business because of the situation

21  that Dan summarized in his e-mail."  You see that?

22     A.  Yes, I do.

23     Q.  Now, do you know if he's referring to a

24  license or consulting business?

25     A.  Probably both.

70

1     Q.  And is that because consulting, to some

2  extent, was related to license sales and that once

3  there was a license sale, in many instances, there

4  would be a follow-on consulting project?

5     A.  Correct.

6     Q.  All right.  Just directing your

7  attention to 546, the first page, and it's an e-mail

8  from you to Larry Ellison and Safra Catz, right?

9     A.  Correct.

10     Q.  October 12th, 2000, right?

11     A.  Uh-huh.

12     Q.  And here you become personally

13  involved --

14     A.  Yes, I do.

15     Q.  -- right?

16     A.  Uh-huh.

17     Q.  And you write to Larry, "Please see the

18  e-mail below from our account team at the client.

19  Ingersoll-Rand has been a big supporter of Oracle.

20  This should have been an easy sale."

21        What did you mean when you said

22  "Ingersoll-Rand was a big supporter of Oracle"?

23     A.  They were the big user or had been a big

24  user of Oracle product.

25     Q.  Uh-huh.  Another line down, you say,

71

1  "They're now seriously considering holding off on

2  this DB," which I assume is database, right --

3     A.  Correct.

4     Q.  -- "this quarter because of the APS

5  issue."  Is that right?

6     A.  That's -- that's what it says here,

7  correct.

8     Q.  And they had purchased 11i applications,

9  right?

10     A.  I don't recall whether they had

11  purchased or they were piloting the product.

12     Q.  You think they were piloting the

13  product?

14     A.  They could bring the product -- I don't

15  know.

16     Q.  Okay.

17     A.  I don't know.  They could have been --

18  there's a term "CRP" that's used in here, and that's

19  Conference Room Pilot.  And so, that's what they

20  were trying to do with the product.  And they may

21  have been piloting it.  Most likely, they had bought

22  the product.

23     Q.  Did you know Steve Carrington at

24  Ingersoll-Rand?

25     A.  I -- I don't believe I ever met him.

72

1    Q.  And in October of 2000, is it fair to
2  say that at least the second version of 11i had been
3  released, 11i.2?
4    A.  I don't recall.  I don't recall.
5    Q.  I'm going to show you what's been
6  previously marked as Block No. 2.  I'll ask you to
7  take a look at Block No. 2, which is Bates numbered
8  NDCA-ORCL 152033.0001 and 0002.
9      Just let me know when you're done.
10   A.  Sure.
11     Okay.
12   Q.  Okay.  Do you recognize Block No. 2?
13   A.  No, I don't.
14   Q.  Okay.  Not one of the documents you
15  reviewed yesterday?
16   A.  No.
17   Q.  All right.  But you see any dates in
18  that document?
19   A.  I see one.
20   Q.  Where is it?
21   A.  On 0001, about three-quarters of the way
22  down, and it says "2002."
23   Q.  Okay.  But in any of the headers to the
24  e-mail, you can't tell when either of these e-mails
25  were sent or received, right?

73

1    A.  Well, there's no header with this
2  e-mail.
3    Q.  Right.  I'm just going to direct your
4  attention to the first page, .001.
5    A.  Uh-huh.
6    Q.  In the middle of the page, it looks like
7  Keith Block is sending you an e-mail, right?
8    A.  Yes.
9    Q.  He says, "Sandy, I want to provide some
10  feedback regarding the issues we're facing
11  surrounding release of 11i.  After speaking to my
12  directs, there are two main concerns."
13      Who were Keith Block's directs in the
14  fall of 2000, if you know?
15   A.  Well, one, we don't know if this was
16  written in the fall of 2000.
17   Q.  I'm just asking you a question about the
18  fall of 2000.
19      And who was his directs in the fall of
20  2000?  It could have been Valerie Borthwick, Mark
21  Salser, and then he had a structure which I believe
22  was east, central, west as well.  So, he had
23  somebody responsible for each of those.  Tim Meehan
24  in the east.  I don't remember who was central.  And
25  in the west was Gary Simler.

74

1    Q.  But Keith Block had consulting, right?
2    A.  In this case, for the U.S., correct.
3    Q.  Consulting for the U.S., meaning his
4  people were doing the implementations, right?
5    A.  Not necessarily.  Oracle Consulting was
6  oftentimes involved in implementations, but it could
7  have been -- and they could have been leading the
8  implementation.  It could be that Accenture is doing
9  the implementation, and Oracle Consulting is not
10  involved at all.  So, it varied depending on the
11  client.
12   Q.  Okay.  Was there anything else in the
13  U.S. in the fall of 2000 that was in charge of
14  Oracle consultants that were actually doing
15  implementations?
16   A.  No.  If it was Oracle Consulting in the
17  U.S., Keith would have that responsibility.
18   Q.  Okay.  So, in this e-mail he tells you
19  or he writes to you that after speaking to his
20  directs, there are two main concerns:  Lack of field
21  and customer training, which we've talked about
22  already, right?
23   A.  Uh-huh.
24   Q.  And the quality of the product itself?
25   A.  Right.

75

1    Q.  Do you know what he meant when he
2  said -- or wrote "the quality of the product
3  itself"?
4    A.  He was probably making a general
5  statement about 11i.
6    Q.  Okay.  And he goes on to say, "As far as
7  training goes, while we're hiring as fast as we can,
8  for people new to Oracle, we cannot get them trained
9  due to a lack of availability of courses."
10      What does that mean?
11   A.  That we are trying -- we are hiring new
12  people to Oracle, most likely not skilled in 11i,
13  since it was a new product and they were new to
14  Oracle.  And it's saying there's a lack of
15  availability of courses for those new people.
16   Q.  Were you -- was Oracle Consulting
17  selling consulting services, knowing that its
18  consultants weren't trained on 11i?
19      MR. GIBBS:  Objection.  Misstates the
20  testimony, argumentative.
21      MR. WILLIAMS:  It's not argumentative.  It's
22  a question.
23      MR. GIBBS:  It is argumentative.
24      THE WITNESS:  When you -- I think it
25  requires, Shawn, an understanding about software.

76

1 This was probably one of the most major releases of
2 software ever within the software industry.  And it
3 was comprehensive, it was integrated, and it was
4 large.
5        And when you first launch a product,
6 it's, I'm sure, just as a new practice area in a law
7 firm, you have fewer people that are skilled in it
8 and particularly if it's a growth area.
9        And it's not surprising to me, and I
10 think it would be the case for any software company
11 launching a product, that you're trying to get
12 training, skilled people and the product all at --
13 in sync.  And when you first launch a product,
14 that's not always the case.
15 BY MR. WILLIAMS:
16    Q.  Okay.  Just going a little bit further
17 down --
18    A.  Okay.
19    Q.  -- in Keith's e-mail to you --
20    A.  Uh-huh.
21    Q.  -- he writes, "In addition, we now
22 have -- we now have customers postponing
23 implementation since training's not available.  For
24 example, Yamaha, one of our largest clients in the
25 west, has told us that they are now going to wait

77

1 until 2002 to upgrade to 11i due to lack of training
2 and product quality."
3    A.  Uh-huh.
4    Q.  Okay.  Now, do you recall any client
5 other than Yamaha in the fall of 2000 that was
6 delaying an upgrade to 11i due to product quality
7 and/or training?
8        MR. GIBBS:  Objection.  Lack of foundation,
9 assumes facts not in evidence.
10        THE WITNESS:  I don't recall any
11 specifically.
12 BY MR. WILLIAMS:
13    Q.  Okay.  He further writes, "Another
14 example is Veriad, where when it came to schedule
15 training, the client was told that the training
16 material would be release 11, not 11i."  See that?
17    A.  Yes, I do.
18    Q.  So, in October of 2000, Oracle had not
19 developed even the training material to have its
20 consultants train customers on 11i --
21        MR. GIBBS:  Objection.
22 BY MR. WILLIAMS:
23    Q.  -- is that fair?
24        MR. GIBBS:  Objection.  Lack of foundation,
25 misstates the document.

78

1        THE WITNESS:  You're saying -- was the
2 question, Shawn, that in October 2000, we didn't
3 have the training?  Is that what you're saying?
4        MR. WILLIAMS:  Training material.
5        THE WITNESS:  And what it said here, if I
6 read the e-mail correctly, they were told the
7 soonest that on-site training could be scheduled was
8 October.
9        MR. WILLIAMS:  Okay.
10        THE WITNESS:  So, according to this, if we're
11 talking about 2000 -- and, obviously, we don't have
12 the date on this e-mail -- then it would say, in
13 that case, we would have training in October of
14 2000.
15 BY MR. WILLIAMS:
16    Q.  Okay.  So, at least at the time of this
17 e-mail, Oracle did not have the training materials,
18 at least what Keith Block is writing --
19        MR. GIBBS:  Object.
20 BY MR. WILLIAMS:
21    Q.  -- to train purchasers for 11i?
22        THE WITNESS:  I don't know --
23        MR. GIBBS:  Let me get the objection.  Lack
24 of foundation, misstates the document.
25        THE WITNESS:  I don't know -- I don't recall

79

1 Veriad.
2        MR. WILLIAMS:  Okay.
3        THE WITNESS:  And I don't know what part of
4 11i they were implementing.  So, it's hard for me to
5 comment on what training material was available or
6 not available.
7 BY MR. WILLIAMS:
8    Q.  Understood.  I'm going to ask you to
9 turn to the next page.
10    A.  Okay.
11    Q.  And in the middle of the remainder of
12 the e-mail, he writes to you, "I'm attaching a
13 spreadsheet which provides detailed account
14 information where we have been forced to work at no
15 cost due to product issues."  You see that?
16    A.  Yes, I do.
17    Q.  When he writes "work at no cost," does
18 that mean that consultants are providing services to
19 customers but are not being billed -- and those
20 customers are not being billed for those services?
21    A.  That's correct.
22    Q.  And "product issues" there, is it fair
23 to say he's still referring to 11i, right?
24    A.  Yes.
25    Q.  And then he writes, "In Q1 alone, this

80

1   equated to 1730 days, a North America hit of
2   approximately $3 million."  See that?
3       A.  Yes, I do.
4       Q.  Does that mean that in Q1, there were
5   consultants working, and those hours couldn't be
6   billed, and there was a cost to Oracle in Q1 of
7   $3 million?
8       MR. GIBBS:  Objection.  Lack of foundation.
9       THE WITNESS:  Ask the question again.  I want
10  to make sure I answer it correctly, if you don't
11  mind.
12  BY MR. WILLIAMS:
13      Q.  Does that mean in Q1 there were
14  consultants working, and those hours couldn't be
15  billed, and there was a cost to Oracle in Q1 of
16  $3 million?
17      MR. GIBBS:  Same objection.
18      THE WITNESS:  That's the way I would read it
19  as well.  And Q1 would be right after the product
20  was released.  And having these kind of issues,
21  while disappointing, was not unusual for us or,
22  again, any major release of a product.
23  BY MR. WILLIAMS:
24      Q.  I understand.  Okay.  And Keith Block is
25  not referring to the entire company.  He's just

81

1   referring to his organization, would that be fair to
2   say, with respect to the 3-million-dollar cost?
3       MR. GIBBS:  Objection.  Lack of foundation.
4       THE WITNESS:  He's talking about North
5   America, which would be Canada and U.S. Consulting.
6   BY MR. WILLIAMS:
7       Q.  Okay.  And he then writes, "As more
8   license deals are closed, I expect this number to
9   increase for Q2."  You see that?
10      A.  Yes, I do.
11      Q.  "Due to the bugs and the number of
12  patches required in some cases, field consulting
13  teams have recommended to clients to wait until the
14  new year until the product shakes out."  See that?
15      A.  Yes, I do.
16      Q.  Were you aware that consultants were
17  telling customers not to purchase the 11i until the
18  new year?
19      MR. GIBBS:  Objection.  Lack of foundation.
20      THE WITNESS:  I don't recall that generally,
21  and I don't recall this e-mail.
22  BY MR. WILLIAMS:
23      Q.  Okay.  But you don't think that Keith
24  was being untruthful when he wrote you this e-mail,
25  was he?

82

1       MR. GIBBS:  Objection.  Lack of foundation.
2       THE WITNESS:  If you're asking about Keith's
3   veracity, I never had a question -- a reason to
4   question that.
5       MR. WILLIAMS:  Okay.  I'll ask the reporter
6   to mark this document as Sanderson No. 3.  It's
7   Bates numbered stamped NDCA-ORCL 169718 through 720.
8       (E-mail string dated 10/2000 re Ford
9   supply chain status marked Exhibit 3 for
10  identification.)
11      THE WITNESS:  Thank you.
12  BY MR. WILLIAMS:
13      Q.  I'm just going to ask you to take a look
14  at that document and let me know when you're done.
15      A.  Okay.
16      Okay.
17      Q.  Okay.  You recognize Sanderson No. 3?
18      A.  No, I don't.
19      Q.  Not one of the documents you saw
20  yesterday, right?
21      A.  No, I didn't.
22      Q.  All right.  But it appears to be an
23  e-mail at least -- well, a series of e-mails
24  including an October 19th e-mail from John Fikany
25  to you and several other people, right?

83

1       A.  Right.
2       Q.  Okay.  And Frank Varasano, he was in
3   your organization, right?
4       A.  Correct.
5       Q.  Charles Linn was?
6       A.  Yes.
7       Q.  How about Nadeem Syed?
8       A.  Nadeem Syed.  I don't recall.
9       Q.  Do you recognize any of the other names
10  in the "to" line that were in your organization in
11  October of 2000?
12      A.  No, none that I recall.
13      Q.  Okay.  The subject line is "Ford Supply
14  Chain," so I'm assuming that's Ford, the motor
15  company --
16      A.  Correct.
17      Q.  -- right?
18      That's one of the customers that were in
19  your sales organization, right?
20      A.  Correct.
21      Q.  Do you know who Todd Allen is?
22      A.  No, I don't.  I wondered that as well
23  when I read it.
24      Q.  Do you know why John Fikany sent you
25  this series of e-mails?

84

1     MR. GIBBS:  Objection.  Lack of foundation,
2  calls for speculation.
3     MR. WILLIAMS:  If you know.
4     THE WITNESS:  I can only speculate.
5     MR. WILLIAMS:  You can speculate.
6     MR. GIBBS:  Objection.  Calls for
7  speculation.
8     THE WITNESS:  That, like a good sales
9  manager, he wanted to -- any information about
10  product, particularly if there were concerns, he
11  wanted it elevated so that would get addressed
12  so that would make his job of selling product easier
13  and more effective.
14  BY MR. WILLIAMS:
15     Q.  And he was an area vice president,
16  right?
17     A.  I believe so.
18     Q.  Okay.  Going down to the -- I guess the
19  bottom third of the page.  Todd Allen writes to
20  Mike -- I'm not sure who that Mike is.  Well, he
21  writes, "We've been on the calls" -- "We've been on
22  the calls and expressed our concerns during the
23  calls.  The problem we're dealing with is that we're
24  getting inconsistent information on a daily basis
25  regarding 11.5.2 release and patches.  At this time,

85

1  we've put in every available patch for CRM up to
2  October 17th.  This is over 100 CRM patches in
3  every" -- sorry -- "This is over 100 CRM patches in
4  the last two and a half weeks.  We still can't get
5  contracts to work."
6     You see that?
7     A.  Yes, I do.
8     Q.  So, it's fair to say that in October of
9  2000, you knew that the CRM applications that were
10  sold to Ford, at least part of it, wasn't working,
11  right?
12     MR. GIBBS:  Objection.  Lack of foundation,
13  mischaracterizes the document.
14     THE WITNESS:  I am copied on an e-mail where
15  that statement was made.
16  BY MR. WILLIAMS:
17     Q.  Ford was one of your largest clients,
18  wasn't it?
19     A.  Yes, it was.
20     Q.  So, it would be fair to say that you
21  knew that Ford was having a difficult time
22  implementing Oracle applications, right?
23     A.  I -- I recall that Ford had issues, yes,
24  I do.
25     Q.  Okay.  And the issue that's articulated

86

1  here that the consultants had applied more than
2  100 -- or over 100 CRM patches in the last two and a
3  half weeks is not inconsistent with what you knew,
4  was it?
5     A.  You're asking me, Shawn, to speculate.
6  I can't say whether it was consistent --
7     Q.  Okay.
8     A.  -- or not.  I didn't focus on the number
9  of patches.  I focused on the fundamental issue of
10  whether the product worked like it was supposed to
11  and what did we need to do to get it there.
12     Q.  All right.  And at least as of
13  October 19th, it appears that contracts didn't
14  work.
15     MR. GIBBS:  Objection.  Lack of foundation,
16  vague.
17     THE WITNESS:  Based on this e-mail, it says
18  the contracts module was not working.
19  BY MR. WILLIAMS:
20     Q.  Okay.  Let's go down to the next
21  paragraph where Todd writes "CRM organization needs
22  to step up and provide us development resources
23  on-site in Webster, New York.  We know that Mark's
24  organization has done this for Ingersoll-Rand and
25  BellSouth, and we need the same attention."  See

87

1  that?
2     A.  Yes, I do.
3     Q.  Did you know that the CRM organization
4  had provided on-site resources at Ingersoll-Rand?
5     A.  I don't recall.
6     Q.  Okay.  And how about at BellSouth, did
7  you know that?
8     A.  I don't recall.  And I probably, for
9  sure, wouldn't know BellSouth because BellSouth was
10  not one of my clients.
11     Q.  Okay.  How about Xerox, was Xerox one of
12  your clients?
13     A.  Yes, they were.
14     Q.  Okay.  Did you know that Xerox was
15  threatening to write a letter to Larry Ellison
16  asking for their money back?
17     A.  I mean, I see it in his e-mail.  I don't
18  recall --
19     Q.  Okay.
20     A.  -- that happening.
21     Q.  All right.  Did you know -- well,
22  withdrawn.
23     Looking at the very last sentence of
24  169718, beginning with "They"?
25     A.  Uh-huh.

88

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

1    Q.  Looks like Todd is referring to Xerox
2  when he writes, "They've also used words like 'your
3  company is two steps away from fraudulent.'  If that
4  can't get us some help, I don't know what can."
5       You see that?
6    A.  Yes, I do.
7    Q.  Do you know whether Xerox ever accused
8  Oracle of being fraudulent with respect to the sale
9  of 11i applications?
10    A.  No, I don't.  And we don't know -- my
11  observation is we don't know who within Xerox.  It
12  could have been a coder.
13    Q.  I understand.
14    A.  It could have been somebody -- I don't
15  know who was making that statement.
16    Q.  I understand.  Do you know if you
17  responded to this series of e-mails?
18    A.  No, I don't.
19    Q.  Do you know if you took any action with
20  respect to the situation at Ford in or around
21  October of 2000?
22    MR. GIBBS:  Objection.  Mischaracterizes the
23  document, which clearly talks about Xerox.
24    MR. WILLIAMS:  It talks about Ford.
25    MR. GIBBS:  Ford is in the "re" line.  The

89

1  entire body talks about Xerox.
2    MR. WILLIAMS:  Okay.
3    MR. GIBBS:  You keep asking about Ford.
4    MR. WILLIAMS:  Okay.  Go ahead and answer the
5  question.
6    THE WITNESS:  Would you ask it to me again?
7  BY MR. WILLIAMS:
8    Q.  I'm asking you if you took any action
9  with respect to Ford in or around October of 2000?
10    A.  I can't recall.  I would also say I
11  can't imagine, as a responsible executive in a
12  company, that I didn't do whatever I could to help
13  rectify this situation.
14    Q.  Okay.  Do you know who Mark Keever is?
15    A.  As I recall, he worked for John Fikany,
16  but I don't recall anything more than that.
17    Q.  He was in license sales?
18    A.  Correct.
19    MR. WILLIAMS:  I'm going to ask the reporter
20  to mark this document as Sanderson No. 4.  It is
21  Bates numbered NDCA-ORCL 056049 through 50.
22       (E-mail dated 10/21/00 re 11.5.1 vs.
23  11.5.2 confusion marked Exhibit 4 for
24  identification.)
25    MR. WILLIAMS:  I'll ask you to just take a

90

1  look at it and let me know when you're done.
2       The reporter has told me that she has to
3  change the tape.  I think while he's reviewing the
4  document, we'll change the tape without taking a
5  break.  Is that okay?
6    THE VIDEOGRAPHER:  Off the record at
7  10:59 a.m., and this marks the end of Tape 1.
8       (A brief recess was taken.)
9    THE VIDEOGRAPHER:  This marks the beginning
10  of Videotape No. 2, Volume I, in the deposition of
11  Edward Sanderson.  The time is 11:04 a.m.
12  BY MR. WILLIAMS:
13    Q.  Mr. Sanderson, have you had an
14  opportunity to review number -- Sanderson No. 4?
15    A.  Yes, I have.
16    Q.  Okay.  Do you recognize it?
17    A.  No, I don't.
18    Q.  It's an e-mail from Kevin Glynn to you
19  in or around October 21st of 2000, right?
20    A.  Correct.
21    Q.  And do you know who Kevin Glynn is?
22    A.  Yes.  He was a consultant, and he was in
23  Valerie Borthwick's organization, and he was
24  somebody that Valerie had designated to operate as
25  an intermediary between Consulting and Development.

91

1    Q.  And was it unusual for him to send
2  e-mails directly to you?
3    A.  Periodically, he would give me updates,
4  and I don't recall this one specifically.  But it
5  was not unusual that I get e-mails from a number of
6  people in the company.
7    Q.  Okay.  And so, he sent this e-mail to
8  you, Sergio Giacoletto and Valerie Borthwick, right?
9    A.  Yes.  He sent it to me, copying those
10  other folks, right.
11    Q.  And Sergio ran what?  Europe?
12    A.  Correct.  He ran Europe, Middle East,
13  Africa.
14    Q.  Okay.  So, the body of the e-mail says,
15  "Hi, Sandy, this is the first of two e-mails on the
16  status of 11i."  See that?
17    A.  Yes, I do.
18    Q.  And 11i was the primary applications
19  product that Oracle was selling at the time, right?
20    A.  Correct.
21    Q.  And he indicates, "11.5.2," which is
22  11i, "is causing more confusion than help."  See
23  that?
24    A.  Yes, I do.
25    Q.  And "The CRM Rollup patches just

92

1   released that will not be certified on 11.5.2."  See
2   that?
3       A.   Yes, I do.
4       Q.   What does that mean?
5       MR. GIBBS:  Objection.  Calls for
6   speculation, lack of foundation.
7       THE WITNESS:  Because of the breadth of 11i,
8   you -- Oracle Development would release patches that
9   may apply to one part of 11i but not to another.
10  And what this is saying is the patches that are
11  coming out for CRM were not certified on 11.5.2.
12  So, that was a step that Development was going to
13  have to go through at some point to get those
14  patches to be consistent or certified on 11.5.2.
15  BY MR. WILLIAMS:
16      Q.   Okay.  So, the term "certified" does
17  that have scientific meaning as it's used in this
18  e-mail?
19      MR. GIBBS:  Objection.  Vague, lack of
20  foundation.
21      THE WITNESS:  I'm not sure what "scientific"
22  means.
23  BY MR. WILLIAMS:
24      Q.   Okay.  Well, does it have a
25  technological meaning?

93

1       A.   Does it have a specific meaning?  It
2   would mean that those patches were tested with
3   11.5.2, successfully completed the testing for
4   11.5.2.  And what this is saying is that had not
5   occurred yet.
6       Q.   Okay.  So, down at the next line, he
7   writes "Development EPR," which I'm assuming is
8   ERP --
9       A.   I think you're right.
10      Q.   -- "and CRM is now saying harmonization
11  will occur in 11.5.3, tentatively scheduled for the
12  end of November."  See that?
13      A.   Yes, I do.
14      Q.   And when -- do you know what Kevin Glynn
15  meant when he wrote "harmonization"?
16      A.   Yes.
17      MR. GIBBS:  Objection.  Calls for
18  speculation.
19      THE WITNESS:  That's when the CRP patches
20  will be certified with 11.5.2.
21  BY MR. WILLIAMS:
22      Q.   You mean CRM patches?
23      A.   He's saying ERP and CRM, so it's saying
24  that all -- the different patches that have been
25  released on 11i will be brought together and all

94

1   tested and consistent with each other in 11.5.3.
2       Q.   So, at least in October or as of
3   October 21st of 2000, some ERP and CRM modules,
4   including their patches, had not even been tested in
5   terms of their ability to work together.  Is that
6   fair?
7       MR. GIBBS:  Objection.  That completely
8   misstates his testimony and the document.
9   BY MR. WILLIAMS:
10      Q.   Is that fair?
11      A.   No.  No, I don't interpret that at all.
12  What it's saying is ERP and CRM, when 11i was
13  released, was tested.  Again, because of the
14  significance of the release, you're going to have,
15  in the breadth of the software, because it was the
16  first truly integrated ERP and CRM software.  We
17  called it the EBusiness Suite, and patches were
18  released in some cases on a stand-alone basis as
19  things were discovered.
20           As you might imagine, not every client
21  were -- was implementing the same software at the
22  same time, and so, you would have different patches
23  related to different pieces of the software.
24      Q.   Okay.  Why don't we take a look at the
25  next page.

95

1       A.   Okay.
2       Q.   This appears to be a chart prepared by
3   Kevin Glynn discussing possible client situations
4   and the recommended patching and upgrade, right?
5       A.   Correct.
6       Q.   If you go down to, I guess, the
7   fourth -- one, two, three -- entry where he writes
8   "ERP & CRM 11.5.1 client," see that?
9       A.   Yes, I do.
10      Q.   "Take CRM Rollup patches off Metalink.
11  Do not apply 11.5.2."  See that?
12      A.   Yes, I do.
13      Q.   And isn't it fair to say that he's
14  recommending that clients who are using or purchased
15  ERP and CRM 11.5.1 should not apply 11.5.2?
16      MR. GIBBS:  Objection.  Calls for
17  speculation.
18  BY MR. WILLIAMS:
19      Q.   Isn't that what it says?
20      A.   No.  No, it doesn't.  I mean, that's --
21  I understand your interpretation of that, but I
22  believe your interpretation is wrong.
23      Q.   Okay.
24      A.   What it's saying is when 11.5.1 or any
25  release is made to the product, it doesn't cover the

96

1  entire product.  And what he's done, actually very
2  nicely here, is lay out different client situations
3  and then recommending what clients do from a
4  patching and upgrade.
5        What it's saying is, in lieu of using
6  11.5.2, take the CRM Rollup patches out of Metalink
7  and also obtain the other ERP patches from Metalink.
8  So, that was the best path for clients that were at
9  that level.
10       Q.  At the --
11       A.  This is the kind of information that
12  Consulting really benefited from because then the
13  Consulting had this input and knew what the right
14  path was for their client as it relates to Oracle
15  product.
16       Q.  In terms of the right path -- well,
17  withdrawn.
18           Earlier in the same e-mail, he indicated
19  that 11 -- the CRM Rollup patches had not yet been
20  tested on --
21       A.  11.5.2.
22       Q.  -- with 11.5.2.  Right?
23       A.  Right.
24       Q.  And was it or was it not your testimony
25  that because they had not been tested yet on 11.5.2,

97

1  that one could not determine whether or not they
2  would be -- there would be harmonized, meaning that
3  they'd be working together properly at that time?
4       MR. GIBBS:  Objection.  Vague.
5       THE WITNESS:  Yeah, what the e-mail -- what
6  Kevin said in this e-mail on the first page is that
7  they would not be harmonized until 11.5.3.  What
8  he's saying here, specifically on the second page,
9  the fourth item down that you're talking about is,
10  if you try to install 11.5.2 you're going to have
11  problems because it's not been harmonized or
12  integrated or certified yet.
13          So, he's simply telling you -- he's
14  given guidance here for the consultants on the best
15  way to implement the products so you minimize the
16  issues that you're going to have.
17  BY MR. WILLIAMS:
18       Q.  Okay.  Do you know whether 11i.3 was
19  shipped in November of 2000?
20       A.  I don't recall, Shawn.
21       Q.  Had you asked for an update on the
22  status of 11i, or was this something that Kevin
23  Glynn periodically just sent to you as part of his
24  duties?
25       A.  I don't recall.

98

1       MR. WILLIAMS:  Okay.  Ask the reporter to
2  mark this document as Sanderson No -- are we at 5?
3  It's Bates numbered NDCA-ORCL 056051 through 54.
4       (E-mail dated 10/13/00 re Field Project
5  Feedback Needed on 11i Training & New Apps
6  marked Exhibit 5 for identification.)
7  BY MR. WILLIAMS:
8       Q.  Let me know when you're done.
9       A.  Okay.  I'm ready.
10       Q.  Okay.  Who's Heather Williams, do you
11  know?
12       A.  No, I don't.
13       Q.  Okay.  Sanderson No. 5 appears to be an
14  e-mail among people within your organization in or
15  around October 23rd, 2000.  Is that fair?
16       A.  Not completely.
17       Q.  Tell me how that --
18       A.  Paul Pinn, who I believe ran Asia
19  Pacific Consulting, didn't report to me.
20       Q.  I didn't ask you if they reported to
21  you.  But they were --
22       A.  They're not in my organization.
23       Q.  Not even in your organization?
24       A.  No, correct.
25       Q.  Okay.  But Kevin Glynn was, right?

99

1       A.  Yes.
2       Q.  And Valerie Borthwick was?
3       A.  Yes.
4       Q.  All right.  And if you go to the last
5  page ending 053 -- I'm sorry.  It's not the last
6  page, but -- sorry, page ending 053 --
7       A.  Uh-huh, yes.
8       Q.  -- see where there's an e-mail from a
9  person by the name of Heather Williams?
10       A.  Yes, I do.
11       Q.  And she writes to the team, "OPI
12  Consulting," that's your organization, right --
13       A.  Yes, correct.
14       Q.  -- "has an opportunity to provide
15  feedback on 11i issues directly to Sandy Sanderson.
16  Sandy has requested feedback on specific experiences
17  that you are having or have faced in working with
18  release 11i in general and new applications such as
19  APS, Order Management, iStore, iProcurement,
20  Balanced Scorecard, CRM, etc., specifically in the
21  training area.  Sandy's looking to take the subset
22  of information from OPI and the Americas directly to
23  Larry early next week."  See that?
24       A.  Yes, I do.
25       Q.  Do you recall making such a request?

100

1    A.  No, I don't.

2    Q.  Okay.  Do you think that you did not

3  make such a request?

4    A.  Shawn, your question was do I recall.

5    Q.  No.  I'm not asking --

6    A.  And my answer was no.

7    Q.  Yeah.  And I'm asking you:  Do you think

8  that you would not have made such a request?

9    A.  Do I think I would not have made --

10  yeah, I probably -- I most likely made that request.

11    Q.  Okay.  And if you go back to Bates

12  ending 51 --

13    A.  Okay.

14    Q.  -- you see where at the top of the page

15  Kevin writes an e-mail to Valerie Borthwick?

16    A.  Uh-huh.

17    Q.  You see that?

18    A.  Yes, I do.

19    Q.  And he writes, "I talk to Chuan Yew on a

20  regular basis.  He's been one of the most harsh

21  critics of CRM and the 11i bug levels.  He has a

22  couple of gem quotes.  'CRM is broken' is a

23  favorite."  See that?

24    A.  Yes, I do.

25    Q.  Do you recall anybody ever telling you

101

1  or making such comments to you that "CRM is broken"

2  in the fall of 2000?

3    A.  No, I don't.

4    Q.  Okay.  Valerie Borthwick provide that

5  information to you or say that she had heard this

6  from members of the consulting staff around the

7  world?

8    A.  I don't recall.

9    Q.  Okay.

10    A.  As you see here, I'm not copied on this

11  e-mail.

12    Q.  I understand.  But your expectation was

13  that you wanted a -- you wanted feedback on 11i

14  issues, right?

15    A.  Right, and this would be one piece of

16  feedback.

17    Q.  Right.  So, do you think that Valerie

18  would have sent this information to you?

19    A.  Whether she sent this specific e-mail, I

20  don't recall.  I'm sure having requested, as

21  indicated here in the e-mail, a document was

22  provided to me that took the input from all the

23  folks that provided feedback.

24    Q.  Do you know whether you got such a

25  document?

102

1    A.  I don't recall.

2    Q.  Did you know Chuan Yew?

3    A.  No, I did not.

4    Q.  Did you know that people in

5  Consulting -- well, withdrawn.

6       I'm going to ask you to turn to Bates

7  ending 052.

8    A.  Okay.

9    Q.  Top of the page, appears that Mr. Yew

10  writes to Heather, "Generally, the new modules are

11  very buggy.  Culprits are APS, OM and CRM.  I think

12  the products have not undergone any form of

13  integration testing and is failing in this area."

14  You see that?

15    A.  Yes, I do.

16    Q.  Did people in your consulting staff

17  indicate to you that they had felt that 11i had not

18  undergone any integration testing prior to its

19  release?

20       MR. GIBBS:  Objection.  Lack of foundation.

21       THE WITNESS:  I don't recall being told that,

22  and I know that integration testing had been done

23  with the product.  One of the challenges that

24  Development has is they test the integration of a

25  product within the environment that Development has

103

1  and its specific servers and specific database

2  technology or release.

3       As you get out into the field, one of

4  the challenges that we always had in consulting was

5  you had clients that operated on different hardware,

6  different operating systems, different versions of

7  the database would implement the applications in a

8  different way, that kind of thing.

9       And oftentimes in consulting, once

10  you're out there in the live environment, when

11  you're truly over a period of time testing the

12  product in multiple environments, you find more

13  issues.

14  BY MR. WILLIAMS:

15    Q.  Okay.  You see where Mr. Yew writes, "I

16  also think the patches are not well tested,

17  especially with other modules, to ensure that it

18  does not impact the system."  Do you see that?

19    A.  Yes, I do.

20    Q.  And it also says "Very often the patches

21  break a heck of a lot of other stuff."

22    A.  "A lot of stuff," yes.

23    Q.  I'm sorry.  "A heck of a lot of stuff."

24       Did you know whether 11i patches

25  actually caused other areas of the software not to

104

1  work once they were applied?

2      A.  I don't recall that.  What I would point

3  out is I'm sure this was one of the reasons Kevin

4  Glynn wrote Exhibit 4 to help provide clarity to the

5  field on how to implement using this table here

6  because of these kind of issues.

7      Q.  And -- okay.  Further down in the same

8  e-mail almost halfway down the page beginning with

9  the paragraph that says "Patches that are released

10  are not properly tested" --

11      A.  Okay.

12      Q.  -- see that?

13      This is actually a pretty accurate

14  statement when compared with Kevin Glynn's e-mail to

15  you of October 21st, indicating that at least the

16  CRM Rollup patches had not yet been certified on

17  11.5.2, right?

18      MR. GIBBS:  Objection.  Vague, lack of

19  foundation.  That mischaracterizes both documents.

20      THE WITNESS:  Shawn, do you mind asking the

21  question again?  It would help me answer it

22  correctly.

23  BY MR. WILLIAMS:

24      Q.  Okay.  See where Mr. Yew writes,

25  "Patches that are released are not properly tested"?

105

1  See that?

2      A.  Yes, I do.

3      Q.  And that's on October 20 -- well,

4  sometime -- looks like October 21st or sometime

5  shortly before that, right?

6      A.  Correct.

7      Q.  And that's consistent with what

8  Mr. Glynn had written to you on October 21st,

9  indicating to you that the CRM Rollup patches had

10  not been tested on 11.5.2?

11      MR. GIBBS:  Objection.  Vague, lack of

12  foundation, mischaracterizes both documents.

13      THE WITNESS:  There was a couple points --

14      THE REPORTER:  I'm sorry.  I couldn't hear

15  the end of your objection.  I heard, "Vague, lack of

16  foundation."

17      MR. GIBBS:  Mischaracterizes both documents.

18      THE WITNESS:  What Kevin said in his

19  document, which is Exhibit 4, on the 21st of

20  October, is the CRM patches have not been tested and

21  certified with 11.5.2.  That doesn't mean that they

22  haven't been tested.

23  BY MR. WILLIAMS:

24      Q.  Okay.  Do you recall taking some issues

25  raised by consultants to Larry Ellison specifically?

106

1      A.  I don't recall specifically.  I do know

2  that in -- for example, in our executive committee

3  meetings, Larry would periodically ask for feedback

4  on the product in the early implementations out in

5  the field, and that was not an unusual occurrence.

6      Q.  It was not an unusual occurrence for you

7  to provide that information?

8      A.  Either Larry would ask for the

9  information -- I mean, typically that would be a

10  driver for it.  He would want to know how the

11  implications are going out in the field, the early

12  implementations particularly.

13      Q.  Okay.  Let me show you what's been

14  previously marked as Cullivan No. 9, which is Bates

15  numbered NDCA-ORCL 617453 through 462.

16      I'd just ask you to take a look at that

17  document and let me know when you're done.

18      I can direct your attention to the

19  section I'm interested in or you can read the entire

20  thing.

21      A.  Let me just do a quick cursory review.

22      Q.  Okay.

23      A.  Okay.

24      Q.  Okay.  Do you recognize Cullivan No. 9?

25      A.  No, I do not.

107

1      Q.  Okay.  Going to the second page, 617454,

2  it appears to be an agenda for NAS Executive Dialogs

3  in November of 2000, right?

4      A.  Correct.  That's George Roberts'

5  organization.

6      Q.  Right.  And if you go to the next page,

7  at about halfway down the page, it says

8  "Participants confirmed to attend the November 2nd

9  E-Business Suite dialogue."  See that?

10      A.  Yes, I do.

11      Q.  A couple of your reports are listed

12  there:  Keith Block, Valerie Borthwick?

13      A.  Yes, that's correct.

14      Q.  Who's Rudy Corsi?

15      A.  Rudy Corsi was Keith's operations

16  manager as best I recall.

17      Q.  And so -- okay.  Going to the next page,

18  see where it says "CRM Session"?

19      A.  Yes, I do.

20      Q.  And it says, "Main issue:  No live

21  sites."  See that?

22      A.  Yes.

23      Q.  Do you know that in November -- at least

24  as of November 2nd of 2000, that Oracle had no

25  customers live on 11i CRM?

108

1    MR. GIBBS:  Objection.  Lack of foundation.

2    THE WITNESS:  I don't recall that, but it's

3 not surprising.

4    MR. WILLIAMS:  And --

5    THE WITNESS:  And the reason I say it's not

6 surprising is because of the time that it takes to

7 implement the product even if it was not a

8 newly-released product.

9 BY MR. WILLIAMS:

10    Q.  Okay.  Do you know Tom Sheehan of

11 Entegra?

12    A.  No, I do not.

13    Q.  Have you ever heard of him?

14    A.  No.  I don't recall his name or the

15 company.

16    Q.  Okay.  Ask you to turn your attention to

17 617458.

18    A.  Okay.

19    Q.  Just going down to -- well, withdrawn.

20    See where it says "Joint Development -

21 CRM/ERP"?

22    A.  Yes, I do.

23    Q.  And down where it says "11i Product

24 Issues," see that?

25    A.  Yes, I do.

109

1    Q.  It says, No. 1, "Product quality in 11i

2 both for CRM and ERP is causing problems with

3 customers trying to implement."  See that?

4    A.  Yes, I do.

5    Q.  Did you know that product quality in 11i

6 both for CRM and ERP was causing problems with

7 customers trying to implement in or around November

8 of 2000?

9    MR. GIBBS:  Objection.  Vague, lack of

10 foundation.

11    THE WITNESS:  I don't recall specifically,

12 but I'm sure I understood it at the time.

13 BY MR. WILLIAMS:

14    Q.  What's a fixed-bid proposal, if you

15 know?

16    A.  Are you talking about consulting?

17    Q.  Yes.

18    A.  A fixed-bid proposal is for a defined

19 scope, which includes what's included and what's not

20 included.  So, you define what's included within the

21 scope, and also you want to define what's not

22 included so there's no question with the customer if

23 they later say, "Well, what about this?"  And for

24 that you specify a price for doing -- a fixed price

25 for doing that work.

110

1    Q.  For consulting work?

2    A.  Yeah.  With the defined scope, yes.

3    Q.  So, it gives, I guess, the consulting

4 organization or -- withdrawn.

5    It gives the customer a definite kind of

6 level of payment for consulting work that's going to

7 be done?

8    A.  It allows them to -- right, to plan

9 within the scope what they're going to pay for for

10 that project.

11    Q.  In the fall of 2000, was Oracle doing

12 fixed-bid proposals for 11i implementations?

13    MR. GIBBS:  Objection.  Vague and ambiguous.

14    THE WITNESS:  I don't recall.

15    MR. WILLIAMS:  I think we've been going for

16 about an hour, and I'd like to take a five-minute

17 break if that's okay with you.

18    THE WITNESS:  Sure.  That sounds great.

19    THE VIDEOGRAPHER:  Off the record at

20 11:33 a.m.

21    (A brief recess was taken.)

22    THE VIDEOGRAPHER:  We are back on the record

23 at 11:47 a.m.

24 BY MR. WILLIAMS:

25    Q.  I'm going to show you what's been

111

1 previously marked as Cochran No. 4, and it's Bates

2 numbered NDCA-ORCL 101671 through 673.  Ask you to

3 take a look at it and let me know when you're done.

4    A.  Okay.

5    Q.  Do you recognize what's been marked as

6 Cochran No. 4?

7    A.  No, I do not.

8    Q.  At least part of it is an e-mail from

9 Mark Jarvis to you and several other Oracle

10 executives, right?

11    A.  Correct.

12    Q.  And that's on or around November 8th

13 of 2000?

14    A.  Correct.

15    Q.  Okay.  And do you know Paul Seminara?

16    A.  I do not.

17    Q.  Is he somebody in your organization or

18 somebody that was in your organization?

19    A.  No.  He was in George Roberts'

20 organization.

21    Q.  Okay.  And how can you tell?

22    A.  Because on page 673, at the end, it says

23 he's a regional manager, New York Major Accounts,

24 and George had responsibility for that.

25    Q.  Great.  Did you know that in --

112

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

1   withdrawn.
2       Who is Mark Jarvis?
3       A.   Mark Jarvis at the time was the head of
4   marketing for the company.
5       Q.   Do you recall in November of 2000 him
6   seeking information about customers who had actually
7   implemented 11i?
8       A.   I do not.
9       Q.   And your organization supported North
10  American sales in terms of consulting; is that fair?
11      A.   Correct.
12      Q.   And do you see this e-mail from Paul
13  Seminara to George Roberts on November 9th?
14      A.   Yes, I do.
15      Q.   Do you know whether or not you
16  ultimately got a copy of this e-mail from -- through
17  some other forward?
18      A.   I don't recall.
19      Q.   And do you see where Paul writes
20  "George, I'm trying to be constructive here, but as
21  you know, we're up to our ears in alligators on 11i
22  implementations."  See that?
23      A.   Sure.  Yes.
24      Q.   You see where he further writes, "I
25  believe we need to have a plan to fix the problems

113

1   before we can address the issue of PR"?  See that?
2       A.   Yes, I do.
3       Q.   Did you in November of 2000 share that
4   belief?
5       MR. GIBBS:  Objection.  Vague.
6       THE WITNESS:  I don't recall.
7   BY MR. WILLIAMS:
8       Q.   Okay.  See the next line where he
9   writes, "I have two major 11i customers who are
10  trying to go into production for January 2001 and a
11  third customer who is right behind them.  The
12  stories are all similar."  See that?
13      A.   I see that, yes.
14      Q.   Do you know whether or not members of
15  your consulting organization were working with
16  GMP Worldwide to get 11i applications
17  implemented in November of 2000?
18      A.   I do not.  It was mentioned that Cap,
19  Gemini, Ernst & Young is the integrator, so they
20  could have well been doing it themselves.
21      Q.   And how about did you know whether
22  anyone in your consulting organization was working
23  with Paxar trying to get their 11i implementation up
24  and running?
25      A.   I don't recall, but the e-mail says

114

1   "OCS," which is Oracle Consulting Services, "is
2   doing the implementation."
3       Q.   Okay.
4       A.   So, it would have been my organization.
5       Q.   And in that same section, it indicates
6   "OCS is doing implementation and a fantastic job
7   under the circumstances.  1700 hours of nonbillable
8   bugs."  Do you see that?
9       A.   Yes, I do.
10      Q.   Do you have an understanding of what
11  that means?
12      MR. GIBBS:  Objection.  Calls for
13  speculation.
14      THE WITNESS:  When you say "what that means,"
15  what is "that"?
16      MR. WILLIAMS:  1700 hours of nonbillable
17  bugs.
18      MR. GIBBS:  Same objection.
19      THE WITNESS:  I don't.  It's a -- it was 1700
20  hours of consulting time spent on bugs were issues
21  that could not be charged to the client -- or to the
22  customer.  I don't know what his basis is.  I don't
23  know what his source of information is.
24  BY MR. WILLIAMS:
25      Q.   Okay.  Were you familiar with the

115

1   consulting effort at Paxar in the fall of 2000?
2       A.   I don't recall.
3       Q.   Okay.  And -- well, if your organization
4   was absorbing 1700 hours of nonbillable service, is
5   that something that would be brought to your
6   attention?
7       A.   We would track -- it wouldn't
8   necessarily have it by Paxar, or I might get a
9   report that says, "Here are nonbillable hours," and
10  it might list the customers, that kind of thing.
11  And I might get that information -- I would get that
12  information.  I don't know that I got a specific
13  e-mail around Paxar.
14      Q.   Okay.  See where he further writes, "We
15  have escalated all the way to Ron Wohl, who's been
16  involved directly, but Oracle cannot get the release
17  to be stable"?  See that?
18      A.   Yes, I do.
19      Q.   "They acknowledge our effort thus far,
20  but we have not delivered results.  This is a
21  patient and reasonable customer, and they're right."
22  You see that?
23      A.   Yes, I do.
24      Q.   Do you know whether or not that
25  information was forwarded along to you?

116

1    A.  I don't recall.

2    Q.  Do you know what a SWAT team is?

3    A.  Yes, generally.

4    Q.  Can you tell me what that is?

5    A.  Are you talking about in this context?

6    Q.  Generally, a SWAT team.

7    MR. GIBBS:  You mean an actual SWAT team?

8    THE WITNESS:  Yeah.  Do you --

9    MR. WILLIAMS:  Well, I'm talking about the

10   context of Oracle Consulting --

11   MR. GIBBS:  Objection.  He said in general --

12   MR. WILLIAMS:  No.  He said in the context of

13   the document.

14   THE WITNESS:  In the context of Oracle

15   Consulting or just Oracle in general, a SWAT team

16   would be a team that would consist of members.  It

17   would be -- could be from Consulting, it could be

18   from Support, it could be from Product Development.

19   It's just the right people that you bring together

20   to address the issues.

21   BY MR. WILLIAMS:

22   Q.  Okay.  And did Oracle Consulting in the

23   fall of 2000 have SWAT teams?

24   A.  I don't recall.  It was not an uncommon

25   practice during the six years that I was at Oracle

117

---

1    that we periodically would have teams like that to

2    address specific issues.

3    Q.  Okay.  Just a general question I meant

4    to actually get to before:  Can you describe how --

5    in the fall of 2000 and early 2001, how Oracle's

6    support organization worked with the consulting

7    organization, if they worked together at all?  What

8    was the relationship between the two organizations?

9    MR. GIBBS:  Objection.  Vague, lack of

10   foundation.

11   THE WITNESS:  The support organization was

12   run by Randy Baker.  Randy and I had a good

13   relationship.  They and Oracle Consulting had the

14   same objective, "they" being Support.  Oracle

15   Consulting had the same objective, and that was

16   making customers successful with their

17   implementations.

18   We clearly had different roles, but I

19   would call it a Venn diagram, and there was some

20   overlap.  And some of the procedures that Support

21   would use to help a customer, Consulting would

22   benefit from using them.

23   And, likewise, Oracle Consulting may do

24   something out in the field that they saw that might

25   apply to more than one customer, and they'd feed

118

---

1    that back to the Support organization so they would

2    have the benefit of that.  All in all, I'd say it

3    was a collaborative relationship.

4    BY MR. WILLIAMS:

5    Q.  Is it fair to say that once Oracle

6    consultants completed an implementation, then the

7    responsibility of, sort of, maintaining the customer

8    relationship with respect to the functionality of

9    the product would then shift to Support?

10   MR. GIBBS:  Objection.  Vague.

11   THE WITNESS:  I would answer it this way,

12   Shawn:  The customer relationship always remained

13   with the account manager, the sales account --

14   license sales account manager.

15   And so, whether Oracle Consulting was

16   there, whether it was an implementation going on or

17   not, that account manager had responsibility.  If it

18   was a very specific question around the product,

19   Support organization would do that.  If the client

20   had more questions -- you know, more than a few

21   questions or was considering a new implementation

22   whatever, then Oracle Consulting would come back in.

23   BY MR. WILLIAMS:

24   Q.  Okay.  So, if say, for example, after an

25   implementation, a customer had continued difficulty

119

---

1    with the functionality of the software, and Oracle

2    had to supply either support or consulting resources

3    to the customer at no cost, did Support and

4    Consulting share expenses, or would that cost be

5    absorbed by one or the other?

6    MR. GIBBS:  Objection.  Vague, compound.

7    THE WITNESS:  It is a bit of a general

8    question.  When we sold license to -- a product to a

9    customer, typically what went with that is

10   20 percent of the revenue, the license revenue,

11   would go to Support.

12   So, if it was a million-dollar license

13   deal, $200,000 of revenue would be attached to that

14   as well, and that would go to Support.  So, that

15   helped fund Support's role in serving clients.

16   We -- so, support basically was covered

17   in a macro sense.  And I say in a macro sense

18   because they had support revenue to support their

19   organization -- to fund their organization.

20   On the consulting side, if we went back

21   in to help a client at -- oftentimes and typically,

22   it was for fee.  At times if they were having an

23   issue, we would go in and not charge, at least not

24   initially, until we figured out what the issue is.

25   It could have been product issues.  It

120

1  could have been the way that was implemented, if it
2  hadn't been done by Oracle, or even if was done by
3  Oracle Consulting.  It could be that there was an
4  upgrade provided by Support to the product, and the
5  client chose to implement it themselves and may not
6  have done it right, and so, Oracle Consulting might
7  be brought in to help rectify that situation as
8  well.
9      Q.  Oracle Consulting and Oracle Support had
10  separate P&Ls, right?
11      A.  Correct.
12      Q.  All right.  Let me show you what's been
13  previously marked as Roberts No. 5.  It's Bates
14  numbered NDCA-ORCL 039330 through 332.
15      I'll ask you to take a look at it and
16  let me know when you're done.
17      A.  Okay.
18      Q.  Okay.  You recognize Roberts No. 5?
19      A.  No.
20      Q.  But it's an e-mail from Michael Cochran
21  to George Roberts, cc'ing you and others, right?
22      A.  Correct.
23      Q.  Okay.  And it's fair to say that people
24  in your organization were working with Paxar, right?
25      A.  Correct.

121

1      Q.  And in or around December of 2000, it
2  appears that Paxar was still having some of the
3  difficulties implementing the software that were
4  described in -- now I can't remember, but Sanderson
5  number -- was it 5?
6      A.  It was Cochran 4.
7      Q.  I'm sorry.  Cochran 5.
8      A.  Cochran 4.
9      Q.  4.  Is that fair to say?
10      A.  Yes.
11      Q.  And if you take a look at the next page,
12  Bates ending 331 -- actually, you know what.  Go
13  back to the first page.  The e-mail from Michael
14  Cochran starts out, "Victor Heschaft, Paxar's Vice
15  Chairman, has been dealing with an extremely
16  critical 11i implementation.  By all accounts from
17  those involved, this has been very ugly, and we've
18  put the customer through extreme hardship."  You see
19  that?
20      A.  Yes, I do.
21      Q.  Do you recall anything about the
22  implementation at Paxar?
23      A.  No, I don't.
24      Q.  Okay.  Do you know why Michael Cochran
25  may have cc'd you on this e-mail?

122

1      A.  Yes.  Even though it was George Roberts'
2  client, Oracle Consulting was involved, and so, he
3  copied Keith Block, he copied Tim Meehan, who ran
4  Consulting in the east.  And because Keith reports
5  in to me, he copied me as well.
6      Q.  Okay.  And do you know who Nick Mastro
7  is or was?
8      A.  Where do you see that?  I don't --
9      Q.  It's on the next page, bottom of the
10  next page ending 331.
11      A.  No, I don't know that name.
12      Q.  Okay.  Still looking at that same page,
13  in the middle of the page, do you see where it says
14  "Paxar's Contentions"?
15      A.  Yes.
16      Q.  "Paxar is refusing to pay the
17  $1.8 million license fee that was financed through
18  OFC but later assigned to an outside financing
19  source until such time as they go live on the
20  software which is now projected for March of 2001."
21  See that?
22      A.  Yes, I do.
23      Q.  And it's fair to say that you had this
24  information at the time, right?
25      A.  Yes, since I was copied on the e-mail.

123

1      Q.  All right.  And in this e-mail, it
2  appears, again, that OCS had logged 1700 hours of
3  nonbillable time.
4      A.  Just to be clear, it's the same 1700, I
5  think, that was referred to in Cochran 4.  It's not
6  a different 1700 hours.
7      Q.  How can you tell that?
8      A.  Because -- it is some speculation, I
9  acknowledge that, but if you look at Cochran 4 they
10  talk about Paxar.  It was written in approximately
11  the same period, and it mentions in Cochran 4,
12  17 hours of non -- hundred hours of nonbillable
13  hours.  And then in Roberts 5, page 331, down at the
14  bottom under "OCS," it mentions 1700 hours again.
15      Q.  Okay.  And did you know Al Snyder?
16      A.  Can you show me where his name is?  Oh,
17  here it is under "Support."  Yes.  Now, Al Snyder
18  worked for Randy Baker and, I believe, ran Americas
19  Support.
20      Q.  Okay.  And you see where it says "Al
21  Synder has agreed to fund some support relief to be
22  shared with Sales"?
23      A.  Yes, I do.
24      Q.  Do you know what's meant by "support
25  relief"?

124

1    MR. GIBBS: Objection. Calls for
2  speculation.
3    THE WITNESS: Yeah, it is speculating. But,
4  you know, periodically a client would have an issue,
5  and in resolving the issue, Support would -- might
6  JE a dollar amount from Support over to Sales.
7  BY MR. WILLIAMS:
8    Q. Okay. When you say "JE," you're talking
9  about journal entry?
10    A. Correct.
11    Q. And it would be -- withdrawn.
12    Let me show you what's been previously
13  marked as Block No. 7. It's Bates numbered
14  NDCA-ORCL 026981 through 982. I'll ask you just to
15  take a look at that document and let me know when
16  you're done.
17    A. Sure.
18    Okay.
19    Q. Okay. Do you recognize Block No. 7?
20    A. No, I don't.
21    Q. It appears to be an e-mail from Keith
22  Block to Michael Mayfield, cc'ing you on
23  January 8th of 2001, right?
24    A. Correct.
25    Q. And embedded in there is an e-mail from

125

1  Michael Mayfield to Keith and someone by the name of
2  John, right?
3    A. Yes.
4    Q. You see where Michael Mayfield -- well,
5  withdrawn.
6    Do you know Michael Mayfield?
7    A. The name is familiar, but I don't know
8  that I know him.
9    Q. Okay. How about John Wheeler?
10    A. Yes.
11    Q. And how do you know John Wheeler?
12    A. John Wheeler worked in Jay Nussbaum's
13  consulting organization at one point for quite a
14  while, and that's where I knew him. He actually was
15  in my organization for a brief period of time, but I
16  don't recall what his job was.
17    Q. Okay. Well, see where Michael Mayfield
18  writes to Keith, "Consulting and Support have both
19  been taxed by crises arising in the final stages of
20  many 11i and CRM implementation projects."
21    You see that?
22    A. Yes, I do.
23    Q. Did you disagree with that in January of
24  2001?
25    MR. GIBBS: Objection. Lack of foundation.

126

1    THE WITNESS: No, I wouldn't disagree.
2  Again, as a reminder, it was a large, integrated
3  system, and in the November, December, January
4  timeframe is when a lot of those initial projects --
5  the first implementation of the 11i was being done.
6  BY MR. WILLIAMS:
7    Q. But a lot of those customers in
8  January -- in those months, November, December and
9  January -- withdrawn.
10    A lot of those customers in November,
11  December of 2000 and January of 2001 were
12  implementing either 11i.2 and .3; isn't that fair?
13    MR. GIBBS: Objection. Lack of foundation.
14    THE WITNESS: I don't -- I don't know.
15  BY MR. WILLIAMS:
16    Q. Or they had installed patches from 11i.2
17  and 3, right?
18    MR. GIBBS: Objection. Lack of foundation.
19    THE WITNESS: I would speculate that they
20  were installing the most current versions of their
21  particular project. Again, following the kind of
22  outline that Kevin Glynn identified in Sanderson
23  Exhibit 4.
24    Q. Right. And Sanderson Exhibit 4 is
25  dated -- that's in October e-mail, right?

127

1    A. Yes.
2    Q. All right.
3    A. Was there a significance to the question
4  about that it was in -- but it was an October
5  e-mail?
6    Q. No.
7    A. Okay.
8    Q. Looking at the message from Mayfield to
9  Keith, he also says in the body there in the second
10  paragraph, last sentence, "These delays are
11  frequently due to defects or functional shortcomings
12  in our products." Do you see that?
13    A. Yes, I do.
14    Q. You didn't disagree with that either,
15  did you?
16    MR. GIBBS: Objection. Vague, lack of
17  foundation.
18    THE WITNESS: There were issues, but it was a
19  brand-new product. And no matter how good the
20  product is, when we all buy software, we all buy a
21  house, we all buy a car, we always can find things
22  we'd like to see a little bit better.
23  BY MR. WILLIAMS:
24    Q. Sure. And so, Keith Block forwarded
25  this e-mail -- well, withdrawn.

128

1    Keith Block wrote to Mike, "I have a
2  directs meeting at the end of the month in
3  Washington.  Can you attend and present this to my
4  team?"
5    A.  Uh-huh, yes.
6    Q.  And he cc'd you on that?
7    A.  Yes.
8    Q.  All right.  Do you know if that
9  presentation occurred?
10    A.  No, I don't.  I have no reason to
11  believe it didn't.
12    Q.  Okay.  I'll show you what's been
13  previously marked as Roberts No. 14.  It's Bates
14  numbered NDCA-ORCL 052475 through 478.  Ask you to
15  take a look at that and let me know when you're
16  done.
17    A.  Okay.
18    Q.  Okay.  Do you recognize Roberts No. 14?
19    A.  I do not.
20    Q.  Okay.  It's an e-mail from -- well, it's
21  a series of e-mails that you either sent or received
22  or were copied in January of 2001, right?
23    A.  Yes.
24    Q.  And why don't we just go to page ending
25  476.

129

1    A.  Uh-huh.  Yes.
2    Q.  Just a second.  Do you know who Sandy
3  Moffat is or was?
4    A.  I do not.
5    Q.  How about Mark Aboud?
6    A.  I don't.  I don't.
7    Q.  Okay.  Robert Richards?
8    A.  I do not.  I believe they were in the
9  Canadian sales business.
10    Q.  And that was part of your organization
11  at the time?
12    A.  No.
13    Q.  No?  Who ran Canada Consulting?
14    A.  I ran Canada Consulting.  Canada sales
15  business was run by George Roberts.
16    Q.  Okay.  Why don't we go to the next page,
17  477.  And top of the page, it looks like it has
18  Sandy Moffat's title there.  Looks like senior
19  market director Oracle Consulting Canada.
20    A.  Yes.
21    Q.  So, that was within your organization,
22  correct?
23    A.  Correct.
24    Q.  Okay.  Were you familiar with an
25  implementation project at Hudson Bay in January of

130

1  2001?
2    A.  Vaguely.  I remember meeting with an
3  executive from Hudson Bay at an Oracle event.  I
4  believe it was here in San Diego.  But I don't
5  remember much more than that or anything beyond
6  that --
7    Q.  Okay.
8    A.  -- at this point.
9    Q.  All right.  Well, looking at the e-mail
10  from Sandy Moffat to Mark Aboud on Bates ending 476,
11  he writes, "Mark, it's come to my attention this
12  morning that we have a very serious situation at
13  Hudson's Bay.  HBC has put 11i SSE into limited
14  production over the past few weeks."
15    Do you know what SSE is?
16    A.  I'm speculating, but I think it's
17  Self-Serve Expenses.
18    Q.  Right.
19    A.  It's a module or a program within ERP.
20    Q.  Okay.  He further writes, "The
21  implementation is being done by Oracle Consulting
22  and was delayed by a number of weeks due to multiple
23  product issues but has recently limped into limited
24  production use."  See that?
25    A.  Yes, I do.

131

1    Q.  Do you have an understanding what is
2  meant by "limited production use"?
3    A.  Most likely, it means that part of
4  Hudson Bay's employees or some section of Hudson Bay
5  employees were using the product.  It had not been
6  rolled out company-wide.
7    Q.  And I see where he writes, "There are
8  several outstanding issues being worked on by
9  Development, but the most serious is a bug," and it
10  has the number, "that will not allow SSE entry to be
11  split into individual items.  This is an absolute
12  showstopper."  You see that?
13    A.  Yes.  Very specific issue, yes.
14    Q.  Right.  And "absolute showstopper" means
15  that without this being fixed, the application won't
16  work, right?
17    MR. GIBBS:  Objection.  Lack of foundation.
18    THE WITNESS:  In this particular case for
19  Hudson Bay, it was an issue.  It had a very specific
20  bug number associated with it.  I can't say what
21  "showstopper" means.  Obviously, it's a significant
22  issue for that customer at that point in time.
23  BY MR. WILLIAMS:
24    Q.  In fact, if you go down further, Sandy
25  says, "This is a disaster for the project team, and

132

1 the customer's extremely angry." See that?

2     A. Yes, I do.

3     Q. Further down he writes, "Due to the fact

4 that these product issues have set them so far

5 behind, the customer is threatening to pull out SSE

6 due to product instability and look to Oracle to

7 recover product and implementation costs." Do you

8 see that?

9     A. Yes, I do.

10     Q. Do you know whether they did that?

11     A. I do not.

12     Q. He also writes, "Cancel or delay phase 2

13 due to product instability and support levels." See

14 that?

15     A. Yes, I do.

16     Q. Do you know whether they cancelled or

17 delayed Phase 2?

18     A. I do not.

19     Q. He further indicates that there's a PO

20 in place for $2.5 million to complete this project.

21 Revoke their offer to become an 11i showcase

22 reference account until further notice." Do you see

23 that?

24     A. Yes, I do.

25     Q. Do you know whether Hudson Bay revoked

1 their offer to become an Oracle 11i showcase

2 reference customer?

3     A. I do not.

4     Q. Finally, it says, "They've also

5 indicated that they will not be too interested in

6 our CRM and Customer Loyalty solutions at this

7 time." See that?

8     A. Yes, I do.

9     Q. He further writes, "All in, it looks

10 like this could potentially cost us $4 million in

11 future business plus anything that they feel they

12 can recover from us." See that?

13     A. Yes.

14     Q. Does that refresh your recollection at

15 all with respect to the Hudson Bay account in

16 January of 2001?

17     MR. GIBBS: Objection. Lack of foundation.

18     THE WITNESS: It does not.

19 BY MR. WILLIAMS:

20     Q. And going to the Bates number 475, see

21 in the bottom half of the page, Sandy Moffat writes

22 another e-mail to Michel Lozeau?

23     A. Michel Lozeau.

24     Q. Michel Lozeau.

25     A. I'm assuming you know that person.

1     Q. Yes.

2     A. It's a guy. He's a French Canadian, and

3 he ran the Canadian Consulting practice at that

4 time.

5     Q. Did he report directly to you?

6     A. No, he did not.

7     Q. Who did he report to?

8     A. To Keith.

9     Q. Keith. You see where Sandy writes, "I'm

10 wondering if we may want to copy Sandy Sanderson on

11 this. Sandy's been asked to talk to HBC at

12 Appsworld and has been sent a briefing document on

13 the account." Do you see that?

14     A. Yes, I do.

15     Q. Were you sent a briefing document on

16 this account?

17     A. I don't recall.

18     Q. Okay. What is a briefing document?

19     A. It would be a document that described

20 who the client is, who the -- you know, the company

21 Hudson Bay is, what their revenues are, what their

22 lines of business are, how they're organized, who

23 the individual is that I'm meeting with, what the

24 opportunities are both on product and on the license

25 and consulting side, history of the company with

1 Oracle product, and any issues they might have.

2     Q. So, it's fair to say that if you

3 received this briefing document that you would have

4 gotten a lot of information concerning their

5 implementation problems too, right?

6     A. That typically would be included in a

7 document like that, yes.

8     Q. Okay. And it looks like you actually

9 got this e-mail because Michel forwarded it to you,

10 right?

11     A. Yes, that's correct.

12     Q. And then you wrote to Ron Wohl, "Can you

13 please check into this? This client is pro Oracle

14 but the relationship is being challenged with an

15 issue around Self Service Expense." Right?

16     A. Yes.

17     Q. And do you know whether you met with

18 this client at Appsworld in --

19     A. Yes. I indicated in my --

20     Q. I'm sorry. Just let me finish my

21 question.

22     A. Sure.

23     Q. -- in early 2001?

24     A. I can't say it was early 2001. As I

25 said earlier, just a bit earlier in my testimony, I

1  do remember meeting with an executive from HBC.
2      Q.  Do you remember who that was?
3      A.  I do not.
4      Q.  Do you remember anything about the
5  conversation?
6      A.  I don't.  I just -- I remember that it
7  was a Canadian client, and I remember the name.
8      Q.  Do you know whether or not Oracle lost
9  any future business with HBC due to problems with
10  the applications implementation issue?
11     A.  I do not.
12     Q.  Do you know where that information could
13  be found?
14     MR. GIBBS:  Objection.  Lack of foundation.
15     THE WITNESS:  Not off the top of my head, no.
16  BY MR. WILLIAMS:
17     Q.  The document refers to Appsworld, I
18  guess in the early part of 2001, right?  At least
19  with respect to you being asked to talk to HBC at
20  Appsworld.
21     A.  Correct.
22     Q.  Describe for me very briefly what
23  Appsworld is.
24     A.  Appsworld is a pretty major event where
25  customers and prospective customers come to hear

137

1  presentations.  And Larry would typically speak at
2  those events.  He'd be a keynote speaker.  We might
3  have a former president speak at it.  We had Bill
4  Clinton speak at one.  We might have the CEO of HP
5  or Scott McNeely from Sun Microsystems speak.  So,
6  it would be that.
7      Then the next level of presentations
8  would be speakers from Oracle.  Heads of Development
9  or the different development groups would speak.  I
10  typically spoke at Appsworld.  We would also have
11  breakout sessions where clients could meet on
12  specific issues -- I mean, specific items around the
13  product.  It might be -- for example, it might be
14  how to implement financial applications.  Or it
15  might even be a specific application even more
16  specific than that.  Those are -- and it typically
17  was well attended.  Some 20,000 people would be a
18  guess and would go over three to five days.
19     Q.  And you said you typically spoke at
20  those --
21     A.  Yes.
22     Q.  -- types of events?
23     And prior to speaking at those events,
24  would you meet with Oracle's Public Relations
25  members or Investor Relations -- people in Public

138

1  Relations or Investor Relations?
2      A.  I don't remember around Appsworld doing
3  that, meeting with those people.  I'd meet with
4  Marketing, but I don't remember specifically meeting
5  with Investor Relations.
6      Q.  Do you know Stephanie Aas?
7      A.  Yes, I remember Stephanie.
8      Q.  And how do you remember her?
9      A.  I remember she was in either PR or
10  Investor Relations.  I don't remember which.  I
11  think it was PR.  And, you know, I mean, that's --
12  she was in that organization.
13     Q.  How about Jennifer Glass?
14     A.  I remember that name as well.
15     Q.  And how do you remember her?
16     A.  In -- being in PR or in charge of PR at
17  Oracle at one point.
18     Q.  And is it fair to say that you would
19  meet with members of Public Relations or Investor
20  Relations prior to speaking to at least analysts?
21     A.  Correct.
22     Q.  And they would prepare presentations for
23  you or help prepare presentations for you?
24     MR. GIBBS:  Objection.  Compound.
25     THE WITNESS:  I don't know if they prepared

139

1  the presentations.  They may have at some of the
2  times.
3  BY MR. WILLIAMS:
4      Q.  But you'd meet with them -- withdrawn.
5      Would they be the ones that set up the
6  meetings with analysts for you?
7      A.  Correct.
8      Q.  And so, they'd tell you the time and
9  date, right?
10     A.  Yeah.  Sometimes I'd make a sweep
11  through -- I say "a sweep."  I might go to New York
12  and meet with several analysts.
13     Q.  And they also briefed you on issues that
14  the analysts were interested in hearing about?
15     A.  Yes.  I mean, you say "issues," I mean
16  it would be matters or topics that they would want
17  to talk about.
18     Q.  Right, topics that they would want to
19  talk about.
20     And they would do that by sending you a
21  list of topics that you should expect to be asked
22  about?
23     A.  I don't remember getting a list.  I
24  can't say they didn't, but I don't recall a list or
25  anything of that nature.  Typically, they would come

140

1    meet with me in an office, and we would talk about
2    the presentation.  They would give me some
3    background on the analysts we were going to meet --
4    I was going to meet with, that kind of thing.
5        Q.   When you said you'd go through the
6    presentation, are you talking about, like, maybe a
7    PowerPoint type presentation that somebody prepared
8    for you?
9        A.   Correct.
10       Q.   And did you have someone in your
11   organization that prepared those things for you?
12       A.   It may have been some folks in my
13   organization.  It could have been somebody out of
14   Marketing.  It could have been somebody out of PR.
15   It could have been an organization that Jeff Henley
16   used in speaking to in some public setting that they
17   would use that presentation or some form of that.
18       Q.   And would you also do those analysts
19   presentations during Appsworld-type events?
20       A.   I don't remember speaking to analysts at
21   Appsworld.  I'm not saying I didn't, but I don't
22   remember -- my recollection of analysts is they
23   typically had a fairly big ego, and that meant you
24   went to them and they didn't come to you.
25       Q.   Okay.  And was -- when you met with

141

1    analysts, were they at fixed times, or were they at
2    times when maybe Jennifer or Stephanie may say to
3    you, "Hey, we want you to go out and talk to these
4    guys 'cause they have questions about certain
5    topics"?
6        A.   Do you mean fixed times in the sense
7    regularly scheduled times each year --
8        Q.   That's what I meant.
9        A.   -- or time periods?  No, I mean, it
10   would be random.
11       Q.   Random?
12       A.   It would be periodic.  Yeah,
13   periodically, we would go out and do that.
14       Q.   Okay.  So, the timing of the meetings
15   with analysts would be set by either a request by
16   them or a request by PR or Investor Relations?
17       A.   Correct.
18       MR. WILLIAMS:  Okay.  I'm going to show
19   you -- hold on a second.
20          I'll ask the reporter to mark this
21   document -- where are we at, Sanderson 6?  And it's
22   Bates stamped NDCA-ORCL 143064.
23          (E-mail dated 2/6/01 re GE strategy
24   marked Exhibit 6 for identification.)
25   / / /

142

1    BY MR. WILLIAMS:
2        Q.   I'm going to ask you to take a look at
3    that document and let me know when you're done.
4        A.   Okay.
5        Q.   You recognize Sanderson 6?
6        A.   I don't recognize the e-mail.  I
7    remember the issue.
8        Q.   Okay.  What do you remember about the
9    issue?
10       A.   What's portrayed in the e-mail, and that
11   was -- at Oracle, you have a list price for a
12   product.  And then every time -- or virtually every
13   time we were discounting off that list.  GE was a
14   demanding client, and they would leverage their
15   scale with us in the sense that -- if I remember
16   right, this Mastrioni was in a corporate function,
17   so that whenever we were buying product they would
18   remind us of just how large GE was and how important
19   a customer it was to us, as opposed to just working
20   a CIO of one of their divisions.  And they wanted --
21   they would want the absolute best discount that we
22   would provide, and we would have to work with them
23   in that regard.
24          The real focus was, what Larry was
25   saying was, they've got a good product.  We're doing

143

1    the implementation very quickly for them.  Rice -- I
2    can't remember his first name -- who was the CEO of
3    GE Power was very satisfied and -- and -- was very
4    satisfied.
5          As you might imagine, the CEO of
6    GE Power kind of stayed out of the negotiation
7    piece.  Mastrioni was in there being the bad guy, so
8    to speak, the one that was the tough negotiator,
9    asking that our price be lower.
10       Q.   Okay.  So, Sanderson No. 6 is an e-mail
11   from you to Steve McLaughlin, right?
12       A.   Correct.
13       Q.   In or around February 6th of 2000?
14       A.   Correct.
15       Q.   And it's related to the GE strategy,
16   like you've explained.
17       A.   Right.
18       Q.   Who's Robert Evans, do you know?
19       A.   As I recall, Robert Evans was the
20   account executive, the same as account manager,
21   Shawn.  But just because it was GE, more experienced
22   individual that had responsibility for all of our GE
23   business.
24       Q.   Okay.  You write to Stephen that "We
25   have strong products, and they are being" -- well,

144

1  withdraw.
2      You're actually telling him about a
3  discussion that was had at the executive committee
4  meeting, right, or a recent executive committee
5  meeting?
6      MR. GIBBS: Objection. Lack of foundation.
7      THE REPORTER: I'm sorry?
8      MR. GIBBS: Objection. Lack of foundation.
9      THE WITNESS: What that sentence means, I
10  recall talking about GE at one or more executive
11  committee meetings. Larry was personally involved
12  in working with Rice, the CEO. He would have
13  frequent discussions with him and getting -- and
14  Larry would get the feedback from Rice exactly how
15  the project was going.
16  BY MR. WILLIAMS:
17      Q. Okay. And you write to Steve, "We have
18  strong products, and they're being well received
19  within the GE business. Not surprisingly, Larry
20  cites GE Power as the primary example. We will have
21  a major GE Power plant up and running. Minimal
22  changes to the software within four (that's what
23  Larry says) months." See that?
24      A. Yes, correct.
25      Q. When you write "That's what Larry says,"

145

1  did you not agree with the representation that it
2  was four months?
3      A. No. I didn't -- I hadn't spoken to the
4  project team personally. Four months is an
5  aggressive period of time, Larry had told me
6  that, and I was passing that on to Steve.
7      Q. Do you know whether or not it was true?
8      A. I don't recall that it wasn't true.
9      Q. You don't recall that it was not true?
10      A. Right. Let me be clear 'cause I always
11  get caught up on double negatives. I have no reason
12  to believe it wasn't true.
13      Q. Okay. And were you -- were members of
14  your consulting staff doing the work, the
15  implementation work, at GE Power?
16      A. We had some involvement from my
17  business, I recall, but it was GE Power in Hungary,
18  and so, that would have involved EMEA Consulting as
19  well. We probably had a blended or virtual team.
20      Q. You also write, "Larry challenged why is
21  our GE Power price for ERP so low? I told him 20
22  million. He does not want to reduce the price to
23  handle GE economic pressures." See that?
24      A. Yes.
25      Q. Was the 20 million you're referring to

146

1  here the consulting portion?
2      A. No. That would have been license sales.
3      Q. The license. And what did you mean when
4  you referred to "GE economic pressures"?
5      A. Putting pressure on us to reduce our
6  price.
7      MR. WILLIAMS: Let me show you what's been
8  previously marked as Wohl No. 39. It's Bates
9  numbered NDCA-ORCL 063438 and 39.
10      THE WITNESS: Okay.
11  BY MR. WILLIAMS:
12      Q. Okay. Do you recognize Wohl No. 39?
13      A. I do not.
14      Q. It's a series of e-mails between you and
15  senior management and other members of Oracle staff,
16  correct?
17      A. Yes.
18      Q. The latest one being February 19, 2001,
19  e-mail from you to Ron Wohl?
20      A. Uh-huh. Yes.
21      Q. Do you know Gray Reiner?
22      A. Gary Reiner. It should say "Gary." I
23  didn't -- I didn't know him, but I know at that point
24  he reported directly to Jack Welsh.
25      Q. And was Tony Kender a person in your

147

1  organization?
2      A. No. He was in George Roberts'
3  organization and had responsibility for payroll and
4  benefit application, sales.
5      Q. Do you know why Tony Kender sent this
6  letter e-mail to you, the February 16th e-mail?
7      A. Yeah. This was somewhat of a unique
8  situation. I had responsibility ultimately for GE
9  in all our applications and technology sales there
10  except one, and that was HR and benefits. And Tony
11  Kender was brought in to sell HR and benefits.
12      So, he actually reported in to George
13  Roberts' organization, so George's organization,
14  through Tony, would sell directly into GE for HR and
15  payroll. But because it was my account, I'm sure
16  that's why I was copied.
17      Q. And it appears that Gary Reiner and GE
18  are thinking about buying PeopleSoft HR, right?
19      A. Yes.
20      Q. And do you know whether they actually
21  did buy PeopleSoft HR?
22      A. I don't recall.
23      Q. Did they buy Oracle HR?
24      A. I don't recall. It was a very typical
25  tactic of GE to leverage Oracle with another -- or

148

1   put Oracle up against another company like that.
2       Q.  Well, PeopleSoft was a major competitor
3   at the time, wasn't it?
4       A.  Yeah, they were.  And -- but it was not
5   unusual for them to do that and negotiate a deal and
6   then play one off the other.
7       MR. WILLIAMS:  I'm going to ask the reporter
8   to mark this document as Sanderson No. 7.  It's
9   Bates numbered 099861 with the NDCA-ORCL prefix.
10      (E-mail dated 3/11/01 re Consulting -
11   Food for Thought marked Exhibit 7 for
12   identification.)
13   BY MR. WILLIAMS:
14      Q.  Ask you to just take a look at that
15   document and let me know when you're done.  It's a
16   little off topic, but . . .
17      A.  Okay.
18      Q.  Sebastian Gunningham reported to you in
19   March of 2001?
20      A.  Correct.
21      Q.  And Exhibit No. 7 is an e-mail from him
22   to you on March 11th?
23      A.  Yes.  This is when he was running Latin
24   America sales and consulting.
25      Q.  Okay.  He writes to you, "Sandy, I came

149

1   away last week with some concern about our
2   consulting business.  I think we're going to hit a
3   wall very soon.  Some feedback from the GMM Week
4   senior salespeople.  I'll tell you where most of
5   this came from when we speak."  See that?
6       A.  Yes.
7       Q.  What's GMM Week?
8       A.  Global Manager Meeting Week.  We would
9   bring in probably the top 200 managers from around
10   the world for a week.  I say "we."  Larry would do
11   that.
12      Q.  Larry.  You see where he writes -- well,
13   withdrawn.
14      Then he goes on to write, "OCS should be
15   halved.  OCS is the inhibitor to our partner
16   program.  OCS will be the last to adjust their cost
17   structure for fixed price.  OCS does not want to do
18   FFs."  See that?
19      A.  Correct.
20      Q.  What are FFs?
21      A.  I assume he means fixed-fee bids or
22   fixed-price bids.
23      Q.  All right.  And that's because --
24      A.  Oh, no, no, no.  I don't -- I don't
25   know.  I can think of something else as well.  I

150

1   don't know what FFs is.
2       Q.  Do you have an idea?  Do you have a
3   guess?
4       A.  Either fixed price --
5       MR. GIBBS:  Objection.  Calls for
6   speculation.
7       THE WITNESS:  Yeah, I'm speculating.  Either
8   fixed price, or we had a specific way to implement
9   our applications very quickly, typically for very
10   small customers, called Fast Forward.  And that
11   would be the other thing that FF stands for.
12   BY MR. WILLIAMS:
13      Q.  Do you know what he meant when he wrote
14   "OCS is the inhibitor to our partner program"?
15      A.  Yes.
16      Q.  What does that mean?
17      A.  We had this delicate balance at Oracle
18   of -- of selling our license -- selling our
19   products and getting them implemented correctly with
20   Oracle Consulting and with other companies such as,
21   at that time, Price Waterhouse, which is now IBM
22   Consulting; Bearing Point; Accenture; Cap, Gemini,
23   Ernst & Young, et cetera.
24      And the -- and there is a natural
25   competitive challenge between those organizations

151

1   and Oracle Consulting.  And what Sebastian is
2   arguing here is -- what he's talking about is Oracle
3   Consulting was aggressive when it went after
4   implementations, and that would inhibit our partners
5   working with Oracle Consulting or selling Oracle
6   product potentially.
7       MR. WILLIAMS:  I'll ask the reporter to mark
8   this document as Sanderson No. 8.  It's Bates
9   numbered NDCA-ORCL 101535 through 537.
10      (E-mail string dated 3/01 re Beckman
11   Update marked Exhibit 8 for identification.)
12      MR. WILLIAMS:  Just let me know when you're
13   done.
14      THE WITNESS:  Okay.  Okay.
15   BY MR. WILLIAMS:
16      Q.  Do you recognize Sanderson 8?
17      A.  No, I do not.
18      Q.  It's a series of e-mails between you and
19   members of Oracle staff in March of 2001, right?
20      A.  Correct.
21      Q.  And regarding a customer Beckman?
22      A.  Correct.
23      Q.  Is that Beckman Coulter?
24      A.  I believe it is.
25      Q.  And did you know that Beckman Coulter

152

1    had difficulty implementing 11i applications?

2    MR. GIBBS:  Objection.  Lack of foundation.

3    You can answer.

4    THE WITNESS:  I vaguely remember something.

5    I don't remember the specifics.

6    BY MR. WILLIAMS:

7    Q.  What do you remember generally?

8    A.  I just mean that I -- I remember there

9    were questions about it, and I remember talking to

10   Max about it, Max Hill, who was my regional manager

11   for Southern California who had responsibility for

12   Beckman.

13   Q.  But you don't remember the discussion?

14   A.  No.

15   Q.  And this is kind of one of those areas I

16   was trying to get at earlier in terms of the

17   relationship between Consulting and Support.

18   A.  Uh-huh.  Yes.

19   Q.  You know Michael Rocha, right?

20   A.  Yes, I do.

21   Q.  And did he run Support in March of 2001?

22   A.  To the best of my recollection, he did.

23   Q.  Okay.  Looking at the bottom of 535, you

24   write to -- can't tell who it's to, but my guess is

25   that it's to either Michael Rocha, Dick Sellers,

153

1    people in Support.

2    And you write, "As we have discussed, we

3    need to get on this client quickly.  I'm not sure

4    how there could have been confusion on which

5    account.  This has been a burning issue for a number

6    of weeks.  Also I appreciate you [sic] commitment to

7    absorb the cost for the onsite support until

8    September and delay the support payment until

9    September.  Our hope that this and the commitment

10   being made by Consulting will keep the client from

11   taking legal action."  See that?

12   A.  Yes, I do.

13   Q.  What did you mean when you wrote "I

14   appreciate you," your, "commitment to absorb the

15   cost for onsite support"?

16   A.  I agree with you that I think this was

17   from me to one of the two individuals you mention in

18   Support.  And I believe what Support had done here

19   was commit to foregoing a portion of their

20   support -- the cost of their onsite support.

21   So, in other words, Support typically

22   doesn't work on site at a customer.  And they

23   work in Redwood Shores and do it through -- via

24   telephone and other electronic communications.

25   Periodically, they would go on site.  As I recall,

154

1    it was fairly rare.

2    And they were on site helping that

3    client be successful.  And what they were saying

4    here is -- what I was acknowledging is that Support

5    was not going to charge for that on-site support.

6    Q.  And you also indicate that, "Our hope

7    that this and the commitments being made by

8    Consulting will keep the client from taking legal

9    action."  What commitments had Consulting made to

10   Beckman Coulter in or around March of 2001?

11   A.  I don't recall, but if I said

12   "commitment from Consulting, it would have entailed

13   something to do with putting skilled resources in

14   place to help them work through whatever the issues

15   were.

16   Q.  Very likely, at the cost of Oracle?

17   MR. GIBBS:  Objection.  Lack of foundation.

18   THE WITNESS:  It would be speculation on my

19   part.  I -- I'd say there's a reasonable probability

20   that's the case.

21   BY MR. WILLIAMS:

22   Q.  Okay.  And did you know -- withdrawn.

23   Well, you knew there was at least some

24   chance at this point that Beckman Coulter was going

25   to take legal action against Oracle?

155

1    A.  That's what the e-mail says.  I don't

2    recall that specifically or any context for that.

3    Q.  Do you know if they actually took legal

4    action against Oracle?

5    A.  I don't recall any, but I don't recall

6    specifically.

7    Q.  Do you know whether there were customers

8    in the 2000, 2001 time frame that did in fact take

9    legal action against Oracle with respect to their

10   implementation of 11i?

11   A.  I don't recall any.

12   Q.  If customers did take legal action

13   against Oracle with respect to their implementation

14   of 11i, is that something that you would have known

15   at the time?

16   A.  Absolutely.

17   MR. GIBBS:  Objection.  Calls for

18   speculation.

19   THE WITNESS:  I'm sorry.

20   BY MR. WILLIAMS:

21   Q.  Absolutely?  And why is that?

22   A.  Because I cared about my customers.  And

23   if it got to the point that they took legal action,

24   I would know it ahead of time, that they were

25   considering that and they, in fact, took it.  And I

156

1  don't recall any client doing that, any customer.

2      Q.  And you -- is it fair to say that you

3  would do what you can to kind of make the customer

4  happy before it got to that point --

5      A.  Correct.

6      Q.  -- is that fair?

7          Kind of like what's -- at least what

8  seems to be depicted in Sanderson No. 8?

9      A.  That's correct.

10     Q.  All right.  You see where Michael Rocha

11 writes to Max Hill, the top portion of the e-mail in

12 the second paragraph, he says, "Anyway, we want to

13 do what's right here.  The customer hasn't been able

14 to implement a portion of the application because of

15 product issues.  We're willing to work with you

16 guys" t-p --

17     A.  I think it's "to."

18     Q.  -- or to "make them whole by providing

19 services at no charge."  See that?

20     A.  Yes, I do.

21         I think this highlights a question you

22 had earlier, Shawn, about Support and Consulting

23 working together, and I think that's a good example

24 of that happening.

25     Q.  So, Support would make a commitment

157

1  possibly, and Consulting may make a commitment in

2  order to make the customer happy?

3      A.  Yeah.  It -- it didn't always happen

4  that way.  In fact, as I recall, it was typically --

5  that was not typically the case, but it was not

6  unusual.

7          MR. WILLIAMS:  Maybe this is a good time to

8  take a break.

9          MR. GIBBS:  Sounds good.

10         THE VIDEOGRAPHER:  Off the record at

11 12:56 p.m., and this marks the end of Videotape No.

12 2, Volume I, in the deposition of Edward Sanderson.

13         (Lunch recess taken at 12:56 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

158

1  SAN DIEGO, CALIFORNIA, TUESDAY, JULY 25, 2006

2              1:50 P.M.

3

4          THE VIDEOGRAPHER:  We are back on the record

5  at 1:50 p.m., and this marks the beginning of Tape 3

6  of Volume I of the deposition of Edward Sanderson.

7          At this time I'd like to note for the

8  record additional attendees who have made an

9  appearance via the LiveNote stream service during

10 this morning's session.  These individuals are

11 Jennie Anderson, Willow Radcliffe and Keith Mautner,

12 all with the firm of Lerach Coughlin.  Thank you.

13         MR. WILLIAMS:  Just for the record, Monique

14 Winkler is present at the deposition on behalf of

15 plaintiffs.

16 BY MR. WILLIAMS:

17     Q.  Mr. Sanderson, I'm going to show you

18 what's been previously marked as Jarvis No. 15.

19 It's Bates numbered NDCA-ORCL 121704 through 707.

20         Just ask you to take a look at it and

21 let me know when you're done.

22     A.  Okay.

23     Q.  Okay.  Do you recognize Jarvis No. 15?

24     A.  I do not.

25     Q.  It's an e-mail from Larry Ellison to

159

1  George Roberts, cc'ing you, right?

2      A.  Me, along with a number of other people,

3  correct.

4      Q.  Right.  Forwarding an e-mail regarding

5  Papa John's?

6      A.  Correct.

7      Q.  In the fall of 2000 and the early part

8  of 2001, did you have members of your consulting

9  staff working on a Papa John's implementation?

10     A.  I -- as I recall, we had some level of

11 involvement, yes.

12     Q.  I'm sorry.  You had some --

13     A.  Some level of involvement.  Oracle

14 Consulting was involved, as validated by this series

15 of e-mails.

16     Q.  Where do you see that validation?

17     A.  Page 121706 under "Action Plan," the

18 very first sentence.

19     Q.  Okay.  And looking at the first page

20 where Larry Ellison writes, "Okay.  I want all

21 escalated customers to belong to Development

22 managers," did you know what he meant by the phrase

23 "escalated customers"?

24     A.  These would be customers that -- that

25 were getting the most attention within Oracle around

160

1  the product, and he wanted a product development
2  manager to be responsible for each of those
3  customers.
4      Q.  And why were they getting the most
5  attention?
6      A.  Typically, because there were issues
7  around their implementation of their product.
8      Q.  They were having some difficulty
9  implementing --
10     A.  Correct.
11     Q.  -- 11i?
12         Okay.  And did you have someone in your
13 organization responsible for monitoring escalated
14 customers?
15     A.  No.  We tend -- as I recall -- well, I
16 say "no."  In Valerie Borthwick's organization
17 under, for example, Kevin Glynn, who ran the
18 applications global service line, he would track
19 those, and then we would have the folks in the
20 applications service lines be involved with those
21 escalated customers.
22     Q.  Do you recall -- well, withdrawn.
23         See where Larry writes, "We will meet on
24 this Wednesday to review every escalated customer
25 and every product quality rating"?  See that?

161

1      A.  Yes, I do.
2      Q.  Do you recall being present at that
3  meeting?
4      A.  No, I do not.
5      Q.  Okay.  Do you think you were there?
6      A.  I'm not convinced I am because what --
7  it goes on with the second sentence after that, it
8  talks about the Thursday applications meetings.  And
9  so, I don't know who is "we."  It could well have
10 been, since Larry was not only the chairman/CEO but
11 head of Development, he may have been holding --
12 saying he was going to hold a meeting within
13 Development on these accounts.
14     Q.  Okay.  Going down to the bottom part of
15 the document, there's an e-mail from George
16 Roberts --
17     A.  Yes.
18     Q.  -- right?
19         And he writes, at least the second or
20 third sentence in, "Over the last several years,
21 we've enjoyed a chuckle or two as we read headlines
22 on our competitors' clients and their inability to
23 implement the software they bought from them."  See
24 that?
25     A.  Yes.

162

1      Q.  It also says, "We have avoided all of
2  this ink in the press, but that may be about to come
3  to an end.  I have six situations like this or more
4  depending on the day of the week.  I don't have all
5  the answers for this, but it's time to get more
6  focused and organized on this situation as well as
7  the rest of them from NAS, OPI and OSI."  See that?
8      A.  Yes, I do.
9      Q.  Do you know what accounts in OPI he may
10 have been referring to here?
11     A.  No, I do not.
12     Q.  But it's true that OPI did have
13 implementations that were, at the very least,
14 difficult in this period of time, March of 2001,
15 right?
16     A.  Yes.  We've referred to a couple of them
17 during this deposition.
18     Q.  Do you recall whether or not you or
19 members of the executive staff paid more attention
20 to these situations after, say, March of --
21 March 23rd, 2001?
22     A.  Whether we paid more attention --
23     Q.  Uh-huh.
24     A.  -- after -- what's the significance of
25 March 23rd?

163

1      Q.  Well, that's just the date of this
2  e-mail.
3      A.  No.  If there was an issue with a
4  customer, as soon as it was brought to my attention,
5  I paid attention to it, regardless of the date.
6      Q.  Did you know whether Larry Ellison
7  became more involved in those escalated-type
8  customers after March 23rd, 2001?
9          MR. GIBBS:  Objection.  Lack of foundation.
10         THE WITNESS:  Do I know if Larry became more
11 involved with those escalated customers after
12 March 23rd?  Is that the question?
13         MR. WILLIAMS:  Yes, it is.
14         THE WITNESS:  I don't recall.  I mean, I
15 would say they -- clearly, in his e-mail here, he's
16 putting interest on it, and it became a priority
17 topic within the -- products leadership meeting.
18 BY MR. WILLIAMS:
19     Q.  Were you at those product leadership
20 meetings?
21     A.  I was not.  Nor was I invited.
22     Q.  Was anyone from your team involved in
23 those meetings?
24     A.  No.
25     Q.  Let me show you what's been --

164

1    A.  None that I recall.

2    Q.  Okay.  Let me show you what's been

3  previously marked as Block 23.  It's on an issue

4  that we've talked about a little bit already.  It's

5  Bates numbered NDCA-ORCL 278125 through 127.  Just

6  ask you to take a look at that e-mail and let me

7  know when you're done.

8    A.  Okay.

9    Q.  Okay.  This appears to be an e-mail from

10  Keith Block to Ron Wohl on or around Friday

11  March 23rd, 2001, right?

12    A.  Correct.

13    Q.  And discussing Paxar that you and I have

14  discussed a little bit today, right?

15    A.  Several times.

16    Q.  If you look at 278127, I think that's

17  the page you're looking at right now --

18    A.  Yeah.

19    Q.  -- it appears that Keith writes to Ron,

20  "I understand that Tim spoke with Don regarding help

21  in funding the upgrade (third each for Sales,

22  Consulting, Development) and was turned down.  Ron,

23  my team has already eaten 1.5 million on product

24  quality issues in this account."  See that?

25    A.  Yes, I do.

165

1    Q.  Do you know what Keith was referring to

2  when he -- when he refers to "product quality

3  issues"?

4    MR. GIBBS:  Objection.  Calls for

5  speculation.

6    THE WITNESS:  I would imagine it's related to

7  the 1700 hours that was referenced in previous

8  documents.

9  BY MR. WILLIAMS:

10    Q.  Right.  But I'm specifically talking

11  about the phrase "product quality issues."  Do you

12  know what he means by that?

13    A.  I think he's using -- no, I --

14    MR. GIBBS:  Same objection.  Sorry.

15    THE WITNESS:  My apologies.

16    No, I don't know what he's talking about

17  other than I think you can conclude by going back to

18  the two Paxar documents we've looked at that we

19  could get some sense of what that is.

20  BY MR. WILLIAMS:

21    Q.  Right.  Related to 11i?

22    A.  Related to specific applications within

23  11i, correct --

24    Q.  Right.

25    A.  -- for that client, Paxar.

166

1    Q.  Right.  Now, do you know what the

2  entire -- well, withdrawn.

3    Do you know the aggregate of costs that

4  were absorbed by Sales, Consulting and Development

5  with respect to Paxar alone on the quality issues?

6    A.  I do not.

7    Q.  But at least from this e-mail, it looks

8  like 1.5 million was absorbed by Consulting alone?

9    MR. GIBBS:  Objection.  Lack of foundation.

10    THE WITNESS:  Based on what it says here, is

11  Consulting has eaten 1.5 million --

12    MR. WILLIAMS:  Right.

13    THE WITNESS:  -- and so, that would be the

14  consulting cost for Paxar --

15    MR. WILLIAMS:  Right.

16    THE WITNESS:  -- nonbillable time.

17    MR. WILLIAMS:  I'm going to ask the reporter

18  to mark this document as Sanderson No. 9.  It's

19  Bates numbered NDCA-ORCL 054235 through 244.

20    (E-mail string dated 3/01 re Daily CRM

21  Escalated and Strategic Implementations report

22  marked Exhibit 9 for identification.)

23  BY MR. WILLIAMS:

24    Q.  Just ask you to take a look at that

25  document and let me know when you're done.

167

1    A.  Okay.

2    Okay.

3    Q.  Okay.  Do you recognize Sanderson No. 9?

4    A.  No, I do not.

5    Q.  It appears to be a report sent to you

6  and several others from David Williamson on or

7  around March 27th of 2001, right?

8    A.  That's correct.

9    Q.  And it's titled a "CRM Escalated and

10  Strategic Implementations Report"?

11    A.  Yes.

12    Q.  Do you know David Williamson?

13    A.  No, I do not.

14    Q.  Do you know why he sent this report to

15  you as well as others?

16    MR. GIBBS:  Objection.  Calls for

17  speculation.

18    THE WITNESS:  My speculation is that it was a

19  direct result of Larry Ellison's e-mail of the

20  23rd of March, which was Jarvis 15 -- Exhibit

21  Jarvis 15, where he said he wanted escalated

22  customers to be discussed at the product meeting,

23  and this was probably an outcome of that.

24  BY MR. WILLIAMS:

25    Q.  Right.  But you weren't at the product

168

1    meetings, right?

2        A.  No.

3        Q.  But this report appears to only relate

4    to CRM, right?  At least that's the title.

5        A.  I'd have to study each page if you'd

6    like me to do that.  I don't --

7        Q.  I don't want you to do that.

8        A.  Okay.

9        Q.  Why don't you just take a look at the

10   very top of Bates ending 235, the e-mail from Safra

11   to Ron.

12       A.  Okay.

13       Q.  Can you read that for me?

14       A.  Yeah.  "Is there some ERP" -- "Is there

15   -- "Is there some ERP escalated list?"

16       Q.  Do you know what a "hot escalation" is?

17       A.  I can't recall if there -- if there is a

18   difference or what the significance is of hot

19   escalation versus escalated.

20       Q.  Uh-huh.  You testified earlier that you

21   don't think you had any of your consultants at

22   BellSouth, right?

23       A.  That's correct.

24       Q.  How about Celulares Telefonica?  Yes?

25   It's in Latin America.

169

1        A.  -- we probably had some people from my

2    consulting group involved.  It still could have

3    easily -- and I don't know the answer.  It could

4    have also been out of OSI since they had

5    responsibility for telecommunications clients.

6        Q.  How about Franklin Covey?

7        A.  I don't recall that one.

8        Q.  Toshiba Medical Systems?

9        A.  I do not believe so.  And one of the

10   reasons is, it says "EMEA" here, and it talks about

11   the Dutch marketplace.

12       Q.  Okay.  And would you say the same with

13   Tyco, EMEA?

14       A.  Correct.

15       Q.  How about Videojet?

16       A.  I don't recall.

17       Q.  Okay.  Wincor, looks like another EMEA?

18       A.  Right.

19       Q.  How about Xerox GMO?

20       A.  I believe that was mine.

21       Q.  That was yours?

22       A.  Yeah.  It fell under my organization.

23       Q.  What's GMO, do you know?

24       A.  I don't recall.

25       Q.  See on the next page where -- withdrawn.

170

1        Do you know who Dave El-Ani is?

2        A.  No, I don't.

3        Q.  How about Phil Tate?

4        A.  The name is vaguely familiar.  It says

5    "OSS."  That would be Oracle Support.

6        Q.  Uh-huh.  Now, do you know -- well,

7    withdrawn.

8        See just under Phil Tate's name, the

9    report goes on to kind of indicate a special report?

10       A.  Yes, I do.

11       Q.  Do you know what refers to or means?

12       A.  That category, no, I do not.

13       Q.  Were any of these customers listed in

14   this special report section within -- well,

15   withdrawn.

16       Do you know whether any members of your

17   consulting staff were working on implementations at

18   customer sites with respect to any of these

19   customers listed in this Special Report section?

20       A.  If Hitachi on page 242 -- if that's

21   U.S., that would have been in my organization.  And

22   there's possibly some others here, Shawn.  For

23   example, Xerox Omnifax.  Lexmark, I'm not sure if

24   that's Lexmark Japan or if that's Lexmark USA.  I

25   don't know.  I don't recall specifically.

171

1        Q.  Value Vision wasn't one of yours?

2        A.  I put that in another category -- I

3    mean, that same category.  It could have been, and I

4    don't recall it.

5        Q.  Who do you think would know that

6    information?

7        A.  I would suggest that any of these people

8    that are listed on here that you see on page 244

9    where it says "Project Contacts."

10       Q.  What did you do with these escalated

11   reports when you received them?

12       MR. GIBBS:  Objection.  Lack of foundation.

13       THE WITNESS:  I would follow up -- if they

14   got to this point, we had consulting resources all

15   over the accounts that we were responsible for,

16   unless for some reason it was being done by another

17   implementor, a third-party implementor, and they

18   chose not to have us involved.  But we would have

19   resources on it, and I would get periodic updates on

20   the customers that were mine on how the projects

21   were going.

22   BY MR. WILLIAMS:

23       Q.  Who would you get those updates from?

24       A.  It might be Keith Block or I would call

25   the consulting practice director to find out how the

172

1    project's going.
2        Q.   And the practice director, that's the
3    person who would be actually at the site?
4        A.   It was either somebody at the site or
5    somebody that was -- somebody senior like Tim Meehan
6    that reported in to Keith Block that he would be
7    close enough to it.  And he would be knowledgeable
8    of what was going on, and I would talk to them.
9        I think this report is an example of the
10   focus that we put on the accounts that were at issue
11   to make sure they got the right attention.
12       Q.   At least with respect to CRM?
13       A.   Right, for CRM.
14       Q.   I'm going to show you what's been
15   previously marked as Hamel No. 20.  It's Bates
16   numbered 094069 through 70.
17       A.   Okay.
18       Q.   Have you seen this document before?
19       A.   I don't recall it, and I also see that I
20   was not copied on the e-mail.
21       Q.   And with respect to the subject line, it
22   says "GB 11i Escalations."  Do you think that means
23   General Business?
24       A.   I do.
25       Q.   And do you see anyone in the "to" or

173

1    "cc" line that was in your organization?
2        A.   None that I recall.
3        Q.   And see where -- do you know Ken Hamel?
4        A.   The name is familiar, but I don't know
5    that I knew him.
6        Q.   And if you take a glance at the list of
7    customers on this document, do you recognize any of
8    those customers as ones that your organization was
9    doing implementation on?
10       A.   As I scan the list, a lot of times in
11   General Business, we had third-party implementors.
12   These tended to be smaller companies, and oftentimes
13   the implementation were done by other companies and
14   not Oracle Consulting.
15       Bimbo Bakeries, which is, I believe -- I
16   may be wrong, but I believe is -- they were in
17   Mexico.  And it's actually a fairly large bakery.
18   My guess is this was an implementation probably
19   somewhere in Texas where they had a bakery, and we
20   may have been involved in that.  But to answer your
21   question definitively, I don't recognize any of
22   these as customers that we had in Consulting.
23       Q.   And --
24       A.   It's also been a long period of time.
25       Q.   I show you what's been previously marked

174

1    as Wohl No. 30, which is Bates numbered 063478
2    through 480 with the prefix of NDCA-ORCL.
3        Take a look at this document and let me
4    know when you're done.
5        A.   Okay.
6        Q.   Have you seen Wohl 30 prior to today?
7        A.   Not that I recall.
8        Q.   Have you seen -- withdrawn.
9        Do you know Chuck Phillips?
10       A.   Yes, I do.
11       Q.   How do you know him?
12       A.   I knew him when he was an analyst for
13   Morgan Stanley.  I would periodically meet with him.
14       Q.   And do you know whether or not you met
15   with him in January 2001?
16       A.   I do not.
17       Q.   Would it be unusual for you to meet with
18   him in January of 2001?
19       A.   I don't understand the question.
20       Q.   Okay.  If you -- withdrawn.
21       As far as you know, was he covering
22   Oracle in January 2001?
23       A.   As far as I know, he -- that was one of
24   the software companies that he tracked.
25       Q.   And you said you periodically met with

175

1    him?
2        A.   Yeah.  I probably met with him, as I
3    recall, two or three times while I was at Oracle.
4        Q.   At Oracle or at a Morgan Stanley?
5        A.   The time I remember specifically was at
6    Oracle.  He used to come out and visit Redwood
7    Shores.
8        THE REPORTER:  I'm sorry?  Visit?
9        THE WITNESS:  Would visit Redwood Shores.
10   Redwood, one word, Shores, the headquarters of
11   Oracle.
12   BY MR. WILLIAMS:
13       Q.   And you would talk about, I guess, the
14   business, right?
15       A.   Right.
16       Q.   Directing your attention to on or around
17   March 26th, 2001, you see where, at least in this
18   document, Mark Jarvis writes to Safra Catz, Mark
19   Barrenechea, Ron Wohl about apparent negative
20   article by Forrester?  I think it's in the subject
21   line.
22       A.   Yeah.  I think where it came from was
23   Chuck had sent some comments that were made by
24   Forrester.  And that's -- but I don't believe in
25   Mark Jarvis' article it specifically talks -- I

176

1    mean, his e-mail, it specifically talks about
2    Forrester.
3        Q.    Right.  But see the subject line where
4    it says "Re: forward, forward, forward:  Forrester,
5    Negative on 11i"?
6        A.    Yes, I do.  I see that.
7        Q.    You see the first part of the e-mail, it
8    says, "We're being hit on all sides by the press on
9    11i quality.  The bugs in the software (generally
10   quoted as more than 5,000) started a flurry of press
11   articles about how IBM's approach of integration is
12   better than our approach of soup to nuts"?  You see
13   that?
14       A.    Yes, I do.
15       Q.    Had you heard that Oracle 11i was
16   rumored to have had more than 5,000 bugs?
17       A.    I don't recall.
18       Q.    Did you know in or around March of 2001
19   that there were several negative articles regarding
20   the quality of 11i?
21       MR. GIBBS:  Objection.  Lack of foundation.
22       THE WITNESS:  I don't recall.
23   BY MR. WILLIAMS:
24       Q.    Okay.  Did anyone ever ask you to
25   provide any comments that would be forwarded to the

177

1    press regarding the quality of 11i in the spring of
2    2001?
3        A.    I don't recall being specifically asked
4    to do that or doing it.
5        Q.    Okay.  Did you ever get any e-mails from
6    Chuck Phillips or anyone else outside of the company
7    regarding the quality of 11i products or software?
8        A.    E-mails from outside the company?
9        Q.    Outside the company.
10       A.    I don't recall any.
11       Q.    You see where -- I'm going to ask you to
12   turn to the next page.  Looks like the top of the
13   page is an e-mail from Chuck Phillips to Safra Catz.
14   See that?
15       A.    Yes, I do.
16       Q.    Down in the middle of the e-mail, he
17   writes, "But I'm hearing it from multiple sources,
18   including the user groups and Oracle employees,
19   about the stability of the product.  I think it's
20   improved since much of this was written, but not
21   many people know that, and all the early adopters
22   have plenty of horror stories they willingly share
23   with whomever may call.  It's worth deploying
24   corporate-level consulting resources to get them
25   happy ASAP to turn them into proponents instead of

178

1    critics."  Do you see that?
2        A.    Yes, I do.
3        Q.    Safra Catz ever forward this e-mail to
4    you or indicate to you what Chuck Phillips had
5    communicated to her?
6        A.    I don't recall her ever doing that, but
7    I think by -- and I'm speculating.  But when I look
8    at the e-mail which was Sanderson Exhibit 9 that
9    listed escalated accounts, Safra knew that we were
10   tracking escalated customers and putting all our
11   energy behind taking care of those to get them on
12   the right path.
13       Q.    Did you talk to Safra about it, about
14   that?
15       A.    About?
16       Q.    About tracking customers to get them on
17   the right path.
18       A.    Not so much about tracking customers
19   because that was process-driven.  What I would talk
20   to Safra about, it might be a specific customer
21   where there was concern, and I would update her or
22   get her input on a particular issue around that
23   subject -- I mean, around that customer.
24       Q.    You'd call her up or she would call you?
25       A.    Both.

179

1        Q.    Both.  You see where, the next sentence,
2    Chuck Phillips writes, "A few of the reps I spoke
3    with don't have the confidence to push CRM because
4    of the quality issues in the past."  See that?
5        A.    Yes, I do.
6        Q.    And where -- well, withdrawn.
7            In March of 2001 or February,
8    March 2001, were any of your consulting reps
9    indicating to you that they didn't have the
10   confidence to either sell or install Oracle CRM?
11       A.    No, I don't recall that.  Oracle
12   Consulting's rule was, once the product had been
13   sold to the customer, was to implement.  They
14   weren't asked whether they felt whether they wanted
15   to do it or not.  So, their responsibility -- excuse
16   me -- was to make it happen.
17       Q.    Well, isn't it true that Keith Block had
18   indicated to you that some of the consultants were
19   waiting on clients to wait to upgrade to 11i because
20   of the product problems?
21       A.    You showed me that e-mail earlier.  I
22   don't recall that.
23       Q.    You don't recall hearing -- well, the
24   e-mail was sent to you.  He told you that fact,
25   right?

180

1    A. That's -- as documented in the e-mail,
2  correct.
3    Q. Okay.
4    A. Not that I -- and I'm saying I don't
5  recall that today.
6    Q. I understand.
7    A. Okay.
8    MR. GIBBS: When you move to a new exhibit,
9  you mind --
10    MR. WILLIAMS: I'm sorry?
11    MR. GIBBS: When you move to a new exhibit,
12  do you mind if we take a very short break?
13    MR. WILLIAMS: We can do it now if you like.
14    THE VIDEOGRAPHER: Off the record at
15  2:25 p.m.
16    (A brief recess was taken.)
17    THE VIDEOGRAPHER: We are back on the record
18  at 2:30 p.m.
19  BY MR. WILLIAMS:
20    Q. I show you what's been marked as
21  Exhibit No. 17, although I think it's Borthwick 17,
22  but let me just put the Bates number on the record,
23  which is NDCA-ORCL 159545 through 575. Take a look
24  at that and let me know when you're done.
25    A. Okay.

181

1    Q. Do you recognize what's been previously
2  marked as Exhibit 17?
3    A. No, specifically. But I know it was
4  part of a preparation for the budget.
5    Q. The Fiscal '02 Consulting Budget, just
6  your organization, right?
7    A. Yes.
8    Q. Do you --
9    A. What I do know, I don't believe it
10  included Latin America Consulting, and it probably
11  included OPI Consulting.
12    Q. Okay. Did you -- well, it's the
13  Fiscal '02 Consulting Budget Review, right?
14    A. Yes.
15    Q. And did you create this presentation?
16    A. No. I'm sure I had input to it, but it
17  was prepared by others.
18    Q. Okay. And others in your organization?
19    A. Correct.
20    Q. And just turning your attention to Bates
21  ending 567.
22    A. Okay.
23    Q. And -- well, do you know who you gave
24  this presentation to? Was it to Larry Ellison?
25    A. That's what it was intended for. I

182

1  don't recall whether we walked through it with Larry
2  or not.
3    Q. What do you mean?
4    A. I don't know if, when we met with Larry,
5  whether we had a chance to present it or not.
6    Q. I see.
7    A. Larry decides what you present and what
8  you don't present.
9    Q. Well, here you and your organization
10  indicate that "Adverse business conditions will
11  continue to challenge us," I guess Consulting, "in
12  fiscal '02" --
13    A. Correct.
14    Q. -- right? And what did you mean when
15  you wrote "Uncertainty around the economy"?
16    MR. GIBBS: Objection. Lack of foundation.
17    THE WITNESS: I don't recall.
18  BY MR. WILLIAMS:
19    Q. All right. And how about the dot-com
20  crisis?
21    MR. GIBBS: Same objection.
22    THE WITNESS: What it means here, based on
23  the sub-bullet is we had some accounts receivable
24  write-offs from customers because they were going
25  into bankruptcy.

183

1  BY MR. WILLIAMS:
2    Q. And that had begun in the first half of
3  2000, hadn't it, first half of calendar 2000?
4    A. I don't recall specifically.
5    Q. And the next -- the next bullet point,
6  Product Issues, "21 million in fiscal '01," seems to
7  indicate that your organization absorbed $21 million
8  of costs related to product issues in the fiscal
9  year of '01, right?
10    MR. GIBBS: Objection. Lack of foundation.
11    THE WITNESS: Yes, that's what it says here.
12  BY MR. WILLIAMS:
13    Q. And that -- but it doesn't have a
14  breakdown by quarter?
15    A. No, it doesn't.
16    Q. And this $21 million is just for
17  Consulting, right? This doesn't include some of the
18  support relief that we talked about earlier, right?
19    A. Right. On average, about $2 million a
20  month with a new product, correct.
21    Q. I'm sorry?
22    A. About an average of $2 million a
23  month for a new product, that's correct.
24    Q. What do you mean?
25    A. 11i was a new product that we had

184

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

1  introduced.  The 21 million divided by 12 is
2  approximately $2 million a month.
3      Q.  Oh, that's what you're -- okay.
4      A.  Yeah.
5      Q.  All right.  But in the first quarter of
6  fiscal '01, 11i hadn't been -- hadn't yet been
7  released, right?
8      A.  First quarter of '01, which would have
9  been June of 2000 --
10      Q.  That's right.  So, it had been, right.
11  Okay.
12      A.  -- it had been introduced.
13      Q.  My mistake.
14      What are CPG settlements?
15      A.  It's consumer packaged goods.  It's
16  companies that produce consumer products, and so,
17  food companies, food manufacturers, et cetera.  And
18  we had developed a separate set of products separate
19  from 11i, where we integrated different vendor
20  products or interfaced different products together
21  and produced a CPG solution.  And it ended up being
22  not a huge success, and, as you can see here, we had
23  settlements of $6 million.
24      Q.  Okay.  When you refer to "settlements"
25  in the document, does that mean that legal action

185

1  was indeed brought by these customers, and the
2  company settled out of court, or does it simply mean
3  that there was an issue that you settled?
4      MR. GIBBS:  Objection.  Lack of foundation.
5      THE WITNESS:  As I told you earlier, I don't
6  recall any legal settlements.  This is most likely
7  settlements with the customer.
8  BY MR. WILLIAMS:
9      Q.  Okay.  I'll ask you to turn your
10  attention to Bates ending 569.  It looks like the
11  total for fiscal '01 related to release 11i product
12  issues was 21 million.
13      A.  Correct.
14      Q.  It appears that it's estimated, though,
15  because 4Q had not yet been concluded as of the date
16  of this document, which is April 3rd of 2001,
17  right?
18      A.  Correct.
19      Q.  Do you know what the total was for
20  fiscal '01 for 11i product issues?
21      A.  The actual number?
22      Q.  Yeah.
23      A.  No, I don't.
24      Q.  The title of this page says "Release 11i
25  Product Issues had a large impact year to date,

186

1  further negotiations and settlements are ongoing."
2  What's meant by "large impact"?
3      A.  Remember, this is a budget document, and
4  it's a negotiation document, as far as what your
5  revenue and margin and margin percentage was going
6  to be for the next year.
7      And I think -- I don't recall that
8  comment specifically, "large impact," but I think
9  you can see the fact was that it impacted us by
10  $21 million in unbilled revenue.
11      Q.  Okay.  I'm going to show you what's been
12  previously marked as Roberts No. 25.  It's Bates
13  numbered NDCA-ORCL 162213.  Actually, there appears
14  to be a page missing, 14 is missing, but it goes on
15  to have 15 and 16.
16      Just take a look at this document and
17  let me know when you're done.
18      For the record, I think that 14 just has
19  the Vcard information on it, but we'll double-check
20  to make sure that there's nothing material missing
21  from the document.
22      A.  Okay.
23      Q.  Okay.  You recognize Roberts No. 25?
24      A.  No, I do not.
25      Q.  All right.  Appears to be an e-mail that

187

1  Sergio Giacoletto sent to Mark Barrenechea, cc'ing
2  you among others, right?
3      A.  Correct.
4      Q.  In June 2001?
5      A.  Correct.
6      Q.  And the -- I guess it looks like Sergio
7  is responding to an e-mail that Mark sent earlier,
8  right?
9      A.  Correct.
10      Q.  And if you look at 162215, Mark appears
11  to write or break down -- break down the financials
12  for different areas of the company.  See that?
13      A.  I do.  Just as a clarification, I think
14  it's what you meant, Shawn.  You say "financials."
15  It shows the revenue for CRM.
16      Q.  CRM alone?
17      A.  It would be my guess.
18      Q.  And it appears that Sergio responds.
19  See where he says, "Mark, I also [sic] disappointed
20  by the results"?  See that at the --
21      A.  Yes, I do.
22      Q.  "I also disappointed by the results,
23  but, as you know, we had six to nine months of
24  product issues which caused loss of confidence by
25  sales, partners, analysts and customers."  Do you

188

1   see that?

2       A.  Yes, I do.

3       Q.  You didn't disagree with that statement

4   by Sergio, did you?

5       A.  I don't recall.  I -- I don't recall.

6       Q.  As you sit here today, do you disagree

7   that there were months of product issues in fiscal

8   2001 which caused the loss of confidence by Oracle

9   salespeople, its partners, analysts and customers?

10      A.  Generally speaking, that's right.  We

11  launched a brand-new product, and it was

12  challenging.  It was a challenging period.

13      Q.  And you see where he writes, "Even as of

14  today, release 11.5.4, which is the first stable

15  release, is not available in local language, and we

16  will only get it between July and October 2001"?

17  See that?

18      A.  Yes.

19      Q.  You didn't disagree that 11.5.4 was the

20  first stable release, did you?

21      A.  I don't recall.

22      Q.  And do you have any reason to believe

23  that Sergio's view of -- of the stability of 11i or

24  11.5.4 was inaccurate?

25      A.  Shawn, you're asking me to recall

189

1   something that is over five years ago.  And to say

2   do I have any reason to agree or disagree with it, I

3   think, is somewhat of an unfair question.

4           I mean, I -- I think the product in

5   Europe was a little bit different than the U.S.

6   because of the nature of the language that was

7   associated with it.  And if I had to speculate, I'd

8   probably say that we were more stable more quickly

9   in the U.S. because the language that it was

10  developed for was the English -- U.S. English, not

11  U.K. English.

12      Q.  Well, if you don't recall, you can just

13  say you don't recall.

14      A.  I don't recall.

15      Q.  I'm not trying to trick you or anything.

16      A.  Okay.  I don't recall.

17      Q.  You see where he writes that -- again,

18  the same sentence, "Even as of today, release

19  11.5.4, which is the first stable release, is not

20  available in local language"?  Did you know whether

21  or not as of June 2001 11i was available in European

22  local languages?

23      A.  I don't recall that.  I don't recall.

24      Q.  Do you recall -- withdrawn.

25          Do you know whether this issue was

190

1   discussed at executive committee meetings in June of

2   2000, specifically the issue of the availability of

3   11i in European local language?

4       A.  I don't recall discussing that at the

5   executive committee.  It was not unusual that when

6   you released a new product that other languages for

7   other countries would come at a later date.

8       Q.  You see that Sergio writes "not

9   available" in capital letters.  Did you know why?

10      A.  Sergio's got a big sales number that he

11  has to achieve, revenue number.  And he is going to

12  do everything he can to make sure he's got the

13  product that he needs.  If he doesn't, he's going to

14  make sure Larry knows that so that when negotiations

15  for revenue targets are understood that Sergio's got

16  something like this to point to.

17      Q.  Okay.  Great.  I'm going to show you

18  what's been previously marked as Borthwick No. 17.

19  It's Bates numbered NDCA-ORCL 131696 through 702.

20  I'll ask you to take a look at this document and let

21  me know when you're done.

22      A.  Okay.

23      Q.  Okay.  You recognize what's been

24  previously marked as Borthwick No. 17?

25      A.  I do not.

191

1       Q.  Okay.  Appears to be an e-mail from

2   Ivgen Guner to Keith Block and Valerie Borthwick,

3   right?

4       A.  Correct.

5       Q.  Both in your organization?

6       A.  No -- yes.  I'm sorry.  Correct.

7       Q.  Right.  And it's in June of 2001,

8   actually, June 11th, 2001, right?

9       A.  Correct.

10      Q.  Subject line is the board meeting input?

11      A.  Correct.

12      Q.  All right.  And Ivgen is asking Valerie

13  and Keith to go over his PowerPoint presentation

14  with you before they give it to Jeff Henley; is that

15  fair?

16      A.  That's what it says here, correct.

17      Q.  And the name of it is actually the

18  "Sanderson PowerPoint", right, the file?

19      A.  Yes.

20      Q.  And was it customary for Keith and

21  Valerie to help prepare presentations for the

22  consulting organization for either Larry Ellison and

23  Jeff Henley or the board of directors?

24      A.  Yes.  The only qualification I give,

25  Shawn, is for the board of directors, not directly,

192

1  but just as you said, you know, for Larry or for
2  Jeff to present.  Or if I ever presented to the
3  board, they would help do that.
4       Q.  Right.  Did you present to the board of
5  directors in fiscal 2000, 2001?
6       A.  No.  I did in fiscal 2000.
7       Q.  2000.  On what topic?
8       A.  FY -- or 2000 and -- you may recall
9  there was a technical issue that the industry was
10  facing with the year 2000, and the board asked me to
11  present about what we were doing as a company to
12  prepare for that, if any clients had issues with it.
13  It ended up being a nonissue.
14       Q.  Okay.  I'm going to ask you to turn to
15  Bates ending 699.
16       A.  Okay.
17       Q.  You see "Fiscal '01 Performance vs.
18  Plan"?
19       A.  Yes.
20       Q.  See that?  Second bullet point, "11i
21  E-Business Suite instability issues"?
22       A.  Yes.
23       Q.  "Took one full year to stabilize"?
24       A.  Yes.
25       Q.  Is that consistent with your

193

1  understanding?
2       A.  That would be consistent, yes.
3       Q.  It's also somewhat consistent with
4  Sergio Giacoletto's comment we just talked about in
5  term of six to nine months of product issues and
6  11.5.4 being the first stable release, isn't it?
7       A.  I can't respond on the 11.5.4 because I
8  don't remember.  It's a very specific number, and we
9  had different releases of the product, and I don't
10  recall.
11       Q.  Okay.
12       A.  What I generally recall is it took us a
13  period of time to stabilize the new product, and,
14  you know, one year is probably a good general
15  statement.
16       Q.  Okay.  Which would have been somewhere
17  around May of 2001, right?
18       A.  Correct.
19       Q.  I'm going to ask you to turn to Bates
20  ending 1701.
21       A.  Okay.
22       Q.  With respect to the consulting business,
23  you say or -- withdrawn.
24            With respect to the consulting business
25  here, the challenges for the consulting business for

194

1  fiscal '02 is -- one issue is CRM quality; is that
2  fair?
3       A.  I see that on the page, yes.
4       Q.  What does that mean to you?
5       A.  I don't recall.
6       Q.  Do you have a general understanding what
7  software quality would mean to software consulting
8  doing implementations.
9       A.  Do I have a general understanding of
10  what software quality means to to -- of course I do.
11       Q.  That's all I'm trying to get from you.
12       A.  I understand what the term "software
13  quality" means.
14       Q.  Okay.
15       A.  What does "CRM quality" mean here in
16  June of 2001?  I don't recall.
17       Q.  Okay.  What is your general
18  understanding of what "software quality" means then?
19       A.  Whether the product works as advertised.
20       Q.  Okay.  And --
21       A.  Actually, it's whether the software
22  works according to the documentation --
23       Q.  Right.
24       A.  -- for the product.
25       MR. WILLIAMS:  I'm going to ask the reporter

195

1  to mark this document as Sanderson No. 10.
2  Sanderson No. 10 is Bates numbered NDCA-ORCL 056341
3  through 347.
4            (E-mail string dated 7/01 re GE Aircraft
5  APS Status/Background (NDCA-ORCL 056341-056347)
6  marked Exhibit 10 for identification.)
7       THE WITNESS:  I'm ready.
8  BY MR. WILLIAMS:
9       Q.  Okay.  Do you recognize Exhibit -- well,
10  Sanderson No. 10?
11       A.  I do not.
12       Q.  Okay.  Appears to be a series of e-mails
13  that you were either copied on or received.
14       A.  I believe out of this I was copied on
15  one of the e-mails, the one that Sebastian sent to
16  me --
17       Q.  Okay.
18       A.  -- on the 16th of July.
19       Q.  Actually, he sent it to you rather than
20  copying you, right?
21       A.  That's correct.
22       Q.  And forwarding e-mails behind it?
23       A.  That's correct.
24       Q.  And one of the e-mails was from Robert
25  Evans to Sebastian Gunningham, Maria Victoria Brio,

196

1    Steve McLaughlin, who's in your organization, right?
2        A.   Correct.
3        Q.   Do you know Maria Victoria Brio?
4        A.   I don't know who that is.
5        Q.   Okay.  But the subject matter is GE,
6    right?
7        A.   Correct.
8        Q.   And you indicated earlier that GE was
9    pretty much your client except for HR, right?
10       A.   It fell into my organization, correct.
11       Q.   Right.  And so, Sebastian writes to you
12   on July 16th that GE doesn't want to pay the more
13   than 3.2 million in cost overruns, right?
14       A.   Correct.
15       Q.   Do you know what he's referring to
16   there?
17       A.   I don't.  I didn't read the e-mail line
18   for line.  I did see where we did a fixed-price bid
19   and, as I read it, that we exceeded that fixed-price
20   bid.  And, not surprisingly, GE is coming back
21   saying "It was a fixed-price bid, and it cost
22   $3.2 million more.  And that's your nickel, Oracle,
23   not ours.  Or your responsibility, Oracle, not
24   ours."
25       Q.   Right.  And you wouldn't bill them for

197

1    anything above the fixed price if it's a fixed-price
2    bid, right?
3        A.   Right.  I mean, if you tried to bill it,
4    they would ignore it anyway.  But -- that's not
5    quite true.  If you would go back in situations like
6    this or others and you would -- if you had an
7    overrun, you could still go back to the client if
8    you had a justification.  And a justification might
9    be that they asked for additional functionality that
10   wasn't within the scope, and so, you would try to
11   negotiate that.
12       Q.   You don't know whether or not that
13   occurred here, do you?
14       A.   No.  I'm just saying -- no.  The obvious
15   thing here is we exceeded the fixed-price contract
16   by $3.2 million.
17       Q.   Okay.  See on the top of 342 where it
18   says, "GE has not requested funding from Oracle for
19   GE overrun estimated at 25 million"?  Response to
20   this, "Primarily due to GE shortcomings and HW
21   planning, e.g., backup system"?
22       A.   Right.
23       Q.   Do you know what that refers to?
24       A.   Yeah.  HW would be hardware planning.
25   And when you do -- so, it's hardware planning, for

198

1    example, the backup system for the new application.
2        When you do projects like this, you
3    know, whether it's Oracle Consulting or another
4    third party that's doing it, you are doing it hand
5    in hand with the client typically.  And so, GE had
6    put resources to this project as well, which was
7    pretty typical of our engagements.
8        Q.   Do you know Charles Kendig?
9        A.   Do you have a title there for him?
10       Q.   I don't know.  I'll just show it to you.
11   I'm going to show you what's been marked as Kendig
12   No. 18, and the Bates number is NDCA-ORCL 621416
13   through 621449.  And I'll ask the same question, if
14   you know Charles Kendig.
15       A.   I don't recall him.  I'm trying to
16   remember, Shawn.  The name is somewhat familiar, but
17   I don't recall.  And his title doesn't ring a bell.
18   As I go through here, if I see something that
19   reminds me, I'll let you know.
20       Q.   Okay.
21       A.   Do we know what the date of this
22   document is?
23       Q.   We don't know.
24       A.   We know that it's at least May 4th,
25   2003.  You see that?

199

1        Q.   Well, why don't you tell me what you're
2    looking at.
3        A.   Look at page 1435, and it's a screen
4    printout.  And it has the date that it was last
5    modified.  It was April 4th, 2003.  Excuse me.
6        MR. GIBBS:  One could also read the Kendig
7    deposition.
8        MR. WILLIAMS:  Excuse me?
9        MR. GIBBS:  I said one could also read the
10   Kendig deposition.
11       MR. WILLIAMS:  We can have him read it if
12   that's what you'd like.
13       MR. GIBBS:  No.  I'm just pointing out that
14   that's in the record.
15   BY MR. WILLIAMS:
16       Q.   I take it you don't know Charles Kendig,
17   right?
18       A.   I still don't recall him, yes, right.
19       Q.   I'm going to ask you to turn your
20   attention to Bates ending 422.
21       A.   Okay.
22       Q.   I guess you could look at this page and
23   determine that this document was created sometime
24   after or during June 2003 since it indicates the
25   current 11i release, right, down on the bottom,

200

Sanderson, Jr., Edward J   7/25/2006  9:05:00 AM

1  11i.9?

2      A.  Right.  Long after I had left before --

3  a couple years before then.

4      Q.  Sure.  Looks to be -- document appears

5  to be backward looking.

6      A.  Backward and forward, correct.

7      Q.  Backward and forward, correct.

8      And at least here, it indicates that

9  11i.4 was released in June of 2001; is that fair?

10     A.  Correct.

11     Q.  And if you turn to Bates ending 425, see

12  where it indicates "Approximately 85 percent of our

13  customers working with 11i.  11i.9 shipments as of

14  January 2004," right?

15     A.  Yes.

16     Q.  I guess he's indicating that, at least

17  as of that date, the vast majority of customers

18  would be using .9, right?

19     A.  I'm reading the same thing as you are on

20  the page, correct.

21     Q.  I'm sorry.  And looking at -- going to

22  428, it talks about the 11i history.  Says "Initial

23  11i implementations were troubled.  Product quality

24  and completeness feel" -- well, "product quality and

25  completeness."  Is that consistent with your

201

1  recollection of initial 11i implementations?

2      MR. GIBBS:  Objection.  Lack of foundation,

3  calls for speculation.

4      THE WITNESS:  Yeah, as we discussed today, we

5  had a number of issues when we first released the

6  brand-new product, correct.

7  BY MR. WILLIAMS:

8      Q.  Okay.  And see how he talks about

9  calendar year 2001?

10     A.  Yes.

11     Q.  Says "Spent reacting to the issues one

12  by one."  See that?

13     A.  Yes, I do.

14     Q.  See just under that a "big quality black

15  eye for Oracle"?

16     A.  Yes, I do.

17     Q.  During calendar year 2001, at least

18  until you left Oracle, did you believe that the

19  experiences with implementation of 11i had created a

20  quality black eye for Oracle in that period?

21     A.  I'd suggest you talk to Charles Kendig.

22  I understand you deposed him based on what my

23  counsel just said.  So, he's the one that wrote it.

24  I suggest you ask him about it.

25     Q.  I'm asking you a question, whether or

202

1  not you believed that the experiences with

2  implementations of 11i created a quality black eye

3  for Oracle in that period.

4      A.  I think our financial performance during

5  that year demonstrates that we didn't have a black

6  eye.  I think our financial performance, as I

7  recall, was actually quite good.

8      So, if that's a measure, which is a

9  bottom-line measure -- it's not subjective, it's not

10  qualitative, it's quantitive -- I think the

11  numbers -- we could easily look at the numbers, and

12  I think they speak for themselves.

13     Q.  Sure, I understand that.  I was asking

14  you about quality, though.  I wasn't asking you

15  about --

16     A.  The quality, you have to measure -- so,

17  it's a measure of how do you measure quality?

18     Q.  Okay.

19     Q.  Okay.  And a way to measure quality is

20  what is your financial performance?  What is your

21  growth in the marketplace?  That's ultimately how

22  you can measure it.  Could it have been better?  Of

23  course.

24     Every major implementation -- I mean,

25  major product release from a software vendor every

203

1  time could have been better.  And it's the same case

2  here.

3      Q.  Okay.  So, would you change your answer

4  then with respect to your previous statement that

5  quality meant whether or not the software was

6  performing as represented in its documentation?

7      A.  I mean, that's certainly a measure too.

8  I -- it's not a question of how do you measure -- I

9  mean, it is a question in the end of how do you

10  measure quality.  Here he's concluded "quality black

11  eye for Oracle."

12      I'm actually encouraged by this

13  statement because it shows the candor that was used

14  within Oracle around our product.  We didn't kid

15  ourselves.  We took it very seriously.  We did not

16  try to finesse things.  We were honest and direct

17  with each other.  I wouldn't call it a black eye.

18     Q.  So, you disagree with how he

19  represents --

20     A.  Could it have been saw -- yes, it could

21  have been better, yeah.  Was our financial

22  performance pretty darn good?  Yeah.

23     Q.  Was Business Online, or BOL, part of 11i

24  or was it functioning on 11i software on fiscal '01?

25     A.  Business Online, it was during '01.  I

204

Oracle

Page  201 - 204

1  don't specifically remember when it was released,
2  and I can't remember specifically -- I mean, to that
3  point, whether it was released coincident with 11i,
4  before or after.  But it was a relatively new
5  offering from Oracle in the time just before I left.
6      Q.  Can you describe for me what it was?
7      A.  Business Online was recognizing that --
8  the opportunity that customers may opt not to
9  install the software themselves but have the
10  software run by a third party to the customer -- in
11  this case, that third party was Oracle -- and that
12  they would actually run the applications for the
13  customer.
14      As patches came out, as updates to the
15  software came out, Business Online would
16  automatically apply that for the customer so the
17  customer didn't have to have the skills or put the
18  resources to doing something like that.
19      Q.  Kind of like a -- so, Oracle was
20  basically hosting the environment?
21      A.  That's a good way to put it.  Yes.
22      Q.  But was Oracle hosting the environment
23  with 11i generally?
24      You mean through BOL?
25      Q.  Yeah.

205

1      A.  Yeah.  I think it was an offering for
2  customers to do that, yes.
3      Q.  And it was hosted over the Internet, or
4  the communications would be over the Internet; is
5  that fair?  Since it's Business Online, I was
6  assuming that it's the Internet.
7      A.  Yeah, I don't think it actually is over
8  the Internet technically.  I think it was over a
9  specific network dedicated to that client between
10  the client -- that customer, or client -- I use
11  those terms interchangeably -- and Oracle BOL.
12      Q.  But the environment would be -- well,
13  withdrawn.
14      A.  It would be Internet-like, to your
15  point, but I don't think it was over technically the
16  Internet that we all operate on.
17      Q.  So, would there -- one would not or
18  should not expect communication-type issues that you
19  might experience trying to connect over the
20  Internet?
21      A.  Yeah, you do.  The Internet is a
22  network.  And the network that they may have -- they
23  may have, for example, what they call a T-1 line,
24  which was a dedicated telecommunications line
25  between Oracle and a customer.

206

1  And, sure, you could have challenges --
2  they're both networks.  They're both using routers
3  and servers and that kind of thing.
4      MR. WILLIAMS:  I want to take a short break
5  if that's okay.
6      THE WITNESS:  Okay.
7      THE VIDEOGRAPHER:  Off the record at
8  3:17 p.m.
9      (A brief recess was taken.)
10      THE VIDEOGRAPHER:  We're back on the record
11  at 3:28 p.m.
12      MR. WILLIAMS:  I'm going to ask the reporter
13  to mark this as Sanderson No. -- I think we're at
14  11.
15      (E-mail string dated 7/00 re SC CEO Desk
16  Call marked Exhibit 11 for identification.)
17      THE WITNESS:  Thank you.
18      MR. WILLIAMS:  It's Bates numbered NDCA-ORCL
19  101654 through 656.
20  BY MR. WILLIAMS:
21      Q.  I'll just ask you to take a look at it
22  and let me know when you're done.
23      A.  You know that the right side of this
24  e-mail has been cut off?
25      Q.  Yeah.  And that's the way it was

207

1  produced to us.
2      A.  Okay.
3      MR. WILLIAMS:  If you guys have a complete
4  e-mail and you could produce it --
5      MR. GIBBS:  I think it was produced in the
6  complete form.  I think it was produced in that
7  form.
8      MR. WILLIAMS:  My understanding is this is
9  how it was produced.  So --
10      MR. GIBBS:  Well, I don't have it with me.
11      MR. WILLIAMS:  Huh?
12      MR. GIBBS:  I don't have it with me.
13      THE WITNESS:  Okay.
14  BY MR. WILLIAMS:
15      Q.  You recognize the document?
16      A.  I do not.
17      Q.  It's an e-mail in or around July 30th,
18  2000 -- or, actually, a couple of e-mails between
19  you, George Roberts and other members of Oracle
20  staff.
21      A.  Correct.
22      Q.  And if you look at Bates ending 655,
23  George Roberts sends you an e-mail, along with Safra
24  Catz, Ron Wohl and Mark Barrenchea, stating, "We're
25  having challenges with the 11i demo system that's

208

1    costing us Q1 business."  You see that?

2         A.  Yes, I do.

3         Q.  And did you understand that to mean that

4    because Oracle was unable to show a complete

5    demonstration of 11i that certain business was

6    not -- was either not being captured or lost?

7         MR. GIBBS:  Objection.  Lack of foundation.

8         THE WITNESS:  What -- I don't recall the

9    e-mail, but I do recall the issue.  And I remember

10   that right after we launched 11i that the demo

11   system, which is a completely separate system

12   because it has to operate in a closed-demonstration

13   environment, that there were issues with it as well.

14   BY MR. WILLIAMS:

15        Q.  Okay.  I just want to see if I can get

16   an answer to the question.  Did you understand

17   George Roberts' e-mail to mean that because Oracle

18   was unable to show a complete demonstration of 11i

19   that certain business was either not being captured

20   or lost?

21        MR. GIBBS:  Objection.  Lack of foundation.

22        THE WITNESS:  I don't recall, sitting here,

23   any specific business that we lost.  That said,

24   clearly, having issues with the demo system didn't

25   help.

209

1    BY MR. WILLIAMS:

2         Q.  Well, what he told you was that "We're

3    having challenges with the 11i demo system, and that

4    is costing us Q1 business."

5         A.  And that's George Roberts writing

6    that --

7         Q.  Right.

8         A.  -- and I would suggest you talk to

9    George about that.

10        Q.  I was asking you what your understanding

11   of the e-mail he sent to you was.

12        A.  Oh.

13        MR. GIBBS:  Objection.  Asked and answered.

14        THE WITNESS:  You're asking me to valid -- to

15   confirm that's what -- that the words say what they

16   mean?

17   BY MR. WILLIAMS:

18        Q.  No.  Did you have a different

19   understanding of what those words mean?

20        MR. GIBBS:  At the time?

21        MR. WILLIAMS:  At the time.

22        MR. GIBBS:  He said he doesn't remember.

23        THE WITNESS:  I don't recall specifically

24   about the demo system other than the fact I did say

25   that I do recall having issues with it.  We had

210

1    issues with the demonstration system for 11i.

2    BY MR. WILLIAMS:

3         Q.  Okay.  So, you don't recall what those

4    words meant at the time?

5         A.  George is saying that he -- he is having

6    problems that's costing Q1 business because of the

7    demo system.  That was George's statement.  I don't

8    recall any specific customers that we lost or that

9    were impacted by the demo system.  I'm not saying

10   there wasn't.  I just don't recall any.

11        Q.  Okay.  Just looking at 654, you respond

12   to George asking him if he got -- well, specifically

13   you say, "George, did you get any reaction from

14   Larry or Safra on the e-mail he sent," right?

15        A.  Yes.

16        Q.  Do you know if he responded to you?

17        A.  I don't recall.

18        Q.  And you didn't indicate in here that you

19   were unclear about what he meant about "the 11i demo

20   system that's costing us Q1 business," right?

21        MR. GIBBS:  Objection.  Argumentative.

22        THE WITNESS:  You want an answer to that?

23        MR. WILLIAMS:  Yeah.

24        THE WITNESS:  Restate the question, please.

25   / / /

211

1    BY MR. WILLIAMS:

2         Q.  Question is:  You didn't indicate in

3    your e-mail that you were unclear about what he

4    meant when he wrote "the 11i demo system is costing

5    us Q1 business"?

6         A.  Yes.

7         MR. GIBBS:  Objection.  Argumentative.

8         THE WITNESS:  In this sentence -- I mean, in

9    my reply, which is a phrase and a sentence, I did

10   not comment on anything regarding his statement

11   about the 11i demo system costing Q1 business.

12        MR. WILLIAMS:  Okay.

13        THE WITNESS:  I made no comment.

14        MR. WILLIAMS:  Okay.  I want to ask the

15   reporter to mark this document as Sanderson No.

16   12 -- I'm sorry.  11.  Are we at 12?  And it's Bates

17   numbered NDCA-ORCL 620365 through 371.

18        (E-mail string dated 8/00 re CRM Demos

19   marked Exhibit 12 for identification.)

20        THE WITNESS:  Okay.

21   BY MR. WILLIAMS:

22        Q.  Okay.  Do you recognize Sanderson

23   No. 12?

24        A.  No, I do not.

25        Q.  And it's a series of e-mails, one of

212

1  which is an August 2nd, 2000, e-mail from Frank
2  Varasano to you; is that fair?  If you look at the
3  first page, it's right in the middle of the page.
4  I'm sorry.  From Peter Mauel to Frank and you?
5      A.  Correct.
6      Q.  And cc'ing some other people in your
7  organization, Mike DeCesare, Steve McLaughlin, Tom
8  Thimot, right?
9      A.  Correct.
10      Q.  And who is Peter Mauel?
11      A.  I remember it was pronounced "mall."
12      Q.  "Mall," okay.
13      A.  That would be helpful for both of us.
14          I can deduce from the e-mail that Peter
15  worked for Frank Varasano in OPI and was probably
16  part of Bill Lay's group.  Bill reported in to Frank
17  Varasano.
18      Q.  Okay.  And this August 2000 was right
19  around the time that you had taken over OPI after --
20      A.  Ray left.
21      Q.  -- Ray left, right?
22      A.  Yeah.
23      Q.  And so, Peter writes to you and Frank,
24  "In regard to the state of our CRM demo instance, I
25  would say that there are really two issues that

213

1  challenge the field."
2          Is he referring to the license field or
3  the consulting field, if you know?
4      A.  He would be referring to license.
5      Q.  License.  'Cause the first -- if you go
6  to the next page, he says, "Limited functionality of
7  the Mini ADS environment and data preclude the SCs
8  from presenting effective demonstrations."
9          Those are sales consultants, right?
10      A.  Correct.
11      Q.  And he goes on to say a couple lines
12  down, "But the real complaint is the fact that
13  Oracle releases the 11i product in May and two
14  months later SCs still are unable to show a full
15  suite of CRM 'live.'  This impacts all new and
16  existing clients."  See that?
17      A.  Yes, I do.
18      Q.  Did you have a reaction to that, if you
19  recall, at the time?
20      A.  Yeah, I don't recall a specific action,
21  although I remember being concerned that our demo
22  environment wasn't effective and that there were a
23  number of issues that we had to deal with.
24      Q.  Right.  Because the demo environment, if
25  it's not working properly, it impacts the company's

214

1  ability to sell the product, right?
2      A.  Correct.
3      Q.  And if you go down on the same page, he
4  says, "To summarize, this is impact on all our key
5  accounts and opportunities, for example, Apple, HP,
6  EMC, Ingersoll-Rand, Motorola, Compaq, Sun, GE,
7  Sears, Pepsi, Xerox, et al."  Right?
8      A.  Yes.
9      Q.  And some of those customers, like
10  Ingersoll-Rand and Xerox, were customers who
11  ultimately bought 11i but had very difficult times
12  implementing the product; isn't that correct?
13      MR. GIBBS:  Objection.  Lack of foundation.
14      THE WITNESS:  We know that Ingersoll-Rand had
15  issues.  Who else did you mention?
16      MR. WILLIAMS:  Xerox.
17      THE WITNESS:  Xerox had some issues, yes.
18  BY MR. WILLIAMS:
19      Q.  Uh-huh.  And if you go down to the
20  bottom, there's an e-mail from you on July 30th,
21  right, to Frank Varasano --
22      A.  Uh-huh.
23      Q.  -- right?
24          And you write, "We're facing the same
25  kind of issues in OPI."

215

1      A.  No.  I'm sorry to correct you.  It says,
2  "Are we facing the same kind of issues?"
3      Q.  I'm sorry.  I apologize.  "Are we facing
4  the same kind of issues in OPI?  It would be good to
5  go united front with Majors.  Can we have someone
6  work with Gayle Fitzpatrick?"
7          Did anyone let you know whether or not
8  you were experiencing the same issues in OPI?  I
9  guess that's what Mr. Mauel was indicating to you in
10  the later e-mail, right?
11      A.  Yeah, I think -- when I sent that e-mail
12  to Frank on the 30th of July, I was asking him
13  "Are we facing the same issues?"
14      Q.  Right.
15      A.  And then subsequent to that, Peter Mauel
16  responded back with detail about the issues that we
17  were having with the demo environment --
18      Q.  Right.
19      A.  -- specific to CRM.
20      Q.  Right.  Okay.  And on July 28th,
21  George Roberts had actually forwarded you some
22  information saying, "George, this is the status
23  update on the CRM demo.  We'll be sending it every
24  Friday.  It's critical that this environment become
25  stable."  Maybe it says "stabilized."  I don't know.

216

1   Right?
2       A.  Yes.
3       Q.  Did you know Gayle Fitzpatrick?
4       A.  Yes, I did.
5       Q.  And what was her position, if you know,
6   in or around the summer of 2000?
7       A.  I wrote in here in an e-mail in the top
8   of page 367 where I say "Gayle heads up SC," which
9   is the sales consulting organization for Majors,
10  which would have been -- she worked for George
11  Roberts.
12      Q.  Okay.  And if you go to -- well,
13  withdrawn.
14          On the bottom of 67, it looks like Gayle
15  is summarizing the CRM demo update, right?
16      A.  Yes.
17      Q.  It goes on for several pages?
18      A.  Correct.
19      Q.  All right.  And then on the very last
20  page, 620371, she writes, "The demo situation has
21  become the bottleneck in our pursuit of CRM
22  opportunities."  See that?
23      A.  Yes, I do.
24      Q.  That's -- would you say that that was
25  consistent with George Roberts' statement that the

217

1   demo instances was --
2       A.  Yes.
3       Q.  -- causing him to lose business --
4       A.  Yes.
5       Q.  -- in Q1?
6       A.  It was impacting his ability to sell the
7   product, yes.
8       MR. WILLIAMS:  Are you about to hand me that?
9       THE VIDEOGRAPHER:  Not for a few more
10  minutes.
11  BY MR. WILLIAMS:
12      Q.  Let me show you what's been previously
13  marked as Fitzpatrick No. 15.  It's Bates numbered
14  NDCA-ORCL 063415, 416.
15      A.  Okay.
16      Q.  Okay.  You recognize Fitzpatrick 15?
17      A.  I do not.
18      Q.  Okay.  And it appears to be a Majors
19  applications update that was forwarded to you by
20  e-mail in or around January 18th of 2001; is that
21  fair?
22      A.  It's a Majors application demo update.
23  If you said "demo," I'm sorry, I missed it.
24      Q.  That's what I meant to say, "demo
25  update."

218

1       A.  Okay.
2       Q.  Forwarded to you in or around
3   January 18, 2001, right?
4       A.  Yes.
5       Q.  And as far as you knew, the demo
6   environment was still impacting Oracle's business in
7   January of 2001; isn't that right?
8       A.  I don't recall specifically.  I do see
9   here in George's note at the bottom of 415, it says,
10  "There's been good progress on some of the issues."
11      Q.  Uh-huh.
12      A.  And it talked about installing an ISDN
13  line to help with the connectivity.
14      Q.  Uh-huh.
15      A.  So, if you're asking me to characterize
16  it, I'd say that, yes, we're still having problems
17  with the demo but that the situation had improved.
18      Q.  Okay.  And on January 18th of 2001,
19  George Roberts sent you and Ron Wohl, Mark
20  Barrenechea and Gayle Fitzpatrick a note saying,
21  "Just wanted to update you on the demo systems and
22  lingering issues.  Sandy, are your teams seeing the
23  same?"  See that?
24      A.  Yes, I do.
25      Q.  Okay.  Do you know whether or not in

219

1   January of 2001, OPI and/or your consulting
2   organizations were still dealing with challenges
3   with respect to the demonstration system?
4       A.  Just one point of clarification, on --
5   Consulting typically wasn't involved with a demo.
6   The SCs, or sales consultants, report in to the
7   sales organization.  So, Consulting typically didn't
8   get involved with that.  I don't -- I don't recall.
9       Q.  Okay.
10      A.  I don't recall.
11      Q.  So, part of the forward down at the
12  bottom of the page that you had mentioned a few
13  moments ago, I think that's an e-mail from Gayle
14  Fitzpatrick to George Roberts, right?
15      A.  Good point.  Yes.  I think I said George
16  said that, but you're correct.
17      Q.  And at the very last sentence on that
18  page, she writes, "We're still faced with some
19  challenges in the following areas.  1, system
20  performance, and 2, product integration and
21  stability.  The system stability and performance
22  issues still result in poor showing in front of the
23  customer.  We need to be able to demonstrate that
24  our E-Business solution and architecture is better
25  performing than our competitors, particularly those

220

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

1  who bring their own servers."
2  A.  Right.
3  Q.  Do you see that?
4  A.  Yes, I do.
5  Q.  Do you know what she meant or at the
6  time do you -- withdrawn.
7  Do you know what she meant when she said
8  that one of the challenges that the company was
9  still facing was product integration and stability?
10  MR. GIBBS:  Objection.  Lack of foundation,
11  calls for speculation.
12  THE WITNESS:  She touches on it later that in
13  part -- at least in part answers the question where
14  she says that our competitors bring their own
15  servers.  One of the things that we tried to do with
16  the 11i demo environment -- let me take a step back.
17  The way we used to demo our product is
18  we'd bring in a PC or our own server and demo.  So,
19  it was a stand-alone demo.  What we decided to do or
20  where the decision was made by Larry and the
21  development team was the demo environment would be a
22  hosted environment like you were talking about
23  earlier and that you would access it remotely
24  through the network.
25  And that was one of the issues that we

1  had, and that was a competitive issue for us.
2  Around -- and that would affect probably, at least
3  in part, the stability issue.  Because if you're
4  going over the network -- and it applies in the
5  second paragraph there that we tried to do some
6  things to improve the stability.
7  Gayle is -- was the head of the SC
8  organization.  It was directly involved in selling a
9  product, and if there was any issues around product
10  integration, she was going to highlight that.
11  Whether it was large or small, she was going to
12  highlight it 'cause she wanted to have a perfect
13  demo environment, as any of us would have.
14  BY MR. WILLIAMS:
15  Q.  Sure.  But part of the problem, as you
16  know, was related to the software itself being
17  unstable; isn't that right?
18  MR. GIBBS:  Objection.  Lack of foundation.
19  THE WITNESS:  This was written in
20  January 2001, and so, yes, we were still -- we had
21  released it in May, so we were still having
22  stability issues to some degree at that point,
23  correct.
24  MR. WILLIAMS:  Okay.  I'm going to ask the
25  reporter -- I'm sorry.  Withdrawn.

221                                    222

1  I'm going to show you what's been
2  previously marked as DeCesare No. 3 [sic].
3  The videographer is telling me that she
4  needs to change the tape.  Maybe you can just review
5  the document while she changes the tape.
6  THE VIDEOGRAPHER:  Off the record at
7  3:52 p.m., and this marks the end of Tape No. 3 in
8  Volume I of the deposition of Edward Sanderson.
9  (Discussion held off the record.)
10  THE VIDEOGRAPHER:  We are back on the record
11  at 3:56 p.m., and this marks the beginning of
12  Videotape No. 4 in Volume I of the deposition of
13  Edward Sanderson.
14  BY MR. WILLIAMS:
15  Q.  Have you had a chance to review that
16  document?
17  A.  I have.
18  Q.  And do you recognize it?
19  A.  I don't recognize the e-mail.  I do
20  remember asking Julie Cullivan, who I believe was
21  the head of the SC organization in OPI West, working
22  for Mike DeCesare -- I asked her to collect
23  information around the demos and being very specific
24  so that I could provide that feedback to Ron and
25  Mark.

1  Q.  Okay.  Well, DeCesare No. 3 is at least
2  in part an e-mail from you to Ron Wohl and Mark
3  Barrenechea cc'ing George Roberts, forwarding an
4  e-mail from Julie Cullivan to you and other members
5  of OPI; is that fair?
6  A.  It certainly includes some members of
7  OPI.  I don't know who some of these other people
8  are.
9  Q.  Okay.  And so, as you indicated, it
10  appears that you asked Julie to kind of summarize
11  OPI's experiences with demos somewhere in January of
12  2001?
13  A.  I believe I asked her to summarize what
14  OPI West's experience was with the product.
15  Q.  And what is your belief based upon,
16  information in the document or is that just your
17  recollection?
18  A.  Because Julie Cullivan ran OPI -- the SC
19  organization for OPI West.  She didn't run the SC
20  organization for all of OPI.
21  Q.  Did anyone run the SC organization for
22  all of OPI?
23  A.  The answer is no, formally.  I was
24  trying to think if there was a way informally we did
25  it.  I don't recall.

223                                    224

Oracle                                Page  221 - 224

1    Q.  Okay.  Now, is there -- as you sit here
2    today and reviewing this document, is there any way
3    that someone would understand that this
4    summarization by Julie Cullivan only relates to OPI
5    West?  And I ask because your e-mail to Ron and Mark
6    says, "I know that George consolidated his team's
7    feedback on demos.  Below are the issues we're
8    seeing in OPI."
9        A.  I'll stand corrected because of that
10   statement and also because Julie copied the folks
11   like Steve and Tom Thimot.  So, it probably was
12   OPI -- all of OPI feedback.
13       Q.  Okay.  So, she writes to you on
14   January 31st of 2001 that "The consistent themes
15   continue to be poor performance, inability to prove
16   our E-Business Suite integration story and product
17   stability and quality issues," right?
18       A.  That's what I read, yes.
19       Q.  And at least at the time, you had an
20   understanding of what she meant by those general --
21       A.  Yes.
22       Q.  -- terms, right?
23       A.  Yes.
24       Q.  And at the time you thought that this
25   information was not good as you passed it along to

225

1    Ron and Mark, right?
2        A.  No.  I was going to do everything I
3    could wherever there was an issue around product or
4    demo to make sure that Ron and Mark understand about
5    it -- understand it so they treated it as a high
6    priority.
7        Q.  Okay.  So, when you write or --
8    withdrawn.
9            When you wrote to Ron and Mark, "I know
10   that George consolidated his team's feedback on the
11   demo.  Below are the issues we're seeing in OPI.
12   Please don't shoot the messenger on this," you were
13   really just trying to get their attention there?
14       A.  Yeah.  And just for clarification, when
15   I say "don't shoot the messenger," you know, I was
16   talking about Julie because I wanted -- and not me
17   but Julie.
18           Because Julie, as all SCs did, would
19   work with the Development organization, and I wanted
20   Development to treat her just as well the day after
21   as they did the day before this memo was written.
22       Q.  Okay.  Because this was not positive
23   information?
24       A.  No.
25       Q.  Okay.  And she specifically talks about

226

1    Order Management and Configuration down at the
2    bottom of the page, right?
3        A.  Yes.
4        Q.  And she says "Order Management continues
5    to be very buggy and slow," right?
6        A.  Yeah.  One comment I'd make on "slow,"
7    if you notice up there in the second paragraph in
8    her e-mail to me, she talks about doing the --
9    demonstrating the applications via phone line.
10   We've all dialed into the Internet via phone line.
11   And so, one of the things I remember helping us was
12   getting a dedicated line, high-speed line, to be
13   able to do these demos.  We still had issues.
14           But I'm just pointing out to where she
15   refers to "slow" in a couple of places, it at least
16   was in part due to trying to do demos via the phone
17   line for a pretty comprehensive application.
18       Q.  Okay.  But with respect to OM continuing
19   to be very buggy, that had nothing to do with the
20   phone line?
21       A.  No.
22       MR. GIBBS:  Just for the record -- I'm sorry
23   to interrupt -- but you've referred to this as, I
24   think, as DeCesare 3.  It's DeCesare 1.
25       MR. WILLIAMS:  Oh, I'm sorry.  Thank you.

227

1        MR. GIBBS:  It indicates it's three pages.
2        MR. WILLIAMS:  Three pages, right.  I
3    apologize for that.  Thank you.
4    BY MR. WILLIAMS:
5        Q.  On the next page, she writes with
6    specifics concerning CRM, she says, "Cannot show a
7    complete integrated CRM demo let alone a complete
8    E-Business Suite, ERM/ERP integrated demo."
9            So, she's talking about two issues
10   there, right?  I mean, she's not able to show -- or
11   at least OPI's not able to show ERP working with
12   CRM, and she's not able to show CRM modules working
13   with one another?
14       A.  Correct.
15       Q.  And so, we're talking about -- this is
16   February, so it's, what, seven and a half months
17   later after the release of the product,
18   approximately?
19       A.  June, July, August, September, October,
20   November, December.
21       Q.  Maybe a little longer.
22       A.  Correct.
23       Q.  And down about, you know, another
24   quarter of the way down from there, she indicates
25   that "E-mail Center scenarios do not consistently

228

1  work nor can you even get them all to work
2  together," right?
3      A.  That's a very specific functionality
4  within CRM.
5      Q.  Right.  But it kind of goes to the
6  integration issue, doesn't it, with the CRM modules
7  both functionalities working together?
8      A.  I think she's pointing out there that
9  there's a specific functionality within CRM that
10  wasn't working correctly in the demo environment.  I
11  don't know that it says anything about integration.
12  In that specific case, I think it's just talking
13  about APs of functionality.
14      Q.  Okay.  About six or seven lines down
15  further, she says, "Order Capture is not integrated
16  enough for quote or order tracking.  Cannot enter a
17  price, configure an order, create or contract, query
18  an order, et cetera."  See that?
19      A.  Yes, I do.
20      Q.  Order Capture is part of the CRM module;
21  is that right?
22      A.  Yes.
23      Q.  So, that's an integration issue with
24  respect to CRM modules being able to communicate
25  with one another?

1      A.  This is saying --
2      MR. GIBBS:  Objection.  Lack of foundation.
3      THE WITNESS:  Sorry.  This is saying in the
4  demo environment, you're right, that functionality
5  didn't -- wasn't integrated like it needed to be.
6  BY MR. WILLIAMS:
7      Q.  Okay.  And she just enlists a whole host
8  of things?
9      A.  Right, which is what I asked her to do,
10  to be very specific, because one of the issues we
11  had -- Ron had is if you spoke in generalizations,
12  he didn't handle that very well.  He wanted
13  specifics.
14      MR. WILLIAMS:  All right.  Maybe this will
15  help a little bit.  I'm going to ask the reporter to
16  mark this document as Sanderson No. 13, and it's
17  Bates numbered NDCA-ORCL 061313 through 315.
18      (E-mail string dated 2/1/01 re OPI
19  Demonstration Environment/Product Issues
20  marked Exhibit 13 for identification.)
21      THE WITNESS:  Okay.
22  BY MR. WILLIAMS:
23      Q.  Okay.  Do you recognize Sanderson
24  No. 13?
25      A.  No, but a good part of it is the same

1  e-mail we just previously talked about.
2      Q.  Right.  And the top part of it is an
3  e-mail from you to Julie Cullivan regarding her --
4      A.  Correct.
5      Q.  -- summary of the demo environments in
6  OPI, right?
7      A.  That's correct.
8      Q.  And you say, "Wow.  I've sent this to
9  Ron and Mark.  I know this may cause some pain, but
10  they need to hear this."  See that?
11      A.  Yes, I do.
12      Q.  And that's pretty consistent with what
13  you told me before that, you know, this wasn't
14  really good news.
15      A.  No.  But when I say "cause some pain,"
16  what I was -- there was a real concern among the SCs
17  just generally that they have to work with
18  Development, closely with Development, and
19  Development, being human beings, may react
20  negatively to somebody that's being critical of
21  them.  And so, when I talk about here "I know this
22  may cause some pain," I meant some pain for her
23  because she was clear -- she was so specific --
24      Q.  Right.
25      A.  -- but they need to hear this.

1      Q.  Okay.  And -- right.  "I know this may
2  cause some pain, but they need to hear this."
3      And you also write, "let's hope this
4  gets them motivated to fix these issues," right?
5      A.  Yes.
6      Q.  Do you know how Jeff Henley got this
7  document?  Did you bcc him on this e-mail?
8      MR. GIBBS:  Objection.  Lack of foundation.
9  BY MR. WILLIAMS:
10      Q.  Well, withdrawn.  Do you see Jeff
11  Henley's name on the top left-hand corner of this
12  e-mail?
13      A.  Yeah.  I don't know how he got it.  I
14  didn't play that game.  If I wanted Jeff to send it,
15  I would have -- I mean seen it, I would have sent it
16  to him.  When I say "I didn't play that game," I
17  didn't -- I didn't do much bcc'ing.  I didn't play
18  that game.
19      Q.  Okay.  Now, did you have SCs reporting
20  up through your organization as well?  Were there
21  SCs in OPI?
22      A.  Yeah, SCs in OPI reported in to Frank
23  Varasano when Frank was running OPI.  When he left,
24  I can't remember now who they reported to.  And then
25  when Sebastian Gunningham took over OPI, they

1  reported up through him.
2       I don't remember what the specific
3  structure underneath was for SCs, but there was
4  somebody that -- I'm sorry.  I'll take a step back.
5       The SC organization reported up through
6  East, Central, West and OPI.  So, whoever the AVP
7  was in OPI, the -- whoever was in charge of SCs
8  reported up to that area of vice president.
9       Q.  So, each sales, I guess, AVP had their
10 own kind of geographic organization, and everyone
11 had SCs working with them --
12      A.  Yes.
13      Q.  -- to, I guess, facilitate sales?
14      A.  Yeah.
15      Q.  All right.  I'm going to show you what's
16 been previously marked as Fitzpatrick No. 22.  Just
17 going to ask you to take a look at the top section
18 of that.  It's Bates numbered NDCA-ORCL 617970
19 through 974.  Let me know when you're done.
20      A.  I'm ready.
21      Q.  Okay.  It appears to me -- well,
22 withdrawn.
23      Fitzpatrick No. 22 appears to be the
24 same OPI demonstration e-mail or information we've
25 been talking about, with the top section being a

233

1  February 5th, 2001 e-mail from Gayle Fitzpatrick
2  to George Roberts, right?
3       A.  Correct.
4       Q.  And she says in this e-mail to George,
5  "The note outlining the specific issues from OPI are
6  some of the same demo issues that we have also seen
7  in Majors," right?
8       A.  Yes.
9       Q.  And she also describes the top three as
10 being performance, product quality/stability and the
11 ability to show a complete integrated E-business
12 Suite solution, right?
13      A.  That's right.  That's what it says.
14      Q.  She also -- I'm sorry.
15      THE REPORTER:  I'm sorry.  Your answer?
16 BY MR. WILLIAMS:
17      Q.  She also writes, "I would also say that
18 right now more than 50 percent of an SC's time is
19 spent resolving or working around demo/environment
20 issues versus sales-related activities."  See that?
21      A.  Yes, I do.
22      Q.  Was that the experience that the OPI
23 salespeople were communicating to you?
24      A.  I don't remember percentage of time, but
25 you want your SCs spending 100 percent of their time

234

1  around sales.  You want them to spend zero time
2  around resolving or working around demo environment
3  issues.
4       As a matter of course, you're going to
5  have some of those anyway, but that would be -- you
6  certainly don't want 50 percent.  You want to get it
7  as small as possible.
8       Q.  And would you say that if SCs were
9  spending 50 percent of their time on demo issues
10 that it would have a negative impact on sales?
11      MR. GIBBS:  Objection.  Calls for
12 speculation, lack of foundation.
13      THE WITNESS:  Shawn, I'm sorry.  Say that one
14 again.
15 BY MR. WILLIAMS:
16      Q.  Would you say that if SCs were spending
17 50 percent of their time on demonstration issues, as
18 we've discussed over the last couple hours, that
19 that would have a negative impact on their ability
20 to facilitate sales?
21      MR. GIBBS:  Objection.  Calls for
22 speculation, lack of foundation, incomplete
23 hypothetical.
24      THE WITNESS:  Yes.  As I indicated, if
25 they're not spending 100 percent or a majority of

235

1  their time towards sales, that's going to have an
2  impact on their ability in the sales cycle.
3  BY MR. WILLIAMS:
4       Q.  Okay.  I'm going to show you what's been
5  previously marked as Roberts No. 21, which is
6  NDCA-ORCL 094090 through 93.  I'll ask you to just
7  take a look at Roberts 21 and let me know when
8  you're done.
9       A.  Okay.
10      Q.  Okay.  Do you recognize Roberts No. 21?
11      A.  No, I do not.
12      Q.  Okay.  I'm going to ask you to turn to
13 Bates No. 091.  Actually, the bottom of the first
14 page rolling over to the next page.
15      See on the March 19th, 2001, e-mail at
16 the bottom of the page, it says, "George Roberts
17 wrote"?
18      A.  Yes.
19      Q.  And then there's some text there, right?
20 See that?
21      A.  Yes.
22      Q.  And then at the bottom of that text, it
23 says, "Sandy and Jay, is the experience for your
24 team similar"?
25      A.  Yes.

236

1  Q.  See that?

2      That suggests that the e-mail was sent

3  to you and Jay Nussbaum; is that correct?

4  A.  That's correct.

5  Q.  But I don't see a header for you or Jay

6  in this e-mail.

7  A.  Correct.

8  Q.  All right.  In any event, I want to talk

9  about the March 2001 -- March 19th, 2001, e-mail

10  that George Roberts appeared to send to you and Jay.

11  Okay?

12      See where he writes, "Here's the latest

13  on ADS from Majors.  While 11.5.3 looks more

14  complete to the field, performance does not appear

15  to have improved.  This quarter we have to perform

16  flawlessly to maximize our revenues and margins.  If

17  this does not improve, it will continue to impact

18  our conversion rate."  See that?

19  A.  Yes, I do.

20  Q.  And at the time, you understood that the

21  demonstration systems or the problems with it were

22  having a negative impact on the ability -- on the

23  company's ability to execute sales; is that right?

24  MR. GIBBS:  Objection.  Lacks foundation.

25  THE WITNESS:  Yeah, it certainly didn't help.

237

1  BY MR. WILLIAMS:

2  Q.  And it impacted -- at least George is

3  saying it was "continuing to impact our conversion

4  rate."  See that?

5  A.  Yes.

6  Q.  And you didn't disagree with that, did

7  you?

8  MR. GIBBS:  Objection.  Lack of foundation.

9  THE WITNESS:  You know, I don't recall.

10  MR. WILLIAMS:  Okay.

11  THE WITNESS:  I don't recall.

12  BY MR. WILLIAMS:

13  Q.  Sitting here today, would you disagree

14  with that statement?

15  A.  You mean five years and four months

16  later?

17  Q.  Yeah.

18  A.  Did I disagree --

19  Q.  I can rephrase the question.

20  A.  Okay.  Why don't you do that.

21  Q.  I'm just asking you:  Sitting here

22  today --

23  A.  Yeah.

24  Q.  -- would you disagree with what George

25  Roberts is indicating here, that if the

238

1  demonstration environment does not improve that it

2  would continue to impact conversion rates?

3  A.  I know that it would -- if your demo

4  environment -- and ADS stands for Application Demo

5  System -- if it's not working like you need, it's

6  going to impact your conversion rate.

7      Now, continue?  Did that continue from

8  last quarter, from the last year, from last week?  I

9  don't know.  And five years and four months later, I

10  can't say.

11  Q.  Looking at the first page, 090, Jeff

12  Henley responds to George Roberts, and he writes,

13  "This is excellent.  You should continue to publish

14  these every week until they get fixed.  When you see

15  all the names of prospects, it's really sickening.

16  Hopefully Larry will get sick as well and put more

17  pressure on getting this fixed."  See that?

18  A.  Yes, of course.

19  Q.  All right.  And if you go to the next

20  page, it appears that Gayle Fitzpatrick forwarded

21  George Roberts' information about -- well, update on

22  demonstrations.  You see that?

23  A.  Correct.

24  Q.  And it includes do-overs, demos impacted

25  due to performance, and feedback on 11.5.3, right?

239

1  A.  Correct.

2  Q.  Do you know whether in March of 2001 the

3  issues surrounding the demonstrations or

4  difficulties doing demonstrations was discussed

5  among the executive committee at the weekly or

6  sometimes weekly executive staff meetings?

7  A.  I don't remember.

8  Q.  Okay.  I'm going to show you what's been

9  previously marked as Hamel No. 12.  It's Bates

10  numbered NDCA-ORCL 063462 through 464.

11      Just take a look at it and let me know

12  when you're done.

13  A.  Okay.

14  Q.  Do you recognize Hamel No. 12?

15  A.  No, I do not.

16  Q.  All right.  Is it fair to say that it is

17  an e-mail from George Roberts to Larry Ellison,

18  Safra Catz, Ken Hamel, Ron Wohl, you, Ed Sanderson,

19  and Mark Barrenechea, Jay Nussbaum and Jeff Henley?

20  A.  Yes.

21  Q.  All right.  And he writes, "Looks like

22  General Business is experiencing the same challenges

23  as Majors.  Sandy, Jay, is it any different for OPI

24  and OSI?"  Do you see that?

25  A.  Yes, I do.

240

1    Q.  Do you know whether or not it was
2  different for your organization?
3    A.  I don't recall.
4    Q.  Okay.  I show you what's been previously
5  marked as Hamel No. 15.  It's Bates numbered
6  NDCA-ORCL 061370 through 373.
7    A.  Okay.
8    Q.  You recognize Hamel No. 15?
9    A.  No, I do not.
10    Q.  And it's an e-mail from George Roberts
11  to several individuals, including you, on or around
12  April 19th of 2001, right?
13    A.  Yes.
14    Q.  And it's to Larry Ellison as well.  And
15  George Roberts writes, "Larry" -- well, withdrawn.
16    Subject line is the "ADS Demo Feedback
17  for the Week Ending April 13th."  See that?
18    A.  Yes.
19    Q.  Were you getting these every week?
20    A.  I don't recall.
21    Q.  George writes to Larry, "The scores for
22  General Business demos for last week, they're not
23  heading in the right direction yet.  Performance and
24  product issues continue to injure us every day."  Do
25  you see that?

241

1    A.  Yes, I do.
2    Q.  Were you guys experiencing anything
3  different in OPI?
4    A.  I don't recall what our numbers were for
5  OPI.
6    Q.  Okay.  I'm going to show you what's been
7  previously marked as Klaiss No. 8.  It's Bates
8  numbered NDCA-ORCL 056440 through 442.
9    Just take a look at that and let me know
10  when you're done.
11    A.  Okay.
12    Q.  Okay.  Do you recognize Klaiss No. 8?
13    A.  I do not.
14    Q.  You weren't cc'd or copied on this
15  e-mail at all, right?  Doesn't appear to be at
16  least.
17    A.  No.
18    Q.  But you know Don Klaiss, right?
19    A.  Yes, I know Don Klaiss.
20    Q.  Okay.  And you know, obviously, Ron Wohl
21  and Mark Barrenechea?
22    A.  Correct.
23    Q.  Do you see -- do you know Drew Campbell?
24    A.  The name's familiar, but I don't
25  remember him specifically.

242

1    Q.  Okay.  See at the bottom of the first
2  page he sends an e-mail to Don and Ron, apparently
3  Don Klaiss and Ron Wohl.
4    A.  Right.
5    Q.  And he says, "FYI, I'm sending you a
6  copy of Hema's" -- I can't read the next word; I
7  think it's "e-mail" --
8    A.  Right.
9    Q.  -- "regarding the need for a test
10  environment for integrated CRM/ERP suite."  See
11  that?
12    A.  Yes.
13    Q.  He indicates, "At this time we do not
14  have a controlled environment where completed
15  integrated systems testing for the whole ERP/CRM
16  suite can take place.  The ADS environments are the
17  only place where all of the code comes together, but
18  they are too dated for systems testing of developing
19  releases."  See that?
20    A.  Yes, I do.
21    Q.  All right.  Going back to the first
22  page, Don Klaiss writes to Mark Barrenechea and Ron
23  Wohl regard -- the subject line is "ERP CRM
24  Integration Testing."  He writes --
25    A.  Wait.  I'm sorry.  Where did you --

243

1    Q.  I'm sorry.  First page.
2    A.  Okay.
3    Q.  It looks --
4    A.  Where is Don -- Mark Barrenechea sending
5  something?
6    Q.  No.  I'm sorry if I'm unclear.  It
7  says -- looks like Don Klaiss is sending an e-mail
8  to Mark Barrenechea --
9    A.  Okay.
10    Q.  -- at the very top of the page.
11    A.  Yeah.
12    Q.  David Williamson, Alan Fletcher and Ron
13  Wohl.
14    A.  Okay.
15    Q.  Mark Barrenechea was head of CRM
16  Development, right?
17    A.  Correct.
18    Q.  And Ron Wohl was head of ERP
19  Development, at least for some period?
20    A.  Correct.
21    Q.  And Don writes "Mark, Alan and David, we
22  need to get" -- I can't read that.  I think it says
23  "CRM products into the TST115 integration testing
24  environment."  You see that?
25    A.  Yes, I do.

244

1     Q.  Do you know what the TST115 integration

2  testing environment was?

3     A.  No, I don't.

4     Q.  I can't read that first word in the next

5  sentence.  Can you?

6     A.  I --

7     Q.  I think it may say "Today's situation."

8     A.  I don't know.  Yeah, it's difficult to

9  read, you're correct.

10    Q.  "Situation is that we cannot test

11 integrated business flows prior," it appears to be,

12 "to customer shipment."  Would you agree with that?

13    A.  That's what it appears to be.

14    Q.  "We are releasing new ERP and CRM Family

15 Packs --" I can't read the next word.

16    A.  I think the word is "regularly."

17    Q.  Okay, "regularly."  "But do not test

18 them against each other.  Clearly a bad situation."

19 See that?

20    A.  Yes, I do.

21    Q.  Did you know that the company was

22 shipping ERP and CRM Family Packs without testing

23 them against --

24    MR. GIBBS:  Objection.

25  / / /

245

1  BY MR. WILLIAMS:

2     Q.  -- against each other?

3     MR. GIBBS:  Objection.  Lacks foundation.

4     THE WITNESS:  I did not.  I did not.

5  BY MR. WILLIAMS:

6     Q.  And that was in June -- July of 2001,

7  right, that e-mail?

8     A.  Correct.

9     MR. WILLIAMS:  It's a good time for a break.

10 For me it is.

11    THE WITNESS:  I'm ready to keep going, but if

12 you want to take a break --

13    MR. WILLIAMS:  I actually need to take a

14 break.

15    THE WITNESS:  Okay.

16    THE VIDEOGRAPHER:  Off the record at

17 4:33 p.m.

18    (A brief recess was taken.)

19    THE VIDEOGRAPHER:  We are back on the record

20 at 4:46 p.m.

21 BY MR. WILLIAMS:

22    Q.  Mr. Sanderson, is it fair to say that

23 sometime in fiscal 2001 Oracle internally upgraded

24 to 11i?

25    A.  I recall us upgrading to 11i.  I don't

246

1  remember the specific time frame.  But it would

2  be -- since we released it in May of 2000, it

3  probably was 2001, fiscal 2001.

4     Q.  What, if anything, did you or OPI do to

5  prepare for the upgrade and how it would impact your

6  business?

7     A.  I know there's some things on the

8  consulting side that we had to prepare for.  I

9  don't remember specifically.  For me personally, the

10 new systems didn't impact my day-to-day.

11    Q.  When you say "personally," you're really

12 referring to you, not your organization?

13    A.  Me personally, correct.

14    Q.  Do you have a recollection of how it

15 would impact your organization?

16    A.  We -- I remember that OSO was brought

17 online, which was Oracle SalesOnline, and we asked

18 the sales force to start putting in -- their

19 pipeline into OSO.  And I remember that they did

20 that, but I don't remember -- I don't remember that

21 changing and being a big impact for us.

22    Q.  Was -- well, why don't you describe for

23 me what OSO was.  We haven't talked about that

24 today.  Since you raised it, maybe it's a good time

25 to talk about it.

247

1     A.  It's Oracle SalesOnline.  As I recall,

2  you could enter in prospective opportunities,

3  client -- customer opportunities.  You could specify

4  dollar amount, probability percentage, which you

5  could update over time.  You would indicate the

6  dollar split between applications and technology.  I

7  believe you could even -- I believe you indicated

8  within applications, for example, what applications

9  did it apply that were being projected, that kind of

10 information.

11    Q.  And that was a CRM-type application?

12    A.  It was a CRM module, right.

13    Q.  And Oracle began using it -- well, the

14 OSO when, do you remember?

15    A.  No.  But it certainly is factual.  I

16 think you have got documents that show when it was

17 being used.  I don't recall specifically.

18    Q.  Okay.  But you recall using it at least

19 toward the end of your tenure?

20    A.  Yeah.  But I didn't -- as I said, for me

21 personally, I didn't use it a lot because I had

22 other sources of information that I used that we had

23 in place, everybody understood, and I tended to

24 focus on that.

25    Q.  What sources of information --

248

1    A.  It's the --

2    Q.  -- are you talking about?

3    A.  -- forecasting information that we use

4  for OPI, for example.

5    Q.  That's what I'm trying to understand.

6  What type of information are you talking about that

7  was separate from OSO?

8    A.  Well, I know you have the documents for

9  OPI, so you have that information already.  It's

10  information that shows, for example, worst case,

11  most likely and best case; information by client --

12  I mean, per customer, by region, by area.

13    Q.  Are you talking about some of the

14  documents that you may have seen yesterday?

15    A.  Yeah.  And they are ones that I would

16  assume if I've seen them, you've seen them.

17    Q.  Okay.  But I don't know what you looked

18  at yesterday.

19    A.  I just described one of the documents --

20    Q.  Okay.

21    A.  -- that shows worst case, most likely

22  and best case.

23    Q.  Okay.  Did they have a name?

24    A.  They might.  I -- if we look at one, I

25  can look at the top and see if there's a name there.

249

1    But I just call them -- I mean, I referred to them

2  as my forecast spreadsheets is how I remember them

3  today.

4    Q.  Okay.  But they're different from OSO?

5    A.  Yeah.

6    Q.  Who created them?

7    A.  Some combination of the field and

8  finance.

9    Q.  When you say "the field," are you

10  referring to people in the sales organization --

11  your OPI sales, license sales?

12    A.  Yeah.

13    Q.  And would that be just regional

14  managers, AVPs?

15    A.  It was probably prepared by either

16  operations managers or finance people in the field

17  that would capture the information from the account

18  reps working with the regional manager, the AVP, and

19  would categorize or segment the deals in the three

20  categories that I just described.

21    Q.  Okay.  And it's kind of like in an

22  Excel-type spreadsheet?

23    A.  It was an Excel spreadsheet.

24    Q.  Were you the only person who those

25  documents rolled up to, or did all the AVPs and

250

1    regional managers get the information that you're

2  talking about?

3    A.  They got it as well.

4    Q.  Okay.  And it was circulated by, I

5  guess, the -- I guess, field-level finance?

6    A.  It was put together, and then the

7  finance director that reported to me would take that

8  information and consolidate it so that I would have

9  forecast information for east, central and west

10  within OPI.

11    Q.  Was that Richard Blotner?

12    A.  No.  That was -- initially Ivgen Guner

13  and then Jim English.

14    Q.  And Jim English, okay.

15    So, they would gather that information

16  from the field, roll it up to you, and then you'd

17  circulate it back out to the field?

18    A.  Yes, but I'm not sure in the way you're

19  implying.  We would have them put it together, and

20  then when I was going to have either my biweekly or

21  weekly forecast call, that was the basis for the

22  discussion.

23    Q.  Okay.  And so -- and that -- so, the --

24  withdrawn.

25    So, your biweekly call or your weekly

251

1    call would be initiated by whom?

2    A.  We had standing day and time each

3  week -- or, I mean, at the beginning of the quarter,

4  it was biweekly, and then in the -- towards the end

5  of the quarter, it was weekly.

6    And they were standing dates and times

7  that we did these, and they were published, and

8  everybody understood what they were.  I say

9  "published," I think knew, for example, Monday at

10  9:00 a.m. was going to be a forecast call.

11    Q.  And the people that would be

12  participating in the call would all get maybe an

13  e-mail with the spreadsheet that you're talking

14  about?

15    A.  I would -- you'd have to talk to Jim

16  English.  I don't know how it was distributed to

17  them.  I know that, in fact, that they had the

18  information 'cause we used that document to review

19  the forecasts on each forecast call.

20    Q.  And I just -- I'm pausing because I just

21  want to make sure I understand.

22    Are you saying that your people in OPI

23  did not use Oracle SalesOnline, OSO?

24    MR. GIBBS:  Objection.  Misstates the

25  testimony.

252

1      MR. WILLIAMS: It's a question. I'm asking.

2      THE WITNESS: No, they did use it.

3      MR. WILLIAMS: Okay.

4      THE WITNESS: Okay. And I would periodically

5   use it as well.

6      MR. WILLIAMS: Okay.

7      THE WITNESS: I had something that I had been

8   using that was tried and proven, that I continued to

9   use even after OSO was launched. So, I'd

10  periodically use OSO. I'd refer to OSO to go in if

11  I wanted to see some information on a particular

12  deal that I may not have. I could do right there at

13  my desk. I could go online and look at it. But

14  when it came to forecast calls, I used my forecast

15  spreadsheets.

16  BY MR. WILLIAMS:

17      Q. Okay. That's something that you hadn't

18  said before, that -- so, are you saying that you

19  only used the forecast spreadsheets for the calls?

20      A. Versus what?

21      Q. Well, at some point you had to give

22  forecasts to Larry Ellison and Jeff Henley, right?

23      A. And then when I had to give that

24  information, Jim English would take our forecasts.

25  We agree what our forecast was, whether it was, you

253

1   know, for that week, for example. And then Jim

2   English would feed the Oracle applications that fed

3   the information up to Henley and Jennifer Minton and

4   Larry, Safra, that kind of thing.

5      Q. So, you got to bear with me because you

6   were there. I wasn't. So, I'm trying to

7   understand --

8      A. That's fine.

9      Q. -- how it worked. Okay?

10      A. I'll be glad to explain.

11      Q. So, when you -- Jim English would feed

12  what application?

13      A. I don't recall the names of the Oracle

14  applications specifically.

15      Q. But you knew that after -- let me

16  withdraw.

17      So, Jim English would kind of, you know,

18  talk to the AVPs, the regional managers and people

19  in the field and put together a spreadsheet for you

20  based on that information?

21      A. No. It's not "kind of." There was

22  never any "kind of" done. What happened was the

23  regional -- the account -- the area vice presidents

24  would have their own forecast calls and get the

25  input -- I say "forecast calls." I don't know

254

1   exactly how they did it. I don't recall that.

2      But they would talk with each of their

3   account managers and regional managers and get their

4   forecasts for their respective areas. Either their

5   operations manager or their finance person -- and I

6   don't recall which -- would then take that

7   information and put that into the spreadsheet -- the

8   forecast spreadsheet. And Jim English would

9   capture -- take that information and then share it

10  with me, and then I would use that for the forecast

11  calls with the AVPs.

12      Q. You recall being interviewed by Oracle's

13  special litigation committee a few years ago?

14      A. Yes.

15      Q. Okay. And do you recall telling them

16  with regard to OPI forecasting that "The field

17  agents enter their data into Oracle SalesOnline

18  system, OSO, which is a data consolidation database.

19  Then the OPI regional managers, who each manage

20  several accounts, impose their judgment onto those

21  numbers to create a forecast. The forecasting

22  numbers that travel up the ranks of the organization

23  from the area vice presidents to Sanderson, with

24  each manager's judgment being imposed at every

25  level. Finally Sanderson made a final adjustment

255

1   and substituted the OPI forecast" -- I'm sorry --

2   "submitted the OPI forecast to Jennifer Minton, who

3   would make her upside adjustment on the OPI number.

4   Sanderson confirmed that he followed this practice

5   during Q3 of fiscal 2001."

6      Do you recall telling the members of the

7   special committee that in sum and substance?

8      A. Yeah. We've not talked about judgment.

9   I think it's a good description. The one thing you

10  said -- it's a small detail. It was, like, the

11  second to last sentence. Did you say "Sanderson

12  provided that to Jennifer Minton"?

13      Q. It says, "Finally Sanderson made a final

14  adjustment and submitted the OPI forecast to

15  Jennifer Minton, who would make her upside

16  adjustments on the OPI number. Sanderson confirmed

17  that he followed this practice during Q3 of fiscal

18  2001."

19      A. The correction I would make there,

20  because I believe this is an attorney that is

21  interpreting my comments -- right? As opposed to my

22  deposition.

23      Q. Sure.

24      A. So, it's an interview note.

25      Q. Uh-huh.

256

1    A.  The one correction I'd make to all of
2  that, all of it is fine with the exception that
3  Sanderson didn't turn it -- give it to Jennifer
4  Minton.  Jim English would feed that information to
5  Jennifer Minton.
6    Q.  Okay.  Now --
7    A.  But I think the process you described
8  there is -- is as I recall.
9    Q.  Okay.  I didn't read or describe
10  anything about any Excel spreadsheets, though.
11    A.  It was -- the way that we capture
12  judgment, for example, use the term "judgment," I
13  would capture that in that spreadsheet.
14    Q.  Okay.
15    A.  That was one of the ways that I used
16  that spreadsheet.
17    Q.  Okay.  I think your testimony was -- and
18  correct me if I'm wrong -- that Jim English would go
19  out and get information from the field, put it into
20  an Excel spreadsheet, I guess show it to you, and
21  then that spreadsheet would be what you used for the
22  forecast calls.
23         And what the special committee recorded
24  from what you told them was that you explained that
25  the agents -- the field agents enter their data into

257

1  Oracle SalesOnline.
2    A.  Right.  Yeah.  And I'm trying to
3  remember from a long time ago.  But the way you just
4  described it in here is correct.  At some point,
5  that -- the way you just read in that testimony,
6  with that one clarification --
7    Q.  Sure.
8    A.  -- that I just made regarding Jennifer
9  Minton and how she got the information.  The field
10  put the data into OSO, just as you described.  All
11  of that's correct.  That went to the regional
12  managers, and the regional managers would apply
13  judgment.  And then the AVPs would review it and
14  apply their judgment.
15         At some point in that process,
16  information was also put into the spreadsheet that I
17  used so that I could hold my weekly or biweekly
18  forecast calls.
19    Q.  Now, the judgment that the regional
20  managers would put in, was that in the -- in OSO?
21    A.  I don't recall.
22    Q.  And the judgment that the AVPs would
23  include, was that in OSO?
24    A.  I don't recall.
25    Q.  Now, did Jim English take the

258

1  information -- well, withdrawn.
2         Did Jim English take information from
3  OSO to put into your spreadsheet?
4    A.  I don't know how Jim English
5  specifically did it.  I don't recall.
6    Q.  Should I from -- well, withdrawn.
7         Going forward from right now, should I
8  disregard what you said about the spreadsheet
9  because I feel like it's going to impact everything
10  we talk about from now on because I'm not -- I don't
11  quite understand it as it relates to what you told
12  the special committee.
13    A.  There's nothing secretive about it, and
14  it was not something I withheld from anybody.  I
15  mean -- and it's standard practice.  I mean, it's --
16  I mean, standard practice.  I mean, it's not
17  uncommon to track worst case, most likely and best
18  case.  I just found that having it all consolidated
19  on a spreadsheet in the way that I liked to look at
20  the information was very helpful.
21    Q.  I think -- that's fine.  I'm just trying
22  to understand, as I review these documents, should I
23  be looking at OSO or should I be looking at your
24  spreadsheets?
25    A.  They should be consistent.  I'm just

259

1  telling you what I used as a senior manager in the
2  company to do my forecasts.
3    Q.  But they would only be consistent if Jim
4  English was drawing his information from OSO to
5  create your spreadsheet.
6    A.  You should ask Jim English if he did
7  that.  I don't know how he did that.
8    Q.  Well, he reported to you, didn't he?
9    A.  No, he didn't.  As we talked about
10  earlier in this deposition this morning, Finance is
11  a solid line up through Finance.  So, he did not
12  report to me.  He was my designated Finance
13  director, but he did not report to me.
14    MR. MAROULIS:  My apologies for the
15  interruption.  I need to leave.
16         (Mr. Maroulis leaves the deposition
17  room).
18    THE WITNESS:  OSO gives you the capability,
19  as I recall, to export data out of OSO if you want
20  to do some sort of analysis that's different than a
21  standard report in OSO.  And you can export it, for
22  example, to an Excel spreadsheet.
23  BY MR. WILLIAMS:
24    Q.  So that if Jim wanted to do that, he
25  could?

260

1      A.   Yeah.

2      Q.   So -- and you don't know whether or not

3   that's what he did in order to create your -- the --

4   your forecast call spreadsheet?

5      A.   Yeah, I don't remember today how he

6   specifically created those spreadsheets, what the

7   process was that he went through.

8      Q.   Okay.  You told the special committee

9   that you held forecast calls with AVPs at least

10  every other week or something like that; is that

11  correct?

12     A.   Yeah.  It was every other week at the

13  beginning of the quarter, and then it became weekly

14  in the last month of the quarter.

15     Q.   Okay.  Why did you hold those calls with

16  the AVPs rather than, say, the regional managers?

17     A.   Sometimes I'd have the regional managers

18  on or sometimes even the account manager.  But the

19  people that were required to be on it as a regular

20  practice were the AVPs.

21     Q.   And why is that?

22     A.   Why did I have my AVPs on my forecast

23  call?

24     Q.   Why was it that those were the only

25  people that were required to be on the call?

261

1      A.   It -- versus who?

2      Q.   Well, we were just talking about

3   regional managers.  And you said, well, sometimes

4   you had the regional managers on the --

5      A.   Sometimes I --

6      Q.   Just a minute.  Sometimes you had the

7   regional managers on the call --

8      A.   Uh-huh.

9      Q.   -- but AVPs were the only ones that were

10  required to be on the call?

11     A.   As a standard practice --

12     Q.   Right.

13     A.   -- weekly as a standing practice --

14     Q.   Okay.

15     A.   -- AVPs were on the call.  It was not

16  unusual that regional managers or account managers

17  for specific deals would also be on the call.

18     Q.   Would you say that you communicated more

19  frequently with the AVPs than regional managers?

20     A.   Probably in volume.  But if it was --

21  you know, is the deal we're pursuing in GE?  Then I

22  would communicate with regional managers, sometimes

23  even account managers -- I mean, not sometimes.  I

24  would also communicate with account managers.  When

25  I'd go visit accounts, go visit customers or

262

1   prospects, oftentimes I did that with the account

2   manager.  So, I also had that form of input as well.

3      Q.   So, in terms of when you say "in

4   volume," what do you mean?  You actually spoke with

5   them more frequently but not necessarily -- well,

6   withdrawn.

7           I just want to understand what you meant

8   when you said, "Well, in volume, yes."

9      A.   Because the AVPs -- I'm talking about

10  the time when they reported to me.

11     Q.   Right.

12     A.   I tended to communicate with people that

13  report to me more frequently than people that do not

14  report to me.  That's what I meant by "volume."

15     Q.   Okay.  We got a little off track there,

16  and I was beginning to talk about the internal

17  upgrade.

18     A.   Okay.

19     Q.   I kind of want to get back on that --

20     A.   Okay.

21     Q.   -- and we'll talk about OSO, I'm sure, a

22  little bit more tomorrow.

23     A.   Okay.

24     Q.   So, you -- as far as you recall, the

25  upgrade occurred sometime in 2001 --

263

1      A.   Right.

2      Q.   -- right?

3           I'm going to ask the reporter to mark

4   this document as Sanderson No. 14.  It's Bates

5   numbered 020704 through 706 and with the NDCA-ORCL

6   prefix.

7           (E-mail string dated 11/00 re CRM

8   Rollout Date marked Exhibit 14 for identification.)

9           THE WITNESS:  Okay.

10  BY MR. WILLIAMS:

11     Q.   Do you recognize the document?

12     A.   I don't recall it specifically, no.

13     Q.   Okay.  It's an e-mail from Mark

14  Barrenechea to several people of the executive staff

15  including you, right, on November 5th, 2000?

16     A.   Correct, along with a number of other

17  people.

18     Q.   Right, a number of people.

19           And it appears to be a summary of the

20  upcoming CRM rollout --

21     A.   Correct.

22     Q.   -- is that fair?

23     A.   Yes.

24     Q.   If you go to page, I guess, ending 705,

25  I guess the top of the page it's a list of target

264

1  dates for specific applications that are going to be
2  upgraded, right?
3      A.  Right, because it was done over a period
4  of time.
5      Q.  All right.  And so, do you know whether
6  or not these were the first upgrades, or had
7  upgrades been executed prior to November 5th,
8  2000?
9      A.  I don't.  I don't know whether we had
10  rolled out financials, for example, earlier.  I
11  don't know if financials, which is part of ERP, was
12  rolled out earlier.
13      Q.  Okay.  And No. 6 says "Contracts, live
14  with ERP 11i."
15      A.  Right.
16      Q.  See that?
17      A.  Yes.
18      Q.  Do you know whether that's the same 11i
19  contracts module that customers had difficulty
20  implementing we talked about earlier today?
21      A.  I would assume so, that it's the same
22  application.
23      MR. WILLIAMS:  I'll ask the reporter to mark
24  this document as Sanderson No. 15.  It's Bates
25  numbered NDCA-ORCL 028582, 583.

265

1      (E-mail string dated 12/00 re First Q3
2  Forecast Data marked Exhibit 15 for identification.)
3      THE WITNESS:  Okay.
4  BY MR. WILLIAMS:
5      Q.  You recognize the document?
6      A.  I do not.
7      Q.  Okay.  It's an e-mail from Mark
8  Barrenechea again, to you, cc'ing -- and to several
9  other people, cc'ing to Jennifer Minton, Jeff
10  Henley, Frank Varasano, Safra Catz and Larry
11  Ellison, right?
12      A.  Right.
13      Q.  And it's related to Q3 forecast and the
14  pipeline, right?
15      A.  Yeah, I believe what it's really about
16  is the conversion from 11.0.3 to 11i applications,
17  OSO specifically.
18      Q.  Right.  So, the e-mail on the first page
19  ending 582 states -- at least on the bottom, Mark
20  Barrenechea writes "By Tuesday, December 5th,
21  please ensure your teams have completed updating
22  their Q3 pipeline forecast data within Oracle
23  SalesOnline."
24      A.  Right.
25      Q.  And then do you know why that was

266

1  necessary or why Mark Barrenechea requested that?
2      A.  Yeah.  We were converting to OSO, 11i
3  OSO, and you need to -- he's just saying make sure
4  all your data is accurate in 11.0.3 because there
5  was going to be a period of time, as he said here,
6  hopefully it's December 13th, that you'd be
7  without a system while it was being upgraded, which
8  is a standard practice in any company.
9      Q.  Does he say "accurate" or does he say
10  "updated"?
11      MR. GIBBS:  You mean what's the word on the
12  page?
13      MR. WILLIAMS:  Uh-huh.
14      THE WITNESS:  The word says "update."
15      MR. WILLIAMS:  Right.
16      THE WITNESS:  What's the significance of
17  "accurate" versus "update"?
18  BY MR. WILLIAMS:
19      Q.  I just want to make sure that that's
20  what he said.  He didn't say "accurate."  He said
21  "update," right?
22      A.  I think that's a picky point, but --
23      Q.  Okay.
24      A.  -- he has on the document "update."
25  You'd like to think, if somebody's updating it,

267

1  they're going to be putting the most accurate data
2  at that point.  I hope they're not putting in
3  inaccurate data.
4      Q.  Well, what kind of data would be used to
5  update the Oracle SalesOnline?
6      A.  When he talks, for example, here of
7  updating Q3 pipeline?
8      Q.  Right.
9      A.  It might be adding new customers.  It
10  might be removing customers -- I mean, prospects is
11  really what --
12      Q.  Sure.
13      A.  -- or prospective deals.  It could be
14  adding deals, taking away deals, changing the size
15  of the deals, changing the mix of the deals between
16  applications and database, and within applications
17  what they are.  Those kinds of things.  So, making
18  sure that it best reflects your pipeline at that
19  point in time.
20      Q.  And do you know whether or not in
21  December of -- or in the months prior whether the
22  manner or the types of prospective deals that were
23  input into Oracle SalesOnline had changed from prior
24  practices?
25      A.  Oh, the manner in which?

268

1   Q.  Or the type.

2   MR. GIBBS:  Objection.  Compound.

3   THE WITNESS:  What I recall is that the

4   information was similar.  The format was different

5   to some degree.  Oracle SalesOnline was an online

6   system.  I don't remember if the previous system was

7   a batch system, for example.  I don't recall.  But

8   it's the same basic information it was -- but now

9   using OSO.

10  BY MR. WILLIAMS:

11  Q.  Now, isn't it true that in the summer or

12  early fall of 2000, Larry Ellison asked you and the

13  other executive vice presidents to make sure that

14  your teams were including more accurate information

15  in Oracle SalesOnline or in the pipeline as opposed

16  to sort of sandbagging?

17  MR. GIBBS:  Objection.  Lack of foundation.

18  THE WITNESS:  I believe what you're talking

19  about, Shawn, is -- and in the end, I would describe

20  them as two different things.

21  BY MR. WILLIAMS:

22  Q.  Describe what as two different things?

23  A.  What you just described:  What's in the

24  pipeline and being more accurate and not

25  sandbagging.

269

1   Q.  Okay.

2   A.  The -- one thing that we all wanted,

3   Larry -- I remember Larry asking for it, and I was

4   after it as well, is sometimes there is a reluctance

5   of a salesperson to put a deal into OSO or into the

6   sales pipeline because, as soon as they did that,

7   somebody is going to start asking them questions

8   about it.  And they may conclude in their mind

9   somewhere that the deal hadn't matured enough in the

10  process to do that.

11  So, I -- I actually made it a point as

12  well that I wanted our sales reps to make sure they

13  were putting all deals into OSO.  It

14  wasn't -- if they were working on it, it went in.

15  Q.  Was that before or after Larry had asked

16  for people to include more information in Oracle

17  SalesOnline or in the pipeline?

18  A.  As I recall, it was right about the same

19  time.  And I can't remember if Larry was the impetus

20  for that or it was because I took over OPI that I

21  was the impetus.

22  Q.  Okay.

23  A.  You made a point about sandbagging.

24  Q.  Sure.

25  A.  Sandbagging was typically associated --

270

1   that term was typically associated with somebody's

2   forecast and whether they were being too

3   conservative in their forecast.  That's why I was

4   saying I felt it was two different things.

5   Sandbagging related to forecast and then having your

6   pipeline current was something different.

7   Q.  Okay.  Well, tell me -- well, okay.

8   I just want to be careful with the terms

9   that I use in asking the questions because I think

10  there you just said "having the pipeline current"

11  and I think that, based on what you've told me in

12  the last minute or two -- are you referring to the

13  pipeline including deals that previously a

14  salesperson may not have thought it was mature

15  enough to include into the pipeline?

16  A.  Ask the question one more time just to

17  make sure I give you a good answer.

18  Q.  When you say "keeping the pipeline

19  current," are you -- does that mean that your

20  expectation at the time was that salespeople would

21  include deals in the pipeline -- I'm sorry -- yeah,

22  in the pipeline, that prior to this, you know, you

23  taking over OPI or Larry Ellison's --

24  A.  Right.

25  Q.  -- comments, they may not have included

271

1   because the deal was not mature enough in their view

2   to include in the pipeline?

3   A.  To some degree, yes, and some degree,

4   no.  And let me explain so I'm not confusing.  One

5   of the things that OSO did is gave global

6   visibility.  Larry, for example, could sit in his

7   office or at home and go on OSO and see what the

8   pipeline was in OPI.  He could see what the pipeline

9   was for a particular account manager.  He could do

10  that around the world.

11  So, we did make it initiative -- before

12  it didn't -- the pipeline didn't have as much

13  visibility like that, that anybody could go take a

14  look at it.  That was one of the benefits of 11i:

15  It gave you that global visibility.

16  Q.  When you say "before" --

17  A.  Well, under like 11.0.3.  Yeah, like

18  before 11i.

19  Q.  So, are you saying that before the

20  December upgrade, that that database was

21  unavailable, that global view was unavailable?

22  A.  Yeah.  Yes, because, one, as I -- I

23  don't recall it being online access.  But one of the

24  issues we also had is EMEA had its database of OS --

25  you know, that it captured sales opportunities, and

272

1  they may even have had more than one database.  For
2  example, U.K may have had a database separate from
3  the French database, separate from the U.S.
4  database, separate from George Roberts' OSO, you
5  know, sales database.  One of the things that OSO
6  did was create one database that captured all of
7  that sales information worldwide.
8      Q.  Now --
9      A.  It was a real advantage of the product.
10     Q.  Was OSO in use prior to December of
11  2000?
12     A.  I don't recall.  I think we've got some
13  memos here and probably other information that would
14  tell us that.
15     Q.  All right.  Back to my previous question
16  about the pipeline being current.
17     A.  Yeah.
18     Q.  You made a comment that prior to some
19  date, some salespeople wouldn't include deals in the
20  pipeline because they may not have believed the deal
21  was mature enough.
22     A.  Yeah.  Now, we're also talking about a
23  very, very small percentage of the deals.  I mean,
24  this was a random, unusual occurrence.  I just
25  wanted a standard practice, if a sales rep was

273

1  working on anything, any client -- any customer
2  opportunity or a prospective opportunity, that was
3  in OSO.
4      In the end, I think we're making a much
5  bigger deal of it than it was.  It -- instead of
6  capturing 99 deals, we now captured 100 deals when I
7  gave that mandate.  I just wanted to make sure we
8  captured it.
9      Q.  And that occurred when, right around the
10  time you started, you took over OPI?
11     A.  Yeah, and I don't remember specifically.
12  And, again, as we rolled out OSO, I could sit down,
13  I could go online right at my desk or when I was
14  traveling and go online.  I could go into OSO, and I
15  could see what Max Hill, who's one of the regional
16  managers we talked about earlier, I could go see
17  what his deals are.  I could see what he's saying is
18  the latest around Bechtel -- or Beckman, as an
19  example.
20     And it gave us a lot -- all of us a lot
21  more visibility.  It gave Finance more visibility.
22  It gave Larry more visibility.  It gave me more
23  visibility to my respective areas of responsibility.
24     Q.  Okay.  And that's fine.  We're talking
25  about and you're telling me about OSO, but I just

274

1  want to make sure that I've buttoned down this --
2  what is going into the pipeline issue, keeping the
3  pipeline current.
4      A.  Yeah.
5      Q.  So, are you saying that when Larry, in
6  the summer or early fall of 2000, said that he
7  wanted everything in the pipeline, that necessarily
8  included deals that prior to that time salespeople
9  may not think that the deal had matured enough to be
10  included in the pipeline?
11     A.  Yeah -- I'll say it again.  I think,
12  one, we're making a big deal out of nothing.  Number
13  two is we had 99 -- as an example, we had 99 deals
14  in there.  This mandate now got us to 100.  Not 150,
15  not 200.  On the margin, it would give us a deal or
16  two more that I could have visibility to.
17     Typically, just so you know, if the
18  sales rep didn't feel it was mature enough to put
19  into the pipeline, if it was a debate in their mind,
20  it was not a deal that I was going to spend any time
21  on anyway because I wanted to spend my time and my
22  management's time around deals that were substantive
23  and had real opportunities to close that quarter.
24     Q.  Okay.  One of the things you testified
25  to earlier was that Oracle SalesOnline allowed you

275

1  to put in win probability, right?
2      A.  Yes.
3      Q.  Okay.  And that ranged from, what, 10 to
4  100?
5      A.  I don't remember what the mechanism was,
6  whether it was one to ten or whether it was a
7  percentage, but it was something -- it is something
8  like that.
9      Q.  Something low to high?
10     A.  Yeah, and it's some numerical -- to your
11  point, it's some sort of numerical assessment.
12     Q.  Right.  So, would you say -- say, for
13  instance, it's 10 to 100, just hypothetically.
14  Would you say a probability of 10 would be a deal
15  that wasn't quite mature?
16     MR. GIBBS:  Objection.  Lack of foundation,
17  vague.
18     THE WITNESS:  If we say 10 to 100, is it all
19  right to use percentages and say that's 10 percent?
20     MR. WILLIAMS:  Sure.
21     THE WITNESS:  So, 10 percent could mean a
22  number of different things.  It could mean that it's
23  very early in the cycle.
24  BY MR. WILLIAMS:
25     Q.  Meaning not mature?

276

1    A.  Yes.  I think it's -- we could decide
2  what "mature" is.  We could have a discussion around
3  that.  But it's very early in the cycle.
4         It could be that it was a higher
5  probability and then, for some reason, it went back
6  down to 10 percent.  So, it may have been a very
7  mature deal that new information -- the client
8  decided not to buy our product or the client decided
9  internally because of their own financial or capital
10  constraints that they were going to delay this into
11  the future.  So, we could have a deal that we
12  thought was 70 or 80 percent that moves back to
13  10 percent.  Very mature deal but moved back to
14  10 percent.
15    Q.  So, and sometimes if it's mature, it
16  could almost mean that the deal is dead?
17    MR. GIBBS:  Objection.  Vague, lacks
18  foundation.
19    THE WITNESS:  The more you understood about
20  the deal -- and there's lots of things that you
21  understand around a deal -- the more accurate you
22  could give a percentage probability that that deal
23  was going to close.
24  BY MR. WILLIAMS:
25    Q.  Or not.

277

1    A.  I think the fact that I say percentage
2  that the deal is going to close means there's an "or
3  not" in there.
4    Q.  Okay.  Actually, it means or not for the
5  quarter, though; isn't that fair?
6    A.  What I don't remember is in a percentage
7  did it have the quarter in there as well.  I just
8  don't recall after these number of years.  It could
9  be a probability, and it may have also -- you would
10  indicate the quarter that it was going to close.
11    Q.  Okay.  Give me a moment, please.
12         I'll show you what's been previously
13  marked as Wohl No. 11.  It's Bates numbered
14  NDCA-ORCL 012385.
15    A.  Okay.
16    Q.  Do you recognize the document?
17    A.  No, I do not.
18    Q.  Okay.  And do you -- well, it appears to
19  be an e-mail from Larry Ellison to Ron Wohl and an
20  exchange of e-mails between them and others, right?
21    A.  Correct.
22    Q.  In December 2000, December 9th?
23    A.  Right.
24    Q.  Okay.  And did you know that the
25  internal upgrade in December of 2000 had been

278

1  delayed?
2    A.  I don't recall.  You mean for two weeks
3  so that we could take the benefit of the New Year's
4  weekend to do it when volumes were slower?  Is that
5  your question?
6    Q.  Well, for any reason, do you know
7  whether it was delayed?
8    A.  No, I don't recall that.  It's not
9  unusual, though.
10    Q.  Why not?
11    A.  I think if someone was experienced in
12  information systems, they would understand the point
13  that it's not unusual that you might delay an
14  implementation or conversion to a new system.  I
15  think that's a base knowledge that somebody would
16  have.
17         The fact that it was two weeks, I
18  thought Ron, reading this e-mail, did a nice job of
19  explaining that waiting until New Year's weekend,
20  when people wouldn't be working, wouldn't be putting
21  transactions into the system, probably made a lot of
22  sense.
23    Q.  Right.  Let me show you what's been
24  previously marked as Wohl No. 6.  It's Bates
25  numbered 052474.

279

1    A.  Okay.
2    Q.  Do you recognize the document?
3    A.  No, I do not.
4    Q.  Do you know Carolyn Balkenhol?
5    A.  Yes, I do.
6    Q.  Who was she?
7    A.  She is Larry's assistant.  And one of
8  the things that she did for Larry is -- at least
9  then was play some sort of operations role and would
10  review -- I don't know if it was deals or it could
11  be that she was being asked to review requests for a
12  new laptop.  I think that's typical.  Those were the
13  kinds of things that she would review.
14    Q.  What is WEBREQS, did you know?
15    A.  It was a web-based requisition software,
16  but I don't remember much beyond that.
17    Q.  Was it part of 11i?
18    A.  I don't recall specifically.
19    Q.  Do you know Kevin Miller?
20    A.  Yes, I remember Kevin.
21    Q.  And who was he?
22    A.  He was the development manager reporting
23  in -- he was in Ron Wohl's organization that was
24  responsible for our procurement portion of the
25  E-Business Suite.

280

1    Q.   That iProcurement?

2    A.   IProcurement would be a piece of it, but

3 I believe they were other pieces to procurement as

4 well.

5    Q.   And that was WEBREQS would be part of

6 that, wouldn't it?

7    A.   Logically speaking, yes.

8    Q.   Were any of the consultants on your

9 staff participating in the internal upgrade?

10    A.   I don't recall.

11    Q.   Let me show you what's been marked as

12 Godwin No. 8.  Ask you to take a look at it and let

13 me know when you're done.

14    A.   Okay.

15       Okay.

16    Q.   Do you recognize this document?

17    A.   No, I do not.

18    Q.   And the bottom half of the document, the

19 e-mail from Ron Wohl to several people on

20 December 30th of 2000, see that?

21    A.   Yes, I do.  I don't think, just as a

22 point, I'm obviously not included on it, and none of

23 my folks are that I recognize.

24    Q.   Okay.  I show you what's been previously

25 marked as Scott No. 6.  It's Bates numbered

1 NDCA-ORCL 219741 to 746.

2    A.   Okay.

3    Q.   Do you recognize the document?

4    A.   No, I don't.

5    Q.   It's an e-mail from Brad Scott to you on

6 or around January 15 of 2001, right?

7    A.   Right.

8    Q.   And if you go to the Bates ending

9 219744, there's an e-mail there from Sharon Prosser

10 in the middle of the page.

11    A.   Yes.

12    Q.   Who is Sharon Prosser?

13    A.   I don't know.

14    Q.   And she's sending an e-mail to you about

15 the forecast call for Monday, right?

16    A.   When you say "for the forecast call," I

17 think she's saying that it's more focused on the

18 status of a product called OTS.  And that's really

19 the substance of the product.  It just says "Per the

20 forecast call on Monday."

21    Q.   Okay.  So --

22    A.   I don't think it's related to the --

23    Q.   This is a Tuesday, so maybe she's

24 referring to the previous day?

25    A.   Yeah, could be.

1    Q.   Okay.  And do you know what OTS was or

2 is?

3    A.   No.  I was trying to remember.

4    Q.   Is it Oracle 11i telesales or something

5 along those lines?

6    A.   It could be.  As I said, I don't recall.

7 I don't recall.

8    Q.   And do you know who the Erica that

9 she's referring to?

10    A.   Yeah.  Erica did run telesales for Latin

11 America, yeah.

12    Q.   And so, she says that "I've been

13 speaking with Erica regarding her experience in

14 Latin America."  Is LAD Latin America Division or

15 something like that?

16    A.   Correct.

17    Q.   "Downtime days are projected at a total

18 of $4 million loss in revenue, so we're being

19 cautious."  What is she referring to there?

20    MR. GIBBS:  Objection.  Lack of foundation,

21 calls for speculation.

22    THE WITNESS:  My speculation is that when LAD

23 converted to this OTS system, that they were down

24 for a period of time which resulted in $4 million of

25 loss in revenue.  In other words, they probably had

1 a day or some number like that, day or two, where

2 they weren't able to take telesales order, and it

3 was a 4 million loss.  That doesn't mean, by the

4 way, it wasn't captured later on when the system

5 came back up.

6 BY MR. WILLIAMS:

7    Q.   Do you know whether or not it was?

8    A.   I don't.  I also know that it -- I mean,

9 I don't know that it didn't.

10    Q.   I'm sorry.  Say that again.

11    A.   You asked do I know that it happened.

12    Q.   Okay.

13    A.   The answer is no.  I also know that I

14 don't know that it didn't happen.

15    Q.   Okay.  I'm going to show you what's been

16 marked as Borthwick No. 10.  It's Bates numbered

17 NDCA-ORCL 056213 through 214.

18    A.   Okay.

19    Q.   Okay.  Do you recognize the document?

20    A.   No, I do not.

21    Q.   And at least the bottom half of the

22 first page is an e-mail from Saran Kopp to Jim

23 English, who's one of your operations -- was your

24 operations person, right?

25    A.   No.

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

1    Q.  Or assigned to you?

2    A.  He was my finance director assigned to

3    me.

4    Q.  I'm sorry.  Finance director.

5        And Keith Block, Valerie Borthwick, Mark

6    Salser, John Wheeler, Steve Perkins, all in your

7    organization?

8    A.  No.  Block, Borthwick, Salser were.

9    Wheeler was in OSI.  Perkins was in OSI.

10   Q.  All -- OSI Consulting?

11   A.  No.  I believe -- well, Wheeler, I

12   believe, was in OSI Consulting reporting to Jay

13   Nussbaum.  Steve Perkins was a head of sales --

14   financial services sales -- license sales for Jay

15   Nussbaum.

16   Q.  You see where she writes -- Sarah Kopp

17   writes, "To address the issue of consultant's

18   accessing the incorrect expense entry screen, IT-ERP

19   are removing duplicate responsibilities from anyone

20   who currently holds both U.S. expense reporting and

21   U.S. expense reporting with Projects so that they

22   are forced to use the Projects entry screen."  You

23   see that?

24   A.  Uh-huh.

25   Q.  Do you know what she is talking about as

285

1    it relates to 11i migration update?

2    A.  I do not.

3    Q.  Do you know whether the time and expense

4    module of 11i was one that the consultants had a

5    difficult time updating or using?

6    A.  I don't.  What they are talking about

7    here is expense entries, so that would be, like,

8    out-of-pocket expenses for consultants.

9    Q.  Out-of-pocket?

10   A.  Expenses for consultants.  Hotels, cars.

11   Q.  I show you what's been marked as Block

12   No. 18.  It's Bates numbered 034382 and 383.

13   I'm going to ask you to take a look at it and let me

14   know when you're done.

15   A.  Okay.

16   Q.  Another update from Sarah Kopp to you

17   and others, and a few of those were in the

18   consulting organization, right?

19   A.  Correct.

20   Q.  In on around January 29th of 2001?

21   A.  Correct.

22   Q.  And it's regarding "Projects 11i Upgrade

23   Status."

24   A.  Uh-huh.

25   Q.  Right.  And Projects is the application

286

1    for out-of-pocket expenses for consultants?

2    A.  Projects was capturing time and

3    expense -- or is capturing time and expense.  So,

4    it's a project-control system that is a part of 11i.

5    Q.  And she's indicating that -- well,

6    withdrawn.

7        She says the "Most significant issues,

8    in order of importance:  No. 1, Self-Service

9    Applications.  The applications (Self-Service Time

10   and Expense) have been down since 10:00 a.m. today.

11   Operational impact:  Not able to enter time in order

12   to calculate labor revenue or rebill expenses.  We

13   risk falling behind again like we have in the last

14   two weeks."

15       Do you know what she's referring to

16   here?

17   A.  She's referring to the self-service

18   application that was down since 10:00 a.m. that day.

19   Is that answering your question?

20   Q.  Well, what I'm asking really is what she

21   means by the "Operational impact:  Not able to enter

22   time in order to calculate labor revenue."

23   A.  I think what she's saying is, since

24   10:00 a.m. that day, consultants were not able to

25   enter their time into the system or their expenses.

287

1    Q.  And that impacts what Oracle can bill

2    customers in the quarter, right?

3    MR. GIBBS:  Objection.  Lacks foundation.

4    THE WITNESS:  At that specific point.  But as

5    soon as it comes back up, then you go ahead and put

6    your time in then.  It just means that if a

7    consultant tried to enter their time in sometime

8    that day after 10:00 a.m., they couldn't.  That

9    doesn't mean the next day if it was back up, they

10   couldn't put in the time that they meant to put in

11   the day before.

12   MR. WILLIAMS:  Sure.  I understand that.

13   THE WITNESS:  So, does it have any kind of

14   lasting impact or significant impact on revenue that

15   it was down for a short period of time, if in fact

16   it was?  No.

17   BY MR. WILLIAMS:

18   Q.  Well, doesn't it impact what Oracle

19   could, for example, invoice that day?

20   A.  Yeah, but you could go the next day.

21   This was not the end of the quarter.  This is the

22   29th of January.

23   Q.  I'm not making a big point about it.

24   I'm just asking if it would impact that.

25   A.  Yeah, but I mean -- yeah, they couldn't

288

1  bill during that time it was down.

2     Q.  Right.

3     A.  That doesn't mean, as soon as it came

4  back up --

5     Q.  -- you couldn't bill?

6     A.  -- you couldn't bill.

7     Q.  Right.  But you don't know how long it

8  was down, right?

9     A.  No.

10    Q.  And, in fact, she indicates that "We

11  risk falling behind like we have during the last two

12  weeks," right?

13    A.  Uh-huh.

14    Q.  And --

15    A.  To be clear, I don't recall ever hearing

16  that we weren't able to bill consulting revenue or

17  expenses because the system was down sometime during

18  that period of time.  That would have been elevated

19  to me.  I would have -- I would have made it a huge

20  issue if we had our backs against the wall, and I

21  don't recall that ever happening.

22    Q.  Okay.  Just going down to No. 3 on the

23  first page of the document, "Project Accounting."

24    A.  Yes.

25    Q.  WIP, I guess, that means work in

289

1  progress?

2     A.  Yeah, either work in progress or work in

3  process.

4     Q.  Okay.  "Utilization reports are

5  incorrect.  Operational impact:  Managers are unable

6  to view current status of projects."

7     A.  Uh-huh.

8     Q.  Do you recall that being an issue with

9  respect to the internal upgrade of 11i?

10    A.  I don't.

11    Q.  How about, "No. 2, Self-Service

12  Applications:  Week ending date issue; consultants

13  unable to override default date.  Operational

14  impact:  Not able to enter time in the appropriate

15  dates and frustrated end users or transaction

16  controls needed to be set.  Estimated resolution:

17  This is being worked on.  Time could be entered via

18  preapproved form."

19       Do you know what the preapproved form is

20  that she's referring to?

21    A.  No, but it sounds like it's a form that

22  you could complete that would accomplish the same

23  thing but was probably more manual than being able

24  to do it online.

25    Q.  Online, okay.

290

1     A.  There was a work-around.

2     Q.  Did you have a Blackberry back in 2001?

3     A.  I had one for a brief period of time,

4  but I don't know how long.

5     MR. WILLIAMS:  All right.  I'm going to stop

6  here for today.

7     THE WITNESS:  Okay.

8     MR. WILLIAMS:  I've hit the seven-hour mark,

9  and we'll just pick it up tomorrow morning.

10    THE WITNESS:  Sounds good.

11    THE VIDEOGRAPHER:  This marks the end of

12  Videotape No. 4 of Volume I of the deposition of

13  Edward Sanderson.  The original videotapes will be

14  retained by LiveNote World Service.

15       Going off the record.  The time on the

16  monitor is now 5:57 p.m.

17       (Deposition adjourned at 5:57 p.m.)

18          * * * * *

19

20

21

22

23

24

25

291

1        I declare under penalty of perjury that

2  the foregoing is true and correct; that I have read

3  my deposition and have made the necessary

4  corrections, additions or changes to my answers that

5  I deem necessary.

6        Executed on this _____ day of

7  _____, 2006.

8

9

10       _____

            EDWARD J. SANDERSON, JR.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

292

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

```
1

2

3          REPORTER'S CERTIFICATE

4

5          I, KAE F. GERNANDT, a Certified

6    Shorthand Reporter for the State of California, do

7    hereby certify:

8          That the witness in the foregoing

9    deposition was by me duly sworn; that the deposition

10   was then taken before me at the time and place

11   herein set forth; that the testimony and proceedings

12   were reported by me stenographically and were

13   transcribed through computerized transcription under

14   my direction; and the foregoing is a true and

15   correct record of the testimony and proceedings

16   taken at that time.

17          IN WITNESS WHEREOF, I have subscribed my

18   name this 2nd day of August, 2006.

19

20

21

22   _____

23          Kae F. Gernandt, CSR No. 5342

24

25
```

293

Oracle                                                          Page  293

1

2

3                    REPORTER'S CERTIFICATE

4

5           I, KAE F. GERNANDT, a Certified Shorthand

6    Reporter for the State of California, do hereby certify:

7           That the witness in the foregoing deposition

8    was by me duly sworn; that the deposition was then taken

9    before me at the time and place herein set forth; that

10   the testimony and proceedings were reported by me

11   stenographically and were transcribed through

12   computerized transcription under my direction; and the

13   foregoing is a true and correct record of the testimony

14   and proceedings taken at that time.

15           IN WITNESS WHEREOF, I have subscribed my

16   name this 3rd day of August, 2006.

17

18

19

20   _____

21           Kae F. Gernandt, CSR No. 5342

22

23

24

25

568

EXHIBIT M

```
 1      IN THE UNITED STATES DISTRICT COURT
 2      NORTHERN DISTRICT OF CALIFORNIA
 3         SAN FRANCISCO DIVISION
 4
 5  In re ORACLE CORPORATION
 6  SECURITIES LITIGATION.
 7         Master File No. C-01-0988-MJJ
 8  This Document Relates To:
 9
10     ALL ACTIONS.
11  _____/
12
13         ---oOo---
14         CONFIDENTIAL
15  VIDEOTAPED DEPOSITION OF JENNIFER MINTON
16         Volume 2
17     Monday, September 25, 2006
18         ---oOo---
19   SHEILA CHASE & ASSOCIATES
         REPORTING FOR:
20    LiveNote World Service
      221 Main Street, Suite 1250
21  San Francisco, California 94105
       Phone: (415) 321-2300
22      Fax: (415) 321-2301
23
24  Reported by:
    RACHEL FERRIER, CSR
25  CSR No. 6948
```

271

```
 1         I N D E X
 2     INDEX OF EXAMINATION
 3                    PAGE
 4  EXAMINATION BY MR. BRITTON      277
 5
 6         ---oOo---
 7     INDEX OF EXHIBITS
 8  DESCRIPTION              PAGE
 9  Exhibit 22A   Financial Report
       Bates-stamped NDCA-ORCL
10      440076-092         295
11  Exhibit 23A   (None marked.)
12  Exhibit 24A   Financial Report
       Bates-stamped NDCA-ORCL
13      440093-109         295
14  Exhibit 25A   Financial Report
       Bates-stamped NDCA-ORCL
15      440110-126         295
16  Exhibit 26A   Financial Report
       Bates-stamped NDCA-ORCL
17      440127-143         295
18  Exhibit 27A   Financial Report
       Bates-stamped NDCA-ORCL
19      440144-160         295
20  Exhibit 28A   Financial Report
       Bates-stamped NDCA-ORCL
21      440246-262         295
22  Exhibit 29A   Financial Report
       Bates-stamped NDCA-ORCL
23      440161-177         295
24  Exhibit 30A   (None marked.)
25
```

272

```
 1  Exhibit 31A   Financial Report
       Bates-stamped NDCA-ORCL
 2      440178-194         295
 3  Exhibit 32A   Financial Report
       Bates-stamped NDCA-ORCL
 4      440195-211         295
 5  Exhibit 33A   Financial Report
       Bates-stamped NDCA-ORCL
 6      440212-228         295
 7  Exhibit 34A   Financial Report
       Bates-stamped NDCA-ORCL
 8      440229-245         295
 9  Exhibit 42    E-mail from Sarah Kopp
       to Jennifer Minton dated
10      1/18/01            302
11  Exhibit 43    E-mail from Larry Garnick
       to Jennifer Minton, et al.,
12      dated 1/17/01      311
13  Exhibit 44    License & Consulting Report
       Q3 FY01 Week 8      319
14
    Exhibit 45    E-mail from Larry Garnick
15     to Jennifer Minton, et al.,
       dated 2/8/01        333
16
    Exhibit 46    E-mail from Jennifer Minton
17     to Michael Rocha dated
       2/16/01            343
18
    Exhibit 47    E-mail from Jennifer Minton
19     to Michael Rocha dated
       4/20/01            356
20
21
22
23
24
25
```

273

```
 1      BE IT REMEMBERED that on Monday, September 25,
 2  2006, commencing at the hour of 1:08 p.m., thereof,
 3  at the Law Offices of LERACH, COUGHLIN, STOIA,
 4  GELLAR, RUDMAN & ROBBINS, LLP, 100 Pine Street, Suite
 5  2600, San Francisco, California, before me, RACHEL
 6  FERRIER, a Certified Shorthand Reporter in and for
 7  the State of California, personally appeared
 8         JENNIFER MINTON,
 9  called as a witness by the Plaintiffs herein, who,
10  being by me first duly resworn/affirmed, was
11  thereupon examined and testified further as
12  hereinafter set forth.
13         ---oOo---
14  Appearing as counsel on behalf of Plaintiffs:
15    DOUGLAS R. BRITTON, Esquire
      GAVIN BOWIE, Esquire
16    LERACH, COUGHLIN, STOIA, GELLAR, RUDMAN &
      ROBBINS, LLP
17    655 West Broadway, Suite 1900
      San Diego, California 92101-8498
18    (619) 231-1058
      dougb@lerachlaw.com
19    gbowie@lerachlaw.com
20
    Appearing as counsel on behalf of the Defendants:
21
      PETER A. WALD, Esquire
22    MICHELE F. KYROUZ, Esquire
      LATHAM & WATKINS, LLP
23    505 Montgomery Street, Suite 2000
      San Francisco, California 94111-2562
24    (415) 391-0600
      peter.wald@lw.com
25    michele.kyrouz@lw.com
```

274

Minton, Jennifer (30b6)  9/25/2006  1:08:00 PM

1    JAMES C. MAROULIS, Esquire
     ORACLE CORPORATION
2    500 Oracle Parkway, MS 5OP7
     Redwood Shores, California 94065
3    (650) 506-5200
     jim.maroulis@oracle.com
4
5
6    Also present:  Cassia Leet, Videographer
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

275

1    THE VIDEOGRAPHER:  Here begins the
2    videotaped deposition of Jennifer Minton, Tape 1,
3    Volume 2, in the matter of In Re Oracle Corporation
4    Securities Litigation in the United States District
5    Court, Northern District of California, Case No.
6    C-01-0988-MJJ.
7        Today's date is September 25th, 2006, and
8    the time on the video monitor is 1:08.
9        The Video Operator today is Cassia Leet,
10   representing LiveNote World Service, located at
11   221 Main Street, Suite 1250, San Francisco,
12   California 94105; phone number, (415) 321-2300.
13       The Court Reporter is Rachel Ferrier of
14   Sheila Chase, reporting on behalf of LiveNote World
15   Service.
16       Today's deposition is being taken on behalf
17   of the plaintiff and is taking place at 100 Pine
18   Street, San Francisco, California.
19       Counsels, please introduce yourselves and
20   state whom you represent.
21       MR. BRITTON:  Doug Britton with Lerach,
22   Coughlin on behalf of plaintiffs.
23       MR. BOWIE:  Gavin Bowie with Lerach,
24   Coughlin on behalf of plaintiffs.
25       MR. WALD:  Peter Wald with Latham &

276

1    Watkins on behalf of the witness and defendant.
2        MS. KYROUZ:  Michele Kyrouz of Latham &
3    Watkins on behalf of the defendant.
4        MR. MAROULIS:  James Maroulis of Oracle
5    Corporation for Defendant Oracle Corporation.
6        MR. BRITTON:  Okay.
7        THE VIDEOGRAPHER:  Would the Court Reporter
8    please swear in the witness.
9            JENNIFER MINTON,
10   having been duly resworn, testified further as
11   follows:
12       THE VIDEOGRAPHER:  Please begin.
13           EXAMINATION
14   BY MR. BRITTON:
15   Q    Good afternoon, Ms. Minton.  Thank you for
16   coming back.
17       We've arranged, your counsel and I, to
18   exchange some documents that have wrong dates, and
19   I'll go through that as we go through the deposition.
20       The question I have is whether the reports
21   that are supposed to be produced pursuant to
22   Judge Infante's order going back to 1999 are here
23   today?
24       MS. KYROUZ:  No.
25       MR. BRITTON:  No --

277

1        MS. KYROUZ:  You mean the sales forecasts
2    that go back to '99?  No.  We will have those on
3    Friday.
4        MR. BRITTON:  Okay.  So given that there
5    may be some issues that we may have to cover with
6    Ms. Minton in a subsequent deposition, since they are
7    not here -- so you are going to take your position;
8    we will take ours -- but depending upon what those
9    documents mean, we will reserve our rights and
10   proceed accordingly.
11       MR. WALD:  Fair enough.  Let's agree that
12   we will reserve our rights without agreeing with what
13   you say.
14       MR. BRITTON:  Sure.
15       MR. WALD:  Doug, as I mentioned to you
16   right at the beginning, the witness would like to
17   clarify two points that she testified about
18   previously.
19       MR. BRITTON:  Certainly.  Why don't you do
20   that.
21       THE WITNESS:  Well, while I was thinking
22   about my testimony in recent days, I recalled that
23   there was a question that was asked of me about
24   whether or not I knew about the investigation that
25   the company undertook once we had some complaints

278

Oracle                                                    Page  275 - 278

1  filed about accounting allegations.  I just want to
2  clarify what I did know.
3      I knew that there was an investigation
4  going on.  I knew that -- but I was not involved in
5  the actual underlying investigation itself.
6      In addition, I believe -- not believe, but
7  I know that after -- thinking about it, that I did
8  become aware of the results of the investigation
9  outside of attorney-client privileged communications.
10     And to further that point, I did, in fact,
11  have conversations with both -- with Tom Williams;
12  that I can't recall specifically anyone else that
13  evaluated the -- that discussed the financial results
14  of that investigation, and we did an evaluation of
15  those results to determine if there was a material
16  impact on our fiscal 2001 financial statements.
17     And we had concluded that we had not --
18  that there was not a material impact on those
19  financial statements, so I needed to clarify that
20  aspect of my testimony.
21     MR. WALD:  And just so the record is clear,
22  I believe the witness testified previously that she
23  did know the results but through privileged
24  communications, so this is a further elaboration of
25  that point.

1  BY MR. BRITTON:
2    Q   When did you become aware of the results of
3  the investigation?
4    A   I don't recall exactly when, but it would
5  have been after the investigation had been, for the
6  most part, concluded, and the investigation did not
7  even begin until after the allegations were actually
8  made, which I believe were sometime in October of
9  2002.
10    Q   How long after the investigation was
11  concluded did you become aware of the results?
12    A   Again, I do not recall how long it took for
13  the investigation to take place, but prior to
14  confer -- conveying the results of that investigation
15  to our audit committee meeting, which was done in an
16  attorney-privileged session, I had been made aware of
17  the financial results of it and whatnot, as I
18  previously testified.
19    Q   So you were made aware of the results of
20  the investigation at the audit committee meeting?
21    A   I was made aware at the audit committee
22  meeting.
23    Q   Okay.  Did you know before the audit
24  committee meeting?
25    A   I do -- I cannot recall the timing of when

1  Was it written?
2    A   The analysis would have been a financial
3  analysis to evaluate the impact on our fiscal
4  financial -- fiscal 2001 financial periods -- period.
5    Q   Was it written, in writing?
6    A   I believe the underlying analysis was
7  performed in Excel.
8    Q   The results of that investigation that were
9  contained in the Excel spreadsheets, were those
10  produced in this litigation, do you know?
11    A   I do not have personal knowledge of what
12  was or was not provided.
13     MR. BRITTON:  Counsel, is that a question
14  that you can answer?
15     MS. KYROUZ:  No, it's not a question we can
16  answer right now.  I'm guessing somebody else on your
17  side probably knows the answer as well, but I can't
18  tell you today.
19  BY MR. BRITTON:
20    Q   Did you request Tom Williams to prepare
21  this financial analysis?
22    A   I don't recall.
23    Q   And how long after you became aware of the
24  results of the investigation did you receive this
25  financial analysis from Tom Williams?

1  I had conversations with Tom Williams, but it was
2  more likely than not that I was made aware of it
3  prior to the audit committee meeting because we did,
4  indeed, do an analysis as to whether or not the
5  financial results of that investigation -- whether or
6  not they had a material impact on our fiscal 2001
7  financial statements, and we concluded that we --
8  that they had not.
9    Q   Did you do an investigation or an
10  evaluation into whether they had an effect on the
11  second quarter of fiscal 2001?
12    A   I don't recall whether we did an audit --
13  whether we evaluated the financial impact on
14  fiscal 2Q.
15    Q   Okay.
16    A   I remember we did it for the full of the
17  fiscal year and that it was not material.  I also
18  believed that we evaluated the effect on Q3 and Q4,
19  but I don't recall precisely.
20    Q   Who was involved in this evaluation?
21    A   Tom Williams.
22    Q   Were you?
23    A   Did I perform the analysis?  No.  The
24  analysis was prepared for me.
25    Q   And in what form did the analysis take?

Minton, Jennifer (30b6)  9/25/2006  1:08:00 PM

---

1    A    Again, I did not say that I was -- that I
2  received an analysis. I was made aware of an
3  analysis that was performed.
4    Q    So you didn't receive the Excel
5  spreadsheets in your hand?
6    A    Not that I recall, no. I'm assuming they
7  were Excel spreadsheets because they were
8  mathematical computations. It could have been in the
9  form of a Word document.
10    Q    But you didn't see it or receive it; is
11  that right?
12    A    I don't recall the manner in which I became
13  aware of this information. I do know that it was
14  discussed at a audit committee meeting, and I --
15  again, I am testifying that I spoke with Tom Williams
16  more likely than not prior to that audit committee
17  meeting because we would have wanted to performed the
18  analysis, the evaluation as to whether or not it
19  would have had a material impact on our fiscal 2001
20  financial results, for which it did not, and for
21  which also our outside auditors concluded.
22    Q    Was this analysis shared with the outside
23  auditors?
24    A    Yes.
25    Q    Did the analysis show that the --

283

---

1  committee meeting about the results of the analysis?
2    A    There were -- there were discussions about
3  the analysis and that it did not have a material
4  impact on our fiscal 2001 financial statements.
5    MR. WALD: And you have already testified
6  about the results of the investigation, so I think
7  that's perfectly fine. I just want to remind you
8  that the audit committee meeting that you are
9  testifying about was a privileged meeting --
10    THE WITNESS: That's correct.
11    MR. WALD: -- in which lawyers were
12  present --
13    THE WITNESS: That is correct.
14    MR. WALD: -- so I would caution you not to
15  reveal attorney-client confidences. Thank you.
16  BY MR. BRITTON:
17    Q    Were your outside auditors at this audit
18  committee meeting?
19    A    I don't recall.
20    Q    Were you involved in any discussions with
21  the outside auditors outside of this audit committee
22  meeting?
23    A    I don't recall any specifically, but it's
24  possible.
25    Q    Do you know if Tom Williams had any

285

---

1  withdrawn.
2    Did the financial analysis show any impact
3  on Oracle's financial results for fiscal 2001?
4    A    The financial results showed that there was
5  an immaterial financial impact.
6    Q    And by "immaterial," can you tell me the
7  amount?
8    A    I don't recall precisely, but I recall it
9  was clearly less than $20 million in revenues.
10    Q    And in what quarter did it have the impact
11  of clearly less than 20 million in revenues?
12    A    I do not recall, but that was the impact
13  also for the full year. It was not the full impact
14  for any one quarter.
15    Q    And you can't tell me, sitting here today,
16  whether the analysis was performed for Q2, or can you
17  tell me that it was not performed for Q2?
18    A    I do not recall. I recall there being
19  analysis prepared in connection with the fiscal 2001
20  financial statements.
21    Q    Okay. Were you involved in presenting the
22  results of the analysis at all at the audit committee
23  meeting?
24    A    I attended the audit committee meeting.
25    Q    Did you have any discussions at the audit

284

---

1  discussions with the outside auditors outside of the
2  audit committee meeting?
3    A    Tom Williams would have discussed this with
4  the auditors.
5    Q    All right. Why don't you grab the
6  binder --
7    MR. WALD: I'm sorry. Was there a second
8  point that you wanted to clarify?
9    THE WITNESS: Yeah.
10    The second point that I wanted to
11  clarify -- you asked whether or not there were any
12  internal controls in effect. I don't recall the
13  question specifically at the moment. And my response
14  at the time was "I do not know."
15    As I think back about it, we did, indeed,
16  have internal controls in place, including account
17  reconciliations, review of variation analyses, which,
18  as I did testify to, is no different than the types
19  of controls that an auditor -- a review that an
20  auditor would undertake to determine if there -- or
21  to detect and investigate if there were any items
22  that needed further investigation or to ensure that
23  accounts were fairly stated.
24  BY MR. BRITTON:
25    Q    All right. Going back to the

286

---

Oracle

Page  283 - 286

1  investigation, did you, personally, conclude that
2  there was no material impact on the 2001 financial
3  statements?
4     A   Based on the financial results that were
5  presented, yes.
6     Q   Okay.  You didn't do your own
7  investigation?
8     A   The investigation that was undertaken was
9  undertaken by the company under the direction of
10  counsel.
11    Q   Okay.  Other than the presentation
12  materials, did you review any other documents
13  relating to this investigation?
14    A   Not that I recall.  Again, there was a
15  discussion.  There -- I'm assuming that there was
16  some sort of analysis that I may have had presented
17  to me, but not that I recall, in order to compute the
18  impact that the financial results of the
19  investigation had on the fiscal 2001 financial
20  results, which were immaterial.
21    Q   Did you document your conclusions anywhere
22  about the impact of -- withdrawn.
23        Did you document your conclusions about the
24  investigation and the effect on Oracle's financial
25  statements anywhere?

287

1     A   I, personally?
2     Q   Mm-hmm.
3     A   No.
4     Q   Okay.  Did Tom Williams document the
5  conclusion anywhere?
6     A   I believe Tom Williams is the individual
7  who had documented the analysis or prepared and
8  documented the analysis.
9     Q   Okay.  And the analysis that he documented
10  and the conclusion that he documented, that was what
11  was presented at the audit committee meeting?
12    A   I think we are getting hung up in an
13  analysis.  I'm assuming he prepared a financial
14  analysis.
15    Q   Did you see it?
16    A   I remember seeing something that was
17  subject to client -- attorney-client privilege,
18  confidential information, so --
19    Q   Okay.  Did you see anything that was not
20  subject to the attorney-client privilege?
21    A   Not that I recall, but I did have
22  discussions about the financial results of the
23  investigation which, again, I want to emphasize, were
24  not material.
25    Q   And who came to the conclusion that the

288

1  impact on the financial statements was not material?
2     A   I came to the conclusion, as did other
3  members of the finance team.
4     Q   Did Tom Williams?
5     A   Yes.
6     Q   Okay.  Did Tom Williams come to that
7  conclusion before reaching the audit committee
8  meeting?
9     A   We had come to that conclusion, yes.
10    Q   So you both said to that conclusion
11  before the audit committee meeting?
12    A   Yes.
13    Q   Okay.  So why don't you tell me about your
14  conversations with Tom Williams before the audit
15  committee meeting.
16    A   Again, I just recall that we had a
17  conversation about the financial results.
18    Q   Okay.  And did you talk -- did you ask
19  Mr. Williams about the impact on the second quarter
20  of fiscal 2001?
21    A   I do not recall.
22    Q   During this conversation with Tom Williams,
23  did he give you any materials that reflected his
24  analysis?
25    A   I do not recall.

289

1     Q   Okay.  Now, you are recalling quite a bit
2  about the investigation.
3        Why -- why were you not able to testify
4  about this in the first day of your deposition?
5     A   I didn't recall it at the time.
6     Q   Okay.  Did you have --
7     A   And when I was reading my deposition, my
8  memory was becoming refreshed.
9     Q   Okay.  Did you have any conversations with
10  anybody else concerning your memory being refreshed?
11    A   The only conversations I've had regarding
12  my deposition have been with counsel.
13    Q   Okay.  Anybody else at Oracle?
14    A   Only with counsel.
15    Q   Okay.  And what about the reviewing your
16  deposition refreshed your memory about the details of
17  this investigation?
18        MR. WALD:  Again, for the record, the
19  witness did testify previously that she was aware of
20  the results but only through privileged
21  communications.  I think what got refreshed was that
22  she had conversations that were not privileged and,
23  therefore, that she had an obligation to disclose
24  them.
25        MR. BRITTON:  Right.

290

1    THE WITNESS:  And that's the clarification
2  I'm trying to make.
3    MR. BRITTON:  Right.  And I also think you
4  testified that she didn't know any of the details of
5  the investigation, so --
6    THE WITNESS:  No.  I was not involved in
7  the actual underlying investigation.  And I knew the
8  financial results, but I did -- was not involved in
9  the actual investigation itself.
10    MR. WALD:  I think -- just, Doug, I mean,
11  obviously the record is what it is --
12    MR. BRITTON:  Right.
13    MR. WALD:  -- I think you asked her two
14  questions.  I think one was her involvement in the
15  investigation.  I think she said she wasn't involved.
16  The second was the results, and I think she said that
17  she knew those but only through privileged
18  communication.
19    Subsequent to that, she realized that she
20  had these other conversations with Tom Williams, and
21  that's why she wanted to clarify that.
22  BY MR. BRITTON:
23    Q    Okay.  Did anybody influence your -- did
24  anybody influence the change in your recollection
25  about the investigation?

291

1    A    Absolutely not.
2    Q    Okay.  Now, let's go to the internal
3  controls.
4    Why were you not able, during the first day
5  of your deposition, to testify about the internal
6  controls that existed at Oracle?
7    A    At the time, I couldn't recall.  I believe
8  I said "I don't know" when I should have said "I
9  don't recall."
10    Q    And you are the -- you were the controller
11  at the time at Oracle; is that right, during the
12  second and third quarter fiscal 2001?
13    A    Yes.
14    Q    Okay.  And you couldn't, on your first day
15  of your deposition, testify about any internal
16  controls at Oracle?
17    A    I couldn't recall about the specific
18  internal controls surrounding the unapplied cash
19  question that you put forth to me, not any internal
20  controls.  In fact, I did testify about internal
21  controls.
22    Q    Did you do any investigation after the
23  first day of your deposition into the internal
24  controls that impacted that unapplied cash account?
25    A    Can you repeat the question?

292

1    Q    Did you do any investigation into the
2  internal controls that would have affected the
3  unapplied cash account?
4    A    After my deposition?
5    Q    Yes.
6    A    Absolutely not.
7    Q    Okay.  Did you talk to anybody about the
8  internal controls that would have affected the
9  unapplied cash account?
10    A    The only conversations I've had are with
11  outside counsel, briefing them on my memory being
12  refreshed as a consequence of thinking about this
13  upcoming deposition.
14    Q    That's it?
15    A    That's all I would like to clarify.
16    Q    That's all you would like to clarify?
17  Okay.
18    Take the binder that's in front of you, I
19  would appreciate it.
20    Since your last deposition and based in
21  part on the testimony you gave about the legibility
22  of some of the reports that I've showed to you, I had
23  a conversation with your counsel about reports that
24  are easier to read, and there's some issues with the
25  dates on the reports that are easier to read in the

293

1  production.
2    Now, what has been presented to us today is
3  a binder of upside reports with an index of the
4  original reports that I marked at the last
5  deposition, and then new exhibit numbers with A's,
6  new Bates numbers, and then the dates on the far
7  right column.
8    Do you see where I'm looking?
9    A    Mm-hmm.
10    Q    Have you looked at these reports prior to
11  today?
12    A    I was shown the reprinted versions of these
13  reports today.
14    Q    Okay.  And will you agree that the reports
15  that are contained in the binder that are referenced
16  as Minton Exhibit 22A through 34A -- will you -- will
17  you agree that the dates on the reports are incorrect
18  and that the reports in this binder are the dates of
19  the upside reports that occurred in the third quarter
20  of 2001?
21    A    Yes.
22    Q    Okay.  And if you look at the first page of
23  the binder, there's the index -- very first page.
24  There's a column on the far right-hand side.
25    Will you agree that the dates that are

294

1  listed in that date column are the dates on the
2  corresponding exhibits?
3      A   Are the dates of the upside reports, yes.
4      Q   Correct.
5          And that other than the printed dates on
6  the reports, the reports are authentic copies of the
7  reports that were produced and printed out on those
8  respective dates?
9      A   Yes.
10         MR. BRITTON:  Counsel, thank you for
11  putting this together.  We appreciate it.
12         (Exhibit Nos. 22A, 24A-29A, 31A-34A were
13         marked for identification.)
14  BY MR. BRITTON:
15     Q   Now, if you would take a look at
16  Exhibit 24A for me, please.
17         I'm going to pull out the first page of
18  this.
19     Q   Okay.  We looked at Exhibit 24 during your
20  first deposition, so I just wanted to use this to
21  refresh your memory about where we were and where we
22  left off so I can ask you questions about subsequent
23  upside reports.
24         Is that okay?
25     A   Sure.

295

1      Q   Is that okay?
2      A   Sure.
3      Q   All right.  So if you turn to the second
4  page of Exhibit 24A, which is the December 25th, 2000
5  upside report, that shows the field forecast, your
6  upside adjustments, and the potential forecasts for
7  that date; is that right?
8      A   That is correct.
9      Q   Okay.  And the upside adjustment that you
10  made for license revenues as of that date was 159.9
11  million; is that right?
12     A   That is correct.
13     Q   Okay.  Now, if you turn to the page ending
14  with Bates 97?
15     A   Yes.
16     Q   These -- and on the top row, these are the
17  upside adjustments that are broken down by division;
18  is that right?
19     A   By organization, that is correct.
20     Q   Okay.  And for OSI, the upside adjustment
21  was 25 million?
22     A   That is correct.
23     Q   For NAS, the upside adjustment was
24  50 million?
25     A   That is correct.

296

1      Q   And for OPI, the upside adjustment was
2  35 million?
3      A   That is correct.
4      Q   And I think, for the record, Exhibit 24A
5  starts at Bates NDCA-ORCL 440093 and ends at 109.
6          Okay.  You can put that -- that's all I
7  have for that exhibit.
8          All right.  Now, I would like you to turn
9  to Exhibit 25A.
10         This is the upside report for January 15th,
11  2001; is that right?
12     A   That is correct.
13     Q   Okay.  And if you turn to the second page
14  of Exhibit 25A, that shows that the upside
15  adjustments for license revenues dropped to 94.910
16  million; is that right?
17     A   That is correct.
18     Q   Okay.  Can you tell me why you adjusted
19  your upside down from 159.5 million to 94.9 million?
20     A   As I previously testified, I don't recall,
21  nor did I ever document the specifics of how we
22  arrived at any upside adjustments at any point in
23  time.
24         I took into consideration various inputs,
25  whether they were held, you know, through EC

297

1  meetings, whether they were held through American --
2  America's Forecast calls, any e-mails or other
3  telephone conversations that I may have had with
4  management and/or with my finance team, so --
5      Q   Okay.  And down at the bottom of the page
6  with Bates 440111, there's market expectations, 12
7  cents, and that was the guidance that Oracle gave to
8  the street -- or the third quarter of 2001; is that
9  right?
10     A   This is as of 1/15?  That's correct.
11     Q   Okay.  And the earnings per share above
12  that was 12.11 cents.
13         That's the potential forecast; is that
14  right?
15     A   I'm sorry.  What page again?  40111?
16     Q   Yeah, 111, right above the market
17  expectations.
18         So you were -- you were forecasting 12.11
19  cents per share as of this date; right?
20     A   That is correct.
21     Q   Okay.  And the field was forecasting 10.6
22  cents per share; is that right?
23     A   I'm sorry.  I don't see where you see that
24  number.
25     Q   Earnings per share under the "Forecast"

298

1    column?
2    A   Oh, yes. Sorry.
3    Q   Okay. Now, the -- the two columns to the
4    right of the forecast upside and potential say:
5    Forecast versus prior year percentage and potential
6    growth percentage.
7      Do you see that?
8    A   Mm-hmm.
9    Q   So the left column is the field forecast
10   growth percentage; is that right?
11   A   The forecast versus prior year percentage?
12   Q   Yes.
13   A   The minus 17 percent? Yeah, that's the
14   submitted forecast.
15   Q   Okay. So the field was forecasting growth
16   of 20 percent year over year in license revenues; is
17   that right?
18   A   Where do you see 20 percent?
19   Q   Top row under "Q3 Forecasts vs. Prior
20   Year" --
21   A   For license --
22   Q   For license --
23   A   -- yes.
24   Q   Right, for license.
25      And you were forecasting 29 percent for

299

1    license; is that right?
2    A   That is correct.
3    Q   And this document was distributed at the
4    executive management committee meetings?
5    A   I don't believe that this document
6    necessarily was distributed, being that that was a
7    holiday, December 25th, Christmas.
8      MR. WALD: This is January 15th.
9      THE WITNESS: Oh, January 15th. Oh, I'm
10   sorry. I'm down one.
11      January 15 -- I'm not certain if we had an
12   EC meeting on that date or not.
13   BY MR. BRITTON:
14   Q   But if you had one, it would have been
15   distributed?
16   A   Well, here's the -- if we had one, it would
17   have been distributed, correct.
18   Q   Okay. If you turn to the page that ends
19   with Bates 114 on Exhibit 25A, this breaks down
20   license revenue by organization; is that right?
21   A   That is correct.
22   Q   Okay. And you have eliminated any upside
23   to OSI; is that right?
24   A   That is correct.
25   Q   Why did you do that?

300

1    A   I don't recall exactly why I made the
2    change to his forecast at that point in time.
3    Q   Okay.
4    A   Again, it would have been based off of
5    information that I received, as I testified earlier,
6    whether it be in conversations, e-mails, review of
7    historical pipeline conversion analyses, whatnot,
8    so --
9    Q   But you can't tell me specifics today on
10   why you dropped -- you eliminated the upside
11   adjustment --
12   A   No --
13   Q   -- for OSI?
14   A   -- we never documented specifically how we
15   documented our upside numbers.
16   Q   And that's the same answer for the NAS
17   upside adjustment; is that right?
18   A   That is correct.
19   Q   And you brought it down from 50 million to
20   14 million; is that right?
21   A   From which forecast period?
22   Q   From the prior report that we looked at,
23   which was December 25th?
24   A   I brought OSI down -- from 25 down to 0;
25   NAS, from 50 million to 14.

301

1    Q   And OPI you kept --
2    A   Remained at 35.
3    Q   -- kept at 35.
4      (Discussion off the stenographic record.)
5      (Exhibit No. 42 was marked for
6      identification.)
7    BY MR. BRITTON:
8    Q   Okay. Placed before you what's been marked
9    as Plaintiffs' Exhibit 42.
10      Will you take a moment to look at this
11   exhibit, please?
12      Okay. Do you recognize Exhibit 42?
13   A   Yes.
14   Q   What is Exhibit 42?
15   A   It's an e-mail note from Sarah Kopp to me,
16   giving me an update on the forecast for OSI.
17   Q   This was three days after the last upside
18   report that we looked at; is that right?
19   A   That would be correct.
20   Q   This is dated Thursday, and it's at 17:29.
21   Looks like military time.
22      That would be 2:29; is that right?
23   A   I'm not certain. It depends on the date of
24   the person's -- I'm not sure how these dates are --
25      MR. WALD: I think, normally, it's 5:29

302

1  p.m. in some time zone.

2      MR. BRITTON:  In some time zone.

3  Q   And would that have been before or --

4  A   That doesn't mean when I read it.

5  Q   This would have been before or after the

6  America's Forecast call on Thursdays?

7  A   I don't know if this came before or after

8  the forecast call.

9  Q   When do those typically take place?

10 A   On Thursday afternoons.

11 Q   Afternoons.

12 A   I believe early afternoons.

13 Q   Was this Mrs. Kopp's attempt to giving her

14 independent view of the forecast for OSI?

15 A   Yes.

16 Q   Now, if you look at the second paragraph

17 before the chart, it says, "He would like to sit in

18 tomorrow; just called me from the road and went over

19 his numbers with Larry."

20     And I presume that's talking about -- is

21 that Jay Nussbaum?

22 A   Yes.

23 Q   It says, "He is still confident in the 225,

24 as long as none of the very large opportunities drop

25 out."

303

1      Do you see that?

2  A   Yes.

3  Q   Okay.  Did this impact your upside

4  adjustments at all?

5  A   Again, I did not document precisely how I

6  arrived at my upside adjustments at any point in

7  time.  I would consider information such as these

8  types of e-mails when deriving my final upside

9  adjustments.

10 Q   Okay.  But you can't tell me if this

11 specifically did; is that right?

12 A   I cannot -- I can tell you that this would

13 be one point to consider when deriving my upside

14 adjustments.

15 Q   Okay.  Is it typical for Oracle to close

16 all of the large opportunities that it's -- it has

17 pending in a given quarter?

18 A   Not all deals close in a given quarter.

19 Q   How confident were you that none of the

20 very large opportunities would drop out?

21     MR. WALD:  The witness personally?  The

22 witness personally?

23     THE WITNESS:  At this point in time, I

24 don't recall.

25 BY MR. BRITTON:

304

1  Q   If you look down at the bottom, there's --

2  well, let's look in the columns that are in the

3  middle of the e-mail.  There's a "My Projection"

4  column.

5      Do you see that?

6  A   Yes.

7  Q   And "Jay's Forecast," do you see that?

8  A   Yes.

9  Q   "My Projections," that's Sarah Kopp's

10 estimate of what's going to happen in the quarter; is

11 that right?

12 A   Yes.

13 Q   All right.  And "Jay's Forecast" is Jay

14 Nussbaum's estimate of what would happen in the

15 quarter?

16 A   That is correct.

17 Q   If you look at "Jay's Forecast," at the

18 total, it says "225," and then there's a line that

19 says "75% confidence level."

20     Do you see that?

21 A   Yes.

22 Q   Do you recognize the writing?

23 A   Yes, it's my writing.

24 Q   And what led you to draw that conclusion?

25 A   I must have had a conversation with

305

1  somebody, Sarah and/or Jay, after printing out this

2  e-mail note, because I printed it out and I made

3  notations on it.

4  Q   Okay.

5  A   So it was likely based on input that I got

6  from either Sarah or the field -- or, I should say,

7  Sarah or Jay.

8  Q   Okay.  And did this impact your upside

9  adjustment for OSI?

10 A   I don't recall.  Did it impact it; was it

11 taken into consideration?  Yes, as was our America's

12 Forecast calls and any other conversations that I

13 had.  Again, I can testify over and over that there

14 are multiple data points that came into consideration

15 when determining my upside amounts.

16 Q   And, now, your upside adjustments were used

17 to give your view of what would happen in that

18 division for the quarter as of that period of time;

19 is that right?

20 A   My upside adjustments were to come to the

21 forecasts that we thought that the company would more

22 than likely meet.

23 Q   Right.

24     And when you were talking about a specific

25 organization, your upside adjustments would be used

306

1  for the same purpose for that organization; is that
2  right?
3      A   I would try my best, but it wasn't
4  necessarily -- you know, I might make it off on one
5  organization and maybe cancelled out by getting it
6  off on another organization, going in the opposite
7  direction.
8          But, in general, if you look at the
9  forecasts that I would come up with over the prior
10  history, my forecasts were more on line with our
11  actual results than were the field forecasts.
12      Q   All right.  Move to strike as
13  nonresponsive.
14          The 75 percent confidence level -- so as of
15  January 18, 2001, you were presented with
16  Mr. Nussbaum's forecast of 225 with the 75 percent
17  confidence level; is that fair?
18      MR. WALD:  Object to the form.
19      THE WITNESS:  No.  I've told you that I was
20  presented with this and that I wrote down 75 percent
21  confidence level.
22  BY MR. BRITTON:
23      Q   Is that -- well, I guess I should have
24  asked you:  What does 75 percent confidence level
25  mean?

307

1      A   That somebody was 75 percent confident in
2  achieving that forecast.
3      Q   Okay.  Mostly likely Jay Nussbaum?
4      A   Most likely Jay Nussbaum.
5      Q   So if Mr. Nussbaum presented with you 225
6  and said 75 percent confidence level, it would be
7  reasonable to assume that you would give a negative
8  upside adjustment to come in somewhere less than what
9  he thought he would do; is that fair?
10      MR. WALD:  Object to the form.
11      THE WITNESS:  No.
12  BY MR. BRITTON:
13      Q   Why not?
14      A   Because Jay's history of forecasting was
15  not accurate or always in line with his actual
16  results.
17      Q   Okay.  Now, your finance --
18      A   If I may?
19      Q   Sure.
20      A   There was clearly an awful lot of deals in
21  play, so he had to close just a couple of these large
22  deals, and he would have easily exceeded his
23  forecast.
24      Q   Okay.  Now, if you believed that, that
25  would have been reflected in your upside adjustments;

308

1  right?
2      A   Not necessarily.
3      Q   Why not?
4      A   My upside adjustments were based on my best
5  estimate at the time, so there was a large swing
6  factor, and so, again, this does not necessarily
7  indicate why or why -- let me step back.
8          How I came up with my upside adjustments
9  were based on a variety of information.  So the fact
10  that he had lots of large deals in play did not
11  necessarily mean that they would be converted by the
12  end of the quarter.
13      Q   Okay.  But if you believe that they would
14  be converted --
15      MR. WALD:  Sorry.
16          Were you done?  Were you done?
17      THE WITNESS:  Yes.
18  BY MR. BRITTON:
19      Q   If you believe they would be converted by
20  the end of the quarter, then you would have increased
21  the number base or with your upside adjustment; is
22  that right?
23      A   Not necessarily at this stage because we
24  have so many large deals that close on the very last
25  day of the quarter.  So I was being prudent.

309

1      Q   Okay.  Doing what?
2      A   By not increasing the upside above and
3  beyond the 225.
4      Q   Okay.  And you know that for sure that you
5  didn't do that?
6      A   Well, I'm looking at this one here for
7  226 -- sorry, January 22nd, and I didn't.  I didn't
8  do it here.
9      Q   Okay.  Well, we will get to that.  We will
10  get to that document.
11          Now, your finance report for OSI, Sarah
12  Kopp, she was your finance report; is that right?
13      A   She was a direct report.
14      Q   Of yours; right?
15      A   Yes.
16      Q   And her estimate was 205; is that right?
17      A   She believed that it was going to come out
18  around 210 at that time.
19      Q   Okay.  She says that in the --
20      A   In our schedule, it says 205, but in the
21  text, it says, "My sense still is that we'll come out
22  about 210 as it stands today."
23      Q   So she was $15 million less than Jay's
24  forecast; is that right?
25      A   At that point in time, that is correct.

310

1    Q    Okay.  So you have $225 million forecast
2  for OSI with a 75 percent confidence level, and your
3  direct report is telling you may be a little less, at
4  210; is that fair?  Am I reading this document
5  fairly?
6    A    That is correct.
7    Q    Yet, you didn't change your upside
8  adjustment?
9    A    That is correct.
10    Q    How come?
11    A    Because I didn't feel there was any
12  indicative information for me to reduce it at that
13  point in time.
14    Q    Okay.
15        (Exhibit No. 43 was marked for
16        identification.)
17  BY MR. BRITTON:
18    Q    I've placed in front of you what's been
19  marked as Minton Exhibit 43.
20        Will you take a moment to look at this
21  exhibit, please.
22        Do you recognize Exhibit 43?
23    A    Yes, I do.
24    Q    What is it?
25    A    It is a e-mail from Larry Garnick

311

1  describing the results for December of fiscal '01.
2    Q    You got this e-mail on January 17th, 2001?
3    A    That's the date the e-mail was sent, yes.
4    Q    If you look at the first paragraph of the
5  summary, Mr. Garnick is talking about growth rates,
6  and he takes out the Covisant transaction to look at
7  what OPI had done so far.
8        Do you see where I'm looking at?
9    A    Yes.
10    Q    Okay.  Do you know why Mr. Garnick looked
11  at OPI with Covisant and excluding Covisant?
12    A    Because Covisant was a very large deal that
13  was transacted in December.
14    Q    And why would --
15    A    And had a binary effect on the financial
16  results.
17    Q    So why remove it?
18    A    Because it had a binary effect on the
19  financial results.
20    Q    Okay.  And by removing it, what benefit did
21  that give you in looking at the results of the
22  company for December?
23    A    It looked at what the underlying license
24  revenue growth would have been had we not closed that
25  transaction.

312

1    Q    Okay.  And why was that important?
2    A    It was just -- it was a data point to see
3  how well the transactions had closed in the month of
4  December.
5    Q    Why was it important to look at the
6  transactions in that manner?
7    A    One of the issues at that point in time was
8  the -- was OPI's relative profitability, and OPI
9  tended to have very large transactions and not very
10  many small transactions, but they had an awful lot of
11  head count, and so I specifically recall during this
12  time period us being focused on whether or not Sandy
13  Sanderson should be reducing his overall head count
14  and becoming more efficient and not relying so much
15  on large deals to make his forecast because of the
16  impact that it had on margins.
17    Q    So without Covisant for the month of
18  December, OPI was down 85 percent year over year; is
19  that right?
20    A    That's what this says, "Excluding Covisant,
21  OPI license revenue growth would have been negative
22  85%."
23    Q    Okay.  If you go to the third bullet
24  point --
25    A    Yes.

313

1    Q    -- it says, "December license results
2  represents 19% of the total forecast for Q3 FY01."
3        Do you see where I'm reading?
4    A    Yes.
5    Q    That total forecast, do you know if that's
6  the field forecast or if it's the potential forecast
7  after your upside adjustment?
8    A    I don't recall.  I would have to -- I
9  suspect it's the field, but I would have to do the
10  calculation to confirm.  I'm not certain.
11    Q    Is there any way you can do that
12  calculation here?
13    A    If you have a calculator.
14    Q    I might.
15    A    One that I can use.  I'm pretty fond of the
16  HPs.
17    Q    I thought I did.  Not an HP.
18    A    Does it go backwards or forwards?
19        So if you take a look at the numbers here,
20  62,584 for Sandy, and you back out the -- let's just
21  say 60 million -- that meant that he only did -- do
22  you see those numbers?
23    A    No.  I think you are going back to the
24  Covisant transaction.
25    A    Didn't you ask me to recompute whether

314

1   there would be negative 85 percent growth?
2   Q   No, no. I asked you whether the total
3   forecast in the third bullet point was either the
4   field forecast or your potential forecast.
5   A   Well, then, we would have to compare the
6   numbers here. Well, they are not -- I can't compute
7   it based on the information here because I don't have
8   the forecast. Sorry.
9   Q   If you go down to the --
10   A   Now, I can try to go back to one of these
11   documents --
12   Q   If you could, yes --
13   A   -- if that's what you would like for me to
14   do.
15   MR. WALD:  Just for the record, I'm not
16   sure -- you know, with the caveat that they may or
17   may not line up in exactly the right time frame.
18   THE WITNESS:  If I take the number 240,524,
19   which is on the third page of Exhibit No. 43 --
20   BY MR. BRITTON:
21   Q   The third page or the second page?
22   A   On the third page.
23   -- to get to total license revenue?
24   Q   Okay. It shows up in both places, but
25   okay. The bottom -- the bottom column on the third

315

1   page of Exhibit 43.
2   A   Right.
3   Do you see the number there, 240,524?
4   Q   Yes.
5   So that's total license revenue for
6   December of fiscal '01 and actual U.S. dollars.
7   And just taking it based off of the
8   forecast as of January 15th --
9   Q   Which is Exhibit 25A?
10   A   Yes.
11   -- and I divide that by the 126,573, and I
12   get 19 percent.
13   Q   Where is the 1265 --
14   A   On 440114.
15   You refer to that as the Bates number; is
16   that correct?
17   Q   Yes.
18   MR. WALD:  Yes.
19   BY MR. BRITTON:
20   Q   So it's the field forecast?
21   So the field forecast would be 19 percent.
22   Let me just double-check. Yep.
23   Q   So in the third bullet point --
24   A   It would be 18 percent for the total
25   potential.

316

1   Q   Okay. So on Exhibit 43, the first page,
2   the third bullet point where it references "December
3   license results represents 19% of the total forecast
4   for Q3 FY01," the total forecast referenced there is
5   the field forecast; is that right?
6   A   As I calculate it based off of this
7   forecast, which is January 15th, Exhibit 25A, it
8   would be 19 percent of the field forecast and
9   18 percent of the total license forecast.
10   Q   Then the next sentence says, "In FY00 and
11   FY99, December represented 16% and 19%, respectively,
12   of the quarter total."
13   Do you see that?
14   A   I do.
15   Q   Is it fair to read this document to mean
16   that December license results for Q301 were on track,
17   historically, to meet the field forecasts for the
18   quarter?
19   MR. WALD:  Can I have the question back?
20   Hold on.
21   To meet the field -- object to the form.
22   THE WITNESS:  I'm sorry. Can I have the
23   question read back.
24   (Record read by the Reporter as follows:
25   "QUESTION:  Is it fair to read this

317

1   document to mean that December license
2   results for Q301 were on track,
3   historically, to meet the field forecasts
4   for the quarter?")
5   THE WITNESS:  It would be fair to say that
6   we were on track; that the reality is the Covisant
7   transaction gave us a healthy start despite the fact
8   that we got off on a slow start, excluding Covisant.
9   So Q3's tend to be very back-end loaded.
10   BY MR. BRITTON:
11   Q   If you go down to the next bullet point, it
12   said, "Applications product growth was 216% and,"
13   brackets, "(ERP 365%)" and then CRM has a negative
14   58%.
15   Does that mean that year over year CRM
16   product growth was down 58 percent?
17   A   Yes.
18   Q   Okay. Did this impact your --
19   A   For the month of December.
20   Q   Did this impact your upside adjustment at
21   all?
22   A   This particular point here?
23   Q   Mm-hmm.
24   A   Again, I don't recall. It would have been
25   another data point that I tended not to focus on the

318

1  product revenue forecasts.  They weren't as
2  meaningful in deducing a upside number.  I tended to
3  look at license revenues in totality, not by product.
4      Q    Put that document aside.
5          All right.  If you turn to the
6  January 22nd, 2001 upside report, which is Exhibit
7  26A, starts at Bates 440127 and ends at 143; if you
8  look at the second page of Exhibit 26A, the upside
9  adjustment for license revenues is not changed; is
10  that right?
11     A    That is correct.
12     Q    Okay.  And the earnings per share that you
13  are projecting is 12.06 cents per share?
14     A    That is correct.
15     Q    And the field is forecasting 10.7 cents per
16  share; is that right?
17     A    That is correct.
18     Q    If you go to the page ending with 131, no
19  adjustments to the -- withdrawn.
20         No upside adjustments for the
21  organizations, no change?
22     A    That is correct.
23         (Exhibit No. 44 was marked for
24          identification.)
25  BY MR. BRITTON:

319

1      Q    Placed in front of you what's been marked
2  as Plaintiffs' Exhibit 44.
3          Will you take a moment to look at this
4  exhibit.
5      A    This is for the week of January 22nd?
6      Q    That's one of my questions:  Do you
7  recognize it, and what is it?
8      A    This is an America's Forecast report that
9  was sent out to Jay Nussbaum, Sandy Sanderson, and
10  George Roberts as well as other EC members and
11  finance team.  And this document is a printout of
12  that report for the week of January 22nd.
13     Q    And January 22nd is a Monday; I checked.
14     A    Right.
15     Q    So would this have been produced after --
16     A    It's for that week.
17     Q    It would have been produced after the
18  executive management committee meeting or before?
19     A    This would have been produced in
20  preparation for the Thursday calls, not for the EC
21  meetings, so for the Thursday America's Forecast
22  calls.
23     Q    So any effect that information in this
24  document would have would show up on the following
25  week's upside report; is that right?

320

1      A    I would have to go back and look at a
2  calendar.  But, generally speaking, we would take --
3  that would be correct, because you would have -- you
4  would have your forecast come in on Wednesday nights.
5  Some are, you know, pulled together Thursday
6  mornings.  You would have this call.  Then it would
7  be at the subsequent EC meetings where either the
8  numbers stay the same or they didn't, but these were
9  generally done after that forecast period.
10     Q    All right.  The handwriting on these pages,
11  do you recognize it?
12     A    Roberta Ronsse.
13     Q    The first page, there's some handwriting on
14  the bottom that says, "Margin doing an analysis.  The
15  margin downturn because of GB and 11i."
16         Do you know what that means?
17     A    I'm sorry.  Can you repeat your question?
18     Q    Do you know what "margin downturn because
19  of GB and 11i" means?
20     A    No, I don't know what she was thinking when
21  she made these notations.  Again, as I mentioned
22  earlier, we were looking at Sandy's business, because
23  if you backed out Covisant, he did not have revenue
24  growth, so we were focused on his margins and his --
25  and the fact that we felt that he had excess sales

321

1  capacity.
2      Q    The reference to "GB," I assume that
3  meant --
4      A    Where are you at?
5      Q    The first page, the handwritten remark
6  "margin downturn because of GB and 11i," I assume
7  "GB" meant general business.
8          Do you know what "GB" means here?
9      A    I'm sorry.  I don't see where you are
10  seeing "GB."
11     Q    First page.
12         MR. WALD:  I think what he's -- he's --
13  he's suggesting that that's what this says.
14         THE WITNESS:  I don't see "GB" in there.
15  BY MR. BRITTON:
16     Q    What do you -- can you read that part that
17  says "margin downturn"?  Can you read that part?
18     A    "Margin downturn because of" something plus
19  11i, but it's not GB -- well, maybe it is GB.  I
20  don't know.
21     Q    All right.
22     A    But for -- if it's Sandy -- I mean, if you
23  would think that these comments are relating to
24  Sandy --
25     Q    That was my --

322

Minton, Jennifer (30b6)  9/25/2006  1:08:00 PM

1    A  -- that does not make sense, because the
2    general business was not his turf; it wasn't part of
3    his overall territory.  That was under North America
4    Sales, George Roberts.
5    Q   Did any of the information that is
6    contained in Exhibit 44 impact your upside
7    adjustments for the following week?
8    A   Again, I do not recall specifically how I
9    came to any -- the amount of any upside adjustment in
10   any given forecast period.  I would consider all
11   types of data points, the America's Forecast calls,
12   any e-mails that I received, any conversations I may
13   have had, any meetings I may have attended that
14   discussed the forecast.
15   Q   All right.  I've placed in front of you
16   what has been marked in a previous deposition as
17   Winton Exhibit 51.
18       Will you take a moment to look at this
19   exhibit.
20       And, for the record, Exhibit -- Winton
21   Exhibit 51 starts at Bates NDCA-ORCL 040628 and ends
22   at 269.
23       Do you recognize Winton Exhibit 51?
24   A   Yes.
25   Q   What do you recognize it to be?

323

1    A   An e-mail note that David Winton sent to
2    George Roberts, with a copy to me, looking at the --
3    analyzing the impact of the deterioration in the
4    dot-com business on their revenue outlook for the
5    second half of fiscal '01.
6    Q   All right.  And the top box on the first
7    page references "tech."
8        Is that technology revenue?
9    A   I believe it's his entire revenue base.
10   I'm not sure if it's -- yeah, technology.  It
11   probably, most definitely, excludes applications.
12   Q   Excludes applications.  All right.
13       And it's forecasting for the fiscal year
14   '01, for Q3, a negative 6 percent growth for
15   technology; is that right?
16   A   I'm not sure if this is a forecast or an
17   outlook.  Meaning the budget?  I'm trying to see if
18   we have a breakdown of the total forecast.
19       So, I'm sorry.  What was your question
20   again?
21   Q   He's forecasting a negative 6 percent
22   growth in technology revenues for Q301.
23   A   So what confuses me, if I may -- that's why
24   I'm not certain if it's really technology or if it's
25   this whole sector --

324

1    Q   Sure.
2    A   -- is he's got a forecast on the
3    January 22nd forecast of --
4    Q   That would be Exhibit --
5    A   Exhibit 46.
6    Q   -- 26A?
7    A   Yes.  So that would just be technology.
8    Sorry.  I was reading above it.
9    Q   All right.  And then the next box shows
10   dot-coms and ASPs for Q3/01 down 54 percent?
11   A   That is correct.
12   Q   And then the technology brick and mortar up
13   31 percent; is that right?
14   A   That is correct.
15   Q   All right.  Did any of that information
16   contained in Winton Exhibit 51 impact your upside
17   adjustments?
18   A   I do not recall if this particular e-mail
19   had an impact.
20   Q   All right.
21   A   It would have been something I may have
22   considered.
23   Q   All right.  If you look to Exhibit 27A in
24   the binder, this is the January 29th, 2001 upside
25   report?

325

1    A   Yep.
2    Q   All right.  Starts at Bates NDCA-ORCL
3    440144 and ends at 160.
4        Looking at Winton Exhibit 51, can you tell
5    me if the upside report was prepared before or after
6    this e-mail?
7    A   This upside report -- the one that's for
8    January 29th --
9    Q   Right.
10   A   -- was likely prepared in advance of this
11   e-mail.
12   Q   So before this e-mail?
13   A   That would be correct.
14   Q   All right.
15       MR. WALD:  Doug, for the record, I think
16   the same numbers appear in the 1/22.
17       MR. BRITTON:  Do they?
18       MR. WALD:  Yeah, I think so.  You might
19   want to check.
20   BY MR. BRITTON:
21   Q   If you turn to the second page of
22   Exhibit 27A, so you have now reduced your upside
23   adjustment by about $50 million for license revenues;
24   is that right?
25   A   I have to do a compare.  I can see that I

326

1 brought down -- from the prior forecast, I didn't
2 have -- an upside adjustment for OSI.
3    Q   I'm looking total.
4        If you look at the second page --
5    A   Okay.
6    Q   -- of Exhibit 26A and compare it to the
7 second page of Exhibit 27A, a little more than
8 $50 million; is that right?
9        MR. WALD: I'm sorry.  From which one,
10 Doug?  The prior one?
11       MR. BRITTON: 27 -- 26A --
12       THE WITNESS: 26A --
13       MR. BRITTON: -- to 27A --
14       THE WITNESS: -- it's showing it's gone
15 down not by 50 but by 95 million, 94.9.
16 BY MR. BRITTON:
17    Q   It's gone down by that?
18    A   I'm sorry.  Up by that.  That's the upside
19 adjustment.
20    Q   Right.
21       So it went from 94.9 million down to 43.4?
22    A   That is correct.
23    Q   And that's roughly --
24    A   50.
25    Q   -- 50 million?

327

1    All right.  If you look down at the bottom
2 on Exhibit 27A, the earnings per share, this is the
3 first time that your upside adjustment and your
4 forecast for earnings per share for the quarter fell
5 below market guidance; is that right?
6    A   Are you on 27A?
7    Q   Yes.
8    A   I see that the --
9        MR. WALD: Object to form.
10       THE WITNESS: -- EPS is 11.58 cents.
11       MR. BRITTON: Right.
12    Q   And this was distributed at the executive
13 management committee meeting?
14    A   27A?
15    Q   Yes.
16    A   You are saying that the -- that it fell
17 below EPS?
18    Q   Correct.
19       That's the first time it fell below market
20 expectation --
21       MR. WALD: Object to the form.
22 BY MR. BRITTON:
23    Q   -- is that right?
24    A   11.58 cents in rounded terms is 12
25 percent -- is 12 cents.  Sorry.

328

1    Q   11.58 cents is less than 12 cents; is that
2 right?
3    A   But we have a practice of rounding, so this
4 is still hitting market expectations of 12 cents.
5    Q   Okay.  So with your rounding, you are right
6 at market expectation as of January 29th, 2001; is
7 that right?
8    A   We are still at market expectations of
9 12 cents.
10    Q   And the field is still forecasting
11 10.7 cents per share; is that right?
12    A   That is a combination of revenue and
13 expense, but, yes, it's still 10.7.  With upside
14 adjustments and other adjustments that were made, we
15 arrive at the 11.58, which is 12 cents.
16    Q   Now, if you go to the page ending with 148,
17 which is the organizational adjustments --
18    A   Yes.
19    Q   -- you are now down a negative $35 million
20 adjustment for OSI.
21       Do you see that?
22    A   Yes.
23    Q   Do you know why?
24    A   Again, I don't recall the specifics as to,
25 you know, how any of the upside numbers were derived.

329

1 We, unfortunately, never documented how we arrived at
2 those numbers.
3    Q   All right.  And you are still -- at zero
4 upside adjustments for NAS?
5    A   That is correct.
6    Q   And OPI, $35 million upside adjustment?
7    A   That is correct.
8    Q   Now, if you move to the February 5th, 2001
9 upside report, turn to the second page of that
10 report, your upside adjustments come down?
11    A   That is correct.
12    Q   From 43.4 million to 32.796 million?
13    A   That is correct, but the forecast also
14 changed; the forecast also came down.
15    Q   And that's the first time that the field
16 forecast came down; is that right?
17    A   I don't know.  I would have to go back and
18 validate if that's a true or not statement -- a true
19 statement or not.  Sorry.
20    Q   I'll represent that it is.
21       The earnings per share, now, this is the
22 first time without rounding that you are falling
23 below market expectation; is that right?
24       MR. WALD: Object to the form.
25       THE WITNESS: Yes.

330

1  BY MR. BRITTON:
2      Q   So even with rounding, you are not going to
3  achieve market guidance?
4      A   At this point in the quarter.  But, again,
5  our quarters are so back-end loaded that this is not
6  indicative that we aren't going to make our quarter.
7      Q   Well, this is your best estimate of where
8  the quarter was going --
9      A   At that point in time.
10     Q   Okay.  And if you knew of anything that
11 would change in the last few days of the quarter,
12 they would have been reflected here; right?
13         MR. WALD:  As of February 5th?
14         MR. BRITTON:  Correct.
15         THE WITNESS:  If the information that came
16 to me in the last few days of the quarter had been
17 brought to my attention earlier in the corner -- in
18 the quarter, as of February 5th, they would have been
19 reflected here.
20         MR. BRITTON:  Right.
21     Q   And the field forecast, it's down to
22 10.5 cents per share; right?
23     A   That is correct.
24     Q   And this February 5th, 2001 upside report
25 was passed out at the executive committee meetings;

331

1  is that right?
2      A   If we had an executive committee meeting on
3  that date, it would have been passed out to certain
4  members of the executive committee.
5      Q   Okay.  And that would include Larry
6  Ellison, Jeff Henley, Sandy Sanderson, among others?
7      A   Sandy Sanderson -- no, it would not.  The
8  entire upside package was only distributed to Larry,
9  Jeff Henley, and Safra Catz, as well as myself.  The
10 field guys, meaning the folks such as Sandy
11 Sanderson, Jay Nussbaum, and whatnot, only received a
12 couple of pages from the forecast which showed the
13 license revenue forecast only.  We did not have a
14 wide distribution of the total company-wide forecast.
15     Q   All right.  If you turn to Exhibit 28A with
16 the Bates ending at 250?
17     A   Yes.
18     Q   Now, you have no upside adjustments for any
19 of the field organizations; is that right --
20 withdrawn.
21         You have no upside adjustments for OSI,
22 NAS, or OPI; is that right?
23     A   That is correct.
24     Q   Okay.  Why not?
25     A   Again, I do not have the -- I do not recall

332

1  the details, nor did I ever document the specific
2  reasons for any upside adjustment numbers.  I only
3  took into consideration all the various points of
4  data that I had to determine the upside numbers,
5  whether it was zero negative or positive.
6      Q   And do you think they were not sandbagging
7  as of this point in the quarter?
8      A   I don't recall.
9      Q   Okay.  If you thought they were
10 sandbagging, you would have an upside adjustment
11 there; right?
12     A   This reflected my best estimate as to where
13 we were going to land at the quarter -- at the end of
14 the quarter based on this time in the quarter.
15     Q   But am I correct that if you thought any
16 one of the division heads were sandbagging, you would
17 have put --
18     A   I would have put in an adjustment if I felt
19 that the forecast was not reflective of what I
20 thought we would ultimately do, based on all the
21 information that I had and my historical experience
22 of forecasting.
23         (Exhibit No. 45 was marked for
24         identification.)
25         THE WITNESS:  Can I just point something

333

1  out that you represented to be true and correct?
2          MR. BRITTON:  Sure.
3          THE WITNESS:  And I just want to make sure
4  that we all understand the facts.
5          MR. BRITTON:  Sure.
6          THE WITNESS:  So are you saying that the
7  forecast never came down as of what period in time?
8          MR. BRITTON:  January 29th, the field
9  forecast had not --
10         MR. WALD:  The representation was that it
11 had -- that February 5th was the first time it
12 dropped.
13         MR. BRITTON:  Right.
14         THE WITNESS:  Okay.  It -- okay.  And you
15 were referring solely to the America's --
16         MR. BRITTON:  Yes.
17         THE WITNESS:  -- not the entire
18 company-wide forecast.
19         MR. BRITTON:  Correct.  Correct.
20         My representation was the America's
21 organizations; February 5th was the first upside
22 adjustment -- or was the first upside report that
23 reflected a decrease in the field forecast.
24     Q   Is that not right?
25     A   I was looking at the total forecast,

334

1  license forecasts, and there are ups and downs.

2   Q   Right.

3      So I have placed in front of you --

4      MR. WALD:  It's 45, Doug?

5      MR. BRITTON:  Yes, 45.

6   Q   Placed in front of you what's been marked

7  as Minton Exhibit 45.

8      Will you take a moment to look at this

9  exhibit.

10   A   Okay.

11   Q   Do you recognize Exhibit 45?

12   A   Yes, I do.

13   Q   What is it?

14   A   It's an e-mail note from Larry Garnick

15  reporting on the January quarter-to-date revenue

16  results.

17   Q   Okay.  And you -- he sent this to you on

18  February 8, 2001?

19   A   He sent it on February 8, 2001, that is

20  correct.

21   Q   To you and others?

22   A   To me and others.

23   Q   Did any of the information contained in

24  Exhibit 45 affect your upside adjustments at any

25  point on or after February 8, 2001?

1   A   The information would have been considered

2  whether -- you know, how it impacted a specific

3  adjustment, I cannot speak to because, again, we

4  didn't document how we arrived at any of our upside

5  adjustments, whether a negative, positive, or none at

6  all.  It would have been another point to consider.

7   Q   All right.  If you turn to Exhibit 29A in

8  the binder -- this is the February 12, 2001 upside

9  report -- starts at Bates 440161 and ends at 177.

10      Is this the February 12th, 2001 upside

11  report?

12   A   The one that starts with 440161?

13   Q   Yes.

14   A   Yes.

15   Q   Turn to the second page.  Your earnings per

16  share projection under "Potential" has gone back up

17  to 11.58 cents per share.

18      Do you see that?

19   A   That is correct.

20   Q   And can you tell me why?

21   A   You want me to analyze the differences

22  between the February 12th forecast and the --

23   Q   If you can --

24   A   -- prior forecasts?

25   Q   -- tell from looking at the two reports why

1  it went back up.

2   A   The license revenues increased from --

3  wait.  Sorry.  This is 2/12.  You want to know from

4  the 5th?

5      So license revenues on the 5th were

6  1 million 259, and they went up to 1 million 265.  So

7  the field forecasts had gone up.

8      Do you see that, Doug?

9   Q   Yes.

10      And then --

11   A   Total revenues had gone from 2.829 to

12  2.871 -- or 2.829 -- sorry -- to -- I'm getting

13  confused here, from 2.818 from the field to 2.829.

14   Q   So license revenues went up about

15  10 million; is that right?

16   A   That's correct.

17      MR. WALD:  As a matter of field forecast.

18      THE WITNESS:  As a meter of field forecast.

19  BY MR. BRITTON:

20   Q   Your upside adjustment came down a million

21  three?

22   A   You know, I'm going to, if I may -- so what

23  do you want to look at?  The total forecast?

24   Q   I'm trying to figure out why you went back

25  up to 11.58 cents per share.

1      And you've already indicated there was a

2  $10 million increase in the field forecast, and I'm

3  asking you if your --

4   A   So we have to take these two reports side

5  by side to see what's changed.  And I would recommend

6  that we -- so you can see, again -- and I'm looking

7  now at the 2/8 -- I mean the February 5th to the

8  which date?

9   Q   February 5th is 28A to February 12th, which

10  is 29A.

11   A   Okay.  I'll put them in order like this.

12      MR. WALD:  And there's two pages you are

13  referring to, each of which has Bates numbers.  That

14  might be the easiest way to do it.

15      MR. BRITTON:  Right.

16      THE WITNESS:  Okay.  So --

17      MR. WALD:  February 5th.

18      THE WITNESS:  -- 44247?

19      MR. WALD:  Okay.  February 12th?

20      THE WITNESS:  Which is 440162?

21      MR. BRITTON:  Okay.

22      THE WITNESS:  So if you want to just look

23  at the potential column, or do you want to look at

24  the --

25      MR. BRITTON:  Well, I'm trying to figure

1  out --
2      THE WITNESS:  -- forecast column?
3      MR. BRITTON:  -- yeah.  I think it would be
4  the upside column now, because you've already
5  shown --
6      THE WITNESS:  The upside columns haven't
7  really changed much on total revenue.
8  BY MR. BRITTON:
9      Q   Your licensed upside adjustment went down
10  from 32.8 to 31.4?
11      A   That is correct.
12      Q   Okay.  Consulting.  Now there's an upside
13  adjustment of 1.9 million.
14          Do you see that?
15      A   Yes.
16      Q   Can you tell me why?
17      A   I do not recall.
18      Q   Okay.  And then support comes down from 8.5
19  million to 7.7 million; is that right?
20      A   It did, but the total forecasts stayed the
21  same.
22      Q   Right.
23      A   Do you see that?
24          So maybe it's best just to go with the
25  total revenue numbers.

339

1      So the license revenue numbers increased
2  from 12 -- from 1.259 to 1.266.
3      Q   1.2 -- right.
4      A   Right?
5      Plight (phonetic) consulting revenues went
6  up by roughly 2 million.
7      Q   Right.
8      A   The support revenues, despite the changes
9  to the upside amounts, remained at the 932, 933
10  million range.
11      Q   I see what you are saying, right.
12      A   Total revenues for education remained
13  roughly at the 116.  Other revenues remained the same
14  at 9.5.  So most of your increase was because of a
15  change in license.
16      Q   Right.
17      MR. WALD:  In the field forecast.
18      THE WITNESS:  In the field forecast.
19  BY MR. BRITTON:
20      Q   All right.  Now, let's look at support for
21  a second.
22      What is support?
23      A   Support revenues?
24      Q   Yes.
25      A   Post-contract support?

340

1      Q   Right.
2      A   We sell support contracts.
3      Q   Okay.  And what is that?  How does a
4  customer benefit from a support contract?
5      A   Well, when you buy a support contract, you
6  are entitled to get free maintenance and updates and
7  technical support assistance --
8      Q   Okay.
9      A   -- for your licenses.
10      Q   Can you tell me how support -- how a
11  contract for support revenue is accounted for at
12  Oracle?
13      A   It's accounted for ratably over the
14  contract period.
15      Q   Okay.  Is it a year contract?
16      A   Not always, but, generally speaking, they
17  are typically one year in advance, but if they are
18  government customers, they could be in quarterly in
19  arrears.
20      Q   Okay.  So would you say a majority of the
21  support contracts are a year?
22      A   I would say typically.
23      Q   Typically, support contracts are a year?
24      And then --
25      A   But some customers who have large license

341

1  contracts will by multiyear support.
2      Q   Okay.
3      A   Again, I could not testify as to what
4  percentage of which.
5      Q   Okay.
6      A   But they typically are one-year contracts.
7      Q   So for a year contract for support, when is
8  the money owed by the customer?
9      A   We typically bill one year in advance.
10      Q   So --
11      A   But, again, if it's a government customer,
12  it's quarterly in arrears.
13      Q   So if it's a typical customer that has a
14  year-support contract, all of the -- all the amount
15  is billed up front on Day 1, the entire year?
16      A   It's billed up front.
17      Q   Okay.  Now, is a accounts receivable all
18  that is owing as of Day 1 in terms of when they have
19  to pay?
20      A   That would be correct.
21      Q   Okay.  So they pay in advance, and then
22  Oracle ratably over the year recognizes 112; is that
23  right?
24      A   That is correct.
25      Q   All right.  Okay.

342

1   A   Should I put this one back in?

2   Q   Yes.

3      (Exhibit No. 46 was marked for

4   identification.)

5   BY MR. BRITTON:

6   Q   I've placed in front of you what's been

7   marked as Minton Exhibit 46.

8      Will you take a moment to look at this

9   exhibit.

10   A   You want me to read the whole thing, or

11   just --

12   Q   I think I am -- my questions are going to

13   focus on the first two pages.

14   A   Okay.

15   Q   Okay.  Do you recognize Exhibit 46?

16   A   Yes, I do.

17   Q   And what is Exhibit 46?

18   A   It's a note to Mike Rocha with a copy to a

19   number of other individuals regarding the -- some

20   issues that we had with the support revenues that

21   were recognized during the course of the quarter --

22   or, I should say -- yeah, during January, which would

23   be during the course of the quarter.

24   Q   And the e-mail is talking about a $20

25   million drop-off in revenue during the month of

343

1   January; is that right?

2   A   Yes, it is.

3   Q   So this e-mail is dated February 16th;

4   right?

5   A   Yes.

6   Q   When did you find out that support revenues

7   were off by $20 million?

8   A   In the middle of February, because we

9   wouldn't have had the results until sometime in

10   February.

11   Q   Okay.  So by the time you found out that

12   there was a $20 million drop-off in revenue in the

13   month of January for support, you already needed

14   rounding to get to market guidance for the quarter;

15   is that right?

16   A   This is not referring to the forecasts.

17   This is talking about the revenues that had been

18   booked to date in the month of February.

19   Q   Right.  And they were --

20   A   Sorry.  In the month of January.

21   Q   And they were $20 million less than

22   expected; right?

23   A   But we were investigating as to why.

24      Do you recall that this is the time when we

25   were upgrading to a new version of support renewals

344

1      So this was highlighting an issue that we

2   needed to jump on top of, the whole support renewal

3   order process, and ensure that every contract that

4   was up for renewal was definitely being worked by the

5   support sales renewal organization so that the

6   revenue could be recognized in the current quarter.

7   Q   But this would affect your forecast?

8   A   No.  This is an actual revenue report

9   number --

10   Q   Okay.

11   A   -- it's not a forecast.

12   Q   And why did you --

13   A   That's why I'm trying to make the

14   distinction for you.

15   Q   Why did you say -- or why did you write on

16   the second page, The support organization missed

17   their December and January revenue forecast by $20

18   million?

19   A   Can you show me where?

20   Q   Second page, bottom e-mail, first line.

21   A   And, again, I think it was because of the

22   fact that we had been converting to this system OKS.

23   Q   Right.

24   A   And in order for them to get back on track

25   with their forecasts, their monthly forecast, to get

346

1   called OKS?

2   Q   Correct.

3      And my question is:  By the time -- when

4   you found this out, you already needed rounding to

5   get to market guidance in your forecast?

6   A   I don't know.  When I found this out, it

7   was mid-February.

8      When was rounding?

9   Q   Let's see --

10   A   If I may, this was talking about actual

11   revenues for the month.  It didn't mean that the

12   forecast for support was not going to be solidified.

13   The issue was trying to understand why our revenues

14   were not as -- what we expected them to be in the

15   month of January, and we had attributed that, based

16   on some theories at the time, to a few things, one

17   being that some contracts that should have been

18   renewed had not yet been renewed in the course of the

19   quarter as a consequence of our conversion from an

20   old system to OKS.

21      If those contracts were renewed in the

22   current quarter, then the revenue for those

23   contracts, if the contract renewal was effective,

24   let's say, from December 1st, then we would have had

25   all of the revenue recorded still in that quarter.

345

1 to the total quarter forecast, they needed to renew
2 those contracts that were up for renewal in the
3 period that had not yet been renewed.
4 Q   This wasn't good news, was it?
5 A   This was -- what do you mean by "good
6 news"?
7 Q   Well, it drove your forecasts down clearly
8 below market guidance, didn't it?
9 A   This was -- had nothing -- this was dealing
10 with an issue with the system's conversion and the
11 fact that the system's conversion failed to allow our
12 support renewals reps to be as productive as possible
13 and to identify all support contracts that were
14 available for renewal during the period.
15 Q   Okay.  If you look at Exhibit --
16 A   And if they had failed to do it, then we
17 would have a problem with the -- with our support
18 revenue for the quarter.
19 Q   Okay.  If you look at Exhibit 31A -- it's
20 the upside report for February 19th, 2001.
21       If you look at the second page --
22 A   What's the Bates number, please?
23 Q   Bates number is 440179 of --
24 A   997 or 179.
25 Q   179, second page of Exhibit 31A, page 2.

347

1 A   Yes.
2 Q   You look a lot deeper into the document
3 than I am.
4       MR. WALD:  No, she's right.
5       THE WITNESS:  440179?
6       MR. BRITTON:  Right.
7 Q   You now have a $12.8 million negative
8 adjustment to support.
9       MR. WALD:  Negative upside adjustment.
10       MR. BRITTON:  Yes, negative upside
11 adjustment to support.
12 Q   The information that you received about
13 support revenues, as reflected in Exhibit 46, what
14 caused you to put in a negative upside adjustment for
15 support on February 19, 2001?
16 A   What I can tell you is we were concerned
17 that we would not make the support revenue forecast
18 as a consequence of these conversion problems.
19 Again, I don't know precisely how we derived at this
20 particular upside adjustment.
21 Q   But is it reasonable to assume that the
22 issue that is being discussed in Exhibit 46 is the
23 same thing that's reflected in the negative upside
24 adjustment to support in Exhibit 31A?
25 A   It is reasonable to assume that this issue

348

1 had clearly caused our forecast to be in jeopardy,
2 but whether or not this 20 million relates to the
3 20 million that you see on that page, I do not
4 recall.
5       MR. WALD:  I'm sorry.  What's the
6 20 million on that page?  12 million, you mean?
7       THE WITNESS:  Sorry.  12 million.
8 BY MR. BRITTON:
9 Q   Now, on the second page of Exhibit 31A, the
10 earnings per share projection with your upside
11 adjustments now is 11.23 cents --
12 A   That's correct.
13 Q   -- is that right?
14       Even with rounding, that's below market
15 guidance?
16 A   That is correct.
17 Q   Okay.  You can put -- actually, let's go
18 back to Exhibit 46 for a second.
19       This -- the first sentence says, "I have
20 asked the ERP team to focus on evaluating why we had
21 a $20 million drop off in revenue in the month of
22 January from support renewals."  But when I look at
23 the numbers reflected September through February,
24 about a paragraph down --
25 A   Yeah.

349

1 Q   -- looks like the February number is what
2 is down.
3       Can you tell me why the $20 million
4 drop-off in revenue in the month of January would be
5 reflected in February, or am I reading this wrong?
6 A   This is the opening revenue, not the actual
7 revenue for support.
8 Q   Right.
9 A   So, for example, it wouldn't include
10 contracts that had closed in the current quarter.  It
11 wouldn't include contracts that were in backlog.  We
12 had a lot of backlogged contracts, because the
13 support renewals team had not -- the support renewal
14 sales team had not renewed every single contract that
15 was up for renewal in the quarter; they had fallen
16 behind.  So this is just based on the contracts that
17 were in the system.
18       If you took that and looked at their
19 projected accounting distribution when the revenue
20 would be recognized in the subsequent months, it is
21 showing that there was a drop in -- from January to
22 February.  And this -- so, yeah.
23       MR. BRITTON:  Okay.  Why don't we take a
24 short break.
25       Five minutes until the tape.

350

1    THE VIDEOGRAPHER:  This marks the end of
2  Videotape No. 1, Volume 2, in the deposition of
3  Jennifer Minton.
4    Going off the record, the time is 2:53.
5    (Recess taken.)
6    THE VIDEOGRAPHER:  Here marks the beginning
7  of Tape No. 2, Volume No. 2, in the deposition of
8  Jennifer Minton.
9    The time is 3:01; we are back on the
10  record.
11  BY MR. BRITTON:
12    Q    Okay.  Ms. Minton, staying with Exhibit 46,
13  the numbers that are reflected in the September
14  through February chart there midway down, you see
15  where I'm reading?
16    Are those --
17    MR. WALD:  Page 1?  I'm sorry.
18    MR. BRITTON:  Yeah, page 1.
19    Q    Are those the numbers that are based upon
20  the estimated renewal rate for each of those months?
21    A    No.
22    Q    No.  Okay.
23    What are they?
24    A    And if I may, so what this represents is
25  the revenue that is already scheduled to be

351

1  recognized based on contracts that have already been
2  renewed and are recognized -- recognizable as revenue
3  during the period.
4    Q    Okay.
5    A    It does not represent contracts that are --
6  have not been renewed that should have been or could
7  have been renewed.  We had a large backlog of
8  contracts that had not yet been renewed, in part, due
9  to the system conversion issues that we had when we
10  upgraded internally to 11i.  And it also does not
11  include a number of those contracts that would come
12  up for renewal in the current February time period.
13    So it was only anything that was actually
14  entered in the system.  It's not your population of
15  total possible contracts for which you can recognize
16  revenue.
17    Q    Okay.  If you look down at the e-mail that
18  Michael Rocha wrote?
19    A    "Rocha."
20    Q    "Rocha."
21    He says, in the third sentence, "The $20
22  million shortfall that Jennifer refers to in her note
23  would mean that our renewal rate was approaching 70%
24  (we assume 96%)."
25    So where would -- so the drop off from

352

1  January to February of roughly $20 million does not
2  impact or have -- withdrawn.
3    Does Mr. Rocha's statement that "The $20
4  million shortfall that Jennifer refers to in her note
5  would mean that our renewal rate was approaching 70%
6  (we assume 96%)," does that have any impact on the
7  numbers that are reflected in September or from
8  January to February?
9    A    I would have to read the beginning part of
10  his note, but if he's referring -- so let me just
11  step back and see, because my note is after his.
12    Q    Okay.
13    A    Right?
14    Q    Yes.
15    A    So I think what Mike is stating, no
16  different than I, is that we must have either a
17  systems issue that's not capturing 100 percent of all
18  of our contracts, or that we haven't renewed all
19  that's possible to renew because our historical
20  conversion rates -- not conversion rates, excuse me,
21  our historical renewal rates are in the high 70s --
22  or high 90s -- or, sorry, low 90s.  Midpoint.  He
23  says 96.  I think it was probably just a tad below
24  that.
25    And if you look at what the schedule of

353

1  revenue is to be in February, that's what his -- I
2  think that's more or less what he's implying, is that
3  you can't have this kind of shortfall in revenue
4  that's real unless you had a sudden decline in your
5  support renewals rate.
6    So I'm not sure to which part of the
7  numbers in this long chain, it would take me a few
8  minutes.  If you want me to take the time out to
9  review it all, I can.
10    Q    No.
11    A    But I think he's more or less
12  emphasizing my point, is that the revenue's there; we
13  just need some visibility to make sure that every
14  contract that is up for renewal in the quarter is
15  indeed renewed; that we have the visibility to it and
16  that we reconcile from the systems conversion that
17  all of the contracts came over into OKS from the
18  other system so that we know that we are indeed
19  recognizing the right amount of revenue for the
20  quarter.
21    And, Doug, I would have to go back and
22  look, but I don't think we had a significant
23  shortfall at the end of the day in support revenues
24  for the quarter.
25    Q    Yeah, we will have to look.

354

1    But the -- the sentence that I've been
2    referring to, the $20 million shortfall would mean a
3    renewal rate of 70 percent -- we assume 96 percent --
4    how do assumptions impact Oracle's recognition of
5    support revenues?
6    A    This is not an assumption of our revenue
7    recognition.  This is how we do our forecast.
8    So when we are preparing a support revenue
9    forecast, we make certain assumptions that our
10    contract base is going to renew, and that's what he's
11    referring to.
12    Q    Okay.  If at the end of -- let's take a
13    typical customer that we talked about earlier.
14    Somebody that buys one year of support.
15    At the end of the first year, does -- and
16    the contract expires, does Oracle assume that the
17    customer will renew the support contract and
18    recognize revenue in the quarter after the contract
19    expires?
20    A    We only recognize revenue after a contract
21    has been signed with the customer.  So, no, we would
22    not recognize revenue.
23    Our forecast would assume, however, that we
24    would recognize it, but we certainly would not
25    recognize the revenue until such time that we have a

355

1    signed commitment from the customer to renew that
2    contract for the year.
3    Q    All right.  So the contract expires;
4    revenue isn't recognized until somebody gets that
5    customer on the phone and that customer puts a
6    signature on a new contract; right?
7    A    Until the customer enters into a new
8    binding, legal agreement, we do not recognize the
9    revenue.
10    Q    Okay.
11    A    But the point -- well, I'll leave it at
12    that.
13    (Exhibit No. 47 was marked for
14    identification.)
15    BY MR. BRITTON:
16    Q    All right.  I've placed in front of you
17    what's been marked as Exhibit 47.
18    Will you take a moment to look at this
19    exhibit.
20    For the record, Exhibit 47 starts at Bates
21    NDCA-ORCL 120113 and ends at 114.
22    Do you recognize Exhibit 47?
23    A    I see the e-mail was sent to me.  I vaguely
24    recall it.
25    Q    What do you recognize it to be?

356

1    A    Again, it's an e-mail that's going --
2    that's -- discusses, in part, some of the -- how
3    should I say?  Some of the unknown facts around
4    revenue -- or contracts that did not appear to be
5    renewed and -- well, just contracts that did not
6    appear to be renewed.
7    Q    Okay.  If you look down at the bottom of
8    the first page, it talks about -- he asks, "Why was
9    there $24 million in backdated revenue recognized in
10    February?"
11    Can you tell me what "backdated revenue"
12    means?
13    A    No, because, if you see, I say:  Where are
14    you getting the $24 million backdated revenue?
15    So, Doug, at this time, there was a lot of
16    confusion and a lot of finger-pointing between Mark
17    Barrenechea's organization, the responsibility -- who
18    was responsible for developing the application, OKS
19    application.  You had the support renewals
20    organization that didn't have the sufficient reports
21    and complaining about the system not having the
22    necessary reporting capabilities in order for it
23    to -- in order for them to be able to renew all
24    contracts that were open for renewal, so you -- and
25    you just had a lot of unknown certainties going on,

357

1    so this was just a lot of -- where these numbers came
2    from, I don't know, but I can just tell you it was a
3    time where everybody was trying to get to the bottom
4    of some of these questions that were raised during
5    the course of the quarter and since we had actually
6    upgraded to OKS.
7    Q    The term "backdated revenue," does that
8    have a meaning at Oracle?
9    A    I believe what he's referring to here are
10    contracts that may have been recognized in the
11    current quarter because they related to contracts
12    that were up for renewal in previous quarters.
13    Q    Okay.
14    So if I can help you out here --
15    Q    Sure.
16    A    -- if you are -- in Month 1 through 12, we
17    recognize revenue.  Month 12 comes and goes and you
18    don't recognize -- you don't renew your contract but
19    we still provide you support during this open period,
20    if you recognize revenue -- sorry, if you renew the
21    contract in the subsequent quarter following that
22    expiration period, then that revenue for the prior
23    quarter, those three months where the contract had
24    not actually been recognized, would be recognized
25    upon contract signature.

358

Minton, Jennifer (30b6)  9/25/2006  1:08:00 PM

| | |
|---|---|
| 1 | Does that make sense? |
| 2 | Q   Yes. |
| 3 | A   So I suspect that's what he's referring to, |
| 4 | but I don't know.  This was a period of a lot of |
| 5 | confusion. |
| 6 | Q   Okay.  You can put that document aside. |
| 7 | Okay.  Were you involved -- withdrawn. |
| 8 | Do you have any knowledge about the finance |
| 9 | and audit committee's investigation of Jay Nussbaum |
| 10 | in fiscal 2001? |
| 11 | A   I did not know there was an investigation |
| 12 | that was initiated by the audit committee. |
| 13 | Q   Okay.  You have no knowledge of any |
| 14 | investigation -- |
| 15 | A   Not that I recall -- |
| 16 | Q   Okay. |
| 17 | A   -- that there was an investigation. |
| 18 | Q   Okay.  Did you -- were you a member of the |
| 19 | finance and audit committee? |
| 20 | A   The members of the finance and audit |
| 21 | committee are members of the board -- |
| 22 | Q   Right. |
| 23 | A   -- I attend finance and audit committee |
| 24 | meetings. |
| 25 | Q   But you are not a member of those |

359

| | |
|---|---|
| 1 | meetings -- of those -- |
| 2 | A   The members are your board of directors. |
| 3 | Q   Yeah.  Okay. |
| 4 | A   And if I may, when there's matters that are |
| 5 | discussed that are confidential relating to |
| 6 | employment matters or investigations or whatnot, |
| 7 | those are generally held in an executive session with |
| 8 | general counsel only in attendance as well as the |
| 9 | members of the audit committee.  That would be the |
| 10 | board of directors. |
| 11 | MR. BRITTON:  Okay.  I think I'm out of |
| 12 | time. |
| 13 | MR. WALD:  Thank you, Doug. |
| 14 | MR. BRITTON:  Thank you, Ms. Minton. |
| 15 | THE VIDEOGRAPHER:  No more questions? |
| 16 | MR. WALD:  Thank you, Madam Court Reporter. |
| 17 | THE VIDEOGRAPHER:  This marks the end of |
| 18 | Videotape No. 2, Volume 2, in the deposition of |
| 19 | Jennifer Minton. |
| 20 | The original videotapes will be retained by |
| 21 | LiveNote World Service. |
| 22 | Going off the record, the time is 3:16. |
| 23 | MS. KYROUZ:  We do want to mark the |
| 24 | transcript "Confidential." |
| 25 | MR. BRITTON:  Thank you. |

360

| | |
|---|---|
| 1 | (Deposition concluded at 3:16 p.m.) |
| 2 | // |
| 3 | // |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

361

| | |
|---|---|
| 1 | CERTIFICATE OF WITNESS |
| 2 | |
| 3 | I, the undersigned, declare under penalty of |
| 4 | perjury that I have read the foregoing transcript, |
| 5 | and I have made any corrections, additions, or |
| 6 | deletions that I was desirous of making; that the |
| 7 | foregoing is a true and correct transcript of my |
| 8 | testimony contained therein. |
| 9 | |
| 10 | EXECUTED this _____ day of _____, |
| 11 | 20____, at _____, _____. |
| | (City)              (State) |
| 12 | |
| 13 | |
| 14 | |
| | _____ |
| 15 | JENNIFER MINTON |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

362

Minton, Jennifer (30b6)  9/25/2006  1:08:00 PM

```
1        CERTIFICATE OF DEPOSITION OFFICER
2        I, RACHEL FERRIER, CSR, CSR No. 6948, duly
3    authorized to administer oaths pursuant to Section
4    8211 of the California Code of Civil Procedure,
5    hereby certify that the witness in the foregoing
6    deposition was by me sworn to testify to the truth,
7    the whole truth and nothing but the truth in the
8    within-entitled cause; that said deposition was taken
9    at the time and place therein stated; that the
10   testimony of said witness was reported by me and was
11   thereafter transcribed by me or under my direction by
12   means of computer-aided transcription; that the
13   foregoing is a full, complete and true record of said
14   testimony; and that the witness was given an
15   opportunity to read and correct said deposition and
16   to subscribe same.
17       I further certify that I am not of counsel or
18   attorney for either or any of the parties in the
19   foregoing deposition and caption named, nor in any
20   way interested in the outcome of the cause named in
21   said caption.
22       IN WITNESS WHEREOF, I have hereunto subscribed
23   by my hand this 5th day of October, 2006.
24
25       RACHEL FERRIER, CSR No. 6948
```

363

```
 1            CERTIFICATE OF DEPOSITION OFFICER
 2        I, RACHEL FERRIER, CSR, CSR No. 6948, duly
 3    authorized to administer oaths pursuant to Section
 4    8211 of the California Code of Civil Procedure,
 5    hereby certify that the witness in the foregoing
 6    deposition was by me sworn to testify to the truth,
 7    the whole truth and nothing but the truth in the
 8    within-entitled cause; that said deposition was taken
 9    at the time and place therein stated; that the
10    testimony of said witness was reported by me and was
11    thereafter transcribed by me or under my direction by
12    means of computer-aided transcription; that the
13    foregoing is a full, complete and true record of said
14    testimony; and that the witness was given an
15    opportunity to read and correct said deposition and
16    to subscribe same.
17        I further certify that I am not of counsel or
18    attorney for either or any of the parties in the
19    foregoing deposition and caption named, nor in any
20    way interested in the outcome of the cause named in
21    said caption.
22        IN WITNESS WHEREOF, I have hereunto subscribed
23    by my hand this 5th day of October, 2006.
24
25    _____
             RACHEL FERRIER, CSR No. 6948
```

1               CERTIFICATE OF DEPOSITION OFFICER

2          I, RACHEL FERRIER, CSR, CSR No. 6948, duly

3     authorized to administer oaths pursuant to Section

4     8211 of the California Code of Civil Procedure,

5     hereby certify that the witness in the foregoing

6     deposition was by me sworn to testify to the truth,

7     the whole truth and nothing but the truth in the

8     within-entitled cause; that said deposition was taken

9     at the time and place therein stated; that the

10    testimony of said witness was reported by me and was

11    thereafter transcribed by me or under my direction by

12    means of computer-aided transcription; that the

13    foregoing is a full, complete and true record of said

14    testimony; and that the witness was given an

15    opportunity to read and correct said deposition and

16    to subscribe same.

17         I further certify that I am not of counsel or

18    attorney for either or any of the parties in the

19    foregoing deposition and caption named, nor in any

20    way interested in the outcome of the cause named in

21    said caption.

22         IN WITNESS WHEREOF, I have hereunto subscribed

23    by my hand this 5th day of October, 2006.

24

25              RACHEL FERRIER, CSR No. 6948

EXHIBIT N

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

| | |
|---|---|
| 1 | 00001:01   IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA |
| 2 | 02        IN AND FOR THE COUNTY OF SAN MATEO |
| 3 | 03           ---o0o--- |
| 4 | 04  COORDINATION PROCEEDING |
| 5 | 05 |
| 6 | 06 |
| 7 | 07           PROCEEDING NO. 4180 |
| 8 | 08  THIS DOCUMENT RELATES TO: |
| 9 | 09  ALL ACTIONS |
| 10 | 10 |
| 11 | 11 |
| 12 | 12       DEPOSITION OF JEFFREY O. HENLEY |
| 13 | 13         Tuesday, March 2, 2004 |
| 14 | 14         Volume I (Pages 1 - 274) |
| 15 | 15 |
| 16 | 16  CONFIDENTIAL:  THIS TRANSCRIPT IS DESIGNATED AS |
| 17 | 17  THE COURT ON JUNE 21, 2002, CONTAINS DOCUMENTS MARK |
| 18 | 18  EXCEPT PURSUANT TO THE TERMS OF THE PROTECTIVE ORD |
| 19 | 19 |
| 20 | 20  REPORTED BY: |
| 21 | 21  HOLLY MOOSE, RDR-CRR-CRP |
| 22 | 22 |
| 23 | 23 |
| 24 | 24       Certified Shorthand Reporters |
| 25 | 25       San Francisco, California  94102 |

1

| | |
|---|---|
| 1 | 00002:01   IN THE COURT OF CHANCERY OF THE STATE OF DELAWA |
| 2 | 02        IN AND FOR NEW CASTLE COUNTY |
| 3 | 03 |
| 4 | 04  IN RE ORACLE CORPORATION |
| 5 | 05  DERIVATIVE LITIGATION |
| 6 | 06  _____/ |
| 7 | 07 |
| 8 | 08 |
| 9 | 09 |
| 10 | 10 |
| 11 | 11 |
| 12 | 12 |
| 13 | 13 |
| 14 | 14 |
| 15 | 15 |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |

2

| | |
|---|---|
| 1 | 00003:01        A P P E A R A N C E S |
| 2 | 02 |
| 3 | 03  FOR CALIFORNIA PLAINTIFFS: |
| 4 | 04    BERMAN, DEVALERIO, PEASE, TABACCO, BURT & PUCILLO |
| 5 | 05       ELIZABETH GUARNIERI, ESQ. |
| 6 | 06   San Francisco, CA  94104 |
| 7 | 07 |
| 8 | 08 |
| 9 | 09   BY:  DAVID PEREZ, LAW CLERK |
| 10 | 10   Suite 1000, Tenth Floor |
| 11 | 11 |
| 12 | 12 |
| 13 | 13 |
| 14 | 14   BY:  DOUGLAS WILENS, ESQ. |
| 15 | 15   Boca Raton, FL  33432 |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19 | 19   BY:  ALAN N. SALPETER, ESQ. |
| 20 | 20   190 South La Salle Street |
| 21 | 21   (312)782-0600 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |

3

| | |
|---|---|
| 1 | 00004:01        A P P E A R A N C E S (continued) |
| 2 | 02 |
| 3 | 03  FOR ORACLE CORPORATION: |
| 4 | 04    MORRISON & FOERSTER |
| 5 | 05    755 Page Mill Road |
| 6 | 06    (650)813-5818 |
| 7 | 07  AND |
| 8 | 08    ORACLE CORPORATION |
| 9 | 09    500 Oracle Parkway |
| 10 | 10    (650)506-9221 |
| 11 | 11 |
| 12 | 12  ALSO PRESENT:  Joanna Lenn, Videographer |
| 13 | 13        Jill Weader, Berman paralegal |
| 14 | 14 |
| 15 | 15 |
| 16 | 16   425 California Street, Suite 2025 |
| 17 | 17   (415)433-3200 |
| 18 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21          ---o0o--- |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |

4

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

```
1  00005:01          I N D E X
2  02
3  03 DEPOSITION OF JEFFREY O. HENLEY
4  04
5  05 EXAMINATION BY:                    PAGE
6  06  MS. LAVALLEE                 9
7  07
8  08 DC EXHIBITS
9  09 135 Statement Of Changes In Beneficial
10 10
11 11   Pursuant To Rule 144 Under The
12 12   2 pages                      59
13 13 137 Oracle analyses, CA-ORCL 022288-90    100
14 14 138 Oracle Corp. Pipeline Reporting
15 15   003216-28, 13 pages          103
16 16 139 Oracle analyses, ORCL 0122102-12,
17 17
18 18   call, CA-ORCL 010710-42, 33 pages   187
19 19 141 Oracle analyses, CA-ORCL
20 20
21 21   17 pages                     194
22 22 143 Undated e-mail to Henley from Henley,
23 23
24 24   15 pages                     213
25 25           ---o0o---
```

```
1  00006:01      BE IT REMEMBERED that, pursuant to Notice and
2  02 on Tuesday, March 2, 2004, commencing at the hour of
3  03 9:29 a.m., before me, HOLLY MOOSE, CSR No. 6438, a
4  04 Certified Shorthand Reporter in the State of California,
5  05 there personally appeared
6  06
7  07        JEFFREY O. HENLEY,
8  08
9  09 called as a witness by the Plaintiffs, who, having been
10 10 first duly sworn, was examined and testified as
11 11 hereinafter set forth:
12 12
13 13
14 14
15 15           ---o0o---
16 16
17 17
18 18
19 19
20 20
21 21
22 22
23 23
24 24
25 25
```

5

6

```
1  00007:01 PROCEEDINGS                9:29 A.M.
2  02
3  03      THE VIDEOGRAPHER:  Good morning.  This marks
4  04 the beginning of Volume I, videotape number 1 in the
5  05 deposition of Jeffrey Henley in the matters of
6  06 Coordination Proceeding Special Title Oracle Cases in
7  07 the superior court of the state of California, county of
8  08 San Mateo, Judicial Council Coordination Proceeding
9  09 number 4180, and In Re Oracle Corp Derivative
10 10 Litigation, in the court of the Chancery of the state of
11 11 Delaware, in and for New Castle County, consolidated
12 12 case number 18751.
13 13      Today's date is March 2nd, 2004, and the
14 14 time is 9:35.  The location of this deposition is 425
15 15 California Street, Suite 2025, San Francisco,
16 16 California.  The deposition was noticed by counsel for
17 17 plaintiffs and the videotape is being produced on behalf
18 18 of same.  The video operator is Joanna Lenn, a
19 19 California notary public for the county of San
20 20 Francisco, employed by Dan Mottaz Video Productions LLC,
21 21 182 Second Street, Suite 202, San Francisco, California,
22 22 94105, 415-624-1300.  The court reporter is Holly Moose
23 23 with Robert Barnes.
24 24      Would counsel present please identify
25 25 themselves and state whom they represent.
```

```
1  00008:01     MS. LAVALLEE:  Nicole Lavallee of Berman,
2  02 DeValerio for the California plaintiffs.
3  03      MS. GUARNIERI:  Betsy Guarnieri of Berman,
4  04 DeValerio, California plaintiffs.
5  05      MR. WILENS:  Doug Wilens, Cauley, Geller,
6  06 Bowman & Rudman, for the Delaware plaintiffs.
7  07      MR. PEREZ:  David Perez, McManis, Faulkner &
8  08 Morgan, for the California plaintiffs.  For the record,
9  09 I'm a law clerk.
10 10      MS. WEADER:  Jill Weader for the California
11 11 plaintiffs, also from Berman, DeValerio.  I'm a
12 12 paralegal at Berman.
13 13      MS. WHITE:  Anna Erickson White from Morrison
14 14 & Foerster for Oracle Corporation.
15 15      MS. SEGAL:  Lauren Segal from Oracle
16 16 Corporation for Oracle Corporation.
17 17      MR. RUBINSTEIN:  Javier Rubinstein, Mayer,
18 18 Brown, Rowe & Maw, for the individual defendants.
19 19      MR. SALPETER:  Alan Salpeter, Mayer, Brown,
20 20 for the individual defendants.
21 21      THE VIDEOGRAPHER:  If there are no
22 22 stipulations, the court reporter may administer the
23 23 oath.
24 24      (Witness sworn).
25 25 ///
```

7

8

00009:01          JEFFREY O. HENLEY,
02  having been first duly sworn, testified as follows:
03          EXAMINATION BY
04      MS. LAVALLEE:  Q.  Good morning, Mr. Henley.
05  My name's Nicole Lavallee.  I introduced myself just
06  prior to the deposition.
07      Can you tell me, have you ever been deposed
08  before?
09      A.  Yes.
10      Q.  Okay.  More than a couple of times?
11      A.  Several times, yes.
12      Q.  So I guess you're somewhat familiar with the
13  process that's going to happen today?
14      A.  Yes.
15      Q.  And you understand that your testimony's given
16  under oath and can be used in a court proceeding?
17      A.  Yes.
18      Q.  I won't spend too much time on general
19  instructions, but just a couple I'd like to remind you
20  of and -- the witness of, and myself as well.
21      First thing is that it's really important to
22  always respond with a verbal answer.  A nod of the head
23  or a shrug or a "yes" -- "yes" will work, but "uh-huh,"
24  those types of things don't read well on a transcript.
25      The second instruction is that it's really

9

00010:01  important for us to be careful to allow the other person
02  to finish either the answer or the question.  So I'll
03  try to let you complete your answer before asking you a
04  question.  If you could do the same, that would be
05  great.  Does that make sense?
06      A.  It does.  You'll probably have to stop me a
07  few times when I violate those general guidelines.
08  Sometimes I'll start answering a question quickly, so --
09      Q.  Sure.
10      A.  -- just tell me.  Remind me.
11      Q.  That's a normal reaction.  I was just doing it
12  right there.  And the court reporter will probably
13  remind us as well.
14      The other thing is to just watch our speed as
15  we talk.  I have a tendency to speak quickly, and
16  sometimes the witnesses do as well.  It makes it more
17  difficult for the court reporter.
18      The other thing is if -- and this is very
19  crucial -- if you don't understand my question, please
20  let me know, 'cause I'm more than happy to rephrase it.
21  I want to make sure you understand the question.
22      And finally, to the extent that a question --
23  you don't know the answer to a question and you'd have
24  to be guessing, I don't want your guess.  I would like
25  your best estimate.  An educated estimate or thoughtful

10

00011:01  guess is good, but a guess is not something that we need
02  here.  So if you -- if the answer -- if the question
03  requires a guess, just let me know.
04      Does that make sense?
05      A.  Yes.
06      Q.  All right.  Mr. Henley, did you meet with
07  anybody to prepare for this deposition prior to today?
08      A.  Yes.
09      Q.  And who --
10      A.  Yes, I did.
11      Q.  Who did you meet with?
12      A.  My lawyers.
13      Q.  And who are they?
14      A.  Mr. -- Javier and Alan right here.
15      Q.  Mr. Salpeter?
16      A.  Yes, Mr. Salpeter.
17      Q.  Anybody else present?
18      A.  Javier was there, both of them.
19      Q.  And nobody else?
20      A.  No.
21      Q.  Okay.  And how many times did you speak with
22  them before today for your deposition?
23      A.  Yesterday we met for several hours.  I
24  reviewed some documents.  We met briefly this morning.
25      Q.  Okay.  And you say "several hours."  Is that

11

00012:01  five hours or more or five hours or less?
02      A.  Oh, no, well less than five hours.  Took me
03  just a couple of hours to review documents, refresh my
04  memory.  It's been several years.
05      Q.  Can you tell me what documents you read in
06  preparation for today's deposition?
07      A.  I reread my affidavit, the interview I gave, I
08  think, on the derivative suit with a couple of Oracle
09  committee members.  I reread the notes from the earnings
10  calls, both in the second quarters and third quarters, a
11  couple of different memos.  A variety of things.
12      Q.  Anything else other than those categories?
13      A.  I don't believe so.
14      Q.  Okay.  And you said "other things."  Were
15  there documents that fell within a category other than
16  the ones --
17      A.  No, I'm sorry.  Those -- those were the things
18  I was speaking to.
19      Q.  Okay.  And when you say your affidavit, are
20  you speaking of the affidavit filed in connection with
21  the Delaware summary judgment motion?
22      A.  I believe that's the one.  I think there was
23  only one affidavit that I signed.  But it was an
24  affidavit.  I assume that was the one.
25      Q.  And when -- you mentioned the interviews.  Are

12

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00013:01 you referring to summaries of two interviews that were
02 conducted by the special litigation --
03    A.  Right, that's what I meant.
04    Q.  Okay.  And was that the first time you read
05 those interview summaries?
06    A.  I may have read them right afterwards, but
07 certainly -- I can't recollect, but certainly reread
08 them or read them for the first time yesterday.
09    Q.  Okay.  And did you feel that those summaries
10 were -- accurately summarize what you told the SLC
11 during that interview -- those two interviews?
12    A.  Yes.
13    Q.  And you mentioned memos.
14    A.  E-mails, I mean, by "memos."  We don't really
15 do memos anymore, but e-mails.
16    Q.  Okay.
17    A.  Electronic memos, I guess, if you want to call
18 them, but e-mails.
19    Q.  And do you recall which e-mails you read?
20    A.  I really don't.  I flashed through a bunch
21 of -- several different e-mails.  I don't recall
22 exactly, you know, which ones they were.  But they all
23 related to things that happened during that period of
24 time.
25    Q.  And by "that period of time," what period of

13

00014:01 time are you --
02    A.  In the -- in the -- I would say the fiscal
03 third quarter period to kind of -- the December through
04 February, March kind of frame, you know, ending in early
05 March '01.
06    Q.  Okay.  And you -- okay.  You mentioned the
07 fiscal third quarter.
08    A.  That would have been -- our fiscal third
09 quarter would have been the months of December through
10 February.
11    Q.  Right.
12    A.  February '01.
13    Q.  Okay.  Did you read any deposition transcripts
14 prior to this deposition today in connection with
15 depositions taken in this action or in the Delaware --
16 either the California or Delaware derivative action?
17    A.  I read -- I think -- I believe I read
18 affidavits that Jennifer Minton and Larry gave.  I don't
19 think I read a deposition or transcript of a deposition.
20    Q.  Okay.  And by "Larry," you're referring to --
21    A.  Larry Ellison, right.
22    Q.  Again, Mr. Henley, I would ask, actually, just
23 for you to wait for me to finish my answer [sic].
24    A.  Okay.
25    Q.  'Cause you do have a tendency to --

14

00015:01    A.  Told you I would do that.
02    Q.  And that's fine.  But just if you could make a
03 conscious effort to remember.
04    A.  I'll keep trying.
05    Q.  Thank you.  All right.  Can you tell me
06 whether or not Oracle has any policies regarding trading
07 by its senior executives.
08    A.  Yes, we do.
09    Q.  Can you identify what those policies are to
10 me -- for me.
11    A.  Well, we have a policy for the officers of the
12 company that they require clearance from our general
13 counsel.  And both my general counsel and myself get
14 involved in that process.  But in the most recent years,
15 generally our general counsel has been the one to clear
16 them.
17       So anytime they want to trade -- exercise
18 options, trade Oracle stock, they're required to get the
19 approval so that -- 'cause only he and I know if there's
20 something that would preclude them.  So they have to
21 check with us to make sure there's no reason they can't
22 trade shares in Oracle.
23    Q.  All right.  And other than that particular
24 policy -- well, actually, let me step back.
25       Is that policy written down anyplace in a

15

00016:01 particular document at Oracle?
02    A.  I think so.  I believe so.  We also have a
03 quiet period.  So there is a quiet period where people
04 can't trade, no matter what.  But outside the -- outside
05 the quiet -- so-called quiet period, if people want to
06 trade that are 16(b) officers, they require clearance to
07 be sure that they're not trading where there's something
08 that's not known by the public that's significant, that
09 sort of thing.
10    Q.  And other than the clearance procedure and the
11 quiet period rules, are there other policies governing
12 insider trading by senior officers at Oracle
13 Corporation?  Actually, let me step back.
14       Let me clarify my question relates to the
15 third quarter of 2001.
16    A.  I think the policies we've had have been in
17 place for many, many years.  So I don't think there was
18 anything unique about that period of time, but -- I
19 think that's it.  We have had a formal policy
20 administered by the general counsel and myself, because
21 I have insight into the financial facts sometimes that
22 general counsel doesn't.
23    Q.  Okay.  And can you clarify what you mean by
24 you have insight into financial facts the general
25 counsel doesn't.

16

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00017:01    A.  Yeah.  I attend executive committee meetings,
02  I see financial forecasts, a lot of things that the
03  general counsel doesn't.  So he relies on me to tell him
04  if there's something that's materially changed, or
05  something, from what the public might know.
06    Q.  Okay.  I'd like to focus a moment on -- well,
07  actually, you said just before that the policies were
08  memorialized somewhere at Oracle.
09        I'd like to show you a document that has been
10  previously marked as Exhibit No. 1 in this -- DC-1 in
11  these litigations.  And I'd ask you to tell me whether
12  or not it's your understanding that this memorializes
13  some of the policies applicable to senior officers at
14  Oracle during the third quarter of 2001.
15    A.  Well, I'm reading something -- I don't see a
16  date on it, other than there's been some stamped date,
17  so ...
18    Q.  Correct.
19    A.  I mean, I ...
20    Q.  Okay.
21    A.  I mean, it comes from Dan Cooperman.  It looks
22  to me like what we have as a policy.  Whether -- whether
23  it was -- this is exactly what was written during this
24  time frame, I'm not sure I know because I don't see a
25  date on this.

17

00018:01    Q.  All right.  And I'll just let you know that
02  Mr. Cooperman indicated that this was indeed the
03  executive trading policy that was applicable in the
04  third quarter of 2001.
05    A.  Okay.
06    Q.  Okay.  Mr. Henley, actually, I'll ask that you
07  hold on to a document --
08    A.  Okay.
09    Q.  -- a moment longer.  I'm going to have a
10  couple of questions relating to the document.
11        The second paragraph reads,
12        "Before making any purchase or sale of
13        Oracle securities, Oracle's corporate
14        policies require that you consult with
15        Oracle's chief financial officer and with
16        Oracle's general counsel or his designee
17        for clearance of your trade."
18        Is it your understanding that this policy
19  requires clearance from both the general counsel and the
20  chief executive -- financial officer?
21    A.  I guess that's true.  I would say
22  administratively that's not the way it's worked in
23  recent years.  I've let them go directly to Dan.
24        Dan knows that -- Dan Cooperman, our general
25  counsel, knows that if I ever believe there's something

18

00019:01  that's -- would require people not to trade, I would
02  tell him.
03        So administratively we both have to clear the
04  person, but the reality is Dan has done the clearing
05  subject to me telling him "Dan, you shouldn't be letting
06  people trade."
07    Q.  Okay.  Do you -- let me step back.
08        How do you make a determination -- well,
09  actually, I'll ask a different question.
10        Are you the chief financial -- you were the
11  chief financial officer of the company?
12    A.  I was and I still am.
13    Q.  Okay, during the third quarter 2001, right?
14    A.  Mm-hm.
15    Q.  Okay.  And when you say that you let
16  Mr. Cooperman know when you think that somebody
17  shouldn't trade, are you -- do you specifically look at
18  any particular requests for trade or do you just provide
19  him with guidance as to what period of time you think --
20    A.  In earlier --
21    Q.  Let me finish my question.
22    A.  Okay.
23    Q.  -- think trading should not occur?  You can go
24  ahead.
25    A.  Okay.  In earlier years, I -- my recollection

19

00020:01  was I used to literally be copied on these things.  We
02  decided that there was enough people doing this that
03  this was cumbersome.
04        So in later years, these things went directly
05  to the general counsel and he would clear people, copy
06  me, typically, on those clearances so that I was aware
07  of that if there was -- just to jog my memory if there was
08  some reason I had to stop this.
09        But the reality is I've operated that as soon
10  as I have any concern, I would go directly to the
11  general counsel and alert him immediately if I thought
12  there was some reason, something's going on, that should
13  preclude anyone from trading stock.
14    Q.  Okay.  And under what circumstances do you
15  believe that you should preclude somebody from trading
16  stock?
17    A.  You know, if there is a significant or
18  material event that's occurred that the public doesn't
19  know, is kind of my general way of describing it.
20        So one would be if there was a major merger or
21  something that would -- that could have some negative
22  financial impact.  Most of these things are on the
23  negative side.  The -- or if I saw something change in
24  the financial outlook of the company that was
25  significantly negative.

20

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

| | |
|---|---|
| 1  00021:01        And one way of measuring that is are we going | 1  00022:01     A.  Net income, earnings per share, either one. |
| 2  02  to make our current forecast for the quarter, and that | 2  02  But they kind of boil it down to earnings per share. |
| 3  03  sort of thing, so ... these are typically what would | 3  03     Q.  Okay.  And are there other factors as well, |
| 4  04  cause me to have a discussion with him and maybe | 4  04  other than EPS, or -- |
| 5  05  actually say, you know, "We should stop anybody from | 5  05     A.  Sure, I think people look at the tone of your |
| 6  06  trading." | 6  06  revenue.  If your revenue is -- particularly your |
| 7  07     Q.  Okay.  And you said that you looked for | 7  07  license revenue -- is significantly going to miss, |
| 8  08  something -- some -- let me get the exact language here. | 8  08  people are sensitive to that as an indication of change |
| 9  09  Something -- if you saw something change in the | 9  09  in the business, as well as earnings. |
| 10  10  financial outlook of the company -- | 10  10      But they were somewhat correlated.  If you have |
| 11  11     A.  Mm-hm. | 11  11  a significant revenue shortfall, typically your earnings |
| 12  12     Q.  -- that was significantly negative.  What type | 12  12  fall short as well. |
| 13  13  of changes would you be speaking about there? | 13  13     Q.  Is that always true? |
| 14  14     A.  Well, I mean, obviously if the -- if the -- | 14  14     A.  There's a fairly good correlation, |
| 15  15  the thing that's sort of typical in the industry that | 15  15  particularly in license revenue.  So the marginal impact |
| 16  16  people look at is are you going to make your earnings, | 16  16  of that is significant.  Almost all of it falls to the |
| 17  17  are you significantly going to miss your earnings | 17  17  bottom line.  So it's a very strong correlation. |
| 18  18  forecast. | 18  18      If you have a significant license revenue |
| 19  19      So that's typically what -- you know, the | 19  19  shortfall in particular, but certainly other revenue, |
| 20  20  most -- the thing we're most sensitive to, is are we | 20  20  and expenses don't fall correspondingly, then, yeah, |
| 21  21  going to make our earnings or not. | 21  21  that pretty well correlates to an earnings miss as well. |
| 22  22     Q.  And by "earnings," are you talking about | 22  22     Q.  Okay.  So are you saying that if you have an |
| 23  23  earnings per share or -- | 23  23  earnings shortfall, it will always necessarily impact |
| 24  24     A.  Yes. | 24  24  EPS, or are there circumstances where it might not? |
| 25  25     Q.  Okay. | 25  25     A.  Well, no -- you mean revenue or earnings?  You |

21

22

| | |
|---|---|
| 1  00023:01  said if I have an earnings shortfall. | 1  00024:01  your -- how well you performed, even in license, how |
| 2  02     Q.  Oh, I'm sorry, I meant revenues.  Thank you. | 2  02  well your apps did, how well your database -- so there's |
| 3  03     A.  I wouldn't say -- I'd never say never.  I | 3  03  a lot of things they look at beyond just -- just |
| 4  04  mean -- and again, what's significant?  You could have | 4  04  earnings. |
| 5  05  revenue come -- drop, but you could also have your | 5  05     MS. LAVALLEE:  Q.  Okay.  And what else do you |
| 6  06  expenses drop.  So it's not a perfect correlation. | 6  06  think the investors look at beyond earnings and beyond |
| 7  07      But typically in a short period of time, if | 7  07  some of the items that you just identified?  Can you be |
| 8  08  you've accurately estimated your expenses, if you have, | 8  08  more specific? |
| 9  09  and the revenue falls, usually on the margin there's a | 9  09     A.  Investors look to the future.  Investors look |
| 10  10  fairly significant amount of that that affects your -- | 10  10  to how your industry's doing, how well you're competing, |
| 11  11  affects your earnings. | 11  11  how well the general market's doing.  Investors look at |
| 12  12     Q.  All right.  Would it be significant or | 12  12  lots of things.  They look at history.  But clearly |
| 13  13  material if -- in your view -- if the revenues -- there | 13  13  markets are forward-looking for sure. |
| 14  14  was a revenue shortfall that may not have impacted EPS? | 14  14     Q.  Right.  Okay.  Now, you mentioned something |
| 15  15     MR. SALPETER:  Objection to form. | 15  15  about earnings earlier about how -- that depending how |
| 16  16      You may go ahead and answer. | 16  16  accurately you're projecting your earnings, that |
| 17  17      THE WITNESS:  Again, I -- as I just told you, | 17  17  revenues may or may not -- or depending how accurately |
| 18  18  I think investors look at revenue, and they look at | 18  18  you're projecting your earnings, revenues may or may not |
| 19  19  particularly license revenue.  And so there's a | 19  19  correlate to an EPS change.  Am I accurately summarizing |
| 20  20  sensitivity to how well your license revenue is | 20  20  what you said? |
| 21  21  performing, even if you make your earnings. | 21  21     A.  I don't think so. |
| 22  22      So they're always -- they always care about | 22  22     Q.  Okay.  Let me get to the passage here.  I |
| 23  23  both.  But ultimately, I think the earnings are the | 23  23  don't want to mischaracterize your testimony.  Okay. |
| 24  24  ultimate thing that people look to.  But they certainly | 24  24  You said, |
| 25  25  examine the makeup of your expenses, the makeup of | 25  25      "I never say never -- again -- and |

23

24

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

| | |
|---|---|
| 1 00025:01  again, what's significant?  You could have | 1 00026:01  been reasonably accurate over the many years. |
| 2   02  revenue drop, but you could also have your | 2   02    Q.  Okay.  And in terms of estimating expenses, |
| 3   03  expenses drop.  So it's not a perfect | 3   03  how much focus is placed on that during a quarter? |
| 4   04  correlation.  But typically in a short | 4   04    A.  Again, a lot of time is spent in the finance |
| 5   05  period of time, if you've accurately | 5   05  organization trying to understand, you know, the |
| 6   06  estimated your expenses, if you have, and | 6   06  expenses, the outlook for the next three quarters. |
| 7   07  the revenue falls, usually on the margin, | 7   07      And we're reasonably accurate.  There's |
| 8   08  there's a fairly significant amount of that | 8   08  clearly -- you know, there's variances and that sort of |
| 9   09  that affects your earnings." | 9   09  thing.  But typically we're better able to estimate that |
| 10   10    A.  That's correct.  That's accurate what I said. | 10   10  than the revenues. |
| 11   11    Q.  In terms of earnings, how easy -- how much | 11   11      Revenues, particularly license revenues, are |
| 12   12  time does Oracle spend estimating earnings and | 12   12  more volatile.  There's -- it's more difficult to get |
| 13   13  forecasting for earnings in a quarter? | 13   13  your arms around that number. |
| 14   14    A.  It's a continuous process, and we're very -- | 14   14    Q.  Can you describe for me -- or define for me |
| 15   15  we spend a lot of time talking about it -- talking about | 15   15  what you believe the term of "materiality" to mean. |
| 16   16  our business in general, but specifically how well we're | 16   16    A.  Different -- no one's ever been able to tell |
| 17   17  in a quarter and, as we get through a quarter, | 17   17  me exactly because no one ever wants to make a |
| 18   18  then how well we're going to do next quarter.  And it's | 18   18  commitment, whether it's the accountants, the lawyers, |
| 19   19  something we spend a lot of time on.  It's a constant | 19   19  whatever.  But I've always used the rule of thumb about |
| 20   20  exercise. | 20   20  ten percent. |
| 21   21      And we've been pretty accurate.  I've been | 21   21      So if our earnings are off ten percent or |
| 22   22  here 52 quarters.  We had three quarters, I think, that | 22   22  more, I've always viewed that as material.  I've had |
| 23   23  we missed our earnings.  Several quarters we beat our | 23   23  different people tell me different things, but generally |
| 24   24  earnings, and for the most part made our earnings.  So I | 24   24  that's kind of what I've used. |
| 25   25  think we've been -- we spend a lot of time, and we've | 25   25    Q.  Okay.  And when faced with the issue of |

25 26

| | |
|---|---|
| 1 00027:01  whether or not to grant clearance or whether or not to | 1 00028:01    Q.  Okay.  Other than in the circumstances that |
| 2   02  halt trading during a particular period of time, how do | 2   02  you just described, would there be any circumstance |
| 3   03  you determine whether or not the inside information that | 3   03  where you would halt trading or tell Dan to halt |
| 4   04  you're aware of is material? | 4   04  trading? |
| 5   05    A.  Um ... | 5   05    A.  Again, I think I described some -- I didn't |
| 6   06    Q.  Actually, let me rephrase that.  That wasn't a | 6   06  get very specific -- some kind of event, something, that |
| 7   07  very good question. | 7   07  would have a significant material negative impact on our |
| 8   08    A.  Okay. | 8   08  earnings outlook, or, in the short-term, if there was a |
| 9   09    Q.  When you're determining whether or not to halt | 9   09  earnings miss, a very high probability of missing our |
| 10   10  trading or to grant a clearance to trade, how do you | 10   10  earnings. |
| 11   11  determine whether or not there's material adverse | 11   11    Q.  Okay.  And in terms of just your general |
| 12   12  information that's not -- not public that should prevent | 12   12  revenue growth and -- forecasting and revenue growth, |
| 13   13  trading? | 13   13  under what circumstances would you deem there to be a |
| 14   14    A.  Well, again, if there were some event I knew | 14   14  material change that would require you to halt trading? |
| 15   15  or something that was going to significantly affect our | 15   15    A.  I've never worried about that because, again, |
| 16   16  earnings outlook negatively beyond what the Street knows | 16   16  as I said, if there were a material revenue shortfall, I |
| 17   17  about, or more specifically, if I thought we were going | 17   17  think it would generate typically a material earnings |
| 18   18  to miss our earnings estimate for the quarter -- that's | 18   18  shortfall.  So it really -- there's a fairly good |
| 19   19  the more common situation -- and there it's, you know, | 19   19  correlation generally, as I said earlier. |
| 20   20  will we miss our number.  I would not -- I mean, I don't | 20   20      So I tend -- I tended -- I tend to use the |
| 21   21  even use the ten percent.  It's kind of like as long as | 21   21  earnings thresh -- the earnings as the way to say, you |
| 22   22  I'm highly -- I'm highly certain that -- or pretty darn | 22   22  know, we've missed our earnings. |
| 23   23  certain that we're liable to miss the number, that's | 23   23    Q.  Okay.  So in terms of forecasting and looking |
| 24   24  what would trigger me to, you know, tell Dan "We should | 24   24  forward in terms of the growth of the company, are there |
| 25   25  stop clearing people." | 25   25  anything other than whether or not you're going to make |

27 28

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00029:01  your quarter or miss your earnings EPS number that you
02  look at?
03      MR. SALPETER:  Well, I object. He's already
04  outlined a number of things. Do you mean in addition to
05  what he's already said? He's already described
06  different kinds of events that would precipitate this.
07      MS. LAVALLEE:  Okay.
08      Q.  Now, other than -- you mentioned mergers. Let
09  me ask a different question.
10      You mentioned mergers and you mentioned some
11  significant event. By "significant event," are you
12  talking about anything that relates to forecasting or
13  the general growth of the business?
14      A.  Yeah, growth earnings. I mean, if we had some
15  major merger that was going to degrade the earnings of
16  the company -- I doubt we would want to do that. But if
17  we were, I think we'd be obligated not to say -- to halt
18  trading until that merger was announced.
19      Q.  Okay. And other than --
20      A.  Hasn't been one of those, but that's a
21  possibility.
22      Q.  Sure. And other than a transactional-type
23  deal or a merger, or something along those lines, in
24  terms of just general forecasting-type data, is there
25  anything that you would consider to be material that

29

00030:01  would require halting trading, other than being pretty
02  certain that you're going to miss your EPS?
03      MR. SALPETER:  Objection to form, asked and
04  answered a couple times.
05      MS. LAVALLEE:  Q.  Can you answer, please.
06      A.  Yeah, I'm not sure what you're getting at. I
07  think I've answered the question. I don't -- I don't
08  know what else. I mean, I've said the markets are
09  forward-looking. I've said the markets want to, you
10  know, get a sense of where things -- you know, where
11  things are going and that sort of thing.
12      We have never -- I've never given guidance
13  beyond a quarter because it's difficult enough even to
14  know what's going on in a quarter, let alone what's
15  going on beyond that. It's very difficult. It's a very
16  volatile business.
17      And so I do the best I can to describe the
18  general outlook of our business for competitive and all
19  that sort of thing. But investors know as much as I do
20  about the future, to be honest with you. And I do try
21  to give them some sense, at least, of our quarter.
22  That's about the best I can do.
23      Q.  Okay. And when you give guidance, what type
24  of guidance do you give to the investors beyond EPS
25  numbers?

30

00031:01      A.  We tend to give -- there's several numbers: a
02  license growth rate, a total revenue growth rate, an
03  earnings growth rate. If there are changes like in our
04  tax rate, or a few things like that, I'll typically
05  mention those. But those three numbers are the key
06  numbers that I think investors obviously need to know.
07      And then analysts kind of derive their own
08  set of assumptions on expense trends, and all that sort
09  of thing.
10      Q.  Okay. In terms of license growth and license
11  figures, do you divide that beyond the total licenses
12  for the company when you give guidance?
13      A.  Sometimes we have; sometimes we haven't, I
14  think. You know, sometimes -- we always disclose
15  actuals for our database and our applications license
16  revenue. And sometimes I think we've given indications
17  going forward of that breakdown. I think sometimes I
18  haven't.
19      But they are always interested in how both
20  those businesses are doing.
21      Q.  Okay. And you think that that's something the
22  investors care about?
23      A.  Of course.
24      Q.  Mr. Henley, if I could ask you to take a look
25  at Exhibit No. 1 again. I'm going to draw your

31

00032:01  attention -- actually, let me show you a different
02  document. I'd like to show you a document that was
03  previously marked as Exhibit No. DC-2 in these
04  litigations.
05      A.  Okay.
06      Q.  Mr. Henley, this is a document that's
07  Bates-stamped ORCL 0003303 through 323. Can you take a
08  look at this document and identify for me what it is.
09      A.  The title is "Summary Of oracle Business
10  Values And Business Conduct Policies And Relationships."
11      Q.  Do you recognize this document?
12      A.  Yes.
13      Q.  Is this a document that's applicable -- that
14  sets forth code of conduct for all employees at Oracle
15  Corporation?
16      A.  Yes.
17      Q.  Can you tell from looking at the document
18  whether or not this was the code of ethics in place in
19  the third quarter of 2001?
20      A.  I'm not sure I can. There's a date down at
21  the bottom says "5/20/02" at "5:06 p.m." Looks like
22  it's part of the document.
23      Q.  Right.
24      A.  So whether this was in place, you know, 15
25  months earlier or not, I'm not certain. But I know that

32

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00033:01  we've had policies like this through that period.
02  Whether this was exactly the policy or not, I don't --
03  I'm not sure.
04      Q.  Okay, thank you.  If I could turn your
05  attention to page Bates stamp ORCL 0033307.
06      A.  Yes.
07      Q.  Do you see the heading "Securities And Insider
08  Trading"?
09      A.  Yes.
10      Q.  The third paragraph below that reads,
11          "Material information includes any
12  information that a reasonable investor
13  would consider important in a decision to
14  buy, hold or sell securities.  Such
15  information may include financial and key
16  business data, merger, acquisition or
17  divestiture discussions, award or
18  cancellation of a major contract, changes
19  in key management, forecasts of
20  unanticipated financial results,
21  significant litigation and gain or loss of
22  a substantial customer or supplier."
23          Do you see that?
24      A.  Yes, I do.
25      Q.  Okay.  Is that your -- does that definition of

33

00034:01  "materiality" -- are you in agreement with that
02  definition of "materiality"?
03      A.  Yes.
04      Q.  Can you explain for me what the statement at
05  the very -- towards the very end, "forecasts of
06  unanticipated financial results," refers to.
07          MR. SALPETER:  Objection to form.  You want to
08  know what it means to him?
09          MS. LAVALLEE:  Yeah.
10      Q.  What it means to you.
11      A.  What it means to me?
12      Q.  Yes.
13      A.  I think pretty much what I've said earlier,
14  that if we were going to miss our quarter, if we were
15  going to have a significant miss to our quarter.  I
16  described that earlier.
17      Q.  And what would be -- constitute a significant
18  miss?
19      A.  Again, I described earlier what I -- my
20  definition of materiality is ten percent.
21      Q.  Okay.  Mr. Henley, is it your understanding --
22  I'm referring now to Exhibit 1 -- whether that -- the
23  executive trading policy, whether it be this particular
24  one or the one that was applicable in Q3 2001, was
25  applicable to all senior officers of the company -- or

34

00035:01  actually, let me ask you a different question.
02          Is it your understanding the executive trading
03  policy would be applicable to both you and Mr. Ellison?
04      A.  Yes.
05      Q.  Okay.  Other than these two documents, were
06  there other documents that set forth policies for
07  trading by senior executives at Oracle Corporation
08  during Q3 2001?
09      A.  I'm not certain.  I mean, I would -- I'm just
10  not certain.
11      Q.  Can you tell me what the purpose of the
12  clearance procedure that we discussed earlier is.
13      A.  To make sure that a so-called insider or
14  executive officer wouldn't be trading stock, as I said
15  earlier, when the company had material information that
16  the public didn't know.
17      Q.  And why is this significant?
18      A.  Because it's -- my understanding is there's
19  laws on insider trading, so ... this is why we have
20  these policies.  This is why we have clearance policies,
21  to make sure we don't run afoul of the securities laws.
22      Q.  Okay.  And by "we," are you talking about
23  Oracle?
24      A.  The company.  The company, right.
25      Q.  And why is it that the policy requires

35

00036:01  clearance from both you and Mr. Cooperman as opposed to
02  just one of you?
03      A.  Because I think we both -- first of all,
04  there's safety in numbers.  Both of us, you know, doing
05  it I think is helpful.  But there are certain things
06  that the general counsel may know that I don't know:
07  Mergers.  We might be doing some things -- or lawsuits,
08  other things that I'm not even aware of or fully aware
09  of.
10          And there's certainly financial matters that
11  he wouldn't have -- be privy to 'cause he wouldn't be in
12  all the meetings or be reviewing all the forecasts.  So
13  we kind of both cover some areas, and then we jointly
14  understand some issues, so ...
15      Q.  Okay.
16      A.  And he also, I think, gives me advice in terms
17  of what is material and the laws.  And so he's -- you
18  know, gives me a second read sometimes.
19          If I bring a matter to him and say "Gee, is
20  this material?  What do you think," and that sort of
21  thing.  So he gives me advice and counsel.
22      Q.  Okay.  You mentioned you consult with
23  Mr. Cooperman to discuss whether some particular item is
24  material.  Is that something you do on a regular basis,
25  or is that something you do only when you determine that

36

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00037:01 something could possibly be material?
02     A.  The latter.
03     Q.  Okay.  And did you ever have occasion to do
04 that in the third quarter of 2001?
05     A.  I don't -- I don't recall.  I really don't.
06     Q.  Okay.  And would you do that in the instance
07 where you're aware of financial data as well as
08 transactional data, or do you seek his consultation only
09 in connection with matters of -- more of a transactional
10 nature?
11     A.  Again, I'm not just not sure what you mean by
12 that.
13     Q.  Okay.  Let me rephrase my question, then.
14         Do you seek his guidance in terms of -- well,
15 let me ask a different question.
16         When is it that you determine -- that you
17 decide you need to seek his advice regarding whether
18 something is material?
19     A.  Generally it would be around financial
20 matters.  I think I'm fairly experienced.  I've been
21 doing this stuff for a long time.  But I always --
22 always helps to have somebody else to bounce something
23 off.
24         So if I saw something that I thought might be
25 a material problem, then that's when I might go to him

37

00038:01 and bounce it off of him.
02     Q.  Can you give me an example of when you've done
03 that in the past.
04     A.  Over my 13 years -- and again, we've had two
05 general counsels during my period of time, so -- I think
06 there was one potential merger idea we had a number of
07 years ago that I went to him and said "Gee, if we were
08 to do this, is this something we should hold off
09 trading?"
10         I think we concluded that it was enough of a
11 possibility -- we were having some discussions that we
12 probably ought to just tell people to refrain.  That was
13 one time.
14     Q.  Okay.  Can you --
15     A.  We were both aware of it, to be honest with
16 you, but I kind of -- he came to me or I came to him and
17 we kind of discussed it.
18     Q.  Okay.  Can you think about any other instance
19 where you sought his guidance on whether a particular
20 set of facts would constitute material?
21     A.  I think there was one time, again, going back
22 a number of years ago, where we had done a
23 reorganization or something and I was concerned about
24 whether -- whether this could affect the quarter.
25         And my recollection is only once did we

38

00039:01 actually stop people from trading 'cause we were just a
02 little bit concerned about the quarter.  Concerned
03 enough, I should say, that based upon the set of changes
04 we had made, that we decided to stop trading.
05         I think those are the only two times I can
06 think -- and I may have -- we had discussions I don't
07 remember of other things.  But it's pretty darn
08 infrequently.
09     Q.  Okay.  Do you recall telling the SLC -- by
10 "SLC" I mean the special litigation committee -- that
11 about five years ago you were afraid that Oracle would
12 not meet its quarterly earnings projections so you
13 halted trading?
14     A.  I think that's what I was referring to, that
15 second answer that I gave you.
16     Q.  Okay.  And can you just explain for me --
17 maybe I'm not clear on it -- what the circumstances
18 were --
19     A.  By the way, we didn't miss --
20     Q.  Let me finish my question -- what the
21 circumstances were that caused you to be afraid that
22 Oracle might not meet its quarterly earnings projections
23 at that time.
24     A.  I don't remember.  I believe it was -- there
25 was -- I think we had a re -- a major reorganization or

39

00040:01 something.  And so -- sometimes when we've done that,
02 it has destabilized the sales force for some time.  So
03 it makes it hard to get everybody focused to make the
04 quarter.  I believe that was -- I don't even remember.
05         But it's the only time in my recollection, my
06 13 years, where we saw something we had done that
07 could -- we knew about something we had done that maybe
08 could affect it.  As I say, we didn't actually miss the
09 quarter, but ...
10     Q.  Right.  Okay.  And do you recall which quarter
11 this was?
12     A.  I don't.  I really don't.
13     Q.  Do you recall how far into the quarter it was
14 that you made this decision?
15     A.  I think it was very late in the quarter.  I
16 think that -- my recollection was it was -- we -- our
17 quiet period came either two weeks or a month into the
18 quarter.  It was right before the quiet period.  And I
19 think I just -- somebody was trying to trade, and I said
20 "Look, it's just not worth it.  It's too late in the
21 quarter.  Let's just not do it."
22     Q.  Okay.  Do you recall who that was who
23 requested clearance at that time?
24     A.  I -- I -- I don't.  I can't definitively
25 recall.

40

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00041:01    Q.  Okay.  Had other people traded in that
02  quarter?
03    A.  Can't remember.
04    Q.  Other than the reorganization, was there --
05  were there any other factors at that particular point in
06  time that caused you to be concerned about -- or caused
07  you to be afraid that Oracle would not meet its
08  quarterly earnings projections?
09    A.  I just don't remember.  It -- you know, it --
10  I'd be speculating.
11    Q.  You indicated at the very beginning of our day
12  here that Mr. Cooperman copies you on clearance
13  requests.  Is that -- was that true in Q3 2001?
14    A.  I believe so.
15    Q.  Okay.  And when you receive those -- or when
16  you -- is that by e-mail?
17    A.  Yes.
18    Q.  Okay.  Do you routinely check your e-mail?
19    A.  Yes, I do.  I don't remember every e-mail I
20  ever get, but I get -- I get a bunch of them.  But
21  they -- I do read them, or I at least delete them,
22  so ...
23    Q.  Okay.  And when you travel -- and when you --
24  let's focus now on Q3 2001.  When you were traveling,
25  how would you check your e-mail?

41

00042:01    A.  At my home or hotel, I'd just dial -- dial up
02  and connect and do my e-mail, so ...
03    Q.  All right.
04    A.  Nobody reads -- nobody does my own e-mail.  I
05  do all my own e-mail.  But again, sometimes I don't pay
06  much attention to it.  Sometimes I delete a lot of stuff
07  that I get that I just don't bother to read, so ...
08    Q.  Okay.  And do you -- what was your practice in
09  terms of indicating to Mr. Cooperman whether or not you
10  were willing to grant clearance for that -- for a
11  particular request that you received in Q3 2001?
12    A.  Again, my approach has always been if I see
13  any reason why we should halt trading, I immediately go
14  to him.  I don't wait for him to tell me that somebody
15  wants to trade.
16    Q.  Okay.  So do you respond to the e-mails in any
17  way?
18    A.  Typically I haven't.  Typically I haven't.
19      As I say, we went through a transition in the
20  early days of my career, as actually -- I actually got
21  involved in some of these things, and then we went to
22  this procedure a number of years ago that I described; I
23  typically don't respond to those e-mails.
24    Q.  And when you receive a request, do you
25  generally communicate with Mr. Cooperman at that time?

42

00043:01    A.  Again, I don't receive a request.  Requests go
02  to him, and he copies me when he approves them.
03    Q.  Okay.
04    A.  There's sort of a standard form that he gives,
05  "Jeff, if you have any concerns, let me know."  But
06  again, I don't operate on that.  I operate on if I know
07  there's a problem, I notify him immediately.
08    Q.  So your general practice when you receive the
09  e-mail from Mr. Cooperman regarding a clearance that
10  he's granted, you don't necessarily call him or discuss
11  the matter with him?
12    A.  I don't at all.  It just would be highly
13  unusual.  There's no need for me to call because my
14  procedure is I go in immediately if I have a concern and
15  tell him about it.  And it would -- if you know, if we
16  both conclude it's a problem, then we would halt trading
17  at that point.
18    Q.  Okay.  And other than Mr. Cooperman, is there
19  anybody that you consult with to determine whether or
20  not any particular information might be material adverse
21  information that requires halting of trading?
22    A.  Well, I rely on, as I've stated before in
23  these affidavits, forecast information; I rely on
24  conversations with the executive committee.  So I'm
25  having conversations with lots of people to formulate an

43

00044:01  opinion of whether I think that there's going to be a
02  high probability of a significant miss to our forecast.
03      So I don't -- I don't operate in a vacuum.  So
04  all that stuff gets factored in before I would go to the
05  point where I would then go to Dan and say "Look, I've
06  now accumulated a tremendous amount of knowledge and
07  information.  I think we got a problem," blah, blah,
08  blah.  So ...
09    Q.  Okay.  And I guess my question is slightly
10  different.  My question relates to seeking guidance from
11  somebody else as to whether or not any particular
12  information that you are aware of might be material.
13    A.  I don't believe so.  I think ultimately -- the
14  question of materiality?  I mean, I think I would
15  primarily rely on -- on Dan, absolutely.
16    Q.  And if you came to the conclusion that
17  something may or may not be material and it's on the
18  fence and you're having a hard time deciding, what would
19  you do in that circumstance?
20      MR. SALPETER:  Objection to form.
21  Hypothetical.
22      MS. LAVALLEE:  Q.  You can answer.
23    A.  I would talk to Dan.
24    Q.  And would you then make a decision as to
25  whether or not it's material, or would you possibly just

44

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

| | |
|---|---|
| 00045:01 determine that it's on -- it's a situation that's on the | 00046:01 grant a clearance?  And by way of example, do you |
| 02 fence and then decide whether or not to halt on that | 02 consider the size of the trade that the person is |
| 03 basis? | 03 seeking clearance for? |
| 04      MR. SALPETER:  Same objection. | 04      A.  I never -- I never have ever asked somebody |
| 05      MS. LAVALLEE:  Q.  You can answer. | 05 how much they're selling. |
| 06      A.  I think he and I would consult and we'd | 06      Q.  Okay.  And if you're aware that somebody is |
| 07 make -- make a determination, you know, after -- after | 07 actually seeking clearance for trade, is it your |
| 08 discussion. | 08 practice to actually communicate with that person? |
| 09      Q.  I think you testified earlier that you don't | 09      A.  Again, I don't get involved in clearing them. |
| 10 recall any circumstance in Q3 2001 where you spoke to | 10      Q.  Okay. |
| 11 him regarding whether -- or consulted with him regarding | 11      A.  Dan does. |
| 12 whether or not any particular information was material; | 12      Q.  All right.  So is it fair to say that if you |
| 13 is that correct? | 13 learned that somebody's requested clearance from |
| 14      A.  I don't recall doing -- having a conversation | 14 Mr. Cooperman, that you don't actually communicate with |
| 15 like that. | 15 that person regarding the clearance request? |
| 16      Q.  Okay.  And if you were to consult with him, do | 16      A.  That's correct. |
| 17 you generally do that in person? | 17      Q.  Okay.  And then it's fair to say also that you |
| 18      A.  Boy, I haven't had many consultations, to be | 18 don't actually -- well, strike that. |
| 19 honest with you.  But no, if I'm traveling, I wouldn't | 19      Let me go back to my earlier question.  I'm |
| 20 wait to get back.  I would get on the phone with | 20 not sure I got a complete answer.  But do you consider |
| 21 him, so ... it could be e-mail; it could be telephone; | 21 any factors specific to the actual trades that are |
| 22 it could be person, you know, so ... | 22 contemplated to determine -- or to determine whether or |
| 23      Q.  Okay.  Do you consider any factors other than | 23 not Mr. Cooperman should grant clearance? |
| 24 the actual material or potentially material information | 24      A.  Could you repeat the question. |
| 25 that would be nonpublic in determining whether or not to | 25      Q.  Sure.  Other than -- well, let me rephrase it. |

45

46

| | |
|---|---|
| 00047:01      Do you consider any factors specific to the | 00048:01 somebody is in violation of either the internal policies |
| 02 person's request for trade -- trading -- trading request | 02 or the law in terms of insider trading? |
| 03 to determine whether or not they should be allowed to | 03      MR. SALPETER:  Objection to form. |
| 04 trade? | 04      THE WITNESS:  I'm not even certain.  I mean, |
| 05      A.  I've testified earlier all I consider is | 05 I -- we have a policy -- I don't recollect in our |
| 06 whether there's a reason they shouldn't trade.  It has | 06 policies we've ever had requirements on how much you can |
| 07 nothing to do with quantity or anything else, so ... I | 07 or can't trade, so ... I don't know anything -- I'm not |
| 08 described to you earlier what would cause me to say to | 08 sure what the securities laws are.  I don't concern |
| 09 Dan "Anyone -- everyone needs to be stopped immediately | 09 myself with that. |
| 10 from trading." | 10      MS. LAVALLEE:  Q.  Okay.  You say you don't |
| 11      Q.  Okay, that's fair.  Now, why is it that you | 11 concern yourself with the security laws. |
| 12 don't consider issues specific to the person's trading | 12      A.  In terms of technical requirements.  I leave |
| 13 request; for example, the size of their trades or the | 13 that to Dan. |
| 14 length of time that they might want to trade? | 14      Q.  Okay. |
| 15      A.  Again, I've told you earlier I have -- I never | 15      A.  But I just concern myself with is there a |
| 16 get involved with the quantities they're trading.  Dan | 16 financial problem here in the company that's not -- |
| 17 has rules -- keeps a fairly short window on how long | 17 that's not been disclosed that should keep -- prevent |
| 18 they can have the trade.  And they have to come back to | 18 people from trading, irrespective of quantity. |
| 19 him if they want more time. | 19      Q.  Okay.  Are you familiar with the case law on |
| 20      Q.  Okay.  Why is it that you don't consider those | 20 issues of what constitutes material information? |
| 21 factors? | 21      MR. SALPETER:  Objection to form. |
| 22      A.  'Cause I think that's a person's personal | 22      MS. LAVALLEE:  Q.  Do you understand my |
| 23 decision, how much they want to sell.  And the company's | 23 question? |
| 24 not tried to legislate that. | 24      A.  I think so.  No, I -- I am not a lawyer, don't |
| 25      Q.  Is it relevant to determine whether or not | 25 read case law, so ... I think I have a general |

47

48

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00049:01 understanding of -- lawyers have told me what's
02 material. But I have no idea what -- about case law.
03    Q.   And who are the lawyers who've given you
04 information on this issue?
05    A.   Various general counsels in the -- in the
06 several companies -- I've been a CFO for the past 25
07 years, so I've had -- been briefed over time about these
08 matters and so forth, read articles, that sort of thing,
09 so ...
10    Q.   When you're informed that a person has --
11 well, strike that.
12         When Mr. Cooperman provides you with an e-mail
13 informing you of his decision to grant clearance for a
14 particular trade, do you make any determination as to
15 whether or not that particular person was in possession
16 of material information that you may not be aware of?
17    A.   I don't.
18    Q.   Do you know if anybody else does?
19    A.   I'm not sure. I believe -- I believe Dan has
20 a form that goes back to him and requires that -- you
21 know, them to disclose anything material. But -- but I
22 don't do any checking.
23    Q.   Okay. Have you ever seen this form that
24 you're speaking about?
25    A.   It's just part of the e-mail he sends back to

49

00050:01 the person.
02    Q.   Okay. And does he require a response back
03 from the person?
04    A.   I don't know.
05    Q.   You mentioned earlier that Mr. Cooperman has
06 some guidelines in terms of the length of -- period of
07 time he allows somebody to trade for once he grants
08 clearance. Are you familiar what his practice is in
09 that regard?
10    A.   Roughly. I mean, I think it's roughly seven
11 to ten days, something -- it's a relatively short period
12 of time.
13    Q.   And do you know why he sets that period of
14 time?
15    A.   I think his concern is that there may be new
16 facts that happen within -- within a -- so he likes to
17 keep refreshing this, so that if there are new facts,
18 obviously, he wants the right to be able to stop
19 trading.
20    Q.   Okay. And once clearance has been granted, do
21 you ever consider information that you receive after the
22 clearance is given to determine -- to go back and make a
23 decision as to whether or not the person should be
24 prevented from continuing to trade?
25         MR. SALPETER: Objection. Hypothetical.

50

00051:01         THE WITNESS: As I testified earlier, the
02 moment that I have a concern that we will miss our --
03 significantly miss our forecast, I would go immediately
04 to our general counsel. So I think that covers it.
05         It's nothing about who's been trading or
06 clearances he's granted. I would immediately go to him.
07    MS. LAVALLEE: Q. Okay. And at that point in
08 time, do you know whether or not people who might have
09 authorization or clearance to trade are then notified
10 that they should cease all trading?
11         MR. SALPETER: Objection to form.
12         THE WITNESS: I believe that if Dan and I
13 concluded we have to close the trading window, he
14 would -- you know, if there were anybody, you know, that
15 was still thinking they had a clearance, he'd
16 immediately tell them to stop.
17    MS. LAVALLEE: Q. Okay. And has that
18 situation ever arose in the past?
19    A.   As I've told you, I think it's only happened a
20 couple of times over the course of time, one in the case
21 of a potential merger and one time when we had concern
22 late in the quarter about we might possibly miss. It's
23 been very infrequent.
24    Q.   Mr. Henley, did you ever learn that in
25 January 2001, Mr. Ellison intended to exercise options

51

00052:01 and then sell those shares immediately?
02    A.   I can't recall. I see that I was copied on an
03 e-mail, so clearly I must have. But I don't always read
04 all these e-mails I get on these clearances, so ... so I
05 don't remember if I knew he was or not.
06    Q.   Okay. Do you recall when you first -- so you
07 don't recall when you first heard of Mr. Ellison's
08 intent to actually exercise shares and sell them in
09 January of 2001; is that correct?
10    A.   Yeah, I -- I don't remember if I knew about
11 it --
12    Q.   Okay.
13    A.   -- at the time.
14    Q.   Do you recall ever discussing with Mr. Ellison
15 the fact that he had options that were expiring in
16 August of 2001?
17    A.   Yes. Yes. Remember roughly that previous
18 summer we had talked to him and tried to get him to
19 realize there was a large grant. Larry doesn't --
20 rarely sells -- exercise or sells shares, so we wanted
21 to make sure that he was aware that within a year or so,
22 he had a large set of options he would have to exercise.
23    Q.   So was it you who broached the subject with
24 him?
25    A.   I don't remember. It was either me -- I was

52

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00053:01 prompted by our tax people. But I didn't even realize.
02 But I think I probably broached the subject to him.
03     Q.   And the tax people, who are you referring to?
04     A.   Deb Lange, our senior director of tax, senior
05 vice president of tax.
06     Q.   And why would the tax people be concerned with
07 whether -- with Mr. Ellison's expiring options?
08     A.   Just in terms of our own tax planning. We get
09 a tax deduction. And this was a large grant, so the
10 issue from our tax planning, were we going to get a
11 deduction in -- in -- you know, what year, what quarter,
12 and that sort of thing.
13       So they were just kind of curious. And again,
14 it's Larry's decision, but they were, just from their
15 own forecasting standpoint, curious. I was -- also just
16 wanted to make sure Larry was aware he had this coming
17 up.
18     Q.   Okay. And do you recall specifically when
19 this conversation took place?
20     A.   I want -- I'll say summer of '00, is my
21 rough -- my recollection.
22     Q.   And was this the only --
23     A.   It was clearly, I think -- my recollection was
24 a year or so to go, so, you know, there was still time,
25 but there was -- time was running.

53

00054:01     Q.   And was it only on one -- one instance that
02 you had these conversations with Mr. Ellison?
03     A.   That's my recollection.
04     Q.   And can you tell me what the substance of
05 those discussions were.
06     A.   Just what I told you.
07     Q.   What -- how did Mr. Ellison respond to what
08 you discussed with him?
09     A.   We didn't have a long discussion. You know,
10 I've never gotten into his personal finances. He has
11 financial advisors. So I just wanted to make sure he
12 realized that, you know, I wasn't -- that was it.
13     Q.   Did he indicate to you what his intent was at
14 that time regarding these expiring options?
15     A.   I don't -- I don't think he did. I don't
16 recollect. And I didn't expect him to, you know. If he
17 had some idea, we just kind of wanted to get a sense for
18 it. But I -- my recollection was he didn't give us any
19 forecast. He was still trying to think of what he
20 wanted to do.
21     Q.   Okay. You mentioned earlier that you don't
22 recall whether or not you actually -- whether or not you
23 were aware that Mr. Ellison intended to sell shares in
24 2001; is that correct?
25     A.   Whether in 2001 -- you mean --

54

00055:01     Q.   January 2001.
02     A.   January 2001. Again, yes, that's what I said.
03 I -- I wasn't aware -- clearly, after looking at
04 e-mails, I was copied. But I don't -- my recollection
05 was I didn't realize it at the time.
06     Q.   Okay. And do you recall whether or not you
07 had any discussions with Mr. Cooperman about granting
08 clearance to Mr. Ellison?
09     A.   No, I don't -- I don't recall discussing it.
10 But that would be normal. I don't typically discuss it
11 with anybody that gets cleared [sic], as I said earlier.
12     Q.   And is it fair to say you don't recall
13 discussing this matter with Mr. Ellison in January 2001;
14 is that correct?
15     A.   That's correct.
16     MS. LAVALLEE: We've been going for an hour.
17 Do you want to take a break?
18     MR. SALPETER: Sure.
19     MS. LAVALLEE: Okay, five minutes.
20     THE VIDEOGRAPHER: We're going off the record.
21 The time is 10:35.
22     (Recess taken).
23     THE VIDEOGRAPHER: We're back on the record.
24 The time is 10:47.
25     MS. LAVALLEE: Hi, Mr. Henley. I have just a

55

00056:01 few more questions regarding Mr. Ellison's trading; then
02 we'll move on to a different subject.
03     Q.   Did you ever discuss Mr. Ellison's
04 January 2001 trades with anybody after the fact of the
05 trades?
06     A.   Discuss the -- I don't believe so.
07     Q.   Okay. And you never had any discussions with
08 Mr. Cooperman, say?
09     A.   I don't believe so.
10     Q.   Or with Mr. Ellison?
11     A.   No.
12     Q.   Mr. Henley, did you trade, during Q3 2001 --
13     A.   Yes, I did.
14     Q.   -- Oracle stock? Okay. When did you trade?
15     A.   Very early in January.
16     Q.   And do you recall how many shares you traded?
17     A.   I believe it was a million shares.
18     Q.   Okay. Were those shares that you acquired on
19 the same day through an exercise of options?
20     A.   That's correct. Did a so-called same-day
21 sale.
22     Q.   And when you made those trades, both the
23 exercise and the sale of shares, was it your
24 understanding that you were bound by Oracle's internal
25 policies regarding trading by senior executives?

56

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

| | |
|---|---|
| 1 00057:01   A.  Yes. | 1 00058:01   marked for identification). |
| 2 02   Q.  Prior to making those trades, did you make any | 2 02   MS. LAVALLEE:  Q.  Mr. Henley, if I could ask |
| 3 03 additional inquiries, beyond what you knew of in your | 3 03 you to take a look at this document.  And when you've |
| 4 04 capacity as chief financial officer, to determine | 4 04 had a chance to review it, please identify it for the |
| 5 05 whether or not there was material inside information at | 5 05 record. |
| 6 06 Oracle? | 6 06   A.  I'm trying to find the date of it.  Just see |
| 7 07   A.  Well, I cleared, as everybody else is required | 7 07 here.  Maybe it's on the second page, huh. |
| 8 08 to do, the trade through Dan Cooperman.  So I wanted to | 8 08   Q.  There is also a third page. |
| 9 09 be sure it wasn't something he didn't know and he had to | 9 09   A.  There it is, okay.  So this would be the Form |
| 10 10 clear me. | 10 4 that I'm required to sign.  Typically it's |
| 11 11   Q.  Anything else?  Did you do anything else | 11 administered through our stock options administration |
| 12 12 beyond that? | 12 group when I've exercised my options, sold stock and so |
| 13 13   A.  No.  No, I don't believe so. | 13 forth. |
| 14 14   Q.  Okay.  And did you discuss your trades with | 14   And it is dated in that period of time, in the |
| 15 15 any other person prior to making the trades? | 15 early '01 period.  So it relates to that million-dollar |
| 16 16   A.  Other person inside Oracle? | 16 thing that I earlier testified to. |
| 17 17   Q.  Yes. | 17 17   Q.  Okay.  And if I could draw your attention to |
| 18 18   A.  Other than Dan Cooperman, no. | 18 the third page of this document. |
| 19 19   MS. LAVALLEE:  I'd like to mark as Exhibit -- | 19 19   A.  Yep. |
| 20 20 what number are we up to? | 20 20   Q.  Can you tell me if that is your signature at |
| 21 21 | 21 21 the bottom of this document. |
| 22 22   MS. GUARNIERI:  I believe we're at 135. | 22 22   A.  Yes, it is. |
| 23 23   MS. LAVALLEE:  Exhibit 135 is document that is | 23 23   Q.  And you hand-wrote the date in there? |
| 24 24 Bates stamped CA-ORCL 008304 through 306. | 24 24   A.  Yes. |
| 25 25   (DC Exhibit No. 135 | 25 25   Q.  Thank you. |

57

58

| | |
|---|---|
| 1 00059:01   I'd like to mark as Exhibit No. 136 a document | 1 00060:01   A.  I'm not sure. |
| 2 02 Bates-stamped CD-I 01514 through 15. | 2 02   Q.  Okay.  Did you have an assistant in -- during |
| 3 03   (DC Exhibit No. 136 | 3 03 the Q3 2001 time frame? |
| 4 04   marked for identification). | 4 04   A.  I did. |
| 5 05   MS. LAVALLEE:  Q.  Mr. Henley, can you take a | 5 05   Q.  And did you have more than one assistant? |
| 6 06 look at this document and then identify it for the | 6 06   A.  No. |
| 7 07 record once you've had a chance to look at it. | 7 07   Q.  And who was your assistant? |
| 8 08   A.  Well, it's Form 144 that again, I think, | 8 08   A.  Sharon Montoya. |
| 9 09 relates to the million shares that I previously talked | 9 09   Q.  Do you know whether or not it's her |
| 10 10 about. | 10 handwriting? |
| 11 11   Q.  All right.  And Mr. Henley, there is some | 11 11   A.  I do not know. |
| 12 12 handwritten notations on this document.  Is this all | 12 12   Q.  And did you indeed sign this document on or |
| 13 13 your handwriting? | 13 about January 4th, 2001? |
| 14 14   A.  I don't believe so.  So you're saying the form | 14 14   A.  That -- yes.  That's my signature. |
| 15 15 was filled out? | 15 15   MR. SALPETER:  Can we have an agreement that |
| 16 16   Q.  Correct. | 16 you'll delete the social security numbers the way we did |
| 17 17   A.  I don't believe -- I don't believe I filled it | 17 on some of the other documents? |
| 18 18 all out, but I signed it. | 18 18   MS. LAVALLEE:  Yes.  Thank you. |
| 19 19   Q.  Okay.  So the signature is yours? | 19 19   All right.  I'd like to show you a document |
| 20 20   A.  Yes. | 20 that has been previously marked as Exhibit No. DC-17 in |
| 21 21   Q.  Okay.  But none of the other handwriting on | 21 these litigations. |
| 22 22 this document is yours? | 22 22   I'll just note for the record that it is |
| 23 23   A.  Doesn't look like mine.  I don't believe I | 23 redacted.  It was redacted to delete the portion of the |
| 24 24 filled it out, but I did sign it. | 24 social security number.  And actually, the original had |
| 25 25   Q.  Okay.  Do you know whose handwriting it is? | 25 the information.  A redacted copy was then sent to the |

59

60

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

1  00061:01 court reporter by fax, and that is the document that
2      02  actually got placed into the record.  And that is why
3      03  the Berman, DeValerio fax header appears on the
4      04  document.
5      05    Q.  Mr. Henley, if you could take a look at this
6      06  document.  Once you've had a chance to review it, please
7      07  identify it for the record.
8      08    A.  This is the Oracle stock option exercise form
9      09  that I signed, again, relating to that -- those million
10     10  shares.
11     11    Q.  And is it indeed your signature on each page
12     12  of the document?  There are three pages, Bates-stamped
13     13  CD-I 1 -- no, CD-I 01518 through 20.
14     14    A.  Yes, it's my signature.
15     15    Q.  And is any of the handwriting on this document
16     16  yours?
17     17    A.  I believe it is.  Looks like my -- my
18     18  handwriting.  I don't know if the grant numbers and the
19     19  grant date, that section, but I believe the first part
20     20  that describes my name, address, phone number -- that
21     21  looks like mine.  And the information on the third page
22     22  looks like my -- my handwriting.
23     23        I -- I'm not convinced that the exercise
24     24  instruction section where the grant numbers and so
25     25  forth -- I'm not sure if that's mine or not.

61

1  00062:01    Q.  Okay.
2      02    A.  Might be.
3      03    Q.  Okay.  And was it your understanding in
4      04  executing this document that you were bound by the terms
5      05  of this document?
6      06    A.  Yes.
7      07    Q.  Do you have any understanding as to whether or
8      08  not you signed the most recent version of the -- of
9      09  Oracle's stock option exercise form?
10     10    A.  I'm not sure -- I'm not sure what you mean.
11     11    Q.  Okay.  I take it that this is a standard form,
12     12  this -- that you completed --
13     13    A.  Yes.
14     14    Q.  -- in connection with your exercise of
15     15  options?
16     16    A.  Yes.
17     17    Q.  Do you have any understanding as to whether
18     18  the standard form you used when you completed this
19     19  document that is marked Exhibit 17 was the latest form?
20     20    A.  I have no idea.
21     21    Q.  Okay.  Was it your intent to file -- to sign
22     22  the form that was the most --
23     23    A.  Sure.
24     24    Q.  -- recent?
25     25    A.  I signed whatever forms they gave me.  I

62

1  00063:01 assumed they were current.
2      02    Q.  Okay.  Okay, Mr. Henley, I'd like to move on
3      03  to a more broader discussion regarding Oracle and some
4      04  of its business terms and processes.
5      05        Can you explain for me what the term
6      06  "pipeline" means, as used at Oracle during Q3 2001.
7      07    A.  Sure.  It's a -- it's a amalgamation of all
8      08  the transactions that the sales force around the world
9      09  is pursuing.  These are -- there are a variety of
10     10  stages, from very early "Gee, there's something here we
11     11  gotta look into," to very late stages of negotiating
12     12  contracts, and all that sort of thing.
13     13        So it's a summation of all -- hundreds and
14     14  hundreds of different transactions that the company has,
15     15  the sales force is working on in some stage.
16     16    Q.  Okay.  Does the company use different forms
17     17  of -- strike that.  Let me ask a different question.
18     18        Is a pipeline number something that is used --
19     19  that is constant and always used in the same way in the
20     20  company at all levels, or is the information that's
21     21  contained in a pipeline number sometimes filtered or
22     22  weighted differently?
23     23        MR. SALPETER:  Objection to form.
24     24        THE WITNESS:  I think I understand what you're
25     25  asking me.  There is a process that salespeople and

63

1  00064:01 sales management all the way up the chain use to try to
2      02  enter in deals they're working on, assign values of the
3      03  deal, the probability of closing, close dates.
4      04        There's a -- management reviews that.
5      05  Management sometimes questions dates.  Sometimes the
6      06  dates are changed.  There's -- there is some management
7      07  judgment as to how people assess probabilities and
8      08  things like that.  But, you know, there is human
9      09  judgment, I guess, in some of the stuff.
10     10        But the attempt is that we get something that
11     11  by the time Larry and I get it, it's a amalgamation of
12     12  deals that is consistently put together as well as we
13     13  can do.  But there is human judgment on probabilities
14     14  and things like that.
15     15        MS. LAVALLEE:  Q.  Okay.  In terms of the
16     16  numbers for pipelines that you and Larry get, in what
17     17  what -- you get pipeline information in what form?  Do
18     18  you get it in a particular report?
19     19    A.  I typically get a summary that is a part of
20     20  our forecast document.  And there we have the forecast
21     21  for the quarter.  There's a column that shows pipeline
22     22  information for all the various summary -- Europe, Asia,
23     23  that sort of thing.
24     24    Q.  Okay.  And it sounds like you're --
25     25        MS. SEGAL:  Nicole, can I just -- what time

64

```
1   00065:01 frame are you talking about?
2   02      MS. LAVALLEE:  Q3 2001.
3   03      THE WITNESS:  That -- my assumption, right.
4   04      MS. LAVALLEE:  Okay.
5   05      Q.  Now, it sounds as though you're talking about
6   06 a specific document.  Are you indeed?
7   07      A.  Yes.  Yes, I am.
8   08      Q.  Okay.  And what is the name of that document?
9   09      A.  I'm not even certain.  It's what -- our
10  10 standard global forecast reports.  You know, it's the
11  11 most critical report that I review, obviously.  And it
12  12 shows the latest up -- latest forecast that we have from
13  13 around the world at a summary level by major geography,
14  14 by major management, member of the executive committee.
15  15      Q.  Okay.  And is that a document that's sometimes
16  16 referred to as an upside report, do you know, or is that
17  17 something different?
18  18      A.  I don't call it that.  But it includes a
19  19 column that tries to factor in judgment on top of what
20  20 the particular business units have turned in.
21  21      Q.  Okay.  Now, the number that -- the pipeline
22  22 number that you're talking about on these particular
23  23 reports, is that something that includes closed deals?
24  24      A.  The pipeline would include closed deals.  We
25  25 don't literally take closed deals out until the end of
```

65

```
1   00066:01 the quarter.
2   02      Q.  Okay.
3   03      A.  So throughout the quarter, it would include
4   04 closed deals, as well as all open deals that the field
5   05 feels have a chance of closing that quarter.
6   06      Q.  And you said it's up until the end of the
7   07 quarter.  Is there a period of time at which you
8   08 actually do remove the closed deals?
9   09      A.  Once the quarter's over.
10  10      Q.  Okay.
11  11      A.  Mm-hm.
12  12      Q.  And what is the source of the data -- or what
13  13 is the source of the pipeline figure that you're
14  14 referring to in this report?
15  15      A.  It's varied over the years, but in the most
16  16 recent years, it's a name we call our -- the OSO
17  17 report.  It's an application that Oracle developed over
18  18 the last several years that we sell to customers.  We
19  19 use it ourselves.  And so that has become the universal
20  20 global report.
21  21      But years before, they used spreadsheets.
22  22 There was a variety of ways.  But the methodology's
23  23 always been the same, that people enter in all their
24  24 transactions, we sum it up around the world and get a
25  25 sense of what people's pipelines are.
```

66

```
1   00067:01      Q.  And you mentioned the word "OSO."  What does
2   02 that refer to?
3   03      A.  I'm -- never remember all the acronyms and
4   04 what they're called, so it's a ...
5   05      Q.  Oracle Sales On-line, does that sound
6   06 familiar?
7   07      A.  Yeah, that's probably it.
8   08      Q.  Okay.  And can you tell me what this is.
9   09      A.  Again, I think I described it earlier.  It's
10  10 an Oracle -- standard Oracle application that we've
11  11 begun to used inside Oracle once that product was built
12  12 several years ago.
13  13      Q.  And in terms of pipeline data, is it your
14  14 understanding the sales force enter the pipeline data
15  15 into that system?
16  16      MR. SALPETER:  Are we talking about Q3 '01,
17  17 right?
18  18      MS. LAVALLEE:  Yes.  And let me clarify.
19  19      MR. SALPETER:  And he should assume that,
20  20 right?
21  21      MS. LAVALLEE:  Yeah, for the purposes of this
22  22 line of questioning that we're talking about Q3 2001.
23  23 Thank you.
24  24      THE WITNESS:  I believe everyone around the
25  25 world was using it.  I can't be certain.  It's possible
```

67

```
1   00068:01 some country was still using spreadsheets.  We were
2   02 going through a transition.
3   03      But the process, the numbers that rolled up to
4   04 us, would still be the same irrespective of the system
5   05 they were using.
6   06      MS. LAVALLEE:  Q.  Okay.  Mr. Henley, I'd like
7   07 to show you a document that was previously marked as
8   08 Exhibit No. DC-134.  If you could take a moment and look
9   09 at this document and tell me what it is.
10  10      A.  It appears to be an extract of the forecast
11  11 report that I referred to earlier.  I don't believe it
12  12 has all the pages.  Typically the report's a little
13  13 longer than that.  But it seems to have most of the --
14  14 the meat of the report.
15  15      Q.  Okay.  And can you tell me what other
16  16 additional information would have been included in this
17  17 report in the Q3 2001 time frame?
18  18      A.  Well, there's a -- unless these are out of
19  19 sequence, there's a summary page that you start with.
20  20 That doesn't appear to be here.
21  21      Q.  And what information is contained on that
22  22 summary page, or was contained on that --
23  23      A.  Perhaps it's the second page.  But it's not
24  24 the first page.  This is -- this may be out of sequence.
25  25 I'm sorry.  I think the summary page is the second page
```

68

00069:01  here.
02    Q.   Okay.
03    A.   But typically it is a financial forecast.  It
04  includes revenue for the major geographies.  It includes
05  expenses by line -- by type of expense for the
06  different -- by line of business and so forth, all the
07  way down to an earnings-per-share number.
08        So it is -- it is the financial forecast that
09  focuses on the current quarter that we're in.  So this
10  related to Q3 fiscal '01.
11    Q.   Okay.  Mr. Henley, if I could draw your
12  attention to the page Bates-stamped 3612.
13    A.   3612, okay.
14    Q.   I'd just like you to -- I'd like to just go
15  through some of the -- some of the columns and some of
16  the headers to the columns and have you explain for me
17  what they are.
18        This -- this is the -- has a heading marked
19  "Product Forecast," and then the next column is "Q3 FY
20  '00."  Can you tell me what those figures represent.
21    A.   What the column is meant to portray?
22    Q.   Yes.
23    A.   The column is the actual results for the
24  previous Q3 fiscal '00 in this case.
25    Q.   Okay.

69

00070:01    A.   So we're always interested in comparing our
02  current year to our prior year.
03    Q.   Okay.  And do you always compare the same
04  quarter to the prior year same quarter?
05    A.   Yes.
06    Q.   Okay.
07    A.   That is the best comparison.
08    Q.   And why?
09    A.   Comparable fiscal -- fiscal periods.
10    Q.   And why is that the best comparison?
11    A.   'Cause there's a seasonality to our business.
12    Q.   Okay.  So generally do you ever look at
13  quarter over quarter sequentially?
14    A.   Rarely.  We do -- we do look at patterns.  We
15  know that there's a large seasonality in our business,
16  but there's a historical relationship.  So we are --
17  when we look at a Q3, we'll see how does that compare to
18  Q2, because we know historically they're fairly similar.
19        But the most -- the fairest comparison is
20  really Q3 to Q3 in time, but ...
21    Q.   Okay.  And then the next column has three --
22  well, the next grouping has three columns.  And if I'm
23  reading this correctly, it says "Q3 FY '00," and then it
24  has a "forecast" column, an "upside" column and a
25  "potential" column.

70

00071:01    A.   Right.
02    Q.   Can you identify for me what the "forecast"
03  column is meant to portray.
04        MR. SALPETER:  I think you said "'00."  I
05  think you meant to say "'01."
06        MS. LAVALLEE:  '01, thank you.
07        THE WITNESS:  The forecast is the -- forecast
08  is submitted through the finance organization in these
09  different business -- business units.  And we add all
10  those up -- lay them out, add them up, so forth.
11        And then the second column are -- are
12  adjustments -- judgments made by typically the senior
13  finance staff, Jennifer Minton and her people, where
14  based upon history, based upon what they're hearing,
15  they'll go in and apply judgment to what the field is
16  saying.
17        And again, I've never used the word "upside."
18  This is Jennifer's shorthand, I guess, 'cause as you
19  can see, there's negatives and positives.  I've
20  always considered it an adjustment, trying to reflect
21  our best judgment as to what we really think's going to
22  happen.
23        MS. LAVALLEE:  Q.  Okay.  And do you know what
24  Jennifer Minton and her group look at to determine
25  what's the best judgment to be made there?

71

00072:01    A.   They look at the forecasting track record of
02  these units.  They talk to the finance people who have
03  information that maybe the management -- they feel
04  they're being overly optimistic or overly con -- you
05  know, whatever.
06        And we -- these people typically have worked
07  for Oracle a long time.  Some of them may be a little
08  more optimistic than some.  And so we try to factor that
09  in.  So there's a variety of things they try to look at
10  to try to come to what we really think is going to
11  happen.
12        That's what she calls potential.  That's,
13  again, a bad term.  It is the absolute -- her best
14  judgment, at least, as to what she thinks is going to
15  happen at the time.
16    Q.   Okay.  Now you're speaking of the third column
17  now?
18    A.   Yes, called "potential."
19    Q.   Okay.
20    A.   It's potential.  I've never -- I've never --
21  it's not my report.  I rely on it, but I have never
22  tried to wordsmith these columns.  I would say that's
23  our best thinking as to what the business will do --
24    Q.   Okay.
25    A.   -- based upon what they've submitted, based on

72

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

```
 1  00073:01  a judgment we've applied to revenues and expenses
 2      02  leading up to what our best thinking is to what we're,
 3      03  you know, really -- really going to do. And again,
 4      04  maybe "potential" isn't a bad word because we don't
 5      05  know. It's the best thinking. And it's potentially
 6      06  what'll happen, but clearly it could be better; it could
 7      07  be worse.
 8      08     Q.  Okay. The next column says "Q3 forecast
 9      09  versus VSPY percent." Can you explain to me what that
10      10  represents.
11      11     A.  That means the percentage based upon the
12      12  forecast compared to the prior year and then the
13      13  potential forecast to the prior year. So we just
14      14  simply -- those are simply calculations to quickly show
15      15  people the percentage change.
16      16     Q.  Okay. So you're comparing there the actual
17      17  forecast number, which is the second column, to --
18      18     A.  To the first column.
19      19     Q.  -- to the first column. Okay. And what is
20      20  the next column? It says "Q3 potential growth
21      21  percentage."
22      22     A.  Again, it's the potential, the fourth column,
23      23  divided by the first column.
24      24     Q.  Divided by? Yeah.
25      25     A.  Mm-hm.
```

73

```
 1  00074:01     Q.  Okay. The next column says "Q3 targeted" -- I
 2      02  can't read this very well.
 3      03     A.  "Targeted growth," I believe it says.
 4      04     Q.  "Targeted growth."
 5      05     A.  "Targeted 30-percent growth."
 6      06     Q.  Okay. And what does that represent?
 7      07     A.  At the time -- and we've used different things
 8      08  over the years. But at the time, Larry was very
 9      09  interested on how well people were growing. And so we
10      10  felt like 30 percent was reasonable.
11      11        And so we were trying to show what 30 percent
12      12  would have been by organization. Obviously different
13      13  organizations were growing at different rates. But he
14      14  was kind of trying to make the point to some of them
15      15  that "you're not growing fast enough" and kind of, you
16      16  know, "I understand what you think you're doing, but
17      17  you're not -- you're not doing as well as you could --
18      18  should be, in my opinion."
19      19     Q.  Okay. And this is a target number. Is it
20      20  derived at any particular point in time? Is it part of
21      21  the budget?
22      22     A.  My recollection was that -- and this isn't
23      23  something we've done every year. If you went to this
24      24  year's form, you wouldn't see that, but ...
25      25        My recollection was we were having a lot of
```

74

```
 1  00075:01  discussion about continuing to grow, and all that sort
 2      02  of thing. And so I think it was something we started
 3      03  way back in the budget time.
 4      04     Q.  Okay. And do you have any understanding of
 5      05  what the term "growth company" means? Is that a term of
 6      06  art that you've heard before?
 7      07     A.  Growth company? I'm not sure -- I'm not sure
 8      08  if that's a term of art, no.
 9      09     Q.  Okay. Growth business, same thing?
10      10     A.  I don't think that's a term of art, no.
11      11     Q.  Is it a term that's commonly used in certain
12      12  industries or among analysts?
13      13     A.  Well, I think -- I think people talk about
14      14  industries as a growth industry, a young, dynamic
15      15  industry that has a lot of endemic growth. That would
16      16  be -- I don't know if it's a term of art, but that's
17      17  common. People talk about it.
18      18        Or if a company's been growing very fast, has
19      19  good prospects, they might say that's a good growth
20      20  company, something like that. So certainly those are
21      21  terms I've heard used over time.
22      22     Q.  And during this period of time, at the
23      23  start of Q3 2001, would you have described Oracle as a
24      24  growth company?
25      25     A.  Clearly. We'd grown enormously over the
```

75

```
 1  00076:01  years, and we're continuing to grow very nicely.
 2      02     Q.  Okay. All right. Can you explain for me what
 3      03  the next column represents. Says "Q3 FY '01 pipeline."
 4      04     A.  So we talked about what constitutes a
 5      05  pipeline. So this is just the pipeline at this point in
 6      06  the report. This report is updated every couple of
 7      07  weeks. So we go back and look at what was the pipeline
 8      08  at that workweek in that quarter a year ago, in '00, and
 9      09  compare it to what is the pipeline in this point in time
10      10  a year later. And then there is a growth rate
11      11  calculated in the next column.
12      12     Q.  Okay.
13      13     A.  Year over year.
14      14     Q.  Okay. So you're bringing in -- you're talking
15      15  about two columns now?
16      16     A.  Yes, the prior year pipeline, then this year's
17      17  pipeline, the '01 pipeline, and then the calculation,
18      18  the growth rate calculation of that.
19      19     Q.  Okay. And the -- and I may have skipped,
20      20  actually, a column, and that's probably where there's some
21      21  confusion here. But the Q3 -- the seventh column, which
22      22  is "Q3 FY '00 pipeline," where -- what number from the
23      23  prior year is chosen to be entered there?
24      24     A.  As I said, we do this report every couple of
25      25  weeks. And so to be comparable, we try to pick the
```

76

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00077:01 current pipeline for this year, based upon, you know,
02 workweek five, six, seven, whatever it is at that point,
03 and then compare that to the comparable work -- because
04 the pipeline is dynamic. It changes throughout the
05 quarter.
06    Q. So it's important to compare this pipeline at
07 the same period of time in the quarter --
08    A. That's correct.
09    Q. -- prior quarter? Okay. And just so I'm
10 clear, the Q3 FY '01 and '00 pipeline figures there
11 include closed deals?
12    A. That's correct.
13    Q. And again -- we went over this, but I just
14 want to be clear for the record -- this is information
15 that is extracted from the OSO system, and that's your
16 understanding?
17    A. Again, subject to -- I don't -- we were going
18 through a transition. I can't remember when we
19 finished. And we may have had a few countries still not
20 in OSO, but I don't remember. But the data would be the
21 same, irrespective of the system it's in.
22    Q. Okay. And when -- do you know what date of
23 the week these reports were prepared?
24    A. No. There are -- the data is prepared and
25 then submitted, and then the report comes out literally

77

00078:01 a few days after the submission. So I don't remember
02 the exact date, but it's fairly current. I mean,
03 whatever comes in the report can't be more than a few
04 days old typically.
05    Q. Is it your understanding there is a couple
06 days' lag on the information, though?
07    A. Yes. Takes time to get all of it submitted,
08 prepared, so forth.
09    Q. Sure.
10    A. But it's meant to be reasonably -- reasonably
11 close in time to the current. And it's meant to be
12 reasonably comparable, trying to pick periods of time
13 that are comparable.
14        Comparability's very important 'cause these
15 numbers are all dynamic. Every one of these actual
16 forecasts, they keep changing. So we're always looking
17 at -- trying to look at the latest information and make
18 it comparable to the year before.
19    Q. Okay. And now the next column says "pipeline
20 conversion ratio forecast." And I may be, actually,
21 misreading that because those -- those words are sort of
22 shortened there. But is -- can you tell me if -- what
23 that number represents.
24    A. That's meant to divide the forecast by the
25 pipeline. So we know that all the pipeline doesn't

78

00079:01 materialize. We know that -- we lose deals. We know
02 that more often deals slip, they don't happen, they
03 don't get closed that quarter.
04        So just because you have a pipeline, we know,
05 based on history, that only a certain percentage of that
06 pipeline typically gets, as we call, converted or gets
07 translated into revenue in that quarter.
08    Q. Okay. So just so we're clear, which two
09 columns are you comparing there to come up with that
10 number?
11    A. I'm looking at the pipeline for '01, which
12 would be the fourth from the last column --
13    Q. Yes.
14    A. -- okay, and I'm dividing that into the second
15 column, the forecast, for the next column called
16 "pipeline conversion to forecast."
17    Q. Okay.
18    A. And then I'm dividing that into the fourth
19 column, the potential forecast, or our best -- our best
20 judgment of forecast, if you will, all right.
21    Q. Okay.
22    A. Trying to look at those conversion rates to
23 see how realistic they are, just based on do we have
24 enough pipeline, based upon historical conversion rates,
25 to meet the forecast. So there's a variety of things we

79

00080:01 look at to try to get comfortable that the forecast
02 makes sense to us.
03    Q. Okay. And you talked there about the
04 potential one. It's the last column that reflects the
05 comparison between the pipeline and the potential,
06 correct?
07    A. The -- the last one divides the '01 pipeline
08 into the fourth column, the potential forecast --
09    Q. Okay.
10    A. -- or our best -- our best guess forecast of
11 what we think will happen.
12    Q. Okay. And why do you look at the last number?
13 Why is that last number generated?
14    A. Again, because my best judgment coming from my
15 financial people, Jennifer Minton, is that's what we
16 think will happen this quarter, based on their best
17 judgment.
18        So we still say "Okay, how does that compare
19 to the pipeline? Does that look -- does that conversion
20 ratio seem realistic?"
21    Q. Okay. And wouldn't -- do you compare that
22 last column number to anything else to make a
23 determination as to whether it's realistic?
24    A. Do I compare the last column -- those
25 percentages?

80

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

```
1   00081:01   Q. Yeah.
2   02    A.  Well, I compare them to previous conversion
3   03   ratios.  So I don't know in a vacuum whether that's a
4   04   good number or not.
5   05    Q.  Right.
6   06    A.  But we look painstakingly at previous years
7   07   and trends of second quarters, third quarters, all that
8   08   sort of thing, to try to figure out, gee, is this a
9   09   reasonable conversion ratio based on history.
10  10    Q.  Okay.  And based on history, what type of time
11  11   frame are you looking at?  You mentioned you look at the
12  12   prior year and various quarters.  Do you go back more
13  13   than one year when you look at --
14  14    A.  Yes.
15  15    Q.  Okay.  And do you have any idea of how many
16  16   years you go back to look at that or how many years you
17  17   looked at --
18  18    A.  And I don't remember how many years we were
19  19   doing at this point in time.  I really don't.  But it
20  20   would be typical you'd look at more than one year.
21  21    Q.  Okay.
22  22    A.  And I'll also add we -- we didn't used to take
23  23   the great care of keeping all this pipeline data.  So we
24  24   worked hard in the years leading up to this to try to
25  25   get pipeline globally that was consistent.  And so, you
```

81

```
1   00082:01   know, we were -- the OSO was an improved way of doing
2   02   it.
3   03       And so we were still -- but -- and as we said
4   04   today, we're constantly working on trying to figure out,
5   05   trying to get numbers as comparable, as apples to
6   06   apples.  Despite all that, there is variation.  That's
7   07   why you need to look at more than one year.
8   08    Q.  Okay.  Can you tell me, just sitting here
9   09   today, what numbers specifically you would look at in
10  10   prior years to compare to this particular pipeline
11  11   conversion ratio?  Like is there -- is there a
12  12   particular document that you went to to compare to this
13  13   figure to get that information?
14  14    A.  I can't remember what we had then.  I know
15  15   today I have a little more fresh recollection of what
16  16   we're doing.  We will typically have a document
17  17   in the -- before we start the quarter, for instance,
18  18   we'll -- we'll reflect upon the last several years'
19  19   conversion rates by quarter to kind of look at this
20  20   number again and say, you know, how does this fit with
21  21   how we've performed the last couple of years, that sort
22  22   of thing.
23  23       I don't remember exactly what I would have
24  24   looked at, you know, back then.
25  25    Q.  And does this document that you're referring
```

82

```
1   00083:01   to that you now look at that you may or may not have
2   02   looked at in Q3 2001 have a name?
3   03    A.  I can't -- I don't know if it's got a name.
4   04    Q.  Okay.  And who generates that document?
5   05    A.  Jennifer Minton, her people.
6   06    Q.  Okay.  And is it correct that Jennifer
7   07   Minton's group actually generated this particular
8   08   document we're looking at?
9   09    A.  Mm-hm, that's correct.
10  10    MS. LAVALLEE:  The tape is actually ending in
11  11   five minutes, so why don't we take a short break at this
12  12   point.
13  13    THE VIDEOGRAPHER:  This marks the end of
14  14   videotape number 1 in Volume I in the deposition of
15  15   Jeffrey Henley on March 2nd, 2004.  We're going off
16  16   the record.  The time is 11:23.
17  17    (Recess taken.)
18  18    THE VIDEOGRAPHER:  This marks the beginning of
19  19   videotape number 2 in Volume I in the deposition of Jeff
20  20   Henley on March 2nd, 2004.  We're back on the record.
21  21   The time is 11:26.
22  22    MS. LAVALLEE:  Q.  Mr. Henley, you said
23  23   earlier that "we look at these numbers very closely,"
24  24   meaning the conversion ratio and some of the other data
25  25   we've just been discussing.  Are you including yourself
```

83

```
1   00084:01   in that "we"?
2   02    A.  Yeah, absolutely.
3   03    Q.  Okay.  When is it that you receive this
4   04   document that we've marked as Exhibit -- or that was
5   05   previously marked as Exhibit 136?
6   06    A.  I'm not sure.  I really not sure.
7   07    Q.  Actually, let me -- let me rephrase my
8   08   question.
9   09       Is this a document that you received -- not
10  10   this particular document, but this type of report --
11  11   during Q3 2001 -- is this something that you received by
12  12   e-mail, or is it something you received in a meeting; do
13  13   you know?
14  14    A.  Typically it would be delivered to me.  I
15  15   think -- there's a lot of pages to it, so typically they
16  16   would give me a hard copy, unless I were traveling or
17  17   something.
18  18    Q.  Okay.  And is it something that you -- so it's
19  19   something that you received not in the context of a
20  20   meeting, but something that was actually provided to you
21  21   outside the context of a meeting; is that correct?
22  22    A.  Typically they bring it to my office before I
23  23   go to our executive committee meeting.
24  24    Q.  Okay.  Well, can you tell me the executive
25  25   committee --
```

84

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00085:01   A.  By the way, and sometimes it would be
02   delivered to me in the meeting, so ... but I would
03   typically start the meeting having this document.
04      Q.  Okay.  Is this a document that you actually
05   retained?
06      A.  Typically we keep a few of them.  But by the
07   time that a quarter was over, I'd typically get rid of
08   them because I know all the originals are in our
09   corporate finance group.
10      Q.  It's not something that you left at the
11   meeting and --
12      A.  Oh, no, no, no, no.  In fact, we don't -- we
13   don't give them to all the management.  So there's
14   certain people don't have a need to know this stuff.
15      Q.  Okay.
16      A.  So this information is very important that a
17   lot of people don't know about it 'cause we don't want
18   leaks; we don't want the stuff getting out publicly.
19         So there's only a few people that really have
20   access to all the information of the company.
21      Q.  Okay.  And who are those people?
22      A.  Myself.
23      Q.  Actually, let me phrase my question -- I'm
24   sorry to interrupt you, but let me rephrase the question
25   to say who were those people in Q3 2001?

85

00086:01   A.  The -- myself, Larry Ellison, Safra Catz,
02   Jennifer Minton.  Those are all the people that go to
03   the executive committee meeting.  Several of Jennifer
04   Minton's staff prepare the reports.
05         So of the people who attend the meeting, it's
06   a very small group of people.  There's other EC members
07   who are very important people, but to protect them, as
08   well as to protect the company, we just don't want --
09   the fewer people that know this stuff, the less chance
10   it's going to get out.
11      Q.  And why is it important that it not get out?
12      A.  Because we don't want any information getting
13   leaked out that analysts or other people can see.  So
14   it's important that we, you know, keep this stuff quiet.
15   I think we've done a good job over the years.  People do
16   not know what's going on inside the company till we
17   release it to everybody.
18      Q.  Okay.  And why is it important to the company
19   that this type of data not be released to the public?
20      A.  Well, I -- I don't -- I think that -- couple
21   reasons.  First of all, I don't -- I don't think the
22   public, and even analysts, would understand what to do
23   with it, certainly even sophisticated analysts.
24         If we gave it to them, I think they could
25   create all kinds of rumors and all sorts of things that

86

00087:01   wouldn't necessarily be true 'cause the numbers do
02   change over the course of the quarter.
03         So we try to give analysts and the public
04   information about the company, try to do it once a
05   quarter and try to be as thorough and as helpful as we
06   can.  But intraquarter, it's very important that
07   everybody get the same information.
08         And so either we would give all of this to
09   everybody, which would be crazy -- and nobody does that,
10   to the best of my knowledge.  So it's important that we
11   don't give -- we have to have full disclosure.  So the
12   more the people that know at Oracle, the fewer chance --
13   the more the chance that maybe somebody would
14   inadvertently say something that would not be good.  So
15   the fewer people that know, less chance for leaks.
16         And that's kind of the philosophy.  It's
17   worked well.  As I said, I think our numbers really have
18   always been sort of -- people anticipate; they can
19   speculate.  But best of my knowledge, nobody really
20   understands, until we release them to everybody, what's
21   going on inside the company.  And that's the way we want
22   to continue to operate.
23      Q.  Okay.  And my question was what was the
24   reasons for that, and you articulated, I believe, one
25   reason.  Were there other reasons beyond what you've

87

00088:01   just articulated?
02      A.  That only a few people know?
03      Q.  Yes.
04      A.  No.
05      Q.  Is this type of information you think that the
06   analysts, investors, would want to see?
07      A.  Oh, they'd love to see it.  But as I said, I'm
08   not sure some of them wouldn't make false conclusions.
09   But sure, an analyst would love to get inside
10   information on the company ahead of everybody else.
11      Q.  All right.  Going back now to the pipeline
12   figures that's set forth in Exhibit No. 134.  I believe
13   that you indicated this report -- and correct me if I'm
14   wrong -- this type of report is generated every few
15   weeks.
16         Is it your understanding that it's generated
17   every two weeks at the beginning of the quarter, and
18   then in the last month it's generated weekly?
19      A.  That's generally correct.  I believe it's
20   actually the last couple of weeks in the last month of
21   the quarter.  So as you get towards the end, we do a
22   little more frequently.  But I think it's only the last
23   couple of weeks.  It's not -- I don't think it's the
24   last full month.
25      Q.  Okay.  And as you start the quarter -- as you

88

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00089:01 start a quarter, for example, Q3 2001, how reliable are
02 the pipeline numbers for the first week?
03      A.   How reliable are they.  Well, they -- they're
04 as reliable as what people submit to us.  So, I mean,
05 there's all kinds of judgments that people make on
06 whether a deal's going to close.  They assign
07 probabilities, everything else.
08          So it's -- it's people's best judgment.  And
09 because there's judgment involved, the numbers are
10 not -- they're not actuals.
11      Q.   Right.  Well, I guess my question's slightly
12 different.  My question is, in the first week is the
13 pipeline data a little less accurate than maybe in the
14 second and third week of a quarter?
15      A.   Yeah, historically the very first report has
16 not been thoroughly reviewed by the management in some
17 cases.  So once the management gets in and reviews it
18 and sort of questions, you know, why did you think this
19 is going to happen, typically there's some cleanup that
20 goes on.  And they'll conclude that some of these
21 just aren't going to happen this quarter, and the rep is
22 just being overly optimistic.
23          So these -- they'll be slipped out into a
24 later quarter.  So typically there's a phenomenon within
25 a few weeks you start to see the pipeline coming down a

89

00090:01 little bit.  And that's mostly 'cause of management
02 review.  Then as you go through the quarter, the
03 pipeline continues to drop as time passes and people get
04 new updates as to when they think decisions will be made
05 and when they learn something will slip; then they move
06 it out to a future column or future quarter.
07      Q.   Okay.  And you stated earlier that some of the
08 managers or executives tend to be a little more
09 aggressive or less aggressive with forecasting; is that
10 correct?
11      A.   More -- I would say maybe just optimistic or,
12 you know, have a better record of really getting a
13 sense -- of predicting when something will actually -- a
14 decision will actually be made.
15      Q.   Okay.
16      A.   I'm not sure if it's aggressive or not,
17 but ...
18      Q.   Okay, that's fair.  The -- do you recall
19 who -- and actually, I guess it's listed right here on
20 this document.  But is it your understanding that Jay
21 Nussbaum was the executive in charge of the OSI division
22 of Oracle in Q3 2001?
23      A.   Yes, he was.
24      Q.   Okay.  And then George Roberts was in charge
25 of NAS?

90

00091:01      A.   Yes, he was.
02      Q.   And Mr. Sanderson was in charge of OPI?
03      A.   Yes, he was.
04      Q.   Can you tell me whether or not -- when you
05 were talking about executives having a tendency to -- to
06 be more optimistic or less optimistic, were you
07 referring to managers at this level or at a lower level?
08      A.   Both.
09      Q.   And of these three, can you describe for me
10 which you would think would have a tendency to be overly
11 optimistic or more optimistic than the others.
12          MR. SALPETER:  Time frame?
13          MS. LAVALLEE:  In Q3 2001.
14          THE WITNESS:  My recollection was that --
15 they're all senior people.  They were all -- at Oracle.
16 Roberts and Nussbaum, they're like ten years at the
17 time, or almost ten years in the case of Jay.
18          My recollection was that George Roberts was --
19 had had a number of quarters where he had exceeded his
20 forecast.  And so we used to kid him that he was
21 sandbagging his forecasts and so forth.
22          Jay Nussbaum had some variety in his
23 forecasts, sometimes good, sometimes bad, again, because
24 he had some large deals.  They all did.  So that was the
25 hard part with of all of them.  I think they all -- they

91

00092:01 all -- at their level, they were all pretty good.
02          But they -- they liked to try to overachieve
03 if they could.  So they would tend sometimes to
04 underestimate under the theory that if they missed, they
05 were bad; if they -- if they beat, they were -- they
06 were good, so ...
07          MS. LAVALLEE:  Q.  Okay.  And was that
08 something that you or some of your colleagues at your
09 level would try to control or try to stop?
10      A.   Well, we'd certainly have discussions about
11 what their forecasts were.  You know, we would say
12 "Aren't you being a little conservative; aren't you
13 being a little aggressive?"  We'd try to challenge them,
14 and then they would respond as to why they had submitted
15 what they submitted.  And we would try to make judgments
16 based on their track record.
17          Again, George Roberts had a track record of
18 consistently beating his forecast, so ... when we looked
19 at what we best thought in this so-called "potential"
20 column, these judgments were always there, based upon
21 the more immediate history, the last year or so, what
22 had been their record, how well -- how well they'd been
23 predicting their business.
24          And again, some of it was just large deals,
25 and so ... but George, my recollection, had some pretty

92

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

| | |
|---|---|
| 1 | 00093:01  good record of overachievement.  And so in his case, at |
| 2 | 02  least, for that last year or so, the bias seemed to be |
| 3 | 03  he was doing a lot better than he was forecasting. |
| 4 | 04      Q.  Okay. |
| 5 | 05      A.  And this is -- they would look at this |
| 6 | 06  pipeline.  And we'd grill them, "Gee, your conversion |
| 7 | 07  ratios, based on your pipeline, seem a little low" or |
| 8 | 08  "seem a little high," or something like that.  So there |
| 9 | 09  was always discussion. |
| 10 | 10      And ultimately Jennifer would talk to the |
| 11 | 11  finance people, and she would -- Jennifer Minton -- |
| 12 | 12  would try to make a judgment as to, you know, "Based on |
| 13 | 13  the best I can figure out, here's my guess, irrespective |
| 14 | 14  of what they say, of what I think will really happen |
| 15 | 15  this quarter." |
| 16 | 16      Q.  Okay.  And did you do anything differently or |
| 17 | 17  unique in Q3 2001 to address the issue that some of them |
| 18 | 18  were more or less optimistic in a number? |
| 19 | 19      A.  No.  I mean, it's a constant battle to try to |
| 20 | 20  figure out what we really think's going on in the |
| 21 | 21  business.  And again, these guys are all professionals, |
| 22 | 22  and it's not like they're trying to play games with us |
| 23 | 23  necessarily. |
| 24 | 24      But I think that sometimes they tended to be a |
| 25 | 25  little conservative because they just felt like they'd |

93

| | |
|---|---|
| 1 | 00094:01  get more credit if they overachieve rather than |
| 2 | 02  underachieve. |
| 3 | 03      Q.  Okay.  And prior to Q3 2001, had Oracle ever |
| 4 | 04  conducted any studies to determine how accurate either |
| 5 | 05  the forecast or potential numbers were? |
| 6 | 06      A.  We've used a variety of techniques over the |
| 7 | 07  years to kind of look backwards and look at people's |
| 8 | 08  forecasting track records, and all sorts of things, |
| 9 | 09  sure. |
| 10 | 10      Q.  Okay.  And can you describe some of those |
| 11 | 11  techniques as they existed by the Q3 2001 time frame. |
| 12 | 12      A.  It never changes.  You basically look back |
| 13 | 13  at -- at what people's track record is.  Here's what |
| 14 | 14  they originally forecast; here's what they actually did. |
| 15 | 15      And you use -- I use that technique all my |
| 16 | 16  career because forecasting is a -- is a bit of an art, |
| 17 | 17  and it's imprecise.  And so you're always trying to get |
| 18 | 18  people to learn how to be as accurate as they can in the |
| 19 | 19  way they forecast because forecasting's obviously very |
| 20 | 20  important to the company. |
| 21 | 21      Q.  Okay.  Were there specific indicators that you |
| 22 | 22  looked at to determine the accuracy based on historical |
| 23 | 23  figures? |
| 24 | 24      A.  Yes, as I said.  I said that earlier. |
| 25 | 25      Q.  Can you identify what those indicators would |

94

| | |
|---|---|
| 1 | 00095:01  be. |
| 2 | 02      A.  I think I indicated that.  It would be how |
| 3 | 03  well you performed and -- your actual results to your |
| 4 | 04  forecast. |
| 5 | 05      Q.  Okay.  So you'd be comparing -- that's what my |
| 6 | 06  question is.  You'd be comparing actual results to |
| 7 | 07  forecast numbers? |
| 8 | 08      A.  Historical performance, actual forecasts, what |
| 9 | 09  was the degree of variation. |
| 10 | 10      Q.  Okay.  And would you be looking at conversion |
| 11 | 11  ratios as well? |
| 12 | 12      A.  That really -- that really -- we do, but |
| 13 | 13  that's a different question.  We've already addressed |
| 14 | 14  that as well.  I mean, just looking at the bottom line, |
| 15 | 15  how well did an organization forecast to what they |
| 16 | 16  actually did. |
| 17 | 17      Q.  Okay. |
| 18 | 18      A.  That's different than conversion ratios, to be |
| 19 | 19  honest with you. |
| 20 | 20      Q.  Okay. |
| 21 | 21      A.  That's the bottom -- at the end of the day, no |
| 22 | 22  matter what techniques you've used, how well are you |
| 23 | 23  doing at forecasting your business -- |
| 24 | 24      Q.  Okay.  So when you -- |
| 25 | 25      A.  -- based on how the business turned out that |

95

| | |
|---|---|
| 1 | 00096:01  quarter. |
| 2 | 02      Q.  Okay.  So you'd be looking at, for that -- |
| 3 | 03      A.  And by the way, revenue and expenses. |
| 4 | 04      Q.  Okay.  So what you were looking at was really |
| 5 | 05  the actual forecast numbers versus what the actual |
| 6 | 06  results were at the end of that particular quarter? |
| 7 | 07      A.  We -- again, to address your question, yes -- |
| 8 | 08  relating to do we do historical looks -- how do you do |
| 9 | 09  it?  Yes, that's how we do it historically. |
| 10 | 10      Q.  Okay.  In this document, there's a variety of |
| 11 | 11  terms that I'd like you to help explain here.  The |
| 12 | 12  particular chart we were looking at -- actually, maybe |
| 13 | 13  not.  Let's start on the first page of the document |
| 14 | 14  which has been identified at document 134. |
| 15 | 15      At the very top, it says "constant dollar." |
| 16 | 16  Can you tell me what that term refers to. |
| 17 | 17      A.  Yeah.  We're -- as I say, the primary way we |
| 18 | 18  measure our business is year over year, comparable |
| 19 | 19  quarters.  And because we're a global company and we're |
| 20 | 20  dollar based, when you look at converting everybody's |
| 21 | 21  business in yen and Deutschmarks, euros today, back to |
| 22 | 22  dollars, because exchange rates are different than they |
| 23 | 23  were a year ago, we're really interested in how -- |
| 24 | 24  taking out the effect of exchange rates, because a |
| 25 | 25  company's results could be influenced positively or |

96

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

```
1  00097:01 negatively.
2   02      So we -- we -- we view constant dollar
3   03 analysis as the best way to comparably measure
4   04 performance.  We obviously also have a page in here
5   05 called actual rates because the market, at the end, gets
6   06 reports in actual dollars.  So there's two.  There's
7   07 constant dollar growth rate measurement and an actual
8   08 dollar growth rate measure --
9   09   Q.  Okay.
10  10   A.  -- growth rate measurement.
11  11   Q.  All right.  And does the term "constant
12  12 dollar" mean the same thing as budget dollar?
13  13   A.  Pretty much.  It's pretty -- pretty similar.
14  14 The budget rate is supposed to be -- approximate
15  15 constant dollar rate.  It's supposed to take out the
16  16 effect of currency.
17  17   Q.  Okay.  Let's go back to the constant dollar
18  18 figure.  So the constant dollar figure is adjusted for
19  19 the U.S. dollar -- well, actually, let me strike -- is
20  20 there a base year that you use for the constant dollar
21  21 figures?
22  22   A.  It takes the results in yen or pounds, or
23  23 whatever, and uses the same exchange rate for both
24  24 years.  So in the '01, the '00 numbers, you use the same
25  25 exchange rate for all these countries so that when you
```
97

```
1  00098:01 measure the growth rate, that it is in constant exchange
2   02 rates; it's in the same exchange rate.  So you've really
3   03 taken out the effect of currency.
4   04   Q.  Okay.  And I assume you use an exchange rate
5   05 from a particular point in time, correct?
6   06   A.  Yeah, you use the same exchange rate.
7   07   Q.  Okay.
8   08   A.  So you take -- you take, you know, a hundred
9   09 yen, 200 yen a year later and you take out the effect --
10  10 if you want to convert that to dollars, 'cause we still
11  11 talk to dollars, you would translate both those years at
12  12 the same exact exchange rate.  Doesn't matter what point
13  13 in time, just that you use the same exchange rate.
14  14   Q.  Right.  And which exchange rate did you choose
15  15 to use in Q3 2001?
16  16   A.  I don't remember.
17  17   Q.  Okay.
18  18   A.  Exchange rates vary.  The key is that for
19  19 constant dollars, I've used the same exact exchange rate
20  20 for both years in those different countries, based
21  21 on their foreign currencies, so that I can see what the
22  22 real growth rate is for those countries expressed in
23  23 dollar terms.
24  24   Q.  Okay.
25  25   A.  So I can see the actual dollar results, see
```
98

```
1  00099:01 the real dollars that add up.  There's $2 billion worth
2   02 of revenue.  When I go down and cut through the numbers,
3   03 there's 80 million in Japan, let's say.  What's the real
4   04 growth rate here?  'Cause we don't talk in yens.  It's
5   05 too complicated.
6   06      So you express everything in dollars, but you
7   07 ultimately want to say in real terms what's that yen
8   08 business in Japan really growing at.
9   09   Q.  Okay.
10  10   A.  So it is the way that we -- and others, by the
11  11 way -- and we actually disclose this publicly.  We talk
12  12 about constant dollar growth by region -- done this for
13  13 years -- because it is the real measure of what's going
14  14 on in your business.
15  15   Q.  Right.  And in terms of the budget rate, you
16  16 said that it is similar to the constant dollar rate.
17  17 Does it differ in any way?
18  18   A.  It's -- it's roughly the same.  I'm not sure I
19  19 can describe the distinction.  So at constant
20  20 dollars and I look at -- that's what we publish
21  21 publicly, the constant and the actual dollars, which
22  22 are -- I think I've described the difference.
23  23      In terms of internal, people always want to
24  24 talk about their budgets.  So we kind of try to fix a
25  25 rate that's the budget rate.  And it fairly closely
```
99

```
1  00100:01 approximates constant.  But I'm -- I -- I -- I can't
2   02 remember -- I don't look at it.
3   03   Q.  Okay.
4   04   A.  I really look at constant dollar.  That's what
5   05 matters to me.
6   06   Q.  Okay.
7   07   A.  And that's what I talk about publicly.
8   08   Q.  We talked earlier about conversion rates.  Can
9   09 you just describe what a coverage ratio is.  Do you
10  10 know?
11  11   A.  Well, that's the inverse of a conversion
12  12 ratio.  So if you -- if you convert 50 percent of your
13  13 deals, that you basically have two times coverage.  You
14  14 have twice as much in your pipeline as you need to make
15  15 your forecast.  So if you convert half of it, you'll
16  16 make your forecast.
17  17   Q.  And have you ever heard of the term "growth
18  18 gap"?
19  19   A.  No.
20  20      MS. LAVALLEE:  I'd like to mark -- what's the
21  21 next number?
22  22      THE REPORTER:  137.
23  23      (DC Exhibit No. 137
24  24      marked for identification).
25  25      MS. LAVALLEE:  I'd like to mark as Exhibit No.
```
100

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

| | |
|---|---|
| 1 | 00101:01 137 a document Bates-stamped CA-ORCL 022288 through 90. |
| 2 | 02    (Discussion off the record). |
| 3 | 03    MS. LAVALLEE:  Q.  Mr. Henley, can you take a |
| 4 | 04 look at this document and then tell me if you recognize |
| 5 | 05 it. |
| 6 | 06    A.  Well, it looks to be the kind of analysis that |
| 7 | 07 I described earlier that we've done historically, kind |
| 8 | 08 of looking at the last couple years' worth of conversion |
| 9 | 09 ratios. |
| 10 | 10      So it's got -- the first page, I guess, is |
| 11 | 11 similar to the one -- one of the pages you showed |
| 12 | 12 earlier where we're -- we've got different |
| 13 | 13 organizations, revenue/expense projections year over |
| 14 | 14 year.  This is Q4 '00 versus Q4 '99.  Then the second |
| 15 | 15 and third pages relate to pipeline.  We kind of show the |
| 16 | 16 historical conversion rates and so forth. |
| 17 | 17    Right.  Okay. |
| 18 | 18    A.  So I don't recognize the exact report, but |
| 19 | 19 it's certainly the kind of stuff we were doing back |
| 20 | 20 then.  And the formats have changed over the years, but |
| 21 | 21 the basic thing we're trying to look at has remained the |
| 22 | 22 same. |
| 23 | 23    Q.  Okay.  There's actually some handwriting on |
| 24 | 24 this document.  Do you recognize any writing here? |
| 25 | 25    THE REPORTER:  You're going to have to slow |

101

| | |
|---|---|
| 1 | 00102:01 down. |
| 2 | 02    MS. LAVALLEE:  Okay. |
| 3 | 03    THE WITNESS:  Handwriting.  There's |
| 4 | 04 handwriting on the third page. |
| 5 | 05    MS. LAVALLEE:  Correct. |
| 6 | 06    THE WITNESS:  Looks like my handwriting, to be |
| 7 | 07 honest. |
| 8 | 08    MS. LAVALLEE:  Q.  Okay.  Actually, this |
| 9 | 09 document was indicated it was produced from your files. |
| 10 | 10 Can you tell me what calculations you were trying to do |
| 11 | 11 there. |
| 12 | 12    A.  Well, I'll have to think about it for a |
| 13 | 13 minute. |
| 14 | 14    Q.  Sure. |
| 15 | 15    MR. RUBINSTEIN:  You mean on the third page? |
| 16 | 16    THE WITNESS:  The handwritten calculation? |
| 17 | 17    MS. LAVALLEE:  Q.  Yeah.  You seem to be |
| 18 | 18 calculating something. |
| 19 | 19    A.  I know, and I'm trying -- I'm trying to |
| 20 | 20 recollect what it would be.  Okay.  I think I -- I wait a |
| 21 | 21 minute.  Sure.  Okay.  I was calculating the difference |
| 22 | 22 between the pipeline growth for month three, the |
| 23 | 23 third -- fourth to last column -- |
| 24 | 24    Q.  Okay. |
| 25 | 25    A.  -- and the actual growth rate.  And as you can |

102

| | |
|---|---|
| 1 | 00103:01 see from this, there's variation. |
| 2 | 02    Q.  Right. |
| 3 | 03    A.  Minus 17, minus 9, plus 3, plus 8, plus 13, |
| 4 | 04 minus 8. |
| 5 | 05    Q.  Okay. |
| 6 | 06    A.  So the fact of the matter is that there have |
| 7 | 07 been differences.  Pipeline, while it's interesting |
| 8 | 08 information, doesn't closely correlate always to actual |
| 9 | 09 results.  But it -- it's data.  We try to use it.  And |
| 10 | 10 certainly the field looks at their pipeline when trying |
| 11 | 11 to makes forecasts. |
| 12 | 12    Q.  Okay.  And what were you trying to figure out |
| 13 | 13 there, just so I have an understanding? |
| 14 | 14    A.  Remind myself of how good the correlation was |
| 15 | 15 in -- in pipeline growth versus license growth.  In this |
| 16 | 16 case, I was comparing towards the end of the quarter. |
| 17 | 17    Q.  Right. |
| 18 | 18    A.  So I was comparing month 3. |
| 19 | 19    Q.  Okay. |
| 20 | 20    MS. LAVALLEE:  Okay.  I'd like to mark as |
| 21 | 21 Exhibit No. 138 a document Bates-stamped CA-ORCL 003216 |
| 22 | 22 through 28. |
| 23 | 23    (DC Exhibit No. 138 |
| 24 | 24    marked for identification). |
| 25 | 25    MS. LAVALLEE:  Q.  Mr. Henley, can you take a |

103

| | |
|---|---|
| 1 | 00104:01 moment to look at this document and then identify what |
| 2 | 02 it is for me, please. |
| 3 | 03    A.  Yeah.  It is a pipeline reporting package, |
| 4 | 04 it's called, that was produced in August 28th of 2000. |
| 5 | 05 And again, these -- these formats have changed over |
| 6 | 06 time.  But at the time, this was the particular format |
| 7 | 07 that was being produced. |
| 8 | 08    Q.  Okay.  And actually, if we look at the page |
| 9 | 09 Bates-stamped 227, I think the report now actually |
| 10 | 10 contains a column that reflects the calculations you |
| 11 | 11 were doing earlier. |
| 12 | 12    A.  Which page? |
| 13 | 13    Q.  3227. |
| 14 | 14    A.  Way towards the end.  Right here.  Yes.  Yeah, |
| 15 | 15 in fact, I think -- my recollection, I just told them to |
| 16 | 16 start doing it manually.  I said "Why |
| 17 | 17 don't you just throw this into the report format." |
| 18 | 18    Q.  Okay.  And actually, if you look at the first |
| 19 | 19 page, it appears to be a reference to that -- there's an |
| 20 | 20 index that actually refers to pipeline growth versus |
| 21 | 21 license growth.  And that's effectively what that last |
| 22 | 22 calculation's all about, right, comparison between those |
| 23 | 23 two figures; is that right? |
| 24 | 24    A.  I believe so, yeah.  That's what it looks |
| 25 | 25 like. |

104

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

```
1   00105:01  1.  Okay.  I realize this is a little dull going
2      02  through all these documents, but part of the process
3      03  here.
4      04       When we were talking about accuracy in
5      05  projections a little earlier today, you mentioned the
6      06  big deal reports.  Were you implying that it's less or
7      07  more difficult to predict, when there was high level,
8      08  accuracy of closure of big deals than regular deals?
9      09   A.  There's always big deals.  So there's always
10     10  some amount of large deals.  And there's sometimes
11     11  skewing in the numbers, positive and negative, if
12     12  more -- if you get a higher conversion of big deals in a
13     13  quarter than quarters where we -- maybe a greater
14     14  preponderance of normal slip.
15     15       So yeah, I think that's why the business is
16     16  difficult to forecast.  If the big deals don't happen at
17     17  the end of a quarter or if we overachieve and have more
18     18  of them that close that quarter, it can skew the numbers
19     19  up or down.
20     20   Q.  Okay.  I guess when you're comparing
21     21  historically, is there something that you do to
22     22  compensate for any possible skewing by the big deals?
23     23   A.  It's very difficult.
24     24   Q.  Okay.  Do you try to accommodate for that fact
25     25  in any way?
```

105

```
1   00106:01  1.  Do I or ...
2      02   Q.  Does the company?  Let's put it that way.
3      03   A.  Does the company.  Each sales manager -- Jay
4      04  Nussbaum, these people whose names you mentioned, and
5      05  others try to go through the big deals.  They try to go
6      06  through them.  Their sales managers go through them.
7      07  And that's how they build their forecast.
8      08       They look at this deal and they say, you know,
9      09  "I think that one will happen; I think that one won't
10     10  happen."  So they put their best guess of when these
11     11  deals -- will they be won, and if they're won, will they
12     12  be closed --
13     13   Q.  Okay.
14     14   A.  -- in that quarter.  But it's difficult.
15     15  Nobody has perfect insight, although the large law of
16     16  numbers starts to work where, you know, you know this
17     17  won't win them all or they won't all close that quarter,
18     18  so you have to assume, you know, which ones won't.  But
19     19  it has varied historically, these -- sometimes you do a
20     20  little bit better; sometimes you do a little bit worse.
21     21   Q.  All right.  And are you familiar with the term
22     22  "sales cycle"?
23     23   A.  Sure.
24     24   Q.  Okay.  Can you tell me what that term refers
25     25  to.
```

106

```
1   00107:01  1.  My definition of, at least, what it is that
2      02  when you first -- as a salesperson, when you first are
3      03  made aware that there is an opportunity that a customer
4      04  wants to buy -- potentially buy something, you typically
5      05  go through a multistep process to get to the point where
6      06  they make a decision.  And then if they make it for you,
7      07  you actually get a contract negotiated and finished.
8      08       So it's a whole -- there's professional books
9      09  written about sales cycle management and all the steps
10     10  of, you know, responding, doing demos, all this kind of
11     11  stuff.  So there is a long period of time in the
12     12  business that we're in from the -- from when you first
13     13  hear about something to when it -- even if you hopefully
14     14  win it and close it, a number of months go by.
15     15   Q.  And typically when the sales force put deals
16     16  into the pipeline, do they put deals into the pipeline
17     17  after they've reached a certain point in the sales cycle
18     18  or as soon as they enter the sales cycle?
19     19   A.  Well, it varies, unfortunately.  They're
20     20  supposed to put the -- in the reports as soon as they're
21     21  aware of it.  We want to know, you know.  And again,
22     22  they put it in and then they put a date.  So the key is
23     23  just because it's in the fore -- in the pipeline doesn't
24     24  mean it's in this report, 'cause this only focused on
25     25  the near term.
```

107

```
1   00108:01       But ideally if it's a six-month sales cycle,
2      02  it's in the pipeline, but it's projected out into the
3      03  future quarter or quarters, whatever.
4      04   Q.  Right.
5      05   A.  I think historically some reps are sloppier
6      06  than others, some reps don't -- didn't do a good job of
7      07  putting the stuff into the reports until later.
8      08       But we pushed hard over the years to try to
9      09  get more discipline, try to get people identifying so we
10     10  can get a sense for, you know, the -- you know, the
11     11  aggregate pipeline, let alone what we think will
12     12  close -- potentially close this quarter, the current
13     13  quarter.
14     14   Q.  Okay.  Just so I'm clear and it's clear on the
15     15  record, the deals that actually appear in the pipeline
16     16  in the two documents and reports -- types of reports
17     17  we've been looking at are deals that you anticipate to
18     18  close in that same quarter, or does it include all deals
19     19  in the pipeline?
20     20   A.  Typically -- we've done both, but typically I
21     21  think the reports we're showing here are focused on the
22     22  quarter.  These are ones that our sales force has said
23     23  "We think we'll get a decision this quarter."
24     24       And again, as I testified earlier, we know
25     25  historically that doesn't happen.  We know there is --
```

108

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00109:01 some percentage of them, you know, get deferred;
02 sometimes we lose them.  But a lot of them just slip.
03 They don't get decided that quarter.
04     So we know that you have to factor out that
05 pipeline to expect they're not all going to close.
06  Q.  Okay.  And going back to the concept of the
07 sales cycle.  For your deposit -- I understand you have
08 different types of products that you sell at Oracle.
09 There's database products; there's applications.
10 Anything else?
11  A.  We publicly -- in our public report, you know,
12 classify what we call our technology products under the
13 term "database."  But there's technically development
14 tools, some other -- systems management, other products
15 beyond a pure database.
16     But historically -- I mean publicly, we just
17 lump all that into what we call our technology.  And
18 then we have a broad set of different applications that
19 we call applications.
20     Internally there's many, many products.  And
21 we have several different ways of categorizing groups of
22 products inside the company.  But they fall roughly into
23 these two categories of technology products and
24 application products.
25  Q.  Okay.  So technology is a broader category

109

00110:01 than database, correct?
02  A.  That's correct.
03  Q.  Okay.  Now, is there -- well, let me step
04 back.
05     In the first half of fiscal year 2001, was
06 there a typical sales cycle for applications sales?  Was
07 there a range for sales cycle for those types of
08 products?
09  A.  Sure.  Sure.
10  Q.  Okay.  What was that range; do you know?
11  A.  I'm not sure I could tell you I've ever
12 calculated it to actually know precisely.  But -- but I
13 know that it's a number of months typically.  These are
14 decisions -- take a number of time to go through all
15 these steps to get to a point where you if you win, you
16 get a contract signed.
17  Q.  Okay.  So you're talking maybe several months
18 to -- you know, can you give me a range?
19  A.  It would be a wide range.  I mean -- boy.  You
20 know, I mean, there's outliers.  I've heard of deals
21 happening in a month.
22  Q.  Right.
23  A.  I've heard of deals taking two years.
24  Q.  Okay.
25  A.  I mean, it really is -- but if you want to

110

00111:01 just pick an average, it's a number of months.  It --
02 these things don't happen quickly, so ...
03  Q.  Okay.
04  A.  But all that's factored into when these people
05 forecast when they'll ultimately get -- they think
06 they'll get a decision made.
07  Q.  Okay.  In the database or technology products,
08 was there a longer or shorter sales cycle?
09  A.  Typically those would be shorter.
10  Q.  Okay.  I think for -- we need to be careful
11 we're not talking over one another.
12  A.  I have to wait.
13  Q.  Okay.  And for big deals, were those -- did
14 those deals have typically longer or shorter sales
15 cycles than regular deals?
16     MR. SALPETER:  We're still back in '01, right?
17     MS. LAVALLEE:  Correct.
18     THE WITNESS:  Again, I think big deals relate
19 to technology deals or they relate to applications
20 deals.  So I think this answer's kind of the same.  I
21 think on average, applications big deals take longer
22 than technology big deals.
23     And the reason is that our database is much
24 better understood.  Many times the buyers are repeat
25 buyers, and so it doesn't take them as long to make a

111

00112:01 decision on the vendor 'cause they've already pretty
02 well picked us.  It's just a matter of negotiation.
03     MS. LAVALLEE:  Q.  Okay.  Now, I guess my
04 question is slightly different.  Within applications,
05 for example, does the size of the deal impact the length
06 of the sales cycle?
07  A.  I -- I don't know.  I suspect not.
08  Q.  Okay.
09  A.  We've never precisely measured it.
10  Q.  Have you ever heard of the term "technology
11 drag"?
12  A.  Yes.
13  Q.  Can you explain that for me, please.
14  A.  We have said -- used to more than today, but
15 we always talked about, being in the applications
16 business, that when we sold an application, unless the
17 customer already had a lot of excess database, they
18 would typically need to buy Oracle database and some
19 other things.
20     So the applications business dragged along
21 some incremental database business.
22  Q.  And did you -- did Oracle run any studies in
23 terms of the technology drag in the fiscal year 2001
24 period?
25  A.  I -- I don't remember.  I actually did a study

112

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

1  00113:01  one time and announced the results at an analyst day.
2      02  And at that point -- and I don't remember when it was,
3      03  whether it was before or after.  The data I looked at
4      04  had been over the last three or six months or something,
5      05  but I thought at that time it was representative.  And
6      06  it was about 50 cents on the dollar.
7      07      So I said for every dollar -- said this at one
8      08  of our analyst days -- for every dollar of applications,
9      09  we drag along 50 cents of technology, primarily
10     10  database.
11     11  Q.  Okay.  And why is it that the company looks at
12     12  those figures?
13     13  A.  Well, let's see.  Why did -- I'm -- I can't
14     14  answer for the company.  I can tell you why I was
15     15  interested, why I thought analysts would be interested.
16     16  Q.  Please do.
17     17  A.  And we have not routinely measured this, by
18     18  the way.  So if we were really interested, I guess we
19     19  would measure it every quarter, but ...
20     20      I felt that the -- the analysts would just be
21     21  interested in knowing how much our applications business
22     22  helps our database business.  We'd gotten questions
23     23  about that from time to time.
24     24  Q.  Okay.
25     25  A.  And we've also published information on how

113

1  00115:01  do they think they may end up, up or down.
2      02      And so in the quarter, we had that
3      03  conversation.  And I typically will, you know, bore in
4      04  on them and ask them, or Larry will ask them, questions,
5      05  that sort of thing.  So we certainly try to get
6      06  commentary, perspective, beyond just looking at the
7      07  numbers.
8      08      And Jennifer Minton, as I said earlier, has
9      09  talked to finance people, and she's done her own work.
10     10  But I'm also kind of trying to judge what they say and
11     11  what she says and just -- you know, Larry is too.  We're
12     12  trying to figure out what the range of possibilities
13     13  are.
14     14  Q.  Okay.  And you're talking now about
15     15  conversations during -- are you talking now about
16     16  conversations during the EMC meetings?
17     17  A.  Yes.
18     18  Q.  And other than the EMC meetings, what other
19     19  types of methods do you use to obtain information
20     20  regarding these figures in Q3 2001?
21     21  A.  I don't remember.  I mean, it's certainly --
22     22  over the years I've had ad hoc conversations sometimes
23     23  with people.  Sometimes they've sent e-mails in from
24     24  time to time, you know, we'll talk about how their
25     25  business is.

115

1  00114:01  much our competitor -- applications competitors -- what
2      02  percentage of their wins usually have an Oracle database
3      03  associated with them too.  So they're always interested
4      04  in that as well.
5      05  Q.  Okay.  Now, other than -- we've looked at two
6      06  types of reports here today.  Other than the data that's
7      07  compiled in these reports, can you tell me how you
8      08  personally were able to access information regarding
9      09  forecasts, numbers, or potential numbers during Q3 2001.
10     10  A.  How I was able to access?
11     11  Q.  Or how you were able to learn of the potential
12     12  or forecast numbers.
13     13  A.  Oh.  Two -- you know, basically two ways.
14     14  One, looking at the reports.  And we did share some of
15     15  the report with other members of the EC; we just didn't
16     16  give them the full financial forecast.
17     17      But we'd typically go around the room, and the
18     18  sales executives talk about their license numbers.  So
19     19  that, they know; they just don't know the full financial
20     20  forecast.  So we give them one or two pages out of this
21     21  report and they comment on how they were doing.
22     22      And there's obviously always narrative that
23     23  goes on in these meetings about, you know, how good they
24     24  think their forecast is, what the upside, the downside.
25     25  They typically talk in a range of how -- you know, what

114

1  00116:01      In the U.S., I should say -- in the U.S.,
2      02  we've also had typically what we call a weekly forecast
3      03  call.  And so it's not a global meeting.  And I
4      04  sometimes am on those calls; I sometimes am not.
5      05      But that's another way that I listen to what
6      06  they think.  But it's basically a regurgitation of what
7      07  I hear in the EC meeting.  There's generally not a whole
8      08  lot of difference.  But it's an opportunity again to ask
9      09  questions or you, know, get a sense for how they think
10     10  things are going, that sort of thing.
11     11  Q.  Okay.  And any other sources?
12     12  A.  I don't think so.
13     13  Q.  All right.  Going back now to the EMC
14     14  meetings.  Does that stand for executive committee
15     15  meetings?
16     16  A.  Yeah.  Some people call them executive
17     17  committee; some people call them executive management
18     18  committee.  They're the same meeting.
19     19  Q.  Okay.  And do they typically occur on Mondays?
20     20  A.  If Larry's in town.  Sometimes he's traveling
21     21  or on vacation.  But short of that, they typically
22     22  always occur -- and he always has them at the same -- he
23     23  has -- all my 13 years -- he was doing it before I got
24     24  there, so ...
25     25  Q.  Okay.  And can you tell me who would be in

116

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

1   00117:01 attendance at these meetings typically in the third
2   02 quarter of 2001.
3   03   A. Individuals?
4   04   Q. Correct.
5   05   A. Well, we've talked about some of them earlier.
6   06   Q. Right.
7   07   A. Safra Catz, Larry Ellison, Jeff Henley,
8   08 Jennifer Minton. She joined the EC meetings at some
9   09 point. And again, I could be wrong. She might have
10  10 joined after. I can't remember. But the last several
11  11 years she's been in there.
12  12      But the other names I'm certain of, Jay
13  13 Nussbaum, George Roberts, Sandy Sanderson, representing
14  14 the Americas. And then I think Sergio Giacoletto.
15  15 There was a guy ahead of him, Pierre Carlo. I think he
16  16 was gone by then, so I think it would have been Sergio
17  17 Giacoletto. Derrick Williams, who's run Asia Pacific
18  18 for us for many years.
19  19      Q. Anybody else?
20  20      A. We've had several development people over the
21  21 years. And I don't remember exactly who would have been
22  22 there at that time. I believe Ron Wohl. I don't know
23  23 about Chuck Rozwat. I just don't remember.
24  24      But typically -- we've typically had one or
25  25 more development SVPs or executive vice presidents there

117

1   00118:01 as well.
2   02      And Mike Rocha, I believe, was there. Mike
3   03 was running support. I'm pretty sure Mike Rocha would
4   04 have been there. So I don't -- again, I don't
5   05 recollect. I know who's on the -- today. I just forget
6   06 when some of these people sequenced into the meetings.
7   07      But the sales executives are the guys that
8   08 make the forecasts for license revenue. I think I've
9   09 accurately named all those people.
10  10      Q. Okay. And typically were there agendas for
11  11 these meetings in Q3 2001?
12  12      A. I don't remember if there was a agenda. There
13  13 is today. Once Safra Catz came into the company, she
14  14 began to publish an agenda. So since she was there, I
15  15 suspect there was an agenda.
16  16      Q. Okay.
17  17      A. In the earlier day -- my earlier years we just
18  18 sort of showed up and sometimes just sort of -- we still
19  19 do that, by the way. Sometimes people add things that
20  20 they want to talk about that aren't on the agenda.
21  21      Q. Okay. And in terms of notes, do you
22  22 personally take notes at these meetings?
23  23      A. Rarely. Rarely. Sometimes I'll make a
24  24 notation to go call or do something like that. But I
25  25 certainly don't keep formal notes or something like

118

1   00119:01 that.
2   02      Q. Okay. And would you keep the notes that you
3   03 take?
4   04      A. Typically no. Usually it's, again, reminding
5   05 myself to follow up something, to call somebody. And I
6   06 do it and throw the note away.
7   07      Q. Okay. And other than the reports -- I think
8   08 you indicated earlier that the report that we looked at
9   09 that was marked as Exhibit 134 was some -- was a portion
10  10 of what you saw or that was reviewed at the EMC meetings
11  11 by some of the members, correct, or am I misstating
12  12 that?
13  13      A. Yes, yes, yes. I think I testified that, yes.
14  14      Q. Okay. Were there any other documents, other
15  15 than that report, that was reviewed at the EMC meetings?
16  16      A. I don't -- I mean, that's a broad question.
17  17 What do you mean by -- financial documents or ...
18  18      Q. Yeah.
19  19      A. Boy. I don't recollect. That's the primary
20  20 document. But from time to time, somebody would come in
21  21 and make a report on their business or something. So
22  22 there could have been financial information in
23  23 somebody's PowerPoints or something, but ...
24  24      Q. Okay. And of the people you mentioned that
25  25 you described who were in attendance at the meeting, who

119

1   00120:01 are the people who were actually provided with copies --
2   02 actually, I think I asked that question.
3   03      A. Yes, you did.
4   04      Q. Yeah. In the SLC interview notes summary, it
5   05 indicates that you basically describe the meetings as
6   06 "candid, free-range discussions of the business. There
7   07 is no incentive not to be honest."
8   08      Is that an accurate statement of what you told
9   09 the SLC?
10  10      A. Absolutely.
11  11      Q. And do you believe that that was the situation
12  12 at Oracle in fiscal year 2001?
13  13      A. I always say what I believe, yes.
14  14      Q. Okay. I assume as chief financial officer you
15  15 probably receive a lot of forecasting and financial-type
16  16 data. But during the third quarter of 2001, can you
17  17 tell me what reports that you would have received, other
18  18 than the two we've described here, that relate to
19  19 forecasting-type information.
20  20      A. I'm typically sent a U.S. report.
21  21      Q. Yeah, let's limit it to U.S.
22  22      A. Right. We have this -- what I call this
23  23 weekly forecast meeting. And it's a report what the
24  24 guys' latest forecasts are. In those days it would have
25  25 been those three individuals I mentioned running the

120

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

1  00121:01 Americas for us.
2      02        And it has a list of big deals.  And sometimes
3      03  I get on the call and sometimes I don't.  But, I mean,
4      04  if I care to, I'll get on the call and listen to what
5      05  these guys have to say.  But they're all in the same
6      06  meeting on Mondays.  And so that's where I, you know,
7      07  usually get information, so forth.
8      08        But that's another source of information,
9      09  somewhat duplicative and more detailed in that we get
10     10  the big deals.  We typically review all those at the EC
11     11  meeting.
12     12      Q.    Okay.  So let me just step back here.
13     13        On the forecasting calls, were those held
14     14  generally on Thursdays; is that your understanding?
15     15      A.    Yes.  That was the U.S., or the Americas call.
16     16  It excluded the rest of Europe and Asia.
17     17      Q.    Okay.  And were there documents that were
18     18  disseminated prior to or for that particular phone call?
19     19      A.    Yes.
20     20      Q.    What were those reports called; do you know?
21     21      A.    I don't remember the name.  One was the big
22     22  deal -- I call it the big deal, just a detail of the
23     23  larger deals in the pipeline and what the status was and
24     24  were people putting them in their forecast or not.
25     25        And then there was a report that kind of just

121

1  00122:01 went through each executive's stuff that's in the EC
2      02  report: their forecast, change from the prior week, that
3      03  sort of thing.
4      04      Q.    Okay.  And do you know if that document is
5      05  called the Americas forecast packages?  Does that sound
6      06  right?
7      07      A.    It sounds right.
8      08      Q.    Okay.  In terms of the big deal reports, it's
9      09  my understanding that there were a couple of reports
10     10  that were big deal reports.  Some were prepared only at
11     11  the end of the quarter and some were prepared biweekly
12     12  or more frequently throughout the entire quarter.  Is
13     13  that correct or ...
14     14      A.    That's not my recollection.  I could be wrong.
15     15  Might be thinking about today.  But I think even then we
16     16  were listing all the -- or at least at some cutoff level
17     17  big deals.  They were over a million or over a half a
18     18  million.  There was a cutoff.  We didn't list every
19     19  deal.
20     20        But the idea was just to identify the larger
21     21  transactions and where those deals stood.  And that was
22     22  part of the conversation.  They would talk about "Gee,
23     23  I've got these ten deals I'm working on; here's my
24     24  assessment of where we are with them," that sort of
25     25  thing.

122

1  00123:01      Q.    Okay.  And it's your understanding that those
2      02  reports were prepared throughout the quarter?
3      03      A.    I know the sales guys had them.  I believe
4      04  they were being sent to -- I know they are today, and I
5      05  believe they were then.
6      06      Q.    Okay.  And in terms of --
7      07      A.    I don't always look at them, by the way.  But
8      08  they were -- you know, the information's out there.
9      09      Q.    Okay.  And did you receive these reports, the
10     10  big deals reports, electronically or did you receive
11     11  them a different way?
12     12      A.    I really don't remember.  I get them
13     13  electronically today.  But whether I was getting them
14     14  electronically or in paper form, I don't remember.
15     15      Q.    And were these reports that you kept?
16     16      A.    Typically not.  Again, you know, might keep
17     17  them for a quarter or something, but there's no reason
18     18  for me to keep them.
19     19      MR. SALPETER:  Why don't we take a short
20     20  break.
21     21      MS. LAVALLEE:  Sure.
22     22      THE VIDEOGRAPHER:  We're going off the record.
23     23  The time is 12:16.
24     24        (Lunch recess from 12:16 to 12:45).
25     25

123

1  00124:01 AFTERNOON SESSION
2      02
3      03      THE VIDEOGRAPHER:  We're back on the record.
4      04  The time is 12:58.
5      05        EXAMINATION RESUMED BY
6      06      MS. LAVALLEE:  Q.    Good afternoon, Mr. Henley.
7      07  Just want to pick up where we left off.
8      08        We were discussing some of the reports that
9      09  you receive -- or received during the third quarter of
10     10  2001.  And we were discussing some of the meetings that
11     11  you attended during that period as well.
12     12        In terms of pipeline data, other than the
13     13  reports we've looked at, were there other reports that
14     14  you received that gave you pipeline-related data during
15     15  Q3 2001?
16     16      A.    I don't believe so.
17     17      Q.    Okay.  And did you have access to any on-line
18     18  database that would provide you with either forecast or
19     19  data information during Q3 2001?
20     20      A.    Additional reports, you mean ...
21     21      Q.    On-line -- on-line systems that would provide
22     22  either the information contained in the reports we
23     23  looked at or just different information.
24     24      A.    I had access to the OSO system, but I don't
25     25  believe I ever used it.

124

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00125:01   Q.  And what about other systems?
02   A.  I had access to the -- something we called
03   Oracle Financial Analyzer, which produces our forecasts
04   and other actuals, but I never used it.
05   Q.  And going back to the OSO, you said that you
06   never use it.  Did you have anybody look on behalf or
07   access that system on your behalf during that period of
08   time?
09   A.  I don't believe so.  I mean, I, again, rely on
10   the summary stuff that is produced out of that data,
11   but ...
12   Q.  Okay.  And for the Financial Analyzer, did you
13   have anybody look on that system for you to derive some
14   information during Q --
15   A.  I don't believe so.  Again -- sorry.
16   Q.  -- during Q3 2001?
17   A.  I don't believe so.
18   Q.  And were there other databases that you had
19   access to during Q3 2001 that would contain pipeline or
20   forecasting-type data?
21   A.  Technically our e-mail system is on an Oracle
22   database.  But again, I don't -- other than some
23   occasional e-mail or something, no.
24   Q.  Okay.  In terms of actual results, did you
25   receive intraquarter actual results during Q3 2001?

125

00126:01   A.  Yes.  We always publish monthly actuals.  So
02   that quarter, I received reports.  And I always get them
03   every month.
04   Q.  Okay.  And did these reports take a particular
05   form or have a particular title?
06   A.  I don't remember the titles.  It's a --
07   there's a bound hard-copy monthly report, and usually
08   someone in the accounting department would send an
09   e-mail that would highlight some of the results.
10   Q.  And do you know who that person was?
11   A.  In those days, I think Larry Garnick was head
12   of the general accounting group.
13   Q.  Was Mr. Garnick somebody that you spoke to on
14   occasion during Q3 2001?
15   A.  Boy, I can't remember.
16   Q.  Okay.
17   A.  I mean, clearly I would see him, speak to him
18   from time to time, but not regularly.
19   Q.  Okay.  Other than the monthly actual reports
20   that you just mentioned and the e-mail summary that came
21   from Mr. Garnick, did you have access to any actual
22   result information during Q3 2001?
23   A.  I don't believe so.
24   Q.  Okay.  And did you occasionally communicate
25   with people to obtain that type of information orally?

126

00127:01   A.  I don't believe so.
02   Q.  Okay.  That type of information, was that
03   discussed at the EMC meetings on Mondays during Q3 2001?
04   A.  Rarely.
05   Q.  You say "rarely."  Did it -- was it on
06   occasion discussed?
07   A.  It -- the discussion might go something like
08   "Well, the first month we got off to a good start; first
09   month we didn't -- we didn't get off to a good start."
10   It immediately focused on what was going to happen for
11   the quarter, because the reality is the first month
12   doesn't mean a lot.  It's a relatively small part of the
13   quarter, and it's historically not been particularly
14   indicative of how we'll do for the quarter.
15   Q.  Okay.  And you say it's historically been a
16   small portion of the quarter.  Do you know what portion
17   of the quarter the first month typically represented?
18   A.  I think something in the order of 15 to
19   20 percent of the license revenue.  The -- and that's
20   what I meant by "not a significant part."
21   The support revenue tend to be more
22   proportional, you know, more like one third of the
23   quarter.  But on the license side, it was heavily
24   back-end-loaded.
25   So I think, out of memory, it's something like

127

00128:01   15, 20 percent, maybe, of the license revenue would be
02   in the first month.
03   Q.  Okay.  And was that something that you had
04   tracked historically, how much of the revenue was
05   generated in the first month of a quarter?
06   A.  Absolutely.
07   Q.  Okay.  And where did you track that type of
08   data?
09   A.  Again, I don't know the name of the report,
10   but I set up -- asked them to set up that report -- and
11   I think it was in place for a number of years -- where
12   we routinely looked at historical performance by
13   quarter, by month, so we could kind of see historically
14   how we were getting out of the gate for the first month,
15   the second month, so forth.
16   Q.  Okay.  And was that data contained in the
17   third quarter of 2001 in the monthly actual reports that
18   you received; do you recall?
19   A.  I don't recall.  I know it was -- we did -- I
20   know we kept the information.  I don't remember what
21   report it came in.
22   Q.  Okay.  And did you discuss actual results
23   during the forecasting calls that were held on Thursdays
24   during the third quarter of 2001?
25   A.  I can't remember ever, any quarter, discussing

128

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

```
1  00129:01 actuals on that -- in that meeting.
2     02    Q.  Okay.  And did you on occasion ever
3     03 communicate, outside of the EMC meetings and forecasting
4     04 calls, with Mr. Sanderson during that time frame?
5     05    A.  During that Q3 time frame?
6     06    Q.  (Nods head).
7     07    A.  I can't recall.  As I testified earlier, over
8     08 the years I might have ad hoc meeting -- calls with
9     09 certain sales executives overseas or the U.S.  But it
10    10 wasn't -- it was random and -- they might call me on
11    11 some other matter and we'd talk about "How you doing
12    12 this month or this quarter?"  Typically not the month as
13    13 much as the quarter.
14    14    Q.  Okay.  And would that be true of Mr. Nussbaum
15    15 and Mr. Roberts as well?
16    16    A.  Sure, absolutely.  But I do remember
17    17 specifically that quarter talking to all of them, but I
18    18 can't remember if it was just in the EC meeting or
19    19 whether it would have been separately as well.  But for
20    20 sure I was questioning all of them on their forecast
21    21 that quarter.
22    22    Q.  And why do you specifically recall that for Q3
23    23 2001?
24    24    A.  Because people had asked us publicly about,
25    25 you know, the economy, you know, what's going on with
```

129

```
1  00130:01 the economy.  We had talked about it in the quarterly
2     02 call in December, and we kept getting questions because
3     03 there was a concern about the general economy and how
4     04 that might be affecting our business.
5     05       So I kept asking these guys, you know, "Are
6     06 you seeing anything in the economy?  I know you've got
7     07 good forecasts here, but how confident are you that the
8     08 general economy's not going to affect you and not going
9     09 to affect your results this quarter?"
10    10       So I do recollect having more pointed
11    11 comments, more pointed grilling that quarter, just
12    12 because of some of the questions I was getting
13    13 externally.
14    14    Q.  Okay.  And is it fair to say, then, the market
15    15 was very concerned with how the quarter was progressing
16    16 at Oracle because of the economy?
17    17    A.  Sure, absolutely.  I mean, I think they --
18    18 there were signs from the summer that the general
19    19 economy was starting to show some signs for wear.  And
20    20 we had been getting questions.  And we read the
21    21 newspapers; we'd been wondering ourselves was this going
22    22 to have an effect on us or not.
23    23    Q.  All right.  Was it your understanding that in
24    24 that type of economical -- economic times that the
25    25 market is more sensitive to information regarding
```

130

```
1  00131:01 revenue growth and that type of data?
2     02    MR. SALPETER:  Objection to form.
3     03    THE WITNESS:  Yeah, I don't think -- I think
4     04 the market is always very keenly interested in the
5     05 future, positive or negative.  Doesn't matter.
6     06       They are clearly always interested in what --
7     07 what's going on, things getting better, worse, whatever.
8     08 That all has an impact on whether they want to buy and
9     09 sell.
10    10    MS. LAVALLEE:  Q.  Right.  Okay.  I'd like to
11    11 just go back to the issues of the reports.
12    12       Other than the monthly actual reports and the
13    13 Garnick report -- e-mails that we mentioned, did you
14    14 have access to any on-line system that would provide you
15    15 with information regarding actual data -- actual result
16    16 data during the quarter?
17    17    A.  No, I don't think so.
18    18    Q.  Okay.  Have you ever heard of a system called
19    19 the Americas Datamart?
20    20    A.  I think I know what you're referring to.  I
21    21 don't know what it -- I don't know if I heard that term.
22    22 But I think the U.S. had a datamart where they kept a
23    23 lot of information.
24    24    Q.  Can you explain to me what that is.
25    25    A.  Not really.  I mean, I don't know exactly what
```

131

```
1  00132:01 was in there.  I know we ultimately got rid of it 'cause
2     02 it was redundant and sort of duplicative.  But they did,
3     03 for a time, have their own sort of separate system.  But
4     04 I don't know exactly what was in it.
5     05    Q.  Okay.  Was this a system that compilated [sic]
6     06 information from other sources and stored it so there
7     07 would be a historical record of what occurred on a
8     08 particular time?
9     09    A.  Yeah, I think that's what a datamart does; it
10    10 gets data from all -- various places, puts it in one
11    11 place.  And, you know, they were -- that was why they
12    12 had it.  And subsequently, we kind of united the whole
13    13 company into one system.
14    14    Q.  What system is that?
15    15    A.  We have the -- I think I described those
16    16 earlier.  We have a general ledger, a set of financial
17    17 systems which now run globally in one single data
18    18 center, one single database.
19    19       Then we have this OFA, Financial Analyzer,
20    20 system we've used for financial reporting, forecasting,
21    21 budgeting.  And we actually had it in those days, but
22    22 they chose to create this other thing in addition to
23    23 that.  So we finally realized they were running a whole
24    24 separate set of systems which we felt were redundant, to
25    25 be honest with you.
```

132

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

```
 1  00133:01     So it wasn't a question of -- there was just a
 2  02  lot of duplication of data and effort.  So we finally
 3  03  got them all on one set of single systems.
 4  04     Q.  Okay.  The general ledger system, is that
 5  05  something that you had access to?
 6  06     A.  Technically.  I've never used the general
 7  07  ledger system.  I suppose I could go figure out how to
 8  08  use it if I -- somebody gave me a lot of training.
 9  09     Q.  And have you ever heard of the Rev Manager?
10  10     A.  Sure.
11  11     Q.  And can you tell me what that system is.
12  12     A.  I can tell you what I think it is.  I think --
13  13  I've never used it, again.  It's used in the U.S., at
14  14  least, to keep a daily running total of what revenue had
15  15  been generated from for the quarter, typically license
16  16  revenue.
17  17     I don't know if there were other -- the other
18  18  lines of business used it, but I know the license people
19  19  tracked their invoicing cumulative up to see what had
20  20  been billed for the quarter.
21  21     Q.  Okay.  And the information that's compiled in
22  22  the monthly actual reports, do you know where -- what
23  23  the source of that information is?
24  24     A.  Well, the sources are subsidiary systems that
25  25  feed our general ledger.  All this comes out of,
```

133

```
 1  00134:01  ultimately, the general ledger.
 2  02     But we have a receivable system, a billing
 3  03  system that creates -- you know, we have a payable
 4  04  system, fixed asset system.
 5  05     So there's a variety of subsidiary Oracle --
 6  06  we call Oracle financials.  These are products that we
 7  07  sell to customers and we use inside Oracle.
 8  08     Q.  Okay.  And have you ever heard of the Order
 9  09  Entry system?
10  10     A.  Yes.
11  11     Q.  Can you --
12  12     A.  Another Oracle application that's a subsidiary
13  13  system that feeds the general ledger ultimately -- or
14  14  feeds -- feeds -- feeds receivables, where we do our
15  15  billing ultimately.  And then that data ends up in the
16  16  general ledger.
17  17     Q.  What type of data's entered into the Order
18  18  Entry system?
19  19     A.  Order information.  Customers sign a contract
20  20  to buy software.  And a lot of the information you need
21  21  to bill -- ship the software and bill the customer is
22  22  contained there.  So name, address, what they're
23  23  ordering, what the price is, things like that.
24  24     Q.  Okay.  In the -- one of the interview
25  25  summaries by the SLC, there is a statement that -- where
```

134

```
 1  00135:01  you told the SLC that,
 2  02     "Minton and Henley can see the gross
 3  03     pipeline on their computers, which allows
 4  04     them to see Oracle's conversion rates,
 5  05     i.e., the rate at which a potential
 6  06     contract becomes an actual sale.  Henley
 7  07     stated that the pipeline is in realtime but
 8  08     that he does not look at it on a daily
 9  09     basis; instead he reviews it weekly."
10  10     A.  On the reports that I -- been showing me some
11  11  of them.
12  12     Q.  Okay.  Is this --
13  13     A.  I don't look -- I don't think Jennifer Minton,
14  14  to be honest with you, looks a lot at the live system.
15  15  I think some of her people do from time to time.
16  16     But it's a system used primarily by the
17  17  business units to look at a lot of detail.  I get big
18  18  deal information out of it in hard copy.  I get some of
19  19  the other financial reports.  But it's not something
20  20  that I looked at even -- even weekly.
21  21     But we took snapshots, as we call it, of data
22  22  contained in there, summarized data.  And that's what
23  23  was presented to me and Larry and some of the senior
24  24  members.
25  25     Q.  Okay.  And what system were you referring to
```

135

```
 1  00136:01  there?
 2  02     A.  Looking at -- go back to the -- I think you
 3  03  were talking about the OSO, I think.  Were you talking
 4  04  about pipeline?
 5  05     Q.  Yes.  It says "gross pipeline."
 6  06     A.  Right.  That would have been the OSO system,
 7  07  that we were taking snapshots, reducing that to
 8  08  summarized data on hard copies that I looked at.
 9  09     Q.  Okay.  And I assume that this was a correct
10  10  summary of what you told the SLC, the statement I just
11  11  read to you?
12  12     A.  Best of my knowledge.  I always -- you know,
13  13  assuming I read the stuff right and it reflected what I
14  14  said.  But I believe so, yeah.
15  15     Q.  Okay.  And if you wanted to get certain
16  16  information outside -- apart from what you receive on a
17  17  regular routine basis in the reports, who would you turn
18  18  to to ask for forecasting pipeline-type data, or who
19  19  would you have turned to in Q3 2001?
20  20     A.  If I understand the question, if I wanted a
21  21  supplemental detail or some more information beyond
22  22  maybe what was contained in the report --
23  23     Q.  Yes.
24  24     A.  -- I'd probably go to either Jennifer Minton
25  25  or a woman named Ivgen Guner, who reported to her.  So I
```

136

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00137:01 would say those two people would typically be the people
02 I'd go ask questions. I wouldn't go on line and look at
03 it myself.
04     Q. Okay. Anybody else?
05        A. I don't think so. I think those would be the
06 two people 'cause they've got all the global data. So
07 if I want to see the U.S. or Europe or anywhere, I
08 typically wouldn't have need to call somebody overseas.
09 They've got it all. All the data, they've got. So
10 they'd be the people to go to.
11     Q. Okay. And do you recall any instance in
12 2000 -- in Q3 2001 where you would have sought to obtain
13 supplemental information beyond what was contained in
14 any of the reports that you received during that period?
15        A. I don't recall -- I don't recall requesting
16 additional. Could have. I don't recall it. I mean,
17 we -- we have a awful lot of information that gets
18 produced, so it's more a question of figuring out how to
19 try to figure out and examine all of the information
20 you've got --
21     Q. Okay.
22        A. -- and then try and interpret it, you know,
23 ask some questions to kind of understand.
24     Q. Other than the reports we've just discussed,
25 were there other reports that you routinely received in

137

00138:01 Q3 2001 relating to forecasting-type data you used to do
02 the analyses that you wanted to do in that time frame?
03        A. I don't believe so.
04     Q. Did you ever receive forecast packages for any
05 of the divisions other than the Americas division -- for
06 example, NAS or OPI or OSI -- during Q3 2001?
07        A. I don't -- I don't recall. They -- they off
08 and on over the years sent me copies of the prior
09 quarter. When they finished the quarter, they would
10 send me some reports -- recent years I haven't even
11 gotten those -- but that showed their actual results.
12        And perhaps there was something in there on
13 their forecast. But it would have been totally
14 duplicative of what I was already getting from Jennifer
15 or what I heard on the weekly calls.
16     Q. Okay. Mr. Henley, I'd like to show you a
17 document that was previously marked as DC Exhibit 112.
18 Mr. Henley, if you could take a look at this document
19 and, once you've had a chance to review it, just
20 identify for me what it is.
21        A. The pipeline reporting package dated
22 January 15th, 2001.
23     Q. All right. I'd like to go through this in a
24 similar fashion that we did the other report earlier.
25 And if I could turn your attention to the second page of

138

00139:01 this document, which is Bates-stamped 0003441.
02        And there's several columns on this as well in
03 this report, in this chart. The first column says
04 "constant dollar, thousands, May '00 rates." The second
05 column says "Q3 FY '01 pipeline."
06        Can you tell me what data was used to compile
07 that number.
08        A. It should all be the same as what I described
09 earlier, that all this stuff gets ultimately printed in
10 the forecast report that Jennifer Minton does for me
11 that goes to the executive committee. And I reviewed
12 those definitions.
13        Far as I know, this is the same. Now, the
14 only question I have, I can't -- it's not obvious to me
15 whether this is constant dollars or whether this is
16 actual dollars, but ...
17     Q. Does the first column tell you in the --
18        A. It says "constant," right. So this would be
19 constant. Sometimes I might get the reports in the U.S.
20 that don't make the distinction, and there is no need
21 to. But yeah, this one would be constant, so ...
22     Q. Okay. So the first and second column are the
23 same as the columns -- the same information that's
24 contained in the same columns in the other report,
25 right?

139

00140:01     A. That's correct.
02     Q. Okay. And the variance is the difference
03 between the first and second column?
04        A. That's correct.
05     Q. And the variance percentage is reflected as a
06 percentage?
07        A. Right.
08     Q. The Q3 '01 forecast number is the actual
09 forecast at that week, week 6, for the particular
10 divisions listed, correct?
11        A. Yep.
12     Q. And the Q3 '00 actuals are the actual figures
13 that -- for the third quarter of fiscal year 2000 that
14 were reported for each of these divisions, correct?
15        A. Yeah. The conversion would be -- as I
16 described before -- would be based on the submitted
17 forecasts rather than the so-called potential forecast
18 there. Far as I can tell from this report -- wait a
19 minute. Oh, there is -- the potential, I guess, is
20 later on. So this would be based upon the forecast --
21     Q. Okay.
22        A. -- and the pipeline.
23     Q. Okay. And the next column is the actuals for
24 the prior quarter?
25        A. The prior year quarter, yes. Q3 the year

140

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

1   00141:01  before.

2      02     Q.  Okay.  And the next column says "forecast

3      03  growth."  What does that represent?

4      04     A.  The estimated forecast, you mean '01 forecast

5      05  based upon the ratio?

6      06     Q.  I'm sorry, are you asking me a question?

7      07     A.  When you say "forecast growth" -- no, you

8      08  asked me the next column was --

9      09     Q.  Oh, okay.  I'm looking at the one, two, three,

10     10  four, five, six ... seventh column.

11     11     Q.  Okay.  Before that -- before the conversion

12     12  ratio?

13     13     Q.  Yes.

14     14     A.  Right.

15     15     Q.  And what does that represent again?

16     16     A.  That would be the percentage based upon the

17     17  two prior columns.

18     18     Q.  Okay.

19     19     A.  The '01 growth rate over -- '01 divided by

20     20  '00.

21     21     Q.  And the next one is the conversion ratio, and

22     22  how do you calculate that?

23     23     A.  Again, that's what I was previously -- again,

24     24  that's the forecast for '01 divided by the pipeline for

25     25  '01.

141

1   00142:01     Q.  And the next column is actually something I

2      02  don't believe appeared on the prior report.  That says

3      03  "Q3" --

4      04     A.  That's right.

5      05     Q.  -- "FY '00 actual conversion ratio."

6      06     A.  Right.

7      07     Q.  Can you tell me what that figure represents.

8      08     A.  That's the same thing.  It would have been

9      09  going back to last -- actually, it's not forecast; it's

10     10  actuals, so what did we actually convert in '01, what

11     11  was our actual revenue, divided by our pipeline.

12     12     Q.  And --

13     13     A.  This '01 pipeline a year ago.  So it's meant

14     14  to compare that to see our conversion ratios in our

15     15  forecast somewhat aligned to what we did a year ago.

16     16     Q.  Okay.  And when you say you're looking at the

17     17  pipeline a year ago, are you looking at the pipeline

18     18  figure for week 6 a year ago?

19     19     A.  I believe so.  I believe that's the way it

20     20  should be done.

21     21     Q.  Okay.  And why do you calculate that figure?

22     22  What's the importance of that figure?

23     23     A.  For comparison purposes, to get a sense for

24     24  the current forecast, how are we converting that

25     25  forecast, that forecast versus this pipeline versus

142

1   00143:01  how'd we do it a year ago.

2      02        If these conversion ratios were wildly

3      03  different, then I would -- it would raise a flag in my

4      04  mind.  So if they were higher or lower, I'd try to

5      05  understand why are -- why are these conversion ratios so

6      06  dissimilar?

7      07        Turns out in total 47 versus 51 isn't a lot

8      08  different.  But there are obviously variations between

9      09  the different lines here and the devil's in the details.

10     10  And I'm trying to understand why there would be a

11     11  difference.

12     12     Q.  Right.  And you said that that was not a

13     13  wildly different figure.  What -- when would you start

14     14  asking questions about the difference between the

15     15  conversion ratio for this forecast period versus the

16     16  actual conversion ratio for the prior year?

17     17     A.  You know, anything -- any significant

18     18  difference would raise a question.  Then you kind of

19     19  look back -- sometimes you look back even further and,

20     20  you know, say -- and the people that run these

21     21  businesses know a lot more about their own ratios,

22     22  right.

23     23        So let's take, for instance, OPI.  A year ago,

24     24  it was .33.  And this year it says it's .43.  So

25     25  that's -- that's significant, in my opinion.

143

1   00144:01        It could be that .33 is just abnormally low.

2      02  If you look back at how they've performed, they have a

3      03  higher proportion of big deals, so their conversion

4      04  rates historically kind of tended to vary a little bit

5      05  more than some people.

6      06        So you could say, well, if the average was

7      07  43 -- I'm just speculating, 'cause I don't even remember

8      08  the data.

9      09     Q.  Right.

10     10     A.  But this is the process you go through to try

11     11  to understand differences.  There may be a legitimate

12     12  explanation for differences.

13     13     Q.  Sure.

14     14     A.  There may not be.  You're not convinced

15     15  sometimes -- still seems strange to you.  But that is

16     16  the process, try to understand the details of why you

17     17  have these differences.

18     18     Q.  Okay.  And you mentioned the ten-point

19     19  difference in this thing.  That's a significant

20     20  difference that would cause you to question why there's

21     21  a difference --

22     22     A.  Yeah, I don't have a standard.

23     23     Q.  -- and determine --

24     24     A.  I don't -- at ten I question.

25     25     Q.  Right.

144

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00145:01    A.  I'm just saying anything that is a -- you
02  know, is a difference.  And the greater the difference,
03  the greater you would say, you know, "I wonder why."
04      Q.  Right.
05      A.  You may intuitively know why; you may have to
06  do a little work to get behind the number and figure out
07  why.
08      Q.  Okay.
09      A.  One of the reasons we've only missed three
10  quarters out of 52 in my life at Oracle is we do a lot
11  of work to understand and try to make our forecast high
12  quality, make sure that they're reasonably predictable.
13          They don't always predict 'cause we missed
14  three times over -- over 13 years.
15      Q.  Right.
16      A.  But there's a lot of tools we use to try to
17  figure out if these forecasts are reasonable, you know,
18  reasonably predictive of how we're going to do that
19  quarter.
20      Q.  And that's something that you as chief
21  financial officer spend a fair bit of time doing, I
22  imagine?
23      A.  My people do, and I do too.  I personally
24  spend a lot of time trying to understand forecasts.  I
25  always have, 'cause ultimately I'm accountable to try to

145

00146:01  project to the Street how we're doing, how we're going
02  to do.
03      Q.  Okay.  The next column says -- I believe that
04  says "estimated Q3 FY '01 forecast based on Q3 FY '00
05  ratio."  Can you explain.
06      A.  Well, I'll have to look at it.  Q3 '01
07  forecast, which would be here, based on '03 -- it's not
08  intuitive right off the bat.  I'll have to struggle.
09      Q.  Take your time.  Take your time.
10      A.  Perhaps you've looked at it and can figure it
11  out already.  I don't know.
12          "Estimated '01 forecast based on '03" -- I'm
13  at a loss.  If I study this for another five or ten
14  minutes, I can probably figure it out.  But it's -- I
15  don't know.
16      Q.  Do you believe --
17      A.  It's not a column I've relied on heavily in
18  the past obviously, so ...
19      Q.  Okay.  Do you believe that it could relate to
20  the first column, which is the Q3 FY '01 pipeline,
21  versus the -- actually, the column right before, a
22  comparison between those two numbers?
23      A.  Well, let's see.  Half of that would be 215.
24  Yeah, sure -- well -- actually, I'm not -- just making a
25  calculation, if it's .48 times 436?  It's 827.  Is that

146

00147:01  what you're saying?
02      Q.  I'm asking.
03      A.  I don't know.
04      Q.  Okay.
05      A.  It's the actual conversion ratio times -- that
06  must be what it is.  It must be it.  Must say if I took
07  the conversion ratio -- sure, I'm sure that's what it
08  is.  It's saying if we use the conversion rate a year
09  ago in that quarter, if that were to happen, what would
10  the revenue be.  Sure.  That's what it is.
11      Q.  Okay.  Actually, why don't I give you a
12  calculator.  Can you test whether -- see whether you
13  think that's what it is.
14      A.  So .48 times '01, 436.  I got the wrong
15  column.  This is -- this is times '01.  600 times .48.
16  No, I don't know what it is.  So I'm taking the '01
17  number times .48.
18      Q.  Is there any document that I could give you
19  that would help you figure out what --
20      A.  I have no idea.  I -- you know, I'm sure the
21  numbers must be right.  I just don't know how they --
22  which column they're applying this to.
23      Q.  Okay.
24      A.  I took the .48 times the first column, right,
25  the 436.

147

00148:01    Q.  Sure.
02      A.  And I don't get 236.  So I'm not quite sure.
03  But I think that's what they're trying to do.  They're
04  trying to say if -- if we converted our pipeline at the
05  same ratio as a year ago, here's what the revenue would
06  be.  And then they've taken that versus the current
07  forecast, I assume.
08          MR. SALPETER:  Let me have the calculator,
09  please.
10          THE WITNESS:  Yeah.
11          MS. LAVALLEE:  Q.  Oh, actually, you know
12  what; I think we're looking at the wrong column,
13  actually.  The first column is the pipeline versus -- as
14  opposed to -- the fifth column is the forecast.
15      A.  Again, I don't think they're taking the ratio
16  on the forecast, so I -- I believe --
17      Q.  Right.  We're talking about forecast.
18      A.  I believe they must be saying that -- I think
19  the idea was -- we've done this before inside the
20  company, you know.  If we --
21          THE REPORTER:  Slow down, please.
22          THE WITNESS:  If we convert at a -- the same
23  ratio of last year or something, then what would we
24  do -- how does that compare to this current quarter's
25  ratio, you know, what's the upside or downside, that

148

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00149:01 sort of thing.  But as I do the calculation, I can't get
02 the 236.  So I don't know what they're using to
03 calculate it.
04      MS. LAVALLEE:  Q.  Okay.  Now, you just
05 described a comparison that you do do -- you do look at,
06 or that you did look at in Q3 2001.
07      Why is it that you compared or applied the
08 actual conversion rate for the prior year, same period,
09 same week, to the pipeline?  What was the significance
10 of doing that?
11      A.  I'm not sure that's what they've done, 'cause
12 I can't get the number to compute.
13      Q.  No, that's fine.
14      A.  But the notion --
15      Q.  The notion --
16      A.  The notion of looking at conversion rates is
17 one of the many techniques we use to try to figure out
18 what's the best -- our best guess as to what the
19 forecast's going to be.
20      So pipeline data is subjective, and we know
21 there is some degree of variability to it.  And we know
22 historically our conversion ratios are never the same.
23 So there's a range of conversion -- I previously
24 testified to that, so ...
25      But one drill is to, you know, see, you know,

149

00150:01 what did we convert a year ago.  There is -- there is
02 some seasonality to our business and -- but based on
03 history, we don't always convert the same rate in third
04 quarter, the same rate in the second quarter.  So it's
05 just an exercise.
06      Obviously the more a conversion rate is out of
07 the norm, the more we would question whether that's a
08 good conversion rate to use, right.
09      So looking at and doing some comparisons
10 helps.  Maybe there's explanations for these rates.
11 Sometimes there isn't, but -- so ... in this case, they
12 were trying to see, gee, if we converted at last year's
13 rate, what would that mean in terms of potentially
14 higher revenue in this case?
15      Q.  Okay.  And you mentioned that that's one of
16 the indicators -- that might not have been your word --
17 but generally that one of the indicators that you would
18 look to test the accuracy of the forecast.
19      A.  It's one of the techniques we use.  We look at
20 the detail of big deals and percentage of -- you know,
21 that they're going to close.  We look at conversion
22 rates.  We look at aggregate pipeline.  We look at
23 people's forecasting.
24      I've testified to all this.  There's a variety
25 of techniques.  And in the end, it's never perfect.

150

00151:01 Some quarters we do better; some quarters we do worse.
02 But in general, we've set forecasts out there that all
03 but three times in 52 quarters we met or exceeded.
04      Q.  That's a pretty good record.
05      A.  I think so.  It's better than most anybody in
06 the industry.
07      Q.  Okay.  Other than the techniques that we've
08 already discussed, are there others that you used to
09 test the accuracy of forecasts?
10      A.  I don't -- I think I've covered all the
11 very -- the different things we've looked at.
12      Q.  Mr. Henley, I'll ask you just to take a look
13 again at Exhibit No. 134.  It's a document that was
14 previously identified that we've been discussing.  And
15 it is a -- it looks like this.
16      THE WITNESS:  I'll just use yours, okay.
17      MR. SALPETER:  Yep.
18      THE WITNESS:  It's there somewhere.
19      MS. LAVALLEE:  Q.  Mr. Henley --
20      Q.  If I could ask you to turn your attention to
21 page Bates-stamped 3612.
22      A.  Yes.
23      Q.  These are the same figures we went over
24 earlier.
25      A.  Yes.

151

00152:01      Q.  And I think you said earlier that the fifth
02 column from the right represents the pipeline during the
03 same period of time, from Q3 '00; is that correct?
04      A.  Supposed to.
05      Q.  Okay.  I'm going to actually give you a copy
06 of -- and mark as the next exhibit a copy of the upside
07 report from that corresponding period.  And I want you
08 to tell me whether or not you can find that number in
09 there.  And maybe I'm looking at the wrong thing, and if
10 so, just tell me that.
11      (Discussion off the record.)
12      (DC Exhibit No. 139
13      marked for identification.)
14      MS. LAVALLEE:  Q.  Mr. Henley --
15      A.  So this is trying to find the comparable page?
16      Q.  Yeah.  Where would you find --
17      A.  This one here, I think.
18      Q.  Okay.  I just trying to find -- right now
19 we're looking at the document that's been marked 130 --
20 what is this?
21      A.  134 is the original one.
22      Q.  139.
23      A.  Right, I have that.
24      Q.  Okay.  And it's Bates number 122102 through
25 112.

152

1  00153:01  A.  Right.
2  02  Q.  Where would you expect to find the Q3 FY
3  03  pipeline figure in this report?
4  04  A.  Well, in the new one you just gave me, 139,
5  05  it's the third from the end, and it's called the "'03 FY
6  06  '00 pipeline."  Says
7  07  two-billion-fifty-eight-three-nine-nine.
8  08  Q.  Okay, Mr. Henley.  If I could ask you to
9  09  actually give me the Bates -- the page that you're
10  10  looking at, the bottom number.
11  11  A.  0122104.
12  12  Q.  All right.  And you're looking now at which
13  13  column?
14  14  A.  The third from the last column.
15  15  Q.  Right.
16  16  A.  '03 FY '00 pipeline.
17  17  Q.  Okay.  Now, that number does not correspond
18  18  exactly with the number that is in the prior exhibit.
19  19  A.  That's correct.  And it wouldn't --
20  20  Q.  Okay.
21  21  A.  -- because -- because they're both calculated
22  22  at budget rates.  And the rates of exchange would be
23  23  different a year later.
24  24  Q.  Okay.
25  25  A.  So the difference is, while they don't -- are

153

1  00154:01  not equal, they're very close.  One's
2  02  two-billion-eighteen; one's two-million-fifty-eight.
3  03  And I'm guessing -- assume this is correct -- this
4  04  relates merely to the difference in exchange rates.
5  05  Q.  Okay, great.  And then am I to understand from
6  06  that that in order to calculate the budget rates and the
7  07  constant dollar rate figures, that the company uses
8  08  different -- different conversion --
9  09  A.  Exchange rates.
10  10  Q.  Exchange rates, thank you -- in each year?
11  11  A.  Each year.  We use whatever the -- at the time
12  12  of the budget, whatever those exchange rates are.  And
13  13  invariably, they change.
14  14  Now, you'll note that the U.S. numbers, OSI
15  15  and NAS, are virtually the same because there is no
16  16  exchange rate difference.  Everything is
17  17  dollar-denominated.
18  18  Q.  Okay, thank you.  Mr. Henley, you mentioned
19  19  earlier a term called "won deals," W-O-N.  I think you
20  20  referred to that earlier; am I correct?
21  21  A.  Juan?
22  22  Q.  Deals that are won, W-O --
23  23  A.  Oh, won, I'm sorry.  Won deals.
24  24  MS. SEGAL:  She's from Canada.
25  25  THE WITNESS:  Okay.  I thought you meant

154

1  00155:01  Chinese Juan or something.  Won deals, yes.
2  02  MS. LAVALLEE:  Yes.
3  03  THE WITNESS:  In the pipeline, you know,
4  04  there -- some deals ultimately we lose.  So the ultimate
5  05  is we have to first win them, then we have to get them
6  06  closed in that quarter to be converted to revenue.
7  07  MS. LAVALLEE:  You were using a sentence
8  08  that made it sound like there was a difference between
9  09  that term and closed deals.
10  10  A.  No, I used it in the sense that you first have
11  11  to win the deal, and then you have to -- sales cycle --
12  12  and then you have to convert it to revenue 'cause you
13  13  have to negotiate a contract.  And usually that happens.
14  14  Sometimes you can't agree on contract terms, but ...
15  15  Q.  Okay.  All right, that's fine.  And is there a
16  16  method of tracking --
17  17  A.  And by the way, sometimes there are items
18  18  that can't be recognized for revenue.  So you can win a
19  19  contract, you can have a contract, and you may not be
20  20  able to recognize the revenue for a -- we can have a
21  21  day's discussion on revenue recognition, but ...
22  22  Q.  Well, we won't get into that.  And what was
23  23  the method of tracking these deals in Q3 2001?
24  24  A.  I'm not sure -- you mean tracking, what, won
25  25  deals?

155

1  00156:01  A.  Yeah.  Yes.  How did you track them?  Was
2  02  there a system, a database, that you used to track
3  03  these?
4  04  A.  The systems I've talked about.  We -- in the
5  05  OSO, we should actually track it.  If we win it, it
6  06  should actually be identified in there as won.
7  07  Q.  Okay.
8  08  A.  Ultimately it shows up into our general ledger
9  09  and gets reported as revenue.  But there's no other
10  10  system than the ones I've described earlier.
11  11  Q.  When we talked earlier about forecast numbers,
12  12  you indicated that you compare them generally year over
13  13  year to the same week in the prior year -- in the
14  14  prior -- yeah, same week in the prior year, same
15  15  quarter.
16  16  A.  No, it depends.  If I'm looking at pipeline,
17  17  what I said is I like to compare that to the same
18  18  pipeline.  If I'm comparing forecast, I compare it --
19  19  it's a quarterly -- it's the end-of-quarter forecast to
20  20  the prior year's end of quarter.  Has nothing to do with
21  21  weeks.  It's just updated every other week.
22  22  Q.  Okay.  And when you look at the forecast
23  23  number, do you make any comparisons in the middle of a
24  24  quarter -- or say on week 8, do you make any comparisons
25  25  of that forecast figure itself to any historical data?

156

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00157:01   A.  I'm not sure what you mean.
02   Q.  Okay.  Well, let me ask a different question.
03        Do you compare the forecast number week over
04   week to see if there's changes?
05   A.  As we change the forecast?
06   Q.  Yes.
07   A.  Sure, absolutely.  That's the format in the
08   report typically.
09   Q.  Okay.
10   A.  To say, you know, what's changed since the
11   last time we ran the report.
12   Q.  What are you looking for at that point --
13   strike that.  Let me ask a better question.
14        Why is it that you compare forecast week over
15   week?
16   A.  Well, we're always interested in what's
17   changed.  So it's a quick way to see -- you know, a lot
18   of times there's no change; oop, there's a change; plus,
19   minus, why, that sort of thing.
20        And sometimes on the call, people will talk
21   about that in the meetings, you know, "Gee, I've lowered
22   my forecast" or "I've raised my forecast based upon
23   these factors."
24   Q.  Okay.  And can the same be said of the
25   potential number, or is the thought process there

157

00158:01   different?
02   A.  Oh, sure, the potential can definitely change
03   from week to week as well, based upon new information.
04   Q.  Okay.  And you're looking to see, if there is
05   a change, why that change may exist?
06   A.  Yes, although I don't think we have
07   typically -- some of the reports we don't isolate it and
08   show it as a variance.  But clearly when Jennifer talks
09   to me, sometimes she'll say, you know, "I've lowered the
10   potential plus or minus," whatever, "based upon -- based
11   upon the following reasons."
12        So sure, we're interested in every number that
13   changes --
14   Q.  Okay.
15   A.  -- and why it changed.
16   Q.  And other than comparing, week over week, the
17   forecast and the potential number, did you compare them
18   to any other period?
19   A.  You're talking about within the current
20   quarter or something or ...
21   Q.  Well, or to any other quarter.  I mean, you
22   compare them week over week.  Do you compare the current
23   week's forecast or potential to another period, or is it
24   just week-to-week comparison that you make?
25        Do you look year over year; do you look --

158

00159:01   A.  The year over year is what we always look at.
02   That's the most important thing.  Secondarily, we are
03   interested in you, know, why things are changing week to
04   week in that period.
05        But the most fundamental thing is
06   understanding, you know, what our growth rate is over
07   the prior year.
08   Q.  If I could turn your attention back to Exhibit
09   No. 134.
10   A.  Yes.
11   Q.  There's pipeline data for -- and forecast data
12   and upside data and potential data for a number of
13   different divisions.
14        Was -- were you -- when you looked at these,
15   did you look at the numbers for each of these different
16   divisions, or did you focus primarily on the total
17   company number?
18   A.  It varies from time to time.  Clearly always
19   look at the total.  And then sometimes, depending how
20   much detail I want to get into, might examine every
21   line; I might examine, you know, just what's changed
22   from what I was hearing before.  There's just a variety
23   of things.  But the data's all there to -- for me to get
24   a very comprehensive view of what's going on.
25   Q.  Okay.  So if you saw a change in OSI, for

159

00160:01   example, you two look at that?
02   A.  Could.  It depends upon how much it changed.
03   If it changed a thousand dollars, I wouldn't care.  But,
04   you know, if it was a significant change, sure.
05   Q.  Okay.  But you look at --
06   A.  Usually I don't even have to look at it.
07   Usually on the call somebody will tell me, "By the way,
08   I've changed my forecast and here's why."  They know to
09   do that.  If they're going to change something, they
10   need to explain why they've changed it.
11   Q.  Right, right.
12   A.  By the way, in this particular format, looking
13   at it, this is not the one I referred to that actually
14   we calculate the change.
15        In the U.S. report, the one we do -- the
16   weekly forecast call, in that report, my recollection is
17   we actually calculate the change from the previous week.
18   In this one, we don't.  You have to sort of figure it
19   out.
20   Q.  Okay.  And have we looked at the report that
21   we're talking about -- that you're talking about?
22   A.  I don't believe you showed that to me yet.
23   I'm sure you have it in your files.
24   Q.  Oh, yeah.  Okay.  And that is the Americas
25   forecast package, you believe?

160

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

```
 1   00161:01   A.  Yeah.  Well, I think -- I assume that's what
 2   02   it is.  I never remember the names of these things.
 3   03   Q.  Sure.
 4   04   A.  But it's the one that's reviewed -- it's sent
 5   05   out and reviewed on these so-called weekly forecast
 6   06   calls, so ... if that's what it's called, sure.
 7   07   Q.  Okay.  Looking at the pipeline data on, for
 8   08   example, Exhibit No. 134, were there certain factors
 9   09   that you took into account or considered that might
10   10   render some of the pipeline data inaccurate or
11   11   unreliable?
12   12   A.  The devil's in the details.  So as I've said
13   13   before, different -- in any pipeline, in any geography,
14   14   in any city, whatever, there are differing probabilities
15   15   of closure in your quarter.  There's all sorts of
16   16   things, so ...
17   17   One of the things at the high level in these
18   18   forecast meetings, like in the U.S., the reason they
19   19   give us these big deal reports is so they can kind of
20   20   give us a sense for some of the bigger transactions that
21   21   are in that pipeline and how good or bad they feel about
22   22   winning them, getting them closed this quarter, and so
23   23   forth.
24   24   But the pipeline data is one of a variety of
25   25   tools we use.  And it is inherently, you know, less than
```

161

```
 1   00162:01   totally predictable, as you've seen from some of the
 2   02   other reports you've shown me.
 3   03   We converted different rates.  I mean, there's
 4   04   different things.  But it's certainly a piece of --
 5   05   valuable piece of information that we've always tried to
 6   06   use to understand our business.
 7   07   Q.  Okay.  Mr. Henley, did you play any role in
 8   08   the budgeting process at Oracle, in the fiscal year 2001
 9   09   budgeting process?
10   10   A.  Sure.
11   11   Q.  Okay.  What was your role?
12   12   A.  I attend most -- if I'm in town -- most of the
13   13   budget meetings.  We typically have budgets submitted by
14   14   all the major operating units and usually have a formal
15   15   review.  And I typically attend, as I say, if I'm in
16   16   town.
17   17   So I don't prepare the people's budgets, other
18   18   than my own; I'm responsible for my own function.  But I
19   19   play a review role to understand what people are saying,
20   20   to challenge them, to understand their assumptions.  And
21   21   then ultimately I present the total budget for the
22   22   company to our board of directors.
23   23   Q.  Okay.  And when does the budgeting process
24   24   typically begin in the -- in a quarter or in a year?
25   25   A.  Well, we typically start it at the corporate
```

162

```
 1   00163:01   level, at least, in trying to get stuff submitted in the
 2   02   last few months of the -- of the then year, so ... the
 3   03   whole cycle takes several months to get through 'cause
 4   04   we typically go through several iterations.
 5   05   MS. LAVALLEE:  Okay.  Actually, the court --
 6   06   the videographer has indicated that the video is going
 7   07   to end in about five minutes.  So why don't we take, at
 8   08   this point, a break.
 9   09   THE VIDEOGRAPHER:  This marks the end of
10   10   videotape number 2 in Volume I in the deposition of
11   11   Jeffrey Henley.  We're going off the record.  The time
12   12   is 1:50.
13   13   (Recess taken).
14   14   THE VIDEOGRAPHER:  This marks the beginning of
15   15   videotape number 3 in Volume II -- correction -- Volume
16   16   I in the deposition of Jeffrey Henley on March 2nd,
17   17   2004.  We're going back on the record.  The time is
18   18   1:54.
19   19   MS. LAVALLEE:  Q.  Mr. Henley, we just started
20   20   talking about the budgeting process.  I just want to
21   21   step back a moment.  And we mentioned a number of
22   22   factors -- we've discussed a number of factors today
23   23   that you consider in determining whether or not the
24   24   forecast appears accurate, and a lot of different things
25   25   that you consider.
```

163

```
 1   00164:01   But one thing we didn't discuss is market
 2   02   forces.  Do you consider market forces, the economy as a
 3   03   whole or anything related to that, in considering the
 4   04   accuracy of the forecasts?
 5   05   A.  Sure.  You're interested in what the demand
 6   06   for your products are.
 7   07   Q.  Right.
 8   08   A.  And you're interested in your competitive
 9   09   positions, if you're, you know, doing better against
10   10   competition or doing worse.  There's several things
11   11   that, at a macro level, play a very important part into
12   12   [sic] the forecast.
13   13   In the very short term, i.e., a quarter, those
14   14   are less important.  But even in quarter, they can --
15   15   they can have a -- they can make an impact.
16   16   Q.  What type of factors do you look at to
17   17   determine the demand for products?  Are there particular
18   18   indices that sort of give you a sense of where the
19   19   demand is?
20   20   A.  Yeah, we rely on a lot of research.  I mean,
21   21   one internal fact is our pipeline.  That obviously gives
22   22   us some sense of demand.  It's hard to figure out how
23   23   much of it's competitive versus market demand, but
24   24   there's an aggregate sense of how much business is being
25   25   identified and so forth.
```

164

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00165:01    But there are -- is lots of research that
02  analysts do to -- CIO surveys by products, and that sort
03  of thing.  So we've long tried to look at all sorts of
04  things to get a sense for what's going on with demand
05  for our products.
06    Q.  Okay.  And anything else in terms of demand
07  for products that you can think of?
08    A.  In terms of forecasting or in terms of
09  understanding where -- what -- you know, what the
10  outlook for our -- is, and that sort of thing, you're
11  saying?
12    Q.  Well, let's step back.  Let's look at it in
13  terms of just generally how the growth of the business
14  appears to be going.
15    A.  Well, we look -- we look at the momentum in
16  our business.  That's a big -- you know, there's a bit
17  of trending in our business, how things are going
18  historically over the last year, last quarter, whatever.
19    We look at the -- what the market demand seems
20  to be going forward, either over the next quarter or the
21  next year, depending upon whether you're budgeting for
22  the next year, whether you're forecasting for the next
23  quarter, whatever.
24    And we try to understand competitive threats
25  or competitive change, whether we're gaining or losing

00166:01  versus certain competitors and how that might affect our
02  ability to generate revenue.  I'd say generally those
03  are the three --
04    Q.  Categories?
05    A.  -- kinds of things we try to look at.
06    Q.  Okay.  And going back to the momentum of
07  business and the trends there, what are the trends that
08  you look at to determine what the momentum of the
09  business is?
10    A.  How well we've been doing, our recent results,
11  run rates, as we call them, growth rates, revenues,
12  expenses, things like that; momentum in our pipeline, as
13  I said, the historical momentum, what it looks like
14  going forward; competitors, how competitors are doing.
15  You know, they also give us a sense for the market.
16    If our competitors are gaining or slowing
17  down, that's an indication of demand potentially.  Maybe
18  we're not -- we're doing better or worse than they are,
19  but it's something we look a lot at, is what are the
20  competitors saying, what they're hearing.
21    Q.  Right.
22    A.  That sort of thing.
23    Q.  Are these all factors that you consider
24  yourself personally?
25    A.  Absolutely.

165

166

00167:01    Q.  And what about in terms of your customers and
02  trends that you're seeing in terms of deal closures or
03  things that may impact closing of deals?
04    A.  Well, that's imbedded into what I just
05  discussed, I think.  When I say "actuals," I mean, it's
06  obviously made up of a lot of different transactions.
07  I'm not aware of all of them, but I'm aware of some of
08  them.  And what I'm hearing from customers and what
09  they're saying.  We talk -- we -- our field people tell
10  us.  I spend a lot of time traveling.  I talk to
11  customers a lot, you know, that sort of thing, sure.
12    Q.  Okay.  And in terms of -- other than actuals,
13  what other factors do you look at in terms of customers
14  to determine whether or not, going forward, the business
15  is looking good?  Do you look at things like the sales
16  cycle, if it's getting longer?
17    A.  I just don't personally track it.  I'm not
18  aware that we have a formal tracking of the sales cycle.
19  It exists, and I described what it is.  But I don't try
20  to really look at it.
21    Q.  Do you factor in things like how well your
22  customers are doing in their own businesses?
23    A.  Sure.  I mean, sure.  But I mean, ultimately
24  what I'm trying to figure out is what's happening in
25  demand for our software.  And so one of things that's

00168:01  classically used in the industry, others use and we use,
02  is these survey datas where people go out and survey
03  customers.
04    And we do surveys of ourself, you know, are
05  you going to spend more or less this year than last
06  year, and that sort of thing, so ...
07    You know, they -- we're interested in what's
08  going on in their business, but -- and obviously if
09  they're growing or contracting, you know, that can have
10  an effect of demand.  But, I mean, it's really trying to
11  get a sense for their appetite for taking on new
12  projects, that sort of thing.  That's classically what's
13  used in this industry.
14    Q.  Okay.  And you mentioned surveys conducted at
15  Oracle on this point.  Who conducts those surveys?
16    A.  Most of the surveys are external.  We've
17  actually just started.  We hired a guy named Chuck
18  Phillips, who came from the sales side.  And he's
19  actually started doing some more surveys internally.
20    But we've kind of gone sporadic off and on
21  over the years, done occasionally.  But Chuck intends to
22  start doing a more regular survey.  But this is pretty
23  recent.
24    Most of the surveys we relied on
25  historically have been -- most of the surveys I've

167

168

Oracle Related Cases

Page  165 - 168

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

1   00169:01  relied on historically have been public.  And there's a
2   02  number of them.  There's a number of the research firms,
3   03  like Gartner, and sort of thing, do them.  Different
4   04  magazines, Information Week, people like that.  And then
5   05  certain sell-side analysts, Morgan Stanley, different --
6   06  run surveys.
7   07       So there's a wealth of survey information
8   08  about tech spending, and usually down to the level of
9   09  databases, applications.  And so those are -- those are,
10  10  again, interesting valuable information.  Not always
11  11  predictive, but at least it's one thing we've tried to
12  12  use to gauge demand.
13  13   Q.  Okay.  Are there any indicators that you see
14  14  or that you've typically seen in the past that help
15  15  indicate that there may be a slowdown in demand?
16  16   A.  There -- there aren't -- there aren't good --
17  17  really good leading indicators, unfortunately, that I've
18  18  found in the past.
19  19       We've gone through several cycles in the 13
20  20  years I've been here.  And I've said this publicly over
21  21  the years, that usually modest slowdowns don't have a
22  22  big effect on us.  But I've said that if we see a very
23  23  sharp, really pronounced, deep slowdown in the economy
24  24  or something, it can -- it definitely can affect us.
25  25       We saw that in Asia in 1997.  Unfortunately,

169

1   00170:01  we couldn't predict it.  That was one of the three
2   02  quarters we missed in our history.  Ray Lane and I were
3   03  running the company, went right up to the end of the
4   04  quarter, missed the quarter.  And -- and that whole Asia
5   05  meltdown happened very quickly.
6   06       So we literally had no idea till it happened
7   07  that all these orders would slip out.
8   08   Q.  Generally when the customers are -- when
9   09  there's a slowdown in the customers' demand, do you see
10  10  that there is a more difficult approval process at the
11  11  customer level to get deals closed?
12  12   A.  Well, again, it depends on the degree of
13  13  slowdown.  So going back to the quarter we just talked
14  14  about, as you know in reading all the information, it
15  15  turns out that in that February/March time frame, the --
16  16  there was a tremendous slowdown that occurred very
17  17  quickly in this industry.
18  18       We saw it.  Our competitors saw in their March
19  19  quarter.  And we were all surprised at how quickly it
20  20  turned down.
21  21       So if there's a very quick meltdown in demand,
22  22  then customers definitely are very slow to sign
23  23  contracts.  They become much more -- and they were for
24  24  the next couple years.  We've commented on that quite
25  25  well on the industry, that the customers continued to be

170

1   00171:01  very cautious.  And so that delayed -- elongated sales
2   02  cycles.
3   03       So again, we've never measured it precisely,
4   04  but we know it takes customers longer to make decisions
5   05  once they go into a deep economic slowdown.
6   06   Q.  Okay.  And that's --
7   07   A.  The distinction is deep, because we've had
8   08  several periods over the years where there's been, you
9   09  know, changes in the economy and it hasn't had a big
10  10  effect.
11  11       But if you go into a very precipitous, sharp
12  12  meltdown, like in Asia in '97, like in the U.S. in this
13  13  period, it definitely has some effect on people signing
14  14  up for contracts.
15  15   Q.  Okay.  Now, we discussed multiple amount --
16  16  the multiple different indicators that you look at in
17  17  determining where the business is going.  Are any of
18  18  these indicators, in your view, a better indicator than
19  19  others?
20  20       MR. SALPETER:  Objection to form.
21  21       THE WITNESS:  There -- it -- it -- it -- it --
22  22  there is no one indicator that's better than the other,
23  23  in my opinion.  There's a variety of things you look --
24  24  and in the end, if you -- if you have a lot of
25  25  experience and you have enough different points of view,

171

1   00172:01  we can generally pretty reasonably predict a quarter.
2   02  But as I said, not always.  My mantra, three out of 52
3   03  quarters we missed.  So, I mean, it doesn't always work.
4   04       But there is no one -- that's why we have a
5   05  variety, because there is no one perfect answer to any
6   06  of this stuff.
7   07       MS. LAVALLEE:  Q.  So you try to look at them
8   08  all together --
9   09   A.  Have to.
10  10   Q.  -- to get a big picture?
11  11   A.  Have to.  Have to look at it as many different
12  12  ways as you can to get your best judgment of what you
13  13  think's going to happen.
14  14   Q.  Right.  Okay.  Going back to the budgeting
15  15  process.  Do you recall the budgeting process for fiscal
16  16  year 2002, whether or not that started a little later in
17  17  the year than you normally would start the budgeting
18  18  process?
19  19   A.  I honestly don't.  I don't remember
20  20  precisely --
21  21   Q.  Okay.
22  22   A.  -- when we started versus other years.
23  23  Clearly we were in disarray after missing the February
24  24  quarter.  So we were all scratching our heads.  And, you
25  25  know, at a time like that, you're clearly trying to buy

172

Henley, Jeffrey O. (Vol. 01) - 03/02/2004   3/2/2004  8:51:00 AM

00173:01 some time to figure out what to plan for next year.
02    So, you know, we may well have delayed a
03 little bit, but ... I don't remember precisely the
04 timing versus -- of whatever normal is.
05    We ultimately did produce a budget for our
06 board.  And even when we do a budget, we always tell
07 them, you know -- we try to give some sense of the
08 degree of certainty of how good the budget is, you know,
09 that sort of thing, so ...
10    Q.  Okay.  And you just mentioned that -- and I'm
11 not sure if you were talking about something you
12 specifically recall or something that you think that
13 might have occurred.
14    A.  Might have occurred.  That's why I say --
15 that's a good point.  It might have occurred.  'Cause I
16 know we were all scratching our heads.  Whenever
17 you're -- the trend is dramatically changed all of a
18 sudden, it's even more difficult to predict the future.
19    Q.  Right.  And does a budget represent a
20 prediction of the future?
21    A.  It is a very important tool for the company
22 because you have to make a set of assumptions, if
23 nothing else, to plan your head count and your expense
24 levels.
25    So for us, it's very important to try to

173

00174:01 figure out what our revenue's going to be because that
02 has a big impact on whether we need to add more people,
03 whether we need to cut, hold, and so forth.  So it's
04 very important for just running the business.
05    Now, things can change.  So budget is not the
06 be-all, end-all.  That's why we constantly reforecast,
07 and we'll alter our spending plans based upon our latest
08 views of things.  But it is -- but it is an important
09 tool.
10    Most companies have budgets, and periodically
11 the board wants to get a sense for the business and kind
12 of looking out over the next year.  Some companies do
13 five-year plans.  We don't do that.  It's hard enough to
14 predict one year.  But it is -- most companies
15 typically, every year, kind of like to rethink, you
16 know, the next year and how -- all that sort of thing.
17 So it's a process we've gone through for years.
18    Q.  Okay.  And do you recall in Q3 -- pardon me --
19 in fiscal year 2001 whether or not there was any
20 rebudgeting of the original budget set at the end of the
21 prior year?
22    A.  You're saying, now, this would have been
23 entering into '01?
24    Q.  The budget for '01.
25    A.  '01, right.  So entering into -- we set a

174

00175:01 budget the first of the year.
02    Q.  Right.
03    A.  Did we change the budget?
04    Q.  Yes.
05    A.  I don't remember.  I know -- I think on a
06 couple of years of my 13, we may have changed the
07 budget.  Well, we have, actually, more than that,
08 because sometimes we do acquisitions, and so we would
09 budget in -- modify the budget to reflect a assumption
10 of a bigger lump of revenue and expense, for instance.
11 So we've had some alterations sometimes because of
12 acquisitions.
13    And I think one year we just felt like things
14 were too uncertain, and so we came back to the board at
15 the next board meeting and changed the budget somewhat.
16 But I can't remember if we did in '01.
17    Q.  Okay.  In that particular instance that you
18 remember, do you remember -- can you describe for me the
19 reasons why you did that?
20    A.  It would, again, be that we hadn't -- we
21 either were uncertain about the next year or perhaps we
22 hadn't -- we changed our mind about how we wanted to do
23 the budget.  Sometimes we -- sometimes years we -- I've
24 told the board "I feel like this budget's probably a
25 little aggressive or this budget maybe is conservative."

175

00176:01    I always try to give them some sense of, kind
02 of, our feeling or our sense of where things are going,
03 stuff like that.  So there's -- you know ...
04    And typically -- one of the reasons we've
05 never changed -- typically don't change budgets is
06 because we have a forecasting system.  I mean, our
07 assumption is it's a point in time -- nothing is certain
08 in any year.  So, you know, this is our budget and you,
09 know, we'll -- every board meeting we'll give you
10 updates on, you know, how the year looks, good or bad,
11 and whatever.
12    Q.  Okay.  Can you explain for me the process by
13 which the budget numbers are reached.
14    A.  As I said, people go through a submittal.
15 There's discussion of the budgets, challenge --
16 challenging; then "you're too aggressive; you're too
17 conservative; you forgot this; you forgot that."
18    So then people go back and in many cases make
19 some degree of modifications to their budgets.  They may
20 do it a couple of times, depends.
21    And then usually after the year-end actuals
22 come, if somebody carried over a bunch of revenue they
23 couldn't finish or brought in a lot of new deals, they
24 may come back and say "I want to just tweak my budget
25 because of what happened in -- in the May quarter."

176

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

| | |
|---|---|
| 1  00177:01      So there might be one more final set of | 1  00178:01 ultimate responsibility to carry the budget -- his |
| 2   02 changes or assumptions.  Sometimes there's | 2   02 budget to the board for their approval. |
| 3   03 reorganizations between entities, and so we'll have to | 3   03    Q.   Okay.  And then the division heads, though, |
| 4   04 move budget between the two entities. | 4   04 have input into this back-and-forth.  And when you say |
| 5   05      So that's why I say there's several iterations | 5   05 there's challenges, you're talking about the division |
| 6   06 we go through until we sort of finalize a budget in | 6   06 heads challenging the numbers? |
| 7   07 typically the June time frame and present to the board | 7   07    A.   It's more us -- more Larry and myself and |
| 8   08 in July. | 8   08 others at the corporate level.  Maybe not -- |
| 9   09    Q.   Okay.  And the initial budget number that's | 9   09 questioning, trying to understand the assumptions and |
| 10   10 set before the negotiation, the back-and-forth, who is | 10   10 how they've built their budget.  Sometimes challenging |
| 11   11 that set by? | 11   11 them, but -- you know, we think they're too optimistic |
| 12   12    A.   Ultimately Larry Ellison is the CEO.  And | 12   12 or too pessimistic or whatever. |
| 13   13 he -- he -- he really, I don't know, many times ratifies | 13   13      But the budget's ultimately -- you never want |
| 14   14 or agrees to their budget or sometimes asks them to | 14   14 to have a division set a budget they don't believe in. |
| 15   15 change things or rethink things.  But ultimately he has | 15   15 So ultimately we want them to believe their budgets. |
| 16   16 to sort of agree to the budget.  And then ultimately the | 16   16    Q.   Okay.  And you mentioned earlier that you |
| 17   17 board -- we present it to the board for the board | 17   17 thought there may have been some delay in Q3 -- or in |
| 18   18 approval, and they have to sort of agree. | 18   18 fiscal year 2001 for the budgeting process of 2002, but |
| 19   19      And obviously they aren't -- they don't go to | 19   19 you don't recall whether or not that's the case.  But |
| 20   20 the level of detail that we do.  They obviously rely on | 20   20 you mentioned that that could have been tied to the fact |
| 21   21 us to some degree.  But they comment on, you know, | 21   21 that you didn't make the numbers for Q3 2001. |
| 22   22 things they see in it, or question, or want explanation, | 22   22      Is it your understanding that the budgeting |
| 23   23 or so forth. | 23   23 process begins after the close of the third quarter? |
| 24   24      But I'd say basically it's the CEO of the | 24   24    A.   No.  We've had years -- we've had -- gosh, |
| 25   25 company -- and that's pretty traditional -- has the | 25   25 when I joined the company, the guys in Europe started |

177

178

| | |
|---|---|
| 1  00179:01 budgeting in October.  They never presented them to us | 1  00180:01 investors try to invest in something that the stock |
| 2   02 until maybe March or April. | 2   02 price will go up or it will relatively outperform, you |
| 3   03      But I think we -- we -- we -- it's varied. | 3   03 know, another body of stock. |
| 4   04 Some years we've asked them to send in budgets in | 4   04      So it's all about obviously the investment |
| 5   05 February, March.  Other years it's -- we've waited till | 5   05 generates some return hopefully better than some other |
| 6   06 April.  There's never been, sort of, one date. | 6   06 set of alternatives they had, you know. |
| 7   07      But ultimately we have to get something to the | 7   07      And so you look at the market in general, the |
| 8   08 board by July.  So there is a multi-month process to get | 8   08 valuations of securities in general, the market for the |
| 9   09 this all together and reviewed so we can present | 9   09 stock you're invested in, that industry, valuations in |
| 10   10 something to the board that we believe in. | 10   10 that industry, cyclicality, market share, momentum, you |
| 11   11    Q.   Okay.  Do you have any role in approving | 11   11 know, all the usual suspects. |
| 12   12 deals, license deals at Oracle, or did you have any such | 12   12    MS. LAVALLEE:  Q.   Okay.  And particular |
| 13   13 role in Q3 2001? | 13   13 information data that's specific to the company in |
| 14   14    A.   No and no. | 14   14 question, what data do you look at? |
| 15   15    Q.   I'm sorry, what? | 15   15    MR. SALPETER:  Objection to form and |
| 16   16    A.   No and no. | 16   16 relevance. |
| 17   17    Q.   Okay.  Mr. Henley, I assume that are you an | 17   17    THE WITNESS:  I think it's pretty much what |
| 18   18 investor in high tech stock other than Oracle? | 18   18 I've said before.  I mean, obviously the more you get |
| 19   19    A.   Yes. | 19   19 down to a specific stock, you're looking at the |
| 20   20    Q.   As an investor, what factors do you consider | 20   20 management, you're looking at their credibility, their |
| 21   21 in determining whether or not to actually purchase a | 21   21 track record of performance, their competitive position, |
| 22   22 particular stock? | 22   22 some of the other things I said, the market environment, |
| 23   23    MR. SALPETER:  Objection to form. | 23   23 all that kind of stuff, external factors, you know, |
| 24   24    THE WITNESS:  I don't think I have any unique | 24   24 general economy, all sorts of things. |
| 25   25 expertise.  I think most investors -- sophisticated | 25   25    MS. LAVALLEE:  Q.   Do you care about the |

179

180

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

1  00181:01  quality of their pipeline?
2  02   A.  Don't see how you can know.  I mean,
3  03  certainly -- you know, I'm not aware that most people
4  04  are publishing their pipeline data.
5  05   Q.  Right.  Is that something that would interest
6  06  you if you know?
7  07   A.  Knowing as much as I know about Oracle, it'd
8  08  scare me to death to know 'cause then I'd have a
9  09  thousand questions somebody'd have to explain to me.
10  10   Q.  What about the quality or -- let me strike
11  11  that.
12  12    What about the quality of their customer base?
13  13   A.  Golly, there's so many things.  Of course
14  14  you'd like to know a ton of things.  That would be one
15  15  interesting thing.  I think generally investors look at,
16  16  you know, what -- the market this company's in, what
17  17  kind of position they're in in that market, the quality
18  18  of their management, their track record of delivering
19  19  what they do.  You know, there's a variety of things.
20  20    But I'd just highlight again a couple of
21  21  things I think are, you know, really important.  Not
22  22  that there aren't other things.
23  23   Q.  And in terms of the growth of the company,
24  24  you'd be interested in terms of the expected growth --
25  25  future growth of the company; that's something that

181

1  00182:01  would interest you?
2  02   A.  Of course, sure.  Obviously the future is very
3  03  important.  Past is interesting; the future is really
4  04  important.
5  05   Q.  Mr. Henley, do you recall any time in the
6  06  history of Oracle that the stock price dropped mid
7  07  quarter on information that was not information
8  08  regarding its end-of-quarter results?
9  09   A.  I mean, our stock is -- jumps all around every
10  10  quarter.  I'm sure there's tons of times the stock
11  11  dropped.
12  12   Q.  Let me rephrase of the question 'cause that
13  13  probably wasn't a very good question.
14  14    But in terms of release of information
15  15  regarding the company's financials, other than
16  16  information regarding the end-of-the-quarter or
17  17  end-of-year results, have you ever seen that type of
18  18  information move the market price?
19  19   A.  Best of my knowledge -- you're talking about
20  20  in general as an investor or something or ...
21  21   Q.  No, specifically at Oracle.
22  22   A.  For Oracle?  But again, the company typically
23  23  doesn't release financial information in the middle of a
24  24  quarter.
25  25   Q.  Okay.  That's fair.  Do analysts ever make

182

1  00183:01  projections based on information they've received or ...
2  02   A.  They make all kinds of speculation.
3  03   Q.  And does that type --
4  04   A.  They issue reports all the time, and they
5  05  speculate.  And it truly is speculation, as far as I can
6  06  tell.  There's a lot of things that are said I have no
7  07  idea where they get this information.  But they make --
8  08  you know, they're in the business, I guess, of trying to
9  09  handicap what's going to happen in a company.
10  10   Q.  Okay.  And that type of information has been
11  11  known to move the market price?
12  12   A.  I'm sure.  I'm sure it's had -- I mean, people
13  13  issue a hold or a buy or something like that, and I've
14  14  seen the stock go up 50 cents or a dollar sometimes.  So
15  15  clearly analysts have impacted the market based upon
16  16  things they've said.  Whether it's true or not is a
17  17  different issue.  But they clearly can have an impact.
18  18   Q.  Right.
19  19    Actually, why don't we take a moment to break
20  20  here for five minutes.
21  21    THE VIDEOGRAPHER:  We're going off the record.
22  22  The time is 2:20.
23  23    (Recess taken).
24  24    THE VIDEOGRAPHER:  We're back on the record.
25  25  The time is 2:31.

183

1  00184:01   MR. SALPETER:  Before you start with the next
2  02  question, I'd like to make a very brief statement for
3  03  the record.  We've been here about five hours.  And in
4  04  my view, we've spent an enormous amount of time on
5  05  irrelevant inquiries.  We've had a great deal of
6  06  repetition of questions.  We've had a lot of
7  07  hypotheticals that are very far afield from this case.
8  08  We have a lot of subjects that have been covered with
9  09  other people, subjects many times that are not in
10  10  dispute.
11  11    We've had a lot of subjects covered with
12  12  Mr. Henley that could easily be covered with other
13  13  people.  You've asked him lots of questions about
14  14  definitions of terms that have been testified to
15  15  repeatedly by other people, what labels on documents
16  16  mean.
17  17    And we alerted you earlier to the need to
18  18  finish tomorrow by 2:00.  And it just, you know, seems
19  19  to me that we're wasting a lot of time on things that
20  20  aren't at issue in the case.  We all know what the case
21  21  is about; it's about a narrow time frame and what
22  22  Mr. Henley knew during that time frame.
23  23    And I guess you can spend your time however
24  24  you want.  I'm not going to tell you how to take the
25  25  deposition.  But I think a lot of this deposition is

184

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00185:01 very wasteful and is being used to cover irrelevant
02 material.  And I want to object to it very vigorously,
03 because if we have a dispute later over whether or not
04 we're going to finish tomorrow, I'm going to ask that
05 the court review the record with those objections in
06 mind.
07     MS. LAVALLEE:  Okay.  Clearly we have a
08 disagreement.
09     Q.  Mr. Henley, I'd like to discuss now the issue
10 of guidance.  I understand that Oracle gave guidance to
11 the market regarding its Q3 '01 projections in December
12 of 2000; is that correct?
13     A.  Q3 of '01 --
14     Q.  Yes.
15     A.  -- that's correct.  We give our guidance --
16 when we have our -- what we call our analyst call couple
17 weeks after the quarter, we review what happened in that
18 quarter.  And we also try to give them our best view
19 with all the caveats that we don't know, can't be
20 certain, all that sort of thing, to the next quarter.
21     So yes, in December we would have given them
22 guidance for that coming fiscal Q3.
23     Q.  Okay.  And historically had Oracle provided
24 such guidance in the past?
25     A.  A number of years historically we didn't.  We

185

00186:01 didn't give any guidance.  And I think our -- we were
02 advised in those days that we shouldn't.  When Reg FD
03 came out, all of a sudden we were getting conflicting
04 views.
05     But I think the view we came around to was
06 that rather than being misinterpreted by certain
07 analysts, we would give one guidance to everybody on the
08 call so that nobody could be unclear as to what our
09 view, at least, was.
10     Now, they could do whatever they want, but at
11 least we'd give them our best view of a range of
12 possibilities for the company.
13     Q.  Okay.  And when -- do you recall precisely
14 when you started giving the guidance?
15     A.  I don't.
16     Q.  Okay.  And was the reason primarily related to
17 the implementation of Regulation --
18     A.  That's my recollection, right.  Reg FD was
19 kind of a watershed.  And we kind of reviewed all the
20 different ideas that people had, and that was one of the
21 decisions we decided, that we'd go ahead and start
22 giving guidance.
23     But I strongly believed that giving more than
24 a quarter was just really difficult.  So I said I'll
25 give guidance at least to the current quarter, 'cause

186

00187:01 that's most of the focus of the company, and I'd have
02 the best judgments on that.  And beyond that, it'd be
03 difficult.
04     Q.  Okay.  And generally what type of information
05 did Oracle give guidance for?  Was it related to growth
06 rates for a number of different divisions or was it more
07 general?
08     A.  The same thing I described earlier.  That's
09 the guidance I -- my recollection, that's how we started
10 and that's how we've continued.
11     MS. LAVALLEE:  Okay.  I'd like to mark as
12 Exhibit 140 a document Bates-stamped CA-ORCL 010710
13 through 010742.
14     (DC Exhibit No. 140
15     marked for identification).
16     MS. LAVALLEE:  Mr. Henley, can you take a
17 look at this document and then please identify it for
18 the record.
19     A.  I believe it's a transcript of the analyst
20 call that we did on December 14th, 2000 at the end of
21 our fiscal 2 -- fiscal year 2001.
22     Q.  Okay.  And this was an analyst call on
23 December 14th, 2000, correct?
24     A.  That's what I said, yes.
25     Q.  Okay.  And was this a call that you provided

187

00188:01 the guidance for for Q3 2001 that you discussed earlier?
02     A.  Yes.
03     Q.  In here you've spent -- you spent some time
04 giving some guidance to the market and provide actual
05 figures for a number of factors, including projection
06 for total license, for database growth -- actually, let
07 me restate that.
08     It was actually growth for total license,
09 growth for database, growth for tools -- maybe not
10 for tools, but then for applications, for services, for
11 support, for consulting and education and total revenue
12 and an earnings-per-share figure.
13     Does that sound about right?
14     A.  Sounds right.  I think when we started this,
15 in the first couple times we actually got into the
16 services and so forth.  In subsequent quarters and for
17 the last a number of quarters, we only give the numbers
18 I gave earlier: license, database, apps, total revenue,
19 earnings.
20     Q.  Okay.
21     A.  We haven't -- they don't typically care about
22 the other services 'cause they can trend those pretty
23 well.
24     Q.  All right.  I notice that you did not give a
25 figure for net income.  Do you have any recollection

188

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00189:01  what you were anticipating for net income at that time?
02      A.  No, not exactly.  But again, they can back
03  into it because the numbers of shares outstanding don't
04  move around much.
05      Q.  Okay.  Do you recall what data you used to
06  form these projections or how you came about to come up
07  to these numbers for your projections for these items?
08      A.  Yeah, the process I've gone through ad nauseam
09  this morning and early afternoon.
10      Q.  Okay.
11      A.  Same process I talked about.
12      Q.  Okay.  And do you use figures in some reports
13  as of a particular date; do you recall?
14      A.  Sure.  I use that forecast report that
15  Jennifer Minton prepares, as I told you, and I use
16  whatever the current version is early in the quarter; so
17  it's typically the first or second version of it.
18      Q.  Okay.  If I could turn your attention to page
19  10716.
20      A.  Yep.
21      Q.  Okay.  At the very end of the second full
22  second paragraph it says, "Based" --
23          "So clearly we think that there's an
24  opportunity to do better in the third
25  quarter based on the pipeline and a belief

189

00190:01  that we'll see growing momentum in our
02  applications business now that we've" --
03  "now that we're through this first six
04  months."
05          That was an accurate statement at the time you
06  made it?
07      A.  I believe so.  Unless they mistyped the thing,
08  this would be precisely what I said on the call.
09      Q.  Okay.
10      A.  I always say what I believe.
11      Q.  And you were seeing growing momentum in
12  applications at that point in time?
13      A.  That's -- that's correct or I wouldn't have
14  said it.
15      Q.  Okay.
16      A.  And obviously there is a -- there's a -- I'm
17  trying to give the sense a real -- the market a sense
18  not only what's in our pipeline, but just our confidence
19  or our sense of the potential success of our new -- then
20  new version of our 11i applications, which we were very
21  bullish about at the time.
22      Q.  And if I could turn your attention to the next
23  page, you indicate there at the bottom of the second
24  paragraph,
25          "And certainly the pipeline we have

190

00191:01  for Q3 looks very exciting at this point."
02      A.  Again, I say what I believe.
03      Q.  Okay.  And was that something that held true
04  throughout Q3, 2001, that the pipeline looked exciting?
05      A.  Yeah, I think the business -- right up to the
06  end, we thought we were going to do pretty well.  And
07  again, we were tracking, as you know, pretty close to
08  that number right up till the last week or so.  So yeah,
09  I think the business still looked good to us.
10      Q.  Were there any concerns that you had about
11  risks going into the quarter, or at this point in time?
12      A.  Oh, absolutely.  I had the same concern that
13  the market had.  The 64-jillion-dollar question was
14  what's happening to the economy?  We knew it was
15  softening.  Is this going to be a soft slowdown or is
16  this going to be a hard meltdown?
17          And so, you know, we and everybody worried
18  about that.  We even put it in our risk factors that
19  quarter in our 10Q.  I presented it at the Morgan
20  Stanley day.  I said something like "The economy is a
21  wild card -- the aggregate economy is a wild card."
22          We knew the economy was softening.  The issue
23  was how would it affect demand -- or first of all, how
24  much would it continue to decelerate, would it be sharp.
25  Nobody knew that.  There was lots of speculation about

191

00192:01  whether it would be a really sharp contraction or not.
02  And then what kind of impact would that have on
03  software -- enterprise software spending.
04      Q.  Okay.  If I could turn your attention to the
05  next page, 10719.  In the first full paragraph, the
06  second -- or third sentence says,
07          "So there's nothing that we -- no
08  weakness in our applications business, and
09  the pipelines at every one of these
10  geographies look outstanding [sic] for this
11  next quarter."
12          I assume also that that was a true statement
13  when you made it?
14      A.  Again, I assume they typed my words -- I
15  usually don't use the word "astounding."  I would think
16  that was something Larry would say.  But I was pretty
17  bullish, so I must have really been bullish at the time.
18      Q.  Okay.  Mr. Henley, did you discuss these
19  guidance figures with Mr. Ellison prior to making these
20  statements at the December 14th, 2000 analyst --
21      A.  Yeah, I think almost any quarter I would have
22  reviewed, you know, my view of the forecast.  And we
23  would agree upon, you know, what we want to tell the
24  Street, and that sort of thing, sure.
25      Q.  And do you recall Mr. Ellison expecting

192

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00193:01 earnings per share of 16 cents for the quarter?
02    A.  Larry's always more optimistic than I am.  So
03 I don't recall what he said.  But Larry will always
04 think things are going to be better than I will.  It's
05 just the role.  I think that's Larry's natural optimism.
06    Q.  But you don't specifically --
07    A.  I don't recall specifically what he thought.
08    Q.  Okay.  And do you specifically recall seeing
09 any internal documents that projected 16 cents for that
10 quarter?
11    A.  I don't remember.  I know we -- I don't
12 remember what our forecast -- you know, we had this
13 so-called forecast, potential.  And I don't remember
14 what the potential EPS was.  I don't remember.  And
15 whether it was -- what exactly it was or whether -- if
16 it didn't say 16, maybe some other document.  I don't
17 know.  But no, I don't remember that number.
18    MS. LAVALLEE:  All right.  Mr. Henley, I'm
19 going to mark as Exhibit 141 a document Bates-stamped
20 CA-ORCL 021346 through 360.
21    (DC Exhibit No. 141
22    marked for identification.)
23    MS. LAVALLEE:  Q.  Mr. Henley, can you
24 identify for the record what this is.
25    A.  This is the forecast, either the first version

193

00194:01 or final version, of early -- it says "12/08."  So it
02 would be something I got before we gave our guidance.
03 Typical forecast package.
04    Q.  Okay.  And there's some handwriting on the
05 first page.  Is that your handwriting?
06    A.  Yes.
07    Q.  And what were you -- you were writing down a
08 number of things there.  What were those notes?
09    A.  I assume those were -- when we talked to some
10 of these guys, George Roberts, Jay Nussbaum, they were
11 mentioning some of the deals they were trying to do that
12 quarter.  I guess that's what I -- what those were.
13    Q.  Okay.  Do you recall those deals specifically
14 for that quarter?
15    A.  The only thing I remember was Covisint 'cause
16 that was the largest deal in the history of the company.
17 So that one stuck in my mind.  The other ones -- there's
18 always some number in big deals, so no, I don't
19 specifically remember them all.
20    MS. LAVALLEE:  Okay.  I'm going to mark as 142
21 a document Bates-stamped ORCL 0002986 through 3002.
22    (DC Exhibit No. 142
23    marked for identification.)
24    MS. LAVALLEE:  Q.  Mr. Henley, can you take a
25 look at this document and identify it for me.

194

00195:01    A.  Again, it's -- says "Q3," so it's the same
02 quarter -- it's the same report forecast -- format.  I
03 don't know what the date is.
04    Q.  Do you see a date in the bottom right-hand
05 corner?
06    A.  Well, I'm not sure.
07    Q.  You don't --
08    A.  It says -- it says -- is this something
09 you've -- no, it says "upside 12," underscore "11."  I
10 don't know what that -- I'm not sure what that means.
11    Q.  Okay.  To the extent that it was
12 December 11th, do you believe that you relied on one
13 of these reports for either December 8th or
14 December 11th in preparing your guidance?
15    MR. SALPETER:  I'm going to object to that.
16 You're now testifying rather than asking him a question.
17    MS. LAVALLEE:  Let me -- let me -- let me not
18 tie it to the documents, but let me ask a question.
19    Q.  Is it your understanding that you would have
20 relied on a report either dated December 11th or
21 December 8th to prepare your guidance?
22    A.  Again, I don't know the dates.  I relied on
23 this report from Jennifer Minton that catalogued all the
24 forecasts, that put in her judgment as to where she
25 thought we would end up, over, under, in some of these

195

00196:01 areas and, you know, discussed this with Larry.  And we
02 made a judgment as to what guidance we should give the
03 Street.
04    MS. LAVALLEE:  Okay.  I'm going to mark as
05 Exhibit 143 a document Bates-stamped ORCL 0045275.
06    (DC Exhibit No. 143
07    marked for identification.)
08    MS. LAVALLEE:  Q.  Okay, Mr. Henley, can you
09 review the document and then identify it for the record.
10    A.  Yeah, this is a document I wrote on, again I
11 down at the bottom, I guess.  I assume the date at the
12 bottom is the date.  I mean, usually in my e-mails I
13 think the date's up at the top, but ... the date says
14 "January 4th, 2001."
15    So this was relating to the audit committee
16 that was coming up in about a week or so where I
17 recapped some thoughts about I would briefly describe
18 what happened in the quarter -- most of them had
19 listened to the earnings call -- and then talk a little
20 bit about the forecast.
21    In the audit committee there's always a
22 section where I kind of review what happened to the
23 company the last quarter, what our outlook is.  And then
24 we have a variety of different topics we cover in the
25 audit committee.

196

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

1  00197:01   Q.  Did you indeed send yourself this e-mail on or
2  02  about --
3  03   A.  I assume I did.  It's addressed to me.
4  04   Q.  Okay.  And you believe you wrote this e-mail?
5  05   A.  Absolutely.
6  06   Q.  There's a couple points I'd like to just draw
7  07  your attention to.  In the -- underneath the heading "Q3
8  08  Forecast" --
9  09   A.  Yes.
10  10   Q.  -- it reads, "On the conference call
11  11  we said that we had seen no slowdown in our
12  12  business yet," open paren, "Q2 license
13  13  growth or initial pipeline growth rate,"
14  14  close quote.
15  15      Did you at some point in Q3 start to see a
16  16  slowdown in the business?
17  17   A.  I'm not -- again not sure what that means.  We
18  18  set out a forecast to do 25-percent growth, guidance, I
19  19  think, for the quarter in license growth.  And I think
20  20  we basically did that in the second quarter.
21  21      So we kind of had a guidance that was pretty
22  22  similar, I believe, to what we saw in the second
23  23  quarter.  So I think, as you know, looking through the
24  24  documents, we felt until the end that we were pretty
25  25  much on track to kind of do what we did in the second

197

1  00198:01  quarter.  So I wouldn't describe that as a slowdown.
2  02   Q.  Okay.  So let me -- I'm not sure you answered
3  03  my question.  My question was, you referred here to the
4  04  fact that you were not seeing a slowdown in the business
5  05  yet.  Did you at some point in Q3 feel that you were
6  06  starting to see a slowdown?
7  07   A.  The last couple days of the quarter and the
8  08  last day of the quarter we definitely saw a slowdown.
9  09  But until that point, no, I still thought we were going
10  10  to do 25 percent, which would have been approximately
11  11  the same as we did in the second quarter.
12  12   Q.  Okay.  And you mentioned earlier that you did
13  13  have some concerns because of the market.
14  14   A.  Absolutely.
15  15   Q.  Okay.
16  16   A.  But I think -- as I said earlier, everything I
17  17  could tell, from deep interrogation to our sales
18  18  executives, to looking at what all of our competitors
19  19  announced in mid January for their December actuals,
20  20  which were strong, and what they announced for their
21  21  third quarter guidance, which continued to be strong,
22  22  continuation of the trend they had seen -- I attended
23  23  Tom Siebel's presentation at Morgan Stanley at the time
24  24  I presented.  He was nothing but bullish.  Got all the
25  25  same questions:  What about the economy?  He kind of

198

1  00199:01  echoed what we said.
2  02      So I saw nothing from other software
3  03  executives that we competed with that said anything
4  04  different than what I saw.
5  05   Q.  And is that true throughout the entire
6  06  quarter?
7  07   A.  I believe so because we typically report,
8  08  compared to most of our competitors, a month ahead.  So
9  09  we were the first person to see a report actuals.  They
10  10  then reported their actuals in March.  And my
11  11  recollection is almost all of them missed their quarter
12  12  too.  And they were all in a state of shock, as we were,
13  13  at the end of February.
14  14   Q.  Okay.  And you don't recall any of your
15  15  competitors actually reporting possible slowdown in
16  16  their business in January --
17  17   A.  I -- it's not my recollection.  My
18  18  recollection is most of them were like us.  They were
19  19  concerned about the economy.  We all were getting
20  20  questions.  We all read the newspapers.
21  21      But my impression was the vast majority, at
22  22  least -- there's a lot of competitors, right -- were --
23  23  reported good results, met their expectations in
24  24  December and were not sending out big -- you know,
25  25  downward revisions to forecasts and so forth.

199

1  00200:01   Q.  Okay.  And when you're referring to these
2  02  competitors, can you identify specifically which ones
3  03  you're thinking of?
4  04   A.  They would be people we compete with either in
5  05  technology or applications.  So SAP, PeopleSoft, Siebel,
6  06  IBM, Microsoft, BEA, you know, a number of people.
7  07      So as I said earlier in my testimony, one of
8  08  the things we look at is what's -- trying to figure out
9  09  what's going on in the industry.  If all of our
10  10  competitors see problems, then, you know, we're big
11  11  enough, it's got -- it must be something that's going to
12  12  affect us too.
13  13   Q.  And you next -- at the very end of that
14  14  paragraph, you say,
15  15      "Nobody asked the question about
16  16  Covisint which we announced, it's" -- open
17  17  paren, "it's 60 mill," close paren."
18  18      What was the question you were referring
19  19  to there?
20  20   A.  On the call I mentioned that we had a very
21  21  large applications deal, Covisint, that had slipped and
22  22  we hoped to get that done in the third quarter.  So
23  23  nobody said "Well, how much is it?"
24  24   Q.  Okay.  And that's what you were referring to
25  25  by the question?

200

Oracle Related Cases                                    Page  197 - 200

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

| | |
|---|---|
| 00201:01   A.  I believe that's what I was referring to. | 00202:01  we're -- you know, we're going to make the numbers." |
| 02     Q.  Now, the next paragraph begins, | 02         So I don't know what else to tell you. |
| 03        "At this point, all the data since the | 03     Q.  Okay.  Did you -- now, I guess my question is |
| 04     call point to more economic softening, so | 04  slightly different.  You keep referring to the fact that |
| 05     there is a risk of slippage in deals." | 05  you felt that you were going to make the numbers and the |
| 06         Is that your recollection? | 06  numbers were there.  Did you see any slippage in deals? |
| 07     A.  Absolutely.  Wouldn't have written it if it | 07     A.  We always have slippage in deals.  So every |
| 08  wasn't what I meant. | 08  quarter deals slip. |
| 09     Q.  Okay.  And did you start to see any slippage | 09     Q.  Okay.  Did you see anything beyond what you |
| 10  in deals in December of 2000? | 10  normally see? |
| 11     A.  No.  Again, my recollection is that we had a | 11     A.  Not until the last couple days of the quarter, |
| 12  forecast that was still saying at least 25-percent | 12  and then we saw massive slippage. |
| 13  growth until late into the February -- the month of | 13     Q.  Okay. |
| 14  February. | 14     A.  Which is why we missed the quarter. |
| 15         So people were -- I sent them back checking, | 15     Q.  All right.  And the next sentence refers -- |
| 16  telling me, "Come on, I keep reading about this stuff. | 16  oh, actually you keep referring to questions that you |
| 17  Our competitors are announcing -- they're claiming | 17  had your managers go back to the customers and check the |
| 18  things still look good too, but -- you know, will we see | 18  data.  What precisely did you have them check? |
| 19  a big meltdown in this economy?"  That was the big | 19     A.  Are they still going to do a this deals |
| 20  question.  And will this -- if it's a big meltdown, this | 20  quarter, you know, "Will you be in a position to make a |
| 21  surely must have some impact. | 21  decision," which is what they always try to figure out, |
| 22         Everybody went back, dutifully reported back, | 22  you know.  Some cases, "Are we going to get selected," |
| 23  pushed their people, their people went back to their | 23  as I said earlier, "and if we get selected, will you be |
| 24  customers and said "No, we think we're on track.  We | 24  in a position to, you know, sign a contract this |
| 25  think the business -- we're going to make -- you know, | 25  quarter?" |

| | |
|---|---|
| 00203:01     Q.  Okay.  And anything beyond that? | 00204:01     A.  Well, we thought so.  You never know where you |
| 02     A.  I don't believe so.  Well, again, I'll | 02  find the bottom.  But clearly we had seen a precipitous |
| 03  reiterate again, at the risk of constantly repeating | 03  decline, and so I think our forecast -- I can't remember |
| 04  myself, we not only interrogated our own sales force; we | 04  exactly.  But it reflected a significant year over year |
| 05  looked at what our competitors were saying.  We don't | 05  change because of that. |
| 06  operate in a vacuum. | 06         Whether in the final analysis it was accurate |
| 07     Q.  All right.  Now, you indicated | 07  or not, I can't remember.  But we thought we had |
| 08  that you had some concerns regarding the company because | 08  certainly reflected a significant slowdown that we'd |
| 09  of the market -- economic situation with the market | 09  been seeing for several quarters. |
| 10  generally.  When did you first start to have those | 10         The bigger concern was the general economy and |
| 11  concerns? | 11  whether this was going to be a really serious economic |
| 12     A.  Oh, my recollection, again, would be the late | 12  slowdown or whether this was going to be sort of a soft |
| 13  summer.  I think the late summer, early fall, there | 13  landing. |
| 14  were -- well, there was the dot-com meltdown that | 14     Q.  Okay.  And focusing now on the dot-com issue, |
| 15  happened even before that.  But I think that was | 15  as you moved through December and into January, did you |
| 16  isolated at first to back then, and then you began to | 16  start to see a bigger impact because of the dot-com |
| 17  hear stories about the manufacturing sector showing | 17  slowdown? |
| 18  weakness. | 18         MR. SALPETER: Objection to form.  Impact on |
| 19         And so I would say by early fall there were | 19  Oracle? |
| 20  clearly concerns out there about the slowdown in the | 20         MS. LAVALLEE:  On Oracle. |
| 21  economy. | 21         THE WITNESS:  I don't recall. |
| 22     Q.  Okay.  And you mentioned the dot-com and you | 22         MS. LAVALLEE:  Okay. |
| 23  said that that was an earlier event.  Is it your | 23     Q.  And speaking now generally about the market, |
| 24  understanding that the full impact of the dot-com | 24  you mentioned manufacturing industry and the general |
| 25  slowdown had occurred by the start of Q3 2001? | 25  slowdown in the market.  Did you start to see more and |

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

| | |
|---|---|
| 1   00205:01 more impact as you moved through December and into | 1   00206:01    Q.  All right. |
| 2    02   January, beginning and middle of January? | 2    02    A.  And you can go look at all the other |
| 3    03    A.  Impossible to tell. | 3    03   competitors and what they said when they missed their |
| 4    04    Q.  It's impossible to tell?  None of your | 4    04   March quarters.  They had all the same observations. |
| 5    05   indicators would allow you to determine that? | 5    05    Until you get to the end of the quarter, |
| 6    06    A.  None. | 6    06   unfortunately, in this crazy business I'm in, you really |
| 7    07    Q.  Okay.  And -- | 7    07   don't test your customer to see what they really think |
| 8    08    A.  I already described the various indicators. | 8    08   about their business and what they really think about |
| 9    09    Q.  Yes. | 9    09   the economy.  And then they have to vote 'cause they |
| 10    10    A.  I look at our competitors are saying [sic]; I | 10    10   gotta sign a contract or not.  They voted in a big way |
| 11    11   look at my pipeline; I look -- I look at my forecast; we | 11    11   at the end of February. |
| 12    12   go back, we double-check the forecast.  All those | 12    12    Q.  And did you have any concerns regarding the |
| 13    13   indicators still said we'd make the 25 percent and the | 13    13   pipeline, as you went into -- moved into Q3 2001? |
| 14    14   12 cents a share. | 14    14    A.  I thought, if anything, it was probably a |
| 15    15    Q.  Okay.  Other than -- apart from making you the | 15    15   little overstated.  I thought it was too good to be |
| 16    16   12 cents a share [sic], did you see any slowdown where | 16    16   true.  I discounted it to some degree.  And, you know, |
| 17    17   you could still make your 12 cents, but yet it was still | 17    17   we talked earlier about cleaning up pipelines and that |
| 18    18   impacting, the deals were still coming in slower than | 18    18   sort of thing. |
| 19    19   you would have expected? | 19    19    So I -- I thought it would be great if it was |
| 20    20    A.  I -- I -- I had no substantive information to | 20    20   really that strong.  I knew it was strong, it continued |
| 21    21   prove or disprove that. | 21    21   to look good, but I wasn't sure it was quite as strong |
| 22    22    Q.  Okay. | 22    22   as it said -- as the absolute number it started at. |
| 23    23    A.  Had a concern, as I said earlier.  But till | 23    23    Q.  Okay.  And did you start to see the |
| 24    24   the last week of the quarter, we still thought we'd make | 24    24   pipeline -- did you see the pipeline continue to grow in |
| 25    25   that forecast. | 25    25   the December/January time frame? |
| 205 | 206 |

| | |
|---|---|
| 1   00207:01    A.  The pipelines never grow.  The pipelines | 1   00208:01 forecast is going to happen, that you're going to stick |
| 2    02   typically, as I described earlier, get scrubbed; deals | 2    02   with your forecast, you're going to -- the cumulative |
| 3    03   start slipping.  So the process is by -- I would say by | 3    03   thing adds up to 25 percent?  What kind of risk do we |
| 4    04   the end of the first month, you kind of got a stability | 4    04   have?  Are we going to make it?" |
| 5    05   point, and they just slide from there because deals slip | 5    05    Q.  So that was your only -- |
| 6    06   or deals get lost, or whatever. | 6    06    A.  As I said, there is -- "Guys, we keep reading |
| 7    07    Q.  Okay.  And are you familiar with the term | 7    07   about the economy.  I'm concerned.  Is this going to |
| 8    08   called "backfilling"? | 8    08   affect our business?" |
| 9    09    A.  Some people have used -- I -- I -- I -- that's | 9    09    Q.  And when you asked -- |
| 10    10   not a industry term, per se.  I mean ... | 10    10    A.  "No, no."  Kept coming back "No, we'll make |
| 11    11    Q.  In what context have you heard it used? | 11    11   our forecast." |
| 12    12    A.  It's been used inside the company where | 12    12    Q.  Okay. |
| 13    13   somebody will say "This deal slipped, but I think I can | 13    13    A.  And we had the same conversation in Q2, by the |
| 14    14   fill it or cover it with another deal that we -- now | 14    14   way, 'cause I said by the early fall we knew there was |
| 15    15   looks like we'll be able to close." | 15    15   an economic concern out there.  We asked them all the |
| 16    16    So if that's what you mean by "backfilling" -- | 16    16   same questions.  We ended up overachieving our number, |
| 17    17   I'm guessing that's what you mean by "backfilling." | 17    17   so -- but it was a continual conversation. |
| 18    18    Q.  Okay.  And working off that definition of | 18    18    And I went so far as to put in the queue |
| 19    19   "backfilling," did you have any understanding of whether | 19    19   because the $64,000 question was, were we going to have |
| 20    20   or not the field had a problem backfilling deals in Q3 | 20    20   a really serious down point at some point in time? |
| 21    21   2001? | 21    21   Nobody knew. |
| 22    22    A.  No.  As I testified earlier, you know, there's | 22    22    Q.  When you were asking your field, the |
| 23    23   always deals slip, deals come in, there's always | 23    23   salespeople and I guess their managers, were you asking |
| 24    24   backfilling.  At the end of the day, what I care about | 24    24   them particularly whether or not they were going to make |
| 25    25   is "Are you going to make -- are you confident that this | 25    25   their numbers or were you asking other questions? |
| 207 | 208 |

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

```
1  00209:01    A.  Well, we always ask them "What -- what's the
2     02  business like; what's the trending; how are you doing
3     03  versus your competition; are people -- you know, are
4     04  customers concerned about the economy?"
5     05        You ask them all kinds of questions to get a
6     06  qualitative sense for what's going on up there.
7     07  Constantly do that.
8     08    Q.  What was the feedback on each of these points
9     09  that you just mentioned?
10    10    A.  Feedback which we got is "Yeah, I think people
11    11  are a little concerned about their business.  But
12    12  everybody's committed to these -- the orders because
13    13  people feel like they need the software to drive
14    14  productivity, to drive cost production in their
15    15  business."
16    16    Q.  Any other -- anything else that you recall at
17    17  this point?
18    18    A.  No.  No.
19    19    Q.  Do you recall reading anything about slowdown
20    20  in the telecom industry?
21    21    A.  Absolutely.  I described the dot-com meltdown.
22    22  Some of that related to telecom.
23    23    Q.  Okay.
24    24    A.  That meltdown started well before, a number of
25    25  quarters before.  So definitely there were things going
```

209

```
1  00210:01  on in the tech sector, specifically around dot-coms.
2     02  And telecoms were part of that.  Even the mature telecom
3     03  companies were all part of that dot-com phenomenon.
4     04    Q.  And you say you started to see that impact
5     05  prior to Q3 2001 -- or I'm sorry.
6     06    A.  I read the articles.
7     07    Q.  Let me rephrase that.
8     08    A.  I read things about the telecom industry.  I
9     09  think's what you're asking me.
10    10    Q.  Yeah.
11    11    A.  Definitely.
12    12    Q.  And were you starting to see any impact on
13    13  that slowdown in the telecom industry on Oracle starting
14    14  in Q3 2001?
15    15    A.  Q3 2001.  I don't remember.  I really don't.
16    16  I mean, clearly the so-called dot-coms, the smaller, you
17    17  know, little dot-com companies had clearly fallen.  We
18    18  were getting a substantial business that really was
19    19  evaporating by then.  Can't remember on telecom, per se.
20    20    Q.  Okay.  And do you recall -- you don't recall,
21    21  then, when they started -- when you started to see an
22    22  impact on the slowdown for telecoms?
23    23    A.  I can't remember exactly, no.
24    24    Q.  Now, speaking generally about the economy, did
25    25  you notice whether or not the economy was getting worse
```

210

```
1  00211:01  or staying stagnant or getting better in January 2001
2     02  compared to December?
3     03    A.  I don't remember exactly.  All I remember was
4     04  people were -- there were newspaper articles; there were
5     05  analysts all concerned about what was going to happen to
6     06  the economy.  But I don't specifically remember what
7     07  happened in January versus December.
8     08    Q.  Okay.
9     09    A.  We have an economist on our board, Michael
10    10  Boskin.  Asked him at the board meeting.  I went
11    11  through -- I tried anybody.  Nobody knew what was going
12    12  to happen to the economy.
13    13    Q.  Okay.  Stepping back a moment, there was a
14    14  board meeting in January 2001 --
15    15    A.  That's correct.
16    16    Q.  Let me finish my question.  Do you recall
17    17  discussing the issue of whether to halt trading at that
18    18  meeting?
19    19    A.  No.
20    20    Q.  You don't recall telling the SLC that that was
21    21  something that was discussed in the January 2001 board
22    22  meeting?
23    23    A.  Don't recall that.  What I recall -- and maybe
24    24  I did tell them, but what I recall was clearly
25    25  discussing the concern about the economy.  And that's
```

211

```
1  00212:01  what I alluded to, that even Michael Boskin was there.
2     02  But -- I said, "You know, we keep hearing from analysts,
3     03  we keep reading in the paper, about a concern about the
4     04  general economy.  I want you to know, we've been
5     05  talking" -- and Larry was there -- "we've been talking
6     06  to our guys.  As far as we can tell, it's still not
7     07  affecting us.  And our guys continue to believe even
8     08  though it's affecting PC and hardware, we're going to
9     09  come out relatively better because people need this
10    10  stuff.  And the thing I can't figure out is how bad it
11    11  bad.  And if this really gets bad, it's gotta have some
12    12  effect on us.  But I really don't know, you know, at
13    13  this point.  And nobody's forecasting it."
14    14        So definitely talked about it.  I don't
15    15  recall, per se, saying "Gee, I wonder if we should stop
16    16  trading."  I might have said, if I thought it was, we
17    17  should stop trading, but I don't think I asked anybody's
18    18  opinion whether I should stop trading.  I just kind of
19    19  reviewed the assumptions we were making on our forecast.
20    20        And as far as we could tell, you know, so far,
21    21  so good.  We were holding up.
22    22    MS. LAVALLEE:  Okay.  I'd like to mark as
23    23  Exhibit --
24    24    MR. SALPETER:  144.
25    25    MS. LAVALLEE:  -- 144 a document Bates-stamped
```

212

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

1    00213:01 CA-ORCL 021392 through 406.
2    02       (DC Exhibit No. 144
3    03       marked for identification).
4    04       MS. LAVALLEE:  Q.  Mr. Henley, can you take a
5    05  look at this document and tell me whether or not you see
6    06  a date on it.
7    07     A.  At the bottom it says "12/08/2000."
8    08     Q.  And if you look through the document, there's
9    09  handwriting throughout the document.  Can you tell me
10   10  whether that's your handwriting.
11   11     A.  There's one that says "six points" that
12   12  certainly looks like mine.
13   13     Q.  I'm sorry, the one that says what?
14   14     A.  Second page, it says "six points."
15   15     Q.  Okay.
16   16     A.  It's abbreviated "PTS."  It certainly looks
17   17  like my handwriting, yes.  The second -- page 396, that
18   18  handwriting, "tech pipeline for Jay," those are --
19   19  that's my handwriting, that's correct.
20   20     Q.  Okay.  Anything else on there?
21   21     A.  I didn't examine -- you're saying other pages
22   22  where there's handwriting?
23   23     Q.  Yes.  There's one on page 99.
24   24     A.  Yes, that's my handwriting.
25   25     Q.  Okay.

                                                    213

1    00214:01     A.  Yes.
2    02     Q.  And if I could turn to your attention the page
3    03  marked "96."  Okay.  You have some sentences written at
4    04  the bottom of the chart.  Can you read that for me,
5    05  please.
6    06     A.  "Tech pipeline for Jay down a lot
7    07  since this report, coms is the big upside,
8    08  Sprint, Verizon, AT&T, Bell South, NAS, no
9    09  big deals in pipeline."
10   10     Q.  And NAS refers to one of your divisions,
11   11  correct?
12   12     A.  Yes, the one that George Roberts oversaw --
13   13     Q.  Okay.
14   14     A.  -- in the U.S.
15   15     Q.  All right.  Referring to the "tech pipeline
16   16  for Jay down a lot since this report," was that
17   17  something that caused you any concern?
18   18     A.  Boy, I -- it must have, 'cause I wrote it and
19   19  then I put a question mark on the upside for Jay.
20   20     Q.  Okay.
21   21     A.  So again, when I go through these things, if I
22   22  hear things, I try to correlate them to what Jennifer's
23   23  put in here.
24   24     Q.  Right.
25   25     A.  And so I try to figure out, gee, he --

                                                    214

1    00215:01  apparently his tech pipeline's not as good.  Why does
2    02  he -- why does Jennifer think he has upside?
3    03     Q.  Okay.  Do you know when you would have written
4    04  these notes on this document?
5    05     A.  I don't know.  I assume fairly close to when
6    06  this report came out, but I have no idea.
7    07     Q.  Okay.  And the next sentence, "coms is the big
8    08  upside," what did you mean by that sentence?
9    09     A.  Jay had a number of what we call vertical
10   10  pieces to his number.  And one of them was he ran the
11   11  communications business, the telco sector.  So I think
12   12  what I meant was that there were a number of large deals
13   13  that quarter he hoped to close with Sprint, Verizon,
14   14  AT&T and Bell South.
15   15     Q.  Was that where he was looking for his upside?
16   16     A.  Yes.
17   17     Q.  Okay.
18   18     A.  I assume.  I assume that's what the note
19   19  meant.
20   20     Q.  Okay.  And Jay runs OSI; is that correct?
21   21     A.  That's correct.
22   22     Q.  Or ran OSI during that period.
23   23     A.  Ran OSI, that's correct.
24   24     Q.  "NAS, no big deals in pipeline," was that
25   25  something that caused you any concern at the time?

                                                    215

1    00216:01     A.  No, that's actually good.  The difference
2    02  between Jay's number and OPI versus George were they had
3    03  the larger customer.  So those -- there were more
4    04  so-called larger deals.
5    05      What George identified was that there was no
6    06  big, big deals he had to close.  He just had, obviously,
7    07  a lot of deals to close.  But in theory, if he had a
8    08  normal conversion rate, there should be less risk to his
9    09  number.
10   10     Q.  Okay.  I'd like to show you a document that
11   11  was previously marked as DC-108.  This is a document
12   12  that's Bates-stamped CA-ORCL 9732 through 9735.
13   13     A.  Yes.
14   14     Q.  Can you tell me whether or not this is the
15   15  actual results e-mail that we had discussed earlier
16   16  today.  This is the type --
17   17     A.  Appears to be.  Typically Larry would --
18   18  Garnick would e-mail us the actuals, and that would be
19   19  followed some days later with a hard copy, very detailed
20   20  report of the actual results.
21   21     Q.  And do you believe that you actually
22   22  received -- you're listed as recipient -- a copy of this
23   23  document on or about January 17th, 2001?
24   24     A.  Yes.
25   25     Q.  Okay.  I'd like to draw your attention to the

                                                    216

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00217:01 second sentence under the first bullet point.  It says,
02      "However, excluding the 60 million
03  Covisint license deal, the USD growth rate
04  would have been only six percent."
05      And then the next sentence reads,
06      "Excluding Covisint, OPI license
07  revenue growth would have been negative
08  85 percent."
09      Is that a correct reading of what the document
10 says?
11  A.  Yes.
12  Q.  Can you tell me why Mr. Garnick provided this
13 information when he states he excluded the Covisint
14 license deal?
15  MR. SALPETER:  Objection to form.
16  You may answer.
17  THE WITNESS:  Yeah, as I said earlier, it is a
18 large -- very large -- largest transaction -- single
19 license deal we ever did.  And typically these larger
20 deals happened in the third month.
21  So, you know, clearly there's a apples and
22 orange thing.  And so he just excluded the whole thing.
23 Whether there was a few larger -- large deals in the
24 prior year, I don't remember.  But he just said, look,
25 this is so big, if you look at it -- excluding that,

217

00218:01 typically it would have fallen in the third month.  We
02  got off to a slow start relative to our forecast of
03  25 percent for the third quarter.
04  MS. LAVALLEE:  Q.  Okay, I'm not sure I
05  understand from your answer precisely what you're
06  saying.  So I'm going to ask you another question.
07  Are you saying that basically that it was such
08  a large deal that it could skew the growth rate; is that
09  what you're saying?  The year over year growth rate, or
10  am I mischaracterizing it?
11  A.  Yes.  You -- you -- he's pointing out that
12  it's not normal to get a huge deal like this anytime,
13  but particularly in the first month of the quarter.  So,
14  you know, you ought to really look at this without this
15  deal and see what how we started off the quarter.
16  Q.  Okay.  So looking at it without the Covisint
17  deal would give us a better picture of how you're
18  starting your quarter?
19  A.  Yeah, absolutely.  It would give you a more
20  accurate -- I think it's dis -- it is distorted, you
21  know.  And if he didn't do it, I would have asked him to
22  do it, 'cause clearly you want to understand what the
23  number ex-Covisint was.
24  In a perfect world, he should have gone back
25  and excluded any other large deals, 'cause we don't

218

00219:01 usually have them.  If there were, he should have pulled
02  them out.  But he didn't bother to do that.
03  Q.  And do you know as of this date whether or not
04  there were any other deals in the pipeline for Q3 2001
05  that were as large as the Covisint deal?
06  A.  No, there weren't.
07  Q.  Okay.  Were there other deals that you would
08  characterize as atypical or significant large deals that
09  would be out of the norm in the pipeline for Q3 2001?
10  A.  Well, there are always -- and certainly during
11  this period, there were a collection of big deals, deals
12  over 5-, $10 million.  And what I always chose to do is
13  the Street was, not single out one deal, was I always
14  religiously reported the percentage of large deals as a
15  percentage of our total license revenue.
16  So, you know, the Covisint was certainly a
17  large deal.  Whether the aggregate of all of our large
18  deals together was any different or more unusual than
19  any other quarter, I don't know.
20  Q.  Okay.  And when you say you reported that to
21  the market, are you referring now to when you had actual
22  results --
23  A.  Yes.
24  Q.  -- at the end of a quarter?
25  A.  At the end of a quarter, I always said -- and

219

00220:01 this went back to when I first started.  I always felt
02  that if a quarter had more or less big deals, it could
03  distort the run rates or something.
04  So I always reported the percentage.  And I
05  chose the number half a million.  Obviously this is well
06  above that.  And we had these big, big deals that tended
07  to be, you know 5-, 10 million and plus.  There's not a
08  ton of them, but there's some.
09  And so I always reported what the percentage
10  of deals over half a million were, and so they had some
11  perspective -- and I was comparing that to a year ago,
12  so forth -- so they had some perspective of whether
13  large deals were distorting our numbers or not.
14  Q.  Okay.  And were you concerned about the actual
15  figures for December 2000 as when you read this e-mail?
16  A.  No.
17  Q.  You had no concerns?
18  A.  In a perfect world, I would love to start off
19  with a hundred percent.  The reality is the first
20  quarters, based on history, have very little correlation
21  how we do for the quarter.  They tend to be very low in
22  terms of contribution for the quarter.
23  I always look at the data.  In a perfect
24  world, the bigger, the better.  Don't get me wrong.  But
25  we've had quarters where we started off bad and ended up

220

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

| | |
|---|---|
| 1  00221:01  with a bang.  We've had some quarters where -- we've had | 1  00222:01  Typically do you recall whether or not the December as |
| 2  02  some quarters where we start high, in terms of growth | 2  02  the first month of the third quarter represented a |
| 3  03  rate, and end up well below that for the quarter. | 3  03  larger percentage of the first -- of the final actual |
| 4  04  So didn't have any unusual concerns about it, | 4  04  results for the quarter than other first months did |
| 5  05  no. | 5  05  historically? |
| 6  06  Q.  Okay.  And did the first month of December -- | 6  06  A.  I don't remember. |
| 7  07  did the first month for the third quarter of a year | 7  07  MS. LAVALLEE:  Okay.  Actually, I think I'd |
| 8  08  typically average to a certain amount -- percentage of | 8  08  like to take a four-minute or three-minute break. |
| 9  09  the quarter?  When you looked back historically, did it | 9  09  THE VIDEOGRAPHER:  This marks the end of |
| 10  10  run a particular range generally? | 10  10  videotape number 3 in Volume I in the deposition of |
| 11  11  A.  As I said earlier, I'm recalling -- I gave you | 11  11  Jeffrey Henley on March 2nd, 2004.  We're going off |
| 12  12  a rough range of 15 to 20 -- and again, it could be | 12  12  the record.  The time is 3:23. |
| 13  13  different in various quarters.  So there was a range. | 13  13  (Recess taken). |
| 14  14  It's not ten to 50, or something like that.  But there | 14  14  THE VIDEOGRAPHER:  This marks the beginning of |
| 15  15  isn't a tight little number, every quarter you can count | 15  15  videotape number 4 in Volume I in the deposition of |
| 16  16  on a certain percentage coming in the first quarter. | 16  16  Jeffrey Henley on March 2nd, 2004.  We're going back |
| 17  17  But I did tell you it's always -- typically | 17  17  on the record.  The time is 3:31. |
| 18  18  it's the lowest month usually.  It's the lowest -- that | 18  18  MS. LAVALLEE:  Q.  Okay, Mr. Henley.  I'd like |
| 19  19  first month is usually the lowest.  The quarter tends to | 19  19  to mark as Exhibit No. -- oh, I'm sorry.  This is a |
| 20  20  build, and then there's a very significant | 20  20  document that has been previously marked as DC-109.  And |
| 21  21  disproportionate amount that happens in the last month. | 21  21  if I could ask you to take a look at the document and |
| 22  22  And certainly the bulk of that happens in the last | 22  22  then identify it for the record. |
| 23  23  couple of days of the quarter. | 23  23  A.  So it says "December flash report," dated |
| 24  24  Q.  Okay.  Now, speaking now -- you mentioned | 24  24  January 17th. |
| 25  25  something that you referred to as seasonality earlier. | 25  25  Q.  Okay.  And is this a document -- |

| | |
|---|---|
| 1  00223:01  A.  2001, sorry. | 1  00224:01  Exhibit No. -- |
| 2  02  Q.  And is this a document that you received on or | 2  02  MR. SALPETER:  108.  The Garnick thing? |
| 3  03  about January 17th, 2001? | 3  03  MS. LAVALLEE:  Yeah. |
| 4  04  A.  I'm sure I got it right after, sure. | 4  04  MR. SALPETER:  108. |
| 5  05  Q.  Okay.  And if I look at this document | 5  05  MS. LAVALLEE:  Thanks. |
| 6  06  correctly, I see there's a fair bit of historical data | 6  06  Q.  In the third bullet point, he indicates that, |
| 7  07  in terms of year over year growth rates, and it's | 7  07  "December license results represent |
| 8  08  divided up by month. | 8  08  19 percent of the total forecast for Q3" -- |
| 9  09  A.  Mm-hm. | 9  09  A.  Okay, sure, mm-hm. |
| 10  10  Q.  Okay.  Now, in his e-mail, Mr. Garnick has | 10  10  Q.  -- "Q3 FY '01." |
| 11  11  given numbers for what percentage of the quarter the | 11  11  A.  Right. |
| 12  12  December actuals represented. | 12  12  Q.  And then he refers to, "In FY '00 and |
| 13  13  A.  Mm-hm. | 13  13  FY '99, December represented 16 and |
| 14  14  Q.  Would he have derived that from this chart, to | 14  14  19 percent respectively of the quarter |
| 15  15  your -- is that your understanding? | 15  15  total." |
| 16  16  A.  I don't know.  It may well.  I mean, | 16  16  A.  Right. |
| 17  17  clearly -- got it somewhere.  But it could well have | 17  17  Q.  Can you tell me why he engaged in this |
| 18  18  been here. | 18  18  analysis? |
| 19  19  Q.  Okay. | 19  19  MR. SALPETER:  Objection to form. |
| 20  20  A.  This is a report I've -- format I've looked at | 20  20  MS. LAVALLEE:  Or let me ask a different |
| 21  21  for a number of years. | 21  21  question. |
| 22  22  Q.  And this is a document that you rely on? | 22  22  Q.  Can you tell me why it is that this is |
| 23  23  A.  Definitely.  It's another one of the many | 23  23  something the company considered, if at all it was? |
| 24  24  things I look at to give me perspective. | 24  24  A.  Again, there's a variety of analysis we do to |
| 25  25  Q.  Okay.  In the third bullet point on | 25  25  kind of get some perspective on how well we started the |

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

| | |
|---|---|
| 00225:01 quarter, what percentage it was, based on norms, | 00226:01     Q.   Okay. |
| 02 historic, so forth. | 02     A.   When I look at things, I'm always interested |
| 03        I might add, as I acknowledged earlier, he | 03 in getting some perspective.  And I thought the Covisint |
| 04 culled out Covisint.  And again, that's entirely | 04 point he made was absolutely right on.  But I didn't |
| 05 appropriate in terms of looking at the business absent | 05 want you to think that it wasn't important. |
| 06 Covisint.  But it's -- it is a zero.  Something came in | 06        I mean, it -- it -- it -- we got off to a slow |
| 07 the end.  There's $60 million.  If you want to exclude | 07 start irrespect -- you know, excluding Covisint.  But |
| 08 it now, it still comes in the quarter.  So, you know, if | 08 the good news is there was $60 million that was real. |
| 09 you want to take it out of the first quarter to kind of | 09 And if you don't want to take it in the first month, |
| 10 look at everything else, that's interesting, but then | 10 that's great, but then it gets added in the last month. |
| 11 add it back for the whole quarter. | 11     Q.   Okay.  We've got to remember to slow down -- |
| 12        So it was one of the rocks that we relied on | 12     A.   Yeah. |
| 13 in our whole forecast as to why we were pretty confident | 13     Q.   -- for the court reporter. |
| 14 we'd make 20, 25 percent, 'cause we had a head-start | 14     A.   Yeah. |
| 15 with a very large Covisint deal that we knew we had. | 15     Q.   All right.  And can you tell me when -- the |
| 16     Q.   Okay.  Mr. Henley, I guess my question related | 16 third bullet point, would you be able to -- actually, |
| 17 to the third paragraph.  Is there -- do you have any | 17 strike that. |
| 18 understanding as to whether or not Mr. Garnick was | 18        Let me mark -- no, wrong one.  We'll wait. |
| 19 taking out Covisint in his analysis of what he said in | 19        I'm going to ask you to take a look at another |
| 20 the third point? | 20 document that has previously been marked -- |
| 21     A.   I don't think so.  But we talked earlier about | 21        (Inaudible discussion.) |
| 22 the Covisint being excluded in the first bullet. | 22        MS. LAVALLEE:  Q.   -- as DC-110. |
| 23     Q.   Okay.  So you're just going back to earlier | 23     A.   Which is DC-110? |
| 24 testimony? | 24        MR. SALPETER:  She's going to hand you a new |
| 25     A.   Yeah. | 25 one. |

| | |
|---|---|
| 00227:01        THE WITNESS:  Oh, new one.  Okay.  New one. | 00228:01 the third bullet point, |
| 02        MS. LAVALLEE:  Here you are, Mr. Henley. | 02        "January QTD license results |
| 03     Q.   And after you've had an opportunity to look at | 03        represents 36 percent of the total forecast |
| 04 the document, which is Bates-stamped ORCL 0020831 | 04        for Q3 FY '01.  In FY '00 and FY '99, |
| 05 through 33, can you tell me what it is. | 05        January QTD represented 33 percent and |
| 06     A.   This is the -- a report -- e-mail from Larry | 06        38 percent respectively of the quarter |
| 07 Garnick a month later, approximately, February 8th, | 07        total." |
| 08 that gave another quarterly update.  And we typically | 08        Do you see that? |
| 09 did this on a quarter to date.  So this now was the | 09     A.   Yes. |
| 10 January quarter to date, which incorporates the first | 10     Q.   Do you have any understanding as to whether or |
| 11 two months' actual results for the company. | 11 not he was comparing the results to the actual total |
| 12     Q.   Okay.  And let me ask you a question, | 12 forecasts or to the total pipeline numbers there? |
| 13 Mr. Henley.  Did you have any discussions with anybody | 13     A.   You're speaking of the third bullet? |
| 14 regarding your testimony here today during any of the | 14     Q.   Correct. |
| 15 breaks? | 15     A.   I don't think he's talking about the pipeline. |
| 16     A.   No. | 16     Q.   I'm sorry, potential number. |
| 17     Q.   Okay. | 17     A.   He was using the forecast.  He was comparing |
| 18     A.   Other than I complained it seemed like we're | 18 the first two months' actuals to whatever the forecast |
| 19 taking an awful long time to get to the point, but ... | 19 was at the time for the quarter. |
| 20     Q.   In the first bullet point, Mr. Garnick does a | 20     Q.   Okay. |
| 21 similar analysis what he did in the prior month [sic]. | 21     A.   And then -- excuse me.  In the prior years I |
| 22 And here again, he excludes the Covisint deal to | 22 believe he'd be comparing the actuals for the first two |
| 23 determine some growth rate figures; is that correct? | 23 months as compared to the actual for the full quarter |
| 24     A.   That's correct. | 24 that we know retrospectively happened. |
| 25     Q.   And again, I'd like to draw your attention to | 25     Q.   Okay.  Now, you testified earlier that the |

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

```
 1  00229:01  first month of the quarter doesn't provide, necessarily,
 2    02  a good picture for you of where the quarter will end up
 3    03  because sometimes you have a situation where you have a
 4    04  slow first month, but yet you make your numbers.
 5    05      Would you say that that's true also -- results
 6    06  for both your first and second months?
 7    07   A. Yes.
 8    08   Q. Okay.
 9    09   A. There is not a tight correlation.  But clearly
10    10  the more you can get done early in the -- earlier in the
11    11  year, the less you have to do at the end of the final
12    12  month.
13    13      Again, I'll make the same point to you about
14    14  Covisint, though.  If you want to take the approach of
15    15  excluding it, which Larry did here, which I understand
16    16  why he did, and I thought it made some sense, you also
17    17  have to consider that it then helped us make up the
18    18  difference in the third month.
19    19   Q. Okay.  And in terms of where you were at the
20    20  end of this January 2001 on your actual figures --
21    21  strike that.  Let me ask you a different question.
22    22      Although you say that you're not so concerned
23    23  about where the first and second month end up in terms
24    24  of actual figures, does there sometimes come a time when
25    25  the first and second month actuals are so low that it
```

229

```
 1  00230:01  creates a problem in terms of the amount of pressure it
 2    02  puts on generating revenue for the third month of a
 3    03  quarter?
 4    04   MR. SALPETER:  Objection to form.
 5    05      THE WITNESS:  I don't know about the word
 6    06  "pressure," but I think as I testified earlier, I mean,
 7    07  the more you can get in the first two months, the
 8    08  better.  I mean, the more you got in the drawer versus
 9    09  what you need for the quarter, the better.  There's
10    10  obviously less you have to do the third month to make
11    11  your forecast.
12    12      And I suppose if you carried it to the absurd
13    13  and you had nothing in the first two months, then you
14    14  would have an almost impossible hill to climb at some
15    15  point.
16    16      But I mean, there have been -- there have been
17    17  variations over time, and there's been times we've
18    18  started off well, and yet we just have a lot of
19    19  disappointment in the last month, and other times where
20    20  we started off poorly the first month -- even the second
21    21  month we were running under what we'd like to have had,
22    22  and then we sort of make it up in the last month.
23    23      But, I mean, it's not that we don't look at
24    24  it.  We clearly look at it.  But still gets back to,
25    25  okay, well, you can exclude Covisint, but then I've got
```

230

```
 1  00231:01  a 60-million bogey that helps me fill up the bigger
 2    02  requirement now in the third month, if you want to look
 3    03  at it that way.
 4    04   MS. LAVALLEE:  Q. Okay.  And let's say you're
 5    05  faced with the situation where the percentage of actual
 6    06  revenues that are generated in the first and second
 7    07  month of a quarter are low.
 8    08      Do you -- does that cause some concern that
 9    09  you actually look to see whether or not items in the
10    10  pipeline seem to be strong and whether you look at some
11    11  of the other indicators to ensure that you feel
12    12  comfortable that you would be able to make the revenue
13    13  in the third quarter?
14    14   A. Yeah, sure, definitely.  The lower it is, the
15    15  more I would probably press people "Are you sure about
16    16  your forecast, are you sure that you'll catch it up,"
17    17  and that sort of thing.
18    18   Q. And would you be looking, then, at things like
19    19  pipeline, pipeline conversion rates, and other factors
20    20  that we discussed earlier today?
21    21   A. Yes, and also just talking to the guys.  They
22    22  have the best knowledge of their pipelines.  They have
23    23  weekly meetings with all their people.  So ultimately
24    24  pressing the senior managers who run these businesses
25    25  to, you know, say, you know, "Gee" -- remember those
```

231

```
 1  00232:01  conversations over the years.  "You started off bad in
 2    02  the first month and now you're going to make it up," and
 3    03  that sort of thing.  So clearly have had those
 4    04  conversations a number of quarters [sic].
 5    05   Q. Okay.  And then you -- do you also look to see
 6    06  what Ms. Minton is doing in terms of her upside?
 7    07   A. Look -- I mean, she comes back to me with
 8    08  updates every forecast.
 9    09   Q. So would -- if she was projecting no upside,
10    10  you were faced with that situation, would that be
11    11  something you would look into?
12    12   A. Again, when you say "upside," see, there are
13    13  times when -- there are periods over the years where she
14    14  might have negative -- to use your word "upside" -- I
15    15  call it judgment.
16    16   Q. Okay.
17    17   A. Her role is to try to figure out what does she
18    18  really think is going to happen in different revenue
19    19  lines, different expense items, so I can have a view --
20    20  and she shares it with Larry, and so forth -- as to
21    21  what, in her opinion, based on conversations with
22    22  finance people, her best guess how things will turn out.
23    23   Q. Okay.  Mr. Henley, I am going to show you a
24    24  document previously marked as DC Exhibit 47.  And can
25    25  you take a look at this document, and then once you've
```

232

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00233:01 had a chance to review it, tell me whether you've ever
02 seen it before.
03     A.  I don't recollect.  I'm not shown as a copy,
04 but that doesn't mean somebody couldn't have given me
05 hard copy.  But I don't recollect seeing this.
06     Q.  Okay.  Do you recall ever learning the
07 information contained in this e-mail?  And you can take
08 a moment to read it.
09     A.  I'd have to read it again.
10         I've now read it.
11     Q.  Can you tell me whether or not you recall
12 learning of any of the information provided in this
13 e-mail?
14     A.  If I'm learning what?
15     Q.  If you ever learned any of the facts set forth
16 in this e-mail in about December, January of 2001.
17     A.  I don't -- I don't recall.  I mean, I clearly
18 talked to George in the EC meetings.  And whether he
19 coordinated these facts or not, I don't know.
20     Q.  The second paragraph says "Slow start in FY
21 '01."  And then it says,
22         "A growth comparison to last year have
23 been relatively easy in the first two
24 quarters as we did not perform that well a
25 year ago."

233

00234:01     Can you explain to me whether you have any
02 understanding as to what the author was talking about
03 here?
04     A.  I absolutely have understanding of that.  When
05 you -- when analysts -- and internally -- external
06 analysts -- we always look -- when you look at
07 comparisons, you have to take into account unusual
08 things, if they're distortions, like if you had a
09 disastrous year ago, then your comparison might look
10 better on a relative basis, or if you had a terrific
11 year where you just way exceeded, you would have what we
12 call a tough comparison.
13         So you can't take a percentage face blank.
14 You have to understand what you're comparing to.
15     Q.  Right.  And do you have any recollection of
16 how you -- Oracle performed in Q3 2000?
17     A.  I don't.  But after reading this, apparently
18 NAS, according to David, had had a -- this is Q2.
19     Q.  Q3, I asked.
20     A.  Q3.  No, he says the comparisons were tougher
21 in Q3 and Q4.
22         My recollection was that was still in the
23 dot-com boom and we were still doing really well.  So
24 part of George's businesses got a lot of benefits out of
25 dot-coms.  So that comparison was definitely -- that

234

00235:01 part of it would have been tougher.
02         And I kind of talked about that earlier,
03 'cause by the summer, the dot-com boom was dissipating.
04 We were seeing significant negative growth coming out
05 year over year in the dot-com section.  Maybe -- perhaps
06 that's what he's referring to.
07     Q.  Okay.  So is it fair to say that going into Q3
08 2001, that the -- achieving the growth rates was more
09 difficult for that quarter --
10     A.  According to David.
11     Q.  Let me finish my question -- for Q3 was more
12 difficult than it would have been -- than it was in Q2,
13 based on the historical growth rates for those
14 respective quarters?
15     A.  I don't recall.  David said it was.  He's a
16 good guy, probably right.  But I don't particularly
17 recall that.
18     Q.  Okay.  In the next paragraph, he refers to the
19 fact that,
20         "Note that we have only one deal
21 greater than 5 million currently in the Q3
22 pipe.  Last year we had four deals and
23 netted 28 million."
24         Am I accurately reading what the statement is?
25     A.  Yes, I believe so.

235

00236:01     Q.  And --
02     A.  That's what I read too.
03     Q.  Was that something that caused you any
04 concern -- strike that.
05         Were you aware of this fact?
06     A.  Honestly, I don't remember.
07     Q.  Okay.
08     A.  I really don't.
09     Q.  Okay.
10     A.  But that -- that would -- you know, that --
11 that would be a comparison issue.  So again, if you had
12 more large deals a year ago, it makes it harder to
13 achieve your growth rates and so forth.
14         But that's all factored into the forecast.
15 That's -- all this gets factored into whatever they
16 forecast.  And it gets into explaining why they would
17 forecast a different number than you might think on the
18 surface or something.
19     Q.  Okay.  If I could turn your attention to the
20 next page of the document, the second page,
21 Bates-stamped 122385.  And it's the fourth point.  It
22 says, "Q3 pipe not where it needs to be."
23         Do you have any understanding of what was
24 going on there?
25     A.  Again, I'm speculating -- well, based on a lot

236

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

1  00237:01  of knowledge, but I'd be speculating to say that, you
2      02  know, they're like anybody else we've discussed today.
3      03  They have a certain pipeline. They have certain
4      04  historical conversion rate. So the bigger the pipeline,
5      05  the better the chance of making a certain forecast,
6      06  right?
7      07  Q. Okay.
8      08  A. So I'm speculating he would -- he would -- at
9      09  that very early stage in the quarter would hope that
10     10  they'd have a higher pipeline. Now, as they scrub the
11     11  pipeline, maybe more stuff comes in, whatever.
12     12  And I think that's also part of the
13     13  speculation, that he felt like, based on conversations,
14     14  that maybe the next time he looked at the pipeline in a
15     15  couple of weeks, things -- he'd actually see it grow.
16     16  That's happened before.
17     17  Q. Okay. And sitting here today, you don't have
18     18  any understanding as to whether or not that occurred, do
19     19  you?
20     20  A. I don't -- I don't remember.
21     21  Q. Okay.
22     22  A. In fact, in rereading it, he does say the
23     23  point that I made,
24     24  "Given the past trends, GB major
25     25  should add incremental pipe during next

237

1  00238:01  three weeks."
2      02  As they sort of went to their management
3      03  meetings and got down to the details of the deal and,
4      04  you know, reclassified dates, that was typical many
5      05  times that the management would kind of go through the
6      06  deals. Some deals would slip; some deals would come in.
7      07  Q. Okay. And the sentence right before that is,
8      08  "I think we need another 50 million of
9      09  apps and nearly 70 million of tech to feel
10     10  statistically comfortable to hit our Q3
11     11  budget."
12     12  Do you have any understanding of what he was
13     13  talking about there? And I don't want you to speculate.
14     14  A. Again, as I say, he said "Based on conversion
15     15  history -- it's quite clear that based upon my
16     16  conversion rates that I've been running, to hit the
17     17  forecast I would need some more pipeline."
18     18  Then he goes on to say,
19     19  "Given the past trends, GB and major
20     20  should add incremental pipe during the next
21     21  three weeks."
22     22  Q. Right, but sitting here today, you have no
23     23  idea whether or not that occurred after that?
24     24  A. I don't recall.
25     25  Q. Okay. Going to show you another e-mail from

238

1  00239:01  Mr. Winton, which is dated January 11th, 2001 and was
2      02  previously marked as DC-48. And if I could ask that you
3      03  take a look at the document and then tell me whether or
4      04  not it's a document you've ever seen before.
5      05  A. Again, I'm not copied. I doubt I saw it, but
6      06  I don't know.
7      07  Q. And sitting here today, do you have any
8      08  understanding as to whether or not any of the
9      09  information contained in this report was something that
10     10  you learned during the January -- on or about
11     11  January 11th, 2001?
12     12  A. Well, let me read the thing fully.
13     13  Q. Please.
14     14  A. Okay. I've now read it. So what was the
15     15  question?
16     16  Q. Okay. Let me -- well, let me go back.
17     17  My question was did you ever learn of any other
18     18  facts set forth in this memo or this e-mail in
19     19  January 2001, to the best of your recollection?
20     20  A. Again, I don't recall seeing the e-mail.
21     21  George was giving us comments in the EC meetings.
22     22  Jennifer was talking to David Winton. So I was getting
23     23  all kinds of -- this specific stuff, I don't remember.
24     24  Q. Okay. And second paragraph -- no, the third
25     25  paragraph says, "The pipe has not grown as we had

239

1  00240:01  anticipated."
2      02  Was that something that you were aware of? Do
3      03  you know whether or not the pipe in -- well, let me step
4      04  back.
5      05  Mr. Winton's in which division of the company?
6      06  A. He's in NAS.
7      07  Q. Okay. And are you aware --
8      08  A. Worked for George Roberts.
9      09  Q. Okay.
10     10  A. Or I guess he reported to him. He reported to
11     11  Jennifer Minton as well.
12     12  Q. And what was his position at the company?
13     13  A. He was -- I don't know the title. Finance
14     14  manager, something like that. But the finance analyst,
15     15  manager, had a series of analysts working for him that
16     16  supported NAS, doing forecasting, budgeting, that sort
17     17  of thing.
18     18  Q. And again, the sentence "The pipe has not
19     19  grown as we anticipated," do you have any recollection
20     20  of whether or not that was something that you were aware
21     21  of in Q3 2001, or in January -- middle of January 2001?
22     22  A. Certainly, as I testified earlier, I was
23     23  getting forecast information that included pipeline
24     24  information every couple of weeks.
25     25  I wasn't always checking how that varied to

240

Henley, Jeffrey O. (Vol. 01) - 03/02/2004   3/2/2004   8:51:00 AM

```
 1   00241:01  the last report.  But I was certainly getting pipeline
 2      02  information.
 3      03        And as I testified earlier, some of the
 4      04  pipeline data we got starting -- in total, at least, I
 5      05  was somewhat suspect.  I somewhat didn't quite believe
 6      06  our total pipeline, whether it was in NAS or not, was
 7      07  quite as strong 'cause it was unbelievably strong.
 8      08        And that was part of the reason why we set a
 9      09  forecast that was -- at 25 percent -- that was --
10      10  somewhat discounted that.
11      11     Q.  Okay.  And this sentence actually says that
12      12  "The pipe has not grown as we anticipated."
13      13        So was there some expectation that the
14      14  pipeline for N-A-S would -- or for NAS would grow?
15      15     A.  Again, I don't -- didn't have an expectation.
16      16  According to the previous e-mail you showed me, he did.
17      17  So he said "In three to four weeks, we anticipate, based
18      18  on history the last couple quarters, this will grow."
19      19  Apparently it didn't.
20      20     Q.  Okay.  The next point, 2, says,
21      21        "Lack of big deals.  Unlike Q1 and Q2,
22      22     we have few big deals in this case that
23      23     could drive us past the 360 million
24      24     line" -- pardon me -- "past the 360 line."
25      25        Do you have any understanding of what he was
```

241

```
 1   00242:01  talking about there?
 2      02     A.  Sure.  I mean, again, as we talked earlier,
 3      03  apparently there were several big deals they'd closed
 4      04  the year before.  In looking at his pipeline, he just
 5      05  didn't have those three or four similar-size big deals.
 6      06        But that, again, should have been reflected
 7      07  from the get-go in his forecast.  And I think he
 8      08  continued to reflect the fact in terms of what he
 9      09  thought he would do for the quarter.
10      10     Q.  Okay.  And the next point says,
11      11        "Drop in technology.  As reflected in
12      12     the softening pipe, both the GB and majors
13      13     see a slowdown in both Q3 and Q4."
14      14        Do you have any recollection about this
15      15  occurring?
16      16     A.  We started seeing a slowdown in majors --
17      17  well, you said GB and majors?
18      18     Q.  Yes.
19      19     A.  Okay.  We started seeing a slowdown in GB,
20      20  which is where the dot-coms were, and had continued to
21      21  see that.  And we were still kind of trying to find the
22      22  bottom --
23      23     Q.  Okay.
24      24     A.  -- for a year.  So every quarter I kept
25      25  hearing about "We think we're at the bottom," and then
```

242

```
 1   00243:01  every quarter kept -- kept -- kept doing worse and
 2      02  worse.
 3      03     Q.  And what about majors?
 4      04     A.  No, that -- that bounced around.  So I
 5      05  wouldn't say that -- that's not where the dot-coms were.
 6      06     Q.  Okay.  Do you recall seeing the slowdown that
 7      07  he's referring to in majors in Q3?
 8      08     A.  At the end of the quarter, I did.
 9      09     Q.  But you don't recall it as of the date --
10      10     A.  I don't recall.
11      11     Q.  -- of this e-mail?  Let me finish my question.
12      12     A.  No.
13      13     Q.  Mr. Henley, I'm going to show you a document
14      14  that has previously been marked as DC-56 in this
15      15  litigation.  This is a document Bates-stamped ORCL
16      16  0045571, and it appears to be an e-mail from Jim English
17      17  to Jennifer Minton, dated January 17th, 2001.
18      18        Can you tell me whether or not you've ever
19      19  seen this e-mail before today.
20      20     A.  Again, I'm not copied on it.  Doesn't mean
21      21  that somebody might not get it.  But typically I
22      22  wouldn't get these e-mails.  Jennifer Minton would kind
23      23  of filter all these things, reflect that in her upsides,
24      24  her downsides, her judgment, give me sort of highlights
25      25  of things.
```

243

```
 1   00244:01     Sure.  Can I ask you to take a moment to read
 2      02  the e-mail, please.
 3      03     A.  Okay.
 4      04     Q.  Okay.  Do you recall learning any of the facts
 5      05  set forth in this in or about January 17th, 2001?
 6      06     A.  Again, I testified I don't.
 7      07     Q.  Okay.
 8      08     A.  From this particular e-mail?
 9      09     Q.  Yes.
10      10     A.  I testified that this stuff is filtered
11      11  through Jennifer Minton.  She may have mentioned a
12      12  couple of points.  Sandy Sanderson, his -- ran OPI; this
13      13  was the finance man -- may have reported some of this
14      14  stuff.  But I don't remember anything specifically
15      15  coming from this e-mail.
16      16     Q.  Okay.  That was my question.
17      17     A.  Right.
18      18     Q.  Okay, thank you.  In the second paragraph, the
19      19  second sentence says,
20      20        "If you pull Covisint from pipe, apply
21      21     our week 7 FY '00 coverage rate and then
22      22     add Covisint back in, you get 170M,"
23      23     million, I assume that reads.
24      24     A.  Yes.
25      25     Q.  Can you explain to me what Mr. English was
```

244

Oracle Related Cases

Page  241 - 244

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00245:01  doing there by pulling out?
02      MR. SALPETER: Objection to form, asking the
03  witness to mind-read.
04      MS. LAVALLEE: Q.  Do you have any
05  understanding of what -- what he was doing there?
06      A.  Well, I think -- I think what he probably was
07  doing was saying "Look, Covisint came in early in the
08  quarter rather than late.  So let me exclude that.  And
09  say all the other big deals we have, let's apply a
10  normal conversion rate to them, you know.  And then at
11  the end, I'll add back what I know from Covisint."
12      And that would be, according to this e-mail,
13  potentially 170.
14      Q.  Okay.  So what he was doing was compensating
15  for the fact that this was an outlier deal and a very
16  large deal that was out of the ordinary, and then -- but
17  putting it back in at the end to factor in the fact that
18  it existed and therefore would be counted in at the
19  end-of-the-year -- -quarter results; is that correct?
20      A.  Yes.
21      Q.  Do you think that's a reasonable analysis?
22      A.  Sure, I think that's one way to analyze.  If
23  you have a lot of deals still pending, sort of take the
24  Covisint out, let's look at all my normal deals.  But --
25  but it's -- it's a little bit extreme because we do

245

00246:01  occasionally get big deals in the first or second
02  quarters.  Not this big, but I mean, so --
03      But it's a -- it's a technique.  Again,
04  it's -- it's one of a variety of ways to analyze the
05  business to try to get a handle around the range of
06  possibilities.
07      Q.  Okay.  All right.  In the first paragraph it
08  says,
09      "When you asked for a forecast revenue
10      summary, I should have asked what you were
11      looking for.  I hope this helps."
12      Do you have any understanding why Ms. Minton
13  was asking Mr. English to provide her with this
14  information at this point in time in the quarter?
15      MR. SALPETER: Objection to form.
16      THE WITNESS: I have no idea.  I mean, again,
17  you know, we go back and drill people.  I told you I was
18  drilling extra hard in this month of January at the EC
19  meetings.  So perhaps Jennifer was also going back --
20  assume she was -- you know, and trying to get more --
21  pressing the guys.
22      But she always does.  Whenever they give
23  forecasts, she's always talking to the field.  So I -- I
24  suspect that's what she was doing.
25      MS. LAVALLEE: Q.  Okay.  The next sentence --

246

00247:01  or the last sentence of the second paragraph reads,
02      "We have a lot of pipe at challenging
03      clients."
04      Do you have any understanding as to whether or
05  not -- well, let me ask a different question.
06      Do you have any understanding of what
07  Mr. English was talking about there?
08      MR. SALPETER: Objection to form.
09      THE WITNESS: Again, he kind of clarifies it,
10  I think.  He -- he's talking about companies that have
11  announced pending layoffs, although they were -- says
12  they were reported to do well and then somebody -- GM
13  had poor earnings and Gateway had poor earnings.
14      So a couple of these actually had poor
15  earnings, so ...
16      MS. LAVALLEE: Q.  Okay.  So it's your
17  understanding what he was saying was that some of the
18  pipe -- a lot of pipe is directed at challenging clients
19  where there might be issues about whether or not the
20  deals will close.  Is that your understanding of this?
21      A.  Sure, I think that's what he's saying.
22      Q.  Okay.  At the -- right below the three
23  bullets, sort of nearly halfway down, it says,
24      "Our best is at 220M," which I assume
25      means million," which is a real stretch, as

247

00248:01  several of these deals will be Q4."
02      The next sentence reads, "One AVP
03      talked of starting to see indications of
04      client delays on decisions."
05      Were you aware of any client delays on
06  decisions, starting to see that?
07      A.  I don't recall.  I really don't.
08      Q.  Is that one of the indicators that you would
09  look at to determine whether or not the company's going
10  to be impacted by a slowdown in the economy?
11      A.  It would be if I saw a significant number of
12  delays.  And that's what, of course -- what we finally
13  did see in the last couple of days of February.  And
14  that's why we concluded that the problem wasn't
15  executional or competitive; it was an economic change,
16  fundamental change.
17      And that's why we commented at a -- on the
18  earnings call, talked about it going forward.  We
19  assumed that this was going to impact future quarters as
20  well, so yeah.
21      The problem is you need to see significant
22  numbers of delays, which unfortunately we didn't see
23  until the very end of the quarter and all of our
24  competitors saw in their March -- in their month of
25  March.

248

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

| | |
|---|---|
| 1  00249:01    Q.  Okay.  And -- okay. | 1  00250:01       Do you have any understanding what the |
| 2     02    A.  Based on all their comments. | 2     02  forecast call script was for?  Was it -- whether it was |
| 3     03    Q.  And to the best of your recollection, you | 3     03  for the Thursday forecast? |
| 4     04  don't recall ever seeing [sic] any discussions of client | 4     04    A.  I assume that's what it is, the weekly |
| 5     05  delays on decisions at all, though? | 5     05  forecast call. |
| 6     06    A.  Boy, you know, I don't recall. | 6     06    Q.  Okay. |
| 7     07    Q.  It's a long time, I understand. | 7     07    A.  I'm assuming that's what it is. |
| 8     08    A.  I don't recall. | 8     08    Q.  Okay.  So basically this appears to be a |
| 9     09    Q.  Okay. | 9     09  document that Mr. Sanderson received in anticipation of |
| 10     10    A.  But -- but -- you know, we'd go through Sandy, | 10     10  that call so that he could -- |
| 11     11  George, Jay, talk about things.  Sandy could have said | 11     11    A.  I believe so, yes. |
| 12     12  "Gee, this deal worries me.  I'm not sure if this will | 12     12    Q.  And I assume this is a document that you don't |
| 13     13  happen," or whatever.  But whether he used the word | 13     13  recall receiving during Q3 2001? |
| 14     14  "client delays" or something, I don't know. | 14     14    A.  That's correct. |
| 15     15       But clearly there are always -- there's always | 15     15    Q.  Okay. |
| 16     16  slippage deals.  There always is.  You don't convert all | 16     16    A.  But I sit in on many of the calls.  I don't |
| 17     17  your pipeline, so ... | 17     17  remember if I was on this call. |
| 18     18    Q.  Mr. Henley, I'm going to show you a document | 18     18    Q.  Right. |
| 19     19  that's previously marked DC-61, which is Bates-stamped | 19     19    A.  But if I was on the call, Sandy would have |
| 20     20  ORCL 0022083 through 2108. | 20     20  recounted some of this or put his own judgment on what |
| 21     21       And this is a document that appears to be an | 21     21  the guys had told him. |
| 22     22  e-mail from Kent Kelley to Edward Sanderson and James | 22     22    Q.  Okay.  And I'm going to draw your attention |
| 23     23  English, dated January 17th, 2001.  And the subject | 23     23  to -- under the OPI -- the heading "OPI Q4 '01 license," |
| 24     24  matter is "EJS forecast call script for January 17th, | 24     24  there's -- the first sentence there reads, |
| 25     25  2001." | 25     25       "The Q4 forecast is 167 million, |
| 249 | 250 |

| | |
|---|---|
| 1  00251:01  negative 16-percent growth and 65 percent | 1  00252:01  look apples to apples, start the new quarter, you don't |
| 2     02  of target." | 2     02  have a good feel for what the real forecast is. |
| 3     03       Do you recall learning any information | 3     03       So it's interesting information.  I'm always |
| 4     04  regarding where Mr. Sanderson's group was expecting the | 4     04  interested in information, but I spend very little time |
| 5     05  Q4 forecast to be, whether they expected it to be a | 5     05  worrying about the next quarter typically. |
| 6     06  negative or a positive growth? | 6     06    Q.  Okay.  Just so I recall, Mr. Sanderson is the |
| 7     07    A.  Typically we wouldn't even be talking about | 7     07  head of which division? |
| 8     08  the next quarter till the first week or two into Q4.  So | 8     08    A.  It's called OPI.  And he also had the |
| 9     09  our focus has always been these forecast calls the | 9     09  Latin-American, so ... we tended to lump the two, but |
| 10     10  current quarter.  The units themselves do look at their | 10     10  there was actually two different units there. |
| 11     11  aggregate pipelines, look at outquarters, and that sort | 11     11    Q.  Okay.  And do you have any understanding as to |
| 12     12  of thing.  So I don't recall talking about Q4. | 12     12  which division this e-mail relates to? |
| 13     13    Q.  Okay.  Is this something that would cause you | 13     13    A.  You know, I don't -- I'm not sure.  I'd have |
| 14     14  concern to learn that the next quarter they were | 14     14  to read this more -- I didn't really read it all. |
| 15     15  forecasting negative 16-percent growth? | 15     15    Q.  Well, I guess what we were just reading under |
| 16     16    A.  It would certainly ask me to raise questions, | 16     16  the heading "OPI Q4 '01 license" seems to relate to the |
| 17     17  you know, like, you know, "What's your pipeline?" | 17     17  OPI division, correct, based on the heading? |
| 18     18       And reading this, apparently the pipeline was | 18     18    A.  Well, I turned to the second page and there he |
| 19     19  positive.  So it -- says it's 434, up from 397.  So | 19     19  talks about Latin America.  So I think it is fair to |
| 20     20  I'd -- first question, "Why would, if your pipeline's | 20     20  conclude this is just the U.S. -- we call the large |
| 21     21  up, would your forecast be down?" | 21     21  strategic accounts. |
| 22     22       And, you know, clearly what happens is there's | 22     22       How we ever came up with OPI, I'm not sure. |
| 23     23  always slippage.  And so the reason why, the fourth | 23     23  But it meant the large strategic accounts in the U.S. |
| 24     24  quarter, the next quarter out is always a little suspect | 24     24  And he's got a second page of Latin America, so I think |
| 25     25  'cause you don't know what slips.  So until you kind of | 25     25  it's fair to say that excludes Latin America. |
| 251 | 252 |

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

```
1   00253:01   Q.  You didn't come up with these division names,
2   02   I assume?
3   03      A.  No.
4   04      Q.  All right.  I'd like to show you another
5   05   document that has been previously marked as Exhibit No.
6   06   77.  And it is a document Bates-stamped ORCL 0109623.
7   07   If you could take a moment to look at the document and
8   08   then tell me whether or not it's something you've ever
9   09   seen before.
10  10      A.  Again, I'm not copied.  And I -- I don't think
11  11   I was copied on it or saw it, but ...
12  12      Q.  Okay.
13  13      A.  Same as before.  She talks to Jennifer;
14  14   Jennifer filters this stuff.  So I'm sure I've gotten
15  15   pieces of it somewhere along the way from Jennifer --
16  16      Q.  Okay.
17  17      A.  -- or from Jay on the calls.
18  18      Q.  All right.  If I could turn your attention
19  19   to -- well, actually in the second paragraph, there is a
20  20   reference to,
21  21      "He is still confident in the 225, as
22  22      long as none of the very large
23  23      opportunities drop out."
24  24      Based on my reading of the prior paragraph,
25  25   it's my understanding that the "he" there is
```

253

```
1   00254:01   Mr. Nussbaum.  Does that make sense to you?
2   02      A.  Yes.
3   03      Q.  And then she proceeds to list a series of
4   04   deals.  Do you have any understanding of what the -- or
5   05   any recollection of the deals that are listed here,
6   06   where they were or what was going on with them in the
7   07   third quarter?
8   08      A.  I remember discussion about Lucent because Jay
9   09   kept saying that potentially it's a huge deal.  But we
10  10   all -- even he all [sic] said it's probably not likely
11  11   to happen in its entirety, or whatever.
12  12      Q.  Okay.  And do you recall --
13  13      A.  There are several AT&Ts, so I'm not sure what
14  14   this particular AT&T deal might have been, but ...
15  15      And the same with Bell South.  There were
16  16   several different Bell South transactions, so I'm not
17  17   sure.  But he ran the telco section.  Jay reported to
18  18   him.  And there were, you know, some significant
19  19   opportunities at telcos.
20  20      Q.  And there's also a WorldCom deal listed there.
21  21   Do you have any recollection of the company having
22  22   problems actually obtaining payment from WorldCom on
23  23   other deals that had actually been effectuated and
24  24   closed?
25  25      A.  No.  I remember WorldCom got into a world of
```

254

```
1   00255:01   trouble.  Whether it happened in this time frame or
2   02   later, I can't remember.
3   03      Q.  Right.  I think we all remember that.
4   04      A.  Right.
5   05      Q.  Okay.  The very end -- this --
6   06      A.  My recollection, at least initially with
7   07   WorldCom, they were disputing that they owed us money.
8   08   We had done an audit, said "You owe us -- you were using
9   09   more license than you paid for."
10  10      So my recollection, we was involved in trying
11  11   to get them to pay for licenses they were -- software
12  12   they were already using.
13  13      Q.  So that was something you actually were aware
14  14   of?
15  15      A.  Now whether that was this deal, I'm not -- but
16  16   I know he went through a period where he was
17  17   arm-wrestling with them to try to get paid for.
18  18      And it's difficult.  Sometimes there are
19  19   honest disputes as to how much software -- it's a very
20  20   complicated company -- they were using how much they
21  21   were using.  But Jay was pretty certain that they owed
22  22   us money and had a series of meetings.
23  23      Again, that may or may not relate to this, but
24  24   I think it did.  Could be wrong.
25  25      Q.  Okay.  And the last sentence of this e-mail --
```

255

```
1   00256:01   and I'll just represent to you that we've not received
2   02   the second page or the next -- remainder of this
3   03   e-mail -- appears to be -- this e-mail appears to be
4   04   incomplete.
5   05      But the last line of the first page here
6   06   states,
7   07      "Conversion rates across the board,"
8   08      open paren, "except SNL," close paren, "are
9   09      north of 50 percent."
10  10      Now, we've been discussing conversion rates
11  11   here today.
12  12      A.  Mm-hm.
13  13      Q.  Is it your understanding that the conversion
14  14   rate here -- well, let me ask you this:  What -- what's
15  15   your understanding of what type of conversion rate she's
16  16   talking about here?
17  17      A.  It's the same definition we've said before,
18  18   pipeline versus the forecasted number for the quarter.
19  19      Q.  Right.  Okay.  And --
20  20      A.  SNL means state and local.
21  21      Q.  Thank you.  And north -- or north refers here
22  22   to the fact that it was north of 50?
23  23      A.  Over 50 percent, yeah.
24  24      Q.  And was that something that would have caused
25  25   you concern had you been aware of it at the time?
```

256

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

1  00257:01    A.  It depends upon how confident Jay is that he's
2  02  going to convert these larger deals.  His conversion
3  03  rates have jumped all around, to start with, because
4  04  some quarters he has a bigger preponderance of the
5  05  evidence of so-called large deals.
6  06        So he clearly in this quarter -- and I
7  07  remember he was personally working a number of these:
8  08  Lucent, AT&T, WorldCom, some other ones.  So he was very
9  09  close to them, and he had personal knowledge and
10  10  commitment about getting them resolved and had -- based
11  11  on conversations he'd had, and so forth.  So ...
12  12    Q.  Right.
13  13    A.  If you convert those, then -- more of them
14  14  than normal -- then you'll have a higher conversion rate
15  15  just because you're getting more large deals closed.
16  16    Q.  LAVALLEE:  Okay.  And we've actually been
17  17  going probably for close to two hours now, so I'd like
18  18  to take a few moments' break, maybe five or ten minutes.
19  19        THE VIDEOGRAPHER:  We're going off the record.
20  20  The time is 4:18.
21  21        (Recess taken).
22  22        THE VIDEOGRAPHER:  We're back on the record.
23  23  The time is 4:38.
24  24        MS. LAVALLEE:  Q.  Okay, Mr. Henley, I would
25  25  like to show you -- we're going to be using three sets

257

1  00258:01  of documents in combination together.  They were some of
2  02  the same reports we've been looking at.  And one was
3  03  previously marked as Exhibit 132, one was previously
4  04  marked as Exhibit 133, and then the third was previously
5  05  marked as Exhibit 134.
6  06        And I believe that you have -- 134 is a
7  07  document that we've already been using here today.  So
8  08  if I could ask you to grab that document.
9  09    A.  134, okay.
10  10    Q.  And then I'll give you --
11  11    A.  Pull it out of here?
12  12    Q.  Yes.  And then I'll give you copies of Exhibit
13  13  132 and 133 --
14  14    A.  Okay.
15  15    Q.  -- so we can take a look at some figures here.
16  16        THE WITNESS:  We don't have it?
17  17        MR. SALPETER:  I'll find it for you.
18  18        THE WITNESS:  Here we go.  There's 134 right
19  19  there.
20  20        MS. LAVALLEE:  And here is a document that's
21  21  previously marked 132.
22  22        (Inaudible discussion).
23  23        THE WITNESS:  I think I've had this before
24  24  too, right.
25  25        MS. LAVALLEE:  I'm sorry?

258

1  00259:01        THE WITNESS:  I think I had this one earlier.
2  02        MS. LAVALLEE:  Possibly.
3  03        THE WITNESS:  'Cause it said "12/08."
4  04        MS. LAVALLEE:  Yes, I think it was a
5  05  different --
6  06        THE WITNESS:  I'm pretty sure --
7  07        MS. LAVALLEE:  I'm sorry.
8  08        THE WITNESS:  -- you reviewed this one with me
9  09  before, I think.
10  10        MS. LAVALLEE:  Yeah, I think it was a
11  11  different version.  It had your handwritten notes.  And
12  12  I'm not sure whether --
13  13        THE WITNESS:  But the core document was the
14  14  same, I think.
15  15        MS. LAVALLEE:  Possibly.  This is a document
16  16  that was previously marked as Exhibit 133.
17  17    Q.  Okay, Mr. Henley, if you could take a look at
18  18  this document marked 132.
19  19    A.  Yes.
20  20    Q.  And the very first page has some of the data
21  21  that we've talked about generally, but we haven't really
22  22  focused on this page as of yet.
23  23        And one of the figures is the license -- total
24  24  license in constant dollar, the revenue growth
25  25  percentage, as well as the pipeline growth percentage.

259

1  00260:01  And -- for Q3 '01 forecast --
2  02    A.  Yes.
3  03    Q.  -- versus Q3 '00 actual.
4  04    A.  Yes.
5  05    Q.  And the next column over, the next box over,
6  06  is "Q3 potential versus Q3 actual."
7  07        Now, if you compare those numbers from -- let
8  08  me step back.
9  09        Exhibit No. 132 is dated 12/08/2000.  Exhibit
10  10  133 -- and I can represent to you it was produced to us
11  11  in the SLC report as being the upside report for
12  12  1/15/2001.  And Exhibit 134 was produced as Exhibit --
13  13  as the upside report for 1/29/01.
14  14    A.  Okay.
15  15    Q.  Okay.  If we look at the pipeline growth
16  16  figure for total license revenue in December --
17  17  December 8th, 2000, that figure is 52 percent; is that
18  18  correct?
19  19    A.  Excuse me, the pipeline?
20  20    Q.  The pipeline growth percentage.
21  21    A.  For license.
22  22    Q.  For license.
23  23    A.  52, yes.
24  24    Q.  And then if you look at the January 15th
25  25  report, it is 34 percent; is that correct?

260

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00261:01    A.  Yes.
02    Q.  Was the drop in the pipeline growth percentage
03  something that was of concern to you?
04    A.  Again, I testified earlier that I was somewhat
05  skeptical of the initial number, the 52 percent.  I
06  described it as astounding, and I really did think it
07  was probably a bit overdone.
08        We ended up with a forecast of 25 percent on
09  the basis that that was pretty similar to what we did in
10  the second quarter.  And I just didn't see how the third
11  quarter could get better, even though we had the
12  Covisint deal.  It was possible, but I tended to just
13  try to be conservative and discount that.
14        So sure it dropped from 52 to 34, but I
15  anticipated that some of it probably wasn't real.
16    Q.  Okay.  And you indicated -- maybe I'm
17  misunderstanding your testimony -- that you actually did
18  not feel that you would experience -- that the third
19  quarter could get better than the second quarter?
20    A.  I'm not sure it could.  I wasn't convinced it
21  could.  If I was, I would have given guidance higher
22  than 25 percent.
23    Q.  And when you mean --
24    A.  It's certainly possible.  We certainly had a
25  forecast initially that suggested we could do a lot

261

00262:01  better.
02    Q.  And when you say doing better than the second
03  quarter, do you mean that in terms of absolute dollars
04  or growth percentage?
05    A.  Growth percentage.
06    Q.  Okay.  So it was your expectation even going
07  into the quarter -- the beginning of the quarter that
08  you would be seeing similar growth rate to what you had
09  seen in Q2, but not necessarily any better?
10    A.  Right.  I thought it was possible based on the
11  upsides, based upon, you know, Jennifer's assessment,
12  and all that sort of thing, based upon a stunning
13  pipeline.  But I was still somewhat skeptical, so we
14  ended up with a pipe -- a guidance that was similar to
15  Q2.
16    Q.  Did there come a time when you became nervous
17  about actually -- or concerned about actually meeting
18  the guidance figures that you had set out in December?
19    A.  The 25?
20    Q.  Yes.
21    A.  Well, it's all degrees of nervousness.  I got
22  nervous in the last week of February definitely.
23    Q.  Did you have any concerns prior to that at
24  all?
25    A.  Sure, I always have -- I had a concern the

262

00263:01  quarter we just finished.
02    Q.  Okay.
03    A.  I have a concern every quarter.
04    Q.  That's your job, right?
05    A.  Well, it is, because there's so much that has
06  to happen the last couple of days of the quarter.  And
07  so -- I've never had a quarter at Oracle that I
08  didn't -- and Jennifer Minton running around in circles
09  worried and -- you know, 'cause that's just the way it
10  works.  So sure, you always have concerns.
11    Q.  And if -- can you explain -- well, the first
12  license total revenue growth figure, when we compare
13  12/08 to 1/15, that growth figure is actually
14  increasing.  Not substantially, but --
15    A.  Which increased?
16    Q.  The total license revenue growth percentage
17  figure from December 8th --
18    A.  Went from 22 to 23; is that --
19    Q.  Right.  Right.  Now, in your -- and actually,
20  was it of any concern to you that the revenue growth
21  figure was increasing, whereas the pipeline growth
22  percentage was decreasing, and that the gap between the
23  two was becoming narrower?
24    A.  Again, I think the 22 and then the 23 were
25  much closer to the 25, I always felt like, so ...

263

00264:01    Q.  Okay.  Okay.  But -- so you had -- are you --
02  I'm not sure you answered my question.
03        I guess my question was did the fact that
04  there was the narrowing of the gap between the revenue
05  growth rate and the pipeline growth rate percentage --
06  that there was a narrowing of those two figures -- was
07  that anything that caused you any concern?
08    A.  Again, I just said it, I don't think I had
09  overly great concern.  I would love it to stay at a
10  hundred percent or 200 percent.  You know, I mean, more
11  pipe, the better.  But again, I had discounted -- some
12  of that pipe, in my mind, started to go.  So it
13  didn't -- I wasn't overly concerned that the gap was
14  narrowing, to use your words.
15    Q.  Okay.  And if we turn to the next report,
16  which is dated 1/29, which -- 1/29 of 2001 -- we see the
17  pipeline growth percentage dropping to 31.
18    A.  Yes.
19    Q.  Okay.  Again, same question as before, was the
20  narrowing gap of any concern to you?
21    A.  Again, I'd give you the same answer.
22    Q.  Okay.  When you looked at these figures, did
23  you actually go and compare them -- the pipeline growth
24  percentage to the historical percentages to see whether
25  or not they were in the range?

264

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

00265:01    A.  The pipeline percentages or pipeline growth
02  percentages, was that your question?
03    Q.  No, actually, let me ask a different question.
04    A.  Okay.
05    Q.  Yeah.  Okay.  If I could turn your attention
06  to the second page of each of these reports.
07    A.  Okay.
08    Q.  Okay.  I'd like to draw your attention to the
09  forecast figures for total revenues.  And actually,
10  rather than forecast, what I'd like to look at is the
11  upside figures.  And you've referred to it as the
12  judgment as opposed --
13    A.  Right.
14    Q.  -- to the upside.
15    A.  Correct.
16    Q.  But we're talking here about what you had
17  discussed earlier about Jennifer Minton's judgment?
18    A.  That's correct.
19    Q.  Okay.  And if we look at the January -- the
20  December 8th report, the figure for total revenues is
21  175,000 for upside.  If we look for December --
22  January 15th, that number has dropped to 104,910; is
23  that correct?
24    A.  Correct.
25    Q.  Now, can you tell me whether or not the fact

265

00266:01  that Ms. Minton was dropping her judgment in this manner
02  gave you any pause [sic] for concern?
03    A.  Again, I always thought we were more likely to
04  do 25.  So it validated that, you know, a 38, or
05  whatever we started out with, was probably overly
06  optimistic on her part.
07    Again, I think Jennifer's very good.  She's
08  been -- she takes her best crack at things based upon
09  conversion ratios, all the things we've talked about.
10  But I just found it hard to believe we would do a lot
11  better than we did in the second quarter, so ...
12    Q.  And was this any indication to you possibly
13  that the business was slowing?
14    A.  No.
15    Q.  Okay.
16    A.  Again, for all the reasons I've told you.
17    Q.  And if we look now to the January 29th
18  upside report, Exhibit 134, the number -- Ms. Minton's
19  judgment has dropped here to 54,940, I believe.
20    Can you tell me whether or not the fact
21  the drop from the 1/15 upside report was something that
22  caused you any concern?
23    A.  Well, yeah.  Now you're getting down to the
24  point where she's forecasting, in this case, 24-percent
25  growth.

266

00267:01    Q.  Okay.
02    A.  So it's real close to the 25.
03    Q.  Right.
04    A.  So, I mean, now -- we've had many quarters
05  where we're forecasting virtually what we've ended up
06  doing.  Sometimes a little bit less -- we end up doing a
07  little bit less, little bit more.  But surely I have
08  less -- she's now forecast numbers much closer.  So
09  that -- when you get equal now, that's why I say the
10  last month of the quarter you start thinking, wow, you
11  know, this is more of a horse race.
12    Q.  The number 24 is obviously lower than 25.  At
13  this point are you seeing --
14    A.  Certainly not materially.
15    Q.  No, that -- that's fine.  So you're seeing a
16  trend downwards.  Was the trend itself in -- the decline
17  in these numbers something that was causing you to
18  question?
19    A.  Again, I never believed the 38, or whatever it
20  started at, or I would have set it as guidance on the
21  call.  So, you know, I discounted this to a large
22  degree.  I don't exactly remember what my thought
23  processes were.
24    And throughout the month of January, I said
25  "You guys sure about these forecasts?"  You know.  But

267

00268:01  at this stage, I don't remember myself being any more
02  concerned than normal.  And I always get concerned in
03  the last month of the quarter that we were going to, you
04  know, not make our numbers.
05    Q.  Okay.  Be if we look at the actual -- at the
06  point in January 29th -- strike that.
07    Let me ask ... all right.  And obviously when
08  you see a decline in Ms. Minton's upside or judgment,
09  you see a corresponding -- we see here a corresponding
10  decline in the potential number throughout this whole
11  period as well.  Do you see that?
12    A.  Yes.
13    Q.  Okay.  And is your feeling -- well, did you
14  have any concerns regarding the fact that the potential
15  number was declining?
16    A.  I think I've already commented on that.
17    Q.  Okay.  So the comments you said earlier --
18    A.  Related to those changes in her judgment.
19    Q.  Okay.  If I could draw your attention now to
20  the total operating expenses in the figures in these
21  reports.
22    In the fifth column, there is a figure that
23  represents a percentage.  It says "Q3 forecast versus
24  prior year percentage."  And for total operating
25  expenses in the December 8th upside report --

268

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

| | |
|---|---|
| 1  00269:01    A.  Yes. | 1  00270:01  depositions.  So our reservation regarding completing |
| 2  02    Q.  -- the figure is a negative 11 percent.  Can | 2  02  the deposition, in light of the outstanding discovery |
| 3  03  you just clarify for me whether or not this figure | 3  03  disputes, obviously would apply here as well. |
| 4  04  represents a -- I mean, indicates -- | 4  04    But however, covering the materials that we |
| 5  05    A.  I understand. | 5  05  have, it is my intent to conclude for the day tomorrow |
| 6  06    Q.  -- the expenses were increasing over the prior | 6  06  at 2:00. |
| 7  07  quarter. | 7  07    MR. SALPETER:  Okay, that's great.  I mean, I |
| 8  08    A.  Yes, they were. | 8  08  just want the record to reflect also that Mr. Henley was |
| 9  09    Q.  Okay.  Prior -- actually, let me -- | 9  09  willing to stay later.  I understand there's problems |
| 10  10    A.  Prior year. | 10  10  with the court reporter and fresh air coming into the |
| 11  11    Q.  Prior year? | 11  11  building.  But I -- even despite those problems, |
| 12  12    A.  Similar quarter, third quarter of the prior | 12  12  Mr. Henley was willing to keep going. |
| 13  13  year. | 13  13    But as long as we're going to finish by 2, I |
| 14  14    MS. LAVALLEE:  Okay.  It is actually ten to | 14  14  don't think there's an issue. |
| 15  15  five.  And given that we need to break, and before I | 15  15    MS. LAVALLEE:  No, I think we can accomplish |
| 16  16  start on another line of questioning, I think this is a | 16  16  that by starting at 8:00. |
| 17  17  good breaking point.  And we indicated we'd start again | 17  17    MR. SALPETER:  Thank you very much. |
| 18  18  at 8:00 because the witness needs to leave at 2. | 18  18    MS. LAVALLEE:  Okay.  Thank you. |
| 19  19    MR. SALPETER:  Right.  And you indicated that | 19  19    THE VIDEOGRAPHER:  This marks the end of |
| 20  20  you thought we could finish by 2. | 20  20  videotape number 4, and this concludes Volume I of the |
| 21  21    MS. LAVALLEE:  Yeah, I thought we could | 21  21  deposition of Jeffrey Henley. |
| 22  22  continue and we can complete it by 2:00. | 22  22    The original videotapes will be retained by |
| 23  23    And obviously, as for all the other | 23  23  Dan Mottaz Video Productions LLC, 182 Second Street, |
| 24  24  depositions, it's plaintiffs' position that they are in | 24  24  Suite 202, San Francisco, California, 94105, |
| 25  25  need of additional documents to complete all the | 25  25  415-624-1300.  The time is 4:57 and we're off the |

269

270

| | |
|---|---|
| 1  00271:01  record. | 1  00272:01    CERTIFICATE OF WITNESS |
| 2  02    (Deposition adjourned at 4:57 p.m.) | 2  02 |
| 3  03 | 3  03 |
| 4  04    ---o0o--- | 4  04 |
| 5  05 | 5  05    I, the undersigned, declare under penalty of |
| 6  06 | 6  06  perjury that I have read the foregoing transcript and I |
| 7  07 | 7  07  have made any corrections, additions or deletions that I |
| 8  08 | 8  08  was desirous of making; that the foregoing is a true and |
| 9  09 | 9  09  correct transcript of my testimony contained therein. |
| 10  10 | 10  10    EXECUTED this _____ day of _____, |
| 11  11 | 11  11  200_, at _____, _____. |
| 12  12 | 12  12 |
| 13  13 | 13  13 |
| 14  14 | 14  14 |
| 15  15 | 15  15 |
| 16  16 | 16  16 |
| 17  17 | 17  17    _____ |
| 18  18 | 18  18    Signature of Witness |
| 19  19 | 19  19 |
| 20  20 | 20  20 |
| 21  21 | 21  21 |
| 22  22 | 22  22 |
| 23  23 | 23  23 |
| 24  24 | 24  24 |
| 25  25 | 25  25 |

271

272

Henley, Jeffrey O. (Vol. 01) - 03/02/2004  3/2/2004  8:51:00 AM

| | |
|---|---|
| 1   00273:01          REPORTER CERTIFICATE | 1   00274:01          ROBERT BARNES ASSOCIATES |
| 2    02      I hereby certify that the witness in the | 2    02      San Francisco, California  94102 |
| 3    03  foregoing deposition was by me duly sworn to testify to | 3    03 |
| 4    04  the truth, the whole truth and nothing but the truth in | 4    04      Date:  3/15/04 |
| 5    05  the within-entitled cause; that said deposition was | 5    05  TO:  JEFFREY O. HENLEY |
| 6    06  taken at the time and place herein named; that the | 6    06      ALAN N. SALPETER, ESQ. |
| 7    07  deposition is a true record of the witness's testimony | 7    07      Chicago, IL  60603 |
| 8    08  as reported to the best of my ability by me, a duly | 8    08 |
| 9    09  certified shorthand reporter and a disinterested person, | 9    09  SPECIAL TITLE (RULE 1550(B)) |
| 10   10  and was thereafter transcribed under my direction into | 10   10  Deposition taken March 2, 2004 |
| 11   11  typewriting by computer; that the witness was given an | 11   11 |
| 12   12  opportunity to read and correct said deposition and to | 12   12 |
| 13   13  subscribe the same.  Should the signature of the witness | 13   13  above-entitled action has been prepared and is available |
| 14   14  not be affixed to the deposition, the witness shall not | 14   14  In the alternative, you may wish to review counsel's |
| 15   15  have availed himself or herself of the opportunity to | 15   15  writing of any changes you wish to make to your |
| 16   16  sign or the signature has been waived. | 16   16 |
| 17   17      I further certify that I am not interested in | 17   17  contained in the code.  Unless otherwise directed, your |
| 18   18  the outcome of said action, nor connected with, nor | 18   18  accordance with the code. |
| 19   19  related to any of the parties in said action, nor to | 19   19  If you wish to make arrangements to review the original |
| 20   20  their respective counsel. | 20   20  office during office hours, 9 to 5, Monday through |
| 21   21      IN WITNESS WHEREOF, I have hereunto set my | 21   21 |
| 22   22  hand this 15th day of March, 2004. | 22   22      Sincerely, |
| 23   23 | 23   23 |
| 24   24  _____ | 24   24      CSR No. 6438 |
| 25   25 | 25   25  cc:  All counsel |
| 273 | 274 |