EXHIBIT O

Ronsse, Roberta  4/20/2004  3:09:00 PM

---

1    SUPERIOR COURT OF THE STATE OF CALIFORNIA

2         COUNTY OF SAN MATEO

3

4    Coordination Proceeding    )

     Special Title (Rule 1550(b)) ) Judicial Council Coordination

5                      ) Proceeding No. 4180

     ORACLE CASES        )

6                        )

     This Document Relates To:   )

7                       )

     ALL ACTIONS        )

8                       )

9

10   IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

11        IN AND FOR NEW CASTLE COUNTY

12

13   IN RE ORACLE CORP. DERIVATIVE )

14   LITIGATION          )  C.A. No.: 18751

15                        )

16

17

18        Deposition of ROBERTA RONSSE, taken

19   on behalf of the Plaintiffs at 3811 Valley

20   Centre Drive, Suite 500, San Diego,

21   California, commencing at 10:12 a.m.,

22   Tuesday, April 20, 2004, before Yolanda M.

23   Parks, CSR No. 7523.

24

25

2

---

1    APPEARANCES:

2

3    FOR PLAINTIFFS' CO-LEAD AND LIAISON COUNSEL:

4       NICOLE LAVALLEE, ATTORNEY AT LAW

        BERMAN DEVALERIO PEASE TABACCO BURT &

        PUCILLO

5       425 California Street

        Suite 2025

6       San Francisco, California 94104

        (415) 433-3200

7

     FOR DEFENDANT ORACLE CORPORATION:

8

9       PAUL H. GOLDSTEIN, ESQ.

        MORRISON & FOERSTER

        755 Page Mill Road

10      Palo Alto, California 94304-1018

        (650) 813-5818

11

                - and -

12

13      LAUREN SEGAL, ATTORNEY AT LAW

        ORACLE CORPORATION

        500 Oracle Parkway

14      Mailstop 5OP7

        Redwood Shores, California 94065

15      (650) 506-0221

16   FOR DEFENDANTS LAWRENCE ELLISON AND

     JEFFREY HENLEY:

17

18      JOHN NADOLENCO, ESQ.

        MAYER, BROWN, ROWE & MAW LLP

        350 South Grand Avenue

19      25th Floor

        Los Angeles, California 90071

20      (213) 229-9500

21   ALSO PRESENT:

22      PETER MESSENGER, VIDEO OPERATOR

23

24

25

3

---

1         I N D E X

2

3    DEPONENT     EXAMINATION     PAGE

4    ROBERTA RONSSE   BY MS. LAVALLEE:     7

5

6

7        EXHIBITS FOR IDENTIFICATION

8    PLAINTIFFS'          PAGE MARKED

9    244  Document first page of which    67

        is entitled "Q3 FY01 Week 6"

10      (23 pages)

11   245  Document first page of which    68

        is entitled "Q3 FY01 Week 6"

12      (three pages)

13   246  Document first page of which    113

        is entitled "Q3 FY01 Week 8"

14      (two pages)

15   247  Document entitled "Americas    143

        Forecast Package" (five pages)

16

     248  Copies of working papers    146

17      (14 pages)

18   249  Copies of Big Deals Reports    150

        (15 pages)

19

     250  Portion of an Upside Report    168

20      (nine pages)

21   251  Document first page of which    180

        is entitled "Total Company -

22      Q3 FY01 Forecast (13 pages)

23   252  Document first page of which    182

        is entitled "Total Company -

24      Q4 FY01 Forecast (17 pages)

25

4

---

1        EXHIBITS FOR IDENTIFICATION

2    PLAINTIFFS'          PAGE MARKED

3    253  Document first page of which    186

        is entitled "Total Company -

4      Q4 FY01 Forecast" (16 pages)

5    254  Document entitled "Pipeline    189

        Reporting Package" (nine pages)

6

     255  Handwritten notes (three pages)    203

7

     256  Document entitled "Interview of    205

8      Roberta Ronsse" (28 pages)

9

10      PREVIOUSLY MARKED EXHIBITS

11      EXHIBIT   PAGE

12       32    167

13       36    168

14       39    62

15       72    113

16       77    199

17      156    200

18

19

20

21

22

23

24

25

5

---

Oracle Related Cases

1    SAN DIEGO, CALIFORNIA; TUESDAY, APRIL 20, 2004;
2         10:12 A.M.
3
4         ROBERTA RONSSE, deponent,
5         was sworn, examined and
6         testified as follows:
7
8    VIDEO OPERATOR:  Good morning.  My name is
9    Peter Messenger.  I'm a video technician employed
10   by Barkley Court Reporters.  This is the videotaped
11   deposition of Roberta Ronsse beginning at
12   10:12 a.m. on April 20th, 2004, in Re Oracle
13   Corporation Derivative Litigation, Action
14   No. 18751.  This deposition is taking place at
15   Morrison & Foerster at 3811 Valley Centre Drive in
16   San Diego, California, and is taken on behalf of
17   the plaintiff.
18        May we please have introductions
19   beginning with the witness.
20   THE WITNESS:  Roberta Ronsse.
21   VIDEO OPERATOR:  Thank you.
22   MR. GOLDSTEIN:  Paul Goldstein, Morrison &
23   Foerster for Oracle Corporation.
24   MS. SEGAL:  Lauren Segal, Oracle Corporation.
25   MR. NADOLENCO:  John Nadolenco of Mayer,

6

1    Brown, Rowe & Maw for individual defendants Ellison
2    and Henley.
3         MS. LAVALLEE:  Nicole Lavallee from Berman
4    DeValerio for the plaintiffs.
5         VIDEO OPERATOR:  Will the court reporter
6    please swear in the witness.
7         THE REPORTER:  If you will raise you right
8    hand.  You do solemnly state that the testimony you
9    will give in this proceeding will be the truth, the
10   whole truth, and nothing but the truth, so help you
11   God.
12   THE WITNESS:  Yes.
13
14        EXAMINATION
15   BY MS. LAVALLEE:
16   Q  Good morning, Ms. Ronsse.  Can you state
17   your full name and address for the record, please.
18   A  Sure.  Roberta Joe Ronsse, 3491 Holly Oak
19   Lane, Escondido, California 92027.
20   Q  Before we start, I just want to go over
21   some guidelines that will sort of help us both here
22   today.
23        Have you ever been deposed before?
24   A  No.
25   Q  Okay.  I imagine your counsel has given

7

1    you some understanding of what the process is like.
2    You're being videographed and what you say is taken
3    down and transcribed by the court reporter.  As a
4    result, it's really important that both of us take
5    care to allow the other person to finish completing
6    what they have to say before jumping in with either
7    the next response or the next question.  Sometimes
8    it's difficult for everybody to always remember,
9    but I'll try to do that.  If you can try as well,
10   that would be great.
11   A  Sure.
12   Q  The other thing I would like to mention
13   is to the extent that I ask a question that you do
14   not understand, please let me know.  It's important
15   for the record that we be clear that you've
16   understood the question so that you properly
17   respond.  I'm more than happy to rephrase my
18   question if there's a question -- you have a
19   misunderstanding or just don't understand what I'm
20   trying to say.
21   A  Okay.
22   Q  And the other question -- other
23   instruction I would like to give is that to the
24   extent you want to take a break at any time, just
25   let me know.  I'm more than happy to do that.

8

1    We'll try to take a break every hour.  That's
2    generally what we've tried to do in the past.
3         If there's a question pending, I would
4    simply ask that you provide the answer so that
5    we -- before we take the break, but generally it
6    shouldn't be a problem, so just let me know.
7    A  Okay.
8    Q  Ms. Ronsse, can you give me your -- tell
9    me what your highest level of education is?
10   A  Ah, bachelor's degree from Cal Poly
11   University, San Luis Obispo.
12   Q  And what year did you obtain your degree?
13   A  1994.
14   Q  And where are you currently employed?
15   A  I am not employed currently.
16   Q  Okay.  Were you at one time employed by
17   Oracle Corporation?
18   A  Yes.
19   Q  And during what period of time were you
20   employed by Oracle Corporation?
21   A  From October of 1996 until July of 2003.
22   Q  And when you commenced working at Oracle
23   Corporation in October of '96, what position did
24   you start with?
25   A  Revenue accountant in the U.S.A.

9

1  division.

2     Q  And how long did you maintain that

3  position?

4     A  For approximately one and a half years.

5     Q  And what position did you take after

6  that?

7     A  Revenue accounting manager in the U.S.A.

8  division.

9     Q  And how long were you the revenue

10  accounting manager in the U.S.?

11     A  For approximately another year until the

12  fall of 1999.

13     Q  And in the fall of 1999, what position

14  did you assume?

15     A  The forecasting manager within corporate

16  finance at Oracle.

17     Q  And how long did you stay in that

18  position?

19     A  Until March of 2002.

20     Q  And in March of 2002, what position did

21  you hold?

22     A  I became the global process owner for

23  reporting within corporate finance.

24     Q  What does that mean?  What is global

25  processing owner?

10

1     A  I was responsible for -- for -- I'm

2  trying to word it the best way -- uhm, for working

3  with the different divisions within Oracle to

4  ensure that their reporting -- their financial

5  reporting needs were met through the systems that

6  we had available at Oracle.  So I interfaced with

7  the business users and the technical folks at

8  Oracle to be ensure that that could be provided.

9     Q  Okay.  And how long did you maintain that

10  position?

11     A  Until I left in 2003.

12     Q  Okay.  And just stepping back now, I'm

13  going to focus primarily on the period of time from

14  December of 2000 through the end of the quarter

15  2000 -- February 2001 -- January, February 2001

16  time frame which I understand is the third quarter

17  of Oracle's fiscal year 2001; is that your

18  understanding?

19     A  Yes.

20     Q  You mentioned that during that period of

21  time, if I understand correctly, you were

22  forecasting manager in corporate finance during the

23  third quarter of 2001, correct?

24     A  Yes.

25     Q  Okay.  And what was your -- what was your

11

1  role as forecasting manager?

2     A  My role was to work with two other

3  financial analysts that worked underneath me to

4  consolidate the forecast numbers for Oracle

5  Corporation through the use of Oracle Financial

6  Analyzer, our financial database.  And I would

7  report those numbers to my management within

8  corporate finance.

9     Q  Okay.  Now, you mentioned two other

10  financial analyzers who were below you.  Who were

11  those?

12     A  I cannot remember the specific analysts

13  at that time.  The names of the analysts I can't

14  remember.

15     Q  Okay.  Did you have a variety of people

16  who held those positions during the time that you

17  were forecasting manager in corporate finance?

18     A  That's correct.

19     Q  Okay.  Do you remember, generally, who

20  might have been -- from the period in the fall of

21  '99 through March of 2002 -- who those people were,

22  generally?

23     A  Yes.  Sammy Lee, Jennifer Ku.

24     Q  How do you spell Ku?

25     A  K-u.  Mark Wunderling.

12

1     Q  Anybody else?

2     A  Those are the three -- no, those are the

3  three that spent the most time in that group.

4     Q  Okay.  And you mentioned that you would

5  report the consolidated figures to your managers.

6  And who were they?

7     A  My manager up until January of 2001 was

8  Lia Burke and after that time was Ivgen Guner.

9     Q  And what was -- what were their titles?

10     A  I believe it was director, but they were

11  in charge of financial planning and analysis.  Lia

12  Burke may -- Lia Burke's title, I think, was

13  different than director of financial planning

14  analysis.  I can't remember her exact title,

15  though.

16     Q  Okay.  And you described your functions

17  as consolidating financial numbers through the use

18  of OFO -- OFA.  Can you tell me what "OFA" is?

19     A  Sure.  It stands for Oracle Financial

20  Analyzer and it was the database where we collected

21  forecast, budget, and actual information for

22  purposes of reporting forecast -- you know, total

23  company consolidated forecasts, budgets, and actual

24  performance reports.

25     Q  And you mentioned a variety of people

13

Ronsse, Roberta  4/20/2004  3:09:00 PM

1  that worked for you and that you worked for.  Were
2  there other people that -- on a regular basis you
3  would deal with in your capacity as the
4  financial -- or forecasting manager in corporate
5  finance?
6      A  Yes.
7      Q  And who would those people be?
8      A  Uhm, there were all of the other managers
9  that worked for the financial planning and analysis
10  team.  Do you want their names?
11      Q  Sure.
12      A  Darren Knox, Agnes Devin -- that's a
13  French name -- A-g-n-e-s, D-e-v-i-n, Julie
14  Garrison, and I think those were all of us
15  managers.
16      Q  And what was your role vis-a-vis these
17  people?  What -- how did you deal with them in your
18  capacity as forecasting manager?
19      A  They were my peers.
20      Q  Can you describe for me,
21  generally, what types of functions you carried out
22  in terms of consolidating financial information?
23      A  Uhm, could you clarify a little bit
24  exactly what you would like me to explain?
25      Q  Sure.  When you say you consolidate

14

1  financial numbers through the OFA system --
2      A  Uh-hum.
3      Q  -- what do you create?  Do you generate
4  reports?  Is that what you mean?
5      A  Yes.  All of the individual divisions
6  within Oracle would input their information.  What
7  I was interested in was their forecast information
8  since I was the forecast manager.
9      We would work with those divisions to
10  ensure that the numbers were correct and then we
11  would run reports, perform analyses on the
12  information as requested by management or as needed
13  and then we would generate various reports
14  according to our forecast schedule.
15      Q  Okay.  You mentioned you were primarily
16  focused on forecast -- the forecast component of
17  the information on OFA.  Did you have any role in
18  connection with the budgeting information?  Was
19  that something you dealt with?
20      A  I did not -- was not in-charge of the
21  budget process nor the budget reporting.
22      Q  Okay.  Were you involved in any way in
23  that?
24      A  On an ad hoc basis, yes.
25      Q  And what type of involvement would you

15

1  have had in the -- in connection with the budgeting
2  process for fiscal year 2001?
3      A  I don't remember specifically the ad hoc
4  that I may have done during that time frame.
5      Q  Okay.  Generally, what type of -- do you
6  remember generally what type of work it would have
7  been?
8      A  Typically I would have supported my
9  manager, Ivgen Guner, on analysis that may have
10  included budget numbers.
11      Q  Okay.  And what time frame would that
12  have been if you were budgeting for fiscal year
13  2001?
14      A  It could have been any time of the year
15  depending on the needs of management.
16      Q  Okay.  So it wasn't necessarily sitting
17  in on the initial budget for the year but also in
18  follow-up throughout the year?
19      A  Correct.
20      Q  Okay.  But you don't generally -- you
21  don't remember any specific types of tasks that you
22  performed?
23      A  No.
24      Q  Okay.  Now, in terms of -- you mentioned
25  that the OFA had forecast budget and actual results

16

1  information on it.  In terms of the actual results
2  information, in your capacity as forecasting
3  manager, did you have any involvement in generating
4  reports or dealing with that type of data?
5      A  Yes.
6      Q  And what were -- what involvement did you
7  have in that capacity?
8      A  At the end of every quarter, my group was
9  responsible for producing either what's called the
10  blue book or the white book for management at the
11  end of the quarter.
12      Q  Okay.  And was that the only role?
13      A  No.
14      Q  Okay.  What else?
15      A  There were ad hoc analyses also at the
16  end of the month or the end of the quarter
17  performed for management -- my management.
18      Q  You said at the end of the month and at
19  the end of the quarter?  Did I understand
20  correctly?
21      A  Yes.
22      Q  Okay.  Anything else?
23      A  No.
24      Q  Okay.  Let's just step back now.  You
25  mentioned the blue book.  Can you just describe

17

1  briefly what those are?

2      A  Yes.  The blue book is what -- what was

3  also called the key performance measures package,

4  and that had a number of reports within it that

5  reported on actual results for each of the

6  divisions geographically and line of business that

7  indicated what different metrics had been attained

8  for each division during the past quarter and

9  compared it to previous years or to budget,

10  depending on the report.

11      Q  Okay.  And what was your role in

12  connection with producing that blue book?

13      A  My team was responsible for obtaining the

14  information needed to produce the reports from OFA

15  and producing the reports, putting it together as a

16  package and distributing it --

17      Q  Okay.

18      A  -- to management.

19      Q  And when you say "distributing it to

20  management," was this a report that was distributed

21  to Mr. Ellison?

22      MR. NADOLENCO:  Objection.  Foundation.

23      THE WITNESS:  I don't remember if he was on

24  the distribution list.

25      Q  BY MS. LAVALLEE:  Okay.  You mentioned a

18

1  white book.

2      A  Yes.

3      Q  Okay.  The white book, I take it, is

4  different from a blue book?

5      A  Yes.

6      Q  Can you describe what the white book is?

7      A  The white book, I cannot remember the

8  other name we used for it, but it was the package

9  of quarterly results that was, again, produced out

10  of OFA and was distributed to management in

11  addition to the board of directors in preparation

12  for the board of directors meeting that followed

13  each quarter.

14      Q  Okay.  And, uhm, what was your role in

15  connection with the white books?

16      A  Again, my team was responsible for

17  obtaining the information from OFA and producing

18  the reports, packaging it, and distributing it --

19  distributing the packages.

20      Q  And you mentioned that those are

21  distributed to members of the board of directors of

22  the company, correct?

23      A  Yes.

24      Q  Okay.  Did you have any other role in

25  connection with preparing packages or materials for

19

1  the board?

2      A  Not that I can remember.

3      Q  Okay.  Ms. Ronsse, you're represented

4  here by counsel, correct?

5      A  Yes.

6      Q  Okay.  Mr. Goldstein?

7      A  Yes.

8      Q  All right.  Did you meet with counsel

9  prior to this deposition?

10      A  Yes.

11      Q  Okay.  And how many times did you meet?

12      A  Once.

13      Q  Okay.  And when did that meeting take

14  place?

15      A  Yesterday, April 19th.

16      Q  Okay.  And how long did it last?

17      A  Approximately four hours.

18      Q  And who was present?

19      A  Paul Goldstein and Lauren Segal.

20      Q  In preparation for this deposition, did

21  you review any documents?

22      A  Yes.

23      Q  Okay.  What documents did you review?

24      A  I reviewed the Americas Forecast Package

25  from January 15th, 2001, and January 22nd, 2001,

20

1  and two e-mails, one from David Winton, I can't

2  remember the exact date in January, I believe, and

3  one from Lia Burke through Sandy Sanderson sometime

4  in the year 2000.

5      Q  Okay.  And what was the substance of the

6  e-mail -- well, let me step back.

7      The e-mail from Mr. Winton, who was that

8  directed to?

9      A  Jennifer Minton.

10      Q  And do you recall what the substance of

11  that e-mail is?

12      A  The substance was the breakdown, if you

13  will, of his organization's forecast for North

14  America sales.

15      Q  Was that a document that you had seen

16  prior to yesterday?

17      A  No.

18      Q  And the e-mail from Lia Burke, what was

19  that?

20      A  That was an analysis of forecast

21  accuracy, historical forecast accuracy for each

22  division.

23      Q  Was that an e-mail that you saw prior to

24  yesterday?

25      A  I was -- it looks like I was copied on

21

1  the e-mail, yes.

2      Q  Do you have any recollection of receiving

3  it?

4      A  I don't have a recollection of receiving

5  it, no.

6      Q  Did you have a recollection of the

7  substance of what was discussed in that e-mail?

8      A  Yes.

9      Q  And you mentioned -- so that you reviewed

10  prior to today's deposition in preparation for

11  today's deposition, you reviewed the Americas --

12  two Americas Forecasts and those two e-mails.

13  Anything else?

14      A  Not that I can remember.

15      MS. LAVALLEE:  Excuse me.  Off the record for

16  a moment.

17      VIDEO OPERATOR:  We are off the record at

18  10:32 a.m.

19      (Pause in proceedings.)

20      VIDEO OPERATOR:  We are on the record at

21  10:33 a.m.

22      Q  BY MS. LAVALLEE:  All right.  Ms. Ronsse,

23  I want to go back to the discussion we had

24  regarding the -- your tasks in performing ad hoc

25  analysis regarding the actual results.

22

1      Can you tell me what types of tasks you

2  performed when you say you performed ad hoc

3  analysis on the actual results?

4      A  The types of tasks would be or would have

5  been obviously dependent on what was asked by

6  management, but various reports comparing forecast

7  information to budget, to actuals, uhm, looking at

8  actual information compared to prior years,

9  different metrics compared to prior years, trend

10  information, so -- so actual numbers for a variety

11  of quarters, all different, based on the need for

12  the organization and what management was asking

13  for.

14      Q  Okay.  And when you refer to "management"

15  in this context, who are you speaking of?

16      A  My manager or -- Ivgen Guner or Lia

17  Burke, or as passed down from their management.

18      Q  And their management at the time of Q-3

19  2001 would have been?

20      A  Jennifer Minton and/or Larry Garnick.

21      Q  Do you recall what Mr. Garnick's position

22  was at this time?

23      A  Ah, I believe the title was assistant

24  controller.

25      Q  And Ms. Minton?

23

1      A  She's the controller.

2      Q  Now, you mentioned a variety of different

3  reports.  Can you -- were there any particular

4  reports that you prepared on a regular basis in

5  connection with -- in analyzing actual result

6  information?

7      A  We prepared management summary reports

8  regularly which included actuals as compared to the

9  prior year actuals, as compared to the budget

10  numbers for every division in every line of

11  business.

12      We would also regularly in the same

13  management summary format for every line of

14  business and geography compare the final actuals to

15  the forecast, the final forecast to see -- and give

16  variances to the final forecast.  Those were --

17  those were the regular reports that we would run

18  every quarter.

19      Q  Okay.  Now, those are quarterly reports

20  looking at quarter end results?

21      A  Correct.

22      Q  Okay.  What types of reports would you

23  have worked on that dealt with monthly actual

24  results?

25      A  Although my group was not responsible for

24

1  it, I would assist in the preparation of the red or

2  gray books, which also consisted of management

3  summary reports, but for -- with month numbers, and

4  also summary income statements, detail income

5  statements, balance sheets.

6      Q  And anything else?

7      A  No, not that I can remember.

8      Q  Okay.  And when you refer to the red/gray

9  books, that was one thing, and you've talked about

10  summary income statements and balance sheets.

11      A  Uh-hum.

12      Q  Those are separate items?

13      A  Reports within the red/gray books.

14      Q  Okay.  And do you recall any other types

15  of reports that may not have been regular reports

16  that you prepared or that were prepared at your

17  direction by your group regarding actual results in

18  Q-3 of 2001 or for Q-3 2001?

19      A  No.

20      Q  When you were asked to do ad hoc types of

21  analysis, you discussed a number.  Were there ones

22  that were specific to -- actually, let me -- let me

23  ask a different question.

24      When you prepared these reports, were

25  these reports that you prepared on the next --

25

Ronsse, Roberta  4/20/2004  3:09:00 PM

1   prepared on an Excel sheet?  How would you go about
2   preparing reports, and where would you save them?
3       A  It depended on the report.  Some were
4   produced directly out of OFA.  Others were using
5   Excel, so we would link the information from OFA
6   into an Excel workbook.
7       Q  Okay.  And when you did -- when you
8   linked them up to an Excel workbook, is that
9   something that you would -- as your practice, would
10  you save that onto your system, onto the network?
11  How would you go about doing that?
12      A  We had a server where all of our reports
13  were saved.
14      Q  And when you say "we," are you talking
15  about your division?
16      A  Yeah, the corporate finance division.
17      Q  Okay.  So all your reports were saved on
18  that system --
19      A  Yes.
20      Q  -- is that correct?
21      Would that be true of a report that you
22  generated off of OFO?
23      MR. GOLDSTEIN:  OFO?
24      MS. LAVALLEE:  OFA.  I apologize.  Thank you.
25      THE WITNESS:  Can you repeat the question?

26

1       Q  BY MS. LAVALLEE:  No problem.  When you
2   generated a report directly off OFA -- I believe
3   you said you did -- was that something that you
4   would separately save once the report was actually
5   generated onto another system or as a separate
6   document, or was it just something that was
7   generated and not saved?
8       (Telephone interruption.)
9       MS. SEGAL:  Sorry.
10      (Whereupon, Ms. Segal left the
11      deposition room.)
12      THE WITNESS:  It was typically generated and
13  saved within the OFA database.
14      Q  BY MS. LAVALLEE:  Okay.  So there was a
15  means to actually save a specific report.  You
16  would give it a title, and it would be on the
17  system as a report that existed as a separate
18  document?
19      A  Correct.
20      Q  Okay.  You indicated that when you --
21  some of the ad hoc analysis, you gave me a
22  description a little earlier, where you looked at
23  trend information, you looked at different matrixes
24  comparing actual results from one year to prior
25  years.

27

1       When you did that type of information,
2   what type of time frame did you compare one period
3   to other periods to?
4       A  Typically, the current quarter compared
5   to the same quarter of the previous year, sometimes
6   also looking back to the same quarter of two years
7   before or three years before.  Uhm, and from time
8   to time from quarter to quarter, so an analysis
9   including all quarters of, say, the previous fiscal
10  year and the current fiscal year.
11      Q  Okay.  Any other time frames?
12      A  No, not that I can think of.
13      Q  Okay.  And can you tell me about any
14  specific reports that you generated that had the --
15  fall within the categories of what you described
16  about the ad hoc reports other than what you've
17  already -- the reports you've already enumerated?
18      A  I'm sorry.  Repeat the question.
19      Q  Okay.  That wasn't a very good question.
20      You've given me a general description of
21  some comparisons you did with actual results, and
22  then we went through a couple of specific reports
23  that you actually recall doing on a regular basis.
24  In terms of the reports that were not done on a
25  regular basis, would you -- do you recall any

28

1   specific report that you performed while you were
2   the finance manager?
3       A  Sure.  There were summary income
4   statement trend analyses where instead of looking
5   at line of business information, we would look at
6   summary income statement, what we call the line
7   item information and the trend -- trends on those
8   line items.
9       (Whereupon, Ms. Segal entered the
10      deposition room.)
11      THE WITNESS:  There were forecast accuracy,
12  pipeline -- pipeline attainment report --
13  reporting.  We didn't actually call it pipeline
14  attainment, but pipeline-type reports.  That's all
15  that I can remember.
16      Q  BY MS. LAVALLEE:  Okay.  Pipeline -- you
17  mentioned pipeline attainment and then corrected
18  yourself and said you didn't really refer to it as
19  that.  But what were those reports?  Can you
20  describe them for me?
21      A  We would report pipeline and compare --
22  the pipeline for the current quarter for each week
23  of the quarter, compare that to the same quarter of
24  the previous year to look at the momentum of the
25  pipeline, and then the actual conversion ratio at

29

Ronsse, Roberta  4/20/2004  3:09:00 PM

1  the end of the quarter compared to the previous
2  year, the same quarter previous year.
3      Q  Okay.  Anything else that you looked at
4  in that report?
5      A  Not that I can remember.
6      Q  Okay.  I understand that that is not --
7  let me step back.
8         Did that report have a specific name or
9  title?
10     A  No.
11     Q  Okay.  And that was not something that
12  was regularly --
13     A  Correct.
14     Q  Do you recall what -- what period of time
15  you actually prepared that report?
16     A  No.
17     Q  Okay.  Was it something that you prepared
18  more than once during your time that you held that
19  position as finance manager?
20     A  Yes.
21     Q  Was it something you did more than once
22  every year?
23     A  Yes.
24     Q  Okay.  But was it something that you did
25  generally the same time in each fiscal year or is

30

1  it just a random --
2      A  It's random.
3      Q  And those reports were done at whose
4  request?
5      A  My management.
6      Q  Meaning Ivgen Guner or Lia Burke?
7      A  Correct, or their managers.
8      Q  And "their managers" meaning Ms. Minton
9  or Mr. Garnick?
10     A  Correct.
11     Q  And you also mentioned the forecast
12  accuracy report.  Is that the actual title or a
13  description of the report?
14     A  We typically called it the forecast
15  accuracy report.
16     Q  Okay.  And can you tell me what this
17  report is?
18     A  This report compared forecast numbers by
19  line of business and geography for each week of a
20  quarter, or sometimes we would just look at the
21  first forecast of every month and then compare
22  those numbers to the actual numbers at the end of
23  the quarter and give a ratio of what actually
24  closed of their forecast.
25         MS. LAVALLEE:  Okay.  Could I have the answer

31

1  read back, please.
2         (The record was read as follows:
3         "A  This report compared forecast
4         numbers by line of business and geography
5         for each week of a quarter, or sometimes we
6         would just look at the first forecast of
7         every month and then compare those numbers
8         to the actual numbers at the end of the
9         quarter and give a ratio of what actually
10        closed of their forecast.")
11     Q  BY MS. LAVALLEE:  All right.  And was
12  this a report that was generated from the OFO
13  system -- OFA system or you used OFA information
14  to -- let me strike -- let me restart that
15  question.
16         Was this report something that you
17  generated from the OFA system, or was it something
18  that was compiled from data contained on OFA?
19     A  It was compiled from OFA data.
20     Q  Okay.  So this was a report you prepared
21  in Excel and saved onto your network?
22     A  Yes.
23     Q  And do you recall how frequently you
24  prepared this report while you held the position of
25  forecast manager?

32

1      A  No.
2      Q  Was it more than once?
3      A  Yes.
4      Q  Okay.  Was it something you did more
5  frequently than once a year?
6      A  Yes.
7      Q  And was it something that you tended to
8  do at a particular time in a fiscal year, or is it
9  just randomly done?
10     A  It was random.
11     Q  Okay.  And when you completed the
12  forecast accuracy report, who was it that you gave
13  that to?
14     A  My manager, either Lia Burke or Ivgen
15  Guner.
16     Q  And do you have any understanding or
17  knowledge or to what -- where that report went
18  after that?
19     A  It was typically shared with their
20  management, Larry Garnick and/or Jennifer Minton.
21     Q  Okay.  Do you know if it was shared
22  beyond Mr. Garnick and Ms. Minton?
23     A  No.
24     Q  Okay.  And were these reports
25  something -- well, the forecasting -- forecast

33

Ronsse, Roberta  4/20/2004  3:09:00 PM

1  accuracy report, was that something that you
2  discussed after completing it with anybody?
3      A  Yes.
4      Q  And who did you have discussions with
5  about that report?
6      A  It could have been any of those four
7  people, my management team, or the people that work
8  for me.
9      Q  Okay.
10     A  Because they typically helped me to
11  produce it.
12     Q  Okay.  And, uhm, do you recall any
13  specific discussions regarding forecast accuracy
14  reports during the time you held the position of
15  finance manager?
16     A  No.
17     Q  And were there any follow-up
18  communications regarding this type -- this type of
19  report?
20     MR. GOLDSTEIN:  Object to the form.
21     THE WITNESS:  Well, can you clarify
22  "follow-up communications"?
23     Q  BY MS. LAVALLEE:  Okay.  Other than
24  actually generating it and distributing the
25  report -- well, let me step back.

34

1      How did you distribute that report?  Was
2  it something -- a hard copy you sent or an e-mail
3  that you would have sent?
4      A  It could have been either.
5      Q  Okay.  Other than that actual transfer of
6  that document, were there any other communications
7  other than oral communications regarding the
8  information contained in that report?
9      MR. GOLDSTEIN:  Objection to form.
10     THE WITNESS:  I don't remember.
11     Q  BY MS. LAVALLEE:  Okay.  You don't
12  remember sending any e-mails back and forth, for
13  example?
14     A  I don't remember, no.
15     Q  Okay.  In terms of the pipeline
16  attainment report -- can I call it that?
17     A  Ah --
18     Q  Or is that not an accurate term?
19     A  I hate to use "attainment" because it --
20  I kind of threw that out there, and we never used
21  that word, so if we just call it the actual
22  pipeline analysis.
23     Q  Okay.
24     A  Since we're focusing on actuals.
25     Q  Okay.  Let me ask you this:  This is not

35

1  the pipeline reporting package, I assume, correct?
2      A  Correct.
3      Q  Okay.  So the actual pipeline --
4      A  Analysis.
5      Q  -- analysis report -- we'll call it that.
6  When you prepared these, I assume you distributed
7  them to various people.  Who did you distribute
8  them to?
9      A  To my management, to Ivgen Guner or Lia
10  Burke.
11     Q  Okay.  Do you have any knowledge whether
12  or not it was distributed to anybody else beyond
13  them?
14     A  Yes, only to their management.
15     Q  Okay.  So it's your understanding that
16  they, then, gave it to their management, which by
17  that you mean Ms. Minton or Mr. Garnick?
18     A  Possibly they could have, yes.
19     Q  Okay.  But you don't have any specific
20  knowledge one way or another?
21     A  Correct.
22     Q  Okay.  And was that a report that you
23  discussed with anybody after preparing it?
24     A  Yes.
25     Q  Okay.  And who would you have discussed

36

1  the actual pipeline analysis report with?
2      A  With either Ivgen or Lia or their
3  managers, Larry or Jennifer.
4      Q  And do you have any recollection of any
5  discussions regarding actual pipeline analysis
6  reports during your time as finance manager?
7      A  No.
8      Q  Now, the pipeline -- or the actual
9  pipeline analysis report, is that a report that's
10  generated from the OFA system, or is it generated
11  or created using information from the OFA system?
12     A  Generated from information from the OFA
13  system.
14     Q  Okay.  So that's a report that, again, is
15  compiled into an Excel sheet and saved onto the
16  network?
17     A  Correct.
18     Q  Okay.  Do you know if you create -- if
19  you prepared a forecast accuracy report in Q-3
20  2001?
21     A  No.
22     Q  You --
23     A  I don't know.
24     Q  You don't know.  And same question for
25  the pipeline or actual pipeline analysis report.

37

1  Do you know if you prepared any such report during
2  Q-3 2001?
3      A  I don't know.
4      Q  Okay.  Do you recall -- do you know why
5  the actual pipeline analysis report was prepared?
6      A  Uhm, perhaps some reasons.
7      Q  Okay.  What reasons do you know of?
8      A  For informational and analysis purposes
9  to aid management in making decisions or in this
10 case with -- I'm sorry -- with actual information,
11 uhm, to gain an understanding of what had occurred
12 in the current quarter as compared to other
13 quarters.
14     MS. LAVALLEE:  Could I have my last question
15 read back.
16     (The record was read as follows:
17      "Q  Do you know why the actual pipeline
18      analysis report was prepared?")
19     Q  BY MS. LAVALLEE:  And were there any
20 other reasons than what you just discussed?
21     A  Not that I know of.
22     Q  Okay.  And you hesitate because you can
23 guess as to other reasons?  Is that the issue?  I
24 mean, the way you responded, I'm just wondering --
25 not that you know of, the way you emphasized that,

38

1  was it that you believe there might have been other
2  reasons?  And I don't want you to guess as to what
3  they are, but I'm just trying to understand the
4  emphasis you were placing on your response.
5      MR. NADOLENCO:  Objection.  Foundation.
6      THE WITNESS:  No, it's just that it's not
7  that I can remember discussing with anyone any
8  other reasons.
9      Q  BY MS. LAVALLEE:  Okay.
10     A  For preparing the information.
11     Q  Okay.  And do you recall any -- you say
12 that -- well, let me step back.
13     You mention that it was informational and
14 analysis for making -- to help make decisions.  Do
15 you remember or do you know of any decisions that
16 were taken as a result of any information that was
17 reviewed and set forth in the actual pipeline
18 analysis reports?
19     A  No.
20     Q  Let me ask you about the forecast
21 accuracy reports.  Do you know what reasons those
22 reports were prepared?
23     A  Again, the reasons that I know of are
24 to -- to help in looking at the past, the past
25 ratios of forecast to -- to actual performance, to

39

1  gain an understanding into the current forecast as
2  to, you know, based on trends where the forecast
3  may make sense or may not make sense for a given
4  organization.
5      Q  Okay.  And do you recall any specific
6  conclusions that you or your team or your managers
7  drew from any of the forecast accuracy reports?
8      MR. GOLDSTEIN:  Objection --
9      THE WITNESS:  No.
10     MR. GOLDSTEIN:  -- to form.
11     MR. NADOLENCO:  And I add an objection.
12 Foundation.
13     Q  BY MS. LAVALLEE:  Do you recall whether
14 or not there were any changes in trends that you
15 saw during the time you prepared the forecast
16 reports?
17     MR. NADOLENCO:  Objection to form.
18     THE WITNESS:  I -- can you specify the
19 question?  Are you saying in general when I
20 prepared them, or are you talking about a specific
21 quarter at this point?
22     Q  BY MS. LAVALLEE:  Okay.  Let me -- I
23 think my question is the former.
24     When you were preparing these reports
25 during the time you were finance manager --

40

1      A  Uh-hum.
2      Q  -- over time or in connection with any
3  specific report, do you recall noticing any
4  difference or changes in trends?
5      MR. GOLDSTEIN:  Objection to form.
6      MR. NADOLENCO:  Join.
7      THE WITNESS:  I don't remember.
8      Q  BY MS. LAVALLEE:  Okay.  When you
9  prepared the forecast accuracy report, did you ever
10 print a hard copy and keep it in a filing system
11 somewhere?
12     A  I don't remember.
13     Q  Same question for the actual pipeline
14 analysis report.
15     A  I don't remember.
16     Q  Okay.  I would like to go back now to the
17 tasks that you performed in connection with
18 forecasting matters as finance manager.
19     Can you tell me, generally, what tasks
20 you performed that related to the forecasting
21 process at Oracle Corporation while you were
22 finance manager?
23     MR. GOLDSTEIN:  Objection to form.
24     THE WITNESS:  So to clarify, a specific task
25 during the week or -- what exactly would you like

41

Ronsse, Roberta  4/20/2004  3:09:00 PM

1  me to describe?
2      Q  BY MS. LAVALLEE:  Okay.  Let me -- let me
3  ask a different question, then.
4          During a particular quarter, let's focus
5  now on the third quarter of 2001.  Did your role
6  vary from week to week in terms of the tasks that
7  you performed?
8      A  Not for the forecast, no.
9      Q  Okay.  Can you then describe for me the
10  typical week that -- of work that you did relating
11  to forecasting matters as finance manager?
12      A  Relating to forecast, we had a forecast
13  every other week in the first two months of the
14  quarter and every week during the last month.
15  During those weeks, uhm, typically Monday through
16  Wednesday, we would -- we would work with the
17  divisions to help them input their data or, uhm,
18  answer questions that they may have.
19          On Wednesday the information would -- was
20  consolidated.  We ran various reports beginning
21  Wednesday evening into Thursday morning to tie up
22  the numbers and make sure everything was correct
23  and what the divisions expected.
24          On Thursday we would prepare the Americas
25  Forecast Package in preparation for the Americas

42

1  Forecast Call then and proceed to prepare the
2  Worldwide Forecast Package directly from OFA.
3          And then the -- and then I was
4  responsible for populating the upside report and --
5  and working with management -- with either Ivgen
6  Guner or Jennifer Guner -- to complete that report
7  in preparation for Monday's EC meeting.
8      Q  And "EC meeting" you mean the executive
9  committee meeting?
10      A  Correct.
11      Q  Does that cover the gamut of your tasks
12  during a typical week?
13      A  As I remember, yes.
14      Q  Okay.  Now, focusing now on the Monday to
15  Wednesday period, you say you worked with divisions
16  to ensure that they were correctly inputing the
17  data and inputting the data into what?
18      A  Into OFA.
19      Q  Okay.  And by divisions, are you -- who
20  are you referring to?
21      A  I'm referring to all sales, consulting,
22  education, so all revenue-generating organizations,
23  and all non-revenue-generating organizations, the
24  expense-only organizations.
25      Q  Okay.  And they would be putting in

43

1  expense-oriented data?
2      A  Yes.
3      Q  Okay.  Now, are these finance directors
4  from these divisions, or are they the actual
5  salespeople that are putting this information in
6  the OFA?
7      A  They are finance personnel.
8      Q  Okay.  And the finance personnel are
9  obtaining that information from what source?
10      MR. GOLDSTEIN:  Objection to form.
11      THE WITNESS:  It's different for each
12  organization.
13      Q  BY MS. LAVALLEE:  Okay.  And focusing on
14  the Q-3 2001 now, for the Americas divisions,
15  divisions in the U.S., do you -- what was the
16  source of their -- that information?
17      A  I'm sorry.  Which divisions within --
18  well, for the U.S., we had the
19  non-revenue-generating and the revenue-generating.
20  We had sales and consulting, so I -- since I did
21  not work in those organizations, I don't know all
22  of the -- you know, how they came up with their
23  numbers and all of the sources for their
24  information.
25      Q  Okay.  And you mention on Wednesday and

44

1  Thursday you would run some reports -- actually,
2  let me step back.
3          You mentioned at some point in the week
4  you would actually generate reports to check the
5  figures and whatnot.  What -- was that in the
6  Monday/Wednesday time frame?
7      A  Monday through Wednesday we would be
8  available, yes.
9      Q  What types of reports would you run to
10  check the figures?
11      A  We would run reports directly out of OFA.
12  They were called tie-out reports.
13      Q  Okay.  And the purpose of doing that is
14  just to ensure that the -- I'm not quite sure.
15  What was the purpose?
16      A  The purpose was to ensure that there were
17  no systematic glitches, that the numbers that we
18  were producing on the report from OFA were what the
19  division -- the finance personnel in the division
20  expected the numbers to be.
21      Q  Okay.  And then on Wednesday and Thursday
22  you generated reports.  Now, you mention the
23  Americas Forecast Reports.
24          Were there other reports as well?
25      A  Not regularly.  There was the large

45

1    packet that was called the Americas -- or I'm
2    sorry.  Did you ask me if it was just the Americas
3    Forecast Package?
4        Q   Correct.
5        A   Okay.  No, there was not just the
6    Americas Forecast Package.
7        Q   Okay.  And what other reports were there?
8        A   There was the large package called the
9    Worldwide Forecast Package.
10       Q   Okay.  Now, that Worldwide Forecast
11   Package was generated and provided to whom?
12       A   That was generated from OFA and provided
13   only to the personnel in corporate finance that
14   would be applicable, so my manager, Ivgen Guner,
15   the people that work for me, and possibly Ivgen's
16   management, if needed, on an as-needed basis.
17       Q   Okay.  And was that something you --
18   well, what was the purpose of generating those
19   particular reports?
20       A   The purpose was to have a package of
21   forecast data for every division that compared
22   forecast to the prior year, in the same quarter,
23   and to budget and to gave variances.  It was the
24   raw data, if you will, of the forecast.
25       Q   Okay.  And other than the Worldwide

46

1    Forecast Package and the Americas Package --
2    Americas Forecast Package, what other reports did
3    you and your group generate in a typical
4    forecasting week?
5        A   I also generated the upside report.
6        Q   Okay.  And anything else?
7        A   No.
8        Q   Okay.  And putting aside regular reports,
9    during the third quarter of 2001, were there other
10   reports that you may have generated that were not
11   regularly -- regularly prepared reports?
12       MR. GOLDSTEIN:  Objection to form.
13       THE WITNESS:  I don't remember.
14       Q   BY MS. LAVALLEE:  Okay.  Do you remember
15   any reports during the time frame that you were
16   forecast manager that fall within the category I
17   just discussed?
18       MR. GOLDSTEIN:  Objection to form.
19       THE WITNESS:  Actually, there were pipeline
20   reports that I don't think I mentioned earlier that
21   I want to actually add to my answer before.  I'm
22   just remembering that we had the pipeline package
23   as well.
24       Q   BY MS. LAVALLEE:  Okay.  And now you're
25   not talking about the actual pipeline analysis.

47

1    Now you're --
2        A   This is a forecast package, right.
3        Q   Okay.  So it's the pipeline reporting
4    package?
5        A   Yes.
6        Q   And that was one of the regular reports?
7        A   Yes.
8        Q   Okay.  And anything else?
9        MR. GOLDSTEIN:  Objection to form.
10       Q   BY MS. LAVALLEE:  Let me ask -- let me be
11   clear in my question.  My question is:  In terms of
12   reports that may not have been regularly prepared
13   but that you did actually prepare during the time
14   that you were finance manager that related to
15   forecast matters, other than the reports you've
16   already discussed?
17       MR. GOLDSTEIN:  Objection to form.
18       THE WITNESS:  I don't -- I don't remember.
19   Uhm, I don't remember.
20       Q   BY MS. LAVALLEE:  Okay.  And the pipeline
21   reporting package, when did you prepare those,
22   during what period of time in a week?
23       A   Well, that was actually prepared at the
24   beginning of each month --
25       Q   Okay.

48

1        A   -- so the first forecast of each month,
2    and that would also be prepared on the Thursday of
3    the week of the forecast.  So we would -- we only
4    requested pipeline information during the first
5    forecast of every month, so only three times --
6        Q   Okay.
7        A   -- a quarter.
8        Q   All right.
9        A   And that -- during that forecast week for
10   that first forecast of the month, we would
11   prepare -- again, the deadline was the same and we
12   would prepare the pipeline reporting package on
13   Thursday.
14       Q   I see.  So it was the Thursday -- the
15   first Thursday of each month?
16       A   Correct.  Well, the -- when there was the
17   first forecast of each month, the Thursday of that
18   forecast week.
19       Q   Okay.  And where was the information
20   obtained to prepare that report?
21       A   OFA.
22       Q   Okay.  And was this a report that was
23   generated from OFA, or was it a report that
24   generated using information contained on OFA?
25       A   Using information from OFA.

49

1    Q   Okay.  So there, again, it's an Excel
2    sheet report that was saved somewhere on your
3    network?
4    A   Correct.
5    Q   Was it -- were there other sources of
6    information other than OFA?
7    MR. GOLDSTEIN:  Objection to form.  You mean
8    for that report, I assume?
9    MS. LAVALLEE:  For that report, yes.
10   THE WITNESS:  No.
11   Q   BY MS. LAVALLEE:  Let me step back.  In
12   terms of the forecast accuracy report that we
13   discussed earlier, were there other sources of
14   information other than the OFA?
15   A   No.
16   Q   Okay.  And with respect to the actual
17   pipeline analysis report we discussed earlier, were
18   there other sources of information other than OFA?
19   A   No.
20   Q   And when you prepared the pipeline
21   reporting package, who did you then distribute it
22   to?
23   A   To my manager, either Lia or Ivgen.
24   Q   Anybody else?
25   A   No.

50

1    Q   And how did you distribute that?  Was it
2    by e-mail?
3    A   Either hard copy or potentially e-mail,
4    but typically hard copy.
5    Q   And did you routinely discuss the results
6    of the pipeline reporting package after preparing
7    and submitting that report?
8    A   Did I routinely discuss it?  Is that the
9    question?
10   Q   Well, yeah.
11   A   No.
12   Q   Okay.  Going back now to the upside
13   reports, can you tell me what your role was in
14   connection with preparing this report?
15   A   Yes.  My role was to take the raw data
16   from OFA, link it into an Excel workbook, which was
17   the shell for the upside report.
18   Q   Okay.  And did you compile and finalize
19   the report, or did you just create a portion of it
20   for later completion by somebody else?
21   A   I compiled and finalized the report.
22   Q   Okay.  And what was the sources of
23   information that you used to prepare the upside
24   report?
25   A   I used OFA --

51

1    Q   Uh-hum.
2    A   -- the upside numbers, and the upside
3    column came from Jennifer Minton.
4    Q   Any other sources?
5    A   No.
6    Q   Okay.  And did you discuss with
7    Ms. Minton her upside numbers, or did she just
8    provide you with the information?
9    A   She provided me the information.
10   Q   So you never discussed the actual -- the
11   analysis or the -- anything about the numbers
12   themselves with her?
13   A   Ah, we may have from time to time.
14   Q   Okay.
15   A   Not regularly.
16   Q   Okay.  And in what instance would you
17   actually discuss it with her?
18   A   No particular instance.  It was random.
19   Q   Okay.  Do you recall any specific
20   discussions that you had with her regarding the
21   upside numbers during the fiscal year 2001?
22   A   No.
23   Q   Usually when you discussed the
24   information, was it because there was something
25   unusual about the information or was it simply a

52

1    random discussion?
2    A   It was random.
3    Q   And after preparing the upside report,
4    what did you do with them?
5    A   I distributed hard copies to my manager,
6    Ivgen Guner.
7    Q   You just gave her a set of hard copies?
8    A   Correct.
9    Q   Okay.  And do you know for what purpose?
10   A   Well, for her informational purposes.
11   Q   Okay.  And was it also to be used for the
12   EC meeting you mentioned earlier?
13   MR. NADOLENCO:  Objection.  Foundation.
14   THE WITNESS:  I was asked to make copies for
15   Jennifer Minton from time to time as well.
16   Q   BY MS. LAVALLEE:  And when you
17   made copies for Ms. Minton, was that for the
18   purpose of the EC meetings?
19   MR. NADOLENCO:  Objection.  Foundation.
20   THE WITNESS:  I -- as -- typically, yes, it
21   was for her to take on Monday morning.
22   Q   BY MS. LAVALLEE:  Okay.  And did you
23   prepare a set number of them -- the reports?
24   A   Uhm, I don't remember the number.  It
25   would depend on what was asked of me that week,

53

1  anywhere between five and ten --

2  Q  Okay.

3  A  -- copies.

4  Q  Okay.  And were there some copies that

5  contained less than all of the report?

6  A  Yes.

7  Q  And other than providing the copies to

8  Ms. Minton and Ms. Guner, did you do anything else

9  with the upside reports?

10  A  I saved a copy for myself as record, a

11  hard copy.

12  Q  Okay.

13  A  And I saved it on our network.

14  Q  Okay.  And when you saved it on the

15  network, you're talking now about the finance

16  division's network, correct?

17  A  Correct, password protected.

18  Q  Okay.  And where did you maintain hard

19  copies of reports such as the upside reports when

20  you kept them?

21  A  I had a binder for each quarter.

22  Q  Okay.  And generally did you keep a copy

23  of every report that you prepared in your binder?

24  A  Yes.

25  Q  Okay.  Did you keep copies of other

54

1  things other than reports you prepared?  For

2  example, materials you received from third -- from

3  other people?

4  A  Yes.  If there was communication with the

5  finance personnel or anything having to do with the

6  forecast, I typically saved that information.

7  Q  Okay.  Would that include e-mails or

8  reports generated by other people?

9  A  Yes.

10  Q  Okay.  Did you typically -- what type of

11  reports did you receive that were generated by

12  other people when you were finance manager?

13  A  Ah, typically tie-out reports or

14  packages -- their division's package of information

15  that provided a tie-out to our numbers or

16  reconciliation to our numbers.

17  Q  Okay.  Any other type of report?

18  A  Not that I can remember.

19  Q  Did you receive any reports that your

20  peers prepared in your finance division?

21  A  Uhm, is this in general or for my

22  forecast binder?

23  Q  Well, let me step back.  So you had a

24  forecast binder, and then you had other binders, or

25  is it just you received other documents that you

55

1  may or may not have included?

2  A  Well, I may have received other documents

3  from my peers within corporate finance for

4  different ad hoc purposes analyses; but in terms of

5  for the forecast, that was not typical to receive

6  reports from my peers.

7  Q  Okay.  And if you received reports that

8  related to any subject from your peers, what would

9  you have done with those reports?

10  A  Typically used them for the analysis

11  needed, and I'm not sure where they would have gone

12  after that.  I just would have, you know, trashed

13  them if I didn't need them any more for the

14  analysis or kept them for the period of time when I

15  needed them.

16  Q  Okay.

17  MR. GOLDSTEIN:  Nicole, at an appropriate

18  time, could we take a break?

19  MS. LAVALLEE:  Yes.  We can take a break

20  right now.

21  VIDEO OPERATOR:  We are off the record at

22  11:18 a.m.

23  (A recess was taken.)

24  (Whereupon, Ms. Segal was not

25  present at resumption.)

56

1  VIDEO OPERATOR:  We are on the record at

2  11:25 a.m.

3  Q  BY MS. LAVALLEE:  Ms. Ronsse, I would

4  actually like to go back and talk briefly about the

5  Americas Forecast Package, and it was a package you

6  indicated you prepared, correct?

7  A  Correct.

8  Q  Okay.  And that was something you

9  prepared on Thursdays.  And was that something you

10  prepared using data on OFA?

11  A  Yes.

12  Q  Okay.  And it was a separate report that

13  was generated by Excel; is that correct?

14  A  Yes.

15  Q  And when you completed this report, who

16  did you provide the report to?

17  A  This report was provided to the

18  participants of the Americas Forecast Call, which

19  occurred on Thursdays of a forecast week.

20  Q  All right.  And did you participate in

21  the phone call?

22  A  Yes.

23  Q  Okay.  Generally, how long did they last?

24  A  Generally, a half an hour.

25  Q  Did they often -- sometimes last longer?

57

1   A   Sometimes, yes.
2   Q   And do you -- who were, generally,
3   participants in the Americas Forecast Call?
4   A   My manager, Ivgen Guner; Jennifer Minton;
5   the executive vice presidents in charge of North
6   America sales, OPI and OSI, and their finance
7   directors -- well, in Latin America, but that was
8   the same EVP as OPI.
9   Q   And that was Mr. Sanderson?
10   A   Yes.
11   Q   And Mr. Nussbaum and Roberts, were
12   they --
13   A   Correct.
14   Q   -- EVPs in Q-3?
15   A   Correct.
16   Q   And anybody else?
17   A   From time to time Safra Katz and Jeff
18   Henley.
19   Q   Uh-hum.  And anybody else?
20   A   From time to time Larry Garnick.
21   Q   Okay.  Anybody else?
22   A   Not that I can remember.
23   Q   Okay.  Did Mr. Ellison occasionally
24   participate?
25   A   Not that I can remember.

58

1   Q   Okay.  And what was the purpose of these
2   calls?
3   A   The purpose was to review the forecast
4   numbers for each of the organizations and the large
5   deals for -- in play for each of the organizations.
6   Q   And in anticipation of this call, were
7   materials other than the Americas Forecast Package
8   distributed to the participants?
9   A   No.  The Americas Forecast Package
10   included the forecast report and a Big Deals
11   Report.
12   Q   Okay.  Did you prepare the entire package
13   itself or just components of it?
14   A   We prepared the forecast portion of the
15   Americas Forecast Package.
16   Q   And who prepared the big deals component
17   of it?
18   A   The finance personnel in each of the
19   divisions.
20   Q   Okay.  And did you receive copies of the
21   big deal components?
22   A   Yes.
23   Q   Okay.  Let me step back.  You -- you
24   mentioned earlier that as one of the -- the tasks
25   that you did in terms of the forecasting -- your

59

1   forecasting duties was to perform analyses.
2       Other than what we've already discussed,
3   were those specific analyses that you performed
4   during the typical forecasting week while you were
5   finance manager?
6   A   Can you repeat the question?
7   Q   Okay.  I think when you itemized your
8   particular tasks as forecast- or forecasting-type
9   tasks you undertook as finance manager, you
10   mentioned that you would perform analyses; is that
11   correct?
12   A   On an ad hoc basis?
13   Q   It was just you mentioned that you would
14   run reports, you ensure numbers are correct, you
15   would generate reports, and you would perform
16   analyses.
17   A   Correct.
18   Q   I'm just wondering what you meant by
19   that.
20   A   It would be random depending on
21   management's request of different analyses
22   comparing forecast information to budget, to
23   previous years, looking at trends of forecast.  The
24   forecast accuracy would fall into that.
25   Q   Right.

60

1   A   They were random requests depending on --
2   depending on what management was interested in
3   seeing.
4   Q   Okay.  And other than Ivgen Guner, Lia
5   Burke, and Ms. Minton and Mr. Garnick, did you ever
6   receive requests for analysis regarding forecasting
7   matters from any other personnel?
8   A   Not that I remember.
9   Q   It would usually come through them?
10   A   Yes.
11   Q   Okay.  Back to the Americas Forecast
12   Package, were you the one who typically distributed
13   these packages to the participants of the Thursday
14   calls?
15   A   Yes.
16   Q   And how did you distribute the package?
17   A   Via e-mail.
18   Q   Okay.  And did you generally include a
19   summary of information in the e-mail or cover
20   e-mail that said anything, or was it just simply
21   here it is?
22   A   It was a standard e-mail that said simply
23   here it is for this week.
24   Q   Okay.  And did Ms. Burke ever issue --
25   send out these e-mails?

61

Ronsse, Roberta  4/20/2004  3:09:00 PM

1    A  She did previous to her leaving on
2  maternity leave and me assuming the role.
3    Q  Okay.  And when did she leave on
4  maternity leave?
5    A  It was in the December time frame of
6  2000.
7    Q  Okay.  And do you know how long she was
8  out for?
9    A  I don't remember.
10    Q  Was it for the entire third quarter of
11  fiscal year 2001?
12    A  I don't remember.  I believe so.
13    Q  I'm just going to show you a document
14  that was previously marked in this case as Exhibit
15  No. 39.
16      (Whereupon, Deposition Exhibit 39
17      was placed before the witness.)
18    Q  BY MS. LAVALLEE:  Okay.  Can you tell
19  me -- take a moment and look at it and then tell me
20  what it is?
21      (Pause in proceedings.)
22      THE WITNESS:  This is the Americas Forecast
23  Package.
24    Q  BY MS. LAVALLEE:  Okay.  And it's -- has
25  a cover e-mail that's from you --

62

1    A  Uh-hum.
2    Q  -- and it's dated September 20th, 2000,
3  correct?
4    A  Correct.
5    Q  Okay.  And is it your understanding that
6  this indeed is an e-mail and the attachment that
7  you sent out on or about September 20th, 2000?
8    A  It looks to be.
9    Q  Okay.  I notice that there's the word
10  "draft" on the forecast attachment.  Was that
11  typical?
12    A  Yes.
13    Q  Okay.  And why would you stamp it
14  "draft"?
15    A  We would stamp these "draft" because
16  Thursday was considered to still be a working day
17  for us in the forecast and, uhm, there was a
18  potential that we would get information from the
19  finance personnel in the divisions that there might
20  be something wrong in the system.
21    Q  Okay.  And I notice that this is coming
22  from you to the -- a number of recipients who, I
23  would assume, are the participants on the Thursday
24  call, correct?
25    A  Correct.

63

1    Q  Okay.  There are a number -- a couple
2  additional people beyond those that we discussed
3  earlier.
4      Were those people who actually did
5  participate in the call, to the best of your
6  recollection?
7    A  I don't remember.
8    Q  Okay.  I just want to be clear, when you
9  mentioned earlier that Ms. Burke went on maternity
10  leave, you indicated that she went on maternity
11  leave in December and at that time you took over
12  the role of actually sending these out.
13    A  Uh-hum.
14    Q  I gather you occasionally sent them out
15  also on behalf of your division and Ms. Guner -- or
16  Lia Burke?
17    A  Oh, on behalf of.
18    Q  Okay.  That's what this would indicate,
19  correct?
20    A  Right.
21    Q  Okay.  There's a short message included
22  in the attachment.  Is that standard what you
23  would do throughout the time that you sent these
24  out?
25    A  It was actually standard to only find the

64

1  first sentence on what I typically sent out.
2    Q  Okay.  Why did you include the second
3  sentence on this particular instance?
4    A  I don't remember.
5    Q  Okay.  But that was not typical?
6    A  It was not.
7    Q  Okay.  Did you have regular staff
8  meetings or meetings with people who worked for you
9  during your time as finance manager?
10    A  Occasional, not regular.
11    Q  Okay.  So there wasn't like a standard
12  Monday morning call that you would have or meeting
13  that you would have with your staff?
14    A  Correct, there was not.
15    Q  And how about you with Ms. Guner or
16  Ms. Burke?
17    A  We would have one on ones, but, again,
18  they weren't regular.  We would try to make them
19  regular, but they weren't regular.
20    Q  Okay.  Were there regular meetings over
21  the broader group of people from the finance
22  division?
23    A  Not regular, no.
24    Q  Okay.  So you didn't have any regular
25  meetings that you had to attend other than -- was

65

1  the Thursday call the only regular meeting that you
2  had on your schedule?  And let me restrict my
3  question to the fiscal year 2001.
4      A  I don't remember.
5      Q  Okay.  How about the third quarter of
6  2001, does that assist you to focus on that period?
7      A  I don't remember any other regular
8  meetings.
9      Q  Okay.  I take it you didn't participate
10  in the Monday morning executive committee meetings,
11  right?
12     A  That's correct, I did not.
13     Q  Did you use the OSO system?  Are you
14  familiar with that terminology?
15     A  I'm familiar with OSO.
16     Q  Okay.  Is that a program that you used?
17     A  I did from time to time, not regularly,
18  but yes.
19     Q  Okay.  What does "OSO" stand for, just so
20  it's clear?
21     A  Oracle sales on line.
22     Q  And was that something that you used in
23  your capacity or in your forecasting duties?
24     A  Ah, yes, irregularly.
25     Q  Okay.  And for what purpose would you

66

1  actually go on to OSO or use OSO?
2      A  From an ad hoc perspective to -- to see
3  if a deal that had been mentioned on a Big Deals
4  Report or elsewhere was actually in the system in
5  the division and to see if possibly it had changed
6  or also to look at the forecast numbers, the top
7  level forecast numbers to ensure that they matched
8  what was in OFA.
9      MS. LAVALLEE:  Okay.  Why don't we just go
10  off the record for a moment.  I have to check the
11  next exhibit number.
12     VIDEO OPERATOR:  We are off the record at
13  11:40 p.m. -- a.m.  Sorry.
14     (Pause in proceedings.)
15     VIDEO OPERATOR:  We are on the record at
16  11:41 a.m.
17     MS. LAVALLEE:  I would like to mark the next
18  Exhibit 244, a document Bates stamped CA-ORCL
19  004615 through -4636.
20     (Plaintiffs' Exhibit 244 was marked for
21     identification by the deposition officer and
22     is attached hereto.)
23     MS. LAVALLEE:  And I would also like to mark
24  as 245 an exhibit that is Bates stamped CA-ORCL
25  037623 through -25.

67

1      (Plaintiffs' Exhibit 245 was marked for
2      identification by the deposition officer and
3      is attached hereto.)
4      BY MS. LAVALLEE:  Which is actually just
5  excerpts from the same -- some of the same pages
6  from 244 but where the handwriting is a little
7  easier to read.
8      Ms. Ronsse, if I could ask you to take a
9  look at these two exhibits and then when you've had
10  a chance to look at them, please identify them for
11  me.
12     (Pause in proceedings.)
13     THE WITNESS:  On 245, this looks to be the
14  Americas Forecast Package for the forecast week
15  ending January 15th.
16     244, the first few pages -- two pages
17  look to be the same and after that, uhm, looks like
18  the pipeline report for a few pages.  There's a
19  number of things stapled together that aren't --
20  there are a number of packages stapled together,
21  which is not typical.
22     Q  BY MS. LAVALLEE:  Okay.  Great.  Can you
23  tell me, please, where the Americas Forecast
24  Package begins and ends on Exhibit 244?
25     A  Page 1 and 2 would have been part of the

68

1  Americas Forecast Package.  Do we have numbers on
2  here?
3      Q  Yeah, there's -- if you look to the side,
4  there's a Bates range number that starts CA-ORCL.
5      A  So -4614 and -4615 --
6      Q  Right.
7      A  -- appear to be Americas Forecast Package
8  information.
9      Q  Right.
10     A  -4616, -617, this is pipeline package
11  information.
12     Q  Right.
13     A  -618, uhm, is part of the Americas
14  Forecast Package, I believe.  Typically we put
15  consulting in.  And then we get to -4619, which
16  looks like a page from the Americas Forecast
17  Package again.  And then starting -4620 through the
18  end -4636, this actually is not something that I
19  recognize that I would regularly -- that I would
20  regularly produce.
21     Q  Okay.
22     A  I'm not exactly sure what these pages
23  are.  It may have been something that I was given.
24  It looks to be support service information, one of
25  their reports, potentially, for the forecast week.

69

1    Q  Okay.  Okay.  If I could ask you, then,
2  to focus -- well, let me ask another question.
3       You identified about four or five pages
4  from Exhibit 244 that were from part of the
5  Americas Forecast Package.  Would that have been
6  the entirety of the package or would there have
7  been other additional pages beyond those?
8    A  Uhm, the only other thing that I think
9  would typically be included is the Big Deals
10 Report.
11   Q  Okay.  But this is a component that you
12 prepared?
13   A  Correct.
14   Q  Okay.  Now, if we look at Exhibit 245,
15 there's a series of handwriting on it on the first
16 two -- actually, all three pages.
17      Can you identify the handwriting for me?
18   A  Yes.
19   Q  Is it your handwriting?
20   A  Yes.
21   Q  Okay.  And do you know when you took
22 these notes?
23   A  Uhm, they would have been taken during
24 the forecast call.
25   Q  Okay.

70

1    A  The Americas Forecast Call.
2    Q  Okay.  For that same week?
3    A  For the week.
4    Q  Okay.  Actually, let me ask you another
5  question.  Is this a document that you reviewed in
6  preparation for this deposition?
7    A  Yes.
8    Q  Was it this document or was this part of
9  a document you reviewed in anticipation for this
10 deposition?
11      MR. NADOLENCO:  Objection to the form.
12      THE WITNESS:  It was --
13      MR. NADOLENCO:  I'm sorry.  You mean
14 Exhibit 245?
15      MS. LAVALLEE:  Yes, or 244.  Either one.
16      THE WITNESS:  It was this document
17 (indicating).
18   Q  BY MS. LAVALLEE:  It was the Exhibit 245?
19   A  245.
20   Q  Okay.  Can you -- your handwriting is
21 actually fairly neat -- fairly good.  Can you
22 actually just, though, starting from the left, read
23 through your handwritten notes so we're clear on
24 what you're stating here.
25   A  Going down?

71

1    Q  Yeah.  Let's start from the top and go
2  down.  On the left-hand side I think it starts at
3  the very bottom:  "Sandy said."
4    A  "Sandy says 60 percent, YTD," question
5  mark.  "Growth," question mark.  "Is this right,"
6  question mark.  Do you want me to go on?
7    Q  Let me stop you there and we'll go
8  through and ask questions as you discuss -- as you
9  repeat or as you state what you've written here.
10 "Sandy said 60 percent, YTD."  What does
11 that refer to?  Year to date?
12   A  "YTD" would refer to year to date.
13   Q  Okay.  And do you have any understanding
14 as to what your -- your notation "Sandy said
15 60 percent year to date?  Growth?  Is this right?"
16 what you were referring to?
17   A  I don't remember.
18   Q  Okay.  If you look up on the actual chart
19 itself, uhm, for Sandy's division, what type of
20 growth was he -- was estimated?  Can you tell?
21   A  Well, this is only quarterly growth.
22   Q  Right.
23   A  Uhm, but it shows 80 percent for OPI,
24 11 percent for Latin America on revenue.
25   Q  Do you remember any discussion regarding

72

1  this issue at the forecasting call?
2       MR. GOLDSTEIN:  Objection to form.
3       THE WITNESS:  No.
4    Q  BY MS. LAVALLEE:  Okay.  Can you continue
5  with your reading, please.
6    A  "Concern in East," and then "LAD 28
7  percent business is in."
8    Q  Okay.
9    A  I think 28, if I'm reading it right, 28
10 or 23.
11   Q  All right.  Now, can you tell from your
12 notation where one thought begins and one thought
13 ends?
14      MR. GOLDSTEIN:  Objection to form.
15   Q  BY MS. LAVALLEE:  Let me ask a different
16 question.  The phrase "Concern in East," do you
17 have any understanding what you were noting when
18 you wrote that?
19   A  I don't remember.
20   Q  Okay.  Do you remember any discussions at
21 the forecasting call or at any time during Q-3
22 about concerns in East?
23   A  No.
24   Q  Okay.  Do you know what you referred
25 to -- pardon me.

73

1      Do you know what you meant when you said
2  "East"?  Was that a particular division that you
3  were talking about?  Can you tell?
4      A  From this note, I can't tell.
5      Q  Okay.  Do you have any understanding, as
6  you sit here today, as to what you were referring
7  to?
8      A  No, except that it -- well, there were
9  divisions, East, West and Central, within OPI.
10     Q  Okay.  Do you believe you were talking
11 about OPI there?
12     A  Most likely because it was under Sandy.
13     Q  Okay.
14     A  Because the note is under what Sandy
15 said.
16     Q  Okay.  Do you believe that everything
17 underneath that column there refers to Sandy's
18 division, Mr. Sanderson's division?
19     MR. GOLDSTEIN:  Objection to form.
20     THE WITNESS:  It looks as though -- it looks
21 as though, so yes.
22     Q  BY MS. LAVALLEE:  Okay.
23     A  From the notes.
24     Q  Okay.  And the fourth line down "LAD 28
25 percent" or "23 percent business is in."

74

1      A  Uh-hum.
2      Q  What does that statement refer to?
3      A  I don't remember.
4      Q  Okay.  What does "LAD" stand for?
5      A  Latin America Division.
6      Q  Okay.  And do you have any recollection
7  or any discussion regarding your note there?
8      A  No.
9      Q  Can you continue reading?
10     A  "Ingersoll Rand is unraveling, less
11 promising," and then "Gap, U.S. Filter," and then
12 the word is cut off but I believe it's "Motorola
13 dropped from Q-2, possible for this quarter."  And
14 then in the middle it says, "Footnote pipeline
15 without Covisent."
16     Q  Okay.  Let me stop you right there.  Do
17 you recall any discussion -- well, let me ask a
18 different question.
19     Ingersoll Rand, do you know what that was
20 referring to?
21     A  Ah, I don't remember.
22     Q  Okay.  Is that a potential deal?  Is that
23 your understanding of what you were discussing
24 there or what you were noting?
25     A  It -- I don't remember.  It could have

75

1  been.
2      Q  Okay.  And what about "Gap," the
3  reference to "Gap"?
4      A  That was a potential deal.
5      Q  Okay.
6      A  I can't remember if it was forecast or
7  upside, but it was a potential deal.
8      Q  Okay.  Do you recall any discussion in or
9  about or around January 15th regarding the Gap
10 deal?
11     A  I don't recall.
12     Q  Okay.  All right.  You started to read
13 from the next column.  It says, "Footnote pipeline
14 without Covisent."
15     Do you have any understanding of what you
16 were writing there?
17     MR. NADOLENCO:  Objection to form.
18     Q  BY MS. LAVALLEE:  Let me ask -- phrase
19 that a little bit differently.
20     Do you have any understanding of what was
21 the substance of what you were taking a note on
22 there?
23     A  Yes.  For a number of our reports, I
24 was -- we were asked to include a footnote which
25 showed revenue numbers and growth numbers and

76

1  pipeline growth numbers and conversion ratios
2  without the Covisent amount of the Covisent deal
3  included.
4      Q  And were you asked to do that during this
5  time frame?
6      A  I don't -- I don't remember.
7      Q  Do you recall who asked you to do that?
8      A  My manager, Ivgen, and Jennifer Minton.
9      Q  Okay.  Do you have any recollection of
10 why you were asked to do that?
11     MR. NADOLENCO:  Objection.  Foundation.
12     THE WITNESS:  It was included as a footnote
13 for informational purposes.
14     Q  BY MS. LAVALLEE:  Okay.  And do you know
15 why?
16     A  No, I don't remember specifically except
17 that it was, in general, again, for information
18 purposes to know what the numbers were without
19 it -- just to have an easier comparison to previous
20 years or to, uhm, to forecast and for other
21 analysis purposes.
22     Q  Okay.  What --
23     A  For other ratios that you might -- might
24 do conversion ratios, comparisons of conversion
25 ratios, pipeline conversion ratios.

77

1     Q  Okay.  And what other type of analysis
2  would that be relevant to?
3     MR. GOLDSTEIN:  Objection to form.
4     THE WITNESS:  I guess when I say analysis for
5  when you're looking at -- when you're analyzing
6  prior -- comparing prior year growth numbers to
7  other quarters prior year growth numbers, that type
8  of analysis.
9     (Whereupon, Ms. Segal entered the
10     deposition room.)
11    Q  BY MS. LAVALLEE:  Okay.  Anything else?
12    MR. GOLDSTEIN:  Objection to form.
13    Q  BY MS. LAVALLEE:  Any other analysis or
14  comparisons?
15    A  No.  Again, I didn't mean actual analyses
16  like paper analyses.  More informational, you know,
17  analyses in your mind, if you will, in comparing
18  numbers --
19    Q  Right.
20    A  -- from one quarter to another.
21    Q  Okay.  And would it be relevant for
22  forecasting purposes as well?
23    MR. GOLDSTEIN:  Objection to form.
24    Q  BY MS. LAVALLEE:  And by -- let me
25  clarify.  Would it be relevant to -- look at

78

1  pipeline without Covisent for forecasting purposes
2  as well or revenue figures without Covisent?
3     MR. GOLDSTEIN:  Same objection.
4     THE WITNESS:  For -- I guess if you can
5  clarify relevant on -- for forecasting.
6     Q  BY MS. LAVALLEE:  How about -- you've
7  talked about some of the reasons why you would do
8  an analysis, pipeline or revenue, without Covisent.
9  I guess my question is:  You've referred to --
10  actually, let me do something else.
11    Could I have her response to the initial
12  question on this line of questioning read back?
13    (The record was read as follows:
14     "A  No, I don't remember specifically
15     except that it was, in general, again,
16     for information purposes to know what the
17     numbers were without it -- just to have an
18     easier comparison to previous years or to,
19     uhm, to forecast and for other analysis
20     purposes.")
21    Q  BY MS. LAVALLEE:  I guess my question is:
22  What did you mean by comparison to forecast or
23  other -- to forecast?
24    A  I guess what I meant was, uhm, that --
25  what I really meant to say was comparison to

79

1  previous years, the forecast, the current forecast
2  number to previous years, and in comparing the
3  current forecasted growth rate and conversion ratio
4  against previous years growth rate and conversion
5  ratios.
6     Q  Okay.  Why would it be relevant or
7  important to take out the Covisent from these
8  analyses?
9     MR. GOLDSTEIN:  Objection to form.
10    Q  BY MS. LAVALLEE:  Like how does that help
11  I guess is my question.
12    MR. GOLDSTEIN:  Same objection.
13    MR. NADOLENCO:  And, Nicole, we're still
14  operating under the assumption that I'm joining in
15  all of Oracle's objections?
16    MS. LAVALLEE:  Yes, and vice versa.
17    THE WITNESS:  Uhm, from my perspective when
18  you're looking at revenue growth, including a deal
19  that large, comparing it to a previous year, you
20  tend to want to see the reason why it is so large
21  and so that's why we would kind of neutralize the
22  effect of Covisent to compare it to the -- to the
23  previous year.
24    Q  BY MS. LAVALLEE:  Okay.  Do you recall
25  any specific discussion regarding your instruction

80

1  to "Footnote pipeline without Covisent" or
2  footnote -- or revenue without Covisent?
3     MR. GOLDSTEIN:  Objection to form.
4     THE WITNESS:  No.
5     Q  BY MS. LAVALLEE:  Can you continue
6  reading --
7     A  Sure.
8     Q  -- right below that?
9     A  "NAS 14,400 for upside, OSI zero.  Check
10  on rates for this week expecting 2 point
11  improvement."
12    Q  Okay.  If I could stop you there.  Do you
13  recall what was the significance or what was the
14  meaning of your notation "NAS 14,400 for upside"?
15    A  No.
16    Q  Okay.  Were you -- do you have any
17  understanding as to whether you were referring to a
18  specific dollar amount there for what represented
19  the upside?
20    A  From the note, it seems that it would be
21  a dollar amount.
22    Q  Okay.  And OSI, was that dollar amount,
23  do you believe that refers to the upside figure?
24    A  Since it's underneath the NAS note for
25  upside, yes.

81

1    Q   Okay.  Do you have any recollection of
2  any discussions regarding upsides for Q-3 2001?
3       MR. GOLDSTEIN:  Objection to form.
4       THE WITNESS:  No.
5    Q   BY MS. LAVALLEE:  Okay.  Do you recall
6  the trend of the upside trend -- let me ask a
7  different question.
8       Do you recall what the upside numbers --
9  what the upside numbers were during any of the
10  weeks of Q-3 2001?
11    A   No, I don't remember.
12    Q   Do you recall the trend of how it moved,
13  the upside number?
14       MR. GOLDSTEIN:  Objection to form.
15       THE WITNESS:  It -- no -- well, what do you
16  mean by "trend"?
17    Q   BY MS. LAVALLEE:  I guess -- that's a
18  fair question.
19       Do you recall how the upside number for
20  any division or for the company as a whole changed
21  throughout Q-3 2001, if indeed it changed?
22    A   I don't recall.
23    Q   And your next notation "Check on rates
24  for this week expecting 2 point improvement," do
25  you have any understanding of what you were taking

82

1  a note of there?
2    A   Uhm, the rates -- I would have been
3  speaking about the exchange rates --
4    Q   Okay.
5    A   -- that we loaded into OFA, the
6  forecasted exchange rates.
7    Q   Okay.  And what would have been the
8  significance of making a note of that?
9       MR. GOLDSTEIN:  Objection to form.
10       THE WITNESS:  We always checked to make sure
11  that we had the accurate rates and it was probably
12  just something I noted to myself.  I don't remember
13  precisely.
14    Q   BY MS. LAVALLEE:  Okay.  Do you remember
15  any specific discussions regarding exchange rates
16  during Q-3 2001?
17    A   No.
18    Q   All right.  Could I ask you to continue
19  reading -- well, actually before we go to the
20  column on the right, you have some notations on
21  numbers and tick marks and whatnot in the actual
22  chart itself.
23       Do you have any understanding of what you
24  were doing when -- what those notes reflect?
25    A   No, I don't.

83

1    Q   Okay.  Can you continue reading, then, on
2  the bottom right with your word notations?
3    A   "OSI, Higher Ed deals are key" -- and it
4  says "UT," I think.
5    Q   Do you know what "UT" stands for?
6    A   No.  UT, no.
7    Q   Okay.  Do you have any understanding of
8  what that phrase generally refers to?
9    A   Which phrase?
10       MR. GOLDSTEIN:  You mean the whole note?
11    Q   BY MS. LAVALLEE:  Yeah, let me -- the
12  sentence "Higher Ed deals are key UT," do you have
13  any understanding of what it was you were making a
14  note of there?
15    A   Since it's under "OSI," "Higher Ed" is a
16  division of OSI.  That's -- that's about as much as
17  I would know what was being discussed was "Higher
18  Ed deals."
19    Q   Okay.  And your next notation?
20    A   Looks like "Opportunities in" -- this one
21  is hard -- "in comm" -- "communications" I think is
22  what is spelled out, and I can't read what's to the
23  far right on that line.
24    Q   Uh-hum.
25    A   "But commit to 59."

84

1    Q   Okay.  Does the word "commit" have any
2  significance to you?
3    A   What do you mean by "significance"?
4    Q   Does that word have any meaning in terms
5  of the forecasting terminology?
6    A   No.
7    Q   Okay.  Do you have any understanding of
8  what you were taking note of there in that
9  sentence?
10    A   I don't remember.
11    Q   All right.  Let's keep going.  Can you
12  continue reading to the next line?
13    A   "Low 185."
14    Q   Uh-hum.  Do you have any understanding of
15  what you were making a note of there?
16    A   I don't remember.
17    Q   Okay.  And your next notation?
18    A   "Best maybe" -- I don't know if that's
19  "maybe" or not.  I can't read the next word after
20  that.
21    Q   Okay.
22    A   "Safe at 210" is the next line.
23    Q   Okay.  Do you have any understanding of
24  what you were making note of there?
25    A   No.  These are all just things that was

85

1  said about OSI.

2    Q  Okay.  And the figure "210," do you have

3  any understanding of what that refers to?  Was that

4  a dollar figure that you were referring to?

5    A  Most likely, yes.

6    Q  Okay.  And what would that be?  Would

7  that be a forecast figure?

8    A  I don't know.

9    Q  Okay.  And the next notation?

10    A  "Federal big agency deals."  Under that I

11  can't -- I can't read the first word.  It says

12  "Q-1" and "Q-2" and "Air Force," I think "Q-4" in

13  parentheses.

14    Q  Okay.  And do you have any understanding

15  of what you were making a note of there?

16    A  Not more than -- than what is -- you

17  know, than what is written.

18    Q  Okay.

19    A  No, I don't remember.

20    Q  The actual notes themselves don't have

21  any meaning to you at this stage?

22    A  No, not that -- nothing that I remember

23  or recall.

24    Q  Okay.  And do you think that -- do you

25  recall any discussions regarding deals in the

86

1  federal division?

2    A  No.

3    Q  Do you recall any discussions or do you

4  recall -- well, strike that.

5      Do you recall any discussions regarding

6  what the growth rates in OPI looked like without

7  the Covisent deal?

8    A  No, I don't recall.

9    Q  Do you recall what the numbers actually

10  were for Q-3 2001 without Covisent?

11    A  No.

12    Q  Do you recall -- okay.  Let's continue to

13  the next page, which is Bates stamped CA-ORCL

14  037624, and there's a couple of notations on the

15  charts with check marks as well as -- I guess

16  there's one of the numbers is circled.

17      In terms of the notations on the chart

18  itself, do you have any understanding of what you

19  were doing by those notes?

20    A  No.

21    Q  Okay.  Now, in terms of the written words

22  below on the side, can you read the ones -- the one

23  on the bottom?

24    A  The one in the middle?

25    Q  Yes.

87

1    A  On the bottom?  The arrow "Reluctant at

2  185."

3    Q  Okay.  Do you have any understanding of

4  what the reference there was?

5    A  No.

6    Q  Okay.  Can you explain for me what

7  this -- the chart represents on the bottom of this

8  page 37624?

9    A  The one titled "License Scenario

10  Analysis"?

11    Q  Yes.

12    A  This -- these were numbers provided to us

13  by the finance personnel in the divisions as to

14  what each division believed their worst, most

15  likely, and best dollar amounts that they would

16  close in the quarter.

17    Q  Okay.  And the worst represents what?

18    MR. GOLDSTEIN:  Objection to form.

19    BY MS. LAVALLEE:  The worst figure for

20  each of these divisions on license represents what?

21    A  Ah, the understanding was that that would

22  be the lowest amount that they would close for the

23  quarter.

24    Q  Okay.  And the best figure represented

25  what?

88

1    A  The potential amount.

2    Q  Okay.  And the most likely figure?

3    A  As it states, what they would most likely

4  come in at.

5    Q  Okay.  And do you have any

6  understanding -- recollection of any discussion

7  regarding Mr. Sanderson's division OPI and the

8  reference to 185?

9    A  No.

10    Q  And can you read the notations on the

11  right-hand side?

12    A  "Best down from 390 to 360, FY 30 percent

13  dash 25 percent 9iAS," question mark, "Majors 13

14  percent."  There's a dash there.

15    Q  Do you have any understanding as to

16  whether that represents a negative figure?

17    A  I don't, no.

18    Q  Keep going.

19    A  "GB" it looks like "2 percent."

20    Q  Right.  No negative there, right?  No

21  dash there, right?

22    A  I don't see a dash.

23    Q  All right.  Keep going.

24    A  "Can," which would be Canada, and I can't

25  read -- there's a dash.  It looks like an "NG,"

89

Ronsse, Roberta  4/20/2004  3:09:00 PM

1    maybe.
2        Q   Do you know what that would mean?
3    Negligible?  You don't know?
4        A   Uhm, I don't remember.
5        Q   Okay.  And the notation below?
6        MR. GOLDSTEIN:  We just want you to know that
7    we don't consider Canada to be negligible at all.
8        MS. LAVALLEE:  I appreciate hearing that.
9    Thank you, Paul.
10       MR. GOLDSTEIN:  You're welcome.  She's from
11   Canada.
12       THE WITNESS:  Oh, okay.  I understand now.
13   And then "Economic" at the bottom.
14       Q   BY MS. LAVALLEE:  Okay.  Do you have any
15   understanding of what you were referring to in
16   these notations here?
17       A   I don't remember.
18       Q   Okay.
19       A   Besides what's on it.
20       Q   Do these notes have any significance to
21   you?  Do you understand, based on how you take
22   notes, what this could mean?
23       A   Uhm, it would be verbatim what -- well,
24   not necessarily verbatim, but it would be what was
25   spoken of on the call.

90

1        Q   Okay.  So the line "Best" arrow down
2    "from 390 to 360," generally that's talking about
3    the best case number of -- on the left-hand side of
4    that chart, is that what that's refer to?
5        A   Generally, yes.
6        MS. LAVALLEE:  Okay.  There's five minutes
7    left on the tape.  So let's take a couple minutes
8    just to change the tape and take a break at this
9    time.
10       MR. GOLDSTEIN:  Do you want to take a lunch
11   break or --
12       MS. LAVALLEE:  Why don't we finish with the
13   line of questioning, and then we'll take a lunch
14   break.
15       MR. GOLDSTEIN:  That's fine.
16       VIDEO OPERATOR:  This concludes Videotape
17   No. 1 in the videotaped deposition of Roberta
18   Ronsse.  The time is 12:13 p.m. on April 20th,
19   2004, and we are off the record.
20       (Pause in proceedings.)
21       VIDEO OPERATOR:  This begins Videotape No. 2
22   in the videotaped deposition of Roberta Ronsse.
23   The time is 12:16 p.m. on April 20th, 2004, and we
24   are on the record.
25       Q   BY MS. LAVALLEE:  Ms. Ronsse, the word

91

1    "best," do you have any understanding as to whether
2    that refers to the "Best" column on the left-hand
3    side of that chart?
4        A   Uhm --
5        Q   The numbers are down from --
6        A   It looks like it does.  It looks like it
7    does, yes.
8        Q   And it's your understanding there would
9    have been a discussion about that subject at the
10   call?
11       A   Yes.
12       Q   Okay.  Do you -- generally, how would
13   that proceed?  Would there be a discussion as to
14   why the number was dropping?
15       A   Uhm, there isn't any -- the discussions
16   were random, so I couldn't say generally.
17       Q   Okay.  Who was basically the person who
18   sort of coordinated the call in terms of actually
19   speaking at the call and sort of organizing how it
20   proceeded?
21       A   Typically, Jennifer Minton.
22       Q   And was there a standard sort of
23   procedure in terms of how matters were discussed or
24   in what order things were discussed?
25       A   Nothing standard, no.

92

1        Q   Okay.  What were the general subject
2    matters of these calls?
3        A   Ah, generally, the executive would review
4    his or her -- his numbers and the big deals, the
5    large big deals typically that were on their Big
6    Deals List.
7        Q   Okay.  And would there be some
8    back-and-forth discussion about that?
9        A   Yes.
10       Q   Okay.  And would people pose questions?
11       A   Yes.
12       Q   And who generally would do the speaking
13   and asking of questions?
14       A   Generally Jennifer Minton, Jeff Henley,
15   when he attended, and Safra Katz, when she
16   attended.
17       Q   Do you recall any discussions regarding
18   any specific deals on the Thursday calls in Q-3
19   2001?
20       A   No.
21       Q   Okay.  Do you recall anything unusual
22   about Q-3 2001?
23       MR. GOLDSTEIN:  Objection to form.
24       MR. NADOLENCO:  I agree.
25       THE WITNESS:  In terms of "unusual," what --

93

1    Q  BY MS. LAVALLEE:  Let me rephrase my
2  question.  Let me ask you a different question.
3    Well, let's continue with the notes.  The
4  FY 30 percent hyphen 25 percent, do you have any
5  understanding of what that phrase there -- and the
6  notation on the end is 91 AS, correct?
7    A  9iAS.
8    Q  9iAS.  Thank you.  And do you have any
9  understanding what that phrase means or what that
10  notation is?
11    A  Not -- not the notation, no.  The entire
12  notation, no.
13    Q  Okay.  Any portion of it?
14    A  Well, I just know that "9iAS" stands for
15  the application server, 9i Application Server.
16    Q  Okay.  And the -- do you recall any
17  discussions regarding the majors divisions and how
18  it was performing in Q-3 2001?
19    A  I don't recall.
20    Q  Okay.  Do you -- "GB," what does that
21  stand for?
22    A  General business.
23    Q  Okay.  Do you have any recollection of
24  how that was performing in Q-3 2001?
25    A  No.

94

1    Q  And the notation "Economic," do you have
2  any understanding of what you were referring to
3  there?
4    A  No.
5    Q  Okay.  And the next page there's some
6  handwritten notes.  Those, I take it, are yours as
7  well, right?
8    A  Yes.
9    Q  Okay.  And do you have any understanding
10  of what you were noting in -- with these
11  handwritten notations?
12    A  No.
13    MS. LAVALLEE:  All right.  Why don't we break
14  now for lunch.
15    MR. GOLDSTEIN:  Okay.
16    VIDEO OPERATOR:  We are off the record at
17  12:20 p.m.
18    (Whereupon, a luncheon recess was
19    taken at 12:20 p.m.)
20
21
22
23
24
25

95

1    SAN DIEGO, CALIFORNIA; TUESDAY, APRIL 20, 2004;
2    1:14 P.M.
3    - - -
4    EXAMINATION (RESUMED)
5    VIDEO OPERATOR:  We are on the record at
6  1:14 p.m.
7    MS. LAVALLEE:  Could I have the last question
8  and answer read back, please.
9    (The record was read as follows:
10    "Q  Okay.  And do you have any
11    understanding of what you were noting in --
12    with these handwritten notations?
13    "A  No.")
14    Q  BY MS. LAVALLEE:  Ms. Ronsse, we were
15  talking about, before we broke for lunch, the
16  Thursday forecasting calls and generally some of
17  the subject matters that were touched upon during
18  those calls.
19    Do you -- can you tell me, did you,
20  generally, take notes at those calls?
21    A  Yes.
22    Q  Okay.  And did you take notes on reports
23  such as the one that we just looked at,
24  Exhibit 245?
25    A  Yes.

96

1    Q  Okay.  Do you generally take notes when
2  you attend most meetings?
3    MR. NADOLENCO:  Objection to form.
4    Q  BY MS. LAVALLEE:  Let me ask a different
5  question.  During the third quarter of 2001, did
6  you generally take notes when you attended
7  meetings?
8    A  I don't remember.
9    Q  Okay.  And when you attended the
10  forecasting -- the Thursday forecasting calls, did
11  you bring with you materials that you might need to
12  reference during those calls?
13    A  I don't remember bringing any others
14  besides this.
15    Q  Okay.  Were you actually called upon to
16  talk during those calls?
17    A  No.
18    Q  Okay.  So, to the best of your
19  recollection, did you ever speak at any Thursday
20  forecasting call?
21    A  No.
22    Q  And we spoke about the fact that the
23  executive vice presidents from the various
24  divisions would speak and talk about their
25  forecasts and there would be some questioning by

97

1   various people, including Ms. Minton, Mr. Henley,
2   and Ms. Katz to the extent they were present.
3        Is that fairly accurate?
4        A  Yes.
5        Q  Okay.  Apart from that type of
6   discussion, what other types of discussions were
7   there during the Thursday forecasting calls?
8        A  Discussions surrounding the accuracy of
9   the numbers that were presented in the package
10  would also come up from time to time.  If there was
11  something wrong, that would be discussed.
12       Q  Okay.  And who would speak to that issue?
13       A  Either the EVP or the finance director on
14  behalf of the EVP.
15       Q  Okay.  And do you recall any specific
16  discussions regarding those issues from the Q-3
17  2001 time frame?
18       A  No.
19       Q  And other than the accuracy of the
20  numbers and the forecasts from the particular
21  divisions that we discussed earlier, were there
22  other subject matters that were touched upon during
23  the forecasting calls?
24       A  I don't remember any others.
25       Q  Okay.  Were there discussions regarding

98

1   trends or -- let me ask a different question.
2        Were there discussions regarding how the
3   current forecast and numbers compared to historical
4   figures ever discussed or happen during the
5   Thursday forecasting calls, to the best of your
6   recollection?
7        A  I don't remember besides the numbers that
8   were on the reports.
9        Q  Okay.  And -- but there were discussions
10  regarding the deals, right?  I think we talked
11  about that.
12       A  Typically, yes.
13       Q  Okay.  And I guess there would be some
14  back and forth regarding if there were problems
15  with particular deals; is that the general concept?
16       A  Uhm, yes, but not only problems but --
17  either way, problems or advancements with pending
18  deals.
19       Q  Right.  Okay.  And were the topics of --
20  you know, were there a lot of deals out there or
21  whether or not there were -- the size of the deals,
22  were those generally topics that were discussed
23  during the Thursday forecasting calls?
24       A  Uhm, yes, generally.
25       Q  Do you recall any discussions regarding

99

1   deals from the fiscal year 2001 time frame?
2        A  Specific deals, no.
3        Q  Okay.  Uhm, trends regarding deals?
4        MR. GOLDSTEIN:  Objection to form.
5        THE WITNESS:  Trends -- I don't understand --
6        Q  BY MS. LAVALLEE:  Okay.
7        A  -- what you mean by "trends regarding
8   deals."
9        Q  Okay.  Well, do you recall ever
10  discussing the issue of how many big deals there
11  were in a particular division in the fiscal 2001
12  time frame?
13       A  I don't remember.
14       Q  Okay.  Do you recall any discussions,
15  generally, either at a Thursday forecasting call or
16  outside of Thursday forecasting calls, discussions
17  regarding the fact that there were less big deals
18  in the pipeline in a particular division such as
19  NAS?
20       A  No.
21       Q  Generally, were there discussions at the
22  Thursday forecasting calls regarding trends in
23  terms of -- let me strike -- let me ask a different
24  question.
25       Were there discussions regarding how

100

1   customers were behaving generally?  Is that
2   something that was discussed at the Thursday
3   forecasting calls?
4        MR. NADOLENCO:  Objection as to form.
5        THE WITNESS:  I don't remember.
6        Q  BY MS. LAVALLEE:  Okay.  In terms of the
7   actual report, the forecast -- the Americas
8   Forecast Report, and I'm referring now to
9   Exhibit 245, can you point to a particular section
10  of the report that were the types of numbers or
11  figures that were discussed during the calls?
12       A  Uhm, revenue was discussed, revenue
13  figures, typically margin figures.
14       Q  Were the actual forecast figures
15  discussed, or was there a discussion regarding the
16  comparison between the current week's forecast and
17  the second call in the prior week's forecast?
18       A  There would be discussions comparing to
19  the prior week.
20       Q  And about the year -- prior year's
21  growth, the growth over the prior year which, I
22  believe, is the fourth column; is that correct?
23       A  Yes.
24       Q  Was that -- those figures -- type of
25  figures discussed?

101

Ronsse, Roberta  4/20/2004  3:09:00 PM

1    A  Sometimes.

2    Q  Anything else?

3    A  Let's see.  Do you mean just on the first

4    page or anywhere --

5    Q  Any page.

6    A  Uhm, pipeline numbers and as they

7    compared to the previous week.

8    Q  And are you referring to any particular

9    column on any particular page?

10   A  On the page marked -7624 --

11   Q  Yes.

12   A  -- the pipeline columns here, the Q3 FY01

13   Pipeline, Prior Week Pipeline.  In general,

14   pipeline would be discussed.

15   Q  Okay.  And what about the conversion

16   ratio?

17   A  It -- from time to time, yes.

18   Q  And was there -- what would trigger a

19   discussion on the conversion ratio in one week as

20   opposed to another?

21   MR. NADOLENCO:  Object to the form.

22   THE WITNESS:  Yeah, I don't -- I couldn't

23   speculate as to what -- or can't really remember

24   what would trigger it.

25   Q  BY MS. LAVALLEE:  Okay.  So was it

102

1    usually a discussion regarding some issues that

2    might not always be discussed because there was a

3    variant that cost somebody -- or something unusual

4    about a figure that caught someone's eye or could

5    it be just for any reason?

6    MR. GOLDSTEIN:  Objection as to form.

7    THE WITNESS:  It was random.

8    Q  BY MS. LAVALLEE:  Okay.  And the growth

9    versus prior year percentage on the pipeline

10   figure, that was something that was discussed

11   occasionally or routinely?

12   A  Potentially occasionally.  Sorry.

13   MR. GOLDSTEIN:  That's fine.

14   MS. LAVALLEE:  Could I have the last answer

15   read back?

16   THE WITNESS:  I just realized it was

17   forward-looking and then back-wards looking with my

18   "potentially occasionally."  I just meant

19   "occasionally."  I threw in "potentially" not on

20   purpose.

21   Q  BY MS. LAVALLEE:  That's fair.  The box

22   on the bottom, the worst case, most likely, and

23   best case, the "License Scenario Analysis," that

24   box in its entirety, was that something that was

25   discussed?

103

1    A  Occasionally.

2    Q  I gather on June 15th, week six, based on

3    your notes, is it fair to say that those numbers

4    were discussed?

5    MR. GOLDSTEIN:  You said June.  I think you

6    meant January.

7    MS. LAVALLEE:  January 15th.  Thank you,

8    Paul.

9    THE WITNESS:  I can't remember, but it -- my

10   notes seem to refer to that box.

11   Q  BY MS. LAVALLEE:  Okay.  What about from

12   the third page of Document 245?

13   A  Typically, consulting would be discussed,

14   the revenue figures and margin figures and --

15   change from the previous week, variance from the

16   previous week.  I think that's the only other new

17   information that is on this page.

18   Oh, I'm sorry.  And this showing Q-4 '01,

19   so it's the next quarter out.  I just realized this

20   was Q-4 of '01.  That typically did not get

21   discussed.  It was more for informational purposes.

22   Q  Okay.  And is it fair to say, based on

23   this chart, that you performed certain amounts of

24   either compilation of data or analysis of data for

25   the next quarter when you -- in the forecasting

104

1    process?

2    A  Yes.

3    Q  Okay.  So this was not an unusual sheet

4    to appear in the Americas Forecast Report; is that

5    fair?

6    A  Yes.

7    Q  Okay.  At what point in a quarter did you

8    start looking to the next quarter for forecast, to

9    compile forecasting-type data?

10   A  It wasn't regular.  Uhm, it was upon

11   direction of management when they felt we were

12   prepared and the finance personnel in the divisions

13   were prepared to -- to provide the information.

14   Q  Okay.  And I notice that you have

15   annotations on page -625.  Does that sort of

16   reflect notes that you took during the forecasting

17   call?  Can you say?

18   A  I can't say, no.

19   Q  Okay.  It's fair to say you looked at

20   these numbers, though, at some point because you

21   made notes on them?

22   A  Yes.

23   Q  Do you have any recollection whether or

24   not the fourth quarter numbers were actually looked

25   at on -- or in connection with the forecasting call

105

1   for January -- the week of January 15th?

2   A   No, I don't remember.

3   Q   Okay.  Do you recall any -- were there --

4   let me ask a different question.

5       Were there any discussions of general

6   economic factors that might impact the forecast

7   during the Thursday forecasting calls?

8   A   Not that I remember, no.

9   Q   Okay.  Is it fair to say that, though, to

10  the extent one of the divisions was seeing

11  particular growth or was experiencing some real

12  upside, they would discuss that at the call?

13      MR. NADOLENCO:  Object to the form.

14      THE WITNESS:  Can you repeat the question?

15  Q   BY MS. LAVALLEE:  To the extent there was

16  one particular division that might have been seeing

17  some growth, more than anticipated growth, that

18  they would -- that that would be something that

19  would be discussed in the calls?

20      MR. NADOLENCO:  Object to the form.

21      THE WITNESS:  Upside or downside would be --

22  would be discussed or would be brought up.

23  Q   BY MS. LAVALLEE:  Okay.  So --

24  A   Potentially.  I'm sorry.  Not all the

25  time.

106

1   Q   But that's something that to the extent

2   there was something going on, that might be

3   discussed?

4   A   It might be, yes.

5   Q   Okay.  Would issues like -- do you

6   know -- let me ask a different question.

7       Are you familiar with the term "deal

8   cycle"?

9   A   No, I never -- I never used it.

10  Q   Have you heard it used before?

11  A   I don't remember.

12  Q   Okay.  Do you have any understanding as

13  to generally how long it takes for a license deal

14  to close from beginning -- from the time it first

15  became an opportunity to the time it closed at

16  Oracle?

17  A   No, I don't have that knowledge.

18  Q   Okay.  Was that -- was the time frame for

19  closing of deals something that was ever discussed

20  at Thursday forecasting calls?

21  A   I don't remember.

22  Q   Okay.  Were the budget rate -- pardon

23  me -- the budget numbers ever something that was

24  discussed in the forecast calls?

25  A   From time to time.

107

1   Q   Okay.  In what context would those

2   numbers be discussed?

3   A   Typically comparing forecast to their

4   budget numbers.

5   Q   Okay.  And -- okay.  Was that something

6   that was regularly discussed?

7   A   No, from time to time.

8   Q   Okay.  And do you recall any specific

9   times when that was discussed?

10  A   No.

11      Going back a couple years here.

12  A   Yeah, four.  Lots of calls.

13  Q   Do you recall any discussions regarding

14  the dot com business and when it started to slow

15  down and what impact that might have on the

16  company?

17      MR. NADOLENCO:  Object to the form.

18      THE WITNESS:  I don't recall.

19  Q   BY MS. LAVALLEE:  Do you recall whether

20  that was ever discussed?

21  A   Sure.  After -- at the very end of the

22  quarter, after the fact of -- you know, it was one

23  of the reasons we gave as a company for not making

24  our numbers.

25  Q   After --

108

1   A   -- I believe.  Pardon.

2   Q   Are you talking about a particular

3   quarter now?  Q-3 --

4   A   Yes.

5   Q   -- 2001?

6       Okay.  So do you recall ever having

7   discussed it prior to the end of the quarter?

8   A   No.

9   Q   Okay.

10      MR. GOLDSTEIN:  My coughs are being

11  electronically propagated.  Sorry.

12  Q   BY MS. LAVALLEE:  Generally, would there

13  be a discussion at the Thursday forecasting calls

14  regarding whether or not the pipeline was growing

15  or getting smaller throughout the quarter?

16  A   Generally, yes.

17  Q   Okay.  So the -- just the trend of -- is

18  it fair to say that the trend, the direction that

19  the pipeline was taking was something that you

20  discussed occasionally?

21      MR. NADOLENCO:  Object to the form.

22      THE WITNESS:  Uhm, do you want to explain the

23  "trend," what you mean by a "trend"?

24  Q   BY MS. LAVALLEE:  Okay.  Do you -- is a

25  "trend" a term that you used at Oracle in the

109

1  forecasting scenario?

2     A  Not with forecasting specifically.

3     Q  Okay.  Was it a term they used generally

4  at the company?

5     A  For different ad hoc analyses we might

6  look at trends.

7     Q  Okay.  And in what -- what do you mean by

8  "trends" in that context?

9     A  Uhm, in that context, I mean by looking

10  at either every quarter over the last year, over

11  the last two years, uhm, the same quarter in

12  previous fiscal years.  That's what I mean by

13  "trend."

14     Q  Okay.  Well, let's use that same

15  definition to apply to my question, and my question

16  is:  Did you discuss the trends of pipelines -- the

17  pipeline trend during the forecasting calls?

18     A  Typically --

19     MR. GOLDSTEIN:  Objection to form.

20     THE WITNESS:  Typically not.

21     Q  BY MS. LAVALLEE:  But you would just

22  consider pipeline in terms of the numbers as

23  presented in the charts?

24     A  Correct.  It's compared from the previous

25  week and over the previous year.

110

1     Q  Okay.  Do you recall any specific

2  discussions from the January 15, 2000 -- strike

3  that.

4        Do you recall any specific discussions

5  regarding any matter at the Thursday forecasting

6  call for week six of the third quarter of fiscal

7  year 2001?

8     A  I don't remember that call.

9     Q  Okay.  Do you remember any call from that

10  quarter?

11     A  No.

12     Q  Do you recall any calls from the second

13  quarter of the fiscal year 2001?

14     A  No.  I also didn't start attending those

15  until later when I assumed the role of Lia Burke in

16  Q-2 of 2001.  That's when I assumed her role and

17  started to attend them, just to clarify.  I didn't

18  attend all the forecast calls in Q-2 of 2001.

19     Q  Okay.  Did you attend them all in Q-4

20  2001, do you know?

21     A  I -- I should have, unless I was absent

22  or -- but it was my role to attend them at that

23  time.

24     Q  Okay.  And was that simply a function of

25  Lia Burke not being there or is it something -- a

111

1  new role that you took on?

2     A  It was a new role.

3     Q  Okay.  And did your job as finance

4  manager change from the time you first became named

5  finance manager in the fall of '99 through March of

6  2002?

7     A  It did.  At the -- at the beginning up

8  until when Lia Burke left for maternity leave, I

9  simply prepared -- not "simply."  I was just

10  responsible for the Americas Forecast Package for

11  compiling it and for the executive committee

12  forecast package, but not for the upside report or

13  for the pipeline reporting package.

14     Q  Okay.

15     A  When Lia came back, she assumed a

16  different role and I took on the upside reporting

17  and the pipeline reporting as well as the other

18  responsibilities --

19     Q  Okay.

20     A  -- I kept.

21     Q  And what role did she take on at that point

22  in time when she came back from maternity leave?

23     A  I -- I think -- I can't remember, but I

24  think it was in marketing finance.  I knew she

25  eventually moved into that, but I can't remember if

112

1  it was right after she came back.

2     Q  But you at that point had started to

3  report directly to Ivgen Guner?

4     A  Correct.

5     Q  Do you recall any discussions from the

6  Q-4 2001 time frame regarding -- discussions at the

7  forecasting calls?

8     A  No.

9     Q  I would like to show you a document that

10  was previously marked as Exhibit 72.

11        (Whereupon, Deposition Exhibit 72

12        was placed before the witness.)

13     THE WITNESS:  Do you want these back?

14     Q  BY MS. LAVALLEE:  No, you can hold on to

15  those.  Actually, at the end of the day the court

16  reporter will take the marked ones with her --

17     A  Okay.

18     Q  -- for compilation in the transcript.

19  And I said this was Exhibit 72.

20        I'm also going to mark as the next

21  Exhibit 246, a document Bates stamped CA-ORCL

22  037626 through -627.

23        (Plaintiffs' Exhibit 246 was marked for

24        identification by the deposition officer and

25        is attached hereto.)

113

1    Q  BY MS. LAVALLEE:  Ms. Ronsse, if I could
2  ask you to take a moment and look at these two
3  documents.  You'll see that the second document is
4  just an excerpt of a couple pages from Exhibit 72,
5  but the handwriting is a little clearer on that.
6    A  Uh-hum.
7    Q  Once you've had an opportunity to review
8  them, can you please just identify them for the
9  record, please.
10    (Pause in proceedings.)
11    THE WITNESS:  246 is -- looks to be the
12  Americas Forecast Package for week eight for the
13  week ending January 22nd.
14    Q  BY MS. LAVALLEE:  Okay.  Does it appear
15  to be the entire forecast for the Americas Forecast
16  Report?
17    A  No.  It looks to be just the first two
18  pages.
19    Q  Okay.  And Exhibit 72?
20    A  The first two pages are the same and then
21  there are pages from the Pipeline Reporting
22  Package, and then another page of the Americas
23  Forecast Package, which showed the consulting
24  bookings and then the pre -- the last page is for
25  Q-4 '01 for the Americas.

114

1    Q  Okay.  Just so I'm clear and the record
2  is clear, it's pages 811, 812 and --
3    A  Right.
4    Q  -- 815 and 816 are part of the Americas
5  Forecast Report?
6    A  Yes.  I'm not sure why the pipeline is
7  attached to these and it only shows the Americas,
8  so it might have been an analysis that we included.
9  I -- I don't remember, though.
10    Q  Okay.  It's possible that you actually
11  sent out the Americas Forecast with this
12  information in it, but you just don't know or is
13  that unlikely?
14    A  It's possible, but also possible that we
15  just may have stapled it along with it because we
16  were doing the analysis for the Americas pipeline.
17    Q  Okay.
18    A  I don't remember.
19    Q  Okay.  But the pages -13 and -14 are
20  excerpts from the Pipeline Reporting Package; is
21  that correct?
22    A  Yes.
23    Q  Excuse me.  If I could turn your
24  attention to Exhibit 246.  Can you tell me if you
25  recognize the handwriting on this document?

115

1    A  Yes.
2    Q  Is this your handwriting?
3    A  Yes.
4    Q  Okay.  Can you -- starting at the top --
5  read what the handwriting indicates?
6    A  It says, "Think will be closer to 210"
7  with a dollar sign.
8    Q  Uh-hum.
9    A  "If it get comms upside."
10    Q  Okay.  And do you have any idea what
11  particular division or what you were referring to
12  there?
13    A  Well, "comms" is short for
14  communications.  If I remember correctly, that was
15  part of OSI.
16    Q  Uh-hum.  And do you have any
17  understanding what your -- what fact you were
18  reflecting in your notes?
19    A  I don't remember.
20    Q  And when you wrote "Think will be
21  closer," do you have any idea whose -- whose
22  comment you were referring to?
23    A  I don't remember.
24    Q  Okay.  The number 210, does that -- is
25  that a number that you -- that you can correlate to

116

1  any numbers on this chart from page 37626 or any
2  other pages in Exhibit 246?
3    MR. NADOLENCO:  Objection to form.
4    THE WITNESS:  No, I mean, I can't.  I just
5  see the 210.  I don't know what it's referring to
6  exactly.
7    Q  BY MS. LAVALLEE:  And you don't know if
8  that refers to the forecast number?
9    A  Correct, I don't know.
10    Q  Okay.  Do you -- as you sit here today,
11  do you have any understanding of what you could
12  have been talking about?
13    A  No, I don't remember what this note was
14  precisely about.
15    Q  Okay.  And just -- but based on your
16  general understanding of how you would take notes,
17  you can't figure out or make an educated assumption
18  what you were talking about?
19    A  Well, one of the numbers would be close
20  to 210, but I don't know which -- which number.
21    Q  Okay.
22    A  I mean, I would have written that down
23  because one of the numbers would be close to 210.
24    Q  Okay.  And your notation on the bottom on
25  the left-hand corner, what is that?

117

1    A  It looks like "Univ" -- for University of
2    Texas.
3    Q  Do you have any understanding what you
4    were referring to by making that notation?
5    A  I don't.
6    Q  The notations on the chart on the
7    right-hand side, can you read those for me, please.
8    A  Next to the circles?
9    Q  Yeah, the -- yes.
10   A  I think it says, "Issues Bell South," and
11   I'm not sure what is underneath it.
12   Q  Okay.  And the next notation?
13   A  Ah, "GB" it looks like.
14   Q  Uh-hum.
15   A  And "11i" it looks like.
16   Q  Okay.  Do you have any understanding
17   what -- what facts you were noting in those
18   comments?
19   A  I do remember that Bell South was an
20   issue in the consulting area --
21   Q  And what do you mean --
22   A  -- for OSI.
23   Q  What do you mean by "an issue"?
24   A  Well, it was, uhm -- it was costing OSI a
25   lot of money to satisfy quality issues that they

118

1    had at Bell South.
2    Q  Okay.  And was this an existing deal, then?
3    A  Yes.
4    Q  Okay.  So this was on the consulting
5    side?
6    A  Correct.
7    Q  Okay.  And do you recall any discussions
8    regarding this fact?
9    A  I remember it being discussed, but I
10   don't remember specific --
11   Q  Okay.
12   A  -- discussions, more than what I've said.
13   Q  Okay.  And "GB 11i," do you have any
14   understanding what you're referring to by that
15   notation?
16   A  I don't remember that.
17   Q  Okay.  And you've circled a couple
18   numbers.  I take it, you're not quite sure why?
19   A  Correct, I don't know why.
20   Q  The notation on the bottom right-hand
21   side below the chart, can you read that for me?
22   A  It says, "Sandy, majors" looks like "used
23   to be 70 percent of" -- that's an
24   abbreviation for "business" --
25   Q  Uh-hum.

119

1    A  -- "now 30 percent."
2    Q  Yeah.  Do you have any understanding what
3    you were referring to there?
4    A  Just from the note, it looks like
5    consulting business, just a fact about their
6    consulting business --
7    Q  Okay.
8    A  -- from the note.
9    Q  And by "their," you're saying -- you're
10   referring to --
11   A  Sandy's.
12   Q  -- Sandy's meaning OPI?
13   A  Well, in consulting it's actually
14   referred to as EJS.
15   Q  EJS.  Okay.  And you believe that this
16   notation refers to consulting, not licensing?
17   A  Yes.
18   Q  And why do you say that?
19   A  Because it's under the consulting
20   section.
21   Q  Okay.  And that's how you would take your
22   notes?
23   A  Yes.
24   Q  Okay.  And do you recall any discussions
25   about the fact that the majors used to be 70

120

1    percent of the business and now it's 30 percent?
2    A  No, I don't remember the discussion.
3    Q  Okay.  Do you recall that fact?
4    A  No.
5    MR. GOLDSTEIN:  Objection to form.
6    THE WITNESS:  No, just from my notes here.
7    Q  BY MS. LAVALLEE:  Okay.
8    A  Just reading this.
9    Q  Okay.  And the next line?
10   A  "Margin doing an analysis," and "Margin
11   downturn because of GB and 11i."
12   Q  Do you have any understanding of what
13   you're referring to in the first sentence, "Margin
14   doing an analysis"?
15   A  No, besides just from my note that they
16   were going to do an analysis perhaps.  That's
17   speculation, though.
18   Q  "They" being who?
19   A  Ah, his organization -- his finance
20   organization.
21   Q  Okay.  And doing an analysis regarding
22   margins; is that what --
23   A  According to my note.
24   Q  Okay.  But you don't recall any
25   discussion regarding that?

121

1    A  I don't.

2    Q  Okay.  And the next, "Margin downturn

3  because of GB and 11i," do you have -- what is your

4  understanding of what you were referring to, as you

5  sit here today?

6    A  Nothing more than what is in the note.

7    Q  Okay.  And what does the phrase "margin

8  downturn" mean to you?

9    A  Ah, it looks to be explaining the margin

10  decrease over the prior year.

11    Q  Okay.  And you're referring specifically

12  to what -- what paragraph -- or what figure?

13    A  The margin prior year growth percentage

14  under EJS, minus 10 percent.

15    Q  Okay.  And your next line says what?

16    A  "Integration issues."

17    Q  Okay.  Do you have any understanding of

18  what you're referring to there?

19    A  Not more than my note.

20    Q  Is that a continuation of the prior line?

21  Do you know?

22    A  I don't know for sure.  I don't know.

23    Q  Okay.

24    A  But I would assume.

25    Q  Can you make an educated assumption?

122

1    A  I can assume, yeah.

2    Q  Okay.  So do you know what "11i

3  integration" refers to?

4    A  Not more than what the note says.  I

5  don't -- I don't remember anything else.

6    Q  Okay.  Do you know -- do you have any

7  understanding of what "11i" is or was?

8    A  Yes.

9    Q  Okay.  Can you tell me.

10    A  It was one of our versions of our

11  application suite.

12    Q  What would integration -- "11i

13  integration" refer to?

14    A  The -- from my understanding, the work

15  that consulting did to help customers implement

16  the -- the application at their site.

17    Q  Okay.  And do you recall or do you have

18  any knowledge regarding what issues arose in that

19  time frame regarding that matter?

20    A  I don't.

21    Q  You don't recall any discussions

22  regarding 11i integration?

23    A  I don't recall, no.

24    Q  Do you recall whether such a discussion

25  took place?

123

1    A  I don't remember.

2    Q  Okay.  Excuse me.  The next line, can you

3  read that for me?

4    A  "Utilization up 4 points over" -- it

5  looks like "P year" -- maybe prior -- "prior year."

6    Q  Okay.  And do you have any understanding

7  of what you were making a notation of there?

8    A  Not more than -- than what is here, no.

9    Q  And by "four points," does that have --

10  the concept of four points have any significance to

11  you?

12    A  Four points -- there was a metric of

13  utilization that was discussed in points.  I can't

14  remember the calculation for it, but that's what it

15  would be referred -- what it would be referring to

16  is that utilization metric.

17    Q  Okay.  Can you explain to me what a

18  utilization metric is?

19    A  Uhm, I don't know if I remember, so I

20  don't think I can explain it.  I know it had to do

21  with consultants -- amount of time consultants

22  spent on projects as compared to potential amount

23  of time that they were available.

24    (Whereupon, Ms. Segal left the

25    deposition room.)

124

1    Q  BY MS. LAVALLEE:  Okay.  And beyond that,

2  can you explain any more?

3    A  I can't do the calculation, no.  I can't

4  remember how to do the calculation.

5    Q  Okay.  And do you recall discussions

6  about that issue, the utilization points?

7    A  Uhm, I don't recall discussions.

8    Q  That's something that would have been

9  discussed?

10    A  From time to time.

11    Q  Okay.  And if you could turn to the next

12  page, which is 37627.

13    Off the record a moment, please.

14    VIDEO OPERATOR:  We are off the record at

15  1:52 p.m.

16    (Pause in proceedings.)

17    VIDEO OPERATOR:  We are on the record at

18  1:53 p.m.

19    Q  BY MS. LAVALLEE:  All right.  If we could

20  go through the notes on this page and let me ask

21  you first, are these all your notes on this page?

22    A  Yes.

23    Q  All right.  Starting at the top, can you

24  read your notes, please.

25    A  "LAD got 8 M" -- meaning 8-million-dollar

125

1  deal.  Looks like "2 million on RevRec deal."  I

2  can't read that next word.  It looks like a "CA" --

3  or "Cacxa," I think, "procurement for Brazilian

4  government."

5      Q   Okay.  Do you have any understanding of

6  what you were referring to there?

7      A   No.

8      Q   Okay.  Continuing down, there's some

9  notation on the left-hand side.

10     A   The "Will be moving to 47"?

11     Q   Yes.  Do you have any understanding what

12  you were referring to there?

13     A   Not more than what is in the note.

14     Q   Okay.

15         (Whereupon, Ms. Segal entered the

16  deposition room.)

17     Q   BY MS. LAVALLEE:  And continuing down?

18     A   "Sandy 66 M."

19     Q   Okay.  Do you have any understanding what

20  that refers to?

21     A   No.

22     Q   Okay.  Is it -- it's a number.  Is it

23  supposed to represent a number somewhere in the

24  revenue column?  Do you have any understanding?

25     A   No.

                                                126

1      Q   You just don't know?

2      A   I don't know.

3      Q   Okay.  And if you can continue down at

4  the bottom on the left-hand side, can you read

5  those notes, please.

6      A   "OPI worst 120, best" -- it looks like a

7  "70 M" or it could be a "9" -- I'm not sure on that

8  number there -- "have 40 to 50 percent prob, says

9  upside of about 220."

10     Q   Do you have any understanding of what you

11  were referring to by those notes?

12     A   Not more than what is on the note.

13     Q   Is it your understanding this relates to

14  the license scenario analysis chart?

15     A   It looks to be, yes, since I mention

16  worst and best in the note.

17     Q   Okay.  And continuing down?

18     A   "Selectron up 13 million."

19     Q   Okay.  And what is "Selectron"?

20     A   Ah, it sounds familiar as a deal.

21     Q   Okay.  Do you have any recollection of

22  any discussion regarding Selectron?

23     A   I don't.

24     Q   Do you have any recollection or any

25  understanding of any discussion regarding the

                                                127

1  comment above regarding OPI best and worst figures

2  and probability numbers?

3      A   I don't.

4      Q   Okay.  Continuing below.

5      A   "Softness in east."

6      Q   Do you have any understanding of what

7  division "east" refers to?

8      A   Uhm, just from my -- my note, it looks --

9  it's under "OPI," but I -- that doesn't necessarily

10  mean it's OPI.  I don't know.

11     Q   Okay.  But based on your note-taking

12  habits --

13     A   In likelihood, it would have been during

14  the OPI discussion.

15     Q   Okay.  Do you recall any discussion

16  regarding softness in east?

17     A   I don't.

18     Q   Okay.

19     A   No.

20     Q   Do you recall any -- any issue regarding

21  the softness in any division -- east division?

22     A   No, I don't.

23     Q   And the next note below?

24     A   "Gap still trying 10 to" -- looks like

25  a -- "12 million license deal but are backing off

                                                128

1  slightly.  Plan still to bring in GE anywhere 8 to

2  32 million this quarter," dash, "cancellation

3  clause, won't cancel."

4      Q   Okay.  Do you have any understanding what

5  you were talking about regarding gap?

6      A   Not more than my note says, no.

7      Q   Okay.  What do you understand your note

8  to refer to, "Still trying 10 to 12 million license

9  deal but are backing off slightly"?

10     Q   Do you have any understanding of what

11  that means?

12     A   It was just what was said.

13     Q   Okay.  And the phrase "backing off," does

14  that have any significance to you?

15     A   In general or specifically?  "Backing

16  off" --

17     Q   As you sit here and read this sentence,

18  what do you understand this to mean?

19     A   That potentially -- I mean, it could be

20  somebody is backing away from the deal.

21     Q   Okay.

22     A   I'm not sure what party or what have you,

23  but something is happening.

24     Q   Okay.  And do you recall any discussion

25  regarding GE deal?  I'm assuming "GE" refers to a

                                                129

1   deal.  Is that a fair assumption?

2       A   That would be a fair assumption.  I don't

3   remember.

4       Q   Okay.  And the phrase "cancellation

5   clause, won't cancel," does that have any

6   significance to you?

7       A   Not more than my remembrance that there

8   being such cancellation clauses -- hearing about

9   them in our contracts.

10      Q   Okay.  And in what context did you hear

11  about such clauses?

12      A   Just in my days as a revenue accountant

13  and from a revenue recognition perspective.

14      Q   Okay.  And what is your understanding of

15  what those cancellation clauses were?

16      A   Well, if there's a cancellation clause,

17  then there's special treatment with regards to

18  revenue.

19      Q   Okay.  And do you recall any discussion

20  regarding cancellation clauses in any deals in Q-3

21  2001?

22      A   I don't, no.

23      Q   Okay.  Now, right in the License Scenario

24  Analysis Chart, there's some annotations there.

25  Can you read those?

130

1       A   Uhm, "Need to have" -- I don't know if I

2   can read that next word.  Something "shown" --

3   "moving shown"?  I can't read that next word.

4       Q   Okay.

5       A   "Need to have" -- I can't read that.

6       Q   Okay.

7       A   "Shown" it looks like the last -- is the

8   last word.

9       Q   Is this either Document 246 or

10  Document 72, Exhibit 72, documents that you

11  referred to earlier that you reviewed in

12  preparation for this deposition?

13      A   Yes.

14      Q   Okay.

15      A   But not in detail on every single note.

16  Sorry.

17      Q   You didn't review it in detail?

18      A   I mean, I didn't read every single

19  word --

20      Q   Okay.

21      A   -- is what I mean to say.

22      Q   Sure.  But these were the same documents?

23      A   Yes, these are the same documents.

24      Q   Okay.  And do you have any understanding

25  what you were making a note of by the phrase which

131

1   is hard to read "need to have" something?

2       A   "Need to have" something "shown."  I

3   don't.  I don't know what I was referring to.

4       Q   And there is further up in the chart,

5   middle of the page, is a circle around the figure

6   negative 6 percent.  And then there's an arrow to

7   some notes to the right-hand side.

8       Can you read those?

9       A   "NAS technology analysis."

10      Q   Uh-hum.

11      A   "ASP" with a down arrow "14 million over

12  last year" --

13      Q   Uh-hum.

14      A   -- it looks.  "Dot com" with an arrow --

15  down arrow, "47 million," I think it is.  And then

16  it comes to a total that I can't read.

17      Q   With an arrow down and then a number?

18      A   Right, with an arrow down and then a -- I

19  presume it's a number I can't read, though.

20      Q   Okay.

21      A   It's probably the sum of the two.

22      Q   Which would be 60 --

23      A   61.

24      Q   61.  Looks --

25      A   And then an up arrow, it looks like "43

132

1   in other business."

2       Q   Okay.  And do you have any

3   understanding -- what is "ASP"?

4       A   I believe it stands for Application

5   Service Provider, if I remember correctly.

6       Q   Okay.  And "dot com"?

7       A   Uhm, that was just a segment of -- of

8   business.

9       Q   Okay.  Do you have any understanding what

10  you're referring to or what was meant by your notes

11  "ASP down 14 million"?  Does this appear to be a

12  breakdown of the negative six technology revenue

13  number?

14      A   From my note, it appears to be, yes.

15      Q   So it's showing what comprised the

16  negative six growth year -- negative 6 percent

17  growth from last year?

18      A   Correct.

19      Q   For the technology revenue in NAS, right?

20      A   Ah, yes.  That's what it appears to be.

21      Q   Okay.  And do you recall any discussion

22  regarding the fact that there was a negative

23  6 percent growth in NAS technology revenue?

24      A   No, I don't remember.

25      Q   Okay.  Is it fair to say, based on your

133

Ronsse, Roberta  4/20/2004  3:09:00 PM

1    notes, that that was something that was discussed?
2        A    Sure, yes.
3        Q    And the breakdown was in -- ASP and dot
4    com seems to be the discussion, correct?
5        A    Ah, yes.  It seems somebody discussed it.
6        Q    Okay.  And below that, can you read the
7    next set of notes?
8        A    Ah, "18 million shortfall in technology
9    from last year."
10       Q    Do you have any understanding what that
11   shortfall relates to?
12       A    Uhm, I don't know what that's referring
13   to.  No, I don't.
14       Q    Okay.  What does the term "shortfall"
15   mean?
16       A    Oh, shortfall would mean down, if you
17   will.
18       Q    Okay.  So does this appear to be the
19   decrease in 18 million in technology from the prior
20   year?
21       A    Yes, but I'm not sure which --
22       Q    Division?
23       A    -- division specifically.  It seems to be
24   under NAS.
25       Q    Uh-hum.

134

1        A    If it's related to this breakdown -- it
2    seems to be related to this breakdown, the sum of
3    the 43 and the 61, just from my notes here.
4        Q    Okay.  And do you recall any discussion
5    regarding shortfall in technology in NAS in Q-3
6    2001?
7        A    I don't.
8        Q    Do you recall discussions, generally,
9    about any shortfall anywhere in Q-3 2001?
10       A    I don't --
11       Q    Okay.
12       A    -- recall.
13       Q    Do you have any understanding as to
14   whether or not there was, indeed, a shortfall in
15   technology in NAS in 2001?
16       A    Yes, once we closed the quarter.
17       Q    Okay.  And what is your understanding of
18   that fact once you called closed the quarter?
19       A    What is my understanding of the close of
20   the quarter or --
21       Q    That was a terrible question.  Let me
22   rephrase that question.
23            Sitting here today, what is your
24   understanding of what the shortfall was in
25   technology in NAS for Q-3 2001?

135

1        A    What made up the shortfall?
2        Q    Yes.  Do you have any understanding?
3        A    Uhm, I don't remember the specifics
4    behind the shortfall, no.
5        Q    Okay.  But you recall there was a
6    shortfall?
7        A    Yes.
8        Q    Do you recall whether there was a
9    shortfall in any other division at the company in
10   Q-3 2001?
11       A    Uhm --
12       MR. NADOLENCO:  Object to the form.
13       THE WITNESS:  I believe OSI there was a
14   shortfall, if I'm remembering correctly.
15       Q    BY MS. LAVALLEE:  Okay.  Any other
16   division?
17       A    I don't remember.
18       Q    Okay.  Do you recall anything more
19   specific than there existed a shortfall regarding
20   either of those divisions?
21       MR. GOLDSTEIN:  Objection to form.
22       THE WITNESS:  I don't remember specifics.
23       Q    BY MS. LAVALLEE:  Okay.  The next
24   sentence, can you read that?
25       A    "85 percent growth last year."

136

1        Q    Uh-hum.
2        A    Or "83."  I'm not sure if that's a -3 or
3    a -5.
4        Q    Okay.
5        A    And "Pipe has not gone up.  Best case is
6    not going to go up."
7        Q    Okay.  Now, going to the sentence "83" or
8    "85 percent growth last year," do you have any
9    understanding what division you're talking about or
10   what figures you're talking about there?
11       A    No, I don't.
12       Q    Okay.  And you can't decipher that based
13   on your understanding of how you take notes?
14       A    No.
15       Q    Okay.  And the next sentence, "Pipe has
16   not gone up," do you have any understanding --
17   well, first of all, what does the word "pipe" mean?
18       A    Pipeline.
19       Q    Okay.  Do you have any understanding what
20   fact you were noting there?
21       A    I don't remember.
22       Q    Okay.  But, basically, it's your
23   understanding this is saying the pipeline hasn't
24   gone -- has not gone up?
25       A    Right, but I don't know the specifics

137

1  behind that.
2      Q  Okay.  Do you know whether you -- whether
3  you're referring to the pipeline going up from the
4  prior quarter or from the prior week?  Do you have
5  any understanding that way?
6      A  I don't remember.
7      Q  Okay.  Do you have any understanding
8  whether or not you're still talking about NAS or
9  any other division of the company?
10     A  No, I don't.
11     Q  Okay.  If the pipe hadn't gone up, is
12  that something that would have -- strike that.
13         This is a note you took at the Thursday
14  call, I take it, right?
15     A  Most likely, yes.
16     Q  Yeah.  So is it your understanding that
17  there was a discussion regarding the fact that the
18  pipe has not gone up at the Thursday call in the
19  week of January 22nd, 2001?
20     A  I don't remember specifically if there
21  was.
22     Q  Okay.  But you believe these notes to
23  relate to notes you took at the Thursday
24  forecasting call, based on your general practice?
25     A  Yes.  Based on general practice, yes.

138

1      Q  Okay.  The "Best case is not going to go
2  up," do you have any understanding of what you're
3  referring to there?
4      A  I don't, no.
5      Q  Okay.  "Best case" refers to what?  That
6  phrase, does that have a particular meaning at
7  Oracle?
8      A  Well, that would have referred to our
9  best case that is depicted in the license scenario
10  analysis.
11     Q  The third column?
12     A  Right.
13     Q  Do you have any understanding whether or
14  not you were referring to the numbers as a whole or
15  NAS or any other division?
16     A  I don't.
17     Q  Okay.  What is your understanding of the
18  phrase "Best case not going to go up"?
19     A  Uhm, as it reads, it's not going to go up
20  for --
21     Q  Based --
22     A  -- some best case number is not going to
23  go up, but I don't remember which one.
24     Q  Okay.  And by not going up, it's not
25  going to get any higher?

139

1      A  Any bigger, right.
2      Q  All right.  And the top of the page on
3  the right-hand side, I don't believe we read
4  through that notation.
5      A  Oh, "Thinks 50 assuming would get this
6  deal, absence in large deals this quarter."  And
7  then there's scribbled out -- a number scribbled
8  out.
9      Q  Okay.  Does that look like a "48"?
10     A  Looks like a 40-something, 48 or 49.
11     Q  Or 47 even?
12     A  Or 47.
13     Q  Is that a continuation of the note with
14  the arrow on the left-hand side?  Can you tell?
15     A  No, I can't.
16     Q  All right.  Do you have any understanding
17  of what you were referring to by that notation?
18     A  No.
19     Q  Can you reread what the sentence says?
20  I'm not sure I understood.
21     A  Starting from --
22     Q  The "Thinks 50...."
23     A  "Thinks 50 assuming would get this deal,
24  absence in large deals this quarter."
25     Q  All right.  Focusing on the first part of

140

1  the -- first phrase, "Thinks 50 assuming would get
2  this deal," do you have any understanding whether
3  that's referring to the procurement deal for the
4  Brazilian government that's referred to, to the
5  left or you don't know?
6      A  I don't know.  I don't remember if it is.
7  I don't know if it's referring to that one.
8      Q  Okay.  And the next phrase "Absence in
9  large deals this quarter," do you have any
10  understanding what that refers to?
11     A  I don't.
12     Q  Does that seem to be a notation
13  reflecting the fact that there was an absence of
14  large deals in the quarter for a particular
15  division?
16     MR. GOLDSTEIN:  Objection to form.
17     THE WITNESS:  I don't know more than what is
18  in the note.  I don't know what the note says.
19     Q  BY MS. LAVALLEE:  Is that what your note,
20  generally, seems to be saying?
21     MR. GOLDSTEIN:  Objection to form.
22     THE WITNESS:  There's nothing more than just
23  what --
24     Q  BY MS. LAVALLEE:  An "absence in large
25  deals"?

141

Ronsse, Roberta  4/20/2004  3:09:00 PM

1    A  "Absence in large deals this quarter,"
2  but I can't tell you what -- what was behind it,
3  who said it or what division or --
4    Q  Right.
5    A  -- in what context it was in.
6    Q  Okay.  And then if you continue down on
7  the chart, I guess it's a pipeline component of the
8  chart.  There's an annotation right next to the
9  number.
10    A  Oh, whoa.  I really can't read that one.
11    Q  Do you recall whether the notes you read
12  were easier to read than the copied here?
13    A  Like I said, I didn't read every note.
14    MR. GOLDSTEIN:  Do you want to know what I
15  think it says?  Seriously.  I'll tell you.  It
16  looks like "Emerson Electric."
17    MS. LAVALLEE:  Yes.
18    MR. GOLDSTEIN:  And then I don't know what
19  the word under that is.
20    MR. GOLDSTEIN:  "Emerson Electric" would
21  probably make sense in this context.
22    Q  BY MS. LAVALLEE:  Do you have any
23  understanding of whether or not that is what it
24  indicated?
25    MR. GOLDSTEIN:  Electron.

142

1    THE WITNESS:  I see that.  I can see that it
2  might be "Emerson Electric."  I can't read the next
3  line.
4    Q  BY MS. LAVALLEE:  And you have no
5  recollection of what you were making a note of
6  there?
7    A  No.
8    Q  Okay.
9    MS. LAVALLEE:  Why don't we take a short
10  break now.  It's a good breaking point for me.
11    VIDEO OPERATOR:  We are off the record at
12  2:14 p.m.
13    (A recess was taken.)
14    VIDEO OPERATOR:  We are on the record at
15  2:21 p.m.
16    Q  BY MS. LAVALLEE:  I would like to mark as
17  Exhibit 247 a document that is Bates stamped
18  CA-ORCL 004394 through -98.
19    (Plaintiffs' Exhibit 247 was marked for
20    identification by the deposition officer and
21    is attached hereto.)
22    Q  BY MS. LAVALLEE:  If you could take a
23  look at this document and then when you've had a
24  chance to review it, identify it for me, please.
25    (Pause in proceedings.)

143

1    THE WITNESS:  Uhm, okay.  So the first page,
2  4394 --
3    Q  BY MS. LAVALLEE:  Uh-hum.
4    A  -- looks to be the Americas Forecast
5  Package, although it seems like the working paper
6  behind it.
7    Q  Okay.
8    A  As opposed to the one that we would send
9  out.
10    Q  The word "tie-out" on the bottom right,
11  what does that mean?
12    A  Tie-out is the phrase we used to -- on
13  reports to communicate with the finance personnel
14  in the divisions to ensure that the numbers that
15  they submitted into OFA matched what we were
16  reporting out of OFA.
17    Q  Okay.  So this is something you would
18  send to, say, Sarah Kopp and say, "Check this
19  against your numbers"?
20    A  Right, their division or they would send
21  to us.
22    Q  Oh.
23    A  So somebody within Sarah's organization
24  would send their tie-out to us.
25    Q  All right.  And you would compare it to

144

1  the numbers you're seeing in the report you're
2  preparing off of OFA?
3    A  Correct.  So this looks like a working
4  paper and there are only numbers in OSI, so it
5  looks to be the OSI tie-out report.
6    Q  Okay.
7    A  And the next page, 4395, this looks to be
8  an OFA report --
9    Q  Uh-hum.
10    A  -- for the OSI organizations.  Again, a
11  working paper.
12    Q  Okay.  And this seems to be listing
13  deals?
14    A  No.  This is actually listing the
15  organizations within OSI.
16    Q  Okay.  And --
17    A  And their revenue numbers.
18    Q  Okay.  And does this reflect -- this
19  reflects forecast numbers, correct?
20    A  Yes.
21    Q  It says "Forecast" at the top.  The next
22  page is 4396 and this is another tie-out report,
23  but there's numbers in the OPI area, so it looks to
24  be OPI's tie-out report.

145

Ronsse, Roberta  4/20/2004  3:09:00 PM

1     The next page 4397 is the report from OFA
2   for the OPI organizations or revenue numbers and
3   expense and head count forecast.  And the last page
4   4398 is the tie-out report for NAS.
5     Q  Okay.  Thanks.  I would like to mark as
6   48 -- I'm sorry -- Exhibit 248, a document Bates
7   stamped CA-ORCL 037632 through -45.
8       (Plaintiffs' Exhibit 248 was marked for
9       identification by the deposition officer and
10      is attached hereto.)
11    Q  BY MS. LAVALLEE:  And if you could take a
12  moment and look at the document and then just tell
13  me what it is.
14      (Pause in proceedings.)
15    THE WITNESS:  The package all seems to be
16  working papers, again, going through each one,
17  37632, the tie-out report for the DSD organization
18  which stood for Development Support -- Development
19  and Support Division, I believe, is what the
20  acronym was, and it included these organizations
21  listed.
22    Q  BY MS. LAVALLEE:  Okay.
23    A  It's their tie-out report.  The next
24  page, 7633, is the same thing but for the Q-4 2001
25  forecast data.

146

1     Q  Right.
2     A  7634 is an OFA report, a working paper
3   for -- it looks to be NAS, the NAS organizations.
4     Q  Is this a report that you generated?
5     A  I can't -- I don't know if I generated
6   this.
7     Q  Okay.  Is that the type of report you
8   would generate?
9     A  Our group would generate a report like
10  this.
11    Q  Okay.  And the handwriting on this, is
12  this your handwriting?
13    A  No, this isn't my handwriting.
14    Q  Do you have any idea whose handwriting it
15  is?
16    A  I don't.  Most likely somebody that
17  worked for me in the tie-out report.
18    Q  All right.  And do you have any
19  understanding what the figures that are handwritten
20  refer to?
21    A  No, except that this is a tie-out report,
22  so it was probably tie-out figures from the
23  divisions.
24    Q  All right.
25    A  The next page, 7635, this is the tie-out

147

1   report from NAS.  It looks like a working paper
2   where they're telling us what the numbers are and
3   what they should be.  The next page, 7636, the same
4   thing but for Q-4.
5     Q  Right.
6     A  The next page, 7637, looks to be a
7   tie-out report for NAS.  The next page, 7638, a
8   tie-out report for EJS, looks to be, for the
9   consulting --
10    Q  Right.
11    A  -- organization EJS.  7639, tie-out
12  report for OPI.  7640, a report from OFA, an ad hoc
13  report, just looking at the last four quarters or
14  three-quarters.
15    Q  For expenses?
16    A  For expenses, yes, operating expenses.
17    Q  Okay.
18    A  7641, an ad hoc report from OFA for
19  revenue for the four quarters of '01.
20    Q  Actually, could you go back to page -40.
21  Does that reflect all the expenses for all the
22  divisions?
23    A  It appears so, yes, because it rolls up
24  to all lines of business, so the top number would
25  be.

148

1     Q  The top number is a compilation of all
2   the numbers below?
3     A  Below, correct.
4     Q  And it reflects all the expenses that are
5   being forecasted for Q-3 and Q-4 as well as the
6   actuals for the prior quarters; is that correct?
7     A  Well, I can't -- there's a date
8   stamp on this.  I don't know when it was run.  It
9   was a working paper, so I don't know if these are
10  final numbers.
11    Q  Okay.
12    A  But that's what it would -- all lines of
13  business would be the total.
14    Q  Okay.  The next page has a notation on
15  the top right in handwriting.  What does that say?
16    A  Looks like it says "U.S.A."
17    Q  Okay.
18    A  And going back to the previous page, I
19  didn't catch that it's just the U.S.A. expenses.
20    Q  Okay.
21    A  For all lines of business in the U.S.A.,
22  these two pages.
23    Q  All right.
24    A  And then the revenue for all lines of
25  business in the U.S.A. company only, so not for

149

1    total company.  Again, an ad hoc working paper.
2        Q   Okay.
3        A   7642 is a tie-out report for NAS.  7643,
4    a tie-out report for OPI.  And 7644 is a Europe
5    report, looks like an ad hoc report.
6        Q   Okay.  I would like to mark as
7    Exhibit 248 or 249 --
8        THE REPORTER:  -9.
9        MS. LAVALLEE:  -- a document Bates stamped
10   CA-ORCL 37116 through -130.
11       (Plaintiffs' Exhibit 249 was marked for
12       identification by the deposition officer and
13       is attached hereto.)
14       Q   BY MS. LAVALLEE:  Ms. Ronsse, if you
15   could take a look at this document and once you've
16   had a chance to review it, tell me what it is.
17       (Pause in proceedings.)
18       THE WITNESS:  These are Big Deal Reports.
19   Going through one by one, because they're
20   inconsistent on dates, I'm not sure why it's all
21   stapled together, but the first one, I can't tell
22   what organization it is, the header is cut off.
23       Q   BY MS. LAVALLEE:  Uh-hum.
24       A   It seems to be for the week of
25   January 29th.  That's all I can really see.

150

1        Q   Do you have any understanding of what
2    year it relates to?
3        A   Not by looking at this, no, because the
4    header is cut off.
5        Q   And you don't recognize it by the deals?
6        A   No, I don't.
7        Q   All right.  And there is some handwriting
8    on this particular page, 37116.  Can you tell me if
9    that's your handwriting, any of this is your
10   handwriting?
11       A   Some of it is, yes.
12       Q   Can you tell me which handwriting is
13   yours?
14       A   Uhm, so the handwriting to the bottom
15   left portion --
16       Q   Uh-hum.
17       A   -- starting with -- I think it's "AT&T
18   opportunistic," and it looks like there's a little
19   bit up above that that says, "Upside AT&T, Lucent,
20   World Comm."
21       Q   Okay.
22       A   But then everything under the "AT&T
23   opportunistic" -- I can't read what is right after
24   that.  Something "large" -- everything below that
25   is mine.

151

1        Q   Okay.  Now, can you recognize what unit
2    this is based on the company deals: AT&T, World
3    Comm and Lucent?
4        A   Well, in my notes, those would be
5    communication deals, but looking up at the -- I
6    don't see those on the list of typewritten.  I see
7    "AllTell" which -- and "SBC," which is
8    communications, and "Bell South," so I guess -- I
9    guess that would be OSI.
10       Q   All right.  There's actually a
11   handwritten note --
12       A   Up here circled it kind of looks like
13   "OSI," but that's not my writing.
14       Q   And the notes to the left of that "OSI"
15   and notation are not your handwriting either?
16       A   No.
17       Q   And going back down, it says "Upside
18   AT&T, Lucent and World Comm."  The word "upside"
19   and those notation -- those deals listed below, do
20   you have any understanding what you meant to convey
21   or what you were writing there?
22       A   No, I don't -- I don't remember.
23       Q   Do those deals -- were they identified as
24   deals that constituted the upside number?  Can you
25   tell?

152

1        A   No, I can't tell.
2        Q   Do you know when you took these notes?
3        A   No.
4        Q   This Big Deal Report, was it part of the
5    Americas Forecast Report?
6        A   This particular one, I do not know.
7        Q   Okay.  Is this the form in which they are
8    produced when they're attached to --
9        A   No.  Typically a copy further back in
10   this package is the format in which they were
11   produced.
12       Q   Okay.
13       A   This looks like the format in which they
14   were -- like a working paper sent by the finance
15   personnel in each of the divisions.
16       Q   Okay.  And going back to your handwritten
17   notes, can you continue reading what they say?
18       A   "Lost Texas 15 million.  Decided to
19   go" -- maybe "up school by school instead."  That
20   really doesn't make sense but "go" --
21       MR. GOLDSTEIN:  "With"?
22       THE WITNESS:  -- "with school by school."
23   "School" --
24       Q   BY MS. LAVALLEE:  All right.
25       A   "Instead of" -- and I can't read that

153

1  next word underneath there.

2      Q  All right.  Can you read any further?

3      A  The next line I can't make out the first

4  word, but "Technology," looks like the second word.

5      Q  Uh-hum.

6      A  I can't read the next one.  "Two million

7  is this Sprint," I think is what it says at the end

8  of that sentence.

9      Q  Uh-hum.

10     A  "RevRec deal, 70 to 100 million plus

11  CRM." I think that's "150." It might just be

12  "50." "Lucent" -- I can't read the next two words.

13     Q  Okay.

14     A  "35" -- I can't make out -- it looks like

15  "fixed," but then I can't make out what's after

16  that.

17     Q  All right.  The second page of this

18  document, is that part of the same report from

19  page 1?

20     A  It looks -- it looks to be a

21  continuation, yes.

22     Q  Okay.  And do you have any understanding

23  what your notes refer to on page 1, any of the

24  notes?

25     A  Nothing more than what they say here, no.

154

1      Q  "AT&T opportunistic," what does that term

2  "opportunistic" mean to you?

3      A  An opportunity.  Uhm, possibility.

4      Q  That's what it means to you?

5      A  Just in terms of -- yeah, a synonym is

6  the best thing I can think of is a possibility.

7      Q  Okay.  And the third page, does that

8  appear to be a continuation or a different report?

9      A  This looks to be the North America -- the

10  NAS division's Big Deals Report or working paper

11  that they would have sent to us.

12     Q  Okay.  Now, you referred to working

13  papers, so is this also a working paper that you

14  used but not what was attached to the America's

15  forecast?

16     A  This was -- the information was sent to

17  us and we put it into this format that was attached

18  to the Americas Forecast Package, so we simply

19  changed the format.

20     Q  Okay.  So this information appeared in

21  the America's forecast in a different format or in

22  this format?

23     A  In a -- in a different format.

24     Q  Okay.  And does this report continue on

25  the next page, next couple pages?

155

1      A  Yes.

2      Q  Where does this particular report end,

3  the report starting on 37118?

4      A  It ends on 37120.

5      Q  All right.  And there's handwriting on

6  this particular report on -118 through -120.  Can

7  you tell me if this is your handwriting or any of

8  it is your handwriting?

9      A  It looks like on -120 there's a small

10  amount of my handwriting.  It looks like my

11  handwriting.

12     Q  And can you tell what you wrote there?

13     A  I can't make -- I can only make out an

14  "R" and then the word "pay" -- or the start of the

15  word that might start with "pay," p-a-y, it looks

16  like.

17     Q  All right.  Anything else?

18     A  No.

19     Q  All right.  And do you recognize whose

20  handwriting is on -118?

21     A  It looks like Ivgen's, Ivgen Guner.

22     Q  Would that be the same on page -116, the

23  handwriting that --

24     A  Yes.

25     Q  -- is not yours?

156

1      A  Yes.

2      Q  When you wrote your notes, were her notes

3  already on the page?  Do you know?

4      A  I don't remember.

5      Q  And the next report, where does it

6  start --

7      A  On --

8      Q  -- and end?

9      A  On 37121 is where it starts -- this is

10  the OSI -- and ends on 37122.

11     Q  All right.  And this is a Big Deal Report

12  for OSI?

13     A  Correct.

14     Q  Okay.  Was this the report that was sent

15  to you from the finance director for OSI?

16     A  Or someone within that person's

17  organization, finance organization.

18     Q  Okay.  And do you have any understanding

19  how the people in the finance organization for NAS,

20  OPI, and OSI actually prepared these particular Big

21  Deal Reports when they sent them to you or prior to

22  sending them to you?

23     A  I know that they used OSO.

24     Q  And do you know anything beyond that?

25     A  I knew the report that they used, which

157

1  was called the Forecast Summary by Product Category
2  Report.
3      Q  Is that a report that you actually
4  received?
5      A  That I received?
6      Q  Yeah, the Forecast Summary by Product
7  Report?
8      A  No, I received this (indicating).  I
9  received this Excel report from them.
10     Q  Okay.  Did you receive a copy of the
11  Forecast Summary by Product Report?
12     A  Directly out of OSO, perhaps from time to
13  time as a working paper, but not on a regular
14  basis.  What -- this is what came to us regularly.
15     Q  Okay.  And do you know who prepares the
16  Forecast Summary by Product Report?
17     A  It would have been somebody within the
18  finance director's organization.
19     Q  For each of the respective divisions?
20     A  Right.
21     Q  Okay.  If you received a Forecast Summary
22  by Product Report, how would you have received
23  that?
24     A  Via Excel.  There's no way to
25  electronically send that to me.  It would have just

1  been a download into Excel and then sent soft copy,
2  if they did send it.
3      Q  Okay.  I just want to make sure I
4  understand what you're saying.  Could it be -- are
5  you saying it was sent as an attachment to an
6  e-mail, or are you saying it couldn't be sent as an
7  attachment?
8      A  It could, but it would have been an Excel
9  document.
10     Q  Okay.  So it's a report that's generated
11  from information contained on OSO, or is it an OSO
12  report that's generated and then saved?
13     A  That's the name of the report in OSO.
14     Q  Okay.
15     A  But to be able to share it with anybody,
16  you would have to download it into Excel.
17     Q  Okay.  And is it then saved -- do you
18  know where, then, that particular report -- the
19  product summary by -- no the Forecast Summary by
20  Product --
21     A  Category, yeah.
22     Q  -- where that type of report would have
23  been saved as an Excel document?
24     A  It -- depending on what the nature of why
25  I was receiving it, I would have saved it in e-mail

1  or just saved it in our network as a part of our
2  working documents for that forecast period.
3      Q  Okay.  And page -121, there's handwriting
4  on that page.  Do you recognize that handwriting?
5      A  Yes.
6      Q  Okay.  Is that your handwriting?
7      A  It looks to be mine, yes.
8      Q  Can you read that for me?
9      A  Ah, the only thing I can make out, the
10  first line I think the second word is "down."
11     Q  Uh-hum.
12     A  But I can't make out what else is on that
13  line.
14     Q  Is it "Judgment down"?  You can't read
15  that?
16     A  I can't say.
17     Q  Okay.  Anything else?
18     A  I see "NY State," the bottom of the
19  second line.
20     Q  Uh-hum.
21     A  I can't make out what's on top of that or
22  next to that.
23     Q  Okay.  And do you have any understanding
24  of when you would have made notes on these
25  particular documents?

1      A  No.  It could have been at any point in
2  time preparing the forecast for that week.
3      Q  Okay.  And in preparing the forecast, did
4  you speak to people in the sales divisions?
5      A  From time to time, yes.
6      Q  Okay.  And who within the sales divisions
7  would you speak to from time to time?
8      A  Oh, I'm sorry.  Within the finance part
9  of the sales division.
10     Q  Okay.
11     A  So somebody within the finance director's
12  organization, their analysts.
13     Q  So somebody -- Sarah Kopp or Jim English
14  or in Mr. Winton's division?
15     A  Yes.
16     Q  And in speaking with them, you might have
17  made notes on this report?
18     A  Yes, or in speaking with my manager or
19  just --
20     Q  Okay.
21     A  -- during the preparation process.
22     Q  And you don't have any understanding of
23  what these notes on page -121 refer to?
24     A  I don't.
25     Q  All right.  Page -123, and although

1  that's a little bit clearer, I actually have a

2  clearer copy of that page, so if you have a hard

3  time understanding what is written there, I can

4  show you that.

5      A  -123 I can read.

6      Q  Yeah.

7      Q  And this is the format in which we would

8  have sent it out --

9      Q  Okay.

10     A  -- as a part of the Americas Forecast

11  Package.

12     Q  Just so I am clear, this is the page --

13  is it page 37123 and -124 that you would have sent

14  out as the OSO Big Deal attachment to the Americas

15  Forecast Report?

16     A  Ah, I believe so, yes.

17     MS. LAVALLEE:  Could I go off the record for

18  a moment?

19     VIDEO OPERATOR:  We are off the record at

20  2:49 p.m.

21     (Pause in proceedings.)

22     VIDEO OPERATOR:  Back on the record at

23  2:49 p.m.

24     Q  BY MS. LAVALLEE:  Ms. Ronsse, can you

25  tell me -- can you read me your notes on page -123?

162

---

1      A  Down at the bottom, "Where are their

2  University of Texas deals.  Jay counting on Texas

3  and communications deals."

4      Q  Okay.  Do you have any understanding

5  whether or not those were notes taken during a

6  forecasting call on Thursday?

7      A  I don't remember.

8      Q  Okay.

9      A  And, actually, can I clarify from an

10  earlier question?  We've -- we use different

11  versions of the Big Deals Reports to send out, so I

12  just wanted to clarify that I know sometimes we

13  sent out this version or this format and sometimes

14  we sent out the earlier version, and I can't

15  remember when we would have sent out what format.

16     Q  Okay.  So it's possible you may have sent

17  out the format set forth in pages 3716- through --

18     A  Correct.

19     Q  -22 -- -122?

20     A  Correct.  As I'm looking through that, I

21  remember that we used the different formats from

22  time to time.

23     Q  Okay.  Now, is it a situation where you

24  generated both formats and might have attached one

25  or the other, or is it a situation where at one

163

---

1  point in time you were using one format and then

2  you switched to a new format?

3      A  Uhm, it was we were trying to switch over

4  to this latter format --

5      Q  Okay.

6      A  -- because it was more directly from the

7  system.

8      Q  All right.  Now, going back to your

9  handwritten notes on page -123 in Exhibit 249, can

10  you tell me what you were referring to by these

11  notes?

12     A  No, I don't remember.

13     Q  Okay.  And "Jay," is that a reference to

14  Mr. Nussbaum?

15     A  It would be, yes.

16     Q  And "Counting on Texas and comm deals,"

17  by that do you mean that he's counting on the deal

18  with Texas and telecom deals?

19     A  I don't remember what I was referring to.

20     Q  And the word "comm," does that have any

21  significance for you?

22     A  That would have been an abbreviation for

23  communications.

24     Q  And his division had telecom deals?

25     A  Correct.

164

---

1      Q  But you don't understand what you meant

2  by the phrase "Counting on Texas and comm deals"?

3      A  Correct.

4      Q  Okay.  And as you sit here, you don't

5  understand what you would have meant by that?

6      A  I don't remember the context in which I

7  took this note, no, so I don't understand what I

8  meant.

9      Q  Okay.  All right.  And where does this

10  particular report end?  The OSI Forecast Summary

11  Report by Product Category is two pages and then it

12  switches to NAS Forecast Summary Report by Product

13  Category --

14     A  Correct.

15     Q  -- which is pages -126 to -127.  Does

16  that appear to be the Big Deal Reports as you

17  referred to earlier for NAS?

18     A  Yes.  It switches to NAS on -125, -126,

19  and -127.

20     Q  Okay.  And then on -128, -129, what --

21  are those the OPI Forecast Summary Reports by

22  Product Category, which you referred to as the Big

23  Deal Reports?

24     A  Yes.

25     Q  And there's a notation on -128.  Is that

165

1  your handwriting?

2  A  Yes.

3  Q  Okay.  And can you read that, please.

4  A  "Emerson looks good per Sandy.  Where

5  is" --

6  Q  -- "it"?  Is that possible?

7  A  I don't know if it's "it" or -- it could

8  be possible with a question mark as to where is it

9  on the list.

10  Q  Pardon me.  I take it you don't have any

11  understanding of what you were trying to convey

12  there either or what you were writing there?

13  A  Not more than what the note says, no.

14  Q  Okay.  And the last page is LAD Forecast

15  Summary Report by Product Category?

16  A  Correct.

17  Q  Is that Latin America --

18  A  Yes.

19  Q  -- division?

20  Okay.  Now, the reports that are

21  contained on pages -123 through -130, would those

22  encompass the entirety of the type of Big Deal

23  Reports that you would attach to the forecasting

24  report?

25  A  For these divisions, yes, although like I

166

1  said earlier, I don't remember on which forecast

2  weeks we sent this format versus the one previous.

3  Q  Okay.  Did you receive forecasting

4  reports that were prepared by the sales division or

5  the finance division for any of the North America

6  divisions during the Q-3 2001 time frame?

7  A  Ah, can you clarify any reports?  Other

8  than we discussed or --

9  Q  Yeah.  Let's talk about reports other

10  than we discussed that showed forecast figures,

11  best case, worst case figures, for any of the

12  particular divisions.

13  A  Not that I remember.

14  Q  Okay.  Let me just briefly show you two

15  exhibits that were previously marked in the

16  depositions earlier.  The first one is Exhibit

17  No. 32.

18  (Whereupon, Deposition Exhibit 32

19  was placed before the witness.)

20  BY MS. LAVALLEE:  If you could take a

21  look at this document and tell me whether or not

22  it's the type of document that you received in your

23  capacity as finance manager at Oracle.

24  A  You know, this -- this isn't familiar to

25  me.

167

1  Q  Okay.  And I would like to show you a

2  document that was previously marked as Exhibit

3  No. 36 in one of the prior depositions.

4  (Whereupon, Deposition Exhibit 36

5  was placed before the witness.)

6  Q  BY MS. LAVALLEE:  If you could tell me

7  whether or not that is a document or a type of

8  report that you would have received in your

9  capacity as finance manager at Oracle Corporation?

10  A  This isn't familiar either.

11  Q  Okay.  Do you have any knowledge of who

12  prepared those reports?

13  A  No.

14  Q  Okay.  I would like to mark as Exhibit

15  No. 250 a document Bates stamped CA-ORCL 004848

16  through -4856.

17  (Plaintiffs' Exhibit 250 was marked for

18  identification by the deposition officer and

19  is attached hereto.)

20  BY MS. LAVALLEE:  Ms. Ronsse, could you

21  take a look at the document and then tell me if you

22  recognize it and what it is, if you do?

23  A  This is part of pages from the upside

24  report, but it's not dated.

25  Q  Okay.  And can you see further at the

168

1  bottom?  Does that help?

2  A  On the second page, oh, sorry.  Yes.  I'm

3  typically looking at the top for the week, so as of

4  January 18th, it seems it was printed.

5  Q  Okay.  And was this the report you were

6  working -- that you would have worked on for that

7  time frame?

8  A  It looks like a working copy of the

9  upside report.

10  Q  Does it look like your working copy?

11  A  I don't know if it's mine or somebody

12  else's.

13  Q  Okay.  Are the handwritten notes on this

14  document yours?

15  A  Some notes are mine.

16  Q  All right.  Starting on page -4848, can

17  you tell me which notes are yours?

18  A  Ah, starting in the middle to the right,

19  the "Plugged 25,000 30 percent e-x-p growth,"

20  expense growth, "growth of 10, didn't" -- looks

21  like -- "change percentages."

22  Q  Okay.

23  A  Underneath that it says "Cooperman" to --

24  next to the FY02 budget percent -- percent margins,

25  57, 56, 56, and then at the bottom "Alliances 10

169

1  percent, Development 10 percent."  I can't read the
2  bottom one.  It's cut off.
3     Q  Okay.  The reference to "Cooperman," is
4  that the reference to Daniel Cooperman?
5     A  It's his last name, but I don't know what
6  I was referring to.
7     Q  Okay.  Do you know who Mr. Cooperman is?
8     A  Yes.
9     Q  And did you have occasion to deal with
10  him in your capacity as finance manager at Oracle?
11     A  No, not directly.
12     Q  Did you occasionally communicate with
13  him?
14     A  No.
15     Q  Did you ever communicate with him --
16     A  No.
17     Q  -- while at Oracle?
18     Okay.  And do you have any understanding
19  of what any of your notes refer to or mean on this
20  page?
21     A  There -- it just looks like working notes
22  of fixes or changes that we needed to make in the
23  course of preparing the document.
24     Q  Okay.  So it's your understanding that
25  this is your notes as you were preparing the

170

1  document, but not notes taken after it was
2  finalized because this isn't a final document?
3     A  Correct.
4     Q  Looking at the document, what is it that
5  indicates to you that it is not a final document?
6     A  Well, the -- the notes would indicate.
7  On a final document I typically would not have any
8  notes and there are -- I typically, with my
9  notetaking, would have a working copy to remind me
10  to -- to make certain changes that needed to be
11  made before the final was final.
12     Q  Okay.  The upside reports, were these
13  reports that were prepared weekly for each of the
14  Monday morning weekly executive calls?
15     A  They were prepared according to the
16  forecast schedule --
17     Q  Okay.
18     A  -- which was every other week in the
19  first two months of the quarter and every week
20  during the last month.
21     Q  Okay.  And I believe some of the other
22  witnesses have testified that on -- there was
23  weekly -- Monday morning calls for the executive
24  committee every week and that on the weeks that
25  didn't correspond to a forecasting week, an oral

171

1  report would be generated.  And to the extent there
2  was any new information known, it would be then
3  updated and a report would be -- an upside report
4  would be generated every week.
5     Does that correspond with your
6  understanding?
7     A  My responsibility was to prepare it in
8  accordance with the forecast schedule.
9     Q  Okay.  So you were never asked to update
10  it or to even just reprint it with a new date?
11     A  Not that I remember, no.
12     Q  Okay.  And the upside report, was that
13  ever a report that you discussed with anybody other
14  than Ms. Minton?
15     A  With my manager, Ivgen Guner, we would
16  also discuss and potentially with Larry Garnick as
17  another part of my management team, and from time
18  to time if Jeff Henley had a question.
19     Q  Okay.  And Mr. Henley's questions, would
20  they be posed during the -- while you were
21  preparing the upside report or something that he
22  would pose later?
23     A  No, later, and unusually through
24  Jennifer.
25     Q  And Jennifer would say to you,

172

1  "Mr. Henley had for you this question"?
2     A  A question, correct.
3     Q  And do you recall any specific questions
4  that he may have posed over the course of your time
5  as finance manager?
6     A  No, not specific questions.
7     Q  Okay.  What was the nature of the types
8  of questions he would be asking?
9     MR. GOLDSTEIN:  Objection to form.
10     THE WITNESS:  Just -- just about the numbers
11  on the report, just are these numbers correct.
12     Q  BY MS. LAVALLEE:  Okay.
13     A  That substance, you know, did we prepare
14  this correctly? is the number correct? --
15     Q  Okay.
16     A  -- and validation of it.
17     Q  All right.  And would he ask for anything
18  beyond validation?
19     A  Not that I can remember, no.
20     Q  Okay.  And was that a frequent request or
21  something that occasionally happened?
22     A  No, very random --
23     Q  Okay.
24     A  -- and seldom.
25     Q  Okay.  And do you recall specifically in

173

Ronsse, Roberta  4/20/2004  3:09:00 PM

1   what time frame such a request might have been
2   made?
3       A   No.
4       Q   I take it you don't know whether or not
5   such a request was made in the fiscal 2001?
6       A   No, I don't remember.
7       Q   And how would such a request be conveyed
8   to you, by e-mail or verbally?
9       A   Verbally.
10      Q   Did you communicate with Ms. Minton by
11  e-mail?  And let me --
12      A   Uhm --
13      Q   Let --
14      A   Sorry.  Go ahead.
15      Q   Let me just put a time frame there -- in
16  the Q-3 2001 time frame.
17      A   I don't remember.
18      Q   Okay.  Generally, when you communicated
19  with people at Oracle, did you tend to communicate
20  by e-mail frequently or did you tend to communicate
21  by phone or in one-on-one conversations or personal
22  conversations, in-person conversations?
23      A   The people within corporate finance that
24  I worked closely with on one-on-one conversations,
25  others, like with the finance divisions, via

174

1   telephone or e-mails.
2       Q   Okay.  Because a lot of them weren't in
3   the same offices?
4       A   Correct.
5       Q   Did you have occasion to communicate
6   directly with the head -- the executive VPs of any
7   of the U.S. divisions:  Mr. Nussbaum,
8   Mr. Sanderson, or Mr. Roberts?
9       A   No.
10      Q   I take it you didn't have occasion to
11  deal with Mr. Henley directly?
12      A   Only if he was present in our forecast
13  calls or present with Ivgen or Jennifer in their
14  offices.
15      Q   So occasionally you would be -- you were
16  requested to meet with Ms. Guner or Ms. Minton and
17  Mr. Henley may appear or may be there?
18      A   Correct.
19      Q   And you may be in the same room having a
20  conversation with him outside the context of a
21  meeting?
22      A   Yes.
23      Q   Okay.  And was that a frequent
24  occasion -- a frequent incident?
25      A   No.  Seldom.

175

1       Q   Seldom.  Okay.  Do you recall
2   specifically any of those meetings?
3       A   Not specific meetings, no.
4       Q   Do you recall generally the type of
5   discussions you would have at those types of
6   meetings?
7       A   No.
8           (Whereupon, Ms. Segal left the
9           deposition room.)
10      Q   BY MS. LAVALLEE:  Would --
11      A   They would just -- specifically, no.  In
12  general, about reports or, you know, just reviewing
13  reports that we had given to him or were to prepare
14  for him.
15      Q   Okay.  And do you recall when any such
16  meeting took place?
17      A   No.
18      Q   Do you recall if any such meeting took
19  place in the third quarter of 2001?
20      A   No.
21      Q   Okay.  And did you ever have an
22  opportunity to communicate with Mr. Ellison?
23      A   No.
24      Q   Okay.  Did you ever attend -- ever attend
25  any meeting where Mr. Ellison was present?

176

1       A   No.
2       Q   Okay.  And the forecasting calls, they
3   were actually telephonic calls, correct?
4       A   Yes.
5       Q   Okay.  Were you in the room with anybody
6   when they took place, or were you in your office
7   alone?
8       A   I was in Jennifer Minton's office.
9       Q   Okay.
10      A   So I was with Jennifer and Ivgen.
11      Q   Okay.
12      A   And occasionally Jeff, if he was in town.
13      Q   Okay.
14      A   If he was in town and came to Jennifer's
15  office to listen to the call.
16      Q   And would he occasionally attend by
17  telephone but not in Ms. Minton's office?
18      A   Yes.
19      Q   Were your offices located close to
20  Ms. Minton's?
21      A   Yes.
22      Q   Same floor or --
23      A   Yes.
24      Q   All right.  Back to Exhibit No. 250.
25  Page 4850, is the handwriting on this page your

177

1   handwriting?

2       A   Some handwriting is, yes.

3       Q   Okay.  Can you just read out for me what

4   your handwriting is?

5       A   It looks like at the top -- I think

6   that's a point 600, maybe a comma, "600 to get to

7   15 percent" -- that's mine.

8       Q   Okay.  The 692 before it is not?

9       A   That's not mine.

10      Q   And do you have any understanding as to

11  whose handwriting that is?

12      A   I don't know.  It would either be Ivgen's

13  or Jennifer's, but I can't make it out.

14      Q   Okay.

15          (Whereupon, Ms. Segal entered the

16      deposition room.)

17      BY MS. LAVALLEE:  Any of the other

18  handwriting yours?

19      A   Uhm, yes.  It looks like at the top, the

20  "2" dash -- I don't know if that's a "20" dash

21  "15."  That's mine.  I don't think that next "15"

22  is mine.  And then going down the page, that next

23  paragraph is mine.

24      Q   What does that read?

25      A   "Took out" dash "10,000 in Germany Q-4

178

1   consulting forecast added 1 million to UK."

2       Q   Okay.

3       A   It looks like.

4       Q   And the next -- the point, that is yours?

5       A   The next one down looks like "added

6   1,234" a million or if it's a thousand "in expense

7   to UKl to get margin at 148909."

8       Q   All right.  Anything else on your -- down

9   the page yours?

10      A   In the middle, that number "148,909"

11  looks to be mine.

12      Q   Uh-hum.

13      A   And then the numbers on the margin

14  percentage where it starts with "14, 20, 28, 22, 15

15  and change one of these."

16      Q   Okay.

17      A   That seems to be it.

18      Q   Do you have any understanding what that

19  references?

20      A   I don't.

21      Q   And the negative numbers, you have no

22  idea what the -- or the dash numbers, you have no

23  idea what those are?

24      A   No.

25      MS. LAVALLEE:  All right.  The -- there's

179

1   just a couple minutes left on the tape, so why

2   don't we take a short break and he can change the

3   tape at this stage.

4       VIDEO OPERATOR:  This concludes Videotape

5   No. 2 in the videotaped deposition of Roberta

6   Ronsse.  The time is 3:11 p.m. on April 20, 2004,

7   and we are off the record.

8       (A recess was taken.)

9       (Whereupon, Ms. Segal was not present

10      at resumption.)

11      VIDEO OPERATOR:  This begins Videotape No. 3

12  in the videotaped deposition of Roberta Ronsse.

13  The time is 3:17 p.m. on April 20th, 2004, and we

14  are on the record.

15      Q   BY MS. LAVALLEE:  I'm just going to mark

16  this document as Exhibit No. 251 and ask one brief

17  question on it.  It is document Bates stamped

18  CA-ORCL 004221 through -4233.

19      (Plaintiffs' Exhibit 251 was marked for

20      identification by the deposition officer and

21      is attached hereto.)

22      Q   BY MS. LAVALLEE:  Ms. Ronsse, if you

23  could take a look at the document and then when

24  you've had a chance to review it, please identify

25  it for me.

180

1       (Pause in proceedings.)

2       (Whereupon, Ms. Segal entered the

3       deposition room.)

4       THE WITNESS:  This -- this is an upside

5   report and it looks like a working copy that would

6   have been printed on December 5th, 2000.

7       Q   BY MS. LAVALLEE:  And you believe it to

8   be a working copy for what reason?

9       A   I believe because I see notes, one

10  indicating the time that we printed it and then

11  there's more notes on page -4225.

12      Q   Okay.

13      A   So that gives me the indication that it's

14  a working copy.

15      Q   And the notes on page -4225, are those

16  your notes?

17      A   Yes.

18      Q   And what do those numbers refer to?

19      A   I don't know.

20      Q   Okay.  You have no idea what those

21  numbers are?

22      A   I don't remember.  Yeah, I don't know.

23      Q   Okay.

24      A   This was not a typical --

25      Q   Notation?

181

Ronsse, Roberta  4/20/2004  3:09:00 PM

1    A   Right.

2    Q   All right.  And the notation on -4222,

3  there's a box or series of chart boxes that are

4  crossed out or there's an X through them.

5       Do you have an understanding as to why

6  that is or what that notation meant?

7    A   No, I don't know why we crossed it out.

8    Q   Okay.  And was it -- you have no idea if

9  that's your cross-out?

10   A   I don't.  I don't know.

11   Q   And the next page, -4223, there --

12  both -- nearly at the end "Earnings Per Share"

13  those certain -- there's figures that are circled.

14      Do you have an understanding as to what

15  that's all about?

16   A   Well, that looks like an error and we

17  found it in reviewing the document.  The numbers

18  didn't come in correctly.

19   Q   Okay.  That's all I have on that

20  document.

21      I would like to mark as Exhibit No. 252,

22  a document Bates stamped CA-ORCL 004676 through -4692.

23      (Plaintiffs' Exhibit 252 was marked for

24      identification by the deposition officer and

25      is attached hereto.)

182

1    Q   BY MS. LAVALLEE:  Ms. Ronsse, if you

2  could, take a look at the document and then

3  identify it for me, please.

4    A   This looks like the upside report dated

5  January 19th.

6    Q   Okay.  Now, it prefers on the top to Q-4

7  fiscal year forecast.

8    A   Right.

9    Q   Does that appear to be --

10   A   This is a Q-4 upside.

11   Q   All right.  Now, can you tell me if it

12  was normal for you to be preparing an upside report

13  for the subsequent quarter?

14   A   It was normal.  It didn't happen every

15  forecast week, but it was normal to prepare upsides

16  for the previous -- the forward-looking quarter.

17   Q   Okay.  And do you know what -- did you

18  prepare these upside reports the same way that you

19  prepared the upside reports for the current fiscal

20  quarter?

21   A   The same way, yes, in that we obtained

22  the information from OFA.

23   Q   Right.

24   A   Yes.

25   Q   And who was it who on occasion would ask

183

1  you to prepare an upside report for the subsequent

2  quarter?

3    A   My manager, Ivgen Guner.

4    Q   Okay.  And when she asked you to do that,

5  did she ever give a reason why she would want an

6  upside report for the subsequent quarter?

7    A   Uhm, just that management was interested

8  in -- in looking at it.

9    Q   Okay.  Do you have any understanding as

10  to why management was interested in looking at the

11  forecast for a subsequent quarter?

12   A   Uhm, nothing more than just for

13  forward-looking purposes just for their own

14  planning purposes.

15   Q   Okay.  And by "planning," what are you

16  referring to?

17   A   Uhm --

18   Q   Do you have any knowledge?

19   A   I -- not specifically of how management

20  planned, no, but for information purposes to help

21  them in their planning.

22   Q   Okay.  And I guess by "planning," what

23  are you referring to?

24   A   I guess I'm just referring to the

25  responsibility of upper management in looking at

184

1  forward quarters and planning for forward quarters

2  or adjusting or preparing for future quarters in

3  terms of making decisions on head count and

4  expenses and et cetera.

5    Q   Okay.  And do you have any other

6  understanding beyond that?

7    A   No.

8    Q   Okay.  And do you know what happened with

9  upside reports that were prepared for the

10  subsequent quarter?

11   A   Typically, I would make them available to

12  Ivgen, and if Jennifer wanted a copy and if she

13  wanted any other copies, I would make them for her.

14   Q   Okay.  Do you know if this is something

15  that was also provided at some of the Monday

16  morning EMC meetings?

17   A   Occasionally it was.

18   Q   Okay.  And do you recall -- for example,

19  in this particular report, January 19, 2001, if you

20  had prepared this report, do you have any

21  understanding as to whether or not it was then

22  provided to some or all of the members of the EMC

23  meeting -- EMC committee for the Monday morning

24  meetings?

25   A   No, I don't know --

185

1    Q   Okay.

2    A   -- if it was.

3    Q   Okay.  But on some occasions when you

4    prepared them, you knew they went to the EMC

5    members or some of the EMC members?

6    A   Correct.

7    Q   Okay.  And did you ever participate in

8    any discussions regarding what the forecast figures

9    for the subsequent quarter showed?

10   A   No, I don't remember.

11   Q   Okay.  And, generally, how many times a

12   quarter would you be asked to do this?  Do you

13   know?

14   A   Every quarter was different typically.

15   Sometimes it was with every forecast.  Other times

16   it was maybe a couple of times.  It was random.

17   Q   Okay.  I'm going to mark as Exhibit

18   No. 253 a document Bates stamped 4485 through -500.

19       (Plaintiffs' Exhibit 253 was marked for

20       identification by the deposition officer and

21       is attached hereto.)

22   Q   BY MS. LAVALLEE:  Ms. Guner -- pardon me.

23   Ms. Ronsse, could you please take a look at this

24   document and once you've had a chance to review it,

25   please identify it for me.

186

1    A   This is the upside report for

2    January 12th for the next quarter, Q-4 '01.

3        (Whereupon, Ms. Segal left the

4        deposition room.)

5    Q   BY MS. LAVALLEE:  So for this particular

6    week you were also asked to prepare an upside

7    report for the subsequent quarter?

8    A   Apparently, yes.

9    Q   And in the January 12th and January 19th

10   time frame, one of those is a forecasting week and

11   one of them is not; is that correct?

12   A   I would have to look at the calendar, but

13   typically it would -- we wouldn't have it back to

14   back.

15   Q   Right.

16   A   In the second -- yeah.  That's correct.

17   MR. GOLDSTEIN:  You mean a forecasting week?

18   THE WITNESS:  A forecasting week.

19   MS. LAVALLEE:  What did I say?

20   MR. GOLDSTEIN:  I think you said reporting

21   week.

22   MS. LAVALLEE:  I apologize.  Yeah, I did mean

23   forecasting week.  Thank you, Paul.

24   Q   So was that unusual or was that just

25   because of the random nature of the request you

187

1    really can't say it's unusual?

2    A   Right.  From time to time I was asked --

3    Q   Okay.

4    A   -- to prepare a copy.

5    Q   Were you ever asked to prepare upside

6    reports on weeks that were not forecasting weeks --

7    forecasting reporting weeks?

8    A   That's right.  That's the right

9    terminology.  I was never asked to prepare

10   different-based data in an upside report.  It would

11   be the same data as the previous forecast week;

12   but, yes, from time to time I would be asked to

13   prepare an upside report in a nonforecast week, if

14   you will, and make copies.

15   Q   Okay.  Okay.  I thought we discussed that

16   a little earlier and you said no, but maybe I'm

17   confusing or maybe my questions were different and

18   I'm trying to understand how -- so occasionally you

19   did prepare, at someone's request, Ms. Minton's or

20   Ms. Guner's request, upside reports for weeks that

21   were nonforecasting reporting weeks?

22   A   Typically they would just be copies of

23   the previous week.

24   Q   Okay.  And would you change -- reprint them

25   with a new date or you would just copy them again?

188

1    A   We would reprint them from the soft copy

2    that we had on our network, just print them out

3    that day because the final was always considered

4    what was the soft copy --

5    Q   Okay.

6    A   -- you know, in our network.

7    Q   Okay.  And would the date automatically

8    change because it was dated by --

9    A   Right.  You would see the printed-on

10   date.

11   Q   Okay.  And were you ever asked to change

12   any numbers to reflect new information or -- for

13   that particular week?  Like, for example, well,

14   check the pipeline data, has changed on OFO, put in

15   the data?

16   A   No, not the base data, no, not the

17   forecast or pipeline data.

18   Q   Okay.  And what about the revenue data?

19   A   No, not any of the forecast data.

20   Q   Okay.  I would like to mark as Exhibit

21   No. 254 a document Bates stamped CA-ORCL 004197

22   through -4206.

23       (Plaintiffs' Exhibit 254 was marked for

24       identification by the deposition officer and

25       is attached hereto.)

189

1 Q  BY MS. LAVALLEE:  Ms. Ronsse, if you

2 could take a moment to look at this document and

3 when you've had a chance to review it, please

4 identify it for me.

5 (Pause in proceedings.)

6 THE WITNESS:  This is the Pipeline Reporting

7 Package.

8 Q  BY MS. LAVALLEE:  The one we discussed

9 earlier that you said you participated in

10 preparing?

11 A  Right --

12 Q  Okay.

13 A  -- at the beginning of each month.

14 Q  Okay.  And this one is dated December 11,

15 2000?

16 A  Right, but that would have been the first

17 time we would have done the forecast --

18 Q  Okay.

19 A  -- if I remember right, the schedule.

20 Q  And does this look to be a complete

21 Pipeline Reporting Package?

22 A  It looks like it has all of the reports

23 that I remember producing for the Pipeline

24 Reporting Package.

25 Q  Okay.  And can you tell looking at this

190

1 document whether it was a final report?

2 A  Uhm, it indicates "FIN 12-12" on the top

3 right in my handwriting, so that would lead me to

4 assume that it was the final version.

5 Q  Okay.  And in order to create this

6 report, what sources of information did you use?

7 A  This was information all from OFA.

8 Q  Okay.  And you would prepare this you

9 said to -- and finalize it on this Thursday of this

10 the first forecasting week or the beginning of each

11 month?

12 A  Correct.

13 Q  We spoke earlier about pipeline -- no,

14 Actual Pipeline Analysis Reports, I think is what

15 we decided to call it.  Now, can you tell me

16 precisely what data -- what pipeline type of data

17 would appear in that particular report?

18 MR. GOLDSTEIN:  Objection to form.

19 THE WITNESS:  They were ad hoc reports, so

20 there was nothing that was consistently produced.

21 Q  BY MS. LAVALLEE:  But it was more -- it

22 had historical pipeline type information, correct?

23 A  Sometimes, yes.

24 Q  And would it be the type of information

25 contained in this report or sometimes more or

191

1 sometimes less?

2 A  It was random.  It could have been

3 similar information.  Not necessarily more or less,

4 just perhaps different -- formatted a different

5 way.

6 Q  But it could be more, it could be less?

7 It just depends on the report or you don't

8 remember?

9 A  It depends on the request.  I don't

10 remember specifics.

11 Q  Okay.  And on this Pipeline Reporting

12 Package report, when you prepared this report, what

13 did you do with this one?

14 A  This was provided to Ivgen, my manager,

15 and to Jennifer.  From time to time I was asked to

16 make copies for Jennifer.

17 Q  Okay.  Any number of copies?  Did it

18 change from week to week or month to month or was

19 there a set number you were always asked to

20 prepare?

21 A  This was random.

22 Q  Okay.  And did you actually provide them

23 with hard copies or did you provide them with

24 electronic versions?

25 A  Ah, I only remember hard copies.

192

1 Q  Okay.  And when you prepared these, I

2 think you had testified earlier that they were

3 Excel sheets and you saved them onto the network,

4 your department's network.  And did you testify as

5 to whether you kept hard copies in your working

6 files or folders at the -- for your division?

7 A  I may have kept hard copies in my binder,

8 yes.

9 Q  Okay.  And by your "binder," can you

10 explain to me what precisely you mean by your

11 "binder"?

12 A  I had binders for each quarter of the

13 fiscal year, where I kept all of my working papers

14 that I used, and during the forecast week to

15 prepare the reports, and then I would try to put

16 the final versions in those binders as well.

17 Q  Okay.  And did you keep e-mails in those

18 binders as well?

19 A  If I felt they were relevant to the

20 process and had information that helped me to

21 prepare the reports, then yes, I would try to.

22 Q  Okay.  And other than -- well, let me ask

23 a different question.

24 Do you know who the audience was for the

25 Pipeline Reporting Package?

193

1     A   Well, I was preparing it for Ivgen and
2   Jennifer, my immediate management.  That was --
3   that was the -- the immediate audience.
4     Q   And beyond them, do you have any
5   understanding as to who were the recipients of
6   these reports on a regular basis?
7     A   Uhm, not on a regular basis, although
8   from time to time Jeff Henley was interested in
9   this report.
10     Q   And how do you know he was interested in
11   this particular report?
12     A   Because he would ask to see it from time
13   to time.
14     Q   Okay.  And was that a request that was
15   conveyed through somebody else or to you directly?
16     A   Through my management.
17     Q   And would you then personally send it off
18   to Mr. Henley, or would you provide him a copy or
19   would you -- or would it be conveyed to him in a
20   different manner?
21     A   No, it would typically be given by my
22   management.
23     Q   Okay.  And did you ever discuss the
24   contents of the Pipeline Reporting Package with
25   your management or anybody else?

194

1     A   Yes.
2     Q   Okay.  And on what occasions would you do
3   that?
4     A   During the preparation period, uhm,
5   there's review time where they would review and ask
6   questions to ensure accuracy and, uhm, validate the
7   contents.
8     Q   Okay.  Now, is this a compilation of a
9   report that just compiles data that is sort of
10   fixed data that is in the system, or is there any
11   form of judgment or analysis that is included in
12   here?
13     MR. GOLDSTEIN:  Objection to form.
14     THE WITNESS:  This is data straight from OFA.
15     Q   BY MS. LAVALLEE:  Okay.  And -- okay.
16   Did you ever discuss data contained herein with
17   Mr. Henley?
18     MR. GOLDSTEIN:  Objection to form.
19     Q   BY MS. LAVALLEE:  Ah, let me rephrase my
20   question actually.  Did you discuss data in any
21   Pipeline Reporting Package with Mr. Henley?
22     A   From time to time.
23     Q   Okay.  And do you recall any specific
24   instance when you did?
25     A   No.

195

1     Q   Okay.  And do you -- was it -- "from time
2   to time," do you mean that would occur every
3   quarter or every year?  Do you know?
4     A   It was random.
5     Q   Do you recall any discussions with
6   Mr. Henley regarding the contents of this type of
7   report, the Pipeline Reporting Package, during the
8   fiscal year 2001?
9     A   I don't remember.
10     Q   How about do you -- do you recall whether
11   or not you discussed the contents of any Pipeline
12   Reporting Package with Mr. Henley during the third
13   quarter fiscal 2001?
14     A   No, I don't recall.
15     Q   Okay.  And did you ever discuss the
16   contents of the Pipeline Reporting Package with
17   Mr. Larry Ellison?
18     A   No.
19     Q   Okay.  Did you ever communicate directly
20   with Mr. Ellison?
21     A   No.
22     Q   I think we may have covered that.
23     A   Yes.
24     Q   And when you discussed the contents of
25   this Pipeline Reporting Package with Mr. Ellison --

196

1   Henley, were these communications by phone or
2   communications in person?
3     A   In person.
4     Q   And were these the types of
5   communications you referred to earlier when you
6   might be in Ms. Minton's office and Mr. Henley was
7   present?
8     A   Yes.
9     Q   So, generally, there was somebody else
10   there present during these meetings?
11     A   Yes.
12     Q   And I believe you said that the -- the
13   source of all this information contained in this
14   particular report, the Pipeline Reporting Package,
15   was information found on the OFA system, correct?
16     A   Correct.
17     Q   Okay.  Can you tell me what type of
18   information was compiled in the OFA system?
19     A   What type -- all types of information
20   or --
21     Q   Yeah.
22     A   OFA included forecast information for
23   revenue, expenses, and head count for all of the
24   lines of businesses in all of the countries at
25   Oracle and budget information and then actuals

197

1  information once it was available from the general
2  ledger.
3      Q   Okay.  And do you have any understanding
4  as to how long a historical picture this -- let me
5  ask a different question.
6          The data that is contained in the OFA
7  system, how far back historically did it go?
8      A   I don't remember.
9      Q   Okay.  Was it more than a year?
10     A   Yes.
11     Q   Was it more than three years?
12     A   I don't remember.
13     Q   Okay.  Were you ever asked to prepare
14  upside reports for a three-year period?
15     MR. GOLDSTEIN:  Objection to form.
16     THE WITNESS:  This type of upside report --
17  like this exact report?
18     Q   BY MS. LAVALLEE:  Or something similar.
19     MR. GOLDSTEIN:  Same objection.
20     THE WITNESS:  I guess I don't understand.  Do
21  you mean showing three years in the past?
22     Q   BY MS. LAVALLEE:  Any three-year period,
23  past or future.
24     A   We prepared budget reports that showed
25  more than one year -- or more than two years I

198

1  guess I should say.
2      Q   Okay.
3      A   That's what I remember are budget
4  reports.
5      Q   Okay.  And were they in similar format --
6      A   Uh-hum.
7      Q   -- to the upside reports?
8      MR. GOLDSTEIN:  Objection to form.
9      THE WITNESS:  We had management summary as a
10  format that we used in a lot of different reports.
11     Q   BY MS. LAVALLEE:  Okay.
12     A   But that -- that was the type of format,
13  if you will, that we reported -- reported -- or
14  used for reporting, numerous different types of
15  analyses, actuals, budget, forecast.
16     Q   I would like to show you a document that
17  was previously marked as Exhibit No. 77.
18         (Whereupon, Deposition Exhibit 77
19         was placed before the witness.)
20     Q   BY MS. LAVALLEE:  If you could take a
21  look at this document and just tell me whether or
22  not you recognize it.
23     A   No, I don't recognize it.
24     Q   Is any of the handwriting on here yours?
25     A   No.

199

1      Q   Do you recognize any of the handwriting
2  on it?
3      A   Ah, yes.
4      Q   Whose handwriting do you recognize?
5      A   Jennifer Minton's.
6      Q   Okay.  Anybody else's or is it all hers,
7  do you believe?
8      A   It looks to all be hers.
9      Q   I would like to mark as Exhibit 255 a
10  document Bates stamped CA-ORCL -- actually, let me
11  check.  I believe this has already been marked.
12  Let me just double-check.  This is a document that
13  has actually been previously marked as Exhibit
14  No. 156.
15         (Whereupon, Deposition Exhibit 156
16         was placed before the witness.)
17     Q   BY MS. LAVALLEE:  And there's a series of
18  e-mails here with an attachment.  If you could take
19  a look at this document and once you've had a
20  chance to review it, please identify it for me.
21         (Pause in proceedings.)
22     THE WITNESS:  Ah, the report is a Forecast
23  Accuracy Analysis.
24     Q   BY MS. LAVALLEE:  Okay.  And did you
25  indeed receive at least a portion of the e-mail

200

1  that has you as a cc on or about September 18,
2  2000?
3      A   I don't remember, but my name is copied
4  here.
5      Q   So you don't have any reason to believe
6  that you didn't receive it?
7      A   Yes, that's true.
8      Q   Okay.  And the attachment, does that
9  appear to be actually the attachment that belongs
10  with this e-mail?
11     A   Based on the subject of the e-mail, it
12  seems like the report.
13     Q   Okay.  Is this the type of report you
14  would have prepared or somebody at your request in
15  your division?
16     A   Yes.  It's an ad hoc report that -- that
17  I'm familiar with.
18     Q   And do you recall the reason why you
19  prepared this report?
20     A   As requested by management.  I can't
21  recall specific reasons.
22     Q   Generally, you don't recall any reason?
23     A   Well, generally, it was -- it was an
24  analysis -- it was an analysis that we did from
25  time to time to -- to give information about the

201

Ronsse, Roberta  4/20/2004  3:09:00 PM

1　accuracy of the forecast, about what the -- how the
2　different divisions forecasted as compared to their
3　actuals.
4　　Q   Okay.  Did you ever run a similar type of
5　report for the accuracy of the potential number in
6　the upside report?
7　　A   I don't remember.
8　　Q   Okay.  And I -- on the very top after
9　Ms. Burke forwarded this to Mr. Ellison,
10　Mr. Henley, Safra Katz, and a number of other
11　people and cc'd you, it was then forwarded to a
12　variety of people from Mr. Sanderson.
13　　I take it you weren't a recipient of the
14　top e-mail?
15　　A   Correct.
16　　Q   Do you have any understanding of any
17　action that was taken as a result of the generation
18　of this License Revenue Forecast Accuracy Report?
19　　A   No.
20　　Q   Did you have any discussion with anybody
21　regarding the information contained in this report
22　after this report was prepared?
23　　A   I don't remember.
24　　Q   Do you recall if you ever prepared a
25　similar report or similar-type report after this

202

1　report for a subsequent time frame?
2　　A   I don't remember.  We prepared it
3　randomly.
4　　Q   Okay.  Now I would like to mark as
5　Exhibit No. 255 a document Bates stamped CA-ORCL
6　037596 through -598.
7　　(Plaintiffs' Exhibit 255 was marked for
8　identification by the deposition officer and
9　is attached hereto.)
10　　Q   BY MS. LAVALLEE:  Ms. Ronsse, can you
11　take a moment to look at these numbers and then
12　please identify them for me.
13　　(Pause in proceedings.)
14　　THE WITNESS:  These are random notes that I
15　don't know the date -- I don't know the date of
16　which.  Looks like notes that I would have taken
17　for myself during the forecast process, working
18　papers.
19　　Q   BY MS. LAVALLEE:  Okay.  And are all
20　three pages your notes?
21　　A   Well, the first page is my writing.  The
22　second page has writing that I don't recognize, and
23　the third page is -- it looks like most of it is my
24　writing, although down at the bottom it has some
25　writing that's not mine.

203

1　　Q   All right.  Now, do you have any
2　understanding as to what you were doing when you
3　were making these notes on page 37596?
4　　A   It looks like notes that I would take
5　when I'm tying out numbers to the divisions.
6　　Q   Okay.  So that's like doing the Monday
7　through Wednesday time frame of a forecasting week,
8　you would be taking the data from the finance
9　divisions of the sales groups and you would be
10　looking at that and comparing that to what was on
11　OFO and the reports you were generating?
12　　MR. GOLDSTEIN:  OFA.
13　　THE WITNESS:  OFA.
14　　MS. LAVALLEE:  OFA.  Thank you.  I always do
15　that.
16　　THE WITNESS:  Once they -- their deadline was
17　Wednesday night, so I would have typically done
18　this tie-out at the end of the day Wednesday or
19　first thing Thursday morning.
20　　Q   BY MS. LAVALLEE:  Okay.  Is the same true
21　of the significance of the notes that you took on
22　page 37598?
23　　A   Yes.
24　　Q   What does "R-e-v" stand for in here?
25　Revenue?

204

1　　A   Yes.
2　　Q   What about "E-x-p"?
3　　A   Expense.
4　　MS. LAVALLEE:  I would like to mark as
5　Exhibit No. 256 a document that is titled
6　"Interview of Roberta Ronsse."
7　　(Plaintiffs' Exhibit 256 was marked for
8　identification by the deposition officer and
9　is attached hereto.)
10　　Q   BY MS. LAVALLEE:  Ms. Ronsse, if you
11　could take a moment to look at this document and
12　then tell me whether or not it's a document you've
13　seen before today.
14　　(Pause in proceedings.)
15　　THE WITNESS:  Yes, it is.
16　　Q   BY MS. LAVALLEE:  Okay.  And when did you
17　first see this document?
18　　A   I can't remember the exact date, but it
19　was about a month ago.
20　　Q   Okay.  And -- okay.  And is this a
21　document you reviewed in anticipation of this depo?
22　　A   Yes.
23　　Q   Okay.  When you reviewed this -- when did
24　you last review this document?
25　　A   Last evening.

205

1    Q   When you reviewed this document -- well,
2    let me step back.
3         Were you indeed interviewed by members of
4    the -- or counsel for the Special Litigation
5    Committee on April 5th and September 27, 2002?
6    A   Yes.
7    Q   Okay.  And I assume, based on this, there
8    was also several subsequent telephone interviews by
9    them?
10   A   Yes.
11   Q   Do you -- when you read through these --
12   this interview summary, did it accurately reflect
13   your discussion with the SLC attorneys?
14   A   Yes.  There are a few corrections that I
15   had.
16   Q   Okay.  Can you tell me what those
17   corrections were?
18   A   The first one is on page 5 -- or -- yeah.
19   Q   Uh-hum.
20   A   The second paragraph where it says that
21   each upside report included forecast data taken
22   from OSO --
23   Q   Yes.
24   A   -- that's not correct.  It's OFA.
25   Q   Okay.

206

1    A   And then it goes on to say:  "This is
2    reflected in the forecast column.  The information
3    is entered onto the spreadsheet comprising the
4    Upside Report by FP&A personnel."
5    Q   Uh-hum.
6    A   It's more accurate to say that the
7    information is -- is linked to Excel.  We never
8    entered this -- this kind of implies that we
9    created a separate spreadsheet that became the
10   upside report.  It's just linked from OFA.
11   Q   Okay.  Can you explain to me what you
12   mean by that?
13   A   The numbers in OFA were the base numbers
14   for the forecast column and prior year actuals
15   column in the upside report; and we took the data
16   from OFA, downloaded it to Excel, and linked it
17   into our Excel workbook.  So there was no typing or
18   entering of information.
19   Q   Okay.  It was just -- for particular
20   columns it pulled the information from particular
21   portions of OFO?
22   A   OFA.
23   Q   OFA?
24   A   Downloaded reports from OFA.
25   Q   Thank you.  All right.  Anything else in

207

1    here that you wish to correct?
2    A   It will take a little time to find.
3    Q   Sure.  Take as much time as you need.
4    A   Later on, on page 5 it says -- talking
5    about the executive management committee meetings,
6    it said:  "These meetings typically took place
7    bi-weekly during the first two months of the
8    quarter and weekly."  That's not true.  That was
9    our forecast schedule.
10   Q   Right.
11   A   That's when we produced our forecast.  We
12   didn't have any control over when EC meetings took
13   place.
14   Q   Right.
15   A   Uhm, on page 6 under the "Green Book" --
16   Q   Yes.
17   A   -- I wanted to clarify that it says that
18   it was for Oracle North America businesses, that it
19   was just the license businesses of North America.
20   It didn't contain consulting information or any
21   other information.  I believe that was all.
22   Q   Okay.  So, basically, other than that,
23   it -- it accurately reflects what you told the SLC
24   regarding this case?
25   A   Yes.

208

1    Q   Okay.  And there's a description of your
2    week similar to what we talked about earlier on
3    pages 2 and 3 and that seems to accurately reflect
4    what occurred?
5    A   Right.  Two and three -- actually pages 2
6    and 3 discuss --
7    Q   You're right.
8    A   -- OSO.
9    Q   Yeah, I'm sorry.  I misspoke.  But the
10   information in terms of the process that is
11   discussed at 2 and 3 appears to be correct?
12   A   Ah, yes, as far as I -- we didn't go
13   through this process, but it was my understanding
14   of the process of inputting data into OSO by the
15   sales reps.
16   Q   Okay.  And on paragraph -- page 4, the
17   first full paragraph says that:
18        "The sum total of the
19        opportunities for a particular
20        quarter in OSO and other systems, as
21        not all Oracle Licensing business
22        units used OSO in Q-3 fiscal year
23        2001 or even today, is Oracle's
24        pipeline for that quarter."
25   Does that accurately reflect what the

209

1  total opportunities in OSO represent?
2      A  In OS- -- I think I'm confused about the
3  question.
4      Q  Okay.  I guess my question is:  The first
5  sentence -- the first full sentence of page -- the
6  first sentence of the first full paragraph on
7  page 4 --
8      A  Uh-hum.
9      Q  -- is that accurate?
10     A  Yes, it's accurate.
11     Q  Okay.  And then you continue by stating
12  that:
13          "Each organization has its own
14      guidelines for what does and does
15      not get entered into the pipeline,
16      and therefore pipeline data cannot
17      be treated in the same manner as
18      historical sales data."
19      Can you explain in more detail what your
20  understanding is of the pipeline data that is
21  entered into OSO?
22      A  Well, my understanding was that each
23  organization had their own guidelines in terms of,
24  uhm, at what point a deal was considered to be an
25  opportunity within that organization and that's

210

1  when it got entered into OSO.
2      Q  Okay.
3      A  That was my understanding from
4  discussions.
5      Q  Okay.  And do you have any -- any
6  discussions in particular that led you to have that
7  understanding?
8      A  Not in particular.  It was just a topic
9  with the finance folks regarding why we couldn't
10  compare from one organization to another.  They
11  weren't working off of corporate guidelines.
12     Q  Okay.  And were there written guidelines
13  for each of these divisions?
14     A  That, I don't know.
15     Q  What were your understanding of the
16  specificity of the guidelines that were -- existed
17  within NAS, in OPI, and OSI?
18     A  I don't know.  I don't have details.
19     Q  Okay.  Do you understand that the -- do
20  you have any understanding as to whether or not the
21  guidelines related to a level of comfort or
22  probability of closing the deal or something else?
23     MR. GOLDSTEIN:  Objection to form.
24     THE WITNESS:  I don't know.
25     Q  BY MS. LAVALLEE:  Okay.  You don't have

211

1  any idea of what the general nature of the
2  guidelines were, then, or do you?
3      A  Well, the general nature would be for
4  each organization how they were to define their
5  deals and put them into OSO, but I never saw the
6  specifics nor had the opportunity to get into the
7  specifics or the details because it wasn't part of
8  my job.
9      Q  Okay.  Did you have any understanding as
10  to, generally, what type of criteria was used to
11  make a determination for any of the divisions?
12     A  A determination of --
13     Q  Or -- what criteria constituted the
14  guidelines.
15     MR. GOLDSTEIN:  Objection to form.
16     Q  BY MS. LAVALLEE:  Did it relate to
17  probability of close or did it relate to something
18  else?
19     MR. GOLDSTEIN:  Objection to form.
20     THE WITNESS:  I don't know because I -- I
21  didn't see their guidelines.
22     Q  BY MS. LAVALLEE:  Okay.  And do you know
23  whether or not there were actually any written
24  guidelines to view or is it --
25     A  I don't know that there were.

212

1      Q  And I take it when you reviewed the --
2  this interview summary you took a look at the
3  exhibits as well --
4      A  Yes.
5      Q  -- and some of them refer to distribution
6  lists.  Do they seem to be accurate?
7      A  Yes.
8      Q  On page 8 there's a discussion of the
9  Oracle forecast process and a reference to Thursday
10  forecasting calls and there's a list of possible
11  participants or people --
12          "Participants on these calls
13      varied from week to week, but could
14      include Ellison, Henley, Minton,
15      Katz, Guner and the EVPs in charge
16      of Oracle Licensing businesses in
17      North America, Nussbaum, Roberts,
18      and Sanderson."
19      Do you see that?
20     A  Yes.
21     Q  Is that accurate?
22     A  Yes.
23     Q  I believe you mentioned earlier that
24  Ellison did not generally attend these?
25     A  Not generally.  I said from time to time.

213

1    Q  Okay.  So --

2    A  If I remember, right.

3    Q  Okay.

4    A  Very -- very rarely.

5    Q  Okay.  And then it continues to say

6  Ms. Ronsse -- or:

7         "Ronsse sometimes took notes at

8      these meetings, which she kept in a

9      binder.  She provided her binder

10     from Q3 of FY 2001 to the

11     Committee."

12        And I assume that the binder here is the

13  binder that you've been referring to earlier.  You

14  said earlier that you had binders for each of the

15  quarters, so is it my understanding that you

16  provided the binder from Q-3 FY '01 to this SLC

17  committee?

18    A  Yes.

19    Q  Did you ever get back your binders from

20  the Special Litigation Committee or from anybody

21  else?

22    A  I don't remember.

23    Q  You don't have those binders today

24  because they're at Oracle?

25    A  No.  Correct.

214

1    Q  Or they're somewhere, but you don't have

2  them?

3    A  Correct.

4    Q  While you were finance manager at Oracle,

5  did you ever have any contact with the company's

6  auditors, outside auditors?

7    A  I don't remember.

8    Q  Okay.  I assume you did in your prior

9  positions or you may have in your prior positions,

10  right?

11    A  Ah, yes.  It was maybe once or twice.

12    MS. LAVALLEE:  Okay.  Why don't we take a

13  five-minute break, and then we can see how quickly

14  we can wrap up.

15    VIDEO OPERATOR:  We're off the record at

16  4:07 p.m.

17       (A recess was taken.)

18    VIDEO OPERATOR:  We are on the record at

19  4:15 p.m.

20    Q  BY MS. LAVALLEE:  We've reviewed a number

21  of documents today, and you had indicated that you

22  looked at a number of things in preparation for

23  your deposition.

24       Did we go through all the documents that

25  you reviewed in preparation for your deposition?

215

1    A  Ah, there was one e-mail from David

2  Winton --

3    Q  Right.

4    A  -- that I don't remember -- did we review

5  that today?

6    Q  That's --

7    A  No, we didn't.

8    Q  Okay.  And this was an e-mail that you

9  were cc'd on?

10    A  No.

11    Q  You never received it?

12    A  No.

13    Q  Okay.  And had you received it prior to

14  reviewing it in preparation for this deposition?

15    A  No.

16    Q  Were you familiar with the contents of

17  what was in that e-mail --

18    A  No.

19    Q  -- prior to reviewing the e-mail?

20    A  No.

21    Q  Do you recall the date of the e-mail?

22    A  Not the exact date, no.  Sometime in

23  January.

24    Q  Okay.  And do you recall the substance of

25  what was in the e-mail?

216

1    MR. GOLDSTEIN:  Asked and answered.

2    Q  BY MS. LAVALLEE:  If I've asked you, I

3  don't recall.  If you can just answer again.

4    A  Again, it was regarding NAS' forecast for

5  the quarter of Q-3 '01.

6    Q  Okay.  And were there any facts in there

7  precisely -- any of the facts in there something

8  that you recall from the time frame?

9    A  No, not that I remembered.

10    Q  Okay.  Are you familiar with the

11  America's Data Mart --

12    A  Yes.

13    Q  -- Program?

14       Can you tell me what that is?

15    A  That was a system that we did not use in

16  corporate finance, but was used by the finance

17  divisions within North America.

18    Q  Okay.  And what kind of information was

19  contained on this -- was it a database?

20    A  It was a database, yes.

21    Q  And what kind of information was

22  contained on the database?

23    A  I don't know the entirety of the

24  information, but I do know that there was revenue

25  information.

217

Ronsse, Roberta  4/20/2004  3:09:00 PM

1    Q   Okay.  And then are you familiar with
2    anything else that was included on there?
3    A   Not more than it being revenue
4    transaction information.
5    Q   Okay.  And do you understand how -- what
6    the source of the information contained on that
7    database was?
8    A   From my understanding, it was the
9    subledger, so the A/R subledger where the revenue
10   was booked.
11   Q   Okay.  And just for clarification, "A/R"
12   means?
13   A   Accounts receivable.
14   Q   Okay.  And so was it more of an
15   accounting-type or bookkeeping-type program?
16   MR. GOLDSTEIN:  Objection as to form.
17   BY MS. LAVALLEE:  Or was it something
18   different?
19   A   It was a database of the information that
20   was transacted in accounts receivable --
21   Q   Okay.
22   A   -- in the general ledger.
23   Q   So did it refer to actual revenues as
24   opposed to forecasting-type data?
25   A   Yes.

218

1    Q   And do you know who had access to this
2    database?
3    A   I don't know the exact list, no.
4    Q   Okay.  Do you know generally what
5    departments or what type of people would have
6    access to it?
7    A   Ah, generally, finance managers within
8    the sales divisions.
9    Q   Anybody else?
10   A   I don't know.
11   Q   Okay.  Do you know whether any of the
12   more senior management level people would have
13   access to that?
14   A   I don't know.
15   Q   What about the enterprise data warehouse,
16   are you familiar with that?
17   A   Yes.
18   Q   Can you tell me what that is?
19   A   That was -- that's a data warehouse, uhm,
20   that -- similar to the America's Data Mart,
21   collected revenue information from A/R and the
22   general ledger for, ah, reporting purposes and for
23   analysis purposes.
24   Q   Okay.  Was that a program or forecasting
25   database -- strike that.

219

1    Was that a database that you or your
2    people in your department used?
3    A   Yes.
4    Q   Okay.  And for what purpose did you use
5    this database?
6    A   We used it primarily for ad hoc research
7    purposes.  It -- while I was at Oracle -- was never
8    complete, meaning we didn't have all organizations'
9    data collected into the data warehouse.  It was a
10   work in progress, so we used -- as such we could
11   only use it on an ad hoc basis to research
12   transactions as they -- they were booked.
13   Q   Okay.  Do you have any role in preparing
14   any of the senior management, the executive
15   management -- for example, Mr. Henley -- in
16   preparing for earnings calls?
17   A   Specifically -- I'm sorry.  Repeat the
18   question.
19   Q   Do you know what an "earnings call" is?
20   A   Yes.
21   Q   Okay.  And did you have any role in
22   preparing or -- for these calls or preparing any
23   individual for these calls?
24   A   Not preparing individuals, no.
25   Q   Okay.  Did you have any role in

220

1    connection with these calls, earnings calls at all?
2    A   Not in connection with the calls, no.
3    Q   Okay.  You had a role, though, in
4    gathering the information for the actual earnings
5    results?
6    A   I had a role in producing reports at the
7    end of the quarter --
8    Q   Okay.
9    A   -- which may or may not have been used by
10   management in preparation for that -- for those
11   calls.
12   Q   Okay.  And did you have a role in
13   compiling any data for guidance information for
14   subsequent quarters that might be given at earnings
15   calls?
16   A   Ah, nothing more than the forecast -- you
17   know, what was produced during the forecast period.
18   Q   Okay.
19   A   And if so, it was on an ad hoc basis.
20   MS. LAVALLEE:  Okay.  Those are all the
21   questions I have for today.  Thank you so much for
22   your time.
23   THE WITNESS:  You're welcome.
24   VIDEO OPERATOR:  This concludes Videotape
25   No. 3 and concludes the videotaped deposition of

221

Ronsse, Roberta  4/20/2004  3:09:00 PM

1    Roberta Ronsse.  The time is 4:22 p.m. on April 22,
2    2004, and we are off the record.
3        THE REPORTER:  Are you ordering a copy?
4        MR. NADOLENCO:  Yes.
5        MR. GOLDSTEIN:  Yes.
6        (Deposition session concluded at 4:22 p.m.)
7            -  -  -
8        I have read the foregoing deposition
9    transcript and by signing hereafter, approve same.
10
11   Date _____.
12
13
14       _____
15            ROBERTA RONSSE
16
17
18
19
20
21
22
23
24
25

222

1        DEPOSITION OFFICER'S CERTIFICATE
2
3    STATE OF CALIFORNIA    )
4                 )  ss.
5    COUNTY OF ORANGE    )
6
7        I, Yolanda M. Parks, hereby certify:
8        I am a duly qualified Certified Shorthand
9    Reporter in the State of California, holder of
10   Certificate Number CSR 7523 issued by the Court
11   Reporters Board of California and which is in full
12   force and effect. (Bus. & Prof. Sect. 8016.)
13       I am not financially interested in this
14   action and am not a relative or employee of any
15   attorney of the parties, or of any of the parties.
16   (Civ. Proc. Sect. 2025(k)(1).)
17       I am authorized to administer oaths or
18   affirmations pursuant to California Code of Civil
19   Procedure, Section 2093(b) and prior to being
20   examined, the deponent was first duly sworn by me.
21   (Civ. Proc. Sect. 2025(r)(1).)
22       I am the deposition officer that
23   stenographically recorded the testimony in the
24   foregoing deposition and the foregoing transcript
25   is a true record of the testimony given.

223

1    (Civ. Proc. Sect. 2025(r)(1).)
2        I have not and shall not offer or provide
3    any services or products to any party's attorney or
4    third party who is financing all or part of the
5    action without first offering same to all parties
6    or their attorneys attending the deposition and
7    making same available at the same time to all
8    parties or their attorneys.  (Civ. Proc. Sect.
9    2025 (k)(2).)
10       I shall not provide any service or
11   product consisting of the deposition officer's
12   notations or comments regarding the demeanor of any
13   witness, attorney, or party present at the deposition
14   to any party or any party's attorney or third party
15   who is financing all or part of the action, nor shall
16   I collect any personal identifying information about
17   the witness as a service or product to be provided
18   to any party or third party who is financing all or
19   part of the action.  (Civ. Proc. Sect. 2025(k)(3).)
20
21   Dated April 30th, 2004.
22
23
24       _____
25            Yolanda M. Parks

224

Roberta Ronsse

EXHIBIT P

```
 1          UNITED STATES DISTRICT COURT
 2         NORTHERN DISTRICT OF CALIFORNIA
 3                  -oOo-
 4    IN RE
      ORACLE CORPORATION
 5    SECURITIES LITIGATION
                 MASTER FILE NO.
 6               C-01-0988-MJJ
      This Document Relates To:
 7
      ALL ACTIONS
 8    _____/
 9
10
11                  -oOo-
12
13             CONFIDENTIAL
14    VIDEOTAPED DEPOSITION OF SARAH KOPP
15             June 14, 2006
16
17                  -oOo-
18     SHEILA CHASE & ASSOCIATES
            REPORTING FOR:
19     LiveNote World Service
       221 Main Street, Suite 1259
20     San Francisco, CA 94105
       Telephone: (415) 321-2300
21     Fax: (415) 321-2301
22                  -oOo-
23    Reported by:
      KELLIE A. ZOLLARS, CSR, RPR, CRR
24    CSR License No. 5735
25
                                              1
```

```
 1              I N D E X
 2         INDEX OF EXAMINATION
 3                         PAGE
 4    EXAMINATION BY:
 5      MS. McLAUGHLIN          9, 112
 6
 7
 8    "AFTERNOON SESSION"         112
 9
10              -oOo-
11         INDEX OF EXHIBITS
12    EXHIBIT NO.      DESCRIPTION      PAGE
13    EXHIBIT 1   E-mail from Mr. Nussbaum
                  dated 05 Dec 2000 with attached
14                e-mail CONFIDENTIAL - 2 pages   33
15    EXHIBIT 2   #39 Interview Memorandum of
                  Sarah Kopp 07/30/02
16                CONFIDENTIAL - 26 pages     52
17    EXHIBIT 3   Forecast Report
                  CONFIDENTIAL - 5 pages      58
18
      EXHIBIT 4   Forecast Report
19                CONFIDENTIAL - 5 pages      58
20    EXHIBIT 5   Forecast Report
                  CONFIDENTIAL - 5 pages      58
21
      EXHIBIT 6   Forecast Report
22                CONFIDENTIAL - 5 pages      58
23    EXHIBIT 7   Forecast Report
                  CONFIDENTIAL - 12 pages     58
24
      EXHIBIT 8   Forecast Report
25                CONFIDENTIAL - 5 pages      58
                                              2
```

```
 1    EXHIBIT 9    Forecast Report
                   CONFIDENTIAL - 5 pages      58
 2
      EXHIBIT 10   Forecast Report
 3                 CONFIDENTIAL - 10 pages     58
 4    EXHIBIT 11   Forecast Report
                   CONFIDENTIAL - 5 pages      58
 5
      EXHIBIT 12   E-mail from Ms. Burke dated
 6                 Nov. 2000 with attachments
                   CONFIDENTIAL - 15 pages     70
 7
      EXHIBIT 13   Oracle Service Industries
 8                 Forecast - Q3FY01 ($M)
                   CONFIDENTIAL - 2 pages      72
 9
      EXHIBIT 14   Oracle Service Industries
10                 Forecast - Q2FY01 ($M)
                   CONFIDENTIAL - 2 pages      72
11
      EXHIBIT 15   Oracle Service Industries
12                 Forecast - Q2FY01 ($M)
                   CONFIDENTIAL - 2 pages      72
13
      EXHIBIT 16   Oracle Service Industries
14                 Forecast - Q3FY01 ($M)
                   CONFIDENTIAL - 2 pages      72
15
      EXHIBIT 17   OSI  Q3 '01 Week 12 ($M)
16                 CONFIDENTIAL - 2 pages      72
17    EXHIBIT 18   OSI - Q3 '01 Week 13 ($M)
                   CONFIDENTIAL - 2 pages      72
18
      EXHIBIT 19   Oracle Service Industries ($M's)
19                 Pipeline History CONFIDENTIAL
                   - 7 pages              81
20
      EXHIBIT 20   Oracle Service Industries ($M's)
21                 Pipeline History CONFIDENTIAL
                   - 7 pages              81
22
      EXHIBIT 21   Oracle Service Industries ($M's)
23                 Pipeline History CONFIDENTIAL
                   - 7 pages              81
24
      EXHIBIT 22   Oracle Service Industries ($M's)
25                 Pipeline History CONFIDENTIAL
                   - 6 pages              81
                                              3
```

```
 1    EXHIBIT 23   Oracle Service Industries ($M's)
                   Pipeline History CONFIDENTIAL
 2                 - 7 pages              81
 3    EXHIBIT 24   E-mail from Mr. Avila dated
                   08 Jan 2001 CONFIDENTIAL
 4                 - 1 page               81
 5    EXHIBIT 25   E-mail from Jennifer Minton
                   Dated 8 Jan 2001 CONFIDENTIAL
 6                 - 3 pages              97
 7    EXHIBIT 26   E-mail from Sarah Kopp dated
                   14 Feb 2001 with attached
 8                 Power Point Presentation
                   CONFIDENTIAL - 13 pages     97
 9
      EXHIBIT 27   E-mail from Sarah Kopp dated
10                 22 Feb 2001 CONFIDENTIAL
                   - 1 page               97
11
      EXHIBIT 28   E-mail from Sarah Kopp dated
12                 18 Jan 2001 CONFIDENTIAL
                   - 1 page               97
13
      EXHIBIT 29   E-mail from Mr. Nussbaum dated
14                 11 Jan 2001 CONFIDENTIAL
                   - 2 pages              97
15
      EXHIBIT 30   OSI Q3 License Status as of
16                 13-feb-01 CONFIDENTIAL
                   - 7 pages              97
17
      EXHIBIT 31   E-mail from Ms. Kopp dated
18                 27 Feb 2001 with attachments
                   CONFIDENTIAL - 26 pages    112
19
      EXHIBIT 32   OSI Big Deal Summary Analysis
20                 CONFIDENTIAL - 1 page      112
21    EXHIBIT 33   Q4 FY01 - Projection March 1,
                   2001 CONFIDENTIAL - 3 pages   112
22
      EXHIBIT 34   FY01 Q3 Forecast vs. Actuals
23                 with attachments CONFIDENTIAL
                   - 4 pages              112
24
      EXHIBIT 35   Q4 FY01 Week 1 March 1, 2001
25                 with attachments CONFIDENTIAL
                   - 4 pages              112
                                              4
```

Kopp, Sarah  6/14/2006  9:02:00 AM

1    EXHIBIT 36   OSI Q3 Pending License Deals
2                 Status with attachments
                  CONFIDENTIAL - 6 pages         112
3    EXHIBIT 37   Summary of Americas > $1M Big
                  Deal Slippage Q2 to Q3
4                 CONFIDENTIAL - 2 pages         112
5    EXHIBIT 38   Oracle Service Industries
                  Forecast Summary Report By
6                 Product Category Mon Aug 7
                  with attachments CONFIDENTIAL
7                 - 5 pages                      112
8    EXHIBIT 39   OSI Forecast Summary Report
                  By Product Category CONFIDENTIAL
9                 - 2 pages                      112
10   EXHIBIT 40   OSI Forecast Summary Report
                  By Product Category CONFIDENTIAL
11                - 2 pages                      112
12   EXHIBIT 41   OSI Forecast Summary Report
                  By Product Category CONFIDENTIAL
13                - 16 pages                     112
14   EXHIBIT 42   Forecast Analysis CONFIDENTIAL
                  - 1 page                       112
15
     EXHIBIT 43   (not used in deposition and
16   through      not attached)
     EXHIBIT 45                                  112
17
     EXHIBIT 46   E-mail from Ms. Kopp dated
18                01 Mar 2001 with attached
                  OSI Q3 License Status
19                CONFIDENTIAL - 2 pages         112
20   EXHIBIT 47   E-mail from Ms. Kopp dated
                  19 Jan 2001 and e-mail from
21                Ms. Kopp dated 18 Jan 2001
                  CONFIDENTIAL - 2 pages         112
22
     EXHIBIT 48   E-mail from Safra Catz dated
23                30 Jan 2001 and e-mail from
                  Mr. Sanderson dated
24                30 Jan 2001 CONFIDENTIAL
                  - 2 pages                      112
25

1    EXHIBIT 49   E-mail from Ms. Minton dated
                  08 Mar 2001 CONFIDENTIAL
2                 - 3 pages                      112
3    EXHIBIT 50   E-mail from Ms. Minton dated
                  07 May 2001 CONFIDENTIAL
4                 - 5 pages                      112
5    EXHIBIT 51   E-mail from Ms. Kopp dated
                  05 Mar 2001 with attachments
6                 - 13 pages                     112
7    EXHIBIT 52   (not used in deposition and
                  not attached)                  112
8
     EXHIBIT 53   Document identified by the
9                 witness as a version of a big
                  deals report - 14 pages        112
10
     EXHIBIT 54   (not used in deposition and
11                not attached)                  112
12   EXHIBIT 55   Oracle USA Q3 - FY01 Top 20
                  License Contracts Revenue
13                Recognition Review
                  CONFIDENTIAL - 36 pages        112
14
     EXHIBIT 56   (not used in deposition and
15                not attached)                  112
16   EXHIBIT 57   Total Company - Q3 FY01 Forecast
                  CONFIDENTIAL - 17 pages        112
17
                  -oOo-
18
19
20
21
22
23
24
25

5

6

1        BE IT REMEMBERED THAT, pursuant to the laws

2    pertaining to the taking and use of depositions, and

3    on Wednesday, June 14, 2006, commencing at the hour of

4    9:01 a.m. thereof, at the offices of LERACH COUGHLIN

5    STOIA GELLER RUDMAN & ROBBINS LLP, 100 Pine Street,

6    Suite 2600, San Francisco, California, before me,

7    KELLIE A. ZOLLARS, CSR No. 5735, a Certified Shorthand

8    Reporter in and for the State of California.

9                -oOo-

10   Appearing as counsel on behalf of Plaintiff:

11       LAW OFFICES of LERACH COUGHLIN STOIA GELLER
         RUDMAN & ROBBINS LLP

12       By:  VALERIE McLAUGHLIN, ATTORNEY AT LAW
              JENNIFER IRVINE, ATTORNEY AT LAW

13       655 West Broadway, Suite 1900
         San Diego, California 92101-3301

14       Tel: (619) 231-1058

15   Appearing as counsel on behalf of Defendants and the
     witness:

16

         LAW OFFICES of LATHAM & WATKINS

17       By:  MICHELE KYROUZ, ATTORNEY AT LAW
              KYRA G. BUSBY, ATTORNEY AT LAW

18       505 Montgomery Street, Suite 2000
         San Francisco, California 94111-2562

19       Tel: (415) 391-0600

20   Also present:

21       Gary Brewer, Videographer

22                -oOo-

23

24

25

7

1            SARAH KOPP

2        having been first duly sworn to

3        tell the truth, the whole truth

4        and nothing but the truth, was

5        thereupon examined and testified

6        as is hereinafter set forth:

7

8        THE VIDEOGRAPHER:  Good morning.  We are going on

9    the record.  Here marks the beginning of Videotape 1,

10   Volume 1, in the deposition of Sarah Kopp in the

11   matter of "In Re Oracle Corporation Securities

12   Litigation" in the United States District Court,

13   Northern District of California, Case No.

14   C-01-0988 MJJ.  Today's date is June 14th, 2006, and

15   the time is 9:02 a.m.

16       The video operator is Gary Brewer,

17   representing LiveNote World Service, located at

18   221 Main Street, Suite 1250, San Francisco, California

19   94105.  Phone number (415) 321-2300.  The court

20   reporter is Kellie Zollars on behalf of LiveNote World

21   Service.

22       Today's deposition is being taken on behalf

23   of the plaintiff, and it is taking place at 100 Pine

24   Street, San Francisco, California.

25       Would Counsel please identify themselves and

8

Kopp, Sarah  6/14/2006  9:02:00 AM

1  state whom they represent.
2      MS. McLAUGHLIN:  Valerie McLaughlin for the
3  plaintiffs.
4      MS. IRVINE:  Jennifer Irvine for the plaintiffs.
5      MS. KYROUZ:  Michele Kyrouz and Kyra Busby from
6  Latham & Watkins representing the defendants and the
7  witness.
8      THE VIDEOGRAPHER:  Would the court reporter please
9  swear in the witness.
10     (Witness sworn.)
11          -oOo-
12          EXAMINATION
13     BY MS. McLAUGHLIN:
14     Q.  Good morning, Ms. Kopp.  My name is Valerie
15  McLaughlin; and as you've just heard, I represent the
16  plaintiffs.  I'm with the law firm of Lerach Coughlin..
17     Could you please state your name and then
18  spell your last name for the record.
19     A.  Sarah Kopp, K-o-p-p.
20     Q.  And could you give us your business address on
21  the record, please.
22     A.  It's 1910 Oracle Way, Reston, Virginia 20190.
23     Q.  Thank you.
24     Now, I know you've had your deposition taken
25  before because I've read it.  So I know you probably

1  know the drill, but I'm going to go over a little bit
2  with you again if that's okay.
3     A.  Uh-huh.
4     Q.  When your deposition is taken, it's under
5  oath.  It's just like if you were sitting in a
6  courtroom in front of a jury and a judge.  Okay?
7     When you respond, please respond verbally to
8  my questions; because it's really important to get a
9  clear record for the court reporter, that you fully
10  respond with full verbal statements.  So "uh-huhs" and
11  "uh-hums," that kind of stuff, we get it on the record
12  but it's not always the best.  So "yes," "no" is
13  helpful.
14     A.  Okay.
15     Q.  Your counsel will most likely object to a lot,
16  if not all, of my questions today.  When they do that,
17  let them finish their objection and then please
18  respond to me after that unless they instruct you not
19  to answer my question.  Okay?
20     If you don't understand any of my questions --
21  or one of them, feel free to stop me and say please
22  could you rephrase or I don't understand what you're
23  asking me.
24     If you have to take a break at any time, just
25  go ahead and ask me to go ahead and stop the -- break

9

10

1  the record.  And I would appreciate it, though, if I
2  do have a question pending to you and you want to take
3  a break, that you answer my question and then request
4  to take the break.  Understood?
5     A.  Okay.
6     Q.  I know you've had your deposition taken in the
7  related derivative case.  Have you ever had another
8  deposition taken?
9     A.  No.
10     Q.  "No."  Okay.
11     And today you have Latham & Watkins
12  representing you here?
13     A.  That's correct.
14     Q.  In preparation for your deposition did you
15  have meetings with your counsel?
16     A.  I did.
17     Q.  How many meetings did you have?
18     A.  Just one.
19     Q.  Just one.  Okay.  And what was the duration of
20  the meeting?
21     A.  A few hours.
22     Q.  Okay.
23     A.  I don't know exactly.
24     Q.  And when was that meeting?
25     A.  That was yesterday.

1     Q.  Did anyone request that you search for
2  documents in preparation for this deposition?
3     A.  Not in preparation for this deposition.
4     Q.  Okay.  Have you searched for documents in this
5  case?
6     A.  I have.
7     Q.  Okay.  And when was that?
8     A.  Roughly four years ago.
9     Q.  Okay.  And have you recently searched for any
10  documents in this case?
11     A.  I have not.
12     Q.  Okay.
13     Were you asked to preserve any documents in
14  relation to this or any matter that's relating to this
15  case?
16     A.  Yes.
17     Q.  Okay.  And when was that?
18     A.  I don't remember exactly.  It was long before
19  the other deposition.
20     Q.  Okay.  And do you recall if that was in 2001?
21     A.  I don't recall.
22     Q.  Okay.  What is your practice in document
23  retention generally?
24     MS. KYROUZ:  Objection.  Vague.  Calls for
25  speculation.

11

12

1    THE WITNESS:  Most of the time I try and save
2  whatever documents I think are important.  I mean, it
3  doesn't happen all the time and in 68 quarters
4  there's -- not always everything can be kept; but
5  generally if I have a document, I try and hang on to
6  it.
7  BY MS. McLAUGHLIN:
8    Q.  Okay.  Do you have any internal, like, clock
9  of your own where you sort of, by way of an example,
10  every 30 days would you purge, say, documents?  Or do
11  you --
12    A.  No.
13    Q.  "No."  Okay.
14    When you were asked to preserve the documents,
15  do you remember who gave you that request?
16    A.  Not -- no.
17    Q.  "No."
18    Do you remember if it came internally from
19  someone at Oracle?
20    A.  I believe it would have been internal.  I
21  don't recall seeing anything from an external source,
22  but I don't remember who it was.
23    Q.  And would it have been via e-mail?
24    A.  Likely.
25    Q.  Okay.  Let's start with your background.

1  When -- I believe you started at Oracle in 1989; is
2  that correct?
3    A.  That's correct.
4    Q.  What was your first position in 1989 at
5  Oracle?
6    A.  I was a revenue analyst for the federal
7  consulting organization.
8    Q.  And how long did you hold that position?
9    A.  About a year in that particular position.
10    Q.  And what position did you occupy after that?
11    A.  Well, up until our fiscal '97, I guess, I was
12  always associated with the government consulting
13  organization.  Starting out as an analyst, moving up
14  to manager with a team as the company grew.  But
15  always with the same organization.
16    Q.  Okay.
17    A.  Which was government consulting.
18    Q.  And I believe you said that it was up until
19  1997?
20    A.  Up until our fiscal 1997 ended.
21    Q.  Okay.  And after fiscal 1997 ended what
22  position did you occupy at Oracle?
23    A.  Finance Director for Global Financial
24  Services.
25    Q.  Okay.  And what did your position of

13

14

1  finance director for the global -- was it government?
2    A.  It was financial services --
3    Q.  Financial services --
4    A.  -- for the financial industry.
5    Q.  What did that entail?  What were your duties
6  there?
7    A.  Similar to what they are now.  Forecasting,
8  building budgets.
9    Q.  So you were forecasting and building budgets
10  for that particular business unit?
11    A.  For that particular business unit, which
12  encompassed consulting and software sales and license.
13    Q.  And how long did you occupy that position?
14    A.  One year.
15    Q.  Okay.
16    And then what was the next position you held?
17    A.  Well, the global verticals were kind of thrown
18  out.  It was a one-year idea that didn't take hold.
19  So after that the person who I was working for in the
20  global vertical came to work for OSI and asked me to
21  join him.  So I was finance director for financial
22  services vertical, for the federal government
23  vertical, as well as for OSI consulting.  And that
24  started in our fiscal '99.
25    Q.  Fiscal '99?  Okay.

1    And you said a person asked you to come and
2  join him?
3    A.  Uh-huh.
4    Q.  And who was that person?
5    A.  Steve Perkins.
6    Q.  Okay.  And he was the head of that particular
7  business unit?
8    A.  He was the head of financial services.  He was
9  asked by Jay Nussbaum, when the financial -- when the
10  vertical thing didn't take hold, to come work for OSI.
11    Q.  Okay.  And how long did you occupy that
12  position?
13    A.  Roughly two and a half years.  While -- as
14  long as OSI continued to be in existence, which was
15  November of 2001.
16    Q.  Okay.
17    A.  So it was through our fiscal second quarter
18  of -- second quarter of our fiscal '02 was when the
19  OSI was --
20    Q.  Resolved?
21    A.  -- OSI/OPI thing stopped happening, yeah.
22    Q.  So am I to understand from 1999 -- fiscal 1999
23  to fiscal 2002, you were the -- and could you repeat
24  exactly what your title was?  Finance director --
25    A.  Yeah.

15

16

1  Q. -- of OSI?

2  A. It wasn't all of OSI.

3  Q. Okay.

4  A. So initially, for the first year, I think, it

5  was I only had federal financial services and

6  consulting for OSI. So there were other verticals

7  that I did not run. I wasn't the finance lead for OSI

8  at that point.

9  Q. And when did you become the finance lead for

10  OSI?

11  A. In October -- actually middle of October of

12  2000.

13  Q. Okay.

14  A. So middle of our second quarter of '01.

15  Q. Okay.

16  And did -- in that position as finance lead

17  for OSI, what were your duties?

18  A. Similar functions just a wider scale.

19  Q. Okay.

20  A. So still budgeting, forecasting.

21  Q. So budgeting, forecasting, personnel issues

22  with your finance group?

23  A. With my own organization, certainly.

24  Q. Okay. And during that time who did you report

25  to?

17

1  A. When I was -- when I took over OSI or before?

2  Q. Yeah, let's just talk about when you took over

3  OSI.

4  A. When I took over OSI, I was reporting to

5  Jennifer Minton.

6  Q. And you no longer were reporting to Steve

7  Perkins or Jay Nussbaum at this point in time?

8  A. No.

9  Q. Do you remember your direct reports at that

10  time?

11  A. Some of them.

12  Q. Okay. Can you name them for me?

13  A. Fred Avila.

14  Q. And if you wouldn't mind when you give me

15  their name can you tell me what they did.

16  A. A-v-i-l-a.

17  Q. That's helpful, too. But if you could let me

18  know what, I guess, vertical they were working in for

19  you.

20  A. Fred was more at the HQ level, pulling reports

21  together across OSI. He was not linked with a

22  particular VP.

23  Q. Okay.

24  A. Karen Bowman.

25  Q. Okay.

18

1  What did Karen do?

2  A. She supported the telecom.

3  Q. Telecom.

4  Do you remember anybody else?

5  A. It's the timing issue so -- Alex San Juan.

6  Q. Okay. Why don't I -- why don't I -- I'll

7  interrupt you here. Let's assume for the remainder of

8  the deposition, the whole day, unless I tell you

9  otherwise, that we're going to be discussing at or

10  around Q3 '01 fiscal. So that would be I'd say from

11  the time you took over OSI as the lead, from October

12  2000, until March, May, give or take. So it will be

13  that time frame. It won't be limited just fiscal

14  quarter but that sort of time frame. And if I

15  otherwise tell you, I'll tell you the time frame I'd

16  like you to respond for.

17  A. Okay.

18  Q. Okay?

19  So we'll go back to that time frame.

20  A. Okay.

21  Q. So you said Alex -- I'm sorry, what was the

22  last name?

23  A. San Juan.

24  Q. San Juan. Okay. And what did he do?

25  A. He had federal.

19

1  Courtney Jung, J-u-n-g, had consulting.

2  Q. Consulting.

3  A. Mark Benjamin had financial services..

4  Q. Healthcare?

5  A. Healthcare. I think Alex covered

6  healthcare --

7  Q. Okay.

8  A. -- also.

9  Q. State and local?

10  A. Steve Quinn.

11  Q. Okay.

12  Did we cover it all?

13  A. I think so.

14  Q. Okay.

15  I think I'd like to ask you some questions

16  about OSI generally, the structure of OSI. Jay

17  Nussbaum was the VP of OSI --

18  A. Correct.

19  Q. -- during that time period; is that correct?

20  A. Yes.

21  Q. Okay. And do you know who his direct reports

22  were at that time?

23  A. Some of them.

24  Q. Okay.

25  A. Terry Ford. And Terry ran operations.

20

1 Charles Kendig.  Quality.

2 Q.  When you say quality, what does that mean?

3 A.  He focused on customer satisfaction reporting,

4 things like that.

5 Q.  Okay.

6 A.  Jose Garcia.  State and local.

7 Q.  Okay.

8 A.  Steve Perkins.

9 Q.  We talked about him.

10 A.  We talked about him.

11 Jim O'Neill.

12 Q.  Okay.  And he was --

13 A.  He was Telecom.

14 Q.  -- Telecom?

15 A.  And that's all I can remember.

16 Q.  Okay.

17 OSI -- I'll just sort of ask you questions,

18 you can correct me if I'm wrong, we'll just get

19 through it quickly.  OSI comprised of two different

20 sort of business or -- sorry, had two different lines

21 of business, one being consulting and the other being

22 license; is that correct?

23 A.  That's correct.

24 Q.  Okay.  And within OSI there were business

25 verticals that -- or there were business units called

21

1 verticals; is that correct?

2 A.  That's correct.

3 Q.  And as I think we've talked earlier, we had

4 the Telecom vertical, correct?

5 A.  Yes.

6 Q.  Federal vertical?

7 A.  Yes.

8 Q.  Healthcare vertical?

9 A.  Yes.

10 Q.  Consulting -- was that a vertical?

11 A.  No.

12 Q.  Did consulting go across all the verticals?

13 Is that how it was set up?

14 A.  Consulting went across all the verticals that

15 were within OSI.

16 Q.  Okay.

17 A.  It was limited to that.  It wasn't all of

18 North America consulting, just the verticals that were

19 in OSI.

20 Q.  Okay.

21 I think you said financial services?

22 A.  That's right.

23 Q.  And state and local.

24 A.  Yes.

25 Q.  Am I missing any?

22

1 A.  Did we say Teleco?

2 Q.  We -- yeah.

3 A.  I think that's it.

4 Q.  Okay.

5 Now, when you -- when you were the lead

6 finance director for OSI, you had a finance group; and

7 I think we talked about who they were earlier, so I

8 think for today I'll just refer to them as your group.

9 Okay?

10 A.  That's fine.

11 Q.  Were you or your group responsible for

12 preparing any periodic reports?

13 A.  Yes.

14 Q.  And we're always going to be in that time

15 frame so we'll have that standing as the time frame

16 every time I ask a question.

17 Okay.  Yes, you were.

18 Can you recall those reports?

19 And we'll go through one by one, and then I'll

20 probably ask you what it entailed.  And it's kind of

21 tedious, but...

22 MS. KYROUZ:  Objection.  Vague.

23 BY MS. McLAUGHLIN:

24 Q.  So you said you were responsible -- you and

25 your group were responsible for preparing periodic

23

1 reports; is that correct?

2 A.  Yes.

3 Q.  Okay.  Let's go through them.

4 What's the first you remember?  Do you recall?

5 A.  We had forecast reports.

6 Q.  Okay.

7 Were there different kinds of periodic

8 forecast reports?

9 MS. KYROUZ:  Objection.  Vague.

10 THE WITNESS:  Yes.

11 BY MS. McLAUGHLIN:

12 Q.  Could you identify those for me.

13 A.  Well, there were different kinds in the sense

14 that there were changes to the same reports that were

15 being made --

16 Q.  Okay.

17 A.  -- during that time frame.

18 Q.  Okay.

19 A.  So there was a forecast report that just

20 listed the forecast for the licensing consulting

21 organization, and then there were "big deals lists" we

22 called them.

23 Q.  Okay.  So the forecast reports, what were

24 those called?

25 A.  It was just called the forecast report.  We

24

1    didn't really -- we didn't have a name.
2       Q.  Okay.  So it was the OSI forecast report?
3       A.  I -- I mean we didn't -- like I say, we didn't
4    call it anything in particular.  It was just the
5    forecast report.
6       Q.  Okay.  And who prepared that?
7       A.  Fred Avila on my team.
8       Q.  Okay.  And do you know who received that
9    report?
10      MS. KYROUZ:  Objection.  Lacks foundation.
11      THE WITNESS:  No.  I know who we sent it to, I
12   don't know who ultimately received it.
13      BY MS. McLAUGHLIN:
14      Q.  Okay.  Who did you send it to?
15        Or your group?
16      A.  We sent it to Jay Nussbaum.
17      Q.  Anyone else within OSI?
18      A.  Terry Ford.
19        And I think that's all within OSI.
20      Q.  Did Jennifer Minton receive this report?
21      A.  Yes..
22      Q.  Did anyone else receive --
23      A.  I don't know.
24      Q.  How often were these forecast reports
25   prepared?

25

1    A.  I don't know that they were prepared according
2    to the forecast schedule.  We had a schedule, but they
3    weren't always done according to that schedule so...
4       Q.  What was the forecast schedule?
5       A.  The forecast schedule was every other week in
6    the first two weeks of a quarter and then every week
7    in the final week of a quarter.
8       MS. KYROUZ:  You mean month?
9       THE WITNESS:  Yes.  Sorry.  Month.
10      BY MS. McLAUGHLIN:
11      Q.  So let me -- I'll just clarify, and you can
12   tell me if I'm wrong.  So it was every two weeks for
13   the first two months of the quarter and then every
14   week for the last month of the quarter?
15      A.  That's correct.  Sorry.
16      Q.  Okay.
17        And that was your -- and that -- you're
18   comfortable with calling that -- that was the forecast
19   schedule?
20      A.  That was corporate's forecast schedule.
21      Q.  Corporate's forecast schedule.  Okay.
22        Did OSI have a different forecast schedule?
23      A.  I just don't recall that we always stuck to
24   that one, so I guess the answer would be potentially
25   yes.

26

1       Q.  Okay.  So these forecast reports, were they
2    generated for a purpose?
3       MS. KYROUZ:  Objection.  Vague.
4       THE WITNESS:  Yes.
5       BY MS. McLAUGHLIN:
6       Q.  Would they have been generated for a meeting?
7    For preparation of a meeting?
8       MS. KYROUZ:  Same objection.
9       THE WITNESS:  Not generally.
10      BY MS. McLAUGHLIN:
11      Q.  Not generally.  Okay.
12        What was the purpose of preparing the report?
13      A.  Was to -- it was just required that we submit
14   a forecast every two weeks so...
15      Q.  Okay.
16      A.  So it was detail supporting the forecast.  Or
17   supporting Jay's forecast.
18      Q.  When you say supporting Jay's forecast, did
19   Jay have a separate forecast of his own?
20      MS. KYROUZ:  Objection.  Vague.
21      THE WITNESS:  Other than the package I prepared
22   for him?
23        No.  Not that I'm aware of.
24      BY MS. McLAUGHLIN:
25      Q.  Okay.  So can we talk about the process of

27

1    this forecasting report.
2       A.  Uh-huh.
3       Q.  Could you explain to me the process that you
4    went through -- or you or your group went through to
5    prepare those reports?
6       MS. KYROUZ:  Objection.  Vague.
7       THE WITNESS:  In broad strokes.  It's been a long
8    time.  Many different forecast packs since then.
9        In general we looked at the business with
10   Jay, talked to him about where he believed the
11   businesses would wind up.  We put in those forecasts
12   based on his input and based on the input of his
13   directs, and we pulled pipeline data from our systems
14   and provided him some data points to help support his
15   forecast.
16      BY MS. McLAUGHLIN:
17      Q.  In a particular quarter when do you start this
18   sort of process of the forecast?  Does it occur prior
19   to the commencement of the quarter or is it started
20   right at the beginning of the quarter?
21        It's compound, I know, but...
22      MS. KYROUZ:  Objection.  Vague.
23      THE WITNESS:  So we're talking about that quarter.
24      MS. McLAUGHLIN:  Yes.  Yes.
25      THE WITNESS:  Not do you, but -- yeah.

28

Kopp, Sarah  6/14/2006  9:02:00 AM

1    MS. McLAUGHLIN:  Let's talk about that quarter.
2   That's what I'm really interested in.
3       THE WITNESS:  At that time it was probably a
4   process that started right at the beginning of the
5   quarter as opposed to ahead of time.
6   BY MS. McLAUGHLIN:
7       Q.  And would you have a meeting with Jay and
8   others, I guess the directs you said, to discuss the
9   forecast?  At the beginning of the quarter?
10      MS. KYROUZ:  Objection.  Vague.
11      THE WITNESS:  Not on any kind of set schedule, no.
12  BY MS. McLAUGHLIN:
13      Q.  Okay.  So you -- so when you said that you
14  would produce this forecast report every two weeks for
15  the first part of the quarter, let's start, like, at
16  the beginning of the quarter.  So the first week would
17  you -- you said you would compile data from the
18  pipeline and from the people who are, I guess, the
19  sales reps in the field?  Was that correct?
20      MS. KYROUZ:  Objection.  Misstates testimony.
21      THE WITNESS:  Not exactly.  No.
22         So we would pull pipeline data out of the
23  system and we would get input from -- well, my staff
24  would provide me input from their business leads.  So,
25  for instance, on the consulting side, they had a whole

29

1   different process.  So they had a more detailed
2   forecast and they would just feed me the forecast that
3   was coming out from the VPs in consulting.  And then
4   on the license side the same thing, they would provide
5   me with that input.  I would sit down with Jay and go
6   through that input, and then we would set his
7   forecast.
8   BY MS. McLAUGHLIN:
9       Q.  Okay.  And when you -- when you say input,
10  could you describe to me what the input would be.
11      A.  Well, the pipeline is pulled directly from the
12  system.
13      Q.  Okay.
14      A.  And then there was an area in the system where
15  the VPs could go in and put in high-level projections
16  for where their numbers would come in so...
17      Q.  Okay.  And the pipeline you said you pulled
18  from the system, is that from the Oracle -- the OSO?
19  the Oracle services Online?
20      A.  Sales.
21      Q.  Sales Online.  Oracle Sales Online?
22      A.  That's what it was then, yes.
23      Q.  And that's where you would pull the pipeline
24  information from?
25      A.  That's where I pulled the current year

30

1   pipeline information from.
2       Q.  Okay.  And when you would pull this
3   information, would you -- what would that -- what sort
4   of information would be in the pipeline?
5       MS. KYROUZ:  Objection.  Vague.
6       THE WITNESS:  Well, the pipeline is just a
7   summation of deals that are in the system.
8   BY MS. McLAUGHLIN:
9       Q.  Okay.  And are the deals input by the sales
10  rep into OSO?
11      A.  That's the intent, yes.
12      Q.  The intent.  Okay.
13         When the sales reps would input the deals,
14  were they required to put any specific information
15  about the deals into the OSO?
16      MS. KYROUZ:  Objection.  Lacks foundation.  Vague.
17      THE WITNESS:  There are fields.  So I don't know
18  that they were forced to.  I don't enter deals in
19  there so I don't know exactly what the fields were,
20  but there are fields.
21  BY MS. McLAUGHLIN:
22      Q.  And do you recall the fields?
23      A.  Some of them.  Customer, deal, opportunity,
24  value.  And then at some point there was a worst,
25  likely, and best value.

31

1       Q.  Do you recall whether there was a win
2   probability?
3       A.  There was also a win probability.
4       Q.  Okay.  And a product specification field?
5       A.  I don't know that one very well so I'm not
6   sure.
7       Q.  Do you -- do you know if there were any
8   requirements for the sales reps to enter all of the
9   information in each of the fields?
10      A.  I don't know.
11      Q.  Do you recall if there was a practice in doing
12  so at that time?
13      MS. KYROUZ:  Objection.  Vague.  Lacks foundation.
14      THE WITNESS:  No, I don't know.
15  BY MS. McLAUGHLIN:
16      Q.  Okay.  Do you recall there ever being any
17  problems with the sales reps not properly entering the
18  information into the OSO?
19      MS. KYROUZ:  Same objections.
20      THE WITNESS:  They weren't as diligent about
21  getting everything in there, I think, as, you know,
22  the corporate people would have liked to have seen.
23      MS. McLAUGHLIN:  Okay.  I'm going to show you a
24  document, and I think I'll start it at Kopp 1.
25         Where would you like these placed on here?

32

1  Has there been a practice so far?
2  THE REPORTER:  It doesn't matter.
3  (Exhibit No. 1 was marked for identification.)
4  BY MS. McLAUGHLIN:
5  Q.  Could you take a look at that and identify
6  that for the -- what you see there for the record.
7  MS. KYROUZ:  I am going to object.  Are you asking
8  whether she recognizes the document?
9  MS. McLAUGHLIN:  I just want her to take a look at
10  it and then identify it, and then I'll ask her if she
11  recognizes it.
12  But for the record it is NDCA-ORCL 040644
13  through 040643 (sic).
14  MS. KYROUZ:  643 to 644 you mean?
15  MS. McLAUGHLIN:  Oh.  I'm sorry.
16  Q.  You have two there?
17  MS. KYROUZ:  Let me just make sure you have the
18  right pages.
19  MS. McLAUGHLIN:  I think they're actually the same
20  now that I look at them.
21  MS. KYROUZ:  I think it looks like a two-page
22  document.
23  MS. McLAUGHLIN:  Oh, I'm sorry, it is a two-page
24  document.  Just read through the whole thing.
25  MS. KYROUZ:  I take it back.  It says 1 of 1.  I'm

1  not sure the second page is at all related.
2  MS. McLAUGHLIN:  Yeah, it's a chain.
3  MS. KYROUZ:  I don't think it is a chain.  If you
4  look at the bottom it says 1 of 1.
5  MS. McLAUGHLIN:  Right.  It's a chain of e-mails
6  starting with an original e-mail and response and --
7  MS. KYROUZ:  Okay.
8  MS. McLAUGHLIN:  -- a forward.
9  Q.  Do you recognize this document?
10  A.  It appears to be a note from Jay Nussbaum.  I
11  don't remember it specifically.
12  Q.  Do you have any reason to believe you wouldn't
13  have received it in the ordinary course of your
14  business?
15  A.  No, I probably did.
16  Q.  Does it look altered to you in any way at all?
17  A.  I wouldn't know.  I don't remember how it -- I
18  don't remember receiving it specifically so I don't
19  know what it would have looked like.
20  MS. KYROUZ:  And you're referring to the first
21  page of Kopp 1?
22  MS. McLAUGHLIN:  Yes, I'm referring --
23  THE WITNESS:  The second one.
24  MS. McLAUGHLIN:  Yeah, I was referring to the
25  first page.  I am going to ask you questions off of

1  the first page.
2  Q.  Could you please go down to -- it's the third
3  paragraph.  And it will say "the current pipeline for
4  Q3 in OSO represents a 10 percent reduction in
5  pipeline from the same period last year."  And then it
6  goes on to say "my initial forecast for Q3 seems to
7  indicate a 50 percent growth in license revenue.  This
8  leaves me with the belief that we have a number of
9  missing opportunities in OSO."
10  Do you remember this situation at that time?
11  A.  I don't remember it specifically.
12  Q.  Okay.  Do you recall if any action was taken
13  in response to this e-mail?
14  MS. KYROUZ:  Objection.  Lacks foundation.  Vague.
15  THE WITNESS:  Yeah, I don't know.
16  BY MS. McLAUGHLIN:
17  Q.  Okay.  Do you recall in this point in the
18  quarter, which is first month of the quarter, there
19  being an issue with sales reps not entering, I guess,
20  deals into the system properly?
21  A.  I don't remember any specifics around this
22  particular quarter --
23  Q.  Uh-huh.
24  A.  -- but in the first month of a quarter we do
25  tend to have issues with all of the data being in

1  there accurately.
2  Q.  Okay.
3  A.  The sales reps entering all their deals and
4  all that.
5  Q.  But you don't remember specifically this
6  situation --
7  A.  No.
8  Q.  -- though?
9  Okay.  We'll move on.
10  THE WITNESS:  What should I do with this?
11  MS. McLAUGHLIN:  What we'll do, turn them over,
12  and you'll end up stacking them; and it will be a big
13  stack by the end of the day.
14  Q.  Now, we discussed earlier Jay Nussbaum's
15  forecasts.  Now, Jay Nussbaum was the head of OSI.
16  And was it his responsibility to set the forecast for
17  OSI?
18  A.  It was.
19  Q.  Okay.  And did you have any responsibility in
20  verifying whether his forecast was correct?
21  MS. KYROUZ:  Objection.  Vague.  Lacks foundation.
22  THE WITNESS:  Uhm, I had a responsibility in terms
23  of validating with my boss whether I thought his
24  forecast was reasonable.  I think "correct" is a hard
25  thing to --

1    MS. McLAUGHLIN:  Okay.

2    THE WITNESS:  -- say.

3    BY MS. McLAUGHLIN:

4    Q.  So in your forecasting duties for OSI one of

5    them was to verify whether you thought his forecast

6    was reasonable to Jennifer Minton?

7    A.  That's right.

8    Q.  And did you do this for each forecasting

9    period?

10    MS. KYROUZ:  Objection.  Vague.

11    THE WITNESS:  No.

12    BY MS. McLAUGHLIN:

13    Q.  Okay.  When would you do that?

14    A.  Periodically.  There wasn't any specific

15    timing for that.

16    Q.  Would you do it at the beginning of the

17    quarter?

18    A.  Potentially.

19    Q.  And when you would verify whether you felt it

20    was reasonable, what steps would you take in that

21    endeavor?

22    MS. KYROUZ:  Objection.  Vague.

23    THE WITNESS:  I would generally talk to Jay.  And

24    in some cases talk to his directs.  I pulled system

25    data as a data point, but I also would talk to Jay --

37

1    because he was very personally involved in the

2    deals -- and try and understand, you know, where he

3    was in coming up with those numbers and who he had

4    spoken to.

5    BY MS. McLAUGHLIN:

6    Q.  And so you would on occasion speak with his

7    directs to verify what Jay's position was with the

8    forecast?

9    MS. KYROUZ:  Objection.  Misstates testimony.

10    Vague.

11    THE WITNESS:  So when I would speak it wasn't

12    directly just me.  Jay had periodic staff meetings.

13    Not on any set schedule, but he would have a staff

14    meeting every so often, at which time he would go

15    around and validate the forecast numbers with his

16    directs.  And so I would be a part of that.

17    BY MS. McLAUGHLIN:

18    Q.  Okay.  And at these meetings would you or he

19    pull the information off of OSO and ask the sales reps

20    if this -- or his directs if these, in fact, were

21    deals in the pipeline?

22    MS. KYROUZ:  Objection.  Vague.  Misstates

23    testimony.

24    THE WITNESS:  I don't remember exactly what he

25    would ask them --

38

1    BY MS. McLAUGHLIN:

2    Q.  Okay.

3    A.  -- but...

4    Q.  Is it possible he would do that in a meeting?

5    A.  It's possible, yes.

6    Q.  Would that be a way that you could verify

7    whether Jay's forecast was reasonable?

8    MS. KYROUZ:  Objection.  Vague.  Lacks foundation.

9    THE WITNESS:  Yeah.

10    BY MS. McLAUGHLIN:

11    Q.  Okay.  Did you have periodic meetings for the

12    forecasts with -- outside of the people in OSI?

13    MS. KYROUZ:  Objection.  Vague.

14    THE WITNESS:  There were some forecast calls late

15    in the quarter, but I don't remember how many of them

16    and exactly who was on the call.

17    BY MS. McLAUGHLIN:

18    Q.  Would Jay always be in on these calls?

19    A.  No..

20    Q.  "No."

21    Did you have periodic forecasting calls?

22    A.  I'm not following you.

23    Q.  Were there Thursday calls?

24    A.  There were Thursday calls.  I don't think they

25    were every Thursday.

39

1    Q.  Okay.  Were they like during the forecasting

2    period?  So if it were every two weeks, would you have

3    like every two weeks a Thursday call and then at the

4    end a weekly?

5    MS. KYROUZ:  Objection.  Lacks foundation.  Vague.

6    THE WITNESS:  There were Thursday calls, but I

7    don't remember the regularity.

8    BY MS. McLAUGHLIN:

9    Q.  Okay.  And during these Thursday calls, who

10    would attend these Thursday calls?

11    MS. KYROUZ:  Objection.  Lacks foundation.

12    THE WITNESS:  It was a finance call.  But not

13    always the same people were on the call.

14    BY MS. McLAUGHLIN:

15    Q.  Do you recall during that quarter who would

16    have been on the call?

17    A.  It was Jennifer's call, but she wasn't always

18    on the call.  So she might have someone subbing for

19    her running the call instead.  So I don't remember

20    which days she was on and which days she wasn't on,

21    but it was thought of as the finance call.

22    Q.  Okay.  And were -- was it Jennifer and just

23    the OSI people for these Thursday calls?

24    A.  I believe other people were on, but that we

25    took turns.  I don't think we were all listening to

40

Kopp, Sarah  6/14/2006  9:02:00 AM

1  everybody else's forecast.
2      Q.  So it would be like the other divisions in the
3  company, like OPI and NAS at the time?
4      A.  It would have been.  Yeah, it was just North
5  America; so it wouldn't have been outside of that.
6      Q.  Okay.
7          Okay.  So the Thursday call would have been a
8  North American finance call?
9      A.  Yeah, but I don't know if we were broken up.
10  The call has changed forms throughout the years so I
11  can't remember back then the exact form.
12      Q.  Okay.
13          Did you attend any other periodic calls during
14  that time?  Would you have ever been on a Monday call?
15      A.  No.
16      Q.  Are you aware what a Monday call is?
17      A.  It -- well, I don't --
18  MS. KYROUZ:  Objection.  Vague.
19  THE WITNESS:  -- know specifically what you're
20  talking about, but there is an executive committee
21  call that Larry has had for years on Mondays, if
22  that's what you're referring to.
23  MS. McLAUGHLIN:  Yeah.
24  THE WITNESS:  And I never would have attended
25  that, no.

41

1  BY MS. McLAUGHLIN:
2      Q.  And would Jay Nussbaum have attended that?
3  MS. KYROUZ:  Objection.  Lacks foundation.
4  THE WITNESS:  He would have been invited.  Whether
5  he attended them all, I don't know.
6  BY MS. McLAUGHLIN:
7      Q.  Okay.  And on these Thursday calls do you
8  remember or recall what was discussed?
9      A.  It was just a means for Jennifer to ask the
10  EVPs and/or finance where they thought the forecast
11  was going to land.
12      Q.  Okay.
13      A.  It was a very brief call.
14      Q.  Did you prepare any documents for this call?
15      A.  Not that I recall..
16      Q.  When you said this forecast report, the
17  general forecast report, was that in preparation for
18  this Thursday call?
19  MS. KYROUZ:  Objection.  Vague.
20  THE WITNESS:  No.  We did those -- when they were
21  done they were given to Jay on Monday so that he would
22  have them for his call.
23  MS. McLAUGHLIN:  Okay.
24  THE WITNESS:  We used them as a basis -- forecasts
25  were submitted on Tuesday or Wednesday, one of those;

42

1  and we used it as a basis for that.
2  BY MS. McLAUGHLIN:
3      Q.  Okay.  We were on forecast reports.
4          Okay.  So we have the general forecast report,
5  and then I think you mentioned there was a big deal
6  report?
7      A.  Yeah.
8      Q.  And do you recall the official name of that in
9  OSI back then?
10      A.  I think it was just called the big deals
11  report.
12      Q.  The big deals report.  Okay.
13          And what did the big deals report comprise of?
14      A.  It listed the deals that were in OSO that had
15  an opportunity value that was higher than 500k.
16      Q.  Okay.  And I -- is it correct that the big
17  deals report was compiled of information pulled from
18  OSO?
19      A.  Partially.
20      Q.  Okay.  And what other information would be in
21  the big deals report?
22      A.  We had added a comments column.  Just if there
23  were, you know, things that the sales teams wanted us
24  to know about that deal.  And so that was manually
25  pulled together, not from the system.

43

1      Q.  And when you say comments column, would that
2  be, like, comments on that specific deal?  Where it is
3  or --
4      A.  Yes.
5      Q.  Okay.
6          And how would you manually pull that
7  information together?
8      A.  We would actually poll -- I would poll my
9  finance team, and they would -- I don't know how they
10  got it.  They would call whoever they could get an
11  answer out of, I guess.
12      Q.  Okay.
13      A.  Whether it was the rep or the VPs or whoever,
14  I don't know.
15      Q.  So it would be your finance people inputting
16  the information manually about the deals?
17      A.  Yes.
18      Q.  Okay.  Do you know if the sales reps -- the
19  sales rep ever would enter information on their own
20  for this report?  Like, would they ever submit
21  information directly to you?
22      A.  No.
23      Q.  "No."  Okay.
24          Do you have something called big deal
25  scenarios in OSI?

44

Kopp, Sarah  6/14/2006  9:02:00 AM

1    A. We did for some time.  I don't remember how
2    many of them were produced, though.
3    Q. And what would be the difference between a big
4    deal report or a big deal scenario?
5    MS. KYROUZ:  Objection.  Vague.  Lacks foundation.
6    MS. McLAUGHLIN:  If there was a difference.
7    THE WITNESS:  The big deal scenario was just a
8    different way of looking at the big deals report.
9    That was something Jennifer wanted to see.  So it was
10   similar data in a different format.
11   BY MS. McLAUGHLIN:
12   Q. Would it have any additional data?
13   A. I don't remember exactly.
14   Q. Do you remember when those were created?
15   Those big deal scenarios?
16   A. Not specifically.
17   Q. Do you remember who would have created them?
18   A. I know it was under Jennifer's direction.  I
19   don't know who created them.
20   Q. So it would have been someone in her
21   department, not in OSI?
22   A. Well, we would fill in the deal information;
23   but the actual format that came out, it came from
24   corporate finance.
25   Q. Okay.  And would it be your -- your directs

45

1    that would give her the information --
2    A. Yes.
3    Q. -- on the deals?
4    A. Yes.
5    Q. Okay.
6    Okay.  I want to talk a minute about the
7    pipeline.  Could you define for me what you think the
8    pipeline is.  Or was at that time.
9    MS. KYROUZ:  Referring to Q3 of '01?
10   MS. McLAUGHLIN:  Yes.  At that time.
11   THE WITNESS:  The pipeline is just a list of --
12   it's not a list of deals, it's the sum total of the
13   opportunity values that were in OSO.
14   BY MS. McLAUGHLIN:
15   Q. Okay.  And was there a criteria for a
16   particular deal to make it into the pipeline?
17   A. No.
18   MS. KYROUZ:  Objection.  Vague.
19   BY MS. McLAUGHLIN:
20   Q. So there was no, like, standard criteria that
21   was given to sales reps for what a deal in the
22   pipeline would be?
23   MS. KYROUZ:  Objection.  Vague.
24   BY MS. McLAUGHLIN:
25   Q. Is that correct?

46

1    MS. KYROUZ:  Lacks foundation.
2    THE WITNESS:  That's correct.
3    BY MS. McLAUGHLIN:
4    Q. So would it be fair to say that the reps --
5    well, I suppose -- the pipeline came from what you
6    would describe as the OSO system; is that correct?
7    A. Yes.
8    Q. Okay.  And it was your directs and the reps
9    entering the information into the OSO system?
10   MS. KYROUZ:  Objection.  Misstates testimony.
11   BY MS. McLAUGHLIN:
12   Q. Is that correct?
13   A. My directs don't enter anything into the OSO.
14   Q. Okay.  Just the sales reps would enter --
15   A. I don't know who enters.  You know, whether
16   it's sales reps, sales managers, whoever.  The sales
17   organization.
18   Q. Sales organization.
19   A. Yes.
20   Q. That's fair.
21   So would it be fair to say that it was a
22   subjective sort of decision on, I guess, any different
23   salesperson whether to input the information into the
24   pipeline?
25   MS. KYROUZ:  Objection.  Lacks foundation.  Vague.

47

1    Misstates prior testimony.
2    THE WITNESS:  They're supposed --
3    MS. McLAUGHLIN:  As --
4    THE WITNESS:  -- to enter --
5    MS. McLAUGHLIN:  -- opposed to --
6    THE WITNESS:  -- the stuff in, but it's fair to
7    say that the reps are going to use some subjectivity
8    in what they put in, yes.
9    BY MS. McLAUGHLIN:
10   Q. Were there any objective criteria for these --
11   whether or not to place these deals into the pipeline?
12   MS. KYROUZ:  Objection.  Lacks foundation.  Vague.
13   THE WITNESS:  Not that I'm aware of.
14   BY MS. McLAUGHLIN:
15   Q. Now, the pipeline, when -- so would it be fair
16   to say if a deal had actually closed, like Oracle
17   would at that point say "this deal is closed, the
18   contract's been signed," would that specific deal be
19   pulled out of the pipeline?
20   A. No.
21   Q. "No."  Okay.
22   It would just stay in the pipeline?
23   A. It would stay in the pipeline as closed.
24   Q. Okay.
25   And so was there a particular way of tracking

48

1  closed deals within the pipeline?

2    A.  Their status within OSO.  So if it had moved

3  to close, it would show as a closed deal; but it

4  wouldn't come out.

5    Q.  Well, I think what my question really is:  The

6  pipeline, I think we've referred to it as sort of this

7  compilation of all of the deals for that particular

8  time period.  If one would close, then -- I'm sorry.

9      I guess really my question is why would it

10  stay in the pipeline if it were closed when the -- in

11  fact the pipeline is supposed to be deals that could

12  close in that time frame.

13    MS. KYROUZ:  Objection.  Misstates her testimony

14  as to what the pipeline was.  Vague.  Lacks

15  foundation.

16    BY MS. McLAUGHLIN:

17    Q.  Do you understand my question?

18    A.  I understand your question.

19    Q.  Uh-huh.

20    A.  I have never -- I mean, it's the way the

21  pipeline's defined.

22    Q.  Okay.

23    A.  So at the end of the quarter your pipeline, in

24  effect, equals your forecast when you're done.  That's

25  how it is.  That's how it's always been.

49

1    Q.  Okay.

2    A.  Unless someone were to ever report on open

3  pipeline, which we didn't typically do.

4    Q.  What would open pipeline be?

5    A.  That would be not closed pipeline.

6    Q.  Not closed pipeline.

7    A.  But we did not report on that.

8    Q.  OSI did not report on that?

9    A.  Not typically.

10    Q.  Did you know if Jay Nussbaum was aware of

11  this -- of your perception of what the pipeline was?

12    MS. KYROUZ:  Objection.  Vague.  Lacks foundation.

13  Calls for speculation.

14    MS. McLAUGHLIN:  If you know.

15    THE WITNESS:  I don't know.  And it wasn't my

16  definition, it was the definition of pipeline as I

17  understood it.

18    BY MS. McLAUGHLIN:

19    Q.  And who would have defined the pipeline?

20    MS. KYROUZ:  Objection.  Vague.  Lacks foundation.

21    THE WITNESS:  Corporate finance.  I don't know

22  specifically who, but...  There was never any question

23  as to that within my team anyway.

24    MS. McLAUGHLIN:  Within your team.  Okay.

25      So if -- okay.

50

1      I might have to come back to it.

2      Can we take a break?

3    THE VIDEOGRAPHER:  Off the record.  The time is

4  9:52 a.m.

5    (Recess taken.)

6    THE VIDEOGRAPHER:  We are back on the record.  The

7  time is 10:09 a.m.

8    BY MS. McLAUGHLIN:

9    Q.  Before we go any further, I forgot to ask you

10  earlier did you review any documents in preparation of

11  your deposition today?

12    A.  Yes.

13    Q.  Okay.  Do you recall what those documents

14  were?

15    A.  No.  I mean, they were just a series of

16  documents.

17    Q.  Were they -- did you see any forecasting

18  reports?

19    A.  I did.

20    Q.  Did you by chance get a chance to review your

21  SLC interview transcript?

22    A.  Part of it.  I didn't get through the whole

23  thing.

24    Q.  Okay.  I'm going to show it to you; and ask

25  you to, I think, read through it.  And I don't need

51

1  you -- I'm not going to ask you to read every single

2  line, but I'd like you just to read it enough to

3  familiarize yourself so that you can tell if this is,

4  in fact, the document.

5    A.  Okay.

6    MS. McLAUGHLIN:  Okay.

7    MS. KYROUZ:  You said "transcript."

8    MS. McLAUGHLIN:  I'm sorry.  I meant interview

9  memorandum from the SLC.

10    MS. KYROUZ:  And you're asking her to identify

11  what?  That it is the same document that she's talking

12  about that she looked at?  Or that it is, in fact, the

13  SLC memo?  Because it's not her document; as you know,

14  it's a lawyer document.

15    MS. McLAUGHLIN:  Yes, I do know that.  And I'm

16  asking if she reviewed it, and if this is the one that

17  she reviewed.

18    MS. KYROUZ:  Okay.

19    MS. McLAUGHLIN:  So here.  We'll mark it as

20  Exhibit 2.

21      And do we have a stapled copy for her?

22    MS. IRVINE:  Yes, we do.

23    MS. McLAUGHLIN:  Yeah.  Let's give her that.

24    (Exhibit No. 2 was marked for identification.)

25    MS. McLAUGHLIN:  And for the record this is

52

1    NDCA-ORCL 299314 through 299339.

2        THE WITNESS:  So I have gone through some of this.

3    Not in great detail.  Yeah, I did glance at it.

4    BY MS. McLAUGHLIN:

5        Q.  Okay.  Does this appear to be a true and

6    correct copy of what you reviewed -- looked at?

7        A.  Of what I looked at?

8        Q.  Yeah.

9        A.  It looks like it.

10       Q.  Okay.

11          I'd like you to -- well, let me -- let's

12   discuss the budgeting process a little.  What does the

13   budget process entail for -- or what did it entail for

14   this time period?

15          Let's go back -- we're always going to be in

16   that time period.  So if I speak in the present, it's

17   really about the past.

18       MS. KYROUZ:  You're done with this exhibit?

19       MS. McLAUGHLIN:  I think I'm going to ask her a

20   question about it.

21       MS. KYROUZ:  Okay.

22       THE WITNESS:  So for the fiscal year 2001 --

23       MS. McLAUGHLIN:  Uh-huh.

24       THE WITNESS:  -- I didn't participate in the

25   budget process for Jay specifically.

                                                    53

1        MS. McLAUGHLIN:  Okay.

2        THE WITNESS:  I didn't take over that job until

3    the budget was already set for 2001.

4    BY MS. McLAUGHLIN:

5        Q.  Okay.  At that point in time do you remember

6    how the budget was -- were you at all involved with

7    the budgeting process for OSI?

8        A.  To the extent I received targets from Jay for

9    the organizations that I supported within OSI, yeah,

10   we would then build a P&L to substantiate the targets

11   we were given.  But -- yeah.

12       Q.  So when you say you were given from Jay, that

13   means it was like a top-down budget?

14       A.  Yes.

15       Q.  Okay.  And do you know where the top of that

16   budgeting process was?  Was it Jennifer Minton?

17       MS. KYROUZ:  Objection.  Lacks foundation.  Vague

18   as to whether you're referring to fiscal '01.  And

19   lacks foundation as to that year.

20       THE WITNESS:  I don't know.

21   BY MS. McLAUGHLIN:

22       Q.  Fiscal '01, yeah, were there --

23       A.  Yeah, I wouldn't know who gave Jay the number

24   at his level.

25       BY MS. McLAUGHLIN:

                                                    54

1        Q.  Do you -- I guess -- so do you know now who

2    gives the budget?

3        MS. KYROUZ:  You're talking about fiscal '07 we're

4    going into?

5        MS. McLAUGHLIN:  Yes.

6        THE WITNESS:  It's a combination of a proposal

7    from the EVPs and a discussion with Larry and the

8    copresidents.  So it's a collaborative sort of.

9    BY MS. McLAUGHLIN:

10       Q.  Did you start being involved with the budget

11   in fiscal year '02?

12       A.  Yes.

13       Q.  For OSI?

14       A.  For OSI, right.

15       Q.  And at that point in time was it your

16   understanding that it was the same budgeting process

17   as for fiscal year '01?

18       MS. KYROUZ:  Objection.  Vague as to process.

19   Same budgeting process.

20       THE WITNESS:  I don't have an independent

21   recollection; but having looked at this, it looks as

22   though '02 was done similarly to how '01 had been

23   done, although I didn't do '01.

24       MS. KYROUZ:  You're referring to Kopp Exhibit 2.

25   You said looking at this.

                                                    55

1        THE WITNESS:  Yeah, I'm referring to Kopp

2    Exhibit 2.  I don't have an independent recollection.

3    BY MS. McLAUGHLIN:

4        Q.  Okay.  Could you read through that budget part

5    real quick.

6        A.  Uh-huh.

7        Q.  It's on page 299318.

8        A.  Yep.

9           Now, I'm talking a lot here about actually

10   that current year I was in when the interview was

11   taken, as opposed to later on.

12       Q.  Because you see Kevin Fitzgerald in there?

13       A.  Yeah.  Well, I'm saying what Kevin and Keith

14   are doing as opposed to.

15       Q.  Are you done looking at it?

16       A.  Yep.

17       Q.  Okay.  In the first paragraph here in the

18   budgeting process, the SLC noted that you stated that

19   in prior years the budget was formulated from a

20   top-down fashion.  Now, what you just described to me

21   as, like, your 2000 (sic) budget and you said it was

22   like -- I don't want to misstate your testimony so

23   please let me know if I'm correct.  It was Larry

24   Ellison and his copresidents and it's more of a

25   collaborative effort now.  Is that -- is this versus

                                                    56

1  the top-down that is described in this paragraph?
2      MS. KYROUZ:  You said 2000.  I think you mean
3  2007.
4      MS. McLAUGHLIN:  I meant 2007.  I'm sorry.
5      THE WITNESS:  Yes.  So this paragraph I'm talking
6  about 2002 being different for -- than 2003.  So I'm
7  saying that in 2003 it appeared to be a much more
8  collaborative process.
9      MS. McLAUGHLIN:  Okay.
10     THE WITNESS:  At that point and forward.
11  BY MS. McLAUGHLIN:
12     Q.  And is the -- what was -- what it was changed
13  to in 2003, is that what you guys currently have
14  today?
15     MS. KYROUZ:  Objection.  Vague.  Lacks foundation.
16     THE WITNESS:  Largely.
17     MS. McLAUGHLIN:  Okay.  We'll put this aside for a
18  while.
19     Q.  Okay.  I'm going to put stacks of reports in
20  front of you, and I'm going to ask you to read them.
21  And this is sort of the tedious part of this process,
22  so I apologize to the degree it's my fault, but this
23  is a series of -- what I'm going to ask you questions
24  about.  And I believe these are forecasting reports,
25  but we'll discuss them.  And I think what I'll do

                                                    57

1  is -- these should be marked so pardon us for a
2  moment.  If you want to go off the record, that would
3  probably help.
4      THE VIDEOGRAPHER:  Off the record.  The time is
5  10:20 a.m.
6      (Recess taken.)
7      (Exhibit Nos. 3 through 11 were marked for
8  identification.)
9      THE VIDEOGRAPHER:  We are back on the record.  The
10  time is 10:24 a.m.
11  BY MS. McLAUGHLIN:
12     Q.  You got 3?
13     A.  I got 3.
14     Q.  Okay.  For the record, Exhibit 3 is Bates
15  numbered CA-ORCL 036623 through 036627.
16      Could you identify this report for me.
17     A.  It is --
18     MS. KYROUZ:  Objection.  Lacks foundation.
19     THE WITNESS:  It appears to be a forecast report
20  from sometime in Q2 of '01.
21  BY MS. McLAUGHLIN:
22     Q.  Is the reason you know this is from fiscal
23  year Q2 '01 because it is not the form in which you
24  used when you took over in OSI to report this
25  information?

                                                    58

1      A.  The format, as well as at the top it shows
2  actuals for September and forecasts for October,
3  November, so it sounds like we were still in October.
4      Q.  Okay.  Did you ever receive this report?
5      A.  Not before I took over.  Which was, I think,
6  October 15th or 14th.
7      Q.  But you do recognize this as what a
8  forecasting report would have looked like --
9      A.  Used to look like.
10     Q.  Used to look like.
11     A.  Yes.
12     Q.  And would this have been prepared in the
13  regular course of business in Q2?
14     A.  Likely, yes.
15     Q.  Does anything look altered to you in this
16  report?
17     A.  Without examining every number, no.  It looks
18  like it would have --
19     Q.  Okay.  And do you know who would have prepared
20  this report?
21     A.  It would have been prepared under the
22  direction of Terry Ford, who was my predecessor.
23     Q.  Okay.  And let's -- let's skip 4 right now.
24  We'll go to 5 and 6.
25     A.  Okay.

                                                    59

1      Q.  Do you recognize Exhibit 5?
2      A.  I recognize the format, yes.
3      Q.  Can you identify what Exhibit 5 is for me.
4      A.  It would be end of Q2 forecast moving to a
5  different format.  It's a forecast report looked at
6  differently.
7      Q.  Was this prepared by you or someone in your
8  group on or about the date of the document?
9      A.  I believe so.  It would have been..
10     Q.  Was it prepared in the regular course of your
11  business at Oracle to prepare this document?
12     A.  Yes.
13     Q.  Okay.  That's that one.
14      And now 6.  Do you recognize Exhibit 6?
15     A.  It looks -- well, without looking at all the
16  numbers it looks like the same as 4.  It still has
17  actuals for September and forecasts for October going
18  out so...
19     Q.  So do you know who prepared this Exhibit 6?
20     A.  I don't know who specifically did.  But again,
21  it would have been under the direction of my
22  predecessor Terry.
23     Q.  So I guess we'll go look at Exhibit 4.  Do you
24  recognize Exhibit 4?
25     A.  Yes.

                                                    60

1    Q.  And you said --
2    MS. KYROUZ:  I think you meant Exhibit 3.  Did you
3    mean --
4    MS. McLAUGHLIN:  Is it the same information --
5    yeah, 3.  I'm sorry.
6    THE WITNESS:  It looks like the information in 3
7    and 6 is -- if not -- I don't know if it was the same
8    week, but it's the same stuff.  And it appears to be
9    over the same time frame just based on the headers,
10    but I don't know.  I don't see any difference.  I
11    would have to go line by line and see but...
12    MS. McLAUGHLIN:  All right.  We'll put those
13    aside.
14    Q.  Okay.  So Exhibit 4 is where we're on now.
15    A.  Okay.
16    Q.  Could you identify -- or do you recognize
17    Exhibit 4?
18    A.  I recognize the format.  What was our new
19    forecast format.
20    Q.  Can you identify for me what Exhibit 4 is.
21    A.  It's a forecast report for OSI for license and
22    consulting.
23    Q.  For the week of December 4, 2000; is that
24    correct?
25    A.  That's what it says so I would think so.

61

1    Q.  Was this prepared by you or by someone in your
2    group on or about the date of the document?
3    A.  I would think so, yes.
4    Q.  Does this appear to be a genuine and authentic
5    copy of the original?
6    A.  As I say, without looking at every number, I
7    can't say for sure; but it looks like it, yes.
8    Q.  Was this prepared in the regular course of
9    your group's business at Oracle?
10    A.  Yes.
11    Q.  Was it your regular practice to produce these
12    types of reports?
13    A.  Can you define "regular" for me?  I mean.
14    Q.  We talked about earlier periodic reports.  Is
15    this one of those periodic reports?
16    A.  Yes.
17    Q.  And would this be the forecasting report you
18    were referring to?
19    A.  Yes.
20    Q.  Okay.  Well, we can do it -- if you want to,
21    we can do these in -- oh, I have gaps, I guess we
22    can't do it in groups.  So let's go to Exhibit 7.
23    A.  All right.
24    Q.  Do you recognize Exhibit 7?
25    A.  I do.

62

1    Q.  Okay.  Could you identify for me what
2    Exhibit 7 is.
3    A.  It's a license and consulting forecast report
4    for OSI for Q3 of fiscal '01, the third week of the
5    quarter.
6    Q.  Was this produced by you or someone in your
7    group on or about the date of the document?
8    A.  Yes.
9    Q.  Does this appear to be a genuine, authentic
10    copy of the original?
11    A.  It appears to be.
12    Q.  Was it your group's responsibility to produce
13    this document?
14    A.  Yes, it was.
15    Q.  Was it produced in the regular course of your
16    business at Oracle?
17    A.  Yes.  And if I could clarify an earlier
18    point --
19    Q.  Sure.
20    A.  -- it appears that there was also a projection
21    for an outlying quarter in here.  I said Q3, but it
22    looks like it's Q3 and Q4 in the back.
23    Q.  On 7?  Exhibit 7?
24    A.  On Exhibit 7.  One, two, three -- the fourth
25    page starts with Q4.

63

1    Q.  Q4, yeah.
2    A.  And it goes back to Q3.  I'm not sure why.
3    But I just want to clarify that point.
4    Q.  Was it something that your group would have
5    done, would be start an early forecast of Q4 in Q3?
6    A.  Not -- we hadn't done that up until that time.
7    Q.  Okay.
8    A.  This was a new practice.
9    Q.  Okay.  And do you remember the reason why you
10    or your group did this this quarter?
11    A.  My recollection was we were asked to put
12    together a six-month projection at that point.
13    Q.  At that point?
14    A.  I don't remember by who.
15    Q.  You don't remember by who.  Okay.
16    A.  Yeah.
17    Q.  Do you remember when you were asked to do it?
18    A.  When I was asked to do this report or --
19    Q.  Or when you were asked?
20    A.  -- when I was asked to start capturing the
21    future quarter?  No.
22    Q.  No, you don't.
23    Okay.  Is it fair to say sometime before
24    September 19, 2000?
25    A.  That's right.

64

1    Q.  Okay.  Let's go to 8.

2        Do you recognize Exhibit 8?

3    A.  Yes.

4    Q.  Could you identify it for me.

5    A.  This is the Q3 and Q4 of fiscal '01 forecast

6    for license and consulting for OSI for Week 5 of the

7    quarter --

8    Q.  Okay.

9    A.  -- dated January 9th.

10   Q.  Was this produced by you or your group

11   on or about the date it was -- on the document?

12   A.  Yes.

13   Q.  Does this appear to be a genuine and authentic

14   copy of the original?

15   A.  Yes, it does.

16   Q.  Was it your group's responsibility to produce

17   this document?

18   A.  It was.

19   Q.  Okay.  Was it prepared in the regular course

20   of your business at Oracle?

21   A.  Yes.

22   Q.  And was it your regular practice to produce

23   such a report?

24   A.  My team, yes.

25   Q.  Yes, your team.

1        Okay.  We'll move on from that.  Let's go to

2    Exhibit 9.  Do you recognize Exhibit 9?

3    A.  Yes, I do.

4    Q.  Can you identify it for me.

5    A.  It is the Q3 and Q4 fiscal '01 forecast for

6    license and consulting for OSI as of Week 7 of Q3

7    dated January 16th.

8    Q.  Okay.  Was this produced by you or your group

9    on or about the date that appears on the document?

10   A.  Yes.

11   Q.  Is it a genuine and authentic copy of the

12   original?

13   A.  It appears to be, yes.

14   Q.  Okay.

15       Was it your group's responsibility to produce

16   this report?

17   A.  Yes.

18   Q.  Okay.  Was it your regular practice in your

19   business at Oracle to produce this report?

20   A.  Yes.

21   Q.  Okay.  And was it produced in the regular

22   course of your business at Oracle?

23   A.  Yes.

24   Q.  We'll move on.

25       Do you recognize Exhibit 10?

1    A.  Yes.

2    Q.  Okay.  Can you identify it for me.

3    A.  It is the Q3 and Q4 -- it looks like there's

4    some duplication in here; but it looks like the Q3 and

5    Q4 forecast for OSI license and consulting as of Q3,

6    Week 10, dated February 6th of 2001.

7    Q.  Was this produced by you or your group

8    on or about the date of the document?

9    A.  Yes..

10   Q.  Okay.  Does it appear to be a genuine and

11   authentic copy of the original?

12   A.  It does.

13   Q.  Was it your group's responsibility to produce

14   this report?

15   A.  Yes.

16   Q.  Okay.  Was it your group's practice to produce

17   such a -- this report in the ordinary course of your

18   business at Oracle?

19   A.  Yes.

20   Q.  Was it your regular practice to produce this

21   report?

22   A.  Yes.

23   Q.  Okay.  Move on to 11.

24       Okay.  Do you recognize 11?

25   A.  Yeah.

1    Q.  Is Exhibit 11 different than the prior

2    exhibits as far as its form?

3    A.  It's printed differently.

4    Q.  Is the information contained within this

5    report similar to the -- or the same kind of

6    information that would be contained in the previous

7    reports we went through?

8    A.  Yes.

9        Yeah.  It appears to be the same, just printed

10   portrait instead of landscape.

11   Q.  Was this produced by you or someone in your

12   group?

13   A.  Yes.

14   Q.  On or about the date that appears on the

15   document?

16   A.  Yes.

17   Q.  Does it appear to be a genuine, authentic copy

18   of the original?

19   A.  Other than the way it's printed, yeah.  I

20   didn't used to print them this way, but.

21   Q.  Okay.

22       Was it your group's responsibility to produce

23   this report?

24   A.  Yes.

25   Q.  Okay.  Was it produced in the regular practice

1  of your group?

2    A.  Yes.

3    Q.  Okay.  And was it produced in the regular

4  course of business of yours at Oracle?

5    A.  Yeah.

6    Q.  All right.  Good.

7      Another group of these.

8      Before I go on to the next group, I would like

9  to actually ask you a few questions about these

10  reports generally.

11    A.  Uh-huh.

12    Q.  These were the forecasting reports that we

13  discussed earlier in the -- in our deposition this

14  morning.

15    A.  Yes.

16    Q.  And were these prepared for Jay Nussbaum?

17    MS. KYROUZ:  Objection.  Vague.

18    THE WITNESS:  In part.

19    BY MS. McLAUGHLIN:

20    Q.  In part.

21      Who were they pro-- who did you produce or

22  submit these to?

23    MS. KYROUZ:  Objection.  Asked and answered.

24    THE WITNESS:  Yeah.  To Jay and Terry.  Jay

25  Nussbaum and Terry Ford to and Jennifer Minton.

69

1    BY MS. McLAUGHLIN:

2    Q.  And do you believe that all of these reports

3  reached those three individuals in fact?

4    MS. KYROUZ:  Objection.  Lacks foundation.

5    THE WITNESS:  To the best of my knowledge.

6    (Exhibit No. 12 was marked for identification.)

7    MS. McLAUGHLIN:

8      There's just one here, right?

9    MS. IRVINE:  Yes.

10    BY MS. McLAUGHLIN:

11    Q.  Okay.  This is Exhibit 12.  If you could take

12  a look at Exhibit 12.

13      And again, let me know when you're done

14  looking through it.

15    A.  Okay.

16      Okay.

17    Q.  Do you recognize this report?

18    A.  I recognize it, yeah.

19    Q.  Do you know who prepared this report?

20    A.  I don't know specifically who prepared it.

21    Q.  Did you or your group have any input into the

22  preparation of this report?

23    A.  They would have --

24    MS. KYROUZ:  Objection.  Vague.

25    THE WITNESS:  They would have taken what I

70

1  submitted in the previous packages and pulled

2  information from those.  That was the process.

3  Whether that was always followed, I don't know; but

4  that was the process.

5    BY MS. McLAUGHLIN:

6    Q.  So the Exhibits 3 through 11 would have -- the

7  process -- is it fair to say the process was that you

8  would produce what we have in Exhibits 3 through 11,

9  and you would produce and submit this to Jennifer

10  Minton's group; and they would then prepare, off the

11  basis of that and other documents, this report?

12    MS. KYROUZ:  Objection.  Vague.  Lacks foundation.

13    MS. McLAUGHLIN:  This kind of report.

14    MS. KYROUZ:  Same objection.

15    THE WITNESS:  Yeah.

16    BY MS. McLAUGHLIN:

17    Q.  Do you know what the purpose of this report

18  is?

19    MS. KYROUZ:  Objection.  Lacks foundation.

20    THE WITNESS:  It's a consolidation of the other,

21  so OSI with the other North America organizations.

22    BY MS. McLAUGHLIN:

23    Q.  In your forecast calls did you discuss these

24  kinds of reports?

25    A.  Which forecast calls?

71

1    Q.  Your forecast calls that you had on Thursdays?

2    A.  Yes.

3    Q.  Okay.  And you previously stated that you do,

4  in fact, recognize this report?

5    A.  I recognize it, yes.

6    Q.  Does it appear to be a genuine and authentic

7  copy of the original?

8    A.  Yes.

9    MS. McLAUGHLIN:  Okay.  Let's move on from this.

10      Okay.  Exhibit 13.

11      Now we're going to have another series of

12  reports that we're going to go through.

13      Why don't we go off the record for a minute.

14    THE VIDEOGRAPHER:  Off the record.  The time is

15  10:46 a.m.

16    (Recess taken.)

17    (Exhibit Nos. 13 through 18 were marked for

18  identification.)

19    THE VIDEOGRAPHER:  We are back on the record.  The

20  time is 10:49 a.m.

21    BY MS. McLAUGHLIN:

22    Q.  Okay.  Could you take a look at Exhibits 13

23  through 18, please, and familiarize yourself with them

24  a bit.

25    A.  Okay.

72

1    Q.  Okay.  Do you recognize Exhibits 13 through

2   18?

3    A.  Yes.

4    Q.  What do Exhibits 13 through 18 appear to be to

5   you?

6    A.  Exhibits 13 through 16 are different than

7   Exhibits 17 and 18.

8    Q.  Okay.  Then let's --

9    A.  Can we separate them?

10    Q.  Yes, let's separate them.

11    A.  Okay.

12    Q.  What do Exhibits 13 through 16 appear to be to

13   you?

14    A.  13 through 16 appear to be the big deal

15   scenario reports that Jennifer had started having us

16   produce.

17    Q.  Okay.  Let's look at Exhibit 13.  Is

18   Exhibit 13 produced by you or someone in your group on

19   or about the date that appears at the top of the

20   second column?

21    MS. KYROUZ:  I'm going to object to the documents

22   and the dates -- that she hasn't testified that she

23   prepared these, and that the dates are inconsistent

24   throughout the documents.  Some of them are titled Q2

25   but then they have other dates, so I'm not sure

73

1   that -- which date you're asking her about.

2    MS. McLAUGHLIN:  Well, I'm asking her about the

3   date on the second column, which is what I just said.

4   It appears to me, if you look at them, if it says Q2

5   that they're typos, but I will ask her about them when

6   we get to the document.

7    MS. KYROUZ:  Okay.  Great.

8   BY MS. McLAUGHLIN:

9    Q.  So we're on Exhibit 13.  And my question was

10   was this produced by you or someone in your group on

11   or about the date that appears in the second column on

12   the top that says 1/29?

13    MS. KYROUZ:  Same objection.

14    If you know.

15    THE WITNESS:  Yeah.  And I -- and I don't know

16   when it would have been produced.  Whether the 1/29

17   was the current date at the time or whether that was

18   referring to another time.  Because the same

19   opportunity value appears in two columns.  So I don't

20   know if it's a comparison to 1/29 or if it actually

21   was done on 1/29.

22   BY MS. McLAUGHLIN:

23    Q.  Okay.  How about you look at Exhibit 14.

24    A.  Uh-huh.

25    Q.  And you mention a comparison to 1/29.  Could

74

1   you explain to me on Exhibit 14 how you would read

2   this report?

3    MS. KYROUZ:  Objection.  Lacks foundation.  Vague.

4    THE WITNESS:  So it's a listing of deals.  And it

5   appears to be the value that was in OSO for the deal

6   as of 1/29 and then as of some other date and the

7   change.

8   BY MS. McLAUGHLIN:

9    Q.  Do you know how often these big deal scenarios

10   were prepared during Q3?

11    A.  No, I don't.

12    You know, Jennifer took over finance, I think,

13   in September of '00, so Q2 of fiscal '01.  And my best

14   recollection was during Q3, as she had her new team in

15   place, she was trying out different formats of the

16   same kind of data to get at what she wanted.  So this

17   one, I'm not sure when it started and I don't know how

18   long we did it for.

19    Q.  Okay.  And that goes for Exhibits 13 through

20   16?

21    A.  That goes for Exhibits 13 through 16.

22    Q.  Were these reports generally attached to

23   another report, or were they a standalone report?  Do

24   you recall?

25    MS. KYROUZ:  Objection.  Vague.  Lacks foundation.

75

1    THE WITNESS:  I don't recall.

2    MS. McLAUGHLIN:  Okay.

3    THE WITNESS:  We generally did forecast reports

4   and big deal reports at similar times, but they

5   weren't part of the same report or necessarily

6   attached or anything like that.

7   BY MS. McLAUGHLIN:

8    Q.  And you had -- is it correct that these are

9   big deal scenarios?

10    A.  These are, yes.

11    Q.  And those would be different than the big deal

12   reports?

13    A.  Yes.

14    Q.  Okay.

15    Because of the format of the information?

16    A.  Really because of the format.

17    Q.  Would the information be the same?  Of the

18   same kind?

19    MS. KYROUZ:  Objection.  Vague.  Calls for

20   speculation.

21    THE WITNESS:  They're all versions of listing the

22   deals as they appear in the system.

23    MS. McLAUGHLIN:  Okay.

24    Q.  Would these reports have been prepared with

25   dates on them in the -- when they were prepared by

76

1  your group?
2      MS. KYROUZ:  Objection.  Lacks foundation.  Vague.
3      THE WITNESS:  I don't know.  You know, we might
4  have relied on the date it was sent up in e-mail as
5  the date stamp.  I don't know.
6  BY MS. McLAUGHLIN:
7      Q.  Can you -- I guess we should probably -- can
8  you determine the date, by looking at any of these
9  reports, when they were generated?
10     MS. KYROUZ:  Objection.  Vague.  Misstates
11  testimony as to generated.  Lacks foundation as to the
12  date.
13     THE WITNESS:  No, I don't know when they would
14  have been generated.  Exhibit 15 is the only one that
15  appears to show two dates, two specific dates in
16  comparison.  Again, I wouldn't know when it was
17  generated, but it's the only one that has specific
18  dates in the header.
19     MS. McLAUGHLIN:  Right.
20     Q.  And do you believe that the header -- it says
21  "Oracle Service Industries Forecast Q2 Fiscal Year
22  '01" is a typo if we're looking at 1/29 and 2/06
23  comparisons?
24     MS. KYROUZ:  Objection.  Lacks foundation.
25     THE WITNESS:  I don't know what the -- yeah.  It

77

1  appears to be a typo as compared to the other ones and
2  as compared to -- Q2 isn't in January so.
3      MS. McLAUGHLIN:  Okay.
4      THE WITNESS:  Or February.
5  BY MS. McLAUGHLIN:
6      Q.  Okay.  Let's just put these aside and talk
7  about 17 and 18.  Do you recognize Exhibit 17 and 18?
8      A.  Yes.
9      Q.  Can you identify Exhibit 17 for me?
10     A.  It is a big deals list, apparently as of
11  Week 12 of Q3, although I don't know the date.  It has
12  a date on here, but that looks like it's when it was
13  printed not when it was created.
14     Q.  So do you believe that this was prepared by
15  you or someone on your team?
16     A.  Yes.
17     MS. KYROUZ:  Objection.  Lacks foundation.
18  BY MS. McLAUGHLIN:
19     Q.  If it is -- is this a big deal report?
20     MS. KYROUZ:  Objection.  Vague.
21     THE WITNESS:  It is a listing of big deals.  And
22  it's probably a version of the big deal report, yeah.
23  BY MS. McLAUGHLIN:
24     Q.  And, earlier, is it true that you testified
25  that you periodically prepared these big deal reports?

78

1      A.  Or someone on my team..
2      Q.  Or someone on your team.
3      A.  Yes.
4      Q.  And do you recall -- would it be with the --
5  would you prepare them according to the same
6  forecasting schedule that we discussed earlier, which
7  was two weeks for the first two months and every week
8  for the last month?
9      A.  That was the schedule, so I would assume we
10  did --
11     Q.  Okay.
12     A.  -- yeah.
13     Q.  Did you -- okay.
14        So you testified that either you or someone in
15  your group produced this.
16     A.  Some version of this.  Like I'm saying, it
17  changed formats quite a few times that quarter; but
18  some version of the big deals scenario or a big deals
19  report was produced.
20     Q.  Okay.  But you recognize this document
21  specifically -- or these two documents specifically;
22  is that correct?
23     A.  Yes.
24     Q.  And do you believe that you or someone in your
25  group prepared these two documents; is that correct?

79

1      A.  Yes.
2      Q.  On or about the week, the time frame that it
3  states at the top?
4      MS. KYROUZ:  Objection.  Lacks foundation.
5      THE WITNESS:  That seems reasonable.
6  BY MS. McLAUGHLIN:
7      Q.  Do these appear to be a genuine and authentic
8  copy of what the original would have been?
9      A.  Yes.
10     Q.  And you testified that you would have prepared
11  these periodically over the forecast schedule?
12     MS. KYROUZ:  Objection.  Lacks foundation.  Vague.
13  Misstates prior testimony.
14     THE WITNESS:  I would have prepared them --
15  someone on my team would have prepared something like
16  this periodically.
17     BY MS. McLAUGHLIN:
18     Q.  And you agree that it would have been
19  according to -- when I say forecast schedule, I'm
20  meaning you said every two weeks you prepared a
21  forecast package, and so it was a forecast report and
22  a big deal report; is that correct?
23     MS. KYROUZ:  Objection.  Lacks foundation.
24  Misstates prior testimony.  Vague.
25     THE WITNESS:  That was the schedule.  That was the

80

1 corporate forecast schedule. I don't know for a fact
2 that we adhered to every date in the schedule. That
3 was the forecast schedule. We would have done them
4 periodically. Had we done them, you know, we would
5 have done them on or around those dates. I mean, but
6 I don't know that that -- sometimes a forecast will
7 get canceled or, you know, something will be going on
8 with systems where they'll take it down for a
9 couple of weeks and there won't be one. Typically,
10 that is something we would do.
11    BY MS. McLAUGHLIN:
12    Q. And it was your practice to adhere to the
13 corporate forecast schedule unless otherwise you were
14 told to not do so?
15    MS. KYROUZ: Objection. Vague. Lacks foundation.
16    THE WITNESS: To the best of my recollection,
17 yeah.
18    MS. McLAUGHLIN: Okay. Let's move on.
19    (Sotto voce discussion between Ms. McLaughlin and
20 Ms. Irvine.)
21    (Exhibit Nos. 19 through 24 were marked for
22 identification.)
23    BY MS. McLAUGHLIN:
24    Q. Okay. I apologize, we're not going in
25 chronological order; but this is Exhibit 24.

81

1    A. Okay.
2    Q. Please read Exhibit 24 and identify it for me.
3    A. Okay. It's an e-mail from corporate
4 finance -- looks like Roberta was in that role then --
5 just saying that we don't need to submit the big deal
6 scenario version of the report for two forecasts.
7      And that they only want Q3. So they just want
8 a regular OSO big deals list as opposed to that
9 scenarios report.
10    Q. Okay. Who was Roberta Ronsse?
11    A. She used to work for, I think, Ivgen Guner,
12 who worked for Jennifer.
13    Q. Do you believe that to be the Roberta that's
14 on this e-mail?
15    A. Yeah. I don't remember another Roberta.
16    Q. Okay. Do you know the reason why Roberta
17 asked this team not to produce the big deal scenarios
18 for those two periods?
19    A. No.
20    Q. "No."
21      Okay. Move on.
22      Some are easier than others.
23      Another batch of reports.
24    A. Okay.
25    MS. McLAUGHLIN: Why don't we go off the record

82

1 again.
2    THE VIDEOGRAPHER: This is a good time to end this
3 tape --
4    MS. McLAUGHLIN: Oh.
5    THE VIDEOGRAPHER: -- so I'll conclude this
6 videotape.
7      One moment, please.
8      We are going off the record. Here marks the
9 end of Videotape No. 1, Volume 1, in the deposition of
10 Sarah Kopp. The time is 11:04 a.m.
11    (Recess taken.)
12    THE VIDEOGRAPHER: We are back on the record. The
13 time is 11:17 a.m. Here marks the beginning of
14 Videotape No. 2, Volume 1, in the deposition of Sarah
15 Kopp.
16    BY MS. McLAUGHLIN:
17    Q. Okay. When we went off the record we were
18 talking about the big deal scenarios. Exhibit 18
19 is -- let's go back to that for a moment..
20      Or is it 19? Sorry.
21      Is it 18 or 19? What do you have as Roberta
22 Ronsee's --
23    THE WITNESS: I have that as 24.
24    MS. KYROUZ: 24.
25    MS. McLAUGHLIN: That's right. 24 because I went

83

1 out of order.
2    Q. Given that Roberta instructed that you or your
3 group not produce the big deal scenarios for the
4 January 29th and 15th -- is that correct? Forecasting
5 schedule? Or periods?
6    MS. KYROUZ: Objection. Misstates the document.
7    BY MS. McLAUGHLIN:
8    Q. Could you read the subject line? It says big
9 deal report?
10    A. The subject line says 8th and 15th.
11    Q. Right. In the text of the e-mail what does it
12 indicate to you?
13    A. It would seem to get -- you know, tying that
14 in with the subject, it would seem to say for those
15 two weeks we don't need to do the scenarios report.
16    Q. Do you see the date it was actually --
17    A. Uh-huh. Monday the 8th.
18    Q. Okay. So it would be -- the two would be the
19 January 8th and the January 15th forecast big deal
20 scenarios?
21    A. That appears to be what she's saying, yes.
22    Q. Okay. Would you otherwise have prepared these
23 big deal scenarios during the quarter?
24    A. As I --
25    MS. KYROUZ: Objection. Vague. Lacks foundation.

84

1    THE WITNESS: As I said earlier, the scenario was
2  a version of the big deals list that Jennifer was
3  playing around with. I don't know when the first one
4  was generated and I don't know when the last one was.
5  I think it was a rather short-lived report. We
6  certainly don't do it now.
7    MS. McLAUGHLIN: Okay.
8    THE WITNESS: So I don't know.
9    BY MS. McLAUGHLIN:
10   Q. But the big deals report, which is, I guess,
11  the same information, you said, but in a different
12  format, that would have been produced for every
13  forecast period during Q3?
14   MS. KYROUZ: Objection. Vague. Lacks foundation.
15   THE WITNESS: I don't know if it was done every --
16   BY MS. McLAUGHLIN:
17   Q. But it would have been your practice unless
18  instructed otherwise to do so?
19   A. Yeah. Unless we didn't have access to the
20  data or we were instructed otherwise, we likely would
21  have produced something, but not that scenarios thing.
22  I don't think that that was done very often.
23   Q. Okay.
24   Q. Or for a very long period of time.
25   Q. Do you recall not having access to the

85

1  information to prepare those big deal reports during
2  Q3?
3    A. I didn't have any independent recollection,
4  but we did take the systems down for some period at
5  the end of December when we were upgrading all of our
6  systems. So I don't know when we took it down exactly
7  and when it came back up exactly, but it's likely
8  there was a period of a few weeks in there that we
9  wouldn't have had access.
10   Q. What would you do with these reports once
11  you've prepared them?
12   MS. KYROUZ: Objection. Vague as to "these
13  reports."
14   MS. McLAUGHLIN: I'm sorry. The big deal reports.
15   THE WITNESS: After I prepared them?
16   MS. McLAUGHLIN: Uh-huh. Or after someone on your
17  team prepared them.
18   Q. Would you store them on your hard drive on
19  your computer?
20   MS. KYROUZ: Objection. Vague. Calls for
21  speculation. Lacks foundation.
22   THE WITNESS: I don't remember specifically every
23  report, but it's likely. I didn't always keep all of
24  them because I didn't prepare them. So it would be
25  more likely the person who prepared the report would

86

1  have all of them. And it's possible if I was out for
2  any reason or whatever, I would rely on that person.
3  But I had a few of them, though, yeah.
4    BY MS. McLAUGHLIN:
5    Q. Stored to your hard drive; is that correct?
6    A. If they were on my hard drive, then yes. I
7  don't know that I saved all of them. Everything I had
8  saved had been turned over though.
9    Q. When you say turned over, what are you
10  referring to?
11   A. Back at the beginning of the investigation my
12  hard drive was -- I handed my computer over to be
13  looked at for any potential documents. And my
14  assumption is everything they needed got taken off of
15  it.
16   Q. Do you remember who you turned your computer
17  over to?
18   A. No.
19   Q. Was it someone from internally at Oracle?
20   A. Uhm, you know, I don't remember. I don't
21  remember, to be honest with you.
22   Q. Do you remember how you were -- do you
23  remember when you were instructed to turn over your
24  computer?
25   MS. KYROUZ: Objection. Vague.

87

1    THE WITNESS: No, I don't.
2    BY MS. McLAUGHLIN:
3    Q. Do you remember where you got the instruction
4  from?
5    MS. KYROUZ: Same objection.
6    THE WITNESS: No, I don't.
7    It's just been a long time, that's all. I
8  don't remember who asked me, I just remember at some
9  time I was without my computer for a couple of hours
10  or something.
11   BY MS. McLAUGHLIN:
12   Q. And would these -- these reports I see that
13  through the production that they've been attached to
14  e-mails. If a report was attached to an e-mail and
15  sent to you, would you have saved that e-mail
16  somewhere in particular?
17   MS. KYROUZ: Objection. Calls for speculation.
18  Vague.
19   BY MS. McLAUGHLIN:
20   Q. During Q3?
21   A. The e-mail itself?
22   Q. Would you have saved the report with it?
23   A. Uhm, so very often if there is a report
24  attached -- so we have quotas in e-mail, so it's
25  unlikely that the e-mails would all have been saved if

88

1 they had big things attached to them.

2 Q. Did you have a file within your e-mail to

3 save or -- to save big deal reports?

4 A. With an e-mail?  No.

5 Q. Okay.  Did you have a file on your computer to

6 save the big deal reports?

7 A. I had a file on my computer called Forecast Q3

8 '01 in which whatever reports I had would have been

9 kept.

10 Q. Was it your practice to save all of the

11 reports that your group produced in that file?

12 MS. KYROUZ: Objection.  Asked and answered.

13 Vague.

14 THE WITNESS: If I had them, they'd be on there.

15 BY MS. McLAUGHLIN:

16 Q. Okay.  Was it your practice to delete these

17 reports in the forecast file regularly?

18 A. No.

19 Q. Would you have saved them for an entire

20 quarter?

21 MS. KYROUZ: Objection.  Vague.  Calls for

22 speculation.

23 THE WITNESS: I don't know.  It's not my practice

24 to go through and delete forecast reports --

25 BY MS. McLAUGHLIN:

1 Q. Do you recall deleting any -- I'm sorry.

2 A. -- on a regular basis.

3 Q. Do you recall deleting any from Q3 prior to

4 the end of Q3?

5 A. No.

6 MS. McLAUGHLIN: Okay.  We made stacks for you

7 guys.  We're going to move on to Exhibits 19 through

8 23.

9 Q. Exhibits 19 through 23.  Would you take a look

10 through the entire series of reports, please..

11 (Witness reviews documents.)

12 Ready?

13 A. Yes.

14 Q. Okay.  Do you recognize Exhibits 19 through

15 23?

16 A. Yes.

17 Q. Can you identify them for me.

18 A. It's an OSI -- or they are OSI pipeline

19 history reports that show by forecast week -- by

20 "forecast week" I mean the corporate forecasting

21 pipeline -- as compared to the prior year.  And the

22 top page looks to be the sum of the other pages.  This

23 report used to have -- it was in Excel, had a bunch of

24 tabs.  So it would have a tab for each vertical and

25 then a sum tab.  Even though they're not marked, I

1 think that's what this is.  The top one is likely the

2 sum of the other ones that are stapled to it.  So it's

3 all at different periods in time.

4 Q. Okay.  So let's look at 19.

5 A. Okay.

6 Q. Was 19 produced by you or someone in your

7 group on or about the week that it reflects on the

8 report?

9 MS. KYROUZ: Objection.  Misstates the document.

10 There's no week reflected on the report.  Lacks

11 foundation.

12 THE WITNESS: Yeah.  I mean, it would have been

13 prepared by my group; but there isn't a week on here.

14 BY MS. McLAUGHLIN:

15 Q. Uhm --

16 A. Yeah.  The best way to see what week we're in

17 is how far it's been completed up to.

18 Q. Right.

19 So on Q3 it has Week 2 completed?

20 A. Yeah, but that's shaded.

21 Q. Uh-huh.

22 A. Which makes me tend to think we weren't --

23 were still in Q2 or maybe right at the end of Q2.

24 Q. Okay.

25 A. Otherwise I don't know why that would have

1 been shaded other than we weren't there yet.  So I

2 don't know the date on there, but...

3 Q. So could that be -- is it possible that that's

4 a projected pipeline?

5 MS. KYROUZ: Objection.  Calls for speculation.

6 THE WITNESS: I don't know.

7 BY MS. McLAUGHLIN:

8 Q. Okay.

9 A. It's possible.  I don't know.

10 Q. So back to does this appear to be a genuine

11 and authentic copy of the original report?

12 A. Yes.

13 Q. Was it prepared in the regular practice of

14 your group at Oracle's business?

15 A. Yes.

16 I don't know that this one was done -- I don't

17 know that this one was done as customarily as the

18 other ones.  I think it was updated every so often.

19 But I honestly don't remember whether we did this one

20 every time we did a forecast pack or if we didn't.

21 Q. And when you say "this one," would you refer

22 to this as the pipeline history report?

23 A. Yes.

24 Q. Okay.  Was it prepared in the regular course

25 of your business at Oracle?

1    A. Yes.

2    Q. Was it your group's responsibility to produce

3    these documents?

4    A. Yes.

5    Q. Okay. Let's go to Exhibit 20.

6       What week would you -- what week -- by looking

7    at this report, what week do you believe this was

8    prepared in?

9    MS. KYROUZ: Objection. Lacks foundation. Calls

10   for speculation.

11   THE WITNESS: It's information captured as of

12   Week 10, but I don't know when it was prepared.

13   BY MS. McLAUGHLIN:

14   Q. Were these reports commonly prepared outside

15   of the week that they reflect the most recent updated

16   information?

17   A. I don't know. I don't remember.

18   Q. Do you remember who in your group prepared

19   this report?

20   A. Would have been Fred or someone who worked for

21   Fred. Avila. He had one guy working for him that

22   would help with the spreadsheet stuff. I don't

23   remember which one was doing this.

24   Q. Was this particular report included in a

25   larger package of reports?

93

1    A. I don't think so, no. It was separate.

2    Q. Was it under your direction that Fred would

3    prepare these reports?

4    MS. KYROUZ: Objection. Vague.

5    THE WITNESS: I don't remember. I mean, yeah -- I

6    mean, when -- when I'd ask him to do it. I don't know

7    that everyone even did these. I think this was

8    something kind of unique to our group. So I don't

9    know that we updated them all the time; but if we did,

10   yeah, I would have told him to do it.

11   BY MS. McLAUGHLIN:

12   Q. What is the reason for preparing this report?

13   A. It's just another data point that shows what

14   the pipeline looks like versus the prior year, the

15   same -- at the same time in the prior year.

16   Q. Would you have used this in your analysis in

17   preparing the forecast?

18   MS. KYROUZ: Objection. Vague. Calls for

19   speculation.

20   THE WITNESS: The information would have been

21   provided. I didn't, you know, create the forecast.

22   So the information would have been provided in terms

23   of, you know, what the pipeline looks like versus last

24   year and -- I don't know how much it was relied upon

25   for the forecasts, but it was a data point that was

94

1    provided.

2    BY MS. McLAUGHLIN:

3    Q. Let's go to Exhibit 23.

4       Does this appear to you to be the report that

5    this particular report generated at the end of Q3?

6    MS. KYROUZ: Objection. Calls for speculation.

7    Lacks foundation.

8    THE WITNESS: It has data through Week 13. So,

9    uhm -- so, yeah. I mean, I don't know when it was

10   prepared, but it has data through Week 13; but I don't

11   know that it's final. I mean, the date down here says

12   trend February 20th, '01, so I'm not -- that part's a

13   little confusing because we're not at the end of the

14   quarter there. So I don't know that it was final.

15   BY MS. McLAUGHLIN:

16   Q. So Week 13 was not the week of February 20th,

17   '01; is that correct?

18   A. I don't know. I mean, I would need a calendar

19   to count that out. What I'm saying is February 20th

20   isn't the last day of the quarter, February 28th is;

21   so I don't know, from a date perspective, if this

22   means it was final for Q3 or it was going into this

23   week or -- do you know what I mean?

24   Q. Would there have been projected pipeline

25   information in this report?

95

1    MS. KYROUZ: Objection. Vague. Calls for

2    speculation.

3    THE WITNESS: I don't know. That wouldn't be a

4    common practice, but I wouldn't -- I wouldn't think

5    so. But again, I don't know if it's the pipeline that

6    was frozen at the beginning of Week 13 or at the end

7    of Week 13. I don't know.

8    BY MS. McLAUGHLIN:

9    Q. So you do not believe that there is any

10   projected pipeline information in this report?

11   MS. KYROUZ: Objection. Asked and answered. Same

12   objections as before.

13   THE WITNESS: So the average and cumulative thing,

14   I think -- I'd have to look at one of the earlier

15   ones, but I think it keeps a running tab whether or

16   not we're finished with the quarter. So the fact that

17   there's a total there doesn't mean it's the end. And

18   the date on here would indicate we weren't at the --

19   we weren't finished. It's just a semantics issue. So

20   I don't think it was the final one for the quarter.

21   BY MS. McLAUGHLIN:

22   Q. Okay. When would it be your practice to

23   prepare the final for the quarter of one of these

24   reports?

25   MS. KYROUZ: Objection. Lacks foundation..

96

1    Misstates prior testimony.

2        THE WITNESS:  We don't have a -- we didn't have a

3    final report.  I mean, I would -- at some point during

4    the subsequent quarter the numbers would get ironed

5    out, but we didn't produce a final one of these that

6    I'm aware of.

7        (Exhibit Nos. 25 through 30 were marked for

8    identification.)

9    BY MS. McLAUGHLIN:

10   Q.  Okay.  Here's -- let's skip to Exhibit 30.

11       Would you read over and identify Exhibit 30

12   for me.

13   A.  It looks like it's an analysis of deals that

14   have been won, and then -- and then other committed

15   deals, and then a separation of -- we had some large

16   deals that quarter so we were trying to separate them

17   out and show them separately because of the potential

18   impact to the forecast.  So this is a summary page,

19   and it looks like each of the subsequent pages are by

20   vertical.

21   Q.  Do you recognize this report?

22   A.  Yes.

23   Q.  Was it produced by you or someone in your

24   group on or about the date that's on the top of the

25   report on the first page?

97

1    A.  I think so, yeah.

2    Q.  Was this report prepared more than once during

3    Q3?  "This report" being the OSI Q3 license status.

4    MS. KYROUZ:  Objection.  Calls for speculation.

5    THE WITNESS:  I don't know.

6        It wasn't usual or customary.  I don't know

7    if I did it more than once.

8    BY MS. McLAUGHLIN:

9    Q.  Did anyone request you to prepare this report?

10   A.  You know, that I don't know either.  I was --

11   I was kind of new in that job so I was trying to do

12   all kinds of snazzy things to show things differently.

13   So I'm not sure if I was asked to do this or if I

14   decided to do it.

15   Q.  Okay.  Was it your group's responsibility to

16   produce this report?

17   MS. KYROUZ:  Objection.  Misstates prior

18   testimony.

19   THE WITNESS:  I mean, define "responsibility."  I

20   think it was something we dreamed up.  I don't --

21   MS. McLAUGHLIN:  Okay.

22   THE WITNESS:  So not necessarily.  I don't believe

23   I was asked to do this by anyone so...

24   BY MS. McLAUGHLIN:

25   Q.  Okay.  Does this appear to be an authentic and

98

1    genuine copy of the original?

2    A.  Yes.

3    Q.  I want to discuss some of the things that we

4    have inside of this -- on this exhibit.

5        Could you explain to me what "Q301 Won

6    Deals" -- and it's the first column on the first page.

7    What does "won deals" mean, w-o-n?

8    A.  So that's a status within Sales Online that

9    the deal has been won.  It's ours.

10   I would liken it to closed.  Same thing

11   really.  "Won" and "closed" are generally the same

12   thing.

13   Q.  Okay.  And what would "Q301 Committed

14   Deals" -- what does the term "committed deals" mean?

15   A.  That means deals that have not been won but

16   are in the status of being forecasted.  A commit -- a

17   commitment that these things will come in.

18   Q.  Now, during Q3 would you consider a deal that

19   was -- if the deal was forecasted in your forecast,

20   was it a committed deal?  Are they synonymous?

21   MS. KYROUZ:  Objection.  Vague.  Calls for

22   speculation.  Lacks foundation.

23   THE WITNESS:  So if the deals were forecasted

24   within OSO?

25   MS. McLAUGHLIN:  Yes.

99

1    THE WITNESS:  Would we consider that a committed

2    deal?

3    MS. McLAUGHLIN:  Yes.  That's the question.

4    THE WITNESS:  Yes.

5    BY MS. McLAUGHLIN:

6    Q.  And do you see the second big box?  It says

7    "Swing Deals" at the top?

8    A.  Uh-huh.  Yes.

9    Q.  What's your definition of a swing deal?

10   MS. KYROUZ:  Objection.  Vague.  Lacks foundation.

11   THE WITNESS:  So -- I don't remember the exact

12   definition, but they were larger transactions that we

13   thought could have a large impact on the forecast as

14   related to the size of each particular business.  And

15   so within there there was a worst, likely, and best

16   case for those specific deals.

17   BY MS. McLAUGHLIN:

18   Q.  What does worst -- as far as your definition,

19   what does it mean to you?  What worst case is for a

20   swing deal.

21   A.  So --

22   MS. KYROUZ:  Objection.  Vague.

23   THE WITNESS:  So I don't define it.  Really, worst

24   is in the eyes of the sales manager.  The worst case

25   generally means these things will close no matter

100

1   what.
2       BY MS. McLAUGHLIN:
3       Q. For that amount that's listed?
4       A. Yeah.  For that combined amount.
5       Q. Combined?
6       A. So that's a combined amount of a series of
7   deals, not one deal.
8       Q. Is the worst case number forecasted for in
9   your forecast?
10      MS. KYROUZ: Objection.  Vague.  Calls for
11  speculation.
12      THE WITNESS: I don't remember.  I would have to
13  look at -- I would have to look at whether that's
14  already included in the other one.  I don't recall.
15      BY MS. McLAUGHLIN:
16      Q. And I guess I have the same question for
17  "likely."  Would "likely" be deals that you had
18  forecasted for in the swing deals category?
19      MS. KYROUZ: Same objection.  Vague.  Calls for
20  speculation.
21      THE WITNESS: And I don't -- and I don't think so.
22  Again, I'm not sure; but I don't think so.  This was
23  kind of saying if they come in, what's the -- you
24  know, what's the -- you know, you have a 10 million
25  dollar deal in there.  If it comes in, is the most

101

1   likely value of that deal 10 million or is it -- in
2   worst case it will be 8.  But it's not a "it's coming
3   in," it's a "if it comes in what are the likely values
4   of those deals."  So I don't think so.
5       BY MS. McLAUGHLIN:
6       Q. So is it fair to say swing deals, by their
7   definition, are deals that wouldn't have necessarily
8   have been in the forecast?  These are if they come in,
9   sort of in the pipeline deals?
10      A. Right.  So they wouldn't necessarily be in the
11  forecast.  They might be, but they wouldn't
12  necessarily be in there --
13      Q. Okay.
14      A. -- that's correct.
15      Q. Do you have a criteria for whether a deal will
16  be in your forecast or not?
17      MS. KYROUZ: Objection.  Vague.  Misstates prior
18  testimony.  Lacks foundation.
19      THE WITNESS: I don't have that criteria.  The
20  sales VPs decide which deals they think they should be
21  forecasting.
22      BY MS. McLAUGHLIN:
23      Q. And the Q301 ISD Forecast.  Now, ISD, is it
24  fair to say those are deals that are under $500,000?
25      A. Yeah, well under.

102

1       Q. -- combined?
2       A. That's telesales.  So that's -- they're very
3   small transactions.
4       Q. Is that a division that's looked after in one
5   of the verticals?  ISD?
6       A. At that point in time?
7       Q. Yeah.
8       A. At that point in time, from the reports I've
9   seen, we had pulled it out separately.  We looked at
10  it a number of different ways.
11      Q. So it could be telecom's finance services, but
12  they were just deals that were smaller than 500,000;
13  is that correct?
14      MS. KYROUZ: Objection.  Misstates testimony about
15  the smaller than 500,000.
16      THE WITNESS: Yeah.  So it's the telesales
17  organization, and the cutoff for what the deal size
18  was varied.  But they generally were not targeted to
19  look after deals that were big deals at all.
20      MS. McLAUGHLIN: Okay.
21      THE WITNESS: But what the threshold is, I mean, I
22  think it was far below 500,000 --
23      MS. McLAUGHLIN: Oh, okay.
24      THE WITNESS: -- but I don't think it was
25  consistent across the groups either.

103

1       BY MS. McLAUGHLIN:
2       Q. Okay.  Let's turn to the second page, which
3   is -- can you identify for me what verticals this page
4   is referring to?  By "this page" I mean Bates No.
5   NDCA-ORCL 156380.
6       A. It says it's federal so I would say it's
7   federal.  They look like federal transactions because
8   of all the abbreviations and stuff.
9       Q. Okay.  Are the -- are these the listed deals
10  that you see, NASA through DLA, are those all swing
11  deals?  Is that what this report is stating?
12      MS. KYROUZ: Objection.  Vague.
13      THE WITNESS: Uhm, if the deal had a potential
14  value greater than 2 million, it appears it would show
15  on here.  So that looks like best case.  So they're
16  not greater than 2 million in any scenario.  It looks
17  like if the potential for the deal is greater than 2
18  million, then it goes on this list.  And that's true
19  of all of the best case values of the deals.
20      BY MS. McLAUGHLIN:
21      Q. Okay.  And were all of these deals then
22  referred to as the swing deals that are denoted at the
23  top?
24      MS. KYROUZ: Objection.  Vague.
25      Lacks foundation.

104

1    THE WITNESS: Based on what this says, yes. I

2    don't remember putting this together, but I'm fairly

3    sure I did. Based on the fact that it says swing

4    deals greater than 2 million and they're listed there,

5    then yes.

6    BY MS. McLAUGHLIN:

7    Q. Were these deals forecasted, do you recall?

8    MS. KYROUZ: Objection. Vague. Calls for

9    speculation.

10    THE WITNESS: I don't recall.

11    BY MS. McLAUGHLIN:

12    Q. Is there a way for you to -- by looking at

13    this sheet here, is there a way for you to discern

14    whether it was forecasted or not?

15    MS. KYROUZ: Same --

16    MS. McLAUGHLIN: Go ahead and answer.

17    MS. KYROUZ: Same objection.

18    THE WITNESS: No. There really isn't. You know,

19    from my other statement there really isn't. This is

20    if they come in, these are the values they would be.

21    Not a...

22    BY MS. McLAUGHLIN:

23    Q. Can I refer you -- did you want to say

24    something?

25    A. I was actually going to say, as it says in the

105

1    asterisk at the bottom, it says worst/likely/best

2    refers to the potential amounts for each deal, not to

3    the total forecast.

4    Q. Right. But it does say worst case is total

5    forecast is -- for total forecast is the total commit.

6    So does that -- are they referring to the total commit

7    line at the top little box?

8    A. That's right.

9    Q. So does that indicate to you that would have

10    been the forecasted amount?

11    MS. KYROUZ: Objection. Calls for speculation.

12    Asked and answered.

13    THE WITNESS: Yeah. It says worst case for the

14    total forecast is the total commit. So no. That says

15    it's the worst case, not that it's the forecast.

16    BY MS. McLAUGHLIN:

17    Q. So there's really no way to determine by

18    looking at this page what was forecasted for these

19    specific deals?

20    A. No. And that wasn't the intent of this.

21    Q. What was the intent of this?

22    A. It was really just to show what big deals were

23    out there that could have the impact. And that's why

24    I say I don't think this was -- it was done on any

25    regular basis. I don't know if I did it any more than

106

1    once. It was just another data point.

2    Q. Okay. Let's go to the Comms/Utility page.

3    It's NDCA-ORCL 156384.

4    On this page do you see that there are hash

5    marks in certain places in lieu of numbers?

6    A. Uh-huh. Yes.

7    Q. In the columns?

8    What do those hash marks indicate to you?

9    A. Zero.

10    Q. So zero meaning zero dollars? Or zero, not a

11    possibility?

12    A. Zero dollars.

13    Q. Okay.

14    So if you look at AT&T's line, is it fair to

15    say the worst case is that there are zero dollars; the

16    likely case is such that it's going to bring zero

17    dollars; and the best case is it's going to bring

18    $15 million?

19    MS. KYROUZ: Objection. Calls for speculation.

20    Vague.

21    THE WITNESS: That's -- yeah. That's what this

22    says, based on what was in OSO at the time. So that

23    would have indicated there was only a best case value

24    for the deal in OSO.

25    BY MS. McLAUGHLIN:

107

1    Q. Okay. And then I guess the same would hold

2    for Lucent. It's got a hash mark, hash mark, and then

3    10. Which is zero dollars, zero dollars, and

4    $10 million?

5    A. That's correct.

6    Q. Does this indicate to you that as of

7    February 13th, that the best case scenario for Lucent

8    for that deal in particular was $10 million?

9    A. No.

10    MS. KYROUZ: Objection. Vague.

11    BY MS. McLAUGHLIN:

12    Q. What does that mean to you then?

13    A. It means that that's the value that was

14    entered into Oracle Sales Online by someone. That

15    doesn't mean that that is the true and accurate status

16    of the deal at the time.

17    Q. How would you ascertain the true and accurate

18    status of the deal at the time?

19    A. I would talk to Jay. He was very involved in

20    that particular deal, and then a lot of the bigger

21    ones; and so he knew, you know. He was talking to, I

22    guess, the CEO every day. He knew what was going on

23    there, I didn't. So what we're showing here is just

24    what it states in Oracle Sales Online. This is what

25    the system shows.

108

Kopp, Sarah  6/14/2006  9:02:00 AM

1    Q. So you're saying that you didn't individually,
2  on your own, verify this information; you simply take
3  it from OSO and place it onto the report?
4    A. That's right. I mean, I wouldn't have done
5  that. I wouldn't have gone and taken data from a
6  system that was entered by a sales rep and manipulated
7  it myself.
8    Q. Or had the right to change anything?
9    A. Correct.
10   Q. With your own judgment or anything?
11   A. Correct. I don't have the right to go into
12 Oracle Sales and change the value of a deal.
13   Q. And so even when you're preparing a
14 report that may -- so these reports do not have your
15 judgment taken into consideration; is that correct?
16   MS. KYROUZ: Objection. Are you referring to just
17 this exhibit? Or all reports we've looked at today?
18   MS. McLAUGHLIN: This report specifically, and any
19 report like this in kind.
20   THE WITNESS: Okay.
21   MS. KYROUZ: You're referring just to Exhibit 30.
22 I still object that it's vague and calls for
23 speculation.
24   THE WITNESS: There is no judgment of mine in any
25 of these -- in any of this exhibit. It is -- it is a

109

1  regurgitation of what is in Oracle Sales.
2    MS. McLAUGHLIN: Okay.
3    All right. Let's move on from this one.
4    Q. Oh. Sorry. Can we go back?
5    I guess we're going to look at the same page
6  we were on before.
7    A. Okay.
8    Q. And it says next to Worldcom "NOT in OSO."
9  What does that mean?
10   MS. KYROUZ: Objection. Vague. Calls for
11 speculation.
12   THE WITNESS: I don't remember. I don't remember
13 why that would have been put in there.
14   BY MS. McLAUGHLIN:
15   Q. Does that indicate to you that the Worldcom
16 deal was not placed in OSO?
17   MS. KYROUZ: Same objection.
18   THE WITNESS: I don't know. To be honest, I don't
19 know.
20   MS. McLAUGHLIN: Okay. We'll move on.
21   What time do we have?
22   THE VIDEOGRAPHER: 11:54.
23   MS. McLAUGHLIN: 54. We can break here if you
24 want.
25   MS. KYROUZ: That would be fine.

110

1    THE WITNESS: Okay.
2    MS. McLAUGHLIN: I still have more reports that I
3  can go through another half hour and break or --
4    MS. KYROUZ: Why don't we break now.
5    MS. McLAUGHLIN: Okay.
6    THE VIDEOGRAPHER: Off the record. The time is
7  11:54 a.m.
8    (Lunch recess taken at 11:54 a.m., proceedings to
9  resume at 1:00 p.m.)
10   -oOo-
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

111

1    AFTERNOON SESSION
2  JUNE 14, 2006                  12:59 P.M.
3    -oOo-
4    (Exhibit Nos. 31 through 57 were marked for
5  identification.)
6    THE VIDEOGRAPHER: We are back on the record. The
7  time is 12:59 p.m.
8    -oOo-
9    EXAMINATION (RESUMED)
10 BY MS. McLAUGHLIN:
11   Q. Welcome back.
12   Before we broke we were talking briefly about
13 your computer and that it was taken from you at some
14 point in time to download the information that was on
15 it. Were you referring to your laptop computer when
16 we were discussing your computer?
17   A. Yes.
18   Q. Have you ever had any other computer -- did
19 you operate any other computer aside from that laptop
20 during Q3, '01?
21   A. I don't believe so, no.
22   Q. Okay.
23   And this isn't in response to your question;
24 but, please, you're still under oath just so you know.
25   A. Uh-huh.

112

1    Q. We broke for today.

2    All right.  I'd like you to look at

3  Exhibit 25.

4    If you can read through that, please.

5    Could you identify for the record what this

6  is?

7    A. It appears to be an e-mail from Jennifer

8  Minton to Ivgen Guner that I was copied on in which

9  Ivgen asked Jennifer a number of questions.  And

10  Jennifer commented on one of them it looks like.

11    Q. Okay.  In the top line it says, "LJE made it

12  clear at the EMC this week that the license revenue

13  growth target for this year and next is 30 percent."

14    A. Uh-huh.

15    Q. Who is LGE in that sentence?

16    LJE.  Sorry.

17    A. It would be Larry Ellison.

18    Q. And what is the EMC?

19    A. That's his Monday meeting, executive committee

20  meeting.

21    Q. Okay.  And if you go down further, it says

22  under budget, "to follow-up my voicemail from last

23  night, the field is getting concerned about the

24  targets."  When they're referring to targets, what

25  does that mean?

113

1    MS. KYROUZ:  Objection.  Lacks foundation as to

2  what Ms. Guner meant.

3    THE WITNESS:  Yeah.  I don't know what she meant.

4  She seems to be referring to a budget, but I don't

5  know for what year.  Because that time line, she could

6  be talking about the current year or the upcoming

7  year.  Since it was in January, we start budgeting for

8  the upcoming year so I don't know.

9    BY MS. McLAUGHLIN:

10    Q. Okay.  I guess if you read down further, does

11  this help you with context for the targets?  Next

12  paragraph says "also since the targets are almost a

13  month late and review meetings are pushed out a week."

14  Does that help you with what the targets time frame

15  would be?

16    MS. KYROUZ:  Same objections.

17    THE WITNESS:  No.  I don't remember that year, at

18  that point in time, whether -- we should have already

19  had targets established for '01 so I don't know.  I

20  don't know what she's talking about.

21    BY MS. McLAUGHLIN:

22    Q. Okay.  Do you remember receiving this e-mail?

23    A. I don't have an independent recollection of

24  it, no.  I mean, obviously, I'm copied on it; but I

25  don't remember it.

114

1    Q. Do you have any reason to believe it's been

2  altered in any way?

3    A. No.

4    Q. Does it appear to be a genuine, authentic copy

5  of the original?

6    A. It appears to be; but like I say, I don't

7  remember getting it.

8    Q. Okay.

9    Let's look at Exhibit 26.  Which is...

10    Okay.  Exhibit 25 (sic) has two parts.

11  I'm sorry, is it 26?

12    26.  Sorry.

13    First part for the record is NDCA-ORCL 099131

14  through 099132, and then there's NDCA-ORCL 095906

15  through 095918.

16    MS. KYROUZ:  And are you representing to the

17  witness that the second portion of the exhibit relates

18  to the first portion?

19    MS. McLAUGHLIN:  I'm not making any

20  representation.  I'm going to be asking her questions

21  about it.

22    Q. Just let me know when you're done looking

23  through it.

24    A. I'm done.

25    Q. Okay.

115

1    Do you recognize Exhibit 26?

2    A. Both parts of it?

3    Q. Yes.

4    A. Yes, I recognize them.

5    Q. Okay.  Is it your belief that this would be

6  the Power Point presentation -- the second part of it

7  would be the Power Point presentation for the senior

8  staff meeting dated February 13, 2001, that would be

9  attached to this e-mail on the second page that

10  indicates there's an attachment?

11    MS. KYROUZ:  Objection.  Lacks foundation.

12    THE WITNESS:  I don't know what this was called

13  exactly.

14    BY MS. McLAUGHLIN:

15    Q. But I'm saying --

16    A. I don't remember what I called it, but it

17  appears a Power Point file was attached.  So -- yeah.

18  I don't remember attaching it, but it says something

19  was attached.  It's probably reasonable it was this,

20  but I don't know for sure that it was.

21    Q. Well, let's look at the e-mail.

22    First paragraph says, "Here are the latest

23  projections after yesterday's senior staff meeting."

24  Would that be the senior staff meeting that this Power

25  Point presentation referred to?

116

1    MS. KYROUZ:  Objection.  Lacks foundation.
2    THE WITNESS:  Based on the dates, probably, yes.
3    BY MS. McLAUGHLIN:
4    Q.  Was this senior staff meeting Power Point
5    presentation prepared by you or someone on your staff?
6    A.  Yes.
7    Q.  On or about the date that it reflects on the
8    front of the report?
9    A.  Yes.  Probably ahead of time, but yes.
10    Q.  Does the -- do both of these seem to be a
11    genuine, authentic copy of the originals?
12    MS. KYROUZ:  I am going to object.  You haven't
13    established that the two are in any way related.  She
14    has testified she doesn't know whether this particular
15    Power Point is the actual exhibit referencing.
16    MS. McLAUGHLIN:  I would disagree with you, that
17    you are mischaracterizing what she just stated on the
18    record.
19    Q.  Do you have any reason to believe this is not
20    the Power Point presentation that was attached to this
21    e-mail?
22    MS. KYROUZ:  Same objection.  Lacks foundation.
23    One way or the other.
24    THE WITNESS:  I don't know one way or the other.
25    A Power Point presentation was attached to this, and

117

1    it was done around the same time frame, so it's not
2    unreasonable; but, again, I can't say for sure that it
3    is this one.  Or that it's this version of it.  I
4    don't know.  You know, I had -- usually when you work
5    on a presentation, you have a few iterations of it;
6    and so I don't know where this came from, if it was
7    the final, if it was the thing that was attached --
8    BY MS. McLAUGHLIN:
9    Q.  Okay.  Well, why don't you take a look at it
10    closer so we can determine that.
11    A.  Well, I don't know that I can determine that
12    five years later, that there was never anything
13    changed in this before it was presented to Jay's team.
14    But -- or that it was the one attached to this.
15    Q.  Okay.
16    A.  A presentation that probably had to do with
17    the senior staff meeting that had taken place the day
18    before was attached.  I just -- you know, I don't know
19    for a fact that it's this.
20    Q.  Did you have more than one senior staff
21    meeting on February 13th, 2001?
22    MS. KYROUZ:  Objection.  Misstates her testimony.
23    Vague.
24    THE WITNESS:  No.  But when working on a
25    presentation, one generally doesn't start and finish

118

1    it on the same day and never make any changes to it.
2    I don't know if this was the final one or -- that's
3    all I'm saying, is generally there are a few
4    iterations of something.  Whether it was overwritten
5    or whether there were versions of it.  And I don't
6    remember what I called it so...
7    Q.  Does it appear to be --
8    A.  I'm not saying it's incorrect, I'm just saying
9    I don't know for a fact that this was the thing that
10    was attached to the e-mail.
11    Q.  Okay.
12    Does it appear to be a draft to you?
13    A.  I don't know.  I don't stamp the word "draft"
14    on it.  I mean, it might have been something I showed
15    to somebody and then put it away and updated it later,
16    I don't know, in prep for this meeting.  Usually I
17    would start them a good week ahead of time.
18    I'm not saying it's not, I'm just saying I
19    can't prove that this is the thing that was attached
20    to this.
21    Q.  I'm not asking you to prove it.
22    A.  Yeah.
23    Q.  Okay.  So let's just look at the e-mail.
24    It says, "One of the key issues continues to
25    be that the reps are just not reflecting deals

119

1    accurately in OSO; or not reflecting the large ones at
2    all -- believing the visibility will somehow commit
3    the deal if it is long shot or a large swing."  Do you
4    remember this being an issue in Q3?
5    A.  Uhm, it's a general issue.  I don't remember
6    it being a specific issue in Q3; although, clearly, I
7    commented that it was.  But it is an issue.
8    Q.  It says in the second paragraph here -- it
9    says -- second line.  From the first, "To illustrate,
10    I showed a comparison with what is in OSO to what we
11    collected manually regarding 'swing' deals and
12    potential impact to forecast to show that we had
13    literally" a hundred -- "that we had a $140 million
14    swing factor, and we needed to understand what was
15    really going to happen."  Would this -- do you
16    remember that report we looked at earlier?
17    What exhibit is this?
18    The OSI Q3 license status report, which was --
19    what exhibit is this?
20    She's got it.
21    Could you read off what exhibit it is.
22    A.  It's 30.
23    Q.  30.
24    Okay.  After reading this e-mail do you
25    believe that you prepared this Exhibit 30 for this

120

Kopp, Sarah  6/14/2006  9:02:00 AM

1  analysis?

2     MS. KYROUZ:  Objection.  Misstates the document.

3  Lacks foundation.  Calls for speculation.

4     THE WITNESS:  No.

5     I make a reference to a swing analysis in

6  here, but I doubt that I would have done this in

7  preparation for sending Jennifer a status update

8  e-mail.  I mean, I wouldn't have prepared this just so

9  that I could put that sentence or that paragraph in an

10  e-mail.

11     BY MS. McLAUGHLIN:

12     Q.  So you do not believe that this is the report

13  that you're referring to in this e-mail?

14     A.  No.  That's not what I said.

15     Q.  Okay.

16     A.  I said I wouldn't have prepared this for this

17  e-mail.

18     Q.  That's not --

19     A.  I prepared this on my own.  And I'm not sure

20  if it's the same thing I'm referring to.

21     Q.  Okay.

22     A.  I'm not saying it's not.

23     Q.  Is it possible that it is?

24     A.  It's possible that it is, yeah.

25     Q.  Do you have any reason to believe it isn't?

121

1     MS. KYROUZ:  Objection.  Misstates the document

2  with respect to the attached presentation in the

3  following sentence.

4     THE WITNESS:  I don't have any reason to believe

5  it's not, but I don't know for a fact that it is.

6     MS. McLAUGHLIN:  Counsel, I would appreciate it if

7  you would restrain from speaking objections and

8  especially testifying on the record what exhibits say.

9  Thank you.

10     Q.  So, to go back before Counsel interrupted, it

11  says "I showed a comparison with what is in OSO to

12  what we collected manually regarding 'swing' deals and

13  potential impact to forecast to show."  I'm not asking

14  you if this was a report that was attached or

15  connected to this presentation, I'm asking you is this

16  possibly the report you prepared to do the swing

17  analysis that you're referring to here.

18     MS. KYROUZ:  Objection.

19     THE WITNESS:  It's possibly that report.

20     BY MS. McLAUGHLIN:

21     Q.  Okay.  Go down to the third paragraph.  It's

22  the last sentence.  It says, "So I believe Jay, his

23  team and I are on the same page at this point and here

24  are the projections and swing factors as of

25  yesterday."  Were you and Jay and his team not on the

122

1  same page up until this point in the quarter regarding

2  the projections?

3     MS. KYROUZ:  Objection.  Lacks foundation.  Calls

4  for speculation.  Misstates the document to the extent

5  counsel continues to omit key sentences from her

6  presentation.

7     MS. McLAUGHLIN:  Counsel, the document speaks for

8  itself.  I'm simply reading excerpts to the witness to

9  question her on those specific excerpts.  Please

10  refrain from speaking objections.

11     MS. KYROUZ:  I'm allowed to say on the record my

12  objection to your mischaracterization of the document.

13     MS. McLAUGHLIN:  You're allowed to object to form

14  in deposition.  You're not allowed to put speaking

15  objections on the record during deposition.  That is

16  being -- that is outside the scope and what is

17  permissible during a deposition.

18     THE WITNESS:  I don't recall whether we were not

19  on the same page all the way -- you know, all the way

20  through the quarter.  In my capacity working for

21  Jennifer, it's my responsibility to let her know if

22  we're not on the same page.  And so I think all I'm

23  saying here is at this point in time we're all on the

24  same page.  That doesn't mean that at any point we

25  weren't necessarily.

123

1     BY MS. McLAUGHLIN:

2     Q.  Okay.  Do you recall there being any

3  disagreement with regard to the projections prior to

4  this date?

5     MS. KYROUZ:  Objection.  Lacks foundation.  It

6  mischaracterizes the document.

7     THE WITNESS:  I don't recall any specific

8  disconnects between Jay and I up until this point.

9     MS. McLAUGHLIN:  Okay.

10     THE WITNESS:  I'm just stating that to her.  That

11  we're on the same page now.  Again, that doesn't mean

12  we weren't before.

13     MS. McLAUGHLIN:  Okay.

14     Q.  Did you prepare this chart that's in the

15  e-mail?

16     A.  Yes.

17     Q.  The table graph?

18     A.  Yes.

19     Q.  On the top line here we have vertical,

20  pipe (inaudible).

21     THE REPORTER:  I'm sorry.  Can you repeat those

22  one more time.

23     BY MS. McLAUGHLIN:

24     Q.  -- (continuing) "Vertical," "Pipe," "Commit,"

25  "Upside," "Swing Impact," and "Comments."  Those are

124

1    the column headings in the graph.

2       I'd like to point to the "Upside" column.

3    A. Uh-huh.

4    Q. What is upside?

5    MS. KYROUZ: Objection. Lacks foundation. Vague.

6    THE WITNESS: It's defined in the minds of the

7    sales reps, but it believes -- you know, it's here's a

8    potentially better case than what we would be willing

9    to commit to.

10    BY MS. McLAUGHLIN:

11    Q. Okay.  And who --

12    A. But --

13    Q. I'm sorry.

14    A. Go ahead.

15    Q. And who -- whose upside is this in this column

16    here?  Do you know?

17    A. I don't remember.

18    Q. Okay.

19       Did you determine upside for OSI?

20    A. No, I did not.

21    Q. Did Jay Nussbaum determine upside for OSI?

22    MS. KYROUZ: Objection. Lacks foundation. Vague.

23    THE WITNESS: So where it's related to this

24    particular chart, I don't know.  If he was asked to

25    commit an upside number to Larry, then it would be his

1    upside number.  But I don't recall what upside number

2    was being used here.

3    BY MS. McLAUGHLIN:

4    Q. Okay.  So different people could have -- I

5    guess they have their own upsides in the division?

6    A. Sure.  Like I don't know if this was what the

7    VP of federal was putting in as his commit in upside

8    or whether this was Jay's commit in upside for those

9    individuals at the time.

10    Q. Would you determine Jay Nussbaum place an upside on a

11    forecast for OSI?

12    MS. KYROUZ: Objection. Vague as to "upside."

13    MS. McLAUGHLIN: Typically during Q3.

14    MS. KYROUZ: Same objection. Vague.  Lacks

15    foundation.

16    THE WITNESS: So I'm not sure I understand the

17    question because you said typically and then during

18    Q3.

19    BY MS. McLAUGHLIN:

20    Q. During Q3.

21    A. He has the ability to do that.  I don't know

22    whether he had any discussions with anyone where he

23    personally placed upside on the forecast.

24    Q. Okay.  So maybe we should use one of the

25    reports as a demonstrative.  It may be more helpful

1    with this upside discussion.

2    A. Okay.

3    MS. McLAUGHLIN: Let's see.

4       Could we go off the record for a moment.

5    THE VIDEOGRAPHER: Off the record.  The time is

6    1:19 p.m.

7    (Recess taken.)

8    THE VIDEOGRAPHER: Back on the record.  The time

9    is 1:20 p.m.

10    MS. McLAUGHLIN:

11    Q. Okay.  Let's still try our discussion with

12    upside.  I understand in terms of this graph you're

13    not sure whose upside that necessarily is, whether --

14    we know it's not yours because you said you didn't

15    place upside on this graph.  Correct?

16    A. (Nods head up and down.)

17    Q. Would you, in your position as the finance

18    director of OSI during that quarter, ever place upside

19    on the forecast?

20    MS. KYROUZ: Object.  Vague as to "upside."  Lacks

21    foundation.

22    THE WITNESS: Right.  So Jennifer could ask me my

23    opinion on the forecast.  I would never adjust my

24    forecast or place upside on it.  The forecast isn't

25    owned by finance, it's owned by the business.

1    BY MS. McLAUGHLIN:

2    Q. So when you say it's owned by the business,

3    would -- did Jay Nussbaum place upside on the forecast

4    in Q3?

5    MS. KYROUZ: Objection.  Vague as to upside.

6    Lacks foundation.

7    THE WITNESS: So -- when you say "place upside on

8    the forecast," that's -- we don't place upside on top

9    of a forecast.  We'll -- you know, he may have given a

10    range in terms of the numbers, which -- with the

11    higher one being the number that he would consider to

12    be upside; but he doesn't -- there isn't a process

13    known as placing upside on something.

14    BY MS. McLAUGHLIN:

15    Q. And is upside -- would, then, upside be placed

16    within the forecast and so it would be -- is "upside"

17    synonymous with "management judgment"?

18    A. No.

19    Q. What's the difference between upside and

20    management judgment, as you understand it?

21    MS. KYROUZ: Objection.  Vague.

22    THE WITNESS: So it -- an upside is just a

23    potentially higher case, which may be substantiated by

24    deals underneath or it may not be.  It doesn't -- it's

25    not the same thing as management judgment at all.

1    I'm trying to think of a -- so, for example,
2  if there was -- like in the swing deal stuff, if there
3  was a range in value for a deal, you know, your commit
4  including that deal, if that deal was forecasted,
5  might be for that deal at a lower value.  And your
6  upside, if that deal was forecasted, might include
7  that deal as a -- at a larger value.  But it's not
8  judgment in the sense that there are no deals, you
9  know -- I guess I'm not -- maybe I'm not being clear
10  on that.
11    So it's -- it's various values of deals or it
12  could be there's a deal that's in the upside column
13  because it's only showing up in best case in Oracle
14  sales and it's not showing up in the likely case.  And
15  so it's a composite of all of that deal information
16  plus what the sales leads really think in terms of
17  their interactions with their reps and interactions
18  with the customers --
19    MS. McLAUGHLIN: Okay.
20    THE WITNESS: -- that comes up with that.  But I
21  wouldn't characterize it as management judgment.
22    BY MS. McLAUGHLIN:
23    Q.  Here on the first line of the fourth paragraph
24  it says, "Although in OSO there is still $55 million
25  of judgment in Jay's number, these guys signed up for

129

1  the $180 million commit yesterday."  So the word
2  "judgment" in that sentence, does that mean management
3  judgment?
4    A.  That does, yes.
5    Q.  And what is that referring to?  Do you know?
6    A.  That is if you roll up all the deals in OSO at
7  that time -- and this kind of orders back to the
8  comment I had made, I think, earlier, that although if
9  you add up all of those deals, they don't in sum add
10  up to a likely case of 180 -- they add up to something
11  less than that -- all of his team in the room still
12  confirm that 180 was the right number.  So it's kind
13  of illustrative of the issue with reps not always
14  entering the full amount of a deal or forgetting to
15  enter it or not wanting to enter it all together.  So
16  that there was -- you know, there was a little bit of
17  a disconnect between what was in the system and what
18  not just Jay was saying but what all of his directs
19  were saying as well.
20    Q.  Okay.  And the next sentence says, "I believe
21  we will come in somewhere between 210 and 220 but
22  there is really such a huge swing in the number that
23  it is difficult to pinpoint with only 34 million
24  booked as of today."  When you say 34 million booked
25  as of today, is this the 34 million -- would this be

130

1  of won deals?  W-o-n deals?
2    A.  Yes.  Won or closed.
3    Q.  So prior to February 14th, there was only
4  $34 million in closed deals in OSI?
5    MS. KYROUZ: Objection.
6    MS. McLAUGHLIN: According to this e-mail.
7    THE WITNESS: According to OSO, uhm, yes.
8    BY MS. McLAUGHLIN:
9    Q.  Do you have any reason to believe that that
10  was an inaccurate number as you're sitting here today?
11    MS. KYROUZ: Objection.  Vague.  Lacks foundation.
12    THE WITNESS: I don't have any reason to believe
13  it's inaccurate.  It's not unusual, but it's not
14  inaccurate I don't think.
15    BY MS. McLAUGHLIN:
16    Q.  So explain to me because I'm a little confused
17  between the first two sentences -- between the two
18  sentences in this paragraph.  It says, "Although in
19  OSO there is $55 million of judgment in Jay's number
20  these guys signed up for the $180 million commit
21  yesterday.  I believe we will come in somewhere
22  between 210 and 220"?
23    A.  Uh-huh.
24    Q.  So are -- in this e-mail are you stating that
25  you think that they will actually -- and it says "come

131

1  in somewhere between," meaning we'll get those amount
2  of deals -- that amount of deals closed above what
3  they were willing to commit the day before?
4    A.  No.  What I'm saying is that I think in total
5  for the quarter they're going to land at a revenue
6  number of somewhere between 210 and 220 based on that
7  commit plus some combination of those big deals.  I'm
8  not saying that the 210 and 220 is on top of anything.
9  That is where I think they will ultimately land.
10    Q.  Okay.  So your -- from your perspective in
11  this e-mail, and correct me if I'm wrong, you believe
12  they'll land somewhere between 30 and 40 million
13  dollars more than they were willing to commit the day
14  before?
15    A.  Uhm, I wouldn't say more than they were
16  willing to commit.  What I would say is they were
17  comfortable with the 180.  That's not to say that they
18  were uncomfortable with it being any higher than that.
19  They were comfortable saying "I will make a commitment
20  that we'll do 180, we could do more."  So I wouldn't
21  say -- I wouldn't say more than they were willing to
22  stand up to because that's not really the case.  It's
23  more than they committed to but not more than they
24  thought they could potentially do.
25    Q.  And you -- and you knew this because you were

132

1  aware of what they were thinking what they could
2  potentially do?  Was there -- or I guess what
3  I'm asking --
4     A.  Yeah.
5     Q.  -- is that what --
6     A.  I certainly --
7     MS. KYROUZ:  Objection.  Vague.  Misstates the
8  document.
9     THE WITNESS:  I wouldn't say I knew what they were
10  thinking, that I was in their heads; but having
11  attended the staff meeting and talking about these
12  deals with Jay, you know, we were going through which
13  deals he thought were likely to close versus unlikely
14  to close; and some of these were not in that 180
15  number or in it for a very small amount.
16     So forecasting is doing that.  It's trying to
17  figure out over and above what's been committed if
18  there's an opportunity for anything better than that.
19  And at that point in time I believed that -- and as I
20  said, there's a huge swing in the numbers so it's
21  difficult to pinpoint.  But at that point in time I
22  thought that the forecast of 210 I think it was and
23  the 220 was -- somewhere in there would be where we
24  would come out.
25     BY MS. McLAUGHLIN:

133

1     Q.  Okay.  And let me ask you this question:  When
2  you say that there's really such a huge swing in the
3  number, are you referring to the fact that the deals
4  you were depending on to close in the next two weeks
5  were those swing deals?  Is that what you're referring
6  to?
7     MS. KYROUZ:  Objection.  Misstates the document.
8  Vague.  Lacks foundation.
9     MS. McLAUGHLIN:  I'm asking her what she thinks.
10     THE WITNESS:  So -- no, I'm not saying that we're
11  relying on all of those deals to close.  I'm saying
12  that we believe some of them will close.  And so my
13  prediction is based on some of them closing.
14     BY MS. McLAUGHLIN:
15     Q.  Okay.  So when we --
16     A.  But no -- sorry.
17     Q.  Sorry.
18     So when we look in the financial services
19  category, it says "10 million at Capital One must
20  close."  What is "must close"?  Is that one of the
21  swing deals that must close for you to make that
22  projected number you're talking about lower?
23     MS. KYROUZ:  Objection.  Vague.  Misstates the
24  document.
25     THE WITNESS:  I don't recall if the must close on

134

1  that particular deal refers to it must close to get
2  the commit number or it must close to get to my
3  number.  I don't remember why I used that -- those
4  words at that point.  Or exactly which number I'm
5  referring back to.
6     BY MS. McLAUGHLIN:
7     Q.  At this point in time -- what happened to the
8  forecasted deals in OSI at that point in time?
9  Because I see we're sort of -- and this is my
10  observation, and I'll ask my question at the end.
11  There's a lot of reliance on larger swing deals at the
12  end of the quarter to make the original forecast, but
13  many of these were not in the forecast.  What happened
14  to those deals that were forecasted for you to make
15  that number?  Do you recall, in that quarter, what was
16  going on?
17     MS. KYROUZ:  Objection.  Vague.  Object to
18  counsel's commentary as inaccurate.  Misstates the
19  documentary evidence.
20     THE WITNESS:  So -- so I -- I'm not sure I
21  understand your question.  I mean, if you look at
22  federal, it says $7 million NAVAIR in commit.  So some
23  of these deals were already, you know, within that
24  forecast.  And the commit number of 180 here does not
25  tie back to the forecast at the time.  So the forecast

135

1  had always assumed some combination of larger deals.
2  We're just showing them separately because a single
3  transaction for $20 million would have a major impact.
4  So the formatting is really something that we did in
5  order to single out the impact that particular deals
6  could have, but that doesn't mean they were never
7  forecasted before.
8     BY MS. McLAUGHLIN:
9     Q.  Okay.  But I was asking you about the swing
10  deals.  And we have in Exhibit 30 that NAVAIR is one
11  of your swing deals listed.  And so -- but my question
12  is, I guess -- since I've looked at these two
13  documents, I can represent to you that all of these
14  deals you're referring to in the Comments category are
15  in your swing deal report -- or, sorry.  It's called
16  the OSI Q3 License Status, down at "Swing Deals."
17     A.  That's right.
18     Q.  Okay.
19     A.  Okay.  The OSI License Status, the commit
20  number on here does not tie back to the forecast.
21  It's only 120 million.  So this was not a forecast
22  pack.  Exhibit 30 was not a forecast pack, it was a
23  different way of looking at things.  So it takes
24  smaller deals that add up to 120 million and then
25  builds up the rest of the forecast with the rest of

136

1    it.

2        When I say swing deals in here, it doesn't

3    mean their upside, it just means they have a big

4    impact.

5        Q.  Okay.

6        A.  So if I'm not mistaken, Jay's actual forecast

7    to the corporation at this point was 210.  He always

8    assumed some piece of it in there.  And this is not a

9    forecast pack.  The license status is not a forecast

10   pack, was not a customary pack; and to my knowledge I

11   only did it once.  So it doesn't -- it's not

12   reflective what was in the forecast versus what

13   wasn't.

14       Q.  I understand that.

15       A.  Okay.

16       Q.  And thank you.  Yes.

17       A.  Okay.  That's all I'm saying.

18       Q.  Uh-huh.

19       A.  So the swing deals doesn't, by definition,

20   mean they weren't in the forecast.  Or weren't assumed

21   in his original forecast.

22       Q.  Okay.

23       A.  Okay?

24       Q.  Then I guess I should go through -- and I

25   don't know if you can recall this at this time, but

---

1    these deals in the Comments categories, were these

2    deals forecasted for to some degree?

3        MS. KYROUZ:  Objection.  Vague.  Lacks foundation.

4        THE WITNESS:  Only to the extent that I have

5    commented in there that they were.  I don't know which

6    ones at this point were in the forecast and which ones

7    weren't.  I mean, they will typically and still do.

8    The managers or executives will say, you know, I have

9    four deals worth $20 million apiece.  I believe any

10   two of them might close; therefore I'm going to

11   forecast, you know, 40 for that 80 million dollars

12   worth of business.  Without saying it's this one

13   that's going to close and that one that's going to

14   close because you don't know as of that point.  So a

15   forecast is built up of making some of those

16   assumptions about some percentage of those deals will

17   close, some percentage of those deals will not close.

18       BY MS. McLAUGHLIN:

19       Q.  Is it fair to say that at this point in the

20   quarter you're relying on these large swing deals to

21   close to make your quarter?

22       MS. KYROUZ:  Objection.  Lacks foundation.

23       BY MS. McLAUGHLIN:

24       Q.  To make your quarter forecast?

25       MS. KYROUZ:  Misstates the documents.

---

1        THE WITNESS:  So the document itself says if these

2    things closed, we would come in at 288, which was not

3    our forecast.  So no.  It assumes some of them will

4    close.  Some percentage of -- if you add all that up,

5    you know, some percentage of that difference will

6    close.  But, no, we weren't relying on all of those to

7    close.

8        BY MS. McLAUGHLIN:

9        Q.  I didn't ask you if you were relying on all of

10   them to close, I was asking if you were relying on

11   some of them to close.

12       A.  Yes, we were relying on some of them to close.

13   And we were, all quarter, relying on some of them to

14   close.  It wasn't a at this point kind of a thing.

15   All quarter we assumed, you know, some of these deals

16   would close.

17       Q.  Okay.  Even if they were not placed in the

18   pipeline?

19       A.  Yeah.  You know, as we've seen in some of the

20   earlier documents, we were trying to get some

21   discipline in the sales reps' use of Oracle Sales

22   Online, but there were reticent at some times to put

23   these big deals in.  And so we were quite reliant on

24   the sales teams, who were close to the customers and

25   close to the deals, to be telling us what was really

---

1    going on.  And Jay personally was involved in some of

2    these larger ones.  And so we were no longer looking

3    at the system -- like here, this is not pulled right

4    out of the system, this is what we're being told now.

5        As you get down to the last, you know, couple

6    of weeks it becomes a lot more word of mouth, "this is

7    what I'm being told is going on at the customer site

8    as we speak," than pulling things from the system.

9        Q.  Was it possible at the time that you were

10   really just getting -- the pipeline was really an

11   accurate -- what deals were being put in the system

12   were really an accurate description of what was going

13   on with OSI at the time and these larger deals that

14   were not actually included by the sales people in this

15   pipeline that didn't end up closing in your quarter

16   really shouldn't have been there?

17       MS. KYROUZ:  Objection.  Argumentative.  Lacks

18   foundation.  Misstates the record.

19       BY MS. McLAUGHLIN:

20       Q.  Is that fair to say?

21       A.  I don't think so.  I mean, we also had deals

22   that weren't in the pipeline all quarter that closed.

23   So, no, I don't think that's -- I don't think that's a

24   fair characterization.

25       Q.  So who would be the person at OSI that would

1  make a decision on whether deals that were not in the
2  pipeline should be relied upon to make your forecast?
3      MS. KYROUZ:  Objection.  Lacks foundation.  Vague.
4  Misstates the evidence.
5      THE WITNESS:  So ultimately the forecast comes
6  from Jay.  So he knows what's in the system, he's also
7  talked to all of his sales leads; but I don't -- I'm
8  not sure I understand what you mean.  You know, he may
9  think some deals are going to close, he may think
10  other ones aren't going to close.
11      BY MS. McLAUGHLIN:
12      Q.  And you relied on Jay's opinion with regard to
13  these issues during this quarter; is that correct?
14      MS. KYROUZ:  Objection.  Vague.  Misstates prior
15  testimony.
16      THE WITNESS:  There were a number of people that I
17  talked to.  So I would talk to Jay, I would talk to
18  his directs.  But at this point in the quarter you're
19  probably looking more at, like I said, word-of-mouth
20  discussions with various people, not just Jay.  You
21  know, attendance at the staff meeting for an example.
22  You know, taking notes on what the general feeling is
23  about these deals.  Not what's in the system because
24  we had, you know, a issue with people putting
25  everything in.  So to just go and look at the pipeline

141

1  and pull it and ignore what all the senior sales
2  people think is going on -- and they're the ones that
3  are talking to the customer -- would probably not be
4  the way to go.
5      BY MS. McLAUGHLIN:
6      Q.  And were you personally having discussions
7  with the senior sales people at this point in time
8  regarding the field?
9      A.  I don't recall.  I mean, there was discussion
10  during his staff meeting.  I don't recall, you know,
11  going -- wandering the halls and talking to them
12  afterwards, no.
13      Q.  Okay.  Let's -- to talk about -- I'm not going
14  to leave this yet, but I'm going to show you
15  Exhibit 57.  If you could look at that for me.
16      Could you read it over and identify that for
17  me for the record.
18      A.  This is not something that would have come to
19  me.
20      Q.  That's okay.  I know that.
21      A.  Okay.
22      Q.  I'm just asking if you can identify it.
23      A.  Well, based on its title, it says it's a total
24  company forecast -- it doesn't have a date on it.
25  Well, it says 12/11, but I don't know if that's when

142

1  it was printed or when it was created.  I didn't
2  create it.  And it's -- like I said, I wouldn't get
3  this because it's total company, and they don't share
4  that.
5      Q.  I understand that, but I just want --
6      A.  It's a forecast pack.  Yeah.
7      Q.  And it's a forecast pack, and it looks like
8  "Q3upside12_11."  Is this what would be known as a
9  upside report?
10      MS. KYROUZ:  Objection.  Lacks foundation.  She
11  says she has never seen the document.
12      THE WITNESS:  I have never seen this, and I don't
13  know what they would call it.
14      BY MS. McLAUGHLIN:
15      Q.  Okay.  Let me refer you to page...
16      I apologize.
17      Let's look at NDCA-ORCL 092917.  Do you see
18  the first line on this page in the third box?  It says
19  "Revenues" and it's "OSI-Nussbaum."
20      A.  Uh-huh.
21      Q.  And then we see "YTD."  Is that year to date?
22      MS. KYROUZ:  Objection.  Lacks foundation.
23      THE WITNESS:  It's typically year to date, yeah.
24      BY MS. McLAUGHLIN:
25      Q.  Okay.  Q3 2000, and then there's a number

143

1  underneath that; but really what I'm getting to, do
2  you see the middle column there, it says upside?
3      A.  I do.
4      Q.  Do you know if this is referring to Jay
5  Nussbaum's upside of the forecast?
6      A.  I have no idea.
7      Because, I mean, that forecast is a year to
8  date forecast.  I'd have to know what it was for the
9  current quarter to know whether it was a part of Jay's
10  number or somebody else's.  I have no idea.  And even
11  then I'm not sure I would know.  It's not my analysis.
12      Q.  Are you aware that Jay did an upside analysis?
13      MS. KYROUZ:  Objection.  Lacks foundation.  Vague.
14      THE WITNESS:  I have no idea if he ever did it.
15      BY MS. McLAUGHLIN:
16      Q.  Did he ever talk to you about what his upside
17  analysis would be?
18      A.  No.
19      MS. KYROUZ:  Objection.  Vague.
20      BY MS. McLAUGHLIN:
21      Q.  Did you ever speak with Jennifer Minton about
22  upside analysis?
23      MS. KYROUZ:  Same objection.
24      THE WITNESS:  No.
25      BY MS. McLAUGHLIN:

144

1    Q. Did she ever talk to you about what upside
2  would be for OSI?
3    MS. KYROUZ: Objection. Vague. Lacks foundation.
4    THE WITNESS: Not in specific. She would ask for
5  my projections like in this e-mail, and I would give
6  her a range of where I thought we would land.
7    BY MS. McLAUGHLIN:
8    Q. And so you --
9    A. So --
10   Q. That's how you're defining upside, is a range
11  of where you would land?
12   MS. KYROUZ: Objection. Mischaracterizes
13  testimony.
14   THE WITNESS: So she would not specifically say
15  "What's your upside analysis for Jay?" She would say
16  "What's your projection?" And that's what I'm giving
17  her here, is a projection range. Whether or not there
18  was analysis done that tacked any other upside on to
19  that, I don't know.
20   BY MS. McLAUGHLIN:
21   Q. Okay.
22      Let's just go on to our reports.
23   A. Okay.
24   Q. And did you, in fact, present at a senior
25  staff meeting on February 13, 2001?

145

1    A. Yeah.
2    Q. And to the best of your knowledge, does this
3  represent the Power Point of what that, in most part,
4  meeting would have --
5    A. Yeah, it looks like it was.
6    Q. -- discussed?
7    A. Again, I don't know if this was a final
8  version of it; but it would have been something very
9  similar.
10   Q. Did you periodically present to senior -- at
11  senior staff meetings?
12   A. Periodically.
13   Q. Would you do that every forecast period?
14   A. No.
15   Q. What would -- under what circumstances would
16  you present at a senior staff meeting?
17   A. He only scheduled senior staff meetings once a
18  month, and they were not always -- they didn't always
19  get held once a month. They were canceled quite
20  often. So if he had a senior staff meeting, he might
21  ask me to present, but they didn't follow a schedule.
22   Q. Was there a particular reason for this senior
23  staff meeting that you can recall?
24   A. No. Like I said, he was supposed to have them
25  monthly. And this time he did, he had it this month.

146

1  on this graph?
2    A. No.
3    Q. Is this your management judgment?
4    A. No.
5    Q. Whose management -- excuse me..
6       Whose management judgment is this?
7    A. That's Jay's. So that's the difference
8  between his 210 forecast and this most likely case.
9  If you do the math --
10   Q. Yeah. Okay.
11   A. -- I mean, that's just what it is.
12   Q. And did you have a discussion with Jay about
13  this management judgment number?
14   A. Well, this was presented at his senior staff
15  meeting, so -- I mean, he was aware of it if that's
16  what you mean. You said did I discuss it with him..
17  It was put up on a big screen --
18   Q. Oh, I understand. I'm clearly not being clear
19  then.
20      Did you have a prior discussion with Jay,
21  prior to the presentation in preparation for this
22  presentation, about this $58 million number?
23   A. No.
24   Q. Where did you get the $58 million number from?
25   A. So the worst, most likely, best cases that are

148

1    Q. I would like to refer you to NDCA-ORCL 095911.
2    A. Okay.
3    Q. It says here "We're still pushing an
4  attainment that is higher than the current 'best'
5  case, but have a number of deals not included in the
6  forecasted numbers." What are you referring to in --
7  specifically about those numbers of deals not included
8  in the forecasted numbers?
9    A. Uhm, well, what I was referring to in the
10  e-mail really. Which is there are deals that we
11  collectively think will close or some of them will
12  close but nobody has committed them in their numbers
13  or put the full value of the deal in.
14   Q. And when you say nobody --
15   A. Well, I don't mean nobody. I mean -- there
16  are deals that for whatever reason either the rep or
17  the manager didn't have them reflected accurately in
18  the system at the time. And that's why I have them
19  listed in my e-mail to show her. That you know, some
20  of them might have been in there but not all of them
21  were.
22   Q. And the last line there we see management
23  judgment.
24   A. Uh-huh.
25   Q. Is that management judgment that you've placed

147

1    logged in OSO.

2    Q. Uh-huh.

3    A. So these numbers are pulled right out of OSO

4    at the SVP level, and then it was a comparison between

5    that and the number he has -- had forecasted for each

6    of those regions.

7    Q. So that's just simply the difference between

8    what is most likely or a commit situation; is that

9    correct?

10    MS. KYROUZ: Objection. Misstates the document.

11    THE WITNESS: It's the difference between the most

12    likely case in Oracle Sales Online from his direct

13    reports and his forecast.

14    BY MS. McLAUGHLIN:

15    Q. Okay. Can we go to NDCA-ORCL 095914. And at

16    the top it says "Some of these key deals are..."

17    A. Uh-huh.

18    Q. I just want -- I want to go through each one

19    of them and talk to you about them to the extent you

20    have a recollection of this stuff. Under Healthcare,

21    this HealthSouth number, this is the one you talked

22    about earlier, you said it was never in the pipeline

23    but it closed?

24    A. It showed up in the pipeline at some point

25    during the quarter, I don't remember when. I do

149

1    recall seeing a pipeline report that showed it as a

2    best case deal for $1 million. I don't know when that

3    was, though.

4    Q. Okay.

5    A. But yes. And it did ultimately close for 23,

6    24 million.

7    Q. And the next one, under Comms we had Worldcom.

8    Was this 20 million -- was this deal in the pipeline

9    at all?

10    MS. KYROUZ: Objection. Lacks foundation. Vague.

11    THE WITNESS: I don't recall specifically, but

12    because we saw that other report where I had those

13    comments "not in OSO" it appears that this was not in

14    the system under that quarter at all.

15    There's always a potential that a deal will

16    be put in for a future quarter. And so when you run a

17    report on the current quarter it doesn't show up

18    because someone may try and pull it in but they're

19    still showing it from a different close date. So I

20    don't know if that was the case in this one, but I

21    know at some period of time this was not reflected at

22    all even in the pipeline.

23    BY MS. McLAUGHLIN:

24    Q. Okay. And what about this AT&T deal at

25    15 million?

150

1    A. That one I don't remember.

2    Q. How about Qwest, 15 million?

3    MS. KYROUZ: Same objections.

4    THE WITNESS: I don't remember. And the potential

5    value here, it still doesn't mean, you know, that it

6    wasn't in the system or was. So I don't think these

7    were pulled out of anything.

8    BY MS. McLAUGHLIN:

9    Q. Where did you -- yeah. Where did you pull

10    this information from, do you remember?

11    A. I don't think I pulled this from anywhere.

12    This was more back -- for HealthSouth, for example,

13    that wasn't in there. So in sitting down discussing

14    with these guys, I don't remember how I came up with

15    it; but this is not a system generated number. The

16    value is not a system generated number.

17    Q. Okay.

18    A. So I --

19    Q. Did you have a discussion with Jay Nussbaum

20    about the potential value for these deals?

21    MS. KYROUZ: Objection. Calls for speculation.

22    THE WITNESS: I don't remember..

23    BY MS. McLAUGHLIN:

24    Q. But you got this information from a human

25    being rather than the system; is that correct?

151

1    A. Yes.

2    Q. And it could have been Jay Nussbaum?

3    A. It could have been, but I don't remember if it

4    was. I don't know where -- you know, if he was

5    traveling or what he was doing coming up on his staff

6    meeting. It could have been him or it could have been

7    his directs or it could have been an operations person

8    working for one of his directs. I would have gone and

9    polled people, but I don't recall specifically for

10    this document who I spoke to to get the number.

11    Q. Do you recall offhand how many of these deals

12    actually closed in 3Q?

13    A. Other than HealthSouth, no, I don't recall if

14    any of the others -- I don't recall the other ones.

15    (Sotto voce discussion between Ms. McLaughlin and

16    Ms. Irvine.)

17    BY MS. McLAUGHLIN:

18    Q. Okay. I would also like to have you look at

19    the consulting -- I guess it's the last two pages

20    dealing with the consulting aspect of the business.

21    Down at the bottom it says, "Margins still behind plan

22    resulting from Bell South; a 4 point hit for the year;

23    removal would place OSI at 23 percent FY01 margin."

24    What does the first portion of -- I guess, prior to

25    the semicolon --

152

1    A.  I'm sorry.  What page are you on?

2    Q.  Oh, I'm sorry.  I apologize.

3        NDCA-ORCL 095916.

4        Could you repeat the question?

5    Q.  What did you mean by "Margins still behind

6    plan resulting from Bell South"?

7    A.  We had a development partnership with Bell

8    South to customize the applications for Teleco.  So we

9    were investing consulting resources in that

10   customization effort.

11   Q.  Do you recall that being a problem for the

12   consulting group?

13   MS. KYROUZ:  Objection.  Vague.

14   THE WITNESS:  Yeah.  I wouldn't characterize it as

15   a problem.  It was a joint venture development.  We

16   were working side by side with Bell South to customize

17   our app.  So I wouldn't call it a problem.  The

18   comment there is just since that was something

19   unusual, to make that kind of investment at that, you

20   know, point, you kind of want to comment on what your

21   results would look like without that investment.  But

22   it wasn't a problem.

23   BY MS. McLAUGHLIN:

24   Q.  Do you recall having a reverse revenue at the

25   end of Q3 because of this Bell South consulting

153

1    situation?

2    A.  Yes.

3    Q.  Is that what this ultimately resulted in, was

4    what you're commenting on here?

5    MS. KYROUZ:  Objection.  Vague.  Lacks foundation.

6    THE WITNESS:  So this is consulting revenue.  The

7    reversal was license revenue.

8    BY MS. McLAUGHLIN:

9    Q.  Uhm, okay.

10       Did you -- was there an issue with consulting

11   revenue at the end of Q3 with Bell South?

12   A.  No.

13       I don't remember.  So nothing I remember, no.

14   Q.  Do you recall there being a problem with the

15   implementation of 11i at Bell South?

16   MS. KYROUZ:  Objection.  Vague.  Lacks foundation.

17   THE WITNESS:  No.  I mean, my only recollection of

18   this is that we were trying to customize our

19   applications for telecommunications company and

20   potentially have a reasonable solution for other

21   Telecos.  So it was looking forward sort of

22   development effort as opposed to a problem, as you --

23   BY MS. McLAUGHLIN:

24   Q.  Okay.  So there were some challenges

25   associated with the implementation at Bell South?  Is

154

1    that fair to say?

2    MS. KYROUZ:  Objection.  Misstates testimony.

3    THE WITNESS:  No, that's not what I said.  What I

4    said was we were trying to customize our applications

5    specific to the requirements of the telecommunications

6    industry.  So that's not a challenge, that's just a

7    customization.

8    BY MS. McLAUGHLIN:

9    Q.  And --

10   A.  So, for example, if the government had

11   applications that required specific line item

12   budgeting for, you know -- I don't know, whatever

13   allocations they get from government budgets, you'd

14   have to change -- you'd have to change the code and

15   the applications to specifically deal with government

16   types of issues.  So that's all we were doing here,

17   was trying to set it up so it had the look and feel of

18   what telecommunications, as an industry, wanted.

19   Q.  But isn't it true that there were considerably

20   more consulting revenue being spent in trying to get

21   this implementation done at Bell South than was ever

22   forecast or thought would be necessary because of the

23   problems with the 11i implementation at Bell South?

24   MS. KYROUZ:  Objection.  Lacks foundation.

25   Misstates prior testimony.

155

1    THE WITNESS:  No.  We didn't invest revenue at

2    Bell South.  There was never a revenue issue.  We were

3    putting consultants on a development effort.  I don't

4    recall what the budget for -- if there was ever a

5    budget for the development effort.  That there was --

6    it was not an issue of revenue for consulting.

7    BY MS. McLAUGHLIN:

8    Q.  Or wasting revenue, I suppose, within a

9    consulting sense.  You put --

10   A.  So it was a conscious decision to put

11   consultants on this development effort.  So, to my

12   knowledge, it wasn't considerably more than estimated

13   or any of those kinds of things.

14   Q.  Okay.

15       All right.  Let's move on to Exhibit 27.  Can

16   you review this and identify it for the record,

17   please.

18   A.  This is an update, a forecast update, to

19   Jennifer from me.

20   Q.  Dated February 22nd, 2001?

21   A.  Yes.

22   Q.  Okay.

23   A.  Actually, there's another one stapled to it.

24   Dated January 18th.  That's from a while earlier.

25       And there's a blank page in the middle.  Did

156

1  you intend for that --
2  MS. McLAUGHLIN:  You know what, I didn't.
3  THE WITNESS:  Shall we just pull it off the --
4  MS. McLAUGHLIN:  Yeah.
5  I did not intend for that.
6  THE WITNESS:  So you just want this top sheet?
7  MS. McLAUGHLIN:  Yeah.
8  THE WITNESS:  Okay.
9  MS. McLAUGHLIN:  That is another exhibit we'll get
10  to on its own.
11  Q.  Okay.  So we're -- do you recognize this
12  e-mail?
13  A.  Yeah.  I mean, it looks familiar.  I don't --
14  it's from me to her.
15  Q.  Does it appear to be a genuine and authentic
16  copy of the original?
17  A.  Yep.
18  Although the writing is not mine.  I don't
19  know where that came from.
20  Q.  Okay.  So this --
21  A.  The e-mail itself is mine.  I don't know where
22  the writing came from.
23  Q.  Okay.
24  Do you recognize this writing?
25  A.  No, I don't.

157

1  Q.  Do you see -- no.  You don't recognize the
2  writing so we'll skip that.
3  A.  No.
4  Q.  Next one.
5  This is Exhibit 28.
6  Which was the second page to that previous
7  report.
8  Could you read this and identify it for the
9  record.
10  A.  This is an e-mail dated Thursday the 18th of
11  January to Jennifer from me with my projection as well
12  as Jay's.
13  Q.  Okay.  Does this appear to be a genuine and
14  authentic copy of the original?
15  A.  Yeah.  It's incomplete.  It looks like there
16  was another page at one point but...
17  Q.  Okay.  I don't have the other page so...
18  A.  Okay.
19  Q.  But does this appear to be the genuine,
20  authentic copy of the first page?
21  A.  Yes.  And, again, I don't recognize the
22  handwriting so...
23  Q.  Okay.  When you have your column called "My
24  Projection," what are these -- what do these
25  projections mean to you?

158

1  A.  In the "My Projection" column, that would have
2  been my best guess at his forecast at that point in
3  time.
4  So not his numbers but my own.  So in this
5  case this is my own number.
6  Q.  And where did you derive your position on each
7  of these projections from?
8  A.  I don't remember specifically for this note
9  how I came up with those projections.  You know, I
10  looked at what was out there.  In many cases I'm
11  similar to him.  I'm probably -- again, I don't think
12  I went deal by deal specific, I probably just said,
13  you know, give or take here and there.  And being in
14  finance, was probably trying to be fairly conservative
15  as well.
16  Q.  Did you feel at that time that Jay was being
17  too aggressive with his forecast?
18  MS. KYROUZ:  Objection.  Vague.  Lacks foundation.
19  THE WITNESS:  I wouldn't say that he was being too
20  aggressive with his forecast.  I think in finance
21  we're always a little bit more conservative.  Or try
22  to be.
23  But I wouldn't say that his forecast was
24  unrealistic.
25  BY MS. McLAUGHLIN:

159

1  Q.  Okay.  Did you know that Jay Nussbaum traded
2  $3 million of his stock right around this time?
3  A.  No.
4  Q.  Did you apply to trade any of your stock
5  during Q3?
6  A.  I don't know if I had any stock during Q3.
7  No.
8  Q.  "No"?
9  All right.  So we'll go to Exhibit 29.
10  Could you read this and identify it for the
11  record for me.
12  A.  This is an e-mail out of Jay Nussbaum's
13  mailbox but from his assistant Paula.
14  Just appears to be letting me know that Jay is
15  not going to attend -- it's a Thursday so it looks
16  like it's warning me Jay is not going to attend the
17  Thursday call.  So I had sent him a packet.  He must
18  have been traveling so I sent him a packet, I guess.
19  Q.  Okay.  Does this appear to be a genuine and
20  authentic copy of the original?
21  A.  Yep.
22  Q.  Okay.  Again I want to refer you to the third
23  paragraph in your e-mail itself.  It says, "In short,
24  we kept your 225 forecast although I was clear to
25  Jennifer that we needed many of these large

160

1  opportunities in HiEd and Comms to come together to
2  get there."  Were you feeling at this time uneasy
3  about these large opportunities closing?
4      A.  I would --
5      MS. KYROUZ:  Objection.  Vague.  Lacks foundation.
6      THE WITNESS:  I wouldn't say I was feeling uneasy.
7  I was pointing out that based on what was in the
8  pipeline, I just wanted him to be aware that we would
9  have to close 50 percent of what was in the pipeline.
10  And ultimately, you know, HealthSouth wasn't even in
11  the pipeline then so I didn't even know about it.  So
12  I think it's more, you know, just looking at straight
13  systems things.  And again, he didn't -- I don't think
14  he changed it so...  That was just me pointing out
15  facts to him.  It seemed like my responsibility to let
16  him know "here's what I'm looking at.  If you still
17  agree, we'll keep it where it is."
18      BY MS. McLAUGHLIN:
19      Q.  Did you feel comfortable at this point in time
20  challenging Jay on his forecast?  Given that you were
21  newly in your position there that quarter?
22      MS. KYROUZ:  Objection.  Vague.  Lacks foundation.
23  Calls for speculation.
24      MS. McLAUGHLIN:  Counsel, how does that call for
25  speculation?  I was asking the witness how she felt

161

1  about a certain issue.
2      MS. KYROUZ:  You were saying given that you were
3  newly in your position.
4      MS. McLAUGHLIN:  That's a fact in the foundation
5  of this record.
6      MS. KYROUZ:  Okay.  Calling for her to speculate
7  about that time period.
8      MS. McLAUGHLIN:  Okay.  I didn't ask her to
9  speculate, I asked her how she felt.
10      MS. KYROUZ:  If she can answer.  She'll let you
11  know.
12      THE WITNESS:  I think -- I wouldn't call it
13  feeling uncomfortable.  I mean, it's my job to point
14  out the facts that support his forecast.  Or -- I
15  don't think even now I would use the word "challenge"
16  an EVP on their forecast.  It's my job to point out
17  all the facts.  Say, "Here's what I see.  It's your
18  forecast, do you want to keep it this way or do you
19  not want to keep it this way?"  I don't think I ever
20  would challenge, but I don't think it had anything to
21  do with me being newly in the position or anything
22  like that.
23      BY MS. McLAUGHLIN:
24      Q.  So it wasn't your job to challenge Jay on his
25  forecast, then?

162

1      A.  Not to challenge him, no.  Just to point out
2  what I knew to be fact from looking at the systems,
3  which is what I did here.
4      MS. McLAUGHLIN:  Okay.  We're going to go off the
5  record.  We're at the end of the tape.
6      THE WITNESS:  Okay.
7      THE VIDEOGRAPHER:  We're going off the record.
8  The time is 2:10 p.m.  Here marks the end of Videotape
9  No. 2, Volume 1, in the deposition of Sarah Kopp.
10      (Recess taken.)
11      THE VIDEOGRAPHER:  We are going back on the
12  record.  Here marks the beginning of Videotape No. 3,
13  Volume 1, in the deposition of Sarah Kopp.  The time
14  is 2:19 p.m.
15      BY MS. McLAUGHLIN:
16      Q.  Okay.  I'm going to -- we were talking before
17  the record -- before we parted from the record about
18  the Bell South implementation of 11i.  And I think you
19  said you didn't remember whether they were -- the
20  customer Bell South was having problems with the 11i
21  implementation.  And I'm going to give you a document
22  that I hope refreshes your recollection and we can
23  talk about it.  This is Exhibit 55.
24      I'm sorry.
25      A.  That's okay.

163

1  And this is a big document.  For the record
2  it's NDCA-ORCL 621793 through 621828.  And it is
3  entitled "Oracle USA Q3-FY01 Top 20 License Contracts
4  Revenue Recognition Review."
5      Do you recognize this document?
6      A.  No.
7      Q.  I'm going to refer you to a page, 621808.
8  It's actually page 16 of the document.
9      And it is the -- well, actually, let's just
10  start at the 621807, which is the beginning.  It's the
11  Bell South Technology Services.  And earlier we
12  discussed the 6.7 million that was reversed out of the
13  quarter.  Could you please read this Bell South
14  portion, please.
15      A.  This whole thing?
16      Q.  Yeah.
17      A.  This whole two pages?
18      Q.  Yeah.  It's three actually.
19      MS. KYROUZ:  To yourself.
20      THE WITNESS:  To myself.  Okay..
21      MS. McLAUGHLIN:  Sorry.
22      THE WITNESS:  I thought you wanted me to read it
23  out loud.  I'm, like, okay.
24      MS. McLAUGHLIN:  Sure, we'd all just love to hear
25  it.

164

| | |
|---|---|
| 1    (Witness reviews document.) | 1    A. So my team has nothing to do with this. |
| 2    THE WITNESS: Okay. | 2    Q. Fair enough. Okay. |
| 3    BY MS. McLAUGHLIN: | 3    A. Yeah. |
| 4    Q. Okay. Does this refresh your recollection of | 4    Q. Okay. Exhibit 35. |
| 5    what was going on with the Bell South's consulting and | 5    Do you recognize this report? |
| 6    the 11i implementation? | 6    A. Yes. |
| 7    MS. KYROUZ: Objection. Lacks foundation. | 7    Q. Was this report produced by you or someone in |
| 8    THE WITNESS: No. I mean, I've never seen this | 8    your group? |
| 9    document before so I can't say it refreshes my memory | 9    A. Yes. |
| 10   because I don't have any -- there was never -- I never | 10   Q. Okay. Is this a genuine and authentic copy of |
| 11   had all of this information. | 11   the original? |
| 12   BY MS. McLAUGHLIN: | 12   A. It appears to be, yeah. |
| 13   Q. So you were never part of this? | 13   Q. Was this the responsibility of your group, to |
| 14   A. No. | 14   prepare this report? |
| 15   Q. In your position as the OSI finance director | 15   A. Yes. |
| 16   at the time, were you supervising the -- well, who | 16   Q. Okay. Was it prepared in the regular course |
| 17   would have -- actually, that's a better question. | 17   of your business at Oracle? |
| 18   Who would have been involved with the revenue | 18   A. Yes. |
| 19   recognition of a specific deal in OSI? | 19   Q. Okay. |
| 20   A. I don't know who was running revenue | 20   And was it your regular practice to prepare |
| 21   recognition at the time, but we have a separate | 21   this report? |
| 22   revenue recognition organization. The field finance | 22   A. Yes.. |
| 23   people do not participate in deciding whether revenue | 23   Q. Okay. Let's just move on. |
| 24   will be deferred. | 24   Now we're going to have a litany of reports |
| 25   Q. Okay. So that's -- | 25   again. Not all together this time. |
| 165 | 166 |
| 1    A. Okay. | 1    Q. Uh-huh. |
| 2    Q. Okay. This is 33. | 2    A. -- appears to be an end of quarter projection |
| 3    How many pages do you have in 33? | 3    versus forecast for Q3 FY01. So that's an end of |
| 4    A. Just one. | 4    quarter projection.. |
| 5    Q. Is it Bates range 409902? | 5    Q. Okay. So this should be a standalone |
| 6    A. Yes. | 6    document? |
| 7    Which appears to be the same as 157870 from | 7    A. This is a standalone, yeah. |
| 8    the previous -- just about. Well, not quite. It's a | 8    Q. Okay. Then let's just -- |
| 9    subset of that page. | 9    A. Actually, they all are. |
| 10   Q. Okay. Do you have -- you only have one page? | 10   Q. They're standalones. |
| 11   A. Yes. | 11   A. They're not connected. Not in any way I |
| 12   Q. Okay. Then those two pages, I think, are the | 12   can -- |
| 13   remainder of her -- | 13   Q. Okay. Well, then let's -- I will still leave |
| 14   MS. KYROUZ: No, these are 902s also. | 14   it as one exhibit. We'll just talk about it -- |
| 15   MS. McLAUGHLIN: Well, I wanted 902, 903, and 904 | 15   A. Separately. Okay. |
| 16   so let's just put that one aside right now, and I'll | 16   Q. The first page, do you recognize this |
| 17   have her make a full 33 for you, and we'll move on to | 17   standalone report? |
| 18   34. | 18   A. Yeah. I don't remember preparing it, but it |
| 19   Q. Here's 34. | 19   looks like something we would have prepared. |
| 20   Could you read this over and identify it for | 20   Q. Okay. So you do believe that it was produced |
| 21   the record. What this report is. | 21   by you or someone in your organization? |
| 22   A. It looks like it's two or three -- it's a | 22   A. Me or someone in my group, yeah. |
| 23   whole bunch of different reports, to be honest with | 23   Q. Okay. |
| 24   you. These things all don't -- they're not from the | 24   Does it appear to be a genuine, authentic copy |
| 25   same thing. Because the first page -- so 090693 -- | 25   of what the original was? |
| 167 | 168 |

1    A. Yes.

2    Q. Was it your group's responsibility to prepare

3  this report?

4    A. I don't know.

5      I don't know if I put it together on my own or

6  if anybody asked me to put it together.

7    Q. Okay.

8    A. It's not a periodical sort of report.

9    Q. Okay.

10      Do you do this at the end of each quarter?

11    A. I generally do something like it at the end of

12  each quarter.

13    Q. Okay. Then let's look at the second document,

14  which is NDCA-ORCL 090694.

15    A. Okay. And this is one page of a forecast, an

16  OSI License and Consulting Forecast from Week 13 of Q3

17  FY01. But it's not the full pack, it's just a page

18  from the pack.

19    Q. Do you believe that either you or someone in

20  your group produced this?

21    A. Yes.

22    Q. Does it appear to be a genuine and authentic

23  copy of the original?

24    A. Yes.

25    Q. Okay.

169

1    A. Aside from being incomplete, yes.

2    Q. Was this part of your responsibility to

3  prepare this?

4    A. Yes.

5    Q. And did you regularly prepare this in the

6  course of your business at Oracle?

7    A. Yes.

8    Q. Was it your practice to produce this kind of

9  document?

10      This document. I'm sorry.

11    A. Yes.

12    Q. Let's go to the third document. That's

13  NDCA-ORCL 090695. Do you recognize this document?

14    A. Yes. I mean, it looks familiar. Again, it

15  doesn't look like something I had done maybe more than

16  once; but it does look like mine.

17    Q. Okay. So you believe that either you or

18  someone in your group produced this document?

19    A. Yes.

20    Q. On or about --

21    A. It would have been on or about the end of Q3

22  because it looks like I have a Q -- it looks like I

23  have a sort of end of quarter view at it.

24    Q. Okay.

25      And then let's move on to the last one. Do

170

1  you recognize this last page, which is

2  NDCA-ORCL 090696?

3    A. I recognize it. It's not prepared by my

4  organization.

5    Q. What is your understanding of what this report

6  represents?

7    A. This is from what we used to call the oatmeal

8  book. Which is the consulting end-of-quarter finance

9  pack. We used to call it oatmeal book because it had

10  an oatmeal colored cover. This came out of corporate

11  finance.

12    Q. Okay. All righty.

13      (Addressing Ms. Irvine) Did you bring --

14  MS. IRVINE: The one I just copied.

15  MS. McLAUGHLIN: That's your first page, but let

16  me give you the other two pages.

17      Can I have that back?

18      (Counsel staples document together.)

19    Q. Do you recognize Exhibit 33?

20    A. Is it supposed to be three pages or four? It

21  looks like -- I have the same thing twice.

22  MS. KYROUZ: So do I.

23  MS. McLAUGHLIN: This exhibit --

24  THE WITNESS: 902, 902, 903, 904.

25  MS. McLAUGHLIN: Okay. I have 902, 903, 904 so

171

1  let's just --

2      THE WITNESS: I just have two 902s. That's all.

3      MS. McLAUGHLIN: I have one that is nicely

4  highlighted for you.

5      Do we have one that's complete?

6      MS. IRVINE: She has one that's complete, right?

7      THE WITNESS: It's complete, it just has an extra

8  sheet in it.

9      MS. KYROUZ: Why don't you just pull out the extra

10  902.

11      MS. McLAUGHLIN: Oh. Okay. Yeah, that works.

12  Thanks.

13      THE WITNESS: We'll just clip it.

14      Okay. There we go. So four.

15  BY MS. McLAUGHLIN:

16    Q. So do you recognize this report?

17    A. Yep. Yes.

18    Q. Do you believe that either you or someone in

19  your group produced this report?

20    A. Yes.

21    Q. On or about the time that's in the front of

22  the report?

23    A. Yes.

24    Q. Does it appear to be a genuine and authentic

25  copy of the original?

172

Kopp, Sarah  6/14/2006  9:02:00 AM

1   A. Yes.

2   Q. Was it your group's responsibility to prepare

3   this report?

4   A. Yes.

5   Q. Did you prepare this report in the regular

6   course of your business at Oracle?

7   A. Yes, I did.

8   Q. Was it your practice to produce this report?

9   A. Yes.

10   Q. Can we go to the last page of the report,

11   which is 409904.

12   A. Uh-huh.

13   Q. Could you explain to me what these two --

14   these two charts represent?

15   A. Sure.

16   MS. KYROUZ:  Can I just object with respect to the

17   document that's three pages, they're numbered pages 4,

18   5 and 6.  It's just not clear that this is the

19   entirety of the report.

20   MS. McLAUGHLIN:  Okay.

21   MS. KYROUZ:  Just for the record.

22   THE WITNESS:  It is a Q4 Fiscal Year '01

23   Consulting Order Bookings Forecast, which is not

24   revenue.  Consulting will book the deals then and burn

25   them down, right?  So the top box shows just for the

173

1   current quarter, which says it's Q4 fiscal '01.  The

2   bottom box is what would it be for the full year

3   assuming that Q4 forecast.  So it's year to date as of

4   Q4.

5   MS. McLAUGHLIN:  Okay.

6   THE WITNESS:  Bookings, backlog, book to bill.

7   MS. McLAUGHLIN:  Okay.  Thank you.  That helps.

8   THE WITNESS:  Uh-huh.

9   BY MS. McLAUGHLIN:

10   Q. Then for -- then let's go to the page prior to

11   it, 409903.

12   A. Okay.

13   Q. And not to belabor this, but the bottom says

14   JHN forecast?

15   A. Uh-huh.

16   Q. That's Jay Nussbaum's?

17   A. Yes.

18   Q. What does -- whose management judgment is

19   that?

20   A. That's Jay's.

21   Q. Okay.

22   A. So we're back to license, though; right?

23   Q. Yes, we are back to license.  Yes.

24   A. All right.

25   Q. So he's actually giving a negative management

174

1   judgment for state and local and for higher education?

2   Is that what that indicates --

3   A. Yes.

4   Q. -- in parens?

5   A. Yes.

6   Q. Okay.

7   I'm trying to get you out of here so you can

8   make your flight.

9   This is Exhibit 36.

10   Do you recognize this?

11   A. Yeah.  I recognize it.

12   Q. What is this report called?

13   A. This is another version of the -- well, hold

14   on.  The first one, two, three -- four pages are -- is

15   another version of the big deals list.

16   Q. Did you or someone in your group prepare this

17   report?

18   A. Someone on my group would have, although I

19   can't tell what date this was done.  I'm just -- I'm

20   going from the heading that it is Q3 '01, not Q3 of

21   '00 or anything like that.

22   Q. Right.

23   A. Yeah, I don't know.

24   Q. Do you know if this kind of report was

25   prepared for each forecast schedule period?

175

1   A. I don't know.

2   Q. Do you know what the last page -- you said

3   that the first four was the big deals list.

4   A. Yeah.

5   Q. I'm sorry.  What do the last two pages consist

6   of?

7   A. This is a -- I think they're identical.

8   Unless I'm wrong.  I think they're the same.

9   MS. KYROUZ:  Yes, they're a duplicate.  You are

10   right.

11   THE WITNESS:  Then it is -- it shows the forecasts

12   we have submitted in the 210 there.  How many deals

13   are projected as won in the system.  And then how much

14   is left to get to that forecast, and then how much

15   pipeline is still open.  And then if you were to weigh

16   the pipeline.  So by weighing the pipeline, I mean to

17   the extent we have deals reflected in Oracle Sales as

18   we talked about earlier, there is a probability field.

19   So, you know, the sums of all those probabilities

20   against the total open pipe --

21   BY MS. McLAUGHLIN:

22   Q. Now, when --

23   A. -- get a weighted pipe.

24   Q. Sorry.  Didn't mean to interrupt you.

25   When you say there's a probability range for

176

Kopp, Sarah  6/14/2006  9:02:00 AM

1    those fields --
2       A. There's a probability field within the OSO
3    system.
4       Q. Okay.  And does that go -- does that go from
5    0 to 100 percent?
6       A. Yes.
7       Q. And do you know if there are assigned values
8    to each of the probabilities that could be placed
9    inside?  Or placed on the system?
10      A. I'm not sure I follow your question.
11      Q. Like a 10 percent probability?
12         Is there a definition of what 10 percent
13   probability means in, I guess, layman's terms?
14      A. At some point some sort of definition was put
15   together; but it was mostly communicated to the sales
16   teams, and I don't know if it was during this quarter
17   or something afterwards.  I know it happened at some
18   point; but, again, I don't know if it was during this
19   quarter or if it was later that there was actually
20   some sort of published definition that says here's
21   what you should be doing if your probability is X, Y,
22   and Z.
23      Q. Okay.  So when you say open pipe, that means
24   that the difference between the deals that have closed
25   in the pipeline and what's still out there remaining?

                                                    177

1       A. Yes.  So this would be the instance where the
2    pipeline does not include deals that have booked,
3    where you specifically call it open pipeline, yeah.
4       Q. Okay.  And the weighted pipeline is whatever
5    the open pipeline is with the weights applied to them?
6       A. That's right..
7       Q. The probabilities applied to them?
8       A. That's right.
9       Q. And could you explain to me the weighted pipe
10   percentages?  Or maybe I didn't let you get there.
11      A. I think in this instance they would have taken
12   all the deals that were in OSO, added them -- each
13   deal would have its own probability assigned to it,
14   okay?  Then -- so if there was a $10 million deal and
15   it had an 80 percent probability, then it would be
16   8 million.  And all of those values would be added up,
17   and then this percentage would be the -- it's just the
18   math.  So you take the total pipe, and then you'd add
19   up all those values you got by weighing your deals,
20   and that's the percentage you would come out
21   with.
22      Q. Okay.  And when you -- those big deal lists
23   and reports --
24      A. Uh-huh.
25      Q. -- would there be an instance where you would

                                                    178

1    actually print them out with their probability ranges
2    on them?
3       A. Uhm, it wouldn't be a probability range so --
4    the probability is a set field.  You can't put a
5    range, you have to pick one..
6       Q. Oh, okay.  And what is it that you would pick
7    from?
8       A. Well, anything from 0 to 100.  You just can't
9    put a whole range in, you have to say it's 60.  You
10   can't say it's somewhere between 60 and 80.
11      Q. Okay.
12      A. You have to say what it is.
13      Q. And does it go by 10 percentage points each
14   incrementally?
15      A. I think so.  I think so.
16      Q. These -- go ahead.  I'm sorry.  I had a
17   question out to you.
18         Was there -- would there be an instance where
19   you would print these sort of big deal lists or
20   reports out with the probability assigned to each deal
21   on it?
22      A. I think there was a version of this big deals
23   list that had probability as a column.
24      Q. And --
25      A. As I say, it moved around a lot in terms of

                                                    179

1    its format; but I think there was a version that had
2    probability attached.  I just don't remember when.
3       Q. And would this report here that we have that
4    says February 23rd, '01, the license status, was this
5    report produced periodically?
6       A. Uhm, I don't know.  I don't remember how often
7    this one was done.  I mean, it would strike me that it
8    would be somewhat irrelevant earlier in the quarter
9    so...
10         I think -- I think probably nearing the end of
11   the quarter it might have been, but I don't know.
12      Q. Okay.  Would this type of information have
13   been stored on your laptop?
14      MS. KYROUZ: Objection.  Vague.  Calls for
15   speculation.
16      THE WITNESS: -- yeah.  If I had a copy of it, I
17   would have stored it on my laptop.  Again, with this
18   one I really don't know what time frame this is
19   looking at so...
20      BY MS. McLAUGHLIN:
21      Q. Do you have the ability, as we sit here today,
22   to retrieve any Q3 data on your computer?
23      MS. KYROUZ: Objection.  Vague.
24      THE WITNESS: Uhm, I'm not sure.
25      BY MS. McLAUGHLIN:

                                                    180

1    Q. Has anyone asked you recently to search for it
2   or print out --
3    A. Not recently. Not since before the other
4   deposition.
5    Q. Okay.
6      When you said -- when you said someone took
7   your laptop and I guess they retrieved what they
8   needed to, did they give you back your laptop and then
9   you just still had that information on your laptop?
10   Or did they remove that information from your laptop?
11    A. Oh, I still had it on there because I was
12   later asked to put things out on our Files Online
13   system, so I went and searched for things then. So I
14   still did -- aside from the fact that they took my
15   computer, I did a search myself and put out everything
16   I could find on Q3.
17    Q. Do you know what has happened with all of that
18   information as we sit here today?
19    A. To my knowledge, it's still out there.
20    Q. And so --
21    A. On our Files Online system, it's still on
22   there.
23    Q. On your Files Online system.
24      And that would be where that sort of, is it
25   fair to say, archived information would be?

1    MS. KYROUZ: Objection. Vague. Lacks foundation.
2    THE WITNESS: That particular information I was
3   asked to go put in a particular folder. So I don't
4   know that I can say all archived information is there.
5   That information is there because I was asked to put
6   it there.
7    BY MS. McLAUGHLIN:
8    Q. And when you say that information, was it the
9   forecast -- the contents of your forecasting file for
10   Q3?
11    A. Of '01.
12    Q. Yes, of '01.
13    A. Yes.
14    Q. Okay. Let's move on..
15      Here's 37.
16      Do you recognize this document?
17    A. No.
18    Q. Is this something that would have been
19   prepared or produced by your group?
20    A. No.
21    Q. Do you know what this document is?
22    A. Well, from the title; but I've never seen it
23   before to my knowledge. I mean, I certainly don't
24   remember ever seeing it. And it includes information
25   outside of my organization, even outside of my

1   division because it's got Latin America on here.
2   So...
3    Q. Well, I guess my question was going to be if
4   you did prepare it, would you have prepared one for
5   Q3; but you didn't prepare this for Q2 so...
6    A. I did not. This is all of Americas. This
7   would have been done at a much higher level than me.
8    Q. Do you ever recall seeing one for Q3?
9    A. No.
10    Q. Okay. We'll move on.
11      Okay. In that vein of the ability to retrieve
12   data on the database that your files were transferred
13   to, here is Exhibit 53.
14      Do you recognize these -- this report?
15    A. It looks like another version of a big deals
16   report; but, again, it's not dated.
17    Q. Right. And do you see the top right-hand
18   corner -- I guess it's -- if you put it in the
19   proper way to view it. 6/5/2006?
20    A. Yeah.
21    Q. Were you asked to print this report out?
22    A. No.
23    Q. Does this header look to you as though it was
24   printed from Oracle? Files Online?
25    A. I can't tell. Files Online, all it does is

1   store Excel or Power Point or any other kind of files
2   out somewhere where more than one person can access
3   them. So it wouldn't have any kind of a header on it,
4   it's just an Excel file. You can open it as if it was
5   on your desktop.
6    Q. Okay. Do you recall this report ever being in
7   this form on your files?
8      In your files. Sorry.
9    MS. KYROUZ: Objection. Vague. Lacks foundation.
10   THE WITNESS: Actually, I don't. It doesn't
11   look -- it doesn't look all that familiar. But it
12   might have been printed differently. I don't know.
13   It does look like a version of the big deals forecast,
14   but it's not all that familiar to me. Especially as
15   you get farther out into the file.
16    MS. McLAUGHLIN: Okay. Put that aside.
17    Q. Okay. This is Exhibit 31.
18      I would ask you to page through this and then
19   identify what this is for the record, please.
20      And I apologize, there's blank pages in here
21   for some odd reason.
22    A. Okay. It's a series of e-mails from me to
23   Jennifer Minton between the 27th and the 28th of
24   February 2001, with updates as to status of where we
25   think we're going to close.

1      Q.  Does this appear to be a genuine and authentic
2   copy of the original e-mails?
3      A.  Yes.
4      MS. KYROUZ:  I'll just note for the record that
5   the documents appear to be unrelated.  It appears to
6   be just a compilation of the e-mails.
7      MS. McLAUGHLIN:  Well, actually, I believe it
8   looks like it's a string of e-mails, that all -- that
9   are either the responses or forwards all to each
10   other --
11      THE WITNESS:  I don't think so.  Because I didn't
12   keep sending her a table on top of an old table on top
13   of a -- it's separate e-mails.
14      There's a couple of them in here that I took
15   an old e-mail and then forwarded to her, but it's not
16   all one string.  And what I was doing, in some of
17   these cases I was sending Jay an update and then
18   forwarding my update to Jennifer.  But in other cases
19   it was just an e-mail to her.
20   BY MS. McLAUGHLIN:
21      Q.  Okay.  Well, I actually just want to talk to
22   you about the first page.
23      A.  Okay.
24      Q.  In the chart we have -- state and local has
25   "state of New York NOT in projection."

185

1      A.  Uh-huh.
2      Q.  And then we have "Fidelity back to life NOT in
3   projection."  Is that what it says?
4      A.  That's what it says.  What it seems to say,
5   yes.
6      Q.  And then "CSFB still unlikely NOT in
7   projection."  "Lucent - IN projection," "Qwest - IN
8   projection," "Sprint - NOT IN projection."  When you
9   say "not in projection," what are you referring to?
10      A.  I'm talking about my projection.  At the top I
11   say "Jay, updated.  Now includes my projections."  So
12   there's a column in there that is hard to read but I
13   think says "my projections" at the top.  So I'm
14   telling him which deals I am not including at that
15   point.
16      And I say that at the bottom.  I say, "so, I'm
17   not counting New York, Fidelity, CSFB or Sprint in my
18   current projection."
19      Q.  Okay.  And so with your projection, is your
20   projection the one that ends in 112?
21      A.  That's not the total.  That's my projection
22   for Comms/Utilities.  The total is illegible.
23      Q.  Oh, it is illegible.  It looks like it says
24   225.
25      A.  I can't read it.

186

1      Q.  Do you recall what that number was?
2      A.  No.  We can probably add them up and figure it
3   out.
4      Q.  Yeah.
5      A.  I hope it fits.
6      It would be 225.  That's what they all add up
7   to.
8      Q.  In the Comms/Utility it has in the forecast
9   column 57, and your forecast is 112?
10      A.  Yes.
11      Q.  Where were you getting these -- this number?
12   What deals were you deriving this number from?  Do you
13   recall?
14      A.  I think primarily from Lucent and Qwest.  Now,
15   I don't know if some portion of Lucent and/or Qwest
16   was already in the forecast.
17      Q.  Uh-huh.
18      A.  Because it's not an all in or all out kind of
19   a thing, sometimes they forecast a piece of it.  But I
20   clearly had said there I'm counting Lucent in my
21   projection, and to my knowledge, to the extent it was
22   in the forecast, it was in for a much smaller amount.
23      Q.  And -- okay.  Then let's, I guess, look back
24   to the end one or close to the end.  When you move
25   your projection down to 175.  It's on page

187

1   NDCA-ORCL 03476.
2      Do you see that?
3      A.  Uh-huh.
4      Q.  What between, in that one day, caused you to
5   lower it in half from 112 to 61?
6      A.  I'd have to go back and look at all the
7   different sheets because -- I don't know if they're
8   sequential, but if they reflect all of my updates sort
9   of one thing after another would have happened.  We
10   would have to put these in order and see how we got
11   there.  I don't recall off the top of my head.  I do
12   know Lucent didn't book.  And there's no reference to
13   Lucent in here.  So the one thing I could probably say
14   with some certainty is that Lucent fell out.  But I'm
15   sure I say that somewhere in here.
16      Q.  Okay.  Well, if you don't otherwise say what
17   didn't book in here -- so Lucent is one off the top of
18   your head that didn't close that you remember --
19      A.  That one, off the top of my head, I remember
20   didn't close.  But, you know, when I send her updates
21   every two hours, I'm not going to repeat the same
22   stuff over and over.  I'm going to say here's what's
23   changed from my last update.  So there were updates in
24   between these two in which -- you know, I wouldn't
25   have just neglected to tell her how I got to 61.  She

188

Kopp, Sarah  6/14/2006  9:02:00 AM

1 would see it sequentially throughout all of these.
2    Q. Well, I guess what my question is is all of
3 these deals that fell out in this last day, these are
4 the sort of larger deals that seem to be in comms, in
5 telecoms, why -- when these were not forecasted -- in
6 fact forecasted in the beginning of the quarter, what
7 happened to the deals that were forecasted at the
8 beginning of the quarter to reach your original
9 forecast?  Given that these weren't ever -- and the
10 size and the nature that they were at the end of the
11 quarter, they were never in the forecast in that
12 matter.
13    Like you said -- and I acknowledge that you
14 said that Lucent may have been in for some smaller
15 number and forecasted and some of the other ones would
16 have been forecasted, but we had these large deals at
17 the end, they were forecasted to have these large
18 closing numbers, they fell out so they didn't make the
19 quarter, but what happened to the forecasted deals?
20    MS. KYROUZ:  So -- objection.  Misstates the
21 record, the testimony, and her prior testimony and the
22 document.  With respect to the use of forecast, it's
23 vague.
24    THE WITNESS:  Okay.  So the forecast itself -- so
25 now I'm referring to the $225 million Jay forecast at

189

1 the beginning of the quarter and deals that are not in
2 the pipeline or showing up in the pipeline are not the
3 same thing.  So at the very beginning of the quarter
4 Jay had assumed that some portion of these deals would
5 come in, and they did make up his $225 million
6 forecast.  He looked across the business, and whether
7 or not something was reflected in OSO in the pipeline
8 or was reflected for the right amount in the pipeline,
9 which certainly Lucent never was, he knew, you know,
10 what was out there as potential opportunity and he
11 assumed that some percentage of those would close.
12    So when you go back and look at his -- you
13 know, the judgment that he was carrying, he always had
14 pieces of these in the forecast.
15    MS. McLAUGHLIN:  Right.  And I understand that.
16    THE WITNESS:  In his forecast.
17    But in OSO they were never there, and OSO
18 never added up to a $225 million forecast.
19 BY MS. McLAUGHLIN:
20    Q. Which is why none of this adds up, and which
21 is why I'm asking these questions.  Because if it's a
22 surprise you didn't make your numbers at the end of
23 this quarter because these large deals that were never
24 forecasted for at the beginning of the quarter --
25    A. They were forecasted.

190

1    Q. Not at that amount.
2    MS. KYROUZ:  Objection.  Misstates testimony.
3    THE WITNESS:  It's the use of the word "forecast."
4 Okay?  The $225 million forecast that Jay had in
5 always assumed these -- or always assumed some portion
6 of these would close.
7 BY MS. McLAUGHLIN:
8    Q. Some portion of them would close?
9    A. Yeah.
10    Q. Because --
11    A. And still did.  Had they all closed, we would
12 have been at 288 or 300 million.
13    Q. Right.
14    A. Yeah.  So he always assumed some percentage of
15 them would close and --
16    Q. But you ended up at 155.  Which is far below
17 what you had originally forecasted.  So --
18    A. That's true.
19    Q. When you're originally forecasting -- my
20 question to you is what -- where did those deals go
21 that were originally forecasted, even if some smaller
22 portion of these large deals at the end that were held
23 back, I guess, until the end of this -- these last two
24 weeks --
25    A. They were not held back.

191

1    Q. Well, they never appeared in the forecast;
2 isn't that correct?
3    MS. KYROUZ:  Objection.  Misstates testimony.
4 Asked and answered.
5    THE WITNESS:  That's not correct.  They never
6 showed up on reports that were pulled directly out of
7 the system.  And not all of them never showed up.  In
8 fact, most of them showed up at some point.  But they
9 were in -- most of these were in -- were in his
10 number.  So forecast and what's in the pipeline are
11 not the same thing.  The pipeline is a list of deals
12 that people are accounting for in the system.  In
13 Oracle Sales online.  They're listing deals that are
14 out there that they might be going after.  Jay is
15 looking at that, along with what he knows in terms of
16 the opportunity that's out there, and he is pegging a
17 forecast.  And he, in his $225 million forecast,
18 Day 1, he knew Lucent was out there; and he had been
19 working that deal all quarter.  So it didn't --
20 because the $225 million forecast -- well, let me put
21 it another way.  Because the pipeline may not have
22 included the full values of these deals does not mean
23 that they weren't in Jay's forecast.  They were always
24 in his forecast.
25 BY MS. McLAUGHLIN:

192

Kopp, Sarah  6/14/2006  9:02:00 AM

1  Q. They were always part of his entire 225
2  forecast or part of his management judgment in the
3  forecast?
4     And I ask you this because you -- and correct
5  me if I'm wrong.  You testified earlier that this
6  commit number comes from what the sales reps put in to
7  OSO.
8  A. And the commit number was 120 million if
9  memory serves, without any of those.
10  Q. Right.  But then we have -- when you say Jay
11  has these deals in his forecast, so that's a part of
12  his management judgment?
13  MS. KYROUZ:  Objection.  Misstates testimony.
14  MS. McLAUGHLIN:  Because I don't understand where
15  you get to when you have sales people saying these are
16  the deals that we have versus the deals that may be
17  out there, may not be out there; and then you make
18  your forecast; but then, in the end it really just
19  turned out to be what the deals were in the pipeline.
20  You know, the original ones --
21  MS. KYROUZ:  Objection.
22  MS. McLAUGHLIN:  -- that were in there.  And I'm
23  just wondering --
24  THE WITNESS:  And I'm not sure that's true.  First
25  of all, HealthSouth was never in the pipeline, never

1  anywhere, showed up and booked for 23 million on the
2  last day of the quarter.
3  BY MS. McLAUGHLIN:
4  Q. Right.  And you would agree that that was not
5  part of your original forecast?  So you were never
6  relying on that deal to make your forecast; is that
7  correct?
8  A. Not on HealthSouth, no.  But that doesn't mean
9  we weren't relying on any of these other ones.
10  Q. Okay.  So you don't know what really happened
11  to --
12  A. And, again, I never listed HealthSouth in a
13  big deals list because it wasn't in OSO.  To the
14  extent Jay knew all quarter that that deal was being
15  worked on and put it in his projection for healthcare,
16  again, he was closer to the deal so he would have
17  forecasted some portion of that.  If he thought it was
18  going to close.
19     So they could go either way, I mean.  And he
20  was close to those deals.  I didn't know about
21  HealthSouth but he did.  And he had it in his
22  projections all along maybe.  I don't know.
23     But they're not -- to say that a rep -- first
24  of all, on a $36 million deal you're not going to have
25  a lonesome field rep chasing it on his own.  Jay

193                                                  194

1  Nussbaum was personally working that deal along with
2  the VP for Teleco.  So that deal was -- it's not a
3  little entry level rep in there telling Jay Lucent's
4  not going to close.  Jay was with Lucent the day
5  before the last day of the quarter.
6  Q. Do you recall if Larry Ellison was with
7  Lucent?
8  A. I have no idea.  No idea.
9  Q. Do you recall if Larry Ellison had any direct
10  involvement in the large deals that didn't close at
11  the end?
12  A. No.
13     And I don't know what extent Jay was involved
14  in the other ones, but I do recall him actually going
15  to Lucent.
16  Q. To Lucent.
17     All right.  Put that one aside.
18     At some point in the quarter were you
19  concerned that the deals that were in OSO were not
20  closing and that you became more heavily dependent on
21  these large swing deals that didn't close in the end
22  of the quarter?
23  MS. KYROUZ:  Objection.  Vague.  Lacks foundation.
24  BY MS. McLAUGHLIN:
25  Q. Do you recall that?

1  A. Uhm, no.  And it seems like two or three
2  different questions all wrapped into one question.  I
3  mean, was I concerned that -- that deals weren't
4  closing?  No.  Maybe as of midnight on the 28th I was
5  concerned that deals weren't closing.  I don't know
6  when you're talking about when you say at some point
7  in the quarter.
8  Q. At some point in the quarter when the deals
9  that were listed in these big deal reports -- because
10  many of them didn't close in addition to the large
11  ones.  When those don't close during the quarter, did
12  that cause you concern?
13  A. At what point?
14  Q. When they weren't closing.  These --
15  A. In January?  I mean -- so, typically, the
16  larger transactions in a quarter all go until the last
17  two days.  Typically.  They still do.  Because they're
18  in intense negotiations, they're trying -- the
19  customers are trying to get higher discounts.  And in
20  reality our customers are trained not to deal with us
21  until the end of the quarter because they think they
22  can get a better deal.  Whether or not they can.  So
23  the larger transactions very rarely close earlier in
24  the quarter.  Very rarely.
25  Q. And -- or -- it is the large transactions

195                                                  196

1 that -- the big deals that are above 500,000 in your
2 sheet, there are several of those --
3   A.  Uh-huh.
4   Q.  -- that didn't close as well.  I understand
5 that these large ones, ones that would be in the last
6 two weeks -- Lucent was at some point forecasted
7 36 million as you said; but all of those deals that
8 were, you know, just above 500,000 or 2 million or
9 3 million.  When those deals started not closing in
10 January, did that concern you?
11   A.  No.
12   Q.  And is this because you believed Jay, that
13 these larger deals would close at the end of the
14 quarter?
15   A.  It's because -- not just the larger deals, but
16 we typically see, I don't know, 65 percent or more of
17 the revenue come in in the last couple of weeks.  The
18 only stuff you see come in in December or January,
19 really, are very -- you know, the telesales kind of
20 transactions that are phone sales that start to build
21 up.  But we don't -- we rarely get concerned with
22 close rates at that point in the quarter.
23   Truly, most of it comes in later.  That's why
24 we don't -- you know, these days we don't even do
25 status update calls until two about three or four days

197

1 out.  We just don't.
2   Q.  Okay.  This is Exhibit 42.
3   MS. KYROUZ:  And how many pages?
4   MS. McLAUGHLIN:  It's just one page.  I threw them
5 all at you by accident.  I apologize.
6   Q.  Can you identify this document for me?
7   A.  It is a page that I used to do for him.  And I
8 don't know when I started doing it because I remember
9 trying to create something that would be helpful to
10 him.
11   But this one's not dated, so I don't know if
12 it's -- what quarter it's for or anything.
13   Q.  Uhm --
14   A.  But it's a sheet that lists the deals that
15 according to OSO are in the "likely" case.  Or in the
16 likely bucket.  And then a list of other deals that
17 are out there, that are in the upside bucket.
18   Q.  Okay.  And would this report ordinarily have a
19 date on it?  If you -- when you prepared it?
20   A.  Maybe not initially.  Like I say, I think I
21 created this for Jay, and I don't even know what
22 quarter I created it in.
23   You know, were I to create something like this
24 now, I'd probably put what forecast week underneath;
25 but this might have been an early genesis of this

198

1 thing.
2   Q.  Okay.
3   Let me give you -- but you do believe you
4 prepared this or someone in your group prepared this?
5   A.  Yes.
6   Q.  And does it look like it's a genuine and
7 authentic copy of the original?
8   A.  Yeah.
9   Q.  Sorry.
10   A.  I see now I have a title on top of it.  Like I
11 say, I was playing around with the format.
12   Q.  That's what was my question.  Is this a
13 similar report to what --
14   A.  Yeah.  It looks like sort of the same report,
15 only I'm trying to change it around.  Maybe to make
16 him like it or whatever.
17   Q.  Is there a way you can discern the date on
18 this report?
19   A.  No.  Other than I think the 320 was his
20 forecast in Q4.
21   Q.  In Q4?
22   A.  I think all this was after Q3.
23   Yeah.  320 was his Q4 forecast so...
24   Q.  Okay.
25   I have a series of reports that are all the

199

1 same thing but they're undated again so I'm going to
2 ask.
3   Here's 38.
4   40.
5   41.
6   (Handing documents to witness and counsel.)
7   Okay.  38 is dated -- do you recognize
8 Exhibit 38?
9   A.  Exhibit 38 is not all the same report.
10   Q.  Okay.
11   A.  So the first one, two -- the first three
12 pages -- let me see.  Hold on.
13   Q.  Are they all standalone reports?
14   A.  Well, this -- the first page and the third
15 page are the same thing.  They're duplicates.  They
16 appear to be anyway.  And they are for the first
17 quarter of fiscal '01.  And I'm basing that on the
18 column called "close dates," and most of the close
19 dates are July or August of '00.
20   Q.  Okay.
21   A.  Okay?
22   Q.  Uh-huh.
23   A.  The last two sheets appear to be for Q3 '01,
24 although I have no idea when this was generated.  And
25 I say -- again I say they appear to be for Q3 because

200

1    the close dates are in February of '01.  There's a
2    couple of Januarys, but the close dates all lie within
3    that Q3 '01 time frame.
4        Q.  Could you look at all of these Exhibits 38
5    through 41 and say that they are all the same kind of
6    report?  Is that a fair statement?
7        A.  Yeah, they're all some version of the same
8    type of report.
9        Q.  And is that the big deal list?  Or report?
10       A.  Yeah.  It's a version of the big deals list
11   that seems to break out product categories.  In all of
12   these.
13       Q.  And do you recognize any of these reports?
14       A.  I mean, they're familiar, yes.  I've probably
15   seen them before, but not any specific one.
16       Q.  Do you -- would there generally be a date
17   attached to these reports?  Or on these reports
18   somewhere?
19       A.  I don't remember.
20       Q.  Do you see --
21       A.  I mean, there doesn't appear to be one.  And
22   if there wasn't one in the header -- there doesn't
23   appear to be one.
24       Q.  Do you see Exhibit 39?
25       A.  Uh-huh.

201

1        Q.  It's at the top left in between "OSI Forecast"
2    and "Product Category" and there's a bunch of
3    little -- "all values have been converted to U.S.
4    dollars," I think.
5        A.  Right.
6        Q.  Would that be where a date would ordinarily
7    sit in a document like this?
8        A.  I don't know.
9        Everyone had their own different way of doing
10   things.  I don't know exactly if this is where anybody
11   would have put one if it was --
12       Q.  Was it a common practice to forward reports
13   without dates on them in your group?
14       A.  I don't know if it was a common practice.
15       I mean, these don't have dates on them.  But I
16   honestly don't remember.  Because they would have been
17   forwarded along with an e-mail, the e-mail would have
18   the date that they were effective of; but I don't -- I
19   don't recall whether these actually were supposed to
20   have dates on them or not.
21       MS. McLAUGHLIN:  Okay.  Let's take one little
22   break, and then I think I'll clean up.
23       THE VIDEOGRAPHER:  Going off the record.  The time
24   is 3:20 p.m.
25       (Recess taken.)

202

1        THE VIDEOGRAPHER:  We are back on the record.  The
2    time is 3:22 p.m.
3        BY MS. McLAUGHLIN:
4        Q.  Okay.  Let's look at Exhibit 47.  Could you
5    read over this and identify it for me for the record.
6        A.  Okay.  This is an e-mail from me to Terry Ford
7    forwarding an e-mail from me to it looks like the
8    consulting leadership at the time, updating them on
9    the status of our internal 11i migration for projects.
10   Because I had responsibility for the business side of
11   the process for projects.
12       Q.  What was your -- what were your
13   responsibilities with the 11i implementation into OSI?
14       A.  When we as a company decided to go on this
15   single instance migration to 11i, there were people
16   assigned out of finance as the process owners for, in
17   my case -- let's see, how was it.  It was ordered to
18   cash or something on the consulting side.  I don't
19   remember exactly what it was called.  But it was the
20   process of booking a consulting order, setting up a
21   project, logging time; and so we had to make sure
22   before we all migrated to the same version of the
23   system that we had all the same process first.  And so
24   we had representatives from each division, there was
25   one representative for consulting, finance, from each

203

1    division really just talking about the process; and we
2    were linked up with people in global IT who were
3    actually doing implementations.
4        Q.  Okay.  And when you're forwarding this to
5    Terry and say, "of course, for the fourth day in a
6    row," I didn't stay up regardless -- "it didn't stay
7    up regardless of the assurances," was this the
8    assurances that you're describing down below that the
9    system would run properly?
10       MS. KYROUZ:  Objection.  Lacks foundation.
11       THE WITNESS:  I don't think I said that.
12       MS. KYROUZ:  Misstates the document.
13       MS. McLAUGHLIN:  Well, I guess, let's just go
14   down.  It says here all -- would you like me to read
15   it or --
16       A.  No, I can read it.
17       Q.  And I guess what I was referring to
18   specifically is, "according to Bret Fuller all the
19   remaining patches have been applied and as of 2:15
20   Pacific time all systems should functioning properly
21   and we expect them to remain available from now
22   through the close."  Are you referring to that as the
23   assurance that the system would run properly?
24       A.  No.  Because I say it didn't stay up.  So I
25   think the assurance was the remaining available piece.

204

1  So they probably had to take it down for the patch,
2  but it -- so that's what I'm referring to it would
3  seem.
4      Q.  Did you experience any frustration with this
5  implementation at your level at OSI?
6      MS. KYROUZ:  Objection.  Vague.
7      THE WITNESS:  Frustration in what sense?
8      BY MS. McLAUGHLIN:
9      Q.  Frustration in having to deal with the issues
10  that arose with the implementation.
11      MS. KYROUZ:  Objection.  Misstates the evidence.
12  Lacks foundation.
13      THE WITNESS:  So no.  I mean, I was happy to be
14  involved in it because I thought it was actually very
15  exciting that we were doing what we were doing.  Uhm,
16  I was -- you know, I did not know what to expect in
17  something like this; and considering we did it over
18  the Christmas holidays, the fact that we were up and
19  running, you know, a couple weeks later to me was
20  pretty good.  You know, I -- no, I wouldn't say -- I
21  wouldn't say I experienced a lot of frustration from
22  that perspective, but it was a long process.
23      BY MS. McLAUGHLIN:
24      Q.  And when you say it's a long process, was it
25  because it wasn't -- it didn't go smoothly?

205

1      A.  No.  No.  I was involved -- I was involved in
2  defining the global process of how we're supposed to
3  do things, and communicate that in to the people who
4  were doing the actual setup of the systems.  So from a
5  change management perspective there were some areas
6  that were frustrating, and I think that was true
7  everywhere.  But it had nothing to do with the system.
8  It was more getting people in Brazil to do the same as
9  people in Germany.
10      Q.  And so when you say "fyi, of course, for the
11  fourth day in a row," what are you referring to then?
12      A.  I honestly don't remember.  But I'm saying it
13  didn't stay up.  I'm not saying -- you know, that's
14  the next thing I say.  So I'm assuming they had to
15  take the system down to do something to it.
16      Q.  Okay.
17      A.  But I don't think that's surprising.  I mean,
18  for a global implementation I would think, you know,
19  it was -- people were still in there so.
20      Q.  Okay.  I'm going to show you Exhibit 48.
21      A.  Okay.
22      Q.  Do you recognize this document?
23      A.  Not the top page.  I'm not copied on it.
24      This is a -- the second and third page is a
25  status report from me to the consulting leadership.

206

1      Q.  Do you recall receiving this e-mail?
2      A.  I don't remember receiving it, but I'm on it
3  so I'm sure I did.
4      Q.  Does this look to you like a genuine and
5  authentic copy of what was sent to you?
6      A.  It looks like something she might send, yeah.
7  But again, I don't remember getting this one
8  specifically.
9      Q.  Okay.  This is 50.
10      I was better at making them over to you
11  before.  I'm sorry.
12      A.  Your arms are getting tired probably.
13      Q.  I know.  Could you review this and identify it
14  for the record for me.
15      A.  It's an e-mail from Jennifer Minton to all of
16  the finance leadership globally it looks like.  Mostly
17  focused on expenses.  And a concern about accuracy in
18  expenses.  And she's asking us to make sure that we're
19  submitting expenses at the summary income statement
20  line item.
21      Q.  Do you recall receiving this e-mail?
22      A.  I don't remember it specifically, no.  But I
23  was on the distribution so...
24      Q.  Does it appear to be a genuine and authentic
25  copy of the original e-mail?

208

1  Since I was responsible for giving them status on
2  the -- on how the upgrade was.
3      Q.  Does this appear to be a genuine and authentic
4  copy of the original e-mail you prepared?
5      A.  Yes.
6      Q.  Okay.  Exhibit 46.  Could you read this over
7  and identify it for the record, please.
8      A.  It is an e-mail from me to Ivgen Guner as of
9  March 1st, 2001, so -- see what time that was.  Middle
10  of the day, I guess.  Giving her a recap of where I
11  expect the number to land after all is said and done.
12  And it appears I took part of that old license status
13  file and sent it to her.  Not the whole thing.
14      Q.  Okay.  This is --
15      A.  Since most of it was irrelevant at this point.
16      Q.  Does this appear to be a true and correct copy
17  of your original e-mail?
18      A.  Yes.
19      Q.  Along with the attachment?
20      A.  It makes sense.  I mean, it's the same number
21  so yeah.
22      Q.  Okay.  This is 49.
23      Would you please read through this e-mail and
24  identify it for the record for me.
25      A.  Okay.

207

1      A.  Uhm, as far as I can tell, yes.  It's her

2  style and it's not unreasonable that she would have

3  asked us to do this so...

4      Q.  Okay.  Moving along.  51.

5      A.  This is part of the reconciliation process.

6  So it's an e-mail I sent to Ivgen, although I can't

7  see any of the e-mail headers or footers on this.

8  Well, I guess there is on the next page.  And I appear

9  to have forwarded on some e-mail discussion between me

10  and a woman named Beth that was on my team at the

11  time, going through just the state and local forecast.

12  And where they landed versus where he had forecasted

13  and why.

14      Q.  And the bottom of -- does this appear to be a

15  genuine and authentic version -- copy of your original

16  e-mail?

17      A.  Yes.

18      Q.  And up here it -- let's go to page

19  NDCA-ORCL 157795

20      A.  Uh-huh.

21      Q.  And at the bottom it says -- and I'm not --

22  someone is saying, I think -- is it Beth to you saying

23  it appears that once again rev share was double

24  counted by field on several deals?

25      A.  I think so.

209

1      Q.  What does that mean to you?

2      A.  That is the -- we used to have a process with

3  the telesales deals, that the field and telesales

4  would share them.  So there used to be -- and we've

5  gone through a few iterations of this.  But I believe

6  during Q3 '01 there was a standard methodology applied

7  to the deals, that some percentage of the deal would stay

8  with the field and some percent would stay with

9  telesales.  So what she's saying here is that both the

10  field and telesales in some of these instances counted

11  the full value or overestimated their portion of the

12  deal.

13      Q.  In the forecast?

14      A.  In the forecast.

15      And an example of that would be -- let's see

16  if there's one.  If there's one up here.

17      It doesn't look like there's one right up

18  above there.  But they're generally very small

19  transactions.

20      Q.  Okay.  Can you turn to page NDCA-ORCL 157799.

21  It says, "strangely enough it was Jose at Jay's last

22  senior staff meeting when Ron and I were hammering on

23  OSO accuracy that pushed back the most; I'm escalating

24  to Jay -- Jose needs to be held accountable."  Do you

25  see that?

210

1      A.  Uh-huh.

2      Q.  Is that Jose Garcia?

3      A.  Yes.

4      Q.  And when you -- when you talk about -- or what

5  are you referring to when you say "in our last senior

6  staff meeting when Ron and I were hammering on OSO

7  accuracy"?

8      A.  So Ron Palise was running sales operations for

9  Jay at the time.  Or, no.  Not -- I'm trying to think

10  what he was doing because Terry was really his ops

11  guy.  But Ron was in there in some sort of operational

12  capacity, probably helping with the deal stuff.  But

13  we were talking about this issue that we've gone over

14  a few times today, which is the reps not entering all

15  their deals in the system.  And with state and local,

16  the average deal size is very, very small.  Much

17  smaller than the other places because they have all of

18  these little municipalities and everything else.  And

19  they just wouldn't -- you know, what happened in the

20  forecast was we had issues with double counting and

21  not counting at all of transactions in state and

22  local, and I was pointing out that that had happened

23  before.  And that we were trying to make a point of

24  calling Jose out on it in particular.

25      Q.  And when you say before, you mean the prior

211

1  quarter?

2      A.  Yeah.

3      MS. McLAUGHLIN:  Okay.  I am done for the moment.

4  I don't know if you have any questions.

5      MS. KYROUZ:  (Shakes head from side to side.)

6      We'd like to mark the transcript

7  confidential.

8      MS. McLAUGHLIN:  Yes.  Sure.

9      And thank you very much for your time today.

10      THE WITNESS:  Sure.

11      THE VIDEOGRAPHER:  One moment, please.  Let me do

12  my thing.  This is the end of Videotape 3, Volume 1,

13  in the deposition of Sarah Kopp.  The original

14  videotapes will be retained by LiveNote World Service.

15  Going off the record, the time on the monitor is

16  3:39 p.m.

17      (At 3:39 p.m. the deposition proceedings

18  concluded.)

19           -oOo-

20

21

22

23      DATE                SARAH KOPP

24

25

212

Kopp, Sarah  6/14/2006  9:02:00 AM

```
1    STATE OF CALIFORNIA   )

2    COUNTY OF SAN MATEO   )

3        I hereby certify that the witness in the

4    foregoing videotaped deposition, SARAH KOPP, was by me

5    duly sworn to testify to the truth, the whole truth,

6    and nothing but the truth, in the within-entitled

7    cause; that said deposition was taken at the time and

8    place herein named; that the deposition is a true

9    record of the witness' testimony as reported by me, a

10   duly certified shorthand reporter and a disinterested

11   person, and was thereafter transcribed into

12   typewriting by computer.

13       I further certify that I am not interested in

14   the outcome of the said action, nor connected with,

15   nor related to any of the parties in said action, nor

16   to their respective counsel.

17       IN WITNESS WHEREOF, I have hereunto set my

18   hand this 27th day of June, 2006.

19

20

21       _____

22           KELLIE A. ZOLLARS, CSR

23           STATE OF CALIFORNIA

24

25
```

213

1    STATE OF CALIFORNIA    )

2    COUNTY OF SAN MATEO    )

3         I hereby certify that the witness in the

4    foregoing videotaped deposition, SARAH KOPP, was by me

5    duly sworn to testify to the truth, the whole truth,

6    and nothing but the truth, in the within-entitled

7    cause; that said deposition was taken at the time and

8    place herein named; that the deposition is a true

9    record of the witness' testimony as reported by me, a

10   duly certified shorthand reporter and a disinterested

11   person, and was thereafter transcribed into

12   typewriting by computer.

13        I further certify that I am not interested in

14   the outcome of the said action, nor connected with,

15   nor related to any of the parties in said action, nor

16   to their respective counsel.

17        IN WITNESS WHEREOF, I have hereunto set my

18   hand this 27th day of June, 2006.

19

20

21             _Alisa Chase_

22        for KELLIE A. ZOLLARS, CSR

23             STATE OF CALIFORNIA

24

25

EXHIBIT Q

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3                                    )

4  In Re:  Oracle Corporation     )
   Securities Litigation          )   No. C-01-0988-MJJ

5  _____)
                                   )

6  THIS DOCUMENT RELATES TO ALL    )
   ACTIONS.                        )

7                                  )
   _____)

8

9

10

11

12    VIDEOTAPED DEPOSITION OF ROBERT GREEN

13         Beverly Hills, California

14        Tuesday, October 18, 2005

15

16

17

18

19

20

21

22

23

24  REPORTED BY: KAE F. GERNANDT
            CSR No. 5342

25

1

---

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3                                    )

4  In Re:  Oracle Corporation     )
   Securities Litigation          )   No. C-01-0988-MJJ

5  _____)
                                   )

6  THIS DOCUMENT RELATES TO ALL    )
   ACTIONS.                        )

7                                  )
   _____)

8

9

10

11

12

13

14      VIDEOTAPED DEPOSITION of

15  ROBERT GREEN, witness herein, taken
   by plaintiff pursuant to the

16  applicable sections of the Code of
   Civil Procedure on TUESDAY,

17  OCTOBER 18, 2005, before me, Kae F.
   Gernandt, CSR No. 5342, beginning at

18  9:36 a.m. and ending at 3:12 p.m. at
   9601 Wilshire Boulevard, Suite 510,

19  in the City of Beverly Hills, County
   of Los Angeles, State of California.

20

21

22

23

24

25

2

---

1  APPEARANCES:

2

3  For the Plaintiffs:

4     LERACH, COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS
      BY:  DOUGLAS R. BRITTON

5        VALERIE L. McLAUGHLIN
         STACEY KAPLAN

6     655 West Broadway, Suite 1900
      San Diego, California  92101

7     619.231.1058 + 800.449.4900

8     dbritton@lerachlaw.com
      vmclaughlin@lerachlaw.com

9

10  For Oracle Corporation and the individual defendants:

11     MAYER, BROWN, ROWE & MAW
       BY:  ROBERT J. KRISS

12        THERESE C. KING
          71 South Wacker Drive

13        Chicago, Illinois  60606
          312.782.0600

14

       rkriss@mayerbrown.com

15     tking@mayerbrownrowe.com

16

   For the witness:

17

       BUSHNELL, CAPLAN & FIELDING

18     BY:  ALAN M. CAPLAN
          221 Pine Street, Suite 600

19        At Battery
          San Francisco, California  94104

20     415.217.3800

21

22  Also in Attendance:

23     Adrian Castro, CLVS, Videographer

24

25

3

---

1                    INDEX

2

3  WITNESS

4  ROBERT GREEN

5

6

7  EXAMINATION BY                    PAGE

8  Mr. Britton ....................   7

9  Mr. Kriss ...................... 112

10  Mr. Britton .................... 166

11  Mr. Kriss ...................... 177

12

13

14            EXHIBITS

15  EXHIBIT NO.   DESCRIPTION         PAGE

16  Exhibit 1   Plaintiff's (Proposed) Revised   25
              Second Amended Complaint for

17            Violations of the Federal
              Securities Laws

18

       Exhibit 2   E-mail string dated        52

19            1/13/01-1/14/01 re BellSouth
              ADSL performance issues

20            (NDCA-ORCL 058347-058349)

21  Exhibit 3    Document entitled "Bell South    56
              Estimating Spreadsheet" (Green

22            001-081)

23  Exhibit 4    Document entitled "ERP/CRM       69
              Implementation project Initial

24            deliverables and project setup,
              Contract S00169AK" (Green

25            082-170)

4

---

EXHIBITS, Continued

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 5 | Estimating results from Telia engagement (Green 171-222) | 81 |
| Exhibit 6 | Telia project charter component documents (Green 227-454) | 84 |
| Exhibit 7 | Project work plan defining the various phases of Telia project (Green 467-516) | 87 |
| Exhibit 8 | Letter dated 9/6/05 to Alan Caplan from Charles E. Harris II | 181 |
| Exhibit 9 | Letter dated 9/19/05 to Charles E. Harris from Alan M. Caplan | 181 |

---

BEVERLY HILLS, CALIFORNIA, TUESDAY, OCTOBER 18, 2005

9:36 A.M.

THE VIDEOGRAPHER:  We're on the record.  Here begins the videotaped deposition of Mr. Robert Green, Tape 1, Volume I, In re Oracle Corporation Securities Litigation, in the U.S. District Court, Northern District of California, Master File No. C-01-0988-MJJ.

Today's date is October 18, 2005, and the time on the video monitor is 9:37 a.m.  The video operator today is Adrian Castro, representing LiveNote World Service, located at 221 Main Street, Suite 1250, San Francisco, California 94105.  Phone number (415) 321-2300.  The court reporter today is Miss Kae Gernandt of Network Deposition Service, reporting on behalf of LiveNote World Service.

Today's deposition is being taken on behalf of the plaintiffs and is taking place at 9601 Wilshire Boulevard, Suite 510, Los Angeles, California 90210.

Counsel, please introduce yourselves and state whom you represent.

MR. BRITTON:  Doug Britton with Lerach, Coughlin on behalf of plaintiffs.  And with me today

---

is Stacey Kaplan and Valerie McLaughlin.

MR. KRISS:  Robert Kriss, Mayer, Brown, Rowe & Maw, with Therese King, representing Oracle Corporation and the other defendants.

MR. CAPLAN:  Alan Caplan, Bushnell, Caplan & Fielding, representing the witness.

THE WITNESS:  Will the court reporter please swear in the witness.

ROBERT GREEN,

witness herein, being first duly sworn, testifies as follows:

EXAMINATION BY MR. BRITTON:

Q.  Good morning, Mr. Green.  We've met before, but I'll introduce myself again.  My name is Doug Britton.  I'm with the law firm of Lerach, Coughlin.  We represent the plaintiffs in a securities suit against Oracle.

Have you ever had your deposition taken before?

A.  Yes.

Q.  You have.  How many times?

A.  Twice.

Q.  Twice.  And briefly can you describe

---

those circumstances for me?

A.  Transamerican Entertainment was the company being sued by search firms who had placed people at that company.  And the people didn't stay.  Company was trying to, obviously, collect their money from Transamerican, and Transamerican said they were in violation of a contract.

Q.  And what was your role in that case?

A.  I was the hiring manager in both cases as a contractor.  I was on contract with Transamerican.

Q.  What was the second case?

A.  Same situation, unfortunately.  Different situation.

Q.  So, you're relatively familiar with the deposition process?

A.  Relatively.

Q.  Let me go over some basic ground rules.  You understand you're under oath?

A.  Yes.

Q.  And that your testimony today has the same seriousness as if it was given in a court of law?

A.  Correct.

Q.  The court reporter is going to be taking

1  down every word that we say, so it's important that
2  we both speak verbally instead of nodding your head.
3      So, if you wait for me to finish my
4  question before you answer, we'll have a clear
5  record. And I'll endeavor to wait for you to finish
6  your answer before I ask my next question.
7      It's commonplace when you're talking to
8  talk over each other, so we've got to try to
9  eliminate that if possible. You understand?
10     A. Yes.
11     Q. From time to time today, you're going to
12  hear objections being made for the record. And what
13  the record is, it's the transcription that's being
14  taken down there.
15     Do you understand that you're obligated
16  to answer my questions unless your counsel,
17  Mr. Caplan, instructs you not to?
18     A. Correct.
19     Q. If you don't understand a question that
20  I ask, will you let me know?
21     A. Correct.
22     Q. And then if at any time if you want to
23  take a break, just let me know.
24     A. Great.
25     Q. What did you do, if anything, to prepare

9

1  for your deposition today?
2      A. I supplied materials that were requested
3  by all parties, I want to say, in the last couple
4  months. I just don't remember the date. Forwarded
5  them to Mr. Caplan.
6      Q. Those were documents you had in your
7  possession?
8      A. Those were documents that I created
9  based upon information that I had in my hands.
10     Q. Can you describe the process for me, how
11  you created this document?
12     A. Basically, I was asked by, I believe,
13  your firm, a representative from your firm did I
14  have any information, and I will say that's sometime
15  in the past. I can't remember, a year and a half,
16  two years ago. And I said, "I believe I do, but let
17  me just check on the computer." I have a business
18  computer at home.
19     Q. And you have information stored on that
20  business computer that relates to Oracle?
21     A. Apparently, I do.
22     Q. And the documents that you produced in
23  this litigation were the documents that you culled
24  from that computer?
25     A. Correct.

10

1      Q. And were they prepared from a database
2  or were these the documents that you produced on
3  your computer in the form that we're seeing them?
4      A. They were documents that were created
5  when I was employed by Oracle and just stored. They
6  were not really, by definition, a database. I'm not
7  sure what your definition of a database is.
8      Q. I'm sure there's many. I'm just trying
9  to get a general idea --
10     A. Right. No, these were stored documents.
11     Q. I'm going to take you -- actually, let
12  me go on.
13     Did you do anything else to prepare for
14  your deposition today?
15     A. Other than talk to Mr. Caplan, no.
16     Q. Did you talk to anybody that you worked
17  with when you were at Oracle?
18     A. No.
19     Q. Do you have interactions with anybody
20  that you used to work with at Oracle?
21     A. Yes.
22     Q. And did you work with any of those
23  people during the 2000-2001 time period?
24     A. Yes.
25     Q. And who are those people?

11

1      A. Gary Moore and Fred Tune.
2      Q. And who is Gary Moore?
3      A. Gary Moore was my boss, and I believe
4  his name is stated in a document provided me about
5  this case. I saw his name in the document.
6      Q. And what was his title?
7      A. Senior director. I do believe in the
8  paperwork provided -- I guess you call it the
9  litigation paperwork.
10     Q. The complaint?
11     A. You have the wrong title.
12     Q. We did, okay.
13     MR. KRISS: Doug, could I interrupt for just
14  a moment?
15     MR. BRITTON: Sure.
16     MR. KRISS: I don't believe that my office
17  received any documents pursuant to the subpoena.
18     MR. CAPLAN: Yes, you did.
19     MR. KRISS: Who did you send those to?
20     MR. CAPLAN: Probably Charles Harris.
21     MR. BRITTON: I think Trace sent me a copy of
22  what the witness provided to you guys 'cause I got
23  two sets, one with a cover letter from Trace. I
24  think it was from Trace, but I'm not 100 percent
25  sure of that.

12

1   BY MR. BRITTON:
2       Q.  When was the last time you spoke to
3   Mr. Moore?
4       A.  End of last year, sometime in Q4.
5       Q.  Q4 of?
6       A.  '04.
7       Q.  Of '04.  Are you talking calendar year?
8       A.  Yes, not the Oracle year.
9       Q.  And Oracle year is -- it's a fiscal
10  year, right?
11      A.  Oracle's fiscal year is June 1st to
12  May 31st -- or was.  I don't know if it still is
13  today.
14      Q.  All right.  Did -- let me go to Fred
15  Tune.  Who is Mr. Tune?
16      A.  Mr. Tune worked for me.
17      Q.  What was his title?
18      A.  Manager, technology.  He was a
19  consultant.
20      Q.  And he worked for you during the
21  2000-2001 time period?
22      A.  Yes, he did.
23      Q.  And when was the last time you spoke to
24  Mr. Tune?
25      A.  Sometime in February of this year.

                                        13

1       Q.  Have you spoken to -- let's start with
2   Mr. Moore.  Have you spoken to Mr. Moore at any time
3   about this case?
4       A.  I was instructed not to talk to anyone,
5   prior employees of Oracle, about this case.
6       Q.  And who -- was the instruction from
7   anyone other than Mr. Caplan?
8       A.  Yes, an investigator in your firm.  I do
9   not remember his name.  I apologize.
10      Q.  Okay.  Mr. Tune, have you spoken to him
11  at all about this case?
12      A.  Not this case, no.  Talked about
13  children.
14      Q.  Now, you mentioned the investigator.
15  Let me take you down memory lane a little bit here.
16  I think we're going to do that all today.
17      A.  I need that.
18      Q.  You did speak to an investigator that
19  was working on behalf of the plaintiffs; is that
20  right?
21      A.  Correct.
22      Q.  And that was in the 2001 time period?
23      MR. KRISS:  Objection to the form of the
24  question.
25      MR. BRITTON:  Go ahead.  You can answer.

                                        14

1       THE WITNESS:  I believe so.
2   BY MR. BRITTON:
3       Q.  Okay.  Do you remember the date?
4       A.  No, I do not.
5       Q.  Do you remember the month?
6       A.  No.
7       Q.  How many conversations did you have with
8   the investigator?
9       A.  Three or four.
10      Q.  And the period of time that spanned the
11  entire conversations, how long was that?
12      A.  Six --
13      MR. KRISS:  Excuse me.  Objection to the form
14  of the question.
15      THE WITNESS:  Year and a half.
16  BY MR. BRITTON:
17      Q.  When was the last time you spoke to the
18  investigator?
19      A.  I really cannot remember, so I would be
20  guessing, and I'd rather not guess.
21      Q.  Okay.  Sure.  Now, your conversations
22  with the investigator, those conversations related
23  to your experiences while you were at Oracle; is
24  that right?
25      A.  Not my entire experience, but the latter

                                        15

1   years relevant to what he told me was the case.
2       Q.  When did you start working for Oracle?
3       A.  November of 2000 -- I mean 1993.
4       Q.  When did you stop?
5       A.  March of 2001 was when the layoff --
6   although they said I could be called back within six
7   months, whatever time frame that was.
8       Q.  Did that ever happen?
9       A.  No.
10      Q.  Where did you go after Oracle?
11      A.  I did some independent consulting, took
12  some time off.
13      Q.  Did you ever land at another company?
14      A.  I went -- first company I actually went
15  to work for was a company called Wellpoint.
16      Q.  When was that?
17      A.  That was in the November time frame
18  of '01.  It was a major contract.
19      Q.  So, it took about seven, eight
20  months off essentially?
21      A.  Well, I did some work on the side, yeah.
22  I didn't need to work.
23      Q.  What was your title when you first
24  started with Oracle?
25      A.  Senior consultant.

                                        16

1    Q.  Did your title change at all?

2    A.  Yes, to finally my final title was

3  director technology.

4    Q.  Were you always in the same business

5  unit while you were at Oracle?

6    A.  No.

7    Q.  Can you describe that for me, what

8  business units you were in when you started and how

9  that changed?

10    A.  I started with government consulting.

11  About a year and a half into government consulting,

12  I moved to commercial consulting.  A year later, I

13  moved back to government consulting.  And sometime

14  in end of 1999 -- I don't remember the date -- I

15  moved back to commercial consulting, and that's

16  basically where I left the company, was commercial

17  consulting.  It was common practice to move between

18  the two groups.

19    Q.  When you moved from government

20  consulting to commercial consulting the last time,

21  what period of time was that?

22    A.  It was the latter part of 1999.  Can't

23  remember, September or October time frame.  I

24  just --

25    Q.  And that carried you all the way through

17

1  to 2001?

2    A.  Yes.

3    Q.  Are you familiar with the larger Oracle

4  corporate structure in terms of its business units?

5    MR. KRISS:  Objection to the form of the

6  question.

7    THE WITNESS:  Not what it is today,

8  obviously.

9    MR. BRITTON:  Back during the 2000 time

10  frame.

11    THE WITNESS:  Back then, I think I was fairly

12  familiar with it, yes.

13  BY MR. BRITTON:

14    Q.  Have you heard of OPI, Oracle Product

15  Industries?

16    A.  Yes.

17    Q.  And have you heard of OSI?

18    A.  No.

19    Q.  Oracle Services Industries?

20    A.  All right.  I've got a question.

21    Q.  Sure.

22    A.  In the industry, OSI means something

23  else, so that's why I'm confused.

24    Q.  Within Oracle --

25    A.  Within Oracle.

18

1    Q.  -- were you familiar with Oracle

2  Services Industry division?

3    A.  Yes.

4    Q.  And then lastly, were you familiar with

5  a North American Sales Division?

6    A.  Yes.

7    Q.  So, of the three divisions that we just

8  spoke about, the OPI division, the OSI division and

9  the NAS division, where did your business group fall

10  under?

11    A.  OSI.

12    Q.  OSI.

13    A.  North America.

14    Q.  Now, were there any geographical

15  divisions in the commercial consulting groups that

16  you were aware of at the time?

17    MR. KRISS:  Objection to the form of the

18  question, vague as to time.

19    THE WITNESS:  Within the North American,

20  there were divisions.  I'm not sure they called them

21  divisions, but there were groups.  There was -- the

22  eastern, western regions were the primary two

23  groups.

24  BY MR. BRITTON:

25    Q.  And which group were you in?

19

1    A.  Eastern region.

2    Q.  You were in the eastern region and

3  working out of San Dimas?

4    A.  My office was my home.  I was one of the

5  first consultants to have a home office.

6    Q.  Were you traveling a lot?

7    A.  95 percent of the time.

8    Q.  Okay.  Where on a map did the divide

9  occur?

10    A.  I always thought it was the Mississippi,

11  but it depended on the time of day.

12    Q.  So, you were responsible -- or withdraw.

13    You worked within the entire eastern

14  region?

15    A.  No.

16    Q.  Okay.

17    A.  I worked anywhere in the world.

18    Q.  You did.  Okay.  So, even though you

19  were technically within the eastern region group,

20  your efforts went beyond that region?

21    A.  Anywhere we got a call.  We were very

22  specialized, the group that I was in.

23    Q.  Okay.  I want to test your memory here a

24  little bit --

25    A.  All right.

20

1    Q.  -- find out who you reported to and who
2  reported to you.
3    A.  Uh-huh.
4    Q.  Is that okay?
5    A.  Sure.
6    Q.  Who was your direct report during the --
7    A.  Gary Moore.
8    Q.  -- 2000-2001 time period?
9    A.  Sorry.  Gary Moore.
10    Q.  And that was the entire 2000-2001 time
11  period?
12    A.  I reported to Gary Moore.
13    Q.  Did you report to anybody else?
14    A.  No.
15    MR. CAPLAN:  During that time period?
16    MR. BRITTON:  Yes.  And all my questions are
17  going to relate to the 2000-2001 time period.
18  BY MR. BRITTON:
19    Q.  Do you know who Gary Moore reported to?
20    A.  I can't remember the VP.  All I know, he
21  was located in Rochester, New York.
22    Q.  In terms of reporting levels, how many
23  levels from the OPI director was Gary Moore's boss,
24  if you know?
25    MR. KRISS:  Objection.  Did you misspeak?

21

1  OPI director?
2    THE WITNESS:  OSI.
3    MR. BRITTON:  OSI director.
4  BY MR. BRITTON:
5    Q.  So, the head of the OSI division, how
6  far removed was Gary Moore's boss?
7    A.  I'd have to guess.  I'd say at least he
8  was three levels down.
9    Question:  Are you speaking about
10  Sanderson, who was head of OSI?
11    Q.  Was that your understanding of who the
12  head of OSI was?
13    A.  Yes.
14    Q.  Yes.  That's who I was referring --
15    A.  Yes, I remember Sanderson.
16    Q.  And your estimate is Gary Moore's boss
17  was about three levels down?
18    MR. KRISS:  Objection.  No foundation, calls
19  for speculation.
20    THE WITNESS:  It would be a guess on my part.
21  I would say at least two, three levels down.
22  BY MR. BRITTON:
23    Q.  Now, who reported to you -- withdraw
24  that.  Let me ask a different question.
25    How many different people reported to

22

1  you?
2    A.  One.
3    Q.  One.  And who was that person?
4    A.  Fred Tune.
5    Q.  Were you aware at the time of Oracle's
6  forecasts for the third quarter of 2001?
7    MR. KRISS:  I'm sorry.  Could I have that
8  read back.
9    (The record was read.)
10    MR. KRISS:  Objection to the form of the
11  question.
12    THE WITNESS:  Forecast in relationship to
13  what?
14  BY MR. BRITTON:
15    Q.  Earnings forecasts and forecasts for
16  growth for its products.
17    A.  Other than --
18    MR. KRISS:  Objection.  Excuse me, sir.
19  Objection to the form of the question, no
20  foundation.
21    THE WITNESS:  Other than what was published
22  on their internal web site.
23  BY MR. BRITTON:
24    Q.  In terms of -- what I'm asking you is:
25  At the time did you know what the Oracle's forecasts

23

1  were for the third quarter of 2001?  And let's start
2  with applications growth.
3    A.  No.
4    MR. KRISS:  Object to the form of the
5  question.
6  BY MR. BRITTON:
7    Q.  No.  So, you didn't go and look on the
8  web site to see what it is?
9    A.  (The witness shook his head.)
10    Q.  Did you have a general understanding of
11  what Oracle's forecasts were for the third quarter
12  of 2001?
13    MR. KRISS:  Object to the form of the
14  question, no foundation.
15    THE WITNESS:  Yes.
16  BY MR. BRITTON:
17    Q.  And how did you gain that understanding?
18    A.  Off the web and internal publications.
19    Q.  And can you tell me how the web informed
20  you generally of what Oracle's forecasts were?
21    A.  It was in the form of an e-mail that
22  went out to employees in the consulting group.
23    Q.  What do you remember about that e-mail?
24    A.  I can't tell you the format, obviously.
25  I guess I kind of laughed 'cause it -- that's

24

1  interesting.  That's all I remember.  Fred and I
2  were both looking at it.  Fred Tune and I were both
3  looking at it together 'cause we we're working on
4  some stuff.
5      Q.  Now, is the e-mail you talked about --
6  if I remember your testimony correctly, it was you
7  had general knowledge of what the forecasts were off
8  the web and through internal documents.
9      A.  We received an e-mail with -- basically,
10  all the employees, I assumed, received it, saying
11  "Here's our forecast.  You can go to the following
12  site."  And they had a link, clicked on it, popped
13  up.
14      Q.  And you went to that site?
15      A.  Absolutely.
16      MR. BRITTON:  Let me mark my first exhibit.
17          (Plaintiff's (Proposed) Revised Second
18  Amended Complaint for Violations of the Federal
19  Securities Laws marked Exhibit 1 for
20  identification.)
21  BY MR. BRITTON:
22      Q.  Can you take a moment and flip through
23  Green Exhibit 1?
24      MR. KRISS:  Let me at this moment object to
25  any use of this document on the grounds that there's

25

1  no proper use for this complaint at this deposition
2  at this point.  It isn't used to refresh the
3  witness's recollection.  The only purpose that this
4  complaint can serve at this point is to lead the
5  witness and to attempt to shape his testimony.
6          Therefore, I object to any question that
7  the witness is asked about this document or any
8  question he's asked after he's looked at this
9  document because I think it is improperly
10  suggestive.
11  BY MR. BRITTON:
12      Q.  Can you take a look?
13      A.  Should I?
14      MR. CAPLAN:  Yes, you can.
15      THE WITNESS:  Okay.
16  BY MR. BRITTON:
17      Q.  Flip through it and let me know if you
18  recognize it.
19      A.  This, I believe, is a document that was
20  forwarded to me -- a copy was forwarded to me.
21  That's it.
22      Q.  Okay.  Do you remember the time when it
23  was forwarded to you?
24      A.  I don't.
25      Q.  You don't.

26

1      A.  No.
2      Q.  I'd like you to take a look at
3  paragraph 46 of the complaint, which is on page 24.
4          And for the record, Exhibit 1 is
5  Plaintiff's (Proposed) Revised Second Amended
6  Complaint for Violation of the Federal Securities
7  Laws.
8      A.  Which line?
9      Q.  Paragraph 46, the first indented --
10  double indented paragraph, starts with, "So the
11  numbers."
12      A.  Uh-huh.
13      Q.  And if you could read from paragraph 46,
14  including that quote, to yourself for me, and let me
15  know when you're done.
16      MR. KRISS:  I continue to object to all
17  questions based upon this document for the reasons I
18  previously stated.
19      MR. BRITTON:  You mean you're not going to
20  use it today?
21      MR. CAPLAN:  That's correct.
22  BY MR. BRITTON:
23      Q.  Have you read the parts that we just
24  talked about?
25      A.  Yes.

27

1      Q.  Okay.  Question for you is whether the
2  language in the double indented quote -- whether
3  that refreshes your memory about what Oracle's
4  forecasts were for the third quarter of 2001.
5      A.  Statements similar to that, it seems to
6  me.  I can't say word for word.
7      Q.  You can put that document aside for now.
8          At any point after you looked at the
9  e-mail on the web site, did you have any reason to
10  believe that Oracle was not going to make its
11  forecasts?
12      A.  Yes.
13      MR. KRISS:  Objection to the form of the
14  question, no foundation.
15  BY MR. BRITTON:
16      Q.  And what was that?
17      A.  It actually -- in my own mind, since my
18  job was to get work as a consultant, it started in
19  late 1999.  I could see that consultant work -- and
20  I'm speaking only to consulting 'cause I really
21  didn't look at the application or database cells,
22  but consulting activity was starting to decrease.
23          By the time 2000 rolled around, it
24  became quite apparent, at least to me, that it was
25  going to be a difficult market for consulting.

28

Green, Robert  10/18/2005  9:36:00 AM

1      Q.  And how did that -- or did that relate
2   in any way to sales of Oracle's products?
3      MR. KRISS:  Objection to the form of the
4   question, no foundation.
5      THE WITNESS:  There generally is a
6   correlation between the sales of applications, to
7   some degree, database and consulting.
8   BY MR. BRITTON:
9      Q.  And how do you know that?
10     A.  Because I was involved with that.
11     Q.  How were you involved with that?
12     A.  Sales would make a sale or potentially
13  try to make a sale, either for application or
14  database, and we would be contacted to participate
15  in preparing a proposal with the sales organization.
16     Q.  So, as the consulting activity
17  decreased, did you form an opinion of what was going
18  on with Oracle's sales of its products?
19     MR. KRISS:  Objection to the form of the
20  question, no foundation.
21     THE WITNESS:  I really don't know if I formed
22  an opinion.
23  BY MR. BRITTON:
24     Q.  Did you have a belief of what was
25  happening with the sale of Oracle's products?

29

1      MR. KRISS:  Objection to the form of the
2   question, no foundation.
3      THE WITNESS:  All I know, talking amongst the
4   other consultants, was we saw a very -- a downturn
5   in our consulting work.
6   BY MR. BRITTON:
7      Q.  Now, did you have any other reasons to
8   question whether Oracle was going to make its
9   forecast for the third quarter of 2001?
10     MR. KRISS:  Objection to the form of the
11  question, no foundation.
12     THE WITNESS:  No.
13  BY MR. BRITTON:
14     Q.  Were you involved at all with any of
15  Oracle's contracts that were supposed to close in
16  the third quarter of 2001 but did not?
17     A.  Yes.
18     Q.  Which ones were those?
19     A.  BellSouth and Telia.  Telia being
20  Swedish phone company.
21     Q.  And it was your understanding at the
22  time that these deals were supposed to close on the
23  third quarter of 2001?
24     MR. KRISS:  Objection to the form of the
25  question, no foundation.

30

1      THE WITNESS:  The schedule given to me by the
2   sales organization would lead me -- led me to
3   believe they wanted to close in Q3.
4   BY MR. BRITTON:
5      Q.  Okay.  And can you describe that
6   schedule for me?
7      A.  BellSouth first.  I was to complete the
8   work that I was doing, which was scoping out the
9   go-forward project, by the first of November of
10  2000.
11     Q.  And who sent you the schedule?
12     A.  It was given to me verbally when I
13  arrived in Birmingham.  Can't remember if it was the
14  last week of September, first week of October of
15  that year.
16     Q.  Okay.  And what made you believe that
17  the Telia deal was supposed to close in the third
18  quarter of 2001?
19     A.  The Monday after Thanksgiving of that
20  year when I arrived in Stockholm, we held a meeting
21  that night -- didn't want to wait until the next
22  day -- at Oracle's offices.
23        And there were a lot of people there.
24  That's all I remember.  And they asked me, they
25  said, "Could you get this proposal and the

31

1   numbers --" and the work that I generally do, could
2   we have this done before Christmas or definitely by
3   the first week in January?
4      Q.  So, I'll go back to those.
5      A.  Sure.
6      Q.  Let me step back for a second and talk
7   about your -- or ask you about your -- what you did
8   for Oracle.  Can you describe your responsibilities
9   in general during the 2000-2001 time period?
10     A.  Provide expertise, services in the area
11  of large-scale integration and primarily in the area
12  of conversion.
13     Q.  What do you mean by "conversion"?
14     A.  Conversion means that you're selling --
15  you're trying to convert, most likely, a Legacy or
16  an old application or applications to the new
17  application or system that you've developed.  We had
18  developed, our group, what we felt was a winning
19  proposal on how to do that.
20     Q.  What do you mean by "a winning
21  proposal"?
22     A.  We could do it quicker for less money,
23  and we proved it, than our competitors.  I --
24  another responsibility was to perform what is the
25  term called "health check."  This is a term they

32

1  used at Oracle, and there was a procedure to go in
2  and do, in effect, an audit, if I can use that term,
3  of an engagement.  But they used the term "health
4  check," not an audit.
5      Q.  So, you would go in and look at what
6  they had and see what you had to --
7      A.  And try to explain to Oracle management
8  what the problem was.
9      Q.  Okay.
10     A.  And I also did proposal development
11  because I was apparently very good at it.
12     Q.  And what do you mean by "proposal
13  development"?
14     A.  Developing proposals with the sales
15  organization on what it was going to actually take
16  if we were engaged as consultants, Oracle
17  consulting, what's the time line, what kind of
18  project charter should we submit to the customer,
19  what kind of documents do we need to include in that
20  project charter to assure success, and estimate what
21  it was going to take and how risky was it going to
22  be.
23     Q.  Now, were these proposals limited to
24  consulting work?
25     A.  I would say -- I need to ask a question.

33

1      Q.  Okay.
2      A.  Sometimes we did strictly consulting,
3  and sometimes it was -- I'll call it a joint venture
4  with the sales organization, who was trying to sell
5  applicational software or data software.
6      Q.  So, is it fair to say that you would go
7  in and look at their systems and then figure out
8  what Oracle could sell them in terms of products and
9  consulting?
10     A.  No.  That had already been done by the
11  sales organization.  My job was to take what they
12  saw, interpret it, try and slate it into a -- what
13  we referred to as a proposal or project charter, how
14  much time and money was it going to take from our
15  perspective, how risky was it.
16     Q.  So, help me understand the joint venture
17  part of your testimony earlier.  If the product had
18  already been sold or selected for the customer, what
19  were you on a joint venture with in terms of coming
20  up with a proposal?
21     A.  Generally what happened is if the sales
22  organization felt there was an opportunity to sell
23  consulting services with whatever they were selling
24  to the customer, consulting was contacted.
25  Dependent upon the situation, they would call

34

1  different consulting groups to say, "Could you help
2  us prepare a proposal?"
3      Q.  Would your proposals include --
4  withdrawn.
5          Would your proposals come up with a
6  value of the project?
7      MR. KRISS:  Objection to the form of the
8  question.
9      THE WITNESS:  Define "value."
10     BY MR. BRITTON:
11     Q.  Let me ask it a different way.  Were
12  your proposals limited strictly to what the costs
13  and the time would be to do the implementation?
14     A.  Yes.
15     Q.  Now, the components of the cost, did
16  that include the cost of the products as well as the
17  cost of the consulting?
18     A.  No, just consulting.
19     Q.  Just consulting.
20         Now, in terms of the integration
21  solutions that you had talked about earlier, were
22  there types of products or types of applications at
23  Oracle that you were focusing on?
24     A.  No.
25     MR. KRISS:  Objection to the form of the

35

1  question.
2  BY MR. BRITTON:
3      Q.  Okay.  Let me ask it a different way
4  then.  What products were you focusing on then in
5  terms of the conversion solutions?
6      A.  We didn't really care, my group.  It
7  could be non-Oracle products such as Siebo, SAP,
8  et cetera.
9      Q.  Have you ever heard of CRM applications?
10     A.  Yes.
11     Q.  What does that mean?
12     A.  Customer Relationship Management.
13     Q.  And have you ever heard of ERP
14  applications?
15     A.  Yes, Enterprise Relationship Program.
16     Q.  And can you tell me what your
17  understanding is of CRM application?
18     MR. KRISS:  Objection to the form of the
19  question.
20     THE WITNESS:  Do you want the marketing
21  verbiage or do you want my interpretation?
22  BY MR. BRITTON:
23     Q.  Let's start with your interpretation.
24     A.  All right.
25     Q.  And now remember, we're talking about

36

1   the 2000-2001 time period.

2     A.  Right.  It basically -- it's an

3   application or applications.  It's more than one

4   application, by the way, for bringing together

5   customer-related information across the organization

6   in the form of a database or multiple databases and

7   providing you, based upon some analysis, you, the

8   company, or you, the consulting firm, to generate a

9   variety of strategically tactical and operational

10   reports about your customer relationship.

11     Q.  How did your view differ from the

12   marketing view that you mentioned earlier --

13     MR. KRISS:  Objection to the form of the

14   question.

15   BY MR. BRITTON:

16     Q.  -- if it did?

17     MR. KRISS:  Object to the form of the

18   question, no foundation.

19   BY MR. BRITTON:

20     Q.  Let me ask it a different way.

21     A.  All right.

22     Q.  Did you know -- do you know whether your

23   interpretation of the CRM application differed from

24   Oracle's marketing view of the CRM application?

25     A.  No.

1     MR. KRISS:  Objection to the form, no

2   foundation.

3   BY MR. BRITTON:

4     Q.  So, earlier when you made a distinction

5   between your view and the marketing view, what were

6   you talking about?

7     A.  I would not personally, if you had hired

8   me coming to your company -- I would have probably

9   not recommended CRM.  There's another way I think

10   you would have gone about it, if you would allow me

11   the time to make the presentation.

12     Q.  Tell me about that.  How would you --

13     A.  We were in the process at that time of

14   developing something called Business Information

15   Engineering, BIE.  It's based upon a premise called

16   the knowledge creating organization.

17     Q.  The knowledge greeting --

18     A.  Creating organization, credit going to

19   two Japanese professors.  I am not the father of

20   that concept.

21     Our concern prior to that time frame and

22   leading up to that time frame was that there was too

23   much information out there in corporate America that

24   was noise and chatter.  So, we felt that you needed

25   to approach whatever you were proposing to do

1   slightly different frame work.

2     We didn't really care whether or not you

3   had a CRM, an ERP, a financial system.  That's why

4   we were brought in, because we look at data.  We

5   were less concerned about the application.

6     Q.  Was Oracle using BIE during the

7   2000-2001 time period?

8     A.  Oracle had not sanctioned BIE, but our

9   group was prototyping it.  It had not been an

10   officially approved framework or -- framework being

11   a method in which you're going to develop systems.

12     Q.  What was your experience with BIE?

13     A.  I was -- some people call me the father

14   of BIE, or the grandfather.  Take your choice.

15     Q.  Okay.  How so?

16     A.  I started writing and doing all the deep

17   thinking on those long flights from Europe to LA.

18     Q.  And what types of writings did you do?

19     A.  I basically -- Oracle -- one thing they

20   did extremely well as they had a very strong what I

21   call techniques group under the heading called

22   "Oracle method."  This is where you develop all the

23   techniques that you want to use as you do

24   engagements.  So, they had a framework to develop a

25   framework.  All right.

1     So, I took that tool, which in my

2   opinion is outstanding.  I can't remember the name

3   of the tool exactly.  I have to think about it.

4   And basically said, all right, I'm going to take

5   this idea of BIE and see if I could, in effect,

6   "Oraclize" it, 'cause they had a pretty in-depth

7   process to do that.

8     Q.  What did you do to try to "Oraclize" it?

9     A.  I basically tried to turn it into a

10   framework on developing business solutions.

11     Q.  And did you accomplish your goal?

12     A.  Not in the eyes of Oracle.

13     Q.  What do you mean by "not in the eyes of

14   Oracle"?

15     A.  I made a presentation in December of

16   2000 in Orlando at Universal Studios facility.

17   There's a hotel.  I can't remember the name of the

18   hotel.  There was a big meeting, and I made a

19   presentation on BIE.

20     Q.  And who was the presentation to?

21     A.  A group of vice presidents, and the

22   group that would determine if they would fund going

23   forward with those kinds of frameworks.

24     Q.  Were any of the senior executives at

25   Oracle there?

1    A.  No.

2    Q.  Okay.  And can you give me the 30-second

3  version of what your presentation said?

4    A.  Basically said we can cut the conversion

5  cost of most engagements by as much as 50 percent,

6  and we can generate most of the application code as

7  a result of the profiling, data profiling, that we

8  did.

9    Q.  Now, at this point in time, Oracle

10  was -- withdrawn.

11    Are you familiar with what Oracle's 11i

12  product was at the time?

13    A.  Yes.

14    Q.  What was that?

15    A.  It basically was a suite of products,

16  all right, based around the Oracle's Database 9

17  series.  I can't remember each of the applications

18  that were in the suite.  It just escapes my mind.

19    But they -- they built suites of

20  products, gave it a tag.  I was very critical

21  because of the new thrust in the e-commerce.  And

22  so, in 11i, you had -- besides CRM and ERP, you had

23  their financial applications.  I don't know about

24  the other applications.  They weren't of interest to

25  me at the time.

41

1    Q.  Okay.  Now, was your BIE focus

2  inconsistent with Oracle's focus on 11i?

3    MR. KRISS:  Objection to the form of the

4  question.  No foundation.

5    THE WITNESS:  I really -- no, I didn't see a

6  conflict.  We were -- we were going after something

7  different.

8  BY MR. BRITTON:

9    Q.  And how -- what were you going after?

10    A.  We basically really didn't care about

11  the applications.  We -- we took a different

12  approach when we sat down with you, the client, and

13  said, "Set the applications to the side for a

14  moment.  They're not relevant.  Your data is the

15  only relevant thing that we want to talk to you

16  about."

17    Q.  And did you have a strategy when you

18  were developing BIE on which products Oracle would

19  use after you set aside the applications --

20    A.  Yes.

21    Q.  -- for a moment?

22    And what was that strategy?

23    A.  What they referred to as the designer

24  developer product.  These are designing software

25  tools.  There's a term called CASE, Computer Aided

42

1  Systems Engineering.  Been around for years.  That's

2  what they're based on.

3    Q.  Okay.  In your strategy, did you

4  envision using 11i as part of the --

5    A.  Never entered my mind.  I wasn't -- that

6  was not, as they say, on the radar.

7    Q.  Now, have you published any works on

8  BIE?

9    A.  Published --

10    Q.  Papers.

11    A.  Well, just internal to Oracle.

12    Q.  How many?

13    A.  I would say probably a half a dozen.

14  I'm not a writer.  I'm not paid to be a writer.

15    Q.  Now, you say that Oracle didn't sanction

16  BIE.  Did they ever stop you from developing it?

17    A.  No.

18    Q.  You said you were critical of the 11i

19  product; is that right?

20    MR. KRISS:  Objection to the form of the

21  question.  Misstates his testimony.

22    THE WITNESS:  I don't think I said I was

23  critical.  It just -- it wasn't on, I'll call it, my

24  to-do thinking list.  I -- I said it's just another

25  product.  But I don't believe I ever said or

43

1  mentioned that I was critical, no.  I'd never be

2  critical of my fellow technologists.

3  BY MR. BRITTON:

4    Q.  Now, as part of your focus on BIE, did

5  you need a technology background?

6    A.  Oh, absolutely.

7    Q.  And let's go into that for a second.

8  What is your technological background?

9    A.  Business modeling.

10    Q.  And explain that for me.

11    A.  Business modeling is where there are

12  different levels of a business model that you would

13  probably pursue.  You could pursue it strategically,

14  tactically or operationally.  Oracle method, in the

15  case of what they called the CASE tool, the

16  designer, developer, had the foundation that allows

17  you to do business modeling.

18    And so, what you're doing is you're

19  coming in and you're getting an organization to tell

20  you from a data or information perspective, what are

21  the critical data, pieces of data in your

22  organization, and what's the relationship between

23  the data.  And you're modeling this, and you're

24  trying -- what you're trying, at the end of the day,

25  is to say "Then produce for me an operational model

44

1  of the information necessary to run this business."
2  Another area that I'm an expert in,
3  according to the people in the industry is planning.
4  Q. Okay. And how so?
5  A. I guess I know project management as
6  well as anyone. I can tell you if that project
7  plan -- I can just go and put your disk in and
8  listen to it turning, and I'll tell you if you have
9  a plan there. I don't even have to look at it.
10  I've gotten good at project management.
11  Q. Okay. Let me step back and go -- let's
12  start from, you know, the basic education.
13  A. Uh-huh.
14  Q. How did you get your knowledge base for
15  project planning and for BIE?
16  A. I'm an econ/math graduate. I believe in
17  economics.
18  Q. Where did you graduate from?
19  A. I graduated from Cal State here in
20  Los Angeles, and I picked up my mathematics from
21  Cambridge England.
22  Q. Cal State LA?
23  A. Cal State -- University of California --
24  yeah, Cal State LA, right. There's so many of them.
25  Q. Yeah, there are. Now, in terms of the

45

1  applications technology, did you have a knowledge
2  base for that?
3  A. Oh, yes.
4  Q. Did you? Okay.
5  How did you develop your knowledge base
6  for that?
7  A. Working for 35 years in the IT industry,
8  touching most of the generally accepted applications
9  that you find in an organization, private or public.
10  Q. Had you ever developed an application?
11  A. Yes.
12  Q. Were you involved in developing Oracle's
13  11i --
14  A. No.
15  Q. Do you have any knowledge about how
16  Oracle developed its 11i?
17  A. No, not really.
18  Q. Okay. Let's talk about the BellSouth.
19  You were involved in that?
20  A. Yes.
21  Q. Can you -- before we get into exactly
22  how you were involved in that, do you know what the
23  project entailed overall?
24  A. Yes.
25  MR. KRISS: Objection, no foundation.

46

1  BY MR. BRITTON:
2  Q. How did you know that?
3  A. Fred Tune, first of all, who worked for
4  me, was on loan starting in April, May time frame of
5  2000. He went down to Birmingham, along with many
6  other consultants working on that project. So, we
7  talk amongst ourselves, and that's how I got
8  familiar with BellSouth.
9  Q. Can you describe the BellSouth project
10  for me?
11  A. The BellSouth project was to -- primary
12  objective was to implement the CRM product as well
13  as look at replacing some of their financial
14  applications.
15  Q. Okay. And were there different business
16  units that BellSouth was intending to implement
17  Oracle's CRM product?
18  A. Yes.
19  Q. Which business units were those in?
20  A. Trying to remember Bellsouth's structure
21  'cause I dealt with a number of telecommunications
22  companies. It was -- there was a group in Atlanta,
23  and I can't remember the business units in Atlanta
24  that was involved, as well as Birmingham. But it
25  had to do with residential and what I call business.

47

1  I believe that's the way they were structured. They
2  had a federal group, but I don't think they were
3  involved.
4  Q. How many different business units did
5  BellSouth intend to install with the 11i product?
6  A. I'd have to look at --
7  MR. KRISS: I'm sorry. Objection, no
8  foundation.
9  THE WITNESS: I'd have to look at the
10  materials that I supplied each of the firms, my
11  worksheets. Just off the top of my head, I don't
12  know.
13  BY MR. BRITTON:
14  Q. You worked on -- withdrawn. What was
15  the -- withdraw that.
16  What did you do for the BellSouth
17  implementation?
18  A. I did two things. First assignment I
19  was requested to do was to help them prepare the
20  proposal for going forward, the CRM being the key,
21  and some interfacing and possible replacement of
22  some of the financial applications.
23  My job was to assist the sales internal
24  technical staff in putting together a proposal,
25  using the Oracle tools that allow you to do

48

1    estimating, risk management, et cetera.
2        Q.  Okay.
3        A.  The second engagement, I got a call from
4    another Oracle account manager.  I was asked to go
5    to Miami and help them put together an accounts
6    receivable application proposal.  I found that
7    strange that it was separated out from the other
8    proposal, but I didn't ask questions.  I just
9    thought it would be nice to go to Miami.
10       Q.  The first engagement, where did that
11   occur?
12       A.  Birmingham, at the BellSouth facility.
13       Q.  And then the second engagement, that was
14   in Miami?
15       A.  At the Oracle office in Miami.
16       Q.  Okay.  Did you ever work on an
17   engagement for BellSouth in Atlanta?
18       A.  No.
19       Q.  Did anybody ever ask you to work on an
20   engagement for BellSouth in Atlanta?
21       A.  No.  I just talked to people from
22   Atlanta who came over.
23       Q.  Okay.  Were there -- was there an
24   engagement going on in Atlanta, to your knowledge?
25       A.  I really don't know.

49

1        Q.  Did you come in with a proposal for the
2    Birmingham engagement?
3        A.  Yes.
4        Q.  What was the value of that proposal?
5        A.  I'd have to look at my notes that I sent
6    you.  I can't remember.
7        Q.  Can you estimate that?
8        A.  That's all I do is estimate, so I've got
9    to keep them separate.  I've got so many going on
10   right now.  It was a few million dollars.
11       Q.  Do you remember what the total value of
12   the BellSouth engagement was in the 2000-2001 time
13   period?
14       MR. KRISS:  Objection.  No foundation.
15       THE WITNESS:  I can't remember the number.
16   BY MR. BRITTON:
17       Q.  Does 40 million sound familiar?
18       MR. KRISS:  Objection.  No foundation.
19       THE WITNESS:  It would be a guess on my part.
20   BY MR. BRITTON:
21       Q.  All right.  Let's talk about the
22   Birmingham, Alabama engagement.  Were there any
23   problems with the installation at the Birmingham,
24   Alabama facility?
25       MR. KRISS:  Objection.  No foundation.

50

1    fix problems.  But that's my observation.
2        Q.  And what was that observation based on?
3        A.  What people were telling me.
4        Q.  Who other than Fred Tune have you talked
5    to about the implementation?
6        A.  I really can't remember the name, but
7    just the consulting group, you know.  You talk
8    amongst yourselves.  And I knew John Wheeler who was
9    managing the engagement.
10       Q.  Did you have an opinion on how he was
11   managing the engagement?
12       MR. KRISS:  Objection to form of the
13   question, no foundation.
14       THE WITNESS:  I'm surprised he didn't bring
15   me in earlier.
16   BY MR. BRITTON:
17       Q.  And why is that?
18       A.  Because John knows that when it comes to
19   doing a health check and sorting it out and telling
20   what has to get done and putting a plan together,
21   that I was the go-to guy.  But I wasn't in his
22   division at the time, so --
23       MR. BRITTON:  Next.
24       (E-mail string dated 1/13/01-1/14/01 re
25   BellSouth ADSL performance issues marked Exhibit 2

52

1        THE WITNESS:  I'm really not sure, your
2    question.  When you talk about the installation, are
3    you talking about what was going on or what was
4    being proposed?
5        MR. BRITTON:  What was going on at the time,
6    the actual implementation at the facility.
7        MR. KRISS:  Objection.  No foundation.  Also
8    objection to the form of the question.
9        THE WITNESS:  Oh, I'm sorry.
10       MR. BRITTON:  Go ahead.
11       THE WITNESS:  Listening to the consultants
12   that were in and out of that engagement, including
13   Fred Tune, there appeared to be issues, and the
14   issue that I thought was the primary issue was there
15   was no plan.
16   BY MR. BRITTON:
17       Q.  And what do you mean by that?
18       A.  I guess after doing this for 30-some
19   years, you know, I can stand back, and I can listen
20   to the discussion.  And chances are that the
21   majority of the time, the reason you've got the
22   problem that you've got is there is no plan.  You
23   have a piece of paper, but that's all you've got.
24           And I think you you -- I got the opinion it
25   was, like, a fire drill, people chasing people to

51

1   for identification.)
2      MR. BRITTON:  Take a moment to review
3   Exhibit 2.
4        For the record, Exhibit 2 has a Bates
5   stamp NDCA-ORCL 058347 through 49.
6   BY MR. BRITTON:
7      Q.  Ask you to take a look and see if you've
8   ever seen this document before.
9      A.  I've never seen this document.
10      Q.  Okay.  Ask you to read the first page of
11  the bottom underneath where it says "Generally."  It
12  starts with "We are live at BellSouth."
13      For the record, the document says, "We
14  are live at BellSouth with 11,000 users on the
15  system.  There are very serious performance problems
16  with the various components in the software stack
17  (Database, Forms Server, CRM application, SqL."
18      Was this consistent with your
19  understanding of what was going on with the
20  BellSouth engagement?
21      MR. KRISS:  Objection to the form of the
22  question, no foundation.
23      THE WITNESS:  The performance problem had
24  been communicated to me throughout 2000 or leading
25  up to the time I arrived at BellSouth, that there

53

1   was a performance issue -- subissues, and it was
2   constantly need to change what is called various
3   SqL, statements like that.  But that's it.
4   BY MR. BRITTON:
5      Q.  How did you gain an understanding of
6   that?
7      A.  People like Fred Tune and other -- other
8   consultants talking in the coffee room or having a
9   drink.
10      Q.  So, this is stuff that you heard from
11  others?
12      A.  From others.
13      Q.  And you didn't have any firsthand
14  knowledge of it?
15      A.  I had no firsthand knowledge, no
16  experience.
17      Q.  Do you know if John Wheeler was let go
18  from Oracle?
19      A.  I don't know if he was let go or he
20  resigned.  I really don't know.  But he came back.
21      Q.  What do you mean "he came back"?
22      A.  He left -- the first time he left, he
23  went to Nextel, I believe, there in Washington.  And
24  then he was brought back or came back -- I don't
25  know the circumstances -- in less than a year after

54

1   he left Oracle the first time.
2      Q.  Okay.  The Birmingham, Alabama
3  engagement, when did that finally close?
4      A.  I don't know the close date.
5      Q.  Do you know if it closed in the third
6  quarter of 2000?
7      A.  I really don't know.
8      Q.  Did you know at the time in 2001 or you
9  just don't recall today?
10      A.  I don't think -- I don't think anyone
11  ever communicated to me, up to my leaving Oracle,
12  the status of the BellSouth other than they didn't
13  win the contract.  That's all I know.
14      Q.  Okay.  Let's go next to the Miami
15  engagement.  You worked on that.
16      A.  Yes, writing the proposal.
17      Q.  Okay.  And what did you do?
18      A.  I wrote the proposal with the sales
19  director.  I do not remember his name.  I think he
20  was Venezuelan.  That's all I remember.
21      Q.  When did you arrive in Miami?
22      A.  The -- I arrived the Sunday -- back up.
23  How would you say it?  It was the -- not the Sunday
24  before Thanksgiving, but the prior Sunday.  Whatever
25  you referred to that from a terminology standpoint.

55

1   I was only there a week.
2      Q.  Did you get the proposal done?
3      A.  I got the proposal done, yeah, yeah.  It
4  was pretty straightforward.
5      MR. BRITTON:  I've placed in front of you
6  what's been marked as Plaintiff's Exhibit 3 -- or
7  Green Exhibit 3.  Would you take a moment to look at
8  this exhibit.  For the record, Green Exhibit 3
9  starts with Bates Green 0001 through 81.
10      (Document entitled "Bell South
11  Estimating Spreadsheet" marked Exhibit 3 for
12  identification.)
13      THE WITNESS:  Uh-huh.
14  BY MR. BRITTON:
15      Q.  Are you familiar with this document?
16      A.  It's the document I sent you and the
17  Oracle legal counsel -- or I sent it to him and he
18  sent it.
19      Q.  What is this exhibit?
20      A.  This is an estimating -- if you go to
21  the first page up here -- it lists the different
22  worksheets.
23      Q.  Yes.
24      A.  And this is the spreadsheet or the --
25  what is called the AIM, A-I-M, which is their

56

1    Application Integration Methodology, estimating
2    package that Oracle had developed.
3        And this is the template that I used to
4    ascertain answers to questions and then to generate
5    the estimate, eventually then a project plan, and
6    the cost and the time from a consulting standpoint.
7        Q.  Okay.  And is this the estimate or the
8    proposal for the Miami --
9        A.  No.  This is the one from Birmingham.  I
10   could not find the Miami estimate.  Either it was so
11   good, it disappeared.  I don't know.
12       Q.  Now, did this document inform you about
13   what the proposal was for the Birmingham engagement?
14       A.  Yes, partially.
15       Q.  Okay.  And how would it do that?
16       A.  It would do that by a number of things.
17   If you go to -- let me make sure on the page.  If
18   you go to page 4 of 80, this starts to list the
19   different components that are available and are
20   factored into the estimating algorithms.
21       These are the products, I guess you
22   would call them.  And so, what I would do is say,
23   "All right.  Which of the products are you proposing
24   to the client?"  And we would go in and put a factor
25   in.  And I believe that goes on to page 5.

57

1        Q.  And where is the factor you're talking
2    about?
3        A.  The factor is basically behind the
4    spreadsheets.  I don't know what experience you have
5    with Excel.  Excel is obviously a spreadsheet tool
6    from Microsoft, which is how this estimator was
7    built by the Oracle people.  I did not build the
8    estimator.  I want that perfectly clear.  And,
9    basically, there's algorithms behind it, which then
10   starts to generate for you page 6 through page 80.
11       And out of that you can then decide to
12   export the results into a project work plan
13   template, whether it's in Microsoft Project or what
14   they call ABT Workbench.  That's another project
15   management tool.  So, you took your choice.
16       Q.  So, you would use this to create the
17   proposal?
18       A.  Yes.  And this would basically be the --
19   would not be given to the customer, obviously.
20       Q.  Only the proposal would be given?
21       A.  Correct.
22       Q.  And do you have the proposal for the
23   Birmingham facility?
24       A.  No, I do not.  The final proposal, is
25   that your question?

58

1        Q.  Yes, yes.
2        A.  No.  I never saw it.  I was gone.
3        Q.  Now, explain to me how your proposal
4    would ultimately get to the customer, if you know.
5        A.  The proposal basically, once I completed
6    this work and generated the project work plan 'cause
7    I'm a great believer, I'm not going to give you an
8    estimate unless I run the project tool.  Because in
9    there there are a number of factors that I'm looking
10   for.
11       That information then -- we went over
12   the next step was to create what is called a Project
13   Charter, which is an Oracle template in Oracle
14   Method, a Word document basically.  And you would go
15   and bring the template in and just start filling,
16   you know, with statements and so forth.  And once
17   that charter was done, it was then turned over to
18   the sales organization.
19       Now, they were involved as you were
20   building it.  It wasn't -- you didn't blindside them
21   with it.  But I did just this part (indicating).  I
22   did not write the charter.  I told them how to do it
23   because they clearly didn't know how to do it.
24       Q.  So, before you wrote this, and then you
25   left for a different project?

59

1        A.  I went from this task down to Miami
2    to do fundamentally the same thing, different results.
3    While I was in Miami, I got a call and said, "Be in
4    Stockholm the Monday after Thanksgiving."  So, I
5    went home for Thanksgiving and then left for
6    Stockholm.
7        Q.  Now, you mentioned earlier that Oracle
8    didn't win the business, right?
9        A.  To my knowledge, they did not win this
10   business (indicating).  To my knowledge, they won
11   the Miami -- I'll refer to it as "the Miami
12   proposal."
13       Q.  So, they didn't win the Birmingham
14   proposal, but they did win the Miami proposal?
15       A.  That was my understanding.
16       Q.  And do you have an understanding of what
17   was the larger of the two?
18       A.  Oh, the Birmingham by far, by far.  That
19   was the continuation of 11i, CRM, and a variety of
20   others.  As you can see in here, all the products in
21   here.
22       Q.  Right.
23       A.  Yeah, it's big.
24       Q.  Do you know when the -- did you ever --
25   were you ever informed when they did not win the

60

1   proposal?
2       MR. KRISS:  Objection.  No foundation.
3       THE WITNESS:  I was in Stockholm, and a
4   couple individuals from the Birmingham project, a
5   couple directors who were involved down there, they
6   brought them over, I think, either the end of
7   December, first of January, to look at the proposal
8   that was going to Telia.  And they mentioned that it
9   seemed like the proposal was not going well.  They
10  thought it was a done deal.
11  BY MR. BRITTON:
12      Q.  And then ultimately did you find out
13  that it actually did not close?
14      A.  I found out later sometime in
15  February -- I don't -- I can't remember exactly how.
16  I think I was back from Stockholm and found out in
17  one of my travels that they had -- I didn't follow
18  up on it.
19      Q.  Okay.  That was -- was this the
20  Birmingham BellSouth deal, was this a big deal
21  within Oracle at the time?
22      A.  Oh --
23      MR. KRISS:  Objection to the form of the
24  question.
25      THE WITNESS:  Yes.

61

1   BY MR. BRITTON:
2       Q.  Yes.  And what makes you think it was a
3   big deal?
4       A.  The investment Oracle had --
5       MR. KRISS:  Excuse me, excuse me.
6           Objection to the form of the question,
7   no foundation.
8       MR. BRITTON:  Go ahead.
9       THE WITNESS:  The investment made on behalf
10  of Oracle leading up to the proposal.
11  BY MR. BRITTON:
12      Q.  Okay.  And do you know what that
13  investment was?
14      A.  It was 100-plus consultants for nine
15  months or longer at a discounted rate.
16      Q.  You think the senior executives at
17  Oracle knew about it?
18      MR. KRISS:  Objection to the form of the
19  question, no foundation.
20      THE WITNESS:  I would have thought they
21  would.  I don't know for a fact.
22  BY MR. BRITTON:
23      Q.  What makes you think that you would have
24  thought?
25      MR. KRISS:  Objection to the form of the

62

1   question, no foundation.
2       THE WITNESS:  There's a term -- I think we've
3   all used it -- it was on the radar.
4   BY MR. BRITTON:
5       Q.  How do you know it was on the radar?
6       MR. KRISS:  Objection to the form of the
7   question, no foundation.
8       THE WITNESS:  'Cause John Wheeler was
9   reporting up the chain of command, to the best of my
10  knowledge, for meetings on the subject going on.  I
11  don't know who was in the meetings.
12  BY MR. BRITTON:
13      Q.  How do you know that he was reporting up
14  the chain?
15      A.  I don't know that he was reporting.  I
16  just assumed, knowing John.
17      Q.  Okay.  Would you be surprised if
18  Oracle's senior executives did not know about the
19  Birmingham BellSouth deal not closing?
20      MR. KRISS:  Objection to the form of the
21  question, no foundation.
22      THE WITNESS:  I would absolutely be
23  dumbfounded.
24  BY MR. BRITTON:
25      Q.  Do you have any knowledge about why the

63

1   Birmingham engagement did not close?
2       MR. KRISS:  Objection to the form of the
3   question, no foundation.
4       THE WITNESS:  No knowledge as to what went
5   on.
6   BY MR. BRITTON:
7       Q.  Let's take you to Sweden.  When did you
8   arrive in Sweden again?
9       A.  That Sunday after Thanksgiving 2000.  I
10  had a week off for Thanksgiving and then went to
11  Sweden.
12      Q.  And what was your responsibility with
13  respect to the Telia deal in Sweden?
14      A.  Well, it changed each day as we got into
15  it.  I basically arrived at the Marriott there in
16  Stockholm Monday.  I actually stopped in London on
17  Sunday and stayed the night in London and flew into
18  Stockholm Monday.
19          They had a car waiting for me at the
20  hotel to take me out to Oracle, and Gary Moore was
21  there.  He had already informed me about it.  And
22  they apparently had been working on the deal, as we
23  refer to, for some time -- I'll say three or four
24  months -- and were having difficulty getting the
25  numbers together.

64

1    So, they said, "Bob, we need you to walk
2    us through the process of putting a proposal
3    together." They had never used the estimating tool
4    set.
5        So, we started that Monday night. And I
6    was there for roughly two weeks straight before I
7    returned to Los Angeles 'cause I had other
8    commitments and then returned to Stockholm.
9        Q.  When did you return to Stockholm?
10       A.  I went home for -- I took a week after
11   the first two weeks, come back to the U.S. to
12   finalize a couple deals I was working on -- Oracle
13   deals. And then returned to Stockholm. I
14   volunteered to hold down the fort over the holidays.
15       Q.  And how long were you ultimately in
16   Stockholm?
17       A.  Through the last week in January.
18       Q.  Did the Telia project ultimately close?
19       A.  No.
20       Q.  Why not?
21       MR. KRISS:  Objection. No foundation.
22       MR. BRITTON:  Withdrawn.
23   BY MR. BRITTON:
24       Q.  Do you know why not?
25       MR. KRISS:  Objection. No foundation.

65

1        THE WITNESS:  Apparently, they were waiting
2    on word from BellSouth on the BellSouth project.
3    Sometime in January -- I don't know when -- the word
4    came down "We're not going to proceed with 11i and
5    the CRM proposal from Oracle." That was Telia
6    saying that.
7    BY MR. BRITTON:
8        Q.  And how do you know this?
9        A.  They told me to close down the effort.
10       Q.  Who told you to close down the effort?
11       A.  Gary Moore 'cause he was communicating
12   with the CIO of Telia on a day-to-day basis.
13       Q.  Do you know if Oracle senior executives
14   knew about the Telia deal not closing?
15       MR. KRISS:  Objection. No foundation.
16       THE WITNESS:  I have to assume they did.
17   BY MR. BRITTON:
18       Q.  Would you be surprised to learn that
19   they did not know about the Telia deal not closing?
20       MR. KRISS:  Objection to the form of the
21   question, no foundation.
22       THE WITNESS:  I would be dumbfounded.
23   BY MR. BRITTON:
24       Q.  And why is that?
25       MR. KRISS:  Objection to the form of the

66

1    question, no foundation.
2        THE WITNESS:  I guess after close to eight
3    years at Oracle, I just would find that hard to
4    believe.
5    BY MR. BRITTON:
6        Q.  And what do you base that opinion on,
7    your eight years? What are you thinking about when
8    you say you find it hard to believe?
9        A.  Well, the --
10       MR. KRISS:  Excuse me, sir. Objection to the
11   form of the question.
12       THE WITNESS:  Having seen Oracle's senior
13   management involvement on other very important
14   projects, i.e., Kellogg's in the past, of which I
15   was involved with, I felt that the Telia, BellSouth
16   projects fit the same level of importance.
17   BY MR. BRITTON:
18       Q.  And what made you think that Telia,
19   BellSouth deals fit the same level of importance?
20       MR. KRISS:  Objection to the form of the
21   question, no foundation.
22       THE WITNESS:  Just the urgency of what they
23   were asking me to do.
24   BY MR. BRITTON:
25       Q.  Let's step back for a second now. Can

67

1    you describe the Telia project for me, what it was?
2        A.  Well, initially the project was to
3    obviously go forward with the 11i CRM suite
4    following the same model that they were deploying
5    there with BellSouth. The concerns apparently -- a
6    concern that someone at Oracle and Sweden had was
7    there's something different about this project, and
8    they weren't sure what it was.
9        I don't know how the communication came
10   through to Gary Moore, Gary being my boss. That's
11   when he called me in Miami and said, "Bob, you need
12   to get over here to Sweden. They need to hear your
13   message." And I said what's -- he explained what
14   was going on.
15       Once I got there, it was obvious that it
16   was more than just an 11i CRM suite kind of
17   situation. The client really wanted to see what it
18   was going to take to integrate, which was my special
19   specialty, non-Oracle products, SAP, very popular in
20   Europe, some of their products, Legacy systems.
21       They had clearly defined business units.
22   I can't remember the name of it 'cause they use
23   Swedish names on it and you kind of got lost.
24       And I said, "This is not just
25   classical," I used the term, "BellSouth 11i CRM

68

1    project.  You need to look at" -- and I think that's
2    what Gary saw -- "this whole data issue."
3        So, basically, I was proposing also the
4    BIE approach to looking at, examining what it is
5    that you're trying to do from a business -- they
6    were going through deregulation, by the way, at that
7    time, which I had become apparently a subject matter
8    expert according to some people.
9        So, that kind of changed what we were
10   doing.  So, it was more than just cranking out or
11   copying the BellSouth proposal.
12       MR. CAPLAN:  Let's take a break.
13       MR. BRITTON:  Let's go off the record.
14       THE VIDEOGRAPHER:  We're going off the
15   record.  The time is 11:01 a.m.
16       (A brief recess was taken.)
17       THE VIDEOGRAPHER:  We're back on the record.
18   The time is 11:14 a.m.
19       (Document entitled "ERP/CRM
20   Implementation project Initial deliverables and
21   project setup, Contract S00169AK" marked Exhibit 4
22   for identification.)
23       MR. BRITTON:  Mr. Green, I've placed in front
24   of you what's been marked as Green Exhibit 4.  Will
25   you take a look at this exhibit.

69

1        For the record, this Exhibit 4 contains
2    six separate documents.  Let me go document by
3    document in terms of Bates number 'cause I do
4    believe I pulled one out because it looked like a
5    duplicate to me.
6    BY MR. BRITTON:
7        Q.  First document in Exhibit 4 starts with
8    Bates Green 000082 and ends at 95.  Second document
9    starts at Green 000110 and it ends at 117.  Next
10   document starts at 118 and ends at 126.  The next
11   document starts at 127 and ends at 142.  Next
12   document starts at 143 and ends at 156, and the last
13   document starts at 157 and ends at 170.
14       MR. CAPLAN:  I have seven documents.  Did you
15   say six?
16       MR. BRITTON:  Seven then.
17       MR. CAPLAN:  Seven, yeah.
18       MR. BRITTON:  Oh, you know what, I pulled it
19   out of my stack.  It's still in there, so we need to
20   find out which one I didn't identify.
21       THE WITNESS:  It's these.  These two.
22       MR. BRITTON:  It's the second one.  It
23   probably starts with 96 and ends at 109.
24       THE WITNESS:  Yeah.
25       MR. BRITTON:  Okay.  Keep it within there.

70

1        THE WITNESS:  Sure.
2    BY MR. BRITTON:
3        Q.  Do you recognize these documents,
4    Mr. Green?
5        A.  By just looking at the cover page or can
6    I look inside?
7        Q.  Oh, no.  Take whatever time you want to
8    look at these.  I think they were produced from
9    documents that you produced in response to the
10   subpoena.
11       A.  Yes, they were documents that were -- I
12   was involved with.
13       Q.  Okay.  And did you produce these
14   documents in response to the subpoena?
15       A.  Yes.
16       Q.  Okay.  This is part of the group of
17   documents that you gave to your lawyer --
18       A.  Yes.
19       Q.  -- who you understood forwarded them to
20   counsel?
21       A.  Yes, yes.  This was under Telia.
22       Q.  Let's go through the documents one by
23   one.  The first document in Exhibit 4, the one that
24   starts with 82 and ends with 95, what is this
25   document?

71

1        A.  This is a template used by Oracle at the
2    time to describe the initial deliveries and the
3    project setup statements.  If you go to the -- I see
4    it's missing the table of contents, but can't speak
5    to that, but basically what you're trying to do is
6    trying to define the major deliverables.
7        Q.  What do you mean by that?
8        A.  Deliverables would be an agreed-to list
9    of deliverables that you believe the customer wants
10   to see to show progress.  Does not include
11   necessarily all the deliverables that would make up
12   a project, but it's the -- what I call the high-end
13   deliverables.
14       Q.  Can you give me an example?
15       A.  Business system design, test plan,
16   project plan.  Those would be high-end deliverables.
17       Q.  Okay.  And how would you show that to
18   the customer to show that you were making progress?
19       A.  Through -- generally through the project
20   work plan, which is a -- in this case, I think in
21   Telia -- I don't know this to be true -- I believe
22   we used Microsoft Project and not ABT Workbench.
23       Q.  How did you come into possession of
24   these documents?
25       A.  Since when I arrived on the scene, first

72

1  thing they said "Let's give you all the
2  documentation up to date, because you're going to
3  have to help us sort it out."  Some of the documents
4  I did not create personally.
5      Q.  Okay.  Now, let's go to the next
6  document, and that document which starts with
7  Bates 96.
8      A.  Uh-huh.
9      Q.  And this is labeled "ERP/CRM
10  Implementation project, Initial deliverables and
11  project setup, Contract S000169AK."  Is this any
12  different than the document before?
13      A.  This was the predecessor.  The only
14  difference is they forgot to update the version
15  number on this guy here, which is the first one.
16  And you can tell by the dates.
17      This is what they had done prior to me
18  arriving (indicating), and this apparently is what
19  they updated as a result of the work or discussions
20  held when once I arrived.
21      Q.  And for the record, the one that they
22  undated after you were there is the document that's
23  Bates 82 through 95?
24      A.  Correct.
25      Q.  All right.  Let's go to the next exhibit

73

1  which -- or the next document in Exhibit 4, which
2  starts at Bates 110 and ends at 117.  It has the
3  title "Oracle Svenska AB, Telia TeleCom AB, contract
4  S00165AK, Proof of Concept, 11i."  What is this
5  document?
6      A.  This is another deliverable, example of
7  a deliverable where you're basically -- some
8  customers want a proof of concept initially before
9  they'll basically go forward with the project.  So,
10  the people at Oracle Sweden basically were to --
11  were apparently planning to conduct a proof of
12  concept, in this case on 11i.  This was developed
13  prior to me arriving.
14      Q.  Okay.  Let's go to the next document
15  within Exhibit 4, and it starts with Green 118, and
16  it ends at Green 126.
17      A.  Uh-huh.
18      Q.  And the title is "Telia and Oracle
19  Corporation Letter of Intent."
20      A.  Uh-huh.
21      Q.  What is this document?
22      A.  This is a letter that was created
23  between Telia and Oracle Sweden on the intent of --
24  apparently Oracle was able to get Telia to pay for
25  the preparation of the proposal.  Very unusual.

74

1  Generally customers don't want to pay for that kind
2  of work.
3      Q.  You have any knowledge of how they were
4  able to do that?
5      A.  None whatsoever.
6      Q.  Now, the fact that they, Oracle, was
7  able to get Telia to pay for the preparation of the
8  proposal, does that mean that they were able to
9  close the deal?
10      A.  Not necessarily.
11      Q.  Okay.  Let's go to --
12      A.  Question.
13      Q.  Sure.
14      A.  Are -- "close the deal" in getting the
15  customer to pay for this initial analysis but not
16  the final product?
17      Q.  No, I'm talking about the final
18  product --
19      A.  Oh, I'm sorry.
20      Q.  -- the overall deal.
21      A.  All right.  No.
22      Q.  So, the fact there was a letter of
23  intent does not mean that the overall deal closed?
24      A.  No.
25      Q.  Okay.  Next document starts with 127 and

75

1  ends at 142.  It's entitled "ERP/CRM Implementation
2  project, Initial deliverables and project setup."
3      A.  Uh-huh.
4      Q.  What is this document?
5      A.  This basically is very similar to the
6  first two documents you have in your stack.  This
7  was an attempt of the team that was there prior to
8  me arriving, to update the initial deliverable
9  project setup report for the third time.  And that's
10  when the decision was made, apparently, sometime
11  around November 22nd, they needed help.
12      Q.  Okay.  Next document starts at 143 and
13  ends at 156, and it's entitled "Program Management
14  of Oracle Projects for Telia AB."  What is this?
15      A.  This is a classical letting you know, as
16  the customer, the project management approach that's
17  going to be used by Oracle in the proposed
18  engagement.  It's a very cookie cut, this comes
19  right off the system, with few minor modifications.
20  They were proposing to use Oracle Project Management
21  Method to manage the engagement.
22      Q.  What is the Oracle Project Management
23  Method?
24      A.  As I mentioned earlier, Oracle had a
25  framework called Oracle Method.  One of the

76

1 components in it was project management.  You have a
2 framework in there for AIM, which was installing
3 packages, doing data warehousing.  This is project
4 management.
5      Q.  And then the next document starts at 157
6 and ends at 178.  What is -- oh, excuse me.  Ends at
7 170.  What is this document?
8      A.  This is a document that they had
9 developed prior to me arriving, the team that was
10 there.  And it basically talks about the scope of
11 the preparation work.  It's a classical what are
12 my -- what are the objectives, what are the critical
13 success factors for doing this work I'm about to do
14 for you, and the approach that they're going to
15 take.
16      Q.  Did you use any of these documents for
17 your work at the Telia project?
18      A.  I reviewed them because that's what they
19 dropped on me that Monday night when I arrived.
20 They said, "Here is all the material that we have
21 developed to date.  And you may want to review
22 these.  And could you review them overnight and get
23 with us on" -- I think it was Tuesday.
24      Q.  Okay.  Do you know what the value was of
25 the Telia AB deal?

77

1      A.  The initial preparation work or the
2 final proposal?
3      Q.  The final proposal.
4      A.  I don't know because of the translation,
5 you know, between Swedish and -- I think it was in
6 Swedish -- in the Swedish currency at one time.  I
7 don't remember what it was.  I did it in dollars,
8 and I said, "It's not my job to convert."
9      Q.  When did you know that the Telia deal
10 wasn't going to close?
11      MR. KRISS:  Objection.  No foundation.
12      THE WITNESS:  Two weeks before my -- before I
13 departed.
14 BY MR. BRITTON:
15      Q.  So, that was in the February 2001 time
16 frame?
17      A.  No, that was in January.
18      Q.  In January of 2001?
19      A.  Yes.  I departed the last Friday --
20 well, I departed Sweden in the last Saturday in
21 January.  I departed Telia officially the
22 Thursday -- the last Thursday.  I took Friday off
23 and walked around Stockholm.
24      Q.  Now, did the failure to close the
25 BellSouth deal in Birmingham and the Telia deal in

78

1 Sweden, did that give you any cause for concern
2 about Oracle making its forecasts for the third
3 quarter of 2001?
4      MR. KRISS:  Objection to the form of the
5 question, no foundation.
6      THE WITNESS:  I never thought about it.  I
7 was ready to move back, and I was working on three
8 other proposals.  I was disappointed, Telia
9 particularly.  I wanted to stay in Sweden for a
10 while.
11 BY MR. BRITTON:
12      Q.  Do you know what a gap analysis is?
13      A.  Yes.
14      Q.  What is it?
15      A.  A gap analysis is -- there are different
16 types of gap analyses.  There could be a gap
17 analysis where you're looking at differences in
18 data, which I'm very familiar with.  There's gap
19 analysis in the financial world, which I'm working
20 on right now.  Major issue.
21      But basically what you're trying to do
22 is you're trying to determine from a set target to
23 another set of targets what is the difference.
24      Q.  Okay.  And in terms of at Oracle in
25 2000-2001, did gap analysis have any meaning

79

1 particular to Oracle?
2      A.  I'm not aware that it does particularly.
3 I only did it when I was doing what is called data
4 profiling, which was look at your data.
5      Q.  So, is it fair to say that gap analysis
6 is you look at what the customer has and you look at
7 what Oracle wants to install, and how to get from
8 Point A to Point B is the gap analysis?
9      A.  The gap --
10      MR. KRISS:  Excuse me.  Objection to the form
11 of the question.
12      THE WITNESS:  The gap analysis in the field
13 of data profiling, which is one of our expertise in
14 the group that I worked with, is we look at your
15 data.  Our target is the Oracle database of the
16 application being proposed.
17      Obviously, you want to determine what is
18 it going to take for you to go from here to here
19 (indicating), and that determination is called the
20 gap, and it's made up of different components.
21      The gap could be that you've got bad
22 data here, you've got a lot of cleaning to do.  The
23 gap could be that you're missing data that you need
24 over here.  And so, basically you're trying to lay
25 out a road map -- the gap analysis lays out the road

80

1 map of what you're going to have to do to go from
2 Point A to Point B.
3     MR. BRITTON: Okay. I placed in front of you
4 what's been marked as Green Exhibit 5. Take a
5 moment to look at this exhibit, please.
6     THE WITNESS: Uh-huh.
7        (Estimating results from Telia
8 engagement marked Exhibit 5 for identification.)
9     MR. BRITTON: For the record, Green Exhibit 5
10 starts at Bates Green 000171 and ends at 222. And
11 the first page says "Telia/e-Bolaget,"
12 B-o-l-a-g-e-t, "CRM Foundation Implementation
13 Estimate Spreadsheet Index."
14     MR. KRISS: Doug --
15     MR. BRITTON: Yes.
16     MR. KRISS: -- my document sort of ends at
17 196.
18     MR. CAPLAN: So does mine.
19     MR. KRISS: It's not in numerical order.
20     MR. CAPLAN: It's not in order.
21     THE WITNESS: Oh.
22     MR. CAPLAN: Looks like I recopied -- we can
23 be off the record for this -- 171.
24     THE VIDEOGRAPHER: We're going off the
25 record. The time is 11:30 a.m.

81

1        (Discussion held off the record.)
2     THE VIDEOGRAPHER: We're going back on the
3 record just to switch tapes. We're back on the
4 record. The time is now 11:31. This marks the end
5 of Tape No. 1, Volume I, in the deposition of
6 Mr. Robert Green. We're going off the record. The
7 time is 11:32 a.m.
8        (A brief recess was taken.)
9     THE VIDEOGRAPHER: We're back on the record.
10 This marks the beginning of Tape No. 2, Volume I, in
11 the deposition of Mr. Robert Green. The time is now
12 11:34 a.m.
13 BY MR. BRITTON:
14     Q. Okay, Mr. Green, have you had a chance
15 to look at Exhibit 5?
16     A. Yes.
17     Q. Okay. And you recognize it?
18     A. Yes.
19     Q. What is it?
20     A. It is the estimating results from the
21 Telia engagement that I was asked to prepare for the
22 Oracle people there in Stockholm.
23     Q. You actually prepared this?
24     A. I actually prepared this.
25     Q. And this is not the proposal; is that

82

1 correct?
2     A. This is used to feed the proposal.
3     Q. Did you actually generate a proposal?
4     A. No.
5     Q. Why not?
6     A. I wasn't asked to.
7     Q. Okay. If you look at the pages that
8 start with 185 and end at 188, these appear to
9 relate to the BellSouth project, although they are
10 consecutively within the 51 pages, it is noted down
11 at the bottom of the page.
12     A. Uh-huh.
13     Q. Do you know why those are in there?
14     A. Basically, they requested that we
15 only -- when you estimate a project, projects have
16 phases. Generally, this is what you try to do. And
17 they only wanted to see design through what is
18 called -- the design through production phases. So,
19 this represents the tasks that would be included in
20 the final plan for the design through production
21 phases only.
22     Q. When you say "they," who are you talking
23 about?
24     A. The -- the Oracle people there, right.
25 They wanted to see the results at BellSouth. So,

83

1 what we did was we just, in effect, inserted the
2 BellSouth results for design through production.
3 They wanted them to look the same. For what reason,
4 I have no idea.
5     Q. Now, were you aware at the time whether
6 Telia Networks was implementing 11i?
7     A. No.
8     Q. You were not, okay.
9        Actually I'm going to ask you another
10 question on Exhibit 5.
11     A. I'm sorry.
12     Q. Can you tell what the value of the
13 contract was for the Telia AB deal based upon
14 Exhibit 5?
15     A. No.
16     MR. BRITTON: Okay. Court reporter has
17 placed in front of you what's been marked as
18 Plaintiff's -- or Green Exhibit 6. It starts with
19 Bates Green 000227 and ends at 454.
20        (Telia project charter component
21 documents marked Exhibit 6 for identification.)
22 BY MR. BRITTON:
23     Q. Do you recognize Exhibit 6?
24     A. Yes.
25     Q. And what is Exhibit 6?

84

1    A.  This is basically what I call the

2    project charter components.

3    Q.  This was for Telia?

4    A.  Yes, it was.

5    Q.  Is this a proposal?

6    A.  No.  This is support documents that

7    would be given to the customer once the proposal was

8    signed.

9    Q.  Did you prepare these documents?

10   A.  I believe I need to go through each one.

11   I -- at least the ones I see.  If my name's on it,

12   there's a high probability.

13       The only one I did not prepare would be

14   the item that says "Agenda."

15   Q.  And what Bates number does that start

16   with?

17   A.  That's 415.

18   Q.  Do you know who prepared --

19   A.  Mr. Gary Moore.

20   Q.  Gary Moore, all right.

21       How did you become in possession of

22   that?

23   A.  Basically I took notes at the meeting or

24   attempted to take notes.

25   Q.  Do you know if the proposal was ever

85

1    made to Telia AB?

2    MR. KRISS:  Objection.  No foundation.

3    THE WITNESS:  I don't know which -- whether

4    it was or not.

5    MR. BRITTON:  Okay.  Done with that document.

6    BY MR. BRITTON:

7    Q.  Actually, let me ask you another

8    question about -- how did you use the documents that

9    are within Exhibit 6 as part of your business in

10   Sweden for Oracle?

11   A.  I'm not sure of the question.

12   Q.  How did you use these documents?

13   A.  Basically, I used these to -- first of

14   all, to communicate with the customer and then

15   eventually deliver the results to the Oracle sales

16   organization, saying, "All right.  Here's the packet

17   that you would go forward with if you're going to

18   obviously get the contract for consulting."

19   Q.  It was part of your job responsibilities

20   to prepare these?

21   A.  Absolutely.

22   Q.  And when did you prepare these

23   documents?

24   A.  They were prepared over a number -- it

25   actually started on December 2nd -- my birthday,

86

1    by the way -- through the end of January.

2    MR. BRITTON:  All right.  You can put that

3    aside.

4        Okay.  I've placed in front of you what

5    has been marked as Plaintiff's Exhibit -- Green

6    Exhibit 47 [sic].  Take a moment to look at this

7    exhibit.

8        For the record, Exhibit 47 -- excuse me,

9    Exhibit 7 starts with Green 000455 through 516.

10   (Project work plan defining the various

11   phases of Telia project marked Exhibit 7 for

12   identification.)

13   MR. KRISS:  Starts at what?

14   THE WITNESS:  455.

15   MR. KRISS:  I got 499 to 510.

16   MR. BRITTON:  Can we go off the record for a

17   second.

18   THE VIDEOGRAPHER:  We're going off the

19   record.  The time is 11:43 p.m.

20   (Discussion held off the record.)

21   THE VIDEOGRAPHER:  We're back on the record.

22   The time is 11:47 a.m.

23   MR. BRITTON:  Okay.  It appears as though we

24   had a copying issue, so Exhibit 7 now starts with

25   Bates Green 000467 and ends at 516.

87

1    BY MR. BRITTON:

2    Q.  Do you recognize Exhibit 7, Mr. Green?

3    A.  Yes.

4    Q.  What is Exhibit 7?

5    A.  This is a project work plan defining the

6    various phases that was recommended that they move

7    forward with the implementation of the CRM

8    component.

9    Q.  And did you prepare this?

10   A.  This was generated as a result of the

11   estimator.  And then I broke it up into more

12   manageable parts.

13   Q.  Who generated it?

14   A.  I did.

15   Q.  Did you give it to anybody?

16   A.  Yes.

17   Q.  Who?

18   A.  Gary Moore saw it first since I was

19   reporting to him.  He was the program director.  And

20   it was reviewed with other members of the Oracle

21   team and with certain members of Telia.  I don't

22   remember who at Telia.

23   Q.  Now, do you prepare these schedules

24   typically --

25   A.  Yes.

88

1 Q. -- as part of your estimating?

2 With every project?

3 A. 99 percent.

4 Q. And you prepared this as part of your

5 job responsibilities at Oracle?

6 A. Yes.

7 Q. And when did you prepare it?

8 A. It was prepared in the December, January

9 time frame. I don't know the specific dates.

10 Q. December 2000, January 2001?

11 A. Correct.

12 Q. All right. You can put that back.

13 Okay. The deal that you were talking

14 about before that you working on simultaneously with

15 BellSouth and Telia, do you recall that?

16 A. Yes.

17 Q. Which one do you --

18 A. First one was with the University of

19 Southern California. Subject was strategic

20 planning.

21 Second one was with the Teamsters

22 Western Region Retirement Group, and they wanted to

23 convert their current system using new Oracle

24 technology.

25 The third one was in Harrisburg,

89

1 Pennsylvania, with the State of Pennsylvania,

2 Classified Employees Retirement System. They were

3 looking to, in effect, possibly use BIE to develop a

4 redoing of their Legacy systems.

5 Q. Did any of these projects involve the

6 sale of 11i?

7 A. No.

8 Q. Did any of these deals close in the

9 third quarter of 2001?

10 A. No.

11 Q. Were any of these deals expected to

12 close in the third quarter of --

13 A. They were expected to close in Q4 of

14 2001, which would have been March, April, May

15 timeframe.

16 Q. Were you aware in the December, January

17 time period about a sale of 11i to Michigan?

18 MR. KRISS: Objection. No foundation.

19 THE WITNESS: No. I assume when you say

20 Michigan -- the State of Michigan?

21 MR. BRITTON: Yeah, or any entity in

22 Michigan.

23 THE WITNESS: No.

24 BY MR. BRITTON:

25 Q. Okay. I want to step away from

90

1 individual products or the individual projects. And

2 did you have a view about how Oracle's business was

3 performing in light of the economic conditions in

4 the 2000-2001 time period?

5 MR. KRISS: Objection to the form of the

6 question. Vague as to time. Also no foundation.

7 THE WITNESS: As it impacted what our group

8 was doing, yes.

9 BY MR. BRITTON:

10 Q. And how did it impact what your group

11 was doing?

12 MR. KRISS: Objection to the form of the

13 question, no foundation.

14 THE WITNESS: Consulting opportunities became

15 fewer, sometimes more difficult to negotiate. And

16 hate to use the expression, within the consulting

17 world, it became a dog-eat-dog environment.

18 BY MR. BRITTON:

19 Q. And what did you -- how did you

20 attribute these -- the items that you just mentioned

21 to the economic conditions in 2000-2001?

22 MR. KRISS: Objection. No foundation. Also

23 object to form. Vague as to time.

24 THE WITNESS: It would -- my involvement with

25 other engagements prior to BellSouth and Telia

91

1 starting in 1999, mid '99 into -- leading up to

2 BellSouth, engagements just became more difficult.

3 Consultants were being let go because of no work.

4 In communicating with the rest of the

5 market, people outside of Oracle in consulting --

6 'cause, you know, it's a community -- the Big Sixes

7 were having their problems. Everyone was having

8 their problems 'cause I was looking to get contracts

9 with Deloitte and Price Waterhouse for Oracle.

10 BY MR. BRITTON:

11 Q. When were you doing that?

12 A. Starting about mid-1999 leading all the

13 way up to when I got called to go to BellSouth, and

14 that took every hour of the day to work on that.

15 Q. Okay. Did the difficulties that you

16 encountered getting new consulting business, did

17 that get increasingly more severe?

18 A. Oh, yes.

19 MR. KRISS: Objection to the form of the

20 question. Vague.

21 BY MR. BRITTON:

22 Q. How so?

23 A. It just became more difficult. The

24 customers were not -- were not spending. They were

25 cutting back.

92

Green, Robert  10/18/2005  9:36:00 AM

1    Q.  Do you think the senior executives at
2  Oracle knew about that?
3    MR. KRISS:  Objection.  No foundation.
4    THE WITNESS:  They had to know about it.
5  Being as knowledgeable as they are, I do respect
6  their knowledge.
7  BY MR. BRITTON:
8    Q.  Okay.  And what do you mean "they had to
9  know about it"?
10   MR. KRISS:  Objection.  No foundation.
11   THE WITNESS:  Well, I assume they picked up
12  at least one of the major publications, at least the
13  Wall Street Journal or the London Financial Times or
14  watched television, you know.  It's -- I can't
15  really -- you know, I can't -- I don't know how
16  Larry -- what he reads.
17  BY MR. BRITTON:
18   Q.  Would you be surprised to learn that the
19  senior executives did not know about the decline in
20  economic conditions?
21   A.  I would find that --
22   MR. KRISS:  Objection to the form of the
23  question, no foundation.
24   THE WITNESS:  I would find that
25  extraordinary.

93

1  BY MR. BRITTON:
2    Q.  Why is that?
3    MR. KRISS:  Objection to the form of the
4  question, no foundation.
5    THE WITNESS:  As leaders of a corporation, if
6  they're not aware of it, they should not be leaders
7  of the corporation.
8  BY MR. BRITTON:
9    Q.  Would you be surprised to hear the claim
10  that Oracle's senior executives did not know that
11  the economy was having an effect on Oracle's
12  business?
13   MR. KRISS:  Objection to the form of the
14  question, no foundation.
15   THE WITNESS:  I would find that
16  extraordinary.
17  BY MR. BRITTON:
18   Q.  And why is that?
19   MR. KRISS:  Objection to the form of the
20  question, no foundation.
21   THE WITNESS:  Let me see.  There's an
22  expression called "It's obvious to the most casual
23  observer."  And I believe in it.  For them not --
24  for anyone at that time, particularly the sales
25  force, which was well aware of it, not to be aware

94

1  that the economy was having difficulties.  And as a
2  somewhat practicing economist, you know, I'm an
3  authoritative source, it was obvious to me.
4  BY MR. BRITTON:
5    Q.  How do you know the sales force knew
6  about the effect of the economy on Oracle's
7  business?
8    MR. KRISS:  Objection to the form of the
9  question, no foundation.
10   THE WITNESS:  Just the way they were out
11  there trying to drum up deals.
12  BY MR. BRITTON:
13   Q.  Did you have personal interaction with
14  them?
15   A.  Oh, constantly.
16   Q.  When you say "constantly," you
17  interacted with the sales force, was it the sales
18  force in any particular region that you were dealing
19  with?
20   A.  Well, I -- I think I mentioned earlier I
21  was, in effect, a global kind of available resource.
22  So, I got calls from every -- every segment of
23  Oracle, particularly on health checks.  People used
24  to refer to me as Darth Vader.
25   Q.  Why is that?

95

1    A.  Because when I walked through the door,
2  people knew they had a problem.
3    Q.  What kind of problems are we talking
4  about?
5    MR. KRISS:  Objection to the form of the
6  question.
7    THE WITNESS:  Well, one engagement, the one I
8  like to cite 'cause I think it's the classic example
9  of overzealous salesmanship, is a project in Ghana
10  in Africa with the Ghanaian government between the
11  World Bank and Ghana.
12   And I was called here again, said "Can
13  you be in Accra, Ghana, the following Monday?"  I
14  said, "Well, it's Wednesday."  I knew where Ghana
15  was, by the way.
16   And I said, "I suspect I'm going to have
17  to get visas, shots," and et cetera, et cetera.  "I
18  don't know if I can get it done."  "Do everything
19  you can."
20   Well, I was able to get the shots.  So,
21  I went to Ghana.  And Oracle -- or Ernst & Young,
22  World Bank were working on a project in which they
23  were trying to automate the financial business of
24  the Ghanaian government.
25   And the concern on the part of the head

96

1    of the European -- gosh, I can't remember his title,
2    but he was in Zurich, was that they had used
3    80 percent of the budget but, according to the
4    status, they had only completed 20 percent of the
5    work. So, I was asked to go down there and find out
6    what the problem was.
7         And the problem, keep it in the simplest
8    terms, was this was 1999, and the Ghanaian
9    government, from a financial standpoint from
10   financial management standpoint, was back in the
11   '50s. I said, "You cannot implement Oracle's
12   financials and all this technology here in Ghana.
13   You need to stop and re-educate the Ghanaian
14   establishment as to what is -- what is a balance
15   sheet." They didn't know what it was.
16        So, that's one of the jobs, when I had
17   to tell the World Bank, "This is going to fail" and
18   try to find a way for Oracle to get out of the
19   contract and not lose any more money. That's the
20   one that's the classic.
21   BY MR. BRITTON:
22       Q.  Did -- were you aware of the decline in
23   the dot-com business in the 2000-2001 time period?
24       A.  It was in --
25       MR. CAPLAN: Objection to the form of the

97

1    question, no foundation.
2         THE WITNESS:  It was in all of the major
3    technology publications.
4    BY MR. BRITTON:
5        Q.  And you were reading those?
6        A.  Oh, yes.
7        Q.  Can you tell me which publications
8    you're talking about?
9        A.  Computer World, CIO -- the CIO magazine.
10   I think it's called CIO.  It's one of the major
11   journals.  Software -- I don't remember the last
12   name of it.  But it was the hot issue on all of the
13   letters-to-the-editor page.
14       Q.  And what period of time was this?
15       A.  This started latter part of 1999.
16       Q.  Did it get more severe as time went on?
17       A.  Yes.
18       MR. KRISS:  Objection to the form of the
19   question, no foundation.
20   BY MR. BRITTON:
21       Q.  How so?
22       MR. KRISS:  Objection to the form of the
23   question, no foundation.
24       THE WITNESS:  The layoffs that started to
25   occur, particularly in the Silicon Valley area, you

98

1    know, headquarters in Redwood Shores, was quite a
2    hot object in the San Francisco papers.  People
3    being laid off and losing their options and
4    et cetera.
5    BY MR. BRITTON:
6        Q.  You think the senior executives at
7    Oracle knew about the decline in the dot-com
8    business?
9        MR. KRISS:  Objection to the form of the
10   question, no foundation.
11       THE WITNESS:  They had to be aware of it.
12   BY MR. BRITTON:
13       Q.  Would you be pretty surprised to learn
14   if they claimed that they did not know about it?
15       A.  I'd be --
16       MR. KRISS:  Objection to the form of the
17   question, no foundation.
18       THE WITNESS:  I would be dumbfounded.
19   BY MR. BRITTON:
20       Q.  Why is that?
21       MR. KRISS:  Objection to the form of the
22   question, no foundation.
23       THE WITNESS:  Since many of them lived there
24   in the Silicon Valley, they must have picked up the
25   San Francisco Examiner, and all of the other papers

99

1    in that area and seen the layoffs occurring.
2    BY MR. BRITTON:
3        Q.  Were the layoffs occurring at Oracle?
4        A.  They were a few layoffs that occurred
5    during that time leading up to the layoff there in
6    March of '01.
7        Q.  Were you aware of whether the dot-com
8    crash affected Oracle's business at all?
9        MR. CAPLAN:  Objection to the form of the
10   question, no foundation.
11       THE WITNESS:  I'm really not in a position
12   to -- I just never took the time to analyze that.
13   BY MR. BRITTON:
14       Q.  Now, in terms of 11i, did you hear any
15   complaints about the technology of 11i in the 2000
16   time period --
17       MR. KRISS:  Objection to the form of the
18   question.
19   BY MR. BRITTON:
20       Q.  -- from customers?
21       A.  Not from customers as much as other
22   consultants who were involved with the installation
23   were concerned that some of the components were
24   still beta.
25       Q.  And was this having an effect, to your

100

1    knowledge, on Oracle's ability to sell the product?
2        MR. KRISS:  Objection to the form of the
3    question, no foundation.
4        THE WITNESS:  I really don't know.
5        MR. BRITTON:  Okay.  You can take the
6    complaint out.  I think it was the first exhibit
7    that we marked.
8        THE WITNESS:  First exhibit, sure.
9        MR. KRISS:  Again, I object to the use of the
10   complaint at this point.  There's no legitimate
11   purpose for it other than to suggest answers to the
12   witness and to lead him.
13   BY MR. BRITTON:
14       Q.  Okay.  Turn with me, if you will, to
15   paragraph 45, which is on page 23.  I would like for
16   you to read for me, if you will, the paragraph 45
17   and the subparts (a) through (d).  Read them to
18   yourself.
19           Have you had a chance to read
20   paragraph 45?
21       A.  Uh-huh, yes.
22       Q.  Do you recognize any of the statements
23   that are quoted in paragraph 45?
24       A.  I don't recognize any or remember
25   hearing of them.

101

1        Q.  Okay.  Are the statements in
2    paragraph 45 relating to the effect of the economy
3    on Oracle business -- are those consistent with your
4    understanding of what was happening at Oracle in
5    December of 2000?
6        MR. KRISS:  Objection to the form of the
7    question, no foundation.
8        THE WITNESS:  It does not correlate with what
9    we were hearing and seeing out in the field.
10   BY MR. BRITTON:
11       Q.  Do you think the information out in the
12   field was finding its way to the senior executive?
13       MR. KRISS:  Objection to the form of the
14   question, no foundation.
15       THE WITNESS:  It would be speculation on my
16   part, but I'd be surprised if it wasn't.
17       MR. KRISS:  Move to strike as speculation.
18   BY MR. BRITTON:
19       Q.  Will you turn for me, if you will, to
20   paragraph 60 of the complaint?
21       MR. CAPLAN:  What paragraph?
22       MR. BRITTON:  Sixty.  It's on page 53.
23   BY MR. BRITTON:
24       Q.  Okay.  Read for me, if you will,
25   paragraph 60 and quotes that are contained in that

102

1    paragraph.
2           Do you recognize the statement that's
3    quoted in paragraph 60?
4        MR. KRISS:  Object to the use of this
5    document as the --
6        MR. BRITTON:  Counsel, you've already
7    objected to the use of the document.  If you keep
8    doing it, I'm going to consider it a speaking
9    objection, and --
10       MR. KRISS:  No, I have to object by question.
11       MR. BRITTON:  Well, you've already
12   objected to the use of the document.  If you have an
13   objection to form, you can use it.
14       MR. KRISS:  I'm going to keep objecting, so
15   just go on.
16       THE WITNESS:  And the question was?
17   BY MR. BRITTON:
18       Q.  The question was:  Do you recognize the
19   statement that is quoted in paragraph 60?
20       A.  Other than reading it prior to this
21   meeting, no.
22       Q.  Okay.  The statement or the statements
23   in paragraph 60 relating to the effect of the
24   economy on Oracle's business, are those consistent
25   with your knowledge at the time of what was

103

1    happening at Oracle?
2        MR. CAPLAN:  Objection to the form of the
3    question, no foundation.
4        THE WITNESS:  You need to rephrase that.  I'm
5    sorry.
6    BY MR. BRITTON:
7        Q.  Are the statements in paragraph 60
8    relating to the effect economic slowdown was
9    having on Oracle's business?  Are those statements
10   consistent with your knowledge of what was happening
11   at Oracle?
12       A.  No.
13       MR. KRISS:  Objection to the form of the
14   question, no foundation.
15   BY MR. BRITTON:
16       Q.  And why not?
17       MR. KRISS:  Objection to the form of the
18   question, no foundation.
19       THE WITNESS:  Because of what I and others,
20   and I in particular, were seeing in the field.
21   BY MR. BRITTON:
22       Q.  Would you be surprised if the senior
23   executives didn't know what was happening in the
24   field?
25       MR. KRISS:  Objection to the form of the

104

1    question, no foundation.

2        THE WITNESS:  I'd absolutely be dumbfounded.

3    BY MR. BRITTON:

4        Q.  Okay.  If you'll turn to paragraph 65

5    for me -- actually 65(c), which is on page 57.

6        A.  Yes.

7        Q.  It's a February 9th, 2001, statement

8    by --

9        A.  Jennifer.

10       Q.  -- Jennifer Glass.  Do you recognize

11   that statement?

12       MR. KRISS:  Object to the use of the

13   document, leading.

14       THE WITNESS:  Like I said, I've seen it only

15   in this document.

16   BY MR. BRITTON:

17       Q.  Okay.  And did you view the economic

18   slowdown at the time as an opportunity for Oracle in

19   the sale of its products?

20       MR. KRISS:  Objection to the form of the

21   question, no foundation.

22       THE WITNESS:  Let me make sure I understand

23   the question.  You're saying, as it relates to

24   Oracle products available at that time?

25       MR. BRITTON:  Right.

105

1        THE WITNESS:  My feeling was that customers

2    that I was talking to seemed to indicate, because

3    they were slowing down in their purchasing of

4    software, that what I was working on could actually

5    be of greater value.  And this was the BIE, because

6    it basically went in and said, "We're now going to

7    restructure all of IT for you and affect your bottom

8    line."

9    BY MR. BRITTON:

10       Q.  You recall any of those customers?

11       A.  Bell Canada, Department of Defense.  I

12   don't know if that's -- but they were interested in

13   one of the components that we developed.  The State

14   of Pennsylvania Public Employees Retirement System I

15   think it's called.  Those were the ones that come to

16   mind off the top of my head.

17       Q.  Okay.  Turn with me, if you will, to

18   paragraph 49.  And it's 49(f) on page 39.  If you'll

19   read that paragraph for me, please, to yourself.

20       MR. KRISS:  Object to the use of the document

21   as leading.

22   BY MR. BRITTON:

23       Q.  Have you had a chance to read paragraph

24   49(f)?

25       A.  Yes.

106

1        Q.  I want to focus you on the last quote in

2    that subparagraph.  It says, "As Larry said on the

3    March 1 conference call, cracks started to appear in

4    the last four days of the quarter.  At first it

5    showed in our general business dot-com mid-market

6    forecast, which came down each of the last four

7    days."

8        Is it consistent with your experience at

9    Oracle that the dot-com crash only affected Oracle

10   in the last four days of its fiscal third quarter

11   2001?

12       MR. KRISS:  Objection to the form of the

13   question, no foundation.

14       THE WITNESS:  It was always "the last four

15   days of the quarter" since the day I arrived at

16   Oracle.  It was always the problem time.  I find

17   this humorous, this statement.

18   BY MR. BRITTON:

19       Q.  Why do you find it humorous?

20       A.  It's -- the last four days or the last

21   week in every quarter at Oracle was panic time.

22       Q.  Do you believe this statement?

23       A.  No.

24       MR. KRISS:  Objection to the form of the

25   question, no foundation.

107

1    BY MR. BRITTON:

2        Q.  Why don't you believe it?

3        MR. KRISS:  Objection to the form of the

4    question, no foundation.

5        THE WITNESS:  Past experience.

6    BY MR. BRITTON:

7        Q.  So, you believe that the dot-com crash

8    affected Oracle before the last four days of the

9    third quarter of 2001?

10       MR. KRISS:  Objection to the form of the

11   question, no foundation.

12       THE WITNESS:  Absolutely.

13   BY MR. BRITTON:

14       Q.  And that's based on your experiences --

15       A.  Right.

16       Q.  -- at Oracle at the time?

17       A.  Right.

18       MR. KRISS:  Objection to the form of the

19   question, no foundation.

20   BY MR. BRITTON:

21       Q.  Do you remember Larry Ellison selling

22   shares during the third quarter of 2001?

23       A.  Well, after the fact.

24       Q.  Did you see it at the time that he was

25   selling them?

108

1    A.  No, I did not see at the time he sold

2  them.  I was consulting, working, trying to make

3  money.

4    Q.  Have you heard that Oracle attributed a

5  savings of a billion dollars to an internal

6  implementation of 11i?

7    A.  Yes.

8    Q.  Do you believe that?

9    A.  No.

10    MR. CAPLAN:  Objection to the form of the

11  question, no foundation.

12  BY MR. BRITTON:

13    Q.  Why not?

14    MR. KRISS:  Objection to the form of the

15  question, no foundation.

16    THE WITNESS:  First of all, not only was it

17  not true for Oracle, but other companies that used

18  the same framework, cost savings.  And I've done

19  cost analysis on hard dollar -- I only believe in

20  hard dollar.  I don't believe in soft savings.  I

21  believe and find it to be a false statement on

22  behalf of -- most of the time I see that statement.

23    I don't believe it happened at Oracle

24  because it obviously was not shown on the bottom

25  line at that time.  And I would never have used that

1  quote in any future discussion with a client.

2  BY MR. BRITTON:

3    Q.  Okay.  If you turn to paragraph 68 of

4  the complaint --

5    A.  What page was that?

6    Q.  It's page 58.  If you could read the

7  paragraph 68 and the quote in the first -- the first

8  quote in that paragraph.

9    MR. KRISS:  Object to the use of the document

10  as leading.

11    THE WITNESS:  Which quote are you talking

12  about?

13    MR. BRITTON:  The first quote.  The one above

14  the three stars.

15    THE WITNESS:  Oh, I'm sorry.

16  BY MR. BRITTON:

17    Q.  It says, on February 21st, 2001, Larry

18  Ellison spoke at the Oracle AppsWorld Conference and

19  said "We were the first company to use this

20  eBusiness suite and in the very first year we put it

21  in, we saved $1 billion."

22    Do you think that statement's true?

23    A.  No.

24    MR. KRISS:  Objection.  No foundation.

25    THE WITNESS:  Question.

1    MR. BRITTON:  Sure.

2    THE WITNESS:  That statement or references to

3  that type of statement were made well before that

4  date, in published material, sales material,

5  marketing material from Oracle, at least a year

6  before that date.

7  BY MR. BRITTON:

8    Q.  And did it attribute those savings to

9  11i?

10    A.  Yes.

11    Q.  It did.  When did Oracle start

12  implementing 11i internally?

13    A.  I don't know the specific day, but it

14  started the end of '99.  We started hearing about

15  it.

16    MR. BRITTON:  Okay.  Can we go off the

17  record.

18    THE VIDEOGRAPHER:  We're going off the

19  record.  The time is 12:17 p.m.

20    (Lunch recess taken at 12:17 p.m.)

21

22

23

24

25

1  BEVERLY HILLS, CALIFORNIA, TUESDAY, OCTOBER 18, 2005

2    1:15 P.M.

3

4    THE VIDEOGRAPHER:  We're back on the record.

5  The time is 1:15 p.m.

6    MR. KRISS:  Good afternoon, Mr. Green.  My

7  name is Robert Kriss.  I represent Oracle

8  Corporation and the other defendants in this case.

9    MR. BRITTON:  Robert, actually, let me make

10  one comment before you start.

11    This is Doug Britton.  I'm finished with

12  my examination.  It's requested that -- thank you

13  for your time, Mr. Green.

14    THE WITNESS:  You're welcome.

15    MR. BRITTON:  I request a few minutes at the

16  end to have any rebuttal, if necessary.

17

18  EXAMINATION BY MR. KRISS:

19    Q.  Let me take you back to the period of

20  September through November 2001.  Let me rephrase.

21    Let me take you back to the period

22  September through November 2000.

23    A.  All right.

24    Q.  You understand that to be the second

25  quarter of Oracle's fiscal year 2001?

1    A.  Q2 and the start of Q3.

2    Q.  So, September through November 2000 is

3    the period of Oracle's second quarter '01, right?

4    A.  If you don't mind, I have to count on my

5    fingers.  Is that okay?

6    Q.  Sure.

7    A.  You're correct.

8    Q.  Okay.  And the period December 2000

9    through February 2001 is the third quarter of

10   Oracle's fiscal year 2001, correct?

11   A.  Correct.

12   Q.  Now, during 2Q '01 were you a member of

13   the OSI Consulting Group?

14   A.  Would you rephrase the question?

15   Q.  During 2Q '01, you were employed by

16   Oracle, correct?

17   A.  Yes.

18   Q.  And were you assigned to the OSI

19   Consulting Group?

20   A.  I understand you to say Q2 of '01.  I

21   was not with Oracle in Q2 of '01.  It was Q2 of '00.

22        MR. CAPLAN:  Are you saying 2-2 or 2Q?

23   BY MR. KRISS:

24   Q.  During the period September 2000 through

25   November 2000, were you a member of the OSI

113

1    Consulting Group?

2    A.  Yes.

3    Q.  And were you a member of the OSI

4    Consulting Group during the period December 2000

5    through February 2001?

6    A.  Correct.

7    Q.  Did you have any role whatsoever in

8    forecasting sales of applications at Oracle?

9    A.  No.

10   Q.  Did you have any role in any respect in

11   forecasting sales of database?

12   A.  No.

13   Q.  Did you have any role in forecasting

14   consulting revenue for OSI Consulting?

15   A.  Yes.

16   Q.  What was your role in that regard in the

17   period September 2000 through February 2001?

18   A.  It was to forecast what we thought our

19   small group was going to do, which was the group

20   that I spoke of earlier, which was myself and Fred

21   Tune and Gary Moore.

22   Q.  Three people?

23   A.  Three of us, yeah.  What opportunities

24   did we have.

25   Q.  Did you ever see any forecast for the

114

1    sale of applications while you were at Oracle?

2        MR. BRITTON:  Objection.  Asked and answered.

3        THE WITNESS:  During the time period that you

4    specified earlier or earlier?

5    BY MR. KRISS:

6    Q.  The time period that I want you to focus

7    on, unless I indicate otherwise, is

8    September 2000 --

9    A.  All right.

10   Q.  -- through February 2001.

11   A.  Answer to your question is no.

12   Q.  Did you ever see any forecast for

13   database sales during that period of time?

14   A.  No.

15   Q.  Did you ever see any forecast for OSI

16   Consulting during that period of time?

17   A.  I saw some.

18   Q.  Did you ever see any forecast for any

19   consulting group other than OSI Consulting during

20   that time?

21   A.  No.

22   Q.  What OSI Consulting forecast did you see

23   during the period September 2000 to February 2001?

24   A.  Our respective group, what we had

25   forecast and the telco -- what they call telco

115

1    business.

2    Q.  Anything else?

3    A.  No.

4    Q.  Did your group have a name?

5    A.  Our group just was called -- we named

6    ourselves the Business Information Engineering Group

7    based upon what we were attempting to do.  That was

8    what was on the business card.

9    Q.  Do you recall the amount of revenue that

10   you were forecasting for the BIE group during any

11   portion of this time of September 2000 through

12   February 2001?

13   A.  I'm trying to remember the numbers.  I

14   can't give you a specific dollar amount, but I --

15   percentage of hours booked, we were looking at

16   roughly 70 to 74 percent of our hours would be

17   billable.  What that translates to dollars, I just

18   can't remember off the top of my head.

19   Q.  Again, to try to make this clearer on

20   the record, when I refer to 2Q '01, I am referring

21   to September 2000 through November 2000.

22   A.  Right.

23   Q.  Okay?  Did your BIE group achieve its

24   forecast for 2Q '01?

25   A.  Yes.

116

1    Q.  Did your BIE group achieve its forecast
2  for 1Q '01, which would be June 2000 through
3  August 2000?
4    A.  No.
5    Q.  Do you recall what your percentage of
6  utilization was --
7    A.  It was --
8    Q.  -- let me finish, please -- during
9  1Q '01?
10    A.  Less than 50 percent.
11    Q.  Who prepared the telco business forecast
12  that you saw during 2Q '01 and 3Q '01?
13    A.  It would be pure speculation on my part,
14  and that would be the Oracle Sweden.
15    Q.  I'm sorry?
16    A.  Oracle Sweden, the sales organization
17  there in Stockholm.  It's my speculation.
18    Q.  Did you see any business forecast for
19  the telco business during 2Q '01?
20    A.  No.
21    Q.  And did you see any business forecast
22  for the telco business group in 3Q '01?
23    A.  Yes.
24    Q.  When did you see that forecast?
25    A.  The second week in December 'cause I was

117

1  in Orlando, yeah.
2    Q.  Did you see any other business forecasts
3  for the telco business group other than the forecast
4  you saw in the second week in December 2000?
5    A.  No.
6    Q.  Do you recall the amount of revenue
7  forecasted by the telco business group at the time
8  that you saw its forecast in December 2000?
9    A.  I did not see revenue.  I just saw
10  possible client -- a number of clients.
11    Q.  And these were clients for the
12  consulting group?
13    A.  Yes.
14    Q.  These were not sales customers, right?
15    A.  Correct.
16    Q.  And who were the possible clients for
17  the consulting group listed on the telco business
18  forecast you saw in December 2000?
19    A.  It was the raw number.  It did not name
20  the companies.
21    Q.  What was the raw number?
22    A.  Four.
23    Q.  Can you give me any order of magnitude
24  estimate of the amount of revenue that your BIE
25  group forecast for 2Q '01?  Are we talking about a

118

1  million dollars, $2 million?
2    A.  It's under 2 million.
3    Q.  Under 2 million?
4    A.  Yes.
5    Q.  Is it under 1 million?
6    A.  No.
7    Q.  And -- I'm sorry.
8    A.  I'm trying to think.  I can't remember
9  the specific number, but I know it was under 2.
10    Q.  And was the BIE group forecast for
11  3Q '01 also under $2 million?
12    A.  No, it was slightly more than 2 million.
13  2.2 seems to ring a bell.
14    Q.  So, am I right that the BIE group's
15  forecast for 3Q '01 was higher than its forecast for
16  2Q '01?  Am I right?
17    A.  Yes.
18    Q.  So, other than the four companies listed
19  without names in the telco business forecast that
20  you saw and your own forecast for the BIE group
21  in -- for third quarter 2001, you had absolutely no
22  information regarding what any other organizational
23  entity at Oracle was forecasting for its business
24  for 3Q '01, correct?
25    A.  I only heard rumors.

119

1    Q.  Okay.  What I'm asking is:  Other than
2  the telco business forecast --
3    A.  Uh-huh.
4    Q.  -- and the BIE group forecast for
5  3Q '01 --
6    A.  Uh-huh.
7    Q.  -- did you have any other information
8  from any source as to what any other organizational
9  entity was forecasting for 3Q '01?
10    A.  Can I ask a question?
11    Q.  Yeah.
12    A.  Are you talking about seeing a physical
13  forecast before the other groups, or are you talking
14  just discussions amongst peers?
15    Q.  First let's talk about seeing a
16  forecast.
17    A.  No.
18    Q.  Now let's talk about discussion between
19  employees.
20    A.  Yes.
21    Q.  Okay.  Which employees did you talk to
22  about that subject?
23    A.  That was that second week in December in
24  Orlando, Oracle meeting.
25    Q.  Any other information from any source

120

1    regarding anybody's thoughts about their forecasts
2    for 3Q '01 other than discussions that you had with
3    some employees during the second week in
4    December 2000?
5        A.  I held a discussion in February of '01
6    with the branch office in Woodland Hills,
7    consulting, who were going to go -- who owned the
8    customer -- two of the customers -- well, one of the
9    customers I was talking to, which was University of
10   Southern California, and they -- the consulting
11   director basically talked about his forecast for his
12   particular group.  That's the only other forecast
13   that I saw.
14       Q.  That's the only other forecast that you
15   heard about, right?
16       A.  I actually saw the numbers.
17       Q.  Okay.
18       A.  All right.
19       Q.  So, during this second week in
20   December 2000 in Orlando, who did you speak with
21   about a forecast?
22       A.  It was at a cocktail reception the first
23   night that we arrived there prior to the meetings.
24   And it was just talk amongst the various people.
25   "How are things going?"

121

1        Q.  Okay.  Who was present?
2        A.  I can't remember their names,
3    unfortunately.  It was just a lot -- there were VPs
4    there.  There were other presenters at the cocktail
5    hour.
6        Q.  Can you remember the name of anybody who
7    was involved in that discussion during the cocktail
8    hour?
9        A.  Really can't.  I'd have to go back and
10   spend a lot of time thinking.
11       Q.  Where was the discussion?
12       A.  It was at -- at Universal Studio Hotel.
13   I'm trying to remember the name of the hotel.
14   Actually, a very nice hotel on the Universal
15   properties.
16       Q.  How long was the discussion?
17       A.  Discussion that evening, probably lasted
18   a half hour.  The meeting went on for three days.
19       Q.  What did each of the participants in
20   that conversation have to say about forecasts?
21       A.  We were all looking for opportunities.
22   Did we know of opportunities we were working on that
23   they could help out on?  Everyone was scrambling for
24   business was the tone of what I heard that time,
25   including myself.  I was --

122

1        Q.  Apart from the tone, can you tell me the
2    substance of what anybody said during that
3    conversation?
4        A.  "We're not going to be able to make our
5    forecast unless we can generate some new business."
6    Bob, John, whoever the person's name was, "Are you
7    working on something that I could help you with and
8    possibly pick up some consulting hours?"
9        Q.  And were all the participants in this
10   conversation in Orlando members of the telco group?
11       A.  No.
12       Q.  What organizational entities were they
13   from?
14       A.  They were a cross-section, because this
15   was basically a meeting for people like ourselves to
16   present proposals for additional funding for work --
17   research and development we might be doing or new
18   ideas that needed funding to develop a new product,
19   a new method, et cetera.
20       Q.  Were the -- I'm sorry.  Are you
21   finished?
22       A.  Yes, I am.
23       Q.  Were they all consultants?
24       A.  No.
25       Q.  What other people other than consultants

123

1    were present during that conversation?
2        A.  People from HR.  There was an HR person.
3    People from finance, because I was the -- financing
4    this work.  There were people from product sales
5    because they would be interested in any new idea
6    that was being put forward for funding.  Could it
7    help them.
8            This is a program that Oracle has had --
9    I don't know if they still have it, but it basically
10   is to fund new ideas outside of the normal
11   mainstream of business.
12       Q.  Did anybody during this conversation
13   talk about the numbers that they had forecast for
14   their prospective business?
15       A.  Not really.
16           Excuse me.  Can I take off my jacket?
17       Q.  Certainly.
18       A.  It's getting a little stuffy in here.
19   If you don't mind.  Thank you.
20       Q.  During this discussion in February of
21   2001 in Woodland Hills, who was present?
22       A.  The director of consulting for that
23   branch, and one of his managers who was involved --
24   the manager was involved with the USC -- who managed
25   the USC account, I should say.

124

1    Q.  When you say "director for consulting at
2  that branch," what branch do you mean?
3    A.  Woodland Hills, California, higher
4  education consulting group.
5    Q.  Was that a part of OSI Consulting?
6    A.  I don't believe so.  I really don't know
7  the answer on that question.
8    Q.  Was any forecast -- let me rephrase
9  that.
10    Do you remember the names of these
11  people?
12    A.  No, I don't.
13    Q.  And where was this conversation?
14    A.  The conversation started at their office
15  in Woodland Hills, California.  It's -- I'm trying
16  to remember the address.  It's on Canoga.  That's
17  all I remember.
18    Q.  How long was that conversation?
19    A.  I would say it lasted for a couple hours
20  in the morning, I remember.
21    Q.  And was there a continuation of that
22  discussion somewhere else?
23    A.  Yes.
24    Q.  Where was that?
25    A.  USC, University of Southern California,

125

1  offices of the CIO.
2    Q.  The same day?
3    A.  No, no.
4    Q.  When?
5    A.  I'm going to say a few days later.
6    Q.  And what was the substance of what was
7  said during those two conversations regarding
8  forecasts?
9    A.  Really nothing about the forecast other
10  than they were looking for business.  They said, "It
11  would really help my forecast, Bob."  Since I didn't
12  work for him and I had been invited in to USC, not
13  them, but he owned the account, I was just
14  communicating and asking his permission to deal with
15  the customer.
16    Q.  Okay.  Do you recall the substance of
17  anything else that was said during those two
18  conversations in Woodland Hills, California
19  regarding forecasts other than what you told me?
20    A.  The only thing I reminded them is that
21  the customer had asked the BIE team to come in to do
22  the work.  I was informing him that I was in his
23  territory.  I would be more than willing to use a
24  representative from his consulting staff, and here's
25  the number that I -- here, I needed one consultant

126

1  and one consultant only.
2    Q.  Did OSI Consulting achieve its forecast
3  for 1Q '01?
4    A.  '01?
5    Q.  1Q '01, which means June of 2000 --
6    A.  Right.
7    Q.  -- through August of 2000.
8    A.  No.
9    Q.  Did OSI Consulting achieve its forecast
10  for 2Q '01?
11    A.  No.
12    Q.  How do you know that?
13    A.  We had meetings at least every two weeks
14  saying -- coming down, how are we going to get some
15  additional revenue here?  We're not meeting our
16  forecast.  And that came down through, I'll call it,
17  the chain of command.
18    Q.  Well, apart from these conversations
19  that you had about how were you going to make your
20  numbers, did you ever have a conversation with
21  anybody during which they told you whether OSI
22  Consulting, in fact, was able to achieve its
23  forecast for 1Q '01?
24    A.  I remember no discussions where they
25  said we're going to make it.

127

1    Q.  I didn't ask that question.
2    A.  All right.
3    Q.  My question is:  Did you ever have a
4  conversation with anybody -- let me rephrase more
5  generically.
6    Did you ever receive any information
7  from any source as to what OSI Consulting's actual
8  results were compared to its forecast for 1Q '01?
9    A.  No.
10    Q.  Did you ever find out from any source
11  what OSI's actual results were compared to its
12  forecast for 2Q '01?
13    A.  Is the question on the actuals?
14    Q.  Yes.
15    A.  No.
16    Q.  So, as you sit here today, you don't
17  know whether OSI Consulting achieved its forecasted
18  results for 1Q '01 or 2Q '01, correct?
19    A.  Wrong.
20    Q.  Okay.  How do you know whether they
21  achieved their forecasted results for either of
22  those quarters?
23    A.  Because in 2Q of 2001, we were told, the
24  whole consulting group, in some e-mail
25  communications, talking amongst the peers, that we

128

1  had not met our Q1 '01 objectives.

2  Q. When you say "we did not make," who's

3  the "we"?

4  A. It would be, in the case of a group, not

5  the BIE group, but the eastern region.

6  Q. So, the only information you have as to

7  whether OSI Consulting achieved its 1Q '01 forecast

8  is some communication that the eastern region did

9  not achieve its forecast for 1Q '01; is that right?

10  A. That is correct.

11  Q. Now, it's possible that the western

12  region compensated for that shortfall, correct?

13  MR. BRITTON: Objection to form.

14  THE WITNESS: I don't -- well, it's always

15  possible.

16  BY MR. KRISS:

17  Q. And, in fact, you don't know whether OSI

18  Consulting as a whole achieved its forecast for

19  1Q '01, correct?

20  A. I do not have factual information.

21  Q. And you don't have any information as to

22  whether OSI Consulting as a whole achieved its

23  forecast for 2Q '01 either, right?

24  A. Other than being told we hadn't.

25  Q. Other than being told that the eastern

129

1  region had not, correct?

2  A. Correct. Oh, I stand corrected. And

3  also Europe. European Consulting Group 'cause I was

4  involved with them at that time.

5  Q. Okay. Did you ever have any information

6  as to what OSI Consulting was forecasting for 3Q '01

7  other than your two groups, the telco group and your

8  BIE group?

9  A. No.

10  Q. Did you keep utilization statistics

11  while you worked at Oracle -- utilization statistics

12  for yourself?

13  A. Absolutely.

14  Q. And how were those kept? How were they

15  computed?

16  A. Just a spreadsheet. Basically on

17  billing --

18  Q. What's the numerator and what's the

19  denominator?

20  MR. BRITTON: Bob, are you saying

21  "realistic"?

22  MR. KRISS: No, utilization statistics.

23  MR. BRITTON: Realization statistics? All

24  right.

25  MR. KRISS: Utilization.

130

1  THE WITNESS: I understand what you mean.

2  Yeah, I kept it strictly for our group on the

3  billable hours and projected hours for just our

4  group.

5  BY MR. KRISS:

6  Q. So, the utilization is billable hours

7  divided by some denominator? Yes?

8  A. A denominator basically is 40 hours a

9  week.

10  Q. Did you ever have any information about

11  the utilization statistics for any consultant in the

12  Oracle organization other than the three people who

13  comprised the BIE group?

14  A. During the time frame that we're focused

15  in on, no.

16  Q. And that time frame is 2Q '01 and

17  3Q '01, correct?

18  A. Correct.

19  Q. So, as you sit here today, you don't

20  have any idea as to how people's utilization in the

21  consulting organization of Oracle were during 2Q '01

22  and 3Q '01 other than three people in your group?

23  A. No. Because I was involved with many

24  other consulting groups, as we did work for most of

25  them. We didn't own anything. I was being told

131

1  that a number of people were on the bench, which

2  meant they weren't working in these groups. Could

3  I -- could I employ any of those people? The only

4  thing I could speculate is that they had people on

5  the bench, and they were concerned about it.

6  Q. Tell me which conversations you had

7  about people being on the bench in 2Q '01.

8  A. The consulting group out of Atlanta --

9  and I can't remember the director -- there were

10  multiple directors, and the consulting group out of

11  Atlanta for eastern region. I do not remember the

12  names. And they were saying, "Bob, can you get

13  these people assigned to this proposed project

14  you're working on here at BellSouth? They have a

15  number of people on the bench."

16  Q. Was this one conversation or more than

17  one conversation during 2Q '01?

18  A. Multiple conversations.

19  Q. How many?

20  A. I'm guessing between six and nine.

21  Q. With whom?

22  A. The directors of consulting services out

23  of the Atlanta office.

24  Q. Do you remember any names?

25  A. I really don't.

132

1    Q.  Did you have any other conversations
2  with anybody regarding consultants being on the
3  bench during 2Q '01 other than the six to nine
4  conversations you had with the Atlanta eastern
5  region?
6    A.  Yes.
7    Q.  Who?
8    A.  The consulting director in the
9  Cincinnati, Ohio office.  I think that's what it's
10  called.  As I had done work for him prior that year,
11  and he had some people on the bench, and he would
12  call and say, "Bob, are you working on anything
13  where I could assign one of my people to it?"
14    Q.  And when did that conversation occur?
15    A.  I would say sometime in the June, July
16  period or Q1 of '01.  There was another
17  conversation -- oh, gosh -- government consulting,
18  other side, there were a number of government
19  consulting directors, one of them out of the Dayton
20  office, who I had done work for, called and said,
21  "Bob, are you working on anything that you might be
22  able to employ one of my people?"
23    Q.  When did that conversation occur?
24    A.  It happened sometime in Q4 of '00.
25    Q.  Any conversations that you can

133

1  recall with anybody about people being on the bench?
2    A.  No.  Oh, wait.  When I was there in
3  Stockholm, which was Q3 of '01, I was talking to --
4  I can't remember the gentleman out of the London
5  branch who was doing work there at Telia.  And he
6  was asking me in the month of December, "As you're
7  putting this plan together, is it possible we could
8  get some people who were on the bench in London on
9  this project?"  And I told him it wasn't my
10  decision.
11    Q.  Any other conversations that you can
12  recall with anybody talking about people on the
13  bench during 2000 or 2001?
14    A.  No.
15    Q.  Wasn't it the case that at all times at
16  Oracle there were people on the bench?
17    A.  Oh, absolutely.
18    Q.  And that was true not only in 2000 and
19  2001 but also in 1999 and 1998, right?
20    A.  Oh, goes back to 1993 when I first
21  showed up, yeah.
22    Q.  And you have no information -- let me
23  rephrase that.
24        Do you have any objective benchmark to
25  use to determine whether there were more people on

134

1  the bench in 2Q '01 and 3Q '01 than there had been
2  in prior periods at Oracle?
3    A.  None whatsoever.
4    MR. BRITTON:  Objection to form.
5  BY MR. KRISS:
6    Q.  Did you ever hear of anything called a
7  pipeline report when you were at Oracle?
8    A.  Yes.
9    Q.  What was your understanding of what a
10  pipeline report was?
11    A.  Pipeline report basically showed -- and
12  I can only speak to the consulting side, the
13  application side.  Is that okay?
14    Q.  Sure.
15    A.  Was what -- what work were -- what
16  demand we were looking at going forward?  And the
17  report broke it down into regions, groups,
18  application subject areas in some cases.
19    Q.  Did it list customers?
20    A.  You know, it did.  The one I'm most
21  familiar with when I saw this is I was working at --
22  I think it was 1998, '99 time frame.  I remember the
23  City of New York.
24    Q.  Did you see any pipeline reports during
25  2Q '01 and 3Q '01?

135

1    A.  No, I did not.
2    Q.  What was your understanding of the
3  purpose for these pipeline reports?
4    A.  Communication tool, both internally, at
5  least at the director level and above.  I'm not
6  familiar with it ever being used below the director
7  level.
8    Q.  What do you mean, "director level"?
9    A.  Role that you played in the corporation.
10  You know, there are consultants and different levels
11  of consulting, manager, director, senior director,
12  vice president and just went on.  So, generally it
13  was intended for directors and above, but I don't
14  know whether or not they ever distributed it to
15  anyone below the director level.
16    Q.  You testified earlier that you saw a
17  downturn in some group of consulting -- let me
18  rephrase that.  You testified earlier that you saw
19  some downturn in consulting.  Do you recall that
20  testimony?
21    A.  Yes.
22    Q.  When did you see that downturn?
23    A.  First time I saw it and it was of
24  concern was in the October, November time frame of
25  1998, when we lost a contract with the Department of

136

1  Defense and what is called DFAS, which is their
2  financial accounting services.  So, I had been part
3  of some work there.  They lost that contract, major
4  concern on the part of government consulting.
5      Q.  The word "downturn" implies to me some
6  sort of benchmark to compare in order to say there
7  has been a downturn.  Does that have the same
8  meaning to you?
9      A.  Generally yes.
10      Q.  What benchmark were you using in 1998 in
11  identifying a downturn at that time?
12      A.  The fact that the forecast that the
13  organization -- and I was not part of government
14  consulting, I was just on loan to them -- it
15  indicated a forecast that they were going to win
16  this contract plus additional DOD contracts.
17          And DOD basically said they were pulling
18  back, and it kind of just -- I had a sense that this
19  was probably the beginning of something.  I still
20  wasn't sure what it was.
21      Q.  So, in your mind, a downturn is any time
22  that Oracle fails to win a major contract?
23      A.  No.
24      Q.  How is it different than that then?
25      A.  It's different only in that you -- you

137

1  have, from experience with that client or that
2  industry, been on a growth path for -- for a
3  substantial period of time.  And all of a sudden
4  there is no growth.
5          In the case of DOD at that time, leading
6  up to that point in time, Oracle had a tremendous
7  track record with the DOD and, in this case, DFAS.
8  And all of a sudden, it went to zero.
9      Q.  Did you see any downturn -- in your
10  view, a downturn in Oracle's business between June
11  of 1999 and June of 2000?
12      A.  Getting consulting work was starting to
13  appear to be more difficult.  Companies we're seeing
14  were not going to budget any more monies for
15  consulting.  At least the people that we were
16  talking to or people that I heard talking to other
17  customers.
18      Q.  Did you see any downturn in the -- what
19  benchmark were you using to determine whether there
20  was a downturn during that period of time,
21  June 2000 -- I'm sorry -- June 1999 to June 2000?
22      A.  Number of reports in various trade
23  journals that talk about the dollars that IT
24  organizations were going to use for consultants.
25  There were a number of reports that came out -- I

138

1  think it's Foster, probably no longer.
2          But there are a number of companies that
3  measure activity in the IT space.  And I remember
4  reading one report that said the projection for the
5  budget year 2000, the normal 2000 year, not
6  Oracle's, was projecting that IT organizations were
7  planning to spend fewer dollars on consulting.
8      Q.  When did you see that article?
9      A.  I would say sometime latter part -- I'll
10  say Q4 of '99.
11      Q.  By Q4 '99, do you mean --
12      A.  Not Oracle's but the standard fiscal
13  year.  I'm sorry.
14      Q.  So, you mean October through December?
15      A.  Yes.
16      Q.  1999?
17      A.  Yeah.
18      Q.  Were there any other indicators,
19  economic indicators, that you thought were relevant
20  in forecasting Oracle's business other than this
21  measure of dollars that would be spent in the IT
22  space?
23      A.  I'm not a forecasting expert, even
24  though I believe I know economics as well as anyone.
25  It was just, what I was reading, I came to the

139

1  conclusion.
2      Q.  My question is:  Were there any other
3  economic indicators that you thought were relevant
4  in forecasting Oracle's future business performance
5  other than this measure of dollars available for
6  investment in the IT space that you referenced in
7  this Q4 '99 article?
8      A.  Since I was -- at that time, I believe I
9  was -- as I said, I subscribed to Wall Street
10  Journal and Baron's, and I read them quite often.
11  There seems to be a sense, at least in the articles
12  being written in those two publications, that things
13  for the year 2000 may not be what they were in the
14  prior two years.
15      Q.  When did you see those articles?
16      A.  It was during Q4 of 1999, October,
17  through December, on my trips back and forth to
18  Ghana.
19      Q.  Did you see any information about
20  economic indicators that you thought were relevant
21  to forecasting Oracle's business performance after
22  December 1999?
23      A.  Other than some of Oracle's competitors,
24  SAP, Siebo, PeopleSoft, here again reading in
25  different technology magazines, they were projecting

140

1 possibly a turndown -- a turndown.

2    Q. When did you see these articles?

3    A. I would have to say it was sometime in

4 Q1, or January through March, of 2000.

5    Q. Did you see any other information

6 concerning economic indicators that you felt were

7 relevant in forecasting Oracle's performance after

8 March 2000?

9    A. Sometime in January of 2000, I was

10 watching the BBC in Accra, Ghana. Wasn't much else

11 to do there, and they -- it was an international

12 forum talking about the global economy. And there

13 were -- I don't know the number of people that were

14 in the conversation, in the report, but it caught my

15 attention only that globally, not just the U.S., but

16 globally, there was a sense that there was a

17 downturn.

18    Q. And that was January 2000?

19    A. I believe it was January 2000.

20    Q. My question is: Did you receive any

21 information regarding economic indicators that you

22 thought were relevant in determining or forecasting

23 Oracle's business after March of 2000?

24    A. No.

25    Q. So, from your vantage point, am I right

141

1 that the potential impact of the economy on Oracle's

2 business for 3Q '01 didn't look any different than

3 the potential impact of the economy on Oracle's

4 business for 2Q '01 and 1Q '01, right?

5    A. Correct.

6    Q. Did Oracle as a company meet its 1Q '01

7 forecast?

8    A. I cannot remember.

9    Q. Did Oracle as a company meet its 2Q '01

10 forecast?

11    A. I believe it did.

12    Q. You made some comments or -- sorry. In

13 your testimony earlier today, you said that some

14 Oracle employee commented to you that there were

15 some modules of 11i in beta version. Do you

16 remember that testimony?

17    A. Yes.

18    Q. Do you remember who the person was who

19 told you that?

20    A. There were individuals on the BellSouth

21 account, and it was in the October timeframe of

22 2000.

23    Q. Do you remember the names of the people?

24    A. No, I don't. They were technical people

25 on the staff there, who I asked the question, "Are

142

1 all of the modules that we're identifying in this

2 spreadsheet in production?"

3    Q. Do you recall which modules they said

4 were in beta version as of October 2000?

5    A. I really can't say until I -- unless I

6 looked up the details that were prepared at that

7 time.

8    Q. Did you ever receive any information

9 that any modules of 11i were in beta version after

10 October of 2000?

11    A. I asked the same question when I went to

12 Telia, and the answer was still some of the modules

13 are still in beta.

14    Q. Do you recall who said that?

15    A. A representative from the CRM team who

16 flew in from Redwood Shores. I do not remember his

17 name. He was a vice president. That's all I know.

18    Q. When was this conversation?

19    A. It was in the December time frame of

20 2000.

21    Q. Do you recall which modules?

22    A. No, I do not.

23    Q. Was it the case that Oracle was

24 attempting to actually develop specialized CRM

25 modules that would be suitable for the

143

1 telecommunications industry during this period of

2 time of October 2000 to February 2001?

3    A. They were -- my understanding, they were

4 being customized for the telco industry.

5    Q. And so, when these individuals told you

6 that these modules were in beta version, they were

7 talking about the modules that were being customized

8 for the telecommunications industry?

9    A. I have to assume that.

10    Q. Yes?

11    A. I have to assume that.

12    Q. Is it fair to say, in your experience in

13 technology, that modules that are customized may

14 have different operational problems than modules

15 that are in standard form?

16    A. True.

17    Q. And modules that have to -- strike that.

18    And 11i modules that have to interact

19 with non-11i Legacy systems may have different

20 problems than Oracle 11i modules that only interact

21 with other Oracle 11i modules, correct?

22    A. Correct. That's why they called me in.

23 That was my specialty.

24    Q. Your specialty was trying to get

25 Oracle --

144

1  A.  Working -- I'm sorry.

2  Q.  -- to work with non-Oracle, right?

3  A.  Non-Oracle products and Legacy.

4  Q.  And that's the kind of challenging task

5  that was involved in best-of-breed applications,

6  right?

7  A.  Correct.

8  Q.  And BellSouth required customization?

9  A.  Correct.

10  Q.  And BellSouth required interaction of

11  11i with non-Oracle Legacy systems, right?

12  A.  Correct.

13  Q.  And I think you told us Telia AB --

14  A.  Telia.

15  Q.  -- Telia AB also required customization,

16  right?

17  MR. BRITTON:  Objection to form.

18  THE WITNESS:  They thought it did, and I was

19  there to convince them "You don't want to customize

20  this software."

21  BY MR. KRISS:

22  Q.  You don't want to customize which

23  software?

24  A.  Either/or, and you want to use what is

25  called an API strategy.  You build -- you build the

145

1  logic for this difference in the form of an API,

2  which is an Application Program Interface, 'cause

3  every time you open up either/or, the Legacy or the

4  Oracle, you're increasing your risk.  Let me, the

5  API -- if I can use myself as the API -- let me

6  handle the differences.

7  Q.  I see.  So, what you were suggesting is

8  to create a customized API to deal with the

9  differences between the functionality of standard

10  11i products and the special business requirements

11  of Telia AB?

12  A.  Correct.  Using BIE.

13  Q.  If you could look at Exhibit 6, please.

14  A.  All right.

15  Q.  This document is for Telia -- it's

16  entitled "Program Management Guide," at least on the

17  first page, and you are noted as its author, right?

18  A.  Yes.

19  Q.  And the document indicates that it was

20  last updated on January 26, 2001?

21  A.  Correct.

22  Q.  Does that mean that you were still

23  working on the Telia project as of January 26, 2001?

24  A.  Yes.

25  Q.  When did you stop working on the Telia

146

1  project?

2  A.  The last Thursday in the month in

3  January.

4  Q.  Sometime after January 26th, 2001?

5  A.  Right, yes.  I just can't remember the

6  date.

7  Q.  Sure.  And who told you to stop working

8  on the project?

9  A.  Gary Moore.

10  Q.  And what did Gary Moore say to you?

11  A.  He said, "Bob, there's no longer a need

12  to continue on this program, and we are returning to

13  the U.S."

14  Q.  Do you know whether any other

15  representatives of Oracle visited with Telia after

16  you left Telia to continue discussions about a

17  potential deal?

18  A.  No, I do not.

19  Q.  Did you ever receive any information

20  from any source as to what decision Telia made with

21  regard to working with Oracle?

22  A.  The communications from Gary Moore to

23  myself, which preceded that January 26th date, I

24  can't remember if it was the week before or two

25  weeks before, he said that Telia has decided not to

147

1  move forward with the proposal.

2  Q.  If he told you that Telia had decided

3  not to move forward with the proposal before

4  January 26, 2001, why then did you prepare the

5  document that is Exhibit 6, dated January 26th,

6  2001?

7  A.  Because the customer -- oh, I'm sorry.

8  The customer had asked -- is it -- people left the

9  project, but they said, "We'd like Bob to stick

10  around.  And could you finalize all this

11  documentation?  And we will pay you to do that."

12  Q.  Did you have any understanding as to why

13  Telia wanted you to finalize the documentation?

14  A.  It would be pure speculation on my part.

15  Q.  And I take it, then, also that it would

16  be pure speculation on your part as to the reasons

17  that Telia made any decisions with regard to whether

18  to move ahead with Oracle after January 26 or not;

19  am I right?

20  MR. BRITTON:  Object to form.  You can go

21  ahead.  I just objected to form.

22  THE WITNESS:  Other than what Mr. Gary Moore

23  told me that they have elected not to go forward.  I

24  was disappointed, but he said, "They would like you

25  to stick around and complete the documentation and

148

1  put all the documentation in a proper format for
2  them to use."
3  BY MR. KRISS:
4      Q.  And when did Mr. Moore tell you that
5  Telia had decided not to go forward?
6      A.  Like I said, it was about a week to week
7  and a half before my last day there, which was that
8  Thursday.
9      Q.  But Mr. Moore did not tell you the
10  reasons that Telia decided not to go ahead; is that
11  correct?
12      A.  He did not go into the detail, no.
13      Q.  And you don't know whether or not people
14  from Oracle continued to talk with Telia about this
15  deal in February 2001, correct?
16      A.  No, I do not.
17          Excuse me.  Could I get a cup of coffee?
18          MR. KRISS:  Oh, yeah.  We'll take a break off
19  the record.
20          THE VIDEOGRAPHER:  This marks the end of Tape
21  No. 2, Volume No. I, in the deposition of Mr. Robert
22  Green.  We're going off the record.  The time is
23  2:15 p.m.
24          (A brief recess was taken.)
25          THE VIDEOGRAPHER:  We're back on the record.

149

1  This marks the beginning of Tape No. 3, Volume I, in
2  the deposition of Mr. Robert Green.  The time is now
3  2:26 p.m.
4  BY MR. KRISS:
5      Q.  Mr. Green, could you get Exhibit 3 in
6  front of you.  It has on the front "BellSouth
7  Estimating Spreadsheet."
8      A.  Sure.
9      Q.  Do I correctly understand that you
10  prepared this document?
11      A.  Yes.
12      Q.  When did you prepare it?
13      A.  In the October-November time frame of
14  the year 2000.
15      Q.  Would you also take a look at Exhibit 2?
16      A.  Exhibit 2, yes.
17      Q.  Exhibit 2 talks about BellSouth going
18  live on or about January 13, 2001.  You see that?
19      A.  Yes.
20      Q.  Can you explain how the proposal that's
21  Exhibit 3 relates to the go-live that is reflected
22  in Exhibit 2, if at all?
23      A.  I don't believe there's any
24  relationship.
25      Q.  So, your understanding is that Exhibit 3

150

1  was talking about a project entirely different than
2  the project that went live at BellSouth in January
3  of 2001; is that your testimony?
4          MR. BRITTON:  Objection to form.
5          THE WITNESS:  I really don't know if there's
6  a correlation between the two without further
7  analysis on my part.
8  BY MR. KRISS:
9      Q.  Is there anything that you could do, as
10  you're sitting here today, that would help answer
11  that question?
12      A.  Well, first of all, this, if I may be
13  open, is a very vague document.
14      Q.  Exhibit 2?
15      A.  Yes.
16      Q.  Yeah.
17      A.  It's very vague.  So, it would take me
18  some time.  Let me --
19      Q.  Let me ask you:  Exhibit 3, was that
20  work that was being done for BellSouth Technology
21  Services or BellSouth Communications?
22      A.  Oh.
23      Q.  Exhibit 3.
24      A.  I'm sorry.  I'm sorry.  It's late in the
25  day.

151

1      Q.  Do you recall which BellSouth --
2      A.  You know, I really don't remember, I
3  just -- yeah, I don't remember.  Let me see if I
4  may --
5      Q.  Sure.
6      A.  See if I can look at my notes in --
7          All right.  Your question?
8      Q.  My question is whether the materials
9  that are in Exhibit 3, do they relate to the work
10  that went live as reflected in Exhibit 2?
11      A.  I don't believe so.
12      Q.  Do you understand any relationship at
13  all between what you were doing in Exhibit 3 and
14  what BellSouth Technology Services was implementing
15  in January of 2001?
16      A.  It would be pure speculation on the
17  January implementation, what they were physically
18  implementing based upon the documents that were
19  here.  But I cannot see a correlation with what is
20  contained in this document here.
21      Q.  Do you know whether the -- let me back
22  up.  Is Exhibit 3 a proposal or is it something
23  else?
24      A.  It is a proposal to go forward.
25      Q.  And do you know whether this particular

152

1 proposed deal reflected in Exhibit 3 was ever listed

2 in any pipeline report?

3     A. I have no idea.

4     Q. Did you ever receive any information

5 from any source as to what happened to the proposal

6 that is Exhibit 3?

7     A. Two gentlemen from the BellSouth

8 project, two directors -- I can't remember their

9 names, other than very outspoken individuals --

10 arrived at Telia mid-December, maybe the second week

11 in December, to try to help the Oracle sales team on

12 the proposal for Telia. And we asked them, "What's

13 the status of the proposal with BellSouth?" And

14 they said it was still being reviewed.

15     Q. Okay. And is that the last you heard

16 about what happened to the proposal which is

17 Exhibit 3?

18     A. No. In January of 2001, Gary Moore came

19 to me and said, "Bob, are you aware that the

20 BellSouth proposal that you participated in was

21 rejected"? I said, "This is the first time I'm

22 aware of it."

23     Q. And do you recall when in January you

24 were told that?

25     A. Before my wife went home 'cause she was

153

1 over there. She came over for the holidays. I'm

2 trying to remember. I'm going to say the second

3 week in January. I -- she stayed for a couple

4 weeks, I remember.

5     Q. Did you ever receive any information

6 from any source as to why BellSouth decided not to

7 go forward with the proposal that's Exhibit 3?

8     A. No.

9     Q. Mr. Britton asked you some questions

10 about Oracle's claim that using its software helped

11 Oracle save a billion dollars. Do you recall that?

12     A. Yes.

13     Q. And you made some reference to hard

14 savings versus soft savings.

15     A. Uh-huh.

16     Q. You said you didn't believe in soft

17 savings. Could you explain what you understand to

18 be the difference between hard savings and soft

19 savings --

20     A. Sure.

21     Q. -- as you use it?

22     A. Hard savings is real dollars. For

23 example, cutting headcount, reducing inventory,

24 reducing expenditures for consulting services.

25         Soft savings are the climate here will

154

1 be improved; that is, the climate for the people.

2 We may get additional sales. Those are soft

3 savings. The others are hard.

4     Q. Did you ever do any analysis to

5 determine whether Oracle's installation of 11i

6 software resulted in any hard savings, as you've

7 defined it?

8     A. No.

9     Q. Did you ever have any conversation with

10 anybody who did such an analysis?

11     A. I was not aware of anyone doing such

12 analysis.

13     Q. You're not saying that nobody did the

14 analysis; you don't know one way or the other

15 whether they did, correct?

16     A. I know of no one doing that, and I know

17 of no documentation that would support the

18 $1 billion savings. I never saw anything physical.

19     Q. But there's no reason that you would see

20 anything, right? I mean, your responsibilities at

21 Oracle didn't require anybody to submit that kind of

22 information to you?

23     A. They didn't have to come to me for

24 approval.

25     Q. Did you ever perform an analysis of hard

155

1 savings for a customer of Oracle?

2     A. Yes.

3     Q. Which customer?

4     A. Kellogg's. Kellogg's, the cereal

5 company, in their Latin American operation.

6     Q. Any others?

7     A. Not to that extent of a full analysis.

8 I made suggestions of how they could save money

9 after we got there, sure.

10     Q. And when was the Kellogg's work done?

11     A. That started in '95 and ending in '96.

12     Q. Kellogg's work obviously didn't involve

13 11i in any way.

14     A. Oh, no, no, no.

15     Q. Did you have any responsibility for

16 dealing at all with the following customers of

17 Oracle, JDS Uniphase?

18     A. No.

19     Q. The Principal Financial Group?

20     A. No.

21     Q. HealthNet?

22     A. I'm working for them now under contract

23 but not then.

24     Q. Citibank?

25     A. No.

156

1    Q. Citicorp?

2    A. I made a proposal.

3    Q. Okay.  Nantucket Nectars?

4    A. No.

5    Q. Alliance Coal?

6    A. No.

7    Q. Motorola?

8    A. No.

9    Q. Telia Net?

10   A. No.

11   Q. You were asked on direct examination

12   whether Telia Network went live, and said you didn't

13   know.

14   A. I have no idea.

15   Q. Do you know whether Telia Net went live

16   with 11i?

17   A. No idea.

18   Q. When did you do a proposal for Citicorp?

19   A. Sometime in '98 or '99.  Just can't

20   remember the month and the week.

21   Q. Did you ever go by a nickname of Monte?

22   A. No.

23   Q. Did you --

24   MR. BRITTON:  What was the nickname?

25   MR. KRISS:  Monte.

157

1    BY MR. KRISS:

2    Q. Did you know anybody at Oracle named

3    Monte Green?

4    A. No.

5    Q. What was your salary at Oracle during

6    3Q '01?

7    A. Base salary?

8    Q. Yes.

9    A. I think it was 145,000.

10   Q. Were you also on any sort of commission

11   basis?

12   A. No.

13   Q. So, what other remuneration were you

14   entitled to receive from Oracle in 3Q '01 other than

15   your salary?

16   A. Car allowance, obviously, the benefits,

17   stock options.

18   Q. Anything else?

19   A. That's it.

20   Q. Did you ever own any Oracle stock?

21   A. Yes.

22   Q. When did you first begin owning -- when

23   did you first own Oracle stock?

24   A. I believe it was 1994.

25   Q. Did you own Oracle stock during 3Q '01?

158

1    A. Yes.

2    Q. How many shares approximately?

3    A. About 8,000.

4    Q. And when did you leave Oracle?

5    A. In March of '01 was the layoff.

6    Q. Do you recall approximately how many

7    shares of Oracle stock you owned in 2Q '01?

8    A. It was somewhere between 7- and 8,000.

9    I know prior to that I had sold some shares when

10   they were high.

11   Q. When did you sell the shares?

12   A. It was in 2000 -- it was in July, August

13   timeframe.  That's all I can remember.

14   Q. July, August 2000?

15   A. 2000, yes.

16   Q. Did you increase your ownership of

17   Oracle stock between 2Q '01 and 3Q '01?

18   A. Yes.

19   Q. By approximately how many shares?

20   A. Let's say -- oh, probably about 500.

21   Q. Why did you do that?

22   A. They gave them to me.

23   Q. Part of your options?

24   A. Yes.  And they have a stock purchase

25   plan.

159

1    Q. Did you sell any stock between 2Q '01

2    and -- did you sell any stock during the period

3    2Q '01 and 3Q '01, any Oracle stock?

4    A. As I mentioned, in July, August of 2000,

5    which is Q1, I did sell some shares, totaling about

6    $90,000 -- that's the profit I made -- to reinvest

7    elsewhere.

8    Q. But after 1Q '01, did you sell any

9    stock --

10   A. No.

11   Q. -- between 1Q '01 and the time you were

12   terminated?

13   A. No.

14   Q. Have you bought any Oracle stock since

15   you were terminated?

16   A. No.

17   Q. Do you still hold Oracle stock?

18   A. About 6500 shares.

19   Q. Did you ever receive any documents from

20   the plaintiff's counsel or their investigator?

21   A. Other than -- I don't know what you call

22   the official document.

23   MR. CAPLAN:  He's asking if you received

24   documents from those lawyers or their investigator.

25   THE WITNESS:  The only thing I received from

160

Green, Robert  10/18/2005  9:36:00 AM

1   your lawyers or the investigator -- I believe it was
2   the investigator, was the complaint.  I guess you
3   call it the complaint.
4   BY MR. KRISS:
5       Q.  Okay.  That's Exhibit 1.
6       A.  One of those -- yeah, I believe it was.
7   And then, letterhead memo kind of things
8   saying, "Here's the document."  That's it.
9       Q.  Do you recall what was said in the cover
10  letter to the complaint?
11      A.  "You might want to read this.  For your
12  information."  That's it.
13      Q.  Did you keep the cover letter?
14      A.  I don't believe so.  I can't find it.  I
15  did try to go back when this obviously moved to this
16  stage.  I tried to see if I kept it.
17      Q.  Did you review the complaint when you
18  got a copy of it?
19      A.  First time, no.
20      Q.  So, did you get a copy of a complaint
21  more than once?
22      A.  Yes 'cause I asked the investigator --
23  when he called back sometime later, he asked me,
24  "Have you read the complaint?"  And I had to
25  apologize.  I said, "Like everything else, I

161

1   shredded it."
2       Q.  And did he send you another copy?
3       A.  He sent me another copy.  I did read it
4   that time.
5       Q.  And when was that the second time that
6   you received a copy --
7       A.  I would say about a year ago.  Sometime
8   in the last year.  I just can't remember the date.
9       Q.  And when you received it the second
10  time, did it have any sort of cover letter attached
11  to it?
12      A.  Other than the typical things that I
13  guess firms put on top, "Here's the requested
14  document" and "You may be hearing from us," that's
15  it.
16      Q.  And you don't have a copy of that
17  document?
18      A.  No, I do not.  No.
19      Q.  And you did read the complaint the
20  second time you were sent it?
21      A.  Yes.  I figured out who I was in the
22  document.
23      Q.  How did you figure that out?
24      A.  The code and the title.  There was only
25  one director of technology in there.  I said, "It's

162

1   got to be me."  And it's Telia, BellSouth.  It was a
2   simple deduction.
3       Q.  But they didn't indicate in their cover
4   letter --
5       A.  No, no.
6       Q.  -- which CW you were; is that right?
7       A.  That is true.
8       Q.  Did you ever give the plaintiff's
9   counsel or their investigator any documents other
10  than the documents that you ultimately produced to
11  both sides in response to the subpoena?
12      A.  No.
13      Q.  How did you decide who would represent
14  you at this deposition?
15      A.  The plaintiff's firm -- I can't remember
16  the gentleman who called -- said, "They're going to
17  want to take a deposition, and you are entitled to
18  counsel.  You can have your own or we can select one
19  for you."
20          And first question, I guess because I'm
21  Irish, is "Who's paying for this?"  And he said, "We
22  are.  We will select someone outside of our firm,
23  independent."  And that's how this gentleman was
24  appointed or called me.
25      MR. CAPLAN:  You don't have to talk about our

163

1   conversations.
2       THE WITNESS:  Right, right.
3   BY MR. KRISS:
4       Q.  Have the plaintiffs or their
5   representatives paid you any money in connection
6   with this case?
7       MR. CAPLAN:  You mean other than the witness
8   fee?
9       MR. KRISS:  Yeah.  Other than -- other than
10  the statutory witness fee with the --
11      THE WITNESS:  The 60-some dollars, I think it
12  was.
13      MR. KRISS:  Yeah.
14      THE WITNESS:  No.
15  BY MR. KRISS:
16      Q.  Have they promised to pay you any money?
17      A.  No.
18      Q.  Have they agreed to pay you for your
19  time working on this case in any way?
20      A.  No.
21      Q.  Have they promised to confer any benefit
22  upon you of any sort?
23      A.  No.
24      Q.  Were you given any reasons for your
25  termination in March of 2001?

164

1    A.  Other than, "As you know, Bob" -- this

2  came from one of the VPs.  I can't remember the

3  gentleman's name.  "We are laying off approximately

4  500-plus people.  And your group has been" -- group,

5  Gary Moore, myself and -- my mind went blank.

6    Q.  Fred Tune?

7    A.  Yeah, Fred Tune.  "Your services are no

8  longer needed."  I said, "Well, what about the

9  contracts I'm working on?"  "We'll worry about

10  that."  That's it.  "We'll send you a letter,"

11  typical layoff.

12    Q.  Had you received any indication up to

13  March of 2001 that anybody at Oracle felt that your

14  performance did not meet their expectations?

15    A.  No.

16    Q.  Did you believe that Oracle treated you

17  fairly at the time that it terminated your

18  employment?

19    A.  Yes.

20    Q.  Did you complain about your termination

21  to anybody?

22    A.  Other than my wife, and my dog, that was

23  it.

24    Q.  Okay.  Did your dog have any comments?

25    A.  No, as long as you scratch her.  No, no.

1    MR. CAPLAN:  That's privileged.

2    THE WITNESS:  That's privileged, yeah.  It's

3  a black lab.

4    MR. KRISS:  They're notoriously quiet.

5    THE WITNESS:  They are.  She's still here.

6    MR. KRISS:  Okay.  Let's take a few-moment

7  break.  I want to just take a look at my notes, and

8  we're close to being done.

9    THE WITNESS:  Okay.

10    THE VIDEOGRAPHER:  We're going off the

11  record.  The time is 2:50 p.m.

12    (A brief recess was taken.)

13    THE VIDEOGRAPHER:  We're back on the record.

14  The time is 2:55 p.m.

15    MR. KRISS:  Thank you, Mr. Green.  I have no

16  further questions at this time.

17    THE WITNESS:  Thank you.

18

19  FURTHER EXAMINATION BY MR. BRITTON:

20    Q.  Okay, Mr. Green, I just have a few

21  questions to follow up --

22    A.  Sure.

23    Q.  -- tie some loose ends together.

24    Do you recall the testimony that you

25  gave in response to counsel's questions about not

165

166

1  seeing any forecasts relating to Oracle during the

2  2000 time period?

3    A.  I remember the question, yes.

4    Q.  Right.  And I believe you testified that

5  you didn't see any applications forecast, and you

6  didn't see any database forecast; is that right?

7    A.  For all of the consulting area, no, I

8  did not.

9    Q.  Now, we had talked earlier about you

10  receiving an e-mail that contained information about

11  what Oracle had told the public.

12    A.  Yes.

13    Q.  Were you intending to exclude that

14  forecast from your answer?

15    MR. KRISS:  Objection to the form of the

16  question.

17    THE WITNESS:  I didn't view that e-mail as a

18  forecast.

19  BY MR. BRITTON:

20    Q.  What did you view it as?

21    A.  I viewed it as an announcement that we

22  are meeting, you know -- I call it a -- what's that

23  term?  It really wasn't a forecast that I would

24  classify as a forecast.  It wasn't a spreadsheet

25  that showed me detail.

1    Q.  Right.

2    A.  It just basically said, you know,

3  "Here's our overall forecast."  All right.  And

4  we -- "this is what we're targeting."

5    Q.  So, you're defining what's in that

6  e-mail different than what --

7    A.  Oh, yes.

8    Q.  -- a forecast is?

9    A.  Absolutely.  I don't rely on the e-mails

10  anymore.

11    Q.  So, when you're talking about forecasts,

12  you're talking about forecasts internal at Oracle;

13  is that fair?

14    A.  Yes.

15    MR. KRISS:  Objection to the form of the

16  question.

17  BY MR. BRITTON:

18    Q.  The Oracle meeting that was in -- I

19  believe you said Orlando?

20    A.  Yes.

21    Q.  Okay.  Can you tell me what regions of

22  Oracle were represented in that meeting?

23    A.  Well, we had people from Latin America.

24  There's groups from Argentina, I remember that.  I

25  talked to them.  Pretty good cross-section of most

167

168

1    of the groups here in the U.S.  No one from Europe,
2    and one group from Australia.  I just happened to
3    talk to them 'cause I had gone there.
4       Q.  And that was the meeting where people
5    were inquiring about "How do we get more consulting
6    business?"
7       A.  That was not the purpose --
8       MR. KRISS:  Object to the question.
9       THE WITNESS:  That was not the purpose of the
10   meeting.
11   BY MR. BRITTON:
12      Q.  Right.  But those conversations took
13   place at that meeting?
14      A.  At the cocktail --
15      MR. KRISS:  Object to the form.  Excuse me,
16   sir.  Objection to the form of the question.
17      THE WITNESS:  At the cocktail hour, as I
18   called it, yeah.
19      MR. BRITTON: Okay.  Fair enough.
20   BY MR. BRITTON:
21      Q.  You testified earlier that there were
22   people on the bench at all times at Oracle.
23      A.  It was not uncommon to have people on
24   the bench at Oracle at all times.
25      Q.  Did you see an increase in the number of

169

1    people on the bench in 2000?
2       MR. KRISS:  Objection to the form of the
3    question, no foundation.
4       THE WITNESS:  Yes, at least from the groups I
5    was involved in.
6    BY MR. BRITTON:
7       Q.  And what's your basis for that answer?
8       A.  Because I received calls from consulting
9    managers and directors saying, "Bob, are you working
10   on anything?"  This is common practice of just
11   communicating amongst ourselves.  "Are you working
12   on anything where you could use one or two of my
13   people?  I've got people on the bench."
14      Q.  Now, we -- you and I had talked about
15   whether there were any BellSouth engagements in
16   Atlanta, Georgia.
17      A.  Yes.
18      Q.  I remember you testified that you don't
19   recall that there was?
20      A.  I'm not aware of any.  I just -- it
21   wasn't on my radar.
22      Q.  Okay.  Now, in response to counsel's
23   questions, you mentioned that you had spoke to, I
24   believe, a director of consulting services that were
25   in Atlanta.

170

1       A.  There were a couple of them in Atlanta.
2       Q.  Why were you talking to those directors
3    if there were no implementation of BellSouth in
4    Atlanta?
5       A.  They called numerous times saying, "Bob,
6    as you're preparing the proposal for BellSouth,
7    could you see if there's any opportunity for the
8    following skills that I have on the bench right
9    now?"  And I said, "That's not my job.  I define the
10   skills, but I don't assign the people."
11      Q.  All right.  Counsel took you through a
12   number of questions about what formed your opinion
13   that Oracle's business was declining in 2001.  Do
14   you recall that testimony?
15      MR. KRISS:  Objection to the form of the
16   question.
17      THE WITNESS:  Yes.
18   BY MR. BRITTON:
19      Q.  And is it fair to say that your answers
20   essentially captured all non-Oracle specific
21   information?
22      MR. KRISS:  Objection to the form of the
23   question.
24   BY MR. BRITTON:
25      Q.  Baron's and articles outside of --

171

1       A.  Yes, I do a lot of reading in that
2    space.
3       Q.  And counsel had asked you whether the
4    economy had any different impact in Q1 2001 versus
5    Q3 '01.  Follow that?
6       A.  Yes, I do follow the question.
7       Q.  Can you explain that to me?
8       MR. KRISS:  Object to the form of the
9    question.
10      THE WITNESS:  Here again, reading the
11   journals that I read and the newspapers that I read
12   seemed to indicate that this was the case, and it
13   became apparent in Q3 by the calls I was getting
14   from other consulting managers, directors.  It just
15   seemed that the chatter or "Do you have any work for
16   our people" was much more noticeable than in prior
17   years.
18   BY MR. BRITTON:
19      Q.  So, there was Oracle-specific
20   information that helped form your opinion that
21   business was declining in 2001?
22      MR. KRISS:  Objection to the form of the
23   question.
24      THE WITNESS:  Yes.
25      / / /

172

1 BY MR. BRITTON:

2    Q. And that was conversations with other

3 consulting people; is that right?

4    MR. KRISS: Objection to the form of the

5 question.

6    THE WITNESS: Yes.

7 BY MR. BRITTON:

8    Q. And conversations with salespeople; is

9 that right?

10    MR. KRISS: Objection to the form of the

11 question, leading.

12    THE WITNESS: No.

13 BY MR. BRITTON:

14    Q. Just conversations with consultants?

15    A. Yes.

16    Q. I want you to pull out Exhibits 2 and 3.

17    A. 2 and 3, all right.

18    Q. Okay. You testified earlier that you

19 weren't sure whether Exhibit 2 related to what you

20 had done in Exhibit 3; is that right?

21    A. Correct.

22    Q. Can you take me back and tell me which

23 BellSouth implementation was going forward at the

24 time versus which one you were bidding on?

25    MR. KRISS: Objection. No foundation.

173

1    THE WITNESS: Without further analysis on it

2 but just first impression of this document, what

3 this, I believe, deals with is the implementation of

4 work that was going on prior that had started prior

5 to us starting this proposal here. This was work

6 that started early in the year 2000. I don't know

7 specifically when that I mentioned earlier.

8    MR. BRITTON: Okay. And what facility was

9 that at, if you know?

10    MR. KRISS: Objection. No foundation.

11    THE WITNESS: This was at the Birmingham.

12 BY MR. BRITTON:

13    Q. The Birmingham facility?

14    A. I don't know which business. Just

15 Birmingham.

16    Q. Now, the language in Exhibit 2, it says,

17 "We are live at BellSouth with 11,000 users, and

18 there are very serious performance problems." Were

19 you aware that in the third quarter of 2001 whether

20 there were any problems in the BellSouth

21 implementation in Birmingham?

22    MR. KRISS: Objection. No foundation.

23    THE WITNESS: Yes, because some of the

24 questions that were asked of the team that was there

25 trying to support this estimating, was, you

174

1 know -- and I expect honesty. If I find out there

2 isn't honesty, I walk; I will not complete this.

3    So, I demanded honesty as to the

4 questions that are contained in here that drive the

5 estimate and the risk. And people knew, because of

6 my track record, if you lie to me and I find out,

7 there are going to be problems.

8 BY MR. BRITTON:

9    Q. Did that help you form an opinion on how

10 the implementation was going in Birmingham?

11    MR. KRISS: Objection. No foundation.

12    THE WITNESS: I did not try to form an

13 opinion at that stage. I was only focused on -- I

14 had a request to put together a proposal for this

15 upgraded solution, and this was it. This is my

16 focus.

17 BY MR. BRITTON:

18    Q. What was the difference between the

19 Birmingham implementation that was going on from

20 2000 and the one that you were looking at in

21 Exhibit 3?

22    A. There obviously are far more modules in

23 this component. This was -- the best of my

24 knowledge, the complete suite of telco recommended

25 11i component. This was not (indicating).

175

1    Q. Okay. Do you know what was in the

2 BellSouth implementation in Birmingham before --

3    A. In Exhibit 2?

4    Q. Yes.

5    A. Other than what's stated here, no.

6    Q. Describe your participation in the

7 Oracle stock option plan for me.

8    A. Well, stock option, you could obviously

9 buy a certain percentage dependent upon your salary.

10 I can't remember the formula the IRS sets, but you

11 could buy so many shares.

12    Q. Did you have -- go ahead and finish.

13    A. And the options -- I guess, the board --

14 I can't remember how often the board would set the

15 price. I just don't remember.

16    Q. Did you have a set schedule for how much

17 you would invest in Oracle each period?

18    MR. KRISS: Objection to the form of the

19 question.

20    THE WITNESS: Each -- it was probably --

21 well, the options were once a year, but I had

22 multiple options. I don't remember the schedule

23 'cause they varied.

24 BY MR. BRITTON:

25    Q. Now, when you -- earlier when you said

176

1 that you increased your holdings between Q2 '01 and
2 Q3 '01, when did you receive those shares?
3     A.  Oh, gosh.  I really don't know.  All I
4 know is that -- it just came in.  I really can't
5 give you a pay period that it happened.
6     MR. BRITTON:  Okay.  I have no further
7 questions.  Thank you very much for your time.
8     MR. KRISS:  I have a little follow-up.
9     THE WITNESS:  Sure.
10
11 FURTHER EXAMINATION BY MR. KRISS:
12     Q.  Mr. Green, the options that you received
13 from Oracle required you to pay money to exercise
14 them, right?
15     A.  Well, depends upon what you mean by --
16 basically, the options were set at a price.  All
17 right.  So, the option, let's say, was -- I'll pick
18 a number -- $10 a share.  If I executed the option,
19 you know, I really didn't -- no cash came out of my
20 pocket on an option.  Is that's what you're talking
21 about?
22     Q.  Where did the cash come from, then, to
23 pay for the option?
24     A.  Oracle paid the -- had to pay for the
25 difference between -- you know, had to pay -- I

177

1 forget what portion of that they paid.  The only
2 thing I paid was the taxes on the monies that I
3 earned based upon the option.  I paid no money out
4 of my pocket.  There again, real dollars, that's all
5 I'm interested in.
6     Q.  Can you quantify in any way how much
7 more chatter you heard in 3Q '01 than you did in any
8 prior period about people on the bench?
9     A.  It just seemed to be, you know, I was
10 getting more and more calls from other directors and
11 managers saying, "Bob" -- they knew what we were
12 working on.
13         They thought, well, maybe this was
14 something new that was going to pick up new
15 business.  So, I was getting a lot of calls from
16 different managers, "Bob, do you have any work?"
17     Q.  My question is:  Can you quantify the
18 difference in the amount of calls that you got in
19 3Q '01 about people being on the bench compared to
20 the prior periods?  Can you quantify it in any way?
21     A.  Sure.  Three, five times.
22     Q.  Okay.  Then tell me who it was in 3Q '01
23 who talked to you about people being on the bench
24 and asking for your assistance.
25     A.  Two individuals, two directors out of

178

1 Atlanta, the director -- I think he was a
2 director -- I could be wrong here -- of the Dayton
3 practice for Oracle was one.  There were two
4 gentlemen from the government consulting group.  I'm
5 not -- I can't remember whether they were out of the
6 Bethesda office or not.  And there were people here
7 on the west coast 'cause I know a lot of people in
8 the western region, and they were just calls.  Some
9 were not calls, some were e-mails.
10     Q.  Who is the western region?
11     A.  There's two people that were here, one
12 in the Orange County office and one in the LA office
13 down by the airport.  It just -- you establish a
14 network amongst yourself, and we did a lot of
15 networking.
16     Q.  I'm not asking about what you did with
17 networking.  I'm asking you to identify the people
18 you talked to.
19     A.  I don't know who --
20     MR. CAPLAN:  Excuse me, Counsel.  I don't
21 think he was finished with his answer.
22     MR. KRISS:  I don't mean to interrupt you,
23 but I want you to know what my question is.
24     MR. CAPLAN:  Well, I don't want to be
25 interrupted either.  So, when he's completed an

179

1 answer, please let him complete it and don't tell
2 him he's not answering the question when he's trying
3 to finish his answer.
4     THE WITNESS:  I don't have the names.
5 BY MR. KRISS:
6     Q.  Can you give me the name of any person
7 who you claim talked to you about people being on
8 the bench and asking for your help to get people
9 working in 3Q '01?
10     A.  Oh, gosh.  She's out of Washington.
11 Give me a second.  Sylvia -- I can't remember her
12 last name, but I've worked with her for years.
13     Q.  Anyone else?
14     A.  Not by name, no.  I apologize.
15     MR. KRISS:  No other questions.
16     MR. BRITTON:  Thank you very much for your
17 time.
18     THE WITNESS:  You're welcome.
19     MR. CAPLAN:  I have a small housekeeping.  At
20 the beginning of the day, counsel for Oracle had a
21 question about whether we had sent the documents on
22 to Oracle, which we had.
23         And I allowed counsel to look at my
24 copy, but I would like to have marked for the record
25 as -- I guess you're marking exhibits in order for

180

Green, Robert  10/18/2005  9:36:00 AM

1   each deposition?

2       MR. BRITTON:  Yes.

3       MR. CAPLAN:  -- as next in order a letter

4   from Charles Harris at Mayer, Brown setting the date

5   for September 20th to produce documents.

6       And as the next exhibit in order and the

7   only other exhibit is my cover letter with the

8   documents to Mr. Harris and to Monique Winkler,

9   plaintiff's counsel.

10      Okay.  So, those documents were FedEx'd

11  on the 19th to be received on the 20th by

12  Mr. Harris.  And as the letter notes, we

13  hand-delivered to Lerach, Coughlin in San Francisco

14  the following day so that each counsel would have

15  the documents for the same period of time.

16      (Letter dated 9/6/05 to Alan Caplan from

17  Charles E. Harris II marked Exhibit 8 for

18  identification.)

19      (Letter dated 9/19/05 to Charles E.

20  Harris from Alan M. Caplan marked Exhibit 9 for

21  identification.)

22      MR. KRISS:  Thank you.

23      MR. BRITTON:  Good.  Thank you.  That

24  concludes the deposition.

25      THE VIDEOGRAPHER:  Let me close the video

181

1   record.  This marks the end of Tape No. 3, Volume I,

2   in the deposition of Mr. Green, Robert Green.

3       Original videotapes will be retained by

4   LiveNote World Service.  We're going off the record.

5   The time is 3:12 p.m.

6       (Deposition adjourned at  3:12 p.m.)

7       * * * * *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

182

1       PENALTY OF PERJURY CERTIFICATE

2

3       I hereby declare I am the witness in the within

4   matter, that I have read the foregoing transcript and

5   know the contents thereof; that I declare that the same

6   is true to my knowledge, except as to the matters which

7   are therein stated upon my information or belief, and as

8   to those matters, I believe them to be true.

9       I declare being aware of the penalties of perjury,

10  that the foregoing answers are true and correct.

11

12

13

14

15      Executed on the _____ day of _____ 2005,

16  at _____, _____.

17          (CITY)          (STATE)

18

19

20

21      _____

22  ROBERT GREEN

23

24

25

183

1   STATE OF CALIFORNIA        )

2                             ) ss:

2   COUNTY OF SAN DIEGO        )

3

4       I, KAE F. GERNANDT, do hereby certify:

5       That I am a duly qualified Certified Shorthand

6   Reporter, in and for the State of California, holder of

7   certificate number 5342, which is in full force and

8   effect and that I am authorized to administer oaths and

9   affirmations;

10      That the foregoing deposition testimony of the

11  herein named witness was taken before me at the time and

12  place herein set forth;

13      That prior to being examined, the witness named

14  in the foregoing deposition, was duly sworn or affirmed

15  by me, to testify the truth, the whole truth, and

16  nothing but the truth;

17      That the testimony of the witness and all

18  objections made at the time of the examination were

19  recorded stenographically by me, and were thereafter

20  transcribed under my direction and supervision;

21      That the foregoing pages contain a full, true

22  and accurate record of the proceedings and testimony to

23  the best of my skill and ability;

24      That prior to the completion of the foregoing

25  deposition, review of the transcript was not requested.

184

Green, Robert  10/18/2005  9:36:00 AM

1        I further certify that I am not a relative or

2    employee or attorney or counsel of any of the parties,

3    nor am I a relative or employee of such attorney or

4    counsel, nor am I financially interested in the outcome

5    of this action.

6

7        IN WITNESS WHEREOF, I have subscribed my name

8    this _____ day of _____, _____.

9

10

11        _____

12    KAE F. GERNANDT, CSR No. 5342

13

14

15

16

17

18

19

20

21

22

23

24

25

185

---

1        ERRATA SHEET

2

3    If any corrections to your deposition are necessary,

     indicate them on this sheet, giving the change, page

4    number, line number and reason for change.

5    PAGE  LINE  FROM          TO

6    ____  ____  _____  _____  _____

7    Reason _____

8    ____  ____  _____  _____  _____

9    Reason _____

10   ____  ____  _____  _____  _____

11   Reason _____

12   ____  ____  _____  _____  _____

13   Reason _____

14   ____  ____  _____  _____  _____

15   Reason _____

16   ____  ____  _____  _____  _____

17   Reason _____

18   ____  ____  _____  _____  _____

19   Reason _____

20   ____  ____  _____  _____  _____

21   Reason _____

22   ____  ____  _____  _____  _____

23   Reason _____

24

     _____      _____

25   Signature of Deponent       Date

                                 186

-

1    STATE OF CALIFORNIA        )

                                   ) ss:

2    COUNTY OF SAN DIEGO        )

3

4          I, KAE F. GERNANDT, do hereby certify:

5          That I am a duly qualified Certified Shorthand

6    Reporter, in and for the State of California, holder of

7    certificate number 5342, which is in full force and

8    effect and that I am authorized to administer oaths and

9    affirmations;

10         That the foregoing deposition testimony of the

11    herein named witness was taken before me at the time and

12    place herein set forth;

13         That prior to being examined, the witness named

14    in the foregoing deposition, was duly sworn or affirmed

15    by me, to testify the truth, the whole truth, and

16    nothing but the truth;

17         That the testimony of the witness and all

18    objections made at the time of the examination were

19    recorded stenographically by me, and were thereafter

20    transcribed under my direction and supervision;

21         That the foregoing pages contain a full, true

22    and accurate record of the proceedings and testimony to

23    the best of my skill and ability;

24         That prior to the completion of the foregoing

25    deposition, review of the transcript was not requested.

1        I further certify that I am not a relative or

2    employee or attorney or counsel of any of the parties,

3    nor am I a relative or employee of such attorney or

4    counsel, nor am I financially interested in the outcome

5    of this action.

6

7        IN WITNESS WHEREOF, I have subscribed my name

8    this 28th day of October          , 2005.

9

10

11    _____

12    KAE GERNANDT, CSR No. 5342

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT R

```
1        IN THE UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF CALIFORNIA
3    In re ORACLE CORPORATION
     SECURITIES LITIGATION      Master File No.
4    _____        C-01-0988-MJJ
5    This Document Relates To:
6    ALL ACTIONS.
     _____/
7
8
9              ---oOo---
10            CONFIDENTIAL
11    DEPOSITION OF KELLY A. WOOD
12      Friday, October 7, 2005
13             ---oOo---
14   M&M COURT REPORTING SERVICE, INC.
15          REPORTING FOR
16        LiveNote World Service
17      221 Main Street, Suite 1250
18    San Francisco, California 94108
19        Phone:  (415) 321-2311
20        Fax:  (415) 321-2301
21
22   Reported by:
23   SHERI LUDIKER FOOTE, RPR, CRR
24   IDAHO CSR #90
25
                                        1
```

```
1            A P P E A R A N C E S
2    FOR THE PLAINTIFFS:
3      LERACH, COUGHLIN, STOIA, GELLER, RUDMAN,
4      ROBBINS, LLP
5      655 West Broadway, Suite 1900
6      San Diego, California 92101-3301
7      619/231-1058
8      BY:  DOUGLAS R. BRITTON, Attorney at Law
9      E-mail:  dbritton@lerachlaw.com
10   FOR THE DEFENDANTS:
11     MAYER, BROWN, ROWE & MAW, LLP
12     Two Palo Alto Square, Suite 300
13     Palo Alto, California 94306-2112
14     650/331-2037
15     BY:  LEE H. RUBIN, Attorney at Law
16     e-mail:  lrubin@mayerbrowrowe.com
17   AS THE VIDEOGRAPHER:
18     GARCIA & LOVE REPORTING & VIDEOGRAPHY
19     36 South State Street, Suite 1220
20     Salt Lake City, Utah 84111
21     801/538-2333
22     BY:  Josh Jentzsch, Legal Videographer.
23
24
25
                                        2
```

```
1              ---oOo---
2
3    I N D E X   O F   E X A M I N A T I O N
4
5    TESTIMONY OF KELLY A. WOOD          PAGE
6    Examination by Mr. Britton          5
7    Examination by Mr. Rubin           69
8    Further Examination by Mr. Britton  184
9    Further Examination by Mr. Rubin    190
10
11             ---oOo---
12
13   I N D E X   O F   E X H I B I T S
14
15   NO.    DESCRIPTION              PAGE
16   Exhibit 1  Plaintiff's (Proposed) Revised  179
17       Second Amended Complaint for
18       Violations of the Federal Securities
19       Laws, dated 12/09/2002
20
21
22
23
24
25
                                        3
```

```
1        BE IT REMEMBERED THAT, pursuant to Notice
2    and on Friday, October 7, 2005, at the hour of 10:01
3    a.m. thereof, at Greener Banducci & Shoemaker, 815 W.
4    Washington Street, Boise, Idaho, before me, SHERI
5    LUDIKER FOOTE, RPR, CRR, CSR No. 90, a Certified
6    Shorthand Reporter in the State of Idaho, there
7    personally appeared:
8            KELLY A. WOOD,
9    called as a witness by the Plaintiffs; who, being by me
10   first duly sworn, was thereupon examined and testified
11   as follows:
12             ---oOo---
13        THE VIDEOGRAPHER:  This is the videotaped
14   deposition of Kelly A. Wood, tape No. 1, in the matter
15   of Oracle Corp Securities Litigation in the United
16   States District Court, Northern District of California,
17   Master File No. C-01-0988-MJJ.
18        Today's date is October 7, 2005, at 10:02
19   a.m. My name is Josh Jentzsch, legal videographer for
20   Garcia & Love Reporting in association with LiveNote
21   World Service located at 221 Main Street, Suite 1250 in
22   San Francisco, California, 94105, with phone number
23   2 -- I'm sorry, (415)321-2300.
24        The Court Reporter is Sheri Foote of M&M
25   Court Reporting Service reporting on behalf of LiveNote
                                        4
```

1   World Service.

2       Today's deposition is being taken on behalf

3   of the Plaintiff at Greener Banducci Shoemaker at 815

4   West Washington Street in Boise, Idaho.

5       Will counsel please state their appearances

6   for the record and the witness will be sworn.

7       MR. BRITTON:  Doug Britton with Lerach

8   Coughlin on behalf of Plaintiffs.

9       MR. RUBIN:  Lee Rubin from Mayer Brown

10  Rowe & Maw on behalf of Defendants.

11      (Witness sworn.)

12          EXAMINATION

13  QUESTIONS BY MR. BRITTON:

14      Q.  Good morning, Mr. Wood.  My name is Doug

15  Britton.  We met before the deposition started.  I

16  wanted to talk to you before we begin about the fact

17  that you're not represented by counsel here today; is

18  that correct?

19      A.  Correct.

20      Q.  And you understand that you had the

21  opportunity to be represented by counsel?

22      A.  Yes.

23      Q.  And do you understand that my firm does not

24  represent you in this action?

25      A.  Yes.

5

1       Q.  Okay.  And does anybody from the Defendant's

2   firm, Mayer Brown Rowe & Maw, represent you --

3       A.  No.

4       Q.  -- in this action?  Okay.  And you've

5   elected to proceed without representation --

6       A.  Yes.

7       Q.  -- is that right?  Okay.  Have you ever had

8   your deposition taken before?

9       A.  Relating to this case?

10      Q.  Any case.

11      A.  Any case?  The only thing that would have

12  come close is the telephone conversation that I had.

13  So, I don't know if that was a deposition or not.

14      Q.  Okay.  But a formal deposition where you're

15  sitting down --

16      A.  Oh, no.

17      Q.  -- with attorneys?

18      A.  No.

19      Q.  Okay, let me give you a few of the ground

20  rules:  The natural tendency in a conversation is to,

21  you know, anticipate the question and then give an

22  answer.  This is a formal process where we're trying to

23  keep a record.  So, you have to let me finish my

24  question before you answer.  And I will try to let you

25  finish your answer before I ask a question.  Is that

6

1   okay?

2       A.  Okay.

3       Q.  And we'll violate that rule, but we'll try

4   to stay on it.  You realize that you're under oath

5   today?

6       A.  Yes.

7       Q.  And that the testimony that you give today

8   has the same seriousness as if it was given in a court

9   of law?

10      A.  Yes.

11      Q.  Occasionally you will hear the attorneys

12  object.  And that objection is for the record and is

13  being preserved.  So, it has no bearing on you.  It's

14  just between the lawyers and the Court Reporter.  Do

15  you understand that?

16      A.  Yes.

17      Q.  Now, if you don't understand a question that

18  I ask, will you let me know?

19      A.  Yes.

20      Q.  And then if you at any time want to take a

21  break, let me know and we can go ahead and take a

22  break.

23      MR. BRITTON:  And for the record, Mr. Wood

24  has scheduled his -- first his schedule was such that

25  he had to leave at 11:00, but he has accommodated us

7

1   and moved that back to 3:00.  So, I'm going to endeavor

2   to finish my questions early and give counsel for the

3   Defendants time to finish his questions so we can all

4   be done to accommodate the witness's schedule.

5       MR. RUBIN:  And obviously we will do our

6   best to accommodate your schedule.  Just for the

7   record, as you know, Mr. Britton, the Defendants have

8   cross-noticed Mr. Wood.

9       MR. BRITTON:  Right.

10      MR. RUBIN:  So, we have our own subpoena.

11  And so, I would simply say that in the unlikely event

12  that we run out of time, we'll have to determine what

13  to do to make sure that all parties have an opportunity

14  to pursue their questioning.  But presently I don't

15  anticipate a problem.

16      MR. BRITTON:  Okay, good.

17      Q.  (BY MR. BRITTON)  Did you do anything today

18  to prepare for your deposition?

19      A.  No.

20      Q.  Have you done anything at any point in time

21  to prepare for your deposition today?

22      A.  No.

23      Q.  Have you talked to anybody about your

24  deposition today?

25      A.  My ex-wife, just from a scheduling

8

1    perspective with my children.

2        Q. Do you have contact with anybody that you

3    worked with at Oracle back in 2001?

4        A. Yes.

5        Q. You do?  Have you talked to any of those

6    people about your deposition today?

7        A. Right after I got the initial subpoena or

8    whatever that document was called, I mentioned that to

9    one or two people at Oracle that I -- just co-workers.

10        Q. Were they still at Oracle when you talked to

11    them?

12        A. Yes.

13        Q. And what were their names?

14        A. Joseph Wood and Mark Overfelt.

15        Q. And Mark Overfelt?

16        A. Overfelt, O-v-e-r-f-e-l-t.

17        Q. And what did you talk to Mr. Wood about?

18        A. I just said that I had been -- and I don't

19    think I had even testified at that point.  But I had

20    been depositioned or whatever that was called,

21    subpoenaed or whatever to testify in the case.  And it

22    was a two-sentence statement.

23        Q. And what did Mr. Wood say to you in

24    response?

25        A. "Oh, shit" or something like that.  Not in a

9

1    -- not in a, "Oh, gees, that's bad," but just in a, you

2    know -- yeah.

3        Q. "Oh, fun" type of --

4        A. Yeah, exactly.

5        Q. What's Mr. Wood's title?

6        A. He's no longer with Oracle.  He was a senior

7    practice director at the time.

8        Q. Did you work with him when you were in

9    Oracle?

10        A. Yes.

11        Q. Did you work with him in the 2000, 2001 time

12    period?

13        A. Yes.

14        Q. Okay.  Did you report to him or were you

15    co-workers?

16        A. At one point I did work for Joe.  I don't

17    remember if I did in the 2000, 2001 time frame.

18        Q. Now, Mark Overfelt.

19        A. Yes.

20        Q. What did you say to Mr. Overfelt when you

21    received the subpoena?

22        A. The same kind of thing.  So, this was after

23    I had been terminated from Oracle in a conversation.

24    You know, just ongoing dialog, friendships with both of

25    them, I said something about, "Oh, you know, I just got

10

1    this subpoena in the mail today," you know.

2        Q. And what did Mr. Overfelt say to you in

3    response?

4        A. "Oh, fun" or something of that.

5        Q. And Mr. Overfelt, is he still with Oracle?

6        A. No.

7        Q. He's not?  When did he leave; do you know?

8        A. He left about six months ago.  Joe left

9    about a year and a half ago.

10        Q. Okay.  And did you work with Mr. Overfelt

11    when you were at Oracle?

12        A. Yes.

13        Q. Was that in the 2000, 2001 time period?

14        A. Yes.

15        Q. And what was Mr. Overfelt's position during

16    that period of time?

17        A. We were peers.

18        Q. Okay.  Did you talk to either Mr. Wood or

19    Mr. Overfelt at all about the substance of what you

20    know about the case and things of that nature?

21        A. No, I don't remember any dialog about --

22        Q. Okay, I'm going to take you down memory road

23    today and we're going to start with 2001.  You had a

24    conversation with an investigator; is that right?

25        A. Yes.

11

1        Q. Okay.  And can you tell me about how you

2    were contacted and what happened.

3        A. I think I got something in the mail.  And

4    then I believe it was a telephone conversation where he

5    just asked me some questions and I just, you know,

6    responded off the cuff.

7        Q. How long was -- withdrawn.  How many

8    conversations did you have with the investigator?

9        A. I believe it was only one.

10        Q. Only one?  And how long did the conversation

11    take place?

12        A. I believe it was less than an hour.  It was

13    a pretty short conversation as I remember it.

14        Q. Do you remember the name of the investigator

15    that called you?

16        A. No.  Actually, there may have been more than

17    one conversation.  I can't remember.

18        Q. Was it still back in the 2001 time period?

19        A. Yes.  I can't say for sure what the years

20    were.

21        Q. The document that you think you may have

22    received in the mail, do you have a copy of that?

23        A. No, I don't.  And again, I think the

24    document -- I believe it was just a letter saying,

25    "We're attorneys doing this and we'd like to talk to

12

1   you.  Call this number."

2   Q.  Okay.  Do you have any documents in your

3   possession relating to your work at Oracle during the

4   2000, 2001 time period?

5   A.  No.

6   Q.  Do you have any documents relating to your

7   work at Oracle at all?

8   A.  No.

9   Q.  Okay, I'm going to ask you a few questions

10   about your background starting with your time with

11   Oracle; is that okay?

12   A.  Okay.  Yes, sir.

13   Q.  When did you start working for Oracle?

14   A.  December of '95 or '96.  I believe it

15   was '95.

16   Q.  And what job did you take when you first

17   started?

18   A.  I was a database developer working on an

19   application with the Postal Service as a consultant

20   with Oracle.

21   Q.  That was before you arrived at Oracle?

22   A.  No, that was my first job for Oracle.

23   Q.  Okay.

24   A.  I was a consultant for Oracle.  I hired into

25   the consulting group, the government practice of

13

1   Oracle's consulting organization.  And I was placed on

2   an engagement with the Postal Service.

3   Q.  And what was your title when you first

4   started?

5   A.  Senior consultant.

6   Q.  And did that title change at all over time?

7   A.  Yes.

8   Q.  How so?

9   A.  I got a promotion that first year to -- I

10   can't remember what it was.  And then I got another

11   promotion 18 months later to practice manager.  And

12   then two years later I got a promotion to practice

13   director.  And then I became a client services

14   director, which was somewhat a lateral move, except

15   it was a sales position.  So, it was more upside

16   compensation.

17   Q.  What was your position in the 2000, 2001

18   time period?

19   A.  So, I was a client services director.  So,

20   that was the sales position.

21   Q.  Does the title "Director of E-Business

22   Consulting Services" sound familiar?

23   A.  Yes.

24   Q.  What is that?

25   A.  So, at the time during the dotcom heyday,

14

1   there was a lot of companies looking for E-commerce

2   solutions.  And so, I was basically a consulting sales

3   guy selling both -- primarily consulting, but also

4   software as well in this E-business arena.  The

5   territory was almost all of the west except Southern

6   California and San Francisco.

7   Q.  Were there any parts of California that you

8   worked on?

9   A.  Yes, I went to Sacramento for one or two

10   opportunities.

11   Q.  The title "Director of E-Business Consulting

12   Services," is that the same as the practice director

13   that you were referring to earlier?

14   A.  Yes.

15   Q.  Okay.  Can you describe your

16   responsibilities in that position a little more in

17   detail.

18   A.  So, I was responsible for talking to clients

19   about our offerings, both software and consulting.  So,

20   I was a sales guy.  So, it was -- you know, it was

21   everything from cold calling to developing business

22   relationships to selling, you know, hardware -- or I'm

23   sorry, software and consulting and then delivering on

24   those solutions.

25   Q.  Were you a tech guy where you would go in

15

1   and actually do the implementations or the consulting

2   work?

3   A.  No.  I mean, I had a tech background, but at

4   that point I was really just managing customer

5   relationships and managing implementations and not, not

6   doing hands-on technology.

7   Q.  On a percentage basis, how much of your

8   sales work was devoted to consulting versus the

9   software, if you can break it down that way?

10   A.  I only got compensated on consulting.  So,

11   my intent was certainly around consulting.  Oftentimes

12   there was a software component of that.  So, in order

13   to get my money, you know, we had to close software

14   deals as well.  So, 60, 70 percent consulting.

15   Q.  And what products were you selling?

16   A.  We had an E-business consulting solution

17   around implementing E-commerce.  There was a -- so,

18   there was a couple of different ones.  There was a

19   consulting package around implementing the E-commerce

20   solution, which was basically a website.  There was a

21   financials offering, again a consulting offering around

22   implementing our financials.  And a consulting offering

23   around implementing supply chain, order management.

24   Those were the primary consulting packages we were

25   selling.  And then there was always a component of that

16

1  which was custom development integration to back-end
2  systems.
3      Q.  The different offerings you were talking
4  about, could those fairly be characterized as falling
5  within the customer relationship management modules of
6  Oracle's products?
7      A.  So, my focus was certainly around the CRM,
8  the customer relationship management suite.  But again,
9  in order to put that in place there's what we call back
10  office stuff, the financials and order management
11  stuff, which sometimes had to go along with that.  So,
12  my focus was around CRM, but there was what we call
13  pull-through, you know, on the back-end stuff as well.
14      Q.  What does it mean to pull through the
15  back-end stuff?
16      A.  So, a pull-through is when you, you -- a
17  customer is interested in product A, but in order to
18  implement product A, they have to have been with
19  product B.  So, in this case they were interested in
20  CRM, interested in driving sales through their
21  customers, but they needed accounts payable, accounts
22  receivable, general ledger.
23      Q.  What group were you in in the 2000, 2001
24  time period?
25      A.  So, I was in the, quote, "Northwest

17

1  Consulting Practice."
2      Q.  And did that fall under a larger umbrella, a
3  larger division?
4      A.  The first level would have been western.
5  So, I had basically everything but, you know, some
6  portion of California.  So, the next level up would
7  have been the Western Americas consulting practice.
8      Q.  Are you familiar with the unit, the North
9  American sales unit?
10      A.  Yes.
11      Q.  Are you familiar with Oracle's OPI unit?
12      A.  What does "OPI" stand for?
13      Q.  OPI?  It's Oracle Product Industries.  And
14  then -- are you familiar with that?
15      A.  Vaguely.
16      Q.  Okay.
17      A.  That was awhile ago.
18      Q.  Okay.  Who did you report to in the 2000,
19  2001 time period?
20      A.  Rick Gage.
21      Q.  And what was his position?
22      A.  Senior practice director for northwest
23  consulting.
24      Q.  Did you report to anybody else?
25      A.  I can't remember that, you know, 2000,

18

1  whether I worked for Joe in that time or whether I
2  didn't.  I don't think I did.  There was always the
3  organizational changes two or three times a year.  So,
4  it's hard to remember.
5      Q.  Did you have anybody reporting to you?
6      A.  I don't believe so.  Again, during that time
7  frame?
8      Q.  Correct.
9      A.  Yeah, I don't believe so.
10      Q.  What states did you cover in the
11  northwestern region?
12      A.  Northern California, Oregon, Washington,
13  Idaho, Montana, Utah, Alaska, Nevada, Arizona, New
14  Mexico.  All of the states without any population.
15      Q.  That makes your job more difficult.  Okay.
16  Now, you mentioned you were terminated from Oracle?
17      A.  Yes.
18      Q.  And when was that?
19      A.  I believe -- I believe it was 2001 or 2002,
20  the week after -- the week of Mardi Gras.  So, the
21  third week of February.
22      Q.  And can you tell me why you were let go?
23      A.  I don't really know.  That was certainly the
24  start of -- or it wasn't the start.  We had been
25  shedding people for about a year.  So, I don't know if

19

1  it was -- I was a guy in Boise primarily doing business
2  in Seattle and Utah and they were just looking at
3  travel costs or -- yeah, I was never really sure.
4      I have suspected that there was a -- as a
5  sales guy, we tracked sales.  Because you had a quota.
6  So, you got sales and all of that stuff was tracked.  I
7  was what's called an overlay sales guy.  So, whatever I
8  would sell would actually be, quote, "booked" by
9  somebody else and it actually wouldn't book under my
10  name.
11      That was the whole -- that was an important
12  component of this whole CSD thing is that you didn't
13  have turf sensitivity, that it was collaborative.  So,
14  in order to get collaborative, you allowed it to be
15  booked under their name and then you both got
16  compensated for it equally.  So, a concept of double
17  booking, which means it gets -- it only gets booked in
18  the order entry system once, but it gets booked into
19  the sales compensation system twice equally.
20      So, I think as the business started going
21  down, they looked in the booking system where things
22  were entered once and I didn't have anything in there.
23  So -- and Rick was -- okay.  So, you know, I did work
24  for somebody in that time frame other than Rick Gage.
25  And I'll -- if you give me a minute, I may remember who

20

1 that is.
2         So, it was a relatively new thing.  Rick
3 came in kind of halfway through.  So, I don't think
4 Rick understood how things were being booked.  So, when
5 he ran a bookings report, I showed up with nothing.
6 And I remember several times when I was in the Seattle
7 office he said, "How come I don't see anything in the
8 bookings for your name?"  And I tried to explain this
9 double booking thing and I don't think -- anyway.
10         So, anyway, I think what happened is they
11 looked at everybody that wasn't at their quota and
12 dumped them.  But in retrospect, I was, you know, I was
13 way ahead of my numbers.  But it was -- again, it was
14 kind of in this other system.  So, a long-winded
15 justification for why I got let go.
16         Q.  Were you let go with the group?
17         A.  Yes, we were.
18         Q.  How many people in the group were let go?
19         A.  So, there were eight or nine of us.  Two of
20 us that I know of were let go, you know, on that same
21 day, same week.
22         Q.  Would you characterize your termination as
23 part of downsizing at Oracle?
24         A.  Definitely.
25         Q.  There was nothing you did wrong personally

21

1 that justified or caused the termination that you know
2 of?
3         MR. RUBIN:  Objection.  Objection, form.
4         THE WITNESS:  Do I still answer that
5 question?
6         MR. RUBIN:  You can still answer.
7         THE WITNESS:  Okay.
8         MR. RUBIN:  It's just for the record that I
9 object.
10         THE WITNESS:  I don't believe -- I certainly
11 don't know of anything.  I don't -- nobody told me
12 anything.  I don't recall anything that would have led
13 to that.
14         Q.  (BY MR. BRITTON)  You mentioned CSD earlier.
15 What does that stand for?
16         A.  So, again, CSD is, that's the client
17 services director, the same as the practice director.
18         Q.  Did you have any forecasting
19 responsibilities in your position as client services
20 director?
21         A.  Yes.
22         Q.  And can you describe those responsibilities
23 for me, please.
24         A.  So, we would have periodic pipeline calls,
25 what we call pipeline calls, which is where the deals

22

1 you're working, where the deals you're about to close.
2 So, my primary responsibility was in the context of
3 consulting.  I attended calls with the OPI group that
4 you talked about for several different regions that
5 aligned to my territory, and would provide comments and
6 perspective of the deals that were in that pipeline and
7 their closability.
8         Q.  Did you as part of your responsibility have
9 access to Oracle's pipeline database?
10         A.  Yes.
11         Q.  Did that have a name?
12         A.  I'm sure it did.  I don't remember what it
13 was.
14         Q.  Was it a CRM pipeline database?
15         A.  I don't believe it was just CRM.  I think it
16 was an applications pipeline.
17         Q.  Are you familiar with Oracle's 11i suite?
18         A.  Yes.
19         Q.  Okay.  Was the database pipeline that you
20 had access to as part of your forecasting
21 responsibilities part of the 11i suite?
22         A.  Yes.  The forecast was a combination of
23 applications deals, which is 11i, and technology deals,
24 which is the database.  So, that was one set of calls
25 in the OPI group.  The other set of calls was in the

23

1 consulting group, which is where I organizationally
2 belonged.
3         Q.  So, even though you were organizationally in
4 the consulting group, you also participated in the OPI
5 forecast calls?
6         A.  Yes.
7         Q.  How often did those forecast calls occur?
8         A.  It depended on how we were doing.  If we
9 weren't doing well, they were once a week, sometimes
10 twice a week, especially towards the end of the
11 quarter.  Other times they were once a month.
12         Q.  Okay.  The pipeline database, did that
13 enable you to see sales opportunities that were pending
14 at Oracle at the time in your region?
15         A.  Yes.
16         Q.  Okay.  Let me ask it broader:  What did the
17 pipeline database enable you to get access to?  What
18 type of information?
19         A.  So, again, there was two pipelines.  There
20 was the applications, the 11i, including CRM, the back
21 office end, and there was the product.  So, the
22 pipeline allowed you to see all of the deals in those
23 two spaces and their probability of closing.  So, you
24 could see by customer, you could see what products they
25 were looking at, whether consulting or software, and,

24

1  you know, the, quote, "stage" of the sale that they
2  were in and the probability of closing and the size of
3  the deal.
4      Q. And how did you use that information for
5  your forecasting responsibilities?
6      A. I provided that information on the
7  consulting side.  You know, my responsibility was to
8  provide updates, provide, you know, new leads, you
9  know, status of deals, closed deals, size of deals, all
10 of those kinds of things on the consulting side.  And
11 then I was an advisor on the product side.
12     Q. What do you mean "an advisor on the product
13 side"?
14     A. So, they would say, "Company XYZ is looking
15 at buying financials worth a million dollars.  You
16 know, Kelly, what do you think the probability of that
17 closing is by this date?"
18     Q. And how did you know that information?
19     A. Because I was directly involved with certain
20 deals.  And so, some deals we would actually be -- we
21 would actually take the lead on.  And so, we would
22 actually be the lead sales guy.  And so, we were
23 sometimes in the best position to tell when not just
24 the consulting things, but the product sales would
25 close as well.

25

1      Q. And how did the consulting group use the
2  information that you gave concerning the potential
3  sales in the pipeline?
4      A. So, there was a couple of things.  Obviously
5  one was to report up, you know, the financial forecast.
6  Are we going to hit our numbers?  You know, those kinds
7  of things.
8         Second of all, on the consulting end, we
9  used those numbers to staff.  So, as we saw -- you
10 know, as opportunities moved through the pipeline, that
11 results in the number of consultants that you need.
12 And so, as this number drops or increases, you know
13 what your demand is going to be for your consultants.
14 So, it allows you to hire or downsize.
15     Q. Did it enable you to -- withdrawn.  Did the
16 information about the potential sales opportunities
17 enable the consulting group to sell their services at
18 all?
19     A. Yeah, definitely.  We would use the sales
20 pipeline.  When we would see a big deal come through
21 that we weren't engaged in, you know, we would talk to
22 the sales guy and get engaged for consulting services
23 as well.  So, yeah, that was a lead generation activity
24 for us as well.
25     Q. Did you have any involvement in actually

26

1  creating the forecasts for your region at any time
2  during the 2000, 2001 time period?
3      A. Yes.
4      Q. And can you explain that for me?
5      A. So, there was -- I believe it was a
6  spreadsheet that we would fill out giving, you know,
7  the deals, the size of the deals, the probability of
8  them closing, the kinds of products that were included
9  in there, you know, all of those kinds of things.  So,
10 we would submit that information on a periodic basis to
11 update the consulting pipeline.
12     Q. Did you have a personal forecast?
13     A. Yes.  So, that spreadsheet, that would be
14 our personal forecast.
15     Q. Okay.  And then that would go up into a
16 larger forecast for the unit?
17     A. Exactly.
18     Q. Did you have any involvement in creating the
19 forecast for the unit other than submitting your
20 individual forecast?
21     A. No.
22     Q. Were you able to see what the unit forecast
23 was?
24     A. Yes.
25     Q. And how did you do that?

27

1      A. So, we would submit our forecast and then we
2  would get on these calls where, you know, they would
3  beat us up and, you know, and pressure and goad us into
4  selling more and selling it sooner and faster.  So, as
5  a part of those beatings, you know, you would get
6  exposed to other people and their sales shortcomings.
7      Q. Do you remember what your forecasts were in
8  the 2001 time period?
9      A. So, the timing of this is, is hard.  So, do
10 you guys know when I got let go?  Was that in 2002?
11     Q. It was 2001.
12     A. It was 2001?
13     Q. And it was February 26, 2001.
14     A. Okay, 2001.
15     MR. RUBIN:  Or 23rd maybe.
16     MR. BRITTON:  Or 23rd, somewhere around
17 there.
18     MR. RUBIN:  Yes.
19     THE WITNESS:  Okay.  So, in the quarter
20 prior to that.  So, in roughly the quarter that ended
21 in October.
22     Q. (BY MR. BRITTON)  The second quarter, 2001?
23     A. Yeah, the second quarter.
24     MR. RUBIN:  That ends in November.  Just
25 so -- I mean.

28

1      MR. BRITTON:  Let's establish the different
2  fiscal periods.
3      MR. RUBIN:  Right.
4      Q.  (BY MR. BRITTON)  Do you know what the
5  different fiscal periods were for Oracle during 2001?
6      A.  So, May of 2001 was the end of the fiscal
7  year.  So, if you backed up six months from that, that
8  would be November.  So, it was either the quarter that
9  ended in November -- so, it was either Q2 or Q1 I
10  received a $39,000 bonus based on sales.  So, I was, I
11  was killing my number.  And I received -- so, that was
12  Q2.
13      In Q1 I received $15,000.  So, I was at my
14  number by the end of Q2, my year number.  So, I was
15  doing really well.  My forecast was good.  And
16  actually, I had a relatively good pipeline in Q3
17  because there was a customer I had done business with
18  before that had -- was going to buy right in the Q3
19  timeline.  And I might have had some smaller things
20  that closed in Q3.  So, my numbers were good.
21      Q.  Okay.  Do you remember what the actual
22  forecast was for those quarters, how much in revenue
23  you were forecasting to generate?
24      MR. RUBIN:  What unit are you talking about?
25      MR. BRITTON:  Him personally.

29

1      MR. RUBIN:  Oh, okay.
2      THE WITNESS:  It was $3,000,000?
3      Q.  (BY MR. BRITTON)  Was that the same each
4  quarter?
5      A.  That was -- I'm sorry, that was for the
6  fiscal year.
7      Q.  That was fiscal year?  Okay.  Do you
8  remember by quarter what it was?
9      A.  It would have been $750,000 or -- you know,
10  the 3.2, it would have been dividing that equally by
11  four.  So, $770,000 a quarter.
12      Q.  Okay.  Do you remember what the forecast was
13  for the division that you worked in?
14      A.  No, I don't.
15      Q.  Does $18,000,000 per quarter sound familiar?
16      A.  That doesn't -- that doesn't register.  It
17  would depend on what level that was at.  If that was at
18  the northwest level or if that was -- for the northwest
19  level that's probably high.  I'm not sure.
20      Q.  Okay, let's talk a little bit more about the
21  pipeline, what was in that pipeline database.  What
22  opportunities were represented in that pipeline
23  database?
24      A.  The specific company?
25      Q.  Yeah, the --

30

1      A.  -- opportunities that were in there?
2      Q.  Right.
3      A.  There was probably over 100 companies in
4  there.
5      Q.  I mean more generally.  Did it include every
6  conceivable deal or just the ones that had a certain
7  probability of closing?
8      A.  We only put them in the pipeline if --
9  they had to be past -- they had to be greater than a
10  certain percentage of closing.  In other words, you had
11  to have gone through -- if you divided the sales
12  process into seven steps, you had to be past the second
13  step.
14      Q.  Okay.
15      A.  You know.  So, it had to have a 25 percent
16  chance of closing.
17      Q.  So, deals that were less than 25 percent
18  wouldn't be entered into the pipeline?
19      A.  Correct.
20      Q.  Okay.
21      MR. RUBIN:  I'm sorry, can we just clarify
22  which pipeline we're talking about just for clarity?
23      Q.  (BY MR. BRITTON)  I'm talking about the
24  pipeline database that you were accessing.
25      MR. RUBIN:  For consulting or sales?

31

1      THE WITNESS:  Consulting.
2      MR. RUBIN:  Okay, consulting.
3      Q.  (BY MR. BRITTON)  What about for the product
4  sales?
5      A.  I believe they had -- it was the same thing.
6  Their criteria may have been different.  They may have
7  shown everything.  They may have had everything in
8  there, but they just in these calls would look at
9  25 percent.
10      Q.  Was there any guidance -- and now we're
11  talking about the sales pipeline, product pipeline
12  right now.  Was there any guidance in terms of what
13  percentage you would attribute to a particular
14  opportunity?
15      A.  It was pretty loose.  There was some
16  guidelines, but it was pretty loose and open to a lot
17  of interpretation.
18      Q.  What were the guidelines you were thinking
19  about?
20      A.  I don't remember.
21      Q.  Was it available in the database, you know,
22  what the different percentages meant?
23      A.  I believe so.
24      Q.  Okay.  Could you tell me today what those
25  different percentages meant?

32

1     A.  No.

2     Q.  Do you remember if you discussed with the

3  investigator back in 2001 what those percentages meant?

4     A.  I may have.

5     Q.  In the sales pipeline database, did it have

6  a column dealing with what the forecast was for the

7  particular time period for that region?

8     MR. RUBIN:  Did you say in the sales?

9     MR. BRITTON:  In the product pipeline.

10     THE WITNESS:  The total or the forecast per

11  entry?

12     Q.  (BY MR. BRITTON)  Let's go with the total

13  first.

14     A.  Sure, it would have had a total in there.

15     Q.  A total forecast for that period for the

16  unit?

17     A.  Yes.  It would have had a total forecast.

18  So, there's a forecast number which is what we think

19  we're going to hit.  And then there's, a what I'll call

20  a budget number, which is what we've committed to

21  delivering.  So, if you say there's a budget number and

22  a forecast number, yes, both of those numbers would

23  have been in there.

24     Q.  Okay.  And the budgeted number, how did you

25  derive that as a unit?

33

1     A.  That was a tops down number.  So, at the

2  corporate level they would say, "We need this

3  quarter" or "fiscal year."  And then that would take

4  your divisions, each get a component of that, and then

5  it comes down to the region and then boom.  And so,

6  it's loosely based on history but very much a tops down

7  at the time, a tops down forecasting model.

8     Q.  And do you know what top it came from?

9     A.  It would have -- it would have come at the

10  corporate level.

11     Q.  Okay.  So, the corporate level would feed

12  your unit on what the budgeted forecast would be for

13  the fiscal year?

14     A.  Yes.

15     Q.  What about per quarter?

16     A.  That would apply to on a quarterly basis as

17  well.

18     Q.  Would it simply be taking the fiscal year

19  forecast and dividing it by four?

20     A.  No.

21     Q.  So, when did you get the top down forecast

22  each quarter?

23     MR. RUBIN:  Objection, form.  I think he's

24  talking about the budget, not the forecast.  But I'll

25  let you answer.

34

1     Q.  (BY MR. BRITTON)  Withdrawn.  When did you

2  receive the top down -- withdrawn.  Let me -- let me

3  clarify the testimony.  You mentioned a -- you

4  mentioned a budgeted number and a forecasted number.

5  What's the difference between the two?

6     A.  The budgeted number is the number you

7  committed to at the beginning of the fiscal year or the

8  beginning of the quarter.  That's the budgeted number.

9  The forecasted is now you're in the quarter.  This is

10  what you think you're actually going to deliver.

11     Q.  Now, what was top down on a quarterly basis?

12     A.  That would have been the budgeted number.

13  So, it comes down at the beginning of each fiscal year,

14  there's a budgeted number and it's -- you know, it's by

15  quarter.  And then there's a budget revision process.

16  So, you -- you get the chance to either, you know,

17  raise your -- raise your budget or drop your budget,

18  depending on all -- the corporate environment.

19     Q.  And what did that budgeted number mean to

20  the unit for each particular quarter?

21     A.  It meant a lot.  I mean, that was -- you

22  know, people got fired if the budgeted number wasn't

23  hit.  So, you know, it meant a lot.

24     Q.  So, you were striving to get that number?

25     A.  (Witness nodding head.)

35

1     (Reporter clarification.)

2     THE WITNESS:  Yes.

3     Q.  (BY MR. BRITTON)  Now, the forecasted

4  number, how did the unit derive that number each

5  quarter?

6     A.  So, that was a pretty dynamic number.  You

7  know, that number changed from day 1 to day 90.  That

8  depended on the deals and the status of the deals and

9  as deals grew and shrank and -- you know, that number

10  was pretty dynamic.

11     Q.  Okay.  So, going back to the database, the

12  pipeline database for product sales, was the forecasted

13  column in that database, was that changing regularly

14  throughout the quarters?

15     A.  Yes.

16     Q.  It was?  Okay.  And how did it change?  What

17  would cause it to change?

18     A.  A customer would say -- would pick SAP.  So,

19  we're going to buy SAP.  We're not going to -- so,

20  obviously that means --

21     (Reporter clarification.)

22     THE WITNESS:  So, that would take out the

23  applications portion of a deal.  And there would be --

24  you know, it would be zero.  So, yeah, your numbers

25  would go down when somebody would select a different

36

1  vendor.

2      Q. (BY MR. BRITTON)  Okay.  So, when you're --

3  when a potential deal told you that "We're going to use

4  a competitor," the salesman would have to go into the

5  database and change the information in the database; is

6  that right?

7      A. Yes.

8      Q. Okay.  Now, was there any projected

9  revenues -- withdrawn.  Was there any other type of

10  forecasting column in the product pipeline database?

11     A. Not that I remember.

12     Q. Was there an upside column?

13     A. Yes.

14     Q. And what did that upside column represent?

15     A. So, there was always a chance in a deal to

16  increase the discount and let a customer buy a little

17  more than they originally planned to.  So, if they want

18  to buy for future growth, if they want to buy future

19  modules, instead of giving them a 30 percent discount,

20  you give them a 40 percent discount.  You know, just

21  classic, you know, sales tools to you, you know, increase

22  the deal.  So, yeah, there was an upside number that

23  we'd say, "Well, they want to buy this, this, and this,

24  but if you give me this kind of a discount, I think I

25  could sell this and this."  And so, instead of a half a

37

1  million dollar deal, it could be a $750,000 deal.  So,

2  there's a 250K upside.

3      Q. And how would that be reflected in the

4  pipeline database for products?

5      A. So, there would have been a separate column

6  for upside.

7      Q. Now, was there -- was there a time

8  limitation on the upside?  I think the example you gave

9  was, you know, a customer buying modules in the future.

10  Did that upside column represent, you know, as much as

11  we could ever get for this customer going forward?

12     A. So, the pipeline was very much focused on

13  that quarter's opportunities, that quarter's upside,

14  that quarter's budget.  So, the pipeline had the

15  ability of shifting from out of this quarter into next

16  quarter.  So, you could say, "Well, it's zero this

17  quarter, but it's" -- you know, but again, the focus

18  was what are you going to close this quarter?  It was

19  always, you know, this quarter, this quarter, this

20  quarter.  Don't talk about next quarter.

21     Q. Was the consulting sales pipeline, was that

22  generated any differently than the product sales

23  pipeline?

24     A. The product sales pipeline was always --

25  there was more rigor around it, there was more process

38

1  around it, and there was, you know, honestly probably

2  more accuracy around it because they were a true sales

3  organization.  We were sales/delivery.  And so, we

4  never had as much, you know, processing rigor and

5  accuracy around ours as they did.

6      Q. So, the product -- the product forecasts

7  were more accurate than the consulting forecasts?  Is

8  that fair to say?

9      A. I guess that would be a derived assessment.

10  I didn't look at the history and compare the two.  But

11  just given the fact that they had process, they had --

12  and they had sales tools that we didn't have.  You

13  know, they had an ability to discount more steeply than

14  we did to pull deals into a quarter and hit, you know,

15  a quarter-by-quarter objective.  So, I would -- I would

16  just say based on the process, based on the -- you

17  know, the sales professionals that they have, that yes,

18  they would be better at doing that.  But I don't have a

19  historical --

20     Q. Okay.  Can you explain the forecasting

21  process for the consulting division.  How was that

22  number derived?

23     A. It was the same way.  You submit a

24  spreadsheet.  You put in the size of the deal, the

25  percentage of deal closing.  And yeah, I think there

39

1  was an upside column in there as well.  And submit them

2  in and they get rolled up and they combined it up into

3  the -- at the regional level.  And, you know, 15 sales

4  guys, here's what they forecast.  And so, you see a

5  composite number for the region.

6      Q. And was that number changing rapidly as

7  well, the consulting forecast number?

8      A. Yes.

9      Q. It was?  So, when the consulting forecasts

10  or the consulting sales opportunities would change, the

11  consulting salesmen would go in and change the database

12  to reflect --

13     A. Yes.

14     Q. Okay.  Did the consulting division generate

15  any periodic reports relating to its forecasts?

16     A. Yes.  So, we would have these -- we would

17  submit our numbers.  It would be reviewed by Rick or

18  Mike Underwood in these big calls and then he would --

19  he would take those numbers and then he would, you

20  know, summarize those and present those to his boss and

21  say, "Here's our forecast."

22     Q. And was that the same for the product sales

23  division?

24     A. It probably was.  I had less visibility to

25  the product sales.

40

1  Q. Now, let's talk a little bit about those --
2  the weekly conference calls you were talking about and
3  sometimes they would be more frequent. Who
4  participated in those calls?
5  A. On the product side or the consulting side?
6  Q. Let's talk about the consulting side.
7  A. So, you would have all of the people in the
8  consulting organization involved with sales. So, you
9  had the salespeople there. And then if you had sales
10  support people, they would be on those calls. And some
11  of the folks involved with delivery would be there
12  because it let them know if they had to hire or
13  downsize.
14  Q. What do you mean by "delivery"?
15  A. So, you have the sales side, which is when
16  you sell an engagement, and then you have the folks
17  that actually come in that actually do the work. So,
18  you have sales and delivery.
19  Q. Were there different weekly conference calls
20  for the product side as well?
21  A. Yes, they were separate calls.
22  Q. Did you participate in those calls?
23  A. Yes.
24  Q. Okay. And how often did those calls occur?
25  A. I believe there was a standing call once a

41

1  week.
2  Q. And do you know what day that was?
3  A. No.
4  Q. Let's go back to the conference calls for
5  the consulting group. Were there senior managers on
6  that call as well?
7  A. It would depend on how you define "senior
8  manager." We would have calls with Mike Underwood, a
9  VP. In my mind, he definitely would be a senior
10  manager. Rick Gage would be on the weekly calls and
11  the senior practice director, I don't know whether he'd
12  be a senior manager or not.
13  Q. Okay, who was the senior practice director?
14  A. That was Rick Gage.
15  Q. That was Rick Gage? What about Gary
16  Simmler? Does that name ring a bell?
17  A. Yes.
18  Q. And who was that?
19  A. So, at the time I reported to Rick Gage,
20  senior practice director, who reported to Mike
21  Underwood, vice president, who reported to Gary
22  Simmler, senior vice president.
23  Q. Okay. Was Gary Simmler on those calls that
24  you know of?
25  A. I don't remember Gary being on our weekly

42

1  calls, the weekly calls that I was on. Certainly he
2  would have been at some point in those -- in that
3  chain.
4  MR. BRITTON: Why don't we take a short
5  break and change the tape.
6  THE VIDEOGRAPHER: Going off the record.
7  End of tape No. 1 at 11:00.
8  (Recess held.)
9  THE VIDEOGRAPHER: This is tape No. 2 of the
10  deposition of Kelly Wood. The time is 11:06.
11  Q. (BY MR. BRITTON) What was the purpose of
12  the weekly calls for the consulting organization?
13  A. There was a couple of purposes. Obviously
14  the key one was to do the forecast, update the forecast
15  and, you know, provide upstream visibility updating the
16  numbers. The other purpose was again, the delivery
17  part of the organization, to give them a sense of
18  needs -- consulting needs coming in the future.
19  Thirdly, just an opportunity to seek additional
20  resources within a sales opportunity to close the deal.
21  Q. Now, let's talk about the product sales
22  conference calls. Who participated in those?
23  A. So, each of the sales representatives was
24  there, the district manager was there. And then one of
25  their key resources was people that did demonstrations,

43

1  demoing the software. So, those reps were there and
2  then consulting was there.
3  Q. Now, the district manager, do you remember
4  who that was at the time?
5  A. There was different district managers, again
6  on the product side.
7  Q. Right.
8  A. Glen Seninger in Salt Lake. I can't
9  remember the ones in Seattle and other regions.
10  Q. Were the senior managers that you mentioned
11  for the consulting side, were they also on the product
12  calls,
13  A. No, Mike Underwood, for example, was not on
14  those calls. Rick Gage, my manager, sometimes would
15  be.
16  Q. Okay. Now, in terms of the forecasts for
17  your unit, at what point during a quarter would you say
18  you would become comfortable whether you knew you would
19  make it or miss it in terms of the unit?
20  A. So, you've got a three-month quarter. An
21  experienced manager could tell at two months into the
22  quarter.
23  Q. And that's for consulting?
24  A. Yes.
25  Q. Okay, what about for product sales?

44

1    A. The product sales guys again were better at
2  that than we were.  Their deals were so -- I remember
3  a, you know, senior district manager telling me that he
4  could tell within the first three weeks whether a deal
5  was -- whether they were going to make their quarter or
6  not.
7    Q. And in terms of going back to the consulting
8  forecasts, what factors would go into giving the unit
9  comfort that it would meet its forecasts or not meet
10  its forecasts by the second month of the quarter?
11    A. So, certainly just the size of the pipeline,
12  the size and the probability of the pipeline.  And we
13  had this -- we had this goofy algorithm.  We would take
14  the size of a deal times the probability.  So, if it
15  was a $2,000,000 deal with a 50 percent probability,
16  you'd put a million dollars in the -- in the pipeline.
17  I don't think that's a very accurate way of doing a
18  forecast, so --
19    Q. Is there anything else that went into giving
20  the unit comfort at the second month in terms of how
21  things were invoiced or sold or --
22    A. So, actually, that's a great point.  On the
23  consulting side, there's two parts to the pipeline.
24  There's the revenue pipeline, the sales pipeline that I
25  was involved with, and then there's the profit margin

45

1  pipeline, which is really more the delivery side.  So,
2  it's different than the sales pipeline where if you
3  sell it, you recognize that revenue immediately.  In
4  consulting, you sell it but you don't recognize the
5  revenue until you deliver it.
6    So, our pipeline was, was quoted and
7  budgeted and all of that, but that didn't really affect
8  company earnings.  It was a -- it was a forecaster of
9  future earnings.
10    So, on the third pipeline, which was the
11  delivery consulting pipeline, that pipeline was much
12  more predictable.  You could probably tell that
13  pipeline at month 1 within 75 or 80 percent accuracy
14  what you were going to do for the rest of the quarter.
15    Q. Now, would that pipeline feed up to
16  earnings?
17    A. Definitely.  And actually, as opposed to the
18  consulting sales pipeline, which would not.
19    Q. Because consulting sales, you don't
20  recognize revenue on the agreement?
21    A. Correct.
22    Q. So, am I right to say that it would go from
23  consulting sales to the delivery and then as the
24  services were delivered, that's when the revenue would
25  get recognized --

46

1    A. Exactly --
2    Q. Very good.  Now, you mentioned that the
3  product sales guys were better at telling when they
4  were going to be able to make their forecasts.  Are you
5  familiar with the hockey stick effect?  Have you ever
6  heard that phrase before?
7    A. Yes.
8    Q. And how do you think the hockey stick
9  effect -- withdrawn.  Did you -- at the time that you
10  were at Oracle, did you believe that the hockey stick
11  effect on product sales impacted the ability to
12  forecast where you were going to be at the end of the
13  quarter?
14    A. So, I'm struggling to remember what the
15  hockey stick effect was in that context.
16    Q. What's your understanding of the hockey
17  stick effect?
18    A. So, the hockey stick is -- at the time we
19  were experiencing what we called the hockey stick
20  phenomenon because of the dotcom growth.  You know, if
21  you put a hockey stick out, you know, the growth -- if
22  you follow the handle of the hockey stick, it's pretty
23  significant; right?  We experienced the hockey stick
24  effect with the dotcom era and all of the  dotcoms that
25  were buying our software and our consulting.

47

1    So, I'm struggling a little bit to relate
2  that topic to your question about how does that affect
3  your ability to -- well, so, I guess, how -- we were in
4  uncharted territory because of the dotcom, because of
5  the hockey stick phenomena.  So, it would be
6  difficult -- so, a lot of -- going back to what I said
7  about folks that could predict a quarter based on the
8  first month; right?  They gained that ability over
9  years and years and years of looking at sale -- sales
10  forecasts coming through.  As we were in this hockey
11  stick, it created an unnatural environment.  So, it was
12  harder to use history to forecast future because it
13  was -- it was something that most of us had never seen
14  before.
15    Q. Now, how did the dotcom phenomenon create a
16  hockey stick effect?  How was that different than
17  before the dotcom era?
18    A. You just had people get 4 or $5,000,000 in
19  venture capital money and they wanted to spend 25 or
20  50 percent of that on technology.  And so, their -- the
21  big difference was they were very time constrained.
22  You know, time was money in the dotcom era.  And so,
23  they wouldn't have these exhaustive sales processes.
24  You know, they'd make a -- they'd make a decision
25  within 30 days on a two or $3,000,000 deal.  So, the --

48

1  so, A, their -- the timelines of the sales were highly
2  condensed.  And then B, you just had people spending
3  money in volumes that you wouldn't normally see small
4  companies spending money in.  So, you'd see basically a
5  start-up company spend $4,000,000 on technology.  You
6  would never see that outside of the dotcom world, or I
7  never saw it outside of the dotcom world.
8      Q.  My understanding of the dotcom -- I mean,
9  not the dotcom, the -- withdrawn.  My understanding of
10  the hockey stick effect is that customers would wait
11  till the end of the quarter because they could get a
12  better deal at the end of a quarter.
13      MR. RUBIN:  Is that a question?
14      MR. BRITTON:  Hold on.  Hold on.
15      Q.  (BY MR. BRITTON)  Is that your understanding
16  of the hockey stick effect?
17      A.  So, yes, there's another -- the hockey stick
18  we used in a couple different -- one of the contexts we
19  used it in is, yes, customers wait -- would wait until
20  the last couple weeks to -- smart customers, to --
21  because they knew that they would get a bigger
22  discount.  That was available on the product side, not
23  necessarily on the consulting side.
24      Q.  And the hockey stick effect in your mind was
25  different with -- what was causing the hockey stick

49

1  effect in your mind was different with the dotcom
2  customers?
3      A.  So, we talked about two different hockey
4  sticks.  We talked about the hockey stick of the dotcom
5  era and then now we're talking about the hockey stick
6  of buying software from a software company and knowing
7  that the later you buy it, the bigger the discount you
8  get.  Most dotcoms were not smart enough to realize
9  that if they waited until the end of the quarter, they
10  could get bigger discounts.  Most dotcoms weren't that
11  smart.  Primarily it was our legacy customers that knew
12  that game and knew how to play that game.  And that
13  game was somewhat available in Q1 and Q2, but it really
14  was in Q4.  Q4 is always the big push for Oracle.
15  That's when -- that's when that hockey stick really was
16  big, because people would do anything to hit their --
17  or people would be very aggressive to hit their Q4
18  number.
19      Q.  Now, talking about the hockey stick effect,
20  the discount hockey stick effect, did that undermine
21  the product sales side's ability to forecast where they
22  were going to come out at the end of the quarter?
23      A.  Sort of.  Again, you know, a good smart
24  district -- the hockey stick effect was Oracle's
25  legacy.  That was never anything new.  It was never

50

1  anything that changed.  So, any manager within the
2  product sales side knew how to -- knew that that was
3  there.  They knew which customers would use -- would
4  leverage that.  So, analytically, yes, it would make it
5  harder.  But I think in practice, I don't think it did.
6  I think -- yeah, it did.  It did make it harder.
7      Q.  But did it -- but with the trends and the
8  history of Oracle, they had -- they had the experience
9  with the hockey stick effect prior to the fiscal year
10  2001; is that right?
11      MR. RUBIN:  Objection, form.
12      THE WITNESS:  So, I'm sorry, I had a
13  thought.  And so, let me express my thought and then
14  I'll come back and answer your question.
15      Q.  (BY MR. BRITTON)  Go ahead.
16      A.  So, I never saw the hockey stick affect our
17  deals.  In the northwest region, our deals were
18  relatively small deals, relatively small companies.  We
19  didn't have these $100,000,000 deals come through that
20  came through in other parts of the country.  So, I
21  didn't see the hockey stick affect very many deals in
22  our region.  But certainly being a stockholder, I heard
23  and believed that it affected bigger deals that we just
24  didn't have visibility to.  So, you had these great
25  big -- you know, Procter & Gamble, Boeing, all those

51

1  great big companies had special sales, special
2  pipelines, all that stuff.  And so, I'm absolutely sure
3  that the hockey stick affected their ability to
4  forecast.  I don't think it affected ours because we
5  didn't have a lot of those big deals come through.
6      Q.  Would it be fair to say that the hockey
7  stick effect eliminated the ability to forecast,
8  forecast where you were going to be able to come in at
9  at the end of a quarter?
10      A.  No, I think it -- no, I'm sorry, you used
11  the word did it "eliminate"?
12      Q.  Right.
13      A.  Certainly, no, it did not eliminate the
14  ability to forecast.  Again, within the pipelines that
15  I saw, the hockey stick was not really a factor in
16  forecasting.  So, you might have 100 deals that a
17  district manager needed to manage to hit their number.
18  Only one or two of those deals would be materially
19  impacted by the hockey stick.  The rest of those deals
20  would not be.  So, at our level I don't believe the
21  hockey stick was a factor.  Certainly in these bigger
22  corporate accounts, right, it was and could definitely
23  affect their ability to forecast.
24      Q.  Now, in terms of the bigger deals that
25  you're talking about, was it your experience that they

52

1  would, you know, take a long time to go from
2  opportunity to booking?
3      MR. RUBIN: Objection, form, foundation.
4      THE WITNESS: So, it depended. I mean, you
5  know, again, some of these dotcoms signed 3,
6  $4,000,000, which, you know, in our region was a big
7  deal. So, yeah, some of them didn't take a long time
8  and then certainly others did.
9      Q. (BY MR. BRITTON) You referred to the legacy
10  customers. Did you have any experience on any of those
11  larger deals?
12      A. Oh, sure.
13      Q. And what experiences did you have with those
14  larger deals?
15      MR. RUBIN: Objection, foundation. Maybe
16  you could define larger. That would be helpful.
17      Q. (BY MR. BRITTON) When you -- when you
18  testified about the larger deals, the megadeals, what
19  were you referring to?
20      A. Over $1,500,000, $2,000,000.
21      Q. Okay. Did you have experience with the
22  product sales in that level?
23      A. Yes.
24      Q. Okay. Did you have experience with those
25  types of product sales in the 2000, 2001 time period?

53

1      A. Yes.
2      Q. Okay. Did you witness the hockey stick
3  effect in terms of the discounts at the end of the
4  quarter for those deals?
5      A. Yes.
6      Q. Okay. And how did you witness that?
7      A. You would just see this gamesmanship taking
8  place. Again, I only saw it on a couple of deals my
9  whole time where that, the hockey stick of waiting
10  until the end of the quarter, really affected the
11  deals. I only saw it a couple times. And I -- the
12  deal almost always closed. The gamesmanship was
13  around, "If I give you this much discount, will you buy
14  this upside?" So, it didn't materially affect the deal
15  closing. It would affect the size of the deal.
16      Q. The size of the deal?
17      A. And again, in our region it wasn't like it
18  started out as a $10,000,000 deal and because of the
19  hockey stick it became a $100,000,000 deal. It would
20  be a $2,000,000 deal that might become a $2,400,000
21  deal. That would be a big upside hockey stick related
22  again within our region.
23      Q. In terms of the discounts that you witnessed
24  and the motivations to close a deal at the end of the
25  quarter, would a customer benefit from allowing the

54

1  deal to slip into the next quarter in order to get a
2  bigger discount?
3      A. The Oracle party line was if they did that,
4  if they -- if they messed around with us and slipped it
5  into the next quarter, it would actually hurt them.
6  So, most companies -- so, from Oracle's perspective, if
7  that happened, they would -- they would remember that
8  when the next quarter ended. If they tried to do that
9  gamesmanship again, they would -- you know, but people
10  get desperate at the end of the quarter. So, yeah,
11  deals would slide, you know, and then they would still
12  get the same discount potentially.
13      Q. Okay. Were you able to in your region to
14  monitor at what stage each deal was at during the
15  times -- during various periods in the quarter?
16      A. Yes. Although I only focused on the deals
17  that I was really involved with, both on the product
18  side and on the consulting side.
19      Q. And how were you able to monitor where the
20  deal was?
21      A. Most of my monitoring came place (sic) from
22  interaction with the product sales guy.
23      Q. In terms of being able to access and see,
24  you know, any of the deals that are in your unit, how
25  would you be able to monitor where that deal was at in

55

1  terms of closing?
2      A. So, we would have the sales calls and then
3  we got a weekly dump of what was in the pipeline. So,
4  it was both mechanisms. And again, primarily our
5  objective was just to look for deals that were going to
6  close that maybe we could go some sell consulting.
7      (Reporting clarification. )
8      Q. (BY MR. BRITTON) Would the pipeline enable
9  you to tell whether or not sales were trending
10  downwards or upwards in any particular quarter?
11      A. Yes.
12      Q. And how would it do that?
13      A. You could see the budget number and you
14  could see the forecast number. And you could just --
15  just in listening to calls, you know, you could get a
16  general sense that they were in trouble or they weren't
17  going to, you know, exceed their number.
18      Q. Do you remember what Oracle's forecasts were
19  as a company for the third quarter of 2001?
20      A. No.
21      Q. Okay. Do you remember what the anticipated
22  growth rates for applications were during that period
23  of time?
24      A. No.
25      Q. Do you remember what the anticipated growth

56

1   rates were for the database sales for the company?

2       A.  No.

3       Q.  Okay.  At any point during fiscal year 2001,

4   did you have any concerns about whether Oracle was

5   going to make its forecasts in terms of what it gave to

6   the street?

7       A.  Sure.

8       Q.  And can you explain that for me.

9       A.  So, in late 2000 and early 2001, you know,

10  there was publications, you know, talking about the

11  dotcom downslide.  So, certainly we heard it there

12  first.  That was our first clue.  And then we saw

13  dotcoms -- we saw fewer dotcoms and we saw dotcoms

14  being more prudent with their money end of 2000, start

15  of 2001.  And it was pretty dramatic.

16      Q.  And that caused you to question whether you

17  were going to be able to make your forecasts -- or

18  whether the company was going to be able to make its

19  forecasts during that period of time?

20      A.  Yes.

21      Q.  Okay.

22      A.  Both.  So, I questioned that both just

23  internally looking at what was going on saying, "How

24  are we going to hit our numbers?"  And then looking at

25  the pipeline calls, you know, we were seeing dotcoms,

57

1   you know, zero out.

2       Q.  And where were you seeing the dotcoms zero

3   out?

4       A.  Again, primarily out of the Seattle office

5   and the Utah office.

6       Q.  And when the -- when the company met its

7   forecasts in the first and second quarter of 2001, did

8   you have any reason to question on how it did so?

9       A.  Sure.  I didn't know of any -- any trickery

10  with the numbers.  But yeah, you looked at the -- at

11  what was happening, you know, at the technology economy

12  and you had to ask yourself, "How the heck did we do

13  that?"  But I never had any insight to any trickery

14  that was taking place.

15      Q.  Did you have any conversations with anybody

16  outside of your division in terms of how their division

17  was doing during the fiscal -- during the 2001 time

18  period?

19      A.  Yes.

20      Q.  Okay.  And were they -- withdrawn.  Were any

21  of those conversations dealing with the same

22  experiences that you were having?

23      A.  Yes.

24      Q.  Okay.  And can you describe who you had

25  conversations with and what divisions they related to?

58

1       A.  I can't remember who it was.  I had some

2   friends in the Bay area.  You know, I started with

3   Oracle in the Bay area.  So, I had a number of friends

4   there.  And that's where I saw the precipitous fall in

5   dotcoms.  We didn't have a lot of dotcoms in our

6   region.  Certainly San Francisco did.  And I had a

7   couple of conversations with my peers down there, I

8   don't remember who.  And it was, you know, they went

9   right off the end of the table.

10      Q.  Okay.  Did the dotcom slide cause anybody to

11  miss their forecasts that you were -- that you knew of

12  during that period of time?

13          MR. RUBIN:  Objection, form.

14          THE WITNESS:  I can't say -- I can't

15  remember for certain that I had a direct dialog with

16  somebody who said, "I'm going to miss my numbers."

17      Q.  (BY MR. BRITTON)  Okay.  So, you saw -- you

18  saw the dotcom slide affect sales in the 2001 time

19  period; is that fair?

20      A.  Yes, fiscal year 2001.

21      Q.  Fiscal year 2001.  When did you start seeing

22  it and when did it become its worst in your mind?

23      A.  Really it became its worst after I left.  It

24  was kind of -- or probably halfway to the worst when I

25  got canned.  So --

59

1       Q.  Did you see a softening in Oracle's business

2   in any other regard outside of the dotcom slide in

3   fiscal 2001?

4       A.  I think there was a little -- so, yes, I

5   think there was a psychological effect that it had on

6   all technology buyers.  I think all technology buyers

7   as a part of the dotcom, or many technology buyers,

8   whether they were, you know, non-dotcom brick and

9   mortars or dotcoms, there was this passionate embrace

10  of technology and the technology was the solution to

11  bigger profits, bigger sales, all of those things.  So,

12  I think there was a psychology that took place in the

13  dotcom that affected non-com -- non-dotcoms as well.

14          As the dotcoms started to come down, I saw

15  in my customers a psychological backoff of this, you

16  know, almost manic embrace of technology.  And that

17  they became -- they decide -- you know, I saw them

18  becoming more pragmatic, more thorough, and less --

19  less in a hurry to buy technology.

20      Q.  Okay.  And did that cause the sales trends

21  at Oracle to fall during fiscal 2001 in your unit?

22          MR. RUBIN:  Objection, form, foundation.

23          THE WITNESS:  I would -- so, your question

24  was specific around the psychology of technology

25  buying?

60

1    Q. (BY MR. BRITTON)  Well, let me go broader.
2  Did you see sales trending downward in your unit in
3  2001?
4    A. Definitely.  Definitely.
5    Q. Did it get worse as time went along?
6    A. Yes.
7    Q. Was that in product sales?
8    A. Both product sales and in consulting.
9    Q. Was it also in consulting revenue, the
10  delivery side that we talked about earlier?
11    A. Yes, there would have been some translation
12  into their -- I didn't have direct access to their
13  pipeline, but I know that dotcoms were halting
14  engagements, halting implementations, were running out
15  of money.  So, yes, I saw it.  In my customer
16  relationships, I saw events that would have certainly
17  impacted the delivery side.
18    I didn't really look at their forecasts.
19  So, I didn't get a chance to, you know, validate that
20  directly, but -- and in conversations with people in
21  the delivery side, I could tell that they were -- that
22  their pipeline was leaving, was -- so, we would sell
23  $5,000,000 in consulting and then theoretically we
24  would deliver.  What I saw in the delivery side was
25  companies opting out of that $5,000,000 commitment.

61

1    Q. And did you see that in each quarter in
2  fiscal 2001?
3    A. Each quarter.  I mean, it would be hard to
4  say Q1, Q2, Q3 I saw it in each, but certainly I saw a
5  trend throughout that where people were backing off and
6  saying, "No, I changed my mind.  I'm not going to
7  implement this module.  So, instead of spending
8  $2,000,000, I'm only going to spend a million and a
9  half."
10    Q. Was that trend getting worse toward the end
11  of the year?
12    MR. RUBIN:  Objection, form, vague.
13    THE WITNESS:  It seemed like it was building
14  momentum, but, you know, it would have been a -- you
15  know, a self-analysis.  It wouldn't have been looking
16  at actual numbers that showed it.
17    Q. (BY MR. BRITTON)  Did you -- were you aware
18  of whether any of Oracle's other business units were
19  seeing the same downward trends that you were seeing in
20  product sales and consulting sales?
21    A. I don't remember.  We would get second- and
22  third-party reportings of the eastern part of the
23  United States.  Can I say that -- I cannot say that
24  that was directly associated with any of the fiscal
25  2001 numbers.

62

1    Q. Okay.  Did the northwest consulting sales
2  miss its forecasts in the first quarter of 2001?
3    A. I don't remember.
4    Q. Okay.  Did it miss its forecasts in the
5  second quarter of 2001?
6    A. I believe so.
7    Q. Do you know by how much?
8    A. Actually, I -- I believe we missed it pretty
9  big.  I don't remember the number.
10    Q. And how about the third quarter of 2001?
11    A. We were behind, but I don't -- I don't think
12  I was there through the end of the quarter.  So --
13    Q. Did the product sales, the northwest
14  division product sales miss its forecast in the first
15  quarter of 2001?
16    A. I don't remember.
17    Q. How about the second quarter of 2001?
18    A. I don't remember.
19    Q. How about the third quarter?
20    A. I would not have known that one.
21    Q. Okay.  Do you remember what the state of the
22  economy was like back in the fiscal year 2001 time
23  period?
24    MR. RUBIN:  Objection, vague.
25    THE WITNESS:  I don't remember if the

63

1  timing's right, but certainly in 2000 the economy was
2  riding the dotcom bubble and non-technology companies
3  were benefiting from that.  At what point that tipped,
4  whether that was in 2000 or 2001, I don't -- I don't
5  remember.
6    Q. (BY MR. BRITTON)  Okay.  Outside of the
7  dotcom era or sales to the dotcom customers and the
8  spending -- aggressive spending of the money, did you
9  see a similar type of mindset with other customers in
10  terms of unsophisticated buyers buying Oracle's
11  products?
12    MR. RUBIN:  Objection, form.
13    THE WITNESS:  I'm sorry, can you state that
14  question again, please.
15    Q. (BY MR. BRITTON)  In terms of the -- you
16  testified earlier about the dotcoms, that they weren't
17  very sophisticated technologically.  Did you see that
18  outside of the dotcom area?
19    A. Sure.
20    Q. Okay.  And how did that -- how do you
21  remember that playing into Oracle's sales?
22    A. So, if they weren't smart buyers, it was
23  easier, you know, because you don't have that
24  end-of-quarter gymnastics to go through.  And again, it
25  was -- on the consulting side, we didn't -- we didn't

64

Wood, Kelly A  10/7/2005  10:01:00 AM

1 really play that game. So, it wasn't a big part of our
2 space. But we certainly saw it with our peers in
3 the -- in the product sales side.
4 So, again, you know, the bigger companies
5 were typically pretty good at buying. They had more
6 sophisticated procurement departments. So, they knew
7 the game. Certainly the legacy folks did. Some of the
8 smaller companies were ruthless negotiators, but they
9 didn't understand the hockey stick yet.
10 Q. Did those customers, the smaller, less
11 sophisticated customers, were they pulling back as well
12 through 2001?
13 MR. RUBIN: Objection, form.
14 THE WITNESS: There was a couple of
15 customers specifically that I -- in retrospect I think
16 backed off because of that technology psychology that
17 was in place. So, yes, I think a couple of -- I think
18 I saw directly a couple of customers back off. Even
19 though they weren't in the dotcom space, they saw folks
20 pulling back and so, they did too.
21 Q. (BY MR. BRITTON) Did these topics in terms
22 of the pullback come up during the weekly conference
23 calls that you were on?
24 A. Was your question around dotcoms or with the
25 technology psychology?

65

1 Q. The technology psychology and the effect on
2 sales.
3 A. No. The dialogs at the time were about the
4 dotcom. Again, it was really only in retrospect that I
5 was able to just look at deals that didn't close and
6 say in part they didn't close because they saw that the
7 dotcom -- and smart business people would have said,
8 "As that goes down, the economy is going to go down and
9 my business" -- so, part would be psychology and
10 smart -- part would be just smart forecasting of the
11 future American economy.
12 Q. What about the dotcom slide? Was that
13 discussed on the weekly conference calls?
14 A. Definitely.
15 Q. And what do you recall about those
16 conversations?
17 A. We just saw -- you know, I'm sure there were
18 specific cases. I was probably even involved with some
19 specific dotcoms that fell off. But yeah, there was --
20 there was dialog around, you know, the dotcoms are not
21 spending money. There's fewer dotcoms, there's no VC
22 money.
23 Q. And this was in the consulting sales calls
24 as well as the product sales calls?
25 A. We had specific dialog around that in the

66

1 consulting sales calls. That part is clear. It's very
2 clear. I would -- I believe it took place in the sales
3 calls.
4 Q. Okay. Do you remember what Oracle was
5 saying about the savings that it was making from an
6 internal implementation of 11i in 2001?
7 A. Yes, it was a billion dollar savings.
8 Q. Right. And was it your belief that the
9 billion dollar savings was attributable to 11i, the
10 internal implementation?
11 MR. RUBIN: Objection, form, foundation.
12 THE WITNESS: There was -- internally we
13 were questioning that number. Internally we were
14 having a hard time getting 11i to work in a domestic
15 setting let alone an international setting. It was
16 really the international flavor of 11i that would have
17 represented that savings for Oracle. So, yeah, there
18 was -- we were questioning that. So, yes, we were
19 questioning that.
20 Q. (BY MR. BRITTON) Okay. Was Oracle
21 downsizing at that time?
22 MR. RUBIN: Objection to the form, "that
23 time."
24 Q. (BY MR. BRITTON) The 2001 time period.
25 A. Yes.

67

1 Q. Okay. In your mind, was any of the savings
2 coming from a reduction in workforce?
3 MR. RUBIN: Objection, form.
4 THE WITNESS: There was a couple of
5 downsizings that were taking place at Oracle at the
6 time. There was the IT consolidation that I knew of
7 indirectly that was reducing the number of IT
8 employees. So, certainly that reduction was taking
9 place and was a vast component of that billion dollar
10 story. We had started to lay off consulting people as
11 well, as the dotcoms started to come. So, two kind of
12 really different events, unrelated events.
13 MR. BRITTON: Why don't we take a quick
14 break so I can -- I think I'm pretty close to being
15 done.
16 THE VIDEOGRAPHER: Going off the record at
17 11:48.
18 (Recess held.)
19 THE VIDEOGRAPHER: This is tape No. 3 of the
20 deposition of Kelly Wood. The time is 11:53.
21 Q. (BY MR. BRITTON) Okay, a couple more
22 questions and then I think I'll be done. The dotcom
23 slide that we've been talking about, was that visible
24 in your mind by the third quarter of 2001, which starts
25 in the beginning of December of 2000?

68

1    MR. RUBIN:  Objection, form.

2    THE WITNESS:  Yes.

3    MR. BRITTON:  I have no further questions.

4         EXAMINATION

5    QUESTIONS BY MR. RUBIN:

6    Q.  Okay, Mr. Wood, my name is Lee Rubin, as I

7    had said earlier, and I represent Oracle and individual

8    Defendants in this litigation.  The same ground rules

9    that Mr. Britton described will apply here.  Please

10   listen to my questions and then wait till I'm finished

11   and then respond.  Respond audibly because we have a

12   court reporter as well as a -- a stenographer as well a

13   videographer.  So, they'll need to hear "Yes's" or

14   "No's" as opposed to just nods, which would only be

15   picked up by one medium and not the other.

16   A.  Okay.

17   Q.  There you go.  And as Doug said, if you have

18   any questions or there's any confusion about any

19   question I ask, please ask me to clarify and I'll do

20   so.  And if you don't ask me, I'll assume you

21   understood the question.

22   A.  Okay.

23   Q.  What I'd like to do first, Mr. Wood, is try

24   to understand your position in the larger context of

25   Oracle.  So -- and first before I -- before I ask you

69

1    questions about the direct reports and the

2    organizational structure, what is your best memory on

3    when you became director of E-business consulting?

4    A.  I believe that was in 2000.

5    Q.  If I told you the records indicated that it

6    was approximately March of 2000, would that be

7    consistent with your memory?

8    A.  Okay, it seems a little early -- seems

9    early, but maybe that -- maybe it was then.

10   Q.  Without -- without any indication from me,

11   when -- sitting here today, when do you think you moved

12   into that position?

13   A.  I would have said May.

14   Q.  You would have said May of 2000?  Okay.  And

15   what was your position prior to taking on the

16   E-business consulting position?

17   A.  So, I would have been in a similar position,

18   just not focused on E-business.  So, the E-business

19   position was very focused on E-commerce, websites,

20   those kinds of activities.  The position prior to that

21   was a similar position, just with a broader financials,

22   manufacturing, supply chain scope.

23   Q.  Prior to moving into the particular focus of

24   E-business consulting, was your -- was the region that

25   you worked in more narrow, that is -- that is was it

70

1    specifically dedicated to some states within the

2    northwest super-region, all industries within -- all

3    companies within a certain amount of states, and then

4    when you moved to E-business consulting it was a

5    narrower subject matter but broader number of states?

6    Is that -- is that accurate?

7    MR. BRITTON:  Objection to form.

8    THE WITNESS:  I believe that's true.  I

9    believe that prior to becoming an E-business person, my

10   region was the -- based out of Utah.  I don't believe

11   before taking E-business that I had Seattle.  That's

12   not true.  I did have Seattle before I took the

13   E-business job.

14   Q.  (BY MR. RUBIN)  Well, let me ask you this:

15   Based upon a review of other records, there's some

16   indication that northwest was split into two regions.

17   There was the northwest super-region.  There was

18   Alaska, Oregon, and Washington in one region and then

19   there were the remaining states of the northwest

20   region, which included Arizona, Colorado, Utah, Nevada

21   in another subgroup of the northwest super-region.  Is

22   that consistent with your memory?

23   A.  Yeah, that -- where it gets hard is that we

24   reorganized that several times and remembering where

25   that was in 2000 is hard.  But yes, before taking the

71

1    E-business role, I had a role in Seattle.  So, I would

2    have been that northwestern portion of the northwest

3    territory.  And I believe it was right before I took

4    the E-business role.

5    Q.  Okay.  And at that time was Rick Gage your

6    supervisor when you were in the northwest -- the upper

7    northwest section of the northwest region?

8    MR. BRITTON:  Now, this is prior to becoming

9    director of business --

10   MR. RUBIN:  Prior, right.

11   THE WITNESS:  I can't remember.

12   Q.  (BY MR. RUBIN)  Is it your memory that at

13   that time that you would have been responsible for

14   consulting sales in Oregon, Washington, and Alaska?

15   A.  Yes.

16   Q.  And at that time, I'm talking --

17   A.  And Idaho.

18   Q.  And Idaho, okay.  At that time, so, I'm

19   talking about early 2000, 1999, perhaps extending back

20   to 1999, where were you based?  Where were you

21   physically located?

22   A.  In Boise.

23   Q.  Okay.  All right.  Then when you moved into

24   the E-business consulting position, did your territory

25   then expand to other parts of the northwest region?

72

1     A. Yes.

2     Q. Okay.

3     A. So, at that point I had -- so, I went back

4   and forth in roles where I would own part of the

5   northwest region in part. At the point I became

6   E-business, then I had coverage for the whole thing.

7     Q. In the specific area -- in the specific area

8   of E-business consulting?

9     A. Yes.

10    Q. So, after you transitioned to E-business

11   consulting, were you no longer making -- responsible

12   for any sales efforts to manufacturing industries or

13   telecommunications or other areas that are otherwise a

14   part of Oracle's business?

15    A. We would take credit for anything we could.

16   So, a couple of deals that I sold during that

17   E-business time were not really E-business deals, but

18   we -- I was involved with the sale, we sold them, they

19   closed. So, we took credit. But yes, it was primarily

20   an E-business focus.

21    Q. Now, did the position you had as director of

22   E-business consulting have anything to do with the

23   business -- online business unit in Oracle?

24    A. Yes.

25    Q. How so?

73

1     A. Oracle Online was an opportunity for small

2   companies to not buy boxes and all that crap. They

3   would just, you know, go with a managed service. So --

4     Q. It was a web-based service?

5     A. A web-based service; correct. So, that was

6   a part -- that was theoretically a part of our solution

7   set. And I guess we did sell a couple of deals to

8   Oracle Online. A couple of my deals did go to Oracle

9   Online. So, yes, that was a part of our solution set.

10    Q. So, one of the things that you would sell to

11   customers was this web-based access that Oracle

12   essentially ran and provided to customers?

13    A. Yes.

14    Q. Okay. Can you give me a percentage of what

15   portion of your business was the business online

16   portion as opposed to actually selling -- selling other

17   aspects of Oracle's consulting packages?

18    A. Very small. Less than 10 percent.

19    Q. Okay. So, now let's talk about the time

20   period in which you were in the E -- were focusing on

21   E-business consulting. So, as I understand your

22   testimony previously, at some point in time you believe

23   you were a direct report to Rick Gage; is that right?

24   During that time period?

25    A. Yes.

74

1     Q. And we'll use -- just for purposes of

2   questioning, we'll say the spring of 2000 until your

3   departure in February of '01; is that fair?

4     A. Okay.

5     Q. So, I know I said that the records indicated

6   March. You said your memory is May. So, we'll just

7   say the spring of 2000.

8     A. Okay. And excuse me. Let me go back. So,

9   I think you asked me who I worked for before Rick. It

10   was actually Rodney -- I can't remember Rodney's last

11   name. Rodney something. So, that was actually who I

12   worked for before Rick.

13    Q. And was that when you were dedicated to the

14   northwest or upper northwest corridor? Or was that

15   after you went to E-business consulting?

16    A. No, I actually worked for Rodney --

17   originally I worked for Rodney out of Utah. So, the

18   southern part of the northwest region. And then when

19   I -- when I worked out of the northwestern part of the

20   northwest region, I think I still worked for Rodney.

21    Q. Okay. When do you think Rick Gage became

22   your supervisor?

23    A. Sometime in fiscal year 2000.

24    Q. And he was your supervisor at the time you

25   were terminated?

75

1     A. Yes.

2     Q. Okay. So, you were an employee within the

3   northwest super-region for consulting; correct?

4         MR. BRITTON: Objection to form in terms of

5   time.

6     Q. (BY MR. RUBIN) Again, this is all -- unless

7   I say otherwise, this is all the spring of 2000 to the

8   time you left the company.

9     A. Okay.

10    Q. Okay? And that was within the consulting

11   organization; correct?

12    A. Yes.

13    Q. Now, and you directly reported to Rick Gage;

14   correct?

15    A. Yes.

16    Q. Now, did Rick Gage have any counterparts?

17   Were there other senior practice directors at his level

18   within the northwest super-region?

19    A. Yes.

20    Q. Who else?

21    A. Joe Wood.

22    Q. Okay. And he's not related?

23    A. No.

24    Q. I had to ask that because I heard you

25   mention that we hadn't followed up yet. So, I felt

76

1  obliged.
2        And you never directly reported to Mr. Wood?
3     A. I did.
4     Q. You did?  Okay.  That was pre-2 -- pre-March
5  2000 or pre-spring, 2000?
6     A. I don't remember when.
7     Q. Okay.
8     So, it was Rod -- it was Joe, then Rodney,
9  then Rick.
10     Q. Okay.
11     A. And I don't remember the timing of when my
12  relationship between Joe and -- I don't remember the
13  timing of that.
14     Q. Do you remember an individual named Steven
15  Parra?
16     A. Yes.
17     Q. Did he serve as your supervisor at any time
18  during the spring of 2000, February of 2001 time frame?
19     A. Yes, I did work for Steve.  So, I believe I
20  worked for Steve Parra in 2000 and then I worked for
21  Rick.  We would get two or three or four managers a
22  year.  So -- or five or six.
23     Q. But even though there were different
24  managers, essentially the same structure, that you were
25  directly reporting to a senior practice director within

77

1  the northwest super-region?
2     A. Yes.
3     Q. Whether it was Steve or Rick?
4     A. Yes.
5     Q. Okay.  Okay, you said that Joe Wood was a
6  counterpart of Rick Gage's, also a senior practice
7  director within the -- within northwest super-region
8  consulting?
9     A. Yes.
10     Q. And then did you ever hear of a fellow named
11  David Green?
12     A. Yes.
13     Q. And what did you understand his position to
14  be?
15     A. He was a peer -- at times he was -- he was a
16  peer of Joe Wood, Rick Gage.
17     Q. Same level, organizational level?
18     A. Same level, yes.
19     Q. Okay.  And was he in charge of apps
20  consulting?
21     A. Yes, at various times.
22     Q. Now, how did that differ from what you were
23  doing?
24     A. So, you know, again, if we're talking about
25  the context of my E-business position, he was a part --

78

1  so, E-business had this solution stack of products that
2  included the application space that David owned.
3     Q. Okay.
4     A. There were other pieces of that architecture
5  that David didn't own, the delivery of it.
6     Q. ERP?
7     A. Yes.  So, David was ERP.
8     Q. Okay.
9     A. Applications.  That was a part of our
10  E-business stack.  And then, you know, there were
11  pieces that David didn't own.
12     Q. And who -- was there somebody named Sharon
13  Bekke or Bikke who also was a counterpart of David
14  Green's in apps, a senior practice director for apps
15  consulting?
16     A. I don't remember that name.
17     Q. Okay.  Greg Quirk?
18     A. Yes.
19     Q. And what did you understand his position to
20  be?
21     A. So, again, within the E-business stack there
22  was a portion that was custom development.  Really the
23  E-commerce engine of the E-business stack was really
24  Greg Quirk.
25     Q. Okay.  And did you interface with him at

79

1  all?
2     A. Yes.
3     Q. Okay.  All right.  So, again, going back
4  to -- I just wanted to clarify.  When you talked about
5  David Green's role, you have this -- I think your title
6  was, what, "Client Solutions Manager"?
7     A. Yes.
8     Q. As of spring of 2000; is that right?
9     A. Yes.  I think it was director, but I --
10     Q. Client solutions director.  Okay.  So,
11  describe for me if you can, and I know -- I apologize
12  if you've been through this before.  I'm just --
13  because I'm still a little bit confused.  What were you
14  actually selling to customers when you walked into a
15  potential customer's offices?  What products within --
16  you're in the consulting organization.  What were you
17  selling to them in this role as E-business consulting?
18     A. The primary deliverable was a consulting
19  engagement to produce an E-commerce engine for a
20  company.  So, an E-commerce engine would be a website
21  where you could look at products, buy products, you
22  could look at support, to buy support, you could look
23  at product documentation, basically anything -- any
24  interaction that a customer wanted from a company, we
25  would provide that kind of capability.  Again, from a

80

1 consulting standpoint. Again, you know, products came
2 into that.
3 Q. Well, did they -- my question is:  Did they
4 necessarily come into that?  Could you, for example,
5 sell -- could you sign a contract for a consulting
6 engagement in which you would provide those services
7 with someone else's software, not Oracle's?
8 A. There were parts of that -- again, going
9 back to the technology stack.  There was parts -- that
10 technology stack included a bunch of Oracle products
11 and non-Oracle products.  So, yes, theoretically we
12 could have sold something that didn't include any
13 Oracle products.  But that was -- we were not
14 encouraged to do that because, you know, that wasn't
15 supporting the bigger life of the company.  And I don't
16 remember that I did sell anything that was -- did not
17 involve Oracle products.
18 Q. Okay.  So, when you go -- when you would
19 successfully sell a consulting package, it would
20 involve an engagement that would -- in which they would
21 be paying for some number of consultants' time, the
22 services being rendered; is that correct?
23 A. Yes.
24 Q. In addition to underlying products being
25 sold?

81

1 A. Yes.
2 Q. And that was all a part of one package
3 typically?
4 A. Part of the same package, but there would be
5 different contracts.
6 Q. Okay.  So, there would be a license
7 agreement?
8 A. Exactly.
9 Q. And then a consulting agreement?
10 A. Yes.
11 Q. Okay.  And then -- and during the time
12 period in which you were, again, the director -- client
13 solutions director, what types of Oracle applications
14 were you selling to customers?
15 A. ERP and CRM.
16 Q. Okay.  And ERP, does that include the back
17 office applications that you were describing earlier?
18 A. Yes.
19 Q. Okay.  So, that would be financials?
20 A. Yes, financials, supply chain management,
21 order management.
22 Q. Okay.  And then you said "CRM."  What CRM
23 applications were you selling as part of this package?
24 A. So, we had a web store that was:  Look at a
25 product, buy it, add it to your shopping cart, provide

82

1 your Visa, you know, provided all of those things.
2 Then there was some customer service components of
3 that.  "My product broke.  I need help."  So, it was --
4 it was an E-commerce engine and a customer support
5 stack.
6 Q. Right.  So, you listed for me the ERP
7 specific applications that you can recall selling.
8 What were the specific CRM applications that you recall
9 selling?
10 A. Web store.
11 Q. The web store is a CRM app?
12 A. At the time it was, yes.
13 Q. Okay.
14 A. There was a shopping cart application,
15 customer support, customer service, contracts.  Those
16 are the ones I remember.
17 Q. Okay.  And did your work, there was -- could
18 you ascribe a percentage of how much -- to the extent
19 that part of your sales were Oracle applications, how
20 much of it was ERP compared to CRM during your time as
21 an E-business -- as the E-business client solutions
22 director?
23 A. I would say 60, 70 percent was ERP and the
24 rest was CRM.
25 Q. Now, what about database?

83

1 A. So, the bulk of the consulting that we did
2 was around applications.  It wasn't around DBAs,
3 database administrators.  Database administrators are
4 the consultants associated with database product.  So,
5 we had database -- database administrators, I'm sorry,
6 not assistants.  We had database administrators for
7 every engagement.  20 to 30 percent of our consulting
8 engagements would have included database
9 administrators.
10 Q. Okay.  And did you as part of your client
11 solutions package sell the database?
12 A. Yes.
13 Q. Okay.  And so -- and was that -- did that
14 necessarily have to accompany the applications?
15 A. Yes, almost always there was a database
16 component to an applications licensing deal product.
17 Q. And did these customers typically have an
18 Oracle database before you approached them for this
19 client solutions package?
20 A. Many did.
21 Q. Because the database is an expensive
22 component of a -- of these license deals, wouldn't it
23 be, if it was from scratch, in other words?
24 A. Yes.  That's where Oracle made their money,
25 right, was on the database part of it.  So --

84

Wood, Kelly A  10/7/2005  10:01:00 AM

1      Q.  Okay.  So, I think you said many already had
2    an Oracle database.  So, you were coming to them, "We
3    can give you consulting services.  We can give you some
4    applications -- Oracle applications as well"?
5      A.  Yes.
6      Q.  So, in that sense these customers -- many of
7    these customers were, as you defined it before, legacy
8    Oracle customers?
9      A.  Yes.
10      Q.  Okay.  So, then, organizationally you
11    said -- I think you said in response to Mr. Britton's
12    question you did not personally have any direct
13    reports?
14      A.  From 2000 on, that's correct.
15      Q.  Did you have any peers within E-business
16    consulting?  Were there other people within the
17    northwest super-region that were doing the same thing
18    you were?
19      A.  Yes.
20      Q.  How many?
21      A.  Six, seven, eight.
22      Q.  Okay.  And were you all let loose within the
23    same region or within the -- within northwest that they
24    were going to create internal competition or were
25    you -- did you try to divvy up by geography?

85

1      A.  There were some loose guidelines about that.
2    I don't remember what they were.  Again, it always
3    changed.
4      Q.  Okay.  Do you remember at any point during
5    that, during the spring of 2000 to February 2001 time
6    period where you were loosely assigned to a particular
7    area?
8      A.  Yeah, the looseness was in -- was probably
9    in Seattle.
10      Q.  Do you mean you were loosely assigned to
11    Seattle?
12      A.  I was assigned to Seattle, but the
13    boundaries of -- so, there was another CSD in Seattle.
14    And the boundaries about who owned what within Seattle
15    were pretty loosely defined.
16      Q.  Okay.  Where else were you generally
17    directed to put your efforts forth?
18      A.  Seattle, Oregon, Idaho, Alaska, and, I
19    think, Nevada.  Actually, I think in 2000 I owned -- at
20    one time or another I worked on the whole northwest
21    region.  Because I remember I did deals in Utah and I
22    did deals in Nevada under that CSD comp plan that I got
23    paid for.  So, I must have had -- at one time or
24    another I had the whole -- I never had the whole thing
25    by myself, but it changed.  My geography changed within

86

1    that time frame.  So, I think I said something counter
2    to that earlier.  But during that 2000, 2001 time plane
3    I owned pieces of the whole northwest thing.
4      Q.  And did the other six to seven to eight
5    people have other pieces?
6      A.  Yes.
7      Q.  I mean, in other words, was there an attempt
8    to try to divide it geographically?
9      A.  Yes.
10      Q.  Okay.  So, your regions -- or your
11    subregions may have changed, your states, but however
12    they changed, there was an effort to assign one or two
13    people to particular states within the northwest
14    super-region?
15      A.  Yes.
16      Q.  As opposed to all eight of you, "Even if
17    you -- we don't care if you see each other in the
18    airport in Phoenix, just cross the northwest territory
19    and good luck to you"?
20      A.  Yes, there was always some attempt to
21    divide.
22      Q.  Okay.  Let me just continue on with the
23    chart.  Okay.  So, you then with six or seven or eight
24    other people then, you were -- reported to at some
25    point Rick Gage and then earlier on, perhaps Mr. Parra

87

1    or others; correct?
2      A.  Yes.
3      Q.  Okay.  And then your understanding is that
4    Mr. Gage's organizational line reported to
5    Mr. Underwood; is that correct?
6      A.  Yes.
7      Q.  And is it your understanding Mr. Underwood
8    was the -- was a vice president or senior director in
9    charge of the entire northwest super-region?
10      A.  He was a vice president in charge of the
11    western region.
12      Q.  In charge of the entire west or the
13    northwest?
14      A.  I'm sorry, northwest.
15      Q.  Okay.  And were there others at Mike
16    Underwood's organizational line that were in charge of
17    other parts of the western region?
18      A.  Yes.
19      Q.  And foundationally, let me just ask you the
20    first question:  Your northwest super-region was a
21    component or a part of the west region; correct?
22      A.  Yes.
23      Q.  So, Mr. Underwood was in charge of the
24    northwest super-region; correct?
25      A.  Yes.

88

1    Q. Then did you ever hear of a fellow named
2  Tignur, Terry Tignur?
3    A. Yes.
4    Q. And is it your memory he was in charge of
5  the southwest region of the west -- southwest subregion
6  of the west region?
7    A. Yes.
8    Q. And then somebody named Hutchinson, Ike
9  Hutchinson --
10    (Reporter clarification.)
11    Q. (BY MR. RUBIN)  Ike.  Does that name sound
12  familiar?
13    A. I believe it was Mike.
14    A. I think it was Mike.
15    A. I think the name was Mike.
16    Q. Yeah.  Does that name sound familiar?
17    A. Yes.
18    Q. And he was -- did you understand him to be
19  involved in some CRM related activities?
20    A. I don't remember Mike having a CRM focus.
21    Q. Okay.  Did you understand him to be on the
22  same organizational line as Underwood and Tignur?
23    A. Yes.
24    Q. Okay.  Now, describe the contacts that you
25  had during the -- during the spring of 2000 to February

89

1  of 2001 time period with Mike Underwood.
2    A. I don't remember any one-on-one dialog with
3  Mike Underwood.  I remember Mike on the sales
4  forecasting calls where he would encourage us to sell
5  more, sell faster.  But that was in a larger audience.
6    Q. Those were the consulting sales calls?
7    A. Yes.
8    Q. How many people were on those calls
9  typically?
10    A. 10, 20.
11    Q. So, again, we're still talking about the
12  spring of 2000 to February of 2001 time period.  So,
13  would your peers, the six or seven or eight other
14  E-business consulting directors, have been on the call?
15    A. Yes.
16    Q. Assuming they were available at any
17  particular time.
18    A. Yes.
19    Q. And these were on a weekly basis?
20    A. They would go -- again, on the consulting
21  calls --
22    Q. Consulting.
23    A. -- they were infrequent.  So, at times they
24  were scheduled weekly and other times they were less
25  frequently.

90

1    Q. Okay.  So, your six or seven -- six, seven
2  or eight peers -- now, were there other peers, people
3  who you would consider organizationally your peers,
4  that were also on the call that were not -- that were
5  in consulting sales that were not specifically devoted
6  to E-business consulting within the northwest
7  super-region?
8    A. Yes, there were.
9    Q. Those were people that were more broadly
10  dedicated to selling consulting packages to other kinds
11  of companies?
12    A. Actually, more narrowly focused.  So, they
13  would be folks like in Dave Green's organization that
14  were just responsible for selling or implementing ERP.
15    Q. I see.  I see.  Particular applications?
16    A. Yes.
17    Q. Okay.  And so, they would have been on the
18  call as well?
19    A. Yes.
20    Q. Okay.  And then you would have the group of
21  individuals at Rick Gage's level, organizational level
22  on the call?
23    A. No, typically not.  Typically we would just
24  have a call with Rick.  Rick would have a call with
25  just his people and then other interested parties.

91

1  Rick's peers would not have been on those calls unless
2  it was a call that Mike had where Mike wanted to go
3  through his whole organization and talk about big
4  deals, likely deals at a whole organizational level.
5    Q. Okay.  So, some -- so, typically there
6  were -- there were different consulting calls it sounds
7  like, then.  There were some that Rick Gage had a call
8  with his group?
9    A. Yes.
10    Q. Which was you and the -- and the six or
11  seven or eight others in E-business consulting?
12    A. Yes.
13    Q. And any other consultants, then, that would
14  have directly reported to him?
15    A. Yes.  I thought that Rick only had
16  E-business people.
17    Q. Okay.
18    A. So, anyway, yes, there could have been --
19  there would have been -- there would have been other
20  people on the call.
21    Q. Who?
22    A. Particularly the delivery people.
23    Q. I see.  Okay.  So, there would have been --
24    A. So, you had the ERP sales guys, consulting
25  sales guys, and then the delivery people.

92

1   Q. In addition to your group?

2   A. Yes.

3   Q. Okay. And would that have then meant that

4   David Green or Joe Wood were on the call as well?

5   A. Joe Wood was a peer of Rick's. So, Joe

6   typically would not have been on the call, would not

7   have been on a call that Rick would have. David Green,

8   yes.

9   Q. Okay. Because Joe was covering another

10  subregion of the northwest super-region; is that right?

11  A. Yes.

12  Q. Okay. So, there were those calls. And did

13  those calls happen on a regular basis?

14  A. They were supposed to have, but they didn't

15  always happen.

16  Q. So, can you give me any sense of the

17  frequency with which they occurred?

18  A. Certainly once a month. Again, you know, it

19  just depended.

20  Q. Right.

21  A. You know, towards the end of the quarter it

22  would be every week. Early in the quarter it would be

23  once a month.

24  Q. Okay. And then you said that there were

25  also, then, separate calls that might occur from time

93

1   to time with Mike Underwood in which you participated.

2   A. Yes. I remember a couple of calls with Mike

3   cracking the whip.

4   Q. During this time period that we're

5   discussing?

6   A. Yes.

7   Q. Okay. And in -- in those calls, you

8   said Rick Gage typically would not have been on the

9   call?

10  A. No, he would have been on the --

11  Q. He would have been on the call?

12  A. He would have been because Mike was his

13  boss.

14  Q. Right. That's what I thought.

15  A. So, Mike --

16  THE REPORTER: One at a time, please.

17  Q. (BY MR. RUBIN) Okay. Go ahead.

18  Q. So, yes, Rick would have always been on the

19  call that Mike was on.

20  Q. All right. Now, you said you remember a

21  couple of telephone calls with Mike pushing, pushing

22  the group to perform better?

23  A. Yes.

24  Q. And do you remember the time period that

25  those calls took place?

94

1   A. Once a month.

2   Q. Do you remember within this approximately 10

3   or 11 months that we're talking about when they --

4   those would have occurred? Summer of 2000? Fall of

5   2000? Winter of '01?

6   A. So, we definitely had a once-a-quarter call

7   with Mike where Mike would have everybody on the call

8   once a quarter. He would review past quarter and

9   upcoming quarter. And then again, depending on the

10  quarter, sometimes we'd have those calls once a month.

11  A. So, there would be at least one call that

12  was sort of a postmortem of the quarter, "Here's where

13  we ended up," and talking about what's coming up the

14  next quarter.

15  A. Yes.

16  Q. Okay. Was -- in terms of the content or the

17  substance of these meetings, did Mike go person by

18  person on the call and ask about, "What's going on in

19  your particular subregion or what do you have in the --

20  you know, I see on the pipeline that this is what's

21  going on. What's the -- any change on that?" Was he

22  going through some kind of a, of a list or was it more

23  of a general discussion?

24  A. It could have been both. You know, the

25  detailed conversations were he had a list and he was

95

1   walking through the list and asking questions about it.

2   So, yes, he would have each of his managers go through

3   and then he would reserve the right to question certain

4   specific deals.

5   Q. Do you remember that specifically from calls

6   that he was on?

7   A. Yes.

8   Q. Okay. All right. And then other than --

9   and so, other than those calls which you said you

10  remember -- you have a specific memory of a couple of

11  them?

12  A. Yes.

13  Q. And do you remember -- do you remember any

14  other contact with Mike Underwood other than on those

15  group calls?

16  A. No.

17  Q. Okay. Then Mike Underwood directly

18  reported to Gary Simmler; is that correct?

19  A. Yes.

20  Q. And Gary Simmler was head of the west

21  region?

22  A. Yes.

23  Q. For consulting?

24  A. Yes.

25  Q. Okay. And what kind of contact, if any, did

96

1  you have with Gary Simmler during this -- again, all
2  during this time period?
3      A. So, Gary would have periodic calls where he
4  would review things at his level.  I don't remember
5  how, if that was once a quarter or once a half.
6      Q. Once a half-year?
7      A. Correct.
8      Q. And that was also in a group, group
9  conference call setting?
10     A. Yes.
11     Q. Kay.  And other than that review, do you
12  remember any other contact or communication with
13  Mr. Simmler?
14     A. No.
15     Q. Okay.  And then Gary Simmler at some point,
16 I believe, in this -- during this time period reported
17 to a fellow by the name of Keith Block; is that
18 correct?
19     A. I don't remember.  It sounds right, but I
20 can't say for sure.
21     Q. Did you have any personal interaction with
22 anybody named Keith Block?
23     A. I don't remember.  I don't believe so.
24     Q. And then Block reported to Sandy
25 Sanderson?  Do you know -- do you recognize the name?

97

1      A. Yes.
2      Q. Okay.  And did you ever have any -- is
3  that -- is that your understanding, that Block reported
4  to Sanderson?  Or you don't -- you don't remember or
5  no?
6      A. It sounds right.
7      Q. You're not certain?
8      A. Correct.
9      Q. Okay.  Did you ever have any direct contact
10 with Mr. Sanderson?
11     A. No.
12     Q. Okay.  And then prior to July, 2000, Ray
13 Lane was with the company.  Did you ever have any
14 contact with Mr. Lane?
15     A. No.
16     Q. Okay.  And how about Jay Nussbaum?
17     A. Yes, I had contact with Jay, but not in the
18 context that we're talking about, not in the time
19 period that we're talking about.
20     Q. You had contacts with Jay when you were
21 doing government work?
22     A. Yes.
23     Q. Because that was his sector?
24     A. Yes.  And then at some point he moved out of
25 government.

98

1      Q. Okay.  So, but during this time frame where
2  you were client solutions director, no contact with
3  Nussbaum?
4      A. No.
5      Q. Okay.  Now, is it your understanding that
6  Oracle was divided up, within consulting Oracle was
7  divided up into geographic regions; correct?
8      A. Yes.
9      Q. We've been talking about the fact that you
10 were part of the northwest super-region; correct?
11     A. Yes.
12     Q. And you were one component of the northwest
13 super-region; right?
14     A. Yes.
15     Q. And then northwest super-region was, in
16 turn, a component of the west region; correct?
17     A. Yes.
18     Q. Which we had discussed before included the
19 southwest region also?
20     A. Yes.
21     Q. And then there were other regions in the
22 country as well; correct?
23     A. Yes.
24     Q. And it included the northeast region?
25     A. Yes.

99

1      Q. Did you ever hear of a fellow by the name of
2  Tim Mann or Mahan who ran the northeast region?
3      A. No.
4      Q. Okay.  And then there was the southeast
5  region; correct?
6      A. Yes.
7      Q. Okay.  And then there was the south central
8  region?
9      A. Yes.
10     Q. There was the north central region?
11     A. Yes.
12     Q. And there was Canada?
13     A. Okay.
14     Q. Not clear about that one?
15     A. Correct.
16     Q. So, at least --
17     A. Again, it was all pretty volatile, right.
18 So --
19     Q. Right.  But those -- the names of those
20 regions generally sound familiar to you?
21     A. Yes.
22     Q. Your understanding generally was the west
23 was one of -- at any given time the west region of
24 which you were -- belonged to a subpart was one of five
25 or six regions in the country for consulting?

100

1    A. Yes.

2    Q. At any point in time during the spring 2000,

3    February 2001 time period, did you ever take part in

4    any group conference calls in any region outside of

5    your own?

6        MR. BRITTON:  Are you talking about the west

7    or northwest?

8    Q. (BY MR. RUBIN) Oh, I'm sorry, any region

9    outside of the west region.  So, put another way:  Did

10   you ever take part in any consulting conference calls

11   in the northeast region?

12   A. No.

13   Q. In the southeast region?

14   A. No.

15   Q. In the south central region?

16   A. No.

17   Q. In the north central region?

18   A. No.

19   Q. Okay.  Then dropping down to the west

20   region, did you ever take part in any conference calls

21   that discussed issues outside of the northwest

22   super-region?  So, for example, a conference call that

23   involved the southwest region -- super-region of the

24   west region?

25   A. Not that I remember.

101

1    Q. Okay.  So -- and would it also -- is it also

2    accurate that you never played any role in assisting

3    with the forecasting process in the northeast region?

4    A. Correct.

5    Q. Or the south -- the same would be true for

6    the southeast region?

7    A. Yes.

8    Q. The same would be true for south central?

9    A. Yes.

10   Q. And the same would be true for north

11   central?

12   A. Yes.

13   Q. Okay.  Now, in terms of -- and let me just

14   finish that line.  In terms of were -- was the sales or

15   license organization similarly divided up by region?

16   A. Yes.  They didn't have exactly the same

17   territory boundaries that we did, but it loosely

18   represented the sales organization, the product sales

19   organization.

20   Q. Okay.  And that would be for license sales;

21   correct?

22   A. Yes.

23   Q. Which would include the applications and

24   database sales that we've discussed earlier?

25   A. Yes.

102

1    Q. Okay.  And do you have any memory of taking

2    part in any group conference call in connection with

3    the license sales for any region outside of your own?

4    A. No.

5    Q. Okay.  Did you ever review in any way any

6    pipeline data for sales in any region outside your own?

7    A. I don't believe so.

8    Q. Okay.  In terms of -- all right, let's turn

9    to the -- let's turn to the pipeline data that you had

10   discussed before with Mr. Britton that you did say that

11   you had had access to.  We've got the northwest

12   super-region and the west region.  At what level did

13   you have access to sales data?

14   A. Product or consulting?

15   Q. Let's talk about consulting first.

16   A. Pipeline data?

17   Q. Pipeline data.

18   A. Consulting pipeline data?

19   Q. Yes.

20   A. I believe only the northwest.

21   Q. And what database or through what -- through

22   what database did you have access to that information?

23   Well, let me back up.  Let me strike that question.

24       Let's talk about the different means in

25   which you had information about sales -- about

103

1    consulting in the northwest.  You had -- I think you

2    described to Mr. Britton you had some conference calls;

3    right?

4    A. Yes.

5    Q. And you said that's one of the ways you

6    learned about what was happening in the northwest

7    region?

8    A. Yes.

9    Q. And you said that was one of the ways you

10   learned about what was happening in the northwest

11   region?

12   A. Yes.

13   Q. Okay.  And you also I believe indicated that

14   you had access to some electronic data of some sort?

15   Or is that not accurate?

16   A. For consulting sales pipeline, I think the

17   only thing I had access to was a spreadsheet.  There

18   was no -- it was just a spreadsheet listing all the

19   deals.

20   Q. An Excel spreadsheet?

21   A. Yes.

22   Q. That you -- that was sent to you via e-mail

23   or through -- electronically or only in hard copy?

24   A. Electronically.

25   Q. Okay.  And that spreadsheet covered

104

1  consulting opportunities for the northwest region?
2      A.  Yes.
3      Q.  Okay.  And I think you testified earlier
4  that one of the responsibilities -- in responding to
5  Mr. Britton's question about any forecasting
6  responsibilities, one of the responsibilities you had
7  was to update that spreadsheet?
8      A.  Yes.
9      Q.  So, your supervisor, whether it was Mr. Gage
10  or someone else during this time period, would provide
11  you and your peers with a spreadsheet and ask you to
12  update it on some regular basis?
13      A.  Yes.
14      Q.  Okay.  And other than that, other than that
15  spreadsheet, you didn't have any other visibility into
16  the -- into the information?  It was just that
17  spreadsheet?  Into any pipeline -- quote, "pipeline
18  information"?
19      A.  Correct.
20      Q.  Did that, did the spreadsheet that you
21  received cover your peers in E-business consulting or
22  did it cover other consultants within the northwest
23  region as well?
24      A.  That would have been a combined spreadsheet
25  of all opportunities within the region, of all

105

1  consulting opportunities within the region, not just
2  E-business.
3      Q.  Now -- okay.  Now, had you ever heard of --
4  have you ever heard of the resource management system
5  in connection with the Oracle consulting pipeline data?
6      A.  Yes.
7      Q.  And what is it?
8      A.  That's where all the delivery opportunity --
9  the delivery stuff gets put in.  So, I need a DBA for
10  five weeks.  That goes into that system.  I need an ERP
11  configuration consultant.  All that goes into RMS.
12      Q.  So, the information that you're providing
13  your level gets rolled up into the RMS; is that
14  accurate?  Or is it something different than what
15  you're providing?
16      A.  I believe RMS only included sold business.
17  So, earlier this morning we talked about pipeline
18  versus delivery.  I believe RMS only included delivery
19  engagements and did not include pipeline.
20      Q.  Thank you.  So, other than the spreadsheet
21  that you described, was there any other information
22  that was available to you to monitor or show the state
23  of the consulting pipeline in any given quarter?  You
24  talked about the Excel spreadsheets.  Anything else?
25      A.  Informal dialog with peers, e-mails.  You

106

1  know, there would be informal ways of getting a sense
2  of other regions.
3      Q.  And -- okay.  So, you had the conference
4  calls.  You had the informal discussions with some of
5  your peers about the state of business, what's
6  happening in the -- out in the field; right?
7      A.  Yes.
8      Q.  And then you said watching e-mail traffic?
9      A.  Yes.
10      Q.  Anything else?
11      A.  No.
12      Q.  Okay.  Now, as to these Excel spreadsheets
13  on the -- that were -- that you were responsible for
14  updating for your particular sales opportunities, how
15  many sales opportunities would be listed on the Excel
16  spreadsheets on average?  How long was this list for
17  the northwest region consulting?
18      A.  I would say 100.
19      Q.  And how many were you responsible for where
20  you were following up on?
21      A.  10 to 20.
22      Q.  Okay.  And when you updated -- when you
23  updated the information on the Excel spreadsheet, did
24  the spreadsheet have a function that would
25  automatically change totals that were on the -- that

107

1  were reflected on the, on the spreadsheet?  In other
2  words, if you changed -- I'll just give you an example.
3  Say you had a lead and something had happened and you
4  decided that instead of 60 percent probability or --
5  that it was 70 percent probability that it would close
6  in the quarter.  Did that change?  Did that change any
7  totals on the Excel spreadsheet?
8      A.  We used a couple of different tools during
9  my time, a couple different forecasting tools.  So,
10  some I remember there was some math in there that would
11  allow you to automatically convert.  So, if you changed
12  that cell like you talked about, it would automatically
13  update your forecast.  And some were more static in
14  nature.
15      Q.  Well, my understanding is that each of --
16  you and each of your peers were providing this updated
17  data, which in turn was going to Rick Gage or someone
18  else who would then be rolling it up essentially for
19  Mike Underwood; is that fair to say?
20      A.  Yes.
21      Q.  Okay.  And after he -- after Mike -- excuse
22  me, after your supervisor would take the data and roll
23  it up, did he distribute copies -- did he circulate
24  copies of what he had sent on to Mike Underwood?
25      A.  Yes.

108

1       Q.  Okay.  And that would be, "Here's what I --
2   here's what I provided for northwest consulting for the
3   week of February 1st," for example?
4       A.  Yes.
5       Q.  And then -- and you had indicated that there
6   were certain aggregate numbers on that Excel
7   spreadsheet; is that right?
8       A.  Yes.
9       Q.  And did that include a forecasted amount for
10  the northwest region?
11      A.  Yes.
12      Q.  Okay.
13      MR. RUBIN:  I guess we'd better stop.
14      THE VIDEOGRAPHER:  This is the end of tape
15  No. 3 of the deposition of Kelly Wood at 12:51.
16      (Recess held.)
17      THE VIDEOGRAPHER:  This is tape No. 4 of the
18  deposition of Kelly Wood.  The time is 12:59.
19      Q.  (BY MR. RUBIN)  Okay, Mr. Wood, I think we
20  were talking about the Excel spreadsheets that were
21  used in the consulting, that were used in your -- in
22  your consulting work to track sales opportunities.
23      A.  Okay.
24      Q.  Now, do you remember any discussion within
25  the consulting group how the consulting pipeline

109

1   differed in any meaningful or material ways from the
2   sales pipeline?  And let me -- let me be more specific.
3   Was there -- do you recall any discussion about any
4   difference in terms of -- in terms of how consulting
5   utilized the probability percentage as a forecasting
6   tool as opposed to sales?
7       A.  I don't remember.
8       Q.  Okay.  Do you remember whether in assigning
9   a percentage probability on the Excel spreadsheet
10  whether you were being -- whether you were asked or you
11  had been instructed to have the percentage -- to have
12  the percentage reflect the stage in which the -- in
13  which the deal was as opposed to the likelihood that it
14  was going to close?
15      A.  So, yes, there was -- we used different
16  probabilities.  We used the percentage column
17  differently between consulting and sales.
18      Q.  How so?
19      A.  I don't remember.  I think one approach was
20  given the stage, there was a probability and then there
21  was -- there was another approach.  I can't remember
22  who used what approach.  But yes.  70 percent on ours
23  meant something different on the sales side.
24      Q.  Okay.  And did that -- and did the way in
25  which you utilized that percentage impact the way in

110

1   which the Excel spreadsheet could be used as a
2   forecasting tool?
3       A.  Yes, I think -- so, not only were the
4   number -- did the numbers mean different things, but
5   then they did different things in that computation of
6   forecast.  I don't remember the mechanics of that,
7   though.
8       Q.  Do you know what, if anything, your
9   supervisors did and the supervisors above them to
10  actually create a consulting forecast for the northwest
11  region that was rolled up in the west region and then
12  on to -- on to corporate finance?
13      A.  No, I don't know the details of that.
14      Q.  You didn't play any role in the -- in that
15  process?
16      A.  Correct.
17      Q.  Okay.  Was it your understanding that
18  management judgment would come into play in providing
19  those numbers up the chain of command?
20      MR. BRITTON:  Objection to form.
21      THE WITNESS:  Yes, I believe management
22  perspective would play a critical role in that.
23      Q.  (BY MR. RUBIN)  So, other than providing
24  input into the spreadsheets on your particular
25  opportunities, you didn't play any other role in the

111

1   forecasting process for the northwest region?
2       A.  Correct.
3       Q.  Did you ever have access to or did you ever
4   review any forecasts for the west region consulting?
5       A.  I don't remember.
6       Q.  Now -- you don't recall?
7       A.  Correct.
8       Q.  Now, did you have -- sitting here today, do
9   you recall what the -- do you know what Oracle's west
10  region consulting forecast was as of February 2001?
11      A.  No.
12      Q.  Okay.  Were you aware that the actual
13  performance, the actual revenues for the west region
14  was within approximately $200,000 of the forecast for
15  the third quarter of 2001?
16      MR. BRITTON:  Objection to form.
17      THE WITNESS:  No.
18      Q.  (BY MR. RUBIN)  Okay.  And would that
19  surprise you if you learned, if I told you that the
20  forecast as of February 2001 was $34,000,000 -- was
21  $34.3 million and the actual recorded revenue for the
22  west region consulting was $34,000,000, would that
23  surprise you that it was within $300,000 for the third
24  quarter of '01?
25      A.  Yes, it would surprise me.  Again, going

112

1  back to what I talked about, there's -- that's revenue.
2  What would surprise me is if our sales forecast was
3  that close.
4      Q.  When you say "sales forecast," you mean the
5  margin forecast?
6      A.  No.  So, you've got -- in consulting, right,
7  you have the revenue side and you have the sales side.
8  You sell it, but you don't get to recognize revenue
9  until you deliver it.
10     Q.  So, you're -- and you would be certain --
11  what you're saying is you would be surprised if the
12  sales, actual sales that occurred in the third quarter
13  of '01 matched the forecast?
14     A.  Correct.
15     Q.  And was that actually forecasted separately
16  from revenue?
17     A.  Yeah.  Yes.
18     Q.  So, you -- so, what different, what
19  different metrics were forecasted?  You had a revenue
20  forecast?
21     A.  Yes.
22     Q.  And then you had a sales forecast?
23     A.  Yes.
24     Q.  Okay.  And what did sales forecast measure?
25     A.  Bookings.  So, you --

113

1      Q.  So, it's a bookings forecast essentially?
2      A.  Exactly.  Because -- and I make that
3  distinction because revenue, consulting revenue is
4  really a backwards looking metric.  It shows you what
5  you sold three, six, nine months ago, which is not
6  reflective of licensing revenue.  Licensing revenue is
7  current.  So, that's why I make the distinction
8  consulting sales matches up to license sales.
9      Q.  So, but -- right, no, I understand your
10 distinction.  So, the revenue -- so, when you were,
11 when you were providing your input into these Excel
12 spreadsheets, what kind of forecast was that providing?
13 Sales --
14     A.  Sales.
15     Q.  -- or revenue or both?
16     A.  Sales.
17     Q.  You didn't play any role in the revenue
18 forecasting for the northwest region?
19     A.  No.  There's a -- you could have derived
20 future revenues based on consulting sales and discount
21 drive to future margin and used that to forecast future
22 margins.  I don't know that anybody did that, but --
23     Q.  But now, of course, as you said before, if
24 you're -- if you have an opportunity, it includes an
25 opportunity for some component of license sales and

114

1  some future -- to be provided in the future consulting
2  services; correct?
3      A.  Yes.
4      Q.  So, some portion of any opportunity that you
5  were tracking would be, if sold, part of that quarter's
6  revenue?
7      A.  Yes.  But we only inputted -- provided input
8  for consulting.  We consulted on license revenues, but
9  the spreadsheets I put in -- actually, we did
10 forecast -- we did forecast software sales as well.
11     Q.  Within your consulting spreadsheet?
12     A.  Yes.
13     Q.  So, those spreadsheets then wouldn't
14 necessarily equate to how Oracle's publicly reporting
15 their numbers between license and consulting?
16     A.  Correct.
17     Q.  So, the forecasts that you're seeing, to the
18 extent you were seeing a forecast at the bottom --
19 forecasted number, we were talking about before that
20 after Rick Gage or some other supervisor took all of
21 your input, he would send you a copy of what he sent on
22 to Mike Underwood.  Is it your understanding that the
23 number there was just for consulting or would it have
24 included, then, some license sales?
25     A.  It would have been both.

115

1      Q.  Okay.  So, that number ultimately as it
2  works its way up Oracle would have been divided out for
3  purposes of forecasting?
4      A.  Yes.
5      Q.  Okay.  Do you know at what stage that would
6  happen?
7      A.  No.
8      Q.  And does Oracle -- did Oracle at the time
9  that you were there publicly forecast or give guidance
10 to the market about its bookings forecast?  Did it tell
11 the market, "Here's how much we think we're going to
12 book" as opposed to revenue or earnings guidance?
13     A.  No.
14     Q.  Okay.  All right.  Now, I wanted to switch
15 to any access to pipeline license sales information
16 that you have.  We talked about consulting.  I wanted
17 to talk to you about license sales.
18     A.  Okay.
19     Q.  So, first of all let's talk about conference
20 calls.  Did you -- I believe that you testified earlier
21 that you participated from time to time in conference
22 calls with the sales -- with the license sales
23 organization?
24     A.  Yes.
25     Q.  Okay.  And which license sales

116

1  organization's conference calls did you participate in?
2  When I say "which," I mean region or subregion?
3      A. It would have been the northwest. And
4  again, it would have been -- so, it would have been the
5  northwest region of the product sales.
6      Q. Okay. And how often would those conference
7  calls occur?
8      A. Once a week.
9      Q. And how many people typically would
10  participate in those calls?
11      A. 10, 20, 30. Because that would be both
12  product sales and consulting. So, you had -- both
13  audiences would attend those calls.
14      So, all of your peers in E-business
15  consulting would attend the calls?
16      A. Yes.
17      Q. As well as other apps consulting?
18      A. Yes.
19      Q. And then -- and then the sales reps for
20  license?
21      A. Yes.
22      Q. Okay. And was there an individual during
23  this time period that we've been talking about, spring
24  of 2000 to February 2001, an individual or individuals
25  who would lead those calls? Was there a supervisor or

117

1  somebody who would run those calls?
2      A. So, Glen Seninger ran those for the
3  southwest.
4      Q. For the southwest --
5      A. The south -- the southern portion of the
6  northwest territory. And then Jim Rooney for the
7  northern portion.
8      Q. And did you take part in Mr. Rooney's
9  conference calls, Mr. Seninger's, or both?
10      A. At various times both.
11      Q. When you say, "At various times, both," are
12  you -- at any one particular time one or the other? Is
13  that what you're saying? But it might have moved
14  around? Or were you taking part in both in any
15  particular quarter?
16      A. I don't remember if I did both.
17      Q. Okay. You don't remember?
18      A. Correct.
19      Q. Okay. And what was your understanding of
20  the purpose of these calls?
21      A. First would be to predict whether they were
22  going to hit their quarter or not. Second of all, to
23  schedule resources for the different sales activities
24  and prioritize resources.
25      Q. Okay. And in terms of predicting a quarter,

118

1  what input, if any, did you provide during these calls?
2      A. They would ask if -- my opinion on if the
3  deals were going to close or not. At times I had
4  better relationships with the customers than the
5  license sales guys. So, sometimes I would have a good
6  feel of whether I thought a deal was going to close and
7  how much it would close for.
8      Q. So, if I understand correctly, there might
9  have been a potential license sales opportunity that's
10  separate and apart from your E-business consulting
11  opportunity?
12      A. Yes.
13      Q. And you might know that customer and have
14  some input on whether you think they're really ready to
15  pull the trigger on purchasing the software or not?
16      A. Yes.
17      Q. Is that a fair characterization?
18      A. Yes.
19      Q. Okay. Now, what about the underlying
20  software license components of your E -- of your
21  E-business consulting package? Did you provide input
22  on that during those calls?
23      A. Yes.
24      Q. Did the salespeople have visibility into the
25  license components of your packages?

119

1      A. Yes.
2      Q. How would they get that?
3      A. Ideally it was a joint -- they were joint
4  sales calls.
5      Q. I see.
6      A. So, ideally we would have been, you know,
7  brothers in pursuit of those. And they would take
8  the lead and they would play more of a secondary role.
9      Q. I see.
10      A. And so, sometimes I would know a little bit
11  better what they were looking to buy and when they were
12  looking to buy by.
13      Q. But it was within their data? In other
14  words, they would -- whether it was -- whether you were
15  taking the lead or you were partnering, if there was a
16  license component to a potential opportunity of yours,
17  it would be reflected in their forecasting data?
18      A. Yes.
19      Q. Do you remember at any particular time
20  during the third quarter of 2001 any indications on
21  those calls about whether the northwest region was or
22  wasn't going to make its quarter?
23      A. I remember it looked grim for them on the --
24  on the product side.
25      Q. On the product side?

120

1    A. Yes.

2    Q. Okay. And what in particular -- do you

3  remember anything in particular, hearing

4  about any particular sales in particular?

5    A. Any sales that like weren't going to close

6  or --

7    Q. Any particular -- right. Do you remember

8  hearing about any particular problems arising that

9  caused pessimism on the call? Any particular sales

10  that were dropping out or that didn't look like they

11  were materializing?

12    A. Woodgrain Millworks was one. So, yes, there

13  were several deals that I was involved with. I can't

14  remember the names. There were several deals I was

15  involved with that slid into -- that either slid into

16  Q4 or we just lost.

17    Q. And do you remember at what point in time in

18  the quarter some of this, some of the grimness, as you

19  described, started to surface?

20    A. I remember there being a grimness at the

21  beginning of the quarter because of the bigger economic

22  situation.

23    Q. And was -- and as you understood it, was

24  the -- was the new realization or the view about the

25  probability of making these license sales, was that --

121

1  was the forecast that license sales was preparing, was

2  that being updated to reflect the new reality?

3    A. Yes.

4    Q. Okay. You didn't have any indication

5  anybody was holding back on that information?

6    A. No.

7    Q. Okay. So, to the extent that it was at the

8  beginning of the quarter, then by the end of December

9  or January, a month into the quarter, some -- the

10  attitudes or the concerns that you were hearing raised

11  were being reflected in the forecasts that were being

12  updated and sent up the chain of command; correct?

13    A. Yes.

14    Q. Now, did you have access to any -- other

15  than the calls, did you have access to any data? Like

16  in consulting you reviewed Excel spreadsheets, you both

17  had input into them and then would get updated ones

18  from time to time. Did you receive the same from the

19  sales organization in the northwest?

20    A. Periodically I would get a dump of all of

21  the sales, of the sales pipeline. And I would go

22  through there and look for deals that I might be able

23  to attach myself to in the consulting business.

24    Q. Now, when you say a "dump," what does that

25  mean?

122

1    A. Just a -- you know, just a report of the

2  pipeline tool showing everything within our region, all

3  the deals, what their probability was, what the -- how

4  big they were.

5    Q. Within the northwest region?

6    A. Yes.

7    Q. Okay. And how often would you get that?

8    A. At least once a month. Sometimes once a

9  week.

10    Q. And did you receive that electronically?

11    A. Yes.

12    Q. Somebody would send it to you as an

13  attachment or --

14    A. Yes.

15    Q. And did you perform any tasks similar to

16  consulting? Did you provide any input or updating of

17  that data?

18    A. Not -- no.

19    Q. Right.

20    A. Not other than during the phone call we

21  would have.

22    Q. Okay. So, you -- so, in that sense, you

23  didn't play any role in the forecasting process for

24  license sales other than what you described, that it

25  could have some impact on license sales, other than the

123

1  consulting work that you did might have some impact on

2  license sales?

3    A. I believe that in our spreadsheet at times

4  we would not just reflect consulting, we would also

5  reflect licensing. And so that licensing information,

6  if not already in the licensing pipeline, would have

7  gone into the licensing and created new entries in

8  the -- in that pipeline.

9    Q. I see. So -- right. And that's what you

10  had described before.

11    A. Yes.

12    Q. So, to the extent there was a license

13  component to your consulting sales work, that -- your

14  understanding is one way or another that would get fed

15  into the license sales forecast?

16    A. Yes.

17    Q. Okay. But you personally, when you -- when

18  you received this dump of pipeline information, you

19  didn't have any -- it wasn't your job to update it in

20  any way?

21    A. Correct.

22    Q. So, if you saw a license, a potential

23  license deal that you knew was connected to some deal

24  that you were working on, that information would be

25  input through the consulting work that you did and not

124

1  directly by you in getting the license information?
2      A.  Correct.
3      Q.  Okay.  And other than the data that you
4  received that would show the license pipeline
5  opportunities, did you have any other access to
6  information, any other access to license sales pipeline
7  information?
8      A.  No.
9      Q.  Did you have any access to -- have you ever
10  heard of Oracle Sales Online?
11      A.  Yes.
12      Q.  Okay.  What is that?  What is your
13  understanding of what that is?
14      A.  So, that's a tool that the sales guys were
15  supposed to use to enter in their deals, their
16  forecasts, provide updates.  And it had a reporting
17  component out of it that actually would have created
18  that dump that I talked about.
19      Q.  So, your understanding is OSO generated the
20  dump that you -- that you received electronically?
21      A.  Right.  It didn't really seem to work.  So,
22  I don't know exactly where that dump came from, if that
23  came from OSO or if it came from a spreadsheet that,
24  you know, somebody was doing offline.
25      Q.  I see.  You're not sure?

125

1      A.  Correct.
2      Q.  You did not personally have direct access
3  into OSO?
4      A.  I think I did.  I think I did.
5      Q.  You could -- you actually could access OSO
6  and go in directly?
7      A.  And do reports.
8      Q.  I'm sorry?
9      A.  And do reports.
10      Q.  What -- I don't know what you mean.
11      A.  I could do a dump, do my own dump.
12      Q.  Of your information?
13      A.  Of information from my -- so, again, OSO was
14  a -- was a product.  So, I could go in and do a dump
15  for my region.  I don't ever -- I don't ever remember
16  doing that.
17      Q.  You never recall doing that actually?
18      A.  Correct.
19      Q.  Okay.  Did you have access to look at the
20  other data that was in OSO at any particular point in
21  time?  In other words, could you access OSO?  You said
22  you could make a report, although you don't remember
23  doing it.  But could you otherwise just go into OSO and
24  say, "Oh, I want to see what northwest region is up
25  to"?

126

1      A.  I could have done that, yes.  I don't
2  remember ever doing that.
3      Q.  So, your recollection sitting here today is
4  the only -- the vehicle through which you received data
5  was this data dump that you received electronically
6  from the license organization?
7      A.  Yes, in addition to the teleconferences we
8  would have where we would --
9      Q.  I was talking about like data that's
10  actually, you know, either electronically -- I
11  understand that there were oral communications.
12      A.  Yes.
13      Q.  But other than -- I'm just now trying to
14  talk about either your access to data that you used or
15  relied upon that -- strike that.
16      I just want you to focus -- I just want you
17  to focus your answer on data that you either reviewed
18  or had access to within Oracle.  And so, I'm just
19  trying to be sure I understand your answer, that the
20  only data that you recall reviewing from license sales,
21  the only pipeline data is this data dump that you
22  received on a monthly basis?
23      MR. BRITTON:  Objection to form,
24  mischaracterizes testimony.
25      THE WITNESS:  Correct.  So -- but again,

127

1  when we would -- so, yes, I had access to the Oracle
2  Sales Online dumps.  Additionally, when we would walk
3  through those sales pipeline calls, you would see that
4  same data presented there.  Different format, but --
5      Q.  (BY MR. RUBIN)  You would hear it being
6  presented, you mean?  You mean when you walked through
7  it on the telephone calls?
8      A.  Yes.  I thought we had -- I thought we would
9  also be able to view that information at times.  There
10  would be a -- it seems like we had view information, we
11  weren't just hearing them audibly.  We also were seeing
12  that visually.  I don't know if we had -- I don't
13  remember what technology we had to share presentations,
14  but it seemed like, it seemed like I remember being
15  able to see that data as well.
16      Q.  So, your recollection is through some means
17  or another some data was sent to you that would
18  accompany the conference calls?
19      MR. BRITTON:  Objection.
20      THE WITNESS:  Yes.
21      Q.  (BY MR. RUBIN)  Okay.  But you have no
22  memory of actually directly accessing Oracle Sales
23  Online to get the data?
24      A.  Correct.
25      Q.  All right.  And then you had indicated I

128

1  think earlier that in terms of other input you had
2  about trends and the status of license sales, that you
3  spoke to individuals outside of your region?
4  A. Yes.
5  Q. And you had a specific memory of talking to
6  a couple of people in San Francisco?
7  A. Yes.
8  Q. And who were those individuals?
9  A. I don't remember.
10  Q. Okay. And do you remember the time period
11  in which you spoke to them?
12  A. It would have been in that 2001 time period.
13  Q. Do you remember whether any particular
14  customers were discussed?
15  A. No.
16  Q. Other than those conversations, what other
17  conversations do you recall, if any, with any sales --
18  license sales reps outside of your region on Oracle's
19  performance during the -- during this time period?
20  A. So, I would have conversations with product
21  sales guys as well, just, you know, from -- used to
22  work together, you know, as I moved from territory to
23  territory. So, just those kinds of conversations with
24  prices -- with product sales guys.
25  Q. And were the two guys in San Francisco, were

129

1  they consulting sales or product sales?
2  A. Consulting.
3  Q. Those two were consulting?
4  A. Yes.
5  Q. Okay. Did you ever have any conversations
6  with anybody in license sales outside of the northwest
7  region during this time period?
8  A. No.
9  Q. Okay. And now, within the region you said
10  you had talked to individuals who were responsible for
11  license sales, product sales --
12  A. Yes.
13  Q. -- right? Because you would partner with
14  them from time to time.
15  A. Right. So, I had -- I had visibility to
16  their pipeline via dialog and the dumps.
17  Q. Right.
18  A. Separately I would just occasionally talk to
19  people within the northwest region, but not within
20  my -- so, if I was in the north region, I would talk to
21  people in the south region.
22  Q. The southwest region we had discussed?
23  A. Yes.
24  Q. Okay. And do you remember any specific
25  conversations during this time period with people in

130

1  the southwest region?
2  A. No, not specific conversations.
3  Q. You had indicated I believe that for Q1 and
4  Q2 of 2001 that you personally exceeded your own
5  quotas; is that right?
6  A. Yes.
7  Q. And you received a healthy bonus one of
8  those quarters; right?
9  A. Yes.
10  Q. Which quarter was it that you received a
11  bonus?
12  A. I received a bonus both quarters. I believe
13  it was in Q2 that I got a relatively big one.
14  Q. And who were your principal customers that
15  you can recall during Q2?
16  A. There was a -- there was a company, Aquia,
17  A-q-u-i-a.
18  Q. Not Ikea?
19  A. Correct.
20  Q. All right.
21  A. It's a Spanish word for something.
22  Aqui.com. Aqui, that was it.
23  Q. Aqui.com?
24  A. We sold a roughly $2,000,000 consulting
25  deal.

131

1  (Cell phone.)
2  THE WITNESS: Sorry about that. So, it was
3  roughly a $2,000,000 consulting deal with Aqui.com.
4  Q. (BY MR. RUBIN) What kind of work did they
5  do?
6  A. They never did anything.
7  Q. Would they fairly fall within the venture
8  capital dotcom category?
9  A. Yes, they spent virtually all their money
10  with us and never got any money to run their company.
11  Q. And that was in the second quarter of '01,
12  you believe?
13  A. Yes.
14  Q. So, that was -- that was a large deal from
15  your perspective?
16  A. Relatively, yes.
17  Q. Okay.
18  A. So, there was that and then there was a
19  company called Deals.com, which is now Overstock,
20  that was a Q1, Q2 deal that closed.
21  Q. Okay. And that was a dotcom -- that was a
22  company that you would fairly describe as a dotcom
23  also?
24  A. Yes. And I believe we sold -- that's all I
25  remember.

132

1       Q.  Okay.  So, in Q2 '02, would it be fair to
2   say you exceeded your performance expectations;
3   correct?
4       A.  Yes.
5       MR. BRITTON:  Objection to form.  '01, you
6   mean?
7       MR. RUBIN:  Q2 -- did I say '02?
8       MR. BRITTON:  Yes.
9       Q.  (BY MR. RUBIN)  Q2 '01.
10      A.  Yes.
11      Q.  And the same was true in 2001?  The first
12  quarter of 2001 you exceeded your quota?
13      A.  I don't know that I exceeded it in Q1
14  proper.  By the end of Q2, I exceeded both my Q2 number
15  and my H1 number.  I don't specifically remember Q1.
16      Q.  I see.  So, you exceeded your half-year
17  number?
18      A.  Yes, and -- yes.
19      Q.  And what percentage of your business during
20  the first two quarters of '01, if you have any -- if
21  you have any sense sitting here today, was dotcom
22  compared to other?
23      A.  Mine was pretty high because of the Aqui.com
24  deal.  60, 70, 80 percent of mine was dotcom related.
25      Q.  Okay.  And what about your pipeline going

133

1   into the third quarter?  Do you know how much of it was
2   dotcom?
3       A.  I don't remember any dotcom deals in Q3.
4       Q.  You don't remember anticipating any or
5   any -- I'm talking about any that would have been in
6   your pipeline at the closing?
7       A.  I don't remember anticipating any.
8       Q.  And obviously that information, then, would
9   have been reflected in the forecasting information that
10  you conveyed; correct?
11      A.  Yes.
12      Q.  And do you remember for your region as a
13  whole how much dotcom was in the pipeline going into
14  the third quarter or was anticipated?
15      A.  No, I don't.
16      Q.  Do you have any memory of believing at the
17  time that the northwest region -- that the northwest
18  region had -- well, let me take a step back.  Did
19  you -- you had said before that you were not involved
20  in -- you did not work with Rick Gage or Mike Underwood
21  in developing an actual forecast for consulting that
22  was passed on up the chain of command; is that right?
23      A.  Correct.
24      Q.  Did you actually see -- even though you
25  weren't involved in developing it, did you actually see

134

1   the forecast that was being passed up in the beginning
2   of each quarter, see the numbers?
3       A.  We would see the number for -- I would see
4   the number for Rick's level.  I would not necessarily
5   see the number for Mike's level.
6       Q.  Okay.  Because Mike's obviously included
7   other components?
8       A.  Yes.
9       Q.  Right.  So, you would see the level for Rick
10  and his direct reports, which included you?
11      A.  Yes.
12      Q.  Right.  And do you have any memory of
13  believing that any information that Rick was passing on
14  to Mike was incorrect or inaccurate?
15      A.  No.
16      Q.  Would you have brought that to his attention
17  if you thought it was?
18      A.  Yes.  I wouldn't have -- so, yes, if I would
19  have known, yes, I would.
20      Q.  Right.  I mean, if you would have seen
21  something that you thought was --
22      A.  Yes.
23      Q.  -- materially off, you would have alerted
24  him to it?
25      A.  Yes.  I mean, I hesitate because the guys I

135

1   was -- if they're worried about their job, they would
2   project a more rosy future, you know.  So, I remember
3   sometimes that happening.
4       Q.  Do you remember for the third quarter?
5       A.  No.
6       Q.  Okay.  And that's what I was asking, if you
7   thought that something was so rosy that it was
8   materially unattainable or off or was going to mislead
9   others, you would have said something?
10      A.  Yes.
11      Q.  And you don't remember giving any such
12  feedback?
13      A.  Correct.
14      Q.  All right.  Now, let me ask you about, did
15  you ever -- during your entire time at Oracle, did you
16  ever see a global forecasting report for any particular
17  quarter?
18      A.  No.
19      Q.  So, it would be fair to say, then, as to any
20  particular columns or categories of information on a
21  global report, you wouldn't know what they are because
22  you never saw one?
23      A.  Correct.
24      Q.  Okay.  I think that Mr. Britton had asked
25  you earlier whether you ever used or accessed Oracle's

136

1  internal CRM database system.  And I believe your
2  answer is you had not.  That wouldn't have been
3  something that you would use; correct?
4      MR. BRITTON:  Objection, form.
5      THE WITNESS:  That's correct.
6      Q.  (BY MR. RUBIN)  Okay.  And Mr. Britton had
7  spoken before about this call from the investigator,
8  which I want to ask you about in a few minutes.  But do
9  you remember him asking you anything about your use or
10  access of CRMs, of a CRM database pipeline system at
11  Oracle?  Do you remember that subject coming up?
12      A.  No.
13      Q.  But sitting here today, you wouldn't -- you
14  would not have ever described a system that you had
15  access to as a CRM pipeline database system; would you?
16      MR. BRITTON:  Objection to form.
17      THE WITNESS:  So, I mean, the sales force
18  automation tool that you talked about, that's really
19  part of the CRM suite.  So, yes, I had -- I had access
20  to it.
21      Q.  (BY MR. RUBIN)  But you didn't use it?
22      A.  I don't remember using it.
23      Q.  Did you tell the investigator that you used
24  it?
25      A.  I don't remember telling him that.  I don't

137

1  remember using it.  So --
2      Q.  So, it would be -- it would be unlikely that
3  you would have told him you used it if you don't have
4  any recollection of using it?
5      MR. BRITTON:  Objection to form.
6      THE WITNESS:  Correct.
7      Q.  (BY MR. RUBIN)  And this -- and this system
8  that we talked about, we're talking about Oracle Sales
9  Online; correct?  Is that the database that you're
10  referring to --
11      A.  Yes.
12      Q.  -- that would have been a part of CRM?
13      A.  Yes.
14      Q.  That only contained license sales, not
15  consulting; correct?
16      A.  I don't know if it contained consulting or
17  not.  I know they had talked about it and were trying
18  to get it in.  Whether they actually got it in or not,
19  I don't -- I don't know.
20      Q.  Did you ever use it for consulting for --
21  well, let me strike that.
22      You don't -- your answer is sitting here
23  today, you don't whether it actually ever contained
24  consulting information?
25      A.  Correct.

138

1      Q.  When you say they talked about it, was that
2  being discussed at the end of your tenure at Oracle?
3      A.  It had been discussed for a year about
4  getting the consulting into the Sales Online tool as
5  well.
6      Q.  But I gather since you don't remember ever
7  accessing it for any purpose, you didn't -- it would be
8  fair to say you didn't access it for consulting either,
9  for consulting numbers either?
10      A.  Correct.
11      Q.  You had -- I wanted to talk to you about
12  Suite 11i.  What is your understanding of what the
13  Suite 11i product at Oracle was at the time you were
14  there?
15      A.  It was an upgrade to Oracle's ERP suite.  It
16  included a bunch of CRM stuff.  It included, you know,
17  an Internet component to it, a web-based access, which
18  was really where the "i" came from.  And like all new
19  Oracle application releases, it was pretty problematic.
20      Q.  Okay.  And tell me in particular what you --
21  what you know about any problems that Suite 11i had.
22  Well, let me back up before I ask you that.  Do you
23  remember when Suite 11i was rolled out or first
24  introduced by Oracle?
25      A.  I do not.

139

1      Q.  Do you remember a general time period?  '98?
2  '99?  2000?  2001?
3      A.  I would say late '99, early 2000.
4      Q.  All right.  And tell me what you understand
5  to have been the problems with Suite 11i when it was
6  introduced.
7      A.  The order management didn't work, couldn't
8  get it to work.
9      Q.  Was that an ERP product?
10      A.  Yes.
11      Q.  Okay.
12      A.  Couldn't get it to work, couldn't get
13  support to help us get it to work -- to work.  And the CRM
14  component did not work either.
15      Q.  And you said like other Oracle products that
16  there -- that there was -- there were some initial
17  problems at the time that it was introduced.  Had that
18  been your experience with other products that Oracle
19  had introduced when it was initially rolled out?
20      A.  Yes.
21      Q.  Okay.  And is that your understanding of
22  a -- is it your understanding that software of this
23  sort generally has initial problems when it's first
24  introduced?
25      A.  Yes.  I think -- I think 11i had a greater

140

1 number of problems than we were used to seeing.  Being
2 the consultants, we would see the problems, you know,
3 with all of the releases.  11i seemed especially
4 problematic.
5     Q.  And did you -- and can you tell me any
6 specific customers that you recall Suite 11i
7 implementation issues with?
8     A.  Ultradent, a dental company down in Salt
9 Lake City.
10     Q.  Okay.
11     A.  I can't remember the names of the other
12 companies.
13     Q.  And what is your understanding, if any, of
14 the specific problem that Ultradent had with respect to
15 Suite 11i?
16     A.  We couldn't get order management to work.
17 We couldn't get it to process, to take orders into the
18 system and create manufacturing orders and
19 manufacturing schedules and those kinds of things.
20 That was the primary issue with --
21     Q.  And did Oracle consultants -- were Oracle
22 consultants called upon to work on the problem?
23     A.  Yes, we were doing the implementation of
24 Suite.  So, we were -- we couldn't even finish our job because
25 it wouldn't work.

141

1     Q.  So, did you play a specific role in that
2 implementation?
3     A.  I sold the deal and was the account manager.
4 So, yes, I was involved with the customer being upset,
5 disappointed.  We had to give them consulting -- free
6 consulting because our consultants basically had to
7 troubleshoot the application.  And so, we had to
8 basically do that work for free.
9     Q.  And when consultants do work for free, whose
10 numbers does that come out of?  Consulting's or
11 license?
12     A.  It depends.  Sometimes it came out of our
13 consulting numbers and sometimes the product guys would
14 actually give us money back and -- you know, because we
15 lost revenue basically on the consulting end, they
16 would give us money from the -- from their products.
17     Q.  How was that determined?
18     A.  You would submit an account and an estimate
19 of the amount of non-billable hours.  And then they
20 would -- they set aside this pool of money to, you
21 know, to address those situations.  And then you would
22 get some amount of that, you would recover basically
23 some amount of that revenue from the product guys.
24     Q.  And did the Ultradent order management
25 problem get resolved ultimately?

142

1     A.  Yes.
2     Q.  And so, they went live with order management
3 ultimately?
4     A.  Yes.
5     Q.  And do you remember when that was?
6     A.  No.
7     Q.  Okay.  What other specific Suite 11i
8 problems do you recall?
9     A.  I can't remember the names of the companies.
10     Q.  Okay.  Do you -- did you have any
11 understanding of the internal rating system that Oracle
12 technical support folks used for rating the severity of
13 a bug or a problem?
14     A.  I sort of remember it.  There were like
15 priority -- you would call in a ticket and there would
16 be priority 1 tickets -- I'm pretty fuzzy on that
17 rating system.
18     Q.  Okay.  So, you don't remember how one would
19 describe priority 1 as opposed to priority 2 as opposed
20 to priority 3 or priority 4?  Do you know what the
21 guidelines were or the distinctions between the
22 different ratings?
23     A.  I believe priority 1 meant that a system in
24 production was down and not operational and that
25 priority 2 would be -- so, during an implementation

143

1 before you went live, you couldn't have a priority 1
2 issue.  You'd have to go through some escalation
3 process because you weren't live yet but it was
4 preventing you from going live.  So, that was -- that
5 was a significant effort for us was to get things into
6 some magic priority status so that we could get folks
7 to look at it so that we could actually take the
8 customer live.  So, there was a significant amount of
9 effort around that.  The exact rating system I don't
10 remember.
11     Q.  And did you -- do you understand the term
12 "integrated" as it relates to Oracle applications,
13 Suite 11i in particular?
14     A.  Depending on the context, I guess.
15     Q.  Well, what would your understanding of the
16 term be in the context of Suite 11i?
17     A.  So, the term "integration" would be
18 integration between the financials and your
19 manufacturing system and between your E-commerce and
20 your financials and your manufacturing system.
21     Q.  So, the different modules and their ability
22 to communicate?
23     A.  Yes.
24     Q.  Is that fair to say?
25     A.  Yes.

144

1    Q.  And do you recall any of the Suite 11i, I
2  mean any 11i problems that you encountered?  Putting
3  aside you don't remember any other customers other than
4  Ultradent, specifically were you ever told that the
5  problem specifically related to an integration problem?
6    A.  Order entry would have been the integration
7  problem.
8    Q.  At Ultradent?
9    A.  Yes.
10    Q.  Okay.  And what did you understand the --
11  what did you understand the integration problem to be?
12    A.  That order entry was not fully integrated
13  with the financials and not fully integrated with
14  manufacturing.
15    Q.  And what did you understand that the
16  consulting team did to resolve that?
17    A.  It was always a combination of you work on
18  support, you know, you beat up support until they
19  finally, you know, find a fix for you.  And in
20  parallel, you just change the configuration of order
21  entry until it works.  Basically you -- ERP has a bunch
22  of just little switches, software switches.  So, you
23  just flip switches until you find some combination that
24  allows now an order to integrate through and pass into
25  financials or manufacturing.

145

1    Q.  And that kind of alteration of the switches
2  for customization purposes is not unusual, is it, for
3  when you bring in a product to a company?
4    MR. BRITTON:  Objection.
5    THE WITNESS:  That is not unusual.
6    Q.  (BY MR. RUBIN)  And did you have any reason
7  to believe that the Suite 11i system was not designed
8  to be interoperable?  I know you've discussed at this
9  particular company that there were some switches that
10  needed to be changed.  But in terms of its design, do
11  you have any reason to believe sitting here today that
12  Suite 11i wasn't designed to be integrated and
13  interoperable?
14    MR. BRITTON:  Objection, foundation.
15    THE WITNESS:  I do not have any knowledge of
16  it not being designed.
17    Q.  (BY MR. RUBIN)  Okay.
18    (Reporter clarification.)
19    Q.  (BY MR. RUBIN)  Did you understand that the
20  Suite 11i modules used a common data scheme?
21    A.  Yes.
22    Q.  And do you understand whether it used a
23  single database?
24    A.  I don't remember.
25    Q.  Do you know whether it was constructed with

146

1  the same computer language?
2    A.  I don't know.
3    Q.  Okay.  So, other than Ultradent, do you have
4  any other specific recollections of any particular
5  Suite 11i implementation problem?
6    A.  No.
7    Q.  Do you recall other customers going live
8  with some portion of Suite 11i while you were at
9  Oracle?
10    A.  Yes.
11    Q.  Do you remember any of those customers?
12    A.  No.
13    Q.  Do you remember how long it took at
14  Ultradent to resolve the order management issue?
15    A.  A couple months.
16    Q.  Okay.  Now, I wanted to ask you about some
17  of the responses that you had provided to Mr. Britton
18  in terms of the trending, the sales trending that you
19  had commented on.
20    A.  Okay.
21    Q.  Did you ever yourself, sort of separate and
22  apart from the numbers that were being produced by
23  license sales, did you ever yourself go back and do any
24  metrics of year over year or quarter compared to
25  quarter to analyze any trending analysis?

147

1    A.  No.
2    Q.  When the investigator -- when you talked to
3  the investigator, did you have any numbers or
4  quantitative data in front of you when you were
5  speaking to him?
6    A.  I certainly didn't have any analysis in
7  front of me.  I probably had a better mental
8  recollection.
9    Q.  You had indicated, I think earlier that you
10  said that your conversation with the investigator was
11  "off the cuff."  What did you mean by that?
12    A.  It was a casual -- I was providing -- it was
13  a less formal setting than today's.  So, it was a -- it
14  was a less formal response and just a less formal
15  setting, a less formal, you know, set of -- less
16  thoughtful than this setting.
17    Q.  And when you say, "less thoughtful," you
18  mean you were less careful about what you were saying?
19    MR. BRITTON:  Objection to the form.
20    THE WITNESS:  Yes.
21    Q.  (BY MR. RUBIN)  Okay.
22    MR. RUBIN:  Why don't we go ahead and switch
23  the tapes.  I probably only have about 15 more minutes.
24    THE VIDEOGRAPHER:  This is the end of tape
25  No. 4 at 13:58 of the deposition of Kelly Wood.

148

1    (Recess held.)
2    THE VIDEOGRAPHER:  This is the beginning of
3    tape No. 5 of the deposition of Kelly Wood.  The time
4    is 14:02.
5    Q.  (BY MR. RUBIN)  Okay, Mr. Wood, do you -- in
6    terms of the -- we're still on the topic of the trends
7    that you spoke to the investigator about -- or that you
8    responded to Mr. Britton about.  Do you remember
9    observing a significant decline in sales starting the
10   summer of 2000?
11   A.  Yes.
12   Q.  Okay.  And when you say, "Yes," tell me what
13   specifically you recall.
14   A.  That's when the news really started to hit.
15   It was really kind of in the spring of 2000 that, you
16   know, you started to read more and more about dotcoms
17   struggling.  And by summer, you know, there was fewer
18   and fewer and fewer dotcoms --
19   Q.  What about --
20   A.  -- in our pipeline.
21   MR. BRITTON:  Let him finish his testimony.
22   (Reporter clarification.)
23   Q.  (BY MR. RUBIN)  Now, when you say --
24   MR. BRITTON:  Are you finished with your
25   testimony?

149

1    THE WITNESS:  There were fewer dotcoms in
2    our pipeline.  You know, the technology psychology was
3    starting to take effect.  And so, from my perspective,
4    yeah, I saw -- I saw a decline in business pipeline.
5    Q.  (BY MR. RUBIN)  Okay.  So, when you say --
6    that's what I want to focus on.  First we're talking
7    about the northwest region when you said "my area" or
8    "my sector" or whatever word you used; correct?
9    A.  Yes.
10   Q.  That's what -- we've talked for about four
11   hours now.  That's what you had visibility into;
12   correct?
13   A.  Yes.
14   Q.  Not any other region of the country?
15   A.  Correct.
16   Q.  And not the entire west even?
17   A.  Yes.
18   Q.  Is that correct?
19   A.  Yes.
20   Q.  Right.  So, in terms of the northwest, what
21   specific -- what do you recall, what specifically do
22   you recall seeing in Oracle's pipeline numbers that
23   indicate to you there was a significant decline in
24   sales?  Do you remember any specific numbers?  Do you
25   remember any quantitative data that caused you to reach

150

1    the conclusion that there was a significant and deep
2    decline in sales in 2000, summer -- starting in the
3    summer of 2000?
4    A.  So, my impression came from A, seeing a
5    decline in my pipeline and B, listening to the calls
6    where we talked about product pipeline and C, just
7    dialog with peers and friends in other parts of
8    Americas.
9    Q.  And when you say, "A decline in pipeline,"
10   were you using as a benchmark -- or what were you using
11   as a benchmark?  The quarter before or the year before?
12   A.  Our ability to hit that upcoming quarter's
13   numbers.  So, at Oracle we never really worried about
14   what we did last year, from a -- you know, at our
15   level, the quarter-by-quarter trending was never -- we
16   never worried about that.  We just worried about our
17   ability to hit this quarter.  And with all of those
18   different channels it was just becoming more and more
19   obvious to me that we weren't going to hit our numbers.
20   Q.  So, in terms of -- so, what you're saying is
21   that when you talk about a deep decline, you're not
22   talking about a deep decline in Q2 '01 compared to Q2
23   '00, for example?  That's not the benchmark you were
24   using?
25   A.  Correct.

151

1    Q.  Okay.  When you talked about it trending
2    downward, you're talking about the increasing
3    difficulty of making the forecasted numbers?
4    A.  Yes.
5    Q.  Okay.  And now, for Q1 and Q2, did your
6    quota for your own sales get reduced to reflect the
7    emerging challenges?
8    A.  No.
9    Q.  Because, of course, as you had said earlier,
10   you had exceeded your quota for both the first quarter
11   and the second quarter; right?
12   MR. BRITTON:  Objection to form,
13   mischaracterizes testimony.
14   THE WITNESS:  I exceeded my Q2 and my H2
15   number.  I don't remember if I exceeded my Q1 number.
16   Q.  (BY MR. BRITTON)  Oh, okay.  So, you
17   exceeded your Q2 number and your H1 number?
18   A.  Yes.
19   Q.  And so, when you talk about -- just so I
20   understand, when you talk about trending or a decline,
21   are you expressing that there was -- qualitatively it
22   was more difficult to exceed your numbers in the second
23   quarter?
24   A.  Again, from my perspective -- so, my
25   personal perspective came from I had a couple of

152

1  dotcoms that came in that spent money and allowed me to
2  make my quarter.  But the rest of my pipeline was
3  significantly decreasing.  So, if you take what we call
4  the "bluebirds" out, you know, you just got lucky and
5  this guy came through and he's going to spend money
6  with you.  If you take the bluebirds out, right, and
7  you look at the more, the non-bluebird business, you
8  know, yeah, it was -- it was not trending well.
9      Q.  And you were -- and then as it was trending
10  down, you were pulling those -- had to pull those
11  opportunities out of the pipeline as the quarters -- or
12  as the year progressed?
13      MR. BRITTON:  Object to the form.
14      THE WITNESS:  Yes.
15      Q.  (BY MR. RUBIN)  So, the pipeline was
16  shrinking?
17      A.  Yes, my future pipeline was shrinking.
18      Q.  Right.
19      A.  And in addition to these other calls that I
20  was on, I could see other people's pipelines, you know,
21  being affected very significantly.
22      Q.  Now, do you have any sense of whether your
23  region was more affected -- I think that this was
24  something you spoke to before -- whether it was
25  disproportionately affected by the dotcom phenomenon

153

1  compared to other parts of the country?
2      A.  We would have been less affected by the
3  dotcom than certainly the southwest region and --
4      Q.  Of the west?
5      A.  Yes, and the east region -- the eastern
6  region.  There was a lot more dotcoms in California, a
7  lot more dotcoms in the east coast than there was in
8  the northwest portion.
9      Q.  What about other parts of the country?  Do
10  you have any sense one way or another whether you would
11  be -- you would have been more or less affected by the
12  dotcom issues?
13      A.  No.
14      Q.  And again, you say you observed some
15  shrinking pipelines in both license sales and in
16  consulting; is that right?
17      A.  Yes.
18      Q.  And that was all being reflected in the
19  forecasting that was being -- that was being generated
20  up to corporate management; correct?  If you know.
21      A.  I can only say about mine.  My hesitation is
22  at Oracle, if you're in a sales position at Oracle, you
23  were always reluctant to say you weren't going to hit
24  your number because --
25      (Reporter clarification.)

154

1      THE WITNESS:  -- you would get fired.  So,
2  whether that was truly being reflected in the -- in the
3  pipeline or not was -- I can't say for sure.
4      Q.  (BY MR. RUBIN)  You can't say -- you can
5  say for you, you were reflecting it?
6      A.  Yes.
7      Q.  Okay.  And as far as you knew, your fellow
8  consulting peers were or were not?
9      A.  I -- I couldn't say.
10      Q.  Okay.  I thought -- I thought you had said
11  earlier that you did not at the beginning of the third
12  quarter believe -- or you didn't observe, you don't
13  recall observing any material discrepancy between what
14  you thought the forecast should be and what the numbers
15  that were being reported out should be.
16      MR. BRITTON:  Objection to form.
17      Q.  (BY MR. RUBIN)  Is that -- is that accurate?
18      A.  So, as far as I knew, the numbers that were
19  being forecasted were correct.  But knowing my peers
20  like I did, I couldn't testify to the accuracy of it.
21  Given the consequences, I don't know how accurate the
22  data was.  And certainly in the past I had been liberal
23  with my -- as a sales guy, you're always a half full --
24  the glass is half full guy.  And so, yeah, we were
25  always prone to being overly optimistic about the

155

1  chances of closing a deal, especially in light of
2  Oracle's culture.  You had to be.  So, given that
3  background, yeah, I think -- I think there was doubt of
4  the accuracy of the -- of the numbers being pushed up.
5      Q.  Was there a phenomenon at Oracle because of
6  those pressures that people wanted to be sure that
7  their -- that their forecast was low enough that they
8  would make it?
9      A.  Yes, people would sandbag.  So, yes, people
10  would sandbag.
11      Q.  That's what I was asking.
12      A.  People would forecast this knowing -- hoping
13  that they would come in here.  But also, you had to
14  forecast a certain amount or you'd lose your job;
15  right?  If you forecasted nothing, then you were in
16  jeopardy of losing your job.  So, there was -- there
17  was -- there was upper and lower pressure.
18      Q.  So, and those pressures would then push you
19  in opposite directions; correct?
20      A.  Yeah, depending if you were at the bottom,
21  there's pressure pushing you up.  If you were at the
22  top, it was -- and then the external pressures were
23  always pressuring you to go up, right.
24      Q.  And in fact, isn't it your memory that prior
25  to 2001 Oracle was exceeding its forecasts by

156

1  substantial amounts globally?
2     A.  Yes.
3     Q.  And would you attribute some of that
4  phenomenon to people lowballing or sandbagging?
5     A.  You know, I couldn't say.
6     Q.  Okay.  But you do recall Oracle exceeding
7  its forecast by substantial amounts prior to 2000 -- FY
8  2001?
9     A.  Yes.
10    Q.  And that had been a pattern that Oracle
11 management had seen quarter after quarter?
12       MR. BRITTON:  Objection to form.
13       THE WITNESS:  Yes.
14    Q.  (BY MR. RUBIN)  And is it your memory that
15 in the first quarter of 2001 Oracle globally made its
16 earnings forecast?
17    A.  I don't remember.
18    Q.  Okay.  Do you remember the second quarter?
19    A.  No.
20    Q.  So, aside or separate and apart from what
21 you've -- what you described about the input that you
22 received that caused you to conclude there was some
23 decline in sales starting in the summer of 2000, did
24 you ever perform -- do you have any other metrics that
25 you could point me to to support your conclusion that

157

1  you did at the time or did later to support that
2  conclusion?
3        MR. BRITTON:  Objection.
4        THE WITNESS:  I'm sorry?  Support --
5     Q.  (BY MR. RUBIN)  Any other quantitative
6  metrics?  Do you have in your mind any other numbers
7  that you were looking at at the time that led you to
8  the conclusion that there was a decline in sales
9  beginning in the summer of 2000 in the northwest
10 region?
11    A.  So, other than my personal forecast and the
12 calls that I listened to --
13    Q.  Right.
14    A.  -- and the, you know, the indirect dialog --
15 or the dialog I would have with my peers, no.
16    Q.  Okay.
17    A.  Nothing outside of that.
18    Q.  Now, were all of the consulting sales
19 triggered by product sales at Oracle?
20    A.  No.
21    Q.  Explain.
22    A.  An upgrade from version X to version Y would
23 not necessarily require product sales.  That could just
24 require consulting.  Or they say, "We're going to go
25 develop this new application."  That would be

158

1  consulting resources, not necessarily product resources
2  and product licenses.
3     Q.  And did you sell any consulting engagements
4  that dealt with those types of services that didn't
5  involve sale of an Oracle product?
6     A.  Yes.
7     Q.  And what, if anything, do you recall about
8  the demand for 11i itself in the second or third
9  quarter of fiscal year 2001?
10    A.  It -- 11i had a -- was starting to get a
11 reputation, I believe in about that time frame, that it
12 was a difficult -- it was not completely -- that it was
13 very buggy.  So, it was starting to get a reputation
14 and customers were hearing that and were becoming leery
15 of or were nervous about 11i.
16    Q.  Do you recall any particular customer?  Do
17 you recall learning whether there was any particular
18 customer who canceled or delayed a sale because of
19 concerns about Suite 11i?
20    A.  I cannot remember specific companies.  I
21 can't remember specific companies.
22    Q.  Okay.  So, your testimony about leeriness or
23 concern is based upon the conversations that you had
24 with others during your time at Oracle?
25       MR. BRITTON:  Objection to form.

159

1        THE WITNESS:  Conversation with customers --
2     Q.  (BY MR. RUBIN)  Okay.
3     A.  -- during the sales process.
4     Q.  Okay.  And so, putting aside the customer
5  name, do you remember any particular customer who you
6  can remember other things about the customer in which a
7  customer said to you, "I am not purchasing or I'm
8  delaying this purchase because of what I've heard about
9  the Suite 11i problems"?
10    A.  So, is your question do I remember specific
11 companies or do I remember --
12    Q.  Do you remember -- if you can't remember --
13 I just want to be sure that I'm -- that you're
14 providing me with any information you have even if you
15 can't remember the name of the company.
16    A.  Okay.
17    Q.  So, do you remember any communications with
18 any customer, name unknown, relating to -- in which you
19 were informed specifically, you know, "I'm not
20 purchasing this module or this product because of what
21 I've heard about Suite 11i"?
22    A.  Okay.  No, I do not remember.
23    Q.  Okay.  Or "I'm delaying purchase because of
24 what I've heard"?
25    A.  No, I do not remember.

160

Wood, Kelly A  10/7/2005  10:01:00 AM

1    Q.  Okay.  Did you -- were you aware of any
2    report or metric or measurement within Oracle that
3    showed 11i, particularly 11i sales over time?  Was
4    there any report that you had access to or any data
5    that would show the amount of, quote, "Suite 11i sales"
6    over time during the spring of 2000, February 2001 time
7    period?
8    A.  No, I do not.
9    Q.  Okay.  You had -- I think Mr. Britton asked
10   you about the hockey stick phenomenon.  And you spoke
11   about two different hockey sticks.
12   A.  Yes.
13   Q.  I wanted to ask you about the hockey stick
14   phenomenon relating to the gamesmanship that goes on at
15   the end of -- at the end of quarters and you said at
16   the end of the year as well.
17   A.  Okay.
18   Q.  Okay.  You had indicated that in your -- in
19   the northwest region, the magnitude or size of the
20   deals was generally lower than it was in other parts of
21   the country?
22   A.  Yes.
23   Q.  Why is that?
24   A.  Just the size of the companies that are in
25   the northwest.  You don't have a lot of Fortune 200

1    companies that typically drive the big deals.  You
2    know, Boeing did big deals.  That's the only company I
3    can remember in the northwest -- Franklin Covey, that
4    did big deals, and Micron Electronics at the time.
5    Those are the only three companies that really did big
6    deals with --
7    Q.  And how are you defining "big"?
8    A.  Over $5,000,000 a year with Oracle.  As
9    opposed to San Francisco where there's probably ten
10   companies that did over $5,000,000 a year with Oracle,
11   and Los Angeles, which is probably -- you know.
12   Q.  So, in those regions would it be fair to say
13   the hockey stick phenomenon is more pronounced?
14   A.  Yes.
15   Q.  Because there's more at stake, I gather?
16   A.  Yes.
17   Q.  Somebody who's making a $10,000,000 purchase
18   at Oracle is going to have more interest in waiting
19   until that last moment to see what they can sweep out
20   of the company?
21   A.  Yes.
22   Q.  And it was well known and I gather in
23   sophisticated companies that, at least the perception
24   was that they could do better if they waited?
25       MR. BRITTON:  Objection to form.

161                                                                                    162

1        THE WITNESS:  Yes.
2    Q.  (BY MR. RUBIN)  So, in the regions where
3    there were a greater amount of larger deals, would it
4    be fair to say that it would likely have been harder to
5    forecast the ultimate outcome of the quarter at an
6    earlier point in the quarter?
7        MR. BRITTON:  Object to the form, asked and
8    answered.
9        THE WITNESS:  I mean, it seems logical, but
10   I don't say that I could -- other than just using logic
11   to answer that question, I certainly don't have any
12   history or any data that would validate that.
13   Q.  (BY MR. RUBIN)  You can't draw on anything
14   else other than following the syllogism?
15   A.  Correct.
16   Q.  Do you remember any time at Oracle that on a
17   global level any quarters in which you were there
18   during the entire quarter that the question of whether
19   Oracle was going to make the quarter came down to the
20   last week or two because of big deals that had not yet
21   come in?
22   A.  No, I never had any visibility as to whether
23   Oracle was going to make their number or not.
24   Q.  Right.  And you didn't have any visibility
25   because you weren't seeing any of the forecasting

1    reports above your -- above your direct reports level;
2    right?
3    A.  Correct.
4    Q.  So, to that extent, for the third quarter of
5    2001, the updated forecasting reports that were coming
6    in on an aggregate basis or that Oracle finance
7    management was preparing on an aggregate basis for
8    January, February, you had no visibility into those?
9    A.  Correct.
10   Q.  Okay.  Do you have any understanding of how
11   much of Oracle's pipeline business going into the third
12   quarter of 2001 was business that you would fairly
13   characterize as dotcom business?
14   A.  No.
15   Q.  Mr. Britton asked you about the statement
16   that had been made that there was a billion dollars in
17   savings coming from the internal implementation of
18   Suite 11i.
19   A.  Yes.
20   Q.  Do you remember his question about that?
21   A.  Yes.
22   Q.  And did you ever -- were you ever a part of
23   or did you participate in any internal analysis one way
24   or the other to determine whether any savings had come
25   from that?

163                                                                                    164

Wood, Kelly A  10/7/2005  10:01:00 AM

1      A. A good friend of mine, Mark Overfelt, had
2   done a detailed analysis or had done -- had an analysis
3   of that billion dollar savings.  And I don't remember
4   if I helped him with that or if I saw that.
5      Q. And would that have been done on a global
6   basis or within the northwest region?
7      A. Global.  That would have been a global
8   analysis.  What we were trying to do was document that
9   case so that we could present that to other customers
10  and say, "Here's how we saved a billion dollars."
11     Q. Okay.  And what do you remember about that
12  analysis?
13     A. I thought I remember that being shaky, that
14  the --
15     Q. How so?
16     A. Somebody -- and it may not have been Mark.
17  Somebody came back and said they didn't believe the
18  numbers.  I don't remember.  I don't remember if it was
19  Mark or not, but somebody came back from that analysis
20  and said, "I don't see where we got a billion dollars
21  in savings."
22     Q. So, there was -- so, your memory is there
23  was some analysis that reflected approximately a
24  billion dollars in savings and you remember some
25  questions being raised about it?

165

1      MR. BRITTON:  Objection to form.
2      THE WITNESS:  Yes.
3      Q. (BY MR. RUBIN)  Is that fair to say?
4      A. Yes.
5      Q. But some analysis had been done internally?
6      A. Yes.
7      Q. And you don't remember whether you
8   participated in the analysis or not?
9      A. I thought I remember trying to come up with
10  a piece of that billion dollar number.  Somebody said,
11  "What if we got rid of X many servers?"  You know, I
12  thought I remembered doing a little bit of math there
13  on what that would save and that being a small piece of
14  a bigger analysis.
15     Q. Do you remember what -- do you remember
16  anything more about which servers or what piece that
17  was?
18     A. No.
19     Q. Okay.  Do you remember anything else about
20  the analysis, you know, what data went into it or what
21  Mr. Overfelt or others did to sort of put together the
22  analysis?
23     A. No.
24     Q. Do you remember any individual or
25  individuals who questioned or asked for additional work

166

1   to be done on the analysis?
2      A. No.
3      Q. Do you remember the time period this took
4   place?
5      A. No.
6      Q. And during your time at Oracle, did you ever
7   meet Larry Ellison?
8      A. I was in meeting -- in presentations with
9   him, but certainly, you know, from more than 50 feet
10  away.
11     Q. Did you ever have any direct one-on-one --
12     A. No.
13     Q. -- contact with him?
14     A. No.
15     Q. And what about Jeff Henley?
16     A. No.
17     Q. No meeting, no direct contact?
18     A. I actually had a lunch with Jeff Henley, 20
19  of us with Jeff Henley.
20     Q. Do you remember when that was?
21     A. Early '90 -- I'm sorry, that was Ray Lane.
22     (Reporter clarification.)
23     THE WITNESS:  Ray Lane, '96.
24     Q. (BY MR. RUBIN)  Ray Lane in '96?
25     A. Yes.

167

1      Q. Jeff Henley, no?
2      A. Correct.
3      Q. Did you ever have any direct contact with
4   Mr. Henley?
5      A. No.
6      Q. Stephanie -- excuse me, Jennifer Minton, did
7   you ever -- do you know who she is?
8      A. No.
9      Q. So, you wouldn't recall meeting her then?
10     A. No.
11     Q. You had said, I think, to Mr. Britton that
12  the ability to forecast consulting revenues is easier
13  than license because of the static nature of it,
14  because you know basically what's been moved and what's
15  coming?
16     MR. BRITTON:  Object to form.
17     THE WITNESS:  Yes.
18     Q. (BY MR. RUBIN)  Is that accurate?
19     A. Yes.
20     Q. So, your ability to see into the horizon of
21  where the quarter is going to end up is greater in
22  consulting than it is in license sales; is that fair to
23  say?
24     MR. BRITTON:  Are you talking revenues or
25  sales?

168

1        MR. RUBIN:  Revenues.
2        Q.  (BY MR. RUBIN)  I'm sorry, consulting
3    revenues versus license revenues.
4        A.  Yes, revenues are much easier to predict
5    than sales, product sales.
6        Q.  Than product -- let's just say product -- I
7    just want to compare apples to apples.
8        A.  Okay.  Okay.
9        Q.  I mean, I understand that a sale, that it
10   turns into revenue when it leaves the door because of
11   revenue recognition, but I just want to be sure from a
12   terminology vantage point, I'm asking about consulting
13   revenue forecasting versus license revenue forecasting.
14       And is it -- is it your testimony that
15   because of the nature of consulting revenue, because
16   it's flowing from a previously booked order, some of
17   it, that it's easier to forecast consulting revenue at
18   the beginning of a quarter than license revenue?
19       A.  I don't know how they forecast product
20   revenue.  I don't know if that's -- revenue is
21   20 percent of product sales.  So, I don't know how hard
22   it is to forecast product revenue.
23       Q.  I'm not sure -- I'm not sure of the
24   distinction you're drawing.
25       A.  Well, product -- you've got sales and

169

1    revenue.  Oh, you --
2        Q.  I'm talking about a license, a software
3    license --
4        A.  Okay.
5        Q.  -- a database or application sale.
6        A.  Okay.  So, yes, I -- so, yes, consulting
7    revenue would be easier to forecast than product
8    revenue, yes.
9        Q.  Okay.  And that's because of the underlying
10   components of revenue and consulting; correct?  In
11   other words, isn't it -- isn't it your testimony that
12   because the revenue that flows in a particular order
13   from consulting is a deal that you're already aware of?
14       A.  You've already booked, yes.
15       Q.  Yes.  So, you've sold the -- you've entered
16   into the engagement, you're going to recognize the
17   revenue as services are delivered, and that gives you a
18   much more tangible, concrete basis for estimation than
19   it does in the license context; correct?
20       A.  Yes.
21       Q.  Because license, the revenue doesn't come
22   until you actually sell the product and ship it;
23   correct?
24       A.  Yes.
25       Q.  And that makes that much more uncertain in

170

1    any particular quarter; correct?
2        A.  Yes.
3        Q.  Sitting here today, do you have any basis to
4    quantify how much, if any, the dotcom erosion or the
5    dotcom bubble burst as it's popularly called, how much
6    it contributed to Oracle missing its quarter in the
7    third quarter of '01?  Do you know from a quantitative
8    vantage point?
9        A.  No.
10       Q.  And can you -- have you seen any analysis
11   that would allow you sitting here today to know whether
12   the dotcom crisis itself is the cause of Oracle's
13   failure to meet its third quarter forecast?
14       MR. BRITTON:  Object to form, assumes facts.
15       THE WITNESS:  No.
16       Q.  (BY MR. RUBIN)  Now, in terms of the
17   conversation that you had with the investigator, how
18   did the investigator introduce himself when he -- I
19   assume he called you; right?
20       A.  I don't remember.
21       Q.  Okay.  Well --
22       A.  Certainly at some point he would have called
23   me.  Whether -- for that dialog, whether I initiated
24   the call or he did, I don't remember that.
25       Q.  All right.  Let me back up.  You had spoken

171

1    to Mr. Britton about a letter that you had received.
2        A.  Yes.
3        Q.  Okay.
4        A.  I believe I received a letter.
5        Q.  Okay.  And is it your memory that that
6    letter came before or after the telephone call from the
7    investigator?
8        A.  I believe it came before.
9        Q.  Okay.  So, it's your memory that you
10   received a letter indicating that -- well, tell me what
11   the -- what you remember the letter said.
12       A.  I believe I received a letter saying, "So
13   and so may -- will contact you about a legal case
14   against Oracle."
15       Q.  Okay.
16       A.  But that could have just been -- it could
17   have just been a phone call as well.  I thought I
18   received a letter.
19       Q.  All right.  But you said that you're not
20   clear whether you placed the call to the investigator
21   or the investigator called you.  So, what would have --
22   to the extent that it's possible that you would have
23   called him, what would have triggered your call to him?
24       A.  The letter.
25       Q.  Okay.

172

1   A. So, if I received a letter -- I don't

2   remember.

3   Q. If you received a letter, you may have

4   called him?

5   A. I may have called him or he may have called

6   me.

7   Q. Okay.

8   A. I don't remember.

9   Q. All right. And who did you understand the

10   investigator represented? Who did you understand that

11   he was working on behalf of?

12   A. I believe it was -- at the time, I

13   interpreted his -- so, going back to the thing, I'm

14   just a little -- I was just a little peon within

15   Oracle; right? So, this whole conversation, I didn't

16   take it very seriously because I don't know anything

17   about -- I mean, I had some opinions that, "Hey, we

18   should have known this, we should have known this."

19   But I don't -- I didn't have this global view where I

20   could have said, "Man, somebody messed up"; right?

21   So, that dialog -- this whole dialog, I

22   didn't really -- it was -- it was, like I said, a

23   pretty casual conversation because I'm just a little

24   peon within this, you know, corporate shell; right?

25   So, how that conversation was initiated -- oh, I'm

173

1   sorry. So, your question was what was his role? I

2   interpreted his role to be on a -- initiating a lawsuit

3   against Oracle, so that he was not on the Oracle side.

4   He was on the other side.

5   Q. Okay. Do you understand who that other side

6   is or did you at the time understand who the other side

7   was who was suing or thinking of suing Oracle?

8   A. I mean, there was a law firm associated with

9   that, but I don't know the name or -- I don't remember

10   the name.

11   Q. Okay. And did you understand who they would

12   be representing or who they were -- who the law firm

13   was looking to sue on behalf of?

14   A. No. I may have known at the time, but I

15   don't recall that now.

16   Q. During your conversation with the

17   investigator, did you convey any of the views that you

18   just conveyed here, that is that you were a peon within

19   the company or words to that effect and/or that you

20   were just expressing your own opinions but you didn't

21   really necessarily have a basis for the opinions

22   globally? Did you tell the investigator any of that?

23   MR. BRITTON: Objection to form.

24   THE WITNESS: I don't believe so.

25   Q. (BY MR. RUBIN) So, what you're conveying

174

1   now is your mindset on why you approached the

2   conversation in such a casual manner?

3   A. I'm sorry, can you say the question again?

4   Q. So, your response -- or your explanation of

5   your mindset at the time was -- is that -- well, strike

6   that.

7   You had just indicated a few minutes ago

8   that you were relatively low in the organizational

9   chart at Oracle; right?

10   A. Yes.

11   Q. And that you could offer your opinions, but

12   you were not at a level that actually saw global

13   forecasts or even forecasting for the entire west

14   region; correct?

15   A. Correct.

16   Q. So, in describing that, were you attempting

17   to explain to me why you regarded the conversation with

18   the investigator -- or you approached it in a casual

19   manner?

20   A. Yes.

21   Q. All right. So, you had stated previously

22   that you recall that the conversation was approximately

23   an hour or a little less than an hour?

24   A. Yes.

25   Q. At the time during this initial telephone

175

1   conversation, did the investigator inform you or --

2   inform you that he intended to use your statements in

3   any way in the lawsuit?

4   A. I don't remember.

5   Q. Okay. Did the investigator ever ask you

6   whether you wanted to remain confidential, that you

7   didn't want your name to be associated with your

8   statements?

9   A. I don't remember.

10   Q. Okay. Do you remember expressing any

11   concerns about confidentiality to the investigator?

12   A. No.

13   Q. Okay. We both represented to you -- both

14   sides have represented to you that you left in February

15   of 2001. To the best of your memory, when did this

16   call from the investigator occur?

17   A. I don't know.

18   Q. Do you think it was three months after you

19   left? Six months after you left? A year after you

20   left?

21   A. I don't -- I don't remember.

22   Q. Okay. Were you already working somewhere

23   else at the time you got the call?

24   A. I don't remember.

25   Q. Okay. So, you don't know?

176

1    A.  Correct.

2    Q.  You can't place it even in a year?

3    A.  Correct.

4    Q.  Okay.  All right.  Do you remember the

5  investigator ever indicating to you that he was going

6  to attribute some of your statements, that he was going

7  to use some of your statements in an actual complaint,

8  in a legal complaint?

9        MR. BRITTON:  Object to the form, asked and

10  answered.

11        THE WITNESS:  I do not remember him saying

12  that.

13    Q.  (BY MR. RUBIN)  Okay.  Do you ever -- other

14  than what you've described about the telephone call

15  with the investigator, do you remember anything else

16  about what he said or what you said?

17    A.  No.

18    Q.  Okay.  All right.  Was there ever a -- prior

19  to being served with a subpoena for this deposition,

20  which occurred within the last couple of months;

21  correct?

22    A.  Yes.

23    Q.  Prior to that, did you ever get any other

24  call from an investigator or anybody else representing

25  the law firm who was suing Oracle?

177

1    A.  I got voice messages that I -- you know,

2  I've gotten voice messages that I don't really -- I

3  never pick up my home voice messages.  So, my daughter

4  would always pick them up and say, "Oh, so and so left

5  you a voice message"; right?  So, I may have gotten a

6  voice message, but I don't remember any dialog other

7  than that one interview.

8    Q.  And do you remember having any understanding

9  of who the voice message was from?

10    A.  I would get voice messages from the -- from

11  this law firm, from Doug's law firm.  I believe it was

12  Doug's law firm.

13    Q.  But until this notice of deposition, you

14  have no recollection of actually communicating with

15  anybody from Doug's law firm?

16    A.  No.

17    Q.  Do you ever remember receiving in the mail

18  any communication from Doug's law firm or from the

19  investigator representing Doug's law firm that

20  contained a copy of the complaint or any other

21  information relating to the suit?

22    A.  No.  I moved a couple of times.  You know,

23  after I got canned, I got divorced; right?  And so,

24  there was a number of addresses.  So, my ex-wife got a

25  bunch of -- you know, so, there could have been mail

178

1  that I just didn't ever get.  So --

2    Q.  Before receiving your subpoena for this

3  deposition, was there ever a time in which you reviewed

4  any draft complaints or a complaint concerning the

5  words that were being attributed to you in the

6  complaint?

7    A.  No, I don't remember any.

8    Q.  Okay.  Were you aware prior -- well, let me

9  just ask you a different question:  Are you aware

10  sitting here today that you are -- that there are words

11  attributed to you in this complaint, in the complaint

12  that was filed in connection with this lawsuit?

13    A.  No, I'm not aware of that.  I was not aware

14  of that.  I saw -- I mean, I got this (indicating) and

15  there's -- you know, there was some statements in here

16  associated with me, but I didn't -- I really even

17  understand what this is other than just telling me to

18  appear here.

19    Q.  Well, I guess -- I just want to mark

20  it and just see if you recognize this document.  I

21  don't have another copy, but I'll just mark it and

22  maybe we can -- and maybe the law firm can just make a

23  copy so the Court Reporter can have it.

24        (Exhibit 1 marked.)

25        (Discussion held off the record.)

179

1    Q.  (BY MR. RUBIN)  Mr. Wood, I'd like you to

2  take a look at that and tell me if you recognize the

3  document itself and then I'll ask you some follow-up

4  questions.

5    A.  Okay, I did receive this.

6    Q.  Okay.  And when you say "this," what do you

7  recognize the document -- the document that we've

8  marked as Exhibit No. 1 to be?

9    A.  This class action lawsuit.

10    Q.  Okay.  And is it identified as the complaint

11  in the lawsuit?  Does it say, "Revised Second Amended

12  Complaint" in the caption on the first page?

13        MR. BRITTON:  To the right.

14    Q.  (BY MR. RUBIN)  In the middle there, yeah.

15    A.  Oh, yes, "Revised Second Amended Complaint."

16    Q.  Okay.  And now, looking at it, does that

17  refresh your memory that you received a copy of the

18  complaint?

19    A.  Yes.  Yes.

20    Q.  Okay.  And when did you receive a copy of

21  the complaint?

22    A.  I don't remember.

23    Q.  Okay.  Did you receive -- at the time you

24  received a copy of the complaint, did you receive any

25  correspondence or communication that was attached or

180

1    connected to the -- to the copy?

2        A. I assume so, but I don't -- I don't remember

3    any correspondence.

4        Q. Well, at the time that you received the

5    complaint, what did you do with it?

6        A. I briefly looked through it and that was it.

7        Q. Do you have it today?

8        A. No.

9        Q. Okay. And I'm assuming you don't have any

10    of the other -- any correspondence that might have been

11    with it?

12        A. Correct.

13        Q. Okay. And based upon your prior response,

14    is it fair to say that at the time that you received

15    the complaint, you did not know that you were being

16    designated or you had been designated as confidential

17    witness No. 2 in the complaint?

18        A. Yeah, I -- I believe I did make some

19    association that I was CW something.

20        Q. Did you -- did you review those

21    portions of the complaint that attributed words to your

22    particular confidential witness number?

23        A. I remember looking at a -- at a couple of

24    them. And then I don't -- I don't remember if I looked

25    at all of them or not.

181

1        Q. Okay. Do you remember whether there was any

2    communication, any communication whether through

3    voicemail or by letter, that asked you to provide

4    feedback to Doug's firm if you thought that there were

5    any concerns or questions? Did they ask you to do

6    that?

7        A. I do not remember.

8        Q. Okay. So, I gather you threw the complaint

9    away after you received it?

10        A. Yes.

11        Q. Okay. And do you remember how long ago you

12    received a copy of the complaint?

13        MR. BRITTON: Objection, asked and answered.

14        THE WITNESS: No, I do not remember.

15        MR. RUBIN: Okay. Let me just take two

16    minutes and I might be done.

17        THE VIDEOGRAPHER: Going off the record.

18        (Discussion held off the record.)

19        THE VIDEOGRAPHER: Back on the record at

20    14:51.

21        Q. (BY MR. RUBIN) Mr. Wood, was there any

22    report generated at Oracle that you saw that provided

23    data on businesses that Oracle believed fell into the

24    category of dotcoms? In other words, some report or

25    some aggregation of data that monitored dotcom sales or

182

1    dotcom revenues?

2        A. No, I don't -- I don't know of any report.

3        Q. Okay. Were you aware of any other efforts

4    to measure or monitor revenue that would be

5    attributable to what Oracle regarded as dotcom

6    businesses?

7        A. No.

8        Q. In describing the representation, describing

9    Oracle's view that there was a billion dollar savings

10    that came from the internal implementation of Suite

11    11i, have you ever to anyone described that as a Wall

12    Street marketing gimmick?

13        A. Yeah, I may have.

14        Q. Okay.

15        A. The context that I remember was it was a

16    gimmick that we published to sell 11i. So, the term

17    "Wall Street" is the term that -- given a chance to

18    clarify or -- I would say it was more of a -- it was

19    more of a term to help sell our products to our

20    customers.

21        Q. And when you use the term "gimmick," do you

22    have any information that caused you to believe at the

23    time that the information was -- that the billion

24    dollar savings had been proven not to be accurate?

25        MR. BRITTON: Object to form, asked and

183

1    answered.

2        THE WITNESS: I do not have details saying

3    that that billion dollars was not valid.

4        MR. RUBIN: All right. I don't have any

5    other questions.

6        MR. BRITTON: Okay, I just have a few more

7    questions and then we'll let you get out of here.

8        THE WITNESS: Okay.

9        FURTHER EXAMINATION

10    QUESTIONS BY MR. BRITTON:

11        Q. I want to talk to you about your

12    conversation with the investigator. You understood

13    that that conversation related to an investigation of

14    the lawsuit; is that right?

15        A. I understood it was an investigation.

16    Whether I understood it was a lawsuit or not, I can't

17    say today.

18        Q. Okay. Did you exaggerate the truth during

19    that conversation to your memory?

20        A. Not intentionally. I didn't intentionally

21    exaggerate. Given that it was a casual conversation,

22    could I have been more precise? Yes. I didn't

23    exaggerate. Could I have been more precise? Yes. So,

24    was it a willful exaggeration? No. Could I have been

25    more precise? Potentially.

184

1    Q. Did you say anything that was untrue during

2    that conversation?

3    A. No.

4    Q. Okay. Now, you testified earlier that you

5    did -- you don't remember telling the investigator that

6    you actually accessed the database sales pipeline. Do

7    you recall that testimony?

8    A. What I remember about that testimony is I

9    had access to the pipeline tool.

10    Q. Right.

11    A. I could have -- and I could have and maybe

12    did look at the pipeline, but I had access to the

13    pipeline indirectly or in a dump fashion.

14    Q. Do you -- sitting here today, do you

15    remember telling the investigator that you did not look

16    at that database with the pipeline information in it?

17    A. I don't remember if I said that or not.

18    Q. Okay. Now, you talked to the investigator

19    about the pipeline information; is that right?

20    A. Yes.

21    Q. Okay. And you told him about the different

22    components of the information you were receiving in the

23    pipeline report that you were getting; is that right?

24    A. Yes.

25    Q. Okay. Now, is it fair to conclude based

185

1    upon the conversation that you had with the

2    investigator that you told him that you did have access

3    to the database pipeline?

4    MR. RUBIN: Objection, form, calls for

5    speculation.

6    THE WITNESS: I'm sorry, can you say the

7    question again?

8    Q. (BY MR. BRITTON) Would you have reasonably

9    concluded from the conversation you had with the

10    investigator that you had access to the database

11    pipeline?

12    MR. RUBIN: Objection, form, calls for

13    speculation about what the investigator could have

14    concluded.

15    THE WITNESS: So, yes, I had -- I had access

16    to the -- I had access -- I believe I had access to the

17    tool online. And I certainly had access to a report

18    from that tool. So, I had access to the information

19    either directly through the tool or via the report. I

20    had access to that pipeline information.

21    Q. (BY MR. BRITTON) Okay. And you told the

22    investigator that to the best of your memory?

23    MR. RUBIN: Objection, asked and answered.

24    THE WITNESS: I'm not sure what level of

25    clarity -- if I was specific in saying I had access to

186

1    the -- to a dump versus access -- that I regularly

2    accessed the dump or regularly accessed the tool

3    online. I don't know that I was that specific.

4    Q. (BY MR. BRITTON) Now, the dump that you're

5    referring to, was that -- that's an electronic dump?

6    A. Yes.

7    Q. Were you seeing the screen on your computer

8    in the same way that you would have seen it had you

9    gone and accessed the tool?

10    A. No.

11    Q. How was it different?

12    A. I don't know. I don't remember looking at

13    that sales pipeline via the online tool. So, I don't

14    know how the two would have been different. But the

15    report captured the details of the online tool and put

16    it into a report.

17    Q. So, the data you were looking at in the

18    report was the same data that was in the pipeline tool?

19    A. Yes.

20    Q. Okay. Now, we talked about the difference

21    between consulting bookings and consulting revenues and

22    how Oracle did not report consulting bookings. Do you

23    recall that testimony?

24    A. Correct.

25    Q. Is it true that the consulting bookings

187

1    would have given you insight into the consulting -- or

2    into the product sales?

3    A. Yes.

4    Q. And why is that?

5    A. Because most product deals had a consulting

6    element to them. So, there's an association between

7    the two. If they're selling product, we're going to be

8    selling consulting. Or they could sell product and --

9    Oracle consulting had competitors; right? So, they

10    wouldn't always go with us to sell consulting. They

11    would go with our competitors sometimes. But we would

12    almost always know about those deals via the pipeline.

13    So, whether they were booked with us or booked with our

14    competitors, we would -- we would know about the deals.

15    So, that would be the big gap between whether we were

16    tracking or not. Because if they were doing half of

17    their business with one of our competitors, obviously

18    our numbers could be down and they could be ahead.

19    (Discussion held off the record.)

20    Q. (BY MR. BRITTON) Mr. Rubin had asked you

21    about whether it was your memory that Oracle had beaten

22    its forecasts in prior years and specifically fiscal

23    year 2000. Do you recall that testimony?

24    A. Yes.

25    Q. And you recall that Oracle had beaten its

188

1  forecasts during fiscal year 2000?

2      A.  I mean, I knew that we had beat our numbers,

3  whether it was year 2000, '99.

4      Q.  And fiscal year 2000 was a large component

5  of Oracle's sales to dotcom customers?

6      MR. RUBIN:  Objection, form, vague.  I

7  don't -- "large component"?

8      THE WITNESS:  I only know details about

9  things in the northwest region from my own experience.

10  Certainly I was an Oracle stockholder.  So, I was

11  actively pursuing knowledge about the corporate.  So,

12  my understanding was as a stockholder that yes, the

13  dotcoms represented a significant amount of

14  our '98, '99, and 2000 revenues.  By -- anyway --

15      Q.  (BY MR. BRITTON)  Now, going to the

16  testimony that you gave about your conversations with

17  customers and not remembering specifics about whether

18  they told you they weren't going to buy 11i because of

19  problems or what they had heard.  Do you remember that

20  testimony?

21      A.  Yes.

22      Q.  Did you have conversations with customers

23  about difficulties with 11i that other customers were

24  experiencing?

25      A.  Yes.

189

1      MR. BRITTON:  No further questions.

2      MR. RUBIN:  I just have another minute or

3  two.

4          FURTHER EXAMINATION

5  QUESTIONS BY MR. RUBIN:

6      Q.  You said you were an Oracle stockholder.

7  Are you an Oracle stockholder today?

8      A.  Yes.

9      Q.  How did you purchase -- did you purchase

10  your stock under a stock purchase plan?

11      A.  Stock purchase plan, 401(k), and I may have

12  purchased Oracle stock outside of those two venues, you

13  know, for my personal.

14      Q.  Have you purchased Oracle stock since

15  leaving the company?

16      A.  No.

17      Q.  Okay.  Now, when you purchased Oracle stock,

18  was it -- was it discretionary?  That is, were you on

19  a -- were you on a plan that you would buy a certain

20  amount at every -- at a certain interval, you know, as

21  long as you had checked the box?  Or did you have to

22  volitionally go in and say, "I want to buy stock" at a

23  particular time?

24      A.  I was under the -- I was under the -- from a

25  401(k) perspective, it just -- I bought it every month

190

1  and from a stock purchase plan, I just -- I bought it

2  every six months.

3      Q.  But you weren't on a -- you weren't on a set

4  plan that unless you went in and said, "No," that it

5  would just automatically be purchased or --

6      A.  It was all automatic purchase.

7      Q.  So, you would just -- could you have pulled

8  it back at any particular time?

9      A.  Yes.

10      Q.  Could you have said, "No, I don't want to

11  purchase any more of the stock"?

12      A.  Yes.

13      Q.  Okay.  So --

14      MR. RUBIN:  I guess we have to change the

15  tape.  Because I only have like three minutes.  All

16  right, go ahead and change it.  Sorry.

17      THE VIDEOGRAPHER:  Going off the record at

18  15:03.

19      (Discussion held off the record.)

20      THE VIDEOGRAPHER:  This is tape No. 6 of the

21  deposition of Kelly Wood.  The time is 15:05.

22      Q.  (BY MR. RUBIN)  Okay.  Mr. Wood, you said

23  that you purchased Oracle stock during your time at

24  Oracle; is that right?

25      A.  Yes.

191

1      Q.  And that was -- and describe what were the

2  different vehicles or what were the different

3  investment funds through which you purchased the stock.

4      A.  So, I purchased it through the 401(k).  I

5  had 100 percent allocation in Oracle stock for my

6  401(k) and then I bought the maximum 10 percent stock

7  purchase plan.  And actually, when I started with

8  Oracle, about six months I converted virtually all

9  of my other stock to Oracle as well.

10      Q.  Okay.  So, virtually all of your 401(k) was

11  in Oracle?  Or all of it by the time you left?

12      A.  Yes.  Yeah, I believe it was all of it.

13      Q.  Okay.  And now the stock purchase plan, was

14  that -- where is that stock held?  It's not in the

15  401(k)?

16      A.  Correct, it's just in a separate brokerage

17  account with E*Trade.

18      Q.  Okay.  And do you remember how much at each

19  interval you would -- you would purchase?

20      A.  10 percent of my yearly income, you know,

21  divided by two.  You know, you purchase twice a year.

22      Q.  You paid the market rate?

23      A.  Well, it was a -- you take the -- so, a

24  period is between March and -- March 1 and November 1.

25  So, they take the lowest price of those two points and

192

1  then a 15 percent discount.

2  Q. Okay.  And you -- is it consistent with your

3  memory that you -- that through the stock purchase

4  plan, you purchased stock in December of 2000, January

5  of 2000, and February of 2000?

6  A. That's through the stock purchase plan?

7  Q. Yes.

8  A. You actually only purchase at the

9  beginning -- or is really the end of a six-month

10  window.

11  Q. Okay.

12  A. So, you don't actually purchase it every

13  month in the stock purchase plan.  In the 401(k) you

14  do, but in the stock purchase plan -- so, it's like a

15  May and -- so, the periods end in May and November.

16  So --

17  Q. Okay.

18  A. So, you actually only purchase in November.

19  Q. And then it's distributed over time?

20  A. No, you get it all right then.

21  Q. Okay.  So --

22  A. So, you sign up -- so, May to November --

23  10 percent of each paycheck goes into this fund; right?

24  November 1 they say, "Which is the lowest price?"  And

25  then you got 85 percent.  And then boom, all of that

193

1  stock gets assigned to your name at that -- at that

2  point.  So, you actually don't --

3  Q. Is there any reason that any internal data

4  would show that the effective date of the stock is

5  staggered over a six-month period?

6  A. It doesn't matter -- doesn't matter what the

7  stock price does between that opening and ending date.

8  It's just the opening date, ending date.  Just those

9  two dates, take the lowest one and then you take

10  85 percent of that.

11  Q. So, as of the last period before you left

12  Oracle -- your memory is in November; right?  November

13  would have been the last sort of cutoff when you would

14  have allocated additional funds to purchase through the

15  stock purchase plan; correct?

16  A. It's the last time I would have actually

17  purchased.

18  Q. That's what I'm saying.

19  A. I allocated money all of the way through.

20  Q. Right.  I'm sorry.  So, not allocating

21  funds, but the last time you would have purchased would

22  have been November of '00?

23  A. Yeah, and I don't -- I don't remember.

24  Yeah, I don't remember the exact -- I'm giving you the

25  dates of HP's plan.  I don't remember the exact dates

194

1  of Oracle's plan.  So, it could have been November,

2  could have been January, could have been February.  I

3  don't know what the exact schedule was for Oracle's

4  stock purchase plan.

5  Q. Okay.  Do you remember ever considering not

6  making the stock purchase plan during your last six

7  months at Oracle?

8  A. No.

9  Q. And do you remember specifically making

10  additional purchases through your 401(k) plan during

11  your last six months at Oracle?

12  A. Yes, I purchased -- yeah, I didn't change

13  that.  So, I purchased -- basically I purchased 401(k)

14  stock at every paycheck.  So, twice a month.

15  Q. Okay.  And is it your understanding that

16  you're a member, potential member of the class of

17  Plaintiffs that's suing Oracle here?

18  A. Yeah, I guess I am.

19  Q. So, you could potentially recover from any

20  amount, recovery that they obtain from Oracle?

21  A. Yes.

22  Q. Now, I don't think either of us have covered

23  it.  Where do you currently work?

24  A. Hewlett-Packard.

25  Q. HP?

195

1  A. Yes.

2  Q. In Boise?

3  A. Yes.

4  Q. And what do you do for them?

5  A. I'm program manager, implementing CRM

6  solutions.

7  Q. HP CRM solutions?

8  A. No, in this -- today we're implementing SAP.

9  Q. SAP?

10  A. Which is a competitor to Oracle's.

11  Q. Okay.  And based on your memory, from the

12  time that you left Oracle, how much Oracle stock have

13  you sold, if any?

14  A. I had to -- I haven't sold any.

15  Q. All right.

16  MR. RUBIN:  I don't have anything else.

17  MR. BRITTON:  I have nothing else.  We can

18  go off the record.

19  THE VIDEOGRAPHER:  The Kelly Wood deposition

20  concludes with tape 6 at 15:11.

21  (Whereupon the deposition of KELLY A.

22  WOOD is concluded at 3:11 p.m.)

23  (Signature requested.)

24

25

196

Wood, Kelly A  10/7/2005  10:01:00 AM

CERTIFICATE OF WITNESS

1    I, KELLY A. WOOD, being first duly sworn, depose

and say:

2    That I am the witness named in the foregoing

deposition, consisting of pages 1 through #; that I

have read said deposition and know the contents

thereof; that the questions contained therein were

propounded to me; and that the answers contained

therein are true and correct, except for any changes

that I may have listed on the Change Sheet attached

hereto:

3    DATED this _____ day of _____, 200___.

_____

KELLY A. WOOD

SUBSCRIBED AND SWORN to before me this _____ day

of _____, 200___.

_____

NAME OF NOTARY PUBLIC

NOTARY PUBLIC FOR _____

RESIDING AT _____

MY COMMISSION EXPIRES _____

197

---

ERRATA SHEET FOR KELLY A. WOOD

Page ___ Line ___ Reason for Change _____
Reads _____
Should Read _____

Page ___ Line ___ Reason for Change _____
Reads _____
Should Read _____

Page ___ Line ___ Reason for Change _____
Reads _____
Should Read _____

Page ___ Line ___ Reason for Change _____
Reads _____
Should Read _____

Page ___ Line ___ Reason for Change _____
Reads _____
Should Read _____

Page ___ Line ___ Reason for Change _____
Reads _____
Should Read _____

Page ___ Line ___ Reason for Change _____
Reads _____
Should Read _____

Page ___ Line ___ Reason for Change _____
Reads _____
Should Read _____

You may use another sheet if you need more room.
WITNESS SIGNATURE _____

198

---

REPORTER'S CERTIFICATE

I, SHERI LUDIKER FOOTE, CSR No. 90, Certified

Shorthand Reporter, certify:

That the foregoing proceedings were taken before

me at the time and place therein set forth, at which

time the witness was put under oath by me;

That the testimony and all objections made were

recorded stenographically by me and transcribed by me

or under my direction;

That the foregoing is a true and correct record

of all testimony given, to the best of my ability;

I further certify that I am not a relative or

employee of any attorney or party, nor am I financially

interested in the action.

IN WITNESS WHEREOF, I set my hand and seal this

14th day of October, 2005.

_____

SHERI LUDIKER FOOTE, CSR, RPR, CRR

Notary Public

P.O. Box 2636

Boise, Idaho  83701-2636

My commission expires January 17, 2010

199

```
 1                    REPORTER'S CERTIFICATE
 2          I, SHERI LUDIKER FOOTE, CSR No. 90,
 3     Certified Shorthand Reporter, certify:
 4          That the foregoing proceedings were taken
 5     before me at the time and place therein set
 6     forth, at which time the witness was put under
 7     oath by me;
 8          That the testimony and all objections made
 9     were recorded stenographically by me and
10     transcribed by me or under my direction;
11          That the foregoing is a true and correct
12     record of all testimony given, to the best of my
13     ability;
14          I further certify that I am not a relative
15     or employee of any attorney or party, nor am I
16     financially interested in the action.
17          IN WITNESS WHEREOF, I set my hand and seal
18     this _____ day of _____, 200__
19
20     _____
21     SHERI LUDIKER FOOTE, CSR, RPR, CRR,
22     Notary Public
23     P.O. Box 2636
24          Boise, Idaho  83701-2636
25     My commission expires January 17, 2010
```

*M & M COURT REPORTING SERVICE, INC. - (208) 345-9611*

# EXHIBIT S

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

**Page 1**

```
 1        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2             IN AND FOR THE COUNTY OF SAN MATEO
 3                        ---o0o---
 4   COORDINATION PROCEEDING
 5   SPECIAL TITLE (RULE 1550(b)),
 6
 7   ORACLE CASES
 8
 9             JUDICIAL COUNCIL COORDINATION
10                 PROCEEDING NO. 4180
11   THIS DOCUMENT RELATES TO:
12   ALL ACTIONS
13   _____/
14
15
16         DEPOSITION OF PHILIP B. SIMON
17            Tuesday, March 16, 2004
18
19
20   CONFIDENTIAL:  THIS TRANSCRIPT IS DESIGNATED AS
21   CONFIDENTIAL PURSUANT TO A PROTECTIVE ORDER APPROVED BY
22   THE COURT ON JUNE 21, 2002, CONTAINS DOCUMENTS MARKED
23   CONFIDENTIAL, AND THE CONTENTS ARE NOT TO BE REVEALED
24   EXCEPT PURSUANT TO THE TERMS OF THE PROTECTIVE ORDER, BY
25   ORDER OF THE COURT OR BY AGREEMENT OF THE PARTIES
26
27   REPORTED BY:
28   HOLLY MOOSE, RDR-CRR-CRP
29   CSR NO. 6438
30
31       ROBERT BARNES ASSOCIATES
32       Certified Shorthand Reporters
33         760 Market Street, Suite 844
34        San Francisco, California  94102
35          Phone:  (415)788-7191        1
36             C O N F I D E N T I A L
37
```

**Page 2**

```
 1        IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
 2                IN AND FOR NEW CASTLE COUNTY
 3
 4   IN RE ORACLE CORPORATION
 5             Consolidated C.A. No. 18751
 6   DERIVATIVE LITIGATION
 7   _____/
```

**Page 3**

```
 1              A P P E A R A N C E S
 2
 3   FOR CALIFORNIA PLAINTIFFS:
 4      BERMAN, DEVALERIO, PEASE, TABACCO, BURT & PUCILLO
 5      BY:  NICOLE LAVALLEE, ESQ.
 6           JOSEPH TABACCO, ESQ.
 7      425 California Street, Suite 2025
 8      San Francisco, CA  94104
 9      (415)433-3200
10
11   AND
12
13      McMANIS, FAULKNER & MORGAN
14      BY:  MATTHEW SCHECHTER, ESQ.
15           PAUL YANG, ESQ.
16      50 West San Fernando Street
17      Suite 1000, Tenth Floor
18      San Jose, CA  95113
19   AND
20      COREY, LUZAICH, PLISKA, DE GHETALDI & NASTARI
21      BY:  JERRY E. NASTARI, ESQ.
22      700 El Camino Real
23      Millbrae, CA  94030
24      (650)871-5666
25
26   FOR ORACLE CORPORATION:
27      MORRISON & FOERSTER
28      BY:  KATHLEEN DUROUSSEAU, ESQ.
29      425 Market Street
30      San Francisco, CA  94105
31      (415)268-7126
32   AND
33      ORACLE CORPORATION
34      BY:  LAUREN SEGAL, MANAGING COUNSEL
35      500 Oracle Parkway
36      Redwood Shores, CA  94065
37      (650)506-9221
38
```

**Page 4**

```
 1          A P P E A R A N C E S (continued)
 2
 3   FOR INDIVIDUAL DEFENDANTS ELLISON AND HENLEY:
 4      MAYER, BROWN, ROWE & MAW
 5      BY:  JOHN NADOLENCO, ESQ.
 6      350 South Grand Avenue, 25th Floor
 7      Los Angeles, CA  90071
 8      (213)229-9500
 9
10   FOR THE WITNESS:
11      BARTKO, ZANKEL, TARRANT & MILLER
12      BY:  GLENN P. ZWANG, ESQ.
13      900 Front Street, Suite 300
14      San Francisco, CA  94111
15      (415)956-1900
16
17   ALSO PRESENT:  Trudi Aemett, Videographer
18              (415)624-1300
19
20
21   TAKEN AT:
22      BERMAN, DEVALERIO, PEASE, TABACCO, BURT & PUCILLO
23      425 California Street, Suite 2025
24      San Francisco, CA  94104
25      (415)433-3200
26
27
28
29                   ---o0o---
30
31
32
```

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

```
1           I N D E X
2
3   DEPOSITION OF PHILIP B. SIMON
4
5   EXAMINATION BY:              PAGE
6       MS. LAVALLEE            10
7       AFTERNOON SESSION          133
8
9   DC EXHIBITS
10  186  Interview Of Philip Simon, 20 pages    68
11  187  E-mail to Ellison from Simon,
12       PS0001, 1 page            90
13
14  188  E-mails, PS0002-3, 2 pages        93
15
16  189  E-mails, PS0004-8, 5 pages        97
17
18  190  E-mails, PS0013-14, 2 pages       105
19
20  191  E-mail to Ellison from Simon,
21       PS0018, 1 page           108
22  192  Lawrence J. Ellison Libor Contracts,
23       PS0019, 1 page           115
24
25  193  E-mails, ORCL 0093843, 1 page       133
26
27  194  E-mails, SP0020, 1 page         145
28
29  195  E-mails, PS0021-22, 2 pages       146
30
31  196  E-mails, CD-I 03234, 1 page       148
32
33  197  Yahoo! Finance, Stocks Of Interest,
34       PS0345-46, 2 page          154
35  198  E-mails, CD-I 03231,1 page        162
36  199  E-mail to Balkenhol from Simon,
37       PS0033, 1 page           165
38
```

```
1   DC EXHIBITS (continued0)          PAGE
2
3   200  Handwritten notes titled "Larry
4        Ellison,"  1/22/01, PS0517, 1 page   172
5   201  E-mails, CD-I 03235-36, 2 pages     173
6   202  E-mails, CD-I 03061-62, 2 pages     173
7   203  E-mails, CD-I 03241-42, 2 pages     174
8   204  E-mails, CD-I 03240, 1 page       175
9   205  E-mails, ORCLA 0023691-93, 3 pages    176
10  206  E-mails, CD-I 03250-51, 2 pages     189
11  207  Bloomberg headline, CD-I 03094-85,
12
13  208  Handwritten note titled "Ellison,"
14       PS0505, 1 page           191
15  209  E-mails, CA-ORCL 010493-94, 2 pages    192
16  210  E-mails, ORCLA 0023494, 1 page      194
17  211  E-mails, CA-ORCL 010496-97, 2 pages    195
18  212  E-mails, CA-ORCL 010499, 1 page     197
19  213  E-mails, CA-ORCL 010498, 1 page     200
20  214  E-mails, CD-I 03267, 1 page       205
21  215  E-mails, CD-I 03263, 2 pages       205
22  216  E-mails, CA-ORCL 010501-02        207
23  217  E-mails, CD-I 01503, 1 page       208
24  218  E-mails, PS0063-64, 2 pages       214
25  219  E-mails, PS0060-62, 3 pages       215
26  220  E-mails, CD-I 03095-97, 3 pages     218
27  221  E-mails, PS0074-75, 2 pages       223
```

                                          5                                                 6

```
1   DC EXHIBITS (continued)          PAGE
2
3   222  E-mails, ORCLA 0023479-82, 4 pages    223
4
5   223  E-mails, ORCLA 0023515-16, 2 pages    236
6
7   224  Group of documents beginning with
8        "Lawrence J. Ellison - 2000 Stock
9        Option Exercise," PS0300, 40 pages   250
10
11
12
13
14           ---o0o---
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
```

```
1        BE IT REMEMBERED that, pursuant to Notice and
2   on Tuesday, March 16, 2004, commencing at the hour of
3   9:35 a.m., before me, HOLLY MOOSE, CSR No. 6438, a
4   Certified Shorthand Reporter in the State of California,
5   there personally appeared
6
7           PHILIP B. SIMON,
8
9   called as a witness by the Plaintiffs, who, having been
10  first duly sworn, was examined and testified as
11  hereinafter set forth:
12
13
14
15           ---o0o---
16
17
18
19
20
21
22
23
24
25
```

                                          7                                                 8

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1    PROCEEDINGS                    9:35 A.M.
2         THE VIDEOGRAPHER:  Good morning.  This marks
3    the beginning of videotape Volume I, tape 1 in the
4    deposition of Philip B. Simon in the matter of the
5    Coordination Proceedings Special Title, Oracle Cases, in
6    the superior court of the state of California, for the
7    county of San Mateo, Judicial Council Coordination
8    Proceeding number 4180, In Re Oracle Corporation
9    Derivative Litigation, in the court of Chancery of the
10   state of Delaware, in and for New Castle County,
11   consolidated CA number 18751.
12        Today's date is March 16th, 2004, and the
13   time is 9:35 a.m.  The location of this deposition is at
14   the Law Offices of Berman, DeValerio, et al., 425
15   California Street, San Francisco, California.  The
16   deposition was noticed by attorneys for plaintiff, and
17   the videotape is being produced on behalf of the same.
18        The video operator is Trudy Aemett, a
19   California notary public for the county of Alameda,
20   employed by Dan Mottaz Video Productions LLC, 182 Second
21   Street, Suite 202, San Francisco, California, 94105,
22   415-624-1300.  The court reporter today is Holly Moose
23   of Robert Barnes Associates.
24        Would counsel present please identify
25   themselves and state whom they represent.

9

1         MS. LAVALLEE:  Nicole Lavallee of Berman,
2    DeValerio on behalf of the California plaintiffs.
3         MR. SCHECHTER:  Matthew Schechter with
4    McManis, Faulkner & Morgan on behalf of the California
5    plaintiffs.
6         MR. NADOLENCO:  John Nadolenco of Mayer,
7    Brown, Rowe & Maw on behalf of individual defendants
8    Larry Ellison and Jeff Henley.
9         MS. SEGAL:  Lauren Segal from Oracle
10   Corporation on behalf of Oracle Corporation.
11        MR. ZWANG:  Glenn Zwang for Philip Simon.
12        THE VIDEOGRAPHER:  If there are no
13   stipulations, the reporter may administer the oath.
14        (Brief interruption.)
15        MS. LAVALLEE:  Let's go off the record.
16        THE VIDEOGRAPHER:  We are off the record.  The
17   time is 9:37.
18        (Discussion off the record).
19        THE VIDEOGRAPHER:  We are back on the record.
20   The time is 9:38.
21        (Witness sworn).
22        PHILIP B. SIMON,
23   having been first duly sworn, testified as follows:
24        EXAMINATION BY
25        MS. LAVALLEE:  Q.  Good morning, Mr. Simon.

10

1    My name's Nicole Lavallee and I represent the California
2    plaintiffs.  Can you state your full name and address
3    for the record.  Your business address will be fine.
4         A.  My full name is Philip Bernard Simon.  My
5    business address is 101 Ygnacio Valley Road, Suite 310,
6    Walnut Creek, California.
7         Q.  Okay.  Mr. Simon, have you ever been deposed
8    before?
9         A.  I don't believe so, but maybe once a long time
10   ago.
11        Q.  Okay.  And do you -- why do you think you may
12   have been deposed at one point in time?
13        A.  I believe I was prepped once as an expert
14   witness, but I don't believe it happened.  But my
15   recollection of what happened a long time ago is vague.
16        Q.  Okay, great.  Before we start, then, I'd like
17   like to make a couple preliminary statements about some
18   of the ground rules in terms of how we can proceed most
19   effectively.
20        First thing is, to the extent I ask a question
21   that you don't understand, please let me know 'cause I
22   don't want you to assume or misassume what I'm saying.
23   So I'm more than happy to rephrase my question if it's
24   not clear to you.
25        The other thing to remember is that it's

11

1    really important to let me finish my question before you
2    commence your answer, and I'll try to do the same and
3    let you finish your answer before I start my next
4    question.  Does that make sense?
5         A.  Yes.
6         Q.  The other point to make is that to the extent
7    you want to take a break at some point in time, just let
8    me know.  That's not a problem.  I would simply ask that
9    if there's a question pending, that you answer the
10   question fully before we take a break.
11        Does that make sense?
12        A.  Mm-hm.
13        Q.  Okay.
14        A.  I have my cell phone on for urgent calls, so I
15   may need to take a break, but I don't think so.  I've
16   asked people not to call me, but there's a possibility.
17   So I might not be able to let you complete questions if
18   that happens.
19        Q.  Okay.  We'll play it by ear and see what
20   happens.  Thank you for letting me know that ahead of
21   time.
22        Mr. Simon, can you tell me what your
23   educational background is in terms of college education?
24        A.  Undergraduate degree from Yale University in
25   Russian studies, 1975; JD from Stanford Law School,

12

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  1978; almost completed my master's in taxation at Golden
2  Gate.
3      Q.  Okay.  And when was that that you did your
4  portion of your master's for taxation at Golden Gate?
5      A.  '78 to '81, let's say.
6      Q.  Okay.  Now, when you went to Stanford, was Dan
7  Cooperman in your class?
8      A.  I don't -- I don't know.
9      Q.  Okay.  Do you know who Dan Cooperman is?
10     A.  Yes.
11     Q.  Do you know if he went to Stanford around the
12  same time as you?
13     A.  I didn't know he went to Stanford.  I
14  assume -- there's an assumption in your question that he
15  did go to Stanford.  I didn't know he went to Stanford.
16     Q.  Okay.  Have you ever heard of a man named
17  Joseph Grundfest?
18     A.  Yes.
19     Q.  Did you go to school with Mr. Grundfest?
20     A.  Yes, he was in my class.
21     Q.  Do you know where Mr. Grundfest's currently
22  employed?
23     A.  I believe he's a professor at Stanford.
24     Q.  Okay.  Were you friendly with Mr. Grundfest in
25  law school?

13

1      A.  No.
2      Q.  Have you kept in touch with Mr. Grundfest at
3  all since law school?
4      A.  Could you explain what you mean by keeping in
5  touch.
6      Q.  Have you ever communicated with him since law
7  school?
8      A.  I believe when I was interviewed as part of
9  the Special Litigation Committee investigation, I think
10  Joe was there.
11     Q.  Okay.
12     A.  I bumped into him at a reunion for the law
13  school, a reunion dinner, six months ago.  And I may
14  have seen him at a tenth reunion or twentieth reunion.
15  Joe became an SEC commissioner, so everybody in the
16  class, even if you didn't know him, remembered him.
17     Q.  During those prior reunions that you just
18  referenced, did you speak to him at all those
19  reunions?
20     A.  Probably.
21     Q.  Okay.  And other than the context -- or the
22  situations that you've just discussed, have you
23  communicated with Mr. Grundfest since graduating from
24  law school?
25     A.  It's possible.  I have no recollection, but I

14

1  don't know who I met, I mean.  It's possible.
2      Q.  Okay.  Is it fair to say that you don't
3  socialize with him?
4      A.  Correct.
5      Q.  You mentioned the Special Litigation
6  Committee.  And you mentioned that you were interviewed
7  by them, correct?
8      A.  Correct.
9      Q.  Okay.  Do you recall when your interview took
10  place?
11     A.  No.
12     Q.  Did you ever review a copy of the summary of
13  the interview that was done?
14     A.  No.
15     Q.  Okay.  Prior to this deposition -- actually,
16  let me step back a moment.
17         You're represented by counsel here today,
18  correct?
19     A.  Correct.
20     Q.  Okay.  And who is your counsel?
21     A.  Glenn Zwang.
22     Q.  Okay.  Did you have an opportunity to meet
23  with anybody in preparation of this deposition prior to
24  today?
25     A.  Yes.

15

1      Q.  And who did you meet with?
2      A.  I met with Glenn Zwang.
3      Q.  And did you meet with anybody else?
4      A.  I met with people in my office who went
5  through the files to pull documents pursuant to the
6  subpoena.
7      Q.  Okay.  Going back to -- anybody else?
8      A.  No.
9      Q.  Okay.  And going back to your meeting with
10  Mr. Zwang, was that in person or by some other means?
11     A.  We met in person.
12     Q.  Okay.  And did you meet on more than one
13  occasion?
14     A.  For that purpose or for other purposes?
15     Q.  For the purpose of this deposition.
16     A.  That was the only meeting.
17     Q.  Okay.  Have you met with Mr. Zwang in
18  connection with any other matter related to this action
19  or the Delaware action or any litigation involving the
20  trades by Mr. Ellison or Mr. Henley during --
21     A.  Do you define "meeting" in person, or is
22  meeting a communication?
23     Q.  I mean any communication.
24         MR. NADOLENCO:  Object to form.
25         MS. LAVALLEE:  Q.  You can answer the

16

1  question.

2    A. Yes, we sent e-mails back and forth trying to

3  schedule the deposition and schedule a time to meet to

4  prepare for the -- this deposition.

5    Q. Okay. And when did you meet with Mr. Zwang in

6  connection with this deposition?

7    A. A few days ago.

8    Q. And how long did that meeting last?

9    A. Two to three hours.

10    Q. And was anybody else present?

11    A. Part of the time, yes.

12    Q. And who was present?

13    A. Catherine Ong, who's a CPA in my office, who

14  works with me, who did a lot of the legwork in pulling

15  together the subpoenaed documents. O-N-G is how you

16  spell her last name.

17    Q. Thank you. Anybody else?

18    A. I don't believe so.

19    Q. Okay. And you mentioned in connection with

20  this deposition you searched your files to produce

21  certain documents; is that correct?

22    A. Yes.

23    Q. Okay. Prior to the time of this deposition --

24  or prior to the time you received the subpoena in

25  connection with this deposition, had you ever been asked

17

1  to search your files to produce documents in connection

2  with this litigation or related litigation?

3    A. I don't think so, but I don't recall.

4    Q. Okay. And when you searched your files, did

5  you search your personal files for responsive documents?

6    A. When you refer to "you," do you mean me

7  personally or do you mean the people who I had doing

8  this for me?

9    Q. Okay, that's a good point. The -- either you

10  or anybody who was searching the files on your behalf to

11  respond to this subpoena or in connection with this

12  deposition, did you search your personal files in your

13  office, or did you search another location? Can you

14  explain that to me.

15    MR. NADOLENCO: I apologize. Object to the

16  form. Nicole, you keep referring to it as subpoena.

17    MS. LAVALLEE: Okay, that's a fair point.

18    MR. NADOLENCO: Yeah, I mean, I don't know if

19  you issued a subpoena, but I thought it was a notice.

20    MS. LAVALLEE: Okay, that's fine.

21    MR. ZWANG: I'm going to object to the

22  question as vague. Are you asking him whether he

23  searched his office or outside of the office? Is that

24  the point of --

25    MS. LAVALLEE: Okay. And let me clarify and

18

1  ask a better question.

2    Q. In connection with producing documents for

3  today's deposition or in anticipation of today's

4  deposition, did you or anybody acting on your behalf

5  search -- let me ask a different question.

6    Where did the people search to search for

7  documents that are responsive to the documents we asked

8  for in connection with this deposition?

9    A. They searched the files in my office that we

10  thought were pertinent to the document request. We also

11  searched my current computer files. And I had an old

12  laptop, and we searched the old laptop.

13    Q. Okay. And were those the two computers that

14  were -- you were using in the period of time from

15  December 2000 to January 31st, 2001?

16    A. Yes and no.

17    Q. Okay. And can you explain your answer?

18    A. The laptop was being used at that point in

19  time. My current desktop was not.

20    Q. Okay. And were you using any other period --

21  any other computer during that period other than the

22  laptop?

23    A. I'll take your question to mean was I using

24  any other computer at work while engaged in matters

25  relevant to the question -- this litigation. The answer

19

1  is no. But I do have a computer at home that I use for

2  personal purposes, as do my wife and children.

3    Q. And I assume none of those computers are used

4  for any matters related to this litigation?

5    A. That is correct.

6    Q. And in searching for documents, was a search

7  made for documents that may have been communications

8  between members of your office, but not you personally,

9  and Mr. Ellison or any other third party related to Mr.

10  Ellison's trades?

11    A. I believe so, but I don't know for certain.

12    Q. Okay. In connection -- or -- connection of

13  preparing for this deposition, did you review any

14  documents prior to today?

15    A. Yes.

16    Q. Can you tell me what documents you reviewed.

17    A. I reviewed the -- a file that we call -- that

18  dealt with -- that we just kept a separate file for the

19  stock trades during that period. And then I reviewed a

20  bunch of e-mails that had been pulled off my computer

21  that the people that pulled it went through my computer

22  and said were relevant to the document request.

23    Q. Okay. Anything else?

24    A. No.

25    Q. You didn't read any deposition transcripts?

20

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  prior to today?

2      A.  No.

3      Q.  Okay.  And I assume you didn't read anything

4  today --

5      A.  No.

6      Q.  -- for -- okay.  Who was it at your office who

7  pulled the documents that you produced to respond to

8  the -- our request?

9      A.  There were two people, Catherine Ong, who I

10  referred to before, and who was a CPA who has worked

11  with me handling Larry's tax records for the last

12  decade, and my administrative assistant did the copying.

13      Q.  And what is his or her name?

14      A.  Gina Alvarado.

15      Q.  Thank you.

16      A.  A-L-V-A-R-A-D-O.

17      Q.  And you've never done this before.

18      Can you tell me where you're employed

19  currently.

20      A.  I'm employed in the accounting firm Howson &

21  Simon CPAs, LP.

22      Q.  Okay.

23      A.  As -- I really have two jobs.  That's one job.

24  I'm a partner there.  And I'm also a member of a

25  partnership called Lawrence Investments.  I'm president

21

1  of Lawrence Investments.

2      Q.  Okay.  And is Lawrence Investments a

3  partnership?

4      A.  It's a limited -- it's a California limited

5  liability company.

6      Q.  Okay.

7      A.  So technically I'm a member.  I shouldn't have

8  said a partnership.

9      Q.  And what is your role in connection with that

10  limited liability company?

11      A.  On behalf of Lawrence Investments, it's how I

12  receive compensation for providing financial services to

13  Larry Ellison.

14      Q.  And what is the purpose of Lawrence

15  Investments?

16      A.  The purpose of Lawrence Investments is -- it's

17  a separate entity that compensates me separate from the

18  firm and also handles -- it also is a conduit through

19  which many of Larry's private equity investments and

20  other investments are made.

21      Q.  Are any of his equity investments included in

22  that?

23      MS. SEGAL:  Object to the form.

24      MR. NADOLENCO:  Object to the form.

25      MS. LAVALLEE:  You can answer the question,

22

1  unless you don't understand it.

2      THE WITNESS:  The answer's yes.  I said yes,

3  his private equity investments.

4      MS. LAVALLEE:  Oh, I'm sorry, thank you.

5      THE WITNESS:  And there's -- there are some

6  publicly-traded securities held indirectly by Lawrence

7  Investments.

8      MS. LAVALLEE:  Okay.

9      Q.  And does Mr. Ellison hold any Oracle

10  securities through the -- or strike that.  Let me ask

11  another question.

12      Lawrence Investments, does it hold any Oracle

13  securities?

14      A.  Directly, indirectly, the answer's no.

15      Q.  Okay.

16      (Brief interruption.)

17      MS. LAVALLEE:  Q.  And who are the other

18  members of Lawrence Investments?

19      A.  The other members of Lawrence Investments are

20  Steven P. Fink, F-I-N-K, and the Lawrence J. Ellison

21  Revocable Trust.

22      Q.  Any others?

23      A.  No.

24      Q.  And who is Mr. Fink?

25      A.  He is a financial advisor.

23

1      Q.  Okay.  And is he a member of your -- Howson &

2  Simon?

3      A.  No, he's not.  He's based in Los Angeles.

4      Q.  You indicated that you have two positions or

5  two employments, one was the -- as a member of Lawrence

6  Investments and one was as a member of Howson & Simon,

7  correct?

8      A.  As a partner.

9      Q.  As a partner?

10      A.  Howson & Simon's a partnership.

11      Q.  All right.  In connection with your Lawrence

12  Investments membership role, what portion of your work

13  time is devoted to that aspect of your work?

14      A.  Ninety-plus percent.

15      Q.  All right.  And as a partner in Howson &

16  Simon, what is -- what is your role there?  What is your

17  day-to-day business like?

18      A.  My day-to-day role is -- are you asking about

19  the current time, or at the time in question when the

20  trades were taking place?

21      Q.  Okay, well, that's a good point.  Let's go

22  back to the period of 2000 and 2001.

23      A.  My responsibility then was I was responsible

24  for Larry's tax return in related entities and a few

25  other clients' tax returns, as well as rendering

24

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  financial advice to one other individual, unrelated to
2  Oracle and this litigation.
3      Q.  Okay.  And are any of your other clients,
4  people for whom you prepare tax returns, employed by
5  Oracle Corporation?
6      A.  I believe the answer is no, none that I work
7  on directly.  And I do not believe there are any in the
8  office.
9      Q.  Okay.  When did you first come to work for Mr.
10  Ellison?
11      A.  Approximately 1983.  Actually, '93, excuse me.
12      Q.  Okay.  And what were you initially retained to
13  do?
14      A.  To prepare his tax return.
15      Q.  And was that under the -- the -- guise of
16  Howson & Simon, through Howson & Simon?
17      A.  Correct.
18      Q.  Okay.  And did your role -- since that time,
19  have you worked consistently for Mr. Ellison?
20      A.  In addition to working for other clients?
21      Q.  Yes.
22      A.  By "consistently," I mean there's --
23      Q.  What I mean is consistently in terms of time
24  frame, since '93 to the present.
25      A.  Correct.

25

1      Q.  Have you been working for Mr. Ellison?
2      A.  Yes, but not exclusively.
3      Q.  Okay.  Was there ever a period of time that
4  you worked exclusively for Mr. Ellison?
5      A.  No.
6      Q.  And has your role in your work for Mr. Ellison
7  changed since 1993?
8      A.  Yes.
9      Q.  Can you tell me how it has developed over the
10  time.
11      A.  I was initially hired just to prepare his tax
12  return.  And over time, my role as an advisor has
13  increased.  My responsibilities have increased, and I've
14  taken on increased responsibility and involvement in his
15  personal financial matters.
16      Q.  Okay.  And when did that -- has it been a
17  consistent increase of your role -- in your role, or was
18  there a period of time at which it changed?
19      A.  It increased consistently, but there was a
20  dramatic change probably around seven years ago when
21  Lawrence Investments was formed, maybe eight years ago.
22      Q.  Okay.  And at that time, Lawrence Investments
23  was actually formed?
24      A.  Correct.
25      Q.  Okay.

26

1      A.  And at that point in time, I agreed to commit
2  a fixed minimum amount of time to work on Larry's
3  affairs.  And I resigned from working on all my other
4  clients but for one or two other clients.
5      Q.  Okay.  During the 19 -- 1999 time frame, can
6  you tell me what portion of your time you devoted to Mr.
7  Ellison's affairs.
8      A.  Somewhere around 80 to 90 percent.
9      Q.  Okay.  And in 19 -- in 2000, was it the same?
10      A.  Approximately.
11      Q.  In 2002?
12      A.  Approximately.
13      Q.  2001?
14      A.  It's approximately the same throughout.
15  Depends on how you measure that.
16      Q.  What do you mean by that?
17      A.  Do you measure by time; do you measure by
18  effort; do you measure by thought when you're at home,
19  your dreams?
20      Q.  Let's start with actual time.
21      A.  But if you measure by time, what is -- I'm not
22  trying to be facetious, but I don't know what is time,
23  'cause I don't bill by the hour --
24      Q.  Right.
25      A.  -- anymore.  So when you're responsible for

27

1  affecting a result and you think about it on the
2  weekends and you worry about that, is that time or not?
3      Q.  All right.  Let's exclude that, but actual
4  time when you sit at your desk to devote to it.
5      A.  What?  So ask the question again.  What is the
6  question?  I've forgotten what the question is.
7      Q.  The question is what portion of your time,
8  when you're actually devoted to working and not just
9  randomly thinking about it, but --
10      A.  It's not random.
11      Q.  All right, maybe it's not random.
12      A.  (Inaudible).
13      Q.  We can all relate to this.
14      MR. ZWANG:  What portion of your working
15  time --
16      THE WITNESS:  I've said 80 to 90 percent.
17      MR. ZWANG:  -- however you define it --
18      THE WITNESS:  Eighty to 90 percent.  I've said
19  that --
20      MR. ZWANG:  There you go.
21      THE WITNESS:  -- repeatedly.
22      MS. LAVALLEE:  Q.  Perfect.  Just wanted to be
23  clear.  You've started to sort of say, well, it might be
24  more or less, depending on what you wanted to include in
25  there.

28

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1   A.  Well, depending -- well, that's true.

2   Q.  Okay, that's fair.  It sounds like it's fair

3  to say that Mr. Ellison's an important client to you and

4  that you spend a serious amount of time thinking about

5  his affairs.

6   A.  Absolutely.

7   Q.  How do you generally communicate with Mr.

8  Ellison?

9   A.  It has varied over time.

10   Q.  Okay.  How do you currently communicate with

11  Mr. Ellison?

12   A.  Now I communicate in three ways: by e-mail to

13  his assistants, who I ask to communicate things to him;

14  e-mail to Larry directly; and on rare occasion when I

15  want to speak with him, I call the assistants and ask

16  them to put me on the call list to have Larry call me.

17  And then on occasion, Larry may call me.

18   Q.  Okay.  Now, going back to the 1999/2000 time

19  frame, same question:  How did you communicate with Mr.

20  Ellison?

21   A.  I have no clear recollection because -- I was

22  surprised when I went through the e-mails because I

23  would have thought I was communicating the same way.

24  And when I had my files searched, we first did a search

25  for e-mails to Larry, and it's readily apparent that at

29

1  that point in time I primarily communicated through his

2  assistants.  There were an occasional e-mail to Larry,

3  but most of them were to Carolyn Balkenhol, his

4  assistant.

5   Q.  Okay.  And other than those e-mails in the

6  1999 -- or actually, in the 2000 and 2001 time frame,

7  how else did you communicate with Mr. Ellison?

8   A.  The occasional phone call.

9   Q.  And did you ever meet with Mr. Ellison during

10  that time frame?

11   A.  Possibly.

12   Q.  Generally during that time frame, did you have

13  a -- meet with him on a -- you know, semiannually or

14  quarterly?  Did you have a routine in that way?

15   A.  No, no routine.  The meetings were infrequent.

16  I remember going once for over a year, year and a half

17  without a one-on-one meeting.

18   Q.  Okay.  You had indicated -- maybe I'm wrong.

19   A.  Excuse me for one second.  I want to clarify.

20  That was the one and only meeting.  There are times when

21  I meet with Larry when we have agreements or documents

22  that need to be signed with third parties, and I will be

23  there for -- with other people.  But it was never a

24  meeting where we were communicating.  It was a meeting

25  where there was a group.

30

1   Q.  Okay.  Where are your la -- offices located?

2   A.  In Walnut Creek.

3   MR. ZWANG:  Excuse me.

4   MS. SEGAL:  Object.

5   MR. ZWANG:  The question -- listen to the

6  question she asked.  Where are your law offices located?

7   MS. LAVALLEE:  Oh, I'm sorry.

8   MR. ZWANG:  I don't think he's testified that

9  he's practicing law.

10   THE WITNESS:  I don't have law offices.

11   MS. LAVALLEE:  Okay.  And that's fine.  I

12  didn't realize I asked that question.

13   MR. NADOLENCO:  Neither did the court

14  reporter.

15   MS. LAVALLEE:  Neither did the court reporter,

16  looking at the transcript.  I apologize.

17   THE REPORTER:  We'll have to play the audio on

18  that one.  I'm sure you guys are right.

19   MR. ZWANG:  I could be hearing things.

20   MS. SEGAL:  No, I heard it too.

21   MS. LAVALLEE:  Q.  Okay.  Where are your

22  offices located?

23   A.  Walnut Creek, California.

24   Q.  And I -- have they been located there since

25  the '99 to present time frame?

31

1   A.  Correct.

2   Q.  Are you an attorney?

3   A.  I don't --

4   Q.  Let me ask a different question.  You seem --

5   A.  I don't know how to answer that question.

6   Q.  Okay.  Are you admitted to any Bar?

7   A.  No.

8   Q.  Okay.  Have you ever been admitted to any Bar?

9   A.  Yes.

10   Q.  Okay and what Bar were you admitted to?

11   A.  State of California.

12   Q.  Okay.  And during what period of time?

13   A.  Approximately 1978, when I graduated law

14  school and passed the Bar in the fall, until when they

15  enacted continuing minimum legal education.

16   Q.  Generally what time frame was that?

17   A.  Mid '80s.  I'm speculating.  I don't know.

18   Q.  Can you describe for me in general the types

19  of tasks that you perform for Mr. Ellison.

20   MR. ZWANG:  Object to the form.

21   MS. LAVALLEE:  Actually, let me rephrase my

22  question.

23   Q.  Can you describe for me generally the types of

24  tasks that you performed for Mr. Ellison during the 2000

25  and 2001 time frame.

32

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1   A.   I was responsible for handling the tax filings
2   for Larry and his related entities.  I was responsible
3   for cash management, cash flow, managing bank
4   relationships, brokerage relationships, private equity
5   investments.  Essentially everything financial in
6   Larry's life outside of Oracle.
7   Q.   Okay.  And you referred to his -- his
8   entities.
9   A.   Mm-hm.
10   Q.   What entities were those during that time
11   frame?
12   A.   I can't be certain because entities have been
13   added and subtracted.  But the entities primarily
14   consist of legal entities that would hold his airplanes,
15   that would hold homes, that would hold investments.
16   Larry's limited liability companies and corporations.
17   Q.   Okay.  Can you tell me which entities held his
18   securities in Oracle Corporation during the 1996 through
19   2001 time frame.
20   MR. ZWANG:  Object to the form.
21   THE WITNESS:  Am I supposed to answer it when
22   he objects?
23   MS. LAVALLEE:  Yes, actually, maybe --
24   basically the rule is that if -- they can raise
25   objections.  But unless your counsel specifically

1   advises you not to respond to the question, you should
2   answer the question.
3   THE WITNESS:  Okay.  Thank you.
4   MR. ZWANG:  The lawyers talk for the judges.
5   THE WITNESS:  Okay.  Ask the question again.
6   MS. LAVALLEE:  Yes.
7   MR. ZWANG:  It was what entity or entities --
8   MS. LAVALLEE:  Actually, could I just have the
9   question read back, please.
10   MR. ZWANG:  Sure, go ahead.
11   (Record read as follows:
12   Q.   Can you tell me which entities held
13   his securities in Oracle Corporation during
14   the 1996 through 2001 time frame.)
15   MR. NADOLENCO:  Same objection.
16   THE WITNESS:  Larry's Oracle shares were
17   originally held in his own name, Lawrence J. Ellison.
18   Sometime during this time frame they were transferred
19   from his own name to the name of the Lawrence J. Ellison
20   Revocable Trust.  His options were not transferred;
21   they're -- because they are employee options, they are
22   still registered in his own name.
23   MS. LAVALLEE:  Thank you.
24   Q.   And do you know when the change from ownership
25   in his own name to the Lawrence J. Ellison Trust for the

1   shares occurred?
2   A.   Yes.
3   Q.   Generally do you believe it was prior to or
4   after December 2000?
5   A.   Prior to, definitively.
6   Q.   Are you a trustee of the Lawrence J. Ellison
7   Trust?
8   A.   Yes, I am.
9   Q.   And who else is a trustee?
10   A.   Lawrence J. Ellison.
11   Q.   Do you have a power of attorney on behalf of
12   Mr. Ellison?
13   A.   Yes, I --
14   MR. NADOLENCO:  Object to the form.
15   THE WITNESS:  Yes, I do.
16   MS. LAVALLEE:  Q.   And is it a general or a
17   limited?
18   A.   General power of attorney, nondurable.
19   Q.   Generally when you sign documents as -- in
20   your capacity as power of attorney for Mr. Ellison, how
21   do you actually sign?
22   A.   Pursuant to the power of attorney, I sign
23   "Lawrence J. Ellison by Philip B. Simon," comma, "his
24   attorney in fact."
25   THE REPORTER:  In effect or in fact?

1   THE WITNESS:  In fact.
2   THE REPORTER:  Thank you.
3   MS. LAVALLEE:  Q.   And that's your general
4   practice?
5   A.   Generally.
6   Q.   Do you deviate from that any?
7   A.   I may.  I try not to.
8   Q.   And is it fair to say that in your capacity as
9   power of attorney, you have the ability to trade Oracle
10   securities on behalf of Mr. Ellison?
11   A.   I have the legal authority, yes.
12   Q.   And you seem to hesitate there in making a
13   distinction as to legal authority.  Does -- in practice,
14   do you really have that authority or you -- just your
15   use of the term "legal authority" indicates to me that
16   you might be qualifying that some way.  Am I incorrect?
17   A.   No.  I have the legal authority to sell all of
18   Larry's Oracle shares, to do anything I want with all of
19   Larry's assets.  But I work for Larry and I generally
20   follow his instructions, and I hold myself as a
21   fiduciary.
22   Q.   Okay.  And generally is it Mr. Ellison who
23   makes the decisions as to whether or not to purchase or
24   sell his securities in Oracle Corporation?
25   A.   Correct.  Excuse me, I'd like to modify that

Simon, Philip B. (Vol. 01) - 03/16/2004   3/16/2004   12:00:00 AM

1    that is generally the case except for exercising stock
2    options at year-end.
3        Q.  Okay.  And why is there an exception in that
4    instance?
5        (Mr. Nastari entered the room).
6        THE WITNESS:  We -- we've evolved the practice
7    over the years that you -- for tax planning purposes,
8    when you want to bring in more income for his tax
9    return, to exercise options.  And if you were merely
10   exercising options but not doing -- disposing of the
11   underlying shares, there's no change in the economic
12   ownership interest in the company.
13       And over time, since it's gotten to be a
14   recognized tax planning strategy, I've basically evolved
15   to the authority position, since I have the legal
16   authority where I exercise the options to trigger the
17   income.  And I frequently now sometimes do it and e-mail
18   Larry after the fact --
19       MS. LAVALLEE:  Okay.
20       THE WITNESS:  -- rather than getting okay
21   before.  But I do not sell the underlying shares.
22       MS. LAVALLEE:  Okay, thank you.
23       (Mr. Nastari and Ms. Lavallee confer
24   privately).
25       MS. LAVALLEE:  I apologize for that.

37

1        MR. NADOLENCO:  Nicole, I'm hopeful that
2    that's not something that's going to keep happening
3    today.
4        MS. SEGAL:  Or more specifically that he's not
5    reporting on testimony of Chuck Phillips to impact your
6    questioning of Philip Simon.
7        MS. LAVALLEE:  No.  The purpose of --
8        (Ms. Durousseau entered the room).
9        MS. LAVALLEE:  -- our discussion really
10   related to the timing of what's going on in there.
11       MS. SEGAL:  Okay.
12       MS. LAVALLEE:  Just so you know.
13       MS. SEGAL:  Thanks.
14       MS. LAVALLEE:  I just need to read back here.
15       Q.  Mr. Simon, can you tell me when you started
16   the practice -- or you and Mr. Ellison started the
17   practice of -- that you discussed just a few minutes ago
18   regarding tax planning at year-end?
19       A.  Probably the first year he -- Larry became a
20   client.
21       Q.  And when was it that you started to execute
22   this practice and alert Mr. Ellison after the fact?
23       A.  Recent years.
24       Q.  And by "recent years," do you -- can you be
25   more specific.  Was it before or after 2001?

38

1        A.  I -- I don't recall.  It just gradually became
2    a nonevent because there was no change in economic
3    ownership when you convert from an option to an equity.
4    And if you were just making the exercise to trigger the
5    unrealized gain as taxable income, it really is just a
6    tax planning exercise.  And I have the authority to
7    optimize tax planning strategy.  And so it just happened
8    over time.
9        Q.  Okay.  Mr. Simon, do you have a cell phone
10   currently?
11       A.  Yes.
12       Q.  Okay.  And did you have a cell phone in the
13   2000/2001 time frame?
14       A.  Yes.
15       Q.  Okay.  And do you carry a Palm Pilot?
16       A.  No.
17       Q.  Or some variation of a PDA?
18       A.  No.
19       Q.  Okay.  Lucky you.  Do you -- I assume you have
20   access to e-mail because we've been talking about
21   e-mails.
22       A.  Correct.
23       Q.  And that was the case also in 2001/2002?
24       A.  Correct.
25       Q.  You also indicated that you have a laptop and

39

1    that the laptop was something that was in use in the
2    December 2000 to January 2001 time frame.
3        A.  It was my sole computer at that -- during that
4    time frame.
5        Q.  Okay.  Okay.  If Mr. Ellison wants to reach
6    you, how does he communicate with you?  Does he have all
7    your phone numbers, or does he have a certain practice
8    that he calls one in particular or does one type of
9    thing to communicate with you?
10       MR. ZWANG:  I'm going to object.  He's already
11   told you how he communicates with Mr. Ellison.
12       MS. LAVALLEE:  Well, let me step back and
13   actually ask a different question that might resolve
14   your concern.
15       Q.  Does Mr. Ellison have all your phone numbers?
16       MR. NADOLENCO:  Objection.  Lacks foundation.
17       THE WITNESS:  I don't know.
18       MS. LAVALLEE:  Okay.
19       Q.  Do you know if Mr. Ellison has your cell phone
20   number?
21       A.  I don't know.
22       Q.  Do you know if his assistant has your cell
23   phone number?
24       A.  Yes, I do.
25       Q.  Okay.  And does she --

40

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  A.  Yes.

2  Q.  Okay.  And who was Mr. Ellison's assistant or

3  assistants during the December 2000 January 2001 time

4  frame?

5  A.  Carolyn Balkenhol, B-A-L-K-E-N-H-O-L.  And

6  there were -- Joyce Higashi was probably there,

7  H-I-G-A-S-H-I.  And maybe there were others.  I don't

8  know.

9  Q.  Okay.  And generally who did you communicate

10  with?

11  A.  Carolyn.

12  Q.  Did you ever communicate with Joyce Higashi?

13  A.  Possibly, but unlikely.

14  Q.  Prior to December of 2000, when was the last

15  time Mr. Ellison had sold any securities of Oracle

16  Corporation?

17  A.  I don't know without looking at the documents

18  that were provided you.

19  Q.  Okay.  And do you recall generally whether or

20  not that had occurred between 1997 and 2000; do you

21  know?

22  A.  I do not know.

23  Q.  Do you recall that in December of 2000, Mr.

24  Ellison had a series of options that were about to

25  expire -- or that were going to expire in August of

41

1  2001?

2  A.  I did not recall that until I reviewed the

3  e-mails and documents that you requested and prepared

4  for the deposition.

5  Q.  Okay.  Is it your understanding that he had

6  some options at that time that were going to expire in

7  August of 2001?

8  A.  Based on my review of the documents, yes.

9  Q.  Can you tell me whether -- strike that.

10  Can you tell me when you first had a

11  communication with Mr. Ellison regarding those specific

12  options that were going to expire in August of 2001.

13  A.  I don't recall.

14  Q.  Do you recall discussing those options any

15  time prior to December of 2000?

16  A.  Based on e-mail communication that I reviewed

17  as part of preparing data for your document request,

18  those e-mails indicate that yes, I did.

19  Q.  Okay.  And do you have any recollection beyond

20  what you saw in those e-mails?

21  A.  No specific recollection, though I was aware

22  of these.  And it was my job to bring expiring options

23  to Larry's attention.

24  Q.  Okay.  And generally what was -- in terms of

25  your -- you talked about your task to bring it to his

42

1  attention.  What was it that you did to do this, to

2  bring it to his attention?

3  A.  Twelve, 18 months out, when it was an

4  appropriate time, I'd mention that "There are expiring

5  options, and you don't want to let your options expire,

6  and we have to plan" --

7  Q.  Okay.

8  A.  -- "the timing for exercise."

9  Q.  And generally after mentioning the fact that

10  these options exist and they're going to expire, did you

11  have a practice as to make recommendations?

12  A.  Yes.

13  Q.  And generally what were your recommendations?

14  Did it depend?

15  A.  My general recommendation to Larry was to

16  exercise and sell your stock options, to diversify and

17  to reduce debt.

18  Q.  Was that consistently your recommendation

19  during the 1999 -- or 1998 to 2001 time frame?

20  A.  No.  As the option got closer to expiring, the

21  urgency or the strength with which I felt "you have to

22  do something" rose.  And as Larry's debt level rose,

23  my -- and cash spending rose and liquidity needs

24  increased, I spoke up more strongly.

25  MS. SEGAL:  "Liquidity," I think, was the

43

1  word.

2  THE WITNESS:  What?  Liquidity?

3  MS. SEGAL:  The court reporter.

4  THE WITNESS:  You okay?

5  MS. LAVALLEE:  She got it.

6  THE WITNESS:  Okay.

7  MS. LAVALLEE:  Q.  You mentioned that Larry's

8  debt level rose.  When did that occur?

9  A.  Incrementally over time.

10  Q.  Okay.  And his cash spending rose.  Was that

11  also an incremental increase over time?

12  A.  Incrementally, but if -- yes.  Your debt level

13  rises, but it grows at an ever-increasing rate over this

14  period of time as commitments were made to invest in

15  companies and to purchase assets.  And you also have the

16  accrual of interest on the debt.

17  Q.  And when did the commitments increase as a

18  result of investments in companies?

19  A.  Continuously, 'cause Larry's continuously been

20  investing in companies since I've been working with

21  Larry.

22  Q.  You indicated -- indicated -- and correct me

23  if I'm wrong -- that generally -- you know, in the

24  general period of, say, 1997 through 2001, you would

25  recommend that he sell -- exercise his options and sell

44

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  them to diversify and reduce debt; is that correct?
2  A.  I wouldn't -- I don't think I said "1997."
3  Q.  Okay.
4  A.  You were asking within the 12- to 18-month
5  time frame preceding the stock sales --
6  Q.  Okay.
7  A.  -- in question.
8  Q.  So what period of time, then, are we talking
9  about?
10  A.  Twelve to 18 months.
11  Q.  So we're talking, then, about June of 1999,
12  roughly, through --
13  A.  I would assume so.  I don't have an exact
14  cutoff or an exact date for you.
15  Q.  Okay.
16  A.  It's just trying to recall an approximation.
17  Q.  Okay.  And prior to that time, did you have
18  discussions with Mr. Ellison regarding expiring options,
19  or his options in Oracle securities?
20  A.  I probably did, but I don't know if there were
21  expiring options -- significant expiring options before
22  that time.
23  Q.  Okay.  That's a fair question.  Prior -- so
24  let me clarify my question to say prior to the June '99
25  time frame, or roughly then, did you have discussions

45

1  with Mr. Ellison about selling some -- or exercising and
2  selling some of his options in Oracle Corporation?
3  A.  I assume some, you know, throughout the period
4  that I've worked for Larry that I have periodically
5  brought up the concept of diversification.  I do not
6  know if I specifically brought up the concept of
7  diversification via exercising and selling options,
8  because I believe in the earlier years, the options were
9  not expiring.
10  So you generally have an option.  The longer
11  you hold it, you get a better economic benefit by riding
12  the option.  So I would suspect then you -- you know,
13  before that 18-month time frame, referring to options,
14  it's unlikely, other than the year-end -- what I would
15  call -- it's a large dollar amount, but relative to
16  Larry's holdings in Oracle, very minor option exercises
17  at year-end for tax planning purposes.
18  Q.  Okay.  So if I understand you correctly,
19  generally you would recommend -- barring any external
20  considerations like reducing debt or diversification,
21  you would recommend that he generally hold on to his
22  options for a certain period of time because there was
23  advantages to doing that; is that correct?
24  A.  Correct, yes.
25  Q.  Okay.  And then now going back to the

46

1  June 1999 or roughly thereabout time frame, going
2  forward to the time of the trades in question in
3  December and January 2001, is it correct to say that you
4  testified -- I just want to be clear on the record that
5  generally your recommendations were that Mr. Ellison
6  should sell -- exercise and sell -- exercise his option
7  and sell the shares he acquires from the exercise in
8  order to diversify, and then to reduce debt as well; is
9  that correct?
10  A.  And primarily, which you're not -- I may have
11  not stated, is the options expire.  My recommendation
12  was indeed that you exercise the options and extract the
13  economic value rather than letting them expire.
14  Q.  Okay.
15  A.  That's the first consideration.
16  Q.  Okay.  And --
17  A.  The second consideration, yes, is it does
18  achieve diversification and raise cash to pay down debt.
19  Q.  Okay.  And in terms of expiring options,
20  what choices did Mr. Ellison have in terms -- just
21  generally when he had expiring options in Oracle
22  securities, what were his options in terms of what to do
23  with those options in --
24  A.  You're asking, really, what are your
25  alternatives with expiring options?

47

1  Q.  Correct.
2  A.  'Cause you used the word "options" with
3  "options."  Just to make it clear --
4  Q.  Yes.
5  A.  -- we'll refer to one's investment
6  alternatives with respect to expiring options.
7  As I see it, you basically have two
8  alternatives:  You can exercise the options and sell
9  them to extract the gain, or you can let them expire
10  unused and forgo the economic benefit to you and also
11  cause an injury to Oracle Corporation by not -- because
12  you're not giving rise to a tax deduction.
13  I'm -- you know, when you exercise stock
14  options, the employee picks up compensation income for
15  the built-in gain, but the corporation also gets a
16  deduction that reduces its tax liability.
17  Q.  Okay.  Any other alternatives?
18  A.  Basically -- that I raised with Larry?
19  Q.  No, generally.
20  A.  You could also -- if you have the cash to pay
21  the strike price and the income tax withholding and the
22  tax liability, you could exercise and hold the option.
23  So basically there are three alternatives.
24  Q.  And is there any other alternative?
25  A.  Not that I'm aware of.

48

Simon, Philip B. (Vol. 01) - 03/16/2004   3/16/2004   12:00:00 AM

1    Q.   Okay.
2    A.   Let me just clarify that.  I don't believe
3  there's any other alternative.  But at one point in time
4  when I reviewed my e-mails, someone from Morgan Stanley
5  contacted me about some sort of derivative that
6  supposedly would enable you to exercise the option but
7  somehow enter into a derivative transaction that would
8  somehow allow you to synthetically extend the option out
9  for a longer period of time.
10       I don't understand that.  I don't know if it
11  really exists.
12       MS. LAVALLEE:  Okay.  Actually, we've been
13  going for about 55 minutes.  I'd like to take a break at
14  this point for five minutes, if that's good.
15       THE WITNESS:  Okay.
16       MS. LAVALLEE:  Thanks.
17       THE VIDEOGRAPHER:  We are off the record.  The
18  time is 10:26.
19       (Recess taken).
20       THE VIDEOGRAPHER:  We are back on the record.
21  The time is 10:37.
22       MS. LAVALLEE:  Hi, Mr. Simon.  We were
23  just talking before the break regarding various
24  alternatives that Mr. Ellison would have when he has
25  options that are expiring.  And you covered four

49

1  options, I believe -- or alternatives.  Can you think of
2  anything else?
3    A.   Nothing comes to my mind right now.
4    Q.   Okay.  And prior to that, we were actually
5  discussing conversations that you had with Mr. Ellison
6  between the general time frame of roughly around
7  June 1999 through December of 2000 with respect to the
8  options that he had in Oracle securities that were to
9  expire in August of 2001.  You recall that?
10   A.   That we were discussing this?
11   Q.   Yes.
12   A.   Yes.
13   Q.   Okay.  Do you recall when was the first time
14  that you had any such discussion with Mr. Ellison?
15   A.   No.
16   Q.   Do you recall any of the discussions that you
17  had with Mr. Ellison in that time frame?
18   A.   No.
19   Q.   Okay.  Stepping back again, we -- we talked
20  about your general practice when -- during that time
21  frame to recommend that Mr. Ellison, one, exercise the
22  options, and then two, sell them in order to diversify
23  as well as to reduce debt; is that correct?
24   A.   Correct.
25   Q.   Okay.  Can you tell me what Mr. Ellison's

50

1  reaction or response to those recommendations were
2  during that June 1999 to December --
3    A.   I --
4    Q.   -- 2000 time frame?  Thanks.
5    A.   From June '99 through ...
6    Q.   Through December of 2000.
7    A.   I don't recall having those conversations
8  myself, so I don't recall any response.
9    Q.   Okay.  But you -- based on your reading of the
10  documents or e-mails that you produced, it's your
11  understanding that generally those types of discussions
12  took place during that time frame; is that correct?
13   A.   There was e-mail, and there was also notes in
14  the documents of a meeting with Larry documenting that
15  we discussed this.
16   Q.   Were those handwritten notes?
17   A.   Yes.
18   Q.   And can you -- do you recall now whether -- or
19  when that meeting took place?
20   A.   No.
21   Q.   Okay.
22   A.   If it would help you when you search the
23  documents chronologically, I would suspect in the
24  March 2000 to June 2000 time frame there might be some
25  handwritten -- there's a one-page handwritten note.

51

1    Q.   Okay.
2    A.   Somehow the date March 27th, 2000 sticks in
3  my mind, but I don't know if that's correct.
4    Q.   Okay.  That's helpful, thank you.  Is it fair
5  to say that Mr. Ellison, during the time frame of
6  June 1999 and, say, November of 2000, did not adopt your
7  recommendation to sell and -- or exercise and sell those
8  options?
9    A.   No, because my recommendation was to exercise
10  and sell the options, but we never discussed the timing
11  of when to exercise and sell.  And since he did exercise
12  and sell in January, I could conclude that he did follow
13  my recommendation.  I just don't know.
14   Q.   Okay.
15   A.   There's multiple variables in the
16  determination of when to make it -- when and how to make
17  a decision.
18   Q.   Okay.  And what would those variables be?
19   A.   Should you exercise the option, and when
20  should you exercise the option.
21   Q.   Okay.  I think I misunderstood your
22  question -- your answer, then.
23   A.   Well, you were asking did he follow my
24  recommendation, and the answer is yes and no.  I don't
25  know what the question -- he did follow a recommendation

52

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1 'cause he did exercise and sell the options.
2 Q. But you don't know, actually -- do you know
3 whether or not it was because he wanted to follow your
4 recommendation?
5 A. I would like to believe that my
6 recommendations had some influence.
7 Q. All right. But you actually don't
8 specifically know. You're not Mr. Ellison, right?
9 A. No.
10 Q. Okay. Do you recall generally any response or
11 reaction that Mr. Ellison had to those recommendations
12 during that general time frame of June 1999 through
13 November of 2000?
14 A. No. I would have to look at the documents
15 provided and see what's noted there and draw some
16 conclusions from the notes or the e-mails.
17 Q. Okay. All right. During that same time frame
18 of June 1999 through the end of, let's say, November of
19 2000, did you have any discussions with anybody other
20 than Mr. Ellison regarding the options that were going
21 to expire in August of 2001?
22 A. I have no clear recollection, but I suspect
23 within my office we had discussions for tax planning
24 purposes about trying to plan -- how to deal with the
25 exercise of this large option grant.

53

1 And there may have also been communications
2 with Oracle's tax department. I'm not certain if
3 there's communications in the specific time frame you
4 referred to. But you will see, I believe, in the e-mail
5 packet there's an e-mail dated January 10, 2001 from Deb
6 Lange, Oracle's tax department, talking about Oracle's
7 preferences for the timing of the option exercise.
8 Q. Okay. And why is it that you were
9 communicating with Oracle's tax department regarding the
10 issue of the timing of Mr. Ellison's exercise of the
11 options?
12 A. You're communicating with the tax department
13 and with Oracle's budgeting because we would be
14 contacted, because when Oracle's putting together its
15 budget, what Larry does personally affects Oracle's
16 budget and planning for these years.
17 They would ask us -- or ask me, representing
18 Larry, what our plans were. It would affect the budget
19 because the option grant had such a large amount of
20 built-in gain that, from a budgeting standpoint, the
21 executive -- the cost center would have to bear the
22 Medicare tax of 1.45 percent, which is a very large
23 dollar amount. So they were concerned about when to
24 budget that in their budgeting for fiscal years.
25 And from the corporate tax perspective, as I

54

1 alluded to before, when you exercise a nonqualified
2 stock option, the built-in gain is taxable income to the
3 employee. It's compensation income. But the
4 corporation gets an offsetting tax deduction, which
5 reduces their corporate income tax liability.
6 And I believe Oracle was -- Oracle legal --
7 Oracle tax department was contacting me, as Larry's
8 representative, to find out what our -- what Larry's
9 plans were so they could plan their tax strategy for
10 Oracle Corporation on both cash flow, as well as
11 maximizing their (inaudible), a whole range of issues.
12 THE REPORTER: I'm sorry, I missed that. Cash
13 flow, as well as what -- maximizing their what?
14 THE WITNESS: Tax strategies and, for example,
15 possibly creating a net operating loss and carrying back
16 a net operating loss.
17 You will see that referenced in the
18 January 10, 2001 e-mail.
19 MS. LAVALLEE: Q. Okay. And did you ever
20 have any discussions with Mr. Ellison regarding -- at
21 any point in time regarding the tax consequences for
22 Oracle Corporation?
23 A. I don't recall.
24 Q. Okay. Do you have any understanding as to
25 whether or not Mr. Ellison was aware of those issues?

55

1 A. I have no way of knowing.
2 Q. Okay.
3 A. It's possible I raised them, but I don't
4 recall.
5 Q. And with respect to the budgeting concerns for
6 Oracle Corporation, do you -- did you have any
7 discussions with Mr. Ellison regarding that particular
8 issue at any point in time?
9 A. I doubt it. I don't recall.
10 Q. Okay. And do you know whether or not Mr.
11 Ellison was aware of those particular issues?
12 A. I have no way of knowing.
13 Q. But you did indicate that the tax department
14 at Oracle contacted you regarding their concerns in
15 terms of the tax implications of when Mr. Ellison
16 exercised his options?
17 A. They were doing their planning and they wanted
18 to know what we were planning on doing so they could do
19 effective planning for Oracle Corporation.
20 Q. Okay. So I guess it's fair to say that they
21 would want to know, as soon as a decision is made, what
22 the decision was, to sort of take that into account on
23 their planning?
24 A. Or they would want to affect the decision,
25 because if we could benefit Oracle Corporation, our

56

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  planning, our general policy is to benefit Oracle
2  Corporation.  So if we can do something that would work
3  for the benefit of the corporation -- so basically you
4  want to -- you want to basically integrate the planning
5  to a limited extent.
6      Q.  And when you say "we," who are you referring
7  to?
8      A.  We, me.  I take responsibility for managing
9  Larry's tax liability optimization strategy and cash
10  flow.
11      Q.  Okay.
12      A.  And when I -- if I can accomplish those
13  objectives while benefiting Oracle Corporation, I always
14  do that.
15      Q.  Okay.  Do you know if that's a factor that Mr.
16  Ellison took into account in his decision-making as to
17  when to exercise his options?
18      A.  I do not know.
19      Q.  Do you recall any discussions during the same
20  June 1999 to the end of November of 2000 time frame --
21  any discussions regarding the possibility of donating
22  the shares -- the options that were expiring in
23  August 2001?
24      A.  I have no recollection, but when I reviewed
25  e-mail in preparation for the deposition today, I saw an

57

1  e-mail referring to a possible thought, could the
2  options possibly be donated to charity.
3      Q.  Okay.  And do you recall any discussions with
4  Mr. Ellison regarding that matter?
5      A.  No.
6      Q.  Okay.  Do you know whether or not you had any
7  such discussions with Mr. Ellison?
8      A.  Since I don't recall, there's no way for me to
9  know whether I did or did not.  I think it's unlikely,
10  but I do not recall.
11      Q.  Okay.  I just wanted to clarify that.  Thanks.
12          And why was it that you wanted -- that you
13  were making recommendations to Mr. Ellison to diversify
14  during that time frame?
15      A.  Prudence.  The -- during that time frame, the
16  stock market had risen significantly.  There was a stock
17  market -- in hindsight, there was a stock market bubble
18  that peaked at the end of March, I think, 2000, and
19  stocks had risen significantly.
20          So on general macroanalysis, and it made sense
21  to diversify out of a stock that had appreciated to a
22  significant amount, and Larry's debt level had also been
23  increasing rapidly.
24      Q.  Okay.  Focusing now on the diversification,
25  were there any issues particular to his financial

58

1  situation that caused you to want him to diversify?
2      A.  Yes.
3      Q.  And what were those?
4      A.  Single stock position and large amount of
5  debt.
6      Q.  Now, in terms of the debt level, I think you
7  indicated that it was generally increasing during this
8  time frame.
9      A.  At an increasing rate.
10      Q.  Okay.
11      A.  It was accelerating.
12      Q.  Okay.  All right.  We'll come back to that
13  issue a little bit later.
14      A.  Okay.
15      Q.  When was it that you first learned that Mr.
16  Ellison had made a decision to exercise his options that
17  were expiring in August of 2001?
18      A.  My recollection is sometime in January, I
19  believe the Friday afternoon before the -- or Friday
20  morning before the stock trades began.
21      Q.  Okay.  And do you recall whether that was
22  January 19, 2001?
23      A.  What was the first day of the trading; do you
24  know?
25      Q.  January 22nd.

59

1      A.  That'd be the Monday?  Was that a Monday.
2      Q.  Yes, I believe so.
3      A.  If January 22nd was a Monday, then
4  January 19th would be the date.
5      Q.  Okay.
6      A.  It would be Friday.
7      Q.  And why do you -- why is it that you recall
8  specifically that date?
9      A.  I was just getting home from a vacation.  I
10  just got home the day before, and I was off work.
11      Q.  Okay.  Had you gone back to the office on the
12  19th?
13      A.  No, I was called at home.
14      Q.  Okay.  And who called you?
15      A.  I suspect it was Carolyn.  I don't know.
16      Q.  Okay.  And where were you on vacation?
17      A.  I think I was in New Zealand at that time.
18      Q.  Okay.  How long had you been gone for?
19      A.  Two weeks, 13 days, something like that.
20      Q.  Okay.  Actually, I'd like to step back and go
21  back to the December time frame.
22          Had you had any discussions with Mr. Ellison
23  in December of 2000, do you recall, regarding his
24  exercise -- or his options that were expiring in August
25  of 2001?

60

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  A.  I have no recollection.  However, when I
2  reviewed the documents and the e-mails in preparation
3  for this deposition, I saw that we -- that we, I,
4  exercised some stock options in December for tax
5  planning purposes.
6  So as I told you is my pattern, I either
7  checked with Larry first or gave an e-mail while I was
8  doing it.  So clearly there was some form of
9  communication from me to Larry about the options.  And
10  no doubt, while I did that, I would probably have
11  e-mailed or communicated that there are also a whole
12  bunch of expiring options that have to be dealt with in
13  the very near future.
14  Q.  Okay.  And based on your review of the
15  documents and your recollection, do you have any
16  understanding as to whether or not Mr. Ellison responded
17  to your suggestions at that time?
18  A.  I have no recollection.
19  Q.  And what was discussed -- or what were your
20  communications on the Friday, January 19th?
21  A.  I was -- I -- I'm -- I'm speculating.  I can
22  only try to guess my recall.  But it was that Larry said
23  let's go, we should exercise the options and I should
24  get it set up.
25  Q.  Okay.  And I don't want you to guess, just --

61

1  but to the extent you have -- can make a reasonable --
2  respond reasonably, based on your understanding of what
3  might have occurred or what did occur --
4  A.  It would be all speculation --
5  Q.  Okay.
6  A.  -- 'cause I have no recollection of what --
7  who -- I don't know who called me --
8  Q.  Okay.
9  A.  -- or what was said, other than that I know I
10  got the instruction to set up --
11  Q.  Okay.
12  A.  -- to get the -- get going, to get ready to do
13  the stock option exercise and trading.
14  Q.  Okay.  And prior to that time, had you made
15  any decision as to which brokerage firm you would use if
16  Ellison actually exercised those options?
17  A.  I don't know if I did.  That's generally my
18  decision.  I don't know if I -- clearly I probably
19  thought about it.  But I don't know if I had made a firm
20  decision before that date.
21  Q.  Okay.  And did you use -- you indicated
22  earlier that you did your annual exercise of options at
23  year-end, a calendar year-end in December of 2000.  And
24  did you use Merrill Lynch at that time?
25  A.  You don't use a broker when you exercise and

62

1  hold options at year-end.
2  Q.  Okay.
3  A.  That is just a form you file with Oracle to
4  exercise your options.  You pay the wage withholding and
5  the strike price, and the certificate is delivered from
6  Equiserve, on behalf of Oracle's transfer agent, to the
7  employee.
8  Q.  Okay, perfect.  So sitting here, you don't
9  have any recollection that you actually communicated
10  with Merrill Lynch any time prior to receiving the
11  instruction to trade on January 19th?
12  A.  That is correct.
13  Q.  Do you recall what your instructions were in
14  terms of the actual trades?
15  A.  No, I do not.
16  Q.  Okay.  Do you recall generally whether or not
17  they were instructions to exercise all the expiring
18  options?
19  A.  I'm relying on the documents that are provided
20  to you pursuant to the document request.  And based on
21  that document request and my review of the documents, it
22  appears that my instruction was to exercise and sell all
23  the options, if possible.
24  Q.  Okay.  And did you have any understanding
25  whether there was an intent to sell shares that were

63

1  acquired prior -- previously?
2  A.  Based -- again, based on my review of the
3  documents and my e-mail communications, which -- copies
4  of which you have, they lead me to conclude that yes,
5  there was a discussion about trying to get the debt paid
6  down to $400 million.  And that was roughly a paydown of
7  like $825 million.
8  And I saw an e-mail calculating the amount --
9  the number of shares that would need to be sold, I think
10  it's 40.7 million shares, to generate enough after-tax
11  proceeds to do the debt paydown.
12  Q.  Okay.  But you have no specific recollections
13  regarding any communications about that?
14  A.  I have the e-mail document from me to Carolyn
15  or to Larry that's in the document packet that sets
16  forth -- sets this forth.  But prior to my reviewing, if
17  you had asked me, I have no recollection.
18  Q.  Okay.  And in turn, do you have any
19  recollection regarding the specific terms or conditions
20  placed on the actual execution of the trades?
21  A.  I had no recollection.  However, when I
22  reviewed my notes better and the e-mails that have been
23  provided to you, it appears there was, at one point in
24  time during part of the trading process, a $30-per-share
25  floor limit.

64

Simon, Philip B. (Vol. 01) - 03/16/2004   3/16/2004   12:00:00 AM

1     Q.   Okay.  And do you know whether or not there
2     had actually ever been a $32 floor limit?
3     A.   No, I do not recall.
4     Q.   Okay.  And who was it who initially raised the
5     issue of a price floor limit?
6     A.   It would be me probably, or Larry, because
7     when I would -- I don't have any recollection, but --
8     I'm just speculating here.  But when I ask for an
9     instruction and request an instruction, I need clear
10    instructions.  And I would raise the issue.  If you tell
11    me to sell something, I would say "At what price, what
12    terms, when?  Let's discuss the parameters."
13    Q.   Okay.  And do you recall anything regarding a
14    limit or conditions on the volume of shares to be traded
15    on a particular day?
16    A.   I have a vague recollection that I was
17    concerned about -- there's a general rule of thumb that
18    you don't want to sell more than ten percent of the
19    trading volume in any one day.  This was information I
20    received from Merrill Lynch and other brokers.
21         And if you sell more than ten percent, you can
22    have a negative effect, potentially, on the stock price
23    and on -- so therefore, I know there was -- I know I had
24    discussions at least with Merrill Lynch about trying to
25    keep our volume within the set limits.

65

1     Q.   Okay.  And do you recall whether or not you
2     had any such discussions with Mr. Ellison?
3     A.   No, but it would not -- I would probably pass
4     along that information to Larry when I tried to explain
5     how long it would take to sell the number of shares that
6     we wanted to sell, 'cause we're mapping out a plan.
7     And I would set out "This is the number of days it would
8     take."
9         So I assume I communicated in some fashion,
10    but I have no recollection.
11    Q.   Okay.  Is it your understanding, though, that
12    you had these discussions initially with Merrill Lynch
13    and spoke to them in terms of what the volume limit
14    should be?
15    A.   Correct.
16    Q.   Okay.
17    A.   Not with Merrill Lynch, but from other people
18    who would provide financial advice to me.  And I would
19    act to interpret it and make decisions based on the
20    advice I'd been given.
21    Q.   Okay.  And you indicated that the purpose in
22    that was to ensure that you weren't affecting the market
23    price --
24    A.   In an adverse way, yes.
25    Q.   And why is --

66

1     THE REPORTER:  What was that answer?
2     THE WITNESS:  In an adverse way.
3     MS. LAVALLEE:  Q.  And can you tell me why
4     that was a concern?
5     A.   I can tell you why it would be a concern for
6     me.  I don't know why it would be a concern for Merrill
7     Lynch or for Larry.  But it would be a concern for me
8     because when I am executing a trade, I am trying to do
9     it properly, ethically and maximize the price at which I
10    execute the trade.
11         And so you want to do that without tipping
12    your hand to the buyers.  If the buyer, let's say, is a
13    Fidelity fund, if they pick up the idea that there's
14    large volume coming, they will stop bidding and the
15    price will drop.
16         You'd rather do it more intelligently to get a
17    better price.
18    Q.   Okay.  Any other reason?
19    A.   No.
20    Q.   Mr. Simon, I believe that you indicated you
21    had never seen the written summary of your interview
22    with the SLC's --
23    A.   I don't recall whether -- I -- just to make it
24    clear, for all questions I've answered today, I have
25    limited recollection of whatever I have said or done in

67

1     the past.  All statements are based on belief and vague
2     recall.
3     Q.   Okay.
4     A.   So I have no recall ever having seen my notes
5     of the Special Litigation Committee.  It does not mean
6     that they -- maybe they provided them to me.  I don't
7     know.
8     MS. LAVALLEE:  Okay.  I'm going to mark as
9     Exhibit 186 a document titled "Interview of Philip
10    Simon."
11    (DC Exhibit No. 186
12    marked for identification).
13    MS. LAVALLEE:  And the court reporter will
14    give you the original.
15    THE WITNESS:  Thank you.
16    MS. LAVALLEE:  Q.  Mr. Simon, I'm just going
17    to ask you to take a quick look at this.  You don't have
18    to read all of the document.  I'm going to refer you
19    specifically to certain excerpts of the document.
20    A.   Okay.
21    Q.   And I'll represent to you that this is a copy
22    of the summary of the -- of your interview that was
23    submitted by the Special Litigation Committee to the
24    court --
25    A.   Okay.

68

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1    Q.  -- in the Delaware derivative action.
2        MR. NADOLENCO:  I don't think we stipulated at
3    the beginning of the deposition on the record that the
4    transcript would be marked confidential pursuant to the
5    protective order.
6        MS. LAVALLEE:  Yeah, that's fine.  And
7    obviously plaintiffs reserve the right to seek to have
8    any portion undesignated.
9    Q.  And I'm going to refer you specifically to the
10   section -- and I'm just looking for it here.  Actually,
11   I'll refer you to page 7.
12   A.  Mm-hm.
13   Q.  The -- under the paragraph heading
14   "Discussions Preceding Ellison's Q3 FY '01 stock sales."
15   The section reads,
16       "Simon initiated discussions with
17       Ellison about Ellison's expiring options
18       approximately two years prior to their
19       expiration, summer of 1999, because of the
20       limited windows available for trading."
21       And then it continues.  You can read that
22   paragraph to yourself.
23   A.  I read it.
24   Q.  Okay.  Can you tell me if that accurately
25   summarizes what you told the SLC.

                                                          69

1    A.  I have no recollection.
2    Q.  Okay.  Do you believe that that accurately
3    summarizes what you -- your understanding of your
4    position?
5    A.  It seems reasonable --
6    Q.  Okay.
7    A.  -- that that's what I would have told the S --
8    is it SLC?
9    Q.  Yes.
10   A.  Yes, SLC.
11   Q.  Just for the record so we're clear between
12   both of us, when I refer to SLC, I mean the Special
13   Litigation Committee.
14   A.  Okay.
15   Q.  All right.  And then I'd like to refer your
16   attention specifically to the third full paragraph on
17   page 8.
18   A.  Mm-hm.
19   Q.  And it reads in part, starting at the second
20   line,
21       "Simon was anxious for Ellison to pay
22       down some of his debt towards of end of
23       calendar year 2000.  At that time, Ellison
24       did not have enough remaining credit in his
25       bank lines to meet his cash needs for the

                                                          70

1    coming year.  Simon did not want to ask for
2    a covenant waiver from the banks.  He
3    preferred Ellison to start paying off the
4    debts."
5        I assume you don't recall this testimony.
6    A.  (Shakes head).
7    Q.  Okay.  Does that seem --
8    A.  It seems right.
9    Q.  -- consistent?
10   A.  Yes.
11   Q.  Can you identify for me what debts you were
12   referring to there.
13   A.  There were bank debts totaling, from -- a
14   group of banks, totaling around $1.2 billion.
15   Q.  Okay.  And do you recall what banks these were
16   with?
17   A.  There's a document in the material provided to
18   you.  I don't recall exactly which banks because banks
19   that are currently -- different banks are -- participate
20   in lending at different points in time.  There's been a
21   lot of merger and acquisition.  So I can't recall back
22   in 2000 exactly which banks were lending, without
23   looking at the documents that I've provided to you.
24   Q.  Okay.  Well, we'll take a look at them a
25   little later, then.

                                                          71

1    A.  Then I can give you specifics.  'Cause we have
2    schedules, I know, and there's a schedule detailing the
3    banks and the exact amount.
4    Q.  Okay.
5    A.  I can go over that with you then.
6    Q.  Okay.  And were these loans, though -- is it
7    your understanding that these loans were loans that --
8    were these new loans or were they loans that were in
9    existence for a period of time?
10   A.  These were bank loans that had grown since I
11   started working for Larry and had grown over time and
12   kept increasing.
13   Q.  Okay.  And do you recall the terms of any of
14   the specific loans?
15   A.  They vary over time.  But I know the
16   critical -- I know some of the critical terms, yes.
17   Q.  Okay.  Can you tell me what you know about any
18   of those loans.
19   A.  They were generally -- they were secured by
20   Oracle shares.  They were generally Libor, L-I-B-O-R,
21   Libor-based financing, priced at a spread over Libor.
22   Q.  What does Libor stand for?
23   A.  London interbank offerage rate.  The terms of
24   the loans, they were generally, at that point in time,
25   for two-year terms.  There were probably four or five

                                                          72

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  banks in the group.  The lines expired at different
2  points in time.  There were covenants restricting the
3  aggregate amount of debt that Larry could have.
4  Q.  Anything else?
5  A.  Those are basic key terms.
6  Q.  Okay.  In the passage that we read -- well,
7  actually, let me ask you this:  Do you have any
8  understanding that -- of -- that there were debts owing
9  to Merrill Lynch?
10  A.  Yes.
11  Q.  Okay.  And do you have any specific
12  recollection regarding those, other than what you just
13  testified to?
14  A.  Other than Merrill Lynch?
15  Q.  No, any terms other than the terms you've just
16  talked about with respect to the loans to Merrill Lynch
17  or from Merrill Lynch.
18  A.  We had financial covenants, had to provide
19  financial information on a regular basis.  I can't
20  recall, without looking at the loan documents that were
21  in existence then -- and there were different banks; and
22  the documents were similar, but not identical -- to know
23  what the covenants were or the representations were and
24  the limitations.
25  Q.  Okay.

73

1  A.  But I'm not sure any of the others are really
2  that critical.  If you have specific questions, I'll
3  answer them for you.
4  Q.  Oh.  You mean any other terms?
5  A.  Any other terms are that critical.
6  Q.  Okay.  Do you remember the interest rates on
7  any of these?
8  A.  They were variable.  They were -- Libor is a
9  floating rate.  And you pay a spread over Libor to the
10  banks.
11  Q.  Okay.  And do you remember any more details
12  other than that?
13  A.  I do know the spread, but I'd like to keep
14  that confidential.
15  Q.  Well, this transcript is marked confidential,
16  so ...
17  A.  I would prefer not to disclose that.  I'd ask
18  my attorney to raise that.  And if the judge orders
19  that, I will disclose that.  But this is my negotiating
20  advantage with banks.
21  MS. SEGAL:  I don't know how it's relevant.
22  THE WITNESS:  It's a very good spread.
23  MR. TABACCO:  You can leave a blank in the
24  transcript for now, and then if it becomes an issue --
25  THE WITNESS:  It is a hundred basis points

74

1  over Libor.
2  MS. LAVALLEE:  Q.  Actually, maybe this
3  will -- you indicate in your SLC -- to the SLC that he
4  gets a better rate -- that Ellison gets a better rate
5  than GE.
6  A.  Yeah, I think that's an overstatement.  We
7  have a very good rate.
8  Q.  Okay.
9  A.  We have an extraordinarily good rate.  And I
10  don't want to undermine my rate, but yes, we have a very
11  good rate.
12  MS. SEGAL:  I don't think you need to say any
13  more now.  If it becomes an issue, we'll address it
14  then.
15  MS. LAVALLEE:  Q.  Was there a lead bank on
16  these loans?
17  A.  It varies.  Depends what you mean by a "lead
18  bank."  Can you explain what you mean by a "lead bank."
19  Q.  Well -- well, what is your understanding of
20  lead bank in this context?
21  A.  Well, lead bank can -- in my --
22  MR. NADOLENCO:  Objection to form.
23  MS. LAVALLEE:  You can answer.
24  THE WITNESS:  Okay.
25  MR. ZWANG:  Well, it's your question.

75

1  MR. NADOLENCO:  Right, it's your question.
2  MS. LAVALLEE:  Q.  Okay.  Let me ask a
3  different question.  Do you have any understanding of
4  the term "lead bank" in connection with loans?
5  A.  Okay, yes.
6  Q.  And what is your understanding?
7  A.  A lead bank generally, I think, is if you have
8  a syndicate, you have a lead bank that you get your
9  financing with the lead bank, and the lead bank
10  syndicates it among a group of banks and that you do
11  negotiations with one bank, and they set the terms.
12  We do not have a lead bank, in that
13  definition, because when you do that, you lose your
14  flexibility in negotiation.  So I do not syndicate.
15  Rather, I get the loans directly by going to the banks.
16  And what you do is you can basically set up a
17  competition among the banks.  So you can control the
18  terms and get as borrower-friendly terms as possible.
19  And so basically we have five different
20  agreements with five different banks -- or four
21  different banks.  I don't know how many banks there were
22  then.  And I negotiated the terms.  And I had them
23  staggering on maturity dates so we had more control and
24  more leverage to effectively negotiate and maintain
25  control over the borrowing.

76

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1       So -- and in my vein, I did use -- we did have
2    a lead bank at one point in time -- probably BankAmerica
3    back then, but then we moved to J.P. Morgan Chase --
4    that handled most of the transaction activity for Larry.
5       So in that sense, we had a lead bank that we
6    relied on for most transaction activity, but we never
7    had a lead bank in the sense of a syndication where one
8    bank controlled the terms and negotiated on behalf of
9    the group.
10      Q.  Okay.  And when did the changeover from
11   BankAmerica to J.P. take place?
12      A.  Shortly after NationsBank acquired Bank of
13   America.
14      Q.  Okay.  Do you recall generally when that was?
15      A.  No.
16      Q.  Okay.
17      THE WITNESS:  '90, '99?  Anybody know it?
18      MR. TABACCO:  '98.
19      THE WITNESS:  '98?  Then maybe I moved --
20   maybe J.P. Morgan was my main transaction bank by then.
21      MS. LAVALLEE:  Okay.
22      Q.  Were there any changes in the terms of any of
23   these loans from the -- say from September of 2000
24   through January/February of 2001?
25      A.  I don't recall.  The amount or the borrowings

77

1    increased.
2       Q.  And other than that, you don't have any
3    specific recollection?
4       A.  I would have to go through old files and read
5    the agreements.  But we did have -- just so you know,
6    there's -- aggregate debt cap is one of the covenants.
7    So as your debt rises, you get closer to breaching a
8    covenant.
9       Q.  And had you received any communications from
10   any of the banks in terms of the issue of debt -- of
11   the -- the aggregate debt cap?
12      A.  Yes.  As -- I don't recall when, but as
13   Larry's debt increased and broke over a billion dollars,
14   some of the banks were more nervous and they were
15   concerned about Larry's plan to pay down the debt.
16      Q.  And do you recall when that took place?
17      A.  That happens.  No, I do not know.
18      Q.  Okay.  Do you recall, beyond that, any
19   specific communications with any of those banks?
20      A.  No, but these communications took place, but I
21   don't know specific communications.
22      Q.  Okay.  And do you know whether or not that
23   took place prior to or after the trades?
24      A.  It would be prior to because after the trades,
25   we paid down the debt.

78

1       Q.  Okay.  That's fair.  Do you recall whether it
2    was more than one bank that had made such
3    communications?
4       A.  Yes.
5       Q.  Okay.  And do you recall whether it was all or
6    how many, roughly?
7       A.  Most every bank officer was calling me as the
8    debt kept increasing.
9       Q.  Okay.  And you indicated to the SLC, going
10   back to that same passage we talked about on page 8 --
11      A.  Page 8, okay.
12      Q.  -- that you did not want to ask for a covenant
13   waiver from the banks.  What were you referring to
14   there?
15      A.  I assume that was the aggregate debt
16   limitation, that the banks had caps on how much debt
17   Larry could have outstanding, because, as I mentioned to
18   you, we did not have a syndicate; we had independent
19   bank loans.  And the banks knew about each other's
20   loans.
21      So therefore, to have control over the
22   aggregate amount of debt and the number of Oracle shares
23   pledged to secure that debt, they had a covenant
24   restricting the aggregate amount of debt that Larry
25   could have outstanding at any one point in time.

79

1       Q.  Okay.  And did you communicate with any of the
2    banks about getting a covenant waiver, as you indicate
3    here?
4       A.  I don't recall.
5       Q.  Do you recall what the debt-to-asset ratio
6    Mr. Ellison had at that point in time?
7       A.  I could roughly calculate it.
8       Q.  What's your rough estimate at this time?
9       A.  His debt then was around a billion-three,
10   let's say a billion-two, billion-three.  And when the
11   Oracle shares were sold, they were trading around 30.
12   And he has -- with options around 1.4 billion.
13   1.4 billion times 30 is roughly 42 -- I think that's 42
14   billion, if I do the math right.  So let's say
15   1.3 billion divided by 42 billion, that's around four
16   percent, three, four percent.
17      Q.  Okay.  And --
18      A.  Am I doing the math right?  Fourteen, 28, 42,
19   yeah, okay.  That's pretax.
20      Q.  You're faster than me on that.
21      A.  That's pretax.
22      Q.  Okay.  We're talking about debt-to-asset
23   ratio.  You referred specifically to his Oracle
24   holdings.  What portion of Mr. Ellison's assets were
25   comprised of Oracle securities?

80

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1    A.   At that point in time -- it depends upon how
2  you value private equity investments, 'cause they have a
3  range of values.  During the peak of the bubble, private
4  equity values looked very good, but then they dropped by
5  90 percent.  But realistically those other assets,
6  including his homes and other personal assets, probably
7  represented around two percent of his total net worth.
8    Q.   So am I to understand that roughly at the
9  time -- time period of December/January 2001, roughly
10  98 percent of Mr. Ellison's assets were in Oracle
11  securities?
12    (Mr. Yang entered the room.)
13    THE WITNESS:  Yes.  Maybe a tad more.
14    MS. LAVALLEE:  Give or take a little.  All
15  right.
16    Q.   Going back to the bank loans, were any of
17  those bank loans that you discussed actually maturing or
18  becoming due?
19    A.   I had them staggered.  And at that point in
20  time, they were on two-year terms.  So if I had five
21  bank lines maturing over two years, I would assume
22  there'd be a bank line maturing every four to six
23  months.
24    Q.   Okay.
25    A.   But I don't have -- I don't know if they

81

1  were -- I tried to have them perfectly staggered, but
2  you can't always control that.
3    Q.   Right.  When you first communicated with
4  either Mr. Ellison or his representative in the
5  January 19th time frame just prior to commencing the
6  trades, were there -- was there some discussion of where
7  the money would -- that was generated from these trades
8  be used for, what it would be used for?
9    A.   I don't recall.  But on issues like that, I'm
10  normally given, and I assume, free authority to apply
11  the cash proceeds as intelligently as possible to
12  maximize the economic benefit to Larry.  So in that
13  vein, I may or may not have raised it.  I doubt I did
14  because it was clear what had to be done.
15    Q.   Okay.  So it was probably you got -- you were
16  told "We're going to sell this," and then you --
17    A.   I ran with the ball.
18    Q.   You ran with the ball and did it?
19    A.   And paid down the bank debt, yes.
20    Q.   So it wasn't a situation where Mr. Ellison
21  said "I want this amount of the sale proceeds to go here
22  and this amount to go here"?
23    A.   No.  We don't talk.  That's all within my --
24  that's cash management.  I handle that.
25    Q.   Okay.  I think you mentioned earlier how

82

1  much -- based on your reading of the documents -- how
2  much you indicated -- how much -- actually, let me ask a
3  different question.
4    Going back to your trip to New Zealand, do you
5  recall precisely the dates you were gone?
6    A.   No, but reading the Special Litigation
7  Committee, it said I came back on the 19th.  I don't
8  know if I came back -- I probably came back the 18th
9  at night.  I don't know.
10    Q.   And it was generally a two-week trip?
11    A.   I think it was 13 days, is my recollection.
12  It was the first time we were away from our children for
13  that long.  So I think it's the longest time we've ever
14  been away.  So that's my recollection.
15    Q.   Sounds like a nice break.
16    A.   Mm-hm.
17    Q.   Were you visiting cities?  Where did you go in
18  New Zealand?
19    A.   Went to Auckland, went to the south island,
20  went kayaking, hiking.
21    Q.   Okay.  Prior to leaving, did you actually
22  contact Mr. Ellison and indicate you'd be traveling,
23  either Mr. Ellison or his assistants?
24    A.   I always left Carolyn -- let Carolyn know
25  where I was so she could reach me at any point in time

83

1  anywhere.
2    Q.   You were reachable during that time frame?
3    A.   Not really.  I was probably reachable at
4  certain points in time while I was there.
5    Q.   Okay.
6    A.   And if I had hotel reservations at certain
7  places, normally I would set forth an itinerary for my
8  office to be able to contact me.  I would normally
9  e-mail a copy to Carolyn.
10    Q.   And did you actually clear the time frame with
11  Mr. Ellison's office prior to leaving?
12    A.   I let Carolyn know when I was going away.
13    Q.   Okay.  And was it a situation where she said
14  "Oh, that might not be a good time," or basically you
15  had authority over your own schedule?
16    A.   I have authority over my own schedule.
17    MS. LAVALLEE:  Okay.  Actually, I think this
18  is probably a good time for a short break.  And we'll
19  resume then and have lunch maybe in an hour or so, or 40
20  minutes.
21    THE VIDEOGRAPHER:  This marks the end of
22  videotape Volume I, tape 1 in the deposition of Philip
23  Simon.  The time is 11:23 a.m.  We are off the record.
24    (Recess taken.)
25    THE VIDEOGRAPHER:  This marks the beginning of

84

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  videotape Volume I, tape 2 in the deposition of Philip
2  Simon.  The time is 11:40 a.m.  We are back on the
3  record.
4      MS. LAVALLEE:  Q.  Hi, Mr. Simon.  I just want
5  to follow up on a couple of matters that we discussed a
6  little earlier today.  First thing is we talked briefly
7  about the fact that there were certain limits or --
8  yeah, limits placed on the trades for the January 2001
9  time frame.  And in particular, we talked about the
10  price floor.  Do you recall that?
11     A.  Yes.
12     Q.  Okay.  Can you tell me why that particular
13  price was chosen.
14     MR. ZWANG:  This is the $30 price?
15     MS. LAVALLEE:  Yes.
16     MR. NADOLENCO:  Objection.  Asked and
17  answered.
18     THE WITNESS:  I don't recall, but I also see
19  on page 10 of the Special Litigation Committee report
20  that you handed to me a discussion of this price floor.
21     As I noted -- I noticed that the Special
22  Litigation Committee interview was on July 22nd, 2002.
23  That was much closer to the events than today.  So I
24  think there's some conclusions that could or could not
25  be drawn from the -- my testimony there.

85

1      MS. LAVALLEE:  Okay.  And having read that,
2  can you answer my question.
3      MR. ZWANG:  Does it refresh your recollection
4  at all?  Does it give you any independent recollection?
5      THE WITNESS:  No, I can only repeat back
6  what's in there.  And this seems like it's a reasonable
7  statement of what happened.  But I have no recollection.
8      MS. LAVALLEE:  Q.  Okay.  And what is your
9  understanding of what's in the report summary?
10     A.  I'm looking.  I can read it to you.  It says,
11  "According to Simon, Ellison's initial
12  parameters were to sell options at no less
13  than $32 per share.  However, as of Monday,
14  January 22nd, Oracle shares were trading
15  at the $30 per share.  Simon sought and
16  received authority from Ellison to drop the
17  floor to $30 per share so that selling
18  could begin."
19     Q.  Okay.  And why is it that a particular price
20  floor is selected when you make the trades, generally?
21     A.  A person could pick a price floor for a number
22  of reasons.  The most obvious -- I'm speculating.  I
23  don't know why -- why I would?  Normally when I sell
24  shares of stock myself, I want to limit the broker's
25  discretion just to ram it through and take a spread,

86

1  'cause they'll trade -- I mean, they're not supposed to
2  front-run, but people have different incentives.  So I
3  want to limit the broker's ability to take advantage of
4  me.
5      Q.  Okay.  And do you have any specific of Mr. --
6  or general understanding of Mr. Ellison's intent?
7      A.  No, I do not.
8      Q.  Okay.  Was the price floor something that you
9  discussed and -- discussed with the Merrill Lynch
10  broker?
11     A.  Yes, I would set the floor.  I'm giving
12  them -- I'm giving the Merrill Lynch broker trading
13  parameters and setting standards on how to trade so I
14  could judge their execution.
15     Q.  And do you have any understanding as to -- let
16  me step back.
17     In the passage that you referred to in the SLC
18  report on page -- or SLC summary on page 10, it
19  indicates that the price floor was initially 32 and then
20  dropped to 30 on the first day of trading; is that
21  correct?
22     A.  That's what it says, yes.
23     Q.  Okay.  Do you have any understanding as to why
24  the drop was done?
25     A.  It says that Oracle shares were trading at 30.

87

1  And if the floor was 32, you cannot trade any shares.
2  And you have expiring options, and you have a debt
3  that's increasing with potential to breach a bank
4  covenant and have -- oh, I did not mention one term in
5  our loan agreements.
6      They have what's called cross-default
7  language.  So if you have a default on one bank line,
8  you have a default on all bank lines, causing immediate
9  acceleration and demand for payment of 1.2 billion in
10  cash, which you don't have.
11     So therefore, you -- the reason I suspect they
12  went back to Larry was that you can't sell any stock if
13  you have a floor price above the trading range.
14     Q.  Just back to that additional term you just
15  described, is that something that's fairly standard in
16  loans?
17     A.  Cross-default?
18     Q.  Yeah.
19     A.  Yes.
20     Q.  Okay.  Do you recall whether or not after this
21  initial setting of the floor price on January 22nd,
22  whether or not there was any further discussions
23  regarding the price floor?
24     A.  No, I have no recollection.
25     Q.  You have no recollection one way or another?

88

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1   A.  Correct.
2   Q.  Can you tell me who Dan Scott is.
3   A.  Dan Scott.
4   Q.  Scott.  Do you know?
5   A.  No.
6   Q.  Okay, Don Scott maybe?
7   A.  Doesn't ring a bell.  Can you --
8   Q.  Okay, that's fine.
9   A.  -- give me a reference and I'll try and answer
10  it for you.
11  Q.  We'll come back to that.
12  A.  Okay.
13  Q.  How about Steve Edmundson?
14  A.  (Shakes head).
15  Q.  Okay.  Did he -- somebody who worked for
16  Barbara Wallace?
17  A.  (Shakes head).
18  Q.  Okay.  Do you know who Barbara Wallace is?
19  A.  Yes.
20  Q.  And who is she?
21  A.  I believe she's the person at Oracle -- I
22  don't know her title, but I think she handles employee
23  stock transfer.
24  Q.  At Oracle?
25  A.  At Oracle.

89

1   MS. LAVALLEE:  I'd like to mark as Exhibit 187
2   a document that is Bates-stamped PS0001.
3   (DC Exhibit No. 187
4   marked for identification.)
5   MS. SEGAL:  We're still doing DC, right?
6   MS. LAVALLEE:  Yes.
7   THE WITNESS:  Okay.
8   MS. LAVALLEE:  Q.  Mr. Simon, if you could
9   take a moment and look at the document.  And when you've
10  had a chance to review it, please identify what it is
11  for the record.
12  A.  This is an e-mail from me to Larry.
13  Q.  Okay.  And is it your understanding that this
14  is an e-mail that you actually sent to Mr. Ellison on or
15  about January 17th -- and I actually cannot, for the
16  life of me, figure out what the date is.
17  A.  I think that was a Y2K problem when they
18  rolled over.  I think it -- from the context, I think
19  it's December 17th, 1999 is my guess.
20  Q.  That was my guess as well, but I wouldn't want
21  to --
22  A.  That would be my guess.  Yes, it's referring
23  to 1999 taxable income, so I assume it's
24  December 17th, 1999.
25  Q.  Okay.  And there is a discussion here of the

90

1   tax benefit to exercising some options.  Is that the tax
2   situation that you discussed earlier today?
3   A.  Correct.  That is basically recognizing
4   nonqualified stock option income, triggering taxable
5   income to offset losses that you would otherwise have on
6   your tax return.
7   Q.  Can you tell me why it is that Mr. Ellison was
8   going to recognize a loss for that particular tax year?
9   A.  Yes.  He has -- in calculating taxable income,
10  you basically take into account on your tax return a
11  whole variety of items of income and expense and
12  deduction, such as interest expense that is accruing on
13  your bank loans, charitable deductions, losses from
14  trades or businesses or partnerships that you're in,
15  offset by your salary income and your option income.
16  And so based on this, there's a large -- it
17  looks like we had a $50 million tax loss in 1999
18  projected in December.  And as this e-mail says, you
19  would lose half of that loss as a tax benefit for
20  California purposes because California only has a
21  50-percent-of-net-operating-loss carryover.  So you'd
22  lose half -- the benefit of half the tax loss.
23  So I was e-mailing to let Larry know that I
24  would be triggering -- I would like to exercise options
25  to trigger taxable income.  And as you can see in the

91

1   next to last paragraph, I say "I would take this action
2   even if you failed to reply."  It shows that I felt I
3   have this authority.
4   Q.  Okay.  All right.  And do you have any
5   understanding as to what income Mr. Ellison was drawing
6   from Oracle Corporation in this time frame?
7   A.  There was a period of time when Larry Drew no
8   salary.  I don't know if 1999 was one of those years.  I
9   think it was a four-year period.  My best guess is 1999
10  might have been a year where he was taking, I think, one
11  dollar of salary a year from Oracle.
12  Q.  Oracle.  Was it your understanding that in
13  lieu of a salary or bonus, he was actually obtaining
14  options in Oracle Corporation?
15  A.  I believe that is -- I do not know if that's a
16  fact, but that was -- I believe there was a large option
17  grant in lieu of salary.
18  Q.  Okay.  Do you know if that's still the case
19  today?
20  A.  That there's -- that he's not drawing a
21  salary?
22  Q.  Correct.
23  A.  No, I believe the four years have run and the
24  salary has commenced again.
25  Q.  Okay.

92

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1   MS. LAVALLEE:  I'd like to mark as Exhibit No.
2   188 a document Bates-stamped PS0002 through 0003.
3   (DC Exhibit No. 188
4   marked for identification).
5   THE WITNESS:  Thank you.
6   MS. LAVALLEE:  Q.  Mr. Simon, if you could
7   take a moment and look at this letter -- or this
8   document, and then please identify it for the record.
9   A.  This is an e-mail that I sent to Larry on
10   February 27th, 2000, forwarding him an e-mail I had
11   sent earlier in the day.
12   MR. ZWANG:  Let me stop you.  I note that at
13   the top of the page, it says "3/27/200" [sic].
14   THE WITNESS:  Uh-huh.
15   MR. ZWANG:  I think you just said -- did you
16   say February?
17   THE WITNESS:  I said -- no, I meant -- I'm
18   sorry, March 27th, 2000.  If I said February, I was
19   mistaken.  It was March 27th, 2000.  It appears I sent
20   this e-mail to Larry, forwarding on an e-mail that I'd
21   sent to Carolyn.
22   MS. LAVALLEE:  Q.  Okay.  And is it your
23   understanding that you actually did indeed send this
24   e-mail to Mr. Ellison on or about March 27th, 2000?
25   A.  I don't know for certain whether I hit the

93

1   send button, but that would be -- I would assume most
2   likely, yes.
3   Q.  Okay.  You indicate in the third paragraph
4   that you're becoming increasingly concerned about stock
5   market valuations and believe that this would be a good
6   time to take some money off the table.  Consulting --
7   pardon me --
8   "Counting options both vested and
9   unvested, you control 714.5 million shares.
10   I'd initiate a half-of-one-percent
11   quarterly sale program."
12   Do you remember actually communicating with
13   Mr. Ellison regarding this matter?
14   A.  I -- I see this e-mail.  And this e-mail's a
15   communication.  And I believe I sent it.  So yes, I
16   believe I communicated this to --
17   Q.  And beyond this particular e-mail, do you have
18   any recollection of your discussion?
19   A.  About selling?
20   Q.  About what you discuss here about initiating a
21   one-half-of-one-percent quarterly sale program.
22   A.  I know I frequently spoke to Larry about
23   different ways to try to appeal to him to sell stock.
24   Q.  And what was Mr. Ellison's reaction to those
25   appeals?

94

1   A.  I don't know.
2   Q.  Did he ever indicate to you that prior to
3   December or January of 2001 that he wanted you to
4   actually proceed with any of those suggestions?
5   A.  I have no recollection now.  But you'll find
6   further on in the material there's that handwritten note
7   that I had a meeting with Larry talking about this.  And
8   he had some -- I wrote a note about a comment about it.
9   Q.  Okay.  And do you recall what that comment
10   was?
11   A.  I only -- I read it Sunday night in
12   preparation.
13   Q.  Sure, that's fine.
14   A.  But I don't remember -- I don't remember what
15   I read Sunday night, let alone what happened three years
16   ago.  But I know there's a piece of paper with a note,
17   and you'll find it somewhere.
18   Q.  Okay.  That's fine.  It's not -- you know,
19   this isn't a memory game or a test in any way.
20   A.  No, but I don't remember.
21   Q.  Okay.
22   I just want to point out for the record,
23   though, however, that March 27th, 2000 was the peak of
24   the bubble.  It was a very good call.  And if we all
25   followed my advice, we'd be in Tahiti now and very

95

1   wealthy.
2   (Discussion off the record.)
3   MS. LAVALLEE:  Q.  Mr. Simon, to the best of
4   your knowledge, was a one-half-of-one-percent quarterly
5   sale program or any other sale program initiated prior
6   to January 2001?
7   A.  No.  And I would just like to state this is me
8   coming up with ideas, just proposals, food for thought.
9   Q.  Okay.  Why were you doing that?
10   A.  That's my job.
11   Q.  Okay.  But what was the goal, in your mind?
12   A.  The goal was to sell Oracle shares to raise
13   cash to pay down debt, to minimize risk, and -- and
14   basically take advantage of what in hindsight clearly
15   was an irrational, exuberant stock market.
16   You'll also notice that this e-mail contains
17   the reference to budgeting for Oracle's planning.
18   Q.  Okay.
19   A.  That's in there as well.  And that's what
20   triggered this e-mail, was Oracle trying to budget for
21   themselves.  And that's what triggered this.
22   Q.  So this was triggered by a request --
23   A.  So they could plan their own budget for the
24   fiscal year '01.
25   Q.  And do you recall, subsequent to this e-mail,

96

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  how you responded to their inquiries?
2    A.  No.
3    Q.  Would you have responded by e-mail?
4    A.  I think this was my reply.
5    Q.  This was your reply?
6    A.  You see my -- if you look at this e-mail
7  chain, there's an e-mail from Carolyn to me --
8    Q.  Yeah.
9    A.  -- talking about their budget meeting and how
10  many options they were going to exercise in 2000, in
11  fiscal year, so they could budget.
12      I then reply to Carolyn what he owns and what
13  I think he should be doing.  And then I forward it on to
14  Larry to remind him and nudge him.
15    Q.  Okay.  But you didn't specifically then
16  communicate back to anybody at Oracle, other than
17  Mr. Ellison or his representative?
18    A.  Carolyn, yes.
19      MS. LAVALLEE:  Okay.  I'm going to mark as
20  Exhibit 189 a document Bates-stamped PS0004 through
21  0008.
22      (DC Exhibit No. 189
23      marked for identification.)
24      MS. LAVALLEE:  Q.  Mr. Simon, if you could
25  take a moment and review the document and then tell me

97

1  what it is.
2    A.  It's an e-mail -- chain of an e-mail to me --
3  from me to Larry, dated March 29, 2000, and forwarding
4  on.  It's replying to his March 29, 2000 e-mail to me
5  responding to the e-mail I forwarded on to him referred
6  to as DC-188.  So it's Larry's reply to my e-mail to
7  him, DC-188, and my reply to Larry.  And it also
8  contains another copy of DC-188, showing the entire
9  e-mail chain.
10    Q.  Okay.  And there's an attached -- there's a
11  chart or a document at the end -- well, actually,
12  there's two pages at the end of this exhibit.  Can you
13  tell me whether these pages relate to the substance of
14  the e-mail.
15    A.  Yes.
16    Q.  Okay.  And can you just explain for me in the
17  last e-mail, responding to Mr. Ellison's question, what
18  you were trying to explain to him here.
19    A.  Yes.  What I was trying to explain was that
20  for income tax purposes in the United States, we have
21  two parallel tax systems, what we call the regular tax
22  and the alternative minimum tax, also known as the AMT.
23      A tax -- a taxpayer pays the greater of these
24  two taxes annually.  And under the -- you pay the
25  great -- you have two taxes, and you pay the greater of

98

1  the two.  And you have different tax rates that apply to
2  different types of income for different purposes on
3  these two tax rates.  Some deductions are allowed for
4  other tax purposes, some for AMT purposes.
5      And what I was trying to explain to Larry --
6  the goal, from a tax optimization strategy, is to blend
7  ordinary income and capital gains.  So for example, if
8  you did an option exercise, like these expiring options,
9  that would trigger a lot of ordinary income taxed at a
10  high rate for regular tax purposes but a lower rate for
11  AMT purposes.  But would also yield a state income tax
12  deduction which is deductible for regular tax purposes
13  but not for AMT purposes.
14      So you have a greater amount of income taxed
15  at a lower rate for AMT purposes and a smaller amount of
16  income taxed at a higher rate for regular tax purposes.
17  If you blend in capital gains, which is taxed at the
18  same rate for both purposes, you can effectively get a
19  greater after-tax return on the capital gains when you
20  trigger capital gains income at a certain ratio -- at
21  the same time you're triggering option income.
22      So from a tax strategy standpoint and an
23  economic after-tax maximization standpoint, you want to
24  blend option exercises with the sale of already-owned
25  Oracle stock to generate the capital gain.

99

1      So basically -- and I was explaining to him
2  the ratio.  And I think I refer to a two-to-one ratio
3  between capital gain income and option income.
4    Q.  Okay.
5    A.  I can get into the specifics, but the math
6  below --
7      MR. NADOLENCO:  That wasn't specific?
8      THE WITNESS:  Okay.  Anyway, there's an
9  example below -- I'm sorry.
10      MS. LAVALLEE:  No, that was funny.  The taxes
11  went over -- way over everybody else's head.
12      THE WITNESS:  Okay.
13      MS. LAVALLEE:  But that's okay.  No, that's
14  fine.  I don't need you to go into more specifics.
15      THE WITNESS:  Okay.  But the basic thing this
16  is a -- it basically works out to a higher sale price
17  when you sell Oracle shares that are already owned.  And
18  it calculates to 5 point --
19      THE REPORTER:  It basically works out to a
20  higher price ...
21      THE WITNESS:  On the sale of Oracle shares
22  already owned.  I mathematically calculated it to be the
23  equivalent of a 5.2 percent greater share price or sale
24  price.
25      So therefore, if you exercised options, you

100

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  then want to blend some -- the sale of some founder
2  shares to trigger capital gain to optimize your taxes.
3      MS. LAVALLEE: Q.  Okay.  And just for the
4  record and so I'm clear, what were you really
5  recommending to Mr. Ellison in this context?
6      A.  That in addition to exercising stock options
7  and sell them same day to raise the cash to pay the
8  withholding tax and your income tax liability on the
9  option, you also sell some of your founder stock and
10  other shares already owned to generate capital gains to
11  maximize your tax strategy.
12      Q.  Okay. and you -- at this point in time -- this
13  is March 29th, 2000 -- do you recall whether or not
14  there were any further communications between you and
15  Mr. Ellison or anybody on Mr. Ellison's behalf regarding
16  this particular recommendation?
17      A.  I would have to look in my e-mails that you're
18  going through chronologically to see what the next
19  response is.  We tried to print out every e-mail we
20  could find for you.
21      And my recollection today is based solely on
22  the e-mails that we've printed out for you, also as
23  refreshed by the Special Litigation Committee report,
24  which was closer to the date of the transaction and is
25  probably a better recollection of what happened than my

101

1  recollection today.
2      MS. LAVALLEE:  Okay.  I'm going to mark as
3  Exhibit 190 a document Bates -- actually, I'm not going
4  to mark this document.  It has been previously marked in
5  this case.  And it is DC-101.  Okay.
6      (Discussion off the record).
7      MS. LAVALLEE: Q.  Mr. Simon, if you could
8  take a moment and review the document and then identify
9  it for the record, please.
10      A.  Okay.
11      Q.  Can you identify the document, please.
12      A.  It appears to me to be a chain of e-mail from
13  me to Safra Catz at Oracle, dated Monday, April 10, 2000
14  is the latest, with e-mail going back and forth -- all
15  the e-mail exchanges that day.
16      Q.  Okay.  And do you regularly -- did you
17  regularly communicate with Safra Catz?
18      A.  No.
19      Q.  Okay.  Who is Jeff Detwiler?
20      A.  Jeff Detwiler is our tax attorney.
21      Q.  At your -- by your tax attorney, what do you
22  mean?
23      A.  No, it's a tax -- for much of Larry's work, we
24  use a small law firm in San Francisco currently named
25  Dudnick, Detwiler, Rivin & Stikker.  And we farm out

102

1  special litigation -- special securities work to other
2  firms.  But Jeff Detwiler's a tax partner, a very good
3  tax attorney at that firm.  So when I have tricky tax
4  questions, I would bounce the e-mail to him for his
5  input.
6      Q.  Okay.  And Mary Jo Lloyd?
7      A.  She's a elapsed [sic] CPA, works for me in our
8  offices as sort of -- I call her the controller,
9  handling Larry's cash.
10      Q.  And Catherine Ong is the person you identified
11  earlier?
12      A.  Yes, a CPA in my office, handling Larry's
13  affairs.
14      Q.  And Andrew Dudnick?
15      A.  He's the attorney at Dudnick, Detwiler, Rivin
16  & Stikker who takes the lead in handling Larry's general
17  corporate work.
18      Q.  So he does corporate, and his partner at
19  Detwiler does the tax?
20      A.  Tax work, yes.
21      Q.  In here there is reference to Mr. Ellison
22  possibly making a $1 billion donation to charity and the
23  use of stock options for this purpose.
24      A.  Mm-hm.
25      Q.  Do you recall discussions regarding this

103

1  subject?
2      A.  Not until I looked at this e-mail.
3      Q.  Okay.
4      A.  When I prepared for the depo, I looked at this
5  on Sunday, is when I saw it.
6      Q.  Do you -- so you don't recall considering
7  making such a donation -- or having Larry make such a
8  donation at any point in time?
9      A.  Well, based on this e-mail, I obviously sent
10  e-mail out to Jeff Detwiler for his input on it.  I
11  don't recall how Jeff Detwiler responded.  But my tax
12  question, I was being kind in my response.  I think
13  there's a serious assignability of income problem with
14  the assigning of stock option income.
15      The concept of the assignability of income is
16  basically you have the right to assign income.  The mere
17  assignment of income triggers the recognition of income
18  in your hands.
19      So if someone told me you could donate stock
20  options to charity, I'd be very skeptical 'cause I want
21  to know how they get around the concept of assignment of
22  income, and I'd never seen it done.  However, since it
23  was raised, I wanted to talk to other people who I
24  respect to see if they have heard of this.  And since I
25  have no recollection, my guess is this died.

104

Simon, Philip B. (Vol. 01) - 03/16/2004   3/16/2004   12:00:00 AM

1    Q.  Okay.  But you don't have any recollection one
2  way or another?
3    A.  No.
4    Q.  Okay.  And you don't have any recollection of
5  actually discussing it with Mr. Ellison personally?
6    A.  No.  No.
7    Should I be keeping these that you're labeling
8  separate from this pile so you can get them back in an
9  organized way from me?
10    Q.  That would be wonderful, if you can.
11  Obviously --
12    A.  Okay.  I will keep the things that are labeled
13  on one side and these on the other side.
14    Q.  That's very kind.  Thank you.
15    I'd like to mark as Exhibit 190 a document
16  Bates-stamped PS0013 through 14.
17    (DC Exhibit No. 190
18    marked for identification.)
19    MS. LAVALLEE:  Q.  Mr. Simon, if I could ask
20  you to take a look at the document and then please
21  identify it for the record.
22    A.  It's an e-mail from me to Larry, dated
23  April 7, 2000, cc to Carolyn Balkenhol, with a few
24  paragraphs to Larry forwarding on an e-mail from Deborah
25  Lange.  This is the -- okay.

105

1    Q.  There are a couple issues raised in here that
2  I'd like to draw your attention to.  And the e-mail from
3  Deborah Lange to Daniel Cooperman and a couple of others
4  discusses a possibility of Larry selling directly to
5  Oracle.
6    And I believe the con -- from the context,
7  that they're talking about -- actually, let me ask you,
8  do you have any understanding of what they're talking
9  about there?
10    A.  Mm-hm.
11    Q.  And what is your understanding?
12    A.  Based on my e-mail to Larry, when Deb Lange
13  called me about tax planning for Oracle to coordinate
14  Oracle's tax planning with Larry's, I raised the issue
15  about the options.  And it's a same-day exercise and
16  sale.
17    And I believe -- I don't know for a fact --
18  that probably Oracle has a share repurchase program
19  going on.  And being ever-frugal, I would hate to have
20  Oracle buying stock on the market and paying a
21  commission and Larry selling stock in the market, paying
22  a commission and having someone make a spread.
23    So I posed the idea maybe instead of having
24  the brokers make a spread, we just exercise the option
25  and sell them to Oracle.

106

1    Q.  Okay.
2    A.  And that apparently was -- anyway, we'll get
3  to it.  But it was rejected for the appearance of a
4  potential conflict of interest.  And it was better to
5  pay the commission expense to do the right thing, to
6  appear to do the right thing and keep it completely
7  aboveboard.
8    Q.  And you based -- the last portion of it in
9  terms of what was decided -- it's not something that
10  appears in this e-mail.  You're basing your --
11    A.  There's another e-mail that will come up that
12  talks about this, I believe, that I saw on Sunday.  And
13  I also raised to Larry the basic issue if he picks up a
14  billion dollars of option income, Oracle gets a
15  billion-dollar deduction.
16    And that's why there's tax planning on the
17  Oracle side, 'cause that's a big deduction.
18    Q.  And were you at this point in time making a
19  recommendation to Mr. Ellison as to whether or not to
20  actually exercise options?
21    A.  I have -- I suspect my -- I don't know.  I'd
22  be speculating.  I was just reminding him that he had
23  these options that were expiring.
24    Q.  Okay.  And do you know -- other than the other
25  e-mail that you just referred to with respect to the

107

1  decision being made not to go the route of selling
2  directly to Oracle, do you have any other recollection
3  regarding that particular subject?
4    A.  No.
5    Q.  You mentioned something, a "sherri purchase"?
6  What was that?  I'm not sure I heard you correctly
7  earlier, your response.
8    A.  I think Oracle Corporation has a share
9  repurchase -- had at one point in time a share
10  repurchase going on.
11    THE REPORTER:  Gotcha.
12    MS. LAVALLEE:  I had a feeling that one sort
13  of slipped out into the radar there.
14    Q.  All right.  And how are you spelling that?
15  Just so we have it clear on the record.
16    A.  Share, S-H-A-R-E, repurchase,
17  R-E-P-U-R-C-H-A-S-E, program.
18    Q.  It was showing up on the record a little
19  strange, so I wanted to clarify that.
20    MR. ZWANG:  Purchasing people named Sherri?
21    THE REPORTER:  Or the drink.  I don't know.
22    MS. LAVALLEE:  I'm going to be marking as
23  Exhibit No. 191 a document Bates-stamped PS0018.
24    (DC Exhibit No. 191
25    marked for identification.)

108

Oracle Related Cases

Page  105 - 108

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1      MS. LAVALLEE:  Q.  Mr. Simon, if you could
2  take a moment to look at this document and identify it
3  for the record, please.
4      A.  It is an e-mail from me to Larry, dated
5  June 5, 2000.
6      Q.  All right.  And can you tell me the -- in the
7  third paragraph, you state -- well, actually, let me
8  step back.
9      Is this an e-mail that you indeed, to the best
10  of your understanding, sent to Mr. Ellison on or about
11  June 5th, 2000?
12      A.  It would appear so.
13      Q.  Thank you.  In the third paragraph of the
14  text, you state,
15      "Also, as discussed, Morgan Stanley
16  put together a proposal for me, which I'm
17  having them refine to show you, whereby you
18  can in effect extend the option out for a
19  number of years with a prepaid forward.
20  You could raise cash to pay the taxes on
21  exercise of the options next August, have
22  downside protection and retain a portion of
23  future appreciation."
24      You're talking there specifically about which
25  options?

109

1      A.  I am talking about the options that are
2  expiring on August 1, 2001.
3      Q.  Okay.  And who was it -- Morgan Stanley, what
4  was their role in Mr. Ellison's affairs at this time?
5      A.  Salesmen.
6      Q.  And was it -- were they a brokerage firm that
7  Mr. Ellison, or you on behalf of Mr. Ellison, had
8  retained?
9      A.  No, we -- we work with most every brokerage
10  house and firm in -- in the United States and western
11  Europe.  And they are always approaching me with ideas
12  to sell product.
13      Q.  Okay.  And was this particular proposal that's
14  discussed in this paragraph a proposal that Morgan
15  Stanley approached you with?
16      A.  Correct.
17      Q.  Okay.  And can you -- I believe you referred
18  to this earlier --
19      A.  Correct.
20      Q.  -- in the testimony.  Okay.  Can you tell me
21  what your understanding is of the proposal they were
22  making.
23      MR. ZWANG:  Do you want to the details?
24      MS. LAVALLEE:  Q.  You can explain it as
25  simply as you can for the rest of us to understand.

110

1      A.  I will do my best to synthesize and talk
2  slowly.  As we discussed previously, you had asked me
3  what the alternatives were to deal with expiring
4  options.  And I mentioned the alternatives --
5  theoretical alternatives are let them expire and just
6  throw away your money, exercise and hold, exercise and
7  sell, which is my preferred mode, and then I said
8  there's also -- my recollection from reviewing e-mail,
9  there was a proposal put together by Morgan Stanley to
10  do what I then called a synthetic extension of the
11  option.
12      And as I look at this e-mail, what I believe
13  Morgan Stanley was proposing was that instead of
14  exercising and selling to raise the cash proceeds to pay
15  the taxes and the withholding and the strike price when
16  he exercises the option, they would propose a -- they
17  had a product, a prepaid forward product whereby in lieu
18  of you selling, you would exercise the shares; and in
19  lieu of you selling the shares, you would enter it into
20  a prepaid forward contract, which is a derivative
21  transaction, with Morgan Stanley where you would -- they
22  would lend you money against that prepaid forward that
23  would give you the cash to pay down -- pay your
24  withholding taxes and your strike price.
25      And then -- and then you would share -- they

111

1  would give you downside protection if the stock dropped,
2  and you would share in some of the future appreciation.
3      Now, I think it's very important that you
4  understand what a prepaid forward is and what this
5  derivative is because superficially it might look, to
6  the uninitiated person, that it's a mechanism not to
7  sell the stock.
8      What you are really doing, though, is when you
9  enter into a prepaid forward with a counterparty, let's
10  say me with Glenn, Glenn lends me the money, but then
11  Glenn goes into the market and sells the Oracle shares
12  to raise the cash to lend to me the money.  They then
13  also -- they do what's called dynamic hedging.  And your
14  downside protection and your upside protection are
15  generally offset by what you would do as a collar.
16      Q.  Right.
17      A.  And you have a collar both on the ups and the
18  downs.  The spread -- the amount of appreciation you
19  want -- you can do a zero cost collar or you pay for the
20  collar.  But the important thing is, is the broker is
21  going in, and they actually short the stock that you
22  are -- would otherwise sell -- I think it's up to
23  85 percent.
24      So if Larry had, let's say here, 22 million
25  option shares, they would actually go into the market

112

Oracle Related Cases                                    Page  109 - 112

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1    and probably short 19 million shares.  So your effect on
2    the overall market would be selling 19 million shares up
3    front versus 22, so you're still going to have the same
4    negative market impact.
5           You also then have a derivative transaction,
6    which are very opaque.  I personally would never advise
7    doing a derivative transaction because the reason the
8    brokers sell them, they want the product, is because
9    they're opaque and you need a physicist to understand
10   them, to understand the mathematical modeling.
11          And if I was going to do one, I would hire
12   someone on my side to analyze the math.  But basically I
13   avoid and recommend against all derivative transactions.
14          You also have -- with the derivative
15   transactions, you have very complex tax reporting
16   issues.  You have very complex securities issues dealing
17   with, I believe, compliance with Section 16, whether you
18   have a short swing profit.  And the question is when you
19   close the transaction, are you blocked out?
20          So you have bad -- so you have bad pricing,
21   you have bad tax consequences, you have opaque, very
22   expensive product that everybody wants to sell to you
23   'cause if they can fool you, they can make a lot of
24   money off of you.
25          But as a fiduciary for Larry, I have a duty to

113

1    present to him alternatives that I reject.  So this is a
2    theoretical -- this is a theoretical alternative which
3    no one should do unless you want to enrich the broker.
4        Q.  Okay.  I assume, based on that, that you
5    actually recommended against this product?
6        A.  Correct.
7        Q.  Okay.  And do you recall --
8        A.  So that's why I want to be clear that your
9    options really are let the option expire, exercise and
10   hold if you have enough money, or exercise and sell.
11       Q.  Okay.  And do you recall discussing this
12   particular option with Mr. Ellison, other than what's in
13   this particular e-mail?
14       A.  No.
15       Q.  So you don't know his reaction to this
16   proposal?
17       A.  Not this specific proposal.  But Larry, in the
18   past, has always told me he likes to keep things simple,
19   which mirrors my desire to understand what I own and
20   what I'm buying.
21          And so in the past when derivative
22   transactions have been presented to me and I passed
23   along the idea to Larry with a recommendation that we
24   not pursue it, he would always get back and respond
25   "Yes, let's keep things simple."

114

1        Q.  Okay.  But you don't know whether or not he
2    specifically responded to this proposal?
3        A.  No, I do not.  Actually, could I add one
4    thing.  If you look at my last paragraph to Larry, it
5    says "I'm not sure it's worth fussing with the prepaid
6    forward."
7           So basically I'm telling him my
8    recommendation --
9        Q.  Right.
10       A.  -- is to ignore it.
11       Q.  Right.
12       A.  Which is probably what he did.
13       MS. LAVALLEE:  I'm going to mark as Exhibit
14   No. 192 a document Bates-stamped PS0019.
15          (DC Exhibit No. 192
16          marked for identification.)
17       MS. LAVALLEE:  Q.  Mr. Simon, can you identify
18   for the record what this document is.
19       A.  This appears that I prepared for a
20   meeting with Larry and it indicates that I presented to
21   Larry on July 13, 2000 to discuss his increasing
22   indebtedness and the bank lines.
23          And this is the schedule I was referring to
24   that had my handwritten note earlier.  So that had --
25   this is the note that says "7/13/2000."  This is the

115

1    note I was referring to earlier.
2        Q.  Okay.  Thank you.  Can you actually -- is this
3    handwriting on here yours?
4        A.  Yes, it is.
5        Q.  Okay.  And was this particular document that's
6    typed up something that you prepared?
7        A.  Me or Mary Jo.
8        Q.  Can you tell me what your handwriting reads,
9    starting at the top.  This is a little difficult to
10   always understand other people's handwriting.
11       A.  Okay.  The first -- top says "LJE
12   correspondence file."  That's me routing a copy of this
13   to our file.
14       Q.  Okay.  Let me stop you right there and ask,
15   what is your filing system with respect to all
16   correspondence or materials regarding Mr. Ellison's
17   financial matters?
18       A.  We have a very complex and evolving filing
19   system.  For each of the legal entities, we have the
20   traditional files for a tax client, which would be a tax
21   return file, a financial statement file, a permanent
22   file and a correspondence file per entity.
23          For each investment that we make, we have a
24   permanent file, a correspondence file and a financial
25   statement file.

116

1  Q. By "investment," are you referring to each
2  actual trade or --
3  A. No, no.
4  Q. -- each type of equity or --
5  A. Let's say Larry, through one of the entities,
6  makes an investment in XYZ private company. And let's
7  say we buy $2 million worth of preferred stock. We'll
8  have a separate file set up just for that investment
9  under that investment company's name.
10  Q. Okay.
11  A. So you're segregating your types of files by
12  investment. We would also have for Larry a general
13  correspondence file for matters relating to Larry
14  personally. And this appears to have been routed to
15  Larry's general correspondence file as opposed to XYZ
16  company.
17  Q. Is that it in terms of the filing system?
18  A. We also have special project files. So we
19  sort based by taxable entity, we sort by investment, and
20  we sort by special project files. And for example, in
21  connection -- we had a file labeled "January 2001 stock
22  trades correspondence file." And that's the file we
23  went -- the first file we went to when we -- to produce
24  the documents that you requested that had all the notes.
25  And there's -- somewhere in your documents

1  there'll be a complete set of what may look like
2  random -- we've organized documents that were just from
3  that file in the chronological order they were placed
4  in.
5  Q. Okay. And other than that, were there any
6  other files that you can think of?
7  A. We also have bank statement files for all the
8  bank accounts for all the entities that are separate.
9  Q. Anything else?
10  A. I keep files in my drawer that are just
11  working files. Mary Jo keeps files in her drawers. We
12  have files for stuff -- projects you're working on but
13  aren't yet complete.
14  Q. Okay. And how long do you maintain your
15  personal files in your drawers for?
16  A. You mean my desk?
17  Q. Yeah.
18  A. As quickly as I can move them off my desk, I
19  move them off my desk 'cause there's like a foot of
20  paper.
21  Q. And where do you have them routed?
22  A. They go to the file room.
23  Q. Okay. So you don't actually maintain a
24  separate file system in your office?
25  A. No.

117

118

1  Q. Okay. Does any of your associates or partners
2  or people in your office maintain separate file systems?
3  A. No.
4  Q. Okay. I interrupted you as you were going
5  through and listing the -- or explaining the handwriting
6  on the document. If you can continue with that, please.
7  A. Would you like me to explain the document so I
8  can explain the handwriting in context, or you just want
9  me to read the handwriting?
10  Q. Okay. Why don't -- why don't you do the
11  former.
12  A. Okay. This is a schedule detailing Larry's
13  Libor contracts dated as of July 14, 2000. It -- and it
14  lists by bank -- I said we had five banks. And it lists
15  the five banks we were working with at the time.
16  It shows the principal balance outstanding at
17  that date, the line limit, the maturity -- that is not
18  the maturity date of the line; that is the maturity date
19  of the Libor contract.
20  Q. Right.
21  A. And Libor contracts you can do 30, 60, 90, 180
22  days, you can do shorter periods. And we generally do
23  30-day Libor contracts. So that's why you're seeing
24  them all mature. It's the contract roll, not the
25  maturity date of the underlying loan agreement.

1  Q. Okay.
2  A. And then it has the number of days, and each
3  bank has its own policy on how many days' advance notice
4  you have to give to book a Libor contract.
5  Q. I'm not sure I followed that last piece. How
6  many days you had to book a Libor contract?
7  A. How many days in advance you have to call the
8  bank to book a Libor contract. Under floating rate
9  loans based on Libor, technically all bank agreements
10  are written where you can either borrow at prime or at
11  Libor with a spread over Libor at your election.
12  Q. Right.
13  A. You have to book these contracts and you have
14  to notify the bank so many days in advance. And I
15  suspect this dates back to when they were originally
16  done off-shore borrowing in London and has so many days
17  in advance notice for them to do matching 'cause they
18  would borrow the money on the interbank market to match
19  your contract.
20  Q. And when you're saying the number of days in
21  advance, you're talking in advance of the maturity date?
22  A. Of the -- of the Libor -- of the 30-day
23  rolling Libor contracts. So this was prepared by Mary
24  Jo, and she controls this. For example, UBS is Union
25  Bank of Switzerland. Or it may have been after they

119

120

1  merged with Swiss Bankcorp.  It may be UBSAG.
2  But you have to contact UBS two days prior to
3  the maturity of the contract to renew your -- to tell
4  them whether you want a 30-, 60- or 90-day roll on the
5  contract.  Otherwise the loan would go to prime.
6  Q.  Okay.
7  A.  So this is just data for us.
8  Q.  And in connection with -- if I were to -- or
9  if you were to want to try to find out what the actual
10  contract maturity dates on any of these loans are, where
11  would you go to find that information in your office?
12  A.  There are schedules kept in my office, or you
13  can go to the underlying loan agreement.  I am fairly
14  certain you're going to find a schedule, as we go
15  through my documents, detailing the maturity dates of
16  the contracts --
17  Q.  Okay.
18  A.  -- okay, in here, was presented to you.
19  What you will note on the line limit, Larry's
20  aggregate limit was 1,350,000,000.  At that point in
21  time, his drawings were 1,022,000,000.  We had available
22  $327 million.
23  Q.  Right.  And this is July of 2000; is that
24  correct?
25  A.  Yes.

121

1  Q.  You were continuing to explain the document
2  and proceeding with the handwriting.
3  A.  Okay.  And I was clearly detailing to Larry
4  likely expenditures over the next six to 12 months.  I
5  would suspect I was meeting with Larry to say "There's
6  going to be a cash issue coming up; the debt's reaching
7  its lending limit; we have to start paying down debt."
8  And this is listing out for Larry expenditures
9  that I see.  And I'll just read the ones circled first.
10  "Expenditures," 1 is "lifestyle, annual 20 million";
11  number 2, "interest accrual."  That's accruing of
12  interest at around six and a half percent annual is at
13  75 million.  He was thinking, at the time, of buying a
14  villa in Japan.  That was 25 million.
15  He had entered into a contract to build a new
16  yacht budgeted at 194 million over three years.  He was
17  contemplating the Americas Cup campaign that was held in
18  New Zealand in 2003, budgeted at 80 million.
19  Q.  Over three years?
20  A.  Yes.
21  Q.  Okay.
22  A.  And then it says -- number 6 is UAD,
23  12 million over three years.  UAD was underwater
24  archeology development.  It was a project that did not
25  go forward.

122

1  Q.  What kind of project was it, just so I'm
2  clear?
3  A.  Doing archeology -- funding archeology digs
4  somewhere.  I'm not sure where in the world.
5  Q.  Okay.  And when did that fall --
6  A.  Underwater.  That's all ...
7  Q.  In many ways, right.  When did that fall
8  through?
9  A.  Sometime during this period it fell through.
10  I don't know.
11  Q.  Okay.  You believe it fell through sometime in
12  the summer of 2000?
13  A.  I don't recall.  I was basically -- my job on
14  these things is to try to protect Larry and be very
15  pleasant with these people and keep the project moving
16  while discouraging it from happening.
17  Q.  Very valuable, I'm sure.
18  A.  I shouldn't say that to Larry.  He's going to
19  read my deposition now.  But basically this was -- this
20  was one of them.
21  Q.  Okay.  I mean, do you have any understanding
22  as to whether or not it was something that Mr. Ellison
23  decided not to proceed with before September of 2000?
24  A.  There's undoubtably [sic] a UAD file in my
25  office somewhere under special projects.  I would have

123

1  to go search.  But I have no recollection.
2  Q.  Okay.  But it's something that did not go
3  forward?
4  A.  I know it did not go forward.
5  Q.  Okay.  Do you know if it didn't go forward by
6  the January 2001 time frame?
7  A.  I suspect it did not, but I don't know.
8  Q.  Why do you say you suspect it did not?
9  A.  Because you can only keep people being
10  pleasant and string -- and negotiating for a certain
11  period of time.  This is July.  This was hard to keep --
12  and it was underwater archeology and summer digs.  It's
13  hard to keep the discussions going being pleasant for
14  six months into winter, but I don't recall.
15  Q.  Okay, thanks.  And the third item that you
16  referred to as the villa in Japan.  At what point -- you
17  indicated that Mr. Ellison did not actually purchase a
18  villa in Japan.
19  A.  He did not, yes.
20  Q.  And when was the decision made not to purchase
21  the villa?
22  A.  Sometime during this year.  I suspect that
23  also went on for three to six months.
24  Q.  Okay.  Was this -- do you have any time frame
25  as to when the discussions started and when they might

124

1    have ended?
2      A.  I would have to look at my villa subject
3    matter file, which I did not copy for you because I
4    didn't think it was directly relevant to your document
5    request.
6      Q.  Okay.  Do you -- I'm sorry.
7      A.  Above it says "Also nCUBE-Chase 44 million,
8    38.5 million drawn."  That's another debt -- nCUBE is a
9    company Larry owns most of.  He has guaranteed up to
10   $44 million of debt.  And that also counts toward our
11   aggregate debt limit.  And that was just another debt I
12   was flagging for Larry in addition to the numbers above.
13     Q.  Okay.  And -- oh, this -- is this a number --
14   okay.  What do you mean by "guaranteed up to 44 million
15   of debt"?
16     A.  A corporation wants to borrow money, wants to
17   go to the bank.  It has terrible credit rating, can't
18   borrow.  I'd guarantee the debt to the bank.  The bank
19   says, gee, I look creditworthy.  They will lend money to
20   the corporation.  When you're the guarantor, you put a
21   limit on the maximum amount that you want to guarantee.
22     Q.  Okay.  And do you have any understanding of
23   whether or not the bank actually sought to have Mr.
24   Ellison make any payments as the guarantor for that
25   company prior to, say, February of 2001?

125

1      A.  I negotiated the loan for this company with
2    the bank.  So this is treated by the bank as if it's a
3    part of Larry's line.  And the answer is they would
4    never ask Larry to guarantee it -- I mean to make a
5    payment because we are guaranteeing it.  And it's part
6    of our aggregate debt limit.  So it's really a piece
7    broken off from Larry's line for a special purpose.
8      Q.  Okay.  And I guess my question's slightly
9    different.  What is -- what is the role of a guarantor?
10   Can you explain that --
11     A.  What is the role --
12     Q.  -- just so it's clear for the record?  I mean,
13   what was Mr. Ellison doing when he was providing that
14   $44 million guarantee?
15     A.  I structured this.  It's a very complicated
16   transaction.  Do you really want the explanation?
17     Q.  Can you explain in just sort of -- simply
18   explain what the concept of the guarantor -- guarantee
19   is.
20     A.  Correct.  NCUBE was a company that Larry owned
21   99 percent of.  It merged sometime in '98 or '99 -- in
22   fact, in '99, from prior e-mails -- with a company
23   called SkyConnect.  As part of my negotiations of the
24   merger with the seller of SkyConnect, nCUBE had a lot of
25   money owed to Larry.  We were able to get the lender --

126

1    the SkyConnect owner to agree to keep certain kept
2    outstanding as part of nCUBE's liability rather than
3    forcing Larry to absorb that at the time of the
4    negotiations.
5      Q.  Right.
6      A.  Larry's going to get the same percentage of
7    the merged company whether I can keep the debt on the
8    books or not.  I was able to persuade the guy that this
9    is a proper level of debt on the books.  So we didn't --
10   Larry did not have to pay off the debt.
11       So therefore, Larry got around, let's say, two
12   thirds of the merged company, yet I shifted 44 million
13   of debt -- or 40 million of debt -- actually, 38.5 --
14   onto nCUBE's books.  But nobody would lend to nCUBE
15   'cause it was cash-flow negative.
16       So to accomplish that, I then arranged with, I
17   think, originally Bank of America, then it was moved to
18   J.P. Morgan Chase, to lend directly to nCUBE secured by
19   Larry's guarantee and Larry's Oracle shares as part of
20   our line to nCUBE.  And basically I got the debt on the
21   books of the corporation.  And since we only owned two
22   thirds of it, I effectively shifted one third of the
23   debt obligation onto the shareholders of SkyConnect.
24     Q.  Okay.  And do you have any understanding as to
25   whether or not this loan -- nCUBE loan was in good

127

1    standing throughout 2000?
2      A.  Yeah, it's still in good standing.  It's part
3    of Larry's line.
4      Q.  Okay.
5      A.  I mean, I fund money.  I mean, it's -- yes.
6      Q.  Okay.
7      A.  When nCUBE needs money to pay the interest, I
8    fund the money to nCUBE from Larry.
9      Q.  Okay.  There's a couple more handwriting
10   notations.
11     A.  "7/13/00, per Larry, we will sell Oracle to
12   raise cash for these expenditures."
13     Q.  Okay.  And you have a date on that.  Was that
14   the date that Mr. Ellison gave you that instruction?
15     A.  That is not an instruction.
16     Q.  Okay.  Tell me what it is, then.
17     A.  Larry likes -- understands when I raise
18   problems and issues, and he likes to give me the answers
19   that will solve the problems and that will, in a sense,
20   please me and make me go away, to come back every
21   quarter to raise the same issue.
22       So he's basically telling me "Okay, you've
23   told me we're running up against -- we have 200" -- if
24   you look at this, we have $320 million of operating
25   room, okay.  I'm budgeting expenditures of 400 million

128

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  or 500 million.

2      Q.  Over the course of three years?

3      A.  Yeah, but things -- you know, the world --

4  things are front-loaded.  This is over three years, but

5  things are front-loaded.

6      Q.  Right.

7      A.  Interest accrual is just one year.  So even if

8  you take one year budgeting a couple hundred million

9  dollars -- and this does not even include his investing

10  in private equity companies.

11      So Larry's basically telling me -- it's like

12  a -- it's like a train running into a stone wall.  I'm

13  saying "Look, we have a freight train going down a track

14  hitting a debt wall.  You have options that are also

15  expiring.  We have to deal with the expiring options in

16  a tax-efficient way and deal with the debt before the

17  freight train hits the wall."

18      And Larry's telling me "Okay, you're right.  I

19  see it."

20      And that's -- that's what this says.  It's not

21  an instruction to sell.  It's Larry acknowledging in

22  advance that there's an issue here that needs to be

23  dealt with.

24      Q.  Okay.  And after that acknowledgment, when did

25  he actually provide you with the instructions to execute

129

1  this --

2      A.  Per prior e-mails and the Special Litigation

3  Committee, January 19th, 2001.

4      Q.  Okay.  And during the period of time between

5  this July 14, 2000 meeting -- or July 13th, I think is

6  what your handwritten notes say -- and that January 19,

7  2001, would -- did you have further discussions, that

8  you can recall, regarding this particular issue?

9      MS. SEGAL:  I object to the form of the

10  question.

11      MS. LAVALLEE:  You can answer.

12      THE WITNESS:  I don't recall.  I think we

13  should move forward into the e-mail and see what

14  the e-mail tells us.

15      MS. LAVALLEE:  Q.  Okay.  But you have no

16  specific recollection?

17      A.  No.

18      MS. LAVALLEE:  Okay, great.  You know what;

19  it's 20 to 1.  What do you say we break for lunch?

20      THE VIDEOGRAPHER:  We are off the record.  The

21  time is 12 --

22      MR. NADOLENCO:  Hold on, hold on, hold on.  I

23  just wanted to put on my record my offer that I made to

24  you, Nicole, before the deposition still stands.  As I

25  told you, we withheld from the production certain

130

1  documents that related to the '95 to '99 time frame.

2  You had indicated that you thought we should produce

3  them pursuant to one of the prior court orders or

4  agreements.  I asked you to get that for me.  I'm happy

5  to review it.

6      If you could do that, I'd review it and

7  reevaluate whether we should go ahead and produce them.

8  I do have the documents here with me.  But I would have

9  to see what you were talking about.

10      MS. LAVALLEE:  Okay.  And I'd just like to

11  state for the record that we were produced roughly --

12  well, documents Bates-stamped up from 1 to 580, in that

13  range, with some documents missing, which is the

14  documents you're talking about, just late yesterday

15  after the close of business.

16      So clearly it's something that we haven't

17  actually had a chance to look at what's been provided.

18  I'll consider --

19      MR. NADOLENCO:  (Inaudible) Number of them.

20      MS. LAVALLEE:  Well, that's true.  But I

21  haven't had a chance to study them.  Nobody else has.

22  So what we'll do is I'll consider your suggestion, but I

23  may not be in a position today to do that.

24      We can go off the record.

25      THE VIDEOGRAPHER:  We are off the record.  The

131

1  time is 12:42.

2      (Lunch recess from 12:43 to 1:43).

132

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1   AFTERNOON SESSION              1:54 P.M.
2               EXAMINATION RESUMED BY
3       THE VIDEOGRAPHER:  We are back on the record.
4   The time is 1:54.
5       MS. LAVALLEE:  Q.  Welcome, Mr. Simon.  I
6   believe that we were -- we had nearly completed
7   discussion of, actually, Exhibit -- I didn't make a
8   note -- the last exhibit.
9       A.  192.
10      Q.  192, exactly.  And I think we covered that.
11  So what I'd like to do is actually mark a new exhibit,
12  which is 193, and which is a document Bates-stamped ORCL
13  0093843.
14      (DC Exhibit No. 193
15      marked for identification).
16      MS. LAVALLEE:  Q.  And Mr. Simon, if you could
17  take a moment to look at the document and identify it
18  for the record.
19      MR. ZWANG:  Let me note first that this isn't
20  one of the documents that Mr. Simon produced 'cause it
21  doesn't have his Bates stamp number, so ...
22      MS. LAVALLEE:  That's correct.
23      MR. ZWANG:  And he's not shown as a party to
24  the e-mail, to either -- and I don't see his name as a
25  party to the e-mail.  So he may not be able to identify

133

1   it for you.
2       MS. LAVALLEE:  Okay.  I'd just like to let you
3   know, we're functioning under Delaware law for these
4   depositions, and objections should be limited to making
5   an objection, period, no speaking objections.
6       But I appreciate your comments.  And you are
7   correct, he is not listed as a
8   recipient or sender on either one of these e-mails.
9       MR. ZWANG:  Well, while I want to comply with
10  whatever rules you've chosen to govern yourselves by as
11  parties, Mr. Simon is a California resident and has all
12  the rights of a deponent in California and -- including
13  the right to counsel, so ...
14      MS. LAVALLEE:  Don't dispute his right to
15  counsel.
16      Q.  All right, Mr. Simon --
17      A.  I'm still reading it --
18      Q.  Sure.
19      A.  -- 'cause I've never seen this before.
20      Q.  Okay.  Please, take your time, then, and let
21  me know when you're done reading it.
22      MR. ZWANG:  Actually, I think that answers
23  your first question, which was "Can you identify it?"
24  And I think the answer was no, he's never seen it
25  before.

134

1       MS. LAVALLEE:  Okay.  Well, he's going to
2   testify, not you.
3       MR. ZWANG:  I believe that's what he just
4   said.
5       MS. LAVALLEE:  Okay, that's fine.
6       MR. NASTARI:  You have to acknowledge the
7   rules of a deposition, and they are Delaware rules.
8   It's not just --
9       MR. ZWANG:  I'm going to do my best --
10  frankly, I don't know Delaware rules, but I'm going to
11  do my best to comply with whatever rules you've chosen
12  to conduct the deposition by.
13      MS. LAVALLEE:  Thank you.
14      THE WITNESS:  Okay, I'm ready.
15      MS. LAVALLEE:  Okay.
16      Q.  Mr. Simon, this appears to be an e-mail trail
17  from somebody named Chris to Catherine Ong and -- back
18  and forth, a series of e-mails; is that correct?
19      A.  Correct.
20      Q.  Catherine Ong is the person you identified
21  earlier who works in your office; is that correct?
22      A.  She's a person who's worked with me on Larry's
23  tax matters since Larry became a client of Howson &
24  Simon, handles and manages Larry's tax compliance, and
25  did the document search.  As I told you before, I guess

135

1   we didn't search her computer, and I apologize for that.
2       Q.  All right.  We would actually ask --
3   plaintiffs would ask that a search be made of all
4   computers.  And to the extent that wasn't done, if you
5   could advise us whether or not there are additional
6   documents in light of that search, that would be --
7       A.  Sure.  I'll have her do a search and get ...
8       Q.  Thank you.
9       A.  Excuse me a second.  I just want to write a
10  note to remind myself.
11      Q.  Sure.
12      MR. NADOLENCO:  Nicole, maybe this is a good
13  time for me to say that over the lunch break, we decided
14  to go ahead and produce to plaintiffs the documents that
15  we previously had withheld from the '95 to '99 time
16  frame.
17      At this point, the only document we have
18  withheld from the production are related to tax
19  withholdings for Mr. Ellison.  And we're asserting a tax
20  privilege for those, as well as those that are
21  completely irrelevant.  So I've withheld those.  And the
22  ones we produced, plaintiffs' counsel is currently
23  copying.
24      MS. LAVALLEE:  Okay.  And I appreciate that
25  production.  And as I indicated to counsel, obviously we

136

1 haven't had a chance to fully review the documents.  And
2 particularly I believe you gave me a stack that was a
3 fairly large stack just a few minutes before we
4 commenced after the lunch break.  So we haven't had a
5 chance to review that.  So obviously we can't indicate
6 whether or not there remains a dispute or not.  But we
7 will try to do that.
8 MR. NADOLENCO:  And I apologize.  There is one
9 other document that we withheld, and it's a part of a
10 Schedule D from Mr. Ellison's tax return.  We're
11 asserting the same privilege on that, but that's just a
12 single page.
13 MS. LAVALLEE:  Okay, thank you.
14 THE WITNESS:  Might I add one thing about
15 searching Catherine's computer.  Up until a year ago, we
16 did not have a central server.  Our offices in Walnut
17 Creek are right below Morrison & Foerster's offices.
18 Morrison & Foerster's offices were broken into around a
19 year and a half ago, and all of their computers were
20 stolen, and so were many of our computers.  And my --
21 Catherine's may have been one stolen.
22 And we now have a server with backup and
23 everything, but we may not have anything for Catherine.
24 But I will check her computer and see what we have.
25 MS. LAVALLEE:  Okay.  I appreciate that.

137

1 THE WITNESS:  But there may not be -- there
2 may be nothing for that reason.
3 MS. LAVALLEE:  Okay.
4 Q.  Generally is it the practice of your firm to
5 print and keep hard copies of e-mails?
6 A.  No.  You print some really critical ones, but
7 as the volume of e-mail has gone up in recent years, I
8 don't think anybody prints every -- ten years ago, yes.
9 Now, forget it.
10 The answer is we try to print critical ones
11 that give authorization or something like that.  But you
12 can't print everything nowadays.
13 Q.  Okay.
14 A.  And anything that was printed has been
15 searched and provided to you.
16 Q.  Okay.
17 A.  We hope.
18 Q.  I appreciate the explanation.  I take it
19 you've never seen this document before?
20 A.  No.
21 Q.  Are you familiar with the subject matter
22 discussed in this e-mail?
23 A.  Yes, it's the same subject matter alluded to
24 in other e-mails that I've actually had with Deb Lange
25 that I alluded to earlier in my -- in the questioning.

138

1 Q.  Okay.  And I'd just like to draw your
2 attention to one sentence, and that is on the actual
3 middle of the document where there's an e-mail from
4 Catherine to Chris, the second sentence.
5 "Given the amount of the options, I'm
6 talking about hundreds of millions of
7 taxable income, we may have him exercise
8 some in December 2000 and the remainder in
9 August of 2001.  But that will depend on
10 our year-end tax planning after review of
11 the 2000 transactions."
12 Do you have any understanding of her reference
13 to the possible exercise in December as well as then a
14 subsequent exercise in August of 2001?
15 A.  Yes, I do.
16 MS. SEGAL:  I'm going to object to the form of
17 the question first because you said some "in December"
18 and it says "by December."
19 MS. LAVALLEE:  Oh, I apologize and appreciate
20 that.  Thank you.
21 Q.  I'm sorry, please respond.
22 A.  Okay.  The reference to "exercise some by
23 December" actually was probably Catherine's reference to
24 exercise some in December for year-end tax planning,
25 'cause Catherine does Larry's tax projection, does the

139

1 planning.
2 So Lauren raised the precise question.  It was
3 Catherine's inartful use of a word, a preposition.  So
4 you got it right.  You understood what Catherine
5 intended.  So that was the normal stock option exercise
6 at year-end.
7 With respect to the remainder --
8 THE REPORTER:  I've got to slow you down.
9 THE WITNESS:  Okay.  With respect to the
10 remainder in August of 2001, that is Catherine just
11 speculating.  Catherine has never spoken to Larry or
12 e-mailed with Larry, and in fact, she's not aware of the
13 securities issues that govern trading by insiders.
14 In fact, you cannot trade in August because
15 the window's closed on sales.
16 (To Ms. Segal) Isn't August -- I think it's
17 August.
18 MR. ZWANG:  You're not allowed to ask
19 questions.
20 THE WITNESS:  I can't ask, so let me count.
21 May, June, July, August.  You can't trade in August
22 'cause the window on insider trading is closed.
23 MS. LAVALLEE:  Q.  Okay.  And are you
24 referring to the close -- closing the window in the
25 third month of a quarter?

140

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1     A.  Yeah.  And more importantly, the options
2  expire on August 1, so you couldn't trade in August
3  anyway because the options were expired.
4        So what Catherine was basically referring to
5  is probably exercise some in December for tax-planning
6  purposes.  And of course, the options expire on
7  August 1st, so something has to be done before then.
8     Q.  Okay.
9     A.  That's the most likely interpretation.
10     Q.  Okay.  You say "most likely."  You haven't
11  actually discussed this with her, so ...
12     A.  First time I've seen this e-mail.
13     Q.  Okay.  And going back to the third month of
14  the quarter, is it your understanding that Oracle had a
15  practice whereby they prohibited trading in the third
16  month of the quarter or discouraged trading in the third
17  month of the quarter?
18     A.  No.  Back then, my understanding, though I
19  recommend, first of all, you check with Oracle legal;
20  they would have a better understanding of the rules.
21        My recollection, though, is at that point in
22  time, Oracle insiders -- the window generally opened, I
23  think, on the third trading day after earnings are
24  announced for the preceding quarter and closed sometime
25  in the middle of the month on the third month of the

141

1  quarter.  I think it was the 15th, or two or three
2  weeks before the end of the quarter.
3        The rule has since changed, I believe, for
4  certain insiders so the entire third month is blocked
5  out.  But during the relevant period, I believe you
6  could trade into February.  In fact, you'll see some
7  e-mails -- there's a e-mail from Dan Cooperman giving
8  clearance to sell through February 2nd.
9        We only sold into the -- through the second
10  month of the quarter, primarily, I suspect, to be very
11  proper.  But trading was allowed into the third month.
12     Q.  Okay.  But do you have any understanding as to
13  whether or not Mr. Cooperman actually discouraged
14  trading in the third month during that time frame?
15     A.  I have a recollection of Dan telling me -- and
16  this is a paraphrase, so it's not accurate -- but
17  something like "You can trade into the third month of
18  the quarter."  He's been in the software business long
19  enough now that he realizes that nobody knows what
20  earnings are going to be for the quarter until the last
21  week of the quarter.  "But from a cosmetic perspective
22  and a market perception perspective, it would probably
23  be better to sell only into the second month of the
24  quarter.  But you're clear to sell into the third
25  month."

142

1     Q.  Okay.  If I could turn your attention now to
2  the document we marked as 186 --
3     A.  Mm-hm.
4     Q.  -- which is the summary of the interview.
5     A.  Yes.
6     Q.  And page 9 in particular.
7     A.  Mm-hm.
8     Q.  In the second full paragraph, it states,
9        "Simon stated that Cooperman
10     reiterated Oracle's unofficial practice of
11     not selling during the last month of the
12     quarter.  Cooperman stated that Ellison and
13     Oracle maintain a better appearance of
14     propriety by not trading during February,
15     even though Oracle's formal policy allows
16     trading to continue to the final two weeks
17     of the quarter."
18        Do you have any understanding as to whether or
19  not this accurately summarizes what you told the SLC?
20     A.  I think that's exactly -- in other words,
21  that's identical to what I just told you two minutes
22  ago.
23     Q.  Okay.  So you think --
24     A.  Thirty seconds.  So I think it's consistent.
25     Q.  So you believe that Cooperman did reiterate

143

1  Oracle's unofficial practice of not selling during the
2  last month?
3     A.  I don't know if I would say it's Oracle's
4  unofficial practice.  That might be a summary of what I
5  said.  What I recalled was what I told you, is that you
6  can sell into the third month of the quarter, but --
7  it's proper, but it would look -- it's better not to
8  'cause we live in a very -- I'm -- I don't want to say
9  his words, but basically --
10     Q.  Okay.
11     A.  -- "You can sell, but it's preferred -- it's
12  better not to."
13     Q.  Okay.  Thank you.
14     A.  And any inconsistency between my prior
15  statement and the statement in the SLC should be read as
16  duplicative and saying the same thing in different
17  words.
18     Q.  Okay.  And I'm not suggesting there's an
19  inconsistency.  I just wanted to be clear 'cause this
20  said a little bit more, so ...
21     A.  I would take my recollection of this as being
22  consistent and identical.
23     Q.  Okay, that's fine.
24        I'd like to mark as Exhibit 194 a document
25  Bates-stamped PS0020.

144

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1      (DC Exhibit No. 194
2      marked for identification).
3      MS. LAVALLEE:  Q.  Mr. Simon, if I could ask
4   you to take a moment to look at the document.  And when
5   you've had a chance to review it, just identify it for
6   the record.  And I'll have just one question for you
7   with respect to this document.
8      A.  Okay.
9      Q.  Okay.  Is this -- does this document reflect a
10  series of e-mails between you and Andrew Dudnick?
11     A.  Correct.
12     Q.  And do you believe that this was a series of
13  e-mails that were actually sent and received?
14     A.  Most likely.
15     Q.  Okay.  There's just two names on here that I'm
16  not familiar with.  And I draw your attention to roughly
17  a little -- nearly two thirds down the page.
18        "It might not be a bad idea to send
19     updates to SEB himself via e-mail and
20     possibly Carolyn and Steve."
21        Who is Steve?
22     A.  Steve is Steve, Steven P. Fink, who I referred
23  to earlier as one of the members of Lawrence
24  Investments.
25     Q.  Okay.  And who is SEB?

145

1      A.  SEB, that goes back from years ago.  That's a
2   nickname for Larry in e-mail for confidentiality, that
3   we don't -- that is just used occasionally still.
4      Q.  Okay, thank you.
5         I'd like to mark as Exhibit No. 195 a document
6   Bates-stamped PS0021-22.
7         (DC Exhibit No. 195
8         marked for identification).
9         MS. LAVALLEE:  Q.  When you've had a chance to
10  review it, just identify it for the record.
11     A.  Okay, I'm ready.
12     Q.  Can you tell me what this is.
13     A.  This was an e-mail from me to Carolyn
14  Balkenhol, dated December 18, 2000, referring to Larry's
15  year-end tax projection and my desire to trigger
16  $20 million of option income to offset tax losses, and
17  giving Carolyn a heads-up to alert the people at Oracle
18  so we can do quick action, given you have to wait till
19  the Oracle window opens after the announcement and you
20  need to get legal clearance and get everybody on board,
21  and you have the Christmas holidays.
22        So this is a preliminary notification that we
23  have a rough projection showing a $20 million loss and
24  we wanted to fine-tune it, wanted people to be ready
25  once we were ready to execute.

146

1      Q.  Okay.  And is your understanding there were
2   shares that were -- or options that were exercised to
3   actually effectuate this tax planning that you referred
4   to?
5      A.  I believe that's what we talked about this
6   morning, yes, every December.
7      Q.  At this time of year?
8      A.  Yeah.  This is the end of December.  And I
9   assume -- I don't have -- we'll get to it later on in
10  the documents I presented to you.  I don't know exactly
11  what was exercised, but I do believe, subject to looking
12  at the documents, that we did exercise options in late
13  December 2000.
14     Q.  Okay.  I'm going to show you a document that's
15  been previously marked as DC-113, which is Bates-stamped
16  CA-ORCL 7291 through 95.  Just be a moment.  Actually,
17  we're not marking ...
18     A.  Thanks.
19     Q.  Mr. Simon, could you take a look at and
20  identify for the record [sic].
21     A.  This appears to be a fax from Catherine Ong,
22  in my office, to Barbara Wallace and Steve Edmundson.
23     Q.  Okay.  And have you ever seen the document
24  attached, titled "Oracle Corporation Stock Option
25  Exercise Form" and then "Oracle Corporation Stock Option

147

1   Exercise Notice and Agreement" and "Stock Option
2   Exercise Supplement"?
3      A.  I may -- I've seen the basic Oracle stock
4   option forms in the past.  I don't know if I've seen
5   this one, this specific one.  I may have; I may not
6   have.
7      Q.  Okay.  Can you tell me whether any of the
8   handwriting or signatures on this document are yours.
9      A.  No.  Just to be clear, I'm not saying I can't
10  tell you, 'cause you asked the question can I tell you.
11  I'm telling you yes, I can tell you, but no, they're not
12  mine.
13     Q.  Okay, thank you.  I assumed that that was your
14  response, but I appreciate the clarification for the
15  record.  Thank you.
16        (Discussion off the record).
17        MS. LAVALLEE:  I'd like to mark as Exhibit No.
18  196 a document Bates-stamped CDI 03234.
19        (DC Exhibit No. 196
20        marked for identification).
21        MS. LAVALLEE:  Q.  If you could take a look at
22  this document and identify it for the record.
23     A.  This is an e-mail from Deb Lange to me and
24  from me back to Deb Lange.
25     Q.  Okay.  And this is actually an e-mail that you

148

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1    believe was sent and received, correct?
2        A.   Most likely.  I believe there's a copy of this
3    one in my e-mail set as well.
4        Q.   Okay.
5        A.   I saw this when I reviewed the e-mails on
6    Sunday night.
7        Q.   Okay.  And I gather from this that Deborah
8    Lange was responding to an inquiry on -- oh, actually, I
9    apologize.  So on January 10, you wrote --
10       A.   No, on January 10th -- on January 10th,
11   Deb Lange wrote to me -- this is when I was in New
12   Zealand, but she sent an e-mail to me telling me, with
13   respect to Larry's options, Oracle would prefer that the
14   options are exercised earlier rather than later 'cause
15   they would like to get the offsetting deduction in their
16   fiscal year ending May 31, 20.
17          So since there were only two or three windows
18   left to exercise the options, it was Oracle's preference
19   that Larry exercise them earlier.
20       Q.   Okay.
21       A.   And I was replying back to her on my first day
22   back in the office, "Got it.  Understood."
23       Q.   Okay.  And you -- I'm sorry.  Do you have any
24   understanding as to whether she was responding to a
25   particular inquiry that you had made or somebody in your

149

1    office had made?
2        A.   No, but we went through e-mail earlier today
3    where they started this discussion -- there's an e-mail
4    you showed me earlier -- I'm not sure which number it
5    is -- talking about Oracle's utilization of foreign tax
6    credits and their subsidiaries.
7           And I suspect it relates to -- you don't want
8    me to go into the technicalities, but to utilize and
9    maximize the foreign tax credit utilization, NOL
10   utilization, at the corporate level, it depends upon --
11       THE REPORTER:  Wait, wait, wait.  "You don't
12   want me to go into the technicalities, but to utilize
13   and maximize the foreign" ...
14       THE WITNESS:  Tax credits and net operating
15   losses when you deal with offshore subsidiaries, you
16   have to take into consideration the repatriation of
17   subsidiary earnings.
18          And there was an earlier e-mail you showed me
19   discussing these issues that Oracle is addressing.  And
20   Deb was apparently contacting us.  And I don't know what
21   Deb was thinking, but my impression would be, and
22   inference from this is, if possible, they would like to
23   nudge us to nudge Larry to basically exercise his
24   options in the January -- before May 31st 'cause it
25   was to Oracle's benefit.

150

1    frame as well?
2        A.   Not March/April.  End of February/March time
3    frame.
4        Q.   Okay.
5        A.   The answer is yes, if you want to go down to
6    the wire.  See, when you have options, they're normally
7    ten-year options, and so you want to let your options
8    run to get the maximum appreciation.  But as you get
9    closer to the separation date, you have to exercise them
10   before they expire.
11          When you're not an insider, you have a lot of
12   flexibility, but when you're an insider, you have -- the
13   trading window opens at a certain point.
14       Q.   Right.
15       A.   That's just the general rule.  If there's a --
16   as you well know since you're in this business, if
17   there's a material transaction going on, the window
18   would be closed.  So as an insider, you would never want
19   to wait until the last theoretical window 'cause that
20   theoretical --
21       THE REPORTER:  You would never want to
22   wait ...
23       THE WITNESS:  To that last theoretical open
24   window because that open window may not open.
25       MS. LAVALLEE:  Q.  Right.  And --

152

1        MS. LAVALLEE:  Right, yeah.
2        THE WITNESS:  And I was saying from a tax
3    perspective -- and this was a continuing dialogue that
4    had been going on from prior e-mails.
5        MS. LAVALLEE:  Q.  Right.  And her concern was
6    fiscal year '01 versus fiscal year '02, she indicates?
7        A.   Correct.  And Larry's options expired on
8    August 1.  So in theory, you could wait until after
9    earnings are announced for May 31st, which would be
10   around, let's say, June 15th.
11          And you could sell June 15th through the end
12   of July if you weren't worried about having another
13   transaction which would close the window.
14          It's a very high-risk thing to do.  So I would
15   normally recommend exercising well before the expiration
16   date.  And Deb is giving us -- implying that Oracle,
17   in its interest, was -- indirectly was requesting that
18   Larry exercise his options.  And she was e-mailing me on
19   the 10th.
20       Q.   Right.  And she's saying fiscal year '01 April
21   versus fiscal year '02?
22       A.   Correct.
23       Q.   And you mentioned that there was a window in
24   the June time frame.  Is it your understanding also that
25   there was a window to trade in the March/April time

151

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1    A.  So you would never -- in my mind, it's almost
2  irrational to wait until that point in time.
3    Q.  Okay.  And that sort of goes along with the
4  theory of why you were constantly bugging, for lack of a
5  better word, Mr. Ellison to trade in the prior periods
6  in the e-mails we saw in the spring of 2000?
7    A.  It was suggesting that we not trade in the
8  prior periods; it was suggesting that we establish a
9  plan to trade.  And in my mind, a good plan would be to
10  trade two or three -- three, four windows before --
11  ideally three windows -- before -- I mean, quite
12  honestly trading in this January time frame was an ideal
13  matching of the risks of the option terminating.
14    Q.  Okay.  Is it also fair to say, though, that in
15  your prior recommendations -- I think you testified
16  earlier that you'd made a series of recommendations from
17  June '99 period going forward, and you also were
18  recommending that those options be exercised because
19  they were expiring.
20      So that's sort of consistent with your theory
21  that you don't want to wait till the last minute; is
22  that correct?
23    MS. SEGAL:  Objection to the form.
24    THE WITNESS:  Okay.  What I was -- in the
25  prior things, I was flagging the issue that you had to

153

1  address it.  I was not recommending or advising when to
2  exercise.  I was just raising the issue so Larry would
3  have time to think about it.
4      And yes, I think diversifying and paying down
5  debt is sensible.  But I wasn't necessarily recommending
6  exercising the options of this window versus that
7  window, other than that you should exercise them in
8  advance, well in advance, of when they might expire.
9    MS. LAVALLEE:  Right.
10    THE WITNESS:  And that from a tax planning
11  perspective, I'd want to blend selling already-owned
12  stock with options to get the maximum tax benefit.
13    MS. LAVALLEE:  Q.  If I can draw your
14  attention again to Exhibit 186 and to page 5 of that
15  document.
16    A.  Mm-hm.
17    Q.  Actually, you know what; we'll come back to
18  that.
19    A.  Okay.
20    Q.  We'll come back to that in a moment.
21      I'm going to mark as Exhibit No. 197 a
22  document that is Bates-stamped PS0345.
23      (DC Exhibit No. 197
24      marked for identification.)
25      (Discussion off the record.)

154

1    MS. LAVALLEE:  Q.  Mr. Simon, if you could
2  take a moment to just look at this document and then
3  tell me what it is.
4    A.  Okay.
5    Q.  All right.  Can you tell me what it is.
6    A.  This appears to be a printout from Yahoo!,
7  dated Thursday, January 4, 2001.  And if you flip to
8  page 2, it appears to be getting the -- it's giving the
9  market price for Oracle as of that -- at the close as of
10  that date.
11    Q.  Okay.  And did you conduct the search to print
12  this out or ask somebody to do that?
13    A.  This looks like it's printed by me because if
14  you look at it, it's called "portfolio for PBS."  Those
15  are my initials.  I have -- at Yahoo!, where I just
16  click on my home page and it pops up stocks that I
17  follow, gives me the quotes throughout the day.
18      And it's also my handwriting at the top
19  referencing where to route this printout to.  It says
20  "CHO" at the top, which is Catherine H. Ong.  And then
21  it's going the Ellison 2001 tax return file.  And this
22  is my handwriting.
23    Q.  Okay.  And why were you -- just tell me why
24  you ran that search, if you know.
25    A.  My guess is, based on page 2, is the

155

1  following:  I believe -- at first I was surprised --
2  could not figure it out.  So it's a clue -- I would have
3  to look at the tax return files to confirm, but my
4  educated guess, with a 95-percent degree of reliability,
5  is that I am pricing Oracle stock, getting the average
6  of the high and low on January 4th because we did a
7  charitable donation of shares.  It appears to be 300,000
8  shares to one entity and 31,200 to another entity.
9      And I was pricing the charitable deduction to
10  know how much was given away.
11    Q.  Okay.
12    A.  And for income tax purposes, it's the average
13  of the high and the low of the stock on the day of the
14  charitable donation and the day you effect the transfer.
15    Q.  Okay, thank you.  Okay.  I'm going to show you
16  a document that has been previously marked as DC-10.  If
17  I could ask you to take a look at the document and then
18  identify it for the record.
19    A.  This appears to be an e-mail from Dan
20  Cooperman to me, dated January 19, 2001, with a cc to
21  Matt Ng, Barbara Wallace and Jeff Henley, basically
22  giving me -- giving Oracle legal department's clearance
23  to exercise and do same-day sale of Larry's stock
24  options starting on Monday -- I didn't read it that
25  closely, but it's giving the trading authority for

156

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1   probably the first week of trading.
2       Q.  Okay.  And this is dated January 19th.  And
3   this indeed is something you received, I assume, on that
4   date?
5       A.  I believe it was received by my computer on
6   that date.  Remember I'd just come back from New
7   Zealand.  I was at home making the phone calls.
8       Q.  Okay.
9       A.  I probably received this Monday morning.  So I
10  got oral confirmation 'cause I'm compulsive.  I'm sure I
11  had a phone call confirming it was sent out.
12      Q.  Okay.  So did you -- was this in response to a
13  request that you made to the legal department at Oracle
14  for clearance for Mr. Ellison's trades?
15      A.  I have no recollection of what actually
16  happened, but based on the documents that we provided
17  you in the e-mail chain and what we've discussed today,
18  it appears that Carolyn Balkenhol called me Friday.
19  Friday I made phone calls to people to get this set up.
20      And one of the things I would normally do
21  before I exercise any Oracle options or do any trade
22  involving Oracle shares, I always contact Oracle legal
23  department and get clearance to implement the trade.
24      Q.  Okay.  And do you have any recollection of
25  what you told the legal department in order to obtain

157

1   the authorization?
2       A.  No.
3       Q.  Okay.  What is your general practice?  Do you
4   provide details regarding the amount of shares at issue
5   and that type of detail, or do you know?
6       A.  I generally try to provide complete, full and
7   comprehensive disclosure to enable Oracle legal
8   department to make an intelligent evaluation.
9       Q.  And what do you think is the criteria that you
10  would have given for that purpose?
11      A.  I would have explained that Larry has options
12  that are expiring, 22-some-odd million, he wants
13  exercised into a same-day sale.  We also had what I call
14  some high-basis-tax lots from previous exercises and
15  hold at year-end, December 31, 2000, December 1999, and
16  so on, that we'd want to sell.  And probably I'd also
17  discuss that we have, obviously, Larry's founder stock
18  that he may want to be sold.
19      And I do not know at this time, you know, what
20  I had been told about how much to sell or what the plan
21  was, but I probably said the plan -- I know there's an
22  e-mail that you've -- will get to or will show me where
23  it says that Larry wants to pay down 800 million of
24  debt.  That equates to 1.2 billion of sales, and
25  mathematically it's 40.7 million of Oracle shares had to

158

1   be sold.
2       There were 22 point, I don't know, 8 or
3   9 million of options, around 3 to 4 million of
4   high-tax-basis slots.  So that would imply, I think,
5   around 12 to 13 million of founders shares being sold.
6       So given that, I probably would have laid this
7   all out to Dan or to Matt.  I may not have spoken to Dan
8   Cooperman; I may have spoken to Matt Ng.
9       MS. LAVALLEE:  Okay.  We have a minute left on
10  the tape, so we need to take a break just --
11      THE WITNESS:  Okay.
12      MS. LAVALLEE:  -- to allow the tapes to be
13  changed.
14      THE VIDEOGRAPHER:  This marks the end of
15  videotape Volume I, tape 2 in the deposition of Philip
16  Simon.  The time is 2:32 p.m.  We are off the record.
17      (Recess taken).
18      THE VIDEOGRAPHER:  This marks the beginning of
19  videotape Volume I, tape 3 in the deposition of Philip
20  Simon.  The time is 2:38 p.m.  We are back on the
21  record.
22      MS. LAVALLEE:  Q.  Welcome back.
23      A.  Thank you.
24      Q.  The document that we were just looking at,
25  Exhibit 10; is that correct?

159

1       A.  Yes.
2       Q.  The clearance.  Can you tell me whether or not
3   you made any efforts to determine whether or not Mr.
4   Ellison was in possession of adverse material nonpublic
5   information at this time.
6       MR. NADOLENCO:  Object to the form.
7       MS. LAVALLEE:  Q.  It may not have been within
8   the scope of your duties, but if you could just --
9       A.  I don't recall.  I generally do not.
10      Q.  Okay.
11      A.  I don't know what I did then.  But I have no
12  recollection.
13      I just wanted to clarify my response to the
14  other question, the prior question.  It was all based on
15  what I think I said.  I have no recollection of what I
16  really told Matt Ng.
17      Q.  Okay.
18      A.  It was just telling you that I try to be
19  comprehensive and clear.
20      Q.  Okay.
21      A.  But I have no recollection of exactly what
22  happened.
23      Q.  Okay.  But when you were actually instructed
24  by Carol Balkenhol to execute these trades, you then did
25  contact somebody --

160

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1   A. Yes.

2   Q. -- at the legal department?

3   A. Yes.

4   Q. Okay. Did you also contact anybody at the tax

5   department when you actually made -- when you actually

6   informed them that Mr. Ellison wanted to execute trades?

7   A. I have no recollection of what happened, but I

8   would say in response to your prior question about did I

9   contact Larry about whether he had any material inside

10  information, when Carolyn -- since we now know that

11  Carolyn probably contacted me on Friday, I'm certain in

12  discussion with Carolyn I would have probably raised the

13  issue and assumed that she had discussed it with Larry.

14  Q. So it would have been part of your practice to

15  just raise that with --

16  A. Possibly. But basically everybody knows the

17  rules. We've been through this routine so many times.

18  Q. Right.

19  A. Oracle checks with Dan Cooperman. Dan

20  Cooperman checks with Jeff Henley. Jeff Henley knows

21  what's going on. They check with Larry.

22      So no one initiates a trade if they have

23  material inside information, is the general operating

24  procedure, because we're trying to comply with the

25  rules.

1   Q. Right.

2   A. Okay. Now, in response to your second

3   question dealing with the tax department, I have no

4   recollection of contacting the tax department.

5       However, these were same-day option exercise

6   and sales. To exercise options, you have to complete

7   the forms, the stock option forms you showed me earlier.

8   You have to pay the strike price. You have to deal with

9   the withholding.

10      And most likely, I -- I had Catherine Ong

11  coordinate with Deb Lange, as you saw before, and

12  communicate and get all this taken care of for me.

13  Q. Okay.

14  A. I may have been involved in some of the phone

15  calls or communications, but I have no recollection.

16  MS. LAVALLEE: All right. I'm going to mark

17  Exhibit No. 198, a document Bates-stamped CD-I 0 -- I

18  got it here -- 3231.

19  (DC Exhibit No. 198

20  marked for identification).

21  THE WITNESS: Thank you.

22  MS. LAVALLEE: Q. Okay. Can you take a look

23  at this document and identify it for the record, please.

24  A. This appears to be an e-mail from me to

25  Carolyn Balkenhol, dated Monday, January 22nd, 2001.

1   And it shows a date of August 16th, 2002 above, from

2   me to me.

3       In case you're confused about this is --

4   I'm -- I was always on Eudora. I then switched to

5   Outlook.

6   Q. Okay.

7   A. And to move your files, I think our computer

8   person had to basically send the e-mails from me to me

9   to move my old folder on. That's why on a lot of

10  e-mails you'll see to me from me with different dates.

11  You have to look down below to see the real e-mail.

12  Q. Okay. And what is the substance of what you

13  were telling Carolyn right there?

14  A. I was reporting to Carolyn on how many options

15  were exercised and sold apparently on the first day of

16  trading.

17  Q. I'd like to show you a document that was

18  previously marked as Exhibit 121. If you could take a

19  moment to look at the document and then identify it for

20  the record.

21  A. Okay.

22  Q. Was this indeed a series of e-mails

23  that you sent to -- or it's actually just one e-mail --

24  that you sent to Carolyn?

25  A. It looks like that, yes.

1   Q. On January 22nd, 2001?

2   A. Correct.

3   Q. Okay. It refers to some PR issues. Do you

4   recall there being any issues as to when Mr. Ellison or

5   how Mr. Ellison would disclose to the public his

6   exercise of options?

7   MS. SEGAL: Object to the form.

8   MR. NADOLENCO: Join.

9   THE WITNESS: Until I saw this e-mail when I

10  reviewed the e-mails for preparation on Sunday, I had no

11  recollection.

12  MS. LAVALLEE: Q. Do you know who Joe

13  Lockhart is?

14  A. Yes, I do.

15  Q. Can you tell me who he is.

16  A. He was Bill Clinton's press secretary.

17  Q. Okay, fair enough. Do you have any

18  recollection whether or not he ever did any work for

19  Oracle or for Mr. Ellison?

20  A. I believe he worked for Oracle for a short

21  period of time.

22  Q. And did you have any dealings with him?

23  A. I don't believe I ever spoke with him, but I

24  have no recollection.

25  Q. Okay. And do you have any understanding as to

1    what period of time he worked for Oracle?

2        A.  Nothing clear.  However, when I reviewed the

3    e-mails that you have, there were some reference [sic]

4    someplace to Joe Lockhart.  So I would assume that his

5    presence at Oracle somehow overlapped this period of

6    time.  But I would refer you to the e-mails that I

7    provided you.

8        Q.  You indicate in here that "I would" -- "I'd be

9    of a mind not to mention the debt with respect to the

10    options."

11        What -- was there a reason why you felt that

12    that may not be necessary to disclose?

13        A.  I'd -- I have no direct recollection.

14        Q.  Okay.

15        A.  But I can --

16        Q.  Don't speculate.  We just want your accurate

17    recollection.

18        A.  Well, it's embarrassing -- it's embarrassing

19    and also affects my ability to obtain financing from

20    banks.  You want to keep your personal matters as

21    private as possible.

22        MS. LAVALLEE:  Okay.  I'd like to mark as

23    Exhibit 199 a document that is Bates-stamped PS0033.

24        (DC Exhibit No. 199

25        marked for identification).

165

1        MS. LAVALLEE:  Q.  Before you actually look at

2    the document, let me ask you a different question.  Do

3    you know what a Form 144 is?

4        A.  Yes.

5        Q.  Okay.  Can you tell me what it is.

6        A.  It's a form you file, I suspect, with the

7    SEC -- I'm not certain where -- that an insider files

8    within a certain time period after he or she starts

9    trading shares in the company.

10        Q.  Okay.  Is it your understanding that it's

11    something you file after you start trading, or is it

12    something that you file it to indicate your intention to

13    trade?  Do you have any understanding?

14        A.  I believe it has to be filed -- I'm not

15    certain what the rules were then.  The time frame for

16    filing changes.  It may be an indication of intent.  But

17    you file -- I think you have to -- by then you had to

18    file within -- on the day you initiated trading or the

19    second or third day after you did the trade.

20        Q.  Okay.

21        A.  I don't know the exact rules back then.

22        Q.  Okay.  And it wasn't your role, I gather,

23    then, to oversee the -- Mr. Ellison's filing of these

24    forms?

25        A.  No, it was.

166

1        Q.  It was, okay.

2        A.  But the rules have changed.  And basically

3    Merrill Lynch handled the Form 144 filings for us.

4        Q.  Okay.  So you -- you had them handle the

5    filing?

6        A.  Correct.

7        Q.  Okay.  Do you have any understanding what a

8    Form 4 is?

9        A.  Yes.

10        Q.  Okay.  And what's your understanding with

11    respect to a Form 4?

12        A.  It's a filing showing your holdings in the

13    corporation in your capacity as an insider.

14        Q.  Okay.  And is that after the fact, after the

15    trades?

16        A.  Are you asking about the rules on the current

17    legislation --

18        Q.  No.

19        A.  -- or back then?

20        Q.  Let's focus on back then.

21        A.  Okay.  I'm not a securities law expert, but my

22    recollection back then is that Form 4s were, I think,

23    filed at the end of the calendar quarter, or maybe at

24    the end of the calendar month.  And you reported the

25    trade that happened in the preceding calendar quarter or

167

1    the preceding calendar month.

2        Q.  Okay.

3        A.  The rules have since changed requiring

4    accelerated filing.

5        Q.  Okay.  If you could take a look at this

6    document now and tell me what it is.

7        A.  It's an e-mail from me to Carolyn Balkenhol

8    talking about the timing of the filing of the Rule 144

9    form.

10        Q.  Okay.  And you indicate in here -- there was

11    some discussion as to when the announcement regarding

12    Mr. Ellison's trades would become public, and there was

13    some back-and-forth as to people's views as to how

14    quickly that would hit the press or the public.  Why was

15    that of concern?

16        A.  It -- I have no recollection.  I could

17    speculate why it was a concern to me, but I don't know.

18        Q.  Okay.  I --

19        A.  This is three years ago.

20        Q.  Yeah, I would ask that you not speculate.

21        Okay.  Then you -- further down, you indicate

22    that,

23        "We mailed out the first filing late

24    this afternoon regular mail.  We filed for

25    5 million shares, though we sold only 3.1.

168

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1    The thought is that we'd file for 5 million
2    tomorrow as well, assuming we get off a
3    significant number of shares tomorrow."
4        Q.   Do you have any understanding as to why the
5    decision was made to indicate 5 million shares?
6        A.   My recollection is that Merrill Lynch advised
7    that the best way to file was as you were trading.  And
8    this implies that you have to file by the close of
9    business on the date you execute the trade.  And so they
10   were filing as you were trading.
11       Q.   Okay.  Was there any discussion as to whether
12   or not to file a Form 4 beginning -- indicating the
13   intent to trade the entire amount Mr. Ellison intended
14   to trade?
15       A.   You referred to Form 4.  I assume you meant
16   Form 144.
17       Q.   I did, and I apologize.  Thank you for -- I
18   assume your answer was based on the assumption I was
19   talking about a Form 144?
20       A.   So far, yes.
21       Q.   I appreciate that.  Thank you for bringing
22   that up.
23       A.   I believe we discussed it with Merrill Lynch.
24   And I never -- this is my first time doing -- managing a
25   large trade for an insider.  And I spoke with Merrill

169

1    Lynch, and they advised me on how insiders regularly
2    file their Form 4s and how they recommend it be done.
3    And I followed their advice 'cause it seemed to make
4    sense to me.
5        Q.   Okay.  And did you have any discussions with
6    Mr. Ellison about this particular matter?
7        A.   I have no recollection.  Unlikely.
8        Q.   Okay.  I'm going to show you a series of
9    documents that were marked Exhibit 113 through 119.
10       (Inaudible discussion.)
11       MS. LAVALLEE:  And actually, on 113 I appear
12   to only have one copy, so ... they all are Form 144s
13   that were previously filed.
14       Q.   Could I ask you to take a look at those.
15       A.   Mm-hm.
16       Q.   They were previously produced.  Could you tell
17   me whether or not you recognize these documents.
18       And just, again, for everybody, I did not
19   circulate 113 because I only had one copy of that one.
20   But it's the earlier version.  It's in one of the 144s.
21       (Discussion off the record.)
22       THE WITNESS:  These look like a series of Form
23   144 forms.
24       MS. LAVALLEE:  Q.  And do they appear to
25   relate to the trades in December and January 2001?

170

1        A.   They do.
2        Q.   Okay.  Do you recognize any of the signatures
3    on there?
4        A.   Mm-hm.  There's some signed by me.
5        Q.   Can you tell me which ones were signed by you,
6    please.
7        A.   The ones that say "Philip B. Simon, attorney
8    in fact" and the ones that say "Philip B. Simon,
9    attorney in fact."  And I think there's some that say
10   "Philip B. Simon, trustee."
11       Q.   Okay.  And can -- just for the record, can you
12   identify which exhibits you're referring to.
13       A.   Okay.  16 -- 116, 117, 118, 119 are signed by
14   me.
15       Q.   Okay.  What about 113, 114, 115; you don't
16   believe that those are your signatures?
17       A.   No, those -- nope.
18       Q.   Okay.  Do you have any idea whose signatures
19   they are?
20       A.   They say "Larry."
21       Q.   Okay.  So it's your assumption, but you don't
22   know whether or not those are actually Mr. Ellison's
23   signatures, do you?  And I can --
24       A.   I wasn't there.
25       Q.   Yeah, okay.  That's fine.

171

1    I'd like to mark as Exhibit No. 110 --
2        THE REPORTER:  200.
3        MS. LAVALLEE:  Oh, I'm sorry, 200.  Not even
4    close -- a document Bates-stamped PS0517.
5        THE WITNESS:  What number are we on?
6        MS. LAVALLEE:  It's a new exhibit.
7        THE WITNESS:  Out of sequence?
8        MS. LAVALLEE:  No, some of those -- I think
9    you said --
10       (Discussion off the record.)
11       MS. LAVALLEE:  Q.  Mr. Simon, can you take a
12   moment and look at this document and then tell me
13   whether or not you recognize it.
14       (DC Exhibit No. 200
15       marked for identification).
16       THE WITNESS:  It's my handwriting.
17       MS. LAVALLEE:  Q.  And can you tell me what
18   you were doing here in this document.
19       A.   I believe the first day of trading was Monday,
20   the 22nd.  And this is my hand calculations of the net
21   cash proceeds to Larry.
22       MS. LAVALLEE:  Okay.  That's all I have on
23   that document.
24       I'm going to mark as Exhibit 201 a document
25   Bates-stamped CD-I 03235.

172

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1    (DC Exhibit No. 201
2    marked for identification).
3    MS. LAVALLEE:  Q.  Can you take a look and
4 identify it for the record, please.
5    A.  Mm-hm.
6    Q.  Do you recognize this document?
7    A.  I don't -- I don't remember it, but it appears
8 to be an e-mail from me to Carolyn.
9    Q.  Okay.  And you don't have any reason to
10 believe that that wasn't actually sent and received?
11    A.  No.
12    MS. LAVALLEE:  All right.  Okay.  I'd like to
13 mark as Exhibit No. 1 -- 202 a document Bates-stamped
14 CD-I 03061 through 62.
15    (DC Exhibit No. 202
16    marked for identification).
17    MS. LAVALLEE:  Q.  If you could take a moment
18 and look at the document and then identify it for the
19 record.
20    A.  This appears to be an e-mail exchange between
21 me and Dan Cooperman, dated January 26, 2001.
22    Q.  Okay.  And does this appear to relate to
23 clearance?
24    A.  Correct, extends trading clearance for another
25 seven days, for the next trading week.

173

1    Q.  Okay.  And you were discussing with
2 Mr. Cooperman -- you were indicating what the intent was
3 with respect to further trades; is that correct?
4    A.  That is correct.
5    MS. LAVALLEE:  Okay.  I actually went out of
6 order in terms of chronology, so we're going to go back
7 a couple of days here.  It'll just be a moment.
8    I'd like to mark as Exhibit ... 212?
9    THE REPORTER:  203.
10    MS. LAVALLEE:  203.  I'm having a difficult
11 time with these document numbers.
12    THE WITNESS:  So it's not just me.
13    MS. LAVALLEE:  No, no, not at all.
14    (DC Exhibit No. 203
15    marked for identification).
16    MS. LAVALLEE:  And if you could take a
17 look at it, identify it for the record, and then I'll
18 just briefly ask you what the purpose of sending this
19 e-mail was.
20    A.  Okay.
21    Q.  Was this an e-mail that you sent to Carolyn?
22    A.  Yes, it is.
23    Q.  And what was the purpose of sending this
24 e-mail, just generally?
25    A.  It appears to be to update Carolyn and Larry

174

1 on trading activity for the day.
2    Q.  Okay.  And you sent these e-mails to Carolyn.
3 Did you have any understanding as to whether or not she
4 was forwarding these to Mr. Ellison?
5    A.  I assumed she was communicating with Larry,
6 but I don't know for certain.
7    Q.  Okay.  Was it your understanding that Mr.
8 Ellison was aware of the trades that were going on in
9 this period, though?
10    A.  Yes.
11    Q.  Okay.  And he'd instructed you to make the
12 trades, and you were authorized by him to make the
13 trades, correct?
14    A.  I believe I was authorized.  But I get
15 instructions from Carolyn --
16    Q.  Okay.
17    A.  -- and Larry.  And when I get instructions
18 from Carolyn, I take it to mean from Larry.
19    Q.  Right.  Okay.
20    I'd like to mark as Exhibit No. 204 a document
21 Bates-stamped CD-I 03240.
22    (DC Exhibit No. 204
23    marked for identification).
24    THE WITNESS:  Mm-hm.
25    MS. LAVALLEE:  Q.  Can you identify this

175

1 document for me.
2    A.  Yes.  This is the same e-mail as part of
3 Exhibit No. 203.
4    Q.  Right.  Okay.
5    A.  Reporting to Carolyn on Tuesday's trading.
6 And then she wrote back, "Thanks, what happened
7 yesterday?"
8    And then I replied "This is what happened
9 yesterday," 'cause she forgot what I e-mailed her the
10 prior day.
11    Q.  Okay.
12    A.  In 203.
13    MS. LAVALLEE:  All right.  I'd like to mark as
14 Exhibit No. 205 a document Bates-stamped ORCLA 0023691
15 through 93.
16    (DC Exhibit No. 205
17    marked for identification).
18    THE WITNESS:  Okay.
19    MS. LAVALLEE:  I'm going to -- do you
20 recognize this document?
21    A.  It appears to be -- I don't recognize it or
22 remember it, but it appears to be an e-mail exchange
23 between me and Carolyn with a forwarded e-mail from
24 Safra to Joe Lockhart and Carolyn -- or maybe from Joe
25 Lockhart.  Actually, I thought it was from Joe Lockhart,

176

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1 but it looks like it's from Safra to Joe and Carolyn and

2 then forwarded on to me for my input.

3    Q.  Okay.  And if I could draw your attention down

4 to sort of through nearly the bottom of the page, there

5 is -- the portion of -- first page I'm talking about --

6 there's two points there.  First one states -- and this

7 is the portion of the e-mail from you to Carolyn.  It

8 states that.

9       "We already spoke about selling his

10 high-basis previously-exercised option

11 shares, 5.2 million, from '98, '99, 2000

12 exercise."

13    A.  Mm-hm.

14    Q.  "Though I think we may have trouble

15 getting even the 22.232 million current

16 options sold in today's market."

17       What were you talking about in terms of the

18 trouble in getting them sold?

19    A.  I have no recollection, but drawing

20 conclusions from the e-mail, it appears there was a $30

21 floor price that I -- was the authorization I'd been

22 given.  And if the stock traded below 30, I didn't have

23 authorization to sell.

24    Q.  Okay.  And do you have any understanding as to

25 whether or not you could go back to Mr. Ellison and

177

1 discuss the matter further with him?

2    A.  You can always go back and discuss anything

3 with anybody.

4    Q.  Okay.  Did you have any understanding in terms

5 of why there would be difficulty trading the amount of

6 shares in today's market, as you state, for any other

7 reason other than the price?

8    A.  No.  Trading volume.  It's just the more you

9 sell, you know, you put trading pressure on the share

10 price.  No, that's -- it was just the price.

11    Q.  Okay.

12    A.  How can you move -- how much volume you can

13 move at a price without material -- driving the market

14 down with your own trading.

15    Q.  Right.  And do you have any understanding as

16 to whether or not Mr. Ellison did not want to drive the

17 price of the stock down?

18    A.  I don't believe we ever discussed it.  But I

19 assumed, within my ambit, my job was to sell at a

20 better -- a higher price rather than a lower price.  So

21 I take as within my authority to try to do it

22 sensibly --

23    Q.  Right.

24    A.  -- and prudently and economically efficiently.

25    Q.  Okay.  So, I mean, basically you're saying

178

1 that you want to sell at the market price 'cause you

2 don't want to lose money by selling below?  I'm not sure

3 I understand your response.

4    MS. SEGAL:  I object to form.

5    MS. LAVALLEE:  Q.  Can you just clarify for

6 me.  I'm not sure I understood your response.

7    A.  I had been given authorization to sell at the

8 floor price.

9    Q.  Right.

10    A.  Within that constraint, I try to give

11 instructions to Merrill Lynch to sell subject to that

12 floor price in an intelligent fashion as they advise me.

13    Q.  Right.

14    A.  And I judged them based on their execution

15 price and what we call the volume weighted average

16 price, otherwise known as VWAP.

17       And when you want to hold a broker responsible

18 for their execution, you have to give them clear

19 instructions, let them know in advance how you're going

20 to judge them, and then you want to hold them

21 accountable.

22    Q.  Okay.

23    A.  So within that, they will give you feedback on

24 how much they feel they can trade, because each broker

25 has -- is trading volume at Oracle.  And each firm --

179

1 Merrill Lynch, Goldman Sachs, Morgan Stanley or any of

2 the other brokers -- have a percentage of that volume.

3       And it's -- if you want to trade, you try to

4 trade intelligently.  And I was relying on the advice

5 given to me by Merrill Lynch in how to effectively

6 execute a trade.

7    Q.  Okay.  And I guess my -- not confusion, but I

8 guess what I'm trying to understand is what the volume

9 of the shares sold -- how that relates to their ability

10 to actually sell shares.  I mean, what is the connection

11 there?

12    A.  Okay.  The general rule that had been

13 explained to me by Merrill Lynch and other brokers is

14 that you can generally trade up to ten to 15 percent of

15 average trading volume without materially affecting the

16 price of the stock being sold.

17    Q.  Okay.

18    A.  So therefore, we tried to sell within that

19 constraint.

20    Q.  Okay.  Now I get it.

21    A.  Okay.  I'm sorry, I wasn't being clear.  My

22 mistake.

23    Q.  No, no, you -- that's perfectly clear now for

24 the record.  Thanks.

25       I'd like to show you a document that was

180

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  previously marked as Exhibit 122.

2    A.  Thank you.

3    Q.  Okay.  Can you tell me what this is.

4    A.  This appears to be an e-mail from me to Larry,

5  dated Wednesday, January 24th, 2001.

6    Q.  Okay.  And this was an e-mail from you to Mr.

7  Ellison; is that correct?

8    A.  Correct.

9    Q.  Okay.  And in here, you were referring to a

10  conversation that you had with Mr. Ellison earlier that

11  day regarding where the money from the shares sold would

12  be allotted; is that correct?

13    A.  Correct.

14    Q.  Okay.  Now, just for the -- so I'm clear, you

15  had indicated earlier that when you were called on

16  January 19th, that was the first time you were told to

17  trade and that Mr. Ellison had made a decision he wanted

18  to exercise shares, sell them, and also sell additional

19  shares.  Is that your -- accurate?

20    A.  What I said was I was -- I had -- obviously,

21  as we know, I've had communications for months before

22  alerting Larry to the fact that his options were

23  expiring and that the debt was increasing.

24    Q.  Right.

25    A.  We did an option exercise at the end of

181

1  December for tax purposes.  I then went -- then we did a

2  donation of shares, per prior e-mail, in January of the

3  following year, January 2001 --

4    Q.  Right.

5    A.  -- to get the tax deduction for the charitable

6  contribution in 2001 versus 2000.  That was tax

7  planning.

8    Q.  Right.

9    A.  And then I went off on vacation.  And when I

10  got back from vacation is when I was notified that Larry

11  wanted to execute and exercise his options and sell some

12  Oracle shares to pay down the debt.

13    Q.  Okay.  And I just want to be clear.  I think

14  you indicated that the specific allotment of where the

15  money from the sale of the shares that were exercised,

16  as well as the additional shares, was something that you

17  decided, where specifically the money would be

18  allocated; is that right?

19    MR. NADOLENCO:  Objection.  Misstates the

20  testimony.

21    MS. LAVALLEE:  Q.  Can you answer -- tell me

22  if I'm correct in that or if I'm mischaracterizing it.

23    MR. ZWANG:  Before you answer, is the question

24  who made the decision as to how the proceeds should be

25  allocated?

182

1    MS. LAVALLEE:  Yeah, basically.

2    THE WITNESS:  Larry clearly controls his own

3  money.  If he tells me to send $5 million and give it to

4  you, and I believe him, I follow his instructions, okay.

5    But within him making an investment or

6  alternative, dealing with, as this e-mail refers to,

7  $800 million of after-tax proceeds, and even more 'cause

8  you have a tax reserve, Larry and I would never discuss

9  what to do with the cash management 'cause that is just

10  a administerial [sic] administrative activity, where the

11  obvious goal is to maximize the economic return.

12    And I can hold cash or I could pay a bank --

13  pay down a bank line.  And there's a negative carry on a

14  bank line.  I am borrowing at a spread over Libor.  But

15  when I hold cash, I'm the equivalent of a money market

16  fund and I am lending to the bank, who makes a spread to

17  lend back to me.

18    So within that, when cash comes in, I just

19  handle it and manage it intelligently.  We never discuss

20  it.

21    MS. LAVALLEE:  Okay, thanks.  I just wanted to

22  clarify that for the record.  Thank you.

23    How long have we been going for?  Do we want

24  to take a short break?

25    (Discussion off the record).

183

1    THE VIDEOGRAPHER:  We are off the record.  The

2  time is 3:19.

3    (Recess taken).

4    THE VIDEOGRAPHER:  We are back on the record.

5  The time is 3:35.

6    MS. LAVALLEE:  Q.  Okay.  Mr. Simon, I'd like

7  to show you a document that has been previously marked

8  as Exhibit 123.  It is a document Bates-stamped CA-ORCL

9  010491.  If you could take a moment to look at the

10  document and then identify it for the record.

11    A.  Okay.

12    Q.  Can you tell me whether or not -- can you tell

13  me what the document is.

14    A.  It appears to be an e-mail from me to Carolyn

15  Balkenhol, dated Wednesday, January 24th, 2001.

16    Q.  Okay.  And you believe that this is actually

17  an e-mail that you did indeed send to Ms. Balkenhol?

18    A.  It appears to be the case.

19    Q.  And in here you were giving an update for that

20  particular date, which is January 24th, 2001?

21    A.  Correct.

22    Q.  And it's indicated that, "Not a good

23  trading day.  Stock traded down closing at

24  $30.  65 million total trading volume.  ML

25  was aggressive at the end of the day trying

184

1   to get to the 5 million total.  So average
2   price is below daily weight average trading
3   price of 30.85 per share.  I was asked if
4   any change in instructions.  I said no, to
5   proceed as previously instructed unless I
6   call back.  ML expressed concern about
7   getting the whole piece done by the end of
8   this week in this trading environment
9   unless we get really aggressive, which they
10  don't recommend.  Carolyn, please update
11  Larry."
12      Do you have any recollection, other than
13  looking at this document, of these discussions?
14  A.  No.
15  Q.  Okay.  Do you have any understanding of why
16  ML -- does that represent Merrill Lynch?
17  A.  Correct.
18  Q.  -- Merrill Lynch expressed concern about
19  getting the whole piece done by the end of this week in
20  this trading environment?  Do you have any understanding
21  what they were talking about, this trading environment?
22  A.  I think they're talking about -- it's talking
23  about how the market is trading, the volume and the
24  feel, the stock, the soft -- whether it's a rising
25  market, declining market, the softness.

185

1       And they want to sell -- you -- basically it's
2   ideal to sell when someone wants to buy --
3   Q.  Right.
4   A.  -- rather than to sell when no one wants to
5   buy.  And I think they're talking about the market
6   environment and how many buyers are out there.
7   Q.  Okay.  And then the sentence continues,
8   "Unless get really aggressive, which they don't
9   recommend."  The "they" there is Merrill Lynch?
10  A.  Merrill Lynch.
11  Q.  And why is it that Merrill Lynch wasn't
12  recommending getting more aggressive about trading at
13  that time?
14  A.  You're asking me to speculate about their
15  ideas, but I think it's that they believe the best way
16  to sell, to get the best price, is to participate in the
17  market, not sell too large a percentage of the daily
18  volume, and if the market isn't absorbing the volume,
19  you want to sell readily.
20      The only way to do that is to get more
21  aggressive and to try to force it into the market.  And
22  that would have -- that would be -- that's not what they
23  recommend.
24  Q.  Okay.  And -- okay.  And do you have any
25  understanding as to why they wouldn't recommend that?

186

1   A.  It comes down to I'm balancing buyers and
2   sellers, supply and demand.  And you're trying -- when
3   you're selling stock, you're putting out supply.  I
4   mean, it's just like basic economics supply/demand
5   curves, and they have to intersect.  And so you want to
6   meet demand.  If you -- anyway, that's basically what
7   they're talking about.
8   Q.  Okay.  And I gather here that -- well, let me
9   ask this:  It says,
10      "I was asked if there was any change
11      in instruction.  I said no, to proceed as
12      previously instructed unless I call back."
13      Can you tell from this, if you recall now
14  having read this, whether or not you received the call
15  from Merrill Lynch and then gave them an answer right
16  away or whether you went back to Mr. Ellison to ask him
17  whether to change the instructions?
18  A.  The way I read this is Merrill Lynch reports
19  to me every day.  They want to know -- they said it was
20  hard to get things done, "Can we do -- you want to
21  change instructions?"  And I told them no.
22  Q.  So it wasn't something where you
23  conferred with Mr. Ellison on that particular --
24  A.  No.  In fact, I was updating Carolyn to update
25  Larry to let him know what instructions I said -- I

187

1   gave.
2   Q.  Right.
3   A.  And if there was any change, let me know.  It
4   was more like "I took care of it, but this is what I
5   did."
6   Q.  Okay.  And who was your contact at Merrill
7   Lynch at this time for these trades?
8   A.  My general broker was a guy named Richard
9   Gadbois, but I think Richard was on vacation.  And I
10  think the main contacts were an associate working with
11  Richard, named Tom Blanchfield, and his assistant, named
12  Kimberly Clarke.
13  Q.  Okay.  And do you recall any discussions that
14  you specifically had with Mr. Blanchfield in this time
15  frame regarding these trades?
16  A.  No.
17  Q.  Mr. Blanchfield told the SLC that he recalls a
18  conversation where Mr. Ellison was patched in from his
19  boat on phone with -- three-way conversation with you,
20  Mr. Ellison and Mr. Blanchfield, where Mr. Ellison was
21  on his boat.
22      And it was sometime during the trading period.
23  And you discussed the impact of Mr. Ellison's trade on
24  the market.  And Mr. Ellison indicated that he did not
25  want to be too aggressive and adversely impact Oracle

188

1   stock price. Do you recall anything about that?

2   A.  No, I don't.

3   Q.  Okay.  So that doesn't refresh your

4   recollection, hearing that he spoke about that?  Okay.

5   A.  It's not inconceivable.  I just don't recall.

6   Q.  Okay.  That's okay.

7   A.  And I'm surprised that Larry was still on his

8   boat at that point in time.  He may have been.

9   Q.  Okay.  But he was -- if he was on his boat or

10   one of his boats, he would have been reachable by phone?

11   That sounds conceivable to you?

12   A.  Yeah, there are sat-coms.

13   THE REPORTER:  There are what?

14   THE WITNESS:  Sat-coms, satellite

15   communications.

16   MS. LAVALLEE:  All right.  I'm going as mark

17   the next Exhibit CD-I 03250 through 51.

18   (DC Exhibit No. 206

19   marked for identification).

20   MS. LAVALLEE:  Q.  Mr. Simon, if you could

21   take a moment, look at the document and then identify it

22   for the record.

23   A.  This appears to be an e-mail from me to

24   Carolyn updating Carolyn on trading on January 25th,

25   '01, which is, I believe, the fourth day of trading, and

189

1   updates for the day and cumulative.

2   Q.  Okay.  Thank you.  And you indeed did send

3   this to Ms. Balkenhol, to the best of your knowledge --

4   understanding?

5   A.  It would appear so.

6   MS. LAVALLEE:  I'm going to mark the next

7   Exhibit, 207, a document Bates-stamped CD-I 03084.

8   (DC Exhibit No. 207

9   marked for identification)

10   MS. LAVALLEE:  Q.  Mr. Simon, if you could

11   take a moment and tell me whether you've ever seen this

12   document before.

13   A.  I have no recollection.

14   Q.  Okay.

15   A.  But I may have seen it.  It looks like I

16   may -- looks like it was addressed to me.

17   Q.  Okay.  And actually, I believe there was a

18   similar copy but just different Bates range that was

19   produced in your documents last night.  But ...

20   A.  Mm-hm.

21   Q.  I believe that's the case.  Do you recall ever

22   learning of the announcement -- this is a bulletin board

23   printout -- but a public announcement regarding Mr.

24   Ellison's trades in or about January 25, 2001?

25   A.  Could you restate the question, please.

190

1   Q.  Do you recall learning in January -- in or

2   about January 25th, 2001 about the press release or

3   the announcement or public announcement of Mr. Ellison's

4   trades?

5   A.  I have no recollection.

6   MS. LAVALLEE:  Okay.  I'm going to mark as

7   Exhibit No. 208 a document Bates-stamped CD-I 03063.

8   (Discussion off the record).

9   MS. LAVALLEE:  I'm actually going to mark a

10   different document as 208.  This document is the same

11   document but a different Bates stamp, PS0505.

12   (DC Exhibit No. 208

13   marked for identification).

14   MS. LAVALLEE:  Q.  Mr. Simon, is this your

15   handwriting?

16   A.  It appears to be the case.

17   Q.  Okay.  Can you read for me the notes.

18   A.  It says, "Ellison, phone call with Dan

19   Cooperman, 1/26/01."  Point 1, "He'll clear

20   Larry for sales all through next week.

21   Will send e-mail confirming so.  Recommends

22   we not trade past 1/31.  Perception better

23   if not trade into last month of Q, but will

24   clear through February 2nd."

25   Q.  Okay.  And that's consistent with your earlier

191

1   testimony about what occurred in your conversations with

2   Mr. Cooperman, right?

3   A.  Correct.

4   Q.  Okay.  And do you recall whether or not you

5   did indeed receive clearance from Mr. -- written

6   clearance in -- by way of a written document from

7   Mr. Cooperman?

8   A.  I believe it's one of the exhibits that you

9   gave to me that we've already reviewed.  I may be

10   mistaken.  I'll go back and search what we've already

11   gone over.

12   Q.  No, that's fine.  That could very well be.

13   A.  Please look at document 202.

14   Q.  Okay, thank you.  Okay.

15   I'd like to mark as the next document in order

16   a document Bates-stamped CA-ORCL 010493 through 494.

17   (DC Exhibit No. 209

18   marked for identification).

19   MS. LAVALLEE:  Q.  Can you take a moment, and

20   when you've had a chance to look at it, then please tell

21   me for the record what it is.

22   A.  It appears to be an e-mail from me to Kimberly

23   Clarke at Merrill Lynch, dated Friday, January 26, 2001.

24   Q.  Okay.  And in this -- you indeed sent this

25   e-mail to Ms. Balkenhol, to the best -- or to Kimberly

192

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  Clarke, to the best of your knowledge?
2      A.  That would appear to be the case.
3      Q.  Okay.  At the very end on the second page, it
4  says,
5          "Finally, when you start to sell these
6      shares, please start with the December 27,
7      2000, 815,000-share lot, highest basis,
8      then move to the 2,852,000 December 29, '99
9      lot, next highest cost basis, and then
10     finally move on to the 1998 lot."
11         You were referring to different -- what were
12  you referring to there?
13     A.  I was referring to different lot -- tax lots.
14     Q.  Okay.  But you were referring to different
15  shares specifically that you would want -- wanted sold
16  and in what order you wanted them sold; is that correct?
17     A.  Specific lots of stock, which were represented
18  by specific certificates.  And I was giving instructions
19  on the ordering of selling these specific certificates,
20  yes.
21     Q.  And these were shares that were actually
22  previously owned by Mr. Ellison, and these dates relate
23  to when he actually acquired those particular shares; is
24  that correct?
25     A.  These are what I call the option shares that

193

1  were previously exercised for tax purposes in late
2  December of each year, if you look at the lot date.
3          And when you exercise options, you get a tax
4  basis equal to fair market value on date of exercise.
5  And I was setting the structure of the sale to sell the
6  highest tax basis shares first to minimize the amount of
7  capital gain recognized.
8      Q.  Okay.  And was -- is it your understanding
9  that the shares that were sold in January actually
10  followed this order?
11     A.  Absolutely.
12     Q.  Okay, thank you.
13         I'm going to mark as the next document in
14  order a document that's Bates-stamped ORCLA 00294.
15         (DC Exhibit No. 210
16         marked for identification.
17     THE WITNESS:  Okay.
18     MS. LAVALLEE:  Q.  Mr. Simon, can you tell me
19  what this document is.
20     A.  This appears to be an e-mail from me to
21  Carolyn, dated Friday, January 26, 2001, reporting on
22  the results of trading for that date.
23     Q.  Okay.  And you indeed -- you believe that you
24  indeed sent this out to Ms. --
25     A.  I would assume, yes.

194

1      Q.  Okay.  The -- one of the sentences states,
2  "Trading instructions remain unchanged."
3          Do you have any understanding as to what you
4  were referring to there?
5      A.  It appears to me, interpreting my own wording,
6  that I am reporting to Carolyn that my instructions to
7  Merrill Lynch have remained unchanged.
8      Q.  Okay.  And do you have any understanding as to
9  whether you had any further communications with
10  Ms. Balkenhol, other than what we've seen already about
11  that issue?
12     A.  No.
13     MS. LAVALLEE:  I'd like to mark as the next
14  Exhibit, which is 211, a document Bates-stamped CA-ORCL
15  010496 to 497.
16         (DC Exhibit No. 211
17         marked for identification).
18     MS. LAVALLEE:  Q.  Mr. Simon, if you could
19  take a moment and look at the document and then identify
20  it for me, please.
21     A.  Okay.
22     Q.  Can you tell me generally what the reference
23  to is -- well, generally what the document is.
24     A.  It's an e-mail exchange with history between
25  me and Carolyn forwarding on an e-mail that Barbara

195

1  Wallace sent to Carolyn.
2      Q.  Okay.  And what was the substance of this,
3  just briefly?
4      A.  How to fill out the stock option exercise
5  forms.
6      Q.  Okay.  And in here, in the PS at the middle of
7  the first page, it indicates that -- I believe that
8  there was a conversation -- you had a conversation with
9  Mr. Ellison.  Is that my correct understanding of the
10  reading of the sentence.
11         "When I last spoke with Merrill Lynch
12     15 minutes ago right after Larry called,
13     they had sold 750,000 so far today, leaving
14     only 332,000 to go on the 22.232 million
15     option tranche."
16         Is that a correct reading --
17     THE REPORTER:  Option what?
18     THE WITNESS:  Tranche.
19     MS. LAVALLEE:  Tranche, T-R-A-N-C-H-E.
20     THE WITNESS:  That is the correct reading.
21  That is the correct reading.
22     MS. LAVALLEE:  Q.  Okay.  So you -- based on
23  this, you probably -- it appears you had a conversation
24  with Mr. Ellison that day.  Does that --
25     A.  That would be the conclusion I would probably

196

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  draw from this e-mail.
2     Q.  Okay.  And can you -- do you have any
3  independent recollection, or does this e-mail refresh
4  your recollection, as to what the substance of your
5  conversation was?
6     A.  I suspect it's about the trading, but I have
7  no other recollection.
8     Q.  Okay.  That's fine.  He didn't tell you to
9  stop trading, did he?
10    A.  Doesn't look like it.  I don't know.
11    Q.  Do you have any understanding as to whether or
12  not the exercise form was signed at that -- on that date
13  or at a later date?
14    A.  I don't know.  That's something that Barbara
15  Wallace and -- that's an internal Oracle matter.
16    Q.  Okay.
17    A.  And ... I don't know.
18    Q.  It wasn't a document that you personally
19  signed?
20    A.  I don't know.  I may have.
21    MS. LAVALLEE:  I'm going to mark as the next
22  exhibit a document Bates-stamped CA-ORCL 010499.
23    (DC Exhibit No. 212
24    marked for identification.)
25    MS. LAVALLEE:  Q.  Can you take a moment and

197

1  look at the document.  Then when you've had a chance to
2  review it, please identify it for the record.
3     A.  This appears to be a document -- it appears to
4  be an e-mail from me to Carolyn Balkenhol, dated Monday,
5  January 29th, 2001, reporting on trading during the
6  day.
7     Q.  Okay.  And to the best of your knowledge, this
8  is an e-mail that you actually did send to
9  Ms. Balkenhol; is that correct?
10    A.  It would appear that I would have.
11    Q.  Yeah, on the date listed on this e-mail, which
12  is January 29th, 2001?
13    A.  Actually, since you're using an Oracle copy of
14  it versus my copy, and it's from Carolyn's machine,
15  there would be some evidence on this e-mail that she
16  actually received it.
17    Q.  Okay.
18    A.  If you look at the different font -- there's
19  different font between my font and her font.
20    Q.  So the e-mails that have this appearance
21  appear to be e-mails that are printed from Oracle
22  computers, not yours?
23    A.  Correct.  And you'll see duplicate copies in
24  my sent -- that I've printed out of my sent file.
25    Q.  Right.  The very last sentence of the text

198

1  reads, "Per Tom, the stock's trading slow today."
2     Tom, is that Tom Blanchfield?
3     A.  Correct.
4     Q.  Okay.  And do you have any understanding, as
5  you sit here today, as to what he was referring to by
6  that sentence, or what you were referring to by that
7  sentence?
8     A.  I believe I was quoting what Tom told me.
9     Q.  And do you have any understanding as to why
10  the market was slow at that time?
11    A.  Because it was slow.
12    Q.  Excellent answer.  Do you have any
13  understanding as to what he meant by saying the market
14  was slow?
15    A.  I think it means --
16    MR. NADOLENCO:  Objection.  Misstates the
17  document.
18    MS. LAVALLEE:  Thank you.
19    Q.  Do you have any understanding as to what he
20  means by saying the -- or what you meant by saying that
21  the stock -- actually, let me rephrase that.
22    You were relaying what Mr. Blanchfield was
23  saying.  And he said that the stock trading slow today,
24  or something to that effect.  Do you have any
25  understanding as to what the phrase "the stock trading

199

1  slow today" means?
2     A.  I could only give you my interpretation today.
3  I don't recall what I inferred before, 'cause I was
4  repeating what Tom told me.  But I think it means stock
5  is trading slowly and that it means there's slow volume,
6  less volume, that day.
7     Q.  Okay.  So that makes it more difficult, then,
8  for him, Mr. Blanchfield, to actually execute the trades
9  that Mr. Ellison wanted to trade; is that correct?
10    MR. NADOLENCO:  Objection.
11    THE WITNESS:  That would be a reasonable
12  inference.
13    MS. LAVALLEE:  Q.  Okay.  Was it -- okay.
14  I'd like to mark as the next document, which
15  is Exhibit No. 213, a document Bates-stamped CA-ORCL
16  010498.
17    (DC Exhibit No. 213
18    marked for identification.)
19    MS. LAVALLEE:  Mr. Simon, if you could
20  take a moment and look at this document and then tell me
21  what it is.
22    A.  This appears to be an e-mail from me to
23  Carolyn Balkenhol and Sue Bachman, updating Carolyn and
24  Sue on trading activity on Monday, January 29th, 2001.
25    Q.  Okay.  And it's your understanding that this

200

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  e-mail was indeed received by either -- received by
2  Ms. Balkenhol and Sue Bachman?
3      A.  It would appear to be, since this is a
4  printout from the Oracle receipt side of it.  I don't
5  know whether it's Sue Bachman's or Carolyn's printout,
6  but yes.
7      Q.  Okay.  And who is Sue Bachman?
8      A.  Sue is one of Larry's administrative
9  assistants who worked with Carolyn.
10     Q.  And do you know what -- was she have --
11 strike that.
12         Did she have any involvement in the issue of
13 Mr. Ellison's trading in the third quarter of 2001?
14     MS. SEGAL:  Object to the form of the
15 question.
16     MS. LAVALLEE:  And actually, let me rephrase
17 the question because we haven't been talking
18 specifically about third quarter.
19     THE WITNESS:  If you can do it in calendar
20 quarters, it would be easier for me, that convert to
21 Oracle fiscal quarters.
22     MS. LAVALLEE:  Right.
23     Q.  Did she have any involvement in the issue of
24 Mr. Ellison's trade in December 2000 or January 2001?
25     MR. NADOLENCO:  Objection.  Lacks foundation.

201

1      THE WITNESS:  I don't recall.  It appears that
2  I copied Sue on this.  Sue sometimes filled in when
3  Carolyn was out or doing something else.  So maybe
4  Carolyn was out so I copied Sue so I knew the message --
5  so the message might get relayed to Larry.
6      MS. LAVALLEE:  Okay.
7      THE WITNESS:  But I don't know -- I really
8  don't -- I'm just speculating based on this e-mail.
9      MS. LAVALLEE:  Q.  So you don't specifically
10 recall any communications with Ms. Bachman, other than
11 this particular e-mail?
12     A.  Correct.
13     Q.  The second line -- I'm sorry -- the last
14 sentence of the text of the e-mail reads,
15         "We're continuing on with the trading
16 tomorrow, as per Larry's instruction."
17         I assume that that term "Larry" refers to Mr.
18 Ellison, correct?
19     A.  That's correct.
20     Q.  Okay.  And you refer specifically to Mr.
21 Ellison's instructions.  Do you have any understanding
22 as to whether or not you received further instructions
23 from Mr. Ellison on that day or just prior to that day
24 specifically about the trading on January 30th?
25     A.  I have no specific recollection, but my

202

1  general recollection is I got some authority and I just
2  kept running with it until I was told to stop.  And so I
3  kept running.  And every day when I updated them, I said
4  "I'm continuing."
5      Q.  Okay.  So you --
6      A.  So the heads-up to say "If you want me to
7  stop, you better tell me."
8      Q.  Okay.  And is this -- does -- this particular
9  sentence doesn't refresh your recollection as to whether
10 or not you actually got a response on that date or just
11 prior to that date regarding trading on January 30th,
12 2001?
13     A.  No.
14     Q.  When did you receive instructions to cease
15 trading?
16     A.  I don't recall.
17     Q.  Okay.  But you did indeed receive instructions
18 at some point in time to cease trading in that period,
19 right?
20     A.  Based on when I reviewed the documents in
21 preparation for my questioning today, we ceased trading,
22 I believe, on January 31st.  And since I ceased
23 trading on that date, I must have gotten instructions to
24 stop trading on that date.
25     Q.  Okay.  Do you recall anything else about cease

203

1  trading, other than that?
2      A.  No.  I'm just deducing that from the facts
3  that we stopped trading.
4      Q.  All right.  I'm going to show you a document
5  that is -- was previously marked, I believe, as Exhibit
6  127.  And it is Bates-stamped CA-ORCL 010500.
7      A.  Okay.
8      Q.  Can you identify this document for me, please.
9      A.  It appears to be an e-mail from me to Larry,
10 dated Monday, January 29th, 2001.
11     Q.  All right.  And it's your understanding that
12 you did indeed send this to Mr. Ellison on or about
13 January 29, 2001?
14     A.  I have no recollection, but that would be a
15 reasonable conclusion to draw from the e-mail.
16     Q.  Okay.  And you're updating him on the activity
17 of that day, correct?
18     A.  That is correct.
19     Q.  The final sentence of the text indicates --
20 states, "ML will continue trading tomorrow as
21 instructed."
22         And I guess my question is similar to what I
23 asked you in the last document, and that is, looking at
24 this document, or based on your own recollection, do you
25 have any understanding as to whether you had a specific

204

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1   conversation with Mr. Ellison on or about January 29th

2   about trading on January 30th?

3     A.  No, I believe this is just me saying, as I

4   said before, "I'm continuing to run with the ball.  Let

5   me know if instructions have changed."

6     MS. LAVALLEE:  Okay.  Next document in order,

7   214, which is Bates-stamped CD-I 03267.

8     (DC Exhibit No. 214

9     marked for identification.)

10    MS. LAVALLEE:  I'm going to also mark another

11  document the next in order, which is a document

12  Bates-stamped CD-I 03263 through 64.

13    (DC Exhibit No. 215

14    marked for identification.)

15    MS. LAVALLEE:  Q.  And they're actually a

16  e-mail trail, so the next document actually has a little

17  more detail.  So I'll ask you simply to look at that

18  one.

19    A.  Okay.

20    Q.  Actually, I'll ask you to look at them in

21  conjunction 'cause one of them is partially redacted.

22  You know what; let's take them one at a time 'cause I

23  was thinking I was looking at something different.  So

24  let's start with the first document.

25    A.  214.

205

1     Q.  Correct.  And can you tell me what this

2   document is.

3     A.  This appears to be an e-mail from me to

4   Carolyn Balkenhol, dated Monday, January 29th, 2001.

5     Q.  And this is actually on the different format

6   from the ones we looked at a little earlier -- some of

7   the ones we looked at a little earlier.  And it appears

8   to be printed from your computer; is that correct?

9     A.  That appears to be the case.

10    Q.  Okay.  Is it nevertheless your understanding

11  that you did indeed send this document -- e-mail to Ms.

12  Balkenhol on or about January 29, 2001?

13    A.  With a cc to Sue Bachman.  That would be a

14  reasonable conclusion.

15    Q.  Okay.  In the second paragraph of the text,

16  you indicate that "I'm concerned about publicity as more

17  Rule 144 filings go public."

18        What was your concern at that time regarding

19  this issue?

20    A.  I have no recollection.  If you'd like me to

21  speculate, I'm happy to speculate.

22    Q.  Please don't speculate.

23    A.  Okay.  By the way, this explains why I was

24  copying Sue Bachman, 'cause Carolyn was apparently sick,

25  'cause I'm copying Sue in case Carolyn was out sick.

206

1   That's why I started copying Sue on the other e-mails.

2     Q.  Thank you.  And the next document which we'll

3   mark ... 215?

4     (Discussion off the record.)

5     THE WITNESS:  That is a copy of document 212.

6     MS. LAVALLEE:  Okay.  Indeed it is.  Okay.

7     (DC Exhibit No. 216

8     marked for identification).

9     MS. LAVALLEE:  Mr. Simon, can you take a

10  look at this document, and then when you've had a chance

11  to review it, identify for the record what it is.

12    A.  It's an e-mail from me -- it appears to be an

13  e-mail from me to Kimberly Clarke at Merrill Lynch with

14  a cc to Carolyn Balkenhol and Catherine Ong, dated

15  Tuesday, January 30, 2001.

16    Q.  Okay.  And it refers to -- well, let me step

17  back.

18        Is it your understanding that this -- you did

19  indeed send this e-mail to Kimberly Clarke with cc to

20  several people on or about January 30th, 2001?

21    A.  That would appear to be the case.

22    Q.  Okay.  And in the first paragraph of the text,

23  you state -- you refer to something called Integral

24  Capital Partners.  And Integral -- actually, Integral

25  Capital Partners distribution lot.  Can you explain for

207

1   me what that is.

2     A.  Integral Capital Partners is an investment

3   partnership that invests -- invested in high-technology

4   companies.  When the partnership wound down, it

5   distributed out shares in stock it had acquired.  As

6   part of the distribution, Larry received shares in

7   Oracle Corporation.

8     Q.  Okay.

9     A.  These shares had a high tax basis lot.  And

10  this was me identifying the specific lots being sold to

11  identify, for income tax purposes, the high tax basis

12  lots that were being sold.

13    Q.  Thank you.

14        All right.  We'll mark as Exhibit No. 217 a

15  document Bates-stamped CA-ORCL 010503.

16    (DC Exhibit No. 217

17    marked for identification.)

18    MS. LAVALLEE:  Q.  Mr. Simon, if you can take

19  a moment to look at the document and then identify for

20  the record what it is.

21    A.  This appears to be an e-mail from me to

22  Carolyn Balkenhol and Sue Bachman, dated Tuesday,

23  January 30, 2001, reporting on the trading for that

24  date.

25    Q.  Okay.  And indeed, you believe that you sent

208

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1   this e-mail on or about January 30th, 2001 to Carolyn
2   Balkenhol, Sue Bachman and cc'ed -- no cc's.
3       A.  That would appear to be the case, since this
4   is Oracle font.  So this looks like it was printed off
5   an Oracle computer.
6       Q.  Okay.  And you refer in here to the fact that
7   you've sold all the high basis -- high tax basis shares
8   and have sold 300,000 of the old zero-basis shares.  And
9   can you explain briefly what "old zero-basis shares"
10   refers to.
11       A.  Yes.  That refers to what is also known as
12   founders -- Larry's founder stock, the stock he acquired
13   when Oracle was originally formed.  It has -- does not
14   have a zero, but has a very small fraction of a penny
15   tax basis.
16       And when we were selling stock after
17   exercising the options, remember I went in reverse
18   order, first all the option shares, then the highest tax
19   basis lots, down to the lowest tax basis lots.  And this
20   is saying that we're getting into the lowest tax basis
21   lot.
22       Q.  Okay, great.  Thank you.  I'm going to show
23   you now a document that was previously marked as Exhibit
24   128.  And it is a document Bates-stamped CA-ORCL 010504.
25   Can you take a moment, look at the document, and then

209

1   identify for me what it is.
2       A.  This appears to be an e-mail from me to Larry
3   Ellison, dated Wednesday, January 31, 2001, reporting on
4   trading on that date and cumulative to date trading.
5       Q.  Okay.  And can you read for me your PS,
6   please.
7       A.  "The U.S. capital markets are pretty amazing,
8   raising almost 1 billion in eight days."
9       Q.  Okay.  And what did you mean by that?
10       A.  That the U.S. capital markets were pretty
11   amazing.
12       Q.  Anything more than that?  Why is it amazing to
13   sell -- to -- what was amazing about it?  Please tell
14   me.
15       A.  The number of shares that Larry sold as a
16   percentage of his holdings are very small.  And it was a
17   very modest diversification.  But in absolute dollars,
18   it's a large number.
19       And we had very liquid capital markets.  The
20   U.S. is an amazing free market capitalist system that is
21   very productive and an engine for the world.  And I was
22   just commenting that this is one example of the U.S.
23   free market system effectively deploying capital.
24       Q.  Okay.  Were you certain that you would be able
25   to accomplish all the trades that you accomplished at

210

1   the time, or was there some question in your mind as to
2   whether or not you'd be able to sell as much as you
3   wanted to sell?
4       MR. ZWANG:  Were you certain at what point?
5       MS. LAVALLEE:  At any point during this period
6   of time in January 2001.
7       MR. NADOLENCO:  Object to the form.
8       THE WITNESS:  I was hopeful.  You -- whenever
9   you're trying to do a trade and you set limit orders and
10   constraints on the traders, you always have to worry
11   about the market and exogenous events.
12       We had the bombings in Madrid a few days ago,
13   an exogenous event which affects the capital markets.
14   So I'm a very conservative, risk-averse person who takes
15   my job seriously.  So yes, I worry about everything all
16   the time.
17       MS. LAVALLEE:  Q.  Okay.  Do you think that
18   Mr. Ellison would have been able to trade 50 percent of
19   his holdings in the same eight-day period that he --
20       A.  Fifty percent?
21       MR. NADOLENCO:  Objection.  Incomplete
22   hypothetical, calls for speculation.
23       MS. LAVALLEE:  Q.  You can answer the
24   question.
25       A.  The answer is you can sell anything you want.

211

1   The question is price and terms.
2       Q.  Okay.  And if he had attempted to do that, do
3   you have any understanding what that might have done to
4   the market?
5       A.  Fifty percent --
6       MR. NADOLENCO:  Same objection and calls for
7   speculation.
8       MS. LAVALLEE:  Q.  You can answer.
9       A.  I'm not an expert on the capital markets, but
10   I do understand supply/demand curves.  And as you
11   increase supply, price drops to have intersection of the
12   supply and demand curves.  So applying classical
13   economic thinking, the more you sell, the lower the
14   price.
15       Q.  Okay.  And 50 percent of Mr. Ellison's holding
16   would have represented what portion of Oracle's
17   outstanding stocks at that time?  Do you have any
18   understanding?
19       A.  Actually, 11 percent.
20       Q.  Okay.
21       A.  A relatively modest amount, actually.
22       Q.  And you think that's a modest amount of stock
23   to trade in a period of time?
24       MR. NADOLENCO:  Objection.  Calls for
25   speculation, incomplete hypothetical.

212

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1      THE WITNESS:  The answer is -- the question is
2  in a period of time, absolutely it's not an unreasonable
3  amount.  The question is the period of time and the
4  terms.
5      MS. LAVALLEE:  Okay.
6      THE WITNESS:  Let me just raise an anecdote.
7  I once spoke with someone about -- the question is, can
8  you sell something.  I always said it just depends upon
9  the price.  And the gentlemen said "No, it's not just
10  the price; it's the terms.  I will buy anything from you
11  at any price on a nonrecourse basis with payments due
12  2,000 years out."
13      So the question is terms and price.
14  Everything is negotiable.
15      MS. LAVALLEE:  All right.  Fair enough.  Thank
16  you very much.
17      Can we just go off the record a moment just so
18  I can check something.
19      THE WITNESS:  Sure.
20      THE VIDEOGRAPHER:  We are off the record.  The
21  time is 4:21.
22      (Recess taken.)
23      THE VIDEOGRAPHER:  We are back on the record.
24  The time is 4:23.  This marks the end of videotape
25  Volume I, tape 3 in the deposition of Philip Simon.  The

213

1  time is 4:23 p.m.  We are off the record.
2      (Recess taken.)
3      THE VIDEOGRAPHER:  This marks the beginning of
4  videotape Volume I, tape 4 in the deposition of Philip
5  Simon.  The time is 4:34 p.m.  Where back on the record.
6      MS. LAVALLEE:  I'd like to mark as Exhibit
7  214 --
8      THE WITNESS:  218.
9      MS. LAVALLEE:  -- 218 a document Bates-stamped
10  PS0063-64.
11      (DC Exhibit No. 218
12  marked for identification.)
13      MS. LAVALLEE:  Q.  Mr. Simon, if you could
14  take a moment and look at the document and then identify
15  it for me, please.
16      A.  Okay.  This is an e-mail exchange between --
17  this appears to be an e-mail exchange between me and
18  Mary Jo Lloyd in my office, dated January 31, 2001 from
19  Mary Jo to me and me responding to Mary Jo on
20  February 1, 2001.  And there appears to be attached
21  unrelated e-mail.
22      Q.  Okay.  Focusing now on the first page of this
23  document, it indicates -- she's asking the question
24  whether or not you know if Mr. Ellison will be selling
25  any more Oracle sales [sic] between now and the end of

214

1  February; is that accurate?
2      A.  That's what Mary Jo appears to be telling me,
3  correct.
4      Q.  Okay.  And then you say that you're done, no
5  more share -- trades; is that correct?
6      A.  No.
7      Q.  Okay.  What is --
8      A.  I think "done, thanks" means I'm telling Mary
9  Jo I got the message, I took care of it --
10      Q.  Okay.
11      A.  -- thanks.  Though it may also mean your
12  interpretation.  I don't know.
13      Q.  Okay.
14      A.  But evidence indicates we stopped trading, so
15  both interpretations are probably right.
16      MS. LAVALLEE:  I'd like to mark as the next
17  exhibit a number [sic] Bates-stamped PS0060.
18      (DC Exhibit No. 219
19  marked for identification.)
20      MS. LAVALLEE:  Q.  Can you take a moment and
21  look at the document and then identify what it is for
22  me.
23      A.  Okay.
24      Q.  Do you recognize this -- or can you tell me
25  what the document is.

215

1      A.  This is -- this appears to be an e-mail
2  exchange between me and Carolyn Balkenhol with history
3  of e-mail exchanges attached.
4      Q.  Okay.  And if I could refer your attention
5  specifically to page 2.
6      A.  Mm-hm.
7      Q.  At the very top, this is a portion of an
8  e-mail from you to Ms. Balkenhol, I believe.  And it
9  states.
10      "Re Merrill Lynch, the stock traded
11      above 30 today.  But since Larry never
12      called me, we did not trade any shares, as
13      instructed.  As I see it, I think we're
14      done for this quarter, though I don't know
15      for sure until tomorrow passes without a
16      call from Larry."
17      Was it your -- well, do you see that?
18      A.  Yes.
19      Q.  Did I generally accurately --
20      A.  You've read what it said clearly.
21      Q.  Okay.  Do you have -- does this refresh your
22  recollection as to whether or not -- or as to what
23  instructions you received about termination of -- or
24  ceasing to trade in the January time frame?
25      A.  No, I have no recollection whatsoever.

216

1  However, I can interpret what this says and make
2  inferences.  But I have no -- no independent
3  recollection, other than this e-mail.
4      Q.  Okay.  Do you have any understanding of what
5  you were trying to convey there?
6      A.  I -- I believe I can interpret it and give you
7  my today's interpretation of what I was saying, which is
8  not necessarily the same as my interpret -- what I meant
9  back then, which is likely to be the case.
10     Q.  Okay.  If you think it was a reasonable
11 interpretation of what you were saying, I'll take that.
12     A.  I think it says that stock traded above 30.
13 Larry never called me, so we didn't trade anything, as I
14 was instructed.  I have Oracle clearance to trade
15 through February 2nd.  This was February 1st.  So I
16 can only trade tomorrow.  If I'm not called and given
17 authorization to trade tomorrow, then I'm not going to
18 be trading the next day 'cause I don't have any Oracle
19 clearance.
20     Q.  Okay.  Prior to this, you'd been -- you had --
21 it was your understanding that you had a standing
22 authorization to trade unless told otherwise.  This
23 seems to imply differently; am I correct?
24     A.  That is -- your interpretation appears to be
25 correct, particularly since I stopped trading on

217

1  January 31st, so --
2      Q.  Okay.
3      A.  The impression would be that I was instructed
4  to stop trading.
5      MS. LAVALLEE:  Okay.  I would like to mark as
6  the next exhibit a document Bates-stamped CD-I 03095
7  through 97.
8      (DC Exhibit No. 220
9      marked for identification).
10     MS. LAVALLEE:  And this is No. what?
11     THE REPORTER:  220.
12     MS. LAVALLEE:  220.
13     THE WITNESS:  Okay.
14     MS. LAVALLEE:  Q.  Can you identify this
15 document for me, please.
16     A.  This appears to be an e-mail exchange between
17 Barbara Wallace -- Kimberly Clarke and Barbara Wallace,
18 dated February -- Monday, February 5, 2001.
19     Q.  Okay.  Do you see yourself as a recipient of
20 this e-mail?
21     A.  I was copied on it.
22     Q.  Okay.  Or actually, it was actually sent to
23 you directly.
24     A.  Actually, it was -- actually, I was one of the
25 recipients on the "to" line.

218

1      Q.  Do you have -- is it your understanding that
2  you -- do you have any understanding that you did not
3  receive this document on or about February 5th, 2001?
4      A.  It's normal to assume I received the document.
5  And if you look on page 3 of the exhibit, there's a
6  schedule attached that apparently came with it.  And you
7  see the handwriting on that schedule, which is my
8  handwriting, which further evidences that I received the
9  e-mail and the attachment.
10     Q.  Okay.  Do you believe that this document --
11 the third page of this document actually constitutes the
12 attachment that was sent with this e-mail?
13     A.  I have no way of knowing.  It seems -- it's a
14 logical assumption, but I don't know.
15     Q.  Okay.  Can you tell me what this -- well,
16 first let me ask a different question.
17     The handwriting on the third page of this
18 document, is that your handwriting?
19     A.  Yes, it is.
20     Q.  Okay.  I believe you may have testified as to
21 this earlier.  Is this a document you prepared, the
22 third page?
23     A.  I have no recollection.  And let's read the
24 e-mail.  Let me see.  It looks like this is a Barbara
25 Wallace attachment 'cause it says.

219

1      "To Kim from Barbara, I've attached a
2      spreadsheet of Larry's transactions in
3      January."
4      Q.  Okay.
5      A.  And then further, I am ticking, showing
6  whether it ties to my records.  If you look at my first
7  note on the bottom of the third page, it says "Ties to
8  H&S records."  That's ties to Howson & Simon records, my
9  records.
10     So based on that, that I'm tying it to my
11 records, and that Barbara's telling Kim that a schedule
12 is attached, I would conclude, though not conclusively,
13 that this schedule was prepared by Barbara Wallace.
14     Q.  Okay.  And can you read for me the
15 remaining handwritten notes that you have here.
16     A.  The first one says "Ties to Howson & Simon
17 records."  The next tick mark, the little W with the
18 slash-through --
19     Q.  Yeah.
20     A.  -- referencing the last C138880, says,
21     "No H&S record to tie to, though
22     9,968,800 share certificate reconciles to
23     10 million share certificate list, 3" --
24     "less 31,200 share donation on 1/4/01 to
25     UCD."

220

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1     Q.   Okay.  And can you explain to me what that
2   refers to.
3     A.   Until today, I would have not had a clue.  But
4   earlier on today, one of the documents you had with the
5   Yahoo! schedule where I had the pricing, that listed the
6   stock price, the average of the high and low, on
7   January 4, 2001.
8         I conclude it probably referred to stock
9   donations to charity and referred to a 300,000-share lot
10  and a 31,200-share lot.  And I was not certain to which
11  charity the 31,200 shares were donated.
12        This refers to a January 4, '01 donation to
13  UCD, which is University of California at Davis.
14    Q.   Okay.  And the annotations on the top right of
15  the document, what does that say?
16    A.   That is a little squiggle mark looking at the
17  difference between the 32,232 number and the 29 million
18  number, which is a delta of 3,147,424.  And it says
19  "Room left on Rule 144 filing made 1/30/01."
20        And I'm reconciling how many shares had been
21  filed for, less how many have been sold, and the
22  difference that is available.
23    Q.   Okay.  And am I to understand from this that
24  brokers -- this "rep" line refers to the number of
25  shares actually sold in this January time frame, the

221

1   29,884,576?
2     A.   I believe that's the case.  I would have to
3   look at my records and the documents I previously --
4   that I've provided to you to verify if that's the right
5   number.  But it seems correct.
6     Q.   Okay.  And what -- I know we talked about this
7   earlier.  What was the number of shares that you
8   actually were hoping to sell in this time frame; do you
9   recall?
10    A.   At one point -- I was hoping to sell as many
11  as possible to pay down the debt, 'cause that's my
12  personal desire.  There were indications from Larry, a
13  communication earlier we saw, where the hope was to pay
14  down the debt by 800 million.
15        Then I e-mailed Larry explaining to Larry how
16  many shares that would represent so you would have
17  enough after-tax proceeds to reduce the debt to
18  400 million.  But I can only give you what I would have
19  liked to have sold.
20    Q.   Okay.  Do you recall what your instructions
21  were from Mr. Ellison regarding the total number of
22  shares to attempt to sell?
23    A.   No, I do not.
24    MS. LAVALLEE:  Okay.  I'd like to mark as the
25  next document in order a document Bates-stamped

222

1   PS0074-75.
2         (DC Exhibit No. 221
3         marked for identification.)
4     THE WITNESS:  Okay.
5     MS. LAVALLEE:  Q.  Can you identify this
6   document for me.
7     A.   This appears to be an e-mail exchange from me
8   to Carolyn on -- about a trip I'm planning to take to
9   New York to meet with Merrill Lynch.  The e-mail to
10  Carolyn is dated -- I can't tell.  She's replying to me
11  on February 27th, 2001, and I reply to her on
12  February 27th, 2001.  So I don't know the date of the
13  first e-mail.
14    Q.   Okay.  In the e-mail that you wrote -- and by
15  "the first e-mail," you're referring to -- well, let me
16  direct your attention to the header on the document.
17  Does that appear to be the date of the top e-mail from
18  you to Carolyn?
19    A.   I don't know the date of the first one.  I
20  would assume the header on the top is probably my -- I
21  wrote to Carolyn, she replied, wrote back to her.
22    Q.   Right.
23    A.   She replied to me on February 27th,
24  11:30 a.m.  And I apparently responded to her at
25  2:09 p.m. on the same date.  I don't know what the date

223

1   of my first e-mail to her is.
2     Q.   Okay.
3     A.   But it was probably -- to make it easy, it was
4   probably the same date.
5     Q.   Okay.  No, I see.
6     A.   I'm just looking at the e-mail train.
7     Q.   Right.
8     A.   The reply doesn't always copy the date of the
9   first e-mail on the history.
10    Q.   Right.  In the first e-mail, the very first
11  one, you indicate that,
12        "I am -- "was not fully satisfied
13        (maybe wrongfully so, but I'll learn more
14        in New York) with the way the trading went
15        when we sold the 29 million shares."
16        Can you tell me what your understanding of
17  what you were trying to convey there.
18    A.   Yes, I remember this quite clearly.  Remember
19  earlier on in our discussion we talked about VWAP,
20  volume weighted average price.
21        That's the mechanism by which you can trade
22  [sic] the execution of the trader when you give them an
23  order to sell a large volume of stock.  What you want to
24  judge, the performance, is what gross price you are
25  getting before your commission relative to VWAP.

224

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1    And the difference -- you can look at the high
2    and the lows of the day.  And if you take the mean, that
3    is just the average between the high and the low, the
4    volume weighted average price is the weighted mean
5    price.
6        So for example, if you had 99 percent of the
7    stock selling at $32 a share and one percent selling at
8    28, the mean is 30, but the volume weighted average is
9    probably 31.98 per share.
10       So you're looking at VWAP to compare the
11   performance they were -- they provided and what I was --
12   and what we got.
13       Q.  Okay.  And were you initially just unsatisfied
14   with the performance?
15       A.  Yep.
16       Q.  Okay.  And then at the bottom you say,
17       "Note that there were many reasons,
18       some quite legitimate, for not matching the
19       daily weighted average sale price.  The
20       main one is volume.  There's a trade-off
21       between the number of shares sold, i.e.,
22       how aggressive we are, and the price
23       received."
24       I believe this relates to matters we've been
25   discussing earlier.  What is your understanding of what

225

1    you're referring to there?
2        A.  I was being kind.  I was going to Merrill
3    Lynch 'cause I was unhappy with the execution price.  In
4    New York, they obfuscated and covered up.  And when I
5    finally met with the trader, the truth came out they
6    tacked on a commission that was not agreed to.  And we
7    had negotiations and settlement talks.
8        Q.  Okay.  And you look like you're still angry
9    about it.
10       A.  I am.  You can price and charge, but you have
11   to do it honorably and tell the truth.  You don't say
12   one thing and then layer on a commission.
13       Q.  Okay.  And when you talk about many reasons
14   for not matching up the daily weighted average sale
15   price, what are the other types of reasons that you're
16   referring to?
17       A.  Other than charging commissions?
18       Q.  Mm-hm.
19       A.  You can have a floor price.  Now, what's
20   interesting is if you have a floor and the stock drops
21   below the floor, you should actually get a better volume
22   weight -- your average price should be better than VWAP.
23       Q.  Right.
24       A.  Other reasons are let's say you hit the
25   floor -- and this did not happen in this case -- then

226

1    you change your instructions midday.  But if you -- and
2    the lesson is that you have to give very explicit
3    instructions up front, tell them explicitly how you're
4    going to judge them and what standard, request daily
5    reporting of VWAP with daily -- with cumulative totals
6    and immediately yank the trade if they fail to perform.
7        Basically it's keeping the brokers and the
8    traders honest and setting objective yardsticks by which
9    they can be measured.
10       MS. LAVALLEE:  Okay.  Can I have that answer
11   read back, 'cause my feed isn't working here.
12       (Record read as follows:
13       A.  Other reasons are let's say you hit
14       the floor -- and this did not happen in
15       this case -- then you change your
16       instructions midday.  But if you -- and the
17       lesson is that you have to give very
18       explicit instructions up front, tell them
19       explicitly how you're going to judge them
20       and what standard, request daily reporting
21       of VWAP with daily -- with cumulative
22       totals and immediately yank the trade if
23       they fail to perform.
24       Basically it's keeping the brokers and
25       the traders honest and setting objective

227

1    yardsticks by which they can be measured.)
2        MS. LAVALLEE:  Okay.
3        Q.  You indicated you can hit the floor, but that
4    didn't happen here.  What did you mean by that?
5        A.  Well, what I meant is -- actually, let me
6    restate.  That is not a hundred percent accurate.
7        On certain days I believe we had -- I'm not --
8    I don't recall this, but based on reading e-mails and
9    our conversation today, it appears that we had -- at
10   least at some point in time there was a $30-per-share
11   floor price.
12       If Oracle traded below 30 on a particular day,
13   the trader was not authorized to trade.  Therefore, to
14   the extent that Oracle traded below 30, the average
15   price that we should have gotten should be higher than
16   VWAP because we had no trades below our floor, which
17   bring down the average.
18       That would be a reason why you should expect a
19   higher average selling price from VWAP.
20       Q.  Okay.
21       A.  And also, what I didn't explain -- this is a
22   little wrinkle -- when you're dealing with VWAP -- and
23   it has changed today.  But when they moved from fraction
24   to decimalization -- and the bid offer spread has
25   narrowed.  And before, there used to be an inside market

228

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1 and the brokers did not charge inside commission -- they
2 did not charge an explicit commission; they worked off
3 the bid offer spread.  And there was both a retail and
4 a -- retail spread and a wholesale spread.
5     Today, in today's market, basically we moved
6 to decimalization.  There was no bid offer spread, just
7 trades at less than a penny per share.  So you can
8 actually get VWAP.
9     But see, if someone is buying -- there's a bid
10 offer spread, you have the right --
11     THE REPORTER:  I've got to slow you down.  "If
12 someone is buying" ...
13     THE WITNESS:  Buying and selling, and you're
14 looking at VWAP and there's a bid offer, VWAP is an
15 average of all trades.  VWAP will be right in the middle
16 of the bid -- an offer.  If you're selling your
17 offering, you're always going to be off VWAP, a little
18 bit below VWAP, if you're selling.
19     MS. LAVALLEE:  Okay.  Can I have my last
20 question and then the answer read back, when you have a
21 moment.
22     Actually, why don't we go off the record for a
23 few minutes.  I just want to get something.
24     THE VIDEOGRAPHER:  We're going off the record,
25 the time is 4:58.

229

1     (Recess taken).
2     THE VIDEOGRAPHER:  We are back on the record.
3 The time is 5:06.
4     MS. LAVALLEE:  Q.  Hi, Mr. Simon.  We were
5 talking earlier about the fact that Mr. Ellison intended
6 to trade not only expiring options, but, as well, some
7 of his low-basis and zero-basis shares.
8     Do you have any understanding as to whether or
9 not he sold as many as he intended to sell during that
10 time period, or that you discussed selling?
11     MS. SEGAL:  Object to the form of the
12 question.
13     MR. NADOLENCO:  And asked and answered.
14     THE WITNESS:  Repeat your question
15 specifically 'cause I got confused by the objections, if
16 you would, please.
17     MS. LAVALLEE:  Q.  Okay.  My question was, is
18 it your -- do you have any understanding as to whether
19 or not all the trade -- all the shares that Mr. Ellison
20 had intended or instructed to be sold were actually sold
21 in the January time frame?
22     A.  I do not know for certain, but per prior
23 e-mail that we discussed referring to -- that indicated
24 Larry's desire to pay down 800 million of the debt and
25 my calculations, after he said that, to pay down

230

1 40.7 million shares -- now, I quantified that for Larry,
2 but I do not know whether Larry appreciated that it was
3 that number of shares to pay down that amount of debt
4 when he raised the 800 million number with me.
5     Q.  Okay.
6     A.  So I do not know how many shares he expected.
7 I know what my goal was 'cause I wanted to, remember,
8 blend option income with capital gains and to sell -- I
9 would have liked to reduce debt to zero.
10     Q.  Okay.  Can I refer you to Exhibit No. 186 that
11 we started with.
12     A.  Mm-hm.
13     Q.  And specifically to page 11.
14     A.  Mm-hm.
15     Q.  At the very bottom, I'll read a portion of the
16 text here.
17     "Simon stated that the target of selling 340
18 million was" -- hold on.  Let me start above, 'cause
19 it's not the first reference.  Okay.
20     "Simon stated that he received implicit
21 authority" -- this is a little higher --
22     A.  Mm-hm.
23     Q.  -- "to continue selling to achieve the
24 goal of reducing Ellison's debt to 40
25 million -- "400 million, which would

231

1 require the sale of approximately
2 40 million shares."
3     A.  Mm-hm.
4     Q.  And then below it says, "Ellison" --
5     "Simon stated," pardon me, "that the
6 target of selling 40 million shares was
7 within the Rule 144 limit for legal
8 trading.  Ultimately Ellison sold
9 approximately 29 million shares, far short
10 of the goal of 40 million."
11     Do you see where I'm reading?
12     A.  Yes.
13     Q.  Okay.  Is that basically -- does that
14 accurately summarize your general understanding of what
15 occurred during that time frame?
16     A.  I have no current recollection, but this seems
17 like this was -- this -- my -- my -- my interview by the
18 Special Litigation Committee was much closer to the date
19 of the relevant transaction.  It is more likely to be a
20 better and more accurate recitation of the facts than
21 any recollection today.
22     And all I could say is this seems accurate,
23 does not appear inconsistent with any e-mails or other
24 documents we reviewed today.  So I would say this is
25 indeed a reliable -- this is as reliable a record of the

232

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1   facts as possible -- as I think we can have today.
2       Q.  Do you have any understanding why the
3   40 million goal was not achieved?
4       A.  Mm-hm.
5       Q.  And why is that?
6       A.  I would think it's because we had a volume --
7   we didn't want to affect the volume.  We had a $30
8   floor, so you couldn't trade when the stock traded below
9   the floor.  And I'm reciting only based on e-mails that
10  I've seen today that I have -- and I have no
11  recollection.
12      Q.  Okay.
13      A.  But Tom Blanchfield said at one point, and you
14  asked what it meant, that the stock is trading slow.  I
15  take that to mean that there was light trading volume.
16  So therefore, you can only -- the amount you could sell
17  was limited.
18      Q.  Okay.
19      A.  If you don't want to have an adverse effect on
20  the market, you're limited.
21      MS. LAVALLEE:  Okay.  I'd just like to mark a
22  document Bates-stamped ORCLA 0023479 and 480 [sic].
23      (DC Exhibit No. 222
24  marked for identification).
25      MS. LAVALLEE:  Q.  If you could just review

233

1   the document and then tell me generally what the -- what
2   it is.
3       A.  This appears to be an e-mail from me to Larry
4   with a cc to Carolyn Balkenhol, dated Tuesday, March 5,
5   2002.
6       Q.  And do you believe that you actually did
7   indeed send this document or e-mail to Mr. Ellison on or
8   about March 5th, 2002?
9       A.  I have no recollection whether I hit the send
10  button after writing the e-mail.  But this is a printout
11  apparently from the Oracle server, which would evidence
12  that it was received at the Oracle -- by Oracle.
13      MR. ZWANG:  Let's go off a second.  Let's go
14  off the record for a second.  Let me talk to you for a
15  second.
16      MS. SEGAL:  It's about the document, not about
17  his testimony.
18      MS. LAVALLEE:  Glenn, no, we --
19      MR. ZWANG:  There's no question pending, as
20  far as I know.
21      MS. LAVALLEE:  No, but under Delaware rules,
22  you can't talk to the witness during the course of the
23  deposition about the deposition.
24      MS. SEGAL:  Well, then we can do it publicly.
25      MS. LAVALLEE:  If you want to publicly tell me

234

1   what you want to talk to him about ...
2       MR. ZWANG:  I'll talk to him about the
3   document and then I'll talk to you.
4       MS. LAVALLEE:  No, I'm sorry.  You can't do
5   that under Delaware rules.
6       (Inaudible).
7       MR. ZWANG:  I can talk to my client anytime I
8   want.
9       MR. NASTARI:  He's produced pursuant to
10  Delaware rules.
11      (Inaudible).
12      MS. LAVALLEE:  This is the understanding.  He
13  was produced under the understanding that this was --
14      MR. NADOLENCO:  We can avoid the issue, I
15  think.
16      MS. LAVALLEE:  Just tell us --
17      MR. ZWANG:  Maybe we can -- I mean, you can
18  have whatever rules you want, but Mr. Simon is a citizen
19  of the state of California being deposed in California.
20  He's not waiving his right to counsel or anything else.
21      MR. NASTARI:  We're not talking about waiving.
22      MS. LAVALLEE:  Are we off the record?
23      THE REPORTER:  No.  Do you want to go off the
24  record?
25      MS. LAVALLEE:  Yes.

235

1       THE VIDEOGRAPHER:  We are off the record.  The
2   time is 5:13.
3       (Discussion off the record).
4       MS. LAVALLEE:  We can go back on the record.
5       THE VIDEOGRAPHER:  We are back on the record.
6   The time is 5:16.
7       MS. LAVALLEE:  All right.  I'm just checking
8   for my question here.  All right.  We can move on to the
9   next document.
10      THE WITNESS:  We're done with this one?
11      MS. LAVALLEE:  We are done with this one.
12      All right.  I'd like to mark as the next
13  document in order a document Bates-stamped ORCLA 0023515
14  through 516.
15      (DC Exhibit No. 223
16  marked for identification).
17      THE WITNESS:  Thank you.
18      MS. LAVALLEE:  Q.  Mr. Simon, would you take a
19  moment and look at the document and then identify it for
20  the record, please.
21      A.  All right.
22      Q.  Is this an e-mail that you sent to Mr. Ellison
23  on or about May 3rd, 2002?
24      A.  Yes.
25      Q.  Okay.  Is this another effort on your, I

236

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1    guess, very regular efforts to have Mr. -- to recommend
2    to Mr. Ellison to diversify?
3        A.  There's an assumption in your question that
4    it's very regular efforts.
5        Q.  Oh, okay, I'm sorry.  We talked earlier --
6        A.  But I do, on a periodic basis, raise the
7    issues of diversification with Larry.  And this is
8    apparently one of my more humorous efforts.
9        Q.  Okay.  And you say -- I think the language you
10   used was "periodic."  You're referring now to the topics
11   we discussed earlier --
12       A.  Mm-hm.
13       Q.  -- when you said regularly or periodically you
14   would refer to him to the fact that you would like him
15   to diversify?
16       A.  Mm-hm.
17       Q.  And he didn't always follow that
18   recommendation, did he?
19       A.  Larry and I have very different risk profiles.
20   I'm more a conservative person who went to law school
21   and became an accountant, while Larry became an
22   entrepreneur.
23       Q.  And I guess the answer to my question is ...
24       A.  My job is to raise the issues that Larry's
25   confronting, make certain he sees them in advance, try

237

1    to help him -- steer him to the decisions that I believe
2    are proper but respect his independent judgment and
3    decision-making and execute on the instructions
4    provided.
5        Q.  Okay.  And does he regularly -- when you
6    routinely tell him to diversify, does he do it every
7    time?
8        MR. NADOLENCO:  Objection.  Misstates the
9    testimony.  Oh, I'm sorry.
10       MS. LAVALLEE:  Q.  When you periodically tell
11   him to diversify, does he always diversify in response
12   to your recommendation?
13       A.  When I bring to Larry's attention a situation
14   where we have expiring stock options and the debt is
15   reaching our lending limit and we have a serious problem
16   with the amount of debt and expiring options, in my
17   experience, the answer is yes, he regularly heeds my
18   advice --
19       Q.  Okay.  Can I --
20       A.  -- when we confront those issues.
21       MS. LAVALLEE:  Can I have my question read
22   back.
23       'Cause I believe you're not responding to the
24   specific question posed.
25       (Record read as follows:

238

1        MS. LAVALLEE:  Okay.
2        THE WITNESS:  I never in that -- there's no
3    documentation about when you diversify.  I was raising
4    the issue in mid 2000 that the debt level was
5    increasing, we had spending commitments and he had
6    expiring options.  And I was recommending that a plan be
7    adopted to deal with this.
8        MS. LAVALLEE:  Okay.
9        Q.  And what was the next action that took place
10   after that, regarding his trading, that you recall?
11       A.  Larry apparently, on the note that we saw,
12   acknowledged there would be a plan to sell the Oracle
13   shares.
14       Q.  Right.
15       A.  And one was implemented and executed in
16   January 2001.
17       MS. LAVALLEE:  Okay.  Okay.  If we want to
18   take five minutes, I can figure out what I need to do to
19   wrap up, and then we can probably finish --
20       MR. ZWANG:  Sure.
21       MS. LAVALLEE:  -- within a half-hour or so.
22       THE VIDEOGRAPHER:  We are off record.  The
23   time is 5:25.
24       (Recess taken).
25       THE VIDEOGRAPHER:  We are back on the record.

240

1        Q.  When you periodically tell him to
2    diversify, does he always diversify in
3    response to your recommendation?)
4        THE WITNESS:  And my answer, as I said, is --
5    the answer is yes, when I present him with persuasive
6    evidence on the rationale to diversify, he has always
7    responded, to date.
8        MS. LAVALLEE:  Q.  Okay.  Can you -- are
9    you -- and does he always respond immediately?
10       A.  No.
11       Q.  Okay.  I believe we talked about some
12   instances in 2000, including a conversation you had in
13   July of 2000, when you asked him to diversify, exercise
14   and sell his expiring options; his options were expiring
15   in August of 2001.  When did he actually exercise them?
16   Regardless of why he actually did it, when did he
17   actually do that?
18       MS. SEGAL:  Object to the form of the
19   question.
20       THE WITNESS:  I want to be very careful and
21   respond accurately to you --
22       MS. LAVALLEE:  Okay.
23       THE WITNESS:  -- and honestly.  I never -- the
24   reference you're referring to is me raising a potential
25   issue that we have to deal with.

239

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1   The time is 5:39.
2       MS. LAVALLEE:  Q.  All right.  I just have a
3   few more questions, and then we'll be done for the day.
4       A.  That's no problem.
5       Q.  Thanks.  You've been very patient.
6       Can you tell me whether or not you had any
7   discussions with any persons other than the people we've
8   seen in the e-mails or that we've discussed today
9   with -- about Mr. Ellison's trade -- trades in the
10  January -- month of January 2001?
11      MS. SEGAL:  Object to the form of the
12  question.
13      MR. NADOLENCO:  Join.
14      THE WITNESS:  Let me think.
15      MS. LAVALLEE:  Sure, take your time.
16      THE WITNESS:  Let me say who I think I spoke
17  with, and then you can check them off.
18      MS. LAVALLEE:  Okay.
19      THE WITNESS:  Obviously I communicated with
20  Carolyn.  There was an e-mail copied to Sue Bachman.
21  There are e-mails to Larry.  I spoke with the people at
22  Merrill Lynch that we discussed.  When I was back in New
23  York, I met with some of the Merrill Lynch -- additional
24  Merrill Lynch personnel.  I brought a consultant with me
25  when I went to New York, a gentleman named J.D. Jenson,

241

1   who's referred to in one of the e-mails.
2       There are other people in my office who were
3   dealing with the tax implications of it.  And there were
4   probably communications with -- there was e-mails going
5   to Andy Dudnick, Larry's attorney.
6       And without doubt, I kept -- I probably kept
7   the other banks informed, maybe after the fact because I
8   wanted to be discrete.  But there's always -- I always
9   try to maintain a free flow of information between me
10  and the various banks that are lending to Larry to --
11  and I'm sure at some point I communicated with them to
12  them what was going on.
13      MS. LAVALLEE:  Q.  Okay.  Did you have any
14  communications with anybody other than the people you
15  just identified at Oracle, somebody who was employed at
16  Oracle, regarding Mr. Ellison's trades -- and actually,
17  let me step back and say I believe Safra Catz's name
18  appears on some of the e-mails.  Do you recall that?
19      A.  Her name, yes.
20      Q.  Okay.  Other than what appeared in the
21  e-mails, did you have any recollection of speaking with
22  Ms. Catz about Mr. Ellison's trades at any point in
23  time?
24      A.  I don't have any recollection.
25      Q.  Okay.  And do you know who Mike Hanlon is?

242

1       A.  No, I do not know.
2       Q.  Did you have any communications with
3   Mr. Henley, Jeffrey Henley, regarding Mr. Ellison's
4   trades in January 2001?
5       MS. SEGAL:  Object to the form of the
6   question.
7       MR. NADOLENCO:  Join.
8       THE WITNESS:  I don't know if I ever
9   communicated with Jeff.  I may have spoken to him on the
10  phone once or had an e-mail exchange with him.  My basic
11  communication with Jeff, or see him, is when I receive
12  clearance from Dan Cooperman and Jeff is copied.
13      MS. LAVALLEE:  Q.  Okay.  Do you know who
14  Mr. Henley is?
15      A.  Yes, I do.
16      Q.  Okay.  And who is he?
17      A.  He then was the CFO at Oracle.  He's currently
18  chairman of Oracle and may still be CFO.
19      Q.  All right.  When you say you may have
20  spoken to him on the phone or had an e-mail exchange
21  with him, do you have any recollection generally when
22  that would have taken place?
23      A.  Sometime in the last 11 years.
24      Q.  Can we narrow that?
25      A.  I don't know -- I don't know if I've ever

243

1   spoken with him or e-mailed with him directly.  But
2   there are issues that arise at times where you interface
3   between Larry's personal issues and Oracle issues.  And
4   at times Jeff is copied on the e-mail communication.
5   But I don't know if there's any direct e-mail between me
6   and Jeff.
7       Q.  Okay.  And can you explain for me what type of
8   circumstances you're talking about when there may be an
9   interaction between his -- Mr. Ellison's personal issues
10  and Oracle issues.
11      A.  A simple example is if Larry conducts business
12  at his home and provides meals at his home at his own
13  expense for meetings related to Oracle, a question
14  arises to what extent, if at all, should Larry seek
15  reimbursement from Oracle for business expenses that
16  he's incurred to benefit Oracle.
17      The disbursements for these costs, since
18  they're Larry personal -- run through Larry's personal
19  checking account, an area over which I have
20  responsibility, and then when you want to discuss with
21  Oracle the mechanics for discussing expense
22  reimbursement, how to calculate this because there would
23  be interface between what I view the area that I'm
24  responsible for, which is Larry's personal finances, and
25  Oracle's.

244

1     That's just one example, but there are other

2     instances.

3     Q.  Can you -- is that something you would have

4     went -- spoken with Mr. Henley about?

5     A.  No, but it's an example of things that would

6     go up, maybe, to the tax department.  And Jeff might be

7     copied on something when you're trying to establish --

8     and this would not be establishing does this meal for

9     $20 -- expense reimbursement mechanism.  You're trying

10    to establish a policy that can be implemented in a clear

11    way.  And the tax department at Oracle might just copy

12    him or copy someone in his staff on it.

13    Q.  Okay.  But you don't have any specific

14    recollection of talking with Mr. Henley?

15    A.  I don't believe -- I don't know.  But it is

16    possible.

17    Q.  Okay.

18    A.  But we -- but with respect to these specific

19    trades, I'm fairly certain I never spoke to Jeff --

20    Q.  Okay.

21    A.  -- about these trades.

22    Q.  Do you actually do any investment advising or

23    investment work for any other clients other than

24    Mr. Ellison?

25    A.  In my capacity as a CPA, I do help other

245

1     people handle their financial affairs.

2     Q.  Okay.  And -- well, how many other

3     customers -- clients do you have other than Mr. Ellison?

4     A.  Me personally or the office?

5     Q.  You personally.

6     A.  At this point in time, I really -- I primarily

7     work on Larry's affairs and the affairs of one other

8     individual, who I was handling before I took Larry on as

9     a client.  And I continue to help him manage his wealth.

10    He sold his company.

11    Q.  Okay.

12    A.  And I have a few other clients that my office

13    still does tax work for where I've become sort of like

14    an adopted son, a trustee.  And I meet with these people

15    twice a year for dinner and discuss their finances.

16    Q.  All right.  You have a sister who works for

17    Oracle, right?

18    A.  That is correct.

19    Q.  Okay.  And what is her position at Oracle

20    currently?

21    A.  I really don't know.

22    Q.  Okay.  Do you have a general idea of what

23    level -- is she in management?

24    A.  I believe so, yes.

25    Q.  Okay.  And do you know generally what area she

246

1     works in?

2     A.  Marketing.

3     Q.  Okay.  Do you know what her position title is?

4     A.  I think so, but I'm not certain.

5     Q.  What's your understanding?

6     A.  I think she's a SVP.

7     Q.  Okay.  And how long, from the first time she

8     was employed at Oracle -- when was she first employed at

9     Oracle; do you know?

10    A.  She's been at Oracle a long time.  I believe

11    when I first went to work for Larry in '93, she was not

12    at Oracle, had left, and then she came back.

13    Q.  Okay.

14    A.  And so she was at Oracle, then left, then came

15    back.  She was there full time for a period of -- for a

16    long period of time.  She since has had two children.

17    And my older sister has metastatic breast cancer, and

18    Sheri's taking care of her.  So she's working --

19    Q.  I'm sorry.

20    A.  -- on a limited basis.

21    Q.  Do you want to go off the record for a moment?

22    A.  That's okay.

23    Q.  I'm sorry.  Didn't mean to get into anything

24    personal like that.

25        The -- do you know if she was employed at

247

1     Oracle during Q3 2001?

2     A.  I suspect so.

3     Q.  Okay.  Let me ask you a different question.  I

4     assume that you're not copied on Oracle documents; is

5     that correct?

6         MS. SEGAL:  Object to the form of the

7     question.

8         MS. LAVALLEE:  Well, let me ask a different

9     question.

10    Q.  I assume that you don't receive financial or

11    internal Oracle documents in your duties?

12    A.  No.

13    Q.  Okay.  And is Oracle's financial situation or

14    events at Oracle something that you would ever discuss

15    with Mr. Ellison or anybody else at Oracle?

16        MS. SEGAL:  Objection to the form of the

17    question.

18        THE WITNESS:  I never talk to Larry or really

19    anybody at Oracle about Oracle's financial matters.

20    Every once in a while when I see Sheri, I'll say "How

21    are things going?"

22        MS. LAVALLEE:  Right, in general.

23        THE WITNESS:  But I don't -- I have -- I have

24    enough on my plate to deal with Larry's personal

25    affairs.  And I'd like to go home and see my children

248

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1    and my wife.
2         So I don't really -- I don't really understand
3    Oracle's business.  I don't try to get involved because
4    it's good -- the less I know the better.  So this is one
5    thing I tell you:  I don't know what's going on at
6    Oracle.  I don't talk, I don't listen, and I'm too busy.
7         MS. LAVALLEE:  Okay.  I can -- that makes
8    complete sense.
9         THE WITNESS:  And I personally have never
10   owned a share of Oracle stock.
11        MS. LAVALLEE:  Okay.  I'm going to just mark
12   as an exhibit a series of some of the documents that
13   were produced last night and just generally have you
14   identify a couple of them for me.
15        THE WITNESS:  Okay.
16        MS. LAVALLEE:  They're in no particular order.
17   They're generally in the order in which they were
18   produced.  But there's gaps because different types of
19   documents were removed.
20        THE WITNESS:  Okay.
21        MS. LAVALLEE:  And this is 224.
22        MR. NADOLENCO:  Removed by you.
23        MS. LAVALLEE:  Yes, and actually withheld, I
24   believe, but ...
25        MR. ZWANG:  Do you want him to authenticate a

249

1    stack of documents?
2         MS. LAVALLEE:  I'm going to point him to
3    specific ...
4         THE REPORTER:  224.
5         MS. LAVALLEE:  This will be Exhibit 224,
6    PS03002 -- well, it's actually an inconsistent -- it's a
7    series of documents.  I won't run through the Bates
8    range.
9         (DC Exhibit No. 224
10   marked for identification.)
11        THE WITNESS:  Do you want me to flip through
12   it all or do you want to go item by item, page by page,
13   and I'll look at it?
14        MS. LAVALLEE:  Could you just take a glance at
15   each page.
16        THE WITNESS:  Okay.
17        MS. LAVALLEE:  Q.  What I'm going to actually
18   do is ask you if these all came from your files -- these
19   are all documents that you generated or somebody on your
20   behalf generated.  And to the extent it is, and if you
21   see a document that isn't, could you just identify that
22   document.
23        A.  And to expedite the process, may I just state
24   up front that I am -- I have no recollection of these
25   documents.  I've never seen them until they were

250

1    produced -- I may have seen them, but I have no
2    recollection of having seen them.  And everything I am
3    saying about whether these documents came from my files
4    and whether they are accurate is really an
5    interpretation of what I'm seeing based on my general
6    understanding, but it really is not confirmation that I
7    really know if these are genuine or real --
8         Q.  Oh, okay.
9         A.  -- from memory.  But I will tell you -- that's
10   what I've been saying throughout the whole thing --
11        Q.  Sure.
12        A.  -- 'cause I have no recollection.  But I can
13   tell you what I think they are.
14        Q.  Okay.  And --
15        A.  And then we'll just go quickly --
16        THE REPORTER:  Slow down.
17        THE WITNESS:  Then I'll go through, quickly,
18   each one, but we should assume that each statement I
19   make about every document has the caveat that I have no
20   recollection.
21        MS. LAVALLEE:  Okay.
22        Q.  And actually, let me just -- and I don't want
23   you to identify each of the documents.  What I'd like
24   you to do is tell me if you, as you go through them,
25   believe that any of the particular documents are

251

1    documents that you did not generate from your -- and you
2    can tell me that you don't understand any of them to be
3    something that was generated from your office, or maybe
4    just some.  If you could just tell me that.
5         A.  Okay.  You want me to flip through or do you
6    want --
7         Q.  Just -- no, just -- why don't you just flip
8    through it.  And if you see any that --
9         A.  Were not from my office?
10        Q.  -- were not from your office, if you could
11   just identify those.
12        A.  PS0428 --
13        Q.  Okay.
14        A.  -- looks like a report from Oracle that was
15   sent to us.
16        Q.  Okay.
17        A.  It was produced by Delphi Asset Management,
18   which I believe is a Oracle subsidiary based in Nevada
19   under -- and that's where Barbara Wallace works.
20        MR. ZWANG:  The way you're interpreting the
21   question, just so that we're clear, is you're -- all of
22   these documents that have a PS number came from
23   Mr. Simon's files.  But what he's doing is he's going
24   through this and telling you what he thinks his office
25   didn't generate as original work product.

252

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1    MS. LAVALLEE:  Is that what you're --

2    THE WITNESS:  That's what I thought I was

3  saying.

4    MS. LAVALLEE:  Yeah, okay.  And that was my

5  question.

6    MR. ZWANG:  I thought that was your question,

7  but I wanted to be clear.

8    THE WITNESS:  It's actually easier for me if I

9  might just say "This is our office, this is not our

10  office."  Can I just do each one?

11    MS. LAVALLEE:  Sure.

12    THE WITNESS:  PS0300 looks like our office

13  generated this schedule.

14    PS0427, subject to all my caveats, looks like

15  our -- my office generated this.

16    MS. LAVALLEE:  Q.  Does that look like your

17  handwriting on that document?

18    A.  No, that's not my handwriting.

19    Q.  Okay.

20    A.  PS0428, 0429 look like they were an

21  Oracle-generated schedule.

22    PS0430 is a schedule prepared by my office,

23  most likely prepared by me.  It has some of my

24  handwriting and the squiggles and somebody else's

25  handwriting elsewhere.

253

1    Q.  Okay.

2    A.  PS0433 appears to be a memo I wrote, dated

3  January 31, 2001, doing a lot designation for tax

4  purposes.  We talked about the Integral Capital share

5  lots before.

6    PS0492 appears to be another schedule prepared

7  by me or my office tracking the sales.

8    PS0493 is the same, prepared by my office.

9    0494 is another schedule that is -- I marked

10  "superseded" because when I prepared it, I did not

11  realize that the SEC fee is one third of one basis point

12  of gross proceeds.  And I had to redo my calculations

13  when I got the trade slips from Merrill Lynch.

14    PS0495 looks like my office, probably me

15  preparing.

16    PS0496 seems like another version of a similar

17  schedule prepared by my office.

18    PS0497 is a superseded version of schedules

19  that appear to be prepared by my office.

20    PS0498 appears to be a summary schedule

21  prepared by my office on the trades.  PS0501, the same

22  thing.  PS0506, same thing, my office.

23    PS0511 appears to be a schedule prepared by

24  Merrill Lynch.

25    Q.  Or a cover sheet attaching --

254

1    A.  With a fax which probably came from Merrill

2  Lynch.  Does not look like something prepared by my

3  office.

4    Q.  Okay.

5    A.  Maybe it was prepared by Oracle Corporation,

6  went to Merrill Lynch, and then forwarded it on to me.

7    Q.  Okay.

8    A.  PS0513 appears to be a fax from me to Kim

9  Clarke at Merrill Lynch.  And that is -- that is -- that

10  appears to be my signature.

11    PS0514 appears to be a fax cover sheet from

12  Kim Clarke to me.

13    PS0515 appears to be a schedule that was faxed

14  to me.  It has my handwriting on it saying that it

15  agrees to my records.  I do not know who generated this

16  schedule.  It says "Oracle Corporation" in the upper

17  left-hand corner, but then I look at the fax number

18  coming from area code (714)955-6079, and that's Merrill

19  Lynch's fax number in the Newport Beach office.

20    Q.  Do you have any understanding as to whether or

21  not document 514 and 515 appear to be the fax cover

22  sheet with the actual account reconciliation attached?

23    A.  Just because it's ordered that way, and the

24  cover sheet refers to a January 23, 2001 transaction

25  report from Oracle Corporation, and the attached page

255

1  below appears to be it.

2    Q.  And also the header on the -- well, the fax

3  transmittal line?

4    A.  Yeah, it says page "01 of 2" and seems to be

5  from the same phone number.  And then if you look at the

6  time stamping, they're both at 10:44 p.m. -- or

7  10:44 a.m.  So it would indicate they're the same.

8    PS0518 appears to be a fax from me to Kim

9  Clarke with a cc to Carolyn.  I used Merrill Lynch's

10  cover sheet to make it quickly with a handwritten note

11  by me.

12    PS0522 is a schedule prepared by my office.

13  Same thing for PS0523.

14    PS0530 is a schedule prepared by my office

15  reconciling Larry's share holdings and has my notes on

16  the bottom.

17    Q.  Okay.

18    A.  PS0531 appears to be a schedule prepared by my

19  office.  I recognize the font, but I don't think I

20  prepared this, though I may have.

21    PS0533 appears to be a schedule prepared by my

22  office.

23    PS0536 is a fax sheet from -- appears to be a

24  fax sheet from Kim Clarke to me.

25    Q.  Does the next page appear to be the second

256

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  page of that fax?

2     A.  That's a reasonable conclusion based on the

3  referred schedule, and on the date and time stamp and

4  the fax number from Merrill Lynch.

5     PS0538 and 0539 appear to be the same.  I

6  can't confirm whether it's the same schedule that's

7  referred to as attached, but I would assume it is

8  because the date-stamp did not copy completely.

9  Actually, maybe it did, 11/28.  It looks like it's the

10  same time, so I'd assume they're -- it's a reasonable

11  assumption to assume they're the same.

12     PS0549 and PS0550, I would say they appear to

13  be a fax with an attached schedule from Merrill Lynch.

14     PS0561 is a copy of the schedule that is

15  another document that we've previously reviewed here.

16     Q.  Right.

17     A.  I don't know what document number it is.

18     Q.  Right.

19     A.  That appears to be -- that we thought -- we

20  concluded came from Merrill Lynch.

21     PS0562 is a schedule prepared by Merrill

22  Lynch.  This is the first cut at dealing with VWAP and

23  the discrepancy that I noticed.

24     Q.  Okay.

25     A.  And PS0563, 0564 and 0565 are the same.

1     Q.  The same as the prior exhibit?

2     A.  Schedules prepared by Merrill Lynch trying to

3  deal with the, it looks like -- the volume -- VWAP,

4  number of shares traded and trying to establish how they

5  performed.

6     PS0568 appears to be a schedule maintained in

7  my office by Catherine Ong detailing Larry's Oracle

8  shares and the tax basis in all the shares.  And that

9  carries on to PS0570.

10     PS0580 appears to be a schedule prepared by

11  Merrill Lynch.  And we see on the Merrill Lynch contact

12  name above John Ebey at Merrill Lynch, who is another

13  person I work with at Merrill Lynch, who I called for

14  assistance when I was concerned about the discrepancy.

15     Q.  Okay.  And what is Mr. Ebey's position at

16  Merrill Lynch; do you know?

17     A.  He is -- I guess they called him financial

18  consultant these days.

19     Q.  Okay.  And did he have any role in the actual

20  execution or -- actual execution of Mr. Ellison's trades

21  in the January 2001 time frame?

22     A.  Very tangentially.  He was the person I had a

23  relationship with and introduced me to Merrill Lynch.

24  And he -- his specialty is not dealing with inside --

25  affiliate stock.  So he referred the business on to a

1  group that specializes in Rule 144 stock.  But he wanted

2  to maintain an aspect of the relationship.

3     MS. LAVALLEE:  Okay.  Those are the only

4  questions I have for today.  And there is a dispute

5  among the parties in terms of, you know, the document

6  production and the like.  And I understand that you

7  take -- the parties disagree on that.

8     And also, we did talk about the document

9  production from last night and at lunch.  Obviously we

10  didn't have the time to go through that and review those

11  documents.  But we're finished for today.

12     MR. ZWANG:  Are you done with your deposition?

13     MS. LAVALLEE:  We're done for today, yeah.

14     MR. ZWANG:  You say "for today."  As far as we

15  know, we're done.

16     MS. LAVALLEE:  There's a disagreement with the

17  parties.  There was an issue with the documents.

18  Obviously there's a disagreement as to whether we're

19  completely done.  That is not to say that we necessarily

20  will ask for Mr. Simon back.

21     MR. ZWANG:  I understand.  You have -- you and

22  Ellison are fighting over whether certain documents are

23  going to be produced.

24     MS. LAVALLEE:  That's the issue essentially.

25     MR. ZWANG:  I understand.

1     MR. NADOLENCO:  Well, is that the issue?  My

2  understanding was the timing of the production.  We're

3  not in dispute about any documents that were not

4  produced, are we?

5     MS. LAVALLEE:  Well, I haven't reviewed the

6  documents that you've produced.  So, I mean, I got a

7  thick pile, an inch or half an inch to three quarters of

8  an inch thick, at lunchtime.  So we haven't reviewed

9  those documents.  So there may not be a dispute.

10  However, I cannot speak to that issue.

11     MR. NADOLENCO:  All I will say for the

12  record -- I'm sorry to cut you off.  If you wanted them

13  earlier, you should have not noticed them for the day of

14  the deposition.

15     MR. ZWANG:  Well, actually, you know, we

16  tried -- I'll tell you -- I don't know if we're on the

17  record or not, but we tried to get these things out to

18  you ahead of time.

19     MS. LAVALLEE:  Okay.

20     MR. ZWANG:  And it just so happened that in

21  pulling these things together, we didn't get them over

22  to John until, I think, the Friday --

23     MS. LAVALLEE:  Okay.

24     MR. NADOLENCO:  It was Saturday.  And they

25  actually came to my house, and I reviewed them over the

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  weekend.

2      MS. LAVALLEE:  And I --

3      MR. ZWANG:  An effort was made to get these to

4  you.

5      MS. LAVALLEE:  No, I understand.  And I'm not

6  suggesting that we have a disagreement.  I'm just

7  reserving our rights to raise it at a later date.  And

8  there may simply be no disagreement.  We just don't know

9  at this stage.

10      And I appreciate your time.  Thank you so

11  much.

12      THE WITNESS:  You're welcome.

13      THE VIDEOGRAPHER:  This marks the end of

14  videotape Volume I, tape 4 in the deposition of Philip

15  Simon.  The number of tapes used today is four.  The

16  original videotapes will be retained by Dan Mottaz Video

17  Productions.  The time is 6:04 p.m.  We are off the

18  record.

19      (Deposition concluded at 6:04 p.m.)

20

21          ---o0o---

22

23

24

25

261

---

CERTIFICATE OF WITNESS

5      I, the undersigned, declare under penalty of

6  perjury that I have read the foregoing transcript and I

7  have made any corrections, additions or deletions that I

8  was desirous of making; that the foregoing is a true and

9  correct transcript of my testimony contained therein.

10      EXECUTED this _____ day of _____,

11  200_, at _____, _____.

17      _____

18      Signature of Witness

262

---

1          REPORTER CERTIFICATE

2      I hereby certify that the witness in the

3  foregoing deposition was by me duly sworn to testify to

4  the truth, the whole truth and nothing but the truth in

5  the within-entitled cause; that said deposition was

6  taken at the time and place herein named; that the

7  deposition is a true record of the witness's testimony

8  as reported to the best of my ability by me, a duly

9  certified shorthand reporter and a disinterested person,

10  and was thereafter transcribed under my direction into

11  typewriting by computer; that the witness was given an

12  opportunity to read and correct said deposition and to

13  subscribe the same.  Should the signature of the witness

14  not be affixed to the deposition, the witness shall not

15  have availed himself or herself of the opportunity to

16  sign or the signature has been waived.

17      I further certify that I am not interested in

18  the outcome of said action, nor connected with, nor

19  related to any of the parties in said action, nor to

20  their respective counsel.

21      IN WITNESS WHEREOF, I have hereunto set my

22  hand this 29th day of March, 2004.

23

24      _____

25      HOLLY MOOSE, CSR NO. 6438

26

263

---

1          ROBERT BARNES ASSOCIATES
2          760 Market Street, Suite 844
3          San Francisco, California  94102
4          Phone: (415)788-7191
5
6          Date:  3/29/04
7  TO:  PHILIP B. SIMON
8          C/O: Howson &Simon
9          101 Ygnacio Valley Road, Suite 310
10         Walnut Creek, CA  94596
11         (925)977-9060
12  RE:  COORDINATION PROCEEDING
13         SPECIAL TITLE (RULE 1550(B))
14
15  Deposition taken March 16, 2004
16
17  Dear PHILIP B. SIMON:
18
19  The original transcript of your deposition taken in the
20  above-entitled action has been prepared and is available
21  at this office for your reading, correcting and signing.
22  In the alternative, you may wish to review counsel's
23  copy.  Please notify this office and all counsel in
24  writing of any changes you wish to make to your
25  deposition transcript.
26
27  Your rights regarding signature of this deposition are
28  contained in the code.  Unless otherwise directed, your
29  original deposition transcript will be sealed in
30  accordance with the code.
31  If you wish to make arrangements to review the original
32  transcript of your deposition, please contact this
33  office during office hours, 9 to 5, Monday through
34  Friday, to make an appointment.
35
36          Sincerely,
37
38          Holly Moose
39          CSR No. 6438
40  cc:  All counsel
41

264

---

# EXHIBIT T

1    page

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

-oOo-

IN RE

ORACLE CORPORATION

SECURITIES LITIGATION

MASTER FILE NO.

C-01-0988-MJJ

This Document Relates To:

ALL ACTIONS

_____/

-oOo-

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF PHILIP B. SIMON

September 6, 2006

-oOo-

SHEILA CHASE & ASSOCIATES

REPORTING FOR:

LiveNote World Service

221 Main Street, Suite 1250

San Francisco, CA 94105

Telephone: (415) 321-2300

Fax: (415) 321-2301

-oOo-

Reported by:

KELLIE A. ZOLLARS, CSR, RPR, CRR

CSR License No. 5735

1

2    page

I N D E X

INDEX OF EXAMINATION

PAGE

EXAMINATION BY:

    MR. SOLOMON                        8

"AFTERNOON SESSION"                  139

-oOo-

INDEX OF EXHIBITS

PHILIP B. SIMON    DESCRIPTION        PAGE

EXHIBIT 1    E-mail dated 12/17, 1 page

    Control No. 294177           54

EXHIBIT 2    E-mail exchange dated

    January 4, 2000,

    Control Nos. 001455 - 524    58

EXHIBIT 3    E-mail dated January 6, 2000,

    1 page, Control No. 005517   60

EXHIBIT 4    E-mail exchange dated March 27,

    2000, 3 pages Control Nos.

    294178 - 180                 61

EXHIBIT 5    E-mail exchange dated March 29,

    2000, 5 pages, Control Nos.

    294181 - 185                 70

EXHIBIT 6    E-mail exchange dated April 7,

    2000, 3 pages, Control Nos. 294187

    - 189                        73

EXHIBIT 7    E-mail exchange dated March 24,

    2000, and April 10, 2000, 1 page,

    Control No. 049596           82

2

1    EXHIBIT 8    E-mail exchange dated April 12,
2        2000, 3 pages, Control Nos. 042801
         - 803                       84
3    EXHIBIT 9    E-mail dated 6/5/2000, 1 page,
         Control No. 042804          86
4
5    EXHIBIT 10    Schedule prepared by Mr. Simon
         dated July 2000, 2 pages,
         Control Nos. 294192 - 193    96
6
7    EXHIBIT 11    E-mail exchange dated October 10,
         2000, 2 pages, Control Nos. 194194
         - 195                       101
8
9    EXHIBIT 12    E-mail exchange dated 10/17/2000,
         2 pages, Control Nos. 294196 - 197   105
10   EXHIBIT 13    E-mail exchange, 2 pages,
         Control Nos. 145744 - 745    109
11
12   EXHIBIT 14    E-mail dated 10/17/2000, 3 pages,
         Control Nos. 294198 - 200    111
13   EXHIBIT 15    E-mail exchange dated 12/18/2000, 2 pages,
         Control Nos. 042809 - 810    115
14
15   EXHIBIT 16    E-mail exchange, 1 page,
         Control No. 409678          116
16   EXHIBIT 17    Printout of a Yahoo! Finance page
         and e-mail dated 1/4/2001, 3 pages,
17       Control Nos. 294203 - 205    118
18   EXHIBIT 18    E-mail exchange dated January 10,
         2001, 3 pages, Control Nos.
19       300659 - 661                120
20   EXHIBIT 19    E-mail dated 1/10/2001, 1 page,
         Control No. 060974          121
21
22   EXHIBIT 20    Handwritten notes entitled
         "Larry Ellison," 2 pages,
23       Control Nos. 294210 - 211    125
24   EXHIBIT 21    E-mail dated January 22, 2001,
         1 page, Control No. 042818   127
25   //

3

1    EXHIBIT 22    E-mail exchange dated 1/10/01,
         1 page, Control No. 024193   130
2
3    EXHIBIT 23    Interview Memorandum of Philip
         Simon, 30 pages, Control No.
         300598 - 628                145
4
5    EXHIBIT 24    E-mail dated January 22, 2 pages,
         Control Nos. 294208 - 209    148
6    EXHIBIT 25    Draft e-mail dated 1/24/2001,
         1 page, Control No. 035365   150
7
8    EXHIBIT 26    Draft Press Release, 1 page,
         Control No. 609894          152
9    EXHIBIT 27    E-mail exchange, 4 pages,
         Control Nos. 294223 - 226    153
10
11   EXHIBIT 28    E-mail exchange dated 1/24/2001, 3 pages,
         Control Nos. 300623 - 625    158
12   EXHIBIT 29    Fax dated 1/25/2001, 3 pages,
         Control Nos. 294230 - 232    160
13
14   EXHIBIT 30    E-mail to Ms. Clarke from
         Mr. Simon, 3 pages,
         Control Nos. 294235 - 237    162
15
16   EXHIBIT 31    E-mail dated 1/26/2001, 2 pages,
         Control Nos. 294238 - 239    163
17   EXHIBIT 32    E-mail dated 1/26/2001, 1 page,
         Control No. 357858          163
18
19   EXHIBIT 33    E-mail to Mr. Cooperman from
         Mr. Simon, 2 pages,
         Control Nos. 294216 - 217    165
20
21   EXHIBIT 34    Handwritten note, 2 pages,
         Control Nos. 294233 - 234    167
22   EXHIBIT 35    E-mail exchanges dated 1/29/2001,
         1 page, Control No. 042835   168
23
24   EXHIBIT 36    E-mail dated 1/29/2001, 1 page,
         Control No. 042839          169
25   //

4

Simon, Phillip  9/6/2006  1:30:00 PM

EXHIBIT 37   E-mail dated 1/29/2001, 2 pages,
                     Control Nos. 300645 - 646            170

EXHIBIT 38   E-mail exchange, 3 pages,
                     Control Nos. 294240 - 242            171

EXHIBIT 39   E-mail exchange dated 1/29/2001,
                     2 pages, Control Nos. 294245 - 246   171

EXHIBIT 40   E-mail dated 1/30/2001, 2 pages,
                     Control Nos. 294255 - 256            172

EXHIBIT 41   E-mail dated 1/31/2001, 3 pages,
                     Control Nos. 300652 - 654            173

EXHIBIT 42   E-mail dated 1/30/2001, 3 pages,
                     Control Nos. 294252 - 254            175

EXHIBIT 43   E-mail exchange dated 2/1/2001,
                     4 pages, Control Nos. 294260 - 263   176

EXHIBIT 44   E-mail from Ms. Wallace to
                     Ms. Clarke, 5 pages,
                     Control Nos. 294264 - 268            176

EXHIBIT 45   E-mail exchange dated 2/27/2001,
                     2 pages, Control Nos. 294269 - 270   179

EXHIBIT 46   Schedule, 2 pages,
                     Control Nos. 294274 - 275            185

EXHIBIT 47   E-mail exchange dated 3/7/2001,
                     4 pages, Control Nos. 300655 - 658   186

EXHIBIT 48   E-mail dated May 3, 2002, 2 pages,
                     Control Nos. 612086 - 087            190

EXHIBIT 49   E-mail exchange dated 3/5/2002, 3 pages,
                     Control Nos. 294271 - 273            196

EXHIBIT 50   Printout of a
                     San Francisco Chronicle article,
                     6 pages                              202

                     -oOo-

---

BE IT REMEMBERED THAT, pursuant to the laws
pertaining to the taking and use of depositions, and on
Tuesday, September 6, 2006, commencing at the hour of
9:05 a.m. thereof, at the offices of LERACH COUGHLIN STOIA
GELLER RUDMAN & ROBBINS LLP, 100 Pine Street, Suite 2600,
San Francisco, California, before me, KELLIE A. ZOLLARS,
CSR No. 5735, a Certified Shorthand Reporter in and for the
State of California, the following proceedings took place:

                     -oOo-

Appearing as counsel on behalf of Plaintiff:

        LAW OFFICES of LERACH COUGHLIN STOIA GELLER
        RUDMAN & ROBBINS LLP
        By:   MARK SOLOMON, ATTORNEY AT LAW,
              STACEY KAPLAN, ATTORNEY AT LAW
        655 West Broadway, Suite 1900
        San Diego, California 92101-3301
        Tel: (619) 231-1058
        marks@lerachlaw.com

Appearing as counsel on behalf of Defendants and the
witness:

        LAW OFFICES of LATHAM & WATKINS LLP
        By:   MICHELE KYROUZ, ATTORNEY AT LAW
        505 Montgomery Street, Suite 1900
        San Francisco, California 94111-2562
        Tel: (415) 391-0600
        michele.kyrouz@lw.com


        LAW OFFICES OF LATHAM & WATKINS LLP
        ANDREW FARTHING, ATTORNEY AT LAW
        140 Scott Drive
        Menlo Park, California 94025-1008
        Tel: (650) 328-4600

Also present:
        James Terrell, Videographer

---

                     -oOo-

                     PHILIP B. SIMON

                     having been first duly sworn to

                     tell the truth, the whole truth

                     and nothing but the truth, was

                     thereupon examined and testified

                     as is hereinafter set forth:

                     -oOo-

        THE VIDEOGRAPHER:  This begins the videotaped
deposition of Philip B. Simon, Tape 1, Volume I, in the
matter In Re Oracle Corporation Securities Litigation filed
in the United States District Court, Northern District of
California, Case No. C 010988 MJJ.  Today's date is
September 6, 2006, the time on the video monitor is 9:07.

        The video operator today is James Terrell
representing LiveNote World Service located at 221 Main
Street, Suite 1250, in San Francisco, California 94105.
The phone is (415) 321-2300.  The court reporter is Kellie
Zollars of Sheila Chase and Associates reporting on behalf
of LiveNote World Service.

        Today's deposition is being taken on behalf of
the plaintiffs and is taking place at 100 Pine Street in
San Francisco, California.

        And if counsel will please introduce themselves
and state whom they represent.

---

        MR. SOLOMON:  Mark Solomon representing plaintiffs.

        MS. KAPLAN:  Stacey Kaplan representing plaintiffs.

        MS. KYROUZ:  Michele Kyrouz and Andrew Farthing from
Latham & Watkins representing the witness and defendants.

        THE VIDEOGRAPHER:  Thank you.

        And the reporter may swear in the witness.

(Witness sworn.)

                     -oOo-

                     EXAMINATION

BY MR. SOLOMON:

        Q.  Good morning, Mr. Simons.  Could you state your
full name, please.

        A.  Philip B. Simon.

        Q.  Okay.  And your address, your home address?

        A.  3416 Echo Springs Road, Lafayette, California,
94549.

        Q.  Okay.  And do you understand that you're here
pursuant to a subpoena?

        A.  Yes.

        Q.  And do you have an understanding what the case is
about that the subpoena relates to?

        A.  Somewhat.

        Q.  Okay.  Have you seen the subpoena?

        A.  Yes.

        Q.  And did you read it?

---

1    A.  In part, yes.

2    Q.  Okay.  There was a schedule attached to the

3    subpoena requesting documents.  Do you recall that?

4    A.  Yes.

5    Q.  And what did you do, if anything, to comply with

6    the request for documents?

7    A.  I spoke with my attorney.

8    Q.  And who's that?

9    A.  Glen Zwang at Bartko, Zankel, Tarrant & Miller.

10   Q.  Okay.  And what was the outcome of that

11   conversation?

12   A.  My understanding is he communicated with your firm

13   and there was a conclusion reached that your document

14   request included the same documents that had been provided

15   pursuant to the document request in the state litigation;

16   and that you accepted, since you have all those copies,

17   that that was sufficient.

18   Q.  Okay.  You refer to the state litigation.  You, in

19   fact, gave sworn testimony in that --

20   A.  I gave -- yes.

21   Q.  Sworn testimony, correct?

22   A.  Yes.

23   Q.  And you also at one stage were interviewed by

24   special litigation committee of Oracle's board of

25   directors?

9

1    A.  Correct.

2    Q.  And so does this represent the third formal

3    occasion in which you've been called to talk about the

4    facts?

5    A.  Correct.

6    Q.  Have you ever been contacted by the SEC to discuss

7    Mr. Ellison's trading?

8    A.  No.

9    Q.  Or by the Justice Department?

10   A.  No.

11   Q.  When you looked at the subpoena and the schedule

12   of documents, was it -- is it -- as a result is it your

13   understanding that all of the documents requested were

14   provided in the derivative litigation and thereby -- and

15   thereon provided to us?

16   A.  I believe so, yes.

17   Q.  What did you do in terms of looking for documents

18   in the derivative case?

19   A.  That was the state?

20   Q.  The state case, yes.

21   A.  The state case.  In response to the subpoena

22   request we searched all our hard copy files during the

23   relevant period, and we also searched all existing computer

24   hard disks that we had in my office for the relevant

25   periods trying to find all relevant documents that had been

10

1    requested.

2    Q.  Okay.  And in doing that search did you discover

3    that any documents that had existed that would have been

4    responsive had been destroyed or lost or somehow weren't

5    available?

6    A.  That's an impossible question to answer.

7    Q.  I'll try and do it better for you.

8    What sort of documents do you understand that you

9    were asked to look for in the state litigation?

10   A.  I was asked to provide all documents relevant to

11   the trading during the period.  I don't recall the exact

12   period that was subject to the subpoena, but all documents

13   relevant to Larry Ellison's stock trading, e-mails to or

14   from Larry regarding his Oracle shares, recommendations to

15   sell stock, and so on and so forth.

16   Q.  When you made that search, would all of the

17   documents that were relevant to that trading, were they all

18   still in existence?

19   MS. KYROUZ:  Objection.  Vague.

20   THE WITNESS:  No.

21   BY MR. SOLOMON:

22   Q.  So go ahead.  You said "no"?

23   A.  "No."

24   Q.  And why is that?

25   A.  Actually, the answer's not no, the answer is I

11

1    don't know for certain.

2    Q.  Okay.  Do you have a routine of -- I want to say

3    destroying, but you maybe want to use another word -- of

4    destroying documents?

5    A.  No, we did not destroy any hard copy documents;

6    but at the time, until just recently, we were a very small

7    firm, we did not have a server, we just had a desktop.  And

8    as they crashed and got destroyed, I had to replace them.

9    And we did search old -- when we did the document request

10   we did search old hard disks to the extent we were able to

11   extract data.  But the reason I say I cannot give

12   100 percent assurance that we were able to find every

13   e-mail, there could have been old hard disks that we could

14   not find.  I don't think there were, I think we actually

15   found them.  But also there were times where I'd send

16   e-mail and sent e-mails would not be put in the sent e-mail

17   file.  And those are only saved for a certain period of

18   time; and when the disk was getting full of storage,

19   anything, like, over six months or a year I would just

20   delete to create room on my hard disk.

21   This goes back a long time.  Computers had much

22   smaller disk capacity then.  So I don't have assurance

23   every e-mail that I may have sent that could have pertained

24   to the document request was in existence at the time.

25   However I can tell you that we made the best effort to

12

Simon, Phillip  9/6/2006  1:30:00 PM

1    locate everything that existed at the time to provide
2    pursuant to the subpoena for the state litigation.
3        Q.  Okay.  And is it fair to say when you did do a
4    search, you were surprised at how few e-mails you recovered
5    between you and Mr. Ellison?
6        A.  No.
7        Q.  Okay.
8        A.  Not at all.
9        Q.  Okay.
10           Were you ever asked by anybody to preserve
11   documents and materials on your computers?
12       A.  No.
13       Q.  Okay.
14           Do you remember hearing in March of 2001 that
15   Oracle was going to miss its quarterly forecast numbers?
16       MS. KYROUZ:  Objection.  Vague.
17       THE WITNESS:  No.
18       BY MR. SOLOMON:
19       Q.  Did you ever hear that?
20       A.  No.
21       Q.  So, as you sit here today, are you unaware that in
22   the third quarter of fiscal '01 Oracle missed the numbers
23   it had forecast to investors?
24       A.  What I would say is I don't know what happened,
25   but there's been litigation apparently involving that

13

1    issue.
2        Q.  Uh-huh.
3        A.  So I assume this issue is subject to dispute, but
4    I am not involved at all with Oracle Corporation so I
5    really don't know what's going on at Oracle.
6        Q.  Okay.  It's fair to say -- we'll get into more
7    detail later, but it's fair to say in January of 2001, on
8    behalf of Mr. Ellison, you arranged the sale of over
9    $900 million worth of securities?  Is that fair to say?
10       A.  I handled Mr. El- -- Larry's personal finances.
11   And as part of managing his personal finances, I played a
12   key role in exercising certain stock options; and I think
13   the gross sales proceeds were 894 million.
14       Q.  Okay.  So I stand corrected.  Just under
15   900 million.
16       A.  Correct.
17       Q.  And is it also true that all of those sales were
18   accomplished at a minimum price of $30 per share?
19       A.  I don't recall, but that may be correct.
20       Q.  By the end of March of 2001 isn't it true that
21   Oracle's share price had almost fallen in half?
22       A.  I don't know.
23       Q.  And you don't -- just to make sure we're clear on
24   this, you don't remember -- no.  Stop.  Withdraw that.
25           In March of 2001 you did not become aware that

14

1    Oracle's stock price had plummeted as a result of its
2    missing -- as a result of it telling Wall Street it was
3    missing its numbers?
4        A.  Two comments.  To be perfectly correct, I don't
5    recall what I knew in March -- is it 2001 we're talking
6    about?
7        Q.  Yes.
8        A.  I do not recall what I knew in March 2001 about
9    Oracle's stock price, but I do periodically have a Yahoo!
10   home page that lists stocks that I follow, my personal
11   stocks, and as well as Oracle; and I look at that every
12   couple of days.  So I would have been aware at the time
13   what -- most likely what Oracle's stock price was.
14   However, your question also gave an assumption of
15   causation; and I have no knowledge why the stock price
16   would have declined.  Generally stocks decline because
17   there's more sellers than buyers.  And the causation, the
18   rationale, I don't think it's a valid question.
19       Q.  Okay.
20           Now, you are a lawyer as well as a CPA; is that
21   correct?
22       A.  It depends by -- I don't mean to parry with you.
23   What do you mean by lawyer?  Did I go to law school?  Yes,
24   I went to law school.  But I'm not a member of the state
25   bar anymore.

15

1        Q.  You were a member of the California state bar at
2    one stage?
3        A.  Yes.
4        Q.  And then you let that lapse?
5        A.  Correct.
6        Q.  And you don't provide Mr. Ellison, and you never
7    have provided Mr. Ellison, with legal advice; is that
8    correct?
9        A.  That's correct.
10       Q.  What was your undergraduate degree?
11       A.  Russian studies.
12       Q.  And what was your graduate degree?
13       A.  I went to law school.
14       Q.  And where did you go to law school?
15       A.  Stanford Law School.
16       Q.  Did you take a course in securities transactions?
17       A.  I think I did.  I'm not 100 percent certain, but I
18   think most likely I did.
19       Q.  Okay.  And after finishing law school, did you
20   then take the bar immediately?
21       A.  Yes.
22       Q.  And what did you do then?
23       A.  I then went to work for the San Francisco office
24   of Arthur Young & Company in the tax department.
25       Q.  Okay.  And what functions did you perform?

16

1  A.  As a tax accountant.  I became a certified public
2  accountant.
3  Q.  Okay.  And how many years did you keep your bar
4  license?
5  A.  The answer is until they instituted continuing
6  legal education requirements and also ruled that the ^ TAPE
7  continuing legal education and CPA could not be met, so you
8  had to do three to four weeks of continuing education
9  versus two.  At that point in time I said I'm not
10  practicing law so I decided not to do the continuing legal
11  education requirements.
12  Q.  Was that sometime in the mid 1980s?
13  A.  That would be my guess.
14  Q.  And after working in the tax department, what did
15  you do then?
16  A.  You mean professionally?
17  Q.  Professionally.
18  A.  After three years I set up my own accounting firm.
19  With my partner.
20  Q.  And who's your partner?
21  A.  Jeff Howson.
22  Q.  Okay.
23  A.  At that point in time.  We now have another
24  partner.
25  Q.  And what's the name of the firm?

17

1  A.  Howson & Simon.  Howson is spelled H-o-w-s-o-n.
2  Q.  What year did you form the firm?
3  A.  1981.
4  Q.  And is it true you met Mr. Ellison in 1993?  For
5  the first time?
6  A.  I think it was 1994.
7  Q.  Okay.  So between 1981 and 1994 were you
8  practicing as a CPA in your own firm, within your own firm?
9  A.  Correct.
10  Q.  And what services did you provide as a CPA?
11  A.  We prepared tax returns.  And for our clients we
12  provided general tax and financial advice.
13  Q.  Did you engage or orchestrate securities
14  transactions for your clients in that time frame?
15  A.  I do not believe so.  Actually, maybe on occasion.
16  Q.  Okay.
17  Were you aware, as a result of your law school
18  teachings, of the rules surrounding insider trading in
19  publicly traded corporations?
20  MS. KYROUZ:  Objection.  Vague.
21  THE WITNESS:  I had a general understanding of the
22  securities laws, but I do not know the specific details.
23  BY MR. SOLOMON:
24  Q.  Time frame is January of 2001.  You had an
25  understanding then of what the rules were surrounding

18

1  insider trading?
2  A.  I have a general understanding of the general
3  concepts but not the specific provisions.
4  Q.  What are the general concepts?
5  A.  Basically you shouldn't trade on material insider
6  information.  And the basic thing I knew is when they need
7  clearance from Oracle's Legal Department.  And the basic
8  understanding I had is you want to get the advice of an
9  attorney with knowledge about the rules.
10  Q.  Has your understanding of the concepts of insider
11  trading rules changed in any way over time?
12  MS. KYROUZ:  Objection.  Vague.
13  THE WITNESS:  Since I only have a general
14  understanding and don't know the specifics, my general
15  understanding remains the same.  But I know the law has
16  evolved because the law does evolve.  I never knew the
17  specifics so, therefore, I -- I don't know how to answer
18  your question.  I'm not sure what you're asking me.
19  BY MR. SOLOMON:
20  Q.  Okay.  Did you view it at any time as your role to
21  police Mr. Ellison in terms of whether or not he was
22  trading on insider information?
23  A.  To what?
24  Q.  To police him.
25  MS. KYROUZ:  P-o-l-i-c-e?  Is that the word?  Police?

19

1  P-o-l-i-c-e?
2  MR. SOLOMON:  Uh-huh.
3  MS. KYROUZ:  Objection.  Vague.
4  THE WITNESS:  I don't know what you mean by the word
5  police.  Can you use different terminology?
6  It's my responsibility, in executing a trade on
7  behalf of Larry, to check in with Oracle Legal Department
8  to make sure securities filing is done properly, to confirm
9  that the window is open, that they're not aware of any
10  transaction or material event that would close the window.
11  And also get the okay from Larry.
12  BY MR. SOLOMON:
13  Q.  And in your experience have you ever been told
14  that it's not okay to trade because of some event or --
15  A.  Yes.
16  Q.  And when has that happened?
17  A.  During the -- only one -- I mean, are you
18  asking -- when the window's closed, obviously, we never
19  asked.
20  Q.  Sure.
21  A.  The only other time that I'd ever had I think was
22  during Oracle's dealings on the PeopleSoft acquisition.
23  This is subsequent, in later years.  I don't know, two,
24  three years ago.
25  Q.  Okay.  And tell me about the PeopleSoft issue.

20

Simon, Phillip  9/6/2006  1:30:00 PM

1   A.  I was -- I wanted to do a transaction, whether it
2   was -- a donation to a charity possibly.  And the answer
3   was even though the window's open the window is shut during
4   the regular period, and that's what I heard.
5   Q.  So no transaction took place; is that right?
6   A.  Yes.  And I did not know it was about PeopleSoft,
7   I only knew that PeopleSoft was going on.  I still actually
8   don't know why the window was closed, but there was a
9   PeopleSoft transaction going on and there was a lot of news
10  in the paper two, three weeks later; but I never knew why.
11  Q.  Who did you speak to on that occasion at Oracle?
12  A.  I generally e-mail someone -- there were three
13  people in the Oracle Legal Department at the time, I'm not
14  sure whom.  It would either be Matt Ng, who has since
15  departed from the Oracle Legal Department; George Ducker,
16  who is still there; and they would interact with Dan
17  Cooperman.  And I do not know if I connected directly with
18  Dan.  Probably not.  It was either Matt or George.  And I
19  was told the window's not open.
20  Q.  Okay.  Going back to the -- your meeting with
21  Mr. Ellison in 1994, how did that meeting come about?
22  A.  I -- there was a law firm in town that just had a
23  business -- had broken away from a small law firm -- from a
24  bigger law firm; my partner Jeff Howson knew the
25  people, and we just took them out to lunch to meet them and

21

1   to just welcome them into their business.  And it turned
2   out that one of the partners there worked for Larry, and
3   one of his assignments was to find a new accountant for
4   Larry.
5   Q.  And who was that?
6   A.  That was a gentleman named Andrew Dudnick.
7   D-u-d-n-i-c-k.
8   Q.  And what was his relationship with Mr. Ellison?
9   A.  He was engaged by Larry as his attorney.
10  Q.  Is he still his attorney?
11  A.  He still does work for Larry, yes.
12  Q.  And a meeting was set up?
13  A.  I then met with -- and met with, I believe,
14  Jennifer Overstreet, who was Larry's administrative
15  assistant, and was interviewed by her.
16  Q.  And what was said in that interview?
17  A.  I don't recall.
18  Q.  Did she tell you what Mr. Ellison was looking for?
19  A.  I would speculate she must have talked about what
20  he was looking for, yes.
21  Q.  Do you have a general recollection of what --
22  A.  She was -- something Larry needs to get a new
23  tax accountant, and you've been referred to us; and she
24  asked questions about me, just the normal getting to know
25  each other.

22

1   Q.  And how long did that interview take?
2   A.  Half hour, maybe 45 minutes.
3   Q.  And what happened next?
4   A.  Then I was called back, I met with Larry.
5   Q.  At Oracle headquarters?
6   A.  I don't recall.  Probably, but I do not recall.
7   Q.  And how long was that meeting?
8   A.  Two to three minutes.
9   Q.  And what was said?
10  A.  Larry said, "Fine.  Jenny says you're the right
11  person to pick, so okay."  Something like that.  I don't
12  recall.  Larry was very pleasant.  I was engaged.
13  Q.  And at that stage how many other clients did you
14  have?
15  A.  Personally or the firm?
16  Q.  Let's break it down both ways.  First the firm,
17  then personally.
18  A.  Depends upon how you count clients, if you count
19  relationships or entities.  But let's count relationships.
20  I would assume I probably had 10 to 15 clients at that
21  time.  Or relationships, maybe 10.  And the firm had maybe
22  around 25 relationships.
23  Q.  And over time you became more and more exclusively
24  devoted to Mr. Ellison's finances; is that true?
25  A.  Correct.

23

1   Q.  And you passed clients to other accountants in
2   order to do that?  Is that how it worked?
3   A.  Yes.
4   Q.  And did those clients pass to other accountants in
5   your firm or outside the firm?
6   A.  The -- most of the clients remained with the firm.
7   But I don't work exclusively for Larry.  Even now.
8   Q.  Who else do you work for?
9   A.  Well, I consult primarily three other clients.
10  Q.  And who are they?
11  A.  Is that relevant?
12  Q.  It might be.  I don't know until you give me the
13  answer.
14  A.  Well, I feel there's some confidentiality to my
15  clients, and I don't feel it's appropriate to bring up my
16  other clients.  Am I required to?
17       I tell you what, I will object to that, that the
18  information is not relevant and they have no relationship
19  with Larry.  And I will provide that information upon -- I
20  will object, and we can -- I will if a judge issues, but I
21  really don't want to discuss my other clients because I
22  don't think it is germane.  But they have absolutely -- I
23  can represent 100 percent to you that they have no
24  relationship to Larry at all.
25  MR. SOLOMON:  Well, I understand it's for your lawyer

24

1      to object, and notice she hasn't objected.  For good
2      reason.  And I do want an answer to the question.
3          MS. KYROUZ:  Well, Mark, you know, is it really
4      necessary?  I don't see the relevance personally.  Now that
5      my client has said that he has an objection on
6      confidentiality grounds, I would ask you to move on.  I
7      don't really see the point --
8          MR. SOLOMON:  Let me just see if I can help you there.
9      There is a confidentiality order in this case.
10         MS. KYROUZ:  We'll mark this transcript confidential
11     and it will be held confidential.  I agree with you that
12     it's not relevant.
13         THE WITNESS:  Confidential is not valid.  I've seen my
14     e-mails placed on --
15         MS. KYROUZ:  On the front page --
16         THE WITNESS:  -- the first page of --
17         MS. KYROUZ:  -- of the Chronicle, yeah.
18         THE WITNESS:  -- the Chronicle; so, no, I will not
19     say.  But I will tell you again that upon receiving an
20     objection with a Court order, I will provide that
21     information if issued by a judge.  But at this point in
22     time I do not want to give you -- I will give you all
23     truthful data.  They have nothing to do with Larry.  And I
24     don't see why my other clients, who live in the Bay Area,
25     have to be brought into this and have their name disclosed

                                                              25

1      but I cannot give you a definitive answer to such really
2      silly questions.
3          Q.  Do you provide the same sort of services to these
4      three clients as you provide to Mr. Ellison?
5          MS. KYROUZ:  Objection.  Vague.
6          THE WITNESS:  Ask me what specific services.  What do
7      you -- in general, yes, I find I provide tax advice and my
8      firm does their income tax returns.  And I provide general
9      advice to them, and I help them out in their financial
10     affairs.
11         BY MR. SOLOMON:
12         Q.  Do you engage in securities transactions on their
13     behalf?
14         MS. KYROUZ:  Objection.  Vague.
15         THE WITNESS:  I don't know what you mean by engaging
16     securities transactions.  I do not have legal authority on
17     behalf of these clients to execute trades.  They -- I mean
18     I don't own those assets, I don't have legal authority, I
19     don't have power of attorney.  So do I -- I help them at
20     times when they're dealing with their stockbroker or
21     dealing with their financial advisors and they ask "can you
22     help me implement this?"  Will I help get on the phone and
23     explain things to them so they understand it and then help
24     implement securities transactions, for two out of the three
25     I have helped.  But I don't have any legal authority.

                                                              27

26     page
1      in what will likely be public.
2          BY MR. SOLOMON:
3          Q.  So I at least gather from that they live in the
4      Bay Area?
5          A.  Correct.  Of course.  I do tax accounting work.
6          Q.  And there are three of them?
7          A.  Uh-huh.
8          Q.  And they're three individuals?
9          A.  Uh-huh.
10         Q.  Are they well known?
11         A.  No.
12             Well, it depends.  If you Google -- two of the
13     three will probably pop up if you Google them, but
14     everybody -- one is not so well known.
15         Q.  As far as you know, none of them have ever met
16     Mr. Ellison?
17         A.  Correct.
18         Q.  But you -- that's as far as you know.  You don't
19     know for sure; is that right?
20         A.  How do I know if you've -- I mean, you're asking
21     me -- I have not followed -- I will tell you I have not --
22     since these clients are all older than me, so, therefore,
23     it was impossible for me to follow them around their entire
24     life.  I do not know who they played with in the
25     kindergarten.  I do not -- the answer is most likely no,

                                                              26

1          BY MR. SOLOMON:
2          Q.  Okay.  Do you know what the ingredients of their
3      stock portfolios are?
4          A.  Of these clients?
5          Q.  Uh-huh.
6              Do you know what companies they're invested in?
7          A.  Generally.
8          Q.  Are they invested in Oracle?
9          A.  All three clients have fully diversified
10     portfolios with investment managers and sometimes multiple
11     investment managers.  I have not looked at all their
12     securities holdings; and it's possible that one or all of
13     them could have a holding of Oracle securities, but we're
14     talking about a manager may have 2000 shares of Oracle in
15     the portfolio.  I just don't know.
16         Q.  Have you ever been involved in any Oracle
17     securities related transactions with those three clients?
18     Any of those three clients?
19         A.  No.
20         Q.  And has any member of your firm?
21         A.  With these three clients?
22         Q.  Correct.
23         A.  No.
24         Q.  Okay.
25         A.  Just to be clear, if you're talking about

                                                              28

1    securities transactions, one of the clients is 80 years
2    old; and I helped them set up a mutual fund.  Is that what
3    you're referring to securities transaction?  As that's what
4    I'm referring.  I helped one client set up a mutual fund;
5    and when on the phone they get confused; and I helped
6    clarify, helped them fill out the forms.
7        Q.   Make sure the context is right.  In January of
8    2001, on behalf of Mr. Ellison, you arranged the exercise
9    and sale of a number of stock options, correct?
10       A.   Correct.
11       Q.   Okay.  And have you ever performed that service --
12   not necessarily related to stock options but maybe just
13   ordinary shares, performed that service for any of the
14   other three clients?
15       A.   Not exercising someone's stock options.  Helping
16   coordinate the sale of securities.
17       Q.   Correct.
18       A.   Yes.
19       Q.   Okay.  And have any of those involved Oracle
20   related securities?
21       A.   To the best of my knowledge, no.
22       Q.   Okay.
23            You were quoted in the press, you talked a little
24   bit earlier about being reticent to give the names of those
25   three clients for the potential being revealed in the

29

1    media, correct?
2        A.   Correct.
3        Q.   And do you recall early this year Larry Ellison's
4    financial matters being exposed to the media?
5        A.   Correct.
6        Q.   Did you read the articles or at least any of the
7    articles?
8        A.   I think I read part of the one in the Chronicle.
9    And I think there was one in the Wall Street Journal that I
10   noticed.  There are apparently a lot more.
11       Q.   Was that how you found out, by picking up the
12   paper and reading?  Or did you have some foreknowledge?
13       A.   I had been -- I was -- I believe I was traveling
14   or out of town, I was -- I got a voicemail that some
15   journalist was trying to contact me.
16       Q.   That was the first inkling you had?
17       A.   And I think I may have also gotten an e-mail or a
18   call from somebody from Carolyn Balkenhol at Oracle telling
19   me that there might be something, but I -- coming out, but
20   I had no idea.  My first awareness was my sister called me
21   in the morning to wake me up, laughing.  She saw the
22   Chronicle.
23       Q.   Did you laugh with her?
24       A.   At first, no.
25       Q.   Did you speak with Mr. Ellison about that?

30

1        A.   No.
2        Q.   You never have done?
3        A.   I've never spoken with him, no.
4        Q.   Have you ever communicated with Mr. Ellison about
5    it?
6        A.   Yes.
7        Q.   And in what form of communication?
8        A.   E-mail.
9        Q.   And describe the substance of the e-mail, please.
10       A.   Larry told me not to worry about it, it will pass
11   in a day.
12       Q.   And was that in response to an e-mail that you had
13   sent him?
14       A.   Yes.  But I believe my e-mail may have been on
15   another matter.  I believe the e-mail was on another matter
16   and he was responding to the other matter and then he just
17   made a comment that not to worry, things like this happen,
18   don't get too upset, something like that.
19       Q.   And did you provide that e-mail exchange to your
20   lawyers?
21       MS. KYROUZ:  Objection.  Vague.
22       THE WITNESS:  Uhm, in the state litigation?
23       MR. SOLOMON:  No, in this litigation.
24       THE WITNESS:  No.  Because the state litigation
25   document request, that was -- that was deposed before.  I

31

1    thought the document request was within the same time
2    period of code terminus with this.
3        BY MR. SOLOMON:
4        Q.   Is it fair to say that the contents of these
5    e-mails relate back to the stock sales in 2001?  Is that
6    fair to say?
7        MS. KYROUZ:  Objection.  Vague.  Misstates his
8    testimony.  Calls for a legal conclusion.
9        THE WITNESS:  No.
10       BY MR. SOLOMON:
11       Q.   All right.
12       A.   I'm not sure what you're asking.  I don't want to
13   say yes or no.  I don't understand what you're asking.
14       Q.   The press reports talked about Mr. Ellison's
15   spending habits as revealed in the state court litigation;
16   is that fair?
17       A.   I don't know.  I didn't read all the press
18   reports.  I read the Wall Street Journal one and most of
19   the -- and the Chronicle one.
20       Q.   So after starting work for Mr. Ellison and working
21   for him more and more exclusively until you got to the
22   stage of just having him and three other clients --
23       A.   Correct.
24       Q.   -- did you -- did your advice change -- strike
25   that.

32

Simon, Phillip  9/6/2006  1:30:00 PM

1    First of all, did you advise Mr. Ellison in 1994
2  or thereafter that he needed to diversify his stock
3  holding?
4    A.  I have no recollection.
5    Q.  Have you ever advised Mr. Ellison that he needs to
6  exercise options and sell stock?
7    A.  Yes.
8    Q.  And when did you first give him that advice?
9    A.  I don't recall.
10   Q.  How often have you given him that advice?
11   A.  Periodically, but I really don't know.
12   Q.  And has he accepted or rejected that advice?
13   A.  Generally, over time, he's accepted that advice.
14   Q.  It took a while before he accepted that advice; is
15  that true?
16   A.  Sometimes.  Sometimes no.
17   Q.  Do you have an understanding why it took time for
18  him to accept the advice?
19   MS. KYROUZ:  Objection.  Vague.  Compound.
20   THE WITNESS:  Are you asking me to -- I'm trying to
21  answer your question, I'm not trying to be evasive.  Are
22  you asking me to speculate why, on what I think Larry's
23  thinking?  Or are you asking me to comment on what Larry's
24  told me?
25   BY MR. SOLOMON:

33

1    Q.  First of all, what's he told you.
2    A.  Nothing.  That's an easy question.  I don't -- I
3  have no direct -- I don't know.  He's never told me
4  anything.
5    Q.  In writing?
6    A.  What?
7    Q.  What about in writing as opposed to --
8    A.  Well, in telling me what I say he never -- we
9  don't sit down and have a two-hour discussion about
10  philosophy on these kinds of issues so I don't recall
11  anything specific, Larry telling me anything specific or in
12  writing.  There may have been some e-mails that you
13  probably have that refer to this particular transaction
14  period, but I don't recall.
15   Q.  And do you recall becoming frustrated or concerned
16  that Mr. Ellison did not diversify his Oracle stock
17  holdings more than he was at any point in time?
18   MS. KYROUZ:  Objection.  Compound.  Vague.
19   THE WITNESS:  I recall being concerned about
20  increasing amount of debt.  And being concerned that we
21  should be paying down the debt.
22   BY MR. SOLOMON:
23   Q.  And you communicated that concern to Mr. Ellison
24  periodically?
25   A.  Correct.

34

1    Q.  And until January of 2001 did he accept that
2  advice ever?
3    MS. KYROUZ:  Objection.  Compound.
4    THE WITNESS:  I believe there were some stock sales
5  prior to that, yes.
6    BY MR. SOLOMON:
7    Q.  And can you tell me what you remember about those
8  stock sales?
9    A.  I think there were some sales earlier on in the
10  '90s, and I believe there -- both option exercise and
11  same-day sales as well, but I don't have the specifics.
12   Q.  Sometime in the 1990 --
13   A.  I would assume so, yes.
14   Q.  -- and 2000.
15    And going into 2000 were you concerned about the
16  macro -- the state of the macro economy in the USA?
17   MS. KYROUZ:  Objection.  Vague.
18   THE WITNESS:  I guess what I would answer is that
19  looking at investments, my own personal investments in the
20  world, I'm always concerned about everything all the time.
21  So I don't understand what you're asking.
22   BY MR. SOLOMON:
23   Q.  Did you warn Mr. Ellison at any time, first in
24  early 2000, that the state of the economy was such that he
25  ought to be selling stock?

35

1    A.  I may have.
2    MS. KYROUZ:  Objection.  Vague, compound.
3    THE WITNESS:  I don't recall.  But I don't generally
4  comment or analyze the overall economy because I'm not an
5  economist.  But I would talk about the specifics of his
6  debt and that share prices were high.  There was a lot
7  of -- you know, there were a lot of newspaper articles
8  about the high price of stock prices during what's now
9  known as the bubble.  And I certainly would have --
10  believe I may have commented on those issues in some
11  communications with Larry.
12   BY MR. SOLOMON:
13   Q.  And do you remember his responses?
14   A.  No, I do not.
15   Q.  Do you know who Safra Catz is?
16   A.  Yes.
17   Q.  And when did you first get to know Safra Catz?
18   A.  I don't recall.
19   MS. KYROUZ:  Objection.  Misstates testimony.
20   BY MR. SOLOMON:
21   Q.  Have you met her?
22   A.  Yes.
23   Q.  How many times have you met her?
24   A.  Four or five, eight times.  Six times.  I don't
25  know.

36

1  Q. What was the context?  Business or social or both?

2  A. I think I met her at a couple of picnics.  She was

3  just at one of the big picnics and she was around, I went

4  up and said hello to her.

5  Q. And are these Oracle picnics or friends of Larry

6  picnics?

7  A. Friends of Larry picnic.

8  Q. Have you discussed with Miss Catz at any time

9  Mr. Ellison's stock transactions?

10  A. I don't think so.  I don't recall.  I do not

11  believe so, but I do not know for certain.

12  Q. Have you ever heard -- do you recall ever hearing

13  from Ms. Catz any view as to whether Mr. Ellison should

14  engage in any stock transaction or not?

15  A. I have no recollection.  I'm sorry.

16  Q. And do you know who Carolyn Balkenhol is?

17  A. Yes.

18  Q. She's Mr. Ellison's assistant?

19  A. Correct.

20  Q. Do you interact with her often?

21  A. Are you talk -- the answer is I used to on a daily

22  basis.  Not as much now.

23  Q. And would she be at the picnic as well?

24  A. She used to be, yes.

25  Q. What were your daily interactions with

37

1  Miss Balkenhol typically concerning?

2  A. I used to help her two or three times a day, maybe

3  more.  Or talk to her.  Could be daily.  Or several times a

4  day, or we'd go twice a week or once a week, but I had

5  daily communications with Carolyn.

6  Q. Typically, what would those communications

7  concern?

8  A. Basically at that time my instructions.  I worked

9  through Carolyn with Larry so all my communications -- not

10  all, but the vast majority of my communications with Larry

11  and instructions came through Carolyn.

12  Q. Okay.  So if you say two to three e-mails a day to

13  Ms. Balkenhol, your -- is it fair to say that you're

14  saying, on average, maybe 15 per week?

15  MS. KYROUZ:  Objection.  Vague.

16  THE WITNESS:  E-mails to Carolyn during that period?

17  Potentially.  I don't -- I mean, it could be one a day; but

18  something -- we had regular communications.  And if you --

19  and I just want to clarify each time you hit the send

20  button is a different e-mail.  So I ask Carolyn a question,

21  she replies; and I replied, "great, got it," I would count

22  that as two e-mails.

23  BY MR. SOLOMON:

24  Q. Okay.  Right.

25  A. So a typical -- and to explain, Carolyn was

38

1  handling Larry's checkbook at the time and all the bills so

2  a lot of these communications were "could you put money in

3  this account?"  "Okay.  Will do."  These are the kinds of

4  communications.  It was more administrative.

5  Q. Okay.

6      And did you turn over all of those communications

7  in the state court proceedings?

8  A. To the extent they had any information pertaining

9  to Oracle.  Advice to Larry about Oracle's sales, stock

10  sales, if they were discovered, yes, absolutely.

11  Q. Are you saying by that, to the extent they were,

12  for example, as you suggested, put money here or put money

13  there, those sort of documents were not turned over?

14  A. Any --

15  MS. KYROUZ:  Objection.  Misstates testimony.

16  MR. SOLOMON:  I just want to be clear about it.

17  THE WITNESS:  To the extent there was an e-mail that

18  said -- I'm just trying to think of an example.  Please,

19  you know, wire $5,000 to let's say -- I'm just making

20  something up, there's a donation to a school.  I said

21  "okay.  Will do."  Indeed, I did not copy those

22  communications.  To the extent they were uncovered, I did

23  not provide those.

24  BY MR. SOLOMON:

25  Q. Okay.  Apart from Ms. Balkenhol, did you

39

1  communicate with other people at Oracle?  Again, the time

2  frame generally is the third fiscal quarter of 2001.

3  A. We're talking about January?  December, January,

4  right?

5  Q. This particular time frame, yes.

6  A. I probably communicated with Carolyn.  I think at

7  the time she had -- she worked with another assistant, Sue

8  Bachman.  I may have had communication with Larry during

9  this period.

10  I know -- I believe we did a stock option exercise

11  in December of that year.  And I would have gotten

12  clearance, and I probably would have communicated with

13  Matt Ng and/or Dan Cooperman.  And in connection with stock

14  option exercises, we had to get legal clearance; and then

15  you have to manage it through the unit at Oracle that deals

16  with share transfers.  And that would be Barbara Wallace's

17  unit.  And then, also, when you exercise stock options,

18  there's withholding required; and either I or people in my

19  office would communicate with the tax department, headed by

20  Deborah Lange, at Oracle.

21  It's possible we communicated -- I may have

22  communicated with other people at Oracle, but that's all I

23  can recall right now.

24  Q. Okay.  Do you know whether or not Mr. Ellison was

25  contemplating in 2000 giving up to a billion dollars away

40

1　in charity that year?  In calendar 2000?

2　　　MS. KYROUZ:  Objection.  Vague.

3　　　THE WITNESS:  Can't recall.

4　BY MR. SOLOMON:

5　　Q.  Have you heard of that suggestion?

6　　A.  I don't know.  I really don't recall.

7　　Q.  You don't recall whether you've ever heard that

8　suggestion?

9　　A.  Correct.

10　　Q.  Okay.  Does it ring a faint bell?

11　　　MS. KYROUZ:  Objection.

12　BY MR. SOLOMON:

13　　Q.  Why do you say that?

14　　A.  I don't even know if it rings a faint --  the

15　difficulty is I don't recall what people may have said six

16　years ago; and then if I hear about a donation, a sizable

17　donation, I don't know what time period it may have related

18　to.  And the concept of giving a billion dollars away many

19　people may have raised in the past, I just don't know.

20　　Q.  Okay.

21　　A.  I've had people approach me and tell me "Larry's

22　agreed to give me $200 million" and he's never spoken to.

23　So -- and, for example, someone -- I may have been asked a

24　similar question in the state litigation, I had no

25　recollection.  So the subject may have been raised, but the

41

1　truth is I don't recall any serious discussion about this.

2　It doesn't mean it did not take place, but I have no

3　recollection of any serious discussion about this.

4　　Q.  Do you remember in 2000 becoming concerned that

5　Mr. Ellison was getting close to hitting his credit limit?

6　　A.  Yes.

7　　Q.  Was that the first time that you became concerned

8　that he was hitting his credit limit?

9　　　MS. KYROUZ:  Objection.  Vague.  Compound.

10　　　THE WITNESS:  Uhm, I'm always concerned about debt

11　because I don't like debt.  And, personally, I have no

12　debt.  Not even a home mortgage.  So I'm always concerned

13　about debt.  But there's always a question when you talk

14　about credit limits.  Credit limits can be changed,

15　increased, reduced.  So it's hard -- I just want to make

16　certain that there's no absolute fixed credit limit; but

17　was I concerned that Larry's debt was rising?  The answer

18　is yes.

19　BY MR. SOLOMON:

20　　Q.  Did you express that concern to anyone?

21　　A.  I'm sure I expressed it to Larry.  Probably

22　Carolyn.  Possibly people in my office.

23　　Q.  Did you talk to people at the banks that were

24　loaning Mr. Ellison money about that issue?

25　　　MS. KYROUZ:  Objection.  Vague.

42

1　　　THE WITNESS:  About what issue?

2　　　MR. SOLOMON:  The issue of him getting close to or

3　hitting his credit limits.

4　　　THE WITNESS:  I was always -- and I maintain good

5　relationships with the banks, that's part of my

6　responsibility.  And I always communicated with them and

7　well aware as we -- you have credit lines, as your

8　percentage drawn rises, I'm always managing those credit

9　lines.  Increasing when they need to be increased and

10　adjusting.  I would have been in regular periodic

11　communication with the banks.

12　　　MR. SOLOMON:  And --

13　　　THE WITNESS:  Excuse me.  Could I just clarify?

14　　　A few questions ago you had asked me if I had

15　communicated with anyone at Oracle in this time frame.  I

16　don't know if it's in this time frame, but I believe --

17　this is based on yesterday we did a little bit of

18　deposition preparation and we went through some of the

19　e-mails that were provided in the state litigation.  And I

20　seem to recall, may be mistaken, that there was one e-mail

21　communication -- I don't know if it was directly from me to

22　Safra or to Safra or Carolyn to me, and it may not have

23　been Safra; but there was one communication dealing with

24　donating stock options.  So I just want to clarify that.

25　But there is -- you probably have a binder with all the

43

1　e-mails.  There's something there.  I just want to bring

2　that to your attention.

3　BY MR. SOLOMON:

4　　Q.  Okay.  That may have been the faint bell that was

5　ringing?

6　　A.  What?

7　　Q.  That may have been the faint bell that was

8　ringing?

9　　A.  No, no, that was not a billion dollars.  It was

10　just the concept, tax concept, "Can you donate stock

11　options?"

12　　Q.  Okay.

13　　A.  The question was asked.  And I think the answer is

14　you can't for income tax purposes, but I'm not certain.

15　　Q.  Now, at the time in 2000 when you became concerned

16　that Mr. Ellison was getting close to his credit limits,

17　did you have an understanding of what stock options

18　Mr. Ellison had?

19　　A.  Yes.

20　　Q.  And they were granted at varying dates; is that

21　true?

22　　A.  Correct.

23　　Q.  With varying exercise prices?

24　　A.  Correct.

25　　Q.  And did you become aware again, at the same time

44

Simon, Phillip  9/6/2006  1:30:00 PM

1     in 2000, that any of those options were going to need to be
2     exercised in the short or medium term?
3          A.   Okay.  The answer to your question literally is
4     no.  Because, yes, I became aware.  And the answer is no
5     because I maintain schedules tracking this as part of my
6     job to monitor Larry's stock options.  We maintain a
7     schedule, and we make certain that Larry's holdings match
8     what's in the Oracle proxy.  And we track options so I've
9     been continuously aware.  So the answer is I was aware but
10    I didn't become aware.  I'm not certain which -- how you
11    want me to answer the question.
12         Q.   Okay.  Had you, prior to 2000, discussed with
13    Mr. Ellison the issue of exercising options before their
14    expiration date?
15         MS. KYROUZ:  Objection.  Vague.  Compound.
16         THE WITNESS:  Okay.  I have no specific recollection.
17    However, I would in one form or another, via e-mail,
18    personal communication, or via Carolyn, communicate with
19    Larry that he has options that are expiring to flag the
20    issue for him in advance of the time when you have to take
21    action before the option expires.  I don't know how --
22    normally I would do that 12 to 18 months away; but I don't
23    know -- and I believe the options in question were expiring
24    in August 2001 if I'm correct, but I haven't looked at this
25    in a long time and you have better data.  But if we're

45

1     assuming -- I think it's August 2001, then sometime in 2000
2     or maybe late 1999 I would have started raising the issue
3     that this is something we have to deal with.
4          BY MR. SOLOMON:
5          Q.   And I know you said you haven't looked at these in
6     a long time, but you looked at e-mails yesterday --
7          A.   Correct.
8          Q.   -- that would cover this topic; is that true?
9          A.   Correct.
10         Q.   And, again, so what conversations do you recall
11    having with anyone concerning his exercise of the --
12         A.   Unfortunately, I have absolutely no
13    recollection --
14         Q.   -- of the options?
15         A.   -- at this point in time.
16              If you -- later on I assume you're going to go
17    through e-mails, and from those I could try to interpret or
18    deduce what may have gone on; but at this point I really
19    don't have recollection.
20         Q.   Okay.
21         A.   But I'll try to help you as we go through the
22    e-mails later.
23         Q.   What efforts, if any, did you make in arranging
24    securities transactions for Mr. Ellison ensuring that he
25    was not in possession of nonpublic adverse information?

46

1          MS. KYROUZ:  Objection.  Vague.  Calls for a legal
2     conclusion.
3          BY MR. SOLOMON:
4          Q.   Did you take any steps?
5          A.   With respect -- I -- I checked with Dan Cooperman
6     in Oracle Legal Department to confirm that they -- that
7     from the Legal Department's perspective there was no --
8     that the window for sales was open.
9          Q.   And did you have an understanding -- was it your
10    understanding that Mr. Cooperman would know whether or not
11    Mr. Ellison was in possession of nonpublic information?
12         MS. KYROUZ:  Objection.  Vague.
13         THE WITNESS:  I never thought --
14         MS. KYROUZ:  Misstates testimony.
15         THE WITNESS:  I never thought about the issue.  My
16    responsibility, I believe, was to get clearance from Oracle
17    Legal Department.  And that's all I did.
18         BY MR. SOLOMON:
19         Q.   So the potential issue of Mr. Ellison trading
20    while in possession of nonpublic information was something
21    that never surfaced for you?
22         MS. KYROUZ:  Objection.  Misstates testimony.
23              You're asking aside from what he's already
24    testified to?
25         MR. SOLOMON:  Yeah.

47

1          THE WITNESS:  I believed that when I spoke with Oracle
2     Legal Department and/or Dan Cooperman, Dan Cooperman would
3     understand what was happening at Oracle and would know
4     what's going on, and would be much better placed than me to
5     make the determination.  And I relied on Oracle clearance.
6          BY MR. SOLOMON:
7          Q.   And in 2000 did you have any information about the
8     inner workings of Oracle?
9          A.   The answer is to any information?
10         Q.   To inside information.
11         A.   Oh, inside information?  No.
12              But to any information, my sister worked at Oracle
13    for a period of time so I knew about her and her friends at
14    Oracle.
15         Q.   And how did you know about her and her friends at
16    Oracle?  Did you have conversations with her about them?
17         A.   She's my sister.
18         Q.   So you talked about Oracle with your sister?
19         A.   Actually, we tried not to talk -- we almost never
20    spoke about Oracle's business with her, but if I'd go to
21    a -- let's say a party at her house, her friends, her work
22    colleagues would be there and there would be people from
23    Oracle; so I knew she had some friends who worked at
24    Oracle.  But my sister and I have generally never spoken
25    about Oracle's business or operations.

48

1 Q. And your sister worked in marketing; is that
2 correct?
3 A. Correct.
4 Q. Does she still work there?
5 A. No, she does not.
6 Q. Was she working there in 2000 and 2001?
7 A. The answer is I don't know.  She was on maternity
8 leave for a period of time, and my niece just started -- my
9 oldest niece just started first grade so I'm not sure when
10 my niece's birthday was, but she was born sometime in 2000.
11 And my sister, unfortunately, had a very bad pregnancy, was
12 out on maternity leave, bed rest for, like, 6 or 9 months
13 so I don't know the exact overlap.  But she was still on
14 Oracle payroll or maybe she was on leave of absence while
15 she was ill.  I don't know the specifics.
16 Q. Did you help arrange getting your sister a
17 position at Oracle?
18 A. No.
19 Q. Or was it coincidental?
20 A. She was hired before me.
21 Q. Did she have a role in getting you hired?
22 A. No.  It was coincidental.
23 Q. So in mid 2000 is it true that Mr. Ellison's debt
24 hit a billion dollars?
25 A. I do not know for certain, but that seems right.

49

1 I think it would be best that I defer the exact answer
2 until we go through the documents that you have and we look
3 at the schedules.  But I believe it was above the billion
4 dollars, but I just don't know.
5 Q. Let's just assume that it was a billion.  Was that
6 the highest debt at that point that you'd experienced
7 Mr. Ellison was in?  Had been in?
8 A. I don't know.  I would assume more likely than not
9 yes because there had not been any large sales for a number
10 of years, and the only sources for paying it down would be
11 stock sales.  But I just don't know.  I would have to look
12 at the data that you have to confirm, but I think that's a
13 reasonable operating assumption.
14 Q. And do you know at what point the banks would
15 require or you would need a waiver from the banks before
16 covenants were breached?
17 A. No, I do not.  But once again, those documents are
18 available and there's data in the material that's been
19 provided to you.  If you have copies of the documents
20 subpoenaed we can deduce some of that information.
21 Q. Did the point at which it hit a billion dollars
22 mark a particular point of concern for you?
23 MS. KYROUZ:  Objection.  Vague.
24 THE WITNESS:  You know, I don't recall whether the
25 mere going from, you know, 999 million to a billion, it was

50

1 a psychological point.  I don't believe it was a
2 psychological point, but I don't recall.  Maybe my e-mails
3 would -- somewhere in my e-mails that I provided will
4 provide a better documentary trail of my state of mind at
5 the time, but I just don't recall.  It was six years ago.
6 I'm sorry.
7 Q. That's all right.
8 Do you have an understanding what the 11i suite
9 is?
10 A. No.
11 Q. You never heard of it?
12 A. I'm embarrassed to say.  I may have heard it, but
13 I think the closest I heard was just now from you.
14 I assume it's an Oracle suite that you're asking
15 me?
16 Q. Yes.
17 A. Okay.
18 Q. At least it purports to be.
19 A. Okay.
20 Q. So it's fair to say you haven't had any
21 conversations with Mr. Ellison about Oracle products
22 specifically; is that right?
23 A. That is correct.
24 Q. Did Mr. Ellison ever share with you his view of
25 the financial condition of Oracle?

51

1 A. No.
2 Actually, let me state the general answer is no;
3 but maybe once every three, four years I would say, "how
4 are things going?"  He says, "Oh, business is great."  You
5 know, I might get a general comment like that, three words
6 once every three to four years in a passing comment.
7 Q. And aside from Mr. Ellison, have you had any
8 conversation at all with anybody about the state of
9 Oracle's business at any time?
10 A. I generally tried -- I have a lot of work to do,
11 and my jobs deal with Larry's personal finances; and so I
12 generally have more on my platter than I can handle, than I
13 can deal with.  And I've tried to maintain, quite honestly,
14 a very rigid barrier on information with Oracle because I
15 just don't need to know; and the less I know, I always
16 feel, is better.  But -- so the general answer would be no
17 to your question; but since I'm a very precise person, I
18 may have had a similar offhand comment or exchange of
19 e-mails with Carolyn Balkenhol or even with my sister.
20 "How are things going?"  And they'd say "great" or "good"
21 or something like that.  But I think you're asking about
22 more detailed discussions.  But I just want to answer
23 precisely to you.
24 Q. Right.
25 A. So I may have had casual comments to a couple of

52

1   people.

2   Q.  Okay.

3       Do you have a policy concerning investing in

4   Oracle?  Do you or don't you?

5   A.  Personally?

6   Q.  Yes.

7   A.  Yes.

8   Q.  And what's your policy?

9   A.  I don't invest in Oracle stock.

10   Q.  And is that -- would that include your firm as

11  well?

12   A.  No.  Well, my firm as a business, as a legal

13  entity, does not invest in Oracle.

14   Q.  But your partners do?

15   A.  I don't know what my partner does.  He generally

16  only invests in mutual funds so I doubt he's personally

17  ever invested in Oracle directly, but I do not know.  I

18  suspect he would probably apply the same policy, but we

19  never discussed -- we never talked about Oracle so I don't

20  know.

21       And what I do want to say is indirectly I

22  personally may have invested in Oracle and may currently

23  invest in Oracle because I invest in the Vanguard S&P Stock

24  Index Fund and also the Total Stock Index Fund; and I

25  believe Oracle is in the total stock market obviously, and

53

1   I don't know if it's in the S&P 500.  I assume Oracle's in

2  the S&P 500, but I don't know.

3       MR. SOLOMON:  All right.  Let's take a five-minute

4  break.

5       THE VIDEOGRAPHER:  Off record at 10:05.

6       (Recess taken.)

7       THE VIDEOGRAPHER:  On record at 10:18.

8       MR. SOLOMON:  Okay.  We'll have marked as the first

9  exhibit to this deposition a document produced by Oracle

10  and the defendants with the control number 294177.  And

11  it's an e-mail dated 12-17 -- can't quite see the year.

12       (Exhibit 1 was marked for identification.)

13       THE WITNESS:  Excuse me.  Am I supposed to look at

14  this?

15       BY MR. SOLOMON:

16   Q.  Take a look at it, first of all.

17   A.  Okay.

18   Q.  And after you've had a chance to look at it, let

19  me know if you recognize it.

20   A.  Okay.

21   Q.  Okay.  Do you recognize this e-mail?

22   A.  I don't recognize it, but it looks like an e-mail

23  I sent to Larry.

24   Q.  You say the fact -- under facts, "you currently

25  hold 6,474,750 Oracle options."  Do you see that?

54

1   A.  Correct.

2   Q.  And you indicate the strike price is 90 cents.

3   A.  Uh-huh.

4   Q.  Do you know when those options were issued to

5  Mr. Ellison?

6   A.  Uhm, I believe, but I'm deducing it based on the

7  data in this e-mail -- and I'm assuming this e-mail is an

8  e-mail I actually sent, it looks like it is -- and I'm

9  normally pretty accurate; so if they expire on August 1,

10  2001, generally -- I don't know for certain all the time,

11  but generally options have a 10-year period before they

12  expire.  So, based on August 2001 expiration date, I would

13  believe they were probably issued on or about August 1,

14  1991.

15   Q.  Okay.  And do you have an understanding how the 90

16  cent strike price was set?

17   A.  Generally stock options are granted and the strike

18  price is fixed at the fair market value on the date of

19  issue.  So my general assumption would be that these

20  options were granted at the then fair market value of

21  Oracle share price, which was 90 cents.

22   Q.  And do you have an understanding how it came to be

23  that in August of 1991 Mr. Ellison acquired those

24  6 million-plus options?

25       MS. KYROUZ:  Objection.  Vague.  It lacks foundation.

55

1       THE WITNESS:  In August '91?

2       MR. SOLOMON:  Uh-huh.

3       THE WITNESS:  I'd just be speculating, but I assume it

4  was an employee stock option grant.  I wasn't working for

5  Larry in 1991, and I don't -- I'm generally not involved

6  with Oracle business specifically so I don't know.

7       BY MR. SOLOMON:

8   Q.  Okay.  Further down the page, under the heading

9  "Approval Request," the third paragraph there talks about

10  avoiding a 2.3 million -- sorry.  Talks about 2.3 million

11  tax benefit.  Do you see that?

12   A.  Correct.

13   Q.  And then you go on to say "There is no need to

14  sell the underlying share -- or "shares, thus there is no

15  change in your economic position with respect to your

16  Oracle holdings."  Do you see that sentence?

17   A.  Correct.

18   Q.  Did you have an understanding that Mr. Ellison had

19  a concern with respect to what you describe as his economic

20  position with respect to Oracle holdings?

21       MS. KYROUZ:  Objection.  Vague.  Lacks foundation.

22       THE WITNESS:  Okay.  I want to answer your question,

23  but I want to make certain I understand it.  So can you

24  just restate?  You want to know if I --

25       BY MR. SOLOMON:

56

1    Q.  Yeah.  Basically I want to know why you felt it
2    relevant to say that.
3        A.  Okay.  Okay.  I'm speculating based on my current
4    state of mind and thinking because I have no recollection.
5    Until you presented this e-mail to me I had no recollection
6    of having even written this e-mail.  I'm not 100 percent
7    certain it's mine, but I believe it is mine.  It looks like
8    something I would write and the way I word things so I
9    suspect it's mine.  So are you asking about my current
10   state of mind --
11       Q.  Yes.
12       A.  -- or are you asking me to speculate about what my
13   state of mind was at the time I wrote this e-mail?
14       Q.  How about your current state of mind, first of
15   all.
16       A.  My current state of mind is -- because that's easy
17   to tell you what my opinion is right now because I know
18   what my opinion is right now, it's not speculating.  My
19   current state of mind is my experience over a lifetime is
20   that founders of companies find it very, very hard to sell
21   their stock.  They don't like to sell their stock.  They're
22   very attached to it.  It's their child so to speak.
23       So if you are -- so my current state of mind is if
24   you're trying to encourage someone to take an action that
25   will save, let's say -- because my job is to optimize tax

57

1    liability, minimize taxes, you try to present something so
2    it becomes a nonevent, so you don't have to deal with the
3    issue about are you parting -- you know, letting go of your
4    child, so to speak.
5        And so, basically, the mere exercise of an option
6    doesn't change your economic position vis-a-vis the holding
7    or the account of interest in the company you founded.  So
8    that's my current state of mind.
9        And I speculate, if you want to get to the next
10   question, that was probably my state of mind then, but I
11   don't recall.  Because I'm just speculating on what my
12   state of mind might have been at the time.
13       MR. SOLOMON:  Okay.
14       We'll have marked as the next exhibit a document
15   produced by the defendants with the control numbers 001455
16   to 524.
17       And again, the drill will be take a look at it;
18   and, then, once you've looked at it, tell me if you
19   recognize it.
20       (Exhibit 2 was marked for identification.)
21       THE WITNESS:  Thank you.
22       Okay.
23       MR. SOLOMON:  And for the record, while you're looking
24   at it, this is an e-mail exchange dated January 4, 2000,
25   involving Matthew Ng, that's N-g; Jeff Henley; Dan

58

1    Cooperman; and Larry Ellison.
2        That's on the first page.  On the second page,
3    excuse me, there's a e-mail from Philip Simon --
4        A.  I was looking at --
5        Q.  -- to Matt.
6        A.  I've finished my review.
7        Q.  Okay.  And have you seen any of these e-mail
8    exchanges before?
9        A.  I have no recollection.  However, because I want
10   to be precise, it looks like an e-mail exchange and it
11   looks like I initiated it because it looks like something I
12   did, but I have no recollection of this.
13       Q.  Okay.  And this was you seeking clearance for
14   Mr. Ellison to donate 30,000 shares to a charity; is that
15   right?
16       A.  Correct.
17       Q.  And do you know if that donation was made?
18       A.  I assume so.  I have no recollection.  But if I
19   received the clearance, my normal procedure would be to
20   ex- -- you know, implement the donation.  And when I looked
21   at some e-mails yesterday, I think they referred to this,
22   which would evidence that it probably happened.  I would
23   have to go back --
24       Q.  Okay.
25       A.  -- and search files to determine whether this, in

59

1    fact, happened.
2        MR. SOLOMON:  Okay.
3        Have marked as the next exhibit an e-mail
4    produced by the defendants with control number 005517.
5    It's dated January 6, 2000, and it's from Philip Simon to
6    Susan Hafley.
7        THE WITNESS:  The name rings a bell, but I don't know
8    what she did at Oracle at the time.
9        (Exhibit 3 was marked for identification.)
10       THE WITNESS:  Okay.
11       BY MR. SOLOMON:
12       Q.  And do you know who Miss Hafley is?
13       A.  The name rings a bell to me now that I look at it;
14   and, obviously, it's another person at Oracle I e-mailed
15   that I did not mention to you before, until you mentioned
16   it.
17       I'm speculating here, but I suspect she worked in
18   the department that Barbara Wallace now works for dealing
19   with share transfers, but I just don't recall.  Until I saw
20   this e-mail I didn't remember her, Susan Hafley.  And when
21   you first said Susan, I thought you were going to say Sue
22   Bachman.  I remember her name, which might pop up.
23       And this -- in respect to your prior question,
24   this looks like an e-mail from me.  I don't recall it, but
25   it looks like one I would send.  And this would answer your

60

1  prior question that it does appear that the 30,000 share
2  donation to Ellison Medical Foundation was indeed
3  implemented.
4          Oh.  Look at this.  It's from Susan to Barbara
5  Wallace, if you look above.  So I bet you Susan worked for
6  Barbara.
7      Q.  Okay.
8      A.  That would be more evidence to confirm that for
9  you.
10     MR. SOLOMON:  Okay.
11         Have marked as the next exhibit a document
12 produced by Oracle with control numbers 294178 to 180.
13     (Exhibit 4 was marked for identification.)
14     THE WITNESS:  Thank you.
15     MR. SOLOMON:  These are e-mail exchanges among Carolyn
16 Balkenhol, Phil Simon -- Philip Simon, and Larry Ellison.
17     THE WITNESS:  Okay.  Can I just look at it for a
18 second?
19     MR. SOLOMON:  Sure.  Take your time.
20     THE WITNESS:  Okay.
21     BY MR. SOLOMON:
22     Q.  Okay.  Do you recognize this?
23     A.  It appears to be an e-mail exchange from me to
24 Carolyn and Larry.
25     Q.  Did you see this e-mail yesterday?

61

1      A.  I don't recall.  I may have, but I don't think so.
2  But I may have.
3      Q.  Okay.  Do you recognize some of the contents of
4  this e-mail being reported in the media, as we've
5  discussed earlier?
6      MS. KYROUZ:  Objection.  Vague.
7      THE WITNESS:  No.  But it may have.
8      MR. SOLOMON:  Okay.
9      THE WITNESS:  The one e-mail I remember is the one --
10 there's another e-mail that I do remember being reported,
11 but I don't recall this one.  But it may have.
12     BY MR. SOLOMON:
13     Q.  This is dated March 27, 2000.
14     A.  Uh-huh.
15     Q.  And I'm looking on the first page where you write
16 to Larry -- middle paragraph.  You say, "I'm getting
17 increasingly concerned about stock market valuations."  Do
18 you see that?
19     A.  Uh-huh.
20     Q.  Do you recall receiving a response to that
21 expression of concern from you from Mr. Ellison?
22     A.  I have no recollection.  I would look -- you know,
23 the best way to look is we should go through the e-mails
24 and see what was provided.  Because anything I had in my
25 files I provided, and it would probably -- you know, be in

62

1  the state litigation, unless we go through and see if
2  there's a response.
3      Q.  Do you think there would be -- if there were a
4  response, would it be in writing?  In other words, did you
5  have a telephone conversation with Mr. Ellison around this
6  time --
7      A.  I have no recollection.
8      Q.  -- concerning --
9      A.  But I should just let you know because you're
10 asking a range of questions, Larry and I rarely meet in
11 person, we rarely speak on the phone.  Communication was
12 via e-mail.  Most of my e-mails were through Carolyn, and I
13 don't -- the general practice is I don't -- I would say
14 more often than not I don't get responses to my e-mails.
15 So it's very likely -- I don't know in this particular
16 instance, but if -- it's very likely there would be no
17 response.
18     Q.  Okay.
19         You say, if you look at the next paragraph, the
20 last sentence, "as previously discussed, this was a very
21 good trade.  I'd just like to start cashing out."  Do you
22 see that?
23     A.  Uh-huh.
24     Q.  The trade being discussed is the 20 million
25 options that's referred to in that sentence; is that right?

63

1      A.  Uh-huh.
2      Q.  And do you recall the discussion that you refer to
3  there?
4      A.  No, I do not.
5      Q.  You say that -- you refer to "the 20 million
6  option position you acquired last year in return for giving
7  up your annual salary."  Do you see that?
8      A.  Correct.
9      Q.  And is it your understanding that in whatever year
10 that refers to, instead of Mr. Ellison having a salary he
11 had 20 -- these 20 million options awarded to him?
12     A.  I believe that was my understanding.  I don't know
13 if it's correct or not, but I believe that was my
14 understanding.
15     Q.  And did -- do you have an understanding as to what
16 the exercise price was on those options?
17     A.  I don't recall, but we have schedules in my office
18 now that track this; and I know there's schedules that were
19 provided that would detail all his options.
20     Q.  Okay.
21     A.  And I know Oracle maintains option schedules for
22 all its employees, so it's readily available.  It was the
23 fair market value on the date of the grant.  And if you can
24 figure out the grant date for that, we would know what the
25 strike price was.

64

Simon, Phillip  9/6/2006  1:30:00 PM

1    Q.   Okay.
2         With respect to the options that were set to
3    expire in August of 2001 --
4    A.   Uh-huh.
5    Q.   -- what, at around the time of these e-mails, did
6    you consider Mr. Ellison's options to be as to the exercise
7    or nonexercise of those options?
8    MS. KYROUZ:  Objection.  Vague.
9    BY MR. SOLOMON:
10   Q.   Let me back up and I'll ask you a question.
11   A.   I'm sorry --
12   Q.   What I want --
13   A.   -- I'm confused.
14   Q.   -- to know is what you considered his options to
15   be when you identified that these options were going to
16   expire in 2000?
17   A.   You mean what do I consider his alternatives to
18   be?  Or what do I consider his options, the stock options,
19   to be?  I'm sorry.
20   Q.   I'm sorry.  Too much use of the word "options."
21        In around March of 2000 you were concerned that he
22   had these options that were due to expire in August of
23   2001, correct?
24   A.   Correct.
25   Q.   And he had a number of alternative actions he

65

1    could take, presumably, with respect to those options; is
2    that true?
3    A.   Not really.  No.
4    Q.   He could sell them and he could exercise in one
5    window or another window; is that true?
6    A.   Okay.  If you're asking -- I thought you meant by
7    number of -- let's use the word "alternatives," not
8    "options."  Keep it clear.
9    Q.   All right.
10   A.   I thought you were referring to alternatives other
11   than exercising and selling.  So I view that as one
12   alternative.  If you're viewing the timing of exercising
13   the alternative as subpart alternatives, then I would say
14   yes because you had 16 months and there were so many
15   windows left, there would be three to four windows left in
16   which you could exercise and sell your options.
17   Q.   All right.
18   A.   I thought you were referring to that there's an
19   alternative other than exercising the option, and I
20   guess -- and selling.  And I guess the alternative would be
21   to let it expire.
22   Q.   Okay.
23   Q.   Okay?
24        And I wouldn't consider that a real alternative.
25   Q.   Uh-huh.

66

1         Is it possible in your experience to get an
2    extension on the expiration date?
3    A.   I've never seen it.
4    Q.   You've never seen it.
5         In any event, in terms of the windows, when you
6    wrote this e-mail he had a number of options -- a number of
7    alternative windows in which he could exercise the options?
8    A.   What I would say is this is consistent with what I
9    told you before; and, actually, it's nice to see this to
10   confirm my general recollections that, as I said, 12 to 18
11   months out, or two years, I'd start advising Larry that
12   there's a coming deadline and you need to be aware of
13   this --
14   Q.   Right.
15   A.   -- so we can exercise the options.
16   Q.   Right.
17   A.   And so the answer is yes, that's what I was doing.
18   I was floating the issue.
19   Q.   And at that point of time -- and, again, we're in
20   March of 2000, were you -- would it have been possible for
21   Mr. Ellison to exercise his options in April of 2000?
22   A.   I don't know because I'd have to go through the
23   Oracle calendar.  I think Oracle's a May 31st year end, so
24   April would generally be an open window.  But I don't know
25   if there's a blackout for any reason; so the answer is I

67

1    don't know.  But if you're asking are there three or four
2    windows before they expire in which, absent special
3    circumstances, you would be able to sell, the answer is
4    yes.  But if you're asking about a specific month, I can't
5    answer because I don't know.  I didn't ask -- seek
6    clearance from Oracle's Legal Department.
7    Q.   And did you suggest in March of 2000 to
8    Mr. Ellison, or to anybody else, that he exercise any of
9    his options in the next available window?
10   A.   I have no recollection.  All I could do is -- I
11   guess what I suggested to Larry and/or Carolyn would be
12   best evidenced by -- in this e-mail.  But I do not recall,
13   there may have been other communications.  But if they were
14   in e-mail form or written form, they would have been
15   provided to you.
16   Q.   And again -- sorry.  If you could focus back on
17   that document.
18   A.   Okay.
19   Q.   Towards the bottom of the page, the second from
20   the last paragraph on the first page starts with "what I
21   don't know."  Do you see that?
22   A.   Uh-huh.
23   Q.   "What I don't know is how much Larry will exercise
24   in calendar year 2000."
25   A.   Uh-huh.

68

Oracle                                          Page  65 - 68

1    Q.  "And how much in calendar year 2001."  You know

2    now, is it true, that Mr. Ellison didn't exercise any of

3    the options in calendar 2000?

4    A.  I don't have a precise recollection, but I think

5    that is actually incorrect.

6    Q.  Okay.

7    A.  I believe there were some options exercised in

8    December.  I think you showed me an e-mail or we discussed

9    it earlier.  I think that was -- that was 1999.  But I

10    think you'll find a further e-mail where there was an

11    option exercised in December 2000 to trigger income to

12    offset deductions on his income tax return.

13    Q.  And this is something that you had practiced, that

14    you had developed over the last few years; is that right?

15    Prior to --

16    A.  It became a standard operating procedure to use

17    option income to offset deductions.

18    Q.  Right.  And that would amount in a relatively

19    small amount of income, correct?

20    A.  It's a large --

21    MS. KYROUZ:  Objection.  Vague.

22    THE WITNESS:  It's a large absolute amount of income;

23    but as a percentage of the built-in gain on the total

24    options that are expiring on August 2001, it would be a

25    small percentage.  I don't recall what percentage.  It

69

1    might have been 5, 8, 10 percent.  It would have been that

2    range, but it was still a large absolute amount.

3    MR. SOLOMON:  Okay.  I've marked as the next exhibit a

4    document produced by the defendants with control numbers

5    294181 through 185.

6    (Exhibit 5 was marked for identification.)

7    THE WITNESS:  Thank you.

8    Okay.

9    BY MR. SOLOMON:

10    Q.  Okay.  And these are e-mail exchanges dated

11    March 29, 2000, among Philip Simon, Larry Ellison, and

12    Carolyn Balkenhol?

13    A.  This appears to be the case.

14    Q.  And do you recognize these exchanges?

15    A.  I don't remember it, but it appears to be an

16    e-mail I sent.  And it also appears to be an e-mail that

17    came out of my correspondence file when we searched our

18    hard copy records during the relevant period because you

19    could see up in the upper right-hand corner "Ellison -

20    letter file," that looks like that's my handwriting, and it

21    looks like after I sent it I printed it out and routed it

22    to the correspondence file.

23    Q.  If you go to the next page --

24    A.  Uh-huh.

25    Q.  -- which should have at the -- should have a

70

1    control number 294183.

2    A.  Correct.

3    Q.  Okay.  Good.

4    There's an e-mail that you sent to Larry in the

5    middle of the page.

6    A.  Uh-huh.

7    Q.  And the third paragraph reads in part, "I'm

8    getting increasingly concerned about stock market

9    valuations."

10    A.  Uh-huh.

11    Q.  And you ask whether he's seen the book

12    Irrational Exuberance --

13    A.  Uh-huh.

14    Q.  -- and you say you believe this would be a good

15    time to take some money off the table.

16    A.  Uh-huh.

17    Q.  So, again, you're -- the purpose of this is to try

18    and persuade Mr. Ellison that he should consider

19    diversifying?

20    A.  Isn't this the same e-mail we looked at before, in

21    the prior exhibit?  So are you asking the same question?

22    The purpose of the e-mail was to flag the issue and to, you

23    know, discuss timing of when to exercise the options.

24    Q.  Okay.  And then the last paragraph here, some of

25    which we've gone over before; but you say, "note that it

71

1    would take six quarters at this rate just to sell the

2    20 million option position."  Do you see that?

3    A.  Correct.

4    Q.  What's the basis for the six quarters?

5    A.  Uhm, what I was ref- -- I'm interpreting the

6    e-mail, okay?  I have no recollection of why I said this at

7    the time; but interpreting it, it appears to say if you

8    institute one-half of 1 percent quarterly sale program, you

9    would need six quarters at one-half of a percent, that's

10    3 percent.  3 percent of 714 million shares outstanding is

11    21 million.  So, mathematically, it takes six quarters to

12    sell 20 million shares at that pace.

13    Q.  And does that represent a suggestion from you to

14    Mr. Ellison that that's what he should do?

15    MS. KYROUZ:  Objection.  Vague.

16    THE WITNESS:  You're asking me to interpret what it

17    says.  It's an idea of a -- it's an idea of one

18    alternative.

19    BY MR. SOLOMON:

20    Q.  Okay.  And it's fair to say he didn't take you up

21    on that suggestion; is that right?

22    A.  I believe that's the case.  Because I believe what

23    happened was that we exercised options in December 2000 and

24    then the sale program that we're talking about happened in

25    early Jan- -- sometime in January 2001.

72

1  Q.  And that program in January 2000 (sic) was along
2  the lines of this suggestion?  Is that what you're saying?
3  MS. KYROUZ:  Objection.  Misstates testimony.
4  THE WITNESS:  I don't know what you mean by along the
5  lines, but if it was -- if the flagging the issue of the
6  options expiring that need to be exercised before they
7  expire, yes, it was along the lines that the options were
8  expired, that you have to exercise them.
9  Q.  And --
10  A.  If you're asking if it was done in half a percent
11  a quarter, I think the answer would be that the message
12  that you need to exercise your options was indeed taken and
13  the options were exercised and sold.
14  If you're asking literally were they done a half a
15  percent a quarter, the facts would indicate that they were
16  not done at half a percent a quarter.
17  MR. SOLOMON:  All right.
18  I've marked as the next exhibit documents
19  produced by the defendants with the control numbers 294187
20  through 189.
21  (Exhibit 6 was marked for identification.)
22  THE WITNESS:  I wonder if I just might add regarding
23  this.  You had asked earlier if Larry had responded; and,
24  clearly, he did respond with a technical question.  That
25  was to the prior e-mail.

73

1  MR. SOLOMON:  Thank you.
2  THE WITNESS:  I just want to flag that for you.
3  MR. SOLOMON:  That's fine.
4  THE WITNESS:  Okay.
5  (Witness reviews document.)
6  Okay.  I've looked at this.
7  BY MR. SOLOMON:
8  Q.  Do you recognize these exchanges?
9  A.  They appear to be an e-mail exchange from Deb
10  Lange to a bunch of people -- Dan Cooperman, Bruce Lange,
11  Jennifer Minton, and me -- and then an e-mail that I
12  forwarded on to Larry.
13  Q.  Okay.  And it's dated 7th of April, 2000.  Do you
14  see that?
15  A.  Give me -- yes.
16  Q.  First of all, who's Deborah Lange?
17  A.  I believe Deborah Lange was the head of the tax
18  department at Oracle at the time.
19  Q.  Okay.  And do you know who B. Lange is?
20  A.  I believe that was Debra's ex-husband or current
21  husband at the time.  And I think he headed up Treasury or
22  some -- I don't know Oracle functions very well.
23  And Jennifer Minton was somebody else who
24  worked --
25  Q.  Do you know what she does?

74

1  A.  No.  In Treasury or in the CFO -- I just don't
2  know.
3  Q.  I'm looking at the bottom of the second page of
4  the exhibit, the first page of the e-mail exchanges, at the
5  e-mail from Deborah Lange.  It says in part we are working
6  proactively with Larry's accountant to figure out the best
7  time to exercise and sell for both the market and tax
8  standpoint.  Do you see that?
9  A.  Uh-huh.
10  Q.  Do you understand you're the person being referred
11  to there?
12  A.  I believe that would be the case.
13  Q.  And then it goes on to say, "One question that has
14  come up 'can Larry sell directly to Oracle?'  We need to
15  figure out if this is legal.  We assume the same
16  disclosures would be required, but the stock could not go
17  through the market.  Jen and I have not," in quotes, "'got
18  our arms around the pros and cons of this.'  There is a
19  possibility that the public could put a negative spin on
20  this even if all above board."  It goes on to the next
21  page, "Bruce Daniel thought."  Do you see that?
22  A.  Go down to the next page.
23  Yes.
24  Q.  Then it goes on to say, "Philip Simon, Larry's
25  accountant, would like a meeting on this in the next couple

75

1  of weeks because if Larry's going to exercise and sell in
2  this fiscal year, we have only a small window of time
3  left."  Do you see that?
4  A.  Uh-huh.
5  Q.  So that last bit reflects the potential for
6  selling in April of 2000.  And that would be the last
7  window of that fiscal year; is that fair?
8  A.  It's referring to the possibility of a sale in
9  that fiscal year, correct.
10  Q.  And then it mentions that you want to have a
11  meeting about the proposed sale.  Do you recall asking for
12  that meeting?
13  A.  No.
14  Q.  Do you know if the meeting occurred?
15  A.  No.
16  Q.  You don't know if it occurred or not?
17  A.  I don't know if it occurred or not.
18  Q.  What about the issue of Mr. Ellison selling
19  directly to Oracle?  Do you recall that arising?
20  A.  Now that I see the e-mail, sort of, yes.  But
21  before I saw the e-mail, no, I had no recollection of it.
22  Q.  Okay.
23  Did you have a reaction?
24  A.  I have no recollection of the issue even being
25  raised or of this e-mail until you presented it to me.

76

1   Q.  Okay.

2   A.  If you'd like me to speculate on what I might have

3   thought at the time or my frame of mind, I'm more than

4   happy to speculate for you.

5   MS. KYROUZ:  He's not --

6   MR. SOLOMON:  Go ahead.

7   MS. KYROUZ:  -- asking you to speculate.

8   THE WITNESS:  You're not asking me to speculate?

9   MR. SOLOMON:  Well, now I am, but --

10   THE WITNESS:  I expect the question --

11   MS. KYROUZ:  I would object that it calls for

12   speculation.

13   THE WITNESS:  Okay.

14   BY MR. SOLOMON:

15   Q.  Go ahead.

16   A.  My guess is if at all, if the question is I

17   believe -- I'm not certain, but I believe Oracle had a

18   share repurchase program going on at the same time.  And,

19   basically, if we were to exercise and sell, we have -- we

20   are basically selling brokers' commissions, Oracle's paying

21   brokers' commissions; and you could basically avoid paying

22   brokers' commissions on both sides of the trade.

23   Q.  Okay.

24   A.  So why waste money.

25   Q.  Great.

77

1   A.  That is what I would speculate is what the thought

2   was.  But my also speculation is that the conclusion was

3   it's better to incur the costs.

4   Q.  And why?  Why that conclusion?

5   A.  Because --

6   MS. KYROUZ:  Objection.  Lacks foundation.

7   THE WITNESS:  Okay.

8   BY MR. SOLOMON:

9   Q.  Go ahead.

10   A.  Just basically less dealing directly between

11   Oracle and Larry.  Just trade in the market so there's no

12   appearance of any self dealing.  To have -- to look -- to

13   have a proper transaction, a bona fide proper transaction

14   appear even better.

15   Q.  Okay.

16   Do you know when the share repurchase program that

17   you just mentioned was implemented?

18   A.  No, I do not.

19   Q.  And do you know who was involved in executing on

20   the share repurchase --

21   A.  No, I do not.

22   Q.  -- program?

23   And do you know the amount of shares repurchased

24   in --

25   A.  No, I do not.

78

1   Q.  -- fiscal 2001?

2   A.  No.

3   THE REPORTER:  I'm sorry, can you please wait until he

4   finishes his question.

5   THE WITNESS:  Okay.

6   THE REPORTER:  Thank you.

7   BY MR. SOLOMON:

8   Q.  And do you have any knowledge of whether the share

9   repurchase program was being executed in January of 2001?

10   A.  No.

11   Q.  You don't know either way?

12   A.  I know nothing about it.  I don't even know if

13   they had a share repurchase program going on.

14   Q.  Because you speculated?

15   A.  Correct.  You asked me to speculate.

16   Q.  So I'm looking at the top of the page now, is your

17   e-mail to Larry Ellison.  And you say in the middle

18   paragraph that you took -- I'll read it.  "I took the

19   opportunity to raise with Deb the idea that maybe Oracle

20   would want to purchase your position since you'd probably

21   want to do a simultaneous option exercise and sale at least

22   to cover your income tax liability.  Do you see that?

23   A.  Correct.

24   Q.  So that reflects your suggestion that Oracle may

25   want to enter into a direct transaction with Mr. Ellison?

79

1   A.  It evidences an idea that I must have raised on a

2   phone call with Deb Lange.

3   Q.  And also you say that you'd expect he'd want to do

4   a simultaneous option exercise and sale at least to cover

5   tax liability?

6   A.  That is indeed what the e-mail says.

7   Q.  And what would be the advantage, if any, of

8   exercising and selling some but not all of the shares?

9   MS. KYROUZ:  Objection.  Vague.

10   THE WITNESS:  You have -- when you exercise options

11   you have to pay income tax taxes at roughly a 46 or 47

12   percent on the built-in gain.  So, basically, you have to

13   have the income tax liability.  So the reason you'd want to

14   sell is so you have the cash to pay the income taxes.

15   There's mandatory withholding at the time.  So...

16   MR. SOLOMON:  All right.

17   THE WITNESS:  You need cash to pay the taxes.

18   Government wants the money right away.

19   BY MR. SOLOMON:

20   Q.  But if you thought the stock was going to

21   appreciate in value, once you've sold -- exercised and sold

22   enough to satisfy your tax liability, you could hold on to

23   the stock and sell later.  True or not?

24   MS. KYROUZ:  Objection.  Lacks foundation.  Vague.

25   THE WITNESS:  You are asking if someone exercised

80

1   stock and they thought the share price would appreciate,
2   could they profit if the share price appreciated?  The
3   answer is if stock goes up and you hold the stock, you do
4   benefit.
5        MR. SOLOMON:  Okay.
6        THE WITNESS:  But you take on risk because there's no
7   certainty in this world.  So I guess I -- I'm sorry, I
8   don't understand what you're asking me.
9   BY MR. SOLOMON:
10       Q.  Do you --
11       A.  Are you asking is it better to sell stock at a
12   high price versus a low price?  And that I agree.  I guess
13   I don't understand what you're asking me to comment on.
14       Q.  Okay.  I'm trying to get into what seems to be
15   implied in the sentence when you say "you probably want to
16   do a simultaneous option exercise and sale," and you say
17   "at least to cover your income tax liability."  Implicit in
18   that is that maybe you want to exercise and not sell.  Is
19   that implicit in what --
20       A.  Not sell at all?
21       Q.  At least not sell beyond what you need to sell to
22   cover your income tax liability.
23       A.  Okay.  So just to be clear, you're asking me to
24   speculate about my state of mind at the time, in 2000, six
25   years ago plus, when I wrote this e-mail.  Okay?  If you'd

1   like me to speculate today -- is that what you're asking
2   me?
3        Q.  Yes.  If you have to speculate because you don't
4   remember --
5        A.  Yes.  Because I have no recollection.  I speculate
6   I was trying to encourage Larry to exercise and sell the
7   entire position.
8        Q.  Okay.
9        A.  Because the advice I would give is you have to
10   cover your income tax liability and you have to raise cash
11   to pay down your debt.  And I speculate I was planting a
12   seed.
13       MR. SOLOMON:  Okay.
14       THE VIDEOGRAPHER:  Ten minutes to tape.
15       MR. SOLOMON:  I've marked as the next exhibit a
16   document produced by the defendants with the control number
17   042796 -- excuse me, 9596.
18       THE REPORTER:  Number 7.
19       (Exhibit 7 was marked for identification.)
20       THE WITNESS:  I've looked at this.
21   BY MR. SOLOMON:
22       Q.  Okay.  And you will see that this is an exchange
23   among Carolyn Balkenhol and yourself --
24       A.  Correct.
25       Q.  -- dated March 24, 2000, and April 10, 2000.

1        A.  Correct.
2        Q.  Who's Jeff Detwiler?
3        A.  Jeff Detwiler is a tax attorney.
4        Q.  Do you know what firm he's at?
5        A.  The same firm as Andrew Dudnick.  It's called
6   Dudnick, Detwiler, Rivin and Stikker.
7        Q.  And you'll see there's reference here to a
8   suggestion that Larry donate to the Stanford Scholar
9   Program.  Do you see that?
10       A.  Uh-huh.
11       Q.  Do you recall discussing or being aware of that
12   issue around this time?
13       A.  Until I saw this e-mail I had no recollection.
14       Q.  And was that -- is it the first time you've seen
15   this e-mail today?
16       A.  Correct.
17           Well, I saw the bottom half that you showed me
18   earlier, but you're talking about incremental.
19       Q.  Sure.
20       A.  I don't believe anything you've given me contains
21   this.  If I'm incorrect, please let me know.
22       Q.  Now, you say at the top "I just copied you on an
23   e-mail to Safra with a cc to Jeff Detwiler.  I also
24   discussed this briefly with Larry on the phone.  I've never
25   seen options donated, but it doesn't mean it can't be

1   done."  Is that right?
2        A.  That's what it says.
3        Q.  Do you recall having that conversation you refer
4   to with Larry on the phone?
5        A.  No, I do not.
6        Q.  And it's fair to say it would be one of very few
7   phone conversations you ever had with him?
8        A.  Depends what you mean very few, but yes.
9        Q.  And do you know whether the options were donated
10   or not?
11       A.  I do not believe they were donated.  I do not
12   believe you can donate them.  I alluded to that earlier
13   when you asked about alternatives.  I don't believe it can
14   be done from a tax perspective.
15       MR. SOLOMON:  Okay.
16           I've marked as the next exhibit a document
17   produced by Oracle with the control numbers 042801 and 802.
18       (Exhibit 8 was marked for identification.)
19       THE WITNESS:  Okay.
20   BY MR. SOLOMON:
21       Q.  Okay.  Do you recognize these exchanges?
22       A.  They appear to be e-mail exchanges that I was
23   involved in.
24       Q.  Okay.  They're dated April 12th of 2000.  And
25   you'll see at the bottom there's a reference "Dan Cooperman

1  wrote," and you go to the next page and you'll see that
2  it's redacted.  Do you see that?
3      A.  Correct.
4      Q.  Do you know what was communicated on that page?
5      A.  I don't have a clue.
6      Q.  You never saw it?  As far as you know?
7      A.  I'm not going to say that because I don't know
8  what I've seen.
9      Q.  Okay.
10     A.  And if I was copied on the e-mail chain, I would
11  assume it was sent on to me.  So I would -- I think the
12  logical assumption is that something I was -- whatever was
13  redacted at that time was probably forwarded on to me.
14     Q.  Okay.  You have no idea what it was?
15     A.  No.
16     Q.  Okay.  Can you just check, please, Mr. Simon, and
17  make sure that's a three-page exhibit that I just gave you.
18     A.  Yes.  Two redacted pages.
19     Q.  Okay.  I may have missed a page when I identified
20  it.  The range is 042801 to 803.  And on 802 and 803
21  there's no information there, it's been redacted.
22     A.  Correct.
23     MR. SOLOMON:  We'll go off the record because you need
24  to change your tape.
25     THE VIDEOGRAPHER:  This marks the end of Tape 1,

85

1  Volume I, in the deposition of Philip B. Simon at 11:09.
2  Going off the record.
3      (Recess taken.)
4      THE VIDEOGRAPHER:  On record at 11:14.  This marks the
5  beginning of Tape 2, Volume I, in the deposition of Philip
6  Simon.
7      MR. SOLOMON:  We'll have marked as the next exhibit a
8  document produced by the defendants with the control number
9  042804.
10     (Exhibit 9 was marked for identification.)
11     BY MR. SOLOMON:
12     Q.  This is an e-mail dated 6/5/2000 from Philip Simon
13  to Larry Ellison, copying Carolyn Balkenhol.
14     A.  Uh-huh.
15         I'm ready.
16     Q.  Okay.  Do you recognize this?
17     A.  It appears to be an e-mail that I sent to Larry,
18  with a cc to Carolyn.
19     A.  Okay.  And it starts off, it says, "Dear, Larry, I
20  checked my file and reconfirmed that the 11,523,500
21  options' strike price 0.4507 per share expire on August 1,
22  2001, 14 months from now, not in two months."  Do you see
23  that?
24     A.  Correct.
25     Q.  So until then had you been laboring under the

86

1  assumption that the option expiration date for those
2  particular options was in August 2000?
3      A.  I don't believe -- I don't recall.
4      Q.  Okay.
5      A.  I don't believe so.
6      Q.  Do you remember why you wrote this?  Saying
7  "14 months from now, not in two months"?
8      A.  Probably to clarify.
9      Q.  Okay.  But you don't remember whether there was a
10  question as to whether it was that year or the following
11  year?
12     MS. KYROUZ:  Objection.  Vague.
13     THE WITNESS:  I don't recall, but I think I was
14  clarifying when they expired so intelligent planning could
15  be done.
16     MR. SOLOMON:  Okay.
17     Q.  You then, in the next paragraph, tell him -- tell
18  Mr. Ellison how many shares he controls.  Do you know why
19  you were telling him that?
20     A.  When I present data to people to help enable them
21  to make a -- make an intelligent decision, I try to provide
22  all relevant facts so the data is encapsulated.
23     Q.  And do you know -- you were aware at this stage
24  that how many shares Mr. Ellison controlled was very
25  important to him?  Is that fair?

87

1      MS. KYROUZ:  Objection.  Lacks foundation.
2      THE WITNESS:  I have no recollection.  I think it was
3  important to him to know how many -- I think it's important
4  to anybody to know, when you're contemplating a sale or an
5  option exercise, to know what percentage of your holdings
6  they are.  So I think data is relevant.
7      BY MR. SOLOMON:
8      Q.  Okay.  In the next paragraph you actually talk
9  about a way in which the options could be extended.  Do you
10  see that?
11     A.  I see the paragraph.  I don't agree with your
12  conclusion.
13     Q.  Oh, I see.
14         Okay.  Well, let's use your language or read your
15  language.  You say, "also, as discussed, Morgan Stanley put
16  together a proposal for me" and then in parentheses "(which
17  I'm having them to refine to show you) whereby you can in
18  effect extend the option out for a number of years."  Do
19  you see that?
20     A.  Correct.
21     Q.  So that's not you providing or talking about a
22  proposal to, in effect, extend the option?
23     A.  Okay.  I'm sorry to be difficult with you, but the
24  option has a fixed expiration date.  This is a proposal
25  whereby you can extend your economic interest in the

88

Simon, Phillip  9/6/2006  1:30:00 PM

1  company via synthetic derivative, but the option has
2  expired.  So I was just trying to be precise.  You are not
3  modifying the terms of the option agreement between a
4  person, as an employee of Oracle, and Oracle Corporation;
5  rather, you are entering into a derivative transaction
6  which Morgan Stanley asserts -- not necessarily true --
7  could potentially extend your economic interest through a
8  synthetic contract.
9      Q.   This suggestion or proposal was not taken up; is
10  that true?
11      A.   That's my recollection, yes.
12      Q.   Have you ever engaged in a transaction along the
13  lines of the transaction described here?
14      A.   Are you asking me about me personally?
15      Q.   You on behalf of any of your clients.
16      A.   I have never done that.  I do not like synthetic
17  derivatives.  I view them as products marketed by the
18  brokerage houses that are opaque and confusing,
19  specifically to drive up spreads for the brokerage houses
20  to make a lot of money.  So I avoid them.
21          However, I feel it's my responsibility to be aware
22  of what's being sold in the marketplace if per chance
23  there's a nugget of gold amidst all of what I consider the
24  dregs being sold.
25      Q.   Do you know whether you were asked to approach

89

1  Morgan Stanley to discuss the proposal that's proposed
2  here?
3      A.   I have no specific recollection, but I suspect
4  not.  My --
5      Q.   So you suspect you did it of your own initiative?
6      A.   I -- I suspect strongly it was not my initiative.
7  It was Morgan Stanley's initiative, as well as everybody
8  else contacting me.
9      Q.   Okay.
10      A.   They're selling product.
11      Q.   Okay.
12          And do you know how Morgan Stanley got involved in
13  the issue of what Mr. Ellison could do with his expiring
14  stock options?
15      A.   Every brokerage house has information, and the
16  high grossing brokers go through the listing of executives
17  who hold shares, who are wealthy, and as -- I don't call
18  them targets, but I guess prospects must be the proper
19  terminology.  And they prospect and they go through the
20  Rolodex and they do "Dialing for Dollars" as salesmen.
21      Q.   Now --
22      A.   And this is -- as you know, Larry's holdings are
23  for the public record so that's how they'd know that.
24      Q.   So is it your belief this was sort of a
25  unsolicited almost cold call you were getting from Morgan

90

1  Stanley?
2      A.   Yeah.  I have a relationship with people at Morgan
3  Stanley.  I have a relationship with -- for Larry with
4  almost -- with people at almost every securities firm.  And
5  my job was to manage relationships and basically to block
6  them and be the target to take all the calls.
7      Q.   You don't -- tell me if I'm wrong.  You don't tell
8  Mr. Ellison about every single proposal you get from a
9  brokerage house with respect to his investments, do you?
10      A.   I try to make Larry aware of ideas out there so I
11  feel he is fully informed and has the data to make
12  sensible, fully informed decisions, and so I act as a
13  filter.  And if ten people approach me with the same idea,
14  I will only mention it once so he knows what exists out
15  there in the marketplace.
16      Q.   Okay.  Now, you say that you're having them refine
17  the proposal for you.  Do you see that?
18      A.   Uh-huh.
19      Q.   Did they refine the proposal?
20      A.   I have no recollection.
21      Q.   And when you searched for documents, do you recall
22  ever coming across the Morgan -- any Morgan Stanley
23  proposal along these lines?
24      A.   I have no recollection.
25          And just to reiterate, I have a bias against these

91

1  and consider them all junk.  And I --
2      Q.   The security, you mean?
3      A.   What?
4      Q.   You say -- when you're saying junk.
5      A.   I'm referring to marketing proposals by firms --
6      Q.   Got you.
7      A.   -- trying to sell you synthetic products.
8      Q.   Got you.
9          But with respect to this, you did go back to them
10  and ask them to refine it and get you something that you
11  could show Mr. Ellison; isn't that true?
12      A.   I can only tell you what this e-mail says.  I have
13  no recollection about meeting with Morgan Stanley or any of
14  the events that you're talking about.  So if you'd like, we
15  could reread the e-mail to clarify what this e-mail says.
16      Q.   Well, I'm taking from the language in parens,
17  where you say "which I'm having them refine to show you,"
18  I'm assuming that means you're having Morgan Stanley refine
19  the proposal to show Mr. Ellison.
20      A.   It says that -- the e-mail states -- if it's
21  correct, and I have no reason to believe it's not
22  correct -- that I asked Morgan Stanley to refine a
23  proposal.  I don't know if I ever received it, I don't know
24  if I ever showed it to Larry.  My best guess is I probably
25  did not because I probably rejected it as not worthy of

92

1       consideration.

2          Q.  If -- if Mr. --

3          A.  I don't know.  And you may have something in your

4       records which would shed some light on this.

5          Q.  If Mr. Ellison was of the view that Oracle's

6       future was fantastic and the stock was going to continue to

7       increase, would this not be an attractive proposal for him?

8          A.  No.  Definitely not.  You're opera-- you're

9       making a fallacious assumption.  You assume that when you

10      sell something you want to sell it at the top, you want the

11      stock to go down.  The answer is you try to sell at a

12      reasonable position and you want the market to go up.  You

13      hold additional holdings.  So, I mean, it's a silly

14      paradigm.  I mean, you're saying -- if you're asking me

15      does everybody want to sell for a higher price than a lower

16      prior price, the answer is yes.

17              If you're asking me is it a sensible decision, if

18      you're optimistic about a stock, to continue holding

19      100 percent of your assets, or actually 110 percent if

20      you're leveraged, in a single stock, even if you think it's

21      going to appreciate, the answer is absolutely not.

22      Categorically not.  It's not sensible, good investment

23      advice.  You should diversify your portfolio because even

24      if you have confidence, you don't know what the world will

25      hold.  Even if you have confidence in your own company, you

93

1          could be wrong.  There are exogenous world events.  We live

2       in a world -- a very dynamic world with cata- -- with

3       events going on all the time.  So what you're doing is

4       you're trying to manage risk.  So no.  You sell even when

5       you expect the stock to go up because that's prudence.

6          Q.  Right.  But isn't it true in 2000 you were

7       frustrated because Mr. Ellison wouldn't sell?

8          A.  I have no recollection other than what the e-mails

9       say.  And I would reiterate I'm a very conservative person.

10         Q.  And you were aware in June that Mr. Ellison was

11      particularly concerned that he not lose his percentage

12      stake in Oracle; isn't that true?

13         MS. KYROUZ:  Objection.  Misstates the evidence in

14      prior testimony.

15         THE WITNESS:  I have no recollection.  We could look

16      at some e-mails that might come through that might shed

17      some light on that, but I have no recollection.

18      BY MR. SOLOMON:

19         Q.  But -- so the next paragraph, so it's the

20      penultimate paragraph, it says, "in one example with a

21      five-year maturity date from date you enter into the

22      contract, you can cash out 56.5 percent of the value of the

23      underlying shares, be protected against a more than a

24      20 percent Oracle share decline, and retain the first 150

25      percent of appreciation."  Do you see that?

94

1          A.  Correct.

2          Q.  Doesn't that appear to be an attractive

3       proposition that you communicated?

4          A.  No.  I don't find -- to restate, I do not find

5       derivative transactions attractive.  I find them as

6       proposals that brokers sell to extract the largest amount

7       of money for the broker.  And I think in -- I always

8       recommend not doing derivative transactions to my clients.

9          Q.  And they're not worth considering; is that right?

10         A.  I think a client should know about them because I

11      have a responsibility or fiduciary duty.  If I was handling

12      your affairs, I would want you to know about what I'm

13      rejecting because it's in the paper but have you know that

14      I'm rejecting it.

15         Q.  And then your final line is that -- it reads, "I'm

16      not sure it's worth fussing with prepaid forwards since

17      11,523,500 expiring options represent less than 2 percent

18      of your Oracle holdings.  But it's something worth

19      considering."  Do you see that?

20         A.  Correct.

21         Q.  So at least as of the date of this e-mail, you

22      were telling Mr. Ellison that it was something that was

23      worthy of his consideration.

24         MS. KYROUZ:  Objection.  The document speaks for

25      itself.

95

1          THE WITNESS:  My interpretation of what I say is

2       consistent with my responsibility to raise alternatives or

3       thoughts or ideas presented to me, as a filter, to bring

4       them up to Larry's attention.  And my wording may say

5       something, but no.  Because I have to be -- I have my own

6       opinions on things, but I want to raise the issues.  But I

7       reject derivatives.

8          MR. SOLOMON:  Okay.  I'll have marked as the next

9       exhibit a couple of pages produced by Oracle and the

10      defendants with the Bates -- or control numbers 294192 and

11      193.

12         (Exhibit 10 was marked for identification.)

13         THE WITNESS:  Yes, I've reviewed it.

14      BY MR. SOLOMON:

15         Q.  And do you recognize the second page of the

16      document?

17         A.  It appears to be a schedule I prepared, and it

18      appears to be my handwriting.

19         Q.  Okay.

20             And the date at the top against loan balances that

21      reads 7/14/2000?

22         A.  Correct.

23         Q.  Do you believe that this document was created and

24      your notations were made around that date?

25         A.  That would be what my notations appear to

96

1    indicate.

2        Q.  Okay.  And in the bubble at the top it says

3    "presented to Larry 7/18/00."  Do you see that?

4        A.  My copy looks like 13, but that doesn't make sense

5    because it was prepared on the 14th.  So maybe it is 18.  I

6    can't read the copy.

7        Q.  It's not clear, actually, my copy could say the

8    13th.

9        A.  But it doesn't make sense.  Because if it is dated

10   on the 14th, it was probably on the 18th would be my guess.

11   But on or around --

12       Q.  Right.

13       A.  -- the middle of July of 2000 would be a

14   reasonable conclusion.

15       Q.  Yep.  The bubble on the middle on the right-hand

16   side, can you read to me what that says?  It looks like it

17   says 7 -- that looks like 7/12.

18       A.  It doesn't make sense.  It does look like 7/12.

19   That appears to be my handwriting.

20       Q.  What does it say?

21       A.  It seems to say "per Larry we will sell Oracle to

22   raise cash for these expenditures."

23       Q.  Okay.  And then the expenditures are then listed.

24   Can you just read them into the record for me, please.

25       A.  1, lifestyle annual, 20 million; 2, interest

97

1    accrual annual, 75 million; 3, Villa in Japan, 25 million;

2    4, new yacht, 194 million over three years; 5, America's

3    cup, 80 million over three years.  6, UAD 12 million over

4    three years.

5        Q.  So it appears that as of the middle of July '00

6    Mr. Ellison was telling you that he would sell Oracle stock

7    to defray those expenditures?  Is that right?

8        MS. KYROUZ:  Objection.  Misstates testimony.

9        THE WITNESS:  Will you restate -- I'm sorry.  Can you

10   restate the question.

11       MR. SOLOMON:  Do you mind reading that back, please.

12       (Record was read by the reporter.)

13       THE WITNESS:  What I can say is my note indicates from

14   communication with Larry that the plan would be to sell

15   Oracle shares to raise cash for these expenditures.

16       BY MR. SOLOMON:

17       Q.  Was it your understanding that he was referring to

18   exercising the options and selling the August '01 expiring

19   options and selling?

20       A.  I have no recollection.

21       Q.  Now, if this is middle of July '00, when was the

22   next window in which Mr. Ellison could trade?

23       MS. KYROUZ:  Objection.  Lacks foundation.

24       THE WITNESS:  August would generally be closed, so

25   you'd be talking about when earnings are announced for the

98

1    August quarter, which would be in September.  So I would

2    say sometime September, October time frame.  And then,

3    again, that would be the first one.  And the next window

4    would be -- December, January time frame would be the

5    second window after this discussion.

6        MR. SOLOMON:  Okay.

7        Q.  And still in this exhibit, almost halfway down the

8    page it says "available at 7/14/00."  Then there's a figure

9    of 327 million, 967 thousand, and some change, right?

10       A.  Correct.

11       Q.  Is that the available credit Mr. Ellison had at

12   that stage?

13       A.  Interpreting this schedule, it would seem to

14   indicate to me that I'm saying the entire credit line -- if

15   you see the limit line, there's a billion, 350 million; the

16   amount drawn was a million -- I'm sorry, a billion,

17   22 million; and the delta, which is the difference, is the

18   undrawn amount on the line of 327 million and change as of

19   that date.

20       Q.  Okay.  And then if you could just read for me the

21   writing, the handwriting below the principal.

22       A.  It says, "also nCUBE - Chase 44.0 million,

23   38.5 million drawn."

24       Q.  And that's in addition to the banks listed at the

25   top; is that right?

99

1        A.  Correct.  This is another loan from Chase

2    guaranteed by Larry.

3        Q.  Okay.

4        So did there come a time, then, approaching the

5    window in September and October when you made any effort to

6    persuade Mr. Ellison to exercise the expiring options and

7    sell?

8        A.  I have no recollection.

9        Q.  Do you know whether in the September, October

10   window Mr. Ellison exercised any options?

11       A.  I do not believe, but I think it's best that we go

12   through the e-mails and the data; and that would tell for

13   sure, for certain.  But I do not believe so.  But I just

14   don't recall.

15       Q.  Okay.  Do you -- were you tracking Oracle's stock

16   price throughout the year 2000?

17       A.  What do you mean by tracking?

18       Q.  Were you making yourself regularly aware of the

19   performance of Oracle's stock during calendar 2000?

20       A.  I think I mentioned to you that I have a Yahoo!

21   home page that -- where I list stocks of interest to me,

22   and Oracle's stock price is listed there.  So when I

23   periodically go look at my personal stock, the Oracle share

24   price will pop up.

25       Q.  Okay.

100

Simon, Phillip  9/6/2006  1:30:00 PM

1    A.  But I don't -- I don't plot and pay attention to
2    Oracle share prices.
3        Q.  And do you have any recollection of the trends in
4    Oracle's share price in that year?
5        A.  No, I do not.
6        MR. SOLOMON:  Okay.  We'll have marked as the next
7    exhibit an e-mail produced by defendants with control
8    number 294195.  Excuse me.  To complete the exhibit is
9    294194 and 195.
10       (Exhibit 11 was marked for identification.)
11       MR. SOLOMON:  Let me know if you've seen any of --
12       THE WITNESS:  I haven't seen it.  I'm just finishing
13   reading.
14       MR. SOLOMON:  Sure.
15       THE WITNESS:  I'm sorry, I'm trying to understand the
16   tax issue.
17       Okay.  I generally understand the tax issue.
18       BY MR. SOLOMON:
19       Q.  Okay.  Do you recognize these exchanges?
20       A.  They appear to me to be e-mail exchanges between
21   Deborah Lange and Catherine Ong in my office.  And I've
22   never heard of Chris Fisher until now.  I may have, but I
23   have no recollection of who Chris Fisher is.
24       Q.  Do you expect you would have seen this exchange
25   around the 10th of October, 2000?

101

1    A.  Maybe.  Maybe not.
2        Q.  Okay.
3        A.  But Catherine works for me.  So she might have
4    shared it with me, or she might have just did this just on
5    top of things she's managing with the Oracle Tax
6    Department.
7        Q.  Okay.  Starting at the bottom, it reads,
8    "Catherine, does Larry have any plan for exercising options
9    for 2000 and 2001?  Deb Lange is going to call to discuss
10   this issue.  It makes a significant difference in our
11   corporate tax planning, mostly related to utilization of
12   foreign tax credits."  By planning and timing -- excuse me.
13   "By planning the timing of triggering foreign source income
14   before or after May 31 we can make the best use of/try not
15   to lose the foreign tax credits."  Do you see that?
16       A.  Correct.
17       Q.  That's the tax issue you're trying to get your
18   head around?
19       A.  Uh-huh.
20       Q.  And then Catherine -- Catherine's reply reads,
21   "I'm glad you asked because Larry has an absolute ton of
22   options that will expire 8/1/01.  Given the amount of the
23   options and (I'm talking about hundreds of millions of
24   taxable income), we may have him exercise some by
25   December 2000 and the remainder in August of 2001, but that

102

1    will depend on our year-end tax planning after review of
2    2000 transactions.  It will also, of course, depend on
3    Oracle's stock price and Larry's mood."  Do you see that?
4        A.  Correct.
5        Q.  Do you have an understanding why Ms. Ong was
6    talking about Mr. Ellison exercising some in December of
7    2000 and the remainder in August of 2001?
8        A.  Yes.
9        Q.  Okay.  What's your understanding?
10       A.  As we discussed previously, we adopted as standard
11   operating procedure to exercise stock options in December
12   every year to trigger income.  Taxable income when we
13   needed it to do tax optimization on Larry's individual
14   income tax return.
15       Q.  Okay.
16       Then, if you look at the first message -- I'm
17   sorry, the message at the top.  It says in part,
18   "Catherine, it may be to Oracle's benefit if he exercises
19   more before May 31, 2001, versus after May 31, which could
20   put Oracle U.S. into a taxable loss that we could carry
21   back or at least lump most of the deduction into one fiscal
22   year."  Do you see that?
23       A.  Correct.
24       Q.  Did you -- were you aware of this issue, the
25   May 31 before and after issue, in October of 2000?

103

1    A.  I have no recollection.
2        Q.  Okay.  What is your understanding of the tax
3    issue?
4        A.  I am trying to interpret this e-mail because I
5    have no recollection of the event.  My understanding is the
6    following:  For income tax purposes when an employee
7    exercises his stock option, the built-in gain is treated as
8    compensation income and taxable as ordinary income to the
9    employee.  There is an offsetting corporate income tax
10   deduction in the like amount.  So my understanding of this
11   e-mail, the tax issue is that since this is a large stock
12   option with a meaningful amount of built-in gain -- six,
13   seven hundred million of built-in gain -- Oracle, just like
14   we're trying to do tax optimization on Larry's individual
15   1040, Oracle is trying to do their tax optimization on
16   their federal Form 1120.  And I interpret this as an e-mail
17   between the tax technicians at Oracle trying to do
18   tax-sensible planning and strategizing for their Form 1120
19   utilizing both foreign tax credits and net operating losses
20   and foreign source income.
21       Q.  Did the -- did those efforts factor into the
22   advice that you were giving Mr. Ellison as to how to --
23       A.  I don't recall.
24       Q.  -- transact?
25       A.  I don't recall.

104

1   Q.  Do you -- okay.

2       Have marked as the next exhibit e-mail exchanges

3   produced by the defendants with the control numbers 294196

4   and 197.

5       (Exhibit 12 was marked for identification.)

6   THE WITNESS:  Okay.

7   BY MR. SOLOMON:

8   Q.  Okay.  These are e-mail exchanges dated 10/17/2000

9   among Andrew Dudrick --

10  A.  "Dudnick."

11  Q.  "Dudnick," thank you.

12      -- (continuing) Philip Simon --

13  A.  Correct.

14  Q.  -- and Carolyn Balkenhol and Mary Joe Lloyd.

15  A.  Right.

16  Q.  Who is Mary Joe Lloyd?

17  A.  Mary Joe Lloyd works for me also.  Catherine Ong

18  is -- did but now manages tax compliance for me.  Mary Joe

19  Lloyd is our personal controller, handling all of our

20  personal disbursements.

21  Q.  Okay.

22      At the top of the page it reads in part, "Thanks.

23  I'm getting a bit worried about available cash.  Interest

24  and lifestyle spending is accruing at about 8.5 million per

25  month.  Then we have the following commitments," and then

105

1   there are 10 commitments.  Do you see that?

2   A.  Correct.

3   Q.  And according to this, the first is RK Planet, and

4   there's a dollar amount of 2.5 million indicated.  The

5   second is NICC with 4.5 million indicated.  Do you know

6   what NICC stands for?

7   A.  It's the name of a company.  I think it stood for

8   New Internet Computer Company.

9   Q.  And was this a company being financed by

10  Mr. Ellison?

11  A.  In part.

12  MS. KYROUZ:  Objection.  Vague.

13  THE WITNESS:  Yes.

14  BY MR. SOLOMON:

15  Q.  And what was the function of that company?

16  A.  I believe it was trying to design, before computer

17  prices had come down, Internet computers.  Selling in lieu

18  of, let's say, a Dell laptop before laptops were -- a

19  different device to hook up to the Internet, just to use to

20  hook up to the Internet.

21  Q.  The third is Net Ledger, 10 million.  That's

22  another company?

23  A.  Correct.

24  Q.  The next is nCUBE.  Which is another company,

25  correct?

106

1   A.  Correct.

2   Q.  And there's a -- it says no details yet but

3   suspect we'll need $10 million for the next three months?

4   A.  Correct.

5   Q.  And then No. 5 is Oracle Racing.  That's the

6   America's Cup team; is that right?

7   A.  Correct.

8   Q.  And that's 10 to 15 million over next six months.

9       And the next is new yacht, No. 6.  And it says

10  80 million over three years.  Say 20 million funded to

11  date, not sure when next installment is due.  Do you see

12  that?

13  A.  I do see it.

14  Q.  Then there's a reference to 7 million for a refit

15  of another boat; is that right?

16  A.  Correct.

17  Q.  Then No. 8 is EMF geared up funding, say

18  20 billion over the next year.  What is EMF?

19  A.  Ellison Medical Foundation.

20  Q.  And then "Woodside project" with a number of

21  question marks.  That's Mr. Ellison's home?

22  A.  His current home, yes.

23  Q.  And then, No. 10, the fruit company.  Possibly

24  $100 million.  Do you see that?

25  A.  Correct.

107

1   Q.  What is the fruit company?

2   A.  I think that was a reference to Apple Computer.

3   Q.  Okay.  And that was a reference to purchasing

4   Apple stock?

5   A.  I think there was discussion at one point in time

6   that Larry would acquire Apple Computer before Steve Jobs

7   went back.

8   Q.  So, in other words, you're saying this was part of

9   a takeover strategy?

10  A.  Potentially, yes.

11  Q.  So at --

12  A.  Or maybe -- actually, I don't know if it was a

13  takeover or to buy a position in Apple.  I just don't

14  recall.

15  Q.  Okay.

16      And just back to the top, you said that you were

17  getting worried about available cash.  Do you remember

18  being worried in October of 2000 --

19  A.  I don't recall being worried.

20  Q.  Okay.  But you're not denying you wrote that you

21  were worried?

22  A.  No.  You're asking me if I recall.

23      I just want to clarify I'm usually worried about

24  what can go wrong.

25  Q.  Okay.

108

1  This is dated 10/17/2000.  Was that date during an
2  open window period in which Mr. Ellison could have
3  transacted?
4  MS. KYROUZ:  Objection.  Lacks foundation.
5  THE WITNESS:  I believe the quarter ends
6  November 30th, so October 17th would be in the second month
7  of the quarter.  But once again, I do not know if the
8  window was actually open; but it was during a period when
9  the window would be open absent special events.
10  MR. SOLOMON:  Okay.
11  Okay.  Let's take a five-minute break.
12  THE VIDEOGRAPHER:  Off record at 11:51.
13  (Recess taken.)
14  THE VIDEOGRAPHER:  On record at 12:03.
15  MR. SOLOMON:  We'll have marked as the next exhibit a
16  document produced by Oracle with the control numbers 145744
17  and 745.
18  (Exhibit 13 was marked for identification.)
19  THE WITNESS:  I've reviewed this.
20  BY MR. SOLOMON:
21  Q.  Okay.  Do you recognize these exchanges?
22  A.  It appears to be e-mail exchanges between
23  Carolyn -- internal e-mail exchanges between Carolyn
24  Balkenhol and other people at Oracle, and then the trail
25  was then forwarded on to me.

109

1  Q.  And the options that are referred to here, the
2  transactions that are referred to, these are the end of
3  year tax planning transactions that you've testified about
4  earlier?
5  A.  That would appear to be the case, yes.
6  Q.  And as of this stage, Mr. Ellison had still not
7  exercised any of the options that were due to expire in
8  August of '01; is that right?
9  MS. KYROUZ:  Objection.  Vague.
10  THE WITNESS:  I don't know if that's the case because,
11  as you recall, I previously stated that I believe there
12  were also some tax planning option exercises in
13  December '99 and December '98.  I do not know what tranche
14  of options those came from.  They could have come from the
15  same tranche, I do not recall.  You'll have data that will
16  be able to determine that.
17  BY MR. SOLOMON:
18  Q.  Did you ever ask Mr. Ellison why he didn't
19  exercise and sell shares in the September, October 2000
20  window?
21  A.  I have no recollection.
22  Q.  Do you have a recollection of ever discussing that
23  with anybody?
24  A.  I have no recollection of discussions.  This is
25  what, six years ago?  I just don't recall.

110

1  Q.  Do you have any understanding why he didn't?
2  A.  No.  I have no recollection.
3  MR. SOLOMON:  We'll have marked as the next exhibit
4  documents produced by the defendants with control numbers
5  294198 to 200.
6  (Exhibit 14 was marked for identification.)
7  BY MR. SOLOMON:
8  Q.  Do you recognize this?
9  A.  No.  But it appears to be an e-mail communication
10  between me and Carolyn.
11  Q.  Okay.
12  It's dated 12/18/2000.
13  A.  Correct.
14  Q.  And there's an e-mail from you to Carolyn
15  Balkenhol, correct?
16  A.  That's what it appears to be, yes.
17  Q.  And you reference in the first paragraph a loss of
18  $20 million.  Do you see that?
19  A.  I do see that.
20  Q.  And we just looked at the last exhibit, which
21  refers to the sales and exercise of an amount of
22  20 million.  Is that the offset?
23  A.  Correct.
24  Q.  Then you say further down, "Note:  You should
25  probably give Larry a heads up, get whatever signatures you

111

1  need ready; though I suspect you can sign on internal
2  Oracle stuff.  But if you do tell Larry about this, let him
3  know this is really a nonevent.  We are just exercising
4  options that would otherwise have to be exercised by next
5  August.  The exercised shares will not be sold."
6  Is that right?  Did I read that right?
7  A.  It appears you read it right.
8  Q.  And you go on to say "so he retains the same
9  economic ownership interest in Oracle, essentially just
10  taking the opportunity to exercise $20 million of options
11  with no or very little income taxation."  Do you see that?
12  A.  I do see that.
13  Q.  So, again, you felt it necessary to emphasize that
14  he retain the same economic interest in Oracle?
15  MS. KYROUZ:  Objection.  Misstates the document.
16  THE WITNESS:  What -- I'm not certain what you want --
17  what the question is.  I'm sorry.
18  BY MR. SOLOMON:
19  Q.  Okay.  You've noted again --
20  A.  Uh-huh.
21  Q.  -- that he would maintain the same economic
22  ownership.  Is that in response to an abiding concern that
23  he had that he not reduce his economic stake in Oracle?
24  A.  No.  That's actually in response to my sense of my
25  authority.  And I feel free to take actions for Larry that

112

1   reduce costs or increase income and that have no other
2   impact on him.  So, therefore, I'm saying this is a
3   nonevent that does not in fact -- early on say don't even
4   bother telling Larry.  I'm letting Carolyn know this is
5   within my sense of my preexisting authority.
6        Q.   Okay.
7        A.   That's what I'm trying to make clear.
8        Q.   All right.  I hear you.
9             Now, you went away on vacation to New Zealand
10  around this time; is that right?
11       A.   Apparently.  I did not know that until -- I know I
12  went to New Zealand, but I did not know it was around this
13  time until we had -- I met with Michele and Andrew
14  yesterday for around two hours, and they told me I went to
15  New Zealand during this period.
16       MS. KYROUZ:  You should not reveal what we talked
17  about.
18       THE WITNESS:  Oh, I'm sorry.
19       MS. KYROUZ:  You can say you looked at documents --
20       THE WITNESS:  I'm not sure.
21       MS. KYROUZ:  -- and concluded that.
22       THE WITNESS:  Well, I didn't see the documents.  But
23  it appears I went to New Zealand during this period of
24  time.
25            And I did not know -- and I know I gave testimony

113

1   in a prior deposition closer to the time when the events
2   that we're discussing occurred; and I also had to meet with
3   the Special Litigation Committee.  And I would just say
4   that what I said then is closer to the facts and more
5   likely to be accurate.  And apparently at that point in
6   time I said I went to New Zealand.
7             I know I was in New Zealand.  I will tell you
8   that.
9   BY MR. SOLOMON:
10       Q.   Did you look at the interview memorandum prepared
11  by the Special Litigation Committee yesterday?
12       A.   I skimmed it.
13       Q.   Are there -- we can take a look at it later
14  perhaps; but just as you sit here now, is there anything
15  that is recorded inaccurately?
16       A.   Yeah.
17            Not materially, but yes.
18       Q.   Do you know what is inaccurate?
19       A.   No.  We'd have to go line by line.
20       Q.   Okay.
21       A.   I mean, basically, it's -- it looks like someone
22  took notes and then summarized the notes.  And sometimes
23  when someone summarizes their notes, shading, coloring,
24  wording, adjectives are not exactly -- they don't --
25  actually, it may be right; but what I'm saying is based on

114

1   today, it appears that some things are slightly incorrect
2   factually, but they usually are not material.
3        Q.   At the moment --
4        A.   But not always.
5        Q.   -- you don't know of a material error?
6        A.   I don't -- I'm not aware of any material error,
7   and I would have to go through it.  I only skimmed it
8   briefly, for, like, five minutes; but I noticed, like, some
9   dates were wrong and so on.
10       MR. SOLOMON:  So I've marked as the next exhibit a
11  document produced by the defendants with the control
12  numbers 042809 to 8010 -- sorry, to 810.
13       (Exhibit 15 was marked for identification.)
14       THE WITNESS:  I've reviewed this.
15  BY MR. SOLOMON:
16       Q.   Okay.  Do you recognize this exchange?
17       A.   I don't recall it, but it appears to be an e-mail
18  exchange between Carolyn Balkenhol and Barbara Wallace
19  which was forwarded on to me.  And I replied to Carolyn and
20  copied Catherine Ong in my office.
21       Q.   Were you e-mailing from New Zealand?  Or does this
22  mean you would have been in the U.S. as of this date?
23       A.   I did not have remote e-mail capacity.  I was in
24  the U.S. at this date.  And I normally would not -- I was
25  here.

115

1        Q.   And it references -- it's dated 12/18/2000 and it
2   references the quiet period ending, correct?
3        A.   Uh-huh.
4        Q.   And you say at the top of the page "Catherine, the
5   quiet period ended today.  Larry's free to exercise options
6   whenever we're ready to do so."  Do you see that?
7        A.   Yes, I do see it.
8        Q.   Did you have Mr. Ellison's commitment then that he
9   was going to sell stock in the -- exercise and sell stock
10  in the next trading window?
11       A.   I believe this was referring to the end of the
12  year tax planning, the 60,000 options -- or 660,000 that we
13  saw in the prior e-mail.
14       Q.   The $20 million?
15       A.   Again, this was pure -- I'm almost certain this
16  was pure Catherine was handling this.  I'm just delegating
17  to trigger the income.
18       MR. SOLOMON:  Good.
19            I'm going to mark as the next exhibit a document
20  produced by the defendants with a control number 409678.
21       (Exhibit 16 was marked for identification.)
22       THE WITNESS:  I've looked at this.
23  BY MR. SOLOMON:
24       Q.   Okay.  Do you recognize this exchange?
25            I note that you're not -- you don't seem to appear

116

Simon, Phillip  9/6/2006  1:30:00 PM

1    on it.
2        A.  No.  It looks like an e-mail exchange, internal
3    e-mail exchange, dealing with clearance to trade in Oracle
4    securities.
5        Q.  Okay.  I'm interested in the bottom portion of the
6    document where it says "Jeff and Dan."  "Larry's accountant
7    just called me to ask for approval for Larry to exercise
8    and hold an option to purchase about 850,000 shares of
9    stock next week before year end.  Please confirm that he
10   can do so."  Did you see that?
11       A.  Yes, I do.
12       Q.  Do you recall asking for their approval for that
13   transaction?
14       A.  No.
15       Q.  Okay.  You don't dispute that you did, but you
16   just don't recall --
17       A.  Right.
18       Q.  -- is that correct?
19       A.  And I believe this is the same December
20   transaction.  We were trying to trigger 20 million of
21   income.
22       Q.  Then "FYI he's also planning to donate about
23   $9.5 million in Oracle stock to his foundation in January."
24   Do you see that?
25       A.  Yes, I do.

117

1        Q.  Do you know if that actually happened?  Did he
2    make that donation?
3        A.  I believe we saw an e-mail earlier today that
4    would evidence that, that we already discussed about
5    transfers to Ellison Medical Foundation; but I don't -- I'd
6    have to go through these files, but I'm sure he had
7    something later on.  I suspect it happened.
8        MS. KYROUZ:  Just to clarify, I don't think the
9    document has been referenced today.  You're referencing --
10       THE WITNESS:  We referred to a donation.  Was it '99?
11       MS. KYROUZ:  I think it was a different one.
12           You're welcome to go back and look.
13       THE WITNESS:  You may be right.
14       MR. SOLOMON:  We've marked as the next exhibit a
15   document produced by the defendants with control numbers
16   294203 to 205.
17       (Exhibit 17 was marked for identification.)
18       THE WITNESS:  Okay.
19       BY MR. SOLOMON:
20       Q.  Okay.  Do you recognize this?
21       A.  It appears to be a printout of Yahoo! Finance.
22   This is the page I was referring to on my computer.
23       Q.  And is the handwriting yours?
24       A.  Uhm, most of it is.
25           We're looking at page 2?

118

1        Q.  Yes.
2        A.  That's me sending it to CHO, Catherine H. Ong, and
3    those are her initials, and then routing it to the 2001 tax
4    return file.
5        Q.  It's dated January 4, 2001.  Were you back from
6    New Zealand by that date, do you know?
7        A.  I don't think I left to go to New Zealand yet.
8        Q.  Okay.
9        A.  I believe that I came back around the 17th or
10   18th.  I was there for 10 days and a day or two traveling.
11   I probably left shortly after this.
12       Q.  Okay.
13           And I'm looking at the third page of the exhibit.
14   There's a number of calculations in handwriting?
15       A.  Correct.
16       Q.  Can you take me through them and tell me what they
17   are, please.
18       A.  It looks like there's a line where it says "AVG,"
19   stands for average, 32.125 per share, 300,000 at 32.125
20   equals 9,637,500.
21       Q.  Do you know what that refers to?
22       A.  Based on your question before, I think this is the
23   request to donate the shares to the Ellison Medical
24   Foundation of around 9 and a half million.  I suspect this
25   was me pricing the Oracle shares to do the donation.

119

1        Q.  Okay.
2        A.  Do you want the next set of numbers read to you as
3    well?
4        Q.  Sure.  Yes, please.
5        A.  That says 31,200 at 32.125 equals 1,200,300.
6        Q.  Do you know what that dollar figure was referring
7    to?
8        A.  I think, but I'm not certain, it refers to another
9    donation that was made at that time.  I suspect we'll find
10   an e-mail confirming that.
11       MR. SOLOMON:  Okay.
12           We'll mark this next exhibit a document produced
13   by defendants with the control numbers 300659 to 661.
14       (Exhibit 18 was marked for identification.)
15       THE WITNESS:  I've finished reviewing this.
16       BY MR. SOLOMON:
17       Q.  Okay.  Do you recognize the exchanges?
18       A.  It appears to be an e-mail exchange from me to
19   Carolyn Balkenhol dated January 4, 2001.
20       Q.  And you have a postscript to your message that
21   reads, "I'm very pleased with our timing.  Better 32-plus
22   dollars per share than 26 dollars two days ago.  Hail, Alan
23   Greenspan" with exclamation marks.  Do you see that?
24       A.  Yes, I do.
25       Q.  What had Alan Greenspan done to improve the stock?

120

Simon, Phillip  9/6/2006  1:30:00 PM

1    A.  I don't know.

2       Probably lowered interest rates.

3       Or made a nice speech.

4    MR. SOLOMON:  I have marked as the next exhibit a

5    document produced by the defendants with a control number

6    060974.

7    (Exhibit 19 was marked for identification.)

8    BY MR. SOLOMON:

9    Q.  Have you seen this before?

10   A.  I don't believe so.

11   Q.  It's dated January 10, 2001, and it's from Deborah

12   Lange to Jeff Henley.  Do you know who Jeff Henley was?

13   A.  Jeff was the CFO of Oracle Corporation.

14   Q.  You didn't handle any of his transactions, did

15   you?

16   A.  You mean -- I don't know what you --

17   Q.  You didn't work for Jeff Henley at all?

18   A.  I don't think I ever met him.  I don't think I'd

19   recognize him.

20   Q.  It starts at the top Jeff -- no, it doesn't start.

21   Deborah Lange wrote, "Jeff, we are working with Larry's

22   accountants as to the timing of him exercising his options

23   which expire August of this year.  Larry may be willing to

24   exercise in April if it is beneficial to the company."  Do

25   you see that?

121

1    A.  Correct.

2    Q.  So as of January 10, were you aware that

3    Mr. Ellison had indicated that he might be willing to

4    exercise the expiring options in April of 2001?

5    MS. KYROUZ:  Objection.  Lacks foundation.

6    THE WITNESS:  The answer is I never saw this e-mail so

7    I have no knowledge about this.

8    MR. SOLOMON:  Right.  That wasn't the question,

9    though.

10   A.  Okay.

11   Q.  The question was as of around the date of this

12   e-mail, were you aware that Mr. Ellison had indicated a

13   willingness to exercise his expiring options in April of

14   2001?

15   A.  Okay.  I think your premise is possibly and

16   probably mistaken because I think Deb Lange is referring to

17   Catherine Ong's e-mail that you showed me earlier saying

18   that Catherine would be willing to do so.  So Deb Lange was

19   referring to Catherine Ong, not Larry.

20   Q.  Oh, I see.  Okay.

21      So when it says Larry may be willing to exercise

22   in April, you're speculating that really had nothing to do

23   with whether Larry was willing to or not?

24   A.  Correct.  Larry is like when you say "Oracle is

25   willing to do it," you're referring to certain people at

122

1    Oracle.  Deb Lange is making recommendation for Oracle;

2    Catherine Ong, the tax technician, a good tax professional,

3    was making a comment to Deb Lange.  So I read this, though

4    I'm not saying I'm necessarily right; but I think the

5    better reading is given the prior e-mail exchange between

6    Deb Lange and Catherine; but I don't know, I've never seen

7    this before.  This is an internal Oracle e-mail.

8    Q.  Okay.

9       So you went to New Zealand for two weeks, was it?

10   Do you recall?

11   A.  I think ten days.

12   Q.  Ten days.  And that was in January?

13   A.  Approximately.  I don't recall.

14   Q.  In January of 2001?

15   A.  Apparently.

16   Q.  And when you returned from New Zealand to the

17   U.S., did you have any immediate communication with

18   Mr. Ellison?

19   A.  I believe on the Friday I returned home I got a

20   phone call from Carolyn Balkenhol.

21   Q.  And tell me what you remember about that call,

22   please.

23   A.  That's my recollection; but this is based on

24   reviewing documents yesterday and that you have.  So we

25   might take a look at the documents for specifics.  My

123

1    understanding is that decisions were made to exercise and

2    start selling the stock options.

3    Q.  And how did you react?

4    A.  My reaction was to implement and take care of

5    that.  So my phone call was to Oracle Legal Department to

6    confirm that we had clear -- trading clearance to do so.

7    And then I made a phone call to a brokerage firm, Merrill

8    Lynch, to handle the exercise and sale.  And get them set

9    up from a legal perspective so they could coordinate with

10   Oracle Legal.  So if we were going to start executing the

11   trades on Monday, we'd have the legal clearance from both

12   Oracle internally and from Merrill Lynch Finance

13   Department.

14   Q.  Before that call did you have any knowledge that

15   Mr. Ellison was planning to exercise and sell in January of

16   2001?

17   A.  I have no recollection.

18   Q.  Were you surprised when you received the call?

19   MS. KYROUZ:  Objection.  Vague.

20   THE WITNESS:  I have no recollection what my reaction

21   was, but I knew we had to start exercising and selling the

22   options because they were going to be expiring.

23   BY MR. SOLOMON:

24   Q.  Were you delighted?

25   A.  I was pleased, yes.

124

Simon, Phillip  9/6/2006  1:30:00 PM

1    Q.  Okay.  Did you have any concern that Mr. Ellison
2    may be in possession of material information?
3    A.  Absolutely none.  Or I would not have executed and
4    implemented the trade.
5    Q.  And is it true that you have had and have no idea
6    what inside information Mr. Ellison may or may not have
7    possessed?
8    A.  That is true.
9    MR. SOLOMON:  So we'll have marked as the next exhibit
10   a document produced by the defendants with the control
11   numbers 294210 and 211.
12   (Exhibit 20 was marked for identification.)
13   BY MR. SOLOMON:
14   Q.  Let me know if you recognize it after you've
15   looked at it.
16   A.  This appears to be my handwriting.
17   Q.  And it says "Larry Ellison" at the top?
18   A.  Correct.
19   Q.  And does this -- do these handwritten notes
20   reflect the trading details for January 22, '01?
21   A.  That would appear to be the case.
22   Q.  And did you create a handwritten note like this
23   for every day that Mr. Ellison traded?
24   A.  I do not recall.  But I certainly kept -- I kept
25   records.  I do not know if I did handwritten records every

125

1    day or what I did.
2    Q.  Okay.  Do you know if this was the first day he
3    traded?
4    A.  No, I do not.
5    Q.  How long was the call with Ms. Balkenhol when you
6    got back from New Zealand?  Was it a short or a long call?
7    A.  I have no recollection.
8    Q.  Do you -- strike.
9    Do you know who Joe Lockhart is?
10   A.  Yes.
11   Q.  And who is he?
12   A.  I believe he was President Clinton's press
13   secretary.  And then he came to work for a period of time
14   at Oracle.  Somehow involved with public relations for
15   Oracle or maybe some other role.  I just don't know.
16   Q.  Did you ever have any communication with
17   Mr. Lockhart?
18   A.  I may have.
19   Q.  And what do you remember about any communications
20   you had with him?
21   A.  Nothing.
22   Q.  He wasn't at the company long; is that right?
23   A.  I don't know.
24   Q.  Do you know who hired him?
25   A.  No.

126

1    Q.  Do you know why he left?
2    A.  No.
3    MR. SOLOMON:  I'll have marked as the next exhibit a
4    document produced by defendants with a control number
5    042818.
6    (Exhibit 21 was marked for identification.)
7    THE WITNESS:  I have finished my review of this.
8    BY MR. SOLOMON:
9    Q.  Okay.  And do you recognize this?
10   A.  It appears to be an e-mail from me to Carolyn
11   Balkenhol dated January 22, 2001.
12   Q.  Okay.  In the second paragraph, halfway down you
13   say, "there's also the question you/Larry need to resolve
14   whether you want to refer to paying down outstanding debt
15   to justify the sales.  I'd be of a mind not to mention the
16   debt with respect to the options.  Do you see that?
17   A.  Uh-huh.
18   Q.  Why would you -- why were you of a mind not to
19   mention the debt?
20   MS. KYROUZ:  Object that the document speaks for
21   itself.
22   THE WITNESS:  Don't recall what I --
23   MS. KYROUZ:  Mischaracterizing --
24   THE WITNESS:  -- was thinking at the time.
25   BY MR. SOLOMON:

127

1    Q.  You go on to say, "I think the expiring options
2    and the associated tax liability says enough.  We could
3    then refer to the debt should Larry sell shares later on."
4    Do you see that?
5    A.  Correct.
6    Q.  Do you understand why you wanted to parse that out
7    and refer to the debt later on?
8    A.  No.
9    Q.  And then No. 3 says, "I assume you've heard the
10   rumors re Oracle amending its 10-Q."  Do you see that?
11   A.  Correct.
12   Q.  So this implies to me, at least, that you had
13   heard of rumors that Oracle was amending its 10-Q.  Had
14   you?
15   A.  It says -- I have no recollection of the events so
16   I can only repeat back.  I'm reading what it says.  And
17   this appears to be an e-mail that I sent.  But at the time
18   I was -- I probably got information given to me by the
19   Merrill Lynch brokers.
20   Q.  Okay.
21   It goes on to say, "Oracle apparently issued a
22   press release denying the rumor."  Did you ever see that
23   press release?
24   A.  I don't recall.
25   Q.  Okay.  Then you go on to say, "the Dow Jones

128

1  newswire reports this to explain Oracle's down day." Do
2  you see that?
3      A.  Yes, I do see that.
4      Q.  Now, is it possible that Oracle's down day was in
5  reality the result of Mr. Ellison selling?
6      MS. KYROUZ:  Objection.  Lacks foundation.
7      THE WITNESS:  Unlikely.  It could be.
8      MR. SOLOMON:  Okay.
9      THE WITNESS:  I -- as I said earlier, stocks go up and
10  down based on supply and demand.
11      BY MR. SOLOMON:
12      Q.  And he was selling?
13      A.  But there are other people selling as well.
14      Q.  Do you know if Oracle ended up actually purchasing
15  some of the very stock that Mr. Ellison was selling in
16  January?
17      A.  The answer is no.  We sold into the market via
18  Merrill Lynch.
19      Q.  Right.
20          And was Oracle not purchasing in the open market
21  at the same time?
22      A.  I don't --
23      MS. KYROUZ:  Objection.  Lacks foundation.
24      THE WITNESS:  I don't know.
25      BY MR. SOLOMON:

129

1      Q.  Are you aware Oracle had a stock repurchase
2  program?
3      MS. KYROUZ:  Objection.  Misstates testimony.
4      THE WITNESS:  I do not know, but I had heard they had
5  one.
6      MR. SOLOMON:  Okay.
7          So, we've marked as the next exhibit a document
8  produced by defendants with the control number 024193.
9      (Exhibit 22 was marked for identification.)
10      THE WITNESS:  Okay.  I've finished my review.
11      BY MR. SOLOMON:
12      Q.  Do you recognize this exchange?
13      A.  It appears to be an e-mail exchange from Deb Lange
14  to me and her reply.
15      Q.  And Deb sends to you the following message dated
16  1/10/01.  And it says, "Our general philosophy is" in
17  quotes "'earlier the better.'  It is obviously Larry's
18  call, but there is a possible benefit to the company of
19  exercising in FY '01 (April rather than FY '02)," and it
20  goes on to talk about the tax consequences.  Do you see
21  that?
22      A.  Uh-huh.
23      Q.  "Many thanks, Deb."  And then you reply on Monday
24  the 22nd, "Got it.  Thanks Deb."  Do you see that?
25      A.  I do see it.

130

1      Q.  First of all, do you know why Deb Lange was
2  forwarding that January 10th e-mail to you on the 22nd of
3  January?
4      A.  I don't believe she's forwarding to me.  I think
5  she sent it to me on January 10th.  I was in New Zealand,
6  and the 22nd appears to be the first day back and I was
7  just clearing my e-mail.
8      Q.  Got you.
9          Now, this is timed 1741 in the afternoon?
10      A.  Minus 11 hours.  So it looks like -- I'm not sure
11  if the 1741 is Eastern Standard Time or Greenwich Mean
12  Time; but it's minus 800s, which means -- I think that's --
13  we're eight hours time difference from London.  So I think
14  it's 1741 Greenwich Mean Time, which means it's 11:41 a.m.
15  Pacific Standard Time.
16      Q.  Okay.  You received this e-mail from Deb Lange and
17  opened it presumably, then, on the Monday the 22nd.  And
18  you see that she's referring to the exercise of the
19  expiring options in April of '01.  Do you see that?
20      A.  Yes.
21      Q.  And then your response doesn't tell Ms. Lange, in
22  fact, Mr. Ellison has already started trading.  Did you
23  deliberately not want to tell her that?
24      MS. KYROUZ:  Objection.  Lacks foundation.
25      THE WITNESS:  I actually think you're misinterpreting

131

1  her e-mail.
2      MR. SOLOMON:  I may be.
3      THE WITNESS:  What she's saying is Oracle wants the
4  income tax deduction, the compensation deduction, in their
5  fiscal year ending May 31st.  She's using April as a
6  shorthand for the fiscal year.  So I'm replying "yes, got
7  it" because we're actually doing what she requested.
8  Because it was to Oracle's benefit to trigger the gain.
9  The option gain in the current fiscal year.
10      MR. SOLOMON:  I'm not sure if I follow you, but let's
11  see if we can get that.
12          She's talked of the possible benefit of the
13  company of exercising in FY '01, and then she puts
14  "(April)."  What is it you're telling me that you think is
15  the reason?
16      A.  Fiscal year '01 is the fiscal year ending
17  May 31st, 2001.
18      Q.  Uh-huh.
19      A.  And from her prior e-mails that you showed me
20  Oracle wanted the corporate tax deduction for the built-in
21  gain triggered in their fiscal year ending May 31st.  They
22  did not want Larry to exercise the shares in June, July, or
23  August of 2001.
24      Q.  Right.
25      A.  They wanted the deduction in the 2001 fiscal year

132

Simon, Phillip  9/6/2006 1:30:00 PM

1  so they could utilize their foreign tax credits; and if
2  there's a large enough gain, to take the loss as a
3  carryback to their 1999 fiscal year return and get a tax
4  refund.
5       So what Deb was suggesting was encouraging us to
6  exercise in the fiscal year ending May 31st, and we
7  responded. And so I was saying yes, got it, we're doing
8  it. So what I'm saying is our actions were consistent with
9  what she recommended. You are misinterpreting the "April."
10  She's referring to the fiscal year. And that goes back to
11  the interpretation of the tax concepts that I was looking
12  at with the foreign tax credit utilization and with foreign
13  source -- and foreign source income.
14  BY MR. SOLOMON:
15       Q. Now, she's saying fiscal year, which ends May 31,
16  and she's put in April because that is an open window
17  period for Mr. Ellison. That's the reality, isn't it?
18  MS. KYROUZ: Objection. Misstates the document.
19  THE WITNESS: No. You're misinterpreting it. January
20  is an open window as well.
21  BY MR. SOLOMON:
22       Q. Well, it is; but the expectation that Ms. Lange
23  is communicating is that he was -- he might be willing -- as
24  you know from a prior exhibit, he might be willing to do it
25  in April.

133

1  A. No. You're --
2  MS. KYROUZ: Objection.
3  THE WITNESS: I'm sorry. I understand what you're
4  trying to conclude, but I believe that you are
5  misinterpreting hers -- her reference because you don't
6  understand the tax consequences well. If you understood
7  the tax consequences, it's absolutely clear to me, as a tax
8  professional, that she's referring to triggering gain in
9  fiscal year May 31.
10       And, in fact, from a tax perspective, the
11  corporation is better triggering the tax deduction earlier
12  because it reduces their -- it minimizes their estimated
13  tax payments. So January, actually, is better than April,
14  and it triggers the loss in the correct fiscal year to
15  optimize the tax deduction for Oracle, and actually works
16  to Oracle's benefit.
17       So, I'm sorry, but I just reiterate -- and you
18  can bring in a tax consultant. You are just
19  misinterpreting her e-mail. You can try again, and you can
20  read it again; but you're wrong.
21       Q. I've got a feeling you never want to agree with me
22  on this one because it doesn't really help your client,
23  does it?
24       A. No. I'm disagreeing with you because you are
25  misinterpreting the tax concept. It has nothing to do with

134

1  what helps my client or not. I'm giving you the correct
2  interpretation. And you may want to argue; but if you want
3  to misinterpret the data, you're welcome to misinterpret
4  it. But I'm going to tell you how I interpret it and what
5  it means.
6       Q. Okay. Tell me, please, precisely why April is
7  chosen to somehow deal with this tax issue? Why April?
8       A. To me it's a shorthand way of saying the last
9  window in the fiscal year. It's saying we want the tax
10  deduction in this fiscal year.
11       Q. And the last window for Mr. Ellison in the fiscal
12  year was --
13       A. April.
14       Q. -- April.
15       Correct?
16       A. But I'm not going to let you get away with
17  misinterpretation. Nobody waits until the last window
18  because if there was a special transaction going on that
19  would close the window in April, you're taking the risk of
20  moving the deduction to the next year. Common tax planning
21  and sense would be to trigger it earlier. So your
22  interpretation -- I know you're trying to make a case.
23  This is just -- you're just plain wrong. It just --
24  would move on to another issue. You're wrong.
25       Q. I kind of like this issue, believe it or not.

135

1       A. You could like it, but you're wrong.
2       Q. So you've heard of abstain or disclose?
3       A. No.
4  MS. KYROUZ: Objection. Calls for a legal conclusion.
5  BY MR. SOLOMON:
6       Q. No?
7       You never heard of that in the context of
8  securities transactions?
9       A. No.
10       Q. So you can't help me any more than you've already
11  tried to help me. The reason she's put in April as opposed
12  to January, you don't know?
13       A. I've told you she's giving the end of the fiscal
14  year in which you can make the option sale. If your fiscal
15  year -- what she's telling me is please exercise by the end
16  of the fiscal year; and because of windows please exercise
17  by the end of April. That's how I interpret it.
18       Q. Okay. And do you remember seeing a previous
19  exhibit in which the statement was that -- to the effect
20  that Mr. Ellison may be willing to exercise in April?
21       A. I believe you're referring to Deb Lange's
22  referring to Catherine Ong in my office. Because Catherine
23  Ong -- people at Oracle refer to our office as Larry's
24  office; and so I do recall we had this discussion that Deb
25  Lange was paraphrasing Catherine Ong's comment to Deb Lange

136

1    and we had the e-mail there.  Yes, I do recall that.
2        Q.  And, of course, had Mr. Ellison exercised in
3    April, as Deb Lange seems to be anticipating in this
4    e-mail, the truth about Oracle's condition would have
5    already been disseminated to the investors and he would
6    have realized substantially less on his sales; isn't that
7    true?
8        MS. KYROUZ:  Objection.  Lacks foundation.
9    Argumentative.  Misstates the evidence and the testimony.
10       THE WITNESS:  I don't know.  I don't know what Oracle
11   share price was then.
12       Oh.  And if I may add?
13       MR. SOLOMON:  Sure.
14       THE WITNESS:  Oracle Corporation actually benefitted
15   if -- assuming your assumption is correct, that the share
16   price declined to April -- I don't know if it did -- Oracle
17   actually benefited from a higher share price because it got
18   a larger income tax deduction.  Because its income tax
19   deduction is measured by the gain so it's actually in
20   Oracle Corporation's interest to have the higher share
21   price.  And Deb Lange referred to that in her tax memo.
22       MR. SOLOMON:  No, it's in the shareholder's interest
23   to have a higher share price.  No one is disputing that.
24       A.  No, no, no.  I'm talking about Oracle Corporation
25   benefited from a higher share price.  It had to pay less

137

1    income tax.  Oracle Corporation actually had to pay less
2    income tax.  So I'm just saying is your pre- --
3    assumption -- I don't even know about your facts, but your
4    assumption is just flawed.
5        Q.  Which assumption?
6        A.  That Oracle would benefit with a lower share
7    price.  Oracle Corporation has a low -- anyway, we're
8    talking about tax issues.  Let's move on.  It's irrelevant.
9    You're just wrong on the tax issues.
10       MR. SOLOMON:  I have no idea what you're talking about
11   so it's probably a good idea to take a break.
12       MS. KYROUZ:  Why don't we take a lunch break?
13       THE VIDEOGRAPHER:  This marks the end of tape 2,
14   Volume I, in the deposition of Philip Simon at 12:50.
15   Going off the record.
16       (Lunch recess taken at 12:50, proceedings to resume at
17   1:45.)
18            -oOo-
19
20
21
22
23
24
25

138

1         AFTERNOON SESSION
2    AUGUST 6, 2006                    1:46 P.M.
3            -oOo-
4        THE VIDEOGRAPHER:  On record at 1:46.  This marks the
5    beginning of Tape 3, Volume I, in the deposition of Philip
6    Simon.
7        MR. SOLOMON:  I have marked as the next exhibit the
8    interview memorandum of Philip Simon produced by defendants
9    and the Bates range -- control number range 300598 to 628.
10       (Exhibit 23 was marked for identification.)
11           -oOo-
12       EXAMINATION (RESUMED)
13   BY MR. SOLOMON:
14       Q.  I guess what I want you to do, Mr. Simon, is go
15   through the memorandum itself -- I don't think there's any
16   need to look at exhibits, at least not now.  Go through the
17   memorandum itself, and then what I'd like you to do is tell
18   me where you believe that it contains inaccuracies.  So it
19   may be a little time-consuming, but I'd like to go through
20   that exercise.
21       A.  Why don't we go paragraph by paragraph?
22       Q.  That's fine.
23       A.  First, I don't know if we met on July 22nd.  I
24   have no recollection of the date.
25       I don't recall the name of the counsels that were

139

1    there.
2        Nor the time, how long it lasted.
3        Q.  Okay.  Well, let's just stop there then.  You know
4    Joe Grundfest, right?
5        A.  I do know --
6        Q.  You went to law school with him?
7        A.  Correct.
8        Q.  And you know that he was part of the interviewing
9    team?
10       A.  I did know Joe was there.  I did not know who Joe
11   Newcomb and Jessica Spiegel were.
12       Q.  Okay.  Carry on.
13       A.  I'm at the Simon's introduction to Ellison
14   paragraph.
15       I think it was the fall of 1994, not 1993.
16       Q.  Okay.
17       A.  But I could be wrong.
18       Q.  Okay.
19       A.  I was actually interviewed by Andy Dudnick and
20   Jenny Overstreet, not by Larry, to be hired for the job
21   like I told you earlier.
22       That's -- the first page seems pretty accurate.
23       I do not know whether Lawrence Investments started
24   in 1997.  It seems reasonable it might have been '96, but
25   it's a reasonable time frame.  Lawrence Investments

140

Simon, Phillip  9/6/2006  1:30:00 PM

1  indirectly has interests in two limited partnerships that
2  hold Larry's private equity holdings.  It does not hold the
3  private equity holdings directly.  And the bank lines are
4  not -- lines are not part of Lawrence Investments.  The
5  bank lines are in the name of Lawrence J. Ellison Revocable
6  Trust or in Larry's name personally.
7  Q.  Okay.
8  A.  The second paragraph, "Simon explained that he has
9  a profit participation in Lawrence Investments because his
10  monthly retainer is paid by Lawrence Investments."  It's
11  not exactly accurate.  I have a profit participation and my
12  monthly retainer is paid by Lawrence Investments.  It's
13  not -- there's no causation.
14  MR. SOLOMON:  Sounds better.
15  THE WITNESS:  Where it says, "In Ellison Family
16  Company, Simon is president of all of these companies."
17  Simon is president of most of these companies.  In some
18  limited liability companies you don't have corporate
19  officer status.
20  MR. SOLOMON:  Okay.
21  THE WITNESS:  Ellison Revocable Trust.  It is not
22  Ellison-Simon Revocable Trust.  The full name is the
23  Lawrence J. Ellison Revocable Trust.  My name's not in it.
24  MR. SOLOMON:  Okay.
25  THE WITNESS:  Reading about power of attorney.

141

1  MR. SOLOMON:  Uh-huh.
2  THE WITNESS:  Where it says in the second, "sign," he
3  has power to sign all of Ellison's documents except those
4  documents requiring Ellison's signature as a director of
5  Oracle.  It's not only the director of Oracle but other
6  director positions because on director positions under
7  California law are not delegable, you can't give a power of
8  attorney.  But that is under California corporate law.  In
9  the UK, for example, you can delegate signature authority
10  for director; but for California corporations, so it's not
11  just Oracle, but when Larry is a director of another
12  company I cannot sign for him.
13  Simon's relationship with Ellison, that paragraph
14  is basically correct.
15  I'm on page 4.  So the rest of page 3 looked
16  good.
17  Okay.  Under "Simon's authority to act on
18  Ellison," I'm starting there now.
19  Page 4, the rest is fine.
20  MR. SOLOMON:  Okay.
21  THE WITNESS:  I'm starting on "Simon's advice to
22  Ellison about Oracle."  Reading "A, Ellison," the next
23  paragraphs seem reasonably correct.
24  I'm on Ellison's balance sheet right now.
25  MR. SOLOMON:  Okay.

142

1  THE WITNESS:  On the bottom of page 5, the last line.
2  "He acknowledged that Oracle's official policy allows
3  trading for the first two weeks of the quarter, the last
4  month but no" --
5  (Interruption by the reporter.)
6  THE WITNESS:  I'm sorry.
7  This is the paragraph.  "He acknowledged that
8  Oracle's official policy allows trading into the first two
9  weeks of the last month but then practice no in-trades
10  during the entire last month of the quarter.  I do not
11  believe but in practice -- the phrase "but in practice no
12  in-trades during the entire last month of the quarter" is
13  necessarily correct because I have no knowledge what
14  anybody else does at Oracle.  So I may have alluded to
15  that, but it can't be a true statement.
16  MR. SOLOMON:  Okay.
17  THE WITNESS:  I may have said it, though.
18  MR. SOLOMON:  Okay.  Got it.
19  THE WITNESS:  On page 6, where it's "According to
20  Simon, Cooper explained what a hockey stick effect makes it
21  very uncertain the outcome in any given quarter."  That is,
22  in essence, what I meant Dan had told me.  I don't know if
23  that's an exact quote, I don't recall the exact quote.  So
24  this is generally correct but not precisely correct.
25  MR. SOLOMON:  Okay.

143

1  THE WITNESS:  I'm on page 6.
2  MR. SOLOMON:  Okay.
3  THE WITNESS:  Ellison's trades in 1998 to 2000.
4  MR. SOLOMON:  Okay.
5  THE WITNESS:  On the bottom paragraph on page 6,
6  "Simon exercised options to generate income in '98, '99,
7  2000."  That seems reasonably correct, but I have no
8  recollection what we did each year.
9  MR. SOLOMON:  Okay.  Okay.
10  THE WITNESS:  The same comment regarding the first
11  paragraph on paragraph 7.  It seems correct, but I have no
12  recollection right now.
13  MR. SOLOMON:  Okay.
14  THE WITNESS:  I don't know about the timing in the
15  next paragraph on page 7.  It could be right, I just don't
16  recall.
17  BY MR. SOLOMON:
18  Q.  You're referring to the two years prior to --
19  A.  The summer of 1999.  I don't know if it was summer
20  1999.  I mean, we saw some e-mails earlier talking about
21  some time frame, but I don't recall right now.
22  Page 8 now.
23  Q.  Okay.
24  A.  The first full paragraph seems correct.  I have no
25  recollection, though.

144

Simon, Phillip  9/6/2006  1:30:00 PM

1    Q.  Okay.

2    A.  The second paragraph, I don't recall the

3  specifics, but it's basically correct.  And the point about

4  being paid options in lieu of salary that was the point of

5  my e-mail.  About, you know, they took options in lieu of

6  salary that we referred to earlier in today's deposition.

7    Q.  Okay.

8    A.  And I'm on to the paragraph Friday, November 19,

9  2001.

10    Q.  Okay.

11    A.  On to page 9, A, "Simon contacted Oracle Legal

12  Department."

13    Q.  Okay.

14    A.  Okay.  I'm on to B, Simon contacted Merrill Lynch.

15    Q.  Okay.

16    A.  A minor item, but on paragraph B Gadbois is

17  spelled incorrectly.  It's b-o-i-s not b-o-y.

18    Q.  And on page 10 the other associate is not Tom

19  Blechfield.  It's Tom Blanchfield, B-l-a-n-c-h-f-i-e-l-d.

20    I'm on to the next paragraph, Simon's authority

21  for Ellison's Q3 fiscal year '01 stock sales.

22    Q.  Okay.

23    A.  I'm on to page 11.

24    On item C, "Press Releases."  It says, "Once

25  Ellison was required to file forms, Rule 144 forms, his

145

1  trades became public information, Oracle would have to

2  issue a press release."  I don't know if that's true.  I

3  know there was -- as I was reading this, it seems to

4  refresh there was discussion about issuing a press release;

5  but I don't know if it was legally mandated, and I do not

6  know if one was issued.

7    Okay.  Page 12.

8    Q.  All right.

9    A.  On page 12, where it says, "Ellison made almost

10  1 billion from these trades."  I would say the gross sales

11  proceeds were approximately 894 million.  And that's gross

12  sales proceeds because you have withholding taxes and

13  everything.  And I don't know what the net was after taxes.

14    Q.  Okay.

15    A.  I can't comment on the specifics on January 22nd,

16  23rd trades; but I'm sure they're accurate.  I have e-mails

17  that are attached as reference.

18    Q.  Okay.

19    A.  Page 14 I'm on to now.

20    Q.  Okay.

21    A.  Page 15.

22    Page 16.

23    And once again, all of these pages referring to

24  attached e-mails and the numbers and amounts.  I'm assuming

25  they tie to the attached e-mails --

146

1    Q.  That's fine.

2    A.  -- I'm not verifying the accuracy.

3    Q.  Okay.

4    Went to page 18.  Page 18, Simon's view of Oracle

5  in fiscal Q3, fiscal year '01.

6    Q.  Yeah.

7    A.  The third sentence, "he believed the economy was

8  overvalued."  No.  The stock market, not the economy.

9    Q.  Okay.

10    A.  On page 19 now.

11    I believe -- once again, he believed the economy

12  was overvalued.  I would say the stock market was

13  overvalued.  On page 19, second paragraph.

14    Of course, I may have said "economy" when I spoke

15  to them, but I was probably actually talking about the

16  stock market.

17    Q.  Okay.

18    A.  I have no recollection about the third paragraph

19  on page 19.  It's probably true, but I have no

20  recollection.

21    Q.  Beginning with "consistent with this view"?

22    A.  Yes.

23    There may be e-mails about this, but I have no

24  recollection.

25    "Simon's contact with Oracle."  It's generally

147

1  correct, the first sentence on Simon's contact, but there

2  are other administrative assistants working with Carolyn

3  Balkenhol I may have e-mailed at times.  But the basic

4  premise that I don't know what's going on at Oracle and I'm

5  not involved is correct.

6    Q.  Okay.

7    A.  Page 20.  My sister.

8    Q.  Yes.

9    A.  I believe my sister was employed before I came to

10  work.  She then quit Oracle, went to one or two startups,

11  and came back.  I think she was hired before -- the first

12  time before I joined, but I don't have quite the perfect

13  sequence.

14    Q.  Okay.

15    A.  Okay.

16    Do you want me to look at the attachments?

17    Q.  I don't think there's any need to.  Thank you very

18  much.

19    A.  Okay.

20    Q.  Thank you for that.

21    A.  You're welcome.

22    MR. SOLOMON:  Okay.  What I've marked as the next

23  exhibit is a document produced by Oracle with the control

24  numbers 294208 and 209.

25    (Exhibit 24 was marked for identification.)

148

1    THE WITNESS: Okay. I'm finished reading this.

2    BY MR. SOLOMON:

3    Q.  Okay.  Do you recognize this exchange?

4    A.  It appears to be an e-mail from me to Carolyn

5    Balkenhol dated January 22, 2001.

6        It doesn't say 2001, but that's my guess.

7    Q.  Okay.

8        Do you recall being involved in drafting the press

9    release or any press release concerning Mr. Ellison's

10   transactions?

11   A.  I recall -- I have no clear recollection, but from

12   reviewing e-mails yesterday or today, I'm not sure when, I

13   recall having input trying to confirm that the -- any press

14   release, if one was issued -- I don't know if one was

15   issued or not -- was factually correct.

16   Q.  Now, I'm looking at the e-mail; and you say in

17   part at the beginning, "Carolyn, I just got off the phone

18   with Matt Ng, N-g, (Oracle Legal Department).  He wanted to

19   know about Larry's Rule 144 filing and when we expected it

20   to be public.  Dan and Matt spoke about giving Oracle"

21   investors a heads up to spin the news --

22   MS. KYROUZ:  I'm sorry.  "About giving Oracle Investor

23   Relations a heads up."

24   MR. SOLOMON:  Thank you very much.

25       "About giving Oracle Investor Relations a heads

149

1    up to spin the news, but decided not to do so last Friday."

2    Do you see that.

3    A.  Yes, I do.

4    Q.  Do you recall being involved in a conversation

5    with Dan and Matt concerning the spinning of the news?

6    A.  No.

7    Q.  Okay.  Do you have any recollection how the news

8    was spun?

9    A.  I don't even know if it was spun.  That was my

10   word, and may have been a poor choice of words.  It's about

11   reporting the news and disclosing it.

12       I just know, as I said before, I was involved at

13   one point.  I believe there were e-mails where I was trying

14   to make certain that any press release was factually

15   accurate.

16   Q.  Okay.

17       I'll have marked as next exhibit a document

18   produced by the defendants with a control number 035365.

19       (Exhibit 25 was marked for identification.)

20   THE WITNESS: I've finished looking at this.

21   BY MR. SOLOMON:

22   Q.  Okay.  Did you see this draft e-mail around the

23   time --

24   A.  I have no recollection.

25   Q.  I am just going to finish.

150

1        -- (continuing) around the time of its date, which

2    is Wednesday, the 24th of January, 2001?

3        Your answer is you don't have a recollection,

4    correct?

5        Now, you've told the SLC, if you go back if you

6    want to refer to it.  You told the SLC that -- and I'm

7    looking at --

8    A.  What page?

9    Q.  -- page 12, which is control No. 300610.  I'm

10   looking at the bottom where it says -- in the e-mail that's

11   referenced as Exhibit B it says, "Some state that his

12   overall target was to sell 40 million shares, which would

13   enable Ellison to reduce his debt to $400 million.  Simon

14   devised this plan to present it to Ellison in the hopes

15   that Ellison would agree and realize the necessity to

16   exercise and sell as much as possible after these expiring

17   options to try to reduce his debt."  Do you see that?

18   A.  Yes.

19   Q.  How did you arrive at the $400 million figure as

20   being what you'd like to see his debt reduced to?

21   A.  I try to get to a number I might be comfortable

22   with.

23   Q.  Is there any ratio involved in that or is that

24   just a --

25   A.  No.

151

1    Q.  -- instinct?

2    A.  Just a gut feeling.

3    Q.  And then it goes on to say, "Although Ellison was

4    initially reluctant about continuing to sell past the

5    22 million expiring options, he ultimately agreed to sell

6    enough stock to reduce his debt to $400 million."  In other

7    words, Mr. Ellison was reluctant to do it at first, but

8    then you persuaded him?  Is that fair?

9    A.  I think that's a -- I mean, I'm reading what

10   you're saying; and I don't have a specific recollection.

11   What I would say is when given a chance, I try to sell;

12   and given an opportunity, I'd try to sell more.  So this is

13   consistent with my overall -- overall objective and

14   consistent with my approach working with Larry.

15   Q.  Okay.  I've marked as the next exhibit --

16   A.  Excuse me.  Should I keep this out?  Because I

17   don't want to get the order mixed up.

18   MR. SOLOMON:  I think you're probably done with it.

19       I'll have marked as the next exhibit a document

20   produced by the defendants with the control number 609894.

21       (Exhibit 26 was marked for identification.)

22   BY MR. SOLOMON:

23   Q.  Now, I noticed your name is not on here.  The

24   question is do you recognize it?  Have you seen it before?

25   A.  I don't recall.  It seems very similar to the

152

1  press release we looked at just a few moments ago.  This
2  looks like this might be a draft of what I looked at just a
3  few minutes ago.
4      Q.  But you have no recollection of being involved in
5  responding to or reviewing this particular message?
6      A.  My -- I do recall -- I don't know why, maybe from
7  reviewing e-mails, but I do believe trying to edit when I
8  was shown a draft of a proposed press release, trying to
9  clarify to make certain it was accurate.
10     Q.  Okay.
11     A.  But I don't know if this is the one I saw.
12     Q.  Okay.
13         Do you recall whether you faxed back a version of
14  the draft with your handwritten edits or any edits?
15     A.  I have no recollection.
16     MR. SOLOMON:  Okay.  I'd like to mark the next exhibit
17  a document produced by the defendants with control numbers
18  294223 to 226.
19     (Exhibit 27 was marked for identification.)
20     THE WITNESS:  Okay.  I've finished reviewing this.
21     BY MR. SOLOMON:
22     Q.  Do you recognize these e-mail exchanges?
23     A.  No.  But they appear to be e-mail exchanges from
24  me to Carolyn Balkenhol regarding the press release that we
25  looked at just before --

153

1      Q.  Right.
2      A.  -- and consistent with my recollection somewhat
3  vague this details, actually, how I was trying to make
4  certain the facts were accurate.
5      Q.  Okay.  If you go to the last page of the exhibit,
6  with the control number 294221, you'll see that it looks
7  like very similar language to what we looked at in the
8  prior exhibit.
9      A.  It looks similar, yes.
10     Q.  And, then, if you go to the next page in the
11  document, the prior page, 294225, you'll see that there's a
12  reference "What do you think?  What data should we give
13  them?"  Do you see that?  "Thanks, Carolyn"?
14     A.  Uh-huh.
15     Q.  Do you understand those questions are addressed to
16  you?
17     A.  I think so.  I can't -- it seems -- let me see who
18  she's sending it to.
19         I don't know.  That's a possible interpretation, I
20  just can't tell --
21     Q.  Okay.
22     A.  -- from the -- maybe you can decipher the e-mail.
23     Q.  Okay.
24     A.  I don't see it going to, from there.
25     Q.  Okay.  Now, it appears from the e-mail on the last

154

1  page that at the point that draft was sent there was an
2  understanding that Mr. Ellison had finished his
3  transactions; is that fair?
4      A.  No.  Not at all.
5      Q.  Okay.
6          And going to the second page, now, of the exhibit,
7  which is the first page with text, you write, "Carolyn, here are a few
8  facts/comments to digest.  Then we can talk about what data
9  to give them.  1, the selling may not end with the option
10  shares if we can get more sold above 30.  This morning said
11  he would like to get his debt paid down to 400 million or
12  slightly over 1.2 billion."  Do you see that?
13     A.  Correct.
14     Q.  Now, what does "this morning said he would like to
15  get his debt paid down to $400 million" refer to?
16     A.  I don't recall.  I could tell you what I think it
17  means.  It probably refers to a conversation or some
18  communication with Larry.
19     Q.  Okay.
20     A.  We talked about the 400 million target for
21  reducing debt.
22     Q.  And this reflects that he said to you that he
23  would like to get his down to 400 million?  Is that
24  true?
25

155

1      A.  Potentially.
2      Q.  Okay.  And then you go on to say, "We already
3  spoke about selling his high basis, previously exercised
4  option shares," then in parens "(5.2 million from
5  98/99/2000 exercise).  Though I think we may have trouble
6  getting even the 22,232 million current option shares sold
7  in today's market."  Did I read that correctly?
8      A.  22.223.
9      Q.  Thank you.
10         Then you go on to say, "I'd word the press release
11  to leave open future selling by Larry so he can continue
12  the option exercise and sale program if not completed and
13  sell additional shares to reduce debt."  Do you see that?
14     A.  Yes, I do see that.
15     Q.  Okay.  Then there's a sub 2.  Can -- my text is
16  vague, but it seems to say no tax immediately due --
17     A.  No, it says re tax --
18     Q.  Re tax --
19     A.  -- immediately due two points.
20     Q.  Slash questions?
21     A.  Correct.
22     Q.  All right.
23         And then on the next page you go on into
24  discussing the tax consequences, correct?
25     A.  The 35.45 percent immediately withholding plus the

156

Simon, Phillip  9/6/2006  1:30:00 PM

1   payment strike price.  Then the additional amount that's
2   due, the residual income tax that's due.
3       Q.  Okay.  Then you say 2 against 2.  You say, "Larry
4   did not sell in 1996 for," in quotes, "'similar tax
5   planning purposes.'  He sold for tax planning purposes in
6   1996, but I wouldn't call the tax reasons similar to what
7   we're doing now."  Do you see that?
8       A.  Yes, I do.
9       Q.  What's the difference?
10      A.  I don't recall, but I'm really dealing with
11  there's tax reasons for doing it, but the tax reasons are
12  different.
13      Q.  And, No. 3, you say, "Since Larry might stop
14  exercising and selling the options once the news hits (if
15  the stock price drops), I don't know if I'd automatically
16  say that Larry exercised and sold over 22 million of
17  expiring options.  It might be less."
18      A.  I do see that.
19      Q.  Then, 4, you set out the consequences to Larry
20  selling -- Larry Ellison selling 22.232 million in options,
21  correct?
22      A.  Not the consequences.  I was trying to get the
23  correct data --
24      Q.  Okay.
25      A.  -- on his holdings so it could be accurately

157

1   reflected in the press release.
2       Q.  Yeah.  Okay.
3       So, in fact, that was a point-by-point comment,
4   wasn't it, on the press release that was --
5       A.  I don't know.  Let me look.  It seems like I was
6   commenting on the press release and trying to correct it.
7       Q.  Okay.
8       A.  I mean, just for example, it says "was issued the
9   24th."  He exercised, he was exercising.  I was changing
10  past to present tense.
11      Q.  So whose idea was it to get Mr. Ellison's debt
12  down to 400 million?  Was it your idea or Mr. Ellison's
13  idea?
14      A.  I have no recollection.
15      MR. SOLOMON:  I'll have marked as the next exhibit a
16  document produced by the defendants with the control
17  numbers 300623 to 625.
18      (Exhibit 28 was marked for identification.)
19  BY MR. SOLOMON:
20      Q.  Let me know if you recognize it when you've had a
21  chance to review it, please.
22      A.  Okay.
23      This appears to be an e-mail from me to Larry
24  Ellison dated January 24, 2001.
25      Q.  Okay.

158

1       At around the time of this e-mail, which is dated
2   24th of January, 2001, were you negotiating with any of the
3   banks with respect to their covenants concerning
4   Mr. Ellison's debt?
5       MS. KYROUZ:  Objection.  Vague.
6       THE WITNESS:  I don't specifically recall, but I am in
7   constant -- I'm generally in regular periodic contact with
8   all the banks talking about the loans, the renewals, where
9   we are on that.
10  BY MR. SOLOMON:
11      Q.  Did you ever get to the stage of negotiating
12  covenant waivers?
13      MS. KYROUZ:  Objection.  Vague.
14      THE WITNESS:  I have amended loan agreements many
15  times, and as part of the loan agreements you get changes
16  to the wording language.  So amendments would include any
17  corporate covenant waivers.  I don't know if I had any
18  specific discussions on or around this time.
19      Actually, rather than covenant waivers, modifications
20  to the covenant.
21  BY MR. SOLOMON:
22      Q.  Okay.  Do you have a sense, or did you have a
23  sense then, of what aggregate amount of debt would trigger
24  the requirement for covenant modifications?
25      A.  We've had in our loan agreements aggregate debt

159

1   limits.  So I would have been focusing on the aggregate
2   amount of debt that we could have.
3       Q.  Okay.  Do you know what that amounted to in 2001?
4       A.  No, I do not.
5       Q.  Were these the largest securities transactions,
6   private securities transactions, that you had ever been
7   involved in?
8       MS. KYROUZ:  Objection.  Vague.
9       THE WITNESS:  Up until that time, yes.
10  BY MR. SOLOMON:
11      Q.  And since then, have you been involved in larger
12  transactions?
13      A.  Yes.
14      Q.  With Mr. Ellison?
15      A.  Yes.
16      Q.  And is that in connection with his 10b --
17      A.  51 plan, yes.
18      Q.  Okay.  Thank you.
19      Just for clarification, that's in connection with
20  his 10b51 plan.
21      Mark as the next exhibit a document produced by
22  the defendants with the control numbers 294230 to 232.
23      (Exhibit 29 was marked for identification.)
24  BY MR. SOLOMON:
25      Q.  And my question's going to be have you seen this

160

1    before?

2    A.  I have no recollection, but it appears to have

3    been sent to me.

4    Q.  And do you know who sent it to you?

5    A.  No.  I was trying to read the fax.  It was dated

6    January 25, '01, and I can't see which group it was.  And I

7    was trying to look at the phone number.  So I'd have to

8    speculate.  If you'd like.  I assume it came from Merrill

9    Lynch.  Faxed it to me.

10    MR. SOLOMON:  Let's take a five-minute break and

11    organize.

12    THE VIDEOGRAPHER:  Off the record.  It's 2:39.

13    (Recess taken.)

14    THE VIDEOGRAPHER:  On record at 2:51.

15    BY MR. SOLOMON:

16    Q.  During the transactions you arranged on behalf of

17    Mr. Ellison in January of 2001, did you devote each day of

18    every business day to those transactions?  Was it a

19    full-time job while you were doing it?

20    A.  I don't believe so.

21    Q.  Okay.  And during the days that you were engaged

22    in the transactions, occasionally you spoke on the

23    telephone to Mr. Ellison; is that right?

24    A.  I don't recall.

25    Q.  But you see documents suggesting that you did?

1    A.  Correct.  In the earlier period, the first few

2    days, yes.

3    Q.  Where was Mr. Ellison when those trades were

4    taking place?

5    A.  I don't know.

6    Q.  Don't know.

7    Do you know if he was at Oracle?

8    A.  I don't know.

9    MR. SOLOMON:  Okay.

10    I've marked as the next exhibit a document

11    produced by defendants with the control numbers 294235 to

12    237.

13    (Exhibit 30 was marked for identification.)

14    BY MR. SOLOMON:

15    Q.  And just let me know if you recognize this.

16    A.  This appears to me to be an e-mail from me to Kim

17    Clarke at Merrill beach.  I'm sorry.  At Merrill Lynch in

18    Newport Beach.

19    Q.  Okay.  And does this reflect that having sold the

20    initial options in August of 21 (sic)

21    you were now moving into selling additional shares?

22    A.  This indicates selling the high tax basis lots,

23    which were option shares -- options shares that had been

24    acquired upon exercise of previous options, including the

25    one of December 27th of 2000.

1    MR. SOLOMON:  Okay.  Mark as the next exhibit a

2    document produced by defendants with control numbers 294238

3    and 239.

4    (Exhibit 31 was marked for identification.)

5    BY MR. SOLOMON:

6    Q.  Let me know, when you've had a chance to look at

7    it, if you recognize this.

8    A.  This appears to be an e-mail from me to Carolyn

9    Balkenhol dated January 26, 2001.

10    Q.  Did you have a practice of reporting to

11    Ms. Balkenhol the transactions that you were engaged in

12    with Mr. Ellison?

13    A.  That would appear to be the case, yes.

14    Q.  Were you speaking with Ms. Balkenhol on a daily

15    basis during this time?

16    A.  I don't recall, but I may have.

17    Q.  Do you -- strike.

18    I've marked as the next exhibit a document

19    produced by the defendants with the control number 357858.

20    (Exhibit 32 was marked for identification.)

21    MR. SOLOMON:  Tell me if you recognize this after

22    you've had a chance to look at it.

23    THE WITNESS:  This appears to be an e-mail from Dan

24    Cooperman to me dated January 26, 2001.

25    BY MR. SOLOMON:

1    Q.  Okay.  And it starts saying, "Philip, at your

2    request the trading clearance below is extended -- is

3    extended an additional 7 days, now expiring at the close of

4    the market on Friday, February 2, 2001."  Do you see that?

5    A.  Yes, I do.

6    Q.  You requested of Mr. Cooperman seven days

7    additional trading clearance; is that right?

8    A.  That appears to be the case.

9    Q.  And do you know what prompted that request?

10    A.  Yes.  We were in the midsts of a trading program,

11    and I believe my first authorization was -- each time I was

12    authorized for 7 days.  I was told to check back after 7

13    days, so I checked back and got a further clearance to

14    ensure that there was further clearance.

15    Q.  Now you'll see it says that the expiration now is

16    Friday, February 2nd, 2001.  Do you see that?

17    A.  Yes, I do see that.

18    Q.  Did you ask for any extensions after this

19    particular request was granted?

20    A.  I don't recall.

21    Q.  Okay.

22    A.  Though I would note that I believe trading

23    stopped, the final day of trading was January 31st.

24    Because I was cleared through February 2nd.  Since we

25    stopped trading, logically, I would not have asked.  But I

1    may have, I don't recall.
2        Q.  Okay.
3            And you were familiar with at least the practice
4    at that time at Oracle, and that was not to trade at all in
5    the last month of the quarter?
6        MS. KYROUZ:  Objection.  Misstates prior testimony.
7        THE WITNESS:  I was told you were allowed to trade
8    Oracle up until the last two weeks of the third month of
9    the quarter.  And that was the rule I was given.
10   BY MR. SOLOMON:
11       Q.  There was never a but?  You never heard "but the
12   practice here is not to trade at all in the last month"?
13   You never heard that?
14       A.  I remember being told it would be better if you
15   did not, but you're free to because optically it might look
16   worse.  Or something like -- I want to -- I don't know what
17   they said.
18           I knew that you could trade until -- up until the
19   last two weeks of the quarter, but it's better if you only
20   trade up until the end of the second month of the quarter.
21       Q.  I've marked as the next exhibit a document
22   produced by defendants with the control numbers 294216 and
23   217.
24       (Exhibit 33 was marked for identification.)
25   BY MR. SOLOMON:

165

1    any recollection of the substance of the conversations or
2    of the conversations?
3        A.  I have no -- I have no recollection of a
4    conversation that I might have had five and a half years
5    ago; but for something I could deduce from the e-mails that
6    appear to be from me which would say that something might
7    have happened.
8        Q.  Okay.
9            Do you recall whether Mr. Ellison was enthusiastic
10   about the selling process?
11       MS. KYROUZ:  Objection.  Vague.
12       THE WITNESS:  Since I have no recollection of the
13   conversation, it's hard to have a recollection about level
14   of one's attitude.
15       MR. SOLOMON:  Okay.
16           So we'll have marked as next exhibit another
17   document produced by defendants with the control numbers
18   294233 and 234.
19       (Exhibit 34 was marked for identification.)
20   BY MR. SOLOMON:
21       Q.  Let me know if you recognize this, please.
22       A.  This appears to be my handwriting.
23       Q.  And if you could read it for me from "Ellison"
24   down, I'd appreciate it.
25       A.  (Reading):  Phone call with Dan Cooperman 1/26/01.

167

1        Q.  And just let me know if you recognize it when
2    you've had a chance to look at it, please.
3        A.  This appears to be my responding e-mail to Dan
4    Cooperman when he sent me the clearance to trade for an
5    additional 7 days.  It appears to me to be acknowledging
6    receipt from Dan and thanking him, updating him on my
7    plans, and at the same time copying Kim Clarke at Merrill
8    Lynch for their compliance so they know that we've received
9    legal clearance from Oracle Legal Department to continue
10   trading for the following week.
11       Q.  Okay.  And do you recall having any conversations
12   with Mr. Ellison about trading not only his option shares
13   and not only his high basis shares but also his old zero
14   basis shares?
15       A.  I have no recollection of a conversation at this
16   point in time, but something we've looked at today, whether
17   e-mail or the Special Litigation Committee report or
18   something, refers to a discussion or an e-mail that I sent
19   to Larry laying this out with -- when we talked about the
20   400 million debt level.
21       Q.  Again just to be --
22       THE WITNESS:  (Addressing Ms. Kaplan)  I thought you
23   were raising your hand.  I apologize.
24   BY MR. SOLOMON:
25       Q.  Just to be clear you don't -- you just don't have

166

1    Bullet point, he'll clear Larry for sales all through next
2    week.  Will send me an e-mail confirming so.  Bullet point,
3    recommends we not trade past 1/31.  Perception better if
4    not trade in the last month of quarter or will clear
5    through February 2nd.
6        MR. SOLOMON:  Okay.
7            Then we'll mark as the next exhibit a document
8    produced by Oracle with the control number 042835.
9        (Exhibit 35 was marked for identification.)
10       THE WITNESS:  I've reviewed the document.
11   BY MR. SOLOMON:
12       Q.  Okay.  Do you recognize this exchange?  Or these
13   exchanges?
14       A.  I do not have any recollection of it, but it
15   appears to be an e-mail exchange between me and Carolyn
16   Balkenhol dated January 29th, 2001.
17       Q.  Okay.
18           And in response to your report to her as of
19   10:24 a.m. PST, she writes back saying, "Most excellent
20   work, Philip.  You ought to be very proud."  Do you see
21   that?
22       A.  Yes, I do.
23       Q.  Do you know what the excellent work was that she
24   was referring to?
25       A.  I think she's giving me positive feedback and

168

Simon, Phillip  9/6/2006  1:30:00 PM

1 thanking me for a good job executing the trades and doing
2 it properly.
3    Q.  Was that a difficult task, the execution?
4    A.  In hindsight it does not seem difficult; but at
5 the time, since I had never done it before, managing the
6 trades, managing people at Merrill Lynch, getting
7 clearance, doing everything properly and smoothly, it took
8 some effort.  It seems basic now, but at the time it was
9 probably stressful for me because it seemed like large
10 dollars at the time to me.
11    Q.  Your vacation ended abruptly?
12      And then you say, "Thank you, Carolyn.  Yes, I'm
13 very pleased."  Very pleased with the results of the
14 transactions?  Is that what you're referring to?
15    A.  I think I'm referring to that I'm very pleased to
16 be able to generate cash to pay down the debt, yes.
17 Because I find debt, as I've said before, uncomfortable.
18    MR. SOLOMON:  And we'll have marked as the next
19 exhibit another document produced by the defendants with
20 the control number 042839.
21    (Exhibit 36 was marked for identification.)
22 BY MR. SOLOMON:
23    Q.  When you've had a chance to review it, let me know
24 if you recognize it, please.
25    A.  I'm done reviewing this.

169

1    Q.  Okay.  Do you recognize this as a message you sent
2 to Carolyn Balkenhol?
3    A.  I have no recollection of the message, but it
4 appears to be an e-mail from me to Carolyn Balkenhol,
5 cc'ing Sue Bachman, dated January 29th, 2001, at 5:28 p.m.
6 in the afternoon.
7    Q.  And you expressed concern about publicity as more
8 Rule 144 filings go public.  Do you see that?
9    A.  Yes, I do see that sentence.
10    Q.  Thank you.  And what was your concern?
11    A.  I don't recall, but I think my concern was -- was
12 that Larry might want to stop selling because he's
13 concerned about negative comments about his selling, and I
14 wanted to sell as much as possible to pay off the debt.
15    MR. SOLOMON:  Okay.
16    Mark as the next exhibit a document produced by
17 defendants with control numbers 300645 and 646.
18    (Exhibit 37 was marked for identification.)
19 BY MR. SOLOMON:
20    Q.  Do you recognize this?
21    A.  I have no recollection of it, but it appears to be
22 an e-mail from me to Larry Ellison dated January 29th,
23 2001.
24    Q.  Okay.  And you report to him cumulative gross
25 proceeds of $756.4 million.  Do you see that?

170

1    A.  I see that.
2    Q.  And you tell her that after tax he's raised
3 $432 million?
4    A.  I see that.
5    Q.  Do you recall any response to this?
6    A.  I have no recollection of a response.
7    MR. SOLOMON:  Mark as the next exhibit a document
8 produced by defendants with control numbers 294240 -- bless
9 you.
10    THE WITNESS:  Thank you.
11    MR. SOLOMON:  -- 242.
12    (Exhibit 38 was marked for identification.)
13 BY MR. SOLOMON:
14    Q.  And the same question is do you recognize this?
15    A.  I have no recollection of this e-mail, but it
16 appears to be an e-mail exchange that Carolyn Balkenhol has
17 forwarded me on that she had with Barbara Wallace, and I
18 replied on January 29th, 2001.
19    MR. SOLOMON:  Okay.  I've marked as the next exhibit a
20 document produced by the defendants with control numbers
21 294245 to 246.
22    (Exhibit 39 was marked for identification.)
23 BY MR. SOLOMON:
24    Q.  Let me know if you recognize this.
25    A.  I have no recollection of this document, but it

171

1 appears to be an e-mail exchange from me to Carolyn
2 Balkenhol and Sue Bachman dated January 29, 2001.
3    Q.  Okay.  And you see at the end of your e-mail you
4 say, "We're continuing on with the trading tomorrow as per
5 Larry's instructions."  Do you see that?
6    A.  Yes.
7    Q.  And that would be -- tomorrow is referring to
8 January the 30th, 2001?
9    A.  That would appear to be the case, yes.
10    Q.  And do you recall how you received the
11 instructions from Larry that you refer to there?
12    A.  No, I do not.
13    MR. SOLOMON:  Mark this next exhibit, a document
14 produced by defendants with the control numbers 294255 and
15 256.
16    (Exhibit 40 was marked for identification.)
17 BY MR. SOLOMON:
18    Q.  Again, if you'd just let me know when you've had a
19 chance to review it, whether you recognize the exchange.
20    A.  I have no recollection of this document, but it
21 appears to be an e-mail from me to Carolyn Balkenhol and
22 Sue Bachman dated Tuesday, January 30, 2001.
23    Q.  And, again, it's you're reporting on the sales
24 results, correct?
25    A.  That's what it appears to be.

172

1    MR. SOLOMON:  Have marked as the next exhibit a

2    document produced by the defendants with control numbers

3    300652 to 654.

4    (Exhibit 41 was marked for identification.)

5    BY MR. SOLOMON:

6    Q.  Let me know if you recognize it when you've had a

7    chance to review it.

8    A.  I have no recollection of this document, but it

9    appears to be an e-mail from me to Larry Ellison dated

10    Wednesday, January 31, 2001, sent at 12:38 p.m. Pacific

11    Standard Time.

12    Q.  Okay.  And, again, you're reporting on this

13    occasion to Mr. Ellison the results of sales transactions,

14    correct?

15    A.  That's what it appears to be, yes.

16    Q.  And does this appear to be the final tally?

17    A.  I believe that's the case; but, uhm, I will find

18    out as we get to the next e-mail.  I think we stopped on

19    the 31st, but I don't recall.

20    Q.  And you'll see under point 2, and I think you

21    referred to this number earlier on, you see cumulative

22    gross sale proceeds of 894 million --

23    A.  Correct.

24    Q.  -- and some hundreds of thousands of dollars.  Do

25    you see that?

173

1    A.  Uh-huh.

2    Q.  And then at the bottom you say "PS, the U.S.

3    capital markets are pretty amazing, raising almost

4    $1 billion in eight days."  Were you surprised -- sounds

5    like you were pretty surprised that you were able to

6    accomplish that.

7    A.  No.  It's just more comment about we live in a

8    wonderful country with wonderful capital markets, and

9    commenting about it.

10    Q.  There was a floor price of $30 per share; is that

11    right?

12    A.  At one point in time during the period I believe

13    there was.  I do not recall if it was maintained throughout

14    the period.

15    Q.  Okay.  Do you know how that $30 minimum came

16    about?

17    A.  No, I don't recall.

18    Q.  Do you believe -- do you have any belief as to

19    whether or not it was Mr. Ellison's idea or not?

20    A.  Since I follow instructions, it was most likely a

21    result of discussion between Larry and me.  Or I should

22    say -- "discussion."  Communication because it could have

23    been e-mail or -- if that floor price did exist throughout

24    the trade period.

25    MR. SOLOMON:  I'll have marked as the next exhibit a

174

1    document produced by defendants with the control numbers

2    294252 to 254.

3    (Exhibit 42 was marked for identification.)

4    BY MR. SOLOMON:

5    Q.  And, again, when you've reviewed it, let me know

6    if you recognize it, please.

7    A.  I do not recall this document, but it appears to

8    be an e-mail from me to Kim Clarke at Merrill Lynch dated

9    Tuesday, January 30th, 2001, with cc's to Carolyn Balkenhol

10    and Catherine Ong.

11    Q.  Okay.  And, then, what's the relationship between

12    Mr. Ellison and Integral Capital Partners?  Or what was it?

13    A.  Integral Capital Partners is an investment

14    partnership; and Larry had been an investor in Capital

15    Partners and the partnership liquidated, sold most of its

16    assets, and issued some shares in kind to its investors.

17    Q.  Okay.  And these refer to Oracle shares?

18    A.  Correct.

19    Q.  And was Integral Capital Partners liquidated in

20    order to sell the shares?

21    A.  No.  These came out from the Integral Capital

22    Partners years before.

23    Q.  Okay.

24    A.  And I was tracking them because they had a high

25    tax basis, as opposed to the founders stock.

175

1    MR. SOLOMON:  And I've marked as the next exhibit a

2    document produced by the defendants with the control

3    numbers 294260 to 263.

4    (Exhibit 43 was marked for identification.)

5    THE WITNESS:  Thank you.

6    BY MR. SOLOMON:

7    Q.  And when you've had a chance to review it, let me

8    know if you recognize it.

9    A.  Okay.  I've finished reviewing these.

10    Q.  Do you recognize these exchanges?

11    A.  Once again I do not recall this document.  It

12    appears to be e-mail exchanges between me and Carolyn

13    Balkenhol dated March 1, 2001 -- I'm sorry.  Dated

14    February 1, 2001.

15    Q.  Okay.

16    And there's a reference to Equiserv?

17    A.  That is correct.

18    Q.  What is Equiserv?

19    A.  Equiserv was and may still be a transfer agent for

20    Oracle shares.

21    MR. SOLOMON:  I'll mark as next exhibit document

22    produced by defendants with the control numbers 294264 to

23    268.

24    (Exhibit 44 was marked for identification.)

25    THE WITNESS:  Okay.

176

1      BY MR. SOLOMON:
2      Q.  Do you recognize this document?
3      A.  No, I have no recollection of the document;
4   however it appears to be an e-mail from Barbara Wallace at
5   Oracle to Kim Clarke at Merrill Lynch with a cc to me.
6      Q.  Okay.  It starts saying Ricky Richardson at
7   Equiserv confirmed that he has both opinions for Larry's
8   stock sales.  Do you see that?
9      A.  Yes.
10     Q.  Do you know what opinions are being referred to?
11     A.  I believe they're referring to Larry's -- Larry as
12  an insider and founder of the company so his shares have a
13  restricted endorsement on it.  And in order to negotiate
14  the shares after the sale Oracle has to issue opinion that
15  they're freely transferrable; so Equiserv reissues the
16  shares in the name of DTC, Depository Trust Company, so
17  they can be freely transferred.
18     Q.  And if you go into the document, to the third
19  page, there's handwriting.  Do you see that?
20     A.  Correct.
21     Q.  Is that your handwriting?
22     A.  It does look like my handwriting.
23     Q.  And can you read, first of all, what's in the
24  upper or middle right-hand side of the page.
25     A.  There's a bracket and it says 3,147,424, room left

177

1   on Rule 140 (sic) filing made 1/30/01.
2      Q.  What does that mean?
3      A.  It's basically showing how many shares have been
4   sold versus how many we had filed the Rule 144 form for,
5   and showed the room that was available within the Rule 144
6   filing for additional sales.
7      Q.  Okay.  And then the bottom of the page, can you
8   read that, please.
9      A.  There's a little tick mark, which is a circle with
10  a line through it; and it's cross-referenced to a little
11  tick mark with a line through the line for a certificate
12  under the certificates in the far left-hand column, that's
13  referring ties to H&S records.  H&S stands for Howson &
14  Simon records, so it ties to my records.
15     Q.  Okay.
16     A.  Then there's another tick mark, a little w with
17  a -- on a horizontal line going through it, referring to --
18  and you see Certificate No. C138880.  And my comment says,
19  "No H&S record to tie to though 9,968,800 shared
20  certificate reconciles to 10,000 share certificate less
21  31,200 shares donation on 1/4/01 to UCD."  Which is
22  University of California Davis, which was the million
23  dollar donation in stock that we referred to earlier.
24     MR. SOLOMON:  I'll have marked as the next exhibit a
25  document produced by defendants with the control numbers

178

1   294269 and 270.
2      (Exhibit 45 was marked for identification.)
3      THE WITNESS:  I've reviewed the document.
4      BY MR. SOLOMON:
5      Q.  Do you recognize this?
6      A.  I don't recall the document, but it appears to be
7   an e-mail exchange from -- with me and Carolyn Balkenhol
8   dated February 27, 2001.
9      Q.  Okay.
10     Looking at the e-mail from you to Carolyn
11  Balkenhol, you, first of all, in the first paragraph talk
12  about a trip that you're making to New York; and you say
13  you're going to meet the head of NASDAQ trading for Merrill
14  Lynch, correct?
15     A.  That's what it says, yes.
16     Q.  What was the purpose of meeting with him?  Or her?
17     A.  I wasn't happy with the execution we received on
18  the trades from Merrill Lynch.
19     Q.  Now, which is reflected where you say "I was not
20  fully satisfied"?
21     A.  Correct.
22     Q.  And what was it that you were unhappy about or not
23  satisfied with?
24     A.  I don't believe we got the best price, and I
25  thought -- I was suspicious they had marked up the price.

179

1   I had asked for transparency in the commission they were
2   quoting to me I was promised that, but I was suspicious
3   that they clipped us.
4      Q.  When you say -- that's interesting.
5      When you say "they," who are you referring to?
6      A.  Merrill Lynch.  Institutionally.  Not individuals
7   at Merrill Lynch, Merrill Lynch institutionally.
8      Q.  You say, "I was not fully satisfied," then you say
9   in parens, "(maybe wrongfully so but I'll learn more in
10  New York) with the way the trading went when we sold the
11  29 million shares.  Big picture, we did wonderfully,
12  29 million shares sold at a good price, very discreet, the
13  market really didn't pick up on the sales until we were
14  almost done.  In many ways I'd rate the outcome as an A,
15  but I was hoping it would match or get close to the daily
16  volume weighted average price each day.  We did on a few
17  days, but generally only when Oracle traded below our 30
18  limit."  That's the $30 limit, correct?
19     A.  Correct.
20     Q.  "Otherwise we tended to be 12 to 13 cents off."
21     Is it your belief that Merrill Lynch was somehow
22  ripping you off to the tune of 12 to 13 cents?
23     A.  Are you asking me about the time I sent this
24  e-mail or after I came back from New York?
25     Q.  Take them one at a time.  When you wrote the

180

1    e-mail?

2        A.  At the time I sent the e-mail I was suspicious.

3        Q.  You say here you would learn more in New York,

4    right?

5        A.  Correct.

6        Q.  Did you learn more in New York?

7        A.  Yes.

8        Q.  Did your opinion change?

9        A.  What?

10       Q.  Did you change your opinion or your view?

11       A.  I went from suspicious to absolute certainty.

12       Q.  That you had been ripped off?

13       A.  Let me put it this way:  They promised me complete

14   transparency and a certain stated commission, and that's

15   what the people thought they were getting, and I believed

16   them.  But they were not sophisticated enough to control

17   their NASDAQ desk, and the NASDAQ desk was lying or

18   omitting to tell the people I was working with in Newport

19   Beach.  And I spent a day in meetings in New York and they

20   obfuscated, never said anything, until I met with the head

21   trader.  And I said, "Okay, bygones are bygones."  I said,

22   "We just want to learn from the experience.  How can I do

23   it better in the" past?  "In the future."

24       And the measure of performance is volume weighted

25   average price or what's called VWAP.  VWAP is the standard

                                                          181

1    measurement of performance.  And you get the volume

2    weighted average price throughout the day.  And that's how

3    you measure performance.  And I said we were 12 to 13 cents

4    off was what I was picking up.  And they could obfuscate

5    because we had a limit.

6        The trader, who's not a salesman on the floor,

7    after hours of discussions, when I asked the question what

8    could we do in the future?"  He said, "Well, I can get

9    VWAP.  Then I don't have to pay the 1/8th to the trading

10   desk.  1/8th is 12 and a half cents.

11       And then they all denied that he even said it; but

12   I had my expert with me and we both confirmed that's what

13   we heard.  And now when I trade I trade very differently.

14       Q.  Do you still use Merrill Lynch?

15       A.  They're one of our lenders, and I have used them.

16   And I've used other banks in our 10b51 plan.  But I have a

17   very, very different rein.  I'm judging them against VWAP.

18   I have a much lower commission.  And the 10b51 plan is with

19   me so I have the right to move it from broker to broker if

20   they don't perform.  And the next set of trading in the

21   10b51 plan we were a fraction of 1/100th of a penny off

22   VWAP.

23       Q.  And talking about the 10b51 plan, when was that

24   put in place?

25       A.  Two thousand -- it ran for four quarters.  I would

                                                          182

1    say it started sometime in January 2005 through January

2    2006.  I don't have quite the data.

3        Q.  Is there no current 10b51 plan?

4        A.  That is correct.

5        Q.  Did you -- was it you that persuaded Mr. Ellison

6    to participate in such a plan?

7        A.  Yes.

8        Q.  Was it difficult to persuade him to?

9        A.  It depends what you mean by difficult.

10       Q.  What efforts did you have to make to persuade him

11   to?

12       MS. KYROUZ:  Objection.  Vague.

13       THE WITNESS:  You suggest, you cajole, you whine.  You

14   talk.

15       BY MR. SOLOMON:

16       Q.  And this is over years and years?

17       A.  Over periods of time.

18       Q.  Did you have conversations with Mr. Ellison --

19   have you had conversations with Mr. Ellison about the 10b51

20   plan?

21       MS. KYROUZ:  Objection.  Vague.

22       THE WITNESS:  This is in 2005, well after this?

23       MS. KYROUZ:  Object on grounds of relevance for the

24   line of questions.

25       THE WITNESS:  The answer is I must have had

                                                          183

1    communications with him because I set it up.  But I don't

2    recall the specific details.

3        BY MR. SOLOMON:

4        Q.  Okay.  Were the January transactions, the trades,

5    ever mentioned in the context of discussing the 10b51 plan?

6        A.  I have no recollection but don't believe so.

7        Q.  Why did he drop the plan?

8        A.  It was a one-year plan, and we fulfilled the terms

9    of the plan.

10       Q.  Okay.

11       And that's one --

12       A.  Just to clarify.  So it wasn't dropped.

13       Q.  It was a one-year plan and it expired?  That's

14   what --

15       A.  Correct.

16       Q.  -- you're saying?

17       And there's not another one in place as of yet?

18       A.  There is no plan currently in place.

19       Q.  And that was one time that Mr. Ellison has

20   participated in such a plan; is that right?

21       MS. KYROUZ:  Objection.  Lacks foundation.

22       THE WITNESS:  I believe the 10b51 plan provisions came

23   in 2003, 2000 -- I don't recall when the regulation was

24   enacted, but I believe we've only done one since then.

25       BY MR. SOLOMON:

                                                          184

Simon, Phillip  9/6/2006  1:30:00 PM

1    Q.  Did you get any compensation from Merrill Lynch?
2    A.  Me, personally?
3    Q.  No.  For Mr. Ellison and the fact that they had
4  ripped him off.
5    A.  No, because it was never clear.  But I got better
6  service in the future.
7      And I'm -- you know, you still never have
8  100 percent certainty, you just have higher probability.
9    MR. SOLOMON:  I'll have marked as the next exhibit a
10  document produced by the defendants with the control
11  numbers 294274 and 275.
12    (Exhibit 46 was marked for identification.)
13    THE WITNESS:  Might I add just to clarify your prior
14  comment --
15    MR. SOLOMON:  Sure.
16    THE WITNESS:  -- just for explanation about
17  compensation?
18      It turns out that the world is much more
19  complicated.  Merrill Lynch -- to understand that e-mail,
20  the trader was actually dinged.  Several of the large
21  mutual funds stopped trading with Merrill for, I don't
22  know, a week or two to punish them for not leaking that
23  they had big trading volume.  And so, therefore, in a sense
24  when you trade, you also have to compensate the firm you're
25  trading with to honor their confidentiality to you not to

185

1  benefit their regular customers.  So it's not so clear-cut
2  whether we were taken advantage of or whether it's a
3  necessary comp- -- commission structure you have to pay to
4  induce good behavior.
5      Does that make sense to you?
6    MR. SOLOMON:  It's a den of thieves as far as I'm
7  concerned, sir.  None of this surprises me.
8    Q.  Anyway, let's look at this document.  Do you
9  recognize this?
10    A.  This -- I don't recognize the document, but it
11  appears to be a schedule that I would have prepared or my
12  office would have prepared for me.
13    Q.  Okay.  And does this reflect an increase in
14  Mr. Ellison's borrowing ability?
15    A.  What's this?
16    Q.  Does this reflect any increase in Mr. Ellison's
17  borrowing ability?
18    MS. KYROUZ:  Objection.  Vague as to time.
19    THE WITNESS:  It does appear to indicate that the
20  LIBOR -- the aggregate lines are up to 1.7 billion, which I
21  believe was previously 1.35.
22    MR. SOLOMON:  I have marked as the next exhibit a
23  document produced by the defendants with the control
24  numbers 300655 to 658.
25    (Exhibit 47 was marked for identification.)

186

1    THE WITNESS:  I'm finished reviewing this.
2    BY MR. SOLOMON:
3    Q.  And do you recognize these exchanges?
4    A.  This appears to be the first e-mail from me to
5  Carolyn forwarding on an e-mail, which is a e-mail exchange
6  from me to Larry --
7    Q.  Okay.
8    A.  -- dated March 7, 2001.
9    Q.  Okay.
10      And the e-mail that you write to Larry Ellison
11  basically provides a description of the status of his bank
12  lines and stock sale proceeds and cash position, correct?
13    A.  Yes, that appears to be the case.
14    Q.  Looking at page 2, which is 300657 --
15    A.  Correct.
16    Q.  -- you say under point 3, "application of
17  648 million dollars net sales proceeds," and you say
18  "340 million dollars have been used to pay down various
19  bank lines."  Do you see that?
20    A.  Yes, I see that.
21    Q.  And then you say "after paying a few additional
22  items, including paying off the mortgage on your Atherton
23  home, the current cash balance is about 300 million.  I've
24  tentatively decided to allocate this 300 million as
25  follows," and then there's sub A, which refers to

187

1  86 million as a reserve to pay residual income taxes?  Do
2  you see that?
3    A.  I see that.
4    Q.  150 million as a reserve to fund personal
5  expenditures over the next 12 months.  Do you see that?
6    A.  I see that.
7    Q.  Did that, in fact, occur?  Was 86 set aside to pay
8  residual income taxes and was 150 million set aside to fund
9  personal expenditures?
10    A.  I have no recollection, but I would assume that
11  was the case.  It appears to be my summary of the plan of
12  what I would do.  And there may have been minor variations,
13  but I don't recall exactly what happened.
14    Q.  Then you -- in sub B you talk about what the
15  personal expenditures include --
16    A.  Uh-huh.
17    Q.  -- and you mention the construction of the
18  Woodside home, and there's a mention of an installment
19  payment to Larson.  Is that the yacht builder?
20    A.  Correct.
21    Q.  And you say that Larson payments projected for
22  2001 total $90 million, $45 million due in the next few
23  weeks and further $45 million toward the end of October,
24  correct?
25    A.  That's what it says.

188

Simon, Phillip  9/6/2006  1:30:00 PM

1    Q.  Is it your belief that those payments were made?
2    A.  Yes.  Maybe not exactly on those dates.
3    Q.  Okay.
4        Then you say, "As previously discussed, I'm
5    retaining the reserve for income taxes and personal
6    disbursements (rather than paying down the lines further
7    and then reborrowing) because the income tax rules provide
8    that the interest expense on funds borrowed for personal
9    purposes, which include income tax payments, is
10   nondeductible."  Is that right?
11   A.  You're reading correctly.
12   Q.  Then you say, "Thus, if I pay down the bank lines
13   and then reborrowed, the interest expense on the borrowed
14   funds would be nondeductible."  Do you see that?
15   A.  I see that.
16   Q.  So, in fact, did his debt remain at around a
17   billion dollars after these transactions?
18   MS. KYROUZ:  Objection.  Misstates the documents and
19   his testimony.
20   THE WITNESS:  I don't think so.  I think we paid it --
21   there's a schedule.  Weren't we looking at earlier?  You
22   gave me a LIBOR schedule.  It dropped -- on February 28th
23   it dropped to --
24   MS. KYROUZ:  That's 2002.
25   THE WITNESS:  Oh, that's 2002.

189

1        So let me think.
2        Do you know what the debt was in January?  It was
3    around a billion one, let's say.  Billion, one.
4    MR. SOLOMON:  A billion, 22.
5    THE WITNESS:  340 has been used so far, another 64, so
6    it's 340,404.  My guess it got paid down to around
7    700 million level or something like that.  I would have to
8    look at the other documents you have to reconcile this for
9    you.
10   MR. SOLOMON:  Okay.
11   THE WITNESS:  And I can do that for you if you get me
12   the other documents.
13   MR. SOLOMON:  Okay.
14       I've marked as the next exhibit a document
15   produced by Oracle with the control numbers 294271 to 273.
16       (Exhibit 48 was marked for identification.)
17   MR. SOLOMON:  In fact, I think you just have two
18   pages; is that right?
19   A.  Correct.
20   Q.  Okay.  So the exhibit, to be correct, is 29472
21   (sic) and 73.
22   MS. KYROUZ:  Those aren't the numbers --
23   MR. SOLOMON:  294272 and 73.
24   MS. KYROUZ:  Actually, the one that we just got --
25   THE WITNESS:  612086.

190

1    MS. KYROUZ:  -- was 612086.
2    MR. SOLOMON:  Okay.  We've just got them reversed.
3    Hold on one second.
4        We can look at that one.
5    MS. KYROUZ:  Okay.
6    BY MR. SOLOMON:
7    Q.  So what's the number you have on the first page
8    there, Mr. Simon?
9    A.  612086.
10   Q.  And then the second one is 87, correct?
11   A.  Correct.
12   Q.  Okay.  Why don't you look at this one first, and
13   then we'll come back to the other one.
14       First of all, just let me know if you recognize
15   it.
16   A.  I have no recollection of this.  Well, actually, I
17   do have some recollection of this.  You have an e-mail that
18   I have some recollection of.
19   Q.  Bingo.
20   A.  I think this is the one that was in the Chronicle.
21   The promised confidentiality.
22   THE VIDEOGRAPHER:  Five minutes, Counsel.
23   MR. SOLOMON:  Okay.
24   THE WITNESS:  So I do have a recollection of this
25   e-mail, and it does appear to be an e-mail from me to Larry

191

1    dated March -- dated May 3, it looks like, 2002.
2    BY MR. SOLOMON:
3    Q.  Okay.  And EMF is Ellison Medical Foundation?
4    A.  That is correct.
5    Q.  And, again, you're expressing your concern in here
6    that Mr. Ellison sell stock and diversify?
7    A.  I think I'm really saying pay down debt first.
8        I don't know if it's -- I didn't read it close
9    enough to refer to diversification, but that would be --
10   the first would be to reduce debt and then diversification.
11   Q.  Okay.
12       If you look at the second page, you say --
13   A.  Oh, yes.  One billion -- no debt and a billion
14   after tax proceeds.  So, indeed, it does deal with
15   diversification.
16   Q.  You say on the second page, in part, I know all
17   the eloquent arguments you can make to counter my proposal.
18   See that?
19   A.  Yes.
20   Q.  What are those eloquent arguments?
21   A.  Larry is very smart and clever and very quick, and
22   he can engage in intellectual debate arguing the
23   intellectual merits of diversification versus
24   nondiversifying assets.  That's what I was referring to.
25   Q.  And what's his argument in favor of

192

Oracle                                    Page  189 - 192

Simon, Phillip  9/6/2006  1:30:00 PM

1  nondiversification?
2      A.  I don't know what his argument would be, but I
3  know my own argument.  And this is that wealth is preserved
4  or more likely slowly lost via diversification because of
5  taxes, inflation.  But real wealth -- and with putting all
6  your eggs in one basket, that's how real wealth is created;
7  but it's also how you have the greatest risk of losing your
8  wealth.  So the question comes down, are you going to put
9  all your eggs in one basket and watch that basket very
10  closely?  Or are you going to diversify and have your
11  assets spread and have your wealth spread across a broad
12  class of assets which will have, on average, average
13  returns.  Which -- without the volatility inherent in a
14  single asset.  So that would basically be the discussion.
15  More eloquently stated though.
16      Q.  Has Mr. Ellison, in your view, moved from a
17  nondiversification perspective to a diversification
18  perspective?
19      MS. KYROUZ:  Objection.  Vague.
20      THE WITNESS:  You're asking current position?  Or are
21  you asking in 2002?  I'm not sure what --
22      MR. SOLOMON:  Currently would be fine.
23      MS. KYROUZ:  Objection.  Not relevant.
24      THE WITNESS:  Like most founders, Larry is very
25  attached to his holdings and prefers not to sell the stock

193

1  of the company he founded.  That's my interpretation of
2  what I've observed over the years, it's not based on any
3  discussions I've had with Larry.
4      BY MR. SOLOMON:
5      Q.  All right.  Then you go on to say, "I do not want
6  you to end up like Carl Karcher, Wang, Bernie Ebbers, and
7  the countless others."  Do you see that?
8      A.  Yes.
9      Q.  Did you discuss this concern with Mr. Ellison
10  other than in this e-mail?
11      A.  I have no recollection, but probably not.
12      Q.  And do you recall whether Mr. Ellison responded to
13  this e-mail?
14      A.  I have no recollection of a response.
15      Q.  Did you hear any reaction from Ms. Balkenhol or
16  anybody else to this e-mail?
17      A.  I don't recall.  There may be.  And there would be
18  e-mails.  If we find something, there may be e-mails.
19      Did I copy Carolyn on this?  Yes, Carolyn was
20  copied.
21      Q.  Okay.  Do you get on well with Ms. Balkenhol?
22      MS. KYROUZ:  Objection.  Vague.
23      THE WITNESS:  I do, and I did.
24      BY MR. SOLOMON:
25      Q.  Did you ever have any disagreements concerning

194

1  Mr. Ellison's securities transactions with Ms. Balkenhol?
2      A.  No, never.
3      Q.  With anybody?
4      A.  I'm not sure what you mean by disagreements, but I
5  think I'm fairly pleasant, and my job is to execute
6  transactions in an effective, efficient way.  So I don't
7  recall ever having run into trouble with or having any
8  problems with anybody.
9      Q.  And I'm still looking at the same e-mail.  And you
10  say towards the end that "you told me years ago that it's
11  okay to raise the 'diversification issue,'" in quotes,
12  "with you quarterly.  Well, I'm doing so.  Yet," excuse me.
13  "View this as a call to arms."  Do you see that?
14      A.  Uh-huh.
15      Q.  Do you know when you're referring to when you say
16  he told you years ago it was okay to raise diversification
17  issues with him quarterly?
18      A.  No, I don't really recall.  Sometime in the very
19  early stages of our relationship.
20      Q.  And then you finish by saying, "I'd be happy to
21  meet with you at any time to discuss this further and to
22  work out a" definite plan -- sorry, "a definitive plan."
23  Do you see that?
24      A.  Yes.
25      Q.  And did any such meeting ever take place?

195

1      A.  I do not recall having any such meeting.
2      MR. SOLOMON:  Okay.  Then we'll have marked --
3      THE VIDEOGRAPHER:  Change tape?
4      MR. SOLOMON:  Of course.  Thanks.
5      THE VIDEOGRAPHER:  End of Tape 3, Volume I, in the
6  deposition of Philip Simon at 3:54.  Going off the record.
7      (Recess taken.)
8      THE VIDEOGRAPHER:  On record at 4:00.  This marks the
9  beginning of Tape 4 in Volume I in the deposition of Philip
10  Simon.
11      MR. SOLOMON:  I'll have marked as the next exhibit a
12  document produced by the defendants with control numbers
13  294271 through 273.
14      (Exhibit 49 was marked for identification.)
15      THE WITNESS:  Okay.
16      BY MR. SOLOMON:
17      Q.  And let me know if you recognize that, please.
18      A.  I have no recall of this document.  But it appears
19  to be an e-mail from me to Larry Ellison dated Tuesday,
20  March 5, 2002, with a cc to Carolyn Balkenhol.
21      Q.  Okay.  And it refers to an Excel spreadsheet
22  detailing -- see there at the bottom there's a reference to
23  an Excel spreadsheet?
24      A.  Correct.
25      Q.  Do you have a copy of that spreadsheet?

196

1    A.  It's not attached to this.

2    Q.  Did you review it before this deposition, do you

3    know?

4    A.  No.

5        Actually, I don't recall.

6    Q.  Okay.

7        Do you sit on the board of any publicly traded

8    companies?

9    A.  At the current time, no.

10   Q.  Have you in the past?

11   A.  Yes, I have.

12   Q.  Can you describe them to me, please.

13   A.  I was on the board of Spring PLC, a UK public

14   company.

15   Q.  And that's the only one?

16   A.  Yes.

17   Q.  Okay.  When were you on the board of that?

18   A.  For 12, maybe 18 months.  I resigned sometime I

19   think in the first quarter of '06.

20   Q.  Was Mr. Ellison involved in that company as well?

21   A.  He had no personal involvement, but he indirectly

22   owned a percentage of the stocks of the shares of Spring

23   PLC.

24   Q.  And was it at his instigation that you were placed

25   on the board?

                                                    197

1    A.  He had nothing to do with it.  Put it this way, I

2    was placed on the board because of Larry's ownership in

3    interest in this company but was not at Larry's

4    instigation.  Larry probably is barely aware of this

5    company and what it does.

6    Q.  Because you've managed that investment for him; is

7    that fair?

8    A.  There's a colleague I work with that has managed

9    this asset for him, and the distribution out -- the

10   holdings are not directly in Larry's name or one of the

11   entities we control; but it came out of a distribution from

12   an invest- -- a company which we'd invested.

13   Q.  Okay.  To the SLC Committee you described your

14   relationship with Mr. Ellison as professional and not

15   social.

16   A.  That is correct.

17   Q.  Does that remain the case today?

18   A.  Yes.

19   Q.  And with Ms. Balkenhol is the answer the same?

20   A.  No.

21   Q.  What's the difference?

22   A.  Carolyn and I have had at one point in time a very

23   close relationship.  We'd talk on the phone, e-mail

24   regularly.  And I don't know if we ever got together

25   socially, but we've gotten together several times to visit

                                                    198

1    and talk.

2    Q.  Okay.  And were you -- did you have that friendly

3    relationship with her at the time of the stock transactions

4    in January 2001?  Had it reached that point?

5    A.  Yes.  But this is -- just so you know, this is a

6    work friendship, not a personal friendship.

7    Q.  I hear you.

8    A.  I mean, it's not -- what I'm saying is -- it is

9    not a romance, it's not even a friendship friendship with a

10   friend.  What I'm saying is I had a very good, warm working

11   relationship with Carolyn.  And, yes, during the time of

12   this transaction, yes, I had a very good, warm working

13   relationship with her.

14   Q.  Okay.

15       And had -- was that the case with Ms. -- her

16   predecessor?

17   A.  Jenny Overstreet?

18   Q.  Overstreet?

19   A.  Less so.

20   Q.  Okay.

21   A.  But a decent working relationship.

22   Q.  Have you had any disputes with anyone at Oracle

23   during the time you've been looking after Mr. Ellison's

24   finances?

25   A.  Yes.

                                                    199

1    Q.  Who have you had disputes with?

2    A.  With Carolyn.

3    Q.  What did those disputes concern?

4    A.  She got very upset with me at one point in time

5    several years back in our relationship and --

6    Q.  What was the reason?

7    A.  You know, I still don't fully understand it.  I

8    could try to explain it -- I'm not even certain I could

9    explain it.  She felt I was not protective of her in a

10   situation where I should have been potentially.  I did not

11   understand her situation well enough so she was upset with

12   me.  And we've since reconciled to a certain extent, but I

13   don't work with Carolyn very regularly at all now.

14   Q.  And protective of her with respect to Mr. Ellison?

15   A.  Correct.

16   Q.  Does Mr. Ellison tend to lose his temper?

17   A.  I have no way of --

18   MS. KYROUZ:  Objection.  Vague.

19   THE WITNESS:  First of all, I have no way of knowing

20   because I don't -- I've -- on average, I've -- I mean it's

21   hard to tell how frequently I've met with Larry in person;

22   but maybe it's averaged two, three times a year.  Maybe

23   five times.  I don't know, but maybe I've met with Larry 30

24   times or 40 times over 12 to 13 -- well, maybe 13 years

25   now.  And I've had maybe more regular but maybe 8 phone

                                                    200

Simon, Phillip  9/6/2006  1:30:00 PM

1  calls a year.  And during certain periods, you know, more
2  regular as you saw here; but I've had no -- I've been
3  treated very -- I'm very amicable but --
4  BY MR. SOLOMON:
5  Q.  He hasn't yelled at you?
6  A.  -- brief.
7  I've never been yelled at.  And I have a brief,
8  short relationship with Larry.  When we talk on the phone
9  it's a minute or two minutes dealing with specific business
10  transactions.  In contrast with Carolyn, after we do the
11  business I'll say, "how are your children doing?"  And
12  we'll talk about her children.  So I have a different
13  relationship with Carolyn than I would with Larry.
14  Q.  What was the issue that she felt you hadn't
15  protected her concerning?
16  MS. KYROUZ:  Objection.  Vague.
17  THE WITNESS:  This happened in 2005 or 2006.
18  MS. KYROUZ:  Also, objection.  Relevance.
19  THE WITNESS:  I'm trying to figure out exactly what --
20  I don't totally understand, but I probably was -- I don't want to
21  really understand the issue, but we're beyond it.  It's one
22  of personal hurt feelings.
23  This has nothing to do with the -- with the
24  Oracle securities sales, it has nothing to do with Larry's
25  financial business.  It has to do with personal

201

1  relationships, and I hurt her feelings.
2  MR. SOLOMON:  Okay.
3  All right.  Well, let's take a break; and then,
4  hopefully, we'll get done very quickly after the break.
5  THE VIDEOGRAPHER:  Off the record at 4:08.
6  (Recess taken.)
7  THE VIDEOGRAPHER:  On record at 4:15.
8  MR. SOLOMON:  I've marked as the next exhibit a
9  printout of a San Francisco Chronicle article.
10  (Exhibit 50 was marked for identification.)
11  THE WITNESS:  Okay.  I've read this exhibit.
12  BY MR. SOLOMON:
13  Q.  Do you recognize this as the article we discussed
14  earlier?
15  A.  It appears to be.
16  Q.  Looking at page 4, at the top where it says
17  "page 4 of 6."
18  A.  Uh-huh.  Yes.
19  Q.  First of all, the floor price of $30 -- I know we
20  mentioned this earlier, I just want to be absolutely sure.
21  You don't recollect who insisted on the floor price of $30
22  per share?  Is that fair?
23  A.  I said I have no current recollection, but I
24  suspect Larry insisted on it.
25  Q.  Okay.

202

1  And you see that there was the floor of $30 a
2  share and this report says, "Oracle's shares fell to $16.88
3  in March of that year, after Oracle warned that its third
4  quarter profit would not meet market expectations."  Do you
5  see that?
6  A.  I see that.
7  Q.  And do you remember we started off today with me
8  asking whether you recalled in March Oracle announcing that
9  it missed its numbers and the stock price collapsing.  And
10  I think your testimony this morning was you didn't have a
11  recollection?
12  A.  That is correct.
13  Q.  Does this refresh your recollection?
14  MS. KYROUZ:  Objection.  Lacks foundation.
15  BY MR. SOLOMON:
16  Q.  Go ahead.
17  A.  The answer is no because I don't know if this is
18  an accurate -- this is just an article in the newspaper.
19  I'm not trying to be facetious here, but this is an article
20  in the newspaper.  And I think it was published recently,
21  I'm not sure when.  In January 2006.  So I don't know if
22  this is accurate or not.  It probably is, but I don't know.
23  But it doesn't refresh any recollection because I was
24  not --
25  Q.  Okay.

203

1  A.  I'm sorry, I just don't recall.
2  Q.  If -- let me put it this way.  Let's assume that
3  this is an accurate recitation, that it fell to $16.88 in
4  March.
5  A.  Okay.
6  Q.  Is it true that you would have been aware of that
7  because on your Yahoo! screen on a daily basis you were
8  looking at Oracle's stock price?
9  MS. KYROUZ:  Objection.  Misstates prior testimony.
10  Asked and answered.
11  THE WITNESS:  The answer is I have no recollection of
12  what Oracle's stock price was at any point in time; but I
13  do know that when the bubble burst Oracle stock declined
14  like almost every other technology stock; but I do not know
15  the price at the time.  But if this, indeed, was the price
16  in March of 2001, I did have a Yahoo! home page that lists
17  the Oracle price on it and I do look at it daily, every
18  other day; so I would have probably noticed this, yes.
19  BY MR. SOLOMON:
20  Q.  Okay.  And is it your belief, as you testified
21  today, that the decline to $16.88 per share in March of
22  2001 was part of the bubble bursting generally?
23  MS. KYROUZ:  Objection.  Lacks foundation.
24  THE WITNESS:  I don't -- you said is it my belief
25  based on testimony today.

204

Simon, Phillip  9/6/2006  1:30:00 PM

BY MR. SOLOMON:

Q.  No.  Is it your belief as you testified today?

A.  Okay.  Because I don't recall what I testified today.  Okay.

Q.  You talked a few minutes ago about the bubble bursting and everything coming down.  Is it your belief that this decline in price referred to here, $16.88 in March of 2001, was part of the general bursting of the bubble?

A.  At --

MS. KYROUZ:  Objection.  Lacks foundation.

THE WITNESS:  I'm not an expert in specific securities selection, but my general understanding is that all technology stocks declined during this bubble --

Q.  Yeah.

A.  Some by up to 80 or 90 percent in value from their peak, and I believe Oracle's price declined with that.  I've never mapped out a decline of the overall technology stock or specific stocks and comparing Oracle's trend line to any other stock or index of technology stocks so I'm really not equipped or prepared to opine to you on the correlation.

Q.  Okay.

A.  Specifically.  However, my general sense is the overall market declined.  I know the overall market

205

declined; and apparently based on this, Oracle stock declined.  And there was PE contraction during this period.

Q.  And when you talk about declined, are you talking about March in particular of 2001?

A.  No.

Q.  So what period of time are you talking about?

A.  From when the bubble burst until the end of the -- when the trough was sometime in 2002, 2003.  I'm not sure.  Or 2004.  I'm not sure when the trough was.

Q.  Okay.  When did the bubble burst?

MS. KYROUZ:  Objection.  Lacks foundation.  Asked and answered.

THE WITNESS:  Once again, you're asking me a comment -- I'm not an expert on this.  My general sense is the peak of the stock market of the NASDAQ was sometime in March of 2000.  And the stocks started to decline somewhat at that point in time, and I'm not sure how long it continued and when the trough was reached in the overall market, but two to three years would be my assumption.

BY MR. SOLOMON:

Q.  Okay.  Let's carry on going down this page.

And we see that you've itemized on the bottom 1 through 6.  Do you see that?

A.  Correct.

Q.  Lifestyle.  What do you mean by lifestyle?

206

MS. KYROUZ:  Objection.  Mischaracterizes the article and the document.  Asked and answered to the extent we've already discussed the document.

THE WITNESS:  Okay.  Assuming this is correct, which you showed me an e-mail before --

MR. SOLOMON:  Yeah.

THE WITNESS:  And I would be much more comfortable to work off an actual e-mail that we -- that appears to be an e-mail I sent versus an article summarizing it.  But assuming this is an identical summary of an e-mail that appears to be an e-mail that I sent --

MR. SOLOMON:  Okay.

THE WITNESS:  -- lifestyle refers to basic living expenses.  Electricity.  You know, basic expenses to live life.  Costs that include household staff, clothing, operation of the airplane and operation of the yacht.

MR. SOLOMON:  Okay.

THE WITNESS:  Operational expenses.

BY MR. SOLOMON:

Q.  Okay.

Villa in Japan, No. 3.  When did you become aware that $25 million should be assigned to a villa in Japan?

A.  I don't recall.  But apparently sometime around the time I sent the e-mail I was aware there was a possibility of acquiring a piece of property in Japan.

207

Q.  Do you know how you became aware of that possibility?

A.  Contacted by Carolyn or Larry.

Q.  Okay.  And was there -- was, in fact, that amount of money spent on a villa in Japan?

A.  No.

Q.  Do you know why not?

A.  Decided not to do the purchase.

Q.  Okay.

No. 4 is new yacht, 194 million over three years.  Do you see that?

A.  Yes, I do.

Q.  When did you become aware of Mr. Ellison purchasing a new yacht?

MS. KYROUZ:  Objection.  Misstates the document.

THE WITNESS:  Uhm, I don't recall when I became aware; but there was a construction contract signed to build a new yacht.  It wasn't a purchase.  So I became aware of it at the time I was involved in negotiating the purchase -- the construction agreement.

MR. SOLOMON:  Okay.

THE WITNESS:  It was before the time of this e-mail.

MR. SOLOMON:  Okay.

THE WITNESS:  I believe.  Though it may have been planned but not yet signed at the time.  I don't recall.

208

1    BY MR. SOLOMON:
2    Q.  Do you have a copy of that construction contract?
3    A.  With me here today?
4    Q.  No.  I'd be fascinated if you did.  I doubt if you
5    do.
6    A.  No.  I do have a copy of it.
7    Q.  And do you have copies of any other documents
8    relating to the new yacht as referred to in item 4?
9    A.  Yes.
10   MS. KYROUZ:  Objection.  Vague.
11   THE WITNESS:  Yes.
12   BY MR. SOLOMON:
13   Q.  What other documents do you have?
14   A.  Correspondence going to and from.  I have records
15   of payment, purchasing foreign exchange, e-mails to and
16   from the shipyard and to our project manager.
17   Q.  And were these documents turned over in the state
18   court litigation?
19   A.  To the extent these documents were responsive to
20   their items requested in the subpoena from the state court
21   litigation, they were turned over.  To the extent they were
22   not requested, they were not turned over.  And to the
23   extent that these documents occurred after the time period
24   for which the document was requested -- for example, if I
25   had an e-mail from the shipyard three weeks ago, it was not

                                                            209

1    turned over.
2    Q.  And do you have any idea whether or not documents
3    concerning Mr. Ellison's new yacht would be responsive to
4    the subpoena served upon you in this litigation?
5    A.  My understanding that agreement was reached that
6    the documents I submitted in the state court litigation
7    covered a period and were relevant to the subpoena issued
8    here and therefore met the requests; and therefore,
9    accordingly, my understanding from my attorney was that we
10   met your request; and they had spoken with you and that
11   satisfied your document request.
12   Q.  Did you start off by saying your understanding was
13   an agreement had been reached?
14   A.  I understood there was a discussion between my
15   attorney and your office that the documents that were
16   provided were adequate.
17   Q.  Really.  Boy.
18        Who told you that?
19   A.  I don't know.  That was just my understanding.
20   Because everything was provided that was requested.
21   Q.  Well, since that's absolutely not true, I'd be --
22   A.  Okay.
23   Q.  -- very interested in knowing you was telling you
24   that.
25   A.  Then I don't know, maybe I was wrong.

                                                            210

1    Q.  Just one of your lawyers, but you can't tell the
2    difference --
3    A.  No.  Maybe I said -- maybe I was just concerned
4    about do I have to search my records.  The answer was no,
5    we've provided everything.  So I didn't do another document
6    search.
7    Q.  Well, what I want you to do is be sure not to
8    destroy any of these documents because it's our position
9    that they are called for and responsive and we're entitled
10   to see them.  Okay?
11   A.  (No response.)
12   Q.  The America's Cup.  $80 million over three years.
13   When did you become aware that the America's Cup would need
14   $80 million from Mr. Ellison over three years?
15   MS. KYROUZ:  Objection.  Misstates the document.
16   THE WITNESS:  I don't recall.
17   BY MR. SOLOMON:
18   Q.  Do you have America's Cup related documentation?
19   A.  Yes, I do.
20   Q.  And what sort of documentation do you have?
21   A.  I have e-mails to and from, from the people
22   running the America's Cup campaign.  I have tax returns for
23   the legal entities.  I have Secretary of State filings for
24   the legal entities.  I'm president of the corporation.  I
25   have correspondence files.  I have employment contracts

                                                            211

1    with certain key people.  And I also get financial
2    statements and their budgets.
3    Q.  Okay.  And those documents would include documents
4    in your possession in the third fiscal quarter of 2001?
5    A.  I don't know because I'm not sure when the
6    corporation was set up.  Actually, the answer must be yes.
7    I went to New Zealand.
8    Q.  That was part of the --
9    A.  I saw the people at America's Cup campaign in
10   Auckland; so, obviously, Oracle Racing had been established
11   by that time.  So, yes, there were files in my office
12   dealing with the America's Cup campaign at that time.
13   Q.  Okay.  And let's just go back to new yacht for a
14   moment.  Do you know if all of the payments have been made
15   on the new yacht?
16   MS. KYROUZ:  Objection.  Relevance.  Lack of
17   foundation.
18   THE WITNESS:  Are you asking about the 194 million or
19   are you asking about the total payments for the total
20   construction of the yacht?
21   MR. SOLOMON:  Let's start with the 194 million over
22   three years.
23   MS. KYROUZ:  Same objections.
24   THE WITNESS:  I do not know if it was paid over three
25   years, but I do know cumulatively more than 194 million has

                                                            212

Simon, Phillip  9/6/2006  1:30:00 PM

1    been paid for construction of the yacht.
2    BY MR. SOLOMON:
3        Q.  Were all payments made in a timely manner?
4    MS. KYROUZ:  Same objections.
5    THE WITNESS:  Would you please define timely.
6    BY MR. SOLOMON:
7        Q.  Were there due dates when installments were due?
8        A.  There -- in the construction of any project there
9    were issues with the construction.  So payments were made
10   timely, there were disputes and issues in completing the
11   construction, and there were disagreements amicably
12   resolved between the builder and the owner about the timing
13   of payments and work that should be done.  And everything
14   has been resolved.  So from -- I guess it depends on the
15   term timely; but, yes, everything has been met pursuant to
16   the contractual amendments.
17       Q.  Okay.  And have any penalties, financial
18   penalties, been paid by either side related to the
19   performance or nonperformance?
20   MS. KYROUZ:  Same objections.  Relevance.  Lacks
21   foundation.
22   THE WITNESS:  To your answer penalties -- how do you
23   define penalties?
24   BY MR. SOLOMON:
25       Q.  Well, were there penalties for late payment?

213

1        A.  There were penalties for late payment.  There
2    could be interest assessed for late payment.  There are
3    also delay penalties imposed on the shipyard for not
4    completing the construction on the agreed date.  In the
5    course of negotiations on the completion of the project,
6    there was swapping of the late penalties for certain change
7    orders and whatever.
8        Similarly, recently we agreed to pay some interest
9    for a period of time but we also received certain
10   compensation in terms of fixing certain items, so it's very
11   hard to know if penalties or interest was paid.  There was
12   swapping and negotiations throughout --
13       Q.  Okay.
14       A.  -- at the end of the project.
15       Q.  When did Mr. Ellison first commit himself
16   financially to the yacht?
17   MS. KYROUZ:  Objection.  Relevance.  Lacks foundation.
18   THE WITNESS:  I don't -- can't recall.  It's sometime
19   around 2000, 2001.  I don't recall.
20   BY MR. SOLOMON:
21       Q.  And how much has been paid to date?
22   MS. KYROUZ:  Same objections.
23   THE WITNESS:  To the shipyard or in total for the
24   yacht?
25   MR. SOLOMON:  In total.

214

1    Give me with or take 5 percent.  I don't have any
2    data in front of me.
3        Q.  Okay.
4        And is that now all paid up?
5        A.  No.
6        Q.  How much remains to be paid?
7    MS. KYROUZ:  Objection.  Relevance.
8    THE WITNESS:  I believe there's approximately
9    6.25 million euro outstanding.
10   BY MR. SOLOMON:
11       Q.  Now, is that in dispute or is that something that
12   is simply going to get paid in due course?
13   MS. KYROUZ:  Same objection.
14   THE WITNESS:  That is an amount that is agreed to be
15   paid upon the shipyard completing their work.
16   BY MR. SOLOMON:
17       Q.  Okay.  And what work has not been completed?
18   MS. KYROUZ:  Same objections.
19   THE WITNESS:  There is certain work that needs to be
20   completed dealing with making certain repairs, fixing
21   certain wiring that we felt was not done up to the standard
22   expected.  And certain problems with particle filler --
23   basically, it's like finishing a house and the contractor
24   thinks he's done but the door isn't hanging up yet.  And
25   you say well, you're basically done, but we'd like you to

216

1    THE WITNESS:  Approximately 250 million.
2    BY MR. SOLOMON:
3        Q.  And how much to the shipyard?
4    THE WITNESS:  I'm thinking.  I'm not trying to be
5    difficult.
6    MS. KYROUZ:  Same objections.
7    THE WITNESS:  It was a Deutschmark denominated
8    contract that got converted to euros, then you have to
9    convert the euros to dollars, and then you have to look at
10   the exchange rates when you made the payments.  So there's
11   no one answer.
12   MR. SOLOMON:  Okay.
13   THE WITNESS:  But if you look at when we bought the
14   foreign exchange I believe the rough approximate amount
15   paid to the shipyard is around 225 million.  That could be
16   off 5 or 10 million.
17   BY MR. SOLOMON:
18       Q.  Okay.  Now, how does that 225 million relate to
19   the 250 million for the yacht?
20       A.  Well, you just don't pay the shipyard.  There are
21   other things you have to buy.
22       Q.  So I have to add these two up to?
23       A.  No.  The total cost was 250, roughly.
24       Q.  Okay.  Thank you.
25       A.  Okay?

215

Simon, Phillip  9/6/2006  1:30:00 PM

1   hang the door, put the door on the wall.  So there's things
2   like that.
3        So, basically, there's roughly a two and a half
4   percent residual amount that is agreed to that has to be
5   paid, and it is agreed payment as soon as the shipyard
6   finishes certain steps -- and there is an amount allocated
7   to each specific task, and as soon as each specific task is
8   finished, payment will be made.
9   BY MR. SOLOMON:
10       Q.  Is that yacht up for sale?
11       MS. KYROUZ:  Objection.  Relevance.
12       THE WITNESS:  I do not believe so.
13   BY MR. SOLOMON:
14       Q.  UAD, 12 million over three years.  That's No. 6.
15       A.  Yes.
16       Q.  Did that monies get paid over?
17       A.  No.
18       Q.  And do you know why?
19       A.  Yes.  The project never occurred.
20       Q.  If you go over the page, we're on page 5 of 6.
21       A.  Uh-huh.
22       Q.  It says, "Since this rough budget, Ellison has
23   reportedly spent $200 million building a Japanese style
24   estate in Woodside."  Is that accurate?
25       MS. KYROUZ:  Objection.  Relevance.

217

1       THE WITNESS:  I think that's big picture accurate.  I
2   don't know the -- I cannot recall the exact amount.
3   BY MR. SOLOMON:
4       Q.  Okay.  Is that house up for sale?
5       A.  Not that I'm aware of.
6       MS. KYROUZ:  Same objection.
7   BY MR. SOLOMON:
8       Q.  And he also -- I'm reading from the report.  He
9   has also bought multiple properties in Malibu, 180 million
10   dollars worth by one report.  Is it true --
11       A.  Where is that?
12       Q.  That's at the top of page 5 of 6.
13       A.  Okay.
14       Q.  Is it true that Mr. Ellison has spent $100 million
15   on properties in Malibu?
16       MS. KYROUZ:  Objection.  Relevance.  Lacks foundation.
17       THE WITNESS:  Potentially true.  I have not added up
18   all the pieces.  It could be off by 25 or 50 million, but
19   it's broad brush.
20   BY MR. SOLOMON:
21       Q.  Okay.  Just skipping down the page a little bit.
22   It says, "And when Oracle executive Safra Catz mentioned in
23   a 2000 e-mail that Ellison might want to donate $1 billion
24   worth of expiring stock options to charity, Simon seemed
25   shaken."  And then, in quotes, "I had no idea that Larry

218

1   was even considering donating $1 billion to charity, such a
2   large amount.'"  That seems to be attributed to you.  Is
3   that an accurate attribution?
4       MS. KYROUZ:  Objection.  Lacks foundation.
5       THE WITNESS:  I have no idea.  I don't recall -- I
6   don't recall ever saying that or writing that.  It doesn't
7   mean I didn't.  And I don't recall in all the e-mails we've
8   gone through that exact comment.  But maybe you attached --
9   maybe if you pull out the e-mails that were attached to the
10   Chronicle article, maybe it's there.  I don't know.
11   BY MR. SOLOMON:
12       Q.  But as you sit here today, is it consistent with
13   your recollection that you -- that they say that you had no
14   idea that Larry was even considering such a donation?
15       MS. KYROUZ:  Objection.  Lacks foundation.
16       THE WITNESS:  I don't recall the event so it's very
17   hard for me to have a recollection about my perception at
18   the time.
19   BY MR. SOLOMON:
20       Q.  Okay.
21        And then on the last page you'll see there's a
22   reference to an e-mail that we saw a few minutes ago where
23   you, among other things, called for diversification.
24       A.  Uh-huh.
25       Q.  Do you see that?

219

1        And you've gone on to say -- well, this quotes you
2   as saying, "If this means sacrificing 30 percent of your
3   current holdings in Oracle, so be it."  Do you see that?
4       A.  Uh-huh.
5       Q.  Then you go on to say, "With stock options and
6   Oracle share repurchases, your ownership percentage has
7   been increasing somewhat over the last year or two."  Do
8   you see that?
9       A.  Uh-huh.
10      Q.  So then it's fact then, is it, that
11   notwithstanding his sale -- sales in January of 2001, he,
12   in fact, continued to increase his share of ownership in
13   Oracle?
14      A.  If this is an accurate quote of my e-mail, and if
15   it was my e-mail, and my e-mail was correct at the time, it
16   would seem to indicate that despite the sale of the
17   30 million shares that were sold -- or 29 million that were
18   sold in January 2001, that his owner-- his percentage
19   ownership of Oracle may have risen a percent or two.
20      Q.  Have you ever described Mr. Ellison as being
21   reckless with respect to his investment decisions?
22      A.  No.
23      Q.  And you don't hold that view?
24      A.  No.
25      THE REPORTER:  I'm sorry.  I didn't hear --

220

Simon, Phillip  9/6/2006  1:30:00 PM

1      MR. SOLOMON:
2      Q.  And you don't hold that view?
3      A.  No.  Absolutely not.
4      Q.  And if called for, you would have no difficulty
5   producing the documents concerning the yacht and concerning
6   the America's Cup and --
7      A.  I would have difficulty.
8      MS. KYROUZ:  Objection.  Let him finish his question.
9      MR. SOLOMON:  I was going to ask you what the
10  difficulty would be.
11     MS. KYROUZ:  Objection.  To the prior question I was
12  objecting, misstates his question -- misstates his
13  testimony.
14     THE WITNESS:  Okay.  So, I'm sorry.  Can you ask me
15  what -- what am I supposed to answer?  I'm confused at this
16  point.
17  BY MR. SOLOMON:
18     Q.  Would you have any difficulty producing the
19  documents that you have concerning Mr. Ellison's yacht and
20  concerning the America's Cup?
21     A.  Yes.
22     Q.  And would you have difficulty producing any
23  documents concerning the $200 million that reportedly has
24  been spent on his Woodside home?
25     A.  Yes.

221

1      Q.  And what would that difficulty be?
2      A.  The difficulty would be time.
3      Q.  How long will it take?
4      A.  Probably I could have the data sometime by the end
5   of November.
6      Q.  You could have the data sometime by the end of
7   November is what you just said?
8      A.  Or all the hard copy.  And then for the e-mails, I
9   don't know how long it would take and what data exist right
10  now.
11     Q.  And why would it take until the end of November to
12  get the documents?
13     A.  We're a tax accounting firm, and the most critical
14  time to do tax returns for all individual tax returns are
15  due on October 15th.  My staff are working 7 days a week,
16  12 hours a day right now getting tax returns out so they
17  have no time and I have no time between now and
18  October 15th to even look at this.  And then, after
19  October 15th they all crash and need time off, and they
20  will not be coming back into the office until November 1st.
21  And on November 1st we could start going through our files
22  and looking for this.
23     MR. SOLOMON:  Okay.
24     A.  And that's, I mean, so the difficulty.  And then
25  on the electronic copies, we'd have to bring in an IT

222

1   specialist to start searching through old hard disks and
2   doing a search like we did before.  And then we'd also need
3   to know what time frame.  So it would be a very labor
4   intensive and costly endeavor.
5   BY MR. SOLOMON:
6      Q.  Okay.  And then just for the physical documents,
7   is it your belief that all of the physical documents that
8   you have concerning those various transactions still exist
9   in your possession?
10     MS. KYROUZ:  Objection.  Lacks foundation.
11     THE WITNESS:  I think your question was a tautology.
12  You're asking if all the physical documents in my
13  possession exist in my possession.  And the answer to that
14  is yes, 100 percent.  Everything I possess I possess.
15  BY MR. SOLOMON:
16     Q.  I'm not sure if I was that bad, but I may have
17  been.  I was asking do the documents concerning the
18  transactions still exist?
19     MS. KYROUZ:  Objection.  Vague.
20     THE WITNESS:  I'm not certain.
21     MS. KYROUZ:  Compound.
22     THE WITNESS:  All documents pertaining to the Oracle
23  transaction, the sale of the Oracle stock options, have
24  been provided.  You're asking about a contract to purchase
25  a yacht and documents associated with all my e-mail

223

1   correspondence and all our written correspondence with --
2   let's say to the yacht, that occurred, let's say, in 2004,
3   2005 and 2006.  All physical documents that are in my
4   possession or in my office possession are in my office.
5   Some files, because we don't have room in the file room,
6   have been moved to storage.  I do not know if the files
7   related to the yacht have been partially moved to storage
8   or not.  And if they have been moved to storage, then part
9   of the document recovery would be to pull these files from
10  storage.
11  BY MR. SOLOMON:
12     Q.  Okay.  And I was probably clumsily trying to get
13  at have any of the physical documents, to your knowledge,
14  been destroyed?
15     MS. KYROUZ:  Objection.  Vague as to what documents
16  you're talking about.
17  BY MR. SOLOMON:
18     Q.  The documents I'm talking about are documents that
19  would have been in your possession in the third fiscal
20  quarter of 2001 that relate to the --
21     A.  Construction of the yacht.
22     Q.  The yacht, the Atherton house, the America's Cup.
23     MS. KYROUZ:  Same objections.
24     THE WITNESS:  To the best of my knowledge, all
25  documents that were in -- physical documents that were in

224

1  my possession -- and what date was it in 2000?
2     MR. SOLOMON:  In the third fiscal quarter of 2001.
3     THE WITNESS:  -- (continuing) in the third fiscal
4  quarter of 2001 are still in my possession or in storage.
5     MR. SOLOMON:  Okay.
6     THE WITNESS:  There has been no -- to the best of my
7  knowledge, there's been no destruction of any documents,
8  physical documents.
9     BY MR. SOLOMON:
10     Q.  Okay.  And then once your staff has time to devote
11  to the project and you have time to devote to the project
12  in November sometime of this year, how long do you estimate
13  it would take to be able to recover the physical documents?
14     MS. KYROUZ:  Objection.  Lacks foundation.
15     THE WITNESS:  I would have to review -- I would have
16  to know which documents you want and how many files we'd
17  have.  I would say a reasonable time -- we're also busy in
18  December.  If we start in November, maybe we could get done
19  by the end of November, we have Thanksgiving.  Maybe we
20  need into February.  But, basically, within three months of
21  when we start we should be able to search the files and
22  find documents.
23     MR. SOLOMON:  Okay.  All right.
24     Okay.  Well, subject to resolving any dispute
25  concerning those documents, I'm finished with my

225

1  questioning.  But should the Court order that those
2  documents be produced, then I'll reserve the right to
3  question you further once I've seen those documents.  And
4  in the meantime, thank you for your testimony.
5     THE WITNESS:  You're very welcome.
6     MS. KYROUZ:  We obviously disagree with the position.
7     Please mark the deposition confidential.
8     THE VIDEOGRAPHER:  This marks the end of Videotape 4,
9  Volume I in the deposition of Philip B. Simon.  The
10  original videotapes will be retained by LiveNote World
11  Service.  We're going off the record.  The time on the
12  video monitor is 4:45.
13     (At 4:45 p.m. the deposition proceedings
14  concluded.)
15        -oOo-
16
17
18
19     PHILIP B. SIMON
20
21
22
23
24
25

226

1     STATE OF CALIFORNIA )
2     COUNTY OF SAN MATEO )
3        I hereby certify that the witness in the foregoing
4  deposition, PHILIP B. SIMON, was by me duly sworn to
5  testify to the truth, the whole truth, and nothing but the
6  truth, in the within-entitled cause; that said deposition
7  was taken at the time and place herein named; that the
8  deposition is a true record of the witness's testimony as
9  reported by me, a duly certified shorthand reporter and a
10  disinterested person, and was thereafter transcribed into
11  typewriting by computer.
12        I further certify that I am not interested in the
13  outcome of the said action, nor connected with, nor related
14  to any of the parties in said action, nor to their
15  respective counsel.
16        IN WITNESS WHEREOF, I have hereunto set my hand
17  this 20th day of September, 2006.
18
19
20     _____
21        KELLIE A. ZOLLARS, CSR
22        STATE OF CALIFORNIA
23
24
25

227

1  STATE OF CALIFORNIA    )

2  COUNTY OF SAN MATEO    )

3        I hereby certify that the witness in the

4  foregoing deposition,

5  was by me duly sworn to testify to the truth, the

6  whole truth, and nothing but the truth in the

7  within-entitled cause; that said deposition was taken

8  at the time and place herein named; that the

9  deposition is a true record of the witness's testimony

10  as reported by me, a duly certified shorthand reporter

11  and a disinterested person, and was thereafter

12  transcribed into typewriting by computer.

13        I further certify that I am not interested in

14  the outcome of the said action, nor connected with,

15  nor related to any of the parties in said action, nor

16  to their respective counsel.

17        IN WITNESS WHEREOF, I have hereunto set my

18  hand this _20___ of _September__, _2006_.

19

20

21        _____

22              KELLIE A. ZOLLARS, CSR

23              STATE OF CALIFORNIA

24

25

# EXHIBIT U

1          Monday, March 19, 2007

2     (10:31 a.m.)

3          THE VIDEOGRAPHER:  Here begins videotape number 1

4     in the deposition of Matthew Symonds, in the matter of in

5     Re. Oracle Corporation Securities Litigation in the

6     United States District Court, Northern District of

7     California.  Case number C-01-0988-MJJ.

8          Today's date is March 19th, 2007.  The time on

9     the video monitor is 10:31.  The video operator today is

10    Wendy Viner of Merrill Legal Solutions.  This video

11    deposition is taking place at Harbottle & Lewis, Hanover

12    House, 14 Hanover Square, London, West 1.

13          Counsel, would you please voice identify

14    yourselves and state whom you represent.

15          MR. SOLOMON:  Mark Solomon from Lerach Coughlin in

16    San Diego, representing the Plaintiffs.

17          MS. KAPLAN:  Stacey Kaplan of Lerach Coughlin,

18    representing the Plaintiffs.

19          MR. MULLIKEN:  David Mulliken of Latham & Watkins

20    in London, representing the Defendants.

21          MR. GIBBS:  Patrick Gibbs, also from

22    Latham & Watkins, for the Defendants.

23          MR. FENTON:  I am Adam Fenton QC.  I am the

24    Examiner appointed by the court.

25          MR. SHILLITO:  Richard Shillito, solicitor,

1

1     representing Matthew Symonds, the witness.

2          MR. PARKES:  Richard Parkes QC, barrister,

3     representing Matthew Symonds, the witness.

4          THE VIDEOGRAPHER:  Thank you.  The court reporter

5     today is Rose Kay of Merrill Legal Solutions.  Please

6     proceed.

7     STATEMENT BY MR. FENTON:

8          MR. FENTON:  There is one matter I am going to

9     raise on the record before taking the oath from Mr. Symonds

10    and that is that I have suggested to the parties that in

11    relation to objections to questions based on grounds other

12    than privilege, that I should not offer my opinion which in

13    any event is only a non-binding opinion on those objections;

14    in the interests of saving time and money for the parties.

15          And the parties are agreeable to that, but I have

16    made clear and I stress for the record that should anyone

17    wish me to start offering my opinion on objections generally

18    or in relation to a specific objection, I would be delighted

19    to do so; and the only reason I am suggesting I don't is in

20    fact to save time and money for the parties.

21          So with that introduction, I am going to swear

22    Mr. Symonds.  Will you please say after me.

23          MATTHEW SYMONDS

24          having been duly sworn,

25          testified as follows:

2

1          MR. FENTON:  Very good.  So the questioning may

2     proceed.

3     DIRECT EXAMINATION BY MR. SOLOMON:

4          BY MR. SOLOMON:

5          Q.  Thank you, Mr. Fenton.

6          Mr. Symonds, could you tell me your full name,

7     please.

8          A.  My name is Matthew John Symonds.

9          Q.  And what is your occupation?

10          A.  I am on the advice of counsel as to the

11    privilege.  Sorry, Richard.

12          MR. PARKES:  No, may I interrupt at that point,

13    sir.

14          MR. FENTON:  Yes.

15          MR. PARKES:  On the advice of counsel, Mr. Symonds

16    will not be answering any further questions.  He will be

17    asserting privilege not to answer, pursuant to the Fifth

18    Amendment to the U.S. constitution.

19          MR. FENTON:  Right.  Well, what I would be

20    grateful for some assistance on is: is this, as your

21    submission, advice, is this objection being taken as

22    a matter of American law or is it being taken as a matter of

23    English law?

24          MR. PARKES:  It is taken ultimately as a matter of

25    American law, but in the short term it has to be taken also

3

1     as a matter of English law.

2          MR. FENTON:  Because as I understand it, I am

3     required to rule on matters of privilege.  But I am

4     obviously in a position to rule as a matter only of English

5     law, as I understand it.  And I will need some assistance as

6     to whether or not the privilege against self-incrimination

7     would apply in these circumstances, given that it is

8     evidence being taken for foreign proceedings.

9          MR. PARKES:  I think that the correct position, as

10    far as English law is concerned, would be simply that there

11    is a discretion in the court as to whether or not to order

12    the answering of a question.

13          There is no right to self-incrimination under

14    English law in respect of potential foreign criminal

15    proceedings.  Section 14 of the Civil Evidence Act 1968

16    plainly does not apply, which in general terms establishes

17    the right to a privilege to self-incrimination in this

18    jurisdiction; does not apply in respect of foreign criminal

19    proceedings.  And --

20          MR. FENTON:  And I am sorry to interrupt, but

21    these are obviously not criminal proceedings in any event.

22          MR. PARKES:  These are not; that is certainly

23    true.  But of course the question would be whether the claim

24    to privilege related to anticipated foreign or domestic

25    criminal proceedings, and I have to accept that the claim to

4

1  privilege in this case would relate to the possibility of
2  foreign criminal proceedings.  And therefore section 14 of
3  the Civil Evidence Act would have no application.
4        MR. FENTON:  Right.
5        MR. PARKES:  It would appear to be that the
6  closest that one can -- the furthest that one can go,
7  I think, under the English jurisdiction is, and I am afraid
8  that in my haste this morning, I have left this particular
9  authority behind.  I will have to ask Lawrence Abramson if
10  he will be kind enough to extract it for me from his
11  library.
12        The furthest one can go is a decision of
13  Mr Justice Morritt in the case of Arab Bank v Hashim,
14  I think the name is.  Number 2.  Can I give you the
15  reference if you don't mind.  I am so sorry about that.
16        MR. ABRAMSON:  Do you want this now?
17        MR. PARKES:  I think it would probably be helpful
18  to have it now.
19        MR. FENTON:  I think I would like it now if it is
20  going to be relied on, please.
21        MR. PARKES:  May I just find my note.  It is 1990,
22  1 Weekly Law Reports.  If you could get me the 1990 volume,
23  the first volume of the 1990 --
24        MR. ABRAMSON:  What is the name of the case?
25        MR. PARKES:  It is Arab Monetary Fund, I think.

5

1  I am sorry, not Arab Bank.  Arab Monetary Fund, number 2,
2  I think.  But could I possibly borrow your copy of Phippson
3  for a moment, sir.
4        MR. FENTON:  Yes.
5        MR. PARKES:  Because I think I can get the
6  reference out of that.
7        MR. CASTELLANI:  It is Arab Monetary Fund v
8  Hashim.
9        MR. PARKES:  Against Hashim, that is right.
10        MR. CASTELLANI:  1989, 1 Weekly Law Reports.
11  There is a number 2; it came later.
12        MR. PARKES:  There were several, actually.
13  I think it was --
14        MR. CASTELLANI:  It is 1 All England, 673.
15        MR. FENTON:  I think one needs to be careful
16  because Arab Monetary Fund v Hashim has generated an
17  enormous number of interlocutories.
18        MR. PARKES:  That is absolutely right.
19        MR. FENTON:  So let's just make sure it is the --
20  you may well be right.
21        MR. ABRAMSON:  But it is a first instance
22  decision.
23        MR. PARKES:  It is a first instance decision of
24  Mr Justice Morritt and I think actually, I think it is 1990,
25  I think, 1 All England, 673, I think is going to be the

6

1  right reference.
2        MR. FENTON:  At the top, it looks as if that is in
3  89, 1 Weekly.  It looks like it is ...
4        MR. PARKES:  There are two related decisions.
5  There is one of Mr Justice Hoffman the following year and
6  one of Mr Justice Morritt.  And it may well be -- I am
7  sorry, I think you may well be right.  Yes, I am sorry.  Can
8  somebody go after Mr. Abramson?  It is 1989, 1 Weekly Law
9  Reports.
10        MR. FENTON:  Could I just ask.  There is no --
11  aside to this question at all, has the fact that privilege
12  is going to be taken, when was that communicated to you?
13        MR. PARKES:  Only this morning, I am afraid.
14        MR. FENTON:  Right.
15        MR. PARKES:  In the light of discussions with the
16  San Francisco counsel, in the course of the weekend.
17        MR. FENTON:  Yes.  As I said, there was no sign of
18  this.
19        MR. PARKES:  No, I understand.
20        MR. FENTON:  I am just anxious to ensure that
21  everyone concerned has an opportunity to consider the point.
22        MR. PARKES:  Yes.
23        MR. FENTON:  So there will now be a short delay
24  whilst the relevant authorities are ...
25        MR. PARKES:  I apologize that I left that behind.

7

1        THE VIDEOGRAPHER:  Shall we go off the record?
2        MR. FENTON:  Yes, that is probably sensible.
3        THE VIDEOGRAPHER:  Going off the record.  The time
4  is 10:41.
5        (10:41 a.m.)
6              (A short break)
7        (11:01 a.m.)
8        THE VIDEOGRAPHER:  We are back on the record.  The
9  time is 11:01.
10        MR. FENTON:  Right.  Now, do you want to say
11  something?  I was going to say something, if you don't mind.
12        MR. PARKES:  Please.
13        MR. FENTON:  Which is that having taken advantage
14  of the brief adjournment to look at the matter myself, it
15  seems to me that the privilege against self-incrimination
16  under English law does not apply; it clearly does not apply
17  to section 14, as Mr. Parkes mentioned, which I have
18  confirmed for myself.
19        But I think I should also say that the matter
20  appears to me to be dealt with in section 3 of the Evidence
21  (Proceedings in Other Jurisdictions) Act 1975, which is the
22  Act pursuant to which this deposition is taking place.
23        And section 3(1), which is headed "Privilege of
24  witnesses", says:
25        "A person shall not be compelled by virtue of an

8

1  order under section 2 above ..."
2      The order in this case is under section 2.
3      "... to give any evidence which he could not be
4  compelled to give:
5      (a).  In civil proceedings in the part of the UK
6  in which the court that made the order exercises
7  jurisdiction."
8      It seems to me that is not relevant because there
9  is not a privilege against self-incrimination as a matter of
10  English law.  That is to say, with a view to being
11  incriminated by reference to English proceedings.
12      "(b).  Subject to subsection (2) below, in civil
13  proceedings in the country or territory in which the
14  requesting court exercises jurisdiction."
15      So section 3(1)(b) is, on what Mr. Parkes has
16  said, potentially applicable because it is -- it provides
17  effectively that a person shall not be compelled by virtue
18  of an order under this Act to give evidence which he could
19  not be compelled to give in civil proceedings in the country
20  or territory in which the requesting court exercises
21  jurisdiction.
22      So that would be a matter for the District Court.
23  A question of what the District Court in California would
24  do.
25      However, section 3(2) says:

9

1      "Subsection (1)(b) above ..."
2      Which is the potentially relevant section I have
3  just mentioned about a witness not being compelled to give
4  evidence where he could not be compelled in the civil
5  proceedings in the jurisdiction of the requesting court.
6      "Subsection (1)(b) above shall not apply, unless
7  the claim of the person in question to be exempt from giving
8  the evidence is either:
9      "Supported by a statement contained in the
10  request."
11      Which is not the case in this case, I interject.
12  Or (b):
13      "Conceded by the applicant for the order."
14      And I have not heard the Plaintiffs yet, but
15  I infer it won't be conceded.
16      "And where such a claim made by any person is not
17  supported or conceded as aforesaid, he may (subject to the
18  other provisions of this section) ..."
19      And I interject there, I don't see that those are
20  relevant.
21      "He may be required to give the evidence to which
22  the claim relates, but that evidence shall not be
23  transmitted to the requesting court if that court, on the
24  matter being referred to it, upholds the claim."
25      And so the situation, as I see it, and I hope this

10

1  is a helpful rather than an unhelpful interjection, is that
2  I have a discretion to require the evidence to be given, to
3  require Mr. Symonds to answer.  But the evidence will not be
4  transmitted even to the requesting court if I required it
5  and if he answered it, or the court required it and he
6  answered it, the English court required it and he answered
7  it; if objection was taken to the admissibility of the
8  evidence before the Californian court.  And would that only
9  be transmitted if the Californian court held that it was
10  admissible?
11      But that, as I see it, is a summary of the
12  position.  What I would like some assistance on is on the
13  exercise of my discretion as to whether or not Mr. Symonds
14  should be required to answer.  And it seems to me again,
15  hopefully being helpful rather than unhelpful, that I would
16  be grateful for some assistance on how the Californian court
17  or the jurisdiction and the relevant place in California,
18  would regard what is alleged to have been done or may
19  alleged to have been done; whether that would be regarded as
20  criminal.
21      In other words, what the risk of being required to
22  answer the questions, what risks that might or might not
23  expose Mr. Symonds to.  That is one thing that occurs to me.
24      But I am in no way curtailing anything that anyone
25  else wants to say; and as I say, I hope that has been

11

1  a helpful rather than not interjection.  And that is all
2  I have to say.
3  SUBMISSIONS BY MR. PARKES:
4      MR. PARKES:  That is thoroughly helpful, sir,
5  because that saves me taking you there, which was going to
6  be my next step.
7      The purpose of the reference to the case of the
8  Arab Monetary Fund v Hashim decision of Mr Justice Morritt
9  was simply to point out to you that this being in the
10  context of a Mareva injunction which entailed discovery in
11  aid of the injunction, there is a dictum of
12  Mr Justice Morritt at page 474 of the decision which simply
13  says that -- obviously this is in the context of an
14  injunction and therefore it is a slightly different
15  matter -- in the case of self-incrimination for offences
16  under the law on any part of the United Kingdom, he says.
17      MR. FENTON:  Sorry.
18      MR. PARKES:  I am sorry, 474(c).
19      MR. FENTON:  Sorry.
20      MR. PARKES:  "In the case of self-incrimination
21  for offences under the law of any part of the UK, privilege
22  exists.  In the case of offences under the criminal law of
23  a foreign state, there is no privilege, but I see no reason
24  why the possibility of self-incrimination or the
25  incrimination of others should not be a factor to be taken

12

1  into account in deciding whether and, if so, in what terms
2  a disclosure order should be made."
3      And no doubt similar considerations will inform
4  the court's decision as to whether or not to require
5  a witness to give an oral answer to a question.  But that,
6  I think, is as far as I can take matters; apart from
7  section 3.
8      MR. FENTON:  Right.
9      MR. PARKES:  As far as section 3 is concerned,
10  first of all I would like to explain to you what the
11  potential risk is for Mr. Symonds in the United States.
12  ^^  And also to argue that the claim of Mr. Symonds to be
13  exempt from giving the evidence is supported by a statement
14  contained in the request.  Plainly that is not so in express
15  terms, but I will explain if I may in a moment.
16      MR. FENTON:  I don't mean to pre-judge that.
17      MR. PARKES:  Obviously you are right in the sense
18  that there is no express assertion in the letter of request
19  that the matters for which the deposition is sought are
20  likely to attract Fifth Amendment privilege.
21      You will have seen from the letter of request that
22  it seeks information in particular, if we -- I don't know
23  how you have got it.  Mine is paginated throughout,
24  unfortunately.
25      MR. FENTON:  I have got it as an exhibit.

13

1      MR. PARKES:  To Mr. Symonds's affidavit.  That is
2  right, witness statement.  It is page 5.  I would like to
3  take you to first the letter of request.  You will
4  observe --
5      MR. FENTON:  Here begins these ...
6      MR. PARKES:  That's right.  That is the summary
7  of -- the end of the summary of the complaint, the letter of
8  request.
9      MR. FENTON:  Yes.
10      MR. PARKES:  You will see that the Plaintiffs are
11  pursuing relief in the class action for the defendants'
12  destruction of evidence.  Plaintiffs have claimed that
13  Defendants have engaged in additional evidence destruction
14  since the commencement of this action in March 2001.  And
15  therefore among the remedies Plaintiffs seek for evidence
16  destruction are judgment or an adverse inference instruction
17  to the jury at trial.
18      MR. FENTON:  Yes.
19      MR. PARKES:  If one looks on, there is then
20  at page 6 a description of the interviews which Mr. Symonds
21  conducted with Mr. Ellison.
22      MR. FENTON:  Yes.
23      MR. PARKES:  And at page 7, fifth line down, we
24  see that -- well, take it at the top.
25      "Plaintiffs immediately requested information

14

1  regarding Defendants' production of the Softwar materials."
2      That is following the order for production by the
3  U.S. court.
4      "In response, Plaintiffs counsel has stated that
5  counsel for Defendants indicated that they were not yet sure
6  whether Defendants' would take the position that the
7  materials no longer existed or that Symonds was refusing to
8  produce them.  Defendants' counsel denies suggesting the
9  possibility that the materials were destroyed.  Nonetheless,
10  on January 11, 2007, Defendants' counsel represented to
11  Plaintiffs that at least some of the materials had been
12  destroyed.  As Symonds' November 9, 2006 declaration made it
13  clear that the materials still existed at that point, to the
14  extent that they have been destroyed, such destruction must
15  necessarily have taken place between 9th November and
16  11th January.  However, all information Plaintiffs have
17  regarding the whereabouts of the materials ordered
18  no "to be"   produced has come from counsel for Defendants.
19  Plaintiffs are seeking production of such materials directly
20  from Symonds or, to the extent that such materials have, in
21  fact, been destroyed, testamentary evidence regarding that
22  destruction."
23      And then you will see going down that page, that
24  it is said that Mr. Symonds, according to the Defendants
25  counsel, Mr. Symonds --

15

1      MR. FENTON:  Yes.
2      MR. PARKES:  You will see that there is some
3  reference to PC World.
4      MR. FENTON:  Yes.
5      MR. PARKES:  And I don't want to drag you there
6  this at enormous length.  The point is, one sees it again if
7  one goes over the page to page 8, Mr. Symonds' attempt to
8  replies with the order by production of transcripts.
9      And then over on page 9, "Purpose of the evidence
10  or judicial act sought".
11      "The evidence at issue in this letter of request
12  consists of materials containing direct statements by
13  Defendant Larry Ellison regarding the events at issue in
14  this class action, as well as information regarding the
15  possible deliberate destruction of some of those materials.
16  The evidence regarding destruction of these materials is
17  relevant to the scienter, or mens rea, of Defendants, the
18  falsity of Defendants' statements, and the materiality of
19  Defendants' statements, all of which are elements that
20  PlaintiffsDefendants must prove at trial.
21      "In addition, after reviewing any evidence
22  regarding their destruction, should the court find that
23  these materials were destroyed in violation of either the
24  U.S. Federal Rules of Civil Procedure or the Private
25  Securities Litigation Reform Act of 1995, possible sanctions

16

1 include default judgment of the presentation of evidence
2 regarding the destruction at trial accompanied by an adverse
3 inference jury instruction."
4    So you will see that the letter of request majors
5 strongly on concerns about possible destruction of
6 information.  Plainly in the first instance, that concern
7 relates to the Defendants in the U.S. action.  But it is
8 Mr. Symonds who is to be deposed regarding these matters.
9    And I obviously don't want to speculate, but, and
10 plainly Mr. Symonds's position is that there is any question
11 of any breach of United States law.  But the question of
12 destruction of evidence appears to be covered by 18
13 United States code, section 1512(c).  Which if I may drn.
14    MR. FENTON:  Sorry, can I have that?
15    MR. PARKES:  18, United States code,
16 section 1512(c).
17    MR. FENTON:  And is that a Civil Code or
18 a criminal code?
19    MR. PARKES:  That is a criminal code, as
20 I understand it.  I am looking for a nod from Mr. Solomon.
21    MR. SOLOMON:  Read on and I will let you know.
22    MR. PARKES:  As I understand it, given that the
23 consequences of conviction are a possible sentence of
24 imprisonment of up to 20 years, I think that may take it
25 that as a criminal provision.  If I may read the subsection

17

1 to you, this is section 1512(c) provides that whoever
2 corruptly:
3    "1.  Alters, destroys, mutilates or conceals
4 a record, document or other object or attempts to do so with
5 the intent to impair the object's integrity or availability
6 for use in an official proceeding."
7    Just pausing there, there is no question that an
8 official proceeding includes a proceeding before a judge or
9 court of the United States:
10    "Or 2, otherwise obstructs, influences or impedes
11 any official proceeding or attempts to do so shall be fined
12 under this title or be imprisoned not more than 20 years or
13 both."
14    Now, for obvious reasons I do not want to explore
15 this matter further than I need to.
16    MR. FENTON:  No.
17    MR. PARKES:  But if, as appears, Mr. Symonds is to
18 be asked about questions of destruction of evidence, the
19 concern might be, or is, that the appropriate U.S. criminal
20 provision which covers destruction of evidence in certain
21 circumstances is section 1512(c) and his claim to privilege
22 would relate certainly to that provision of the
23 United States code.
24    MR. FENTON:  Yes.  I mean, as I see it, my reading
25 of section 3.

18

1    MR. PARKES:  Yes.
2    MR. FENTON:  The question is really there is no,
3 as I see it at the moment, there is no question of
4 a privilege against self-incrimination arising under English
5 law, because it appears that that is only available in
6 relation to potential prosecutions in English courts and
7 possibly under disciplinary proceedings in English
8 tribunals.  But it is territorially disriktd.
9    MR. PARKES:  Yes.
10    MR. FENTON:  So the question really is, as I see
11 it, whether or not this would be available to Mr. Symonds
12 under U.S. law.  In other words, whether he could avoid
13 answering the question on the basis it was liable to
14 incriminate him under U.S. law.  And on that, you have said
15 that there is potential for infringement of a US criminal
16 statute.
17    MR. PARKES:  Well, the structure of evidence, yes,
18 may fall within that (destruction).
19    MR. FENTON:  Yes.  I say potential, yes.
20    MR. PARKES:  Yes.
21    MR. FENTON:  But the Fifth Amendment which
22 underlies this would be, that would permit Mr. Symonds to
23 refuse to answer these questions as a matter of U.S. law.
24 Is that your submission?  Yes, it is, although of course
25 that is a question of which in the normal course of matter

19

1 would be decided by the U.S. District Court.
2    MR. FENTON:  Yes.  Obviously it has to be, but --
3    MR. PARKES:  Yes.
4    MR. FENTON:  But it is, as far as my powers go,
5 I am going to require not Mr. Symonds to answer, by
6 reference to the position under the law in California and so
7 I obviously need to try to understand.  But the Fifth
8 Amendment, you say, would allow him to refuse to answer
9 these questions as a matter of U.S. law.
10    MR. PARKES:  Certainly.
11    MR. FENTON:  Can I ask a question.  Does the U.S.
12 code have extrater torrial effect?  In other words, if you
13 commit an act which apparently falls within the section that
14 you read, section 1512(c).
15    MR. PARKES:  Yes.
16    MR. FENTON:  In England, is that an act which is
17 prohibited by this section?
18    MR. PARKES:  Yes, it is.  As I understand it, the
19 position is that there is extrater torrial federal
20 jurisdiction over an offenc under section 1512.  I think it
21 would probably be appropriate if I were a US lawyer, which
22 I am not, to refer to the case in the United States v Black,
23 in which, as I understand it, it was said that congress has
24 expressly made its intent clear to criminalise conduct
25 outside the United States that obstructs official

20

Symonds, Matthew  3/19/2007  10:01:00 AM

1  proceedings in the United States relation apparently to the
2  section.
3      MR. FENTON:  This is conrad Black, is it?
4      MR. PARKES:  No.  Oh, I do not think so.
5      MR. SOLOMON:  I think it is probably older than
6  that.
7      MR. PARKES:  It is 2006.  It might be an early
8  hearing in the Black case, I suppose.
9      MR. SOLOMON:  I think you are right.
10      MR. PARKES:  Entirely possible.  My difficulty,
11  sir.  You must forgive me for brg a little scuffy in this
12  because I have only been in consultation with U.S. counsel
13  yesterday.
14      MR. FENTON:  There is no question of any reproach
15  on my part.  I am really just trying to see what the
16  position is, what assistance you can provide me and I am
17  grateful for it.
18      MR. PARKES:  Yes.
19      MR. FENTON:  All right.  Now, is there anything
20  else you would like to say to me at this point, Mr. Parkes?
21      MR. PARKES:  Yes.  May I just make one other point
22  and that is that you will note that the letter of request at
23  page 10, paragraph 13, stipulates that the examination shall
24  be taken under the Federal Rules of Civil Procedure of the
25  United States of America, except of course to the extent

21

1  that such rules are incompatible with the internal rules of
2  the United Kingdom in which case such laws will take
3  control.
4      And what I would like to submit is that under the
5  Federal Rules of Civil Procedure, there is a general
6  discovery rule, federal rule of civil procedure 26 little B
7  (1 sfwhvment (.
8      MR. FENTON:  Just let me get that in.
9      MR. PARKES:  Federal rule of civil proceed 26 (b)
10  1.  Sorry I have not had time to put this in writing but the
11  time has not allowed it ^check.
12      MR. FENTON:  Right.
13      MR. PARKES:  As I understand it, that is a general
14  discovery rule which states that, and I quote:
15      "Parties may obtain discovery regarding any matter
16  not privileged, that is relevant to the claim or defence of
17  any party."
18      MR. FENTON:  Right.
19      MR. PARKES:  And rule, if I may just go on
20  a little further.
21      MR. FENTON:  Yes, please.
22      MR. PARKES:  Rule 30 (d) (1) which is part of the
23  rule which governs depositions, states that, and I quote:
24      "A person may instruct a deponent not to answer
25  only when necessary to preserve a privilege."

22

1      MR. FENTON:  Right.
2      MR. PARKES:  And finally if I may say so, if I may
3  refer to this.  Rule 30 (c) -- actually, I am not sure that
4  I need to refer to rule 30 (c) I think that is sufficient.
5      But the Ninth Circuit, as I understand it, which
6  is the relevant circuit for the purposes binding authority
7  in proceedings in California, has stated in respect of rule
8  26, which is the general discovery rule which I have cited
9  to you, said this:
10      "Rule 26 provides that discovery may only be had
11  of matter 'not privileged, which is relevant to the subject
12  matter involved in the pending action'."
13      MR. FENTON:  Right.
14      MR. PARKES:  And what is privileged is defined by
15  the federal rules of evidence which include of course the
16  privilege against self-incrimination.
17      So the way in which I put it, therefore, is that
18  given that the letter of request demands that the
19  examination be taken under the Federal Rules of Civil
20  Procedure, there is necessarily a statement in the letter of
21  request that the Fifth Amendment will be applied where
22  appropriate.  That must follow from -- that must follow in
23  the light of the references which I have given you, as to
24  the procedure.
25      MR. FENTON:  Yes, I am not sure what "discovery"

23

1  means in that context.  It is often used in a wider sense in
2  the States.
3      MR. PARKES:  Yes.
4      MR. FENTON:  I mean, I would require a lot of
5  persuasion that there is obviously a concept of privilege in
6  the United States.  And I think the real question is (would
7  not).
8      MR. FENTON:  Yes.
9      MR. FENTON:  The extent to which it actually
10  applies here.
11      MR. PARKES:  Well --
12      MR. FENTON:  Nor would I require that much
13  persuasion that there is privilege against
14  self-incrimination in general terms but that is obviously
15  subject to what Mr. Solomon or anyone else may say.
16      MR. PARKES:  Yes.  Well, I do not want to labour
17  the point unduly.  I could, I think there are other
18  references in the federal --
19      MR. FENTON:  Yes.
20      MR. PARKES:  In the U.S. rules which I can take
21  you to.  But the point is, broadly speaking, that the letter
22  of request rules ^check in the United States except in the
23  event there is a conflict.  And that necessarily impraifses
24  the right to privilege against self-incrimination.  That
25  being so, what I submit is that the claim.  Person in

24

1 question then, Mr. Symonds to be exempt from giving the
2 evidence is to that extent supported by a statement
3 contained in the request within section 32 of the 1975 Act,
4 because the statement contained in the request is the
5 examination it be to be taken under the Federal Rules of
6 Civil Procedure which embrace the right to privilege against
7 self-incrimination ^check.
8      MR. FENTON:  Very well.
9      MR. PARKES:  I need to address you also on the
10 question of discretion.  I have done so to an extent already
11 because I have referred to the relevant section.  It may be
12 necessary, depending on the arguments which are raised
13 against me, to come back to you on that and make a further
14 point but I would rather not do so at this stage if it is
15 not necessary to do so.  It rather depends on what line is
16 taken against me.
17      MR. FENTON:  So be it.
18      MR. PARKES:  So I think that is all that I have to
19 say for the moment.  Submissions by.
20      MR. SOLOMON:  In the light of this being a late
21 breaking development, we would like to take a break and
22 discuss it if we may.
23      MR. FENTON:  I was going to ask if you felt you
24 had adequate time.
25      MR. ABRAMSON:  We need ten minutes.

25

1 requiring Mr. Symonds to answer questions.
2      MR. ABRAMSON:  Indeed, yes.  We are accepting that
3 discretion exists.  We think, that is exactly what you
4 should do, for the following reasons.
5      First, we had correspondence with Mr. Symonds'
6 lawyers last week over the terms of which Mr. Symonds would
7 appear.  During the course of that correspondence, the list
8 of questions that Mr. Symonds was being asked to answer was
9 severely cut down.  Have we got the correspondence that has
10 been circulated?  And that culminated with Farrer saying on
11 the 7th March:
12      "Our client accepts the deletion of the five
13 proposed lines of questioning, but with two provisos.
14      "The first is that your clients accept our request
15 that the deposition be postponed (we suggest that it be
16 postponed to Monday, 19 March)."
17      Which is today.
18      "To allow our client further time to consider his
19 position.  The second proviso, bearing in mind the
20 objections expressed previously to the proposed lines of
21 questioning in our letter of 6 March, 2007, but in the
22 interests of saving costs if possible, is that our client
23 must reserve the right to argue before the Examiner on the
24 day that the other lines of questioning to which we have
25 referred are also irrelevant and, if necessary, apply to the

27

1      MR. PARKES:  I ought to apologize to everybody the
2 fact.  You will appreciate, it has been difficult for us to
3 take U.S. advice.  It could only be done yesterday.
4      MR. ABRAMSON:  Can I just make a point of detail
5 on lunch.  Who wants sandwiches and who wants to go out for
6 a break?  Any preferences?
7      THE VIDEOGRAPHER:  I will go off the record?
8      MR. ABRAMSON:  Sorry, yes.
9      THE VIDEOGRAPHER:  Going off the record.  The time
10 is 11:28.
11      (11:28 a.m.)
12                (A short break)
13      (12:10 p.m.)
14      THE VIDEOGRAPHER:  We are back on the record.  The
15 time is 12:10.
16 SUBMISSIONS BY MR. ABRAMSON:
17      MR. ABRAMSON:  Right.  Our position is we do
18 accept you have a discretion whether to proceed as you have
19 suggested, with you directing Mr. Symonds to answer
20 questions and then his deposition being held in the, the by
21 the Master pending decisions by the United States court as
22 to whether or not his claim to privilege would be upheld.
23      MR. FENTON:  Yes.  That is what would happen.
24 I have not made that as positive suggestion.  I said that is
25 what would happen if I exercised discretion in favour of

26

1 court at that point."
2      That is the basis upon which this deposition was
3 moved to today and no reference there to self-incrimination.
4      Second, in the time we have had, we have looked to
5 whether the Fifth Amendment applies.  We believe it applies
6 to U.S. citizens and U.S. residents.  Mr. Symonds is neither
7 and therefore he has no Fifth Amendment right.
8      Thirdly, we would ask you to consider to what
9 extent any prosecution is likely if Mr. Symonds has
10 destroyed evidence.  He is a journalist who just happened to
11 write a book about one of the parties to this litigation.
12 It is, I suggest, unlikely off his own bat that he would
13 have decided to destroy evidence in the litigation.  If he
14 has done so, the likelihood is he has done so at the instig
15 nation of or in the collusion of one of the parties.  Whilst
16 that might not resolve him from liability, the chances are
17 the prosecution that is brought off the back would be
18 brought against one of the parties ^check.
19      Fourthly, costs.  We have five U.S. lawyers in the
20 room.  Five or six.  And several English ones.  We have not
21 done this just to get a list of "sorry, I take the Fifth
22 Amendment".  It would be far more cost effective to order
23 questions to be answered question.  For the answers to be
24 held here and to assume that our -- the American judge will
25 form the right decision to protect Mr. Symonds if indeed he

28

1　needs protection.

2　　　　Finally, I would ask you to bear in mind what the

3　original question was that smashished this debate: what is

4　your occupation?  To the extent that you are otherwise

5　minded not to direct Mr. Symonds to answer questions, then

6　it should be on a question-by-question basis; and not every

7　question.

8　　　　That is all I need to say, sir.

9　　　　MR. FENTON:  Mr. Solomon, you were being to?

10　　　MR. SOLOMON:  I have nothing further to say,

11　except that it is by no means you be clear, as Mr. Abramson

12　said, that Mr. Symonds is entitled to the protections of the

13　U.S. constitution in these circumstances.  But I have every

14　expectation that when that issue, if that issue needs to be

15　fully briefed, that the U.S. court will be able to make the

16　right determination.

17　　　MR. FENTON:  Are you a US qualified lawyer?

18　　　MR. SOLOMON:  Yes, I am.

19　　　MR. ABRAMSON:  Sorry --

20　　　MR. FENTON:  Are you able to give me any authority

21　in relation to that concept?  I mean, I appreciate you have

22　had ...

23　　　MR. SOLOMON:  Yes.  We didn't have the best

24　internet connection available but I can give you one U.S.

25　Supreme Court decision that certainly suggests that the

29

1　intention is that only residents of the U.S. or citizens of

2　the U.S. be embraced by the protections of the U.S.

3　constitution.  In particular, the Fifth Amendment and the

4　site that we were able to pull, at least for that scwawl.

5　Is Kwong Hai Chew, K-W-O-N-G, H-A-I, C-H-E-W.  That is a US

6　Supreme Court decision, I believe from 1953.  344 U.S. 590.

7　　　MR. FENTON:  I have to say that I, I am bound to

8　say I find that a slightly surprising proposition, in the

9　sense that if, to use an example as I said before, if conrad

10　Black, who is I think not a US citizen, is being prosecuted,

11　which he is, I think, in the U.S., I can't really see why he

12　should not be entitled to refuse to prosecute himself.  Any

13　more than a US citizen would.

14　　　MR. SOLOMON:  He is a resident.

15　　　MR. FENTON:  He is a resident, is he?  I see.

16　Very well.

17　　　MR. ABRAMSON:  The only point that is worth adding

18　to that of course is that the onus should be on Mr. Symonds

19　to prove his privilege, rather than for us to disprove it.

20　　　MR. FENTON:  I appreciate that.  Very good.  Now,

21　does anyone else want to say anything before we go back to

22　Mr. Parkes?  Do the Defendants want to say anything on this?

23　　　MR. MULLIKEN:  Since Mr. Symonds is a non-party

24　inked proceeding, I think the Defendants don't have

25　a position on this.  We obviously refer to the judgment of

30

1　counsel for the witness and the Examiner.

2　　　MR. FENTON:  So be it, thank you.

3　　　MR. GIBBS:  We would add only that we disagree

4　with the suggestion that any of the Defendants participated

5　in any of the conduct the parties are alleging but that is

6　not an issue for today.

7　　　MR. FENTON:  Yes.  That is not an allegation you

8　need to answer here.  Mr. Parkes.

9　　　MR. PARKES:  Yes.  May I deal with Mr. Abramson's

10　points.  Would you just give me a moment.  There is one

11　point I need to find in my notes.  It won't take me

12　a second.

13　　　MR. FENTON:  Do you want to go off the record?

14　　　MR. PARKES:  I am content, if you just allow me

15　a moment or two, I can find it.

16　　　MR. FENTON:  Yes, of course.  (Pause).

17　　　I will do what I can, sir, I think.  For a start,

18　a reference was made to the correspondence and to the letter

19　of the 7th March which we have.

20　　　MR. FENTON:  Yes.

21　　　MR. PARKES:  Mr. Abramson in reading that

22　paragraph, omitted three crucial words.  You will see that

23　the sentence he read in full is:

24　　　"The first is that your clients accept our request

25　that the deposition be postponed to allow our client further

31

1　time to consider his position and take advice."

2　　　That having been a theme of the earlier

3　correspondence, that it was essential for Mr. Symonds to

4　take advice on the position under U.S. law and that of

5　course is the relevance of the expression "and to take

6　advice".

7　　　The whole thrust of the early correspondence to

8　which that is a reference was to explain it necessary for

9　Mr. Symonds to take in respect of his position under U.S.

10　law which plainly could only depend whether or not

11　appropriate should be asserted against self-incrimination

12　^check.  The second question on the point of whether or not

13　the Fifth Amendment is non-applicable to non-U.S. citizens.

14　As I understand --

15　　　MR. FENTON:  Or residents, I think.

16　　　MR. PARKES:  I am sorry, to U.S. citizens or

17　residents.

18　　　MR. FENTON:  That it applies only to U.S.

19　citizens.

20　　　MR. PARKES:  Yes, that is right.  As I understand

21　it, that is not the case.  What I am struggling to do, and

22　I don't think I am going to be able to do is produce chapter

23　and verse because the U.S. lawyers have not yesterday

24　completely -- have not yet given us a complete statement of

25　the U.S. law.  As I understand the position, given the

32

1  extraterritorial nature of the statute in question, the
2  probability is that the Fifth Amendment protections would
3  extend to anybody who is charged under legislation with an
4  extraterritorial effect. But I can't take it any further at
5  the moment because I am not in a position to develop that.
6      But plainly that is a question which I suppose is
7  really impossible to resolve today. Our position is of
8  course the question of the U.S. law ^check. That is as far
9  as I can take my response to Mr. Abramson's submission
10  there.
11      His next point was to question whether or not any
12  prosecution was likely, even if Mr. Symonds has destroyed
13  evidence. Well, that of course is a question entirely of
14  speculation, sir, and one has absolutely no idea whether or
15  not, if the evidence were given, U.S. prosecuting
16  authorities would or would not decide to proceed against
17  him. And it would be quite impossible for you to conclude
18  that a prosecution was unlikely. The fact is there must be
19  a risk of a prosecution if we are talking about, as the
20  Plaintiffs seek to do, destruction of evidence in the light
21  of the terms of section 1512(c).
22      Fourthly, the question of costs. Well, five U.S.
23  lawyers in room and Mr. Abramson says we have not done this
24  to get a claim to the Fifth. Well, of course that is right
25  and the question of costs is one which the court is going to

33

1  have to consider. At the appropriate point but it can't be
2  material to the question of whether or not Mr. Symonds ought
3  to be allowed to make the claim to privilege.
4      As regards the final point, he said: let's go back
5  to the original question: what is your occupation? Now, the
6  reason for the assertion of privilege in respect of what may
7  seem on the face of it to a layman mention as that, as
8  I understand it, if the privilege is not asserted in toto in
9  respect of a line of questioning, there are always potent
10  arguments under U.S. law that privilege has been waived.
11  If, for example, a question is answered about the sort of
12  work which Mr. Symonds does, and that was what the question
13  was directed to, it would be argued or might be argued in
14  the U.S. proceedings that he had waived his right to assert
15  the privilege in respect of other questions which concern
16  his journalistic and professional entities ^check. That is
17  what I understand the position to be from our U.S. counsel.
18  And that is why even on such a seemingly innocuous question
19  as that, the privilege was asserted.
20  MR. FENTON: Right.
21  MR. PARKES: Can I just mention -- well, perhaps
22  I should not do so yet, but as I understand it, what you are
23  considering, sir, is first whether or not you should
24  exercise your discretion to require Mr. Symonds to ...
25  MR. FENTON: Yes. As I see it, the first question

34

1  is whether or not this claim is supported by the statements
2  in the letter of request. If it is, will not have any
3  discretion ^check. If it is not, I then have a discretion
4  whether or not to require Mr. Symonds to answer. If I do
5  and he does answer, then there are various consequences.
6  And if I don't, there are also various possible
7  ramifications.
8  MR. PARKES: I think there probably is one further
9  point which I ought to make, which I think is relevant to
10  the exercise of your discretion. Your reference to the
11  ramifications is, I imagine, a reference to the procedure
12  under part 34, rule 20 of the Civil Procedure Rules
13  whereby --
14  MR. FENTON: Yes. I mean, sorry. To cut across
15  you. But if I require you to answer the questions (him),
16  then what will happen is that if he does answer them,
17  a separate statement, a separate part of the deposition will
18  be brought into existence. It will go to the Senior Master
19  with an explanation from me as to why it is separate, which
20  will involve me saying what has happened, settings the
21  grounds of privilege ^check. It will then be held by the
22  Senior Master. He will ask the Californian court whether or
23  not the claim to privilege is well founded. If the
24  Californian court says it is, then the evidence will be
25  returned to Mr. Symonds.

35

1  MR. PARKES: Yes.
2  MR. FENTON: And that will be an end of it. If
3  the Californian court says it is not, then subject to
4  whatever remedies there may be by way of an appeal in
5  California, the evidence will be transmitted. And obviously
6  if I don't require him to answer, then it may be that there
7  is an application to the Master to require him to answer.
8  MR. PARKES: Yes, certainly. Can I just raise,
9  then, one further point.
10  MR. FENTON: Please do.
11  MR. PARKES: That is that I just need to address
12  you on the implications of your ordering him to answer,
13  having regard to the procedure which the English Civil
14  Procedure Rules contemplate which is what you just
15  described.
16      When the privilege against self-incrimination is
17  tested in the U.S. courts, counsel on both sides argue the
18  question of principle in front of a judge. As I understand
19  it, what then happens is that the witness puts forward,
20  usually I think in written terms, the facts which give rise
21  to the privilege. And those are passed to the judge who
22  sees them, but does not pass them to the other side.
23      So that in effect, the detailed facts which give
24  rise to the privilege are not disclosed to the other side.
25  That, as I understand it, is what happens in the

36

1 United States.
2       The English procedure contemplated by rule 20 is
3 in dramatic contrast; because if it is followed, because
4 what it envisages is that the questions are answered but
5 kept aside in a separate document.  But they are answered in
6 the presence of counsel for the parties in the litigation in
7 the United States.
8       Mr. Symonds would in effect be testifying under
9 oath as to all the facts.  And whatever he said would be
10 admissible against him either via the transcript or via the
11 witnesses, the evidence of witnesses in the room at the
12 instance of federal prosecuting authorities.
13      So the point is that although no doubt he would be
14 preserving his position as far as the evidence which he
15 gives in the civil proceedings is concerned, plainly he
16 would be, he would be exposing himself to precisely the risk
17 which he seeks to avoid by taking the Fifth.  Because the
18 evidence which he gives in this court could be admissible in
19 criminal proceedings in the United States; notwithstanding
20 the procedures which we have for transmission of the
21 material subject to ^check by the Senior Master.
22      So your --
23      MR. FENTON:  Is there any authority for that from
24 U.S. law?  I mean, I understand what you are saying.
25      MR. PARKES:  Yes.  I have no more at the moment.

37

1 I mean, I have been told, plainly I have been told in
2 extremely clear and plain terms that the English procedure
3 is what the U.S. lawyers regard as, in their terms, horrific
4 in terms of its implications ^check.  But I am not in
5 a position at this point to cite authority but apparently as
6 I understand it, as a matter of principle, there is nothing
7 to stop the prosecuting authorities from obtaining the
8 transcript or from requiring those present in this room to
9 depose as to what Mr. Symonds says, which would be
10 admissible in criminal proceedings.  As I understand it, it
11 is --
12      MR. FENTON:  Well, no-one here could be required
13 to do that.  But --
14      MR. PARKES:  Well, under U.S. law.  Apparently
15 U.S. counsel present on this room are susceptible to the
16 jurisdiction of the U.S. courts could be compelled to depose
17 as to what Mr. Symonds has said here today.  They could no
18 doubt be required to hand over copies of the transcript
19 which they have.  And apparently that material would be
20 admissible against Mr. Symonds in the U.S. criminal
21 proceedings.  That is the difficulty.  I mean, it is most
22 curious that the -- although the fact plainly envisages that
23 it is important to protect the interests of somebody who
24 wishes to assert the privilege in foreign proceedings, the
25 Civil Procedure Rules have adopted a procedure which does

38

1 precisely the opposite.  It exposes the deponent to the risk
2 of a prosecution, rather than protecting him.  And that is
3 a matter, I suggest, which is relevant to your discretion as
4 to whether or not he ordered to be answer the questions at
5 all.
6      MR. FENTON:  Yes, it is relevant, if it is
7 correct.
8      MR. PARKES:  Well --
9      MR. FENTON:  And I don't say that with any
10 disrespect.
11      MR. PARKES:  No, I know you don't.
12      MR. FENTON:  Mr. Solomon, have you anything to say
13 in relation to that because that is a point of law that I do
14 not think was foreshadowed in the opening submissions of
15 Mr. Parkes.
16      MR. SOLOMON:  Well, if the invocation of the Fifth
17 Amendment assertion were litigated in the U.S., I don't know
18 that there is any hard and fast procedure as to how that
19 would get litigated.  It is possible that there would be an
20 "in camera" review with respect to some of the underlying
21 bases for the assertion.  But it is not something that I can
22 give you any detailed information on.  It is not something
23 that I think is subject, as I say, to any regular process.
24      I would say that I think the Fifth Amendment is
25 designed for utilisation in particular proceedings.  There

39

1 has never been a guarantee that there would not be leakage
2 of the information one way or the other.
3      If it is not embraced and is not protected by the
4 Fifth Amendment, I think it is right to the extent it exists
5 and I think that is in dispute in any event, it is right to
6 the extent it does not exist, it is not absolute and does
7 not guarantee, there is no guarantee of complete secrecy.
8      MR. ABRAMSON:  It is somewhat counter intuitive to
9 suggest that an American -- this is all, we know that
10 Mr. Symonds has no privilege against self-incrimination
11 under English law, so all that is let is one of the U.S.
12 law.  Are the U.S. judges going to determine that the
13 privilege exists or it does not.  If it does not, then his
14 testimony can be used.  And if it does and a US judge has
15 determined that privilege exists, it steams difficult to see
16 how second hand evidence such as the deposition itself could
17 be introduced into evidence or any of us in this room could
18 be asked to give what is presumably hearsay evidence of what
19 Mr. Symonds said.  It is difficult to see how that argument
20 can be run every single time.
21      MR. FENTON:  There is something in that point.  My
22 difficulty is that I have no basis to choose between you at
23 the moment.
24      MR. PARKES:  Could I -- yes.  No, I am sorry.
25      MR. FENTON:  That is really down to the state at

40

1  which the point has been taken.  Again, I do not raise that
2  by way of any criticism.  It is just that no doubt both
3  sides are doing their best in the time available.
4      MR. PARKES:  Can I just say, sorry.  Just on one
5  point, I am sorry if I am interrupting you.  As I understand
6  it, I think under English law the position would be the
7  same.  Any admissions made by Mr. Symonds against his
8  interest would be exceptions, common law exceptions to the
9  hearsay rule.  I think in English the English law of
10  evidencest evidence.  As I understand it, the position is
11  the same under U.S. law.
12      MR. FENTON:  There must be a question of policy as
13  to whether you are going to allow effectively indirect
14  evidence of self incriminating material which I apprehend is
15  the basis of Mr. Abramson's point.
16      MR. PARKES:  Yes.
17      MR. FENTON:  That whether in a sense you would be
18  allowed to circumvent the whole purpose for the invocation.
19  If the civil court has said you can invoke it to protect you
20  from the evidence being given.
21      MR. PARKES:  Yes.
22      MR. FENTON:  It does seem quite surprising that
23  the very purpose for which the civil court has enabled the
24  amendment to be invoked can then be circumvented by the fact
25  that, and I quite follow the position logically, the witness

41

1  and kept by the Senior Master, the transcript of the
2  evidence could still be obtained if necessary by a federal
3  Grand Jury subpoena.  And a Grand Jury could also, as I am
4  informed, compel the evidence of witnesses to his
5  deposition; even if the transcript was not available.
6      And so as I understand it, there is every reason
7  to believe that that evidence could be obtained by a federal
8  prosecutor.  That is the basis of my concern.
9      MR. ABRAMSON:  Did I hear the suggestion that the
10  Grand Jury would subpoena something in the possession of an
11  English Master?
12      MR. PARKES:  No, I am sorry.  No, but presumably
13  the transcript would be in the possession of the various
14  parties who are present in the deposition.
15      MR. ABRAMSON:  Well, is the way around that to
16  ensure there is only one copy that is left with the court
17  pending this argument, if this is really a concern?
18      MR. PARKES:  That would be obviously of assistance
19  as I understand it but it does not answer the point that
20  witnesses are susceptible to subpoena to give their evidence
21  as to what was said during the hearing of the deposition.
22  (Pause.)
23      MR. FENTON:  Is that --
24      MR. PARKES:  I think that is all I can usefully
25  say.

43

1  has given evidence and there happens to be somebody else who
2  can testify as to what evidence the witness gave.  It seems
3  to me that there would be a large policy question as to
4  whether or not criminal authorities ought to be able to rely
5  on evidence in those circumstances.
6      MR. PARKES:  Can I -- yes.
7      MR. FENTON:  Please.
8      MR. PARKES:  Can I just say that it appears that
9  the federal courts may issue protective orders in cases
10  where witnesses are concerned about giving evidence that may
11  be incriminating.  And there is one case cited in support of
12  that proposition, which is Grand Jury proceedings (Williams)
13  995 F.2 d 1013 (11th Circuit 1993).  The purpose of such
14  an order being to allow the witness to give his evidence
15  without any fear that federal prosecutors can obtain the
16  information by way of a Grand Jury subpoena of the
17  transcript.
18      Well now, apparently the Ninth Circuit which is of
19  course the relevant circuit for our purposes, has held that
20  federal criminal Grand Jury subpoenas take precedence over
21  such protective orders protecting the interests of the
22  witness giving evidence.
23      So the position appears to be that if Mr. Symonds
24  answered questions in accordance with the English procedure
25  and his evidence was then sprayed from the remainder of it

42

1      MR. FENTON:  What I would like to ask for my own
2  purposes is: what is the timetable we are facing in the
3  context of the U.S. litigation?  Sorry, that is to say when
4  must evidence be put before the court, or when -- if
5  evidence is to be taken from Mr. Symonds, when must it be
6  taken to be taken account of in the trial?
7      MR. SOLOMON:  At present, the magistrate, the
8  special Master that is in charge of discovery has ordered
9  that depositions take place to the extent they are still
10  pending, prior to March 31st.  The only exception to
11  that is Larry Ellison himself, and apparently there is the
12  potential that his deposition will be continued next
13  session, the next session of his deposition will take place
14  the first two weeks of April.
15      At the moment, we don't have any further latitude
16  from the court.
17      MR. FENTON:  And what is the trial?
18      MR. SOLOMON:  The trial is scheduled --
19      MR. FENTON:  The trial date?
20      MR. SOLOMON:  November 26th.  And before that,
21  just so you know, we will be going through an expert witness
22  phase, followed by a positive motion phase, followed by
23  pretrial work and the calender is pretty jam packed.
24      MR. GIBBS:  Just a point of clarification.  My
25  understanding of the special Master's ruling about the

44

1   timing of the depositions is that the depositions of
2   Mr. Ellison and Mr. Katz, Ms. Katz, were going to be taken
3   by the end of March, with the possible exception of
4   Mr. Ellison who may go in April. I don't understand there
5   to be any ruling setting a deadline for Mr. Symonds'
6   deposition.
7         MR. SOLOMON: I think that is fair. I think it is
8   implicit probably that the magistrate expects the
9   depositions to be concluded. We certainly don't have any
10   permission to take Mr. Symonds' deposition beyond
11   March 31st. However, of course, if there were a good
12   cause, we would seek to do that if we had no choice.
13         MR. FENTON: Very well. I am now going to take
14   a few minutes to consider what I am going to say. Can we go
15   off the record.
16         THE VIDEOGRAPHER: Going off the record. The time
17   is 12:42.
18         (12:42 p.m.)
19                 (A short break)
20         (12:58 p.m.)
21         THE VIDEOGRAPHER: We are back on the record. The
22   time is 12:58.
23   RULING BY THE EXAMINER:
24         MR. FENTON: This morning, Mr. Symonds was due to
25   be deposed in the proceedings with which we are concerned,

45

1   which is the Local 144 Nursing Home Pension Fund against
2   Sawyer, which are taking place in the U.S. District Court,
3   Northern District of California.
4         Mr. Symonds has come this morning, but Mr. Parkes
5   QC, his counsel, has objected to him answering questions and
6   indeed objected to the second question which was what was
7   his occupation; on the grounds of, to put it broadly,
8   self-incrimination. The privilege against
9   self-incrimination.
10         And the way that was developed was that it was not
11   said that there was a danger of incriminating Mr. Symonds in
12   relation to any UK laws, but that he runs the risk of
13   incriminating himself in relation to U.S. laws in relation
14   to which would be susceptible.
15         Now, the argument was put on two bases by
16   Mr. Parkes. Firstly, that the claim to privilege was
17   supported by a statement contained in the letter of request
18   within the meaning of section 3(2)(a) of the Evidence
19   (Proceedings in Other Jurisdictions) Act 1975.
20         I am satisfied that that is not so supported, but
21   that is not the end of the matter because in those
22   circumstances, the same subsection gives the Examiner
23   a discretion as to how to proceed.
24         Now, the difficulty which I as the Examiner face
25   this morning is that this point, the privilege point, has

46

1   only been taken this morning; and I offer no criticism of
2   anyone in relation to the timing. But by its nature, it
3   depends very heavily upon various matters of U.S. law and
4   understandably, given the timing, there has not been any
5   opportunity really to produce materials relating to U.S. law
6   or to develop any arguments in relation to it.
7         Now, in those circumstances, I have put myself in
8   the same position as if I were the Master who were deciding
9   this, to which either party can go if they are dissatisfied
10   with my decision.
11         And I find myself in some difficulty as to being
12   able to answer the question at all on the current state of
13   the information as to U.S. law.
14         And what I propose to do, although I am willing to
15   be addressed on it by the parties, is to adjourn this until
16   10 o'clock tomorrow morning to allow the parties to put
17   before me any further material in relation to U.S. law, and
18   also the risk of -- actual risk of prosecution which
19   Mr. Symonds faces.
20         And there are four points in particular which
21   have -- which seem of some significance to me.
22         The first is whether or not the U.S. code relied
23   on by Mr. Parkes is of extraterritorial effect.
24         The second is whether the Fifth Amendment is or is
25   not open to U.S. non-residents or U.S. non-citizens.

47

1         The third question is the actual or factual
2   likelihood of prosecution if this evidence is required to be
3   given.
4         And fourthly, the point raised by Mr. Parkes in
5   reply; that if evidence is required to be given by
6   Mr. Symonds, notwithstanding that restrictions could be
7   placed on the transcript or any copies of the transcript,
8   that at least the U.S. lawyers present in the room could be
9   enforced to give evidence of Mr. Symonds' evidence by
10   subpoena issued against them by U.S. federal authorities.
11         Now, I appreciate that adjourning it for even
12   a day is not particularly satisfactory, and no doubt from
13   anyone's point of view. But given the timing at which
14   this -- the time at which this point has come forward, it
15   seems to me that sensibly and to arrive at a rationally
16   defensible decision, I ought to adjourn it for a short term.
17   As I say, if the parties wish to address me on the length of
18   the adjournment, I am open to be addressed on that point.
19         That is my ruling. Do you want to say anything
20   now or would you like to go off the record?
21         MR. SOLOMON: I would like to go off the record,
22   please.
23         MR. PARKES: Yes, please.
24         MR. FENTON: Thank you.
25         THE VIDEOGRAPHER: Going off the record. The time

48

1 is 13:06.

2 (1:06 p.m.)

3 (A short break)

4 (1:24 p.m.)

5 THE VIDEOGRAPHER:  We are back on the record.  The

6 time is 1.24.

7 Submissions by Mr. Parkes.

8 MR. FENTON:  Mr. Parkes.

9 MR. PARKES:  Sir, could I say that I will

10 certainly be grateful for the opportunity to put symptom

11 more material before the court, before you to assist you to

12 reach a conclusion.

13 My only hesitation is as to whether I ought to be

14 asking you for a longer period than simply an adjournment

15 until tomorrow morning.

16 I have taken it upon myself, I am afraid, not yet

17 to ring U.S. counsel to ask how long he will need, because

18 I am conscious that it is still half past 6 in the morning

19 in San Francisco and I hoped that you might be prepared,,

20 depending on what Mr. Solomon says to you, to defer the

21 question of -- if you are minded to adjourn -- of when that

22 adjournment will be to, until after you have dealt with the

23 deponent from PC World, to enable me to call U.S. counsel at

24 a slightly more civilised hour and to give him at least

25 perhaps 7 o'clock in the morning, instead of half past 67.

49

1 MR. FENTON:  Right.  What are you asking me to do?

2 MR. ABRAMSON:  I am asking you therefore to

3 proceed with the deposition, at least to the first question,

4 and see what the answer is.

5 MR. PARKES:  For my part, sir, I would very much

6 prefer that you should be in a position to make a decision.

7 And to that end, I would want to do my best to come up with

8 further authorities in support of the propositions which

9 I have been trying to advance.

10 MR. FENTON:  Right.

11 MR. ABRAMSON:  An alternative is it to adjourn

12 this decision to a Master, defer it.

13 MR. FENTON:  Is that right?  Does there not need

14 to be some decision which can then be taken to the court?

15 I suppose the decision to adjourn can be taken to the court,

16 but that is rather unsatisfactory.

17 MR. ABRAMSON:  I am not sure your decision is one

18 that the appealing party has to prove is wrong as a matter

19 of law.  I think --

20 MR. FENTON:  It is the rehearing, is it?

21 MR. ABRAMSON:  I would have thought so.  I do not

22 have an authority for that, but ...

23 But if it is a hearing which it must be possible

24 for you to adjourn to a Master.  That is what I thought.

25 The same as a Master can adjourn a hearing for the judge to

51

1 MR. FENTON:  That seems to be sensible if it is

2 not going to have any practical implications.

3 MR. ABRAMSON:  Just --

4 MR. FENTON:  Yes, I am sorry.  The question of

5 deferring the decision as to whether we come back tomorrow

6 morning or at some point, until after the deposition of

7 Mr. Prendergast.  Unless that has practical implications

8 or ...

9 MR. ABRAMSON:  It might be because if you were to

10 direct, at the end of this you were to direct Mr. Symonds to

11 answer the questions.

12 MR. FENTON:  Yes.

13 MR. ABRAMSON:  I am not sure he is going to, or

14 whether he would take it off to the Master to appeal.  If he

15 is going to do that, then our preference would be for you to

16 proceed now, direct him to answer, at which point he will

17 say: no, I will not.  Then if we can sort that out now, we

18 can have a prospect of getting before a Master tomorrow or

19 if not a Master, a judge.  If there is a prospect of this

20 depositions taking place in our favour by tomorrow because

21 Mark and Stacey have to leave on Wednesday morning.  They

22 cannot stay longer than that.  So I wouldn't want to get

23 into position where we are putting it back until tomorrow,

24 only to find that we are in a position of saying: sorry, go

25 to a Master.  If that is going to happen, let's go now.

50

1 make that decision.

2 MR. PARKES:  Sir, I know ...

3 MR. FENTON:  Sorry.  But that would result in my

4 saying on what view do you want me to adjourn it to a Master

5 to be heard tomorrow, which I would have great hesitation in

6 doing because the Master would be in charge of his own list.

7 MR. ABRAMSON:  Well no, but if you refer to

8 a Master for the first available opportunity, it would be up

9 to us to get it on tomorrow if we can.

10 MR. FENTON:  Mr. Parkes, what do you say?

11 MR. PARKES:  Well, I know in a sense that I am the

12 author of my own misfortune although you have kindly

13 accepted and it is the case, that we have done our best to

14 take U.S. advice as soon as we have been able to.

15 MR. FENTON:  I am not sure I have accepted that.

16 But it seems to me the timing point, we are where we are.

17 MR. PARKES:  We are where we are, precisely so.

18 I am anxious that these difficult questions should not be

19 determined in an overly rushed fashion.  It is difficult

20 enough for the court to have to try to resolve questions of

21 a foreign law, without the proper materials being before the

22 court to assist it in that determination.

23 MR. FENTON:  Yes.  That may or may not be

24 difficult, I don't know.  Again, I am not ... but at the

25 moment, it is really for my position, it is simply a case of

52

1  assertion and cewnter assertion and I cast no as

2  persecutions on either side.  But they may be quite

3  straightforward questions in reality.

4        But on the practical side, Mr. Abramson, what

5  happens if the deposition does not go ahead tomorrow?

6        MR. ABRAMSON:  It will have to be rescheduled for

7  another date, later in the month.  Next month, I guess.

8        MR. FENTON:  But your concern, I am just trying to

9  get -- your concern is the accounts of the costs of everyone

10  coming over again.  Rather that if it does not happen

11  tomorrow, the opportunity will be lost for good?

12        MR. ABRAMSON:  Mark?

13        MR. SOLOMON:  A part of the issue is in the

14  States, we are allowed to choose the order in which

15  depositions take place in order to advance our strategy.

16  And at the moment we are in a position that we wanted to be

17  in, and that was that we were going to take Mr. Symonds's

18  deposition and gather his evidence.

19        MR. FENTON:  In advance of Mr. Ellison.

20        MR. PARKES:  Precisely.  We are running against

21  the possibility that that will be upset.  We are running up

22  against the possibility that it will be difficult to

23  (mr. Solomon) reschedule prior to his deposition, whenever

24  that takes place.  That is my concern.

25        Now, counsel for Mr. Ellison obviously is present

53

1  and assert to you that there is a possibility that

2  Mr. Ellison's deposition will be rescheduled for the first

3  two weeks of April.  If they were able to give us any

4  indications of what dates in those next two weeks

5  Mr. Ellison would make himself available, that might inform

6  this process.

7        MR. FENTON:  I see.  Because my concern really is

8  not to do anything which is going to jeopardise the progress

9  of the litigation in the States; obviously insofar as that

10  is compatible with Mr. Symonds' rights.

11        But it strikes me at the moment that if you get

12  before a Master tomorrow in this situation, there is

13  a danger -- it may not occur -- that the Master may feel the

14  same way as I do.  But in a sense, that is a matter for

15  Mr. Abramson.

16        But what I wonder is whether Mr. Parkes, if you

17  can get in touch or get one of your team to get in touch

18  with your Californian lawyers, and maybe we can see what

19  material is available after we have dealt with

20  Mr. Prendergast later on this afternoon.

21        And if on Mr. Abramson's side they are prepared to

22  go ahead and on the state of the material is then available,

23  maybe I can reach a decision this evening; depending on what

24  material has come forth.

25        MR. PARKES:  It is envisaged that I might be able

54

1  to get hold of some more material this afternoon?

2        MR. FENTON:  Yes.

3        MR. SOLOMON:  Is it not the case that if there is

4  more clarity on the invocation of the Fifth Amendment, that

5  that would answer a lot of the subsidiary questions and

6  issues?  And if that is the case and if that were the focus,

7  I would imagine that both sides could work quickly to try

8  and get the final answer.  I note that over the weekend,

9  counsel for Mr. Symonds was unable to find any authority

10  establishing that right.  We have been unable to find any

11  authority establishing that right.  We have seen notations

12  that the rights are intended for citizens and residents

13  connected with the USA may be important.  If that can be

14  resolved sooner rather than later, we may be move forward

15  rather more expeditiously.

16        MR. FENTON:  Yes, that is possibly right.  But

17  I would have thought an issue like that something which

18  ought to be capable of fairly fast resolution.

19        MR. SOLOMON:  I agree, I agree.

20        MR. FENTON:  There may be other questions which

21  are not.  And equally the extraterritoriality ought not, of

22  the relevant privilege under the criminal code, I would have

23  thought.  Which should be suss acceptable really to the

24  answer.  I can't belief this is the first case in which such

25  a question would have arises ^check.

55

1        But I think in view of of what has been said, it

2  may be unsatisfactory.  I think I am going to adjourn this,

3  my decision, as Mr. Parkes suggested.  I don't know when we

4  adjourn this to, to after Mr. Prendergast.  But I think

5  I will leave the matter open generally at that point as to

6  whether or not we, depending on what you both say to me at

7  that point, whether we just give whatever further argument

8  there is and I will issue a decision or whether I will defer

9  to tomorrow morning.

10        Now, one possibility tomorrow morning, if it does

11  go tomorrow morning, is that we could meet very early in

12  order to allow matters to proceed.  Or if necessary, do it

13  by phone maybe at 8 o'clock in the morning.  I would

14  certainly make myself available if that was going to assist.

15        MR. PARKES:  What, you were envisaging doing it by

16  a telephone hearing?

17        MR. FENTON:  Yes.  Because if the position is --

18  and I am very conscious that Mr. Symonds' rights must, if he

19  has the right, it must take precedence over everything.  But

20  if I am being told by Mr. Abramson that one of the problems

21  with my suggested course ask that his U.S. lawyers have to

22  go tomorrow and therefore in effect an adjournment until

23  tomorrow is an adjournment to an unknown date, one

24  possibility if we can't deal with it this evening is to deal

25  with it early tomorrow morning and then to potentially allow

56

1 mobilisation of whatever needs to be mobilised in an attempt
2 to get on tomorrow. Which both parties may want to
3 consider.
4 But I say that because it has occurred to me in
5 the course of what has been said in the last few minutes.
6 MR. PARKES: Okay.
7 MR. FENTON: All right, so as I said, probably
8 said no three times, I appreciate it may be unsatisfactory
9 but I think I will adjourn the matter effectively generally
10 as to what -- as to what time I make the decision.
11 MR. PARKES: Can I just say, sir, that it seems to
12 me most unlikely that I am going to be able to supplement
13 the material which I can put before you in the time
14 available this afternoon, because U.S. lawyers -- it is now
15 20 to 7 San Francisco time. He is going to have to get into
16 his office. I don't know how long that is going to take
17 him. But it is going to be some while before he is even
18 there.
19 MR. FENTON: Yes.
20 MR. PARKES: Let alone even be able to apply his
21 minds to these questions.
22 MR. FENTON: I assumed he might have applied his
23 mind to them a little bit already.
24 MR. PARKES: He has, but plainly he wanted further
25 time. He spent a great deal of yesterday on this, as

57

1 I understand it, Sunday.
2 MR. ABRAMSON: On the question of whether non-U.S.
3 residents have constitutional rights is presumably many
4 lawyers on the east coast who can answer that who would have
5 been up for some time now.
6 MR. FENTON: I think that what we should do. In
7 terms of time, how long is Mr. Prendergast likely to take?
8 MR. SOLOMON: I would say an hour or so frrks my
9 perspective.
10 MR. FENTON: Right. Well, if he is coming at 2,
11 then we will be here at 3. And I mean, that is not
12 realistically a very long time if we are then going to
13 proceed to further argument.
14 What about the suggestion that we do something
15 very early tomorrow morning, should that arise?
16 MR. ABRAMSON: Fine by me.
17 MR. SOLOMON: Fine by me.
18 MR. FENTON: Does anyone have any ... but does
19 that, there is no point in doing that unless that is going
20 to address the concern that you have expressed. That is the
21 only point in doing it, to allow either party to do
22 something tomorrow if that happens.
23 MR. ABRAMSON: In a sense, it depends on you,
24 doesn't it? What is actually -- I mean, we are on the
25 record still, are we?

58

1 THE VIDEOGRAPHER: Yes.
2 MR. FENTON: If you want to go off the record.
3 MR. ABRAMSON: It is a question for you and I do
4 not want to embarrass you.
5 MR. FENTON: I am sure Mr. Parkes won't be
6 embarrassed.
7 MR. ABRAMSON: We know what you can do and how far
8 you can appeal things. We know that if you are determined
9 that no deposition is going to take place tomorrow, come
10 what may, that can be done.
11 MR. PARKES: I am sorry, I wouldn't quite put it
12 that way. We are absolutely determined to assert
13 Mr. Symonds' Fifth Amendment rights and if that is something
14 which we have to go some way up the traditional hierarchy in
15 this country to achieve, we shall do so.
16 MR. FENTON: I am sure you can take it Mr. Parkes
17 will protect Mr. Symonds rights to that extent.
18 MR. ABRAMSON: The assumption one will go to the
19 Court of Appeal tomorrow.
20 MR. PARKES: If one is realistic, this matter is
21 not going to be determined tomorrow.
22 MR. FENTON: Right. In that case, there seems
23 little point in trying to go through as many of the hoops as
24 we can get there tomorrow if there are going to remain hoops
25 to go through at a later date.

59

1 MR. FENTON: No, that is what I was wondering.
2 There is certainly no point in concertinaing things in order
3 to have a resolution tomorrow. If in fact there is not
4 going to be a resolution tomorrow. But I nonetheless think,
5 unless someone else is going to say something to me,
6 I nonetheless think this ought to be determined so far as
7 I am concerned tomorrow morning. And that was behind my
8 original suggestion, so that matters can be moved on quickly
9 by either side.
10 MR. PARKES: Yes.
11 MR. FENTON: So that the matter can be resolved.
12 MR. ABRAMSON: That is plainly sensible but
13 I think the difference between 8 o'clock and 9 o'clock or
14 9.30 is of little consequence in those circumstances.
15 MR. FENTON: That is fine and I would not suggest
16 that it be done at 8 o'clock unless there was some point in
17 doing it then, rather than at 10. So as things stand, I am
18 persuaded back to the original position of 10 o'clock; given
19 what has been said.
20 MR. GIBBS: If I may speak to that. Some of us
21 are currently scheduled to go home tomorrow on a flight
22 close to midday. I would have a preference for doing it
23 earlier as long as it is not inconvenient for everyone.
24 Obviously we will do what works for everyone but if the
25 issue is not going to be resolved tomorrow in any event,

60

1    I would prefer an earlier start to the degree it is

2    feasible.

3        MR. FENTON:  I hear that but I have to be aware

4    that the burden is going to fall on Mr. Parkes, Mr. Solomon

5    and Mr. Abramson.  And you, I think, would be able to pick

6    up what happens from the transcript anyway.  So I would

7    be -- I would in those circumstances be bound to hear what

8    they have to say about starting before 10.

9        But shall we leave it, gentlemen?  But at the

10    moment, I am minded to adjourn it until, with respect to

11    10 o'clock tomorrow morning.  Unless anyone wants to say

12    anything else to me about it after the evidence of

13    Mr. Prendergast.

14        MR. PARKES:  Can I just suggest that if anybody

15    has anything to say, it might be well to say it now.  You

16    may be able to make a decision now and get on with work.

17        MR. FENTON:  Yes, sorry.  I was trying to be

18    helpful, rather than ...

19        MR. PARKES:  I do appreciate that.

20        MR. FENTON:  Well, has anyone else have anything

21    to say?  Now, shall we reconvene at 10 o'clock tomorrow

22    morning for this matter to be resolved.

23        THE VIDEOGRAPHER:  Going off the record.  The time

24    is 13:43.

25    (1:43 p.m.)

61

1        (The deposition concluded)

62

# EXHIBIT V

Symonds, Matthew  3/20/2007  10:56:00 AM

IN THE MATTER OF THE EVIDENCE (PROCEEDINGS IN OTHER
JURISDICTIONS) ACT 1975 AND THE CIVIL PROCEDURE RULES
1998 PART 34
AND IN THE ACTION IN THE UNITED STATES DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA Case No. C-01-0988-MJJ
IN THE MATTER OF THE INTENDED EXAMINATION OF MATTHEW
SYMONDS AND A REPRESENTATIVE OF DSG RETAIL LIMITED
IN THE HIGH COURT OF JUSTICE, QUEEN'S BENCH DIVISION

- - - - - - - - - - - - - - - - - -

BETWEEN:

LOCAL 144 NURSING HOME PENSION FUND (1)

ROBERT D. SAWYER (2)

Plaintiffs

and

ORACLE CORPORATION (1)

LAWRENCE J. ELLISON (2)

JEFFREY O. HENLEY (3)

EDWARD J. SANDERSON (4)

Defendants

- - - - - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF MR. MATTHEW SYMONDS

VOLUME II

Tuesday, March 20, 2007

AT:  11:38 a.m.

Taken at:

HARBOTTLE & LEWIS LLP

Hanover House

Hanover Square

London W1S 1HP

UNITED KINGDOM

1

A P P E A R A N C E S

The Examiner:

ADAM FENTON QC
Seven King's Bench Walk
Temple
London EC4Y 7DS
UNITED KINGDOM
Tel: (+44) 20 7910 8300

Appearing on behalf of the witness:

RICHARD PARKES QC
Five Raymond Buildings
Gray's Inn
London WC1R 5BP
UNITED KINGDOM
Tel: +44 (0) 20 7242 2902

RICHARD SHILLITO
Farrer & Co
66 Lincoln's Inn Fields
London WC2A 3LH
UNITED KINGDOM
Tel: +44 (0) 20 7917 7526

Appearing on behalf of the Plaintiffs:

MARK SOLOMON
STACEY M. KAPLAN
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
655 West Broadway, Suite 1900
San Diego
California 92101-3301
Tel: (619) 231 1058
LOUIS CASTELLANI
Harbottle & Lewis LLP
Hanover House
Hanover Square
London W1S 1HP
UNITED KINGDOM
Tel: +44 (0) 20 7667 5000

2

Appearing on behalf of the Defendants:

DAVID L. MULLIKEN
NEIL BLAKE
Latham & Watkins LLP
99 Bishopsgate
London EC2M 3XF
UNITED KINGDOM
Tel: +44 (0) 20 7710 1000

PATRICK E. GIBBS
Latham & Watkins LLP
140 Scott Drive
Menlo Park
California 94025-1008
Tel: (650) 328 4600

The Court Reporter:

ROSE KAY
Merrill Legal Solutions
190 Fleet Street
London
UNITED KINGDOM
Tel: +44 (0) 20 7404 1400

Videographer:

WENDY VINER
Merrill Legal Solutions
190 Fleet Street
London
UNITED KINGDOM
Tel: +44 (0) 20 7404 1400

3

I N D E X

DEPONENT                          PAGE

STATEMENT BY MR. CASTELLANI: .. ... ... ... ...  5

MATTHEW SYMONDS ... ... ... ... ... ... ... ...  8

DIRECT EXAMINATION BY MR. SOLOMON . ... ... ... ..  8
(continued):

4

1        Tuesday, March 20, 2007
2    (11.38 a.m.)
3        THE VIDEOGRAPHER:  Today is March 20th.  This is
4    the continuing deposition of Matthew Symonds.  We are on the
5    record.  The time is 11:38.
6        MR. FENTON:  Now, as I understand it, there have
7    been some discussions in relation to the objection on the
8    grounds of privilege.
9    STATEMENT BY MR. CASTELLANI:
10       MR. CASTELLANI:  Sir, yes.  If I may grasp the
11    nettle.
12       MR. FENTON:  Yes.
13       MR. CASTELLANI:  What became clear overnight and
14    having discussed the position with Mr. Symonds'
15    representation this morning, is that the questions that you
16    asked us to go away and think about overnight are ones --
17    particularly in relation to the Fifth Amendment point --
18    that are, we have agreed, best considered in writing by the
19    U.S. court.
20       That is with the greatest respect to you and to
21    the English court.  We just think they are rights that
22    emanate under U.S. law, for the courts in that jurisdiction
23    to decide it.  This is also the fear that we would all be
24    caught up in a series of appeals in this jurisdiction, and
25    ultimately the point could be remitted back to the U.S.

5

1    anyway.
2       On that basis, we have agreed a way of proceeding
3    today which is as follows; and Mr. Parkes will come in at
4    the end and add anything he needs to.  That you do not
5    exercise your discretion today to make any decision at all
6    under Section 3.  That the deposition proceeds, but on the
7    basis of the rights that each side thinks the other has or
8    doesn't have.
9       That is to say that Mr. Solomon on behalf of the
10    Plaintiffs will ask a series of questions of Mr. Symonds in
11    accordance with the letter of request, and Mr. Symonds, if
12    he wishes to proceed on the basis of his Fifth Amendment
13    rights, does so, he will answer however he sees fit; what
14    we will then ask you to do at some stage is at the end of
15    the deposition to adjourn it and there will be a number of
16    administrative things done at the end, perhaps stipulations
17    and things said for the record for the purposes of filing in
18    the U.S. court the briefings to enable the Fifth Amendment
19    point to be decided in the U.S.
20       We will do that at the end.  What is important for
21    today is that you adjourn and keep open this deposition so
22    that depending on what is decided in the U.S., the parties
23    can come back if necessary; or in the alternative, the
24    testimony that is given today can stand, depending on what
25    happens in the United States.

6

1       MR. FENTON:  Yes, I understand that.  That seems
2    very sensible to me.
3       MR. CASTELLANI:  Mark, do you have anything to add
4    to that?
5       MR. SOLOMON:  No, except that I am going to plan
6    on asking questions consistent with the lines of questioning
7    that I believe have been distributed and the parties are in
8    possession of.  And that I would like to proceed as
9    expeditiously as possible and get on with my questioning.
10       MR. PARKES:  Can I just say on behalf of
11    Mr. Symonds that this proposal is agreed to.  It seems
12    eminently sensible that the matter should be determined by
13    the U.S. courts and there is an agreed schedule of filings
14    of briefs and a hearing of the judge is available.
15       I should make it clear that it is agreed that
16    there should be no limitation on appellate rights in the
17    United States by either party.  But subject to that, to the
18    schedule which we have agreed, this course seems sensible to
19    us.
20       MR. FENTON:  And can I take it, and I will just
21    say it out loud so there is no misunderstanding, I am not
22    going to rule on any objection taken.  Questions will be
23    asked.  Objections will be taken on the grounds of
24    privilege, if that is thought that the parties want it.  And
25    we will then move on to the next question.

7

1       And should it arise that any objection is taken on
2    any ground other than privilege, I will proceed as yesterday
3    and not give you the benefit of my opinion on that
4    objection.
5       Good, so let us proceed.
6       (A technical problem)
7       THE VIDEOGRAPHER:  Going off the record.  The time
8    is 11:42 a.m.
9    (11:42 a.m.)
10       (A short break)
11    (11:44 a.m.)
12       THE VIDEOGRAPHER:  We are back on the record.  The
13    time is 11:44.
14       MR. FENTON:  Mr. Solomon.
15       MR. SOLOMON:  Thank you very much, Mr. Fenton.
16       MATTHEW SYMONDS
17    having previously been duly sworn,
18    testified as follows:
19    DIRECT EXAMINATION BY MR. SOLOMON (continued):
20    BY MR. SOLOMON:
21    Q.  Good morning, Mr. Symonds.
22    A.  Good morning.
23    Q.  And just for the record, although we have
24    agreed to this procedure, I will state on behalf of the
25    Plaintiffs that we are not waiving any rights with respect

8

Symonds, Matthew  3/20/2007  10:56:00 AM

1  to our right to question Mr. Symonds fully and get full
2  answers, and we intend to exercise those rights in due
3  course.
4      Also, I want to state for the record that although
5  we have agreed to a schedule for briefing on disputes that
6  may emanate from this deposition, I remain hopeful that
7  notwithstanding that, Mr. Symonds will find it possible to
8  answer substantively some of my questions.  And with that,
9  I will start my line of questioning.
10      My first question, Mr. Symonds, is: have you since
11  the beginning of November 2006 been in contact with either
12  Mr. Ellison or his lawyers?
13      A.  On counsel's advice, I assert the privilege
14  not to answer, pursuant to the Fifth Amendment of the U.S.
15  constitution.
16      Q.  Do you know who Mr. Gibbs of Latham & Watkins
17  is, Mr. Symonds?
18      A.  On counsel's advice, I assert the privilege
19  not to answer, pursuant to the Fifth Amendment of the U.S.
20  constitution.
21      Q.  When was the last time you spoke with
22  Mr. Larry Ellison?
23      A.  On counsel's advice, I assert the privilege
24  not to answer, pursuant to the Fifth Amendment of the U.S.
25  constitution.

9

1      Q.  Have you ever spoken with Mr. Gibbs?
2      A.  On counsel's advice, I assert the privilege
3  not to answer, pursuant to the Fifth Amendment of the U.S.
4  constitution.
5      Q.  Did you ever draft a declaration for
6  submission to a U.S. court in connection with pending
7  proceedings against Oracle Corporation and Mr. Ellison and
8  others?
9      A.  On counsel's advice --
10      MR. PARKES:  I think I will ... may we pause
11  there?  Can we go off the record for a moment?
12      MR. FENTON:  Yes, if you wish to.
13      THE VIDEOGRAPHER:  Going off the record.  The time
14  is 11:46.
15  (11:46 a.m.)
16          (A short break)
17  (11:47 a.m.)
18      THE VIDEOGRAPHER:  We are back on the record.  The
19  time is 11:47.
20      BY MR. SOLOMON:
21      Q.  And the pending question is: have you ever
22  drafted a declaration for submission to a U.S. court in
23  connection with pending proceedings against Oracle
24  Corporation and Mr. Ellison and others?
25      A.  Yes, I have.

10

1      Q.  And when did you do that?
2      A.  Early November 2006.
3      Q.  And did somebody ask you to draft that
4  declaration?
5      A.  On the advice of counsel, I assert the
6  privilege not to answer, pursuant to the Fifth Amendment of
7  the U.S. constitution.
8      Q.  Okay.  But your testimony is that you did
9  draft it, as opposed to simply signing it; is that true?
10      A.  No.  Well, I signed --
11      MR. PARKES:  Forgive me.  I am instructing
12  Mr. Symonds to assert his privilege.
13      A.  Okay.  On the advice of counsel, I assert the
14  privilege not to answer, pursuant to the Fifth Amendment of
15  the U.S. constitution.
16      BY MR. SOLOMON:
17      Q.  Did somebody ask you to sign that declaration?
18      A.  On the advice of counsel, I assert the
19  privilege not to answer, pursuant to the Fifth Amendment of
20  the U.S. constitution.
21      Q.  Okay.  I go back to my question, asking if you
22  drafted a declaration.  Is that true or false?  Did you
23  draft a declaration?
24      A.  On the advice of counsel, I assert the
25  privilege not to answer, pursuant to the Fifth Amendment of

11

1  the U.S. constitution.
2      Q.  So your testimony, to begin with, was that you
3  did draft it.  Are you changing that testimony?
4      A.  On the advice of counsel, I assert the
5  privilege not to answer, pursuant to the Fifth Amendment of
6  the U.S. constitution.
7      Q.  Have you ever been in contact with lawyers
8  from Latham & Watkins?
9      A.  On the advice of counsel, I assert the
10  privilege not to answer, pursuant to the Fifth Amendment of
11  the U.S. constitution.
12      Q.  Did you have any communications with lawyers
13  from Latham & Watkins concerning the declaration?
14      A.  On the advice of counsel, I assert the
15  privilege not to answer, pursuant to the Fifth Amendment of
16  the U.S. constitution.
17      Q.  Why did you sign the declaration?
18      A.  On the advice of counsel, I assert the
19  privilege not to answer, pursuant to the Fifth Amendment of
20  the U.S. constitution.
21      Q.  Have you ever seen Plaintiffs' motion to
22  compel the production of materials relating to Softwar?
23      A.  On the advice of counsel, I assert the
24  privilege not to answer, pursuant to the Fifth Amendment of
25  the U.S. constitution.

12

1    Q.  Have you ever seen Defendants' opposition to
2  Plaintiffs' motion to compel the production of Softwar
3  materials?
4    A.  On the advice of counsel, I assert the
5  privilege not to answer, pursuant to the Fifth Amendment of
6  the U.S. constitution.
7    Q.  Do you have a computer with you today for
8  production in this case?
9    A.  On the advice of counsel, I assert the
10  privilege not to answer, pursuant to the Fifth Amendment of
11  the U.S. constitution.
12    Q.  So I am not allowed to know if you have
13  a computer for production today?
14    A.  On the advice of counsel, I assert the
15  privilege not to answer, pursuant to the Fifth Amendment of
16  the U.S. constitution.
17    Q.  Did you enter into an agreement with
18  Mr. Ellison, pursuant to which you would write a book about
19  him and Oracle Corporation?
20    A.  On the advice of counsel, I assert the
21  privilege not to answer, pursuant to the Fifth Amendment of
22  the U.S. constitution.
23    Q.  Have you ever e-mailed Mr. Gibbs or any other
24  lawyer at Latham & Watkins?
25    A.  On the advice of counsel, I assert the

13

1  privilege not to answer, pursuant to the Fifth Amendment of
2  the U.S. constitution.
3    Q.  Have you ever received any e-mail or any other
4  communication from any lawyers at Latham & Watkins?
5    A.  On the advice of counsel, I assert the
6  privilege not to answer, pursuant to the Fifth Amendment of
7  the U.S. constitution.
8    Q.  Have you ever had a telephone conversation
9  with Mr. Gibbs or any other lawyer from Latham & Watkins?
10    A.  On the advice of counsel, I assert the
11  privilege not to answer, pursuant to the Fifth Amendment of
12  the U.S. constitution.
13    Q.  Have you discussed with Mr. Ellison the issue
14  that is being addressed today?  And that issue I should
15  define, I guess, as the production of materials connected
16  with the book Softwar.
17    A.  On the advice of counsel, I assert the
18  privilege not to answer, pursuant to the Fifth Amendment of
19  the U.S. constitution.
20    Q.  When was the last time you met with
21  Mr. Ellison?
22    A.  On the advice of counsel, I assert the
23  privilege not to answer, pursuant to the Fifth Amendment of
24  the U.S. constitution.
25    Q.  Did you conduct interviews with Mr. Ellison in

14

1  preparation for a book called Softwar?
2    A.  On the advice of counsel, I assert the
3  privilege not to answer, pursuant to the Fifth Amendment of
4  the U.S. constitution.
5    Q.  Do you have in your possession any recordings
6  of any interviews with Mr. Larry Ellison?
7    A.  On the advice of counsel, I assert the
8  privilege not to answer, pursuant to the Fifth Amendment of
9  the U.S. constitution.
10    MR. PARKES:  May I interpose.  I would also
11  instruct Mr. Symonds to assert in connection with this
12  question his reporter's privilege under the U.S.
13  constitution and the Federal Rules of Evidence.
14    Could Mr. Symonds have a glass of water?  Thank
15  you very much.
16    BY MR. SOLOMON:
17    Q.  Have you turned over to Plaintiffs copies of
18  some transcripts of interviews with Mr. Ellison that you
19  conducted in 2002?
20    A.  On the advice of counsel, I assert the
21  privilege not to answer, pursuant to the Fifth Amendment of
22  the U.S. constitution.
23    Q.  Are the transcripts of the interviews that you
24  turned over to the lawyers in this litigation, with respect
25  to interviews in 2002, protected by the privilege that your

15

1  lawyer just asserted?
2    A.  On the advice of counsel, I assert the
3  privilege not to answer, pursuant to the Fifth Amendment of
4  the U.S. constitution.
5    MR. PARKES:  I should say that the privilege, as
6  far as I am concerned, would be asserted in respect of the
7  transcript of interviews.  Indeed, the reporter's privilege
8  is asserted in connection with the interviews which
9  Mr. Symonds may have had with Mr. Ellison and any
10  information contained in them; any questions as to those
11  matters.
12    BY MR. SOLOMON:
13    Q.  And to the extent there ever was any
14  privilege, which the Plaintiffs dispute, that clearly has
15  been waived.  But that is for another day.
16    Have you ever spoken with a woman called Safra
17  Catz?
18    A.  On the advice of counsel, I assert the
19  privilege not to answer, pursuant to the Fifth Amendment of
20  the U.S. constitution.
21    Q.  And have you ever spoken with a man called
22  Jeff Henley?
23    A.  On the advice of counsel, I assert the
24  privilege not to answer, pursuant to the Fifth Amendment of
25  the U.S. constitution.

16

1   Q.  Have you ever been instructed by anybody to
2   preserve evidence in connection with current proceedings
3   against Oracle, Larry Ellison and others in the U.S.A.?
4   A.  On the advice of counsel, I assert the
5   privilege not to answer, pursuant to the Fifth Amendment of
6   the U.S. constitution.
7   Q.  Are you willing to produce any and all e-mail
8   exchanges between you and Larry Ellison or his lawyers
9   concerning the production of evidence in the pending
10  litigation against Oracle, Larry Ellison and others?
11  A.  On the advice of counsel, I assert the
12  privilege not to answer, pursuant to the Fifth Amendment of
13  the U.S. constitution.
14  Q.  Are you willing to divulge any communications
15  that you may have had with Mr. Gibbs or any other lawyer
16  from Latham & Watkins, concerning the production of evidence
17  in the pending litigation against Oracle, Larry Ellison and
18  others?
19  A.  On the advice of counsel, I assert the
20  privilege not to answer, pursuant to the Fifth Amendment of
21  the U.S. constitution.
22  Q.  Did Larry Ellison tell you not to produce the
23  documents or the tapes?
24  A.  On the advice of counsel, I assert the
25  privilege not to answer, pursuant to the Fifth Amendment of

17

1   the U.S. constitution.
2   Q.  Did any lawyer from Latham & Watkins ask you
3   to produce or preserve the Softwar materials in
4   November 2006?
5   A.  On the advice of counsel, I assert the
6   privilege not to answer, pursuant to the Fifth Amendment of
7   the U.S. constitution.
8   Q.  Did any lawyer in November of 2006 advise
9   you that failing to preserve evidence in a case pending
10  against Oracle, Larry Ellison and others could result in
11  criminal penalties?
12  A.  On the advice of counsel, I assert the
13  privilege not to answer, pursuant to the Fifth Amendment of
14  the U.S. constitution.
15  Q.  Did any lawyer in November of 2006 ask you
16  to provide Softwar-related materials to Latham & Watkins'
17  London office?
18  A.  On the advice of counsel, I assert the
19  privilege not to answer, pursuant to the Fifth Amendment of
20  the U.S. constitution.
21  Q.  Did -- strike that.
22  Do you have telephone records of any calls between
23  you and Larry Ellison in November 2006?
24  A.  On the advice of counsel, I assert the
25  privilege not to answer, pursuant to the Fifth Amendment of

18

1   the U.S. constitution.
2   Q.  And the same question with respect to
3   December of 2006 through today?
4   A.  On the advice of counsel, I assert the
5   privilege not to answer, pursuant to the Fifth Amendment of
6   the U.S. constitution.
7   Q.  Are there telephone records of communications
8   between you and any lawyer from Latham & Watkins between
9   November 2006 and today?
10  A.  On the advice of counsel, I assert the
11  privilege not to answer, pursuant to the Fifth Amendment of
12  the U.S. constitution.
13  Q.  Have you ever heard of the name James
14  Maroulis?
15  A.  On the advice of counsel, I assert the
16  privilege not to answer, pursuant to the Fifth Amendment of
17  the U.S. constitution.
18  Q.  Have you discussed ever with Mr. Ellison the
19  status of Oracle Corporation in the period December 2000
20  through March 2001?
21  A.  On the advice of counsel, I assert the
22  privilege not to answer, pursuant to the Fifth Amendment of
23  the U.S. constitution.
24  Q.  Have you ever discussed with Mr. Ellison his
25  sales of almost $1 billion worth of stock in January of

19

1   2001?
2   A.  On the advice of counsel, I assert the
3   privilege not to answer, pursuant to the Fifth Amendment of
4   the U.S. constitution.
5   Q.  Have you ever discussed the product Suite 11i
6   with Larry Ellison?
7   A.  On the advice of counsel, I assert the
8   privilege not to answer, pursuant to the Fifth Amendment of
9   the U.S. constitution.
10  MR. PARKES:  Can we interpolate that, please.
11  I am not clear whether or not these questions relate to
12  interviews -- questions about interviews with Mr. Ellison in
13  connection with the preparation of the book.  But if so,
14  I will instruct Mr. Symonds to assert his reporter's
15  privilege under the U.S. constitution and the Federal Rules
16  of Evidence.
17  BY MR. SOLOMON:
18  Q.  Have you ever discussed the so-called "billion
19  dollar savings" as a result of the utilisation of 11i with
20  Mr. Larry Ellison?
21  A.  On the advice of counsel, I assert the
22  privilege not to answer, pursuant to the Fifth Amendment of
23  the U.S. constitution.  And I also assert my reporter's
24  privilege under the U.S. constitution and the Federal Rules
25  of Evidence.

20

Symonds, Matthew  3/20/2007  10:56:00 AM

1    Q. Is Larry Ellison a close friend of yours?
2    A. On the advice of counsel, I assert the
3    privilege not to answer, pursuant to the Fifth Amendment of
4    the U.S. constitution.
5    Q. Did you throw away the computer that contained
6    audio and other materials concerning Softwar at an
7    ecological dump?
8    A. On the advice of counsel, I assert the
9    privilege not to answer, pursuant to the Fifth Amendment of
10   the U.S. constitution.
11   Q. Will you identify the ecological facility to
12   Plaintiffs' counsel now, please?
13   A. On the advice of counsel, I assert the
14   privilege not to answer, pursuant to the Fifth Amendment of
15   the U.S. constitution.
16   Q. Did Mr. Ellison tell you it was critical that
17   these materials never be produced in their complete form?
18   A. On the advice of counsel, I assert the
19   privilege not to answer, pursuant to the Fifth Amendment of
20   the U.S. constitution.
21   MR. PARKES: In that respect, I also instruct
22   Mr. Symonds to assert his reporter's privilege under the
23   U.S. constitution and the Federal Rules of Evidence.
24   BY MR. SOLOMON:
25   Q. Did Mr. Ellison fear that he was "going down"

21

1    like Bernie Ebbers in 2001?
2    A. On the advice of counsel, I assert the
3    privilege not to answer, pursuant to the Fifth Amendment of
4    the U.S. constitution.
5    MR. PARKES: I also instruct Mr. Symonds to assert
6    his reporter's privilege under the U.S. constitution and the
7    Federal Rules of Evidence.
8    BY MR. SOLOMON:
9    Q. Did Mr. Ellison explain to you in 2001 or
10   thereafter why he was worried that he might "go down" like
11   Bernie Ebbers?
12   A. On the advice of counsel, I assert the
13   privilege not to answer, pursuant to the Fifth Amendment of
14   the U.S. constitution.
15   MR. PARKES: And I instruct Mr. Symonds to assert
16   also his reporter's privilege under the U.S. constitution
17   and the Federal Rules of Evidence.
18   BY MR. SOLOMON:
19   Q. Did anybody from Latham & Watkins or from
20   Oracle talk to you while they were preparing their
21   opposition to Plaintiffs' motion to compel to get the
22   Softwar materials?
23   A. On the advice of counsel, I assert the
24   privilege not to answer, pursuant to the Fifth Amendment of
25   the U.S. constitution.

22

1    Q. Did anybody from Latham & Watkins or Oracle
2    suggest to you what the position should be that you and
3    Mr. Ellison take?
4    A. On the advice of counsel, I assert the
5    privilege not to answer, pursuant to the Fifth Amendment of
6    the U.S. constitution.
7    Q. Who was involved in negotiating and publishing
8    the contract between you and Mr. Ellison concerning the book
9    Softwar?
10   A. On the advice of counsel, I assert the
11   privilege not to answer, pursuant to the Fifth Amendment of
12   the U.S. constitution.
13   Q. Without asking you the substance of the
14   interview, did you interview Mr. Ellison in connection with
15   the book Softwar?
16   A. On the advice of counsel, I assert the
17   privilege not to answer, pursuant to the Fifth Amendment of
18   the U.S. constitution.
19   MR. PARKES: Mr. Symonds also asserts his
20   reporter's privilege under the U.S. constitution and the
21   Federal Rules of Evidence.
22   BY MR. SOLOMON:
23   Q. Did you ever interview Safra Catz?
24   A. On the advice of counsel, I assert the
25   privilege not to answer, pursuant to the Fifth Amendment of

23

1    the U.S. constitution.
2    MR. PARKES: And Mr. Symonds also asserts his
3    reporter's privilege under the U.S. constitution and the
4    Federal Rules of Evidence.
5    BY MR. SOLOMON:
6    Q. Did you interview Jeff Henley?
7    A. On the advice of counsel, I assert the
8    privilege not to answer, pursuant to the Fifth Amendment of
9    the U.S. constitution.
10   MR. PARKES: Mr. Symonds also asserts his
11   reporter's privilege under the U.S. constitution and the
12   Federal Rules of Evidence.
13   BY MR. SOLOMON:
14   Q. How many hours of interviews did you conduct
15   with Mr. Ellison?
16   A. On the advice of counsel, I assert the
17   privilege not to answer, pursuant to the Fifth Amendment of
18   the U.S. constitution.
19   MR. PARKES: Mr. Symonds also asserts his
20   reporter's privilege under the U.S. constitution and the
21   Federal Rules of Evidence.
22   BY MR. SOLOMON:
23   Q. When did you first retain counsel in
24   connection with this matter?
25   A. On the advice of counsel, I assert the

24

1  privilege not to answer, pursuant to the Fifth Amendment of
2  the U.S. constitution.
3      Q.  Have you ever received any advice from
4  Latham & Watkins or any of the lawyers in-house at Oracle?
5      A.  On the advice of counsel, I assert the
6  privilege not to answer, pursuant to the Fifth Amendment of
7  the U.S. constitution.
8      Q.  Have you ever asked any questions of counsel
9  for Mr. Ellison?
10      A.  On the advice of counsel, I assert the
11  privilege not to answer, pursuant to the Fifth Amendment of
12  the U.S. constitution.
13      Q.  Have you ever been to a store called PC World
14  in Brentford?
15      A.  On the advice of counsel, I assert the
16  privilege not to answer, pursuant to the Fifth Amendment of
17  the U.S. constitution.
18      Q.  Have you ever met with any lawyers from
19  Latham & Watkins' London office?
20      A.  On the advice of counsel, I assert the
21  privilege not to answer, pursuant to the Fifth Amendment of
22  the U.S. constitution.
23      Q.  Does anybody other than you currently have
24  copies of any of the materials that are the subject of this
25  deposition?

25

1      A.  On the advice of counsel, I assert the
2  privilege not to answer, pursuant to the Fifth Amendment of
3  the U.S. constitution.
4      Q.  Did Mr. Gibbs or any other lawyer representing
5  Mr. Ellison ever ask you for the make of the computer on
6  which the materials were stored?
7      A.  On the advice of counsel, I assert the
8  privilege not to answer, pursuant to the Fifth Amendment of
9  the U.S. constitution.
10      Q.  Did any lawyer representing Mr. Ellison ever
11  ask you on what dates, or date, you disposed of the computer
12  or the materials?
13      A.  On the advice of counsel, I assert the
14  privilege not to answer, pursuant to the Fifth Amendment of
15  the U.S. constitution.
16      Q.  Who is paying your legal fees in connection
17  with this matter?
18      A.  On the advice of counsel, I assert the
19  privilege not to answer, pursuant to the Fifth Amendment of
20  the U.S. constitution.
21      Q.  Is it Mr. Ellison?
22      A.  On the advice of counsel, I assert the
23  privilege not to answer, pursuant to the Fifth Amendment of
24  the U.S. constitution.
25      Q.  Have you ever spoken with Sandy Sanderson?

26

1      A.  On the advice of counsel, I assert the
2  privilege not to answer, pursuant to the Fifth Amendment of
3  the U.S. constitution.
4      Q.  Have you ever spoken to any customers of
5  Oracle?
6      A.  On the advice of counsel, I assert the
7  privilege not to answer, pursuant to the Fifth Amendment of
8  the U.S. constitution.
9      Q.  Which customers of Oracle have you spoken
10  with?
11      A.  On the advice of counsel, I assert the
12  privilege not to answer, pursuant to the Fifth Amendment of
13  the U.S. constitution.
14      Q.  Have you ever discussed with Mr. Ellison
15  issues concerning software problems with the 11i?
16      A.  On the advice of counsel, I assert the
17  privilege not to answer, pursuant to the Fifth Amendment of
18  the U.S. constitution.
19      Q.  Have you ever discussed with Mr. Ellison how
20  those problems adversely affected Oracle in 2000 and 2001?
21      A.  On the advice of counsel, I assert the
22  privilege not to answer, pursuant to the Fifth Amendment of
23  the U.S. constitution.
24      Q.  Is Mr. Ellison an habitual liar?
25      A.  On the advice of counsel, I assert the

27

1  privilege not to answer, pursuant to the Fifth Amendment of
2  the U.S. constitution.
3      Q.  Can you describe what attention to detail at
4  Oracle Mr. Ellison described to you that he devoted?
5      A.  On the advice of counsel, I assert the
6  privilege not to answer, pursuant to the Fifth Amendment of
7  the U.S. constitution.
8      Q.  Did you talk with Mr. Ellison about Oracle's
9  sales online?
10      A.  On the advice of counsel, I assert the
11  privilege not to answer, pursuant to the Fifth Amendment of
12  the U.S. constitution.
13      MR. PARKES:  Mr. Symonds also asserts his
14  reporter's privilege under the U.S. constitution and Federal
15  Rules of Evidence.
16  BY MR. SOLOMON:
17      Q.  Have you ever discussed with Mr. Ellison the
18  issue of the purging of the OSO database after this
19  litigation was initiated?
20      A.  On the advice of counsel, I assert the
21  privilege not to answer, pursuant to the Fifth Amendment of
22  the U.S. constitution.
23      Q.  Have you ever discussed with Mr. Ellison the
24  fact that he made no effort to retain e-mails from or to him
25  in connection with this litigation after he was under a duty

28

1  to retain such documentation?
2      A. On the advice of counsel, I assert the
3  privilege not to answer, pursuant to the Fifth Amendment of
4  the U.S. constitution.
5      Q. Have you ever spoken with any analysts,
6  financial analysts, that covered Oracle in 2000 and 2001?
7      A. On the advice of counsel, I assert the
8  privilege not to answer, pursuant to the Fifth Amendment of
9  the U.S. constitution.
10     MR. PARKES:  Mr. Symonds also asserts his
11 reporter's privilege under the U.S. constitution and the
12 Federal Rules of Evidence.
13     BY MR. SOLOMON:
14     Q. Why was one of the chapters of Softwar
15 entitled "Ready or Not"?
16     A. On the advice of counsel, I assert the
17 privilege not to answer, pursuant to the Fifth Amendment of
18 the U.S. constitution.
19     Q. At the time you were writing the book, did
20 anybody from Oracle advise you a duty to retain materials
21 in connection with it?
22     A. On the advice of counsel, I assert the
23 privilege not to answer, pursuant to the Fifth Amendment of
24 the U.S. constitution.
25     Q. What was the timeframe in which you were

29

1  writing the book?
2      A. On the advice of counsel, I assert the
3  privilege not to answer, pursuant to the Fifth Amendment of
4  the U.S. constitution.
5      Q. What did Mr. Ellison tell you about his
6  relationship with General Electric Corporation?
7      A. On the advice of counsel, I assert the
8  privilege not to answer, pursuant to the Fifth Amendment of
9  the U.S. constitution.
10     MR. PARKES:  Mr. Symonds also asserts his
11 reporter's privilege under the U.S. constitution and the
12 Federal Rules of Evidence.
13     BY MR. SOLOMON:
14     Q. What did Mr. Ellison tell you about his
15 trading of stock in January of 2001?
16     A. On the advice of counsel, I assert the
17 privilege not to answer, pursuant to the Fifth Amendment of
18 the U.S. constitution.
19     MR. PARKES:  Mr. Symonds also asserts his
20 reporter's privilege under the U.S. constitution and the
21 Federal Rules of Evidence.
22     BY MR. SOLOMON:
23     Q. You agree, do you not, that it was untrue for
24 Ellison to claim that 11i had enabled Oracle to save
25 $1 billion?

30

1      A. On the advice of counsel, I assert the
2  privilege not to answer, pursuant to the Fifth Amendment of
3  the U.S. constitution.
4      Q. What did Mr. Ellison tell you about the timing
5  of the launch of 11i?
6      A. On the advice of counsel, I assert the
7  privilege not to answer, pursuant to the Fifth Amendment of
8  the U.S. constitution.
9      MR. PARKES:  Mr. Symonds also asserts his
10 reporter's privilege under the U.S. constitution and the
11 Federal Rules of Evidence.
12     BY MR. SOLOMON:
13     Q. Has Mr. Ellison ever told you that he has no
14 problem with lying?
15     A. On the advice of counsel, I assert the
16 privilege not to answer, pursuant to the Fifth Amendment of
17 the U.S. constitution.
18     MR. PARKES:  I am not at all clear that is
19 a question which corresponds with the lines of questioning
20 which were indicated, and which were ordered to be
21 appropriate by the English court.
22     BY MR. SOLOMON:
23     Q. Has Mr. Ellison ever addressed with you how
24 reckless he is?
25     A. On the advice of counsel, I assert the

31

1  privilege not to answer, pursuant to the Fifth Amendment of
2  the U.S. constitution.
3      MR. PARKES:  I repeat my concern about that
4  question, which on the face of it is not one which
5  corresponds with the lines of questioning which have been
6  permitted by the order of the English court.
7      BY MR. SOLOMON:
8      Q. Have you written about how reckless
9  Mr. Ellison is?
10     A. On the advice of counsel, I assert the
11 privilege not to answer, pursuant to the Fifth Amendment of
12 the U.S. constitution.
13     Q. Have you reported in your writings that
14 Mr. Ellison said to you that he has no problem lying?
15     A. On the advice of counsel, I assert the
16 privilege not to answer, pursuant to the Fifth Amendment of
17 the U.S. constitution.
18     MR. PARKES:  I repeat my concern that these are
19 not questions which are proper to be asked in accordance
20 with the lines of questioning indicated to the English
21 court, and on the basis of which the English court ordered
22 that this deposition should take place.
23     BY MR. SOLOMON:
24     Q. Since January 2, 2007, have you communicated
25 in any way with any lawyer from Latham & Watkins?

32

Symonds, Matthew  3/20/2007  10:56:00 AM

1      A. On the advice of counsel, I assert the

2    privilege not to answer, pursuant to the Fifth Amendment of

3    the U.S. constitution.

4      Q. Between January 2 and January 11 of 2007,

5    did any lawyer from Latham & Watkins contact you?

6      A. On the advice of counsel, I assert the

7    privilege not to answer, pursuant to the Fifth Amendment of

8    the U.S. constitution.

9      Q. Have you ever had a discussion with any lawyer

10   for Mr. Ellison as to whether or not the position you should

11   take should be that the documents have been destroyed or

12   that you simply would not turn them over?

13     A. On the advice of counsel, I assert the

14   privilege not to answer, pursuant to the Fifth Amendment of

15   the U.S. constitution.

16     Q. Are you aware that until recently,

17   Mr. Ellison's lawyers took the position that he had not been

18   in contact with you at all concerning the materials, the

19   subject of this deposition?

20     MR. GIBBS:  Objection, lack of foundation.

21     A. On the advice of counsel, I assert the

22   privilege not to answer, pursuant to the Fifth Amendment of

23   the U.S. constitution.

24     BY MR. SOLOMON:

25     Q. Are you aware that recently for the first

33

1    time, lawyers for Mr. Ellison disclosed to the court that in

2    fact he has been in contact with you?

3      A. On the advice of counsel, I assert the

4    privilege not to answer, pursuant to the Fifth Amendment of

5    the U.S. constitution.

6      Q. Will you tell me the content of the

7    communications that lawyers for Mr. Ellison are now

8    telling the court that he has had with you?

9      A. On the advice of counsel, I assert the

10   privilege not to answer, pursuant to the Fifth Amendment of

11   the U.S. constitution.

12     MR. SOLOMON:  Let's take a five, ten minute break

13   if that suits everybody and go off the record.

14     MR. FENTON:  Certainly.

15     THE VIDEOGRAPHER:  Going off the record.  The time

16   is 12:24.

17   (12:24 p.m.)

18        (A short break)

19   (12:46 p.m.)

20     THE VIDEOGRAPHER:  We are back on the record.  The

21   time is 12:46.

22     MR. MULLIKEN:  Excuse me, for the record, when did

23   we go off the record?

24     THE VIDEOGRAPHER:  12:24.

25     MR. MULLIKEN:  Thank you.

34

1     MR. SOLOMON:  And we have just had a discussion

2    off the record.  And to accommodate the witness and counsel

3    and allow this to be as painless as possible, I am going to

4    from now on ask questions and I am going to ask Mr. Symonds

5    if he is going to invoke any Fifth Amendment right that he

6    has, and he will respond either "yes" or "no".  And we will

7    take it from there.  Counsel for Mr. Symonds, in terms of

8    the reporter's privilege, is simply going to assert in that

9    way that it pertains.

10     Mr. Symonds, did Mr. Ellison ask you to destroy

11   the Softwar-related materials?  Do you intend to assert the

12   Fifth in response to that question?

13     A. Yes, I do.

14     Q. I am going back now to the beginning of the

15   deposition, and I am going over a question and an answer

16   that you offered at the beginning.

17    I asked you:

18    "Have you ever drafted a declaration for

19   submission to a U.S. court in connection with pending

20   proceedings against Oracle Corporation and Mr. Ellison and

21   others?"

22    And then there was some discussion among your

23   counsel.  And when I restated the question, you answered:

24    "Yes, I have."

25    And when I asked you:

35

1    "And when did you do that?"

2    You said:

3    "Early November 2006."

4    And when I asked:

5    "Did somebody ask you to draft that declaration?"

6    And you said:

7    "On the advice of counsel, I assert the privilege

8    not to answer, pursuant to the Fifth Amendment."

9    And that was the only answer, in fact, substantive

10   answer -- excuse me.  I then went to say:

11    "But your testimony is that you did draft it, as

12   opposed to simply signing it, is that true?"

13    And you said:

14    "No.  Well, I signed --"

15    And then your counsel intervened again.

16    My position is that by answering the question with

17   respect to the declaration, as far as that line of

18   questioning is concerned, there is a waiver of any

19   applicable right and I want to ask you subsidiary questions

20   now concerning that declaration.  And starting with: did you

21   have any communication with Latham & Watkins lawyers or any

22   other lawyers for Larry Ellison, with respect to that

23   declaration?

24    And again, my question we have agreed on asking

25   now is: are you going to assert the Fifth, notwithstanding

36

1   what I have said?
2        A.  Yes, I am.
3        Q.  Do you know the names and contact details of
4   any of the transcribers of the audio of the interviews you
5   conducted with Mr. Ellison in connection with the book
6   Softwar?
7        A.  On the advice of counsel, I assert the
8   privilege not to answer --
9        Q.  I apologize.
10       A.  -- pursuant to the Fifth Amendment to the U.S.
11   constitution.
12       MR. FENTON:  Can I suggest.  It might be easier if
13   Mr. Symonds simply said, "I assert the Fifth" so that you
14   don't have to ask a double question every time.
15       MR. SOLOMON:  Thank you very much, Mr. Fenton.  Is
16   that okay?
17       MR. FENTON:  Mr. Parkes, Mr. Symonds?
18       MR. PARKES:  That is fine, if it is all right with
19   Mr. Symonds.
20       A.  Yes.
21       MR. PARKES:  I am sorry.  May I just remind myself
22   of what that question was, or could you repeat it?
23       BY MR. SOLOMON:
24       Q.  Yes.  Do you know the names and contact
25   details of any of the transcribers of the audio of the

37

1   interviews you conducted with Mr. Ellison in connection with
2   the book Softwar?
3        MR. PARKES:  Thank you, Mr. Solomon.
4        A.  I assert the privilege not to answer, pursuant
5   to the Fifth Amendment.
6        BY MR. SOLOMON:
7        Q.  Do you know who Jason Wright is?
8        A.  I assert the privilege not to answer, pursuant
9   to the Fifth Amendment.
10       Q.  Isn't it true that you and Mr. Wright and
11   Mr. Gibbs have been in e-mail communications with each
12   other?
13       A.  I assert the privilege not to answer, pursuant
14   to the Fifth Amendment.
15       Q.  Have you ever asked Mr. Gibbs for legal
16   advice?
17       A.  I assert the privilege not to answer, pursuant
18   to the Fifth Amendment.
19       Q.  Has Mr. Gibbs ever offered you legal advice?
20       A.  I assert the privilege not to answer, pursuant
21   to the Fifth Amendment.
22       Q.  Have you ever asked any of Mr. Ellison's
23   lawyers for legal advice?
24       A.  I assert the privilege not to answer, pursuant
25   to the Fifth Amendment.

38

1        Q.  And has any lawyer for Mr. Ellison ever
2   provided you with legal advice?
3        A.  I assert the privilege not to answer, pursuant
4   to the Fifth Amendment.
5        Q.  Do you have a copy of the contract between you
6   and Mr. Ellison concerning Softwar?
7        A.  I assert the privilege not to answer, pursuant
8   to the Fifth Amendment.
9        Q.  Are there any amendments or modifications to
10   that contract?
11       A.  I assert the privilege not to answer, pursuant
12   to the Fifth Amendment.
13       Q.  Have you shared the proceeds of sales of the
14   book Softwar with Larry Ellison?
15       A.  I assert the privilege not to answer, pursuant
16   to the Fifth Amendment.
17       Q.  When did you first meet Mr. Larry Ellison?
18       A.  I assert the privilege not to answer, pursuant
19   to the Fifth Amendment.
20       Q.  When did you first speak with Mr. Ellison
21   concerning the book Softwar?
22       A.  I assert the privilege not to answer, pursuant
23   to the Fifth Amendment.
24       Q.  Have you utilized the materials that you had,
25   as a result of creating the book Softwar, to write any other

39

1   articles or books?
2        A.  I assert the privilege not to answer, pursuant
3   to the Fifth Amendment.
4        MR. PARKES:  Mr. Symonds also asserts his
5   reporter's privilege; which for shorthand I shall not in
6   future state occurs, as it does, under the U.S. constitution
7   and the Federal Rules of Evidence.
8        BY MR. SOLOMON:
9        Q.  Isn't it true that all Mr. Ellison had to do
10   was tell you to produce all the materials, and you would
11   have done?
12       A.  I assert the privilege not to answer, pursuant
13   to the Fifth Amendment.
14       Q.  Did you write to Mr. Gibbs on January 14,
15   2007?
16       A.  I assert the privilege not to answer, pursuant
17   to the Fifth Amendment.
18       Q.  Did you enclose with your letter to Mr. Gibbs
19   on January 14, 2007 certain transcripts of interviews with
20   Mr. Ellison?
21       A.  I assert the privilege not to answer, pursuant
22   to the Fifth Amendment.
23       Q.  Is it your position that the transcripts of
24   the interviews that you produced on January 14, 2007 are
25   nonetheless protected by the reporter's privilege that has

40

1    been asserted by your counsel?

2        A.  I assert the privilege not to answer, pursuant

3    to the Fifth Amendment.

4        Q.  Which Oracle executives, other than

5    Mr. Ellison, Ms. Catz, Mr. Henley and Mr. Sanderson, did you

6    talk to in preparation for the book Softwar?

7        A.  I assert the privilege not to answer, pursuant

8    to the Fifth Amendment.

9        MR. PARKES:  Mr. Symonds also asserts his

10   reporter's privilege.

11       BY MR. SOLOMON:

12       Q.  Did you talk to salespersons at Oracle in

13   connection with the book Softwar?

14       A.  I assert the privilege not to answer, pursuant

15   to the Fifth Amendment.

16       MR. PARKES:  Mr. Symonds also asserts his

17   reporter's privilege.

18       BY MR. SOLOMON:

19       Q.  Did you talk to software developers at Oracle

20   in connection with the book Softwar?

21       A.  I assert the privilege not to answer, pursuant

22   to the Fifth Amendment.

23       MR. PARKES:  Mr. Symonds also asserts his

24   reporter's privilege.

25       BY MR. SOLOMON:

41

1    Q.  Did you talk to competitors of Oracle in

2    connection with the book Softwar?

3        A.  I assert the privilege not to answer, pursuant

4    to the Fifth Amendment.

5        MR. PARKES:  Mr. Symonds also asserts his

6    reporter's privilege.

7        BY MR. SOLOMON:

8        Q.  Did you talk about concessions that Oracle was

9    having to make because of problems with the Suite 11i in

10   connection with the book Softwar?

11       A.  I assert the privilege not to answer, pursuant

12   to the Fifth Amendment.

13       MR. PARKES:  Mr. Symonds also asserts his

14   reporter's privilege.

15       BY MR. SOLOMON:

16       Q.  Did you discuss with Mr. Ellison his practice

17   of bribing unsatisfied customers in order to facilitate

18   sales of 11i?

19       MR. GIBBS:  Objection, lack of foundation.

20       A.  I assert the privilege not to answer, pursuant

21   to the Fifth Amendment.

22       MR. PARKES:  Mr. Symonds also asserts his

23   reporter's privilege.

24       BY MR. SOLOMON:

25       Q.  Have you heard of Mr. Ellison's practice of

42

1    insisting that dissatisfied customers become references for

2    Oracle if they wanted their problems fixed?

3        MR. GIBBS:  Objection, lack of foundation.

4        A.  I assert the privilege not to answer, pursuant

5    to the Fifth Amendment.

6        MR. PARKES:  Mr. Symonds also asserts his

7    reporter's privilege.

8        BY MR. SOLOMON:

9        Q.  Did you discuss with Mr. Ellison or anyone

10   else at Oracle the internal implementation at Oracle of the

11   Suite 11i?

12       A.  I assert the privilege not to answer, pursuant

13   to the Fifth Amendment.

14       MR. PARKES:  Mr. Symonds also asserts his

15   reporter's privilege.

16       BY MR. SOLOMON:

17       Q.  Have you discussed with Mr. Ellison or others

18   the problems that Oracle had even attempting to demonstrate

19   the 11i in 2000 and 2001?

20       A.  I assert the privilege not to answer, pursuant

21   to the Fifth Amendment.

22       MR. PARKES:  Mr. Symonds also asserts his

23   reporter's privilege.

24       BY MR. SOLOMON:

25       Q.  Have you discussed with Mr. Ellison or others

43

1    at Oracle the accounting fraud that Plaintiffs allege took

2    place at Oracle in 2000 and 2001?

3        A.  I assert the privilege not to answer, pursuant

4    to the Fifth Amendment.

5        MR. PARKES:  Mr. Symonds also asserts his

6    reporter's privilege.

7        BY MR. SOLOMON:

8        Q.  Have you discussed with Mr. Ellison or others

9    at Oracle the HP deal signed just before midnight at the end

10   of the second fiscal quarter of 2001?

11       A.  I assert the privilege not to answer, pursuant

12   to the Fifth Amendment.

13       MR. PARKES:  Mr. Symonds also asserts his

14   reporter's privilege.

15       BY MR. SOLOMON:

16       Q.  Have you discussed with Mr. Ellison or others

17   at Oracle the "Covisint" deal that was transacted in

18   December of 2000?

19       A.  I assert the privilege not to answer, pursuant

20   to the Fifth Amendment.

21       MR. PARKES:  Mr. Symonds also asserts his

22   reporter's privilege.

23       BY MR. SOLOMON:

24       Q.  Have you discussed with Mr. Ellison or others

25   the timing of his sales of stock in January 2001?

44

1    A.  I assert the privilege not to answer, pursuant
2    to the Fifth Amendment.
3        MR. PARKES:  Mr. Symonds also asserts his
4    reporter's privilege.
5        BY MR. SOLOMON:
6        Q.  Has Mr. Ellison ever paid you any sums of
7    money?
8        A.  I assert the privilege not to answer, pursuant
9    to the Fifth Amendment.
10       Q.  Has Mr. Ellison ever asked you to give false
11   testimony?
12       A.  I assert the privilege not to answer, pursuant
13   to the Fifth Amendment.
14       Q.  Going back to the line of questioning that
15   involved the declaration submitted by you in November of
16   2006; did you read the contract between yourself and
17   Mr. Ellison prior to signing that declaration?
18       A.  I assert the privilege not to answer, pursuant
19   to the Fifth Amendment.
20       Q.  Did you ever discuss with Mr. Ellison in the
21   2000 and 2001 timeframe how the economy was affecting
22   Oracle's performance?
23       A.  I assert the privilege not to answer, pursuant
24   to the Fifth Amendment.
25       MR. PARKES:  Mr. Symonds also asserts his

45

1    reporter's privilege.
2        BY MR. SOLOMON:
3        Q.  Who -- which party to the contract between you
4    and Mr. Ellison, concerning Softwar, suggested that
5    a non-disclosure agreement should also be reached?
6        A.  I assert the privilege not to answer, pursuant
7    to the Fifth Amendment.
8        Q.  Have you spoken about this matter, and "this
9    matter" being the production of the Softwar materials, with
10   anyone other than your lawyers?
11       A.  I assert the privilege not to answer, pursuant
12   to the Fifth Amendment.
13       MR. SOLOMON:  Let's go off the record just for two
14   minutes, please.
15       MR. FENTON:  So be it.
16       THE VIDEOGRAPHER:  Going off the record.  The time
17   is 13:01.
18       (1:01 p.m.)
19           (A short break)
20       (1:07 p.m.)
21       THE VIDEOGRAPHER:  We are back on the record.  The
22   time is 13:07.
23       BY MR. SOLOMON:
24       Q.  Is it your position, Mr. Symonds, that
25   Mr. Ellison waived his right to the Softwar-related

46

1    materials?
2        A.  I assert the privilege not to answer, pursuant
3    to the Fifth Amendment.
4        Q.  When you enclosed the transcripts of the
5    2002 -- or some of the 2002 interviews with the January 14
6    letter you sent to Mr. Gibbs, why did you produce those
7    transcripts?
8        A.  I assert the privilege not to answer, pursuant
9    to the Fifth Amendment.
10       Q.  In connection with your interviews of
11   Mr. Ellison concerning Softwar, who paid for the audio
12   equipment?
13       A.  I assert the privilege not to answer, pursuant
14   to the Fifth Amendment.
15       MR. PARKES:  And Mr. Symonds also asserts his
16   reporter's privilege.
17       BY MR. SOLOMON:
18       Q.  Have you ever heard of the Wylie Agency?
19       A.  I assert the privilege not to answer, pursuant
20   to the Fifth Amendment.
21       Q.  Have you ever heard of www.typing.co.uk?
22       A.  I assert the privilege not to answer, pursuant
23   to the Fifth Amendment.
24       Q.  Have you ever provided any information
25   concerning www.typing.co.uk to any of Mr. Ellison's lawyers?

47

1    A.  I assert the privilege not to answer, pursuant
2    to the Fifth Amendment.
3        Q.  Have you ever been asked to provide any
4    information concerning www.typing.co.uk to any of
5    Mr. Ellison's lawyers?
6        A.  I assert the privilege not to answer, pursuant
7    to the Fifth Amendment.
8        Q.  Have you ever provided any information to any
9    of Mr. Ellison's lawyers concerning the Wylie Agency?
10       A.  I assert the privilege not to answer, pursuant
11   to the Fifth Amendment.
12       Q.  And did any of Mr. Ellison's lawyers ask you
13   for any information concerning the Wylie Agency?
14       A.  I assert the privilege not to answer, pursuant
15   to the Fifth Amendment.
16       Q.  Do you intend to participate in a movie about
17   the book or of the book?
18       A.  I assert the privilege not to answer, pursuant
19   to the Fifth Amendment.
20       Q.  Did you ever identify to any lawyer for
21   Mr. Ellison the identity of the ecological dump you claim
22   that you left the computer at?
23       A.  I assert the privilege not to answer, pursuant
24   to the Fifth Amendment.
25       Q.  It is true, you do claim to have disposed of

48

1 the computer at an ecological dump; is that right?
2        A.  I assert the privilege not to answer, pursuant
3 to the Fifth Amendment.
4        Q.  Have you ever spoken with Mr. Gibbs concerning
5 that disposition or disposal?
6        A.  I assert the privilege not to answer, pursuant
7 to the Fifth Amendment.
8        Q.  Did Mr. Gibbs or any other lawyer for
9 Mr. Ellison ever ask you to identify the ecological dump?
10        A.  I assert the privilege not to answer, pursuant
11 to the Fifth Amendment.
12        Q.  Did you tell Mr. Gibbs a story concerning
13 going to PC World with the computer?
14        A.  I assert the privilege not to answer, pursuant
15 to the Fifth Amendment.
16        Q.  And did you discuss with either Mr. Gibbs or
17 any other lawyer for Oracle the credibility of that story?
18        A.  I assert the privilege not to answer, pursuant
19 to the Fifth Amendment.
20        MR. SOLOMON:  It is our position that the Fifth
21 Amendment -- this is not a question; this is a statement for
22 the record.  It is our position that the Fifth Amendment
23 does not apply to Mr. Symonds, and obviously that is going
24 to be contested in the courts in the U.S.A.
25        In the meantime, I understand that the parties

49

1 here agree that there is no waiver of my right, if I am
2 successful in arguing that the Fifth Amendment does not
3 apply, to resume this deposition and to both ask the
4 questions that I have already asked and get substantive
5 answers; and to ask subsidiary questions that I would have
6 been asking today, but for the invocation of the privilege.
7 And subject to that being agreed around the table, I have no
8 further questions at this time.
9        We have agreed also to a briefing schedule to
10 address the invocation of the privilege that we are going to
11 propose to Judge Jenkins, and we are going to ask that Judge
12 Jenkins enter an order approving our agreement.
13        And the dates of the briefing that we have agreed
14 are as follows.
15        We will file on March 28th our motion to
16 compel answers.
17        The Defendants -- excuse me.  Mr. Symonds will
18 respond with his opposition on April 11th.
19        We will reply on April 18th, and we will ask
20 for a hearing to be scheduled for April 24th; and later
21 on today, we will circulate a proposed stipulation among the
22 lawyers reflecting those dates.
23        My understanding is that the position of Oracle,
24 Mr. Ellison and the other Defendants is that they do not
25 object to that and they don't anticipate participating in

50

1 the briefing process.
2        Is that accurate?
3        MR. MULLIKEN:  With the additional condition that
4 obviously the Defendants do not intend to waive any rights
5 they may have to cross-examination, in the event the court
6 concludes that Mr. Symonds may be required to testify on
7 certain issues.  And we would intend to fully exercise those
8 rights of cross-examination consistent with the Federal
9 Rules of Civil Evidence if and when Mr. Symonds is called
10 upon to testify.
11        MR. PARKES:  That schedule is agreed.  It is
12 understood that the proposal is that the reference to the
13 U.S. court should go straight to Judge Jenkins in the U.S.
14 District Court, Northern District of California.
15        MR. SOLOMON:  Yes, correct.
16        MR. GIBBS:  One other caveat.
17        We don't intend to file a brief taking a position
18 on one side or the other on the Fifth Amendment issue.  We
19 may file something simply to note our reservation of rights
20 to cross-examine, in the event there is an order compelling
21 testimony.  But we don't plan to take the position on
22 whether or not the witness is entitled to assert the
23 privilege.
24        MR. SOLOMON:  Okay, understood.  Thank you very
25 much.  Thank you very much, Mr. Fenton and the court

51

1 reporters.
2        MR. FENTON:  As requested at the start, what I am
3 going to do is simply to adjourn --
4        MR. SOLOMON:  Thank you, sir.
5        MR. FENTON:  -- this examination to a date to be
6 fixed, if any.
7        MR. SOLOMON:  Thank you very much.
8        MR. PARKES:  Thank you very much.
9        MR. SOLOMON:  Thank you, Mr. Symonds.
10        THE VIDEOGRAPHER:  Going off the record.  The time
11 is 13:14.
12 (1:14 p.m.)
13        (The deposition concluded)
14
15
16
17
18
19
20
21
22
23
24
25

52

Symonds, Matthew  3/20/2007  10:56:00 AM

```
1                                              1
2              CERTIFICATE OF DEPONENT              CERTIFICATE OF COURT REPORTER
3                                              2
4   I, MATTHEW SYMONDS, hereby certify that I have read the     3   I, ROSE HELEN CLAIRE KAY, an Accredited LiveNote Reporter
    foregoing pages, numbered 1 through 55, of my deposition of     with Merrill Legal Solutions (a LegaLink company) of London,
5   testimony taken in these proceedings on Tuesday, March 20,     4   England, and Asia, hereby certify that the testimony of the
    2007, and, with the exception of the changes listed on the        witness MATTHEW SYMONDS in the foregoing transcript,
6   next page and/or corrections, if any, find them to be a true     5   numbered pages 1 through 55, taken on Tuesday, March 20,
    and accurate transcription thereof.                 2007 was recorded by me in machine shorthand and was
7                                              6   thereafter transcribed by me; and that the foregoing
8                                                  transcript is a true and accurate verbatim record of the
9                                              7   said testimony.
10                                             8
11  Signed: .......................                 9   I further certify that I am not a relative, employee,
12  Name:   MATTHEW SYMONDS                         counsel or financially involved with any of the parties to
13  Date:   .......................            10   the within cause, nor am I an employee or relative of any
14                                                 counsel for the parties, nor am I in any way interested in
15                                             11   the outcome of the within cause.
16                                             12
17                                             13
18                                             14
19                                             15
20                                             16  Signed: .......................
21                                             17  ROSE HELEN CLAIRE KAY
22                                             18  Dated:   Tuesday, March 20, 2007
23                                             19
24                                             20
25                                             21
                                              22
                                              23
                                              24
                                              25
                                   53                                              54
```

```
1
2                  E R R A T A
3          Deposition of MATTHEW SYMONDS
4   Page/Line No.    Description    Reason for change
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21  Signed: ...................
22  Name:   MATTHEW SYMONDS
23  Date:   ...................
24
25
                                   55
```

Oracle                                                          Page  53 - 55

# EXHIBIT W

Sanderson, Jr., Edward J  7/26/2006  9:00:00 AM

```
1       IN THE UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF CALIFORNIA
3                          )
4    In re ORACLE CORPORATION    )
     SECURITIES LITIGATION       ) Master File No.
5    _____ )
                                 ) C-01-0988-MJJ
6    THIS DOCUMENT RELATES TO:   )
                                 )
7        ALL ACTIONS.            )
     _____ )
8
9
10
11            CONFIDENTIAL
12
13             VOLUME II
14   VIDEOTAPED DEPOSITION OF EDWARD J. SANDERSON, JR.
15       Wednesday, July 26, 2006
16
17            VIDEOTRACK LLC
               Reporting For:
18
19         LiveNote World Service
           221 Main Street, Suite 1250
20       San Francisco, California  94105
            Phone:  (415) 321-2300
21          Fax:  (415) 321-2301
22
23
24   REPORTED BY: KAE F. GERNANDT
              CSR No. 5342
25
                                              294
```

```
1       IN THE UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF CALIFORNIA
3                          )
4    In re ORACLE CORPORATION    )
     SECURITIES LITIGATION       ) Master File No.
5    _____ )
                                 ) C-01-0988-MJJ
6    THIS DOCUMENT RELATES TO:   )
                                 )
7        ALL ACTIONS.            )
     _____ )
8
9
10       CONFIDENTIAL VIDEOTAPED DEPOSITION of EDWARD J.
11   SANDERSON, JR., Volume II, defendant herein, taken
12   by plaintiff pursuant to the applicable rules of the
13   Federal Rules of Civil Procedure on WEDNESDAY,
14   JULY 26, 2006, before me, Kae F. Gernandt, CSR No.
15   5342, beginning at 9:00 a.m. and ending at 5:42 p.m.
16   at 655 West Broadway, Suite 1900, in the City of
17   San Diego, County of San Diego, State of California.
18
19
20
21
22
23
24
25
                                              295
```

```
1    APPEARANCES:
2
3    For the Plaintiffs:
4    LERACH, COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS
       BY:  SHAWN A. WILLIAMS
5          MONIQUE C. WINKLER
     100 Pine Street, Suite 2600
6    San Francisco, California  94111
     (415) 288-4545
7    shawnw@lerachlaw.com
8
9    For Oracle Corporation and the individual
     defendants:
10
     LATHAM & WATKINS
11     BY:  PATRICK E. GIBBS
       140 Scott Drive
12   Menlo Park, California  94025-1008
     (650) 463-4696
13   patrick.gibbs@lw.com
14
15   LATHAM & WATKINS
       BY:  KYRA G. BUSBY
16   505 Montgomery Street, Suite 2000
     San Francisco, California  94111-2562
17   (415) 391-0600
     kyra.busby@lw.com
18
19   Also in Attendance:
20   SHAYNE DAVIDSON, CLVS, Videographer
     VideoTrack LLC
21   401 West "A" Street, Suite 135
     San Diego, California  92101
22   (619) 234-1990
23
24
25
                                              296
```

```
1              I N D E X
2
3    WITNESS
4    EDWARD J. SANDERSON, JR.
5      (Volume II)
6
7
8    EXAMINATION BY                   PAGE
9    Mr. Williams ................... 303
10   Mr. Gibbs ...................... 561
11
12
13
14      EXHIBITS MARKED FOR IDENTIFICATION
15   EXHIBIT NO.   DESCRIPTION        PAGE
16   Exhibit 16   E-mail string dated 12/00 re  303
                  Dec 15th
17                ERP-Contracts/Installbase
                  GOLIVE (NDCA-ORCL
18                308087-308088)
19   Exhibit 17   OPI Q2 Forecasts dated 11/10/00  311
                  and 11/22/00 and OPI Q3/Q4
20                Forecast dated 12/15/00
                  (NDCA-ORCL 620717-718,
21                620643-644, 620604-605)
22   Exhibit 18   E-mail dated 12/18/00 re Q3  337
                  Incentive (NDCA-ORCL 040653)
23
     Exhibit 19   Document titled "Financial Ops  352
24                Reviews" (NDCA-ORCL
                  069368-069386)
25
                                              297
```

Sanderson, Jr., Edward J  7/26/2006  9:00:00 AM

EXHIBITS MARKED FOR IDENTIFICATION, Continued

| | EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|---|
| 3 | Exhibit 20 | E-mail string dated 2/01 re Leveraging the Power of Oracle (NDCA-ORCL 155966-155969) | 382 |
| 5 | Exhibit 21 | Defendants' Response to Plaintiffs' First Set of Requests for Admissions | 388 |
| 7 | Exhibit 22 | Document from Gretchen Teagarden dated 1/10/01 (NDCA-ORCL 005785-005788) | 405 |
| 9 | Exhibit 23 | Document titled "TSC Streetside Chat: Oracle's Executive Vice President Sandy Sanderson, Jr." (NDCA-ORCL 141672-141678) | 423 |
| 11 | Exhibit 24 | E-mail dated 2/9/01 re Oracle Under Pressure article (NDCA-ORCL 276934-276943) | 444 |
| 13 | Exhibit 25 | Report dated 2/9/01 by Charles E. Phillips (NDCA-ORCL 276944-276949) | 446 |
| 15 | Exhibit 26 | E-mail string dated 2/01 re ORCL Under Pressure (NDCA-ORCL 146668-146675) | 449 |
| 17 | Exhibit 27 | Transcript titled "Oracle Presentation" (NDCA-ORCL 03281-03311) | 451 |
| 19 | Exhibit 28 | Article from TheStreet.com titled "Goldman Conference: Its Stock Weak, Oracle Talks of Strong Business" (NDCA-ORCL 141794-141794) | 475 |
| 22 | Exhibit 29 | Presentation papers titled "Oracle, Software Powers the Internet" (NDCA-ORCL 016268-016318) | 477 |

298

EXHIBITS MARKED FOR IDENTIFICATION, Continued

| | EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|---|
| 3 | Exhibit 30 | E-mail string dated 1/01 re Software: What Happened & What to Do From Here (NDCA-ORCL 014161-0147181) | 482 |
| 5 | Exhibit 31 | E-mail string dated 10/00 re Carly Fiorina Meeting Update (NDCA-ORCL 028927-028928) | 485 |
| 7 | Exhibit 32 | E-mail string dated 10/00 re HP Update (NDCA-ORCL 028737-028738) | 489 |
| 9 | Exhibit 33 | E-mail string dated 11/00 re HP Deal & Discounts (NDCA-ORCL 025020-025021) | 517 |
| 11 | Exhibit 34 | Letter Agreement between Oracle Corporation and Hewlett-Packard Company on 11/30/00 with handwritten notes (NDCA-ORCL 020839-020843) | 520 |
| 14 | Exhibit 35 | E-mail string dated 12/00 re Early Returns Q2 CRM update (NDCA-ORCL 020728-020730) | 527 |
| 16 | Exhibit 36 | Letter dated 11/30/00 to Carly Fiorina from Larry Ellison with handwritten notes (NDCA-ORCL 020835-020838) | 529 |
| 19 | Exhibit 37 | Letter dated 11/30/00 to Carly Fiorina from Larry Ellison (NDCA-ORCL 021378-021381) | 532 |
| 21 | Exhibit 38 | E-mail string dated 12/00 re Covisint Contract NDCA-ORCL 041967-041969) | 533 |
| 23 | Exhibit 39 | E-mail string dated 11/00 re Kaiser Customer Call Report (NDCA-ORCL 226718-266719) | 546 |

299

EXHIBITS MARKED FOR IDENTIFICATION, Continued

| | EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|---|
| 3 | Exhibit 40 | E-mail dated 9/19/00 re OPI Forecast (NDCA-ORCL 027949) | 551 |
| 5 | Exhibit 41 | E-mail dated 10/3/00 re Forecast Prep for 10/3 (NDCA-ORCL 101602) | 555 |

EXHIBITS REFERRED TO

| | EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|---|
| 11 | Exhibit 2 | (DeCesare) E-mail string dated 11/00 re HP Q2 Execution Plan Update for November 10 Thursday (NDCA-ORCL 055957-055962) | 495 |
| 13 | Exhibit 3 | (DeCesare) E-mail string dated 11/00 re HP CRM Close Plan (NDCA-ORCL 020844-020849) | 507 |
| 15 | Exhibit 4 | (DeCesare) E-mail dated 12/1/00 re HP is In (NDCA-ORCL039320) | 526 |
| 17 | Exhibit 5 | (DeCesare) E-mail string dated 11/00 re HP Q2 Order Update (NDCA-ORCL 020850-020851) | 503 |
| 19 | Exhibit 8 | (Classick) General Business U.S. Q3 OPS Review document (NDCA-ORCL 609310-609337) | 345 |
| 21 | Exhibit 8 | (Roberts) E-mail dated 1/11/01 re Forecast Update (NDCA-ORCL 612311) | 348 |
| 23 | Exhibit 9 | (Roberts) E-mail dated 1/17/01 re December FR01 Revenue Results (NDCA-ORCL 013382-013385) | 362 |

300

EXHIBITS REFERRED TO, Continued

| | EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|---|
| 3 | Exhibit 10 | (Cullivan) E-mail dated 2/2/01 re Updated Charts from Thurs/Friday OPI Mgmt. Meeting (NDCA-ORCL 276696-276715) | 375 |
| 5 | Exhibit 11 | (DeCesare) Oracle Product Industries, Q3 '1 and Q4 '01 Forecast Package, Week 12 - February 14, 2000 (NDCA-ORCL 084863-084891) | 396 |
| 8 | Exhibit 15 | (Roberts) E-mail string dated 2/01 re January FY01 QTD Revenue Results (NDCA-ORCL 00544-00546) | 391 |

301

1   SAN DIEGO, CALIFORNIA, WEDNESDAY, JULY 26, 2006
2       9:00 A.M.
3
4       THE VIDEOGRAPHER:  This is the beginning of
5   Tape 1, Volume II, in the deposition of Edward
6   Sanderson in re Oracle securities litigation.
7   Today's date is July 26th, 2006, and it is now
8   9:00 a.m.
9       My name is Shayne Davidson, with
10  VideoTrack and LiveNote World Service, located at
11  221 Main Street, San Francisco.  The court reporter
12  today is Kae Gernandt, reporting on behalf of
13  LiveNote World Service.  Today's deposition is being
14  taken on behalf of the plaintiff.
15      Please be aware that the video and audio
16  recording will take place at all times throughout
17  this deposition unless all counsel agree to go off
18  the record, at which time I will announce the time
19  that we are going off the record, and the recording
20  devices will then be stopped.
21      Would counsel please introduce
22  yourselves and state who you represent?
23      MR. WILLIAMS:  Shawn Williams, Lerach,
24  Coughlin, Stoia, Geller, Rudman & Robbins, on behalf
25  of plaintiff.

302

1       MS. WINKLER:  Monique Winkler of Lerach,
2   Coughlin on behalf of plaintiff.
3       MR. GIBBS:  Patrick Gibbs from Latham &
4   Watkins for the defendants.
5       MS. BUSBY:  Kyra Busby, Latham & Watkins, for
6   the defendants.
7       THE VIDEOGRAPHER:  We're okay.  Go ahead.
8       MR. WILLIAMS:  Ready?  Oh, okay.
9
10      EDWARD J. SANDERSON, JR.,
11  defendant herein, having been previously duly sworn,
12  testifies as follows:
13
14  EXAMINATION BY MR. WILLIAMS, Continued:
15      Q.  Good morning, Mr. Sanderson.
16      A.  Good morning, Mr. Williams.
17      Q.  You understand you're still under oath?
18      A.  I do.
19      MR. WILLIAMS:  I'm going to ask the reporter
20  to mark this document as Sanderson No. 16.  And it's
21  Bates numbered NDCA-ORCL 308087 through 88.
22      (E-mail string dated 12/00 re Dec 15th
23  ERP-Contracts/Installbase GOLIVE marked Exhibit 16
24  for identification.)
25      THE WITNESS:  Thank you.

303

1       MR. WILLIAMS:  Was 16 the right number?
2       THE REPORTER:  Yes.
3   BY MR. WILLIAMS:
4       Q.  I'll ask you to take a look at the
5   document and let me know when you're done.
6       A.  Okay.
7       Q.  Do you recognize Sanderson No. 16?
8       A.  No.
9       Q.  The second half -- or the bottom half of
10  the first page is an e-mail from Mark Barrenechea to
11  Larry Ellison, Ron Wohl, Safra Catz, John Henley and
12  yourself, right?
13      A.  Correct.
14      Q.  On or around December 1st of 2000,
15  right?
16      A.  Correct.
17      Q.  And the subject matter is in relation to
18  the internal upgrade of Oracle systems to 11i and
19  specifically ERP Contracts; is that fair to say?
20      A.  That's what it says in the title,
21  correct.
22      Q.  Okay.  And this is somewhat consistent
23  with what we talked about yesterday regarding the
24  internal upgrade of 11i occurring late in 2000 or
25  early 2001?

304

1       A.  When you say "somewhat consistent," is
2   it the way you just defined?
3       Q.  Yeah.
4       A.  Okay.
5       Q.  Right.
6       A.  Good.
7       Q.  Is that fair?
8       A.  Yeah.
9       Q.  See where Ron writes --
10      A.  Just one point of clarification --
11      Q.  Sure.
12      A.  I'm sorry, Shawn.  It was started, as we
13  saw in e-mails yesterday, in late 2000.  It was a
14  rollout over a period of time.
15      Q.  Okay.  All right.  Is it fair to say
16  that at least this document is discussing the
17  rollout or go-live of Oracle Contracts on or around
18  December 15th --
19      A.  Yes.
20      Q.  -- of 2000?
21      A.  As I read the e-mail the same way you
22  do, it says "Contracts" in the subject line.
23      Q.  Okay.  And see where Mark writes to Ron,
24  "There are over 60 P1 defects in OM," which is Order
25  Management; is that fair?

305

Sanderson, Jr., Edward J  7/26/2006  9:00:00 AM

1   A.  That would be my recollection.
2   Q.  Do you know what QP is?
3   A.  I do not.
4   Q.  How about TCA?
5   A.  Don't recall.
6   Q.  And AR, that would be accounts
7   receivable?
8   A.  Most likely.
9   Q.  "That continue to significantly slow
10  progress on Contracts testing."
11      So, it's fair to say that on or around
12  December 15th, the company was still testing the
13  Contracts application?
14      MR. GIBBS:  Objection.  Lack of foundation.
15      THE WITNESS:  Based on what the e-mail says
16  here, it mentions Contract testing, so you would
17  think that there was something going on with
18  Contracts testing at that time.
19  BY MR. WILLIAMS:
20  Q.  Okay.  What do you understand P1 defects
21  to be?
22  A.  I believe they were more significant
23  issues or bugs that needed to be addressed in the
24  software.  There was a scheme that was used to rank
25  the bugs, and P1, I believe, was the one that you

306

1   wanted to put highest priority on.
2   Q.  Okay.  And did you know that Mark
3   Barrenechea felt at the time that
4   December 15th for the upgrade to -- upgrade of
5   Oracle Contracts was, in his words here, wacko?
6   A.  Did you know?  I just told you I don't
7   recall this e-mail.  I don't recall this being
8   discussed.  So, did I know?  You're asking me to
9   recall something I don't remember.
10  Q.  Okay.  So, the answer is no?
11  A.  The answer is --
12  Q.  Well, you're not sure if you knew?
13  A.  No.  I'm saying the answer is, do I
14  recall?  No.
15  Q.  That's fine.  Do you know why you were
16  sent this e-mail?
17      MR. GIBBS:  Objection.  Lack of foundation.
18      THE WITNESS:  He mentions Ingersoll-Rand,
19  Xerox and NCR, which were customers within my
20  organization, and I assume that's why he did it,
21  particularly since he puts in parentheses "Sandy,
22  heads up."
23  BY MR. WILLIAMS:
24  Q.  Right.  And why don't we go down to
25  that.  The last paragraph, he writes to you and

307

1   others, "Further, as of today I've stopped work on
2   Ingersoll-Rand, Xerox and NCR 100 percent (Sandy
3   heads up) to make a date that's not achievable.
4   This was for Contracts only, but these customers
5   will most likely escalate across the entire
6   E-Business Suite next week.  Heads up all."
7       Do you know what he meant by "heads up"
8   to you and "heads up all"?
9   A.  I can -- I think I've got a reasonable
10  idea.  It's not unusual when you're coming down to
11  the final stages of converting to a new application
12  that you set priorities.  And one of the things that
13  we were doing here as a priority was to get Oracle
14  up on the Contracts module.
15      And Mark was communicating to me, and I
16  think in a very typical style, in a systems
17  implementation, that there are priorities.  And he's
18  telling me that there are three of my customers that
19  temporarily were going to be slowed down or stopped
20  so that we could do the internal implementation,
21  which, by the way, they would ultimately benefit
22  from because it was now Contracts being implemented
23  at Oracle.  And so, we'd be using it in a live
24  environment, which would allow us to further
25  validate the system.

308

1   Q.  In or around December 2000,
2   Ingersoll-Rand, Xerox and NCR were customers that
3   your team was doing implementations on, right?
4   A.  I don't recall whether my teams -- I
5   assume you mean Consulting team --
6   Q.  That's right, uh-huh.
7   A.  -- was doing implementation.  I don't
8   recall that.  I do recall that those three were
9   customers of mine from a license side.
10  Q.  Okay.  Do you know why Mark Barrenechea
11  would be working on Ingersoll-Rand, Xerox and NCR?
12  He wasn't doing implementations, was he?
13  A.  No.  But as we saw in previous e-mails
14  yesterday, we -- and I think any software company
15  does this, is they put high priority on their
16  initial implementations, and these were ones that
17  Mark knew about.
18      I would, along with my sales team and if
19  Consulting was involved, Consulting would do it as
20  well, to help Development understand which customers
21  were going live so that they got the right priority
22  in Development if there were any questions that came
23  up.
24  Q.  Isn't it true that Ingersoll-Rand and
25  Xerox were two of the customers that we talked about

309

1  yesterday that had difficulty with implementations?
2      A.  Yes.  In the many implementations that
3  were going on at that time, those were two customers
4  that we discussed yesterday.
5      Q.  Do you know when Oracle actually went
6  live on Oracle -- or withdrawn.
7          Do you know when Oracle went live on 11i
8  Contracts internally?
9      A.  I do not.
10         This is a very typical e-mail about
11  balancing priorities in the implementation phase of
12  a project.
13     Q.  I want to just switch gears a little bit
14  and talk specifically about the third quarter of
15  2001.
16     A.  Sure.
17         MR. WILLIAMS:  I'm going to ask the reporter
18  to mark this document as Sanderson No. 17, which is
19  Bates numbered NDCA-ORCL 620716 -- I'm going to mark
20  it as one exhibit, but the Bates numbers skip a
21  little bit, but they're similar documents.  You can
22  probably help me understand them.
23         It's 620716 and 717, then 620643 and
24  644, and 620604 and 605.  They are a bunch of
25  two-page documents.  This is going to be one

1  exhibit.
2      MR. GIBBS:  Okay.  So, it's a group exhibit
3  that appears to consist of three two-page documents.
4      MR. WILLIAMS:  Right.
5      MR. GIBBS:  Okay.
6      (OPI Q2 Forecasts dated 11/10/00 and
7  11/22/00 and OPI Q3/Q4 Forecast dated 12/15/00
8  marked Exhibit 17 for identification.)
9  BY MR. WILLIAMS:
10     Q.  I'll just ask you to take a look at
11  Exhibit No. 17.  Just let me know when you're done.
12         If you look at them in chronological
13  order, you'd be starting from the back.
14     A.  I just rearranged them to do that.
15     Q.  Okay.
16     A.  Okay.
17     Q.  I'm going to start from the last page,
18  620604.
19     A.  Okay.
20     Q.  Do you know what the document is?
21     A.  It's an OPI Q2 forecast for
22  November 10th.
23     Q.  And is this a document that was created
24  by you or for you?
25     A.  I did not prepare it.  It was clearly

310

311

1  prepared by someone else.  Most likely, the finance
2  organization, Jim English -- Jim English or someone
3  in his organization.  I'm trying to remember if I
4  used this for my -- I used it in some form.  I don't
5  remember for what.
6          For example, I don't know if I used it
7  with the Thursday phone call with -- with Jeff and
8  Jennifer or was this something that came out of
9  the -- what was typically a Monday forecast call
10  that I had with the AVPs for OPI.  I don't recall.
11     Q.  Okay.  Do you know who Lynn Segal is?
12     A.  No, I don't recall.  I saw the name on
13  there.
14     Q.  And how about Patty McManus?
15     A.  Patty McManus was -- I don't remember if
16  she was in operations or finance.  She lived Back
17  East, and I remember she was having a baby, and so,
18  she was only involved at the beginning of the year,
19  and then I think she went on maternity leave.
20     Q.  Okay.  I just have, you know, some
21  questions about some of the things --
22     A.  Sure.
23     Q.  -- in here.
24         If you look at -- I'm still on the last
25  page.  The summary observations -- you don't know

1  who prepared this, right?
2      A.  As I said, just previously in my
3  testimony, I believe it was done by Jim English or
4  somebody in his organization.  This is what Finance
5  would typically do.
6      Q.  Okay.  Is it fair to say you got
7  something like this on a weekly basis?
8      A.  Yes.  With one qualification, Shawn.  At
9  the beginning of the quarter, I might get it every
10  two weeks, and then toward the end of the quarter, I
11  would get it every week.  And then possibly even --
12  I would say once a week at least.
13     Q.  Okay.  In the first section, it appears
14  to be a summary of the forecast for each region that
15  you were responsible for, right?
16     A.  Right.
17     Q.  And the last row says "HQ."  I'm
18  assuming that's headquarters.
19     A.  Uh-huh.
20     Q.  Do you know what that line represents?
21     A.  That may have been my judgment --
22  "Management judgment has become larger since prior
23  forecast."  That must have been my judgment.
24     Q.  The HQ judgment was --
25     A.  Yeah.

312

313

1  Q.  -- your judgment?

2  A.  Yeah.

3  Q.  Okay.  On the right, it has some reasons

4  for changes in the forecast.

5  A.  Uh-huh.

6  Q.  And the first one from the Central says

7  "Compaq removed from forecast."  You see that?

8  A.  Yes, I do.

9  Q.  Does that indicate that, at least for

10  2Q, whatever deal this is referring to is not going

11  to close in Q2?

12  A.  Yeah.  Through the process -- for

13  example, you might do -- you typically do the demo

14  early on in the sales cycle.  And then after you've

15  done the demo, you'll have more discussions with the

16  client.  You'll, obviously, from a sales perspective

17  be encouraging the client to close that quarter.

18  They may have different reasons that they choose not

19  to.

20         And I don't recall here why that's the

21  case.  But, obviously, Compaq went out of the -- was

22  in the forecast, and then we took it out, which was

23  not unusual to have deals move in and out during the

24  quarter.

25  Q.  Sure.

314

1  A.  I mean, that's the art of sales.

2  Q.  Okay.  And the next row says, "Large

3  upside deals," explaining changes in the West.  And

4  that's Sun and Gap, right?

5  A.  Uh-huh, yes.

6  Q.  And does that appear to indicate that

7  the expectation was that Sun and Gap would be part

8  of a possible upside for the quarter?

9  A.  Yes.  Just as Compaq had moved out, Sun

10  and Gap either came into the -- into the -- had some

11  relation to the forecast or were already there and

12  had increased.

13  Q.  Okay.  Just going down to where it says

14  "Consulting, LOB."

15  A.  Uh-huh -- yes.

16  Q.  A few bullet points, probably six or

17  seven bullet points down, it says, "Bookings of

18  50 million represent a 1.3:1 book to bill ratio."

19  Can you explain that to me?

20  A.  One of the things that, as I recall,

21  that you want to do -- I was always -- I like to

22  focus to book to bill ratio.  And what you wanted is

23  that you're booked, which means new consulting

24  engagements sold, so new projects -- that I'd want

25  that number ideally to be higher than what we were

315

1  billing so that I was, ideally, taking in at least

2  as many bookings as I was currently billing so I

3  could get some indication of utilization as a basis

4  for understanding what consulting utilization would

5  be.

6         It's probably worthy of note that in

7  consulting, you sign a contract, and even if --

8  regardless of what the size of the contract is, you

9  earn that revenue over time.  On a license side, you

10  could sign a contract at 11:59 the last day of the

11  quarter, and you get to recognize all that revenue,

12  as long as you met the rev req requirements,

13  et cetera.

14  Q.  Does this say 1.3 to 1?

15  A.  Yeah, it is, 1.3 to 1.

16  Q.  And the next bullet point, it says,

17  "Utilization remains at 74 percent."

18  A.  Correct.

19  Q.  Can you just explain to me what that

20  means?

21  A.  What -- consultants, like attorneys,

22  oftentimes bill on an hourly basis.  I know that's

23  not always the case.  But for consultants, that's

24  typically the case, and that's the way it was at

25  Oracle.

316

1         And this meant that 74 percent of -- on

2  average of consultants within OPI -- or -- yeah,

3  within OPI Consulting were operating at 74 percent

4  utilization.  The balance of that 26 percent balance

5  would be vacations, holidays, training, proposals,

6  things of that nature.

7  Q.  Now, is there a range that is considered

8  optimal in terms of utilization?

9  A.  I would say anything from the mid 60s

10  above is good.  And also you might imagine that at

11  some point, you could have too high utilization,

12  because if it was too high it means you weren't

13  training, you weren't letting people go on vacation,

14  those kinds of things.  You weren't doing developing

15  or marketing opportunities for new -- or marketing

16  efforts for new opportunities.

17  Q.  Okay.  And just going down to the bottom

18  of the page where it says "Total November deals

19  closed" --

20  A.  Yes.

21  Q.  -- "7.2 million."  Then in the West the

22  Beckman Instruments deal at, what, 3.3 million --

23  A.  Yes.

24  Q.  -- see that?

25         Is that Beckman Caulter?

317

Sanderson, Jr., Edward J  7/26/2006  9:00:00 AM

1   A.  I can't -- I don't recall now.

2   Q.  Okay.  Just at the very bottom, it says

3   "Large Deal Impact:  74 percent of our field

4   forecast is made up of deals over a million

5   dollars."  Do you know why "field" is italicized and

6   underlined?

7   A.  I do not.

8   Q.  Is -- is 74 percent of the field

9   forecast being over a million dollars -- is that

10  optimal?

11  A.  I don't recall, and I'm not sure that it

12  was, quote, ever "optimal."  It was just something

13  that I liked to track what the mix was of the deals

14  for the quarter.

15  Q.  But it would mean that your forecast was

16  made up of fewer deals, although larger?

17  A.  If you -- not necessarily.  You're

18  assuming a million dollars is a large deal.

19  Q.  It says "Large Deal Impact."

20  A.  But I don't know that's -- I still don't

21  know whether that says that we were considering

22  those large deals.  We may have set the bar at a

23  million dollars.  I just don't remember.

24  Q.  I'm looking now at 620643 and 44.

25  A.  I'm just putting notes down.  I'm trying

318

1   to remember how the quarters worked.  So, November,

2   September, October, November was Q2.  Okay.

3   Yes, I'm ready.

4   Q.  Okay.  I just -- I'm looking at 620643

5   and 44 now.

6   A.  Okay.  I have them in front of me.

7   Q.  Okay.  And basically the same type of

8   formatted document with similar information, except

9   it's a couple weeks later, maybe 12 days later?

10  A.  Correct.

11  Q.  And still prepared by somebody likely in

12  the Finance Department for you, right?

13  A.  Correct.

14  Q.  So, still Q2, and it appears that if you

15  compare the current revenue forecast to the prior

16  week, it appears that the forecast has gone down

17  somewhat for all three, East, Central and West,

18  regions.  Is that fair?

19  A.  I think you're focusing on management

20  judgment.  The first bullet under "Revenue" shows

21  versus 11/10.  Then, in fact, our forecast had gone

22  up from 87 million to 97 million.

23  Q.  I want to make sure we're looking at the

24  same thing.  I'm actually looking at the little

25  chart.

319

1   A.  Yeah, but you used the term "forecast."

2   Q.  Okay.

3   A.  That's not the forecast.  That's

4   management judgment.

5   Q.  I see.

6   A.  That's a subset.

7   Q.  Thank you.  Okay.

8   A.  That's the subset of the forecast.

9   Q.  I got it.

10  So, this chart represents management

11  judgment only?

12  A.  Yes.  That's -- that fourth bullet --

13  Q.  Right, with the chart below it.

14  A.  Correct.

15  Q.  Right.  Okay.

16  But that's what I'm looking at.

17  A.  Okay.

18  Q.  All right?  Can you describe the

19  difference between November 22nd, 2000, with

20  respect to the management judgment and

21  November 10th of 2000?

22  A.  I mean, the numbers are different.  I'm

23  not sure what you're after.

24  Q.  Well, let's start with the management

25  judgment in the East.  Okay?  Current is $2 million,

320

1   right?

2   A.  Yep.

3   Q.  And it says prior week is 4 million --

4   was 4 million?

5   A.  Right.

6   Q.  But if you look at the

7   November 10th --

8   A.  Yep.

9   Q.  -- summary, that week appears to have

10  been 5 million.

11  A.  Correct.

12  Q.  So, there may have been one of these

13  summaries in between these two dates?

14  A.  Well --

15  Q.  Is that possible?

16  A.  Yeah.  And I -- having put my notes

17  here, November was the last month of the quarter,

18  and at that point, we were doing forecasting on a

19  weekly basis.  So, yeah, you do get an insight to

20  what the previous week's forecast was, at least in a

21  couple of ways.  One is it shows what the prior week

22  judgment was.

23  Q.  Well, let's just compare November 10 and

24  November 22 since that's all we have in front of us.

25  A.  Okay.

321

Oracle                                                    Page  318 - 321

1    Q.  Sound okay?  And it appears that the --
2    for the East, the judgment dropped approximately
3    $3 million, right?
4    A.  Okay.  Yes.
5    Q.  Is that -- yeah?
6       From these documents in front of you,
7    are you able to tell the reason why management
8    judgment dropped $3 million for the East in that
9    week-and-a-half period?
10   A.  There's no "Reasons for Change" column
11   if that's what you're highlighting.  I would imagine
12   at the time that I understood the reason.  And,
13   again, in sales it's not unusual to have numbers
14   moving back and forth like that.
15   Q.  I understand.
16   A.  Right.
17   Q.  In fact, for the East, it looks like
18   somewhere sometime prior to November 10th, it
19   was -- management judgment was 6 million, and by
20   November 22nd, it had dropped to 2 million, right?
21   A.  Yeah, which is typically what you want.
22   As the quarter comes more and more to an end, you
23   want specific deals identified, because management
24   judgment was an experiential number of what you
25   think you were going to cover, and there were

322

1    different deals the way you could do that.
2       Ideally, what happens is that your
3    judgment gets less the closer you get to the end of
4    the quarter, so you have specific deals identified
5    with every revenue dollar.
6    Q.  Why would your judgment get less as the
7    quarter came closer to the end?
8    MR. GIBBS:  Objection.  Asked and answered.
9    THE WITNESS:  Okay.  I thought -- let me try
10   it again.
11   MR. WILLIAMS:  Let me withdraw the question.
12   THE WITNESS:  Okay.
13   BY MR. WILLIAMS:
14   Q.  Your testimony was that, ideally, what
15   happens is that your judgment gets less the closer
16   you get to the end of the quarter.
17   A.  Correct.
18   Q.  Why is that?
19   A.  Why is that?  And I think if you read
20   the rest of the testimony -- but I'll be glad to say
21   it 'cause I -- as I'm not an attorney; we're not all
22   salespeople -- typically, judgment is an
23   experiential number that says "I'm not going to say
24   that it's" -- and let's assume the judgment is
25   positive.  In other words, we're raising the -- it's

323

1    impact is raising the forecast for the quarter.
2    Judgment could also lower the forecast.
3       I could say -- if I have judgment in
4    there, I could be pointing at some point in the
5    quarter, saying, "Okay, there are three different
6    deals that I believe I'm going to get 2 million or
7    5 million from.  But I'm not ready to say which one
8    of those deals are going to do it."
9       As you get to the end of the quarter,
10   you want more clarity on where that 2 or $3 million
11   is going to come from.  And so, I'd want to reduce
12   my judgment because I want to be able to assign it
13   to a specific deal or deals that are going to cover
14   that dollar amount so that I -- because my -- my
15   forecast is based on specific customers and specific
16   contracts or proposals that ideally lead into
17   contracts.  And I wanted more and more clarity of
18   what that was as the quarter went on.
19   Q.  So, are you saying that your judgment
20   number is simply like a clarity number?
21   MR. GIBBS:  Objection.  Vague.
22   THE WITNESS:  I'm saying that judgment is a
23   standard practice in any sales organization,
24   particularly in the software industry, where because
25   you can recognize revenue all the way up to the last

324

1    second of a quarter, and you get to recognize all
2    that revenue, that you are using your experience and
3    the information you're getting from account
4    managers, from regional managers, from your AVPs
5    from talking with the customer, of what deals you
6    think you're going to close.
7       And I might have three that I'm saying
8    are 60 percent or 70 percent at -- three different
9    deals 60 or 70 percent at a point in the quarter.
10   But I have the confidence that out of those three
11   deals at 70 percent that I'm going to generate 2 to
12   3 to $5 million, whatever the judgment was.
13   BY MR. WILLIAMS:
14   Q.  Okay.  You should know I'm not trying to
15   challenge your use of judgment.  I'm really just
16   trying to understand.
17   A.  No, no, but -- I understand that.
18   That's why -- I know.
19   Q.  So, at least --
20   A.  Sure.
21   Q.  -- for the East in that period, your
22   judgment went down from 5 to 2 million in the East?
23   A.  Correct.
24   Q.  Okay.  And we don't know the reasons why
25   by looking at these documents alone?

325

1   A.  Not looking at these documents.

2   Q.  All right.

3   A.  If -- since it was the last -- we're

4  right down to within eight days of the final day of

5  the quarter.  You know exactly -- I knew exactly

6  what was going on in each one of these --

7   Q.  At the time.

8   A.  -- and what made the numbers up, yeah.

9   Q.  Okay.  So, just taking a look at the

10  Central --

11   A.  Okay.

12   Q.  -- if you look at November 10th,

13  you've got -- the current judgment is a million

14  dollars, and by November 22nd, it's negative

15  3 million?

16   A.  Correct.

17   Q.  And that means -- when your judgment

18  goes negative, what does that indicate?

19   A.  You know, if you -- if we think about it

20  in this frame work or this hierarchy of

21  organization, you got account managers, regional

22  managers, AVP and myself.

23   And this Central management judgment is

24  coming from the Central AVP.  He is saying that he

25  believes that his regional managers may be

326

1  overstating a deal or deals, and so, he's just using

2  his judgment.  He may also know where, for example,

3  a customer -- the regional manager or the account

4  manager has a deal in the forecast, but the

5  regional -- the AVP knows the customer personally

6  and may not be as bullish on the deal as the account

7  manager is.

8   Q.  Okay.  Got it.  Thank you.

9   Going to the West, it looks like the

10  judgment drops from 17 million on November 10th to

11  6 million.

12   A.  Uh-huh.

13   Q.  -- on November 22nd.

14   A.  Correct.

15   Q.  And that indicates that maybe a deal or

16  two fell out of the manager's judgment.

17   A.  It -- it means -- it could mean a couple

18  things.  One -- you know, there's two factors that

19  an AVP is dealing with:  What their forecast is, and

20  then what their judgment is.

21   And if you notice up in line 1, OPI

22  forecast had gone from 87 million on November 10th

23  to 97 million on November 22nd.  So, what most

24  likely happened or could well have happened is that

25  some of the deals for the West AVP moved out of

327

1  judgment into revenue identified with specific

2  customers that ultimately helped increase our

3  forecast.

4   Q.  Okay.

5   A.  So, it moved from judgment to specific

6  deals.

7   Q.  Was that -- I guess that's the part that

8  I didn't really understand earlier.  So, is it your

9  testimony that part of -- that judgment can change

10  if a deal becomes more solidified and, therefore, it

11  will increase the forecast?

12   A.  Yes.  I -- but I characterize it just

13  slightly differently.  Judgment will change, up or

14  down -- let me just -- let me try it again because

15  you actually -- read back to me 'cause you may have

16  it.  Why don't you read it back, what you just said,

17  about judgment.

18   Q.  Okay.  "Is it your testimony that part

19  of that judgment can change if a deal becomes more

20  solidified and, therefore, it will increase the

21  forecast?"

22   A.  Judgment will change as deals become

23  clearer as to whether they're going to happen or

24  not.  Whether they're going to happen or not is

25  going to raise my forecast or lower my forecast.

328

1   Q.  So, you don't really know, then, what

2  the value is of a manager's judgment unless you're

3  able to see if the forecast has changed; is that

4  fair?

5   A.  Let me see if this does it.  On

6  November 10th, the forecast was 87 million with a

7  judgment of 19 million.  So, in that 87 million, we

8  had 68 million, if I'm doing my math right --

9  68 million in forecasted deals, and I had

10  $19 million in judgment that got me to the 87-.

11   In November -- on November 22nd, I had

12  a forecast of 97 million, of which 7 million was

13  judgment.  So, I had $90 million of specific deals I

14  was forecasting for the quarter.  I still had some

15  deals we were going to be working on those last

16  eight days that told me I felt that I would get

17  $7 million more in revenue for that quarter.

18   Q.  So, you're saying that the forecast of

19  97 million includes 7 million of judgment?

20   A.  For the November 22nd forecast,

21  correct.

22   Q.  Okay.  I'm going to direct your

23  attention to the Consulting LOB again.

24   A.  Okay.

25   Q.  It's about five bullet points down.  I'm

329

1  sorry.  And I'm talking about one, two, three
2  four -- six bullet points down.  Utilization still
3  at 74 percent --
4      A.  Correct.
5      Q.  -- right, for the quarter?
6          But it -- it looks like the bookings
7  ratio changed somewhat.
8      A.  Right.
9      Q.  Can you read that for me?
10      A.  Yeah.  The bookings of 52 million
11  represent a 1.4 to 1 book to bill ratio.  And it's
12  if you compare it with the Q2 forecast for 11/10,
13  for November 10th, it was at 50.  So, we had
14  another $2 million of bookings.  In other words,
15  future work.
16          So, that increased our book to bill
17  ratio.  So, that -- I mean, that's a nice trend to
18  see that you're covering your billings with future
19  bookings even more.
20      Q.  Okay.  And going down to the last
21  section again for "Large Deal Impact."
22      A.  Uh-huh.
23      Q.  And it rolls over to the next page, and
24  says "85 percent of our field forecast is made up of
25  deals over a million dollars."

330

1      A.  Uh-huh.
2      Q.  Again, the same question:  Is that
3  optimal to have that much of the field forecast be
4  made up of large deals?
5      A.  I don't know that we ever looked at as
6  what's optimum.  I personally -- what I recall, a
7  million dollars was a good number.  It was not an
8  extraordinary number.
9          It -- one of the things in sales, again,
10  because you can recognize revenue all the way up to
11  the last minute of a quarter, is -- you know, if you
12  can get a million dollar deal at one customer, and
13  you compare that to four 250-thousand-dollar deals
14  at four other customers, in that case, you got one
15  deal to deliver.  In the other case, you got four
16  deals to deliver.  And so, there's just more
17  complexity with the four deals.
18          So, again, this was something that I
19  tracked.  As I look at it today, I'm not concerned
20  that 85 percent of it were deals over a million
21  dollars.
22      Q.  Okay.  Do you know whether the large
23  deal impact is for OPI License or OPI Consulting?
24      A.  OPI License.
25      Q.  How can one tell that by looking at the

331

1      Q.  This is what I'm asking.
2      A.  Yeah.
3      Q.  Because the top of the document begins
4  with the license line of the business.
5      A.  Right.
6      Q.  And then the second half is the
7  consulting line of business.  And then the large
8  deal impact kind of trails off at the end.  It
9  appears, logically, that it might relate to the
10  second half.
11      A.  It doesn't relate to Consulting.  And I
12  mean, it's not consulting as well.  If you notice
13  under "Consulting LOB," the very first bullet on
14  11/22, it says revenue forecast is 38 million.
15          If you see on November 10th revenue
16  forecast is 38 million.  We didn't even put judgment
17  against consulting because you can project out
18  billable hours and that kind of thing.  Where you
19  had the more -- you know, the -- where things were
20  less defined was on the sales side, and so, you
21  would track those deals.
22          I also tracked deals, what -- one of the
23  things I did when I took over OPI, I wanted to track
24  the deals in each month of the quarter.  And as you
25  can see, September, October, and November, I saw it

333

1  document?
2      A.  It's -- it is from having used the
3  reports.  If you see the category that says
4  "Forecast Analysis" on 643, about two-thirds of the
5  way down, these closed deals were license closed
6  deals.
7      Q.  Are you saying that based on your
8  recollection of --
9      A.  Yes.
10      Q.  -- how things worked with the company?
11      A.  Yes.
12      Q.  Is there anything on the document
13  objectively that indicates that the large deals are
14  license transactions?
15      A.  No.  But again, this wasn't designed at
16  the time to be used by an outside party.  It was to
17  be used by me, and I knew what it meant.
18      Q.  I understand.
19      A.  Yep.
20      Q.  I just wanted to make sure that I wasn't
21  missing something here.
22      A.  Yep.
23      Q.  I want to follow up.  Could it be both?
24  Could it be both license and consulting?  Only --
25      A.  Go ahead.

332

Sanderson, Jr., Edward J  7/26/2006  9:00:00 AM

1  shows what deals we closed and what the trend is.
2       And, not surprisingly, particularly in a
3  sales organization, you're closing more deals in the
4  last month of the quarter than you did in the first
5  month.
6       Q.  Okay.  Just going to 620717.
7       A.  New quarter.
8       Q.  Right, the beginning of the third
9  quarter, right?
10      A.  Correct.
11      Q.  It -- maybe about a quarter of the way
12  down the page, it has the pipeline.
13      A.  Uh-huh.
14      Q.  And it indicates that the pipeline is
15  down 33 million from last week, right?
16      A.  Correct.
17      Q.  But it doesn't offer reasons here?
18      A.  No.  But it was not unusual -- right
19  after a quarter starts, it's when the reps go back
20  and everybody starts focusing on that quarter, and
21  they look at which deals are going to happen this
22  quarter and which deals are going to happen next
23  quarter or not at all.  So, they're cleaning up
24  their pipeline for the new quarter.
25      Q.  Yesterday we talked a little bit about

334

1  reps updating the pipeline prior to, I think it was,
2  December 15th --
3       A.  At that point, we were -- as I recall,
4  we were implementing OSO internally, and Mark
5  Barrenechea was just simply putting a request out
6  that --
7       Q.  That people update.
8       A.  -- we make sure because the system was
9  going to be down for a period of time as we went to
10  the new application.
11      Q.  Right.  So, he wanted everyone to update
12  it before the system went down, right?
13      A.  Until the old system was -- was stopped
14  so that they could begin the preparation to
15  implement OSO, correct.
16      Q.  Do you think that this pipeline
17  reference is a number that's before or after it was
18  updated by the sales reps?
19      A.  I -- I don't recall.
20      Q.  Okay.  Going down to Consulting --
21      A.  Uh-huh.
22      Q.  -- looking at, I guess, the sixth or
23  seventh bullet point down, it has the utilization at
24  57 percent.
25      A.  Uh-huh.

335

1       Q.  Which is almost a 20-point drop from a
2  few weeks earlier.
3       A.  Uh-huh.
4       Q.  Do you know what would account for that
5  reduction?
6       A.  Yeah.  That quarter is the quarter that
7  you have both Thanksgiving -- actually, you don't
8  have Thanksgiving but you have Christmas and New
9  Year's.  And those days count against your
10  utilization.  So, most likely, the large part of
11  that impact is the impact of the holidays.
12      Q.  So, you would see utilization for prior
13  years drop typically in that -- in that period?
14      A.  Yeah, absolutely.  If you think -- not
15  if you think about it, but it's not unusual that the
16  week of Christmas, week of New Year's, people don't
17  work.  So, that's two billable weeks that you
18  wouldn't typically lose in most of the other
19  quarters.
20      Q.  By looking at this document alone, is
21  that something that you know or is that something
22  that you are surmising from your experience?
23      A.  Having practiced in consulting for --
24  for practice in consulting for six years at Oracle,
25  twelve years at Andersen, a year and a half at

336

1  Unisys, and six or seven years of consulting -- so,
2  well over twenty years, I know that.
3       Q.  Your experience?
4       A.  Yeah.
5       Q.  Now, is this utilization number a
6  prospective number, or is it a current number, do
7  you know?
8       A.  I don't recall whether it was what we
9  were forecasting for the quarter.  Looking at it,
10  since revenue is forecasted, expense is forecasted,
11  gross margin is, most likely that utilization is for
12  the quarter.
13      Q.  For kind of a future --
14      A.  It's what you're projecting to be at the
15  end of the quarter.
16      MR. WILLIAMS:  Okay.  I'm going to ask the
17  reporter to mark this document as Sanderson No. 18,
18  Bates numbered NDCA-ORCL 040653.
19      (E-mail dated 12/18/00 re Q3 Incentive
20  marked Exhibit 18 for identification.)
21      THE WITNESS:  Okay.
22  BY MR. WILLIAMS:
23      Q.  Do you recognize Sanderson 17 [sic]?
24      A.  I don't recognize the e-mail, but I
25  remember when Jay raised this.

337

1    Q.   Okay.  And Sanderson 17 [sic] is an

2  e-mail from Jay Nussbaum to Larry Ellison cc'ing

3  you, Safra Catz and George Roberts, right?

4    A.   Correct.

5    Q.   Regarding the Q3 incentive?

6    A.   Uh-huh.

7    Q.   It appears that Jay is asking Larry to

8  approve a Q3 incentive of $100,000 -- or special

9  incentive of $100,000 for his salespeople; is that

10  right?

11    A.   Yeah.

12    Q.   Let me back up just a second.  I think

13  this is Exhibit No. 18.

14    A.   It is.

15    Q.   Yeah.  And he writes, "I can provide the

16  list of names if you need it.  It's intended to

17  incent them to bring in the transactions in Q3 and

18  not wait until Q4.  This additional 20 million in

19  revenue adds an additional 10 percent of growth for

20  OSI, which keeps us on target for year-over-year

21  30 percent growth rate."  You see that?

22    A.   Yep.

23    Q.   So --

24    A.   Yes.

25    Q.   So, at the time, did you ask for a

338

1  special incentive for your group?

2    A.   No.

3    Q.   But you knew that -- at least Jay felt

4  at this time that he needed one?

5    A.   Jay was very creative in this regard.

6  He -- Jay would like to do things like this.  He

7  sent me a note and said, "What do you think?  Are

8  you going to do the same thing?"  And I said, "No."

9    Q.   You remember this?

10    A.   Yes, I do.  That's why I said I remember

11  the situation.

12    Q.   Why did he ask you if you were going to

13  do the same thing, do you remember?

14    A.   Because what -- sure.  Because he's

15  hoping that George and I and -- that George, Jay and

16  I would band together and convince Larry this was a

17  good idea.

18    Q.   Do you know why?

19    A.   It's this -- Jay is -- my background was

20  consulting and sales.  I didn't grow up in sales, I

21  mean, from day one.  I had a lot of experience in

22  sales.

23        A lot of Jay's experience was sales.

24  And sales are always about special incentive

25  programs.  There's a term called SPIFs in selling --

339

1  I mean, in sales.  And Jay -- which is special

2  incentive funds or programs.  And Jay was always an

3  advocate of that.

4        I felt that we had a compensation plan

5  in place that compensated our salespeople for their

6  performance.  And if they did -- if they sold well,

7  they got compensated well.  If they didn't sell

8  well, they didn't.  Jay came with this program, and

9  I thought it was unnecessary and communicated both

10  to Jay and Larry that I didn't think it was needed.

11    Q.   For your group?

12    A.   Yeah.

13    Q.   And was this something that Jay did

14  every quarter?

15    A.   I don't recall this specifically, but it

16  was not unusual that Jay would have different ideas

17  over time of ways to provide special incentive

18  programs for salespeople.

19    Q.   Do you know whether he suggested or

20  asked for a special incentive in Q1 of fiscal '01?

21    A.   I don't recall.  I remember this is the

22  one time that he came to me and asked me if I would

23  join forces with him.

24    Q.   Okay.  And that's kind of what -- I want

25  to make sure that we're not talking about, you know,

340

1  something that was regular that Jay did unless I

2  have some sort of documents in front of me.

3    A.   Yeah.  I can't -- I just -- Jay was a

4  very creative guy --

5    Q.   Okay.

6    A.   -- when it came to sales programs.

7    Q.   Okay.  All right.  You also indicated in

8  there that he believed that this special incentive

9  would keep his group on target to reach 30 percent

10  growth.  I mean, that's just what he wrote.

11    A.   I think you should talk to Jay.  I mean,

12  I'm reading the same thing as you in all of that.  I

13  don't know what was behind Jay doing this other than

14  what he put in the e-mail.

15    Q.   I'm not asking you what was behind it.

16  I'm just saying you see that he wrote this to Larry

17  Ellison and you.  So, all I'm saying or asking is

18  that you recognize that, at least in this e-mail, he

19  says that the reason for it is to stay on target for

20  his group --

21    MR. GIBBS:  You're asking him to confirm --

22    BY MR. WILLIAMS:

23    Q.   -- on 30 percent growth?

24    MR. GIBBS:  You're asking him to confirm

25  what's on the paper.

341

Sanderson, Jr., Edward J  7/26/2006  9:00:00 AM

1    MR. WILLIAMS:  Sure.
2    THE WITNESS:  Shawn, that's my reaction too.
3    MR. WILLIAMS:  Okay.
4    THE WITNESS:  I told you I don't remember the
5    e-mail.  I remember the situation.  I'm reading the
6    e-mail the same time as you --
7    MR. WILLIAMS:  Okay.
8    THE WITNESS:  -- and you're asking me to
9    validate what's on a piece of paper which is very
10   clearly stated on this piece of paper.
11   MR. WILLIAMS:  So, should I assume as we go
12   forward that everything on e-mails that you write
13   means what I think it means?
14   MR. GIBBS:  That's not what you're asking
15   him, Shawn.
16   THE WITNESS:  But you're asking me what did
17   Jay mean.
18   MR. WILLIAMS:  I did not ask you that.  I
19   asked you --
20   MR. GIBBS:  Well, then you asked him to
21   assume --
22   MR. WILLIAMS:  Excuse me.  Do you have an
23   objection?  Make the objection.  I'm asking him a
24   question.  We can get an answer, and we can move on.
25   MR. GIBBS:  He's given you an answer.

                                                342

1    BY MR. WILLIAMS:
2    Q.  Okay.  So, I'm asking you --
3    A.  Yeah.
4    Q.  -- whether or not it's clear on this
5    document that Jay indicated to all three of the
6    recipients -- or four of the recipients of this
7    e-mail that the reason for the special incentive,
8    from his view, was to stay on target on the
9    30 percent growth rate target?
10   MR. GIBBS:  I do have an objection.
11   MR. WILLIAMS:  Make it.
12   MR. GIBBS:  I will object it's vague.  You
13   keep switching back and forth between asking him
14   what Jay meant and what the document says.
15   MR. WILLIAMS:  I'm not asking you what you --
16   MR. GIBBS:  I just want you -- can I finish?
17   I just want you to be clear as to whether you're
18   asking him to confirm what the document says, which
19   is one thing, or whether you're asking him to opine
20   about --
21   MR. WILLIAMS:  I understand.
22   MR. GIBBS:  -- what Jay or someone else
23   meant, which is another thing.
24   BY MR. WILLIAMS:
25   Q.  I understand.  And I'm not asking you to

                                                343

1    opine upon what Jay meant.  I'm asking you to
2    confirm what he indicated to you and the other
3    recipients of the e-mail.
4    MR. GIBBS:  In that case, the objection is
5    that the document speaks for itself.
6    BY MR. WILLIAMS:
7    Q.  Okay.  Good.  Can you answer the
8    question, please?
9    A.  I don't mean to be nonresponsive, Shawn.
10   I'm reading the e-mail as you did.  I don't recall
11   what this -- what the year-on-year 30 percent growth
12   rate is that he's referring to.
13   Q.  Okay.
14   A.  You know, when he says 20 million at
15   revenue adds an additional 10 percent of growth, is
16   he talking about 10 points of growth, which is what
17   I think he really means, not 10 percent growth.  You
18   know, I'm reading the e-mail just as you are.
19   Q.  All right.  Well, we won't, you know --
20   A.  I apologize.
21   Q.  -- stay on this.
22   A.  Okay.
23   Q.  Although I will say that you just
24   offered me what you think he meant.  So, you
25   concluded.

                                                344

1    A.  No, no.  I just said -- I'm saying is it
2    10 percent growth or is it 10 points of growth?  I
3    don't know.  Is it -- where does the year-on-year
4    30 percent growth rate target come from?  I don't
5    remember a 30 percent year-on-year growth rate.  So,
6    I don't know what he meant.
7    Q.  All right.  Do you know what the
8    budgeted growth rate was for fiscal '01 for your
9    group as of December 18th of 2000?
10   A.  I don't.
11   Q.  Okay.  I'm just going to show you what's
12   been previously marked as Classick No. 8.
13   I just have very specific questions
14   about this.  I don't know if you need to --
15   A.  Okay.
16   Q.  -- review the whole thing.
17   A.  If you want to show me where, and if I
18   need to read it, I will.  Otherwise I'd be happy --
19   Q.  Sure.
20   A.  -- to respond.
21   Q.  I'm just going to ask you to turn to
22   Bates ending 313.
23   A.  Okay.
24   MR. WILLIAMS:  Just for the record, the Bates
25   number of this document is NDCA-ORCL 609310 through

                                                345

1  01202 -- I'm sorry, 609337.
2  BY MR. WILLIAMS:
3       Q.  Do you know John Nugent?
4       A.  Yes, I do.
5       Q.  And how do you know him?
6       A.  He was the head of General Business,
7  senior vice president, General Business, for George
8  Roberts.
9       Q.  And when he made sales -- or his group
10  made sales to, you know, customers in General
11  Business, sometimes there would be a consulting
12  project associated with it?
13      A.  Sometimes, right.  And I think you're
14  implying what we talked about yesterday.  A lot of
15  his clients were smaller customers and -- the small
16  end, 500 million in revenue or less.  And a lot of
17  times those implementations were done by third
18  parties and not necessarily Consulting -- Oracle
19  Consulting.
20      Q.  Okay.  Sometimes they were?
21      A.  As I recall, the majority of the time,
22  it was done by third parties.
23      Q.  Okay.  You see where, I guess, he or
24  whoever prepared this document for him, writes that
25  fiscal '01 year-to-date accomplishments, and I guess

346

1  the last dash there says "Worked with OCS and
2  Support to weather the 11i storm."
3       A.  Uh-huh.
4       Q.  Do you have an understanding of what
5  that might mean?
6       A.  I think it's related to what we spent a
7  good part of yesterday on.  And we launched a new,
8  comprehensive product that touched every part of a
9  customer's business system.  And it was a new
10  application, and this is in January, and the -- when
11  we launched it in May, it still takes time for
12  clients to go through that process, like I talked
13  about, the planning, the design and the
14  implementation.
15      And this is about the time we start to
16  have implementations in customers, and not
17  surprisingly, with a new product, you're going to
18  have some challenges.  And I think that's the way
19  they -- whoever wrote this for John, or if John did
20  it, that he characterized the situation.
21      Q.  Okay.
22      A.  Again, it shows working -- how
23  collaborative it's working with Sales -- Sales,
24  Consulting and Support working together.
25      Q.  Right.  I'm going to show you what's

347

1  been previously marked as Roberts No. 8.  It's Bates
2  numbered NDCA-ORCL 612311.  I'd ask you to take a
3  look at it and let me know when you're done.
4       A.  Okay.
5       Q.  Have you seen this document prior to
6  today?
7       A.  No.
8       Q.  Have do you know David Winton?
9       A.  I don't know if I ever met him.  I
10  believe he was George's finance director, but I'm
11  sure you've got an organization chart that could
12  validate that.
13      Q.  You'd be surprised.
14      A.  I'm sure that it's something that could
15  be easily determined.  George, I'm sure, could tell
16  you.
17      Q.  All right.  So, the document appears to
18  be a January 11th, 2001, e-mail from Dave Winton
19  to Jennifer Minton, right?
20      A.  Correct.
21      Q.  And he writes to Jennifer, in the first
22  line, "We finished the Ops Reviews this afternoon,
23  and I wanted to give you a quick update on the
24  current quarter and full-year look."  See that?
25      A.  Yes, I do.

348

1       Q.  He further writes, "Our Q3 forecast of
2  346 has not changed but the upside or best is
3  revised down by 16.8 million to 360 million."  See
4  that?
5       A.  Yes, I do.
6       Q.  He describes the factors for that,
7  stating, No. 1, "The Pipe," I assume is pipeline,
8  "has not grown as we advertised.  We're actually
9  slightly down from December end reporting."  You see
10  that?
11      A.  Uh-huh -- yes, I do.
12      Q.  Okay.  And in the -- drop down to No. 3,
13  where he says "Drop in Technology."
14      A.  Yes.
15      Q.  "As reflected in the softening pipe,
16  both General Business and Majors sees a slowdown in
17  both Q3 and Q4.  General Business' dot-com bubble
18  has burst.  They expect the West to end the year 30
19  or $40 million behind their original budget for
20  Technology."  You see that?
21      A.  Yes, I do.
22      Q.  He goes on to say that "Majors sees a
23  slowdown in spending along with smaller deal sizes.
24  Also, the change in the ASP model for Generic Tech
25  hosting licenses, coupled with the dot-com crash, is

349

1  impacting projected tech results in that segment."
2  You see that?
3      A.  Yes, I do.
4      Q.  Now, were you experiencing the same
5  issues in OPI that David Winton is articulating here
6  in or around January of 2001?
7      MR. GIBBS:  Objection.  Vague and compound.
8      THE WITNESS:  It's the question of what you
9  mean by saying -- we did not have any dot-coms in
10  OPI.  The way we structured it, the -- with General
11  Business took on the smaller businesses, and
12  dot-coms were John -- John Nugent's responsibility
13  and George's since John reported to George.  We
14  didn't have dot-coms, so I, to answer your question,
15  did not have the impact of dot-coms.
16  BY MR. WILLIAMS:
17      Q.  I'm actually talking about Consulting as
18  well.  OPI's License Sales and Consulting.
19      A.  I -- I don't recall an impact like they
20  were feeling here because of the dot-coms.  And as
21  you can see, six weeks before the quarter's over
22  they're highlighting this issue and building it into
23  their forecast.
24      Q.  Now, does -- withdrawn.
25      Would a softening pipeline in Majors and

350

1  General Business have an ultimate effect on
2  consulting sales?
3      A.  Would a softening in GB or Majors, is
4  that what you said --
5      Q.  Uh-huh.
6      A.  -- have an -- on their pipeline have an
7  impact on consulting?
8      Q.  Uh-huh.
9      A.  In the end, no.  What would impact
10  consulting is actually the number of deals and the
11  dollar value associated with it.  Again, in General
12  Business, it would tend to have less of an impact on
13  consulting because we probably did fewer of those
14  engagements than we did in national accounts or
15  major accounts and in OPI.
16      Q.  How about Majors?
17      A.  Majors and national -- I said
18  national accounts or Majors.  Yeah, Majors, yeah.
19  It's not about the pipeline.  It's about what you
20  get across the finish line.
21      Q.  Okay.  Doesn't the company -- didn't the
22  company use the pipeline to forecast sales?
23      A.  When you say "company," what do you mean
24  by "company"?
25      Q.  Oracle.

351

1      A.  But who?
2      Q.  The company itself, Oracle.
3      A.  No.
4      Q.  Okay.
5      A.  I mean, it -- what my -- I say "no."
6  What I did in my business -- and I'm sure you can
7  find out from Sergio and the others how they did
8  it -- is you did it based on specific deals,
9  knowledge of specific customers.  Pipeline was
10  interesting, and we paid attention to it.  But my
11  forecast, to answer your question, was based on
12  specific deals.
13      MR. WILLIAMS:  I'm going to ask the reporter
14  to mark this document as Sanderson No. 18 -- 19.
15  It's Bates numbered NDCA-ORCL 069368 through 386.
16      (Document titled "Financial Ops Reviews"
17  marked Exhibit 19 for identification.)
18      THE WITNESS:  Shawn, is this another document
19  you want me to look at the whole thing or do you --
20      MR. WILLIAMS:  Yeah, I think you should just
21  take a look at the whole thing, and then you can
22  just let me know when you're done.
23      THE WITNESS:  Okay.
24  BY MR. WILLIAMS:
25      Q.  Okay.  Do you recognize the document?

352

1      A.  No.
2      Q.  It appears to be a Financial Ops Review,
3  right?  At least that's what it says on the first
4  page.
5      A.  Okay.
6      Q.  And if you turn to the next page, ending
7  369, the title is "EJS Q301 Ops Review," right?
8      A.  Correct.
9      Q.  And EJS, those are your initials?
10      A.  That's correct.
11      Q.  All right.  So, if anything, it would
12  mean or relate to either OPI and Consulting and
13  Latin America in 3Q '01, right?
14      A.  Right.
15      Q.  And are you able to tell from your brief
16  review of the document when it was created?
17      A.  I would say probably sometime -- I don't
18  know.
19      Q.  Okay.
20      A.  I don't know.
21      Q.  Okay.
22      A.  Since Q3 '01, it's giving an ops review
23  for Q3 '01, it would be sometime either during
24  Q3 '01, or most likely, Q4 '01.
25      Q.  Well, if you go to the next page, ending

353

1  370, it has a Q3 year-to-date section.  It may
2  suggest that it's during Q3 '01 since they're not
3  actual numbers, right?
4      A.  Well, no.  It says "Q3 '01 Actual" --
5      Q.  Okay.
6      A.  -- if you look at it.
7      Q.  Right there.
8      A.  So, most likely, it's after Q3 had been
9  completed.
10     Q.  Okay.  Thank you.  If you look at that
11 same document, at the very top, it says "SE revenue
12 up 33 percent headcount increase and 4-point CO," I
13 guess that's "utilization gain," correct?
14     A.  Correct.
15     Q.  Do you know what "SE" means?
16     A.  Southwest.
17     Q.  Then it says "OPI up on 14-point
18 utilization increase.  EJS flat year-over-year on
19 slowing MA & GB license and product problems."
20         What does that mean, starting with "EJS
21 flat"?
22     MR. GIBBS:  Objection.  Calls for
23 speculation.
24     THE WITNESS:  "Flat" means the growth is flat
25 year-over-year.

354

1  BY MR. WILLIAMS:
2      Q.  For you?  When it says "EJS," do you
3  know what that refers to?  Your entire organization?
4      A.  I don't know, Shawn.  And the fact this
5  is a financial ops review, it could have been an ops
6  review within the finance department, and I may
7  never even have seen this.  So, I'd have to
8  speculate what that means.
9      Q.  Okay.  Other than you know those are
10 your initials?
11     A.  Right.
12     Q.  Okay.  So, "flat year-over-year on
13 slowing MA & GB license," does that refer to Majors
14 and General Business?
15     A.  Correct.
16     Q.  "And product problems" --
17     A.  Right.
18     Q.  -- right?
19         Now, why would your financials be flat
20 year-over-year on slowing Majors and General
21 Business license and product problems?
22     A.  I don't know.  If you turn to 383 --
23 069383, interestingly, it says bookings, "MA
24 bookings increased despite problems in the license
25 organization."  So, here it's saying bookings was

355

1  increasing, so I can't explain it.
2      Q.  Okay.  And the reason I ask is because
3  you indicated earlier that OPI License Sales and
4  Consulting may not necessarily be impacted by
5  slowing pipeline in General Business and Majors.
6      A.  If I understand you right, I don't think
7  this is license at all.  It's strictly consulting,
8  and it refers to OPI up on 14 percent utilization
9  increase.
10     Q.  Okay.  Okay.  That -- I mean, that
11 actually confirms, at least for me, my basis for the
12 question, 'cause I think I asked whether a slowing
13 sales pipeline in General Business and Majors would
14 impact consulting.  And I think your answer was very
15 likely not.
16     A.  I didn't say "likely not."
17     Q.  Okay.
18     A.  What you asked me is if the pipeline
19 would impact --
20     Q.  Okay.
21     A.  -- and I said, no, it's what you get
22 across the finish line.  And, again, if you look at
23 the page that I just cited for you, 383, in fact,
24 bookings increased.
25         So, I think that's counter to the fact

356

1  that a pipeline might be slowing.  It showed that
2  it's what you get across the finish line and the
3  size of the consulting engagements associated with
4  that.
5      Q.  Right.  On 370, you can't explain what
6  that means?
7      A.  Five and a half years later, I can't
8  explain "EJS flat YOY."  Year-on-year is what I'm
9  sure that means.  But -- and I think I just
10 highlighted where you're concerned about, Majors and
11 General Business.  I just showed you that, in fact,
12 bookings, consulting bookings, new contracts were up
13 in dollar value.
14     Q.  Why don't we go to the next page ending
15 371.  Can you read the top of that page for me?
16     A.  "MA E-Business Apps License continues to
17 struggle" -- I'm reading this as you've directed me.
18     Q.  I understand.
19     A.  "Continues to struggle, database license
20 falls 36 percent on market downturn."
21     Q.  Okay.  And what relationship would --
22 well, withdrawn.
23         Does "MA" appear to be Majors?
24     A.  That would be my recollection.
25     Q.  Okay.  What relevance would Majors

357

1 E-Business Apps License continuing to struggle and
2 database license falling 36 percent have on the
3 consulting organization?
4     A.  I'm not trying to be argumentative,
5 Shawn.  I'll point you back to that same page again,
6 and it showed that the bookings for consulting was
7 up.
8     Q.  I don't want to be argumentative either.
9 We'll get to that page.  I want to -- I'm trying to
10 understand this page because it seems inconsistent
11 with the page that you are referring me to.
12         So, all I'm asking is:  What relevance
13 does Majors E-Business Apps License continuing to
14 struggle and a fall in database license of
15 36 percent have on the consulting organization?
16     A.  It may have an effect.  It may not.
17     Q.  Okay.  Let's go to the next page, 372.
18 It says "OPI license bucks the downward trend thanks
19 to Covisint, Apps License grows 102 percent,
20 database growth of 68 percent."  You see that?
21     A.  Yes.
22     Q.  That appears to be discussing OPI
23 license being a little different than the trends in
24 Majors and General Business.  Is that fair?
25     A.  On the license side, correct.

358

1     Q.  Sure, on the license side.
2         Next page says that "GB E-Business Apps
3 license grew 9 percent but database license fell
4 23 percent as the .Com market evaporated."
5         What impact would that have on the
6 consulting organization, if any?
7     MR. GIBBS:  Objection.  Lack of foundation.
8     THE WITNESS:  I would -- I would have to
9 speculate.  I think that you just look at what the
10 bookings were for that time for consulting in the GB
11 space, and you'd have the answer.
12 BY MR. WILLIAMS:
13     Q.  Well, I don't understand that.  What
14 does that mean?
15     A.  I'm saying there -- you asked a question
16 of what's the impact of this on Consulting.
17     Q.  What would it be?
18     A.  I -- the results -- we're not talking
19 about the future.  We're talking about the past.
20 Okay.  So, there were some -- the quarter's
21 finished.  It was finished a long time ago.  So, the
22 answer to that question is factually answered
23 someplace else.  I don't recall.
24     Q.  Okay.  So, you're saying if there's an
25 impact, it could be found in some number somewhere?

359

1     A.  You would think so.
2     Q.  All right.  Can you go to Bates ending
3 375.
4     A.  Okay.
5     Q.  The top of that page says, "EJS hit rate
6 is high."  Do you know what that means?
7     A.  Well, completing that headline, I think
8 it's referring to the fact that Oracle Consulting is
9 involved on 79 percent of the top 14 application
10 license opportunities.
11     Q.  Okay.  And so, does that suggest that
12 the hit rate being high means that, on the license
13 sales, Oracle Consulting is involved in a lot of
14 them, in a high number of them?
15     A.  I just clarify, Shawn, the term
16 "involved."  I know it says here "involved."  But
17 what the -- what's implied here is that if there was
18 a license sale, there was also a consulting contract
19 associated with that.
20     Q.  Okay.  But my question was:  The EJS hit
21 rate being high, does that suggest that, with
22 license sales, that Oracle Consulting is involved in
23 a high number of those?
24     A.  I'm not trying to be -- not answer the
25 question.  They've taken the 14 top application

360

1 deals for Q3 '01 and made that happen to cover Major
2 and General Business.  And of those 14, 79 percent
3 of those deals, which I assume is -- one, two,
4 three, four, five, six, seven, eight, nine, ten,
5 eleven -- divided by 14 gets you to 79 percent.  And
6 it says in 11 of those 14 deals there's a consulting
7 engagement associated with those customers.
8     Q.  Okay.  And it appears that that's how
9 they -- whoever created this developed this hit
10 rate, right?
11     A.  If you'd like, I'll pull out my
12 calculator and divide 11 by 14.
13     Q.  Listen, you know, you can do that if you
14 want to.  I'm not asking you to do that.
15     A.  Okay.
16     Q.  What I'm telling you -- what I'm asking
17 you is that it appears based on the document that
18 that's how whoever created it calculated this
19 number.
20     A.  I'm going to take my mike off for a
21 minute.
22     Q.  Okay.
23     A.  The 11 --
24     THE VIDEOGRAPHER:  Can you place the mike
25 back on, please?

361

Sanderson, Jr., Edward J  7/26/2006  9:00:00 AM

1       THE WITNESS:  I'm sorry.  11 divided by 14 is
2   .7857, so it appears that's how the 79 percent got
3   calculated.
4   BY MR. WILLIAMS:
5       Q.  Okay.  And the list on this document
6   includes -- six deals from General Business
7   and, I think, eight deals in Majors.
8       A.  Correct.
9       MR. WILLIAMS:  This might be a good time for
10  a break.
11      THE WITNESS:  Okay.  Are we finished with
12  this document?
13      MR. WILLIAMS:  I don't know yet.  We might
14  be.
15      THE VIDEOGRAPHER:  Off the record at
16  10:25 a.m., and this marks the end of Tape 1 of
17  Volume II.
18      (A brief recess was taken.)
19      THE VIDEOGRAPHER:  We are back on the record
20  at 10:39 a.m., and this marks the beginning of
21  Tape 2 of Volume II.
22  BY MR. WILLIAMS:
23      Q.  I want to show you what's been
24  previously marked as Roberts No. 9.  It's Bates
25  numbered NDCA-ORCL 013382 through 385.  I'll ask you

362

1   to take a look at it and let me know when you're
2   done.
3       A.  Are you going to ask me any question --
4       Q.  I was just waiting for you --
5       A.  Are you going to ask me any questions
6   about this page?
7       Q.  I don't think so.
8       A.  Okay.  Good.  Then I'm ready.
9       Q.  Do you recognize the document?
10      A.  I do not.
11      Q.  Okay.  It appears to be an e-mail from
12  Larry Garnick to you, Jennifer Minton, Jeff Henley,
13  Chuck Rozwat, Ron Wohl, Sergio Giacoletto, Derek
14  Williams, and Larry Ellison on January 17th, 2001,
15  right?
16      A.  Correct.
17      Q.  And the subject line is "December
18  Fiscal '01 Revenue Results," right?
19      A.  Correct.  I just add it's also to Safra
20  and George.  They're off to the side.  It's not as
21  evident.
22      Q.  And Safra Catz and George Roberts,
23  right?
24      A.  Okay.  Yes.
25      Q.  And now, this is the type of report that

363

1   you would receive prior to the weekly EC meetings?
2       A.  I don't recall.  I don't recall.
3       Q.  Okay.  Does it appear that everyone that
4   this e-mail is sent to was a member of the executive
5   committee in or around January 17th, 2001?
6       A.  Yeah.  I -- I don't know if Jennifer was
7   a member of the executive committee or not.
8       Q.  Okay.  Did she go to the executive
9   committee meetings?
10      A.  She -- as I recall, she was typically
11  there.
12      Q.  Okay.  How about the other people?
13  Anyone else here not on the executive committee?
14      A.  No.  As you might imagine, Sergio and
15  Derek would participate typically by phone.
16      Q.  And you would participate live when you
17  could?
18      A.  Correct.
19      Q.  So, it appears that the document
20  summarizes the December 2000 and December fiscal '01
21  revenue results, right?
22      A.  Correct.
23      Q.  And Larry Garnick writes in the first
24  bullet point, "Licensed revenue growth rate was
25  35 percent in U.S. dollars, 25 points better than

364

1   the 10 percent growth rate we experienced in
2   December fiscal 2000 over December fiscal '99."
3       He further writes, "However, excluding
4   the $60 million Covisint license deal, the U.S.
5   growth rate would have only been 6 percent.
6   Excluding Covisint, OPI license revenue growth would
7   have been negative 85 percent."  Right?
8       A.  Right.
9       Q.  Okay.  And that Covisint transaction was
10  a transaction that -- in your division?
11      A.  Correct.
12      Q.  All right.  And it was a
13  60-million-dollar license deal?
14      A.  As I recall, correct.
15      Q.  But for that transaction, OPI's growth
16  would have been substantially negative for that
17  month, right?
18      A.  Sure.  For December, right.
19      Q.  For December.
20      And would that have been unusual to be
21  at 85 percent negative for December?
22      A.  I think the fact that it was negative is
23  not what you want.  One of the challenges that you
24  have in License, and we particularly faced -- you
25  know, in companies, software companies and companies

365

Sanderson, Jr., Edward J  7/26/2006  9:00:00 AM

1  like Oracle and Siebel and others, SAP is the deals
2  tend to happen in the latter part of the quarter, in
3  the last month and sometimes in the last two weeks,
4  sometimes in the last week, and sometimes on the
5  last day.
6      Q.  I understand.  I'm just talking about
7  December.  That's it.
8      A.  Yeah, I -- I mean, I certainly -- what
9  I'd be focusing on if I had gotten this e-mail,
10 which obviously I did -- I'd be focusing on what's
11 my forecast for the quarter?  What am I going to do
12 in January and February to make the quarter?
13     Q.  Right.
14     A.  I didn't get hung up if I was
15 85 percent.  I don't recall this number and,
16 obviously -- I mean, it certainly wasn't engrained
17 in my mind today.
18     Q.  All right.  Again, I'm not asking you
19 that.  I'm just asking you whether or not 85 percent
20 negative for any month would have been unusual?
21     A.  But it wasn't 85 percent negative.
22     Q.  I said, if it was 85 percent negative
23 for any month, if that would have been unusual.
24     A.  Are you talking about OPI or --
25     Q.  Yeah, just talking about --

366

1      A.  -- are you talking about just General
2  Business?
3      Q.  No, I'm talking about OPI.
4      A.  But OPI wasn't negative 85 percent for
5  the quarter.  Didn't happen.
6      Q.  Okay.  Well, let's go back.  Okay?
7          Larry Garnick wrote to everybody on the
8  executive committee --
9      A.  Right.
10     Q.  "Excluding in the $60 million
11 Covisint license deal, U.S. dollar growth rate would
12 have been only 6 percent."
13     A.  Uh-huh.
14     Q.  "Excluding Covisint, OPI license revenue
15 growth would have been negative 85 percent."
16     A.  "Would have been."
17     Q.  I'm not disputing that.  I'm asking
18 you --
19     A.  Right.
20     Q.  -- if it had been negative 85 percent,
21 would that have been unusual?
22     A.  Well, why don't we talk about negative
23 150 percent or why don't we talk about negative
24 5 percent?
25     Q.  Because I get to ask the questions.

367

1      A.  Well -- but I don't understand the
2  relevance of asking me if it had been --
3      Q.  So, are you not going to answer?  So,
4  you say, "You know what, Shawn, I refuse to answer
5  that question."
6      MR. GIBBS:  You don't need to either cut him
7  off, nor do you need to raise your voice.
8      MR. WILLIAMS:  I'm not raising my voice.
9      MR. GIBBS:  You did.
10     THE WITNESS:  Shawn, I'd be happy to answer
11 it.  To speculate on a number that didn't happen,
12 because my growth rate in December included
13 Covisint, which was a 60-million-dollar deal -- I
14 did not have a negative number.
15         Just so you know, I remember -- and I
16 don't remember.  It may have been Garnick or
17 whoever, but I remember this came up in an executive
18 committee meeting.
19 BY MR. WILLIAMS:
20     Q.  What came up?
21     A.  If they wanted to exclude 60 million.
22 And my comment then, as I'll share with you now, if
23 we're going to exclude Covisint, why don't we
24 exclude a couple other engagements or contracts, and
25 why don't we add some back in?

368

1          You know, if we're going to start
2  arbitrarily taking in and out -- we had put a
3  considerable effort, sales effort, behind Covisint.
4  I had spent a lot of my personal time in making
5  Covisint happen.  And it happened in December.  I
6  didn't have a minus 85 percent growth in OPI in the
7  month of December.
8          And I'm making that point to you now,
9  obviously, and I made that point in that executive
10 committee meeting.  And I can tell you that Larry
11 didn't -- he didn't jump on the bandwagon about
12 minus 85 percent or you, know, what Garnick did.  I
13 think he -- it was a nonissue to him as well.
14 BY MR. WILLIAMS:
15     Q.  Well, I appreciate that.  And I'm not
16 judging, you know, how much work you did on the
17 deal.
18     A.  I know.
19     Q.  I'm reading a document that I,
20 obviously, didn't create.  So, all -- I was asking
21 you a very simple question, which is:  If it was
22 indeed negative 85 percent, would that have been
23 unusual in your experience?
24     A.  In any business, whether it's Oracle,
25 whether it's any software company, a consumer

369

1  packaged goods company, if they had minus 85 percent
2  growth, no one would be happy with that.  In OPI in
3  December of '01, I did not have minus 85 percent
4  growth.
5      Q.  Okay.  Just go down to the fourth bullet
6  point.  It says, "Applications product growth was
7  216 percent.  ERP equals 365 and CRM at 58" -- at
8  negative 58.  "While database products growth was
9  17 percent, server being 21 percent and Tools at 26
10  percent."
11      A.  Yeah, and I think that's minus
12  26 percent for Tool.
13      Q.  I'm sorry.  Minus 26 percent.  I
14  apologize.  "Excluding Covisint, applications
15  product growth would have been negative 46 percent
16  and database product growth would have been
17  13 percent."  You see that?
18      A.  Yes, I do.
19      Q.  Did you -- was this an issue that was
20  discussed at the EC meeting that you were referring
21  to just a moment ago?
22      A.  I don't remember talking about that
23  specific point, because I reacted to the first one,
24  and it just -- I mean, when I reacted to that and as
25  I -- I don't recall talking about anything around

370

1  applications or database growth when it excluded
2  Covisint.
3      Q.  Did you react to the exclusion, or the
4  reference to the exclusion, of Covisint during the
5  EC meeting or when you got the e-mail with the
6  exclusion percentage?
7      A.  I don't recall.  I -- I can't help but
8  imagine when I saw this e-mail sent to me -- and
9  this was Wednesday, and we typically had our
10  executive committee meetings on Monday.  So, I had
11  some time to think about this.  But I remember
12  specifically reacting to it in the EC meeting.
13      Q.  Now, I just want to understand the
14  reaction to it.  Were you upset about it?
15      A.  No.  I just thought that to arbitrarily
16  pull out a deal -- to arbitrarily pull out a deal
17  was very inappropriate, because if we're going to
18  start pulling out deals, then I wanted the
19  opportunity to add some deals back in and take some
20  deals out.  I mean, if we're going to start playing
21  that game, you know -- I mean, if this is what
22  Garnick or whoever wanted to do it.
23      Q.  Right.  That's what I'm getting at.
24  Why -- wasn't Covisint the largest deal that Oracle
25  had -- or largest license deal that Oracle had in

371

1  its history at the time?
2      A.  I believe that's the case.  I believe
3  that's the case.
4      Q.  Right.
5      A.  I don't know for sure.
6      Q.  All right.  So, do you think that this
7  type of analysis was arbitrary?
8      A.  You're asking me to justify why Larry
9  Garnick chose to pull it out.  I don't know why he
10  did.
11      Q.  Okay.  I'm not asking you to justify
12  that.  I'm asking you whether or not you believed
13  pulling it out was arbitrary in light of the fact
14  that it was the largest deal -- largest license deal
15  that Oracle had completed in its history.
16      MR. GIBBS:  Objection.  Asked and answered
17  and argumentative.
18      THE WITNESS:  If it was 50 million, if it was
19  40 million, should we ask the same question if it
20  was 30 million, if it was 20 million?
21      I didn't look at it because it was the
22  largest deal, and I didn't focus on it as the
23  largest deal, and I didn't work to make it the
24  largest deal.  I had a customer, a very complex
25  customer, by the way, because of three automotive

372

1  companies, and their team of attorneys, by the way.
2  I don't mean that -- you can imagine, dealing with
3  one set of attorneys, dealing with three sets of
4  attorneys from three different auto companies, that
5  was quite a challenge.
6      But I mean, I worked to get the deal,
7  and it came in in December, and I thought it was --
8  I didn't care what the size of the deal; it was a
9  deal we brought in.
10  BY MR. WILLIAMS:
11      Q.  Right.  Now, do you know what the
12  purpose these e-mailed revenue results was?  Were
13  they for discussion at the EC meeting?
14      A.  I don't recall whether this was the
15  purpose of the discussion or that we discussed it at
16  the EC meeting.  Obviously, what I do remember
17  coming up in that EC meeting was somebody in Finance
18  arbitrarily deciding to pull out a deal in their
19  analysis.  I just -- I don't agree with that.
20      Q.  You used "arbitrarily" again.
21      A.  Yeah.
22      Q.  Did someone in -- and so, you think it
23  was arbitrary?
24      A.  Yeah.
25      Q.  And did anyone else react to it that you

373

Sanderson, Jr., Edward J  7/26/2006  9:00:00 AM

1  can recall?

2      A.  What I do recall is I was pleased that

3  Jeff Henley didn't react against what I said.  Larry

4  didn't react differently than what I said.  I mean,

5  no one took opposition, which I -- as I recall.  And

6  I think we know that the number that I delivered in

7  that quarter was substantially larger than

8  60 million.

9      Q.  Okay.  So, you don't recall anyone

10  else -- well, withdrawn.

11      Did you talk about license trends during

12  the EC meeting?

13      A.  Meetings?

14      Q.  Uh-huh, meetings.

15      A.  I don't recall that, Shawn.  And

16  probably part of the reason is Larry -- and I'm

17  similar to Larry in this part.  I can't -- I can't

18  react to trends.  I mean, we can talk about it, but

19  you don't spend any time on it.

20      What you're talking about are what are

21  the programs that you have -- sales program you have

22  in place.  Is the trend you're experiencing at that

23  point consistent with what you expect for the

24  quarter?  Those kinds of things.

25      So, what's your -- what's your -- let's

374

1  talk about facts is what Larry's approach was.

2  What's your forecast for the quarter?  Trends are

3  interesting.  The numbers you're going to deliver

4  for the quarter is what's important.

5      Q.  Okay.  So, the answer is you don't

6  recall whether or not you talked about trends during

7  the EC meetings?

8      A.  And if we did, we didn't spend much time

9  on it.  I don't recall doing it.  And if we did

10  discuss it, trying to remember this much later, it

11  was not a key topic of discussion.

12      Q.  I'm going to show you what's been

13  previously marked as Cullivan 10.  It's Bates

14  numbered NDCA-ORCL 276696 through 715.  Ask you to

15  take a look at it and let me know when you're done.

16      A.  Okay.

17      Q.  Okay.  Do you recognize Cullivan No. 10?

18      A.  I do not.

19      Q.  Okay.  Do you know who Shari Simon is?

20      A.  Yes, I do.

21      Q.  Who is she?

22      A.  Shari is -- let me just check a name

23  here and I can answer it even better.  Shari Simon,

24  I brought her in to run my OPI -- I don't recall the

25  name of the group, but it was sales program.

375

1      I asked her to help me identify specific

2  solutions that we could take to the marketplace to

3  customers.  And it might include -- I mean,

4  oftentimes, it would include our applications, it

5  would include database.  But it was programmatic

6  ways to better sell our product.  And I thought the

7  more that we defined what the four or five programs

8  were, the better job we could do selling them in the

9  marketplace.  It's the background that I brought

10  from just my years of experience in how to think

11  about the business.  And I had asked Shari to do

12  that.

13      Q.  Okay.  So, you hired her, or she was

14  somebody that was already within the organization?

15      A.  She was already within Oracle, and as I

16  recall, she left on maternity leave, and when I

17  heard she was coming back, I -- I did my best to get

18  her to come into my organization.

19      Q.  Okay.  And so, she sent this e-mail to

20  you and, it looks like, several other individuals in

21  your organization, right?

22      A.  Yes.

23      Q.  Okay.  And it's February 2nd of 2001?

24      A.  Yes.

25      Q.  And the title is "Action Requested:

376

1  Updated Charts from Thursday/Friday OPI management

2  meeting."

3      A.  Correct.

4      Q.  Did you have regular Thursday or Friday

5  OPI management meetings, or was this any specific

6  meeting, if you recall?

7      A.  I didn't have regular OPI management

8  meetings, but I must have had a two-day -- or OPI

9  had a two-day meeting at that point, and I probably

10  participated in part of it.

11      Q.  Right.  I'm going to ask you to turn to

12  Bates ending 276698.

13      A.  Okay.

14      Q.  And you see where just starting at the

15  beginning, it says, "We have significant capability

16  that can be brought to the sales process."

17      A.  Right.

18      Q.  "We have a big hill to climb in Q4.

19  We're short $150 million in pipe."

20      A.  Right.

21      Q.  "We're not leveraging the power of

22  Oracle to create pipe and win deals."

23      So, it's fair to say that, in or around

24  February of 2001, for Q4 you believed that your

25  pipeline was short $150 million, at least as it

377

1  relates to whatever your budgeted number for the
2  quarter or the year was?
3  MR. GIBBS:  Objection.  Lack of foundation.
4  THE WITNESS:  The -- as you probably know, Q4
5  is always a big quarter, or historically has been a
6  big quarter, for Oracle.  And what we were doing --
7  and I'd ask Shari to focus on what we needed to do
8  around these programs that would help us build pipe.
9  And when this was written in February, we were still
10  short in pipe for the Q4, which by the way, was not
11  unusual --
12  MR. WILLIAMS:  Okay.
13  THE WITNESS:  -- that early.  When you're
14  sometime operating in the previous quarter, you're
15  just not focused on the next quarter as much because
16  you're focusing on this quarter.
17  BY MR. WILLIAMS:
18  Q.  In the next paragraph, it says, "I've
19  spoken to both reps and sales management and
20  frequently the Q4 answer is a specific large deal
21  that we will do everything we can to bring in.
22  That's good, but that's not the programmatic and
23  predictable behavior I want to see in the business."
24  See that?
25  A.  Yes, I do.

378

1  Q.  It sounds like these are your comments;
2  is that fair?
3  A.  They are.  I remember that, Shawn, I do.
4  Q.  Okay.  And what did you mean when you
5  wrote, "That's good, but that's not the programmatic
6  and predictable behavior I want to see in the
7  business"?
8  A.  Sales -- interesting, in consulting
9  world, we tend to be more focused on -- on programs
10  that we can leverage -- programs -- sales programs
11  or consulting programs that we can leverage in the
12  business.
13  On the license side is that companies
14  tend not to be.  I was trying to inject some of that
15  thinking on the sales side --
16  Q.  On the license sales side?
17  A.  -- on the license sales side, to be more
18  programmatic.  Let's look at all our products, which
19  is a lot of products, around applications and
20  database and how can we synthesize that into some
21  specific license sales programs that we can put
22  together for, we can do some extra training, those
23  kind of things, to help us be successful.
24  Q.  And you -- I'm sorry.  I thought you
25  were done.

379

1  A.  And so, that's -- I was trying to
2  introduce new thinking into sales.
3  Q.  And thinking that would make sales more
4  predictable?
5  A.  Yeah.  In the sense that if we -- I felt
6  like leveraging the -- the -- these programs, that
7  it would help us in some predictability.  Because in
8  license sales, it's an art, not a science.  And as
9  you see in forecasting, as we talked earlier where
10  we use management judgment.  And what I was just
11  trying to do was introduce programs that would drive
12  more predictable behavior --
13  Q.  Okay.
14  A.  -- as opposed to pursuing a specific
15  deal, and that sales rep -- relying simply on the
16  sales rep to decide what resources they needed.
17  If they were selling a program, one of
18  the programmatic approaches, then it would be even
19  clearer to them the kind of resources that they
20  would need.
21  Q.  You compare it, at least in this section
22  here, to large deals which apparently your
23  salespeople were telling you about at the time,
24  right?
25  A.  Uh-huh.

380

1  Q.  And large deals weren't as
2  predictable -- withdrawn.
3  Large deals weren't the predictable
4  types of deals that you wanted in the business in
5  terms of predictability.  Of course, you wanted
6  large deals, but they weren't the types of
7  predictable deals that --
8  A.  No, I loved -- I loved the big deals,
9  and I want us to pursue those big deals.  But for
10  account reps or account managers that didn't have
11  that big deal, I wanted to arm them with some tools,
12  these programmatic approaches to help them create
13  deals, and maybe even then turn into big deals.
14  Q.  But large deals aren't predictable, are
15  they?
16  A.  I think that's a -- a tough question to
17  answer, Shawn.  It's theoretical.  They're -- you do
18  take -- we did have a sales approach at Oracle
19  called -- I forget what it was called, but it's why
20  buy -- I'm sorry -- yeah, why buy, why buy Oracle
21  and why buy now?
22  And it was a sales process that we used
23  with all our accounts, and one could argue that
24  following that process helped with the
25  predictability of large deals.

381

1    MR. WILLIAMS:  Okay.  I'll ask the reporter
2  to mark this document as Sanderson No. 20.  It's
3  Bates numbered NDCA-ORCL 155966 through 69.
4    (E-mail string dated 2/01 re Leveraging
5  the Power of Oracle marked Exhibit 20 for
6  identification.)
7    THE WITNESS:  Thank you.
8  BY MR. WILLIAMS:
9    Q.  Just take a look at it and let me know
10  when you're done, please.
11    A.  Okay.
12    Q.  Do you recognize Exhibit No. 20?
13    A.  Yes, I -- do I recognize it?  I don't
14  recall it, but I know what it's about.
15    Q.  Okay.  And it appears to be from Marco
16  Tilli to Sohaib Abbasi, forwarding an e-mail that
17  you wrote to opi_us --
18    A.  Correct.
19    Q.  -- cc'ing a bunch of people, some in
20  your organization, some not --
21    A.  Correct.
22    Q.  -- right?
23    And the date you wrote the e-mail is
24  February 5th, right --
25    A.  Correct.

382

1    Q.  -- 2001, right?
2    That was a couple days after the
3  spreadsheet we were just looking at, which I think
4  was February 2nd, right?
5    A.  Yeah.
6    Q.  And generally talking about some of the
7  same topics; is that fair?
8    A.  Right.  When you say spreadsheet, you
9  mean this --
10    Q.  Right.
11    A.  -- document we just --
12    Q.  Yeah, Cullivan 10, I think it was.
13    A.  Cullivan 10, yes, correct.
14    Q.  Right.  Do you know why you sent this
15  e-mail to Safra Catz?
16    A.  Yeah.  One, I liked Safra to know what I
17  was doing.  Two, I strongly believed that putting
18  these kinds of programs in place could help drive my
19  business.  And I also felt that it was something
20  that other businesses around the world could benefit
21  from as well.  And so, I just wanted Safra to have
22  visibility, and it was up to her whether she wanted
23  to forward this to others to leverage as well, such
24  as Sergio and Derek.
25    Q.  Okay.  Just quickly, if you turn to the

383

1  next page, 68.
2    A.  Okay.
3    Q.  And you reference here a CRM incentive
4  compensation program, right?
5    A.  Uh-huh.
6    Q.  What was that program?
7    A.  It was the incentive compensation module
8  within CRM.  It was --
9    Q.  So, it's a module?
10    A.  Yeah, it's a module.
11    Q.  Okay.
12    A.  These were all applications and
13  technology programs that we were driving that we
14  thought customers -- we -- as I said in there, we
15  had spent a couple of days looking at all the
16  different programs we might launch, and these are
17  the ones that worked their way to the top.
18    Q.  So, this is an application --
19    A.  Yeah.
20    Q.  -- within CRM?
21    A.  Correct.
22    Q.  Okay.  And going back to the text of the
23  e-mail, you write, "During the first two months of
24  this quarter, I have met with many of you and called
25  on your accounts.  It's clear that everyone is

384

1  working hard, working the pipeline and driving to
2  our Q3 number."
3    What did you mean by "working the
4  pipeline"?
5    A.  It's what a sales organization would do,
6  taking the pipeline that they have, the specific
7  accounts in their pipeline, and working those
8  accounts to -- to win the business.
9    Q.  Okay.  And then you say, "My
10  observation, though, is that we're getting there by
11  sheer tenacity."
12    A.  Right.
13    Q.  What did you mean?
14    A.  Again, we just weren't -- I felt we
15  could be taking a more programmatic approach as
16  opposed to just pursuing an account and relying on
17  that account manager to figure out what they needed.
18  I wanted to give them help, give them tools to be
19  able to do that.
20    Q.  The last sentence of that paragraph, you
21  write "In other words" -- well, let me just read it
22  to make sure there's context around it.
23    You further write "Good, but not good
24  enough.  We need to do a much better job of
25  leveraging what I refer to as the 'power of Oracle.'

385

Sanderson, Jr., Edward J  7/26/2006  9:00:00 AM

1    In other words, making sure we bring everything we
2    can to the table to build pipeline and win."
3        A.  Right.
4        Q.  Right?
5        And there when you say "build pipeline,"
6    you're referring to the pipeline generally but also
7    to Q4; is that fair?
8        A.  There, I wasn't focused on Q4.  I was
9    simply talking about that we needed to leverage the
10   power of Oracle, bringing all the capabilities of
11   Oracle to a particular customer opportunity.  And if
12   we did that, it would help us build pipeline in
13   general.
14       Q.  Okay.  Then you go on to say, "Late last
15   week, I had my OPI and OCS management team identify
16   and develop the associated action plans for key
17   programs and capabilities that will generate an
18   additional 200 million in Q4 pipe."  Right?
19       A.  Uh-huh.
20       Q.  There you're --
21       A.  Here --
22       Q.  -- specific to Q4 pipe?
23       A.  Correct.
24       Q.  Because at that time you were short at
25   least 150 million in Q4 pipe?

386

1        A.  Right.  But, again, I would tell you
2    this was still in the middle of Q3, and I was also
3    trying to get Sales to look to -- even better to the
4    next quarter, and this is a way to do it.
5        And that's going to be appealing to
6    Sales.  When they see something that's going to help
7    them build pipe, they're going to be inclined to pay
8    attention to it.
9        Q.  Okay.  And the next paragraph, beginning
10   on the second sentence, you write, "For the next
11   16 weeks, these will be the programs that I will
12   focus on.  I'll be reviewing their success weekly
13   and in March we will institute measures within
14   OSO" -- Oracle SalesOnline, right?  Right?
15       A.  Yes, correct.
16       Q.  "And the OPI forecast to track how we're
17   leveraging these programs to build pipe and close
18   deals."
19       A.  Right.
20       Q.  There are you referring to -- well,
21   withdrawn.
22       You specifically reference the next
23   16 weeks so, it sounds like you're referring to Q4.
24       A.  Sixteen weeks would be the next four
25   months, so it would be the last month of Q3 and then

387

1    the three months of Q4 most likely.
2        MR. WILLIAMS:  All right.  I'm going to mark
3    this document as Sanderson Exhibit No. 21.
4        (Defendants' Response to Plaintiffs'
5    First Set of Requests for Admissions marked Exhibit
6    21 for identification.)
7        THE WITNESS:  Thank you.
8        MR. WILLIAMS:  For the record, I'll note that
9    Sanderson Exhibit No. 21 is Defendants' Response to
10   Plaintiff's First Set of Requests for Admissions,
11   dated February 8th of 2004.
12   BY MR. WILLIAMS:
13       Q.  I'll just ask you to take a look at it
14   and let me know --
15       A.  Could you -- I'm not an attorney, so
16   could you tell me what this is?
17       Q.  It's exactly what it's titled.  It's
18   Defendants' Response to Plaintiff's First Set of
19   Requests for Admissions.  And what it is is
20   plaintiffs served a request on the defendants to
21   admit certain facts, and this is their response
22   to --
23       A.  Okay.
24       Q.  -- those requests.
25       A.  Okay.

388

1        Q.  You don't necessarily have to read the
2    whole thing, but if you'd like to, it may take a
3    while.  And if you want to do that, that's fine.
4        A.  Is there a particular area you want to
5    point me to --
6        Q.  Yeah.
7        A.  -- and I can read that?
8        Q.  Sure.  I'm going to ask you to turn to
9    page 2.
10       A.  Okay.
11       Q.  And see where it says "Request for
12   Admission No. 1"?  It's on the top of the page.
13       A.  Okay.
14       Q.  Okay.  See where it says "Admit that
15   between December 11th, 2000, and December 25th,
16   2000, Oracle's best estimate of its sales pipeline
17   growth for 3Q '01 as compared to 3Q '00 decreased
18   from 52 percent to 34 percent."  See that?
19       A.  Yes.  Yes, sure.
20       Q.  And just below that there is a response
21   to Request No. 1.
22       A.  Okay.
23       Q.  See that?
24       A.  Yeah, uh-huh.
25       Q.  It says --

389

Sanderson, Jr., Edward J  7/26/2006  9:00:00 AM

1    A.  Go ahead.  I'm sorry.

2    Q.  It says, "Defendants incorporate their

3  general objections as though fully set forth herein.

4  Defendants further object to Request No. 1 as vague

5  and ambiguous as to 'between December 11th, 2000,

6  and December 25th of 2000.'  Defendants further

7  object to Request No. 1 as vague and ambiguous as to

8  the revenue metric.

9       "However, subject to and without waiving

10  these objections, Defendants admit that on

11  December 11th, 2000, Oracle's sales pipeline

12  growth for 3Q was 52 percent in constant dollars and

13  on December 25th, 2000, Oracle's sales pipeline

14  growth for 3Q '01 was 34 percent in constant

15  dollars."

16    A.  Okay.

17    Q.  You see that?

18    A.  Yes, I do.

19    Q.  Do you recall those being the facts?

20    A.  I don't.

21    Q.  Okay.  Have you ever seen these requests

22  for admissions?

23    A.  I don't recall.  I don't recall.

24    Q.  You understand that that response to

25  Request No. 1 is a response by you, Larry Ellison,

390

1  Jeff Henley and the company?

2    A.  Yes.  And anything like that, I did -- I

3  don't recall this one specifically.  But I did --

4  any time it was a document like that, Oracle and my

5  attorneys were good to -- very good at making sure

6  that I participated appropriately.

7    Q.  Okay.

8    A.  I just don't recall it specifically.

9    Q.  That's fine.

10       I'm going to show you what's been

11  previously marked as Roberts No. 15.  Roberts No. 15

12  is Bates numbered NDCA-ORCL 00544 through 546.

13       I'd ask you to take a look at it and let

14  me know when you're done.

15    A.  Okay.

16    Q.  You recognize the document?

17    A.  I do not.

18    Q.  But it's an e-mail from Larry Garnick to

19  you, Jennifer Minton, Jeff Henley, Safra Catz, Chuck

20  Rozwat, Ron Wohl, Sergio Giacoletto, George Roberts,

21  Larry Ellison and Derek Williams, right?

22    A.  Correct.  That's what the e-mail says,

23  correct.

24    Q.  And it's similar to one of the e-mails

25  we were talking about earlier with respect to the

391

1  December revenue results, right?

2    A.  Correct.

3    Q.  But this one appears to be for January

4  of 2001 --

5    A.  Correct.

6    Q.  -- is that right?

7       And it's dated January -- I'm sorry.

8  It's dated February 8th of 2001.

9    A.  Yes.

10    Q.  All right.  You were laughing.  Why were

11  you laughing?

12    A.  Because I obviously had tremendous

13  impact on Larry Garnick.

14    Q.  That was going to be my question.  So,

15  Larry Garnick -- the e-mail states, "Summarized

16  below are the January '01 quarter to date

17  revenue results for your review."  See that?

18    A.  Yes, I do.

19    Q.  And then he goes on to say, "License

20  revenue growth rate was 25 percent in U.S. dollars,

21  12 points better than the 13 percent growth we

22  experienced in January fiscal '00 quarter to date

23  over January fiscal '99 quarter to date.  However,

24  excluding the $60 million Covisint deal, the U.S.

25  dollar growth rate would have been only 8 percent."

392

1    A.  Uh-huh.

2    Q.  "Excluding Covisint, OPI quarter to date

3  license revenue growth would have been negative

4  63 percent."  You see that?

5    A.  Yes, I do.

6    Q.  Do you recall reacting to this e-mail

7  from Larry Garnick at the time?

8    A.  I don't recall this one.  I may have put

9  all my ammo into the -- ammunition into the first

10  time.  But needless to say -- not needless to say,

11  my reaction was I still thought that to arbitrarily

12  pull out a deal was wrong.

13    Q.  I guess that's -- when you say "pull out

14  a deal," what are you referring to?  Even talking

15  about it separately?

16    A.  No.  To pull out -- to talk about --

17  when I say "pull out," to extract a deal -- the

18  revenue associated with a deal that I did and then

19  do calculations based on pulling -- you know,

20  extracting that, excluding that, from my number was

21  wrong.

22    Q.  Okay.  Going down to the last bullet

23  point, he writes, "The analyst community is

24  expecting 23 percent license revenue growth and

25  18 percent overall revenue growth for Q3 '01.  To

393

Oracle

Page  390 - 393

1  deliver 23 percent U.S. dollar license revenue
2  growth, we need 1.341 million in constant dollar" --
3  I'm sorry -- "in constant," yeah, "license revenue
4  for the quarter, 95 million, or 8 percent more than
5  our current forecast. January quarter to date
6  constant dollar license represents 33 percent of
7  that requirement." Do you see that?
8      A. Okay. Uh-huh.
9      Q. And so, here Mr. Garnick is indicating
10  that the company needs to make $95 million more than
11  forecasted to meet the analyst community
12  expectations, right?
13      A. For Oracle Corporation, correct.
14      Q. Right. For the company, right?
15      A. Correct.
16      Q. Did you react to that?
17      A. I don't recall reacting to that. I --
18  I'm sure that I continued to focus on whatever my
19  forecast was at the time and the specific deals that
20  I had, the specific deals that I had that I was
21  working on.
22      Q. That you were working on.
23      A. And let me just give one more
24  clarification. When I say "I," I mean that, in this
25  case, that OPI was working on.

394

1      Q. Okay. And would you also say
2  Consulting, or would you exclude that from your
3  comment?
4      A. I -- I worked less on Consulting or
5  focused less on Consulting. One is Keith Block and
6  I had worked together for a number of years, and I
7  had absolute faith in him as a consulting manager,
8  number one.
9      Number two, what happens in consulting
10  is oftentimes the consulting revenue that Oracle
11  Consulting is delivering, for example, in Q3 is
12  based on license deals that were sold in Q1 and Q2.
13  If -- for example, if we sold a million-dollar
14  license deal in Q3 '01 on the last day of the
15  quarter and we had a million-dollar consulting
16  engagement as well, we wouldn't get a single dollar
17  of that consulting revenue that quarter.
18      So, this is -- Consulting is much more
19  predictable because it was revenue that would be --
20  or bookings, contracts, consulting contracts that
21  were signed in previous quarters.
22      Q. Right, 'cause they would trail license
23  sales, right?
24      A. Exactly.
25      Q. Okay. Do you -- did you and the members

395

1  of the executive committee discuss the fact that as
2  of February 8th of 2001, the company needed
3  95 million more than its current forecast to meet
4  analysts' expectations?
5      A. I don't recall.
6      Q. I'm going to show you what's been
7  previously marked as DeCesare No. 11, and it's Bates
8  numbered NDCA-ORCL 084863 through 891. Why don't
9  you take a look at it and let me know when you're
10  done.
11      A. Okay. I'm ready.
12      Q. Okay. Do you recognize the document?
13      A. I don't recognize the document
14  specifically, but I remember this was our forecast
15  package format.
16      Q. Okay. For your division, for OPI?
17      A. Correct.
18      Q. And does it include Consulting or no?
19      A. I'd have to go back and look, if you
20  want me to look.
21      Q. And --
22      A. Do you want me to look?
23      Q. Where would you have to go back to?
24      A. I'd have to flip through the document to
25  see that.

396

1      Q. Sure. Go ahead.
2      A. You're asking does it include
3  Consulting?
4      Q. Right.
5      A. "License, license, license, license and
6  consulting."
7      There's a page -- it's Bates 873, it
8  says "license and consulting." But as I look at it,
9  I don't see Consulting on here.
10      Q. Okay.
11      A. Then product information, pipeline
12  information, targets -- closed deals -- I don't
13  believe there's any Consulting information in there.
14      Q. Okay. All right. Who prepared this
15  document for your organization?
16      A. The finance group.
17      Q. Possibly Jim English --
18      A. Correct.
19      Q. -- and his people?
20      A. Yes.
21      Q. And then it was circulated to you?
22      A. Yes, among others.
23      Q. I'm going to ask you to turn to the
24  third page with the ending 865.
25      A. Okay.

397

1  Q. And you see some handwriting on that
2  page?
3  A. Yes, I do.
4  Q. Is that your handwriting?
5  A. No.
6  Q. Do you know whose handwriting it is?
7  A. I do not.
8  Q. Okay. Going back to the first page, it
9  appears that as of --
10  A. Okay. First page --
11  Q. I meant to say the second page Bates
12  page 64.
13  A. Okay.
14  Q. Looking at the top of the page, there is
15  a line for -- well, a Q3 '01 summary of revenue,
16  right?
17  A. Yes.
18  Q. And two lines down, it indicates that
19  best dropped from 30 million to 195 million. See
20  that?
21  A. Yeah, dropped 30 million to 195 million,
22  right.
23  Q. Right. And what is best?
24  A. When you forecast, at least the practice
25  we use and I think it's an industry practice, is you

398

1  forecast worst case, most likely and best case. And
2  best case is what you think the maximum dollars
3  you'll do for that quarter. And
4  Q. And so, at least as of February 14th,
5  OPI's best had dropped by 30 million, right?
6  A. Right. But it's not unusual, as a
7  quarter goes along, you get more definition of
8  whether a deal is going to come into the forecast or
9  out. And in this case, we had some deals that
10  either fell out or moved to the Q4.
11  Q. Okay. And see the next line where it
12  says "Pipeline"?
13  A. Yes.
14  Q. It says "Pipeline is 295 million."
15  A. Right.
16  Q. And that's down 63 million from last
17  week?
18  A. Right.
19  Q. All right. See the next line where it
20  says "Expenses"?
21  A. Yeah. But did you want to comment on
22  pipeline is -- the fact that it's down, we were
23  still 41 percent growth over the prior year, number
24  one.
25  And, number two, the fact that the

399

1  pipeline is 295, and then it dropped, again, it's
2  not unusual, particularly that time in the quarter,
3  because as you work the management judgment, you may
4  have deals that ultimately move out of the pipe for
5  that quarter into the next quarter, as an example.
6  So, the down 63 million is not -- is not a surprise
7  or alarm to me at all.
8  Q. It's not -- okay. It's not -- for the
9  quarter, though, it means -- well, withdrawn.
10  If, as you explain, that some deals may
11  go out the fourth quarter, which is not unusual,
12  right, that could cause the -- this -- the current
13  quarter's pipeline to drop, but it may increase the
14  next quarter's pipeline; is that fair?
15  A. It could. It's going to have some
16  impact in the next quarter. But the next quarter is
17  also going to have deals that are going to come in
18  and drop out as well.
19  Q. I understand that. All I'm saying is
20  that what you're saying here is the fact that Q3
21  pipeline dropped 63 million --
22  A. Uh-huh.
23  Q. -- it could be that those deals went
24  into the fourth quarter.
25  A. Right. Or it could be that -- yeah, I

400

1  mean, that's an example. I mean, there are a number
2  of reasons why your pipeline -- a dollar amount
3  could change.
4  Q. Sure. But it's something that the
5  company looked at, you know, per quarter at least,
6  right?
7  A. Right. As you can see, forecast
8  coverage is 204 percent.
9  Q. Right.
10  Q. So, that's the kind of numbers you want
11  to see.
12  Q. Right. If you go to the next page, I
13  think there's some detail around the pipeline,
14  right?
15  A. Next page.
16  Q. Next page.
17  A. Yeah, I'm with you.
18  A. Okay.
19  Q. You see where I'm talking about?
20  A. Yes, I do.
21  Q. And there's a little bit more detail
22  surrounding why --
23  A. Yeah.
24  Q. -- in that one week that the pipeline
25  dropped. So, in the East 10 million -- it was

401

1   reduced 10 million due to a couple deals moving into
2   the fourth quarter, like we just talked about?
3      A.  Right, exactly.
4      Q.  Meaning that those deals aren't going to
5   come in in the third quarter, right?
6      A.  Right.  At that point in the quarter,
7   that was our best guess.
8      Q.  Right.  And as you look through that
9   entire section, it gives an explanation of why the
10   pipeline fell 63 million.
11      A.  Right.  And then I think you'd see in
12   any of these kinds of forecast reports that it would
13   have this kind of detail and explain to you what
14   happened -- or explaining to me what happens to the
15   pipe.
16      Q.  Right, right.
17      A.  I think it also gives you a sense of the
18   level of detail that we manage the business.
19      Q.  Right.  Going back to 864 --
20      A.  Okay.
21      Q.  -- to the expense line, it says,
22   "Expense forecast remains at budget, 49 million.
23   Bottoms up analysis gives us approximately
24   2.5 million in cushion in this FC."
25      What's FC mean, do you know?

402

1      A.  "Bottoms up analysis gives us
2   approximately 2 1/2 million cushion in this" -- I
3   don't know.
4      Q.  And then it states, "I've contacted
5   legal for heads-up on any legal settlements that may
6   impact Q3."
7      A.  Uh-huh.
8      Q.  Do you think that that's a reference to
9   whoever created the document, not you?
10      A.  Yeah.  I didn't create the document,
11   yeah.
12      Q.  Whoever created the document also looked
13   at Covisint again and the forecast with and without
14   it?
15      A.  Yeah.  You can tell I was having
16   tremendous impact on that point.
17      Q.  Right.  And so, it appears from the
18   middle of the page in December with Covisint, Oracle
19   SalesOnline was forecasting 63 deals, and without
20   Covisint, it was three deals?
21      A.  I think that's 63 million.
22      Q.  Okay.  I'm sorry.  63.  And without
23   Covisint, 3 million?
24      A.  3 million.
25      Q.  Okay.

403

1      A.  Again, I'll just restate my point, I
2   thought the fact that anybody would pull it out was
3   wrong, and it was a disservice to a sales team that
4   worked quite hard to bring that deal in.
5      Q.  Uh-huh.  Looking at the next page, in
6   the middle of the page, there appear to be
7   additional comments, and it states, "Additional
8   comments.  Detailed below in the impact on the FC
9   products growth and pipeline without Covisint."  See
10   that?
11      A.  Yeah.
12      Q.  And apparently there -- well, withdrawn.
13      There appear to be two different
14   scenarios, one with 60 million of Covisint backed
15   out of the forecasting pipeline, and one with
16   40 million of Covisint backed out of the forecasting
17   pipeline.  Do you see that?
18      A.  Yes, I do.
19      Q.  Do you know why there would be a 60- and
20   a 40-million-dollar back-out?
21      A.  I don't recall.
22      MR. WILLIAMS:  I'd like to take five minutes
23   if that's all right.
24      THE VIDEOGRAPHER:  Off the record at
25   11:45 a.m.

404

1      (A brief recess was taken.)
2      THE VIDEOGRAPHER:  We are back on the record
3   at 11:56 a.m.
4      MR. WILLIAMS:  I'm going to ask the reporter
5   to mark this document as Sanderson No. 22.  It's
6   Bates numbered NDCA-ORCL 005785 through 788.
7      (Document from Gretchen Teagarden dated
8   1/10/01 marked Exhibit 22 for identification.)
9      THE WITNESS:  Thank you.
10   BY MR. WILLIAMS:
11      Q.  Do you know Gretchen Teagarden?
12      A.  The name is familiar, but I don't
13   remember her.
14      Q.  Okay.  Why don't you take a look at the
15   document and let me know when you're done.
16      A.  Okay.
17      Q.  Okay.  Do you recognize the document?
18      A.  I do not.
19      Q.  It appears to be a January 10th, 2001,
20   Salomon Smith Barney analyst's report; is that fair
21   to say?
22      A.  That's what it appears to be, yes.
23      Q.  And you visited Salomon Smith Barney
24   sometime during the week prior to January 10th of
25   2001?

405

1    A.  It's obviously right around -- it says
2   "on Tuesday."  So, it was a recent visit just before
3   this document was created.
4    Q.  Right.  And do you now recall who
5   Gretchen Teagarden was?
6    A.  I remember her as an analyst with Smith
7   Barney, and I remember going to New York, but -- and
8   talking to her, her group.  But I don't remember
9   anything more than that.
10   Q.  So, she writes that you visited Salomon
11  Smith Barney's office on Tuesday to address investor
12  inquiries with traction with 11i E-Business Suite,
13  right?
14   A.  That's what it says.
15   Q.  And there's no reason to believe that's
16  not true, is there?
17   A.  It says "to address investor inquires
18  [sic] about traction with 11i E-Business Suite."  I
19  don't remember that was specifically what I was
20  there for.  I think I was giving an update on the
21  E-Business Suite and 9i is the way I recall it.
22   Q.  And she writes that you noted that
23  Oracle -- well, withdrawn.
24      She writes, "Oracle sees robust demand
25  for both its database and applications business.

Specifically, Sanderson noted demand for ERP is
surprisingly robust, while advanced planning and
scheduling, CRM and SCM, products also are
performing well."  See that?
5    A.  Yes, I do.
6    Q.  Did you do a PowerPoint presentation?
7    A.  I -- I don't recall what I used for
8   the -- for my meeting there.
9    Q.  And when you told her that CRM and SCM
10  products are also performing well, did you mean that
11  they were selling well or they were functioning well
12  technologically?
13  MR. GIBBS:  Objection.  Lack of foundation.
14  THE WITNESS:  Those are her words, and that
15  was -- as I said, I don't ever remember seeing this
16  document.  I think you'd have to ask Gretchen what
17  she meant by those terms.
18  BY MR. WILLIAMS:
19   Q.  Well, she says that you noted "demand
20  for ERP is surprisingly robust, while advanced
21  planning and scheduling, CRM and SCM, products are
22  also performing well."
23   A.  I may have said that.  My only point is
24  this is not a direct quote from me.
25   Q.  Okay.

406

407

1    A.  This was Gretchen's interpretation of
2   what I said.
3    Q.  Okay.
4    A.  That's the only point that I'm making.
5    Q.  All right.  As you sit here today, do
6   you believe that she was incorrect here?
7    A.  You're asking me to recall something
8   from a long time ago and questioning, the way I
9   interpret is, Gretchen's veracity.  And I obviously
10  don't have any reason to -- on 787, it highlights
11  120 live customers, 1300 implementations in process,
12  3500 copies of the application shipped.  And that
13  must have been the basis for her making that
14  statement.
15   Q.  Well, what must have been the basis for
16  her making that statement?
17   A.  I'm sorry.  When you look at these
18  numbers, and this would be the kind of information
19  that I would walk in with into an analyst meeting.
20  And I -- I am speculating that from that kind of
21  information she would draw those conclusions.
22   Q.  You're not saying that you did not say
23  to her substantively, not quoting, that demand for
24  ERP is surprisingly robust, while advanced planning
25  and scheduling, CRM and SCM, products also

performing well?
2    A.  My challenge, Shawn, is you're asking me
3   to recall something that happened five and a half
4   years ago.  And I just don't recall.
5    Q.  That's fair.  Do you know if she
6   e-mailed this report to you or anyone at Oracle?
7    A.  I don't recall.
8    Q.  It's fair to say --
9    A.  I don't recall receiving it.
10   Q.  Okay.  On 786 she writes again "Oracle
11  EVP Sandy Sanderson visited our offices on Tuesday.
12  Mr. Sanderson is responsible for Oracle Exchanges,
13  Oracle Product industries, Oracle Consulting, and
14  Latin America Division."  You see that?
15   A.  Yes, I do.
16   Q.  That's correct, right, at least at the
17  time?
18   A.  No.
19   Q.  No, it wasn't correct?
20   A.  The reason I say that is, as an example,
21  it's largely correct, Shawn.  But Oracle Consulting,
22  if you recall, I had Oracle Consulting for U.S.,
23  Canada, Latin America and OPI.  I did not have
24  worldwide consulting.  I mean, I didn't have
25  responsibility for consulting in AsiaPac, EMEA.  I

408

409

1  didn't have responsibility for OSI Consulting.

2      Q.  Okay.  So, are you saying that you did

3  not tell her that you were responsible for

4  consulting generally?

5      A.  I said -- I believe what I would tell

6  her is that I had responsibility for Oracle

7  Consulting, followed by being more descriptive of

8  what part of the consulting group I had

9  responsibility for.

10      Q.  Okay.

11      A.  She just happened to capture it as

12  Oracle Consulting.

13      Q.  I just want to clarify.  So, you're

14  saying you think you said something more than what

15  she's written here?

16      A.  I believe I told her what is on this

17  page, but where it says "Oracle Consulting," that I

18  most likely gave her more specifics about what part

19  of the consulting business that I had responsibility

20  for.

21      Q.  Okay.  And she again writes, "The

22  purpose of the event was to address investor

23  inquires [sic] into the following issues:  Traction

24  with 11i E-Business Suite and 9i products, Oracle's

25  view on the strength of database and applications

410

1  market, given the projected projection in IT

2  spending in 2001."  See that?

3      A.  Yes, I do.

4      Q.  Is there any reason to believe that

5  she's incorrect when she wrote that?

6      A.  She says the purpose of the event, you

7  know, I'm sure I -- I say "I'm sure."  I would

8  imagine that I was there.  Most likely I was there

9  at her request.  And that was what she wanted out of

10  the conference.

11      Q.  And you presented, I guess, your -- or

12  the company's position on these two issues to her?

13      A.  What I -- what we typically did on this

14  was we would have a corporate presentation that we

15  would use for these presentations.  It was not

16  something that I prepared myself or even had

17  somebody that worked for me prepare it.  It was

18  typically done by -- I'm sure marketing had some

19  input, Finance had input too, Investor Relations or

20  PR to prepare the topic.

21      Q.  Okay.

22      A.  Most likely Investor Relations.

23      Q.  Stephanie Aas -- withdrawn.

24          Stephanie Aas's group.

25      A.  Yeah.  Was Stephanie Aas Investor

411

1  Relations?

2      Q.  Okay.

3      A.  Was she?  If she was -- I can't remember

4  if she was Investor Relations or PR.  I believe it

5  was Investor Relations.

6      Q.  Okay.

7      A.  Okay.  And if that's the case, yes, it

8  would have been her group.

9      Q.  Okay.  And Miss Teagarden goes on to

10  write, "To recap, Oracle's 11i E-Business Suite

11  includes modules for traditional ERP (HR,

12  financials), CRM (sales and marketing),

13  eProcurement, supply chain management (SCM), and

14  exchanges.  Oracle reiterates two value propositions

15  for the suite solution versus the best-of-breed

16  approach."

17          Then for the bullet points, she writes,

18  "The suite provides a single view of the customer

19  across the enterprise by incorporating a single data

20  module."  See that?

21      A.  "Data model."

22      Q.  I'm sorry.  Data model.

23      A.  Correct.

24      Q.  And that's something that you told her,

25  right?

412

1      A.  Yes.  I mean, I say "yes," that was one

2  of our key messages around 11i, correct.

3      Q.  Okay.  And the next is that "The suite

4  is pre-integrated and fully interoperable out of the

5  box, helping to lower consulting costs and time to

6  value."

7          That's something that you would have

8  told her too, right?

9      A.  Along that line, what -- the message

10  that we had was that it was all about the Oracle

11  solution versus best-of-breed.  And if you use

12  best-of-breed, meaning that you would couple

13  together interface products from different vendors,

14  you would have to do that interfacing.

15          For example, if you were interfacing

16  Oracle -- Oracle financials to PeopleSoft's HR, what

17  we did with E-Business Suite is we did all of that

18  interfacing or integration already for the customer.

19      Q.  I understand.

20      A.  And that was a very distinct difference

21  to best-of-breed.

22      Q.  Sure.  I understand.  So -- so, where

23  she writes, "The suite is pre-integrated and fully

24  interoperable out of the box, helping to lower

25  consulting costs and time-to-value," that's

413

1  something that you would have indicated to her?

2      A.  No.  I would have -- to be -- if we're

3  going to get that specific, the suite is

4  pre-integrated, that's true.

5          Fully interoperable out of the box, I

6  wouldn't say that because you've got to -- it

7  implies if it's fully operable out of the box, you

8  take it out of the box and you put it on the table

9  and somehow it works.  It has to be put on the

10  customer's hardware, unless they were having a

11  hosted environment.  You've got to set the

12  parameters with the additional -- for each of the

13  applications specific to that customer, et cetera.

14      Q.  Okay.

15      A.  Now, helping to lower consulting costs

16  is true, because one of the things that we did in

17  Consulting that was counter to other consulting

18  businesses out there, many of the consulting

19  businesses, like Accenture or IBM Services

20  Consulting Services, wanted to maximize the amount

21  of consulting services.

22          At Oracle, our play was around the

23  product.  And so, the more that we could integrate

24  the product, the less consulting time that required.

25      Q.  Okay.  So, the section that says "fully

414

1  interoperable out of the box," you're saying you

2  would not have said that to you?

3      A.  I -- no.  I -- no.

4      Q.  Because that wasn't true.

5      A.  Yeah, it -- based on my understanding of

6  what "fully interoperable out of the box" -- I don't

7  know of any software package that's fully

8  interoperable out of the box.  If you buy Microsoft

9  Word in a box and you pull it out of the box there's

10  still a little more work that has to be done before

11  anybody uses it.

12      Q.  She then writes "Sanderson quantified

13  the second value proposition with the services to

14  product ratio comparison.  Instead of spending 4 to

15  $7 on consulting for every dollar spent on software,

16  as many industry suggests is the norm, Oracle sees a

17  1:1 ratio internally."

18          Is that something you told her?

19      A.  Right, which would have been based on

20  the performance of implementing -- when she says

21  "Oracle sees a 1:1 internally," I believe when she's

22  saying "internally," she's talking about within

23  Oracle.  And our implementation ratio between

24  services and license costs was probably around 1:1.

25      Q.  Okay.  Now, let me just clarify.  Why do

415

1  you think she is referring to what Oracle is seeing

2  internally, based on what you read here?

3      A.  Fair point.  I am speculating on what

4  she meant by "internally," and probably in fairness,

5  we should -- you should ask Gretchen Teagarden what

6  she meant by "internally."  I was just giving my

7  interpretation.

8      Q.  Because as of January 10th, Oracle had

9  not fully upgraded to 11i, right?

10      A.  No.  But by then, some of the

11  applications had been implemented.

12      Q.  Some of them.  Okay.

13      A.  Right.

14      Q.  She then says, "According to Sanderson,

15  this reduction is a key component of the $1 billion

16  Oracle purports to have saved by transitioning to a

17  fully Web-enabled e-business and will contribute

18  substantially to the second 1 billion the company

19  expects to save."  See that?

20      A.  Yes, I do.

21      Q.  Is that something that you told her?

22      A.  What I recall saying about that topic is

23  that one of the things that led to our

24  billion-dollar savings at Oracle with the E-Business

25  Suite is we put a number of self-service

416

1  applications in.  For example, time and expenses.

2  And that could be for consulting, for sales,

3  whatever.

4          And before, you would typically fill out

5  a form, and somebody would have to process it.  With

6  the E-Business Suite around time and expense, the

7  consultants did that online.  So, they were -- you

8  could disintermediate people, you know, or

9  departments or rationalize departments that you

10  didn't need anymore because it was an online system.

11      Q.  The example you just gave is one of

12  those applications that, at least at some point

13  during January, wasn't working properly, right?

14      A.  I gave it, Shawn, by way of example.

15      Q.  I understand.

16      A.  I'm just -- and to say that, I'd have to

17  go back and look to see where -- time and expense.

18  We did talk about an e-mail yesterday where there

19  were issues around it.  I also recall that there was

20  a work-around with some of that to overcome the

21  issue.

22      Q.  Right.

23      A.  We also talked about the system was down

24  at 10:00 a.m. that day.  It didn't talk about

25  whether it was down just that day or whether it was

417

1  down for a week or for a month.  So, on a specific
2  day, at 10:00 a.m., we knew that application wasn't
3  working --
4      Q.  Right.  Well --
5      A.  -- as I recall from what we reviewed
6  yesterday.
7      Q.  The work-around you're talking about, it
8  was a manner to fill out a form offline, right?
9      A.  That was my interpretation, but I don't
10  recall.
11      Q.  Okay.  And if you heard that time and
12  expense didn't work for three or four weeks in
13  December and January, would that surprise you?
14      A.  You're asking me to speculate on
15  something I don't recall.
16      Q.  Okay.  If you go to the next page ending
17  787, on the top, Miss Teagarden writes that you gave
18  her -- or "Oracle provided Salomon Smith Barney with
19  the following statistics," right?
20      A.  I see those words --
21      Q.  You see that?
22      A.  -- up at the top.  Yes, I do.
23      Q.  Do you think that was part of the
24  presentation that you may have provided to her?
25      A.  Yes.  I don't recall specifically, but

418

1  this is the kind of information that I would be
2  given in order to be able to speak factually about
3  the product.
4      Q.  Okay.  And later -- well, you also --
5  so, one of the things you told her was that the
6  pipeline looks strong, right, on the second or third
7  bullet point?
8      A.  "3500 copies of applications shipped.
9  Pipeline looks strong."  She -- you know, there are
10  two different points.  And so, you'd have to talk to
11  her.  If she's concluded -- you know, did she
12  conclude because 3500 copies of the application
13  shipped that the pipeline was strong, or was she
14  making that a separate point?
15      Q.  So, you don't think that you provided
16  that information to her?
17      MR. GIBBS:  Objection.  Vague.
18      THE WITNESS:  I -- it is an abstract phrase
19  in a document --
20      MR. WILLIAMS:  Okay.
21      THE WITNESS:  -- that I didn't prepare, so
22  it's hard for me to comment --
23      MR. WILLIAMS:  Well, let's --
24      THE WITNESS:  -- one way or the other.
25      MR. WILLIAMS:  I'm sorry.

419

1  BY MR. WILLIAMS:
2      Q.  Let's go down to the next section where
3  it begins "Market Update" --
4      A.  Okay.
5      Q.  -- where she writes, "Oracle sees robust
6  demand for its database and applications business.
7  Specifically, Sanderson noted demand for ERP is
8  surprisingly robust, while advanced planning and
9  scheduling, CRM and SCM, are also performing well."
10  See that?
11      A.  Yes, I do.
12      Q.  So, that appears to be something that
13  you told her, right?
14      A.  What I would have done is this would be
15  most likely based on some pipeline numbers that
16  Oracle kept, you know, as we've talked about
17  earlier, on pipeline data.  And it would -- and to
18  make those statements, we would have data that would
19  support what the pipeline was for those various
20  products.
21      Q.  Right.  But what I'm saying is that this
22  is something that you told her; at least that's what
23  she writes?
24      A.  She wrote in here this is what I told
25  her.

420

1      Q.  And do you have any reason to believe
2  that you didn't tell her these things?
3      A.  Do I have any reason to believe?  I
4  don't, but it was five years ago, and I don't
5  recall.  As I told you, I vaguely remember going to
6  New York to meet with her and other analysts.
7      Q.  Okay.  All right.  She goes on to write,
8  "Oracle says it's also seeing sustained demand for
9  its database product, despite industry-wide concern
10  over contracting IT budgets."  You see that?
11      A.  Yes, I do.
12      Q.  Is that something that you provided to
13  her?
14      A.  Again, I don't recall.  It would have --
15  my answer or statement would have been based on what
16  we were seeing as far as pipeline --
17      Q.  Okay.
18      A.  -- for the product.
19      Q.  All right.  And you then go on -- well,
20  withdrawn.
21      She then writes, "Sanderson noted two
22  trends driving demand for databases are demand for
23  the 11i applications that are typically bundled with
24  the database as well as applications of other
25  vendors that rely on the functionality of the Oracle

421

Sanderson, Jr., Edward J  7/26/2006  9:00:00 AM

1  database."  See that?

2  A.  Yes, I do.

3  Q.  And so, you told her that two trends

4  driving demand for database was demand for

5  applications -- demand for 11i applications?

6  A.  No.  She's talking about here demand for

7  databases.  And two of the drivers for database are

8  just the two identified here.  As the more demand

9  around 11i applications, it would require typically

10  the customer to buy more database.

11  And, typically, you sold database

12  through what we call seats, the number of seats; in

13  other words, the number of users using the database.

14  And then if the customer bought more 11i

15  applications, that would be more users, and so, you

16  would sell more database under the context of the

17  number of seats.

18  Also, you know, because of Oracle's

19  database position in the marketplace, as Siebel sold

20  more applications, as SAP sold more applications, as

21  an example, oftentimes it was with Oracle database

22  and creating a demand for our product -- our

23  database product.

24  Q.  All right.  My question was:  So, it's

25  fair to say that you told Miss Teagarden that two

422

1  trends driving demand for databases is demand for

2  the 11i applications that are typically bundled with

3  the database as well as applications of other

4  vendors that rely on the functionality of the Oracle

5  database?

6  A.  I don't remember saying the word

7  "trends."  I'm sure that, as I recall today, as

8  being two ways that we drove our database project,

9  two drivers driving demand for database is the

10  demand for 11i applications as well as applications

11  from other vendors.  I don't know if I used the word

12  "trends."

13  MR. WILLIAMS:  Okay.  I'll ask the reporter

14  to mark this document as Sanderson No. 23.

15  Sanderson 23 is Bates numbered NDCA-ORCL 141672

16  through 678.

17  (Document titled "TSC Streetside Chat:

18  Oracle's Executive Vice President Sandy Sanderson,

19  Jr." marked Exhibit 23 for identification.)

20  THE WITNESS:  Thank you.

21  BY MR. WILLIAMS:

22  Q.  I'm going to ask you to take a look at

23  the document and let me know when you're done.

24  A.  Why don't we go ahead.  I haven't

25  finished the document, but I know we're going to run

423

1  out of time.

2  Q.  Okay.  Do you recognize the document?

3  A.  I don't recall it.

4  Q.  It appears to be an interview or a

5  transcript of an interview of you by a Mr. Joe

6  Bousquin, right?

7  A.  Yes.

8  Q.  And do you know Joe Bosquin?

9  A.  I don't remember him.

10  Q.  Is there any reason to believe that you

11  did not give him an interview on or around

12  March 20th of 2001?

13  A.  No.  I remember talking to somebody

14  from -- I think it's thestreet.com, and it must have

15  been Joe Bousquin.

16  Q.  Okay.  And on January 16th of 2001,

17  Oracle held, I guess, a business-to-business day?

18  A.  Yes.  That's what it says here.

19  Q.  And Joe Bousquin asked you to tell him

20  about your responsibilities at Oracle, right?

21  A.  Uh-huh.

22  Q.  And you said, "I probably do four

23  things.  First, I'm responsible for all our

24  products' industries.  So, I have responsibilities

25  for all our customers in automotive, high tech, also

424

1  process industries like consumer packaged goods,

2  energy, retail, chemical.  I have all those

3  customers.  Second, I have responsibility for

4  consulting at Oracle."

5  A.  Uh-huh.

6  Q.  "We have about a 13,000-person

7  consulting organization.  I'm responsible for that."

8  See that?

9  A.  Yes, I do.

10  Q.  Were you responsible for the entire

11  Oracle consulting organization?

12  MR. GIBBS:  Objection.  Asked and answered.

13  THE WITNESS:  We talked earlier what I have

14  responsibility for.  The -- what I was responsible

15  for in that regard of the 13,000, as I mentioned,

16  the service lines and the methodology and the

17  training.  And apparently, I chose to characterize

18  it that way that day.

19  BY MR. WILLIAMS:

20  Q.  Okay.  Just going over to the next page

21  in the middle of the page -- or just above the

22  middle of the page, Joe Bousquin asks you, or he

23  says, "And when you say suite, you meet a collection

24  of computer programs and each unit within that

25  collection of programs performs a different

425

Oracle

Page  422 - 425

1  function."
2      And you respond, "Exactly.  And we're
3  talking about the E-Business Suite from a functional
4  perspective.  We're talking about ERP, enterprise
5  resource planning.  So, it's included in there.
6  ERP, being financials, manufacturing, order
7  management, human resources.  And CRM, customer
8  relationship management, which is marketing, sales
9  and service.  And then what we've done in our
10  E-Business Suite is we've brought all of that
11  together, ERP and CRM, so it's integrated from a
12  business perspective and a technical perspective,
13  and again, it provides you with a single view of the
14  customer no matter what the interaction with the
15  customer is."  Do you see that?
16      A.  Yes.
17      Q.  All right.  As of January 20th, do you
18  know if any customer was live on both ERP and CRM of
19  the 11i suite?
20      A.  One, I don't recall; and, two, I don't
21  understand the relevance of the question to the
22  quote here.
23      Q.  I'm just asking you a question.  I guess
24  the answer is you don't recall?
25      A.  I don't recall.

426

1      Q.  Okay.
2      A.  Although, when I spoke on January 10th
3  or sometime shortly before January 10th with
4  Gretchen Teagarden, I mentioned in there that there
5  were 120 live customers, and I included names
6  listed.
7      So, my answer still is I don't recall,
8  but here's another -- I mean, here's some evidence
9  that says that we did have some customers up on the
10  product about that time.
11      Q.  Okay.  When you say -- when it's written
12  here that "there are 120 live customers" --
13      A.  Right.
14      Q.  -- are you saying that that means that
15  you had 120 live customers on the entire E-Business
16  Suite, including ERP and CRM?
17      A.  It would be -- at that point, it would
18  be customers up on some portion of 11i E-Business
19  Suite.
20      Q.  Okay.  So, not necessarily ERP and CRM
21  together?
22      A.  Not necessarily.
23      Q.  Okay.  Which is the question that I had
24  asked you.  I asked you:  As of -- as of the time
25  you spoke to Mr. Bousquin in January of 2001 whether

427

1  there was any customer that was using 11i ERP and
2  CRM together.  And I think your answer was you don't
3  recall.
4      A.  Correct.  There's 120 customers listed
5  on a page, and I don't know those 120, specifically
6  what they had implemented at that point.
7      Q.  Okay.  All right.  Very quickly, on the
8  previous page, Bates ending 672, I guess
9  Mr. Bousquin writes, "On January 16th, the company
10  hosted a B2B day at its Redwood Shores, California,
11  campus to introduce new software that helps
12  companies collaborate with suppliers and customers
13  over the Internet, allowing them to operate more
14  efficiently.  This software is the cornerstone of
15  Oracle's much-touted 11i E-Business Suite, a
16  collection of complex business software programs
17  designed to streamline a corporation's business
18  processes."  You see that?
19      A.  Yes, I do.
20      Q.  Based on our conversation yesterday,
21  would you disagree with his characterization of 11i
22  E-Business Suite as complex business software
23  programs?
24      A.  Those are his terms.
25      Q.  Okay.

428

1      A.  It's not a quote.  That was his terms.
2      Q.  Okay.  Looking at 141673, on the bottom
3  you talk a little bit about Ariba.
4      A.  Uh-huh, yes.
5      Q.  And then you talk a little bit about the
6  number of developers that Oracle has, and you talk a
7  little bit about the exchanges, right?
8      A.  Now, the 3,000 developers, I believe,
9  was the total developers that we had at Oracle
10  working on all products.
11      Q.  On all products, right?
12      A.  Yeah.
13      Q.  Okay.  Well, later in the same section,
14  you write, "Third, we've implemented those solutions
15  within Oracle.  So, the bottom line, the fact that
16  we've got integration already built in really is a
17  quick way to save tremendous costs and get the value
18  out of this much more quickly."  You see that?
19      A.  No, I don't.
20      Q.  I'm sorry.  It's at the beginning
21  with -- it's the third paragraph.
22      A.  Oh, "Third"?
23      Q.  Yeah.  It says, "Third," yeah.
24      A.  Okay.
25      Q.  Okay.  As of January 20th of 2001, do

429

1  you know whether any 11i customer had actually saved
2  tremendous costs due to the integration of the
3  modules within 11i?
4      A. Let me read this carefully, because I'm
5  not sure it's talking about 11i.
6      Q. Okay.
7      A. It's not talking about 11i E-Business
8  Suite. It's talking about the exchange software.
9      Q. Had Oracle implemented its exchange
10 software?
11     A. As I recall, they had.
12     Q. What was it called?
13     A. It was -- there were different
14 exchanges, but Oracle Exchange was how I believe it
15 was referred to.
16     Q. Okay.
17     A. Was one of the key exchanges.
18     Q. A little further down, you say, "I don't
19 know why you would" -- well, withdrawn.
20        In response to one of Joe Bousquin's
21 questions when he suggests that maybe Oracle is a
22 jack-of-all-trades, you respond by saying, "No. I
23 don't know why you would conclude that a
24 jack-of-all-trades is a master of none. We are
25 world-class in supply chain."

430

1      What did you mean by that?
2      A. We had been doing supply chain software
3  for a number of years and selling that to customers.
4      MR. WILLIAMS: Okay. He has to change the
5  tape.
6        How long will it take you? Five
7  minutes?
8      THE VIDEOGRAPHER: Yeah.
9        Off the record at 12:39 p.m., and this
10 marks the end of Tape 2 of Volume II.
11        (A brief recess was taken.)
12     THE VIDEOGRAPHER: We're back on the record
13 at 12:43 p.m., and this marks the beginning of
14 Tape 3 of Volume II.
15 BY MR. WILLIAMS:
16     Q. I just want to direct your attention to
17 Bates ending 674.
18     A. Okay.
19     Q. And Mr. Bousquin says to you, "I saw an
20 article this morning where Ariba CEO Keith Krach was
21 talking about procurement, and I think the question
22 was who was Ariba seeing out there as competition?
23 Was it seeing Oracle? And Keith Krach said that
24 since former Oracle president Ray Lane departed in
25 June, you guys had, quote, 'vaporized.'"

431

1  And you laughed, apparently, and
2  responded by saying, "I would respond by saying
3  66 percent application growth in Q2, and I would
4  respond by saying 55 percent or 50 percent
5  application growth for the year." You know, you're
6  going to see -- you're going to say -- "You know,
7  people are going to say whatever they want, but in a
8  company like Oracle we have a pretty strong presence
9  out there in our competitors, you know, Oracle
10 alumni."
11        Now, when you were referring to the
12 66 percent applications growth, you were referring
13 to the entire company, right, not your division?
14     A. I don't recall. That's what it should
15 be.
16     Q. What should be? Should it be --
17     A. Should be for the company.
18     Q. -- the entire company?
19     A. Right.
20     Q. Okay. Directing your attention to Bates
21 ending 677 --
22     A. Okay.
23     Q. -- Joe Bousquin says, "By some analysts'
24 estimates, as far as applications growth goes, you
25 were talking earlier about 66 percent, which pleased

432

1  many analysts on Wall Street, but there is still
2  some discussion out there that in order to make the
3  numbers for the year, you guys will have to do a
4  billion dollars in applications sales for the fiscal
5  fourth quarter, which ends in May. Now, Oracle's
6  quarters are, or its year, is back-ended loaded, in
7  that most of your business does come in the fourth
8  quarter."
9        And then he asks you, "Can you make
10 those applications numbers on applications sales
11 this year?" And you respond by saying, "You know,
12 it's a big hill to climb. Every year we climb that
13 hill. I expect we'll do it again. Our pipelines
14 are strong, and we're well-positioned from a
15 products perspective, so it's all about execution."
16 You see that?
17     A. Yes, I do.
18     Q. Isn't it true that between
19 December 11th and December 25th, Oracle's sales
20 pipeline had dropped from -- its growth pipeline had
21 dropped from 54 percent to 34 percent?
22     A. Are you going back to the request for
23 admissions? Okay. One, I don't recall.
24     Q. Okay.
25     A. Okay. The comment I'd give you, though,

433

1  is that was a point in time.  And, as we've talked
2  about previously in my testimony, is that the
3  pipeline will change over time.  Some deals become
4  clear for the quarter.  Some deals are going to move
5  out to another quarter.  Some deals are going to go
6  away.
7      Q.  Right.
8      A.  And to arbitrarily pick a certain time,
9  you know, to me is -- is, in the end, a bogus
10  question --
11      Q.  Well, I don't think it --
12      A.  -- with all due respect.
13      Q.  I don't think it was a bogus time.  But
14  your answer is you don't recall?
15      A.  Right, I don't recall.
16      Q.  One of the things I wanted to clarify
17  with you, because we talked about trends earlier,
18  and you said that -- you said that you didn't
19  typically use the term "trends" or you didn't
20  evaluate trends in the company because, from your
21  perspective, it was about whether or not you were
22  going to get there at the end of the quarter, right?
23      A.  Right.
24      Q.  Now, do you -- you indicated --
25      A.  But that's a, to some degree, statement

434

1  out of context --
2      Q.  Okay.  That's fine.
3      A.  -- or around a specific point.
4      Q.  That's fine.
5      A.  I'd look at all the data that was
6  available to me --
7      Q.  And that's fair.
8      A.  -- and I would use that.  But to take
9  something out of context like that I think is a
10  little unfair.
11      Q.  Did you think that when we were talking
12  about trends earlier, I was taking it out of
13  context, even though the document we were talking
14  about said "trends"?
15      A.  I --
16      MR. GIBBS:  I'm going to object to that as
17  argumentative.
18      MR. WILLIAMS:  Okay.  Go ahead.
19      MR. GIBBS:  Answer the question.
20      THE WITNESS:  All I'm saying is that we
21  talked about a very specific point at that time
22  during the testimony.  To now take that and
23  generalize it and say, you know, you're not -- "You
24  didn't pay attention to trends," I would use trends
25  as I needed to --

435

1      MR. WILLIAMS:  Okay.
2      THE WITNESS:  -- as I felt it was important.
3  BY MR. WILLIAMS:
4      Q.  Okay.  Understood.  Well, yesterday you
5  testified that you recalled testifying at at least
6  one other deposition related to this case -- I mean,
7  related to Oracle.  Right?
8      A.  Yes.  I said, yeah, I had two cases
9  related to Oracle.
10      Q.  And I think you said that you recalled
11  one in, I think, September 2004.
12      A.  I believe it was March of 2004.
13      Q.  March of 2004.  My mistake.
14      I'm going to read to you questions that
15  you were asked and your responses, and let me know
16  if you recall these being asked these questions and
17  responding in the way that I have read.
18      "Q.  I mean" -- this is Mr. DeGhetaldi.
19      "I mean, you log into Oracle's server or
20  one of Oracle's servers or one of Oracle's databases
21  to find out how you're doing at a particular time.
22  Were you able to do that?
23      "A.  Yes.  I could go into OSO and get
24  that information.
25      "Q.  Okay.  Did you?

436

1      "A.  Infrequently.
2      "Q.  All right.  Was that -- other than
3  OSO were you able to go anywhere else to get that
4  information?
5      Question again, "In electronic form?"
6      "A.  In electronic form, I might get an
7  e-mail with an attachment that would have a forecast
8  package.  So, that's electronic.
9      "Q.  Okay.
10      "A.  And I could access it in that way.
11      "Q.  All right.  Any other databases?
12      "A.  None that I recall.
13      "Q.  OFA, or Oracle Financial Analyzer?
14      "A.  No, I did not use that product.
15      "Q.  All right.  Did you use any data
16  warehouse products?
17      "A.  None that I recall.
18      "Q.  In the process of forecasting
19  during this same time period, these -- the first
20  three quarters of 2001, did you look at any trends,
21  intraquarter trends?
22      "A.  It's a -- it's a fairly broad
23  question.  I -- what I would specific -- as an
24  example, it was -- it was important to me, trends
25  were, or our pipelines looked like for the quarter.

437

1  That was a trend I watched pretty closely."
2      Do you recall being asked those
3  questions and giving those answers?
4      A.  Not specifically, but I don't have a
5  problem with the answers.
6      Q.  Okay.
7      "Q.  Okay.  In other words, you watched
8  how the pipeline numbers developed throughout the
9  quarter?
10     A.  Right, how it changed throughout
11  the quarter."
12     Do you recall being asked that question
13  and giving that answer?
14     A.  I don't recall it specifically, no.
15     Q.  Okay.
16     "Q.  Did you also look at those figures
17  together; that is, how the license growth and the
18  pipeline growth numbers were behaving compared to
19  each other?
20     A.  Yes.
21     "Q.  Okay.  And can you tell me about
22  the comparison that you did there?
23     A.  I would look at whether the
24  pipeline was growing, staying the same or declining,
25  and I would look at what our license forecast was.

438

1  And there was a broad-based association with the
2  two, and in the sense that you would like to make
3  sure that your license forecast was covered by your
4  pipeline.
5      "Q.  Okay.
6      "A.  As an example, I would look at
7  that.
8      "Q.  Okay.  I guess I was asking about
9  something slightly different.  You're talking about
10  the -- a more static relationship between -- or it
11  seems like you're talking about a more static
12  relationship."
13     A.  Shawn, I'm sorry.  Excuse me.  Who's
14  talking?
15     Q.  This is question, Mr. DeGhetaldi.
16     A.  Thank you.
17     Q.  "What I was asking about was more trends
18  intraquarter to see how the pipeline trends were
19  comparing to the forecasting trends.
20     A.  I'm not sure my answer would be any
21  different, Dario.
22     "Q.  Okay.
23     "A.  I would watch the pipe, for
24  example -- pipeline to see how it changed during the
25  course of the quarter.  It was not unusual, for

439

1  example, that after the quarter started, the
2  pipeline would increase, and then as you start to
3  substantiate deals, the pipeline might decrease
4  somewhat.  For example, a deal might move out of
5  this quarter to the next quarter.
6      "Q.  Okay.
7      "A.  I would look at that.  I would look
8  at license trends with the expectation, and I think
9  I delivered it every quarter, that I would deliver
10  against the forecast for that quarter based on my
11  experience."
12     Do you recall being asked those
13  questions and giving those answers?
14     A.  I don't.  But I don't have any questions
15  about the answers.
16     Q.  Okay.  And is there a clarification with
17  respect to how you viewed trends or whether or not
18  you analyzed trends in the pipeline that you'd like
19  to give?
20     A.  Yes.  If we go back to DeCesare 11,
21  which was one of the documents we had this morning,
22  and if you go to 870 --
23     Q.  Okay.
24     A.  -- and look at the line that says "Total
25  License," which is the last line of the table

440

1  there --
2      Q.  Okay.
3      A.  -- and go over to the right.  And it
4  says "Total Pipeline."  Here's an example of a trend
5  that I would use.
6      Q.  Let me just make sure I'm in the right
7  place.  The last box?
8      A.  Yeah, where it says 295.  It's "Total
9  Pipeline" --
10     Q.  I got it.
11     A.  -- yeah, and here's an example.  "295,
12  change prior," as we've discussed, was from the
13  prior week or the prior forecast was 63 million
14  down.  We still had a 204 percent coverage.  And I'd
15  look at -- so, I'd look at that.  Then how does
16  it compare to the trend -- to the pipe the previous
17  same quarter of the previous year.  It was
18  210 million.  So, that was a 41 percent growth.  I
19  would pay attention to those numbers.
20     I -- the number that ultimately mattered
21  was what was the revenue that I delivered for the
22  quarter, as we've talked about.  But here's an
23  example where I would look at that information.
24     Q.  Okay.
25     A.  It would be interesting.  It would be

441

1   helpful, but the number ultimately I had to focus on
2   and deliver was the forecast for the quarter.
3       Q.  Okay.  Like I said, I just wanted to
4   make sure that I was clear on trends because
5   Miss Teagarden wrote that you noted one of the
6   trends that you had seen, and you responded to me by
7   saying that you don't think that you would have used
8   the term "trends."
9       A.  I -- I think if -- if we want to check
10  the testimony, we can.  What I was reacting to was
11  something different in the notion of the word
12  "trends."  And if you go to Sanderson Exhibit 22,
13  787, about 40 -- I'm sorry, about 50 percent of the
14  way down --
15      Q.  Right.
16      A.  -- with the paragraph under "Market
17  Update," it says, last sentence, "Sanderson noted
18  two trends."  And I just said there were two -- what
19  I recall was saying that there were two drivers --
20      Q.  Okay.
21      A.  -- for database technology, database
22  sales.  I don't recall using the word "trends" in
23  that case.
24      Q.  Okay.  That's fair.
25      A.  Okay.

442

1       MR. WILLIAMS:  It's three minutes to 1:00.
2   It makes sense for us to break for lunch now.
3       THE WITNESS:  Okay.  Sounds good.
4       THE VIDEOGRAPHER:  Off the record at
5   12:57 p.m.
6           (Lunch recess taken at 12:57 p.m.)

443

1       SAN DIEGO, CALIFORNIA, WEDNESDAY, JULY 26, 2006
2               1:49 P.M.
3
4       THE VIDEOGRAPHER:  We are back on the record
5   at 1:49 p.m.
6       MR. WILLIAMS:  I'm going to ask the reporter
7   to mark this document as Sanderson -- 24, are we on?
8   It's Bates numbered NDCA-ORCL 276934 through 276943.
9           (E-mail dated 2/9/01 re Oracle Under
10  Pressure article marked Exhibit 24 for
11  identification.)
12  BY MR. WILLIAMS:
13      Q.  I'd ask you to take a look at the
14  document.  Let me know if you recognize it.
15      Do you recognize the document?
16      A.  I've not seen it before.
17      Q.  All right.  Turning your attention to
18  the first page, Bates ending 934, it's an e-mail
19  from Stephanie Aas, but it doesn't say who it's to,
20  right?
21      A.  Correct.
22      Q.  And the subject line is "ORCL Under
23  Pressure," right?
24      A.  Correct.
25      Q.  And "ORCL" refers to Oracle; would you

444

1   agree with that?
2       A.  Yes.
3       Q.  And it appears to be attaching a
4   February 8th, 2001, Morgan Stanley analyst report
5   regarding Oracle, right?
6       A.  Correct.
7       MR. WILLIAMS:  Just for the record, Counsel,
8   I don't know if you guys have a copy of this
9   document or something similar which indicates who
10  Stephanie Aas actually sent this e-mail to.  But if
11  you can try to find, I'd appreciate it.
12      MR. GIBBS:  I'll take it under advisement.
13  I'm not sure it was sent to anybody.
14  BY MR. WILLIAMS:
15      Q.  Okay.  This Morgan Stanley report
16  appears to be written by Chuck Phillips, right?
17      A.  Correct.  It has his name on the report
18  on page 936.
19      Q.  Right.  And you testified yesterday that
20  you know Chuck Phillips, right?
21      A.  As I said, I had met with him a few
22  times.  I don't remember how many.  And he came to
23  Oracle after I had left.
24      Q.  Right.  I'm talking about while he was a
25  Morgan Stanley analyst.  I think you testified

445

1  yesterday that you had met with him --
2      A.  That's correct.
3      Q.  -- on a few occasions.
4      And let me correct the record.  Looking
5  at 276936, the article, it has two different dates
6  on it.  One says February 8, 2001, on the left-hand
7  side, and on the top right-hand column, it says
8  February 9th of 2001.
9      Have you seen this document before?
10     A.  No.
11     Q.  No?
12     A.  I have not.  I don't recall seeing it.
13     Q.  Okay.  Do you know whether it was usual
14 or unusual for Stephanie to kind of get these
15 analysts' reports directly from the analysts?
16     MR. GIBBS:  Objection.  Lack of foundation.
17     THE WITNESS:  I have no basis for answering.
18     MR. WILLIAMS:  Okay.  I'm going to ask the
19 reporter to mark this document as Sanderson 25.
20 It's Bates numbered NDCA-ORCL 276944 through 949.
21     (Report dated 2/9/01 by Charles E.
22 Phillips marked Exhibit 25 for identification.)
23 BY MR. WILLIAMS:
24     Q.  Do you recognize the document?
25     A.  I do not.  Okay.

446

1      Q.  It appears to be the same analyst's
2  report in text form with an e-mail written by
3  someone by the name of Stephanie above it, right?
4      A.  It appears to be.  I didn't study the
5  document page by page, but it appears to be.
6      Q.  Appears to be the same, okay.
7      And do you know whether or not Stephanie
8  sent this -- Stephanie Aas sent you this e-mail with
9  the Morgan Stanley analyst's report attached?
10     A.  I don't -- I don't recall seeing it.
11     Q.  Okay.  All right.  She writes to an
12 unknown recipient here, "Oracle closed down
13 13.13 percent to 23 9/16 on heavy trading volume of
14 92 million.  Average equals 50 million shares in a
15 rough market.  Chuck Phillips issued a report today
16 sparking investor concern over the outlook on the
17 database business."
18     Do you recall being informed of this
19 fact on or around February 9th of 2001?
20     A.  No, I don't.
21     Q.  Okay.  She further writes, "He lowered
22 his third-quarter database license growth estimate
23 to 10 to 13 percent from his original estimate of
24 15 percent growth.  Chuck's concern over database
25 growth stems from a tough comparison that results

447

1  from 32 percent reported growth in Q3 a year ago."
2  See that?
3      A.  Yes, I do.
4      She writes, "This growth a year ago was
5  driven primarily by the surging dot-com market that
6  does not exist anymore.  His reasoning has nothing
7  to do with Oracle's competitive position vis-a-vis
8  IBM or Microsoft."
9      Do you have any idea what she might mean
10 by that, "the competitive position vis-a-vis IBM or
11 Microsoft"?
12     MR. GIBBS:  Objection.  Calls for
13 speculation.
14     THE WITNESS:  It would be speculating on my
15 part --
16     MR. WILLIAMS:  Okay.
17     THE WITNESS:  -- yeah, and I suggest
18 Stephanie could tell you.
19 BY MR. WILLIAMS:
20     Q.  All right.  She then writes, "Chuck met
21 with several executives over the last several weeks
22 for detailed briefings on the major product
23 segments."  See that?
24     A.  Yes, I do.
25     Q.  Did you meet with Chuck Phillips in

448

1  either January or February of 2001?
2      A.  I don't recall.
3      Q.  "Chuck remains very bullish on the
4  application business and believes that customers are
5  responding well to the E-Business Suite message.
6  Unfortunately, Chuck's cautionary comments on Q3
7  database growth outweighed his positive reviews."
8  See that?
9      A.  Yes, I do.
10     Q.  Now, is this something that Stephanie at
11 the time would likely have communicated to Oracle
12 senior executives?
13     MR. GIBBS:  Objection.  Calls for
14 speculation.
15     THE WITNESS:  I don't recall.  I don't
16 remember seeing anything like that.
17     MR. WILLIAMS:  Okay.  I'll ask the reporter
18 to mark this document as Sanderson No. 26.  It's
19 Bates numbered NDCA-ORCL 146668 through 675.
20     (E-mail string dated 2/01 re ORCL Under
21 Pressure marked Exhibit 26 for identification.)
22 BY MR. WILLIAMS:
23     Q.  Just take a look at that document and
24 let me know if you recognize it.
25     Just for the record, it's the same --

449

1    appears to be the same e-mail from Stephanie but
2    with an addition on the top of the first page, 668.
3        A.  Okay.  And you asked me a question.  I
4    don't recognize it.  Sorry.
5        Q.  Okay.  And the top portion of Bates
6    ending 668 appears to be a response to Stephanie
7    Aas's e-mail from Sohaib, right?
8        A.  It does.
9        Q.  And that's Sohaib Abbasi?
10       A.  Yeah.  Sohaib Abbasi, correct.
11       Q.  Now, if you look just below his name
12   there, there's a header for the e-mail that
13   Stephanie sent, right?  But it doesn't say who the
14   e-mail went to?
15       A.  Correct.  I think it's the same issue we
16   had on Exhibit 24.
17       Q.  Right.
18       A.  It looks to be, in fact, the same.
19       Q.  Same e-mail, right --
20       A.  Yeah.
21       Q.  -- with the same title, "ORCL Under
22   Pressure."
23       A.  Correct.  In fact, it's the same exact
24   time as this Exhibit 24, date and time.
25       Q.  Right.  Do you know why on the -- the

450

1    e-mail that it doesn't have the "to" line or who it
2    went to?
3        A.  No, no.
4        Q.  Okay.  So, it may have gone to you; you
5    just don't know, sitting here today, right?
6        A.  Yeah, it may have gone.  I don't recall
7    it.
8        MR. WILLIAMS:  Okay.  That's fine.
9        I'm going to ask the reporter to mark
10   this document as Sanderson No. 27.  It's Bates
11   numbered NDCA-ORCL 03281 through 03311.
12       (Transcript titled "Oracle Presentation"
13   marked Exhibit 27 for identification.)
14       THE WITNESS:  What would you like me to do?
15   BY MR. WILLIAMS:
16       Q.  We're going to talk about it, so you can
17   just -- if you want to flip through it --
18       A.  Yeah, let me do that.  I won't read
19   every bit of it.
20       Q.  Okay.  We can work our way through it.
21       A.  Yeah.  Let me just flip through to see
22   if there are any charts or anything attached at the
23   end or something.
24       Okay.
25       Q.  Okay.  Do you recognize this document?

451

1        A.  I do not.
2        Q.  This appears to be a transcript, though,
3    right?
4        A.  Yes, it does.
5        Q.  A transcript of a presentation that you
6    gave?
7        A.  I -- it looks like it's me.  It says
8    that -- it's got Stephanie was there, and I was
9    there.  In fact, it has "Stephanie Aas, Senior
10   Director of Investor Relations," which relates to a
11   question we had earlier.
12       Q.  Okay.  If you can't answer that question
13   just yet, then that's fine.
14       A.  Yeah.  Okay.  It does look like a
15   presentation I gave.
16       Q.  Okay.  Do you recall doing a
17   presentation or giving a presentation to Goldman
18   Sachs in or around February 13th of 2001?
19       A.  I did give a presentation.  I don't
20   recall when it was.
21       Q.  Okay.  And just looking at the first
22   page of this document, the first -- the top of it
23   says "Oracle Presentation," which suggests somebody
24   at Oracle gave it, right?
25       A.  Yes.  Right, agree.

452

1        Q.  The first couple lines says, "Okay.
2    It's a pleasure to welcome Oracle Corporation to our
3    conference.  We have with us today from the company
4    Andy Sanderson" -- I guess that's you, they left the
5    "S" off -- "executive vice president of Product
6    Industry Sales Division & Consulting," right?
7        A.  Right.
8        Q.  And below that it says, "We also have
9    Stephanie Aas, Senior Director of Investor Relations
10   up here with us."  See that?
11       A.  Yes, I do.
12       Q.  Was it unusual for Stephanie to
13   accompany you to investor conferences?
14       A.  I don't remember.  I mean, you say was
15   it unusual?
16       Q.  Right.
17       A.  No, it wouldn't be unusual.  I don't
18   know that she was there at every one, but it's not
19   unusual.
20       Q.  Because I think one of the things you
21   testified to yesterday was that either someone in PR
22   or Investor Relations would schedule these types of
23   things for you, right?
24       A.  Correct, correct.
25       Q.  And they would help prepare you for

453

1 those presentations?

2    A.  That's correct.

3    Q.  All right.  And sometimes help you or

4 people in your organization create slides and things

5 of that nature?

6    A.  Yeah.  All true, Shawn, except typically

7 it wasn't people in my organization.  They would end

8 up preparing the presentation.  They may reach out

9 to my organization.  They may reach out to Finance,

10 different organizations.  But as I recall, it was,

11 in this case, Investor Relations that typically put

12 the presentations together.

13    Q.  Okay.  Was it typical for you to give a

14 presentation on behalf of the entire company, not

15 just your division?

16    A.  I did some of it.  I didn't do a lot of

17 it, but I did some of it, correct.

18    Q.  Okay.  Going down to line 17, it appears

19 that you are describing some of your

20 responsibilities.  And you say, "I just want to

21 touch on my responsibilities.  I've spoken at a

22 number of these events, but I think it's worthwhile

23 just giving you a sense since I may be a new face to

24 some of you.  I have responsibility probably for

25 four things at Oracle."  You see that?

454

1    A.  Yes, I do.

2    Q.  That's kind of similar of what you said

3 to Joe Bosquin a couple weeks before --

4    A.  Yeah.

5    Q.  -- right?

6    And you say, "One of them is all our

7 products industries, so our discrete and process

8 manufacturing, retail industries are my

9 responsibility.  That includes automotive, A&D, high

10 tech, in the discrete side," correct?

11    A.  Yes.

12    Q.  What's discrete side?

13    A.  Yeah.  Discrete processing, or discrete

14 manufacturing process, process -- making a candy bar

15 is a process.  Making an automobile that is --

16 'cause what they do on a candy is they create a big

17 sheet of candy.  I used to work with M&M, so I know

18 this -- as a client.  And then they chunk up the

19 candy bars at the end.  That's process

20 manufacturing.

21    In discrete manufacturing, it's building

22 an aircraft or building a car, something like that

23 that's stand alone.  It's a discrete product.

24    Q.  The next page, you say, "I have global

25 responsibility for consulting."

455

1 from my business.

2    Q.  All right.  I'm going to ask you to

3 turn -- actually, turn to page 5.

4    A.  Okay.

5    Q.  And you write -- or you say that, "I

6 think -- and I may -- I think our applications are

7 written in 23 different languages.  So not only do

8 we have, you know, for example an E-Business Suite,

9 which I'll tell you more about.  But it's basically

10 ERP and CRM all integrated together.  But it's

11 written in 23 different languages."  See that?

12    A.  Yes, I do.

13    Q.  As of February 13th, 2001, was the

14 E-Business Suite actually written in 23 different

15 languages?

16    MR. GIBBS:  Objection.  Vague.

17    THE WITNESS:  One, I don't know.  I don't

18 believe it was.  But we did have applications --

19 since 11i was not our first release of applications,

20 we did have release of applications in 23 different

21 languages, I believe.

22    And then, secondly, what you do when you

23 launch a product, an application product, you also

24 provide a time frame that's available to customers

25 of when that product would be in their language.

457

1    A.  Uh-huh.

2    Q.  And that kind of goes back to the issue

3 we've been talking about whether or not you

4 communicated to people that you had global --

5    A.  Right.

6    Q.  -- responsibility for consulting.

7    And I would say the same thing here as I

8 told the reporter from thestreet.com, obviously,

9 thinking about my global responsibilities that I

10 carried out in methodology training and service

11 lines.

12    Q.  Okay.  Same page --

13    A.  Uh-huh.

14    Q.  -- you say, "Another thing, I've been at

15 Oracle about six years.  And I don't normally point

16 that out, but I'm actually one of the junior members

17 in that regard, tenure of the management team, even

18 though I think I run about 25 percent of the

19 business."  Do you see that, right around line --

20 between line 17 and 21?

21    A.  Yes.

22    Q.  Were you running 25 percent of the

23 business in February of 2001?

24    A.  We'd have to go look and see what the

25 revenue was for the company and then the revenue

456

1  So, there was -- would have been a schedule
2  associated with that, when the E-Business Suite
3  would be in all 23 different languages.
4  BY MR. WILLIAMS:
5  Q.  Okay.  So, are you saying that here you
6  weren't referring to the E-Business Suite when you
7  said that "it's written in 23 different languages"?
8  A.  When I say "I think our applications are
9  written in 23 different languages," as I recall, I
10 believe that was historically speaking that our
11 applications were written in 23 different languages.
12 Q.  Okay.  Ask you to turn to page 8.
13 A.  Okay.
14 Q.  And you can just take a look at, say,
15 line 8 through 20, and I'll ask you a couple
16 questions.
17 A.  Okay.
18 Q.  See where you say -- it looks like
19 you're talking about implementation of the
20 E-Business Suite, and it's saving consulting dollars
21 generally.  Is that fair?
22 A.  It is.  And I do say with the E-Business
23 Suite, this focus-on-reducing theme here is the
24 number of -- the amount of consulting effort --
25 Q.  Right.

458

1  A.  -- related with our applications.  We
2  had started that even before the E-Business Suite.
3  Q.  Okay.  But here you're talking about the
4  E-Business Suite, aren't you?
5  A.  We were talking -- yeah, "leading into
6  the E-Business Suite."
7  Q.  Okay.
8  A.  Leading into -- implying that it is the
9  E-Business Suite.  But, again, we were making
10 efforts in that regard about consulting-to-license
11 ratios even before the E-Business Suite.
12 Q.  And so, you say that "in the General
13 Business space, the mid-market space, where we've
14 had a number of rapid implementation programs, we've
15 actually been able to get down to less than a dollar
16 for consulting for every dollar of license.  And so,
17 this is a significant benefit."  You see that?
18 A.  Yes I do.
19 Q.  And are you referring to the partners of
20 Oracle that were spending less to implement, or were
21 you talking about Oracle Consulting?
22 A.  Here what I would speculate that I'm
23 talking about Oracle Consulting.  What we did is --
24 when I say, if you notice here in line 18, it
25 mentions -- or line 17 and 18, it mentions rapid

459

1  implementation programs.  We launched a program
2  called Fast Forward.
3  And we had Fast Forward ERP, Fast
4  Forward CRM, those kinds of things.  And as we
5  developed those, we also shared them with our
6  development part -- with our other implementation
7  partners in the GB marketplace.
8  Q.  So, was Oracle Consulting doing the fast
9  forward implementations for General Business.
10 A.  Yeah, we did some of those, yes.  Yes.
11 Q.  Do you have a sense of how much of it
12 Oracle Consulting was doing?  I ask because you
13 indicated to me earlier that the majority of
14 consulting implementations for Sales and General
15 Business was done by third parties.
16 A.  I'm sure you could find out from John
17 Nugent just how many license deals we did.  The
18 interesting thing about General Business versus
19 others like Majors and OPI and OSI, it was a volume
20 business.  I mean, you were -- it was a very high
21 number of customer business.
22 As you -- I'm just referring back to,
23 actually, a document we talked earlier, Exhibit 19,
24 Sanderson.  I'll just show you -- it was where we
25 listed GB and Major --

460

1  Q.  Right.
2  A.  -- accounts where Oracle Consulting was
3  involved.  And --
4  Q.  Those are the top 14 or something like
5  that?
6  A.  Yes, it was the top 14.  And some of
7  these were GB accounts.  So, again, we were doing
8  the implementation.  So, again, we did some of them.
9  But as I recall, the majority or a large portion of
10 those implementations were -- my recollection is
11 that they were being done by third parties.  We did
12 some, but third parties did them as well.
13 Q.  And with those, you were spending less
14 than a dollar for every consulting dollar -- or
15 every license dollar?
16 A.  Yeah, just to give you an example to
17 bring that to life a little bit, if we were
18 implementing financial applications for a client, if
19 it was a large client, you would go in and actually
20 work with them to help define their chart of
21 accounts for their general ledger.
22 In a smaller account, you'd go in and
23 say, basically, "This is what we think your chart of
24 accounts should look like, given our understanding
25 of companies of your size."

461

Sanderson, Jr., Edward J  7/26/2006  9:00:00 AM

1     And so, we would -- and we'd review that
2  with the client, and they'd sign off on it.  But we
3  would show that to the client.  That was a way we
4  could save time.
5        Q.  Now, yesterday we talked a little bit
6  about the partner program.  And I can't remember the
7  person's name now, but was there someone in your
8  consulting organization that was in charge of
9  implementation partner relationships?
10       A.  There -- yes.  The answer is yes.
11  Valerie Borthwick, that fell into her responsibility
12  as well.  And my guess is she had somebody
13  underneath her that did that.  And then John Nugent
14  also had a similar person playing that role in his
15  sales -- license sales organization.
16       Q.  And if you go to the next page, one of
17  the things that you say at the top of the page is
18  that "One of the missions, for example, within
19  Oracle Consulting and working with our partners is
20  to make Oracle successful, not the consulting
21  business successful.  And in fact, as you look at
22  our numbers -- and in consulting we're forecasting
23  this year that we'll be somewhere around zero to
24  5 percent growth.
25        "And can really attribute that to two

462

1  factors.  One is that we're doing everything we can
2  to increase the implementation of our applications.
3  And secondly, leveraging partners more, which has
4  been something that we've really needed to do.  So,
5  we've been successful there."
6        What did you mean when you wrote
7  "leveraging partners more" -- or when you said
8  "leveraging partners more"?
9        A.  That using more companies for -- you
10  know, other implementation companies such, again, as
11  Cap, Gemini or Bearing Point, companies such as
12  that.
13       Q.  And when you say "So we have really been
14  successful there," what were you referring to?
15       A.  I think -- what I would speculate is
16  that I was talking about that we had been successful
17  in leveraging partners.  And I think a perfect
18  example of that is what we did in the GB space.
19       Q.  In the --
20       A.  In the General Business.
21       Q.  -- General Business space?
22       A.  In the General Business space, yeah.
23       Q.  Okay.  Do you know Renee Ni?
24       A.  Yes, sure.
25       Q.  And how do you know her?

463

1        A.  She used to work for me.  She was in my
2  group, and then she -- she ran my applications
3  service line.  And then she had an opportunity to
4  have a promotion, and I believe that she went over
5  and ran the partnering program, I think, for the
6  company or for the Americas.  I think probably for
7  the -- I'm not sure, but she went into some
8  partnering role, but it was a promotion for her.
9        Q.  And that was similar to what Valerie
10  Borthwick was doing?
11       A.  Valerie's focus on partnering was
12  largely around the General Business space.  What
13  Renee, as I recall, was doing, was focusing on
14  partner programs in general, whether it applied to
15  Majors, whether it applied to OPI.
16        She would have relationships with
17  companies like Accenture, Deloitte.  I remember she
18  actually brought Deloitte into my office a couple of
19  times.  And it could be Price Waterhouse when --
20  before they became part of IBM Global Services,
21  those kinds of things.
22        So, she would have kind of the more
23  executive-level relationships, broad-based
24  relationships within those companies.  And in those
25  companies, they would typically have a Renee Ni-like

464

1  person that she would connect with.
2        Q.  Okay.  Let's take a look at page 11 --
3        A.  Okay.
4        Q.  -- and from line 12 down to 25.  If you
5  can just read that to yourself.
6        A.  Okay.
7        Q.  Okay.  Here's what you're talking about,
8  the E-Business Suite, right?
9        A.  It is, but particularly a subset of the
10  E-Business Suite, and that is the one -- the concept
11  of one data model for all the applications.
12       Q.  Right.  And then you talk about that,
13  the single customer database.  And line 22, you say,
14  "Whether you're touching them there.  Whether you're
15  touching them through once you've taken the order,
16  through orders that once you capture that order,
17  that that impacts your manufacturing," et cetera,
18  are you referring to order management or supply
19  chain management there?
20       A.  What I'm talking about is, regardless of
21  the application, if -- within the E-Business Suite
22  or the module within the E-Business Suite, if it's
23  touching the customer, it's going to go to one
24  database.
25        So, to answer your question, if it's

465

Sanderson, Jr., Edward J  7/26/2006  9:00:00 AM

1  accounts receivable, if it's taking an order, if
2  it's -- if it has something to do with manufacturing
3  a product, a discrete product for a particular
4  customer, that would all be captured in that single
5  database.
6      Q.  Okay.  So, you're not talking about a
7  specific module in that section?
8      A.  No.  It's actually a series of
9  modules --
10     Q.  Okay.
11     A.  -- just showing that the architecture of
12 the product was that you had one database, which was
13 a real advantage over best-of-breed solution because
14 then everybody brings their own customer database
15 in, and that's when you have to do the interfacing.
16     Q.  Okay.  If you go to page 13 at the
17 bottom --
18     A.  Okay.
19     Q.  -- you -- looks like you're talking
20 about -- well, you say, "For example, in the sales
21 area, the sales automation area, I can now -- Larry
22 can look at, for example, our forecast on a global
23 basis, our forecast around the world up to the
24 minute at any level of detail you want to see.  You
25 can go down to that account rep in Hungary or you

466

1  can look at it on a global around the world."  See
2  that?
3      A.  Yes, I do.
4      Q.  And that's referring to Oracle
5  SalesOnline there?
6      A.  That would be -- yes.  At least -- I
7  can't say it's only Oracle SalesOnline but, clearly,
8  Oracle SalesOnline is the module that comes to my
9  mind that does that.
10     Q.  Okay.  And that's what -- well,
11 withdrawn.
12         Then later on on page 14, you say, "Now
13 I can see every deal out there that my reps around
14 the world are working.  So, that's a significant
15 benefit."
16     A.  Yeah.
17     Q.  Still talking about Oracle
18 SalesOnline --
19     A.  Most likely, yes.
20     Q.  -- mostly?
21         On the bottom of page 15, you say, "It's
22 all about 11i.  That's our E-Business Suite.  Here's
23 the status of our internal rollout because we're
24 implementing these in Oracle."  Right?
25     A.  Uh-huh.

467

1      Q.  It appears that maybe you had a
2  PowerPoint presentation or something like that?
3      A.  It does appear like that, yeah.
4      Q.  And you say, as you can see here, "We've
5  made significant progress around marketing, sales
6  compensation, contract, sales online, financials,
7  telesales, all those applications have been
8  implemented at Oracle worldwide.  Worldwide."  You
9  see that?
10     A.  Yes, I do.
11     Q.  Do you know whether any of those modules
12 had been at the time of -- as of February 13th of
13 2001, implemented and working at Oracle?
14     A.  What I recall is marketing, sales
15 compensation, sales online, financials and
16 telesales, to my best of my recollection.  I can't
17 remember contracts.  I just don't recall it.  But
18 I -- that we had -- were using those applications.
19     Q.  Okay.  Isn't it true that contracts, in
20 fact, was not working at Oracle in February of 2001
21 or at least as of February 13th?
22     MR. GIBBS:  Objection.  Asked and answered.
23     THE WITNESS:  I would only base it on -- I
24 mean, as far as -- I can't recall.  The way that I'd
25 base it is on the discussion yesterday in the

468

1  documents.  And I remember there was an e-mail, as
2  we recall, from Mark Barrenechea about December,
3  January time frame and getting time -- for the
4  timing of implementing contracts.  I don't recall
5  beyond that.
6  BY MR. WILLIAMS:
7      Q.  Okay.  Turning to page 19, you say at
8  line 6, "And with Release 3 of 11i, we think that we
9  now have product that is clearly stable and meets
10 the needs.  And we just launched that at the end of
11 January."  See that?
12     A.  Yes, I do.
13     Q.  Isn't it true that the release of 11i.3
14 was not clearly stable?
15     A.  You know, I don't recall, Shawn.
16     Q.  Okay.
17     A.  Each -- I know that each release
18 improved the product, and as it does today.  I'm
19 sure that Oracle's continued to make releases to 11i
20 to add functionality and make it even better.
21     Q.  Okay.  Turning to the next page,
22 page 20, you say, "And then if you look at the
23 mid-market customers also, we continue to be very
24 successful in that space as well with 11i."
25         When you say "mid-market," you're

469

1    talking about General Business?

2    A.  Yeah, exactly.

3    Q.  Okay.  And you say, "We also just on the

4    partner front -- it's actually quite interesting --

5    I haven't seen the interest among the partners in

6    the way that we've seen now.  We've got -- I told

7    Larry a while ago.  I said, 'It really takes three

8    things for us to be successful with our partners.

9    We have to have a great product, we have to have

10    mind share, and we have to have a good go-to-market

11    plan with a partner.'"  See that?

12    A.  Yes, I do.

13    Q.  What did you mean when you said "We have

14    to have mind share"?

15    A.  I just was reading it, if it applies

16    just to General Business or more broadly.  "Mind

17    share" just means that when they walk in to a

18    client, to a customer, or to a prospect, Oracle is

19    going to be at the top of the list or -- you know,

20    for them to talk to the customer about or one of the

21    top products that they're going to talk to the

22    customer about.

23    Q.  Okay.  And that's one of the products

24    that the partner is going to talk to the customer

25    about?

470

---

1    A.  Correct.

2    Q.  Okay.  And -- and would you -- you list

3    three things here.  "We have to have a great

4    product, mind share and a good go-to-market plan."

5    What's a good go-to-market plan?

6    A.  If you walked into a partner -- and

7    let's call it Acme Consulting as a name -- just

8    making it up.  And you say, "We want to partner with

9    you," they go "Great."

10    But then the issue is, "How are we

11    going to go to market together?"  And you might look

12    at Acme Consulting and see that they work with a lot

13    of small discrete manufacturers, maybe making little

14    engineered products, for example.  And so, they've

15    done a lot of work with those kinds of customers.

16    So, we'll say, "We'll work with you to

17    help you be successful in that space.  Maybe you've

18    worked with aerospace discrete manufacturers, and

19    we're going to introduce you to defense

20    manufacturers that have that product."

21    So, you lay out specifically

22    geographically by product those -- by product,

23    meaning Oracle product, how you'd work together,

24    what kind of resources you'd put on it, what kind of

25    training you might give them, that kind of thing.

471

---

1    Q.  Looking at page 29 --

2    A.  Okay.

3    Q.  -- you're asked a question by someone,

4    and they say, "Sandy, I'm curious about this new

5    sales forecasting you have.  How is that working?"

6    I guess they were referring to Oracle SalesOnline?

7    A.  That would be my guess.

8    Q.  And you say it's working great.

9    A.  Right.

10    Q.  The next question is, "As you get

11    together every week and sort of roll up your

12    numbers, the economy -- what's the sense, what are

13    you hearing from the field in terms of how -- the

14    economy and sales cycles, anything changing there?"

15    See that?

16    A.  Yes, I do.

17    Q.  And you respond by saying, "We're

18    actually -- I guess I'd start out by saying our

19    pipelines are -- at application and database have

20    never been stronger."  You see that?

21    A.  Yes, I do.

22    Q.  Isn't it true that prior to

23    February 17th -- prior to February 13th of 2001,

24    the application and database pipelines had been

25    stronger than they were as of February 13th?

472

---

1    A.  Ask that question one more time.  I'm

2    sorry.

3    Q.  Isn't it true that prior to

4    February 13th of 2001, the pipelines around

5    database and application had, in fact, been stronger

6    just weeks before?

7    A.  What's your basis for saying that?

8    Q.  That's a question.  I have a good-faith

9    basis for asking the question.

10    A.  Yeah, and I don't know the basis that

11    you're asking for.  And I don't recall.

12    Q.  So, your answer to that question is --

13    A.  I don't recall.

14    Q.  -- you don't recall?

15    Okay.  You did see the request for

16    admission that Oracle responded to, right?

17    A.  Right.  But your assumption is it went

18    from 52 to 34 percent and that it never went back up

19    again.

20    Q.  No, I'm not assuming that.

21    A.  Yeah.  Well, yeah -- it happened, but

22    any time during a quarter you're going to have

23    fluctuations in the growth of your pipeline.

24    Q.  I'm not assuming that.  I'm just asking

25    you a question.  And your answer is you don't

473

1 recall?

2     A.  You said, sometime before February,

3 hadn't it been larger --

4     Q.  Right.

5     A.  -- I believe is the essence of your

6 question.

7     Q.  Right.

8     A.  I don't know the answer to that.  It

9 could have, in fact, been larger; it could have been

10 smaller.

11     Q.  Okay.

12     A.  I don't recall.

13     Q.  And you go on to say that that -- "and

14 that continues to be the case" --

15     A.  Right.

16     Q.  -- right?

17         You later say, "In some cases it may be

18 deals moving to the next quarter," right?  Kind of

19 what you explained to me earlier today.

20     A.  Yeah.

21     Q.  On page 30 --

22     A.  Yes.

23     Q.  -- you say that -- on line 9, "But we're

24 also seeing other companies out there because of the

25 economy, knowing the competition isn't going away,

474

1 that see the power of leveraging the Internet that

2 are actually accelerating their decisions around

3 applications."

4     A.  Right.

5     Q.  See that?  Then you say, "I was with a

6 company that they were going -- it was going to be

7 our Q4, March, April, May time frame is when we had

8 them targeted for making a decision.  I met with the

9 COO.  They want to do it in February.  The COO

10 brought his entire management team out to Oracle."

11 You see that?

12     A.  Yes, I do.

13     Q.  Do you recall which company that was?

14     A.  I do not.  Just to be clear, I wouldn't

15 say a statement like that unless it was -- unless it

16 was true.

17     MR. WILLIAMS:  We'll mark this document as

18 Sanderson No. 27 -- 28.

19         (Article from TheStreet.com titled

20 "Goldman Conference:  Its Stock Weak, Oracle Talks

21 of Strong Business" marked Exhibit 28 for

22 identification.)

23     MR. WILLIAMS:  Sanderson 28 is Bates numbered

24 NDCA-ORCL 141794, 795.

25     THE WITNESS:  Okay.

475

1 BY MR. WILLIAMS:

2     Q.  Okay.  Do you recognize the document?

3     A.  No, I do not.

4     Q.  It looks like a Street.com article, kind

5 of summarizing the Goldman Sachs conference that you

6 spoke at, right?

7     A.  Right.

8     Q.  And it's dated February 13th of

9 2001 --

10     A.  Correct.

11     Q.  -- is that correct?

12         It says -- does it refresh your

13 recollection as to when you may have given that

14 speech or that presentation?

15     A.  I know I spoke to Goldman -- I remember

16 speaking to a Goldman conference.  I remember making

17 comments about some companies slowing down and some

18 speeding up.  I remember that.  I just don't

19 remember -- recall specifically when.

20     Q.  Okay.  Well, looking at this document,

21 about a third of the way down, it says, "TSC

22 Conference Coverage, Goldman Sachs," and there's a

23 date below there, February 12th --

24     A.  Right.

25     Q.  -- through 15th.  So, safe to assume it

476

1 was somewhere between those dates?

2     A.  Yeah, safe to assume it was around that

3 period of time.

4     Q.  Okay.  Just going back to the prior

5 exhibit very quickly.  I think it was Sanderson

6 20- --

7     A.  -- 7.

8     Q.  -- 7.  And we talked about Stephanie Aas

9 there.  And at the end somebody says, "Sandy and

10 Stephanie, you know, thanks so much."

11         Prior to this presentation, did

12 Stephanie Aas brief you on Chuck Phillips'

13 February 9th analyst report?

14     A.  I don't know.

15     MR. WILLIAMS:  Actually, I need to take five

16 minutes.

17     THE VIDEOGRAPHER:  Off the record at

18 2:45 p.m.

19         (A brief recess was taken.)

20     THE VIDEOGRAPHER:  We are back on the record

21 at 2:53 p.m.

22     MR. WILLIAMS:  I'm going to ask the reporter

23 to mark this document as Sanderson 29, Bates

24 numbered NDCA-ORCL 016268 through 318.

25         (Presentation papers titled "Oracle,

477

1   Software Powers the Internet" marked Exhibit 29 for
2   identification.)
3   BY MR. WILLIAMS:
4       Q.  Looks like this may be a PowerPoint
5   presentation for the Goldman Sachs --
6       A.  Okay.
7       Q.  -- conference.  Take a look at it and
8   let me know when you're done.
9           If you look at the first page of the
10  document, it says, "Sanderson -- Goldman Sachs
11  Presentation."  The first page, very first page,
12  cover page.
13      A.  Yes, I see that.
14      Q.  So, maybe this is that PowerPoint that
15  you used during the February Goldman Sachs
16  presentation.
17          I'm going to ask you to turn to Bates
18  ending 286.
19      A.  Okay.
20      Q.  It says, "11i E-Business Suite Update."
21      A.  Uh-huh.
22      Q.  Indicates that there are 2500-plus
23  customers implementing, right?
24      A.  Correct.
25      Q.  Is that the 11i E-Business Suite, as it

478

1   indicates on the top of the slide, or does it refer
2   to one or two applications of 11i?
3       MR. GIBBS:  Object to your characterization
4   of what it says at the top of the page.
5       MR. WILLIAMS:  Okay.  Well, what -- I'm
6   sorry.  Go ahead.
7   BY MR. WILLIAMS:
8       Q.  What it says on the top of the page is
9   "11i E-Business Suite Update;" isn't that correct?
10      A.  Correct.
11      Q.  My question is whether the third bullet
12  point down where it says "2500-plus Implementing,"
13  does that imply that 2500-plus customers were
14  implementing the 11i E-Business Suite?
15      MR. GIBBS:  Objection.  Vague.
16      THE WITNESS:  Versus part of the E-Business
17  Suite?
18      MR. WILLIAMS:  Right.
19      THE WITNESS:  My guess would be that was part
20  of the E-Business Suite --
21      MR. WILLIAMS:  Okay.
22      THE WITNESS:  -- some portion of the
23  E-Business Suite.
24  BY MR. WILLIAMS:
25      Q.  Okay.  And when it says "160 Live

479

1   Customers," does that refer to what it says, "11i
2   E-Business Suite" or some part of the --
3       MR. GIBBS:  Same objection.
4   BY MR. WILLIAMS:
5       Q.  -- E-Business Suite?
6       MR. GIBBS:  Same objection.  Mischaracterizes
7   the document.
8       THE WITNESS:  You're implying an
9   interpretation up there that "11i E-Business Suite"
10  means the entire suite as far as with your questions
11  below.
12          Any of those products, if we implemented
13  the time and reporting feature of 11i, that's an 11i
14  implementation.  If we were implementing supply
15  chain management, that's 11i implementation.
16  BY MR. WILLIAMS:
17      Q.  Okay.  Is that --
18      A.  The "160 live customers" meant that we
19  had 160 customers using some or all of the
20  E-Business Suite.
21      Q.  Okay.  I wasn't implying anything.  I
22  was reading.  It says "11i E-Business Suite."  Now,
23  if you have an interpretation that is different from
24  what it says, that's the question I was asking you.
25  And you've answered it I think.

480

1       A.  Good.
2       Q.  Okay.
3       A.  Great.
4       Q.  Now, going to the next page --
5       A.  Okay.
6       Q.  -- where it says "11i Enterprise
7   Customers" --
8       A.  Yes.
9       Q.  -- what does that mean?
10      A.  "11i Enterprise Customers."  I don't
11  recall what the word "enterprise" means.
12      Q.  Okay.  And the "Live and Implementing,"
13  what does that mean?
14      A.  I -- again, I'm guessing, but I would
15  imagine it means customers that are both live as
16  well as customers that are implementing.
17      Q.  Okay, some live, some implementing?
18      A.  Correct.
19      Q.  Some customers may be live on one module
20  but implementing another?
21      A.  Correct.
22      Q.  Some of these customers were customers
23  that members of your consulting organization were
24  working with at the time; is that fair?
25      A.  Yeah -- with the number of customers on

481

Sanderson, Jr., Edward J  7/26/2006  9:00:00 AM

```
 1   there, I'm sure that we, Oracle Consulting, was
 2   participating in some of these implementations.
 3       MR. WILLIAMS:  I'm going to ask the reporter
 4   to mark this document as Sanderson No. 30.
 5       (E-mail string dated 1/01 re Software:
 6   What Happened & What to Do From Here marked Exhibit
 7   30 for identification.)
 8       THE WITNESS:  Thank you.
 9       MR. WILLIAMS:  It's Bates numbered NDCA-ORCL
10   014162 through 181.
11       THE WITNESS:  Okay.
12   BY MR. WILLIAMS:
13       Q.  You recognize the document?
14       A.  I do not.
15       Q.  It appears to be an e-mail -- at least
16   the first page appears to be an e-mail from Jeff
17   Henley to you and several other Oracle employees,
18   right?
19       A.  Correct.
20       Q.  Forwarding one of Chuck Phillips'
21   analyst's reports titled "What Happened and What to
22   Do From Here"; is that fair?
23       A.  Correct.  That's what the topic -- title
24   says, yes.
25       Q.  All right.  Do you know whether or not
```

482

```
 1   you met with Chuck Phillips in early January of
 2   2000 [sic]?
 3       A.  I do not.  You're saying in early 2001?
 4       Q.  Yeah.
 5       A.  Yeah, no.
 6       Q.  How about December 2000?
 7       A.  I don't -- I don't recall.
 8       Q.  Okay.  I want to kind of switch gears a
 9   bit and talk a little bit about Q2 of '01 and
10   specifically a sale to -- a large sale to
11   Hewlett-Packard.
12       A.  Okay.
13       Q.  Are you familiar with that transaction?
14       A.  We did have some sales with
15   Hewlett-Packard.  As I hear more, I might be able to
16   recall better.
17       Q.  Okay.  And Hewlett-Packard was a
18   customer within OPI?
19       A.  Correct.
20       Q.  And do you know who was the account
21   manager or the account rep for HP?
22       A.  I don't recall.
23       Q.  Was it in the East, Central or West?
24       A.  That would be West.
25       Q.  So, the area VP was Michael DeCesare?
```

483

```
 1       A.  Yes.  Yes -- yes.  I'm sorry.  I was
 2   trying to think.  I know Mike left, but I was trying
 3   to think.  I think he was still there.
 4       Q.  And he left -- withdrawn.
 5           And he reported directly to you?
 6       A.  Yes.  He initially reported to Frank,
 7   and then after Frank Varasano left, he reported to
 8   me --
 9       Q.  Okay.
10       A.  -- until I brought Sebastian Gunningham
11   in to take over.
12       Q.  Have you ever met Carly Fiorina?
13       A.  Yes, I remember being in a meeting with
14   Larry and with Carly and other executives in the
15   room from HP.
16       Q.  And what was -- when was that, if you
17   remember?
18       A.  I don't.  It was -- I remember it more
19   towards the latter time of my time at Oracle.  So,
20   2000, 2001, something like that.
21       Q.  Do you know what -- do you recall what
22   the meeting was about?
23       A.  As I recall, it was a meeting, the kind
24   of meeting we'd periodically have or Larry would
25   have with HP, with Sun, companies like that, to talk
```

484

```
 1   about how we'd work together.
 2       Q.  And you were probably there because it
 3   was in your territory?
 4       A.  Is there any other reason?  That would
 5   be a logical reason, yes.
 6       Q.  Aside from you, Larry and Carly, do you
 7   recall anyone else being at the meeting that you're
 8   talking about?
 9       A.  I wouldn't be surprised if Safra was
10   there, but I don't recall.
11       Q.  And did it occur in Redwood Shores?
12       A.  As I recall it, we did it at HP
13   headquarters.
14       Q.  And that's in Palo Alto, is it?
15       A.  In that area, yeah.
16       Q.  In that area.  Okay.
17           I'm going to have the reporter mark this
18   document as Sanderson 31.  It's Bates numbered
19   NDCA-ORCL 028927 and 928.
20       (E-mail string dated 10/00 re Carly
21   Fiorina Meeting Update marked Exhibit 31 for
22   identification.)
23       THE WITNESS:  Okay.
24   BY MR. WILLIAMS:
25       Q.  Do you recognize the document?
```

485

Sanderson, Jr., Edward J  7/26/2006  9:00:00 AM

1     A.  I do not.

2     Q.  Do you recognize that it's an e-mail or

3  series of e-mails, the last one October 18 --

4  October 13th, 2000, sent from Carolyn Balkenhol to

5  you, right?

6     A.  Correct.

7     Q.  And it's concerning HP?

8     A.  Correct.

9     Q.  Are you familiar with the subject matter

10  of the document?

11     A.  "Carly Fiorina Meeting Update."  This

12  could have been the meeting that I attended.

13     Q.  Okay.  In October of 2000?

14     A.  Yeah -- yes.

15     Q.  Well, the e-mail -- I guess one, about

16  an inch and a half down the page, appears to be from

17  Michael Rocha to Larry Ellison, Safra Catz, Carolyn

18  Balkenhol, Gary Bloom and Juan Jones.  You see that?

19     A.  Yes, I do.

20     Q.  Do you know who Juan Jones is?

21     A.  I don't recall.

22     Q.  Michael Rocha in October of 2000, was he

23  in your organization, or was he in Support?

24     A.  No.  Mike Rocha ran -- I believe at that

25  point ran the Support organization for Larry.

486

1     Q.  Okay.  And he writes, "Larry, we

2  understand that you are meeting with Carly Fiorina

3  tomorrow.  In spite of their marketing campaign,

4  this is still the same old HP and you need to be

5  prepared for a lot of unproductive complaining.

6  That said, according to Mike DeCesare, we have a

7  25-million-dollar opportunity, 15 million in CRM and

8  10 million in technology.  Anywhere, this is what

9  you can expect."  See that?

10     A.  Yes, I do.

11     Q.  And Mike DeCesare -- the opportunity

12  that Mike DeCesare seems to have referred to Michael

13  Rocha would be in OPI, right?

14     A.  Yeah.  The CRM -- I remember it was CRM

15  with HP or that we did a CRM deal with HP, and that

16  would have been in OPI West.

17     Q.  OPI West, right?

18     A.  Right.

19     Q.  Okay.  Do you know whether in or around

20  October 13th, 2000, your division was on track to

21  meet its 2Q '01 number?

22     A.  I don't recall.  I think we had a good

23  quarter, but I don't recall.

24     Q.  Okay.  See No. 1, "HP isn't happy with

25  the quality of the CRM product"?  You see that?

487

1     A.  Yes, I do.

2     Q.  Did you know that at the time?

3     A.  I recall that there were issues, but I

4  don't recall much beyond that.

5     Q.  You see where he writes, "HP believes

6  that they received an uninstallable product and were

7  asked to pay consulting fees to make it work."  You

8  see that?

9     A.  Yes, I see that.

10     Q.  Do you know that to be true?

11     A.  As I said, I don't recall.

12     Q.  Okay.  Well, as of October 2000, Oracle

13  didn't have any customers live using the 11i CRM;

14  isn't that true?

15     A.  I don't recall.

16     Q.  You see where he writes in the second

17  paragraph, "HP does not believe that Oracle has

18  purchased the hardware that we committed to last

19  year."  You see that?

20     A.  Yes, I do.

21     Q.  Do you know what he's talking about

22  there?

23     A.  I remember that Ron Wohl, through his

24  working with Larry or Larry working with Ron, made a

25  commitment to use more HP product in our Development

488

1  organization than we had been using.

2        To answer your question more

3  specifically, I don't remember -- I don't recall

4  what the details of that were.  I, frankly, wasn't

5  involved in that.  My focus was on the CRM deal and

6  the technology, the database deal, the license deal.

7     Q.  Okay.  But this quarter apparently.

8     A.  In this quarter.  But any time there was

9  any agreement between HP and Sun, Intel, which was

10  also a client of ours -- customer of ours, if there

11  was any negotiation on using their hardware or

12  buying their hardware or whatever, that was done

13  separately from anything we did on the license side.

14     MR. WILLIAMS:  Okay.  I'll ask the reporter

15  to mark this document as Sanderson No. 32.

16     (E-mail string dated 10/00 re HP Update

17  marked Exhibit 32 for identification.)

18     MR. WILLIAMS:  It's Bates numbered NDCA-ORCL

19  028737 and 738.

20  BY MR. WILLIAMS:

21     Q.  I'd ask you to take a look at the

22  document and let me know when you're done.

23     A.  Okay.

24     Q.  Okay.  Do you recognize the document?

25     A.  I do not.

489

1    Q.  It appears to be an e-mail, the last of
2  which, October 24th, 2000, is an e-mail from you
3  to Gary Bloom, Mike DeCesare, Michael Rocha and
4  Conway Snyder, right?
5    A.  Correct.
6    Q.  And its subject line is the "HP Update"?
7    A.  Correct.
8    Q.  And appears to have several e-mails
9  below it that kind of end up with you, right?
10   A.  Correct.
11   Q.  Okay.  Starting from the bottom, see
12  where it says "Michael DeCesare wrote"?
13   A.  Yes, correct.
14   Q.  He writes, "Gary and Sandy," so it
15  appears that he sent this one to you directly,
16  right?
17   A.  Yeah, and to Gary Bloom, it looks like.
18   Q.  To Gary Bloom.   "Over the past week
19  Conway and I met with the procurement/alliance team
20  from HP.  Although both teams were still working
21  today's having executable contracts ready for
22  November close (About 20-25 million license for tech
23  and CRM), HP has made it clear that they will not
24  sign any additional business with Oracle until the
25  issues Carly and Larry discussed are fixed."

490

1    You see that?
2    A.  Yes, I do.
3    Q.  At the time do you know what the issues
4  that Carly and Larry had discussed were?
5    MR. GIBBS:  Objection.  Lack of foundation.
6    THE WITNESS:  Did I know what the issues that
7  Larry and Carly discussed?  I don't recall.  I don't
8  know if there were issues that raised -- that were
9  raised in the meeting that I attended or was it a
10  separate conversation that Larry had with Carly.  I
11  don't know.
12  BY MR. WILLIAMS:
13   Q.  Okay.  You see where Michael DeCesare
14  wrote, second bullet point, "They still feel we have
15  not fulfilled our obligation on achieving parity
16  with Sun"?
17   A.  Yes.
18   Q.  Do you know what he meant by that?
19   A.  What I would believe it means is what I
20  referred to just a few minutes ago, that -- or at
21  least implied, that I believe we used primarily Sun
22  for development -- for product development servers.
23    And what they're asking -- what the
24  discussion -- I recall a discussion that took place
25  between HP and Oracle and, I assume, Larry and Carly

491

1  about using more HP hardware, buying more HP
2  hardware.
3    And I think that's what they're talking
4  about here, is they -- Carly or HP wants us to be --
5  wants to be on more of a parity with Sun as far as
6  number of servers or the fact that we're building
7  our product on HP product -- HP hardware.
8    Q.  Okay.  Just above Michael DeCesare's
9  e-mail, Gary wrote, "Have any of you actually talked
10  to Larry to get his version of what he said he would
11  do?  He did not reply to my e-mail requesting an
12  update on the meeting."  See that?
13   A.  Yes, I do.
14   Q.  So, it seems to suggest that Larry did
15  meet with Carly at some point, right?
16   A.  Correct.
17   Q.  And did you know that Larry met with
18  Carly?
19   A.  As I said, I was in that one meeting, I
20  don't know if he had other meetings with her.
21   Q.  Okay.  Then you reply, saying, "I did.
22  He committed to have 100 percent of Oracle's data on
23  HP by June."  Do you see that?
24   A.  Yes, I do.
25   Q.  And what did Larry say to you?

492

1    A.  I don't recall.  I'm reading the e-mail
2  as we're seeing here, both of us.
3    Q.  Okay.  He -- you also wrote, "He
4  admitted that he didn't know what this precisely
5  meant, but he wants it to be worked out."  See that?
6    A.  Yes.
7    Q.  And what do you mean by that?
8    A.  Just one point that might help clarify.
9  I remember the question, and it's actually asked,
10  answering your question as well, at least partly.
11    When Larry -- I remember this question
12  about 100 percent of Oracle's data, and there's a
13  lot of question of what that means.  And Larry said
14  that it meant Oracle production data.
15    So, for example, if we were using OSO,
16  the actual data that's stored on a server for that
17  system, for that application, that module would be
18  on HP, what Larry was committing to do by June or --
19  by June.
20   Q.  I'm sorry.  When you say "data," what --
21   A.  Data.  For example, remember we were
22  talking about pipeline in OSO that lists customers
23  and who the account rep is and all that?  That's
24  data.
25   Q.  Sure.

493

1  A.  So, that's production data versus test
2  data, where you're just testing the applications.
3  And so, I remember Larry committing to having Oracle
4  production data on HP for at least some of the
5  applications.  I don't remember if it was all.
6  And he -- you know, when he said -- he
7  admitted that he didn't know what this precisely
8  meant but wants it to be worked out, he is a senior
9  executive, was giving us a direction, and expected
10  me or somebody to work out exactly what that meant.
11  Q.  I understand.  You then go on to say,
12  "As I indicated in another e-mail, we have a
13  25-million-dollar deal with HP this quarter that's
14  dependent upon putting details against Larry's
15  commitment."  You see that?
16  A.  Yes, I do.
17  Q.  And that means -- that sounds like what
18  you're saying is "Unless we get this ironed out or
19  get these details corrected, we're not going to get
20  this 25-million-dollar deal this quarter."
21  A.  Yeah.  HP, even though it was a separate
22  thing about using their hardware, was using it as
23  leverage --
24  Q.  Right.
25  A.  -- as you can imagine one company does

494

1  to another, as leverage, in whether they were going
2  to sign our deal or not.
3  MR. WILLIAMS:  Right.  I'm going to show you
4  what's been previously marked as DeCesare No. 2.
5  It's Bates numbered NDCA-ORCL 055957 through 962.
6  BY MR. WILLIAMS:
7  Q.  I'll ask you to take a look at it and
8  let me know when you're done.
9  A.  Okay.
10  Q.  Do you recognize the document?
11  A.  No, I don't.
12  Q.  You recognize the subject matter,
13  though, right?
14  A.  I do.
15  Q.  Okay.  And --
16  A.  I do.
17  Q.  And the first page of the document
18  appears to be an e-mail from Michael DeCesare to
19  you, Frank Varasano and Kurt Speck, right?
20  A.  Correct.
21  Q.  Forwarding -- or it's trailing a couple
22  of other e-mails regarding "HP Q2 Execution Plan
23  Update for November 10 Thursday" --
24  A.  Correct.
25  Q.  -- right?

495

1  And this appears to be --
2  A.  I'm sorry.  Did you say November 10th?
3  Q.  Isn't that what's in the subject line?
4  A.  Correct.  I'm sorry.  I was looking at
5  the date.
6  Q.  The date is actually November 9th,
7  though, right?
8  A.  You're correct.
9  Q.  It appears that maybe there's some
10  deadline that you guys are trying to make on
11  November 10th.  I don't know.
12  Anyway, appears to be talking about the
13  same issues, this transaction with HP that Oracle is
14  trying to get for 2Q, right?
15  A.  Right.  There's one that Development is
16  making a commitment to regarding hardware, and then
17  there's the license deal that we have around CRM and
18  Technology.
19  Q.  Uh-huh.  Okay.  Michael DeCesare writes
20  to you, "Sandy and Frank, HP confirmed today that
21  they will try and pull the CRM portion of the order
22  off providing we deliver what we have outlined in
23  Development and Production systems."  You see that?
24  A.  Yes, I do.
25  Q.  And since they don't need all of the

496

1  license users right now, they're hedging on how big
2  the order they will do until they see how much
3  production hardware Oracle comes back with."  See
4  that?
5  A.  Yes, I do.
6  Q.  Do you know why he capitalized the word
7  "all"?
8  MR. GIBBS:  Objection.  Calls for
9  speculation.
10  THE WITNESS:  I don't recall.
11  BY MR. WILLIAMS:
12  Q.  Okay.  And who's Conway Snyder?
13  A.  I don't know for sure, but I believe he
14  was in the alliance organization.  And when I spoke
15  earlier and I mentioned -- you asked about Renee Ni,
16  and I said she ran the partner organization.  I
17  believe her actual title was, like, senior vice
18  president of alliances.  And I would imagine Conway
19  Snyder was in her group.
20  Q.  Okay.  What are alliances?
21  A.  Alliances would be -- it could be
22  related to partners, implementation partners like
23  we've talked before like Bearing Point.  It could be
24  alliances like Sun and HP, Compaq when Compaq
25  existed, where we would identify ways to work

497

Sanderson, Jr., Edward J  7/26/2006  9:00:00 AM

1  together.
2      For example, I remember we had an
3  alliance with Dell and the -- the world was moving
4  from mainframe computers to actually small servers,
5  given the power of PCs.  And so, we had an alliance
6  with Dell where we worked collaboratively together
7  so that our database worked on their product, and
8  alliances would help facilitate that.
9      Q.  Okay.  Could the reason that Michael
10  DeCesare capitalized "all" be that HP didn't intend
11  to use all of the licenses that it bought but only
12  some of them currently?
13      MR. GIBBS:  Objection.  Lack of foundation,
14  calls for speculation.
15      THE WITNESS:  It is speculation.  I can't
16  imagine a customer buying -- take a step back.
17  Remember I said in database we sold by seats,
18  typically, as the number of users.
19      MR. WILLIAMS:  Right.
20      THE WITNESS:  It's the same thing in
21  applications.  We just happen, instead of using
22  "seats," we said "users" for application side.  I
23  can't imagine a client, a customer, buying --
24  spending money for something they're not going to
25  use.

498

1      On the other hand, what Oracle would do
2  sometimes, if the customer came back and said, "You
3  know, I'm going to need -- I'm going to need 100
4  users for an application.  I want to pay for 100
5  users."  But their plan is to roll it out to the
6  entire company, and that means that there's going to
7  be a thousand users in the end, what we would do, as
8  any software company would do, is go back and say,
9  "Okay.  If you buy 100 users, we'll give you a
10  10-percent discount.  If you buy a thousand users
11  now, we'll give you a 25-percent discount."
12      And so, companies would look at not only
13  what their current needs are but their projected
14  needs, and so, sometimes companies would buy on that
15  base.  It was a win for them; it was a win for us.
16  BY MR. WILLIAMS:
17      Q.  Now, in circumstances like you've
18  described where a customer might say, "Well, I have
19  need for 100 now, but I intend to roll out to the
20  entire company over the next couple of years, so I'm
21  going to buy 1,000 now," would Oracle recognize the
22  revenue, the license revenue, for the entire 1,000
23  on that sale up front?
24      MR. GIBBS:  Objection.  Lack of foundation.
25      THE WITNESS:  One, it goes through rev req.

499

1  I mean, any deal --
2  BY MR. WILLIAMS:
3      Q.  What does that mean?
4      A.  Any deal goes through revenue
5  recognition.  It was a group in Finance that looked
6  at the deal.  And if there was any questions, they
7  went to our accountants, outside external
8  accountants, to verify it.
9      But if it was a legitimate license deal,
10  HP bought, you know, license from Oracle, and it was
11  a legitimate deal, which our deals were, then you
12  got to recognize that revenue.  That's standard
13  revenue-recognition practices.
14      Q.  Okay.  I kind of got lost there.
15      A.  Okay.
16      Q.  When you say it's a -- if it's a
17  legitimate deal --
18      A.  Yeah.
19      Q.  -- just based on my hypothetical, are
20  you saying that if a customer said that it was going
21  to implement 1,000 users two years from now but only
22  was going to roll out 100 now --
23      A.  Uh-huh.
24      Q.  -- but you told them 1,000 licenses now,
25  are you saying that Oracle could recognize the

500

1  revenue on the -- on 1,000 licenses upon the sale?
2      A.  Yeah, because that's what --
3      MR. GIBBS:  Objection.  Lack of foundation.
4      THE WITNESS:  Yeah, because that's what the
5  customer bought.
6  BY MR. WILLIAMS:
7      Q.  Okay.  Even if they weren't going to use
8  it for a couple years?
9      A.  That's the customer's decision, but
10  that's what they bought from Oracle.
11      Q.  Okay.
12      A.  It's as if a company said to an
13  automobile dealership, "I only need one car now, but
14  I'm going to need ten in a year," and we say, "Okay.
15  We'll give you 10 percent on that one car.  We'll
16  give you 25 percent on all the ten."
17      They might buy the ten.  That dealer
18  recognizes the revenue on all ten cars, even though
19  their customer may only be using one initially.
20      MR. WILLIAMS:  I'm told that the tape has to
21  be changed --
22      THE WITNESS:  Okay.
23      MR. WILLIAMS:  -- so why don't we take five.
24      THE VIDEOGRAPHER:  Off the record at
25  3:34 p.m., and this marks the end of Tape 3 of

501

Oracle

Page  498 - 501

1   Volume II.
2        (A brief recess was taken.)
3        THE VIDEOGRAPHER:  We are back on the record
4   at 3:39 p.m., and this marks the beginning of Tape 4
5   of Volume II.
6   BY MR. WILLIAMS:
7        Q.   Still on DeCesare No. 2, if you turn to
8   Bates ending 958, that's at the top of the page.
9   Appears to be an e-mail that -- a continuation of an
10  e-mail from Conway Snyder to Juan.  He writes, "HP
11  confirmed again today that they're willing to do a
12  Q2 CRM deal in some amount if we can pull together
13  machine requirements into a binding PO and resolve
14  the development issues we're working on.  According
15  to Phil May, HP is willing to buy as much CRM from
16  Oracle as we buy in HW," which I'm assuming is
17  hardware, right --
18       A.   Yes.
19       Q.   -- "Support and other requirements,"
20  right?
21       A.   Uh-huh.
22       Q.   So, you knew that this CRM sale was,
23  like you said, dependent upon an agreement with HP
24  to actually buy HP hardware and support?
25       MR. GIBBS:  Objection.  Lack of foundation,

502

1   mischaracterizes the document.
2        THE WITNESS:  As I said, I knew that there
3   was discussion that Larry had had with Carly around
4   HP -- using HP product and, as I pointed out also,
5   that it was around production data.
6        I don't recall a lot beyond that now.  I
7   don't recall the fact that there was a purchase
8   order -- you know, that there would be need to be a
9   binding purchase order.  I don't recall that.
10  BY MR. WILLIAMS:
11       Q.   Right.  I understand that.  But I mean,
12  all I'm saying is that Michael obviously forwarded
13  you this information --
14       A.   Right.
15       Q.   -- at the time, right?
16       A.   Correct.
17       Q.   All right.  I'm going to show you what's
18  been previously marked as DeCesare No. 5.  DeCesare
19  No. 5 is Bates numbered NDCA-ORCL 020850 and 851.
20       A.   Okay.
21       Q.   Do you recognize the document?
22       A.   I do not.
23       Q.   It's an e-mail from Mark Barrenechea to
24  Michael DeCesare, cc'ing Larry Ellison, you, Gary
25  Bloom, Frank Varasano, Gary Roberts, Ron Wohl,

503

1   Conway Snyder, Kurt Speck and Andrea Fletcher,
2   right?
3        A.   Correct.
4        Q.   Dated November 11th, 2000, right?
5        A.   That's what the e-mail says.
6        Q.   And the subject line is "HP Q2 Order
7   Update," right?
8        A.   Correct.
9        Q.   And it's still talking about the same
10  subject that we've been discussing for the past few
11  minutes, a Q2 HP sale of CRM in exchange for
12  purchase of hardware from HP?
13       A.   Yeah.  I think what you said is right,
14  Shawn, as far as an exchange.  But I wouldn't -- I
15  mean, it was -- as I recall, it was treated as two
16  separate items.  It was a CRM deal, and then there
17  was an agreement with HP around product.
18       And it says in here based on an MOU that
19  had been done, quote, "last summer."  "Exchange" can
20  imply to somebody that it was something other than
21  that.
22       Q.   Right.  Well, let's just work through
23  this.
24       A.   Okay.
25       Q.   So, the e-mail that Mark sent to you

504

1   actually forwards an e-mail that Mike DeCesare
2   wrote, and he writes, "We have an opportunity to
3   move a Q3 15-million-dollar-plus CRM order into Q2.
4   For this to occur, we need tight coordination
5   between all the needed Oracle parties.  Because of
6   this, I'm copying all the Oracle executives I
7   believe need to be involved to make this happen."
8        Then he goes on to say "Development
9   Issues:  There's a meeting scheduled next week
10  between members of our development organization and
11  HP.  The goal is to generate a document which is
12  more specific than the MOU from last summer that
13  spells out what Oracle will do to further improve on
14  the parity issues that HP perceives exists between
15  Oracle on HP versus Oracle on Sun," right?
16       A.   Yes.
17       Q.   "This document will be nonbinding but
18  needs to be bought into from all the stakeholders on
19  Oracle side since HP will expect us to execute
20  against these commitments.  Conway Snyder owns this
21  process on the Oracle side."
22       And you think Conway was in alliances,
23  right?
24       A.   That is my best guess.
25       Q.   Okay.  Then he goes on to say,

505

1  "Production Hardward Commitment:  Conway Snyder is
2  currently working with all Oracle organizations to
3  come up with what hardware Oracle will need to
4  purchase to fulfill our commitment of 100 percent of
5  the database servers on HP by June."  You see that?
6      A.  Yes, I do.
7      Q.  Okay.  Then deeper into the -- he also
8  says, "We need to ensure this list is comprehensive
9  and lists what time frame Oracle will need the
10  hardware.  We will then need to cut HP a binding
11  purchase order for the hardware, even though it will
12  be ordered as needed.  To ensure that we are not
13  rushing at the end, I would like to ask that we
14  begin to work the contract issues with HP now to
15  ensure that all documents are in place before
16  November close."
17      So, it looks like Michael DeCesare is
18  doing what he can to make sure this deal gets into
19  the second quarter of 2001, right?
20      A.  Yes.
21      Q.  "Provided HP has confidence that both
22  companies have a common game plan on the development
23  side and HP has confidence that Oracle is stepping
24  up to all the hardware they feel we've already
25  committed to purchase, they've committed to move

506

1  forward on the CRM order.  I believe we will need
2  Larry to speak to Carly after we have the above
3  needed documentation as a final step."
4      Q.  Do you know whether Larry spoke to Carly
5  regarding this transaction?
6      A.  I do not.
7      Q.  Okay.  I'm going to show you what's been
8  previously marked as DeCesare No. 3.  It's Bates
9  numbered NDCA-ORCL 020844 through 849.
10      Take a look at DeCesare No. 3 and let me
11  know when you're done.
12      A.  Okay.
13      Q.  Okay.  DeCesare No. 3 is an e-mail from
14  Michael DeCesare to Larry Ellison, you and Safra
15  Catz, right?
16      A.  Correct.
17      Q.  Regarding the close plan for HP -- well,
18  regarding the HP CRM close plan?
19      A.  Correct.
20      Q.  Still discussing the same transaction,
21  CRM transaction, that we've been discussing over the
22  past few minutes, right?
23      A.  Right.  Appears that, yes.
24      Q.  And, apparently, Michael DeCesare spoke
25  with Phil May again on or around November 28th of

507

1  2000.  Actually, he says tonight he spoke with him.
2      He writes, "I spoke again to Phil May,
3  HP GM of Oracle business unit, tonight and he
4  informed us that Karen Slatford, HP SVP WW Sales, is
5  gaining support from Duane Zitsner to go to Carly
6  tomorrow to try to get approval to move forward on
7  our deal."  See that?
8      A.  Yes, I do.
9      Q.  Do you know Karen Slatford?
10      A.  I remember meeting with her.
11      Q.  Did you meet with her in November of
12  2000?
13      A.  I don't recall.
14      Q.  Do you know Phil May?
15      A.  I don't recall whether I met him or not.
16      Q.  Okay.  Going down to the first bullet
17  point, he writes -- Michael DeCesare writes,
18  "Consistent with Larry's conversations with Carly,
19  HP will expect a purchase order for the following
20  amounts."  See that?
21      A.  Yes, I do.
22      Q.  Do you know that Larry Ellison had
23  spoken with Carly Fiorina concerning this
24  transaction?
25      MR. GIBBS:  Objection.  Lack of foundation.

508

1      THE WITNESS:  You know, consistent with my
2  previous testimony, I don't recall -- I mean, I
3  don't recall that, and this doesn't help refresh my
4  memory.
5  BY MR. WILLIAMS:
6      Q.  Any reason to believe that he did not,
7  based on what is in the document?
8      A.  You know, I have difficulty with those
9  kinds of questions because you're -- I mean, I'm
10  reading the same thing that you are.  And, again,
11  it's questioning the veracity of somebody.  And I
12  assume if DeCesare put that in there, that it
13  probably happened.  I just don't recall.
14      Q.  Okay.  And going down to the next bullet
15  point, "CRM Development:  As a follow-up to Larry's
16  conversation with Carly, Mark Barrenechea will be
17  sending me a note tonight which will spell out
18  exactly what Oracle will do within the CRM
19  development environment to move to HP."  See that?
20      A.  Yes, I do.
21      Q.  Did you ever see such a note from Mark
22  Barrenechea?
23      A.  I don't recall.
24      Q.  Going down to the last bullet point on
25  the page, "CRM Functional Issues:  There are 14 show

509

1  stoppers that HP feels are keeping them from being
2  able to achieve their global rollout which is
3  scheduled between April and October."  See that?
4      A.  Yes, I see that.
5      Q.  Do you know whether Oracle Consulting
6  was doing the implementation of Oracle software at
7  HP during this time frame?
8      A.  I don't recall specifically.
9      Q.  Going to the next page, going down one,
10  two, three -- four bullet points where it begins
11  with "Tomorrow by 10:00 a.m." --
12      A.  I see that.
13      Q.  See where he writes, "Tomorrow by
14  10:00 a.m., we will be delivering a new version of
15  the Order Documents that have the following changes:
16  The payments have now been moved to an operating
17  lease that will keep the expense for HP out of the
18  current quarter and allowing the payments and
19  expense recognition of the licenses with when HP
20  will be going live."  You see that?
21      A.  I do.
22      Q.  Do you have an understanding of what
23  that means?
24      A.  I assume the "Order Document" means the
25  order document for HP purchasing CRM.  "The payments

510

1  have now been moved to an operating lease," which is
2  another vehicle that customers could use to purchase
3  product, "that will keep the expense of HP out of
4  the current quarter."  I don't know if they're
5  talking about our quarter or their quarter.  "And
6  align the payments and expense recognition of these
7  licenses when HP will be going live."
8      So, what they've done is somehow HP
9  tied -- it appears, tied their purchase of the
10  software to when they go live in various parts of
11  the company.
12      Q.  Right.  And it appears that they're
13  going to recognize the expense for the purchase
14  later than the current quarter and when they are
15  actually live on the software, right?
16      A.  Yeah, but I'm not an accounting expert,
17  so I can't comment other than what I read here.
18      Q.  Okay.  Going down to the last bullet
19  point on that page, "CRM Development Document:  To
20  incent HP to move on Oracle order in November and to
21  get closer to HP as a partner, Oracle is committed
22  to move the entirety of our CRM development
23  environment to HP."  See that?
24      A.  Yes, I do.
25      Q.  Was that what you understood?

511

1      A.  I don't recall that specific commitment,
2  but I see what it says here.
3      Q.  Going to the next page, on the next
4  page, see where it says "Hardware Spend Document"?
5      A.  I do.
6      Q.  See where he writes, DeCesare writes,
7  "As an incentive to move on the Oracle order in
8  November, we are prepared to issue a binding
9  commitment for 20 million in total revenue" -- I
10  mean, "in total hardware.  Oracle expects the HP
11  sales force to work aggressively on ensuring demand
12  is created and configurations are finalized prior to
13  these dates expiring."
14      And below that, the third bullet point
15  says, "Larry Ellison will issue an internal note to
16  Oracle confirming the commitment to HP."  See that?
17      A.  Yes, I do.
18      Q.  Did you see a note from Larry Ellison
19  confirming the commitment to HP?
20      A.  I don't recall.
21      Q.  You see where it says "good" there?
22      A.  Yes.
23      Q.  Is that your handwriting?
24      A.  It does look like my handwriting.
25      Q.  Okay.  And do you know why you wrote

512

1  "good" in that section?
2      A.  "Instead of allowing each member within
3  Oracle to purchase HP machines when the machines
4  they are currently using need to be upgraded, this
5  is a corporate wide commitment to move everything to
6  HP according to a schedule we have discussed.  This
7  will result in more money and a more rapid sales
8  process than HP would ever be able to achieve
9  selling business unit by business unit."
10      What Oracle -- it appears from Oracle is
11  doing here, which is what you see companies do --
12  and I was giving the example of GE yesterday -- that
13  they put their procurement control at a senior level
14  in a consolidated level.  It appears that's the same
15  thing that Oracle was doing to deal with HP.
16      Q.  So, it appears that you were -- even
17  though you don't recall, you were clearly involved
18  in the transaction, right?
19      A.  Yeah -- yes, I obviously saw these
20  documents.
21      Q.  Can you go to Bates ending 848.
22      A.  Okay.
23      Q.  Is that your handwriting on that page
24  too?
25      A.  It looks like it.

513

1  Q.  Can you just go to the bottom right-hand
2  corner and tell me if you can read what that says,
3  the handwriting?
4  A.  "Bought HP solution.  'Dazzle' software.
5  Will take six to nine months to get this done.
6  Doing in all of our offices."
7  Q.  What does that mean, do you know?
8  A.  I have no idea.
9  Q.  If you go to the top of the document,
10  there's more handwriting there.  What does that say?
11  A.  It looks like it says "Plans being done.
12  May go to summer" is what I guess I wrote.
13  Q.  And how about on the left-hand side of
14  that chart?
15  A.  Where my handwriting is?
16  Q.  Right, the handwriting.
17  A.  "Will be June" something "to 5/31"
18  something.
19  Q.  Okay.  Can you go to the next page.
20  First, do you recognize the handwriting on this page
21  to be yours?
22  A.  Yeah, it looks like it's mine.
23  Q.  Can you read it for me?
24  A.  The left side where it's next to the
25  bullet "Hardware requirements to get 100 percent

514

1  database service on HP," it says, "5 to 10 million
2  for," I imagine that's "production data, plus
3  development requirements plus printers and
4  maintenance plus middle" something.  Maybe "middle
5  tier."  I don't know.
6  Q.  Okay.
7  A.  Down at the bottom, the two bullets "We
8  can make happen now, requiring hardware purchase or
9  wait 'til May showing we have delivered."
10  The last bullet, "They've given us a
11  commitment" -- I don't know what that is.
12  "46 million list rates, 23 million at 50 percent
13  discount, 15 million at 70 percent discount."
14  Q.  Okay.  And it looks like you wrote -- or
15  you have a couple bullet points there.  It appears
16  that they may fall under that last section there,
17  "Q2 CRM order to HP," right?
18  A.  I mean, it physically falls there.  I'd
19  have to study the memo pretty closely to figure out
20  whether those two bullets relate to that topic.
21  Q.  Okay.  So, there it looks like Michael
22  DeCesare writes that "2Q CRM Order to HP.  HP will
23  not require the additional licenses until
24  January 2001 through June of 2002, but is willing to
25  commit to the licenses in exchange for the above

515

1  points.  List price on the new licenses is
2  46 million, and we are currently in front of them at
3  a 50 percent discount for a net license deal of
4  23 million."
5  A.  Yeah.
6  Q.  Do you know what the discount ultimately
7  was?
8  A.  I don't recall.
9  Q.  Michael DeCesare uses the term
10  "exchange" here, and he says that HP is willing to
11  commit to these licenses in exchange for the above
12  points even though they don't need the -- or don't
13  require the additional licenses until January 2001
14  through June of 2002.
15  A.  Is that a question?
16  Q.  Well, I'm asking if -- you see that,
17  right?
18  A.  I do see the words, yes.
19  Q.  And it appears that he is saying that
20  this order was indeed in exchange for, I guess, the
21  above points, the, I guess, hardware requirements to
22  get to 100 percent date database servers on HP.
23  A.  Okay.
24  Q.  Do you agree with that?
25  A.  That's the term he uses there, correct.

516

1  This is an example also of what I was talking about
2  where, in order to get a bigger discount, customers
3  will buy the additional licenses they're going to
4  need to have ahead of time so that they get the
5  benefit of the price discount.
6  MR. WILLIAMS:  Ask the reporter to mark this
7  document as Sanderson No. 33.
8  (E-mail string dated 11/00 re HP Deal &
9  Discounts marked Exhibit 33 for identification.)
10  THE WITNESS:  Thank you.
11  MR. WILLIAMS:  It's Bates numbered NDCA-ORCL
12  025020 and 021.
13  MR. GIBBS:  Shawn, the last page of this is
14  not a consecutive Bates number.  I've got three
15  pages, the third of which is Bates numbered 020703.
16  It doesn't appear to be part of the document.
17  MR. WILLIAMS:  I think you're right.  And why
18  don't we just take that page off.
19  MR. GIBBS:  Okay.
20  THE WITNESS:  You want me to take it off of
21  this?
22  MR. WILLIAMS:  Yeah.  And you can give it
23  back to me.  Thank you.  And the exhibit, again,
24  it's 025020 and 21.
25  THE WITNESS:  Okay.

517

1  BY MR. WILLIAMS:
2      Q.  You recognize the document?
3      A.  No, I do not.
4      Q.  It's an e-mail, however, from Jeff
5  Henley to Tom Williams on November 30th of 2000,
6  right, forwarding, right --
7      A.  Right.
8      Q.  -- forwarding an e-mail from Gary
9  Roberts to you -- I'm sorry -- to Larry Ellison,
10  cc'ing Safra Catz, Jennifer Minton, Jeff Henley,
11  Maria Maskiewicz and you, correct?
12      A.  Correct.
13      Q.  Who's Maria Maskiewicz?
14      A.  I'm trying to recall -- I mean, I don't
15  recall 100 percent, but I believe she was the
16  procurement person for Gary Roberts, who was the --
17  our CIO at that time.
18      Q.  All right.  And "procurement," meaning
19  purchasing, right?
20      A.  Yeah.
21      Q.  And this is the last day of the second
22  quarter of 2001, isn't it, November 30?
23      A.  Yes, it is.
24      Q.  And so, Gary writes to Larry, "I believe
25  you'll be discussing discounts with HP today.

1  Please keep these figures in mind."  See that?
2      A.  Yes, I do.
3      Q.  As you reviewed the document, was it
4  consistent with your understanding and the documents
5  that we've been reviewing concerning this HP deal
6  for the second quarter of 2001?
7      MR. GIBBS:  Objection.  Compound.
8      THE WITNESS:  Shawn, when you say
9  "consistent," in what way?
10  BY MR. WILLIAMS:
11      Q.  Well, it just seems like a continuation
12  of the same subject matter --
13      A.  Yeah, it does appear --
14      Q.  -- of the same deal?
15      A.  Yeah, it does appear that it's related
16  to the hardware purchase that we've been talking
17  about with HP.
18      Q.  And the software sale to HP of CRM,
19  right?
20      A.  Yeah, I don't see anything here that
21  specifically refers to the CRM purchase.  I think
22  this memo itself is talking about purchase of HP
23  product.
24      Q.  Okay.
25      MR. WILLIAMS:  I'll ask the reporter to mark

1  this document as Sanderson No. 34.  It's Bates
2  numbered NDCA-ORCL 03 -- I'm sorry -- 020839 through
3  843.
4      (Letter Agreement between Oracle
5  Corporation and Hewlett-Packard Company on 11/30/00
6  with handwritten notes marked Exhibit 34 for
7  identification.)
8  BY MR. WILLIAMS:
9      Q.  Just take a look at the document and let
10  me know if you recognize it.
11      A.  Okay.
12      Q.  All right.  Do you recognize the
13  document?
14      A.  I do not.
15      Q.  It appears to be a letter agreement
16  between Oracle and Hewlett-Packard dated
17  November 30th, 2000, correct?
18      A.  That's correct.  That's what it says on
19  there, yeah, first page.
20      Q.  And it appears to be in relation to what
21  we've been talking about, the CRM sale to HP and the
22  hardware purchase by Oracle --
23      MR. GIBBS:  Objection.
24  BY MR. WILLIAMS:
25      Q.  -- right?

1      MR. GIBBS:  Objection.  Compound,
2  mischaracterizes the document.
3      THE WITNESS:  I'm sorry, Shawn.  If you'd ask
4  that question again.
5  BY MR. WILLIAMS:
6      Q.  I'm just asking you if it appears to be
7  related to what we've been talking about for the
8  past half an hour --
9      A.  It does.
10      Q.  You see some handwriting on this
11  document?
12      A.  Yes, I do.
13      Q.  Do you know whose handwriting it is?
14      A.  Looks like mine.
15      Q.  Okay.  And on the top right-hand corner,
16  you write "the real story"?
17      A.  Uh-huh.
18      Q.  And do you know why you wrote that?
19      A.  I do not.
20      Q.  Okay.  And would it suggest that this is
21  the real story behind this transaction between HP
22  and Oracle?
23      A.  I would speculate that, as we saw in the
24  Gary Roberts e-mail which was Exhibit -- Sanderson
25  Exhibit 33, there was still questions about what

1  discounts were going to be given, and then this
2  ultimately implies what the final terms that were
3  agreed upon between HP and Oracle.
4      Q.  Okay.  And on the top -- on the
5  left-hand side, you write "To demonstrate
6  partnership."  But it looks like it's related to
7  another note that you wrote, right?
8      A.  Right.  I made -- it says, "I made
9  30 million deals happen to demonstrate partnership."
10     Q.  Okay.
11     A.  And I don't know who the "I" is.  As I
12 read this, I don't know if I was on the phone with
13 somebody, and these are the comments they were
14 making or if this is -- it seems to me I'm getting
15 feedback from somebody.
16     Q.  Okay.  The next point you make -- you
17 write is what?
18     A.  "Sun is really unhappy."
19     Q.  What does that mean?  What was Sun
20 unhappy about?
21     A.  I was going to speculate, but this kind
22 of deal is -- we saw earlier Larry was going to do a
23 communication within Oracle.  That could have gotten
24 over to Sun.  It could be the Sun alliances at
25 Oracle found out about the deal and was unhappy

522

1  about it.
2          But as you might imagine, my best
3  guess -- I mean, my best guess is and, as you might
4  imagine, if Sun found out -- or when Sun found out
5  about this deal, they wouldn't be very happy, just
6  as if we did the deal with Sun, HP wouldn't be
7  happy.
8      Q.  Sure.  What's the next comment you write
9  there?
10     A.  "Is this the way we are going to do
11 deals, each has to buy something."
12     Q.  Do you know what you meant by that?
13     A.  I think either I or somebody was
14 questioning, saying, you know, when you're working
15 with HP and Sun, you know, for example, when we do
16 Sun, are they going to place requirements on us
17 would be my guess.
18     Q.  Looking at the agreement No. 4, entry
19 No. 4, it states, "If Oracle does not complete the
20 commitments in 1 through 3 above, then Oracle will
21 pay a cancellation fee of $15 million less the
22 invoiced amount of products delivered from this
23 blanket purchase order and paid for by
24 June 15th of 2001."  You see that?
25     A.  Yes, I do.

523

1      Q.  Were you aware of that at the time --
2  well, withdrawn.
3          Do you know who negotiated that
4  cancellation?
5      A.  It certainly wasn't me.  As I said, this
6  was a totally separate deal.  It's signed by Safra
7  Catz.  I think if you talk to Safra, she can explain
8  it for you.
9      Q.  Okay.  You see these fax lines on the
10 top here.  Do you know what Bardwick is?
11     A.  I do not.
12     Q.  Okay.  I can't recall if I asked you
13 what the handwriting on the right-hand side was on
14 this page.
15     A.  It says "Gives flexibility."
16     Q.  "Gives flexibility," okay.
17         Turn to the next page, please.  Can you
18 tell me what the handwriting -- well, withdrawn.
19         Is the handwriting on this page your
20 handwriting?
21     A.  It appears to be.
22     Q.  Can you tell me what it says on the
23 left?
24     A.  It looks like on the left it's next to
25 No. 3, where it says "Oracle will operate CRM online

524

1  services, the Oracle Store," et cetera, specified in
2  this document, and I've written there "almost all
3  done."
4      Q.  And how about on the bottom left?
5      A.  "Ask sales team," I --
6      Q.  Okay.
7      A.  -- believe is what it says.
8      Q.  How about on the right-hand side?
9      A.  Related to No. 2, it looks like, "Done
10 as of last weekend, even middle tier, disk too."
11     Q.  Do you know whether HP actually
12 implemented the CRM software that was sold to
13 them --
14     A.  I don't --
15     Q.  -- as part of this agreement?
16     A.  I don't recall.
17     Q.  Do you know if Oracle paid any
18 cancellation fee related to this agreement?
19     A.  I don't recall hearing anything like
20 that, and I think, frankly, something that
21 significant, I would recall, but I don't recall
22 anything like that.
23     Q.  Do you know whether Oracle recognized
24 the revenue from the CRM sale in Q2 '01?
25     A.  Why wouldn't they recognize the CRM

525

Sanderson, Jr., Edward J  7/26/2006  9:00:00 AM

1  revenue?

2      Q.  I'm -- does that mean, as far as you

3  know, yes?

4      A.  I don't -- I don't remember, frankly,

5  whether we did the deal with HP.  It implies here

6  that we did in Q2.

7      Q.  Okay.

8      A.  But I don't even remember whether we did

9  it or not.

10      Q.  Okay.  I'll show you what's been marked

11  as DeCesare No. 4.

12      A.  Okay.

13      Q.  You recognize DeCesare No. 4?

14      A.  I do not.

15      Q.  It appears to be an e-mail from Mark

16  Barrenechea to Michael DeCesare, cc'ing Larry

17  Ellison, Safra Catz, you and Frank Varasano, right?

18      A.  Yes, correct.

19      Q.  Forwarding an e-mail from Michael

20  DeCesare, in which he writes -- well, in the subject

21  line "HP is in, for over 21 million in CRM license."

22  See that?

23      A.  Yeah.  The subject line is "HP is in."

24      Q.  Right.

25      A.  And then under Mike DeCesare's note, it

526

1  says, "for over 21 million in CRM license."

2      Q.  Okay.  And that suggests that --

3      A.  That suggests --

4      Q.  -- that it actually made it in 2Q '01?

5      A.  Yes, that's correct.

6      MR. WILLIAMS:  I actually have a couple of

7  copies that I need to make that I wish that I had,

8  so I'd like to take five minutes.

9      THE VIDEOGRAPHER:  Off the record at

10  4:22 p.m.

11      (A brief recess was taken.)

12      THE VIDEOGRAPHER:  We are back on the record

13  at 4:31 p.m.

14      MR. WILLIAMS:  Ask the reporter to mark this

15  document as Sanderson No. 35.

16      (E-mail string dated 12/00 re Early

17  Returns Q2 CRM update marked Exhibit 35 for

18  identification.)

19  BY MR. WILLIAMS:

20      Q.  It's Bates numbered NDCA-ORCL 020728

21  through 30.  Ask you to take a look at the document

22  and let me know when you're done.

23      A.  Okay.

24      Q.  Do you recognize the document?

25      A.  I do not.

527

1      Q.  It appears to be an e-mail from Jeff

2  Henley to Stephanie Aas on December 4th of 2000,

3  forwarding an e-mail from Mark Barrenechea to

4  Ellison, Catz and Henley.  Is that a fair

5  characterization?

6      A.  That's what the document says, yes.

7      Q.  Did you know that Mark Barrenechea had

8  kind of -- did a summary of all the CRM sales,

9  including from your division, for Q2?

10      A.  I don't recall.  I don't think I saw

11  this.

12      Q.  Okay.  And going to the last page,

13  ending 730, see where he writes "Special

14  Highlights"?

15      A.  Uh-huh -- yes.

16      Q.  He writes, "OSI:  We missed BellSouth

17  but the convertible Q3 pipeline looks good."  See

18  that?

19      A.  "Looks great," correct.

20      Q.  I'm sorry.  "Looks great."  And with

21  respect to OPI, he writes, "Without HP, it would

22  have been different.  The East did not bring in any

23  business.  Steve M. has a large Q3 pipeline."

24      A.  Right.

25      Q.  Is that consistent with your

528

1  understanding of Q2 --

2      A.  As --

3      Q.  -- for your division?

4      A.  For OPI, as I mentioned to you, I didn't

5  remember that we had gotten the HP deal, so I don't

6  remember any specifics -- other specifics either

7  about the quarter.

8      Q.  You don't, okay.

9      It looks like -- if you go to the

10  previous page, it looks like that HP transaction was

11  21 million -- 21.5 million in license revenue for

12  the quarter.

13      A.  Right.  That's what it says here.

14      MR. WILLIAMS:  I'd ask the reporter to mark

15  this document as Sanderson No. 36.

16      (Letter dated 11/30/00 to Carly Fiorina

17  from Larry Ellison with handwritten notes

18  marked Exhibit 36 for identification.)

19  BY MR. WILLIAMS:

20      Q.  I'd ask you to take a look at Sanderson

21  36.

22      A.  Okay.

23      Q.  You recognize that document?

24      A.  I do not.

25      Q.  Appears to be a letter to Carly Fiorina,

529

1  dated November 30th, 2000, from Larry Ellison, but
2  it's not signed, right?
3      A.  Correct.
4      Q.  And is that your handwriting on the
5  document?
6      A.  Yes, it appears to be.
7      Q.  Okay.  Can you tell me what you wrote on
8  the first page, top right-hand corner?
9      A.  "Where is this the same as committed in
10  the MOU?  How many servers?"
11      Q.  Right.
12      A.  "What do we need for HP to make this
13  work?"
14      Q.  What did you mean by "What do we need
15  for HP to make this work?"
16      A.  I don't know.
17      Q.  How about the bottom of the page in your
18  handwriting?
19      A.  "We have weekly calls to track
20  progress."  We've -- "We are" or "We're committing
21  30 million."
22      Q.  Okay.  And the next page handwriting?
23      A.  "CRM and ERP."
24      Q.  And if you'd go to the next page.
25      A.  Under -- next to No. 7, "Ongoing

530

1  implementation."  And then further down next to
2  "Oracle SalesOnline.com.  Already on HP, learning
3  experience for both of us, work well together, in
4  production 100 days, blew through 200,000
5  subscribers."
6      Next to "Oraclesupport.com," it says
7  "customer care."  And then down at the bottom of
8  837, it says, "Including mid-tier."
9      Q.  Okay.  Go to the next --
10      A.  Okay.  Next to "field readiness,"
11  No. 10, "Field Readiness," it says, "This is where
12  latest and greatest CRM demo will exist.  Will
13  complete" -- no, "will compete with Sun.  And then
14  in parentheses, it looks like it says something like
15  "for updates."
16      Also related to No. 10, it says,
17  "Opportunity."  That was a shorthand I used for
18  "opportunity."  "Opportunity to compare HP versus
19  Sun."  And then under "ADS," which was the
20  demonstration environment, "Updated four times a
21  year."
22      Q.  Okay.  And this -- this appears to be a
23  draft of a letter, right, simply because it's not
24  signed by Larry?
25      A.  It could -- it could be a draft, or it

531

1  could be that this was what was sent, and they just
2  electronically sent -- Larry signed the letter and
3  mailed it to Carly or however he had it delivered,
4  hand-delivered, and then --
5      Q.  And they sent you one?
6      A.  -- and somebody sent an electronic
7  inversion of what Larry signed.  So, it could either
8  be a draft or the final.
9      MR. WILLIAMS:  I'm going to ask the reporter
10  to mark this document as -- I'm sorry.
11      Ask the reporter to mark this document
12  as Sanderson Exhibit No. 37.
13      (Letter dated 11/30/00 to Carly Fiorina
14  from Larry Ellison marked Exhibit 37 for
15  identification.)
16      THE WITNESS:  Thank you.
17      MR. WILLIAMS:  It's Bates numbered NDCA-ORCL
18  021378 through 381.
19      THE WITNESS:  Okay.
20  BY MR. WILLIAMS:
21      Q.  That appears to be a signed version of
22  that letter?
23      A.  That's -- it does appear to be the case,
24  yes.
25      Q.  Signed by Larry Ellison, right?

532

1      A.  Correct.
2      Q.  On November 30th, 2000?
3      A.  Right.
4      Q.  Do you know whether or not OPI would
5  have made its 2Q '01 forecast without the HP
6  transaction?
7      A.  Two comments:  No, I don't recall.  Two,
8  I put that in the same category as suggesting we
9  pull Covisint out, or maybe we should find some
10  other deals in that quarter that we could pull out
11  and then see if we were going to make the quarter or
12  not.  I don't.  Short answer is I don't.
13      Q.  I just have a couple of questions about
14  the Covisint.
15      A.  Okay.
16      MR. WILLIAMS:  I'll ask the reporter to mark
17  this document as Sanderson No. 38.
18      (E-mail string dated 12/00 re Covisint
19  Contract marked Exhibit 38 for identification.)
20      MR. WILLIAMS:  It's Bates numbered NDCA-ORCL
21  041967 through 969.
22      THE WITNESS:  Okay.
23  BY MR. WILLIAMS:
24      Q.  Okay.  Do you recognize the document?
25      A.  No, I don't.

533

1  Q.  Okay.

2  A.  I do remember the issue.

3  Q.  Okay.  It appears to be an e-mail,

4  December 31st, 2000, e-mail, from Safra Catz to

5  Tom Williams, Jennifer Minton, Jeff Henley, Larry

6  Garnick, forwarding a series of e-mails, one of

7  which you are the recipient, a December 22nd,

8  2000, e-mail to you, Safra, cc'ing Mike Rosser, from

9  Mark Barrenechea, discussing the -- I guess the

10  product breakdown of the Covisint transaction,

11  right?

12  A.  Correct.

13  Q.  All right.

14  A.  It's the -- I'm sure this is what you're

15  saying, but it's the allocation of revenue across

16  the different license components for the Covisint

17  deal.

18  Q.  That's exactly what I meant to say.

19  A.  Right.

20  Q.  You said that you do recall the issue?

21  A.  I do.

22  Q.  What do you recall about it?

23  A.  The issue that I'm talking about is I

24  remember Mark was unhappy -- Mark Barrenechea was

25  unhappy that CRM -- on a 60-million-dollar deal, CRM

534

1  which was included in the deal was only going to

2  give revenue to recognize for CRM of $128,000.

3  Q.  All right.  That's all that you remember

4  about the issue?

5  A.  That was -- yeah, that's the only thing

6  that was at issue.  I remember Mark being unhappy

7  about that.  He wanted more revenue recognized for

8  CRM, as Mike Rosser, who worked for Mark, suggested

9  in the last page of this document.

10  Q.  Now, the Covisint transaction was a

11  transaction out of OPI, right?

12  A.  Correct.

13  Q.  Been negotiated for a long time, many

14  months --

15  A.  Yeah.

16  Q.  -- fair?

17  A.  Yeah.  It was a very complex deal, yes.

18  Q.  And Ray Lane had been negotiating the

19  contract for OPI up until he left, right?

20  A.  That's correct.

21  Q.  And you kind of picked up the leadership

22  on the transaction sometime in July, early August of

23  2001?

24  A.  Yeah.

25  Q.  I'm sorry.  2000.

535

1  A.  2000, right after Ray left.

2  Q.  And do you know how long it had been in

3  the making prior to that?

4  A.  I don't, but it was a number of months.

5  Q.  Okay.  And the way that it appears to be

6  broken down here on the last page of this document,

7  can you explain to me what the list price for the

8  Oracle software represents?  It appears to show --

9  at least the top breakdown shows a list price of

10  12 billion -- is that billion dollars for exchange?

11  A.  Twelve -- I guess so, yeah, 12 billion.

12  Q.  I think it's 12 billion, right?

13  A.  No, it is, but I also -- I know that's

14  what the numbers say, but I was also trying to see

15  if I recall what the list price was.  Okay.

16  12 billion.

17  Q.  Okay.  Was that not the list price?

18  A.  I have no reason to question that price.

19  Q.  Right.  Had Oracle sold exchange

20  software prior to selling it to Covisint?

21  A.  We did have other exchange customers,

22  and I don't know what the timing was, whether they

23  were before or after Covisint.

24  Q.  Okay.  Was the exchange that was -- the

25  exchange software that was sold to Covisint software

536

1  that was built for Covisint, or was it Oracle

2  Exchange that it had built for customers?

3  A.  It was -- it was primarily the Oracle

4  Exchange product.  It's not unusual, when you're

5  working with a strategic customer, that they may

6  provide input into what they'd like to see in the

7  product.

8  Q.  Right.  Okay.  So, do you know how

9  Oracle came up with the list price of $12 billion

10  for the exchange piece of the software?

11  A.  I -- I vaguely remember.  We -- we used

12  units, for example, as I talked about earlier on

13  database used number of users -- I'm sorry, number

14  of seats, and then on the applications, you said the

15  number of users.

16  The -- so, we had parameters like that

17  that you applied against our pricing schedule or

18  pricing software that would produce that number.

19  The -- I remember -- hopefully, this is helpful.  I

20  remember when we were negotiating with General

21  Motors, DaimlerChrysler and Ford, which frankly was

22  one of the challenges to get them to agree and had a

23  lot to do with why the deal took so long, that at

24  one point they were giving us astronomical -- what I

25  would term as astronomical numbers of users for the

537

1  product because they envisioned the Exchange being
2  used by employees of Covisint and, as I recall, some
3  employees within Ford, within DaimlerChrysler,
4  within GM, and it created a huge number.
5      And, in fact, I even remember us going
6  back and challenging them as to whether they really
7  needed that many users because it was at one point a
8  transaction much larger than 60 million.
9      Q. And so, you think that's how you,
10  Oracle, came up with the $12 billion --
11      A. Billion dollars --
12      Q. -- list price, and it was based upon the
13  number of users that Covisint had intended to have
14  using the software?
15      A. Yes. Excuse me for interrupting.
16      Q. Okay.
17      A. Yeah, or it was either number of users
18  or some parameter like that that we used for the
19  exchange. And I don't recall what the specific
20  parameter was.
21      Q. Okay. And how about the database
22  portion? Same issue, number of users --
23      A. Most --
24      Q. -- planned?
25      A. I apologize again.

538

1      Q. Okay.
2      A. Most -- in most cases, database was sold
3  on number of seats, which led to a
4  1.3-billion-dollar number at list price.
5      Q. Would you say the same for the CRM and
6  the ERP?
7      A. Yes. And I think the difference here,
8  as I recall, was the exchange and the database was
9  going to be used by a large number of users, which I
10  want to -- I just thought of one other thing I
11  should tell you. But to answer your answer
12  specifically around CRM and ERP, that was only going
13  to be used within Covisint itself. It wasn't going
14  to be used by employees outside the company.
15      One other thought I thought about the
16  exchange and the database, the exchange was a -- is
17  business-to-business, and it was going to allow
18  companies like Ford to work with its suppliers. And
19  it was electronic business environment. And so, you
20  actually factored in supplier, you know, users as
21  well.
22      Q. Okay. What was the basis of the
23  99.5 percent discount?
24      A. Are you talking about -- is that what
25  the overall discount -- yeah, I see it. I'm sorry.

539

1  Now I see it.
2      I don't recall specifically how we
3  landed at it. I don't know how we landed on the
4  60 million, which -- I don't know if the 60 million
5  came first or the 14 -- I know the 14 -- we probably
6  shared the 14 billion with the customer just to help
7  them understand the number of users that they were
8  asking for.
9      Q. The 12 billion you mean?
10      A. Yeah. I was just doing 12, and I was
11  adding the other --
12      Q. Oh, the remainder?
13      A. -- remainder, and I was rounding up.
14      Q. Okay, I see.
15      A. Yeah, 12 billion. I don't know how we
16  came to the 99.5 percent discount. It was
17  negotiation with those three companies and Oracle,
18  and, as I indicated to you, it was quite a
19  protracted negotiation.
20      Q. Did you share that number with Covisint,
21  the 12-billion-dollar list price?
22      A. I can't recall, but I wouldn't be
23  surprised that one of our salespeople shared it with
24  them.
25      Q. But a 99.5 percent discount is pretty

540

1  much giving the software away, right, in terms of
2  percentage of the discount?
3      A. Yes. On one hand, yes. On the other
4  hand, we never believed in Oracle that they were
5  going to have as many users as they said they were
6  going to have on this software, and we got into a
7  debate on that.
8      Q. Right.
9      A. And I mentioned to you, we actually
10  tried to get them to reduce the numbers of people
11  they said that would use it. And as I recall, we
12  weren't very successful at that, because I think
13  they determined that that was some -- we were trying
14  to reflect on what -- how successful we thought it
15  would be or wouldn't be.
16      And we thought the number of users would
17  be ridiculous and, as a result, we gave them,
18  obviously, a very substantial discount that still
19  led to a very substantial deal for Oracle.
20      Q. Do you know whether Covisint said, "All
21  right. $60 million is what we intend to spend. I
22  don't -- and you guys figure out how you want to
23  break down the software package"?
24      A. Yeah, I don't recall that. And, in
25  fact, as I recall also, we did not -- CEO was a

541

1    incorporated company joint venturer across the three
2    firms that I just mentioned, automobile
3    manufacturers.  And I believe at this time -- I'm
4    not sure if the CEO was in place --
5        Q.   I see.
6        A.   -- so, which made it more, you know,
7    obviously, challenging in doing this deal.
8        Q.   If you turn to the first page of the
9    document, the e-mail from Safra to Tom Williams --
10       A.   Right.
11       Q.   -- and, actually, the e-mail from Tom
12   Williams below that.  You can't tell who he's
13   writing to, but the fact that Safra responds to
14   it, one would assume that she was at least one of
15   the recipients.  Is that fair to say?
16       A.   That would be fair to say.
17       Q.   And he writes to whomever, "We should
18   discuss following our normal policy of allocating
19   discounts to all products based on relative list.
20   This is what the deal is (minimal revenue for apps).
21   I can't change that.
22            "However, this is obviously an unusual
23   deal in that they are I believe using our database
24   and selected other products but relying on
25   Commerce 1 for the exchange software."  See that?

542

1        A.   Yes, I do.
2        Q.   So, do you know whether Covisint
3    intended to use any of the exchange software that
4    was part of the deal?
5        A.   I don't think they would have bought the
6    product if they weren't planning on using it.
7        Q.   Do you know what Tom Williams is
8    referring to here when he says "I believe" -- "This
9    is obviously an unusual deal in that they are, I
10   believe, using our database and selected other
11   products but relying on Commerce 1 for the exchange
12   software"?
13           MR. GIBBS:  Objection.  Lack of foundation,
14   calls for speculation.
15           THE WITNESS:  What I do recall is they did
16   have Commerce 1 in-house, and they were unhappy with
17   it.
18   BY MR. WILLIAMS:
19       Q.   Covisint did?
20       A.   Yeah.  Covisint had Commerce 1 software
21   in-house and was -- and was unhappy with it.
22   They -- as I recall, and I -- I recall to the best
23   of my recollection, they also wanted our software.
24   And I think our expectation was that the Commerce 1
25   software would be removed and our software would be

543

1    put in place.
2        Q.   Wasn't Covisint a relatively new
3    conglomerate?
4        A.   Joint venture.
5        Q.   Joint venture.  And they had already
6    purchased Commerce 1, based on your recollection --
7        A.   Yeah.
8        Q.   -- for the exchange.
9        A.   And I'm not sure, as an example,
10   Covisint even existed when they bought Commerce 1.
11   It could have been the three companies -- you know,
12   or somebody within those three companies decided to
13   buy the Commerce 1 software even before Covisint was
14   created.
15       Q.   Okay.  Still looking at this e-mail from
16   Tom Williams, he goes on to say, "As an incentive to
17   help them consider switching to our technology, we
18   gave them as much (actually likely more) as they
19   could ever use (some 2.4 trillion in annual volume
20   for exchange platform, though I might be off a digit
21   or so).  Who knows what the real value of the
22   component are?"
23       A.   Yes.
24       Q.   So, at this point as of December 31st
25   of 2000, Oracle did not know whether Covisint was

544

1    going to use the exchange software that was sold to
2    them, right?
3        MR. GIBBS:  Objection.  Lack of foundation.
4        THE WITNESS:  I recall them clearly using it.
5    But the fact that they were going to use it or not,
6    there was a legal transaction between Covisint and
7    Oracle, and which was represented in $60 million of
8    license revenue and some additional support revenue.
9        MR. WILLIAMS:  Okay.
10       THE WITNESS:  So, I think that's an
11   interesting question, but I don't know that it
12   impacts the deal at all.
13       MR. WILLIAMS:  All right.
14       THE WITNESS:  It doesn't.
15   BY MR. WILLIAMS:
16       Q.   You don't know or it doesn't?
17       A.   I'll leave it at this:  Since we're
18   talking about five and a half years ago -- I mean,
19   let me take a step back.  We would have never been
20   able to do this deal unless it went through revenue
21   recognition, which was Tom Williams --
22       Q.   Right.
23       A.   -- that reviewed that deal.  The fact
24   that we got to recognize $60 million, my speculation
25   is, because of the size of the deal, we even had our

545

1   auditors review the deal.

2     Q.  Right.

3     A.  And we recognized $60 million in the

4   third quarter of '01.

5     Q.  Like I said, I was just wondering if you

6   knew why he would write something like that, which

7   sounds like they're using Commerce 1.

8     A.  As you notice, I'm not copied on this

9   e-mail. I don't recall seeing it, and I'm sure Tom

10   Williams -- I would like to think Tom Williams can

11   explain it for you.

12     MR. WILLIAMS:  Okay.  I'm going to ask the

13   reporter to mark this document as Sanderson No. 39.

14     (E-mail string dated 11/00 re Kaiser

15   Customer Call Report marked Exhibit 39 for

16   identification.)

17   BY MR. WILLIAMS:

18     Q.  Sanderson 39 is Bates numbered NDCA-ORCL

19   266718 through 719. I'm going to ask you to take a

20   look at this document and let me know when you're

21   done.

22     A.  Okay.

23     Q.  All right.  Do you recognize the

24   document?

25     A.  I don't.

1     Q.  Appears to be an e-mail from Tyler

2   Hofinga to Kathryn Dalton and several other people

3   forwarding an e-mail that you wrote to Tom Williams.

4   Is that right?  Or an exchange between you and Tom

5   Williams.

6     A.  Yeah -- yes.

7     Q.  And it's -- the subject matter says

8   "Kaiser Customer Call," but appears to be related to

9   Covisint, right?

10     A.  I had -- that's why I was a little

11   confused.  Yeah, the title is different than the

12   substance of the e-mail.

13     Q.  Do you know why?

14     A.  No.

15     Q.  Okay.  Do you recall the subject matter

16   of this exchange between you and Tom Williams?

17     A.  I don't.  I was just reading it now.  It

18   doesn't -- I don't recall this issue.

19     Q.  Okay.  Well, Tom Williams appears to

20   write to you that he is -- it is his nature to

21   question the nature of every aspect of a

22   transaction, referring to Covisint, right?

23     A.  Yeah.  But he -- he clearly was very

24   diligent on any revenue recognition issue, correct.

25     Q.  Right.  And he says to you, "If they say

1   they're unwilling to wire us the money by

2   November 30th, I ask myself why."

3     As far as you know, was Covisint

4   refusing to wire the money for the transaction by

5   November 30th, 2000?

6     A.  I don't recall. I do refer you to my

7   comments up above where I say "I don't know that

8   they are unwilling to wire us the money by

9   November 30th."

10     Q.  Right.

11     A.  "This is an assumption on your part."

12     Q.  Okay.  Was the intent, from your

13   perspective, to close the transaction by

14   November 30th?

15     A.  My intent was to close the transaction

16   as soon as I could.

17     Q.  Okay.  But November 30th is the date

18   that's repeated at least twice or three times in

19   this -- this exchange between you and Tom Williams,

20   and that's why I'm asking the question.

21     A.  Yeah, it seems you could draw a

22   conclusion from this that, yes, we were trying to --

23   I was trying to get this done by the end of Q2.

24     Q.  Okay.  And do you know why it wasn't

25   done by Q2?

1     A.  I don't recall specifically.  I do -- I

2   do recall -- as I said, it was a complex

3   transaction.  It was very hard to get somebody that

4   was in a decision-making role, and I remember having

5   a meeting up at -- in Detroit with a senior

6   executive from each of the three companies, and we

7   would reach agreement in the room.  I was

8   negotiating with all three.

9     And then as soon as we got the attorneys

10   involved, I -- I mean, and I know that everybody's

11   trying to protect their own interest -- it would

12   become problematic.

13     As we talked about earlier, there was

14   issues on number of users.  And I recall the GM had

15   some have tough contract requirements typically in

16   their contracts around liability and -- that were

17   very onerous.  And we literally spent a lot of time,

18   Safra and I -- and Safra was really the one that led

19   the legal negotiation for us -- trying to work

20   through those issues.  All that said, it was a

21   complex deal, and I tried to get it done as soon as

22   I could.

23     Q.  Okay.  So -- but Safra -- withdrawn.

24     Do you know who Tyler Hofinga is?

25     A.  Tyler Hofinga -- the name's familiar,

1  but I don't recall who they are.

2      Q.  Do you have any recollection of actually

3  talking to Safra about this deal approximately --

4  well, withdrawn.

5      Do you recall talking to Safra with Tom

6  Williams on or around November 17th?

7      A.  I don't -- I don't recall.  As you can

8  see, what's implied in my message as well is I found

9  that when you have issues of disagreement that I

10  felt talking to each other on the phone was a better

11  way to resolve than firing e-mails back and forth at

12  each other.

13      Q.  Right.

14      A.  Thus the term "e-mail hell."

15      MR. WILLIAMS:  Why don't we take five.  I'm

16  almost done.

17      Do you intend to have a lot of cross

18  or some?

19      MR. GIBBS:  Very little.

20      MR. WILLIAMS:  Okay.  All right.  Take five.

21      THE VIDEOGRAPHER:  Off the record at

22  5:12 p.m.

23      (A brief recess was taken.)

24      THE VIDEOGRAPHER:  We are back on at

25  5:17 p.m.

1      MR. WILLIAMS:  I'm going to ask the reporter

2  to mark this document as Sanderson No. 40.  It's

3  Bates numbered NDCA-ORCL 027949.

4      (E-mail dated 9/19/00 re OPI Forecast

5  marked Exhibit 40 for identification.)

6  BY MR. WILLIAMS:

7      Q.  Ask you to just take a look at it and

8  let me know when you're done.

9      Don't write on the document.

10      A.  You're right.  Thank you.

11      MR. GIBBS:  You can write on this one if you

12  like.

13      THE WITNESS:  Yeah.  Let me -- okay.

14  BY MR. WILLIAMS:

15      Q.  You recognize the document?

16      A.  I do not.

17      Q.  It's an e-mail written by you to Frank

18  Varasano, Jim English and Ivgen Guner on

19  September 19th of 2000, right?

20      A.  Correct.

21      Q.  And the subject line is the "OPI

22  Forecast"?

23      A.  Yes.

24      Q.  And this is just a couple months after

25  you took over OPI; is that fair?

1      A.  Correct.

2      Q.  So, you're sending an e-mail to Frank

3  Varasano, and it appears that you're discussing one

4  of the forecast packages or something like that.

5      A.  Right.  And, specifically, the results

6  or projected results for the first month of the

7  quarter.

8      Q.  Right.  And you write Frank, "As I

9  mentioned in a prior e-mail, I most likely won't be

10  on the forecast call today.  I looked at the

11  forecast package, and there are three things I'd

12  like you to pursue on the call."

13      The first thing you say is the number of

14  September -- "The number for September has dropped

15  by half."

16      Do you know what you meant by that?

17      A.  I don't remember that specific point,

18  but I know what's behind it.  One of the things that

19  I was encouraging OPI to do was to not be so

20  back-end loaded in a quarter and that we delivered

21  revenue in all three months so that at the back end

22  we weren't having to work extra hard to make the

23  number.

24      And so, I had started the process of

25  asking OPI to forecast their numbers for each month

1  of the quarter.  That was new.  They had not done

2  that in the past.  We had gotten them to do it, and

3  then you can see right after I had done that or

4  sometime after I had done that, they originally said

5  that they would deliver -- OPI would deliver

6  20 million -- the sales team would deliver

7  20 million in September, the first month of the

8  quarter, and in fact it dropped to 10 million.

9      Q.  Okay.  And then you say "and this drop

10  is concerning.  My view is there are a number --

11  there are some October/November deals that should

12  fall into September.  Let's make sure we don't let

13  half the year go by before we start to deliver,

14  e.g., November."

15      What do you mean by that?

16      A.  I believe -- and that's why I underlined

17  a point.  I believe I meant that let's don't let

18  half the quarter go by before we start to deliver.

19      Q.  Well, end of November would be half the

20  fiscal year, wouldn't it?

21      A.  You're right.  You're right.  Maybe I

22  did -- you may -- I stand corrected.  Maybe that is

23  correct, the way the e-mail's written.

24      Q.  Okay.  The next thing you write second

25  is "Steve's management judgment."  Talking about

1   Steve McLaughlin there?
2       A.  Yeah.
3       Q.  And he was in the East, right?
4       A.  Correct.
5       Q.  Area vice --
6       A.  He was the East AVP.
7       Q.  Right.  And you write, "His positive
8   judgment is as big as OPI's negative judgment."
9           What does that mean?
10      A.  What Steve was doing was projecting a
11  number, a revenue number, for the quarter.  And what
12  I take from this is that he was putting a lot of
13  judgment against his number.  So, he wouldn't have
14  deals against it; he just had management judgment in
15  there of some millions of dollars.
16          And -- and then OPI -- and I would
17  assume this is Frank Varasano at this point since he
18  was the AVP responsible for OPI reporting in to
19  me -- is he was applying negative judgment overall,
20  which meant he was taking the forecast from the
21  three AVPs and bringing it down.
22      Q.  Okay.  And based on what Mark
23  Barrenechea wrote to Safra and Jeff Henley in
24  December, Steve McLaughlin didn't bring in anything
25  for Q2; is that fair?

554

1       A.  No.  He didn't bring in any CRM deals in
2   Q2.
3       Q.  Any CRM.  Okay.
4       A.  That doesn't mean he didn't bring in
5   database and ERP application deals.
6       Q.  Right.  Thank you.  So, then you say,
7   "Steve needs to talk about the specific deals that
8   cover his judgment or he needs to lower his
9   judgment."
10          That's kind of what you were just
11  explaining to me, right?
12      A.  Correct.
13      MR. WILLIAMS:  All right.  I'm going to ask
14  the reporter to mark this document as Sanderson 41.
15          (E-mail dated 10/3/00 re Forecast Prep
16  for 10/3 marked Exhibit 41 for identification.)
17  BY MR. WILLIAMS:
18      Q.  It's Bates numbered NDCA-ORCL 101602.
19      A.  Okay.
20      Q.  Okay.  You recognize the document?
21      A.  I do not.
22      Q.  It's an e-mail from Richard Blotner to
23  you on or around October 3rd, 2000, right?
24      A.  Correct.
25      Q.  Regarding forecast prep for the same

555

1   day, October 3rd, right?  That's what the subject
2   line says.
3       A.  Correct.
4       Q.  And Richard Blotner was -- what was his
5   position again?  Actually, withdrawn.
6           He's vice president of operations for
7   Americas Consulting, Latin America and OPI Sales,
8   correct?
9       A.  Correct.
10      Q.  And he writes to you "Closed in
11  September was very weak, negative 3 million.  I
12  think probably the lowest first month in three
13  years."  See that?
14      A.  Yes.  I don't know that -- it may be
15  negative -- I didn't know if that was 3,000 or
16  3 million.  It probably was 3 million.  Okay.
17      Q.  And he says, "A sense of urgency must be
18  there to make this up in October.  Time is right now
19  where you and Sebastian can make some executive
20  calls for the big deals.  This situation definitely
21  makes me worry a little."  You see that?
22      A.  Yes, I do.
23      Q.  Do you recall being worried as well?
24      A.  I don't.
25      Q.  He writes to you "Perhaps time to make

556

1   special incentives to the ones like Prepa that have
2   been hanging around for a while."  See that?
3       A.  Yes.
4       Q.  The special incentives he's referring
5   to, is that something for the salespeople?
6       A.  Yes, exactly.  It's along -- when we
7   talked earlier where Jay was suggesting --
8       Q.  Right.
9       A.  -- a special -- it's called a SPIF, a
10  special incentive program.  And Prepa was a
11  customer -- or client in Latin America.  This is all
12  about Latin America.
13      Q.  How can you tell?
14      A.  Because Sebastian was running Latin
15  America for me.  Prepa was -- I remember, was a
16  Latin America customer.  And then we mentioned later
17  on Mexico was a little light at this time.  Mercosur
18  and Ela were all Latin America clients.
19      Q.  Okay.  He writes later, "Most November
20  deals are dated November 30.  This is bad in my mind
21  set."
22          Do you know what he meant by that?
23      A.  Yeah, most -- I now see what you're
24  saying.  Yeah, what they would have in their
25  pipeline or their deal list for Latin America was

557

Sanderson, Jr., Edward J  7/26/2006  9:00:00 AM

1    that they were going to close -- if it was projected
2    for a November close, they were projecting a
3    November 30th close date.
4         And this, frankly, was part of -- you
5    would find sales reps that just weren't being
6    diligent.  The easiest thing for them to say was
7    November 30th.  If they put November 10th, and
8    they didn't close it on November 10th, they know
9    they'd start getting calls.
10        Q.  When he writes "Good activity in Brazil
11   so hopefully we're back on track there.  Critical to
12   close out this Bank Boston exchange deal," was the
13   Bank Boston exchange deal a Latin America deal?
14        A.  Yeah -- yes, they were -- Bank of Boston
15   was doing a deal down in -- in, I believe, Sao
16   Paulo.
17        Q.  Sao Paulo, okay.
18        Do you recall when this lawsuit was
19   filed in March of 2001?
20        A.  I recall that it was filed shortly after
21   the quarter was over.  And you said March of 2001 --
22        Q.  Right.
23        A.  -- and I'll take you at your word that
24   it was sometime during that month.
25        Q.  And how did you learn about it?

558

1    A.  I don't recall.  I don't recall.
2    Q.  And did anyone ask you to preserve all
3    of the documents in your files that might be
4    relevant to the lawsuit?
5    A.  Yeah.  What I recall is right when I
6    found out -- and I don't recall specifically how --
7    there was an e-mail and a phone call, and I can't
8    remember who did the phone call, that I was to
9    preserve all -- you know, all my documents.  I think
10   they said that they were going to copy my hard
11   drive -- you know, my laptop, and that was fine.
12   Q.  Do you recall anyone coming to do that?
13   A.  I do.  I recall somebody coming to do
14   that and also going through all my files.
15   Q.  In your office?
16   A.  Yeah.
17   Q.  And did you -- did you talk to any of
18   the people that reported to you about preserving
19   their documents?
20   A.  I don't recall.  I remember Legal took a
21   pretty active role on this to make sure that we were
22   responsive, and I don't know what kind of
23   conversations they had with my directs.
24   Q.  I'm actually just talking about you,
25   whether or not you told your direct reports?

559

1    A.  Yeah.  I said I don't recall.
2    Q.  Okay.  And do you know whether they
3    actually did preserve all documents that might be
4    related to the case?
5    MR. GIBBS:  Who's "they"?  I'm sorry.
6    THE WITNESS:  They are --
7    BY MR. WILLIAMS:
8    Q.  "They," your direct reports.
9    A.  I don't recall.  I don't recall being
10   involved in that.  I may have.  I just don't recall.
11   MR. WILLIAMS:  I don't have anything further.
12   MR. GIBBS:  I have just a couple of minutes.
13   Just because of the way the table's shaped, I would
14   like to switch.
15   MR. WILLIAMS:  Yeah, that's fine.
16   MR. GIBBS:  It won't take long.  We don't
17   need to go off the record.
18   MR. WILLIAMS:  Thank you.
19   THE WITNESS:  You're welcome.  Will you come
20   over now and help me?
21   MR. WILLIAMS:  Yeah.  I'll sit next to you.
22   THE WITNESS:  Thank you.
23   MR. WILLIAMS:  They might need some help
24   questioning you.
25   MR. GIBBS:  Go ahead?

560

1    MR. WILLIAMS:  Yeah.
2
3         EXAMINATION
4    BY MR. GIBBS:
5    Q.  Mr. Sanderson, I just have a couple of
6    topics I want to cover with you.  First of all, you
7    spent some time yesterday talking to Mr. Williams
8    about the demo environment at Oracle during 2000 and
9    2001.  Do you remember that topic?
10   A.  Yes, I do.
11   Q.  How, if at all, did issues involving
12   Oracle's demo environment during that time period
13   relate to your forecast for the third quarter of
14   fiscal year 2001?
15   A.  The -- as we discussed, there were
16   issues around the demo.  That was known.  It wasn't
17   a hidden fact.  And the sales teams would know it as
18   well.
19        That said, typically, in the sales
20   process, the demo is one of the things that you do
21   early on to help the customer understand what the
22   product does.  And then there is a period of time
23   after that that it takes to have the deal to specify
24   what the deal is, get agreement within the customer
25   to get -- get agreement with the customer at the

561

1  level that you're working with, to get that deal to
2  work up the chain within the customer to somebody
3  that had signing authority for the deal.  So, that
4  would take a period of time.
5          When we had a demo, as we -- also, I
6  want to bring forecasting in for a minute, I think,
7  in answering the question.  As you recall, I tracked
8  three cases -- three situations on deals:  Worse
9  case, most likely and best case.
10         And this is something that I tracked
11 regularly and, obviously, talking with the AVPs, the
12 RAMs and the account managers, as appropriate.  And
13 if a deal -- if we had a deal out there and the demo
14 did not go well or was problematic and, for example,
15 if that deal was in forecast, it would move to
16 upside.  And it was not something that we kept in
17 the forecast if, in fact, we were having
18 demonstration problems.
19     Q.  So, during the third quarter of 2001,
20 did you ever consider changing your forecast because
21 of the general demonstration environment issues that
22 you discussed with Mr. Williams yesterday?
23     A.  Because of the general demonstration
24 environment issues?  No.  It's -- I put that -- no.
25 And I put that in the same category as I would if we

562

1  were talking about trends for -- economy -- trends
2  in the economy, because I would -- you know, I've
3  been asked that in the past as well.
4          It all gets down to what's my forecast
5  by account and what's the revenue associated with
6  that and was it going to happen this quarter and
7  what did we do -- you know, what was left to make it
8  happen.  The fact that there was a troubled demo
9  environment was of concern, but on the other hand,
10 my forecasts were deals that -- that were live
11 deals.  I knew where they stood and what we need to
12 do to make it happen.
13     Q.  Let me switch to a slightly different
14 topic.  You also discussed with Mr. Williams, I
15 think yesterday, your expectations of your
16 salespeople with regard to the information they put
17 into the OSO database.  Do you recall that issue?
18     A.  Yes.  Oracle SalesOnline.
19     Q.  I think you said that you expected your
20 salespeople to put accurate information into the OSO
21 database?
22     A.  Right.
23     Q.  I want to talk about some of the
24 specific information that was in the OSO database.
25 One of the fields in the database was win

563

1  probability, correct?
2     A.  Correct.
3     Q.  When you were doing your forecasts that
4  you then sent up the organization, did you rely on
5  the win probabilities in the OSO database?
6     A.  I would -- I would look at them, but
7  where I really relied was on the spreadsheet that I
8  talked about where I extracted data out of OSO
9  and -- that I had for East, Central and West in
10 categories -- categorized in the three categories
11 that I just mentioned a few minutes ago.
12         And that's where I focused on most
13 likely -- you know, what was most likely going to
14 happen, for a couple reasons.  One is I -- as much
15 as I would ask the sales reps to update OSO and keep
16 it accurate or keep it current, by human nature, it
17 didn't always happen.
18         And it could be for different reasons.
19 Somebody could have a million dollar -- I mean,
20 sorry -- a 5-million-dollar deal, and they'll put it
21 in as a million dollars.  And the reason is, most
22 likely, the people above or they're going to, most
23 likely, get less phone calls around a million dollar
24 deal than they a 5-million-dollar deal.  It's
25 just the nature of salespeople.

564

1  Also, as you go through the quarter, and
2  particularly towards the end of the quarter in the
3  last month, last couple weeks, last week,
4  particularly in the last couple of weeks, the sales
5  reps are not, by nature, keeping OSO -- at least
6  when I was there, keeping OSO current because they
7  were putting their energy around the deal and what
8  it took to -- you know, they were putting all their
9  focus specifically on the deal and not coming back
10 and updating OSO.
11         Also, just on the question -- so, that
12 was one issue about not being able to rely on the,
13 to your question, the probability factor that was in
14 percentage of OSO.
15         The second thing, again, I used those
16 spreadsheets, the extracted data, now formatted in a
17 way that I use particularly towards the end of the
18 quarter.  I found that was the best tool for me to
19 manage the process.
20     Q.  So, how did you go about determining
21 which deals were likely to close and how likely they
22 were to close during the quarter?
23     A.  I would talk to the AVPs.  I'd talk to
24 the regional managers.  Oftentimes I was talking to
25 the customers.  The sales reps like it when you came

565

Sanderson, Jr., Edward J  7/26/2006  9:00:00 AM

1  out and visited their customers, bringing an
2  executive out to the customer.  So, I'd hear it
3  directly from the account managers.  And the fact
4  that I visited the customer, I'd oftentimes get the
5  input of that.
6      So, I'd take that various input, and
7  that would triangulate to me whether it fell -- what
8  category of those three categories it fell into, a
9  deal fell into.
10     Q.  You referred, in addition to win
11 probability, to the deal value --
12     A.  Right.
13     Q.  -- field within OSO.  Did you rely
14 solely on the deal value within OSO to figure out
15 what potential deals were worth?
16     A.  No.  I mean, it would give me -- at
17 particularly the beginning of the quarter, it might
18 give me an idea if I wanted to go online to -- I
19 mean, look at OSO.  But, no, for the reason I just
20 cited, is that they -- the sales rep sometimes
21 would -- I think Shawn used the term yesterday
22 "sandbag."  And at times, they would sandbag, and
23 they wouldn't highlight the size of the deal.
24     Q.  So, how, in addition to OSO, would you
25 go about figuring out what potential deals were

566

1  worth?
2      A.  For the very same process that I just
3  described on -- I mean, the same sources of
4  information as I described on the percentage
5  probability for the deal.  Talking to the customer,
6  account reps and other people within the sales
7  organization.
8      MR. GIBBS:  That's all I have.  Are we done?
9      MR. WILLIAMS:  Yep.
10     THE VIDEOGRAPHER:  Off the record at
11 5:42 p.m., and this marks the end of this
12 deposition.
13     (Deposition adjourned at 5:42 p.m.)
14         * * * * *
15     I declare under penalty of perjury that
16 the foregoing is true and correct; that I have read
17 my deposition and have made the necessary
18 corrections, additions or changes to my answers that
19 I deem necessary.
20     Executed on this _____ day of
21 _____, 2006.
22
23
24     _____
         EDWARD J. SANDERSON, JR.
25

567

1
2
3         REPORTER'S CERTIFICATE
4
5      I, KAE F. GERNANDT, a Certified
6  Shorthand Reporter for the State of California, do
7  hereby certify:
8      That the witness in the foregoing
9  deposition was by me duly sworn; that the deposition
10 was then taken before me at the time and place
11 herein set forth; that the testimony and proceedings
12 were reported by me stenographically and were
13 transcribed through computerized transcription under
14 my direction; and the foregoing is a true and
15 correct record of the testimony and proceedings
16 taken at that time.
17     IN WITNESS WHEREOF, I have subscribed my
18 name this 3rd day of August, 2006.
19
20
21
22 _____
23     Kae F. Gernandt, CSR No. 5342
24
25

568

1

2

3                    REPORTER'S CERTIFICATE

4

5              I, KAE F. GERNANDT, a Certified Shorthand

6    Reporter for the State of California, do hereby certify:

7              That the witness in the foregoing deposition

8    was by me duly sworn; that the deposition was then taken

9    before me at the time and place herein set forth; that

10   the testimony and proceedings were reported by me

11   stenographically and were transcribed through

12   computerized transcription under my direction; and the

13   foregoing is a true and correct record of the testimony

14   and proceedings taken at that time.

15             IN WITNESS WHEREOF, I have subscribed my

16   name this 3rd day of August, 2006.

17

18

19

20   _____

21             Kae F. Gernandt, CSR No. 5342

22

23

24

25

568