EXHIBIT 21

[Fwd: First Q3 Forecast-Thinking]

Return-Path: <david.winton@oracle.com>
Received: from oracle.com (rociyyx-ppp-6.us.oracle.com [144.25.233.160])by
gmgw01.oraclecorp.com (8.8.8⁻.8.8) with ESMTP id IAA17765for
<GEORGE.ROBERTS@ORACLE.COM>; Thu, 7 Dec 2000 08:28:05 -0800
(PST)
Message-ID: <3A2FE4C5.48FB32D1@oracle.com>
Date: Thu, 07 Dec 2000 11:28:05 -0800
From: David Winton <david.winton@oracle.com>
Organization: Oracle Corporation
X-Mailer: Mozilla 4.7 [en] (Win95; I)
X-Accept-Language: en
MIME-Version: 1.0
To: "Roberts.George" <GEORGE.ROBERTS@oracle.com>
Subject: [Fwd: First Q3 Forecast-Thinking]
Content-Type: multipart/mixed;boundary="-----------71DD06648E5CDB9F8325532E"
X-Mozilla-Status: 8001
X-Mozilla-Status2: 00000000

Here it is again in case you did not find yesterday's

Message-ID: <3A2EBF8E.B0CDC36F@oracle.com>
Date: Wed, 06 Dec 2000 14:37:02 -0800
From: David Winton <david.winton@oracle.com>
Organization: Oracle Corporation
X-Mailer: Mozilla 4.7 [en] (Win95; I)
X-Accept-Language: en
MIME-Version: 1.0
To: David Winton <david.winton@oracle.com>
Subject: Re: First Q3 Forecast-Thinking
References: <3A2EBED2.2900B0F8@oracle.com>
Content-Type: multipart/mixed;boundary="-----------227BF7427D7099564B5F8362"

David Winton wrote:

> Just to let you know the review background and discussions around our initial Q3
> Forecast of $346M.  Our LOB's turned in $311M with $28M of Judgment.  George and I
> added another $39M for this submission.  Some notes(see attached trend spreadsheet):
>
> 1.Slow start in FY'00-  The growth comparisons to last year have been relatively
> easy in the first two quarters as we did not perform that well a year ago.  The
> disruption over account moves in Majors last year was the main factor.
>
> 2.More Big deals this Q1&2- As the schedule shows, our results this year have been
> boosted by big deals in both quarters.  Combined, these>$5M deals contributed over
> $55M year to date.  Note that we only have one deal >$5M currently in the Q3 Pipe.
> Last year we had four deals that netted $28M.
>
> 3.Growth comparisons tougher in Q3&4- NAS results took off last year in Q3 and
> continued into Q4.  Growth rates will slow in the second half but we still feel that
> the annual 31% target is achievable with some potential upside of 2-3points if Q3 is
> strong.

ORACLE CONFIDENTIAL

8/12/2002 7:34 PM

1 of 2

NDCA-ORCL 096150

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER


[Fwd: First Q3 Forecast-Thinking]

>
> 4.Q3 Pipe not where it needs to be- Based on the conversion history, I think we
need another $50M of Apps and nearly $70M of Tech to feel statistically comfortable
to hit our Q3 Budget.  Given the past trends, GB and Majors should add incremental
Pipe during the next three weeks.  If so, we move up.
>
>                           Name: NAS_Q3Q4.xls
>    NAS_Q3Q4.xls          Type: Microsoft Excel Worksheet
(application/vnd.ms-excel)
>                       Encoding: base64
>              Download Status: Not downloaded with message

David Winton <david.winton@oracle.com>

**Content-Type:** application/vnd.ms-excel;name="NAS_Q3Q4.xls"
NAS_Q3Q4.xls  **Content-Transfer-Encoding:** base64
**Content-Disposition:** inline;filename="NAS_Q3Q4.xls"

David Winton <david.winton@oracle.com>

ORACLE CONFIDENTIAL

8/12/2002 7:34 PM

NDCA-ORCL 096151

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER

EXHIBIT 22

## Softwar

### The Rewards of Recklessness: A Portrait of Larry Ellison and Oracle Corporation at War

*By Matthew Symonds*

### A shifting landscape

The Nasdaq index, one-time proud symbol of America's high-tech boom, has more than halved since March. All around, the dot.coms lie dead and dying. Amazon and Yahoo, the names that launched a thousand business magazine covers in the late 1990s, survive, but now exist in some sad Internet twilight zone, their shares worth little more than a tenth of their value a year ago. Even the mighty Lords of Wintel – Microsoft and Intel – have lost two-thirds of their value in the last 12 months as PC growth has slumped. Shares in WorldCom, so recently the very model of next-generation telecoms, are down to $14 compared with $55 at the beginning of 2000. Wherever you look, whether at once fashionable Internet business software firms such as Ariba, Commerce One and i2 or those paragons of New Economy management cool, Cisco and Dell, the rule is the same: lowered expectations, and investors stampeding for the exit.

An exception to that rule is Oracle, the number one database software supplier and second biggest vendor of applications for automating businesses. Despite a run-up of 600% in its stock during the year to July, and the shock departures of two of its most senior and high profile executives, Ray Lane and Gary Bloom, Oracle is still worth five times more than it was eighteen months ago. And since announcing a blow-out quarter in mid-December, its shares have risen as the Nasdaq slumped still further. Contrasting those 2nd quarter numbers with a profit warning from Microsoft on the same day, the influential Lex column in the *Financial Times* observed: "Oracle beat profit forecasts yesterday and talked of accelerating sales. Microsoft is still a strong, profitable company. But in terms of both growth and significance for the technology sector, the baton has well and truly passed to a new generation."

In fact, Oracle is the only big-cap high-tech stock that has not seen its value pretty much cut in half in recent months. But if the market is smiling on Oracle, much of the



EXHIBIT 14

155

Ellison 3.30.07

2

rest of the computing industry is not. Many fear it and see it as intent on becoming the new Microsoft, equally dominant and rapacious. And Microsoft itself, bloodied from the antitrust case that Larry Ellison has cheered on, and still threatened by the wave of change unleashed by the Internet, is getting ready to fight back with its huge resources and unmatched capacity for focused aggression.

What is it that has made Oracle both one of the hottest and most controversial companies in the world today? The answer lies in two bets made by Larry Ellison, Oracle's founder and chief executive. The first, in 1997, was to gamble that the Internet would make possible a new form of computing that could sweep aside the prevailing client/server architecture of the 1990s – the form of computing that had been created by the Microsoft-led PC revolution – and that Oracle's industrial-strength databases would be at its heart.

While other rival software firms, such as the German business applications powerhouse, SAP, and Siebel, the leader in sales automation, were only prepared to nod in the direction of the Internet, Ellison decreed, to the dismay of many in the company, that Oracle would simply cease building client/server software. Although it seemed reckless to the point of irresponsibility at the time, it's now clear that Ellison won that bet. Oracle lost application sales in the short-term, but as e-business took off, Oracle had both the vision of computing and the products that customers were suddenly wanting.

Then last spring, Ellison rolled the dice for the second time: Oracle shipped Release 11i – a complete suite of integrated e-business applications that is the product of one of the most ambitious engineering projects in software history, with GE and Citigroup as early customers. Ellison's new bet was that companies were sick of the expense and complexity involved in trying to make so-called "best-of-breed" software work (laboriously stitching together the best products of myriad different firms) and would see the advantages of a single standardised package – courtesy of Oracle – that would do everything. One of the principle reasons for today's fashionable disillusion with the Internet is that the reliability of the software underpinning early attempts at e-commerce has been abysmal, promising far more than has actually been delivered. Ellison is saying that the only way to fix the problem is by using software that was engineered from the outset to work as a tightly integrated package: software that is designed, built, configured and tested by Oracle.

If the first bet was daring, this second bet is even reckless. For Ellison and Oracle are going to war not only with every other business software firm on the planet, including the old enemy, Microsoft – a dangerous thing to do in an industry in which

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

NDCA-ORCL1053565

3

"co-opitition" and alliances are the rule – but also with the giant consulting and systems integration companies, such as IBM, Andersen Consulting and EDS, who make their billions from the very complexity Ellison is determined to banish. These are not firms that will allow their highly lucrative franchises to be diminished without a bitter struggle.

Ellison says he's only happy when everyone else thinks he's wrong, when he's "walking way out to the end of the limb, and then jumping up and down." But now that the prospect of overhauling Microsoft is both real and close – Oracle's market value is within spitting distance of Microsoft's at about $200 billion versus $250 billion – even that is not enough. For Ellison, it will always be a matter of "win or die". He says: "Without recklessness, you can't innovate. The rewards of recklessness are enormous."

*The origins of the war*

The beginnings, if not the causes, of most wars are obscure. But this one has a time and a date. As Intel's Andy Grove has it, major transitions in high technology are triggered by "inflection points" that are often only apparent after the event. In September 1995, at a conference in Paris, just a month after the release of Windows 95, one of the most hyped marketing events in history, Ellison announced the imminent death of the PC, "a ridiculous device", and, by implication, predicted the pending decline in the power and influence of the company most associated with it, mighty Microsoft. The PC was just too complicated and too expensive, Ellison argued; in the coming age of the Internet, all you needed was a simple appliance that would get all its information and applications simply by plugging into the network. In short, you needed a *network computer* rather than a personal computer.

There followed a dazzling digression. Ellison was right about the importance of the Internet, but it turned out that most people thought the best way of getting to it was through a PC. A few network computers were made by Oracle and a loosely-knit coalition of Microsoft's enemies, such as IBM and Sun Microsystems, but tumbling PC prices and the limitations imposed by slow dial-up connections quickly condemned them to irrelevance. Microsoft crowed; Ellison was made to look a bit foolish. But in some ways, the PC versus the NC was a side-show that attracted attention away from the core struggle for the future of computing, a struggle that was also taking place within Oracle itself.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

NDCA-ORCL1053566

4

By 1997 Oracle was not just a database company. Ray Lane, the chief operating officer, had been brought in from the consultants, Booz Allen, five years earlier to provide a steadying hand after an accounting scandal that nearly engulfed the company. In an effort to make Oracle more stable and "mature", Lane built a 12,000-strong consulting organisation selling complete "solutions" around the database. In addition, Oracle had a fast-growing, albeit under-performing, business in the software applications, known as "enterprise resource planning", that large firms were increasingly using to automate their back-offices. The big player in this market was SAP, with over 60 percent, while Oracle was a distant second with 15 per cent. Some of these applications could run on mainframe computers and be accessed with "dumb" terminals; but all the growth was coming from the form of computing that took the world by storm in the late 1980s,  called "client/server".

