1  COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
2  MARK SOLOMON (151949)
   DOUGLAS R. BRITTON (188769)
3  655 West Broadway, Suite 1900
   San Diego, CA  92101
4  Telephone:  619/231-1058
   619/231-7423 (fax)
5  marks@csgrr.com
   dougb@csgrr.com
6       – and –
   SHAWN A. WILLIAMS (213113)
7  WILLOW E. RADCLIFFE (200087)
   ELI R. GREENSTEIN (217945)
8  DANIEL J. PFEFFERBAUM (248631)
   100 Pine Street, Suite 2600
9  San Francisco, CA  94111
   Telephone:  415/288-4545
10 415/288-4534 (fax)
   shawnw@csgrr.com
11 willowr@csgrr.com
   elig@csgrr.com
12 dpfefferbaum@csgrr.com

13 Lead Counsel for Plaintiffs

14 [Additional counsel appear on signature page.]

15              UNITED STATES DISTRICT COURT

16            NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 17 In re ORACLE CORPORATION SECURITIES LITIGATION | ) ) ) Master File No. C-01-0988-SI |
| 18 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) CLASS ACTION |
| 19 This Document Relates To: | ) ) PLAINTIFFS' NOTICE OF MOTION AND |
| 20    ALL ACTIONS. | ) MOTION TO EXCLUDE THE TESTIMONY ) OF DEFENDANTS' ACCOUNTING |
| 21 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) EXPERT J. DUROSS O'BRYAN; ) MEMORANDUM OF POINTS AND ) AUTHORITIES IN SUPPORT THEREOF |
| 22 | DATE:  January 9, 2009 |
| 23 | TIME:  9:00 a.m. |
| 24 | COURTROOM: The Honorable Susan Illston |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

1

# TABLE OF CONTENTS

2

**Page**

3  I.    INTRODUCTION ...................................................................................................1

4  II.   ARGUMENT .........................................................................................................2

5        A.    Legal Standard .........................................................................................2

6              1.    Rule 702 .........................................................................................2

7                    a.    Testimony Must Be Helpful to the Trier of Fact .............................3

8                    b.    The Expert Must Be Qualified ........................................................4

9                    c.    Expert Testimony Must Be Reliable................................................4

10             2.    Rule 403 .........................................................................................6

11       B.    Mr. O'Bryan's Opinions on the Financial Statement Impact of the Debit
               Memo Transactions Are Based on Unreliable Foundation and a Flawed
12             Methodology ...........................................................................................7

13             1.    Mr. O'Bryan Failed to Produce All Documents, Calculations and
                     Data that He Relied Upon in Forming His Opinions...................................7

14

15             2.    Mr. O'Bryan's Opinions Regarding the Debit Memo Customer
                     Overpayments and the $20 million in Transfers to Oracle's Bad
                     Debt Reserve to Inflate Revenue and Earnings in 2Q01 Are Not
16                   Based on Reliable Foundation ........................................................8

17             3.    Mr. O'Bryan's Opinion That $2 million of the $20 million in
                     Improper Debit Memo Transfers Was Proper Lacks Foundation
18                   and Methodology ..........................................................................10

19                   a.    The $700,000 in Purportedly Appropriate Transfers
                           Relating to "Royalty Payments"..............................................10
20

21                   b.    The $800,000 in Purportedly Appropriate Transfers
                           Relating to "The Use of Credit Memos and/or Inclusion in
                           Oracle's General Bad Debt Reserve" ...........................................11
22

23                   c.    The $500,000 in Purportedly Appropriate Transfers in the
                           "Could Be" Bucket ....................................................................11

24             4.    Mr. O'Bryan's Opinion Regarding the Materiality of Oracle's
                     2Q01 Financial Misstatements Is Speculative and Lacks Reliable
25                   Foundation ..................................................................................13

26       C.    Mr. O'Bryan's Opinion on the Propriety of Oracle's Fraudulent
               Transaction with Hewlett Packard on the Last Day of 2Q01 Is Unreliable
27             and Improper and Should Be Excluded .............................................14

28

Page

        1.     Mr. O'Bryan's Opinion on the HP Transaction Is Not Based on
              Reliable Foundation or Methodology ...........................................................14

    D.    Mr. O'Bryan's Rebuttal Report on the HP Transaction Improperly Relies
          Upon Documents Not Produced to Plaintiffs Until *After* Rebuttal Reports
          Were Exchanged ...........................................................................................16

    E.    Mr. O'Bryan's Failure to Disclose the Exclusion of His Prior Expert
          Testimony Evidences a Lack of Candor .......................................................17

III.    CONCLUSION.................................................................................................................18

1

## TABLE OF AUTHORITIES

2
Page

3 CASES

4 *6816.5 Acres of Land v. United States,*

5      411 F.2d 834 (10th Cir. 1969) ........................................................15

6 *American Key Corp. v. Cole Nat'l Corp.,*
     762 F.2d 1569 (11th Cir. 1985) ...................................................15

7
*Atmel Corp. v. Information Storage,*
8      189 F.R.D. 410 (N.D. Cal. 1999) ...............................................17

9 *Baldwin Graphic Sys., Inc. v. Siebert, Inc.,*
     No. 03 C 7713, 2005 U.S. Dist. LEXIS 10692
10      (N.D. Ill. Feb. 22, 2005)..............................................................17

11 *Bourjaily v. United States,*
12      483 U.S. 171 (1987)......................................................................3

13 *Curtis v. M&S Petroleum, Inc.,*
     174 F.3d 661 (5th Cir. 1999) .........................................................5
14
*Daubert v. Merrell Dow Pharms.,*
15      509 U.S. 579 (1993)............................................................ *passim*

16 *Farnham v. Rehwald,*
17      No. B170124 2005 Cal. App. Unpub., LEXIS 3107,
     (Cal. App. 2005) ..............................................................17, 18, 21
18
*GE v. Joiner,*
19      522 U.S. 136 (1997)............................................................ *passim*

20 *In re Paoli,*
21      35 F.3d 717 (3d Cir. 1994)............................................................4

22 *In re Paoli R.R. Yard PCB Litig.,*
     916 F.2d 829 (3d Cir. 1990)..........................................................4
23
*In re Williams Sec. Litig.,*
24      496 F. Supp. 2d 1195 (N.D. Okla. 2007).......................................4

25 *Kumho Tire Co., Ltd. v. Carmichael,*
     526 U.S. 137 (1999)............................................................ *passim*
26
*Metabolife Int'l, Inc. v. Wornick,*
27      264 F.3d 832 (9th Cir. 2001) ........................................................5

