EXHIBIT 1

---

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

# CASE NO. C-01-0988-MJJ

| | |
|---|---|
| In re ORACLE CORPORATION | ) |
| SECURITIES LITIGATION | ) |
| | ) |
| This Document Relates to: | ) |
| | ) |
| ALL ACTIONS. | ) |

---

**J. Durross O'Bryan, CPA**

**EXPERT WITNESS REPORT IN ACCORDANCE WITH RULE 26**

**Dated: May 25, 2007**

# TABLE OF CONTENTS

---

I.      INTRODUCTION AND QUALIFICATIONS

II.     SUMMARY OF OPINIONS

III.    BACKGROUND

      A.  PLAINTIFFS' ALLEGATIONS
      B.  ORACLE'S BUSINESS
      C.  ORACLE'S ACCOUNTS RECEIVABLE PROCEDURES
      D.  ORACLE'S DECISION TO STANDARDIZE ITS USE OF "ON ACCOUNT"
         FLAGS
      E.  ORACLE'S TRANSFERS OF UNAPPLIED CASH

IV.     THE LAWSUIT

      A.  SOURCES OF PLAINTIFFS' ALLEGATIONS
      B.  ERNST & YOUNG IS HIRED BY ORACLE'S AUDIT COMMITTEE
      C.  PRESENTATION TO THE SEC
      D.  SUBSET OF DEBIT MEMOS ORDERED FOR DISCOVERY PURPOSES
      E.  ORACLE'S ANALYSIS OF TRANSFERS OF UNAPPLIED CASH

V.      KEY PROCEDURES PERFORMED RELATED TO DEBIT MEMOS

      A.  REVIEW OF VARIOUS ACCOUNTING REPORTS AND DOCUMENTS
      B.  REVIEW OF CUSTOMER ADVANCES AND UNEARNED REVENUE TRENDS
      C.  REVIEW OF CASE FILINGS AND TESTIMONY
      D.  REVIEW OF AGREED UPON PROCEDURES PERFORMED BY EY

VI.     KEY PROCEDURES PERFORMED RELATED TO TRANSFERS OF UNAPPLIED
      CASH

      A.  REVIEW SUBSET OF UNAPPLIED CASH TRANSFERS
      B.  MATERIALITY
      C.  REVIEW OF CASE FILINGS AND TESTIMONY
      D.  REVIEW OF WORK PERFORMED BY EY

VII.    REVIEW OF HEWLETT-PACKARD TRANSACTION

VIII.   CONCLUSIONS

IX.     QUALIFICATION

APPENDICES

## I.  INTRODUCTION AND QUALIFICATIONS

Oracle Corporation (the "Company" or "Oracle") and its Counsel have engaged me to opine on certain financial and accounting issues raised in the Plaintiffs' Revised Second Amended Complaint dated December 9, 2002 (the "Complaint").  These issues relate to the accounting and financial statement impact of the Company's creation of more than 46,000 debit memos on November 17, 2000.

I have also been asked to opine on several financial and accounting issues not raised by Plaintiffs in the Complaint, but which Plaintiffs subsequently detailed in their Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs dated January 31, 2007 (the "Supplemental Interrogatory Responses").  These issues relate to certain transfers of unapplied cash to Oracle's bad debt reserve and a transaction Oracle entered into with Hewlett-Packard ("HP") in the second quarter of fiscal year 2001.  I understand that the significance of Plaintiffs' failure to identify these issues in their Complaint is a legal matter.  In addressing these unpled accounting issues, I am expressing no opinion about the legal significance of Plaintiffs' failure to allege these issues in the Complaint.

I have been a licensed Certified Public Accountant ("CPA") for 29 years.  During this period, I have participated in over 200 separate engagements involving accounting issues, including financial statement audits and forensic accounting investigations and accounting expert testimony.   My experience has included engagements involving companies ranging in size from thousands to billions of dollars in assets and/or revenues.  I have experience in numerous industries including hi-tech, software development and distribution, manufacturing, oil and gas,

1

educational supplies and publishing, banking and retail, among others. I have extensive experience and have offered opinions on accounting issues in public and private company settings, performing audits and other accounting engagements in connection with private placement memoranda, initial public offering documents, U.S. Securities and Exchange Commission ("SEC") Comment letters, Form 10-K, Form 10-Q and other related filings.

I am currently a Managing Director in the Financial Advisory Services practice of AlixPartners, LLP ("AlixPartners"). I have been with AlixPartners since February of 2003. My current business address is 515 South Flower St., Suite 3050, Los Angeles, California 90071. My duties include those of Managing Director-In-Charge for the Los Angeles office of AlixPartners. My client responsibilities include, but are not limited to, performing detailed analysis to provide expert accounting testimony, consulting on financial and accounting matters, economic damages, professional standard of care engagements, reorganization/bankruptcy matters and forensic accounting/fraud and SEC investigations.

Prior to joining AlixPartners, I was a Partner in PricewaterhouseCoopers LLP ("PwC"), formerly Coopers & Lybrand LLP ("C&L"), for approximately 16 years. In 1995, I became the Partner-In-Charge of the Financial Advisory Services ("FAS") practice for the Western Region of C&L. In 1998, I became the Partner-in-Charge of the New York Metro Region FAS practice for PwC and served in that capacity until December 31, 1999. On January 1, 2000, I became the Partner-In-Charge of the FAS practice for PwC's Los Angeles office and the Partner-In-Charge of the Dispute Analysis and Investigations practice for the Western Region of PwC.

My curriculum vitae is attached as Appendix A to this report. In addition, I have attached as Appendix B a listing of my testifying experience over the last four years. The time I spend on this

2

matter is being billed to Oracle at the rate of $485 per hour.  Colleagues of mine at AlixPartners have assisted me with this engagement.  Their time is being billed to Oracle at rates between $350 and $410 per hour.

I have reviewed the Complaint, certain deposition transcripts, various documents and other information produced in the litigation, correspondence, legal filings and professional literature and guidance in preparing this report.  In addition, my staff and I have conducted extensive accounting research.  The documents upon which I have relied in forming my opinion are listed in Appendix C.

## II.   <u>SUMMARY OF OPINIONS</u>

Based upon a thorough review and analysis of all of the information referred to herein, together with my knowledge of the issues and Generally Accepted Accounting Principles ("GAAP") promulgated by, among others, the Financial Accounting Standards Board and the SEC, and my more than 29 years of professional auditing, accounting and consulting experience, I have reached the following opinions regarding the allegations made in the Complaint:

1. For each of the over 46,000 electronic receipt records that had an "On Account" flag in Oracle's Accounts Receivable Subledger, Oracle recorded three journal entries on November 17, 2000, which had simultaneous and offsetting debits and credits to the same account, for the exact same amount.

2. Oracle's creation of and accounting for the over 46,000 debit memos processed on November 17, 2000 did not affect its financial statements in the second quarter of fiscal year 2001, or any other accounting period.

3

3.  Oracle's creation of and accounting for these debit memos did not result in any revenue being recognized, and had zero impact on the income statement and balance sheet.

4.  Oracle's creation of and accounting for these debit memos did not violate GAAP.

With respect to the previously unpled issues detailed by Plaintiffs in the Supplemental Interrogatory Responses, it appears that Plaintiffs are challenging certain transfers of unapplied cash to Oracle's bad debt reserve in the second quarter of fiscal year 2001.  In addition, Plaintiffs appear to be challenging a transaction with HP during the second quarter of fiscal year 2001.  With respect to the transfers, I note that at least some of the activity related to these transfers and the subsequent analysis of those transfers by Oracle appear to occur outside the class period identified in the Complaint.  Nevertheless, I have reached the following opinions regarding these unpled allegations:

1.  Even if one assumes that all of the approximately $20 million in transfers to Oracle's bad debt reserve during the second quarter of fiscal year 2001 were improper, the effect of those transfers was immaterial to Oracle's reported financial statements for the second quarter of fiscal year 2001.

2.  As detailed herein, at least $2 million of the transfers -- of the approximately $10.6 million for which we were able to conduct a detailed analysis -- either were properly made to Oracle's bad debt reserve or should have been previously recorded as revenue.

3.  Based upon my review of the evidence, I believe that Oracle's decision to recognize revenue from the HP transaction was appropriate.

4

## III.    BACKGROUND

## A.    PLAINTIFFS' ALLEGATIONS

Per Paragraphs 35-43 of the Complaint, the class action Plaintiffs, those persons who purchased the publicly traded securities of Oracle between December 14, 2000 and March 1, 2001, claim that the directors of the Company caused Oracle to erroneously record more than $228 million in revenue in the second quarter of Oracle's fiscal year 2001, ending November 30, 2000, in order to mask an alleged economic downturn in Oracle's business.[1]   Based on information purportedly provided by confidential witnesses, Plaintiffs allege that certain amounts, listed as "On Account" within Oracle's accounts receivable software application were recognized as revenue by virtue of processing over 46,000 allegedly "phony invoice" debit memos.[2]   In other words, Plaintiffs' allegations, if true, suggest that Oracle recorded revenue it had not yet earned, which would be a violation of GAAP.[3]

Plaintiffs also purportedly rely upon statistical estimations made by Dr. M. Laurentius Marais, who analyzed a sample of 760 Oracle debit memos.[4]   Plaintiffs claim that Dr. Marais identified a reasonable basis to conclude that the estimated value of the more than 46,000 debit memos would be greater than $228 million.[5]   Plaintiffs further attempt to corroborate the information from certain confidential witnesses and Dr. Marais by noting that Oracle's reported balance in its

---

[1] *See* Complaint, at ¶¶ 36, 43.

[2] *Id*. at ¶¶ 36-38.

[3] *Id*. at ¶ 42.

[4] *Id*. at ¶ 39.

[5] *Id*. at ¶ 40.

Customer Advances and Unearned Revenue account declined by $215 million between the first and second quarters of its fiscal year 2001.[6]

In addition to the debit memo allegations in the Complaint, Plaintiffs make reference to other purported accounting issues in recent written discovery responses.   In their Supplemental Interrogatory Responses, Plaintiffs claim that Oracle improperly used customer overpayments to increase its bad debt reserve, thereby materially inflating reported results of operations in its second quarter of fiscal year 2001 financial statements.[7]   These claims, if true, would violate GAAP.   Plaintiffs also challenge Oracle's recognition of revenue from a transaction with HP during the second quarter of fiscal year 2001.

## B.    ORACLE'S BUSINESS

In its fiscal year 2001 annual report, Oracle described itself as the world's leading supplier of software for business information management.   Founded in 1977, the Company developed, manufactured, marketed and distributed computer software that helped corporations manage and grow their businesses.

As further discussed in the fiscal year 2001 annual report, the Company's software products were categorized into two broad areas: systems software and business applications software.   Systems software was a complete Internet platform for developing and deploying applications on the Internet and on corporate intranets.   System software products included database management

---

[6] *Id.* at ¶ 41.

[7] *See* Robert D. Sawyer's Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs ("Sawyer Response"), at 21, 89; 1199 S.E.I.U. Greater New York Pension Fund's Third Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs, at 21-22, 90; Drifton Finance Corporation's Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs, at 21, 89.

software, application server software and developmental tools.   Business applications software automated the performance of business processes for customer relationship management, supply chain management, financial management, project management and human resource management.

In addition to computer software products, the Company offered its customers a wide range of consulting, education and support services.  Oracle also offered its business applications as an online service to customers who chose not to install their own applications.

## C.    ORACLE'S ACCOUNTS  RECEIVABLE PROCEDURES

During the relevant time period, Oracle used a separate Accounts Receivable software application (the "A/R Subledger") to, among other things, track the receipt of cash, as well as how that cash was applied to invoices.   In general, checks or wire transfers sent from customers to Oracle were received in "lock boxes," and temporarily recorded to a liability account, entitled "Customer Advances and Overpayments" ("Account 25005").[8] These receipts were initially flagged in the A/R Subledger as "Unapplied" cash.[9]  If Oracle's systems or Accounts Receivable and Collections Departments were able to match the receipt against an open or unpaid invoice for goods and/or services rendered, the amount initially posted to Account 25005 would be reclassified to the appropriate customer's account receivable balance signifying a proper payment,

---

[8] *See* Deposition of Greg Myers, dated Apr. 12, 2005 ("Myers Dep.") at 26:17-23 ("Generally customers would make a payment to one of two different [bank] lock boxes…and then those banks would send us a file of the payments that were received…and we would take the file sent from the bank and upload it into our accounts receivable module.").

[9] *See* Deposition of Alexander Bender, dated Sept. 21, 2006 ("Bender Dep.") at 93:25-94:4 ("Oracle…would upload lockbox information from a bank…and it would initially be a debit to cash, a credit to the 25005 account….").

and the receipt flag in the A/R Subledger would be changed from "Unapplied" to "Applied."[10] Most of Oracle's cash receipts were processed and applied in this manner.

However, not all cash receipts could be matched to outstanding invoices.[11]  For instance, some companies prepaid certain service contracts, before Oracle had issued invoices over the course of the respective contract.[12]  In these cases, Oracle would not apply the cash payments until an invoice for the respective period's service had been issued, thus leaving the payment in Account 25005 as "Unapplied" until the invoice was processed, and the payment could be applied to the invoice.[13]

Sometimes, Oracle received cash that did not apply to an outstanding customer invoice for goods and services.[14]  Examples of these types of cash receipts include cash received from customers for subleased office space, rental space at Oracle Open World trade shows, duplicate payments or overpayments for an invoice, and cash received from current and former employees for such items as reimbursements and COBRA continuation payments.[15]  Additionally, customers occasionally put a "stop payment" on a check or wire transfer, which meant that while the credit

---

[10] *See* Myers Dep. at 98:6-8 ("I use the term applied to mean that the -- that the payment, the receipt has been applied or has netted down the receivable that -- that was referenced in the invoice.  So, you know, debit, cash, credit, unapplied cash, as the invoice is determined where that unapplied needs to go, that invoice would be applied in the system to that payment.").

[11] Deposition of Michael Quinn, dated Apr. 18, 2006 ("Quinn Dep.") at 250:12-14 ("The unapplied cash account is the account that includes all the cash payments from customers that have not been applied to invoices.").

[12] Deposition of Thomas Williams, dated Jun. 7, 2007 ("Williams Dep.") at 64:16-19 ("I believe there was a listing of customer receipts that could…include customer deposits.").

[13] Myers Dep. at 92:16-21 (stating that items would stay in unapplied cash until they were resolved).

[14] *See id.* at 76:17-19; Deposition of Molly Venkataramana, dated Apr. 13, 2006 ("Venkataramana Dep.") at 107-108:24-17

[15] *See* Venkataramana Dep. at 107:24-108:17.

balance in Account 25005 might still be listed as "Unapplied," the amount was not really a cash receipt that could be used.[16]

Once Oracle's Collections Department determined the appropriate disposition of a receipt, and the disposition was not an application to a customer invoice, the collectors generally did several things. First, they processed a journal entry with offsetting debits and credits to Account 25005, which changed the receipt flag in the A/R Subledger from "Unapplied" to "On Account."[17] This change in flag status was important because it signified to the Accounts Receivable and Collections Departments that the receipt should not be applied to an open invoice.[18] The change of the status from "Unapplied" to "On Account," which was accomplished by recording a debit and a credit to Account 25005 for the exact same amount, did not change the balance of Account 25005.[19]

Second, a journal entry was posted to reclassify the credit amount in Account 25005 to the appropriate account, such as to Accounts Payable in the case of a customer refund.[20] However, even though the disposition of the cash receipt had been resolved through these journal entries,

---

[16] Myers Dep. at 76:12-13 ("For example a customer had made a duplicate payment but caught the duplicate prior to it clearing their bank and they put a stop payment on that check….").

[17] Id. at 77:19-21 ("[T]he first step was that the accounts receivable analyst would have placed the item into an On Account status….").

[18] Declaration of Greg Myers, dated Jun. 6, 2006 ("Myers Decl.") at ¶ 25. ("[T]he 'on account' flag at that time was utilized by Oracle Accounts Receivable Analysts to notify other employees that the disposition of the amount had been identified and the amount could not be utilized for another purpose.").

[19] Myers Dep. at 91:4-7 ("The next step they would take, the accounts receivable analyst would move the cash from status unapplied to status of On Account. That generates net, net, no accounting impact, 25005, 25005 debit, credit.").

[20] Id. at 87:9-15.

9

the "On Account" flag remained within the A/R Subledger, in Account 25005, in some cases for many years.[21]

While the "On Account" flag originally was intended to designate a credit to a customer's account, as noted above, Oracle actually used the flag for another purpose.[22]  Within the United States, Oracle used the "On Account" flag to signal to the Accounts Receivable and Collections Departments that the credit balance in Account 25005 had been or would be used for a purpose other than the satisfaction of an invoice.[23]  Over the years, a substantial number of "On Account" flags accumulated.

## D.   ORACLE'S DECISION TO STANDARDIZE ITS USE OF "ON ACCOUNT" FLAGS

In May 2000, the Company released Suite 11i, which was to be implemented by Oracle on a global basis.  In advance of this implementation, Oracle analyzed its accounting practices to ensure that each department was following global "best practices."[24]  Oracle determined that the

---

[21] *See id*. at 87:3-9 ("The On Account items would be sitting in 25005, but the thing with On Account in the examples I discussed is that there was generally a separate entry that cleared the item out of – though it still sat in On Account as far as the flag, from an accounting perspective, there was an offsetting debit that cleared that credit from sitting in Oracle's balance sheet.").

[22] Williams Dep. 167:8-2 ("[O]n account is you give me $1,000 and you say, 'I haven't bought product yet,' or, 'I am prepaying $500 for an invoice that it outstanding,' and it gets applied.…This wasn't the way that on-account was being used at Oracle.…They used on-account for something other than what is defined here.").

[23] Myers Dep. 83:1-5 ("So putting it On Account was an indefinite flag that [*sic*] do not touch this receipt, another transaction has taken place, therefore, this money should not be taken to an open invoice….").

[24] Declaration of Michael Quinn, dated Nov. 4, 2002 ("Quinn Dec.") at ¶ 4. ("In 2000 my staff participated in the conversion of Oracle's accounts receivable and other related systems over to Oracle's new 11i applications.  As part of that conversion it was determined that the previous functionality of assigning on account notations…was no longer required.").

10

domestic use of "On Account" receipt flags was different from the practice of other territories, and that those differences should be reconciled prior to Suite 11i's implementation.[25]

Furthermore, as noted above, thousands of "On Account" flags had accumulated within Oracle's A/R Subledger over the years.[26]  Even though these flags were maintained in the A/R Subledger (with no financial statement impact) to provide an audit trail for the resolution of all receipts, there was concern that these remnant "On Account" flags could cause confusion with Oracle's customers, as well as its Collections Department staff, who might mistakenly believe that these "On Account" amounts represented payments that could be applied against open and unpaid invoices.[27]  As such, the Accounts Receivable Department decided that the "On Account" flags, which, as discussed above, had no financial statement impact, should be eliminated within the A/R Subledger in anticipation of the roll-out of Suite 11i.[28]

The Accounts Receivable Department instructed Oracle's Information Technology ("IT") Department to create a software program to address the accumulated "On Account" flags.[29]  The IT Department worked for two months to develop a Structured Query Language ("SQL") software program, which was designed to accomplish the standardization in a manner that would have no accounting impact whatsoever, through three simultaneous steps:

---

[25] Myers Decl. at ¶ 5 ("Oracle decided to remove the 'on account' flag…in anticipation of the Company-wide software upgrade.").

[26] *See* NDCA-ORCL 1473340-41 [Email from S. Kumar to K. Bhat, dated Sept. 20, 2000] (reflecting a total of 44,029 "on account" designations).

[27] *See* Myers Dep. at 129:23-130:21.

[28] *See id.* at 110:8-10 ("[W]e would not use On Account as a process going forward once we went to 11i and we started standardizing our processes.").

[29] *See* NDCA-ORCL 1473340-41 [Email from S. Kumar to K. Bhat, dated Sept. 20, 2000] ("Receipts with 'On Account' transaction for refunds should off set [*sic*] by creating a debit memo in AR.  Following was the two step solution proposed by product development: a) create debit memos for all old data sitting in AR for refunds b) apply these debit memos to receipts which has [*sic*] 'On Account' entries….  Because of the volume of the data, it is not possible to do debit memo [*sic*] manually through [*sic*] application screen, so there must be some sort of the script need [*sic*] to be written to achieve a) and b).").

**Step One** – Submit an entry,[30] which would switch the receipt flag in the A/R Subledger from "On Account" to "Unapplied"[31]:



| 25005 - Customer Advances & Overpayments | |
|---|---|
| Debit | Credit |
| $10,000 | $10,000 |

Cash Receipt Flag Status

"On Account" ⟶ "Unapplied"

**Step Two** – Generate a debit memo in the A/R Subledger, again through the use of offsetting entries to Account 25005.  The receipt flag in the A/R Subledger remained as "Unapplied"[32]:

| 25005 - Customer Advances & Overpayments | |
|---|---|
| Debit | Credit |
| $10,000 | $10,000 |

Cash Receipt Flag Status

"Unapplied"
(debit memo created)

**Step Three** – Submit a final entry, which applies the amount for which the receipt flag had been changed to "Unapplied" in Step One, to the debit memo created in Step Two. This changed the receipt flag from "Unapplied" to "Applied"[33]:

| 25005 - Customer Advances & Overpayments | |
|---|---|
| Debit | Credit |
| $10,000 | $10,000 |

Cash Receipt Flag Status

"Unapplied" ⟶ "Applied"
(against new debit memo)

---

[30] For purposes of illustration, we assumed a transaction relating to an "On Account" balance of $10,000.

[31] Myers Dep. at 143:3-8 ("So the first step was to move the item from On Account to unapplied.  And again, that generated a debit/credit in 25005.  No accounting impact, no different than when we applied it to On Account, a debit/credit to 25005….").

[32] *Id.* at 143:9-14 ("The second step was to create the debit memos in the system….  And by raising the debit memos in the system, we debited and credited 25005 as well.  So no accounting impact, no net accounting impact by the debit memos being raised.").

[33] *Id.* at 143:15-21 ("Then the third step was to apply the items that were previously On Account, now sitting in unapplied, to the debit memos, such that now the items that were On Account were now in applied status to these open debit memos.  And when we did the applications of the unapplied to the debit memos, again, debit/credit 25005, no accounting entries….").

12

For each of the three steps, the corresponding journal entries reflect simultaneous offsetting debits and credits to the same Account 25005.  *As offsetting debits and credits for the same amount were posted to the same account, which was a liability account and not a revenue account, there necessarily could be no impact to the balance sheet or income statement.*[34]

The IT Department tested the SQL program to ensure that there would be no balance sheet or income statement impact.[35]  Once their testing was complete, the IT Department ran the SQL program on or about November 17, 2000, and in the process systematically generated over 46,000 sequentially numbered debit memos, which corresponded to the approximately $692 million of cash receipt records that previously had been flagged "On Account."[36]  These 46,000-plus debit memos appear throughout Oracle's Accounts Receivable system, and in several reports that are used by the Company and were occasionally provided to customers upon request.[37]

Gregory Myers, who supervised the creation of the debit memos, correctly indicated that there was no income statement or balance sheet effect from the creation of the debit memos on

---

[34] Williams Dep. at 80:11-16 ("I knew that when they processed those debit memos one of the first things that Greg [Myers] told me is that they booked an equal and offsetting debit and credit through 25005.  So by definition it did not affect the balance sheet and could not have affected the income statement."); Quinn Dep. at 168:17-19 ("Greg Myers did his 46,000 debit memos that had no accounting impact [and] cleaned out the on account item,…freed it up to use it for its intended purpose….").

[35] *See* NDCA-ORCL 048716-18 [Email from S. Kumar to G. Myers, dated Nov. 14, 2000] ("I ran the job to create the debit memos on [*sic*] test system [*sic*] a couple times….").

[36] *See* NDCA-ORCL 005006 [Oracle Transaction Register listing 46,000-plus debit memos totaling $692 million].

[37] *See id*.; *see also* NDCA-ORCL 0123157 [Account Analysis Report with Payable's Detail showing entries of offsetting credits and debits totaling $692 million]; *see also* NDCA-ORCL 0127994-128107, 0127995 [sample screen shot for Household Finance debit memo, number 55043990].

November 17, 2000; the creation of the debit memos merely assisted in the removal of the "On Account" receipt flag.[38]

## E.      ORACLE'S TRANSFERS OF UNAPPLIED CASH

As noted above, during the relevant time period, not all cash received by Oracle could be applied to open and unpaid invoices.  Many times, amounts were paid to Oracle without corresponding remittance information.[39]  Without a remittance advice, or some other supporting documentation, it was difficult for a collector to determine how the payment should be applied.[40]

If a cash receipt remained unapplied for an extended period of time, and the Collections Department exhausted its various resolution procedures, the Collections Department sometimes concluded that the unapplied cash related *not* to an existing invoice, but to one which may have previously been written off.[41]  Accordingly, beginning as far back as 1998, some receivables were written off to the bad debt reserve.[42]

---

[38] Myers Dep. at 143:21-23 ("So at the end of the day, all we really did was move the status from On Account to a debit memo with no accounting impact.").

[39] *Id*. at 72:10-13 ("[T]he customer makes a payment to Oracle Corp. and they don't reference any information that we can use in order to determine where those funds or that payment should be applied.").

[40] *Id*. at 93:6-13 ("[T]he payment comes in, we don't know where to apply the cash to…the next step would be to call the customer and request information as to where they wanted it to go or what invoice or receivable they wanted it applied to.").

[41] Williams Dep. at 212:6-10 ("I believe that at some point if you have done everything you can to try and identify it then you are going to have to dispose of that item similar to how you have to dispose of an invoice.  Eventually you write it off."); *id*. at 176:17-22 ("I can say that if there was an unapplied cash item that was $150 and it had been there for two years, you know, we should just write it off because the reality is that, like the $150 invoice that we were writing off from that same customer as they aged out….").

[42] *See* NDCA-ORCL 104764-65 [spreadsheet entitled "12601 Activity" showing transfers into account 12601 between June 1998 and August 2002].

14

The bad debt reserve was used to estimate the amount of Oracle's receivables that Oracle ultimately would not collect,[43] and was used to offset the debit balance of Accounts Receivable, as reflected on Oracle's financial statements.[44]

To the extent that unapplied cash can be linked to an invoice that previously has been written off as uncollectible, the movement of that cash from the unapplied cash account to the bad debt reserve does not violate GAAP.[45]   However, to the extent that unapplied cash cannot be specifically matched to either a previously written-off receivable, or some other item that should have already been recognized as income (e.g., licensing royalties), Oracle's transfers to its bad debt reserve are considered to be erroneous reclassifications.[46]

## IV.    THE LAWSUIT

## A.    SOURCES OF PLAINTIFFS' ALLEGATIONS

Plaintiffs added their accounting-based allegations to the Complaint in Fall 2002.  Some of the allegations are attributed to a confidential witness, CW49, a former Oracle employee who is currently the target of a criminal proceeding concerning purported embezzlement at Oracle, and who invoked the Fifth Amendment and refused to testify in this case.  Other allegations are

---

[43] Myers Decl. at ¶ 27 ("Oracle has historically used bad debt reserve accounts (including Account 12601, during the relevant time period) to estimate the amount of Oracle's accounts receivable that will prove to be uncollectible.").

[44] *See* Deposition of Jason Sevier, dated Jun. 28, 2006 ("Sevier Dep.") at 186:9-11 ("The first process is the allowance is set up, so you debit expense and you credit allowance for doubtful accounts."); *see also* Deposition of Gary Matuszak, dated Aug. 1, 2006 ("Matuszak Dep.") at 137:11-19.

[45] *See* Williams Dep. 178:11-17 ("[T]here were items that were…written off the company's books, charge taken against revenues that were subsequently found out to be in unapplied cash.  The appropriate entry in that particular instance would, in fact, be to restore revenue, which is effectively what you do when you move it through 12601.").

[46] *See* Accounting Principles Board ("APB") Opinion No. 10, *Omnibus Opinion*, 1966 at ¶ 7 ("It is a general principle of accounting that the offsetting of assets and liabilities in the balance sheet is improper except where a right of setoff exists.").

purportedly based on another confidential witness, CW46, a former financial analyst for a global recovery audit and cost containment company, but who never worked for Oracle.[47]  In this capacity, CW46's role was to work for Oracle's customers in an effort to seek reimbursement of possible overpayments.  If CW46 could convince Oracle that a payment was an overpayment that needed to be refunded to a customer, CW46's employer earned a contingent fee, based on the amount of the alleged overpayments being refunded.[48]  More recently, CW46 earned $200 per hour working as a paid consultant for Plaintiffs' Counsel, with responsibilities related solely to this matter.[49]

Plaintiffs allege that CW46 reported, based on a review of 760 debit memos, that Oracle's reported revenue and earnings for the second quarter of fiscal year 2001 were false when made, as a result of the improper conversion of more than $228 million of "On Account" cash to revenue in the same period.  Some of CW46's allegations are summarized below:

- Oracle did not refund customer overpayments;

- Oracle created debit memos, which had the same financial impact as an actual invoice for a real product sale; and

- Oracle cleared these debit memos by using non-refunded customer overpayments.

Plaintiffs provided Dr. Marais with the 760 debit memos noted above, and asked him to determine if any statistically-valid inference could be made from these debit memos, such that a total dollar amount could be attached to the 46,000-plus debit memos processed on November 17,

---

[47] See Complaint, at ¶ 8; Deposition of CW46, dated Jun. 24, 2006 ("CW46 Dep.") at 66:5-6.

[48] Deposition of David Cochenour, dated Mar. 6, 2006 ("Cochenour Dep.") at 79:17 ("Typically we get a negotiated percentage of the economic benefit that the client got from our work.").

[49] CW46 Dep. at 51:13-23, 52:11-21.

16

2000.[50]  Per the Complaint, Plaintiffs characterize Dr. Marais as having estimated that the total

dollar value of the more than 46,000 debit memos was at least $228 million.

As will be discussed in a later section, these allegations have no merit.

## B.    ERNST & YOUNG IS HIRED BY ORACLE'S AUDIT COMMITTEE

Ernst & Young LLP ("EY") was hired in 2002 to replace Arthur Andersen LLP ("AA") as

Oracle's external financial statement auditors.  At the request of the Audit Committee of Oracle's

Board of Directors (the "Audit Committee"), EY performed a series of agreed upon procedures

related to the November 17, 2000 debit memo project, which included the following:[51]

- EY reviewed the Plaintiffs' allegations in the Complaint.

- EY interviewed Gregory Myers regarding how the debit memo transactions were
  processed by Oracle.

- EY obtained an electronic listing of the more than 46,000 debit memos.

- EY reviewed the details relating to 145 debit memos greater than $500,000, and 55
  arbitrarily-chosen debit memos between $1,000 and $500,000; EY found no financial
  statement impact from these selected debit memos.

- EY created three test transactions in Oracle's system with the same accounting
  distribution lines as the debit memos, noting that no amount was recorded to revenue.

- EY reviewed general ledger analysis reports, related to Account 25005, for the month of
  November 2000, as well as domestic reconciliations for Account 25005 for November

---

[50] Deposition of Dr. M. Laurentius Marais, dated Sept. 12, 2006 ("Marais Dep.") at 91:15-93:10; *see also*
Complaint, at ¶ 39.

[51] *See* EY000143-6 [EY Agreed Upon Procedures Memo].

and August of 2000, and found no amounts recorded to revenue related to the debit memos, as well as no unusual reconciling items.

- EY obtained and read Oracle's Corporate and Accounting policy related to unapplied cash and refunds.

- EY reviewed the Company's analysis of the Customer Advances and Unearned Revenue account[52] for the previous nine quarters, and found that the decline in the second quarter fiscal year 2001 balance was consistent with the Company's historical trends.

As noted above, EY found no evidence that any revenue, or any other financial statement impact, was recorded as a result of the November 17, 2000 debit memo project.

## C.      PRESENTATION TO THE SEC

At the request of the SEC, Oracle made a presentation in October 2003 regarding Plaintiffs' allegations made in Paragraphs 36-43 of the Complaint.[53]  Since this presentation was made, I am aware of no other action having been taken by the SEC regarding these allegations.  As such, it is reasonable to conclude that the SEC did not find merit in Plaintiffs' allegations and was satisfied with Oracle's response to these allegations with respect to the accounting treatment of these debit memos.

## D.      SUBSET OF DEBIT MEMOS ORDERED FOR DISCOVERY PURPOSES

In response to the Court's October 19, 2005 Order, Oracle produced hundreds of thousands of pages of documentation related to the 776 debit memos generated for electronic receipt records greater than $100,000.  This production included a script output, which was designed by Oracle's

---

[52] This financial statement account incorporates amounts contained within Account 25005, plus cash received for revenue not yet earned, as of the respective financial statement date.

[53] *See* NDCA-ORCL 971461-971507.

18

IT Department to compile a step-by-step audit trail for each transaction which contained a debit memo, using data from Oracle's accounting system.[54]  These 776 debit memos comprise roughly $528.2 million, or about 76% of the total value of the November 17, 2000 debit memos.[55]  In addition, Plaintiffs have received, in accordance with the Court's July 17, 2006 Order, similar information and documents related to an additional subset of 150 debit memos selected by Plaintiffs, which represents another $6.6 million, or about 1% of the total value of the November 17, 2000 debit memos.[56]

Therefore, Oracle has produced script output and related documents for at least 926 debit memos (i.e., 776 plus 150), accounting for about $534.8 million, or 77% of the total value of the November 17, 2000 debit memos.  Our work in connection with these 926 debit memos, will be discussed in a later section.

## E.      ORACLE'S ANALYSIS OF TRANSFERS OF UNAPPLIED CASH

Following the filing of the Complaint, and in connection with its investigation into Plaintiffs' allegations concerning debit memos and unapplied cash generally, in the Fall of 2002 Oracle discovered that certain unapplied cash amounts had been transferred to the bad debt reserve.[57] These transfers occurred independently of and prior to the creation of the 46,000 plus debit

---

[54] Myers Decl. at ¶ 14 ("The script output lays out, step-by-step, the accounting treatment of each debit memo covered by the Court's October 19, 2005 Order….").

[55] Id. at ¶ 8 ("There are 776 debit memos in excess of $100,000; these debit memos account for $528 million of the $692 million total of the debit memos created on November 17, 2000.").

[56] See Declaration of Judy Hui, dated Nov. 13, 2006, at ¶¶ 3-11.

[57] Quinn Decl. at ¶ 5 ("Earlier this year, I was personally assigned by Tom Williams to manage an investigation into the proper disposition of unassigned cash receipts that Oracle's collections staff had, over time, assigned to an accounts receivable reserve account known as Account 12601."); Myers Decl. at ¶ 4 ("Earlier this year, I was also involved in an investigation into the disposition of unassigned cash receipts that Oracle's collections staff had, over time, assigned to an accounts receivable reserve known as Account 12601.").

memos which, as noted above, were created via simultaneous and offsetting debits and credits to Account 25005. [58]   Oracle's Accounts Receivable Department, in collaboration with its Collections Department, learned that $20.1 million of unapplied cash had been transferred to the bad debt reserve during the second quarter of fiscal year 2001.[59]  As a precautionary initial step, Oracle reversed these transfers from the bad debt reserve account back to the unapplied cash account.  Thereafter, Oracle tasked the Collections and Accounts Receivable Departments with researching many of the transfers, to ascertain whether the transfers were properly made during the second quarter of fiscal year 2001.[60]

* * * *

The following three sections relate to key procedures performed related to the November 17, 2000 debit memos, the transfers of unapplied cash during the second quarter of fiscal year 2001, and Oracle's transaction with HP during the second quarter of fiscal year 2001.

## V.   KEY PROCEDURES PERFORMED RELATED TO DEBIT MEMOS

I performed numerous independent procedures in order to arrive at my opinions that a) Oracle processed over 46,000 sets of journal entries on November 17, 2000, with debits and credits to the exact same account in the exact same amount, b) this process did not result in any revenue

---

[58] Williams Dep. at 149:11-19 ("The debit memos had no effect on the company's financial statements. The debit and credit went exactly the same place, 25005….Separate from that was an additional issue which is, 'Okay.  Have things moved out of 25005 to 12601?'").

[59] *See* NDCA-ORCL 104764-65 [spreadsheet entitled "12601 Activity" showing transfers into account 12601 between June 1998 and August 2002].

[60] *See* Venkataramana Dep. at 231-232:25-3 (stating that Myers and Quinn explained to lower-level employees the need to address the unapplied cash that was transferred from Account 12601 back into Account 25005); Williams Dep. at 215:1-3 ("[I]f there was an error made in moving something from 25005 to 12601 we put it back where it belonged.").

being recorded, c) this process did not impact any part of the financial statements, and d) this process did not violate GAAP.

## A.    REVIEW OF VARIOUS ACCOUNTING REPORTS AND DOCUMENTS

*Review of Summary Reports*

I reviewed various accounting system reports produced by Oracle, for the purpose of understanding the total impact of the November 17, 2000 accounting entries.  The first report I reviewed was a Transaction Register, which listed all debit memos generated for that day.  I found that the 46,000-plus debit memos added up to over $692 million.  I inspected the Account Analysis Report, and noted that on November 17, 2000, there was a debit to Account 25005 of $692,396,224.73, and a credit to Account 25005 for the exact same amount.  As a result, it would be impossible from an accounting perspective for the debit memos to have any impact on the financial statements, or to any income statement or balance sheet account.

I also reviewed a Sales Journal by GL Account Report, which listed all revenue recorded in the general ledger for November 17, 2000.  I found that only $10.1 million of revenue was recorded on November 17, 2000.  If Plaintiffs' allegations were to be believed, then I would have expected revenue recorded on that day to be at least $228 million (and, more likely, $692 million as the sum total of the debit memos), which did not happen.

*Review of Sample "On Account" Transactions*

I then reviewed Oracle-produced source documentation related to two of the larger debit memo transactions, in order to understand how, on a detailed level, the "On Account" receipt flag was initially generated and eventually removed through the November 17, 2000 debit memo project.

21

Based on my review of the source documentation, including the aforementioned script output for these debit memos, I noted the following:

*Debit Memo 55003965, related to Texas Instruments, for $4,847,389:*

- The Company issued a March 31, 1998 invoice to Texas Instruments for $4,847,389.[61]

- This invoice was paid by Texas Instruments on May 1, 1998.[62]

- Texas Instruments submitted a duplicate payment on May 26, 1998, resulting in a general ledger entry recognizing a cash receipt. This duplicate payment was recorded as "Unapplied" within Oracle's A/R Subledger, since the first payment had already been applied to the invoice in full.[63]

- Texas Instruments immediately recognized that this was a duplicate payment and issued a "stop payment" with its bank on the same day. As such, the duplicate payment never actually cleared through Oracle's lock box account.[64] Once Oracle was notified of the "stop payment," the Collections Department staff changed the receipt flag within Oracle's A/R Subledger to "On Account." The "On Account" flag signaled to other collectors that this amount had been accounted for and should not be used for the satisfaction of an invoice. In fact, the script output for this transaction includes contemporaneous comments from Oracle personnel that "there should be a stop payment on this check."

---

[61] *See* NDCA-ORCL 050391-92.

[62] *See* NDCA-ORCL 597773 [bank statement from May 1, 1998 showing receipt of cash, not listed separately but within the lockbox amount of $7,065,243.72].

[63] *See* NDCA-ORCL 531500 [bank statement from May 26, 1998 showing duplicate receipt of cash, not listed separately but included within the lockbox amount of $114,124,259.09].

[64] *See* NDCA-ORCL 139191 [bank statement from May 29, 1998 showing a stop payment of $4,847,389].

22

- On June 6, 1998, Oracle recorded a journal entry to reverse the initial receipt of the duplicate Texas Instrument payment, effectively eliminating any financial statement impact from the duplicate payment.  However, even though the duplicate payment had been resolved by June 1998, the "On Account" flag remained in the A/R Subledger until November 17, 2000.

- On November 17, 2000, Oracle processed a debit memo to remove the "On Account" flag within its A/R Subledger.[65]

Since Oracle never actually received the cash in question, Plaintiffs' contention that Oracle improperly converted this "On Account" receipt to revenue is incorrect.

*Debit Memo 55008470, related to Sprint Communications, for $2,582,382:*

- The Company issued three invoices to Sprint Communications – on September 23, 1997 for $1,233[66]; on April 9, 1998 for $1,260[67]; on May 31, 1998 for $2,582,382.[68]

- These invoices were paid by Sprint Communications on one combined remittance, for $2,584,875, on July 1, 1998.[69]

- Sprint Communications submitted a duplicate payment for the third invoice, in the amount of $2,582,382, on August 12, 1998, resulting in a general ledger entry recognizing a cash receipt.  This duplicate payment was recorded as "Unapplied"

---

[65] *See* NDCA-ORCL 531517.

[66] *See* NDCA-ORCL 535815 [invoice]; NDCA-ORCL 535818-20 [order documents].

[67] *See* NDCA-ORCL 535814 [invoice]; NDCA-ORCL 535872-73 [order documents].

[68] *See* NDCA-ORCL 535816 [invoice]; NDCA-ORCL 535830-71 [order documents].

[69] *See* NDCA-ORCL 597890 [bank statement from July 1, 1998 showing receipt of funds, not listed separately but included within the lockbox amount of $4,723,086].

within Oracle's A/R Subledger, since the first payment had already been applied to the third invoice in full.

- On September 25, 1998, Oracle's Collections Department staff recognized the existence of the duplicate payment, and changed the receipt flag to "On Account" within the A/R Subledger.  In fact, the script output for this transaction includes contemporaneous comments from Oracle personnel demonstrating that this was a duplicate payment, and that a refund should be issued.

- On October 10, 1998, Oracle recorded a general ledger entry reflecting that  a refund check for the duplicate payment was sent to Sprint Communications,[70] thereby eliminating any financial statement impact from the duplicate payment. However, the "On Account" flag remained in the A/R Subledger until November 17, 2000.

- On November 17, 2000, Oracle processed a debit memo to remove the "On Account" flag within its A/R Subledger.[71]

Since Oracle refunded the duplicate payment in question in October 1998, over two years before the debit memos were created, Plaintiffs' contention that Oracle improperly converted this "On Account" receipt to revenue is incorrect.

*Review of Script Output and Source Documents*

I also reviewed script output for each of the 926 debit memos, created in response to the Court's orders and Plaintiffs' requests, as noted above, to confirm my understanding of how the transactions in question were posted to Oracle's general ledger.  I found that that the three

---

[70] *See* PLF-ORC 000775; NDCA-ORCL 535793 [bank statement from Oct. 29, 1998 showing refund].

[71] *See* NDCA-ORCL 535817.

simultaneous, offsetting standardization steps, as noted in an earlier section, functioned as designed and intended.  That is, I found the three sets of transactions for each debit memo removed the "On Account" flag, and did not result in any revenue recognition, nor did they result in any impact to any financial statement account, and therefore did not violate GAAP.

From these 926 debit memos, I then randomly chose a subset of 60 debit memos[72] to review the actual source documents relating to each transaction.[73]  I found no evidence that revenue was recorded as a result of the November 17, 2000 debit memo project.

## B.  REVIEW OF CUSTOMER ADVANCES AND UNEARNED REVENUE TRENDS

I reviewed a listing of Oracle's reported balances of Customer Advances and Unearned Revenues, for the first and second quarters of fiscal years 1997 through 2002, detailed as follows ($ in millions):[74]

| Fiscal Year | First Quarter | Second Quarter | % Change |
|---|---|---|---|
| 1997 | $   475 | $   444 | (6.5%) |
| 1998 | 694 | 616 | (11.2%) |
| 1999 | 956 | 800 | (16.3%) |
| 2000 | 1,090 | 925 | (15.1%) |
| **2001** | **1,270** | **1,054** | **(17.0%)** |
| 2002 | 1,367 | 1,085 | (20.6%) |

As evident above, the 17% decline for the second quarter of fiscal year 2001 is consistent with the percentage changes for the second quarters of prior fiscal years, as well as for fiscal year 2002.  If

---

[72] Not including the Texas Instruments and Sprint Communications debit memos detailed above.

[73] The sample size of 60 was sufficient to confirm my understanding of how debit memos were processed.

[74] *See* EY000147.

Plaintiffs' allegations were to be believed, I would not have expected to see similar declines in the second quarter balances for the other fiscal years, which there clearly are.

Further, had the debit memos resulted in the recognition of revenue such that they caused a corresponding reduction in the Customer Advances and Unearned Revenues account in the second quarter, that reduction would be commensurate with the sum total of the debit memos. Stated differently, if Plaintiffs' claim had any merit, the reduction in this account balance would not have been $216 million, but instead $692 million.  As Plaintiffs point out in the Complaint, however, the reduction in Customer Advances and Unearned Revenues in the second quarter of fiscal year 2001 was less than three times the sum total of the 46,000-plus debit memos.

## C.       REVIEW OF CASE FILINGS AND TESTIMONY

I reviewed the Complaint, the declarations and depositions of certain Oracle personnel (including Oracle personnel with knowledge of the accounting issues) and all of the other documents listed in Appendix C.  Based on my review of these documents, there is no evidence that any revenue had been recorded, or even that any general ledger account had been impacted on a net basis, as a result of the November 17, 2000 debit memo project.

In addition, I reviewed the deposition transcripts and related exhibits for the two witnesses upon whom Plaintiffs' appear to rely for most of their allegations, CW46 and Dr. Marais.  As noted above, CW49 refused to testify.

*Accounting-based allegations made by CW46:*

I reviewed CW46's deposition transcript, as well as a findings report that appears to have been prepared by CW46, in order to evaluate his/her accounting-based allegations.  As for his/her sworn testimony, I noted the following:

- CW46 conceded that he/she had no first-hand knowledge of how Oracle posted accounting entries to its general ledger, nor how Oracle recognized revenue.[75]

- CW46 conceded that he/she did not know, or did not speak with, anyone from Oracle who had participated in the November 2000 debit memo process.[76]

- CW46 is not a CPA, and does not appear to have ever worked as an accountant responsible for posting entries to a general ledger.[77]

- When presented with an actual general ledger transaction stemming from one of the November 2000 debit memos, CW46 failed to recognize that the debit and credit amounts were posted to the same identical general ledger account, and instead incorrectly insisted that the transaction resulted in revenue being generated within Oracle's accounting system.[78]

- CW46 conceded that the recording of a debit and credit to the same account for the exact same amount would result in a net zero impact on that account.[79]

- CW46's incorrect assumption that debit memos were accounted for in the same manner as unpaid invoices is based solely on an Oracle accounting software instruction manual that he/she downloaded from the Internet.[80]

---

[75] CW46 Dep. at 85:16-22; 114:24-116:1.

[76] *Id*. at 156:18-157:20.

[77] *Id.* at 59:18-21.

[78] *Id*. at 98:1-110:10.

[79] *Id*. at 98:1-8.

[80] *Id.* at 88-4-25.

- CW46 worked at a global recovery audit and cost containment company that was paid contingent fees based on the amounts recovered for its clients.[81]   Thereafter, CW46 worked as a paid consultant for Plaintiffs' Counsel, at the rate of $200 per hour.[82]

As for the written report apparently prepared with the assistance of CW46, I noted the following:

- CW46 had purportedly reviewed 149 debit memo transactions at the time of this report, with one being for what appears to be a $909,728 cancelled check.  Even though CW46 points out that funds were never received, he/she still contends that the related debit memo somehow generated revenue.[83]  This is in direct contradiction of his/her primary allegation that Oracle booked revenue related to customer overpayments.  CW46 does not attempt to reconcile this significant inconsistency.

- CW46 claims that Oracle imposed a series of institutional "roadblocks" to prevent its customers from recovering funds owed to them, providing Oracle with the opportunity to claim these funds as its own revenue.[84]  CW46 does not appear to have produced any documentation to support this series of allegations.  Furthermore, as noted above, CW46 never worked at Oracle.

Based on my review, CW46's allegation that Oracle improperly recognized revenue, as a direct result of the November 17, 2000 debit memo project, is unfounded and incorrect.  I found no evidence to support his/her allegation.  On the contrary, I found overwhelming evidence, as noted above, confirming that no revenue was generated through this process.  As noted above, even when presented with evidence which directly refuted his/her allegations, CW46 was unable to

---

[81] *Id*. at 80:19-24.

[82] *Id*. at 51:13-23, 52:13-21.

[83] *See* MAR004391.

[84] *See* MAR004395-401.

recognize that the transaction in question was being made to the same general ledger account, and therefore could have had no revenue or financial statement impact.

Considering that CW46's prior employer was paid contingent fees based on successful recoveries of possible overpayments from Oracle, and that CW46 worked as a paid consultant of Plaintiffs' Counsel on this matter, CW46 may not be completely objective in making these allegations.  In summary, based on the lack of evidence supporting these allegations, coupled with his/her apparent lack of training and experience as it relates to general ledger accounting, it is my professional opinion that no reliance should be placed on CW46's allegations.

*Statistical Estimation of Debit Memos by Dr. Marais:*

I reviewed Dr. Marais' deposition transcript, in order to evaluate his allegations related to the statistical estimation of the 46,000-plus debit memos.  Notably, Plaintiffs engaged Dr. Marais to opine only on the narrow issue of the total amount of the 46,000-plus debit memos.  Thus, nothing in his testimony is relevant to the issue of whether the debit memos had any financial statement impact.  Regarding the narrow issue upon which Dr. Marais opined, as explained below, his testimony has been rendered both wrong and irrelevant because the sum total of the debit memos is known (i.e., $692 million).  As for his sworn testimony, I noted the following:

- Dr. Marais conceded that, if the total population of debit memos were known (which it is), then his estimations would be irrelevant.[85]

- Dr. Marais indicated that the sample population was heavily skewed by a few very large debit memos, and as such, would have required a sample size of at least 10,000 observations before he could safely rely on the mathematics underlying a statistically-

---

[85] Marais Dep. at 89:2-100:1.

29

valid estimation.[86]  Notably, Dr. Marais looked at data from only 760 debit memos, not 10,000.

- Dr. Marais indicated that he applied a $100,000 cap on the 13 largest debit memos, which had the effect of lowering the skewness of the 760 debit memos to such a degree that a statistically-based estimation could be made.[87]

Since the population of the more than 46,000 debit memos is known, we know that the total amount of debit memos processed on November 17, 2000 was $692 million.  As acknowledged by Dr. Marais, if he had the data for the total population of debit memos, his estimations would be irrelevant.

Even still, based on my review, it appears that Plaintiffs mischaracterized Dr. Marais' work, and should not have relied upon his findings in the first place.  It appears that Dr. Marais arbitrarily manipulated the data from the sample of 760 debit memos in order to achieve, in his opinion, a statistically-valid estimation.  Other than indicating that the process of truncating certain sample outliers is a commonly used practice by statisticians, I found no evidence that Dr. Marais had any factual foundation or support to cap those 13 largest debit memos, or why he chose to use a cap of $100,000.

As such, Plaintiffs should not have placed any reliance on Dr. Marais' findings, either as a basis for estimating the total value of the more than 46,000 debit memos, or as a basis for corroborating the decline in Oracle's Customer Overpayments and Unearned Revenue account in the second quarter of fiscal year 2001.  However, it appears that Plaintiffs did rely on Dr. Marais' findings,

---

[86] *Id.* at 177:6-178:2, 204:8-17.

[87] *Id.* at 177:24-180:14.

and compounded this error by not indicating in the Complaint that Dr. Marais' findings were a direct result of his arbitrary data manipulation.  When presented with the portion of the Complaint attributed to him, Dr. Marais failed to correct Plaintiffs' factual oversight in characterizing his findings.[88]

**D.      REVIEW OF AGREED UPON PROCEDURES PERFORMED BY EY**

I reviewed the work performed by EY related to its agreed upon procedures.  I also reviewed the deposition of EY's then-senior manager on the engagement, as it relates to the agreed upon procedures work performed.  I found that EY's conclusions were consistent with my own, and that EY did not find any independent evidence that revenue had been recorded resulting from the November 17, 2000 debit memo project.

**VI.     KEY PROCEDURES PERFORMED RELATED TO TRANSFERS OF UNAPPLIED CASH**

In order to arrive at my opinions that Oracle's transfer of unapplied cash to bad debt reserve during the second quarter fiscal year 2001 was not material to its financial statements, and some of these transfers either properly were made or should have been recorded as revenue, I performed numerous independent procedures, and reviewed, among other things, a number of documents and other materials produced in this matter, as summarized below.

---

[88] *Id*. at 173:18-174:3.

## A.      REVIEW OF SUBSET OF UNAPPLIED CASH TRANSFERS

As noted above, Oracle generated script output for 926 debit memos processed on November 17, 2000, in response to certain Court orders.  I reviewed the script output for the 926 debit memos, to determine which of the transactions that had debit memos in their accounting histories also had a transfer to the bad debt reserve within their audit trail.  Within the accounting histories of the transactions relating to the 926 debit memos, I found 121 transfers to the bad debt reserve during the second quarter of fiscal year 2001.  These 121 transfers accounted for approximately $10.6 million of the $20.1 million transferred to bad debt reserve during this quarter.  Notably, for the reasons discussed above, the creation of the debit memos on November 17, 2000 did not move any dollar amounts to or from Oracle's bad debt reserve.  Indeed, all of these transfers occurred prior to November 17, 2000, when the 46,000-plus debit memos were created.

I then reviewed the script output and various documents related to a number of these transactions, in order to understand, on a detailed level, how:  a) the balance of unapplied cash originated; b) the balance was then transferred to bad debt reserve; and c) the balance was later reconciled by Oracle as being properly recorded as revenue.

Based on my independent review, I noted the following:

- Of the $10.6 million in transfers subject to my review, almost $700,000 of unapplied cash transferred to bad debt reserve during the second quarter of fiscal year 2001 related to certain royalties paid to Oracle.  These amounts should have been recorded directly to revenue at the time payments were received, but were not.  Therefore, insofar as the result of the transfer of these amounts had a positive impact on income, that impact was appropriate.

- In addition, over $800,000 of other transfers to the bad debt reserve during this period were appropriate, in that Oracle had already reduced its revenues for certain open and unpaid invoices, either all or in part, through the use of credit memos and/or inclusion in Oracle's general bad debt reserve as of the second quarter of fiscal year 2001.

My independent review included analyzing available source documentation, which served to confirm my understanding of each respective transaction.  In addition to these above amounts, I found some evidence which suggests that at least another $500,000 of these transfers were appropriate, although the evidence relating to these transfers is not as complete as the evidence I reviewed in connection with the $1.5 million in transfers noted above.  Thus, I believe there is evidence that at least $2.0 million of the $10.6 million transfers capable of review were appropriate.

By way of example, the following represents chronological details supporting one of the royalty payments and one payment related to a previously credited invoice:

*Unapplied Cash Transfer of $176,487, related to Structural Dynamics Research:*

- On May 31, 2000, a payment of $176,487 from Structural Dynamics Research was recorded.  The balance could not immediately be applied to an open and unpaid invoice.

- On October 1, 2000, this balance was transferred to the bad debt reserve.

- On October 5, 2000, the receipt flag within Account 25005 for this balance was switched to "On Account."

33

- On November 17, 2000, Oracle processed a debit memo to remove the "On Account" flag within its A/R Subledger.[89]

- On November 2, 2002, Oracle reversed the unapplied cash transfer and moved the credit balance from the bad debt reserve back to Account 25005.

- On November 8, 2002, Oracle reversed the processing of the November 17, 2000 debit memo, thus switching the receipt status from "Applied" back to "Unapplied."[90]

- In November 2002, as part of Oracle's investigation of the bad debt transfers, the collectors' notes indicate, "Needs to go to Royalties Gigi to be booked."[91]

- On August 11, 2003, Oracle processed invoices totaling $176,487 to recognize previously unrecorded royalty revenues,[92] based on a royalty statement provided by Structural Dynamics Research.[93]

Since revenue should have been recorded related to the payment as far back as May 2000, but was not, any allegation that this transfer did not reflect a proper recognition of Oracle's revenue and net earnings is incorrect.

*Unapplied Cash Transfer of $91,254, related to Caltrans:*

- On May 31, 2000, Oracle recorded an invoice for $242,400, relating to onsite services for an expected period of May 31, 2000 through May 30, 2001.[94]

---

[89] *See* NDCA-ORCL 471528.

[90] *See* NDCA-ORCL 471529.

[91] *See* NDCA-ORCL 1623795-4264.

[92] *See* NDCA-ORCL 471519-27.

[93] *See* NDCA-ORCL 471502-07.

[94] *See* NDCA-ORCL 776634.

- On August 18, 2000, a payment of $112,464 was received from Caltrans.  The balance could not be applied to an open and unpaid invoice.

- On August 24, 2000, Oracle recorded a credit memo of $242,400, effectively providing a full concession related to the May 31, 2000 invoice, despite being well into the expected service period.[95]

- On September 22, 2000, Oracle applied $14,850 to fully satisfy an open and unpaid invoice, leaving an unapplied cash balance of $97,614.[96]

- On November 5, 2000, a balance of $91,254 was transferred to the bad debt reserve, leaving an unapplied cash balance of $3,180.

- On November 10, 2000, Oracle applied $3,180 to fully satisfy an open and unpaid invoice, fully applying the August 18, 2000 cash receipt.[97]

- On November 13, 2000, the receipt flag within Account 25005 for this balance was switched to "On Account."

- On November 17, 2000, Oracle processed a debit memo to remove the "On Account" flag within its A/R Subledger.[98]

- On November 11, 2002, Oracle reversed the processing of the November 17, 2000 debit memo, thus switching the receipt status from "Applied" back to "Unapplied."[99]

- On November 24, 2002, Oracle reversed the unapplied cash transfer, thereby moving the credit balance from the bad debt reserve back to Account 25005.

---

[95] *See* NDCA-ORCL 776635.

[96] *See* NDCA-ORCL 776636.

[97] *See* NDCA-ORCL 776638.

[98] *See* NDCA-ORCL 776637.

[99] *See* NDCA-ORCL 776633.

- In November 2002, as part of Oracle's investigation of the bad debt transfers, the collectors' notes state "Rebill one of the concessions for the amount in reserve stating that too much of concession was given to customer due to the customer sending in a payment for $91K."[100]

- On January 31, 2003, Oracle reinstated the $91,254 amount to the original May 31, 2000 invoice, following its research and conclusion that excessive concessions were made to Caltrans.

Since revenue was understated related to this payment as far back as August 2000, any allegation that this transfer did not reflect a proper recognition of Oracle's revenue and net earnings is incorrect.

## B.     MATERIALITY

According to Accounting Principles Board Opinion No. 20, if a company discovers that an accounting error was made after the issuance of financial statements, it must determine whether the financial statements would be materially misstated absent correction of the error. If the error is determined to be material, the company needs to restate its prior financial statements, and disclose the nature of the error and its impact on the financial statements.[101]

According to SEC Staff Accounting Bulletin 99 ("SAB 99"), it is important for a company to assess materiality from both a quantitative and qualitative perspective. In defining materiality,

---

[100] *See* NDCA-ORCL 1623795-4264.

[101] *See* APB Opinion 20, 1971.

SAB 99 refers to the following excerpt from the Statement of Financial Accounting Concepts No. 2, as published by the Financial Accounting Standards Board:

> "The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item."

SAB 99 also refers to a Supreme Court decision, which held that a fact was material if there is "a substantial likelihood that the…fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[102]

As a preliminary matter, I note that the $20.1 million in transfers were solely a second quarter of fiscal year 2001 event, and had no accounting impact in the third quarter of fiscal year 2001.

Assessing the issue from a quantitative perspective, we start with the following reported second quarter Net Income and Earnings Per Share, from Oracle's fiscal year 2001 10-K report:

|  | In $000s |
|---|---|
| Net Income | $ 622,812 |
| Shares Outstanding – Diluted | 5,874,987 |
| Earnings Per Share | $   0.1060 |
| Reported As (Rounded) | $     0.11 |

---

[102] SAB 99 (citing *TSC Industries v. Northway, Inc*. 426 U.S. 438, 449 (1976), and *Basic, Inc. v. Levinson*, 485 U.S. 224 (1998)).

As noted earlier, $20.1 million of unapplied cash was transferred to the bad debt reserve during this quarter.  Notwithstanding the above examples -- which establish that at least $2 million of the $10.6 million in transfers to the bad debt reserve either were properly made or should have previously been recorded as revenue -- if we make the most conservative assumption, that the entire amount of the transfers represents an accounting error, this would represent roughly a $13.0 million overstatement in Net Income, after taking into account an incremental tax rate of 35.5%.[103]  As such, Net Income and Earnings Per Share would be adjusted as follows:

|  | In $000s |
|---|---|
| Net Income | $ 609,812 |
| Shares Outstanding – Diluted | 5,874,987 |
| Earnings Per Share | $   0.1038 |
| Reported As (Rounded) | $     0.10 |

The conservative adjustment used above would merit only a 2% reduction in reported Net Income.  This adjustment would reduce the Earnings Per Share calculation by just two-tenths of a cent.  As such, this adjustment is not material from a quantitative sense, and I do not believe it would have influenced the users of Oracle's financial statements.

Further, I note that in the second quarter of fiscal year 2001, Oracle reported revenue of $2.66 billion.[104]  Even if the entire $20.1 million in transfers to the bad debt reserve during the second quarter of fiscal year 2001 were improper -- which they were not -- any resulting revenue

---

[103] Calculated from Oracle's 10-Q Report, dated January 16, 2001.

[104] *See* Oracle's Form 10-Q for the quarter ending November 30, 2000.

from the transfers would constitute less than 1% (approximately .75%) of reported revenue for the quarter.

Assessing the issue from a qualitative perspective, SAB 99 lists a number of considerations, detailed below, which "may render material a quantitatively small misstatement of a financial statement item."  I reviewed each of these considerations, noting the following:

- *Whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision in the estimate* – The bad debt reserve is clearly an estimate, based on the likelihood of ultimate collections.  As noted in a previous section, the challenges inherent in applying cash, accompanied by incomplete remittance information, make it less likely that precise measurements could be obtained.

- *Whether the misstatement masks a change in earning or other trends* – I found no evidence of this issue.

- *Whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise* – The consensus analyst earnings opinion regarding the second quarter fiscal year 2001 was $0.10 per share.[105]  As noted above, even if the full $20.1 million were deemed to have been transferred improperly, the Earnings Per Share would decrease to $0.1038 per share, which would still meet analysts' consensus expectations.

- *Whether the misstatement changes a loss into income or vice versa* – I found no evidence of this issue.

- *Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's*

---

[105] *See* Beartlein, L. "Update 2-Oracle Profits Come in Just Ahead of Expectation" (Reuters December 14, 2000) ("An average of analyst estimates called for earnings of 10 cents per share, according to a survey by First Call/Thompson Financial").

*operations or profitability* – The unapplied cash likely resulted from all of Oracle's operations, as opposed to a singular segment or other significant portion of the business.

- *Whether the misstatement affects the registrant's compliance with regulatory requirements* – I found no evidence of this issue.

- *Whether the misstatement affects the registrant's compliance with loan covenants or other contractual requirements* – I found no evidence of this issue.

- *Whether the misstatement has the effect of increasing management's compensation* – I found no evidence of this issue.

- *Whether the misstatement involves concealment of an unlawful transaction* – There is no evidence that suggests that an orchestrated attempt to unfairly inflate the results of operations existed.  Furthermore, there is no evidence that suggests that Oracle attempted to conceal these transactions.  On the contrary, Oracle preserved these transfers within its A/R Subledger.

In short, I found no evidence, from a qualitative or quantitative perspective, that Oracle's transfers to its bad debt reserve would be considered material, with respect to its reported second quarter fiscal year 2001 financial statements.  In the absence of any quantitative or qualitative evidence, I do not believe that the judgment of a reasonable investor would have changed.

## C.   REVIEW OF CASE FILINGS AND TESTIMONY

I reviewed the Complaint, the declarations and certain depositions of Oracle personnel (including personnel who had knowledge of the accounting issues) and all of the other documents listed in Appendix C.  Based on my review of these documents, I found no evidence that the Defendants had ordered the Company to transfer unapplied cash to the bad debt reserve, or any evidence that

40

any of Oracle's senior management was even aware of the transfers to the bad debt reserve when made.

## D.    REVIEW OF WORK PERFORMED BY EY

As noted above, EY was hired to replace AA as the external auditors of Oracle in April of 2002. EY was made aware of the transfers to the bad debt reserve.[106]  Based on my understanding of Generally Accepted Auditing Standards, promulgated by the American Institute of Certified Public Accountants, and my years of experience in performing financial statement audits, EY had to consider whether the transfers to Oracle's bad debt reserve during second quarter fiscal year 2001 created a material misstatement in Oracle's past financial statements.  If that had been true, Oracle would have been required to restate its past financial statements.

There have been no such restatements.  Furthermore, during Oracle's investigation into these transfers, EY informed the Company's Audit Committee that no audit adjustments were necessary.[107]  As such, EY concluded that these transfers from unapplied cash to bad debt reserve did not have a material impact to past financial statements.

## VII.    REVIEW OF HEWLETT-PACKARD TRANSACTION

In the Supplemental Interrogatory Responses, Plaintiffs suggest that the HP transaction, whereby HP purchased software licenses and services from Oracle, had "little economic value" and

---

[106] *See* Deposition of Jennifer Minton, dated Sept. 25, 2006 ("Minton Dep.") at 283:22-24, 285:20-286:4; *see also* Deposition of Jeffrey Henley, dated Nov. 16, 2006, at 452:21-453:7.

[107] *See* NDCA-ORCL 3043015; *see also* Minton Dep. at 284:25-285:4.

allowed Oracle to achieve earnings per share of $0.11 in the second quarter of fiscal year 2001.[108]

Plaintiffs have not offered any evidence to support this statement, and instead merely point out

that the sale occurred on the last day of the quarter and that Oracle had also agreed to purchase

product from HP.[109]   I understand that HP purchased these additional software licenses so that it

could complete a global roll-out of Oracle's Customer Relationship Management software.[110]   I

note that AA, Oracle's prior financial statement auditors, specifically looked at the HP transaction

from a revenue recognition perspective, and even discussed it with Oracle's Audit Committee on

January 5, 2001.[111]   AA did not recommend that any adjustment be made to the accounting for the

HP transaction.[112]   Based upon the foregoing, I do not believe that there was anything improper in

Oracle's recognition of revenue from the HP transaction.


## VIII.   CONCLUSIONS


Based on my review of the documentation produced in this matter, I found that Plaintiffs'

allegations that the November 17, 2000 debit memo project resulted in more than $228 million of

revenue erroneously recorded in Oracle's financial statements during the second quarter of fiscal

year 2001 are unfounded and incorrect.   On the contrary, I found overwhelming evidence to

---

[108] *See* Sawyer Response, at 17; 1199 S.E.I.U. Greater New York Pension Fund's Third Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs, at 18; Drifton Finance Corporation's Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs, at 18.

[109] *See* Sawyer Response, at 17, 46-47; 1199 S.E.I.U. Greater New York Pension Fund's Third Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs, at 18, 47-48; Drifton Finance Corporation's Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs, at 18, 46-47.

[110] Deposition of Safra Catz, dated Jul. 20, 2006, at 19-20:23-1 ("At the same time HP had already bought and was implementing Oracle CRM, but hadn't done their global rollout; and to do it they would have to buy more software.").

[111] *See* AA000027-34.

[112] Matuszak Dep. 169:17-21 ("[M]anagement concluded that it was appropriate to recognize revenue under the license arrangement.   And Andersen, after reviewing all the…evidence that was provided to us, concurred with management's agreement.").

support the opinion that the Company's removal of these "On Account" receipt flags, and the creation of the associated debit memos had no impact on Oracle's financial statements, and therefore did not violate GAAP.

I also found evidence demonstrating that some of the transfers of unapplied cash to bad debt reserve in second quarter of fiscal year 2001 were appropriate, and that some of the unapplied cash should have been previously recorded as income. Nevertheless, even if one assumed that all of these transfers were improper, the effect of those transfers to Oracle's reported financial statement for that period is not material. In addition, I found no evidence that Oracle's senior management was involved with or even knew about the transfers to the bad debt reserve when made.

Finally, I do not believe that there was anything improper in Oracle's recognition of revenue from the HP transaction.

## IX.   <u>QUALIFICATION</u>

I reserve the right to supplement and/or amend my opinions as necessary as additional documents or information is made available for my review. I may independently, or be asked by counsel to create exhibits after the issuance of this report. These exhibits may then be used as demonstratives during trial. I will be available for further comment on my opinions contained herein at my deposition at some point in the future. Further, in support of my opinions, I may also use any of the previously produced documents referred to in the body of this report or in any Exhibit hereto.

Very truly yours,

*This report has been prepared by:*

J. Duross O'Bryan, Managing Director

# APPENDIX A

## J. DUROSS O'BRYAN

J. Duross O'Bryan is a Managing Director in the firm's Financial Advisory Services Practice. With over 29 years of experience, Duross is a known and respected financial industry leader with an extensive background solving sophisticated accounting challenges and a track record of working effectively and quickly with his clients.

Duross joined AlixPartners from PricewaterhouseCoopers, where he served as the Partner-In-Charge of the Dispute Analysis and Investigations practice for the firm's western region, and as an Audit Partner for the Los Angeles office of PwC. Previously, he served as the Financial Advisory Services Leader of the New York Metro Region of PwC. Before joining Coopers & Lybrand (now PwC) in 1985, Duross was with the San Diego office of Peat Marwick Main & Co. Duross' accounting and auditing experience includes financial statement audits of governmental agencies, public and private companies in the high-tech, financial services, mutual funds, hedge funds, and real estate and industries.

Duross' more recent consulting experiences focus on the areas of economic damages, arbitration, accountants' malpractice, securities litigation defense, and internal corporate investigations. His consulting and testifying experience as either the lead consultant and/or expert in these types of matters now exceeds more than 100 engagements. He also has testified in dozens of State Superior Courts, United States Federal Courts, and in domestic and international arbitration matters. He has also acted as an independent arbitrator and forensic consultant in a number of matters involving complex post merger and acquisition disputes, adjustments to purchase price, disbursement frauds, commingling of restricted funds and other sophisticated financial accounting issues. Recent engagements include, but are not limited to:

- Acted as an expert witness on behalf of a "Big 4" accounting firm in a case alleging an audit failure relating to that firm's alleged "non-discovery" of a highly collusive management fraud.

- Acted as an expert witness on behalf of a Beverly Hills based CPA who allegedly committed professional malpractice through the administration of various accounting, consulting and other business services offered to a significant client.

- Acted as the forensic accountant and expert witness in a case involving the alleged breach of a live entertainment amphitheatre lease.

- Named as an expert in a current matter involving one of the large national public accounting firms concerning services, damages and other aspects of a professional negligence claim.

Duross earned a Bachelor's degree from Northern Arizona University. In addition, he is a member of the California Society of Certified Public Accountants and the American Institute of Certified Public Accountants.

# Testimony at Deposition / Trial and/or Arbitration from May 1, 2003

| | Case | Client | Deposition Date | Trial/ Arbitration Date | Court/Venue |
|---|------|--------|-----------------|--------------------------|-------------|
| 1) | Karpetian v. Gazbiean | Plaintiff | 4/03 | 7/03 | Superior Ct. of CA, County of Los Angeles |
| 2) | Petco Animal Supplies, Inc v. Farmers and Merchants Bank | Plaintiff | 4/03 | 5/03 | Superior Ct. of CA, County of Los Angeles |
| 3) | Markley v. Stearns | Plaintiff | 6/03 | | Superior Ct. of CA, County of Los Angeles |
| 4) | Interealty v. Superlative, et al | Defendant | 7/03 | | U.S. District Ct. Central Dist. of CA |
| 5) | Clark v. Ernst & Young | Defendant | 9/03 | 12/03 | Superior Ct. of CA, County of Riverside |
| 6) | Apex v. TRS - Ratheon | Plaintiff | 2/04 | 4/04 | American Arbitration Association |
| 7) | Canal Properties, LLC v. Alliant Tax Credit V, Inc. | Defendant | 4/04 | 9/04 | U.S. District Ct. Northern Dist. of CA |
| 8) | Stroock & Stroock & Lavan v. Houston RCW Three, Inc. | Plaintiff | 5/04 | | American Arbitration Association |
| 9) | Thayer v. Ernst & Young LLP | Defendant | 5/04 | 7/04 | American Arbitration Association |
| 10) | Hanson Aggregates West v. American Mechanical Dredge | Defendant | 1/05 | | Superior Ct. of CA, County of Los Angeles |
| 11) | Otter Creek Partners Ltd v. Ernst & Young LLP | Defendant | 1/05 | 2/05 | U.S. District Ct. Northern Dist. of CA |
| 12) | Christian Markey v. Jonathan Club | Defendant | 1/05 | 2/05 | Superior Ct. of CA, County of Los Angeles |
| 13) | Oster, et al v. CIBC | Defendant | | 1/05 | National Association of Securities Dealers |
| 14) | GMG Stone, Inc. v. Breton S.P.A | Defendant | 3/05 | | U.S. District Ct. Southern Dist. of CA |
| 15) | People of the St. of Ca. v. Michael Joseph Jackson | Plaintiff | | 5/05 | Superior Ct. of CA, County of Santa Barbara |
| 16) | N.V. Heathorn, Inc. v. USF&G Company | Plaintiff | 4/05 | 6/05 | Superior Ct. of CA, County of Alameda |
| 17) | Flex Equipment Company v. John J. Tasker, et al | Defendant | 10/05 | 11/05 | Superior Ct. of CA, County of Los Angeles |
| 18) | Joshua W. Brack v. Omni Loan Company | Defendant | 10/05 | 11/05 | Superior Ct. of CA, County of San Diego |
| 19) | Securities and Exchange Commission v. Weitzen, et al. | Defendant | 3/06 | 3/07 | U.S. District Court of the Southern Dist. of CA |
| 20) | Clear Channel v. City of Mountain View | Defendant | 3/06 | | Superior Ct. of CA, County of Santa Clara |
| 21) | Roberts v. Andrews | Plaintiff | | 07/06, 03/07 | American Arbitration Association |
| 22) | Robert J. Bekken v. Fisher & Phillips LLP, et al. | Plaintiff | | 10/06 | Judicial Arbitration and Mediation Services |
| 23) | Bronwood, LLC v. Tahoe Reno Utility Services Company, LLC, et al | Plaintiff | 1/07 | 3/07 | Superior Ct. of CA, County of Los Angeles |
| 24) | Senna Investments, LLC v. Fidelity and Deposit Co. of Maryland, et al | Defendant | 11/06 | | Superior Ct. of CA, County of Los Angeles |
| 25) | John M. Gunderson v. Christopher Gruys, et al | Defendant | 2/06 | 12/06 | Superior Ct. of CA, County of Los Angeles |
| 26) | Carl Olson, et al v. Automobile Club of Southern California | Defendant | 1/07 | 2/07 | Superior Ct. of CA, County of Los Angeles |
| 27) | Sasha Match and Cathy Bodhaine v. Petcurean Pet Nutritian, Inc. et al | Defendant | 1/07 | 2/07 | Superior Ct. of CA, County of Alameda |

## APPENDIX C

## In re Oracle Corporation Securities Litigation
## Documents Relied Upon

- Revised Second Amended Complaint, dated December 9, 2002
- Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs, dated January 31, 2007
- Depositions
  - Alexander Bender, dated September 21, 2006
  - Safra Catz, dated July 20, 2006
  - David Cochenour, dated March 6, 2006
  - Jeffrey Henley, dated November 16, 2006
  - Dr. M. Laurentius Marais, dated September 12, 2006
  - Gary Matuszak, dated August 1, 2006
  - Jennifer Minton, dated September 25, 2006
  - Gregory Myers, dated April 12, 2005
  - Michael Quinn, dated April 18, 2006
  - Jason Sevier, dated June 28, 2006
  - Molly Venkataramana, dated April 13, 2006
  - Thomas Williams, dated June 7, 2006
  - CW46, dated June 24, 2006
- Declarations
  - Judy Hui, dated November 13, 2006
  - Gregory Myers, dated November 14, 2002
  - Gregory Myers, dated June 6, 2006
  - Michael Quinn, dated November 14, 2002
- Produced Documents:
  - AA000027-34
  - EY000143-47
  - HP00001-3, 00019-25, 00030-35, 00053-60, 00069-70
  - MAR004391, 004395-4401
  - NDCA-ORCL:

| | | | | | |
|---|---|---|---|---|---|
| 020839 | - | 020841 | 104764 | - | 104765 |
| 020844 | - | 020849 | 139191 | | |
| 022179 | - | 022185 | 261908 | - | 261938 |
| 025018 | - | 025021 | 444427 | - | 444429 |
| 039320 | | | 444993 | - | 445087 |
| 048716 | - | 048718 | 445939 | - | 445941 |
| 049208 | - | 050060 | 446268 | - | 446290 |
| 050356 | - | 050360 | 446796 | - | 446881 |
| 050391 | - | 050392 | 447622 | - | 447735 |
| 055957 | - | 055962 | 449355 | - | 449443 |
| 068221 | | | 449699 | - | 449929 |
| 068225 | | | 452909 | - | 453736 |
| 075926 | - | 075928 | 454216 | - | 454255 |
| 081717 | | | 456138 | - | 456262 |
| 094356 | - | 094358 | 456378 | - | 456380 |

APPENDIX C
Page 2

| | | | | | |
|---|---|---|---|---|---|
| 459116 | - | 459148 | 531517 | | |
| 459313 | - | 459314 | 535793 | | |
| 461887 | - | 461933 | 535814 | - | 535820 |
| 462354 | - | 462356 | 535830 | - | 535873 |
| 462523 | - | 462601 | 543107 | - | 545160 |
| 463567 | - | 463615 | 583022 | - | 584234 |
| 463666 | - | 463713 | 597773 | | |
| 464653 | - | 464699 | 597890 | | |
| 465286 | - | 465329 | 748260 | - | 748268 |
| 466779 | - | 466988 | 748292 | - | 748406 |
| 467455 | - | 467590 | 748424 | - | 748427 |
| 468197 | - | 468241 | 748526 | - | 748530 |
| 468242 | - | 468358 | 748748 | - | 748756 |
| 468821 | - | 468822 | 748822 | - | 748825 |
| 471502 | - | 471507 | 748918 | - | 748921 |
| 471514 | - | 471515 | 748981 | - | 748992 |
| 471519 | - | 471529 | 749049 | - | 749052 |
| 471530 | - | 471578 | 749140 | - | 749142 |
| 471789 | - | 471925 | 749202 | - | 749208 |
| 471926 | - | 472063 | 749257 | - | 749260 |
| 472144 | - | 472146 | 749272 | - | 749278 |
| 473149 | - | 473151 | 749389 | - | 749392 |
| 473400 | - | 473409 | 749859 | - | 749862 |
| 474422 | - | 474580 | 750052 | - | 750054 |
| 475001 | - | 475161 | 758623 | - | 758624 |
| 478350 | - | 478357 | 758626 | - | 758628 |
| 481360 | - | 481427 | 758649 | | |
| 481742 | - | 481968 | 758656 | | |
| 483177 | - | 483188 | 759265 | - | 759379 |
| 486406 | - | 486555 | 760249 | - | 760250 |
| 487912 | - | 488035 | 761522 | | |
| 491000 | - | 491021 | 761915 | | |
| 491155 | - | 491219 | 761917 | | |
| 491421 | - | 491472 | 762682 | - | 762684 |
| 515623 | - | 515624 | 762697 | - | 762791 |
| 515769 | - | 515900 | 765074 | - | 765373 |
| 515891 | - | 515892 | 765618 | - | 766542 |
| 515893A | | | 767128 | - | 767605 |
| 515896 | - | 515900 | 768492 | | |
| 518117 | - | 518222 | 769520 | - | 769531 |
| 518287 | - | 518347 | 770623 | - | 770624 |
| 527593 | | | 770753 | - | 771606 |
| 527595 | | | 774904 | - | 774911 |
| 527599 | - | 527602 | 774916 | - | 774922 |
| 527607 | - | 527611 | 774933 | - | 774937 |
| 527613 | - | 527620 | 775435 | | |
| 527622 | - | 527623 | 775860 | - | 775864 |
| 527782 | - | 527946 | 775868 | - | 775870 |
| 530134 | - | 530146 | 775873 | | |
| 531500 | | | 776633 | - | 776639 |

**APPENDIX C**
Page 3

| | | | | | |
|---|---|---|---|---|---|
| 776986 | - | 777100 | 1885992 | - | 1886020 |
| 777104 | - | 777108 | 1891902 | - | 1892486 |
| 777716 | | | 3000229 | - | 3000896 |
| 777828 | - | 777827 | 3002473 | - | 3002604 |
| 777832 | - | 777833 | 3010464 | - | 3010544 |
| 778089 | - | 778091 | 3011331 | - | 3011504 |
| 779235 | - | 779303 | 3011972 | - | 3012030 |
| 781251 | - | 781262 | 3012033 | - | 3012130 |
| 781311 | - | 781324 | 3015098 | - | 3015169 |
| 781953 | - | 781969 | 3015221 | - | 3015250 |
| 782250 | - | 782263 | 3016689 | - | 3017419 |
| 782251 | - | 782258 | 3018553 | - | 3018572 |
| 782595 | - | 782689 | 3021830 | - | 3021941 |
| 971461 | - | 971507 | 3026170 | - | 3026221 |
| 0123157 | | | 3030443 | - | 3030492 |
| 0126882 | - | 0127101 | 3031861 | - | 3031862 |
| 0127994 | - | 0128107 | 3031881 | - | 3031884 |
| 1058909 | | | 3032038 | - | 3032040 |
| 1623795 | - | 1624264 | 3043015 | | |
| 1473340 | - | 1473341 | | | |

  o   PFL-ORC000775
- Accounting Principles Board Opinion No. 10
- Accounting Principles Board Opinion No. 20
- SEC Staff Accounting Bulletin 99
- Beartlein, L.  "Update 2 – Oracle Profits Come in Just Ahead of Expectation," Reuters December 14, 2000



AlixPartners LLP
| *Change the outcome.*

Chicago   Dallas   Detroit   Duesseldorf   London   Los Angeles
Milan   Munich   New York   Paris   San Francisco   Tokyo

May 24, 2007

Through April 30, 2007 I billed 138 hours at $485 per hour for the Oracle Corporation Securities Litigation and incurred expenses of $759.50 for total fees and expenses of $67,689.50.

Thank you.

J. Duross O'Bryan

EXHIBIT 2

1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3               SAN FRANCISCO DIVISION
 4
 5    In re ORACLE CORPORATION
 6    SECURITIES LITIGATION.
 7              Master File No. C-01-0988-MJJ
 8    This Document Relates To:
 9
10    ALL ACTIONS.
11    _____/
12
13            ---o0o---
14            CONFIDENTIAL
15    VIDEOTAPED DEPOSITION OF JOHN DUROSS O'BRYAN
16          THURSDAY, JULY 12, 2007
17
18            ---o0o---
19       SHEILA CHASE & ASSOCIATES
         REPORTING FOR:
20         LiveNote World Service
         221 Main Street, Suite 1250
20       San Francisco, California 94105
21        Phone:  (415) 321-2311
            Fax:  (415) 321-2301
22
23
      Reported by:
24    DIANA NOBRIGA, CSR, CRR
      LICENSE NO. 7071
25
```

2

```
 1              I N D E X
 2           INDEX OF EXAMINATION
 3                        PAGE
 4    EXAMINATION BY MR. GREENSTEIN          6
 5            ---o0o---
 6      INDEX OF CONFIDENTIAL EXHIBITS
 7    DESCRIPTION                   PAGE
 8    Exhibit 1  J. Duross O'Bryan, CPA Expert
 9         Witness Report            10
10    Exhibit 2  Rebuttal Expert Report of J.
11         Duross O'Bryan, CPA        10
12    Exhibit 3  J. Duross O'Bryan Expert Witness
13         Report in Accordance with Rule 26   35
14    Exhibit 4   Transaction Registers      60
15    Exhibit 5   Account Analysis Reports   73
16    Exhibit 6  Sales Journal by GL Account Report  89
17    Exhibit 7   Presentation to the SEC Staff On
18         Behalf Of Oracle Corporation    94
19    Exhibit 8  E-mail from Molly Littlefield,
20         sent 26 Aug 2004 to Greg Myers     99
21    Exhibit 9  Oracle Receivables User's Guide   118
22    Exhibit 10  Lexis case printout, Donald W.
23         Farnham v. William Rehwald, Inc.   129
24    Exhibit 11  #4 Interview Memorandum of John
25         Banker, 11/13/02          220
```

3

```
 1    Exhibit 12  Audit File, Client File
 2         No. 60020382            227
 3    Exhibit 13  Q2 FY 2001 Accounting Allegations   227
 4    Exhibit 14  Oracle Corporation Variation
 5         Analysis, Unearned Revenue as of
 6         November 30, 2000         249
 7    Exhibit 15  Oracle Corporation Variation
 8         Analysis, Accounts Receivable as of
 9         November 30, 2000         252
10    Exhibit 16  One-page document Bates
11         stamped NDCA-ORCL 603894     261
12    Exhibit 17  Oracle check to Household Finance
13         dated 5/23/02          269
14    Exhibit 18  E-mail from greg.myers, sent
15         31 Oct 2002 to Michael Quinn    269
16    Exhibit 19  Amendment Three to the Software
17         License and Services Agreement
18         Between Oracle Corporation and
19         the Hewlett-Packard Company    316
20    Exhibit 20  Purchase Order No. 47B08440 with
21         attachments             316
22
23
24
25
```

4

```
 1          BE IT REMEMBERED that on Thursday, July 12,
 2    2007, commencing at the hour of 9:29 a.m., thereof, at
 3    the LAW OFFICES OF LERACH, COUGHLIN, STOIA, GELLAR,
 4    RUDMAN & ROBBINS, LLP, 100 Pine Street, Suite 3200,
 5    San Francisco, California, before me, DIANA NOBRIGA, a
 6    Certified Shorthand Reporter in and for the State of
 7    California, personally appeared
 8              JOHN DUROSS O'BRYAN
 9    as a witness by the plaintiffs herein, who, being by me
10    first duly sworn, was thereupon examined and testified
11    as hereinafter set forth.
12            ---o0o---
13    Appearing as counsel on behalf of the Plaintiffs:
14         ELI GREENSTEIN, ESQUIRE
           SHAWN WILLIAMS, ESQUIRE
15         KEITH MAUTNER, CPA, CMA
           LERACH, COUGHLIN, STOIA, GELLAR,
16         RUDMAN & ROBBINS
           100 Pine Street, Suite 2600
17         San Francisco, CA 94111
           Egreenstein@lerachlaw.com
18
19    Appearing as counsel on behalf of Defendants:
20         BRIAN GLENNON, ESQUIRE
           LATHAM & WATKINS
21         633 West Fifth Street, Suite 400
           Los Angeles, CA 90071
22         brian.glennon@lw.com
23    Also Present:  Gerry Fujimoto, Deloitte; Dorian Daley,
24    Oracle; James Terrell, Videographer
25
```

5

1    VIDEOGRAPHER:  This begins the videotaped
2  deposition of J. Duross O'Bryan, tape one, Volume I, in
3  the matter In Re Oracle Corporation Securities
4  Litigation, as filed in the United States District Court
5  for the Northern District of Northern California,
6  San Francisco Division, Case No. C-01-0988-MJJ.  Today's
7  date is July 12th, 2007.  The time on the video monitor
8  is 9:29.
9    The video operator is James Terrell,
10  representing LiveNote World Service, located at 221 Main
11  Street, Suite 1250, San Francisco, California 94105.
12  The phone number is 415 321-2300.
13    The court reporter is Diana Nobriga, with
14  Sheila Chase and Associates, reporting on behalf of
15  LiveNote World Service.
16    Today's deposition is being taken on behalf of
17  plaintiffs and is taking place at 100 Pine Street in
18  San Francisco, California.  If the parties present would
19  please introduce themselves and state whom they
20  represent.
21    MR. GREENSTEIN:  Good morning, Eli Greenstein
22  Lerach, Coughlin, Stoia, Geller, Rudman and Robbins,
23  representing plaintiffs.
24    MR. MAUTNER:  Keith Mautner Lerach, not
25  representing anybody, because I'm an accountant.

6

1    MR. WILLIAMS:  Shawn Williams, Lerach,
2  Coughlin on behalf of the plaintiffs.
3    THE WITNESS:  I'm J. Duross O'Bryan, deponent.
4    MR. GLENNON:  Brian Glennon of Latham and
5  Watkins on behalf of the witness and the defendants.
6    MR. FUJIMOTO:  Gerry Fujimoto, Deloitte,
7  consultants for defense counsel.
8    MS. DALEY:  Dorian Daley for Oracle
9  Corporation.
10    VIDEOGRAPHER:  Thank you.  Can we swear the
11  witness and begin.
12    JOHN DUROSS O'BRYAN
13  having been duly sworn, testified as follows:
14    EXAMINATION BY MR. GREENSTEIN
15    MR. GREENSTEIN:  Q.  Good morning,
16  Mr. O'Bryan.
17    A.  Good morning.
18    Q.  Thank you for being here.  Can you please
19  state your full name and current addresses for the
20  record.
21    A.  John Duross O'Bryan, Jr.  J-o-h-n,
22  D-u-r-o-s-s, O'B-r-y-a-n, Jr.  Address, you want
23  business address?
24    Q.  Current home address, please?
25    A.  6320 Cavalleri Road, C-a-v-a-l-l-e-r-i,

7

1  Malibu, California 90265.
2    Q.  And your current business address, please?
3    A.  515 South Flower Street, Suite 3050, Los
4  Angeles, California.
5    Q.  Thank you.  And who retained you in this case?
6    A.  Oracle Corporation.
7    Q.  Okay.  So you're here as a testifying expert
8  on behalf of individual defendants Larry Ellison, Edward
9  Sanderson, Jeff Henley and Oracle Corporation; is that
10  correct?
11    A.  I believe so, yes.
12    Q.  When were you first retained by Oracle?
13    A.  I have a draft engagement letter somewhere in
14  my file.  As I recall, that retention was the end of
15  2006, beginning of 2007.
16    Q.  And you have a draft engagement letter?
17    A.  I do.
18    Q.  Was that the final engagement letter?
19    A.  As I recall, yes.
20    Q.  Do you know when the initial complaint was
21  filed in this case?
22    A.  I don't recall that date.
23    Q.  Do you know approximately the year it was
24  filed?
25    A.  No.

8

1    Q.  Have you looked at the complaint in this case?
2    A.  Second amended complaint.
3    Q.  Second amended?
4    A.  Yes.
5    Q.  Proposed revised second amended.
6    A.  It is in my document.  Second amended I don't
7  recall what it says.
8    Q.  You've reviewed one complaint in this action?
9    A.  I believe so, yes.
10    Q.  Do you know the date of the complaint?
11    A.  I don't recall the date.
12    Q.  Okay.  So prior to your retention in late
13  2006/2007, did you ever talk to anybody about this case?
14    A.  No.
15    Q.  And after you were retained in late 2006,
16  early 2007, did you talk to anybody besides counsel for
17  the defendants about this case?
18    MR. GLENNON:  I'm just going to insert an
19  objection to the extent it calls for communications that
20  are protected by the stip.
21    MR. GREENSTEIN:  Q.  Right.
22    A.  I have had communications with counsel and
23  consultants to counsel on this matter, would be the two
24  groups that I've spoken with.
25    Q.  When you refer to counsel, do you mean Latham

9

1 and Watkins?
2     A.  Yes.
3     Q.  And consultants for counsel, do you mean --
4 who do you mean?
5     A.  Deloitte and Touche.
6     Q.  Is that the only consultant that you've spoken
7 with after you've been retained?
8     A.  Yes, I believe that's true.
9     Q.  Okay.  So the only people besides Oracle's
10 lawyers that you've talked to after you were retained
11 were consultants for Deloitte and Touche; is that
12 correct?
13     A.  Other than counsel for Oracle, right, the
14 individual defendants, that's correct.
15     Q.  Did you talk to anybody, any employees of
16 Oracle after you were retained?
17     A.  No, I did not.
18     Q.  Have you ever talked to Greg Myers after you
19 were retained?
20     A.  I have not.
21     MR. GREENSTEIN:  I want to mark this as
22 Exhibit 1, which is the expert report, opening expert
23 report filed on, or exchanged on May 25th, 2007.
24 Actually, No. 2 will be Mr. O'Bryan's rebuttal report
25 filed on June 22nd, 2007.

10

1     (Exhibit 1 marked for
2      identification.)
3     (Exhibit 2 marked for
4      identification.)
5     MR. GREENSTEIN:  Q.  Mr. O'Bryan, what's
6 placed before you is what has been marked as Exhibit 1
7 and 2.  Exhibit 1, as you can see, is your opening
8 report; is that correct?
9     A.  It looks to be, yes.
10     Q.  Why don't you thumb through it and make sure
11 that it is all there.
12     A.  You certainly don't want me to go page by
13 page, do you?
14     Q.  No.  You see all the exhibits are attach
15 thereto?
16     A.  Yes.  Appears to be a copy of my original
17 report dated May 25th, 2007.
18     Q.  Did you draft Exhibit 1?
19     A.  Yes, I did.
20     Q.  Did anyone help you draft Exhibit 1?
21     A.  Yes.
22     Q.  And who helped you draft it?
23     A.  My engagement team.
24     Q.  And how many individuals are on your team?
25     A.  There are three other individuals on this

11

1 engagement with me.
2     Q.  What are their names?
3     A.  Ben Sheppard, S-h-e-p-p-a-r-d, a CPA in our
4 office in Los Angeles.
5     Q.  That's Alix Partners?
6     A.  A-l-i-x, P-a-r-t-n-e-r-s.  Next individual is
7 Chris Simons, S-i-m-o-n-s, CPA in our Los Angeles
8 office.  And lastly Shannon Zavoda, Z-v-o-d-a --
9 Z-a-v-o-d-a, excuse me, who is also a CPA in our Los
10 Angeles office.
11     Q.  You currently work for Alix Partners in Los
12 Angeles; correct?
13     A.  I do, yes.
14     Q.  Besides those three individuals, did you work
15 with anyone outside your company on drafting the report,
16 besides Oracle's lawyers?
17     A.  No.
18     Q.  Did you talk to anybody outside your company
19 besides Oracle's lawyers and Deloitte and Touche about
20 your report?
21     A.  No.
22     Q.  When is the last time you looked at your
23 report?
24     A.  This morning.
25     Q.  Before that, when was the last time?

12

1     A.  Last night.
2     Q.  When was the first draft of your report
3 completed?
4     A.  The Exhibit 1?
5     Q.  Yes.
6     A.  The first draft was probably 10th to the 15th
7 of May.
8     Q.  So approximately ten days before it was filed?
9     A.  Ten to 15 days before.
10     Q.  And it took you 138 hours to draft the report;
11 correct?
12     A.  I don't recall the exact time.
13     Q.  Okay.  If you turn to Exhibit -- the last page
14 of Exhibit 1.  Do you see that?  I think that states
15 that as of April 30th, 2007 you had billed 138 hours;
16 right?
17     A.  That was through April 30th, so, between the
18 end of April and the beginning of May there was a
19 significant amount of time spent by me on this report.
20 So my guess is it is significantly higher than that.
21     Q.  Do you have a total amount that you've spent
22 drafting Exhibit 1?
23     A.  No.  I don't know that exact amount.  But it
24 is well in excess of 200 hours.
25     Q.  Could you provide that information?

13

```
1         A.  I can provide bills if you'd like.
2              MR. GREENSTEIN:  Well, we just want to know
3    the total number of hours and the amount billed as of
4    May 25th, 2007 on the opening report.
5              Is that okay with you?
6              MR. GLENNON:  We can provide that.  We, of
7    course, will want the same thing from plaintiff's
8    accounting expert.
9              MR. GREENSTEIN:  Sure.
10        Q.  And those three individuals you mentioned that
11   helped you working -- helped you draft the opening
12   report, did they help you draft the rebuttal report?
13        A.  They did, yes.
14        Q.  How many hours approximately did you spend
15   drafting the rebuttal report?
16        A.  The rebuttal report, this is an educated
17   guesstimate, if you will, it is in excess probably of 60
18   to 80 hours.  Me personally.
19        Q.  Okay.  And would you also be able to confirm
20   the total number of hours billed by you and/or your
21   staff on the report?
22        A.  Certainly.  Yeah, there is bills by day, as I
23   recall, or hours by day.
24        Q.  So is it fair to say you spent more hours on
25   the opening report than the rebuttal?
```

14

```
1         A.  Yes.
2         Q.  Significantly more?
3         A.  No.  The entire team probably spent more time
4    on the original report, because it is just that, an
5    original report.  But as far as the entire team on the
6    rebuttal report, I don't know those numbers.
7         Q.  As you sit here today is there anything you
8    want to change in your opening report?
9         A.  No.  There is a number of references we make
10   into footnotes that we've cleaned up.  We may say
11   something like id that follows the prior footnote, that
12   really follows the prior page.  And there is footnote
13   cleanup items that I'm happy to go through with you if
14   you'd like.
15        Q.  Are those all clerical -- in other words, when
16   you say an id, it shouldn't refer to the prior
17   reference, it should refer to the prior page?
18        A.  Correct.
19        Q.  We just id at footnote, prior footnote?
20        A.  Exactly.
21        Q.  Okay.
22        A.  And there were some Bates numbers that were
23   wrong in the cites, which we've fixed.  But there is
24   nothing in the report that I've changed.
25        Q.  Substantively, you mean?
```

15

```
1         A.  No.  I think I saw two "thats" together.  So I
2    struck one of the "thats."  There is nothing substantive
3    in the report.
4         Q.  When you say Bates numbers changed, can you
5    point out which Bates numbers changed.
6         A.  There is a number of them; for example, on
7    page 13 of my report, under footnote 36, you will see
8    the reference to NDCA-ORCL 005006.
9         Q.  Right.
10        A.  That should be 050060.
11        Q.  050060?
12        A.  Correct.  Down below you will see an Oracle
13   document, '01 23157.  That should be 05036 -- excuse me.
14   050356 through 60.  Also on that page --
15        Q.  I'm sorry, can you repeat that last one?
16        A.  050356 through 60.  Also on that page at the
17   very -- second to the last line says NDCA-ORCL 012799,
18   do you see that one?  That should be 0926 -- excuse me.
19   096264 through 68.
20        Q.  So just to be clear, we're looking at footnote
21   37 on page 13; correct?
22        A.  Correct.
23        Q.  Looking at the last "see also" document?
24        A.  Yes.
25        Q.  And there are two documents?
```

16

```
1         A.  There is a range there.
2         Q.  There is a range and then a single sheet;
3    right?
4         A.  Yes.
5         Q.  Which one are you changing?
6         A.  The top line, 0127994.
7         Q.  That document is now what?
8         A.  That range changes for two, 096264 - 68.
9         Q.  Let me ask about these changes.  Why were
10   those changes made to different documents?
11        A.  When we went back and checked those documents,
12   we found there to be an error in the cite references.
13        Q.  Are they the same documents though?
14        A.  I believe so, yes.
15        Q.  The same type of document?
16        A.  It is not a different document that's being
17   referenced.  And that's it.
18        Q.  Okay.
19        A.  We just had a bad Bates range.
20        Q.  So it is still an account analysis report with
21   payables detail?
22        A.  That's correct.
23        Q.  Okay.  And any other changes in Bates numbers?
24        A.  That's it.
25        Q.  That's it?  But you don't want to change
```

17

1  anything substantively in the report today?
2      A.  No, I do not.
3      Q.  Have you ever changed, substantively changed
4  your expert report the day of a deposition?
5      A.  Have I ever changed it?
6      Q.  Yes, in the deposition?
7      A.  No.
8      Q.  You never have?
9      A.  No.
10      Q.  I just want to talk a little bit about your
11  work history.  Is it fair to say you joined Price --
12  Coopers and Lybrand in 1985?
13      A.  That's correct.
14      Q.  Then, when did you -- and that became PWC?
15      A.  Correct.  On July 1st, 1998.
16      Q.  And from 1995 through 1999, you were the
17  partner in charge of the New York Metro region FAS
18  practice?
19      A.  No.  I was the partner in charge of the FAS
20  practice for Coopers and Lybrand for the western region.
21      Q.  And what does FAS stand for?
22      A.  Financial advisory services.
23      Q.  And what does that mean to be partner in
24  charge?
25      A.  I was the senior partner of that practice for

18

1  the entire western region, meaning I had not only client
2  responsibilities, but also administrative
3  responsibilities in administering the practice.
4      Q.  And financial advisory you said?
5      A.  Correct.
6      Q.  Does that have anything to do with auditing,
7  or is that more consulting side?
8      A.  Both.  There were -- during my tenure as the
9  partner in charge, I continued to do audits of
10  companies, all the way up to 2000, 2001.  Also in my
11  client responsibilities, I continued to work on the
12  auditing side as well as advising clients in auditing
13  and/or accounting issues.
14      Q.  So you actually conducted audits of clients
15  during that time?
16      A.  I did, yes.
17      Q.  Did you sign any audit opinions during that
18  time?
19      A.  I did, yes, several.
20      Q.  More than five?
21      A.  Yes.
22      Q.  Okay.  During that time did you ever work for
23  Oracle?
24      A.  I did not, no.
25      Q.  Have you ever had an engagement with Oracle

19

1  prior to this retention?
2      A.  I have not.
3      Q.  Ever worked for any of the individual
4  defendants prior to being retained?
5      A.  I have not.
6      Q.  And so when did you -- when was your next
7  promotion after you were, let's say, 2000?
8      A.  I don't know if you would call it promotion,
9  but I was asked to go run the FAS practice as partner in
10  charge for the New York Metro practice.  I might
11  consider that a demotion, but.  Anyway, July 1st, 1998 I
12  left California and went to New York and ran that
13  practice for two-and-a-half years.
14      Q.  What is the time frame of that?
15      A.  1998 through about mid 2000, July 1st, 1998,
16  through about mid 2000 I was the partner in charge of
17  the financial advisory service practices for New York.
18      Q.  Okay.  And what was your next position after
19  that?
20      A.  Then was a promotion, I came back to
21  California and was the financial advisory services
22  partner in charge for the western region again from 2000
23  until my departure from PWC, which was January 31st,
24  2003.
25      Q.  So you left PWC January 31st, 2003?

20

1      A.  Correct.
2      Q.  And you joined Alix Partners at that time?
3      A.  On February 1st, 2003.
4      Q.  Okay.  And you were partner in charge of the
5  FAS practice for the LA office during that time; right?
6      A.  That time being July 1st?
7      Q.  2000 through 2003.
8      A.  That's correct.  I came back mid -- beginning
9  to mid of 2000 and left in January of 2003.  And I was
10  the FAS partner in charge as well as the partner in
11  charge of the dispute analysis and investigation
12  practice for the western region.
13      Q.  So what does dispute analysis investigations
14  unit do or department?
15      A.  It is a subset of the financial advisory
16  services practice.  And it deals principally with
17  forensic accounting issues, any other types of disputes
18  or potential disputes involving either litigants or
19  potential litigants.  It can involve expert testimony.
20  It can involve fraud investigation.  It can involve
21  internal corporate investigations.  A number of
22  different things that they have basically those three
23  items in the title, dispute, analysis, and/or
24  investigation.
25      Q.  And when you said fraud investigations, are

21

1   you hired by a company that's being investigated for
2   fraud, or are you hired by some sort of prosecuting
3   body?
4       A.   Most of my retention has been by companies,
5   whether it be the audit committee of the company or the
6   board of the company or the company itself to
7   investigate an alleged fraud.  And that can be simply an
8   internal investigation, or it can also be investigation
9   that is being reviewed by the enforcement division of
10  the SEC.
11      Q.   Okay.  During that time did you ever have any
12  engagements involving Oracle or the individual
13  defendants.
14      A.   No.  As I said, I have not worked for Oracle
15  in the past.
16      Q.   Did you ever work on any engagement involving
17  Ernst and Young?
18      A.   Ernst and Young, yes.
19      Q.   Approximately how many?
20      A.   I have worked on behalf of Ernst and Young on
21  several occasions.
22      Q.   More than five?
23      A.   Yes.
24      Q.   More than ten?
25      A.   Probably slightly more than ten.

22

1       Q.   And are these cases in which you are hired to
2   do an investigation or testify on their behalf or both?
3       A.   Typically testify as to whether or not they
4   breached the standard of care relating to general
5   accepted auditing standards.
6       Q.   Okay.  And have you ever been retained by
7   Arthur Andersen in that capacity?
8       A.   I don't believe so.
9       Q.   Have you ever worked on any engagement with
10  Arthur Andersen?
11      A.   I don't believe so.
12      Q.   Since you left PriceWaterhouse, have you done
13  any work for them?
14      A.   For PriceWaterhouseCoopers?
15      Q.   Yes.
16      A.   No.
17      Q.   You said you left PriceWaterhouse February of
18  2003?
19      A.   January of 2003.
20      Q.   January of 2003; okay.  You're aware there is
21  an issue in this case involving an unapplied cash
22  cleanup that began in October 2002; correct?
23      A.   I am, yes.
24      Q.   And are you aware that PWC was involved in
25  part of that project?

23

1       A.   I have seen their name throughout documents.
2   I don't know exactly what their involvement was.
3       Q.   Do you know when they got involved in that
4   project?
5       A.   I don't.
6       Q.   So it is only what you've seen in documents?
7       A.   Correct.
8       Q.   When you were at PWC, did you talk to anybody
9   that worked on the unapplied cash project?
10      A.   No.  I never heard of the unapplied cash
11  project until I was engaged on this matter.
12      Q.   Okay.  And you haven't talked to anybody since
13  you were retained, anybody from PCW that worked on any
14  part of the unapplied cash project?
15      A.   No.  As I said the only individuals I spoke to
16  in this engagement were the ones we talked about
17  earlier.
18      Q.   Okay.  If you could turn to Exhibit B.  It is
19  Appendix B or Exhibit B to Exhibit 1, your opening
20  report.  It is a list of prior cases in which you've
21  testified.  Appendix B.
22      A.   I'm there.
23      Q.   Okay.  It says, "Testimony at Deposition,
24  Trial and/or Arbitration from May 1st, 2003"; correct?
25      A.   That is correct.

24

1       Q.   And it lists 27 cases; correct?
2       A.   That's correct.
3       Q.   Of these cases did any of them involve
4   securities fraud allegations pursuant to the federal
5   securities laws?
6           MR. GLENNON:  I'd object only to the extent it
7   calls for a legal conclusion.
8           THE WITNESS:  I believe number 19, the FCC v.
9   Weitzen, et al. was under the federal securities laws.
10          MR. GREENSTEIN:  Q.  Do you know, was that a
11  10b-5 case.
12      A.   That's more of a legal issue.  I don't recall.
13      Q.   Do you know what rule 10b-5 is?
14      A.   Yes, I do.
15      Q.   Did that involve rule 10b-5?
16      A.   I don't remember.
17      Q.   Do you remember just the general nature of
18  that case?
19      A.   Well, the CEO, CFO and CAO of Gateway Computer
20  were alleged to have committed fraud and/or negligence
21  in their accounting for certain transactions at Gateway.
22      Q.   Gateway Computer company?
23      A.   Gateway Computer company, yes.
24      Q.   And you testified on behalf of Gateway?
25      A.   I testified on behalf of the three individual

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

25

1  defendants.
2  Q.  One of which was Weitzen?
3  A.  Jeffrey Weitzen.
4  Q.  And he was the CEO?
5  A.  He was the CEO, yes.
6  Q.  And you submitted a report in that case?
7  A.  I did, yes.
8  Q.  And did you find that they -- strike that.
9  What was the conclusion of your report in that case,
10  generally?
11  MR. GLENNON:  I'd object only to the extent it
12  calls for confidential information.  But otherwise you
13  can answer.
14  THE WITNESS:  With respect to Mr. Weitzen, he
15  was removed from the case after we filed our report.
16  And our report concluded that Mr. Weitzen, Mr. Todd, and
17  I can't think of the third individual's name, at Gateway
18  had acted properly with respect to their accounting for
19  certain transactions.
20  MR. GREENSTEIN:  Q.  If you look at that list,
21  are there any other cases that you can see that were
22  securities fraud related?
23  A.  I don't see any others that are securities
24  fraud related.
25  Q.  Have you ever provided expert testimony,

26

1  finding that an accounting transaction or transactions
2  was improper?
3  A.  Yes.
4  Q.  Are those cases listed here?
5  A.  Karpetian v. Gazbiean, the first one, was
6  involving an individual suing a CPA relating to some
7  accounting issues, as I recall.
8  Q.  Okay.  Was that -- have you ever found in a
9  securities fraud case that transactions were improper,
10  any transactions were improper?
11  MR. GLENNON:  Object to the extent it calls
12  for a legal conclusion.
13  THE WITNESS:  I don't recall having done that,
14  no.
15  MR. GREENSTEIN:  Q.  Have you ever provided
16  expert testimony regarding the materiality of financial
17  misstatements?
18  A.  Yes.
19  Q.  And what cases did you do that in?
20  A.  Number 1 would have involved materiality.
21  Number 5 would involve materiality.
22  Q.  Clark versus Ernst and Young?
23  A.  Yes.
24  Q.  And you were retained by Ernst and Young?
25  A.  I was, yes.  Number 9 would have involved

27

1  materiality.
2  Q.  Let me back up.  So number 5, Clark versus
3  Ernst and Young, you were retained on behalf of Ernst
4  and Young, the defendant?
5  A.  That's correct.
6  Q.  And you opined on the materiality of financial
7  misstatements; correct?
8  A.  Any time there is an alleged misstatement,
9  materiality is a factor, so it is by nature a part of
10  the assignment.
11  Q.  So that it is -- that's always the case, if it
12  is a financial misstatement, necessarily it has a
13  materiality component?
14  A.  Well, it has to, yeah, because APB 20, which
15  defines accounting errors, only requires they be treated
16  as a prior period adjustment under GAAP if they are
17  material.
18  Q.  So Clark versus Ernst and Young, you were
19  retained on behalf of Ernst and Young, and did you find
20  that they materially misstated their financials?
21  A.  No.  I found that Ernst and Young's accounting
22  practices and the accounting by which they opined on the
23  assertions of management were appropriate.
24  Q.  And number 9, Thayer v. Ernst and Young, I
25  think you mentioned that involved financial

28

1  misstatements; correct?
2  A.  It did, yes.
3  Q.  And you were retained on behalf of the
4  defendant Ernst and Young; correct?
5  A.  That is correct.
6  Q.  And what was the general opinion that you
7  submitted in that case?
8  A.  Whether or not Ernst and Young had properly
9  complied with GAAS in opining on the GAAP financial
10  statements of Thayer.
11  Q.  Did you find they properly complied with GAAS?
12  A.  I did, yes.
13  Q.  Did you also opine on whether the -- did you
14  just opine on whether Ernst and Young complied with
15  GAAS, or did you also opine whether certain transactions
16  complied with GAAP?
17  A.  Both.
18  Q.  Did you find the transactions that were at
19  issue complied with GAAP?
20  A.  No, they did not comply with GAAP, because
21  they were a fraud.
22  Q.  And what was -- just explain generally what
23  those transactions -- well, strike that.
24  So you found that there were certain financial
25  transactions that violated GAAP but Ernst and Young did

29

1  not violate GAAS in connection with those transactions;
2  is that correct?
3      A.  That's correct.
4      Q.  Do you remember the general nature of the
5  fraud in that case?
6      A.  It was a collusive fraud by management,
7  whereby they were changing bank statements and changing
8  sales invoices.
9      Q.  And you found that Ernst and Young complied
10  with GAAS?
11      A.  I found that Ernst and Young in performing
12  their auditing had complied with GAAS, yes.
13      Q.  Now, let's go down a line.  Any other
14  securities fraud related cases -- I see number 11
15  involves Ernst and Young also?
16      A.  That is correct.
17      Q.  Was that a securities fraud case?
18      A.  You know, I don't remember.  I'm sorry, was
19  that a securities fraud case, was your question?
20      Q.  Correct.
21      A.  I don't know if it was a securities case.  It
22  was a case that involved fraud.
23      Q.  Was it fraud allegations against Ernst and
24  Young?
25      A.  No.  It was allegations that Ernst and Young

30

1  had not performed a GAAS audit.
2      Q.  And you represented Ernst and Young?
3      A.  I did, yes.
4      Q.  What was your conclusion?
5      A.  That they had adhered to GAAS.
6      Q.  Okay.  So just going down the list, any others
7  besides number 19?
8      A.  Sorry, you're looking for --
9      Q.  Securities fraud related accounting fraud
10  cases.
11      A.  Oh.  Well, we talked about 19, that certainly
12  had those issues.
13      Q.  All right.
14      A.  Clear Channel versus City of Mountain View.
15      Q.  Number 20?
16      A.  Yes.  Involved a lease between Clear Channel
17  and the City of Mountain View where there was, I
18  believe, fraud involved.
19      Q.  And you were retained on behalf of the City of
20  Mountain View?
21      A.  That's correct.
22      Q.  What was your conclusion in that case
23  generally?
24      A.  That, in fact, Clear Channel or their
25  subsidiaries had, in fact, misreported certain financial

31

1  information to the city.
2      Q.  But Clear Channel was suing the city; correct?
3      A.  It was.  But the city counter-sued Clear
4  Channel.
5      Q.  Got it.  What was the outcome of that case?
6  Do you remember generally?
7      A.  The City of Mountain View was successful in
8  their case.
9      Q.  Okay.  Have you ever testified regarding
10  revenue recognition issues related to SOP 97-2?
11      A.  Yes.
12      Q.  How many cases, approximately?
13      A.  Dozens of times.
14      Q.  Any on here that jump out at you?
15      A.  The SEC v. Weitzen case involved SOP 97-2, as
16  I recall.
17      Q.  Okay.
18      A.  Thayer v. Ernst and Young involved 97-2.
19      Q.  Okay.
20      A.  Clark v. Ernst and Young involved 97-2.
21  Number 11, Otter Creek versus Ernst and Young involved
22  97-2.  Those would be the ones that come to mind on this
23  list.
24      Q.  Is it fair to say in all of those cases your
25  conclusion was that 97-2 was not violated?

32

1      A.  No, because to the extent there was a fraud,
2  and the earnings process was not complete based on 97-2,
3  the financial statements would have been misstated.
4      Q.  So, of these cases that involved 97-2, did you
5  ever issue an opinion or testify at trial that a
6  particular transaction violated SOP 97-2?
7      A.  On the number 11, I believe there was
8  testimony that because of fraud that certain
9  transactions, certain revenue was recognized
10  inappropriately and it would have been recognized under
11  97-2.  I don't remember if I specifically said 97-2 is
12  violated.
13      Q.  Was it software revenue recognition?
14      A.  It was, yes.  Software and hardware.
15      Q.  In other words, there were software
16  transactions -- you found that there were software
17  revenue transactions that were improperly booked,
18  regardless of whether they were under 97-2 or whatever
19  applicable rules; correct?
20      A.  That's correct.
21      Q.  Okay.  And that was at trial you testified
22  about that?  Or did you issue a report on that?
23      A.  Both.
24      Q.  Both; okay.  Do you have that report from that
25  case?

33

1    A.  Do I?
2    Q.  Yeah.
3    A.  I don't know if I still have that report or
4 not.
5    Q.  Okay.  Do you have a deposition transcript in
6 that case?
7    A.  I wouldn't have that.  I don't save those.
8    Q.  You don't save those?
9    A.  No.
10    Q.  Any?
11    A.  I don't save deposition transcripts.
12    Q.  Okay.  Do you save your reports?
13    A.  Typically I don't.  Whether or not this one
14 has been saved, I have no idea.
15    Q.  Do you save trial transcripts of testimony at
16 trial?
17    A.  I don't even get that.
18    Q.  You don't get that; okay.
19      And so were any of these other four cases that
20 you mentioned involving SOP 97-2, did you issue any type
21 of opinion or testify at trial that any transactions
22 were improper under 97-2?
23    A.  I believe Clark V. Ernst and Young had those
24 issues.  I believe number 9, Thayer V. Ernst and Young
25 had those issues.  Number 11 had those issues.

34

1    Q.  Let me stop you there.  Are you saying in
2 those cases you found -- you either testified or
3 proffered expert -- an expert report finding that a
4 transaction was improper under SOP 97-2?
5    A.  Maybe I need to explain this a little bit.  SOP
6 97-2 is used quite a bit by software and high-tech
7 companies, but it really, if you look at SAB 101, issued
8 by the SEC, the four criteria within SOP 97-2 are the
9 exact criteria, that is evidence of a transaction, fixed
10 or determinable price, that the delivery has taken place
11 and the collectibility is assured.  So that bit of GAAP
12 is really pervasive throughout most revenue recognition,
13 whether it be software or whether it be construction.
14    Q.  Right, okay.  So what I'm trying to get at, in
15 any of those cases did you find a transaction was
16 improper under those rules, a revenue transaction was
17 improper?
18    A.  Yes.  And, that's what I was trying to answer,
19 I'm sorry, on the last question.  As I said, number 5 is
20 that way.
21    Q.  Okay.
22    A.  Do you want me to go down the list again?
23    Q.  You said 5, 9, 11?
24    A.  5, 9, 11, 19.  Those are the ones I can think
25 of as I sit here right now.

35

1    Q.  Do you have the reports in those cases?
2    A.  No.  I don't know if the actual -- some of
3 these I don't know if a report was issued.  And if it
4 was issued, I don't know if I would have it or not.  I
5 would have to check.
6    Q.  Can you do that?  Just make a note, if you're
7 willing to produce those, we would like them.
8    A.  So, so far I'm doing bills and reports.
9    Q.  Correct.
10    A.  So the list is complete.
11    Q.  We don't need the bills in the other cases.
12    A.  Understand.
13    Q.  So 5, 9, 11, 19, 20.
14    A.  Okay.
15    Q.  Has your testimony in any case in the past
16 five years ever been excluded by the court?
17    A.  No.
18    Q.  Never?
19    A.  No.
20      MR. GREENSTEIN:  Okay.  I'd like to mark this
21 as No. 3.
22      (Exhibit 3 marked for
23      identification.)
24      MR. GREENSTEIN:  Q.  For the record, this is
25 an expert witness report dated September 20th, 2004 from

36

1 J. Duross O'Bryan in the case GMG Stone, Inc.  Do you
2 recognize this document, Mr. O'Bryan?
3    A.  I do.
4    Q.  And was this a report that you produced in
5 connection with your report in this case?
6    A.  I'm sorry, what?
7    Q.  Do you recognize this document in front of
8 you?
9    A.  I do, yes.
10    Q.  And did you produce this in connection with
11 this case?
12    A.  Did I produce this in connection with this
13 case?
14    Q.  Yeah.
15    A.  I think it is on the list on Appendix B.
16    Q.  Well, I will represent to you that it was produced
17 to us in connection with your opening report.  Did you
18 know that?
19    A.  I did not know that.
20    Q.  You didn't know that?
21    A.  No.
22    Q.  Okay.  If you look at -- what was this case
23 about, generally?  Actually, strike that.  If you turn
24 to Appendix B in the document.
25    A.  I'm there, yes.

37

```
 1    Q.  And this is -- so this is a report dated
 2   September 20th, 2004.  And it says it is a list of
 3   testimony at deposition, trial and arbitration for
 4   period January 1st, 1994 through September 20th, 2004.
 5   Do you see that?
 6    A.  I do, yes.
 7    Q.  And then it's two pages.  And it looks like it
 8   goes all the way back to 1994; correct?
 9    A.  That's correct.  This produced a much greater
10   number because of the dates.
11    Q.  Right.  So this is ten years of testimony or
12   expert testimony at trial or in deposition; correct?
13    A.  I believe that's true, yes.
14    Q.  Okay.  Do you know if this is accurate?
15    A.  I believe it is, yes.
16    Q.  If you turn to page 2.
17    A.  I'm there.
18    Q.  And well, do you remember a case called Parnes
19   V. Harris involving a company called Puris Technologies?
20    A.  I do.
21    Q.  You do?
22    A.  Yes.
23    Q.  Do you remember when that deposition took
24   place?
25    A.  I don't.
```

38

```
 1    Q.  Do you remember what that case was about?
 2    A.  As I recall, it was about accounting issues,
 3   and it seemed to me it was about bad debt, bad debt
 4   issues or something like that involved.
 5    Q.  Bad debt reserve?
 6    A.  I don't recall if it was reserve, or there was
 7   warranty issues.  I don't recall the details of that
 8   case.
 9    Q.  And do you remember who you were retained by
10   on that case?
11    A.  As I recall it was Brobeck.
12    Q.  Brobeck is a law firm?
13    A.  Correct.
14    Q.  Were you retained by Brobeck to testify on
15   behalf of a party in that case?
16    A.  Yes.
17    Q.  Who was the party?
18    A.  I don't recall who the party was.  It may have
19   been Puris, the company.
20    Q.  Was it KPMG Marwick, perhaps?
21    A.  No.  No, I wasn't -- I was not retained on
22   that for KPMG.  I can't recall.  It was for the company.
23   KPMG was involved, I believe.
24    Q.  For Puris you were retained?
25    A.  I believe that's true, yes.
```

39

```
 1    Q.  Do you remember the approximate date of that
 2   deposition?
 3    A.  I don't.
 4    Q.  You were deposed in that; correct?
 5    A.  As I recall, I was, yes.
 6    Q.  And you submitted a report in that case;
 7   right?
 8    A.  I don't recall whether or not a report was
 9   submitted.
10    Q.  But if it was -- if it was, say, in 2002, it
11   would be on this list here, page 2, Appendix B of
12   Exhibit 3 that you're looking at; right?
13    A.  It would be an page 1 or 2, yes.
14    Q.  Do you see it on this list?
15    A.  I don't.  But I don't know the timing of it,
16   number one.  And number two, sometimes, obviously, the
17   names are different than Puris or the obvious ones.
18    Q.  Do you remember a case called Parnes v.
19   Harris?  I will represent to you that's the case
20   involving Puris.
21    A.  Yeah, I didn't know that was the case name.
22    Q.  Okay.  Okay.  And do you remember ever being
23   involved in a case involving Stroock, Stroock and Lavan,
24   which is a law firm?
25    A.  I do, yes.
```

40

```
 1    Q.  And do you remember who retained you in that
 2   case?
 3    A.  The case I'm thinking of was just in the last
 4   couple of years.  And as I recall, I was retained by the
 5   firm Stroock, Stroock and Lavan.
 6    Q.  You provided expert testimony on behalf of the
 7   law firm Stroock, Stroock and Lavan; correct?
 8    A.  No.  The case settled before I testified, as I
 9   recall.
10    Q.  If you turn to Appendix B of Exhibit 1 now,
11   which is your opening report in this case.
12    A.  Appendix B, I'm there.
13    Q.  You see number 8, Stroock, Stroock and Lavan
14   versus Houston RCW?
15    A.  I see that, yes.
16    Q.  The deposition date was May '04 it looks like;
17   correct?
18    A.  Yes.
19    Q.  Is there a reason that that case is not on
20   Appendix B to Exhibit 3 that we just looked at?
21    A.  Well, this was an American Arbitration
22   Association.  We say deposition.  I don't recall
23   testifying in a case for Stroock, Stroock and Lavan.
24    Q.  Okay.  Let's turn to Exhibit 3 now, Appendix
25   B.  You see it says, "Testimony at Deposition, Trial
```

41

1  and/or Arbitration for Period January 1st, '94 through
2  September 20th, 2004"?
3      A.  I'm sorry, you're on Exhibit 3 now, page --
4      Q.  I know this is confusing.  Appendix B of
5  Exhibit 3.
6      A.  I'm there, yeah.
7      Q.  And you see how it says, "and/or Arbitration"
8  at the top?
9      A.  I do, yes.
10     Q.  Is there a reason that that Stroock case is
11  not listed on there?
12     A.  I don't know.  Unless we realized I didn't
13  testify on that and there was a mistake made in the
14  original report.  Because I don't remember testifying on
15  a case for Stroock.  I know I was named on a case for
16  Stroock.  As I recall it was a Houston case.  But as I
17  recall, that case settled before I testified.
18     Q.  So, were you deposed?
19     A.  I don't recall being deposed.  It says I was
20  in May of '04, but I don't recall that.
21     Q.  Okay.  You said you reviewed the second
22  amended complaint in this case; correct?
23     A.  I believe that's true, yes.
24     Q.  Now, you may not know the distinction, but do
25  you know if it is the second amended complaint or the

42

1  revised proposed second amended complaint?
2      A.  If you let me get to my documents.
3      Q.  Sure, no problem.
4      A.  It says here, "Revised Second Amended
5  Complaint."  I'm referring to tab 2 within my binder.
6      Q.  Tab 2, is that a footnote to your opening
7  report?
8      A.  It is footnote 1 to my opening report.
9      Q.  Okay.  Great.
10     A.  There is an annotated version of this report
11  that has references, read references, that tie to the
12  documents in the three binders I have for the rebuttal,
13  two binders for the original report.  So the sections
14  may not exactly match up with the footnotes because they
15  are just different.
16     Q.  But if I were -- the report I have if I were
17  to look at the footnotes that refer to documents, would
18  those be accurate references?
19     A.  Absolutely.  They may just have a different
20  section within my support binder.
21     Q.  Got it; okay.  So after reading the complaint,
22  what is -- strike that.
23         What is your understanding of which quarters'
24  financial reports are alleged to be false and misleading
25  in this case?

43

1      A.  The second quarter of fiscal '01.
2      Q.  You're not here to testify or you don't intend
3  to testify on the falsity of Oracle's third quarter 2001
4  results; right?
5      A.  I am not testifying on the accuracy of the
6  third quarter of 2001.  I am testifying, however, that I
7  don't believe that any either alleged or potential
8  misstatements affected the second quarter, and they did
9  not affect the third quarter.
10     Q.  So you are not -- in this case you do not
11  intend to provide any testimony as to the accuracy of
12  Oracle's third quarter financial results; right?
13     A.  Only to the extent that my opinion is that any
14  accounting alleged errors or alleged misclassifications
15  affected the second quarter, and not the third quarter.
16  But I'm not going to opine about what those numbers were
17  in the third quarter or what they should have been.
18     Q.  So is it fair to say that to the extent
19  that -- strike that.
20         Are you saying that to the extent that the
21  second quarter results are inaccurate, you're not
22  opining on whether or not the third quarter was
23  inaccurate by nature of the second quarter being
24  accurate?  Is that fair to say?  Is that what you mean?
25         MR. GLENNON:  I object on vagueness grounds.

44

1          MR. GREENSTEIN:  Q.  I don't understand what
2  you mean in your last statement.
3      A.  Maybe I can simplify it.  All I'm suggesting
4  is that the second quarter alleged misstatements affect
5  the second quarter only, they do not affect any other
6  quarter of Oracle.  So they don't affect the third, they
7  don't affect the fourth.  They affect the second quarter
8  only.  They are isolated to the second quarter.
9      Q.  Okay.  Well, to the extent revenue was
10  improperly recognized in the second quarter and should
11  never have been recognized, wouldn't that have an impact
12  on the third quarter results?
13     A.  No.  It would be a second quarter issue.
14     Q.  Right.  But if a transaction was booked, for
15  example, $20 million improperly in the second quarter,
16  and it should never have been booked in any quarter?
17     A.  That would affect the second quarter only.
18     Q.  Wouldn't that revenue be part of Oracle's
19  financial statements in the third quarter?
20     A.  No.  Because it was booked in the second
21  quarter.
22     Q.  But -- so, your testimony in this case is only
23  on the accuracy or -- the accuracy of the second quarter
24  results; is that correct?
25     A.  Yes.  And just to clarify, only that it

45

1   involves the second quarter. It doesn't affect any
2   other quarter.
3       So, in other words, my opinion is that whether
4   it is $$20 million that affected the second quarter or
5   $40 million, $20 million with the bad debt reserve
6   transfers allegedly done improperly, $20 million for the
7   HP transaction allegedly done improperly, those affect
8   the second quarter. There is no rollover effect into
9   the third quarter because of those issues.
10    Q.  Why is that? Why do you believe that to be
11   the case?
12    A.  Because they were booked in the second
13   quarter. And if they are found to be not second quarter
14   transactions, they come out of the second quarter.
15    Q.  Okay. So in the case of a misstatement of a
16   particular quarter in general, is it always the case
17   that that misstatement can't impact the next quarter's
18   results?
19    A.  No. There could be issuances -- there can be
20   instances where you may move from one quarter to the
21   next.
22    Q.  To the extent something was improperly put --
23   improperly reflected in Oracle's balance sheet in the
24   second quarter and remained -- and that was improper,
25   wouldn't it remain on the balance sheet in the third

46

1   quarter?
2    A.  No. Because the third quarter would be
3   trued-up for actual results.
4    Q.  What if they didn't reverse whatever was
5   improper in the second quarter in the third quarter?
6    A.  Well, you wouldn't reverse. What we're
7   talking about here, I think you're talking about is the
8   reserve itself.
9    Q.  No. I'm talking about in general, whether a
10   misstatement in one particular quarter can impact the
11   next quarter.
12    A.  It can if it should have been moved to that
13   next quarter. But in this case, the issues we're
14   talking about just affect the second quarter, not the
15   third quarter.
16    Q.  If you could turn to page 21 in your opening
17   report, which is Exhibit 1, please.
18    A.  I'm there.
19    Q.  See how it says, "Reviewed various accounting
20   reports and documents"?
21    A.  I'm there.
22    Q.  And the first paragraph is, "Review of Summary
23   Reports."
24    A.  I'm there.
25    Q.  On this paragraph it appears that you say in

47

1   the second sentence, "The first report I reviewed was a
2   transaction register"; correct?
3    A.  Correct.
4    Q.  "Which listed all debit memos generated for
5   that day." Do you see that?
6    A.  I do.
7    Q.  Okay. And then the next sentence says, "I
8   inspected the account analysis report." Do you see
9   that?
10    A.  Two sentences down you mean?
11    Q.  The one after the transaction -- yes, yes.
12    A.  "I inspected the account"; I'm there, yeah.
13    Q.  You looked at the transaction register and the
14   account analysis report; correct?
15    A.  I did look at those two reports, yes.
16    Q.  Okay. And then in the next full paragraph it
17   says, "I also reviewed a sales journal by GL account
18   report." Do you see that?
19    A.  I do, yes.
20    Q.  So, the next section says, "Review of Sample
21   On-Account Transactions." You see that?
22    A.  I do, yes.
23    Q.  In those two paragraphs it appears that you
24   say you reviewed three reports, the transaction
25   register, the account analysis report and sales journal

48

1   by GL account report; is that fair to say?
2    A.  Correct, yes.
3    Q.  Now, are those the only reports you relied on
4   in rendering your opinion in this case?
5    A.  No. I've seen dozens of reports.
6    Q.  Okay. So with respect to these particular
7   reports, why did you cite them in this section?
8    A.  Because they have to do with understanding
9   whether or not there was any financial impact of the
10   debit memos booked on November 17th, 2000.
11    Q.  Okay. And so let's take the first one, the
12   transaction register. Do you see that?
13    A.  Yes.
14    Q.  And it says it listed all debit memos
15   generated for that day. Do you see that?
16    A.  I do.
17    Q.  And how does that tell you what the financial
18   statement impact of the debit memo says?
19    A.  You can see both a debit and credit in the
20   account for the debit memos. So you see both debits and
21   credit, which would mean the same amount, $692 million,
22   which would mean there would be no financial statement
23   impact.
24    Q.  Let me back up a little bit. In proffering
25   your expert report, you have a list, Exhibit C, that

49

1    provides all of the documents that you relied upon in
2    rendering your opinion; is that correct?
3        A.  That's correct.
4        Q.  If you could turn to that Exhibit C for me.
5        A.  I'm there.
6        Q.  Okay.  And see how it has a list of
7    depositions?
8        A.  It does, yes.
9        Q.  I'm going to list some names and ask you if
10   you've relied upon those depositions.  Is that okay with
11   you?
12       A.  Certainly.
13       Q.  Do you know who Terry Elam is?
14       A.  Terry Elam.  I don't recall that name.
15       Q.  Did you read his deposition?
16       A.  I don't recall reading that deposition.
17       Q.  Do you know who Julie Chan --
18       A.  I'm sorry, are you talking about with respect
19   to the original report or either?
20       Q.  Just talking about the original, the opening
21   report.
22       A.  Yes.  Julie Chan, yes, I know that name.
23       Q.  Back to Terry Elam, did you read the
24   deposition in connection with your rebuttal report?
25       A.  I have to look at that.

50

1        Q.  Let me ask you this.  If there is not a
2    deposition listed here, is it fair to say that you
3    didn't review that deposition transcript?
4        A.  No, that's not fair to say.
5        Q.  So there is some depositions you reviewed that
6    are not on this list?
7        A.  Yes.
8        Q.  Well, did you read the deposition of Terry
9    Elam at any time?
10       A.  I can't recall that deposition.
11       Q.  Okay.  Now, back to Appendix C with the
12   opening report.  It doesn't indicate that you relied
13   upon Julie Chan's deposition.  Did you read it before
14   you submitted the report?
15       A.  I did read Julie Chan's deposition.
16       Q.  But you didn't rely on anything in her
17   deposition?
18       A.  I did, actually, where she talked about the
19   transferring from the unapplied -- 25005 unapplied into
20   the 12018.
21       Q.  So you relied on Julie Chan's testimony in
22   your opening report?
23       A.  It may be in the rebuttal report.
24       Q.  What I'm asking, did you -- I'm going to focus
25   on this opening report.

51

1        A.  Okay.
2        Q.  Probably for a couple hours.
3        A.  Okay.
4        Q.  So I'm just asking you what you relied upon in
5    your opening report.
6        A.  Well, it would be -- I'm sorry, yes.
7        Q.  Do you understand that?
8        A.  I do, yes.
9        Q.  So what I'm asking is if you reviewed --
10   strike that.  What I'm asking is if you relied upon
11   anything in Julie Chan's testimony in this opening
12   report.
13       A.  I did.  I was aware of her testimony.  I read
14   her testimony specifically about the transfers from the
15   25005 account into the 12018 account.
16       Q.  So, you rely upon her testimony in this
17   opening report?
18       A.  I believe I do, yes.
19       Q.  So why isn't it listed there?
20       A.  There may also be references in the footnotes
21   within the report itself to different testimony.  I
22   don't recall if that's in here or not.
23       Q.  Well, to the extent that Julie Chan is not
24   specifically cited in the opening report, is there a
25   reason why you wouldn't list it if you relied upon her?

52

1        A.  No.  It may be that I was aware of that
2    information, it was something that I considered, it was
3    consistent with what I had seen from other testimony.
4    And I didn't see it necessary to include that.
5        Q.  So you didn't rely upon any testimony of Julie
6    Chan in this opening report, to the extent it is not
7    cited?
8        A.  Well, I mean, I looked at a number of
9    different things.  And some of this testimony I had
10   heard and/or seen from other sources, and with respect
11   to that transfer in the Arthur Andersen document,
12   specifically.  And then if I saw testimony from Julie
13   Chan that corroborated that, I considered that.
14       Q.  So you considered the testimony of Julie Chan
15   in rendering your opening report, but you didn't rely
16   upon it?
17       A.  I think that's a fair statement.
18       Q.  Okay.  The only reason I'm saying this,
19   because it says documents relied upon and you have depo
20   transcripts.  I'm trying to find out if there are any
21   depo transcripts that you relied upon that aren't in
22   here.
23       A.  I can't think of anything that I excluded.
24       Q.  I'm just going to list some names, and let me
25   know if you've read those.

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

53

1    Ian Hitada?
2        A.  I have reviewed some of Ian Hitada's
3    deposition testimony.
4        Q.  Did you review his deposition before you filed
5    your opening report?
6        A.  I don't recall that he's referenced in my
7    opening report.
8        Q.  Okay.  So is it fair to say you did not rely
9    on -- or you did not read Ian Hitada's testimony prior
10   to issuing your opening report?
11       A.  I think I had read it.  I just don't know that
12   I had relied upon it.
13       Q.  How about, do you know who Michelle Davidson
14   is?
15       A.  I don't know that name.
16       Q.  So you probably never read her depo?
17       A.  I may have.  I just don't recall the name as I
18   sit here.
19       Q.  I'll represent to you she was a 30(b)(6)
20   witness that testified on behalf of Household
21   Corporation.
22       A.  Okay.
23       Q.  Did you read that deposition before you
24   submitted your opening report?
25       A.  I don't recall reading that deposition.

54

1        Q.  Okay.  But you opine in your opening report --
2    you opine on the Household transaction; correct?
3        A.  I do, yes.
4        Q.  But you hadn't read Michelle Davidson's
5    testimony in reaching that conclusion?
6        A.  I don't recall reading her deposition, nor do
7    I think it was required to come to the opinion that I
8    did.
9        Q.  Okay.  But I'm just asking if you read it in
10   forming your opinion on Household.
11       A.  I don't recall reading her opinion -- her
12   deposition, excuse me.
13       Q.  Okay.  Was there a reason you didn't?
14       A.  No.
15       Q.  Okay.  Ryan Roberts?
16       A.  I don't recall the name.
17       Q.  Okay.  Sanjay Kumar?
18       A.  I do recall that name.
19       Q.  Do you know who Sanjay Kumar is?
20       A.  I forget who that individual is.
21       Q.  Well, it is not listed in here.  And I'll
22   represent to you that all these names I'm listing aren't
23   cited specifically in your opening report.  So I just
24   want to make it clear, I'm going to establish whether or
25   not you relied upon them, despite the fact it is not

55

1    cited.  Does that make sense?
2        A.  Yeah.  Yeah.  If it is not cited and it is not
3    on Appendix B, it wasn't something I relied on.
4        Q.  So, did you read the deposition of Ryan
5    Roberts prior to issuing your opening report?
6        A.  I don't recall.
7        Q.  Is that a no, or you just don't remember?
8        A.  I don't recall if I read that or not.
9        Q.  Do you know who Ryan Roberts is?
10       A.  No.
11       Q.  Sanjay Kumar, did you read his deposition
12   before you submitted your opening report?
13       A.  I don't recall reading his before my original
14   report, no.
15       Q.  You don't know who he is?
16       A.  I don't recall exactly his title.
17       Q.  Do you know anything about Sanjay Kumar?
18       A.  Not as I sit here right now.
19       Q.  Do you know who Raul Campos is?
20       A.  I do, yes.
21       Q.  Did you read his deposition before you
22   submitted your opening report?
23       A.  I thought I had reviewed through Mr. Campos'
24   deposition before my opening report, yes.
25       Q.  And -- but you didn't rely upon it, obviously,

56

1    right, because it is not listed in Appendix C?
2        A.  Correct.
3        Q.  How about Tom Rathjens?
4        A.  I know who Tom Rathjens is.
5        Q.  He's not listed in Appendix C to your opening
6    report.  Is it fair to say you didn't rely upon his
7    testimony in issuing your opening report?
8        A.  Mr. Rathjens is with HP, and, as you know, our
9    opening report was light on HP testimony, not knowing
10   what Mr. Rathjens might say about that.  So, there was
11   no reference to Mr. Rathjens.
12       Q.  You didn't read Mr. Rathjens' deposition
13   before opining on the HP transaction in your opening
14   report; correct?
15       A.  The original one; that's correct.
16       Q.  You said it was light on HP.  What do you mean
17   by that?
18       A.  If you refer to my opening report, the HP
19   transaction is discussed on page 41.  And when I say
20   light, it's simply a paragraph.  So that's what I mean
21   by light, when the rebuttal report speaks for almost 20
22   pages on the HP transaction.
23       Q.  And what's the reason why in your opening
24   report the HP transaction was, quote, unquote, light?
25       A.  Because that wasn't something that was pled

57

1  that I saw in the revised second amended complaint.  The
2  only accounting issue that I knew was in the revised
3  second amended complaint was the debit memos.
4      Q.  But you provide an expert opinion on page 41
5  of your opening report in which you say, "I do not
6  believe there is anything improper in Oracle's
7  recognition of revenue from the HP transaction."  Do you
8  see that?
9      A.  I do, yes.
10     Q.  So you proffered an expert opinion on the
11 propriety of that deal in this report; correct?
12     A.  I did, yes.
13     Q.  But you didn't read the deposition of HP's
14 witness before providing this testimony; correct?
15     A.  That's correct.
16     Q.  Okay.  So how did you go about determining
17 which depositions to read in connection with your
18 opening report?
19     A.  Ones that were relevant to my opinions.
20     Q.  Okay.  And how did you determine who was
21 relevant to your opinions?
22     A.  I looked through all the depositions that had
23 been taken and decided which ones were relevant or not
24 to me.
25     Q.  So you didn't think Raul Campos was relevant

58

1  to your opinion?
2      A.  As I said, I reviewed Mr. Campos' original
3  deposition in my original report, I just didn't rely on
4  it.
5      Q.  Okay.  How about Mike DeCesare, did you review
6  his deposition prior to rendering your opinion on
7  Hewlett-Packard?
8      A.  I did, yes.
9      Q.  You did?
10     A.  I did.
11     Q.  Did you rely on it?
12     A.  Prior to the original report?
13     Q.  Right.
14     A.  No.  I read Mr. DeCesare's deposition, as I
15 recall, but did not rely on it.
16     Q.  Okay.  So is it fair to say that in rendering
17 your expert opinion on page 41 and 42 of your opening
18 report on the HP transaction, you hadn't read the
19 depositions of either Tom Rathjens or Mike DeCesare; is
20 that correct?
21     A.  I don't think I had read -- I don't recall
22 about Mr. DeCesare's depo.  I don't recall reading
23 Mr. Rathjens' before that initial opinion.
24     Q.  So you don't -- so is that a no?
25     A.  I don't recall reading either one before my

59

1  initial opinion.
2      Q.  Okay.  Do you know who Mike DeCesare was?
3      A.  I do.
4      Q.  Who is he?
5      A.  An individual, as I recall, with HP, having to
6  do with -- excuse me, with Oracle, having to do with
7  some of the products that HP purchased from Oracle.
8      Q.  And you didn't -- you didn't think that was an
9  important deposition to read prior to issuing an expert
10 opinion on the HP transaction?
11     A.  No.  Because when you look at the HP
12 transaction, this was a transaction that was booked by
13 Oracle in the second quarter of 2001 for $19.9 million,
14 approximately.  It was reviewed by the audit committee
15 of Oracle, it was reviewed by Arthur Andersen, the
16 outside auditors, reviewed by the revenue recognition
17 group of Oracle.  That's where my initial opinion really
18 came from.
19         So what others said with respect to that was
20 really, quite frankly, irrelevant, and only additive to
21 my opinion that that transaction was booked properly,
22 which I still believe it is today.
23     MR. GLENNON:  Eli, we've been going for about
24 an hour and 15 minutes.  Can we take a short break?
25     MR. GREENSTEIN:  Sure.

60

1      VIDEOGRAPHER:  Off record at 10:42.
2      (Recess, 10:42 a.m. - 11:05 a.m.)
3      VIDEOGRAPHER:  On record at 11:05.
4      MR. GREENSTEIN:  Q.  Mr. O'Bryan, if you can
5  turn to page 21 of your opening report, which is
6  Exhibit 1.
7      A.  I'm there.
8      Q.  Okay.  And earlier we were talking about the
9  reviewed summary reports, and in these two paragraphs
10 you list out three reports, transaction register,
11 account analysis report and sales journal by GL account
12 report; is that correct?
13     A.  That is correct.
14     MR. GREENSTEIN:  I'm going to mark for the
15 record Exhibit 4, which is a transaction register.
16     (Exhibit 4 marked for
17      identification.)
18     MR. GREENSTEIN:  Q.  For the record, this is a
19 transaction register previously marked at the deposition
20 of Greg Myers as Exhibit 4.
21     Mr. O'Bryan, if you could just take a look at
22 it and let me know when you're done, please.
23     MR. GLENNON:  I object only to the extent it
24 appears this is an expert.
25     MR. GREENSTEIN:  That's true.  For the record

61

1  this is an 800-page document.  What we've done here,
2  which is the same thing we did in Mr. Myers' deposition,
3  was to produce the first ten odd pages and the last
4  pages, because it is a large document.
5      Q.  Do you have a problem with that, Mr. O'Bryan?
6      A.  I don't.
7      Q.  Have you seen this document before?
8      A.  I have, yes.
9      Q.  And what is it?
10      A.  This is a transaction register which reflects
11  the debit memos that were run on November 17th, 2000.
12      Q.  Now, were the debit memos run on November
13  17th, 2000, or another day?
14      A.  I thought they were right around there.  I
15  thought they were on the 17th.  They might have been
16  right around there.
17      Q.  Around the 17th.  But are you sure they were
18  run on the 17th?
19      A.  I'm not exactly sure exactly what day.  That's
20  the transaction date.  The invoice date shown on the
21  transaction register, that's always the date I've
22  referred to as being the debit memo date.
23      Q.  Right.  I'm just asking if you have formed an
24  opinion based on all the evidence you reviewed as to
25  when the debit memos actually were run.

62

1      MR. GLENNON:  Objection; asked and answered.
2      THE WITNESS:  I don't recall.
3      MR. GREENSTEIN:  Q.  So it might not have been
4  November 17th?
5      MR. GLENNON:  Objection; vague and ambiguous.
6      THE WITNESS:  I just don't recall what date
7  specifically.  I've always referred to it as the
8  November 17th, 2000 date.
9      MR. GREENSTEIN:  Q.  Right.  And why do you
10  refer to it as November 17th?  Because that's what was
11  in the complaint?
12      MR. GLENNON:  Same objection.
13      THE WITNESS:  No.  Because that's what the
14  document shows.  If you take a look at the transaction
15  register, it shows invoice date November 17th.  I don't
16  recall that I addressed that specific date in my report,
17  but I may.
18      MR. GREENSTEIN:  Q.  I think you said on or
19  about November 17th.
20      A.  There you go.
21      Q.  In any event, is this the transaction register
22  that you're referring to in the -- on page 21 of your
23  opening report in the first full paragraph under section
24  A?
25      A.  I believe it is, yes.

63

1      Q.  Okay.  And what does this document purport to
2  say?
3      MR. GLENNON:  Objection; the document speaks
4  for itself.  Vague and ambiguous.
5      THE WITNESS:  I'm sorry, what do you mean,
6  what does it say?
7      MR. GREENSTEIN:  Q.  "Relied on this
8  document," quoting your report, "for the purpose of
9  understanding the total impact of the November 17th,
10  2000 accounting entries."  This is the first report you
11  relied on in forming that opinion; correct?
12      MR. GLENNON:  Same objection.
13      THE WITNESS:  I relied on this report.
14      MR. GREENSTEIN:  Q.  Okay.  Well, I'm just
15  reading.  It says, "I reviewed various accounting system
16  reports produced by Oracle for the purpose of
17  understanding the total impact of the November 17, 2000
18  accounting entries."  Do you see that?
19      A.  I do.
20      Q.  Then it says, "The first report I reviewed is
21  the transaction register" --
22      A.  Right.
23      Q.  -- "which listed all debit memos generated for
24  that day."  Do you see that?
25      A.  Yes.

64

1      Q.  Is this that transaction register that you're
2  referring to in there?
3      A.  Is this Exhibit 4?
4      MR. GLENNON:  Objection; vague and ambiguous.
5      MR. GREENSTEIN:  Q.  Is that the document
6  you're referring to there?
7      A.  There is an excerpt document.  I've seen the
8  entire 800 pages.
9      Q.  Assuming that the rest of the pages -- but
10  this is the same document; correct?
11      MR. GLENNON:  Objection; vague and ambiguous.
12      THE WITNESS:  I believe this is the same
13  document.
14      MR. GREENSTEIN:  Q.  Well, just take a look at
15  it.  I'm just wondering, this is the same document that
16  you relied upon?
17      MR. GLENNON:  Objection; vague and ambiguous.
18      THE WITNESS:  I am sorry, I don't mean to be
19  difficult.  I think I testified I think this is an
20  excerpt version of the same document I relied on.
21      MR. GREENSTEIN:  Q.  Okay, but it looks the
22  same as the transaction register that you relied on,
23  right, the 800-page document?
24      A.  Yes.
25      Q.  It reflects the same information; is that

65

1  right?
2       MR. GLENNON:  Same objection.
3       THE WITNESS:  As best I can tell.  It is only
4  ten pages of it.
5       MR. GREENSTEIN:  Q.  Well, what is a
6  transaction register?
7       A.  It is an accounting report that basically
8  summarizes, depending on what the queries are of the
9  individuals running it, summarizes different
10  transactions either by account or by type or by day or
11  by GL number.
12       Q.  You said it depends on what the queries are of
13  the individuals running it; correct?
14       A.  Right.
15       Q.  So, do you know who the individuals were that
16  ran this?
17       MR. GLENNON:  Objection; vague and ambiguous.
18       THE WITNESS:  I don't know who pushed the
19  button to have this report run.
20       MR. GREENSTEIN:  Q.  But this report reflects
21  a query of whatever particular individual ran this
22  transaction register report; correct?
23       MR. GLENNON:  The document speaks for itself.
24       THE WITNESS:  That's correct.
25       MR. GREENSTEIN:  Q.  Do you know when this

66

1  document was run?
2       A.  I don't.  There's a date at the top,
3  November 5, 2002.  That may just be a print date.  So,
4  it looks to me like this document was printed on
5  November 5th, 2002.
6       Q.  And you're aware that there is an unapplied
7  cash project at issue in this case that began in October
8  2002; correct?
9       MR. GLENNON:  Objection; foundation.
10       THE WITNESS:  And you mean project -- I'm
11  aware that the collections department of Oracle went
12  about the process of trying to clean up the transfers to
13  the reserve that occurred in the second quarter of 2001,
14  in October/November of 2002.
15       MR. GREENSTEIN:  Q.  Okay.  And so you said to
16  clean up the transfers to the reserve that occurred in
17  the second quarter of 2001; right?
18       A.  And I only mean -- cleanup, that's the term
19  everyone has used, it is a cleanup process.  And I put
20  that in quotes.
21       Q.  What is your understanding of what the
22  unapplied cash -- strike that.
23       From here on after I'm going to refer to it as
24  the 2002 cleanup.  Is that okay with you?
25       MR. GLENNON:  Objection.  You're going to

67

1  refer to what as the 2002 cleanup?
2       MR. GREENSTEIN:  Q.  The unapplied cash
3  project beginning in October 2002.  You understand what
4  that is; right?
5       A.  I do, yes.
6       Q.  Because you opine on it in your report; right?
7       A.  I do, yes.
8       Q.  Okay.  I'm going to refer to that as the 2002
9  cleanup.  Is that okay with you?
10       MR. GLENNON:  Just point of clarification.
11  You're talking about all components of that, start date,
12  end date?  Anything and everything?  I think you need to
13  clarify exactly what it is you're talking about.
14       MR. GREENSTEIN:  The project that started
15  October 2002 involving the cleanup, as you call it, of
16  unapplied cash.  Is that fair to say?
17       MR. GLENNON:  Objection; vague and ambiguous.
18       THE WITNESS:  Is that a question?
19       MR. GREENSTEIN:  Q.  What is your
20  understanding of the unapplied cash project that began
21  in October 2002?
22       A.  My understanding is that the accounting
23  department of the company, Oracle, became aware of the
24  fact that there may have been transfers from 25005 into
25  12601 during the second quarter of 2001, sometime in

68

1  2002.  And they went about a process of trying to make
2  sure that those transfers were appropriate.
3       And that's what I've referred to as the
4  unapplied cash project.  People call it cleanup.  I'm
5  not sure that's a great name for it.  But that's what my
6  understanding of that unapplied cash project was
7  starting in approximately October of 2002.
8       Q.  Okay.  So, is it your understanding that that
9  project was only focusing on addressing items of
10  unapplied cash that had been transferred from 25005 to
11  12601 during the second quarter?
12       A.  Yes.
13       Q.  And is that the extent of the project?
14       MR. GLENNON:  Objection; vague and ambiguous.
15       THE WITNESS:  I don't know.  I wasn't there at
16  the time they were doing it.  For all I know there were
17  other issues going on.  I do know that that was the
18  project that I understand that started the attempts to
19  make sure and understand the transfers or better
20  understand the transfers from 25005 to 12601.
21       MR. GREENSTEIN:  Q.  Okay.  So it is not your
22  opinion that the -- that the unapplied cash project that
23  began in approximately October 2002 was only focused on
24  the transfers from 25005 to 12601 in the second quarter
25  of '01; correct?

69

1    MR. GLENNON:  Objection; vague and ambiguous.
2    THE WITNESS:  Well, I think that was the
3  primary objective of the exercise.  Whether or not there
4  were other components to it or someone else had to do
5  something during that time frame, I don't know, I wasn't
6  there.
7    MR. GREENSTEIN:  Q.  But you looked at all the
8  evidence in this case that you relied on in your report?
9    A.  I have, yes.
10    Q.  How did you get an understanding what happened
11  during that unapplied cash project?
12    A.  Based on my review in the depositions and also
13  seeing some of the work that was generated from that.
14    Q.  When you say the work generated from that,
15  what do you mean?
16    MR. GLENNON:  Objection; vague and ambiguous.
17    THE WITNESS:  If you look at -- there is a
18  summarized document that really looks at the cash -- the
19  transfers from 25005 into 12601 that was summarized over
20  a long period of time, and where some of the outcome of
21  that project, where that went.  There is a summary page
22  that I've referred to in my report and also relied on.
23    MR. GREENSTEIN:  Q.  And your opinion is that
24  $20.1 million in unapplied cash from 25005 was
25  transferred to 12601 in connection with the second

70

1  quarter in fiscal year '01; correct?
2    A.  In connection with?
3    MR. GLENNON:  Objection; vague and ambiguous.
4    THE WITNESS:  I don't know what you mean, in
5  connection with.
6    MR. GREENSTEIN:  Q.  You say you relied on a
7  document that kind of summarizes the outcome of the 2002
8  unapplied cash project; correct?
9    A.  Correct.
10    Q.  What was the total amount transferred from
11  25005 to 12601 during the second quarter?
12    A.  I think approximately $20 million.
13    Q.  That's reflected in your report; right?
14    A.  Correct.
15    Q.  And I think you said that Oracle learned of
16  these transfers around that time, 2002; correct?
17    MR. GLENNON:  Objection; vague and ambiguous,
18  mischaracterizes the testimony.
19    THE WITNESS:  I think that Oracle was in the
20  process of investigating the allegations made on the
21  debit memos, and that sometime during that process they
22  understood -- they came to find out there may have been
23  transfers between 25005 and 12601.  And that then
24  started a project, which is the unapplied cash project,
25  which started in about October of '02.

71

1    MR. GREENSTEIN:  Q.  It was the result of
2  plaintiffs filing their complaint in October 2002;
3  correct?
4    MR. GLENNON:  Objection; mischaracterizes the
5  testimony, calls for speculation.
6    THE WITNESS:  I don't know if that is the
7  genesis of it, or if -- I have no idea.
8    MR. GREENSTEIN:  Q.  But you mentioned
9  allegations regarding the debit memos; correct?
10    A.  That's correct.
11    Q.  So is it your -- strike that.
12    So are you testifying that Oracle learned of
13  these transfers from 25005 to 12601 in connection with
14  the investigation of the debit memo allegation?
15    MR. GLENNON:  Objection; vague and ambiguous.
16    THE WITNESS:  I don't know exactly how they
17  found out.  My understanding is that it was part of that
18  process.  But there could have been other reasons they
19  found out about it and investigated it.
20    I don't know exactly how they found out.  My
21  assumption it had to do with part of the investigation
22  into the debit memos.
23    MR. GREENSTEIN:  Q.  Okay.  Looking at what's
24  been marked as Exhibit 4, the transaction register for
25  November 17th, 2000.

72

1    A.  Yes.
2    Q.  If you look at the last page, appears to have
3  a total of $692,415,514.97.  Do you see that?
4    A.  I do, yes.
5    Q.  And what does that mean to you?
6    MR. GLENNON:  Objection; vague and ambiguous.
7  The document speaks for itself.
8    THE WITNESS:  What does this mean to me?
9    MR. GREENSTEIN:  Q.  You said of this
10  document, saying that this -- for the, quote, "purpose
11  of understanding the total impact of the November 17th,
12  2000 accounting entries"; right?
13    A.  Yes.
14    Q.  So how does this document help you make that
15  determination?
16    MR. GLENNON:  Objection; vague and ambiguous.
17    THE WITNESS:  This just tells me the total
18  population of $692 million.  There was allegations in
19  the revised complaint that went about a process of
20  trying to extrapolate based on some script outputs of
21  some 926 that alleged that potentially in excess of $228
22  million was erroneously booked into revenue because of
23  the debit memos.  I found some of that -- those
24  calculations by the statistical individual -- I can't
25  think of his name, Mr. Laurentius or something like

73

1   that.
2        MR. GREENSTEIN:  Q.  Marais.
3        A.  Marais?
4        Q.  Yes.  Laurentius, I think it is.
5        A.  Thank you. -- rather interesting.  Because,
6   the fact is, we've been able to quantify this and it is
7   $692 million.
8        So this just starts out to say that was the
9   amount of the debit memos run on November 17th or on or
10  around November 17th for a total amount of $692 million.
11       Q.  So does this document show you what the
12  financial impact of the debit memos are on Oracle's
13  financial statements?
14       MR. GLENNON:  Objection; vague.
15       THE WITNESS:  No.
16       MR. GREENSTEIN:  Q.  It doesn't?
17       A.  No.
18       Q.  Why is that?
19       MR. GLENNON:  Same objection.
20       THE WITNESS:  Because it just totals up to
21  $692 million.
22       MR. GREENSTEIN:  Okay.  Put that aside.  I'm
23  going to mark this as No. 5.
24       (Exhibit 5 marked for
25           identification.)

74

1        MR. GREENSTEIN:  For the record this, is a
2   document Bates stamped NDCA-ORCL 050356 through 360.
3   And it is entitled, "Account Analysis Report."
4        So, have you seen this document before?
5        A.  I have, yes.
6        Q.  And if you turn to page 7 of your rebuttal
7   report for me.
8        A.  7 of rebuttal now?
9        Q.  Yeah.
10       A.  I'm there.
11       Q.  Okay.  And you see that this document is cited
12  in footnote 20; correct?
13       A.  That's correct.
14       Q.  And I'm going to refer you to this sentence
15  that precedes footnote 20, it says, "Furthermore, the
16  account analysis report with payables detail illustrates
17  that the entire $692 million was both debited and
18  credited to the same account on November 17th, 2000."
19  Do you see that?
20       A.  I do.
21       Q.  You refer to this document that's been marked
22  as Exhibit 5; correct?
23       MR. GLENNON:  Objection; vague and ambiguous.
24       THE WITNESS:  I'm referring to Exhibit 5, yes.
25       MR. GREENSTEIN:  Q.  Okay.  Now, what does

75

1   this document purport to be?
2        MR. GLENNON:  Same objection.
3        THE WITNESS:  This document is an account
4   analysis report, which basically looks at, again,
5   accounts, specifically in this case 25005 account.  And
6   it gives a summary of transactions that went on through
7   that for a period of time.
8        MR. GREENSTEIN:  Q.  Okay.  And you say that
9   this document, quote, "illustrates that the entire $692
10  million was both debited and credited to the same
11  account on November 17th, 2000."  Do you see that?
12       A.  That's correct.
13       Q.  Where in this document does it reflect that
14  the entire $692 million was both debited and credited to
15  the same account on November 17th, 2000?
16       A.  On 050357.
17       Q.  Okay.  You're referring to the line where it
18  has a debit of approximately $692 million and a credit
19  of $692 million; right?
20       A.  Yeah.
21       Q.  If you look at the report cited on page 7 of
22  your rebuttal, it says, "The Account Analysis Report
23  with Payables Detail."  Do you see that?
24       A.  Right.
25       Q.  If you look at this document it just says,

76

1   "Account Analysis Report."  It doesn't say, "With
2   Payables Detail."
3        A.  Well, if you look down in the batch name, see
4   where it says payables?
5        Q.  I'm sorry, where?
6        A.  If you look down -- in all the pages, the
7   first two pages, and really throughout the document, if
8   you look, you will see where there is actually payables
9   detail as well.  This is just what's going on in the
10  25005 account.
11       Q.  Okay.
12       A.  And there is payable issues with respect to
13  that.  Payables is probably a refund.
14       Q.  Okay.
15       A.  So that's where we're talking about payables
16  detail there.  You see that referenced to the right of
17  batch name on 050356.
18       Q.  Okay.  So, but in your report it says the
19  account analysis report with payables detail.
20       Now, are you aware of a specific report that's
21  called the account analysis report with payables detail?
22       A.  I'm not suggesting that's the name of the
23  report.  I'm just saying it has payables detail on it,
24  which you can see under batch name.
25       Q.  And I'm asking, do you have an understanding

77

```
 1   there is another report called account analysis report
 2   with payables detail that's different than this?
 3          MR. GLENNON:  Objection; incomplete
 4   hypothetical, assumes facts not in evidence.
 5          THE WITNESS:  I've never seen such a report
 6   like that.
 7          MR. GREENSTEIN:  Q.  So you're saying this is
 8   an account analysis report that has payables detail in
 9   it?
10      A.  Correct.
11      Q.  Okay.  So, again, how does this document
12   illustrate -- this is from your report, you say, "It
13   illustrates the entire $692 million is both debited and
14   credited to the same account on November 17th."
15          MR. GLENNON:  Objection as to form.
16          THE WITNESS:  If you refer back to Exhibit 4,
17   which is the transaction register, which in my opinion
18   is the summary of the debit memos run on or about
19   November 17th, you will see a number $692,415,514.97.
20   That exact same number is on Exhibit 5, and it shows in
21   this account as being both a debit and credit in the
22   account.  Debit memo, it is about ten lines up from the
23   bottom, it is the exact same number.  It is both a debit
24   and a credit, which would mean it has zero financial
25   statement impact.
```

78

```
 1      Q.  Okay.  If you turn to page 12 in your opening
 2   report, which is Exhibit 1.
 3      A.  I'm there.
 4      Q.  You see how there is some T accounts and
 5   there's three steps, debits and credits?
 6      A.  Pretty good, T accounts.
 7      Q.  They are.
 8          So, your opinion in your opening report is
 9   that there were three offsetting debits and credits to
10   account 25005 on or around November 17; right?
11      A.  Correct.
12      Q.  If you look at the document that's Exhibit 5,
13   the account analysis report, you see there appears to be
14   one debit and one credit on November 17th reflecting
15   $692 million; do you see that?
16      A.  I do.
17      Q.  And if you look at page 7 of your rebuttal
18   report.
19      A.  Page 7.
20      Q.  7 of your rebuttal.  You're on it.  And you
21   say, "The account analysis report with payables detail
22   illustrates that the entire $692 million was both
23   debited and credited to the same account, November
24   17th."  Do you see that?
25      A.  I do.
```

79

```
 1      Q.  Okay, so, where in this document does it show
 2   that there were three offsetting debits and credits to
 3   account 25005 of $692 million?
 4      A.  Well, in two places.  With respect to the
 5   debit memos, it is on page 050537.  That is showing the
 6   debit memos going in and out.  Then the total impact,
 7   25005, is on the very last page, excuse me, the second
 8   to the last page, 050358.  And if you look there it is
 9   about $2.06 billion.  If you multiply the 692 times 3,
10   that's the number you will get approximately.
11      Q.  I'm sorry, what page are you looking at?
12      A.  050358.
13      Q.  And you're looking at what number?
14      A.  Just look at the biggest number, $2 billion.
15      Q.  There's two numbers there, $2.923 billion on
16   debits and $2.826 billion on credits.
17      A.  Yeah.
18      Q.  Do you see that?
19      A.  If you add those two together, the bottom
20   ones, it is about the same number.  I think that's where
21   the three kind of were accumulated.
22      Q.  Okay.  But this document only shows one debit
23   and one credit to account 25005 in the amount of $692
24   million; right?
25          MR. GLENNON:  Objection; foundation.  The
```

80

```
 1   document speaks for itself.  Vague and ambiguous.
 2          THE WITNESS:  The document -- this document
 3   shows that in that account, for debit memos, just debit
 4   memos, there was $692 million going through as a debit
 5   and credit.  That's on page 2.
 6          MR. GREENSTEIN:  Q.  Right.
 7      A.  And that's exactly what was debited and
 8   credited to the account.
 9      Q.  So turning you back to page 12 of your opening
10   report, the T accounts.
11      A.  Yes.
12      Q.  You see how it has three steps, and there is a
13   debit and credit to 25005.  Do you see that?
14      A.  I do.
15      Q.  You cite the testimony of Greg Myers for those
16   opinions; correct?
17      A.  Correct.
18      Q.  So what I'm asking is where in this document
19   does it show that there were three debits and credits to
20   25005?
21      A.  The other would net out.  But as I said, I
22   think I looked at this a little bit, just to kind of
23   think about that same issue.  On 050358, the
24   miscellaneous receipts, or receivables, miscellaneous
25   receipts under -- second one down, $2.063 billion.  So I
```

81

```
1   think that's where it actually gets -- all three are
2   shown in summary.
3         But the bottom line is, that it was -- the
4   debit memos went in and went out of the same account for
5   the same amount.
6       Q.   And you're saying -- on page 12 you say it
7   went in and out of the same account three times;
8   correct?
9       A.   Right.
10      Q.   And I'm asking you where on this document does
11  it indicate that that occurred?
12        MR. GLENNON:  Objection; vague and ambiguous,
13  asked and answered.
14        THE WITNESS:  Yeah, I think I've answered
15  that.  It is on page 2, which is the 692, okay.
16        MR. GREENSTEIN:  Q.  Um-hum.
17      A.   That's the sum of the debit memos, the sum net
18  effect of the debit memos, $692 million, which is
19  basically summarized as well on Exhibit 4.
20        Then if you wanted to try and summarize all
21  three, I think that's a component within 050358, which
22  is simply multiply those three by three and seeing that
23  number of about $2.063 billion.
24      Q.   But this report reflects all the debits and
25  credits going in and out of 25005 for this time period?
```

82

```
1       A.   Correct.
2         MR. GLENNON:  Objection; lack of foundation.
3         MR. GREENSTEIN:  Q.  So you look at page 2 of
4   this document, it shows one debit of $692 million and
5   one credit.  Do you see that?
6       A.   That's the one summarized amount that's been
7   summarized.
8       Q.   It's been summarized?
9       A.   Right.
10      Q.   So each of these numbers is a summary of --
11  I'm not sure I understand.
12        MR. GLENNON:  Objection; vague and ambiguous.
13        THE WITNESS:  That's the summary of Exhibit 4.
14  That was the debit memos run that put them into 25005 so
15  that they can then change the flag.
16        MR. GREENSTEIN:  Q.  What I'm asking is, this
17  report reflects all movements, or all debits and credits
18  in and out of 25005 for this time period, November 2000;
19  correct?
20        MR. GLENNON:  Objection; lack of foundation.
21        THE WITNESS:  You mean -- what document are
22  you talking about?
23        MR. GREENSTEIN:  Q.  Exhibit 5.
24      A.   Well, I don't know exactly what period -- this
25  says period October '00 to December '00.
```

83

```
1       Q.   But you said -- this is a document cited in
2   footnote 20 of your rebuttal report; right?
3       A.   Correct.
4       Q.   And you said that this report illustrates that
5   the entire 692 million was both debited and credited to
6   the same account; right?
7       A.   That's correct.  And it is on page 2.
8       Q.   Now, on page 12 of your opening report you say
9   there are three debits and credits to 25005 that occur
10  on that date; right?
11      A.   What I'm saying --
12        MR. GLENNON:  Let me assert an objection.
13  Vague and ambiguous.
14        THE WITNESS:  What I'm saying is that the
15  accounting process took three different steps, changing
16  from on-account to unapplied, going -- then issuing a
17  debit memo, which is transaction number two, or step two
18  of it, then applying those, then just changing the flag
19  back.
20        So the debit memos recorded in 25005 are step
21  two, and that shows -- the other ones are just changing
22  a flag.
23        MR. GREENSTEIN:  Q.  So, when you look at each
24  of these three T accounts, it says 25005; right?
25      A.   Right.
```

84

```
1       Q.   And there is a debit and a credit; correct?
2       A.   Correct.
3       Q.   And there's three debits and credits, or two
4   for each step; correct?
5       A.   Correct.
6         MR. GLENNON:  Object; vague and ambiguous.
7         MR. GREENSTEIN:  Q.  And I'm asking you where
8   that's reflected on this account analysis report, which
9   you said purports to show all the debits and credits
10  that occurred in 25005 during November 2000.
11        MR. GLENNON:  Objection; mischaracterizes the
12  testimony.  It's been asked and answered.
13        THE WITNESS:  Yeah, I think it is on page 2,
14  which is the $692 million.
15        MR. GREENSTEIN:  Q.  That's one debit and
16  credit; right?
17      A.   Right.
18      Q.   Where are the other two?
19      A.   Twofold.  One, it is just a changing of the
20  flag is the first and the third step.  And, two, I
21  believe that on page 05035 -- 60 -- excuse me, 050358,
22  you'll see a total of $2.063 billion.  I think that has
23  something to do with all three of them summarized.
24      Q.   Is it your expert opinion that that is the
25  three summarized?
```

85

1    MR. GLENNON:  Objection; vague and ambiguous,
2  lack of foundation.
3    THE WITNESS:  I haven't really researched it
4  in detail.  It is irrelevant.  $692 million went in and
5  $692 million came out.  That's the net impact.
6    MR. GREENSTEIN:  Q.  And I'm just wondering if
7  you can point me to somewhere on this document that
8  shows the three debits and credits to 25005 that you
9  conclude occurred on page 12 of your opening report.
10    MR. GLENNON:  Objection; vague and ambiguous,
11  asked and answered.
12    THE WITNESS:  Well, I'm not so sure you would
13  see it on there, because it was just a changing of the
14  flag, which wouldn't necessarily be reflected.  It may
15  be, as I mentioned, in the 050358, if that's where it is
16  completely summarized, which I think it might be.  I
17  haven't done that analysis.
18    Page 2 tells you exactly the total number of
19  debit memos that were run, and then used to apply and
20  change the flag.  That's the monetary impact to 25005.
21  The others are simply a changing of flags.
22    MR. GREENSTEIN:  Q.  Right.  But I'm asking if
23  your testimony is that there were three different debits
24  and credits to 25005 during November 2000?
25    A.  As summarized on page 12 of my initial report,

86

1  that's correct.
2    Q.  And those T accounts, your support for that is
3  the deposition of Greg Myers; correct?
4    A.  That is correct.  Well, yes, that's correct.
5  Plus I've seen these entries on output.
6    Q.  But -- besides script output, did you see
7  these three entries on any other document?
8    MR. GLENNON:  Objection; vague and ambiguous.
9    THE WITNESS:  A summary of those three
10  transactions?
11    MR. GREENSTEIN:  Q.  I'm talking about on
12  page 12 you indicate there are three offsetting debits
13  and credits to 25005; correct?
14    A.  That's correct.
15    Q.  And you cite Greg Myers' testimony for that;
16  right?
17    A.  That's one of the issues I cite, yes.
18    Q.  That's the only thing you cite on page 12;
19  correct?
20    A.  I've seen other things to tell me those
21  transactions occurred.
22    Q.  What other things have you seen?
23    A.  The script output.
24    Q.  Is that it?
25    MR. GLENNON:  Objection; vague and ambiguous.

87

1    THE WITNESS:  Also Mr. Williams testifies, on
2  page 13 of my report it says, "I knew that when they
3  processed those debit memos one of the first things that
4  Greg Myers told me is they booked equal and offsetting
5  debit and credit through 25005.  So by definition it did
6  not affect the balance sheet and could not have affected
7  the income statement."  So Williams also talks about it
8  as well.
9    MR. GREENSTEIN:  Q.  And it says Greg Myers
10  told him that, right?
11    A.  Yes.  But that's another individual that
12  understands it that way.
13    So, I don't remember if there is other
14  testimony people have talked about specifically those
15  offsetting.
16    Q.  I'm asking you besides Greg Myers' testimony,
17  besides Tom Williams' testimony based on what Greg Myers
18  told him, and besides the script output, is there any
19  document that reflects three offsetting debits and
20  credits to 25005 during this time?
21    A.  As I recall, the SEC presentation there was
22  also a discussion of the transactions.
23    Q.  Okay.  And that reflected three offsetting
24  debits and credits to 25005?
25    A.  I don't recall the specifics.  But I know it

88

1  talked about the process.  I don't remember if it said
2  three offsetting.
3    Q.  Okay.  Are there any internal Oracle documents
4  that reflect that that actually occurred in the general
5  ledger?
6    MR. GLENNON:  Objection; vague and ambiguous.
7    THE WITNESS:  Yes.
8    MR. GREENSTEIN:  Q.  What documents are those?
9    A.  Exhibit 4.  Exhibit 5.
10    Q.  But there's only one debit and credit on there
11  for 692?
12    A.  That was the sum effect of the debit memo,
13  $692 million.  That's what went into 25005 and was used
14  then to apply the unapplied and change the flag.
15    Q.  Okay.  But you don't see three offsetting
16  debits and credits to this account for $692 million; do
17  you?
18    MR. GLENNON:  Objection; vague and ambiguous,
19  lack of foundation.
20    THE WITNESS:  As I said, it may be part of
21  that last entry on that last page.
22    MR. GREENSTEIN:  Q.  It may be?
23    A.  I haven't done that, the math.  I think it is,
24  but I haven't done that.
25    But you wouldn't necessarily see that, because

89

```
1   it is the net effect of the credit memos, as I've said
2   before, which is the second entry is booking the debit
3   memo to then use to change the flag.
4           MR. GREENSTEIN:  Okay.  I'd like to mark this
5   as No. 6, please.
6           (Exhibit 6 marked for
7           identification.)
8           VIDEOGRAPHER:  This marks the end of tape one,
9   Volume I, in the deposition of J. Duross O'Bryan at
10  11:49.  Going off the record.
11          (Recess, 11:41 a.m. - 11:54 a.m.)
12          VIDEOGRAPHER:  On record at 11:54.  This marks
13  the beginning of tape two in Volume I in the deposition
14  of J. Duross O'Bryan.
15          MR. GREENSTEIN:  Q.  Mr. O'Bryan, referring
16  you to page 21 of your report under "Review of Summary
17  Reports," in the second full paragraph under the heading
18  A, it says, "I also reviewed a sales journal by GL
19  account report which listed all revenue recorded in the
20  general ledger in November 17th, 2000."  Do you see
21  that?
22      A.  I do, yes.
23      Q.  And I just marked what as Exhibit 6, for the
24  record is NDCA-ORCL 048989 through 049207.
25          And it is a Sales Journal by GL Account
```

90

```
1   Report, GL date November 17th, 2000.
2           Mr. O'Bryan, have you seen this document
3   before?
4       A.  I have, yes.  It is referred to in footnote 21
5   of my report, page 7.
6       Q.  Of your rebuttal report?
7       A.  Yes.
8       Q.  And so in your rebuttal report on page 7 you
9   say, "The sales journal by GL account report establishes
10  that Oracle only recognized approximately $10 million on
11  November 17th, 2000."  Correct?
12      A.  Correct.
13      Q.  And you got that -- how did you come to that
14  number?
15          MR. GLENNON:  Objection; vague and ambiguous.
16          THE WITNESS:  Just go to the very last page.
17          MR. GREENSTEIN:  Q.  So, you're referring to
18  the last page where it has a total of $10,111,399.34?
19      A.  Right.
20      Q.  What does that number represent?
21      A.  Revenue booked on that day by Oracle.
22      Q.  Okay.  You didn't do any other calculation to
23  support that number, it is just what is reflected on
24  this document; right?
25          MR. GLENNON:  Objection; vague and ambiguous.
```

91

```
1           THE WITNESS:  I don't understand the question.
2           MR. GREENSTEIN:  Q.  In other words, you
3   didn't do any calculations as to how much revenue was
4   actually booked at Oracle on that day; did you?
5           MR. GLENNON:  Same objection.
6           THE WITNESS:  This is the amount of revenue
7   booked on that day by Oracle.
8           MR. GREENSTEIN:  Q.  Okay.
9       A.  Speaking of calculations as well, I was
10  thinking about the three entries that we talked about a
11  moment ago on Exhibit --
12          MR. GREENSTEIN:  Q.  5?
13      A.  5.  And so what I want to do at the break was
14  see if I could do the math really quick and show to you
15  all three entries on this.
16          And as I thought and mentioned, it is, in
17  fact, on page 050358.  And the way you do the math is if
18  you take the first $692 million of debit memos, which I
19  talked about is the important piece of it, is on page
20  050357.  Then if you go to 05036 -- excuse me, 58, you
21  will see $2.063 billion and $2.095 billion.  The other
22  two transactions, step 1 and step 3 are in that, which
23  would then total $1,384,000,000.  So simply take step 1
24  and step 3 of page 12 of my report, and then the
25  difference between that and the $2.063 billion would
```

92

```
1   simply be the cash that was recognized during the month
2   of November.  And as you know, all cash goes through
3   25005.
4           And you can prove that by looking on page
5   050356 for October.  You will see they brought in during
6   that month $597 million.  And then if you go as well on
7   page 050360, you will see -- that's December, you will
8   see they brought in $662 million, or $635 million.
9           So the November piece is simply the plug that
10  would get you to 2.063.  So I just proved the math to
11  myself based on your earlier questioning.
12      Q.  Do you have any other support for that
13  calculation, any document?
14          MR. GLENNON:  Objection; vague and ambiguous.
15          THE WITNESS:  I have this document here.  You
16  can add it up if you like.  I just did the math here, is
17  my point.
18          MR. GREENSTEIN:  Q.  But on 050357, it only
19  shows one debit and credit to 25005; right?
20      A.  That's step number two, the actual formation
21  of the debit credit -- debit memo.
22          As I told you earlier, I thought it was in
23  05036 -- or 58, and that's, in fact, where it is.  The
24  other step 1 and step 3.
25      Q.  But on the face of this document, there aren't
```

93

1 three separate debits and credits to account 25005 in
2 the amount of $692 million?
3     MR. GLENNON:  Objection; vague and ambiguous.
4     THE WITNESS:  There are.
5     MR. GREENSTEIN:  Q.  Where?
6     A.  On page --
7     Q.  I'm asking if you can show me three separate
8 debits and credits to account 25005 in the amount of
9 $692 million?
10    A.  Yes.
11    Q.  Okay, where?
12    A.  On page 050537 is one.
13    Q.  That's one.
14    A.  And then on page 050358, those 692 are a part
15 of the $2.063 billion.
16    Q.  Where does it say 692 on that page?
17    A.  It won't say.  It is a combined entry.  And
18 the combination is entry one for 692, entry two for 692,
19 which comes to $1.384 billion, then the difference is
20 the cash that was received during the month of November,
21 which was both applied to -- in and out of 25005 to
22 either applied or to some other account.
23    Q.  Okay.
24    A.  So, anyway, I thought you might want to know
25 that I did do that math.

94

1     Q.  Thank you.
2     A.  You're welcome.
3     Q.  Back to the document that's been marked as
4 Exhibit 6.
5     A.  Yes.
6     Q.  And that's the sales journal by GL account
7 report that your opinion is that that reflects $10
8 million approximately in revenue booked by Oracle on
9 that date; correct?
10    A.  That is correct.
11    Q.  And what is the date of this document?
12    A.  Well, it looks like it was run November the
13 5th, 2002.  But GL date, November 17th.
14    Q.  So this report was run on November 5th, 2002;
15 right?
16    MR. GLENNON:  Objection; calls for
17 speculation, lacks foundation.
18    THE WITNESS:  I don't know when it was run.
19 I'm just saying it says report date.  But what you have
20 to look at is the GL date, which is November 17th.
21    MR. GREENSTEIN:  Mark the next as No. 7,
22 please.
23        (Exhibit 7 marked for
24         identification.)
25    MR. GREENSTEIN:  Q.  For the record, this is

95

1 NDCA-ORCL 971461 through 971507.  It says, "Presentation
2 to the SEC Staff On Behalf Of Oracle Corporation," dated
3 October 29th, 2003.  Have you ever seen this before?
4     A.  I have, yes.
5     Q.  If you turn to page 31, which is NDCA-ORCL
6 971491, it has a slide that says, "Revenue By Day For 2Q
7 2001."
8         By the way, for the record, when I refer to
9 2Q, or 2Q '01, what I mean is Oracle's fiscal 2Q '01.
10 Do you understand that?
11    MR. GLENNON:  Objection; are you trying to
12 define a term?
13    MR. GREENSTEIN:  Yeah.
14    MR. GLENNON:  What term are you trying to
15 define, and with which defined term?
16    MR. GREENSTEIN:  When I am talking about
17 Oracle's second quarter fiscal year 2001, I'm going to
18 refer to it as 2Q '01.
19    Q.  Is that okay with you?
20    MR. GLENNON:  Do you understand?  He's saying
21 if he says the phrase 2Q '01, he's referring to second
22 quarter of fiscal year 2001.
23    THE WITNESS:  Yes, I understand.  I'm sorry, I
24 wasn't listening.
25    MR. GREENSTEIN:  Q.  Oracle is not on a

96

1 calendar year, they are on a fiscal year.
2     A.  That's correct.
3     Q.  So if you look at page 31, which is SEC
4 presentation.  And have you ever looked at this slide
5 before?
6     A.  I have, yes.
7     Q.  And if you look at 11/17/00?
8     A.  Yes, I'm there.
9     Q.  And it appears that total revenue, it says
10 $9,354,677.48; correct?
11    A.  That's correct.
12    Q.  And if you look back at the previous document
13 we looked at, I think you testified that the total
14 amount of revenue booked by Oracle in 2Q '01 was $10.1
15 million approximately; correct?
16    A.  That's correct.
17    Q.  Okay.  Can you explain why this document is
18 inconsistent with Exhibit 6?
19    A.  I don't know the exact reconciliation, I've
20 never done that.  But I certainly understand that this
21 was a report run in November of '02, it looks like.  And
22 potentially there were additional adjustments that may
23 have passed through that, $800,000, which is completely
24 immaterial to Oracle.  So why it changes, I don't know.
25 But I did notice that.

97

1    Q.  Okay, so let me see if I understand this
2  correctly.
3        So you're saying that in November 2002 or
4  after November 2002 when that sales report was run,
5  there may have been adjustments to Oracle's second
6  quarter results that were issued two years before?
7        MR. GLENNON:  Objection; mischaracterizes the
8  testimony, lack of foundation.
9        THE WITNESS:  No, I'm not saying that at all.
10       MR. GREENSTEIN:  Q.  I'm just trying to
11 understand the inconsistency between page 31 of
12 Exhibit 6 and the total on Exhibit 5.
13       A.  I don't, as I said, I don't know what the
14 difference is made up of.  I don't know the source of
15 971491.  I don't know where that information came from,
16 nor do I know what document was used, if it was even the
17 same run that was used in Exhibit 6.
18       I can understand why there might be
19 differences, was my point.  But I don't know what they
20 are, and I don't know what the reconciliation of that
21 $800,000 is.
22       Q.  But Oracle's second quarter '01 ended on
23 November 30th; correct?
24       A.  Correct.
25       Q.  So as an auditor, when would -- when would

98

1  somebody make an adjustment two years later to its
2  revenue numbers, such that this would occur?
3        MR. GLENNON:  Objection; lack of foundation,
4  vague and ambiguous, incomplete hypothetical.
5        THE WITNESS:  Well, this could have been a
6  report that was run at the time for 11/17, and there
7  could have been what are called topside adjustments,
8  meaning that someone decided that there was an $800,000
9  reduction in revenue that was appropriate for that day
10 because of subsequent information.
11       So topside adjustments could have very easily
12 been made off of that GL run to that summarized run.
13 There is a lot of reasons it could happen.  I don't know
14 what they are, but there is a lot of accounting reasons
15 that could occur.
16       MR. GREENSTEIN:  Q.  In your opinion, what was
17 the amount of revenue booked at Oracle on November 17th,
18 2000?
19       A.  The document I relied to, I chose the larger
20 of the two just to be conservative.  This shows 10.1.
21 This is actually a lower amount.  I chose to be
22 conservative in my report, and used 10.1.
23       Q.  Do you know what Oracle's total revenue for 2Q
24 '01 was?
25       A.  It was $2.6 billion.

99

1    Q.  Do you know what amount it was for the U.S.?
2        A.  For the U.S.?  No, I didn't break out that
3  component.
4        MR. GREENSTEIN:  Mark this as No. 8.
5        (Exhibit 8 marked for
6         identification.)
7        MR. GREENSTEIN:  For the record, NDCA-ORCL
8  1895918 through 1895922, it is an August 26th, 2004
9  e-mail from Molly Littlefield to Greg Myers and Lilly
10 Hao, H-a-o.
11       Q.  Let me know when you're finished reviewing it.
12       A.  I'm there, thank you.
13       Q.  Have you seen this document before?
14       A.  I have, yes.
15       Q.  Did you rely on this document in either your
16 report or your rebuttal report?
17       A.  No.  Considered it; didn't rely on.
18       Q.  Page 2, 1895919.  In the middle of the page it
19 is an e-mail from Molly Littlefield to a number of
20 individuals dated August 4th, 2004.  Do you see that?
21       A.  I do.
22       Q.  And it says in the first sentence, "Debit
23 memos can be very tricky, especially all the ones
24 created on November 18th, 2000."  Do you see that?
25       A.  I do.

100

1    Q.  Is it your opinion the debit memos were run on
2  November 17th or November 18th, 2000?
3        MR. GLENNON:  Objection; asked and answered.
4        THE WITNESS:  I think I answered that.  I said
5  on or around November 17th.
6        MR. GREENSTEIN:  Q.  Okay.  So it could have
7  been on November 18th; right?
8        MR. GLENNON:  Objection; vague and ambiguous.
9        THE WITNESS:  The documentation I've seen says
10 11/17.  Whether it is the 17th or the 18th really
11 doesn't make a difference.
12       MR. GREENSTEIN:  Q.  But this document written
13 in 2004 says that it was -- they were created on
14 November 18th; right?
15       MR. GLENNON:  Objection; vague and ambiguous.
16 The document speaks for itself.
17       THE WITNESS:  Well, Molly Littlefield thinks
18 it was run on the 18th.  Whether or not she really knew
19 or whether or not she was in a position to know the
20 exact date, or she may have gotten the date wrong, who
21 knows.
22       MR. GREENSTEIN:  Q.  Do you know who Molly
23 Littlefield is?
24       A.  Yes.
25       Q.  Who is she?

101

1    A.  Collections individual within Oracle.
2    Q.  Do you know if she helped create the script
3  output?
4    A.  She did not.
5    Q.  She didn't?
6    A.  I don't believe so.
7    Q.  Who did?
8    MR. GLENNON:  Objection; vague and ambiguous.
9    THE WITNESS:  I think it is Sanjay Kumar.
10    MR. GREENSTEIN:  Q.  I'm sorry.  I said the
11  script output.  I want to make a distinction between the
12  script output and debit memo script, the SQL script.  Is
13  that what you're referring to?
14    A.  I was referring to the SQL.  You asked me
15  earlier, Kumar, and I just remembered who that was.
16    Q.  I'm asking if you know -- you know what the
17  script output is; right?
18    A.  Yes.
19    Q.  What is it?
20    A.  It was done as part of this litigation, as you
21  well know.  There was about 926 produced, and it really
22  gives a transaction summary for any of the accounts
23  typically -- well, to start with, 776, over $100,000
24  that had on-account flags.  And then it -- there was an
25  additional sample 150 chosen by plaintiffs at random.

102

1  They were below potentially 150.  So, I'm sorry, it is a
2  transaction history of those transactions through a
3  period of time.
4    Q.  So a transaction history of all the
5  transactions related to the 926 debit memos; correct?
6    A.  That's correct.
7    Q.  So do you know if Molly Littlefield was
8  involved in creating the script output?
9    A.  I don't know.
10    Q.  Do you know who created the script output?
11    A.  I thought it was a combination of the
12  accounting department and the IT department of Oracle.
13    Q.  Do you know any -- well, let's turn to page 18
14  of your report.
15    A.  Original or rebuttal?
16    Q.  Original.
17    A.  I'm there.
18    Q.  And you see section D it says, "Subset of
19  Debit Memos Ordered for Discovery Purposes."  Do you see
20  that?
21    A.  I do, yes.
22    Q.  Then in the last sentence of that page it
23  says, "This production included a script output which
24  was designed by Oracle's IT department to compile a
25  step-by-step audit trail for each transaction which

103

1  contained a debit memo using data from Oracle's
2  accounting system."  Do you see that?
3    A.  I do, yes.
4    Q.  And what -- and you cite to footnote 54;
5  correct?
6    A.  That's correct.
7    Q.  And that's the Myers' declaration?
8    A.  That's correct.
9    Q.  What other evidence, if any, did you consider
10  in making the statement that the script output was
11  designed by Oracle's IT department to compile a
12  step-by-step audit trail for each transaction which
13  contained a debit memo?
14    MR. GLENNON:  Objection; vague and ambiguous.
15    THE WITNESS:  Well, that was my understanding
16  of what the discovery was all about on the debit memos.
17  So, my understanding that that was what the court
18  ordered, that detail be given for those debit memos, and
19  that that was the byproduct of that, was the script
20  output.
21    MR. GREENSTEIN:  Q.  So other than what you --
22  other than what you cite here, which is the Myers
23  declaration, did you rely upon anything else in making
24  that statement?
25    A.  You know, other than my understanding of what

104

1  the discovery orders were with respect to the scripts.
2    Q.  Okay.  But what I'm asking is, what did you
3  consider or rely upon in stating that the script output
4  was designed by Oracle to be a step-by-step audit trail
5  for each of the 926 debit memos?
6    MR. GLENNON:  Objection; compound and asked
7  and answered.
8    THE WITNESS:  I referred to Mr. Myers'
9  declaration.  I referred to I think now what I
10  understand the discovery orders were, and plus it just
11  makes logical sense to me that, who else is going to
12  design the step-by-step audit trail but Oracle?  I mean,
13  they are the ones that understand the numbers.  So, no
14  one else is going to do that.
15    MR. GREENSTEIN:  Q.  Do you know who designed
16  the script output?
17    MR. GLENNON:  Objection; asked and answered.
18    THE WITNESS:  The individual?
19    MR. GREENSTEIN:  Q.  Right.
20    A.  I think I answered that.  I do not know.
21    Q.  And you rely on the script output in your
22  report; correct?
23    A.  I do, yes.
24    Q.  Okay.  Did you do any assessment to verify the
25  accuracy of the script output?

1  A.  No.  I mean, I saw -- as you well know in my
2  original report, my rebuttal report, we talk about $2
3  million, where we've gone and looked at source
4  documents.
5  And I've also looked at, as you saw in my
6  report, a sample of 60, where we actually got source
7  documents and tied them back.
8  So I have seen support for those, yes.  But I
9  didn't go back and audit all 926.
10  Q.  Right.  So of the 926, you've looked at source
11  documentation for 60 of them; right?
12  A.  Just with respect to the three transactions,
13  the 11/17 debit memos.
14  Q.  There are 46,000 plus 11/17 debit memos;
15  correct?
16  A.  That's correct.
17  Q.  And out of that -- well, how many of those
18  debit memos did you look at in connection with your
19  reports?
20  MR. GLENNON:  Objection; vague and ambiguous.
21  THE WITNESS:  I looked at each and every one
22  of the 926.  And then I took a subset of the 926, 60, to
23  go back and see the individual debit memos to see that
24  they tied.
25  MR. GREENSTEIN:  Q.  So you looked at -- so in

1  looking at the 926, did you look at the source documents
2  for all 926?
3  A.  No.  60.
4  Q.  Sixty.  So, setting aside the 60 you looked at
5  the source documents for, the other debit memos of the
6  926 you relied on the script output for that
7  information; right?
8  MR. GLENNON:  Objection; vague and ambiguous,
9  lack of foundation.
10  THE WITNESS:  I looked at the script and saw
11  that there were three offsetting entries on 11/17/2000.
12  MR. GREENSTEIN:  Q.  Is that all you looked at
13  for those 926?
14  A.  No.  Some of them there has been allegations
15  about refunds, allegations about the failure to refund,
16  there's been allegations about royalties.  I looked at
17  those in a number different ways.
18  But my purpose for the original complaint or
19  the revised second amended complaint had to do with just
20  the debit memos.
21  So my first step in the 926 was to see that
22  all three of those transactions were offsetting in each
23  one of those 926.
24  Q.  Okay.  So, for the 926, you relied upon the
25  script output; correct?

1  MR. GLENNON:  Objection; vague and ambiguous.
2  THE WITNESS:  I relied on the script output,
3  plus I took 60 of those and tied them back to source
4  documents.
5  MR. GREENSTEIN:  Q.  So of the 46,000 debit
6  memos, you looked at source documents for 60 of them;
7  correct?
8  MR. GLENNON:  Objection; vague and ambiguous,
9  lack of foundation.
10  THE WITNESS:  As it relates to the debit
11  memos, that's correct.
12  MR. GREENSTEIN:  Q.  So back to the script
13  output.  So, you didn't verify or test the script output
14  to determine whether it was accurately reflecting those
15  926 debit memos; did you?
16  MR. GLENNON:  Objection; vague and ambiguous.
17  THE WITNESS:  No.  I did.  I looked at each
18  one of the three entries on the 926 script outputs, and
19  I saw there were three corresponding entries into 25005,
20  in and out.
21  MR. GREENSTEIN:  Q.  What I'm saying, did you
22  do any sort of testing or verification that the data in
23  the script output was accurate?
24  MR. GLENNON:  Same objection; asked and
25  answered.

1  THE WITNESS:  Yeah, as I said, I took a
2  subset -- first of all, I'm going to move into an audit
3  perspective here, inquiry and observation is evidence
4  from an auditor's perspective.  So I put on an auditor's
5  hat in looking at that.  And observing there were three
6  offsetting entries into the 926 script outputs helped me
7  understand that those were three offsetting transactions
8  that occurred.  I then decided, using professional
9  skepticism, to then test 60 individually and see the
10  individual source documents.
11  MR. GREENSTEIN:  Q.  I understand.
12  A.  The actual debit memos.
13  Q.  Well, the script output has additional entries
14  other than the three offsetting entries to 25005;
15  correct?
16  A.  Absolutely.
17  Q.  So what I'm asking is, did you perform any
18  independent testing to verify the accuracy of all the
19  data that was contained in the script output?
20  MR. GLENNON:  Objection; asked and answered.
21  THE WITNESS:  No.
22  MR. GREENSTEIN:  Q.  Okay.  So to the extent
23  you rely upon the script output in your reports, you're
24  assuming that the data within that is accurate; right?
25  MR. GLENNON:  Objection; vague and ambiguous.

109

1    THE WITNESS:  I'm assuming that the data
2  within what?  I'm sorry.
3    MR. GREENSTEIN:  Q.  Within the script output.
4    A.  I believe the script output is accurate.
5    Q.  And what do you base that on?
6    A.  Well, based on, A, my review of the three
7  transactions that we talked about, which had to do with
8  the only issue that I thought originally was in this
9  case at the time of my original report, which was the
10  debit memos, then I tested 60 separately.
11    And as I mentioned as part of the $2 million
12  that I believe were properly booked into revenue during
13  the second Q, we've also seen other supporting
14  documentation for that.  But I have not gone back and
15  audited the 926 script outputs.
16    Q.  That's fine.  In performing your review of the
17  926 debit memos -- strike that.
18    So, did you do any review at all of the debit
19  memo -- the 45,000 plus debit memos that were not
20  provided in the script output?
21    MR. GLENNON:  Objection; vague and ambiguous.
22    THE WITNESS:  No.
23    MR. GREENSTEIN:  Q.  So your focus was on --
24    A.  Other than seeing them on the overall debit
25  memo run, that 800 plus pages.

110

1    Q.  Right.  But you didn't look at -- you didn't
2  look at any of the 45,000 plus -- strike that.
3    So your review based on the script output and
4  individual debit memos was confined to the 926; correct?
5    MR. GLENNON:  Objection; vague and ambiguous.
6    THE WITNESS:  Would you repeat that?
7    MR. GREENSTEIN:  Q.  Your review of the debit
8  memos, the individual debit memos and the individual
9  transactions was confined to the 926 that appeared in
10  the script output; correct?
11    MR. GLENNON:  Same objection.
12    THE WITNESS:  That's correct.
13    MR. GREENSTEIN:  Q.  Okay.  Do you know when
14  the script output was created?
15    A.  I don't know the exact date.
16    Q.  Okay.  It was created for this litigation;
17  right?
18    A.  That's my understanding, yes.
19    Q.  Was the script output available on
20  November 17th?
21    MR. GLENNON:  Objection; vague and ambiguous.
22    THE WITNESS:  It certainly could have.  All
23  the script output is, is a download of the accounting
24  information that's in the system.  So, yes, that
25  information was available on 11/17.

111

1    MR. GREENSTEIN:  Q.  But the script output
2  wasn't available, obviously, on November 17th?
3    A.  That exact document?
4    Q.  Right.
5    A.  No.  That was created after that.  But the
6  data that makes up the script output was all available
7  as of 11/17.
8    Q.  And how do you know that?
9    A.  Because it is just a core dump of the
10  accounting system.  So it is -- it was there as of
11  11/17, it was there as of 11/15, 19, any day thereafter.
12    Q.  What do you mean by core dump?
13    A.  They just took the data and dumped it into an
14  SQL, which basically becomes a database and a spread
15  sheet.  So all that information -- I'm sorry, repeat
16  your question.
17    Q.  What is an SQL?
18    A.  It is defined in my report.  Structured Query
19  Language.
20    Q.  And what does that mean?
21    MR. GLENNON:  Objection; vague and ambiguous.
22    THE WITNESS:  That was the software program,
23  that was the name of the software program designed by
24  Oracle's IT department to dump that information out of
25  the accounting records into script outputs.

112

1    MR. GREENSTEIN:  Q.  Just to be clear, are you
2  talking about the debit memo script that was run on or
3  around November 17th, or talking about the script output
4  that was created for this litigation?
5    A.  I'm talking about the debit memo run that was
6  done on November 17th, 2000.
7    Q.  So that's the core dump of data you're talking
8  about?
9    A.  That was the creation of the three entries
10  that then became the 11/17/2000 debit memos.
11    Q.  Okay.  So from now on I'm going to refer to
12  that as the debit memo script.  Is that okay with you,
13  just so we can clarify that's not the script output?
14    A.  That's confusing to me.  I've already confused
15  it once before.  Let's call one the debit memos on
16  11/17 -- call them what you want.
17    Q.  I just want to make sure we're talking about
18  the SQL script.  Would that be easier for you?
19    MR. GLENNON:  I don't mean to be difficult,
20  but I would object to a definition as between the two,
21  because I do think there is a real potential for getting
22  confused on these two.  So maybe you want to identify
23  them by dates?
24    MR. GREENSTEIN:  Sure.
25    Q.  Well, how would you want to define them?  What

113

1   would be easiest for you?
2     A.  One would be the 11/17 --
3     Q.  Script?
4     A.  No.  11/17 debit memos, and the next would be
5   the script output.
6     Q.  So how about I just say the 11/17 script, and
7   then the script output.  Is that confusing to you?
8     A.  Yes, it is.  You can call it what you want,
9   but I may have to have you explain it ten times.
10     MR. GLENNON:  I may have to object.
11     THE WITNESS:  It is confusing to me, because
12   they are both script.  You say script in both of them.
13   I apologize.
14     MR. GREENSTEIN:  Q.  Okay.  So were you
15   involved in creating the script output?
16     MR. GLENNON:  Objection; vague and ambiguous.
17     THE WITNESS:  Was I personally?
18     MR. GREENSTEIN:  Q.  Right.
19     A.  No.
20     Q.  Was any one of your staff involved?
21     MR. GLENNON:  Objection; vague and ambiguous.
22     THE WITNESS:  And I'm sorry to do this, but by
23   script output, you mean the 926?
24     MR. GREENSTEIN:  Q.  How about the 926 script?
25     A.  There you go.

114

1     Q.  Okay.
2     A.  No.  No one within Alix Partners or anyone I
3   know of was involved in the development of that program
4   to dump that data.
5     Q.  Looking at the script for the 926 debit memos,
6   do you find any errors or inaccuracies in that?
7     A.  I thought I remembered seeing one issue I had
8   a question about.  But I don't recall as I sit here
9   right now having any significant problems with the
10   script output.
11     Q.  What issue are you referring to?
12     A.  I know that, for example, one of the debit
13   memos didn't show up on the overall run of 46,000 debit
14   memo projects.  The debit memo run, one didn't show up.
15   And I don't remember specifically any, as I said,
16   significant problems with the script.
17     Q.  And just so we're clear, I'm talking about the
18   script for the 926 debit memos?
19     A.  I'm sorry.  We got confused again.  For the
20   926, I don't remember -- I don't recall having any
21   problems with the accuracy of those reports.
22     Q.  So, for the November 17th debit memo script
23   that was created in November 2000, you said there was an
24   issue with one debit memo that didn't show up; correct?
25     MR. GLENNON:  Objection; mischaracterizes the

115

1   testimony.
2     THE WITNESS:  I thought, as I recall, possibly
3   one of the entries or something didn't show up on the
4   overall run.
5     MR. GREENSTEIN:  Q.  And what -- is there a
6   way to identify that debit memo?
7     A.  Yeah, I have that.  55041671.
8     Q.  I see you are looking at a report.  Are you
9   looking at a particular page?
10     A.  I'm looking at my report.  I have a note on
11   the side.
12     Q.  Do you know what customer that debit memo was
13   for?
14     A.  I don't.
15     Q.  How did you determine that debit memo didn't
16   appear?
17     A.  I think one of my team told me about that.  I
18   think Mr. Sheppard told me about that.
19     Q.  Do you know why it didn't appear on the
20   November 17th script?
21     A.  I don't recall where it was and where it
22   wasn't.  I just heard that may have been the only one
23   that maybe didn't have the three offsetting entries or
24   something like that.
25     Q.  What entries did it have?

116

1     A.  I don't recall.  It wasn't material enough.
2     Q.  You don't know what customer it was for?
3     A.  No.
4     Q.  How did you find it?
5     MR. GLENNON:  Objection; asked and answered.
6     THE WITNESS:  I think one of my team members
7   told me about that, Mr. Sheppard.
8     MR. GREENSTEIN:  Q.  Did he tell you anything
9   else --
10     A.  No.
11     Q.  -- about how he found it?
12     A.  No.  It doesn't surprise me.  Out of 46,000 --
13     MR. GLENNON:  Just put an objection to the
14   extent that the communications between Mr. Duross and
15   his team are protected under the stip.
16     MR. GREENSTEIN:  Okay.
17     THE WITNESS:  Sorry.
18     MR. GLENNON:  That's all right.
19     MR. GREENSTEIN:  Q.  What is your
20   understanding of what a debit memo is?
21     A.  Debit memo is something that would increase an
22   amount owed to a company because of a transaction.  It
23   could be a new invoice, could be an adjustment to an
24   invoice.  But it is an increase to an account
25   receivable, basically.

117

1     Q.  So were the 46,000 debit memos an increase to
2   the accounts receivable?
3         MR. GLENNON:  Objection; vague and ambiguous.
4         THE WITNESS:  No.  They were an increase and a
5   decrease to an account.
6         MR. GREENSTEIN:  Q.  So is that -- that's
7   inconsistent with what you believe to be the purpose of
8   a debit memo; correct?
9         MR. GLENNON:  Objection; vague and ambiguous.
10  Mischaracterizes the testimony.
11        THE WITNESS:  The debit memo was just a
12  process to clear a flag, that's it.  And because of
13  Oracle's accounting system, they had to create a debit
14  to relieve the on-account.  But there was no impact to
15  an individual account or to the overall financial
16  statements.  They were debits in and credits out.
17        MR. GREENSTEIN:  Q.  But the use of debit
18  memos on November 17th was different from the definition
19  that you described; correct?
20     A.  There can be a number -- I mean, I gave you
21  one definition.
22        Another definition would be to use it to clear
23  an on-account flag.
24        MR. GREENSTEIN:  Okay, let's mark this next,
25  9.

118

1           (Exhibit 9 marked for
2           identification.)
3         MR. GREENSTEIN:  For the record, this is
4   NDCA-ORCL 047279 through 048683.  It says, "Oracle
5   Receivables User's Guide."  This was previously marked
6   at Tom Williams' deposition as Exhibit 4.
7      Q.  Mr. O'Bryan, if you could turn your attention
8   to page 048665.
9      A.  I'm there.
10     Q.  You see it has a definition of debit memos?
11     A.  I see that.
12     Q.  Have you seen this document before?
13     A.  I have, yes.
14     Q.  And what is it?
15     A.  This is Oracle Receivables User's Guide, dated
16  March 1997, Volume I, Release 10SC.
17     Q.  Okay.  Did you rely on this document in
18  issuing your report?
19     A.  I certainly considered it.  I don't know that
20  I relied on it.
21     Q.  And the definition of debit memo there, it
22  says, "Debit that you assign to your customer for
23  additional charges that you want to collect."  Do you
24  see that?
25     A.  I do.

119

1      Q.  Is that your understanding what a debit memo
2   is?
3      A.  No.
4      Q.  That definition is inconsistent with what you
5   believe to -- what a debit memo is?
6      A.  There are many definitions of a debit memo as
7   I mentioned.  That certainly is one, which I think I
8   mentioned previously.  But there can be many definitions
9   of a debit memo.
10        Anything to do with increasing a receivable is
11  a debit memo.  Anything to do with increasing any asset
12  is a debit memo.
13     Q.  But that definition is not -- the definition
14  you just described is not in this document; is it?
15        MR. GLENNON:  Objection; vague and ambiguous.
16        THE WITNESS:  No, it doesn't say it.  You can
17  see what it says.
18        MR. GREENSTEIN:  Q.  If you turn to 048672,
19  you see the entry, it says, "On-account"?
20     A.  I do, yes.
21     Q.  And it says, "Payments where you intentionally
22  apply all or part of the payment amount to a customer
23  without reference to a debit item."  Do you see that?
24     A.  I do.
25     Q.  Is that consistent with what you believe to be

120

1   the meaning of on-account?
2      A.  Not the only meaning of on-account.  I mean,
3   we know on-account at Oracle meant something completely
4   different.
5      Q.  But this is Oracle's user's guide; correct?
6      A.  Well, this is a guide that's used in
7   receivables.  The collection department had something
8   completely different when they were thinking of
9   on-account.
10        So on-account, because it said there in a
11  user's guide, does not restrict that's the only
12  definition a company can have to a debit memo or an
13  on-account.  It would morph into exactly what the
14  company is specifically using it for.  And the debit
15  memo was used to clear an on-account.  It is an
16  appropriate use of a debit memo.
17        An on-account at Oracle meant that it was a
18  receipt that had been dealt with.  It had been done,
19  dealt with, and accordingly applied to an invoice,
20  transferred into revenues, written off against bad debt,
21  whatever they did.  There were flags sitting, 46,000
22  that were sitting as of November 2000.
23     Q.  So you say on-account at Oracle meant it was a
24  reset that had been dealt with; right?
25     A.  That's correct.

121

```
 1      Q.  And as of November 17th, how many on-account
 2   items were there at Oracle?
 3      A.  46,881.
 4      Q.  So for all 46,000 of those, the receipt had
 5   been dealt with; right?
 6      A.  That's correct.
 7      Q.  Okay.  And what do you mean by dealt with?
 8      MR. GLENNON:  Objection; vague and ambiguous.
 9      THE WITNESS:  That typically the collection
10   department had previously applied that receipt to
11   something, whether it be a refund, whether it be a
12   royalty that they figured out needed to be booked,
13   whether it be to an invoice.  It had been applied and it
14   was on-account.  It was simply a flag, there was no cash
15   sitting there, it was just a flag.
16      MR. GREENSTEIN:  Q.  No cash sitting there.
17   So were there any -- of the 46,000 receipts, were any of
18   them customer overpayments?
19      A.  No.  They could have been at some point in
20   time.  But as of the date they ran those debit memos,
21   those had all been cleared and put into some other
22   account.
23      Q.  And what accounts could those receipts have
24   been put into?
25      MR. GLENNON:  Objection; vague and ambiguous.
```

122

```
 1      THE WITNESS:  They could have gone into a
 2   refund, they could have gone into royalties, they could
 3   have gone into any income account.  They could have gone
 4   into accounts receivables, they could have gone against
 5   a contra-account to an expense, to a tax rebate.  They
 6   could have gone to a number of different places.  But
 7   they had all been cleared and were just flagged sitting
 8   there.  There wasn't 46,000 amounts of cash sitting
 9   there to apply to something.
10      MR. GREENSTEIN:  Q.  Were any of those 46,000
11   on-account items refunded as part of the 2002 cleanup?
12      A.  They were, yes.
13      Q.  Okay.  How many?  Do you know?
14      MR. GLENNON:  Objection; vague and ambiguous,
15   lack of foundation.
16      THE WITNESS:  I couldn't have an exact number
17   of that.  As I referred to earlier, there is a summary
18   of that cleanup, what's called the unapplied or the
19   reserve process or the transfer to reserve process,
20   which was done in October, November of 2002.
21      And I have a page that summarizes it, it is
22   about $49 million.  And it split into different buckets
23   as to when it hit, those 25005s went into the reserve.
24   And the timing is such that you can't specifically say
25   what was in the quarter.  You can look for, I think it
```

123

```
 1   is August of '00 through about December of '01.  So you
 2   don't get an exact match.  So I can't tell you exactly
 3   what was refunded out of those 46,881 debit memos.
 4      MR. GREENSTEIN:  Q.  Of the 926 debit memos
 5   that you reviewed, how many of those were refunded as
 6   part of the 2002 cleanup?
 7      MR. GLENNON:  Objection; vague and ambiguous.
 8      THE WITNESS:  I don't know that number either.
 9   I don't recall that number.
10      MR. GREENSTEIN:  Q.  But some of them were;
11   right?
12      A.  Certainly.
13      Q.  And why would they be refunded in 2002 if they
14   were sitting on-account as of November 17th, 2000?
15      MR. GLENNON:  Objection; calls for
16   speculation, lack of foundation.
17      THE WITNESS:  Because of the original transfer
18   that took place in, say, October or November of '00,
19   before the debit memos were run to clear the on-account,
20   if they had been put into the reserve account
21   inappropriately they would need to be fixed at some
22   point in time and some further research done.
23      MR. GREENSTEIN:  Q.  So the refunds reflect an
24   inappropriate transfer from 25005 to 12601; correct?
25      MR. GLENNON:  Objection; mischaracterizes the
```

124

```
 1   testimony, lack of foundation.
 2      THE WITNESS:  Way too broad of a question.
 3   Sorry.
 4      MR. GREENSTEIN:  Q.  What did you mean when
 5   you said -- strike that.
 6      So, if an on-account -- one of the on-account
 7   items that were part of the debit memos transactions on
 8   November 17th was refunded as part of the 2002 cleanup,
 9   why was that?
10      MR. GLENNON:  Objection; vague and ambiguous,
11   lack of foundation.
12      THE WITNESS:  Because when the cash, the
13   unapplied cash was transferred into the 12601 account,
14   the 25005 account, into the 12601 account, which
15   happened for the most part in October/November of '00,
16   subsequent to that, at least six weeks later on the
17   October transfers, the debit memos were run to clear the
18   on-account.
19      So if, in fact, when those transfers were made
20   from 25005 to 12601 in October/November, if they were
21   done inappropriately, when the unapplied cash project
22   was done in November, if they researched that and saw
23   they were done inappropriately, there would be a refund.
24   Having nothing to do with the debit memos, having
25   everything to do with what was done in October and
```

125

1  November when there was a decision made to move it from
2  25005 into the 12601 account.
3          MR. GREENSTEIN:  Q.  Let's take a
4  hypothetical.  So an item that was transferred, let's
5  say, in October 2000 from -- a receipt was transferred
6  from 25005 to 12601.  You follow me?
7          MR. GLENNON:  Objection.  Is there a question?
8  Are you setting out a foundation for a hypo, is that
9  what you're doing?
10         MR. GREENSTEIN:  Yes.
11         THE WITNESS:  I understand that.
12         MR. GREENSTEIN:  Q.  And that occurred;
13  correct?
14     A.  This is not a hypothetical?
15     Q.  No.  That occurred.
16         MR. GLENNON:  Objection; vague and ambiguous.
17         MR. GREENSTEIN:  Q.  There were items of
18  unapplied cash from 25005 that were transferred to 12601
19  in October 2000; correct?
20         MR. GLENNON:  Same objection.
21         THE WITNESS:  There were, yes.
22         MR. GREENSTEIN:  Q.  Do you know how much
23  there were?
24     A.  I have the number somewhere.
25     Q.  Around 15 million?

126

1          MR. GLENNON:  Objection; vague and ambiguous.
2          THE WITNESS:  I don't remember the specific
3  number.
4          MR. GREENSTEIN:  Q.  So those items were
5  marked account as of November 17th; correct?
6          THE WITNESS:  Were marked what?
7          MR. GREENSTEIN:  Q.  On-account.
8          MR. GLENNON:  Objection; vague and ambiguous.
9          THE WITNESS:  No.  They had previously been
10  on-account, and that flag needed to go away.
11         MR. GREENSTEIN:  Q.  But, so they were
12  designated on-account as of November 17th; correct?
13         MR. GLENNON:  Objection; vague and ambiguous
14  as to they.
15         THE WITNESS:  I'm sorry, would you remind
16  repeating that?  I lost your question.
17         MR. GREENSTEIN:  Q.  There was 46,000
18  on-account receipts as of November 17th; correct?
19         MR. GLENNON:  Same objection; lack of
20  foundation.
21         THE WITNESS:  Yeah, you got to start over.
22         MR. GREENSTEIN:  Q.  You don't understand that
23  question?
24     A.  46,000 on-account receipts as of
25  November 17th; correct?  I don't even know that's a

127

1  question.
2          MR. GREENSTEIN:  Q.  Let me ask it this way.
3  So, earlier you stated there were 46,000 receipts
4  designated on-account as of November 17th; correct?
5          MR. GLENNON:  Objection; mischaracterizes the
6  testimony, lack of foundation.
7          THE WITNESS:  We can't use the word receipt.
8  There were 46,881 accounts that had an on-account flag
9  on them.
10         MR. GREENSTEIN:  Q.  Okay.  And that -- okay.
11  And some of those items reflected a receipt being
12  transferred from 25005 to 12601; correct?
13         MR. GLENNON:  Objection; vague and ambiguous.
14         THE WITNESS:  And some of those reflected a
15  receipt being transferred -- I don't know what you mean.
16         MR. GREENSTEIN:  Q.  Well, why don't you
17  explain to me what you think the process is on
18  November 17th -- actually, scratch that.
19         So, the 46,000 items that existed as of
20  November 17th, 2000, were all those designated
21  on-account?
22         MR. GLENNON:  Objection; vague and ambiguous,
23  lack of foundation.
24         THE WITNESS:  All of the 46,881 debit memos
25  run, were run to clear an on-account flag on those

128

1  items.
2          MR. GREENSTEIN:  Q.  So all those items had an
3  on-account flag?
4          MR. GLENNON:  Same objections.
5          THE WITNESS:  That is correct.
6          MR. GREENSTEIN:  Q.  Okay.  Meaning they had
7  previously been dealt with before; correct?
8          MR. GLENNON:  Objection; vague and ambiguous.
9          THE WITNESS:  Meaning that they had previously
10  been dealt with by transferring them against an invoice,
11  by applying them to royalties, income, expense, whatever
12  they decided to do.  And some of them had moved from
13  12005 to 12601.
14         MR. GREENSTEIN:  Q.  You mean 25005 to 12601?
15     A.  Yes.  Did I misspeak?
16     Q.  Yes.
17         MR. GLENNON:  I don't want to interrupt.  It
18  is quarter to 1:00.  Can we take our lunch break?
19         MR. GREENSTEIN:  Sure.
20         VIDEOGRAPHER:  Off record at 12:43.
21         (Recess, 12:43 p.m. - 1:36 p.m.)
22         VIDEOGRAPHER:  On the record at 1:36.
23         MR. GREENSTEIN:  Q.  Good afternoon,
24  Mr. O'Bryan.
25     A.  Good afternoon.

129

1  Q.  Earlier you testified your testimony has never
2  been excluded from a case.  Do you remember that?
3  A.  I do, yes.
4  MR. GREENSTEIN:  I'm going to mark this next
5  as Exhibit 10.
6  (Exhibit 10 marked for
7  identification.)
8  MR. GREENSTEIN:  Q.  For the record, this is a
9  Lexis case printed out, dated April 5th, 2005.  Farnham,
10  F-a-r-n-h-a-m, v. Rehwald, R-e-h-w-a-l-d.  Mr. O'Bryan,
11  let me know when you're finished reviewing it.
12  A.  I have.
13  Q.  I would like to direct your attention to
14  page 5 of the document.  It is on the right-hand column,
15  sub point 2.  It says, "The court did not abuse its
16  discretion in excluding the testimony of J. Duross
17  O'Bryan."  Do you see that?
18  A.  I do.
19  Q.  That's you; right?
20  A.  That's correct.
21  Q.  And if you go down to right after the
22  underlined case cites, it says, "In the present case
23  Farnham attempted to prove the collectibility of an
24  enhanced settlement or judgment entirely through the
25  expert testimony of J. Duross O'Bryan, who had given

130

1  deposition testimony as to the value of certain assets
2  purportedly owned by the individual defendants in the
3  underlying action.  The trial court excluded this
4  evidence as unduly speculative and, therefore,
5  insufficient to prove collectibility."  Do you see that?
6  A.  I do, yes.
7  Q.  Is there a reason you didn't disclose this
8  earlier when I asked you if your testimony had been
9  excluded before?
10  A.  Yeah, because I never testified in court.  I
11  gave a deposition, and apparently the judge was not --
12  the judge made this ruling without even hearing my
13  testimony, other than my deposition.  I never testified
14  in court.
15  Q.  But you testified in a deposition; right?
16  A.  Yeah.  No.  When I heard your question this
17  morning, has any of my testimony ever been excluded, I
18  thought you meant as far as trial testimony.  I'm aware
19  of the fact I gave a deposition, and this court decided
20  it did not want to hear my testimony.
21  Q.  Do you know the reasons?
22  A.  What was described to me was that -- it was a
23  legal malpractice case, as I recall.  And one of the
24  issues with respect to the legal malpractice case was
25  whether or not the defendants -- or whether or not the

131

1  original cased defendants, the underlying cased
2  defendants would have had the wherewithal to pay any of
3  the damages.  And so I was asked to comment on some of
4  the values of their underlying assets in the underlying
5  case, which was part of my testimony.  Not all of my
6  testimony.  Just a part of it.  And the judge apparently
7  decided I should not give that testimony that was given
8  in deposition, not trial.
9  Q.  It was deposition testimony?
10  A.  I gave a deposition, yes.
11  Q.  So are there any other cases in which you --
12  your testimony, either deposition or at trial, has been
13  excluded?
14  MR. GLENNON:  Objection; vague and ambiguous.
15  THE WITNESS:  I am not -- this is the only
16  case I'm aware of where I gave deposition testimony that
17  was not admitted in a court.  And I'm not aware of any
18  testimony I've given in court that that has been
19  excluded.
20  MR. GREENSTEIN:  Q.  Okay.
21  A.  And that's what I was referring to this
22  morning.
23  Q.  And I think earlier we talked about a case,
24  Parnes V. Harris, involving Puris.  Do you remember
25  that?

132

1  A.  Yes.
2  Q.  I think earlier you testified you never
3  changed your testimony during a deposition?
4  A.  That's correct.
5  Q.  Do you remember being deposed on June 26, 2002
6  in the Puris case?
7  A.  I don't, no.  I recall a deposition on Puris.
8  I don't recall that specific deposition.
9  Q.  Did you change your testimony in that
10  deposition?
11  A.  Not that I know of.
12  Q.  I want to direct your attention to page 32 of
13  your opening report, which is Exhibit 1, the section
14  entitled, "Review of Subset of Unapplied Cash
15  Transfers."
16  A.  32?
17  Q.  Yeah.
18  A.  Yeah, I'm there.
19  Q.  Okay.  The second sentence you say, "I've
20  reviewed the script output for the 926 debit memos to
21  determine which of the transactions that had debit memos
22  in their accounting histories also had a transfer to the
23  bad debt reserve within their audit trail."  Do you see
24  that?
25  A.  I do, yes.

133

1    Q.  You say, "Within the accounting histories of
2   the transactions relating to the 926 debit memos, I
3   found 121 transfers to the bad debt reserve during the
4   second quarter of fiscal year 2001."  Do you see that?
5    A.  I do, yes.
6    Q.  Then it says, "These 121 transfers accounted
7   for approximately $10.6 million of the $20.1 million
8   transferred to the bad debt reserve during the quarter."
9   Do you see that?
10    A.  I do, yes.
11    Q.  So you -- looking at the 926 that you
12   reviewed of the script output, you found that
13   approximately $10.6 million had been transferred to the
14   bad debt reserve in 2Q?
15    A.  Correct.
16    MR. GLENNON:  Objection; vague and ambiguous.
17    MR. GREENSTEIN:  Q.  Did you do any analysis
18   of the other 9.5 million of the 20.1 total that was
19   transferred in the second quarter?
20    MR. GLENNON:  Same objection.
21    THE WITNESS:  Well, only to review a document
22   prepared by Oracle.
23    I'm sorry, your question is what period of
24   time?
25    MR. GREENSTEIN:  Q.  I'm asking if you did any

134

1   analysis of the $9.5 million in transfers during 2Q that
2   made up the rest of the $20.1 million.
3    MR. GLENNON:  Same objection.
4    THE WITNESS:  Well, as I referred to earlier,
5   there is a document, NDCA-ORCL 1646567.
6    MR. GREENSTEIN:  Q.  Can you repeat that?
7    A.  NDCA-ORCL 1646567.  I don't recall the name of
8   this document.  It's basically a summary, I believe, of
9   some of the reserve work that was done in
10   October/November of 2002 and on.  And it summarized kind
11   of the results of some of the work that was done in that
12   time frame.
13    And as I mentioned earlier, the miscellaneous
14   receipts column, which is column F, approximates $20
15   million.  The time frame is about the same, it's within
16   a month.  And the amount transferred into the bad debt
17   reserve is $18.9 million.  So fairly close to $20
18   million.
19    You can see a summary here of what was
20   resolved and how it was resolved in that regard.  So I
21   have also looked at that in addition to the specific 121
22   script outputs for the 926 subsection of total debit
23   memos.
24    Q.  So other than looking at that document that
25   was created by Oracle, did you perform any independent

135

1   analysis of the remaining $9.5 million in transfers to
2   the bad debt reserve in 2Q '01?
3    MR. GLENNON:  Objection; vague and ambiguous,
4   compound.
5    THE WITNESS:  No.
6    MR. GREENSTEIN:  Q.  With respect to the $10.6
7   million you looked at, the 121 transfers, can you just
8   describe the methodology you used in determining whether
9   those transfers were appropriate?
10    A.  The $10.6 million?
11    Q.  Right.
12    A.  There is a binder I brought with me today that
13   basically summarizes -- what we did was we ran a
14   database that pulled out of the 926 scripts all of those
15   that went from 25005 to 12601.
16    As I said, there was 121, totalling $6.10
17   million.
18    We then printed out script reports, script
19   output reports on each one of those and went through
20   each one of those in detail, and summarized this binder,
21   and as best summarized in a two-page document in front
22   of that binder is really the findings I've laid out with
23   respect to what I believe were appropriately, at least
24   some indication it was appropriate to include those in
25   the second Q '01 as being transferred from 25005 to

136

1   12601.
2    Q.  You're talking about -- you found that $2
3   million was appropriate?
4    A.  Approximately $2 million.  What I did was I
5   then matched that.  I found about $2 million, which I
6   could find some support for in script output, any kind
7   of notes that were taken from the collectors during that
8   time frame on the miscellaneous receipts section of
9   their report.
10    And I then matched that to the document we
11   just talked about, which summarizes the cash transfer
12   project.  And, you know, ours was $2 million.  When I
13   look at the report, it looks like it is at least $5.5
14   million that Oracle had decided was appropriately
15   recognized based into revenue based on that project.  I
16   felt like my number was conservative.
17    Q.  What was the total amount of bad debt
18   transfers that occurred, that Oracle tried to resolve
19   during the 2002 cleanup for all periods?
20    MR. GLENNON:  Objection; vague and ambiguous.
21    THE WITNESS:  I think it was approximately $50
22   million.
23    MR. GREENSTEIN:  Q.  $50 million?
24    A.  Something to that effect.
25    Q.  Could you calculate of that $50 million how

137

1 many items were refunded during the 2002 cleanup?
2 MR. GLENNON:  Same objection.
3 THE WITNESS:  No.  Because -- I did with
4 respect to the second Q.  But, again, the results are a
5 little bit skewed, because you're about a month off on
6 one side, maybe a couple months off on the other.
7 MR. GREENSTEIN:  Q.  So you didn't do any
8 calculations with respect to -- putting 2Q aside, the
9 rest of the, what did you say, $50 million?
10 A.  Might have been $49 million.
11 Q.  So you didn't do any independent analysis of
12 those other transfers, did you?
13 MR. GLENNON:  Objection; vague and ambiguous.
14 THE WITNESS:  What other transfers?
15 MR. GREENSTEIN:  Q.  The transfers in other
16 quarters besides 2Q '01 that were resolved in the 2000
17 cleanup.
18 MR. GLENNON:  Same objection.
19 THE WITNESS:  I didn't look at other Qs other
20 than the second Q.
21 MR. GREENSTEIN:  Q.  Okay.  So going back to
22 that binder, that is something obviously you relied upon
23 in doing your calculations in your opening report;
24 correct?
25 A.  I did, yes.

138

1 Q.  Are you aware there is a stipulation in place
2 in this case that requires you to produce to plaintiffs
3 any spreadsheets, calculations, any documents you relied
4 upon, that you were supposed to produce that to us at
5 the time of your report?
6 A.  Well, I think for the most part, other than
7 maybe a summary schedule that lays out the different
8 buckets, the three different buckets that we talked
9 about in my report, it is either a script output, which
10 you have all of, or there is also some supporting
11 documentation.  Maybe there is credit memos or debit
12 memos, which I think have all been produced, as far as I
13 know.
14 Q.  But that binder, you said you have summaries
15 on there of the $2 million that you deem to be
16 appropriate transfers; correct?
17 A.  Well, one could go and look through each one
18 of the individual sheets and get that information as
19 well.  All we did was summarize the sheet.
20 Q.  But you prepared a summary of that information
21 that you relied upon; correct?
22 A.  That is correct.  Well, did I rely on it?  Not
23 really.  I mean, you could go through each one of these
24 schedules and get that same information out of it.
25 Q.  What schedules are you referring to?

139

1 A.  The script output, or a summary of the script
2 output that we prepared here.
3 Q.  That document that you're pointing to there,
4 did you rely upon that?
5 A.  No.  All this was was just a summary for me
6 when I go through and review all the different
7 individual script outputs or the notes.
8 Q.  So let me get this straight.  You prepared
9 summaries of the $2 million that you felt were
10 appropriate transfers in the second quarter of '01, and
11 you relied upon those summaries in order to come to your
12 conclusions written in your report?
13 MR. GLENNON:  Objection; mischaracterizes the
14 testimony, and asked and answered.
15 THE WITNESS:  Yeah.  No.  What we did was we
16 got the script output for those 121, we reviewed through
17 each one of them individually.
18 We also got the notes, the collectors' notes
19 that were attached to the miscellaneous receipts
20 section, which was that period that best approximated
21 the second Q.  And we looked at those notes.
22 We then got copies of either credit memos or
23 any other notes and data that we could find that had
24 been produced, as far as I know, and summarized that.
25 And basically we came to a conclusion whether

140

1 or not it could be either in the royalty bucket or the
2 credit memo bucket or in a bucket that was one of the
3 two but we just didn't see support for.  And that's all
4 in this binder.
5 So if you took -- and then what we did is in
6 front of each one of those sections, which there is 35
7 of them, we simply put a single page, which summarizes
8 what the script says.  And then we simply then
9 summarized those summaries on two pages in front.
10 If you didn't have those summaries or the
11 summary of the summary, if you will, you can still get
12 that information right out of this binder.
13 MR. GREENSTEIN:  Q.  But you used those to
14 calculate the total amounts, and you put those in
15 summary documents that you rely upon; right?
16 MR. GLENNON:  Objection; mischaracterizes the
17 testimony, asked and answered.
18 THE WITNESS:  The calculation is done in the
19 individual scripts.  All that was is to summarize for
20 one place to go and look to see the number and tie it
21 back to the report.
22 MR. GREENSTEIN:  Q.  So you didn't rely on
23 that binder that's in front of you?
24 A.  I did rely on the binder.
25 Q.  You did?

141

1      MR. GLENNON:  Objection; mischaracterizes the
2  testimony.
3      MR. GREENSTEIN:  Q.  Did you rely on that
4  binder in front of you?
5      MR. GLENNON:  Same objection.
6      THE WITNESS:  I did rely on this binder in
7  front of me.
8      MR. GREENSTEIN:  Q.  And that binder contains
9  summaries of data that was pulled from the script
10  output; correct?
11      MR. GLENNON:  Same objection.
12      THE WITNESS:  As I said, the script outputs
13  were reviewed by us, and the information comes off of
14  that.  You can get all of the numbers that you see in my
15  report as to the $2 million right off of the script
16  outputs or the notes, the miscellaneous receipts.
17      All we did, for ease of summarization, was
18  prepare just that, a summary, which then ties to these
19  numbers.
20      So I certainly looked at it.  But the data
21  that I relied on was the source data, i.e., the script
22  outputs or the underlying source data.
23      MR. GREENSTEIN:  Q.  Turning to page 32 of
24  your report, of your opening report.  See the bullet at
25  the bottom, and it discusses, "Of the $10.6 million,

142

1  subject to my review, almost $700,000 of unapplied cash
2  transferred to the bad debt reserve during the second
3  quarter of fiscal year 2001 related to certain royalties
4  paid to Oracle."  Do you see that?
5      A.  Yes, I do.
6      Q.  How did you come up with that 700,000 number?
7      MR. GLENNON:  Objection; vague and ambiguous.
8      THE WITNESS:  By going through the script
9  outputs and the notes of the collectors as they went
10  through their cash project in October/November of 2002.
11      MR. GREENSTEIN:  Q.  So that $700,000, was
12  that related to one debit memo or multiple debit memos?
13      A.  Multiple.
14      Q.  Multiple.  How many, do you any?
15      MR. GLENNON:  Objection; vague and ambiguous.
16      MR. GREENSTEIN:  For the record the witness is
17  looking in the binder that is in front of him that he
18  said he didn't rely upon.
19      MR. GLENNON:  It is a videotaped deposition.
20      THE WITNESS:  Well, I want to clarify.  When I
21  said I didn't rely on -- when I said I did rely, I
22  relied on the script outputs and the notes.  The
23  summaries I don't need to rely on.  If you want to take
24  those out, that's fine.
25      MR. GREENSTEIN:  Q.  Can you tell me --

143

1  without looking at that binder, can you tell me how many
2  debit memos made up that $700,000 in royalties?
3      A.  Without looking at this binder?
4      Q.  Right.
5      A.  No.
6      Q.  Looking at the binder, can you tell me?
7      MR. GLENNON:  Same objection; vague and
8  ambiguous.
9      THE WITNESS:  Five.
10      MR. GREENSTEIN:  Q.  And can you tell me the
11  debit memo numbers of those five, please?
12      A.  3616, 3655, 7377, 13514, and 33069.
13      Q.  And can you tell me the customers that are
14  associated with those five?
15      A.  Yes.
16      MR. GLENNON:  Same objection; vague and
17  ambiguous.
18      THE WITNESS:  Dell Computer, Dell Computer,
19  Open Market, Structural Dynamic Research, Primavera
20  Systems, respectively.
21      MR. GREENSTEIN:  Q.  And those -- the debit
22  memo numbers that you just testified to, why aren't
23  those 550 numbers?
24      A.  We just truncated the 550.
25      Q.  So it is 550, and then the number?

144

1      A.  All the debit memos are 550.
2      Q.  Right.  And with respect to those five debit
3  memos, why don't you take me through the process of,
4  say, the Dell debit memo, and tell me what you saw in
5  the script output that led you to believe that that
6  royalty for that Dell debit memo was appropriately
7  transferred in the second quarter of '01.
8      A.  If you look at the script output on 10/1/2000,
9  the Dell Computer amount of $40,303 was transferred into
10  account 12601.  So there is the transfer.
11      Q.  On what date?
12      A.  10/1/00.  On November 17th, the debit memos
13  took place.  On 11/13/02, there was a reversal of the
14  debit memos, as the reserve project began.
15      On 5/14 of '04, they actually applied that
16  40,303 to an invoice.
17      Then if you look at the notes, the actual
18  collectors' notes, you will see that there were actually
19  royalties involved, and it was royalties that had not
20  been booked in the past, that went back all the way to
21  like May of 2000.
22      Q.  What was the invoice date of that debit memo?
23      A.  I don't see the actual date of the invoice,
24  the original invoice.  And there wasn't an invoice on
25  this one.  It was royalty that had never been booked

145

1  into revenue.  That's what happened a lot of times on
2  royalties, they would get checks in from people who were
3  paying them royalties, and they hadn't issued an
4  invoice, so there was no invoice to apply it to.  So
5  when they went and did the research, they realized that
6  they had a royalty relationship with these individuals
7  and that amount should have been applied to a royalty
8  income, but there was no invoice to apply it to.
9      Q.  Why wouldn't there be an invoice for a royalty
10  payment?
11      A.  Because sometimes Oracle wouldn't know,
12  specifically on royalty issues -- if they are --
13  basically if some of their computer people are licensing
14  some of their software and they are loading it onto
15  their computer, they paid them a royalty based on how
16  many of those they might sell, how many are loaded on
17  their computer.  Oracle doesn't know how much they
18  loaded.  So they don't know until they get the
19  information from the licensee as to what they loaded.
20  And at that point then they can book the revenue.
21      Some companies have different systems.
22  Apparently Oracle's is not where they can book it based
23  on knowledge of what the end-user loaded onto a
24  computer.
25      Q.  So when did Oracle learn that that $700,000 in

146

1  purported royalties were actually -- should have been
2  booked as revenue?
3      MR. GLENNON:  Objection; vague and ambiguous.
4      THE WITNESS:  You don't know that.  It could
5  have been known when they booked the original transfer
6  from 25005 to 12601.
7      MR. GREENSTEIN:  Q.  Well, you just said they
8  applied it to an invoice in 2004; correct?
9      A.  Right.  But there could have been knowledge of
10  that back in the second Q of '00/'01, and they simply
11  didn't book the invoice, they just booked it right to
12  income, which went through the reserve account.
13      Q.  If they knew that the royalty payment was a
14  royalty payment and they could book it as revenue, why
15  would it need to be applied to an invoice in 2004?
16      MR. GLENNON:  Objection; assumes facts not in
17  evidence, lacks foundation.
18      THE WITNESS:  Because that's when -- there are
19  really two -- in my opinion there were really two
20  investigations that went on with respect to how to apply
21  25005 cash to 12601.  Some of them are in October and
22  November of '00 when individuals made decisions to
23  transfer from 25005 to 12601.  That went right into
24  income, actually went into reserve that went into
25  income.  That was investigation number one in my

147

1  opinion.
2      Investigation number two is when the
3  collectors went back and specifically tested to see if
4  those were properly transferred to 12601 in the
5  second Q.  And if they then found information that told
6  them it was properly booked, they, in fact, did that.
7      MR. GREENSTEIN:  Q.  And you're saying that
8  with respect to -- well, with respect to the Dell
9  royalty payment, that they learned that, according to
10  you, that it was proper, they learned that in 2004;
11  right?
12      A.  No.
13      MR. GLENNON:  Objection; compound, vague and
14  ambiguous.
15      THE WITNESS:  I'm not saying -- I'm saying I
16  do know they knew that in 2004.  I don't know that they
17  didn't know that in 2000.
18      MR. GREENSTEIN:  Q.  Wouldn't you -- you said
19  you looked at some notes, collectors' notes?
20      A.  Correct.
21      Q.  Didn't the collector note tell you when they
22  learned of this?  Isn't it dated?
23      MR. GLENNON:  Same objections.
24      THE WITNESS:  The collectors' notes would all
25  be during the cash receipts project or the cash transfer

148

1  project -- cash reserve project in October/November of
2  2002.  Those notes are from that time frame.
3      My point is, for all I know, that information
4  was known when they made the original transfer from
5  25005 to the 12601 account.  They made that transfer.
6      MR. GREENSTEIN:  Q.  What evidence can you
7  cite that shows they knew at the time of the transfer
8  that it was a royalty payment?
9      MR. GLENNON:  Objection.  Calls for -- let me
10  withdraw that objection and insert a new one.  Vague and
11  ambiguous.
12      THE WITNESS:  Because they made the transfer.
13      MR. GREENSTEIN:  Q.  Because they made the
14  transfer in 2Q, that meant that they knew it was a
15  royalty payment?
16      MR. GLENNON:  Same objection.
17      THE WITNESS:  No.  At that point all they may
18  have known was it was income.
19      MR. GREENSTEIN:  Q.  But if they knew it was a
20  royalty payment, wouldn't they just account for it as
21  any royalty payment?  In other words, book it as
22  revenue?
23      MR. GLENNON:  Same objection; calls for
24  speculation, lack of foundation.
25      THE WITNESS:  That's what they did in

149

1  October/November of 2002 -- or 2000, they booked it as
2  income.
3        MR. GREENSTEIN:  Q.  True.  But what I'm
4  saying is -- well, let me put it this way.  In a normal
5  situation where Oracle receives a royalty payment, what
6  is the debit and credit?
7        MR. GLENNON:  Same objection.  Incomplete
8  hypothetical, lacks foundation, vague and ambiguous.
9        THE WITNESS:  At what point?  When they
10  booked the --
11        MR. GREENSTEIN:  Q.  No.  If a royalty payment
12  such as Dell comes into Oracle, no invoice like you
13  described, and they know it, how do they recognize that?
14  What are the debits and credits?
15        MR. GLENNON:  Same objections.  Lack of
16  foundation, incomplete hypothetical and vague and
17  ambiguous.
18        Do you understand the question?
19        THE WITNESS:  Yeah, I do.  They debit cash,
20  credit 25005 unidentified or unapplied.
21        MR. GREENSTEIN:  Q.  Right.  But if they knew
22  that it was legitimate royalty revenue, how would they
23  book that as revenue?
24        MR. GLENNON:  Same objection.
25        THE WITNESS:  Everything goes through 25005

150

1  when it comes in.
2        MR. GREENSTEIN:  Q.  No, but how would they
3  book -- that means it is unidentified; right?
4        A.  Everything initially goes into 25005.
5        Q.  I understand that.  What I'm saying is if it
6  goes into 25005, it is unidentified and they can't apply
7  it to an invoice; right?
8        A.  It all goes to 25005.  And then it either
9  immediately gets applied by the system to an invoice or
10  it goes into unidentified or it goes into unapplied or
11  it goes into applied.
12        Q.  Right.  But if they figure out where it could
13  be applied, they apply it; right?
14        MR. GLENNON:  Objection; vague and ambiguous.
15        THE WITNESS:  Correct.
16        MR. GREENSTEIN:  Q.  And then it wouldn't be
17  in 25005 anymore; right?
18        A.  Correct.
19        MR. GLENNON:  Same objection.
20        MR. GREENSTEIN:  Q.  So what I'm saying is, if
21  a royalty payment came in in 2Q and Oracle knew that it
22  was a royalty payment and they wanted to book it as
23  revenue, you're saying that they would debit cash,
24  credit 25005?
25        A.  That would be --

151

1        MR. GLENNON:  Objection; vague and ambiguous,
2  incomplete hypothetical.
3        THE WITNESS:  The initial transaction would be
4  a debit cash, credit 25005.
5        MR. GREENSTEIN:  Q.  What would be the next
6  transaction?
7        MR. GLENNON:  Same objections.
8        THE WITNESS:  The next transaction could be
9  that they take it as a debit to a receivable.  And a
10  credit to income, royalty income.
11        MR. GREENSTEIN:  Q.  And so that would be --
12  if Oracle knew that it was a royalty, a legitimate
13  royalty payment that could be booked as revenue and they
14  knew that during 2Q, there would be those two debits and
15  credits; right?
16        MR. GLENNON:  Objection; vague and ambiguous
17  and compound.
18        THE WITNESS:  Well, you could also do it --
19  that's one way of doing it.  There is another way of
20  doing it, which is just taking it against the reserve,
21  the 12601, and saying I recognize that 12601 will create
22  income, and book it there.  It is an immaterial amount
23  of money on a quarterly basis, so it wouldn't matter, as
24  long as it gets to income one way, one how.
25        MR. GREENSTEIN:  Q.  Okay.  So I just want to

152

1  make sure that it is clear.
2        So if a legitimate royalty payment was made
3  during the second quarter of '01, and Oracle knew that
4  it was a royalty payment that should be booked as
5  revenue, the way they would do that is by crediting
6  cash, debiting 25005 --
7        A.  No.
8        Q.  Just take me through the debits and credits of
9  a royalty payment that Oracle knew in 2Q should be
10  booked as revenue.
11        THE WITNESS:  There are a number of ways they
12  could do that.
13        MR. GLENNON:  Let me assert a "vague and
14  ambiguous" objection to the form of the question.
15        MR. GREENSTEIN:  Q.  So just give me the way
16  they could do it.
17        MR. GLENNON:  Same objection.
18        THE WITNESS:  They would debit cash, credit
19  25005.  There would be no invoice to apply it to,
20  because in this hypothetical they don't know there is an
21  invoice out there.
22        They then identify this is a royalty payment
23  of some sort, so they could debit accounts receivable
24  and credit the sales revenues, then apply that cash to
25  the receivable.

153

1      Or they also could debit the 25005 and credit
2  12601. It has the same impact of going to revenue.
3      MR. GREENSTEIN: Q. That's true. Okay. So
4  what evidence do you have that Oracle knew during 2Q '01
5  that the Dell royalty payment was legitimate?
6      MR. GLENNON:  Objection; vague and ambiguous
7  as to legitimate.
8      THE WITNESS:  That it took that second entry,
9  debited 25005 and credited 12601. It was put into
10  income in the second Q.
11      MR. GREENSTEIN: Q. So with respect to --
12  what was the amount of the Dell debit memo?
13     A.  $40,000.
14     Q.  So with respect to the other $660,000 in
15  royalty items that were transferred to the bad debt
16  reserve in 2Q, is it your opinion that Oracle knew at
17  the time that those were royalty payments?
18      MR. GLENNON:  Objection; vague and ambiguous,
19  compound.
20      THE WITNESS:  I have to take you through a
21  little bit of Accounting and Auditing 101.  Sorry.
22      MR. GREENSTEIN: Q. That's fine.
23     A.  Based on APB 20, which is correction of an
24  error, if somebody finds out in an accounting department
25  or a company finds out they have incorrectly accounted

154

1  for something, they need to consider whether that's
2  material.  If it wasn't material, you would leave it
3  where you found it.  But if somebody thinks it was
4  material at the time, then you fix it when you find it.
5  In other words, you make that correction when you find
6  it.
7      So, if in the second Q they were applying the
8  25005 to the 12601, that's recording income.  If -- then
9  remember during October/November time frame they
10  reversed all of that.  It all went out of revenue.  It
11  reduced revenue, basically, by that $20 million.
12      So now what they are doing, they are now
13  trying to go back and redo what somebody potentially did
14  in the second Q.  And in some of these instances I'm
15  finding and they are finding that the way it was booked,
16  at least as a credit to revenue, was appropriate.
17      So if it was done then in the second Q, based
18  on APB 20 and prior period adjustment GAAP accounting,
19  that's when you book it, is the second Q.
20     Q.  But you're saying that they realized that in
21  2004; correct?
22     A.  They may well have known that in 2000, the
23  second Q of 2000.
24      Somebody booked revenue on the Dell, in this
25  Dell example of $40,000 in income, it was booked income,

155

1  we know that, it was then reversed as part of this,
2  quote, unquote, cleanup process.
3      Then somebody went and researched this and
4  said, wait a minute, it was appropriately revenued in
5  the second Q, so it should be revenued in the second Q,
6  that's where you leave it.
7     Q.  Why didn't they reverse it before that?
8      MR. GLENNON:  Objection; vague and ambiguous.
9      MR. GREENSTEIN: Q. Before the 2002 cleanup,
10  why didn't they reverse those transactions?
11      MR. GLENNON:  Same question; same objection.
12      THE WITNESS:  There was no reason to reverse
13  them, because they thought they were properly in income.
14      MR. GREENSTEIN: Q. So what was the reason
15  why they did it during 2002 cleanup?
16     A.  Because they were trying to be conservative.
17  I think you've seen plenty of testimony on this, that
18  when they thought there were transfers from 25005 to
19  12601, not fully understanding the impact, they decided
20  to be conservative and reverse everything and
21  re-research it.  They, being Oracle.
22     Q.  So why did they do that -- why didn't they do
23  that in 2001?
24      MR. GLENNON:  Objection; vague and ambiguous,
25  incomplete hypothetical.

156

1      THE WITNESS:  Because at that point in time
2  they didn't know necessarily the magnitude or that there
3  had been 25005 transfers into 12601.
4      MR. GREENSTEIN: Q. So in looking -- in
5  determining that $700,000 of unapplied cash transferred
6  bad debt reserve in Q2 was appropriate with respect to
7  royalties, did you look at remittance information?
8     A.  We saw some remittance information.
9     Q.  For all five debit memos?
10      MR. GLENNON:  Objection; vague and ambiguous.
11      THE WITNESS:  I don't think it was all five.
12      MR. GREENSTEIN: Q. Was that physical copies
13  of remittance information?
14     A.  To the extent we had it, I think we would
15  have.
16     Q.  Did you cite that in your report?
17     A.  Let's go to the specifics.  You're talking
18  about the five?
19     Q.  Just focused on the $700,000 royalty payments.
20     A.  I'm just going through each one of the
21  documents to see if there is any remittance information.
22      Here I see, this is on Open Market, which is
23  number -- the fourth one I think I mentioned to you,
24  NDCA-ORCL 515892.  NDCA-ORCL 515892.
25      I see a copy of a remittance advice, a copy of

157

1   a check to Oracle from Open Market.
2        Q.   And is there a reason you didn't cite that in
3   your report, that document?
4        MR. GLENNON:  Objection; vague and ambiguous.
5        THE WITNESS:  You mean cite on page 20 --
6        MR. GREENSTEIN:  Q.  32.
7        A.  32?
8        Q.  Yeah.
9        A.  No.
10       Q.  Why not?
11       A.  I didn't see a reason.
12       MR. GLENNON:  Objection; vague and ambiguous.
13       MR. GREENSTEIN:  Q.  I'm sorry?
14       A.  I didn't cite every single document in the
15  report.  I may have relied on it, which would be back in
16  Appendix C, but I didn't cite each and every document we
17  saw in the report.
18       Q.  I understand.  So that document is cited in
19  Appendix C; correct?
20       A.  I believe so.
21       Q.  So what other -- did you look at source
22  documents for the $700,000 royalty payments?
23       A.  To the extent that we had them.  For example,
24  on -- well, some of the Dell information we had some
25  invoices.  On Open Market we talked about, we actually

158

1   have a royalty report that demonstrates to one of the
2   researchers that this was a royalty relationship.  And
3   I'm referring there to NDCA-ORCL 515892, which appears
4   to be attached to remittance advice.  So to the extent
5   we had source documents, we attached those.
6        Q.  So you didn't have some source documents for
7   some of those five debit memos?
8        MR. GLENNON:  Objection; vague and ambiguous.
9        THE WITNESS:  I would have to go through each
10  and every one -- we did have source documents.  I don't
11  know if they were absolutely complete.  But what made it
12  complete was the reviewing of the notes and seeing that
13  there was a royalty relationship based on the notes.
14       MR. GREENSTEIN:  Q.  When you say the notes,
15  you mean collector notes?
16       A.  That's right
17       MR. GLENNON:  Same objection.
18       MR. GREENSTEIN:  Q.  You're referring to the
19  ones in the script output; correct?
20       A.  That's correct.
21       Q.  Okay.  And was there one note for each
22  transaction?
23       MR. GLENNON:  Same objection.
24       MR. GREENSTEIN:  Q.  Strike that.
25       Was there one note for each of the five debit

159

1   memos?
2        A.  There are a number of notes.
3        Q.  So for the Dell debit memo, for example, how
4   many notes were there?
5        A.  For the Dell royalty item, there is one
6   note -- actually, there is, yeah, one note.  "No royalty
7   reports, use cash apps, per Jake, Dell is a full use
8   reseller.  They go through our partner resource network,
9   work directly with OA."
10       Q.  What date is that note?
11       A.  I don't know the exact date.
12       Q.  Okay.  Why not?
13       MR. GLENNON:  Objection; vague and ambiguous.
14       THE WITNESS:  Why not?
15       MR. GREENSTEIN:  Q.  Right.
16       A.  Because I don't see that exact date right
17  here.
18       Q.  Do you know when the note was written that you
19  just read?
20       A.  No, it doesn't matter when the date -- when it
21  was written, to me.
22       Q.  Why not?
23       MR. GLENNON:  Vague and ambiguous.
24       THE WITNESS:  I'm sorry, I thought I described
25  that, and I'll do it again.

160

1        I believe that there was work done in October
2   and November of '00 to transfer money from the 25005
3   into the 12601, and that created revenue, either
4   through -- principally through increasing the reserve.
5        Then because of the part of this cleanup
6   process, cleanup of the reserve process, that was all
7   reversed on a conservative approach by Oracle, and
8   completely re-researched.
9        And in the re-research, as far as I can tell,
10  and I will even take the later date, there is a note
11  here that Dell should be reported as a royalty.
12       So, if it was figured out in '02 or '03 or '04
13  as a royalty, that it should have been applied back at
14  the time, back into the second Q, or at the time that
15  original transfer was made it's appropriately recorded
16  as revenue then under GAAP.
17       MR. GREENSTEIN:  Q.  What do they do in 2004
18  once they learned that it was appropriate?
19       MR. GLENNON:  Objection; vague and ambiguous.
20       THE WITNESS:  They --
21       MR. GLENNON:  Incomplete hypothetical.
22       THE WITNESS:  They rebooked it to income,
23  which they had done in the second Q of '01.
24       MR. GREENSTEIN:  Q.  Do you know the date they
25  did that?

161

1    A.  The original?
2         MR. GLENNON:  Objection; vague and ambiguous.
3         MR. GREENSTEIN:  Q.  No.  The date in which
4    they booked it to revenue?
5    A.  Yes.
6         MR. GLENNON:  Same objection.
7         THE WITNESS:  On 5/11/04.
8         MR. GREENSTEIN:  And what document are you
9    referring to, the document you just looked at?
10   A.  I'm referring to the script.
11   Q.  The summary of that transaction; right?
12   A.  The script.
13        MR. GLENNON:  Objection; misstates the
14   testimony.
15        MR. GREENSTEIN:  Q.  What's the Bates number
16   of the document you're looking at?
17   A.  This is simply a printout of -- there is no
18   Bates on this.  It is just a printout of the script for
19   Dell.
20   Q.  So there is no Bates number, so I can't go
21   look at that information in a Bates numbered document;
22   right?
23        MR. GLENNON:  I object.  Plaintiffs know the
24   Bates number for the access database are all script
25   outputs.

162

1         MR. GREENSTEIN:  Q.  So you can't identify a
2    Bates number where that information is; correct?
3    A.  There is no Bates on this.  We simply printed
4    it off a database.
5    Q.  That's part of the summaries you were talking
6    about earlier?
7         MR. GLENNON:  Objection; mischaracterizes the
8    testimony.
9         THE WITNESS:  This is the script output, and
10   it is, as I said, debit memo 3616 for Dell.  And you can
11   see the application of the invoice on May 11, 2004.
12        MR. GLENNON:  We're happy to provide
13   plaintiffs with a Bates number for the script output if
14   you would like it.
15        MR. GREENSTEIN:  We're going to be requesting
16   any compilations or summaries or spreadsheets that
17   Mr. O'Bryan relied upon in coming to these conclusions,
18   which it is obvious he did, because he keeps looking at
19   them and he can't give me a Bates number.  So we're
20   going to request it, because under the stip we're
21   entitled to those documents.
22        MR. GLENNON:  I don't think you met your
23   foundation, because he's got to rely on them, and he
24   specifically said probably eight times that he relied on
25   the source documents in the script output.  And that's

163

1    what he was just referring to.
2         If you want to keep pressing him on what it
3    was he relied on, be my guest.  But I don't think you
4    met your foundation yet.
5         MR. GREENSTEIN:  Q.  Can you cite a Bates
6    number for the Dell debit memo that shows when the
7    royalty was booked?
8         MR. GLENNON:  Objection; vague and ambiguous.
9    Are you talking about the script output?
10        MR. GREENSTEIN:  Q.  Do you understand the
11   question?
12   A.  The script output, is that what you're talking
13   about?
14   Q.  No.  I'm asking if you can cite Bates numbers
15   for the source documents that you relied upon in doing
16   the calculations for the Dell debit memo.
17        MR. GLENNON:  I'm going to object again,
18   because, as you know, and as you guys printed out and
19   produced to our witnesses, when you print out specific
20   components of script output, the Bates number doesn't
21   appear on the script output.  We can provide it to you.
22   And the script output is certainly cited in the
23   appendix.
24        MR. GREENSTEIN:  Q.  So you're not willing to
25   turn over those summaries of those debit memos?

164

1    A.  I'm happy to give you the whole binder.
2    Q.  You are?
3         MR. GLENNON:  I'm not.  I don't think you've
4    met your foundation.
5         He said he relied on the underlying source
6    documents, and was reviewing and referring to the script
7    output, which plaintiffs have.
8         MR. GREENSTEIN:  Q.  So, Mr. O'Bryan, you just
9    said that you're willing to give us that binder of
10   summaries so we can figure out what you did in order to
11   calculate these amounts and how you did it; right?
12   A.  You don't need the summaries.  The two-page
13   summary that was done and the 35 individual summaries,
14   you don't need that to figure out what I've done.  All
15   you need is the 121 debit memos that had a transfer from
16   25005 to 12601.  That's all you need.  And then look at
17   the script output.  And then also have the notes from
18   the collectors with respect to the script output.
19   Q.  Why did you compile that information in
20   summary form?
21   A.  It is just easier to review.
22   Q.  Right.
23   A.  But the source of that information is the
24   script output, the notes, and any other documentation we
25   gather.

165

1   Q.  I understand that.  What I'm asking is if
2   you're willing to produce your summaries of your
3   calculations, which we believe we're entitled to anyway,
4   but if you're willing to produce those to plaintiffs?
5        MR. GLENNON:  I object.  It's outside the
6   scope of the stipulation.  He's got to rely on the
7   summaries, and he didn't rely on the summaries, he
8   hasn't relied on the summaries.  In fact, you haven't
9   identified a single piece of information that's in the
10  summaries that's not in the source documents.  He's
11  walked you through this.
12       MR. GREENSTEIN:  Q.  Are you willing to do
13  that?
14       A.  What I'm willing to do with respect to turning
15  over, I'm not the one that makes that decision.
16       MR. GLENNON:  He's not.
17       MR. GREENSTEIN:  Q.  But you're willing to do
18  it?
19       MR. GLENNON:  No, he's not.  It is not covered
20  by the stip.
21       THE WITNESS:  There is nothing in this
22  document to hide.  This is all -- except for the
23  summaries --
24       MR. GREENSTEIN:  I agree.  I agree.
25       THE WITNESS:  -- information I got that we

166

1   pulled out of the script.  So the documents are the
2   documents, the summaries are not necessary.  It is
3   simply for easier review on my part.  Whether or not it
4   is produced is certainly not my decision.
5        MR. GLENNON:  We're not going to be producing
6   anything we're not obligated to produce under the
7   stipulation, and that's the end.  That's just it.  And I
8   think we've produced everything that we were required
9   to.
10       MR. GREENSTEIN:  I understand that.
11       Why don't we take five minutes.
12       VIDEOGRAPHER:  This marks the end of tape two
13  in Volume I in the deposition of J. Duross O'Bryan.  At
14  2:21, going off the record.
15            (Recess, 2:21 p.m. - 2:34 p.m.)
16       VIDEOGRAPHER:  On record at 2:34.  This marks
17  the beginning of tape three in Volume I of the
18  deposition of J. Duross O'Bryan.
19       MR. GREENSTEIN:  Q.  Mr. O'Bryan, if we could
20  turn your attention to page 32 of your opening report,
21  same section we were talking about earlier.  In the
22  first paragraph you talk about the 121 transfers to the
23  bad debt reserve that you found of the 926?  Do you see
24  that?
25       A.  I do, yes.

167

1   Q.  Do you have a list of the 121 debit memo
2   items?
3        A.  I do.
4        Q.  And rather than ask you to tell me all of them
5   on the record, is there a list you can provide to
6   plaintiffs of those items?
7        MR. GLENNON:  Why don't we have this
8   discussion at the end.  I don't know if he relied on
9   that list.  Like I said on the record shortly before our
10  break, I don't want him to turn over anything that we're
11  not obligated to turn over.
12       MR. GREENSTEIN:  Okay.  I understand your
13  position, Brian.  What I'm saying is we believe we're
14  at least entitled to a list, if nothing else, a list of
15  these 121 transfers.  He would have had to rely on the
16  names of the customers in the debit memos.
17       MR. GLENNON:  Well, sure.  My point is simply
18  this, he's got to rely on the document or the summary in
19  order for it to be discoverable, and you haven't
20  established that he relied on this list.  In fact, he
21  couldn't have relied on this list, because he would have
22  had to generate the list in the first instance.  So you
23  don't know what he relied upon in order to determine
24  there was 121 transfers in the bad debt reserve in the
25  second quarter of fiscal year 2001.  If you want to ask

168

1   him that question, you can.
2        MR. GREENSTEIN:  Q.  This 121 transfers, can
3   you tell me right now what the names of those -- what
4   customers and debit memos they are?
5        A.  Yes.
6        Q.  And is there a document that I could -- a
7   Bates numbered document I could look at just to find out
8   what debit memo numbers they are?
9        A.  Well, it is in the script.
10       Q.  Right.  But I don't know which ones they are.
11  There is 926 in the script output; correct?
12       A.  Correct.
13       Q.  You found 121 of them that you're relying upon
14  in drawing conclusions about the appropriateness of
15  them; correct?
16       MR. GLENNON:  I object to the extent it
17  mischaracterizes the testimony and to the extent you're
18  trying to get our expert to do work that you guys can
19  easily do on your own with the materials you have.
20       MR. GREENSTEIN:  How can we find out what the
21  121 debit memos are, Brian?
22       MR. GLENNON:  Are you asking me a question?
23       MR. GREENSTEIN:  Q.  I'm asking you.
24  Mr. O'Bryan, is there any way sitting here if I go back
25  to the script output I could determine the debit memo

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

169

1  numbers for these 121 transfers?
2      A.  Yes.
3      Q.  Okay.  How would I do that?
4      A.  You just go into the script and run a sort in
5  the database that has the credit amount 12601, then it
6  prints all the information about that.  That's all we
7  did.
8      Q.  So if I did that, and then whatever came up as
9  crediting 12601, there would 121 transfer items?
10     MR. GLENNON:  Objection; vague and ambiguous.
11     THE WITNESS:  It would be 121 debit memos or
12  transfers from 25005 into 12601, totaling
13  $10,586,182.02.
14     MR. GREENSTEIN:  Q.  What document are you
15  looking at when you just made that calculation?
16     MR. GLENNON:  Objection; vague and ambiguous,
17  mischaracterizes the testimony.
18     THE WITNESS:  This is a summary of that query
19  that we ran off the script.
20     MR. GREENSTEIN:  Q.  And you're relying on
21  that document as we sit here right now to tell me the
22  total number; correct?
23     MR. GLENNON:  Objection; mischaracterizes the
24  testimony.
25     THE WITNESS:  Again, the basis of this is just

170

1  the script.  I didn't go through the script, all 926 of
2  them, and look to see the credited 12601 and add those
3  all up.
4      My engagement team at my request ran a query
5  on the database simply summarizing all the 12601s and
6  totaled those.  And that's 121 scripts, and $10.6
7  million.
8      MR. GREENSTEIN:  Q.  Okay.  Back to debit memo
9  55003616, it is one of the royalties that you mentioned
10  earlier.
11     A.  Yes.
12     Q.  Do you know which one that is?  The Dell, I
13  believe.
14     A.  I do.
15     Q.  Is it the Dell debit memo?
16     A.  3616?
17     Q.  Yes.
18     A.  Yes, I believe that's Dell.
19     Q.  I think you said it was reversed at some point
20  in November 2002 out of the reserve?
21     A.  Correct.
22     Q.  So there was a debit to 12601 in November
23  2002?
24     A.  Yes.
25     Q.  And is that in the script output?

171

1      A.  Yes.
2      Q.  And what is your basis for saying that there
3  was a debit to 12601 --
4      MR. GLENNON:  Objection; vague and ambiguous.
5      MR. GREENSTEIN:  Q.  -- for that debit memo in
6  November 2002?
7      MR. GLENNON:  Same objection.
8      THE WITNESS:  I'm sorry, what was your
9  question?
10     MR. GREENSTEIN:  Q.  My question is, can you
11  tell me the date that that debit memo, 55003616, was
12  reversed out of the bad debt reserve?
13     A.  I misspoke.  There is no reversal of it into
14  the 12601 account.  What I meant to say is a reversal of
15  the debit memo transaction.
16     Q.  But that item was transferred to 12601 in Q2;
17  correct?
18     A.  Correct.
19     Q.  Then during November 2002, you said it was
20  reversed out; correct?
21     MR. GLENNON:  Objection; vague and ambiguous.
22     THE WITNESS:  I misspoke on that.  It was not
23  reversed out.
24     MR. GREENSTEIN:  Q.  So it's still sitting in
25  the reserve then?

172

1      MR. GLENNON:  Objection; calls for
2  speculation, lack of foundation.
3      THE WITNESS:  No.  It was simply applied, it
4  was simply then applied to the appropriate revenue
5  account, which is a royalty, in '04.
6      MR. GREENSTEIN:  Q.  What were the debits and
7  credits in '04 to do that transaction?
8      MR. GLENNON:  Objection; vague and ambiguous.
9      THE WITNESS:  It was a debit to unapplied cash
10  and a credit to receivables.
11     MR. GREENSTEIN:  Q.  So it was never -- the
12  12601 was never debited; right?
13     MR. GLENNON:  Objection; vague and ambiguous.
14     THE WITNESS:  The 12601 was debited -- the
15  12601 was credited in October of '00.
16     MR. GREENSTEIN:  Q.  Right.  That's when it
17  was transferred to the bad debt reserve; correct?
18     A.  Correct.
19     MR. GLENNON:  Objection; vague and ambiguous.
20     MR. GREENSTEIN:  Q.  I think you testified it
21  was in November 2002 they reversed that transfer as part
22  of the cleanup; correct?
23     MR. GLENNON:  Same objection.
24     THE WITNESS:  As I said, I misspoke.  They did
25  not.

173

1     MR. GREENSTEIN:  Q.  So they didn't reverse
2  that transaction out of the reserve?
3     A.  No.
4     MR. GLENNON:  Same objection.
5     MR. GREENSTEIN:  Q.  So that credit of that
6  Dell debit memo is still sitting in 12601?
7     MR. GLENNON:  Calls for speculation, lack of
8  foundation.
9     THE WITNESS:  No.  It is now in -- they put it
10  into the receivable, and then they took it out of the
11  receivable on the 12601.
12     MR. GREENSTEIN:  Q.  Well, help me understand
13  this, because I'm not an accountant.  But if there was a
14  credit to -- there is a debit and credit for every
15  transaction; right?
16     A.  Yes.
17     Q.  And that's an accounting principle; correct?
18     A.  That is, yes.
19     Q.  So if there was a credit in October 2000 of
20  that debit memo in, and then in 2002, November,
21  what you're telling me, there is no debit to 12601;
22  right?
23     MR. GLENNON:  Objection; vague and ambiguous,
24  compound, incomplete hypothetical.
25     THE WITNESS:  Your question was?

174

1     MR. GREENSTEIN:  Q.  The question -- I'm just
2  wondering, the item was transferred, credited to 12601
3  in October 2000.  I'm wondering when Oracle reversed
4  that transfer, if at all.
5     MR. GLENNON:  Same objection.  Lacks
6  foundation, vague and ambiguous.
7     THE WITNESS:  Well, they reversed it by virtue
8  of taking it against the receivable when they realized
9  it was a royalty.  Then they applied the royalty to
10  that.  So effectively what you have is it coming out of
11  12601 and netting with the revenue.  So it was a zero
12  impact.
13     MR. GREENSTEIN:  Q.  Well, but there was a
14  credit in 12601.  In order to get that out of there, you
15  have to debit it; correct?
16     MR. GLENNON:  Objection; incomplete
17  hypothetical.
18     THE WITNESS:  Or that's just increasing
19  income.  Right?  I'm sorry, I didn't mean to say right.
20     MR. GREENSTEIN:  Q.  I'm asking, there was a
21  credit to 12601, and I'm wondering if ever there was --
22  how it got out of 12601 in November 2002.
23     MR. GLENNON:  Objection; vague and ambiguous.
24     THE WITNESS:  Out of 12601?  It didn't come
25  out of 12601.  It got recorded as a revenue applied

175

1  against an invoice in November of '02.
2     MR. GREENSTEIN:  Q.  And you said --
3     A.  Excuse me, March of '04.
4     Q.  March of '04 or November '02?
5     A.  March of '04.
6     Q.  So you said it was applied to a receivable.
7     A.  It was actually applied to an invoice.
8     Q.  An invoice dated what?  What was the date of
9  the invoice?
10     MR. GLENNON:  Objection; vague and ambiguous.
11     THE WITNESS:  All this occurred on May 4th --
12  May 11, 2004.
13     MR. GREENSTEIN:  Q.  Right.  But when was the
14  original royalty payment?
15     MR. GLENNON:  Objection; vague and ambiguous.
16     THE WITNESS:  I don't know when the original
17  royalty payment was.
18     MR. GREENSTEIN:  Q.  Wait, but didn't you say
19  earlier that the royalty -- if a royalty comes in, there
20  is no invoice?
21     MR. GLENNON:  Objection; mischaracterizes the
22  testimony, incomplete.
23     MR. GREENSTEIN:  Q.  Right?
24     A.  That's my testimony.  That's why I didn't know
25  the date of invoice, because there is no invoice,

176

1  because the royalties don't have invoices.
2     Q.  So in 2004 you just said that they applied
3  that to an invoice; right?
4     A.  They would have created an invoice and credit
5  memoed it up, because -- or adjusted it up, because
6  there was no invoice that existed, so you would have to
7  create the invoice, which was done in May of '04.
8     Q.  So they created an invoice for a payment that
9  was made prior to November 2000; correct?
10     MR. GLENNON:  Objection; vague and ambiguous.
11     THE WITNESS:  Correct.  You would have to,
12  because you have to apply that somewhere.
13     MR. GREENSTEIN:  Q.  Do you know the date they
14  created the invoice?
15     MR. GLENNON:  Same objection.
16     THE WITNESS:  May 2004.
17     MR. GREENSTEIN:  Q.  A specific date?
18     A.  May 11th, 2004.
19     Q.  Page 33, the bullet, "In addition, over
20  $800,000 of over transfers to the bad debt reserve
21  during this period were appropriate."  Do you see that?
22     A.  Where are you?
23     Q.  Page 33.
24     A.  Yes.
25     Q.  The bullet at the top of the page, the

177

1 $800,000?

2    A.  Yes.

3    Q.  It says, "In addition, over $800,000 other

4 transfers to the bad debt reserve during this period

5 were appropriate."  Do you see that?

6    A.  I do.

7    Q.  You mean 2Q '01?

8    A.  Correct.

9    Q.  Then you say, "It's appropriate in that Oracle

10 had already reduced its revenues for certain open and

11 unpaid invoices either all or in part through the use of

12 credit memos and/or inclusion in Oracle's general bad

13 debt reserve as of the second quarter of fiscal year

14 2001."  Do you see that?

15    A.  That's correct.

16    Q.  So can you explain what you mean there?

17    A.  That when the collections department was

18 researching the applied cash project, during the applied

19 cash project in October/November of '02 time frame, they

20 researched individually all these that came -- all these

21 debit memos that got reversed.

22        And in certain instances, we have one, two,

23 three, four, five, six, seven -- twelve instances where

24 the evidence is that they are effectively adjusting up

25 an invoice because they had inappropriately issued a

178

1 credit memo back in the 2000 time frame.

2    Q.  You said 12 items.  Is that 12 debit memos?

3    A.  That's correct.

4    Q.  So 12 debit memos made up the $800,000;

5 correct?

6    A.  That's correct.

7    Q.  Can you tell me -- can you just tell me the

8 debit memo numbers --

9    A.  Certainly.

10    Q.  -- of those?

11    A.  10200, 29695, 33442, 41212 -- actually, let me

12 go back.

13        These are the numbers that relate to a credit

14 memo that are in the $800,000 or that are in part of

15 that component.  And that would be, again --

16    Q.  Let me stop you there.  So are there debit

17 memos associated with those 12 items?

18    A.  You mean credit memos?

19    Q.  I mean debit memos.

20    A.  Oh, yes.

21    Q.  So can you tell me the debit memos -- the

22 debit memo numbers?

23    A.  I am sorry.  10200, 29695, 33442, 41212, 54 --

24 excuse me -- 42380, 43304, 45164, 45180, 45240, 45311,

25 45948, and 46151.  Those total up about $727,000.

179

1    Q.  Okay.  So you just rounded up to 800,000?

2    A.  Correct.

3    Q.  Why didn't you round down to 700,000?

4    A.  Because on the -- one of the other amounts, I

5 think it is 368,000, we rounded down.

6    Q.  Okay.

7    A.  So there is another category.

8    Q.  So there is $700,000 in royalties on page 32

9 of your report; right?

10    A.  Correct.

11    Q.  And $800,000 of what you call these adjusted

12 up items, to $800,000; correct?

13        MR. GLENNON:  Objection; mischaracterizes the

14 testimony.  Vague and ambiguous.

15        THE WITNESS:  I'm sorry.

16        MR. GREENSTEIN:  Q.  I'm trying to determine

17 what you mean by the 368,000 that you rounded down.

18    A.  It is a separate column.  I probably confused

19 you.  I apologize.

20    Q.  I just want to make sure there is -- that

21 we're looking at the items; right?

22    A.  Correct.

23    Q.  Well, so, my question is -- what was the total

24 of those 12 debit memos?

25    A.  $726,581.

180

1    Q.  My question was, why did you round that up to

2 800,000 instead of rounding down to 700,000?

3    A.  Because there is other items that make up the

4 $800,000 that are not part of the credit memo piece.

5    Q.  How many debit memos are those?

6    A.  Those are one, two, three, four --

7        MR. GLENNON:  Objection; vague and ambiguous.

8        THE WITNESS:  Those are five.

9        MR. GREENSTEIN:  Q.  And what -- that makes up

10 the part of the 800,000; correct?

11    A.  Yes.  When you include those five, it would be

12 $875,000, or to be exact $874,808.  That is my rounding

13 down.

14    Q.  Were those items that were resolved in the

15 same manner as the other items that had been adjusted

16 up?

17        MR. GLENNON:  Objection; vague and ambiguous.

18        THE WITNESS:  No.

19        MR. GREENSTEIN:  Q.  Can you please explain

20 why you think those are appropriate?

21    A.  Yeah.  These are very unusual ones.  These are

22 ones where there was cash that existed, obviously, in

23 the October/November time frame, where these amounts

24 were moved from 25005 into 12601.  So the cash existed

25 and it was written into the reserve.

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

181

1       However, upon further review of the invoices,
2 these were invoices that were very old, and given
3 Oracle's internal policy of reserving -- they have an
4 internal policy that over x number of days 50 percent
5 automatically goes to the reserve, over x number of days
6 20 percent goes to reserve -- those would have been
7 reserved anyway given the age of the invoice. So this
8 is a case where you literally are taking into income
9 amounts which have previously been written off, when you
10 shouldn't have written them off because you had the
11 cash.
12     Q.  Okay.  What is the total of those items?
13     A.  Those only total $150,000.
14     Q.  And how many debit memos?
15     A.  One, two, three, four -- five.
16     Q.  Can you list out the --
17     A.  7412, 38577, 41310, 42059, and 5 -- 45 --
18 45161.
19     Q.  So I'm going to break it into two parts.  I'm
20 going to first focus on the 12 debit memos that you said
21 were applied to previously written off invoices.  Is
22 that fair to say?
23     MR. GLENNON:  Objection; mischaracterizes the
24 testimony.
25     THE WITNESS:  No.  The 12 have to do with,

182

1 really, credit memos.
2     MR. GREENSTEIN:  Q.  Okay.  For those 12, why
3 don't you just take me through the debits and credits
4 that occurred during the 2002 cleanup to resolve those
5 items.
6     A.  Yeah, for all 12?
7     Q.  No, no.  Just -- they all were resolved in the
8 same manner; correct?
9     A.  Yeah --
10     MR. GLENNON:  Objection; lack of foundation.
11     THE WITNESS:  They all were resolved basically
12 in the same manner, which was based on the research done
13 by the collection department during the October/November
14 of 2002 time frame, it was discovered that a credit memo
15 had been inappropriately recorded on those amounts that
16 should not have been.  And if you recorded a credit memo
17 that should not have been recorded, then you should be
18 recording income once you discover that.
19     MR. GREENSTEIN:  Q.  So in each of those cases
20 for those 12 debit memos, your testimony is that Oracle
21 discovered in 2002 that there had been an erroneous
22 credit memo issued with respect to that debit memo;
23 correct?
24     MR. GLENNON:  Objection; mischaracterizes his
25 testimony.

183

1     THE WITNESS:  Well, yeah, those are all credit
2 memos.
3     MR. GREENSTEIN:  Q.  So why don't you take me
4 through the debits and credits that occurred in 2002
5 with respect to these 12 items, an example.
6     A.  Okay.  Before we -- I drank too much water.
7 Can I take a bathroom break?
8     MR. GREENSTEIN:  Sure.
9     VIDEOGRAPHER:  Off record at 2:56.
10     (Recess, 2:56  p.m. - 3:11 p.m.)
11     VIDEOGRAPHER:  On the record at
12     MR. GREENSTEIN:  Q.  Back to page 3 of your
13 opening report.
14     A.  Yes.
15     Q.  We were talking about the first bullet point
16 on the top of the page that says, "There were $800,000
17 of other transfers to the bad debt reserve during the
18 period that were appropriate."  And I think you
19 testified they were appropriate because Oracle had found
20 that there was an erroneous credit memo issued previous.
21 Is that correct?
22     MR. GLENNON:  Objection; mischaracterizes the
23 testimony.
24     THE WITNESS:  No.  It was either an
25 inappropriately applied credit memo, or you also have

184

1 the situation where there was items that were written
2 off, but then they had the cash for it, so they had been
3 inappropriately written off.  Those are the two I can
4 think of in that bucket right now.
5     MR. GREENSTEIN:  Q.  For the $800,000 -- I
6 just want to make sure I'm getting this straight.  For
7 the $800,000 you said there were 12 debit memos that
8 were transferred that related to the erroneous credit
9 memo issue; correct?
10     MR. GLENNON:  Objection; mischaracterizes the
11 testimony, vague and ambiguous.
12     THE WITNESS:  I think for the most part, I
13 haven't gone through them in detail with you, which I
14 can, but I think for the most part those are credit
15 memos.
16     MR. GREENSTEIN:  Q.  Okay.  What was the total
17 amount of those debit memos again?  $728,000?
18     MR. GLENNON:  Objection; vague and ambiguous.
19 Debit memos?
20     MR. GREENSTEIN:  Q.  The 12 debit memos we
21 were just talking about, what was the total amount?
22     A.  The 12 debit memos that had inappropriately
23 applied credit memos were $726,581.
24     Q.  Then you said there were five other debit
25 memos that related to what you called the unique issue;

185

1  correct?
2      A.  Yes.
3      Q.  What was the total of those amounts, or,
4  sorry, those five debit memos?
5      A.  About $148,000, it looks like.
6      Q.  So approximately $874,000; correct?
7      A.  Correct.
8      Q.  So is that the $800,000 you're talking about
9  there?
10     A.  Yes.
11     Q.  So first focusing on the 12 debit memos that
12  were related to erroneous, purportedly erroneous --
13  strike that.
14         Earlier you were talking about a number,
15  368,000.  I just want to clarify that's not part of this
16  800,000?
17     A.  It is not.
18     Q.  You just misspoke?
19     A.  No.  No.  What I said is -- you asked about me
20  rounding.
21     Q.  Okay.  And there was no -- I asked you why you
22  rounded 727 up to eight, remember?
23     A.  Well, I didn't mean -- I didn't round -- what
24  I had not included in the original numbers to you is the
25  five of the unusual or unique issues, which they

186

1  actually total 874.
2      Q.  Got it.
3      A.  And the last bucket, as you can see in my
4  report, is 500,000, which we really don't see all the
5  supporting documentation, but there is some evidence
6  that they were properly booked in or about the second Q
7  of '01.  That totals $482,000.
8      Q.  We'll get to that in a little bit.  So I want
9  to focus on the 12 debit memos that relate to erroneous
10  credit memos.
11         Can you explain the debits and credits that
12  occurred as part of the 2002 cleanup for those
13  transactions.  You can just use an example.
14     A.  Yeah.  Do you have -- do you want me to pick
15  the biggest one?
16     Q.  Sure.
17     A.  The biggest one is General Electric Plastics,
18  credit memo 46151.
19     MR. GLENNON:  Credit memo or debit memo?
20     THE WITNESS:  That's the debit memo number.
21     On October the 1st --
22     MR. GREENSTEIN:  Q.  Actually, why don't you
23  take me through that transaction from the transfer to
24  the bed debt reserve in 2Q and the subsequent
25  resolution.

187

1      A.  All right.  The actual transfer to 2Q to 26 --
2  getting late.
3         The actual transfer to 12601 in the second Q
4  of '00 occurred on October the 1st and October the 5th,
5  2000.  And it was for basically $184,000, where the
6  actual transfer took place, with an eventual credit to
7  12601, and a debit to 25005.
8         So they took it out of the 25005 account and
9  put it into the 12601 account.
10         Then, just to follow all the transactions, on
11  November 17th the debit memo transactions were run,
12  which were three simultaneous debits in and credits out
13  of 25005.
14         Then on November the 8th, 2002, the debit
15  memos were reversed, just reversing the 25005 account,
16  three simultaneous entries.
17         Then on the 24th of November, during the
18  unapplied -- the applied cash project, the reversal of
19  the bad debt transfer took place.  The way that has to
20  happen, you have to first debit and credit cash, because
21  the system doesn't think you have any cash there, it's
22  gone.  So it is a debit and credit to cash.  And then
23  you have a debit to 25005 and a credit to 12601.
24         So all that is doing is just reversing the
25  transfer that occurred back in October of '00.

188

1      Q.  But in order to reverse a credit to 12601
2  which occurred in 2Q, wouldn't you have to debit 12601?
3      A.  It is debited.
4      Q.  I thought you said credit?
5      A.  No, debit 12601, credit to 25005.
6      Q.  Okay, so let me back up.  So in November, you
7  said there was a debit and credit to cash; correct?
8      A.  In November when?
9      Q.  2002.
10     A.  Correct.
11     Q.  Then you said November 14th, 2002 there was a
12  debit to 12601 and a credit to 25005?
13     A.  It was November the 14th, same day.  All it is
14  doing is just reversing the October '02 transaction.
15  And it debits 12601 and it credits 25005, puts it back
16  into customer overpayments unapplied.
17     Q.  So debit 12601, credit 25005?
18     A.  Correct.
19     Q.  Okay.
20     A.  Which would have the result of reducing
21  income.  All right?
22         Then the next day on October -- excuse me,
23  November -- excuse me, a year later, November the 25th,
24  2003, after the research had been done on this
25  transaction, which is, by the way, General Electric

189

```
1    Plastics, they actually realized that there had been
2    credit memos that were inappropriately issued, and they
3    then booked the receivables and booked the sales.  And
4    then unbooked the 25005 account.
5         Q.  Okay.
6         A.  So, and that information was obtained through
7    looking at the notes, the collectors' notes, for this
8    account in the '03 time frame.
9         Q.  So when you say that was reflected in the
10   note, what was reflected in the notes?
11        A.  The credit memo discussion.
12        Q.  So, for these 12 transactions, how do you know
13   that those items were -- had erroneous credit memos?
14        MR. GLENNON:  Objection; vague and ambiguous.
15        THE WITNESS:  From the notes of the --
16        MR. GREENSTEIN:  Q.  Other than the notes, is
17   there any evidence that those 12 debit memos had
18   erroneous credit memos?
19        MR. GLENNON:  Same objection.
20        THE WITNESS:  In some cases you can actually
21   see credit memos.  But for the most part it was the
22   notes the collectors had done contemporaneous.
23        MR. GREENSTEIN:  Q.  Right.  You could see the
24   credit memos, but that doesn't tell you they are
25   proper or improper; correct?
```

191

```
1         MR. GLENNON:  Objection; asked and answered.
2         THE WITNESS:  I know that one on this one
3    would be the summary of what I looked at, the vast
4    majority of the support.
5         MR. GREENSTEIN:  Q.  So there are no other
6    documents?
7         A.  There are other credit memos, but I haven't
8    reconciled those to that number.  They appear to be
9    documents, invoices, et cetera, that support that based
10   on the credit of the collectors' notes.
11        Q.  In other words, the 12 debit memos in which
12   you have concluded had erroneous credit memos in their
13   history, you determined that those credit memos were
14   erroneous by looking at the notes; correct?
15        MR. GLENNON:  Objection; mischaracterizes the
16   testimony.
17        THE WITNESS:  For the most part that's
18   correct.
19        MR. GREENSTEIN:  Q.  Well, is there any other
20   piece of evidence that you relied upon?
21        MR. GLENNON:  Objection; vague and ambiguous.
22        THE WITNESS:  There are other documents,
23   invoices and other support.  I just didn't go back and
24   reconcile them.  They seemed to be support for me.  I
25   didn't reconcile them individually to see that they tied
```

190

```
1         A.  Well, no.  The notes say, "Receipt notes were
2    incorrect; wrong PA; do not show sufficient credit
3    memos; erroneous notes; and credit memo 722616."
4         So you can see, you can trace that back and
5    see there was an inappropriate credit memo on -- at some
6    point in time in the history.
7         Q.  Okay, so other than the notes, is there any
8    evidence that those 12 transactions had erroneous credit
9    memos?
10        A.  That's the summary of what we considered.  As
11   I said, we have a number of different documents here,
12   which is actual invoices, and appears to be documents
13   which were put together by collectors, et cetera, to
14   support that.  I haven't gone through and reconciled
15   those specifically.
16        Q.  So what source documents would tell you that
17   the credit memo is issued erroneously?
18        A.  Well, as I said, for the most part for me I'm
19   using the notes.  Those are the contemporaneous
20   documents I'm using.
21        Q.  I just want to make sure.  You said for the
22   most part.
23        So is there any other document that you're
24   relying upon in making the determination that those 12
25   transactions had erroneous credit memos?
```

192

```
1    exactly back to that.
2         I felt it sufficient to see the collectors'
3    notes done contemporaneous, see that they were talking
4    about credit memos that had been inappropriately
5    applied, and use that in my analysis.
6         MR. GREENSTEIN:  Q.  When you saw the note
7    that said erroneous credit memo in it, you didn't go
8    back to check to see if there was any document that said
9    the credit memo was erroneous; correct?
10        MR. GLENNON:  Objection; vague and ambiguous.
11        THE WITNESS:  Other than reviewing the notes,
12   no.
13        MR. GREENSTEIN:  Q.  Okay.  So for that one
14   debit memo for General Electric Plastics, is there one
15   note for that that indicates it is an erroneous credit
16   memo, or multiple?
17        A.  It is one note.
18        Q.  What does it say?
19        A.  It talks about credit memo, the credit memo
20   actually being 7227616 for -- for the amount of money
21   we're talking about.
22        Q.  Can you just read that note into the record,
23   please?
24        A.  Certainly.  "Receipt notes are incorrect,
25   wrong PA number, and three PRO projects that may
```

193

1  associate with this reserve amount do not show
2  sufficient credit memos.  Erroneous notes.  See
3  supplemental SO 4814239 and credit memo 7227616 for
4  $181,158.40," which is the amount.  "Makes more sense."
5  And then it talks about a 12/15/96 wire, references
6  text.
7      Q.  How does that note tell you there was an
8  erroneous credit memo?
9      A.  Because it talks about credit memo and talks
10 about credit memo 722616, whatever it was.
11     Q.  It doesn't say it was erroneous, does it?
12     A.  It is using a credit memo and that's -- if it
13 is a credit memo, to me that is an inappropriate
14 application of a credit memo.
15     Q.  So -- but couldn't it have been a proper
16 credit memo that was issued, for example, for customer
17 concessions?
18     MR. GLENNON:  Objection; incomplete
19 hypothetical, vague and ambiguous.
20     THE WITNESS:  No.  Because they eventually
21 booked it back to revenue.  So that means the credit
22 memo was inappropriately booked.
23     MR. GREENSTEIN:  Q.  So the fact they booked
24 it as revenue indicates to you that the previously
25 issued credit memo was erroneous?

194

1      A.  And the notes.
2      Q.  And the notes?
3      A.  Correct.
4      Q.  But the note doesn't say that there was an
5  erroneous credit memo; does it?
6      MR. GLENNON:  Objection; calls for
7  speculation.
8      THE WITNESS:  No.  It talks about the credit
9  memos.
10     MR. GREENSTEIN:  Q.  Okay.  And why don't you
11 take me through the next transaction of the 12, the next
12 highest one in the same way you did with the General
13 Electric Plastics, please.
14     A.  The next one is Structural Dynamics Research,
15 which I think I referred to in my report.
16     Cash was received in May of 2000.  In October
17 of 2001 the amount was transferred to 12601.  On the
18 17th of November, the debit memos took place.  On the
19 7th of November, there was a reversal of the
20 November 17th memos.  On 11/2 of '02 there was a
21 reversal of the transfer to 12601.  And -- I'm sorry, I
22 beg your pardon, I was in the wrong bucket.
23     Q.  I was wondering.
24     A.  Somebody could have stopped me before I got
25 there.

195

1      Q.  One quick question about the last transaction,
2  the GE Plastics.  What was the date of the note that you
3  relied upon?
4      A.  I think you asked me that before.  I don't
5  know the date of the note.
6      Q.  Okay.
7      A.  Okay.  Caltrans on November the 5th, 2000,
8  $91,254 was transferred into the 12601 account.  On
9  November 17th, the debit memos were run.  On
10 November 11th, 2002 there was a reversal of the debit
11 memos.  On November 24th there was a reversal of the
12 transfer.  And on 2/3/03 there was an application to
13 invoices.
14     Q.  Actually, is that this transaction that's
15 listed on 35 and 36 of your report?
16     A.  Exactly.
17     Q.  Do you know the date of the note?
18     A.  No.
19     Q.  Okay.  Did you do any analysis, other than
20 looking at the note, of whether the concessions for the
21 amount in reserve -- that there was too much of a
22 concession that was given to the customer due to the
23 customer sending in a payment for 91K?
24     MR. GLENNON:  Objection; vague and ambiguous,
25 assumes facts.

196

1      THE WITNESS:  Well, I think on that one if you
2  look through the script, you can see where there is --
3  the actual credit memo.
4      MR. GREENSTEIN:  Q.  Overpayment?
5      A.  Yeah.
6      Q.  So it was a credit memo, an invoice was memoed
7  reducing the invoice.  The customer made a payment for
8  the full invoice and so overpaid the amount of credit
9  memo; correct?
10     A.  Correct.  And it was later realized that the
11 credit memo should not have been issued because there
12 actually were services being performed.
13     Q.  Were there ever any instances where
14 overpayments occurred and the credit memo was
15 legitimate?
16     MR. GLENNON:  Objection; vague and ambiguous.
17     THE WITNESS:  I'm sorry, I don't understand
18 your question.
19     MR. GREENSTEIN:  Q.  Well, we just talked
20 about an invoice being reduced if you had a credit memo.
21 And somebody overpaid -- paid the full amount of the
22 invoice which resulted in overpayment; correct?
23     MR. GLENNON:  Objection; mischaracterizes the
24 testimony.
25     MR. GREENSTEIN:  Q.  You don't recall that we

197

1    just talked about that?
2        A.  Would you mind just repeating that one more
3    time.
4        Q.  Okay.  I will ask a different question.
5        With respect to those two debit memos that you
6    just went through, the erroneous credit memos, those
7    involved overpayments of invoices; correct?
8        MR. GLENNON:  Objection; vague and ambiguous.
9        THE WITNESS:  I don't recall Caltrans was
10   necessarily an overpayment.  It was just they paid, and
11   then erroneously, Oracle issued a credit memo, not an
12   overpayment, just issued a credit memo thinking they
13   weren't due the money.  And then later realized they
14   were due the money because there were services
15   performed.
16       MR. GREENSTEIN:  Q.  Okay.  So going back to
17   page 33, I want to focus on the five debit memos for
18   $148,000, where you describe a process where cash was
19   moved from 25005 to 12601 during 2Q.  Correct?
20       A.  Yes.
21       Q.  Can you just describe the process from the
22   transfer and then how it was resolved during the 2002
23   cleanup?
24       A.  Yeah, a little different than the other ones.
25   But in this situation what it really is, is a situation

198

1    where you are writing off an invoice that you have cash
2    for, and that's an inappropriate -- in that regard, you
3    should be reporting income.  So, in other words, you
4    have set up a reserve, but you have the cash.
5        So in this situation what happened was, for
6    these five instances, amounts were transferred in
7    October/November of '00 into the 12601 account.
8    However, at the same time you have invoices -- so they
9    are basically recording the income, okay.  However, at
10   the same time -- you actually have that cash that you're
11   taking against it.  At the same time, however, you have
12   reserved for that invoice, because it got too old, it
13   got to five months, six months, whatever the days were.
14   So you're simultaneously recording a reserve which you
15   should not be recording.  You're reducing income, and
16   you shouldn't.
17       So that is a situation where you literally
18   have written off a portion of the invoice, and, in fact,
19   you shouldn't have, because you had the cash.
20       Q.  And then how was that resolved during the 2002
21   cleanup?
22       A.  Well, to the extent that you had reserved it,
23   you should not have reserved for that much, so it should
24   have been taken back into income.
25       Q.  So what are the debits and credits that

199

1    occurred during the 2002 cleanup?  Why don't you take us
2    through the largest of those transactions.
3        A.  Let's just take -- take railroad reserve,
4    $65,901.
5        Q.  What's the debit memo?
6        A.  42059.  So in that transaction, in May, cash
7    was received.
8        Q.  What year?
9        A.  '00.  I'm sorry.
10       Q.  Okay.
11       A.  In October the amount was transferred into the
12   12601 account.  So they had the cash, they took it into
13   the reserve account.  On November 17th the debit memos
14   occur.  On November 12, '02 they reverse the debit memo
15   transactions.  And on November 24 they reverse the bad
16   debt transfers.
17       So what happens there is you effectively --
18   you have reserved too much, because you have an invoice
19   that you had the cash for, but you're recording a
20   reserve because of the age.  So you have to take that
21   into income.  It should be taken into income.
22       Q.  So the invoice that -- the payment was coming
23   in for an invoice that had previously been written off;
24   right?
25       A.  Right.

200

1        MR. GLENNON:  Objection; mischaracterizes the
2    testimony.
3        MR. GREENSTEIN:  Q.  Is that right?
4        A.  Payment comes in, gets written off or gets
5    transferred from 25005 into 12601 account, as if it was
6    into the income account.  However, at the same time you
7    have actually have reserved the invoice because it got
8    too old, but you had the cash.  So you got to reverse
9    that transfer into the reserve out.
10       Q.  How do you reverse that?
11       A.  You take it from 12601.
12       Q.  So it is a debit to 12601 and credit to --
13       A.  Be in income.
14       Q.  What date was that for the particular
15   transaction you were citing?
16       A.  11/24/02.
17       Q.  Was that the only transaction, debits and
18   credits, that occurred during 2002 with respect to that
19   transaction?
20       A.  Yes.
21       Q.  And how do you know that the invoice was
22   previously written off?
23       A.  Because we actually have the invoice and look
24   at the date of the invoice and apply it to the
25   percentages that Oracle would automatically reserve it

201

1    for.
2        Q.   But do you have actual evidence that the
3    invoice was written off?
4        A.   Well, it would be automatically -- you
5    wouldn't see that in the detail we have.  But you would
6    know that happened because of the date of the invoice.
7        Q.   So what you're saying is after a certain
8    amount of days where an invoice hasn't been paid, it
9    will automatically be written off?
10        A.   There are percentages that are written off, 20
11    percent, 50 percent and 85 percent.
12        Q.   So what was the date of that payment, or,
13    sorry, that invoice?
14        MR. GLENNON:  Objection; vague and ambiguous.
15        MR. GREENSTEIN:  Q.  For the railroad
16    transaction.
17        A.   May of '00.
18        Q.   And so when do you -- when did it get written
19    off?
20        A.   Well, a portion of it would have been written
21    off by 11/30/00, at the six month, 180 days.
22        Q.   Why only a portion of it?
23        A.   Because they don't write the whole thing off.
24    You just write a portion of it off.  Which is typical in
25    companies, you say, look, it is automatic at a certain

202

1    day we're going to write off this much automatically,
2    because there is a presumption it can't be collected.
3        Q.   But don't they presume the other portion can
4    be collected?
5        A.   At a later point in time, if they haven't
6    collected it, the remainder of it will be written off.
7    I have seen a number of companies do that.  They say,
8    180 days, automatically 50 percent gets written off no
9    matter what.
10        Q.   Turning to page 33 again, underneath the
11    $800,000 discussion, there is a discussion of at least
12    another $500,000.
13        And you state that, "These transfers were
14    appropriate, although the evidence relating to these
15    transfers is not as complete as the evidence I reviewed
16    in connection with the $1.5 million in transfers noted
17    above."  Do you see that?
18        A.   Yeah.  Yes.
19        Q.   So can you just explain what those
20    transactions are and why you found them appropriate?
21        A.   Well, again, they were originally transferred
22    from 25005 into 12601.  They were reversed in November,
23    November 24th, '02, all these were reversed for the most
24    part.  And when the unapplied cash project was performed
25    at that time, there is some evidence that it looks like

203

1    it was either an unapplied, or a credit memo that was
2    bad or a royalty that was appropriate.  The notes were
3    not necessarily conclusive, or we didn't see any other
4    type of support for that.
5        So that appears to be one that should have
6    been reported, given there is some evidence of a credit
7    memo or there was some evidence of a royalty or some
8    other type of revenue that should have been booked.  But
9    the notes were not conclusive for me, nor did I see any
10    other type of support.  We put that into a bucket of
11    could be.
12        Q.   Could be.  So you can't definitively say that
13    $500,000 of transfers was proper; correct?
14        A.   That's correct.
15        Q.   And how many debit memos made up the $500,000
16    that you're talking about?
17        A.   Twelve.
18        Q.   I hate to do this, but can you just go ahead
19    and list them into the record, please?
20        A.   Certainly.  3503, 3569, 5165, 7992, 10691,
21    40196, 44860, 2601, 5516, 43176, 44788, and 42 -- excuse
22    me, 45238.
23        Q.   Mr. O'Bryan, in your report you state that of
24    the 926 debit memos there are 277 that were refunded
25    prior to November 17th, 2000 for $103 million; is that

204

1    accurate?
2        A.   That is correct.
3        Q.   If I wanted to go into the script output and
4    figure out those 277 debit memos, what would I do?
5        A.   You just go in and run a query on accounts
6    payable to see where there was a refund.
7        Q.   How would a refund show up?  Would it say
8    refund?
9        A.   The best place to go is accounts payable.
10        Q.   So if I just ran a query by accounts payable,
11    277 items would pop up?
12        A.   Yes.
13        Q.   Is there anything else I would need to do to
14    figure out these 277?
15        A.   Let me get to the report and make sure that's
16    right.
17        Do you have the page of my report so I can
18    turn right to it?  I can find it, if you want.
19        Counsel, do you have the page of my report
20    that says that?  I can find it; I just want --
21        Q.   Oh, no, I don't.
22        A.   It is on page 13 of my rebuttal.  Yeah, it is
23    AP payment details.
24        Q.   AP payment details?
25        A.   AP payment details.

205

1    Q.  So if I ran a query in the script output for
2    that column pre November 17th, then 277 items would come
3    up?
4        A.  That is correct, 277 items totaling --
5        Q.  $103 million?
6        A.  $102,906,609, which we rounded up.
7        Q.  So is it fair to say that the other 649 of the
8    926 were not refunded prior to November 17th, 2000?
9        MR. GLENNON:  Objection; assumes facts, lacks
10   foundation.
11       THE WITNESS:  I believe that to be true, yes.
12       MR. GREENSTEIN:  Q.  That's $431 million in
13   debit memos; correct?
14       A.  Correct.
15       Q.  Okay.  So in deriving your calculation of the
16   $20.1 million that was transferred from 25005 to 12601
17   in the second quarter '01, which months did you include
18   in that calculation?
19       MR. GLENNON:  Objection; vague and ambiguous.
20       THE WITNESS:  Which months did I include?
21       MR. GREENSTEIN:  Q.  Yes.
22       A.  Well, what I should include is what's in the
23   quarter, which is September, October, November.
24       Q.  And why did you choose those months?
25       A.  Those are the months in the quarter.

206

1    Q.  Well, are you aware that Oracle had a practice
2    of calculating based on the second month of the quarter?
3    In other words, so for the second quarter, it would be
4    August, September and October?
5        MR. GLENNON:  Objection; lack of foundation,
6    assumes facts, incomplete hypothetical.
7        THE WITNESS:  Yeah, I think you're
8    misunderstanding the way that process works.
9        MR. GREENSTEIN:  Q.  So you didn't see any
10   evidence that that's the way they calculated the 12601
11   transfers for 2Q?
12       A.  Well, the reserve, the actual reserve, the
13   12601 reserve is calculated, looked at on a specific
14   account, on account-by-account basis, at the second
15   month of a Q.  And in the third month of a Q it is then
16   trued up.
17       Q.  Okay.
18       A.  In other words, you then look to see -- I know
19   that the specific items that are going to go bad or are
20   bad in the reserve.  But in the last month I know I
21   booked this much revenue on a historical basis, I
22   typically put 1, 2, 3 percent, whatever it is, then
23   gets trued up.  So a quarter is a quarter.
24       Q.  So, in other words, you calculated September,
25   October and November transfers from 25005 to 12601 in

207

1    order to come up with the $20.1 million; correct?
2        A.  That's correct.
3        Q.  Mr. O'Bryan, previously you said that in order
4    to find out the 277 refunds of the 926, you would run a
5    query on AP payment --
6        A.  Correct.
7        Q.  -- column; correct?  Are you sure that's in
8    the script output?
9        MR. GLENNON:  I'm going to object.  Lack of
10   foundation, vague and ambiguous.
11       THE WITNESS:  It is on the query we ran.
12       MR. GREENSTEIN:  Q.  Okay.  Can you think of a
13   reason why if we looked at the script output we wouldn't
14   see that column there?
15       MR. GLENNON:  Objection; calls for
16   speculation, lack of foundation.
17       THE WITNESS:  I didn't personally run the
18   filter or the run.  It was one of my team.  The thing I
19   see consistent is AP payment detail.  If it was another
20   column that then pulls that up, pulls that in, that may
21   be.
22       But what is consistent on that run, which is
23   in my work papers, is AP payment detail.
24       MR. GREENSTEIN:  Q.  Do you have a list of
25   those 277 in one place?

208

1        A.  I do, yes.
2        Q.  Are you willing to produce those?
3        A.  That's not up to me.
4        MR. GREENSTEIN:  To the extent that you can
5    establish the foundation for requiring production, we'll
6    certainly entertain that discussion.  But I don't think
7    you've done that.
8        MR. GREENSTEIN:  Q.  So you're not willing to
9    do it?
10       MR. GLENNON:  This is counsel's decision, as
11   you know.
12       But what Mr. O'Bryan has said is that
13   everything that he has gleaned and everything he's
14   relied upon is from the script output, which is actually
15   listed in the appendix to his expert report, which I'm
16   happy to point out to you, if you'd like.
17       MR. GREENSTEIN:  Q.  Mr. O'Bryan, do you think
18   it is helpful -- was it helpful for you to have a list
19   of those 277 items?
20       A.  For me personally?
21       Q.  Yeah.
22       A.  Well, certainly it summarized what they were
23   and how much they were.  But they come right out of the
24   script output.
25       Q.  If you could turn -- strike that.

209

1      Mr. O'Bryan, is it your testimony, your expert
2  testimony, that Ernst and Young analyzed the 2Q '01 bad
3  debt transfers, the transfers from 25005 to 12601 in the
4  second quarter?
5      A.  Yes.
6      Q.  They did review it?
7      A.  Yes.
8      Q.  What evidence can you provide that supports
9  your conclusion?
10     A.  As I recall, it was a deposition of Jennifer
11 Minton and also deposition of Mr. Henley.
12     Q.  Is there anything else you relied upon in
13 order to determine, to conclude that Ernst and Young
14 reviewed the $20.1 million in bad debt transfers in the
15 second quarter of '01?
16     A.  Well, just my experience as an auditor, and
17 knowing what auditors would be aware of and would talk
18 to clients about.
19     When you have the chief financial officer,
20 Mr. Henley, saying, "I've talked to them about that, or
21 would have talked to them about it," I think that's
22 pretty good evidence that they would have been spoken
23 to.
24     Then you also have Ms. Minton, who is also in
25 the accounting department, mentioning that they had been

210

1  talked to about it.  To me they would know that.
2      In addition to that, it would be an item that
3  an auditor would be interested in, given the amount, and
4  specifically given the fact that the client is telling
5  you this is something I want you to look at.
6      Q.  When you say an auditor would look at it, it
7  is not your testimony that Ernst and Young audited
8  Oracle's second quarter '01, is it?
9      A.  No.  I'm sure they performed the SAF 71
10 review.
11     Q.  Just so it is clear, Ernst and Young did not
12 audit Oracle's second quarter '01 bad debt transfers?
13     MR. GLENNON:  Objection; vague as to time.  Do
14 you want to clarify?
15     MR. GREENSTEIN:  Q.  At any time.  Is it your
16 testimony that Ernst and Young audited Oracle's second
17 quarter '01 financials?
18     A.  Well, no.  Arthur Andersen was the auditor.
19 But Ernst and Young was made aware of this in the
20 October/November of '02 time frame when this unapplied
21 cash project took place.  And I base that on testimony
22 that I've seen, as well as just my own experience as an
23 auditor that that would be something you'd see, and it
24 would be something you'd look at.
25     And as soon as you see it and as soon as you

211

1  look at it, you have to immediately look at it with
2  respect to the materiality back to the quarter it was
3  appropriately booked.
4      Q.  Why would you have to immediately look at it?
5      A.  Because it is something the clients brought up
6  to you and said, "Hey, will you take a look at this and
7  tell me" -- worst case scenario, hypothetically, which
8  we play out in my report, is the entire $20 million is
9  something that should be taken back to the second
10 quarter and reduce revenues by that.
11     The auditor would immediately say, "Look, I'm
12 not going to go do a bunch of analysis how this
13 happened.  That's the company's internal policy and
14 internal operations.  However, I do want to know if
15 that's something that has to be looked at and
16 investigated for me, the auditor, to know if it was
17 material in the second Q of '01 to potentially have to
18 restate the Q."
19     Even though they didn't audit the second Q of
20 '01, they being Ernst and Young, they certainly would
21 have had to consider materiality to go back and restate
22 that Q.  They would have responsibility for restating
23 that Q even though they did not report on it at the time
24 it was prepared.
25     Q.  So, just to be clear, your testimony is that

212

1  Ernst and Young did a review of the transfers from 25005
2  to 12601 in the second quarter '01, and issued an
3  opinion on that amount?
4      MR. GLENNON:  Objection; mischaracterizes the
5  testimony.  It is also vague and ambiguous as to time.
6      THE WITNESS:  No.  Auditors don't issue
7  opinions on individual transactions and/or accounts
8  within a set of financial statements.
9      MR. GREENSTEIN:  Q.  Let me rephrase.  So
10 you're saying they did review it though; right?
11     MR. GLENNON:  Objection; mischaracterizes the
12 testimony, it's vague and ambiguous.
13     THE WITNESS:  I believe that Ernst and Young
14 was made aware of the transfers and considered,
15 immediately upon being aware of, they would need to
16 consider whether or not it was material to that quarter.
17     MR. GREENSTEIN:  Q.  So do you -- do you know
18 if they considered it or not?
19     MR. GLENNON:  Objection; vague and ambiguous,
20 asked and answered.
21     THE WITNESS:  I do.  And they were.
22     MR. GREENSTEIN:  Q.  So your expert opinion is
23 that Ernst and Young reviewed the $20.1 million in
24 transfers from 25005 to 12601 in the second quarter?
25     MR. GLENNON:  Objection; vague and ambiguous

213

1 as to time, and asked and answered.
2 THE WITNESS:  I'm sorry, I think you are
3 changing that question.
4 My position is that they -- I believe that
5 they were aware of it, of the transfers, and I believe
6 given the fact they were aware of it, they considered
7 the materiality of that into the second Q of '01,
8 Oracle's financial statements.
9 MR. GREENSTEIN:  Q.  Okay.
10 A.  Did they perform audit procedures?  I don't
11 know what procedures they performed.  But I know having
12 been told about it, they would have had to consider the
13 materiality of it to the second Q.
14 Q.  They would have had to consider it; right?
15 A.  They would have, yes.
16 Q.  But do you know if they did consider it?
17 MR. GLENNON:  Objection; vague and ambiguous,
18 asked and answered.
19 THE WITNESS:  If they were told about it, they
20 would have considered it, and considered materiality.
21 Auditors do that.
22 MR. GREENSTEIN:  Q.  And you said the
23 evidence -- the only evidence that you have to support
24 your opinion is testimony from Jennifer Minton and
25 testimony from Jeff Henley, and what you know about what

214

1 auditors look at in general; correct?
2 MR. GLENNON:  Objection; mischaracterizes the
3 testimony.
4 THE WITNESS:  There is also the audit
5 committee minutes.  As I recall, the transactions, the
6 project, the unapplied cash project, was discussed in an
7 audit committee meeting.  And auditors have to, by GAAS
8 requirements, basically should, look at audit committee
9 minutes.
10 So when -- I don't know if they were at that
11 meeting that it was discussed or not; I don't know that.
12 But even if they weren't, they would look at the minutes
13 of those meetings.  It is a required step in audits or a
14 step all auditors perform in audits.  It is actually
15 represented to the auditors that the company has made
16 available to them all the minutes.
17 So the auditor would have seen -- it's
18 Mr. Henley's testimony, Ms. Minton's testimony, it's my
19 understanding what auditors do.  And, lastly, I
20 understand that it was discussed in the audit committee
21 meeting, and Ernst and Young certainly would have seen
22 those minutes and researched what that meant when they
23 were talking about the unapplied cash project or
24 whatever was discussed.
25 MR. GREENSTEIN:  Q.  But you don't know if

215

1 they did that or not, do you?
2 MR. GLENNON:  Objection; vague and ambiguous,
3 mischaracterizes testimony.
4 THE WITNESS:  I have not seen Ernst and
5 Young's work papers or talked to Ernst and Young
6 auditors that may have done that.  I believe the name is
7 Mr. Banker, Mr. Caruso, or something to that effect.
8 But, I know in my 27, 29 years as being an
9 accountant, auditor, that's something that if the CFO
10 told you about it, it would be something you would
11 consider with respect to materiality.
12 MR. GREENSTEIN:  Q.  Can you point me to the
13 Henley testimony that you're talking about?
14 THE WITNESS:  Yeah.  Do you want to take a
15 two-minute break?
16 MR. GREENSTEIN:  Yeah.  I'm going to be asking
17 for the Minton testimony and the Henley testimony.
18 VIDEOGRAPHER:  Off record at 3:55.
19 (Recess, 3:55 p.m. - 4:05 p.m.)
20 VIDEOGRAPHER:  On record at 4:05.
21 MR. GREENSTEIN:  Q.  Mr. O'Bryan, during the
22 break you said you were going to try to find the
23 testimony of Jennifer Minton and Jeff Henley.  Did you
24 do that?
25 A.  I did, yes.

216

1 Q.  Okay.
2 A.  And the reference in my report, I'm sorry, I
3 should have asked you this in the first place, would
4 have expedited things, was on page 41 of my original
5 report, section D, where it talks about review of work
6 performed.
7 And the two cites that we go to, first to
8 Jennifer Minton, Jennifer Minton was the chief
9 accounting officer, CAO, of Oracle by 2001.  And her
10 testimony when asked, "Was this analysis" -- the
11 analysis talked about was the unapplied cash analysis --
12 "shared with the outside auditors?"
13 "Answer:  Yes."
14 Question, over on page 285 --
15 Q.  Actually let me stop you there.
16 MR. GLENNON:  Hold on.  Are you finished with
17 your answer?
18 MR. GREENSTEIN:  Q.  I was going to say, if
19 this is the testimony that you're talking about, we
20 don't need to go through it.
21 A.  There is more testimony.
22 Q.  The one that said -- the stuff you cited on
23 page 41.
24 MR. GLENNON:  If you want to complete your
25 answer, you can.  But it is up to you.

217

1    THE WITNESS:  Well, yeah, I do want to
2  complete the answer, if you don't mind.
3    MR. GREENSTEIN:  Q.  Okay.
4    A.   Then on the next page they are talking about
5  Mr. Wald asked -- there is discussion on 284 if it was
6  discussed at the audit committee meeting.  And the
7  answer was, yes.  Didn't recall if the auditors were at
8  the audit committee.
9    And then also saying Tom Williams would have
10  discussed this with the auditors.
11    So you have Ms. Minton saying it was discussed
12  with the auditors, that it was discussed at the audit
13  committee, doesn't know if the auditors were at the
14  audit committee, and also the fact Tom Williams would
15  have discussed this with the auditors.  Also, given the
16  fact that, again, as I mentioned the auditors would have
17  to look at the audit committee minutes and see that
18  discussion, would have certainly considered this as to
19  materiality in the second Q.
20    Q.  They are talking about auditors there; right?
21    A.  Talking about auditors.
22    Q.  E&Y was not Oracle's auditor at the time were
23  they?
24    A.  This is talking about the auditors at the time
25  when this project was done, which was Ernst and Young.

218

1    Q.  So, okay, so is it fair to say that your --
2  the evidence that you rely on in forming the opinion
3  that Ernst and Young looked at the 2Q '01 transfers of
4  $20.1 million is reflected on page 41 in footnote 106
5  and 107; is that correct?
6    MR. GLENNON:  Objection; mischaracterizes the
7  testimony.
8    THE WITNESS:  Well, the second one is
9  Mr. Henley's testimony, which is, I believe, referred
10  to.  Let me just read it to you.  And that was asked
11  again about the, I think there they called it cleanup.
12  And here it was that the -- "I got Jennifer and asked
13  all the way down.  We get the people in the department
14  itself as well as the others, including the internal
15  audit, external audit, to really get an understanding of
16  what did or didn't happen."
17    Question was: "Okay, so you've answered
18  at least the question partially.  You got Ms. Minton
19  involved, you got external auditors involved.  Which
20  external auditors?
21    "Whoever our public auditors are at the time.
22    "Okay.
23    "Either Arthur Andersen or Ernst and Young, as
24  I testified earlier.  I can't remember when we
25  switched."

219

1    So it is clearly talking about '02, because
2  they did switch from Andersen, which no longer existed.
3    (Discussion off the record.)
4    (Record read as follows:  ANSWER:  It is
5    clearly talking about '02 because they did
6    switch from Andersen, which no longer existed.)
7    MR. GREENSTEIN:  Q.  Is that a fair
8  characterization of your testimony?
9    A.  Yes.
10    Q.  So, other than this deposition testimony of
11  Jennifer Minton and Jeff Henley, and I think you said
12  there is audit committee meeting notes, other than that
13  evidence, is there any other evidence that you believe
14  supports your conclusion that Ernst and Young looked at
15  the $20.1 million in transfers from 25005 to 12601
16  during 2Q '01?
17    MR. GLENNON:  Objection; mischaracterizes the
18  testimony, asked and answered.
19    THE WITNESS:  The only thing I would add would
20  be my understanding of how auditors work and what they
21  would look at and what they would consider.
22    MR. GREENSTEIN:  Q.  Okay.
23    A.  Which clearly would have been looking as to
24  materiality in the second Q.
25    Q.  Did you review the --

220

1    A.  I'm sorry to do this to you, but if you
2  recall, one of the later audit committee minutes states
3  that Ernst and Young was done with their review and they
4  were proposing no adjustments, nor did they adjust the
5  second Q of '01.  So that tells you that it was not
6  material in their mind.
7    Q.  Okay, what audit committee meeting was that?
8    A.  There was a subsequent audit committee meeting
9  where Ernst and Young presented to the audit committee
10  they completed their review of one of the Qs and there
11  were no adjustments.
12    Q.  That was third quarter '01, wasn't it?
13    A.  Exactly right.  The point is that when they
14  say that there is no adjustments, it really goes all the
15  way back.  If you find adjustments at any point in time,
16  you have to go back if it is material.
17    Q.  Okay.
18    A.  Under APB 20.
19    Q.  Did you review the SLC interview memo of John
20  Banker, who is the senior audit partner for E&Y at the
21  time?
22    A.  I haven't seen that, I don't think.
23    MR. GREENSTEIN:  Why don't I mark that.
24    (Exhibit 11 marked for
25    identification.)

221

1      MR. GREENSTEIN:  Q.  For the record, this is
2   NDCA-ORCL 296428 through 296434.  Actually, Mr. O'Bryan,
3   I'm going to focus your attention on a particular
4   portion of this.  So just let me know when you've
5   reviewed it.
6      A.  Yes, I read through that.
7      Q.  Have you seen this document before?
8      A.  I don't recall.
9      Q.  So you didn't -- did you consider it in either
10  your opening report or your rebuttal report?
11     MR. GLENNON:  Objection; vague and ambiguous.
12     THE WITNESS:  If I saw it, I considered it.  I
13  have not referred to it, so I have not relied on it.
14     MR. GREENSTEIN:  Q.  Okay.  So have you read
15  it before?
16     MR. GLENNON:  Objection; asked and answered.
17     THE WITNESS:  Yeah, I just don't recall.
18     MR. GREENSTEIN:  Q.  Okay.  If you turn to the
19  second to the last page.
20     A.  I'm there.
21     Q.  Actually, strike that.
22        Did you review the SLC final report regarding
23  the accounting allegations?
24     MR. GLENNON:  Objection; vague and ambiguous.
25     THE WITNESS:  I don't recall if I reviewed

222

1   that or not.
2      MR. GREENSTEIN:  Q.  Turning to the second to
3   the last page of this document.  You see how the heading
4   begins with, "Accounting Fraud Allegations Regarding
5   Unapplied Cash and Bad Debt Reserve."  Do you see that?
6      A.  I do, yes.
7      Q.  Why don't you go ahead and read the whole
8   thing.
9      A.  I've read that.
10     Q.  Okay.  So you read it just now.  But you're
11  not saying you read it before?
12     A.  I don't recall if I read it before.  I read a
13  lot of things.  I don't remember it.
14     Q.  You see how it says that the committee --
15  second sentence, "The committee discussed with Banker
16  that certain transfers from unapplied cash to the bad
17  debt reserve had occurred in Q3 of fiscal 2001, but that
18  the maximum amount of cash moved to the bad debt reserve
19  in Q3 was approximately $5 million."  Do you see that?
20     A.  Yes, I do.
21     Q.  Okay.  Do you see any evidence here that E&Y
22  looked at the second quarter of 2001?
23     MR. GLENNON:  Objection; document speaks for
24  itself.
25     THE WITNESS:  No.  The second quarter isn't

223

1   discussed.  But certainly Ernst and Young -- this is
2   almost a perfect example of the fact that they knew.
3   Having known -- and it says this process is ongoing.
4   Continuing its investigation of the claims regarding the
5   bad debt reserve, believe me, Ernst and Young would have
6   been all over this and looked back once the information
7   was known, which it was eventually later.
8         This was dated, I believe, November 13th.  So
9   this was before the transfer of all the bad debt, the
10  $20 million in bad debt reserves back to the 25005
11  account, which happened on November 24th.
12        So this is apparently what they knew at the
13  time, was 3Q, apparently not 2Q.  However, knowing that
14  there was ongoing investigation, Ernst and Young would
15  have been all over that.
16     Q.  You said that the reversal of the $20.1
17  million in transfer to the bad debt reserve in Q2
18  occurred on what date?
19     A.  November 24th, 2002.
20     Q.  All that $20.1 million was reversed on that
21  date?
22     A.  That's correct.
23     Q.  Okay.  So you will see this is an interview
24  memorandum from the SLC.
25        Do you know what the SLC ultimately put in

224

1   their final report?
2      MR. GLENNON:  Objection; the document speaks
3   for itself, lacks foundation.
4      THE WITNESS:  I don't recall what that report
5   says as I sit here right now.
6      MR. GREENSTEIN:  Q.  But you didn't rely upon
7   the SLC report in forming your opinion on whether E&Y
8   looked at that issue; right?
9      MR. GLENNON:  Objection; asked and answered.
10     THE WITNESS:  I didn't rely on it in my report.
11  I could have read it at one point or considered it, but
12  apparently haven't relied upon it.
13     MR. GREENSTEIN:  Q.  Mr. O'Bryan, did you --
14  in forming your opinion on Ernst and Young -- on Ernst
15  and Young's purported knowledge of the bad debt
16  transfers in 2Q '01, did you rely upon the deposition of
17  Alex Bender?
18     A.  I did see Mr. Bender's deposition where he
19  stated he didn't know anything about the second Q
20  reviews -- second Q transfers.
21     Q.  And wasn't --
22     A.  I just saved you an exhibit.
23     Q.  And are you aware that Alex Bender was the
24  person -- the witness designated by Ernst and Young as
25  the, quote, person most knowledgeable regarding these

225

1 issues pertaining to Oracle?
2     MR. GLENNON:  Objection; lack of foundation,
3 vague and ambiguous.
4     THE WITNESS:  I don't know if he was the PMK
5 or not.  He was the senior manager on the engagement,
6 Mr. Banker was the partner, but I think Mr. Banker had
7 retired, so was not necessarily available to be deposed.
8 It would probably make sense that the senior manager may
9 have been the PMK.
10     MR. GREENSTEIN:  Q.  So --
11     MR. GLENNON:  It is vague and ambiguous as to
12 these issues pertaining to Oracle as well.  Do you want
13 to clarify what they were designated as PMK for?
14     MR. GREENSTEIN:  No.  He answered.
15     Q.  So, given that you just said that you read
16 Mr. Bender's deposition, you said he didn't know about
17 the 2Q transfers, why do you still -- how do you still
18 form an opinion that they did know?
19     A.  Because --
20     MR. GLENNON:  Objection; vague and ambiguous,
21 asked and answered.
22     THE WITNESS:  You mean they knew, you mean
23 Ernst and Young knew?
24     MR. GREENSTEIN:  Q.  Correct.
25     A.  About the second Q transfers?

226

1     Q.  Right.
2     A.  Because of Ms. Minton's testimony,
3 Mr. Henley's testimony.  And then also my understanding
4 of how an engagement team works.  Not everybody on the
5 team knows everything about what is going on in the
6 engagement.  So it is very likely Mr. Banker could have
7 known about it and gave consideration to it, and
8 somebody else did, but Mr. Bender did not.  That's not
9 untypical at all.
10     Q.  But --
11     A.  An engagement team of an audit doesn't know
12 everything about the entire client, especially a client
13 the size of Oracle, on an ongoing basis.  That's why
14 there is a team.
15     Q.  So you think that it is more reliable to rely
16 on testimony of Jennifer Minton and Jeff Henley rather
17 than the testimony of Mr. Bender, who was designated by
18 Ernst and Young as its person most knowledgeable?
19     MR. GLENNON:  Objection; lack of foundation,
20 argumentative, mischaracterizes the testimony.
21     THE WITNESS:  Yeah, I don't think -- I've
22 considered all that testimony.  And all I'm saying is
23 given all the information that I've seen, I believe that
24 Ernst and Young did review that and did consider it with
25 respect to materiality.  And it is based on Ms. Minton's

227

1 testimony, Mr. Bender's testimony, Mr. Henley's
2 testimony, the audit committee information, my
3 understanding of how an engagement team works, and my
4 understanding of what auditors would be interested in
5 with respect to materiality.
6     MR. GREENSTEIN:  Q.  But you agree with me
7 that Mr. Bender says that he wasn't aware that Ernst and
8 Young looked at the 2Q transfer from 25005 to 12601;
9 correct?
10     MR. GLENNON:  Objection; lacks foundation,
11 document speaks for itself.
12     THE WITNESS:  I recall Mr. Bender saying
13 something to the effect he wasn't aware or didn't know
14 of any second Q transfers to the bad debt reserve,
15 something to that effect.
16     MR. GREENSTEIN:  Okay.  Mark two exhibits, 12
17 and 13.
18     (Exhibit 12 marked for
19     identification.)
20     (Exhibit 13 marked for
21     identification.)
22     MR. GREENSTEIN:  Let's mark 12 first.  For the
23 record, 12 is Bates stamped EY 000001 through EY 000012.
24 And Exhibit 13, for the record, Exhibit 13 is a portion
25 of the SLC report Bates stamped NDCA-ORCL 295517 through

228

1 295591.
2     Q.  Mr. O'Bryan, why don't you let me know when
3 you're finished looking.  Let's start with Exhibit 12.
4     A.  Okay.
5     Q.  Have you seen Exhibit 12 before?
6     A.  I don't recall seeing this document.
7     Q.  But you didn't rely upon it; correct?
8     A.  That's correct.
9     Q.  You see the first page is -- it's a copy of an
10 audit file that says, "Agreed upon procedures with
11 respect to debit memos to account 25005 in November
12 2000."  Do you see that?
13     MR. GLENNON:  Objection; the documents speaks
14 for itself.
15     THE WITNESS:  I do see that it says that, yes.
16     MR. GREENSTEIN:  Q.  What does this appear to
17 be?
18     A.  This is a binder cover from Ernst and Young's
19 work papers for the period 5/31/03.  It appears to be
20 the binder cover for the agreed upon procedure of the
21 work done on the debit memos.
22     Q.  If you turn to EY -- page EY 3.
23     A.  I'm there.
24     Q.  It is an e-mail from John Banker to
25 hfrahn@slblaw.com.  And it says, "Subject:  Re:  Draft

229

1  Insert For Your Review."  And it has a date of
2  11/19/2002.  Do you see that?
3      A.  I do, yes.
4      Q.  And the text of the e-mail says, "Buzz, here
5  is a draft marked for suggested changes by counsel and
6  me.  Please call to discuss.  Thanks.  JB."  Do you see
7  that?
8      A.  I do, yes.
9      Q.  Is it fair to say this appears to be an e-mail
10  from John Banker to an hfrahn, 11/19, enclosing some
11  changes to a document?
12      MR. GLENNON:  I'm going to just briefly object
13  just on the basis -- Eli, can you give me the background
14  on this particular document?  Has this been logged?  Is
15  this privileged?  This looks like it could be
16  privileged.
17      MR. GREENSTEIN:  Well, it was produced by
18  Ernst and Young.
19      MR. GLENNON:  All right, can we take a
20  couple-minute break so I can look into this?  I don't
21  want to shut you down on your questioning, but I can
22  just make a couple phone calls.
23      MR. GREENSTEIN:  Okay.
24      VIDEOGRAPHER:  This marks the end of tape
25  three in Volume I in the deposition of J. Duross O'Bryan

230

1  at 4:26, going off the record.
2          (Recess, 4:26 p.m. - 4:41 p.m.)
3      VIDEOGRAPHER:  On record at 4:41.  This marks
4  the beginning of tape four in the deposition of J.
5  Duross O'Bryan.
6      MR. GREENSTEIN:  Q.  Mr. O'Bryan, you have
7  before you what has been marked as Exhibits 12 and 13.
8  Exhibit 12 was the audit file, couple pages from the
9  audit file, and Exhibit 13 was a portion of the SLC
10  report.  Do you see that?
11      MR. GLENNON:  Objection; foundation.
12      THE WITNESS:  I see 12, which appears to be
13  Ernst and Young Bates stamped documents, and 13,
14  whatever Bates they are.
15      MR. GREENSTEIN:  Q.  If you turn to page EY --
16  on Exhibit 12, EY 3.
17      A.  Yes.
18      Q.  Sorry, EY 6.
19      A.  I'm there.
20      Q.  And it appears to be an e-mail from John
21  Banker to Joel Bonner, dated 3/11/2003.  It looks like
22  it includes the previous e-mail that we looked at dated
23  11/19/2002 from John Banker to Harrison Frahn.  Do you
24  see that?
25      A.  I do, yes.

231

1      Q.  It says, "Buzz, here is the draft marked for
2  suggested changes by counsel and me.  Please call to
3  discuss."  Do you see that?  "Thanks.  JB."
4      A.  I do, yes.
5      Q.  And if you turn to page 10, it appears to be a
6  red-lined Word or Word Perfect, word processing
7  document; correct?
8      A.  Appears to be, yes.
9      Q.  And see at the top it says, "On November 13th,
10  2002 the committee's counsel met with John Banker," and
11  the word "senior" is crossed out, it says, "Audit
12  Partner at EY."  Do you see that?
13      A.  I do, yes.
14      Q.  Look at Exhibit 13, and turn to page 295565.
15      A.  I'm there.
16      Q.  And you see how right under the heading:
17  "E&Y's review of the debit memos was consistent with the
18  committee's conclusions."  Do you see that?
19      A.  I do, yes.
20      Q.  Look at the first sentence at least.  It
21  appears that this language on 295565 is -- matches the
22  language on EY 10, except for the items that have been
23  underlined; correct?
24      MR. GLENNON:  I object to the extent the
25  document speaks for itself.

232

1      THE WITNESS:  I see that it looks a lot less
2  alike than it does alike.
3      Turn to 295566, it says, "Banker," and then,
4  "and Professor Grundfest," which isn't on the EY memo at
5  all.  The next sentence -- the next sentence in the EY
6  memo says it is on 556 -- I don't see -- I mean, are
7  there similar words and sentences?  Possibly.  But I
8  have not matched that up.
9      MR. GREENSTEIN:  Q.  Okay, well, let's just
10  look at it sentence by sentence.
11      So, if you look at the third sentence of both
12  documents.
13      A.  The third sentence.
14      Q.  The one that starts with, "The purpose of
15  these discussions."
16      MR. GLENNON:  Just for the record, it is not
17  the third sentence of Exhibit 13.
18      MR. GREENSTEIN:  Q.  Right.  The third
19  sentence in EY 10, and if you could find that same
20  sentence in 295566.  Do you see that?
21      A.  I see it in Exhibit 12.  And I'm now
22  looking -- I see it also in Exhibit 13.  I just see "The
23  purpose."
24      Are you asking me to do something with that?
25  I'm sorry.

233

1    Q.  Yeah.  I just want to -- it appears to me that
2  the language in EY 10 is the same as the language in
3  295566, in that what was red-lined -- what was red-lined
4  in Exhibit 12 was removed from the final version.  Does
5  that appear to be correct?
6       MR. GLENNON:  Objection; foundation.  The
7  document speaks for itself.
8       THE WITNESS:  Are you just asking me if that
9  sentence matches?
10      MR. GREENSTEIN:  Q.  Yes.
11   A.  If you take out the edited portions of that?
12   Q.  Right.
13   A.  It appears to.
14   Q.  It says, "The purpose of these discussions was
15  to consider both the committee's analysis and
16  conclusions regarding the accounting fraud allegations
17  and procedures performed by EY."  Then you see how it
18  crosses out "analysis"?
19   A.  Yes.
20   Q.  Okay.  So it appears that Mr. Banker removed
21  that word "analysis" and added the words "at the request
22  of Oracle's management with respect to those same
23  allegations."  Do you see that?
24   A.  I don't know who made that change.  I don't
25  know if it was Mr. Banker or Mr. Bonner who made that.

234

1    Q.  But that change was made?
2    A.  Yeah.
3       MR. GLENNON:  Objection; the document speaks
4  for itself.
5       THE WITNESS:  As it should be.
6       MR. GREENSTEIN:  Q.  Why is that?
7    A.  Because this is an agreed-upon procedure
8  report, procedures agreed upon by E&Y and the SLC.
9    Q.  E&Y didn't do its own analysis with respect to
10  the allegations; correct?
11      MR. GLENNON:  Objection; lack of foundation,
12  assumes facts.
13      THE WITNESS:  Are you speaking now about the
14  debit memos or the --
15      MR. GREENSTEIN:  Q.  I'm looking at this
16  document, and the word "analysis" is crossed out.  You
17  said that made sense to you; right?
18      MR. GLENNON:  Objection; mischaracterizes the
19  testimony.  The document speaks for itself, lack of
20  foundation.
21      THE WITNESS:  Well, I believe this becomes
22  part of the agreed-upon procedures report.
23      MR. GREENSTEIN:  Q.  But I'm wondering why --
24  it appears based on this document that somebody removed
25  the word analysis, such that it said that, "The

235

1  procedures performed by EY at the request of Oracle's
2  management," so instead of saying "procedures performed
3  by EY's analysis," they crossed out "analysis" and added
4  "At the request of Oracle's management."  Do you see
5  that?
6       MR. GLENNON:  Objection; the document speaks
7  for itself, lack of foundation.
8       THE WITNESS:  I do see that, yes.
9       MR. GREENSTEIN:  Q.  So doesn't that indicate
10  that EY performed procedures at the request of Oracle's
11  management, but did not perform its own analysis?
12      MR. GLENNON:  Objection; calls for
13  speculation.
14      MR. GREENSTEIN:  Q.  At least according to
15  this document?
16      MR. GLENNON:  Objection; calls for
17  speculation, lack of foundation, document speaks for
18  itself.
19      THE WITNESS:  Well, as part of -- agreed upon
20  procedures are exactly that, they are agreed upon
21  between the two parties, the auditor and whoever is
22  asking the auditor to do that.
23      But as part of the agreed-upon procedures, the
24  auditors perform analysis.  So if you ask me to, agreed
25  upon procedures, to go match up every word in this

236

1  document to this document and I agree to that, that's an
2  agreed-upon procedure between the two of us.  And I then
3  perform an analysis to see if that's true.
4       MR. GREENSTEIN:  Q.  Based on your extensive
5  experience working at audit firms, do you know why E&Y
6  would cross out the word "analysis" and add "at the
7  request of Oracle's management"?
8       MR. GLENNON:  Objection; lack of foundation.
9       THE WITNESS:  Because it looks like it's
10  saying "analysis."  If you look at the rest of the
11  edits, it looks like it would have said, "and procedures
12  performed by E&Y's analysis of those same allegations."
13      E&Y wouldn't make an analysis of the
14  investigations, that's not what they are being asked to
15  do.
16      MR. GREENSTEIN:  Q.  But doesn't it appear --
17  there are two underlying parts of that sentence,
18  correct, which it looks like it was added in, then there
19  is one word that was taken out.  Is that fair to say?
20      MR. GLENNON:  Objection; document speaks for
21  itself, lack of foundation.  The witness didn't author
22  the document.
23      THE WITNESS:  I'm not sure what you're asking
24  me.
25      MR. GREENSTEIN:  Q.  You have seen a red-lined

237

1	document before; right?
2	    A.  I have, yes.
3	    Q.  Based on what you know, it appears that "the
4	procedures performed by" was added, and then "at the
5	request of Oracle's management with respect to" was
6	added; right?
7	    MR. GLENNON:  Objection; the document speaks
8	for itself, lack of foundation.
9	    THE WITNESS:  Well, what it appears to have
10	said in the first instance was, "The purpose of these
11	discussions was to consider both the committee's
12	analysis and conclusions regarding the accounting fraud
13	allegations and E&Y's analysis of those same
14	allegations."
15	    Well, E&Y wouldn't perform an analysis of the
16	investigations.
17	    MR. GREENSTEIN:  Q.  It says allegations.
18	Where does it say investigations?
19	    A.  Excuse me, would not perform an analysis of
20	the allegations.  E&Y would consider the allegations and
21	agree to do procedures that were agreed upon between
22	itself and the committee.  And then in applying those
23	procedures would perform analysis.
24	    So, to me it makes sense that the change was
25	made.  It doesn't say they are not doing an analysis.

238

1	They are simply not doing an analysis with respect to
2	the allegations.
3	    Q.  They are saying they didn't do an analysis of
4	allegations; right?
5	    MR. GLENNON:  Objection; asked and answered,
6	document speaks for itself, calls for speculation.
7	    THE WITNESS:  I think it is just saying E&Y is
8	not trying to analyze what the allegations are, it is
9	simply performing procedures with respect to the
10	allegations.
11	    It wouldn't be Ernst and Young's job to
12	analyze the allegations, what the document says and what
13	the allegations are.  It would be their job to analyze
14	and perform procedures on the specific allegations.
15	    MR. GREENSTEIN:  Q.  Okay.  If you look down
16	to the last paragraph, you see -- why don't you just
17	read that sentence into the record as it was before
18	these red-lines were made.
19	    MR. GLENNON:  Objection to the extent that's
20	even possible.
21	    MR. GREENSTEIN:  Mr. O'Bryan, you're familiar
22	with red-lined documents; correct?
23	    A.  I am, yes.
24	    Q.  And do you feel capable -- that you're capable
25	of reading the sentence as it existed before the

239

1	red-lines were made?
2	    MR. GLENNON:  Are you representing both the
3	edits were made simultaneously?
4	    MR. GREENSTEIN:  Q.  I'm just saying can you
5	read that sentence without the edits in there?
6	    A.  I can read the sentence excluding the
7	underlines and including the line-outs.
8	    Q.  Perfect.
9	    A.  Does that work?
10	    Q.  Yeah.
11	    A.  "Banker informed the committee that E&Y had
12	performed its own examination of the accounting fraud
13	allegations in its review pursuant to principles that
14	E&Y agreed to with Oracle's -- with Oracle's the
15	November 17th debit memos."
16	    Q.  Okay.  And then you see how if you turn back
17	to page 10, EY 10, it appears that somebody crossed out
18	the portion that says -- when it says "EY had performed
19	its own examination of the accounting fraud
20	allegations," somebody crossed out "its own examination
21	of the accounting fraud allegations."  Do you see that?
22	    A.  I do, yes.
23	    Q.  So it appears that EY did not perform its own
24	examination of the accounting fraud allegations; is that
25	right?

240

1	    MR. GLENNON:  Objection; lack of foundation,
2	calls for speculation.
3	    THE WITNESS:  Well, we know what E&Y did,
4	because it is in their agreed-upon procedures.  And it
5	wouldn't surprise me that they -- I mean, examination in
6	auditing means something.  So to strike the words
7	"examination of the accounting fraud allegations" makes
8	all the sense in the world to me.
9	    MR. GREENSTEIN:  Q.  So in the agreed-upon
10	procedures that you just referenced, was there anything
11	in there that indicated that EY was supposed to look at
12	the bad debt transfers from 25005 to 12601 in the second
13	quarter '01?
14	    MR. GLENNON:  Objection; lack of foundation,
15	vague and ambiguous.
16	    THE WITNESS:  No.  The agreed-upon procedures
17	did not deal with the transfers from 25005 to 12601.
18	    MR. GREENSTEIN:  Q.  Okay.  If you look at the
19	sentence that starts, "Banker informed the committee."
20	Do you see that?
21	    A.  On which exhibit?
22	    Q.  Exhibit 12, EY 10.
23	    A.  I see "Banker informed the committee," yes.
24	    Q.  Then if you look at Exhibit 13, it is the last
25	paragraph on 295566.

241

1      A.  I see that, yes.
2      Q.  And if you just read that sentence and then
3 read the Exhibit 12, and let me know if it looks like
4 the changes were made.
5      MR. GLENNON:  I'm just going to object.  The
6 documents speak for themselves.  Do we have dates with
7 these respective documents?
8      MR. GREENSTEIN:  Q.  I'm just asking if it
9 appears those changes in Exhibit 12 EY page 10 were made
10 such that this document Exhibit 13, 295566, reads as if
11 the changes were made.
12      MR. GLENNON:  Same objections.
13      THE WITNESS:  Yeah, the changes on Exhibit 12
14 at pages EY 10 and 11, assuming that I'm interpreting
15 the cross-outs and underlines as being adds and deletes
16 properly, is then written on Exhibit 13, page 295566.
17 Does that answer your question?
18      MR. GREENSTEIN:  Q.  Yeah.  So if you look at
19 Exhibit 12, EY 11, and you go down to the sixth line, it
20 is the sentence that reads, "E&Y observed."  Do you see
21 that?
22      A.  You're on Exhibit 12?
23      Q.  12, yeah.  EY, page 11.
24      A.  "EY observed"?
25      Q.  "E&Y observed," in the sixth line down on the

242

1 right-hand side.
2      A.  Yes.
3      Q.  And it says -- I'm just going to read it, and
4 let me know if you disagree that this is what the
5 sentence says without the red-lines.
6      MR. GLENNON:  I just object to the extent
7 there is no foundation, no way you can determine whether
8 these deletions and additions happened simultaneously or
9 at different times, or how you can possibly determine
10 what the document looked like without the edits.
11      MR. GREENSTEIN:  Q.  So it says, "E&Y observed
12 that the debit memos had no effect upon Oracle's
13 revenues.  In addition, E&Y examined the transfers from
14 account 25005 to see whether there was a single large
15 entry that would be consistent with the accounting fraud
16 allegations claimed that account 25005 was the source of
17 $228 million in revenue on November 17th, 2000."  Do you
18 see that?
19      A.  I see that you've read that and edited it
20 based on line-outs and underlines.
21      Q.  Right.  But was that consistent with how you
22 would read this red-lined document if the edits hadn't
23 been made?
24      MR. GLENNON:  I object on foundation grounds.
25 The document speaks for itself.

243

1      THE WITNESS:  I have no idea who wrote this or
2 what was intended by the underlines -- underlines or the
3 line-outs.  I see the way you read it.
4      MR. GREENSTEIN:  Q.  And do you agree that
5 that would be the way that the sentence would read but
6 for the red-lines?
7      MR. GLENNON:  Objection; lack of foundation.
8      THE WITNESS:  What I agreed to is if you
9 exclude the words that have been lined through and you
10 include the words that have been underlined, that's the
11 way it reads.
12      MR. GREENSTEIN:  Q.  And you see how it says,
13 "E&Y observed that the debit memos had no effect upon
14 Oracle's revenues," and you see somebody crossed out
15 "effect upon" and added "debits or credits to Oracle's
16 revenue"?  Do you see that?
17      A.  I do.
18      MR. GLENNON:  I make a standing objection as
19 to foundation on the edited document.
20      MR. GREENSTEIN:  Q.  Do you know someone
21 would -- someone at E&Y would cross out the words
22 "effect upon Oracle's revenues" an instead insert so
23 that it says, "E&Y observed that the debit memos had no
24 debits or credits to Oracle's revenue"?
25      MR. GLENNON:  Objection; foundation.  There is

244

1 no foundation for who made this edit.
2      THE WITNESS:  Do I know why they would do
3 that?
4      MR. GREENSTEIN:  Q.  Right.
5      A.  I have no idea who was editing this or who
6 made the edit, if it was one of the attorneys or
7 Mr. Banker.  I have no idea.
8      Q.  Is it your expert opinion that E&Y observed
9 that the debit memos had no effect upon Oracle's
10 revenue?
11      A.  Well, I would have to -- I would have to look
12 at their agreed-upon procedures report to validate that
13 back to their report.
14      Q.  Right.  But you didn't say that in your
15 opinion that they observed that the debit memos had no
16 effect upon Oracle's revenues; did you?
17      MR. GLENNON:  Objection; vague and ambiguous.
18 The report speaks for itself.
19      THE WITNESS:  I don't see that it says --
20 talking about my report on page 17?
21      MR. GREENSTEIN:  Q.  There is two places in
22 your report I believe that you talk about E&Y.
23      A.  One is about the debit memos and one is about
24 the bad debt transfer.
25      Q.  Right.  So 17?

245

1    A.  Page 17 talks about the bad debt -- or the
2  debit memos.
3    Q.  Okay.
4    A.  So what is your question?
5    Q.  So you're not opining on page 17 that E&Y
6  observed that the debit memos had no impact on Oracle's
7  revenues, are you?
8    MR. GLENNON:  Objection; the document speaks
9  for itself.
10    THE WITNESS:  If I look at the fourth bullet
11  point down, it says, "E&Y reviewed the details relating
12  to the 145 debit memos greater than $500,000 and 55
13  arbitrarily-chosen debit memos.  E&Y found no financial
14  statement impact from these selected debit memos."
15    Next line down, "E&Y created three test
16  transactions with the same accounting distribution,
17  noting that no amount was recorded to revenue."
18    Next bullet point down says, "and found no
19  amounts recorded to revenue related to the debit memos,
20  as well as no unusual reconciling items."
21    And then my last conclusion is, "As noted
22  above, E&Y found no evidence that any revenue, or any
23  other financial statement impact was recorded as a
24  result of the November 17, 2000 debit memo project."
25    MR. GREENSTEIN:  Q.  Right.  So if you look at

246

1  the sentence that we just read where it says, "E&Y
2  observed that the debit memos had no debits or credits
3  to Oracle's revenue," you see how they removed the words
4  "effect upon Oracle's revenue"?  Do you see that?
5    MR. GLENNON:  Where are you?
6    MR. GREENSTEIN:  On EY 11, Exhibit 12.
7    MR. GLENNON:  Yeah.  Where about?
8    MR. GREENSTEIN:  The sixth line down.
9    MR. GLENNON:  Okay.
10    MR. GREENSTEIN:  Q.  Do you see that,
11  Mr. O'Bryan?
12    A.  I do.
13    Q.  So, is it still your expert testimony after
14  seeing this document that E&Y found no evidence that any
15  revenue or any other financial statement impact was
16  recorded as a result of the November 17, 2000 debit memo
17  project?
18    A.  Yes.
19    Q.  And your opinion doesn't change in looking at
20  what EY removed from this memo?
21    A.  No.
22    MR. GLENNON:  Objection; lack of foundation.
23  There has been no foundation E&Y was responsible for
24  removing what purports to have lines through it in the
25  text.

247

1    THE WITNESS:  No.  I mean, if you look at
2  this, "effect upon," the only way you can effect a
3  revenue at Oracle is to debit it or credit it.  That's
4  accounting.  That's Accounting 101.
5    So, if it didn't have any -- had no debits or
6  credits, that means it had no effect on revenue.  Why
7  those words were changed, I have no idea.  The
8  conclusion is still the same.  If you don't debit or
9  credit a revenue account, it has no effect on it.
10    MR. GREENSTEIN:  Q.  If you look at EY 11
11  again, it is right above the last paragraph, it is four
12  lines crossed out.  Do you see that?
13    A.  I do.  Starting with "Banker stated"?
14    MR. GLENNON:  Five lines?
15    MR. GREENSTEIN:  Q.  Do you see that?
16    A.  I do.
17    Q.  Okay.  And it appears that that portion was
18  removed from this memo; correct?
19    MR. GLENNON:  Objection; lack of foundation,
20  document speaks for itself.
21    THE WITNESS:  I see those lines crossed out,
22  yes.
23    MR. GREENSTEIN:  Q.  Do you know why somebody
24  at E&Y would remove the language that says, "Banker also
25  stated there was nothing in the materials that EY had

248

1  reviewed that indicated to EY that plaintiff's claims
2  about the November 17, 2000 debit memos had any
3  veracity"?  Do you see that?
4    MR. GLENNON:  Objection; lack of foundation,
5  assumes facts.
6    THE WITNESS:  Do I know why they would make
7  the change?
8    MR. GREENSTEIN:  Q.  Right.
9    A.  Well, I don't know who made the change, so I
10  don't know -- I have no idea why they would cross that
11  out.
12    You would have to look at the agreed-upon
13  procedures report and see if that was discussed.  Which
14  the veracity of the claim is really not something an
15  auditor would necessarily do.
16    Q.  So, do you have any evidence that E&Y reviewed
17  the veracity of plaintiff's claims regarding the
18  November 17, 2000 debit memos?
19    MR. GLENNON:  Objection; vague and ambiguous.
20    THE WITNESS:  I think what Ernst and Young
21  did, as laid out in my report on page 17 and 18, and
22  also included in their EY 000143 through 6, which is
23  their agreed-upon procedures memo -- and when I read
24  that memo and I also consider the testimony of
25  Mr. Bender, it appears to me as E&Y concluded there was

249

1  no financial statement impact from the debit memo
2  project.
3      MR. GREENSTEIN:  Q.  And EY 11 doesn't change
4  your opinion one way or the other?
5      A.  Not at all.
6      Q.  Okay.
7      A.  No.
8      Q.  Mr. O'Bryan, did you in connection with your
9  issuing your opinion in your rebuttal report, did you
10 ever calculate the amount of account balance of account
11 25005 as of 11/30 -- November 30th, 2000?
12     MR. GLENNON:  Objection; vague and ambiguous.
13     THE WITNESS:  Did I ever calculate the account
14 balance?  You mean do I know what the account balance
15 was in 25005 at 11/30?
16     MR. GREENSTEIN:  Q.  Correct?
17     A.  I don't know that my report states that.
18     MR. GREENSTEIN:  I want to mark this as
19 No. 14.
20         (Exhibit 14 marked for
21          identification.)
22     MR. GREENSTEIN:  Q.  Have you seen this
23 document before?
24     A.  I have, yes.
25     Q.  Did you rely upon it in issuing your report or

250

1  rebuttal?
2      A.  I considered it, and I think my rebuttal
3  report talks about some of the issues in this document.
4      Q.  What is your opinion as to what the balance of
5  account 25005 was as of November 30th, 2000?
6      MR. GLENNON:  Objection; the document speaks
7  for itself.
8      THE WITNESS:  $125,377,173.
9      MR. GREENSTEIN:  Q.  That's the account
10 balance in -- strike that.
11     What does that $125 million represent to you,
12 knowing what you know about that account, 25005?
13     A.  At that point in time, that is just all the
14 cash that has come in to Oracle that is either in the
15 process of being applied to invoices or has not been
16 applied to invoices at that point in time.
17     Q.  So that 125 million represents unapplied cash
18 that has not yet, as of November 30th, 2000, been
19 applied to an invoice; correct?
20     A.  That's correct.  But that can represent cash
21 that came in that day or the day before that the system
22 just hasn't had the time to make the application.
23     Q.  Right.
24     A.  It doesn't mean, as Mr. Regan would suggest,
25 that they were unable to apply that to an invoice.  I

251

1  believe that's completely irresponsible of Mr. Regan to
2  suggest that.
3      Q.  You just said the $125 million was unapplied
4  cash in that account that had not yet been applied to an
5  invoice; is that right?
6      A.  Yes.  But you have to --
7      MR. GLENNON:  I would also like to insert an
8  objection to the fact that there is handwritten edits
9  throughout this document that I don't think there has
10 been any foundation set for.  I also believe this
11 document has a second page that hasn't been provided.
12     MR. GREENSTEIN:  Q.  Mr. O'Bryan, have you
13 looked at the handwritten notes?
14     A.  Yes.
15     Q.  Does that change your opinion of the balance
16 of 25005 as of November 30th, 2000?
17     MR. GLENNON:  Hold on.  Have you read all the
18 handwritten notes?
19     THE WITNESS:  I'm just in the process of
20 reading them right now.
21     I've read the notes.  Your question was what?
22     MR. GREENSTEIN:  Q.  Do the notes change your
23 opinion as to what you believe the balance was in 25005
24 as of November 30th, 2000?
25     A.  I believe it's that amount.  But my point is

252

1  that this represents cash that could have come in the
2  day before, could have come in two days before.  It
3  simply has not had an opportunity to be applied yet,
4  because the system hasn't matched it up.
5      It is not, as Mr. Regan would suggest, this
6  amount of money that's sitting there that cannot --
7  cannot and has not is different.
8      Q.  Did Mr. Regan say cannot?
9      A.  I believe his report says cannot.
10     Q.  Are you sure about that?
11     A.  Not positive, but I believe it is something
12 like that.
13     So the fact is that Oracle is collecting a
14 significant amount of money every day, and this is an
15 amount that simply the system has not matched up as yet.
16     And I can't read all of footnote D, but it
17 looks like it says something about there is increased
18 consulting activity in Q2, which would explain a higher
19 amount, being that more cash would come in, and has
20 not had the opportunity to apply to any invoices yet.
21     MR. GREENSTEIN:  Mark this as Exhibit 15,
22 please.
23         (Exhibit 15 marked for
24          identification.)
25     MR. GREENSTEIN:  Q.  For the record, this is

253

1 Bates stamped AA 000035.  Have you seen this document
2 before?
3        MR. GLENNON:  I'm going to insert the same
4 objection as the last document.  I don't know if this is
5 the complete document, and there is handwritten
6 notations on the document for which no foundation has
7 been set.
8        MR. GREENSTEIN:  Q.  Did you rely upon this
9 document in your report?
10       A.  I considered this document, yes.
11       Q.  Did you rely upon it?
12       A.  I don't think I reference this document.
13 Probably not.
14       Q.  Can you -- in looking at this document, can
15 you determine what the balance of account 12018, called
16 unapplied cash, was as of November 30th, 2000?
17       A.  12018?
18       Q.  Um-hum.
19       A.  Unapplied cash is $64,594,692.
20       MR. GREENSTEIN:  Okay.  Thank you.  Let's take
21 five minutes.
22       VIDEOGRAPHER:  Off record at 5:14.
23       (Recess, 5:14 p.m. - 5:33 p.m.)
24       VIDEOGRAPHER:  On record at 5:33.
25       MR. GREENSTEIN:  Q.  Mr. O'Bryan, do you know

254

1 what an aging seven buckets report is?
2       A.  I do.
3        I'm sorry to interrupt.  I would like to
4 clarify an earlier answer.  You asked me on Exhibit 14
5 what my belief of the balance of the customer
6 overpayments account was.  I said $125 million.  That
7 number is actually $25 million, $25.4 million.  Sorry,
8 my mic isn't on.
9        And that's the number your own expert, Mr.
10 Regan, shows as $25.4 million in his report.
11       The $125 million, if you look at footnote A,
12 which I didn't have a chance to fully read when you
13 handed me this document, is continued down at the bottom
14 of the page that notes that there is a $100 million loan
15 or advance and should not be classified as unearned
16 revenues.  So you got to debit unearned revenue and
17 credit, looks like, intercompany receivable.
18       So the $125 million should be taken out.
19 Which, just so you know, the reason I went to this, I
20 somewhat remembered in Mr. Regan's report, if you look
21 at his 25005 balance at 11/30, it is $25.4 million.  So
22 the amount of money in the 25005 account at 11/30/00 was
23 $25.4 million.
24       Q.  Okay.
25       A.  Okay.  I apologize for that.

255

1       Q.  So you are familiar with the seven aging
2 buckets report at Oracle; correct?
3       A.  I am, yes.
4       Q.  And what is that document or what is it used
5 for at Oracle?
6       A.  I don't know exactly what they used it for.  I
7 thought it was more of an internal document that appears
8 to show billing history and account history for a
9 certain client.  By nature of its title, it must
10 categorize things into seven buckets.
11       Q.  Did Oracle ever send those reports to their
12 customers?
13       A.  I don't think they typically did.  I think on
14 occasion some may have requested -- I believe there was
15 one on -- I don't remember the client, started with a D,
16 as I recall, that maybe Ms. Orr requested or something
17 and got ahold of.  It had gone out to clients on an
18 occasional basis.
19       Q.  When the 46,000 debit memos were created on or
20 about November 17th, 2000, did those transactions have
21 any impact on what you could see on the seven aging
22 buckets report?
23       MR. GLENNON:  Objection; calls for
24 speculation, lack of foundation.
25       THE WITNESS:  I'm sorry, I don't understand

256

1 your question.
2       MR. GREENSTEIN:  Q.  Well, the seven aging
3 buckets report, what is it -- what information does it
4 show about a particular customer?
5       A.  Invoices, issued invoices paid.  And if you're
6 going to show me the one I think you're going to show
7 me, it shows down below, it is either on-account or
8 debit memo, or something like that down at the bottom of
9 it.
10       Q.  And so when the debit memos were created, did
11 it have any impact on the information that was in the
12 aging seven buckets report?
13       MR. GLENNON:  Objection; vague and ambiguous.
14       THE WITNESS:  Once the debit memos would have
15 been run, the on-account amounts would go away.
16       MR. GREENSTEIN:  Q.  Okay.  So they
17 wouldn't -- so any amounts on-account on the aging seven
18 buckets report that were related to debit memos created
19 on November 17th would not show up on the aging seven
20 buckets report the day after those debit memos were run;
21 correct?
22       MR. GLENNON:  Objection; calls for
23 speculation, lack of foundation.
24       THE WITNESS:  That's correct.  Because the
25 debit memo project got rid of the on-account flag.

257

1   Those weren't amounts of money to be applied to any
2   invoice. They weren't on-account, as you've shown me in
3   Oracle's user guide. Those were simply amounts that had
4   been previously dealt with by Oracle's collection
5   department and just had a flag sitting on them.
6           MR. GREENSTEIN: Q. But weren't some of those
7   on-account items eventually refunded?
8       A. They were.
9       Q. And why was that?
10      A. Simply because --
11          MR. GLENNON: Objection; lack of foundation,
12  calls for speculation.
13          You can answer, if you know.
14          THE WITNESS: You mean why were they
15  eventually refunded?
16          MR. GREENSTEIN: Q. Right.
17      A. Because after the unapplied cash project in
18  October/November of 2002, additional research was done
19  whereby it was discovered that they had made an
20  erroneous transfer in, in October/November of '00,
21  and they refunded the money.
22      Q. Were there any on-account items that were not
23  transferred to 12601 that were on-account, and that
24  eventually were refunded as part of the 2002 cleanup?
25          MR. GLENNON: Objection; vague and ambiguous.

258

1           THE WITNESS: I don't understand the question.
2           MR. GLENNON: Lack of foundation.
3           MR. GREENSTEIN: Q. There were 46,000
4   on-account items on November 17th, 2000; correct?
5       A. Correct.
6       Q. And of those, not all of them were items that
7   had been transferred to 12601; correct?
8       A. That's correct. There was only 120 -- well --
9       Q. Of 926, there was 121; right?
10      A. 926 scripts. There was 121 transfers from
11  25005 to 12601.
12      Q. So those other items that weren't transferred,
13  were any -- of the 926, were any of those items refunded
14  as part of the 2002 cleanup?
15          MR. GLENNON: Objection; lack of foundation,
16  calls for speculation.
17          THE WITNESS: I don't know that.
18          MR. GREENSTEIN: Q. Did you make that
19  determination in issuing your expert opinion?
20          THE WITNESS: I'm sorry, the question again,
21  please.
22          MR. GREENSTEIN: Q. You would agree you
23  reviewed 926 of the 46,000 debit memos in looking at the
24  script output; correct?
25      A. Yes.

259

1       Q. And of those, you said 121 of the 926 were
2   transferred to 12601 in 2Q; correct?
3           MR. GLENNON: I'm just going to object, it
4   mischaracterizes the evidence.
5           THE WITNESS: 121 were transfers, included
6   transfers from 25005 to 12601.
7           MR. GREENSTEIN: Q. For $10.6 million?
8       A. Yeah, totaling $10.6 million.
9       Q. Setting those items aside, those 121 items,
10  and looking at the rest of the population of the 926
11  debit memos, were any of those items refunded as part of
12  the 2002 cleanup?
13          MR. GLENNON: Objection; vague and ambiguous,
14  lacks foundation.
15          THE WITNESS: I think there were, I think I've
16  seen some of those that were. I don't recall the
17  number. There may have been.
18          MR. GREENSTEIN: Q. Why would those items be
19  refunded two years later?
20          MR. GLENNON: Objection; calls for
21  speculation.
22          THE WITNESS: As I've described before, the
23  on-account simply meant that the collections department
24  had classified that receipt, which was -- for this
25  purpose was in the second Q of '00, totaling about $20

260

1   million.
2           And once the company found out there were
3   those transfers, it went about the process of reversing
4   those, all of those, and reinvestigated where they
5   should go.
6           So, I -- so some of those may have been
7   refunded.
8           MR. GREENSTEIN: Q. My question is, setting
9   aside the 121 items that were transferred to the bad
10  debt reserve in 2Q '01, setting those aside, the other
11  debit memos, the other population that made up the 926,
12  why were some of those items refunded during the 2002
13  cleanup?
14          MR. GLENNON: Objection; lack of foundation.
15          THE WITNESS: I beg your pardon. I understand
16  your question now.
17          MR. GREENSTEIN: Q. Okay.
18      A. I don't know if those were or not. I don't
19  recall specifically any details about that.
20      Q. So did you -- in issuing your expert report,
21  did you do any calculation of the number of those debit
22  memos that were not transferred to 12601 in the second
23  quarter that were ultimately refunded as part of the
24  2002 cleanup?
25      A. No.

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

261

1          MR. GREENSTEIN:  Okay.  I want to mark this as
2     16.
3               (Exhibit 16 marked for
4               identification.)
5          MR. GREENSTEIN:  Q.  For the record, this is
6     NDCA-ORCL 603894.  And it -- well, Mr. O'Bryan, do you
7     recognize this document?
8          A.  I do, yes.
9          Q.  And if you turn to page 13 of your rebuttal
10    report it appears that you proffer an analysis of a
11    debit memo relating to Household that was opined on in
12    Mr. Regan's report; correct?
13         A.  Yes.
14         MR. GLENNON:  Objection; the document speaks
15    for itself, and vague and ambiguous.
16         MR. GREENSTEIN:  Q.  And you recall that
17    Mr. Regan -- that the issue involved a debit memo for
18    $76,000 -- approximately $76,000?
19         A.  That's correct.
20         Q.  Do you recall that transaction?
21         A.  I do, yes.
22         Q.  And you did an analysis of that debit memo?
23         A.  I did, yes.
24         Q.  And you see it says here, you say, "One of the
25    very transactions upon which Mr. Regan focuses in his

262

1     expert report establishes that Oracle appropriately
2     refunded money long before the creation of the 46,000
3     plus debit memos.  Mr. Regan points out that Household
4     made a payment to Oracle on November 17th, 1994."  Do
5     you see that?
6          A.  I do, yes.
7          Q.  Then if you go down -- I'll just keep reading.
8          "That same day, Household returned the product
9     and cancelled the order.  However, despite the fact that
10    Mr. Regan has seen a screen shot demonstrating that the
11    money had been refunded to Household by a check that
12    cleared on May 4th, 1995, Mr. Regan ignores this
13    refund."  Do you see that?
14         A.  Yes, I do.
15         Q.  Is this the document in footnote 46?
16         A.  Yes, it is.
17         Q.  Do you rely on this document for the
18    proposition that their debit memo item for $76,000
19    plus --
20         MR. GLENNON:  Eli, can I pause you really
21    quickly.  You said footnote 46?
22         MR. GREENSTEIN:  Yeah.  603894.
23         MR. GLENNON:  Got you.
24         MR. GREENSTEIN:  Q.  Mr. O'Bryan, your opinion
25    is that this debit memo item was refunded by Oracle by a

263

1     check that cleared on May 4th, 1995; correct?
2          A.  That is correct.
3          Q.  And your support for that proposition is the
4     screen shot NDCA-ORCL 603894; is that correct?
5          A.  That is correct.
6          Q.  And did you rely on anything else to support
7     your opinion that this $76,000 plus debit memo was
8     refunded on May 4th, 1995?
9          MR. GLENNON:  Objection; vague and ambiguous.
10         THE WITNESS:  Did I rely on anything else?
11         MR. GREENSTEIN:  Yeah.
12         MR. GLENNON:  Lacks foundation.
13         THE WITNESS:  Well, yeah.  Yes, I did.
14         MR. GREENSTEIN:  Q.  What did you rely on?
15         A.  Well, if you follow this transaction all the
16    way through, this was actually refunded again by Oracle.
17    By the way, this was a transaction that did not go
18    through the bad debt transfers.  This was just research
19    being done by the company.
20         Anyway, when the applied cash project
21    occurred, this was actually refunded again for about
22    $178,000, at which point in time, I think it was
23    Mr. Campos realized it was done in error.  Which would
24    tell me that if they refunded -- and it was two
25    different checks.  It was $100,000 and then this

264

1     $74,000.
2          If they refunded it in error and realized that
3     and made notes saying we refunded this in error during
4     the applied cash project, it tells me --
5          MR. GLENNON:  You mean unapplied cash project?
6     You're talking about two different things.  You said it
7     twice.  I just want to make sure the record is clear.
8          THE WITNESS:  Thank you.
9          MR. GREENSTEIN:  Q.  You're talking about the
10    unapplied cash project in 2002?
11         A.  Yes.  Beg your pardon.  Then that tells me it
12    had been refunded before, as well.  So I use that as
13    anecdotal evidence, because I have seen evidence of the
14    $100,000, as well now as the $76,000.
15         Q.  Okay.  So, you're aware that Oracle refunded
16    Household a $178,000 check in May 2002, and that
17    included the amount for this debit memo, the $76,000?
18         MR. GLENNON:  Objection; lacks foundation.
19         THE WITNESS:  I am.  I believe that was done
20    in error.
21         MR. GREENSTEIN:  Q.  What evidence do you have
22    that it was done in error?  Well, let me stop you there.
23    Looking at this document --
24         MR. GLENNON:  Did you want to answer?
25         THE WITNESS:  Go ahead.

265

1     MR. GREENSTEIN:  Q.  Looking at this document,
2  this is a screen shot; is that fair to say?
3     A.  This is a copy of a screen, yes.
4     Q.  Okay.  And you say, before citing this
5  document, you say that -- you call it a screen shot
6  demonstrating that "money had been refunded to Household
7  by a check that cleared on May 4th, 1995."  Do you see
8  that?
9     A.  Yes.
10    Q.  What in this document indicates to you that
11 this money was refunded by a check that cleared on
12 May 4th, 1995?
13    A.  Well, it is the entire document.  If you look
14 at it, the bank is Wells Fargo Bank, the account, and
15 then the status says cleared.  The cleared amount was
16 $76,000, and the clear date was May 4, 1995.
17    So to me, this is very clear audit evidence
18 that that amount was paid to Household and cleared by
19 May 4th, 1995.
20    Q.  Okay.  Do you have any evidence of a check
21 that actually was paid to Household besides this screen
22 shot?
23    MR. GLENNON:  Objection -- withdrawn.
24    THE WITNESS:  You mean on that date?
25    MR. GREENSTEIN:  Q.  Is there any other

266

1  evidence that this refund was made to Household for this
2  amount on May 4th, 1995?
3     MR. GLENNON:  Objection; lack of foundation,
4  asked and answered.
5     THE WITNESS:  I've not seen a copy of a check,
6  if that's what you're asking me.
7     MR. GREENSTEIN:  Q.  I'm just wondering,
8  besides this screen shot, did you rely upon any evidence
9  indicating that a check was issued to Household on
10 May 4th, 1995 for $76,645.04 for this debit memo?
11    MR. GLENNON:  Objection; asked and answered,
12 lacks foundation.
13    THE WITNESS:  I think I already answered that.
14 I saw evidence that the eventual refund after the
15 unapplied cash project in October/November was a refund
16 of 176 or $178,000 that was done in error, which would
17 tell me that it had been previously refunded.
18    MR. GREENSTEIN:  Q.  So the fact that they
19 refunded it again in May 2002 indicates to you that the
20 refund was issued on May 4th, 1995?
21    MR. GLENNON:  Objection; mischaracterizes the
22 testimony.
23    THE WITNESS:  Yeah.  If you've refunded it
24 once, the $100,000 that was refunded, and then the
25 $76,000, which I believe was done in '95, and in the

267

1  unapplied cash project you refund it again and say, wait
2  a minute, that is not appropriate, this is a duplicate
3  refund, that tells me it was refunded initially.
4     MR. GREENSTEIN:  Q.  So, other than that, that
5  evidence and the screen shot, do you have any -- do you
6  rely upon any evidence indicating that a check was
7  issued for a refund to Household from Oracle on May 4th,
8  1995 for $76,645.04?
9     MR. GLENNON:  Objection; asked and answered.
10    THE WITNESS:  I can't think of any other
11 evidence that was adequate for me, given the
12 documentation.
13    MR. GREENSTEIN:  Q.  But you never saw the
14 actual check; right?
15    A.  No.
16    MR. GLENNON:  Objection; asked and answered.
17    MR. GREENSTEIN:  Q.  Now, did you see this --
18 so, this is one of the 926 debit memos that you reviewed
19 on the script output; correct?
20    A.  Correct.
21    MR. GLENNON:  Objection; lack of foundation.
22    MR. GREENSTEIN:  Q.  So this May 4th, 1995
23 refund should show up in the script output; correct?
24    MR. GLENNON:  Same objection.
25    THE WITNESS:  Yeah, it should.  But as I

268

1  recall, it doesn't show up.
2     MR. GREENSTEIN:  Q.  Do you know why that is?
3     A.  No.
4     Q.  Okay.  But if there was a refund in the
5  accounting history of the 926 debit memos, you would
6  expect to see that in the script output; correct?
7     MR. GLENNON:  Objection; lack of foundation.
8     THE WITNESS:  Well, yeah.  I mean, assuming --
9  as I recall, that was one of the script outputs the
10 plaintiffs requested because it was below the $100,000
11 limit.
12    MR. GREENSTEIN:  Q.  Right.
13    A.  So I expected to see it.  I did not see it.  I
14 saw evidence it was, in fact, paid.
15    Q.  The evidence is what you cited earlier?
16    A.  That's correct.
17    Q.  If you look at the next sentence on page 13 of
18 your rebuttal, it says, "Instead, Mr. Regan states that
19 Oracle did not refund the money to Household until a
20 second erroneous refund occurred on May 23rd, 2002."  Do
21 you see that?
22    A.  I do, yes.
23    Q.  And you cite to Household 1 and 2; correct?
24    A.  I cite to what, I'm sorry?
25    Q.  You cite, in footnote 47, you cite to HI 1 and

269

1    2; right?
2        A.  That is correct.
3        MR. GREENSTEIN:  Let me mark for the record
4    the next exhibit, which is HI 1 and 2.  A check from
5    Oracle to Household in the amount of $178,346.77.
6        MR. GLENNON:  I object to on two grounds.
7    One, I actually think this is part of a larger document
8    that hasn't been provided here.  Second, there is
9    handwritten notes on the document for which there has
10   been no foundation.
11           (Exhibit 17 marked for
12            identification.)
13       MR. GREENSTEIN:  I don't want to go off the
14   record.
15       MR. GLENNON:  It will only take a minute.
16       THE WITNESS:  I don't want to mix these up.
17   Sorry.
18       MR. GREENSTEIN:  Mark this next in line.
19           (Exhibit 18 marked for
20            identification.)
21       MR. GREENSTEIN:  Q.  So you have two exhibits
22   in front of you, one is 17, which is Bates labeled HI 1
23   and 2, and the second, Exhibit 18, is NDCA-ORCL 614018
24   through 614023.  Do you have both of those?
25       A.  I do, yes.

270

1        Q.  Have you seen these before?
2        A.  I do, yes.  These are both in my report.
3        Q.  So this appears to be -- this is the document
4    you cite on page 13 of your rebuttal, where you say --
5    or footnote 47 is Exhibit 17; correct?
6        A.  Footnote 47 is what?
7        Q.  In your rebuttal report is Exhibit 17, the
8    Household check; correct?
9        A.  That is correct.
10       Q.  And Exhibit 49 is Exhibit 18; correct?
11       A.  That is correct.
12       Q.  Okay.  Taking Exhibit 17, did you rely upon
13   this document in your rebuttal report in issuing your
14   opinion on the Household debit memo transaction?
15       MR. GLENNON:  Objection; vague and ambiguous.
16       THE WITNESS:  Did I rely on it?
17       MR. GREENSTEIN:  Q.  Yes.
18       A.  It's in my report, so I certainly relied on
19   it.
20       Q.  And is this the check that you claim was an
21   erroneous refund to Household?
22       A.  Yes.
23       Q.  And what evidence do you rely on in forming
24   your opinion that this was an erroneous refund to
25   Household?

271

1        A.  I then refer to Exhibit 18, which is an e-mail
2    chain from Mike Quinn, and you can see down below on
3    614019, it talks about refund Household Finance
4    $178,346.77, in the subject line.
5        Q.  Right.
6        A.  Then up above Mr. Quinn says, "Ami, Got it.
7    Raul and Adam misinterpreted the 550 debit memos.  This
8    should not have been refunded."
9        Q.  So, is that --
10       A.  Then it goes on to say, "Let's see how we can
11   avoid making these types of mistakes in the future."
12       Q.  Okay.  So, is this the only -- or, strike
13   that.
14       Other than this e-mail, which is Exhibit 18,
15   did you -- what other evidence did you rely upon in
16   forming your opinion that this check, this refund,
17   Exhibit 17, was in error?
18       MR. GLENNON:  Objection; asked and answered.
19       THE WITNESS:  The original refunds on
20   Household of $100,000 and the $74,000, or whatever it
21   was, $76,000.
22       MR. GREENSTEIN:  Q.  Are you referring to the
23   screen shot marked as Exhibit 16?
24       A.  As one of them, plus the $100,000 that was
25   refunded as well.

272

1        Q.  Isn't it your opinion that the $76,000 debit
2    memo item was refunded by a check that was different
3    than the $100,000 item?
4        A.  Yes.  So if you take the 100,000 and add it to
5    the 74,000, you get the approximately 176 or 178 you see
6    here.
7        Q.  You're not aware of the check for $178,346
8    involves more than two debit memos?
9        A.  I'm not aware of what?
10       MR. GLENNON:  Objection; vague and ambiguous.
11       MR. GREENSTEIN:  Q.  That this $178,000 check
12   involves all the debit memos referred to on 614021 in
13   Exhibit 18?
14       A.  Yes.  You can see the 45, the 25 and the 76
15   are some of the ones we've referenced to and are part of
16   the $100,000 refund, plus the $76,000 refund, as
17   evidenced on Exhibit 16.
18       Q.  Okay.  Mr. O'Bryan, did you read Michelle
19   Davidson's deposition before forming your opinion on the
20   Household transaction?
21       MR. GLENNON:  Objection; asked and answered.
22       THE WITNESS:  I think you asked me that this
23   morning.  I don't recall reading that.
24       MR. GREENSTEIN:  Q.  Why didn't you read her
25   deposition transcript?

273

1　　　A.  I didn't think it necessary.
2　　　Q.  Are you aware she was the PMK for Household?
3　　　MR. GLENNON:  Objection; asked and answered.
4　　　THE WITNESS:  I believe so, yes.
5　　　MR. GREENSTEIN:  Q.  Okay.  Are you aware that
6　this $178,000 check was uploaded into Household's
7　general ledger after they received it?
8　　　A.  What do you mean uploaded?
9　　　MR. GLENNON:  Vague and ambiguous.
10　　　MR. GREENSTEIN:  Q.  Are you aware Household
11　cashed this check, a copy of which is on Exhibit 17?
12　　　MR. GLENNON:  Objection; assumes facts, lack
13　of foundation.
14　　　THE WITNESS:  I don't know what they did with
15　the check after it was sent by Oracle.
16　　　MR. GREENSTEIN:  Q.  Did you consider the fact
17　whether this check was cashed or not in forming your
18　opinion?
19　　　A.  No.
20　　　Q.  Okay.  Did you see any evidence that this
21　$178,000 refund made to Household was ever given back to
22　Oracle?
23　　　A.  I don't --
24　　　MR. GLENNON:  Objection; vague and ambiguous,
25　lacks foundation.

274

1　　　THE WITNESS:  I don't recall what the eventual
2　disposition of this was.
3　　　MR. GREENSTEIN:  Q.  Okay.  So you don't know
4　if this $178,000 check was cashed, and you don't know
5　whether it was given back to Oracle, but your opinion is
6　that it was refunded in error; correct?
7　　　MR. GLENNON:  Objection; asked and answered.
8　　　THE WITNESS:  That's what the documents say.
9　If Household cashed it or applied it to other invoices,
10　I don't know what they did.
11　　　MR. GREENSTEIN:  Q.  Okay.
12　　　A.  But it is very clear to me that the documents
13　show that it was refunded in the '90s, and then refunded
14　in error in the 2000 time frame.
15　　　Q.  Okay.  So on page 13 of your rebuttal, last
16　sentence, you say, "As Mike Quinn observed in a
17　contemporaneous e-mail, the May 23rd, 2002 refund was
18　issued by mistake and should not have been made."
19　　　Do you see that?
20　　　A.  Yes.
21　　　Q.  And you cite to what has been marked -- the
22　e-mail marked as Exhibit 18; correct?
23　　　A.  Yes.
24　　　Q.  So is it your opinion that Mike Quinn wrote an
25　e-mail contemporaneous with the May 23rd, 2002 refund

275

1　that indicated it was a mistake?
2　　　A.  I'm not suggesting it was contemporaneous with
3　the exact refund.  I'm just suggesting it was
4　contemporaneous with the time, i.e., the 2002/2003 time
5　frame.  So, when it was written -- all I'm saying, it
6　wasn't written last week and it wasn't written back in
7　1995.
8　　　Q.  Right.  Because the e-mail you're referring to
9　was written after October 25th, 2002; isn't that right?
10　　　MR. GLENNON:  Objection; lack of foundation.
11　The document speaks for itself.
12　　　THE WITNESS:  I don't really know.  I mean, I
13　see the date is Friday, October the 25th, 2002.  When
14　the top part of this e-mail was written by Mr. Quinn, I
15　don't know.
16　　　MR. GREENSTEIN:  Q.  Well, this top e-mail was
17　written by Mr. Myers; wasn't it?
18　　　MR. GLENNON:  Objection; lack of foundation.
19　The document speaks for itself.
20　　　THE WITNESS:  Well, I'm talking about "Mike
21　Quinn wrote."
22　　　MR. GREENSTEIN:  Q.  Right.  So that
23　particular e-mail doesn't have a date?
24　　　A.  Correct.
25　　　Q.  But it is in a string of other e-mails, so the

276

1　e-mail below it is October 25th, 2002; correct?
2　　　A.  The date that I see below the "Mike Quinn
3　wrote," says October 25th, 2002.
4　　　Q.  Right.  So that e-mail that Mike Quinn wrote
5　appears to have taken place after October 25th, 2002;
6　correct?
7　　　MR. GLENNON:  Objection; document speaks for
8　itself, lack of foundation.
9　　　THE WITNESS:  I have no idea when it was
10　written.  It was above the October 25th, so whether it
11　was the same day, same time, I don't know.
12　　　MR. GREENSTEIN:  Q.  Right.  But, I mean,
13　based on what you know about e-mail strings like this,
14　it appears this e-mail was written either on
15　October 25th, 2002 or after; right?
16　　　MR. GLENNON:  Objection; lack of foundation,
17　asked and answered.
18　　　THE WITNESS:  I really don't know.
19　　　MR. GREENSTEIN:  Q.  So seeing that above an
20　e-mail in a string that goes in chronological order
21　doesn't indicate to you that this e-mail was written on
22　or after October 25th, 2002?
23　　　MR. GLENNON:  Objection; lack of foundation,
24　asked and answered three times.
25　　　THE WITNESS:  It would seem to me that given

277

```
1   the form, it was written on or after October 25th.  But
2   I don't know that for sure.
3        MR. GREENSTEIN:  Q.  Well, is it possible that
4   e-mail could have been written before October 25th?
5        MR. GLENNON:  Objection; lack of foundation,
6   calls for speculation.
7        THE WITNESS:  Is it possible?
8        MR. GREENSTEIN:  Q.  Yeah.
9        A.  Well, anything is possible.
10       Q.  Looking at this e-mail, your testimony is that
11   it is possible that that e-mail that occurs after in
12   time to an October 25th, 2002 e-mail could possibly have
13   been written before it?
14       MR. GLENNON:  Objection; mischaracterizes the
15   testimony, asked and answered, lacks foundation.
16       THE WITNESS:  I didn't write this e-mail, so I
17   don't know when it was written.  But have I ever seen
18   circumstances where an e-mail above another e-mail was
19   written before?  Certainly.  You can say I said this and
20   then attach something different.  You can attach it.
21       I don't know how it was attached, I don't know
22   if it was a string.  I don't know if it was pieced
23   together.  I have no idea.
24       MR. GREENSTEIN:  Q.  On page 13 you're not
25   saying that your opinion is that that was a
```

278

```
1   contemporaneous e-mail or that that e-mail marked as
2   Exhibit 18 was contemporaneous with the May 23rd, 2002
3   refund; right?
4        MR. GLENNON:  Objection; mischaracterizes the
5   testimony.
6        THE WITNESS:  I think I explained that.  I
7   said it is contemporaneous to the time.  It is not right
8   in the middle of all this litigation.  It was
9   contemporaneous to that time.
10       MR. GREENSTEIN:  Let me take five minutes,
11   then wrap up.
12       VIDEOGRAPHER:  Off record at 6:05.
13       (Recess, 6:05 p.m. - 6:23 p.m.)
14       VIDEOGRAPHER:  On record at 6:23.
15       MR. GREENSTEIN:  Q.  Mr. O'Bryan is it your
16   opinion there is no material difference between meeting
17   and beating Wall Street expectations in the mind of a
18   reasonable investor?
19       A.  There can be.  It can be material, it may not
20   be material.
21       Q.  In what cases would it be material?
22       A.  If in the total mix of the information it was
23   thought to be informative or more material to a reader.
24       Q.  Okay.  So, in some cases it may be material to
25   a reasonable investor whether a company meets or beats
```

279

```
1   expectations; correct?
2        MR. GLENNON:  Objection; asked and answered.
3        THE WITNESS:  No.  What I'm saying, you have
4   to look at the total mix of the information of that
5   company and historically of that company as to whether
6   or not that meet or beat is material, as well as a
7   multitude of other things you have to consider based on
8   SAB 99.
9        MR. GREENSTEIN:  Q.  Right.  I understand that
10   you have to analyze it company by company; correct?
11       A.  That is correct.
12       Q.  But there could be a material difference
13   between meeting and beating expectations depending on
14   particular facts and circumstances involved in a
15   particular quarter; right?
16       MR. GLENNON:  Objection; vague and ambiguous,
17   mischaracterizes testimony.
18       THE WITNESS:  Are you speaking hypothetically
19   here, or are you speaking about Oracle?
20       MR. GREENSTEIN:  Q.  No.  Just in general.
21       A.  So it is a hypothetical?
22       Q.  Yeah.
23       THE WITNESS:  I'm sorry.  You need to repeat
24   the question.
25       MR. GREENSTEIN:  Can you read it back?
```

280

```
1        (Record read as follows:  QUESTION:  But there
2        could be a material difference between meeting
3        and beating expectations depending on
4        particular facts and circumstances involved in
5        a particular quarter; right?)
6        MR. GLENNON:  I object on the grounds of
7   incomplete hypothetical and vague and ambiguous.
8        THE WITNESS:  I'm sorry, there could be a
9   material difference between meeting and beating
10   expectations?
11       MR. GREENSTEIN:  Q.  Um-hum.
12       A.  Well, materiality is not about whether there
13   is a material difference between the meet or the beat.
14   It is taken as a whole, all of the mix of information
15   whether it is considered material by the company and
16   their auditors.
17       Q.  Whether it is material to the company or its
18   auditors?
19       A.  Two different analyses are done.  The company
20   performs their own analysis, these are the financial
21   statements of the company.  Then separately the auditors
22   have to come up with that same conclusion.
23       Q.  That's determining whether a misstatement
24   internally is material; correct?
25       MR. GLENNON:  Objection.
```

281

```
 1          THE WITNESS:  Why do you say internally?
 2          MR. GLENNON:  Object for the record; vague and
 3   ambiguous.
 4          MR. GREENSTEIN:  Q.  Well, let's look at your
 5   report, page 38 of your opening report.
 6       A.  I'm there.
 7       Q.  You state that -- you're talking about the
 8   $20.1 million of unapplied cash was transferred to the
 9   bad debt reserve during 2Q '01; correct?
10       A.  That is correct.
11       Q.  And you say, "If we make the most conservative
12   assumption, that the entire amount of transfer
13   represents an accounting error, this would represent
14   roughly a $13 million overstatement in net income";
15   correct?
16       A.  That is correct.
17       Q.  Then you calculate earnings per share which
18   indicates that if that amount was an overstatement, that
19   the EPS would be adjusted to 10 cents from the reported
20   11; is that correct?
21          MR. GLENNON:  Objection; mischaracterizes the
22   document and the testimony.  Lack of foundation.
23          THE WITNESS:  Well, I think it adjusts to
24   10.38 or .1038 cents.
25          MR. GREENSTEIN:  Q.  Which would be rounded
```

282

```
 1   down to 10; right?
 2       A.  That's correct.
 3       Q.  And you say that even if that happened and
 4   Oracle reported 10 cents per share in the second quarter
 5   '01, that wouldn't be material in the mind of a
 6   reasonable investor; correct?
 7          MR. GLENNON:  Objection; vague and ambiguous,
 8   lacks foundation, mischaracterizes the testimony.
 9          THE WITNESS:  My testimony is laid out in the
10   report, that I don't think in the entire mix of
11   information that that adjustment was material by any
12   stretch of the imagination.
13          MR. GREENSTEIN:  Q.  So is it your expert
14   testimony that if Oracle in the second quarter '01 had
15   reported 10 cents a share instead of 11 cents a share in
16   net expectations, that would not have been material in
17   the mind of a reasonable investor?
18          MR. GLENNON:  Clarification.  Second quarter
19   fiscal year '01?
20          MR. GREENSTEIN:  Didn't we define that
21   earlier?
22          MR. GLENNON:  I don't know if we did or we
23   didn't.  I'm just asking.
24          MR. GREENSTEIN:  Q.  Do you know what I'm
25   talking about?
```

283

```
 1          MR. GLENNON:  You defined Q2 '01, which is why
 2   second quarter caught me off guard.  Sorry.
 3          THE WITNESS:  I don't think the difference
 4   between 11 cents or 10 cents, given the entire mix of
 5   information that was available to the public investor,
 6   that that was a material change.
 7          MR. GREENSTEIN:  Q.  And what standard did you
 8   use to determine what a reasonable investor was?
 9       A.  What standard did I use?
10          MR. GLENNON:  Objection; vague and ambiguous.
11          MR. GREENSTEIN:  Yeah.
12       A.  I just used the SAB 99, which defines that
13   exact topic.
14       Q.  Okay.  So why don't you take me through your
15   methodology of how you determined that if Oracle had
16   reported 10 cents rather than 11 cents and met investor
17   expectations -- analyst expectations that would not be
18   material?
19          MR. GLENNON:  Objection; mischaracterizes the
20   testimony, lacks foundation.
21          THE WITNESS:  You want me to take you through
22   my report?
23          MR. GREENSTEIN:  Q.  I'm wondering what
24   methodology you used to come to that conclusion.
25       A.  I applied SAB 99.
```

284

```
 1       Q.  Did you take into account the macroeconomic
 2   environment during 2Q '01?
 3          MR. GLENNON:  Objection; lack of foundation.
 4          THE WITNESS:  Sure.
 5          MR. GREENSTEIN:  Q.  What was the
 6   macroeconomic environment during that time?
 7       A.  It was a tech sector, which was probably a bad
 8   time, as I recall it experienced a bit of a downturn.
 9       Q.  Do you know what the dot com bust is?
10       A.  I do, yes.
11       Q.  Wasn't that around March 2000?
12       A.  I think I just said experiencing a downturn.
13       Q.  You said a slight downturn.
14       A.  I said a bit of a downturn.  I didn't say
15   slight.
16       Q.  You don't think the dot com bust was more than
17   a bit of a downturn?
18       A.  It was a downturn.
19          MR. GLENNON:  Objection; lack of foundation,
20   mischaracterizes the testimony.
21          THE WITNESS:  That was the macroeconomics that
22   was going on.
23          MR. GREENSTEIN:  Q.  So how would you
24   characterize the macroeconomic environment as of the
25   date Oracle reported its earnings for second quarter
```

285

```
1   '01?
2       A.  Well --
3           MR. GLENNON:  I'm still going to object on
4   vague and ambiguous as to time.
5           THE WITNESS:  The macroeconomic conditions
6   were that there was a downturn in the tech sector.
7           MR. GREENSTEIN:  Q.  Okay.  Did you do any
8   analysis of what was happening to other companies in the
9   software industry during that time, if they met rather
10  than beat expectations?
11      A.  No.
12      Q.  Did you do any analysis of any companies
13  during that time, what happened when they met rather
14  than beat expectations?
15          MR. GLENNON:  Objection; vague and ambiguous.
16          THE WITNESS:  No.  The issue here is Oracle,
17  not other companies.
18          MR. GREENSTEIN:  Q.  Did you do any analysis
19  of Oracle's previous history of earnings reports to see
20  what happened to Oracle's stock when they met or beat
21  expectations?
22          MR. GLENNON:  Same objection.
23          THE WITNESS:  I did, yes.
24          MR. GREENSTEIN:  Q.  And why don't you take me
25  through what your methodology was in doing that
```

286

```
1   determination?
2       A.  Let me just find that analysis.
3           I have to go to the rest room anyway.  Do you
4   want to take a two-minute break while I find that?
5           MR. GREENSTEIN:  Sure.
6           VIDEOGRAPHER:  Off record.  6:32.
7           (Recess, 6:32 p.m. - 6:38 p.m.)
8           VIDEOGRAPHER:  On record at 6:38.
9           MR. GREENSTEIN:  Q.  So, Mr. O'Bryan, when we
10  left off, I think you were going to look at your
11  methodology in looking at the trends, the historical
12  trends prior to 2Q '01 to determine whether there was a
13  difference whether Oracle met or beat Wall Street
14  expectations; correct?
15      A.  That is correct.
16      Q.  What methodology did you use?
17      A.  I think you actually asked me a different
18  question, which was did I do an analysis of Oracle's
19  previous history of meeting or beating expectation
20  consensus.  And my answer was yes.  And I was looking
21  for that exhibit.  And that's in my work papers.
22          And I did do that analysis.  So, it is right
23  here in front of me, if you would like to talk about it.
24      Q.  You said you did it in your work papers.  Is
25  that something that you relied upon?
```

287

```
1       A.  Yes.
2       Q.  And is that -- did you produce that to
3   plaintiffs?
4       A.  I'm not aware that it was or was not.
5       Q.  Okay.
6           MR. GLENNON:  Did you rely on your work
7   papers, or did you rely on the analyst reports?
8           THE WITNESS:  This is a summary of the analyst
9   reports.
10          MR. GREENSTEIN:  Q.  A compilation?
11      A.  A compilation?  It's just a summary.
12      Q.  Similar to what you did with the script
13  output?
14      A.  Yeah.
15      Q.  So why don't you go through that and what you
16  did to determine that meeting versus beating in the
17  second quarter of '01 would not be material to a
18  reasonable investor.
19      A.  Again, that's a broader question.  I didn't
20  look at just the meet or beat as being materiality.
21  That was one of the considerations.  So do you just want
22  that component of it or an overview?
23      Q.  You did some analysis of prior tends; correct?
24      A.  Correct.
25      Q.  What was that analysis?
```

288

```
1       A.  We looked on a quarter basis for first Q '99
2   all the way through second Q of '01 the actual
3   consensus, analyst expectation, versus the actual
4   reported amounts.  Then we looked at the stock price as
5   it relates to the day that the earnings was released,
6   and the day plus one, day plus three, and day plus five.
7   We basically looked at five different days after Oracle
8   had released its earnings.
9           And what you find is there is absolutely no
10  correlation between beating and any kind of an increase
11  or decrease in the stock.  Which would lead you to
12  believe as an individual applying SAB 99, that's not
13  necessarily the only measurement of materiality.  Which
14  it is a total mix.
15          But, clearly, you have a situation here where
16  the stock went up -- excuse me, the reported was 4 cents
17  over expected in 2Q '99, the stock dropped 5 percent the
18  day of the release, dropped another 6 percent the day
19  after.
20      Q.  Did you do any statistical analysis to
21  determine why the stock price dropped in that quarter?
22          MR. GLENNON:  Were you finished?
23          THE WITNESS:  I wasn't finished.
24          MR. GREENSTEIN:  Q.  Okay.
25      A.  You see here a situation where they beat
```

289

1  expectations by 4 cents in 2Q '00 and it went down 3.6
2  percent.  You see where they beat expectations by 4
3  cents in Q4 '99, went down 5 percent.  One day later it
4  went up 31 percent.  First Q of '01 they beat it 4 cents
5  and it goes up by 3.83 percent.
6      There is absolutely no correlation in my mind
7  from an auditor's perspective and one that looks at and
8  considers materiality almost on a daily basis that they
9  meet or beat measurement within Oracle is at all
10  material.
11     Q.  And you don't think the difference between
12  meeting and beating in a macroeconomic environment, a
13  tech downturn, as was the case in 2Q '01, would be
14  important to a reasonable investor?
15     MR. GLENNON:  Objection; asked and answered,
16  lacks foundation, mischaracterizes the testimony.
17     THE WITNESS:  Again, given my analysis and
18  knowledge of how materiality is measured, the meet or
19  beat issue was not a material enough issue that in the
20  total mix it would have caused the company or its
21  auditors to restate any financial statements.
22     MR. GREENSTEIN:  Q.  But meeting and beating
23  could be important to a reasonable investor; right?
24     A.  In your hypothetical, certainly it could,
25  depending on the entire mix of information.

290

1      Q.  Can you remember -- strike that.  So you said
2  you looked at the prior nine quarters; is that correct?
3      A.  It was ten quarters, including the existing 2Q
4  '01.
5      Q.  How did you determine what the consensus
6  analyst expectation was?
7      A.  We went off of -- I forget what we used, if it
8  was first call, or what number we used.
9      Q.  So out of those ten quarters, in which
10  quarters did Oracle -- how many quarters did Oracle beat
11  expectations?
12     A.  In how many quarters did they beat
13  expectations?
14     Q.  Um-hum.
15     A.  In nine of those ten.
16     Q.  Okay.  And leading up to the second quarter
17  and working backwards, how many quarters in a row had
18  Oracle beat expectations?
19     A.  Four.
20     Q.  The one instance in which they met
21  expectations, what happened to the stock price the day
22  following?
23     MR. GLENNON:  Objection; vague and ambiguous.
24     THE WITNESS:  The day following?
25     MR. GREENSTEIN:  Q.  Um-hum.

291

1      A.  Went down 6 percent.
2      Q.  Okay.  Now, how did you determine -- or strike
3  that.
4      How did you decide to use, I think you said
5  the first -- the stock price on the day following, the
6  third day and the fifth day; is that right?
7      A.  That's an analysis typically done by auditors
8  as it relates to looking at materiality, particularly
9  about stock movement, looking at those first few days.
10     Q.  Is there any accounting principle or rule that
11  outlines that procedure?
12     A.  No.
13     MR. GLENNON:  Objection; vague and ambiguous.
14     MR. GREENSTEIN:  Q.  When you say it is
15  typically done by auditors, can you cite to any
16  literature that says that that's the analysis that
17  should be conducted?
18     MR. GLENNON:  Same objection.
19     THE WITNESS:  It would be professional
20  standards, due to professional care and auditor's
21  judgment.
22     MR. GREENSTEIN:  Q.  Any article or literature
23  you could point to that suggests using that standard?
24     A.  With respect to one day, three days, five
25  days?

292

1      Q.  Yeah.
2      A.  No.  That's up to the auditor's judgment.
3      Q.  You're not a statistician, are you?
4      A.  I'm actually a computer audit specialist.
5      Q.  Computer audit specialist, okay.
6      Did you run a regression analysis of any stock
7  price movement?
8      A.  I was not asked to, nor did I.
9      Q.  Do you know how to run a regression analysis?
10     A.  I do, yes.  Do you want to know about
11  R-squared?
12     Q.  I know a little bit about that.  Do you know
13  what the term vestigial means?
14     A.  Vestigial.  As I sit rear right now, no.
15     Q.  You don't have a definition of the word
16  vestigial?
17     A.  Not as I sit here now.
18     Q.  You use it in your report?
19     A.  I do.  I don't remember the context I use it
20  in.
21     Q.  The word is not part of your vocabulary as you
22  sit here today?
23     A.  Not right now.
24     MR. GLENNON:  Objection; mischaracterizes the
25  testimony.

293

1      Do you want to show it to him in the report to
2  show the context?
3      MR. GREENSTEIN:  Q.  I'm just asking if you
4  know the definition of vestigial.
5      A.  As I sit here now, I don't.
6      Q.  Did you write that word in your report?
7      A.  Mr. Sheppard may have put that word in there.
8  Mr. Sheppard has a better vocabulary than I.
9      Q.  Back to your analysis of the ten prior
10  quarters leading up to 2Q '01.
11      Did you do any sort of statistical analysis to
12  determine which part of the stock price movement
13  following an earnings disclosure was attributed to
14  company-specific information?
15      MR. GLENNON:  Objection; compound, vague and
16  ambiguous.
17      THE WITNESS:  I did not do a statistical
18  analysis of the correlation between meeting or beating
19  and by how much and the resultant stock movement.
20      MR. GREENSTEIN:  Q.  Okay.  So you just looked
21  at what the stock price did the first day following a
22  disclosure, the third day and the fifth day to see if it
23  went up or down; correct?
24      A.  No.  Actually four days.
25      MR. GLENNON:  Plus I want to object,

294

1  mischaracterizes the testimony.
2      THE WITNESS:  We looked at the day of release,
3  the day plus one, day plus three, and day plus five.
4      MR. GREENSTEIN:  Q.  The day of release?
5  Okay.
6      Well, during that time, didn't Oracle issue
7  its earnings releases after hours?
8      A.  I don't know when they issued it.
9      Q.  How would you determine the stock price
10  movement the day of release?
11      A.  You look at the stock price the day they
12  released the earnings.  If it was after hours, you do it
13  the next day.
14      Q.  Okay.  So you don't know if Oracle released
15  earnings after the market closed or before, during those
16  ten quarters?
17      MR. GLENNON:  Objection; mischaracterizes.
18      THE WITNESS:  I don't know.
19      MR. GREENSTEIN:  Q.  You didn't look at that?
20      A.  No.  It is not relevant to my analysis.
21      Q.  Is the stock price movement on the day of an
22  earnings release important in the materiality analysis
23  if Oracle issued its earnings after market hours that
24  day?
25      MR. GLENNON:  Objection; incomplete

295

1  hypothetical.
2      THE WITNESS:  No.  You look -- you don't look
3  at one day, you don't look at one moment.  You look at a
4  number of different data points, which we have here.
5  When they release doesn't matter.  It is not just the
6  meet or beat.  It is an overall mix.
7      MR. GREENSTEIN:  Q.  I understand what SAB 99
8  says.
9      MR. GLENNON:  Are you finished?
10      THE WITNESS:  Yes.
11      MR. GREENSTEIN:  Q.  What I'm asking -- I
12  think you said in your analysis you looked at the stock
13  price movement in the prior ten quarters, the stock
14  price movement that occurred on the day of the earnings
15  release; correct?
16      A.  Correct.
17      Q.  So, assuming that Oracle -- let's take first
18  quarter 2001.  Okay?
19      A.  First quarter 2001.  Certainly.
20      Q.  What was the consensus, Wall Street
21  expectation?
22      A.  Thirteen cents.
23      Q.  And what was the actual?
24      A.  Seventeen cents.
25      Q.  Okay.  And so did you look -- did you look at

296

1  the stock price -- do you know the date of that?
2      A.  I do not.
3      Q.  Did you look --
4      A.  The information is in here.  Actually, you
5  know, I do have that information in here.  It was
6  released on 9/14/2000 at 11:19 a.m.
7      So I think your representation that it was
8  after the market closed may be inappropriate.
9      Q.  You're saying that that quarter's earnings was
10  issued at 11:00 in the morning?
11      A.  Correct.  11:19.
12      Q.  Do you have the time on all of those?
13      A.  I do, yes.
14      Q.  What time was it released in the one quarter
15  that it -- actually, strike that.
16      To the extent the earnings were released
17  after hours, you wouldn't look at the stock price
18  movement before the release, you always would look at
19  the movement after the release; correct?
20      MR. GLENNON:  Objection; mischaracterizes the
21  testimony, compound, vague and ambiguous.
22      THE WITNESS:  It is after -- the day of the
23  release is after the release.
24      MR. GREENSTEIN:  Q.  Any analysis you do of
25  stock price movement, is it fair to say you would look

297

1       at it after the release?
2              MR. GLENNON:  Mischaracterizes the testimony.
3              THE WITNESS:  We looked at the stock price the
4       day of the release, day plus one, day plus three, and
5       day plus five.
6              MR. GREENSTEIN:  Q.  Okay.  But you didn't do
7       any statistical analysis of why the stock price may have
8       gone up or down on those four various days following the
9       earnings release; right?
10             MR. GLENNON:  Objection; asked and answered.
11             THE WITNESS:  I did not perform a statistical
12      analysis as to the correlation between stock price and
13      meet or beat.  I can simply see that information on this
14      chart.
15             MR. GREENSTEIN:  Q.  Okay.  If Oracle in the
16      second quarter issued earnings of 12 cents, would you
17      think that would be material in the mind of a reasonable
18      investor?
19             MR. GLENNON:  Objection; incomplete
20      hypothetical.
21             THE WITNESS:  I haven't been asked to make
22      that determination.  It would have to again be the total
23      mix of all the information with respect to Oracle's
24      operations of what they disclosed, their applications
25      income, net income, revenues, a multitude of things.

298

1              MR. GREENSTEIN:  Q.  Why was applications
2       revenue important?
3          A.  It was one of the many things --
4              MR. GLENNON:  Insert an objection.
5              THE WITNESS:  It was one of the many things
6       being looked at by the street.
7              MR. GREENSTEIN:  Q.  But it was an important
8       factor to investors?
9          A.  Not necessarily.  It was one of the many
10      factors that the street was looking at.  Does that mean
11      it was important to an investor?  That would depend on
12      the individual investor.
13          Q.  Okay, so, let me ask you again.  Is it your
14      opinion that applications growth in the second quarter
15      of '01 was important to investors in Oracle stock?
16             MR. GLENNON:  Objection; incomplete
17      hypothetical, asked and answered, vague and ambiguous.
18             THE WITNESS:  Not necessarily.  I mean, most
19      of the analysts' reports looked at and/or gave a range
20      or expectation of application income, application
21      revenues.  And there were ranges that were suggested by
22      Deutsche Bank, by Smith Barney, Salomon Smith Barney, et
23      cetera.  So it is certainly one of the many things that
24      the street was looking at.
25             MR. GREENSTEIN:  Q.  Looking at analysts'

299

1       reports, do you look at every analyst report for the
2       analysts that cover Oracle during each quarter?
3              MR. GLENNON:  Objection; vague and ambiguous
4       as to time.
5              THE WITNESS:  I'm sure I didn't look at every
6       one.
7              MR. GREENSTEIN:  Q.  How did you determine how
8       many to look at before you were able to issue your
9       opinion?
10          A.  Until I felt like I had sufficient and
11      competent evidence in the matter.
12          Q.  Did you look at the same analyst each quarter?
13             MR. GLENNON:  Objection; vague and ambiguous.
14             THE WITNESS:  I don't recall looking at the
15      exact same one.
16             MR. GREENSTEIN:  Q.  How did you determine
17      which analyst's report to look at in that particular
18      quarter?
19          A.  Whichever one I thought was judgmentally
20      appropriate to look at.
21          Q.  What standard did you use in applying your
22      judgment?
23             MR. GLENNON:  Objection; vague and ambiguous.
24             THE WITNESS:  My 29 years of being an auditor.
25             MR. GREENSTEIN:  Q.  Okay.  Could reasonable

300

1       minds differ as to whether a misstatement is material or
2       not?
3              MR. GLENNON:  Objection; incomplete
4       hypothetical.
5              THE WITNESS:  You mean just in this situation
6       or in --
7              MR. GREENSTEIN:  Q.  Yeah.
8          A.  Well, I don't see how someone can say this was
9       material given the facts and circumstances in the mix.
10      I don't see how someone could say it was material given
11      the number of people that looked at this, the scrutiny
12      that this was under, and the overall mix of information,
13      I don't see how someone can conclude it was material.
14      So I don't think reasonable minds in this situation
15      would differ.
16          Q.  In looking at the analyst reports following
17      the second quarter '01 earnings results, did you find
18      any analysts that cited to the fact that Oracle beat
19      Wall Street expectations by a penny?
20             MR. GLENNON:  Objection; vague and ambiguous.
21             THE WITNESS:  I'm sorry, what?
22             MR. GREENSTEIN:  Q.  In looking at the
23      analysts' reports after Oracle released its second
24      quarter '01 earnings of 11 cents, did you see any
25      analysts discuss the fact that Oracle beat their

301

1   expectations?
2       A.  I think most of them I saw talked about the
3   fact they beat expectations.  Eleven cents versus ten
4   cents would be beating, and it would automatically be
5   talked about.
6       Q.  And why is that?
7       MR. GLENNON:  Objection; vague and ambiguous.
8       THE WITNESS:  Because it is a fact.  Consensus
9   was 10 cents, they got to 11 cents.  So the reader --
10  the analyst doesn't have to say it.  The reader can see
11  that.
12      MR. GREENSTEIN:  Q.  But the analyst said it;
13  right?
14      MR. GLENNON:  Objection; vague and ambiguous.
15      THE WITNESS:  I recall analysts saying that.
16      MR. GREENSTEIN:  Q.  So they thought it was
17  important to put in their reports; right?
18      MR. GLENNON:  Objection; calls for
19  speculation, lacks foundation.
20      THE WITNESS:  You have to talk to them about
21  what they thought was important.
22      MR. GREENSTEIN:  Q.  So you're aware that SAB
23  99 suggests that you look at surrounding circumstances
24  in making a materiality analysis; correct?
25      A.  Of course I am.

302

1       Q.  Did you -- what surrounding circumstances did
2   you look at in finding that meeting expectations in the
3   second quarter would not be material?
4       MR. GLENNON:  Objection; mischaracterizes the
5   testimony.
6       THE WITNESS:  Would you mind restating the
7   question?
8       MR. GREENSTEIN:  Q.  Did you do an analysis of
9   the surrounding circumstances in your materiality
10  analysis?
11      A.  Absolutely.
12      Q.  What were the surrounding circumstances that
13  you looked at?
14      A.  All of the information that was talked about
15  in analyst reports, all of the information looked at
16  with respect to meeting or beating in the stock price,
17  four or five data points after that, the issue with
18  respect to what's being restated, the percentage change
19  in that potential restatement.  There was a multitude of
20  things I looked at in the surrounding circumstances as
21  SAB 99 suggests.
22      Q.  Anything in particular you found important?
23      MR. GLENNON:  Objection; vague and ambiguous.
24      THE WITNESS:  It is all important.
25      MR. GREENSTEIN:  Q.  Anything in particular

303

1   you looked at?
2       A.  I looked at all of that.
3       Q.  You said in looking at the stock reaction
4   after each of the ten quarters that you analyzed -- you
5   looked at the stock price five days after the earnings
6   release; correct?
7       MR. GLENNON:  Objection; mischaracterizes the
8   testimony.
9       THE WITNESS:  I looked at the stock movement
10  five days after the earnings release, yes, as one of
11  four data points, in each one of the ten quarters.
12      MR. GREENSTEIN:  Q.  Is it your opinion that
13  the stock price movement five days after an earnings
14  release is somehow correlated to what the company
15  reports?
16      MR. GLENNON:  Objection; vague and ambiguous.
17      THE WITNESS:  I don't understand your
18  question.
19      MR. GREENSTEIN:  Q.  Why did you look at the
20  fifth day following an earnings release in your
21  materiality analysis?
22      A.  More information is better in the materiality
23  calculations.  So if you want to look at one day, if an
24  auditor decides to do that, or a company does, you can
25  look at two days, you can look at three days.  I thought

304

1   four days was adequate.
2       Q.  Are you aware of a standard, looking at stock
3   price movements, that looks at the stock price from one
4   to three days following the earnings disclosure?
5       MR. GLENNON:  Objection; lack of foundation,
6   vague and ambiguous.
7       THE WITNESS:  Am I aware of a standard?
8       MR. GREENSTEIN:  Q.  Yeah.
9       A.  I'm not aware of any standard that suggests
10  that, no.
11      Q.  So, is it your opinion if you looked at the
12  stock price movement seven days following an earnings
13  result, that would be a factor to look at in a
14  materiality analysis?
15      MR. GLENNON:  Objection; vague and ambiguous,
16  incomplete hypothetical.
17      THE WITNESS:  I'm sorry, you mean seven days
18  after the date of release?
19      MR. GREENSTEIN:  Q.  Right.
20      A.  Do I think that's something to consider?
21      Q.  Um-hum.
22      A.  If an auditor or company decides to do that,
23  yes.  That's up to their judgment.
24      Q.  Why did you decide to stop at five days?
25      A.  Because I thought it was adequate.  And it is

305

1  adequate based on the information that I saw and based
2  on my significant number of years of experience.
3      Q.  On page 38 of your report you state that --
4      A.  My original report?
5      Q.  Yeah, your original report.
6      A.  I'm there.
7      Q.  You state, "I do not believe it would have
8  influenced the users of Oracle's financial statements."
9  Do you see that?
10     A.  I see that.
11     Q.  How did you determine who the users of
12  Oracle's financial statements were?
13     A.  Anyone looking at Oracle's financial
14  statements.
15     Q.  So it -- is the same standard applied to
16  any -- is the same standard applied to any user
17  regardless of their background?
18     MR. GLENNON:  Objection; vague and ambiguous,
19  incomplete hypothetical, lack of foundation.
20     THE WITNESS:  Well, that is really -- that's
21  more of a definition within SAB 99 of what they call a
22  reasonable investor or something to that effect.  So I
23  haven't made a determination about who all the users
24  were.  I just said whoever the user is, in general.
25     MR. GREENSTEIN:  Q.  Is there any difference

306

1  in your mind between an ordinary investor versus what
2  would be reasonable to, say, a hedge fund manager?
3      MR. GLENNON:  Objection; vague and ambiguous,
4  incomplete hypothetical.
5      THE WITNESS:  Well, their sophistication
6  certainly can be different, but they are still users of
7  the financial, which one needs to consider as it relates
8  to materiality.
9      MR. GREENSTEIN:  Q.  Right.  But would you
10 apply the same standard to determining whether something
11 was material to a user any differently depending on what
12 type of investor the person was?
13     MR. GLENNON:  Objection; incomplete
14 hypothetical, lacks foundation.
15     THE WITNESS:  Yeah.  No.  A company and/or
16 auditor don't determine materiality based on whether it
17 is known as a hedge fund or a mom and pop's retirement
18 fund.  It is the total mix and the overall financial
19 statement taken as a whole.
20     MR. GREENSTEIN:  Q.  Do you agree SAB 99 --
21 strike that.
22     What qualitative factor did you look at doing
23 your materiality analysis?
24     A.  Qualitative?
25     Q.  Yeah.

307

1      A.  I looked at the ones we talked about on page
2  39, and anything else that was mentioned in SAB 99.  And
3  you can see those laid out on pages 39 and 40 of my
4  report.
5      Q.  Let's take the first factor, whether a
6  statement arises from an item capable of precise
7  measurement or whether it arises from an estimate, and,
8  if so, the degree of imprecision in that.  Do you see
9  that?
10     A.  I do.
11     Q.  So is it your expert opinion that the
12 transfers from -- the $20.1 million in transfers from
13 25005 to 12601 in the second quarter '01 was an
14 estimate?
15     A.  Yes.
16     MR. GLENNON:  Objection; lack of foundation,
17 vague and ambiguous.
18     THE WITNESS:  It was based on an estimate of a
19 reserve account.
20     MR. GREENSTEIN:  Q.  But the actual transfer
21 from 25005 to 12601 can be accurately calculated, can't
22 it?
23     MR. GLENNON:  Objection; vague and ambiguous,
24 lack of foundation.
25     THE WITNESS:  The amount can be calculated,

308

1  but the resultant account that is being adjusted is the
2  reserve.  And that is one of the most volatile estimates
3  a company has.
4      MR. GREENSTEIN:  Q.  But actual transfers from
5  25005 to 12601 can be accurately measured; right?
6      MR. GLENNON:  Objection; asked and answered.
7      THE WITNESS:  Yes, it can be.  But that's not
8  the way you measure materiality.  Any adjustment can be
9  accurately measured.  The issue becomes would a reader
10 of a financial statement be interested in whether or not
11 an adjustment took place in cash that can be accounted,
12 or, for example, in a reserve account for bad debt that
13 they would expect to have a significant amount of
14 estimated and a significant amount of judgment placed on
15 it?
16     MR. GREENSTEIN:  Q.  Looking at the second
17 factor, whether the misstatement masks a change in
18 earnings or other trends.  Do you see that?
19     A.  Yes.
20     Q.  You stated you found, quote, "No evidence of
21 this issue"?
22     A.  That's right.
23     Q.  Have you ever found -- in conducting
24 materiality analysis, have you ever found evidence that
25 a misstatement masked a change in earnings?

309

1      MR. GLENNON:  Objection; vague and ambiguous.
2      THE WITNESS:  Certainly.
3      MR. GREENSTEIN:  Q.  What factors would allow
4  you to draw a conclusion that a misstatement masks a
5  change in earnings or other trends?
6      A.  Well, if it changes from a loss to income.
7      Q.  That's a different factor though; right?
8      A.  It also can be subsumed into that one.  Mask a
9  change in earnings, well, if you're changing the
10  earnings, that's masking a change in earnings.
11      Q.  Okay.
12      A.  So, or other trends.  Have I ever found that?
13  Is that your question?  I'm sorry.
14      Q.  I think you answered my question.
15      Take the next factor, "Whether the
16  misstatement concerns a segment or other portion of the
17  registrant's business that has been identified as
18  playing a significant role in the registrant's
19  operations or profitability."  Do you see that?
20      A.  You skipped down quite a few.
21      Q.  I'm focusing on certain ones.
22      A.  I thought you said the next one.  I'm sorry I
23  do see that one, yes.
24      Q.  And you -- your opinion is that if Oracle had
25  not been able to book the HP transaction second quarter

310

1  of '01, that would not have been material to a
2  reasonable investor; is that correct?
3      MR. GLENNON:  Objection; incomplete
4  hypothetical, lack of foundation.
5      THE WITNESS:  Now, we're on HP?
6      MR. GREENSTEIN:  Q.  Yeah.
7      A.  My opinion is that had Oracle not booked the
8  HP transaction in the second Q would not have been
9  material; that's correct.
10      MR. GREENSTEIN:  Q.  Did you analyze what
11  Oracle's applications growth would have been in 2Q '01
12  if they did not recognize the HP deal?
13      MR. GLENNON:  Same objections.
14      THE WITNESS:  I did.
15      MR. GREENSTEIN:  Q.  You did?
16      A.  I did, yes.
17      Q.  And what would it be if they didn't recognize
18  it?
19      A.  Fifty-four percent.
20      Q.  What was it -- what was it -- strike that.
21      They did recognize the HP transaction;
22  correct?
23      MR. GLENNON:  Objection; vague and ambiguous.
24      THE WITNESS:  They did.
25      MR. GREENSTEIN:  Q.  What was the applications

311

1  growth rate in the second quarter?
2      MR. GLENNON:  Same objection; lack of
3  foundation.
4      THE WITNESS:  Sixty-six percent.
5      MR. GREENSTEIN:  Q.  So if Oracle had not
6  booked the HP deal in 2Q '01, its applications growth
7  would have been 55 percent?
8      MR. GLENNON:  Objection; asked and answered.
9      MR. GREENSTEIN:  Q.  Sorry, 54 percent?
10      A.  Fifty-four percent.
11      Q.  Fifty-four percent, okay.  Do you know what
12  analysts' expectations were for 2Q '01 in terms of
13  applications growth?
14      A.  I do.
15      MR. GLENNON:  Objection; lack of foundation.
16      MR. GREENSTEIN:  Q.  What was the consensus
17  growth expectation?
18      A.  I don't know what the consensus was.  I looked
19  at it individually.  I don't know if there really was a
20  consensus per se.
21      Smith Barney was 54 percent and Deutsche Bank
22  was 50 to 60 percent, the two that I looked at.
23      Q.  You don't think a reasonable investor would
24  have found it important that Oracle's applications
25  growth would have been more than ten percent lower if

312

1  they hadn't booked that HP deal?
2      MR. GLENNON:  Objection; mischaracterizes the
3  testimony.  Lack of foundation.
4      THE WITNESS:  I don't think in the total mix
5  of information that a reasonable investor would have
6  considered it would have been material to a reasonable
7  investor, no.
8      MR. GREENSTEIN:  Q.  You say in your report
9  that it was the largest deal in that quarter; is that
10  correct?
11      MR. GLENNON:  Objection; mischaracterizes
12  testimony.  Lack of foundation.
13      THE WITNESS:  I think I said third.  One of
14  the largest.
15      MR. GREENSTEIN:  Q.  It was the third largest
16  deals?
17      A.  I believe so, yes.
18      Q.  You don't think -- if the third largest deal
19  in a quarter was improperly booked, you don't think that
20  would be important to a reasonable investor?
21      MR. GLENNON:  Objection; lack of foundation,
22  incomplete hypothetical.
23      THE WITNESS:  The size of the deal only
24  matters with respect to whether or not in the total mix
25  of information it is considered material by the auditor

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

313

1  or by the company.
2      MR. GREENSTEIN:  Q.  Okay.
3      A.  What level it was on the ranking of size of
4  deal makes no difference at all.
5      Q.  Okay.  Do you agree that the HP deal in 2Q '01
6  was the largest applications deal Oracle had that
7  quarter?
8      MR. GLENNON:  Objection; lack of foundation,
9  incomplete hypothetical.
10     THE WITNESS:  I don't recall that information.
11     MR. GREENSTEIN:  Q.  You don't know if it was
12  or it was not?
13     A.  I don't recall that.
14     Q.  I know you don't recall it.  Sitting here
15  today, do you know it?
16     MR. GLENNON:  Objection; asked and answered.
17     THE WITNESS:  I said I don't recall it.
18     MR. GREENSTEIN:  Well, assuming it was the
19  largest applications deal in that quarter, is it your
20  opinion that if that deal was improper, that wouldn't
21  have been important to a reasonable investor?
22     MR. GLENNON:  Objection; lack of foundation,
23  calls for speculation, and vague and ambiguous.
24     THE WITNESS:  What do you mean by improper?
25     MR. GREENSTEIN:  Q.  If that deal hadn't been

314

1  booked, assuming it was the largest applications deal in
2  the second quarter '01, would that have been important
3  to an investor?
4      MR. GLENNON:  Same objections.
5      THE WITNESS:  I don't think, given the entire
6  mix of information, that would have been important to a
7  reasonable investor.
8      MR. GREENSTEIN:  Q.  How many analysts did you
9  look at in determining what Oracle's applications growth
10  estimates -- strike that.
11         How many analysts did you look at in
12  determining what analysts expected Oracle to report in
13  terms of applications growth?
14     MR. GLENNON:  Objection; asked and answered.
15     THE WITNESS:  There were a number.  I don't
16  remember.  I just remember those two numbers
17  specifically, SSB and Deutsche Bank.  But there were a
18  number that I looked at and considered.
19     MR. GREENSTEIN:  Q.  Did you -- so do you
20  recall which ones you looked at?
21     A.  No.
22     MR. GLENNON:  Objection; asked and answered.
23     THE WITNESS:  I could go to the binders and
24  look, if you'd like.
25     MR. GREENSTEIN:  Sure.

315

1      THE WITNESS:  We need to take --
2      MR. GLENNON:  Well, okay.
3      THE WITNESS:  Take a short break?
4      MR. GREENSTEIN:  Q.  You don't remember?  I'm
5  asking if you remember the numbers.
6      A.  I don't remember without looking.
7      Q.  Do you remember a range?
8      MR. GLENNON:  Objection; asked and answered.
9      THE WITNESS:  Smith Barney was 54 percent,
10  Deutsche Bank was 50 to 60 percent.
11     MR. GREENSTEIN:  Q.  Okay.  Looking at the
12  factor of SAB 99 that looks at whether the misstatements
13  affects the registrant's compliance with regulatory
14  requirements, are you aware of that factor?
15     A.  I am.
16     Q.  Did you look at that in connection with the 2Q
17  '01 bad debt transfers?
18     A.  Yes.
19     Q.  Did you consider whether or not those bad debt
20  transfers violated any regulatory requirements?
21     MR. GLENNON:  Objection; vague and ambiguous.
22     THE WITNESS:  They didn't violate any
23  regulatory requirements.  If they were inappropriately
24  transferred, they violated GAAP, which is not a
25  regulatory requirement, it is mentioned or contemplated

316

1  in SAB 99.
2      MR. GREENSTEIN:  Q.  Did you analyze any
3  escheatment laws in doing your materiality analysis of
4  the 2Q '01 bad debt transfer?
5      MR. GLENNON:  Objection; vague and ambiguous,
6  lacks foundation.
7      THE WITNESS:  I know of escheatment laws, I
8  have dealt with them for years.  But I don't recall
9  analyzing any of those as it relates to those transfers.
10     MR. GREENSTEIN:  Okay.  Let's go off the
11  record.
12     VIDEOGRAPHER:  This marks the end of tape four
13  in Volume I in the deposition of J. Duross O'Bryan.  At
14  7:10, going off the record.
15        (Recess, 7:10 p.m. - 7:22 p.m.)
16        (Exhibit 19 marked for
17         identification.)
18        (Exhibit 20 marked for
19         identification.)
20     VIDEOGRAPHER:  On record at 7:22.  This marks
21  the beginning of tape five in Volume I in the deposition
22  of J. Duross O'Bryan.
23     MR. GREENSTEIN:  Q.  Mr. O'Bryan, what's been
24  placed before you are the last two exhibits, 19 and 20.
25     MR. GLENNON:  I just put an objection on the

317

1　record as far as Exhibit 19 is concerned, it looks like
2　what plaintiffs have done is affixed a variety of
3　different documents together and marked them as a single
4　exhibit.
5　　　　So to the extent these represent different
6　documents, I just wanted to note that for the record.
7　　　　MR. GREENSTEIN:  Q.  Mr. O'Bryan, what's been
8　placed before you are Exhibits 19 and 20.  And these are
9　the documents produced as part of your rebuttal report
10　on June 22nd.
11　　　　Do you recognize the documents?
12　　　　A.  I do, yes.  I mean, the ones I've just very
13　quickly looked at.  I recognize the top portion of these
14　two documents, yes.
15　　　　Q.  Okay.  Your opening expert report was issued
16　on May 25th; correct?
17　　　　A.  I believe that date is correct.  Let me just
18　verify that for you.
19　　　　May 25th; that's correct.
20　　　　Q.  And Exhibit 19 and 20, did you have those
21　documents at the time you wrote -- that you issued your
22　report on May 25th?
23　　　　MR. GLENNON:  Objection; vague and ambiguous,
24　lacks foundation.
25　　　　THE WITNESS:  I don't recall if these were

318

1　part of the original production.
2　　　　MR. GREENSTEIN:  Q.  I didn't ask that.  I
3　asked did you have these documents at the time you
4　submitted your May 25th report?
5　　　　MR. GLENNON:  Objection; asked and answered.
6　　　　THE WITNESS:  I haven't looked through all of
7　19, so I can't say specific, unless you want me to look
8　through all of them.
9　　　　MR. GREENSTEIN:  Q.  The first document, did
10　you have that at the time you issued your May 25th
11　report?
12　　　　A.  I don't recall having the SLSA.
13　　　　Q.  So is that a no?
14　　　　MR. GLENNON:  Objection; mischaracterizes the
15　testimony.
16　　　　THE WITNESS:  I just don't recall.
17　　　　MR. GREENSTEIN:  Q.  Do you recall having
18　Exhibit 20 at the time you issued your May 25th report?
19　　　　Let me ask you, are you aware of an e-mail
20　from --
21　　　　A.  I just want to answer your question here.
22　　　　Q.  Okay.
23　　　　A.  I did have -- I beg your pardon.
24　　　　I'm not ready to answer.  I don't have the
25　answer I thought I had.  Sorry.

319

1　　　　Q.  So you don't know if you had the documents
2　that are marked as Exhibit 19 or 20 at the time that you
3　issued your May 25th report?
4　　　　A.  Let me just --
5　　　　Q.  You are looking for it?
6　　　　A.  Yeah.
7　　　　Q.  Sorry.
8　　　　A.  I don't think I had those.  I don't recall,
9　but I don't think that I did.
10　　　　Q.  Do you know when you received those documents?
11　　　　A.  Well, when Mr. Regan issued his original --
12　his report where he spoke in detail about the HP
13　transaction, so maybe his rebuttal report, at that point
14　in time it became clear to at least me what the
15　plaintiff's position was with respect to HP.
16　　　　And at that point in time documents were
17　gathered to show that, in my opinion, Mr. Regan is wrong
18　as it relates to the recognition of revenues.
19　　　　So it was sometime after my original report
20　and prior to my rebuttal report.  I just don't recall
21　the date.
22　　　　Q.  Are the documents in front of you, are those
23　the documents that were gathered?
24　　　　MR. GLENNON:  Objection; assumes facts, lack
25　of foundation.

320

1　　　　THE WITNESS:  Again, Exhibit 19 is 75 pages, a
2　bunch of different things stapled together, and I have
3　not been through those to cross-check those with all the
4　ones we got with respect to the secondary production.
5　　　　MR. GREENSTEIN:  Q.  Is that Exhibit 20, or
6　the smaller one?  You relied on that in your rebuttal
7　report.  So do you recall if you had that, that was one
8　of the documents gathered after you submitted your
9　May 25th report?
10　　　　MR. GLENNON:  Objection; asked and answered.
11　　　　THE WITNESS:  As I said, I don't recall if I
12　saw this prior to the issuance of my original report.  I
13　don't think so, but I just don't recall as I sit here
14　right now.  It's been a long time.
15　　　　MR. GREENSTEIN:  Q.  Let me ask you this.  Are
16　you aware of an e-mail from Shelly Curtis where she
17　purports to describe events surrounding the signing of
18　the HP deal late on November 30th?  Do you recall that
19　e-mail?
20　　　　MR. GLENNON:  Objection; lack of foundation,
21　vague and ambiguous.
22　　　　THE WITNESS:  I am aware of an e-mail that has
23　Shelly Curtis' comments about certifying that the
24　transaction with HP was completed prior to midnight on
25　11/30/2000.

321

1 MR. GREENSTEIN: Q. You recall in that e-mail
2 that she references Arthur Andersen wanted some evidence
3 that the deal was booked on November 30th; correct?
4 MR. GLENNON: Objection; document speaks for
5 itself, lack of foundation.
6 THE WITNESS: Well, somewhere in that e-mail
7 chain is a reference to: Could you give some
8 clarification here, Andersen has asked about that.
9 Which you can see in Andersen's report or Andersen's
10 analysis on 1340.
11 MR. GREENSTEIN: Q. Why would Arthur Andersen
12 as Oracle's auditor, want to know if the deal was signed
13 on November 30th, 2000?
14 MR. GLENNON: Objection; calls for
15 speculation, lacks foundations.
16 THE WITNESS: It is part of a revenue
17 recognition test.
18 MR. GREENSTEIN: Q. Okay. Do you recall
19 having that e-mail from Shelly Curtis prior to issuing
20 your May 25th report?
21 MR. GLENNON: Objection; vague and ambiguous.
22 THE WITNESS: You know, I don't recall having
23 that. I just don't recall as I sit here if I had it or
24 not.
25 MR. GREENSTEIN: Q. If you had it, you would

322

1 have put it on the Appendix C of your opening report and
2 you would have relied on that document?
3 MR. GLENNON: Objection; lack of foundation.
4 THE WITNESS: Had I seen that document, I
5 certainly would have considered it. Whether I relied on
6 it would remain to be seen.
7 MR. GREENSTEIN: Q. If you turn to page 41 of
8 your opening report.
9 A. Sorry, back to the opening report?
10 Q. Yeah. The section on review of
11 Hewlett-Packard transactions. Do you see that?
12 A. I do, yes.
13 Q. It says, "In supplemental interrogatory
14 responses, plaintiffs suggest that the HP
15 transaction..." Do you see that?
16 A. I do.
17 Q. Is it fair to say you read plaintiff's
18 interrogatory responses -- strike that.
19 So you were aware of plaintiff's allegations
20 concerning the HP transaction prior to issuing this
21 report, from their interrogatory responses; correct?
22 MR. GLENNON: Objection; lack of foundation.
23 THE WITNESS: I have seen the supplemental
24 interrogatory responses. And I did see in those, prior
25 to the issuance of this report this allegation that HP

323

1 should not have been booked.
2 MR. GREENSTEIN: Q. And you issued this
3 opinion; correct?
4 A. I issued this opinion?
5 Q. You issued this opinion after learning of
6 plaintiff's allegations about the HP transaction in the
7 supplemental interrogatory responses; correct?
8 MR. GLENNON: Objection; vague and ambiguous
9 as to this opinion.
10 THE WITNESS: I issued opinion number 7 on
11 page 41. And at the time I issued that, I had seen the
12 supplemental interrogatory responses that alleged that
13 HP's transaction had not been properly booked.
14 MR. GREENSTEIN: Q. If you look at page 42,
15 the third to last sentence, it starts with, "I note that
16 AA." Do you see that?
17 A. Yes.
18 Q. You note that "AA, Oracle's prior financial
19 statement auditors, specifically looked at the HP
20 transaction from a revenue recognition perspective and
21 even discussed it with Oracle's audit committee on
22 January 5th." Do you see that?
23 A. I do.
24 Q. You said, "AA did not recommend that any
25 adjustment be made to the accounting for the HP

324

1 transaction." Do you see that?
2 A. Correct.
3 Q. Is it required for an auditor to make an
4 adjustment in order for a revenue recognition deal to be
5 material?
6 MR. GLENNON: Objection; vague and ambiguous,
7 incomplete hypothetical.
8 THE WITNESS: I don't understand your
9 question.
10 MR. GREENSTEIN: Q. If you turn to Appendix C
11 of your opening report.
12 A. I'm there. I'm there.
13 Q. And you see the depositions that you relied
14 upon there?
15 A. I do, yes.
16 Q. You will see that Tom Rathjens' isn't in
17 there?
18 A. That's correct.
19 Q. Is it fair to say you didn't rely on the
20 deposition of Tom Rathjens in issuing this May 25th
21 opinion on the HP transaction?
22 MR. GLENNON: Objection; vague and ambiguous,
23 lacks foundation.
24 THE WITNESS: Yeah, I don't think I looked at
25 Mr. Rathjens' deposition prior to the issuance of this

325

1    initial report.
2        MR. GREENSTEIN:  Q.  And why not?
3        MR. GLENNON:  Objection; vague and ambiguous.
4        THE WITNESS:  Because, as I state in my
5    report, I don't see any evidence, in considering what
6    went on with this transaction, that this was improperly
7    booked at this point in time when I wrote this report.
8        With all due respect to Mr. Regan, he's the
9    only individual, at least accounting professional that
10   I've seen that seven years later suggests the HP deal
11   was not booked properly.
12       This deal was looked at by the company, by the
13   audit committee, by the revenue recognition group of the
14   company and by the auditors.  Every single one of them
15   have looked at this transaction and suggested it was
16   properly stated.
17       Seven years later Mr. Regan comes along and
18   says that that was inappropriate, which I find
19   troubling.
20       So, that was the information I was considering
21   at the time.  And there was no reason for me to look at
22   Mr. Rathjens, who was HP's individual PMK or whatever he
23   was designated as, because this thing had been fully
24   vetted.
25       What HP thought about and thinks about Oracle

326

1    booking their deal is completely irrelevant.  It is how
2    Oracle decides to book this deal.  And it was
3    appropriate to book, and it was appropriate to book
4    given all of the professionals that have looked at this.
5    And I think it is silly, quite frankly, that Mr. Regan
6    suggests otherwise.
7        MR. GREENSTEIN:  Q.  So, is it fair to say
8    that what you just said in that long answer is what you
9    considered before submitting your May 25th report?
10       MR. GLENNON:  Objection; mischaracterizes the
11   testimony, lack of foundation.
12       THE WITNESS:  Well, it is any of the footnotes
13   that I have here or references to documents or
14   depositions.  Mr. Matuszak's deposition, Arthur
15   Andersen's consideration, the audit committee.
16       MR. GREENSTEIN:  Q.  Okay.  So you didn't
17   consider Tom Rathjens' deposition in forming your expert
18   opinion on the propriety of the HP transaction on
19   May 25th?
20       MR. GLENNON:  Objection; asked and answered.
21       THE WITNESS:  In my opinion there would be no
22   need to, given the date of the original report.
23       MR. GREENSTEIN:  Okay, I'm done.
24       MR. GLENNON:  I don't have any redirect.
25       VIDEOGRAPHER:  The number of tapes used for

327

1    this deposition is five.  This is the end of videotape
2    number five in Volume I in the deposition of J. Duross
3    O'Bryan.  The original videotapes will be retained by
4    LiveNote World Service.  We're going off the record.
5    The time on the monitor is 7:37.
6        (Discussion off the record.)
7        MR. GREENSTEIN:  We just had a discussion off
8    the record.  Both parties agree that the deposition and
9    the exhibits should be designated as confidential.
10       MR. GLENNON:  And it is going to get shipped
11   to us for our review in 30 days to review and sign?
12       MR. GREENSTEIN:  Right.
13       (Whereupon, at 7:38 p.m. the deposition of
14   JOHN DUROSS O'BRYAN was adjourned.)
15
16       I declare under penalty of perjury that the
17   foregoing is true and correct.
18
19   Dated:_____  _____
                                        JOHN DUROSS O'BRYAN
20
21
22
23
24
25

328

1    STATE OF CALIFORNIA     )
2                            )
3    COUNTY OF ALAMEDA       )
4        I, DIANA NOBRIGA, hereby certify that the
5    witness in the foregoing deposition was by me duly sworn
6    to testify to the truth, the whole truth, and nothing
7    but the truth in the within-entitled cause; that said
8    deposition was taken at the time and place therein
9    stated; that the testimony of said witness was reported
10   by me, a Certified Shorthand Reporter and disinterested
11   person, and was thereafter transcribed into typewriting,
12   and that the pertinent provisions of the applicable code
13   or rules of civil procedure relating to the notification
14   of the witness and counsel for the parties hereto of the
15   availability of the original transcript of the
16   deposition for reading, correcting and signing have been
17   met.
18       And I further certify that I am not of counsel
19   or attorney for either or any of the parties to said
20   deposition, nor in any way interested in the outcome of
21   the cause named in said action.
22       DATED: _____
23
24                _____
25                DIANA  NOBRIGA, CSR NO. 7071

EXHIBIT 3

1 | LERACH COUGHLIN STOIA GELLER
  |   RUDMAN & ROBBINS LLP
2 | MARK SOLOMON (151949)
  | DOUGLAS R. BRITTON (188769)
3 | VALERIE L. McLAUGHLIN (191916)
  | GAVIN M. BOWIE (235532)
4 | STACEY M. KAPLAN (241989)
  | 655 West Broadway, Suite 1900
5 | San Diego, CA 92101
  | Telephone: 619/231-1058
6 | 619/231-7423 (fax)
  | marks@lerachlaw.com
7 | dougb@lerachlaw.com
  | valeriem@lerachlaw.com
8 | gbowie@lerachlaw.com
  |   – and –
9 | SHAWN A. WILLIAMS (213113)
  | WILLOW E. RADCLIFFE (200087)
10 | MONIQUE C. WINKLER (213031)
  | ELI R. GREENSTEIN (217945)
11 | 100 Pine Street, Suite 2600
  | San Francisco, CA 94111
12 | Telephone: 415/288-4545
  | 415/288-4534 (fax)
13 | shawnw@lerachlaw.com
  | willowr@lerachlaw.com
14 | elig@lerachlaw.com
  | jenniew@lerachlaw.com
15 | moniquew@lerachlaw.com

16 | Lead Counsel for Plaintiffs

17 |                    UNITED STATES DISTRICT COURT

18 |                    NORTHERN DISTRICT OF CALIFORNIA

19 | In re ORACLE CORPORATION      )  Master File No. C-01-0988-MJJ
   | SECURITIES LITIGATION          )
20 |                                )  CLASS ACTION
   | ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ )
21 | This Document Relates To:      )  STIPULATION REGARDING EXPERT
   |                                )  DISCOVERY
22 |    ALL ACTIONS.                )
   |                                )
23 | ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ )

24 |

25 |

26 |

27 |

28 |

1    IT IS HEREBY STIPULATED AND AGREED, by and between the parties to this action,
2  through their undersigned counsel of record, as follows:

3    1.    The purpose of this Stipulation is to modify the provisions of Fed. R. Civ. P.
4  26(a)(2)(B) with respect to required disclosures relating to persons retained to provide expert
5  testimony ("Testifying Experts") and to limit the scope of discoverable information relating to
6  Testifying Experts and experts' opinions.

7    2.    Consistent with Fed. R. Civ. P. 26(a)(2)(B), except as modified or limited by this
8  Stipulation, the parties will serve on the dates established by the Court: (a) the report of any and each
9  Testifying Expert; (b) a list that identifies, either by Bates number, deposition exhibit number, or by
10  page of a deposition transcript, all materials relied upon by each Testifying Expert in forming his or
11  her opinions and copies of all other documents, data, or other information relied upon by each
12  Testifying Expert, including academic literature and other authorities relied upon; (c) documents
13  sufficient to show the total amount of hours, fees and expenses billed by each Testifying Expert; (d)
14  the qualifications of each Testifying Expert, including a list of all publications authored by the expert
15  witness within the preceding 10 years; and (e) a listing of any case or proceeding in which the expert
16  has testified as an expert at trial, hearing, or deposition within the preceding four years.

17    3.    To the extent that a Testifying Expert is in the possession, custody, or control of
18  copies of the Testifying Expert's reports and testimony (if any) in cases listed in response to subpart
19  2(e) above ("Prior Reports and Testimony"), such copies shall also be provided with the Testifying
20  Expert's report if the Prior Reports and Testimony are not subject to a protective order or
21  confidentiality order.

22    4.    To the extent that any Testifying Expert's report relies on, includes or is based on,
23  exhibits, information or data processed or modeled by computer at the direction of a Testifying
24  Expert, machine readable copies of those exhibits, information and data (including all input and
25  output files) along with the appropriate computer programs, instructions, and field descriptions shall
26  be produced with the expert's report. All electronic data and data compilations shall be produced in
27  the same form or format in which it was used for the expert's calculations, in working order with all
28  links to other spreadsheets and/or underlying data. No party need produce computer software

STIPULATION REGARDING EXPERT DISCOVERY - C-01-0988-MJJ                    - 1 -

1    programs that are reasonably and readily commercially available (*e.g.*, Microsoft Word and
2    Microsoft Excel).

3           5.       The following categories of data, information, and documents need not be disclosed
4    by any party, and pursuant to this Stipulation, are outside the scope of permissible discovery
5    (including deposition questions):

6                   (a)      Any notes or other writings taken or prepared by or for a Testifying Expert in
7    connection with this matter including, but not limited to, correspondence or memos to or from, and
8    notes of conversations with, the expert's assistants and/or clerical or support staff, other expert
9    witnesses, non-testifying expert consultants, or attorneys for the party offering the testimony of such
10   expert witness;

11                  (b)      Draft reports, draft studies, draft affidavits, or draft work papers; preliminary
12   or intermediate calculations, computations, or data; or other preliminary, intermediate or draft
13   materials prepared by, for or at the direction of a Testifying Expert; and

14                  (c)      Any oral or written communication between a Testifying Expert and the
15   Testifying Expert's assistants and/or clerical or support staff, other expert witnesses, non-testifying
16   expert consultants, or attorneys for the party offering the testimony of such expert witness.

17          6.       In addition to the limitations on discovery set forth in paragraph 5, above, the parties
18   agree that other data or information that may have been considered by a Testifying Expert but was
19   not relied on by the Testifying Expert in forming her or his opinions need not be disclosed or
20   produced. Nothing in this Stipulation, however, shall be construed to prevent deposition questions
21   relating to the substance of the Testifying Expert's opinions (including alternative theories,
22   methodologies, variables, or assumptions that the expert may or may not have considered in
23   formulating her or his opinions or in preparing her or his report).

24          7.       This Stipulation shall not be construed to preclude reasonable questions at deposition
25   concerning a Testifying Expert's compensation, hours the Testifying Expert expended in preparing
26   his or her report and testimony, and frequency and duration of meetings with counsel regarding his
27   or her report.

28

STIPULATION REGARDING EXPERT DISCOVERY - C-01-0988-MJJ                    - 2 -

1       8.     This Stipulation may be executed in counterparts, and will be effective when executed

2  by both parties.

3  DATED: February 6, 2007           LERACH COUGHLIN STOIA GELLER

4                         RUDMAN & ROBBINS LLP
                            SHAWN A. WILLIAMS

5                         WILLOW E. RADCLIFFE
                         MONIQUE C. WINKLER

6                         ELI R. GREENSTEIN

7

8                         SHAWN A. WILLIAMS

9                         100 Pine Street, Suite 2600
                         San Francisco, CA 94111

10                      Telephone: 415/288-4545
                      415/288-4534 (fax)

11

12                      LERACH COUGHLIN STOIA GELLER
                       RUDMAN & ROBBINS LLP

13                     MARK SOLOMON
                      DOUGLAS R. BRITTON

14                     VALERIE L. McLAUGHLIN
                     GAVIN M. BOWIE

15                     STACEY M. KAPLAN
                     655 West Broadway, Suite 1900

16                     San Diego, CA 92101
                     Telephone: 619/231-1058

17                     619/231-7423 (fax)

18                     Lead Counsel for Plaintiffs

DATED: February 6, 2007           LATHAM & WATKINS LLP
19                     PATRICK E. GIBBS

20

21                       PATRICK E. GIBBS

22                     140 Scott Drive

23                     Menlo Park, CA 94025
                     Telephone: 650/328-4600

24                     650/463-2600 (fax)

25

26

27

28

Feb-05-07 05:47pm  From-                                          T-919  P.07/07  F-200



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LATHAM & WATKINS LLP
Peter A. Wald
Michele F. Kyrouz
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: 415/391-0600
415/395-8095 (fax)

Attorneys for Defendants

[ \Case\SF\Orace\3\5 IY\0034491 doc

STIPULATION REGARDING EXPERT DISCOVERY - C-01-0988-MJJ                     - 4 -

505 Montgomery Street, Suite 2000
San Francisco, California 94111-2562
Tel: (415) 391-0600 Fax: (415) 395-8095
www.lw.com

# LATHAM&WATKINS LLP

**FIRM / AFFILIATE OFFICES**

| | |
|---|---|
| Barcelona | New Jersey |
| Brussels | New York |
| Chicago | Northern Virginia |
| Frankfurt | Orange County |
| Hamburg | Paris |
| Hong Kong | San Diego |
| London | San Francisco |
| Los Angeles | Shanghai |
| Madrid | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| Munich | Washington, D.C. |

**FACSIMILE TRANSMISSION**
February 7, 2007

| To: | Mark Solomon, Esq. | **Fax:** (619) 231-7423 | **Tel:** (619) 231-1058 |
|---|---|---|---|
| | Lerach Coughlin Stoia Geller Rudman & Robbins, LLP | | |
| | Shawn A. Williams, Esq | (415) 288-4534 | (415) 288-4545 |
| | Monique C. Winkler, Esq. | | |
| | Lerach Coughlin Stoia Geller Rudman & Robbins, LLP | | |

| From: | Sean P.J. Coyle |
|---|---|
| **Re:** | In re Oracle Corporation Securities Litigation |
| ☐ Original(s) to follow | **Number of pages, including cover:** 6 |

**Please see attached**

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received the facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S Postal service. Thank you

**If there are any problems with this transmission, please call (415) 395-8015.**

EXHIBIT 4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

MASTER FILE NO. C-01-0988-SI

LOCAL 144 NURSING HOME PENSION FUND,
UFCW LOCAL 56 RETAIL MEAT PENSION FUND,
DRIFTON FINANCE CORPORATION, AND ROBERT D. SAWYER, et al.

vs.

ORACLE CORPORATION, LAWRENCE J. ELLISON,
JEFFREY O. HENLEY, EDWARD J. SANDERSON

REBUTTAL REPORT

OF

D. PAUL REGAN, CPA, CFE

Initially Submitted:  JUNE 22, 2007
Sworn:  OCTOBER 16, 2008

## The Nature of My Assignment

I have been retained, through my employer, Hemming Morse, Inc., by Lerach Coughlin
Stoia Geller Rudman & Robbins LLP, counsel for plaintiffs Local 144 Nursing Home Pension
Fund, et al., to provide expert testimony regarding whether Oracle's revenue and earnings for the
quarterly period ended November 30, 2000 ("2QFY01") were presented in accordance with
Generally Accepted Accounting Principles ("GAAP"), and whether Oracle's financial statements
were materially misstated.  I submitted my expert report on May 25, 2007.  The defendants'
experts also submitted reports at that time.  This rebuttal report responds to specific conclusions
reached by J. Duross O'Bryan as quoted or referenced below, and should be reviewed in
connection with my May 25, 2007 expert report.  I have incorporated the conclusions and
analyses of my prior report into this rebuttal report.

## Summary of My Expert Qualifications

My qualifications and hourly rate are included in my expert report dated May 25, 2007.

## Evidence Considered

The evidence I considered in this case is included in Exhibit B to my expert report dated May 25,
2007.  In addition, new evidence I have considered since that time is included in Exhibit A to this
response.  In particular, I have considered the Expert Report of J. Duross O'Bryan ("O'Bryan
Report"), which he presented on behalf of Oracle as described further below.

## Summary Response to Mr. O'Bryan's Expert Report

This rebuttal report contains the following principal conclusions, each of which is analyzed in
greater detail in a related section of this rebuttal report:

1.      Mr. O'Bryan's conclusion on materiality with respect to Oracle's Q2FY01 financial
        statements is incorrect and contrary to GAAP, including SAB 99,[1] because:

---

[1]      Securities and Exchange Commission ("SEC") Staff Accounting Bulletin No. 99, Materiality
("SAB 99"), *see* my May 25, 2007 report at ¶ 40.

     a.  His analysis did not properly evaluate each misstatement individually and in the aggregate; and

     b.  He failed to consider certain important factors and evidence.

2.    Mr. O'Bryan's analysis of Oracle's Q2FY01 transfers to the Bad Debt Reserve is flawed in that:

     a.  He did not provide any details underlying his assertion that selected transfers were supportable beyond the two examples in his report.  Further, his conclusions related to the two examples rely on evidence developed by Oracle in 2003 rather than what was documented by Oracle contemporaneous to the transfers; and

     b.  He appears to have incorrectly assumed that Ernst & Young LLP ("E&Y") had developed certain conclusions about the 2QFY01 transfers, however, it does not appear that E&Y ever reviewed the transfers in 2Q01 and never reached those conclusions.

3.    Mr. O'Bryan's conclusion that the November 2000 Debit Memos had no financial statement impact is inaccurate.

## Mr. O'Bryan's Conclusion on Materiality With Respect to Oracle's 2QFY01 Financial Statements is Incorrect and Contrary to GAAP, Including SAB 99

Mr. O'Bryan's conclusion regarding the HP agreement in 2QFY01 is incorrect and lacks an independent and/or reliable analysis.

Mr. O'Bryan asserted that Oracle's $20.1 million transfer of unapplied cash to its Bad Debt Reserve in 2QFY01 was not material with respect to its financial statements.  In doing so, Mr. O'Bryan failed to consider certain relevant evidence, including:

*1)   Mr. O'Bryan failed to consider appropriate qualitative evidence, required under SAB 99, to properly conclude whether Oracle's 2QFY01 misstatements were material to its financial statements.*

A. Underline{Whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision in the estimate.}

Mr. O'Bryan concluded that the known misstatements are incapable of precise measurement.[2]  However, it appears that he failed to consider the following:

- The transfer of customer overpayments was not the result of a subjective estimation process but rather a product of exact amounts improperly credited to Oracle's Bad Debt Reserve.  Ultimately these transfers enabled an increase of exactly $20,000,000 to Oracle's revenue and pre-tax earnings in 2QFY01;[3] and

- The improper recognition of revenue related to the HP agreement results from a violation of the accounting rules prescribed under GAAP and is also subject to precise measurement.[4]

Accordingly, the misstatement amounts do not require subjective judgments as each are able to be precisely measured under GAAP.  This factor proved particularly important for Oracle because as 2QFY01 neared completion, its revenues and EPS were just short of beating consensus analyst expectations.[5]  In my opinion, under these circumstances the misstatement was material.

---

[2] O'Bryan Report, p.39.

[3] *See* my report dated May 25, 2007, p.13, footnote 37.

[4] *See* my report dated May 25, 2007, p.34-35.

[5] As noted in my original report in footnote 136, I have reviewed a series of forecast documents that appear to have been prepared by Oracle during the process to finalize its reported financial statements for Q2FY01.  These forecast documents indicate that Oracle identified "potential" revenue of $2,640.5 million and EPS of $0.10 per share.  Ultimately, Oracle reported revenue of $2,659.5 million and EPS of $0.11 per share.  This difference of $19 million closely approximates the revenue related to the HP agreement recorded on the last day of Oracle's quarter [NDCA-ORCL

B.  Whether the misstatement masks a change in earnings or other trends.

Mr. O'Bryan noted "no evidence" of this issue.[6]  Therefore, it appears that he failed to consider the following evidence:

- Leading up to Q2FY01, Oracle established a trend of beating analysts' estimated EPS consensus.  During the consecutive ten quarters preceding Q2FY01, Oracle announced EPS in excess of analysts' consensus nine times. During the single instance when Oracle merely met earnings (and revenue) consensus, the stock price fell 6%.

- Oracle's failure to beat analysts' consensus EPS for 2QFY01 was masked from investors as a direct result of the misstatements at issue in this dispute. Specifically, the known misstatements facilitated Oracle's ability to beat Q2FY01 consensus analysts' expectations by one penny, artificially inflating EPS from $0.10 to $0.11.

---

410399-415].  In addition, the $20,000,000 adjustment that was recorded to reduce Oracle's Bad Debt Reserve was an element of "Corporate Adjustments" that was characterized as "Q2FY01 Upside," and included as an addition to Oracle's 2QFY01 revenue and EPS in Oracle's forecast.

[6] O'Bryan Report, p. 39.

These factors support my conclusion that the misstatement was material because it masked the change in Oracle's earnings trends and Oracle would not have beaten analyst consensus expectations without the misstatements.

C.   Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

Mr. O'Bryan concluded that the misstatements impacted all of Oracle's operations, as opposed to a singular segment or other significant portion of the business.[7] In reaching this conclusion, Mr. O'Bryan does not appear to have considered, at least, the following:

-   The approximately $20 million misstatement related to the HP agreement distorted the Company's application business growth rates. Several of Oracle's analysts commented on Oracle's reported 66% applications business growth rate in 2Q01 as one of the highlights of the quarter.[8&9]  As growth rate

---

[7] O'Bryan Report, p.40, "The unapplied cash likely resulted from all of Oracle's operations, as opposed to a singular segment or other significant portion of the business."

[8] NDCA-ORCL 308884-85, Goldman Sachs, "*Oracle Reports Robust Apps Growth; Mgmt States Strong Business Outlook,*" December 15, 2000, "Oracle delivered strong earnings, benefiting from: 1) growing traction in the application market fueling applications revenue growth of 66% (or 73% in local currencies). . . . Oracle emphasized that its key differentiation is its fully integrated suite of applications that installs relatively quickly, requiring minimal systems integration."  (Emphasis added.)

[9] NDCA-ORCL 420587-89, Deutsche Banc Alex. Brown, "*Oracle Corporation [ORC] 'Strong Buy' Oracle F2Q Delivers the Goods,*" December 15, 2000, "A key part of Oracle's strong F2Q was the strength of the applications business and, more importantly, marquee customer wins with the 11i e-business suit.  Applications license growth of 66% solidly outpaced Street expectations in the 50%-60% range.  The outperformance should also allay concerns about the viability of Oracle's

expectations appeared to range between 50% - 60%, the incremental revenues improperly recognized under the HP arrangement facilitated Oracle's ability to exceed these estimates.  Excluding the improper HP revenues, the Company's applications business growth rate would have dropped to 54%, which would have been 12% below the reported rate; and further, analysts indicated the importance of Oracle's "notable" win at HP to its 11i business.[10&11]

These factors support my conclusion that Mr. O'Bryan's opinion was erroneous and the misstatements at issue were material, using an appropriate SAB 99 based analysis.

D.   <u>Whether the misstatement involves concealment of an unlawful transaction.</u>

Mr. O'Bryan concludes, "[f]urthermore, there is no evidence that suggests that Oracle attempted to conceal these transactions."[12]  However, he does not appear to consider at least the following:

---

applications business and the relative immaturity of release 11i following last quarter's decent, but slightly disappointing 42% growth."  (Emphasis added.)

[10] NDCA-ORCL 420617-19, Thomas Weisel Partners LLC, "*66% Apps Growth Highlights In-Line Q2*," December 15, 2000, "<u>Oracle made up for disappointing applications license sales in Q1 by posting 66% growth in Q2</u>.  <u>Notable wins</u> at American General, <u>Hewlett Packard</u>…highlighted solid demand for the company's 11i e-business suite. . . .  We project Oracle must hit 60% apps growth over the next five years to justify its current valuation."  (Emphasis added.)

[11]  NDCA-ORCL 308890-93, Merrill Lynch, "*Oracle Systems: Q201: Steady As She Goes*," December 15, 2000, "Oracle began to show traction again in its applications business, and the company spoke confidently about improving its growth in applications through the remainder of FY01. The company noted 83 live customers on 11i and <u>new wins with HP (thought to be a $20 mil deal)</u>, Qualcomm and Compaq. This will be an important factor for increased sponsorship of ORCL this spring."  (Emphasis added.)

[12] O'Bryan Report, p. 40.

-   The November 2000 debit memos concealed the fact that Oracle had a large amount of customer overpayments and unapplied cash that it should have refunded to customers or escheated.  Specifically, as set forth in my May 25, 2007 report, Oracle's creation of the debit memos allowed it to "apply" customer overpayments to the debit memos, making it look like an overpayment was actually applied to a legitimate invoice, which limited the ability of Oracle's customers to obtain refunds.[13]

-   Oracle's usage of the debit memos for concealment purposes is also demonstrated by the fact that Oracle engaged in a "clean up" project beginning in October 2002 in which it reversed the November 2000 debit memos and refunded and escheated millions of dollars of debit memo overpayments that had been used to inflate the bad debt reserve in 2Q01.

These facts support my opinion that Mr. O'Bryan was incorrect when he concluded that "there is no evidence that suggests that Oracle attempted to conceal these transactions."

2)  ***Mr. O'Bryan failed to independently analyze, or offer an opinion on, the materiality of the misstatement if the HP agreement also violated GAAP.***

Mr. O'Bryan concluded that the $20.1 million pre-tax earnings impact of Oracle's improper transfers of customer overpayments was quantitatively immaterial to its 2QFY01 financial statements.  In doing so, it appears that he failed to evaluate other known misstatements during Oracle's 2QFY01.  Specifically, it appears that Mr. O'Bryan failed to consider the impact on his materiality analysis of Oracle's $19.9 million overstatement of revenue and pre-tax earnings related to its agreement with Hewlett Packard.[14]  As a result, Mr. O'Bryan appears to have failed to consider that the aggregate

---

[13] *See* my report dated May 25, 2007 beginning at ¶ 26.

[14] While other second quarter misstatements, including the turnaround impact of prior period adjustments, may also impact an assessment of materiality, it is my understanding that Arthur

impact of these items was an overstatement of Oracle's 2QFY01, a) Net Income (after tax) by approximately 4%,[15] and b) application revenues of nearly 8%. Accordingly, Mr. O'Bryan's assessment of the quantitative impact of Oracle's known misstatements is incomplete.

### 3) *Mr. O'Bryan failed to opine on whether Oracle's reported EPS of $0.11 was materially different than its actual EPS of $0.10.*

Mr. O'Bryan's analysis of materiality does not address that the misstatement enabled Oracle to increase its reported EPS from $0.10 to $0.11. This $0.01 increase enabled Oracle to beat consensus analyst expectations for the period. In this case, the misstatements allowed Oracle to round its reported EPS up to $0.11 instead of rounding it down to $0.10. However, Mr. O'Bryan limits his opinion to the increment of EPS that facilitated the rounding, rather than the outcome of the rounding (*i.e.*, beating analyst expectations).[16] Therefore, his materiality analysis is incorrect because it looks at the misstatement in a vacuum, without considering the total reported financial statement impact. This impact is also considered in my analysis of the SAB 99 factors above.

### 4) *Mr. O'Bryan failed to acknowledge that the E&Y investigation was limited in scope and did not consider all of the relevant facts.*

Mr. O'Bryan's conclusion that the improper bad debt transfers in 2QFY01 were not material is based in part upon an analysis performed by E&Y, who replaced AA as Oracle's auditors in 2002. Specifically, Mr. O'Bryan states that:

---

Andersen LLP ("AA") did not produce a complete set of Q2FY01 working papers to enable a determination as to whether any such items existed. Regardless, Mr. O'Bryan failed to consider the possibility of these incremental misstatements in his analysis.

[15] In computing the incremental impact of all known misstatements, I have determined that the impact of any variable expense, such as commissions, related to the HP agreement on net income and EPS percentage changes would not impact the 4% EPS overstatement noted herein.

[16] O'Bryan Report, p.38, "This adjustment would reduce the Earnings Per Share calculation by just two-tenths of a cent. As such, this adjustment is not material from a quantitative sense…."

- "EY had to consider whether the transfers to Oracle's bad debt reserve during second quarter fiscal year 2001 created a material misstatement in Oracle's past financial statements."

- "EY concluded that these transfers from unapplied cash to bad debt reserve did not have a material impact to past financial statements."[17]

However, the evidence does not show that E&Y reached these conclusions. First, there is no evidence that E&Y was asked to perform any procedures that would enable them to reach a conclusion regarding the propriety of the bad debt transfers in 2Q01. Mr. O'Bryan does not cite any evidence that E&Y analyzed or even considered the impact of the bad debt transfers on Oracle's 2QFY01. In fact, E&Y's designated witness under Fed. R. Civ. P. 30(b)(6), Alex Bender, testified that he was not familiar with account 12601, which is the relevant Bad Debt Reserve account, or transfers to this account.[18]

In addition, Mr. Bender testified that the "totality of the procedures performed by Ernst & Young" were documented in their memorandum entitled "Oracle Corporation – Agreed Upon Procedures with Respect to Debit memos to Account #25005 in November 2000."[19] Mr. O'Bryan described this memorandum in detail in his report (*see* p.17). This memorandum does not contain any indication that E&Y performed analyses of Oracle's transfer of customer overpayments to the Bad Debt Reserve.

---

[17] O'Bryan Report, p.41.

[18] Deposition of Alexander Bender, September 21, 2006, 179:18-180:20, including "Q. Do you know if Ernst & Young in the course of its review or engagement related to the debit memo transactions ever looked at the transfers to Account 12601? A. No, I don't recall that specifically. No. Q. Do you recall if they looked at the transfers to the bad-debt reserve? A. For which period? Q. All. A. I don't recall, no." *See also* Bender at 202:12-18, "Q. Do you know when the transfer to Account 12601 happened? [Objection] A. I'm not familiar with the account balance you just referenced and the transfers to that account."

[19]     *Id.* at 51:1-19, 79:1-80:1, and 179:18-180:20, including "Do you know if Ernst & Young would have documented any review of transfers to the bad-debt reserve with respect to its engagement related to the debit memos? [Objection] A. If we would have done something, I believe we would have documented it, yes." *See also* the related E&Y memorandum at E&Y 000143-46.

Further, I considered the possibility that E&Y developed an understanding of the transfer of customer overpayments to the Bad Debt Reserve in 2QFY01 via a review of the Report of Oracle's Special Litigation Committee ("SLC"). However, the SLC only analyzed transfers made to the Bad Debt Reserve in 3QFY01, which totaled $5 million.[20&21] Mr. O'Bryan cites no independent evidence that E&Y or the SLC reviewed the impact of the transfers in 2QFY01.

It is also worthwhile to note that E&Y did not perform a quarterly review of Oracle's financial statements for 2QFY01, and did not issue any opinion with respect to Oracle's fiscal 2001 year. Further, Mr. Bender testified that E&Y did not know or understand how Oracle recorded customer overpayments in fiscal 2001 because it did not audit Oracle.[22] Therefore, it is not appropriate to assert that E&Y reached <u>any</u> conclusion regarding the propriety or materiality of the improper transfers to the bad debt reserve in 2QFY01. Accordingly, it is unclear how Mr. O'Bryan determined that "E&Y's conclusions were consistent with [his] own" after his review of Mr. Bender's testimony.[23]

Similarly, there is no indication that E&Y performed any procedures related to the HP agreement. There is also no evidence that AA, Oracle's external auditors in fiscal 2001, was provided with all of the information related to either of these misstatements. In accordance with the requirements of Generally Accepted Auditing Standards, an auditor is required to evaluate the materiality of known and likely misstatements on an individual

---

[20] *See* SLC Report at NDCA-ORCL 295582.

[21] NDCA-ORCL 296433, "'The Committee discussed with Banker [E&Y Audit partner] that certain transfers from unapplied cash to the bad debt reserve had occurred in Q3 of FY 2001, but that the maximum amount of cash moved to the bad debt reserve in Q3 was approximately $5 million."

[22] Deposition of Alexander Bender, September 21, 2006, 209:6-13, "Q. Do you know if E&Y had an understanding based on its debit memo engagement of how Oracle recorded customer overpayments in fiscal 2001? A. Not really, no. We understood that customer repayments (sic) would be one of the items that would potentially go into the 'on account' status as part of 25005. But since we didn't audit that period, I wouldn't know."

[23] *See* O'Bryan Report, p.31, Section D.

and on an <u>aggregated</u> basis.[24]  Since I am not aware of any evidence to suggest that Oracle's external auditors reviewed all evidence regarding Oracle's misstatements, his reliance on E&Y, AA, or a lack of restatement to conclude that the misstatements were not material is erroneous.[25]

In consideration of the evidence detailed above, I believe that Mr. O'Bryan's conclusions were incorrect.  Mr. O'Bryan failed to perform reasonable procedures and to evaluate appropriate and relevant evidence surrounding the misstatements of Oracle's Q2FY01 financial statements.  As demonstrated in the analyses above (and discussed in my May 25, 2007 report), it is my opinion as an accountant applying SAB 99 and AU 312, that the misstatements at issue in this matter were material.

## Mr. O'Bryan's Analysis of the Q2FY01 Transfers to the Bad Debt Reserve Is Flawed

Mr. O'Bryan acknowledges that Oracle transferred $20.1 million of unapplied cash to its Bad Debt Reserve in 2QFY01.[26]  However, Mr. O'Bryan reviewed only $10.6 million of the 2QFY01 transfers to the Bad Debt reserve.  Within this sample, Mr. O'Bryan identified only $1.5 million of transfers that he believes were supportable.  Nonetheless, other than two examples, Mr.

---

[24] AU 312, "Audit Risk and Materiality in Conducting an Audit," ¶ 34.  AU 312 is explicitly incorporated into SAB 99.

[25] In addition, Mr. O'Bryan stated that it is reasonable to conclude that the SEC was satisfied with Oracle's accounting treatment with respect to the debit memos.  Mr. O'Bryan failed to cite any evidence or perform an independent assessment of the evidence provided to the SEC.  Further, as noted in my report dated May 25, 2007, Oracle failed to provide the SEC with complete information in its presentation (*see* p.31).  In addition, Oracle did not provide the SEC with evidence related to the transfer of customer overpayments to the Bad Debt Reserve or the improper revenue recognition on the HP agreement.  Therefore, it is not possible to conclude that the SEC would have been satisfied that Oracle's misstatements were immaterial.

[26] As discussed in my report, Oracle calculated its 2QFY01 Bad Debt Reserve as of October 31, 2000.  However, Mr. O'Bryan appears to have calculated Oracle's transfers to its Bad Debt Reserve based on the three months ended November 30, 2000.  For purposes of assessing the impact of the transfers to the Bad Debt Reserve on 2QFY01 pre-tax earnings, the transfers to the Bad Debt Reserve for the three months ended October 31, 2000 totaled $19.4 million, and the subsequent $20.0 million adjustment that increased revenue by reducing the reserve.

O'Bryan did not provide any detail of these transfers or the specific documents that he reviewed. Therefore, his conclusion is not supported in his report.

In the two examples of supportable transfers provided by Mr. O'Bryan, it was not until fiscal 2003 that Oracle ascertained that this amount of the transfers in October and November 2000 were appropriate. The entries Oracle made in 2QFY01, which impacted its financial statements, needed to be based upon appropriate contemporaneous evidence gathered at the time the entries were made, not evidence identified two years later. Further, even his example related to Caltrans assumes that Oracle did not initiate a second invoice to Caltrans related to the payment of $112,464. While the collectors' notes state that "too much of concession was given to customer due to the customer sending in a payment," it is not clear from the documents that the original concession was inappropriate or, that the payment of $112,464 did not include a $91,254 customer overpayment.[27]

I also note that Mr. O'Bryan says that he "found some evidence which suggests that at least another $500,000 of the transfers were appropriate."[28] However, Mr. O'Bryan did not provide any evidence or details concerning those items. Therefore, Mr. O'Bryan's conclusions regarding this amount are not supported by his report.

Mr. O'Bryan further notes that Oracle took a "precautionary" measure to reverse these transfers.[29] To be clear, Oracle's "precautionary" measures were taken approximately two years after the Q2FY01 transfers, and after plaintiffs had made their accounting allegations. Furthermore, Oracle's actions as part of a "clean-up" beginning in October-November 2002 involved a blanket reversal of the transfers of customer overpayments to the Bad Debt Reserve as well as the specific reversal of the related November 2000 Debit Memos. This reversal indicates that during the entire time between the transfer and the reversal, Oracle's Bad Debt Reserve was overstated by the presence of these customer overpayments. In addition to the $20

---

[27] Amount of the overpayment obtained from O'Bryan Report, p. 35-36.

[28] O'Bryan Report, p. 33.

[29] O'Bryan Report, p. 20.

million transfers in 2QFY01, Oracle transferred nearly $40 million in other periods that were part of the November 2002 blanket reversal.[30]  It does not appear that Mr. O'Bryan considered these facts in their totality.

### Mr. O'Bryan's Conclusion that the November 2000 Debit Memos Had No Financial Statement Impact Is Inaccurate

Mr. O'Bryan's conclusion that the November 2000 debit memos had "no financial impact"[31] is flawed for several reasons.  First, as stated in my May 25, 2007 report, the debit memo transactions did have a financial impact by enabling Oracle to inflate its revenues and pre-tax earnings by at least $20 million in 2QFY01.  Mr. O'Bryan fails to recognize that the unapplied cash receipts which were improperly transferred to Oracle's bad debt reserve during and prior to 2QFY01 were also applied to the November 2000 debit memos.  As a result, Mr. O'Bryan's conclusions appear to be based on what happened on a single date (November 17, 2000), without taking into account the financial transactions that preceded the debit memos (such as the bad debt transfers) and occurred after the November 2000 debit memos (*i.e.*, credit memos and cash refunds), all of which had an impact on Oracle's financial statements.[32]

In reaching these conclusions, Mr. O'Bryan relied, in part, upon the testing performed by E&Y.[33]  However, Mr. Bender who, as noted above was designated as E&Y's person-most-knowledgeable, stated that E&Y:

---

[30] *See* ¶ 43 of my report dated May 25, 2007.

[31] O'Bryan Report, p. 3, "Oracle's creation of and accounting for the over 46,000 debit memos processed on November 17, 2000 did not affect its financial statements in the second quarter of fiscal year 2001, or any other accounting period."

[32] As described in my report dated May 25, 2007, Oracle removed approximately $59.6 million that had been transferred into its Bad Debt Reserve (*see* ¶43).  Ultimately, these amounts were refunded, applied to adjusted invoices and amounts previously written-off, kept and escheated.  These funds had previously been maintained in Oracle's Bad Debt Reserve.

[33] O'Byran Report, p. 18, "As noted above, EY found no evidence that any revenue, or any other financial statement impact, was recorded as a result of the November 17, 2000 debit memo project."

- Did not look at the underlying transactions related to the debit memos, including unapplied cash items relating to debit memos that were transferred to the Bad Debt Reserve in 2QFY01.  In fact, E&Y only looked at the debit memo entries themselves.[34]

- Would not necessarily have detected improper prior increases to income related to the debit memos.  Specifically, E&Y did not look at Accounts 12601 or 25005 in 2QFY01, when a majority of the transfers of customer overpayments to the Bad Debt Reserve that effected Oracle's 2QFY01 results occurred.[35&36]

Further, Mr. O'Bryan's conclusions appear to be substantially premised upon testimony of current Oracle employee Greg Myers.  This is notable because many documents contradict and refute testimony made by Mr. Myers in his deposition. For example, Mr. O'Bryan referenced the testimony of Mr. Myers that stated regarding the On Account designation, "from an accounting perspective, there was an offsetting debit that cleared that credit from sitting in Oracle's balance sheet."[37]  However, to the extent that the On Account items had been transferred to the Bad Debt Reserve, the credit continued to be present on Oracle's balance sheet.  As a result, Mr. O'Bryan's reliance on Mr. Myers' testimony is inconsistent with Mr. O'Bryan's conclusion that $20.1 million was transferred to the Bad Debt Reserve in 2QFY01.

---

[34] Deposition of Alexander Bender, September 21, 2006, 182:2-9, including "Q. Do you know if it reviewed the receipts related to the debit memos?  A.  I don't believe we looked at that.  We looked at the journal entries to process the debit memos referred to here."  *See also* 184:1-185:14.

[35] *Id*. at 235:23-236:22, including "Q. And I just want to clarify.  I believe you previously stated Ernst & Young did not look at activity in September or October 2000 related to these debit memo transactions; is that correct?  [Objection] A. These – I'm sorry.  These debit memos were in November.  So did we look at Account 25005 in September and October?  The answer is no." Bender's testimony also shows that E&Y did not review the transfers in August 2000.

[36]     *Id*. at 202:12-18 and 216:6-10, including "Q.  Do you know in connection with Ernst & Young's debit memo engagement whether or not it looked at transfers from accounts 25005 to 12601?  A.  As I indicated earlier, I don't recall doing that, no."

[37] *See* O'Bryan report, p.10, footnote 21.

**Mr. O'Bryan's Conclusion Regarding the HP Agreement in 2QFY01 Is Incorrect and Lacks an Independent and/or Reliable Analysis**

Mr. O'Bryan's Report did not provide an independent analysis of the documents, testimony or evidence surrounding the HP agreement.  He also failed to provide foundational evidence or a reliable methodology for independently assessing the propriety of the HP agreement under GAAP.  His conclusion is based entirely upon an unsupported assumption about what Oracle's auditor AA may have considered in 2001.  This conclusion disregards the fact that AA did not appear to review all information necessary to fully assess the propriety of Oracle's revenue recognition treatment of the HP agreement.  Therefore, Mr. O'Bryan's reliance on AA is misplaced, and his opinion on the HP agreement is incorrect.

Specifically, Mr. O'Bryan failed to perform any independent analysis of the facts and documents surrounding the HP deal, including, but not limited to: (i) the underlying source agreements between Oracle and HP, (ii) testimony of those involved in the negotiations and implementation of software sold to HP, including relevant deposition exhibits, (iii) correspondence within and between Oracle and HP surrounding the negotiated agreements and implementation matters identified (including e-mails and other documents), and (iv) the applicable GAAP standards and related interpretations, in place during Oracle's Q2FY01.  As stated in my May 25, 2007 report, the evidence shows that the HP agreement was improperly recognized in 2QFY01.

Mr. O'Bryan failed to consider evidence indicating AA was not provided with all information by Oracle necessary to conclude on the propriety of its revenue recognition treatment of the HP agreement

It also appears that Mr. O'Bryan failed to consider whether AA reviewed, or had access to, all the evidence necessary to properly conclude on Oracle's recognition of revenue on the HP agreement.  In fact, testimony during Gary Matuszak's[38] deposition demonstrates that certain relevant e-mails and documents surrounding the HP agreement (including negotiations pertaining to the contemporaneous sale of Oracle's software and its purchase of HP hardware) were not

---

[38] Gary Matuszak was AA's lead partner on the Oracle audit.

provided to AA.  In one example, Mr. Matuszak testified that he was unaware of the history of concessions that HP had requested before moving forward with the November 2000 agreement.[39&40]  As the existence of concessions either before or after the execution of a software license calls into question the fixed or determinable nature of fees due under an agreement, evidence such as this would have likely impacted AA's evaluation of revenue recognized under the HP agreement.  Mr. Matuszak also testified that he was not aware of several internal Oracle e-mails discussing the reciprocal nature of the deal and confirming that HP's software purchase was contingent on Oracle's purchase of HP hardware.[41]

In addition, as discussed in my May 25, 2007 report,[42] there were 14 "show stoppers" that HP believed would prevent them from being able to roll out Oracle's product.  Mr. Matuszak was not aware of these "show stoppers."[43]  As matters surrounding the functionality of the software sold to HP would impact an auditor's assessment as to whether Oracle had effectively satisfied the delivery requirement under GAAP to record revenue, this information would also have likely impacted AA's evaluation of revenue recognized under the HP agreement.  Mr. Matuszak

---

[39] Referring to the following excerpt from Deposition of Gary Matuszak, Exhibit 6 (NDCA-ORCL 020845) - an e-mail from Michael DeCesare, Oracle's Vice President of Sales –Western Region to various Oracle executives, including Larry Ellison, Chief Executive Officer, dated November 28, 2000, just two days prior to the purported execution of the HP agreement: "Over the past 8 weeks Oracle (Mike DeCesare) and HP (Phil May, Mike Griffith, Karen Montague, Mike Overly..) have been working on a series of concessions that has been requested by HP before they move forward on the purchase of the additional CRM licenses."

[40] Deposition of Gary Matuszak, August 1, 2000, 336:11-337:16; 338:19-25; 339:19-340:21.  "Q. Were you aware of any concessions that were what's written here, that there were concessions that HP was requesting before they move forward on the purchase in Q2? A. I've not seen this memo before and so…I'm not aware of these concessions."

[41] *See id.* at 328:21-330:5; 332:7-334:1.

[42] *See* my report dated May 25, 2007 beginning at ¶ 103.

[43] Deposition of Gary Matuszak, August 1, 2000, 345:20-25.

appeared to agree with this perspective, but acknowledged that AA did not perform this type of analysis.[44&45]

The evidence, as outlined in my report dated May 25, 2007, demonstrates that Oracle improperly recognized $19.9 million in revenue on November 30, 2000 relating to the HP agreement. Therefore, irrespective of AA's knowledge or consideration of the evidence, AA's conclusions as to the propriety of Oracle's Q2FY01 reported revenue was inaccurate. Accordingly, it continues to be my opinion that Oracle failed to recognize revenue under the HP Agreement in accordance with GAAP.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 16th day of October, 2008, at San Francisco, California.

Respectfully submitted:

Signature: _____

D. Paul Regan, CPA, CFE

---

[44] *Id*. at 185:6-14, "Q. Okay.  So – but did you ever perform an analysis with respect to this [HP] deal as to whether the functionality promised to Hewlett-Packard actually worked? [Objection] A. That was not within the scope of our work."; *see also* 171:11-172:15.

[45] *Id*. at 186:6-187:1-10, "Q.  Would it change your analysis at all if you looked -- if the products listed on Oracle's available products list, if some of those hadn't even been developed yet, would that change your analysis if you knew that at the time? [Objection] A.  If there were unavailable products in the license agreement, that certainly would have been a factor we would have considered."

**EXHIBIT A**

<u>DOCUMENTS CONSIDERED</u>
<u>Supplemental to Exhibit B to Expert Report of D. Paul Regan, May 25, 2007</u>

1.    Expert Report of J. Duross O' Bryan

2.    AU 312, Audit Risk and Materiality in Conducting an Audit

EXHIBIT 5

---

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

# CASE NO. C-01-0988-MJJ

| | |
|---|---|
| **In re ORACLE CORPORATION** | ) |
| **SECURITIES LITIGATION** | ) |
| | ) |
| **This Document Relates to:** | ) |
| | ) |
| ALL ACTIONS. | ) |

---

## Rebuttal Expert Report of J. Duross O'Bryan, CPA

### Dated: June 22, 2007

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION

II.     OVERVIEW OF MR. REGAN'S OPINIONS

III.    SUMMARY OF DEFICIENCIES IN MR. REGAN'S EXPERT REPORT

      A. MR. REGAN OFFERS NO OPINION ON THE FINANCIAL STATEMENT IMPACT OF THE 46,000-PLUS DEBIT MEMOS

      B. MR. REGAN OFFERS UNFOUNDED OPINIONS, THAT ARE UNSUPPORTED BY THE EVIDENCE, ON ISSUES THAT PLAINTIFFS DID NOT RAISE IN THE COMPLAINT

      C. MR. REGAN FAILS TO ESTABLISH THAT EITHER THE BAD DEBT TRANSFERS OR THE HP TRANSACTIONS – OR BOTH COMBINED – WERE MATERIAL TO ORACLE'S FINANCIAL STATEMENTS

      D. MR. REGAN DOES NOT ATTEMPT TO LINK THESE UNPLED ISSUES TO ORACLE'S THIRD QUARTER FINANCIAL RESULTS OR THE DECLINE IN ORACLE'S STOCK PRICE

IV.     MR. REGAN FAILS TO OFFER ANY OPINIONS ON THE ONLY ACCOUNTING CLAIM ALLEGED IN THE COMPLAINT

V.      MR. REGAN'S OPINIONS REGARDING ORACLE'S ACCOUNTING PRACTICES, WHICH UNDERPIN HIS OPINIONS RELATING TO THE BAD DEBT TRANSFERS, ARE FUNDAMENTALLY FLAWED

      A. MR. REGAN HAS MISCHARACTERIZED THE NATURE AND EXTENT OF UNAPPLIED CASH

      B. MR. REGAN HAS MISCHARACTERIZED ORACLE'S PRACTICES REGARDING CREDIT MEMOS AND REFUNDS

        1. CREDIT MEMOS

        2. REFUNDS

      C. THE DEBIT MEMOS DID NOT "CONCEAL" CUSTOMER OVERPAYMENTS

VI.     MR. REGAN'S OPINIONS REGARDING THE TRANSFERS OF UNAPPLIED CASH ARE UNSUPPORTED

      A. PLAINTIFFS' CLAIMS REGARDING THE BAD DEBT TRANSFERS WERE NOT ALLEGED IN THE COMPLAINT

      B. THE "ON ACCOUNT" DESIGNATION WAS NOT A "STEP IN THE PROCESS" TO MOVE UNAPPLIED CASH

      C. ORACLE'S REMEDIAL EFFORTS AIMED AT RESOLVING THE BAD DEBT TRANSFERS WERE APPROPRIATE

D.  THE EFFECT ON THE SECOND QUARTER FINANCIAL STATEMENTS WAS
NOT MATERIAL

VII.   MR.   REGAN'S   OPINIONS   REGARDING   THE   HEWLETT-PACKARD
TRANSACTIONS ARE BASELESS

A.  THE HP TRANSACTIONS WERE NOT ALLEGED IN THE COMPLAINT AND
WERE NOT A PROPER SUBJECT OF FACT DISCOVERY
B.  BACKGROUND OF THE HP TRANSACTIONS
C.  THE NOVEMBER 30 TRANSACTIONS WERE NOT IMPROPER "SWAPS"
1.  ORACLE   RECEIVED   SUBSTANTIAL   ECONOMIC   BENEFITS   AS   A
RESULT OF THE HP SERVER PURCHASE AGREEMENT
2.  HP RECEIVED SUBSTANTIAL ECONOMIC BENEFITS AS A RESULT OF
THE CRM LICENSE AGREEMENT
3.  MR.  REGAN  INCORRECTLY  ASSUMES  THAT  THE  NOVEMBER  30
TRANSACTIONS WERE "NONMONETARY" TRANSACTIONS
D.  ORACLE  PROPERLY  RECORDED  REVENUE  ON  THE  CRM  LICENSE
AGREEMENT IN ACCORDANCE WITH SOP 97-2
1.  PERSUASIVE EVIDENCE OF AN ARRANGEMENT EXISTED
2.  DELIVERY HAD OCCURRED
3.  ORACLE'S   FEES   WERE   FIXED   OR   DETERMINABLE,   AND
COLLECTIBILITY WAS PROBABLE
E.  THE EFFECT ON THE SECOND QUARTER FINANCIAL STATEMENTS WAS
NOT MATERIAL

VIII.   CONCLUSIONS

IX.   QUALIFICATION

I.    **INTRODUCTION**

I have been asked to review and analyze the opinions offered by D. Paul Regan in his Expert Report dated May 25, 2007.  Although I have reviewed and respond below in detail to the opinions and assumptions Mr. Regan makes in his Expert Report, I note at the outset that Mr. Regan's opinions appear not to relate to the accounting claims raised by Plaintiffs in their Revised Second Amended Complaint dated December 9, 2002 (the "Complaint").  Plaintiffs' accounting allegations, as set forth in the Complaint, focus exclusively on the purported financial statement impact of Oracle's creation of more than 46,000 debit memos on November 17, 2000.  In his Expert Report, however, Mr. Regan expressly refuses to offer an opinion "about the total financial statement impact of the transactions relating to all $692 million from the 46,881 debit memo transactions in Q2FY01."[1]  In fact, Mr. Regan acknowledges that he is "uncertain" about the financial statement impact of these debit memos.[2]  By failing to offer an opinion on this critical issue, Plaintiffs have abandoned the only accounting allegation pled in the Complaint.  Accordingly, Mr. Regan's Expert Report is more significant for opinions that he does not provide, than for those that he does offer.

Instead of addressing Plaintiffs' debit memo allegations, Mr. Regan offers several opinions about accounting issues that were not alleged by Plaintiffs in the Complaint, but which I understand Plaintiffs detailed, to a certain extent, in their Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs dated January 31, 2007 (the "Supplemental Interrogatory Responses").  These issues concern certain transfers of unapplied cash to Oracle's bad debt reserve and transactions that Oracle entered into with Hewlett-Packard ("HP") in the

---

[1]  *See* Expert Report of D. Paul Regan ("Expert Report"), at p. 31.

[2]  *See id.,* at p. 34.

second quarter of fiscal year 2001.  As I noted in my Opening Report, the significance of Plaintiffs' failure to allege these issues in their Complaint – like their failure to offer any expert opinions on the only accounting issue pled in this case – is a legal matter.  However, I understand that discovery related to the HP transactions was not responsive under any of the discovery orders pertaining to the accounting issue in this case.  I further understand that the Special Master charged with refereeing discovery disputes ruled that evidence pertaining to Oracle's recognition of revenue from Oracle's sale of licenses to HP in the second quarter of fiscal year 2001 was not a proper subject of fact discovery.[3]  Nevertheless, Mr. Regan cites the lack of "evidence" surrounding Oracle's sale of licenses to HP as support for his opinion that Oracle improperly recognized revenue on the last day of the second quarter of fiscal year 2001.[4]

In any event, Mr. Regan's opinions concerning Plaintiffs' newly-styled accounting assertions are incorrect.  Even if the transfers of unapplied cash into the bad debt reserve and the HP transactions (i) were alleged in the Complaint, (ii) both were the proper subject of fact discovery, and (iii) required adjustment from an accounting perspective, I would not modify the opinions in my Opening Report.  Whether viewed individually or in the aggregate, these allegations do not give rise to a material misstatement in the financial statements for the second quarter of fiscal year 2001, and nothing in Mr. Regan's Expert Report proves otherwise.  Indeed, Mr. Regan barely addresses the concept of materiality in his Expert Report.[5]  Equally noteworthy, any accounting impact of the bad debt transfers or the HP transactions would be reflected in Oracle's financial statements for the second quarter of fiscal year 2001, and I have seen no evidence to suggest that they would have had any impact on Oracle's financial results in third quarter of fiscal year 2001.

---

[3] *See* Telephonic Conference at Hewlett Packard Deposition, June 30, 2006, 16:8-17:6.

[4] *See id.*, at pp. 43, 52-53 and 57.

[5] *See id.*, at pp. 21-22.

## II.   <u>OVERVIEW OF MR. REGAN'S OPINIONS</u>

Mr. Regan opines that Oracle's financial statements for the second quarter of fiscal year 2001 were not presented in accordance with Generally Accepted Accounting Principles ("GAAP").[6] He then makes a series of other general opinions which he believes supports this primary opinion:

- Oracle "improperly utilized a series of debit memos to 'apply' unapplied cash," and "conceal(ed) Oracle's use of customer overpayments to overstate its Bad Debt Reserve by at least $20 million.  The overstatement of the Bad Debt Reserve was eliminated by improperly increasing revenue and pre-tax earnings in the same amount in 2QFY01."[7]

- Oracle "overstated its Customer Advances and Unearned Revenue by including customer overpayments and other unapplied cash in this balance."[8]

- Oracle "improperly recognized $19.9 million in revenue and pre-tax earnings on November 30, 2000 as a result of a transaction with HP that failed to meet the criteria needed for this revenue to be properly recognized by Oracle."[9]

- Oracle "overstated its reported earnings-per-share of $0.11," as a result of these two alleged accounting issues.[10]

---

[6] *See id.,* at p. 1.

[7] *See id.,* at p. 2.

[8] *See id.*

[9] *See id.*

[10] *See id.*

3

### III.   SUMMARY OF DEFICIENCIES IN MR. REGAN'S EXPERT REPORT

### A.   MR. REGAN OFFERS NO OPINION ON THE FINANCIAL STATEMENT IMPACT OF THE 46,000-PLUS DEBIT MEMOS

Mr. Regan does not offer an opinion about the financial statement impact of the "transactions relating to all $692 million from the 46,881 debit memo transactions in Q2FY01." [11]   As Plaintiffs' accounting expert, his failure to opine on this issue is surprising, since there is clear, compelling and undisputed evidence (as detailed in my Opening Report) that the November 17, 2000 debit memos were created as part of a process that involved three simultaneous and offsetting debits and credits in the same amount to the same account.  As such, these debit memos did not, and could not, impact Oracle's second quarter financial statements.  By refusing to opine on the financial statement impact of the 46,000-plus debit memos, Mr. Regan fails to provide expert testimony on the *only* accounting allegation pled in the Complaint, *i.e.*, that Oracle erroneously recorded more than $228 million in revenue in the second quarter of fiscal year 2001 through the accounting for over 46,000 "phony invoice" debit memos. [12]

### B.   MR. REGAN OFFERS UNFOUNDED OPINIONS, THAT ARE UNSUPPORTED BY THE EVIDENCE, ON ISSUES THAT PLAINTIFFS DID NOT RAISE IN THE COMPLAINT

As noted above, the Complaint did not raise any accounting claims related to the transfers of unapplied cash to the bad debt reserve or Oracle's transactions with HP during the second quarter of fiscal year 2001.  I understand that Plaintiffs provided detail for these allegations in their Supplemental Interrogatory Responses earlier this year, well after discovery was substantially complete.  Nevertheless, Mr. Regan devotes almost all of his Expert Report to these issues.

---

[11] *See id.,* at p. 31.
[12] *See* Complaint, at paragraph 8.

4

Based upon my review of the evidence, I believe that Mr. Regan's opinions on these two previously-unpled issues lack any factual support.

### C.   MR. REGAN FAILS TO ESTABLISH THAT EITHER THE BAD DEBT TRANSFERS OR THE HP TRANSACTIONS – OR BOTH COMBINED – WERE MATERIAL TO ORACLE'S FINANCIAL STATEMENTS

Even if the entire $20 million in transfers to the bad debt reserve required adjustment from an accounting perspective (which, as discussed in my Opening Report, many transfers did not), any impact on Oracle's financial statements in the second quarter of fiscal year 2001 still would not be material from either a quantitative or qualitative standpoint.  Similarly, assuming for argument's sake that the entire $19.9 million in revenue recognized from Oracle's sale of Customer Relationship Management ("CRM") licenses to HP was recognized erroneously, any impact on Oracle's financial statements would not have been material.  Giving Plaintiffs the benefit of the doubt, and assuming that *both* the bad debt transfers and the decision to recognize revenue from the sale of licenses to HP in the second quarter were erroneous, the combined impact on Oracle's financial statements in the second quarter of fiscal year 2001 still would not give rise to a material misstatement of revenue, pre-tax earnings, net income or earnings per share.

As set forth below, under Staff Accounting Bulletin No. 99 ("SAB 99"), a matter is material if there is a "substantial likelihood that the...fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available…."[13]  Mr. Regan ignores entirely seven qualitative factors that are typically considered in evaluating materiality,[14] and he misapplies the other two factors.  Furthermore, Mr. Regan fails to consider the "total mix"

---

[13]   *See* Staff Accounting Bulletin No. 99 – Materiality (citing *TSC Industries v. Northway, Inc.,* 426 U.S. 438 (1976), and *Basic, Inc. v. Levinson*, 485 U.S. 224 (1998)).

[14]   *See id*.

of information, as SAB 99 recommends, and he provides no support for his belief that there would have been a "substantial likelihood" that the allegations (if true) would have "significantly altered the 'total mix' of information" as viewed by a reasonable investor.

## D.    MR. REGAN DOES NOT ATTEMPT TO LINK THESE UNPLED ISSUES TO ORACLE'S THIRD QUARTER FINANCIAL RESULTS OR THE DECLINE IN ORACLE'S STOCK PRICE

Even if these previously unpled accounting issues resulted in a material misstatement of revenue or net income, such misstatement would be reflected in Oracle's financial statements for the *second quarter* of fiscal year 2001.  Nowhere in his report does Mr. Regan attempt to link these events to Oracle's financial statements for the third quarter of fiscal year 2001, or the decline in the Company's stock price following the third quarter earnings miss – to which Plaintiffs attribute their damages.[15]  In other words, even if a restatement for the second quarter of fiscal year 2001 were required – which I do not believe to be the case – Mr. Regan offers no evidence suggesting that such restatement would have impacted Oracle's financial performance in subsequent reporting periods.

## IV.   MR. REGAN FAILS TO OFFER ANY OPINIONS ON THE ONLY ACCOUNTING CLAIM ALLEGED IN THE COMPLAINT

In order to justify his failure to offer an opinion on the sole accounting issue pled in this case – whether the debit memos had any financial statement impact – Mr. Regan asserts that Oracle produced script output for only 926 of the 46,000-plus debit memos (which, as I understand, was so limited by the Special Master), and that "Oracle did not provide the full audit trail and source

---

[15]  *See* Complaint, paragraphs 17 and 74.

evidence concerning the other $157 million in debit memo transactions."[16]  Mr. Regan also claims that the evidence produced in connection with the script output for the 926 debit memos "appears incomplete."[17]  These excuses are untenable.

Mr. Regan does not need script output for all 46,000-plus debit memos to ascertain their financial statement impact (or, more accurately, lack thereof).  Nor does Mr. Regan need any additional source documents to form an opinion on this issue.  As set forth in my Opening Report, the debit memos were generated by an SQL script that involved simultaneous and offsetting debits and credits in the same amount, to the same account.  These offsetting transactions are consistently displayed in the script output for all 926 debit memos on which discovery has focused in this case.[18]  The 926 debit memos total $534 million of the $692 million sum – *i.e.*, 77% of the total – of the 46,000-plus debit memos.[19]  There is no evidence suggesting that the debit memos that are *not* included in the script output were accounted for any differently, especially considering that all of the debit memos were generated by the same computer script.  Furthermore, the Account Analysis Report with Payable's Detail illustrates that the entire $692 million was both debited and credited to the same account on November 17, 2000.[20]  Moreover, the Sales Journal by GL Account Report establishes that Oracle only recognized approximately $10 million on November 17, 2000.[21]  Thus, as stated in my Opening Report, the evidence is clear and uncontroverted that the November 17, 2000 debit memos had no financial statement impact.

---

[16]  *See* Expert Report, at p. 31.  The 926 debit memos consist of 776 debit memos, for which the Court ordered discovery, and an additional 150 debit memos which Plaintiffs themselves selected for purposes of additional discovery.  *See* Order Granting Plaintiffs' Motion to Compel Production of Documents, at 1; Order Granting in Part and Denying in Part Plaintiffs' Motion to Compel Defendants' Production of Accounting Documents, at 17.

[17]  *See id.*

[18]  *See* NDCA-ORCL 1058909.

[19]  *See id.*

[20]  *See* NDCA-ORCL 050356-60.

[21]  *See* NDCA-ORCL 048989–9207.

In sum, Mr. Regan's refusal to opine on the lack of financial statement impact of the 46,000-plus debit memos on the second quarter of fiscal year 2001 is neither the result of the completeness of the script output nor the adequacy of accounting discovery in this case.  I view Mr. Regan's refusal to opine on this particular issue as an acknowledgement that the creation of and accounting for the 46,000-plus debit memos had no financial statement impact.

## V.  MR. REGAN'S OPINIONS REGARDING ORACLE'S ACCOUNTING PRACTICES, WHICH UNDERPIN HIS OPINIONS RELATING TO THE BAD DEBT TRANSFERS, ARE FUNDAMENTALLY FLAWED

Mr. Regan makes a number of broad, conclusory and incorrect assertions regarding Oracle's purported "policies" concerning unapplied cash, customer overpayments and refunds.  Specifically, based upon an incomplete understanding of the evidence and Oracle's internal accounting practices, he suggests that Oracle purposefully withheld customer overpayments, refused to issue refunds to its customers and "concealed" these overpayments through the creation of the debit memos.[22]  Based upon my review of the evidence Mr. Regan cited, and other documents and deposition testimony in this matter, I believe that these accusations are unfounded.

## A.  MR. REGAN HAS MISCHARACTERIZED THE NATURE AND EXTENT OF UNAPPLIED CASH

Mr. Regan claims that at the beginning of the second quarter of fiscal year 2001, Oracle "had accumulated at least $144 million of cash receipts from its customers that it was unable to apply to an invoice."[23]  In reaching this figure, Mr. Regan appears to have simply added three account

---

[22] *See* Expert Report, at pp. 6 and 15.

[23] *See id.*, at p. 5.

balances at the beginning of the second quarter (Accounts 12018, 12601 and 25005),[24] and then he assumes that the sum represented payments that Oracle was "unable to apply" to open invoices. This analysis grossly mischaracterizes the nature of the amounts reflected in these accounts, and greatly exaggerates the extent to which these amounts could not be applied to open invoices.

For instance, Account 12018, "Unapplied Cash," represents amounts that Oracle believes are likely to be applied to the appropriate accounts in a short period of time.[25]  There is no evidence that the entire balance of Account 12018 at the beginning of the second quarter of fiscal year 2001 consisted of cash receipts that Oracle was unable to apply to open invoices.  In fact, the evidence I have reviewed demonstrates that Oracle was able to (and did) apply significant amounts of unapplied cash to open and unpaid invoices.[26]

Mr. Regan also includes the balance of Account 12601, "Bad Debt Write Offs," in his total of the amount of cash that Oracle allegedly could not apply to open invoices as of the beginning of the second quarter of fiscal year 2001.  However, this account principally represents amounts written off as uncollectible.[27]  Mr. Regan makes no attempt to differentiate between amounts that were properly written off as uncollectible, and any items of unapplied cash in this account. Furthermore, there is no evidence to suggest that the entire balance of Account 12601 consisted of cash receipts that Oracle was unable to apply to open invoices.

Mr. Regan also includes Account 25005, "Customer Overpayments."  This account represents amounts which Oracle still is researching, of which most are expected to be applied against

---

[24] *See id.*, at p. 9.

[25] *See* AA 000005 and AA 000021.

[26] *See* NDCA-ORCL 050356-60 [Oracle Account Analysis Report].

[27] *See* AA 000012.

outstanding invoices in the future.[28,29]  Although this account may have contained some cash receipts that Oracle ultimately could not apply to open invoices during the relevant time period, there is no evidence indicating that the entire balance, as of the beginning of the second quarter of fiscal year 2001, consisted of cash receipts that Oracle was unable to apply.

Thus, by taking the sum of the balances of these three accounts, and treating the sum as unapplied cash that Oracle could not apply to open invoices, Mr. Regan grossly overstates the amount of unapplied cash that Oracle was unable to apply at the time.[30]  Furthermore, Mr. Regan fails to consider the fact that the amount of unapplied cash that Oracle had fluctuated on a daily basis, because even as cash receipts were being applied to open invoices, substantial amounts of new cash payments were being received from Oracle's customers.[31]  By failing to consider these facts, and by assuming that the entire balance of three different accounts consisted of cash that Oracle could not apply to open invoices, Mr. Regan premises his subsequent opinions regarding Oracle's treatment of unapplied cash on an unsupportable foundation.

## B.    MR. REGAN HAS MISCHARACTERIZED ORACLE'S PRACTICES REGARDING CREDIT MEMOS AND REFUNDS

Mr. Regan claims that a "significant cause of the balance of unapplied cash was overpayments made by Oracle's customers."[32]  Mr. Regan describes Oracle's internal policies and "systematic practices" regarding credit memos and the issuance of refunds as the "cause" of these customer

---

[28] *See* Deposition of Gregory Myers, dated April 12, 2005 ("Myers Dep."), at 244:9-11 ("Now, the balance that's sitting in unapplied that we're researching for our customers, that unapplied balance sits in 25005.").

[29] *See* AA 000688 (describing Account 25005 as a "'catch-all' account for all cash receipts company-wide.... The balance of this account consists of items not yet identified to a particular area.").

[30] *See* Expert Report, at pp. 8-9.

[31] *See* NDCA-ORCL 1727982.

[32] *See* Expert Report, at p. 6.

overpayments.[33]  However, he does not quantify the amount of unapplied cash that consisted of customer "overpayments."  Thus, Mr. Regan cannot substantiate his contention that customer overpayments were a "significant cause" of the balance of unapplied cash.[34]

## 1.    CREDIT MEMOS

Mr. Regan claims that Oracle's practice of not sending credit memos to its customers resulted in overpayments because he assumes that Oracle's customers were unaware that the outstanding balance of their invoices had been offset, in full or in part, by credit memos.[35]  However, the very evidence Mr. Regan cites in support of this argument demonstrates that Oracle, in fact, did notify its customers of credits being made to their respective accounts.[36]  Indeed, this same evidence illustrates that Oracle's practices with respect to credit memos were not part of a scheme to induce customer overpayments, but, rather, to reduce customer confusion regarding the meaning of credit memos and their availability for use against other open invoices.[37,38]

---

[33]  *See id.,* at pp. 6-7.

[34]  Mr. Regan also blames Oracle's practice of sending account statements only to those customers that requested such statements, but he does not describe how such a practice is unusual or contrary to normal business practices of other companies in the industry.  *See id.,* at p. 6.  In addition, Mr. Regan does not explain how such a practice "caused" customer overpayments.

[35]  *See id.*

[36]  *See* PLF-ORC 000135 ("Since it is not Oracle's practice to send out Credit Memos to our customers, we often tell them to short pay their original invoice by the amount we credit them.").

[37]  *See* PLF-ORC 000132 ("One big problem with sending the clients copies of the credit memo's [*sic*] is that they then end up short paying an invoice, from any l.o.b. and when we get to the root of the problem they refer to the 'credit' they were given.").

[38]  Mr. Regan also cites an email from Molly Littlefield, *see* NDCA-ORCL 1895745-7, in support of his claim that Oracle's practice of not sending credit memos to customers "caused customers to often be unaware of outstanding credits, resulting in overpayments."  *See* Expert Report, at p. 6.  This email, however, has *nothing* to do with credit memos – in fact, the term "credit memo" does not even appear in the document.  Based upon my review, it appears that the unapplied cash being discussed in that email relates to an order that was paid, but for which an invoice apparently never was booked.

2.     REFUNDS

Mr. Regan also claims that Oracle's unapplied cash balances resulted from internal policies that "inhibited the refund process."[39]   In so doing, however, he misrepresents Oracle's internal accounting policies.   During the relevant time period, Oracle issued refunds to customers upon request.[40]  This practice, like Oracle's policy of not sending credit memos to customers, appears to have been implemented in an effort to reduce customer confusion that resulted when Oracle sent refunds to customers who did not request them.   The evidence suggests that in some instances where Oracle issued a refund to customers who did not specifically request one, customers had no idea why they had received a check from Oracle.[41]   Mr. Regan offers no evidence to suggest that this policy was unusual, that it deviated from the practices of other companies in the industry, or that it was inappropriate under GAAP.[42]

In addition, Mr. Regan overlooks a large body of evidence in rendering his opinions about Oracle's unapplied cash practices.   Multiple Oracle employees have testified that when confronted with a situation where they had a cash receipt that they could not apply, among the first things they would do was contact the customer and solicit the customer's input on whether the payment should be refunded or applied to open invoices.[43]  In fact, of the 926 debit memos

---

[39]   *See* Expert Report, at p. 7.

[40]   *See* Myers Dep., at 56:5-13 ("How would one determine whether it was going to be a refund once the payment was received?  A.    Based upon someone's research that somebody had completed.   So, for example, somebody had called the customer, and the customer requested that the money that they had paid us that was open on their – on the record needed to go back to them, they would submit the request to have that refund processed.").

[41]   *See* Deposition of Ian Hatada, October 5, 2006 ("Hatada Dep."), at 214:22-215:6 ("Q:  Did any customers ever - contact Oracle regarding these refunds and ask, 'Why is this being refunded?' A: Yes. Q: And did you ever talk to any of these customers? A: I answered the phone a couple of times as to 'Hey, we just received this check, and we have no idea why,' and I had to get off the phone and research as to when it was refunded or - why they received it.").

[42]   *See* Expert Report, at pp. 6-7.

[43]   *See* EY 000250; Deposition of Alexander Bender, dated September 21, 2006, at 224:16-17 ("[T]hey make every effort to contact the customer."); Myers Dep., at 169:22-24 ("[W]e would contact customers

12

upon which discovery has focused in this case, 277 contained refunds in their accounting histories that predated November 17, 2000, totaling more than $103 million.[44]  This evidence – which Mr. Regan ignores – demonstrates that Oracle readily refunded customer payments where appropriate.

Indeed, one of the very transactions upon which Mr. Regan focuses in his Expert Report establishes that Oracle appropriately refunded money, long before the creation of the 46,000-plus debit memos.  Mr. Regan points out that Household made a payment to Oracle on November 17, 1994.[45]  That same day, Household returned the product and cancelled the order.  However, despite the fact that Mr. Regan has seen the screenshot demonstrating that the money had been refunded to Household by a check that cleared on May 4, 1995,[46] Mr. Regan ignores this refund.  Instead, Mr. Regan states that Oracle did not refund the money to Household until a second, erroneous refund occurred on May 23, 2002.[47,48]  As Mike Quinn observed in a contemporaneous email, the May 23, 2002 refund was issued by mistake and should not have been made.[49,50]

---

and let them know that we had some sort of overpayment…."); Deposition of Michael Quinn, dated April 18, 2006 ("Quinn Dep."), at 130:17-20 ("Generally speaking, you would call the customer and ask them how they wanted – how they wanted the disposition of that overpayment."); Deposition of Molly Venkataramana, dated April 13, 2006 ("Venkataramana Dep."), at 177:15-18 (Q. "So in researching an item of unapplied cash, the only thing you would do would be to pull the check copy and then contact the customer?"  A.  "And review the history on the item.").

[44]  *See* NDCA-ORCL 1058909.

[45]  *See* Expert Report, at p. 29.

[46]  *See* NDCA-ORCL 603894.

[47]  *See* HI000001-02.

[48]  *See* Expert Report, at p. 30.

[49]  *See* NDCA-ORCL 614018-614023 [Email from Greg Myers, dated October 31, 2002, containing undated email from Michael Quinn ("Raul and Adam misinterpreted what the 550… [d]ebit memos were for.  This should not have been refunded.")].

[50]  Mr. Regan cites the Household transaction throughout his Expert Report in support of the proposition that "the November Debit Memos concealed and misrepresented the balance of unapplied cash and customer overpayments improperly withheld by Oracle from its customers" and that "[O]racle's conduct related to its debit memo overpayments from Household…demonstrates the impropriety of its retention of, and accounting for, cash receipts from customer overpayments."  *See* Expert Report, at pp. 17 and 27.  His opinions in this regard, however, all are premised upon the incorrect assumption that Oracle did not refund Household's money until after November 17, 2000.  Because there appears to be sufficient evidence that Oracle, in fact, did issue this refund to Household long before the creation of the 46,000-plus debit memos, all of Mr. Regan's arguments relating to this particular transaction are unsupported and incorrect.

Mr. Regan's contention that "[e]ven if the customer made such a [refund] request, Oracle would often deny the customer a refund if the customer had any other receivables outstanding or if Oracle had previously written off amounts as bad debt," is not supported by the evidence upon which Mr. Regan relies.[51]  For instance, although Mr. Hatada testified that, during late 2002, Oracle temporarily suspended the practice of issuing refunds,[52] Mr. Hatada conceded that he could not identify a single refund, customer or dollar amount that Oracle allegedly improperly withheld.[53]  Furthermore, there is no evidence, including the testimony of Mr. Hatada, to suggest that Oracle improperly withheld customer refunds prior to November 17, 2000, or at any point during the second quarter of fiscal year 2001.  Accordingly, because Mr. Hatada's testimony does not support Mr. Regan's assumptions regarding Oracle's treatment of customer refunds prior to and including the second quarter of fiscal year 2001, I placed no weight on it.

In the end, to the extent that Oracle had a significant balance of unapplied cash on any given day, there is no evidence indicating that the cause was the accumulation of customer overpayments resulting from Oracle's credit memo or refund policies.  The more likely cause is the sheer volume of cash receipts that Oracle receives on a daily basis.  Oracle recognized $2.6 billion in revenue globally during the second quarter of fiscal year 2001.[54]  As such, Oracle received millions of dollars in cash receipts from customers on a daily basis.  The fact that Oracle could not immediately apply all of these payments upon receipt does not mean that Oracle's policies

---

[51]  *See id.*, at pp. 6-7.

[52]  *See* Hatada Dep., at 64:25-65:11.

[53]  *See id.*, at 501:22-502:4, ("Q. You can't think of a specific instance of customer or dollar amount on the Oracle system that says should be refunded, but, in fact, wasn't refunded; is that correct?  A. Correct.").

[54]  *See* Oracle's 10-Q Report, dated January 16, 2001.

were in any way improper, that they caused or contributed to customer overpayments, or that they deviated from industry norms.[55]

## C.   THE DEBIT MEMOS DID NOT "CONCEAL" CUSTOMER OVERPAYMENTS

Mr. Regan claims that Oracle "concealed" customer overpayments by "applying" unapplied cash to a series of debit memo invoices.[56]  Mr. Regan's opinions are incorrect and contradicted by the evidence.

As set forth in my Opening Report, Oracle created the 46,000-plus debit memos to remove vestigial "On Account" flags.  All of the items that had been placed "On Account" as of November 17, 2000 already had been resolved, primarily through refunds, expense reimbursements, customer stop payments, transfers to lease receivables or transfers into the bad debt reserve.  The "On Account" flag was used as a signal to the Accounts Receivable and Collections Departments to "not touch" the flagged receipt.[57]  Thus, unless a collector misunderstood the meaning of the "On Account" flag, he or she would not have viewed the flagged receipt as an overpayment or credit to a customer's account.  The flaw in Mr. Regan's reasoning is that he assumes that Oracle's collections personnel understood the "On Account" flag to mean that Oracle was withholding customer overpayments.  Therefore, the creation of the

---

[55]  Mr. Regan also opines that unapplied cash receipts held in Accounts 12601 and 25005 should be reported with Accounts Payable.  *See* Expert Report, at p. 11.  However, reporting cash receipts as Accounts Payable, which typically consists of amounts owed to vendors, would result in an overstatement of the balance of Accounts Payable under GAAP.  Most of the cash Oracle received from customers is eventually applied to outstanding invoices or open receivables.  Furthermore, much of the remaining balance of unapplied cash receipts relates either to unearned advance payments, or amounts which appropriately can be applied to royalty revenue not yet invoiced, expense reimbursements and other items, none of which should be included in Accounts Payable.

[56]  *See id,.* at p. 15.

[57]  *See* Myers Dep., at 83:1-4 ("So putting it On Account was an indefinite flag that [*sic*] do not touch this receipt, another transaction has taken place, therefore, this money should not be taken to an open invoice….").

15

46,000-plus debit memos – which were generated as part of the process through which Oracle removed the "On Account" flags –   could not have "concealed" customer overpayments or credits.

Nor did Oracle "conceal" the fact that it eliminated the "On Account" flags through the creation of the debit memos.  Within a day of the creation of the 46,000-plus debit memos, Greg Myers sent an email to various accounting managers explaining the nature and purpose of the debit memos. [58]  The debit memos, by design, were visible and readily identifiable to Oracle's Collections Department.  The debit memos were run on the same day and were given unique, sequential identifying numbers (*i.e.*, the specially-designed prefix of "55").[59,60]  To this day, the debit memos appear throughout Oracle's accounts receivable subledger ("A/R Subledger").[61]  For instance, the standard "7-Bucket Aging By Customer" report shows both the debit memos and the "On Account" receipts for each Oracle customer.[62]  In addition, the standard "Billing History" report identifies each November 17, 2000 debit memo.[63]  In fact, it is precisely because the debit memos appear in Oracle's "Billing History" reports that CW46 and Plaintiffs became aware of the debit memos in the first place.[64]

---

[58]  *See* NDCA-ORCL 623787 [Email from Greg Myers to Pam Janakes, Kim McMurdo, Sam Yohannes, John Badovinac, Jean De Luzuriaga, Kathleen Edwards, Julie Chan, Michael Quinn, Adam Hahn and Sanjay Kumar, November 18, 2000].

[59]  *See* Myers Dep., at 109:9-11 ("Prior to November 17th…. we really didn't use debit memos at all."), 189:12-14 ("[T]hey were not normal course of business, they were not, you know, invoices charging customers of any kind, so we wanted to make sure we were able to isolate these."), and 270:1-6 ("Q. And how do you know that it's a debit memo?  A. It's based upon the invoice number, that it has a 5 series number, 55, which was the sequence we used for the debit memos.  Also using the description on the line item, it says On Account cleanup for U.S.A. date, would be two indicators that this is a debit memo.").

[60]  *See* NDCA-ORCL 049208-050060.

[61]  *See* NDCA-ORCL 1058909.

[62]  *See* NDCA-ORCL 1198884-1208895.

[63]  *See* ORR 000789-803.

[64]  *See id.*

Notably, as discussed in my Opening Report, there were a number of debit memos that related to cash receipts that previously had been refunded or for which a customer had placed a stop payment on the check.[65]  Indeed, as noted above, of the 926 debit memos upon which discovery has focused, 277 contained refunds in their accounting histories that predated November 17, 2000, totaling more than $103 million.[66]  Mr. Regan fails to explain how the application of the "On Account" flag against the November 17, 2000 debit memos "concealed" overpayments or amounts that "should have been" refunded to Oracle's customers considering that there was no money associated with these flagged receipts because the cash had been refunded long before the debit memos were created.

All of these facts are inconsistent with Mr. Regan's apparent belief that Oracle "concealed" overpayments or amounts that should have been refunded to its customers through the creation of the debit memos.  I have seen no evidence to support Mr. Regan's theory that the creation of and accounting for the debit memos "concealed" amounts belonging to Oracle's customers.

## VI.   MR. REGAN'S OPINIONS REGARDING THE TRANSFERS OF UNAPPLIED CASH ARE UNSUPPORTED

Mr. Regan also makes a number of unfounded assertions and unsupportable conclusions regarding certain transfers of unapplied cash into the bad debt reserve during the second quarter of fiscal year 2001.  Although I will respond briefly to some of Mr. Regan's points in this regard, his contentions regarding both the cause and effect of the bad debt transfers ultimately are irrelevant.  Even if one were to assume that the entire $20 million in transfers into the bad debt

---

[65]  For instance, in the Texas Instruments transaction described in my Opening Report, the customer placed a stop payment on the check such that there was no money associated with the "On Account" receipt as of November 17, 2000.  Similarly, in the Sprint transaction described in my Opening Report, Oracle had refunded the underlying payment in 1998, such that there was no money associated with the "On Account" receipt as of November 17, 2000.

[66]  *See* NDCA-ORCL 1058909.

17

reserve were reclassified erroneously (which, as discussed in my Opening Report, they were not), the impact of these transfers on Oracle's revenue, net income and earnings per share in the second quarter would not be material, either from a quantitative or qualitative standpoint.

## A.   PLAINTIFFS' CLAIMS REGARDING THE BAD DEBT TRANSFERS WERE NOT ALLEGED IN THE COMPLAINT

Plaintiffs did not make any allegations in the Complaint about bad debt transfers in the second quarter of fiscal year 2001.  Instead, Plaintiffs' sole accounting allegation pled in the Complaint relates to the creation of and accounting for the 46,000-plus debit memos.  As noted above, Mr. Regan refused to offer any opinions on the financial statement impact (or lack thereof), of the 46,000-plus debit memos.

## B.   THE "ON ACCOUNT" DESIGNATION WAS NOT A "STEP IN THE PROCESS" TO MOVE UNAPPLIED CASH

Mr. Regan claims that "[t]he On Account designation in the accounting system was a step in the process to move unapplied cash to the 12601 Account...."[67]  This statement is demonstrably incorrect.  The vast majority of items that were flagged as "On Account," as of November 30, 2000, had nothing to do with Account 12601.  Indeed, of the 926 debit memos encompassed within the script output, only 121 transactions – consisting of $10.6 million of the $534 million total of the 926 debit memos – involved transfers into the bad debt reserve in the second quarter of fiscal year 2001.[68]  For instance, the transaction with Household Finance, which Mr. Regan features throughout the Expert Report, does not contain any transfers of unapplied cash into (or

---

[67]  *See* Expert Report, at p. 15.  The evidence Mr. Regan cites as support for this contention illustrates that Oracle did not begin using the "On Account" functionality to transfer money into the bad debt reserve until months after the 46,00-plus debit memos were created.  *Id*. (Citing NDCA-ORCL 1609375-76).

[68]  *See* NDCA-ORCL 1058909.

out of) the bad debt reserve, notwithstanding the fact that Household's payment was placed "On Account."[69]  Mr. Regan simply fails to explain how the "On Account" designation "was a step in the process to move unapplied cash to the 12601 Account" considering that the vast majority of the receipts that were flagged "On Account" never touched the bad debt reserve.

Furthermore, the small subset of transactions that *do* contain transfers into the bad debt reserve in their accounting histories also undermine Mr. Regan's conclusion that the "On Account" flag was a "step in the process" to move unapplied cash into the bad debt reserve.  For the vast majority of receipts that were transferred to Account 12601, the corresponding flag in the A/R Subledger was not changed to "On Account" until *after* the transfer had taken place.[70]  For instance, Mr. Regan analyzes the accounting history for a transaction involving Ameritrade in his Expert Report.[71]  According to Mr. Regan's own analysis of that transaction, the transfer to the bad debt reserve occurred on August 5, 2000, while the "On Account" flag was not raised until nearly three weeks later (*i.e.*, August 25, 2000).  Thus, there is no way that the "On Account" flag could have been a "step in the process" to move unapplied cash into the bad debt reserve because the transfer already had taken place.

## C.   ORACLE'S REMEDIAL EFFORTS AIMED AT RESOLVING THE BAD DEBT TRANSFERS WERE APPROPRIATE

Mr. Regan attacks the procedures through which Oracle later investigated and resolved transfers of unapplied cash.[72]  As discussed in my Opening Report, in October 2002, Oracle identified a potential issue with some of the transfers into its bad debt reserve.  At the direction of Oracle's

---

[69]   *See* Expert Report, at pp. 7, 16-17 and 27-31.

[70]   *See* NDCA-ORCL 1058909.

[71]   *See* Expert Report, at pp. 25-26.

[72]   *See id.*, at p. 22.

Audit Committee, the accounting and collections groups investigated these transfers and attempted to identify the appropriate treatment of these receipts, to the extent that these payments did not properly belong in the bad debt reserve in the first place.[73]  I have not seen any evidence, nor has Mr. Regan identified any evidence, suggesting that the transfers into the bad debt reserve or Oracle's subsequent remedial measures were part of a deliberate effort to manufacture revenue or artificially inflate net income or earnings per share.

Mr. Regan states that the unapplied cash receipts were removed from the bad debt reserve and "properly restored" to the unapplied cash account.[74]  This mischaracterizes the nature of the unapplied cash project.  Oracle initially took a conservative approach and transferred the money back to Account 25005 as a way to isolate the transferred amounts, *i.e.*, reducing the bad debt reserve and showing the amounts as "Unapplied."[75]  Mr. Regan points out that some of the money ultimately was refunded, and some was escheated to the state.[76]  What Mr. Regan fails to point out, however, is that at least some of the money properly belonged in the bad debt reserve, and subsequently was returned to the reserve.  Moreover, as I pointed out in my Opening Report, I found evidence that at least $2 million of the approximately $10 million in transfers that I analyzed represented an appropriate recognition of earnings as of the second quarter of fiscal year 2001.

---

[73]  *See* Declaration of Gregory Myers, dated Nov. 14, 2002, at paragraph 4,  ("Earlier this year, I was also involved in an investigation into the disposition of unassigned cash receipts that Oracle's collections staff had, over time, assigned to an accounts receivable reserve known as Account 12601.").  *See also* Declaration of Michael Quinn, dated Nov. 14, 2002, paragraph 5, ("Earlier this year, I was personally assigned by Tom Williams to manage an investigation into the proper disposition of unassigned cash receipts that Oracle's collections staff had, over time, assigned to an accounts receivable reserve account known as Account 12601.").

[74]  *See* Expert Report, at p. 23.

[75]  *See* NDCA-ORCL 1914199-1914286 [Journal Entries Report for account 25005 from November 1, 2002 to November 30, 2002] and NDCA-ORCL 1534024-1534169 [Journal Entries Report for account 12601 from November 1, 2002 to November 30, 2002].

[76]  *See* Expert Report, at pp. 23-24.

Mr. Regan also takes issue with the practice of "adjusting up" invoices, claiming that "Oracle did not have an adequate basis to conclude, in late 2002 or thereafter, that the original credit memo had been issued in error."[77]   There is no evidence to support Mr. Regan's opinion.  The personnel who performed the investigation had the Oracle accounting system at their disposal, and were instructed to arrive at a fair resolution of the transfers.[78]  Every witness who has testified about the practice of "adjusting up" invoices has stated, unequivocally, that Oracle would only "adjust up" an invoice where a credit memo had been previously applied against the underlying invoice in error.[79, 80]   Although Mr. Regan opines that the employees performing the investigation "adjusted up" invoices without adequate support,[81] he does not identify a single invoice that was improperly "adjusted up."[82]

---

[77]  *See id.*, at p. 24.

[78]  *See* NDCA-ORCL 1609379 [Email from Michael Quinn to Ryan Roberts and Greg Myers, "For items in the Miscellaneous Offset Report, August-00 Through September-02, we need to continue to work through each item >$10,000 to determine 1) what should have happened to the cash receipt and 2) make the correction to put it in the right place."].  *See also* Quinn Dep., at 167:18-21 ("[Y]ou told people in the collections department to determine the proper resolution of Oracle's unapplied cash?  A. Yes.").

[79]  *See* Venkataramana Dep., at 260:23-261-3 ("Q. Okay. And what do you recall about those discussions?  A. That if the credit memos were found to be erroneous credit memos and should not – the invoices should not have been credit memo'd, to adjust up the invoice."); and 261:21-25 ("Q. And what do you mean when you say they weren't valid?  A. We would credit memo it as bad debt.  It was aged to some degree and this many days outstanding, so therefore, we want to credit memo it as bad debt."); Hatada Dep., at 282:11-15 ("[I]f we found a credit memo that was due for bad information given to us, then, therefore, the credit memo was done in error and should be adjusted up in an effort to apply the unapplied cash.").

[80] Mr. Regan's assumption that Oracle personnel "adjusted up" invoices, simply because a credit memo had been issued in an amount equal to or greater than the amount that was transferred to Oracle's bad debt reserve, is also unfounded.  *See* Expert Report, at pp. 12 and 24.  I found evidence that a number of credit memos issued in amounts equal to or greater than the amounts transferred to Oracle's bad debt reserve, were refunded as part of the unapplied cash project.  This evidence demonstrates that Oracle evaluated the propriety of the original credit memo.  *See* NDCA-ORCA 1058909   [examples include credit memo 7100288 (refund of $55,010.22 to HRB Management Inc., after credit memo for terminated support), credit memo 7100927 (refund of $52,250 to Smithfield Foods Inc., after credit memo for customer concession) and credit memo 7111910 (refund of $64,000 to City of Seattle, after credit memo for terminated support)].

[81]  *See* Expert Report, at p. 24.

[82] Mr. Regan also opines that Oracle's actions during the "Unapplied Cash Clean-up acknowledge its improper accounting…including the transfers of customer overpayments into the Bad Debt Reserve, which generated $20 million in revenue in Q2FY01."  *See id.* at p. 25.  As I stated in my Opening Report, to the extent that any money that was transferred to the bad debt reserve could not be matched to a previously written off invoice, such a transfer represented an erroneous reclassification.  However, even if the entire $20 million in transfers were erroneous reclassifications (which they were not), this would not have resulted in a material misstatement in Oracle's second quarter financial statements.

Mr. Regan further opines that the unapplied cash project that commenced in 2002 was an "acknowledgement" of the inappropriate "use of debit memos to conceal the customer overpayments in the Bad Debt Reserve."[83]  As discussed above, however, the debit memos did not and could not conceal anything.  This is evidenced by the fact that Oracle was able to locate the transfers into the bad debt reserve and resolve them as part of the 2002 unapplied cash project.  Moreover, as noted above, the vast majority of the debit memos I have analyzed do not contain transfers into the bad debt reserve in their accounting histories.  Thus, it is unclear how the unapplied cash project could serve as an "acknowledgement" of anything improper relating to the creation of and accounting for the debit memos.  In my opinion, the 2002 unapplied cash project reflects an effort by Oracle to address and appropriately resolve potential accounting issues immediately after these transfers came to light.[84]

## D.    THE EFFECT ON THE SECOND QUARTER FINANCIAL STATEMENTS WAS NOT MATERIAL

Mr. Regan claims that Oracle's transfers of customer overpayments to the bad debt reserve ultimately resulted in a material overstatement of earnings in the second quarter of fiscal year 2001.[85]  Mr. Regan concludes that the alleged earnings overstatement was material "because it enabled Oracle to beat consensus earnings expectations of $0.10, and demonstrate a 'strong' trend of earnings."[86]  Mr. Regan's conclusion is incorrect.  As I noted in my Opening Report, even if one assumed that the entire $20 million in bad debt transfers in the second quarter were erroneous

---

[83] *See id.*

[84] Mr. Regan also opines that the unapplied cash project "acknowledges" the lack of an appropriate process to refund money.  *See id.*  As discussed above, I have not seen any evidence to suggest that Oracle's refund policies during the second quarter of fiscal year 2001, or any other period, were inappropriate in any way.  To the extent that Oracle issued additional refunds as part of the 2002 unapplied cash project, that may have resulted from earlier erroneous reclassifications of unapplied cash into the bad debt reserve, but that does not undermine the propriety of Oracle's refund practices.

[85] *See id.,* at p. 4.

[86] *See id.*, at p. 22.

reclassifications (which they were not), any resulting misstatement in Oracle's second quarter financial statements would not be material, either from a quantitative or qualitative standpoint under SAB 99. Significantly, Oracle never has restated its second quarter financial statements.

As an initial matter, Mr. Regan does not attempt to establish that any purported misstatement resulting from the bad debt transfers was material to Oracle's financial statements in the second quarter from a quantitative standpoint. Instead, Mr. Regan premises his entire theory of materiality on the idea that the bad debt transfers in the second quarter resulted in a misstatement in Oracle's financial statements that was qualitatively material. Mr. Regan, however, has failed to provide any basis for concluding that the bad debt transfers resulted in a material misstatement from a qualitative perspective.

Mr. Regan attempts to establish qualitative materiality by citing a September 1998 speech by then-Securities and Exchange Commission ("SEC") Chairman Arthur Levitt, in which Mr. Levitt recalled an instance where a company's stock price fell sharply in one day following an earnings miss of one penny.[87] Mr. Regan attempts to bolster his position by referencing one of the qualitative materiality considerations under SAB 99, which is implicated if the "misstatement hides a failure to meet analysts' consensus expectations for the enterprise."[88] Mr. Regan mischaracterizes, or misunderstands, both Mr. Levitt's speech, as well as the SAB 99 materiality consideration cited in his Expert Report. Both Mr. Levitt's comments and SAB 99 address a situation where a company *failed to meet* analysts' consensus expectations. That is not the case here. As I noted in my Opening Report, Oracle still would have met analysts' consensus expectations even if all of the transfers of unapplied cash to the bad debt reserve in the second quarter of fiscal year 2001 were reversed. Put differently, had the bad debt transfers never taken

---

[87] *See* "The 'Numbers Game'" – Remarks by Chairman Arthur Levitt, SEC, September 28, 1998.
[88] *See* Expert Report, at p. 21.

place, such that no corresponding increase in revenue would have occurred in the second quarter, Oracle still would have met consensus expectations of $0.10 earnings per share.  Mr. Regan does not provide any authority, under SAB 99 or any other professional guidance, that supports his opinion that a failure to *beat* analysts' consensus expectations would be material from a qualitative perspective.

In addition, as support for his position, Mr. Regan references another materiality consideration from SAB 99, in which a "quantitatively small misstatement of a financial statement item may be material if it 'masks a change in earnings or other trends.'"[89,90]  Once again, Mr. Regan has misapplied SAB 99.  First, Mr. Regan fails to explain why he used earnings per share as his comparative benchmark, as opposed to earnings, as discussed in SAB 99.  Moreover, Mr. Regan fails to explain how the reported earnings per share of $0.11 represented any sort of trend, much less a "strong" trend of earnings, and how it could have "mask[ed] a change in earnings or other trends."  Based on my review, in the previous nine fiscal quarters (*i.e.*, from the first quarter of fiscal year 1999 through the first quarter of fiscal year 2001), Oracle either met or beat analysts' consensus expectations.  Thus, regardless of whether Oracle reported earnings per share of $0.11 or $0.10 in the second quarter, Oracle's reported earnings per share were consistent with historical trends.  Accordingly, Mr. Regan has not demonstrated that the reported $0.11 earnings per share in the second quarter of fiscal year 2001 "mask[ed]" anything.

In sum, Mr. Regan has failed completely to establish that the bad debt transfers in the second quarter resulted in a misstatement in Oracle's financial statements that was material from a qualitative standpoint.  Even assuming that the bad debt transfers and the subsequent adjustment

---

[89] *See id.*

[90] Mr. Regan fails to mention the seven other qualitative materiality considerations recommended in SAB 99.

to Oracle's reserve accounts never occurred, and Oracle reported earnings per share of $0.10, rather than $0.11, Oracle still would have met consensus expectations, consistent with prior trends.  Accordingly, the impact of the bad debt transfers on Oracle's second quarter financial statements was not material.

## VII.   MR. REGAN'S OPINIONS REGARDING THE HEWLETT-PACKARD TRANSACTIONS ARE BASELESS

### A.   THE HP TRANSACTIONS WERE NOT ALLEGED IN THE COMPLAINT AND WERE NOT A PROPER SUBJECT OF FACT DISCOVERY

Mr. Regan devotes nearly half of his Expert Report to challenging Oracle's recognition of $19.9 million in revenue from Oracle's sale of additional CRM licenses to HP on November 30, 2000.[91] As noted above, the alleged revenue recognition issues pertaining to the license agreement were not alleged in the Complaint.  I also understand that the Special Master in this case ruled during the deposition of HP's 30(b)(6) witness that the issue of whether Oracle should have recognized revenue in the second quarter based upon an alleged "barter" or "sham" transaction with HP did not fall within the scope of fact discovery in this case.[92]

---

[91]   *See* Expert Report, at pp. 34-63.

[92]   *See* Telephonic Conference at Hewlett Packard Deposition, June 30, 2006, 16:8-17:6.  As explained below, the transactions that Oracle entered into with HP on November 30, 2000 actually consisted of three different agreements:  (1) Oracle's sale of approximately $21 million in additional CRM licenses and additional support to HP; (2) Oracle Credit Corporation's agreement to finance HP's purchase of the additional CRM licenses and support; and (3) Oracle's purchase of approximately $30 million in HP Unix servers.  Although Mr. Regan attacks the validity of each of these agreements, and even suggests that Oracle's revenue on the sale of the CRM licenses should be offset, or "netted," against the purchase of the HP servers, the evidence is clear that these are different agreements, and that each provided independent economic benefits for both parties.

Mr. Regan claims that because he "sees no evidence" pertaining to Oracle's decision to recognize this revenue, Oracle must have failed to properly conduct the required analysis under GAAP.[93] However, the fact that Mr. Regan "sees" no such evidence is a function of the limits that the Court placed on discovery, and not because the evidence does not exist. The sale of additional CRM licenses to HP was one of the largest license deals in the second quarter and, as such, it was closely analyzed by Oracle's revenue recognition group and was specifically tested by Oracle's independent auditor, Arthur Andersen LLP ("AA"). Both concluded that it was proper for Oracle to recognize approximately $19.9 million in the second quarter of fiscal year 2001.[94] For the reasons discussed below, I agree with that conclusion.

## B.  BACKGROUND OF THE HP TRANSACTIONS

In order to understand the nature of and the reasons behind the November 30, 2000 transactions, it is important to understand the business history between the two companies. Although, the relationship between Oracle and HP goes back many years, one of the more significant events leading up to the November 30, 2000 transactions occurred in August 1999.

On August 30, 1999, the parties entered into the following agreements:

---

[93]  *See* Expert Report, at p. 52.

[94]  *See* AA 001339-40; NDCA-ORCL 3043085-109; Deposition of Lawrence Ellison, dated September 21, 2006 ("Ellison Dep."), at 508:12-16 ("[O]ur accountants looked at this transaction very, very carefully. They were aware that they were … we were buying hardware; HP was buying software, and we believe we have accounted for it properly."); Deposition of Edward Sanderson, dated July 26, 2000 ("Sanderson Dep."), at 500:4-8 ("Any deal goes through revenue recognition. It was a group in finance that looked at the deal. And if there was any questions, they went to our accountants, outside accountants, to verify it."); Deposition of Gary Matuszak, dated August 1, 2006 ("Matuszak Dep."), at 169:17-21 ("[M]anagement concluded that it was appropriate to recognize revenue under that license arrangement. And Andersen, after reviewing all the – the evidence that was provided to us, concurred with management's agreement.").

- First, as part of Amendment Three to the 1994 Software License and Services Agreement, HP purchased CRM software licenses from Oracle for approximately $20.1 million.[95]

- Second, HP and Oracle entered into three memoranda of understanding ("MOUs"). The first non-binding MOU established a strategic alliance to "purchase and deploy each others [*sic*] technology within the respective companies" such that there was a "go-to-market plan for HP and Oracle to deliver CRM solutions to the marketplace." The second non-binding MOU detailed a "go-to-market plan for sales and marketing." The third MOU, which is most important for present purposes, required Oracle to move 50% of its production computing environment to HP servers, and provided that "HP would receive orders at a rate of 2-1 over Sun until this is complete."[96]

- Third, Oracle and HP entered into a "Time and Materials Engagement Contract" (the "Engagement Contract") whereby Oracle agreed to assist HP in the implementation of the CRM software. The Engagement Contract was negotiated and bid on separately (earlier in August 1999), and it explicitly stated that (i) the contemplated consulting services were proposed separately from the sale of any program licenses, and (ii) the licenses could be purchased without acquiring any consulting services.[97]

By Fall of 2000, the August 1999 agreements no longer were sufficient. Oracle needed additional servers, and HP believed that Oracle was not making adequate progress in achieving parity with Sun Microsystems ("Sun") servers in the production computing environment.[98] Moreover, HP wanted additional CRM licenses at a larger discount as part of its strategic plan to roll out CRM

---

[95] *See* NDCA-ORCL 3043017-24.
[96] *See* NDCA-ORCL 3043025-39.
[97] *See* NDCA-ORCL 3043052-55.
[98] *See* NDCA-ORCL 014004.

on a global basis.[99]  Because both parties needed something from the other – HP needed the additional licenses and support, and Oracle needed additional servers – the parties negotiated a new set of transactions, leveraging one against the other.

After weeks of negotiations, the parties executed several agreements on November 30, 2000. Specifically, the parties agreed to the following:

- Oracle agreed to purchase $30 million in HP Unix servers, and increased its commitment to move 100% of its production data and CRM development servers to HP servers by November 1, 2001 (the "HP Server Purchase Agreement").[100]

- HP agreed to purchase approximately $21 million in additional "Application User" licenses at a 60% discount, as well as additional support (the "CRM License Agreement").[101]

- HP financed the CRM License Agreement through Oracle Credit Corporation, pursuant to an agreement that obligated HP to make three payments totaling $29.8 million over 11 months and a final, optional $2.1 million payment, due December 1, 2001, to convert the 11-month term of the licenses to perpetual in duration (the "OCC Finance Agreement").[102]

These transactions collectively are referred to herein as the "November 30 Transactions."

---

[99] *See* Deposition of Safra Catz, July 20, 2006 ("Catz Dep."), at 19:20-20:1 ("HP had already bought and was implementing Oracle CRM, but hadn't done their global rollout; and to do it they would have had to buy more software."); Deposition of Thomas Rathjens, 30(b)(6) Hewlett Packard, June 30, 2006 ("Rathjens Dep."), at 37:4-9 ("[D]o you know why HP was considering purchasing these Oracle CRM products? … I believe HP wanted to consolidate some of their software applications on a global basis.").

[100] *See* NDCA-ORCL 021378-021381; HP 00001-03; and NDCA-ORCL 3043118.

[101] In addition, the parties agreed to incorporate – or migrate – certain licenses and support services relating to the August 30, 1999 agreement into the CRM License Agreement.  *See* HP 00030-35.

[102] *See* HP00050.

## C.   THE  NOVEMBER  30  TRANSACTIONS  WERE  NOT  IMPROPER "SWAPS"

Mr. Regan claims that the November 30 Transactions were improper "swap" or "round trip" transactions.[103]  Mr. Regan also cites accounting guidance relating to nonmonetary transactions to support his opinion that the financial impact of these transactions should be offset, thus preventing Oracle from recognizing any revenue on the CRM License Agreement.  Mr. Regan's conclusions regarding the nature of these transactions, however, are incorrect.[104]

Noticeably absent from Mr. Regan's Expert Report is any definition of the term "round trip" transaction.[105,106]  Thus, I obtained two examples of transactions from the relevant time period that the SEC considered to be "round trip" transactions:

---

[103]  *See* Expert Report, at p. 35.

[104]  Mr. Regan cites Training Practice Aid ("TPA") 5100.39 in support of his opinion that the November 30 Transactions should be accounted for as a single arrangement.  Mr. Regan's reliance on TPA 5100.39 is misplaced.  Based upon my review of TPA 5100.39, this guidance relates to one company making more than one sale to another company, such as selling the same product to two separate business units.  The November 30 Transactions are not contemplated by TPA 5100.39, and thus, I do not believe that this accounting guidance applies to these transactions.

[105]  Mr. Regan's failure to define "round trip" in this context is peculiar, considering that he wrote an article entitled "Revenue Recognition," published in California CPA, on September 1, 2003, in which he described a "round trip" transaction.  In that article Mr. Regan states:

> Some companies have recognized revenue for the sale of a product or services in "round-trip" transactions.   These involve two companies that exchange advertising for advertising or when inventory is exchanged for barter credits between the parties.  Such transactions may lack substance and fair value may not be determinable.  For example, companies A and B exchange rights to advertise on each other's websites and both exchange $1 million in cash.   Should both entities record an equal amount of revenue…EITF 99-17 provides the answer.  Recognize $1 million of revenue if the fair value of advertising surrendered is $1 million based on the entity's historical practice of receiving cash, marketable securities or other consideration readily convertible to cash with other unrelated parties.

The November 30 Transactions obviously do not involve "advertising for advertising" or "inventory for barter credits," as described in Mr. Regan's article.  More importantly, the November 30 Transactions are not "round trip" transactions, even under Mr. Regan's definition, because each agreement had economic substance and the fair values were determinable because each party paid cash for the respective products.

- *QuadraMed*[107] – During 1998 and 1999, QuadraMed fraudulently inflated its revenue by essentially paying for the purchase of its own products, in transactions with another software developer that had no independent means of paying for QuadraMed's products. As result of these sales, QuadraMed recorded revenue but never obtained any economic benefit from the transactions, which violated GAAP.   QuadraMed's recognition of revenue further violated GAAP because the collectibility for the transactions was not probable absent financial assistance from QuadraMed.

- *Arsin*[108] – In January 2000, Arsin agreed to purchase software licenses from Unify Corporation ("Unify").   However, Arsin did not have the funds to pay for the software licenses.   Arsin and Unify agreed to amend an earlier Funded Development Agreement (the "FDA"), to provide funds to Arsin, which Arsin used to pay for the software licenses.  However, the amended FDA was a sham transaction, because no technical work was performed under the agreement.  In April 2000, Arsin separately agreed to purchase additional products from Unify, but it did not have sufficient funds to pay for these products.   Unify wired Arsin the funds, which Arsin used to pay for the additional products.  The SEC concluded that Unify violated GAAP by recording revenue for these transactions, because Unify received no economic benefit from the transaction, and Arsin could not have paid for Unify's software absent financial assistance from Unify.

---

[106] Although Mr. Regan references a speech released by the SEC in 2001 as support for his opinion that the November 30 Transactions should be viewed as a single transaction, he fails to explain how a speech dated in 2001 could impact or provide guidance with respect to the proper accounting for a transaction in November 2000.  *See* Expert Report, at p. 51, "Speech by SEC Staff: Revenue Recognition," Remarks by Lynn E. Turner, May 31, 2001, USC SEC and Financial Reporting Institute.

[107] *See* SEC Administrative Proceeding in Re:  Quadramed Corporation, File No. 3-11472, April 30, 2004.

[108] *See* SEC Administrative Proceeding in Re:  Arsin Corporation and Danis Yadegar-Mooshiabadi, File No. 3-11188, July 17, 2003; Litigation Release No. 17522, *SEC v. Reza Mikailli, Gary F. Pado and Unify Corporation*, No. C022426 RS, May 20, 2002.

The underlying theme in both of these SEC enforcement actions is that reciprocal transactions are considered "round-trip" or "swap" transactions if they involve one company essentially paying for its revenue, and not receiving any economic benefit in return.  Under these circumstances, the SEC views the recognition of revenue to be a violation of GAAP.

1.    *ORACLE RECEIVED SUBSTANTIAL ECONOMIC BENEFITS AS A RESULT OF THE HP SERVER PURCHASE AGREEMENT*

The HP Server Purchase Agreement allowed Oracle to build upon an important and profitable strategic business alliance with HP, through which both companies realized benefits.[109]  As part of this strategic business alliance, Oracle committed to move its production data and CRM development environments to HP Unix servers.  This, in turn, allowed both Oracle and HP to better market their products to other companies using HP servers.[110]

---

[109]  *See* Ellison Dep., at 115:9-13 ("I certainly knew about a general expectation.  HP certainly would like to sell us hardware.  In a general sense, they are always trying to sell us more hardware and we were always trying to sell the software."); Catz Dep., at 19:16-23 ("Oracle was already buying a lot of products, and Oracle wanted HP to be the big CRM reference….  And Oracle was already very much trying to have an alternative to Sun, which was our entire platform."); Deposition of Michael DeCesare, February 16, 2006 ("DeCesare Dep."), at 66:14-21 ("All of the engineers that built the CRM products would build it on HP.  They – they would log in, like you're on a PC here, to an HP server instead of a Sun server, which is a very desirable thing for a hardware company because that means the first release comes out on their hardware.  It doesn't have to be ported.  And then it would get ported to Sun and all the other hardware platforms that were out there."), 75:9-17 ("[T]his was a deal that wasn't just as simple as them buying software from us.  There was…heavy involvement from the alliance team that managed the relationship….  Getting HP to use the – to get Oracle to use HP's products was very attractive to both alliance teams as well, because it furthered the partnership."), and 118:5-7 ("Q. Do you know whether or not the intent was to use HP…as a reference?  A. Oh, yeah.  Most definitely.  When a customer implements software, if they have a good experience, they'll say good things, and if they have a bad experience, they will sometimes say bad.").

[110]  *See* Rathjens Dep., at 165:24-166:9 ("Q. And was – was this reference selling part of the Oracle-HP agreement to run Oracle software on HP servers?  A. They were different in nature.  And some were related to CRM – some were, you know, where CRM had a one hour slot to talk to a customer that is there all day.  But in general, it was to – with Oracle it was to show HP and Oracle's partnership in that the Oracle software worked very well on HP hardware."), and 134:18-135:9 ("Q. If you could look to the second bullet point there.  The second – it says 'focus on '99 licenses only.  This is due to Oracle's belief that the '2000' licenses were part of a larger win-win business deal.'  Do you know what they are referring to here?  A. I think the larger win-win business was to sell more HP hardware, where other CRM customers would be putting their – the Oracle CRM software and other Oracle software on HP hardware.  So I think the larger win-win business is jointly selling HP hardware and Oracle software."); see also "Oracle and HP Celebrate Successful CRM Relationship" press release, February 21, 2001, ("Oracle…and Hewlett-Packard…today announced that their joint CRM sales efforts have resulted in more than 40 leading global

Moreover, the evidence demonstrates that Oracle needed additional servers at the time,[111] and Oracle believed that HP built superior servers compared to alternative suppliers.[112]  Oracle also received discounts of 50% and 55% off the list price for the HP Unix servers.[113]  Oracle's independent auditor discussed Oracle's decision to purchase the servers from HP with Tom Williams, who was in charge of Oracle's revenue recognition group at the time.[114]  Mr. Williams explained that Oracle needed this equipment for its development and production departments.  Oracle's Executive Committee met and specifically discussed the HP Server Purchase Agreement, and concluded that the purchase of the additional servers was in the best interests of Oracle and its shareholders.[115]  The purchase of the HP servers also represented a step forward in terms of Oracle's desire to reduce its dependence upon Sun servers.  Indeed, Oracle had purchased $70 million in Sun servers in the previous five quarters alone.[116]  Thus, based upon this evidence, I believe that Oracle received substantial economic benefits from the HP Server Purchase Agreement.

---

customers.  In addition to these customer successes, the relationship has also resulted in HP and Oracle both successfully implementing these joint solutions internally and realizing significant cost savings and customer satisfaction.").

[111]  *See* Deposition of Michael Rocha, April 7, 2006 ("Rocha Dep."), at 206:10-23 ("I'm referring to the fact that we – to build the products – again, I was responsible at this time for porting and joint development and testing, and all that stuff, on the various hardware platforms.  One of those platforms was HP.  And I'm saying here that we need hardware to do our job, and HP wants us to buy the hardware.  And so it's kind of – I'm basically saying it's your call as to whether we pay for it – you know, we pay for it, or we essentially try to go back to them and say this is part of a partnership.  And a partnership organized around sort of building products together.  So the statement, "We need it," is essentially in reference to the hardware."), and Deposition of Jason Sevier, June 28, 2006, at 113:10-25 ("[H]ypothetically, if Oracle would purchase the hardware and we, through audit testing, believed that the purchase was valid, meaning Oracle has a specific plan, they have identified the hardware that's being replaced, that needs to be replaced, and they have specifically earmarked it in the budget, then hypothetically, based on that fact set, you would look at that and say it's a valid business purpose, so there is no revenue implication.  But if it was just extra stuff that was going to sit around in some supply room because they really didn't need it, it would call into question the revenue."); *see* NDCA-ORCL 028735-736 [Email from Michael Rocha to Larry Ellison, about October 12, 2000 ("[Y]ou may want to agree that we'll purchase the hardware.  We need it.")].

[112]  *See* NDCA-ORCL 3043132-33.

[113]  *See* HP 00001-2.

[114]  *See* AA 001339-40.

[115]  *See* NDCA-ORCL 3043132-33.

[116]  *See* AA 001339-40.

2.      *HP RECEIVED SUBSTANTIAL ECONOMIC BENEFITS AS A RESULT OF THE CRM LICENSE AGREEMENT*

The evidence also demonstrates that HP received substantial economic benefits from the CRM License Agreement.  A contemporaneous press release suggests that HP was satisfied overall with the CRM software.[117]  Moreover, HP negotiated a steeper discount (*i.e.*, 60%) off the fees it traditionally paid for CRM licenses, which resulted in overall savings of $11.5 million.[118]  HP also extended for two years an option to exchange any migrated licenses for any other existing licenses for a set fee.[119]  In addition, HP obtained the services of two onsite support analysts, which were included in the support costs.[120]  Although Mr. Regan claims that HP did not need all of the licenses it acquired on November 30, it is not unusual for software companies to purchase additional software or licenses based upon anticipated need.[121]  In fact, it was precisely because HP purchased the additional licenses, which HP planned on using in connection with a scheduled global roll out of CRM,[122] that HP was able to obtain the steeper discount.[123]  In addition, HP was able to use its purchase of additional CRM licenses as leverage to broker a simultaneous agreement through which Oracle committed to move 100% of its production data and its CRM development environments to HP servers.  This was a significant development for HP because it

---

[117] *See* NDCA-ORCL 3043152-55; *see also* "Oracle Q2 Customer Additions Drive Growth in Applications and Database Software" press release, December 14, 2000 ("Having experienced success with its current implementation of Oracle Sales Online, HP…is extending its use of the customer relationship management applications of the Oracle E-Business suite.  'Oracle Sales Online is helping us achieve greater efficiencies in our sales management process,' said Philip May, General Manager of the Oracle business unit at HP. 'The initial implementation has given us a consolidated view of customer interactions across the company and helped to improve contact management.'").

[118] *See* HP 00015-16.  The fact that the parties negotiated for larger discounts is counterintuitive with a round trip transaction.  If the transaction truly were a "round trip" transaction, with no economic benefit, the parties simply would have recorded the transaction at full value.

[119] *See id.*

[120] *See id.*

[121] *See id.*; *see also* DeCesare Dep., at 63:4-7 ("Every software company tries to go out and license customers for what they look like, not for what they will be using in the first month or year."); and Sanderson Dep., at 499:12-15 ("And so, companies would look at not only what their current needs are but their projected needs, and so, sometimes companies would buy on that base.").

[122] *See* "HP Boosts CRM With Oracle," by DSstar, August 1, 2000, Vol.4 No. 31.

[123] *See* HP 00016.

allowed HP to market its servers as the environment in which CRM was developed.[124]  Indeed, HP suggests that, as a result of these transactions with Oracle, its market share would increase by 5%, which it valued at approximately $325 million in incremental sales *in the first year*, not including related services revenue.[125]

Mr. Regan contends that HP "never implemented certain significant modules of the software."[126] This allegation, even if true, is irrelevant.  On September 3, 2001, HP and Compaq announced a definitive merger agreement.[127]  Compaq was in process of implementing Seibel's CRM solution.[128] After the merger was completed, Compaq's Chief Technology Officer assumed an equivalent position at HP, and decided to implement Seibel's CRM at the merged company.[129]  In any event, whether HP opted to implement some or all of the licenses as of September 2001 has nothing to do with whether HP received an economic benefit from the CRM License Agreement as of November 30, 2000.[130]

---

[124]  *See* DeCesare Dep., at 66:6-20 ("There was a second commit, which was to move the entire CRM development platform to HP as well… people would now develop on HP instead of Sun.  Q.  And what do you mean when you say "develop on HP"?  A.  All of the engineers that built the CRM products would build it on HP…which is a very desirable thing for a hardware company because that means the first release comes out on their hardware.  It doesn't have to be ported.").

[125]  *See* HP 00015-16.

[126]  *See* Expert Report, at pp. 47-48.

[127]  *See* Hewlett-Packard Press Release, "Hewlett-Packard and Compaq agree to merge, creating $87 billion global technology leader," September 3, 2001.

[128]  *See* Rathjens Dep., at 77:17-20 ("[W]e merged with Compaq, who was using Seibel software in the CRM space; and a decision was made to consolidate on the Seibel software rather than the Oracle software.").

[129]  *See* Compaq Annual Report 2000, p. 68, and Hewlett-Packard Annual Report 2002, p. 177.  Shane V. Robison, Compaq's Senior Vice President, Technology and Chief Technology Officer in 2000, became HP Chief Technology and Strategy Officer in 2002.

[130]  As a practical matter, whether HP received an economic benefit from the purchase of the additional CRM licenses ultimately is beside the point.  The real issue is whether Oracle received an economic benefit from the purchase of the HP servers.  Mr. Regan's references to emails in which HP employees speculate about HP's purported motivations for purchasing the additional CRM licenses – months after the agreement was executed by HP – do not undermine Oracle's decision to recognize revenue on the sale of the additional licenses in the second quarter of fiscal year 2001.  *See* Expert Report, at p. 47.

Thus, the November 30 Transactions – which, as discussed above, involved intensive negotiations and steep discounts – clearly are distinguishable from the transactions discussed in *Quadramed* and *Arsin*.  Furthermore, while each party effectively used its willingness to enter into one agreement as negotiating leverage for the other agreement, this does not mean that the transactions were improper "swaps," or that Oracle did not receive an economic benefit from the HP Server Purchase Agreement.  Mr. Regan's opinions, to the extent they suggest otherwise, are incorrect.

3.    *MR. REGAN INCORRECTLY ASSUMES THAT THE NOVEMBER 30 TRANSACTIONS WERE "NONMONETARY" TRANSACTIONS*

Mr. Regan attempts to bolster his argument that the November 30 Transactions constituted "round trip" or "swap" transactions by describing the two agreements as a single "non-monetary transaction."  Citing APB 29,[131] EITF 86-29[132] and TPA 5100.47,[133] Mr. Regan states that the HP Server Purchase Agreement and the CRM License Agreement should be netted and recorded at a $0 value and, thus, that Oracle should not have recognized any revenue on the sale of the additional CRM licenses.[134]  The literature upon which Mr. Regan relies in making this argument, however, is inapplicable:

- APB 29 applies to exchanges of nonmonetary assets, where nonmonetary is defined as "assets and liabilities other than monetary ones" and monetary assets are defined as "amounts…fixed in terms of units of currency…examples are cash."  The HP Server Purchase Agreement and the CRM License Agreement both required the payment of cash.[135]

---

[131]   *See* Accounting Principles Board ("APB") Opinion 29:  Accounting for Nonmonetary Transactions.

[132]   *See* Emerging Issues Task Force ("EITF") 86-29:  Nonmonetary Transactions:  Magnitude of Boot and the Exceptions to the Use of Fair Value.

[133]   *See* TPA 5100.47, Nonmonetary Exchanges of Software (Part II).

[134]   *See* Expert Report, at pp. 38, 52-53.

[135]   *See* NDCA-ORCL 3043110-115 and HP 00001-02.

- EITF 86-29 applies to nonmonetary exchanges where the products being exchanged are in the same line of business and the product being received (in this case, by Oracle) will be resold in the marketplace.  Here, the licenses and the servers were not in the same line of business, and there is no evidence that Oracle intended to resell the HP servers.  Indeed, the HP Server Purchase Agreement specifically provides that "[p]roducts ordered under the blanket purchase order are for Oracle's internal use only and are not for resale."[136]

- TPA 5100.47 applies to nonmonetary exchanges of software licenses.  The November 2000 Transactions, as discussed above, did not involve the exchange of software licenses.

Notably, Mr. Regan does not cite EITF 99-19,[137] which represents the appropriate method for determining whether a transaction should be recorded on a gross versus net basis.  As Mr. Regan explained in an article he published on September 1, 2003,[138] sales may be recorded on a gross basis if a party satisfies the following seven "indicators:"  (i) the party is responsible to the customer for satisfaction, (ii) the party maintains general inventory risk, (iii) the party has reasonable latitude in establishing price, (iv) the party exercises discretion in selecting suppliers, (v) the party is involved in the determination of product or service specifications, (vi) the party has physical loss inventory risk, and (vii) the party has credit risk in the event of nonpayment.  I have reviewed each of these considerations and, to the extent these indicators apply to the CRM License Agreement (not every indicator is applicable), Oracle satisfied these requirements.  Thus, I have found no support for Mr. Regan's conclusion that the agreements should have been recorded on a net basis.

---

[136]  *See* HP 00001.

[137]  *See* EITF 99-19, Reporting Revenue Gross as a Principal versus Net as an Agent.

[138]  *See* Regan, "Revenue Recognition," California CPA, September 1, 2003.

## D.  ORACLE PROPERLY RECORDED REVENUE ON THE CRM LICENSE AGREEMENT IN ACCORDANCE WITH SOP 97-2

Mr. Regan claims that Oracle "substantially failed to meet any of the revenue GAAP recognition criteria," which, for the CRM License Agreement, is provided by SOP 97-2.[139,140]  SOP 97-2 sets forth a detailed protocol for recognizing revenue in software license transactions.  This guidance provides that revenue for a sale of software licenses should not be recognized until the following criteria are met:

- Persuasive evidence of an arrangement exists;

- Delivery has occurred;

- Fees are fixed or determinable; and

- Collectibility is probable.

Although I will discuss each of the elements of SOP 97-2 below, I note that SOP 97-2 allows companies to exercise a certain degree of business judgment in how the elements ultimately are analyzed and applied.  As such, reasonable minds may differ.  That said, Oracle's decision to recognize $19.9 million in revenue on November 30, 2000 was reviewed and approved by Oracle's revenue recognition group,[141] specifically tested by AA[142] and featured in a presentation that AA gave to Oracle's Audit Committee.[143]  Each of these entities concluded that it was

---

[139]  *See* AICPA Statement of Position 97-2, "Software Revenue Recognition."  The guidance provided by SOP 97-2 is consistent with that provided by SAB 101, "Revenue Recognition in Financial Statements."

[140]  *See* Expert Report, at p. 38.

[141]  *See* NDCA-ORCL 3043085-109 [USA Revenue Accounting Contract Review Checklist for Order 6346665]; Ellison Dep., at 508:12-16 ("[O]ur accountants looked at this transaction very, very carefully.  They were aware that…we were buying hardware; HP was buying software, and we believe that we accounted for it properly.")

[142]  *See* AA 001339-40; Matuszak Dep., at 169:17-21 ("[M]anagement concluded that it was appropriate to recognize revenue under that license arrangement.  And Anderson, after reviewing all the…evidence that was provided to us, concurred with management's agreement.")

[143]  *See* NDCA-ORCL 261911 and NDCA-ORCL 081755.

appropriate under SOP 97-2 for Oracle to recognize this revenue on the CRM License Agreement in the second quarter.  As explained below, I agree with that conclusion.

## 1.    PERSUASIVE EVIDENCE OF AN ARRANGEMENT EXISTED

Paragraph 17 of SOP 97-2 states that revenue should not be recognized on any element of an arrangement unless persuasive evidence of an arrangement exists.[144]   In this case, there is a clear, complete and executed software license agreement, dated November 30, 2000.[145]  Thus, to the extent that Mr. Regan does not see persuasive evidence of an arrangement, it is because Plaintiffs did not get discovery on this issue.

Mr. Regan challenges whether the agreement was executed in the second quarter based upon a series of facsimile header date and time stamps.[146]  According to Mr. Regan, some of these date and time stamps appear to suggest that at least some copies of certain deal documents may have been faxed after midnight, on December 1, 2000, and therefore in the third quarter.   Other facsimile header stamps, however, suggest that the agreement was executed at 11:53 p.m. on November 30, 2000.[147]

Mr. Regan is not the first person to raise concerns about the date and time stamps on the facsimile header.  Oracle's independent auditor also noted this anomaly and asked Shelley Curtis – then

---

[144] Generally, for two companies which have conducted business in the past, one looks at how these arrangements were formalized in the past to determine whether persuasive evidence of an arrangement exists.  With respect to Oracle and HP, the parties' prior arrangements have been formalized in a variety of ways, including contracts and binding and non-binding MOUs.  SOP 97-2 states that in situations where the vendor does not always rely upon signed contracts, "the vendor should have other forms of evidence to document the transaction."

[145]  *See* HP 00034.

[146]  *See* Expert Report, at pp. 49-51.

[147]  *See* NDCA-ORCL 260113.

Assistant General Counsel at Oracle – about the precise time when she executed this agreement.[148]  In response to this inquiry, Mrs. Curtis stated:[149]

1) Loren Mahon witnessed that signatures of both parties were obtained before midnight as she was present in the area where David Jinnett was working and he took the documents to her.  I am advised that other members of Sales Support also witnessed that – either Loren of [*sic*] David can provide those names to you, if needed.

2) David Jinnett faxed the HP signed signature pages to me, which I then countersigned and faxed back to him and the fax machine date stamped on the signature pages faxed by Commercial Legal was before midnight – it was 11:53.  Legal Assistant Mark Hong watched me sign, then he handled faxing back to David Jinnett, so he is also a witness.

3) If needed, I'm sure that Mr. May and his people at HP would also be happy to testify as to when he signed and faxed.

4) My husband can testify as well, since I left my Oracle office immediately after midnight and drove home, reaching my home in Sunnyvale at approximately 12:35, so I was neither negotiating nor signing after midnight.

Notably, Ms. Curtis stated that HP already had signed the agreement when she received the fax, and that she signed and faxed the fully-executed agreement to HP at 11:53 p.m.  Thus, I have

---

[148] *See* AA 001339-40.
[149] *See* NDCA-ORCL 3043126-128.

found persuasive evidence that an arrangement existed as of November 30, 2000.  Accordingly, the decision to recognize revenue satisfies the first prong of SOP 97-2.[150]

## 2      *DELIVERY HAD OCCURRED*

Paragraph 18 of SOP 97-2 states that revenue should not be recognized on a transaction until the product has been delivered.  Mr. Regan generally asserts three bases for contending that the delivery element of SOP 97-2 was not satisfied by the end of the second quarter of fiscal year 2001.[151]  First, Mr. Regan cites the existence of a 15-day acceptance period in the 1994 Software License Service Agreement ("SLSA").  Second, Mr. Regan claims that Oracle failed to obtain vendor specific objective evidence ("VSOE") of fair value for the elements of the HP transaction.  Third, Mr. Regan cites the existence of 14 "show stoppers," and he argues that the software was not "fully functional."[152]  As discussed in greater detail below, each of these arguments fails. [153]

HP accepted the software upon delivery.  Mr. Regan claims that it was improper for Oracle to recognize revenue on November 30, 2000, because HP had a 15-day acceptance period during which it could have rejected the software.[154]  Notably, the CRM License Agreement does not

---

[150]  The timing of the execution of the CRM License Agreement is consistent with an email sent by Michael DeCesare, one of the Oracle employees who negotiated the sale of the additional CRM licenses.  At 7:59 a.m., on November 30, 2000, Mr. DeCesare sent an email to Larry Ellison, Safra Catz and others, stating: "HP is in!!  [F]or over 21M in CRM license.  Thanks to everyone, Mike."  The timing of this email suggests that the parties may actually have reached an agreement in principle much earlier in the day.  *See* NDCA-ORCL 3043084.

[151]  *See* Expert Report, at p. 38.

[152]  *See id.,* at p. 57.

[153]  There is no question that physical delivery of the software occurred on November 30, 2000, as required by GAAP.  According to Paragraph 21 of SOP 97-2, revenue for an arrangement to use multiple copies of a software product should be recognized upon delivery of the first copy or product master.  According to documents from Oracle's shipping and manufacturing division, the physical CD Pack, which contained the software for which HP was purchasing additional licenses, was shipped from Oracle's warehouse before 8:43 p.m., on November 30, 2000. The terms of shipment were "FOB Shipping."  *See* NDCA-ORCL 3043129-131 [Computer screen shots of shipping details for Waybill 1Z8668200224636442].

[154]  *See* Expert Report, at p. 42-43.

contain a 15-day acceptance period.  It does, however, reference the original SLSA, which included a 15-day acceptance window.[155]  In making this argument, Mr. Regan failed to recognize that the 15-day acceptance period was eliminated in Amendment Three to the SLSA, which Oracle and HP executed in August 1999, as part of HP's initial purchase of CRM licenses.  Paragraph B.5 of Amendment Three to the SLSA provides that "[t]he Programs shall be deemed to be accepted by Customer on delivery."[156]  There is no corresponding 15-day acceptance period in Amendment Three to the SLSA or, as noted above, in the CRM License Agreement.  Thus, HP was deemed to have accepted the software when it was delivered on November 30, 2000.[157]

Oracle established a reasonable fair value of the elements of the CRM License Agreement.

Mr. Regan challenges Oracle's recognition of revenue on the grounds that he "sees no evidence" that Oracle established the fair value of the elements of the software license agreement.[158]  However, I have seen sufficient evidence that Oracle, in fact, did reasonably establish the fair value for (i) the new software licenses, (ii) the undelivered support services related to the new licenses, (iii) the migrated support, and (iv) the onsite technical support services, as follows:

> (1) *New License User Fees* ($21,331,122) – Based upon the evidence, it appears that HP received a 60% discount on the new license fees.[159]  Using that 60% discount, the Oracle E-Business Global Price List, dated November 10, 2000 (the

---

[155] *See* NDCA-ORCL 258186-258218.

[156] *See* NDCA-ORCL 3043017-3043024 [Amendment Three to the SLSA, August 30, 1999].

[157] Even if the 15-day acceptance period applied, however, this provision still did not prevent Oracle from recognizing revenue on the sale of the licenses on November 30, 2000.  According to TPA 5100.67, if uncertainty exists about a customer's acceptance of software, license revenue should not be recognized until acceptance occurs.  However, a software vendor can recognize revenue before formal customer acceptance occurs where, among other things, the length of the acceptance period is short and the individual customer never has invoked the acceptance provision or revoked delivery in prior dealings.  In this case, there is no evidence that HP ever invoked the 15-day acceptance period or rejected past deliveries.  Thus, even if the 15-day acceptance period applied, it was appropriate under GAAP for Oracle to recognize revenue on November 30, 2000, based upon Oracle's historical experience with HP.

[158] *See* Expert Report, at pp. 57-58.

[159] *See* NDCA-ORCL 3043085-109.

"Price List"),[160] and the number of user licenses purchased in the CRM License Agreement, [161] I was able to recalculate the $21.3 million fee that Oracle recognized as revenue at the end of the second quarter.  This establishes that the user licenses were assigned an appropriate fair value.

(2)  *Product Support related to New Licenses* ($4,692,847) – Based upon the Price List and the evidence pertaining to the CRM License Agreement, the product support and upgrade subscription rights should have been valued at 22% of the newly-purchased license fees.[162]  Using these figures, I was able to recalculate the $4.69 million in product support.  Again, this verifies that the product support on new licenses was assigned an appropriate fair value.

(3)  *Product Support related to Migrated Licenses* ($3,250,300) – Certain product support was transferred from the August 1999 purchase agreement to the November 30, 2000 agreement.[163]  This product support covered the period from September 1, 2000 to August 31, 2001.  I have studied the evidence and considered both the annual support fee increases, as well as any subsequent concessions. [164]  Taking all of this information into consideration, I have estimated that a fair value of the product support for the migrated licenses is $3,121,000, which should have been deferred.[165]  Oracle assigned a fair value of the migrated license support of $2,979,000, which was deferred.  The $142,000 difference between the fair value I estimated for the support for the migrated

---

[160]  *See* NDCA-ORCL 3043134-51.

[161]  *See* NDCA-ORCL 260109-10.

[162]  *See* NDCA-ORCL 3043134-51.

[163]  *See* HP 00030-35.

[164]  *See* NDCA-ORCL 020845-46.

[165]  *See* NDCA-ORCL 3043103.

licenses and the amount Oracle actually deferred is immaterial.  In any event, it is clear that Oracle, in fact, did assign fair value to the support for the migrated licenses.

(4) *OnSite Technical Support Services* ($549,700) – According to the OnSite Support Services Exhibit, Oracle agreed to provide 3,200 hours of technical support, for a fee of $549,700,[166] which represented a weighted average fee of $170 per hour.  Oracle's revenue recognition group reviewed these fees and concluded that the fees were consistent with Oracle's support services standard pricing.[167,168]  As such, there is sufficient evidence that Oracle assigned a fair value to the onsite technical support services.

Thus, I have found sufficient evidence that Oracle reasonably allocated the fair value, to the various elements of the CRM License Agreement, based upon vendor specific objective evidence.[169,170,171,172]

---

[166]  *See* HP 00045-49.

[167]  *See* NDCA-ORCL 3043085-109 [USA Revenue Accounting Contract Review Checklist for Order 6346665].  *See also* AA 001339.

[168]  *See* NDCA-ORCL 234898 [email chain which included request for onsite services for McGraw Hill, with a proposed valued of $137,500 for 100 days of onsite support, which represented a weighted average fee of $170 per hour.]

[169]  *See id.*

[170]  *See* Matuszak Dep., at 150:20-151:8 ("Would you look at whether the contracts, the revenue…license contracts met the requirements of SOP 97-2?  A. Yes."), and 150:24-151:8 ("Q. So, you would go through the process of the four elements:  Whether arrangement existed, delivery, the fee was fixed and determinable, and whether collectability [*sic*] was reasonably assured?  You'd go through that with respect to whatever amount of deals that you deemed proper during the quarter; right?  A. We – we would review or conclude each of those four requirements under SOP 97-2.").

[171]  In addition, Mr. Regan states that fair value for support cannot be measured for a contract with terms of one year of less.  *See* Expert Report, at p. 58.  Mr. Regan states that under TPA 5100.53, "it is not possible to measure VSOE for term licenses with a duration of one year or less."  This literature, however, was issued in response to a situation where a short-term license featured a post-license support service renewal option.  The November 30, 2000 license agreement does not contain any support service renewal option.  Thus, the guidance cited by Mr. Regan is not applicable.

<u>There is no evidence that the software required "significant production, modification or customization" as of November 30, 2000.</u>  Mr. Regan challenges the CRM software that Oracle previously licensed to HP in August 1999 as not being "fully functional."[173]  The accounting literature, however, does not require software to be "fully functional" before revenue can be recognized on a license agreement.   Pursuant to Paragraph 7 of SOP 97-2, revenue on an arrangement should be deferred, and accounted for as a long-term construction contract, if the product requires "significant production, modification, or customization of software."  Thus, the accounting literature does not require a vendor to defer revenue simply because a product might contain "bugs."[174,175]  The issue, therefore, is whether there is any evidence to suggest that the software licensed under the August 1999 agreements required significant production, modification or customization as of November 30, 2000.  Mr. Regan has provided no such evidence.

During the relevant time period, Oracle's revenue recognition group adhered to an internal policy that software that was included on the Price List did not require significant production,

---

[172]  Mr. Regan also states that Oracle should have established fair value for various parts of the HP Server Purchase Agreement.  *See* Expert Report, at p. 41.  As discussed above, the HP Server Purchase Agreement is a separate agreement from the CRM License Agreement.  As such, I believe it would be inappropriate to assess fair value for the various pieces of a separate agreement that is not a part of the arrangement being evaluated under SOP 97-2.

[173]  *See id.*, at p. 38.

[174]  *See* SOP 97-2, the Glossary defines Post Customer Support as including "correction of errors (bug fixing or debugging)."  Thus, GAAP anticipates that software will be sold with some "bugs," which will be resolved later.

[175]  Based upon the evidence I have reviewed, it appears that "bugs" are inherent in virtually all new software releases.  *See* Deposition of Mark Jarvis, May 30, 2006, at 168:10 ("Every product has bugs."); Deposition of Keith Block, May 3, 2006, at 74:21-23 ("You know, with any new release of software there is always going to be challenges around the product, new features, functions, so."); Rocha Dep., 212:14-16 ("I have a general recollection, and the general recollection was there was bugs just like every software that's ever gone out of a software lab.").  Thus, if technology companies were required to defer revenue until all "bugs" are resolved – as Mr. Regan seems to suggest – these companies may never be able to recognize revenue on new product releases.

modification and customization for purposes of SOP 97-2.[176]  Oracle considered a product to be sufficiently market ready for revenue recognition purposes when it was included on the Price List.[177]  At that point, the software already had been through beta testing and quality control checks.[178]  Oracle's independent auditors accepted this benchmark as an appropriate indication of the product's functionality for purposes of SOP 97-2.  As noted above, all of the software contemplated by the CRM License Agreement was included on the Price List.

The crux of Mr. Regan's argument appears to be that Oracle should have deferred all or some portion of the revenue recognized on November 30, 2000 because of the existence of 14 so-called "show stoppers."[179]  Notably, I have seen no evidence that anyone, other than Mr. Regan, has suggested that these 14 show stoppers impacted product sales or revenue recognition.  Although Mr. Regan claims that "the existence of even a single showstopper indicates significant functionality did not exist in the product," he fails to articulate the extent to which these show stoppers required additional production, modification or customization of the software.[180]  In fact, 1,800 HP sales representatives had gone "live" with at least some modules of CRM software by early November 2000, and the implementation was ongoing.[181]  Thus, the existence of the 14 show stoppers did not prevent HP from using the software by November 2000.

---

[176]  *See* Matuszak Dep., at 171:19-172:15, ("[P]art of our procedures on the quarterly revenue would be to look at the products that were licensed and shipped under the agreement and to see if they were part of the currently available list of products…. Q. What if they weren't part of the currently available list of products?  A. If a product is not available, it can't be shipped.  If a product cannot be shipped, it cannot be recorded as revenue."; and 184:24-185:5, "[W]e looked to see whether the product was on the currently available product list, which meant that it went through the company's normal QA testing, including beta testing and other testing with customers before it was released in final version.").

[177]  *See* NDCA-ORCL 3043134-51.

[178]  *See* Matuszak Dep., at 184:24-185:5; *see also* DeCesare Dep., at 224:23-225:5 ("Q:  Do you know whether and what sorts of testing Oracle did before it released a product?  …A:  So it went through, you know, development.  Then the code was frozen.  It went through regression testing.  Then it went through porting.  It was a very rigorous – fairly arduous process.").

[179]  *See* Expert Report, at p. 57.

[180]  *See id*.

[181]  *See* NDCA-ORCL 020850-51.

Relying upon these so-called show stoppers, Mr. Regan makes a number of unsupported assumptions based upon very limited data.  The only documents cited in Mr. Regan's Expert Report that contain any detail of the show stoppers – or any other implementation issues HP apparently experienced – are dated months after November 30, 2000.[182]  Thus, even assuming the CRM software required "significant production, modification or customization," as Mr. Regan suggests, he has not cited any evidence indicating that Oracle was aware this fact prior at the time it recognized revenue on the CRM License Agreement.

Moreover, Mr. Regan's assumes that when Michael DeCesare testified that a show stopper is "functionality that the customer requires," this meant functionality that was agreed to and included in the core product, as opposed to additional products or features customers may want in the future.[183,184]  Mr. Regan's assumption in this regard, however, is undercut by the deposition testimony of Thomas Rathjens, HP's 30(b)(6) witness.  When asked whether the 14 show

---

[182]  Mr. Regan cites only one document dated before November 30, 2000, that even mentions the 14 show stoppers.  *See* NDCA-ORCL 020844.  That document, however, does not describe the show stoppers, nor does it state that the CRM software required "significant production, modification or customization."  Moreover, that document specifically states that the 14 show stoppers had "nothing to do" with the CRM License Agreement, and that the HP project manager was using the leverage of the CRM License Agreement "to get more attention from Oracle development."  *Id.*

[183]  Based upon my review of the deposition testimony in this case, it appears that the term "show stopper" can mean a variety of different things.  *See* Deposition of Alan Fletcher, April 6, 2005, at 110:21-22 ("Show stopper was not a scientifically captured term.  It was purely anecdotal."); Deposition of Sukumar Rathnam, May 18, 2006, at 126:2-8 ("Again, show stopper used by different software teams, different companies could be used in slightly different ways.  There's no sort of formal precise definition that, you know, everyone in software development would agree on what a show stopper is, but I have a general notion of what a show stopper is, could be.").  *See also* Rebuttal Expert Report of Edward Yourdon, dated June 22, 2007, at pp. 93-94.

[184]  Later in his deposition, Mr. DeCesare provided a very different explanation of the 14 "show stoppers."  Mr. DeCesare describes the 14 show stoppers in connection with a transaction purportedly involving The Gap.  Given his reference to 14 show stoppers, however, it appears that his reference to The Gap may have been in error, and he may have intended to say HP.  Either way, Mr. DeCesare's own testimony illustrates the variety of meanings attributable to the term "show stopper."  *See* DeCesare Dep., at 233:1-15 ("Well, in the context of the Gap – I mean the Gap was saying there's 14 showstoppers – they hadn't – they hadn't bought the software yet.  . . .  [W]hat they meant was that there were showstoppers, meaning there were things that they felt as requirements that in their analysis of the tool it didn't do.  Nothing to do with a P1, P2, or P3.  They wouldn't have discovered that until they thought it did something and tried to implement it and realizes that it didn't.  . . .  Very different things.  One's presales.  One's post sales.").

stoppers represented functionality that was promised as part of the CRM licenses purchased on November 30, 2000, Mr. Rathjens responded:  "I don't believe so because in November of 2000 we did not have the detail as to what was in the software and what was not." [185,186]

The 14 show stoppers cited by Mr. Regan may relate to additional product or features HP wanted Oracle to develop in the future.  Based upon my review of the Rebuttal Expert Report of Edward Yourdon, I understand that it is common for large customers to pressure software vendors to develop specific features and functions and include them in future releases. [187]  In fact, Mr. Rathjens testified that HP had lobbied Oracle to include specific features and functionality in future releases. [188]  However, whatever the nature of the 14 show stoppers, it does not appear from the evidence I have reviewed that they were necessary for the CRM software to function as agreed upon.  The CRM License Agreement itself makes no mention of the show stoppers, nor is there any evidence indicating that the agreement was contingent upon Oracle addressing or resolving these issues.  To the contrary, internal correspondence from Oracle employees who participated in the negotiations leading up to the CRM License Agreement described the show

---

[185]  *See* Rathjens Dep., at 91:4-6; *see also id.* at  91:23-92:4 ("Q. [W]ith respect to the software that was purchased in November of 2000, … was there functionality that HP thought would be part of the software that wasn't?  A. I think different people within HP had different expectations.")

[186]  The fact that HP may have had some difficulty implementing certain modules of the CRM software does not mean the software required additional production, modification or customization.  Indeed, Mr. Rathjens testified that it was very difficult to deploy software in HP's environment, that part of the delay was due to making the software function to meet HP stakeholder's acceptance criteria, and that "HP was aware that the software was being developed and some modules of the Oracle CRM software – some modules were more developed than others."  *Id.*, 72:22-24.  Indeed, Mr. Rathjens stated that HP purchased the CRM software with the understanding that additional functionality would be added later.  *Id.*, at 75:1-19 and 93:3-7.

[187]  *See* Rebuttal Report of Edward Yourdon, dated June 22, 2007, at pp. 93-94.

[188]  *See* Rathjens Dep., at 75:15-23 ("We had lots of dialogue, discussion, and process to get our requested changes into the Oracle software done by Oracle development that we expected to see in the software products at a further point in time….   And that was a big premise on which we purchased the software. That Oracle would continue to develop it to meet HP's needs.").

stoppers – much like HP's 30(b)(6) witness – as having "nothing to do" with HP's purchase of additional CRM licenses.[189,190]

Thus, I have seen no evidence that the software associated with the licenses sold as part of the CRM License Agreement required additional production, modification or customization as of November 30, 2000.  Nor is there evidence that the CRM License Agreement was contingent upon Oracle addressing or resolving the 14 show stoppers.  Because the evidence demonstrates that the show stoppers had nothing to do with the CRM License Agreement, I believe that Mr. Regan's arguments are unfounded.

3.  *ORACLE'S FEES WERE FIXED OR DETERMINABLE, AND COLLECTIBILITY WAS PROBABLE*

Paragraph 26 of SOP 97-2 requires that a vendor's fee be fixed and determinable, and that collectibility be probable, before revenue can be recognized on a software license arrangement. Mr. Regan contends that this requirement for revenue recognition was not satisfied for two reasons.[191]  First, Mr. Regan claims that the fees due under the agreement were not fixed and determinable because the final payment was not due until a year later.[192]  Second, Mr. Regan claims that the fees due under the agreement were not fixed and determinable because the

---

[189]  *See* NDCA-ORCL 020844.

[190]  As noted above, in attacking the functionality of Oracle's CRM software, Mr. Regan relies heavily upon internal HP correspondence generated nearly a year after the CRM License Agreement was executed, *see* Expert Report, at pp. 54-57.  Tellingly, these documents were created as part of HP's efforts to develop a negotiation strategy to obtain additional consulting services.  Considering the adversarial context in which these documents were created, there is some question whether they represent a fair portrayal of CRM's functionality as of November 30, 2000.  Regardless, they do not suggest that the CRM software for which HP purchased additional licenses in November 2000 required significant production, modification or customization, as described within SOP 97-2.  It is clear that Oracle did not view the software as requiring such upgrades prior to recognizing revenue on the sale of CRM licenses, considering that at the time Oracle entered into the CRM License Agreement, a number of customers – including HP – already had gone "live" with CRM software or various CRM modules.  *See* NDCA-ORCL 020728-020730.

[191]  *See* Expert Report, at pp. 58-59.

[192]  *See id.,* at p. 59.

payments due under the license agreement purportedly were subject to forfeiture, refund or other concession.[193]   As discussed below, I believe that Mr. Regan's opinions in this regard are incorrect.

The fees due under the CRM License Agreement were fixed and determinable.  HP financed the CRM License Agreement through the OCC Finance Agreement, an 11-month lease agreement that gave HP the option of converting the term licenses into perpetual licenses for an additional payment of $2.1 million, due on December 1, 2001.[194]  Notwithstanding the fact that the final payment was optional, and due a year and one day after the agreement was executed, Oracle's fees nonetheless were fixed and determinable as of November 30, 2000.  Oracle and its external auditors considered the possibility that HP would exercise its option on December 1, 2001 to convert the term licenses into perpetual licenses a virtual certainty.[195]  Over 90% of the total lease payments were due within the first 11 months.  In other words, HP could have paid $29.8 million for an 11-month software license, or HP could have opted to make the final payment under the lease agreement and obtained a perpetual license for an additional $2.1 million.  Given the circumstances, Oracle and its external auditors viewed the final payment as a bargain purchase option and, thus, treated the license agreement as perpetual in nature as of November 30, 2000.  Because Oracle and its external auditors viewed the HP transaction as a perpetual license agreement, it was appropriate for Oracle to recognize the license fees on November 30, 2000.

The fees due under the CRM License Agreement were not subject to "forfeiture, refund or other concession."  As an initial matter, there is nothing in the CRM License Agreement which grants HP any forfeiture, refund or other concession rights.   To the contrary, the CRM License

---

[193]   *See id.*
[194]   *See* HP 00050-51.
[195]   *See* AA 001339-40.

Agreement expressly provides that "[a]ll fees due under this Ordering Document shall be non-cancellable and the sums paid nonrefundable, except as provided in the Agreement."[196]

Mr. Regan cites an email that references certain concessions that Oracle previously granted to HP relating to consulting and support services covered by the August 1999 agreements.[197]  The fact that Oracle granted HP a concession on one occasion in the past is insufficient, standing alone, to require Oracle to defer the recognition of revenue based upon the potential risk for future concessions.  More importantly, the prior concession involved (i) consulting, which, as discussed above, was part of a separate contract, and (ii) services, which were deferred under the CRM License Agreement anyway.  Thus, this prior concession does not establish that the license payments due under the OCC Finance Agreement were subject to forfeiture, refund or other concession.[198]

Thus, I have seen sufficient evidence that Oracle's fees were fixed or determinable, and collectibility was probable as of November 30, 2000.

## E.    THE EFFECT ON THE SECOND QUARTER FINANCIAL STATEMENTS WAS NOT MATERIAL

For all of the reasons discussed above, I believe Oracle's decision to recognize revenue for the licenses it sold to HP on November 30, 2000 was appropriate under GAAP.  However, even

---

[196]   *See* HP 00032.  The "Agreement" referenced in the CRM License Agreement is the SLSA.  As discussed above, the Third Amendment to the SLSA eliminated the 15-day acceptance period, and provided that programs shall be deemed to be accepted by customer on delivery.  Moreover, Amendment Three to the SLSA also provided that "[a]ll fees due under this Amendment Three shall be due and payable net 30 days from date of invoice, and shall be non-cancelable and the subs paid nonrefundable."

[197]   *See* Expert Report, at p. 61.

[198]   Mr. Regan also claims that Oracle's fees were cancellable pursuant to the 15-day acceptance period under the 1994 SLSA.  *See* Expert Report, at pp. 59-60.  As discussed above, however, this provision was eliminated as part of the Amendment Three to the SLSA.

assuming that Oracle's decision to recognize revenue on this transaction during the second quarter of fiscal year 2001 was incorrect, any resulting misstatement in Oracle's financial statements would be immaterial, from either a quantitative and qualitative standpoint.  Had Oracle deferred the entire license fee due under the CRM License Agreement, Oracle still would have reported earnings per share of $0.10, consistent with analysts' consensus expectations.  Mr. Regan has identified no support to suggest that meeting consensus expectations, versus exceeding such expectations, renders any such misstatement in Oracle's reported earnings per share material.

Furthermore, even assuming that both the transfers to the bad debt reserve *and* the revenue recognized on the CRM License Agreement required adjustment, any corresponding misstatement in Oracle's second quarter financial statements would not be material  from either a quantitative or qualitative perspective.  In other words, even if Oracle's second quarter revenue was reduced by $40 million (representing the approximately $20 million adjustment to the bad debt reserve and the approximately $20 million in revenue recognized on the HP transaction), Oracle would have reported earnings per share of $0.10, consistent with analysts' consensus expectations.  This $40 million represents only 1.5% of Oracle's total revenue, and 4% of Oracle's net income after taxes, in the second quarter of fiscal year 2001.  Thus, giving Plaintiffs every benefit of the doubt, I have seen no evidence to suggest that Oracle's financial statements for the second quarter of fiscal year 2001 were materially misstated.

## VIII.   <u>CONCLUSIONS</u>

I have seen no evidence indicating that Oracle's financial statements in the second quarter of fiscal year 2001 were materially misstated.  I have seen no evidence to suggest that any of the issues raised in Mr. Regan's Expert Report, even if true, had any impact on Oracle's financial

performance in the third quarter of fiscal year 2001, or that they caused or contributed to the third quarter earnings miss.   To the extent that Mr. Regan suggests otherwise, his opinions are unfounded, incorrect and should not be relied upon.

## IX.   <u>QUALIFICATION</u>

I reserve the right to supplement and/or amend my opinions as necessary as additional documents or information is made available for my review.   I may independently, or be asked by counsel to create exhibits after the issuance of this report.   These exhibits may then be used as demonstratives during trial.   I will be available for further comment on my opinions contained herein at my deposition at some point in the future.   Further, in support of my opinions, I may also use any of the previously produced documents referred to in the body of this report or in any Exhibit hereto.

Very truly yours,

*This report has been prepared by:*

J. Duross O'Bryan, Managing Director

52

EXHIBIT 6



**LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
ROBBINS** LLP

SAN DIEGO • SAN FRANCISCO<br>
LOS ANGELES • NEW YORK • BOCA RATON<br>
WASHINGTON, DC • HOUSTON<br>
PHILADELPHIA • SEATTLE

Eli R. Greenstein
EliG@Lerachlaw.com

July 2, 2007

<u>VIA FACSIMILE</u>

Brian T. Glennon, Esq.
LATHAM & WATKINS LLP
633 West 5th Street, Suite 4000
Los Angeles, CA 90071-2007
213/891-8763

   Re: *In re Oracle Corporation Sec. Litig.*
     Master File No. C-01-0988-MJJ (N.D. Cal.)

Dear Brian:

   I write regarding defendants' June 22, 2007 letter and production of documents concerning Oracle's recognition of revenue on a deal with Hewlett Packard on the last day of 2Q01. As an initial matter, Oracle's failure to produce, and reliance upon, relevant documents that were never given to plaintiffs or their experts until *after* opening and rebuttal reports were already exchanged (some of which have still not been produced), is a serious abuse of the Federal Rules of Civil Procedure and has resulted in extreme prejudice to plaintiffs and their experts. We will address the legal ramifications of defendants' conduct at the appropriate time. In any event, the production on June 22, 2007 is deficient in several respects.

   First, Mr. O'Bryan relies heavily upon certain documents in his rebuttal report purportedly produced by Arthur Andersen (*e.g.,* AA 001339-40) that were never produced to plaintiffs. *See* O'Bryan Rebuttal Report at n.114, 142. Please produce the documents immediately and confirm that Mr. O'Bryan has not considered, reviewed or relied upon any other documents that were not produced to plaintiffs in this case.

   Second, there appears to be extensive hand-written notations and calculations on the documents (*e.g.,* NDCA-ORCL 3043040-47; 3043057; 3043078; 3043085-86; 3043104-115). Please identify the author(s) of the notes immediately.

   Third, it appears that Oracle produced incomplete copies of the email marked as NDCA-ORCL 3043117. That email states in the bottom left hand quarter that it is "Page 1 of 2" but the second page is missing. Further, the first page is missing from documents NDCA-ORCL 3043025-39 and 3043041-47. Finally, it appears that the fax at NDCA-ORCL 043104-15 is missing pages 003, 008-009. Please produce the missing pages immediately.

   Fourth, NDCA-ORCL 3043126-128 is a string of emails one of which is marked "ATTORNEY-CLIENT PRIVILEGED INFORMATION." It appears to contain discussions between Oracle's in-house counsel Shelley Curtis and other Oracle personnel concerning the time that



LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
& ROBBINS LLP

Brian T. Glennon, Esq.
July 2, 2007
Page 2

the HP deal was actually executed and concerns raised by Arthur Andersen about the timing of the deal. Based on your production of this document voluntarily, and Mr. O'Bryan's express reliance on the privileged content of the communication in his rebuttal report, clearly, this document was not produced inadvertently. Consequently, defendants have waived any purported privilege as to all other documents and communications regarding the subject matter of the email, including the timing of the execution of the HP contracts, and communications and review by Oracle and Arthur Andersen in connection with the HP transaction discussed in the documents.

Fifth, Oracle has failed to identify the source of the documents. Please provide the source immediately so that plaintiffs and their experts may properly analyze the documents prior to depositions.

Finally, given that it appears that defendants have produced only a select few self-serving documents relating to the propriety of the HP transaction, we demand all documents relating to the HP transaction booked as revenue on November 30, 2000, including any review by Arthur Andersen and Oracle's internal personnel concerning the propriety of the deal. While we understand defendants' position on the non-discoverability of the HP transaction, we respectfully disagree. Extensive (but incomplete) discovery has already taken place with defendants' involvement, including a subpoena issued to HP regarding the 2Q01 transaction without any objection from defendants. Oracle's unilateral production of a handful of incomplete documents on the topic, and improper use of documents for the first time in an expert rebuttal report, both waives and renders moot any purported argument that may have existed concerning the non-discoverability of the HP transaction.

Given that the issues raised above are relevant and necessary to the impending depositions of both Mr. O'Bryan and Mr. Regan, the issues must be addressed immediately to avoid further prejudice and Court intervention.



Brian T. Glennon, Esq.
July 2, 2007
Page 3

Please call me if you have any questions.

Very truly yours,

Eli R. Greenstein

ERG:cmb

cc:     Paul Konovalov

T:\CasesSF\Oracle3\Corres\Glennon_7-2-07_(ERG)Letter.doc

EXHIBIT 7



LEXSEE

●
Warning
As of: Jul 12, 2007

**DONALD W. FARNHAM, Plaintiff and Appellant, v. WILLIAM REHWALD, INC., et al., Defendants and Respondents.**

**B170124**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DI-VISION SEVEN**

**2005 Cal. App. Unpub. LEXIS 3107**

**April 5, 2005, Filed**

**NOTICE:**  [*1]  NOT TO BE PUBLISHED IN OFFI-CIAL REPORTS. CALIFORNIA RULES OF COURT, RULE 977(a), PROHIBIT COURTS AND PARTIES FROM CITING OR RELYING ON OPINIONS NOT CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED, EXCEPT AS SPECIFIED BY RULE 977(B). THIS OPINION HAS NOT BEEN CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED FOR THE PURPOSES OF RULE 977.

**PRIOR HISTORY:**  APPEAL from a judgment of the Superior Court of Los Angeles County, No. BC252549. Robert H. O' Brien, Judge.

**DISPOSITION:**  Reversed and remanded.

**CORE TERMS:** coverage, settlement, underlying ac-tion, causes of action, defamation, demurrer, malpractice, contingency, nonsuit, fiduciary duty, fee agreement, in-surance policies, arbitration, expert testimony, burden of proof, leave to amend, insured, advertising injury, col-lectibility, homeowners', billing, termination, legal mal-practice, personal injury, provide coverage, shareholder, speculative, speculation, probability, susceptible

**COUNSEL:** Cotkin, Collins & Ginsburg, Joan M. Cot-kin and Terry L. Kesinger for Plaintiff and Appellant.

Manning & Marder Kass, Ellrod, Ramirez, David J. Wil-son and Robert C. Jenkins for Defendants and Respon-dents.

**JUDGES:** PERLUSS, P. J.; WOODS, J., ZELON, J. concurred.

**OPINION BY:** PERLUSS

**OPINION**

In this legal malpractice action the trial court sus-tained without leave to amend demurrers to certain of Donald W. Farnham's claims against his former attorneys and ultimately entered a judgment of nonsuit as to his remaining claims. On appeal Farnham contends those dispositive rulings, as well as certain evidentiary rulings at trial, were erroneous. We reverse the judgment be-cause the trial court abused its discretion when it sus-tained demurrers [*2] to Farnham's claims for fraud and breach of fiduciary duty without leave to amend. In all other respects, we affirm the trial court's orders.

**FACTUAL AND PROCEDURAL BACKGROUND**

*1. Farnham's Employment With Sequoia*

Farnham was the chief executive officer and chair-man of the board of Sequoia Holdings and Sequoia Crea-tive, Inc. (collectively Sequoia) until he was accused of stock fraud by members of his boards of directors. A letter sent by those directors, addressed "Dear Sequoia Stockholder" and referring to "the exercise of question-able stock options by company president and board chairman Mr. Donald Farnham," caused a major transac-tion spearheaded by Farnham to collapse. A memoran-dum written by one of the directors, which was also dis-tributed to various shareholders, vendors and clients,

"strongly" recommended Farnham's termination because he had "placed the entire board in a compromising position." Shortly after the publication of these materials Farnham concluded he had been constructively discharged; he resigned from Sequoia in December 1993.

### 2. Rehwald's Representation of Farnham

In March 1994 Farnham engaged William Rehwald and his law firm Rehwald [*3] Rameson Lewis & Glasner (collectively Rehwald) to represent Farnham in an action for wrongful termination and defamation against Sequoia and certain of its officers, directors and affiliated entities. The parties signed a contingency fee agreement providing Rehwald was to receive one-third of all amounts obtained by settlement, arbitration award or judgment.

In April 1994 Rehwald filed the underlying action, *Donald W. Farnham v. Sequoia Holdings, Inc. et al.*, Los Angeles Superior Court case number BC103544. Named as defendants were Sequoia Holdings, Inc., Sequoia Creative, Inc., Edward R. Whitehurst, Q. David Schweninger, Frank C. Romanski, William P. McCrory, Joseph H. Brown and Amelia A. Gordon. The complaint alleged Whitehurst, Schweninger, Romanski, Brown and Gordon were directors and officers of Sequoia Holdings and Sequoia Creative and shareholders of Sequoia Holdings; McCrory was a shareholder in Sequoia Holdings and Schweninger was the president, chief executive officer, director and chairman of the boards of Sequoia Holdings and Sequoia Creative.

The complaint alleged causes of action for breach of written contract, wrongful termination (constructive discharge in [*4] violation of public policy), wrongful denial of a contract, interference with contractual relations, defamation, intentional and negligent infliction of emotional distress and breach of corporate fiduciary duties and requested an accounting. An amendment to the complaint, filed in October 1994, alleged some $ 11.4 million in damages plus "annual bonuses, profit sharing, increased stock value, etc.," which were described as "value unknown."

Schweninger filed a cross-complaint for defamation against Farnham. Rehwald tendered the defense of the cross-action to Fireman's Fund Insurance Company, which appointed Rehwald as independent counsel to represent Farnham in defending the defamation claim. (See Civ. Code, § 2860; *San Diego Federal Credit Union v. Cumis Ins. Society, Inc.* (1984) 162 Cal. App. 3d 358, 208 Cal. Rptr. 494 (*Cumis*).) [1] The cross-complaint was settled in October 1995. Rehwald was paid $ 50,000 by Fireman's Fund for his representation of Farnham in defense of the cross-complaint.

---

1 Farnham contends Sequoia had three insurance policies that applied to the underlying action: One issued by Fireman's Fund Insurance Company, one issued by National Union and one issued by the Insurance Company of Pennsylvania. Sequoia tendered defense of Farnham's action to Fireman's Fund in July 1994.

[*5] Romanski died intestate in July 1994. Rehwald lawyer Jack Rameson opened an estate to pursue Farnham's creditor's claim against Romanski. [2] In furtherance of that goal Rameson arranged for Farnham to be appointed administrator of the Romanski estate. Rehwald substituted the Romanski estate as a defendant in the Sequoia action on March 22, 1995. On behalf of Farnham as administrator of the Romanski estate, Rehwald also tendered the estate's defense to Fireman's Fund.

> 2 Farnham was billed separately for Rameson's work on an hourly basis. This separate billing forms the basis for one of Farnham's claims in the action against his former attorneys.

While awaiting a response from Fireman's Fund, Rehwald engaged in settlement negotiations with Romanski's daughter Julia. They ultimately agreed to a stipulated judgment for $ 2 million, in exchange for Farnham's covenant not to pursue the individual assets of Romanski's heirs. The estate also assigned to Farnham any claims it might have had against Fireman's Fund for [*6] failing to defend the action.

In 1996 Rehwald represented Farnham in an arbitration of Farnham's claims against Sequoia, pursuant to an arbitration agreement in Farnham's employment contract. The arbitrator found in favor of Farnham on both his defamation and breach of contract claims and awarded $ 1.5 million compensatory damages. Fireman's Fund paid $ 500,000 of the award, the portion attributed by the arbitrator to his defamation damages, pursuant to "Coverage B -- Personal and Advertising Injury Liability" in Sequoia's policy. [3] It also paid the costs of arbitration.

> 3 The Fireman's Fund policy specifically included within its personal injury coverage "injury, other than bodily injury, arising out of [P] . . . [P] oral or written publication of material that slanders or libels a person or organization."

The Sequoia action, which had been stayed as to the individual officers and directors during the arbitration proceedings, resumed as to those defendants. Whitehurst and Brown filed demurrers to the [*7] defamation claim asserted against them, relying on the "sole remedy" provision in Farnham's employment contract. [4] The trial court sustained the demurrers without leave to amend.

Rehwald filed a petition for writ of mandate on behalf of Farnham, and Division One of this court reversed the trial court's order in a published decision, *Farnham v. Superior Court* (1997) 60 Cal.App.4th 69, holding the contractual provision at issue barred claims against Whitehurst and Brown for actions within the scope of their duties as Sequoia directors but did not bar claims arising from actions taken purely in furtherance of their own self-interest. (*Id.* at p. 77, fn. 6.) Such individual actions, however, would not be covered by Sequoia's insurance policies.

> 4   The employment contract provided, "'Sole Remedy. . . . [Farnham] further waives any right he may have for a lawsuit for damages against any shareholder, director, officer, or employee of [Sequoia] for any claim, cause of action, damage, cost, or expense, arising from, in connection with, or in relation to, the terms and provisions of this Agreement or any breach thereof.'" (See *Farnham v. Superior Court* (1997) 60 Cal.App.4th 69, 71-72, italics omitted.)

[*8]  In the summer of 1998 Farnham and the individual defendants participated in a mediation of Farnham's remaining claims. Ultimately, Farnham agreed to settle those remaining claims for an additional $ 500,000. [5] This represented the remaining available policy limits of Sequoia's Fireman's Fund insurance policy. Farnham retained his rights to proceed against Fireman's Fund for any claims the Romanski estate might have had. [6]

> 5   Sequoia Creative had by this time declared bankruptcy and apparently had no assets with which to pay a judgment or fund a settlement.

> 6   By the time of the settlement, the relationship between Farnham and Rehwald was strained at best. In a letter to Rehwald dated July 20, 1998, he said, "You win!!! [P] I am not able to fight the opposition, their attorney(s) and you at the same time. This is the first time I have ever been involved in a negotiation where the only participants supposedly were on the same side . . . that seems to be the approach you prefer." However, he did approve the settlement after obtaining a second opinion from the experienced business litigator who had served as the arbitrator in the arbitration proceeding.

[*9]  After the Sequoia action settled Rehwald filed a complaint against Fireman's Fund on November 2, 1998. The action sought to collect the $ 2 million stipulated judgment and alleged causes of action for breach of the implied covenant of good faith and fair dealing, interference with economic relations and intentional infliction of emotional distress. Fireman's Fund's demurrer to the second and third causes of action were sustained without leave to amend. The trial court then granted summary judgment on the first cause of action for breach of the implied covenant of good faith and fair dealing. The judgment was affirmed on appeal by Division Three of this court in an unpublished opinion. (*Farnham v. Fireman's Fund Insurance* (Aug. 30, 2000, B135463) [non-pub. opn.].)

### 3. *The Malpractice Action*

Farnham filed the present action on June 18, 2001, alleging claims for professional negligence, breach of fiduciary duty and fraud against William D. Rehwald individually, as well as his three partners and their law firm. Rehwald's demurrers to the breach and fiduciary duty and fraud claims were sustained without leave to amend on August 31, 2001. As to the second cause of action, [*10]  the court ruled, "Plaintiff contends that Defendants breached their duty of loyalty by placing their own interests in collecting their fees above their client's interests. This court does not read *Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1089 so broadly as to stand for the proposition that an attorney's interest in earning fees or even fee disputes involve an issue of 'loyalty' are sufficient to raise a breach of fiduciary duty claim." As to the third cause of action, the trial court ruled, "The mere claim of a misbilling or an inadequate settlement without facts that Defendants intended to mis-bill or inadequately settle the case when the agreement was entered into is fatal to this fraud claim. [P] Furthermore, the Complaint is alleged against two corporations, an association, and four individuals. Plaintiff failed to allege the names of the persons who made the misrepresentations, their authority to speak for the corporation, to whom they spoke and what they said."

Farnham's remaining cause of action for professional negligence was based on Farnham's contention Rehwald failed to preserve a bad faith claim against Fireman's Fund, failed to search for individual [*11]  defendants' assets, refused to share *Cumis* counsel fees with Farnham pursuant to the parties' contingency fee agreement and negligently settled the action for a fraction of its worth rather than proceeding to trial.

### 4. *The Trial Court's Rulings*

Farnham's malpractice claim rested on two primary points: Rehwald failed to pursue funding sources for settlement or recovery at trial beyond the $ 1 million actually paid by Fireman's Fund, and Rehwald did not adequately protect Farnham's ability to assert a bad faith claim against Fireman's Fund based on its handling of the defense of the Romanski estate. Both theories of malpractice were greatly undercut by the trial court's rulings before a jury was ever impaneled.

In response to multiple motions in limine filed by Rehwald, the trial court first precluded Farnham from introducing evidence Rehwald had committed malpractice by failing to obtain coverage under Sequoia's insurance policies (other than from Fireman's Fund) unless Farnham could first establish coverage had in fact been available under those policies. Second, the court precluded Farnham from offering evidence Farnham was negligent in failing to obtain more than $ 1 million [*12] from Fireman's Fund unless he could establish the policy's limit of coverage for defamation was more than $ 1 million. Third, the court precluded Farnham from referring to the assets of the Romanski estate as a source of recovery in the underlying action unless he could establish the estate actually had such assets. Fourth, the court ruled, in response to Rehwald's motion seeking to exclude certain testimony by Farnham's experts, that "speculative and conjectural evidence will not be admitted." Finally, it bifurcated for an initial non-jury portion of the trial "various at-law issues" including the existence of insurance coverage for the claims in the underlying action and whether the Romanski estate had any assets.

After conducting the bench portion of the trial, but before issuing its rulings, the trial court denied Farnham's motion to shift the burden of proof on the issue whether the homeowners' insurance policies of the individual defendants in the underlying action would have provided additional settlement money. This motion had been based on Farnham's contention the policies were unavailable because Rehwald had unreasonably failed to obtain and preserve them during the underlying [*13] litigation. (See *Galanek v. Wismar (1999) 68 Cal.App.4th 1417* [party who destroyed physical evidence in product liability action bore the burden in subsequent malpractice action of proving that the missing evidence would not have changed outcome of underlying action].)

After additional briefing and argument the court issued a written ruling on the non-jury issues on August 4, 2003. In addition to confirming the denial of Farnham's motion to shift the burden of proof, the court ruled the Romanski estate did not have any assets and precluded Farnham from referring to the estate in front of the jury as a possible source of recovery. The court also determined there had been no available coverage under Sequoia's National Union and Insurance Company of Pennsylvania liability policies and found the Fireman's Fund policy provided only a total of $ 1 million in potential coverage for defamation and no coverage for conversion in the underlying action. The court thus concluded the only insurance coverage available with respect to the underlying action was the $ 1 million Fireman's Fund had already paid. Finally, the court determined the *Cumis* counsel fee received by Rehwald [*14] was not a "form of recovery" within the meaning of the parties' contingency fee agreement.

Following these rulings, at a hearing on August 5, 2003 the trial court held Farnham's offer of proof regarding the personal assets of the individual Sequoia defendants, consisting of the expert testimony of J. Duross O'Bryan as to the value of those assets, was inadequate to submit to the jury the issue whether Rehwald should have obtained a better settlement by attempting to reach those assets. The court concluded the expert's testimony was simply too speculative, based on his failure to specify the basis for his opinion as to value, and his failure to include any analysis of the individual defendants' debts or liens.

At this point the only aspect of the malpractice claim remaining for the jury was Farnham's contention that Rehwald had been negligent in failing to obtain a judgment against the Romanski estate that would have supported a bad faith claim against Fireman's Fund. To prove this claim, Farnham presented evidence, primarily expert testimony from an experienced business and insurance litigator, that Rehwald should not have entered into a stipulated judgment with the Romanski estate, [*15] which triggered the "no action" clause in the Fireman's Fund policy, but should either have taken the estate's default when it initially failed to answer the complaint and proceeded to a default prove-up or insisted on binding arbitration or a private trial before a retired judge against the Romanski estate. The expert referred to these options as "Plan A" and "Plan B."

Following completion of Farnham's case-in-chief, Rehwald moved for nonsuit. The court granted the motion, ruling the evidence presented was "just speculation" and insufficient to warrant sending the claim to the jury because it could not support a finding of "but for" causation.

## CONTENTIONS

Farnham contends the trial court erred when it (1) sustained Rehwald's demurrer without leave to amend; (2) excluded the expert testimony of J. Duross O'Bryan; (3) found none of Sequoia's three insurance policies provided coverage for the claims in the underlying action other than the $ 1 million paid by Fireman's Fund; (4) failed to shift the burden of proof to Rehwald to show the individual defendants in the underlying action did not have insurance available to satisfy a judgment or settlement; (5) granted Rehwald's [*16] motion for nonsuit and (6) found Farnham was not entitled to a portion of the *Cumis* fees paid to Rehwald.

## DISCUSSION

### 1. *The Trial Court Abused Its Discretion By Sustaining Rehwald's Demurrers Without Leave to Amend*

Farnham's second and third causes of action for breach of fiduciary duty and fraud were both based in part on his allegation Rehwald had falsely represented the status of probate lawyer Jack Rameson as an independent contractor when, in fact, Rameson was a partner in Rehwald's firm. By this misrepresentation Rehwald was able to circumvent the parties' contingency fee agreement and to collect an hourly fee for Rameson's work. The second cause of action also alleged Rehwald had breached his fiduciary duty by pressuring Farnham into accepting a settlement, thereby "placing [his] own interests to obtain immediate payment of a contingency fee ahead of the interests of [his] client."

In *Bird, Marella, Boxer & Wolpert v. Superior Court* (2003) 106 Cal.App.4th 419, decided more than one year after the trial court sustained Rehwald's demurrers to the second and third causes of action, this court held "an attorney owes the client a fiduciary [*17] duty "'of the very highest character." . . .' This fiduciary duty requires fee agreements and billings "'must be fair, reasonable and fully explained to the client."'" (*Id.* at pp. 430-431, fn. omitted.) (See also *id.* at p. 432 [criminal defendant has primary right "to be billed in accordance with the retainer agreement and to be free from unethical or fraudulent billing practices on the part of defense counsel"].)

In sustaining the demurrer to the second cause of action, the trial court failed to address the allegation that Rehwald had breached his fiduciary duty by misrepresenting Rameson's status and therefore improperly billing for his services as if he were an independent contractor. In light of our decision in *Bird, Marella, Boxer & Wolpert v. Superior Court, supra,* 106 Cal.App.4th 419, Farnham adequately pleaded his causes of action for breach of fiduciary duty and fraud based on his allegation that Rehwald's billing for Rameson's services was unethical and fraudulent. Accordingly, it was error to sustain the demurrers to the second and third causes of action. [7] Although Farnham also alleged Rehwald breached his duty [*18] of loyalty by pressuring Farnham to accept the proposed settlement as to the individual defendants, any error in sustaining the demurrers as to this claim was harmless because, as we discuss below, the trial court correctly held in its subsequent rulings that Farnham suffered no cognizable damage as a result of Rehwald's conduct.

> 7  To the extent Farnham's fraud cause of action failed to specifically allege the identity of the individuals who purportedly misrepresented Rameson's status with the law firm and the nature of the firm's billing arrangements with Farnham

or the speakers' authority to bind the partnership, Farnham should have been given an opportunity to cure those defects by amendment, as he asserts he can.

### 2. *The Court Did Not Abuse Its Discretion in Excluding the Testimony of J. Duross O'Bryan*

The plaintiff in a litigation legal malpractice action must prove that but for the negligence of his or her attorney in the underlying action, a better, collectible result would have been achieved [*19] either in the form of a verdict and judgment or an improved settlement. (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 970; *Barnard v. Langer* (2003) 109 Cal.App.4th 1453, 1463.) In the present case Farnham attempted to prove the collectibility of an enhanced settlement or judgment entirely through the expert testimony of J. Duross O'Bryan, who had given deposition testimony as to the value of certain assets purportedly owned by the individual defendants in the underlying action. The trial court excluded this evidence as unduly speculative and therefore insufficient to prove collectibility.

A trial court exercises broad discretion when ruling on the admissibility of expert testimony under Evidence Code section 801. [8] We review the exclusion of expert testimony on the ground that there is no reasonable basis for the opinion for abuse of discretion. (*People v. Mickey* (1991) 54 Cal.3d 612, 687-688, 286 Cal. Rptr. 801; *People v. Bui* (2001) 86 Cal.App.4th 1187, 1196.)

> 8  Evidence Code section 801 provides, "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [P] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [P] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

[*20] The trial court's exclusion of O'Bryan's testimony was neither arbitrary nor capricious and certainly did not "exceed the bounds of reason." (*People v. Brown* (2003) 31 Cal.4th 518, 534 ["'A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that re-

sulted in a manifest miscarriage of justice.' [Citation.]"]; *St. Paul Mercury Ins. Co. v. Frontier Pacific Ins. Co.* (2003) 111 Cal.App.4th 1234, 1251 [""'Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered.'" [Citation.]"].) O'Bryan offered no evidence of the individual directors' equity in the assets he purportedly valued or their overall net worth. In fact, nothing in his testimony addressed whether they could in fact have paid any portion of a judgment or settlement against them individually. Moreover, the values to which O'Bryan testified were based on appraisals conducted in 2003, rather than at the time of the [*21] underlying action.

A similar situation was presented in *Garretson v. Harold I. Miller* (2002) 99 Cal.App.4th 563, 572. In affirming the trial court's order granting a judgment notwithstanding the verdict because the plaintiff had failed to prove collectibility, the Court of Appeal explained, "Turning now to the facts of this matter, plaintiff contends evidence was presented that Dr. Ask was a practicing dentist and owned Jackson Creek, an entity with 25 employees. According to plaintiff, 'the jury was well warranted in concluding that Ronald Ask was a significant income earner just as the result of his dental practice.' Plaintiff further cites evidence that Ask developed the 7,500-square-foot office building housing Jackson Creek and other tenants, which generated rental income, and Ask was 'involved in seven or eight other projects with the same contractor he used in constructing this building.' [P] Notwithstanding the foregoing, plaintiff presented no evidence of Ask's income, expenses, or debts. No evidence was presented that he was insured against property, or liability, claims. From this record, one cannot determine whether Ask had any positive net income, net [*22] worth, or other means of satisfying a judgment. Plaintiff argues it is mere speculation that Ask may have been on the verge of bankruptcy. This is true. However, this speculation is the result of plaintiff's failure to satisfy her burden of presenting evidence of collectibility. Defendant had no burden of presenting evidence of Ask's debts and expenses." (*Ibid.*) As in *Garretson*, the trial court in the present case did not abuse its discretion in excluding O'Bryan's testimony based on its conclusion that evidence of assets alone, divorced from evidence of the rest of the individual directors' financial condition, cannot support a jury finding of collectibility in a legal malpractice action.

3. *The Trial Court Did Not Err In Denying Farnham's Motion to Shift the Burden of Proof to Rehwald Regarding the Individual Directors' Homeowners' Insurance Coverage*

When a legal malpractice case is premised upon mishandling of a products liability action and the product alleged to have caused the original injury is not available due to the original attorney's negligence, the trial court may shift the burden of proof on the issue of the product's defective condition to the attorney [*23] for purposes of the case-within-a-case portion of the malpractice action. For example, in *Galanek v. Wismar, supra*, 68 Cal.App.4th 1417, the plaintiff was injured in an automobile accident. The plaintiff presented evidence the attorney in the underlying action failed to preserve the plaintiff's car, making it impossible for her to prove the driver's seat was defective. Accordingly, the court in the legal malpractice action properly shifted the burden to the attorney to prove the seat was not defective, rather than requiring his client to prove the seat was defective and a better result could have been obtained in the underlying action but for the lawyer's negligence. (*Id.* at pp. 1425-1426.) The rationale for this shift in the burden of proof was explained in *Thomas v. Lusk* (1994) 27 Cal.App.4th 1709, 1717-1718: "In negligence and products liability cases, the doctrine has evolved that the burden of proof on the issue of causation may be shifted to the defendant where demanded by public policy considerations. [Citation.] [P] 'The shift of the burden of proof . . . may be said to rest on a policy judgment that when there is a [*24] substantial probability that a defendant's negligence was a cause of an accident, and when the defendant's negligence makes it impossible, as a practical matter, for plaintiff to prove "proximate causation" conclusively, it is more appropriate to hold the defendant liable than to deny an innocent plaintiff recovery, unless the defendant can prove that his negligence was *not* a cause of the injury.' [Citations.] The essential principle underlying this narrow exception to the usual allocation of proof is that the burden of proving an element of a case is more appropriately borne by the party with greater access to information. [Citations.] '[A] defendant who is in a better position to discover and preserve . . . evidence should not be permitted to profit from the plaintiff's inability to produce it.' [Citation.]"

Farnham contends this rule should apply to shift to Rehwald the burden of proving the individual directors' homeowners' policies would not have covered the injuries alleged in the underlying action. The trial court properly rejected Farnham's contention, finding the burden-shifting procedure inappropriate because the missing evidence had been equally available to [*25] both parties. Although Farnham produced evidence that he had been unable to obtain the homeowners' policies from the individual defendants, there was no showing that Rehwald was in any way responsible (through action or inaction) for that unavailability or that Farnham had exhausted all other means of obtaining the policies.

Even in malpractice cases arising from products liability actions, "no definitive or 'general rule' exists

which delineates the circumstances under which the defendant . . . must prove noncausation of the plaintiff's injuries. [Citation.]" (*Thomas v. Lusk, supra,* 27 Cal.App.4th at p. 1717.) "A shift in the normal allocation of the burden of proof is based upon consideration of a '"number of factors: the knowledge of the parties concerning the particular fact, the availability of the evidence to the parties, the most desirable result in terms of public policy in the absence of proof of the particular fact, and the probability of the existence or nonexistence of the fact."' [Citation.]" (*Ibid.*) These factors do not support burden shifting in this case. Unlike the missing hammer in *Thomas v. Lusk, supra,* 27 Cal.App.4th 1709, [*26] or the car seat in *Galanek v. Wismar, supra,* 68 Cal.App.4th 1417, the homeowners' insurance policies at issue were never in Rehwald's exclusive possession or control. Moreover, the probability that the insurance policies would have provided coverage for Farnham's employment-related claims is extremely low: Farnham's own litigation/insurance expert opined that homeowners' or personal umbrella policies "would normally exclude employment-related conduct under the business pursuits exclusion." No compelling public policy justifies presuming to the contrary.

### 4. *The Trial Court Did Not Err in Finding Farnham Was Not Entitled to a Portion of the Cumis Fees Paid to Rehwald*

The parties' contingency fee agreement provided, "Attorney will only be compensated for legal services rendered if a recovery is obtained for Client. . . . [P] The fees to be paid by Client to Attorney will be Thirty-three and one-third percent (33 1/3%) of the total of all amounts received by settlement, arbitration award or judgment." It further provided, "Client represents that Client does not know of any related legal matters that would require legal services to be provided under [*27] this Agreement. . . . If such matters arise later, Client agrees that this Agreement does not apply to any such related legal matters . . . ."

The trial court found, "the $ 50,000 *Cumis* attorney fee received by Mr. Rehwald was not a 'form of recovery' within the meaning of the contingency fee agreement. No testimony or other evidence to the contrary would be relevant or admissible in the jury phase of the trial. The Contingency fee agreement is not susceptible to an interpretation otherwise. The agreement relates only to fees earned from any settlement, arbitration or judgment."

Farnham contends the *Cumis* fees paid directly to Rehwald constituted a "recovery" under the contingency fee agreement, that he was entitled to two-thirds of that payment and that the trial court erred in refusing to submit the issue to the jury. We agree with the trial court's conclusion that the language of the contingency fee agreement is not reasonably subject to Farnham's interpretation, notwithstanding Farnham's testimony that he understood the agreement to include such payments.

Although extrinsic evidence is admissible to demonstrate ambiguity in a contract and to resolve such ambiguity [*28] (*LaCount v. Hensel Phelps Constr. Co.* (1978) 79 Cal. App. 3d 754, 770, 145 Cal. Rptr. 244), the express language of the contract must be given effect if it is clear and explicit. (Civ. Code, § 1638; *Southern Cal. Edison Co. v. Superior Court* (1995) 37 Cal.App.4th 839, 847 ["When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is 'reasonably susceptible' to the interpretation urged by the party. If it is not, the case is over."]; *United Teachers of Oakland v. Oakland Unified Sch. Dist.* (1977) 75 Cal. App. 3d 322, 330, 142 Cal. Rptr. 105 ["Whether the contract is reasonably susceptible to a party's interpretation can be determined from the language of the contract itself"].)

The parties' agreement limits the application of the contingency fee percentage to "amounts received by settlement, arbitration award or judgment." It is beyond question that the *Cumis* fees received by Rehwald do not fall into any of those three categories. Farnham's vague testimony to his subjective understanding of the agreement is insufficient to create a jury [*29] question where none exists on the face of the document.

"'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.*, § 1639.) The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" (*id.*, § 1644), controls judicial interpretation. (*Id.*, § 1638.) Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning.' [Citations.] [Citation.]" (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 608.) Accordingly, the trial court committed no error in refusing to submit the matter to the jury. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865, 44 Cal. Rptr. 767 ["The interpretation of a written instrument, even though it involves what might properly be called questions of fact [citation], is essentially a judicial function [*30] to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect. [Citations.] . . . It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence."].)

*5. The Trial Court Did Not Err in Finding No Additional Insurance Coverage Was Available for Farnham's Claims in the Underlying Action*

### a. The Trial Court's Order

The trial court's August 4, 2003 order on the issues tried in the non-jury phase of the trial provided in part, "The court finds that neither the National Union nor the Foreign CGL policy [issued by the Insurance Company of Pennsylvania] provide any indemnity coverage for the incidents and issues in the underlying lawsuit. Also, the Fireman's Fund policy that did provide coverage was exhausted and there was no other fund available, that is, the limit was $ 1,000,000 not $ 2,000,000. Accordingly, the three policies are irrelevant in this lawsuit because they could not have been resources to pursue in collecting any possible judgment or increased settlement against the underlying defendants.

[*31] "Even if, as plaintiff argues, defendants were negligent in handling his affairs in the underlying case, he still must show that but for the negligence he would have received a better collectible result, either in the form of a verdict and/or judgment, or a better settlement. In order to do that plaintiff must establish that any better verdict or settlement result would be collectible. In this case plaintiff relies on the three subject policies (Fireman's -- Exhibit 60, National Union -- Exhibit 59 and Foreign CGL -- Exhibit 61) and the possibility of insurance policies of the individual defendants in the underlying case. As established in this order the three subject policies are of no avail nor can plaintiff show the existence of any individual policy. Thus, plaintiff has no evidence of collectibility of any better result relating to a claim against these policies."

### b. The Fireman's Fund Policy

The Fireman's Fund policy covered defamation claims against Sequoia and its officers and directors in their official, rather than individual, capacities under the policy's coverage B -- personal and advertising injury liability. Coverage A -- bodily injury and property damage liability [*32] -- was not applicable in this case.

Farnham does not dispute that his claims in the underlying action were covered, if at all, only by coverage B. Nor is there any issue that the policy specifies the limits of liability under coverage B as $ 1 million. Nonetheless, noting that the policy also provides for a "general aggregate limit" of $ 2 million for coverages A and B, Farnham argues, without citation to any authority, that the $ 2 million aggregate limit governs the multiple incidents of defamation (the letter and the memorandum) in this case. Farnham's interpretation of the applicable limits of coverage, however, is contrary to the plain language of section III, paragraph 4 of the policy, which

states "the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all personal injury and all advertising injury sustained by any one person or organization." Although the general aggregate limit would permit two separate awards of $ 1 million each under coverage B for personal and advertising injury, including defamation, sustained by two different persons, the policy makes it clear that the $ 1 million coverage B limit applies [*33] to Farnham's claims regardless of how many separate acts of defamation he suffered. (See *Atlantic Mutual Ins. Co. v. Ruiz* (2004) 123 Cal.App.4th 1197, 1214 ["'Words used in an insurance policy are to be interpreted according to the plain meaning which a layman would ordinarily attach to them. Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists. [Citations.]' [Citation.]"].)

### c. The National Union Policy

Sequoia's National Union policy provided directors and officers (D & O) liability insurance for wrongful acts committed by the covered individuals "in their respective capacities as directors or officers." The policy expressly excluded injuries from "oral or written publication of a libel or slander or of other defamatory or disparaging material." In addition, the policy excludes actions brought by one insured (an officer or director of Sequoia, such as Farnham) against another insured (the individual directors named in Farnham's Sequoia action). As with the parties' contingency fee agreement, we construe the insurance policies according to their plain meaning. (*Atlantic Mutual Ins. Co. v. Ruiz, supra,* 123 Cal.App.4th at p. 1214.) [*34] The National Union policy defines "insureds" as "any past, present or future duly elected or appointed Directors or Officers of the Company." There is no question that Farnham was an insured, as were the individual defendants in the underlying action.

Farnham nonetheless contends the National Union policy excepts wrongful termination claims from the insured-against-insured exclusion. To be sure, paragraph 4(i) of the National Union policy, which excludes from coverage actions "which are brought by any insured or the Company," also provides "this exclusion shall not apply to wrongful termination of employment claims brought by a former employee other than a former employee who is or was a Director of the Company." Thus, Farnham is partially correct in asserting that wrongful termination claims are generally outside the scope of the insured-against-insured exclusion, but this exception to the exclusion expressly does not apply to claims brought by "a former employee who is or was a Director of the Company." Because Farnham is indisputably a former employee who is or was a Sequoia director, the exclusion applied to his claims; and there was no possibility of coverage. Accordingly, the [*35] trial court properly

excluded evidence that the National Union policy might have provided a source of recovery for Farnham's claims.

#### d. *The Foreign CGL Policy*

In holding the so-called Foreign CGL Policy, issued by The Insurance Company of Pennsylvania, did not provide coverage for the underlying action, the trial court relied on the policy's definition of "Coverage Territory," which "means anywhere in the world excluding: [P] a. the United States of America [and certain other enumerated places]," and concluded this provision provides coverage only for actions actually brought in the courts of a foreign country. We agree with Farnham that the territorial provision at issue is equally susceptible to the interpretation that coverage is available if the injury occurred outside the United States, whether or not the action to recover for the injury was initiated in this country. (Cf. *Industrial Indem. Co. v. Apple Computer* (1999) 79 Cal.App.4th 817, 839 [foreign territory provision provides coverage for injury in England].)

We agree with the trial court, however, that even if the Foreign CGL Policy potentially applied to actions brought in the United States, [*36] the policy has an express exclusion of coverage for the claims in the underlying action. Although the Foreign CGL Policy, like the Fireman's Fund policy, includes "the publication or utterance of a libel or slander" within its definition of "personal injury;" unlike the Fireman's Fund policy it has an express and unambiguous coverage exclusion for "personal injury or advertising injury arising out of a publication or utterance of a libel or slander." Therefore, the trial court properly found the policy provided no "indemnity coverage for the incidents and issues in the underlying lawsuit."

#### 6. *The Trial Court Did Not Err in Granting Rehwald's Motion for Nonsuit*

After the trial court's rulings in the non-jury phase of the trial, Farnham presented what was left of his case to a jury. The only issue remaining was the contention of Farnham's litigation/insurance expert witness that Rehwald should have proceeded differently in his dealings with the Romanski estate in order to increase leverage for additional payments from Fireman's Fund, which insured Romanski. [9] At the close of Farnham's evidence Rehwald moved for nonsuit, and the court granted the motion.

> 9    Farnham also presented the testimony of an experienced probate attorney regarding the standard of care for probate attorneys. However, he does not rely on this testimony in challenging the order of nonsuit.

[*37] Farnham's expert explained two alternate courses of action that Rehwald could have followed rather than enter into a stipulated judgment subject to the "no action" provision in the Fireman's Fund policy. Under Plan A Rehwald would have taken a default against the Romanski estate on the 31st day after service, which the expert opined would have ultimately resulted in a judgment enforceable against Fireman's Fund. However, the record established that Fireman's Fund had already paid its $ 1 million policy limits for defamation; and there was no credible evidence that Fireman's Fund would have responded to the scenario suggested in a manner that exposed it to liability for bad faith handling of a claim. [10]

> 10    Although the expert testified he assumed Fireman's Fund "blew the lid off" the policy limits by its delay in providing a defense for the Romanski estate, he did not present any evidence to support that assertion.

The expert's second scenario (Plan B) was for Rehwald to obtain a reference to arbitration or [*38] to proceed to private trial against the Romanski estate. However, the expert conceded that Romanski's family members would have had to agree to such a proceeding; and Farnham presented no evidence they would have done so. Moreover, any judgment from such a proceeding also would have been enforceable only against the $ 1 million the Fireman's Fund policy had already paid to Farnham, absent evidence that Fireman's Fund engaged in bad faith claims handling.

In granting nonsuit the trial court concluded that the evidence presented by Farnham about the possible outcome of the Plan A or Plan B scenarios was "just speculation of what would have occurred." It explained, "When we are talking in terms of the damages, they have to be almost legally certain. The obscurity of the damage aspect of the case is really very pronounced. So I have come to the conclusion I am going to grant the motion for nonsuit. And reluctantly, but nevertheless, I believe that it can't go forward, unfortunately."

"A motion for nonsuit or demurrer to the evidence concedes the truth of the facts proved, but denies as a matter of law that they sustain the plaintiff's case. A trial court may grant a nonsuit only when, [*39] disregarding conflicting evidence, viewing the record in the light most favorable to the plaintiff and indulging in every legitimate inference which may be drawn from the evidence, it determines there is *no* substantial evidence to support a judgment in the plaintiff's favor." (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 27-28.) On appeal we apply the same standard. (*Ibid.*)

The trial court did not err in granting Rehwald's motion for nonsuit. Farnham simply failed to produce sufficient evidence that he would have obtained a better result had Rehwald followed either Plan A or Plan B. In *Barnard v. Langer, supra,* 109 Cal.App.4th at page 1461, as in this case, the malpractice plaintiff settled the underlying action and then sued his attorney for malpractice, claiming he could have gotten a better settlement. The Court of Appeal affirmed the trial court's order of nonsuit, explaining, "It is not enough for [the plaintiff] to simply claim, as he did at trial of this malpractice action, that it was possible to obtain a better settlement or a better result at trial. There mere probability that a certain event would have happened [*40] will not furnish the foundation for malpractice damages. "'Damages to be subject to a proper award must be such as follows the act complained of as a *legal certainty*.'"" The court further explained the plaintiff's "offer of proof was woefully inadequate and was little more than a wish list of damages, unsupported by evidence that the [defendant] would have settled for more, or by expert testimony to show that Barnard's amounts could have been recovered had the case been tried." (*Id.* at p. 1463.) Similarly, in this case Farnham presented only a "wish list" of damages and alternative scenarios with only speculative outcomes.

## DISPOSITION

The judgment is reversed. The order sustaining Rehwald's demurrers without leave to amend is reversed; all other orders on appeal are sustained. The cause is remanded to the trial court for further proceedings not inconsistent with this opinion with respect to Farnham's claims for fraud and breach of fiduciary duty. The parties are to bear their own costs on appeal.

PERLUSS, P. J.

We concur:

WOODS, J.

ZELON, J.