1   COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
2   MARK SOLOMON (151949)
    DOUGLAS R. BRITTON (188769)
3   655 West Broadway, Suite 1900
    San Diego, CA  92101
4   Telephone:  619/231-1058
    619/231-7423 (fax)
5   marks@csgrr.com
    dougb@csgrr.com
6         – and –
    SHAWN A. WILLIAMS (213113)
7   WILLOW E. RADCLIFFE (200087)
    ELI R. GREENSTEIN (217945)
8   DANIEL J. PFEFFERBAUM (248631)
    100 Pine Street, Suite 2600
9   San Francisco, CA  94111
    Telephone:  415/288-4545
10  415/288-4534 (fax)
    shawnw@csgrr.com
11  willowr@csgrr.com
    elig@csgrr.com
12  dpfefferbaum@csgrr.com

13  Lead Counsel for Plaintiffs

14  [Additional counsel appear on signature page.]

15                  UNITED STATES DISTRICT COURT

16                NORTHERN DISTRICT OF CALIFORNIA

17  In re ORACLE CORPORATION          )   Master File No. C-01-0988-SI
    SECURITIES LITIGATION             )
18  _____ )   CLASS ACTION
                                      )
19  This Document Relates To:         )   PLAINTIFFS' NOTICE OF MOTION AND
                                      )   MOTION TO EXCLUDE EXPERT
20      ALL ACTIONS.                  )   TESTIMONY OF EDWARD YOURDON
    _____ )
21                                        DATE:       January 9, 2009
                                          TIME:       9:00 a.m.
22                                        COURTROOM:  The Honorable
                                                      Susan Illston
23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

memorandum of points and authorities.................................................................................1

I.    INTRODUCTION ...........................................................................................................1

II.   ARGUMENT ....................................................................................................................3

    A.    Standard ................................................................................................................3

        1.    Rule 702 .....................................................................................................3

            a.    Testimony Must Be Helpful to the Trier of Fact ............................4

            b.    The Expert Must Be Qualified.......................................................4

            c.    Expert Testimony Must Be Reliable...............................................5

        2.    Rule 403 .....................................................................................................6

    B.    Any Testimony Proffered by Yourdon Relating to the Integration of Suite 11i Must Be Excluded Under Rule 702 and *Daubert* Because He Is Not Qualified to Offer Such Testimony, and His Testimony Is Not Reliable or Helpful to the Trier of Fact ............................................................................................7

        1.    Because Yourdon Does Not Have the Knowledge Required to Satisfy His Own Test for Integration, He Is Not Qualified to Offer Such an Opinion and His Opinion Is Unreliable ..........................................8

        2.    Yourdon's Analysis of Integration Is Unreliable Because He Evaluated Only Two of the Four Total Forms of Integration....................8

        3.    By Examining Only the Technical Documentation of Suite 11i, Yourdon's Analysis of Integration Does Not Take into Account the Effect of Software Defects on How the Product Actually Performed....................................................................................................10

    C.    Yourdon's Expert Testimony Should Be Excluded in Its Entirety Because He Admittedly Failed to Consider All of the Relevant and Available Evidence..............................................................................................................11

        1.    Yourdon Summarily Dismissed Evidence of Software Defects in Concluding that Suite 11i Was Integrated and Interoperable ...................12

            a.    Evidence of Customer Problems Must Indicate Something to Yourdon Because He States that a Vendor Employs a SWAT Team Only When There Are Serious Problems with an Implementation ......................................................................13

            b.    When Shown Further Evidence of Quality Problems Which He Failed to Consider in Forming His Opinion, Yourdon Insisted that It Did Not Affect His Conclusions in Any Way........13

1
2                                                                                                **Page**

3       D.     The "Comparable Software" Which Yourdon Claims to Compare Suite
               11i to Did Not Exist and Thus His Opinion Has No Reliable Basis and Is
4              Irrelevant ....................................................................................................14

5              1.     Yourdon's Extrapolation from Six Million Hours Worked to
                      267,237 Function Points Is Wild Speculation and Unreliable ..................16
6
        E.     Yourdon's Opinions Concerning the "Truthfulness" of Defendants' Public
7              Statements Lack Foundation, Are Unreliable and Irrelevant................................17

8              1.     Yourdon Inexplicably Limited His Analysis of the Defendants'
                      Statements to the Viewpoint of IT Professionals as Opposed to the
9                     Investing Public ......................................................................................17

10             2.     Yourdon Failed to Consider the Majority of the Alleged False and
                      Misleading Statements .............................................................................19
11
                      a.     Yourdon Never Addresses Whether Customers Saved
12                           Money Fast or at All ....................................................................19

13                    b.     Yourdon Never Assesses Whether Any Customer Installed
                             a Full Suite – Much Less During the Class Period .......................19
14
                      c.     Yourdon Did Not Know When the Class Period Was and,
15                           Therefore, Could Not Assess Whether the Defendants'
                             Statements Were True During the Class Period ...........................20
16
               3.     Yourdon's Claim that Defendants' Statement Were "Accurate,"
17                    "Fundamentally True" or "Not False" Is at Best Confusing and at
                      Worst Simply Wrong ..............................................................................21
18
        F.     Yourdon's Opinion on Lost Deals Related to Suite 11i Must Be Excluded..........22
19
               1.     Yourdon's Qualifying Language Related to Lost Deals Makes His
20                    Analysis Unreliable, Confusing and Irrelevant...........................................23

21      G.     Yourdon Attempted to Change Multiple Elements of His Report at His
               Deposition, Undermining the Credibility and Reliability of His Opinions ..........23
22
III.    CONCLUSION..............................................................................................................24
23
24
25
26
27
28

1

# TABLE OF AUTHORITIES

2

Page

3

## CASES

4

*Bourjaily v. United States,*
    483 U.S. 171 (1987)..................................................................................3

5

*Curtis v. M&S Petroleum, Inc.,*
    174 F.3d 661 (5th Cir. 1999) ...................................................................5

6

7

*Daubert v. Merrell Dow Pharms.,*
    43 F.3d 1311 (9th Cir. 1995) ...................................................................7

8

*Daubert v. Merrell Dow Pharms.,*
    509 U.S. 579 (1993)........................................................................ *passim*

9

10

*GE v. Joiner,*
    522 U.S. 136 (1997).........................................................................3, 4, 6

11

*In re Paoli R.R. Yard PCB Litig.,*
    35 F.3d 717 (3d Cir. 1994).......................................................................5

12

13

*In re Paoli R.R. Yard PCB Litig.,*
    916 F.2d 829 (3d Cir. 1990).................................................................4, 18

14

*In re Williams Sec. Litig.,*
    496 F. Supp. 2d 1195 (N.D. Okla. 2007)..............................................4, 8

15

16

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999)........................................................................ *passim*

17

*Metabolife Int'l, Inc. v. Wornick,*
    264 F.3d 832 (9th Cir. 2001) ...................................................................6

18

19

*Trevino v. Gates,*
    99 F.3d 911 (9th Cir. 1996) .....................................................................5

20

*United States v. Downing,*
    753 F.2d 1224 (3d Cir. 1985)................................................................4, 18

21

22

*Viterbo v. Dow Chem. Co.,*
    826 F.2d 420 (5th Cir. 1987) ...................................................................5

23

24

## STATUTES, RULES AND REGULATIONS

25

Federal Rules of Evidence

26

    Rule 104(a)...........................................................................................3
    Rule 401 ...............................................................................................3

27

    Rule 403 ...................................................................................2, 3, 6, 18
    Rule 702 ..................................................................................... *passim*

28

    Rule 703 ................................................................................................5

1

2                                                                                                    **Page**

3   **SECONDARY AUTHORITIES**

4   3 J. Weinstein & M. Berger,

5         *Weinstein's Evidence* ¶702[02] (1998) ...............................................................................4

6   4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*
          §702.04[6] (2d ed. 2005) ...........................................................................................3
7         §702.05[2][b] ..............................................................................................................5
          §702.05[2][d] ...................................................................................................6, 9, 16

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2       TO:     ALL PARTIES AND THEIR ATTORNEYS OF RECORD

3              PLEASE TAKE NOTICE that plaintiffs will and hereby do move this Court to preclude the

4       testimony of Edward Yourdon ("Yourdon").  The matter will be heard on January 9, 2009 at 9:00

5       a.m. before the Honorable Susan Illston.  This motion is made pursuant to Federal Rules of Evidence

6       401, 403 and 702 on the grounds that he is not qualified as an expert in this matter and his opinions

7       are unreliable, would serve to mislead and confuse the jury, waste the Court's time, and will not

8       assist the trier of fact to understand the evidence or determine a fact at issue.  This motion is based

9       upon this notice of motion, the accompanying memorandum of points and authorities, the

10      Declaration of Shawn A. Williams in Support of Plaintiffs' Motion to Exclude Expert Testimony of

11      Edward Yourdon ("Williams Decl."), filed herewith, the exhibits attached thereto, the pleadings and

12      other papers and records on file, and such further evidence and argument as may be presented to the

13      Court on reply and at the time of hearing.

14                         **MEMORANDUM OF POINTS AND AUTHORITIES**

15      **I.      INTRODUCTION**

16             Yourdon labeled his own report, the Expert Report of Edward Yourdon, dated May 25, 2007,

17      "ponderous."  Ex. 1[1] at 234:18.  This Court must label his opinion inadmissible.  Yourdon's expert

18      report suffers from fatal defects on both a micro and macro level.

