Exhibit 1

1

```
1        IN THE UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF CALIFORNIA
3             SAN FRANCISCO DIVISION
4
5   In re ORACLE CORPORATION
6   SECURITIES LITIGATION.
7            Master File No. C-01-0988-MJJ
8   This Document Relates To:
9
10     ALL ACTIONS.
11   _____/
12
13            ---o0o---
14
15      VIDEOTAPED DEPOSITION OF EDWARD YOURDON
16            TUESDAY, JULY 3, 2007
             ---o0o---
17
18
19
20      SHEILA CHASE & ASSOCIATES
           REPORTING FOR:
21       LiveNote World Service
        221 Main Street, Suite 1250
22     San Francisco, California 94105
          Phone: (415) 321-2311
23        Fax: (415) 321-2301
24   Reported by:
     DIANA NOBRIGA, CSR, CRR
25   LICENSE NO. 7071
```

3

```
1        BE IT REMEMBERED that on Tuesday, July 3,
2   2007, commencing at the hour of 9:07 a.m., thereof, at
3   the LAW OFFICES OF LERACH, COUGHLIN, STOIA, GELLAR,
4   RUDMAN & ROBBINS, LLP, 100 Pine Street, Suite 2600,
5   San Francisco, California, before me, DIANA NOBRIGA, a
6   Certified Shorthand Reporter in and for the State of
7   California, personally appeared
8        EDWARD YOURDON,
9   as a witness by the plaintiffs herein, who, being by me
10  first duly sworn, was thereupon examined and testified
11  as hereinafter set forth.
12            ---o0o---
13  Appearing as counsel on behalf of the Plaintiffs:
14       SHAWN A. WILLIAMS, ESQUIRE
         DANIEL PFEFFERBAUM, ESQUIRE
15       MONIQUE C. WINKLER, ESQ.
         LERACH, COUGHLIN, STOIA, GELLAR,
16       RUDMAN & ROBBINS
         100 Pine Street, Suite 2600
17       San Francisco, CA 94111
         Shawnw@lerachlaw.com
18
19  Appearing as counsel on behalf of Defendants:
20       MATT RAWLINSON, ESQUIRE
         MELANIE BLUNSCHI, ESQUIRE
21       LATHAM & WATKINS
         140 Scott Drive
22       Menlo Park, CA 94025-1008
         matt.rawlinson@lw.com
23
24  Also Present:  Dorian Daley, Oracle; Elizabeth Skye,
25  Oracle; James Terrell, Videographer
```

2

```
1             I N D E X
2         INDEX OF EXAMINATION
3                          PAGE
4   EXAMINATION BY MR. WILLIAMS        5, 242
5   EXAMINATION BY MR. RAWLINSON        241
6             ---o0o---
7         INDEX OF EXHIBITS
8   DESCRIPTION                        PAGE
9   Exhibit 1   Confidential Expert Report of
10      Edward Yourdon, dated May 25,
11      2007                            9
12  Exhibit 2   Confidential Expert Report of
13      Edward Yourdon, dated May 25,
14      2007                          244
15  Exhibit 3   Confidential Rebuttal Expert
16      Report of Edward Yourdon,
17      dated June 22, 2007           244
18
19
20
21
22
23
24
25
```

4

```
1        VIDEOGRAPHER:  This begins the videotaped
2   deposition of Edward Yourdon, tape one, Volume I, in the
3   matter In Re Oracle Securities Litigation, as filed in
4   the United States District Court for the Northern
5   District of California, Master File No. C-01-0988-MJJ.
6   Today's date is July 3, 2007.  The time on the video
7   monitor is 9:07.  The video operator today is James
8   Terrell, representing LiveNote World Service, located at
9   221 Main Street, Suite 1250, San Francisco, California
10  94105.  The phone number is 415 321-2300.  The court
11  reporter is Diana Nobriga with Sheila Chase and
12  Associates, reporting on behalf of LiveNote World
13  Service.  And today's deposition is being taken on
14  behalf of plaintiff, and is taking place at 100 Pine
15  Street in San Francisco, California.  If counsels will
16  now please introduce yourself and state whom you
17  represent.
18       MR. WILLIAMS:  Shawn Williams, Lerach Coughlin
19  Stoia Geller Rudman and Robbins on behalf of plaintiffs.
20       MR. PFEFFERBAUM:  Daniel Pfefferbaum, Lerach
21  Coughlin on behalf of plaintiffs.
22       MS. WINKLER:  Monique Winkler, Lerach Coughlin
23  on behalf of plaintiffs.
24       MR. RAWLINSON:  Matt Rawlinson, Latham and
25  Watkins on behalf of defendants.
```

5

1       MS. BLUNSCHI: Melanie Blunschi, Latham and
2  Watkins on behalf of the defendants.
3       MS. DALEY: Dorian Daley, Oracle Corporation.
4       MS. SKYE: Elizabeth Skye, Oracle Corporation.
5       VIDEOGRAPHER: Thank you. You may swear the
6  witness and then begin.
7          EDWARD YOURDON
8  having been duly sworn, testified as follows:
9        EXAMINATION BY MR. WILLIAMS
10    MR. WILLIAMS: Q. Good morning. Can you
11  state your full name for the record, please.
12    A. Yes. My full name is Edward Yourdon.
13    Q. And does that include a middle initial? Is
14  there a middle name there?
15    A. For a period of time in the early 1980's I
16  used a middle initial, it was never part of my legal
17  name. It was my wife's surname.
18    Q. What was that initial?
19    A. Nash. N for Nash.
20    Q. Did you ever publish anything with Edward Nash
21  Yourdon?
22    A. I believe one of the textbooks that I
23  published in the early 1980s was published as Edward
24  Nash Yourdon.
25    Q. What is your current address?

6

1    A. 275 West 96th Street in New York City.
2    Q. You've testified in depositions before?
3    A. Yes, I have.
4    Q. So you have a decent idea of what's going to
5  happen here today?
6    A. I think so, yes.
7    Q. I'm just going to give you a brief overview.
8  The reporter sitting to your right is going to take down
9  all of the comments here today, my questions, your
10  answers, your lawyer's comments. Unfortunately, she is
11  unable to record head nods or hand gestures. So, in
12  response to any of my questions, I'll just ask you to
13  verbalize your responses. Do you understand that?
14    A. Yes, I do.
15    Q. You understand you are also testifying under
16  oath today and the oath that you've taken is the same
17  oath that would apply in a court of law. You understand
18  that?
19    A. Yes, I do.
20    Q. We'll take several breaks today. We can take
21  them whenever you require or whenever you need. I plan
22  to take a break maybe every hour, hour and ten minutes.
23  But if you need a break at any time, just let me know,
24  I'll finish my question or a line of questioning, then
25  we can take a break. It's totally up to you. Do you

7

1  understand?
2    A. Yes, I do.
3    Q. Now, throughout the day it's very likely that
4  Mr. Rawlinson is going to object to my questions, and he
5  has a right to do that. However, unless he instructs
6  you not to answer a question, you still have to answer
7  the question. Do you understand that?
8    A. Yes, I do.
9    Q. And I'm going to ask you a lot of questions,
10  I'll try to be as clear as I can. There is no doubt
11  some of them will not come out the way that I want them
12  to. If you don't understand the question, ask me to
13  repeat it or clarify it, and I will do the best I can to
14  do that. Do you understand?
15    A. Yes, I do.
16    Q. Any reason why you can't testify today? On
17  any medication that might impact your ability to recall
18  facts?
19    A. No. No reason.
20    Q. There are a couple of comments made before we
21  went on the record regarding your report. I understand
22  that you found some typographical errors, or they were
23  characterized as typographical errors in your report
24  that you want to correct?
25    A. Yes, that's correct.

8

1    Q. I'm not going to have them corrected right now
2  on the record. If they become apparent during the
3  testimony today, you let me know, and we will deal with
4  them that way.
5    If at some point you think you want to amend
6  the report, if there are significant changes, I guess
7  you can do that, and we'll deal with that later. But I
8  think trying to go through those changes prior to the
9  testimony will be time consuming and not helpful for me.
10  Do you understand?
11    A. Yes.
12    Q. When was the last time you testified in a
13  deposition?
14    A. In a deposition, last week.
15    Q. Last week. And geographically, where was
16  that?
17    A. That was in Houston, Texas.
18    Q. And was that in a lawsuit in court or was it
19  in arbitration?
20    A. That was a lawsuit in court.
21    Q. And who were the parties to that action?
22    A. The parties are a company called Fair Isaac,
23  that's two words, F-a-i-r, Isaac, I-s-a-a-c. The other
24  party is Texas Mutual Insurance Company.
25    Q. And were you testifying as an expert in that

9

1 case?
2    A. Yes, I was.
3    Q. Relating to computer programming or computer
4 software?
5    A. Yes, that's correct.
6    Q. And you were testifying on behalf of which
7 party?
8    A. On behalf of Fair Isaac Company.
9    Q. Now, prior to last week, when was the last
10 time that you testified in a deposition?
11    A. As best I can recall, it was October of 2006.
12    Q. About a year ago? About seven months ago?
13    A. Yes, that's right.
14    Q. And who were the parties to that action?
15    A. The parties were Computer Task Group, three
16 words, and the other party was a company called XPAN,
17 all capital letters, X-P-A-N.
18    Q. And who were you testifying on behalf of in
19 that action?
20    A. On behalf of Computer Task Group.
21       (Exhibit 1 marked for
22        identification.)
23    MR. WILLIAMS:  Q. Actually, let me show you
24 what's been marked as Exhibit No. 1, Yourdon No. 1, and
25 it is your report dated May 25th of 2007.

10

1    Do you recognize that report?
2    A. Well, I certainly recognize the cover page.
3    Q. Well, you can just thumb through it, if you
4 like. I don't think we've done anything to it. And
5 just let me know if it fairly and accurately depicts the
6 report that you filed in this case.
7    A. Yes, it appears to, just thumbing through the
8 pages. I don't see any missing pages.
9    Q. When is the last time you saw the report?
10    A. The last time I saw this report, yesterday.
11    Q. And prior to that, when was the last time you
12 saw it?
13    A. Probably the day before yesterday.
14    Q. Okay. I'm going to ask you to just turn to
15 page 144 of the report. Are you there?
16    A. Yes.
17    Q. You see that's titled the "Appendix B Cases in
18 Which Expert Testimony Provided in the Past Four Years"?
19    A. Yes, that's correct.
20    Q. You list approximately 19 different actions or
21 instances in which you provided expert testimony; right?
22    A. That's correct.
23    Q. And is that an accurate list, to the best of
24 your knowledge, of all the cases in which you provided
25 testimony in the last four years?

11

1    A. With the exception of this most recent case
2 you asked me about just a moment ago for which the case
3 has not gone to trial yet, but my deposition took place
4 subsequent to the filing of this report.
5    Q. Okay. And none of the -- most of them are
6 arbitrations appearing after number 7 down through 16 or
7 15, did all of those occur within the last four years?
8    A. Yes, that's correct.
9    Q. Are you able to tell just based on this list
10 when the earliest testimony is? Are these in chron
11 order?
12    A. They are in chronological order with the most
13 recent one first.
14    Q. On the top?
15    A. Yes, that's correct.
16    Q. Now, starting with number 7 down through
17 number 14, it looks like you were a participant in some
18 fashion in multiple lawsuits relating to or with J.D.
19 Edwards.
20    A. That's correct.
21    Q. Is that fair?
22    A. Yes.
23    Q. And you provided expert testimony in each of
24 those lawsuits?
25    A. That's correct. At least to the extent of

12

1 deposition, in some cases the matter was settled before
2 the actual hearing. But, yes is the short answer to
3 your question.
4    Q. And in each of those cases, were you
5 testifying on behalf of J.D. Edwards?
6    A. That's correct.
7    Q. Did you have -- were you working for J.D.
8 Edwards?
9    A. No, sir, I was not.
10    Q. Did you have a relationship with J.D. Edwards
11 that required you to provide testimony on their behalf
12 in lawsuits at all?
13    MR. RAWLINSON:  Objection; vague.
14    THE WITNESS:  No, I did not.
15    MR. WILLIAMS:  Q. So they just in each of
16 these lawsuits they requested your help and you provided
17 it?
18    A. I was retained by counsel for J.D. Edwards to
19 provide help, to represent J.D. Edwards, yes.
20    Q. And was it the same counsel in each one of
21 those cases?
22    A. Yes, as I recall. For number 14 there was a
23 transition under way from the counsel that had been
24 representing J.D. Edwards throughout all these cases to
25 a different one; as part of the acquisition by

13

1  PeopleSoft of J.D. Edwards a different law firm became
2  involved.  As I recall for number 14, the original law
3  firm for whom I had provided the earlier services and
4  the newer law firm were both involved.
5      Q.  And in each --
6      A.  Excuse me for a moment.  I think that may have
7  been true as well for number 13, although number 13 was
8  settled before the hearing.  But I believe the new law
9  firm was also becoming involved in the transition period
10  at that point.
11      Q.  When you say the hearing, do you mean trial or
12  an arbitration hearing where your testimony might be
13  used?
14      A.  An arbitration hearing, as I've indicated, I
15  think with all the cases number 7 through 14, all of
16  them were arbitration hearings.
17      Q.  Was J.D. Edwards a defendant in each one of
18  those cases?
19      A.  One of, in several cases, one of many
20  defendants, but at least a defendant, yes.
21      Q.  And was some issue in each of those cases J.D.
22  Edwards software?
23      MR. RAWLINSON:  Objection to the form.
24      THE WITNESS:  That was, I believe, in every
25  single case, at least one of the issues, though not

14

1  necessarily the only one, yes.
2      MR. WILLIAMS:  Q.  Were any of the companies
3  that were suing J.D. Edwards that you list here in 8
4  to -- or 7 through 14, were any of those companies also
5  software companies or were they customers of J.D.
6  Edwards?
7      A.  Those two characterizations are not
8  necessarily mutually exclusive.  They were all customers
9  of J.D. Edwards.  Looking through them, number 11 was a
10  retailer, an online Internet reseller of computer
11  equipment.  And I believe they had some software
12  capabilities or some software division.  But in this
13  particular matter they functioned as a customer of J.D.
14  Edwards.  And I don't believe the other ones could be
15  characterized as software companies at all.
16      Q.  Have you ever provided testimony or expert
17  testimony on behalf of a party in a lawsuit against a
18  software vendor?
19      A.  Number 19 on the list would fall into that
20  category.
21      Q.  So Bsquare was a software vendor?
22      A.  Yes, that's correct.
23      Q.  And SAGEM --
24      A.  Yes, that's correct, I'm sorry.
25      Q.  And SAGEM Morpho was what kind of company?

15

1      A.  It was the American subsidiary of a French
2  telecommunication company making cell phones for which
3  they required some software that was going to be
4  provided by Bsquare.
5      Q.  Okay.  But none other than number 19 on that
6  list are cases where you provided expert testimony on
7  behalf of a party that was suing a software vendor?
8      A.  That is correct.
9      Q.  When were you retained in this case?
10      A.  As I recall, approximately January of this
11  year.  I don't recall the precise date.
12      Q.  I'm assuming that you reviewed documents prior
13  to writing your report?
14      A.  Yes, I did.
15      Q.  What documents, if you can describe generally
16  in terms of volume, what documents were provided to you
17  and in what form?
18      A.  Let me answer the second part of your question
19  first, since it is a little bit easier.  I was provided
20  with documents both in printed hard copy form and also
21  in electronic form, either on CD or DVD, or in some
22  cases transmitted to me electronically as PDF files or
23  text files.  So those are the two general formats.  And
24  the general categories consisted of depositions and
25  exhibits for numerous witnesses in this case, technical

16

1  documentation associated with the Oracle Suite 11i
2  product, a number of analyst reports originally written
3  or published by stock market analysts or technical
4  analysts in the computer field, a number of articles
5  published in trade magazine public cases about the
6  product and some of the circumstances during the
7  relevant time period, a large number of documents
8  consisting of e-mail correspondence between various
9  parties, PowerPoint presentations made at various times
10  by various individuals.  And then other categories
11  as well.  I'm not sure whether they are itemized
12  particularly here.  Those are the ones that come to mind
13  at the moment.
14      Q.  You said you got some hard copy documents.
15  Were those in boxes shipped to you?
16      A.  Initially as I recall, several boxes, and then
17  periodically the individual documents or packages of
18  documents that would be sent in a Fed Ex envelope.
19      Q.  In terms of boxes, approximately how many
20  boxes of documents, hard copy, did you receive?
21      A.  Initially, this is only a very rough estimate,
22  but I would say on the order of eight to ten boxes.
23      Q.  And then you got some text files or some CDs?
24      A.  Both.
25      Q.  Let's start with the CDs.  How many CDs did

17

1  you receive?
2      A.  Again, this, is a rough estimate, but I would
3  estimate on the order of a dozen CDs.
4      Q.  Okay.
5      A.  Though I can't recall sitting here which ones
6  were CDs and which ones were DVDs, and there is a
7  significant difference in capacity between the two.  But
8  in terms of something in some computer readable medium,
9  it is on the order of a dozen such things.
10      Q.  That would include both the CDs and the DVDs?
11      A.  That's right.
12      Q.  Approximately 12; all right.  And you said
13  that you received many deposition transcripts?
14      A.  Yes, that's correct.
15      Q.  Did you get those on one of the CDs or DVDs or
16  also get those in hard copy?
17      A.  As I recall, I received them both
18  electronically, in some cases shortly after the
19  deposition had been taken, would be transmitted to me by
20  e-mail.  Many of them were organized en mass, in a batch
21  of depositions sent to me on a single CD.  And I
22  believe, as I recall, that I received some as well in
23  hard copy form, though sitting here at the moment I
24  can't recall the extent of overlap, whether there were
25  any that I received only in hard copy but not in

18

1  electronic form.
2      Q.  Okay.
3      A.  It was more likely to be the opposite, that I
4  would have received electronic versions, which if I
5  found convenient I could print out on my own.
6      Q.  Sure.  With respect to the deposition
7  transcripts that you received in electronic form on CDs,
8  were those among the CDs that we just talked about, 12,
9  or were these additional CDs?
10      A.  No.  They were among the CDs that I mentioned.
11      Q.  Among those; okay.  Do you know how many
12  depositions were taken in this case?
13      A.  I don't.
14      Q.  Do you think or do you believe that you have
15  reviewed them all?
16      A.  No.  I did not ask to nor was I asked to
17  review depositions associated with aspects of this case
18  that are beyond my assignment.  Some of the accounting
19  matters and forecasting matters, as I understand, had
20  depositions involving appropriate witnesses.  So, those
21  I definitely did not review.
22      Q.  All right.  Let me -- well, you did provide
23  some generalized opinion regarding forecasting matters
24  though; didn't you?
25      MR. RAWLINSON:  Objection; mischaracterizes

19

1  the witness's report.
2      THE WITNESS:  I offered opinions in a couple
3  of parts of my reports that had to do with such matters,
4  yes.
5      MR. WILLIAMS:  Q.  Right.  So do you know
6  whether you reviewed all of the depositions concerning
7  or which touched upon forecasting issues in this case?
8      MR. RAWLINSON:  Objection; vague and
9  ambiguous.
10      THE WITNESS:  I don't know.  The ones that I
11  reviewed in that particular area have been itemized and
12  cited in my report.
13      MR. WILLIAMS:  Q.  Okay.  And just going back
14  to my earlier question as to whether or not you reviewed
15  all of the depositions, I think your testimony generally
16  was that you did not review or you don't believe you
17  reviewed depositions relating to other portions of the
18  case that may not be related to your expert testimony;
19  is that fair?
20      A.  Not quite.  As I tried to qualify it, I did
21  not make any attempt to review the brood range of all
22  such depositions in other financial and forecasting and
23  accounting matters.  I was asked to review a limited
24  number of such depositions, which I did, and which are
25  cited in my report.

20

1      Q.  So any deposition that is not cited in your
2  report relating to issues other than computer
3  programming type issues you did not review?
4      A.  I believe that's too narrow.  Because some of
5  the depositions that were relevant to my report involve
6  things beyond just computer programming, per se.  I was
7  trying to characterize the depositions associated with
8  accounting and financial and forecasting things as
9  opposed to anything associated with the product or the
10  implementation of the product or the success of the
11  product in customer implementation.  Those are the ones
12  I concentrated on.
13      Q.  Did you select the depositions you were going
14  to review or did someone else select them for you?
15      MR. RAWLINSON:  Objection; ambiguous.
16      THE WITNESS:  It was a combination.  In some
17  cases counsel suggested to me that they felt certain
18  depositions would be useful.  In other cases either I
19  saw reference to other depositions or references to
20  individuals that I thought were probably important
21  enough that they might have been deposed, so I asked if
22  such depositions had been taken and if I could review
23  them.
24      MR. WILLIAMS:  Q.  With respect to the
25  documents you received, who selected the documents that

21

1    were sent to you, if you know?
2        MR. RAWLINSON:  Same objection.
3        THE WITNESS:  Again, this was a combination.
4    In some cases documents were selected for me by counsel,
5    by various individuals within counsel's firm, in other
6    cases I asked for documents, either based on my general
7    familiarity with the subject matter or my expectation
8    that they probably would be such documents, or based on
9    issues that I saw being raised in the depositions, I
10   would initiate a request.
11       MR. WILLIAMS:  Q.  Did you ever ask whether or
12   not there was some database that you could connect to
13   and have access to all of the documents so that you
14   could do your own independent searches for information?
15       A.  No, I did not.
16       Q.  Why not?
17       A.  I felt that it was as practical and
18   expeditious to simply identify and ask for the documents
19   that I felt were relevant.
20       Q.  And did you think that there was some time
21   pressure between the time that you were retained and the
22   time you had to actually get a report done that impacted
23   that decision?
24       A.  No, not time pressure -- well, not time
25   pressure in a specific sense.  I did have the general

22

1    impression that there was a vast quantity of documents
2    involved so that whether the time issue for my report or
3    trial was five months or seven months or a year, I had
4    the general impression there may well have been a
5    lifetime of reading that I could have done if I had
6    asked to see all the documents.
7        Q.  Sure.  I wasn't talking about until trial.  I
8    was talking about until the time you had to actually
9    submit a report.
10       A.  No.  My decision was not influenced by
11   perception of time pressure.
12       Q.  Okay.  So it's fair to say, isn't it, that
13   there may be some documents that relate to the issues
14   that you're opining on or you've offered an opinion on
15   that you may not have seen or considered?
16       A.  That's possible.
17       Q.  Now, prior to May 25th of 2007 when you
18   submitted this report, had you talked to any current or
19   former Oracle employees concerning the matters raised in
20   this action?
21       A.  Yes, I did.
22       Q.  Which ones?
23       A.  I don't know if I can recall all of them
24   sitting here right now.  I believe I spoke to Mr. Alan
25   Fletcher, I believe I spoke to Mr. Cliff Godwin, and I

23

1    believe there may have been two or three others whose
2    names don't come to mind at the moment.
3        Q.  So at the most is it fair to say that you
4    spoke to five current or former Oracle employees
5    concerning the matters raised in this action?
6        A.  I don't think I would want to be pinned down
7    to a precise number like five.  I think it would be fair
8    to say less than a dozen, but it is somewhere in the
9    range of four to a dozen, as I recall.
10       Q.  Were those people all current employees or
11   were they former employees?
12       A.  Current employees.
13       Q.  All current?
14       A.  Yes.
15       Q.  Okay.  So did you talk to layer Larry Ellison?
16       A.  No, I did not.
17       Q.  Did you talk to Keith Block?
18       A.  I don't recall having spoken to Mr. Block.  I
19   don't think so.  But I would have to check my records to
20   be absolutely certain.
21       Q.  Would that -- withdrawn.
22       I guess it is fair to assume you didn't speak
23   to Mark Barrenechea?
24       A.  That is a fair assumption, yes.  My
25   understanding is that he's no longer employed by Oracle,

24

1    not that that would have prevented me necessarily.  But,
2    no, I did not speak to Mr. Barrenechea.
3        Q.  Exactly.  And you didn't speak to Ron Wohl
4    either?
5        A.  I don't believe I did.  I don't recall having
6    spoken to him.
7        Q.  You understand that Ron Wohl and Mark
8    Barrenechea were the primary developers of the software
9    that's at issue in this action?
10       MR. RAWLINSON:  Objection to form, vague and
11   ambiguous.
12       THE WITNESS:  My understanding is that they
13   were the senior executives in charge of the respective
14   development efforts you've mentioned.  Whether they
15   would be called developers, I don't know whether I would
16   go that far.  They were executive vice-presidents or
17   senior vice-presidents.  But I don't know that they
18   actually wrote code.
19       MR. WILLIAMS:  Q.  I'm not going to quibble
20   over whether or not they were developers.  You
21   understood they were the two people in charge of the
22   development of the software at issue in this case?
23       MR. RAWLINSON:  Same objection.
24       THE WITNESS:  They were in charge of the two
25   main components, the ERP and CRM components of the

25

1  software, which certainly were the major components.  I
2  don't know whether it represented exactly 100 percent,
3  but certainly the dominant part, yes.
4      MR. WILLIAMS:  Q.  Have you heard of Don
5  Klaiss?
6      A.  Yes, I have.
7      Q.  Have you talked to him?
8      A.  I don't believe so.  No, I don't believe I
9  have.
10      Q.  How about have you heard of Greg Seiden?
11      A.  Yes, I have.  As I recall, I did speak to
12  Mr. Seiden.
13      Q.  What did you talk to him about?
14      A.  I don't recall the details at this point.  I
15  don't believe that I've cited any conversations or
16  conclusions drawn from that conversation.  So it would
17  have been general issues about the software and how it
18  was developed.
19      Q.  And none of what -- none of the product of
20  that conversation ended up in your report, the May 25th
21  report?
22      A.  Certainly not in the form of citations.  It
23  may well have provided some background information for
24  other documents that I could track down or things of
25  that nature.  So it would have been taken into account,

26

1  but not relied on specifically.
2      Q.  Have you heard of Michael Rocha?
3      A.  Yes, I have.
4      Q.  Have you talked to him?
5      A.  I don't believe I spoke to him, no.
6      Q.  In your preparation for the drafting of your
7  report, did you speak to any current or former Oracle
8  customers?
9      A.  No, I did not.
10      Q.  So, it would be fair to say that most of your
11  correspondence with Oracle or Oracle representatives
12  have been with the attorneys representing Oracle in this
13  case?
14      MR. RAWLINSON:  Objection; vague.
15      THE WITNESS:  Most of my written
16  correspondence, I assume that's what you mean --
17      MR. WILLIAMS:  Q.  I actually mean
18  correspondence, telephone, oral.
19      A.  Could you rephrase the question just to make
20  sure I answer it accurate.
21      Q.  Is it fair to say that most of your
22  correspondence with Oracle or any of its representatives
23  concerning this case was with the lawyers representing
24  Oracle?
25      MR. RAWLINSON:  Same objection.

27

1      THE WITNESS:  I believe that's a fair
2  characterization.
3      MR. WILLIAMS:  Q.  Okay.
4      A.  Yes.
5      Q.  You list and identify a vast amount of
6  publications in your report?
7      MR. RAWLINSON:  You mean his publications?
8      MR. WILLIAMS:  Yeah, your own
9  publications.  How much time in the last four years --
10  how much of your time is devoted to writing as opposed
11  to providing expert analysis or testimony for various
12  parties?
13      MR. RAWLINSON:  Objection; vague and
14  ambiguous.
15      THE WITNESS:  I don't think I would be able to
16  give you any precise quantification.  The amount of time
17  that I've spent over the last four years doing writing
18  that has ended up in some of the lists that you have
19  seen has been less than I've spent doing litigation
20  support activity.  But there have been several other
21  forms of writing that are not listed there, entries on
22  my blog, things of that nature.  So if you take that
23  into account, it would be a larger percentage.  But I
24  have never thought about putting it into numerical
25  terms.

28

1      MR. WILLIAMS:  Q.  And someone who writes as
2  much as you do is very likely to also be criticized for
3  some of their views; is that fair?  Or people disagree
4  with some of your views?
5      A.  I imagine there are people somewhere who
6  disagree with some of the views I've expressed.
7      Q.  If you look at paragraph 5 of your report,
8  you -- I'll give you a chance to get there?
9      A.  I've gotten there.
10      Q.  You list several books from 19 -- I would say
11  1994 through 2004.  Are those the only books that you've
12  written in that space of time?
13      A.  No.
14      Q.  Are there any books that you did not include
15  in that paragraph?
16      A.  There are one, perhaps two books about the
17  so-called Y2K phenomenon in that list.  There may be
18  others as well.  Those are the two that I've noticed
19  looking at this list.
20      Q.  What are the titles of those books?
21      A.  One of them is called Time Bomb 2000, and the
22  other one for which I was -- actually, I was a co-author
23  on that one as well, but the other one I believe it was
24  "A Financial Guide to the Y2K Problem," or entitled
25  roughly along those lines, also co-authored.

---

29

1    Q.    Why did you leave those two off of that list?
2    A.    Because they were of a less technical nature,
3 unlike these books that were aimed at a technical
4 audience, those books were aimed more at the general
5 public.
6    Q.    And were they or were they not relating to
7 anticipated problems that could occur as a result of,
8 you know, speculative Y2K computer glitches?
9    A.    I would disagree with the characterization of
10 speculative.
11    Q.    How would you characterize it?
12    A.    I would characterize it as problems for which
13 the American economy spent roughly 100 billion dollars
14 for real technical problems associated with computer
15 difficulties that would occur both before and after
16 January 1st, 2000.
17    Q.    And what were some of those technical
18 problems?
19    A.    The problems all revolved around the central
20 issue of whether the millions and millions of computer
21 systems around the world would properly recognize the
22 so-called rollover or transition from December 31st,
23 1999 to January 1st, 2000 without either stopping
24 completely or possibly misunderstanding the date to be
25 January 1st of 1900 or various other erroneous decisions

---

30

1 or actions.
2    Q.    Now, you say, however, that those books were
3 less technical in nature than the others that you
4 included here?
5    A.    That's correct.
6    Q.    And can you describe in what fashion they were
7 less technical?
8    A.    Because they were aimed at an audience of
9 non-technical people to try to explain these computer
10 issues that I've just summarized in language that I
11 hoped non-technical people would understand, along with
12 a discussion of some of the possible consequences that
13 they might see in their day-to-day lives.
14    Q.    And the books that you've cited here were for
15 an audience of primarily technical people, the ones you
16 cited in paragraph number 5?
17    A.    Yes, that's correct.
18    Q.    And so you would not expect generally for --
19 well, let me withdraw that.
20          How would you define or describe technical or
21 non-technical people?
22    A.    In the context of this discussion that we've
23 been having, I would define technical people as being
24 people who had a background and education in the field
25 of computer hardware or software, and most likely people

---

31

1 who were employed by or somehow directly involved in
2 companies that provide computer products and services,
3 that would be the rough, broad description of technical
4 people.
5          Non-technical people would be basically
6 everybody else, as well as the technical people who
7 might not have thought of some of the broad social and
8 economic consequences of this Y2K problem with regard to
9 the Y2K book that you have been asking about.
10    Q.    Would you agree that the quote, unquote,
11 technical people that you generally described, that that
12 is a much smaller population in numbers of people than
13 the non-technical audience that you were writing the
14 Time Bomb 2000 for?
15    A.    Yes, I think that's a fair characterization,
16 yes.
17    Q.    And do you -- were you wrong in your opinions
18 concerning the Y2K?
19          MR. RAWLINSON:  Objection to form, vague and
20 ambiguous.
21          THE WITNESS:  I think there were some aspects
22 of my predictions that were somewhat inaccurate.  But
23 overall I don't think I was wrong.
24          MR. WILLIAMS:  Q.  What aspects would you
25 characterize as inaccurate, somewhat inaccurate?

---

32

1    A.    The aspects that turned out to be somewhat
2 inaccurate were primarily the impact of the Y2K problem
3 on developing nations or underdeveloped nations, and the
4 impact as well on so-called embedded systems, that is
5 computers embedded within machinery that runs in many
6 cases without direct human interaction.
7    Q.    And do you know how much -- how much money you
8 made from Time Bomb 2000?
9    A.    From the textbook?
10    Q.    Yes.
11    A.    Only in very rough terms.
12    Q.    That's fine.  I don't need it to be specific.
13    A.    As I recall, on the order of $40,000.
14    Q.    $40,000?
15    A.    Approximately.
16    Q.    Had you ever heard it being criticized as
17 Swami salami verbally?
18    A.    No, no, I had not heard that characterization.
19    Q.    What characterizations have you heard of it?
20    A.    I have heard either characterizations or
21 reviews arguing that I had taken too pessimistic a
22 position with regard to the likely difficulties
23 associated with Y2K.
24    Q.    And that's not -- but that's not why you
25 didn't include it in paragraph 5?

33

1   A.   No.  That is definitely not.  There have been
2   other more technical books, the one that came to mind
3   predated this one, that was technical, but also received
4   criticisms.
5       Q.   Which one is that?
6       A.   Actually, a technical book as well in this --
7   within this same time frame that received some
8   criticisms.
9       Q.   Which one?
10      A.   The first one that immediately came to mind
11  when you raised your question was a book called "Decline
12  and Fall of the American Programmer."
13      Q.   That's not here.
14      A.   That's not here.  It predates these things.
15  It was published in 1992.
16      Q.   Okay.
17      A.   And the other one that does fall into this
18  time period, published, as I recall, in 1996, was called
19  "The Rise and Resurrection of the American Programmer."
20      Q.   And why did you leave that one off, "The Rise
21  and Resurrection of the American Programmer"?
22      A.   I don't recall.  Not for any particular reason
23  that I can recall sitting here.
24      Q.   Do you recall criticisms for any of the books
25  that you did cite here?

