LATHAM & WATKINS LLP
    Peter A. Wald (SBN 85705)
505 Montgomery Street, Suite 2000
San Francisco, California 94111-2562
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
E-mail: peter.wald@lw.com

Attorneys for Defendants ORACLE CORPORATION,
LAWRENCE J. ELLISON, JEFFREY O. HENLEY, and
EDWARD J. SANDERSON

ORACLE CORPORATION
    Dorian Daley (SBN 129049)
    James C. Maroulis (SBN 208316)
500 Oracle Parkway
Mailstop 5OP7
Redwood Shores, California 94065
Telephone: (650) 506-5200
Facsimile: (650) 506-7114
E-mail: jim.maroulis@oracle.com

Attorneys for Defendant ORACLE CORPORATION

LATHAM & WATKINS LLP
    Patrick E. Gibbs  (SBN 183174)
140 Scott Drive
Menlo Park, California 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600
E-mail: patrick.gibbs@lw.com

LATHAM & WATKINS LLP
    Sean M. Berkowitz (*pro hac vice*)
233 South Wacker Drive, Suite 5800
Chicago, Illinois 60606
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
E-mail: sean.berkowitz@lw.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION

In re ORACLE CORPORATION
SECURITIES LITIGATION,

This Documents Relates To:

ALL ACTIONS

Master File No. C-01-0988 (SI) (Consolidated)

**DEFENDANTS' NOTICE OF MOTION AND REVISED MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION**

Honorable Judge Susan Illston

Date:  January 9, 2009
Time: 9:00 a.m.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1

# TABLE OF CONTENTS

2                                                                                                    **Page**

3    I.     INTRODUCTION ................................................................................................. 1

4    II.    FACTS AND CASE HISTORY ........................................................................... 5

5           A.     Oracle's Business ..................................................................................... 5

6           B.     Oracle's 3Q01 Public Financial Projections ........................................... 6

7                  1.     The December 14, 2000 Conference Call .................................... 6

8                  2.     Oracle's Forecasting Process ....................................................... 6

9                  3.     Oracle's Internal Forecast Data Fully Supported The 3Q01
                          Projections Announced On December 14, 2000............................ 8
10

11                 4.     Oracle's Internal Forecast Data Continued To Support
                          Defendants' Statements Through The End Of January 2001 ................... 9

12                 5.     Mr. Ellison Did Not Possess Adverse, Material Nonpublic
                          Information At The Time Of His January 2001 Stock Sales .................. 11
13

14                 6.     Oracle's Internal Forecast Data Continued To Support
                          Defendants' Statements Until The End Of February 2001 ..................... 12

15          C.     Oracle's Sales Force And Management Were Surprised By The
                   Miss........................................................................................................ 14
16

17          D.     Oracle's Pre-Announcement On March 1, 2001...................................... 16

18          E.     After Reviewing the Same Internal Oracle Forecasting Data, The
                   Delaware Chancery Court Found No Rational Basis to Conclude
                   That Either Mr. Ellison Or Mr. Henley Possessed Material, Non-
19                 Public Information At The Time Of Their Stock Sales ........................... 17

20          F.     Procedural History Of The Ninth Circuit Appeal In This Case............... 19

21   III.   LEGAL STANDARD........................................................................................... 20

22   IV.    THE COURT'S SEPTEMBER 2, 2008 ADVERSE INFERENCE ORDER................... 21

23          A.     Adverse Inference Sanctions Must Be "Narrowly Tailored" to Cure
                   Demonstrated Harm to Plaintiffs .......................................................... 21
24

25          B.     Any Adverse Inference Should Be Limited To Mr. Ellison's
                   Knowledge Of Whatever Facts Plaintiffs Are Able To Prove, And
                   Not Be Used To Establish The Underlying Facts Themselves............................ 22
26

27   V.     PLAINTIFFS' SECTION 10(B) CLAIM FAILS: NO FALSE
            STATEMENTS.................................................................................................... 24

28          A.     Claims Regarding Oracle's 3Q01 Projections And Statements

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

During the Quarter About The Economy's Impact On Oracle's Ability To Achieve Those Projections ................................................................ 24

1.   Oracle's 3Q01 Projections ........................................................ 24

   a.   Oracle's December 14, 2000 Projections Were Accompanied By Meaningful Cautionary Statements ............................................................. 25

   b.   Plaintiffs Cannot Show Defendants Had "Actual Knowledge" That The December 14, 2000 Projections Could Not Be Achieved ......................... 27

   c.   Oracle Had A Reasonable Basis For The December 14, 2000 Projections When Made ................................. 27

2.   Statements During The Quarter About Oracle's 3Q01 Projections And The Economy's Impact On Oracle's Ability To Achieve Those Projections .................................... 28

   a.   Defendants' Post-December 14 Statements Reaffirming Guidance and Discussing the Economy's Impact on Oracle's Ability to Meet That Guidance Were Forward-Looking ............................. 29

   b.   These Statements Are Immune Under the Safe Harbor Because Plaintiffs Cannot Prove "Actual Knowledge" of Falsity ............................................. 30

   c.   Even Without the Safe Harbor, Plaintiffs Cannot Prove Falsity Under *Adobe* ...................................... 31

   d.   Even If These Statements Were Not Forward-Looking, Plaintiffs Cannot Prove They Were False When Made ................................................................ 32

B.   Claims Regarding Suite 11i .............................................................. 32

   1.   Oracle's Development And Release Of Suite 11i ................................... 33

   2.   Defendants' Statements About Suite 11i ............................................ 34

   3.   Plaintiffs' "Quality" Evidence Does Not Prove Falsity ........................ 34

C.   Claims Regarding Oracle's 2Q01 Financial Results ........................................ 36

   1.   Plaintiffs Cannot Prove Falsity ...................................................... 37

   2.   Plaintiffs Cannot Prove Scienter .................................................... 39

VI.   PLAINTIFFS' SECTION 10(B) CLAIM FAILS: NO LOSS CAUSATION ................... 40

A.   Oracle's 3Q01 Earnings Miss Was Caused By A Sudden, Unexpected And Industry-Wide Downturn ........................................ 41

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

B.     There Is No Evidence That The March 2 Stock Drop Was Caused By Disclosure of The "Relevant Truth" ................................................ 42

       1.     There Was No Direct Disclosure That Defendants' Statements Were False ........................................................... 43

       2.     Plaintiffs Have Failed to Prove An "Indirect" Disclosure That Defendants' Statements Were False ................................. 45

C.     The Ninth Circuit's *Gilead* Opinion Is Consistent With This Analysis ....................................................................................... 48

VII.  PLAINTIFFS' SECTION 20A CLAIMS FAIL ................................................. 49

VIII. CONCLUSION ................................................................................................. 50

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Acito v. IMCERA Group., Inc.*,
   47 F.3d 47 (2nd Cir. 1995) ........................................................................................... 49

*Akiona v. United States*,
   938 F.2d 158 (9th Cir. 1991) ........................................................................................ 22

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1996).......................................................................................................20

*Byrnie v. Town of Cromwell, Bd. of Edu.*,
   243 F.3d 93 (2d Cir. 2001)............................................................................................20

*Carpe v. Aquila, Inc.*,
   No. 02-0388-CV-W-FJG, 2005 WL 1138833, (W.D. Mo. Mar. 23, 2005)......................... 40

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)........................................................................................................49

*Commodity Futures Trading Com'n v. Wilshire Inv. Mgmt. Corp.*,
   407 F. Supp. 2d 1304 (S.D. Fla. 2005) ................................................................... 36

*Daubert v. Merrill Dow Pharms., Inc.*,
   509 U.S. 579 (1993)........................................................................................................45

*Dura Pharmaceuticals, Inc. v. Broudo*,
   544 U.S. 336 (2005).............................................................................. 40, 42, 43, 44

*Emplrs. Teamsters Local Nos. 175 & 505 Pension Trust Fund v. The Clorox Co.*,
   353 F.3d 1125, 1131 (9th Cir. 2004) .................................................. 14, 25, 26, 27

*Gordon Partners v. Blumenthal*,
   No. 02 Civ. 7377, 2007 WL 1438753  (S.D.N.Y. May 16, 2007), *aff'd*, 2008
   WL 4376259 (2nd Cir. Sep. 24, 2008).......................................................... 20, 40, 49

*Gordon Partners v. Blumenthal*,
    No. 02 Civ. 7377, 2007 WL 431864 (S.D.N.Y. Feb. 9, 2007) ........................................ 20

*Hamilton v. Signature Flight Support Corp.*,
   No. C 05-0490 CW (MEJ), 2005 U.S. Dist. LEXIS 40088 (N.D. Cal. Dec. 20,
   2005) ................................................................................................................................ 22

*Harris v. Ivax Corp.*,
   182 F.3d 799 (11th Cir. 1999) ...................................................................................... 30

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

*Hodge v. Wal-Mart Stores, Inc.*,
   360 F.3d 446 (4th Cir. 2004) ........................................................................... 22

*Howard v. Everex Sys., Inc.*,
   228 F.3d 1057 (9th Cir. 2000) ........................................................................ 39

*In re Adobe Sys., Inc. Sec. Litig.*,
   787 F. Supp. 912 (N.D. Cal. 1992) ..........................................................passim

*In re Advanta Corp. Sec. Litig.*,
   180 F.3d 525 (3d Cir. 1999)............................................................................ 49

*In re Anchor Gaming Litig.*,
   33 F. Supp. 2d 889 (D. Nev. 1999) ................................................................ 39

*In re Apple Computer Sec. Litig.*,
   886 F.2d 1109 (9th Cir. 1989) ................................................................. 45, 49

*In re BP Prudhoe Bay Royalty Trust Sec. Litig.*,
   No. C06-1505 MJP, 2007 WL 3171435 (W.D. Wash. Oct. 26, 2007)............... 27

*In re Broadcom Co. Sec. Litig.*,
   No. SA CV 01-275-GLT MLGX, 2004 WL 3390052 (C.D. Cal. Nov. 23,
   2004) ........................................................................................................ 25, 27

*In re Connectics Corp. Sec. Litig.*,
   542 F. Supp. 2d 996 (N.D. Cal. 2008) ...................................................... 5, 49

*In re Convergent Techs. Second Half 1984 Sec. Litig.*,
   No. C-85-20130-SW, 1990 WL 606271 (N.D. Cal. Jan. 10, 1990) .................... 39

*In re Daou Sys., Inc. Sec. Litig.*,
   411 F.3d 1006 (9th Cir. 2005) ........................................................................ 43

*In re Gilead Sciences Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ........................................................................ 48

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
   131 F. Supp. 2d 680 (E.D. Pa. 2001) ....................................................... 40, 43

*In re Impac Mortg. Holdings, Inc. Sec. Litig,*,
   554 F. Supp. 2d 1083 (C.D. Cal. 2008) ......................................................... 43

*In re Imperial Credit Indust.*,
   252 F. Supp. 2d 1005 (C.D. Cal. 2003) ......................................................... 40

*In re Intershop Communs. AG Sec. Litig.*,
   No. C 01-20333 JW, 2003 U.S. Dist. LEXIS 26923 (N.D. Cal. Jul. 23, 2003).................... 39

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

v

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

*In re JDS Uniphase Corp. Sec. Litig.*,
   No. C 02-1486 CW, 2007 WL 2429593 (N.D. Cal. Aug. 24, 2007) ..................................27

*In re LeapFrog Enters., Inc. Sec. Litig.*,
   527 F. Supp. 2d 1033 (N.D. Cal. 2007) ....................................................................31

*In re Napster, Inc. Copyright Litig.*,
   462 F. Supp. 2d 1060 (N.D. Cal. 2006) ....................................................................21

*In re Omnicom Group, Inc. Sec. Litig.*,
   541 F. Supp. 2d 546 (S.D.N.Y. 2008)..............................................................40, 43, 45

*In re Oracle Corp. Deriv. Litig.*,
   867 A.2d 904 (Del. Ch. 2004)..............................................................................passim

*In re Oracle Corp. Secs. Litig.*,
   No. C01-00988 MJJ, 2006 U.S. Dist. LEXIS 94470 (N.D. Cal. Dec. 20, 2006) ...............43

*In re Stratosphere Sec. Litig.*,
   66 F. Supp. 2d 1182 (D. Nev. 1999)....................................................................37, 39

*In re Tibco Software, Inc. Sec. Litig.*,
   No. C 05-2146 SBA, 2006 WL 1469654 (N.D. Cal. May 25, 2006) ..................................25

*In re VeriFone Sec. Litig.*,
   784 F. Supp. 1471 (N.D. Cal. 1992) ......................................................................28

*In re Williams Sec. Litig.*,
   496 F. Supp. 2d 1195 (N.D. Okla. 2007)..................................................................40

*In re Zonagen Sec. Litig.*,
   322 F. Supp. 2d 764 (S.D. Tex. 2003) ....................................................................40

*Johnson v. Aljian*,
   490 F.3d 778 (9th Cir. 2007) ..........................................................................5, 49

*Keithley v. The Home Store.com, Inc.*,
   No. C-03-04447 (EDL), 2008 U.S. Dist. LEXIS 61741 (N.D. Cal. Aug. 12,
   2008) ..................................................................................................21

*Kowal v. MCI Commcn's Corp.*,
   16 F.3d 1271 (D.C. Cir. 1994)............................................................................28

*Kronish v. United States*,
   150 F.3d 112 (2d Cir. 1998)..............................................................................20

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005)..........................................................................43, 46

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

vi

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

*Lewis v. Telephone Empl. Credit Union*,
    87 F.3d 1537 (9th Cir. 1996) ........................................................................ 21, 22

*Matthews v. Centex Telemanagement, Inc.*,
    No. C-92-1837-CAL, 1994 U.S. Dist. LEXIS 7895 (N.D. Cal. Jun. 9, 1994) ................... 39

*McCabe v. Ernst & Young, LLP*,
    494 F.3d 418 (3d Cir. 2007)................................................................................. 40

*McKowan Lowe & Co., Ltd. v. Jasmine, Ltd*,
    No. 94-5522 (RBK), 2005 U.S. Dist. LEXIS 32164 (D. N.J. 2005) ................ 40, 43, 45, 46

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d  1049 (9th Cir. 2008) ...................................................................... passim

*Nordstrom, Inc. v. Chubb & Son, Inc.*,
    54 F.3d 1424 (9th Cir. 1995) .............................................................................. 31

*Nursing Home Pension Fund v. Oracle Corp.*,
    242 F. Supp. 2d 671 (N.D. Cal. 2002) ................................................................. 30

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ....................................................................... 19, 49

*Olson v. Ford Motor Co.*,
    410 F. Supp. 2d 855 (D.N.D. 2006)...................................................................... 36

*Paracor Fin. Corp. v. General Electric Cap. Corp.*,
    96 F.3d 1151 (9th Cir. 1996) .............................................................................. 49

*Raskin v. Wyatt Co.*,
    125 F.3d 55 (2d Cir. 1997).................................................................................. 45

*Ray v. Citigroup Global Markets, Inc.*,
    482 F.3d 991 (7th Cir. 2007) .............................................................................. 46

*Recr. Devel. of Phoenix, Inc. v. City of Phoenix*,
    220 F.Supp.2d 1054 (D. Ariz. 2002) .................................................................... 36

*Robbins v. Kroger Properties, Inc.*,
    116 F.3d 1441 (11th Cir. 1997) .......................................................................... 43

*Rotella v. Wood*,
    528 U.S. 549 (2000).......................................................................................... 20

*Ryan v. Flowserve*,
    245 F.R.D. 560 (N.D. Tex. 2007) .................................................................. passim

*Schmid v. Milwaukee Electric Tool Corp.*,
    13 F.3d 76 (3d Cir. 1994) .................................................................................. 21

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

vii

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

*SEC v. Todd,*
   No. 03CV2230 BEN, 2007 U.S. Dist. LEXIS 38985 (S.D. Cal. May 30, 2007) ................ 39

*Shaw v. Digital Equip. Corp.,*
   82 F.3d 1194 (1st Cir. 1996) .................................................................................. 10, 31, 50

*Skeete v. McKinsey & Co.,*
   No. 91 Civ. 8093 (PKL), 1993 U.S. Dist. LEXIS 9099 (S.D.N.Y. July 7,
   1993) ............................................................................................................................... 22

*Tuchman v. DSC Communications Corp.,*
   818 F. Supp. 971 (N.D. Tex. 1993) ................................................................................ 47

*Turner v. Hudson Transit Lines, Inc.,*
   142 F.R.D. 68 (S.D.N.Y. 1991) ....................................................................................... 22

*Wyle v. R.J. Reynolds Industries, Inc.,*
   709 F.2d 585 (9th Cir. 1983) ........................................................................................... 21

*Zubulake v. UBS Warburg LLC,*
   229 F.R.D. 422 (S.D.N.Y. 2004) ............................................................................... 22, 23

**STATUTES**

15 U.S.C. § 78u-4(b)(4) ...................................................................................................... 40

15 U.S.C. § 78u-5(c) ............................................................................................................. 2

15 U.S.C. § 78u-5(c)(1)(A) ................................................................................................. 25

15 U.S.C. § 78u-5(c)(1)(B) ........................................................................................... 25, 27

15 U.S.C. § 78u-5(i)(1)(A) ............................................................................................... 2, 24

15 U.S.C. § 78u-5(i)(1)(C) .................................................................................................. 29

15 U.S.C. § 78u-5(i)(1)(D) .................................................................................................. 29

28 U.S.C. § 1658 ................................................................................................................. 37

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

viii

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

PLEASE TAKE NOTICE that on January 9, 2009, at 9:00 a.m., Defendants will and hereby do move for summary judgment under Federal Rule of Civil Procedure 56(c).  In the alternative, Defendants move for summary adjudication that certain facts are not in dispute under Federal Rule of Civil Procedure 56(d).

