# EXHIBIT 402

Pages 1 - 218

United States District Court

Northern District of California

Before The Honorable Martin J. Jenkins

Nursing Home Pension Fund,   )
et al.,                       )
                              )
            Plaintiff,        )
                              )
   vs.                        )          No. C01-0988 MJJ
                              )
Oracle Corporation,           )         COPY
                              )
            Defendant.        )
_____)
                                        San Francisco, California
                                        Thursday, December 20, 2007

**Reporter's Transcript Of Proceedings**

**Appearances**:


For Plaintiff:              Coughlin Stoia Gellar
                            Rudman & Robbins LLP
                            100 Pine Street, Suite 2600
                            San Francisco, California  94111
                      By:   **Mark Solomon, Esquire**
                            **Eli Greenstein, Esquire**
                            **Shawn A. Williams, Esquire**
                            **Doug Britton, Esquire**
                            **Monique Winkler, Esquire**
                            **Stacey Marie Kaplan, Esquire**
                            **Willow E. Radcliffe, Esquire**
                            **Daniel Pfefferbaum, Esquire**


(Appearances continued on next page.)

*Reported By:*          *Sahar McVickar, RPR, CSR No. 12963*
                        *Official Reporter, U.S. District Court*
                        *For the Northern District of California*

                        (Computerized Transcription by Eclipse)

**Appearances, continued:**

For Defendant:                    Latham & Watkins
                                  505 Montgomery Street, Suite 1900
                                  San Francisco, California  94111-2562
                        By:   **Peter Wald, Esquire**
                              **Patrick Edward Gibbs, Esquire**
                              **Michele Frances Kyrouz, Esquire**
                              **Sean Berkowitz, Esquire**

                                  Oracle Corporation
                                  500 Oracle Parkway, M/S 50P7
                                  Redwood Shores, California  94065
                              **By:  James C. Maroulis, Esquire**


                              ---o0o---

1    **MR. WILLIAMS:**  But the reliance on **_FlowServe_** is

2    exactly what we have here, the telltale signs that the

3    historical financials may be questionable.  But they go on to

4    say more.  On March 16th, it's more than the possible

5    connection between the earnings miss and the financials of the

6    second quarter of 2001.  They say -- CIBC says, "We are

7    downgrading the shares to hold due to the impact of the US

8    economy to concerns over acceptance of its E-business

9    applications," that's 11I, "and management's lack of proactive

10   plan to get back on track.  We believe the economy is only a

11   partial explanation for the shortfall.

12          Just one more.

13          Go to the next page, please.

14          Bank of America was a little bit more specific:  "On

15   the application side" -- that is 11I, "especially in light of

16   Oracle's weaker than expected Q3 applications growth, we

17   believe the economy may only explain 20 to 30 percent of the

18   weakness.  The rest, in our view, is a result of the product

19   set, 11I, not reaching a competitive level of functionality

20   relative to the best of breed."

21          **THE COURT:**  What is that based on?

22          **MR. WILLIAMS:**  I'm sorry?

23          **THE COURT:**  What is that based on?

24          **MR. WILLIAMS:**  What is the analysts' commentary

25   based on?  My assumption is it's based on their research.  I

mean, I think the analyst's reports are based on research.

**THE COURT:** But you don't know, do you?

**MR. WILLIAMS:** I don't know.

**THE COURT:** But you want me to accept it as an opinion that supports lost causation in the case.

**MR. WILLIAMS:** I want you to accept it as the connection --

**THE COURT:** Well, that's what we are talking about.

**MR. WILLIAMS:** Absolutely.

**THE COURT:** Okay, I gotcha.

**MR. WILLIAMS:** So a piece of one of your initial questions as to whether or not the economic loss is related to applications.

Also, going back to December 14th of 2001 -- I'm sorry, 2000, just addressing Mr. Wald's comment on Mr. Henley's building of the third quarter of 2001 forecast on the earnings results in the second quarter of 2000 --

**THE COURT:** So this is lost causation with respect to the accounting.

**MR. WILLIAMS:** That's right. Mr. Wald showed you some snippets of what Mr. Henley said on the December 14th, 2000 conference call relating to the forecast for the third quarter of 2001. This is actually what he said, he said, "In the area per share, we think it would be 12 cents. And also, just historically, the third quarter is slightly better than

1    the second quarter.  That is the way sequentially it's worked

2    here."

3              If you look back at the last three years, so he is

4    looking at history, "Sequentially, the third quarter split

5    adjusted has been one cent a share better than the second

6    quarter.  So we did 11 cents," which we say is false, "in the

7    second quarter, so I would assume 12 cents would be a

8    reasonable number at this point.  I don't think history is

9    going to be a lot different here."

