# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

Certified Copy

In re ORACLE CORPORATION

SECURITIES LITIGATION.

Master File No. C-01-0988-MJJ

This Document Relates To:


ALL ACTIONS.

_____/



---o0o---

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF JOHN DUROSS O'BRYAN

THURSDAY, JULY 12, 2007


---o0o---

SHEILA CHASE & ASSOCIATES
REPORTING FOR:
LiveNote World Service
221 Main Street, Suite 1250
San Francisco, California 94105
Phone:  (415) 321-2311
Fax:  (415) 321-2301


Reported by:
DIANA NOBRIGA, CSR, CRR
LICENSE NO. 7071

1    engagement with me.

2         Q.    What are their names?

3         A.    Ben Sheppard, S-h-e-p-p-a-r-d, a CPA in our

4    office in Los Angeles.

5         Q.    That's Alix Partners?

6         A.    A-l-i-x, P-a-r-t-n-e-r-s.   Next individual is

7    Chris Simons, S-i-m-o-n-s, CPA in our Los Angeles

8    office.   And lastly Shannon Zavoda, Z-v-o-d-a --

9    Z-a-v-o-d-a, excuse me, who is also a CPA in our Los

10   Angeles office.

11        Q.    You currently work for Alix Partners in Los

12   Angeles; correct?

13        A.    I do, yes.

14        Q.    Besides those three individuals, did you work

15   with anyone outside your company on drafting the report,

16   besides Oracle's lawyers?

17        A.    No.

18        Q.    Did you talk to anybody outside your company

19   besides Oracle's lawyers and Deloitte and Touche about

20   your report?

21        A.    No.

22        Q.    When is the last time you looked at your

23   report?

24        A.    This morning.

25        Q.    Before that, when was the last time?

1    anything substantively in the report today?

2        A.    No, I do not.

3        Q.    Have you ever changed, substantively changed

4    your expert report the day of a deposition?

5        A.    Have I ever changed it?

6        Q.    Yes, in the deposition?

7        A.    No.

8        Q.    You never have?

9        A.    No.

10       Q.    I just want to talk a little bit about your

11   work history.  Is it fair to say you joined Price --

12   Coopers and Lybrand in 1985?

13       A.    That's correct.

14       Q.    Then, when did you -- and that became PWC?

15       A.    Correct.  On July 1st, 1998.

16       Q.    And from 1995 through 1999, you were the

17   partner in charge of the New York Metro region FAS

18   practice?

19       A.    No.  I was the partner in charge of the FAS

20   practice for Coopers and Lybrand for the western region.

21       Q.    And what does FAS stand for?

22       A.    Financial advisory services.

23       Q.    And what does that mean to be partner in

24   charge?

25       A.    I was the senior partner of that practice for

1   the entire western region, meaning I had not only client

2   responsibilities, but also administrative

3   responsibilities in administering the practice.

4        Q.   And financial advisory you said?

5        A.   Correct.

6        Q.   Does that have anything to do with auditing,

7   or is that more consulting side?

8        A.   Both.  There were -- during my tenure as the

9   partner in charge, I continued to do audits of

10  companies, all the way up to 2000, 2001.  Also in my

11  client responsibilities, I continued to work on the

12  auditing side as well as advising clients in auditing

13  and/or accounting issues.

14       Q.   So you actually conducted audits of clients

15  during that time?

16       A.   I did, yes.

17       Q.   Did you sign any audit opinions during that

18  time?

19       A.   I did, yes, several.

20       Q.   More than five?

21       A.   Yes.

22       Q.   Okay.  During that time did you ever work for

23  Oracle?

24       A.   I did not, no.

25       Q.   Have you ever had an engagement with Oracle

1    prior to this retention?

2         A.    I have not.

3         Q.    Ever worked for any of the individual

4    defendants prior to being retained?

5         A.    I have not.

6         Q.    And so when did you -- when was your next

7    promotion after you were, let's say, 2000?

8         A.    I don't know if you would call it promotion,

9    but I was asked to go run the FAS practice as partner in

10   charge for the New York Metro practice.  I might

11   consider that a demotion, but.  Anyway, July 1st, 1998 I

12   left California and went to New York and ran that

13   practice for two-and-a-half years.

14        Q.    What is the time frame of that?

15        A.    1998 through about mid 2000, July 1st, 1998,

16   through about mid 2000 I was the partner in charge of

17   the financial advisory service practices for New York.

18        Q.    Okay.  And what was your next position after

19   that?

20        A.    Then was a promotion, I came back to

21   California and was the financial advisory services

22   partner in charge for the western region again from 2000

23   until my departure from PWC, which was January 31st,

24   2003.

25        Q.    So you left PWC January 31st, 2003?

1      A.    Correct.

2      Q.    And you joined Alix Partners at that time?

3      A.    On February 1st, 2003.

4      Q.    Okay.  And you were partner in charge of the

5 FAS practice for the LA office during that time; right?

6      A.    That time being July 1st?

7      Q.    2000 through 2003.

8      A.    That's correct.  I came back mid -- beginning

9 to mid of 2000 and left in January of 2003.  And I was

10 the FAS partner in charge as well as the partner in

11 charge of the dispute analysis and investigation

12 practice for the western region.

13      Q.    So what does dispute analysis investigations

14 unit do or department?

15      A.    It is a subset of the financial advisory

16 services practice.  And it deals principally with

17 forensic accounting issues, any other types of disputes

18 or potential disputes involving either litigants or

19 potential litigants.  It can involve expert testimony.

20 It can involve fraud investigation.  It can involve

21 internal corporate investigations.  A number of

22 different things that they have basically those three

23 items in the title, dispute, analysis, and/or

24 investigation.

25      Q.    And when you said fraud investigations, are

1      A.   No.   I mean, I saw -- as you well know in my

2    original report, my rebuttal report, we talk about $2

3    million, where we've gone and looked at source

4    documents.

5           And I've also looked at, as you saw in my

6    report, a sample of 60, where we actually got source

7    documents and tied them back.

8           So I have seen support for those, yes.  But I

9    didn't go back and audit all 926.

10     Q.   Right.  So of the 926, you've looked at source

11   documentation for 60 of them; right?

12     A.   Just with respect to the three transactions,

13   the 11/17 debit memos.

14     Q.   There are 46,000 plus 11/17 debit memos;

15   correct?

16     A.   That's correct.

17     Q.   And out of that -- well, how many of those

18   debit memos did you look at in connection with your

19   reports?

20          MR. GLENNON:   Objection; vague and ambiguous.

21          THE WITNESS:   I looked at each and every one

22   of the 926.  And then I took a subset of the 926, 60, to

23   go back and see the individual debit memos to see that

24   they tied.

25          MR. GREENSTEIN:   Q.  So you looked at -- so in

1    looking at the 926, did you look at the source documents

2    for all 926?

3        A.  No.  60.

4        Q.  Sixty.  So, setting aside the 60 you looked at

5    the source documents for, the other debit memos of the

6    926 you relied on the script output for that

7    information; right?

8        MR. GLENNON:  Objection; vague and ambiguous,

9    lack of foundation.

10       THE WITNESS:  I looked at the script and saw

11   that there were three offsetting entries on 11/17/2000.

