# EXHIBIT 5

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

MASTER FILE NO. C-01-088-MJJ

LOCAL 144 NURSING HOME PENSION FUND, UFCW LOCAL 56 RETAIL MEAT PENSION FUND, DRIFTON FINANCE CORPORATION, AND ROBERT D. SAWYER, et al

vs.

ORACLE CORPORATION, LAWRENCE J. ELLISON, JEFFREY O. HENLEY, EDWARD J. SANDERSON

EXPERT REPORT

OF

D. PAUL REGAN, CPA, CFE

EXHIBIT 2 Regan 7.9.07

**Introduction**

The opinions expressed in this report are my present opinions subject to the following reservations. Amendments or additions to this report may be required as a result of developments prior to or at trial, including, but not limited to, the discovery of new evidence, expert discovery, and the testimony of any other witness in deposition or at trial.

**I.   The Nature of My Assignment**

I have been retained, through my employer, Hemming Morse, Inc. ("HMI"), by Lerach Coughlin Stoia Geller Rudman & Robbins LLP, counsel for Plaintiffs, Local 144 Nursing Home Pension Fund, et al, to provide expert testimony regarding whether Oracle's revenue and earnings for the quarterly period ended November 30, 2000 ("2QFY01") were presented in accordance with Generally Accepted Accounting Principles ("GAAP"), and whether Oracle's financial statements were materially misstated. Specifically, I have been asked to address the following:

1. Oracle's accounting for unapplied cash and customer overpayments,[1] the use of unapplied cash within its Bad Debt Reserve, the relationship of the November 2000 Debit Memos to Oracle's unapplied cash activity in Q2FY01, and the related revenue and earnings impact.[2]

2. Oracle's recognition of $19.9 million in revenue and pre-tax earnings on November 30, 2000 as a result of a transaction with Hewlett Packard ("HP").

**II.   Summary of Opinions**

Oracle's financial statements for the quarterly period ended November 30, 2000 were not presented in accordance with GAAP. Specifically, Oracle:

---

[1] The term customer overpayment includes instances of duplicate payments of an invoice, payments on amounts that were credited, paid amounts where all or portion of the arrangement was cancelled, payments of unnecessary tax, and other instances where customers paid Oracle in an amount that exceeded its related obligation. Certain terms used herein are further defined in Appendix 1, a glossary from Oracle's Account's Receivable User's Guide.

[2] Oracle's fiscal year ends on May 31st. November 30th represents the final date of Oracle's second fiscal quarter. In this report, I have referred to the three months ended November 30, 2000 as "2QFY01."

1. Improperly utilized a series of debit memos to "apply" unapplied cash. These debit memos helped conceal Oracle's use of customer overpayments to overstate its Bad Debt Reserve by at least $20 million. The overstatement of the Bad Debt Reserve was eliminated by improperly increasing revenue and pre-tax earnings in the same amount in 2QFY01. This conduct enabled Oracle to overstate its Q2FY01 diluted earnings-per-share ("EPS") by $.01.

2. Improperly recognized $19.9 million in revenue and pre-tax earnings on November 30, 2000 as a result of a transaction with HP that failed to meet the criteria needed for this revenue to be properly recognized by Oracle. This conduct also enabled Oracle to overstate its Q2FY01 EPS by $.01.

3. Overstated its reported earnings-per-share of $0.11. Oracle's actual EPS should not have included the effects of the overstatement of earnings related to the transfer of customer overpayments into its Bad Debt Reserve, and separately the earnings related to the HP transaction. If Oracle had excluded either one of these transactions from its reported revenue and earnings, its EPS would have been $0.10.

4. Overstated its Customer Advances and Unearned Revenue by including customer overpayments and other unapplied cash in this balance. These amounts were a liability, such as Accounts Payable, that Oracle owed to its customers.

Summary of Expert Qualifications

1. I am a Certified Public Accountant, licensed in the State of California, and a Certified Fraud Examiner. I am currently the President and Chairman of Hemming Morse, Inc., CPAs, Litigation and Forensic Consultants, a 95 person accounting firm. Until July of 2004, I was the Director in charge of its litigation and forensic consulting practice. I had performed that responsibility for more than 29 years. My work in the accounting profession includes experience as an auditor and as a consultant. My expert qualifications, including my testimony in the last four years and the publications I have authored, are described in Exhibit A to this report.

2. I have been a Certified Public Accountant continuously since 1970. During these years I have worked on more than 500 complex litigation matters. Many of these have required an extensive analysis and determination of whether financial statements were presented in accordance with GAAP, including whether revenue was properly recognized in particular periods of those financial statements. I have performed these analyses for large and small companies in the private sector, as well as for public companies. These analyses have involved financial statements of entities across a diverse range of industries, including high technology, software, and leasing companies. I have testified as an expert in more than 70 trials and arbitrations and in more than 125 depositions. These cases were generally in state and federal courts in the United States.

3. I am a member of the California Society of Certified Public Accountants ("CalCPA"). I have served on its statewide Litigation Services Steering Committee since 1990 and I was its Chair during 2004 / 2005. This Steering Committee provides guidance to the more than 800 members of its four Operating Sections – (1) Business Valuation, (2) Economic Damages, (3) Fraud and (4) Family Law. For two and one-half years (through August of 1998), I was Chair of its 250-member Economic Damages Section. I served as Chair of the 28,000-member CalCPA during 2004 / 2005.

