customer overpayments, the 12601 account actually increased the Bad Debt Reserve (i.e., had a $4.4 million <u>credit</u> balance).  Over the course of 2QFY01, the account had a net change of $20 million from the end of the prior quarter, which closely tracked the transfer of the overpayments into the account.[65]

31. It is important to note that a bad debt write-off account such as Oracle's 12601 would typically be reflected as a debit balance.[66]  Indeed, Oracle's reserve reconciliation shows that the 12601 account did have a $15.7 million debit balance at the end of 1QFY01, and had had a debit balance for several years until 2QFY01 (*see* chart below of the ending balance of the 12601 account over the 10 quarters ended 2QFY01):



32. This movement of the account balance in 12601 from a debit balance at the end of 1QFY01 to a credit balance at the end of 2QFY01 was a signal of Oracle's improper accounting for customer overpayments.  It was the opposite balance of what an

---

[65] NDCA-ORCL 1610987, Bad Debt Reserve Reconciliation Q2FY01.
[66] A debit balance would stand in contrast to the other accounts included in Oracle's Bad Debt Reserve calculation. The explanation for this is consistent with the purpose of the account, which is that actual write-offs reduce the balance of the Bad Debt Reserve.

accountant would expect to encounter. An accountant would expect that an account tracking write-offs of accounts receivable would remain in an overall debit position (i.e., it tracked reductions to the reserve, which was a credit balance). The Company could then replenish its reserve to the necessary level by crediting against the Bad Debt Write-offs account and debiting revenue as per Oracle's policy (*see* discussion below).

33. Each quarter Oracle prepared a Bad Debt Analysis utilizing a pre-defined methodology to calculate the required total balance of the Bad Debt Reserve.[67] In 2QFY01, Oracle calculated that the balance of its Bad Debt Reserve needed to be $162.9 million. This amount agrees to the "final version of the Bad Debt Analysis" that was provided to Williams and Oracle's Chief Accounting Officer, Jennifer Minton on December 8, 2000.[68] In addition, this amount exactly agrees to the amount of the Bad Debt Reserve schedule included in Oracle's auditors' workpapers.[69]

34. Once the Bad Debt Analysis had been prepared, Oracle accounting personnel have testified that the Bad Debt Reserve was modified on a quarterly basis, and an offsetting accounting entry was recorded to revenue.[70] This adjustment was recorded to increase or decrease the then-current reserve balance in Oracle's accounting system in line with the amount determined in the Bad Debt Analysis.

35. The table below depicts the calculation made by Oracle for purposes of its 2QFY01 reconciliation of the Bad Debt Reserve:

---

[67] *See* Chan Deposition Ex. 19, NDCA-ORCL 140467-78 at 140468-69, Oracle's Credit Memo and Write-off and Bad Debt and Credit Reserve Policy.

[68] NDCA-ORCL 1610858-989 at 1610859 and 1610872. Note that most of these schedules are prepared as of October 31, 2000. The schedule beginning at NDCA-ORCL 1610871 summarizes the earlier schedules in the package, including Bad Debt Reserve analyses for License (1610861), Consulting (1610863), Support (1610865), Education (1610867) and OCC (Oracle Credit Corporation)/Lease (1610869).

[69] AA 000035, Accounts Receivable Variation Analysis as of November 30, 2000.

[70] Deposition of Jennifer Minton, April 21, 2005, 143:7-12 "And if our bad debt reserve was – if our bad debt reserve was higher than what our requirement analysis told us that we needed, then we would adjust – we would reverse some of the revenues that we had recorded against the reserve during the current quarter." 143:25-144:10, "So I would always estimate a certain amount of revenues that were coming back because we knew that our returns – our monthly returns provision was higher than necessary....I mean, every quarter there is a bad debt reserve analysis." 216:19-25, "We would make a – do a bad debt reserve requirements analysis; and if it turned out that we had sufficient reserves based on our bad debt reserve requirements analysis, which was the same way that we'd reviewed the reserve for years, then the revenue would be given back to the field, and we would allocate it based on the relative revenues. . . ." *See also* Deposition of Jennifer Minton, July 7, 2006, 184:17-21, "Does that make sense? So we always write off everything against revenue rather than to the reserve..."

| $ amounts in millions | Q2FY01 | Ref |
|---|---|---|
| Balance of Bad Debt Reserve before the Q2FY01 Transfers | $163.5 | A |
| Transfer of Customer Overpayments into Reserve (August and October 2000) | $19.4 | B |
| Balance of Bad Debt Reserve after Transfer: | $182.9 | C |
| Required Reserve Adjustment (Increase to Revenue): | $(20.0) | D |
| Required Reserve per Bad Debt Analysis: | $162.9 | E |

36. To be clear, at the end of 2QFY01, the balance of Oracle's Bad Debt Reserve was, according to Oracle's accounting, required to be $162.9 million ("E" in the table above). Therefore, Oracle determined that it was necessary to record a $20.0 million adjustment ("D" in the table above) to reduce the reserve, thereby increasing revenue and pre-tax earnings by $20.0 million. The resulting increase to revenue and pre-tax earnings was directly enabled by the $19.4 million transfer of customer overpayments into the Bad Debt Reserve ("B" in the table above).

