e. Oracle failed to establish vendor specific objective evidence of fair value ("VSOE")[146] for certain undelivered elements under its 11 month term license arrangement with HP, which definitively precluded upfront revenue recognition;

    f. Oracle failed to consider $30 million in refund rights included within the HP Agreement in its assessment of collectibilty; and

    g. Oracle's subsequent granting of concessions indicated fees paid prior to the concessions were not fixed or determinable at the time of sale.

71. In light of these observations, the following table summarizes whether amounts due under the HP Agreement met the four GAAP criteria necessary to recognize revenue as of November 30, 2000:

| GAAP Revenue Recognition Criterion | Fail | Pass |
|---|---|---|
| Persuasive evidence of an arrangement exists | X | |
| Delivery has occurred | X | |
| The vendor's fee is fixed or determinable | X | |
| Collectability is probable | X | |

72. It is important to note that any *one* of the failures listed above would have prevented any gross revenue recognition prior to December 1, 2000. The presence of all of these matters provides further clarity to my opinion that Oracle's recognition of $19.9 million in revenue in 2QFY01 related to the HP Agreement was improper.

### Oracle executes the "swap" agreements with Hewlett Packard

73. As stated above, Oracle entered into the following round-trip or "swap" arrangements with HP:

- Letter of Agreement (the "Oracle Purchase Commitment");

---

[146] Vendor specific objective evidence of fair value for any contractual element is limited to (i) the price charged when the element is sold separately; or (ii) for an element not yet being sold separately, the price established by management having the relevant authority (it must be probably that the price once established, will not change before the element is sold separately).

- Ordering Document and Onsite Support Services Exhibit (collectively the "HP Order Form"); and
- Oracle Lease Agreement (the "HP Term License Agreement").

74. A description of each is provided below to better highlight Oracle's improper revenue recognition treatment of the HP Agreement.

75. *Oracle Purchase Commitment*– This particular agreement was the subject of discussions between Ellison and Fiorina, among other executives of the companies, late in the evening of November 30, 2000 (*see* paragraph 64). In fact, due to its large dollar value, it appears that a Special Meeting was convened to obtain the required approval from the Executive Committee of the Board of Directors of Oracle to enter into this agreement. The Executive Committee consisted of Ellison, Jeff Henley, who was Oracle's Chief Financial Officer, and Donald Lucas. Lucas did not attend the November 30, 2000 Special Meeting. Therefore, Ellison represented 50% of the voting authority at the Special Meeting, and the remaining authority was held by Henley. The Executive Committee delegated relevant authority to Ellison when it gave him an "Approval of Purchase of Hardware and Services." Although Catz was not a member of the Executive Committee, she was present at the meeting on November 30, 2000.[147] It was important for Oracle to hold this meeting because HP had made it clear that it would not purchase software from Oracle in 2QFY01 without the round-trip purchase of hardware from HP.

76. Among other obligations, this agreement committed Oracle to a non-refundable purchase commitment of $30 million in HP hardware. Beginning on the effective date of the agreement, if Oracle failed to make hardware purchases of at least $15 million prior to both December 28, 2000 and September 30, 2001, it was required to pay HP a cash "cancellation fee" equal to the purchase volume shortfall for each respective period (not to exceed $15 million – collectively up to $30 million).

---

[147] NDCA-ORCL 044458, Minutes to the Special Meeting of the Executive Committee of the Board of Directors Oracle Corporation, November 30, 2000. Ellison testified that there was only a "small list" of companies from which Oracle purchased both hardware and services. Consequently, he believed that this approval related to HP (*see* Deposition of Larry Ellison, September 21, 2006, 515:10-19).

77. The cancellation fee was structured so that Oracle guaranteed that it would pay HP $30 million, effectively "round-tripping" monies paid by HP to Oracle in connection with its software purchase referred to in paragraph 79. Purchase order deadlines and payment due dates were contractually established for Oracle. In the absence of meeting these commitments, a cancellation fee would become due. The following table summarizes these dates and amounts:

| Purchase Order Commitment Date | Purchase Payment Date | Cancellation Fee Payable Date | Potential Cancellation Fee |
|---|---|---|---|
| December 28, 2000 | June 15, 2001 | June 30, 2001 | $15,000,000 |
| September 30, 2001 | December 31, 2001 | January 31, 2002 | $15,000,000 |

78. Oracle also made the following other commitments to HP:

   a. Move 100% of its production data to HP UNIX servers by May 31, 2001;

   b. Move 100% of its CRM development servers to HP UNIX servers by November 1, 2001;

   c. Operate all CRM online services, the Oracle Store, the Oracle web-based customer interactions database, the Oracle defect management database, and The Oracle Platinum on HP UNIX services by November 1, 2001;

   d. Agreed that HP would be the exclusive provider to the Company for these services listed as long as HP provides adequate standards of products and services; and

   e. Complete a project plan and schedule with HP by January 31, 2001, to provide support to HP in parity with Sun Microsystems for a period of at least 3 years.

