COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
MARK SOLOMON (151949)
DOUGLAS R. BRITTON (188769)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
marks@csgrr.com
dougb@csgrr.com
    – and –
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
ELI R. GREENSTEIN (217945)
DANIEL J. PFEFFERBAUM (248631)
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@csgrr.com
willowr@csgrr.com
elig@csgrr.com
dpfefferbaum@csgrr.com

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION | ) ) ) Master File No. C-01-0988-SI |
| _____ | ) CLASS ACTION |
| This Document Relates To: | ) ) PLAINTIFFS' OPPOSITION TO |
| ALL ACTIONS. | ) DEFENDANTS' REVISED *DAUBERT* ) MOTION TO EXCLUDE EXPERT ) OPINIONS AND TESTIMONY OF BJORN I. |
| _____ | ) STEINHOLT |

DATE:          January 9, 2009
TIME:           9:00 a.m.
COURTROOM:  The Honorable Susan Illston

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     ARGUMENT ........................................................................................................2

        A.      Legal Standard ........................................................................................2

        B.      Steinholt Is Highly Qualified to Offer Opinions on the Issues of
                Materiality, Loss Causation and Damages.................................................3

        C.      Defendants Do Not Challenge Steinholt's Methodology or Opinions on
                Materiality..................................................................................................4

        D.      Steinholt's Expert Opinion on Loss Causation Is Reliable and Will Assist
                the Jury......................................................................................................5

                1.      Steinholt's Method of Calculating Damages Under §10(b) Is
                        Reliable and Supported by Ninth Circuit and Supreme Court
                        Jurisprudence ...............................................................................9

                2.      The Constant Percentage Inflation Methodology Is Appropriate
                        and Reasonable ..........................................................................11

                3.      Defendants' Quibbling with Market Index v. Peer Group Index Is a
                        Red Herring..................................................................................14

                4.      Steinholt's Analysis of Section 20A Damages Is Reliable and Does
                        Not Violate *Dura* ........................................................................17

III.    CONCLUSION....................................................................................................18

1

# TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4

*Ahlberg v. Chrystler Corp.*,
    481 F.3d 630 (8th Cir. 2007) ...................................................................9

5

6

*Blacke v. Barrack*,
    524 F.2d 891 (9th Cir. 1975) .................................................................14

7

*Daubert v. Merrell Dow Pharms.*,
    509 U.S. 579 (1993) ........................................................................ *passim*

8

9

*DSU Med. Corp. v. JMS Co., Ltd.*,
    296 F. Supp. 2d 1140 (N.D. Cal. 2003) .................................................3

10

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ........................................................................ *passim*

11

12

*Green v. Occidental Petroleum Corp.*,
    541 F.2d 1335 (9th Cir. 1976) ........................................................10, 11

13

*In re Broadcom Corp. Sec. Litig.*,
    No. SACV 01-275 DT(MLGx) 2005 U.S. Dist. LEXIS 41976, at *10

14

    (C.D. Cal. Sept. 12, 2005)............................................................4, 11, 12

15

*In re Daou Sys. Inc. Sec. Litig.*,
    411 F.3d 1006 (9th Cir. 2005) *cert. denied*,

16

    546 U.S. 1172 (2006)...............................................................................5, 6

17

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
    No. H-01-3624, 2008 U.S. Dist. LEXIS 84656

18

    (S.D. Tex. Sept. 8, 2008) ........................................................................13

19

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) .................................................................5

20

21

*In re Gilead Scis. Sec. Litig.*,
    No. C03-4999 MJJ, 2006 WL 1320466

22

    (N.D. Cal. May 12, 2006) .........................................................................6

23

*In re Imperial Credit Indus. Sec. Litig.*,
    252 F. Supp. 2d 1005 (C.D. Cal. 2003) .................................................4

24

*In re Intelligroup Sec. Litig.*,
    468 F. Supp. 2d 670 ...............................................................................11

25

26

*In re JDS Uniphase Corp.*,
    No. 02-01486-CW, (N.D. Cal. Oct. 9, 2007).................................12, 13

27

*In re Motorola Sec. Litig.*,
    505 F. Supp. 2d 501 (N.D. Ill. 2007) ...................................................17

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' REVISED *DAUBERT* MOTION TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY OF BJORN I. STEINHOLT - C-01-0988-SI

- ii -

**Page**

*In re Williams Sec. Litig.*,
    496 F. Supp. 2d 1195 (D. Okla. 2007)..................................................................13

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)...............................................................................................2, 3

*Maiz v. Virani*,
    253 F.3d 641 (11th Cir. 2001) ...................................................................................3

*Nursing Home Pension Fund v. Oracle Corp.*,
    No. C01-00988 MJJ, 2006 U.S. Dist. LEXIS 94470
    (N.D. Cal. Dec. 20, 2006) ...........................................................................................5

*Robbins v. Koger Props., Inc.*,
    116 F.3d 1441 (11th Cir. 1997) ...........................................................................5, 10

*Ryan v. Flowserve*,
    245 F.R.D. 560 (N.D. Tex. 2007) ..............................................................................7

*SEC v. MacDonald*,
    699 F.2d 47 (1st Cir. 1983).................................................................................17, 18

*U.S. v. Sandoval-Mendoza*,
    472 F.3d 645 (9th Cir. 2006) .....................................................................................3

*Wool v. Tandem*,
    818 F.2d 1433 (9th Cir. 1986) .................................................................................10

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78t-1(b)..................................................................................................................18
    §78j(b)....................................................................................................................2, 9

17 C.F.R.
    §240.10b-5 ............................................................................................................9, 10

Federal Rules of Evidence
    Rule 401 .....................................................................................................................3
    Rule 702..........................................................................................................2, 3, 4, 7

**SECONDARY AUTHORITIES**

Bradford Cornell and R. Gregory Morgan, *Using Finance Theory to Measure
    Damages in Fraud on the Market Cases*, 37 UCLA L. Rev., 883, 885
    (June 1990)................................................................................................................11

John Y. Campbell, *et al.*, *The Econometrics of Financial Markets* (1997) ......................15

1

2                                                                                      **Page**

3   Madge S. Thorsen, Richard A. Kaplan and Scott Hakala, *Rediscovering the*
        *Economics of Loss Causation* ............................................................................................5, 12