The idea of client/server was to use the processing power and local storage of PCs (the client) in conjunction with large numbers of quite small servers that were linked together to form a local area network. Applications resided on both the client and the server. People liked it because it was standards-based, highly flexible and decentralised. It liberated departments within companies from the tyranny exercised by high priests of the datacenter to do their own computing thing. Client/server was, in a nutshell, the reason for the rise of Microsoft and the decline of IBM.

But Ellison's conviction was that client/server had unleashed a nightmare of "distributed complexity"; it was not only appallingly labour-intensive to run, but also committed the cardinal heresy of fragmenting corporate data to the point where it was no longer possible to get fast answers to simple questions. The solution was Internet computing. Information and applications could be consolidated in one place and be accessed by hundreds of thousands of users by means of a standard web browser running on a PC, or on the simpler devices Ellison favoured.

While Internet computing had the potential to make the PC a great deal less important, it would have the reverse effect on the databases that Oracle built. In the Internet computing universe in which everything and everybody would be connected to everything else, the demand for bigger, faster and more capable databases would be insatiable. In fact, the database might become the essential platform for Internet computing, effectively displacing and commoditising the operating system. "For the first time in my life," Ellison says, "I realised we had a chance to beat Microsoft and be first on the Internet."

But for Ellison, there was a further reason for extending the war on the PC to the whole client/server paradigm. As long as client/server ruled, it would be impossible to

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

NDCA-ORCL1053567

5

break SAP's stranglehold on the market. The relatively poor showing of Oracle's applications had already led to a major battle in the Oracle board-room and was undermining Ellison's position in the company. Under pressure from Lane (who was by now seen by many, both inside and outside the company, as the man who was really running the company day-to-day), Ellison promised to do something about it. It wasn't what Lane or anyone else at Oracle was expecting. Ellison says: "The first thing I did was cancel projects a year from completion: I said, 'we're cancelling the next version (of Oracle applications) after (Release) 10.7. It doesn't even work. Stop it. Kill it. Go to the next generation.' This was very controversial. I told the engineers, 'It's too late to finish. It's irrelevant.' I made the announcement at Oracle that we were no longer doing client/server. 'With client/server we will never beat Microsoft. From now on, we will only do Internet applications.' Ray disagreed, he was violently opposed. His view was that it was much too risky."

The disagreement with Lane came to a head in early 1998. Ellison recalls: "I got a call from Ray at about midday. He wanted me to come and hear what the sales-force felt about giving up client/server and what the customers were saying. They were having a big meeting at the Hyatt in Burlingame (a few miles north along Highway 101 from Oracle's Redwood Shores base). There were about 200 of them, and they had choreographed everything to tell me how wrong I was and how our customers wouldn't tolerate going to the Internet. I really didn't care about that: the customer doesn't know what he wants, all he knows is what he doesn't like.

But I didn't say that. I felt my position at Oracle was a bit precarious. I wasn't sure whether the board would support me or Ray. And I didn't want to discourage the sales-force, so I said: 'Just tell me what all the problems with applications are.' And I listened to all their comments, and I said: 'You know, you guys are right. I promise you, we'll go on doing client/server. You guys are right, we can't force our customers to go this way.' But I was lying: I had no intention of doing that. I lied because I wanted to appear balanced and reasonable and because I needed time. I never had a problem lying. I knew I was right."

And it seems that he was. Few people now argue about the merits of the transition to Internet computing from client/server. The PC still dominates as the main means of access to the Internet (although other devices are at last starting to appear in numbers), and a debate still rages about how much computing power to keep on the desktop. But even Microsoft has embraced Internet computing to the extent of trying to create a version of it in its own image called "dot. NET". And despite having had to fight within Oracle to "socialise" the idea of Internet computing – "I'd tell people to do something and they literally wouldn't do it" – Oracle shipped its first suite of Internet

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

NDCA-ORCL1053568

6

applications well ahead of the pack in 1999 and for the first time in years started stealing market share from SAP, who were not only later to the Internet but were also a lot quieter about it. Crucially, Ellison's gamble did not just give it an edge in enterprise applications, it also made Oracle seem like not just a big company, but, for the first time in years, a cool one.

### Declaration of war

Ellison depicts the fight against client/server as a Manichean struggle against Microsoft. He says: "I pick a fight, as I have done with Gates and (Microsoft CEO) Ballmer, to make it impossible to go back. If you land on the opposite shore and burn your boats, there's no going back. It's win or die." It was an act of calculated recklessness for a firm of Oracle's size to stop making products that customers still demanded, one that effectively bet the company. But Ellison was hardly alone in realising that "the Internet changes everything"; the sheer speed of the Internet's adoption after 1996 gave him a strong following wind.

However, Ellison's next bet, albeit from a position of greater strength for both himself and Oracle, is far larger and potentially more dangerous. "We're going to war with everyone," he says cheerfully. "Software is and always will be a winner takes all business." With the rules of the game having changed in his favour; Ellison's bet positions Oracle to snatch from Microsoft the mantle it had previously claimed from IBM as the dominant force in computing. And while the reign of Microsoft was temporary, Ellison reckons Oracle could be on top for a very long time. The vision is of "one network, one database"; Ellison says, "You will need a really powerful reason to move away from that. If we win, I really don't know what the next paradigm shift will be."

When Ellison says that Oracle is going to war with everyone, he means it. For the war that he has declared is against the complexity, and consequent cost and unreliability, that is the foundation of the current computing industry and the model, he argues, to which Microsoft remains devoted. The way enterprise computing works today is that big firms call in consultants and systems integrators to work out what will be the ideal mix of software – it's known as selecting the "best of breed" – to run their business and streamline their operations. . Notoriously, companies undergoing an SAP implementation to automate internal processes such as financial systems, human resources and manufacturing, spent several years and tens, or even

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

NDCA-ORCL1053569

7

hundreds, of millions of dollars trying to get the new software to integrate with all their old kit, yet still ended up with something that didn't work as described on the box.

But if that was complicated, the Internet has taken it all to a new level. Companies are now being encouraged by computing firms to create highly integrated value chains that extend their own processes, via their existing ERP (enterprise resource planning) backbones, deep into those of their customers and business partners. The idea is that from the moment an order is taken, from a webstore or from a salesperson on the road with an Internet connection, an entire series of complex interactions ripples instantaneously through to the remotest link in the value chain. All of it theoretically choreographed by software from a host of different vendors – some from the client/server era, some new ones carried in on the Internet tidal wave. And all of it creating unprecedented amounts of new data that (again theoretically) can be retrieved by managers to inform their decisions and increase efficiency still further. If only.

Ellison believes that this is just the latest example of the computing industry's celebration of complexity. He says: "At Oracle, we used to be fervent about best of breed; but it doesn't work. IBM has 130,00 consultants trying to get this stuff to work, and even they can't do it. It's absolutely unique to our industry that in the end it's usually left to the customer to try and make it work. It's completely crazy. The equivalent would be if you wanted a best of breed car and you decided on Honda suspension, a Mercedes engine, a BMW exhaust system, Ford brakes and so on, and you bought all these parts and then tried to build a car out them. Unless you're an engineer, you've got a problem. So you hire an engineer, and you hope he knows what he's doing. That's how companies buy their software today."

Oracle's answer has echoes of the strategy that Microsoft used to dominate the market for desktop productivity software: to provide all the pieces and integrate them so tightly that it no longer makes any sense for a customer to go to different suppliers for word processing, spread sheet or presentation programmes. Ellison is betting that only Oracle has the programming resources and the distribution clout, thanks to the ubiquity of its database, to create a complete soup-to-nuts package of Internet-based integrated business applications – hence the first release of the e-business suite, Oracle 11i, shipped in the middle of last year (2000).

Ellison calculates that the advantages to customers in terms of speed to market, money saved on never-ending systems integration (which always carries with it a risk of failure) and data consolidation will outweigh any fears they might have of

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

NDCA-ORCL1053570

8

being "captured" by one over-mighty vendor. He argues that it doesn't matter if the software product of a more specialised rival, such as Siebel, the top sales automation firm, or Commerce One, a leader in procurement and Internet exchanges, is individually slightly better than Oracle's offering. He says: "The best parts don't yield the best system." The prize of seamless interoperability, out of the box reliability, and holding all data in one place (while each best of breed application needs its own dedicated database) overwhelms everything. To the same end, increasingly Oracle is embedding new features into its database and application servers – a strategy designed to erode the role and importance of the operating system, thus striking at Microsoft's attempts to colonise the corporate datacentre with its new server version of Windows 2000.

And another thing. As e-business is all about connecting with other companies, how much more effective will that be if they are also using Oracle software? For the same reason that Microsoft's Office makes collaboration between individuals easier – because it has become a de facto standard that everybody else in the world uses – so Ellison reckons that the same will be true for companies if Oracle's e-business suite becomes their default choice.

Ellison's new mantra is: "It can't be simple if it's not complete." It's a message that seems to be striking a chord with the kind of blue chip clients Oracle must win over – GE and Citigroup are early 11i customers. But perhaps the most powerful piece of propaganda Ellison has to hand is the transformative effect that "eating its own dog-food", as it is elegantly known in Silicon Valley, has had on Oracle itself. By using its own software and massively consolidating its data, Oracle has become an e-business exemplar, extracting $1 billion of cost savings in one year and automating its operations to such an extent that a swathe of senior managers has been fired and its tetosterone-charged salesforce placed in a computerised straitjacket. Ellison claims that the newly-streamlined Oracle has become "a fact-based organisation" that can respond far faster than its competitors to rapid changes in the marketplace.