28

**Page**

*Sherrod v. Lingle*,
   223 F.3d 605 (7th Cir. 2000) ...........................................................................................17

*Taylor v. B. Heller & Co.*,
   364 F.2d 608 (6th Cir. 1966) ...........................................................................................15

*Trevino v. Gates*,
   99 F.3d 911 (9th Cir. 1996) ...............................................................................................5

*United States v. Downing*,
   753 F.2d 1224 (3d Cir. 1985)..............................................................................................4

*United States v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004) ..........................................................................................6

*Viterbo v. Dow Chem. Co.*,
   826 F.2d 420 (5th Cir. 1987) ..............................................................................................5


**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
   Rule 26(a)(2)(B)...............................................................................................................15
   Rule 26(a)(2) ........................................................................................................... *passim*
   Rule 30(b)(6)....................................................................................................................15

Federal Rules of Evidence
   Rule 104(a).........................................................................................................................3
   Rule 401 .....................................................................................................................1, 2, 4
   Rule 403 .....................................................................................................................1, 2, 6
   Rule 702 .................................................................................................................. *passim*
   Rule703 ................................................................................................................... *passim*

**SECONDARY AUTHORITIES**

3 J. Weinstein & M. Berger, *Weinstein's Evidence* (1998) ...........................................................4

4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*
   (2d ed. 2005) .............................................................................................................3, 5, 6

1   TO:     ALL PARTIES AND THEIR ATTORNEYS OF RECORD

2          PLEASE TAKE NOTICE that plaintiffs will and hereby do move this Court to preclude the

3   testimony of J. Duross O'Bryan ("O'Bryan").  The matter will be heard January 9, 2009 at 9:00 a.m.

4   before the Honorable Susan J. Illston.  This motion is made pursuant to Federal Rules of Evidence

5   401, 403 and 702 on the grounds that Mr. O'Bryan's opinions are unreliable, would serve to mislead

6   and confuse the jury, and will not assist the trier of fact to understand the evidence or determine a

7   fact at issue.  This motion is based upon this notice of motion, the accompanying memorandum of

8   points and authorities, the supporting Declaration of Eli R. Greenstein in Support of Plaintiffs'

9   Motion to Exclude the Testimony of Defendants' Accounting Expert J. Duross O'Bryan

10   ("Greenstein Decl."), filed herewith, the exhibits attached thereto, the pleadings and other papers and

11   records on file, and such further evidence and arguments as may be presented to the Court on reply

12   and at the time of hearing.

13                 **MEMORANDUM OF POINTS AND AUTHORITIES**

14   **I.     INTRODUCTION**

15          Mr. O'Bryan's expert opinion on the accounting issues in this case should be excluded for

16   several reasons.  First, Mr. O'Bryan's opinion concerning the financial statement impact of Oracle's

17   misuse of customer unapplied cash and debit memo transactions to inflate its 2Q01 financial results

18   is based upon unreliable foundation and a flawed methodology.  Most fundamentally, Mr. O'Bryan

19   relied upon documents, facts, data and other information not provided to plaintiffs.  Additionally, in

20   many crucial parts of his opinion on the debit memo transactions, Mr. O'Bryan provided numerous

21   pages of conclusions and speculative inferences without a single footnote or citation to documents,

22   deposition testimony or other information.  *See, e.g.,* Ex. 1[1] at 33-34 (O'Bryan, May 25, 2007

23   Report).

24          Second, Mr. O'Bryan's opinion concerning Oracle's improper "swap" transaction with

25   Hewelett Packard ("HP") on the last day of 2Q01 (the "HP Transaction") lacks any reliable

26

27   [1]     "Ex. ___" refers to Greenstein Decl., unless otherwise stated.

28

1    foundation or methodology and consists of a ***single paragraph*** of text in his opening report.  Ex. 1 at

2    41.  Mr. O'Bryan admitted that his opinion was "light" and that he failed to conduct any independent

3    analysis of his own in forming the opinion in his opening report.  Ex. 2 at 56:8-22 ("***And when I say***

4    ***light, it's simply a paragraph.***").

5           On rebuttal, Mr. O'Bryan tried to cure his inadequate one-paragraph opening report with a

6    26-page rebuttal opinion based upon numerous documents, e-mails and other evidence that were

7    never produced to plaintiffs or their experts until June 22, 2007 – the ***same day*** as the deadline for

8    the parties to exchange expert rebuttal reports.  In other words, Mr. O'Bryan and defendants

9    tactically waited to submit a substantive opinion and produce never-before-seen evidence on the HP

10    Transaction until plaintiffs and their accounting expert had no chance to review, analyze or rebut the

11    new documents.  This type of conduct violates both the spirit and letter of Fed. R. Civ. P. 26(a)(2)

12    and Fed. R. Evid. 702.  Mr. O'Bryan's opinions should be excluded.

13  **II.**      **ARGUMENT**

14        **A.**      **Legal Standard**

15           The admissibility of expert testimony is governed by Federal Rules of Evidence as well as

16    the U.S. Supreme Court's decisions in *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), and

17    its progeny.[2]  Rule 702 addresses an expert's qualifications, the reliability of his/her testimony and

18    its relevance to the issues in dispute.  Rule 703 addresses the situation when expert testimony is

19    based upon inadmissible evidence.  Furthermore, all evidence must be relevant as defined by Rule

20    401.  Finally, under Rule 403, the Court must evaluate the probative value of any evidence proffered

21    against any potential unfair prejudice.

22        **1.**      **Rule 702**

23           Rule 702, originally enacted in 1975, was amended in 2000 to effectively codify the *Daubert*

24    trilogy –*Daubert*, *Joiner* and *Kumho*.  It states:

25

26    [2]      The "Daubert Trilogy": *Daubert*, 509 U.S. 579; *GE v. Joiner*, 522 U.S. 136 (1997), and

27  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999); *see* Fed. R. Evid. 702, Advisory Comm. Notes, 2000 Amendments.

28

1
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

2

3

4

5  Fed. R. Evid. 702.

6      Whether an expert's opinion satisfies Rule 702 and *Daubert* is a legal determination made by

7  the trial judge. *Daubert*, 509 U.S. at 589-91; *see* Fed. R. Evid. 104(a). The party proffering the

8  expert bears the burden in establishing the pertinent admissibility requirements are met by a

9  preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987). If a

10  proffered expert is to offer testimony on multiple subjects, the court must apply the standards of Rule

11  702 and *Daubert* to each subject. 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal*

12  *Evidence* §702.04[6] (2d ed. 2005). An expert may opine only on the subject(s) on which he has

13  been accepted to testify and opinions outside these topics are inadmissible.