19             Most importantly, Yourdon admits that he does not have the basis required to testify or opine

20      on whether Oracle Corporation's ("Oracle") Suite 11i is "fully-integrated" and "fully interoperable

21      out of the box" as defendants claimed.  Exs. 2-3.  This issue is so fundamental to Yourdon's analysis

22      that his failure undermines nearly every opinion he purports to offer.  For example, Yourdon devised

23      a method to evaluate the integration of Suite 11i, which requires what he described as "intimate

24      knowledge of the business requirements for the various Suite 11i components."  Ex. 4, ¶139.

25      Yourdon, however, admits that he "did not acquire an intimate knowledge of the business

26      _____

27      [1]       "Ex. __" refers to the Williams Decl., unless otherwise stated.

28
        PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY OF
        EDWARD YOURDON - C-01-0988-SI                                                                    - 1 -

1    requirements for the various Suite 11i components."  Ex. 1 at 226:20-22.  Furthermore, Yourdon

2    failed to analyze two of the four forms which he identifies that make up integration.  Yourdon

3    analyzed only technical documentation and never used – let alone tested – the actual software even

4    though he had full access to Oracle's systems, employees and resources.  Ex. 4, ¶¶138-141; Ex. 1 at

5    41:2-42:1.  Finally, Yourdon limits his finding to the viewpoint of "IT professionals," and only in

6    the context in which defendants made their statements.  He also admitted that he allowed for "minor

7    inaccuracies" in defendants' statements.  Ex. 1 at 74:17-23.  The result is a conclusion which is both

8    unreliable and irrelevant, and must be excluded under Rule 702 of the Federal Rules of Evidence.

9         Yourdon's entire report is undermined by his inexplicable decision to evaluate defendants'

10   allegedly false statements from the narrow viewpoint of an IT professional (*i.e.*, "IT professionals

11   would not have interpreted . . . .").  Ex. 4, ¶160.  Indeed, Yourdon ignored the essential inquiry in

12   this case, which is whether a reasonable *investor* would have been misled by the false statements

13   alleged in the complaint.  He explicitly stated that he offers no opinion whether investors would have

14   been misled by defendants' statements.  Ex. 1 at 82:17-83:4, 83:19-84:11.  Accordingly, his opinion

15   should be excluded under Rule 702 as irrelevant and under Rule 403 as misleading.

16        While Yourdon's report is universally undermined by his unreliable analysis of integration

17   and irrelevant analysis of the defendants' statements, his specific findings should be excluded under

18   Rule 702 as well.  For instance, Yourdon concludes that Suite 11i did not have an unusual number of

19   defects for software of its size, despite having no reasonable basis to know either the size of the

20   software or the number of defects.  His estimate of the size of Suite 11i is the product of wild

21   extrapolation based on the number of hours Oracle claims to have spent developing the software.

22   His analysis of the Suite 11i defects was limited to dismissing the evidence of "disastrous" customer

23   experiences as "anecdotal."  Yourdon never accounts for Oracle's admission that its development

24   and testing process was flawed or that the software had significant integration and functional gaps.

25   Ex. 5 at 106:14-21; Ex. 6; Ex. 4, ¶201.

26        Yourdon has tortured his reasoning, and conditioned his conclusions, to such an extent that

27   they are neither reliable nor helpful to the trier of fact.  His testimony must be excluded in its

28   entirety.

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY OF
EDWARD YOURDON - C-01-0988-SI                                                                 - 2 -

## II.    ARGUMENT

### A.    Standard

The admissibility of expert testimony is governed by Federal Rules of Evidence as well as the U.S. Supreme Court's decisions in *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), and its progeny.[2] Rule 702 addresses an expert's qualifications, the reliability of his testimony and its relevance to the issues in dispute.  All evidence must be relevant as defined by Rule 401. Furthermore, under Rule 403, the Court must evaluate the probative value of any evidence proffered against any potential unfair prejudice.

#### 1.    Rule 702

Rule 702, originally enacted in 1975, was amended in 2000 to effectively codify the *Daubert* trilogy –*Daubert*, *Joiner* and *Kumho*.  It states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Whether an expert's opinion satisfies Rule 702 and *Daubert* is a legal determination made by the trial judge.  *Daubert*, 509 U.S. at 589-91; *see* Fed. R. Evid. 104(a).  The proponent bears the burden in establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.  *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987).  If a proffered expert is to offer testimony on multiple subjects, the court must apply the standards of Rule 702 and *Daubert* to each subject.  4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* §702.04[6] (2d ed. 2005).  An expert may opine only on the subject(s) on which he has been accepted to testify and opinions outside these topics are inadmissible.

---

[2]    The "*Daubert* trilogy": *Daubert*, 509 U.S. 579, *GE v. Joiner*, 522 U.S. 136 (1997), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *see* Fed. R. Evid. 702, Advisory Comm. Notes, 2000 Amendments.

1   The Supreme Court has made it explicitly clear that Rule 702 requires the trial court to

2   perform a "gatekeeping" function to ensure that proffered expert testimony is relevant, reliable and

3   helpful to the finder of fact.  *Daubert*, 509 U.S. at 589 n.7; *Joiner*, 522 U.S. at 136, 142; Fed. R.

4   Evid. 702; *Kumho*, 526 U.S. 137.  The Court's gatekeeping function applies equally to all proffered

5   expert testimony, whether based in scientific, technical or other specialized knowledge.  *Kumho*, 526

6   U.S. at 151.

7            **a.**      **Testimony Must Be Helpful to the Trier of Fact**

8   An expert witness must provide testimony which "will assist the trier of fact to understand

9   the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  "Expert testimony which does not

10  relate to any issue in the case is not relevant and, ergo, non-helpful."[3]  *Daubert*, 509 U.S. at 591

11  (citing 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶702[02], at 702-18 (1998), and *United*

12  *States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)).  Given the greater potential impact of

13  expert testimony on the finder of fact, mere relevance alone will not suffice under Rule 702.  "[T]he

14  'helpfulness' requirement in Rule 702 'implies a quantum of reliability beyond that required to meet

15  a standard of bare logical relevance.'"  *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 857 (3d Cir.

16  1990) (quoting *Downing*, 753 F.2d at 1235).  The helpfulness requirement has also been deemed the

17  "fit" requirement.  *Daubert*, 509 U.S. at 591; *Downing*, 753 F.2d at 1242.  The "fit" requirement

18  ensures a "valid scientific connection to the pertinent inquiry as a precondition to admissibility."

19  *Daubert*, 509 U.S. at 592.  Thus, the testimony of an expert, no matter how qualified, will not be

20  admissible if their expertise does not shed light on an issue in dispute.

21           **b.**      **The Expert Must Be Qualified**

22  A witness may be "qualified as an expert by knowledge, skill, experience, training, or

23  education."  Fed. R. Evid. 702.  "[R]egardless of the mix of formal credentials and experience that is

24  proffered as establishing the requisite 'qualifications' under the rule, those qualifications must be

25  ***specific*** as well as ***general***."  *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1244 (N.D. Okla.

26  _____

27  [3]    All citations and internal quotations and footnotes are omitted and all emphasis is added unless otherwise noted.

28  PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY OF
EDWARD YOURDON - C-01-0988-SI        - 4 -

1   2007) (emphasis in original).  A proffered expert witness, no matter how impressive his credentials

2   may be, will not be considered qualified if he cannot offer testimony which will assist the trier of

3   fact in his or her decision-making.