34

1       A.   There have been criticisms about the "Death
2   March" book.  That's the only one that I recall in
3   particular.  There may well have been criticisms of
4   other books.  I don't spend much time looking at the
5   Amazon commentaries, but none that come to mind.
6       Q.   Going back quickly to technical people.  You
7   know Brooks Hilliard; right?
8       A.   I know of him.  I've never met him.
9       Q.   You never met him?
10      A.   No.
11      Q.   Ever talk to him?
12      A.   Not to my recollection.  It's possible that he
13  attended a conference where I spoke and introduced
14  himself.  But --
15      Q.   Have you ever read any of -- anything he's
16  written -- well, let me withdraw that.
17          You read his report in this case?
18      A.   Yes, I did.
19      Q.   Have you ever read a report that he's ever
20  provided in any other case?
21      A.   Yes, I have.
22      Q.   Would you describe him generally as a
23  technical person among the audience that you were
24  directing the books in paragraph 5 to?
25      A.   Yes, I would.

35

1       Q.   And have you read how he has depicted his
2   background?
3       A.   Yes, I have.
4       Q.   And you guys attended same school at some
5   point; right?
6       A.   Within the same decade certainly, yes, we did.
7       Q.   And would you consider -- well, withdrawn.
8          Do you have any reason to dispute any of the
9   characterizations of his background that you've read?
10         MR. RAWLINSON:  Objection; vague.
11         THE WITNESS:  I don't know which
12  characterizations you are talking about.  I have no
13  idea.
14         MR. WILLIAMS:  Let me withdraw the question.
15  Maybe it is not a great question.
16      Q.   Do you have any reason to believe that the
17  manner in which he has described his background in the
18  documents that you've read is incorrect or inaccurate?
19         MR. RAWLINSON:  Same objection.
20         THE WITNESS:  I don't, though I must say that
21  was not an area that I was asked to investigate, so I
22  didn't study his stated background in great detail or
23  try to confirm it.
24         MR. WILLIAMS:  Q.  Sure, I understand.
25      A.   I will say for whatever it is worth, as I've

36

1   already told you, I have not met him, the gentleman, and
2   have not encountered him in the various technical
3   computer conferences that I've attended over the last 20
4   years, or seen any of his publications.  Indeed, as I
5   recall from his report, he only lists, I believe, one
6   textbook that's aimed at business, non-technical
7   business people, and I believe only one or two
8   publications.  There may have been others that he's
9   written.  But in order to form an independent opinion of
10  his credentials, background, qualifications, et cetera,
11  I have not had independent exposure to the things that I
12  would normally expect to see.
13      Q.   And would you agree that he is at least an IT
14  professional?
15      A.   With the caveat that I've already expressed,
16  that I have not had any opportunity to confirm that kind
17  of characterization independently.
18      Q.   You wouldn't say that an IT professional -- in
19  order to be an IT professional one would have to have
20  the experience and literary background that you do,
21  would you?
22      A.   Not necessarily.  But in order to have
23  independently formed an opinion before I received those
24  questions, it would make it a lot easier to answer the
25  questions.

37

1    Q.  Sure, understand.
2        Now, in your view, would you consider a
3   technical person that you've described as, you know, the
4   audience for the people that you wrote the books in
5   paragraph 5, to be different from an IT professional?
6    A.  No, I would consider them to be of the same
7   group, same audience, yes.
8    Q.  You testified earlier that you received, you
9   know, approximately 12 CDs with documents relating to
10  this case; is that fair?
11   A.  That's fair.
12   Q.  And did you receive the actual software, 11i
13  software?
14   A.  No, I did not.
15   Q.  Did you ask for it?
16   A.  I don't recall whether I asked for it or was
17  informed in some fashion that the software was not being
18  provided to anyone.  I don't recall which came first.
19   Q.  But both happened?
20       MR. RAWLINSON:  Objection to form.
21       THE WITNESS:  No.  I, as I recall, I did not
22  make a specific request for the software.
23       MR. WILLIAMS:  Q.  Why not?
24   A.  Because I was primarily concerned with
25  investigating the architecture of the software as

38

1   opposed to the actual code of the software.  And for
2   that I was actually more interested in various other
3   forms of documentation.
4    Q.  And no one offered to send it to you either,
5   the software?
6    A.  Not that I recall, no.
7        MR. RAWLINSON:  Objection; vague and
8   ambiguous.
9        MR. WILLIAMS:  Q.  And you understand that
10  there was several versions or several releases of 11i
11  that are at least pertinent to the issues in this case?
12   A.  Yes, I do.
13   Q.  And that's 11i.1, .2, .3 and maybe a couple
14  others; is that fair?
15   A.  That's fair.
16   Q.  And just to be clear, you haven't received any
17  versions of any of the 11i software?
18       MR. RAWLINSON:  Let me interject for a minute.
19  I don't think it matters for your question, but we
20  probably for the record should distinguish between
21  executable and source code.  I don't think it matters
22  for the ultimate answer to your question, but when
23  you're talking about the software, talking about the
24  software that people run?
25       MR. WILLIAMS:  Is there some other software?

39

1   Hold on a second.
2        I just don't know what you're talking about.
3        MR. RAWLINSON:  Well, frame your questions how
4   you want.
5        MR. WILLIAMS:  Is there something you need to
6   clarify with me?
7        MR. RAWLINSON:  Nothing I need to clarify with
8   you, Shawn.
9        MR. WILLIAMS:  Q.  All right.  No one offered
10  to send you the actual software that was sent to
11  customers and at least attempted to be installed in some
12  environment?
13   A.  Okay, I can now appreciate why counsel might
14  have been raising that issue.  I was assuming that you
15  were talking about the source code, the actual computer
16  instructions written by programmers, which would then be
17  compiled and turned into an executable program.  That
18  was not offered to me.  And I would not have wanted
19  that, either.
20       Your most recent question was of a different
21  nature, I believe.  You asked me if I had either asked
22  for or had received the operational software, the
23  executable or binary software.
24   Q.  Okay.
25   A.  I believe that was your most recent question.

40

1    Q.  It wasn't really my question, but I think you
2   tried to clarify it for me.  Did you receive that?
3    A.  I don't believe I did.  I don't think I did.
4   In any case, I did not actually install it or run it, so
5   if by some chance I did, it probably would have been
6   more than the 12 CDs, so I doubt very much that I did.
7   So the answer is no.
8    Q.  I didn't mean to cut you off.  You didn't
9   receive any software, code or other that was executable
10  that you installed on any system?
11   A.  That's correct.
12   Q.  So that also means that you didn't test any of
13  the software, any of the 11i software at issue in this
14  case?
15   A.  I did not test it by running it, that's
16  correct.
17   Q.  All right.  So, you didn't do any of the
18  stress testing that you describe in your report?
19   A.  No, I did not.
20   Q.  You didn't do any of the regression testing?
21   A.  That I described in my report?
22   Q.  No, that's not my question.  Did you do any
23  regression testing?
24   A.  No, I did not.
25   Q.  Do you do any integration testing?

41

1    A. Of the 11i software, no, I did not.
2    Q. You didn't do any of the unit testing either?
3    A. No, I did not. And the reason I'm pausing is
4  that had I been sent the entire software, I don't think
5  that would have been an environment in which I could
6  have done unit testing. That would have required access
7  to the source code so that I could compile and test in
8  isolation one or more units. So the answer is no, I did
9  not.
10    Q. Right. And you didn't do any -- well,
11  withdrawn.
12        There was no reason that you could not request
13  all of the software, code or information you needed to
14  test the software, was there?
15    MR. RAWLINSON: Objection to form.
16    THE WITNESS: With the caveat that I just
17  mentioned, that had I wanted to carry out unit testing,
18  I believe I would have been required to ask for the
19  source code so that I could compile individual units and
20  test them in isolation.
21    MR. WILLIAMS: Q. Sure, but there was nothing
22  limiting you for asking for that information, was there?
23    A. No, I don't believe there was.
24    Q. I mean, you're testifying on behalf of Oracle,
25  defender in this case?

42

1    A. Yes, that's correct.
2    Q. And no doubt they have the source code; right?
3    A. I would assume they have the source code.
4  Someone should have the source code, and I believe they
5  do, yes.
6    Q. You understand also that there are issues
7  pertaining to the demonstration systems or demonstration
8  environments for 11i software during the period that
9  this lawsuit pertains to; right?
10    A. Yes, I am aware of that.
11    Q. Did you at any point between, I guess, January
12  of 2007 to today have access to any of the demonstration
13  systems that were -- are at issue in this case?
14    A. No, I did not.
15    Q. And so you didn't attempt to do a
16  demonstration of any version or release of 11i software
17  on any of the demonstration systems that were in use
18  during the time relevant to this case?
19    A. No, I did not do that.
20    Q. Did you inspect any of the software code,
21  source code, that was used to create or maintain the
22  demonstration systems that were in use during the time
23  frame pertaining to this case?
24    MR. RAWLINSON: By time frame, you mean the
25  last period or something else?

43

1    MR. WILLIAMS: No.
2    Q. Do you have an understanding of the time frame
3  that pertains to this case?
4    A. Well, I've seen different descriptions of the
5  time frame, and I'm not sure which one you're referring
6  to.
7    Q. Why don't we just say from June 2000 to June
8  2001, that's what I mean by pertaining to this case,
9  unless I say otherwise.
10    A. Okay.
11    Q. Did you view -- I forgot my question. Can you
12  read the last question back, please.
13        (Record read as follows: QUESTION: Did you
14        inspect any of the software code, source code,
15        that was used to create or maintain the
16        demonstration systems that were in use during
17        the time frame pertaining to this case?)
18    THE WITNESS: No, I did not.
19    MR. WILLIAMS: Q. And source code actually
20  becomes software at some point; is that fair?
21    A. That's not how most technical people would
22  describe it. Source code through one mechanism or
23  another becomes executable software or executable code
24  or binary code.
25    Q. And just so, I'm not a technical person, just

44

1  so I'm not missing anything, I haven't missed some
2  category of source code, software or any other related
3  information that you may have tested but I simply have
4  not asked the question?
5    A. I don't know what else you may have had in
6  mind.
7    Q. Okay, that's fine. All right. One of the
8  issues pertaining to the allegations in the case relate
9  to representations that 11i software was, you know,
10  preintegrated and interoperable generally; is that fair
11  to say? You understand that?
12    A. Yes, yes, I do.
13    Q. And you provide in paragraph 100 a definition
14  of what you believe an end-user would understand
15  integration to mean?
16    A. Yes, I do.
17    Q. Is that fair?
18    A. Yes.
19    Q. And in your view an end-user is someone who is
20  using the software doing day-to-day activities, someone
21  actually making use of the software; is that fair? Or
22  would you describe that differently?
23    A. Well, in paragraph 100, I also refer to
24  business professionals. But -- let's see whether that's
25  the paragraph where the phrase end-user appears. In

45

1   that paragraph I don't believe the phrase end-user does
2   appear.  Indeed it does at the very beginning.  For the
3   end-user of a software system as well as for IT
4   professionals.  So your question was about the nature of
5   an end-user?  I lost track of your question.
6       Q.  That's okay.  You provide a definition of how
7   an end-user would interpret the word integration; is
8   that fair?
9           MR. RAWLINSON:  Objection to form.
10          THE WITNESS:  I believe in paragraph 100 I'm
11  providing such a definition as it would pertain to
12  end-users, but in the second sentence also business
13  professionals.
14          MR. WILLIAMS:  Q.  Okay.
15      A.  Who in this context would be end-users, yes.
16      Q.  Why don't we take a look at what you said.
17  Read the first two sentences of paragraph 100 for me.
18      A.  Okay, for the record the first sentence says,
19  "For the end-user of a software system as well as for IT
20  professionals, integration simply means that the pieces
21  (or components or modules) of the system 'work
22  together.'  Thus when business professionals use a
23  'office' software suite, they expect the word processing
24  program, the spreadsheet program, and the presentation
25  program to 'work together' so that spreadsheet tables

46

1   can be incorporated into a word processing document and
2   so that formatted word processing text can be
3   incorporated into a presentation slide."
4       Q.  Okay, so, in your view, both IT professionals
5   and other business type people would view integration in
6   the very same way, meaning that the system would work
7   together and they would expect that the word processing
8   program, spreadsheet program and presentation program
9   would work together?  Right?
10      A.  Yes, that's what I wrote.
11      Q.  You don't make any differentiation between an
12  end-user's expectations and an IT professional's
13  expectations?
14          MR. RAWLINSON:  Objection to form.
15          MR. WILLIAMS:  Q.  Is that right?
16      A.  Certainly not in the context of this paragraph
17  as illustrated with an office software suite, that is
18  correct.
19      Q.  Is this the definition, that's in paragraph
20  100, the definition that you rely on to conclude that
21  11i was, indeed, at least integrated?
22      A.  Not just this paragraph.  I believe I relied
23  on the full description in this section, as well as the
24  forms of integration that I went on to describe in
25  detail in the following section.  So I meant all of it

47

1   to be taken into context or to be taken into
2   consideration as what I relied upon for my opinion.
3       Q.  Okay.  So, let's exclude the definition that
4   you provide in paragraph 100, just for purposes of this
5   question.  Well, withdrawn.  Let me do it this way.
6           Say, for example, IT professionals and
7   end-users found that the word processing program, the
8   spreadsheet program and the presentation program did not
9   work together, let's assume that for this question, and
10  that's the definition of integration that you provide
11  there.  Would you still conclude that 11i was, indeed,
12  integrated?
13          MR. RAWLINSON:  Objection to form.
14          THE WITNESS:  I'm puzzled as to your
15  connection between this office suite example and 11i.  I
16  don't understand what connection you are trying to ask
17  me to confirm.
18          MR. WILLIAMS:  Q.  Okay.  You say in paragraph
19  100 that IT professionals as well as other people would
20  interpret the term integration to mean what you wrote
21  here; right?
22      A.  That's correct.
23      Q.  So, if, for example, IT professionals and
24  business professionals found that the word processing
25  program, the spreadsheet program and the presentation

48

1   program did not work together in parts of 11i, would 11i
2   still be integrated?
3       A.  I'm still confused, because the word
4   processing program is not part of 11i or anything like
5   11i, so I --
6       Q.  Does that matter, if there are programs within
7   11i that did not work together, would you still find
8   that 11i was integrated?
9       A.  If there were programs within 11i that did not
10  work together in the broad sense of the term work
11  together, and if I understood in detail what we meant by
12  that, then I might draw such a conclusion.
13      Q.  What do you mean by the broad sense of the
14  word?
15      A.  Well, I did not provide all of the details of
16  the manner in which I would expect the word processing
17  document to be -- sorry, the manner in which spreadsheet
18  tables could be incorporated into the word processing
19  document.  I was referring to that in a fairly broad
20  sense.  There might be 1,000 detailed elements of such
21  incorporation, and I did not mean that necessarily to
22  intend that, you know, that all 1,000 necessarily had to
23  be incorporated, but that in the broad sense that if
24  end-users or IT professionals looked at it they would
25  say it appears that spreadsheets and word processing

49

1 documents can be incorporated into one another.
2     Q.   Have you ever used 11i?
3     A.   No, I have not used it.  I've used other ERP
4 systems, but not 11i.
5     Q.   Same paragraph, few lines down, you say that,
6 "The same is true for ERP products.  The marketplace
7 expects that an integrated ERP product will have
8 financial modules, human resources modules,
9 manufacturing modules, and other modules that work
10 together so that day-to-day business activities can flow
11 back and forth as needed between different software
12 components."  Right?
13     A.   Yes.
14     Q.   So that's generally your definition of what
15 integrated means with respect to ERP software?
16     A.   In general terms, yes.
17     Q.   And so if someone in the marketplace found
18 that the financial modules and human resource modules
19 did not quote, unquote, work together, allowing them to
20 do day-to-day business activities, would it be correct
21 that 11i was not integrated, or at least an ERP product
22 was not integrated?
23     A.   Not necessarily.  Because as you can see in
24 the very next sentence, there is the statement that how
25 well components work together is often in the eye of the

50

1 beholder.
2         So, in your example, there may be one person
3 or one business user within the marketplace that feels
4 that the components of the ERP product do not work
5 together as they need, that does not necessarily mean
6 that the product as a whole would not be considered
7 integrated.
8     Q.   Okay.  So in your view it's -- it depends on
9 the numbers of people or end-users who may not be able
10 to conduct the business -- day-to-day business
11 activities that would allow one to determine whether or
12 not the product was, indeed, integrated?
13     MR. RAWLINSON:  Objection to form.
14     THE WITNESS:  I think it would depend on the
15 number of users individually, but more importantly the
16 number of end-user organizations, since an ERP product
17 is typically not used by one individual in the manner
18 that you and I use word processing programs.  And it
19 would depend on the degree and extent and pervasiveness
20 of whatever issues such organizations or individuals
21 might have.  It is not, in my opinion, a binary all or
22 nothing, either/or situation.
23     MR. RAWLINSON:  Should we take a break for
24 about ten minutes?  We've been going over an hour.
25     MR. WILLIAMS:  We can take one.  It is 10:19.

51

1 Why don't we take five minutes now.
2     THE WITNESS:  Okay.
3     VIDEOGRAPHER:  Off record at 10:19.
4         (Recess, 10:19 a.m. - 10:32 a.m.)
5     VIDEOGRAPHER:  On record at 10:32.
6     MR. WILLIAMS:  Q.  Just going back to
7 paragraph 100, beginning where -- the sentence starting,
8 "The same is true for ERP products," and then you
9 reference generally financial modules, human resource
10 modules -- manufacturing modules.  Any of those three
11 modules, would they be included in CRM application or an
12 ERP application?
13     A.   In most products today, based on my
14 understanding, those three particular examples would be
15 in -- within the ERP side as opposed to the CRM side.
16         By the way, if I might interject, since you
17 have brought my attention back to this paragraph, I had
18 earlier commented how well components work together is
19 in the eye of the beholder, and one aspect of that that
20 I probably should have mentioned as well is that the eye
21 of the beholder includes, or is focused on not just what
22 this particular set of financial modules and so forth
23 does, but is also a relative term based on what other
24 comparable products or competitive products might be
25 doing in the marketplace, as would be the case with

52

1 Office suites.
2         My perception of the extent or degree with
3 which Microsoft Office is integrated is informed at
4 least partly by what alternatives may or may not be out
5 there and also how well I've managed to install them on
6 my computer.  If I neglected to install Excel, it's
7 going to be pretty hard to make Word talk to it.
8         I didn't mean to interrupt your train of
9 thought; since we saw this sentence again.
10     Q.   So, anyway, you cite there the financial
11 modules, human resource modules, manufacturing modules
12 and other modules.  You didn't include any CRM modules
13 in that specific example.  Any reason why, or just
14 didn't come to mind when you were writing this
15 paragraph?
16     A.   No particular reason.  I was simply trying to
17 provide an introductory framework for the whole
18 discussion.  So it was not for some specific purpose
19 that it was omitted.
20     Q.   Just want to direct your attention to page 53.
21 Referring directly to paragraphs 138 and 139, can you
22 just review them for a moment, if you need to.  Maybe
23 you reviewed them this morning or last night.
24         Is it fair to say your opinion with respect to
25 Suite 11i was integrated and interoperable appears at

53

1    138 and 139 -- actually, 138 through say 141?  You can
2    take some time to look at those two pages, if you like.
3        A.    My opinion in terms of my own independent
4    technical assessment is based on paragraphs 138 through
5    141.  But it was also based upon my observation and
6    review of the actual experiences of customers in the
7    field and, you know, all the other testimony and
8    evidence that we talked about earlier.
9        Q.    I was just asking about your opinion about it.
10   Is it fair to say that your opinion on this one issue is
11   captured for the most part in paragraphs 138 through
12   141, and the other stuff you referred to in terms of
13   experience of people in the field supports the opinion?
14       A.    I think that's a fair characterization.  I
15   felt that it was important to reach my own independent
16   opinion based on the technical materials that were
17   available, and then see whether it was supported by or
18   confirmed by or illustrated by, reinforced by various
19   other sources of information.
20       This particular -- I don't know if you've
21   referred to figure 9 at the top of this page, that was
22   simply one illustrative example of the kind of technical
23   evaluation that I did as described in paragraphs 138
24   through 141.
25       Q.    You agree, however, that even in your opinion,

54

1    that it's almost certain that Oracle developers made
2    some errors implementing the logical data model in 11i?
3        A.    Yes, that is the language that I've used in
4    paragraph 140.  It's possible, in fact, almost certain
5    given the studies that some errors probably would have
6    been made.
7        Q.    Right.  And you also agree that it's almost
8    certain that the developers made errors in creating the
9    database tables in 11i?
10       A.    In the same context, possible, indeed almost
11   certain, yes.
12       Q.    Right.  And you agree that Oracle developers
13   almost certainly made errors in creating the indices in
14   11i?
15       A.    Yes.  I think the significant question is how
16   many such errors, and particularly as compared to the
17   number of errors that one would expect to see in
18   software systems of this size or other comparable
19   software, as opposed to any kind of absolute measure.
20       Q.    And you agree that the software -- withdrawn.
21       You agree that Oracle developers almost
22   certainly made errors when coding the triggers and
23   navigation paths in 11i?
24       A.    Yes, with the same caveats, you know, as
25   indicated in paragraph 140.

55

1        Q.    Okay.  And you agree that -- well, withdrawn.
2        And ultimately you find that 11i, the
3    integration was less than perfect?
4        A.    Not based on my own independent review of the,
5    you know, the technical documents.  I did not personally
6    see errors or defects or imperfections.  But based on my
7    general experience and also based on the other evidence,
8    I would agree that there were imperfections.  I believe
9    that's the term you used.  I'm not sure.
10       Q.    I did.
11       A.    Okay.
12       Q.    And now when a developer makes some of the --
13   or withdrawn.
14       When developers make some of the errors that
15   you described in paragraph 140, for example, is that or
16   is that not part of the engineering process?
17       MR. RAWLINSON:  Objection to form.
18       THE WITNESS:  I don't know what you mean by
19   engineering process.
20       MR. WILLIAMS:  Q.    Okay.  Well, is coding part
21   of the software engineering process?
22       A.    Coding would normally be considered part of
23   the software engineering process, yes.
24       Q.    And is creating the database tables part of
25   the software engineering process?

56

1        A.    Yes.
2        Q.    Okay.
3        A.    Part of an overall software engineering --
4    well, I want to make sure I've used my words properly in
5    communicating with you.  It's part of the overall
6    software engineering process where the phrase software
7    engineering is taken in the context of software
8    development.
9        The reason I'm hesitating here is that in some
10   places of the evidence that I've seen, the word
11   engineering is also used in the context of architecture,
12   as opposed to just development.  So with that caveat, I
13   would agree with you.
14       Q.    Would -- well, you want to tell me what the
15   difference is between using the term engineering in the
16   context of architecture and using the term engineering
17   in the context of development?
18       A.    Yes.  Engineering in the context of
19   architecture is normally a description of the work that
20   goes into the so-called design part of the system once
21   the requirements have been known.  You have a group of
22   people whose job is to figure out what the major
23   components are and how they will fit together, what
24   interfaces they will have.
25       The overall process of software engineering is

57

1   the term that's often used in our industry to describe
2   the cradle to grave sequence of requirements,
3   design/architecture, coding, which you talked about,
4   creation of database tables, testing, which I imagine
5   we'll be talking about, deployment and so forth.  That
6   whole sequence is a software development sequence whose
7   activities can be formalized and documented as part of
8   the so-called software engineering process.
9       Q.  So all of that is part of the overall software
10  engineering process?
11      A.  Yes.
12      Q.  That's fair?
13      A.  That's fair.  But when you hear people talking
14  about the engineering of a system in the context of such
15  conversations, they may only be referring to the
16  architecture.
17      Q.  Okay.
18      A.  Okay.
19      Q.  All right.  And would you need to be an IT
20  professional or an expert like yourself to understand
21  when someone is using software engineering but only
22  really referring to architecture?
23      A.  Not necessarily, although sometimes the
24  distinction may be a little bit subtle, it may or may
25  not be apparent to a non-IT professional, depending on

58

1   the context of the discussion or the written material.
2   I'll certainly try to make that distinction if I think
3   it is at all unclear.
4       That's why I wanted to raise it to get the
5   issue on the table, so to speak.  And if I hear you use
6   the word engineering in a context that I think might be
7   intended as something else, I will try to make sure that
8   you and I at least are speaking the same language.
9       Q.  Did you talk to anyone at Oracle between May
10  2007 and today that told you -- well, withdrawn.
11      Have you spoken to anyone at Oracle between
12  January 2007 and today that discussed with you what they
13  believed the difference between software engineering and
14  any of the caveats or subset of architecture and
15  development within it?
16      A.  I don't recall having that specific kind of
17  conversation.
18      Q.  Okay.
19      A.  I do recall having conversations with at least
20  one individual, and I'm hesitating because I can't
21  remember now which one, about the process that Oracle
22  went through to translate, so to speak, the architecture
23  which they had represented in various diagrammatic
24  forms, of which there are a couple of examples in my
25  report, into the coding that would provide a system that

59

1   could be tested.
2       Q.  But you don't remember who that individual
3   was?
4       A.  Not sitting here right now.  If my memory gets
5   refreshed during the day, I'll certainly try to bring it
6   to your attention.
7       Q.  All right.  And was it a male or female?
8       A.  It was a male.
9       Q.  And was it a lawyer or was it an Oracle
10  employee?
11      A.  It was an Oracle employee.
12      Q.  A current Oracle employee?
13      A.  To the best of my recollection, yes.
14      Q.  And the only one that you've been able to
15  identify for me today that you recall speaking to, I
16  think, was either Don Klaiss or Mr. Seiden; is that
17  right?
18      MR. RAWLINSON:  Objection; to the extent it
19  mischaracterizes the previous testimony.
20      THE WITNESS:  I think I may have identified
21  Mr. Fletcher as well.
22      MR. WILLIAMS:  Q.  And Mr. Fletcher, that's
23  right.
24      A.  I think it was probably one of those three
25  individuals.  But, as I say, if my memory is refreshed

60

1   during the course of the day, I will let you know.
2       Q.  Now, some of the things that you discuss,
3   again, in paragraph 140 about some of the errors that
4   may be made in the software engineering process, do any
5   of those errors, or would any of those errors impact the
6   quality of software?
7       A.  As you might appreciate, I'd love to have you
8   tell me what you mean by quality.
9       Q.  Well, why don't we do that.  Haven't you
10  defined the term quality as a lack of bugs in your
11  report?
12      A.  I may well have done so.  I don't recall the
13  language I used and whether I describe that as one
14  aspect of quality.  Normally that would be considered
15  just one aspect of quality.  And I must apologize, I
16  can't remember where I would have put that into my
17  report.
18      Q.  I'm going to find it for you.
19      A.  Thank you.  If I had my laptop computer I
20  could help you, but I don't.
21      Q.  Paragraph 41.
22      A.  Yes, I did do so.
23      Q.  Well, why don't we find it and talk about --
24  can you just read that section for me.
25      A.  Yes, I can read that section.  And having done

61

1 so, I would like to change one Latin abbreviation for
2 another. But let me read it for the record now.
3     Paragraph 41 says, "Most segments of the
4 computer software industry are highly competitive, and
5 vendors compete on a number of factors - including
6 price, functionality, interoperability, quality, (i.e.
7 absence of software defects)."
8     Q. That's not what you wrote.
9     A. I apologize. Thank you for correcting me.
10 "(absence of software bugs) ease of use, and time to
11 market."
12     Q. Okay.
13     A. And looking at this now, I believe I should
14 have used the Latin abbreviation e.g., such as, absence
15 of software bugs.
16     Q. So what you're saying is that you're not --
17 your definition of quality here is not "i.e., absence of
18 software bugs," but, "e.g., absence of software bugs"?
19     A. That's correct.
20     Q. Would you -- that's a considerable
21 definitional change; wouldn't you say?
22     A. That depends on the circumstances. In many
23 cases the absence of software bugs is the most important
24 parameter or aspect of quality.
25     But to give you an example, there may be other

62

1 circumstances in which such things as response time or
2 performance are almost as important. All the more so
3 because software bugs, as I have itemized them here, are
4 not all the same. There may well be systems in which I
5 can tolerate a number of relatively minor bugs, but I'm
6 less able to tolerate other aspects of quality, such as
7 performance and response time.
8     Q. Well, let's go back to what we were talking
9 about prior to finding your definition of quality. And
10 that is back to paragraph 140, and my question was
11 whether or not the errors that you agree almost
12 certainly occurred in the development or the engineering
13 process in 11i would impact the quality of the software?
14     A. I will agree they may impact the quality in
15 one or more dimensions for some customers under some
16 circumstances. I would not agree they always would, nor
17 would I agree they always would in the same way for all
18 people or organizations in the marketplace.
19     Q. All right. But the answer that you just
20 provided me is not consistent with the definition, prior
21 to your change, of quality?
22     MR. RAWLINSON: Objection to form. And
23 objection, mischaracterizes prior testimony.
24     THE WITNESS: No, I don't believe the two are
25 consistent. Certainly I did provide a broader

63

1 definition of quality. But even if we were to restrict
2 it to a definition of quality being equal to bugs, the
3 rest of my statement still stands.
4     The presence of some errors of the sort that
5 we've been discussing in paragraph 140 might affect the
6 quality, bugginess, presence of or visibility of bugs
7 for some customers, but not other customers, might
8 affect them under some circumstances but not other
9 circumstances, might affect them in minor ways or major
10 ways.
11     Now, as I said a moment ago, not all bugs are
12 the same in terms of their severity.
13     MR. WILLIAMS: Q. So it may impact quality?
14     A. Yes.
15     Q. All right. Now, you concluded that, you know,
16 11i was integrated. How many errors that you described
17 in paragraph 140 would it take for you to conclude that
18 an ERP system or software suite was not integrated?
19     MR. RAWLINSON: Objection; vague and
20 ambiguous.
21     MR. WILLIAMS: Q. If you can quantify it.
22     MR. RAWLINSON: Same objection.
23     THE WITNESS: Well, first of all, that would
24 only be part of the evaluation of whether 11i or any
25 other system was integrated. The other part would be

64

1 based on this evaluation that I discussed in paragraphs
2 138 to 140.
3     MR. WILLIAMS: Q. Sure, I understand that.
4     A. But if I concluded that the architecture was
5 integrated by virtue of the database -- the data model
6 being integrated, et cetera, then to go to your question
7 about how many bugs would it take to conclude that the
8 integration essentially was not there, that would be
9 based on, in my opinion, a comparative figure of the
10 number of bugs or errors that are normally seen in
11 products of this sort.
12     And I think I did provide some figures for
13 that in the report. It would be further quantified, if
14 I may continue, by the other aspect that I mentioned a
15 little bit earlier, it would be a function of whether
16 the bugs were visible to, or noticeable to a significant
17 number of customers. And it would also be based on
18 whether the bugs were actually in the software as
19 opposed to being blamed on the software, but ultimately
20 demonstrated to be caused by something other than the
21 software.
22     Q. Isn't it true that even if the architecture or
23 design appears to be such that the intent was to have
24 the product be integrated, that the software engineering
25 process, if the errors in that process are numerous or

65

1    reach a certain level that it could impact the ability
2    of the software to function in the manner in which it
3    was designed to function?
4        A.   It could do so again for some customers under
5    some circumstances, assuming that it had been installed
6    and configured correctly, et cetera, et cetera, that is
7    several caveats, but in general, yes, it could.  I'll
8    admit that as a theoretical possibility.
9        Q.   Now, just going back to -- withdrawn.
10       One of the caveats you just indicated was the
11   dependency on what would be ordinary or comparing what
12   would be ordinary to other ERP systems; is that fair?
13       MR. RAWLINSON:  Objection to form.
14       THE WITNESS:  Yes, I think that's fair.
15       MR. WILLIAMS:  Q.  Right.  Would you need to
16   compare what would be ordinary to make a determination
17   as to whether or not the errors rise to a level that the
18   product, in fact, is just not integrated?
19       A.   I would want to compare what was ordinary
20   within this domain of ERP products.
21       Q.   Sure.
22       A.   Yes.
23       Q.   And you didn't do that in this case in your
24   evaluation?
25       MR. RAWLINSON:  Objection to form.