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

On March 1, 2001, Oracle announced that it missed the 3Q01 guidance made public on December 14, 2000.  In so doing, Oracle explained that a large number of deals had been unexpectedly canceled or delayed in the last few days of the quarter—a period during which Oracle typically generates roughly half of its new software licensing revenue for the quarter. After Oracle's announcement, market analysts concluded that the enterprise software industry had entered a sudden and unexpected downturn due to growing customer concerns about the economy.  Consistent with that conclusion, following the March 1 announcement the stock prices of Oracle's industry competitors all declined, and those competitors all went on to lower or miss their own guidance.  Although no one knew it at the time, the National Bureau of Economic Research ("NBER") concluded in November 2001 that the United States had entered into a recession beginning March 2001.

Oracle's 3Q01 miss came as a complete surprise to management.  Until the very last days of the quarter, Oracle's historically conservative internal forecasting process—which generated projections that Oracle had met or exceeded for seven straight quarters—indicated that Oracle was on track to meet guidance.  The evidence on this is overwhelming: in granting summary judgment to defendants in a derivative case based on the same facts, the Delaware Chancery Court found that: "no rational person could infer from this record that Oracle could have or did predict this seismic shift in its quarterly fortunes. … The Oracle sales units didn't see it coming. And there is no evidence that Henley or Ellison saw it coming."  *In re Oracle Corp. Deriv. Litig.*, 867 A.2d 904, 951-52 (Del. Ch. 2004).

Confronted with the very same internal forecasting and other data considered by Vice

Chancellor Strine in 2004, Plaintiffs have spent the past four years trying to come up with a new story, but the fundamental factual claims remain the same.  Plaintiffs allege that beginning on December 14, 2000 and continuing into February 2001, Oracle and its senior executives made false statements about (1) Oracle's 3Q01 projections and the effect of the economy on Oracle's ability to meet those projections, (2) Oracle's Suite 11i products, and (3) Oracle's 2Q01 financial results.  Plaintiffs assert a claim against all Defendants under Section 10(b) of the Securities Exchange Act of 1934 (and a claim against Ellison and Henley for control person liability under Section 20(a) of the 1934 Act).  Plaintiffs also assert claims against Ellison and Henley under Section 20A of the 1934 Act.  Yet each claim should be dismissed under Fed. R. Civ. P. 56 because Plaintiffs cannot prove one or more element of their claims.

Plaintiffs' Section 10(b) claim begins with Oracle's December 14 projections, which are forward-looking statements protected by the Safe Harbor.  15 U.S.C. § 78u-5(i)(1)(A).  Oracle's December 14 projections are immune from liability because (i) they were accompanied by meaningful cautionary language, and (ii) there is not a shred of evidence that Defendants had "actual knowledge" of Oracle's inability to achieve those projections until the very end of the quarter.  15 U.S.C. § 78u-5(c).  Plaintiffs also cannot prove that Oracle's December 14 projections were false because they cannot show that those projections lacked a reasonable basis when made, or that Defendants were aware of "undisclosed facts tending seriously to undermine" them.  *In re Adobe Sys., Inc. Sec. Litig.*, 787 F. Supp. 912, 919 (N.D. Cal. 1992).

Plaintiffs also wrongly assert that after December 14, Defendants made a series of false statements about Oracle's guidance, including statements that the deteriorating economy did not appear to be negatively impacting Oracle's business and its ability to meet that guidance.  Yet statements that Oracle was "on track" to meet the guidance previously announced, despite current economic conditions (*see* RSAC ¶¶ 9, 12, 45, 47) would only be material if they affect Oracle's ability to achieve its guidance.  Thus, Defendants' post-December 14 statements about Oracle's guidance and the economy's effect on Oracle's ability to meet that guidance are forward-looking and protected by the Safe Harbor.  Though not, for the most part, accompanied by cautionary language, these later statements are immune under the Safe Harbor because

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1    Plaintiffs cannot prove that they were made with actual knowledge of falsity.  Moreover, these

2    statements were true because Oracle's internal forecasting, pipeline, and actual sales data all

3    supported guidance until the very end of the quarter.  After analyzing the internal data available

4    at Oracle in 3Q01, Vice Chancellor Strine concluded that "no rational person" could infer from

5    the record that Oracle could have or did predict" the miss.  *Oracle Deriv.*, 867 A.2d at 951-52.

6            Plaintiffs also have failed to show that Defendants' statements concerning Suite 11i were

7    false.  Having told the Ninth Circuit that these statements were demonstrably false because

8    Plaintiffs could point to specific, identifiable licensing deals that Oracle lost early in the quarter

9    because of problems with Suite 11i, Plaintiffs failed to come forward with *any* evidence—zero—

10   that Oracle lost a single deal during 3Q01 due to such problems.  Their inability to do so is a

11   complete answer to the claim that Oracle "lied" to the market about Suite 11i—a set of products

12   that generated almost $1 billion in licensing revenues during Oracle's 2001 fiscal year.

13           Lacking any evidence that Suite 11i problems had any part in Oracle's miss, Plaintiffs are

14   left with a hollow attack on Suite 11i's overall "quality."  But Plaintiffs' "quality" evidence does

15   not prove that Defendants' statements about Suite 11i were false.  First, the statements

16   challenged in Plaintiffs' complaint did not speak to the "quality" of Suite 11i at all—they spoke

17   to its "design" and "engineering."  Defendants told the market that, unlike competing "best of

18   breed" products from different vendors, the components of Suite 11i were "pre-integrated" with

19   one another.  Plaintiffs do not dispute this fundamental fact, and their transposed attack on Suite

20   11i's "quality" is irrelevant to the claims they have actually advanced.  Second, even on its own

21   terms, Plaintiffs' "quality" claim fails; it is largely premised on hearsay accounts of customer

22   complaints.  Remarkably, the anecdotal evidence that Plaintiffs repeatedly quote does not come

23   from customers who decided against buying Suite 11i, but rather, it comes from customers who

24   *did purchase* the product but were having difficulty implementing it.  Moreover, even Plaintiffs'

25   own expert concedes that these complaints prove nothing about Suite 11i's overall quality.

26           Finally, Plaintiffs cannot prove their accounting claim as to Oracle's 2Q01 results.

27   Having survived a pleadings challenge by alleging that Oracle manufactured "more than $228

28   million" worth of revenue on November 17, 2000, Plaintiffs have entirely abandoned that claim,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1   and their accounting expert denied it was even an issue in the case.  Instead, Plaintiffs now assert

2   two new 2Q01 accounting claims: (i) a claim that Oracle improperly transferred $20 million to a

3   bad debt reserve account in 2Q01, and (ii) a claim that Oracle improperly recognized $20 million

4   in revenue on a single software license agreement with HP.  These amounts were immaterial to

5   Oracle's 2Q01 financial statements, which reflected over two billion dollars in revenue.  More

6   fundamentally, however, there is no evidence to support these claims.  As to the bad debt transfer

7   allegations, Plaintiffs' expert cannot offer evidence about their propriety because he admittedly

8   performed no analysis to determine whether *any* of them were proper or could be recognized as

9   revenue in 2Q01.  Nor is he able to support Plaintiffs' claim regarding the HP deal because he

10  did not review the relevant records and has never applied the accounting literature that governed

11  this transaction.  Plaintiffs' 2Q01 accounting claim also fails because there is no evidence that

12  any of Oracle's senior executives were even aware of the bad debt transfers, or that they had

13  reason to believe the HP revenue could not be recognized.  Indeed, recognition of that revenue

14  had been reviewed by Oracle's revenue recognition group, outside auditor, and audit committee.

15          Independently, Plaintiffs' Section 10(b) claim fails because Plaintiffs cannot establish

16  loss causation.  To do so, Plaintiffs must show that Oracle's stock price dropped when the market

17  learned the "relevant truth"—that is, a "truth" that Defendants had concealed from the market

18  through their alleged false statements.  Plaintiffs may do so either by showing that the "relevant

19  truth" was revealed directly, through a disclosure of facts that had been previously concealed, or

20  indirectly, through a disclosure that the market understood to reveal the previously concealed

21  facts.  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008)

22  (loss causation requires showing that "the market became aware of, and the resulting stock drop

23  resulted from, fraud"); *Ryan v. Flowserve*, 245 F.R.D. 560, 579 (N.D. Tex. 2007) ("When fraud

24  is revealed through indirect disclosure, plaintiffs must provide proof that the market recognized a

25  relationship between the event disclosed and the fraud to establish loss causation.").

26          Here, Oracle's March 1, 2001 announcement did not directly disclose the "truth" that

27  Plaintiffs claim Defendants concealed.  Oracle did not disclose that problems with Suite 11i had

28  caused the earnings miss, nor did Oracle mention any accounting issues relating to 2Q01.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1    Likewise, Oracle never disclosed that it lacked a reasonable basis for its 3Q01 projections or was

2    aware of facts that seriously undermined them, or that the economy had been hurting its business

3    throughout 3Q01.  On the contrary, the direct disclosure that Oracle made to the market on

4    March 1 was that Oracle missed its guidance because of a sudden drop in customer demand.

5         There is no evidence, moreover, that the March 1 announcement revealed the "relevant

6    truth" indirectly, because there is no evidence that the market recognized a relationship between

7    the miss and what Plaintiffs claim is the "relevant truth."  Rather, analysts uniformly concluded

8    that Oracle's miss heralded a sudden downturn in the enterprise applications industry, one that

9    only became apparent in the last days of Oracle's 3Q01 and one that affected all industry players.

10   As the stock prices of Oracle's competitors declined following Oracle's March 1 announcement,

11   and as those competitors lowered or missed their own guidance, it became increasingly clear that

12   the analysts were correct and that Oracle's miss was part of an industry-wide downturn.

13        Finally, Ellison and Henley are entitled to summary judgment on Plaintiffs' Section 20A

14   claim because Plaintiffs' Section 10(b) claim is an essential predicate for it.  These claims also

15   fail because, as the Delaware Court found, neither defendant possessed material non-public

16   information at the time he sold stock.

17        In sum, there was no fraud at Oracle.  With the benefit of hindsight and years' worth of

18   discovery, Plaintiffs have tried to prove that Oracle and its executives inflated Oracle's stock

19   price through fraud, and that Oracle's stock price dropped when the truth emerged.  But

20   Plaintiffs' allegations do not square with the facts.  Defendants are entitled to judgment as a

21   matter of law on each of Plaintiffs' claims.

22   **II.    FACTS AND CASE HISTORY**[1]

23        **A.    Oracle's Business**

24        Oracle is the world's second largest software company.  Its principal business is the

25   ───────────────

26   [1] All Exhibits cited herein are true and correct copies of exhibits attached to the Guner (Exs. 1-28) (Dkt. No. 1184), Bicho (Exs. 29-40) (Dkt. No. 1186), Deal (Exs. 42-43) (Dkt. No. 1188), Anthony (Exs. 44-53) (Dkt. No. 1192), Harrison (Exs. 41, 51, 54-245) (Dkt. No. 1193), Coyle (Exs. 251-322, Ex. 362) (Dkt. No. 1225), Busby (Exs. 323-361) (Dkt. No. 1237), and Tate (Exs. 363-393) (Dkt.No. 1243) declarations, and the *concurrently-filed* Fortney (Exs. 394-429), O'Bryan (Exs. 1-2), James (Exs. 1-2), and Yourdon (Exs. 1-2) declarations.

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1   creation, licensing and maintenance of "systems" and "applications" software to businesses and

2   other organizations.  Database software was Oracle's first major software business and,

3   historically, has been its largest source of software revenue.  During Oracle's 2001 fiscal year

4   (June 1, 2000 through May 31, 2001), Oracle recognized $3.562 billion in database license

5   revenues and $1.022 billion in applications revenues.  Ex. 54 at 143967.

6   **B.      Oracle's 3Q01 Public Financial Projections**

7   **1.      The December 14, 2000 Conference Call**

8        Plaintiffs' Class Period begins on December 14, 2000, when on a conference call with

9   analysts and in a press release, Oracle announced its financial results for 2Q01 (ended November

10  30, 2000) and offered guidance for 3Q01.  Ex. 56. at 03216-22.  For 2Q01, Oracle reported

11  earnings per share ("EPS") of 11 cents, and $2.7 billion in revenue.  Compared to the same

12  period a year earlier, database sales grew 19% (to $775 million), and applications sales grew

13  66% (to $279 million).  Ex. 29 at 296295.  For 3Q01, Oracle projected EPS of 12 cents per share

14  and software license growth of 25% over 3Q00, including 15-20% growth in database revenues

15  and 75% growth in applications revenues.  Ex. 56 at 003221-22.  During the call, CFO Jeff

16  Henley noted that the United States economy was "slowing down" but said: "At this point, we

17  see no impact or slowing in our business."  Ex. 56 at 003218.  Indeed, days before the December

18  14 call, Oracle had closed the largest software license deal in its history—a $60 million software

19  license to a single customer.  Ex. 57 at 74:17-25; Ex. 58 at 025791.  But Henley made clear that a

20  deterioration of economic conditions could impact Oracle's business.  Ex. 56 at 003218.

21  **2.      Oracle's Forecasting Process**

22       The guidance announced on December 14 was based on a bottoms-up forecasting process

23  that Oracle had been using for years.  The process began with sales representatives entering

24  opportunities into a database.  Ex. 59 at 75:9-23.  The sum of all sales opportunities with the

25  potential to close in a quarter was referred to as the "pipeline." Ex. 60 at 93:4-94:6; Ex. 61 at

26  127:15-128:4; Ex. 62 at 46:11-17.  Based on an evaluation of specific opportunities in the

27  pipeline and a determination of which sales were likely to close within the quarter (and for how

28  much), each sales representative submitted a forecast to his or her manager.  Ex. 63 at 351:21-

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

352:12, 565:20-567:7.  Managers, in turn, would submit a forecast to their own supervisors, aggregating their sales representatives' forecasts and adjusting the sum of those forecasts based on the manager's own judgment—informed by the manager's knowledge of each sales representative's forecasting tendencies (as well as frequent and pointed discussions with them), and often through direct contact with potential customers.  *Id.*; Ex. 60 at 120:25-121:13.  Sales representatives and managers viewed their forecasts as commitments to their supervisors and to the Company.  Ex. 61 at 80:5-14, 89:12-19.

This process was repeated up through the heads of the various business units.  Ex. 64 at 96:4-12; Ex. 65 at 102:6-103:9; Ex. 60 at 80:3-18; Ex. 66 at 250:24-251:22, 255:15-257:8; Ex. 62 at 28:9-31:7.  For software licensing in North America, those business units were North American Sales ("NAS"), Oracle Product Industries ("OPI"), and Oracle Services Industries ("OSI").  *See, e.g.*, Ex. 1 at 213091.  The Executive Vice President in charge of each business unit (Edward "Sandy" Sanderson for OPI; Jay Nussbaum for OSI; and George Roberts for NAS) would determine the forecast for that unit after consulting with finance personnel and considering the feedback received through the consolidation process.  Ex. 67 at 251:21-253:16, 256:12-257:21.  Forecasts for the various business units were consolidated by Oracle's finance department.  Ex. 65 at 102:6-103:9.

Jennifer Minton, Oracle's Senior Vice President of Global Finance and Operations, then applied an additional layer of judgment onto the forecasts received from the business units.  *Id.* at 121:24-124:18, 136:4-137:2, 155:4-15.  Minton's judgment had to account for the fact that salespeople, including the business unit heads, typically "sandbagged"—submitted forecasts lower than they expected to achieve—to assure that they would meet or exceed their forecasts.  Ex. 64 at 101:8-18.  Minton's judgment, also known as the "Upside," was then added (or subtracted, if the forecasts were deemed too high) to the various forecasts to reflect Minton's best estimate of Oracle's likely results.  Ex. 65 at 121:24-124:18.  That estimate was referred to as the "Potential" or "Potential Forecast."  *Id.* at 121:24-124:18, 136:4-137:2, 155:4-15.  Historically, the Potential was the best predictor of Oracle's performance, albeit a conservative one; indeed, *in the seven quarters preceding 3Q01, Oracle had met or exceeded the Potential*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1    *EPS estimate each quarter.*  Ex. 42.

2         The consolidated forecast, with Minton's Upside and Potential, was presented in an

3    "Upside Report," which was discussed at Executive Management Committee ("EMC") meetings

4    attended by top executives.  Ex. 65 at 104:22-107:12.  Other reports discussed at these meetings

5    included "Pipeline Reports" and "Flash Reports."  Pipeline Reports reflected the size of Oracle's

6    software license pipeline—that is, the dollar amount of opportunities with the potential to close

7    during the quarter—and the "conversion ratio"—that is, the percentage of the pipeline that

8    Oracle ended up closing based on the same time period in the quarter from the prior fiscal year.

9    *See, e.g.*, Ex. 11.  Minton considered the conversion ratio as a check on the forecast numbers.

10   Ex. 65 at 168:3-25; Ex. 68 307:3-11, 318:24-319:3.  Flash Reports reflected preliminary actual

11   results for the first and second months of the quarter.  *See, e.g.*, Ex. 9.

12        The market understood that Oracle's results were extremely difficult to predict with

13   precision.  This was due largely to the fact that the majority of Oracle's new license revenue

14   came in during the last days of the quarter.  Indeed, during the 2001 fiscal year, Oracle earned

15   more than two-thirds of its new licensing revenue in the United States in the third month of each

16   quarter, with roughly 50% of new license revenue coming in the last week.  Ex. 69.  This

17   phenomenon, referred to as the "hockey-stick effect" when plotted on a chart of the quarterly

18   new license revenue, resembles a hockey stick.  This sales pattern made it impossible for Oracle

19   to know for sure what its quarterly results would be until the very last days of the quarter.  The

20   difficulty of estimating quarterly results in the enterprise software industry was well known to

21   the market, and common in the industry.  *Oracle Deriv.*, 867 A.2d at 910; Ex. 70 at 26:13-27:2.