10             In our view, that provides the Court and the

11   plaintiffs with the connection to the shortfall that occurred

12   in -- in March -- on March 1st of 2001.  It, in our view, is

13   more than enough to demonstrate a genuine issue of material

14   fact as to lost causation on the accounting issues.

15             You'll hear a little bit more about the accounting

16   issues, but that 11 cents, we have evidence that it is

17   materially false.  We think, as you know, that we should win

18   offensively on summary judgment on this point.  So at the very

19   least, in our view, we have satisfied the demonstration of a

20   causal connection between the accounting claims and the

21   remainder of the case with the shortfall that occurred on

22   March 1st.

23             THE COURT:  What I indulge is, one, there was an

24   accounting irregularity that makes the basis for the 11 cents

25   earning per share from the second quarter concerns the

reasonable juror was this a swap deal or was it not?   Looks

like it was a swap deal that everybody knew about.

Now, the last document I want to show you about the

HP transaction, and then I'll move to the debit memos, is Op

Exhibit 63.   Now, this, I would submit to Your Honor, is a

smoking gun, if I've ever seen one.   I know you'll disagree

with me, but --

**THE COURT:**   I don't know that that helps you because

there is no foundation for -- that establishes you know what a

smoking gun is.

(Laughter.)

**THE COURT:**   But you could cleave that from your

presentation and just argue the facts.

**MR. GREENSTEIN:**   True, Your Honor.

**THE COURT:**   All right.

Now, this document is one of the documents that

memorializes the HP deal.   Now, interestingly, you can see the

date on the top of it, which is December 1st, 2000, okay?   That

is the fax line.   There are a lot of documents that say

December 1, 2000.   There is a disputed fact as to when this

deal was signed, okay?   A lot of documents say December 1st.

There is probably one or two that say November 30th.   Again,

Paul Regan, our expert, said he found this deal was not signed,

or at least there wasn't enough evidence to say --

**THE COURT:**   Why would I take his opinion on that

1    question?  That is not the province of an expert, to say when

2    something is signed or not.

3            **MR. GREENSTEIN:**  Whether or not -- if something is

4    not signed, whether that precludes revenue recognition.

5            **THE COURT:**  That is a different question.

6            **MR. GREENSTEIN:**  So our expert, Paul Regan, found

7    that based on the evidence that he looked at, the fact that

8    there was not enough evidence to say that you can book this

9    deal as of November 30 -- and he was looking at the swap

10   E-mails as well as a lot of other documents.

11           So Sandy Sanderson, a defendant in this case,

12   testified that this was his handwriting.  And if you look at

13   the top, it says the real story.  And if you -- and it has the

14   deal kind of laid out.  And then on the left-hand side, the

15   last -- right there.  This says, "Is this the way we are going

16   to do deals?  Each has to buy something," with an exclamation

17   point.

18           Now, he testified that he wrote that, you know.  He

19   tried to explain it away.

20           **THE COURT:**  Is there a problem under 97.2 with each

21   side buying something?

22           **MR. GREENSTEIN:**  Yes.

23           **THE COURT:**  What's the problem?

24           **MR. GREENSTEIN:**  It lacks economic substance.

25           One of the slides that Mr. Wald put up was to say

1   you need --

2           THE COURT:  Isn't that a value determination?

3           MR. GREENSTEIN:  What's that?

4           THE COURT:  Is that a value determination?

5           MR. GREENSTEIN:  There is.  And like I said, it's

6   complex accounting rules, but bottom line is if you pay

7   30 million to get 20 million, you have to net that out somehow.

8   You can't just book the 20 and not take the 30.  I'm

9   simplifying that.

10          THE COURT:  I've had quite a bit of experience with

11  97.2 over a broad range of cases, I've never heard it explained

12  as --

13          MR. GREENSTEIN:  It's whether a deal --

14          THE COURT:  -- as you've set it forth there.

15          But that is a nonissue.  It's what inference I draw

16  from this document right here and the reference in that

17  document.

18          MR. GREENSTEIN:  I would submit to Your Honor that

19  at the worst these documents raise a question of fact about

20  this deal.  And there are a lot of other documents that are in

21  our papers, but I think a juror reading these -- seeing these

22  documents may find, and hearing testimony of our expert and

23  their expert, that it's about experts, whether this was proper

24  or not.  The face of the documents I think speak volumes.

25          I lied, there is one more document I want to show

1    you on the HP deal, it's Op Exhibit 64.  This is pretty

2    remarkable.  This is November 30th, 2000.  So they held a

3    special meeting on the last --

4         THE COURT:  You can't get away from this.  "Smoking

5    gun," "remarkable."