12       MR. GREENSTEIN:  Q.  Is that all you looked at

13   for those 926?

14       A.  No.  Some of them there has been allegations

15   about refunds, allegations about the failure to refund,

16   there's been allegations about royalties.  I looked at

17   those in a number different ways.

18       But my purpose for the original complaint or

19   the revised second amended complaint had to do with just

20   the debit memos.

21       So my first step in the 926 was to see that

22   all three of those transactions were offsetting in each

23   one of those 926.

24       Q.  Okay.  So, for the 926, you relied upon the

25   script output; correct?

1          MR. GLENNON:  Objection; vague and ambiguous.

2          THE WITNESS:  I relied on the script output,

3     plus I took 60 of those and tied them back to source

4     documents.

5          MR. GREENSTEIN:  Q.  So of the 46,000 debit

6     memos, you looked at source documents for 60 of them;

7     correct?

8          MR. GLENNON:  Objection; vague and ambiguous,

9     lack of foundation.

10         THE WITNESS:  As it relates to the debit

11    memos, that's correct.

12         MR. GREENSTEIN:  Q.  So back to the script

13    output.  So, you didn't verify or test the script output

14    to determine whether it was accurately reflecting those

15    926 debit memos; did you?

16         MR. GLENNON:  Objection; vague and ambiguous.

17         THE WITNESS:  No.  I did.  I looked at each

18    one of the three entries on the 926 script outputs, and

19    I saw there were three corresponding entries into 25005,

20    in and out.

21         MR. GREENSTEIN:  Q.  What I'm saying, did you

22    do any sort of testing or verification that the data in

23    the script output was accurate?

24         MR. GLENNON:  Same objection; asked and

25    answered.

```
 1              THE WITNESS:  Yeah, as I said, I took a
 2     subset -- first of all, I'm going to move into an audit
 3     perspective here, inquiry and observation is evidence
 4     from an auditor's perspective.  So I put on an auditor's
 5     hat in looking at that.  And observing there were three
 6     offsetting entries into the 926 script outputs helped me
 7     understand that those were three offsetting transactions
 8     that occurred.  I then decided, using professional
 9     skepticism, to then test 60 individually and see the
10     individual source documents.
11              MR. GREENSTEIN:  Q.  I understand.
12         A.    The actual debit memos.
13         Q.    Well, the script output has additional entries
14     other than the three offsetting entries to 25005;
15     correct?
16         A.    Absolutely.
17         Q.    So what I'm asking is, did you perform any
18     independent testing to verify the accuracy of all the
19     data that was contained in the script output?
20              MR. GLENNON:  Objection; asked and answered.
21              THE WITNESS:  No.
22              MR. GREENSTEIN:  Q.  Okay.  So to the extent
23     you rely upon the script output in your reports, you're
24     assuming that the data within that is accurate; right?
25              MR. GLENNON:  Objection; vague and ambiguous.
```

1   12601.

2        Q.   You're talking about -- you found that $2

3   million was appropriate?

4        A.   Approximately $2 million.  What I did was I

5   then matched that.  I found about $2 million, which I

6   could find some support for in script output, any kind

7   of notes that were taken from the collectors during that

8   time frame on the miscellaneous receipts section of

9   their report.

10          And I then matched that to the document we

11   just talked about, which summarizes the cash transfer

12   project.  And, you know, ours was $2 million.  When I

13   look at the report, it looks like it is at least $5.5

14   million that Oracle had decided was appropriately

15   recognized based into revenue based on that project.  I

16   felt like my number was conservative.

17        Q.   What was the total amount of bad debt

18   transfers that occurred, that Oracle tried to resolve

19   during the 2002 cleanup for all periods?

20          MR. GLENNON:  Objection; vague and ambiguous.

21          THE WITNESS:  I think it was approximately $50

22   million.

23          MR. GREENSTEIN:  Q.  $50 million?

24        A.   Something to that effect.

25        Q.   Could you calculate of that $50 million how

1          MR. GLENNON:   Objection; mischaracterizes the

2     testimony.

3          MR. GREENSTEIN:   Q.  Did you rely on that

4     binder in front of you?

5          MR. GLENNON:   Same objection.

6          THE WITNESS:   I did rely on this binder in

7     front of me.

8          MR. GREENSTEIN:   Q.  And that binder contains

9     summaries of data that was pulled from the script

10    output; correct?

11         MR. GLENNON:   Same objection.

12         THE WITNESS:   As I said, the script outputs

13    were reviewed by us, and the information comes off of

14    that.  You can get all of the numbers that you see in my

15    report as to the $2 million right off of the script

16    outputs or the notes, the miscellaneous receipts.

17         All we did, for ease of summarization, was

18    prepare just that, a summary, which then ties to these

19    numbers.

20         So I certainly looked at it.  But the data

21    that I relied on was the source data, i.e., the script

22    outputs or the underlying source data.

23         MR. GREENSTEIN:   Q.  Turning to page 32 of

24    your report, of your opening report.  See the bullet at

25    the bottom, and it discusses, "Of the $10.6 million,

```
 1    subject to my review, almost $700,000 of unapplied cash

 2    transferred to the bad debt reserve during the second

 3    quarter of fiscal year 2001 related to certain royalties

 4    paid to Oracle."  Do you see that?

 5        A.    Yes, I do.

 6        Q.    How did you come up with that 700,000 number?

 7              MR. GLENNON:  Objection; vague and ambiguous.

 8              THE WITNESS:  By going through the script

 9    outputs and the notes of the collectors as they went

10    through their cash project in October/November of 2002.

11              MR. GREENSTEIN:  Q.  So that $700,000, was

12    that related to one debit memo or multiple debit memos?

13        A.    Multiple.

14        Q.    Multiple.  How many, do you any?

15              MR. GLENNON:  Objection; vague and ambiguous.

16              MR. GREENSTEIN:  For the record the witness is

17    looking in the binder that is in front of him that he

18    said he didn't rely upon.

19              MR. GLENNON:  It is a videotaped deposition.

20              THE WITNESS:  Well, I want to clarify.  When I

21    said I didn't rely on -- when I said I did rely, I

22    relied on the script outputs and the notes.  The

23    summaries I don't need to rely on.  If you want to take

24    those out, that's fine.

25              MR. GREENSTEIN:  Q.  Can you tell me --
```

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

1    without looking at that binder, can you tell me how many

2    debit memos made up that $700,000 in royalties?

3        A.  Without looking at this binder?

4        Q.  Right.

5        A.  No.

6        Q.  Looking at the binder, can you tell me?

7            MR. GLENNON:  Same objection; vague and

8    ambiguous.

9            THE WITNESS:  Five.

10           MR. GREENSTEIN:  Q.  And can you tell me the

11   debit memo numbers of those five, please?

12       A.  3616, 3655, 7377, 13514, and 33069.

13       Q.  And can you tell me the customers that are

14   associated with those five?

15       A.  Yes.

16           MR. GLENNON:  Same objection; vague and

17   ambiguous.

18           THE WITNESS:  Dell Computer, Dell Computer,

19   Open Market, Structural Dynamic Research, Primavera

20   Systems, respectively.

21           MR. GREENSTEIN:  Q.  And those -- the debit

22   memo numbers that you just testified to, why aren't

23   those 550 numbers?