4. The American Institute of Certified Public Accountants ("AICPA") has a national Forensic and Litigation Services Subcommittee ("FLSS") (formerly the Litigation and Dispute Resolution Subcommittee ("LDRS")). From 1998 until July of 2001, I served as one of the nine members of this national committee. The FLSS oversees and provides guidance to the AICPA's 330,000 members in their practice as it relates to litigation consulting and dispute resolution. The FLSS also provides guidance and supervision to its subcommittees, which include Economic Damages, of which I was its Chairperson from 1999 to July 2001. I am presently a member of the AICPA's governing council.

5. My firm is being compensated for my review and analysis in this matter at my standard hourly rate, which is currently $525 per hour. Others have assisted me in my work and my firm is being compensated for their work at their standard hourly rates.

### III. Evidence Considered

In undertaking my assignment, I have considered information from a variety of sources, each of which is of a type that is reasonably relied upon by experts in my field. A detailed listing of these sources is identified in **Exhibit B** to this report.

I have also relied upon my own professional judgment and expertise gathered during the almost 40 years I have been practicing public accounting and the more than 35 years that I have analyzed the accounting for financial transactions, the presentation of transactions in financial statements in accordance with GAAP, audits of financial statements, and transactions that are the subject of legal disputes.

### IV. Detail of Opinions Regarding Oracle's Improper Accounting for Unapplied Cash and Customer Overpayments Associated with Debit Memos

1. For Q2FY01, Oracle inflated its revenue, which resulted in a material overstatement of earnings;

   - As a result of Oracle's improper transfer of customer overpayments, it's Bad Debt Reserve was inflated by at least $20 million in 2QFY01.

   - Based on this improper excess, Oracle improperly recorded a $20 million reduction to the balance of its Bad Debt Reserve. The reduction of the Bad Debt Reserve resulted in a $20 million increase to Oracle's reported revenue and pre-tax earnings in 2Q01.

   - The $20 million increase enabled Oracle to report 2QFY01 earnings-per-share of $0.11. If Oracle had reported earnings that were consistent with GAAP, its EPS would have been $0.10.

2. The 46,881 debit memos that Oracle processed during 2QFY01 allowed Oracle to conceal overpayments and unapplied cash from customers, and facilitated Oracle's improper transfer of customer overpayments to the Bad Debt Reserve.

Page 4 of 64

- Receipts that were in the Bad Debt Reserve *and* "On Account" were outstanding and therefore available to Oracle collections personnel as potential credits or refunds to customers. However, receipts that were "Applied" were not available to Oracle staff for potential credits or refunds to customers.

- The debit memo invoices which caused the cash receipts to become "Applied" were not bona-fide invoices, and Oracle's customers did not intend for their payments to be applied to the debit memos. Oracle did not tell its customers about the debit memo invoices, and took steps to conceal and misrepresent them.

3. Oracle improperly classified customer overpayments and other unapplied cash receipts in its reported balance of Customer Advances and Unearned Revenue.

**The Problem of the Unapplied Cash Accumulation at Oracle**

4. At the beginning of 2QFY01, Oracle had accumulated at least $144 million of cash receipts from its customers that it was unable to apply to an invoice (*see* table in paragraph 9).[3] Oracle attributed the majority of the unapplied cash to the following situations: a) the receipt is to be refunded; b) there is not enough information to determine where the receipt belonged; or c) the receipt pertains to a financed transaction or belongs in a GL account.[4] One of Oracle's Collections Managers testified that this "large" balance of unapplied cash was a "very, very large problem, the biggest problem that anybody in collections or accounts receivable had."[5] Jeff Henley, Oracle's Chief Financial Officer, acknowledged the Company's prior problems with unapplied cash.[6]

---

[3] Deposition of Michael Quinn, April 18, 2006, 158:11-18, "Q. And that's what you were testifying to earlier today, right, that there was a challenge due to accumulating cash partly from customer overpayments in Oracle's unapplied cash account, right? [A] The problem was an accumulation of items in unapplied cash."
[4] NDCA-ORCL 1885992-6020 at 1885996, Oracle memo entitled, "12018/25005 Reconciliation Project, Documentation of procedures, findings, and recommendations."
[5] Deposition of Ian Hatada, October 5, 2006, 78:20-25-79:9 "[A] Yes, it was large from the time I got there to the time I left. [Q] ...I think you characterized it as a 'problem;' right? A. It was a very, very large problem, the biggest problem that anybody in collections or accounts receivable had."
[6] Deposition of Jeffrey Henley, November 16, 2006, 465:7-21"Q. And what was the cause of those problems? A. Again, my recollection, as best I can tell, I think, was that the group over there that was in that department started falling behind and was not – were not staying up on top of the work, and it had – there was a similar problem when I joined the company many years ago, which we cleaned up. And so I was disappointed when I found out about it because here we were repeating sins of the past many years later. Q. And were there no internal controls in place to ensure that that didn't happen again? A. Again, there were a lot more controls in the company

Page 5 of 64

5. A significant cause of the balance of unapplied cash was overpayments made by Oracle's customers. This situation was acknowledged by Oracle in its naming of account 25005, as "Customer Overpayments." These customer overpayments resulted from a variety of circumstances that were enabled by Oracle itself, and included:

- Oracle had a practice to <u>not</u> send credit memos[7] or account statements to its customers, unless those documents were explicitly requested by the customer.[8,&9] Oracle's practice caused customers to often be unaware of outstanding credits, resulting in overpayments.[10]

- Oracle's policy was to not issue a refund unless the customer made a specific request for one.[11] Even if the customer made such a request, Oracle would often deny the

---

over the years, but – and certainly in the revenue recognition area, a number of controls. But in this case, there was a collections department, there was a manager, and **I don't think there was adequate supervision.** So there was some that – while there were controls, they fell behind." (Emphasis added.)