37. As presented in the table above, the unadjusted balance of Oracle's Bad Debt Reserve at the end of 2QFY01 was $182.9 million ("C" in the table above).[71] This balance included the $19.4 million increase from the transfer of the cash receipts from customer overpayments. In other words, without the benefit of the improper transfer of the customer overpayments into the Bad Debt Reserve, Oracle's reserve would have been $163.5 million ($182.9M minus the $19.4M) and no adjustment would have been necessary.[72]

38. Accordingly, an adjustment was recorded to reduce the balance of the Bad Debt Reserve by $20,000,000.[73] This adjustment to the Bad Debt Reserve resulted in an increase to reported revenue and pre-tax earnings in an identical amount.[74]

---

[71] NCDA-ORCL 1610987.  Bad Debt Reserve Reconciliation Q2FY01.  Prior to the $20.0 million adjustment the balance of the reserve was $162.9 million plus the $20.0 million.
[72] Deposition of Tom Williams, June 7, 2006, 124:23-125:1-2, "If there was a significant difference between the requirements and the reserve then an adjustment would be booked.  If it was not a significant difference then no adjustment would be booked."
[73] NDCA-ORCL 1610987 and NDCA-ORCL 140463.
[74] Chan Deposition Ex. 19, NDCA-ORCL 140467-78 at 140468-69, Oracle's Credit Memo and Write-off and Bad Debt and Credit Reserve Policy, "We charge both credit memos and write-offs directly against the current periods

**Oracle's Improper Accounting for Customer Overpayments and Unapplied Cash Related to the November 2000 Debit Memos Resulted in an Overstatement of 2QFY01 EPS by $0.01**

39. Oracle improperly reported EPS of $0.11 for 2QFY01.  If Oracle had not made the improper $20.0 million adjustment to the Bad Debt Reserve, it would have reported EPS of $0.10, which would not have enabled Oracle to beat Wall Street expectations.  In other words, Oracle's ability to beat expectations was partly attributable to its non-GAAP accounting for customer overpayments within the Bad Debt Reserve.  The chart below illustrates this impact:

| Impact of Bad Debt Reserve Adjustment on Q2FY01 | Net Income ($M's) | EPS |
|---|---|---|
| As Reported by Oracle[75] | $622.8 | $0.11 |
| Reverse Bad Debt Reserve Adjustment (after-tax)[76] | (12.9) | (0.01) |
| GAAP | $609.9 | $0.10 |

40. In a September 1998 speech, then Securities and Exchange Commission ("SEC") Chairman Arthur Levitt noted "I recently read of one major U.S. company, that failed to meet its so-called 'numbers' by one penny, and lost more than six percent of its stock value in one day."[77]  In August 1999, the SEC reiterated that a quantitatively small misstatement of a financial statement item may be material if it "masks a change in earnings or other trends" or if the "misstatement hides a failure to meet analysts' consensus expectations for the enterprise."[78]

---

revenue....Although we also reduce revenues for monthly additions to the bad debt and credit reserve, we avoid double counting...by adjusting the bad debt and credit reserve balance quarterly to its required balance, with a corresponding adjustment, upwards or downwards, to the current quarters revenues." (emphasis added)  See also the journal entry demonstrating the adjustment to review at 140474 of this Oracle document.

[75] Oracle Form 10-Q for the quarter ended November 30, 2000, p.4.

[76] Oracle's effective tax rate in 2QFY01 was 35.5% ($343M/$966M), which was identical to the forecasted rate. After tax, the $20 million adjustment would have contributed approximately $12.9 million to Oracle's reported net income.  Without this adjustment to the Bad Debt Reserve, Oracle's reported net income would have been $609.9 million.  Accordingly, diluted EPS would have been $0.1038 or $0.10 on a rounded basis ($609.9/5,874,987 shares).

[77] Transcript of the "Numbers Game," by Arthur Levitt, NYU Center for Law and Business, New York, N.Y., September 28, 1998.

[78] Staff Accounting Bulletin ("SAB") No. 99 "Materiality" issued August 12, 1999.  See Section M (1) – Assessing Materiality.  In addition, SAB 99 notes, "Among other factors, the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material. Consideration of potential market reaction to disclosure of a misstatement is by itself 'too blunt an instrument to be depended on' in considering whether a fact is material.

41. In this case, Oracle's EPS was $0.10, however, it reported EPS of $0.11.  In my opinion, this overstatement of reported EPS was material because it enabled Oracle to beat consensus earnings expectations of $0.10, and demonstrate a "strong" trend of earnings.[79&80]

**Beginning in October 2002, Oracle Conducted an "Unapplied Cash Cleanup" to Reverse the November 2000 Debit Memos, Remove the Improperly Transferred Cash Receipts from the Bad Debt Reserve, and Refund Overpayments to Customers**

42. Ultimately, in October 2002,[81] Oracle began the Unapplied Cash Clean-up. Oracle held a series of meetings to instruct its Collections Managers to "find a home" for tens of millions of dollars in newly unapplied cash and customer overpayments, many of which resulted from the reversal of November 2000 debit memos.[82&83]  Initially, the Unapplied Cleanup developed rapidly:[84]

---

When, however, management or the independent auditor expects (based, for example, on a pattern of market performance) that a known misstatement may result in a significant positive or negative market reaction, that expected reaction should be taken into account when considering whether a misstatement is material."

[79] NDCA-ORCL 005862-65 at 005863, Morgan Stanley, "How Suite It Is," by Charles Phillips, December 15, 2000, "*EPS - Oracle reported fiscal year Q2 2001 earnings per share of $0.11 vs. $0.06 last year and $0.10 consensus number.*" (Emphasis in original.) Phillips also noted, "Given the Microsoft pre-announcement and generally bad news in the PC sector, the market may have trouble assessing whether Oracle's results are an aberration or a changing of the guard."

[80] NDCA-ORCL 005901-03, Lehman Brothers, "Oracle's Application Business Leads Solid Quarter," by Neil Herman, December 15, 2000, "Yesterday after the close, and contrary to the deep skepticism in the market, Oracle reported strong fiscal second quarter earnings of $0.11 per share, one penny above our and the consensus estimate of $0.10."

[81] Chan Deposition Ex. 12.

[82] Deposition of Ian Hatada, October 5, 2006, 38:24 -39:10, "That's part of my responsibilities as a collections manager, but the biggest thing that I was ever responsible for when it came to unapplied cash was the point of Michael Quinn and Greg Myers getting all of us collections managers together and letting us know that there was a problem with the unapplied cash, and we had a large amount of unapplied cash that was a lot larger than us collections managers had ever seen before, and it was our responsibility as quick as possible to clear this unapplied cash and find a home for this unapplied – the unapplied amounts." (Emphasis added.)