79. As elements of the HP Agreement, Oracle was required to determine the fair value of these obligations. Since it is unlikely that Oracle had ever made similar commitments in the past, it is also unlikely that Oracle could have reasonably established the fair value of these commitments.

80. *The HP Order Form* – The HP Order Form's stated effective date is November 30, 2000, which was the final day of Oracle's second quarter of fiscal 2001. The HP Order Form included the following rights granted to HP by Oracle:

   a. Perpetual rights to a specified amount of seats of the Company's Customer Relationship Management Marketing, Sales, Service and Call Center Software ("CRM");

   b. License migration rights for certain specified existing licenses previously purchased by HP;

   c. Rights to one year of support and update subscription services for both the newly purchased software licenses as well as those migrated under pre-existing arrangements with HP; and

   d. Rights to Oracle's Premium Technical Support Services, including up to 400 professional support service days to be provided to HP over a one year period.[148]

81. In exchange for these rights, HP was required to pay Oracle approximately $29.8 million. However, there were no payment terms provided within the HP Order Form. Payment terms are a critical component of the determination that fees are fixed or determinable in accordance with SOP 97-2.

82. This incremental purchase of software, support and services incorporates the terms of the Original Software License and Services Agreement ("Original SLSA") between HP and Oracle. One of the most important contractual obligations established by the Original SLSA was an Acceptance Period. Specifically, the Original SLSA stated:

> For each Program License for which delivery is required under this Agreement, Client [HP] shall have a 15 day Acceptance Period, beginning on the Commencement Date, in which to evaluate the

---

[148] NDCA-ORCL 260109-14, Oracle Ordering Document; HP0045-49.

> Program. During the Acceptance Period, Client [HP] may cancel the license by giving written notice to Oracle...[149]

83. While several amendments were executed to the SLSA subsequent to its original execution date, including those under the November 2000 Agreements noted above, none appear to revoke this acceptance right. In regards to acceptance, SOP 97-2 states: "After delivery, if uncertainty exists about customer acceptance of the software, license revenue should not be recognized until acceptance occurs"[150]

84. Therefore, it would not have been appropriate for Oracle to have recognized any revenue under the HP Agreement until the acceptance right had expired on approximately December 15, 2000, or HP had explicitly provided Oracle with its acceptance. I have seen no evidence to suggest that HP accepted Oracle's software by 2QFY01.

85. *HP Term License Agreement* – This agreement amended the HP Order Form by converting the perpetual license rights to an 11-month term. While the underlying products, support offerings, and services remained the same, HP's rights to the software products were limited to an 11-month term (vs. perpetual rights). The HP Term License Agreement provided HP with several alternatives at the conclusion of the lease.[151]

86. Software revenue recognition interpretations note that it is not possible to establish VSOE on a term license of less than 1 year.[152] Specifically, the guidance states: "For time-based software licenses with a duration of one year or less, the fair value of the bundled PCS services is not reliably measured...." Therefore, since it was not possible for Oracle to establish VSOE, it was improper for Oracle to recognize license fees upfront on

---

[149] NDCA-ORCL 258189. The Original SLSA provides the following definitions: "Program" is defined as "the computer software in object code form owned or distributed by Oracle and specified on the [HP] Order Forms for which Client [HP] is granted a license pursuant to this Agreement; the applicable Documentation; and Updates"; "Commencement Date" is defined as "the date on which the Programs are delivered to Client [HP], or if no delivery is necessary, the Effective Date set forth on the relevant HP Order Form." NDCA-ORCL 258187. Effective Date: February 23, 1994.
[150] SOP 97-2, ¶ 20 (emphasis added).
[151] For example, one of the options enabled HP to reacquire ("revert back to") the perpetual rights stipulated under the HP Order Form (as noted above) in exchange for an additional fee of approximately $2.1 million due December 1, 2001. Other options included a) terminating the agreement and returning the software, b) extend the licenses and services for an additional period, or c) extending the license on a month-to-month basis.
[152] Technical Practice Aids ("TPA") 5100.53, Fair Value of PCS in a Short-Term Time-Based License and Software Revenue Recognition (TPA 53)

November 30, 2000. In this case, ratable revenue recognition was required, and virtually no time had passed between the time the agreement was executed and the quarter had ended.