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.      INTRODUCTION

Defendants' Revised Notice of *Daubert* Motion to Exclude Expert Opinions and Testimony of Bjorn I. Steinholt ("Motion" or "Defs' Mot.") seeking to exclude plaintiffs' expert Bjorn I. Steinholt ("Steinholt") must be denied.  Defendants fail to show that Steinholt's event study methodology to assess loss causation and damages are not reliable or helpful to the jury.  In fact, the arguments they advance are all without merit and ignore the facts and misconstrue what's required for plaintiffs to meet their burden.  Defendants' Motion even contradicts at least one treatise on which they rely.  For example, defendants take issue with Steinholt's usage of the NASDAQ 100 market index to measure Oracle Corporation )"Oracle" or the "Company") predicted returns on March 2, 2001 – the day after the Company disclosed that it would miss 3Q01 earning forecasts – as opposed to a peer group index compiled by defendants. Defs' Mot. at 6.  Defendants do not and cannot cite authority for the proposition that using a market index is not the appropriate and reliable methodology.  In fact, economic theory supports the employment of a market index over a peer group or industry index because the latter rarely produces anything other than marginal explanatory power beyond the market index.  *See* Declaration of Shawn A. Williams in Support of Plaintiffs' Opposition to Defendants' Revised *Daubert* Motion to Exclude Expert Opinions and Testimony of Bjorn I. Steinholt ("Williams Decl.") (filed herewith), Ex. S.  Moreover, defendants fail to alert the Court to the fact that: 1) Oracle has, in this case, submitted to the Court that the NASDAQ 100 is the appropriate market index to measure Oracle's stock price performance in the Class Period; 2) that Steinholt in any event did look at the peer group index of nine companies identified by defendants, six of which were also in the NASDAQ 100; and 3) Steinholt's event study using the market index yields a more conservative damages figure than using peer group index proposed by defendants. Each of these facts fatally undermine their motion.

Defendants' challenges to Steinholt's analysis and opinion on loss causation are equally without merit.  Again, defendants ignore proof demonstrating the causal connection between the misrepresentations and fraud alleged and plaintiffs' economic loss.  Defendants' argument is less related to the reliability and helpfulness of Steinholt's methodologies but instead grounded in the belief that the March 1, 2001 disclosures which caused the stock price decline did not reveal the true

1  financial condition plaintiffs allege was concealed by the fraud.  Of course, the facts ignored by

2  defendants demonstrate that the new information disclosed by Oracle on March 1, 2001 was in stark

3  contrast to the misrepresentations in the Class Period.  Even defendants' expert agrees that the

4  March 1, 2001 disclosures revealed new information of the true financial condition causing

5  plaintiffs' economic loss.

6          Finally, defendants' argument that Steinholt's calculation of damages is inconsistent with

7  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) altogether fails.  First, whether the constant

8  percentage inflation methodology of calculating damages in a legal question and does not affect the

9  reliability of an event study.  In addition, as discussed below, cases in this district post-*Dura* have

10  allowed the constant percentage methodology to be presented to the jury in §10(b) – rejecting the

11  same argument defendants make here.

12          At bottom, Steinholt's analysis and opinions satisfy Fed. R. Evid. 702's standards for

13  admissibility and defendants' motion to exclude Steinholt should be denied.

14  **II.    ARGUMENT**

15      **A.    Legal Standard**

16      Federal Rule of Evidence 702 governs the admission of expert testimony and states that:

17      If scientific, technical, or other specialized knowledge will assist the trier of fact to
18      understand the evidence or to determine a fact in issue, a witness qualified as an
        expert by knowledge, skill, experience, training, or education, may testify thereto in
        the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts
19      or data, (2) the testimony is the product of reliable principles and methods, and
        (3) the witness has applied the principles and methods reliably to the facts of the
20      case.

21  Fed. R. Evid. ("Rule") 702.

22          In *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), the United States Supreme Court

23  explained the requirements under Rule 702 for the admission of expert testimony.  A trial court

24  assesses the expert's "qualifications" and the "reliability" of the proposed testimony to determine

25  whether the expert will assist the trier of fact to understand or determine a fact in issue.  *Id.* at 592.

26  The objective is to "make certain that an expert, whether basing testimony upon professional studies

27  or personal experience, employs in the courtroom the same level of intellectual rigor that

28  characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v. Carmichael*, 526

PLAINTIFFS' OPPOSITION TO DEFENDANTS' REVISED *DAUBERT* MOTION TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY OF BJORN I. STEINHOLT - C-01-0988-SI                              - 2 -

1  U.S. 137, 152 (1999).  "[T]he district court [is] a gatekeeper, not a fact finder."  *U.S. v. Sandoval-*

2  *Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006).  "'[A] district court's gatekeeper role under *Daubert* is

3  not intended to supplant the adversary system or the role of the jury.'"  *DSU Med. Corp. v. JMS Co.,*

4  *Ltd.*, 296 F. Supp. 2d 1140, 1147 (N.D. Cal. 2003) (quoting *Maiz v. Virani*, 253 F.3d 641, 666 (11th

5  Cir. 2001)).  The court's sole gatekeeping responsibility is to determine the reliability of expert

6  opinions through a preliminary assessment of the methodologies underlying the opinion.  *Daubert*,

7  509 U.S. at 592-93.  In performing its gatekeeping role, the court does not focus on the correctness

8  of the conclusions of the expert's testimony.  *See, e.g.*, *DSU Med. Corp.*, 296 F. Supp. 2d at 1146-

9  47.  Rather, the court focuses on whether the methodology used by the expert to reach his

10  conclusions is sufficiently reliable for submission of that testimony into evidence.  *Id.*  If the

11  threshold of reliability is met, "[v]igorous cross-examination, presentation of contrary evidence, and

12  careful instruction on the burden of proof are the traditional and appropriate means" of challenging

13  the testimony.  *Daubert*, 509 U.S. at 596.

14         Under *Daubert* and *Kumho*, relevant expert opinion testimony is admissible.  Expert opinion

15  testimony is relevant if the knowledge underlying it has a "'valid . . . connection to the pertinent

16  inquiry. . . .'"  *Kumho*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592).  The relevance of an

17  expert's opinion is determined by Rule 401 and by the "fit" of the testimony.  *Daubert*, 509 U.S. at

18  591.  Relevant evidence under Rule 401 is "evidence having any tendency to make the existence of

19  any fact that is of consequence to the determination of the action more probable or less probable than

20  it would be without the evidence."  Fed. R. Evid. 401.  Under *Daubert*, Rule 702 requires that the

21  expert's knowledge will "assist the trier of fact to understand the evidence or to determine a fact in

22  issue."  *Daubert*, 509 U.S. at 591-92 (holding that the requirement that the expert testimony "'assist

23  the trier of fact' . . . goes primarily to relevance") (citation omitted).

24         **B.    Steinholt Is Highly Qualified to Offer Opinions on the Issues of**
              **Materiality, Loss Causation and Damages**

25

26         Defendants do not challenge Steinholt's qualifications.  He is highly qualified to testify on

27  matters relating to market efficiency, materiality, loss causation and damages.  Williams Decl., Ex.