Those competitors are well aware of the threat and are not standing still themselves. SAP has struck technology deals with Commerce One and Clarify, a specialist in call centre software, to strengthen its offering against the threat from 11i. Siebel has formed a close partnership with IBM and is increasingly violent in its denunciation of Oracle and Ellison's "pathological" behaviour. Microsoft, in a surprise move just before Christmas, announced the $1.1 billion purchase of the business applications vendor, Great Plains, with the clear intention of heading off Oracle's push into the small and mid-sized business market. With the needs of its forthcoming dot.NET software and business services platform in mind – Gates describes dot.NET as his

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

NDCA-ORCL1053571

9

bet-the-company initiative – it's safe to say that Great Plains won't be the last acquisition of its kind that Microsoft makes.

In the past, Microsoft has been able to dismiss Ellison as a bombastic crank. Although Microsoft still uses the same sneering rhetoric, it now takes the danger posed by Oracle far more seriously. Microsoft knows that Oracle is coming for it, and Gates' firm intends to fight back with every thing it has. Right now, the two giants of the software industry are circling each other, probing for weaknesses and looking for easy opportunities to strike at each other's businesses. But the years of grudging coexistence and détente between Microsoft and Oracle are over: full-scale hostilities are about to begin.

But to win on the scale Ellison intends, Oracle must defeat not just other software firms, it must also take on and pummel into submission the entrenched armies of highly-paid consultants and systems integrators, an industry in itself that turns over hundreds of billions of dollars worth of business each year. What makes that so dangerous is that it is the likes of IBM, Andersen Consulting and EDS who are the kingmakers of the software industry, whose recommendations to clients drive sales. By making enemies of them, Ellison may not only undermine channel support for Oracle's applications, but even for its dominant database, allowing rival offerings from IBM and Microsoft to gain traction.

Not surprisingly, many consulting industry analysts are sceptical to the point of hostility. They believe that Oracle has become too big for its boots and that best of breed is here to stay. Still more to the point, if Oracle succeeds, it eats a large part of their lunch. Ellison is not impressed: "The forward-looking analysts in this industry – like the Gartners and the MetaGroups – all they do is try to explain the past and treat it as some kind of prognostic. It's preposterous. All their money comes from people who don't like change. They don't understand any of this. But I'm glad they don't. That makes it easier for us."

The next two or three years will decide who is right – Ellison or the rest. Thousands of jobs and billions of dollars are at stake. But Ellison has no doubts: "I feel slightly dizzy sometimes when I walk away, because I know that unless we screw up, this is going to happen."

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

NDCA-ORCL1053572

10

*The book*

When business history is being made, you can either wait till the results are clear, and write the story with the benefit of hindsight, or you can attempt to discover what is going on and report it as it happens. Both methods are valid, both have disadvantages: the former lacks suspense, the latter may lack insight. During the writing of this book, I will do something different and more unusual. I will ride alongside Larry Ellison as he makes a high stakes bid for dominance in a war with the rest of an industry that shapes our world. I will narrate from the field the story of how Oracle does battle. Whatever the outcome, it will be a story of high drama and deep significance.

I will also provide an intimate portrait of Ellison himself, how he works and plays, what he thinks and cares about. And he is a man very different from the way in which he is conventionally portrayed. Magazine and newspaper profiles of Ellison invariably regale readers with accounts of his cars, boats, planes and affairs. The all-too obvious theme of the "bad boy of software", still carrying the psychological wound of abandonment by a teenage mother, has been re-worked many times.

He is actually far more interesting than that. He is, above all, very *funny* – and yes: intuitive, vain, charming, passionate, and manipulative, with beautiful manners and a capacity for appalling rudeness. He is extremely clever, at times almost exhaustingly intense, especially when talking of his two principal charitable interests: biotechnology and education. But while his great rival, Gates, is relentless (Gates *grinds*), Ellison dazzles. "I am a sprinter," he observes. "I rest, I sprint, I rest, I sprint again."

Though the narrative of the book will chart Ellison's final sprint to what he sees as the summit of Oracle's achievement, it will also trace two great projects running parallel to the main field of battle. In the course of the book, I will travel with Ellison through those other parts of his life that are key to understanding him: to Kyoto, to examine the influences that ignited the profound interest in Japanese art and culture that finds its apotheosis in the Japanese imperial village that he is replicating in the hills at Woodside, just twenty minutes drive from Oracle's gleaming towers at Redwood Shores; and to Long Beach and New Zealand as Ellison's challenge for the next America's Cup gathers in intensity. Both the final stages of constructing the estate at Woodside and the bid for the America's Cup reach their conclusions near the publication of this book.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER                    NDCA-ORCL1053573

11

The houses at Woodside, crafted entirely by hand from unfinished pine and cedar, although not exactly tiny, have a powerful simplicity and elegance. Like the palaces and gardens of Kyoto that Ellison first saw more than 25 years ago, they are designed to be human in scale and in harmony with their surroundings. Two ornamental bridges, waterfalls surging over huge boulders brought from Yosemite, steaming hot-tubs hollowed from stone and innumerable cherry trees will complete the artfully crafted Zen landscape. The only detail to be resolved is the purchase and demolition of the one house left in the surrounding area that intrudes upon the pastoral perfection of the scene. Just Ellison's luck that it happens to be owned by a lawyer.

The buildings themselves are full of sensual delights and surprises: the smell of natural oils from the wood, the sheer pleasure of running a hand along a cedar roof set to resemble the sweep of a bird's wing, the ease with which wall-sized panels smoothly slide to reveal a grove of redwood trees. This will be, Ellison says, "a refuge from the battle."

As with Oracle, so it is with the America's Cup: winning is the only thing that matters. And Ellison is equally clear that this is also a battle he expects to win and in the same way: by outgunning the competition with more resources, better people and a clearer strategy. The challenge for the 2003 America's Cup comes after several successful years campaigning his Maxi yacht, Sayonara, including a brush with death while winning the tragedy-struck 1998 Sidney-to-Hobart race. But in the race for the America's, the object is to leave nothing to chance: the physical assets of last year's(2000) losing AmericaOne team have been purchased, including its two race boats; Sayonara's proven crew, most of whom were a part of last year's winning New Zealand team, have been put on long-term contracts along with Sayonara's brilliant, if temperamental skipper, Chris Dickson; the world's greatest designer of 12-metre yachts, Bruce Farr, has been engaged to build the two new boats that will actually contest the 2003 series, as has Mickey Ickert, the man who cut the sails for Team New Zealand. It's a potent combination of money (about $80m and counting), continuity, strong management and sailing talent that has already established Oracle Racing as the favourite to win.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

12

### *The collaboration*

I have known Ellison for over three years, since becoming Technology and Communications Editor of *The Economist*. During that time, based in part on a shared belief about what was wrong with today's computing industry and the potential of the Internet to make it better, we became friends and developed a relationship of trust.

During the writing of the book, I will spend at least 10 days each month with Ellison and will record up to 200 hours of one-to-one interviews. I will have office-space at Oracle on the same floor as Ellison and will sit in on every kind of business meeting. I will also travel with him and be present in all parts of his business, and much of his non-business, life. I will interview past and present employees of Oracle as well as Ellison's wide circle of business and personal friends (including Steve Jobs, John Chambers, Scott McNealy, Bill Clinton, Michael Milken and Sandy Weil). I will seek meetings with others who may take a different and less positive view, such as business rivals and colleagues whom Ellison fired. Wherever possible and appropriate, Ellison will help me gain the access I require. Ellison will make available personal documents and photographs as well as previously confidential company memoranda and e-mail.

Ellison and I will be joint copyright holders, but I will be the sole author and will have absolute editorial control; Ellison has no right of approval over content. If, however, Ellison and I take an opposing view of an important event, he will have a right of reply within the pages of the book, over which I will have no right of approval. Ellison fully understands that despite the book's "authorised" status, it is vital that the picture of himself and Oracle that readers will see must be true, honest and whole. The price for that, he realises, is that there will inevitably be aspects of the book that he will not like. Inescapably, there is some tension between intimacy and objectivity. To be frank, this is not a project I could embark upon if I did not like Ellison personally and enjoy spending time with him. But for all that, this will be the work of a candid and, at times, critical observer, not the account of a partisan. While admiring his ambition, I have an open mind as to whether Ellison will win his war. And were he to lose, the consequences for both himself and Oracle will be confronted.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER                    NDCA-ORCL1053575

13

*Matthew Symonds has been Technology and Communications Editor of* The
Economist *since 1997. During that time he has frequently visited Silicon Valley and
has met nearly all the major players in the computing industry. He also advises the
group chief executive on Internet strategy and is chairman of the advisory board of
CFO.com, a subsidiary of the Economist Group. In April 2000, he won the Wincott
Prize for Financial Journalism (the premier award for business writing in Britain) for a
number of articles analysing the rise of e-business, the Microsoft antitrust case and
the phenomenon of "dot.com" hype. When he returns to* The Economist *after leave
of absence to write this book, it will be to an entirely different editorial role.
Symonds was educated at Balliol College, Oxford and worked first at the* Financial
Times *and then at the* Daily Telegraph *(as chief economics commentator)until
leaving in 1986 to co-found* The Independent *– the first new British quality
newspaper for 130 years. After nine years at* The Independent *as Editorial Director
and Executive Editor, he cashed out  after helping to organise a successful bid for
the company by a consortia of European newspapers. In 1995 he became Director
of Strategy at BBC Worldwide (the commercial arm of the BBC) and took the BBC
into commercial digital television by negotiating a $300m  joint venture – UKTV –
with Flextech Television (the European programming arm of TCI). He left the BBC in
1997 to help establish UKTV in the market, but missing journalism, moved to* The
Economist *when offered the chance to write about the coming Internet revolution.
Forty-seven years old, he lives in London with his wife and three children.*

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

NDCA-ORCL1053576

14

NDCA-ORCL1053577

EXHIBIT 23



# The Federal Reserve Board

## Open Market Operations

Open market operations--purchases and sales of U.S. Treasury and federal agency securities--are the Federal Reserve's principal tool for implementing monetary policy. The short-term objective for open market operations is specified by the Federal Open Market Committee (FOMC). This objective can be a desired quantity of reserves or a desired price (the federal funds rate). The federal funds rate is the interest rate at which depository institutions lend balances at the Federal Reserve to other depository institutions overnight.