14      The Supreme Court has made it explicitly clear that Rule 702 requires the trial court to

15  perform a "gatekeeping" function to ensure that proffered expert testimony is relevant, reliable and

16  helpful to the finder of fact. *Daubert*, 509 U.S. at 589 n.7; *Joiner*, 522 U.S. at 136, 142; Fed. R.

17  Evid. 702; *Kumho*, 526 U.S. 137. The court's gatekeeping function applies equally to all proffered

18  expert testimony, whether based in scientific, technical or other specialized knowledge. *Kumho*, 526

19  U.S. at 151. The trial court must "make certain that an expert, whether basing testimony upon

20  professional studies or personal experience, employs in the courtroom the same level of intellectual

21  rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

22              a.      **Testimony Must Be Helpful to the Trier of Fact**

23      An expert witness must provide testimony which "will assist the trier of fact to understand

24  the evidence or to determine a fact in issue." Fed. R. Evid. 702. "Expert testimony which does not

25  relate to any issue in the case is not relevant and, ergo, non-helpful."[3] *Daubert*, 509 U.S. at 591

26  _____

27  [3]      All citations and internal quotations and footnotes are omitted and all emphasis is added unless otherwise noted.

28

PLTFS' NOT OF MTN & MTN TO EXCLUDE TESTIMONY OF DEFS' ACCTG EXPERT J. DUROSS
O'BRYAN; MEM OF P&A IN SUPPORT THEREOF - C-01-0988-SI                    - 3 -

1    (citing 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶702[02], at 702-18 (1998), and *United*

2    *States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)).  Rule 401 requires that all proffered

3    evidence must be relevant to be admissible.  However, given the greater potential impact of expert

4    testimony on the finder of fact, mere relevance alone will not suffice under Rule 702.  "[T]he

5    'helpfulness' requirement in Rule 702 'implies a quantum of reliability beyond that required to meet

6    a standard of bare logical relevance.'"  *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 857 (3d Cir.

7    1990) (quoting *Downing*, 753 F.2d at 1235).

8          The helpfulness requirement has also been deemed the "fit" requirement.  *Daubert*, 509 U.S.

9    at 591; *Downing*, 753 F.2d at 1242.  The "fit" requirement ensures a "valid scientific connection to

10   the pertinent inquiry as a precondition to admissibility."  *Daubert*, 509 U.S. at 592.  Thus, the

11   testimony of an expert, no matter how qualified, will not be admissible if their expertise does not

12   shed light on an issue in dispute.

13                    **b.      The Expert Must Be Qualified**

14         A witness may be "qualified as an expert by knowledge, skill, experience, training, or

15   education." Fed. R. Evid. 702.  "[R]egardless of the mix of formal credentials and experience that is

16   proffered as establishing the requisite 'qualifications' under the rule, those qualifications must be

17   ***specific*** as well as ***general***."  *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1244 (N.D. Okla.

18   2007) (emphasis in original).  A proffered expert witness, no matter how impressive his credentials

19   may be, will not be considered qualified if he cannot offer testimony, which will assist the trier of

20   fact in his or her decision-making.

21                    **c.      Expert Testimony Must Be Reliable**

22         The test for reliability under Rule 702 is a three-pronged analysis.  Reliability requires expert

23   testimony to be: (1) based upon sufficient facts or data; (2) the product of reliable principles and

24   methods; and (3) the application of the principles and methods reliably to the facts of the case.  Fed.

25   R. Evid. 702.  The focus is the admissibility of the testimony – not its correctness, but each factor

26   must be scrutinized carefully as "any step that renders the analysis unreliable under the Daubert

27   factors renders the expert's testimony inadmissible."  *In re Paoli*, 35 F.3d 717, 745 (3d Cir. 1994).

28

1    An expert's opinion cannot be based upon merely subjective belief or unsupported speculation.

2    *Daubert*, 509 U.S. at 590; *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999).[4]

3         Foundational reliability requires an expert to show that his opinion is supported by an

4    adequate foundation of relevant facts, data or other opinions.  *Weinstein's Fed. Evid.* §702.05[2][b].

5    "Where foundational facts demonstrating relevancy . . . are not sufficiently established, exclusion of

6    proffered expert testimony is justified."  *Trevino v. Gates*, 99 F.3d 911, 922 (9th Cir. 1996).  The

7    "source upon which an expert's opinion relies is of such little weight that the jury should not be

8    permitted to receive that opinion."  *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).[5]

9         Methodological reliability requires that expert testimony "have a reliable basis in the

10   knowledge and experience of [the relevant] discipline" and that it is a "product of reliable principle

11   and methods."  *Kumho*, 526 U.S. at 148 (citing *Daubert*, 509 U.S. at 592); Fed. R. Evid. 702,

12   Advisory Comm. Notes, 2000 Amendments.  The focus of the inquiry is not on the expert's

13   conclusions, but the means used to derive such conclusions.  *Metabolife Int'l, Inc. v. Wornick*, 264

14   F.3d 832, 841 (9th Cir. 2001) (citing *Daubert*, 509 U.S. at 595-96).

15        Where expert testimony is not based in scientific expertise, but rather in technical knowledge,

16   skill or experience, these factors are difficult, if not impossible to apply.  Ultimately, the Court's

17   gatekeeping function must ensure that an expert witness "employs in the courtroom the same level of

18   intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho*, 526 U.S.

19   at 152.

20        Connective reliability focuses on the reasoning used by the expert to connect data or

21   assumptions to his conclusions or opinions.  It is "not the reasonableness ***in general***" of the

22   ─────────────────────

23   [4]    *Daubert* offers a list of non-exclusive, non-mandatory factors bearing on the determination of
     reliability: (1) whether the theory or technique will be, can be or has been tested; (2) whether the
24   theory or technique has been subjected to peer review and publication; (3) the known or potential
     rate of error experienced in the application of the particular theory or technique; and (4) the degree
25   of acceptance of the theory or technique in the relevant scientific community, *i.e.*, widespread versus
     minimal.  *Daubert*, 509 U.S. at 593-94.