4               c.        **Expert Testimony Must Be Reliable**

5               The test for reliability under Rule 702 is a three-pronged analysis.  Reliability requires expert

6   testimony to be: (1) based upon sufficient facts or data; (2) the product of reliable principles and

7   methods; and (3) the application of the principles and methods reliably to the facts of the case.  Fed.

8   R. Evid. 702.  The focus is the admissibility of the testimony, not its correctness.  "Any step that

9   renders  the  analysis  unreliable  under  the  Daubert  factors  renders  the  expert's  testimony

10  inadmissible."  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994).  An expert's

11  opinion cannot be based upon merely subjective belief or unsupported speculation.  *Daubert*, 509

12  U.S. at 590; *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999).[4]

13              Foundational  reliability  requires  an  expert  to  show  that  his  opinion  is  supported  by  an

14  adequate foundation of relevant facts, data or other opinions.  *Weinstein's Fed. Evid.* §702.05[2][b].

15  "Where foundational facts demonstrating relevancy . . . are not sufficiently established, exclusion of

16  proffered  expert  testimony  is  justified."  *Trevino v. Gates*, 99 F.3d 911, 922 (9th Cir. 1996).

17  Testimony must be excluded where "the source upon which an expert's opinion relies is of such little

18  weight that the jury should not be permitted to receive that opinion."  *Viterbo v. Dow Chem. Co.*, 826

19  F.2d 420, 422 (5th Cir. 1987).[5]

20              Methodological  reliability  requires  that  expert  testimony  "have  a  reliable  basis  in  the

21  knowledge and experience of [the relevant] discipline" and that it is a "product of reliable principles

22  _____

23  [4]     *Daubert* offers a list of non-exclusive, non-mandatory factors bearing on the determination of
    reliability: (1) whether the theory or technique will be, can be or has been tested; (2) whether the
24  theory or technique has been subjected to peer review and publication; (3) the known or potential
    rate of error experienced in the application of the particular theory or technique; and (4) the degree
25  of acceptance of the theory or technique in the relevant scientific community, *i.e.*, widespread versus
    minimal.  *Daubert*, 509 U.S. at 593-94.

26  [5]     Rule 703 addresses reliance by an expert on inadmissible information.  The sufficiency of the
    basis for an expert's opinion is determined under Rule 702.  *See* Fed. R. Evid. 702, Advisory Comm.
27  Notes, 2000 Amendments.  As a result, Rule 703 is applicable to a "relatively narrow inquiry."  *Id.*

28
    PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY OF
    EDWARD YOURDON - C-01-0988-SI                                                          - 5 -

1   and methods." *Kumho*, 526 U.S. at 148 (citing *Daubert*, 509 U.S. at 592); Fed. R. Evid. 702,

2   Advisory Comm. Notes, 2000 Amendments.  Again, the focus of the inquiry is not on the expert's

3   conclusions, but the means used to derive such conclusions. *Metabolife Int'l, Inc. v. Wornick*, 264

4   F.3d 832, 841 (9th Cir. 2001) (citing *Daubert*, 509 U.S. at 595-96).  Where expert testimony is not

5   based in scientific expertise, but rather in technical knowledge, skill or experience, these factors are

6   difficult, if not impossible to apply.  Ultimately, the Court's gatekeeping function must ensure that

7   an expert witness "employs in the courtroom the same level of intellectual rigor that characterizes

8   the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152.

9          Connective reliability focuses on the reasoning used by the expert to connect data or

10  assumptions to his conclusions or opinions.  It is "not the reasonableness ***in general***" of the

11  methodology used by the expert in drawing his conclusion, but "[r]ather, it was the reasonableness of

12  using such an approach, along with [the expert's] particular method of analyzing the data thereby

13  obtained, to draw a conclusion regarding ***the particular matter to which the expert testimony was***

14  ***directly relevant***." *Id*. at 153-54 (emphasis in original).  Connective reliability evaluates whether an

15  analytical gap exists between the data and the expert's conclusions. *Joiner*, 522 U.S. at 146.  The

16  Court is not required "to admit opinion evidence which is connected to existing data only by the *ipse*

17  *dixit* of the expert." *Id*.[6]

18              **2.     Rule 403**

19         Finally, the Court must perform a balancing test under Rule 403, and exclude relevant

20  evidence "if its probative value is substantially outweighed by the danger of unfair prejudice,

21  confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or

22  needless presentation of cumulative evidence." Fed. R. Evid. 403.  Rule 403 plays an enhanced role

23  for expert witnesses, resulting in the Court exercising more control over an expert than a lay witness.

---

25  [6]        In making their determination, courts have considered the following factors: Whether the
26  proposed witness' conclusions represent an unfounded extrapolation from the underlying data;
    whether the witness has sufficiently connected the proposed testimony with the facts of the case;
    whether the witness has adequately accounted for alternative explanations for the effect whose cause
27  is at issue; and whether the witness relied unduly on the temporal proximity between the occurrence
    of an event and the onset of illness or injury. *See Weinstein's Fed. Evid.* §702.05[2][d].

28

*Daubert*, 509 U.S. at 595.  The reason is practical – expert testimony can be both powerful and quite misleading, due to the difficulty in evaluating it and because such testimony may be assigned talismanic significance in the eyes of lay jurors simply because it is given by a person who has been labeled an expert.  *See id.*

> **B.    Any Testimony Proffered by Yourdon Relating to the Integration of Suite 11i Must Be Excluded Under Rule 702 and *Daubert* Because He Is Not Qualified to Offer Such Testimony, and His Testimony Is Not Reliable or Helpful to the Trier of Fact**

Yourdon's "own independent technical assessment [of integration in Suite 11i] is based on paragraphs 138 through 141" of his opening report.  Ex. 1 at 53:3-5.  It is a confusing and unintelligible process, which he developed for the purpose of this litigation.  In his report, Yourdon states:

> 138.    To evaluate Oracle's claims that Suite 11i was integrated and interoperable, we must use the Oracle data-model diagrams and business flow diagrams . . . to answer three basic questions . . . .

> 139.    Providing a complete answer to these two [sic][7] questions for Oracle's Suite 11i is a complex technical task, and ***it requires intimate knowledge of the business requirements*** for the various Suite 11i components.  I have examined the data-model diagrams for ***a representative subset*** of common data entities (*i.e.*, to address the first question identified immediately above) and associated business flows diagrams (*i.e.*, to address the second and third question identified immediately above) in both the ERP and CRM components of Suite 11i, and am satisfied that ***Suite 11i (as implemented in version 11i.1) is integrated with respect to that representative subset***.

Ex. 4, ¶¶138-139.  The fact that Yourdon developed, and attempted to answer, this inquiry after being engaged by Oracle in this matter, strongly supports (by itself) the conclusion that his opinions are unreliable.  *See Daubert v. Merrell Dow Pharms.*, 43 F.3d 1311, 1317 (9th Cir. 1995).  However, there are other specific failures in his methodology that render his opinion wholly unreliable.  First, Yourdon does not have the "intimate knowledge" of certain business requirements, which he states is necessary to his evaluation of the integration of Suite 11i.  Ex. 1 at 226:20-227:1.  Second, he admittedly evaluates only two of the four forms of integration that he himself sets out to be requirements for integration.  Third, Yourdon's methodology examined only the intended design of

---

[7]      Paragraph 139 should read "three questions."  *See id.* at 226:1-9.

1  the software.  Yourdon never accounts for how the software actually performed or the effect of

2  coding defects on its performance.  As a result, Yourdon's finding that Suite 11i was integrated, and

3  any testimony which flows from this finding, must be excluded.

4           1.       **Because Yourdon Does Not Have the Knowledge Required to Satisfy His Own Test for Integration, He Is Not Qualified to Offer Such an Opinion and His Opinion Is Unreliable**

5

6           Yourdon devised his own test for determining whether Suite 11i was integrated.  There is no

7  indication that it was an established process, peer-reviewed or otherwise tested.  Yet, he still lacks

8  the necessary knowledge to properly evaluate integration as he defines it.   Yourdon states:

9  "Providing a complete answer to these two [sic] questions for Oracle's Suite 11i is a complex

10 technical task, and it ***requires intimate knowledge of the business requirements*** for the various

11 Suite 11i components."  Ex. 4, ¶139.  At his deposition, Yourdon admitted that he does not have the

12 "intimate knowledge" required to evaluate the integration of Suite 11i:

13          A.       . . . I did not acquire an intimate knowledge of the business requirements for
                     the various Suite 11i components.