66

1        THE WITNESS:  I believe that I did do so to
2    the extent of demonstrating what is ordinary based on
3    available statistics.  And also based on the published
4    reports of the 5,000 patches as one published indicator
5    of perceived quality problems.
6        MR. WILLIAMS:  Q.  You did not compare
7    Oracle's software to any other software available in the
8    industry in the time frame relevant to this action, June
9    2000 to June 2001; isn't that true?
10       MR. RAWLINSON:  Objection; vague and
11   ambiguous.
12       THE WITNESS:  That is correct, yeah, I did not
13   compare them --
14       MR. WILLIAMS:  Q.  Sure.
15       A.   -- as of that time frame.
16       Q.   Not as of that time frame?
17       MR. RAWLINSON:  You have to let him finish.
18       MR. WILLIAMS:  Q.  Were you finished?  I
19   didn't mean to cut you off.
20       A.   I may have misunderstood your question.  I did
21   not compare them as they were at that time frame between
22   June of 2000 and June 2001.
23       Q.   Sure.  And you didn't have access, did you,
24   for purposes of analysis that you provide here, to the
25   number of bugs, say, in the PeopleSoft application suite

67

1    available say between June of 2000 and June of 2001, did
2    you?
3        A.   No, I did not.
4        Q.   And you didn't have access to, say, a SAP, SAP
5    application suite that was available in June 2000
6    through June 2001, did you, for purposes of doing your
7    analysis here?
8        A.   No, I did not.
9        Q.   All right.  Nor did you have access to any
10   Siebel application suite available in the period from
11   June 2000 to June 2001 for your analysis as it applies
12   to your report here?
13       A.   No, I did not.
14       Q.   So you don't know what those software vendors
15   were experiencing -- withdrawn.
16       You don't know from any internal company
17   material what those software companies were experiencing
18   in terms of functionality or bugs as it relates to their
19   software suites during that period of time?
20       A.   No, I don't.
21       Q.   So you didn't use any of that information to
22   do any comparison for purposes of your report in this
23   case?
24       A.   No, I did not.
25       Q.   And isn't it true that Oracle represented that

68

1    there was no software available that was comparable in
2    terms of scope to 11i in the marketplace in June 2000
3    through June of 2001?
4        MR. RAWLINSON:  Objection; vague.
5        THE WITNESS:  I believe that may be the case.
6    But I would have to see some of the representations with
7    regard to scope, which you have now begun talking about,
8    as distinct from the bugs that we were talking about a
9    moment ago.
10       MR. WILLIAMS:  Q.  That's fine.  Are you aware
11   of any software vendor that was selling a software suite
12   that included ERP and CRM together in the period between
13   June of 2000 and June of 2001?
14       A.   My recollection from that period is that some
15   of the other vendors included a few CRM pieces in their
16   ERP offering, but I'm not aware of any that offered or
17   provided, marketed the extent of CRM and ERP products
18   integrated together into one product during that period
19   of time.
20       Q.   So when you discuss in your report the
21   necessity of doing a comparison to other software to
22   make a determination as to what would be ordinary for an
23   ERP suite comparable to 11i, that was not something you
24   did; right?
25       MR. RAWLINSON:  Objection; vague and

69

1   ambiguous, mischaracterizes the report.
2          THE WITNESS:  I believe I did so in the
3   context of the industry figures that I've mentioned
4   before.
5          MR. WILLIAMS:  Q.  Okay, I think I understand
6   that.  You didn't do that practically.  What you did was
7   you surmised some things from statistics that you drew
8   from Capers Jones books generally; is that fair?
9          MR. RAWLINSON:  Objection to form.
10         THE WITNESS:  I drew that from industry data
11  of which the one that I cited in detail, that was Capers
12  Jones, yes.
13         MR. WILLIAMS:  I'm being told I need to change
14  the tape.  So we have to take a short break.
15         VIDEOGRAPHER:  This marks the end of tape one
16  in Volume I in the deposition of Edward Yourdon.  At
17  11:03, going off the record.
18         (Recess, 11:03 a.m. - 11:11 a.m.)
19         VIDEOGRAPHER:  On record at 11:11.  This marks
20  the beginning of tape two in Volume I in the deposition
21  of Edward Yourdon.
22         MR. WILLIAMS:  Q.  One of the things that you
23  stated generally in your report is that you had
24  evaluated the statements that -- made by the company
25  that were at issue in this case and determine or

70

1   concluded that they were true or accurate or
2   fundamentally true.  Is that fair?
3          A.  I -- mostly fair.  I evaluated certain
4   statements.  I believe I focused primarily on the ones
5   that were described as false by plaintiffs.  I certainly
6   can't claim that I looked at every press release.
7          Q.  That's actually what I meant, that you
8   evaluated all the statements that were alleged to be
9   false and misleading and concluded that they were
10  accurate?
11         MR. RAWLINSON:  Objection to form.
12         THE WITNESS:  I concluded that they were not
13  false.
14         MR. WILLIAMS:  Q.  Okay, all right.
15         A.  I don't know whether I used the word accurate.
16         Q.  Let's see if we can clarify it.
17         A.  Okay.
18         Q.  Why don't you go to page 92.  And why don't
19  you take a look at the last bullet point on --
20  withdrawn.
21         You see 92 has section XII on there, your
22  conclusions; right?
23         A.  Yes, I do.
24         Q.  Why don't you look at the very last bullet
25  point on that page and read it into the record, please.

71

1          A.  The last bullet point for the record says,
2   "The specific statements regarding the Suite 11i product
3   that plaintiffs have identified as 'false' were, in fact
4   accurate."
5          Q.  Does that refresh your recollection as to what
6   your conclusions were?
7          A.  This does.  I believe this summarizes, you
8   know, a much longer discussion elsewhere in the report
9   where I probably used the phrase "accurate" in the
10  context in which they were made.
11         Q.  All right.  So are you saying that you do not
12  intend to later testify at a trial or some other
13  proceeding in this case that the specific statements
14  regarding the Suite 11i product that plaintiffs
15  identified as false were, in fact, accurate?
16         A.  I would like to compare the summary sentences
17  that I wrote here to see whether it is consistent with
18  the longer -- simply to see whether I have been
19  consistent or whether I need to say something in more
20  detail.
21         Q.  Well, that's the conclusion.  I mean, we can
22  talk more about some other things.  But, so you're
23  saying now you don't know whether or not one of your
24  conclusions will be that the specific statements
25  regarding Suite 11i product that plaintiffs have

72

1   identified as false were, in fact, accurate?
2          A.  I believe they were accurate.  I can imagine
3   possibly adding the caveat that they were accurate
4   within the context in which they were made.  I'm not
5   trying to --
6          Q.  I understand.
7          A.  -- to be tricky here.  But, for example, you
8   know, on page 156 where I said this conclusion is based
9   on the context in which the statements were made as well
10  as my understanding of the statements as an industry
11  expert, so that was the context in which I intended this
12  last bullet point on page 92 to be interpreted.
13         Q.  Looking at page 7 of the report, which has the
14  summary of your opinions, paragraph 12 is the fourth
15  bullet point down, you actually say the exact same
16  thing; right?
17         A.  Yes.
18         Q.  The specific statements regarding the Suite
19  11i product that plaintiffs have identified as false and
20  misleading were, in fact, accurate?
21         A.  Yes, I do say that.
22         Q.  It doesn't say accurate in the context in
23  which they were provided, does it?
24         A.  No, it does not.
25         Q.  I'm going to ask you turn to page 61 of your

73

1   report and look at paragraph 156.
2         MR. RAWLINSON: What paragraph?
3         MR. WILLIAMS: Paragraph 156.
4         THE WITNESS: Yes. That is the paragraph in
5   which I quoted a sentence just a moment ago in answer to
6   your earlier question about accuracy.
7         MR. WILLIAMS: Q. Right. 156 says, and
8   correct me if I'm incorrect, "After having reviewed the
9   factual record provided to me, it is readily apparent
10  that Oracle's statements about 11i, including the nature
11  of the work required to implement it, were fundamentally
12  true."
13     A. Yes.
14     Q. Right?
15     A. You read that correctly.
16     Q. And that conclusion is based on the record
17  that was provided to you that we discussed earlier
18  today; right?
19     A. That's correct.
20     Q. Didn't include all the depositions?
21         MR. RAWLINSON: Don't cut him off.
22         MR. WILLIAMS: He said that's correct.
23         THE WITNESS: That is correct.
24         MR. WILLIAMS: Q. Didn't include all the
25  depositions; right?

74

1     A. That's correct, it did not include the
2   depositions of accounting people and forecasting people,
3   et cetera, as we discussed earlier today.
4     Q. Well, I just wanted to clarify that. Is it
5   your -- is it your testimony that you read every
6   deposition that is related to the product or 11i issues
7   in this case, and that they were provided to you?
8     A. I believe that to be the case to the best of
9   my knowledge sitting here, yes.
10     Q. The factual record that was provided to you
11  did not include all of the documents that were produced
12  in the case; right?
13     A. No, it did not.
14     Q. And in this sentence you qualify the word true
15  with fundamentally. What does that mean?
16         MR. RAWLINSON: Objection to form.
17         THE WITNESS: That means that there may have
18  been minor inaccuracies or minor errors in the
19  statements that Oracle made, but that in my opinion did
20  not detract from the fundamental truth, the basic truth
21  as would be perceived by, as I went on to say at the end
22  of this sentence, the audience for which they were
23  intended.
24         MR. WILLIAMS: Q. So you used the word
25  fundamentally there to convey that there may have been

75

1   some errors in the statements that were made by Oracle?
2     A. It was meant to say that there might possibly
3   have been, in my opinion, minor errors. But, yes,
4   possibly.
5     Q. But you didn't include the fundamentally in
6   your conclusions or in the summary of your conclusions
7   that we looked at just a moment ago; right?
8     A. That's correct.
9     Q. Should you have used fundamentally in the
10  summary of conclusions or in the conclusions, meaning
11  that there may, indeed, have been some errors in what
12  Oracle said?
13     A. No. The only caveat or qualifier that I would
14  have added to that, which I have done in this
15  discussion, is the qualifier in the context that they
16  were made and for the audience for whom they were
17  intended, as I put at the end of paragraph 156.
18     Q. Can you just turn to page 168, please.
19     A. Paragraph 168?
20     Q. I'm sorry, paragraph 168.
21     A. I didn't think my report was quite that long.
22     Q. Just really quickly, the last sentence of that
23  paragraph says, "Your review compels only one
24  conclusion, that plaintiffs' allegations that Suite 11i
25  was not integrated and, therefore, that Oracle's

76

1   statements regarding Suite 11i were false are
2   fundamentally misguided."
3     A. I see that.
4     Q. What does fundamentally misguided mean?
5     A. I believe it means that they were inaccurate
6   or incomplete or misleading in very basic ways, as
7   opposed to possible specific minor ways.
8     Q. So how does the word fundamentally qualify the
9   word misguided as compared to the way in which you used
10  it to qualify the word true in paragraph 156?
11     A. In both cases I believe that a synonym for
12  "fundamentally" would be "basically."
13       So Oracle's statements were basically true,
14  except possibly for minor details. And plaintiffs'
15  allegations were basically misguided, except possibly
16  for minor details.
17     Q. But if the allegations, plaintiffs'
18  allegations relate to the very statements that you admit
19  that included some errors, how could it be -- how could
20  the allegations be fundamentally misguided, or how do
21  you determine that? What was your process?
22         MR. RAWLINSON: Objection; mischaracterizes
23  the prior testimony.
24         THE WITNESS: My process was to look at the
25  extent of integration that was available on a technical

77

1 basis and also the extent, the number and severity of
2 bugs that were reported during the relevant time period
3 to see whether they were numerous and serious and major
4 in existence or in kind as opposed to limited and minor
5 and nonpervasive.
6     MR. WILLIAMS: Q. I thought that you stated
7 that your determination was based on whether or not they
8 were ordinary.
9     A. That would be a part of such a determination.
10     Q. But you didn't say ordinary in your previous
11 answer. You could add it if you intended to include
12 ordinary.
13     A. I would have to be reminded of how I used the
14 word ordinary in my previous testimony to see whether I
15 was talking about the same thing or a different thing,
16 whether it should be added or not. I unfortunately
17 can't recall the exact previous testimony.
18     Though I would also say that even with this
19 issue of minor versus major, the reality is that
20 particularly in this marketplace of ERP products, it is
21 ordinary to even have some number of relatively serious
22 bugs, along with a much larger number of minor bugs.
23     Q. The reason I'm asking these questions is I
24 want to understand exactly what you intend to testify to
25 if and when you testify in front of a jury. And when

78

1 you used the word ordinary before, I think your
2 testimony was one of the ways in which you determined
3 ordinary was to compare the software to other comparable
4 software available at the time, at least that's how I
5 read your report. And you did not do that.
6     A. I would disagree with that. I did do that in
7 terms of industry comparisons, as we discussed earlier.
8 I did not make specific comparisons with whichever
9 companies you mentioned, PeopleSoft, during that
10 relevant time period with internal data provided by
11 those companies.
12     Q. Was there any software available between June
13 2000 and June 2001 that you would describe as comparable
14 to Oracle 11i in the same time frame?
15     MR. RAWLINSON: Objection to form.
16     THE WITNESS: Not as a single integrated
17 product, no.
18     MR. WILLIAMS: Q. And, therefore, you could
19 not -- did you want to say something else?
20     A. I was about to say something else, that one
21 could make and now can make comparisons based on
22 products that are available or have been available for
23 the last few years after the Class Period, so that if
24 one can see some industry data that shows that the
25 Oracle product as was being marketed in the time period

79

1 had bugs that were roughly comparable in nature to
2 integrated comparable products that appeared a couple of
3 years later, then I think I can make a determination of
4 what's normal and not normal.
5     By which I mean that Oracle introduced a
6 product in 2000 for which the number of bugs, in my
7 opinion, was comparable to the number of bugs in other
8 integrated products that did not even arrive until a
9 year or two later, at which point one might have
10 expected even better or fewer bugs because they had the
11 benefit of additional time and possibly improved
12 technology.
13     Q. You didn't do that, did you?
14     A. Yes. By making these industry comparisons,
15 that's what I've been trying to explain, by looking at
16 the industry data.
17     Q. Describe that process exactly the way you did
18 in your analysis and how it relates to this case. Let
19 me withdraw that question.
20     Describe specifically the process that you
21 went through to do the analysis that you just said that
22 you did.
23     A. I went through the analysis of bugs that I
24 could see being reported by Oracle and bugs that were
25 claimed in the marketplace. Although they were patches

80

1 rather than necessarily bugs, I had that data available
2 to me, that was part of the evidence in this case, and I
3 compared that, as I've indicated in my report, against
4 the industry data for ERP products in the textbook by
5 Mr. Jones that was published in 2007, and based on data,
6 as best I can determine, from the last few years. That
7 was the comparison I made.
8     Q. Is that the entirety of the comparison?
9     A. I believe so.
10     MR. RAWLINSON: Objection to form.
11     MR. WILLIAMS: Q. Okay.
12     A. I believe so, certainly with respect to this
13 conversation we're having right now.
14     Q. You testified a few moments ago with respect
15 to paragraph 156 that Oracle's statements concerning 11i
16 were fundamentally true and the conclusion was based
17 both on the context in which the statements were made as
18 well as your -- "my understanding of these statements as
19 an industry expert, i.e., audience for which they were
20 intended." Do you see that?
21     A. Yes, I do.
22     Q. Did someone tell you that the statements that
23 the plaintiffs in this case allege to be false and
24 misleading were intended for industry experts?
25     A. No one told me that. I'm trying to parse your

81

1    question here and my statement simultaneously.
2        It was my intention writing this sentence that
3    industry expert meant somebody like myself, that is, a
4    technical expert.  It is also my understanding that the
5    statements, many of which I've cited here, made by some
6    of the defendants, were made to people that were
7    industry experts, though not necessarily of the same
8    type as me, that is, they were stock market analysts or
9    technical analysts or other forms of experts.
10       But that was not the intent of my statement.
11   I was trying to say that my expertise gives me, I
12   believe, the ability to understand the context in which
13   these statements were made to various audiences,
14   including Wall Street analysts and attendees at Oracle
15   user conferences and so forth.
16       Q.  Is this another one of those sentences that
17   you would rewrite if you had the opportunity?
18       MR. RAWLINSON:  Objection to form.
19       THE WITNESS:  No, I don't think so.  I suppose
20   if I thought you were having difficulty understanding it
21   or that you might interpret it in a manner different
22   than what I intended I would be happy to rewrite it, but
23   I believe the meaning is clear as I wrote it, so I'm
24   happy to leave it as it is.
25       MR. WILLIAMS:  Q.  So is it your opinion or

82

1    your view that the statements that plaintiffs allege to
2    be false and misleading were intended for industry
3    experts and not the public at large?
4        MR. RAWLINSON:  Objection to form, vague.
5        THE WITNESS:  No, that's not my -- that is not
6    my intention as we sit here today, and that was not my
7    intention when I wrote this sentence.
8        MR. WILLIAMS:  Q.  Well, just go back to page
9    52 -- I'm sorry, paragraph 152 and just take a look at
10   paragraph 152 for me, please.
11       A.  Okay.
12       Q.  And if you can look at paragraph 153 as well.
13       A.  Okay.
14       Q.  Now, the block quoted section there is from
15   Oracle's CRM white paper; is that fair?
16       A.  That's correct.
17       Q.  And on the next page you say that "No one in
18   the industry would have adopted any of the
19   interpretations suggested by the plaintiff."  Do you see
20   that?
21       A.  Yes, I see that.
22       Q.  So are you limiting your opinion there as to
23   people in the IT industry, IT professionals?
24       A.  I'm limiting it to people who are involved in,
25   work in or are associated with the IT industry which, in

83

1    my opinion, would include some of these analysts that
2    I've mentioned who, in my opinion, have some degree of
3    expertise with regard to evaluating and assessing
4    products.
5        Q.  So what about institutional investors, for
6    example?  If some of the statements that you evaluated
7    were made to institutional investors, would you still
8    say that the statements were fundamentally accurate or
9    fundamentally true even if the statements were made to
10   people other than those in the IT industry?
11       A.  I believe that to be the case.  If there are
12   specifics you have in mind, I would be happy to look at
13   it.  The comment that you asked me to look at here in
14   paragraph 153 was part of a white paper, and I don't
15   know the audience to whom that was distributed.
16       I focused and I made my sentence statement
17   here based on my understanding of what industry people
18   would have done or how they would have interpreted it.
19       Q.  So if it is later found that the statements
20   were not made to industry people, would you have an
21   opinion as to whether or not the statements could be
22   false or misleading?
23       A.  To people other than people in the IT
24   industry?
25       Q.  Exactly.

84

1        A.  Such as institutional investors?
2        Q.  Or anyone.
3        A.  Or the general public?
4        Q.  General public.
5        A.  I don't think that they would be rendered
6    false by such a thing.  Whether they would be misleading
7    I think would depend on the context of the sentence, for
8    example, the understanding of the word engineering that
9    we had a moment ago.  I am not offering an opinion on
10   that as we sit here today.  I was focusing on the
11   industry people here.
12       Q.  So if it is found, I just want to be clear, if
13   it is found that the IT professional industry is only a
14   small part of the audience to which these statements
15   were made, you would not be offering an opinion as to
16   the -- as to whether or not any of the statements were
17   misleading to any of that broader audience?
18       MR. RAWLINSON:  Objection to form.  Objection
19   to the extent it mischaracterizes prior testimony.
20       THE WITNESS:  Based on the information I've
21   reviewed thus far in this report, I would not be
22   offering an opinion.
23       MR. WILLIAMS:  Q.  Okay.
24       A.  I don't know if I'm going to be exposed to new
25   information between now and trial that might make it

85

1    possible for me to offer such an opinion.  But not based
2    on what I've seen so far.
3         Q.  And you haven't done that type of evaluation?
4         A.  No, I have not.
5         Q.  We've talked a little bit about your opinion
6    concerning integrated.  What I did not see in your
7    opinion, and you can point me to it if it's there, was
8    an opinion concerning Oracle's statements that Suite 11i
9    was fully integrated and fully interoperable.  Does the
10   addition of the word "fully" qualifying integrated or
11   interoperable, would that change your opinion at all?
12        A.  No, it does not change my opinion with the
13   caveat that I think I've been using all the way through
14   that there could be bugs or imperfections in the
15   software, including its integration, but as a general
16   proposition, no, I'm not distinguishing between
17   integration and full integration.
18        Q.  In your view is there any difference between
19   integration and full integration?
20        A.  Not in the sense that Oracle was using it.
21        Q.  I'm just asking for the experience that you
22   can draw on, 40 years as an IT professional.  Do you
23   believe that there is a difference between software
24   being integrated or fully integrated?
25        A.  I believe there can be a difference if it is

86

1    consciously articulated and chosen, as has often been
2    the case in this industry, where an ERP vendor will say,
3    "I have fully integrated my package with these three
4    other components or products," and it is fully
5    integrated with respect to them, but it has not been
6    integrated at all with other components, and certainly
7    not with any legacy systems.  So whether the marketplace
8    or a potential customer views their needs as having been
9    met by a fully integrated product from that vendor might
10   not be the same as what the vendor intended.
11        Q.  So you would require an understanding on your
12   part of the intent of a vendor or the person making the
13   statement?
14        A.  Particularly with regard to the question of
15   whether the integration was intended to take place
16   before the customer acquired or licensed the product
17   versus afterwards.
18        Q.  So you're not offering an opinion -- well,
19   withdrawn.
20        So you evaluate Oracle's statements the same
21   way, if they said fully integrated and fully
22   interoperable, in your view it is the same as saying
23   integrated and interoperable?
24        A.  Yes.  And the distinction I think that Oracle
25   made and that I understood, a distinction between

87

1    preintegrated and post integrated, but in the context of
2    what Oracle was saying, I believe they meant the same
3    thing by integrated and fully integrated.
4         Q.  Do you think -- you don't think it's qualified
5    in the way that you've qualified fundamentally true?
6         A.  Not as I've seen the technical literature or
7    the evidence in this case, no, I think not.
8         Q.  So you're prepared as you sit here to say --
9    you're prepared as you sit here today to say that there
10   is no apparent, at least in your view, qualification
11   meant by using the word fully in front of integrated or
12   fully in front of interoperable, but for your own usage
13   you can say that the usage of the word fundamentally
14   prior to true does have meaning?
15        MR. RAWLINSON:  Objection to form.  Objection
16   to the extent it mischaracterizes testimony.
17        THE WITNESS:  Yes, I think that's a fair
18   statement.
19        MR. WILLIAMS:  Q.  I did not see an opinion
20   specified in your report concerning Oracle's statements
21   that Suite 11i was preintegrated, interoperable or fully
22   integrated and interoperable out of the box.
23        Do you intend to offer an opinion as to
24   whether or not Suite 11i was preintegrated and
25   interoperable out of the box?

88

1         MR. RAWLINSON:  Objection to form.
2         THE WITNESS:  Yes, I'm prepared to offer that
3    opinion, because I believe it was preintegrated and
4    interoperable out of the box.
5         MR. WILLIAMS:  Q.  And is that in your report?
6         A.  I would have to look and see.  As I recall,
7    that was a characterization made in statements by
8    Mr. Ellison and others.  I thought I had cited and had
9    indicated that I agreed with.  I would have to look
10   through my report to see.
11        Q.  Maybe we can do that at lunchtime.  Because in
12   your conclusion, again, you say the statements were, you
13   know, accurate.
14        A.  Yes.
15        Q.  And then you qualified that some with respect
16   to the context, but you don't identify which statements
17   you qualify as being only fundamentally true or accurate
18   with a caveat of context.
19        A.  Okay, fair enough.
20        Q.  But I did not see an opinion on that issue in
21   the report.
22        Do you intend -- well, withdrawn.
23        Do you offer an opinion or did you offer an
24   opinion as to whether or not Oracle's Suite 11i could be
25   up and running in months and that purchasers would get

89

1    savings in months?
2       A.  I don't recall -- I don't recall offering my
3    own opinion about the savings in months.  I do believe I
4    expressed the opinion about the ability of customers to
5    get Suite 11i up and running in months.
6       Q.  So if one of the statements that plaintiffs
7    allege to be false and misleading is that Suite 11i
8    is -- can be up and running in months, you get savings
9    in months, it costs you less -- let me back up.  Why
10   don't I just get the statement.  You actually quote it
11   in your report.  How is that?
12      A.  Most of it sounded familiar.
13      Q.  Go to paragraph 150.
14      A.  Also in paragraph 143 to be helpful.
15      Q.  Down at the bottom of page 59.
16      A.  And, yes.
17      Q.  You see where it begins, that last sentence
18   begins, "And a stomach for risk.  Or, you can buy our
19   complete E-Business suite where all the pieces are
20   designed and engineered to fit together and no systems
21   integration is required.  It's up and running in months,
22   you get savings in months, it costs you less and it
23   takes less time to install."  Do you see that?
24      A.  Not quite accurately quoted.  "You get the
25   savings in months."  The penultimate sentence.

90

1       Q.  It says, "You get the savings in months"?
2       A.  I didn't hear you include the word "the."
3       Q.  Maybe I didn't.
4       A.  I think that's significant, because I believe
5    the interpretation that anyone would have made in this
6    context is the savings that would be associated with no
7    systems integration being required.  Whether or not the
8    company begins increasing its revenues or decreasing its
9    costs and achieving overall financial savings, I don't
10   know, and I don't know whether Mr. Ellison intended
11   that.
12      Q.  I'm sorry, were you done?
13      A.  Yes.
14      Q.  Okay.
15      A.  And I think it would be taken in the context
16   of the next sentence which says it costs you less than
17   would be the case if you had to do your own integration
18   and hiring IBM or Anderson Consulting, and because it
19   costs you less, you would get the associated savings.
20      Q.  But it also says it takes less time to
21   install; right?
22      A.  Than would be the case with a best of breed
23   approach using IBM or Anderson Consulting.
24      Q.  Do you intend to offer an opinion as to
25   whether or not that statement is accurate, fundamentally

91

1    true or true in the context within which you interpret
2    it to be given?
3       A.  The latter two opinions I am prepared to
4    testify that that sentence is fundamentally true and
5    that it is accurate in the context in which it was
6    intended to the audience to whom it was being presented.
7       Q.  Do you know what audience that this statement
8    was being presented to?
9       A.  I believe this was an earnings call made to
10   the Wall Street community.  That's the best of my
11   understanding who the audience was.
12      Q.  But if that audience was broader than the Wall
13   Street community, but instead anyone who was, you know,
14   able or wanted to go listen, you would not have an
15   opinion; is that fair?
16      A.  Well, in this particular case, I would have an
17   opinion, because it comes at the end of a rather lengthy
18   explanation, which I believe would be understandable in
19   this particular case, anyway, even to non-technical
20   people.
21      Q.  So do you think that an expert's opinion as to
22   what this says or means would be helpful to a
23   non-technical person?
24      A.  I believe it would, yes.
25      Q.  And you don't -- Larry Ellison didn't tell you

92

1    what he meant, did he?
2       A.  No, he did not tell me what he meant.
3       Q.  But you think your interpretation of what he
4    meant is more fair and accurate than the public at large
5    interpretation of what he meant?
6          MR. RAWLINSON:  Objection to form.  Objection;
7    assumes facts not in evidence.
8          THE WITNESS:  I am not aware of the public's
9    understanding or interpretation of this sentence.
10         MR. WILLIAMS:  Q.  But you would be offering
11   the public an expert opinion on his meaning; right?
12   Isn't that what you said?
13      A.  I would be offering an expert opinion that in
14   the context of this entire sentence and for the primary
15   audience for whom it was intended that this would be a
16   fundamentally true statement.
17      Q.  With -- withdrawn.
18         Did you do an analysis as to whether or not
19   any customers were up and running on Suite 11i in
20   months?
21      A.  What kind of analysis do you mean?
22      Q.  Any expert analysis.
23      A.  My analysis was primarily to see whether such
24   customers existed, that is customers that did get up and
25   running within a matter of months.  And I believe

93

1  several of them are identified in the two reports that
2  I've been provided.
3      Q.  Did you find any customers that were up and
4  running in months on both ERP and CRM together?
5      A.  I did.  I must admit I don't recall now
6  whether we put that into the report -- I put that into
7  the report.  My recollection from looking at the
8  materials is that there were on the order of a dozen
9  such companies, 10 or 12.
10      Q.  As of December 14th of 2000?
11      A.  I -- oh, as of the date this statement was
12  made?
13      Q.  Statement was made; right.
14      A.  I would have to go back and look at the
15  details.  I believe some of them were up and running by
16  December 14th, though I can't tell you from memory which
17  ones.  Others may have been up and running by the end of
18  the so-called Class Period at the end of February 2001.
19      Q.  Just so you know, my question is that you
20  believe that you found evidence that there were
21  customers up and running in months, both CRM and ERP
22  together, as of December 14th of 2000?
23      A.  I believe there were.  I would not be
24  surprised if there is a relatively limited number given
25  that December 14th was only six or seven months after

94

1  the introduction or launch of the product.  But I
2  believe there were.
3      Q.  And that's somewhere in your report or your
4  rebuttal report you think?
5      A.  I think so.  I can't recall exactly from
6  memory.  But I'm fairly certain that I've seen several
7  such companies in my review of the various
8  implementation efforts.
9      Q.  Okay.  And --
10      A.  If I may pause for a moment, I'm fairly
11  certain that in my report there's a list, at least a
12  partial list of companies that were up and running, you
13  know, within months.  As to which of those met your
14  criterion of being both ERP and CRM, I don't recall
15  whether I identified that subset or that additional
16  qualification.  But I do know from looking at some of
17  the data involved that indeed some of them were both.
18  Whether I called them out in such a way in the report,
19  I'd have to look and see.
20      Q.  And did you analyze whether any Oracle
21  customers on Suite 11i as of December 14th, 2000 had
22  gotten any savings due to their implementation of Suite
23  11i?
24      MR. RAWLINSON:  Objection to form.  Vague and
25  ambiguous.

95

1      THE WITNESS:  No, I did not evaluate that or
2  analyze that.  I'm sorry.  No.
3      MR. WILLIAMS:  Q.  Then how is it that you
4  could sit here today and say that you're prepared to
5  provide an expert opinion as to whether or not the
6  statement that it's up and running in months, you get
7  the savings in months, it costs you less and it takes
8  less time to install is true or fundamentally true?
9      A.  I would be prepared to make that statement
10  based on my experience with the cost of implementation
11  as provided by consulting firms such as IBM and Anderson
12  Consulting, which is quoted in the previous paragraph of
13  Mr. Ellison's statement, usually associated with a great
14  deal of integration activity, after-the-fact integration
15  activity, which generally is far more excessive than the
16  cost of the ERP product itself.  Indeed, as someone has
17  indicated here in some material that I've cited, often
18  as much as ten times more expensive.
19      So I would certainly be willing to make such,
20  or offer such an opinion as having been fundamentally
21  true with the understanding that there might be the
22  occasional outlier or anomaly where perhaps the
23  implementation savings was smaller or nonexistent, but
24  it would be an extreme exception, as opposed to the
25  general case.

96

1      Q.  So you would be prepared to make that -- to
2  provide that expert opinion, notwithstanding the fact
3  that you've been provided substantial documents
4  concerning implementations of Suite 11i in the time
5  frame relevant to this case, but you're unable to cite
6  to any customer that got savings in months due to their
7  implementation of Suite 11i as of December 14th of 2000?
8      MR. RAWLINSON:  Objection to form.  Objection
9  to the extent it mischaracterizes prior testimony.
10      THE WITNESS:  It is unlikely if not impossible
11  that I would have the precise accounting data associated
12  with such savings, because the savings are being
13  realized by customers, not by Oracle.  So while I had
14  access, obviously, to a great deal of Oracle
15  information, I didn't have access to the books of, nor
16  the financial records of all the companies that
17  implemented it.  So there may well have been public
18  statements made by some of these customers as to how
19  much they felt they had saved, but not in any detailed
20  financial form that I could analyze.
21      MR. WILLIAMS:  Q.  So, again, based on what
22  you've seen in the evidence in this case, and not seeing
23  any information provided by an Oracle customer
24  concerning whether they got savings in months from their
25  implementation of 11i as of December 14th, 2000, you

97

1  would be prepared to provide an expert opinion as to
2  whether or not that statement is true?
3       MR. RAWLINSON: Objection to the form.
4       THE WITNESS: I would be prepared to offer
5  such an opinion with my interpretation and understanding
6  that I mentioned earlier, namely that the savings
7  referred to here by Mr. Ellison are savings in
8  implementation costs as compared to the costs that would
9  exist using consulting firms like IBM or Anderson. Not
10  savings necessarily associated with the operational use
11  of Suite 11i once it had been put into production.
12       MR. WILLIAMS: Q. So would you also be
13  willing to provide an expert opinion on what Larry
14  Ellison or Oracle meant by the statement?
15       MR. RAWLINSON: Objection; asked and answered.
16       THE WITNESS: No, I'm not -- I don't claim
17  mind reading amongst my many skills. I would be
18  prepared to testify that the understanding or
19  interpretation of such a statement by Mr. Ellison by the
20  audience that I think is involved here would be that the
21  savings that are being referred to are the savings
22  associated with implementation costs. Mr. Ellison
23  obviously will have to speak for himself as to what he
24  meant by those words.
25       MR. WILLIAMS: Q. Can you turn to paragraph

98

1  197 for me, please, on page 75.
2       A. Okay.
3       Q. You can read that to yourself, if you want.
4       A. Okay, yes, I've read it.
5       Q. You see where you write, "It would be
6  incorrect for me to assert that there were no product
7  problems. During the first year of its release a number
8  of Oracle customers implementing Suite 11i did
9  experience bugs and defects that caused numerous
10  setbacks; however, problems with these early releases of
11  software are common and expected by the industry"? Do
12  you see that?
13       A. Yes, I do.
14       Q. So it's true that Suite 11i experienced
15  certain bugs and defects? You concede that; right? Or
16  you agree with that?
17       A. I agree with that. I don't consider that a
18  concession.
19       Q. You agree with that?
20       A. Yes.
21       Q. And they did cause numerous setbacks for
22  customers; is that fair?
23       A. I think that's fair. Not necessarily
24  permanent or fatal setbacks, but certainly setbacks,
25  yes.

99

1       Q. Sure. In the sentence above that, you say,
2  "As noted above, even problems that are reported to
3  Oracle as TARs are more often than not unrelated to
4  software defects."
5       A. Yes, I see that.
6       Q. Did you evaluate all of the TARs that were
7  logged at Oracle?
8       A. No, I did not.
9       MR. RAWLINSON: During the relevant time
10  period?
11       MR. WILLIAMS: Sure.
12       Q. During the relevant time period.
13       A. No, I did not.
14       Q. And you didn't do an independent evaluation of
15  whether or not problems reported to Oracle as TARs are
16  more often than not unrelated to software defects?
17       A. I did from the testimony of several witnesses,
18  several Oracle witnesses that are reported in this
19  report, and I believe also the other report, indicating
20  that approximately two-thirds roughly speaking of the
21  TARs, as they are often called, turned out not to be
22  software defects.
23       Q. But did you not do an independent analysis of
24  that?
25       MR. RAWLINSON: Objection to form.