22   <b>3.    Oracle's Internal Forecast Data Fully Supported The 3Q01<br>Projections Announced On December 14, 2000</b>

23

24        The December 11, 2000 Upside Report—the last such report available in advance of the

25   December 14, 2000 call—projected strong growth for 3Q01.  Indeed, the December 11 Upside

26   Report reflected a Potential EPS of 12.82 cents, which would generate guidance of 13 cents EPS

27   using Oracle's disclosed policy of rounding earnings to the nearest penny.  Ex. 68 at 329:1-4;

28   *Oracle Deriv.*, 867 A.2d at 920.  Although Minton's Upside Reports were the most accurate

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1    forecasting tool Oracle possessed and had proved to be conservative projections, Henley decided

2    to take an even more conservative approach.  Rather than 13 cents, he projected only 12 cents

3    EPS to the market.  Further, although the December 11 Upside Report projected overall license

4    revenue growth in actual dollars of 33%, including 129% growth in applications (Ex. 1 at

5    213092, 213095),  Oracle's December 14 guidance was more conservative, projecting overall

6    license growth of 25% and applications growth of 75%.

7          The December 11, 2000 Pipeline Report showed that Oracle's total software license

8    pipeline was 52% higher than the year before, and the pipeline for applications was particularly

9    strong, with growth of 144% in the U.S.  Ex. 11 at 033552.  Indeed, given the December 11

10   pipeline, Oracle's December 14, 2000 guidance was extremely conservative, for it assumed a

11   conversion rate of only 42%—which would have been the lowest conversion rate since 4Q99

12   (March 1999-May 1999).  *Id.* at 033557; Ex. 1 at 213092.[2]

13
                      **4.      Oracle's Internal Forecast Data Continued To Support Defendants'**
14                            **Statements Through The End Of January 2001**

15         Following the December 14 call, Oracle's internal forecast data continued to provide a

16   "reasonable basis" for, and did not "seriously undermine" Oracle's 3Q01 guidance.  *See Adobe*,

17   787 F. Supp. at 917.  The first Upside Report after the December 14 call (December 25) changed

18   little from the December 11 Upside Report.  It showed Potential EPS of 12.70 cents, based on the

19   same license revenue projected in the December 11 Report.  Ex. 2 at 1913696.

20         On January 4, 2001, Henley sold less than 7% of his Oracle stock.  Henley Decl., ¶ 14.

21   Henley had sold Oracle stock every year since 1993, and he typically sold stock in January for

22   tax purposes.  *Id.* ¶ 12.  As of January 4, Oracle's internal forecasting data indicated that Oracle

23   would meet or exceed its guidance.  *Id.* ¶¶ 15-16; Ex. 2 at 1913696.[3]  Based on the same facts,

24
     _____
25   [2] Henley testified that he believed the pipeline growth at the beginning of the quarter was "just
     too good to be true," and as a result, Oracle discounted those figures and "decided to be more
26   conservative."  Ex. 71 at 354:4-355:3; *see also* Ex. 419 at 334:14-24.  Though the pipeline
     declined later in December, this was "not a big surprise" to Henley, and it still represented a
27   "very healthy growth rate."  Ex. 71 at 354:7-14, 356:17-21.

28   [3] On that same day, Henley wrote a note to himself recognizing that although "data … point to
     more economic softening so there is risk of slippage in deals[,] [o]ffsetting this is stronger than

1   Vice Chancellor Strine concluded that "[P]laintiffs' claim that Henley possessed material,

2   adverse information comes very close to failing the straight face test and comes nowhere near

3   avoiding summary judgment." *Oracle Deriv.*, 867 A.2d at 944.  The information then available

4   to Henley in no way presaged a substantial likelihood that Oracle's results would be an extreme

5   departure from its public guidance. *Id.* at 945 (citing *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194

6   (1st Cir. 1996)).

7       On January 11, 2001, Oracle told the market that it has "yet to see any signs that its

8   business is being hurt by the economic slowdown." Ex. 181 at 419674.  The December 25

9   Upside Report's projection of 12.7 cents EPS and license revenue growth of 33% provided a

10   reasonable basis for that statement.  Ex. 2 at 1913696.  Similarly, the January 15, 2001 Upside

11   Report indicated a Potential EPS of 12.11 cents, exactly in line with guidance.  Ex. 3 at 1913735.

12   Importantly, there were no changes to the field forecasts from NAS, OSI or OPI—the sales

13   organizations continued to stand by their forecasts.  Compare *id.* at 1913738 *with* Ex. 2 at

14   1913699.  The January 15, 2001 Pipeline Report also was consistent with guidance, showing

15   pipeline growth of 34% compared to 3Q00—again, well above the 25% license growth Oracle

16   had projected on December 14, 2000.  Ex. 12 at 008549.  That Report also indicated that if

17   Oracle could convert 51% of the existing pipeline—the same percentage it had converted from

18   the same point in 3Q00—Oracle would achieve license revenues of nearly $1.6 billion in 3Q01,

19   far more than publicly projected.[4]  *Id.*

20       On January 17, 2001, the first Flash Report was available.  The Flash Report is not a

21   forecast, but rather a report showing actual sales results—in this case, for December 2000.  The

22   January 17 Flash Report indicated that Oracle was on track to achieve guidance.  Compared to

23

24   normal [deal] approval activity in December, the Covisant [sic] deal already in, and checks with
    the 3 U.S. execs saying they aren't as yet hearing of slippage from their managers. … Net, net

25   we still feel good about Q3…." Ex. 420.

26   [4] As it turned out, Oracle's actual License revenues for 3Q01 reflected a conversion rate of just
    41% based on the January 15 pipeline.  Ex. 23 at 975976.  This was seven percentage points

27   lower than *any* conversion rate in the preceding seven quarters, and thirteen percentage points
    less than the mean over that time.  Ex. 12 at 008556.  Had Oracle repeated *any* of these historic

28   rates based on the mid-January pipeline, Oracle would have met its quarterly forecasts.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

3Q00, for example, Oracle's license revenue in December had grown by 35% (compared to guidance of 25% growth), and December license revenue equaled 19% of the forecast, compared to 16% and 19% of total quarterly revenue in 3Q00 and 3Q99. Ex. 9 at 306577, 306579.

On January 22, 2001, the Upside Report presented to the EMC projected 12.06 cents EPS and license growth of 29% (Ex. 394 at 440128), again supporting the guidance given six weeks earlier of 12 cents EPS and 25% license growth. Thereafter, the January 29 Upside Report—the last such report in January—projected 11.58 cents EPS (rounded to 12 cents) and license growth of 24%, both in line with guidance. Ex. 4; Ex. 68 at 329:1-9.

### 5.    Mr. Ellison Did Not Possess Adverse, Material Nonpublic Information At The Time Of His January 2001 Stock Sales

As of 3Q01, Ellison held 22 million Oracle options—worth over half a billion dollars—that were due to expire if not exercised before August of 2001. Ellison Decl., ¶ 6.[5]  On Friday, January 19, 2001, Ellison instructed his financial advisor to begin exercising his Oracle options and selling the underlying shares, and also to sell some additional Oracle shares to pay down debt. *Id.* ¶¶ 5, 9, 12-13. Ellison's decision to sell was consistent with the advice received from his personal financial advisor, who urged him to diversify his stock portfolio and pay down debt. *Id.* ¶ 9. The 29 million shares of stock that Ellison sold in January 2001 amounted to roughly 2% of his overall Oracle holdings—a small fraction of the more than *one billion Oracle shares and vested options* that Ellison then held. *Id.* ¶ 13.

Ellison placed a number of restrictions on the sale of his stock (*id.* ¶¶ 11-12)—restrictions that are fundamentally inconsistent with any suggestion that he sold because he believed Oracle would miss its guidance. Ex. 424 at 16:24-17:4; *see also* Ellison Decl., ¶¶ 3-4, 14. For example, he directed that his sales not exceed 10%-15% of Oracle's total trading volume for any given day; that no sales should be made at all if the price fell below $30; and that no sales should take

---

[5] Under Oracle's insider trading policy, Ellison had only three trading "windows" left in which to exercise those options. Ellison Decl., ¶ 8. If, during any of those windows, Ellison had come into the possession of material, nonpublic information (such as a decision by Oracle to pursue a sizeable acquisition), Ellison would have been unable to trade during that window. *Id.* Thus, if Ellison had not exercised those options during 3Q01, he would have been at risk of losing the ability to exercise them at all. *Id.*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

place after January 31, even though he had been authorized to keep selling into February. Ellison Decl., ¶¶ 11-12; Ex. 187 at 174:10-24, 202:19-24; 164:1-24.  Indeed, because of these restrictions, Ellison ended up selling only 29 million of the 40 million shares that he and his investment advisor had decided to sell.  Ellison Decl., ¶ 13; Ex. 187 at 180:8-19; Ex. 188.

Ellison completed his stock sales on January 31, 2001.  Ellison Decl., ¶ 13.  The uncontroverted evidence shows that during the time Ellison was selling stock, Oracle's internal forecasts projected that the Company would achieve or exceed its public guidance and no Oracle employee ever suggested to Ellison that the Company was in danger of missing guidance. Indeed, the Delaware Chancery Court concluded that "it is impossible for a rational mind to infer that Ellison possessed material, adverse information at the time he instructed his broker to sell shares on January 19, or at the time when he actually sold shares from January 22 to January 31, 2001."  *Oracle Deriv.*, 867 A.2d at 950.  The record, and the reasonable inferences that may be drawn from it, remain the same here.

### 6.    Oracle's Internal Forecast Data Continued To Support Defendants' Statements Until The End Of February 2001

The February 5, 2001 Upside Report, which came out several days after Ellison's last trade, dipped below a rounded 12 cents per share EPS for the first time in the quarter, projecting EPS of 11.29 cents.  Ex. 5 at 1911893.  Given the hockey-stick effect, this slight dip in the internal EPS projection did not suggest, by any means, "a substantial likelihood of an extreme departure" from announced guidance.  Ex. 69.  As Minton testified, this temporary dip was "not indicative that we aren't going to make our quarter."  Ex. 68 at 331:2-6.  Indeed, in several quarters leading up to 3Q01, Oracle's final results were significantly higher than the Potential projection going into the last month of the quarter.  In 3Q00, for example, Oracle's Potential projection hovered around 6 cents per share, below analysts' consensus estimates of 7 cents per share, until the very last week of the quarter—but Oracle ended up "blowing past" the Potential projection and analysts' estimates and earning 8.5 cents per share.  Ex. 42.  In 4Q00, Oracle's Potential projection was 12.35 cents at the beginning of the last month of the quarter, below analysts' estimates of 13 cents per share—but again, Oracle ended up achieving 15.5 cents EPS.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1   Ex. 42.  And in 1Q01, the Potential projection at the beginning of the last month of the quarter

2   was 7.7 cents, and Oracle ultimately achieved 8.5 cents.  Ex. 42.

3           Thus, the fact that the Potential from the February 5 Upside Report was barely below

4   reported guidance did not suggest a "substantial likelihood of an extreme departure" from that

5   guidance.  Based on the February 5 Upside report, Oracle would have needed to increase license

6   revenue by less than 1% of the Potential Forecast to meet guidance.  Ex. 42.  And Oracle's

7   pipeline still included a number of large deals that were expected to close before the end of the

8   quarter and enable the Company to reach EPS of 12 cents.  Ex. 14; Ex. 15; Ex. 16.  The February

9   5 Report also indicated that if Oracle converted its pipeline at the same rate as it had in 3Q00,

10  Oracle would easily meet its guidance.  Ex. 13 at 306677.  On February 7, Henley held a meeting

11  with analysts, who reported that he "reiterated that the company's outlook and guidance were

12  unchanged for [3Q01]" and that Oracle had "yet to see macro-related weakness in its business."

13  Ex. 177 at 91536.  In light of the February 5 Upside Report and Pipeline Report, as well as

14  Oracle's history of exceeding forecasts, those statements had a more than reasonable basis.

15          On February 8, 2001, the second Flash Report for the quarter came out.  Ex. 10.  It

16  showed that through the first two months of the quarter, Oracle's actual license revenues were

17  36% of the total quarterly forecast.  At the same point in 3Q00 and 3Q99, respectively, Oracle

18  had been at 33% and 38% of its final results.  *Id.*  Thus, based on historical data, 3Q01 looked to

19  be right on track.  In light of the Upside Reports and Flash Reports available to senior

20  management at the time, when Oracle stated on February 9, 2001 that "we haven't changed our

21  projections at all," those statements had a reasonable basis.  Ex. 421 at 141679.  Indeed, a few

22  days later, the February 12, 2001 Upside Report showed a rebound in Potential EPS to 11.58

23  cents per share—which would have been rounded to EPS of 12 cents per share.  Ex. 6 at

24  1532827.

25          One week later, the February 19 Upside Report projected a slightly reduced EPS

26  projection of 11.23 cents per share.  Ex. 7 at 1532875.  As with the February 5 Upside Report,

27  this slight dip in Potential EPS did not indicate a "substantial likelihood of an extreme departure"

28  from announced guidance.  As of February 19, Oracle's Potential was at 94% of guidance, and

Oracle had closed much larger gaps in recent years. *Id.*; Ex. 42. For example, at the same point a year earlier Oracle's Potential was just 90% of consensus estimates, and yet Oracle closed the gap in the final weeks of the quarter and actually exceeded estimates. Ex. 42. As in prior quarters, Oracle still had plenty of deals in the pipeline that would make up the deficit if they closed. Ex. 17; Ex. 18; Ex. 19.

Plaintiffs claim that Henley repeated certain of Oracle's 3Q01 projections at an AppsWorld Conference in New Orleans on February 20, 2001.[6] RSAC ¶¶ 70-71; Ex. 154; *see also* Ex. 155; Ex. 156. As shown above, in the week before AppsWorld, Minton's Potential EPS number had hovered around the 11.50 cents needed for Oracle to report 12 cents EPS, and although the Potential was at 11.23 EPS as of February 19, the Potential Forecast was 94% of guidance, and Oracle had actually made up a larger gap in 3Q00. Ex. 7 at 1532875. Thus, even if Henley did reaffirm guidance on February 20, Oracle's internal forecasting data and past experience provided a reasonable basis for such a statement.

## C.    Oracle's Sales Force And Management Were Surprised By The Miss

The first sign of unusual deal slippage came late in the evening of February 25, 2001, three days before the end of the quarter, in an email to Ellison and Henley from the Executive Vice President of the NAS division, George Roberts. Roberts indicated, for the first time, that the General Business West area had lost 70 transactions, worth about $10 million of forecasted business, over the course of a few days. Ex. 73. According to Roberts, "[t]he top reason given by the companies was capital preservation." *Id.* Roberts decided to reduce the NAS forecast by $20 million (*id.*), and he forwarded more detail from Nic Classick, the Area Vice President for

---

[6] By February 20, Oracle was in its quiet period, and Oracle's policy prohibited any public discussion of quarterly results. *See* Ex. 157. Henley testified that he did not reiterate guidance or otherwise comment on the quarter at AppsWorld in February 2001. Ex. 78 at 121:21-122:23; Ex. 71 at 239:15-19, 239:22-242:9, 243:17-24; *see also* Ex. 158 at 180:2-18. A videotape of the analysts' meeting that day proves Henley's testimony was correct—he did not comment on the quarter. Ex. 37. Plaintiffs have adduced no evidence to the contrary, and thus there is no genuine issue of fact that the statement was never made. *Emplrs. Teamsters Local Nos. 175 & 505 Pension Trust Fund v. The Clorox Co.*, 353 F.3d 1125, 1131 (9th Cir. 2004). Furthermore, Oracle gave Safe Harbor cautionary statements at AppsWorld. Ex. 159 at 399566. Thus, any such statement would have been protected by the Safe Harbor, *see infra*.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

14

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

General Business West (Ex. 73):

> The past 6 business days our forecast has dropped to the point that I know our organization will have put John [Nugent, Senior Vice President of General Business], Oracle and yourself in a bad spot. … This is my organization and I am responsible for a forecast to you—I failed.  From the 2-16 forecast to the 2-23 forecast we had 78 field deals, by 47 different reps totaling $14.9m move out of the quarter.  The last month of the quarter I go over deal [sic], line by line item with the managers weekly.  This has been successful in the past as it gives me the oppt [sic] to get accurate info to provide upper management and build a reliable forecast. … In my 6 years with Oracle this is the most difficult news I have had to deliver as a forecast, especially this late in the quarter, is a personal commitment and I have let you and Oracle down.  I am sorry.

The $20 million reduction in the NAS forecast was a small fraction of Oracle's total revenue projection and hardly enough to indicate that Oracle's guidance was unattainable. Indeed, the reason Roberts asked Classick for additional information is that Roberts was even then still "trying to understand what the issue is."  Ex. 67 at 255:4-256:11.  Ellison responded on February 26 by asking whether the deals slipped into 4Q01 or disappeared altogether.  Ex. 74 at 308454.  Roberts asked Classick, and Classick replied (*id.*):

> NET – lost to competition 5%, firm q4 projects 25%, delayed until economic or business conditions are cleared 70%.  We had 5 POs cut that Presidents pulled until April as they wanted to see what their q1 would look like.  The uncertainty of their business and outlooks for the year has [sic] caused many clients to delay until they better understand what directions 2001 will take.  We can't commit this 70% as April results and the business climate will have to determine.

Minton reduced the Upside in the NAS forecast portion of the February 26 Upside Report by $20 million.  Ex. 8 at 1532945, 1532948.  With that adjustment, the Upside Report projected EPS of 11.19 cents, down just .04 cents from the week earlier.  *Id.*  But even with this reduction in projected EPS, Oracle was well within striking distance of its quarterly projections.  As of February 26, 2001 (two days before the end of the quarter), Oracle's earnings projection was 97% of the earnings needed to report 12 cents EPS.  *Id.*  At the same point in 3Q00, Oracle was projecting just 88% of the consensus estimate, but in the last two business days of the quarter Oracle closed enough deals to exceed that estimate.  *Id.*  Thus, as in 3Q00, meeting guidance was well within reach, even in the last 48 hours of the quarter.