6              (Laughter.)

7         MR. GREENSTEIN:  Sorry.  My first summary judgment

8    argument.

9         THE COURT:  You are paralyzing my thought process

10   when you use terms like that.  It doesn't take much to paralyze

11   that process.

12             (Laughter.)

13        THE COURT:  It's getting long in the day, so let's

14   get --

15        MR. GREENSTEIN:  All I want to say about this

16   document is they have a special meeting on the last day of the

17   quarter.  Ellison was there, Henley was there.  And they did

18   this -- it's redacted, so we don't know, but they held a

19   meeting on this deal.  And they established a quorum because

20   Donald Lucas, another board member, wasn't there.  So it was

21   Ellison and Henley.  They all knew what was going on here.

22        THE COURT:  Depending upon what the actual deal was.

23        MR. GREENSTEIN:  I mean, Larry negotiated this deal.

24        THE COURT:  Okay.

25        MR. GREENSTEIN:  So that is it with HP.

1    **THE COURT:**  Now the debit memos.

2    **MR. GREENSTEIN:**  Right.

3    The first thing is that defendants have tried very

4    hard throughout this case to separate out the debit memo issues

5    and these transfers of customer overpayment issues, and you

6    can't do that.  If we get into the spoliation side of this

7    case, it's clear that those two issues are one in the same.

8    And our expert says the same thing, okay?  Every single

9    customer overpayment that was transferred, the 20 million, from

10   the customer overpayments account to the earnings and revenue,

11   was applied to a November 17th debit memo, okay?  So the

12   issue -- you can't unwind the issues.

13   Now, these debit memos, what happened was when you

14   apply a customer overpayment to a debit memo, it makes it look

15   like it was applied to a legitimate invoice, right?  So they

16   create these debit memos.  They look like invoices.  And they

17   apply this money to the debit memos, and essentially it

18   disappears.  Looks like somebody paid and it was applied to an

19   invoice.

20   Now, but the money that they transferred was not

21   their money.  And they shouldn't have applied it to those

22   invoices, and they did.  And that's how they clean up.  Right

23   after we filed our accounting allegations, they engage in this

24   cleanup.  And they say it has nothing to do with the debit

25   memos, but if we get into the spoliation, I'll show you --

1        Mr. Gibbs asked:

2        "Q.    You removed industry factors, in

3        your view, by using the NASDAQ 100

4        index."

5        That was the question.

6        Answer:

7        "A.    That's correct, yes."

8        The next and final question was:

9        "Q.    And you've concluded that

10       100 percent of the Oracle specific

11       information that caused the residual

12       drop was related to the fraud?

13       "A.    Correct."

14       So he did use a market index.  And, in fact, it's

15  the same market index that their expert on class certification

16  used, which Your Honor looked at, analyzed and ruled upon, very

17  same index.  And he found that it was the company specific

18  residual decline that he used.

19       You can take a look at Exhibit I to

20  Mr. Steinholt's --

21       THE COURT:  You know, the class certification motion

22  was not an explication of whether you could meet the issue of

23  lost causation on a record in a summary judgment context.

24       MR. WILLIAMS:  No, I understand that.

25       THE COURT:  I'm just telling you that isn't

1    evidence -- that I fielded the objections they are making now

2    and ruled on in rejecting their arguments with respect to why

3    based on *Dura* and the experts that testified that there weren't

4    common questions of law in fact, that things weren't typical.

5         **MR. WILLIAMS:**  No, I understand, Your Honor.  The

6    only reason I directed you to that was because at the time they

7    believed that that was the appropriate index.

8              The bottom line for us is that whether you used a

9    tighter index that they suggest or the market index does not

10   really go to whether or not the events study is appropriate.

11   It goes to whether -- you can use different event studies or

12   different indices in your event study, but here the index that

13   Mr. Steinholt used was actually more conservative than the one

14   Mr. James used.

15             I am -- I'll just direct you to where you can find

16   that, specifically.  It's Steinholt's rebuttal at Tate

17   Declaration B.  He describes the comparison between the two

18   indices and the expert's findings, and that the index that he

19   used actually results in a lower damages number than the index

20   that the defendants used.

21             You asked another question earlier today about how

22   the, quote/unquote, "customer complaints" actually would be

23   admissible, I didn't address that earlier.  I can address it

24   very quickly.  I think that most of the documents that we

25   submitted that could be considered customer complaints are not

1  quite customer complaints, they are Oracle employees discussing

2  their experiences at the customer sites.  So we think that they

3  are not hearsay.