24       A.  We just truncated the 550.

25       Q.  So it is 550, and then the number?

1    a check to Oracle from Open Market.

2        Q.   And is there a reason you didn't cite that in

3    your report, that document?

4            MR. GLENNON:  Objection; vague and ambiguous.

5            THE WITNESS:  You mean cite on page 20 --

6            MR. GREENSTEIN:  Q.  32.

7        A.   32?

8        Q.   Yeah.

9        A.   No.

10       Q.   Why not?

11       A.   I didn't see a reason.

12           MR. GLENNON:  Objection; vague and ambiguous.

13           MR. GREENSTEIN:  Q.  I'm sorry?

14       A.   I didn't cite every single document in the

15   report.  I may have relied on it, which would be back in

16   Appendix C, but I didn't cite each and every document we

17   saw in the report.

18       Q.   I understand.  So that document is cited in

19   Appendix C; correct?

20       A.   I believe so.

21       Q.   So what other -- did you look at source

22   documents for the $700,000 royalty payments?

23       A.   To the extent that we had them.  For example,

24   on -- well, some of the Dell information we had some

25   invoices.  On Open Market we talked about, we actually

1   have a royalty report that demonstrates to one of the

2   researchers that this was a royalty relationship.  And

3   I'm referring there to NDCA-ORCL 515892, which appears

4   to be attached to remittance advice.  So to the extent

5   we had source documents, we attached those.

6        Q.   So you didn't have some source documents for

7   some of those five debit memos?

8            MR. GLENNON:  Objection; vague and ambiguous.

9            THE WITNESS:  I would have to go through each

10  and every one -- we did have source documents.  I don't

11  know if they were absolutely complete.  But what made it

12  complete was the reviewing of the notes and seeing that

13  there was a royalty relationship based on the notes.

14           MR. GREENSTEIN:  Q.  When you say the notes,

15  you mean collector notes?

16       A.   That's right

17           MR. GLENNON:  Same objection.

18           MR. GREENSTEIN:  Q.  You're referring to the

19  ones in the script output; correct?

20       A.   That's correct.

21       Q.   Okay.  And was there one note for each

22  transaction?

23           MR. GLENNON:  Same objection.

24           MR. GREENSTEIN:  Q.  Strike that.

25           Was there one note for each of the five debit

```
 1    him that question, you can.

 2            MR. GREENSTEIN:   Q.  This 121 transfers, can

 3    you tell me right now what the names of those -- what

 4    customers and debit memos they are?

 5        A.    Yes.

 6        Q.    And is there a document that I could -- a

 7    Bates numbered document I could look at just to find out

 8    what debit memo numbers they are?

 9        A.    Well, it is in the script.

10        Q.    Right.  But I don't know which ones they are.

11    There is 926 in the script output; correct?

12        A.    Correct.

13        Q.    You found 121 of them that you're relying upon

14    in drawing conclusions about the appropriateness of

15    them; correct?

16            MR. GLENNON:   I object to the extent it

17    mischaracterizes the testimony and to the extent you're

18    trying to get our expert to do work that you guys can

19    easily do on your own with the materials you have.

20            MR. GREENSTEIN:   How can we find out what the

21    121 debit memos are, Brian?

22            MR. GLENNON:   Are you asking me a question?

23            MR. GREENSTEIN:   Q.  I'm asking you.

24    Mr. O'Bryan, is there any way sitting here if I go back

25    to the script output I could determine the debit memo
```

1 numbers for these 121 transfers?

2  A. Yes.

3  Q. Okay.  How would I do that?

4  A. You just go into the script and run a sort in

5 the database that has the credit amount 12601, then it

6 prints all the information about that.  That's all we

7 did.

8  Q. So if I did that, and then whatever came up as

9 crediting 12601, there would 121 transfer items?

10   MR. GLENNON:  Objection; vague and ambiguous.

11   THE WITNESS:  It would be 121 debit memos or

12 transfers from 25005 into 12601, totaling

13 $10,586,182.02.

14   MR. GREENSTEIN:  Q.  What document are you

15 looking at when you just made that calculation?

16   MR. GLENNON:  Objection; vague and ambiguous,

17 mischaracterizes the testimony.

18   THE WITNESS:  This is a summary of that query

19 that we ran off the script.

20   MR. GREENSTEIN:  Q.  And you're relying on

21 that document as we sit here right now to tell me the

22 total number; correct?

23   MR. GLENNON:  Objection; mischaracterizes the

24 testimony.

25   THE WITNESS:  Again, the basis of this is just

1   because the royalties don't have invoices.

2       Q.   So in 2004 you just said that they applied

3   that to an invoice; right?

4       A.   They would have created an invoice and credit

5   memoed it up, because -- or adjusted it up, because

6   there was no invoice that existed, so you would have to

7   create the invoice, which was done in May of '04.

8       Q.   So they created an invoice for a payment that

9   was made prior to November 2000; correct?

10           MR. GLENNON:   Objection; vague and ambiguous.

11           THE WITNESS:   Correct.  You would have to,

12  because you have to apply that somewhere.

13           MR. GREENSTEIN:   Q.  Do you know the date they

14  created the invoice?

15           MR. GLENNON:   Same objection.

16           THE WITNESS:   May 2004.

17           MR. GREENSTEIN:   Q.  A specific date?

18      A.   May 11th, 2004.

19      Q.   Page 33, the bullet, "In addition, over

20  $800,000 of over transfers to the bad debt reserve

21  during this period were appropriate."  Do you see that?

22      A.   Where are you?

23      Q.   Page 33.

24      A.   Yes.

25      Q.   The bullet at the top of the page, the

1    $800,000?

2         A.   Yes.

3         Q.   It says, "In addition, over $800,000 other

4    transfers to the bad debt reserve during this period

5    were appropriate."  Do you see that?

6         A.   I do.

7         Q.   You mean 2Q '01?

8         A.   Correct.

9         Q.   Then you say, "It's appropriate in that Oracle

10   had already reduced its revenues for certain open and

11   unpaid invoices either all or in part through the use of

12   credit memos and/or inclusion in Oracle's general bad

13   debt reserve as of the second quarter of fiscal year

14   2001."  Do you see that?

15        A.   That's correct.

16        Q.   So can you explain what you mean there?

17        A.   That when the collections department was

18   researching the applied cash project, during the applied

19   cash project in October/November of '02 time frame, they

20   researched individually all these that came -- all these

21   debit memos that got reversed.

22             And in certain instances, we have one, two,

23   three, four, five, six, seven -- twelve instances where

24   the evidence is that they are effectively adjusting up

25   an invoice because they had inappropriately issued a

```
 1    credit memo back in the 2000 time frame.
 2         Q.    You said 12 items.  Is that 12 debit memos?
 3         A.    That's correct.
 4         Q.    So 12 debit memos made up the $800,000;
 5    correct?
 6         A.    That's correct.
 7         Q.    Can you tell me -- can you just tell me the
 8    debit memo numbers --
 9         A.    Certainly.
10         Q.    -- of those?
11         A.    10200, 29695, 33442, 41212 -- actually, let me
12    go back.
13              These are the numbers that relate to a credit
14    memo that are in the $800,000 or that are in part of
15    that component.  And that would be, again --
16         Q.    Let me stop you there.  So are there debit
17    memos associated with those 12 items?
18         A.    You mean credit memos?
19         Q.    I mean debit memos.
20         A.    Oh, yes.
21         Q.    So can you tell me the debit memos -- the
22    debit memo numbers?
23         A.    I am sorry.  10200, 29695, 33442, 41212, 54 --
24    excuse me -- 42380, 43304, 45164, 45180, 45240, 45311,
25    45948, and 46151.  Those total up about $727,000.
```

1    Q.   Okay.  So you just rounded up to 800,000?

2    A.   Correct.

3    Q.   Why didn't you round down to 700,000?

4    A.   Because on the -- one of the other amounts, I

5    think it is 368,000, we rounded down.