[7] *See* Deposition of Tom Williams, June 7, 2006, 155:4-7. *See also* Williams Deposition, Ex. 4 at NDCA-ORCL 048663. Oracle's manual entitled *Oracle Receivable User's Guide*, Release 105C, March 1997, Volume I, defines a Credit Memo as "A document which partially or fully reverses an original invoice. You can create credit memos through the Receivables, Enter Credit Memos form, or through AutoInvoice." In other words, a Credit Memo is typically used to partially or fully offset the balances of outstanding or future invoices, or is utilized by the customer to obtain a refund, and generally results in a reduction to accounts receivable and revenue.

[8] Deposition of Greg Myers, May 23, 2006, 75:19-21, "We generally don't send statements to our customers unless they request them."

[9] PLF-ORC 000133, "Can we consider sending the Customers the system generated Credit Memos? <u>Our practice of not sending Credit Memos</u> makes account reconciliation extremely difficult. We send the invoice and often send a rebill, but <u>we never send the Credit Memo</u> that clears the original invoice and validates the rebill." (Emphasis added.)

[10] NDCA-ORCL 1895745, e-mail from Molly Littlefield, "We actually have the unapplied cash. We never booked the order but the customer paid. We want to book it or try to get upper management to agree that we should keep this money."

[11] Deposition of Raul Campos, March 28, 2006 126:15-25, "Q. Right. So – so once you did that – once you did some research and found that there was nothing – in circumstances where you found there was nothing to apply it to did you refund the customers? A. If the customer would request a refund. Q. What about if a customer didn't request a refund? A. It would remain unapplied. Q. Did you call customers to tell them, 'Hey, you have money unapplied. Do you want it back?' A. No." *See also* 128:17-129:12, "Q. And did you or anyone at Oracle send letters to the customers saying, 'Hey, there are these items associated with you that are in our Unapplied Account?' …A. I did not personally send any letters out and to my knowledge nobody else did either. Q. Did you call customers and tell them that they had money in On Account that is available for refund or anything like that? A. No. Q. Do you know if anyone else did at Oracle? A. Not to my knowledge."

customer a refund if the customer had any other receivables outstanding or if Oracle had previously written off amounts as bad debt (typically via a credit memo).[12,13&14]

6. The use of the systematic practices described above caused Oracle's customers to pay duplicate and erroneous invoice amounts.[15] The unapplied cash from customer overpayments were amounts Oracle owed to its customers. These cash receipts were not amounts earned by Oracle, and it was not entitled to keep these funds. However, Oracle's policies inhibited the refund process, and in November 2000 it covered up the audit trail within its internal records used to track customer overpayments (see discussion below regarding the November 2000 Debit Memo invoices).

7. Customers that learned of Oracle's practice to not refund overpayments found it unacceptable. For example, one of its customers, Household, wrote to Oracle:

> Two weeks ago we determined that an additional $178,346.77 in Household International and its affiliates' funds [were] being held by Oracle, but Household had not been previously advised....Oracle's continued retention of Household funds, without communication as to the reason for the delay, is unacceptable.[16]

**Oracle's Misclassification of Customer Overpayments and Other Unapplied Cash**

---

[12] *See* Deposition of Ian Hatada, October 5, 2006, 64:23-68:20, including for example, "At times we – we had to put together a request to the Accounts Receivable Department to refund, and at times those requests would be put on hold for long periods of time, and the money would not go back to the client. Q. Okay. So was it determined that an item of unapplied cash needed to be refunded but the process was never implemented so the money never got refunded? Is that correct? [A] True. Q. Even though the collectors determined that it was the customer's money and should go back to the customer, it was never refunded; was it? A. True. Q. And that happened multiple times; didn't it? [A] Yes." *See also*, 139:6-11, "It happened when Quinn had – advised us not to refund anything that was revenue impacting, and it happened when we got farther in to the project and found that there were a lot of items that truly needed to be refunded, and Tom Williams shut off the – the whole refunding of the project."

[13] NDCA-ORCL 1886317, e-mail from Molly Littlefield to various Oracle personnel entitled "Re: [Fwd: REFUND REQUEST/GE Power]," "All, I agree we should not rush into the refund at this point, but I wanted to just add a couple of points. I believe the research that is provided on the refund is correct and we owe the customer this money."

[14] NDCA-ORCL 1865593-600, an Oracle representative provided Verizon a list of unapplied cash in response to an inquiry from a Verizon internal auditor. Littlefield responded, "We probably should not have given them the list of unapplied but since we did we need to make them prove to us that the money is theirs." Littlefield further responded, "[t]hey should be providing us the reasons for refunding. We should not be researching for them. If they want a refund then make them prove to us why? Maybe I am missing something here but if they want the money shouldn't they tell us why?"

[15] *See* detailed reports supporting customer refunds, for example, NDCA-ORCL 1722665-82. This report specifies a number of different origins for amounts that were refunded (*see* "Reason" column).

[16] HI000111.