[83] NDCA-ORCL 1125473-74, Deposition of Molly Venkataramana, April 13, 2005, 225:14-228:1, Deposition of Michael Quinn, April 18, 2006, 224:22-225:7.

[84] Deposition of Ian Hatada, October 5, 2006, 105:1-106:3, including "I'd say once we had that first meeting there was a meeting every couple days to discuss what Mike Quinn or what Jeff Henley wanted us to do moving forward with our action plans." *See also* Deposition of Ian Hatada, October 10, 2006, 265:20-266:21, including "So did Mike Quinn ever say, 'We need to get these results to Jeff Henley?' [A] Yes, he did."

- On October 14, 2002 and again on October 18, 2002, Oracle called Special Meetings of its Finance and Audit Committee.[85&86]

- On October 21, 2002, Greg Myers wrote to Williams and Quinn that "The ability to move something into 12601 via misc receipt is no longer available to Collections," and that Oracle had instructed its Collections Managers to "stop placing items On Account."[87]

- According to the testimony and documents, the Clean-up also assessed the "revenue impact of the debit memos."[88]

43. The Unapplied Cash Clean-up lasted, at a minimum, until Oracle's FY2006.[89] As part of the Unapplied Cash Clean-up, Oracle removed more than $50 million of cash receipts that had been inappropriately transferred into the Bad Debt Reserve from its Customer Overpayments account, including the transfers made in Q2FY01.[90] Oracle also reversed the November 2000 Debit Memo items that had been applied to the customer overpayments transferred into the 12601 account.[91]

44. The Unapplied Cleanup resulted in a modification of Oracle's historical accounting for a large majority of the $45 million Oracle considered (note it appears that Oracle did not evaluate the entire population).[92] After the unapplied cash receipts were removed from the Bad Debt Reserve,[93] their status was properly restored to "unapplied," which allowed

---

[85] NDCA-ORCL 3042931-33, Minutes of the Special Meeting of the Finance and Audit Committee of the Board of Directors, Oracle Corporation.
[86] NDCA-ORCL 3042933-34, Minutes of the Special Meeting of the Finance and Audit Committee of the Board of Directors, Oracle Corporation (the preliminary results were redacted).
[87] NDCA-ORCL 160921-25.
[88] Deposition of Michael Quinn, April 18, 2006, 227:25 to 228:15 (cited above) and PLF-ORC 000002.
[89] NDCA-ORCL 1886329-30, NDCA-ORCL 1894259, NDCA-ORCL 1846553, Deposition of Ian Hatada, October 10, 2006, 266:23-267:24, Deposition of Molly Venkataramana, April 13, 2006, 304:9-17.
[90] NDCA-ORCL 1646554
[91] NDCA-ORCL 1058909, Debit Memo Script Output.
[92] See for example, NDCA-ORCL 1646553-1647198 at 1646554. I note that Oracle did not review nearly 9,000 cash receipts under $10,000 for approximately $14.4 million dollars, including more than 2,800 receipts for $4.5 million that appear directly related to the November 2000 Debit Memos.
[93] The removal of these amounts as a component of the Bad Debt Reserve would have had the opposite impact as the initial transfer of these amounts into the 12601 account. For instance, in 2QFY01, the $19.4 million transfer-in of cash receipts into 12601 facilitated Oracle's adjustment to decrease the Bad Debt Reserve and increase revenue and

Oracle to use the cash for, 1) "hundreds" of customer refunds,[94] 2) escheatment to state governments, 3) application to newly "adjusted up" invoices,[95] or 4) keeping the cash, but reporting it as a contra-asset or liability in Oracle's books and records.[96]

45. During the Unapplied Cash Cleanup, if Oracle found that a customer had invoices with prior credit memos equal to or greater than the overpayment, Oracle reversed the credit memo(s) by the amount of overpayment.[97&98] Instead of refunding these customer overpayments, Oracle often "adjusted up" invoices and then applied the unapplied cash. Oracle justified this position, in part, because the overpayments were often for the same amount as credit memos. However, as noted above, Oracle had a practice to not send credit memos to its customers. I also note that Oracle's process for issuing credit memos required approvals before the credit memo could be processed.[99] In combination, it is to be expected that overpayments were equal to a credit memo, and Oracle failed to objectively evaluate the propriety of the original credit memo.[100&101] In my opinion, Oracle did not have an adequate basis to conclude, in late 2002 or thereafter, that the original credit memos had been issued in error.[102] In this manner, Oracle retained more than $11 million, including $5.3 million of cash receipts that had been transferred to the Bad Debt Reserve by November 30, 2000 (2Q01).[103]

---

pre-tax earnings. On the other hand, it would have been necessary for Oracle to increase its Bad Debt Reserve and reduce its revenue as a result of the transfer-out of the unapplied cash receipts.

[94] Venkataramana, April 13, 2006, 250:9-11: Q: "Is it fair to say it was hundreds of refunds? A: Yes."

[95] As described elsewhere in this report, Oracle increased the outstanding balance of an actual invoice by the amount of the recently unapplied cash, and then applied the cash. It does not appear that Oracle informed its customers that it was using their cash in this manner. NDCA-ORCL 1125473-74, NDCA-ORCL 1897651, Deposition of Raul Campos, March 28, 2006, 126:15-127:16.

[96] NDCA-ORCL 1646554, Deposition of Ian Hatada, October 10, 2006, 266:23-267:24; Deposition of Molly Venkataramana, April 13, 2006, 304:9-17.

[97] NDCA-ORCL 1727749-53 at 1727952-53, "Step-by-Step Guide to Removing Misc Receipts from 12601."