87. As noted above, the total fees on the HP Order Form were approximately $29.8 million, however, the relevant payment terms were not defined therein. Nonetheless, the HP Term License Agreement amended the HP Order Form and provided for Oracle to be paid as follows: [153]

| Due Date | Amount |
|---|---|
| Net 30 | $3,000,000 |
| 1-Apr-01 | 13,402,685 |
| 1-Nov-01 | 13,402,685 |
| Total | $29,805,370 |

**Oracle's execution of the arrangements above are concurrent and dependent upon one another and should be accounted for as a single arrangement under GAAP.**

88. Technical Practice Aid 5100.39, *Software Revenue Recognition for Multiple-Element Arrangements*, states that the existence of <u>any</u> of the following factors (which are not all-inclusive) may indicate that a group of contracts should be accounted for as a single arrangement:

---

[153] In light of this amendment, payments due under the HP Term License Agreement and the Oracle Purchase Commitment were due around the same time, indicating that payments due Oracle coincided with the performance of Oracle purchase of hardware under the Oracle Purchase Commitment. The following table reflects the payment timing of each:

| Due Date | Fees Due Oracle Under Term License Agreement | Potential Cancellation Fee Payable to HP |
|---|---|---|
| Net 30 | $3,000,000 | N/A |
| 1-Apr-01 | $13,402,685 | N/A |
| 30-Jun-01 | N/A | $15,000,000 |
| 1-Nov-01 | $13,402,695 | N/A |
| 31-Jan-02 | N/A | $15,000,000 |
| Totals | $29,805,380 | $30,000,000 |

- The contracts or agreements are negotiated or executed within a short time frame of each other; . . . .
- The fee for one or more contracts or agreements is subject to refund or forfeiture or other concession if another contract is not completed satisfactorily . . . [or]
- Payment terms under one contract or agreement coincide with performance criteria of another contract or agreement.[154]

89. Accordingly, based upon the following key indicators, the HP Agreement between HP and Oracle should be viewed as a single arrangement under GAAP:

| | Indicators (TPA 39) | Present | Not Present |
|---|---|---|---|
| 1 | The contracts or agreements are negotiated or executed within a short time frame of each other.[155] | X | |
| 2 | The different elements are closely interrelated or interdependent in terms of design, technology, or function. | | X |
| 3 | The fee for one or more contracts or agreements is subject to refund or forfeiture or other concession if another contract is not completed satisfactorily (see paragraphs 123 through 133). | X | |
| 4 | One or more elements in one contract or agreement are essential to the functionality of an element in another contract. | | X |
| 5 | Payment terms under one contract or agreement coincide with performance criteria of another contract or agreement (see paragraph 90). | X | |

90. All of the agreements noted above appear to have been negotiated in contemplation of one another. That is to say, each of the agreements appears to have been and would only have been executed, providing all were signed.

91. Oracle itself noted in its "Revenue Recognition Review" summary of the HP transactions that the agreements were "signed concurrently."[156] During depositions and within

---

[154] TPA 5100.39.
[155] All agreements appear to have effective dates of either November 30, 2000 or December 1, 2000, indicating they were executed within a short time frame of each other.

Page 45 of 64

various e-mails, Oracle and HP employees further confirmed the inter-dependency of each arrangement:

    a. DeCesare, Oracle's Vice President of Sales closest to the negotiations, testified: "HP agreed that they would buy a huge CRM order for us, from Oracle, if in return Oracle flipped all of the production and development systems from Sun over to HP." He further stated that the Oracle Purchase of Oracle licenses was **"absolutely"** dependent upon Oracle moving its development over to HP.[157]

    b. In an e-mail to Ellison, Sanderson and Catz, regarding the status of the software license sale, DeCesare noted: "Consistent with Larry's conversations with Carly, HP will expect a purchase order for the following amounts [$20 million]. They will expect this purchase order to be binding and commit Oracle to using the full amounts by the dates we promise."[158]

    c. Sanderson, characterized the negotiations in an October 2000 e-mail stating "we have a $25 [million] deal with hp this quarter that is dependent on putting details against larry's commitment [to have 100% of Oracle's data on HP hardware by June 2001]."[159]

    d. A copy of the executed Oracle Purchase Commitment contains handwritten notes by Sanderson, stating "<u>THE REAL STORY</u>" and "**Is this the way we are going to do deals. Each has to buy something [from each other]!**"[160]

    e. Testifying as HP's person most knowledgeable about this transaction, Thomas Rathjens stated that the Onsite Support Services Exhibit simply "provides