28  A.  Steinholt earned a Master of International Business degree from the University of San Diego and

1    a Bachelor of Science, Computer Science degree from California State University, Long Beach.  *Id.*

2    He earned the professional designation of Chartered Financial Analyst awarded by the CFA Institute.

3    *Id.*  Steinholt is the founding member of Financial Markets Analysis, LLC ("FMA"), an economic

4    consulting and valuation firm.  *Id.*  FMA provides financial analyses and related economic

5    consulting services to clients.  Steinholt's practice area includes the valuation of whole businesses,

6    financial securities and intangible assets.  *Id.*  Additionally, Steinholt provides consulting related to

7    complex securities litigation.  *Id.*  Steinholt previously served as a principal at Business Valuation

8    Services, Inc., where he provided financial and economic analyses for a variety of purposes relating

9    to: mergers and acquisitions; initial public offerings; fairness opinions; bank financing; financial

10   reporting requirements, tax-related issues; general advisory services and shareholder disputes,

11   among other responsibilities.  *Id.*  Accordingly, Steinholt is "qualified as an expert by knowledge,

12   skill, experience, training, [and] education."  *See* Fed. R. Evid. 702.

13       **C.    Defendants Do Not Challenge Steinholt's Methodology or Opinions on**
             **Materiality**

14

15           Unchallenged by defendants is Steinholt's methodology and expert opinion with respect to

16   materiality.  Using an event study and regression analysis, Steinholt analyzed the materiality of

17   Oracle's December 14, 2000 earnings announcement and 3Q01 revenue, earnings and sales forecast.

18   Williams Decl., Ex. A, ¶¶28-32.  His analysis demonstrates that Oracle's stock price increase upon

19   the December 14, 2000 announcement of earnings and guidance for the 3Q01 was statistically

20   significant.  Williams Decl., Ex. A, ¶35.  Steinholt also analyzed the stock price movement when the

21   relevant truth about the Company's financial condition was revealed on March 1, 2001 through the

22   Company's pre-announcement of its 3Q01 results and found that there was a statistically significant

23   price decline following the announcement, a conclusion also reached by that defendants' own expert,

24   Christopher M. James ("James") (Williams Decl., Ex. B, ¶49), demonstrating materiality of the

     disclosures.  Williams Decl., Ex. A, ¶¶43-46.

25           The event study methodology employed by Steinholt is well-established and relevant.  *See,*

26   *e.g.*, *In re Imperial Credit Indus. Sec. Litig.*, 252 F. Supp. 2d 1005, 1014 (C.D. Cal. 2003); *In re*

27   *Broadcom Corp. Sec. Litig.*, No. SACV 01-275 DT (MLGx), 2005 U.S. Dist. LEXIS 41976, at *10

28

1    (C.D. Cal. Sept. 12, 2005). Indeed, the Court recognized the utility of an event study in quoting

2    Steinholt and determining that "loss causation is susceptible to proof on a class-wide basis" in Judge

3    Jenkins' December 20, 2006 Order Re Motion for Class Certification. *Nursing Home Pension Fund*

4    *v. Oracle Corp.*, No. C01-00988 MJJ, 2006 U.S. Dist. LEXIS 94470, at *38 (N.D. Cal. Dec. 20,

5    2006). Moreover, defendants' expert James endorses and, in fact, used the very same method of

6    assessing materiality. Williams Decl., Ex. B, ¶¶12-20.

7        **D.    Steinholt's Expert Opinion on Loss Causation Is Reliable and Will
             Assist the Jury**

8

9        "[T]o prove loss causation, the plaintiff must demonstrate a causal connection between the

10    deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the

11    plaintiff." *In re Daou Sys. Inc. Sec. Litig.*, 411 F.3d 1006, 1025 (9th Cir. 2005) *cert. denied*, 546

12    U.S. 1172 (2006); *see also Dura*, 544 U.S. at 346 ("[P]laintiff [must] prove that the defendant's

13    misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss.").

14    A plaintiff is not required to show "that a misrepresentation was the ***sole*** reason for the investment's

15    decline in value" in order to establish loss causation. *See Robbins v. Koger Props., Inc.*, 116 F.3d

16    1441, 1447 n.5 (11th Cir. 1997) (emphasis added). "[A]s long as the misrepresentation is ***one***

17    substantial cause of the investment's decline in value, other contributing forces will not bar recovery

18    under the loss causation requirement" but will play a role "in determining recoverable damages." *Id.*

19    (emphasis added). *Accord In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008) (citing *Daou*,

20    411 F.3d 1006).

21        Steinholt's opinion on loss causation is based upon the event study methodology that is

22    widely favored by courts and well-established in the scientific community. Williams Decl., Ex. A,

23    ¶¶40-46. With respect to loss causation, Steinholt notes that one of the key issues is whether

24    misrepresentations or omissions were material thus causing the security to trade at artificially

25    inflated levels during the Class Period. *Id.*, ¶40 (citing Madge S. Thorsen, Richard A. Kaplan and

26    Scott Hakala, *Rediscovering the Economics of Loss Causation*, 6. J. Bus. & Sec. L. 93, 95). For

27    purposes of his analysis, Steinholt assumed that plaintiffs will prove their claims. *Id.*, ¶¶7-9. Based

28    upon those assumptions, Steinholt performed an event study and regression analysis in support of his

1 opinions, including his opinion that Oracle's March 1, 2001 disclosure event eliminated the inflation

2 in Oracle's common stock resulting from the alleged false and misleading statements and omissions.

3 *Id.*, ¶¶42-45.[1]

4       Defendants do not challenge Steinholt's event study methodology or opinion on materiality.

5 Instead, defendants manufacture new challenges to Steinholt's expert opinion.   Specifically,

6 defendants raise an unsubstantiated argument that has no bearing on the admissibility of Steinholt's

7 expert opinion: "[p]laintiffs have offered no evidence of loss causation ***other than*** the opinions and

8 testimony of Steinholt." Defs' Mot. at 8.  Further, defendants mischaracterize and simply ignore the

9 factual record including documents in the public domain as it is flush with evidentiary proof that

10 plaintiffs' economic loss was proximately caused by Oracle's misrepresentation.  For example, the

11 March 1, 2001 disclosures in light of the alleged false representation were directly related to the

12 misrepresentations.  For example, the March 1, 2001 press release stated the following:

13      •     3Q01 earnings missed forecast of $0.02 per share.

14
15      •     Overall license revenue growth fell short – reporting only 6% growth as opposed to falsely forecasted 25%.