The Federal Reserve's objective for open market operations has varied over the years. During the 1980s, the focus gradually shifted toward attaining a specified level of the federal funds rate, a process that was largely complete by the end of the decade. Beginning in 1994, the FOMC began announcing changes in its policy stance, and in 1995 it began to explicitly state its target level for the federal funds rate. Since February 2000, the statement issued by the FOMC shortly after each of its meetings usually has included the Committee's assessment of the risks to the attainment of its long-run goals of price stability and sustainable economic growth.

For more information on open market operations, see the article in the *Federal Reserve Bulletin* (102 KB PDF).

## Intended federal funds rate
### Change and level, 1990 to present

| Date | Change (basis points) | | Level (percent) |
|------|----------|----------|--------|
|      | Increase | Decrease |        |
| **2006** |      |          |        |
| June 29 | 25 | ... | 5.25 |
| May 10 | 25 | ... | 5.00 |
| March 28 | 25 | ... | 4.75 |
| January 31 | 25 | ... | 4.50 |
| **2005** |      |          |        |
| December 13 | 25 | ... | 4.25 |
| November 1 | 25 | ... | 4.00 |
| September 20 | 25 | ... | 3.75 |
| August 9 | 25 | ... | 3.50 |
| June 30 | 25 | ... | 3.25 |
| May 3 | 25 | ... | 3.00 |
| March 22 | 25 | ... | 2.75 |

| | | | |
|---|---|---|---|
| February 2 | 25 | ... | 2.50 |
| **2004** | | | |
| December 14 | 25 | ... | 2.25 |
| November 10 | 25 | ... | 2.00 |
| September 21 | 25 | ... | 1.75 |
| August 10 | 25 | ... | 1.50 |
| June 30 | 25 | ... | 1.25 |
| **2003** | | | |
| June 25 | ... | 25 | 1.00 |
| **2002** | | | |
| November 6 | ... | 50 | 1.25 |
| **2001** | | | |
| December 11 | ... | 25 | 1.75 |
| November 6 | ... | 50 | 2.00 |
| October 2 | ... | 50 | 2.50 |
| September 17 | ... | 50 | 3.00 |
| August 21 | ... | 25 | 3.50 |
| June 27 | ... | 25 | 3.75 |
| May 15 | ... | 50 | 4.00 |
| April 18 | ... | 50 | 4.50 |
| March 20 | ... | 50 | 5.00 |
| January 31 | ... | 50 | 5.50 |
| January 3 | ... | 50 | 6.00 |
| **2000** | | | |
| May 16 | 50 | ... | 6.50 |
| March 21 | 25 | ... | 6.00 |
| February 2 | 25 | ... | 5.75 |
| **1999** | | | |
| November 16 | 25 | ... | 5.50 |
| August 24 | 25 | ... | 5.25 |
| June 30 | 25 | ... | 5.00 |
| **1998** | | | |
| November 17 | ... | 25 | 4.75 |
| October 15 | ... | 25 | 5.00 |
| September 29 | ... | 25 | 5.25 |
| 1997 | | | |
| March 25 | 25 | ... | 5.50 |

**1996**

| | | | |
|---|---|---|---|
| January 31 | ... | 25 | 5.25 |

**1995**

| | | | |
|---|---|---|---|
| December 19 | ... | 25 | 5.50 |
| July 6 | ... | 25 | 5.75 |
| February 1 | 50 | ... | 6.00 |

**1994**

| | | | |
|---|---|---|---|
| November 15 | 75 | ... | 5.50 |
| August 16 | 50 | ... | 4.75 |
| May 17 | 50 | ... | 4.25 |
| April 18 | 25 | ... | 3.75 |
| March 22 | 25 | ... | 3.50 |
| February 4 | 25 | ... | 3.25 |

**1992**

| | | | |
|---|---|---|---|
| September 4 | ... | 25 | 3.00 |
| July 2 | ... | 50 | 3.25 |
| April 9 | ... | 25 | 3.75 |

**1991**

| | | | |
|---|---|---|---|
| December 20 | ... | 50 | 4.00 |
| December 6 | ... | 25 | 4.50 |
| November 6 | ... | 25 | 4.75 |
| October 31 | ... | 25 | 5.00 |
| September 13 | ... | 25 | 5.25 |
| August 6 | ... | 25 | 5.50 |
| April 30 | ... | 25 | 5.75 |
| March 8 | ... | 25 | 6.00 |
| February 1 | ... | 50 | 6.25 |
| January 9 | ... | 25 | 6.75 |

**1990**

| | | | |
|---|---|---|---|
| December 18 | ... | 25 | 7.00 |
| December 7 | ... | 25 | 7.25 |
| November 13 | ... | 25 | 7.50 |
| October 29 | ... | 25 | 7.75 |
| July 13 | ... | 25 | 8.00 |

A basis point is 1/100 percentage point.

EXHIBIT 24



## The Federal Reserve Board

# Minutes of the Federal Open Market Committee
## January 30-31, 2001

A meeting of the Federal Open Market Committee was held in the offices of the Board of Governors of the Federal Reserve System in Washington, D.C., beginning on Tuesday, January 30, 2001, at 9:00 a.m. and continuing on Wednesday, January 31, 2001, at 9:00 a. m.

**Present:**

>Mr. Greenspan, Chairman
>Mr. McDonough, Vice Chairman
>Mr. Ferguson
>Mr. Gramlich
>Mr. Hoenig
>Mr. Kelley
>Mr. Meyer
>Ms. Minehan
>Mr. Moskow
>Mr. Poole

>Messrs. Jordan, McTeer, Santomero, and Stern, Alternate Members of the Federal Open Market Committee

>Messrs. Broaddus, Guynn, and Parry, Presidents of the Federal Reserve Banks of Richmond, Atlanta, and San Francisco respectively

>Mr. Kohn, Secretary and Economist
>Mr. Bernard, Deputy Secretary
>Ms. Fox, Assistant Secretary
>Mr. Gillum, Assistant Secretary
>Mr. Mattingly, General Counsel
>Mr. Baxter, Deputy General Counsel
>Ms. Johnson, Economist
>Mr. Stockton, Economist

>Ms. Cumming, Messrs. Fuhrer, Hakkio, Howard, Hunter, Lindsey, Rasche, Reinhart, and Slifman, Associate Economists

>Mr. Fisher, Manager, System Open Market Account

>Mr. Winn, [1]Assistant to the Board, Office of Board Members, Board of Governors



Ms. Johnson, [2] Secretary of the Board, Office of the Secretary, Board of Governors,

Mr. Simpson, Senior Adviser, Division of Research and Statistics, Board of Governors

Mr. Madigan, Associate Director, Division of Monetary Affairs, Board of Governors

Messrs. Oliner, Struckmeyer, and Whitesell, Assistant Directors, Divisions of Research and Statistics, Research and Statistics, and Monetary Affairs respectively, Board of Governors

Messrs. Morton, [1] Rosine, [1] and Sack, [1] Senior Economists, Divisions of International Finance, Research and Statistics, and Monetary Affairs respectively, Board of Governors

Mr. Reifschneider, [3] Section Chief, Division of Research and Statistics, Board of Governors

Ms. Garrett, [3] Economist, Division of Monetary Affairs, Board of Governors

Ms. Low, Open Market Secretariat Assistant, Division of Monetary Affairs, Board of Governors

Mr. Lang, Executive Vice President, Federal Reserve Bank of Philadelphia

Messrs. Beebe, Eisenbeis, Goodfriend, Kos, Ms. Krieger, Messrs. Rosenblum, and Sniderman, Senior Vice Presidents, Federal Reserve Banks of San Francisco, Atlanta, Richmond, New York, New York, Dallas, and Cleveland respectively

Mr. Weber, Vice President, Federal Reserve Bank of Minneapolis

In the agenda for this meeting, it was reported that advices of the election of the following members and alternate members of the Federal Open Market Committee for the period commencing January 1, 2001, and ending December 31, 2001, had been received and that these individuals had executed their oaths of office.

The elected members and alternate members were as follows:

William J. McDonough, President of the Federal Reserve Bank of New York, with Jamie B. Stewart, Jr., First Vice President of the Federal Reserve Bank of New York, as alternate

Cathy E. Minehan, President of the Federal Reserve Bank of Boston, with Anthony M. Santomero, President of the Federal Reserve Bank of Philadelphia, as alternate

Michael H. Moskow, President of the Federal Reserve Bank of Chicago, with Jerry L. Jordan, President of the Federal Reserve Bank of Cleveland, as alternate

William Poole, President of the Federal Reserve Bank of St. Louis, with Robert D. McTeer,



Jr., President of the Federal Reserve Bank of Dallas, as alternate

Thomas M. Hoenig, President of the Federal Reserve Bank of Kansas City, with Gary H. Stern, President of the Federal Reserve Bank of Minneapolis, as alternate.

By unanimous vote, the following officers of the Federal Open Market Committee were elected to serve until the election of their successors at the first regularly scheduled meeting of the Committee after December 31, 2001, with the understanding that in the event of the discontinuance of their official connection with the Board of Governors or with a Federal Reserve Bank, they would cease to have any official connection with the Federal Open Market Committee:

| | |
|---|---|
| Alan Greenspan | Chairman |
| William J. McDonough | Vice Chairman |
| Donald L. Kohn | Secretary and Economist |
| Normand R. V. Bernard | Deputy Secretary |
| Lynn S. Fox and Gary P. Gillum | Assistant Secretaries |
| J. Virgil Mattingly, Jr. | General Counsel |
| Thomas C. Baxter, Jr. | Deputy General Counsel |
| Karen H. Johnson and David J. Stockton | Economists |
| Christine M. Cumming, Jeffrey C. Fuhrer, Craig S. Hakkio, William C. Hunter, David H. Howard, David E. Lindsey, Robert H. Rasche, Vincent R. Reinhart, and Lawrence Slifman | Associate Economists |

By unanimous vote, Peter R. Fisher was selected to serve at the pleasure of the Committee as Manager, System Open Market Account, on the understanding that his selection was subject to being satisfactory to the Federal Reserve Bank of New York.