26   [5]    Rule 703 addresses reliance by an expert on inadmissible information.  The sufficiency of the
27   basis for an expert's opinion is determined under Rule 702.  *See* Fed. R. Evid. 702, Advisory Comm.
     Notes, 2000 Amendments.  As a result, Rule 703 is applicable to a "relatively narrow inquiry."  *Id.*

28

methodology used by the expert in drawing his conclusion, but "[r]ather, it was the reasonableness of using such an approach, along with [the expert's] particular method of analyzing the data thereby obtained, to draw a conclusion regarding ***the particular matter to which the expert testimony was directly relevant***." *Id*. at 153-54 (emphasis in original).  Connective reliability evaluates whether an analytical gap exists between the data and the expert's conclusions.  *Joiner*, 522 U.S. at 146.  The Court is not required "to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Id*.[6]

### 2.      Rule 403

Finally, the Court must perform a balancing test under Rule 403, and exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.  Rule 403 plays an enhanced role for expert witnesses, resulting in the Court exercising more control over an expert than a lay witness. *Daubert*, 509 U.S. at 595.  The reason is practical – expert testimony can be both powerful and quite misleading, due to the difficulty in evaluating it and because such testimony "may be assigned talismanic significance in the eyes of lay jurors" simply because it is given by a person who has been labeled an expert. *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004). *See Daubert*, 509 U.S. at 595.

---

[6]      In making their determination, courts have considered the following factors: Whether the proposed witness' conclusions represent an unfounded extrapolation from the underlying data; whether the witness has sufficiently connected the proposed testimony with the facts of the case; whether the witness has adequately accounted for alternative explanations for the effect whose cause is at issue; and whether the witness relied unduly on the temporal proximity between the occurrence of an event and the onset of illness or injury. *See Weinstein's Fed. Evid.* §702.05[2][d].

B.   **Mr. O'Bryan's Opinions on the Financial Statement Impact of the Debit Memo Transactions Are Based on Unreliable Foundation and a Flawed Methodology**

       1.   **Mr. O'Bryan Failed to Produce All Documents, Calculations and Data that He Relied Upon in Forming His Opinions**

Mr. O'Bryan's opinions on the "financial statement impact" of the November 2000 debit memos and the corresponding transfers of customer overpayments to the bad debt reserve to inflate Oracle's 2Q01 financial results should be excluded under Fed. R. Civ. P. 26(a)(2) and Fed. R. Evid. 702 and 703.

Most fundamentally, Mr. O'Bryan violated the spirit and letter of Fed. R. Civ. P. 26(a)(2) and Fed. R. Evid. 702 by relying upon documents, facts, calculations, and data not provided to plaintiffs. For example, one main component of Mr. O'Bryan's opinion is that $2 million of the otherwise undisputed $20 million in improper transfers of customer overpayments to Oracle's revenue and earnings via the bad debt reserve in 2Q01 was purportedly "appropriate."  Ex. 1 at 33.  As set forth in §II.B.3., *infra*, Mr. O'Bryan's opinion concerning the $2 million in transfers failed to cite a ***single*** document, deposition or reliable fact to support the purported "appropriateness" of the transfers.  *Id.*

During his deposition, Mr. O'Bryan was asked to "describe the methodology you used in determining whether those transfers were appropriate."  Ex. 2 at 135:6-9.  Mr. O'Bryan responded as follows:

> ***There is a binder I brought with me today*** that basically summarizes – what we did was we ran a database that pulled out of the 926 scripts all of those that went from 25005 to 12601…. We then printed out script reports, script output reports on each one of those and ***went through each one of those in detail, and summarized this binder, and as best summarized in a two-page document in front of that binder is really the findings I've laid out*** with respect to what I believe were appropriately, at least some indication it was appropriate to include those in the [2Q01] as being transferred from 25005 to 12601.

*Id.* at 135:12-136:1.  During the deposition it became apparent that most of the foundational facts, data, and "findings" in Mr. O'Bryan's report were based upon documents in his binder that were not produced to plaintiffs.  *See, e.g.*, *id.* at 137-142; 167-168.  The only opinions contained in his report on the $2 million in transfers are unfounded conclusions.  *See* §II.B.3., *infra*.

Plaintiffs' counsel specifically asked Mr. O'Bryan during his deposition if he "relied upon" the data and documents in his "binder" to form his opinions:  "***So going back to that binder, that is***

1    *something obviously you relied upon in doing your calculations in your opening report, correct.*

2    *A. I did, yes.*" Ex. 2 at 137:21-25; *see also id.* at 141:3-7 ("Q. Did you rely on that binder in front of

3    you?  A.  *I did rely on the binder in front of me.*").

4          After a lengthy discussion on the record about how Mr. O'Bryan compiled and created the

5    documents and "findings" in the binder, it became clear that he expressly relied almost exclusively

6    on the documents, data calculations and other evidence in the binder in forming his opinions.  *Id.* at

7    138-142.  Accordingly, plaintiffs requested that Mr. O'Bryan turn over the materials.  *Id.* at 162:15-

8    164:2.  Mr. O'Bryan expressly agreed to produce the materials.  *Id.* at 164:1 ("*I'm happy to give you*

9    *the whole binder.*").  Counsel for defendants, however, expressly forbade Mr. O'Bryan from turning

10   over the materials and overruled his offer.  *Id.* at 162:15-166:9.  This directive is a direct violation of

11   Fed. R. Civ. P. 26(a)(2) and the parties' stipulation regarding the documents required to be produced.

12   Indeed the stipulation requires experts to produce "*copies of all other documents, data, or other*

13   *information relied upon by each Testifying Expert.*"  Ex. 3 at ¶2.  Accordingly, Mr. O'Bryan's

14   testimony on the debit memo issues is improper and should be excluded.

15              **2.      Mr. O'Bryan's Opinions Regarding the Debit Memo Customer**
                        **Overpayments and the $20 million in Transfers to Oracle's**
16                      **Bad Debt Reserve to Inflate Revenue and Earnings in 2Q01**
                        **Are Not Based on Reliable Foundation**
17
          Mr. O'Bryan's opinions on the "financial statement impact" of the debit memo transactions
18
     and the debit memo transfers to the bad debt reserve in 2Q01 lack any indicia of reliability of
19
     foundation or facts.  For example, Mr. O'Bryan states that of the 46,000+ debit memos created in
20
     November 2000,  he reviewed "source documents" for only 60 debit memos and concluded that
21
     "[t]he sample size of 60 was sufficient to confirm my understanding of how debit memos were
22
     processed."  Ex. 1 at 25 n.73.  His entire opinion regarding the sample of 60 debit memos is as
23
     follows:
24
            From [the] 926 debit memos, I then randomly chose a subset of 60 debit memos to
25          review the actual source documents relating to each transaction.  I found no evidence
            that revenue was recorded as a result of the November 17, 2000 debit memo project.
26
     *Id.* at 25.
27

28

1    Mr. O'Bryan failed to provide any foundational facts or analysis for the 60 debit memos he

2    reviewed.  *Id*.  He failed to apply any reliable principles to the facts underlying the 60 debit memos.