14

15          Q.       Which means that you cannot provide a complete answer to the three
                     questions that you posed in paragraph 138?

16          A.       That's correct.

17 Ex. 1 at 226:20-227:1.  Regardless of his credentials ***generally*** as an IT professional, Yourdon lacks

18 the ***specific*** knowledge required in this particular instance to render an opinion on the integration of

19 Suite 11i.  *Williams*, 496 F. Supp. 2d at 1243.  Thus, Yourdon is unqualified to offer an opinion and

20 his opinion is both unreliable and not helpful to the trier of fact.

21          2.       **Yourdon's Analysis of Integration Is Unreliable Because He Evaluated Only Two of the Four Total Forms of Integration**

22

23          Software integration, according to Yourdon himself, comprises four different forms – data

24 integration, workflow integration, functional integration and user-interface integration.  Ex. 4, ¶104.

25 An absence or failure of any one of these four can render software not integrated.  Ex. 7 at 7-8.

26 Though he concludes that Oracle's Suite 11i was indeed integrated, nowhere in his report does

27 Yourdon even mention an analysis of functional integration or user-interface integration.  This is

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY OF
EDWARD YOURDON - C-01-0988-SI                                                                - 8 -

because Yourdon fails to perform any analysis whatsoever on either of those two areas of integration, and will not offer an opinion whether 11i was integrated.  *See* Ex. 4, ¶104 n.38.

> Q.      . . . Is it fair to say you are not offering an opinion as to whether or not Suite 11i was integrated with respect to user interface integration for functional integration?
>
> A.      I have not offered such an opinion in this report. . . .
>
> *        *        *
>
> A.      I have not evaluated the functional integration characteristics or capabilities of Suite 11i or the user interface capabilities.

Ex. 1 at 236:17-238:7.  Yourdon weakly attempts to explain his failure to perform any analysis on these two key points of integration by stating that plaintiffs do not raise issues of functional integration or user interface integration.  *Id*. at 236:17-237:3.  But he admits, as he must, that his decision is not grounded in the facts of the case and that defendants never excluded functional or user interface integration from their statements.  *Id*. at 236:15-237:15.  Rather, defendants repeatedly characterized Suite 11i as ***fully integrated*** and interoperable out of the box:

> Q.      Did you understand statements by the company that Suite 11i was integrated and interoperable to be excluding functional integration or user interface integration?
>
> A.      ***No, I did not***.

*Id*. at 237:4-8.  Under Rule 702, a reliable opinion is one "based upon sufficient facts or data" and "is the product of reliable principles and methods."  Fed. R. Evid. 702.  Yourdon has arbitrarily narrowed his inquiry to only data and workflow integration, only one half of the four elements of integration.  His reasons for doing so are unpersuasive and not supported by any authority.  As a result, it would be impossible for him to provide a complete and reliable analysis of whether Suite 11i was integrated.

Where an expert's conclusion represents an unfounded extrapolation, the court should exclude it.  *Weinstein's Fed. Evid*. §702.05[2][d].  Here, Yourdon has created his own set of parameters (which he could not satisfy) solely for the purpose of this litigation.  He tested a subset of the data for half the forms of integration and then summarily pronounced the entire Suite 11i fully integrated.  Ex. 4, ¶¶138-141.  This is exactly the type of unfounded extrapolation and unreliable testimony which Rule 702 is designed to exclude.

**3.**     **By Examining Only the Technical Documentation of Suite 11i, Yourdon's Analysis of Integration Does Not Take into Account the Effect of Software Defects on How the Product Actually Performed**

Yourdon determined that Suite 11i was integrated by spending several hours looking at a subset of the "massive" software's technical documentation.[8] Ex. 4, ¶¶138-141, 169; Ex. 1 at 227-30.  This documentation purports to show only the structure and design of the software.  This is extremely significant and means that *Yourdon's analysis of integration did not take software defects into account*:

> Q.     One cannot determine, based on the review of the representative subset [of technical documentation] that you looked at, whether or not the software *actually functioned in the way that the diagrams you reviewed depicted?*
>
> A.     *Not completely and not with precision*, you are absolutely right.  I could use this to see the architecture and the design.  And then beyond that point I had to look at actual implementations and reports from customers to see whether it was operating as designed.

Ex. 1 at 230:4-12.  Yourdon concedes that his brief review of select documentation does not allow him to accurately opine on whether 11i performed in an integrated and interoperable manner.  Instead, the technical documentation only represents a blueprint Oracle developers attempted to follow in creating the Suite 11i software.

Yourdon purports to opine on whether Suite 11i was "designed and engineered" to be integrated and interoperable.  Ex. 4, ¶141.  But he never accounts for known failures in the engineering process including Oracle's failure to test the software, despite the fact that defendant Lawrence Ellison ("Ellison") and the Suite 11i developers admit that the engineering process was flawed.  Ex. 8 at NDCA-ORCL 1529167; Ex. 1 at 106:14-21.  Furthermore, Yourdon states that it is "almost certain" that developers made errors in the development process, and that these errors can affect integration.[9]  Ex. 1 at 64:22-65:8; Ex. 4, ¶140.

---

[8]     Yourdon stated the process took in the range of 15 to 40 hours.  Ex. 1 at 235:8-21.

[9]     Q.     . . . And ultimately you find that 11i, the integration was less than perfect?

1    Yourdon's decision to examine what he described as a representative "subset" of Suite 11i

2  *technical documentation* did not provide Yourdon any information about how the software *actually*

3  worked. This is revelatory when viewed in light of (one of) his definitions of integration: "For the

4  end-user of a software system, as well as for IT professionals 'integration' simply means that the

5  pieces (or components or modules) of the system 'work together.'" Ex. 4, ¶100. If a defect in the

6  software caused Suite 11i to not "work together," this would not be evident to Yourdon in his

7  analysis of the documentation alone. As a result, his finding is purely speculative. It does not assist

8  the trier of fact because it does not answer in a reliable manner, if at all, whether Suite 11i was "fully

9  integrated" and "interoperable" as he defined integration.

10   **C.     Yourdon's Expert Testimony Should Be Excluded in Its Entirety**
             **Because He Admittedly Failed to Consider All of the Relevant and**
11           **Available Evidence**

12   Yourdon simply failed to undertake a rigorous investigation of the relevant facts in this case.

13  He was not given access to a full database of the evidence. Ex. 1 at 21:11-19. Furthermore, he did

14  not even consider all the evidence which defendants provided to him. *Id*. at 117:3-7. For example,

15  in evaluating concessions made by Oracle to the customers due to implementation problems and

16  software defects in Suite 11i, Yourdon reviewed only a subset of the evidence, which he describes as

17  the "plaintiffs' evidence," and dismissed it as simply anecdotal and not relevant to his determination

18  of the quality of Suite 11i.[10] Ex. 4, ¶¶201-202. However, Yourdon admits that he had more relevant

19  evidence in his possession:

20       Q.     Did you make an evaluation of – which includes a review of *all of the*
                *evidence that was in your possession* concerning concessions that Oracle paid to
21              customers due to product problems?

22       A.     *No, I did not*.

23  ─────────────────────────────────────────────

24       A.     Not based on my own independent review of the, you know, the technical documents.
     I did not personally see errors or defects or imperfections. But based on my general experience and
25  also based on the other evidence, I would agree that there were imperfections.

26  Ex. 1 at 55:2-8.

27  [10]    Yourdon's analysis suggests that his investigation was compromised solely of looking at
     plaintiffs' revised second amended complaint despite extensive discovery.

28
     PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY OF
     EDWARD YOURDON - C-01-0988-SI                                                          - 11 -

Ex. 1 at 117:3-7.  Furthermore, he stated that a thorough review of that evidence may have "potentially" changed his opinion.  *Id*. at 116:23.  When asked about the failure to undertake a thorough review of the evidence in his possession, he stated, "It seems to me you're asking if I did the plaintiffs' job for them."  *Id*. at 117:19-20.  This is startling since Yourdon purports to be qualified to offer an expert opinion.