100

1       THE WITNESS: I did not do an independent
2  analysis of the TARs themselves to see whether they were
3  ultimately classified as software bugs or not. No, I
4  did not.
5       MR. WILLIAMS: Q. Right. So the more
6  accurate statement here would be after a review of the
7  testimony of certain witnesses, you concluded that based
8  on that testimony. You didn't make this independent
9  finding?
10       MR. RAWLINSON: Objection to form.
11       THE WITNESS: That's not quite true. I did
12  review several of the bug tracking reports that
13  indicated the number of things that had come into the
14  TAR database, so to speak, the ones that were ultimately
15  categorized and classified as being either software
16  defects or nondefects. So I did do that level of
17  analysis.
18       MR. WILLIAMS: Q. Can you take me to section,
19  what is that, section VIII.2.3 of the report?
20       A. That may be a cross-referencing error. It
21  appears there is no section VIII.3.2, Roman numeral
22  VIII.3.2. So I will have to find you the particular
23  section of the report that does address that topic.
24       Q. Okay.
25       A. Would you like me to do that now?

101

1    Q.  No.  That's fine.
2    A.  I apologize for the cross-referencing update
3  or nonupdate.
4    Q.  Just take a look at paragraph 199.
5    A.  Okay.
6    Q.  It looks like you're discussing one of the
7  META group's reports; right?
8    A.  Yes, that's correct.
9    Q.  And the META group says, "Users must approach
10  the newer applications cautiously because many have not
11  been field tested in real world scenarios.  For mission
12  critical applications we recommend that users wait at
13  least six months after the release of 11i to
14  purchase/implement Oracle's newest application."  Do you
15  see that?
16    A.  Yes, I see that.
17    Q.  And why did you think that this was relevant
18  to your analysis?
19    A.  Because it was part of this comment that was
20  preceded in paragraph 198 led by Mr. Kinikin, and going
21  back to paragraph 197 that says it's common for problems
22  to be experienced during the first year of
23  implementation of -- first year of release of a new
24  product, and as a general phenomenon discussed elsewhere
25  in my report, the companies that are most willing to use

102

1  a new product in that early period are often the early
2  adopters, the ones willing to gain the benefits of an
3  early release with the understanding of potential bugs.
4       And I felt that Mr. Bonadio, or however his
5  name is pronounced, was pointing out that if you have
6  mission critical applications, and are, therefore,
7  somewhat perhaps a more conservative customer, it might
8  be a good idea to wait for six months.
9    Q.  Isn't it true that you intend to offer an
10  opinion that you found no customers that were, or
11  potential customers that delayed purchases or
12  implementation due to problems or instability of Oracle
13  11i software?
14    MR. RAWLINSON:  Objection to the form.
15    THE WITNESS:  I believe the language was that
16  there were very few if any.  I would have to recall the
17  or re-examine the language.  But, as I recall, it was
18  something along those lines, very few if any, or very
19  few if any unknown or undisclosed problems, or language
20  somewhere along those lines, yes.
21    MR. WILLIAMS:  Q.  So you found that -- well,
22  withdrawn.
23       Did you not find that potential Oracle
24  customers actually did delay purchases and
25  implementations of 11i software due to undisclosed --

103

1    A.  Unknown or undisclosed.  Not that I recall.
2  Again, I remember addressing that fairly specifically in
3  a later section in my report.  However, I think
4  Mr. Bonadio is saying as a general proposition you might
5  want to consider delaying, without even looking to see
6  if there are specific problems, because newer
7  applications need to be treated cautiously, et cetera,
8  et cetera.
9    Q.  You did find certain customers did delay
10  implementation or purchases of Oracle 11i due to
11  problems with the software; isn't that true?
12    MR. RAWLINSON:  Objection to form.  Objection;
13  mischaracterizes testimony.
14    MR. WILLIAMS:  Q.  If it is not, you can say
15  it is not.
16    A.  Well, again, what I need to do is take a look
17  at the language in my report where I said I -- in
18  section XI, Roman numeral XI, I discussed a number of
19  prospects or companies that were in the sales pipeline
20  that were considering 11i.  And again I would have to
21  look at the language here to see whether there are
22  perhaps one or two -- you know, I have seen no evidence
23  that deals failed to close because of problems that
24  undermined Oracle's statements that the product was
25  integrated and operable.

104

1       But I don't see that as being at all related
2  to the paragraph you directed me to look at by
3  Mr. Bonadio.  There may have been customers that delayed
4  implementation because of advice from analysts of this
5  sort without having specifically looked at the product.
6    Q.  So you're saying that, you know, there is a
7  difference between looking at the product and viewing
8  problems and delaying, or hearing that there may be
9  problems and delaying?
10    A.  Yes, I think that is a significant difference.
11    Q.  Okay.  And did you evaluate whether or not any
12  customers or potential customers heard about problems
13  with Suite 11i and delayed purchases or implementations?
14    MR. RAWLINSON:  Objection; form.
15    THE WITNESS:  The only ones that I would have
16  considered were the ones that heard whatever they heard,
17  whether it was good or bad, but then proceeded farther
18  into the discussions with Oracle to consider such
19  things.  And then the question is whether they would
20  have proceeded or not.
21       I did not analyze the presence or absence of
22  potential customers that heard whatever they heard and
23  then decided to go no further and did not pick up the
24  phone to call Oracle.  That community --
25    MR. WILLIAMS:  Q.  So you have no opinion on

105

1   whether or not potential customers may have heard about
2   problems with Suite 11i and decided to either delay or
3   just not purchase 11i?
4           MR. RAWLINSON:  Objection to form.
5           THE WITNESS:  In the case where their decision
6   was made without any contact or interaction with Oracle
7   so that Oracle would know that it was even an issue,
8   that's what I'm trying to identify.
9           MR. WILLIAMS:  Q.  I understand that.
10      A.  Okay.
11      Q.  But you're not stating you're aware of every
12  customer that contacted Oracle concerning a possible
13  purchase of 11i during the relevant time period, are
14  you?
15      A.  No, no.  Indeed what I discussed here was the
16  particular subset that I did look at more closely, and
17  that was roughly 100 customers or potential customers, I
18  should say, with particular sales figures above a
19  certain level.  That's what I described in here.
20      Q.  You didn't look at any potential customers
21  beyond the ones that I think you said were -- may
22  purchase applications above $2 million or something like
23  that?
24      A.  That was one or two criteria, yes.  Beyond
25  that category I described in my report --

106

1   Q.  You have no opinion on that issue?
2   A.  No, I'm not -- I don't have an opinion.
3   Q.  Okay.  And so a customer that may have planned
4   to purchase a $500,000, you know, package of Suite 11i
5   software, you have not evaluated whether or not that
6   customer may have viewed the product, saw problems and
7   decided to delay or not to purchase at all?
8       A.  I think there may have been a couple of that
9   sort where they had been identified by plaintiffs.  I
10  seem to recall there were a couple under the $2 million
11  price tag.  As a general proposition, no, I did not.
12      Q.  My question, as a general proposition, you
13  didn't evaluate that universe of potential customers?
14      A.  No, I did not.
15      Q.  In fact, you didn't evaluate the universe of
16  potential customers below that $2 million threshold?
17      A.  Except for the ones identified by plaintiffs,
18  and I forgot what the other categories were.
19      Q.  But you understood that Oracle had thousands
20  of potential customers; isn't that right?
21      A.  Well, they had certainly more than 100.  I
22  don't know what the number was.  I imagine it to be a
23  fairly large number.  Whether it was hundreds or
24  thousands or millions, I'm not prepared to offer an
25  opinion here.

107

1   Q.  Didn't you cite to Oracle's statement that
2   they had 2,500 customers implementing 11i?
3       A.  Yes.
4       Q.  So isn't it fair to say 11i had potentially
5   thousands of customers?
6       A.  Yes.  It may have been 2,501.  I'm not trying
7   to quibble.  But, again, I can't tell you if it was a
8   few thousand or many thousands or tens of thousands or
9   hundreds of thousands.  I didn't try to assess that at
10  all.
11      Q.  Can you take a look at paragraph 201 for me,
12  please, where you write, "Plaintiffs' anecdotal evidence
13  of bugs and a handful of escalated customers that
14  experienced escalated concerns for a host of possible
15  reasons do not indicate anything to me about the overall
16  quality of the software."
17      A.  Yes, I see that.
18      Q.  Is that paragraph only tied to the evidence
19  that plaintiffs had pointed to in their complaint, or
20  are you referring to all the evidence that was provided
21  to you to evaluate?
22      A.  The latter of those two scenarios you've
23  mentioned.
24      Q.  The latter?
25      A.  Yes.

108

1   Q.  So this paragraph is inaccurate by saying
2   plaintiffs' anecdotal evidence?
3       A.  And a handful of escalated customers -- could
4   you go back to your earlier question?
5       Q.  I'm just trying to determine whether or not
6   the evidence that you appear to be referring to here is
7   what you believe is the plaintiffs' evidence.
8       A.  No, it is not just the plaintiffs' evidence.
9   So the plaintiffs' evidence of bugs as illustrative of
10  quality problems and the escalated customers that were
11  allegedly evidence of customer problems was not the only
12  thing I looked at in evaluating the quality of the
13  software.
14      There were either bug reports or deposition
15  testimony or other things describing those incidents or
16  those escalated customers that I took into account --
17  I'm not quite done -- which included information beyond
18  just that provided by the plaintiffs, but also
19  information that I asked for from counsel or from Oracle
20  to help gain a better understanding of what was going on
21  in these circumstances where bugs had been reported or
22  escalated customers were involved.
23      Q.  So this paragraph does not convey what you
24  intended to convey; is that fair?
25          MR. RAWLINSON:  Objection to form.

109

1  THE WITNESS: It doesn't convey what I
2  intended to convey. I've provided additional
3  elaboration or perhaps clarification based on your
4  question. But I intended what I wrote.
5  MR. WILLIAMS: Q. I don't -- did you intend
6  what you just said to me, or you intended what you
7  actually wrote?
8  MR. RAWLINSON: He said it doesn't convey,
9  then the rest of the paragraph is confusing.
10  He's asking does the sentence convey what you
11  intended?
12  THE WITNESS: I apologize. The sentence
13  conveys what I intended it to convey.
14  I've also conveyed to you additional
15  information about things that I took into consideration
16  along with the plaintiffs' evidence, and I intended to
17  convey that to you as well.
18  MR. WILLIAMS: Q. So someone who reads this
19  sentence to mean that you were referring to the
20  plaintiffs' anecdotal evidence and handful of escalated
21  customers would be misinterpreting it?
22  MR. RAWLINSON: Objection to form. Objection;
23  incomplete hypothetical.
24  THE WITNESS: If they read it as indicating --
25  or if they understood from this sentence that the only

110

1  means by which I achieved this indication was only the
2  plaintiffs' anecdotal evidence, yes, that would be a
3  misinterpretation.
4  MR. WILLIAMS: Q. No. Plaintiffs' anecdotal
5  evidence and a handful of escalated customers.
6  A. You're absolutely right, yeah.
7  Q. And so really by paragraph 2001 (sic), are you
8  really just talking about all of the evidence that you
9  reviewed?
10  MR. RAWLINSON: Objection to form.
11  MR. WILLIAMS: Q. Is that fair?
12  A. No. No. Let me try it again. What I was
13  trying to convey was that I obviously had some anecdotal
14  evidence of bugs provided by plaintiffs and a handful of
15  escalated customers, what I was trying to find out was
16  does this indicate anything to me about the overall
17  quality of software, all right. And I did not try to
18  reach a conclusion or opinion about that by only looking
19  at the anecdotal evidence and the identification or
20  existence of the escalated customers, but the other
21  evidence that was available about those anecdotal bugs
22  and escalated customers.
23  Beyond that there was even more information
24  about the quality of the software that I took into
25  account to form my overall opinion.

111

1  But as to the question of whether my opinion
2  was based on the plaintiffs' evidence of bugs and the
3  escalated customers, and only the information associated
4  with those from the plaintiff, the answer is no.
5  Q. So what you're referring to in 2001 (sic)
6  is --
7  A. 201.
8  Q. I'm sorry, 201, is a relatively small universe
9  of evidence for the purpose of that paragraph?
10  A. That's correct, though you characterized it as
11  small, but as you can see from the footnote associated
12  with that paragraph, it is not trivial.
13  Q. So all of the evidence that you evaluated that
14  relates to paragraph 201 and the footnote that you cite
15  to and all of the evidence in that footnote didn't
16  indicate anything to you about the overall quality of
17  the software?
18  MR. RAWLINSON: Objection to form.
19  MR. WILLIAMS: Q. Right? At least that's
20  what you wrote.
21  A. Yes, that's what I wrote, because it was not
22  indicative, it did not provide a conclusion or form an
23  opinion or allow me to form an opinion by itself.
24  Q. Now, I just want to be clear that your opinion
25  as it relates to paragraph 201, the evidence that you

112

1  reviewed related to that, what is written in that
2  paragraph and the footnote didn't indicate anything to
3  you about the quality of the software?
4  MR. RAWLINSON: Objection to form.
5  MR. WILLIAMS: Q. And I'm focusing on the
6  word anything.
7  A. And I agree with what you've just said, it did
8  not indicate anything.
9  Q. So it is valueless, you don't need this --
10  this evidence is unimportant and irrelevant relating to
11  the quality of the software?
12  MR. RAWLINSON: Objection to form.
13  THE WITNESS: No, I would not say that it was
14  valueless or irrelevant. It's not conclusive, it is not
15  indicative, it doesn't -- it is there and it may be used
16  as a starting point for further investigation. But by
17  itself it does not indicate anything about the overall
18  quality of the software.
19  MR. WILLIAMS: Q. Okay.
20  A. If I can add to that also, since I was looking
21  at the preceding citation, one of the reasons that it
22  does not indicate anything to me is because of the
23  number of bugs and escalated customers as compared to
24  the larger universe of bugs and customers that would
25  actually allow me to form an overall opinion.

113

```
1      Q.  Okay.  Why don't we look at paragraph 202,
2   just under it.  "Furthermore, plaintiffs' evidence that
3   certain customers were offered discounts for free
4   consulting services including SWAT teams to remedy
5   problems does not indicate anything to me about the
6   quality of the software."  Do you see that?
7      A.  Yes, I do.
8      Q.  In that paragraph are you referring to
9   plaintiffs' evidence there?
10      A.  My intention was similar to what we've just
11   discussed.  I was obviously aware that plaintiffs did
12   provide some evidence that certain customers were
13   offered discounts or free consulting, but that by itself
14   did not indicate anything to me about the quality of the
15   software.
16      Q.  What evidence did plaintiffs provide regarding
17   certain customers being offered discounts on free
18   consulting services?
19      A.  I don't recall sitting here at this moment the
20   exact incidents that were identified in some of the
21   plaintiffs' documents or perhaps in Mr. Hilliard's
22   reports.  All I recall at this point is the general
23   statement or assertion or charge that came from
24   plaintiffs about this phenomenon.
25      Q.  So are you referring -- withdrawn.
```

114

```
1       So you don't know whether the plaintiffs
2   provided any evidence concerning software -- certain
3   customers that were offered discounts or free
4   consulting?
5      A.  Oh, I believe they did.  I just can't recall
6   the specifics.  It is possible that I refer to specific
7   examples in my rebuttal report or elsewhere in here.
8   But this was not made in the absence of specific
9   examples.  I don't recall them now.
10      Q.  I understand that.  I'm just wondering whether
11   or not -- it seems there are places you identify
12   plaintiffs' evidence and other places where you don't
13   discuss plaintiffs' evidence, and I'm trying to
14   understand what you believe plaintiffs' evidence to be,
15   since you referred to it -- since you referred to it in
16   paragraph 202.
17      A.  I've referred to it in paragraph 201 or 202,
18   without having identified it.  And I apologize for not
19   being able to recall exactly what they were, whether it
20   was in the initial complaint or some of the subsequent
21   filings by plaintiffs or Mr. Hilliard's report.
22       All I can tell you sitting here right now is I
23   did see such evidence as part of the official record.
24      Q.  And whatever it was that you reviewed relating
25   to paragraph 200 to 202, did not indicate anything to
```

115

```
1   you about the quality of the software?
2      A.  That's correct.
3      Q.  Again I'm focusing on "anything," the word
4   anything.
5       MR. RAWLINSON:  As opposed to overall quality?
6   Are you asking him to isolate it from the whole
7   sentence?
8       MR. WILLIAMS:  Q.  I want to be sure that the
9   evidence that he's referring to does not indicate
10   anything at all about --
11       MR. RAWLINSON:  Anything at all -- okay, go
12   ahead.
13       MR. WILLIAMS:  Q.  -- to you about the quality
14   of the software.
15       MR. RAWLINSON:  The quality or the overall
16   quality?
17       MR. WILLIAMS:  It says the quality of the
18   software.
19       MR. RAWLINSON:  Okay.
20       THE WITNESS:  Paragraph 201 says the overall
21   quality.
22       MR. WILLIAMS:  Q.  I'm referring to paragraph
23   202.
24      A.  202.  Okay, I think to be consistent I should
25   insert the adjective "overall" into paragraph 202 to
```

116

```
1   make it consistent with paragraph 201.
2      Q.  But, still, that doesn't indicate anything to
3   you?
4      A.  That's correct.
5      Q.  So is it fair to say that if you referred to
6   more evidence than simply just the plaintiffs' evidence
7   concerning concessions that Oracle was providing to
8   customers due to product problems, that would indicate
9   something to you concerning the quality or overall
10   quality of the software?
11      A.  That would give me additional information with
12   which to form an opinion, yes.
13      Q.  I understand it would give you additional
14   information.  I think the information that you referred
15   to here was information that was provided to you that
16   you could use for some purpose; right?
17      A.  Yes.
18      Q.  But if you had information in addition to the
19   plaintiffs' evidence as referred to here relating to
20   concessions that the company was giving to customers for
21   product problems, would that indicate anything to you
22   about the overall quality of the software?
23      A.  Potentially, yes.  If I had a great deal of
24   additional information beyond that provided by
25   plaintiffs and beyond the additional information that I
```

117

1    pursued about those plaintiff situations, yes, then I
2    would use that to assess the quality of the software.
3        Q.   Did you make an evaluation of -- which
4    includes a review of all of the evidence that was in
5    your possession concerning concessions that Oracle paid
6    to customers due to product problems?
7        A.   No, I did not.
8        Q.   So you have no opinion as to whether or not
9    Oracle concessions given to customers due to problems
10   with Suite 11i impacted -- withdraw that.
11       So you didn't draw any conclusions related to
12   concessions, based on all of the evidence that you
13   reviewed, given to Oracle customers due to problems with
14   11i and its impact on your evaluation of the quality of
15   the software?
16       MR. RAWLINSON:  Objection to form.
17       THE WITNESS:  Beyond the review that I
18   conducted of the plaintiffs' subset of that, no, I did
19   not.  It seems to me you're asking if I did the
20   plaintiffs' job for them.  But in any case --
21       MR. WILLIAMS:  Q.  I'm not asking you that.
22       A.   I'm sorry if I misinterpreted.  But, no, I did
23   not evaluate the totality of all such discounts that may
24   have been offered and/or the reasons for why they were.
25       VIDEOGRAPHER:  This marks the end of tape two

118

1    in Volume I in the deposition of Edward Yourdon at
2    12:34, going off the record.
3            (Recess, 12:34 p.m. - 1:40 p.m.)
4        VIDEOGRAPHER:  On record at 1:40.  This marks
5    the beginning of tape three in Volume I of the
6    deposition of Edward Yourdon.
7        MR. WILLIAMS:  Q.  Mr. Yourdon, if you could
8    turn to paragraph 205 on page 77 of your May 25th
9    report.
10       A.   Yes, I see it.
11       Q.   In here you say, "Based on my review of the
12   factual record and my extensive experience in business
13   enterprise software, however, the growing pains
14   encountered by the massive CRM portion of Oracle's Suite
15   11i were neither undisclosed to the public, nor were
16   they out of the ordinary."
17       What part of your analysis, i.e., your review
18   of the factual record or your extensive experience leads
19   you to conclude that the growing pains you refer to here
20   were disclosed, or were not undisclosed?
21       A.   The factual record that I reviewed included
22   presentations by Oracle executives at Oracle conferences
23   about the new version of the CRM portion of Suite 11i,
24   as well as analyses and reports and evaluations provided
25   by various analysts in the computer industry about the

119

1    CRM portion.  My experience with business enterprise
2    software covers --
3        Q.   Maybe my question wasn't clear.
4        A.   I see.
5        Q.   What about your extensive experience led you
6    to conclude that the growing pains encountered by the
7    CRM were not undisclosed?
8        MR. RAWLINSON:  Objection to form.
9        THE WITNESS:  My experience in the field leads
10   me to believe that growing pains associated with any new
11   software component would be disclosed in a variety of
12   media and a variety of forms, and I felt that those were
13   covered, and, therefore, my experience indicated that
14   problems were not undisclosed.
15       MR. WILLIAMS:  Q.  So you're not relying on
16   any specific evidence to suggest that the -- what you
17   call growing pains with the CRM were undisclosed, are you?
18       MR. RAWLINSON:  Objection; mischaracterizes
19   testimony.
20       THE WITNESS:  No.  I think the previous answer
21   I had given you, which you felt didn't respond to your
22   question, my previous answer was that I did see
23   evidence, affirmative evidence of statements about the
24   growing pains of the CRM portion from Oracle executives
25   and from industry analysts that I felt provided

120

1    disclosure.
2        MR. WILLIAMS:  Q.  Maybe I'm not -- I'm not
3    asking the question the right way.
4        A.   Or I'm not understanding.  Sorry.
5        Q.   It looks like you're saying two things in this
6    paragraph.  A, that based on your review of the record
7    and extensive experience, that the growing pains were
8    not undisclosed, nor were they out of the ordinary.
9        A.   That's correct.
10       Q.   Now, based on your experience alone, separate
11   out the factual record, what in your experience led you
12   to conclude that the growing pains that were encountered
13   with the CRM portion of Suite 11i were not undisclosed?
14       MR. RAWLINSON:  Objection; asked and answered.
15       THE WITNESS:  My experience includes
16   introductions and launches of numerous software and
17   business enterprise software products.  And that
18   experience includes previous examples of executives in
19   various computer companies, whether it is IBM or
20   Microsoft, et cetera, making statements as to their
21   assessment of the growing pains or lack of growing
22   pains.  So part of my experience was of that nature
23   where I thought given that that's what corporate
24   executives do about new introductions of software, I
25   would expect Oracle as appropriate to make similar

121

1  comments if they were appropriate about CRM.
2          Similarly, when I've seen new product
3  announcements or new product introductions throughout my
4  experience, I would expect to see reports, reviews,
5  analyses, et cetera, in the computer trade publications,
6  magazines and so forth, as well as reviews, analyses and
7  so forth from computer analysts, industry analysts.
8  That's very common and expected. That led me to believe
9  that one should expect to see similar things with regard
10  to Oracle's CRM.
11         MR. WILLIAMS: Q. Right. But you didn't see
12  that, did you?
13     A. Yes, I did.
14     Q. You don't cite to anything, you don't appear
15  to rely on any factual record here. So can you tell me
16  what you saw in terms of the factual record that the
17  growing pains encountered by CRM were disclosed or not
18  undisclosed?
19     A. Well, paragraph 208, 209, 210 were examples.
20  I think there were others that I've cited either in this
21  report or in the rebuttal report. I don't suggest that
22  those four paragraphs are an exhaustive example. But
23  there is a disclosure in Business Week magazine, which
24  is certainly a widely read --
25     Q. Where are you looking?

122

1      A. Paragraph 208 on the following page, page 78.
2  Paragraph 209 is a very brief citation from an industry
3  analyst called GIGA. Paragraph 210 is an example of
4  obviously Oracle's executive vice-president speaking at
5  an Oracle user group.
6      Q. Okay.
7      A. I think there are others in the report as
8  well.
9      Q. Well, let's take a look at --
10     A. We missed paragraph 206 also.
11     Q. Okay.
12     A. Which is another trade magazine report.
13     Q. All right, let's take a look at 206 quickly.
14  You are basically talking about the Information Week
15  citation?
16     A. Yes, in paragraph 206.
17     Q. And footnote 125 says, "Alorie Gilbert, ERP
18  Vendors Look for Rebound After Slowdown, February 14th,
19  2000"?
20     A. Yes.
21     Q. That was about four months before or three
22  months before Suite 11i was shipped?
23     A. That's correct.
24     Q. So you couldn't -- are you saying that the
25  problems with Suite 11i were in the public domain before

123

1  it was shipped to the public or people who were buying
2  it?
3      A. To the extent that either Mr. or Ms. Gilbert
4  is saying that not all of it would be released at the
5  end of the first quarter -- I'm sorry, she says the
6  fully web-enabled application suite will not be released
7  until the end of first quarter, and some parts of it
8  would be shipped even later, I think --
9      Q. Where are you reading here?
10     A. The top of page 78, the end of the citation,
11  "Some components, such as CRM and order management, will
12  ship even later."
13         That seems to me to be a public disclosure of
14  growing pains in this particular case, growing pains of
15  the nature that the entire thing was not ready to be
16  shipped with the rest of the ERP package in the public
17  launch date of May, some odd, May of 2000.
18     Q. Wasn't CRM and order management shipped in May
19  of 2000?
20     A. As I recall, some of it if not all of it was.
21  But here is a public disclosure there may be problems to
22  watch out for.
23     Q. Is that what you think -- withdrawn.
24         Is that what you say is a disclosure,
25  concerning growing pains encountered by the CRM portion

124

1  of Oracle's Suite 11i?
2      A. Yes, I believe it is.
3      Q. Did you see evidence of any customer, quote,
4  unquote, encountering growing pains in February of 2000
5  as a result of attempts to implement Suite 11i?
6      A. Certainly not in February of 2000, no.
7      Q. Looking at paragraph 208, the Business Week
8  article that you quote there, it is your view that this
9  article is a disclosure of the growing pains encountered
10  by the CRM portion of 11i; right?
11     A. Yes.
12     Q. And the date of that article is May 8th of
13  2000; right?
14     A. That's correct.
15     Q. Again, prior to the public availability of
16  11i?
17     A. I don't recall which day in May it was that it
18  was actually launched.
19     Q. How about paragraph 209?
20     A. Yes.
21     Q. You say that this GIGA article is a public
22  disclosure of the growing pains encountered by the CRM
23  portion of Oracle's Suite 11i.
24     A. Yes.
25     Q. And do you know what the date of that article

125

1   is?
2       A.   According to footnote 127, it is March 27 of
3   2000, with a title, I might add, that says, "Oracle
4   Delays (Pieces of) CRM Release - Early Buyers Beware."
5       Q.   Would one have to be an IT professional to
6   understand that this is a disclosure of massive problems
7   encountered by customers trying to use 11i?
8           MR. RAWLINSON:  Objection to form.
9           MR. WILLIAMS:  Q.  Or the CRM portion of 11i?
10      A.   It is not a disclosure of massive problems.  I
11  thought we were looking for examples of factual record
12  or experience associated with the growing pains that I
13  referred to in paragraph 205.
14      Q.   Do you think it is a disclosure of that?
15      A.   Yes, I do.
16          MR. RAWLINSON:  By that, do you mean growing
17  pains?
18          MR. WILLIAMS:  Q.  Yes.
19      A.   Yes, and that's what I was answering, I do
20  believe it shows evidence of the growing pains.
21      Q.   What do you describe -- withdrawn.
22          What is a growing pain?
23      A.   In the context of this discussion or this
24  sentence, it's the initial difficulties experienced by a
25  software vendor from the introduction of the product

126

1   through the first typically six to twelve months of the
2   product.
3       Q.   So you're saying it is the experience of the
4   vendor, not customers?
5       A.   It is experience of the difficulties of the
6   vendor in its attempt to provide products to the
7   customers.  So in this case with things being reported
8   in March, the difficulties or growing pains are those of
9   the vendor trying to get the product out the door.
10  Presumably from May onward they may be problems either
11  on the vendor's part or customers' part, depending on
12  the situation.
13      Q.   Just taking a look at paragraph 211.  You
14  write, "Again these bugs and problems with functionality
15  are typical of such new and massive software.  The fact
16  that CRM was developed by separate applications groups
17  within Oracle and delivered on separate dates has no
18  bearing on whether the product was integrated and
19  interoperable."
20          Are you relying on anything other than Greg
21  Seiden's testimony for that proposition?
22      A.   I'm relying on my experience in the software
23  field.
24      Q.   Okay.  And in your experience, the fact that
25  the software was developed by two separate organizations

127

1   has no bearing whatsoever on whether it was integrated
2   and interoperable?
3       A.   That's correct.
4       Q.   Do you know whether the people that actually
5   developed this software would agree with you on that
6   point?  Meaning Ron Wohl or Mark Barrenechea?
7       A.   I don't believe they actually developed the
8   software.  They -- what I am aware from the record is
9   that there were disagreements at that level of Oracle's
10  executive management, but that the developers who were
11  several levels below actually doing the software
12  development have indicated that it did not cause a
13  problem.
14      Q.   If either Ron Wohl or Mark Barrenechea
15  disagreed with the proposition that you articulate in
16  paragraph 211, would they be wrong?
17      A.   They may be wrong.  It would depend on whether
18  they had additional testimony to offer that I haven't
19  seen.
20      Q.   Well, so then you may be wrong as well; isn't
21  that fair?  Because you -- I'm sorry, go ahead?
22      A.   Based on the evidence I have seen so far, I
23  don't think I'm wrong.  As I indicated it is possible
24  there is new testimony or additional testimony I have
25  not seen that would make me reconsider that issue.

128

1       Q.   Just to be clear, you're relying only upon
2   your experience and Greg Seiden's testimony?  I think
3   that's what you testified to, for that proposition?
4       A.   No.  I also believe I testified that I had
5   seen testimony -- I'm not quite sure of the language I
6   used -- from people below the level of Mr. Seiden --
7   excuse me, below the level of Mr. Wohl and
8   Mr. Barrenechea who were asked if the disagreements or
9   conflicts between Mr. Wohl and Mr. Barrenechea had
10  caused them any difficulty with regard to the
11  development of an integrated and interoperable system or
12  product.
13      Q.   And they said?
14      A.   And they said no.
15      Q.   But you didn't cite that here.  Is there a
16  reason you didn't rely on that in paragraph 211?
17      A.   No, there is not a reason.
18      Q.   You don't recall the names of those
19  individuals, do you, that testified the way that you've
20  just described?
21      A.   I don't.  No, I don't.
22      Q.   Looking at paragraph 212.  You write, "Oracle
23  truthfully represented that Suite 11i was integrated and
24  interoperable; the early problems with CRM that were
25  widely publicized prior to the Class Period do not

129

1  change of truth of that claim." Do you see that?
2      A.  Yes, I do.
3      Q.  Do you know when the Class Period is?
4      A.  I believe there is still some dispute as to
5  whether the Class Period is December 14th, 2000 to
6  February 26th, or whether it is, as you had suggested
7  earlier, June 1st to June 1st, or May of 2000 to
8  February 26th of 2001.
9      Q.  And was there -- during any period in the time
10  frame between June of 2000 and June of 2001, would a
11  statement that 11i was integrated and interoperable been
12  misleading in your view?
13     A.  No, I don't believe it would be misleading.
14     Q.  If it was true that Suite 11i was designed to
15  be preintegrated or integrated and interoperable, but it
16  didn't work in the field in that fashion, would the
17  statement also be true, nevertheless, in your view?
18     A.  I think that would depend largely on what you
19  mean by work, which you usually indicated was surrounded
20  by quotation marks.
21     Q.  You raise an interesting point, because I
22  forgot to ask you, and I was going to ask you earlier.
23  There are, I would say, dozens of places in your opening
24  report where you quote or put quotations around words or
25  phrases, but you don't cite to where you're quoting

130

1  from.  And I guess generally I wanted to know if there
2  was any reason for that or anything we should understand
3  from that.
4      A.  No, not in general.
5      Q.  And I think one of the places you did that was
6  when you described what business people or end-users --
7  on paragraph 100 you say, "For the end-user of a
8  software system, as well as for IT professionals
9  'integration'" -- with no citation -- "simply means that
10  the pieces or components or modules of the system 'work
11  together'" also in quotes.
12         So I'm really -- I'm using the term work in
13  the way that you've used it in your report.
14     A.  Okay.  And as you recall, when we discussed
15  that this morning, we eventually got down to a sentence
16  later in that paragraph where it says, "How well
17  components 'work together' is often in the eye of the
18  beholder," and we had a lengthy discussion about that.
19  And I think that would be the gist of my response to
20  your most recent question.
21     Q.  That's fine.
22     A.  I think your question was if Suite 11i is
23  shown not to work, quote, unquote, would it still be
24  regarded as integrated.  And I think that is in the eye
25  of the beholder.  It is a question of degree, a question

131

1  of severity.  Does it not work at all or does it not
2  work in one situation out of a million, et cetera.  I
3  don't think I can give an absolute universal answer to
4  such a question.
5      Q.  So when you say it would be in the eye of the
6  beholder, you're saying it is somewhat subjective?
7      A.  That was not my intention.  I think it depends
8  on whether the circumstances that caused a beholder to
9  judge that it wasn't working might turn out to be
10  software and it might turn out to be any number of other
11  reasons.
12         Even if it was a software problem, the extent
13  to which it worked or didn't work might also be a
14  question of degree and frequency and so forth, I didn't
15  mean any of those necessarily to be subjective, but
16  merely to suggest that it is not all or nothing.
17     Q.  I have to confess, it sounds subjective, but
18  that's okay.
19         So you would have to evaluate every
20  circumstance where one believes that the system was not
21  working in order for you to determine whether it
22  rendered the statement that it was integrated and
23  interoperable to be misleading?
24     A.  I believe you would have to at least examine a
25  large enough sample of such occasions to be able to

132

1  detect a pattern or a trend or to be able to make some
2  credible statements about the percentage of
3  circumstances where it didn't work.
4         And also as I said a couple of times, the
5  extent to which it didn't work.  If the nonworking
6  nature or aspect of the system was something that
7  occurred only one time out of a million, one transaction
8  out of a million, I would still judge that it's working.
9  So I need to see something about the number of failures
10  or the percentage of transactions that didn't work or
11  some other quantitative indication of the frequency,
12  severity, pervasiveness, et cetera.
13     Q.  How large of a sample would you need?
14     A.  I don't think I'm prepared as I sit here right
15  now to suggest a particular sample size.  But certainly
16  more than one or two.  I would say a reasonable number.
17  I couldn't put a figure on that at the moment.
18     Q.  But the sample -- the size, at least the
19  evidence that you reviewed, was large enough for you to
20  conclude the opposite, which is that it was integrated
21  and interoperable, regardless of evidence, that at least
22  some evidence that some people felt that it didn't work?
23         MR. RAWLINSON:  Objection to form.
24         THE WITNESS:  Yes, it was, in terms of the
25  individual problems that were reported, particularly by

133

1  plaintiffs, and also on more of an aggregate basis by
2  the number of companies that had installed the system
3  and gone live with it versus the number that were in
4  some escalated state, I believe that I saw a sufficient
5  sample to draw those conclusions.
6       MR. WILLIAMS:  Q.  And you didn't need -- but
7  would you need a different type of sample or a broader
8  sample to conclude that the statement was false if you
9  had found a broader range of people who felt that the
10 product didn't work?
11      MR. RAWLINSON:  Objection to form.
12      THE WITNESS:  Not necessarily.  If that same
13 sample that I reviewed to conclude that it was working
14 and was integrated, if that same sample size had
15 demonstrated that it was not working and they could not
16 go live and could not operate their business on it, I
17 think that would have been sufficient.
18      MR. WILLIAMS:  Q.  You didn't see that here in
19 your view?
20      A.  No, I did not.
21      Q.  You talked just briefly about customers going
22 live on the software, and that would be some indication
23 to you as to whether or not the software worked.  Is
24 that fair?
25      A.  Yes.