Other forecasting data—including the "Big Deal Update"—continued to suggest that Oracle could meet its guidance.  Ex. 422 at 181:5-185:17, 200:8-201:2.  As compared to the same time a year prior, in 3Q01 Oracle had closed almost three times as much revenue from Big

1   Deals ($213 million versus $73 million), and had a pipeline of Big Deals (deals over $500,000)

2   with draft contracts that was $100 million larger than the prior year ($621 million versus $521

3   million). Ex. 20 at 306787. The next day, however, Minton informed Henley that in a single

4   day (February 26 to 27), Oracle's "Big Deals" estimate dropped from 40% to 25% growth over

5   the prior year. A series of emails revealed a rapid deterioration in OSI's conversion of large

6   deals during the last 48 hours of the quarter, causing OSI to reduce its revenue estimates from

7   $243 million to $175 million. Ex. 76. The NAS division also saw a sudden and dramatic drop in

8   business over the last three days of the quarter, from $320 million to $271 million. Ex. 8 at

9   1532948; Ex. 77 at 1533010.

10      The massive and sudden slippage of deals during the last business days of the quarter was

11  a surprise to Oracle and its senior management. During his deposition, Henley testified that he

12  did not know Oracle would miss the quarter until the late afternoon of the last day of the quarter,

13  and that he did not begin to suspect that Oracle would miss until the "last several days." Ex. 78 at

14  127:10-13, 129:21-130:7. This testimony is confirmed by contemporaneous documents in which

15  Henley wrote that "right to the last day we still thought we could get there [to 12 cents EPS]."

16  Ex. 79 at 289923. Each of the individual Defendants affirmed his belief that Oracle was in a

17  position to achieve its public guidance until the very end of the quarter, and Oracle's internal

18  forecasts provided a reasonable basis for those beliefs. Ellison Decl., ¶ 4, Henley  Decl., ¶ 10,

19  Sanderson Decl., ¶ 8. Until the very last days of the quarter: (i) there was no significant drop in

20  the forecasts from the major sales organizations; (ii) there was no news of unusual deal slippage;

21  (iii) there was no sharp drop in Minton's historically conservative Potential Forecast; and (iv) no

22  one told senior management that Oracle was in danger of missing guidance.

23      **D.      Oracle's Pre-Announcement On March 1, 2001**

24      On March 1, 2001, Oracle pre-announced an EPS estimate of 10 cents, with an estimated

25  year-over-year growth of 6% in total license sales, including flat or slightly negative database

26  growth and applications growth of 50% (compared to projected applications growth of 75%).

27  Ex. 30. Oracle explained that "[S]enior managers are deferring expenses and pushing out IT

28  expenditures in light of the uncertain U.S. economy." Ex. 393 at 419802. The next day,

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

16

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

Oracle's stock dropped from $21.38 to $16.88.  On March 15, 2001, Oracle confirmed its preliminary EPS estimate of 10 cents, but announced that database sales had increased by 6%, while applications sales had increased by just 25%, rather than 50%.  Ex. 31.  Despite additional information about the fall-off in applications revenue, Oracle's stock did not decline by a meaningful amount the next day.  James Decl., Ex. 1 at ¶ 73.

Oracle was not the only enterprise software company to be impacted by customer concerns about the economy.  In the months leading up to March 2001, Oracle's competitors had announced record results and consistently beaten market expectations.  Ex. 396; Ex. 397; Ex. 398; Ex. 399.  In so doing, those competitors told the market the same thing Oracle did—that they were not seeing a slowdown in demand for their products, despite general economic uncertainty.  *Id*.  The market perceived Oracle's miss as the sign of a downturn in the enterprise software sector, and therefore market participants expected other enterprise software companies—most of which were due to report their quarterly results one month after Oracle—to experience disappointing results.  Ex. 40 at 435256-57.  Consistent with that expectation, all of Oracle's competitors' stock prices declined on March 2, 2001, and in the following weeks, nearly all of them either reduced or missed their quarterly projections as the entire industry felt the impact of the downturn.[7]  James Decl., Ex. 1 at ¶ 69 and Ex. 8.  Although no one knew it at the time, nine months later the NBER determined that the United States economy had entered a recession beginning in March 2001.  Ex. 400 at 1.  The last month of Oracle's 2001 third quarter, February 2001, was the last month of economic growth before the recession began.

**E.    After Reviewing the Same Internal Oracle Forecasting Data, The Delaware Chancery Court Found No Rational Basis to Conclude That Either Mr. Ellison Or Mr. Henley Possessed Material, Non-Public Information At The Time Of Their Stock Sales**

Plaintiffs' claims mirror those asserted in a related derivative case filed in Delaware days after this case was filed.  *Oracle Deriv.*, 867 A.2d at 906.  In granting defendants' motion for summary judgment in that case, Vice Chancellor Strine reviewed a "massive record," which

---

[7] "Oracle had the misfortune of being the first large cap software company to pre-announce given its February quarter end. … As the announcements start to mount, the economy seems to be taking over as the dominant factor in most cases."  Ex. 395 at 2.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

17

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

included deposition testimony from 40 witnesses, a "ponderous record of evidence compiled with the [special litigation committee]," an "array of appendices [submitted by plaintiffs] . . . totaling over forty volumes" that came "close to an all-evidence dump of discovery," and the Ninth Circuit's decision in this case.  *Id.* at 906-908.  After a two-day hearing, the Chancery Court granted summary judgment to Ellison and Henley, concluding that "no rational trier of fact could find that:  1) Ellison or Henley possessed material, non-public financial information as of the time of their trades; or 2) Ellison or Henley acted with scienter."  *Id.* at 906.

The detailed reasoning and analysis underlying the Chancery Court's conclusion is instructive here.  Vice Chancellor Strine began his analysis with a discussion of Oracle's financial projection system, which he found to have a "conservative bias," "result[ing] in estimates of earnings and license revenue growth that were more likely to be low than high."  *Id.* at 906.  He found it significant that in relying on this process, "Oracle had time and again met or exceeded its guidance."  *Id.* at 913-14.

Having found "no evidence to cast doubt on the integrity of Oracle's estimation process," *id.* at 906, the Vice Chancellor compared the results of Oracle's internal forecasting process to its 3Q01 guidance.  He found it "undisputed" that Minton's Potential Projection in the Upside Reports "were regarded [at the] time as the most accurate financial prediction of how Oracle would perform in a quarter."  *Id.* at 941.  Specifically, Oracle's internal forecast data supported the 3Q01 guidance of 12 cents per share: (1) on December 14, 2000, when Oracle announced the guidance (*id.* at 915-16); (2) on January 4, 2001, when Henley sold stock; (*id.* at 916-17); (3) on January 22, the day Ellison began trading (*id.* at 919-20); and on January 31, the last day Ellison sold Oracle stock during 3Q01 (*id.* at 920).  Applying the federal materiality standard, the Chancery Court held that in light of Minton's historically conservative projections, no rational trier of fact could infer that anyone in Oracle's management anticipated the earnings miss until the very end of the quarter.  *See id.* at 941, 951-52.

Recognizing the devastating nature of this evidence, the plaintiffs in the derivative case, like Plaintiffs here, asked Vice Chancellor Strine to "adopt a Monday-morning quarterback approach to materiality," arguing essentially that "[b]ecause 3Q01 went bad, it must have been

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

reasonably foreseeable at the time." *Id.* at 952.  Like Plaintiffs here, the plaintiffs in the

derivative case urged the court to discount the actual forecasting evidence reviewed and relied

upon by Oracle's senior executives during 3Q01, and to "re-cut" and "reinterpret" that data as

plaintiffs sought to construe it.  In reasoning equally applicable here, the Chancery Court rejected

this invitation and observed:

> [t]he plaintiffs' emphasis on these factors [the alleged unprecedented drop in the
> Pipeline in December 2000] underscores the post-hoc nature of their arguments,
> which depend predominantly on their formulation (after thousands of hours of
> research and after abandoning many other theories they pressed earlier) of ways at
> looking at information that differ from the manner in which Oracle's key financial
> executives processed information in 3Q01.  To a large extent, the plaintiffs are
> saying that if Minton and others at Oracle had been as smart as the plaintiffs'
> lawyers are (and had the benefit of hindsight and two years of processing
> information) they could have predicted . . .  that Oracle would fall short of the
> Market Estimates for 3Q01 by a large margin.

*Id.* at 944-45.

## F.    Procedural History Of The Ninth Circuit Appeal In This Case

Plaintiffs filed this lawsuit on March 9, 2001.  After repeated amendments, Judge Jenkins

dismissed Plaintiffs' complaint three times, but the Ninth Circuit reversed.  *Nursing Home*

*Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004).  In so doing, the Ninth

Circuit relied heavily on Plaintiffs' allegation that Oracle had manufactured "more than $228

million" in revenue through the creation of and accounting for 46,000 "debit memo" invoices on

November 17, 2000.  *Id.* at 1233-34.  The Ninth Circuit described these allegations as "very

important[]" to the issue of scienter, and specifically referenced the allegations attributed to CW

46 and CW 49.  *Id.* at 1233.  The Ninth Circuit likewise relied heavily on Plaintiffs' allegation

that, early in the third quarter, Oracle lost four deals worth up to $186 million—due to problems

with Suite 11i.  *Id.* at 1231-32.

These allegations have vanished in discovery because Plaintiffs were unable to find a

shred of evidence supporting them.  The primary CWs upon whom Plaintiffs relied for their

debit-memo allegations either refused to testify (citing the Fifth Amendment) or had no

percipient knowledge.  Exs. 223; 224; 225 at 66:5-9, 66:19-22, 67:8-68:5, 156:18-157:16.

Indeed, Plaintiffs' accounting expert did not offer an opinion on the financial statement impact of

the debit memos—even denying that it was an issue in the case.  *See* Ex. 226 at 31, 34; Ex. 227

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1   at 96:16-97:6; Ex. 401 at 100:1-10.  Plaintiffs also abandoned their claim that Oracle lost four

2   deals totaling $186 million early in 3Q01 because of defects in Suite 11i.  In fact, despite a

3   massive discovery record, Plaintiffs cannot identify a single customer that canceled or delayed an

4   order *at any time* due to alleged "problems" with Suite 11i.  In other words, Plaintiffs have

5   utterly failed to prove the very allegations the Ninth Circuit assumed to be true—and

6   important—when it reversed the dismissal of Plaintiffs' complaint.

7   **III.   LEGAL STANDARD**

8        To avoid summary judgment, Plaintiffs must put forth admissible evidence showing a

9   "*genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 249 (1996)

10   (emphasis in original).  A fact is "material" only if it will "affect the outcome of the suit."  *Id.* at

11   248.  A dispute is "genuine" only if there is "evidence on which the jury could reasonably find

12   for [Plaintiffs]."  *Id.* at 252.  "The Supreme Court has made clear that strained or inconclusive

13   inferences alone should not defeat a motion for summary judgment.  The rigorous scrutiny of

14   evidence offered in opposition to a motion for summary judgment is no less appropriate in

15   complex, fact-specific securities fraud cases."  *Adobe*, 787 F. Supp. at 918 (citations omitted).

16        By itself, an adverse inference cannot create a genuine issue of fact as to any issue on

17   which Plaintiffs have offered "no evidence" or "utterly inadequate evidence."  *Kronish v. United*

18   *States*, 150 F.3d 112, 128 (2d Cir. 1998) *abrogated on other grounds by Rotella v. Wood*, 528

19   U.S. 549 (2000); *Byrnie v. Town of Cromwell, Bd. of Edu.*, 243 F.3d 93, 107 (2d Cir. 2001).

20   Moreover, if there is a failure of proof on one element of Plaintiffs' claim, the loss of evidence

21   relevant to a different element will not preclude summary judgment.  *Gordon Partners v.*

22   *Blumenthal*, No. 02 Civ. 7377, 2007 WL 431864, at *12-14, n.8 (S.D.N.Y. Feb. 9, 2007) ("The

23   adverse inference as to [falsity and scienter] is irrelevant to the separate element of loss

24   causation."); *Gordon Partners v. Blumenthal*, No. 02 Civ. 7377, 2007 WL 1438753, at *2 n.3

25   (S.D.N.Y. May 16, 2007) (granting summary judgment on loss causation grounds despite

26   adverse inference), *aff'd*, 2008 WL 4376259 (2nd Cir. Sept. 24, 2008).

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

**ARGUMENT**

**IV.    THE COURT'S SEPTEMBER 2, 2008 ADVERSE INFERENCE ORDER**

In its September 2, 2008 Order (the "Order"), the Court ruled that Plaintiffs would be granted an adverse inference regarding Ellison's awareness of "problems with Suite 11i, the effects of the economy on Oracle's business, and problems with defendants' forecasting model . . . ." Order at 12.  The Court directed the parties, in their revised motions, to "specify the precise contours of the adverse inferences that should be drawn" and to "take these inferences into account with regard to the propriety of summary judgment."  Order at 12-13.  The Court pointed out that any "such [adverse] inferences will not assist [P]laintiffs in demonstrating the existence of genuine issues of material fact for every element of their 10(b) claims, such as the element of loss causation."  Order at 12.  As discussed below, Defendants respectfully submit that the adverse inference should be limited to an inference that Ellison was aware of whatever facts Plaintiffs can otherwise prove about Suite 11i, the effects of the economy on Oracle's business during 3Q01, and alleged problems with Oracle's forecasting model.  The inference should not be used to allow the jury to infer that Defendants' challenged statements were in fact false.

**A.    Adverse Inference Sanctions Must Be "Narrowly Tailored" to Cure Demonstrated Harm to Plaintiffs**

Evidentiary sanctions must be "carefully fashioned" to avoid "unduly interfer[ing] with [a party]'s ability to produce relevant evidence."  *Lewis v. Telephone Empl. Credit Union*, 87 F.3d 1537, 1558 (9th Cir. 1996); *see also Wyle v. R.J. Reynolds Industries, Inc.*, 709 F.2d 585, 591 (9th Cir. 1983) ("Sanctions interfering with a litigant's claim or defenses violate due process when imposed merely for punishment of an infraction that did not threaten to interfere with the rightful decision of the case.").  Indeed, in evaluating evidentiary sanctions, the Court must "impose the 'least onerous sanction' given the extent of the offending party's fault and the prejudice to the opposing party."  *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1078 (N.D. Cal. 2006) (*quoting Schmid v. Milwaukee Electric Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994)); *see also Keithley v. The Home Store.com, Inc.*, No. C-03-04447 (EDL), 2008 U.S. Dist. LEXIS 61741, at *3, *10, *51-54 (N.D. Cal. Aug. 12, 2008) (limiting adverse inference to claims affected by spoliation, despite finding of "egregious" discovery misconduct, and noting

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1   that "a court should narrowly tailor any sanctions award to the circumstances in a given case");

2   *Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 449 (4th Cir. 2004) (adverse inference must be

3   "limited to that action necessary to redress conduct which abuses the judicial process") (citations

4   and internal quotations omitted).  Any sanction that exceeds these boundaries is an abuse of

5   discretion.  *Lewis*, 87 F.3d at 1558-59; *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir.

6   1991).

7          To avoid "unduly interfering" with the sanctioned party's right to present relevant

8   evidence, the concept of prejudice or harm to the opposing party is crucial.  That is why courts

9   decline sanctions altogether where there is no extrinsic evidence that any lost evidence would

10  have been helpful to the opposing party's case.  *See Hamilton v. Signature Flight Support Corp.*,

11  No. C 05-0490 CW (MEJ), 2005 U.S. Dist. LEXIS 40088, at *23 (N.D. Cal. Dec. 20, 2005)

12  (rejecting adverse inference where "moving party relies on pure speculation as to the content of

13  these materials"); *see also Skeete v. McKinsey & Co*., No. 91 Civ. 8093 (PKL), 1993 U.S. Dist.

14  LEXIS 9099, at *22-24 (S.D.N.Y. July 7, 1993); *Turner v. Hudson Transit Lines, Inc*., 142

15  F.R.D. 68, 77 (S.D.N.Y. 1991).  And that is why, even when adverse inference sanctions are

16  granted, courts focus carefully on extrinsic evidence of prejudice or harm in order to ensure that

17  the sanction is "narrowly tailored" to cure that harm.  *See Zubulake v. UBS Warburg LLC*, 229

18  F.R.D. 422, 426-30, 436-37 (S.D.N.Y. 2004) ("*Zubulake V*") (granting adverse inference that

19  lost emails would have been favorable based on extrinsic evidence such as existing emails

20  referencing deleted emails and documents as well as witness testimony).

21          **B.      Any Adverse Inference Should Be Limited To Mr. Ellison's Knowledge Of
                      Whatever Facts Plaintiffs Are Able To Prove, And Not Be Used To Establish**

22          **The Underlying Facts Themselves**

23          Defendants respectfully submit that the adverse inference should be limited to Ellison's

24  knowledge of facts Plaintiffs are able to prove regarding the issues identified in the Order—

25  namely, alleged problems with Suite 11i, 3Q01 statements concerning the effect of the economy

26  on Oracle's ability to achieve previously announced guidance, and alleged problems with

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

Oracle's forecasting model.[8]  Thus, to the extent that Plaintiffs can prove Defendants made false statements about these issues, the adverse inference would relieve Plaintiffs of the need to prove that Ellison (and hence Oracle) was aware of those facts.[9]  But the inference should not allow the jury (or Plaintiffs' counsel) to speculate that missing materials would confirm the falsity of Defendants' statements.