4       I think we actually were able to identify the rules

5  under which they come in in our objections, Your Honor.  And

6  I'll just direct you to a couple of cases and case cites that I

7  think support our position.  It's *FTC versus Figge*

8  *International*, 994 F.2d 595, and *U.S. versus Safavian*, 435 F.

9  Supp. 2d at 36, and finally, *Sea-Land Service versus Lozen*, 285

10 F.3d 808 at --

11      *THE COURT:*  And those cases stand for what

12 proposition?

13      *MR. WILLIAMS:*  What I wanted to do was to just get

14 all of the cases --

15      *THE COURT:*  What do they stand for?

16      *MR. WILLIAMS:*  Oh, whether or not information that

17 is in documents that relate to -- I guess I'm just going to use

18 the phrase, "customer complaints" could be admissible.  And I

19 think these apply to circumstances such that Your Honor is

20 going to be kind of ruling on, where a lot of the documents in

21 our view are not -- they are just not hearsay, but they are a

22 lot of Oracle employees saying that their experience with the

23 customer is that they are having X, Y or Z problem, let's do

24 something about it.  They are different evidentiary rules that

25 it comes in under.

**THE COURT:** Well, right, but you may have someone put on notice of a problem, and it's evidence, or circumstantial evidence of their conduct, what they do going forward, it's another thing to admit something that someone says for the truth of the matter asserted.

**MR. WILLIAMS:** Exactly.

**THE COURT:** Can't be rolled up into a document for the truth of the matter asserted.

**MR. WILLIAMS:** I understand that.

**THE COURT:** And I'm asking, do these cases say that they can be considered for the truth of the matter asserted?

**MR. WILLIAMS:** These cases say, and I have to confess, I have not read all of these that I just cited to you, but the issue that we recognize here is that some of them are just notice. Some of them are adoptive admissions. Some of them are direct admissions of a party.

I think that each of these documents probably has to be analyzed independently. We think they are appropriately admissible, but I wanted to address the Court's question, you know, in the short time that I've got left.

Finally, with respect to defendants' earlier argument about whether plaintiffs have to prove not only the causal connection but -- between the alleged -- the misrepresentation or the conduct that results in the economic loss and prove that it is not the decline, is not the result of

1  changed economic circumstances or changed investors'

2  expectations, I think that was the argument --

3          **THE COURT:**  No, that wasn't the argument, because

4  that would postulate the standard a little differently than

5  it's articulated.

6          **MR. WILLIAMS:**  I agree.

7          **THE COURT:**  What I heard was a front-end argument

8  about the strength of the inferences that in the first instance

9  would allow you to establish the connection.

10          **MR. WILLIAMS:**  I agree.

11          **THE COURT:**  Not if there are other causative factors

12  in the record that may be a substantial factor in the decline.

13          **MR. WILLIAMS:**  I agree.  And Your Honor will draw

14  the inferences from what we say is the direct evidence and come

15  to a conclusion.

16          I appreciate the time, Your Honor.

17          **MR. GIBBS:**  You want to hear about spoliation?

18          **THE COURT:**  To the extent that you want to tell me

19  something about it.  I haven't given you the opportunity.

20          **MR. GIBBS:**  I know it is late, so I'm not going to

21  respond to everything Mr. Solomon said.  I think it's pretty

22  well briefed.  And from your questions, it seems clear to me

23  that you know the record and you know our position.

24          I have a couple of items I would like to address,

25  but before I do that I wanted to see if Your Honor had any

1    remaining issues that you would like us to address

2    specifically.

3           THE COURT:  No.  I just saw in the brief here this

4    reference to the OSO database, the Oracle sales online database

5    and your position that the special master denied their request

6    with respect to those documents and how that then ties into the

7    failure to preserve issue and the purge issue that relates to

8    the spoliation question.

9           MR. GIBBS:  To put a little color on the special

10   master's order there, plaintiffs moved to compel production of

11   all data from the Oracle sales online system as it existed

12   during the relevant time period.  In fact, it was a more

13   expanded time period, but they wanted everything, which

14   included the raw data in the database.

15          The special master denied that request with the

16   limited exception of ordering Oracle to produce printouts of

17   data from OSO, not the raw OSO data.  He denied that request.

18          So even if you take at face value their claim that

19   that information was not preserved, they are claiming that

20   Oracle and the individual defendants should suffer default

21   judgment, or perhaps just a crippling evidentiary sanction,

22   because they allegedly didn't preserve something that

23   plaintiffs were not entitled to get in discovery.  How they

24   could possibly show prejudice from that I don't know.

25          There is a second layer there, which is their

## CERTIFICATE OF REPORTER

I, Sahar McVickar, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing. The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_Sahar McVickar CSR_

Sahar McVickar, RPR, CSR No. 12963

**January 4, 2008**