6    Q.   Okay.

7    A.   So there is another category.

8    Q.   So there is $700,000 in royalties on page 32

9    of your report; right?

10   A.   Correct.

11   Q.   And $800,000 of what you call these adjusted

12   up items, to $800,000; correct?

13       MR. GLENNON:  Objection; mischaracterizes the

14   testimony.  Vague and ambiguous.

15       THE WITNESS:  I'm sorry.

16       MR. GREENSTEIN:  Q.  I'm trying to determine

17   what you mean by the 368,000 that you rounded down.

18   A.   It is a separate column.  I probably confused

19   you.  I apologize.

20   Q.   I just want to make sure there is -- that

21   we're looking at the items; right?

22   A.   Correct.

23   Q.   Well, so, my question is -- what was the total

24   of those 12 debit memos?

25   A.   $726,581.

1      Q.   My question was, why did you round that up to

2   800,000 instead of rounding down to 700,000?

3      A.   Because there is other items that make up the

4   $800,000 that are not part of the credit memo piece.

5      Q.   How many debit memos are those?

6      A.   Those are one, two, three, four --

7          MR. GLENNON:  Objection; vague and ambiguous.

8          THE WITNESS:  Those are five.

9          MR. GREENSTEIN:  Q.  And what -- that makes up

10   the part of the 800,000; correct?

11      A.   Yes.  When you include those five, it would be

12   $875,000, or to be exact $874,808.  That is my rounding

13   down.

14      Q.   Were those items that were resolved in the

15   same manner as the other items that had been adjusted

16   up?

17          MR. GLENNON:  Objection; vague and ambiguous.

18          THE WITNESS:  No.

19          MR. GREENSTEIN:  Q.  Can you please explain

20   why you think those are appropriate?

21      A.   Yeah.  These are very unusual ones.  These are

22   ones where there was cash that existed, obviously, in

23   the October/November time frame, where these amounts

24   were moved from 25005 into 12601.  So the cash existed

25   and it was written into the reserve.

1        However, upon further review of the invoices,

2    these were invoices that were very old, and given

3    Oracle's internal policy of reserving -- they have an

4    internal policy that over x number of days 50 percent

5    automatically goes to the reserve, over x number of days

6    20 percent goes to reserve -- those would have been

7    reserved anyway given the age of the invoice.  So this

8    is a case where you literally are taking into income

9    amounts which have previously been written off, when you

10    shouldn't have written them off because you had the

11    cash.

12        Q.   Okay.  What is the total of those items?

13        A.   Those only total $150,000.

14        Q.   And how many debit memos?

15        A.   One, two, three, four -- five.

16        Q.   Can you list out the --

17        A.   7412, 38577, 41310, 42059, and 5 -- 45 --

18    45161.

19        Q.   So I'm going to break it into two parts.  I'm

20    going to first focus on the 12 debit memos that you said

21    were applied to previously written off invoices.  Is

22    that fair to say?

23        MR. GLENNON:  Objection; mischaracterizes the

24    testimony.

25        THE WITNESS:  No.  The 12 have to do with,

```
 1    Plastics, they actually realized that there had been

 2    credit memos that were inappropriately issued, and they

 3    then booked the receivables and booked the sales.  And

 4    then unbooked the 25005 account.

 5         Q.   Okay.

 6         A.   So, and that information was obtained through

 7    looking at the notes, the collectors' notes, for this

 8    account in the '03 time frame.

 9         Q.   So when you say that was reflected in the

10    note, what was reflected in the notes?

11         A.   The credit memo discussion.

12         Q.   So, for these 12 transactions, how do you know

13    that those items were -- had erroneous credit memos?

14              MR. GLENNON:  Objection; vague and ambiguous.

15              THE WITNESS:  From the notes of the --

16              MR. GREENSTEIN:  Q.  Other than the notes, is

17    there any evidence that those 12 debit memos had

18    erroneous credit memos?

19              MR. GLENNON:  Same objection.

20              THE WITNESS:  In some cases you can actually

21    see credit memos.  But for the most part it was the

22    notes the collectors had done contemporaneous.

23              MR. GREENSTEIN:  Q.  Right.  You could see the

24    credit memos, but that doesn't tell you that they are

25    proper or improper; correct?
```

```
 1        A.   Well, no.  The notes say, "Receipt notes were

 2   incorrect; wrong PA; do not show sufficient credit

 3   memos; erroneous notes; and credit memo 722616."

 4             So you can see, you can trace that back and

 5   see there was an inappropriate credit memo on -- at some

 6   point in time in the history.

 7        Q.   Okay, so other than the notes, is there any

 8   evidence that those 12 transactions had erroneous credit

 9   memos?

10        A.   That's the summary of what we considered.  As

11   I said, we have a number of different documents here,

12   which is actual invoices, and appears to be documents

13   which were put together by collectors, et cetera, to

14   support that.  I haven't gone through and reconciled

15   those specifically.

16        Q.   So what source documents would tell you that

17   the credit memo is issued erroneously?

18        A.   Well, as I said, for the most part for me I'm

19   using the notes.  Those are the contemporaneous

20   documents I'm using.

21        Q.   I just want to make sure.  You said for the

22   most part.

23             So is there any other document that you're

24   relying upon in making the determination that those 12

25   transactions had erroneous credit memos?
```

1      MR. GLENNON:  Objection; asked and answered.

2      THE WITNESS:  I know that one on this one

3   would be the summary of what I looked at, the vast

4   majority of the support.

5      MR. GREENSTEIN:  Q.  So there are no other

6   documents?

7      A.   There are other credit memos, but I haven't

8   reconciled those to that number.  They appear to be

9   documents, invoices, et cetera, that support that based

10   on the credit of the collectors' notes.

11      Q.   In other words, the 12 debit memos in which

12   you have concluded had erroneous credit memos in their

13   history, you determined that those credit memos were

14   erroneous by looking at the notes; correct?

15      MR. GLENNON:  Objection; mischaracterizes the

16   testimony.

17      THE WITNESS:  For the most part that's

18   correct.

19      MR. GREENSTEIN:  Q.  Well, is there any other

20   piece of evidence that you relied upon?

21      MR. GLENNON:  Objection; vague and ambiguous.

22      THE WITNESS:  There are other documents,

23   invoices and other support.  I just didn't go back and

24   reconcile them.  They seemed to be support for me.  I

25   didn't reconcile them individually to see that they tied

1    exactly back to that.