8. Oracle had an obligation to either apply the unapplied cash to existing accounts receivable, or acting jointly with its customers, seek an appropriate alternative resolution of the overpayment. For example, Oracle and the customer could have determined that the payment would be applied to another outstanding invoice or that the cash should be refunded to the customer. In the unlikely event that Oracle was ultimately unable to determine how to apply a particular payment that it received from a customer or that a refund was appropriate, it had a legal obligation to escheat the funds to the appropriate government entity.[17]

9. There were at least three general ledger accounts where Oracle maintained the unapplied cash from customer receipts. During 2QFY01, the balance of unapplied cash decreased $49.9 million (see table below):

---

[17] *See* for example NCDA-ORCL 1895998-99. This letter from Oracle to JDS Uniphase ("JDS") in August 2004 indicates that Oracle was holding unapplied cash receipts from JDS. Oracle provided JDS with three options as follows: "[1] Our Records Indicate that the Credits are in Error (Oracle should adjust their records as needed), [2] Issue a Refund of the Above Amount, or [3] Apply Above Amounts to Current Outstanding Invoices." JDS indicated that it desired a refund. This letter indicates that Oracle understood the appropriate alternatives to employ to resolve the customer overpayments, including that it did not have a unilateral right to offset the overpayments against other amounts of its choosing, or to apply customer overpayments to debit memos as it did in November 2000. Finally, this letter indicated that if Oracle did not receive a timely response to the letter, it would escheat the money to the state of California. The individual states have laws requiring amounts to be escheated after certain periods of time that such payments are unclaimed.

|  | Account # | Q2 Beginning Balance | Q2 Ending Balance | Change |
|---|---|---|---|---|
| Unapplied Cash | 12018[18] | $86.3M | $64.6M | $(21.8)M |
| Bad Debt Write Offs | 12601[19] | (15.7) | 4.4 | 20.0 |
| Customer Overpayments | 25005[20] | 73.6 | 25.4 | (48.2) |
| Total |  | $144.2M | $94.4M | $(49.9)M |

10. For the reasons described below, Oracle's usage of both the 12601 and 25005 accounts was improper. In addition, the 12018 account should not have been utilized as an account to indefinitely retain payments from customers that Oracle was not able to assign to proper invoices.

11. I have also reviewed certain evidence to suggest that these balances of unapplied cash may have been larger. However, Oracle appears to have conducted "routine 'Q-end unapplied clean up' drills," in which it reduced unapplied cash by applying the receipts to other invoices without adequate review.[21]

*Customer overpayments and other unapplied cash receipts were improperly included in the 12601 account*

---

[18] AA 000035, Accounts Receivable Variation Analysis as of November 30, 2000.

[19] NDCA-ORCL 1610987, Bad Debt Reserve Reconciliation Q2FY01. This account also was utilized for Bad Debt Write-offs, which offset the unapplied cash. *See also* NDCA-ORCL 104764-65 (identical to NDCA-ORCL 313945-46 below – 12601 Reserve Activity). This document identifies that, in total, the 12601 account included $29.2 million of unapplied cash ($24.356 million from June to November 2000 per 104764 and $4.875 million prior to that time per 104765). As of November 30, 2000, $20.8 million of this unapplied cash was transferred into the account during Q2FY01 (*see* discussion below). A total of $8.4 million of unapplied cash had been transferred into the account in earlier periods. Since the fluctuation of the account in the quarter was approximately equal to the total amount of transfers during Q2FY01, it appears that Oracle did not increase its Bad Debt Write-offs during the quarter, and the only significant impact was from the transfer of unapplied cash.

[20] AA 000040, Unearned Revenue Variation Analysis.

[21] NDCA-ORCL 1856278. E-mail from David Tejeda, an Oracle collections representative, noting "The application that I made to invoice 6057195 is definitely a misapplication. I'm not big on intentionally misapplying funds. However, being a Feb. 2001 application, I'm pretty sure I was involved in one of our routine 'Q-end unapplied clean up' drills, as we used to do on the final months of each Q back then. Please do unapply this payment, as I'm 99% sure it doesn't belong to invoice 6057195." (Emphasis added.)

12. It was improper under GAAP to include unapplied cash in the 12601 account because that account was a component of Oracle's Bad Debt Reserve.[22&23] Oracle did not have rights of ownership with respect to the customer overpayments. Therefore, it was not entitled to use these amounts to offset credit losses from unrelated transactions.

13. GAAP notes that the accounting for the impairment of an asset, such as accounts receivable, requires an accrual (i.e., a charge) to the income statement.[24] Oracle's accounting for unapplied cash within the Bad Debt Reserve was inconsistent with GAAP and its own policy because there was no related charge to the income statement.[25] The unapplied cash was either applicable to existing accounts receivable, in which case the amounts should have remained in 12018, or the amounts had been mistakenly remitted by Oracle's customers, and should have been included in an accounts payable account to be refunded to these customers.