[98] According to Molly Venkataramana, "If a credit memo was found to be done incorrectly, and the customer had made a payment on that invoice, then the invoice would be adjusted up." Deposition of Molly Venkataramana, April 13, 2006, 258:17-19, see also 289:4-17, 324:25-325:9.

[99] Approvals are discussed at NDCA-ORCL 140469 and also at PLF-ORC 000085.

[100] Deposition of Molly Venkataramana, April 13, 2006, 261:18-20: "Q: And did you guys discuss why those credit memos were not valid? A: I don't believe so, no."[100]

[101] See for example, NDCA-ORCL 1486082, comment by "Tyler:" "amt of credit exact amount on account, adjust up and apply. . ."

[102] NDCA-ORCL 1727979-91 at 1727985. On October 25, 2002, in a summary memo to Minton, Williams and others, Oracle wrote that its process for credit memo approval "does not provide for an audit trail."

[103] NDCA-ORCL 1646567.

46. In my opinion, Oracle's actions during the Unapplied Cash Clean-up acknowledge its improper accounting during 2QFY01, including:

- The transfers of customer overpayments into the Bad Debt Reserve, which generated $20 million of revenue in Q2FY01 (via the removal of these amounts from the Bad Debt Reserve);

- The use of the debit memos to conceal the customer overpayments in the Bad Debt Reserve (via the reversal of the November 2000 Debit Memos); and

- The lack of an appropriate process to refund money (via Oracle's issuance of refunds more than two years after the money had been appropriated in the Bad Debt Reserve).

**Specific Examples of Oracle's Improper Accounting for Unapplied Cash and Use of Debit Memos**

47. I have been provided with a script output that Oracle represents to contain a complete record of its accounting for customer related activity (e.g., invoices, payments, credit memos, and refunds) related to 926 of the November 17, 2000 debit memo invoices (the "Debit Memo Script Output").[104]   I have included below detailed examples of transactions within the Debit Memo Script Output that exhibit Oracle's improper accounting with respect to customer overpayments associated with debit memos.

*The Ameritrade Sevices ("Ameritrade") Overpayment*

48. The following timeline illustrates Oracle's impropriety with respect to Ameritrade:

- On October 22, 1999, Oracle received a cash receipt of $246,514.49 from Ameritrade.  According to Oracle, this receipt was a duplicate payment on invoice #1165172.  Oracle assigned #100958 to this receipt, and put the funds in Acct. 25005 (Customer Overpayments), as "Unapplied."

---

[104] NDCA-ORCL 1058909.  The Debit Memo Script Output includes transactions from September 1986 to May 2006.

- On August 5, 2000, Oracle transferred receipt #100958 from its Customer Overpayments account (25005) to its Bad Debt Reserve (12601).

- On August 25, 2000, Oracle changed the status of receipt #100958 from "Unapplied" (available for refund or credit to the customer) to "On Account" (which signaled Oracle staff to leave the receipt in the reserve).[105]

- On November 17, 2000, Oracle created debit memo invoice 55000390 for $246,514.49, which caused the status of the receipt to change from "On Account" to "Applied."

- On November 8, 2002, Oracle processed Credit Memo #7244611 for $246,514.49, and applied it to Debit Memo 55000390. This reduced the value of the debit memo to $0, and caused cash receipt #100958 for $246,514.49 to become Unapplied and once again, "visible" to Oracle's collections staff.

- On November 24, 2002, Oracle reversed the transfer of the receipt out of its Bad Debt Reserve and back to the Customer Overpayments account.

- In February 2003, Oracle refunded the $246,514.49 it had received in October 1999 to Ameritrade. The refund was approved by Mike Quinn and then by Brad Nelson, as "Duplicate payment of Invoice#1165172-please refund."[106] On February 19, 2003, Oracle created accounts payable invoice #AR5340971 and processed a refund check #1539062 for $246,514.49, which Ameritrade deposited.

*The Kforce.com Overpayment*

49. The following timeline illustrates Oracle's impropriety with respect to Kforce.com:

- In November 1999, one of Oracle's customers, Kforce.com, made an overpayment of $258,241.84.

---

[105] As described above, the receipt was On Account, it was still "visible" by Oracle staff as an outstanding Unapplied receipt.
[106] NDCA-ORCL 1485948-67 at 1485949, line 8.

- October 2000 – amount was transferred *from* Oracle's account 25005 "Customer Overpayments" *to* the Bad Debt Reserve Account 12601.[107]
- November 2000 – the overpayment was applied to a debit memo invoice.
- February 2001 – a portion of the overpayment, $92,333.41, was refunded.
- November 2002 – two years later, the debit memo transaction was reversed, and
- March 2003 – over three years after the payment was received, the remainder of the overpayment amount was finally refunded to Kforce.com as part of the 2002 Unapplied Cash Clean-up.

50. I believe that Oracle's conduct related to Ameritrade and Kforce.com demonstrates its improper mischaracterization of Customer Overpayments in the Bad Debt Reserve, concealment of the overpayments using the November 17, 2000 debit memo invoices, and its improper withholding of customer overpayments.

**Oracle's Refund to Household Demonstrates the Improper Application of the November 17, 2000 Debit Memos to Cash Receipts from Customer Overpayments**

51. Based upon my review of the Debit Memo Script Output, and other supporting documents, it appears that Oracle's conduct related to debit memo overpayments from Household, one of its customers, demonstrates the impropriety of its retention of, and accounting for, cash receipts from customer overpayments.