---

[156] NDCA-ORCL 033958, Oracle USA Q2-FY01 Top 20 License Contracts Revenue Recognition Review.
[157] Deposition of Michael DeCesare, February 16, 2006, 59:18-21; 62:3-6.
[158] *See* NDCA-ORCL 020844, DeCesare Deposition, Ex. 3. Ultimately, Oracle's purchase commitments were increased to $30 million. *See* paragraph 77.
[159] *See* NDCA-ORCL 028737-38, Sanderson Deposition, Ex. 32.
[160] *See* NDCA-ORCL 020839 (emphasis added); Edward ("Sandy") Sanderson, Jr. Deposition, July 26, 2006, 521:10-14 wherein Sanderson acknowledges the handwritten notes to be his "Q. You see some handwriting on this document? A. Yes, I do. Q. Do you know whose handwriting it is? A. Looks like mine."

more detail"[161] to the HP Order Form, and the Lease Arrangement meant to convert the HP Order Form to a term license (from a perpetual license).[162]

92. Based upon the contemporaneous execution dates and the evident linked negotiations described above indicating that all agreements would only be executed collectively, the three agreements constitute a single arrangement under GAAP. Accordingly, as noted above, these agreements are collectively referred to as "the HP Agreement."

**Evidence indicates that the HP Agreement lacked a valid business for HP other than to derive additional revenues.**

93. I have reviewed evidence that indicates that certain products sold under the HP Agreement lacked a valid business purpose. This pattern suggests that those elements were sold solely to increase revenue. This evidence includes the following examples:

   a. One HP employee, Sean Hickey, noted in an e-mail discussing a potential $13.1 million write-off of Oracle licenses, that the entire Oracle license purchase was merely an incentive for Oracle to help HP increase its revenue: "There were never any licenses that were purchased in the category of 'Expense category. **These licenses were bought as an "incentive" for Oracle to help us increase HP's revenue. They are probably most accurately categorized as a Headquarters SG&A expense, not IT.**'" [163]

   b. Rathjens testified: "I don't know why HP bought additional licenses.... My opinion was we had enough licenses at the time, and did not feel, personally, that we needed additional licenses at that point in time."[164]

94. To support an assertion that a business purpose existed, there is an expectation that the products acquired would be deployed and utilized. In fact, HP never implemented certain

---

[161] Deposition of Thomas Rathjens, June 30, 2006, 58:12.
[162] Deposition of Thomas Rathjens, June 30, 2006, 60:4-6.
[163] *See* HP 00020, Rathjens Deposition, Ex. 8 (emphasis added).
[164] Deposition of Thomas Rathjens, June 30, 2006, 118:194-21.

significant modules of the software. Rathjens testified to his belief that the Inbound Call Center was never implemented[165] and acknowledged that HP didn't make a reasonable effort to implement the Mobile Sales or Incentive Compensation modules.[166]

95. HP's understanding about the implementation issues was shared by Oracle. In fact, when **Ellison was asked during his deposition whether HP had successfully implemented the software being sold to it by or licensed to it by Oracle in Q2FY01, Ellison stated "I don't believe so."**[167]

96. Also, as discussed above, the HP Agreement required Oracle to pay substantial cancellation fees in the event that the round-trip purchases were not made. The presence of the cancellation fees implied that the parties identified a risk that the products would not be deployed and utilized.