16      •     Applications [11i] revenue growth fell short – reporting only 50% growth as opposed to falsely forecasted 75%.

17
18      •     "The problem is the U.S. economy. . . .  [W]e can't predict when sales growth will improve."

19 Williams Decl., Ex. C.

20       The March 1, 2001 investor conference call led by defendants elaborated, stating the

21 following:

22      •     "[S]enior managers are deferring expenses and pushing out IT expenditures ***in light of the uncertain U.S. economy***."  Williams Decl., Ex. E at 2.
23

24

_____

25 [1]     Defendants' prior motion to exclude Steinholt was almost entirely reliant upon the district

26 court's opinion in *In re Gilead Scis. Sec. Litig.*, No. C03-4999 MJJ, 2006 WL 1320466 (N.D. Cal. May 12, 2006).  That case has been reversed by the Ninth Circuit in August 2008, which has

27 correctly applied the Supreme Court's hold in *Dura* and the Ninth Circuit's hold in *Daou*. Defendants' failure even to cite to the Ninth Circuit's Controlling Opinion in *Gilead* speaks volumes.

28

- Shortfall was equally divided in [11i] applications and database.  *Id.* at 6-7.

- Will application growth get worse? – I don't know.  *Id.* at 8.

Plaintiffs have pled and will prove, as noted by Steinholt, that these disclosures were exactly the opposite of false affirmations during the Class Period that the Company was not and would not be affected by the slowing economy in part because 11i would sell to businesses interested in keeping costs down.  *See, e.g.*, Williams Decl., Ex. P ("We haven't changed our projections at all," Glass said.  "This slowdown is going to provide new opportunities for Oracle as companies need to streamline and be more strategic about the technology they buy.")  The Company repeatedly and falsely assured investors that the slowing economy was not hurting the Company's financial prospects and 3Q01 revenue and earnings forecast were on target.  *Id.*  Finally, the Company repeatedly stated that Suite 11i was working, earlier problems had been corrected, and sales were taking off, thus driving sales growth.  The March 1, 2001 announcement revealed that each of these were not true.  Indeed, by representing facts concerning Suite 11i functionality, investors were misled regarding the future prospects for 11i, *i.e.*, the likelihood that corporate customers would purchase Suite 11i in the future.[2]  Without the false claims, investors would not have expected these customers to be potential purchasers of the Suite 11i in the first place, and would therefore not have been surprised by the double digit percentage shortfall.

Defendants' assertions are further belied by news reports on March 2, 2001 which confirmed that the new information delivered by Oracle on March 1, 2001 had shocked investors not only because of the earnings miss but the size of it and the reasons for it.[3]  Williams Decl., Ex. F.  The *Los Angeles Times*, on March 2, 2001 after the announcement, noted that in December 2000,

---

[2]    The impact of the Suite 11i misrepresentations can be measured independently by the statistically significant increase in Oracle's stock price when Lawrence J. Ellison ("Ellison") claimed that the functionality problems had been fixed on November 30, 2000, a price increase that is similar to the price decline on March 2, 2001.  Williams Decl., Ex. M.

[3]    Whether defendants' fraud moved the market is largely determined from publicly available data as opposed to internal information.  *Ryan v. Flowserve*, 245 F.R.D. 560, 569 (N.D. Tex. 2007).  Steinholt's event study and loss causation analysis is reliable and helpful to the trier of fact and explains that evidence.  Fed. R. Evid. 702.

1   boasting of 11i applications, Oracle "said it wasn't being hurt by the slowdown because corporations

2   were buying [11i] applications software to cut costs and boost efficiency."  Williams Decl., Ex. D.

3   *The Wall Street Journal* reported that Oracle's "***reasons*** for the shortfall were at least as troubling to

4   analysts as its magnitude," also noting that Oracle's stock price tumbled in after hours trading

5   immediately after the market close announcement on March 1, 2001.  *Id.*

6           ***The reasons for the shortfall were at least as troubling to analysts as its***
        ***magnitude*** . . . .  While database sales have been slowing at Oracle for many quarters,
7       analysts were surprised by the abruptness of the latest downturn.  ***Oracle also said its***
        ***line of application software likely grew 50% in the quarter, well below earlier***
8       ***predictions that the business might grow by 75%-100%. . . .  Last week in New***
        ***Orleans, in fact, the company hosted thousands of customers for a trade show that***
9       ***highlighted its application business.  At the show, Oracle Chief Executive Larry***
        ***Ellison gave a bullish assessment of the application business, saying it was "really***
10      ***starting to take off*.**"

11  *Id.*

12          Also, on March 2, 2001, before the market opened, USB Warburg issued a report on the

13  Company's pre-announcement tying the earnings miss directly to defects and gaps in Suite 11i

14  applications and stating they found it "particularly puzzling to attribute a $200 million shortfall to

15  the last couple of days of the quarter to a change in the economic environment."  Williams Decl.,

16  Ex. G.

17          ***We also believe that the weakness in Oracle's applications business is because the***
        ***Company's applications are not yet ready for prime time. . . .  [L]ast week we***
18      ***learned over 200 patches had been developed for the CRM product for the latest***
        ***version*** . . . .   Although feedback from these customers suggested that they were
19      impressed with the idea of fully integrated Suite, ***we were unable to find any that***
        ***had fully integrated and gone live on the Suite***.[4]

20  *Id.*

21

22          This report is consistent with plaintiffs' proof which demonstrates that despite false fanfare

23  of Suite 11i technical prowess, Oracle had in fact, not before or during the Class Period,

24  implemented a full suite of working Suite 11i software anywhere.

25  _____

26  [4]      As alleged, defendants had falsely represented that Suite 11i was complete and fully
    integrated out of the box, including CRM and SCM.  Moreover, on December 14, 2000, Ellison had
27  falsely claimed that "*[w]e've got customers live on the whole E-Business Suite in 30-90 days*."
    Williams Decl., Ex. Q at 18.