> Secretary's note: Advice subsequently was received that the selection of Mr. Fisher as Manager was satisfactory to the board of directors of the Federal Reserve Bank of New York.

By unanimous vote, the minutes of the meetings of the Federal Open Market Committee held on December 19, 2000, and January 3, 2001, were approved.

The next item on the agenda encompassed issues relating in part to the discount window and other matters that are within the legal purview of the Board of Governors. Accordingly, a Board meeting was formally convened and this item was considered in a joint Board-Federal Open Market Committee session. The Board members voted unanimously at the outset to close the Board meeting.

At its meeting in March 2000, the Committee asked the staff to undertake a broad study of alternative approaches to the management of the System asset portfolio in the current and prospective environment of large budget surpluses and rapid associated declines in the amount of Treasury debt outstanding. Such paydowns were having favorable effects on the

macroeconomy and would not impair the Committee's ability to pursue its overall economic objectives. But the FOMC's historical reliance on purchases and sales of Treasury securities to implement monetary policy would be difficult to maintain if steep paydowns of debt were, as seemed likely, to continue. To prepare for such a contingency, the Committee needed to identify and explore alternative instruments for the conduct of monetary policy.

In their discussion at this meeting, the members agreed that continuing paydowns of Treasury debt outstanding could create complications for the implementation of monetary policy well before the full repayment of marketable federal debt. In particular, the Treasury market could be expected to become less liquid over time, making it more difficult for the Federal Reserve to accommodate the trend growth of currency through outright purchases of Treasuries without unduly affecting market prices. Reduced activity in the Treasury repurchase agreement (RP) market could complicate the use of such obligations to respond to seasonal and unexpected variations in the aggregate supply of reserves.

In reviewing the possibilities, the members noted that relative to investments in Treasury securities, all of the options could entail significant drawbacks, including increases in credit risk, reductions in liquidity, and potentially distorting effects on relative prices in financial markets. In light of these potential issues, the Committee agreed that it should proceed cautiously and maintain the current emphasis on Treasury securities in the SOMA portfolio, especially the portion of the portfolio held outright, for as long as practicable. In that regard, some members suggested that the Committee look carefully at whether it could loosen the limits it currently imposes on holdings of individual Treasury issues without causing undue market distortions. Some felt it would be desirable to consider buying and holding Ginnie Mae mortgage-backed securities, which are guaranteed by the full faith and credit of the United States. A few members suggested that consideration might be given to the possibility of continuing to rely on Treasury securities, even as the publicly held debt is paid down, by acquiring such securities through special arrangements with the Treasury.

In the near term, the members agreed that it would be useful to extend for at least another year the temporary authority, in effect since late August 1999, of the Manager to supplement repurchase agreements in Treasuries and direct agency debt with repurchase transactions in mortgage-backed securities guaranteed by a federal agency or a government-sponsored enterprise. They also asked the staff to investigate the possibility of authorizing the Desk to engage in RP operations using assets that could be purchased under existing legal authority but were not currently authorized by the Committee--specifically, certain debt obligations of U.S. state and local governments and of foreign governments. Making a wider range of assets available for RP operations would reduce the potential for distortions to the pricing of instruments collateralizing RPs, but would entail resolving a number of issues. The Congress and market participants would need to be consulted before the Committee decided to undertake any such operations.

From a somewhat longer-term perspective, Committee members identified several alternative issues for further study. One involved the appropriate degree of reliance on outright purchases of a broader array of assets relative to greater use of temporary short-term transactions undertaken through intermediaries. A number of members saw advantages to the greater reliance on the latter--RPs with security dealers and discount window loans to depository institutions--especially when they involved a wide range of underlying assets. It was noted that such instruments would afford the Federal Reserve considerable protection against credit risks, could be structured to provide substantial liquidity to respond to



unanticipated changes in the supply or demand for reserves, and, relative to outright purchases of the underlying collateral, could help to mitigate potential distortions to asset pricing and credit allocation. Many members indicated that a potentially attractive approach to expanding the role of the discount window might involve auctioning such credit to financially sound depository institutions. Some members expressed reservations about this option, noting that such a program would have to be carefully structured in order to avoid situations in which some institutions become heavily dependent on such credit or engage in excessive risk taking. But extremely heavy reliance on temporary transactions could itself influence credit flows, suggesting that approaches to staying longer with Treasury securities or adding new assets not currently allowed by law to the permanent portfolio would also need to be studied.

The use of private securities for temporary transactions or permanent portfolio holdings had a number of risk management and accounting implications that would need to be carefully examined. Another aspect that required further examination was the approach to diversification of the System portfolio in order to minimize any effects on credit conditions. In this context, the members compared the merits of an incremental approach in which classes of private securities were gradually added to the RP pool or the permanent portfolio, with the safest and most liquid being used first, to an alternative approach in which very broad diversification was sought quickly through investment in diverse pools of assets.

In view of the importance of these issues and their complexity, the Committee determined to explore various means to seek the input of the public and the Congress to develop and refine alternatives and to investigate all the associated policy issues.

By unanimous vote, the Committee approved amendments to paragraphs 1(b), 1(c), and 3 of the Authorization for Domestic Open Market Operations to permit temporary operations with a maturity limit of 65 business days.

### AUTHORIZATION FOR DOMESTIC OPEN MARKET OPERATIONS
### (Amended January 30, 2001)

1. The Federal Open Market Committee authorizes and directs the Federal Reserve Bank of New York, to the extent necessary to carry out the most recent domestic policy directive adopted at a meeting of the Committee:

   (a) To buy or sell U.S. Government securities, including securities of the Federal Financing Bank, and securities that are direct obligations of, or fully guaranteed as to principal and interest by, any agency of the United States in the open market, from or to securities dealers and foreign and international accounts maintained at the Federal Reserve Bank of New York, on a cash, regular, or deferred delivery basis, for the System Open Market Account at market prices, and, for such Account, to exchange maturing U.S. Government and Federal agency securities with the Treasury or the individual agencies or to allow them to mature without replacement; provided that the aggregate amount of U.S. Government and Federal agency securities held in such Account (including forward commitments) at the close of business on the day of a meeting of the Committee at which action is taken with respect to a domestic policy directive shall not be increased or decreased by more than $12.0 billion during the period commencing with the opening of business on the day following such meeting



and ending with the close of business on the day of the next such meeting;

(b) To buy U.S. Government securities and obligations that are direct obligations of, or fully guaranteed as to principal and interest by, any agency of the United States, from dealers for the account of the Federal Reserve Bank of New York under agreements for repurchase of such securities or obligations in 65 business days or less, at rates that, unless otherwise expressly authorized by the Committee, shall be determined by competitive bidding, after applying reasonable limitations on the volume of agreements with individual dealers; provided that in the event Government securities or agency issues covered by any such agreement are not repurchased by the dealer pursuant to the agreement or a renewal thereof, they shall be sold in the market or transferred to the System Open Market Account;

(c) To sell U.S. Government securities and obligations that are direct obligations of, or fully guaranteed as to principal and interest by, any agency of the United States to dealers for System Open Market Account under agreements for the resale by dealers of such securities or obligations in 65 business days or less, at rates that, unless otherwise expressly authorized by the Committee, shall be determined by competitive bidding, after applying reasonable limitations on the volume of agreements with individual dealers.

2.I n order to ensure the effective conduct of open market operations, the Federal Open Market Committee authorizes the Federal Reserve Bank of New York to lend on an overnight basis U.S. Government securities held in the System Open Market Account to dealers at rates that shall be determined by competitive bidding but that in no event shall be less than 1.0 percent per annum of the market value of the securities lent. The Federal Reserve Bank of New York shall apply reasonable limitations on the total amount of a specific issue that may be auctioned, and on the amount of securities that each dealer may borrow. The Federal Reserve Bank of New York may reject bids which could facilitate a dealer's ability to control a single issue as determined solely by the Federal Reserve Bank of New York.

3.I n order to ensure the effective conduct of open market operations, while assisting in the provision of short-term investments for foreign and international accounts maintained at the Federal Reserve Bank of New York, the Federal Open Market Committee authorizes and directs the Federal Reserve Bank of New York (a) for System Open Market Account, to sell U.S. Government securities to such foreign and international accounts on the bases set forth in paragraph 1(a) under agreements providing for the resale by such accounts of those securities in 65 business days or less on terms comparable to those available on such transactions in the market; and (b) for New York Bank account, when appropriate, to undertake with dealers, subject to the conditions imposed on purchases and sales of securities in paragraph 1(b), repurchase agreements in U.S. Government and agency securities, and to arrange corresponding sale and repurchase agreements between its own account and foreign and international accounts maintained at the Bank. Transactions undertaken with such accounts under the provisions of this paragraph may provide for a service fee when appropriate.

4.I n the execution of the Committee's decision regarding policy during any intermeeting period, the Committee authorizes and directs the Federal Reserve Bank of New York,



upon the instruction of the Chairman of the Committee, to adjust somewhat in exceptional circumstances the degree of pressure on reserve positions and hence the intended federal funds rate. Any such adjustment shall be made in the context of the Committee's discussion and decision at its most recent meeting and the Committee's long-run objectives for price stability and sustainable economic growth, and shall be based on economic, financial, and monetary developments during the intermeeting period. Consistent with Committee practice, the Chairman, if feasible, will consult with the Committee before making any adjustment.

By unanimous vote, the Committee approved until the Committee's first scheduled meeting in 2002 an extension of the temporary suspension of paragraphs 3 to 6 of the Guidelines for the Conduct of System Operations in Federal Agency Issues. For the year ahead, the Guidelines therefore continued to read as follows:

## GUIDELINES FOR THE CONDUCT OF SYSTEM OPEN MARKET OPERATIONS IN FEDERAL AGENCY ISSUES
### (Reaffirmed January 30, 2001)

1. System open market operations in Federal agency issues are an integral part of total System open market operations designed to influence bank reserves, money market conditions, and monetary aggregates.
2. System open market operations in Federal agency issues are not designed to support individual sectors of the market or to channel funds into issues of particular agencies.

By unanimous vote, the Foreign Currency Authorization was reaffirmed in the form shown below.