3    *Id*.  He failed to explain his methodology for analyzing the 60 sample debit memos and failed to cite

4    the "source documents" he reviewed.  *Id*.  In fact, Mr. O'Bryan failed to provide plaintiffs with a

5    simple ***list*** of the 60 debit memo transactions that he purportedly reviewed.  *Id*.  Plaintiffs still have

6    no way of determining which 60 debit memos Mr. O'Bryan relied upon.  Thus, his conclusions

7    drawn from the "sample" 60 debit memos lacks any reliable foundation or fact and would not assist

8    the jury in assessing this case.

9    Similarly, in the seemingly important section of Mr. O'Bryan's Report entitled "Key

10   Procedures Performed Related to Transfers of Unapplied Cash" and "Review of Subset of Unapplied

11   Cash Transfers," Mr. O'Bryan submits two pages of conclusions without a ***single*** citation to

12   documents, testimony, data or evidence.  Ex. 1 at 32-33.  For example, he opines that "within the

13   accounting histories of the transactions relating to the 926 debit memos, I found 121 transfers to the

14   bad debt reserve during the second quarter of fiscal year 2001."  *Id*. at 32.  Mr. O'Bryan failed,

15   however, to provide the list of the 121 debit memos that were transferred and the underlying facts to

16   verify his conclusion.  *Id*.

17   When asked at deposition, Mr. O'Bryan admitted he relied upon a list of the 121 compiled by

18   his staff, but counsel for defendants refused to turn over the list.  *Compare* Ex. 2 at 167:1-170:7 ("Do

19   you have a list of the 121 debit memo items?  A.  I do.  Q.  And rather than ask you to tell me all of

20   them on the record, is there a list you can provide to plaintiffs of these items?"), *with id*. at 168:16-

21   19 ([Counsel for defendants]: "I object to the extent it mischaracterizes testimony and to the extent

22   you're trying to get our expert to do work that you guys can easily do on your own with the materials

23   you have.").

24   In other words, instead of simply providing plaintiffs with the list of 121 debit memos that

25   Mr. O'Bryan clearly relied upon and already compiled (which would doubtless fit on a single sheet

26   of paper), counsel for Oracle refused to produce the most fundamental data upon which Mr. O'Bryan

27   relied.  Such conduct smacks of gamesmanship, especially in light of the parties' joint stipulation

28   that experts provide all documents and calculations "relied upon."  Ex. 3 at ¶2.  Mr. O'Bryan's

1   refusal to produce the documents, facts, calculations and analyses he relied upon in forming his

2   opinion renders his testimony unreliable and unfounded.[7]

3          **3.      Mr. O'Bryan's Opinion That $2 million of the $20 million in**
                     **Improper Debit Memo Transfers Was Proper Lacks**
4                    **Foundation and Methodology**

5          Mr. O'Bryan provides a conclusory opinion that $2 million of the debit memo bad debt

6   transfers that inflated Oracle's revenue and earnings in 2Q01 were purportedly "appropriate."  Ex. 1

7   at 32-33.  His report addresses the $2 million in three separate opinions and provides a single

8   paragraph conclusion for each, again without any citations to documents, data, evidence or

9   deposition testimony.  Each of the opinions on the purportedly "appropriate" transfers is discussed

10  below.

11         **a.      The $700,000 in Purportedly Appropriate Transfers**
                     **Relating to "Royalty Payments"**
12
13         Mr. O'Bryan claims that $700,000 in transfers of customer unapplied cash to Oracle's bad

14  debt reserve in 2Q01 were "appropriate."  Ex. 1 at 32.  His entire opinion on this $700,000 claim is

    as follows:
15
16         Of the $10.6 million in transfers subject to my review, almost $700,000 of unapplied
           cash transferred to bad debt reserve during the second quarter of fiscal year 2001
17         related to certain royalties paid to Oracle.  These amounts should have been recorded
           directly to revenue at the time payments were received, but were not.  Therefore
18         insofar as the result of the transfer of these amounts had a positive impact on income,
           that impact was appropriate.

19  *Id.*

20         Mr. O'Bryan's opinion that $700,000 in transfers were "appropriate" is entirely conclusory.

21  He provides no foundation or methodology for how he determined that the items "related to certain

22  royalties."  He provides no explanation of which "certain" royalties he relied upon and how he

23  determined that the amounts "should have been recorded directly to revenue at the time the payments

24  were received."  He does not cite or rely upon a single accounting principle, rule or standard in

25  forming his opinion.  He simply concluded that (1) the $700,000 were royalties, (2) those royalties

26  _____

27  [7]      Similarly, counsel for defendants refused to produce the list of 277 debit memos that Mr.
    O'Bryan claimed were refunded prior to November 17, 2000.  Ex. 2 at 207-208.

28

1    "should have" been recorded as revenue, and (3) "therefore" the transfers were proper. *Id.* Such an

2    unsupported opinion, on its face, does not meet the requirements of Fed. R. Civ. P. 26(a)(2) or Fed.

3    R. Evid. 702. *See Joiner*, 522 U.S. at 146 (The Court is not required "to admit opinion evidence

4    which is connected to the existing data only by the *ipse dixit* of the expert.").

5                        **b.      The $800,000 in Purportedly Appropriate Transfers**
                                 **Relating to "The Use of Credit Memos and/or Inclusion**
6                                **in Oracle's General Bad Debt Reserve"**

7          Mr. O'Bryan opines that $800,000 in customer unapplied cash transfers to the bad debt

8    reserve in 2Q01 were "appropriate."  His entire opinion on these items is reproduced below:

9               [O]ver $800,000 of other transfers to the bad debt reserve during this period were
                appropriate, in that Oracle had already reduced its revenues for certain open and
10              unpaid invoices, either all or in part, through the use of credit memos and/or
                inclusion in Oracle's general bad debt reserve as of the second quarter of fiscal year
11              2001.

12   Ex. 1 at 33.  Similar to his opinion on the $700,000 in "royalty" payments cited above, Mr.

13   O'Bryan's opinion on the $800,000 items fails to cite a single document, deposition or supporting

14   data point upon which he relied to form his opinions.  *Id.*  There are no supporting footnotes citing to

15   evidence, as other parts of his report attempt to do.  *See id.* at 35-36.  He does not provide any data,

16   facts, or dates regarding the "certain" open and unpaid invoices and the "credit memos" that he cites.

17   He fails to provide any facts or foundation to support the conclusion that Oracle had "reduced its

18   revenues" for the "certain" invoices that he cites.  He fails to provide any methodology, let alone a

19   "reliable" one in determining which items were reduced via credit memos, and which items were

20   reduced via "inclusion" in the bad debt reserve.  Simply put, because Mr. O'Bryan does not provide

21   *any* foundational facts or analysis, it is difficult to understand what Mr. O'Bryan's opinion means.