### 1.   Yourdon Summarily Dismissed Evidence of Software Defects in Concluding that Suite 11i Was Integrated and Interoperable

After concluding that Suite 11i was "integrated" – using an analysis which fails Rule 702 and *Daubert*, Yourdon summarily dismissed any evidence to the contrary.  For example, Yourdon defines integration as meaning "that the pieces (or components or modules) of the system 'work together.'" Ex. 4, ¶100.  Yourdon then labels evidence that demonstrates that modules did not work together – including the problems with escalated customers and SWAT teams – as merely "anecdotal" and not indicative of quality.  *Id*. ¶201.  Yourdon did not test the software himself.  Ex. 1 at 40:12-16.  Evidence of problems experienced internally at Oracle and by customers is the ***only evidence he had about how the software actually performed***.  *Id*. at 55:2-8.  Thus, it is incomprehensible that Yourdon would then dismiss this evidence as "anecdotal."  In his opening report, Yourdon states:

> 201.   Plaintiffs' anecdotal evidence of bugs and a handful of escalated customers that experienced escalated concerns for a host of possible reasons, ***do not indicate anything to me about the overall quality*** of the software.

> 202.   Furthermore, Plaintiff's [sic] evidence that certain customers were offered discounts or free consulting services (including SWAT teams) to remedy problems ***does not indicate anything to me about the quality*** of the software. . . .

Ex. 4, ¶¶201-202.  Given the opportunity, Yourdon refused to retreat from this analysis at his deposition:  "I was obviously aware that plaintiffs did provide some evidence that certain customers were offered discounts or free consulting, but that by itself did not indicate ***anything*** to me about the quality of the software."  Ex. 1 at 113:11-15, 116:2-4.

1

### a.   Evidence of Customer Problems Must Indicate Something to Yourdon Because He States that a Vendor Employs a SWAT Team Only When There Are Serious Problems with an Implementation

2

3

4          In his opening report, Yourdon stated that "software vendors sometimes use a brute-force

5   strategy of their own when confronted with a problematic, over-budget, behind-schedule software

6   project: a 'SWAT team.'"[11]   Ex. 4, ¶52.   Yet in a remarkable display of cognitive dissonance,

Yourdon states that evidence of Oracle's use of SWAT teams "does not indicate *anything*" about the

7   quality of Suite 11i.   *Id*. ¶202.

8          While Yourdon does not offer any recognizable conclusion on the "quality" of Suite 11i, any

9   analysis he does offer should be excluded under Rule 702 as unreliable.   Yourdon gives short shrift

10  to the actual evidence which supports plaintiffs' claims.   His testimony is not based on a reliable

11  foundation of facts or data because he examined only a *subset* – what he refers to as the "plaintiffs'

12  subset" – of the relevant data related to concessions made by Oracle to customers dissatisfied with

13  Suite 11i.   Ex. 1 at 117:17-20.

14         Ultimately, a court must ensure that an expert witness "employs in the courtroom the same

15  level of intellectual rigor that characterizes the practice of an expert in the relevant field."   *Kumho*,

16  526 U.S. at 152.   By any standard, Yourdon failed to undertake a rigorous investigation of the

17  evidence in this case.   This is clearly grounds for exclusion because he admits that a further

18  investigation may have undermined his conclusions.   As a result, his testimony is unreliable and

19  biased against plaintiffs.

20

### b.   When Shown Further Evidence of Quality Problems Which He Failed to Consider in Forming His Opinion, Yourdon Insisted that It Did Not Affect His Conclusions in Any Way

21

22

23         At his deposition, Yourdon was shown a December 13, 2001 e-mail from Charles Phillips to

24  Mark Barrenchea, Ron Wohl and Jeff Henley ("Henley"), concerning the negative feedback that

25

_____

26  [11]       He explains: "[T]he SWAT teams are usually composed of the organization's most senior
    hardware and software technicians . . . .   The SWAT team is typically deployed to the customer's
27  location for an intense period of trouble-shooting and debugging."   *Id*. ¶53.

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY OF
EDWARD YOURDON - C-01-0988-SI                                                                        - 13 -

1   analysts were getting from dissatisfied Suite 11i customers ("Is our disastrous experience with

2   Oracle 11i typical? . . . [W]e have been extremely disappointed with the quality of the software.")

3   Ex. 6, at NDCA-ORCL 061302.  Although this e-mail exchange was an exhibit to both the

4   depositions of Ron Wohl and Henley, and Yourdon claimed to have read all deposition transcripts

5   related to Suite 11i, he stated that he had not seen the document before.  Ex. 1 at 171:20-24.  Though

6   Yourdon stated that "it certainly would not have hurt" to have reviewed this evidence (which was in

7   his possession) before writing his report, "[b]ut based on what I've seen here, I do not think that it

8   would have changed my opinion at all."  *Id*. at 174:20-22.

9        In his report, Yourdon labels Suite 11i a "market place success within a reasonable period of

10   time."  Ex. 4, ¶12.  At his deposition, he stated that a reasonable period of time would be six to

11   twelve months.  Ex. 1 at 166:11-25.  He was then shown a ***March 22, 2002*** e-mail from Ellison,

12   which indicated that Suite 11i was ***still*** not performing as claimed more than a year after the Class

13   Period.  Ellison states:  "Our top priority is to get Oracle users [that] are 'delighted' with the quality

14   and functionality [of] our CRM products.  ***Until that happens I doubt we will achieve success in the***

15   ***market***."  Ex. 9.  Though this document was an exhibit to Henley's deposition, Yourdon stated that

16   he had not seen it before.  When asked if seeing it prior to writing his report would have "impacted

17   any of [his] opinions," he stated: "I don't believe it would have.  I certainly see the words and the

18   language, but I don't believe it would have impacted my opinions."  Ex. 1 at 169:10-17.

19        Yourdon's deposition testimony makes it clear that his conclusion that Suite 11i was

20   integrated was not the product of a rigorous methodology, which was approached with an open and

21   analytical mindset.  Instead, as a defendants' expert, Yourdon extracted the conclusion he was

22   seeking from as little data as possible, and simply ignored the wealth of evidence to the contrary.

23        **D.    The "Comparable Software" Which Yourdon Claims to Compare**
            **Suite 11i to Did Not Exist and Thus His Opinion Has No Reliable**
24           **Basis and Is Irrelevant**

25        Whether opining on integration, defect levels, reference customers or lost deals, Yourdon

26   repeatedly suggests that he compared Suite 11i to similar software.  Ex. 4, ¶¶12, 181, 197, 200, 214,

27   239-240, 258.  For instance, he states Suite 11i suffered from "problems common to large,

28   sophisticated products in the software industry" and claimed there were no bugs "out of the ordinary

1   for a major new ERP release." *Id.* ¶¶12, 258.  When asked how many errors would be required

2   before software was not considered integrated, Yourdon responded: "I would want to compare what

3   was ordinary within this domain of ERP products."  Ex. 1 at 65:19-20.  However, Yourdon admitted

4   that he did not make any comparisons of Suite 11i, as it existed during the relevant period of June

5   2000 to June 2001, to any other software available at the same time.  *Id.* at 66:6-22.[12]  Therefore, any

6   conclusion of a comparative nature is baseless, inherently unreliable and must be excluded.

7          Moreover, defendants' own representations that Suite 11i was a revolutionary product render

8   any comparative analysis unreliable.  Ellison stated: "[W]hen we finished the Oracle E-Business

9   Suite, it was the first and *only* set of applications to work with a single global database."  Ex.10 at 5;

10  *see also* Ex. 4, ¶73.  Yourdon admitted to not being aware of any comparable product in existence in

11  the marketplace from June 2000 to June 2001.  "I'm not aware of any [other vendor] that offered or

12  provided, [sic] marketed the extent of CRM and ERP products integrated together into one product

13  during that period of time."  Ex. 1 at 67:25-68:19.  Accepting defendants' characterization as true,

14  there was nothing in the marketplace to compare Suite 11i to.  Any reference which Yourdon makes

15  to comparable software or what would be common, average or expected is simply baseless and

16  unreliable.

17         Similarly, Yourdon cites two potential "sizes" for Suite 11i – 250,000 function points and

18  267,237 function points.  Ex. 4, ¶¶78-79, 90.  Both are pure speculation and must be excluded.  The

19  size of Suite 11i, as determined in function points, underlines much of Yourdon's analysis because

20  he makes repeated references to what would be common for "large, sophisticated products" or

21  "ordinary for a major new ERP release" based upon the number of function points in the software.

22  *Id.* ¶¶7, 12, 189, 195.  However, Yourdon did not actually compare Suite 11i to any other software or

23  count the number of function points in Suite 11i.  Ex. 1 at 66:6-24.  Yourdon states that a "full ERP

24  package, with the comprehensive range of features and functions associated with Oracle's Suite 11i,

25  _____

26  [12]       Nor did he compare the software of Suite 11i to past releases of Oracle software.  *Id.* at
27  151:4-9.  This does not stop Yourdon from comparing Suite 11i to past Oracle releases.  *See* Ex. 4,
    ¶221.  Therefore, any such comparison must be excluded as unreliable.