134

1       Q.  And do you know whether all of the
2  customers -- withdrawn.
3       Did you see evidence of customers going live?
4       A.  I saw reports indicating the number of such
5  customers who had gone live.  I don't know if that is
6  responsive to your question.
7       Q.  And what did that indicate to you, if
8  anything?
9       A.  It indicated that there were such customers
10 going live at a relatively early stage in the initial
11 launch of the product, and that that number increased to
12 a fairly substantial quantity over the next six months
13 or so.  In fact, I think I had a month-by-month report
14 or listing of the numbers at some point in my report.
15      Q.  Did you evaluate whether any of those
16 customers that you saw in reports that were going live
17 were using any more than maybe two or three modules of
18 Suite 11i or applications of Suite 11i?
19      A.  I saw various indications about individual
20 customers, including some that implemented virtually all
21 of the components of ERP and CRM.  But I did not
22 enumerate them or quantify them in that regard.
23      Q.  You saw evidence of customers that implemented
24 all of ERP and CRM?
25      A.  I believe I said virtually all.  I don't know

135

1  if it was 100 percent.  I believe that's something you
2  asked me about this morning.
3       Q.  That wasn't quite my question I asked you
4  about this morning?
5       A.  Sorry.  I misunderstood then.  All right.
6       Q.  So you saw customers who had implemented
7  virtually all of ERP and CRM go live and the software
8  was working?
9       A.  That's my understanding, that's my
10 recollection of the information I saw, yeah.
11      Q.  What customers?
12      A.  I don't recall.  I'd have to look at either my
13 report or the information to recall specifically which
14 ones.
15      Q.  Do you think that if you had five minutes to
16 find it in your report that you could?
17      A.  Not necessarily, because I don't recall that
18 in my report I indicated that customer X went live with
19 both ERP and CRM.  I may have done so, but I wasn't
20 focusing on that when I wrote the report.  So I don't
21 know for sure.
22      Q.  But you're sure that that's somewhere in your
23 report?
24      A.  No.  As I just said, I am not sure that in the
25 report itself I indicated that particular customers that

136

1  went live, for which I have mentioned several, whether I
2  indicated in the report whether they went live with all
3  of ERP and CRM or some substantial portion thereof.  I
4  believe I did, but I can't guarantee it.
5       Q.  Just looking at paragraph 213, you write,
6  "Plaintiffs have also asserted that Oracle
7  misrepresented the capabilities of Suite 11i by rigging
8  demonstrations.  I have not seen anything in the
9  evidentiary record in this case suggesting that any
10 salesperson at Oracle misled a customer by rigging a
11 demonstration or misrepresenting Suite 11i's
12 capabilities."  Do you see that?
13      A.  Yes, I do.
14      Q.  Did you see anything in the record suggesting
15 that any person, regardless of whether they are a
16 salesperson at Oracle, rigged any demonstrations?
17      MR. RAWLINSON:  Objection to form.
18      THE WITNESS:  No, not that I can recall.
19      MR. WILLIAMS:  Q.  And did you see anything in
20 the record demonstrating that any Oracle employees used
21 fake data to make it appear that certain functionality
22 was actually occurring when, indeed, it wasn't?
23      MR. RAWLINSON:  Objection to form.
24      THE WITNESS:  I recall some documents, perhaps
25 e-mails, indicating that in order to demonstrate the

—

137

1 integration capabilities in the demonstration
2 environment where the two major components were
3 operating on different servers, that some data had to be
4 created to show what would happen after one part of the
5 system had done its function and the other part of the
6 system took over.
7 　　MR. WILLIAMS:  Q.  Did you find anywhere in
8 the record that that type of information was disclosed
9 to customers during demonstrations?
10 　　A.  I don't recall one way or the other.
11 　　Q.  But you said -- you wrote that, "I have not
12 seen anything in the evidentiary record in this case
13 suggesting that any salesperson at Oracle misled a
14 customer by rigging a demonstration or misrepresenting
15 Suite 11i's capabilities."  Do you see that?
16 　　A.  Yes.
17 　　Q.  Would you say that using fake data in order to
18 demonstrate that certain functionality was occurring
19 when it really wasn't would, indeed, be misrepresenting
20 Suite 11i's capabilities?
21 　　A.  No, I wouldn't.  Because the demonstration
22 environment is not the actual product environment that
23 was being sold, so I don't think it does misrepresent
24 the capabilities.
25 　　Q.  So even if one is demonstrating the

138

1 capabilities of Suite 11i to a customer, but using fake
2 information to make it appear as though certain
3 functionality was occurring, you don't think that that
4 would be misleading, if it wasn't disclosed?
5 　　A.  Not if the actual system was capable of
6 carrying out those operations, no, I don't think that
7 would be misrepresentation.
8 　　Q.  In your view it wouldn't be until later when a
9 customer recognized that something that was demonstrated
10 to them actually didn't work that it would be -- it
11 would have been a misleading misrepresentation?
12 　　A.  No.  Certainly I didn't think that's what I
13 just said, certainly not what I intended to say.
14 　　If the capabilities of the actual system were
15 present and worked properly, but the demonstration
16 environment was not able to fully demonstrate that
17 working capability, particularly because the pieces of
18 the demonstration were operating on different servers,
19 then I don't think such a demonstration would have been
20 a misrepresentation.
21 　　Q.  And so at some point -- withdrawn.
22 　　Did you find that -- withdrawn.
23 　　You didn't inspect the demonstration system at
24 Oracle; right?
25 　　A.  That's correct, I did not.

139

1 　　Q.  Did you know that the demonstration
2 environment was controlled -- well, the demonstration
3 environment that was used to demonstrate 11i to
4 customers was controlled by Oracle?
5 　　A.  The demonstration environment --
6 　　MR. RAWLINSON:  You mean now or at the time?
7 I'm not sure he understands.
8 　　THE WITNESS:  I was not asking about the time
9 frame, but I assume you're talking about the same time
10 period.  I was pausing for a different reason.
11 　　I certainly think that the software was
12 controlled, the demonstration software was controlled by
13 Oracle.  I believe the hardware that was used for the
14 demonstration was controlled by Oracle.  I am not sure
15 whether the telecommunication capabilities were always
16 controlled by Oracle.  And that's why I was hesitating.
17 So I believe that most and possibly all of the
18 demonstration environment was controlled by Oracle.
19 　　MR. WILLIAMS:  Q.  In paragraph 217 you say
20 that given the -- I'm paraphrasing, given the size and
21 complexity of the software it can only be shown to a
22 customer in a demonstration environment, rather than a
23 fully implemented environment, problems experienced with
24 the demonstration environment do not necessarily reflect
25 problems with the underlying product.  To the contrary,

140

1 the demonstration product may have problems resulting
2 from errors in the demonstration platform environment
3 itself, for example, corrupted data, incorrect
4 configuration, hardware problems, operating system bugs.
5 　　Did you in your evaluation of any of the
6 evidence find that the Oracle demonstration system
7 incurred problems resulting from corrupted data?
8 　　A.  I don't recall seeing any examples of that
9 problem.
10 　　Q.  How about incorrect configuration?
11 　　A.  That I don't recall.  I'm more confident about
12 the absence of corrupted data.
13 　　Q.  How about hardware problems?
14 　　A.  I believe that I did see either e-mails or
15 some evidence indicating that some of the
16 demonstration -- demonstrations had been affected by
17 hardware problems.
18 　　Q.  What did you see?
19 　　A.  E-mails indicating that the inability to
20 demonstrate the Suite 11i product successfully to the
21 customer had been caused by crashes in which my
22 assessment, just by reading the information, was that it
23 was probably caused by hardware crashes.
24 　　Q.  So you didn't evaluate whether it in fact was
25 caused by a hardware problem, but you extrapolated from

141

1    some information that a crash was a result of a hardware
2    problem?
3            MR. RAWLINSON: Objection to form.
4            THE WITNESS: I made that assessment from the
5    description of the problem, yes.
6            MR. WILLIAMS: Q. What was the description
7    that you recall?
8    A.    Description was language in e-mails or
9    reports. I don't recall the specific words.
10   Q.    You don't cite to anything or rely on any
11   evidence in this paragraph, do you?
12   A.    No, I do not.
13   Q.    So there is no way for me, for example,
14   without you showing me, to find the document that you
15   are referring to where you have extrapolated that a
16   crash was a result of a hardware problem?
17   A.    Perhaps not.
18   Q.    Did you find any operating system bugs that
19   impacted the demonstration system at Oracle?
20   A.    I don't recall.
21   Q.    Are there any circumstances in your view where
22   problems with a demonstration environment may be the
23   result of problems with the underlying software?
24   A.    Yes. If the -- if it was a new version of an
25   operating system or an operating system that had just

142

1    been updated with a patch or an upgrade by the vendor,
2    yes, I have seen circumstances where the demonstration
3    environment was affected by that.
4    Q.    Do you know whether in this case the
5    demonstration environment that Oracle was using during
6    the relevant time period was impacted by problems with
7    the 11i software itself?
8    A.    In this case I need to ask for clarification,
9    because my understanding is that aside from these issues
10   we've just been talking about, the hardware and
11   operating system and so forth, my understanding is that
12   the demonstration environment did not always involve the
13   same version of Suite 11i software as the actual product
14   that was being sold. And I believe that I recall some
15   documents or evidence indicating that problems in the
16   demonstration environment may have been associated with
17   earlier versions of Suite 11i that may have had problems
18   that were no longer reflected or no longer existing in
19   the version that was being sold.
20   Q.    Okay. So, therefore, you would have to
21   conclude that at least some problems were the result of
22   underlying problems with the software at certain points
23   during the relevant period?
24   A.    No. What I tried to describe is the
25   likelihood that there were problems being observed by

143

1    the Oracle salespeople and potential customers today
2    that were the result or the consequences of bugs in a
3    previous version of Oracle, which is no longer the one
4    that was going to be sold to that customer.
5    Q.    So, for example, the demonstration system
6    could be using 11i.2, and 11i.2 may have some underlying
7    software problems, but a customer who is planning to
8    purchase, you know, eight months from now may be viewing
9    a demonstration system on 11i.2, but it wouldn't be the
10   same version that they would receive, because in the
11   interim 11i.3 might be released; is that what you're
12   trying to describe?
13   A.    That's close. What I'm trying to describe is
14   that the software available for sale now, which would be
15   delivered to the customer tomorrow if he signed the
16   order, might be 11i.3, but the demonstration that's
17   being used to present the availability or the
18   capabilities might be 11i.2. So that in the course of
19   the demonstration, problems might be visible that are no
20   longer associated with the product that actually would
21   be sold to the customer if he signed the order today.
22   That's what I was trying to describe.
23   Q.    But they were previously associated with the
24   software that was being used in the demonstration system
25   at the time it was demonstrated to that customer?

144

1            MR. RAWLINSON: Objection to form.
2            THE WITNESS: Yes. Yes, okay. If I've
3    understood your question correctly, yes, I believe that
4    would be true.
5            MR. WILLIAMS: Q. So you did see evidence
6    where -- withdrawn.
7            Did you see evidence indicating that the 11i
8    demonstration system at times during the relevant period
9    was negatively impacted by problems associated with the
10   underlying software, not problems that you identify in
11   paragraph 217 as corrupted data, incorrect
12   configuration, hardware problems, operating system bugs,
13   et cetera?
14   A.    I saw evidence in the form of e-mails and
15   documents between Oracle people where that was asserted.
16   I did not have a chance to confirm that one way or
17   another.
18           And I don't know the extent to which it would
19   have been confirmed as part of Oracle's normal bug
20   tracking process.
21   Q.    So, you don't have an opinion as to whether or
22   not the Suite 11i system as it was used in the ADS or
23   the demonstration system that Oracle suffered from
24   problems due to underlying problems with the software?
25           MR. RAWLINSON: Objection to form.

145

1      THE WITNESS:  No.  Based on the information
2  available to me now, I don't have an opinion on that.
3      MR. WILLIAMS:  Q.  Looking at paragraph 221,
4  you say or write that, "Any software vendor struggles to
5  secure reference customers early in the lifecycle of an
6  enormous release of business enterprise software.
7  Oracle had the same problem with every one of its
8  releases.  For example, George Roberts testified as
9  follows."  Do you see that?
10      A.  Yes.
11      Q.  When you say that Oracle had the same problem
12  with every one of its releases, what releases are you
13  referring to?
14      A.  In particular, release 11.0 and 10.7, I did
15  not see information prior to those releases.
16      Q.  So are you not really referring to every one
17  of its releases, you're only referring to the ones
18  you've identified today?
19      A.  Yes, I think that's fair.
20      Q.  And did you evaluate the problems, if any,
21  that Oracle had securing reference customers with 10.7?
22      A.  Not in detail, no.
23      Q.  Then how are you able to say that Oracle had
24  the same problem with every one of its releases?
25      A.  Based on my experience in the field and the

146

1  information that I did see about 10.7 and 11.0 and
2  11.1 --
3      Q.  11i?
4      A.  Excuse me, 11i, I apologize, it fits a common
5  and familiar pattern.
6      Q.  But you didn't compare problems with 11i to
7  so-called problems with 11.0 and 10.7, did you?
8      MR. RAWLINSON:  Objection to form.
9      THE WITNESS:  In terms of the effort to secure
10  reference customers, no, I did not.
11      MR. WILLIAMS:  Q.  So, other than what is
12  quoted here from George Roberts, what you've written in
13  221 really doesn't have reliable basis?
14      A.  I think it does have the basis of my
15  experience with -- not just the three versions of Oracle
16  software that I mentioned, but other products, other
17  vendors over the course of my career.
18      Q.  You don't refer to any other vendors here
19  though.  You just referred to every one of Oracle's
20  releases.
21      A.  Well, at the beginning of the sentence, it
22  says any software vendor, again, that was based on my
23  general experience, struggles to secure reference
24  customers.
25      Q.  Yeah, but you say Oracle had the same problem

147

1  with every one of its releases.
2      A.  That's correct.  I can -- I only have the
3  basis of making that statement about 10.7 and 11.0 and
4  11i.
5      Q.  In your view you have a basis to offer that
6  opinion comparing 10.7, 11.0 and 11i based on the record
7  in this case?
8      A.  I do, because I'm not trying to compare
9  whether they had more or less, but rather the existence
10  of such a struggle.  That's all I stated here was that
11  it is a struggle.
12      Q.  Okay.  I'll just note you said the same
13  problem.  I guess what you're telling me is the same
14  problem that you're talking about is a struggle?
15      A.  Yes.  They had a struggle, in each of those
16  three instances that I looked at, specifically in my
17  experience has been that every software vendor struggles
18  with any large business enterprise software product.
19      Q.  In paragraph 223 you write, "I have seen no
20  evidence that would support plaintiffs' attempt to
21  distinguish reference problems of Suite 11i with
22  reference issues in any other software release's early
23  stages."  Do you see that?
24      A.  Yes.
25      Q.  Where did you see plaintiffs' attempt to

148

1  distinguish the reference problems with reference issues
2  in any other software release's early stages?
3      A.  I don't recall the specifics of plaintiff
4  complaints distinguishing it quantitatively or
5  comparatively with reference issues on other software
6  release's early stages, but rather just the general
7  statement as I recall by plaintiffs that the reference
8  problems associated with Suite 11i were either
9  extraordinarily large or unacceptably large or language
10  along those lines.  That's what I recall.
11      Q.  What is your understanding, if you have one,
12  of the difference, if there is one, between a live
13  customer and a referenceable customer?
14      A.  My understanding of a live customer is one
15  that is running some part of its business on some number
16  of products, software products, whereas a referenceable
17  customer is one that is live, that has begun using the
18  software product in an operational fashion and is
19  willing to allow its name to be used as a reference,
20  either in public documents and statements or by the
21  vendor's salespeople, to provide to prospective clients
22  in the future.
23      Q.  And did you find any instances where customers
24  that were references for Oracle 11i either threatened to
25  or did withdraw their authority to be a reference

149

1  customer because of problems with the underlying
2  software?
3      A.  I recall seeing some documents where there
4  were, I don't know if I would characterize them as
5  threats, but statements by the customer that they might
6  withdraw their referenceability if problems were not
7  solved.
8      I do recall seeing that much, yes.  I don't
9  recall seeing anywhere they actually were withdrawn.
10     Q.  Okay, if they were withdrawn, would that
11 indicate anything to you?
12     A.  It would depend on the circumstances.  It
13 might indicate a more forceful negotiating position.  It
14 might indicate a number of things.  It might well
15 indicate an unacceptable situation with regard to the
16 use of the product, which might or might not ultimately
17 be the vendor's fault.
18     Q.  Could it indicate an underlying problem with
19 the software?
20     A.  It could.  It could, yeah, as one of many
21 possibilities.
22     Q.  I just want to turn your attention to your
23 conclusions on page 92.
24     With respect to the bullet point number one,
25 you say, "Oracle's Suite 11i product was an exemplar of

150

1  a large, sophisticated, complex ERP system and, as such,
2  it initially experienced many of the well-known problems
3  common to large, sophisticated products in the software
4  industry."
5      What were the problems that you identified?
6      A.  To answer that, we would need to refer back to
7  a discussion in the earlier part of my report where I
8  identify problems that often occur in large-scale
9  software projects, which is section Roman numeral V.3.
10 And then also Roman numeral VI.5 where I talk about
11 historical difficulties with ERP implementations.  So I
12 don't know where you would like to start to see which
13 ones I did see in the Oracle situation.
14     Q.  Okay, so without going to those sections, are
15 all of the problems that you saw identified in your
16 report?
17     A.  I believe they are, yes.
18     Q.  Okay.  I don't need to go to the sections.
19     A.  Okay.
20     Q.  Looking at bullet point number two, if you
21 take a look at that.  You write, "A review of the
22 evidence compels the same conclusion with regard to
23 Suite 11i.  The problems here were not unique, and there
24 is no evidence that they were of any greater magnitude
25 than any other comparable past release of Oracle ERP

151

1  software."
2      Do you see that?
3      A.  Yes.
4      Q.  You didn't compare 11i to past releases,
5  right, of Oracle ERP software?
6      MR. RAWLINSON:  Objection to the form.
7      THE WITNESS:  That's correct.  I looked at
8  evidence of problems of a greater magnitude, but I did
9  not compare the software myself.
10     MR. WILLIAMS:  Q.  Well, you made a comparison
11 as to whether or not the problems in this case were not
12 of any greater magnitude than any other prior release of
13 Oracle ERP software.  Did you make that comparison?
14     MR. RAWLINSON:  Objection to form.
15     THE WITNESS:  I did not make that comparison
16 myself.  I looked for evidence to see if there was any
17 evidence of problems of a greater magnitude or a
18 comparable magnitude.
19     MR. WILLIAMS:  Q.  Do you know whether or not
20 the evidence that was provided to you, or evidence
21 that's, you know, discoverable in this case, relates to
22 problems or the scope of problems with prior releases of
23 Oracle ERP software?
24     A.  Yes, I believe the evidence, among other
25 things, includes deposition testimony about the extent

152

1  of testing and the extent of bugs that were found during
2  the development of previous versions of Oracle ERP
3  software.
4      Q.  So in your view, that evidence was sufficient,
5  whatever you saw was sufficient for you to make that
6  comparison?
7      MR. RAWLINSON:  Objection to form.  Objection
8  to the extent it misstates the conclusion.
9      THE WITNESS:  Yes, I believe it is sufficient.
10     MR. WILLIAMS:  Q.  Did you understand the
11 problems that are alleged here -- withdrawn.
12     Did you understand whether one of the issues
13 in this case was whether the problems alleged concerning
14 11i were unique?
15     A.  I don't have that understanding that the
16 allegation was that they were unique.
17     Q.  Okay.
18     A.  And indeed that's what I said in my
19 conclusion.  But I don't recall such an allegation.
20     Q.  Okay.  You also say in the same bullet point
21 that, "Notwithstanding the initial difficulties, the
22 Suite 11i product did work, and was both a technical
23 success and a marketplace success within a reasonable
24 period of time, and it continues to be a success today."
25 Do you see that?

153

1    A.  Yes, I do.
2    Q.  What initial difficulties are you referring
3  to?
4    A.  I'm referring to the bugs that were discovered
5  and that had to be fixed.  Primarily I'm referring to
6  the difficulties that some customers had in configuring
7  and installing the Suite 11i product.  I'm referring to
8  the difficulties they may have had customizing or
9  integrating their Suite 11i product with other best of
10  breed components, notwithstanding the advice to the
11  contrary from Oracle.  Those are the primary ones.
12    I guess I would put several of those within
13  the broader umbrella of implementation difficulties,
14  that is the difficulty of configuring and installing and
15  changing the business processes within an organization
16  to accommodate a large, complex system.
17    Q.  How long did those initial difficulties that
18  you identified last?
19    A.  I believe they lasted with decreasing severity
20  for a period of six to nine months.  That is, it is not
21  something where they remained at a constant level and
22  dropped to zero, but that they decreased over a period
23  of time.  Not only because of fixes to the bugs that
24  were made, but also because as time went on different
25  kinds of customers began implementing the Suite 11i

154

1  product.  That is, instead of early adopters, they
2  became more of the mainstream community.
3    Q.  What does that mean, instead of the early
4  adopters, more of the mainstream community?
5    A.  With regard to Suite 11i and almost any high
6  technology product, the early -- the first customers to
7  acquire the product and implement it are typically a
8  more adventurous breed who are sometimes pursuing more
9  aggressive goals and who are aware that they are dealing
10  with an early version of the product.  Very much, for
11  example, the way the first few customers of Apple's
12  iPhones are trying to cope today with getting service
13  from AT&T to make their phones work.  Within a few
14  months after that it is a different category of
15  customers who are not experimenters, not risk takers,
16  and often not attempting to do such aggressive things
17  with their new product.  That's what I meant.
18    Q.  When you say that it did work, how are you
19  defining work?
20    A.  I am defining it in terms of accomplishing the
21  purpose of providing the features and functions that the
22  vendor intended, and also that the customers needed in
23  order to carry out their day-to-day business.
24    Q.  Did you cite any evidence to support this
25  conclusion that the 11i product did work?

155

1    A.  Certainly not right here.
2    Q.  Sure.  If you can find somewhere in this
3  opening report, you know, that's fine.  Maybe at the
4  next break you can find something.
5    A.  It may not have been in the opening report.
6  It may have been in the next report I wrote where I
7  provided results from some industry surveys of customer
8  reactions to 11i.
9    Q.  So the basis of your conclusion that 11i did
10  work is supported by customer surveys?
11    A.  Yes.  At least partially so.  I believe so,
12  yes.
13    Q.  Is there another part supported by something
14  else?
15    A.  By the increased go-live rate and the
16  increased numbers of customers that continued to
17  implement the system, the Suite 11i product over a
18  period of time.
19    Q.  So the fact that you saw evidence of reports
20  where customers were going live, that's in part the
21  support for your conclusion that 11i worked?
22    A.  Yes.  Particularly the fact that it was
23  increasing numbers at somewhat accelerating rate.
24    Q.  Do you know whether the mere fact that someone
25  or a customer went live actually meant that the product

156

1  worked in the way that the vendor intended it and the
2  customer expected, like you described?
3    A.  I don't know that certainly from any one
4  individual customer.  But when I see that experience
5  replicated and repeated dozens if not hundreds of times
6  over the space of the first 6 to 12 months, I believe
7  that establishes a pattern for a reasonable conclusion
8  that the product worked.
9    Q.  What did you see repeated dozens or hundreds
10  of times?  Reports saying that more customers were live?
11    A.  Not just the reports, but the reports that
12  said there were repeated and growing numbers of
13  customers that had gone live, so that if it was 10 one
14  month, it was 20 the next month, then 40, then 80 and so
15  forth.  So the numbers and the increasing rate of such
16  numbers to me was an indication that it was working.
17    Q.  Okay.  Working in the way that Oracle intended
18  and the customers expected as you described?
19    A.  Yes.
20    Q.  Anything else to support your opinion that
21  Oracle -- that 11i worked?
22    A.  As I recall, though I don't have the precise
23  details in mind that I can give you, I believe there was
24  also evidence indicating that the number of TARs
25  increased for a while as the go-live rate increased, but

157

1    then I believe they stabilized and went down as well.
2    That would be an indication.
3        Q.   When did that happen?
4        A.   As I said, I can't recall the specifics or
5    details on that.
6        Q.   Did it happen before March of 2001?
7        A.   I don't recall the details on that.
8        Q.   Anything else to support your opinion that 11i
9    worked or did work?
10       A.   I would add to that list the reports and
11   assessments from industry analysts that I believe also
12   provided confirmation that it was working.
13       Q.   But as of March of 2001?
14       A.   I can't recall the dates on that.
15       Q.   What if the reports indicating growing numbers
16   of live customers also indicated that, you know, the
17   majority -- withdrawn -- not majority -- that some of
18   those customers were running only financials and human
19   resources, would that support your conclusion that the
20   11i suite worked, meaning, you know, CRM and ERP working
21   together?
22       MR. RAWLINSON:  Objection to form.
23       THE WITNESS:  If they were only using some
24   subset of the financials alone, that by itself would not
25   necessarily support the conclusion that the suite

158

1    consisting of ERP and CRM was working, no.
2        MR. WILLIAMS:  Q.   Okay.  I said financials
3    and human resources.
4        A.   I'm sorry.
5        Q.   Would that change your opinion on that?
6        A.   That would not change my answer to your
7    question.
8        Q.   What if the number of customers going live,
9    the reports you reviewed and the increasing numbers
10   going live indicated that most of those customers were
11   going live on ERP applications, would that support your
12   conclusion that 11i, the 11i suite worked, in that ERP
13   and CRM were working together?
14       MR. RAWLINSON:  Objection to form.
15       MR. WILLIAMS:  Q.   Or worked together?
16       A.   No, not that by itself.  And so to respond
17   perhaps to your question, if I see, as I did see,
18   increasing reports of increasing installations of
19   go-live events of customers who were implementing a
20   reasonable subset of ERP and CRM functions together,
21   that would lead me to believe that the entire integrated
22   suite was working.
23       Q.   But if you only saw growing numbers of
24   go-lives for the ERP side of the suite, what, if
25   anything, would that indicate to you about the entirety

159

1    of the suite containing ERP and CRM?
2        A.   That by itself would probably not indicate
3    very much at all.
4        Q.   But your conclusion in 258, you believe that
5    somewhere you saw evidence of growing numbers of
6    go-lives that included ERP and CRM together?
7        A.   Some components from both, yes.
8        Q.   But you don't know whether or not that
9    occurred or you saw evidence of that occurring prior to
10   March of 2001?
11       A.   I don't recall sitting here right now.
12       Q.   Okay.  As you sit here now, do you intend to
13   offer an opinion on that specific point?
14       A.   If I'm asked to, you know, I will investigate
15   whatever issues or offer opinions on, you know, whatever
16   topics counsel instructs me to offer opinions on, to the
17   extent that I can.  And I would think that that
18   information is available and should be easily findable,
19   so I probably could offer an opinion.
20       Q.   But you didn't rely on that in this opening
21   report, did you, any of those documents?
22       A.   Not that I recall.
23       MR. RAWLINSON:  Objection to form.
24       VIDEOGRAPHER:  Off record at 2:53.
25       (Recess, 2:53 p.m. - 3:08 p.m.)

160

1        VIDEOGRAPHER:  On record at 3:08.  Continue.
2        MR. WILLIAMS:  Q.   Okay, in the same bullet
3    point in paragraph 258, bullet point number two, you
4    state that 11i was both a technical success and a
5    marketplace success within a reasonable period of time
6    and it continues to be a success today.
7        What is a technical success?
8        A.   In my opinion, a technical success is a
9    software system that accomplishes a significant degree
10   of features and functions and achieves technical goals
11   or characteristics that in many cases have not been
12   accomplished before, in this case integration being the
13   primary example.
14       Q.   What do you mean by significant degree?
15       A.   I have forgotten now the context of the
16   sentence.
17       MR. WILLIAMS:  Could you read his answer back?
18       THE WITNESS:  Thank you.
19       (Record read as follows:  ANSWER:  In my
20       opinion, a technical success is a software
21       system that accomplishes a significant degree
22       of features and functions and achieves
23       technical goals or characteristics that in many
24       cases have not been accomplished before, in
25       this case integration being the primary

161

1        example.)
2        THE WITNESS:  So what I meant by a significant
3    degree or significant number of features and functions
4    was the list of modules or components of the Suite 11i
5    product as compared to the other ones in comparable
6    products or competitive products that were available at
7    approximately the same time.
8        MR. WILLIAMS:  Q.  By the way, I'm just going
9    to jump back on another issue, is integration in the eye
10   of the beholder?
11       A.  To some extent, yes.  Particularly with regard
12   to business flows or perhaps user interface,
13   integration, different beholders, different end users
14   might have different perceptions of that.
15       Q.  So some people might think it is integrated,
16   other people might not?
17       A.  I don't think that I would agree to that in
18   terms of an all or nothing or absolute characterization.
19   Some people might feel that a product was more
20   integrated than others, or had achieved a greater degree
21   of perfection with regard to integration than others.
22       Q.  And I ask, because in paragraph 100 again, you
23   have integration in quotes as well.  Is there a reason
24   for that, or is that just, you know, you or somebody
25   else put quotes around it?

162

1        MR. RAWLINSON:  Objection to form.
2        THE WITNESS:  No.  I just put quotes around it
3    to draw attention to the fact that that was the main
4    thing that we were discussing in this section of the
5    report, that's all.
6        MR. WILLIAMS:  Q.  Should I assume that
7    throughout the report where there are quotations without
8    citations?
9        MR. RAWLINSON:  Objection; asked and answered.
10       THE WITNESS:  No, not necessarily.  In some
11   cases, for example, I notice at the bottom of page 35
12   where I have -- in the next to the last line, gluing
13   together, I didn't mean to suggest that the whole point
14   of the discussion in here was about gluing together, but
15   rather that that's perhaps not an officially recognized
16   word or phrase, but one whose meaning could probably be
17   understood if, by use of the quotation marks, one called
18   attention to it as a word that you wouldn't find in
19   Webster's dictionary.
20       MR. WILLIAMS:  Q.  But you don't define it or
21   cite to it, you just kind of put quotes around it?
22       A.  That is correct in this case.  I tried in
23   circumstances where I thought the meaning might be
24   particularly important or where it was a reference to a
25   previous phrase or something to provide citations, but I

163

1    did not do so in all cases, certainly.
2        Q.  For example, look at paragraph 137 on page 52.
3    Down to the second to the last line, you say, "The work
4    flow 'crosses the boundary' from CRM to ERP."
5        A.  Yes, I see that.
6        Q.  Why is that in quotes, crosses the boundary?
7        A.  Because I wanted to draw your attention to see a
8    phrase that you might not have expected to see in normal
9    language.  This is not a national or geographical
10   boundary, of course, but of course, having had it
11   brought to your attention as something to pay a little
12   more attention to, you might be more easily able to
13   understand what I intended by that in the context of
14   this Figure 9 that is referred to in the beginning of
15   the paragraph.
16       Q.  Going back to your conclusions, you also -- is
17   there an objective definition for technical success, or
18   is the definition you gave me simply your definition of
19   technical success?
20       A.  It is my definition based on my experience in
21   the field.  I did not get this from a dictionary or, you
22   know, a technical reference document.
23       Q.  You say that it was also a marketplace
24   success; right?
25       A.  Yes, I do.