Such an inference would more than adequately cure any harm Plaintiffs might have suffered from the loss of Ellison's emails or *Softwar* materials.  By their nature, Ellison's emails and interview recordings would reflect what he knew at the time those materials were generated.  Thus, an adverse inference regarding Ellison's knowledge of whatever facts Plaintiffs are able to prove would address the loss of such materials.  But there is no reason to believe that Ellison's missing emails or *Softwar* materials contained unique facts about problems with Suite 11i, the effect of the economy on Oracle's business, or problems with Oracle's forecasting model—facts that are not already reflected in the massive discovery record collected and produced in this case.  While it is true that proving the contents of missing materials can be difficult, that is precisely what courts have required when granting adverse inference sanctions.  *See, e.g.*, *Zubulake V,* 229 F.R.D. at 426-30, 436-37.  And because there is no extrinsic evidence that Ellison's missing emails or *Softwar* materials contained unique evidence regarding the issues identified by the Order, any inference allowing the jury to speculate or invent facts concerning these issues would be completely untethered from the demonstrated harm—namely, Plaintiffs' ability to demonstrate that Ellison received and read the emails bearing his name, which have been produced from the files of others, and was aware of the information set forth in *Softwar* and the related transcripts that have been produced.

To rule otherwise—to allow an inference as to the underlying facts themselves, in the absence of extrinsic evidence showing that such "facts" had appeared in the missing materials— would extend existing jurisprudence in this area, impose a sanction that is disproportionate to the

---

[8]  The Order appropriately does not refer to any adverse inference with regard to Plaintiffs' 2Q01 accounting claims, nor is there any basis for such an inference.

[9]  There has been no finding that either of Henley or Sanderson failed to preserve documents.  As such, there is no basis for an adverse inference against either of them.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

23

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1  harm actually identified, and imply a finding that all such material had been successfully

2  expunged from every single source of evidence available to Plaintiffs in this case.  That is, the

3  Court would have to conclude that Defendants successfully expunged evidence of these "facts"

4  from the files of at least 129 custodians, who collectively produced in excess of 2.1 million pages

5  of documents; that none of the allegedly missing "facts" came out in any of the 134 depositions

6  taken in this case, including those of 46 "confidential witnesses" cited in Plaintiffs' complaint;

7  and that no evidence of those "facts" emerged in either the "massive" discovery record in the

8  related derivative actions (which included at least 40 depositions), or in the Special Litigation

9  Committee investigation that yielded a 1,134-page report with 20,961 pages of exhibits.  There

10 simply is no basis for the Court to find such a wide-ranging, massive loss of evidence—and no

11 basis for the Court to conclude that any un-produced Ellison emails or *Softwar* materials

12 contained "facts" that appear nowhere else in the massive discovery record that has been

13 generated.

14       Indeed, in its Order the Court recognized the "large quantity" of materials that Plaintiffs

15 received in discovery (Order at 6:28-7:1), and rejected Plaintiffs' request for sanctions based on

16 Defendants' document preservation efforts generally.  Order at 8:16-22.  That process plainly

17 resulted in Plaintiffs having a full and complete record as to the truth or falsity of Defendants'

18 statements about Suite 11i, the effect of the economy on Oracle's business during the third

19 quarter, and Oracle's forecasting process.  In light of that record, any inference that would allow

20 the jury to speculate about the underlying facts regarding these issues would be unfair,

21 disproportionate to any demonstrated harm, and would "unduly interfere" with Defendants'

22 ability to present evidence on the issue of falsity.

23 **V.      PLAINTIFFS' SECTION 10(B) CLAIM FAILS: NO FALSE STATEMENTS**

24       **A.     Claims Regarding Oracle's 3Q01 Projections And Statements During the
               Quarter About The Economy's Impact On Oracle's Ability To Achieve
25             Those Projections**

26             **1.      Oracle's 3Q01 Projections**

27       The 3Q01 projections Oracle announced on December 14, 2000, were forward-looking

28 statements under the Safe Harbor.  15 U.S.C. § 78u-5(i)(1)(A).  The Safe Harbor immunizes such

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1    statements from liability if they are accompanied by meaningful cautionary language (15 U.S.C.

2    § 78u-5(c)(1)(A)), "or" the plaintiff fails to prove the statements were made with "actual

3    knowledge" that they were false (15 U.S.C. § 78u-5(c)(1)(B)).[10]  As discussed below, Plaintiffs

4    cannot show a genuine issue of fact as to either question, and thus Oracle's 3Q01 projections are

5    immune from liability under the Safe Harbor.  Furthermore, even if the Safe Harbor did not

6    apply, Plaintiffs cannot demonstrate that the projections were false because Oracle's historically

7    reliable and conservative forecasting process provided a reasonable basis for them when made.

8              a.    **Oracle's December 14, 2000 Projections Were Accompanied
                     By Meaningful Cautionary Statements**[11]

9

10   Cautionary language is "meaningful" under the Safe Harbor if it mentions "important

11   factors of similar significance to those actually realized."  *In re Broadcom Co. Sec. Litig.*, No.

12   SA CV 01-275-GLT MLGX, 2004 WL 3390052, at *1 (C.D. Cal. Nov. 23, 2004); *In re Tibco*

13   *Software, Inc. Sec. Litig.*, No. C 05-2146 SBA, 2006 WL 1469654 at *26 (N.D. Cal. May 25,

14   2006).  Oracle's 3Q01 projections were accompanied by language that easily meets this standard.

15   The December 14, 2000 call began with a statement advising those listening that the call

16   might include forward-looking statements and warning that actual results could differ from

17   projections.  Ex. 56 at 003216.  During the call, Henley specifically noted the risk that a

18   downturn could negatively impact Oracle's actual results.  *Id.* at 003218.  Moreover, Oracle

19   directed listeners to its most recent SEC filings for further information on specific risk factors

20

21   [10] Because these two provisions of the Safe Harbor are phrased in the disjunctive, forward-
     looking statements are protected if either condition is met.  *Clorox*, 353 F.3d at 1131-33
22   (affirming grant of summary judgment on the basis of meaningful cautionary statements despite
23   plaintiff's argument that statements were made with actual knowledge of falsity).

     [11] In response to the Court's question, (*see* Order at 13) Defendants believe that cautionary
24   statements (or references to such statements) must accompany reiterations of guidance if they are
     to be protected by this prong of the Safe Harbor.  However, Defendants contend that only the
25   statements made on December 14, 2000 were accompanied by meaningful cautionary statements,
     and hence protected by this aspect of the provision.  To the extent the Court concludes that
26   Henley reaffirmed guidance on February 20, 2001, Defendants believe that statement was also
27   accompanied by cautionary statements.  As to all forward-looking statements, they are not
     actionable because Plaintiffs cannot show that they were false and made with actual knowledge
28   of falsity.  15 U.S.C. § 78u-5(c)(1)(B)(i).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
                                    25                    DEFENDANTS' REVISED MOTION FOR
                                                          SUMMARY JUDGMENT
                                                          MASTER FILE NO. C-01-0988-SI

1    that could impact actual results (*id.* at 003216), as permitted by the Safe Harbor. *Clorox*, 353

2    F.3d at 1132-33 ("the PSLRA does not require that the cautions physically accompany oral

3    statements"). Those public filings provided cautionary language about a variety of risks,

4    including the very matters that Plaintiffs now claim caused the miss.

5          In its most recent 10-Q, for example, Oracle warned that a "softening of demand for

6    computer software caused by a weakening of the economy may result in decreased revenues or

7    lower revenue growth rates." Ex. 160 at 024182. Oracle explained the "'pipeline' system" and

8    warned that "pipeline estimates are necessarily speculative and may not correlate to revenues in a

9    particular quarter," and thus, that a "variation in the conversion of the pipeline into contracts or

10   in the pipeline itself could cause the Company to improperly plan or budget." *Id.* at 024185.

11   Oracle reminded investors that the forecast was influenced by unpredictable contracting patterns,

12   which could cause revenues to vary for many reasons, including "changes in customer budgets,"

13   and "general economic conditions." *Id.* at 024184-85. Oracle also explained the "hockey-stick"

14   effect. *Id.* The 10-Q says: "Accordingly, the Company's quarterly results are difficult to predict

15   until the end of the quarter, and delays in product delivery or closing of sales near the end of a

16   quarter have historically caused and could cause quarterly revenues and net income to fall

17   significantly short of anticipated levels." *Id.* Oracle also advised investors of the inherent

18   uncertainty around new products such as Suite 11i (and especially the newer CRM products

19   within the Suite), including the risk of "[s]ignificant undetected errors or delays in new products

20   or new versions of a product." *Id.* at 024183. Oracle cautioned that "if customers were to

21   experience significant problems with the implementation and installation of products, or if

22   customers were dissatisfied with product functionality or performance," actual results could

23   differ from projections. *Id.* Oracle thus had "no assurance that the Company's new products

24   will achieve significant market acceptance or will generate significant revenue." *Id.*[12]

25          Taken as a whole, this cautionary language identified the very factors that resulted in the

26   3Q01 guidance miss, whether one accepts Defendants' view of what caused the miss (*i.e.*, a large

27   _____

28   [12] Oracle repeated substantially the same cautionary language in the 10-Q it filed on January 16, 2001. Ex. 161 at 143484-89.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

26

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1   number of deals slipping in the last few days of the quarter due to customers' heightened

2   concerns about the economy) or Plaintiffs' view (*i.e.*, defects in Suite 11i negatively impacted

3   customer acceptance of Suite 11i).  *Clorox*, 353 F.3d at 1132; *Broadcom*, 2004 WL 3390052, at

4   *4-5.  Under the Safe Harbor, Defendants are entitled to summary judgment on Plaintiffs' claims

5   regarding the December 14, 2000 guidance.

6           **b.**      **Plaintiffs Cannot Show Defendants Had "Actual Knowledge"**

7                     **That The December 14, 2000 Projections Could Not Be Achieved**

8         Even if the December 14 guidance had not been accompanied by meaningful cautionary

9   statements, Defendants are still entitled to summary judgment because Plaintiffs cannot show

10  that the December 14 projections were false, or that Defendants had actual knowledge of such

11  falsity.  15 U.S.C. § 78u-5(c)(1)(B)(i).  There is zero evidence that any Defendant had "actual

12  knowledge" Oracle would miss its 3Q01 guidance on December 14, 2000.  *See In re BP Prudhoe*

13  *Bay Royalty Trust Sec. Litig.*, No. C06-1505 MJP, 2007 WL 3171435, at *6 (W.D. Wash. Oct.

14  26, 2007) ("Claims that a defendants 'could have' or 'should have' known that the statements

15  were false are insufficient to satisfy the standard.").[13]  As set forth above, the December 11

16  Upside Report and Pipeline Report presented reliable and conservative internal forecasting data

17  that amply supported guidance.  In addition, in light of the hockey-stick effect, and the

18  undisputed fact that less than 6% of average quarterly license revenues are booked by the second

19  week of the quarter, there is no possible way that Defendants could have had actual knowledge

20  that those projections were false.  *Oracle Deriv.*, 867 A.2d at 911.

21          **c.**      **Oracle Had A Reasonable Basis For The December 14, 2000**

22                    **Projections When Made**

23        Even if the Safe Harbor did not apply, Defendants are entitled to summary judgment

24  _____

25  [13] In response to the Court's question about stock sales as evidence of actual knowledge under
    the Safe Harbor (Order at 12:9-11), even suspicious stock sales, standing alone, cannot create a

26  triable issue as to scienter, much less actual knowledge.  *In re JDS Uniphase Corp. Sec. Litig.*,
    No. C 02-1486 CW, 2007 WL 2429593, at *18 (N.D. Cal. Aug. 24, 2007) (despite concluding

27  that defendants' stock sales were suspicious, holding on summary judgment that "Defendants'
    stock sales, standing alone, are not sufficient to create a triable question of fact with respect to

28  Defendants' scienter").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

27

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1    because there is no evidence that Oracle's 3Q01 projections were false.  As courts in this district

2    have recognized, claims alleging "fraud" based on a failure to meet earnings projections or other

3    opinions require special care at the summary judgment stage:

4    > Common sense tells us—and case law supports the proposition—that courts must
5    > be especially wary of permitting a trial regarding (allegedly) fraudulent forward-
     > looking statements to proceed on the strength of confusing and speculative
6    > inferences, because forward-looking statements—and earnings projections in
     > particular—are uncertain by their very nature.  If the mere existence of differing
7    > implications (for future corporate performance) reasonably drawable from
     > information available at the time a projection is made can create a triable issue of
8    > fact in a lawsuit alleging that the projection was *fraudulent*, then virtually every
     > lawsuit alleging such a projection would, it seems, go to trial—for, indeed, every
9    > projection of corporate earnings is uncertain and subject to different predictive
     > interpretations.  That is why 10b-5 liability for a projection requires that there be
10   > either *no* reasonable basis for believing that the projection was accurate or the
     > awareness of undisclosed facts tending *seriously* to undermine the accuracy of
     > that projection.
11
12   *Adobe*, 787 F. Supp. at 919 (emphasis in original and citations omitted); *see also In re VeriFone

13   Sec. Litig.*, 784 F. Supp. 1471, 1487 (N.D. Cal. 1992); *Kowal v. MCI Commcn's Corp.*, 16 F.3d

14   1271, 1276-77 (D.C. Cir. 1994).

15              Oracle's 3Q01 public guidance had a "reasonable basis."  As of 3Q01, Oracle's internal

16   forecasting process had enabled it to meet or exceed guidance for seven quarters in a row.  Ex.

17   42.  Oracle had an outstanding 2Q01, growing license revenue by 25% over 2Q00.  When Oracle

18   announced its guidance of 12 cents EPS for 3Q01, the output of its accurate, yet conservative

19   forecasting process strongly supported that guidance, projecting 13 cents.  Ex. 1.  Oracle's

20   internal data reflected 52% growth in the overall pipeline over the prior year, including 129% in

21   applications.  *Id*.  Though Plaintiffs have argued that a change in the U.S. economy starting in

22   March 2000 undercut Oracle's forecasting process, Oracle had met or exceeded earnings

23   expectations in each of the first three quarters that took place *after* this supposed economic

24   change.  Ex. 42.  Oracle had a "reasonable basis" for the guidance it announced on December 14,

25   2000, and Plaintiffs cannot prove that it was "false."  *Adobe*, 787 F. Supp. at 919.

26              **2.      Statements During The Quarter About Oracle's 3Q01 Projections
                          And The Economy's Impact On Oracle's Ability To Achieve Those
27                        Projections**

28              In addition to Oracle's December 14 guidance, Plaintiffs claim that Defendants misled

the market through a series of public statements following the December 14 call indicating that

LATHAM&WATKINS<sup></sup>
ATTORNEYS AT LAW
SAN FRANCISCO

28

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1   Oracle remained on track to meet its guidance notwithstanding the worsening U.S. economy.

2   RSAC ¶¶ 9, 12, 45, 47.  Defendants are entitled to summary judgment as a matter of law with

3   regard to these statements—both under the Safe Harbor and because Plaintiffs cannot prove they

4   were false.

5            a.       **Defendants' Post-December 14 Statements Reaffirming**
                      **Guidance and Discussing the Economy's Impact on Oracle's**
6                     **Ability to Meet That Guidance Were Forward-Looking**

7            Although Defendants' statements about the economy, standing alone, were phrased in the

8   present tense, those statements were intertwined with statements reaffirming Oracle's December

9   14, 2000 guidance, and therefore constituted updated projections about Oracle's expected

10  performance during 3Q01.  Indeed, the link between the economy and the 3Q01 projections was

11  often quite explicit.  For example, Henley stated on December 15 that "we told Wall Street that

12  with the economy right now even though it's slowing [it] doesn't seem to be affecting us.  We

13  see no difference in demand for our upcoming third fiscal quarter." Ex. 163 at 141660; *see also*

14  RSAC ¶ 47 ("Oracle's revenue and earnings forecast for 3Q01 and Ellison and Henley's

15  statements (interrelated with those forecasts) that Oracle was not seeing any impact or slowing in

16  Oracle's business due to the slowing economy were false when made.").

17           It is therefore no surprise that analysts understood Oracle's intra-quarter statements about

18  the effect of the slowing economy as relating directly to the Company's ability to achieve its

19  3Q01 guidance.  Ex. 166 at 091445; Ex. 169 at 005851-52; Ex. 170 at 005880; Ex. 171 at

20  005867 ("Importantly, Oracle management has not seen any slowing of its business in the

21  current quarter due to the economic slowdown.  In fact, the third-quarter pipeline looks quite

22  strong.  The company mentioned that it is comfortable with the Street's $0.12 third-quarter EPS

23  estimate."); Ex. 173 at 023377 ("Whether Oracle can stay unscathed in slowing macro

24  environment is the open question and we suspect most investors will need to see another quarter

25  of performance to be convinced."); Ex. 176 at 419979; Ex. 177 at 091536 ("According to

26  management, it has yet to see macro-related weakness in its business.  That said, the full impact

27

28

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

29

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1    of the current macro environment may not be evident until the end of the quarter….").[14]

2          Because the then-current impact of the slowing economy was discussed by Defendants

3    and understood by the market as relating to whether Oracle was on track to meet its guidance,

4    those statements are "assumptions underlying or relating to" the Company's projections, and

5    they are within the Safe Harbor.  *See* 15 U.S.C. § 78u-5(i)(1)(C) and (D); *Harris v. Ivax Corp.*,

6    182 F.3d 799, 805 (11th Cir. 1999) (holding that statement that "'our fundamental business and

7    its underlying strategies remain intact' … is a prediction 'of future economic performance,'" and

8    was subject to the Safe Harbor because "[w]hile it is true that the *state* of Ivax's 'fundamental

9    business' and 'underlying strategies' is a question of present condition, whether they are intact is

10   a fact only verifiable by seeing how they hold up in the future. … That puts this statement in the

11   safe harbor, as well").[15]  And for the same reason, these statements amounted to updated

12   projections concerning Oracle's expected 3Q01 performance.  Thus, in order to prove them false,

13   Plaintiffs must prove that Defendants had no reasonable basis to make these projections or were

14   aware of undisclosed facts tending seriously to undermine them.  *Adobe*, 787 F. Supp. at 919.