2          I felt it sufficient to see the collectors'

3    notes done contemporaneous, see that they were talking

4    about credit memos that had been inappropriately

5    applied, and use that in my analysis.

6          MR. GREENSTEIN:  Q.  When you saw the note

7    that said erroneous credit memo in it, you didn't go

8    back to check to see if there was any document that said

9    the credit memo was erroneous; correct?

10         MR. GLENNON:  Objection; vague and ambiguous.

11         THE WITNESS:  Other than reviewing the notes,

12   no.

13         MR. GREENSTEIN:  Q.  Okay.  So for that one

14   debit memo for General Electric Plastics, is there one

15   note for that that indicates it is an erroneous credit

16   memo, or multiple?

17         A.  It is one note.

18         Q.  What does it say?

19         A.  It talks about credit memo, the credit memo

20   actually being 7227616 for -- for the amount of money

21   we're talking about.

22         Q.  Can you just read that note into the record,

23   please?

24         A.  Certainly.  "Receipt notes are incorrect,

25   wrong PA number, and three PRO projects that may

1   associate with this reserve amount do not show

2   sufficient credit memos.  Erroneous notes.  See

3   supplemental SO 4814239 and credit memo 7227616 for

4   $181,158.40," which is the amount.  "Makes more sense."

5   And then it talks about a 12/15/96 wire, references

6   text.

7        Q.   How does that note tell you there was an

8   erroneous credit memo?

9        A.   Because it talks about credit memo and talks

10   about credit memo 722616, whatever it was.

11        Q.   It doesn't say it was erroneous, does it?

12        A.   It is using a credit memo and that's -- if it

13   is a credit memo, to me that is an inappropriate

14   application of a credit memo.

15        Q.   So -- but couldn't it have been a proper

16   credit memo that was issued, for example, for customer

17   concessions?

18        MR. GLENNON:  Objection; incomplete

19   hypothetical, vague and ambiguous.

20        THE WITNESS:  No.  Because they eventually

21   booked it back to revenue.  So that means the credit

22   memo was inappropriately booked.

23        MR. GREENSTEIN:  Q.  So the fact they booked

24   it as revenue indicates to you that the previously

25   issued credit memo was erroneous?

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

1    A.   And the notes.

2    Q.   And the notes?

3    A.   Correct.

4    Q.   But the note doesn't say that there was an

5    erroneous credit memo; does it?

6        MR. GLENNON:  Objection; calls for

7    speculation.

8        THE WITNESS:  No.  It talks about the credit

9    memos.

10       MR. GREENSTEIN:  Q.  Okay.  And why don't you

11   take me through the next transaction of the 12, the next

12   highest one in the same way you did with the General

13   Electric Plastics, please.

14   A.   The next one is Structural Dynamics Research,

15   which I think I referred to in my report.

16       Cash was received in May of 2000.  In October

17   of 2001 the amount was transferred to 12601.  On the

18   17th of November, the debit memos took place.  On the

19   7th of November, there was a reversal of the

20   November 17th memos.  On 11/2 of '02 there was a

21   reversal of the transfer to 12601.  And -- I'm sorry, I

22   beg your pardon, I was in the wrong bucket.

23   Q.   I was wondering.

24   A.   Somebody could have stopped me before I got

25   there.

1       Q.   One quick question about the last transaction,

2    the GE Plastics.  What was the date of the note that you

3    relied upon?

4       A.   I think you asked me that before.  I don't

5    know the date of the note.

6       Q.   Okay.

7       A.   Okay.  Caltrans on November the 5th, 2000,

8    $91,254 was transferred into the 12601 account.  On

9    November 17th, the debit memos were run.  On

10   November 11th, 2002 there was a reversal of the debit

11   memos.  On November 24th there was a reversal of the

12   transfer.  And on 2/3/03 there was an application to

13   invoices.

14      Q.   Actually, is that this transaction that's

15   listed on 35 and 36 of your report?

16      A.   Exactly.

17      Q.   Do you know the date of the note?

18      A.   No.

19      Q.   Okay.  Did you do any analysis, other than

20   looking at the note, of whether the concessions for the

21   amount in reserve -- that there was too much of a

22   concession that was given to the customer due to the

23   customer sending in a payment for 91K?

24          MR. GLENNON:  Objection; vague and ambiguous,

25   assumes facts.

1         THE WITNESS:  Well, I think on that one if you

2    look through the script, you can see where there is --

3    the actual credit memo.

4         MR. GREENSTEIN:  Q.  Overpayment?

5    A.   Yeah.

6    Q.   So it was a credit memo, an invoice was memoed

7    reducing the invoice.  The customer made a payment for

8    the full invoice and so overpaid the amount of credit

9    memo; correct?

10   A.   Correct.  And it was later realized that the

11   credit memo should not have been issued because there

12   actually were services being performed.

13   Q.   Were there ever any instances where

14   overpayments occurred and the credit memo was

15   legitimate?

16        MR. GLENNON:  Objection; vague and ambiguous.

17        THE WITNESS:  I'm sorry, I don't understand

18   your question.

19        MR. GREENSTEIN:  Q.  Well, we just talked

20   about an invoice being reduced if you had a credit memo.

21   And somebody overpaid -- paid the full amount of the

22   invoice which resulted in overpayment; correct?

23        MR. GLENNON:  Objection; mischaracterizes the

24   testimony.

25        MR. GREENSTEIN:  Q.  You don't recall that we

1    just talked about that?

2        A.   Would you mind just repeating that one more

3    time.

4        Q.   Okay.  I will ask a different question.

5            With respect to those two debit memos that you

6    just went through, the erroneous credit memos, those

7    involved overpayments of invoices; correct?

8        MR. GLENNON:  Objection; vague and ambiguous.

9        THE WITNESS:  I don't recall Caltrans was

10   necessarily an overpayment.  It was just they paid, and

11   then erroneously, Oracle issued a credit memo, not an

12   overpayment, just issued a credit memo thinking they

13   weren't due the money.  And then later realized they

14   were due the money because there were services

15   performed.

16       MR. GREENSTEIN:  Q.  Okay.  So going back to

17   page 33, I want to focus on the five debit memos for

18   $148,000, where you describe a process where cash was

19   moved from 25005 to 12601 during 2Q.  Correct?

20       A.   Yes.

21       Q.   Can you just describe the process from the

22   transfer and then how it was resolved during the 2002

23   cleanup?

24       A.   Yeah, a little different than the other ones.

25   But in this situation what it really is, is a situation

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

1   where you are writing off an invoice that you have cash

2   for, and that's an inappropriate -- in that regard, you

3   should be reporting income.  So, in other words, you

4   have set up a reserve, but you have the cash.

5       So in this situation what happened was, for

6   these five instances, amounts were transferred in

7   October/November of '00 into the 12601 account.

8   However, at the same time you have invoices -- so they

9   are basically recording the income, okay.  However, at

10  the same time -- you actually have that cash that you're

11  taking against it.  At the same time, however, you have

12  reserved for that invoice, because it got too old, it

13  got to five months, six months, whatever the days were.

14  So you're simultaneously recording a reserve which you

15  should not be recording.  You're reducing income, and

16  you shouldn't.

17      So that is a situation where you literally

18  have written off a portion of the invoice, and, in fact,

19  you shouldn't have, because you had the cash.