*Customer overpayments and other unapplied cash were improperly presented in Customer Advances and Unearned Revenue*

14. Oracle's inclusion of unapplied cash in its 25005 account as a component of reported Customer Advances and Unearned Revenue was also improper.[26] GAAP describes Unearned Revenues as "deposits and prepayments received for goods or services <u>to be provided</u>."[27] Therefore, Oracle's balance sheet classification improperly represented that

---

[22] NDCA-ORCL 1610987, Bad Debt Reserve Reconciliation for Q2FY01 showing the inclusion of the 12601 account as a component of the Bad Debt Reserve.
[23] Deposition of Michael Quinn (Oracle's senior Credit & Collections executive), April 18, 2006, 197:12-24, "Q. And 12601, that was the number for an accounts receivable reserve? A. Yes. Q. And prior to November of 2002, money was being transferred between 25005 and 12601, right? A. That's my understanding, yes. Q. And those transfers impacted Oracle's balance sheet, right? A. Yes. Q. And in what way? A. It increased the reserve balance that was in the – that GL account, 12601."
[24] Statement of Financial Accounting Standards (FAS) No. 5 "Accounting for Contingencies," ¶ 8 "An estimated loss from a loss contingency . . . shall be <u>accrued</u> by a *charge to income*." (Emphasis added.) *See also*, ¶74, "The accrual of some loss contingencies may result in recording the impairment of the value of an asset rather than in recording a liability, for example, accruals for expropriation of assets or uncollectible receivables."
[25] *See* Chan Deposition Ex. 19, NDCA-ORCL 140467-78 at 68-69, Oracle's Credit Memo and Write-off and Bad Debt and Credit Reserve Policy.
[26] AA 000040, Variation Analysis as of November 30, 2000.
[27] Emphasis added. *See* FASB Statement of Financial Accounting Concepts ("FASCON") No. 6 ¶ 197, "Elements of Financial Statements," which states, "Deposits and prepayments received for goods or services to be provided – 'unearned revenues,' such as subscriptions or rent collected in advance – likewise qualify as liabilities under the definition because an entity is required to provide goods or services to those who have paid in advance."

the amounts contained within 25005 would ultimately be recorded as revenue. This was inaccurate because the unapplied cash was not future revenue, but instead represented amounts that should have been applied to the corresponding accounts receivable balance or returned to Oracle's customers.

15. Furthermore, Oracle personnel have testified that the amounts within the 25005 "Customer Overpayments" account had generally been flagged for customer refund.[28] Therefore, the unapplied cash included within the Customer Overpayments account, and in particular all of the unapplied cash attributable to customer refunds, represented a liability of Oracle to its customers. In my opinion, Oracle's accounting for unapplied cash as Customer Advances and Unearned Revenue misclassified this obligation.[29]

*Unapplied cash should have been included in Accounts Payable*

16. Accounts Payable is a liability. In my opinion, at a minimum, Oracle should have reported unapplied cash receipts held in its 12601 and 25005 accounts within its reported balance of Accounts Payable. Notably, when Oracle did issue customer refunds the payment was processed through account 20002, which was within Accounts Payable.[30]

17. This opinion is consistent with Oracle's "Unapplied Cash Clean-up" that began in October 2002. At that time, Oracle refunded at least 117 unapplied cash receipts totaling approximately at least $5.1 million million to customers that had been improperly

---

[28] Deposition of Michael Quinn, April 18, 2006, 97:9-19, "What's the difference between unapplied cash that would be in the liability account and unapplied cash that would be in an accounts receivable account? A. Generally speaking, it would be – the items in 25005 would be – actually, I'm sorry. Let me answer the question. The amounts that would be in a liability account would be generally something that are flagged to be refunded to a customer, payable to a customer."

[29] FASCON No. 6 ¶ 196, "Most liabilities presently included in financial statements qualify as liabilities under the definition in paragraph 35 because they require an entity to sacrifice assets in the future. Thus, accounts and notes payable, wages and salaries payable, long-term debt, interest and dividends payable, and similar requirements to pay cash so obviously qualify as liabilities that they need no further comment."

[30] NDCA-ORCL 1885992-6020 at 1885999, Oracle memo entitled, "12018/25005 Reconciliation Project, Documentation of procedures, findings, and recommendations." *See also* Deposition of Michael Quinn, April 18, 2006, 102:2-6; Deposition of Gary Matuszak, August 1, 2006, 195:19-196:8, 197:17-198:13.

transferred to the 12601 account in connection with 2QFY01.[31] Many of these refunds did not take place until Oracle's fiscal 2004.[32] *See further discussion below.*

18. It is also worthwhile to note that Oracle sought to avoid providing its customers with refunds of their overpayments. As part of this effort, Oracle offset customer overpayments against unrelated outstanding receivables. Oracle also reversed prior credit memos provided to customers, and applied the overpayments to fictitious revenue from "adjusted-up" invoices.[33&34] This offsetting of assets and liabilities (such as another receivable and the liability to the customer for the overpayment) is improper except where a right of setoff exists.[35] In my opinion, Oracle did not appear to have a right to offset.[36]

## Oracle's Improper Use of Debit Memos, Customer Overpayments and Other Unapplied Cash to Misstate Its Financial Statements in 2QFY01

---

[31] NDCA-ORCL 1646567-70. Number of cash receipts; *see* p.69, line 37, column F, totaling 117. Amount; *see* p.67, line 16, column F, totaling $5,135,672.

[32] NDCA-ORCL 1624272, NDCA-ORCL 1534642-701; NDCA-ORCL 1058909, Debit Memo Script Output.