<u>Analysis of Oracle's Accounting for the $76,645 Household Overpayment</u>

52. Oracle withhheld this overpayment for over seven years, until 2002, when persistent efforts by Household were undertaken to finally obtain a refund of its cash. The table below summarizes the sequence of events surrounding the application of a debit memo

---

[107] Oracle personnel have testified that this transfer was improper. *See* Deposition of Tom Williams, June 7, 2006, 177:7-15, "Well, to answer your question – I mean, we went through the one example with the 12601. That was an example of where it should not have moved to 12601. But my assumption is that the collector, probably doing their best, couldn't figure out where it belonged and so transferred it to 12601. Obviously subsequent to that found out that that was not the correct entry. It was restored to unapplied cash and refunds were given to the customer."

on November 17, 2000 to an overpayment received from Household in 1994.[108]   The letters in the 2nd column (i.e., "A") reference a related section below where the activity on that particular date is further analyzed.   In those instances when there is no entry in the table, there was no activity related to that particular event.

| Date | Significant Transaction Events and Oracle's Related Accounting | AR (Asset) *Entry* | AR *Balance* | Customer Over-payments (Liability) *Entry* | Customer Over-payments *Balance* |
|---|---|---|---|---|---|
| 10/26/94 | A – Oracle issues invoice. | $60,180 | $60,180 | | |
| 11/17/94 | B – Household makes a $76,645 payment. Oracle records the overpayment. | $(60,180) | $0 | $(16,465) | $(16,465) |
| 11/17/94 | C – Household cancels the order.[109] | | | | |
| 1/1/95 | D – Oracle "unapplies" the remaining overpayment due to C. | $60,180 | $60,180 | $(60,180) | $(76,645) |
| 1/31/95 | E – Oracle issues a credit memo, and places the overpayment On Account. | $(60,180) | $0 | $0 | $(76,645) |
| 11/17/00 | F – Oracle "applies" a debit memo to Household's Overpayment.[110] | $0 | $0 | $0 | $(76,645) |
| 5/23/02 | G – Oracle reverses "E" and "F" and issues a refund. | $0 | $0 | $76,645 | $0 |

*A – Oracle Issues Invoice # 498798*

On October 26, 1994 Oracle issued a sales invoice to Household for $60,180,[111] resulting in an Accounts Receivable balance of $60,180 due from Household. [112]

---

[108] As noted, this table summarizes the net impact of the accounting entries recorded by Oracle.  There were other accounting entries that were recorded to effect these transactions, however, the net accounting for these items remains as presented in the table.
[109] Oracle did not record any accounting entries until it responded to the cancellation in January 1995.
[110] There are a number of entries recorded to apply the Debit Memos to the overpayments, however, the net impact of the Debit Memos on this date is zero.
[111] NDCA-ORCL 776172-73, Invoice.
[112] NDCA-ORCL 1058909.

*B – Household Overpays Invoice # 498798*

Household made a payment on November 17, 1994 in the incorrect amount of $76,645.04.[113] Oracle applied the payment to invoice # 498798.[114] The remaining unapplied portion of the cash receipt, $16,465.04, was recorded as a balance in the Customer Overpayments account 25005.

*C – Household Returned the Product and Cancelled the Order Underlying Invoice 498798*

Also on November 17, 1994, Household returned the product and cancelled the October 26th transaction.[115]

*D – Oracle Unapplies the Household Overpayment*

On January 1, 1995, pursuant to Household's cancellation of the order, Oracle unapplied the $60,180 payment from Household. This transaction restored the balance of Accounts Receivable to $60,180, and increased the total Customer Overpayment balances by the same amount. Consequently, at this time, the Debit Memo Script Output demonstrates that the <u>entire</u> $76,645.04 overpayment from Household was recorded within the Customer Overpayments account 25005.

*E – Credit Memo # 528719 is Created to Formally Cancel Invoice # 498798 But Oracle Does Not Refund the Money to Household*

The credit memo formalizing Household's cancellation of the order was created on January 31, 1995.[116] This credit memo reversed the revenue from the October 26, 1994 sale and the related accounts receivable balance.   At this time, Oracle also designated the Household overpayment as On Account, which signaled to Oracle's collections personnel that this amount was not to be utilized.  Consistent with Oracle's practice, I have seen no evidence that Oracle sent this credit

---

[113] NDCA-ORCL 1058909.
[114] NDCA-ORCL 1058909.
[115] *See* Oracle Call Notes at NDCA-ORCL 649588-650316: "sw MARIE AND this has a rma 2042868 and the prod was returned 11/17, 2 inv already credited (support) Check 67021191 for 76k needs to be returned wil e-mail ar," "per rma #2044580 cust to get full refund and full amt to have sys cm gener ated."
[116] NDCA-ORCL 776162-63.

memo to Household. At the time this credit memo was issued, Oracle should have refunded the entire receipt, which was an overpayment, to Household.

*F – Oracle Applied Debit Memo #55040598 to the Overpayment from Household.*

According to the script output, from January 1995 to November 2000, the $76,645.04 payment remained designated On Account, and could be seen by Oracle personnel as an unapplied cash payment from Household. On November 17, 2000, the $76,645.04 balance in the Customer Overpayments account 25005 was applied to debit memo invoice # 55040598.[117] As described above, after the cash receipt was applied to a debit memo, Oracle's personnel would no longer have been aware of this amount as unapplied and outstanding.[118]

*G – Oracle Reverses Debit Memo #55040598 and Finally Refunds Household's Overpayment*

Household engaged a third-party consultant, Profit Recovery Group ("PRG") to determine whether it had inadvertently made any incorrect overpayments to any of its vendors. After conducting its research procedures, PRG concluded that Household had made 14 overpayments to Oracle totaling $178,346.77. The $76,645.04 was identified as one of these overpayments.

PRG's process to obtain a refund included several examples of Oracle's resistance to refunding the cash receipts from the overpayments even though the amounts were maintained in Oracle's Customer Overpayments account. Household's correspondence regarding this refund process demonstrates its frustration with Oracle (*see* paragraph 7).