**Persuasive evidence of an arrangement *DOES NOT* exist at November 30, 2000.**

97. The first basic criterion that must be met prior to revenue recognition pertains to evidence of an arrangement.[168] The table below addresses the areas where Oracle's accounting failed to appropriately consider GAAP relevant to this criterion:

| NO. | CRITERIA | INDICATE ANSWER | | | REF. |
| --- | --- | --- | --- | --- | --- |
| | | YES | NO | INDETERMINABLE | |
| 1.a | Was the contract duly signed prior to the end of the period? | | | √ | SOP 97-1, ¶17 |
| 1.b | Were reciprocating purchase and sales arrangements identified and properly evaluated? | | √ | | TPA 5100.38 |
| 1.c | Was the HP Agreement properly evaluated as either a monetary or non-monetary exchange under GAAP? | | √ | | APB 29, ¶2; EITF 86-29, ¶7 |

---

[165] Deposition of Thomas Rathjens, June 30, 2006, 76:22.
[166] Deposition of Thomas Rathjens, June 30, 2006, 98:6-10.
[167] Deposition of Larry Ellison, September 21, 2006, 516:20- 517:2.
[168] SOP 97-2, ¶17.

| NO. | CRITERIA | INDICATE ANSWER | | | REF. |
|---|---|---|---|---|---|
| | | YES | NO | INDETERMINABLE | |
| 1.d | Given the effective netting of cash between both HP and Oracle (i.e. net boot exchanged < 25% of the fair value of the assets exchanged), was the HP Agreement properly accounted for pursuant to the fair value provisions of TPA 46 and TPA 47? | | √ | | EITF 86-29; ¶ 7; TPA 5100.46; TPA 5100.47; EITF 86-29 |
| 1.e | Did the exchange of assets under the HP Agreement constitute a business purpose to support Oracle's revenue recognition treatment pursuant to the fair value provisions of TPA 47? | | √ | | TPA 5100.47; EITF 86-29 |

98. SOP 97-2 explicitly stipulates:[169]

> Even if all other requirements set forth in this SOP for the recognition of revenue are met (including delivery), revenue should not be recognized on any element of the arrangement unless persuasive evidence of an arrangement exists.

99. Gary Matuszak, Arthur Andersen's lead audit partner on the Oracle engagement and former member of the AICPA task force on initiatives pertaining to SOP 97-2, further acknowledged this revenue recognition requirement specific to Oracle:

> Q. So if there was a case where on the last day of the quarter Oracle did not have a signed contract from a customer for a software license as of the night on the last day of the quarter, would that preclude revenue recognition under the terms of the policy?...
>
> THE WITNESS [Matuszak]: Generally, yes.[170]

100.    There is evidence to suggest that the HP Agreement was not duly executed by HP and Oracle until after November 30, 2000. Specifically, despite the fact that certain of the portions of the HP Agreement bear an effective date of November 30, 2000, time

---

[169] SOP 97-2, ¶17.
[170] Gary Matuszak Deposition, August 1, 2006, 71:13-21.

Page 49 of 64

stamped e-mails and faxes near midnight on that date detailing ongoing negotiations, as well as the following data, indicate that various contracts within the HP Agreement were not duly executed by such date:

    a. While including a stated effective quote expiration date of November 30, 2000, the Onsite Support Services Exhibit to the HP Order Form, contains a footer that notes "***HP onsite support 12/1/2000.***" This date, typed into the agreement, indicates that the contract was not printed until December 1, 2000. Furthermore, the actual signatures on the contract are made without reference to a date and the only other indicators of the actual contract execution date are two fax dates and time stamps across the top and bottom of the signature page. Each show a date of December 1, 2000 and come from the same two fax machines noted below in paragraph 100b, HP HMCS and DMD.[171]

    b. The HP Order Form denotes a handwritten effective date of November 30, 2000. However, the signature page contains the following fax header date and time stamps indicating the actual dual execution date of the HP Order Form may have been December 1, 2000 and not November 30, 2000 as was necessary to support Oracle's recognize recognition:[172]

        (i) November 30, 2000 at 11:53p.m. from the "Oracle Legal" fax machine;

        (ii) December 1, 2000 (the beginning of Oracle's fiscal Q3'2000) at 1:06 a.m. from the "HP HMCS" fax machine; and

        (iii) December 1, 2000 at 1:39a.m. from the "DMD" labeled fax machine.

    c. The HP Term License Agreement is silent as to the effective date of the arrangement. Both signatures on the agreement are made without reference to a date. In fact, the only indicators of the actual contract execution date are two fax date and time stamps across the top and bottom of the signature page

---

[171] *See* NDCA-ORCL 260009.
[172] *See* NDCA-ORCL 260004.

of the arrangement. Each show a date of December 1, 2000 and come from the same two fax machines noted above in paragraph 100b, HP HMCS and DMD.[173]

101. Based upon the information above, it appears that the HP Agreement was duly executed, **at the earliest**, on December 1, 2000. Accordingly, it does not appear that persuasive evidence of an arrangement existed at November 30, 2000. As a result, and without considering any other factors, no revenue should have been recognized until pervasive evidence of an arrangement existed. This would result in the reduction of $19.9 million in revenues for Oracle's 2QFY01.