28

1    Steinholt details his event study evidence demonstrating that the March 1, 2001

2    announcement that the Company would miss 3Q01 earnings forecasts and that the economy has

3    caused the shortfall "substantially revealed the relevant truth regarding Oracle's true performance as

4    alleged in the Complaint."  Williams Decl., Ex. A, ¶¶42-44.  Steinholt then determined that the

5    March 2, 2001 price decline from $21.38 to $16.88 was "highly statistically significant at the 99%

6    level of confidence."  *Id.*, ¶43.  Defendants' argument that the disclosure did not reveal "***any***

7    ***relevant fact***" is inconsistent with their own expert, who admitted, for example, that the March 1,

8    2001 provided new information about the Company's Suite 11i applications[5]:

9        Well, I think the announcement [ ] – provided the market with what I would view
         ***material new information regarding both the applications business as well as***
10       ***Oracle's other businesses*** and how they were faring in the then current economic
         environment. . . .   Well, I think ***it is clear to me that the market and market***
11       ***participants were concerned about the earnings miss and what it conveyed in terms***
         ***of future business prospects in the then current economic environment***.
12
     Williams Decl., Ex. O at 137:13-18, 137:22-138:1.
13
         Defendants do not (and cannot) explain with scientific or legal authority how on the one hand
14
     they contend the March 1, 2001 disclosure was material new information concerning 11i and the
15
     economy causing a statistically significant stock price decline but on the other hand claim that the
16
     disclosure revealed nothing relevant about the misrepresentations alleged.
17
         1.    **Steinholt's Method of Calculating Damages Under §10(b) Is**
18             **Reliable and Supported by Ninth Circuit and Supreme Court**
               **Jurisprudence**
19
         Steinholt calculated damages under the "out-of-pocket" measure using an event study
20
     methodology to determine the price at which Oracle's stock would have traded absent the alleged
21
     fraud:
22
             The most common method of calculating damages in Rule 10b-5 cases is the
23           out-of-pocket measure.  This text fixes recovery as the difference between the
             purchase price and the value of the security at the date of purchase less the difference
24           between the sale price and the value of the security at the date of sale.

25   _____

26   [5]    Defendants' reliance on *Ahlberg v. Chrystler Corp.*, 481 F.3d 630, 635-36 (8th Cir. 2007), is
     misplaced.  Defendants claim that in that case a proffered expert was excluded because the expert
27   had not applied any methodology to his analysis but they do not and cannot make a similar assertion
     in this case. *Id.* at 8.  The opinion does not bear on the relevant issues here.
28

1   Williams Decl., Ex. A, ¶48.

2          Defendants blatantly ignore controlling authority in the Ninth Circuit.  The out-of-pocket

3   methodology has been followed and explained in this Circuit in Judge Sneed's concurring opinion in

4   *Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1341-46 (9th Cir. 1976) (Sneed, J.,

5   concurring) (adopted in *Wool v. Tandem*, 818 F.2d 1433, 1436-37 (9th Cir. 1986) (damages are

6   measured by inflation at the time of purchase minus inflation at the time of sale)).  *Robbins*, 116 F.3d

7   at 1447 n.5 (proper measure of damages uses the "out of pocket rule").  In *Green*, the court discussed

8   the application of the methodology to determine the true value of a stock:

9          [I]t becomes necessary to establish, for the period between the date of the
           misrepresentations and the date of disclosure, data which when arranged on a chart

10         will form, on the one hand, a "price line" and, on the other, a "value line."  The price
           line will reflect, among other things, the effect of the corporate defendant's wrongful

11         conduct.  The establishment of these two lines will enable each class member
           purchaser who has not disposed of his stock prior to disclosure of the

12         misrepresentations to compute his damages by simply subtracting the true value of
           his stock on the date of his purchase from the price he paid therefor.

13   541 F.2d at 1344.

14         Steinholt explains that the out-of-pocket measure of damages for Oracle shares held through

15   March 1, 2001 is computed by "simply subtracting the true value of [class member's] stock on the

16   date of [class member's] purchase from the price he paid therefor."  Williams Decl., Ex. A, ¶¶49-50

17   (citing *Green*, 541 F.2d at 1344).[6]  The difference between Oracle's actual trading price and its

18   value, *i.e.*, the price at which Oracle shares would have traded absent the alleged fraud, represents

19   the inflation per share, also commonly referred to as the damages per share.  *Id.*, ¶50.  The value line

20   is calculated by backcasting, *i.e.*, working backwards replacing the stock's actual return on the fraud

21   related disclosure days with the predicted returns while using the stock's actual returns on other

22   days.  *Id.*  The event study methodology employed by Steinholt to construct the value line has been

23   recognized as "[t]he most common method of calculating damages in Rule 10b-5 cases," is fully

24   supported by academic literature, and will necessarily result in a constant percentage inflation during

---

26   [6]      Having now filed two *Daubert* motions to exclude Steinholt with largely the same
27   unsupported theories, defendants have carefully and inexplicably avoided Ninth Circuit authority in
     *Green* which supports the methodology performed by Steinholt in calculating damages.

28

periods with no fraud-related disclosures. *See* Williams Decl., Ex. A, ¶48 (quoting Bradford Cornell and R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev., 883, 885 (June 1990))[7]; *see also* Williams Decl., Ex. H.[8] Here again, defendants' expert agrees that the economic analysis – the out-of-pocket method – is appropriate method of calculating damages. Williams Decl., Ex. I, ¶43.

### 2. The Constant Percentage Inflation Methodology Is Appropriate and Reasonable

The constant percentage inflation methodology, as approved by the Ninth Circuit in *Green*, 541 F.2d 1335, remains viable post-*Dura*. *See, e.g.*, *Broadcom*, 2005 U.S. Dist. LEXIS 41976, at *9 ("The most venerable and widely followed explanation of how to calculate such damages comes from this Circuit in Judge Sneed's concurring opinion in *Green v. Occidental Petroleum Corp*. . . ."). Defendants' challenge to the usage of the constant percentage inflation methodology is not based on any economic evidence or authority suggesting a flaw in the constant percentage inflation; rather it is based on defendants' wrong-headed legal interpretation of *Dura*, which did ***not*** address the issue of how to calculate damages. Rather, the Supreme Court in *Dura* simply determined that price inflation

---

[7]     Courts in this circuit and others have relied on Bradford Cornell's article to identify how damages are calculated. *In re Intelligroup Sec. Litig.*, 468 F. Supp. 2d 670 ("The 'event study' approach first assumes that the price and value of the security move together except during days when disclosures of company-specific information influence the price of the stock, *see, e.g., RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587 (PKL) (RLE), 2000 U.S. Dist. LEXIS 4892, 2000 WL 310352, at *6 (S.D.N.Y. Mar. 24, 2000), and then determines whether those abnormal returns are due to fraud or non-fraud related factors. *See* Bradford Cornell & R. Gregory Morgan, Using Finance Theory to Measure Damages in Fraud Market Cases, 37 UCLA L. Rev. 883, 899-900 (1990); *accord Dura*, 544 U.S. at 341.").