## AUTHORIZATION FOR FOREIGN CURRENCY OPERATIONS
### (Reaffirmed January 30, 2001)

1. The Federal Open Market Committee authorizes and directs the Federal Reserve Bank of New York, for System Open Market Account, to the extent necessary to carry out the Committee's foreign currency directive and express authorizations by the Committee pursuant thereto, and in conformity with such procedural instructions as the Committee may issue from time to time:

   A. To purchase and sell the following foreign currencies in the form of cable transfers through spot or forward transactions on the open market at home and abroad, including transactions with the U.S. Treasury, with the U.S. Exchange Stabilization Fund established by Section 10 of the Gold Reserve Act of 1934, with foreign monetary authorities, with the Bank for International Settlements, and with other international financial institutions:

Canadian dollars
Danish kroner
Euro
Pounds sterling
Japanese yen
Mexican pesos
Norwegian kroner

Swedish kronor
Swiss francs

B. To hold balances of, and to have outstanding forward contracts to receive or to deliver, the foreign currencies listed in paragraph A above.

C. To draw foreign currencies and to permit foreign banks to draw dollars under the reciprocal currency arrangements listed in paragraph 2 below, provided that drawings by either party to any such arrangement shall be fully liquidated within 12 months after any amount outstanding at that time was first drawn, unless the Committee, because of exceptional circumstances, specifically authorizes a delay.

D. To maintain an overall open position in all foreign currencies not exceeding $25.0 billion. For this purpose, the overall open position in all foreign currencies is defined as the sum (disregarding signs) of net positions in individual currencies. The net position in a single foreign currency is defined as holdings of balances in that currency, plus outstanding contracts for future receipt, minus outstanding contracts for future delivery of that currency, i.e., as the sum of these elements with due regard to sign.

2. The F ederal Open Market Committee directs the Federal Reserve Bank of New York to maintain reciprocal currency arrangements ("swap" arrangements) for the System Open Market Account for periods up to a maximum of 12 months with the following foreign banks, which are among those designated by the Board of Governors of the Federal Reserve System under Section 214.5 of Regulation N, Relations with Foreign Banks and Bankers, and with the approval of the Committee to renew such arrangements on maturity:

| Foreign bank | Amount of arrangement (millions of dollars equivalent) |
|---|---|
| Bank of Canada | 2,000 |
| Bank of Mexico | 3,000 |

Any changes in the terms of existing swap arrangements, and the proposed terms of any new arrangements that may be authorized, shall be referred for review and approval to the Committee.

3. All   transactions in foreign currencies undertaken under paragraph 1.A. above shall, unless otherwise expressly authorized by the Committee, be at prevailing market rates. For the purpose of providing an investment return on System holdings of foreign currencies, or for the purpose of adjusting interest rates paid or received in connection with swap drawings, transactions with foreign central banks may be undertaken at non-market exchange rates.

4. I t shall be the normal practice to arrange with foreign central banks for the coordination of foreign currency transactions. In making operating arrangements with foreign central banks on System holdings of foreign currencies, the Federal Reserve Bank of New York shall not commit itself to maintain any specific balance unless



authorized by the Federal Open Market Committee. Any agreements or understandings concerning the administration of the accounts maintained by the Federal Reserve Bank of New York with the foreign banks designated by the Board of Governors under Section 214.5 of Regulation N shall be referred for review and approval to the Committee.

5. Fore  ign currency holdings shall be invested to ensure that adequate liquidity is maintained to meet anticipated needs and so that each currency portfolio shall generally have an average duration of no more than 18 months (calculated as Macaulay duration). When appropriate in connection with arrangements to provide investment facilities for foreign currency holdings, U.S. Government securities may be purchased from foreign central banks under agreements for repurchase of such securities within 30 calendar days.

6. All   operations undertaken pursuant to the preceding paragraphs shall be reported promptly to the Foreign Currency Subcommittee and the Committee. The Foreign Currency Subcommittee consists of the Chairman and Vice Chairman of the Committee, the Vice Chairman of the Board of Governors, and such other member of the Board as the Chairman may designate (or in the absence of members of the Board serving on the Subcommittee, other Board members designated by the Chairman as alternates, and in the absence of the Vice Chairman of the Committee, his alternate). Meetings of the Subcommittee shall be called at the request of any member, or at the request of the Manager, System Open Market Account ("Manager"), for the purposes of reviewing recent or contemplated operations and of consulting with the Manager on other matters relating to his responsibilities. At the request of any member of the Subcommittee, questions arising from such reviews and consultations shall be referred for determination to the Federal Open Market Committee.

7. The Chairman is a   uthorized:

   A. With the approval of the Committee, to enter into any needed agreement or understanding with the Secretary of the Treasury about the division of responsibility for foreign currency operations between the System and the Treasury;

   B. To keep the Secretary of the Treasury fully advised concerning System foreign currency operations, and to consult with the Secretary on policy matters relating to foreign currency operations;

   C. From time to time, to transmit appropriate reports and information to the National Advisory Council on International Monetary and Financial Policies.

8. S   taff officers of the Committee are authorized to transmit pertinent information on System foreign currency operations to appropriate officials of the Treasury Department.

9. All   Federal Reserve Banks shall participate in the foreign currency operations for System Account in accordance with paragraph 3 G(1) of the Board of Governors' Statement of Procedure with Respect to Foreign Relationships of Federal Reserve Banks dated January 1, 1944.



By unanimous vote, the Foreign Currency Directive was reaffirmed in the form shown below.

## FOREIGN CURRENCY DIRECTIVE
### (Reaffirmed January 30, 2001)

1. System operations in foreign currencies shall generally be directed at countering disorderly market conditions, provided that market exchange rates for the U.S. dollar reflect actions and behavior consistent with the IMF Article IV, Section 1.

2. To achieve this end the System shall:

   A. Undertake spot and forward purchases and sales of foreign exchange.

   B. Maintain reciprocal currency ("swap") arrangements with selected foreign central banks.

   C. Cooperate in other respects with central banks of other countries and with international monetary institutions.

3. Transactions may also be undertaken:

   A. To adjust System balances in light of probable future needs for currencies.

   B. To provide means for meeting System and Treasury commitments in particular currencies and to facilitate operations of the Exchange Stabilization Fund.

   C. For such other purposes as may be expressly authorized by the Committee.

4. System foreign currency operations shall be conducted:

   A. In close and continuous consultation and cooperation with the United States Treasury;

   B. In cooperation, as appropriate, with foreign monetary authorities; and

   C. In a manner consistent with the obligations of the United States in the International Monetary Fund regarding exchange arrangements under the IMF Article IV.

By unanimous vote, the Procedural Instructions with Respect to Foreign Currency Operations were reaffirmed in the form shown below.

## PROCEDURAL INSTRUCTIONS WITH RESPECT TO
## FOREIGN CURRENCY OPERATIONS
### (Reaffirmed January 30, 2001)

In conducting operations pursuant to the authorization and direction of the Federal Open

Market Committee as set forth in the Authorization for Foreign Currency Operations and the Foreign Currency Directive, the Federal Reserve Bank of New York, through the Manager, System Open Market Account ("Manager"), shall be guided by the following procedural understandings with respect to consultations and clearances with the Committee, the Foreign Currency Subcommittee, and the Chairman of the Committee. All operations undertaken pursuant to such clearances shall be reported promptly to the Committee.

1. The Manager shall clear with the Subcommittee (or with the Chairman, if the Chairman believes that consultation with the Subcommittee is not feasible in the time available):

   A. Any operation that would result in a change in the System's overall open position in foreign currencies exceeding $300 million on any day or $600 million since the most recent regular meeting of the Committee.

   B. Any operation that would result in a change on any day in the System's net position in a single foreign currency exceeding $150 million, or $300 million when the operation is associated with repayment of swap drawings.

   C. Any operation that might generate a substantial volume of trading in a particular currency by the System, even though the change in the System's net position in that currency might be less than the limits specified in 1.B.

   D. Any swap drawing proposed by a foreign bank not exceeding the larger of (i) $200 million or (ii) 15 percent of the size of the swap arrangement.

2. The Manager shall clear with the Committee (or with the Subcommittee, if the Subcommittee believes that consultation with the full Committee is not feasible in the time available, or with the Chairman, if the Chairman believes that consultation with the Subcommittee is not feasible in the time available):

   A. Any operation that would result in a change in the System's overall open position in foreign currencies exceeding $1.5 billion since the most recent regular meeting of the Committee.

   B. Any swap drawing proposed by a foreign bank exceeding the larger of (i) $200 million or (ii) 15 percent of the size of the swap arrangement.

3. The Manager shall also consult with the Subcommittee or the Chairman about proposed swap drawings by the System and about any operations that are not of a routine character.

On January 22, 2001, the continuing rules, regulations, and other instructions of the Committee had been distributed with the advice that, in accordance with procedures approved by the Committee, they were being called to the Committee's attention before the January 30-31 organization meeting to give members an opportunity to raise any questions they might have concerning them. Members were asked to indicate if they wished to have any of the instruments in question placed on the agenda for consideration at this meeting. The Guidelines for the Conduct of System Operations in Federal Agency Issues were placed

on the agenda and an extension of their temporary amendment was approved as noted above.

The Manager of the System Open Market Account reported on recent developments in foreign exchange markets. There were no open market operations in foreign currencies for the System's account in the period since the previous meeting.

The Manager also reported on developments in domestic financial markets and on System open market transactions in government securities and federal agency obligations during the period December 20, 2000, through January 30, 2001. By unanimous vote, the Committee ratified these transactions.

The Committee then turned to a discussion of the economic and financial outlook and the implementation of monetary policy over the intermeeting period ahead. A summary of the economic and financial information available at the time of the meeting and of the Committee's discussion is provided below, followed by the domestic policy directive that was approved by the Committee and issued to the Federal Reserve Bank of New York.

The information reviewed at this meeting indicated that the expansion of economic activity had slowed appreciably over the fourth quarter. Consumer and business spending decelerated further, with outlays for consumer durables and business equipment particularly weak. Housing construction remained relatively firm, though significantly below its brisk pace of earlier in the year. The slower growth of final spending resulted in inventory overhangs in a number of industries, most notably those related to the motor vehicle sector. Manufacturing production declined sharply as a result, and overall employment gains moderated further. Price inflation was still relatively subdued.