22   This type of conclusory opinion will not help a jury understand the issues – it will only serve to

23   confuse them.  *See Joiner*, 522 U.S. at 146.

24                        **c.      The $500,000 in Purportedly Appropriate Transfers in**
                                 **the "Could Be" Bucket**
25

26         Mr. O'Bryan's opinion with respect to the final $500,000 of the $2 million total of

27   purportedly "appropriate" transfers of customer unapplied cash in 2Q01 is even less reliable than the

28   other $1.5 million cited above.  His entire opinion on those items is as follows:

> "In addition to these above amounts, I found some evidence which suggests that at least another $500,000 of these transfers were appropriate, *although the evidence relating to these transfers is not as complete as the evidence I reviewed in connection with the $1.5 million in transfers noted above.* Thus, I believe there is evidence that at least $2.0 million of the $10.6 million transfers capable of review were appropriate."

*Id*. at 33.  Not only does Mr. O'Bryan admit that his opinion is "not as complete" as the unreliable conclusions on the other $1.5 million, but he also fails to cite any foundational facts, data, or evidence that would allow plaintiffs to test or even understand his conclusions.  He fails to provide any indication of what the "some evidence" is that he relied upon.  He fails to explain how that evidence "suggests" that the $500,000 transfers were appropriate.  He fails to even explain what general types of transactions this $500,000 relates to, other than admitting that the amount relates to 12 debit memos.  Ex. 2 at 203:15-17.  Mr. O'Bryan fails to cite a single footnote of evidence as he attempted to do in other sections of his report.

In fact, during his deposition Mr. O'Bryan admitted that his opinion was not conclusive or grounded in any proper foundation:

> [A]. *[t]he notes were not conclusive for me, nor did I see any other type of support. We put that into a bucket of could be.*
>
> Q.  Could be.  So you can't definitively say that $500,000 of transfers was proper; correct?
>
> A.  *That's correct.*

*Id*. at 203:9-14.  Given Mr. O'Bryan's admissions above, his opinion on the $500,000 transfers should be summarily excluded.[8]  *See Joiner*, 522 U.S. at 146.

_____

[8]      In the four-page section of his report entitled "Oracle's Accounts Receivable Procedures," Mr. O'Bryan fails to cite a single document to support his opinion.  He relies almost entirely upon the testimony of the individuals who were involved in the financial misconduct, including Greg Myers and Michael Quinn, both of whom admittedly were involved in the November 2000 debit memo clean up and participated in Oracle's "clean up" project in October 2002.  Relying solely on the self-serving testimony of a few individuals, without more, is not proper foundation under Fed. R. Evid. 702 and 703.

1             **4.     Mr. O'Bryan's Opinion Regarding the Materiality of Oracle's**
                       **2Q01 Financial Misstatements Is Speculative and Lacks**

2                       **Reliable Foundation**

3        Mr. O'Bryan's opinion concerning the materiality of Oracle's financial misstatements in

4 2Q01 boils down to the conclusion that reasonable investors would not have found it material if

5 Oracle reported $0.10 instead of $0.11 per share, and did not beat Wall Street's consensus earnings

6 expectations for 2Q01. Ex. 1 at 36-40. Mr. O'Bryan fails to provide any analysis or consideration in

7 his reports of the stock price reaction following the earnings report for the only other quarter during

8 the prior ten quarters in which Oracle merely met, rather than beat, Wall Street expectations. *Id*.

9        And while Mr. O'Bryan belatedly attempted to conduct a new analysis during his deposition,

10 his materiality opinion is based almost exclusively upon documents relied upon but not produced to

11 plaintiffs. Ex. 2 at 286:17-287:14. Indeed, when plaintiffs asked Mr. O'Bryan to explain the

12 methodology used for analyzing Oracle's historical trends and stock price movements relating to

13 materiality, he again resorted to documents and "work papers" that were never produced to

14 plaintiffs. *Id*. at 286:17-23 ("[D]id I do an analysis of Oracle's previous history of meeting or

15 beating expectations consensus. And my answer was yes. And I was looking for that exhibit. And

16 that's in my workpapers.")

17        In fact, when plaintiffs inquired about the details of his analysis and the documents he relied

18 upon, he could only point to his analyses, calculations and analyst reports that were in his "binder"

19 but were never produced to plaintiffs:

20               We looked on a quarter basis for first Q '99 all the way through second Q of
           '01 the actual consensus, analyst expectation, versus the actual reported amounts.

21           Then we looked at the stock price as it relates to the day that the earnings was
           released, and the day plus one, day plus three, and day plus five. We basically

22           looked at five different days after Oracle had released its earnings.

23 *Id*. at 288:1-14.

24        None of Mr. O'Bryan's "trend" analyses concerning materiality and Oracle's stock price

25 movements in various quarters were cited in either his opening or rebuttal reports. Further, Mr.

26 O'Bryan relied heavily upon numerous analyst reports, stock price "data points" and other

27 "surrounding circumstances" related to materiality:

28        Q. What were the surrounding circumstances that you looked at?

1
2
3

A.   All of the information that was talked about in analyst reports, all of the information looked at with respect to meeting or beating in the stock price, four or five data points after that, the issue with respect to what's being restated, the percentage change in that potential restatement.  There was a multitude of things I looked at in the surrounding circumstances as SAB 99 suggests.

4   *Id*. at 302:12-21.  None of these facts or analyses are contained in Mr. O'Bryan's reports.  Ex. 2 at

5   286:17-289:5.  He did not mention any "data points" for determining the materiality of stock price

6   movements in his reports and failed to explain which analyst reports and "multitude of things" that

7   he relied upon to render his opinion on materiality.  Ex. 1 at 36-40.  His materiality opinions,

8   therefore, are improper and should be excluded.[9]

9
10

C.   **Mr. O'Bryan's Opinion on the Propriety of Oracle's Fraudulent Transaction with Hewlett Packard on the Last Day of 2Q01 Is Unreliable and Improper and Should Be Excluded**

11
12

1.   **Mr. O'Bryan's Opinion on the HP Transaction Is Not Based on Reliable Foundation or Methodology**

13   Mr. O'Bryan's expert opinion on the propriety of the HP Transaction in his opening report

14   consists of a ***single paragraph***:

15
16
17
18
19
20
21

In the Supplemental Interrogatory Responses, Plaintiffs suggest that the HP transaction, whereby HP purchased software licenses and services from Oracle, had "little economic value" and allowed Oracle to achieve earnings per share of $0.11 in the second quarter of fiscal year 2001.  Plaintiffs have not offered any evidence to support this statement, and instead merely point out that the sale occurred on the last day of the quarter and that Oracle had also agreed to purchase product from HP.  I understand that HP purchased these additional software licenses so that it could complete a global roll-out of Oracle's Customer Relationship Management software. I note that AA, Oracle's prior financial statement auditors, specifically looked at the HP transaction from a revenue recognition perspective, and even discussed it with Oracle's Audit Committee on January 5, 2001.  AA did not recommend that any adjustment be made to the accounting for the HP transaction.  ***Based upon the foregoing, I do not believe that there was anything improper in Oracle's recognition of revenue from the HP transaction.***

22   Ex. 1 at 41-42 (footnotes omitted).

23
24
25
26
27

---

[9]      Notably, when asked whether he considered the macroeconomic environment in forming his opinion on materiality, Mr. O'Bryan stated that he considered the environment to be in "a ***bit*** of a downturn."  In fact, between August 2000 and November 2000, the NASDAQ crashed over 1300 points or approximately 30% of its total market capitalization.  Mr. O'Bryan did not provide any meaningful analysis or place any weight on those factors.  Ex. 2 at 284-285; Ex. 1 at 36-40.

28

1    During his deposition, Mr. O'Bryan admitted that his opinion on the HP Transaction in his

2   opening report was "light." Ex. 2 at 56:8-22 (***And when I say light, it's simply a paragraph.***") He

3   admitted that he never even read or considered the deposition transcript of Tom Rathjens, HP's

4   designated witness under Fed. R. Civ. P. 30(b)(6).  Ex. 2. at 324:24-325:1 ("Yeah I don't think I

5   looked at Mr. Rathjens' deposition prior to the issuance of this initial report.")  Mr. O'Bryan also

6   admitted that he did not review or consider the very documents that he later relied exclusively upon

7   in his rebuttal report (which were never produced to plaintiffs) before providing his expert opinion

8   on May 25, 2007.  Ex. 2 at 319:1-9.

9    Mr. O'Bryan's one-paragraph "opinion light" does not, on its face, meet the most

10  fundamental requirements of Fed. R. Civ. P. 26(a)(2)(B).  Mr. O'Bryan's opinion does not "contain a

11  ***complete*** statement of ***all*** opinions to be expressed and the ***basis and reasons therefor***." *See id.*  In

12  fact, Mr. O'Bryan's "opinion" is not really his own opinion at all.  His entire opinion in his opening

13  report is based upon speculation about what other parties – specifically, the now defunct Arthur

14  Andersen –may have "looked at" or "discussed" with Oracle's audit committee and revenue team

15  seven years ago.  Ex. 1 at 41-42.

16   An expert's opinion may not, however, be based on the opinion of someone else, since such

17  other opinions do not constitute "facts reasonably relied upon by experts in the particular field."

18  *American Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985) ("Expert opinions

19  ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or

20  not."); *Taylor v. B. Heller & Co.*, 364 F.2d 608, 613 (6th Cir. 1966) (same); *accord 6816.5 Acres of

21  Land v. United States*, 411 F.2d 834, 839-40 (10th Cir. 1969) (on retrial, "the trial court must take

22  steps to exclude any expert opinion that is predicated upon another opinion").

23   The only evidence Mr. O'Bryan actually cites consists of *six pages* produced by Arthur

24  Andersen that were reviewed and filtered by Oracle's lawyers prior to being produced.  Mr. O'Bryan

25  does not provide any independent analysis of the documents and provides no foundation or

26  methodology for determining the propriety of the HP Transaction on his own.  As mentioned above,

27  Mr. O'Bryan did not even read the deposition transcript of the only HP witness in the entire case

28  prior to submitting his opening report. Ex. 2 at 324:24-325:1.  Mr. O'Bryan relied solely on Arthur

1    Andersen and a vague reference to a "review" performed by Oracle about which Mr. O'Bryan does

2    not explain or analyze.  Ex. 1 at 41.  In fact, Mr. O'Bryan readily admits that HP's "person most

3    knowledgeable" and other testifying witnesses involved with the HP transaction were "irrelevant."

4    Ex. 2 at 59:19-22.  ("[W]hat others said with respect to that was really, quite frankly, *irrelevant*, and

5    only additive to my opinion that that transaction was booked properly….").  This type of one-sided

6    and speculative analysis is not based on "reliable principle and methods" and therefore should be

7    excluded.  *Kumho*, 526 U.S. at 148.

8         D.    **Mr. O'Bryan's Rebuttal Report on the HP Transaction Improperly**
               **Relies Upon Documents Not Produced to Plaintiffs Until** *After*
9              **Rebuttal Reports Were Exchanged**

10        Realizing that his "light" opinion on the HP transaction was not sufficient under Fed. R. Civ.

11   P. 26(a)(2) and Fed. R. Evid. 702 and 703, Mr. O'Bryan attempted to cure this deficiency by

12   submitting a 26-page section of his rebuttal report on the HP transaction.  *Compare* Ex. 1 at 41 *with*

13   Ex. 5 at 25-51.  This fact alone demonstrates the deficiency of his initial opinion on the HP

14   Transaction.   Most importantly, however, Mr. O'Bryan's 26-page rebuttal is based almost

15   exclusively upon 140 pages of new evidence, including e-mails and contractual documents

16   concerning the HP Transaction that were not produced to plaintiffs or their experts until after rebuttal

17   reports were filed.  *See* Ex. 6.

18        Further, the new documents cited by Mr. O'Bryan consist of incomplete e-mails with missing

19   pages, and other documents with handwritten notes having no indicia of reliability.  *Id*.  Plaintiffs

20   requested all of the missing pages and incomplete information, but defendants expressly refused to

21   provide any further information.   Accordingly, plaintiffs and their experts did not have the

22   opportunity to properly rebut Mr. O'Bryan's opinions because his entire opinion on the HP

23   transaction is based almost exclusively upon documents and information hand picked by Oracle ,

24   belatedly produced, and never disclosed to plaintiffs and their experts until *after* rebuttal reports

25   were exchanged on June 22, 2007.

26        Courts have held that "[t]he rebuttal expert report is no place for presenting new arguments,

27   unless presenting these arguments is substantially justified and causes no prejudice."  *Baldwin*

28   *Graphic Sys., Inc. v. Siebert, Inc.*, No. 03 C 7713, 2005 U.S. Dist. LEXIS 10692, at *5 (N.D. Ill.