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY OF
EDWARD YOURDON - C-01-0988-SI                                                    - 15 -

consists of approximately 250,000 function points." Ex. 4, ¶¶78-79.  This is simply copied from Capers Jones' ("Jones") book and is clearly unreliable.  Ex. 11 at 149.  Just one page later, Jones discusses a "typical ERP installation" of only 150,000 function points, indicating that ERP suites can come in a wide range of sizes.  *Id*. at 150.  Without examining the source code, or counting the function points, Yourdon has no basis to assume Suite 11i is a typical ERP suite of any size.

### 1. Yourdon's Extrapolation from Six Million Hours Worked to 267,237 Function Points Is Wild Speculation and Unreliable

Yourdon later posits that Suite 11i contains 267,237 function points.  Ex. 4, ¶90.  This is wildly speculative.[13]  From Alan Fletcher's statement that Oracle developers spent 6,000,000 hours creating Suite 11i, Yourdon extrapolates from person-hours to person-months to function points.  Ex. 12, ¶6.  When the witness' opinion represents unfounded extrapolation from the underlying data, it must be excluded as unreliable.  *See Weinstein's Fed. Evid*. §702.05[2][d].  Jones, the author of the very book which Yourdon cites, states that these productivity figures – like average function points per person-month – are simply not accurate.[14]  The only way to get an accurate count of the number of function points is to have a member of the International Function Point Users Group count them.  *See* Ex. 14.  In emphasizing the lack of accuracy of the figures, Jones states, "[s]uffice it to say there

---

[13]    As he explains in footnote 29:

This [determination of function points] is based on an average productivity of 6.67 function points (FPs) per person-month, as documented by Capers Jones, in *Applied Software Measurement* (McGraw-Hill 1996) at Table 15-3: Example of Activity-Based Costs for Software Development.  Standard software-industry productivity studies assume an average of 152 work-hours per person-month, based on 19 working days per month (including vacations, holidays, sick days, *etc*.), and 8 working hours per day (*see*, for example, Barry Boehm, *Software Engineering Economics*, Prentice Hall, 1981).  This means that 6,000,000 person-hours is equivalent to 39,473.68 person-months; multiplying that by 6.77 yields 267,237 function points.

*Id.* ¶90 n.29.

[14]    As Dr. Randall Jensen points out in his rebuttal report, while Yourdon chose the average productivity of 6.67 function points per person-month, the relevant range for productivity spanned from 1.90 to 13.88 function points per person-month.  Ex. 13, Table 3.17, at 189.  Furthermore, Jones indicates that the average productivity for commercial software of 100,000 function points is 1.96 function points per person-month.

1    is still a high margin of error, and readers are cautioned that 'averages' are often misleading and

2    should not be used for serious business purposes such as contracts or cost estimates."  Ex. 13 at

3    142.[15]  Yourdon's extrapolation from hours spent to the size of Suite 11i stretches the bounds of

4    credibility.  Even Oracle itself does not appear to know the size of Suite 11i.  Both Dr. Jensen, who

5    is profiled in Jones' book as a seminal figure in the field of software estimation, and the author

6    himself, Jones, state that estimates derived from the averages found in these books are simply "not

7    accurate."

8            Adding to the speculation, Yourdon has no knowledge of the number of defects in Suite 11i.

9    Ex. 1 at 99:1-100:4.  Any attempt to quantify the number of bugs per function point or the number of

10   bugs per lines of code is pure speculation.  Thus, Yourdon has no basis whatsoever for his claims

11   that defect levels per function point were normal or ordinary.

12          **E.**     **Yourdon's Opinions Concerning the "Truthfulness" of Defendants'**
               **Public Statements Lack Foundation, Are Unreliable and Irrelevant**
13

14                  **1.**    **Yourdon Inexplicably Limited His Analysis of the Defendants'**
                             **Statements to the Viewpoint of IT Professionals as Opposed to**
                             **the Investing Public**
15

16          In finding the statements made by defendants "accurate" or "fundamentally true," Yourdon

17   analyzed the defendants' statements exclusively from the viewpoint of IT professionals instead of

     from the viewpoint of ***investors***.[16]  For example, he states:
18

19          •       "Any IT professional familiar with enterprise software would have understood the
                    speaker's true meaning."  Ex. 4, ¶146.

20          •       "IT professionals would not have interpreted such a statement as a claim by Oracle
21                  that its 11i system could somehow work with a customer's internal legacy
                    systems . . . ."  *Id*. ¶160.

22

23   _____

24   [15]    In his more recent book, also heavily relied on by Yourdon, Jones writes, "Simple rules of
     thumb are ***not accurate***.  ***Simple rules of thumb should not be used for contracts, bids, or serious***
25   ***business purposes***."  Ex. 11 at 101.

26   [16]    According to Yourdon, IT professionals are the same as "technical people."  *Id*. at 37:2-7.
     "Technical people" are "people who had a background and education in the field of computer
27   hardware or software, and most likely people who were employed by or somehow directly involved
     in companies that provide computer products and services."  *Id*. at 30:23-31:6.

28

- "IT professionals who worked with business enterprise software would not understand such a claim in the way Plaintiffs suggest." *Id.* ¶177.

- "[T]he phenomenon of software bugs in the initial release of a large, complex system is common, familiar, and well understood by technologically sophisticated IT professionals." *Id.* ¶181.

Yourdon provides no basis for examining plaintiffs' allegations from such a narrow audience. Defendants consider their "major audiences" to be "industry analysts, financial analysts/investors, partners, [and] OAUG board," notably not IT professionals.  Ex. 15.  Yourdon readily admits that he offers an opinion only as to whether defendants' statements were true as understood by IT professionals:

> Q.     So are you limiting your opinion there as to people in the IT industry, IT professionals?
>
> A.     ***I'm limiting it to people who are involved in, work in or are associated with the IT industry*** . . . .

Ex. 1 at 82:22-83:4.

> Q.     So if it is later found that the statements were not made to industry people, would you have an opinion as to whether or not the statements could be false or misleading?
>
> *                *                *
>
> A.     . . . ***I am not offering an opinion on that as we sit here today.  I was focusing on the industry people here***.

*Id.* at 83:19-84:11.  Rule 702 requires that expert testimony be helpful to the trier of fact, which "implies a quantum of reliability beyond that required to meet a standard of bare logical relevance." *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 857 (3d Cir. 1990) (quoting *Downing*, 753 F.2d at 1235).  The issue in this litigation is whether the defendants' statements were misleading to a reasonable person or to ***investors***.  Whether the statements were false or misleading as made to IT professionals is not at issue.  Therefore, Yourdon's findings must be excluded because they are "not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591.

Yourdon's analysis of whether IT professionals found defendants' statements false or misleading should be excluded under Rule 403 because its "probative value is substantially outweighed by the danger of unfair prejudice [and] confusion of the issues." Fed. R. Evid. 403.  The potential prejudice of an expert testifying that the statements were not false or misleading as

1   understood by a small segment of investors would unfairly prejudice plaintiffs' case, as the majority

2   of plaintiff investors are unlikely to be IT professionals.  Furthermore, admission of Yourdon's

3   expert testimony will confuse the issue by suggesting that the statements were accurate as interpreted

4   by a certain narrow audience.

5           **2.      Yourdon Failed to Consider the Majority of the Alleged False
                      and Misleading Statements**
6
                   **a.      Yourdon Never Addresses Whether Customers Saved
7                           Money Fast or at All**

8           Yourdon's finding that defendants' statements were "accurate" (or "fundamentally true" or

9   "not false") includes the statement by Ellison that: "It's up and running in months.  You get the

10  savings in months.  It costs you less, and it takes less time to install."  *See* Ex. 4, ¶¶12, 143, 156, 258;

11  Ex. 1 at 70:12-13.  However, Yourdon failed to undertake *any* investigation into whether Suite 11i

12  customers saved money due to their implementation of the software:

13          Q.      And did you analyze whether *any Oracle customers on Suite 11i as of
                    December 14th, 2000 had gotten any savings due to their implementation of Suite
14                  11i?*

15                              *           *           *

16          THE WITNESS:  *No, I did not evaluate that or analyze that*.  I'm sorry.  No.

17  Ex. 1 at 94:20-95:2.  Because Yourdon's claim that Ellison's statement is "accurate" is not based on

18  *any* investigation into the facts, it should be excluded under Rule 702 as unreliable.