164

1        Q.  And what does that mean?
2        A.  It means that it continued to sell in
3    increasing quantities, as far as I could see, from the
4    number of installations, and it was a success
5    financially to the extent that I could see revenues
6    being associated with the product.
7        Q.  Is it associated with quality at all, whether
8    or not it is a marketplace success?
9        A.  I believe it's associated with it in the sense
10   that the complete absence of quality would have made it
11   difficult to be a marketplace success, although the
12   complete presence of quality wouldn't necessarily
13   guarantee it being a marketplace success.
14       Q.  Kind of an all or nothing analysis?
15       A.  No, no, I didn't mean it in that sense.  I
16   mean we've seen examples in various fields where
17   products were built with a great deal of quality, but
18   were nevertheless unsuccessful in the marketplace for a
19   variety of reasons.
20       Q.  Have you ever seen an ERP -- ERP software that
21   could be described as the complete absence, or having a
22   complete absence of quality?
23       A.  No, I don't think I can.  No.
24       Q.  So what does it mean?
25       A.  I'm sorry, what does what mean?

165

1      Q.   The complete absence of quality.
2      A.   What I mean by that is that if a vendor
3   introduced an ERP product or any product for that matter
4   that had either a complete absence of quality or very
5   little quality at all, I would not expect to see it
6   becoming a marketplace success.
7      Q.   Have you ever seen or evaluated software that
8   had very little quality or ERP software that had very
9   little quality?
10     A.   No, not that I recall.
11     Q.   You say that 11i was a technical success and a
12  marketplace success within a reasonable period of time.
13  What is a reasonable period of time?
14     A.   In my opinion it's in the range of 6 to 12
15  months.  In the case of 11 i I believe it was both a
16  technical success and a marketplace success.
17     Q.   Was it a marketplace success within 6 to 12
18  months?
19     A.   I believe so.
20     Q.   That's your opinion?
21     A.   Yes, that's my opinion.
22     Q.   That's based on what?
23     A.   On the increasing number of go-live reports
24  that we've discussed already indicating to me that it
25  was being accepted in the marketplace.

166

1      Q.   Go-lives.  Anything else?
2      A.   I think we went through a similar list a
3   little while ago.  It was a technical success during a
4   period of 6 to 12 months because subsequent versions,
5   11i.2, 11i.3, ultimately 11i.4, so forth, were released
6   with increased functionality, and just improved
7   technical capabilities.
8      Q.   And that would -- and one would expect that to
9   be a technical success after 6 to 12 months one would
10  not continue to see showstopper bugs, for example?
11     A.   No.  One would expect to see fewer showstopper
12  bugs, but they would not necessarily go to zero.
13     Q.   Do they ever go to zero?  Do showstopper bugs
14  ever go to zero?
15     A.   I am not aware of it ever going to zero in an
16  ERP environment.  For smaller simpler programs, but not
17  for large software products of any kind.  In large
18  business software products; I should be careful about
19  that.  Because, as I indicated earlier, in my report
20  there are other large software systems that fall into
21  the safety critical nature where we certainly hope they
22  have no showstopper bugs.
23     Q.   Let me show you what's previously been marked
24  as Henley Exhibit 23.  Henley Exhibit No. 23 is Bates
25  number NDCA-ORCL 059745 through 747.  Let me know when

167

1   you've had a chance to review the document.
2      A.   Okay.
3      Q.   Have you seen this document before today?
4      A.   I'm sorry, it came from Larry Ellison.  Okay.
5   I'm sorry -- are you directing my attention to the
6   e-mail further into the chain from Jeff Henley?  Which
7   one am I supposed to pay attention to?
8      Q.   If you read the whole document, it is only
9   three pages.
10     A.   I thought you mentioned Jeff Henley, so I
11  thought perhaps --
12     Q.   The reason I said that, because on the front
13  page, first page, there is a stamp on there on the
14  bottom right that says Henley.  That's just our
15  identifier of it for this purpose.
16     A.   I understand that.  But indeed, the first
17  e-mail message in this chain, the one that begins at the
18  top of the second page, is an e-mail from Larry Ellison,
19  I believe.
20     Q.   That's right.
21     A.   I just wanted to make sure I understood.
22     Q.   Have you seen that document before today?
23     A.   I don't believe I have, no.
24     Q.   It appears to be an e-mail dated March 22nd,
25  2002 from Larry Ellison to Jeff Henley, Mark

168

1   Barrenechea, Jennifer Minton and Safra Catz.  Would you
2   agree with that?
3      A.   Yes, it does appear to be so.
4      Q.   Have you met Safra Catz?
5      A.   No, I have not.
6      Q.   Have you ever talked to her?
7      A.   No.
8      Q.   How about Jennifer Minton?
9      A.   No.
10     Q.   Jeff Henley?
11     A.   No.
12     Q.   Okay.  Can you just read that message written
13  by Larry Ellison into the record for me, please?
14     A.   Sure.  For the record it begins, "Our top
15  priority is to get Oracle users 'delighted'" -- I'm
16  not sure if that's what he intended there
17  grammatically -- "with the quality and functionality of
18  our CRM products.  Until it happens I doubt we will
19  achieve success in the market.  The biggest problem is
20  missing features as opposed to showstopper bugs.  (There
21  are a few of those as well, but they are much easier to
22  fix).  Every application meeting now centers around
23  representatives from our user community who report back
24  on application quality and set priorities for
25  development.  We cannot remain in denial if we talk with

169

1  our users every day.  We need to work very hard to
2  achieve a high degree of customer satisfaction for our
3  sales and marketing products as soon as possible.  We
4  will have major improvements by June, but we are
5  unlikely to deliver all we need until September.  Doing
6  it by September will require unrelenting focus and a
7  Herculean effort.  It can be done, but not unless we
8  change our development and testing process and do a
9  better job listening to our user community."
10      Q.  If you had seen or reviewed this document
11  prior to drafting your May 25th report, would it have
12  impacted any of your opinions?
13      A.  I don't believe it would have.  I certainly
14  see the words and the language, but I don't believe it
15  would have impacted my opinions.
16      Q.  Not a single one of them?
17      A.  No.
18      Q.  Would it indicate anything to you?
19      A.  It would indicate to me that Mr. Ellison is
20  extremely aggressive and that he is using very strong
21  language.  But it would be in that context that I would
22  read his words.
23      Q.  And you realize that this is almost two years
24  after the release of 11i; right?
25      A.  Yes, I do.

170

1      Q.  Is that a document that you would have liked
2  to have seen before you rendered your opinions?
3      A.  Well, in the sense that it would not have,
4  based on my reading it now, changed my opinion, it would
5  have been interesting, but I don't think at all crucial.
6      Q.  Okay.  So it is not something that you needed
7  to review in order to make your conclusions; right?
8      A.  Not as it has been expressed here, no, I don't
9  think so.
10      Q.  Okay.  You have heard of Chuck Phillips?
11      A.  Yes, I have.
12      Q.  How do you know who he is?
13      A.  I first met Mr. Phillips when he was with
14  Morgan Stanley in 1999 when he, too, was concerned about
15  the Y2K problem.  I understand that -- in fact, I have
16  seen some of his analyst reports about Oracle while he
17  was at Morgan Stanley.  And I'm aware that he was then
18  hired by Oracle.  I have forgotten his exact position.
19  I think maybe president or COO.
20      Q.  Have you talked to him before?
21      A.  I spoke to him in 1999 at a conference about
22  Y2K issues.  I've not, to my recollection, spoken to him
23  since then.
24      Q.  Do you find him to be credible, generally?
25      A.  Generally, yes.

171

1      Q.  On computer type issues or -- let me withdraw
2  that -- on issues relating to market analysts or the
3  Wall Street community, and I guess the companies he used
4  to cover, software companies?
5      A.  Yes, I consider him credible.  Of course, I'm
6  not a Wall Street analyst myself, but in his coverage of
7  technical computer companies for the Wall Street
8  community, I find him credible.
9      Q.  Have you seen any e-mails written by him in
10  this case?
11      A.  I may have.  What I recall more, having seen
12  more of are some of the reports and so forth that he
13  wrote prior to joining Oracle.  I don't recall whether
14  I've seen anything after he became an Oracle employee.
15  I may have, but I don't recall.
16      Q.  I'm going to show you what's been previously
17  marked at actually two different depositions, Henley 28
18  and also Wohl 31.
19      A.  Okay.
20      Q.  It's NDCA-ORCL 061302 to 303.  Take a look at
21  it and let me know when you're done reviewing it.
22      A.  Yes, I see this now.
23      Q.  Have you seen this document prior to today?
24      A.  No, I have not.
25      Q.  Do you know Byron Miller at Giga Information

172

1  Group?
2      A.  No, I don't.  And I have been trying to
3  understand whether the so-called "disastrous experience"
4  in Mr. Miller's e-mail represents his own personal
5  experience, which I doubt, as a Giga employee, or rather
6  the transmission of somebody else's experience.
7      Q.  You would expect that it was not his personal
8  experience but the experience of some other user that he
9  has gathered; right?
10      A.  That would be my expectation.  Simply because,
11  from what I know of Giga as a company, they would not
12  normally be considered an Oracle 11i customer.
13      Q.  Right.  You don't have a general issue with
14  information coming out of Giga, do you?  You cited to at
15  least one or two of their articles in your report.
16      MR. RAWLINSON:  Objection to form.
17      THE WITNESS:  I don't have a general issue.
18  They are a respected analyst firm.  That doesn't
19  necessarily mean of course that everything they said is
20  correct or accurate.  And I don't recall whether any of
21  the things I cited in my report came from Mr. Miller
22  specifically.
23      MR. WILLIAMS:  Q.  Sure.  Do you see what he
24  writes on the bottom of the page -- on the second half
25  of the page, "Chuck, I saw your very positive review of

173

1    11i.  This is what is typical of what I see.  They are
2    on 11.5.4.  Any reaction?"
3         You understand 11.5.4 to be 11i.4; right?
4    A.  Yes, I do understand.
5    Q.  Do you know when 11i.4 was released?
6    A.  I believe it was in the spring of 2001, but
7    that may not be correct.  But that's my best
8    recollection at the moment.
9    Q.  And he writes, "Is our disastrous experience
10   with 11i typical?  You have some early -- you have some
11   circa early 2001 research on this, but I was wondering
12   what it's like now that the product is supposed to be a
13   little more mature.  Here's our experience.  We've
14   recently in October 2001 upgraded from Oracle 10.7 to
15   11i.  We use almost all the financials, order
16   management -- OM and manufacturing modules along with
17   the product configurator and iStore, the latter for
18   order status only so far.  We have several
19   customizations, mostly focusing on our product
20   serialization, but in most cases our modules are fairly
21   out of the box.  While the actual conversion itself went
22   fairly well, we've been extremely disappointed with the
23   quality of the software.  We have opened 158 TARs since
24   going live, well over 100 being severity 1 or severity
25   2, and consistently have dozens of TARs open at any one

174

1    time."
2         Do you see that?
3    A.  Yes, I do.
4    Q.  Did you see evidence consistent with what is
5    related here to Chuck by Byron Miller?
6    A.  I saw some individual instances that were of
7    this approximate variety, yeah.  Particularly with
8    reference to several customizations, which were -- to a
9    computer technical person is an immediate red flag.  And
10   also with reference to the 158 TARs, and dozens open at
11   any one time, suggesting, though not necessarily stating
12   the implication that all of those TARs are bugs, when in
13   fact they could have been caused by any number of other
14   things.
15   Q.  All right, so --
16   A.  So I've seen this.
17   Q.  Is this -- is this something you would have
18   liked to have seen in preparing your report, prior to
19   preparing your report?
20   A.  Well, it certainly would not have hurt.  But
21   based on what I've seen here, I do not think that it
22   would have changed my opinion at all, because, as I say,
23   it has some familiar elements to it that I saw in other
24   documents.  The only thing different that I've seen here
25   is that some unnamed customer apparently passed

175

1    information on to Mr. Miller, who then passed it on to
2    Mr. Phillips.  And that kind of communication -- oh, and
3    Mr. Phillips then passed it on to Mr. Barrenechea and
4    Mr. Wohl.  I don't know how many of those kinds of
5    communications paths I saw.  But as for the technical
6    issues, I don't feel that I would have needed to see
7    this.
8    Q.  Would this information indicate anything to
9    you at all about the software and whether or not it
10   worked in the way that Oracle represented that it did?
11   A.  Not by itself.  First of all, because it
12   represents only one experience out of how many ever
13   hundreds or thousands that were either in the midst of
14   implementation or had gone live by that point.  But even
15   more fundamentally, it is, unfortunately, and I say that
16   with all sincerity, because this is coming from
17   apparently a very frustrated individual, it is not
18   indicative of problems with the software that could be
19   solved by Oracle fixing a bug.  So the answer to your
20   question is no.
21   Q.  So he writes, "Chuck, I saw your very positive
22   review of 11i.  This is what is typical of what I see."
23        So apparently Mr. Miller is saying that, you
24   know, this experience depicted here is typical.
25        If you saw 25 reports similar or exactly like

176

1    this experience depicted in the one that Byron Miller is
2    communicating to Chuck Phillips, would that impact your
3    opinion at all?
4         MR. RAWLINSON:  Objection to form.
5         THE WITNESS:  I'm hesitating only because I'm
6    trying to remember, unsuccessfully, how many customers
7    had gone live with Suite 11i by December 11th of 2001.
8    If, as I recall it was on the order of 2,500, then to
9    have seen 25 letters like this would not give me
10   concern.
11        MR. WILLIAMS:  Q.  I didn't ask you if it
12   would have given you concern.  Would it have impacted
13   your opinion at all?
14   A.  No, it would not, not in that magnitude.  If
15   it was 25 out of 25, it would have affected my opinion.
16   But 25 out of the large number, as I recall, that had
17   gone live by this point in time, no, it does not affect
18   my opinion.
19   Q.  So you have -- going back to what we talked
20   about earlier, you have taken the number of customers
21   that have gone live, so to speak, at face value to mean
22   these customers were running their business on 11i or
23   some version or portion of it without significant
24   problems that are of the type depicted here?
25   A.  Without problems of the magnitude of these

177

1    problems, that would be my conclusion.
2       Q.  But you haven't evaluated that; you just don't
3    know whether or not those customers were actually
4    experiencing problems similar to what's depicted here?
5       A.  I believe I have in at least an indirect
6    fashion, if not direct fashion.  Because customers
7    either in the process of going live or even after having
8    gone live who had problems of this magnitude would
9    sometimes end up in a so-called escalated status, where
10   they had been identified as customers needing attention
11   or having problems of some sort.  And I've seen
12   approximate numbers of that as well.
13       I have no idea whether this individual and his
14   company was one of those.  But the overall number of
15   escalated customers, which generally means customers
16   that have a large number of serious problems either
17   impeding their operation or impeding their ability to go
18   live, that would indicate perhaps something about the
19   quality.  But that number relative to the overall number
20   of go-lives was very small.
21       Q.  So long as go-live meant that the customers
22   were running their business on 11i?
23       A.  Running either all or a significant part,
24   enough of a part so that problems of this description
25   would have been troublesome or difficult, yes.

178

1       Q.  What if the go-lives as we discussed earlier
2    that you looked at, the majority of were customers going
3    live with three or four modules or applications within
4    only ERP?  Would information like this as late as
5    December 13th, 2001 have impacted your opinion at all?
6       A.  No, I don't believe it would have.
7       Q.  Do you know why you were not provided this
8    document?
9       A.  I don't -- it's possible that it was provided
10   to me and that I overlooked it.  That I couldn't say to
11   you.  In fact, it probably was provided to me.  Let me
12   retract that, because I did see Mr. Wohl's deposition
13   and associated exhibits, so perhaps I simply don't
14   remember it.  It is possible that I even did read it.  I
15   believe also that I saw Mr. Henley's deposition, but
16   definitely Mr. Wohl's, so that if it was an exhibit
17   here, it would have been provided to me.
18       Q.  Looking at the Chuck Phillips' message to Mark
19   Barrenechea and Ron Wohl, do you see where he writes,
20   "And this one was worse.  As you know, these market
21   analysts can have significant impact with customers, and
22   two of the most influential analysts at key firms are
23   decidedly negative on the quality of the apps suite.
24   And with this sort of feedback, I can see why"?
25       A.  Yes, I see that.

179

1       Q.  Do you think that Oracle Suite 11i was a
2    marketplace success as of March 2001 or May of 2001?
3       MR. RAWLINSON:  Objection to form.
4       THE WITNESS:  Yes, I do.
5       MR. WILLIAMS:  Why don't you go ahead and
6    change it now.
7       VIDEOGRAPHER:  This marks the end of tape
8    three in Volume I in the deposition of Edward Yourdon at
9    3:43.  Going off the record.
10       (Recess, 3:43 p.m. - 3:54 p.m.)
11       VIDEOGRAPHER:  On record at 3:54.  This marks
12   the beginning of tape four in Volume I in the deposition
13   of Edward Yourdon.
14       MR. WILLIAMS:  Q.  I'm going to show you
15   what's been marked as Exhibit 84.  I don't recall whose
16   deposition it was in.  So it is NDCA-ORCL 061300 through
17   061301.  Take a look at that document and let me know
18   when you're done.
19       A.  Okay.  Okay.
20       Q.  Have you seen this document before today?
21       A.  I believe I have, yes.
22       Q.  And when did you see it?
23       A.  I don't recall.  Sometime during the review of
24   documents during my engagement on this matter.
25       Q.  Did you rely upon the document in your opening

180

1    report?
2       A.  I don't believe I did, no.
3       Q.  Did this impact your analysis of your -- the
4    analysis of what resulted in your opinions in your
5    opening report?
6       A.  No, it did not.  If it had, then I would have
7    cited it in my opening report.
8       Q.  Did it indicate anything to you about the
9    quality of Suite 11i software?
10       A.  No.  It obviously indicated the opinions of
11   one analyst from AMR Research, but not about the overall
12   quality of the software, particularly with regard to an
13   issue we discussed earlier this morning as to whether
14   problems with any software product are out of the
15   ordinary.  And these don't strike me as being out of the
16   ordinary.
17       Q.  When you testified earlier about out of the
18   ordinary, you said out of the ordinary is -- out of the
19   ordinary with respect to comparable software.
20       A.  Yes.
21       Q.  So looking at the middle of the page.  Well,
22   withdrawn.  Do you know Jeffrey Freyermuth?
23       A.  No, I don't.
24       Q.  Have you heard of him?
25       A.  No.  I saw his name when I reviewed this

181

1    document, but I had not heard of him independently.
2        Q.   And the subject line of his e-mail to
3    undisclosed recipients, is, "AMR Research, 11i Quality."
4        A.   That's right.
5        Q.   See where it says, "Since its release in May
6    2000 many customers have expressed concern about the
7    quality of Oracle's E-Business Suite 11i.  AMR Research
8    recently interviewed more than 50 large companies
9    implementing or upgrading to 11i and found that these
10   problems still persist."  Do you see that?
11       A.   Yes, I do.
12       Q.   So that didn't mean anything to you as it
13   relates to forming your opinions that they had
14   interviewed more than 50 large companies implementing or
15   upgrading to 11i and found that these problems still
16   persist?
17       A.   No.  Because 50 is still a very small
18   percentage of the companies that had gone live or were
19   in the process of going live.  This 50 is implementing,
20   present tense, or upgrading, present tense.  So it was a
21   small percentage, a small percentage, and specific
22   examples from just a few individual companies.
23       Q.   How many customers were implementing or
24   upgrading to 11i as of March 25th of 2002?
25       A.   I don't recall sitting here.  I believe I have

182

1    referred to such numbers in either one of my reports.
2        Q.   Okay.
3        A.   And I recall it being a number on the range of
4    25 to 100 -- to 3,500, somewhere in that general range.
5        Q.   So, again, this information -- this
6    information wouldn't mean anything to you?
7        MR. RAWLINSON:  Object to the form.
8        THE WITNESS:  It means what it says, that some
9    number of companies have problems that still persist.
10       MR. WILLIAMS:  Q.   Okay.  You see where it
11   says, "Oracle has also damaged its credibility by
12   frequently patching the software and recommending Family
13   Packs of patches that have sometimes introduced
14   additional new problems while resolving the old ones."
15   Do you see that?
16       A.   Yes, I do.
17       Q.   Did that mean anything to you?
18       A.   No.  The statement about damaging its
19   credibility, in my opinion, looking at this, is an
20   opinion which Mr. Freyermuth is certainly entitled to.
21   The reference of patching of software and recommendation
22   of Family Packs of patches that sometimes introduce
23   additional new problems is a very familiar, I don't want
24   to say universal phenomenon, but one that is so common
25   that I didn't regard it and don't regard it as unusual.

183

1        Q.   And just below that, "At AMR Research Strategy
2    21 conference earlier this year, a CIO called Oracle's
3    11i one of the biggest disappointments in 2001."  Do you
4    see that?
5        A.   Yes, I do.
6        Q.   Had you heard or seen evidence that people
7    referred to Oracle's Suite 11i as a disappointment?
8        A.   I don't recall whether I have seen that
9    particular characterization, it's possible, in some of
10   the documents that I've reviewed.
11       Q.   See the next section where it says, "User
12   feedback.  Almost every customer we spoke with expressed
13   disappointment with the quality of Oracle's software
14   releases.  The following represents a sample of the
15   challenges faced by customers upgrading to 11i, 11.5.5
16   and 11.5.6 versions as recently as February of 2002."
17   Do you see that?
18       A.   Yes, I do.
19       Q.   Does the timing of the articulation of those
20   problems and the releases that the problems are relating
21   to impact your opinions on the overall quality of 11i?
22       A.   No.
23       MR. RAWLINSON:  Objection; vague and
24   ambiguous.
25       MR. WILLIAMS:  Q.   No?

184

1        A.   I didn't mean to interrupt your objection.
2        No, it doesn't.  Obviously that is a later
3    pair of releases in February 2002.  But it is also
4    during a period where there were an even larger number
5    of customers implementing the product.
6        Q.   But you don't know what those customers were
7    experiencing, do you?
8        A.   No, I don't.
9        Q.   So, in fact, this would be some sample for
10   you, wouldn't it, of what was occurring in or around
11   March of 2002?
12       A.   It is a small sample, yes, which identifies
13   issues and problems that, as I say, are in my experience
14   are very common and familiar with large software
15   products of any kind.
16       Q.   Right.  But you didn't have any other sample
17   in or around March of 2002, did you, indicating the
18   opposite of the experiences that were reflected -- that
19   are reflected in this document?
20       A.   I don't recall whether I reported on that in
21   my opening report.  It may have been in my second report
22   where I saw evidence of a positive nature from more than
23   one analyst firm, indicating levels of satisfaction and
24   success from other samples of customers.
25       Q.   Down in the conclusion section of this

185

1  document, you see in the middle of the paragraph where
2  it says, "Unfortunately, finding bugs in new
3  functionality is expected, but patches and upgrades
4  should not break working code." Do you see that?
5      A.  Yes, I do.
6      Q.  Do you agree with that?
7      A.  Just like I believe there should be world
8  peace, patches and upgrades should not break working
9  code.
10         But we have roughly 30 or 40 years of
11 experience in the software industry indicating that not
12 only does it happen, but even approximately how
13 frequently it happens. So this is again a very familiar
14 phenomenon. In fact, as I believe I indicated in my
15 opening report, we have general industry data about this
16 phenomenon for ERP systems.
17     Q.  Do you see where it says, "There is some
18 concern about Oracle's decision not to make 11i --
19 11.5.6 a fully tested maintenance release"?
20     A.  Yes, I do.
21     Q.  Do you know whether or not Oracle fully tested
22 11i.2 or .3?
23         MR. RAWLINSON: Objection to form.
24         THE WITNESS: It's my understanding from
25 having reviewed the documents that they tested it as

186

1  fully in terms of the integration testing, et cetera, as
2  they had 11.5.1. I don't know what Mr. Freyermuth meant
3  by fully tested in the context of this statement.
4          MR. WILLIAMS: Q. Well, do you know whether
5  Oracle did integration testing for 11.1 and .2?
6      A.  Based on the testimony that I've reviewed,
7  yes.
8      Q.  Did you see any other documents other than
9  testimony?
10     A.  Not that I recall, no.
11     Q.  And the testimony was only that they tested a
12 few, what, 20 work flows, wasn't it?
13     A.  Oh, no. No. That was testimony about the
14 so-called auditing, sort of the final sanity test or
15 smoke test that is commonly done by software vendors
16 just before they start manufacturing and shipping the
17 product. But it follows actual integration testing. I
18 have seen testimony in that area.
19     Q.  Did you rely on it in your opening report,
20 cite to it?
21     A.  I don't recall whether I cited to it in my
22 opening report.
23     Q.  Looking at page 92, still on bullet point
24 number four, you write --
25     A.  Sorry, back to my report now?

187

1      Q.  Yep.
2      A.  Okay. Sorry. Okay.
3          MR. RAWLINSON: Which paragraph?
4          MR. WILLIAMS: Q. It is still paragraph 258,
5  bullet point number four.
6          Actually, you know, before I get there, I'm
7  sorry, can we just go back to the document we were just
8  looking at. Go to the second page.
9          See the second paragraph where it says, "There
10 is little doubt that Oracle's 11i quality problems have
11 significantly slowed its momentum in the enterprise
12 application market"?
13     A.  Yes, I see that.
14     Q.  Did you believe that -- withdrawn.
15         Is it your opinion that Oracle had --
16 withdrawn. I'm sorry.
17         Is it your opinion that Oracle 11i had quality
18 problems?
19         MR. RAWLINSON: Objection to form.
20         MR. WILLIAMS: Q. Overall quality problems?
21     A.  It is my opinion that Oracle's 11i did not
22 have overall quality problems of a magnitude or degree
23 of severity greater than beyond that which one would see
24 in other ERP products or other large software
25 applications.

188

1      Q.  That wasn't --
2      A.  Did they have some quality problems? I would
3  agree to that, yes.
4      Q.  In your opinion, did Oracle's 11i suite have
5  quality problems?
6          MR. RAWLINSON: Objection; asked and answered.
7  Objection; vague and ambiguous.
8          MR. WILLIAMS: Q. I am not comparing them to
9  other software ERP offerings.
10         MR. RAWLINSON: Same objections.
11         THE WITNESS: My opinion is that they did have
12 some quality problems.
13         MR. WILLIAMS: Q. Now, do you have an opinion
14 as to whether or not any of those quality problems had
15 impacted negatively its ability to sell Suite 11i?
16         MR. RAWLINSON: Objection; asked and answered.
17         THE WITNESS: My opinion on that is that it
18 did not have an impact as discussed in my opening report
19 in terms of the review that I did of approximately 100
20 pending deals. So, no. My opinion is that it did not
21 affect.
22         MR. WILLIAMS: Q. You only reviewed those
23 deals that you cited to though; right?
24     A.  That's correct.
25     Q.  And we talked about this earlier, you didn't

189

1   review the deals that were valued less than $2 million?
2       A.   Other than those that may have been mentioned
3   by plaintiffs.
4       Q.   Right.
5       A.   But, yes, we did discuss that this morning.
6       Q.   So you don't know what your opinion would be
7   if you had reviewed those deals; do you?
8       A.   I don't know.  But having seen the evidence
9   from the larger deals where concerns about quality would
10  more likely be a significant risk factor for Oracle, my
11  opinion is that there would likely not be substantially
12  different kinds of problems from reviewing smaller
13  deals.
14      Q.   I wasn't asking if there would be different
15  types of problems.  But -- the question is, you don't
16  know what your opinion would be as to whether or not
17  quality problems with 11i had impacted its ability to
18  sell 11i, if you had reviewed deals or potentially lost
19  deals valued at less than $2 million per deal?
20      MR. RAWLINSON:  Objection to form.
21      THE WITNESS:  I don't know with 100 degree of
22  certainty.  But I have a high degree of confidence that
23  my -- I can't remember the rest of your question -- that
24  my opinion would be the same, or that sales would not
25  have been impacted.  I'm trying to recollect the exact

190

1   language of your question.
2       But again, the sense of my answer is that the
3   results that I saw in the large deals would be more
4   severe and would have more impact if there had been one
5   than what I would expect to see from the smaller deals.
6       MR. WILLIAMS:  Q.  Do you think that Oracle
7   has in, terms of volume, more or -- during the period
8   that -- withdrawn.
9       Do you think during the period relevant to
10  this case that Oracle had more smaller deals, meaning
11  deals valued at less than $2 million, than deals valued
12  at more than $2 million, potential deals?
13      MR. RAWLINSON:  Objection to form.
14      THE WITNESS:  I don't know.  I was basing my
15  answer on my experience in the industry as to the risks
16  and reactions of small customers versus large customers
17  when considering quality problems or potential quality
18  problems.  I don't have any knowledge that I recall
19  having seen about the number of such deals, big ones
20  versus small ones.
21      MR. WILLIAMS:  Q.  Say, for example, that
22  Oracle had in any given quarter in our relevant period
23  potentially 100 deals over $2 million, and 1,000 deals
24  valued at approximately $500,000, and that it lost 10
25  deals of the type above $2 million and, you know, 400

191

1   deals valued at $500,000.
2       A.   Four hundred out of how many?
3       Q.   Out of 1,000.  Due to 11i quality problems.
4   Would that impact your opinion at all?
5       MR. RAWLINSON:  This is the opinion about lost
6   deals or broader?
7       MR. WILLIAMS:  No.  He said that his --
8       Q.   What you testified to earlier was that you
9   don't think -- you have no opinion concerning whether or
10  not Oracle lost any deals relating to the quality of 11i
11  for deals less than $2 million because you haven't
12  reviewed any of that information?
13      MR. RAWLINSON:  Objection, form.  Objection to
14  the extent it mischaracterizes prior testimony.
15      THE WITNESS:  I don't have any opinion that
16  can be expressed with 100 percent certainty.  What I
17  said was I would express an opinion with a fairly high
18  degree of confidence.
19      And in the hypothetical situation that you
20  just posed, if evidence was presented to me that said 10
21  out of 100 large customers deferred or cancelled
22  potential sales because of quality problems, which I
23  don't believe is, based on my experience, anywhere
24  near the case, but that 40 percent of the small deals
25  cancelled for similar reasons, would that change my

192

1   opinion, perhaps so.
2       But based on my experience, I would find that
3   an extremely unlikely scenario that a larger percentage
4   of small customers would be more likely to cancel
5   than -- especially that much larger a percentage.
6       Q.   Why is that?
7       A.   Forty percent?  Because the larger customers
8   are usually more demanding, they've got larger
9   installations, more of a mission-critical business, less
10  of an ability to fall back on manual procedures, et
11  cetera, and also more sophisticated and are able to ask
12  more penetrating questions about quality issues.
13      Q.   They got more money, too, though, don't they?
14      A.   Well, they are presumably prepared to spend
15  more money.  But a smaller customer would normally be
16  asking, and, therefore getting less detailed information
17  about all that, et cetera, et cetera.
18      Q.   All right, looking back at paragraph 258 of
19  your report, bullet point number four, you write, "Many
20  of the problems attributed to Suite 11i by customers,
21  industry analysts, computer trade journals and
22  plaintiffs were not attributable to Oracle's software."
23  Do you see that?
24      A.   Yes, I do.  It is the third bullet point.
25  Yes, I see that.

193

1    Q.  What is the basis of that opinion?
2    A.  The basis of that opinion was my review of
3  such computer trade journals, analyst reports, et
4  cetera, combined with my experience in the field, as
5  illustrated by some of these exhibits that you've just
6  shown me a little bit earlier.
7    Q.  Can you show me where in your report you cite
8  to any support for that conclusion that many of the
9  problems attributed to Suite 11i by customers, industry
10  analysts, computer trade journals and the plaintiffs
11  were not attributable to Oracle software?
12    A.  I believe that there is information -- I have
13  not cited specifically here, I agree, with a footnote or
14  anything.  But --
15    Q.  Can you find it in your report if you have
16  time?
17    A.  If we have time this afternoon.  It's possible
18  that it is not in there.  But I certainly have seen
19  testimony, deposition testimony and exhibits of -- in my
20  review of the documents about problems that were
21  attributed by customers, et cetera, that upon further
22  investigation turned out not to be attributable to
23  Oracle software, but rather to setup problems or
24  configuration problems or customization problems, et
25  cetera.