15                     **b.     These Statements Are Immune Under the Safe Harbor Because
                              Plaintiffs Cannot Prove "Actual Knowledge" of Falsity**

16         Although most of Defendants' post-December 14 statements concerning guidance despite

17   worsening economic conditions were not accompanied by cautionary language, the statements

18   are nonetheless immune from liability because Plaintiffs cannot prove that Defendants had

19   "actual knowledge" Oracle would miss its guidance when the statements were made.  *See* 15

20   U.S.C. § 78u-5(c)(1)(B).  Consistent with the undisputed evidence that Oracle's internal

21

22   [14] Judge Jenkins had previously concluded that statements regarding the effect of the economy
23   on Oracle's business were not forward-looking.  *Nursing Home Pension Fund v. Oracle Corp.*,
     242 F. Supp. 2d 671, 678 (N.D. Cal. 2002).  This conclusion, however, is *dicta*, as the Court's
24   dismissal was predicated on Plaintiffs' failure to plead falsity and scienter.

25   [15] If the statements regarding the effect of the economy on Oracle's business were not forward-
     looking, they would be immaterial as a matter of law and inactionable for that reason.  Plaintiffs'
26   market "expert" concedes that materiality is measured by "factors that impact the value of an
     investment," and in particular, "the expected future cash flows" of the company—in this case,
27   the 3Q01 financial results. Ex. 423 at ¶ 28.  Whether the economy was having an "impact" on
     Oracle would have been completely irrelevant to investors, unless that "impact" materially
28   affected the Company's expected financial results (3Q01 projections).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

30

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1    forecasts supported Oracle's guidance throughout the quarter and Oracle's statements that the

2    economy was not affecting Oracle's business at the time, the individual Defendants have testified

3    that they had no reason to believe, until the very end of the quarter, that Oracle would not

4    achieve guidance.  Ellison Decl., ¶¶ 3-4; Henley Decl., ¶¶ 7-10; Sanderson Decl., ¶¶ 6-8.

5          This testimony is unrebutted:  no witness has testified he or she told Defendants that

6    Oracle could not meet its guidance, and no internal document suggested, before the very end of

7    the quarter, that Oracle would miss.  *See In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d

8    1033, 1048 (N.D. Cal. 2007) (dismissing claims because "plaintiffs do not allege that

9    defendants' publicly disclosed financial estimates differed *materially* from the sales information

10   defendants had access to") (emphasis added); *see also Shaw*, 82 F.3d at 1211 (intra-quarter

11   information only material if it represents a "substantial likelihood that the quarter would turn out

12   to be an extreme departure from publicly known trends and uncertainties").  In fact, the

13   undisputed hockey-stick pattern of Oracle's quarterly sales precludes a finding that Defendants

14   had actual knowledge that the post-December 14 statements were false.  *See Oracle Deriv.*, 867

15   A.2d at 942-43, 946-48.  Corporate "scienter" requires a showing of scienter on the part of

16   named individual defendant.  *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435-36 (9th

17   Cir. 1995).

18              c.    **Even Without the Safe Harbor, Plaintiffs Cannot Prove Falsity**
                      **Under *Adobe***

19

20        Even if Defendants' post-December 14 statements were not protected by the Safe Harbor,

21   Plaintiffs cannot prove that Oracle lacked a "reasonable basis" for these statements concerning

     guidance and the effect of the economy on Oracle's ability to meet guidance.  *Adobe*, 787 F.
22
     Supp. at 919.
23
          Plaintiffs have not come close to showing that Oracle lacked a reasonable basis for its
24
     3Q01 guidance at any time during the quarter, nor have they cited any intraquarter data that
25
     seriously undermined Oracle's publicly announced guidance.  To the contrary, the undisputed
26
     data are fully consistent with Oracle's announced guidance, despite worsening economic
27
     conditions.  The Upside Report projected EPS of at least 12 cents through all of December,
28
     January, and the second week in February.  Even when the February 5 Upside Report dipped

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

31

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

below projected EPS of 11 cents, the February 12 Upside Report returned to projected EPS of 12 cents—and Oracle had been in worse situations in prior quarters but had ultimately exceeded expectations.  Pipeline growth throughout the quarter was robust, exceeding the 25% license growth guidance.  Exs. 1-8.  Results for the quarter through the end of December (the January Flash Report) and then through the end of January (the February Flash Report) also showed growth based on actual sales to be in line with guidance.  Exs. 9-10.  Quite simply, Oracle had a reasonable basis for intra-quarter statements that it was not seeing the effects of the economy on its business.  Its statements were true, and Plaintiffs cannot prove that they were made with actual knowledge of falsity.

### d.      Even If These Statements Were Not Forward-Looking, Plaintiffs Cannot Prove They Were False When Made

Even if Defendants' statements about the effect of the economy on Oracle's business were not projections, and thus not subject to the *Adobe* standard, Plaintiffs cannot prove that these statements were materially false.  The undisputed facts show that, until the very end of the quarter (and long after the last alleged public statement about the economy), Oracle was not seeing any negative impact on its business from the economy.  Well into January and February, Oracle's pipeline reports showed strong growth in Oracle's pipelines as compared with the prior year.  And the Flash Reports for the first two months of the quarter showed that Oracle had closed about the same percentage of its projected revenue for the quarter as it had closed in the first two months of the two preceding third quarters.  Simply put, even if Defendants' statements about the effect of the economy on Oracle's business were considered purely present tense statements, there is no evidence that those statements were materially false.

### B.      Claims Regarding Suite 11i

Plaintiffs also claim that Defendants misled the market about Oracle's newest enterprise applications product, Suite 11i.  RSAC ¶¶ 50-51, 58, 63, 68; Ex. 81 at 8-15 (¶¶ 3(e), 7(a), 11(a)-(b), 23, 24(b)).  According to Plaintiffs, Defendants lied about Suite 11i to convince the market that Oracle's sales would grow despite a slowing economy.  RSAC ¶¶ 6-7, 9-10.  Plaintiffs allege that, in truth, Suite 11i was riddled with defects (or "bugs"), and that Oracle's sales in the first half of 3Q01 were "severely impacted" by "defects in the 11i software."  RSAC ¶ 10.  In

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

32

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1   discovery, Plaintiffs' "lost sales" allegations have completely collapsed.  Despite the massive

2   discovery record in this case, including extensive third party discovery directed at Oracle's

3   customers, Plaintiffs have not produced *any* evidence that Oracle lost a single sale due to product

4   defects at any time during 3Q01—much less that problems with Suite 11i caused Oracle to lose

5   $186 million worth of license revenue early in the quarter.

6        Instead, Plaintiffs have simply gathered a collection of every negative statement they can

7   find about Suite 11i, and now claim that Defendants' statements about Suite 11i in 3Q01 were

8   false because the product was so defective it was like "a car without wheels."  RSAC ¶ 52(s); *see*

9   *also*  Ex. 190 at 56, 93-95; RSAC at ¶¶ 54(a)-(m);  Ex. 81 at 72-74, 77-79.  Plaintiffs' claim fails,

10  however, because Defendants' statements did not speak to Suite 11i's overall quality, and in any

11  event, Plaintiffs' expert concedes that their evidence does not prove anything about that quality.

### 1.    Oracle's Development And Release Of Suite 11i

13       Enterprise applications software automates business functions.  Ex. 54 at 143915.  As of

14  3Q01, enterprise applications generally were divided into two categories:  (1) ERP or "enterprise

15  resource planning" applications for "back-office" functions such as accounting, human resources

16  and manufacturing; and (2) CRM or "customer relationship management" applications for

17  "front-office" functions such as call centers.  *See, e.g.*, Ex. 82 at 167136-37; Ex. 83 at 035471;

18  Ellison Decl., ¶ 15.  By the late 1990s, however, no vendor offered a single suite with *both* ERP

19  *and* CRM applications.  Ellison Decl., ¶ 15; Ex. 94 at 3; Ex. 104 at 442971; Ex. 105; Ex. 106 at

20  091478.  As a result, enterprise customers had to pay software engineers to write custom code, in

21  order to "stitch together" programs that were designed and engineered separately—a very costly

22  process referred to as "systems integration."  Ellison Decl., ¶ 16; Ex. 94 at 3; Ex. 95 at 110538;

23  Ex. 96 at 023899; Ex. 97 at 132:23-133:7; Ex. 83 at 035471; Ex. 56 at 003225; Ex. 98 at 420078;

24  Ex. 99 at 64:17-20; Ex. 100 at 141844; Ex. 101 at 306996-70002; Yourdon Decl., Ex. 1 at ¶¶ 71-

25  72, 102.  Systems integration can cost as much as ten times the cost of the underlying software.

26  Ex. 56 at 003225; Ex. 98  at 420078; *see also* Ex. 83 at 035471; Ex. 99 at 64:17-20.

27       In 1998, Oracle began developing Suite 11i to fill this gap.  Ex. 107 at 027782-83; Ex.

28  108 at 117404; Ex. 92 at 008975.  Oracle marketed Suite 11i as a single "suite" of ERP and

CRM applications designed and engineered by a single vendor, that could work together without expensive post-purchase "systems integration."  Ellison Decl., ¶¶ 15-16; Ex. 101 at 306995-7003; Ex. 109 at 003411.  Developing Suite 11i was a massive project, and the resulting software was enormous.  Ex. 99 at 122:8-18; Ex. 104 at 442972; Ex. 111 at 105:4-106:3; Ex. 110; Ex. 112 at 019758; Ex. 104 at 442972.

Oracle released Suite 11i in May 2000 and, in short order, achieved enormous success.  In Suite 11i's first two quarters in the marketplace (1Q01 and 2Q01), Oracle's new applications license revenue exceeded $435 million.  Ex. 25 at 973930; Ex. 26 at 976820.  Oracle sold another $249 million worth of Suite 11i licenses in 3Q01.  Ex. 27 at 977030.  In these quarters, Oracle achieved year-over-year applications growth of 42%, 66% and 25%, respectively—an average of 44%.  *Id.*  During roughly the same period, Oracle's largest competitor, SAP, reported average quarterly new license growth of only 33%.  Ex. 129; Ex. 130 at 307611; Ex. 131 at 307748.  Indeed, during 4Q01—the quarter after Oracle allegedly revealed the undisclosed "truth" about Suite 11i—Oracle sold over $338 million worth of new applications licenses.  Ex. 28 at 977287; Ex. 195 at 110953; Ex. 196 at 430558.

### 2. Defendants' Statements About Suite 11i

Plaintiffs challenged several Class Period statements echoing Oracle's basic marketing message for Suite 11i—that the modules of the Suite were "pre-integrated" with one another, and thus required no expensive "systems integration" to work together.  Ex. 189 at 3; RSAC ¶¶ 50-51, 58, 63, 68; Ex. 81 at 8-15 (¶¶ 3(e), 7(a), 11(a)-(b), 23, 24(b)).  As with Oracle's marketing message, Defendants' statements expressly compared Suite 11i with the then-prevailing "best-of-breed" option, which necessarily required "systems integration" to enable products from different vendors to work together.  Ex. 56 at 003224-25, 003237-38; Ex. 198 at 141655; Ex. 83 at 035471; Ex. 113 at 106690-91; Ex. 199  at 03286-92.  Plaintiffs' expert, Brooks Hilliard, later argued that nearly everything Defendants ever said about Suite 11i—including the statement that it was "available" for sale—was false.  *See, e.g.*, Ex. 190 at 10-21, 50-58.

### 3. Plaintiffs' "Quality" Evidence Does Not Prove Falsity

Plaintiffs cannot prove that Defendants' statements about Suite 11i were false.  As an

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

34

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1   initial matter, the statements Plaintiffs challenge spoke to the way Suite 11i was "designed" and

2   "engineered," and they expressly contrasted Suite 11i with separate "best of breed" products

3   offered by other vendors. *See, e.g.*, RSAC ¶ 50 ("[Y]ou can buy our complete E-Business Suite,

4   where all the pieces are designed and engineered to fit together."); *see also id.* ¶¶ 51, 58, 63, 68;

5   Ex. 81 at 8-15 (¶¶ 3(e), 7(a), 11(a)-(b), 23, 24(b)); Ex. 56 at 003224-25; Ex. 198 at 141655; Ex.

6   83 at 035471; Ex. 113 at 106690-91; Ex. 199 at 03286-92; Yourdon Decl., Ex. 2 at ¶ 128.

7   Plaintiffs do not deny that Suite 11i was "integrated" as compared to "best of breed" offerings

8   (Ex. 197 at 148:22-149:8; 143:25-144:16), nor do they claim that "systems integration" was

9   required for the pieces of Suite 11i to work together (Ex. 197 at 227:11-228:9). Plaintiffs instead

10   claim that these statements were false because the quality of Suite 11i was bad. *See, e.g.*, Ex.

11   190 at 10-21, 50-58; Ex. 197 at 8:17-25. Because Defendants' statements did not speak to the

12   overall quality of Suite 11i, Plaintiffs' Suite 11i-related evidence is irrelevant, as it does not have

13   anything to do with whether Suite 11i was "pre-integrated" when compared with "best of breed"

14   products.

15        But in any event, Plaintiffs' "quality" claim fails even on its own terms. The "facts" that

16   Plaintiffs claim Defendants withheld—supposed evidence that Suite 11i "did not work"—consist

17   almost entirely of anecdotal customer complaints. *See, e.g.,* Ex. 190 at 50-59; RSAC at ¶¶ 54(a)-

18   (m); Ex. 81 at 77-79. These complaints, moreover, were from customers who *purchased* Suite

19   11i and were having trouble implementing it, not from customers who declined to purchase due

20   to problems with the product (as Plaintiffs told the Ninth Circuit they would prove). But, in any

21   event, only a fraction of the problems reported to Oracle ultimately turned out to be defects in the

22   software, as opposed to other issues unrelated to the product itself. Ex. 52; Ex. 111 at 267:14-

23   268:6; Ex. 201 at 228:7-16; Ex. 202 at 38:3-15; Ex. 97 at 87:3-24; Ex. 203 at 240:12-16, 240:18-

24   241:1, 122:4-10; Ex. 133 at 213:2-15; Ellison Decl., ¶ 19; Shaw Decl., ¶ 7-8; Fletcher Decl., ¶

25   22-25.[16] Experts on both sides thus agree that, without more, customer complaints do not show

---

[16] The fact that some small fraction of Oracle's customers complained about Suite 11i's quality
does not prove anything about the quality or functionality of the Suite overall, particularly since
every bug does not affect every customer. Ex. 111 at 134:1-12; Ex. 67 at 141:18-143:1; Ex. 424
at 72:14-73:12; Ex. 142 at 262:7-18; Ex. 197 at 186:9-14; Ex. 132 at 95:12-96:5.

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

35                    DEFENDANTS' REVISED MOTION FOR
                     SUMMARY JUDGMENT
                     MASTER FILE NO. C-01-0988-SI

1  that Suite 11i was defective at all.[17]  Ex. 298 at 83:24-84:24, 86:9-14; Ex. 376 at ¶ 16; *also* Ex.

2  286 at 88:4-10, 91:25-92:3.

3      Indeed, Plaintiffs concede that with this evidence, they cannot prove anything about Suite

4  11i's overall quality.  Opp. to First MSJ (Dkt. No. 1428) at 15 n.24, 24 n.38; Opp. to First

5  Hilliard *Daubert* (Dkt. No.1315) at 18 ("It is undisputed that neither party knows with any

6  degree of accuracy either the size of Suite 11i or the number of defects the software contained.").

7  Plaintiffs' own rebuttal software expert, Dr. Randall Jensen, confirmed that the record does not

8  support any meaningful conclusion about Suite 11i's quality.  Ex. 132 at 38:3-16.  Plaintiffs'

9  claims have collapsed so completely in the face of the evidence that they have since denied ever

10  making them.  *Compare* RSAC ¶ 52(s) (alleging that selling Suite 11i was like selling "a car

11  without wheels") *with* Opp. to Defs.' First MSJ at 15 ("Plaintiffs never alleged that 11i was

12  'defective' like a 'car without wheels.'")  Simply put, Plaintiffs' anecdotal evidence does not

13  support their claim that Suite 11i was so plagued by defects that it was effectively unavailable for

14  sale.  Ex. 197 at 86:21-87:7; Ex. 132 at 29:12-14, 33:22-34:1, 38:10-16, 111:8-112:2).  Plaintiffs

15  cannot prove that Defendants' Suite 11i statements were false.  *Recr. Devel. of Phoenix, Inc. v.*

16  *City of Phoenix*, 220 F.Supp.2d 1054, 1061 (D. Ariz. 2002) (finding anecdotal evidence "non-

17  systematic and non-generalizable").

18      **C.      Claims Regarding Oracle's 2Q01 Financial Results**

19      Having abandoned the only accounting fraud alleged in the RSAC, *see* Order at 12,

20  Plaintiffs have attempted to manufacture two new accounting fraud theories: namely, that Oracle

21  overstated revenue and EPS in 2Q01 by (i) improperly transferring $20 million to a bad debt

22  reserve account, and (ii) incorrectly recognizing approximately $20 million in revenue on a sale

23  of software licenses to HP.

24  _____

25  [17] If offered to prove the facts asserted by the customers, these complaints are hearsay, and
   inadmissible to prove any defects in Suite 11i.  Fed. R. Evid. 801(c), 805; *Olson v. Ford Motor*

26  *Co.*, 410 F. Supp. 2d 855, 861-62 (D.N.D. 2006) ("[C]ustomer complaints, whether contained in
   Ford's business records or compiled by another party, all constitute hearsay."); *Commodity*

27  *Futures Trading Com'n v. Wilshire Inv. Mgmt. Corp.*, 407 F. Supp. 2d 1304, 1315 n.2 (S.D. Fla.
   2005) (holding customer complaints memorialized in reports that fall within hearsay exception

28  are inadmissible hearsay within hearsay); *see also* Ex. 402 at 193:21-196:5.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

36

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1    However, neither of Plaintiffs' new accounting claims was alleged in the RSAC; the

2    pleadings make absolutely no mention of $20 million in 2Q01 bad debt transfers, nor a $20

3    million alleged "swap" with HP.  Plaintiffs cannot overcome summary judgment simply by

4    inventing new claims without subjecting them to the PSLRA and Rule 9(b)'s rigorous pleading

5    standards, *In re Stratosphere Corp. Sec. Litig.*, 66 F. Supp. 2d 1182, 1201 (D. Nev. 1999), and

6    any attempt to amend the pleadings at this late stage would be futile in light of the five-year

7    statute of repose for Section 10(b) claims.  28 U.S.C. § 1658.  And in any event, Plaintiffs cannot

8    prove falsity or scienter as to these two unpled accounting claims.