20  Q.   And then how was that resolved during the 2002

21  cleanup?

22  A.   Well, to the extent that you had reserved it,

23  you should not have reserved for that much, so it should

24  have been taken back into income.

25  Q.   So what are the debits and credits that

1   occurred during the 2002 cleanup?  Why don't you take us

2   through the largest of those transactions.

3       A.  Let's just take -- take railroad reserve,

4   $65,901.

5       Q.  What's the debit memo?

6       A.  42059.  So in that transaction, in May, cash

7   was received.

8       Q.  What year?

9       A.  '00.  I'm sorry.

10      Q.  Okay.

11      A.  In October the amount was transferred into the

12  12601 account.  So they had the cash, they took it into

13  the reserve account.  On November 17th the debit memos

14  occur.  On November 12, '02 they reverse the debit memo

15  transactions.  And on November 24 they reverse the bad

16  debt transfers.

17          So what happens there is you effectively --

18  you have reserved too much, because you have an invoice

19  that you had the cash for, but you're recording a

20  reserve because of the age.  So you have to take that

21  into income.  It should be taken into income.

22      Q.  So the invoice that -- the payment was coming

23  in for an invoice that had previously been written off;

24  right?

25      A.  Right.

1    day we're going to write off this much automatically,

2    because there is a presumption it can't be collected.

3        Q.   But don't they presume the other portion can

4    be collected?

5        A.   At a later point in time, if they haven't

6    collected it, the remainder of it will be written off.

7    I have seen a number of companies do that.  They say,

8    180 days, automatically 50 percent gets written off no

9    matter what.

10       Q.   Turning to page 33 again, underneath the

11   $800,000 discussion, there is a discussion of at least

12   another $500,000.

13           And you state that, "These transfers were

14   appropriate, although the evidence relating to these

15   transfers is not as complete as the evidence I reviewed

16   in connection with the $1.5 million in transfers noted

17   above."  Do you see that?

18       A.   Yeah.  Yes.

19       Q.   So can you just explain what those

20   transactions are and why you found them appropriate?

21       A.   Well, again, they were originally transferred

22   from 25005 into 12601.  They were reversed in November,

23   November 24th, '02, all these were reversed for the most

24   part.  And when the unapplied cash project was performed

25   at that time, there is some evidence that it looks like

1    it was either an unapplied, or a credit memo that was

2    bad or a royalty that was appropriate.  The notes were

3    not necessarily conclusive, or we didn't see any other

4    type of support for that.

5              So that appears to be one that should have

6    been reported, given there is some evidence of a credit

7    memo or there was some evidence of a royalty or some

8    other type of revenue that should have been booked.  But

9    the notes were not conclusive for me, nor did I see any

10   other type of support.  We put that into a bucket of

11   could be.

12        Q.   Could be.  So you can't definitively say that

13   $500,000 of transfers was proper; correct?

14        A.   That's correct.

15        Q.   And how many debit memos made up the $500,000

16   that you're talking about?

17        A.   Twelve.

18        Q.   I hate to do this, but can you just go ahead

19   and list them into the record, please?

20        A.   Certainly.  3503, 3569, 5165, 7992, 10691,

21   40196, 44860, 2601, 5516, 43176, 44788, and 42 -- excuse

22   me, 45238.

23        Q.   Mr. O'Bryan, in your report you state that of

24   the 926 debit memos there are 277 that were refunded

25   prior to November 17th, 2000 for $103 million; is that

1    accurate?

2        A.   That is correct.

3        Q.   If I wanted to go into the script output and

4    figure out those 277 debit memos, what would I do?

5        A.   You just go in and run a query on accounts

6    payable to see where there was a refund.

7        Q.   How would a refund show up?  Would it say

8    refund?

9        A.   The best place to go is accounts payable.

10       Q.   So if I just ran a query by accounts payable,

11   277 items would pop up?

12       A.   Yes.

13       Q.   Is there anything else I would need to do to

14   figure out these 277?

15       A.   Let me get to the report and make sure that's

16   right.

17           Do you have the page of my report so I can

18   turn right to it?  I can find it, if you want.

19           Counsel, do you have the page of my report

20   that says that?  I can find it; I just want --

21       Q.   Oh, no, I don't.

22       A.   It is on page 13 of my rebuttal.  Yeah, it is

23   AP payment details.

24       Q.   AP payment details?

25       A.   AP payment details.

1    Q.  So if I ran a query in the script output for

2    that column pre November 17th, then 277 items would come

3    up?

4    A.  That is correct, 277 items totaling --

5    Q.  $103 million?

6    A.  $102,906,609, which we rounded up.

7    Q.  So is it fair to say that the other 649 of the

8    926 were not refunded prior to November 17th, 2000?

9        MR. GLENNON:  Objection; assumes facts, lacks

10   foundation.

11       THE WITNESS:  I believe that to be true, yes.

12       MR. GREENSTEIN:  Q.  That's $431 million in

13   debit memos; correct?

14   A.  Correct.

15   Q.  Okay.  So in deriving your calculation of the

16   $20.1 million that was transferred from 25005 to 12601

17   in the second quarter '01, which months did you include

18   in that calculation?

19       MR. GLENNON:  Objection; vague and ambiguous.

20       THE WITNESS:  Which months did I include?

21       MR. GREENSTEIN:  Q.  Yes.

22   A.  Well, what I should include is what's in the

23   quarter, which is September, October, November.

24   Q.  And why did you choose those months?

25   A.  Those are the months in the quarter.

1    contemporaneous e-mail or that that e-mail marked as

2    Exhibit 18 was contemporaneous with the May 23rd, 2002

3    refund; right?

4         MR. GLENNON:  Objection; mischaracterizes the

5    testimony.

6         THE WITNESS:  I think I explained that.  I

7    said it is contemporaneous to the time.  It is not right

8    in the middle of all this litigation.  It was

9    contemporaneous to that time.

10        MR. GREENSTEIN:  Let me take five minutes,

11   then wrap up.

12        VIDEOGRAPHER:  Off record at 6:05.

13             (Recess, 6:05 p.m. - 6:23 p.m.)

14        VIDEOGRAPHER:  On record at 6:23.

15        MR. GREENSTEIN:  Q.  Mr. O'Bryan is it your

16   opinion there is no material difference between meeting

17   and beating Wall Street expectations in the mind of a

18   reasonable investor?

19        A.  There can be.  It can be material, it may not

20   be material.

21        Q.  In what cases would it be material?

22        A.  If in the total mix of the information it was

23   thought to be informative or more material to a reader.

24        Q.  Okay.  So, in some cases it may be material to

25   a reasonable investor whether a company meets or beats

1   expectations; correct?

2       MR. GLENNON:  Objection; asked and answered.

3       THE WITNESS:  No.  What I'm saying, you have

4   to look at the total mix of the information of that

5   company and historically of that company as to whether

6   or not that meet or beat is material, as well as a

7   multitude of other things you have to consider based on

8   SAB 99.

9       MR. GREENSTEIN:  Q.  Right.  I understand that

10  you have to analyze it company by company; correct?

11      A.  That is correct.

12      Q.  But there could be a material difference

13  between meeting and beating expectations depending on

14  particular facts and circumstances involved in a

15  particular quarter; right?