[33] In 2002, Oracle's reversal of the November 2000 Debit Memos resulted in more than $50 million of additional unapplied cash from customer overpayments, which Oracle had to "resolve" (*see* discussion below regarding the Unapplied Cash Clean-up). One method utilized by Oracle involved the reversal of credit memos and then applying customer overpayments to the "adjusted up" invoices. Specifically, if a credit memo had been previously issued to the customer, Oracle would reverse that credit memo, and simultaneously create an "adjusted-up" invoice by improperly assuming the original credit memo was in error. This "adjusted-up" invoice was not sent to the customer, but was improperly created for the purpose of applying the customer overpayment to complete the reversal of the previous credit memo. *See* Deposition of Ian Hatada, October 5, 2006, 93:20-94:17, "Typically we only adjusted up invoices if there was a credit memo on them....When – you know, as long as there was a credit memo done on the invoice, you could adjust up the invoice and take away the credit memo to apply.... [Q] So you reverse the previous credit memo that was applied that reduced the invoice; right? A. Correct. Q. And how would you reverse a credit memo? A. It would be a – a request to accounts receivable to reverse the credit, so, therefore, now the credit is no longer on the invoice, there's an outstanding amount. It matches the amount that's in the unapplied, and, like I said, it was at that point a wash once you applied it."

[34] NDCA-ORCL 1889364-69, e-mail from Lilly Hao to Molly Littlefield. Littlefield wrote "I think all the highlighted invoices for Pioneer should be adjusted up. We have plenty of unapplied cash to pay for this money. Once they are adjusted up I can easily apply money. However, in some cases the customers have taken credits for these items and I think if we adjust them up to their normal dollar amount and I can apply the cash and then go back to them and tell them that the credits they took were not valid."

[35] APB Opinion No. 10, Omnibus Opinion – 1966, ¶ 7.

[36] FASB Interpretation (FIN) No. 39: Offsetting of Amounts Related to Certain Contracts (an interpretation of APB Opinion No. 10 and FASB Statement No. 105). GAAP notes that offsetting is only appropriate when <u>all</u> of the following conditions are met: 1) Each of two parties owes the other determinable amounts; 2) The reporting party has the right to set off the amount owed with the amount owed by other party; 3) The reporting party intends to set off; and 4) The right of setoff is legally enforceable. In this case, Oracle included the unapplied cash in the 12601 or 25005 accounts when it could not determine how to apply the payment. Accordingly, Oracle did not meet the criteria for offsetting.

19. During 2QFY01, Oracle used its unapplied cash and customer overpayments for improper purposes in order to inflate its financial results. To do this, Oracle recorded accounting entries that enabled it to account for $19.4 million of the unapplied cash as if these amounts were truly Oracle's assets.[37&38] These accounting entries transferred unapplied cash out of the Customer Overpayments account 25005 and into account 12601, which as noted above was a component of Oracle's Bad Debt Reserve. As a result, these transfers (each of which was associated with a debit memo) also impacted revenue (*see* further discussion below).[39]

20. In total, during August and October of 2000, more than 1,900 customer overpayments were transferred by Oracle from the Customer Overpayments account to its Bad Debt Reserve.[40] This amount is specific to the transfers from the 25005 account in Q2FY01, however, I have reviewed evidence that indicates Oracle improperly accounted for other unapplied cash in this reserve account.[41&42]

---

[37] NDCA-ORCL 313945-46, supporting schedule to the "Report of the Special Litigation Committee of the Board of Directors of Oracle Corporation," Volume 1, November 22, 2002. The total amount of the transfers to 12601 in 2QFY01 was $20.8 million. However, as discussed below, Oracle calculated its Bad Debt Reserve as of the month immediately prior to quarter-end, which in this case was 10/31/00. Therefore, for purposes of assessing the impact of the transfer of customer overpayments on Oracle's 2QFY01 earnings, it is necessary to determine the total transfer activity in the three months ended 10/31/00. These transfers totaled $19.4 million as follows; August 2000 - $3,562,206 and October 2000 - $15,819,640. The addition of these amounts to 12601 in these periods is validated elsewhere. *See* for example NDCA-ORCL 1607481, which is an Oracle document entitled "On Account/Receipt Write-off Summary."

[38] In addition, in earlier periods, Oracle had transferred $4.9 million into the Bad Debt Reserve (NDCA-ORCL 313946). These earlier transfers also inflated the Bad Debt Reserve in 2QFY01. NDCA-ORCL 313945-46.

[39] Deposition of Michael Quinn, April 18, 2006, 227:25-228:15. "Did you prepare an update for the audit committee describing the impact of taking the unapplied cash receipts to the reserve to the audit committee? A. I'm assuming I did. I can't recollect actually putting it together....Did the process of taking unapplied cash to the reserve impact revenue in any of the eight quarters prior to October 2002? A. Yes. Q. And in what quarters? A. I don't know. Q. And did you include that in your update? A. Yes."

[40] NDCA-ORCL 1607784-822, Oracle's Miscellaneous Offset Reports for August and October 2000. The August 2000 report includes 517 receipts (end row # 526 minus beginning row #10) and the October 2000 report includes 1387 receipts (end row #1397 minus beginning row #10). Therefore, the total is approximately 1,900.

[41] NDCA-ORCL 3042910, e-mail from Neal Menon to various Oracle personnel dated November 6, 2000 regarding unapplied cash. Menon identified $16.985 million of unapplied cash related to OCC (Oracle Credit Corporation). Although he requests that Oracle's collection personnel assist in the application of this cash, he notes "Since we are approaching the end of the quarter, we would like to resolve these items as quickly as possible. If there is no response by November 20, 2000, we will review the items and place them in our reserve account." (Emphasis added.)