Ultimately, the Household refund was approved by Tom Williams, Michael Quinn and others at Oracle.[119] The date on the refund check provided to Household was May 23, 2002.[120]

<u>Oracle Failed to Provide the SEC with Important Evidence Regarding the Household Refund</u>

---

[117] NDCA-ORCL 776174, Oracle Debit Memo Invoice.
[118] *See* for example, NDCA ORCL 313986-88. The debit memo invoice on November 17, 2000 caused the overpayment to be removed from the accounts receivable aging report.
[119] NDCA-ORCL 614018-614023. *See also* e-mail from Tom Williams to Michael Quinn (with cc's) entitled "REFUND: Household Finance ($178,346.77)," NDCA-ORCL 1070329
[120] HI0000001-02. This check was in the same amount identified above, $178,346.77.

53. In October 2003, Oracle made a presentation to the SEC, which had inquired with the company about allegations in the Second Amended Complaint. During its presentation to the SEC, Oracle presented evidence that the Household refund related to a corresponding debit memo had occurred on April 27, 1995 and its presentation materials did mention any subsequent refund activity.[121] The evidence included a "screenshot," showing a check to Household for $76,645.04. However, according to Oracle's Debit Memo Script Output this refund did not occur.[122]

54. Instead, the Debit Memo Script Output and other evidence, including the May 2002 check, demonstrate that this Household payment was not refunded until May 2002. During the entirety of the time between January 1995 and May 2002, the overpayment from Household was improperly maintained by Oracle in its Customer Overpayments account 25005.

**Additional Opinions Regarding the November 2000 Debit Memo Transaction**

55. Other than my opinions, already expressed above, I do not offer an opinion about the total financial statement impact of the transactions relating to all $692 million from the 46,881[123] debit memo transactions in Q2FY01.

56. The primary reason for this is that Oracle produced a Debit Memo Script Output containing information relating to only 926 debit memos, or about 2% of the total debit memo transactions. Although the 926 debit memos comprise $535 million (77%) of the $692 million total dollar value of the 2QFY01 debit memo population, Oracle did not produce the full audit trail and source evidence concerning the other $157 million in debit memo transactions.

57. Furthermore, the evidence produced in connection with the 926 debit memos and the Debit Memo Script Output appears incomplete.[124] For example,

---

[121] NDCA-ORCL 050209, 050221-30, "Presentation to the SEC Staff on Behalf of Oracle Corporation." NDCA-ORCL 314031, Payment Overview screenshot.
[122] *Id.* Oracle also provided incomplete information with respect to payments of $45,000 and $25,000 that were refunded to Household in May 2002.
[123] I further note that to the extent it exists, I was unable to review Debit Memo 55041671 because the data was not produced. *See* NDCA-ORCL 282677.

- As noted above, the 926 debit memos were applied to $535 million of unapplied cash receipts. However, this amount is a subset of Oracle's total cash received on these transactions. The total receipts where some portion was later applied to one of the 926 debit memos exceeded $1.5 billion. Therefore, there is more than $1 billion for which Oracle's script output shows receipt of cash, and their placement into customer overpayments account 25005 as "unapplied" cash, but does not show Oracle's subsequent accounting for this unapplied cash.[125]

- I understand that discovery of transfers from customer overpayments was limited to transfers to account 12601 (Bad Debt Write Offs); however, in the sample of 926 debit memo transactions, there are transfers from customer overpayments to other accounts that impact earnings that I was unable to review sufficiently to reach conclusions as to their propriety.[126]

- There are numerous "one-sided" journal entries (a debit without a corresponding credit or vice-versa).[127]

- Many wire transfers have dates that appear inaccurate.[128] Oracle's former controller, Tom Williams, was unable to provide an explanation for this anomaly.[129]

- Certain apparently relevant tables were excluded from the Debit Memo Script Output, including:[130]

    i. AR_APPROVAL_ACTION_HISTORY (Approval and change history for invoice adjustments);

---

[124] Although the Debit Memo Script Output appears incomplete, it yielded substantial useful information pertaining to the 2QFY01 debit memos. For example, more than half of the transfers to account 12601 and significant details thereof were contained in the Debit Memo Script Output. These general ledger details greatly assisted my review.
[125] NDCA-ORCL 1058909, Debit Memo Script Output.
[126] NDCA-ORCL 1058909. *See*, e.g., Debit Memo 55003311, $223,770 transferred from customer overpayments to Interest Income (Account 60000) on November 5, 2000, Debit Memo 55045661, $100,000 transferred from customer overpayments to Conference Income (Account 53207) on October 1, 2000.
[127] *See* the Ameritrade example above.
[128] *See* Debit Memo 55003501 (KForce.com), which indicates that an incoming wire transfer dated February 3, 2000 was received by Oracle on November 15, 1999.
[129] Deposition of Tom Williams, June 7, 2006, 239:7-17.
[130] *Compare* Elam Deposition Ex. 18 (letter to Judge Infante from Peter Wald, *with* attached declaration of Terry Elam, regarding Oracle general ledger "Public Table List") to NDCA-ORCL 1058909 (Debit Memo Script Output).

    ii.  AR_MEMO_LINES_ALL (Standard memo lines for debit memos, on account credits, debit memo reversals, and chargebacks);

   iii.  GL_BALANCES (Account balances for both detail and summary accounts);

   iv.  GL_JE_LINES (Journal entry lines);

   v.  RA_CUSTOMER_TRX_ALL (Header-level information about debit memos, chargebacks, commitments and credit memos); and

   vi.  RA_CUSTOMER_TRX_LINES_ALL (Invoice, debit memo, chargeback, credit memo and commitment lines).

58. Additionally, I understand that more than 800,000 pages of documents relating to the 2QFY01 debit memos, the transfers of unapplied cash to the bad debt reserve in 2Q01, and the 2002 Unapplied Cash Clean Up were not produced until January and February 2007. At this time, nearly all of the depositions relied upon in my report had already been taken, including Jennifer Minton, Thomas Williams, Michael Quinn, Greg Myers, Molly Venkataramana, Terry Elam, Ryan Roberts, Julie Chan, Jason Sevier, Gary Matuszak, Sanjay Kumar, Raul Campos and Ian Hatada. It is my understanding that plaintiffs were not able to question these witnesses about most of the 800,000 pages of documents relating to the transfers, the financial impact and the ultimate resolution of the debit memo transactions.