**Oracle's revenue recognition analysis does not adequately support "gross" accounting.**

102. As discussed in paragraph 92, the HP Agreement should be accounted for as a single arrangement. This treatment includes the round-trip payments of approximately $30 million *to and from* Oracle and HP.

103. In May 2001, the SEC released a speech regarding revenue recognition in which it provided guidance to registrants related to the accounting for cross-payments and complex customer arrangements. Specifically, the SEC noted the following:

   a. "The [SEC] staff is concerned when it appears Company A has taken $1 million out of its left pocket only to receive that $1 million back in its right pocket, and wants to record the $1 million received in revenue."

   b. "The [SEC] staff questions how these types of 'round trip' arrangements result in revenue, and whether, in substance, they are sham transactions engineered solely to inflate the revenue line in the income statement."

   c. "[T]he company and its auditor should consider whether it is appropriate to report the related cash flows, revenues and costs on a gross or net basis."

---

[173] *See* NDCA-ORCL 260012.

104. Oracle recorded the round-tripped monies due under the HP Agreement (approximately $30 million) as revenue or deferred revenue on a "gross" basis, assuming that approach to be appropriate under GAAP. However, I have seen no evidence to suggest that Oracle conducted an analysis pertaining to whether this accounting treatment was appropriate under GAAP. Accordingly, I have conducted such an analysis below.

105. To determine whether revenues should be reported on a "gross" or "net" basis, Oracle would have first determined whether the HP Agreement constituted a monetary or nonmonetary transaction under APB 29 and EITF 86-29.[174]

106. However, irrespective of this determiniation, both APB 29 and EITF 86-29 clarify that Oracle should have accounted for the exchange using "fair value."

> Accounting for nonmonetary transactions should be based on the fair values of the assets (or services) involved which is the same basis as that used in monetary transactions.[175]

107. This concept is expanded upon in TPA 47, which is specifically applicable to software vendors such as Oracle. In order for Oracle to have properly recorded the exchange on a gross basis, this TPA states:

- The exchange should be recorded at <u>fair value</u> provided that the transaction has a <u>business purpose</u>;

- Fair value can be determined within reasonable limits (i.e., VSOE of software given up, or the value of the technology/products received, as if the software vendor had received or paid cash);[176] and

---

[174] Specifically, EITF 86-29 states: "The Task Force discussed an exchange of nonmonetary assets that would otherwise be based on recorded amounts but that also involves monetary consideration (boot) [i.e. cash exchanged, etc.]. The task force reached a consensus that the transaction should be considered monetary (rather than nonmonetary) if the boot is significant, and agreed that "significant" should be defined as at least 25 percent of the fair value of the exchange. As a monetary transaction, both parties would record the exchange at fair value. If the boot in a transaction is less than 25 percent, the pro rata gain recognition guidance in paragraph 22 of Opinion 29 should be applied by the receiver of boot, and the payer of boot would not recognize a gain. The Task Force acknowledged that the ability to satisfactorily measure fair value is a prerequisite to the use of fair value."
[175] See APB 29, ¶18.
[176] VSOE (Vendor-Specific Objective Evidence of fair value) is defined in paragraph 10 of SOP 97-2 as either: (i) "The price charged when the same element is sold separately;" or (ii) "For an element not yet being sold separately, the price established by management having the relevant authority; it must be probable that the price, once established, will not change before the separate introduction of the element into the marketplace."

- The products received in the exchange are expected, at the time of the exchange, to be deployed and utilized, and the value ascribed to the transaction reasonably reflects such expected use.

108. I have not identified evidence to suggest that the <u>fair value</u> of the assets exchanged pursuant to the HP Agreement was determined in accordance with GAAP. Specifically:

   a. I have seen no evidence that Oracle had established VSOE (fair value) of its software, postcontract customer support ("PCS"), services, and other commitments sold/offered to HP in accordance with TPA 47.

   b. I have seen no evidence that Oracle determined the fair value of those assets to be purchased from HP.

109. As noted in paragraph 93, there are several indicators to suggest that HP did not need the software it purchased from Oracle and the only reason HP executed the HP Agreement was to generate additional revenue. Therefore, there are real questions whether this transaction had a legitimate <u>business purpose</u>.