[8]     Defendants' criticism of Steinholt's reference to the June 1990 UCLA Law Review article *Using Finance Theory to Measure Damages in Fraud on the Market Cases* and the 2001 *Litigation Services Handbook: The Role of the Financial Expert* is unfounded. *See* Dkt. No. 1199 at 15 n.9. First, defendants fail to take into account the fact that one of the authors of the law review article, Bradford Cornell, was a finance professor at the time, and the article was reviewed by several economists, including Dr. Myron Scholes. Second, the simple fact that reference material predates *Dura* does not invalidate the material as defendants would suggest. And lastly, defendants cite to a similar piece of academic literature in their challenge to Mr. Steinholt – an article titled *Just How Much Damage Did Those Misrepresentations Actually Cause And To Whom?: Damages Measurement In "Fraud On The Market" Securities Class Actions*, 1505 PLI/Corp. 285 (2005), which, in turn, cites to the UCLA Law Review article. *See* Dkt. No. 1199 at 14-15 (erroneously cited at 15 PLI/Corp. 285 (2005) by defendants).

1    **alone** is not sufficient to demonstrate loss causation, and then expressly stated that it "need not, and

2    do[es] not, consider other proximate cause or loss related questions."  *Dura*, 544 U.S. at 346.[9]

3            Indeed, defendants wholly conflate the facts alleged here, *Dura* and Ninth Circuit authority in

4    their demand for the exclusion of Steinholt because the constant percentage inflation theory is "tied

5    to the inflated purchase price rather than the relevant alleged economic loss." Defs' Mot. at 10.  This

6    red herring fails to acknowledge the truth of Steinholt's analysis which considers Oracle stock price

7    inflation during the Class Period **and** the price decline on March 2, 2001 after the relevant truth was

8    disclosed.  *See* Steinholt Report at 26 ("[T]he value line was then calculated using the predicted

9    returns for the fraud-related days (December 15, 2000 through March 2, 2001), and the actual returns

10   for all other days . . . .").[10]

11           Moreover, defendants' interpretation of *Dura* has been soundly rejected, for example, by

12   Judge Tevrizian in *Broadcom Corp.*, 2005 U.S. Dist. LEXIS 41976.  In *Broadcom*, an objector to

13   plaintiff's Motion for Final Approval argued that the plan of allocation was unlawful because "*Dura*

14   prohibits considering inflation on the day of purchase as any element of a damages calculation."  *Id.*

15   at *13.  Judge Teverizian explained that that *Dura* "does not hold that purchase time inflation is

16   irrelevant to a loss formula."  *Id.* at *14 ("'If the purchaser sells later after the truth makes its way

17   into the marketplace, an initially inflated purchase price might mean a later loss.'") quoting *Dura*,

18   544 U.S. at 342-343 ("higher purchase price will sometimes play a role in bringing about a future

19   loss").  Other courts in this district have allowed the expert testimony on the constant percentage

20   inflation theory.  *See In re JDS Uniphase Corp.*, No. 02-01486-CW, Amended Minute Order (N.D.

21   Cal. Oct. 9, 2007) (Williams Decl., Ex. U) (a post-*Dura* securities case in this district, denying

22   _____

23   [9]       An alternative and more sensible interpretation of *Dura*, fully consistent with the out-of-
     pocket methodology used by Mr. Steinholt, is found in Madge S. Thorsen, Richard A. Kaplan and

24   Scott Hakala, *Rediscovering the Economics of Loss Causation*, 6. J. Bus. & Sec. L. 93, 95:  Loss
     causation exists whenever fraud leads the stock price to be higher than it should be, the buyer pays

25   "too much" for the stock, and the buyer is unable to recover that overpayment in the marketplace.

26   [10]     Defendants in their prior *Daubert* motion had suggested that the latter measure, the residual

27   dollar decline, alone was the measure that should be applied.  Dkt. No. 1199.  Defendants have
     inexplicably abandoned that argument here.

28

1   *Daubert* motion to exclude expert used the constant percentage method to calculate inflation.)  In

2   *JDS Uniphase*, the court noted it was the court's job to determine whether the testimony could be

3   presented to the jury and not whether the expert's conclusions were right or wrong, ultimately

4   allowing presentation of the constant percentage inflation methodology.[11]  Williams Decl., Ex. R.

5          Defendants' reliance on *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195 (D. Okla. 2007), to

6   suggest that the constant percentage inflation method is no longer viable after *Dura* is misplaced.

7   Defs' Mot. at 10.  Significantly, however, defendants fail to acknowledge that the *Williams* court

8   actually approved of the use of the constant percentage method of calculating damages in a case like

9   this with a short class period of a mere two and a half months:

10         > The court can conceive of a case, involving a short class period, in which the
           > constant percentage inflation approach would at least clear the *Daubert* hurdle,
11         > leaving the final determination of the merits of the matter to be resolved by the finder
           > of fact.

12  *Id.* at 1270 n.54.  *Williams* is also factually inapposite.  In *Williams*, the class period was

13  approximately 21 months and the first "corrective disclosure" did not occur until month 18 of the

14  class period.  *Id.*  There plaintiffs sought to recover massive damages under a "leakage" theory and

15  stock price declines occurring ***before*** any company specific information was disclosed.  *Id.*  There,

16  the court noted this fact when it reached the fact-specific conclusion:

17         > Where, as in the case at bar, the value of a common share is ***driven down to the***
18         > ***penny stock range by forces unrelated to revelation of the fraud . . . the application***
           > ***of the constant percentage inflation approach would give the equity investor the***
19         > ***"partial downside insurance policy"*** which *Dura* counsels that the securities law
           > should not provide.

20  *Id.* at 1270 (emphasis added).

21  Steinholt and plaintiffs do not advance a damages theory based upon leakage of information or price

22  declines occurring before the revelation of the truth on March 1, 2001.

23         Defendants' demand for exclusion due to the usage of the constant percentage inflation

24  methodology is unsupported and must fail.  In any event, it is within the district court's discretion to

25  _____

26  [11]      *See also In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, No. H-01-3624, 2008 U.S.
    Dist. LEXIS 84656 (S.D. Tex. Sept. 8, 2008) approving measurement of losses based upon inflation
27  using value line methodology.  *Id.* at 44 n.5.

28

1    determine the method of calculating damages.  *See Blacke v. Barrack*, 524 F.2d 891, 909 (9th Cir.

2    1975).