Labor demand softened further in December, with private nonfarm payroll employment continuing to increase slowly and the average workweek to decline. Nonetheless, the labor market remained very tight and the unemployment rate held at 4 percent, its average for the year. Reduced labor demand in manufacturing accounted for much of the slowdown in nonfarm payroll gains in the fourth quarter, with factory payrolls falling sharply further in December, but in addition sizable cuts in net new hires were recorded in the help-supply and construction industries.

The contraction in industrial production that began in October, largely in the motor vehicle sector, deepened and broadened in November and December. For the fourth quarter as a whole, the drop in production was concentrated in manufacturing; mining activity fell by less while utilities output surged late in the year in response to unseasonably cold weather. Most of the initial weakness in manufacturing output was related directly or indirectly to the slowing in the motor vehicle sector, but by year-end all major market groups had registered steep declines in production. Weaker factory activity in December resulted in a sizable drop in the rate of capacity utilization in manufacturing to a level further below its long-run average.

Against a background of slowing growth of disposable personal income and abrupt declines in consumer sentiment, consumer spending decelerated substantially in the fourth quarter. Purchases of motor vehicles slumped and outlays for other goods increased only a little. However, spending on services picked up somewhat in November (latest data), reflecting at least in part higher expenditures for heating services owing to unseasonably cold weather.

The decline in mortgage rates since the middle of last year had provided some support to residential building activity. Total housing starts increased slightly further in December, with single-family starts recording a brisk rise that might have been, in part, a response to the lower mortgage rates. By contrast, multifamily starts slowed, more than reversing November's run-up. Sales of new homes jumped in December to a very high level, but sales of existing homes dropped considerably.

Business fixed investment contracted slightly in the fourth quarter, reflecting a sizable decline in business spending on equipment and software that was offset in part by a large increase in nonresidential construction. Data on nominal shipments of nondefense capital goods in the fourth quarter indicated a drop in office and computing equipment, only a small gain in communications equipment, and a decline, on net, in non-high-tech equipment. By contrast, investment in nonresidential structures increased briskly further in October and November (latest data). While spending for new office buildings was rising less rapidly, outlays for other commercial structures picked up, and investment in industrial structures remained robust.

Business inventories on a book-value basis mounted further in October and November. Despite production cutbacks, stockbuilding in manufacturing remained rapid and sizable inventory overhangs had emerged in some industries, particularly those related to the motor vehicle sector. As a result, the aggregate stock-sales ratio for the manufacturing sector continued its upward drift that began early last year. Sizable inventory buildups and associated overhangs also were apparent in portions of the retail sector, and the aggregate inventory-sales ratio for the sector remained at the upper end of its range over the past year. At the wholesale level, inventory accumulation was moderate in October and November, but the sector's inventory-sales ratio continued to be at the top of its range for the last twelve months.

The U.S. trade deficit in goods and services fell slightly in October and November after having posted a new record high in September. Nevertheless, the average deficit for October and November was larger than the rate for the third quarter. The value of exports declined in both months, and the average value for the two-month period was below the third-quarter level; the weakness in exports was spread across a number of trade categories. The value of imports for the first two months of the fourth quarter was slightly above the third-quarter average. Economic growth in foreign industrial countries moderated in the second half of last year. The pace of economic expansion in the euro area softened somewhat further in the fourth quarter, as consumer spending remained weak. In Japan, available indicators suggested that economic activity had stagnated in the fourth quarter. Economic growth in Canada and the United Kingdom seemed to have slowed somewhat in the fourth quarter. In addition, the latest data for the major developing countries pointed to reduced expansion in many of those countries.

By most measures, price inflation had remained moderate in recent months. Judging by the consumer price index (CPI), total and core consumer prices rose mildly over November and December, but both accelerated somewhat on a year-over-year basis. In terms of the personal consumption expenditure (PCE) chain-type price index, however, core consumer price inflation was modest in both November (latest data) and the twelve months ended in November, and there was essentially no change year over year. At the producer level, core prices edged up over the November-December period, and the rise in core prices over the year was minimal as well. With regard to labor costs, the employment cost index of hourly

compensation for private industry workers (ECI) decelerated noticeably in the fourth quarter, with both the wage and benefit components recording smaller gains. However, growth of ECI compensation picked up somewhat in 2000 from 1999, probably owing in large part to the upward trend in productivity growth. Productivity improvements also showed through to the average hourly earnings of production or nonsupervisory workers, which exhibited a roughly similar acceleration.

At its meeting on December 19, 2000, the Committee adopted a directive that continued to call for maintaining conditions in reserve markets consistent with an unchanged federal funds rate of about 6-1/2 percent. At the same time, however, the members concluded that the balance of risks had shifted sufficiently that they were now weighted toward conditions that could generate economic weakness in the foreseeable future. Indeed, very recent information seemed to signal sudden further weakness, but it was largely anecdotal and most of the aggregate data on spending and employment suggested continued economic expansion, albeit at a relatively slow rate. As a result, most members believed that it would be prudent to await further confirmation of a noticeably weaker expansion before implementing any monetary easing, particularly given the current high level of resource utilization and the record over the last several years of strong rebounds from brief lulls in growth. If, however, incoming data were to reinforce the recent anecdotal indications, the Committee would be prepared to respond promptly.

Open market operations during the intermeeting period were initially directed toward maintaining the federal funds rate at the Committee's targeted level of 6-1/2 percent. However, information that became available in the weeks after the December meeting tended to confirm the earlier indications of weakness in spending, and at a telephone conference on January 3, 2001, the Committee approved a 1/2 percentage point reduction in the federal funds rate, to 6 percent, and also agreed that the risks remained weighted toward economic weakness. The federal funds rate remained close to the Committee's targets over the intermeeting period, and interest rates on short-term Treasury securities and high-quality private debt obligations declined over the period almost as much as the funds rate. The Committee's action seemed to help ease some concerns about the longer-term outlook, and risk spreads on lower-grade bonds fell substantially while broad indexes of U.S. stock market prices rose on balance over the intermeeting period.

In foreign exchange markets, the trade-weighted value of the dollar changed little on balance over the intermeeting interval in terms of an index of major foreign currencies. The dollar lost ground against the euro as market participants took note of the deterioration of near-term prospects for economic growth in the United States relative to those for Europe. However, that decline was roughly counterbalanced by a rise in the dollar against the yen, reflecting continuing economic stagnation in Japan. The dollar posted a small gain against an index of the currencies of other important trading partners, largely reflecting expectations that some emerging economies might be adversely affected by slower growth in the United States.

The broad monetary aggregates accelerated sharply in December and apparently strengthened further in January. The pickup in M2 growth evidently reflected a flight from heightened equity market volatility late last year to the safety and liquidity of M2 assets along with a recent narrowing of the opportunity costs of holding funds in M2 accounts. M3 grew even faster than M2, boosted in part by stepped-up issuance of large time deposits to fund a pickup in bank credit. The expansion of domestic nonfinancial debt increased in November and December (latest data), reflecting greater business borrowing, perhaps to finance growing

inventories and smaller contractions in the amount of federal debt outstanding.

The staff forecast prepared for this meeting suggested that, after a pause associated in part
with an inventory correction, the economic expansion would regain strength over the next
two years and gradually move to a rate near the staff's current estimate of the growth of the
economy's potential output. The period of sub-par activity was expected to foster an
appreciable slackening of resource utilization and some moderation in core price inflation.
The forecast anticipated that the expansion of domestic final demand would be held back to
some extent by the decline in household net worth associated with the downturn that had
occurred in equity prices, the remaining effects of prior monetary restraint, and the
continuation of somewhat stringent credit terms and conditions on some types of loans by
financial institutions. As a result, growth of spending on consumer durables was expected to
be appreciably below that of the first half of last year and housing demand to be about
unchanged from its recent level. Business fixed investment, notably outlays for equipment
and software, was projected to resume relatively robust growth after a comparatively brief
period of adjustment of capital stocks to more desirable levels; growth abroad was seen as
supporting the expansion of U.S. exports; and fiscal policy was assumed to become more
expansionary.

In the Committee's discussion of current and prospective economic developments, members
commented that while a slowdown in the expansion over the second half of 2000 was not
unexpected in light of the previously unsustainable rate of increase in output, the speed and
extent of the slowdown were much more pronounced than they had anticipated. Consumer
spending and business capital investment had decelerated markedly, partly in association
with a sharp decline in consumer and business confidence. This weakening, which was
especially evident in durable goods producing industries, had led to large cutbacks in
manufacturing output as numerous business firms attempted to pare what they now viewed as
excessive inventories. The eventual degree and duration of the softening in economic
conditions were difficult to predict. In particular, it was unclear whether the pause in the
economic expansion would be largely limited to a relatively short inventory correction or
would involve a more extensive cyclical adjustment.

In general, members saw favorable prospects for an appreciable recovery in overall business
activity as the year progressed. Members referred to indications that both residential and
nonresidential construction activity had remained relatively robust and to fragmentary data
and anecdotal reports suggesting that consumer spending had steadied or possibly turned up
early this year. Several commented that the sound condition of the banking system was
another supportive factor. Some also observed that, counter to the experience generally
associated with the onset of earlier recessions, monetary growth had been well maintained in
recent months, and a few noted that long-term interest rates currently were appreciably below
their peaks of the past year. The prospect that fiscal policy might begin to move in an
expansionary direction later in the year was cited as another factor in the outlook for stronger
economic activity. A decline in energy prices, should it materialize as anticipated in futures
markets, would have a positive effect on both business and consumer spending by lowering
business costs and raising disposable consumer incomes adjusted for energy costs. Perhaps
the most critical element in this outlook was the persistence of elevated growth in structural
labor productivity, which seemed likely to play a vital role in supporting growth in incomes
and aggregate demand while also helping to limit inflation pressures.

At the same time, members also saw considerable downside risks to the economic expansion.