1   Feb. 22, 2005).  Additional information contained in an expert's rebuttal report which should have

2   been included in the direct report cannot cure the deficiencies of the expert's direct report.  *Atmel*

3   *Corp. v. Information Storage,* 189 F.R.D. 410, 411 (N.D. Cal. 1999).  Mr. O'Bryan's attempt to

4   present 26 pages of new opinions based on previously undisclosed evidence and information is

5   unfair surprise and violates the fundamental tenets of the expert witness discovery rules which "are

6   designed to aid the court in its fact-finding mission by allowing both sides to prepare their cases

7   adequately and efficiently and to prevent the tactic of surprise from affecting the outcome of the

8   case." *Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000).  Accordingly, Mr. O'Bryan's opinions

9   on the HP transaction should be excluded.

10          **E.      Mr. O'Bryan's Failure to Disclose the Exclusion of His Prior Expert
                       Testimony Evidences a Lack of Candor**

11

12                The reliability of Mr. O'Bryan's testimony is further called into question by his misleading

13   deposition testimony concerning a prior case in which his expert testimony was excluded.  During

14   his deposition, Mr. O'Bryan was asked pointedly about whether his prior testimony had ever been

     excluded in any case:

15
16          Q.  ***Has your testimony in any case in the past five years ever been excluded by the
                court?***

17          A.  ***No.***

18          Q.  ***Never?***

19          A.  ***No.***

20   Ex. 2 at 35:15-19.

21                This testimony was false.  In fact, Mr. O'Bryan's sworn expert testimony was excluded in

22   2003 by a California state court judge for being "***unduly speculative and therefore insufficient***."

23   *See* Ex. 7 (*Farnham v. Rehwald*, 2005 Cal. App. Unpub. LEXIS 3107, *19 (Cal. App. 2005)).  The

24   lower court's ruling was subsequently upheld by the California Court of Appeals.  Ex. 7 at 5.  ("***The***

25   ***trial court's exclusion of O'Bryan's testimony was neither arbitrary nor capricious and certainly***

26   ***did not 'exceed the bounds of reason.***'").

27                When confronted with the foregoing evidence, Mr. O'Bryan feigned ignorance about what

28   the phrase "testimony in any case in the past five years" means:

1    Q. Is there a reason you didn't disclose this earlier when I asked you if your testimony had been excluded before?

2

3    A. Yeah, because I never testified in court. I gave a deposition, and apparently the judge was not – the judge made this ruling without even hearing my testimony, other than my deposition. I never testified in court.

4

5    Q. But you testified in a deposition; right?

6    A. Yeah. No. When I heard your question this morning, has any of my testimony ever been excluded, I thought you meant as far as trial testimony. I'm aware of the fact that I gave a deposition, and this court decided it did not want to hear my testimony.

7

8    Ex. 2 at 130:7-20. Mr. O'Bryan's unconvincing explanation of his failure to disclose the exclusion

9    of his testimony in *Farnham* demonstrates a lack of candor and is another reason to exclude his

10   unsupported and unreliable testimony in this case.

11   **III.    CONCLUSION**

12        Based on the foregoing, plaintiffs' motion should be granted.

13   DATED:  October 20, 2008                    Respectfully submitted,

14                                               COUGHLIN STOIA GELLER
                                                   RUDMAN & ROBBINS LLP
15                                               SHAWN A. WILLIAMS
                                                 WILLOW E. RADCLIFFE
16                                               ELI R. GREENSTEIN
                                                 DANIEL J. PFEFFERBAUM

17

18                                                      s/ Eli R. Greenstein
19                                               ELI R. GREENSTEIN

20                                               100 Pine Street, Suite 2600
                                                 San Francisco, CA  94111
21                                               Telephone:  415/288-4545
                                                 415/288-4534 (fax)
22

23

24

25

26

27

28

PLTFS' NOT OF MTN & MTN TO EXCLUDE TESTIMONY OF DEFS' ACCTG EXPERT J. DUROSS O'BRYAN; MEM OF P&A IN SUPPORT THEREOF - C-01-0988-SI                              - 18 -

1

2                                        COUGHLIN STOIA GELLER
                                           RUDMAN & ROBBINS LLP

3                                         MARK SOLOMON
                                         DOUGLAS R. BRITTON

4                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101

5                                         Telephone:  619/231-1058
                                         619/231-7423 (fax)

6                                         COUGHLIN STOIA GELLER
                                         RUDMAN & ROBBINS LLP

7                                         STACEY M. KAPLAN
                                         9601 Wilshire Blvd., Suite 510

8                                         Los Angeles, CA  90210
                                         Telephone:  310/859-3100

9                                         310/278-2148 (fax)

10                                        Lead Counsel for Plaintiffs

11  C:\Program Files\pdfDocs\users\PamelaJ\Import\MTN00054941.doc

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 20, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 20, 2008.

  s/ Eli R. Greenstein
ELI R. GREENSTEIN
COUGHLIN STOIA GELLER
          RUDMAN & ROBBINS LLP
100 Pine Street, 26th Floor
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail: elig@csgrr.com

## Mailing Information for a Case 3:01-cv-00988-SI

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jennie@libertylaw.com

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Doug Britton**
  dougb@csgrr.com,jillk@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Joy Ann Bull**
  JOYB@csgrr.com

- **Dorian Estelle Daley**
  dorian.daley@oracle.com

- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,svdocket@lw.com,zoila.aurora@lw.com

- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com

- **Tera Marie Heintz**
  theintz@morganlewis.com,eeberline@morganlewis.com

- **Stacey Marie Kaplan**
  SKaplan@csgrr.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com,sf_filings@hbsslaw.com

- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com,#sfdocket@lw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **William S. Lerach**
  e_file_sd@lerachlaw.com

- **James C. Maroulis**
  jim.maroulis@oracle.com

- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com

- **Brian P Murray**
  bmurray@murrayfrank.com

- **Shinyung Oh**
  shinyungoh@paulhastings.com

- **Dawn S. Pittman**
  dpittman@morganlewis.com

- **Willow E. Radcliffe**
  willowr@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Mark Solomon**
  marks@csgrr.com,e_file_sf@csgrr.com,sholloway@csgrr.com,e_file_sd@csgrr.com

- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com,aelishb@csgrr.com

- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Corey D. Holzer**
Holzer Holzer & Cannon LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

**Raymond Lane**
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

**PRG-Schultz USA, Inc.**
Paul Hastings Janofsky & Walker LLP
55 Second Street
24th Floor
San Francisco, CA 94105

**Darren Jay Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

**Sanna Rachel Singer**
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111

**Monique C. Winkler**
Coughlin Stoia Geller Rudman & Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111