19                 **b.      Yourdon Never Assesses Whether Any Customer
                           Installed a Full Suite – Much Less During the Class
20                          Period**

21          Plaintiffs allege that defendants' statements that Suite 11i was "integrated" and

22  "interoperable out of the box" were false and misleading.  As evidence to rebut plaintiffs' claim,

23  defendants point to evidence of the number of "live" customers using Suite 11i to suggest that the

24  product worked as claimed.  Ex. 4, ¶¶204-205; Ex. 15.  However, Yourdon tucks into a footnote:

25  "As is common in the industry, Oracle listed a customer as 'live' when it had fully implemented at

26  least one module of Suite 11i."  Ex. 16, ¶205 n.277.  Suite 11i contained approximately 75 modules.

27  Ex. 4, ¶134.  The key to integration in Suite 11i is that workflows "cross[] the boundary" between

28  CRM and ERP modules.  *Id*. ¶137.  A customer using only ERP modules is not utilizing the

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY OF
EDWARD YOURDON - C-01-0988-SI                                                    - 19 -

integration between front office CRM and back office ERP.  Thus, identifying those customers, if any, who were using both CRM and ERP modules during the Class Period, is crucial to placing the defendants' "live" customer numbers in context.  In essence, if customers were not using ERP and CRM modules together, then they should not be used to support Yourdon's claim that Suite 11i was integrated and interoperable.  In his deposition, Yourdon stated that he *believed* that a list of customers using both CRM and ERP modules existed in his report or rebuttal report.  Ex. 1 at 93:13-94:8.  It does not.  Furthermore, those companies that Yourdon does list as "success stories" in his rebuttal report are not running ERP and CRM modules together, and were "successful" only after the Class Period.  Ex. 16, ¶¶74-78.

> ### c. Yourdon Did Not Know When the Class Period Was and, Therefore, Could Not Assess Whether the Defendants' Statements Were True During the Class Period

At his deposition, Yourdon did not appear to be aware there was an established Class Period in the case – December 14, 2000 to March 1, 2001.  When asked if he knew when the Class Period was from, he stated:  "I believe there is still some dispute as to whether the Class Period is December 14th, 2000 to February 26th, or whether it is, as you had suggested earlier, June 1st to June 1st, or May of 2000 to February 26th of 2001."  Ex. 1 at 129:4-8.  Yourdon's inability to articulate the Class Period – an absolutely fundamental aspect to his expert analysis – casts doubt upon the reliability of his testimony that the relevant statements were actually true *during the Class Period*.  This is particularly important because defendants rushed a defective product to market.[17]  Later versions of Suite 11i may have remedied some of its failures, but these later versions cannot remedy the fact that defendants' statements about Suite 11i were false and misleading during the Class Period.

---

[17]  Ellison admits that as of the release in May 2000, the order management had "huge problems . . . . It hadn't been used anywhere it had just been finished, *the paint was drying*."  Ex. 8 at NDCA-ORCL 1529167.  Ron Wohl, head of all applications stated: "In terms of the interaction between the groups, clearly in retrospect as well, just as there should have been more testing of the ERP product stand-alone, there should have been more testing of the CRM product stand-alone, there should have been more testing of the boundary points between ERP and CRM."  Ex. 5 at 106:14-21.

### 3.    Yourdon's Claim that Defendants' Statement Were "Accurate," "Fundamentally True" or "Not False" Is at Best Confusing and at Worst Simply Wrong

Yourdon analyzes six statements made by defendants which plaintiffs allege are false and misleading.   Ex. 4, ¶143.   He alternately concludes that the statements are "accurate,"[18] "fundamentally true,"[19] and "not false."[20]  Yourdon's testimony on this issue is unreliable and should be excluded.

In his "Summary of My Opinions" and "Conclusions" sections, Yourdon's report contains the identical statement that: "The specific statements regarding the Suite 11i product that Plaintiffs have identified as 'false' were, in fact, accurate."  Ex. 4, ¶¶12, 258.  In the body of his report, Yourdon hedges his claims to accuracy making them conditional on a three-prong analysis:

> 156.    After having reviewed the factual record provided to me, it is readily apparent that Oracle's statements about Suite 11i . . . were ***fundamentally true***.   This conclusion is based both on [a] ***context*** in which the statements were made, as well as [b] ***my understanding*** of these statements and [c] as an ***industry*** expert (*i.e.*, the audience for which they were intended).

*Id*. ¶156.  At his deposition, Yourdon stated that he found defendants' statements were "not false," and rejected his finding that the statements were "accurate."  Ex. 1 at 70:12-13.  When confronted with the finding in his report that the statements were "fundamentally true," Yourdon admitted that he tolerated some inaccuracy in drawing his conclusions.  He stated that "fundamentally true" "means that there may have been ***minor inaccuracies or minor errors*** in the statements that Oracle made, but that in my opinion did not detract from the fundamental truth, the basic truth as would be perceived by . . . the audience for which they were intended."  *Id*. at 74:17-23.  Yourdon suggested that he should amend his finding that the statements were "accurate" – "The only caveat or qualifier that I would have added to that . . . is the qualifier in the context that they were made and for the audience for whom they were intended."  *Id*. at 75:13-17.  Even this would seem inadequate.  The

---

[18]    *Id*. ¶¶12, 258.

[19]    *Id*. ¶156.

[20]    Ex. 1 at 70:12-13.

statements were not even accurate in context and for Yourdon's presumed audience because he tolerated some falsity in his analysis – *i.e.*, they were only "fundamentally true." Ex. 4, ¶156. Yourdon's analysis of Defendants' statements is unreliable and not helpful to the trier of fact.

### F. Yourdon's Opinion on Lost Deals Related to Suite 11i Must Be Excluded

Yourdon concludes that the evidence does not support plaintiffs' claims that Oracle lost potential customers because Suite 11i did not perform as represented. *Id*. ¶¶12, 258. Yourdon's analysis must be excluded on multiple grounds. First, Yourdon is not qualified to offer expert testimony related to Oracle's forecast or pipeline under Rule 702. Nothing in Yourdon's educational or professional background qualifies him by knowledge, skill or experience to offer an expert opinion on what caused Oracle to miss its third quarter 2001 guidance or provide analysis on Oracle's pipeline. Second, Yourdon failed to review the full factual record as related to lost deals. Therefore, even if he is qualified, his testimony must be excluded as unreliable. He admits to not having read the relevant testimony. His review "did not include the depositions of accounting people and forecasting people, et cetera." Ex. 1 at 74:1-3. Third, Yourdon's methodology is unreliable. He arbitrarily narrowed his review only to deals valued at over $2 million in Oracle's 3Q01 pipeline. Ex. 4, ¶234. He provides no reason for examining such a narrow subset of the evidence nor does he make any claim that such a subset was representative of all deals. Yourdon's analysis on lost deals must be excluded as unreliable and not helpful to the trier of fact under Rule 702.[21]

---

[21] Related to Yourdon's lost deals analysis is his Section X.1.5 analysis of the fake data used by Oracle salespeople in their demonstration system. It should also be excluded under Rule 702 because it is unreliable and not helpful to the trier of fact. Yourdon failed to watch a demonstration, use the demonstration system or analyze the underlying software. Nor did he speak to customers who viewed the system. Also, Yourdon's analysis in Section X.1.6 relating to the small number of reference customers should be excluded because he attempts to compare the number of reference customers to other comparable releases.