194

1      One of my difficulties I have to admit, I can
2  no longer remember what I put in my opening report and
3  my second report.
4    Q.  I'm just concerned about the opening report.
5    A.  I understand that.  I'm trying to be
6  responsive.  It does tend to blur sometimes in my mind.
7    Q.  Okay.  Well, are you saying that somewhere in
8  the -- withdrawn.
9      What process did you engage in to identify the
10  problems attributed to Suite 11i by customers, and
11  separating those by industry analysts, others by
12  computer trade journals, and then those by plaintiffs,
13  if you did?
14    A.  I'm sorry, what was the beginning part of the
15  question?
16    Q.  What process, if any, did you use to identify
17  what was -- what problems were identified by customers,
18  industry analysts, computer trade journals or
19  plaintiffs?
20    A.  The process was to review the problems that
21  were identified as such, as either being customer
22  problems or problems attributed by industry analysts, et
23  cetera, that were referenced and testified to in various
24  referenced, discussed and testified to in various
25  depositions, as well as related documents that were

195

1  provided to me.  So that I did see many industry analyst
2  reports independently of deposition testimony, reviewed
3  it and, if possible, looked to see whether there were
4  responses to those analyst reports and trade journal
5  articles, et cetera.  And not only trade journal
6  articles, but sometimes mainstream newspaper articles,
7  responses by people within Oracle as to whether they
8  were actually software problems or some other problems.
9    Q.  But you don't attach any exhibits supporting
10  this conclusion to this report, do you, this opening
11  report?
12    MR. RAWLINSON:  Objection to form.  Objection
13  to the extent it mischaracterizes prior testimony.
14    THE WITNESS:  As I said earlier, I believe
15  there may be some citations elsewhere in this report, or
16  if not in this report, perhaps the second report I
17  filed.  I can't recall exactly where they are.  I
18  believe they exist.
19    MR. WILLIAMS:  Q.  You go on to say, "Instead,
20  these problems were caused by a wide variety of
21  ancillary factors that are common to large-scale ERP
22  implementations, regardless of vendor, many of which are
23  associated with a combination of decisions, actions and
24  mistakes by customers or third party consultants
25  attempting to implement the product."  Do you see that?

196

1    A.  Yes, I see that.
2    Q.  Where in your report -- and I would like you
3  to identify that for me -- withdrawn.
4      I would like for you to identify for me where
5  in your report you cite the support for that conclusion.
6    A.  My response is the same as I just made a
7  moment ago about the first part of this bullet point,
8  that I believe there are citations in this opening
9  report, or, if not, in the second report that I filed.
10  But I can't recall sitting here right now.  I would have
11  to read through the whole report to find where they are.
12    Q.  Did you find any of the problems that are
13  attributed to Suite 11i to be a result of problems with
14  the underlying software itself?
15    A.  I found them indirectly by virtue of the TARs
16  that were reported in this same context, of which 32
17  percent, roughly speaking, became so-called bugged TARs,
18  that is, problems for which there was not an immediate
19  explanation in terms of mistakes and actions by the
20  customer, and were, therefore, turned over to the
21  software people.
22      So, you know, I certainly feel that some of
23  the problems were attributed in the broadest or most
24  approximate sense, that percentage that I just mentioned
25  a moment ago is indicative of what I was getting at

197

1 here, that roughly 32 percent of the problems that were
2 reported to Oracle were of sufficiently persuasive
3 nature that they were sent on to the developers for
4 further investigation.
5      Q.   And that's the basis of your conclusion that
6 only 32 percent of TARs were defects in the software?
7      A.   Oh, no, I didn't try to say that.  What I said
8 was that 32 percent of them, according to evidence that
9 I've seen, and I believe deposition testimony, were of a
10 sufficiently persuasive nature, i.e., they could not be
11 identified with configuration problems or other customer
12 issues.  They were sufficiently persuasive that they
13 were sent on to the development group where more of them
14 were eliminated as not being software problems.
15      I don't know what the final percentage of
16 so-called bugged TARs were actually identified with real
17 software defects.
18      Q.   Do you know that the order management module
19 of Suite 11i was shipped without any testing?
20      A.   I do not believe that to be the case.
21      Q.   What do you believe to be the case with
22 respect to order management, the order management module
23 of Suite 11i?
24      A.   I believe that it did undergo unit testing and
25 integration testing and regression testing, but that,

198

1 according to the comments by Mr. Ellison, it was not --
2 forgotten the phrase -- battle tested, or tested in the
3 heat of the battle.  I believe that was the manner in
4 which he was characterizing the absence of testing.
5      Q.   Where do you -- where did you see that?
6      A.   Either in his deposition testimony or in some
7 other deposition testimony, I believe, is where I saw
8 it.
9      Q.   And did you rely on that -- withdrawn.
10      Did that -- did the information you say that
11 you saw concerning testing of order management, did that
12 impact your opinions at all or your analysis of whether
13 or not Suite 11i worked?
14      A.   No, it did not.
15      Q.   Did it play a part in your analysis at all?
16      A.   I was aware of it.  I considered it.  I did
17 not believe that that was something I needed to rely
18 upon for my opinion, so in that sense it did not affect
19 it.
20      Q.   You did find evidence, didn't you, that order
21 management -- the order management module suffered from
22 substantial defects; isn't that true?
23      A.   I saw evidence that it had -- I don't know
24 what you mean by substantial, but that it did have bugs.
25 Although some of the testimony as I recall about bugs

199

1 and slow operation also with order management actually
2 turned out to be a description about problems in the
3 demo environment, as I recall, not the actual production
4 version of the software that was delivered.
5      Q.   So, is it your opinion that the failure to
6 test 11i in the manner in which the company admitted to
7 or described did not impact your opinion as to whether
8 or not 11i worked?
9      MR. RAWLINSON:  Objection to form, vague.
10      THE WITNESS:  I don't know what you mean by
11 the manner in which the company admitted or described.
12      MR. WILLIAMS:  Q.  You just said you heard
13 some of Mr. Ellison's comments about the testing of 11i.
14 I've characterized that as an admission.
15      A.   I see.  And the company also; Mr. Ellison is
16 the company.
17      Q.   Yes.
18      A.   I just wanted to make sure I understood your
19 terms.
20      Q.   Yes.
21      A.   No.  That did not affect my opinion.
22      Q.   Go to page 93, please.  The top bullet point,
23 your conclusion there, you write, "The evidence in this
24 case does not support the conclusion that Suite 11i
25 suffered from undisclosed bugs or other problems that

200

1 were out of the ordinary for a major new release of an
2 ERP product."  Do you see that?
3      A.   Yes, I do.
4      Q.   What did you review to determine whether or
5 not bugs were disclosed?
6      A.   I reviewed deposition testimony about this
7 issue, particularly with regard to the disclosure of
8 bugs through Oracle's, I think, META link mechanism, and
9 the fact that bugs were disclosed to customers by virtue
10 of patches and Family Packs and upgrades, part of whose
11 purpose was to fix bugs.  So that process by itself
12 obviously involved the disclosure of bugs.
13      It was also based on my understanding of
14 Oracle's trouble reporting process in which a customer
15 or customer support representative reports a bug to
16 Oracle and then receives feedback relatively shortly
17 thereafter, indicating the agreement that what has been
18 reported is, indeed, a bug, as opposed to some other
19 kind of a problem.
20      Q.   So there you're not talking about disclosure
21 to the public at large, are you, in this opinion here?
22      A.   That's correct.  I am talking about a
23 disclosure to Oracle customers and to analysts and
24 reporters who may have asked about such things in the
25 articles and reviews that they were writing, as opposed

201

1  to the general public.
2  I frankly have no opinion about that. I don't
3  know whether Oracle posted information on its website
4  for anyone to look at about the number of bugs that had
5  been identified.
6  Q. What's your -- what's your understanding of
7  Oracle's sales forecasting process as it was in the
8  third quarter of fiscal 2001, late 2000, early 2001?
9  A. My understanding is relatively limited, and
10  was described in the section of my report about lost
11  deals. And I would have to refer back to that to
12  refresh my memory exactly what my understanding is about
13  that process.
14  Q. You didn't do an analysis about that process?
15  A. Of the forecasting process itself, no, I did
16  not.
17  Q. And so you don't know what the process was for
18  the inclusion or exclusion of potential deals in its
19  sales pipeline?
20  A. Not in any detailed formal fashion. In the
21  process of conducting that part of my review for this
22  report, I certainly saw some documents that discussed it
23  or commented about it, about individual prospects or
24  individual potential deals, but not the overall process.
25  Q. And you didn't -- you said you didn't read the

202

1  depositions concerning the company's forecasting
2  process; right? You may not have even received them?
3  A. I believe that's correct.
4  Q. Nor evidence concerning the management of the
5  company's pipeline system?
6  A. That's correct.
7  Q. And so you don't have any -- you're not
8  offering an expert opinion as to whether or not --
9  withdrawn.
10  You don't believe that you're in a position,
11  do you, to offer an expert opinion on the reasons why
12  deals in Oracle's pipeline either closed or did not
13  close in the third quarter of fiscal 2001?
14  MR. RAWLINSON: Objection; form.
15  THE WITNESS: I believe that I can, and indeed
16  have offered an expert opinion as to the reasons those
17  roughly 100 large deals closed or did not close based on
18  my review of the documents.
19  MR. WILLIAMS: Q. You believe that you're in
20  a position to offer an expert opinion even though you
21  have not reviewed all of the evidence concerning the
22  company's forecasts during the relevant time period?
23  A. I believe so, because what I focused on were
24  the large deals in that pipeline. How they got there, I
25  don't know. Whether they should have been there, I

203

1  don't know.
2  But once they were there, I saw it as a
3  potential big deal in the pipeline that various
4  salespeople were trying to close by February 26th or
5  whenever the end of the quarter was.
6  I did review what I think were the relevant
7  documents indicating the progress or lack of progress
8  they were making in their attempt to do so, and I
9  believe -- well, in most cases I was able to see
10  evidence as to why they did or did not.
11  Sometimes it wasn't clear why they made their
12  decision either not to pursue it or to delay it.
13  Sometimes the information didn't become available until
14  the following quarter.
15  I don't know if I saw all of that. But I
16  think I did see a substantial part, if not all of the
17  relevant evidence describing at least the perception of
18  the Oracle sales representatives and managers who were
19  pursuing these large deals in the pipeline.
20  Q. So you know that you didn't have all the
21  evidence concerning the company's forecasting process;
22  right?
23  A. Yes, I agree with that.
24  Q. And you know you didn't review all of the
25  deposition concerning the company's forecasting process;

204

1  right?
2  A. Yes, I agree with that.
3  Q. And you know you did not receive all the
4  evidence concerning the way the company's pipeline
5  system was managed?
6  MR. RAWLINSON: Objection to form.
7  THE WITNESS: Yes, I would agree with that.
8  MR. WILLIAMS: Q. And you would admit,
9  wouldn't you, that you probably did not receive all of
10  the documents and correspondence concerning specific
11  deals in the pipeline or the reasons they were there or
12  not there?
13  MR. RAWLINSON: Objection to form.
14  THE WITNESS: I would agree with that. As to
15  how they got into the pipeline to begin with or why they
16  were there, who put them there, so forth, no. I may
17  have seen some of that as part of the overall
18  information I reviewed.
19  MR. WILLIAMS: Q. And is it your testimony
20  that none of the documents that you did not see did not
21  include facts concerning the sales or potential deals
22  that you referred to in your report as not closing for
23  reasons other than --
24  A. I'm sorry, I've been overloaded by nots. I
25  couldn't keep up with the double or triple negatives.

205

1  Q.  That's fine.  I'll do it again.
2  A.  Thanks.
3  Q.  Would you agree --
4  A.  Okay.
5  Q.  -- that there is some possibility that among
6  the evidence that you did not see, there is information
7  concerning the very deals that you discuss in your lost
8  deal section of your report?
9  MR. RAWLINSON:  Objection to form.
10  THE WITNESS:  I think it is possible.  I can't
11  guarantee that I saw all of it.  I asked for it, and
12  from what I could see, I got all of the relevant
13  information about why the deal closed or didn't close.
14  But with 100 degree certainty, was there
15  something missing, that I couldn't tell.
16  MR. WILLIAMS:  Q.  You actually thought you
17  received all the documents concerning 11i.2, and I think
18  I have shown you at least one that you have not seen.
19  A.  One of these documents, yes, as I said, I
20  don't recall having seen that or reviewed it, but may
21  have done so.
22  MR. RAWLINSON:  Can we take a short break?
23  MR. WILLIAMS:  Yes.
24  VIDEOGRAPHER:  Off record at 4:38.
25  (Recess, 4:38 p.m. - 4:48 p.m.)

206

1  VIDEOGRAPHER:  On record at 4:48.
2  MR. WILLIAMS:  Q.  Mr. Yourdon, do you have an
3  opinion as to whether or not the demonstration system
4  and problems with it resulted in lost sales for Oracle
5  during the relevant time period?
6  A.  No, I don't have an opinion on that.  I have
7  obviously seen discussions about the demonstration
8  system, but I don't know to what extent, if any, that
9  caused lost sales.
10  Q.  So you do not intend to offer an opinion at
11  all as to whether or not problems with the demonstration
12  system, whether it be the underlying software or not,
13  resulted in lost sales of 11i?
14  MR. RAWLINSON:  Objection to form.
15  THE WITNESS:  I don't intend to offer an
16  opinion based on the material that I've seen so far or
17  based on what I've been asked to investigate.  If I'm
18  provided with additional information between now and
19  trial, and/or instructed to investigate that based on
20  existing information, I would do so.
21  MR. WILLIAMS:  Q.  Can you just turn to page 6
22  of your report, please.  There you in paragraph 10, you
23  discuss your assignment.  Do you see that?
24  A.  Yes, I do.
25  Q.  How did you determine what the assignment

207

1  would be, or how was it determined what your assignment
2  would be?
3  A.  As I recall, that was through a series of
4  discussions with counsel.  I think I probably suggested
5  at least the first item, if not the first two items.
6  And I believe the remaining four were the result of
7  discussions with counsel.
8  Q.  Okay.  With respect to bullet point number
9  four where you say your assignment was to "Address the
10  claim made by plaintiffs that defendants made false
11  statements related to its Suite 11i product by examining
12  the content and meaning of the allegedly false
13  statements," do you see that?
14  A.  Yes, I do.
15  Q.  How does one go about analyzing the meaning of
16  allegedly false statements?
17  A.  In this particular case, I analyzed the
18  meaning of the allegedly false statements within what I
19  felt was the appropriate context, i.e., the entire
20  statement as opposed to perhaps an abbreviated subset,
21  as well as the context in which the statement was made,
22  i.e., whether it was made at a computer conference or in
23  some other form.
24  Q.  But you didn't ask any of the speakers of
25  those statements what they meant by them, did you?

208

1  A.  No, I did not.  I'm trying to recall whether
2  any of the people that I spoke to, as we discussed
3  earlier this morning, at Oracle, whether they themselves
4  were accused of having made false statements.  As best I
5  can recall, even if they were accused of such things,
6  that's not what I asked them about or talked to them
7  about.
8  Q.  Do you think that a reasonable person could
9  disagree with you as to your conclusion of the meaning
10  of the allegedly false statements that you examined?
11  MR. RAWLINSON:  Objection to form.
12  THE WITNESS:  I think a reasonable person, and
13  perhaps unreasonable people, too, could disagree with
14  me.  And it would then be up to the court or the jury or
15  the triers of fact to decide whose interpretation or
16  whose analysis was more accurate or more appropriate.
17  MR. WILLIAMS:  Q.  So you didn't put yourself
18  in the shoes of the speaker of any of the statements and
19  then discuss what that speaker meant by the statement?
20  A.  No, I did not attempt to do so.
21  Q.  Do you have a general understanding of what
22  the issues in dispute are in this case?
23  A.  I believe I do.
24  Q.  Can you tell me what they are, or what you
25  believe they are?

209

1    A.  I believe the issues in dispute are whether --
2  well, let me qualify that statement.  I don't have an
3  understanding of the dispute outside of the so-called
4  product area.  I don't know the details of the dispute
5  with regard to revenues recognition or forecasting or
6  accounting or other financial matters.
7     With regard to the product at issue, my
8  understanding of the dispute is that Oracle allegedly
9  made false statements about the commercial acceptability
10 of its product, about the working nature of the
11 integration of its product, and perhaps other things.  I
12 would have to refer to the summary of product-related
13 statements that I made on page 55 to see if I've left
14 anything out.
15    There are six statements beginning in
16 paragraph 143 that, as I understand, form the basis of
17 the plaintiffs' complaint in the product-related area.
18    Referring to integration and the lack of a
19 need for systems integration, et cetera, I can read all
20 six of these.  But it is the six that are summarized in
21 paragraph 143.  That's my understanding of the dispute.
22    Q.  Can you tell me what, if you can, five, or as
23 many as you can, major ERP releases in the period
24 between 1999 and 2001?
25    A.  ERP releases of what?

210

1     Q.  How about, can you tell me as many as you can
2  major release of ERP products released in the period
3  between 1999 and 2001?
4     MR. RAWLINSON:  Objection to form, vague.
5     THE WITNESS:  Not just those of Oracle, but --
6     MR. WILLIAMS:  Q.  Not Oracle.  Other vendors.
7     A.  Between 1998 and 2001.
8     Q.  You said '99.  But '98 is fine.
9     A.  '99 and 2001.  As I recall, J.D. Edwards had
10 one or more releases during that period.
11    Q.  That you would consider major?
12    A.  That I would consider major.  I'm trying to
13 recall though, I probably can't do so sitting here
14 today, whether that was the period where they moved from
15 their so-called World product, which was an AS 400
16 product, to the One World product, which was a client
17 server product.  But I believe that occurred in that
18 period of time.
19    I believe PeopleSoft and SAP also had major
20 releases during that period of time, but I can't recall
21 sitting here the product versions, product release
22 numbers.
23    I believe Siebel did in the CRM area, I
24 believe Vaughn did also.  But, again, I can't recall the
25 specific version numbers.

211

1     Q.  Okay.  Looking at page 10, the opening report,
2  the second bullet point down where you describe design.
3     A.  Yes, I see that.
4     Q.  You say, "Design which often consists of two
5  or three levels, e.g., high-level architectural design,
6  followed by low-level procedural design."  Then you go
7  on a little bit further.
8     What is architectural design?  What does that
9  mean?
10    A.  The design of the major software components,
11 whether they are identified as modules or subroutines or
12 objects, but it is the building blocks from which the
13 software system is going to be built, what are they,
14 what features and functions will they provide, and what
15 interfaces will they have with other such components.
16 That taken together represents the architecture of the
17 system.
18    Q.  So when software engineers or IT professionals
19 like yourself discuss the software architecture, what
20 they are typically referring to is what you've described
21 to me, the building blocks of the software?
22    A.  Yes.  Now, if it turns out that a major
23 component of the design is the database design, then,
24 again, there may be a discussion of architecture with
25 respect to the overall arrangement of tables or files

212

1  and the relationship between them.
2     So one can talk about architectural design in
3  terms of the database, if it's a major component of the
4  system, as well as architecture of the application code.
5     One can talk about even higher levels of
6  architecture involving higher subsystems, such as
7  financials or inventory.
8     Q.  What are integration bugs?
9     A.  Integration bugs, I don't recall whether I've
10 used that term, per se.  But they would be bugs
11 literally in or related to the interface between
12 components of a system, either bugs associated with the
13 interface between application components or between
14 different parts of the database, or between the system
15 that is being developed and external systems that the
16 customer or end-user may wish to combine together with
17 the system that he's acquiring.
18    Q.  Are integration bugs found by doing
19 integration testing?
20    A.  That is where they are most often and most
21 likely to be found.  They may sometimes become apparent
22 or visible at an earlier stage or at a later stage.  But
23 that's the area where one focuses on and specifically
24 tries to find such bugs, yes.
25    Q.  In your review of the evidence, did you

213

1    consider documents indicating that Oracle sales
2    personnel were advising customers to wait to purchase
3    and install Oracle Suite 11i because it had so many bugs
4    or defects?
5         A.   I believe I saw some such documents associated
6    with the CRM component.  Perhaps along the lines of the
7    advice that Mr. Ron Wohl offered in a speech in one of
8    the Oracle conferences.
9         Q.   Did that impact your analysis and conclusions
10   about quality of 11i or its functionality during the
11   relevant time period?
12        A.   No, it didn't.  It didn't.  Because the CRM
13   component and order management component were new, as we
14   discussed, and because the customers that may have had
15   that choice represented a spectrum of, as I called them
16   earlier, early adopters, people who may have been
17   willing and able, indeed even anxious to begin
18   implementing and adopting early versions of software,
19   versus others who perhaps were better advised to wait
20   because of their conservative nature.
21        Q.   How does whether a customer is going to
22   implement it impact your assessment of 11i quality after
23   viewing documents that Oracle salespeople were advising
24   customers to wait until all the bugs were ironed out of
25   the software?

214

1         A.   Because all software, in my experience, does
2    have some bugs.  The larger the software, the more bugs
3    that one would have.  And that as a result, individual
4    salesperson working with particular customers or
5    accounts might recommend to them that the prudent thing
6    to do, given that perhaps they are not early adopters,
7    would be to wait.
8         To me that's independent of the quality of the
9    software itself.  All software has bugs, the bugs are
10   eventually removed, the software becomes more mature,
11   and at that point perhaps more appropriately used by
12   customers who are not early adopters.
13        Q.   Wouldn't -- if you saw that type of evidence,
14   wouldn't you then also have to conclude that Oracle very
15   likely did lose deals because of problems with Suite
16   11i?
17        MR. RAWLINSON:  Objection to form.
18        MR. WILLIAMS:  Q.  Or deals were delayed due
19   to problems with Suite 11i?
20        MR. RAWLINSON:  Objection to form, vague.
21        THE WITNESS:  In the context I've made such an
22   opinion here, it was stated in terms of undisclosed or
23   unexpected problems with 11i.  I think that I have
24   indicated in the report here that there were public
25   statements about some problems of an expected nature

215

1    with the early versions, which --
2         MR. WILLIAMS:  Q.  That's not what I'm asking.
3    Maybe I should clarify my question.
4         A.   Okay.
5         Q.   You did see documents indicating that Oracle
6    sales staff was advising or they were advising customers
7    or potential customers to wait before they purchased 11i
8    until some of the bugs were ironed out; isn't that fair?
9         A.   I saw e-mails to that effect.  I think they
10   were one step removed, within Oracle.
11        I don't recall having seen documents or
12   e-mails in which some salesperson said, "I yesterday
13   advised my customer not to implement 11i."
14        I do recall seeing statements from one Oracle
15   executive to another along the lines of what you said.
16        Q.   Okay.  If it is true that Oracle's sales
17   personnel were advising customers to wait before they
18   purchased 11i until some of the bugs were ironed out,
19   wouldn't then one have to conclude that some potential
20   deals for 11i were delayed because of problems with 11i?
21        MR. RAWLINSON:  Objection to the form, vague.
22        THE WITNESS:  Not beyond what I would normally
23   expect to see with any new product.  Were there possibly
24   some, greater than zero?  Yes, I would accept that.
25        MR. WILLIAMS:  Q.  I'm not asking you to

216

1    compare it to what you would have seen -- as compared to
2    other products.
3         I'm just asking if it's reasonable to conclude
4    if, indeed, you did find evidence that Oracle sales
5    personnel were advising customers to wait until the bugs
6    were ironed out of 11i to purchase it, that Oracle did
7    experience delays in deals because of problems with 11i?
8         MR. RAWLINSON:  Same objection; vague.
9         THE WITNESS:  I would agree that would be an
10   indication of some delays and some postponements, yes.
11        MR. WILLIAMS:  Q.  Because of problems with
12   11i?
13        MR. RAWLINSON:  Same objection.
14        THE WITNESS:  Because of the normal and
15   expected bugs and problems in 11i.
16        MR. WILLIAMS:  Q.  Turning to page 32 of your
17   report.
18        A.   Okay.
19        Q.   Looking at footnote 33 where you reference or
20   say, "The nearly infinite number of combinations and
21   permutations of hardware, CPUs, memory disks, printers,
22   telecommunications networks, third-party software and
23   customer data makes it impossible to conduct exhaustive
24   testing."  Do you see that?
25        A.   Yes, I do.

217

1       Q.   What is exhaustive testing?
2       A.   Exhaustive testing is a term that's commonly
3   used in the computer industry.  I put that into quotes
4   also to focus your attention on it, because I did not go
5   into an elaborate description of what it means.  Quite
6   literally what it means is testing every single
7   permutation and combination of possible transactions and
8   test cases, exhaustively, so to speak.
9       Q.   And Oracle didn't do that with 11i?
10      A.   No, Oracle did not do that with 11i, nor as I
11  indicated here does any large vendor do so with any
12  large software product.
13      Q.   You don't cite to any authority for what
14  exhaustive testing means though here; right?
15      A.   No, I don't.
16      Q.   Okay.
17      A.   I don't.  And I apologize for not giving that
18  for your benefit.  But it's a very commonly understood
19  term and concept.
20      Indeed, I think what I did do, I can't recall
21  where it was, in one of my other footnotes, with regard
22  to the discussion about configuration settings, which is
23  just one small part of the overall testing issue, I said
24  that even Microsoft Word, which I used as my example,
25  had a couple dozen different configuration settings, and

218

1   that ERP products had hundreds, if not thousands.  And
2   to construct all the different test cases that one would
3   need to exhaustively, or, that is, to absolute test
4   every single possible combination and permutation, would
5   involve a near infinite number.
6       I can find that for you.  But I know that's in
7   this report.
8       MR. RAWLINSON:  Shawn's question is whether
9   that defines exhaustive.
10      MR. WILLIAMS:  Q.  That's all right; I read
11  the report.  I understand what you mean.
12      A.   Okay.
13      Q.   On paragraph 98, you say, "A small percentage
14  of ERP implementations experience such severe and
15  ongoing problems that they are eventually abandoned by
16  the customer." -- Do you see that?
17      A.   Yes, I do.
18      Q.   Did you see evidence of that in your review?
19      A.   I don't recall seeing evidence in that.  I do
20  recall one or two cases where the customer had intended
21  to roll out Suite 11i on several different -- or in
22  several different offices or regions or parts of the
23  country or parts of the world, in which the first one
24  was implemented, but that subsequent ones were
25  postponed.  I don't know whether any were abandoned in

219

1   the ones that I saw.
2       Q.   Okay.
3       A.   So the general answer to your question is no.
4       Q.   All right.  But -- well, withdrawn.
5       In the same paragraph you quote failed
6   implementations.  Is there a reason why?
7       A.   You know, why did I put it in quotes?
8       Q.   Um-hum.
9       A.   In the same manner that I did in other cases.
10  An implementation effort that, at least in the opinion
11  of one of the two parties, if not both, was a financial
12  failure, a technical failure, a business failure, or in
13  some other fashion a failure.
14      Q.   Did you see evidence of failed implementations
15  in your review of the evidence in this case?
16      A.   I don't recall that I did.  I don't believe
17  that I did.  It is quite possible that there were some,
18  and even possible that I saw some and reviewed them.
19  But I can't recall them sitting here right now.
20      Q.   You didn't rely on them for your opening
21  report; right?
22      A.   No.  I would not have relied on them unless
23  there were several high profile failed implementations.
24      Q.   Would they have to be high profile?
25      A.   They would not have to be.  The adjective

220

1   several is the most important thing there.
2       But if there were a few small profile
3   implementations that failed, that's much less likely to
4   have influenced my opinion.
5       Q.   Why is that?
6       A.   Because the smaller -- actually, let me
7   qualify that a bit.  There was a study that I discussed
8   in my second report about the expectations of
9   implementations finishing or being completed on time.
10  And some percentage of customers said that the
11  implementation process had been slower than expected.
12  And it turned out to be the smaller implementations or
13  the smaller customers that were more likely to have that
14  experience.
15      Q.   I guess I understood, when you said high
16  profile, you were -- did you mean large customers?  Or
17  when you don't refer to high profile, does that mean
18  small customers?
19      A.   There is not necessarily a one-to-one
20  relationship between high profile and big or small
21  profile, and small, or -- low profile and small.
22      But generally speaking, the high profile
23  failed implementations tend to be the large ones, where
24  a large amount of money is lost or is associated with a
25  subsequent lawsuit, as illustrated with the example in

221

1  footnote 36 at the bottom of this page. Something
2  involving or leading to a $500 million lawsuit is high
3  profile and most likely was large. Now, that footnote,
4  by the way, as you can see, continues on for most of
5  page 34.
6      Q. Yes, I recall that footnote.
7         Paragraph 115. In that paragraph you say that
8  redundant data elements in Suite 11i are a product of a
9  conscious and deliberate decision made by Oracle
10 developers.
11     MR. RAWLINSON: I'm lost. 115?
12     THE WITNESS: Paragraph 115?
13     MR. WILLIAMS: Yes.
14     THE WITNESS: Q. I don't see the reference to
15 Suite 11i. I see an extraneous sentence at the end of
16 that paragraph, and I apologize for that.
17     MR. WILLIAMS: Q. It is the first sentence,
18 as noted -- you're not referring to 11i here, you're
19 just referring to ERP software generally?
20     A. Not even ERP software generally, but -- well,
21 unless this is within the ERP section.
22     Q. You're talking about integration and forms of
23 integration, the concept of integration. I thought your
24 assignment was ERP. I thought the entire report related
25 to ERP software.

222

1      A. Well, it did. But there was a tutorial
2  discussion about software development in general, which
3  then went on to discuss ERP systems in particular.
4         So let me see if I can figure this out.
5  Because, in fact, that discussion about conscious
6  decisions to replicate data is a much broader phenomenon
7  than just ERP systems.
8         But I believe this is embedded within the
9  discussion, Roman numeral VI.5 that begins on page 28.
10 So I will certainly agree that the conversation in --
11     Q. Well, if it is a much broader topic, I can ask
12 you a more specific question.
13     A. Okay.
14     Q. Did you identify any specific instances of
15 redundant elements in your review of 11i?
16     A. No, I did not.
17     Q. I'm going to ask you to turn to page 44,
18 paragraph 127. You write, "These features presented a
19 number of advantages, including faster implementation.
20 Instead of requiring one to three years to integrate a
21 disparate collection of best-of-breed components,
22 companies can expect to implement an integrated ERP
23 like Suite 11i within a few months." Do you see that?
24     A. Yes.
25     Q. And you testified earlier that you saw

223

1  companies that had implemented Suite 11i, including, you
2  know, a number of components of ERP and a number of
3  components of CRM within a few months?
4      A. I would have to go back and recall the precise
5  testimony. I'm not sure you got it precisely.
6         But I did see and reported on companies that
7  implemented within a few months. I don't recall that my
8  report specifically indicates which ones were doing just
9  ERP or parts of ERP and CRM, versus substantially all of
10 both.
11        My recollection from reviewing the documents
12 is that roughly a dozen companies, 10 or 12 companies,
13 had implemented both ERP and CRM within -- I'm not sure
14 how many a few months -- but within a relatively
15 brief period of time, on the order of 6 to 12 months.
16     Q. Prior to March of 2001?
17     A. To the best of my recollection, yes.
18     Q. But they are not cited in the report, not
19 specifically cited in your opening report?
20     A. Again, I don't recall which of my two reports
21 lists several examples of relatively fast
22 implementation. And that list of relatively fast
23 implementation, I don't recall breaking out which ones
24 are only ERP or only CRM or a mixture of the two.
25     Q. Okay. Can you define work flow integration?

224

1      A. Work flow integration is defined in some part
2  of my report. I would like to make sure I get the words
3  correct. I think it starts on page 35.
4         I provided a definition on page 36, as one of
5  the bullet points in paragraph 104, where I said it is
6  the ability of one part of the system to talk to other
7  related parts of the system, that is to send information
8  to or interact with other parts of the system in order
9  to carry out a so-called work flow, business work flow
10 of the sort that was shown diagrammatically, I believe,
11 in Figure 9.
12     Q. Is that the work flow that would be important
13 to an end-user?
14     A. That would be important to --
15     Q. I'm sorry, let me withdraw the question. Is
16 that the integration that would be important to an
17 end-user, work flow integration?
18     A. I believe that would be important to an
19 end-user, as well as data integration being important to
20 an end-user.
21     Q. In paragraph 104 that you just directed me to,
22 where you describe work flow, you put talk in quotes.
23 Should that have any meaning different than communicate?
24     A. No. It has the meaning of communicate in
25 computer software terms, that is, by sending and

225

1   receiving information, much as you and I send
2   information, you know, by English.
3       Q.   Just going to page 53 on paragraph 138, you
4   say, "To evaluate claims that Suite 11i was integrated
5   and interoperable, we must use the Oracle data model
6   diagrams and business flow diagrams of which Figures 7
7   through 10 are only a few of a large collection to
8   answer three basic questions.  First, do all of the 11i
9   components that interact with a common data entity, for
10  example, a customer or an order or an employee, all
11  refer to the same entity with the same name on the
12  various diagrams?  And, second, do the navigation paths
13  represented by the business flow diagrams support all of
14  the key work flows that might be initiated from various
15  parts of the overall Suite 11i system?  And, third, do
16  the indices and links in the data model diagram support
17  the navigation paths shown in the business flow
18  diagrams, for example, so that the Suite 11i software
19  can navigate from the details of the customer to the
20  details of an order associated with that customer in
21  order carry out an order to cash work flow?"  That's in
22  paragraph 38.
23      In paragraph 39 you say or write, "Providing a
24  complete answer to these two questions for Oracle Suite
25  11i is a complex technical task."

226

1       Which two questions are you referring to
2   there?
3       A.   Sorry, that is a typographical error.  In an
4   earlier draft I had only identified two things in
5   paragraph 138.
6       So it should be "Providing a complete answer
7   to these three questions," apologize for that, the three
8   questions, first, second and third, that were identified
9   in the previous paragraph.
10      Q.   Okay.  All right, "And it requires intimate
11  knowledge of the business requirements for the various
12  Suite 11i components."
13      Did you develop an intimate knowledge of the
14  business requirements for the various Suite 11i
15  components?
16      A.   No.  As I went on to say in the next sentence,
17  that I had examined the data model diagrams for a
18  representative subset, et cetera.
19      Q.   Sure.
20      A.   But I did not acquire an intimate knowledge of
21  the business requirements for the various Suite 11i
22  components.
23      Q.   Which means that you cannot provide a complete
24  answer to the three questions that you posed in
25  paragraph 138?