9                    **1.        Plaintiffs Cannot Prove Falsity**

10   Oracle's 2Q01 financial statements—which have been reviewed by two independent

11   accounting firms—never have been corrected or restated.  O'Bryan Decl., Ex. 1 at 41; Ex. 386 at

12   122:13-123:21; Ex. 387 at 209:1-210:5.  Plaintiffs have offered no evidence, moreover, that

13   those financial statements were false.  As to the bad debt transfer allegation, there is a complete

14   failure of proof.  Plaintiffs' accounting expert, D. Paul Regan, admitted that he performed no

15   analysis whatsoever to determine whether *any* of the 2Q01 bad debt transfers were proper or

16   could be recognized as revenue because he considered such an analysis to be a "useless

17   exercise."  Ex. 264 at 233:21-234:3.  Plaintiffs thus have no evidence that these transfers made

18   Oracle's financial reports materially false.[18]

19   Plaintiffs' HP claim fares no better.  Relying upon emails suggesting that HP used its

20   willingness to purchase software licenses from Oracle as bargaining leverage in negotiating a

21   separate sale of servers to Oracle (Ex. 402 at 138:3-140:14), Plaintiffs argue that the transaction

22   was an improper "swap" because the deals were "entirely contingent."  However, there is

23   nothing improper with companies selling products to one another, or for that matter, with one

24   _____

25   [18] Defendants' accounting expert is the *only* individual who analyzed the propriety of the 2Q01
     bad debt transfers, and he determined that at least $2 million in transfers, or roughly 20% of the

26   $10.6 million in transfers covered by the discovery orders in this case, were proper or previously
     should have been recorded as revenue.  O'Bryan Decl., Ex. 1 at 4, 32-36, 38; Ex. 263 at 136:2-

27   16.  The remaining 80% were not necessarily improper; rather, the evidence was insufficient to
     form an opinion.  In any event, it is not Defendants' burden to prove that the transfers were

28   proper.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

37

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

company using its willingness to enter into an agreement as leverage in negotiating another deal. *Id.* Instead, reciprocal transactions are considered "swaps" only if they involve one company essentially paying for revenue and not receiving any economic benefit in return. O'Bryan Decl., Ex. 2 at 29-31. Here, there is no evidence that Oracle purchased servers it did not need solely to generate 2Q01 revenue from HP's purchase of software licenses. To the contrary, the undisputed evidence demonstrates that: (1) Oracle needed the servers, (2) Oracle used the servers, (3) the purchase expanded upon a strategic business alliance, and (4) Oracle's purchase of HP servers allowed it to reduce its dependence on Sun servers. *Id.* at 31-32; Ex. 403 at 206:10-23; Ex. 429 at 75:9-17; Ex. 425 at 19:12-23.[19]

Moreover, Oracle's recognition of $20 million on its sale of software licenses to HP complied with GAAP. Under the relevant accounting literature (*i.e.*, SOP 97-2), four criteria must be satisfied before revenue can be recognized: (1) persuasive evidence of an arrangement; (2) delivery; (3) fixed or determinable fees; and (4) collectibility is probable. O'Bryan Decl., Ex. 2 at 38-40. Here, Oracle and HP executed a license agreement before the end of 2Q01 (*id.*; Ex. 426 at 260113); the software was shipped to HP on November 30, 2000 (O'Bryan Decl., Ex. 2 at 40-48; Ex. 404 at 3043129); the fees were fixed in a written finance agreement (O'Bryan Decl., Ex. 2 at 48-50; Ex. 426 at 260121); and HP was a creditworthy customer. O'Bryan Decl., Ex. 2 at 48-50; Ex. 426 at 260111. Underscoring the appropriateness of the HP revenue, it was reviewed and approved by Oracle's internal revenue recognition specialists, its outside auditor, and the Finance and Audit Committee. Each concluded, at the time, that Oracle's decision to recognize the revenue was proper. Ex. 71 at 309:16-310:7, 318:17-319:4, 320:8-13; Ex. 63 at 500:1-13; Ex. 236 at 169:16-21; O'Bryan Decl., Ex. 2 at 37-38; Ex. 235 at 325:4-19; Ex. 427 at

---

[19] The only person to suggest that Oracle should not have recognized revenue on the HP deal is Plaintiffs' accounting expert, who claimed he saw "no evidence" that Oracle complied with the accounting literature. Regan saw no such evidence because Special Master Infante held that the HP transaction was not a proper subject of fact discovery. Ex. 232 at 14:11-16:5. In any event, Plaintiffs' expert admitted that he never personally applied the relevant accounting standards, and therefore, is not qualified to opine on the accounting for the HP transaction. Ex. 227 at 208:9-21. Furthermore, Regan admitted that he formed his opinions without reviewing the most critical documents, including Oracle's internal revenue recognition checklist, the auditor's workpapers and the Audit Committee presentation. *Id.* at 172:6-12, 184:14-185:6, 190:1-18.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

38

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1   081755; Ex. 405 at 102704.

2   In any event, even if Plaintiffs could show that Oracle's 2Q01 results were false (which

3   they cannot), these alleged accounting errors were immaterial as a matter of law.  Assuming both

4   accounting entries were improper, Oracle's revenue would have been overstated (according to

5   Plaintiffs) by $40 million, *i.e.*, about 1.5% of Oracle's $2.66 billion in revenue for 2Q01.  Ex.

6   226 at 2; O'Bryan Decl., Ex. 2 at 51; Ex. 235 at 98:23-25; Ex. 227 at 127:19-24; *In re Intershop*

7   *Communs. AG Sec. Litig.*, No. C 01-20333 JW, 2003 U.S. Dist. LEXIS 26923, at *16 (N.D. Cal.

8   Jul. 23, 2003); *In re Convergent Techs. Second Half 1984 Sec. Litig.*, No. C-85-20130-SW, 1990

9   WL 606271, at *10 (N.D. Cal. Jan. 10, 1990).  Plaintiffs also cannot establish materiality by

10  relying upon any purported change in Oracle's EPS for 2Q01.  The impact of these two items on

11  Oracle's 2Q01 EPS was less than half a cent, and Oracle would have met consensus expectations

12  for 2Q01 even if neither occurred.  Ex. 227 at 129:9-18; *SEC v. Todd*, No. 03CV2230 BEN,

13  2007 U.S. Dist. LEXIS 38985, at *13 (S.D. Cal. May 30, 2007); *Matthews v. Centex*

14  *Telemanagement, Inc.*, No. C-92-1837-CAL, 1994 U.S. Dist. LEXIS 7895, at *18 (N.D. Cal.

15  Jun. 9, 1994); *In re Anchor Gaming Litig.*, 33 F. Supp. 2d 889, 894-95 (D. Nev. 1999).

16            **2.      Plaintiffs Cannot Prove Scienter**

17  Plaintiffs also cannot establish scienter with respect to their unpled accounting claims.  In

18  the Ninth Circuit, "recklessness" is "not merely simple or even inexcusable negligence, but an

19  extreme departure from the standards of ordinary care, and which presents a danger of

20  misleading buyers or sellers that is either known to the defendant or is so obvious that the actor

21  must have been aware of it."  *Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1063 (9th Cir. 2000).

22  Plaintiffs cannot meet this standard.  As to the bad debt transfer allegations, Ellison, Henley and

23  Sanderson did not even know the bad debt transfers had taken place during 2Q01.  Ellison Decl.,

24  ¶ 29; Henley Decl., ¶ 19; Sanderson Decl., ¶ 11; Ex. 71 at 451:1-452:5; *In re Stratosphere Sec.*

25  *Litig.*, 66 F. Supp. 2d 1182, 1190 (D. Nev. 1999) ("[I]f the defendant presents affidavits …

26  establishing a lack of scienter, the plaintiff must come forward with some affirmative

27  showing.").  As to the HP revenue, Ellison, Henley and Sanderson have similarly affirmed that

28  they had no reason to believe there was any problem with the revenue Oracle recognized on that

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

39

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1  transaction.  Ellison Decl., ¶ 30; Henley Decl., ¶ 19; Sanderson Decl., ¶ 12.  Indeed, as noted, the

2  HP revenue had been reviewed and approved by Oracle's revenue recognition specialists, its

3  outside auditor and the Finance and Audit Committee.

4  **VI.    PLAINTIFFS' SECTION 10(B) CLAIM FAILS: NO LOSS CAUSATION**

5           Loss causation is an essential element of Plaintiffs' Section 10(b) claim.  15 U.S.C.

6  § 78u-4(b)(4); *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005).  A plaintiff

7  must prove a "causal connection" between a defendant's alleged misrepresentation and the

8  plaintiff's economic loss.  *Id.* at 345-46.  As the Supreme Court has explained, the "logical link

9  between [an] inflated share price" resulting from an alleged misstatement "and any later

10  economic loss is not invariably strong" because "that lower price may reflect, not the earlier

11  misrepresentation, but changed economic circumstances, changed investor expectations, new

12  industry-specific or firm-specific facts, conditions, or other events."  *Id.* at 342-43.  Thus, a

13  Section 10(b) plaintiff must show that the company's stock price dropped because the "relevant

14  truth"—*i.e.*, a "truth" that the alleged fraud concealed—became "generally known."  *Id.* at 344.

15           Accordingly, to avoid summary judgment, a plaintiff must come forward with evidence

16  from which a rational trier of fact could conclude that plaintiff's loss was caused by the

17  disclosure of the "relevant truth," as opposed to other factors; absent such evidence, summary

18  judgment must be granted.  *See McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 427 n.4 (3d Cir.

19  2007) (granting summary judgment on loss causation grounds); *In re Omnicom Group, Inc. Sec.

20  Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) (granting summary judgment on loss causation

21  grounds); *Flowserve*, 245 F.R.D. at 571-74, 582 (same); *Gordon Partners*, 2007 WL 1438753, at

22  *1-2 (same); *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1264 (N.D. Okla. 2007) (same);

23  *Carpe v. Aquila, Inc.*, No. 02-0388-CV-W-FJG, 2005 WL 1138833, at *4-5, *8 (W.D. Mo. Mar.

24  23, 2005) (same); *McKowan Lowe & Co., Ltd. v. Jasmine, Ltd.*, No. 94-5522 (RBK), 2005 U.S.

25  Dist. LEXIS 32164, at *31-34 (D.N.J. June 30, 2005) (same); *In re Zonagen Sec. Litig.*, 322 F.

26  Supp. 2d 764, 781-82 (S.D. Tex. 2003) (same); *In re Imperial Credit Indust.*, 252 F. Supp. 2d

27  1005, 1014-15 (C.D. Cal. 2003) (same); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 131 F. Supp.

28  2d 680, 688-91 (E.D. Pa. 2001) (same).  Here, Plaintiffs have not come forward with evidence

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

40

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

that the March 2, 2001 drop in Oracle's stock price was caused by the disclosure of any "relevant truth."  Accordingly, Defendants are entitled to summary judgment.

### A.      Oracle's 3Q01 Earnings Miss Was Caused By A Sudden, Unexpected And Industry-Wide Downturn

The undisputed facts show the March 2 stock drop was caused not by the disclosure of any "relevant truth," but because the market learned, through Oracle's announcement, of a sudden and unexpected economic downturn that impacted the entire enterprise software industry. Indeed, as part of the March 1 announcement, Defendants explained that "[l]icense growth was strong in the first two months of Q3, and [Oracle's] internal sales forecast looked good up until the last few days of the quarter."  Ex. 30.  Defendants also reported that "a substantial number of our customers decided to delay their IT spending based upon the economic slowdown in the United States."  *Id.*  In reaction to this announcement, analyst after analyst described the miss as resulting from a sudden and unexpected industry-wide downturn at the very end of Oracle's third quarter,[20] and they anticipated that in the coming weeks, the impact of this sudden fallout would resonate throughout the industry as Oracle's competitors announced their results.[21]

---

[20] Ex. 406 at BOA 02690 (BofA:  "A great percentage of sales occur in the third month of each quarter, with a surprisingly high percentage in the final days. … We continue to believe (and Oracle's shortfall seems to bear this out) that at the 11th hour, in an uncertain economy, some technology buyers will defer their purchases."); Ex. 407 at 091349 (Morgan Stanley:  "This [downturn] is worse than past downturns in the suddenness and severity."); Ex. 408 at 2 (Morgan Stanley:  "Both the integrators and software sales reps are saying buyers were frozen like deer in headlights during February and March. … Several CIOs … said they still were surprised at the suddenness of the change[.]").

[21] Ex. 406 at BOA 02690 (BofA:  "We believe this uncertainty will continue to [affect] enterprise software sector fundamentals and, correspondingly, stock prices therein."); Ex. 409 at 091385 (Lehman:  "[W]e would be most cautious on the enterprise applications software space as a whole[.]"); Ex. 410 at 91361 (SSB:  "[Oracle's] shortfall is an omen for other names in our universe. … Given that Oracle has a February-quarter end, and the slow down only began to affect the company during the later portion of February, we believe other applications vendors may face difficulty in March and could have a hard time meeting expectations."); Ex. 411 at CSFB 00075 (Credit Suisse:  "Although bad news for Oracle, we believe the announcement is a problem relating to the economy and not one inherent to the company[.]"); Ex. 412 at 2 (R/S Investments:  "[W]e believe software companies across the board currently face significant challenges and uncertainty in light of the slowing economy."); Ex. 395 at 2 (Morgan Stanley:  "[L]et's hope for a little let up on Tuesday after a Bloody Monday of pre-announcements—a record 8 enterprise software companies in one day…. Including five companies that pre-announced last month, a total of 13 enterprise software companies have fallen on their swords.").

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

41

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

Consistent with Oracle's explanation for the miss and the analysts' expectations, Oracle's competitors soon suffered the negative effects of this abrupt economic downturn.  Before March 1, 2001, Oracle and its competitors had exceeded expectations and were unaffected by the economy.  Following Oracle's March 1 announcement, *all* of Oracle's competitors' stock prices declined.  James Decl., Ex. 1 at ¶ 61 and Ex. 9.[22]  Most of Oracle's competitors went on to miss their own guidance, citing precisely the same economic forces that Oracle had described as causing its earnings miss.  Exs. 413-417.  And as the evidence mounted, analysts continued to describe Oracle's earnings miss as the result of an industry-wide phenomenon that Oracle— given its unique fiscal calendar—was among the very first to weather in the final days of February 2001.  Ex. 395 at 2.  It was not until November 2001 that the NBER determined that the country had entered a recession, and even then, the NBER determined that the country entered the recession in March 2001, not before.  Ex. 400.

Ignoring what Oracle disclosed on March 1, and what market analysts understood that disclosure to mean, Plaintiffs have insisted that the stock drop following Oracle's 3Q01 miss was caused not by the sudden industry forces that Oracle, its competitors, analysts and the market consistently blamed, but instead, by the disclosure of an alleged fraud at Oracle.  RSAC ¶¶ 17-19, 75.  But despite years of discovery, Plaintiffs have failed to adduce a shred of evidence in support of this claim.  On summary judgment, allegations are not enough; Plaintiffs must come forward with evidence that the stock drop was caused by disclosure of the "relevant truth."

### B. There Is No Evidence That The March 2 Stock Drop Was Caused By Disclosure of The "Relevant Truth"

A plaintiff may prove loss causation in one of two ways.  First, a plaintiff may prove that the stock price dropped due to a direct disclosure of the "relevant truth," *i.e.*, an express "corrective disclosure" revealing a "truth" that a defendant's fraudulent statement or omission had concealed.  *Dura*, 544 U.S. at 342-43; *Metzler*, 540 F.3d at 1063-64.  Alternatively, a plaintiff may prove that the market learned the "relevant truth" indirectly, *i.e.*, through new

---

[22] The probability that all of Oracle's competitors' stock prices would decline on the same day absent new, material news related to the market or industry is less than 1%.  James Decl., Ex. 1 at ¶ 61.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

42

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

information that does not expressly correct a prior statement, but nonetheless shows the falsity of that statement. *Metzler*, 540 F.3d at 1063-64; *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1021 (9th Cir. 2005); *In re Oracle Corp. Secs. Litig.*, No. C01-00988 MJJ, 2006 U.S. Dist. LEXIS 94470, at *35-36 (N.D. Cal. Dec. 20, 2006).  But when a plaintiff claims the fraud was revealed indirectly, plaintiffs "must provide proof that the market recognized a relationship between the event disclosed and the fraud to establish loss causation."  *Flowserve*, 245 F.R.D. at 579; *see also Metzler*, 540 F.3d at 1064 ("Metzler is correct to observe that neither *Daou* nor *Dura* require an admission or finding of fraud before loss causation can be properly pled. … [b]ut that does not allow a plaintiff to plead loss causation through 'euphemism' and thereby avoid alleging the necessary connection between defendant's fraud and the actual loss."); *Omnicom*, 541 F. Supp. 2d at 552; *McKowan*, 2005 U.S. Dist. LEXIS 32164, at *26-27; *Ikon*, 131 F. Supp. 2d at 690; *Robbins v. Kroger Properties, Inc.*, 116 F.3d 1441, 1448 (11th Cir. 1997).