16      MR. GLENNON:  Objection; vague and ambiguous,

17  mischaracterizes testimony.

18      THE WITNESS:  Are you speaking hypothetically

19  here, or are you speaking about Oracle?

20      MR. GREENSTEIN:  Q.  No.  Just in general.

21      A.  So it is a hypothetical?

22      Q.  Yeah.

23      THE WITNESS:  I'm sorry.  You need to repeat

24  the question.

25      MR. GREENSTEIN:  Can you read it back?

```
 1              MR. GLENNON:  You defined Q2 '01, which is why
 2      second quarter caught me off guard.  Sorry.
 3              THE WITNESS:  I don't think the difference
 4      between 11 cents or 10 cents, given the entire mix of
 5      information that was available to the public investor,
 6      that that was a material change.
 7              MR. GREENSTEIN:  Q.  And what standard did you
 8      use to determine what a reasonable investor was?
 9          A.   What standard did I use?
10              MR. GLENNON:  Objection; vague and ambiguous.
11              MR. GREENSTEIN:  Q.  Yeah.
12          A.   I just used the SAB 99, which defines that
13      exact topic.
14          Q.   Okay.  So why don't you take me through your
15      methodology of how you determined that if Oracle had
16      reported 10 cents rather than 11 cents and met investor
17      expectations -- analyst expectations that would not be
18      material?
19              MR. GLENNON:  Objection; mischaracterizes the
20      testimony, lacks foundation.
21              THE WITNESS:  You want me to take you through
22      my report?
23              MR. GREENSTEIN:  Q.  I'm wondering what
24      methodology you used to come to that conclusion.
25          A.   I applied SAB 99.
```

1     Q.   Did you take into account the macroeconomic

2  environment during 2Q '01?

3          MR. GLENNON:  Objection; lack of foundation.

4          THE WITNESS:  Sure.

5          MR. GREENSTEIN:  Q.  What was the

6  macroeconomic environment during that time?

7     A.   It was a tech sector, which was probably a bad

8  time, as I recall it experienced a bit of a downturn.

9     Q.   Do you know what the dot com bust is?

10    A.   I do, yes.

11    Q.   Wasn't that around March 2000?

12    A.   I think I just said experiencing a downturn.

13    Q.   You said a slight downturn.

14    A.   I said a bit of a downturn.  I didn't say

15 slight.

16    Q.   You don't think the dot com bust was more than

17 a bit of a downturn?

18    A.   It was a downturn.

19         MR. GLENNON:  Objection; lack of foundation,

20 mischaracterizes the testimony.

21         THE WITNESS:  That was the macroeconomics that

22 was going on.

23         MR. GREENSTEIN:  Q.  So how would you

24 characterize the macroeconomic environment as of the

25 date Oracle reported its earnings for second quarter

1    '01?

2        A.    Well --

3            MR. GLENNON:  I'm still going to object on

4    vague and ambiguous as to time.

5            THE WITNESS:  The macroeconomic conditions

6    were that there was a downturn in the tech sector.

7            MR. GREENSTEIN:  Q.  Okay.  Did you do any

8    analysis of what was happening to other companies in the

9    software industry during that time, if they met rather

10   than beat expectations?

11       A.    No.

12       Q.    Did you do any analysis of any companies

13   during that time, what happened when they met rather

14   than beat expectations?

15           MR. GLENNON:  Objection; vague and ambiguous.

16           THE WITNESS:  No.  The issue here is Oracle,

17   not other companies.

18           MR. GREENSTEIN:  Q.  Did you do any analysis

19   of Oracle's previous history of earnings reports to see

20   what happened to Oracle's stock when they met or beat

21   expectations?

22           MR. GLENNON:  Same objection.

23           THE WITNESS:  I did, yes.

24           MR. GREENSTEIN:  Q.  And why don't you take me

25   through what your methodology was in doing that

1      A.   Yes.

2      Q.   And is that -- did you produce that to

3   plaintiffs?

4      A.   I'm not aware that it was or was not.

5      Q.   Okay.

6          MR. GLENNON:  Did you rely on your work

7   papers, or did you rely on the analyst reports?

8          THE WITNESS:  This is a summary of the analyst

9   reports.

10          MR. GREENSTEIN:  Q.  A compilation?

11      A.   A compilation?  It's just a summary.

12      Q.   Similar to what you did with the script

13   output?

14      A.   Yeah.

15      Q.   So why don't you go through that and what you

16   did to determine that meeting versus beating in the

17   second quarter of '01 would not be material to a

18   reasonable investor.

19      A.   Again, that's a broader question.  I didn't

20   look at just the meet or beat as being materiality.

21   That was one of the considerations.  So do you just want

22   that component of it or an overview?

23      Q.   You did some analysis of prior tends; correct?

24      A.   Correct.

25      Q.   What was that analysis?

1          A.   We looked on a quarter basis for first Q '99

2     all the way through second Q of '01 the actual

3     consensus, analyst expectation, versus the actual

4     reported amounts.  Then we looked at the stock price as

5     it relates to the day that the earnings was released,

6     and the day plus one, day plus three, and day plus five.

7     We basically looked at five different days after Oracle

8     had released its earnings.

9          And what you find is there is absolutely no

10    correlation between beating and any kind of an increase

11    or decrease in the stock.  Which would lead you to

12    believe as an individual applying SAB 99, that's not

13    necessarily the only measurement of materiality.  Which

14    it is a total mix.

15         But, clearly, you have a situation here where

16    the stock went up -- excuse me, the reported was 4 cents

17    over expected in 2Q '99, the stock dropped 5 percent the

18    day of the release, dropped another 6 percent the day

19    after.

20         Q.   Did you do any statistical analysis to

21    determine why the stock price dropped in that quarter?

22         MR. GLENNON:  Were you finished?

23         THE WITNESS:  I wasn't finished.

24         MR. GREENSTEIN:  Q.  Okay.

25         A.   You see here a situation where they beat

1        A.     Went down 6 percent.

2        Q.     Okay.   Now, how did you determine -- or strike

3   that.

4               How did you decide to use, I think you said

5   the first -- the stock price on the day following, the

6   third day and the fifth day; is that right?

7        A.     That's an analysis typically done by auditors

8   as it relates to looking at materiality, particularly

9   about stock movement, looking at those first few days.

10       Q.     Is there any accounting principle or rule that

11   outlines that procedure?

12       A.     No.

13              MR. GLENNON:   Objection; vague and ambiguous.

14              MR. GREENSTEIN:   Q.   When you say it is

15   typically done by auditors, can you cite to any

16   literature that says that that's the analysis that

17   should be conducted?

18              MR. GLENNON:   Same objection.

19              THE WITNESS:   It would be professional

20   standards, due to professional care and auditor's

21   judgment.

22              MR. GREENSTEIN:   Q.   Any article or literature

23   you could point to that suggests using that standard?

24       A.     With respect to one day, three days, five

25   days?

1     Q.   Yeah.

2     A.   No.  That's up to the auditor's judgment.

3     Q.   You're not a statistician, are you?

4     A.   I'm actually a computer audit specialist.

5     Q.   Computer audit specialist, okay.

6          Did you run a regression analysis of any stock

7     price movement?