[42] *See* for example, Deposition of Michael Quinn, April 18, 2006, 205:16-206:11, "Q. So these auto adjustments that we were talking about in Quinn No. 5 would increase the bad debt reserve? A. Correct. Q. Is that the only account that the auto adjustments would impact? A. Other than the unapplied account because it would be taken out of the unapplied account and put into the bad debt reserve account. Q. Bad debt reserve account. A. The 12601. Q. So – and what was the purpose of it? A. What was the purpose of what? Q. What was the purpose of

21. As described above, Oracle misclassified customer overpayments in Account 25005 and Account 12601 (i.e. Unearned Revenue and the Bad Debt Reserve). However, the inclusion of the customer overpayments in its Bad Debt Reserve was particularly improper because activity in this account inflated Oracle's reported revenue and earnings. Oracle's transfers of unapplied cash violated Oracle's obligation to return the amounts related to overpayments to its customers and therefore were inconsistent with GAAP. Two years later during Oracle's "Unapplied Cash Clean-Up," (*see* related section of this report below) Oracle reversed this accounting. Michael Quinn instructed Greg Myers, Oracle's Senior Accounts Receivable Manager, to "confirm that ALL ability to move anything to 12601...has been turned off."[43&44]

22. Although this was not the first time that Oracle transferred a portion of the overpayments to its Bad Debt Reserve, the transfers in 2QFY01 were the largest to that date.[45]

23. Oracle preserved at least $24 million of the transferred customer overpayments in the Bad Debt Reserve by marking them "On Account."[46&47] Oracle began to use the On Account designation as part of the process to move unapplied cash to the 12601 account

---

these auto adjustments? A. At some point you make an assessment as to how much effort you want to expend on a $25 item or a $250 item that's, you know, 75 days old, just as an example, or 180 days old, and it's to clean up and reduce the number of transactions that are out there sitting in unapplied cash." *See also* the Deposition of Tom Williams, June 7, 2006, 178:19-179:2. "Were there instances at Oracle where unapplied cash would be moved to 12601 for reasons that you have just articulated – either they are small dollar amounts, the difficulty in actually determining the proper placement or proper reconciliation would be too difficult? Were there instances where those monies would be transferred to 12601? A. I believe the answer to that is, yes."

[43] NDCA-ORCL 1125473-74, e-mail from Michael Quinn to Greg Myers, Tom Williams and others dated October 21, 2002.

[44] The process to move customer overpayments from the 25005 account into the 12601 account required Oracle to record two new cash receipt entries. The first was a negative cash receipt in 25005 to remove the overpayment from that account. The second was a positive cash receipt in 12601. In both cases the offsetting entry was to cash. During the Unapplied Cash Clean-up, it was necessary to reverse both of these entries. NDCA-ORCL 1885992-6020 at 1885998 and 1856020, Oracle memo entitled, "12018/25005 Reconciliation Project, Documentation of procedures, findings, and recommendations." *See also* NDCA-ORCL 1727952-53, Step-by-Step Guide to Removing Misc Receipts from 12601.

[45] *See* NDCA-ORCL 313945-46, a supporting schedule for SLC Report.

[46] NDCA-ORCL 313945. The $24 million included the $19.4 million transferred into the Bad Debt Reserve in 2QFY01.

[47] On Account was defined as "Payments where you intentionally apply all or part of the payment amount to a customer without reference to a debit item." *See Oracle Receivables User's Guide*, Release 10SC, March 1997, Volume I, NDCA-ORCL 048672 and Deposition of Greg Myers, May 23, 2006, 54:10-14.

in August 2000.[48] The On Account designation in the accounting system was a step in the process to move unapplied cash to the 12601 Account and prevented the money from being refunded to customers.[49] The On Account status remained attached to the cash receipt until specific action was taken to remove them during the On Account Cleanup in 2QFY01.[50]

*The November 2000 Debit Memo Invoices*

24. In a process that appears to have began in September 2000 and was executed in November 2000,[51] Oracle concealed these customer overpayments in its accounting system. Oracle did so by "applying" each of the customer overpayments that had been inappropriately transferred to the Bad Debt Reserve to a series of new, but non-customer initiated, debit memo invoices (the "November 2000 Debit Memos").[52]

25. The concealment of the customer overpayments via the November 2000 Debit Memos occurred in a three step process:[53]

    i. The original cash receipt that had been marked On Account was changed to "Unapplied."[54] This step was necessary to later enable the customer payment to be "Applied."

---

[48] NDCA-ORCL 1609375-76, November 14, 2002 e-mail from Greg Myers to Terry Elam, in response to the following question from Elam: "When I met with Buzz today he had a question about the 12601 account. He wanted to know when we started using 'On Account' to reclass our unapplied to 12601." Myers responded, "We started applying receipts to the 12601 account in August 2000 in the form of misc. receipt. This stopped in December of 2000, and they resumed activity in Feb -01 via a cash receipts placed On Account after the updates were completed to the payment method." (Emphasis added.)

[49] Deposition of Greg Myers, April 12, 2005, 52:14-53:12, "Q. Okay, so if a payment was On Account, it could mean that a payment was moved to directly offset an expense account? A. Well, the placing of the item On Account was just one step of maybe a couple additional steps. It's a series of transactions. So if we're going to – so narrow in on just the placing of the item On Account, that was to reference that the cash really should not be – no future activity should really happen against this payment in relation to moving this money to an open receivable. I mean, it would – at that time, you know, prior to November 17th, meant as a signal for people in the system that the money – that something additional -- some additional transaction had occurred that meant not to, you know, touch this money, or don't touch this receipt in the way that we would use it for some other purpose." (Emphasis added.)