59. There are indications of other transactions and documents related to 2QFY01 debit memos that were not made available which would have assisted my review. Set forth below are some examples:

- Documents suggest that there were more than 46,881 relevant debit memos. For instance, a listing of debit memos produced by defendants references at least 48,224 debit memos.[131] This indicates that there are at least several hundred other relevant debit memos I was unable to review, in addition to the approximately 46,000 discussed above.

---

[131] NDCA-ORCL 1482578-5581, NDCA-ORCL 048716, MOT 00078 (Debit Memo 55047106 for $200,000 to Motorola, dated December 21, 2000), PRG 29740 ($200,000 refund recovery in May 2002 from Oracle on behalf of Motorola).

- I understand from plaintiffs' counsel that approximately 2 boxes of Oracle audit and review workpapers from Arthur Andersen were not produced, except for 100 pages. Based on my experience, the sections I would expect to see, but were not produced, include financial reporting and reporting support, revenue, expenses, Arthur Andersen's bad debt review analysis from 1Q01, 2Q01 and 3Q01,[132] portions of accounts receivable, portions of customer advances and unearned revenue accounts payable, contingent liabilities, partner memos, planning and summary engagement memos, and high level workpapers ordinarily found in what auditors know as the "General Binder.". These audit and review workpapers, to the extent they exist, may have assisted my review.

60. As part of my analysis and opinions concerning Oracle's accounting for unapplied cash, customer overpayments and debit memos during 2Q01, I reviewed plaintiffs Revised Second Amended Complaint. My understanding is that plaintiffs initially alleged that Oracle improperly recognized revenue and earnings of approximately $228 million in connection with the debit memo transactions in November 2000. My understanding is that plaintiffs' allegation was based in part on a statistical extrapolation performed by a statistical expert. I offer no opinion about that statistical extrapolation, and I do not conclude on the $228 million allegation because of the limitations on the data available for my review, set forth above.

61. As a result, other than my opinions offered above, I am uncertain as to the overall financial statement impact of (1) the 926 debit memo transactions, (2) the 46,000+ 2Q01 debit memo transactions, and (3) which accounts of Oracle, other than account 12601, the 2Q01 debit memos impacted. Because of these uncertainties, I have not reached an opinion regarding the full impact of the 2QFY01 Debit Memos beyond those already expressed in this report.

V. **Detail of Opinions Regarding Oracle's Improper Accounting for Its Transaction with Hewlett Packard in 2QFY01**

62. In my opinion:

---

[132] AA 00035, "see further discussion of reserves at B-15" (B-15 was not produced.)

a. As of November 30, 2000, the HP transaction did not meet the criteria necessary under GAAP for revenue recognition.

b. As a result, in 2QFY01, Oracle's revenue and pre-tax earnings were improperly inflated by $19.9 million.

c. The improper revenue recorded by Oracle on this transaction enabled Oracle to report 2QFY01 EPS of $0.11. If Oracle had reported earnings that were consistent with GAAP, its EPS would have been $0.10.[133]

## Summary of Oracle's "Round-Trip" Transaction with Hewlett Packard in 2QFY01, and the Improper Recognition of $19.9 million of License Revenue.

63. As 2QFY01 came to a conclusion on November 30, 2000, Oracle worked with HP in order to close a significant software and hardware "round-trip" or "swap" arrangement. In one of the many e-mails leading up to, and on, the last day of the quarter, Oracle noted "HP confirmed again today they're willing to do a Q2 CRM deal in some amount if we can pull together machine requirements into a binding PO and resolve the development issues we're working on....HP is willing to buy as much CRM from Oracle as we buy in [Hardware], Support and other requirements from HP."[134]

64. In fact, the evidence, including an internal Oracle e-mail below, indicates that HP did not need the software that it purchased from Oracle at that time.

> Sandy/Frank: HP confirmed today that they will try and pull the CRM portion of the order off providing we deliver what we have outlined in Development and Production systems. **Since they (HP) don't need ALL the license users right now they are hedging on how big an order they will do until they see how**

---

[133] *See* the discussion of the materiality of this difference in the conclusion regarding the impact of the transfer of the customer overpayments to the Bad Debt Reserve and the related adjustment to Oracle's revenue.

[134] *See* NDCA-ORCL 055958 – Conway Snyder of Oracle, wrote an e-mail to Juan Jones, now Senior Vice President at Oracle, that included certain details leading up to the final execution of the Agreement between HP and Oracle, including the deal being contingent upon Oracle's commitment to purchase HP hardware. The date of this original e-mail is not available as it pertained to e-mail history existing under an e-mail from Michael DeCesare to Edward Sanderson, Executive Vice President and Kurt Speck dated November 9, 2000. In fact, the e-mail from Snyder was forwarded twice that date to multiple individuals within Oracle including, Sanderson, DeCesare, Rocha, and Roberts. (Emphasis added.)