110. In consideration of the fact that fair value does not appear to have been established, and the indication that a valid business purpose for the products exchanged under the HP Agreement did not exist, the gross basis of accounting applied by Oracle to the HP transaction, is not supportable under GAAP.

**<u>The delivery criterion *DOES NOT* appear to have been met at November 30, 2000.</u>**

111. The second basic criterion that must be met prior to revenue recognition pertains to delivery.[177] The table below addresses the areas where Oracle's accounting failed to appropriately consider GAAP as it relates to delivery:

---

[177] SOP 97-2, ¶ 18.

| NO. | CRITERIA | INDICATE ANSWER ||| REF. |
|---|---|---|---|---|---|
| | | YES | NO | INDETERMINABLE | |
| 2.a | Has a fully functional software product, not requiring significant modification or customization, been delivered? | | √ | | SOP 97-2, ¶¶7-8, 22 |
| 2.b | If the contract is subject to customer acceptance, have acceptance criteria been met? | | √ | | SOP 97-2, ¶20 |
| 2.c | For all other elements (PCS, services, etc.) of the arrangement that have not been delivered as of the end of the period, does vendor specific objective evidence of fair value (VSOE) exist? | | √ | | SOP 97-2, ¶¶10, 12; TPA 5100.53 |
| 2.d | If VSOE does not exist for any undelivered element, has the Company appropriately deferred all revenue until that element is delivered or over the period in which an undelivered service or PCS element is delivered? | | √ | | SOP 97-2, ¶12; TPA 5100.53 |

112. Prior to the execution of the HP Agreement, there is evidence that suggests the products previously licensed by HP had not effectively been implemented into production. This fact is relevant because additional seats of these same products as well as newly released software were purchased under the HP Agreement. Karen Montague of HP noted in an e-mail attachment to various HP employees, including Rathjens:

> [Several] CRM products have had significant delays due to quality issues that precluded HP from utilizing these applications in FY [Fiscal Year]'01 and into FY'02...
>
> <u>OTS</u> – Product lacked forecasting as well as the universal working queue linkage was non-functional. HP used sales online telesales rep. Applications. 0% usage in FY'01

Page 54 of 64

> **Marketing** – Many show stopper[178] patches are still outstanding. Product is still in pilot due to delay Ion bug fixes due to quality issues. 0% usage in FY'01
>
> **Mobile Sales** – Lack of wireless connectivity and poor security on disconnect mode caused delay in product rollout. 0% usage in FY'01...
>
> **Call Center** – 0% usage in FY'01 due to poor quality[179]

113. There is further evidence demonstrating that Oracle's software required significant customization prior to its implementation. For example, DeCesare commented on the significant level of effort required in connection with implementing Oracle's Software stating:

> [W]hen I sold an application deal, for the most part, it took between three and five service dollars to every one license dollar, and those service dollars were to configure, integrate and **customize**.[180]

114. Oracle released its E-Business Suite 11i (which included CRM) to the marketplace in May 2000. At that time it was touted by the Company as an "out-of-the-box solution that manages the entire life-cycle of the 'campaign-to-order' process."[181] Nonetheless, certain testimony and e-mails indicate that the software delivered to HP as of November 30, 2000 may have required significant production, modification or customization of the software. For instance,

   a. DeCesare testified: "[CRM] products were heavily over marketed.... I read through the complaint and look [sic] at that statement by Mark Barrenechea in there. It's not factual. It's not true. It does not operate as integrated out of the box. That's – that's false...Customers like HP...were furious after they started implementations. There's you know, quite a – quite a few examples of that."[182]

---

[178] DeCesare testified that a "showstopper" was "a piece of functionally that the customer requires that isn't currently in the product. *See* footnote 188.
[179] *See* HP 00074.
[180] Deposition of Michael DeCesare, February 16, 2006, 48: 19-23 (emphasis added).
[181] NDCA-ORCL 020894-96, PR Newswire; Oracle Equips Marketers With Tools Needed for E-Business Success, May 24, 2000.
[182] Deposition of Michael DeCesare, February 16, 2006, 234:15-25 and 235:1-5 (emphasis added).