3        **3.      Defendants' Quibbling with Market Index v. Peer Group
                    Index Is a Red Herring**

4

5        In order to calculate damages per share, Steinholt used an event study which calculated the

6    predicted return on December 15, 2000 (the first day of the Class Period) and March 2, 2001 (the

7    day after the relevant disclosure).  In order to measure the market effect, Steinholt used the

8    NASDAQ 100, a capitalization-weighted index.  Williams Decl., Ex. A, ¶53.  Defendants argue that

9    Steinholt's testimony should be excluded because they say he did not eliminate portions of the

10   March 2, 2001 stock price decline attributable to "industry-specific forces" – forces which

11   defendants' motion does not explain or identify.  Defs' Mot. at 6.  Specifically, defendants argue that

12   the NASDAQ index was not the appropriate index to use in the performance of an event study.  *Id.*

13   at 5.  Defendants – again – provide no authoritative support that the NASDAQ 100 index is an

14   improper element of the event study.  In fact, defendants' arguments appear more opportunistic than

15   grounded on economic theory and represents a continuing trend of shifting positions that have

16   become frequent in this case.  For example, defendants in this case submitted the Declaration of

17   Stefan Boedeker in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification

18   (Dkt. No. 298), which relied entirely on the NASDAQ-100 to measure the performance and price

19   movement of Oracle during the Class Period in comparison to companies similar to Oracle.  In his

20   declaration on behalf of Oracle, Boedeker wrote:

21       •    "It is a well established principle of financial economics that any effort to identify,
              segregate, and measure the price effect of an alleged fraud must control for market-
22            driven price movements unrelated to the alleged fraud.  But during the proposed class
              period, Oracle's stock price movements generally mirrored those of the broader
23            market as measured by the NASDAQ-100, an index of stock performance for
              companies similar to Oracle."  *See* Williams Decl., Ex. J, ¶6.

24       •    "The NASDAQ-100 Composite Index measures the performance of the 100 largest
              non-financial firms (by market capitalization) listed on the NASDAQ Stock Market.
25            The Index predominantly reflects the performance of high technology companies like
              Oracle.  Exhibit 1 shows the daily opening and closing prices for the NASDAQ-100
26            Index and for Oracle stock during the four months that encompass the proposed class
              period."  *Id.*, ¶7.

27       •    "During the proposed class period – from the December 14, 2000 open to the
              March 1, 2000 close – (Oracle's stock performance roughly matched that of the
28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' REVISED *DAUBERT* MOTION TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY OF BJORN I. STEINHOLT - C-01-0988-SI            - 14 -

1  NASDAQ-100 index.  Oracle's stock price fell 26.9%, while the NASDAQ-100
   Index fell 28.3%.  Indeed, within the proposed class period Oracle's stock generally
2  followed the NASDAQ-100 as it rose and fell."  *Id.*, ¶¶8-9.

3  Defendants' motion is notably silent on this key undermining fact.[12]

4  In addition, even the authority that defendants rely upon, John Y. Campbell, *et al.*, *The*

5  *Econometrics of Financial Markets* (1997) confirms that the "one factor" market model used by

6  Steinholt, as opposed to a "multifactor" industry model is the appropriate model and that the industry

7  multifactor model produces limited, if any, analytical gains:

8  Typically the factors are portfolios of trade securities.  The market model is an
   example of a one-factor model, but in a multifactor model one ***might*** include industry
9  indexes in addition to the market.  Sharpe (1970) and Sharpe, Alexander, and Bailey
   (1995) discuss index models with factors based on industry classification.

10                                    *       *       *

11     ***In practice the gains from employing multifactor models for event studies***
12  ***are limited***.  ***The reason for this is that the marginal explanatory power of***
    ***additional factors beyond the market factor is small, and hence there is little***
13  ***reduction in the variance of the abnormal return***.  The variance reduction will
    typically be greatest in cases where the sample firms have a common characteristic,
14  for example they are all members of one industry or they are all firms concentrated in
    one market capitalization group.  In these cases the use of a multifactor model
15  warrants consideration.

16  *See* Williams Decl., Ex. S at 155-156.

17  In any event, Steinholt's analysis did account for and eliminate both industry and market

18  factors, and opined plaintiffs' losses were proximately caused by Company-specific factors and his

19  report explains it.  Williams Decl., Ex. A, ¶¶40-46.  Steinholt used the NASDAQ 100 index – a

20  capitalization-weighted index of the 100 largest and most active non-financial domestic and

21  international companies listed on the NASDAQ that includes large technology companies – to

22  remove such factors.  Williams Decl., Ex. A, ¶53; Williams Decl., Ex. L at 179:8-19.  Steinholt also

23  specifically reviewed the so-called peer group referred to by James and determined that the use of

24

25  _____

26  [12]  On March 2, 2001 Reuters published an article titled "Oracle stocks tumble in heavy trading
    after warning," discussing that analysts had cut their ratings on Oracle shares and predicted that "the
27  announcement . . . ***would drag the tech-laden NASDAQ down*** . . . ."  Williams Decl., Ex. K.  *See*
    *also* Williams Decl., Ex. T.

28

1   the NASDAQ 100 produced superior results.[13]  *See* Williams Decl., Ex. M, ¶10.  Notably, six of the

2   nine companies in the peer group identified by James are also in the NASDAQ 100 index used by

3   Steinholt.  *See* Williams Decl., Ex. M.  Steinholt particularly considered "media reports regarding

4   Oracle and its industry issued during the relevant time period."  Williams Decl., Ex. A, ¶4(g).

5   Steinholt also considered the "price and volume data for Oracle common stock, as well as for the

6   ***industry*** and ***market indices***."  *Id.*, ¶4(h) (emphasis added).  Steinholt went even further and

7   analyzed the specific competitors identified by Oracle's expert, James and determined that James'

8   analysis was of little utility as the companies must be looked at individually:

9            [Y]ou have to analyze these companies on a company-specific basis because
         there are just too many variables . . . with each company.  And . . . when one
10       company goes up, the other one goes down so the index may look like it's flat, but
         that's not really the story here. . . .  [T]here's a reason why some companies decline
11       and other companies increase.

12  Williams Decl., Ex. L at 114:7-14; *see also* Williams Decl., Ex. L at 115:8-20.

13            Defendants' expert conceded that even using his industry indices, the March 2, 2001 stock

14  price decline cannot be explained by the market and industry alone and that James' calculation of

15  residual returns would result in greater damages than Steinholt.  Finally, it is important to note that,

16  as admitted by James, other software stocks declined ***in response*** to the new information disclosed

17  by Oracle on March 1, 2001 – not the other way around.  *See* Williams Decl., Ex. B, ¶3c; *see also*

18  Defendants' Revised Motion for Summary Judgment at 42 ("***Following*** Oracle's March 1, 2001

19  announcement, all of Oracle's competitor's stock prices declined . . . .") (emphasis added).

20            Nothing in the record or economic theory supports defendants' claim that Steinholt's event

21  study was defective or unreliable.