Energy prices remained elevated and were continuing to depress business and household purchasing power; the overhang of excess capital stocks in some sectors could turn out to be sizable, depressing investment spending for some time; consumer confidence could worsen appreciably more in the face of weaker expansion of incomes and higher job layoffs; and investor concerns about earnings could increase further, sparking lower equity prices and tighter standards and terms on credit.

Except for prices of energy and medical services, the currently available information indicated relatively subdued rates of inflation, and recent surveys pointed to little change in inflation expectations. Looking ahead, members anticipated that somewhat reduced pressures in labor and product markets would foster some softening in consumer price inflation over coming quarters, a development that would be abetted should prices of oil and natural gas ease during the year in line with current market expectations.

In preparation for a semi-annual report to Congress, the members of the Board of Governors and the presidents of the Federal Reserve Banks provided individual projections of the growth in nominal and real GDP, the rate of unemployment, and the rate of inflation for the year 2001. The forecasts were concentrated in ranges of 4 to 5 percent for the growth in nominal GDP and 2 to 2-1/2 percent for the expansion in real GDP, implying some strengthening of economic activity as the year progressed. With growth in business activity falling short of the expansion in the economy's potential, the rate of unemployment was expected to rise somewhat to an average of about 4-1/2 percent by the fourth quarter of the year. Forecasts of the rate of inflation, as measured by the chain-type price index for personal consumption expenditures, were centered in a range of 1-3/4 to 2-1/4 percent, reflecting declines from the inflation rate last year largely stemming from the projected reductions in energy prices.

The marked deceleration in final sales experienced late last year was concentrated in consumer spending for motor vehicles and other durable goods and in business expenditures for equipment and software. In the household sector, rapidly declining consumer confidence, apparently associated in important measure with increasing worker layoffs and growing concerns about future job prospects, had contributed to generally disappointing retail sales during the holiday season. There was some evidence that sales had stabilized and possibly risen slightly in January, though a part of the improvement could reflect steep price discounts for the purpose of reducing inventories. Other negative factors cited by the members included the adverse wealth effects of the decrease in stock market valuations, relatively high consumer debt service burdens, and possible retrenchment by consumers after an extended period of large increases in purchases and related buildups of consumer durables. Nonetheless, in the absence of possible developments leading to further deterioration in consumer sentiment, the members saw reasonable prospects for strengthening consumer spending this year even assuming some decline in such expenditures relative to income. An important factor in this outlook was the expectation of some reduction in energy prices, which would boost disposable incomes available for non-energy expenditures and likely provide a fillip to consumer sentiment in the process. Moreover, with the relatively high rate of growth in structural productivity showing little or no signs of waning, the longer-run prospects for household incomes remained positive. On balance, the various factors weighing on the outlook for consumer spending later this year seemed favorable, though substantial downside risks clearly would persist for some interim period of uncertain duration.

The depressing effects of lagging final sales on business investment spending, notably for



equipment and software, were reinforced by deterioration in the financial balance sheets of some business firms, tighter supply conditions in segments of the credit markets, and a buildup in excess capacity that had eroded profitability. In this regard, members referred to earlier unsustainable rates of investment by many high-tech firms that were now obliged to retrench despite still high rates of growth in the demand for their products and services. With regard to the nonresidential construction sector, members provided anecdotal reports of continued high levels of activity in several parts of the country and little evidence of the substantial overbuilding that had characterized the construction industry in earlier periods of developing economic weakness. On balance, while the business investment outlook seemed vulnerable to somewhat greater than projected weakness in the short run, the members were persuaded that, against the background of large continuing gains in structural productivity and cost savings from further investment in equipment and software, business firms were likely to accelerate their spending for new capital after a period of adjustment.

Concerning the outlook for housing activity, recent statistical and anecdotal reports indicated that housing sales and construction were being well maintained and indeed were a bright spot in several regions. Reduced mortgage interest rates appeared to be largely offsetting the marked decline in consumer confidence. Accordingly, and contrary to the experience in earlier periods of softening economic activity, the stabilization of housing activity at a pace near its current fairly high level was seen as a reasonable expectation.

The outlook for inventory investment was more uncertain. The drop in final sales during late 2000 evidently was much faster than generally expected, and inventories rose considerably over the fourth quarter as a whole despite sharp downward adjustments in manufacturing output. In keeping with just-in-time inventory policies, which had been furthered in recent years by advances in technology that allowed faster and more complete readings on sales and adjustments in orders, efforts to reduce inventories were continuing in recent weeks and net inventory liquidation was anticipated in the current quarter. Looking further ahead, a number of members commented that they expected a period of inventory correction that would be relatively sharp but short by historical standards. Improvements in inventory management and related indications that inventory overhangs were small compared to earlier historical experience were factors in this assessment. At the same time, members recognized that the inventory correction had just begun and its duration would depend importantly on the ongoing strength of final sales. In this regard, developments bearing on business and consumer confidence and willingness to spend would play a crucial, though at this point uncertain, role.

Members expressed some divergence of views regarding the outlook for foreign economic activity and the implications for the domestic economy. Some emphasized that most of the nation's important trading partners had growing economies that were likely to provide support for expanding U.S. exports. Other members were concerned about indications of growing weakness in a number of foreign economies that might increasingly inhibit U.S. exports and add to competitive pressures on U.S. producers in domestic markets. The large current account deficit was seen as a factor pointing to potential depreciation of the dollar over time, with adverse repercussions on domestic inflation albeit favorable effects on exports.

In their comments about the outlook for inflation, members noted that current indicators continued on the whole to point to subdued price increases, with lagging demand and strong competitive pressures in many markets severely limiting the ability of business firms to raise



their prices. Labor markets were described as still tight across the nation, but reports of layoffs in specific industries were increasing and numerous business contacts indicated that openings were now much easier to fill in many job markets. There were some related indications that wage pressures might be easing. Against the background of a sluggish economy in the near term and forecasts of only moderate economic growth, the members anticipated that inflation would remain contained over the forecast horizon. A key factor in this assessment continued to be their outlook for rapid further gains in structural productivity that would help to hold down increases in unit labor costs. Other factors included the prospect of some decline in energy prices and the persistence of generally benign inflation expectations. On balance, with pressures in labor and product markets ebbing, the outlook for inflation was a source of diminished though persisting concern.

In the Committee's discussion of policy for the intermeeting period ahead, all the members endorsed a proposal calling for a further easing in reserve conditions consistent with a 50 basis point decrease in the federal funds rate to a level of 5-1/2 percent. Such a policy move in conjunction with the 50 basis point reduction in early January would represent a relatively aggressive policy adjustment in a short period of time, but the members agreed on its desirability in light of the rapid weakening in the economic expansion in recent months and associated deterioration in business and consumer confidence. The extent and duration of the current economic correction remained uncertain, but the stimulus provided by the Committee's policy easing actions would help guard against cumulative weakness in economic activity and would support the positive factors that seemed likely to promote recovery later in the year. Several members observed that the evolving nature of the domestic economy, including the ongoing improvements in inventory management and the increase in managerial flexibility to alter the level and mix of capital equipment, associated in part with the greater availability of information, appeared to have fostered relatively prompt adjustments by businesses to changing economic conditions. As a consequence, monetary policy reactions to shifts in economic trends needed in this view to be undertaken more aggressively and completed sooner than in the past. In current circumstances, members saw little inflation risk in such a "front-loaded" easing policy, given the reduced pressures on resources stemming from the sluggish performance of the economy and relatively subdued expectations of inflation.

All the members agreed that the balance of risks sentence in the press statement to be released shortly after this meeting should continue to indicate that the risks would remain tilted toward economic weakness even after today's easing action. The members saw substantial underlying strength and resilience in the economy and they remained optimistic about its prospects beyond the near term in light of the monetary policy stimulus that was being implemented and the persistence of rapid advances in productivity. In this regard, some members commented that the upside risks could not be totally dismissed. But with the adjustments to the stock of capital, consumer durable goods, and inventories to more sustainable levels likely only partly completed and with investors in financial markets remaining skittish, the risks that growth would persist below that of the economy's productivity-enhanced potential continued to dominate the outlook.

At the conclusion of this discussion, the Committee voted to authorize and direct the Federal Reserve Bank of New York, until it was instructed otherwise, to execute transactions in the System Account in accordance with the following domestic policy directive:

The Federal Open Market Committee seeks monetary and financial conditions



that will foster price stability and promote sustainable growth in output. To further its long-run objectives, the Committee in the immediate future seeks conditions in reserve markets consistent with reducing the federal funds rate to an average of around 5-1/2 percent.

The vote encompassed approval of the sentence below for inclusion in the press statement to be released shortly after the meeting:

> Against the background of its long-run goals of price stability and sustainable economic growth and of the information currently available, the Committee believes that the risks are weighted mainly toward conditions that may generate economic weakness in the foreseeable future.

**Votes for this action:** Messrs. Greenspan, McDonough, Ferguson, Gramlich, Hoenig, Kelley, Meyer, Minehan, Moskow, and Poole.

**Vote against this action:** None.

By notation vote completed on March 15, 2001, the Federal Open Market Committee voted unanimously to select Dino Kos as Manager for Domestic and Foreign Operations of the System Open Market Account to serve in that capacity until the first regularly scheduled meeting after December 31, 2001, subject to the understanding that in the event of the discontinuance of his official connection with the Federal Reserve Bank of New York he would cease to have any official connection with the Federal Open Market Committee. It also was understood that this selection needed to be satisfactory to the Federal Reserve Bank New York. Advice subsequently was received that the selection of Mr. Kos as Manager was satisfactory to the board of directors of that Bank.

It was agreed that the next meeting of the Committee would be held on Tuesday, March 20, 2001.

The meeting adjourned at 10:50 a.m. on January 31, 2001.

**Donald L. Kohn**
**Secretary**

▲ Return to top

**Footnotes**

1 Attended Tuesday session only.
2 Attended portion of meeting relating to a staff study of the Federal Reserve asset portfolio.
3 Attended Wednesday session only.

Home | FOMC
Accessibility
To comment on this site, please fill out our feedback form.
**Last update: March 22, 2001, 2:00 PM**

http://www.federalreserve.gov/fomc/minutes/20010131.htm                          7/26/2007