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY OF EDWARD YOURDON - C-01-0988-SI

1

### 1.     Yourdon's Qualifying Language Related to Lost Deals Makes His Analysis Unreliable, Confusing and Irrelevant

2

3          Yourdon states that "there is no evidence that would support the contention that unknown or

4    unexpected product quality issues with Suite 11i" caused Oracle to lose deals.  *Id*. ¶235.  Yourdon

5    does not offer an explanation for why or how he narrowed his analysis to "unknown or unexpected

     product quality issues."  Plaintiffs certainly do not make such a distinction.  Yourdon's decision to
6
     arbitrarily qualify his opinion only highlights its lack of reliability.[22]
7

8          Furthermore, Yourdon states that there is no evidence that Oracle lost deals "because

9    customers became aware of facts that were inconsistent with Oracle's statements regarding

10   integration and interoperability."  *Id*. ¶236.  This opinion is equally unreliable.  First, Yourdon never

11   spoke to any customers, so he cannot testify as to their knowledge.  Ex. 1 at 26:6-9.  Second, his

12   conclusion is dictated by the finding that the software was in fact integrated and interoperable.  As

13   discussed above, Yourdon was not qualified to make such an analysis, and his opinions on

14   integration are unreliable.  In sum, there is nothing in Yourdon's analysis of lost deals that can be

     considered reliable or helpful to the trier of fact.  It should be excluded under Rules 702 and 403.
15

16   ### G.     Yourdon Attempted to Change Multiple Elements of His Report at His Deposition, Undermining the Credibility and Reliability of His Opinions

17

18         In his report, Yourdon defined software quality as the absence of software bugs.  He wrote

19   "quality (*i.e.*, absence of software bugs)."  Ex. 4, ¶41.  However, at his deposition, he sought to

20   change "*i.e.*" meaning "that is" to "*e.g.*" meaning "for example."  Ex. 1 at 60:25-61:19.  This is a

21   substantial definitional change which fundamentally alters his report.  Yourdon makes repeated

22   references to the quality of Suite 11i, but only in this one place in his report did he define quality in

23   the context of software products.[23]  The material nature of some of the alterations which Yourdon

24   ───────────────────

25   [22]      It begs the following questions:  Unexpected by whom?  Unknown by unknown? Unexpected as compared to what other software?  If no comparable software exists, how does
26   Yourdon distinguish between the expected and the unexpected?  How does Yourdon define quality?

27   [23]      As discussed above, Yourdon also sought to change his finding – which appeared verbatim in both his "Summary of My Opinions" and "Conclusions" sections – that defendants' statements were
28   "accurate."  Ex. 4, ¶¶12, 258.  Ex. 1 at 75:15-17.  Yourdon also suggested that he should qualify his

1   sought to make in the course of his deposition suggests that his methodology lacks the rigor which

2   the Court stressed was a hallmark of admissibility in *Kumho*.  *Kumho*, 526 U.S. at 152.[24]

3   **III.    CONCLUSION**

4          Federal Rule of Evidence 702 establishes a clear threshold for the admissibility of expert

5   testimony.  For each opinion proffered, the expert must be qualified, his opinion must be reliable and

6   it must assist the trier of fact.  Yourdon's report fails on all three accounts.  He has been retained by

7   defendants primarily to support their claims that Suite 11i was fully integrated and interoperable out

8   of the box.  However, in rendering his opinion, Yourdon ran afoul of each of the requirements of

9   Rule 702.  First, he devised a method to test the integration of Suite 11i, which required "intimate

10  knowledge" which he does not possess.  He then failed to apply his methodology to two of the four

11  elements which comprise integration.  Finally, he qualified his finding that Suite 11i is integrated, as

12  defendants claimed, only when viewed in the context the statements were made and only from the

13  standpoint of an IT professional.  And of course, Yourdon tolerated minor inaccuracies in his

14  findings.  The result makes a mockery of "expert" testimony.  Yourdon has conditioned, qualified,

15  and tortured findings to support the defendants' claims, but in the process, he has completely and

16  utterly failed the requirements of Rule 702 and *Daubert*.

17

18

19

20

21  finding that evidence of concessions made by defendants to customers did "not indicate anything []
    about the quality of the software."  Ex. 4, ¶202.  At his deposition, Yourdon stated, "I think to be
22  consistent I should insert the adjective 'overall' [before 'quality'] into paragraph 202."  Ex. 1 at
    115:24-116:1.

23  [24]     Yourdon's credibility is further undermined by his failure to list his publications which were
24  widely criticized.  In the introduction to his report, Yourdon lists a number of "recent books" he has
    authored.  Ex. 4, ¶5.  However, a comparison to his complete list of publications in Appendix C
25  reveals that Yourdon left certain publications off this list, including his book, *Time Bomb 2000!*,
    which was criticized for vastly overstating the apocalyptic potential of Y2K (the year 2000) problem.
26  *Id.*, Appendix C, at 146.  At his deposition, Yourdon mentioned that he omitted two other books
    from the same time period, which were also widely criticized:  *A Financial Guide to the Y2K
27  Problem* and *The Rise and Resurrection of the American Programmer*.  Ex. 1 at 28:14-25, 33:17-19.
    Yourdon's failure to include these titles further erodes his credibility.

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY OF
EDWARD YOURDON - C-01-0988-SI                                                        - 24 -

1         Yourdon's opinion must be excluded in its entirety.  Between his unreliable analysis of

2    integration and his irrelevant analysis of defendants' statements from the viewpoint of an IT

3    professional, Yourdon cannot offer a single admissible opinion under Rule 702.

4    DATED:  October 20, 2008              COUGHLIN STOIA GELLER
                           RUDMAN & ROBBINS LLP

5                           SHAWN A. WILLIAMS
                       WILLOW E. RADCLIFFE

6                           ELI R. GREENSTEIN
                       DANIEL J. PFEFFERBAUM

7

8                                    s/ Shawn A. Williams
                       SHAWN A. WILLIAMS

9

10                          100 Pine Street, Suite 2600
                       San Francisco, CA  94111

11                          Telephone:  415/288-4545
                       415/288-4534 (fax)

12                          COUGHLIN STOIA GELLER
                           RUDMAN & ROBBINS LLP

13                          MARK SOLOMON
                       DOUGLAS R. BRITTON

14                          655 West Broadway, Suite 1900
                       San Diego, CA  92101

15                          Telephone:  619/231-1058
                       619/231-7423 (fax)

16

17                          COUGHLIN STOIA GELLER
                         RUDMAN & ROBBINS LLP

18                          STACEY M. KAPLAN
                       9601 Wilshire Blvd., Suite 510

19                          Los Angeles, CA  90210
                       Telephone:  310/859-3100

20                          310/278-2148 (fax)

21                          Lead Counsel for Plaintiffs

C:\Program Files\pdfDocs\users\PamelaJ\Import\NOT00055012.doc

22

23

24

25

26

27

28

1                     <u>CERTIFICATE OF SERVICE</u>

2        I hereby certify that on October 20, 2008, I electronically filed the foregoing with the Clerk

3 of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4 addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5 mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6 participants indicated on the attached Manual Notice List.

7        I certify under penalty of perjury under the laws of the United States of America that the

8 foregoing is true and correct.  Executed on October 20, 2008.

9

                                            <u>s/ Shawn A. Williams</u>

10                                       SHAWN A. WILLIAMS

11                                       COUGHLIN STOIA GELLER

12                                             RUDMAN & ROBBINS LLP

                                    100 Pine Street, 26th Floor

13                                     San Francisco, CA  94111

                                    Telephone:  415/288-4545

14                                     415/288-4534 (fax)

15                                     E-mail:shawnw@csgrr.com

16

17

18

19

20

21

22

23

24

25

26

27

28

## Mailing Information for a Case 3:01-cv-00988-SI

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jennie@libertylaw.com

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Doug Britton**
  dougb@csgrr.com,jillk@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Joy Ann Bull**
  JOYB@csgrr.com

- **Dorian Estelle Daley**
  dorian.daley@oracle.com

- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,svdocket@lw.com,zoila.aurora@lw.com

- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com

- **Tera Marie Heintz**
  theintz@morganlewis.com,eeberline@morganlewis.com

- **Stacey Marie Kaplan**
  SKaplan@csgrr.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com,sf_filings@hbsslaw.com

- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com,#sfdocket@lw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **William S. Lerach**
  e_file_sd@lerachlaw.com

- **James C. Maroulis**
  jim.maroulis@oracle.com

- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com

- **Brian P Murray**
  bmurray@murrayfrank.com

- **Shinyung Oh**
  shinyungoh@paulhastings.com

- **Dawn S. Pittman**
  dpittman@morganlewis.com

- **Willow E. Radcliffe**
  willowr@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Mark Solomon**
  marks@csgrr.com,e_file_sf@csgrr.com,sholloway@csgrr.com,e_file_sd@csgrr.com

- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com,aelishb@csgrr.com

- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Corey D. Holzer**
Holzer Holzer & Cannon LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

**Raymond Lane**
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

**PRG-Schultz USA, Inc.**
Paul Hastings Janofsky & Walker LLP
55 Second Street
24th Floor
San Francisco, CA 94105

**Darren Jay Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

**Sanna Rachel Singer**
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111

**Monique C. Winkler**
Coughlin Stoia Geller Rudman & Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111