227

1       A.   That's correct.  Because it would essentially
2   require reviewing the work from an architectural
3   perspective from some 4,000 people over two years.  So I
4   make no pretenses of that level of super-human
5   capability.  No, I did not.
6       Q.   You say that you examined the data model
7   diagrams for a representative subset of common data
8   entities.  Do you see that?
9       A.   Yes, I do.
10      Q.   How did you determine what subset would be
11  representative?
12      A.   By looking to see what data entities would be
13  used by or required by the business flow diagrams, as
14  illustrated in Figure 9.
15      So it was not just a random selection of data
16  entities, but the data entities that, as best I could
17  determine, would be accessed by or used by or updated by
18  the business flows of which Figure 9 is an example.
19      Q.   Did you ask any of the software developers at
20  Oracle what would be the best way to get a
21  representative subset --
22      MR. RAWLINSON:  Objection; vague.
23      MR. WILLIAMS:  Q.  -- of the common data
24  entities.
25      A.   I did not ask any individuals.  Instead, as

228

1   I've indicated on footnote 59 on the next page, I refer
2   to the baseline requirements document that documented 12
3   business flows, which are listed below.
4       Q.   Okay.
5       A.   One of which I think -- the second bullet
6   point of footnote 59 is the one that is shown in Figure
7   9 back on page 53.
8       Q.   But you only examined the model diagrams to
9   answer the first question, which you say is, "Do all of
10  the 11i components that interact with the common data
11  entity all refer to the same entity with the same name
12  on the various diagrams?"
13      MR. RAWLINSON:  Object to the form.  I'm not
14  sure I understand it.
15      THE WITNESS:  I'm trying to find -- are you
16  quoting something from one of these paragraphs?  If so,
17  I've missed it.
18      MR. WILLIAMS:  Q.  You write in paragraph
19  39 --
20      A.   139, okay.
21      Q.   "I have examined the data model diagrams for a
22  representative subset of common data entities (and to
23  address the first question identified immediately
24  above)" which is, "Do all of the 11i components that
25  interact with a common data entity all refer to the same

229

1   entity with the same name on various diagrams?"
2       A.   Yes.   Then that's followed by a statement that
3   I also examined the associated business flow diagrams so
4   that I could address the second and third question.
5       Q.   But I was just talking about the first
6   question.
7       A.   Okay.
8       Q.   So you were able to answer the first question
9   in your view at least by simply looking at what you
10  defined as a representative subset of diagrams?
11          MR. RAWLINSON:   Objection to form.
12          THE WITNESS:   That is correct, yes.
13          MR. WILLIAMS:   Q.   And that's it?
14      A.   Yes, representative set of business flow
15  diagrams and also representative set of the associated
16  or related data model diagrams, which are illustrated in
17  Figures 7 and 8.   That's correct.
18      Q.   And I might need a microscope to see this, on
19  the top of that page, top right-hand corner, it looks
20  like this was copyrighted 1999 -- yeah, it was
21  copyrighted 1999.
22      A.   I believe that's correct.
23      Q.   And one cannot determine, based on the review
24  of the representative subset that you looked at, whether
25  or not the software actually functioned in the way that

230

1   the diagrams you reviewed depicted?
2       A.   Could you either reread or repeat that
3   question?
4       Q.   One cannot determine, based on the review of
5   the representative subset that you looked at, whether or
6   not the software actually functioned in the way that the
7   diagrams you reviewed depicted?
8       A.   Not completely and not with precision, you are
9   absolutely right.   I could use this to see the
10  architecture and the design.   And then beyond that point
11  I had to look at actual implementations and reports from
12  customers to see whether it was operating as designed.
13      Q.   And you found customers using Suite 11i --
14  withdrawn.   You found evidence of customers that were
15  using Suite 11i, and that evidence demonstrated that the
16  software was functioning as depicted in the diagrams you
17  reviewed with respect to the first question you pose in
18  paragraph 138?
19          MR. RAWLINSON:   Objection to form.
20          THE WITNESS:   Yes, I found that in the
21  negative sense, i.e., I did not see evidence from
22  operational experience or customer reports indicating
23  that the -- that there was a failure to accomplish the
24  first question about common data elements -- common data
25  entities referring to the same entity.

231

1           MR. WILLIAMS:   Q.   So you concluded based on
2   failure to see evidence that, what, customers were
3   complaining that the software didn't work as depicted in
4   the diagram you -- diagrams you reviewed in a
5   representative subset form?
6           MR. RAWLINSON:   Objection to form.
7           THE WITNESS:   That's correct.   So I did not
8   see using the examples here that customers said, you
9   know, we expect to see a data entity called an order or
10  an employee, and we don't find any at all, or we find
11  there are two different versions that are different.   I
12  don't recall seeing that.
13          Had there been a few such instances, I would
14  have concluded that that was simply a bug.   If I found
15  many such instances or a complete absence of adherence
16  to these diagrams, then I would have drawn a different
17  conclusion.
18          MR. WILLIAMS:   Q.   What was the representative
19  subset that you reviewed for -- to help you answer
20  question one?
21      A.   The --
22      Q.   The diagrams.
23      A.   Yeah.   The diagrams that I reviewed were the
24  data model diagrams, as illustrated by Figure 7 and 8,
25  associated with the business flows as illustrated by

232

1   Figure 9, in turn associated with these 12 business
2   flows listed in the bullet point of footnote 59.
3       Q.   So how many diagrams did you review to allow
4   you to answer the question that you pose by the first
5   question in paragraph 138?
6       A.   As I recall, several dozen.   I don't recall
7   the precise number.
8       Q.   But you didn't -- did you cite them?   Did you
9   identify which ones you reviewed specifically to answer
10  question one?
11      A.   No, I did not.
12          MR. RAWLINSON:   Objection to form.
13          THE WITNESS:   I did not.
14          MR. WILLIAMS:   Q.   Is there anyone --
15  withdrawn.
16          Is there any way for me to go and find which
17  ones you reviewed in order to answer question one,
18  without your help?
19      A.   I don't think it requires my help.   But you
20  would need to go through the same kind of process that I
21  went through, with help perhaps from somebody.
22      Q.   I wouldn't be able to identify the very same
23  ones you did, would I -- I'm sorry.   Would I be able to
24  determine the very same diagrams that you used to answer
25  question number one?

233

1       A.   I believe you could.  Again, you might require
2   some technical assistance, either from me or others, and
3   you would start with the business flows in footnote 59,
4   from that you would retrieve the business flow diagrams,
5   similar to Figure 9, and from that identify the data
6   entities for which the data model diagrams shown or
7   illustrated in Figures 7 and 8 are available in
8   technical reference manuals that are readily available
9   documents that are listed in paragraph 130.
10      Q.   And I could -- 138 or 130?
11      A.   I think paragraph 130.
12      Q.   And I could accurately capture the very same
13  representative subset that you used?
14      A.   I believe you could, yes.  Again, perhaps with
15  technical assistance on your end.  But it certainly is
16  not something that I alone in the universe am capable of
17  doing.
18      Q.   Sure.  Is there a reason why you didn't just
19  cite to those, so that one could go and get those
20  diagrams that you used as the representative subset?
21      MR. RAWLINSON:  For the record, I think he's
22  saying he looked at all the diagrams with respect to
23  those identified functions.
24      THE WITNESS:  Is there an outstanding
25  question?

234

1       MR. RAWLINSON:  I'm just not sure you're not
2   talking past each other here.
3       Maybe there is a disagreement, but it seems to
4   me there is just a misunderstanding.
5       MR. WILLIAMS:  Q.  What I was asking, my last
6   question, is there a reason why you didn't just simply
7   cite to and rely on with exhibits the specific diagrams
8   that you used as your representative subset to answer
9   question number one posed in paragraph 138?
10      A.   There was no fundamental reason, other than my
11  feeling that the information that I provided would be
12  sufficient for anyone else with a technical background
13  to understand what I looked at and how I went about
14  finding it, and that to include all of the data model
15  diagrams, of which again there were several dozen, and
16  all of the business flow diagrams, of which there was a
17  dozen, would have extended the length of this already
18  ponderous document.
19      And since I felt it -- I provided an example
20  and kind of an indication of the source of information
21  for that example, that it would be relatively
22  straightforward for others to go through the same
23  exercise.
24      Q.   So you go on to say in paragraph 139, it's
25  kind of a long sentence, "I've examined the data model

235

1   diagrams for a representative subset of common data
2   entities, i.e., to address the first question identified
3   immediately above and associated business flows
4   diagrams, i.e., to address the second and third question
5   identified immediately above in both the ERP and CRM
6   components of the Suite 11i software -- of Suite 11i."
7   How long did that take?
8       A.   Several hours.  I don't recall precisely how
9   many.  But it was -- it was a time consuming process.
10      Q.   Would you say more than 15 hours?
11      A.   For just this one, or for the --
12      Q.   Basically talking about what you describe in
13  paragraph 139.
14      A.   Okay, what I described in paragraph 139 is not
15  just the individual examples illustrated with the
16  figures but a similar exercise that I went through for
17  approximately a dozen.  And, yes, that was more than 15
18  hours.  I don't recall how many more than that.
19      Q.   Forty?
20      A.   Quite possibly 40.  Somewhere in the range of
21  15 to 40.
22      Q.   Okay.  And in that review, you concluded that
23  the entire Suite 11i system is integrated, at least with
24  respect to its database and business work flows?
25      A.   Yes.

236

1       Q.   And that, you know, wasn't using the software
2   at all; right?
3       A.   I did not use the software; that's correct.
4       Q.   Not experiencing firsthand any of its
5   functionality; right?
6       A.   That's correct.  It says based on this review
7   that we've been talking about, yes.
8       Q.   Based on that review you said you were
9   confident that the entire Suite 11i suite is integrated.
10  Can you describe for me what it means to be integrated
11  with respect to database and business work flows?
12      A.   Those are two of the four different forms of
13  integration, that I think I mentioned there were two
14  others that I identified but did not discuss in detail.
15      Those are functional integration and user
16  interface integration.  I can't find that right away.
17      Q.   That's okay.  Is it fair to say you are not
18  offering an opinion as to whether or not Suite 11i was
19  integrated with respect to user interface integration
20  for functional integration?
21      A.   I have not offered such an opinion in this
22  report.  I can imagine offering such an opinion if asked
23  to or if instructed to by counsel through additional
24  review or investigation.
25      But since I did not see or at least I was not

237

1  aware of significant complaints from either plaintiffs
2  or from customers about functional integration or user
3  interface integration, I did not pursue that.
4      Q.  Did you understand statements by the company
5  that Suite 11i was integrated and interoperable to be
6  excluding functional integration or user interface
7  integration?
8      A.  No, I did not.  I did not do so.  But as I
9  explained in footnote 38 at the bottom of page 36, I
10  said that it had very limited relevance to systems
11  integration overall or the market's understanding of
12  whether an ERP was properly described as integrated, et
13  cetera.  And that as I understood the situation at the
14  time, that plaintiffs had not raised issues about those
15  two other aspects or dimensions of integration.
16      Q.  So you cannot -- you cannot provide an opinion
17  that Suite 11i was integrated?
18      MR. RAWLINSON:  Object to the form.
19      THE WITNESS:  I can provide and have provided
20  an opinion with what I understood to be the two most
21  important aspects of integration and the ones about
22  which the complaints were raised.
23      MR. WILLIAMS:  Q.  Isn't it fair to say that
24  you cannot provide an expert opinion as to whether or
25  not Suite 11i was integrated overall?

238

1      MR. RAWLINSON:  Objection to form.
2      THE WITNESS:  I don't believe so for the
3  reasons I've already stated.
4      MR. WILLIAMS:  Q.  You haven't evaluated it?
5      A.  I have not evaluated the functional
6  integration characteristics or capabilities of Suite 11i
7  or the user interface capabilities.
8      MR. WILLIAMS:  Could I take a short break?
9      VIDEOGRAPHER:  Off record at 5:50.
10      (Recess, 5:50 p.m. - 6:17 p.m.)
11      VIDEOGRAPHER:  On record at 6:17.
12      MR. WILLIAMS:  Q.  Do you know Randall Jensen?
13      A.  Yes, I do.
14      Q.  Have you met him before?
15      A.  I have several years ago, but I have.
16      Q.  And who is he?
17      A.  He is a software engineer, I believe the
18  author of a book and some papers in the software field.
19      Q.  Did you read his rebuttal report in this case?
20      A.  Yes, I did.
21      Q.  Did you disagree with his report or the
22  contents of it?
23      A.  In some respects I did, yes.
24      Q.  In what respects were those?
25      A.  I felt that his analysis or his criticisms of

239

1  my estimate of the size of Suite 11i was incorrect.  I
2  felt that he agreed that Suite 11i was very large, and
3  did not offer any disagreement with the estimate that I
4  quoted in my report about ERP systems like Suite 11i
5  being approximately 250,000 function points in size.
6  And I specifically disagreed with an interpretation that
7  he made of one paragraph of my report about urgent bugs
8  being implemented.  I believe it was in paragraph 34 of
9  my report, perhaps it was paragraph 84.
10      There was a paragraph in my report where I
11  said that a decision has to be made about whether to
12  implement patches and bug fixes -- here it is, it is
13  page 13 -- I'm sorry, page 14, paragraph 33, my
14  statement said, "The decision to install 'bug fixes'
15  typically requires careful analysis," et cetera, et
16  cetera, for the remainder of that paragraph.
17      And what I was describing in that paragraph
18  was the decision by customers as to whether or not they
19  would install patches or bug fixes was a decision that
20  required careful analysis.  I believe that the expert,
21  whose name I've now forgotten, at the end of the day --
22      Q.  Randy Jensen?
23      A.  Dr. Jensen interpreted that statement as being
24  the decision by a vendor, i.e., by a company like Oracle
25  to install bug fixes required a careful analysis, and

240

1  that's not what I was talking about at all.
2      Q.  So you're saying that he misinterpreted what
3  you wrote?
4      A.  I believe he did.  And from that drew a
5  conclusion that the 5,000 patches that have been
6  attributed to Oracle 11i were all urgent bugs that had
7  to be implemented.
8      Q.  So had you -- had his interpretation been the
9  correct interpretation, would his conclusion have been
10  correct?
11      A.  I don't believe it would have been, because he
12  used that to conclude that the 5,000 patches, first of
13  all, were all bugs, but equally importantly, that they
14  were priority one or very urgent bugs, and I don't
15  believe that conclusion.
16      Q.  I may have misstated my question.  If you had
17  written or if you intended what he interpreted your
18  comment to be, would his conclusion have been correct?
19      MR. RAWLINSON:  Objection to form, vague.
20      MR. WILLIAMS:  Q.  Do you understand that?
21  You said he misinterpreted what you said; right?
22      A.  Yes.
23      Q.  Based on his interpretation, were his
24  conclusions correct, in your view, based on his
25  interpretation?  Notwithstanding the fact that you

241

1  believe he misinterpreted what you said.  But was there
2  a failure in his analysis or conclusion, or was it
3  simply that he misinterpreted what you wrote?
4      MR. RAWLINSON:  Same objection; vague.
5      THE WITNESS:  I believe that his
6  misinterpretation led to a substantial assumption on his
7  part that changed his opinion, and -- or led to his
8  opinion that I disagreed with.  And if he had
9  interpreted this correctly, I think he would have been
10  using facts that simply were not true.
11      MR. WILLIAMS:  Q.  When you say if he had
12  interpreted it correctly, you mean if he had interpreted
13  it the way you meant it?
14      A.  No.  I meant that if, following your
15  hypothetical scenario, if his interpretation had somehow
16  been correct, if he had assumed that my paragraph about
17  installing bug fixes was something that was pertaining
18  to a vendor installing bug fixes within their base
19  product, that would have led him, as indeed it did lead
20  him, to assumptions that I think were completely
21  incorrect and could not be sustained within this case.
22      MR. WILLIAMS:  I have nothing further.
23      EXAMINATION BY MR. RAWLINSON
24      MR. RAWLINSON:  Q.  Mr. Yourdon, you indicated
25  earlier that you have not examined the user interface

242

1  integration or functional integration with respect to
2  11i; is that correct?
3      A.  That's correct, yeah.
4      Q.  Why did you feel you did not need to examine
5  that for purposes of reaching a conclusion with respect
6  to whether Oracle's statements about integration were
7  true or not?
8      A.  Because, as I explained in my report, in
9  general they are very minor aspects of integration for
10  ERP products, and also because as integration was used,
11  in my understanding, by Oracle in its various
12  representations, it included the two aspects of
13  integration that you measure, more fundamental aspects
14  of integration that I did discuss, that is data
15  integration and work flow integration.
16      Q.  Do you feel that your -- what you reviewed is
17  sufficient for you to opine on whether Oracle's -- the
18  challenged Oracle statements in this case in their use
19  of integration was true or false?
20      A.  Yes, I do, because I think Oracle's
21  representations about integration were based on data
22  integration and work flow integration.
23      MR. RAWLINSON:  No further questions.
24      FURTHER EXAMINATION BY MR. WILLIAMS
25      MR. WILLIAMS:  Q.  You cannot opine, can you,

243

1  as an expert, as to whether or not Suite 11i was
2  integrated overall?
3      MR. RAWLINSON:  Objection; vague.
4      THE WITNESS:  I believe I can opine as to
5  whether Suite 11i was integrated in -- with the meaning
6  or in the context that it was represented by Oracle.
7  Yes, I do.
8      MR. WILLIAMS:  Well, my question was -- well,
9  withdrawn.
10      I think the record is clear.  We're done.
11      VIDEOGRAPHER:  This marks the end of videotape
12  number four, in Volume I in the deposition of Edward
13  Yourdon.  The original videotapes will be retained by
14  LiveNote World Service.  We're going off the record.
15  The time on the monitor is 6:25.
16      (Discussion off the record.)
17      VIDEOGRAPHER:  On record at 6:27.
18      MR. RAWLINSON:  As discussed earlier today,
19  we've offered to plaintiff changes, some corrected
20  examples of Mr. Yourdon's report, primarily
21  typographical errors.  One changed footnote 29, which
22  changes a calculation, but not the fundamental analysis.
23  We want plaintiff to have these.  We offered this to
24  Mr. Williams before the deposition started.
25      Please attach them as the final exhibit to

244

1  Mr. Yourdon's report so they are on the record.
2      (Exhibit 2 marked for
3      identification.)
4      (Exhibit 3 marked for
5      identification.)
6      VIDEOGRAPHER:  This marks the end of tape four
7  at 6:28.  Going off the record.
8      (Whereupon, at 6:28 p.m. the deposition of
9  EDWARD YOURDON was adjourned.)
10
11      I declare under penalty of perjury that the
12  foregoing is true and correct.
13
14  Dated:_____  _____
                        EDWARD YOURDON
15
16
17
18
19
20
21
22
23
24
25

245

```
 1    STATE OF CALIFORNIA      )
 2                             )
 3    COUNTY OF ALAMEDA        )
 4          I, DIANA NOBRIGA, hereby certify that the
 5    witness in the foregoing deposition was by me duly sworn
 6    to testify to the truth, the whole truth, and nothing
 7    but the truth in the within-entitled cause; that said
 8    deposition was taken at the time and place therein
 9    stated; that the testimony of said witness was reported
10    by me, a Certified Shorthand Reporter and disinterested
11    person, and was thereafter transcribed into typewriting,
12    and that the pertinent provisions of the applicable code
13    or rules of civil procedure relating to the notification
14    of the witness and counsel for the parties hereto of the
15    availability of the original transcript of the
16    deposition for reading, correcting and signing have been
17    met.
18          And I further certify that I am not of counsel
19    or attorney for either or any of the parties to said
20    deposition, nor in any way interested in the outcome of
21    the cause named in said action.
22          DATED: _____
23
24          _____
25               DIANA  NOBRIGA, CSR NO. 7071
```

```
 1   STATE OF CALIFORNIA        )

 2                              )

 3   COUNTY OF ALAMEDA          )

 4            I, DIANA NOBRIGA, hereby certify that the

 5   witness in the foregoing deposition was by me duly sworn

 6   to testify to the truth, the whole truth, and nothing

 7   but the truth in the within-entitled cause; that said

 8   deposition was taken at the time and place therein

 9   stated; that the testimony of said witness was reported

10   by me, a Certified Shorthand Reporter and disinterested

11   person, and was thereafter transcribed into typewriting,

12   and that the pertinent provisions of the applicable code

13   or rules of civil procedure relating to the notification

14   of the witness and counsel for the parties hereto of the

15   availability of the original transcript of the

16   deposition for reading, correcting and signing have been

17   met.

18            And I further certify that I am not of counsel

19   or attorney for either or any of the parties to said

20   deposition, nor in any way interested in the outcome of

21   the cause named in said action.

22            DATED:  July 6, 2007

23

24            _____

25            DIANA  NOBRIGA, CSR NO. 7071
```

Exhibit 2

07:05am EST 10-Jan-01 Salomon Smith Barney (Gretchen Teagarden 212-816-8362)
ORCL: Oracle EVP Visit to SSB (Part 1 of 2)

SALOMON SMITH BARNEY

Oracle Corporation (ORCL)
ORCL: Oracle EVP Visit to SSB

2H (Outperform, High Risk)
Mkt Cap: $185,062.5 mil.

January 10, 2001

ENTERPRISE SOFTWARE/B2B
Gretchen Teagarden, CPA
212-816-8362
gretchen.teagarden@ssmb.com

SUMMARY
- Oracle EVP Sandy Sanderson visited our offices on Tuesday to address investor inquires about traction with the 11i E-Business Suite and 9i products and Oracle's view on the database and applications market in 2001.
- Oracle reiterates two key value propositions for its suite approach over best-of-breed: (1) The suite provides a single view of the customer across the enterprise and (2) The suite is pre-integrated and interoperable.
- Sanderson offered insight into Oracle's view of the competitive landscape.
- Oracle sees robust demand for both its database and applications business. Specifically, Sanderson noted demand for ERP is surprisingly robust while advanced planning and scheduling, CRM, and SCM products are also performing well. Oracle says it is also seeing sustained demand for its database product, despite industry-wide concern over contracting IT budgets.

FUNDAMENTALS
P/E (5/01E)                        60.6x
P/E (5/02E)                        50.8x
TEV/EBITDA (5/01E)                 39.9x
TEV/EBITDA (5/02E)                 33.0x
Book Value/Share (5/01E)           $1.10
Price/Book Value                   28.6x
Dividend/Yield (5/01E)             NA/NA
Revenue (5/01E)            $12,005.0 mil.
Proj. Long-Term EPS Growth         NA
ROE (5/01E)                        NA
Long-Term Debt to Capital(a)       10.5%
ORCL is in the S&P 500(R) Index.
(a) Data as of most recent quarter

SHARE DATA                    RECOMMENDATION
Price (1/9/01)        $31.50   Current Rating          2H
52-Week Range   $46.31-$22.31  Prior Rating            2H
Shares Outstanding(a) 5,875.0 mil.  Current Target Price  $33.00
Convertible              No    Previous Target Price   $33.00

EARNINGS PER SHARE
| FY ends | | 1Q | 2Q | 3Q | 4Q | Full Year |
|---|---|---|---|---|---|---|
| 5/00A | Actual | $0.04A | $0.07A | $0.13A | $0.15A | $0.38A |
| 5/01E | Current | $0.09A | $0.11A | $0.12E | $0.20E | $0.52E |
|  | Previous | $0.09A | $0.11A | $0.12E | $0.20E | $0.52E |
| 5/02E | Current | $0.09E | $0.13E | $0.15E | $0.25E | $0.62E |
|  | Previous | $0.09E | $0.13E | $0.15E | $0.25E | $0.62E |
| 5/03E | Current | NA | NA | NA | NA | NA |
|  | Previous | NA | NA | NA | NA | NA |

CA-ORCL 032543
ORACLE CONFIDENTIAL

NDCA-ORCL 035470

First Call Consensus EPS: 5/01E $0.51; 5/02E $0.62; 5/03E NA
Calendar Year EPS: 12/00E NA; 12/01E NA; 12/02E NA; 12/03E NA

ORALCE EVP VISIT TO SSB

Oracle EVP Sandy Sanderson visited our offices on Tuesday. Mr. Sanderson is responsible for Oracle Exchanges, Oracle Product Industries (OPI), Oracle Consulting, and the Latin America Division. The purpose of the event was to address investor inquires into the following issues:

* Traction with the 11i E-Business Suite and 9i products;

* Oracle's view on the strength of the database and applications market given the projected reduction in IT spending in 2001.

Suite vs. Best of Breed

To recap, Oracle's 11i E-Business Suite includes modules for traditional ERP (HR, financials), CRM (sales and marketing), e-procurement, supply chain management (SCM), and exchanges. Oracle reiterates two value propositions for the suite solution versus a "best-of-breed" approach:

* The suite provides a single view of the customer across the enterprise by incorporating a single data model.

* The suite is pre-integrated and fully interoperable out of the box, helping to lower consulting costs and time-to-value.

Sanderson quantified the second value proposition with a services-to-product ratio comparison: Instead of spending $4-$7 on consulting for every $1 spent on software as many industry leaders suggest is the norm, Oracle sees a 1:1 ratio internally. According to Sanderson, this reduction is a key component of the $1 billion Oracle purports to have saved by transitioning to a fully Web-enabled e-business and will contribute substantially to the second $1 billion the company expects to save.

Commentary on Competitive Landscape

Sanderson mentioned the following companies in the presentation:

* Siebel - Oracle anticipates Siebel will develop an e-business suite at some point.

* Commerce One - Oracle questions CMRC's revenue share model because they feel the blue-chip (consortia) e-marketplaces will not see material revenue in the near term.

* Ariba-i2 alliance - Oracle questions the viability of a best-of-breed amalgamation. ORCL attempted such an alliance with Manugistics and other vendors that proved unsuccessful.

* CMRC-SAP alliance - Oracle questions the ability to develop product efficiently under complicated economic arrangements.

* BEA Systems - Oracle believes it has a competitive advantage in the application server market with its enhanced caching functionality that resides on the application server.

Product Update

11i E-Business Suite Update. The company provided the following statistics

**CA-ORCL 032544**
ORACLE CONFIDENTIAL

regarding the status of the 11i E-Business Suite:

- 120 live customers, including Compaq (completed last week), Hallmark, RetailersMarketXchange (RMX), Pac-West, Agilera;

- 1,300 implementations in process, including BellSouth, Citibank, JDS Uniphase, HP;

- 3,500 copies of applications shipped - pipeline looks strong;

- Version 3 (R3) will be released this month (May was first release of 11i);

- 45% of the 110 application modules are new.

9i Application Server Update. Because of the recent (October 2000) release of the 9i Application Server, Oracle is unsure of its market share but is bullish on its prospects. While we have heard mixed reviews of the product, we believe functionality will improve with new releases. Additionally, the unique caching functionality is a differentiator, providing what Sanderson terms "industrial strength." In developing the cache functionality for the 9i release, Oracle copied best practices developed by the experiences of leading Internet-based companies, including eBay, Yahoo!, and Amazon.com, all of whom had developed cache expertise internally.

9i Database Update. Oracle expects the 9i database to be available in the first half of 2001.

Market Update

Oracle sees robust demand for both its database and applications business. Specifically, Sanderson noted demand for ERP is surprisingly robust while advanced planning and scheduling, CRM, and SCM products are also performing well. Oracle says it is also seeing sustained demand for its database product, despite industry-wide concern over contracting IT budgets. Sanderson noted two trends driving demand for databases is demand for the 11i applications that are typically bundled with the database as well as applications of other vendors that rely on the functionality of the Oracle database.

INVESTMENT THESIS

Oracle has leveraged its dominant position in the database market to take advantage of the new and growing market for e-business solutions. We believe that over the next few years, Oracle is going to try and leverage its presence in the database market and the power of the web to do to enterprise applications what Microsoft did to desktop applications - commoditize them by offering them for free as part of the platform. We believe that Oracle's recent launch of oraclesalesonline.com, through which Oracle is offering the sales force automation web-based service for free, is the beginning of a major paradigm shift not only at Oracle but across the entire software industry. Oracle's dominant position in the database market is a strong platform for dominating e-business applications. We believe the Web has the potential to drive a new IT architecture under which the database takes on a more active role in the application delivery. According to Dataquest, Oracle had 31% market share in the database market in 1999. We believe Oracle can quickly upsell the eBusiness Suite to its existing installed based of database customers. Additionally, Oracle has declared an aggressive strategy to increase its operating margins by 'Webifying' its internal operations. The company recently increased the original cost savings goal of $1 billion to $2 billion. By capitalizing on the Internet's inherently low-cost operating structure, Oracle plans to reduce operating expenses through web-based automation and headcount reduction.

CA-ORCL 032545
ORACLE CONFIDENTIAL

NDCA-ORCL 035472

Exhibit 3

**Release**

**Contact(s):**

Carol Sato                          Aimée Brainard
Oracle Corp.                        Applied Communications
650/ 633-5551                       415/365-0222
csato@us.oracle.com                 abrainard@appliedcom.com

# Oracle Ships 11i, Industry's First Integrated
# E-Business Suite

### Built-in Integration in Third-Generation Oracle Internet Applications Suite Completely Eliminates Largest Cost and Risk Factor Associated with Enterprise Application Implementations

**REDWOOD SHORES, Calif., May. 24, 2000** (http://www.oracle.com/tellmemore/?205874) Oracle Corp., the largest provider of software for e-Business, today announced immediate availability of the Oracle(R) E-Business Suite 11i, the industry's first fully-integrated e-Business applications suite. The entire E-Business Suite is available today, adding Customer Relationship Management (CRM) and Order Management components to the already available 11i financials, human resources, manufacturing, procurement, projects and supply chain offerings. Oracle E-Business Suite 11i provides out-of-the-box integration of e-Business applications throughout the extended enterprise from customers and partners to suppliers. This allows companies to completely automate their e-Businesses from web selling and marketing, all the way through to Internet supply chain and procurement.

Using other vendors' software, anyone trying to achieve the breadth of functionality offered by 11i would be forced to undertake expensive and risky custom integrations of several partial solutions such as Siebel, Ariba, Commerce One or SAP. These integration projects often cost in the tens or even hundreds of millions of dollars. With Oracle E-Business Suite 11i, all this integration expense and risk is avoided because the suite comes with out-of-the-box integration as well as robust functionality in each key business area. This integration not only eliminates cost and risk but also provides much better information with which to run a business. Key business processes become much simpler, for example, turning a sales quote into an order that updates available-to-promise totals in inventory. This tight integration is also necessary to achieve a complete view of the impact that customer-related activities have throughout the enterprise. The Oracle E-Business Suite also gives companies complete information about their customers because all parts of the suite share the same customer information.

As Oracle's third-generation 100 percent Internet applications solution, Oracle e-Business Suite 11i, leverages new Internet business practices that allow companies to put their customer interactions, internal operations and supply chains online. These new business practices have emerged as the key to e-Business success, allowing companies to leverage the Internet to expand their markets, retain and strengthen relationships with customers, and increase business efficiency. Additionally, the E-Business Suite, requires only a browser on the desktop and features an intuitive browser interface.

ORACLE CONFIDENTIAL

- more -

CA-ORCL 023030

NDCA-ORCL 026005

Today, Oracle is the only vendor to offer a fully integrated and comprehensive suite of e-Business applications. Specifically, Oracle E-Business Suite 11i, allows companies to:

- sell more at lower cost with integrated web store, telesales and field sales,
- raise customer satisfaction through integrated call center and web-based self-service,
- buy goods and services at lowest cost with Internet Procurement and electronic exchanges,
- lower inventory levels and speed fulfillment through Internet supply chain optimization,
- eliminate administrative costs with comprehensive self-service and
- reduce time to benefit and IT costs with an integrated suite

The Oracle E-Business Suite also supports global operations, multiple languages, multiple currencies and Internet business practices, all from a single global system. Customer interactions can be synchronized over the web, email, field and call center, enabling businesses to offer their customers greater flexibility -- and ultimately greater satisfaction -- in terms of how they communicate with the company. Truly global operations can be achieved through real-time business intelligence via a single, centralized information set. Additionally, companies can adopt Oracle E-Business Suite 11i in a matter of days rather than months, by deploying either the modular, integrated offerings, bundled solutions, or Oracle's hosting services.

"Today marks the end of the ERP era and the beginning of the e-Business era," said Ron Wohl, executive vice president, Oracle Applications Division. "When given the choice, any business would prefer e-Business applications that are already integrated rather than undertake the custom integration effort themselves. We are pleased to offer state-of-the-art e-Business practices throughout the entire suite, enabling each of our customers to improve their business operations extremely rapidly."

"As the Internet continues to revolutionize traditional business practices, companies are presented with new opportunities to manage their customers and partners, improving customer service while increasing company profitability," said Mark Barrenechea, senior vice president, CRM products division. "For example, because the Oracle E-Business Suite is the only one that combines tightly integrated ERP and CRM, Oracle can offer its customers the ability to manage key customer processes, such as 'campaign to order, order to cash,' - the ability to design and execute a marketing campaign, ship the order and collect payment, all from the same system. With the Oracle E-Business Suite, the sales process can be kept 100 percent electronic."

The Oracle E-Business Suite 11i, is available immediately either as a complete suite or on a standalone basis in key business areas. Key application modules have experienced significant customer acceptance as indicated by consistent growth over the past year. In Oracle's most recently announced quarter, Oracle Internet Procurement license sales have grown by 231 percent, while growth rates of Oracle's CRM products posted 179 percent growth.

About Oracle

ORACLE CONFIDENTIAL

- more -

CA-ORCL 023031

NDCA-ORCL 026006

Oracle Corporation provides the software that powers the Internet. For more information about Oracle, please call Oracle Public Relations at 650/506-4176.

###

Trademarks

Oracle is a registered trademark of Oracle Corporation. Other names may be trademarks of their respective owners.

**ORACLE CONFIDENTIAL**

**CA-ORCL 023032**