> ### 1.    There Was No Direct Disclosure That Defendants' Statements Were False

To prove that the market reacted negatively to a direct "corrective disclosure," a plaintiff must identify a disclosure revealing the falsity of a prior representation, *i.e.*, the "relevant truth." *Dura*, 544 U.S. at 342; *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005) (disclosure that "do[es] not reveal to the market the falsity" of prior statements "do[es] not amount to a corrective disclosure"); *In re Impac Mortg. Holdings, Inc. Sec. Litig,*, 554 F. Supp. 2d 1083, 1102 n.13 (C.D. Cal. 2008) (rejecting loss causation theory where disclosure merely "repeated the alleged misrepresentations"); *Flowserve*, 245 F.R.D. at 572 (rejecting loss causation theory where purported "corrective disclosures" reiterated alleged falsehoods).

Here, the March 1, 2001 announcement did not reveal any "relevant truth" that Plaintiffs claim the Defendants concealed.  For example, Plaintiffs claim that Oracle's 3Q01 forecasts were false (RSAC ¶ 46), which requires Plaintiffs to prove that Defendants had no reasonable basis for the guidance given, or were aware of undisclosed facts tending seriously to undermine it.  *Adobe*, 787 F. Supp. at 919.  But Oracle's March 1, 2001 announcement did not reveal anything about the basis for the December 14 guidance, nor did it disclose that Oracle had been

1   aware of facts seriously undermining the forecast when made.  On the contrary, on March 1 the

2   Defendants said that Oracle's "internal sales forecast looked good up until the last few days of

3   the quarter" (Ex. 30 at 442139), but that in the *final days of 3Q01* customers canceled or delayed

4   deals to defer expenditures.  The fact that Oracle had, in fact, missed its guidance, that does not

5   mean the projections had no reasonable basis when first announced.  *See*, *e.g.*, *Metzler*, 540 F.3d

6   at 1064 (plaintiff cannot avoid demonstrating "the necessary connection between defendants'

7   fraud and the actual loss" by claiming that the market understood disclosure as a "euphemism"

8   revealing fraud).

9          Plaintiffs also claim that Defendants fraudulently assured the market throughout 3Q01

10   that Oracle was on track to meet issued guidance, notwithstanding the slowing economy.  RSAC

11   ¶ 45.  But again, Oracle's March 1, 2001 disclosure did not reveal that the economy had been

12   hurting Oracle's business throughout 3Q01.  The March 1 announcement did not reveal any

13   "truth" that had been concealed by Defendants' statements concerning the economy—*i.e.*, that

14   intra-quarter data had indicated a "substantial likelihood of an extreme departure" from Oracle's

15   previously-issued guidance.  *See Dura*, 544 U.S. at 342-43.

16          With respect to Suite 11i, Plaintiffs claim that Defendants' statements were false because

17   Suite 11i's quality was so poor that it was like "a car without wheels."  RSAC, ¶ 52.  But the

18   March 1, 2001 announcement did not reveal anything at all about the quality or functionality of

19   Suite 11i—much less, that the earnings miss was attributable to product problems with Suite 11i.

20   In fact, during the March 1 analyst call, Ellison repeated, almost *verbatim*, many of the same

21   Suite 11i statements that Plaintiffs claim are false.  Ex. 428 at 050627-29, 050637-41; Ex. 393 at

22   419811-14.  Thus, the March 1, 2001 announcement did not reveal any "truth" about Suite 11i

23   that Defendants had concealed through their alleged false or misleading statements.

24          Finally, Plaintiffs claim that Oracle's 2Q01 financial results were artificially inflated by

25   virtue of the bad debt transfers and the HP transaction.  But the March 1, 2001 announcement did

26   not disclose anything about Oracle's 2Q01 financial results.  Indeed, Oracle did not announce—

27

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

44

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1    and has never announced—a restatement of, or any correction to, its 2Q01 financial statements.[23]

2              **2.    Plaintiffs Have Failed to Prove An "Indirect" Disclosure That Defendants' Statements Were False**

3    There is no evidence that the market recognized any relationship between the alleged

4    fraud and Oracle's 3Q01 earnings miss.  *Flowserve*, 245 F.R.D. at 579 ("When fraud is revealed

5    through indirect disclosure, plaintiffs must provide proof that the market recognized a

6    relationship between the event disclosed and the fraud to establish loss causation."); *Metzler*, 540

7    F.3d at 1064; *McKowan*, 2005 U.S. Dist. LEXIS 32164, at *26-27.  Plaintiffs' loss causation

8    expert, Bjorn I. Steinholt, cannot provide the required "causal connection" because he simply

9    assumed that a causal link existed, and that Plaintiffs would prove it.  Ex. 418 at ¶ 13 ("For my

10   purposes, I assumed that plaintiffs' allegations are true, and, consequently, I concluded that the

11   price decline on March 2, 2001 relates directly to plaintiffs' allegations.").[24]

12   In fact, Plaintiffs have not cited any evidence that market analysts recognized the March

13   1, 2001 announcement as revealing some "truth" that Defendants had concealed through their

14   alleged false statements.  Plaintiffs have not identified a single analyst who attributed the miss or

15   the stock drop to any defects in Oracle's forecasting process, much less to the lack of a

16   reasonable basis for Oracle's December 14, 2000 projections or its subsequent statements

17

18   [23] Plaintiffs' loss causation "expert" did not even attempt to tie the alleged 2Q01 accounting

19   issues to the 3Q01 earnings miss, and Plaintiffs' accounting expert admitted that:  (i) the bad

20   debt transfers only impacted 2Q01; and (ii) the HP transaction was not a legitimate sale and should *never* have been booked as revenue—not in 2Q01, not in 3Q01, nor in any subsequent reporting period.  Ex. 227 at 119:16-120:4, 9:22-10:14.

21   [24] In assessing the sufficiency of a plaintiff's evidence, a court must treat admissible expert

22   testimony like any other evidence—recognizing that it is not a "talisman against summary judgment."  *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997); *see also Flowserve*, 245 F.R.D.

23   at 570, 573 n.24 (granting summary judgment on loss causation grounds even without excluding expert testimony); *Omnicom*, 541 F. Supp. 2d at 554 (same); *Daubert v. Merrill Dow Pharms.,*

24   *Inc.*, 509 U.S. 579, 596 (1993)  (even where expert testimony is deemed admissible, if "the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to

25   allow a reasonable juror to conclude that the position more likely than not is true, the court

26   remains free … to grant summary judgment"); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989).  For these reasons, the Court need not rule on the admissibility of

27   Steinholt's opinion testimony to grant summary judgment for Defendants.  If the Court is inclined to rule on the admissibility of this evidence first, however, Defendants have filed a

28   motion to exclude Steinholt's opinions regarding loss causation and damages under *Daubert*.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

45

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1    concerning those projections.  On the contrary, analysts uniformly attributed Oracle's earnings

2    miss to a dramatic slowdown in the industry that became visible in the final days of 3Q01,

3    precisely the same forces that Oracle (and its competitors) blamed.  *Flowserve*, 245 F.R.D. at

4    572-73 ("In short, the collective silence by analysts…is noticeably deafening."); *Lentell*, 396

5    F.3d at 174 ("[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing

6    comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud

7    decreases[.]") (internal quotations omitted).

8           Nor is there any evidence that the market recognized a relationship between Defendants'

9    allegedly false statements about the economy and the March 1 announcement.  *Metzler*, 540 F.

10   3d at 1064; *Flowserve*, 245 F.R.D. at 579; *McKowan*, 2005 U.S. Dist. LEXIS 32164, at *26-27.

11   There is no evidence that the market understood Oracle's March 1 announcement as revealing

12   that the economy had been negatively impacting Oracle's business *throughout* 3Q01.  Instead,

13   analysts consistently described the miss as occurring in the final days of the quarter, and

14   therefore, predicted (correctly) that Oracle's competitors soon would suffer the same fate as

15   Oracle.  *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007) (granting

16   summary judgment where plaintiffs failed to refute evidence that loss was the result of market

17   forces that impacted competitors).

18          There also is no evidence the market recognized Oracle's March 1 disclosure as revealing

19   previously undisclosed facts regarding integration, interoperability or general quality issues with

20   Suite 11i, much less, that any such problems caused the miss.  RSAC ¶¶ 6, 11, 54; Ex. 81 at 85.

21   If the market had understood Oracle's miss to have been caused by problems with Suite 11i, one

22   would expect that only Oracle's stock price would have dropped on March 2, 2001.  That

23   obviously was not the case, as all of Oracle's competitors' stock dropped as well.  And in any

24   event, the undisputed evidence establishes that Suite 11i product issues did not cause the miss.

25   Despite a massive discovery effort, including subpoenas that Plaintiffs served on over 100 Oracle

26   customers, Plaintiffs have not identified a single 3Q01 deal that was canceled or delayed due to

27   alleged "problems" with Suite 11i—and certainly have not shown that the earnings miss was

28   attributable to problems with Suite 11i.  Ex. 81 at 85; *cf. Tuchman v. DSC Communications*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

46

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1   *Corp.*, 818 F. Supp. 971, 977 (N.D. Tex. 1993) ("Plaintiffs fail to provide any facts to support

2   [their] assertions [of reduced orders]. How many customers defected? Which customers? Which

3   orders were cancelled? What equipment was returned? What figures demonstrate a fall-off in

4   new orders?"). Moreover, if Plaintiffs' allegations were true—if the March 1 announcement had

5   revealed that Suite 11i was "like a car without wheels"—one would have expected Suite 11i

6   sales to plummet after the March 1, 2001 announcement. In fact, just the opposite occurred:

7   Oracle's sales of Suite 11i reached an all time high in 4Q01 (the three months *after* Plaintiffs

8   claim the market learned the "truth" about Suite 11i), as Oracle sold $338 million in Suite 11i

9   licenses in 4Q01 ($87 million *more* than in 3Q01). Ex. 28 at 977287; Ex.195 at 110953; Ex. 196

10   at 430558.[25]

11       Finally, with respect to Plaintiffs' 2Q01 accounting allegations, there is no evidence that

12   the market *ever* became aware of the purported accounting errors—not in 2Q01, not on March 1,

13   2001, not at any point thereafter. Thus, even if the Court were to assume that Oracle's 2Q01

14   revenue was inflated by these two $20 million alleged accounting errors (it was not), there is no

15   conceivable theory under which these 2Q01 revenues could have caused, or even contributed to,

16   the stock drop following Oracle's 3Q01 miss.

17

18

---

19   [25] At the summary judgment hearing before Judge Jenkins, Plaintiffs cited a March 16, 2001

20   analyst report from Banc of America, which they quoted as follows: "'On the applications side,' that is 11i, 'especially in light of Oracle's weaker than expected 3Q applications growth, we believe the economy may only explain 20 to 30 percent of the weakness. The rest, in our view,

21   is a result of the product set, 11i, not reaching a competitive level of functionality relative to the

22   best of breed.'" Ex. 402 at 103:14-20. The very next sentence—which Plaintiffs did not quote—says: "The litmus test for Oracle's competitors is in 15-30 days when applications

23   software companies report their March quarters. *If results are weak, it's probably good news for Oracle (Oracle's apps weakness is due more to industry weakness); if they're strong, it's bad*

24   *news (apps business is losing share)*." As it turned out, most of Oracle's competitors ended up missing their guidance in the following weeks. The analyst report, therefore, *supports*

25   Defendants' explanation that Oracle's stock drop was the result of a sudden and unexpected

26   industry-wide downturn. In fact, another Banc of America analyst report, issued two weeks earlier (March 2, 2001), further supports Oracle's explanation of the miss: "Customer behavior

27   is only revealed at the very end of each quarter[.] We continue to believe (and Oracle's shortfall seems to bear this out) that at the 11th hour, in an uncertain economy, some technology buyers

28   will defer their purchases." Ex. 406 at BOA 02690.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

47

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

## C.    The Ninth Circuit's *Gilead* Opinion Is Consistent With This Analysis

The Ninth Circuit's recent decision in *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008) is entirely consistent with this analysis.  In *Gilead*, it was undisputed that the market had learned the "relevant truth," but the parties disagreed as to whether the revelation of this truth caused the stock price to drop.  The district court in *Gilead* dismissed the case because it concluded that the disclosure of the "relevant truth"—a July FDA Warning Letter stating that the company had engaged in illegal "off-label" marketing practices—was insufficiently temporally related to the drop in Gilead's stock price three months later.  *Gilead*, 536 F. 3d at 1055.  The Ninth Circuit reversed, finding that an October press release immediately preceding the stock drop had revealed lower-than-expected revenues, which analysts ascribed to "lower end-user demand."  *Id.* at 1057-58.  That "lower end-user demand," in turn, was alleged to have been caused by the FDA's Warning Letter three months earlier.  *Id.* at 1058.  The Ninth Circuit concluded plaintiffs had adequately alleged that their economic loss was caused by the market learning of and reacting to a "truth" (*i.e.*, that demand had been fueled by "off-label" marketing), which had been concealed by the defendants' alleged misrepresentations (*i.e.*, statements that demand was strong without disclosing the unlawful marketing practices).  *Id.*  Important to this conclusion was the Ninth Circuit's consideration of *both* the July Warning Letter and the subsequent October press release.  Furthermore, in reaching this holding, the Court in *Gilead* contrasted *pleading* loss causation with *proving* loss causation, and observed that a court's "skepticism is best reserved for later stages of the proceedings" when loss causation "can be rejected on evidentiary grounds."  *Id.* at 1057.

This case differs from *Gilead* in two critical respects.  First, as discussed above, there is no evidence here that the market ever learned the "relevant truth," whereas in *Gilead* it was undisputed that the market had learned the truth.  Second, the *Gilead* court addressed the standards for pleading loss causation under Fed. R. Civ. P. 8.  The instant motion, however, concerns Plaintiffs' lack of evidence at summary judgment, which is one of those very "later stages of the proceedings" when loss causation "can be rejected on evidentiary grounds."  Plaintiffs bear the burden of proving loss causation, and therefore summary judgment is required

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

if (as is the case here) they fail to come forward with evidence from which a rational trier of fact could find in their favor. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323, 325 (1986) (where the burden of proof at trial falls on the nonmoving party, it is sufficient for the movant to point to a lack of evidence to the trier of fact on an essential element of the nonmovant's claim); *Gordon Partners*, 2007 WL 1438753, at *2 ("Summary judgment is the time to put up or shut up."). As set forth above (*supra* at 41), courts have not hesitated to grant defendants summary judgment on loss causation grounds where plaintiffs have failed to adduce evidence of a corrective disclosure.

## VII.   PLAINTIFFS' SECTION 20A CLAIMS FAIL[26]

The Ninth Circuit has made clear that "[c]laims under Section 20A are derivative and therefore require an *independent violation* of the Exchange Act." *Johnson v. Aljian*, 490 F.3d 778, 781 (9th Cir. 2007) (emphasis added); *In re Connectics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1014 (N.D. Cal. 2008). Because Plaintiffs cannot establish every element of their Section 10(b) claims, including falsity and loss causation, their Section 20A claim necessarily fails, too.[27]

Defendants Henley and Ellison are entitled to summary judgment on the 20A claim on the separate ground that they did not possess material, nonpublic information at the time of their sales of Oracle stock.[28] *See Oracle Deriv.*, 867 A.2d at 906 (holding that no rational trier of fact

---

[26] Defendants are not moving for summary judgment on the Section 20A claim on scienter grounds, and therefore do not address here the Court's question on what scienter or state of mind Plaintiffs must demonstrate to establish Section 20A liability for defendant Ellison. Order at 13. Defendants expect to address the Court's question on this issue in opposition to Plaintiffs' renewed motion for summary adjudication as to their Section 20A claim.

[27] Because liability under Section 10(b) is a prerequisite for controlling person liability under Section 20(a) (RSAC ¶¶ 94-98), this claim also fails. *See Paracor Fin. Corp. v. General Electric Cap. Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996).

[28] The Ninth Circuit relied on Ellison's stock sales as support for its reversal. *Oracle Corp.*, 380 F.3d at 1232. The undisputed facts discussed above regarding the non-suspicious reasons for Ellison's sales and his voluntarily restrictions on them were not pled in RSAC and therefore not before the Ninth Circuit. These facts affirmatively undercut any inference of wrongdoing arising from those sales, and should be decided in Defendants' favor on summary judgment. *See In re Apple*, 886 F.2d at 1117; *see also Oracle Deriv.*, 867 A.2d at 955 (holding that "Ellison has advanced entirely reasonable, non-suspicious reasons for his trades"). Moreover, one of the individual Defendants, Sanderson, did not sell any stock during the Class Period. That fact alone undercuts Plaintiffs' arguments. *See, e.g., Acito v. IMCERA Group., Inc.*, 47 F.3d 47, 54 (2nd Cir. 1995); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir. 1999).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

49

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI

1   could find that Ellison or Henley possessed material, non-public information as of the time of

2   their trades).  More specifically, and as set forth more fully above, at no time during the third

3   quarter, and certainly at no time before defendants finished their trading on January 31, did

4   information exist that suggested a "substantial likelihood" that Oracle's 3Q01 results would

5   represent an "extreme departure" from the publicly announced guidance.  *Shaw*, 82 F.3d at 1210-

6   11; *Oracle Deriv.*, 867 A.2d at 936-37.

7   **VIII.   CONCLUSION**

8   　　　For the foregoing reasons, Defendants respectfully request summary judgment or, in the

9   alternative, summary adjudication that certain facts are not in dispute.

10

11   Dated:  October 20, 2008                  LATHAM & WATKINS LLP
                                               Peter A. Wald
12                                             Patrick E. Gibbs
                                               Sean M. Berkowitz
13

14
                                                      /s/
15                                           By: _____
                                                  Peter A. Wald
16                                           Attorneys for Defendants ORACLE
                                             CORPORATION, LAWRENCE J. ELLISON,
17                                           JEFFREY O. HENLEY and EDWARD J.
                                             SANDERSON
18

19

20

21

22

23

24

25

26

27

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

50

DEFENDANTS' REVISED MOTION FOR
SUMMARY JUDGMENT
MASTER FILE NO. C-01-0988-SI