8     A.   I was not asked to, nor did I.

9     Q.   Do you know how to run a regression analysis?

10    A.   I do, yes.  Do you want to know about

11    R-squared?

12    Q.   I know a little bit about that.  Do you know

13    what the term vestigial means?

14    A.   Vestigial.  As a I sit rear right now, no.

15    Q.   You don't have a definition of the word

16    vestigial?

17    A.   Not as I sit here now.

18    Q.   You use it in your report?

19    A.   I do.  I don't remember the context I use it

20    in.

21    Q.   The word is not part of your vocabulary as you

22    sit here today?

23    A.   Not right now.

24         MR. GLENNON:  Objection; mischaracterizes the

25    testimony.

1      Q.   Did you -- what surrounding circumstances did

2  you look at in finding that meeting expectations in the

3  second quarter would not be material?

4           MR. GLENNON:   Objection; mischaracterizes the

5  testimony.

6           THE WITNESS:   Would you mind restating the

7  question?

8           MR. GREENSTEIN:   Q.   Did you do an analysis of

9  the surrounding circumstances in your materiality

10  analysis?

11      A.   Absolutely.

12      Q.   What were the surrounding circumstances that

13  you looked at?

14      A.   All of the information that was talked about

15  in analyst reports, all of the information looked at

16  with respect to meeting or beating in the stock price,

17  four or five data points after that, the issue with

18  respect to what's being restated, the percentage change

19  in that potential restatement.  There was a multitude of

20  things I looked at in the surrounding circumstances as

21  SAB 99 suggests.

22      Q.   Anything in particular you found important?

23           MR. GLENNON:   Objection; vague and ambiguous.

24           THE WITNESS:   It is all important.

25           MR. GREENSTEIN:   Q.   Anything in particular

```
 1   in your mind between an ordinary investor versus what
 2   would be reasonable to, say, a hedge fund manager?
 3            MR. GLENNON:  Objection; vague and ambiguous,
 4   incomplete hypothetical.
 5            THE WITNESS:  Well, their sophistication
 6   certainly can be different, but they are still users of
 7   the financial, which one needs to consider as it relates
 8   to materiality.
 9            MR. GREENSTEIN:  Q.  Right.  But would you
10   apply the same standard to determining whether something
11   was material to a user any differently depending on what
12   type of investor the person was?
13            MR. GLENNON:  Objection; incomplete
14   hypothetical, lacks foundation.
15            THE WITNESS:  Yeah.  No.  A company and/or
16   auditor don't determine materiality based on whether it
17   is known as a hedge fund or a mom and pop's retirement
18   fund.  It is the total mix and the overall financial
19   statement taken as a whole.
20            MR. GREENSTEIN:  Q.  Do you agree SAB 99 --
21   strike that.
22            What qualitative factor did you look at doing
23   your materiality analysis?
24       A.   Qualitative?
25       Q.   Yeah.
```

```
 1        A.   I looked at the ones we talked about on page

 2   39, and anything else that was mentioned in SAB 99.  And

 3   you can see those laid out on pages 39 and 40 of my

 4   report.

 5        Q.   Let's take the first factor, whether a

 6   statement arises from an item capable of precise

 7   measurement or whether it arises from an estimate, and,

 8   if so, the degree of imprecision in that.  Do you see

 9   that?

10        A.   I do.

11        Q.   So is it your expert opinion that the

12   transfers from -- the $20.1 million in transfers from

13   25005 to 12601 in the second quarter '01 was an

14   estimate?

15        A.   Yes.

16             MR. GLENNON:  Objection; lack of foundation,

17   vague and ambiguous.

18             THE WITNESS:  It was based on an estimate of a

19   reserve account.

20             MR. GREENSTEIN:  Q.  But the actual transfer

21   from 25005 to 12601 can be accurately calculated, can't

22   it?

23             MR. GLENNON:  Objection; vague and ambiguous,

24   lack of foundation.

25             THE WITNESS:  The amount can be calculated,
```

1    but the resultant account that is being adjusted is the

2    reserve.  And that is one of the most volatile estimates

3    a company has.

4         MR. GREENSTEIN:  Q.  But actual transfers from

5    25005 to 12601 can be accurately measured; right?

6         MR. GLENNON:  Objection; asked and answered.

7         THE WITNESS:  Yes, it can be.  But that's not

8    the way you measure materiality.  Any adjustment can be

9    accurately measured.  The issue becomes would a reader

10   of a financial statement be interested in whether or not

11   an adjustment took place in cash that can be accounted,

12   or, for example, in a reserve account for bad debt that

13   they would expect to have a significant amount of

14   estimated and a significant amount of judgment placed on

15   it?

16        MR. GREENSTEIN:  Q.  Looking at the second

17   factor, whether the misstatement masks a change in

18   earnings or other trends.  Do you see that?

19        A.   Yes.

20        Q.   You stated you found, quote, "No evidence of

21   this issue"?

22        A.   That's right.

23        Q.   Have you ever found -- in conducting

24   materiality analysis, have you ever found evidence that

25   a misstatement masked a change in earnings?

1      MR. GLENNON:  Objection; vague and ambiguous.

2      THE WITNESS:  Certainly.

3      MR. GREENSTEIN:  Q.  What factors would allow

4  you to draw a conclusion that a misstatement masks a

5  change in earnings or other trends?

6      A.  Well, if it changes from a loss to income.

7      Q.  That's a different factor though; right?

8      A.  It also can be subsumed into that one.  Mask a

9  change in earnings, well, if you're changing the

10  earnings, that's masking a change in earnings.

11      Q.  Okay.

12      A.  So, or other trends.  Have I ever found that?

13  Is that your question?  I'm sorry.

14      Q.  I think you answered my question.

15          Take the next factor, "Whether the

16  misstatement concerns a segment or other portion of the

17  registrant's business that has been identified as

18  playing a significant role in the registrant's

19  operations or profitability."  Do you see that?

20      A.  You skipped down quite a few.

21      Q.  I'm focusing on certain ones.

22      A.  I thought you said the next one.  I'm sorry I

23  do see that one, yes.

24      Q.  And you -- your opinion is that if Oracle had

25  not been able to book the HP transaction second quarter

```
1    STATE OF CALIFORNIA          )

2                                 )

3    COUNTY OF ALAMEDA            )

4         I, DIANA NOBRIGA, hereby certify that the

5    witness in the foregoing deposition was by me duly sworn

6    to testify to the truth, the whole truth, and nothing

7    but the truth in the within-entitled cause; that said

8    deposition was taken at the time and place therein

9    stated; that the testimony of said witness was reported

10   by me, a Certified Shorthand Reporter and disinterested

11   person, and was thereafter transcribed into typewriting,

12   and that the pertinent provisions of the applicable code

13   or rules of civil procedure relating to the notification

14   of the witness and counsel for the parties hereto of the

15   availability of the original transcript of the

16   deposition for reading, correcting and signing have been

17   met.

18        And I further certify that I am not of counsel

19   or attorney for either or any of the parties to said

20   deposition, nor in any way interested in the outcome of

21   the cause named in said action.

22   DATED: _____7/16/07_____

23

24   _____

25   DIANA  NOBRIGA, CSR NO. 7071
```