[50] Deposition of Greg Myers, April 12, 2005, 76:3-8.

[51] *See* NDCA-ORCL 623757, e-mail from Dianna Ferguson to Sanjay Kumar dated September 20, 2000.

[52] Another $5 million in customer receipts that were transferred to the reserve in November 2000 were also applied to the Debit Memos. NDCA-ORCL 1607834.

[53] Deposition of Greg Myers, April 12, 2005, 174.

[54] NDCA-ORCL 048682. Definition of an Unapplied Payment: "The status of a payment for which you can identify the customer, but you have not applied or placed on account all or part of the payment."

    ii.    A debit memo was created for the dollar amount of the cash receipt from the customer overpayment.

    iii.    The Unapplied cash receipt was applied to the debit memo.

26. As a result of the application of the debit memos to these overpayments, the cash receipts from customer overpayments were no longer identifiable as "unapplied" cash receipts.[55] This distinction was important because unapplied cash receipts composed the population of cash receipts normally considered by Oracle's collections personnel.[56] Since the debit memos caused the overpayments to appear to be applied, Oracle's collections personnel were told, in effect, that the customer overpayments had been refunded or applied, and thus were not available to be refunded or applied to any other invoice.[57&58] However, as explained below, when the November 2000 debit memos were reversed as part of the 2002 Unapplied Cash Clean Up, Oracle acknowledged that the money belonged to customers and began issuing refunds in 2003.[59]

27. As an example, an AR Aging Report as of October 31, 2000, which is consistent with the documents contemporaneously utilized by Oracle's collections personnel to resolve unapplied cash,[60] shows 14 payments totaling $178,346.77 from Household Finance that

---

[55] Deposition of Ian Hatada, October 5, 2006, 127:18-129:2, including "the best description would just be that there was money in an account that was, you know, unapplied money that we had never seen before, and we were going to all of a sudden see and have to resolve."

[56] NDCA-ORCL 1885992-6020 at 1885997, Oracle memo entitled, "12018/25005 Reconciliation Project, Documentation of procedures, findings, and recommendations." This document notes regarding the reversal of the 12601 unapplied cash amounts "[i]n an attempt to reclassify these items as unapplied and add them back to the population of items being resolved by collections…"

[57] NDCA-ORCL 1731158. August 1, 2002 e-mail from Raul Campos to numerous Oracle personnel regarding a report entitled "Running Billing Histories," which, in part, identified how Oracle had applied customer payments. These reports would have shown customers that unapplied cash had been applied to debit memos. "Before you [run] your next Bill History for your customer, please read the following. Currently there are a ton of 'Debit Memo' #'s pulling up into customer's billing histories that appear to the customer as an invoice….The customer will believe these funds [are] available for a credit or refund, but actually these funds have already been refunded. In order to prevent duplicate refunds or a lot of unnecessary research for you & me (mostly you), I ask you to do the following: After you run [you] billing History, export the report into excel & remove all of the debit #'s that start with '550' before you send it to the customer."

[58] NDCA-ORCL 1895918-22, "Debit Memos can be very tricky. Especially all the ones created on Nov 18, 2000…. If we ever sent a customer a billing history these debit memos should never be included on it."

[59] See, e.g., NDCA-ORCL 1722653-64, February 6, 2003 spreadsheet: "Amount to be refunded" at 1722664 is nearly $5 million.

[60] NDCA-ORCL 140457, the Aging report was sent by Oracle's Revenue Accounting Staff to the Collections management team.

had not been applied. Thirteen of these payments were dated *on or before* November 1994.[61] As a result of this unapplied cash, Household's net balance due to Oracle was a negative $157,870.33. Therefore, Oracle should have provided Household with a refund. After the application of the debit memo invoices, this same report as of November 30, 2000 does not show any of these 14 unapplied payments. Consequently, these unapplied cash payments from Household were no longer visible because they had been inappropriately applied to debit memos. As a result, the November 2000 report indicates that *Household owed* Oracle $24,150.85.[62] This finding is consistent with Oracle's issuance of a refund to Household in May 2002 in the exact amount identified above, $178,346.77.[63] The impact of the debit memos on the overpayments from Household is discussed in greater detail below.

28. The Household example shows that the November Debit Memos concealed and misrepresented the balance of unapplied cash and customer overpayments improperly withheld by Oracle from its customers. This example is consistent with Oracle's description of the purpose of the November 2000 Debit Memos to another one of its customers, "All invoices that start with '550' are actually debit memo #'s. These were created to clean up our unapplied account at that time. They were more than likely overpayments."[64]

29. As a result of the November 2000 Debit Memos, Oracle prevented customer overpayments from being refunded. In aggregate, Oracle created 46,881 debit memo invoices. Ultimately, two years later, the November 2000 Debit Memos related to customer overpayments maintained by Oracle in its Bad Debt Reserve were reversed.

## Oracle's Improper $20 Million Increase to Revenue and Pre-Tax Earnings in 2QFY01

30. Each time a customer overpayment was transferred to 12601 "Bad Debt Write-offs," its balance was credited. This credit entry had the effect of increasing Oracle's total Bad Debt Reserve. In fact, Oracle's reconciliation shows that after the 2QFY01 transfers of

---

[61] NDCA-ORCL 313988.
[62] NDCA-ORCL 313986.
[63] HI0000001-02. This check was in the same amount identified above, $178,346.77.
[64] PLF-ORC 001633. Fax from Raul Campos (Oracle) dated April 5, 2002.