> much production hardware Oracle comes back with.  If this
> turns out to be a large number we could get the entire order.[135]

65. These negotiations were important to Oracle because as 2QFY01 neared completion, its revenues and EPS were just short of previously forecasted levels.[136] The contemporaneous evidence demonstrates that the negotiations between the two companies on these arrangements involved their most senior executives including, Larry Ellison, Oracle's CEO and Safra Catz, Executive Vice President of Global Business Practices and Business Development, and Carly Fiorina, HP's CEO.  For example:

- Michael Rocha, Oracle's Executive Vice President, noted in an e-mail to Larry Ellison about Oracle's "25 million dollar opportunity (15m in CRM and 10m in technology)." Rocha wrote "Given the size of our software sales opportunity, you may want to agree that we'll purchase the (HP) hardware."[137]

- Ellison responded to Rocha in an e-mail on October 12, 2000, under the subject "Re: Carly Fiorina Meeting Update:" "Thanks for the update.  I will let you know how it goes. larry."[138]

- Mark Barrenechea wrote on November 11, 2000 to Ellison, Edward Sanderson, Executive Vice President, Micheal DeCesare, Oracle's Vice President of Sales – Western Region and others: "We have an opportunity to move a Q3 15M+ CRM order into Q2.  For this to occur we will need tight coordination between all the needed Oracle parties.  Because of this I am copying all the Oracle executives I believe need to be involved to make this happen....Provided HP has confidence

---

[135] NDCA-ORCL 055957, DeCesare wrote an e-mail dated November 9, 2000 (which included Conway's e-mail noted above) to three Oracle employees, including Sanderson, Frank Varasano, and Kurt Speck discussing the status of Oracle's then potential CRM deal with HP and the deal size being contingent upon Oracle's purchase of HP hardware. (Emphasis added)

[136] NDCA-ORCL 410399-410415.  I have reviewed a series of forecast documents that appear to have been prepared by Oracle during the process to finalize its reported financial statements for Q2FY01.  These forecast document indicate that Oracle identified "potential" revenue of $2,640.5 million and EPS of $0.10 per share.  Ultimately, Oracle reported revenue of $2,659.5 million and EPS of $0.11 per share.  This difference of $19 million closely approximates the revenue related to the HP transaction recorded on the last day of Oracle's quarter.

[137] See NCDA-ORCL 028735-36.  The date of this original e-mail is not available as Oracle did not produce the original e-mail existing under an e-mail from Ellison to Rocha dated October 12, 2000. Ellison's e-mail contained the subject "Re: Carly Fiorina Meeting Update." In the e-mail, Ellison wrote: "Thanks for the update. I will let you know how it (the meeting) goes. larry"

[138] See NDCA-ORCL 028735.

Page 36 of 64

that both companies have a common game plan on the development side and HP has confidence that Oracle is stepping up to all the hardware they feel we've already committed to purchase they have commited to move forward on the CRM order.  I believe we will need Larry to speak to Carly after we have the above needed documentation as a final step."[139]

- George Roberts, Oracle's Executive Vice President of North American Sales, wrote on November 30, 2000 to Catz, "I understand Larry (Ellison) and Carly (Fiorina) are discussing <u>their purchase of our products this quarter if we commit to purchase $20M - $30M of their product over the next 18-24 months.</u>"[140]

66. Sometime at the end of November or early December 2000, Oracle entered into the following round-trip arrangements with HP:

- Letter of Agreement (the "Oracle Purchase Commitment");
- Ordering Document and Onsite Support Services Exhibit (collectively the "HP Order Form"); and
- Oracle Lease Agreement (the "HP Term License Agreement").

67. For reasons discussed below, these agreements, unless explicitly noted, are collectively referred to hereafter, as "the HP Agreement."

68. SOP 97-2 provides the primary GAAP applicable to these transactions.[141]  SOP 97-2 states that an arrangement to sell software should not be recognized as revenue until *all* of the following criteria have been met:[142]

a. Persuasive evidence of an arrangement exists;

b. Delivery has occurred;

c. The vendor's fee is fixed or determinable; and

---

[139] *See* NDCA-ORCL 020850-51 (DeCesare Deposition, Ex. 5)
[140] *See* NDCA-ORCL 025018.
[141] The American Institute of Certified Public Accountants' (AICPA) Statement of Position No. 97-2, Software Revenue Recognition (SOP 97-2)
[142] SOP 97-2, ¶8 states: "[R]evenue should be recognized when all of the following criteria are met. (1) Persuasive evidence of an arrangement exists. (2) Delivery has occurred. (3) The vendor's fee is fixed or determinable. (4) Collectibility is probable." This treatment is only appropriate for software that does not require significant production, modification, or customization of software.  This issue is addressed separately, later in this report (*see* paragraph 111).

    d. Collectibility is probable.

69. Pursuant to the HP Agreement, Oracle recognized $19.9 million of revenue on the last day of 2QFY01, November 30, 2000.[143]  This transaction was Oracle's largest revenue transaction in that period.[144]

70. However, as of November 30, 2000, Oracle substantially failed to meet any of the revenue GAAP recognition criteria.   Accordingly, Oracle overstated revenue in the amount of $19.9 million in 2QFY01.  This conclusion is reached, in part by Oracle's improper evaluation of the following accounting issues:

    a. Date references on the transmission of the documents between HP and Oracle, as well as on the documents themselves, indicate that the HP Agreement had not been duly executed as of November 30, 2000. Therefore, persuasive evidence of an arrangement did not exist at November 30, 2000;

    b. The HP Agreement should have been recorded on a "net" basis vs. a "gross" basis.   Oracle should have offset fees totaling approximately $30 million received from HP against the $30 million guaranteed to HP related to the hardware purchases involved in the swap transaction.  In other words, the total agreement fees were fully round-tripped between Oracle and HP, and the transaction accounting should have been netted to $0;

    c. Oracle failed to deliver a fully functional version of 11i product prior to November 30, 2000;[145]

    d. Oracle failed to appropriately consider HP's 15 day acceptance right in evaluating its revenue recognition assessment.    In other words, until December 15, 2000, at the earliest, HP had the right to reject Oracle's software;

---

[143] The remainder of the $29.8 million fees pertained to undelivered services to be provided subsequent to November 30, 2000 was deferred.

[144] *See* NDCA-ORCL 010007

[145] Testimony in this matter indicates that Oracle may never have delivered a functional version of the 11i product to HP.  See discussion at paragraphs 111 through 117 below.