b. DeCesare, further testified: "**the functionality [HP] believed the product was supposed to have – it just fundamentally didn't have**.... Like HP was having problems about support-to-sales-force automation, marketing-to-sales-force automation and those types of things, in addition to problems with the rest of the ERP.... [T]he statement that it [Oracle 11i] is completely integrated out of the box is, in my opinion a false statement.... The concerns the customer is having were **lack of functionality in the CRM** and potential integration issues to the ERP side.... **I'm talking about things that were advertised as functionality that just didn't work in the product.**"[183]

c. Rathjens, HP's 30b6 witness testified: "some of the software [modules purchased in the November 2000 CRM deal] was more mature than other modules.... [Others] lacked the functionality that HP stakeholders felt they needed to deploy it."[184]

d. Rathjens further acknowledged that Oracle's software required significant fixes and customizations: "[W]e had thousands things we were tracking, probably in the nature of 20,000.... [T]housands of bugs, thousands of change requests, thousands of configurations."[185]

e. In fact, in an e-mail from Julie Cullivan, Sales Consulting Director, to Sanderson, dated January 31, 2001, three months subsequent to the purported delivery of the CRM software to HP, specified that the product lines ordered by HP were still functionally deficient.[186]

---

[183] Deposition of Michael DeCesare, February 16, 2006, 257:19-20, 259:4-8, 262:10-12, 266:23-25, 267:3-4 (emphasis added).
[184] Deposition of Thomas Rathjens, June 30, 2006, 84:7-9, 85:15-16.
[185] Deposition of Thomas Rathjens, June 30, 2006, 101:21-22, 102:1-2.
[186] *See* NDCA-ORCL 296486. (1) E-mail Center – "E-mail Center scenarios do not consistently work nor can you even get them to all work together;" (2) Call Center – "Call Center Intelligence data and breadth of reports is inadequate;" (3) Telesales – "Screenpops only work with Customer Care – should work with Telesales...;" (4) Service – "Service only supports that a customer is calling about one, non-configured product [and]...does not recognize parties to a service contract, it only validates against the end customer of an install base product;" and (5) CRM (in general) – "Customers set up in CRM app do not always work or show up in ERP [and]...CANNOT SHOW A COMPLETE INTEGRATED CRM DEMO LET ALONE A COMPLETE EBIZ SUITE (CRM/ERP) INTEGRATED DEMO."

  f. In another e-mail dated November 16, 2001, nearly 1 year following the effective date of the 2000 contract, Karen Montague of HP noted that the software was still not functioning properly.[187]

115. On November 28, 2000, just two days prior to the purported delivery date, DeCesare noted: "HP has a critical go live in April 2001. There have been 14 show stoppers that HP has raised of commitments Oracle needs to make to ensure those dates do not slip." DeCesare testified that a "showstopper" was "[a] piece of functionality that the customer requires that isn't currently in the product."[188] Rathjens of HP also affirmed this definition, testifying that a "showstopper" was "[s]ome piece of functionality that we wanted to see incorporated into the software."[189]

116. Based upon this understanding, the existence of even a single showstopper indicates that significant functionality did not exist in the product. Given that this e-mail was sent just two days prior to the purported effective date of the HP Agreement, it is unlikely that all 14 showstoppers had been delivered by November 30, 2000.

117. I have seen no evidence to suggest that Oracle considered these functionality shortfalls prior to the recognition of $19.9 million of revenue on November 30, 2000. In light of the "showstoppers," the apparent complex integration and customization required and other functionality deficiencies, Oracle's upfront revenue recognition treatment was not in compliance with GAAP.

**The HP Agreement included a Term License, wherein certain undelivered elements lacked VSOE, therefore precluding the upfront recognition of revenue at November 30, 2000.**

---

[187] *See* HP 00062- 63. (1) Regarding Telesales or OTS – "HP was having enough trouble getting the OTS software to work and decided to limit the OTS functionality to move into production in FY01 to just passing leads from OMO to OSO. HP does not believe that the software will be ready until the 11.5.6 release is available fro Oracle and put into production at HP," (2) Regarding Inbound Call Center licenses – "Oracle did not deliver contractually on the licenses HP purchased, which were targeted for implementation by call center agents in conjunction with Sales Online," and (3) Regarding Sales Reps or OSO & Mobile Sales – "HP was informed in September'01 that the Mobile licenses do not include "wireless". HP and Oracle have been discussing, throughout the year, wireless access because HP understood that the 9,045 Mobile licenses HP purchased [including those under the Agreement] included wireless."
[188] Deposition of Michael DeCesare, February 16, 2006, 72: 13-14.
[189] Deposition of Thomas Rathjens, June 30, 2006, 90: 22-23.