22

23

24

25

---

26  [13]    Comparing the adjusted r-squared of the regression models, or the proportional variability
    that is accounted for by the statistical model (Williams Decl., Ex. M, ¶10), and noting James'
27  estimate of the price decline on March 2, 2001 net of market and industry factors is ***greater*** than
    Steinholt's estimate.  *See id.*, ¶12.

28

**4.    Steinholt's Analysis of Section 20A Damages Is Reliable and Does Not Violate *Dura***

Steinholt's analysis of §20A damages is reliable and comports with all applicable law. Defendants do not contest the two types of damages calculated by Steinholt – profits made and losses avoided. Defs' Mot. at 11-12. Rather, in a desperate attempt to avoid the staggering resultant amounts – more than $160 million and approximately $451.8 million respectively by type – defendants again attempt to challenge Steinholt's "assum[ption] that 100% of the residual [price] drop was fraud-related and [his] fail[ure] to account for industry [related] factors that influenced Oracle's stock price decline. *Id.* Yet again, defendants offer no legal support for this contention but rely on their flawed interpretation of the Supreme Court's Opinion in *Dura* discussed above. Nonetheless, the fact remains that based upon his analysis and assumption that plaintiffs will prove their case, Steinholt determined that the entire price drop was caused by factors that relate to the alleged fraud. Williams Decl., Ex. L at 178:13-179:13; Williams Decl., Ex. A, ¶¶52-53. Thus, he determined through careful and thorough analysis of available news report and information that no Oracle-specific, non-fraud related information was disclosed on March 1, 2001. Defendants have not identified any. *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501 (N.D. Ill. 2007). No legal authority, including *Dura*, requires an expert or even a plaintiff to apportion fraud. Moreover, neither defendants nor their experts have identified, let alone quantified, any Company-specific factors unrelated to the alleged fraud disclosed March 1, 2001.

Even more frivolous is defendants' challenge to Steinholt's use of the average closing price between March 16, 2001 and April 30, 2001 to calculate loss-avoided damages. Defs' Mot. at 11-12. Defendants ignore the fact that this period represents the first trading window during which defendants Ellison and Jeffrey O. Henley ("Henley") could trade after the March 1, 2001 disclosures and claim that Steinholt was required to use March 2, 2001. Dkt. No. 1199 at 16. Defendants rely solely upon *SEC v. MacDonald*, 699 F.2d 47, 55 (1st Cir. 1983), which rather than providing that the date used to measure loss avoided damages shall be ***no later*** than the date on which the information has been reasonably disseminated simply states that the date should be within a "reasonable time after the inside information had been generally disseminated." *Id.* Moreover, the relevant statutory

1  provision provides that "[t]he total amount of damages imposed under subsection (a) shall not

2  exceed the profit gained or *loss avoided* in the transaction or transactions that are the subject of the

3  violation." 15 U.S.C. §78t-1(b) (emphasis added). Because Ellison and Henley were subject to

4  trading windows, March 16, 2001 and April 30, 2001 were the *first available periods* during which

5  Ellison and Henley could have traded their stock after March 1, 2001 *in order to avoid loss*. *See*

6  Williams Decl., Ex. N. Thus, the period used by Steinholt was indisputably within a "reasonable

7  time after the inside information had been generally disseminated." *MacDonald*, 699 F.2d at 55. In

8  sum, Steinholt's analysis of §20A damages is reliable and comports with all applicable law;

9  defendants' challenge to the methodology used by Steinholt to calculate §20A damages fails.

**III.    CONCLUSION**

11  For the foregoing reasons, plaintiffs respectfully request that the Court deny Defendants'

12  Revised *Daubert* Motion to Exclude Expert Opinions and Testimony of Bjorn I. Steinholt.

13  DATED: November 17, 2008                    Respectfully submitted,

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS
WILLOW E. RADCLIFFE
ELI R. GREENSTEIN
DANIEL J. PFEFFERBAUM


                                                    s/ Shawn A. Williams
                                            ─────────────────────────────
                                                SHAWN A. WILLIAMS

100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

1

2                           COUGHLIN STOIA GELLER
                            RUDMAN & ROBBINS LLP

3                           MARK SOLOMON
                          DOUGLAS R. BRITTON

4                           655 West Broadway, Suite 1900
                          San Diego, CA  92101

5                           Telephone:  619/231-1058
                          619/231-7423 (fax)

6                           COUGHLIN STOIA GELLER
                            RUDMAN & ROBBINS LLP

7                           STACEY M. KAPLAN

8                           9601 Wilshire Blvd., Suite 510
                          Los Angeles, CA  90210

9                           Telephone:  310/859-3100
                          310/278-2148 (fax)

10                           Lead Counsel for Plaintiffs

11 S:\CasesSD\Oracle3\BRF00055364 Opp Exclude Steinholt_rev.doc

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 17, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I further certify that I caused this document to be forwarded to the following designated Internet site at:  http://securities.csgrr.com/.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on November 17, 2008.

s/ Shawn A. Williams
SHAWN A. WILLIAMS
COUGHLIN STOIA GELLER
        RUDMAN & ROBBINS LLP
100 Pine Street, 26th Floor
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail: shawnw@csgrr.com

# Mailing Information for a Case 3:01-cv-00988-SI

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jennie@libertylaw.com

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Doug Britton**
  dougb@csgrr.com,jillk@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_s

- **Joy Ann Bull**
  JOYB@csgrr.com

- **Dorian Estelle Daley**
  dorian.daley@oracle.com

- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,svdocket@lw.com,zoila.aurora@lw.com

- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com

- **Tera Marie Heintz**
  theintz@morganlewis.com,eeberline@morganlewis.com

- **Stacey Marie Kaplan**
  SKaplan@csgrr.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com,sf_filings@hbsslaw.com

- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com,#sfdocket@lw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **William S. Lerach**
  e_file_sd@lerachlaw.com

- **James C. Maroulis**
  jim.maroulis@oracle.com

- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com

- **Brian P Murray**
  bmurray@murrayfrank.com

- **Shinyung Oh**
  shinyungoh@paulhastings.com

- **Dawn S. Pittman**
  dpittman@morganlewis.com

- **Willow E. Radcliffe**
  willowr@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Mark Solomon**
  marks@csgrr.com,e_file_sf@csgrr.com,sholloway@csgrr.com,e_file_sd@csgrr.com

- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,e_file_sf@csgrr.c

- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Corey D. Holzer**
Holzer Holzer & Cannon LLC

1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

**Raymond Lane**
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

**PRG-Schultz USA, Inc.**
Paul Hastings Janofsky & Walker LLP
55 Second Street
24th Floor
San Francisco, CA 94105

**Darren Jay Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

**Sanna Rachel Singer**
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111

**Monique C. Winkler**
Coughlin Stoia Geller Rudman & Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111