Exhibit H

LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
MARK SOLOMON (151949)
DOUGLAS R. BRITTON (188769)
VALERIE L. McLAUGHLIN (191916)
GAVIN M. BOWIE (235532)
STACEY M. KAPLAN (241989)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
marks@lerachlaw.com
dougb@lerachlaw.com
valeriem@lerachlaw.com
gbowie@lerachlaw.com
skaplan@lerachlaw.com
   – and –
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
MONIQUE C. WINKLER (213031)
ELI R. GREENSTEIN (217945)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@lerachlaw.com
willowr@lerachlaw.com
moniquew@lerachlaw.com
elig@lerachlaw.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION | Master File No. C-01-0988-MJJ |
| | CLASS ACTION |
| This Document Relates To: | APPENDIX TO THE EXPERT REPORT OF BJORN I. STEINHOLT, CFA |
| ALL ACTIONS. | |

| **Document Description** | **Exhibit** |
|---|---|
| Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance*, Vol. 25, Issue 2 (May 1970) | 1 |
| Eugene F. Fama, "Market Efficiency, Long-Term Returns, and Behavioral Finance," *Journal of Financial Economics*, Vol. 49 (1998) | 2 |
| William F. Sharpe & Gordon J. Alexander, *Investments* (4th ed. Prentice Hall 1990) | 3 |
| "Oracle 2nd-Qtr Profit Seen Higher as Other Tech Leaders Stumble," *Bloomberg*, Dec. 14, 2000 | 4 |
| "Oracle 2nd-Qtr Net Rises 62%; Applications Sales Jump (Update 2)," *Bloomberg*, Dec. 14, 2000 | 5 |
| Transcript of Oracle Corporation conference call held on December 14, 2000 with Larry Ellison and Jeff Henley | 6 |
| First Union Securities, Inc. December 15, 2000 analyst report on Oracle Corp. | 7 |
| Bear Stearns December 15, 2000 analyst report on Oracle Corp. | 8 |
| Jeff Finkle, "Oracle CFO Says He Plans to Sell $33 Mln in Stock," *Bloomberg*, Jan. 11, 2001 | 9 |
| First Union Securities February 7, 2001 analyst report on Oracle Corp. | 10 |
| Mike Tarsala, "Oracle Says Tech Slowdown Is Passing It By," *MarketWatch*, Feb. 13, 2001 | 11 |
| Deutsche Banc Alex. Brown February 21, 2001 analyst report on Oracle Corp. | 12 |
| BlueStone Capital March 1, 2001 analyst report on Oracle Corp. | 13 |
| William Blair & Company February 21, 2001 analyst report on Oracle Corp. | 14 |
| Madge S. Thorsen, Richard A. Kaplan & Scott Hakala, "Rediscovering the Economics of Loss Causation," *Journal of Business and Securities*, Vol. 6, Issues 1 & 2 (Spring 2006) | 15 |
| Press release, Oracle Corp., "Oracle Announces Preliminary Third Quarter Earnings Results" (Mar. 1, 2001) | 16 |
| Press release, Oracle Corp., "Oracle Net Income Up 16%, Earnings Per Share $0.10, Applications Sales Up 25%, Database Sales Up 6%" (Mar. 15, 2001) | 17 |
| CIBC World Markets March 16, 2001 analyst report on Oracle Corp. | 18 |
| Bradford Cornell & R Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," 37 UCLA L. Rev. 883 (June 1990) | 19 |

| Document Description | Exhibit |
|---|---|
| Nicholas I. Crew, Patrick G. Goshtigian, Marnie A. Moore & Atulya Sarin, "Securities Act Violations: Estimation of Damages," *Litigation Services Handbook: The Role of the Financial Expert*," Ch. 17 (3rd ed. 2001) | 20 |
| Declaration of Stefan Boedeker in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification and Exhibit 1 thereto | 21 |

S:\CasesSD\Oracle3\APP00042273.doc

## DECLARATION OF SERVICE BY HAND DELIVERY

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and employed in the City and County of San Francisco, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 100 Pine Street, Suite 2600, San Francisco, California 94111.

2.      That on May 25, 2007, declarant caused to be hand delivered the **APPENDIX TO THE EXPERT REPORT OF BJORN I. STEINHOLT, CFA** to the following party:

> Peter A. Wald
> Michel F. Kyrouz
> LATHAM & WATKINS LLP
> 505 Montgomery Street, Suite 2000
> San Francisco, CA 94111

3.      That there is a regular communication by mail between the place of mailing and the place so addressed.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 25th day of May, 2007, at San Francisco, California.

_____
JOHN MAYER

# EXHIBIT 15

# REDISCOVERING THE ECONOMICS OF LOSS CAUSATION

*Madge S. Thorsen, Richard A. Kaplan, Scott Hakala*[1]

6 J. Bus. & Sec. L. 93

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 94
II.    WHAT IS THE RELEVANT LOSS AND HOW DOES IT OCCUR? ...................... 95
     A. What is loss? .................................................................................. 95
     B. Inflationary Loss Occurs Whenever Inflation Cannot Be Recouped .............. 97
III.   HOW DOES INFLATION OCCUR? ................................................................ 99
IV.   HOW DOES DISSIPATION OCCUR? ............................................................ 101
     A. The fraud is revealed ................................................................... 101
     B. Improprieties are revealed ........................................................... 102
     C. Questions or Concerns are Raised ................................................ 102
     D. True Financial Condition is Revealed ........................................... 102
     E. Leakage of information ................................................................ 103
     F. Market Forces Operating on the Fraud ......................................... 105
     G. Collapse of the Company ............................................................. 106
     H. Interplay of Dissipating and Inflating Events and Manipulation of Market
        Reaction.................................................................................... 107
V.     EVENT STUDIES DEMONSTRATE INFLATION AND DISSIPATION ............... 109
VI.    VALUATION TECHNIQUES ......................................................................... 112
VII.   HOW DOES THE ECONOMIC ANALYSIS FARE IN THE COURTS? ............... 113
VIII.  ALONG COMES *DURA* ............................................................................ 116
IX.    A *PER SE* RULE OR ON-GOING DEVELOPMENT CONSISTENT WITH ECONOMICS? .... 117
X.     POST-*DURA* DECISIONS: ANY MORE CLARITY? ...................................... 119
XI.    CONCLUSION .......................................................................................... 123

---

[1] Ms. Thorsen, J.D., and Mr. Kaplan, J.D., M.B.A, are trial lawyers and partners in Thorsen Kaplan, L.L.P., and have each represented plaintiffs and defendants in securities fraud cases. Dr. Hakala, Ph.D., CFA, is an economist, financial analyst and Director of CBIZ Valuation Inc. Dr. Hakala has testified for plaintiffs in securities fraud cases, and for plaintiffs and defendants in other valuation matters. The points of view expressed herein are those of the authors and do not reflect the views of their clients, CBIZ Valuation or Thorsen Kaplan L.L.P. The authors acknowledge the invaluable assistance of Shannon N. Lambert Cooper, 2005 cum laude graduate of the University of Minnesota Law School.

# I. INTRODUCTION

Securities fraud litigation visited the Supreme Court in *Dura Pharmaceuticals, Inc. v. Brouda*,[2] and left, again, unenlightened. The Court was asked to consider how investors could plead and prove causation. More specifically, the issue was whether it is sufficient to plead that an investor paid an inflated price for a stock on the day of purchase, and nothing more, in alleging that fraud caused such loss?[3] The Court held that such a statement, standing alone, was not enough to plead (or prove) "loss causation" in these cases.[4] Beyond that, the Court left the doors wide open: to plead causation in a securities fraud case, it said, a plaintiff should "provide a defendant with *some indication* of the loss and the causal connection that the plaintiff *has in mind*."[5] The Court explicitly stated that it was making no other ruling on proximate cause.[6]

Nonetheless, the Supreme Court's dicta in *Dura* created a battleground: Is the only viable way to plead or prove loss causation to demonstrate that the truth about corporate fraud was revealed and was immediately followed by a drop in the corporation's stock price?

This view has gained some traction in the lower courts because it is superficially simple and logical. Losses occur every day in the market. Securities fraud laws are not a guarantee against those ordinary losses. If a company publicly admits accounting irregularities, confessing that "we cooked the books," and then its stock price drops, it is logical to infer that the fraud caused the drop and the company should be held responsible for it. Investors who sell at that point have experienced a loss directly caused by the "cooked books", as the reasoning goes, and their losses can be measured by the amount of the immediate drop (this is a situation that is easily distinguished from the typical market "gamble," against which the law does not protect. Can it be that "truth, then price drop" is the *one and only* template for pleading or proving cause in a fraud-on-the-market case? Has the question—"what is truth?"—finally been answered? Fraud is as varied as the corporate imagination. Despite this fact, could the Supreme Court have intended to establish a narrow litmus test for pleading or proving fraud? The Court seems to have made clear that it had no such agenda.[7] It contemplated a robust examination of facts and circumstances and an ongoing debate about proximate cause. By adopting a simplistic formula, the underlying economic principles that should guide these decisions are obscured. This, in turn, hinders the continuing development of the law on causation, which the Supreme Court expressly left open.

A clear path back to the issues that should remain at the heart of the debate does indeed exist. The starting point is not new; it is based on long-established precedent and accepted economic theory. We express it as follows:

---

[2] 125 S. Ct. 1627 (2005).
[3] *Id.*
[4] *Id.* at 1631.
[5] *Id.* at 1634 (emphasis added).
[6] *Id.* at 1633-34.
[7] *Id.*

Loss causation exists whenever fraud leads the stock price to be higher than it should be, the buyer pays "too much" for the stock, and the buyer is unable to recover that overpayment in the marketplace.

This test is derived from formulations long accepted by courts, but it seems to have been lost somewhere in the shuffle of confusing terminology and procedural vagaries that take place in litigation. It is consistent with the economic, legal and public policy principles underpinning fraud-on-the-market cases and allocates relevant risks fairly to plaintiffs and defendants alike. It mirrors what happens in the real world. It is not foreclosed by *Dura* and in fact is entirely consistent with the same dicta that gave birth to the overly simplistic "truth, then price drop" formula. So long as meticulous attention is paid to terminology and concepts are clearly provided and explained, the test is readily accessible and easy to understand by fact-finders, be they courts or juries.

## II. WHAT IS THE RELEVANT LOSS AND HOW DOES IT OCCUR?

Our examination begins with the basics: what is a fraud-on-the-market securities fraud case and how do investors experience loss as a result of this kind of corporate wrong doing? We approach the issues in lay, legal and econometric terms.

### A. What is loss?

The stock market is presumed to operate on the efficient market theory. An efficient market has many participants. These participants all implicitly trade in reliance on a stock price that should reflect all public information—and this reliance is quite reasonable. The fundamental idea is that the market reacts to all available information to assess the present value of future cash flows of the firm, which in turn will set securities prices. Price is a dynamic, not a static, concept and the market may re-evaluate and re-price a stock on a daily, hourly or even momentary basis.

The Supreme Court accepted the efficient market theory in *Basic Inc. v. Levinson*[8] as the foundation of Section 10(b)(5) "fraud-on-the-market" cases. In a "fraud-on-the-market case", an investor need not show actual reliance on a false statement; rather, reliance is presumed.[9] Moreover, in such a case, fraud has always come to light to some way, shape, or form, otherwise, there would be no litigation. The controversial question is: Once fraud has been established or pled, how can investors establish that the fraud caused their losses?

---

[8] 485 U.S. 224, 248 (1988).

[9] *Id.* at 247. The Court referred to two prominent articles on the efficient market hypothesis. *See* Roger J. Dennis, *Materiality and the Efficient Capital Market Model: A Recipe for the Total Mix*, 25 WM. & MARY L. REV. 373 (1984) and Daniel R. Fischel, *Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities*, 38 BUS. L.J. 1 (1982). The Supreme Court has not questioned *Basic*, nor has Congress ever legislated to alter the Supreme Court's interpretation in that respect; thus, the efficient market theory remains the foundation of the fraud-on-the-market cause of action and we accept it fully here. Some, however, have queried how efficient the market really is and whether the theory should hold in every instance. *See, e.g.,* William O. Fisher, *Does the Efficient Market Theory Help Us Do Justice in a Time of Madness?*, 54 EMORY L.J. 843 (2005). There are variants on the efficient market theory that we do not address herein, other than to note that *Basic* is viewed as adopting the "semi-strong" form of the hypothesis. *See, e.g., In re* Res. Am. Sec. Litig., 202 F.R.D. 177, 189 n.12 (E.D. Penn. 2001).

So how, in the real world, does loss occur due to fraud? A naïve investor might think that because fraud causes stock prices to go up, not down, everybody would make more money as a result. However, fraud infuses false (material) information into the mix of other material information underlying the stock price (or omits to state material information). The market values that false information or omission, and the overall stock price becomes artificially inflated. The value of the firm is then inaccurate because a falsehood has been issued or the truth has been omitted.[10] The value of the false information (or the value incorrectly attributed to the price because true information is omitted) is sometimes referred to in securities litigation as the "inflationary component" of the price.[11] The stock then moves through the marketplace with both a true value and an inflationary component, the latter of which is based on the fraud. The stock's "absolute" price—the dollar amount at which it is actually trading in the real world—will be composed, in other words, in part of true value and in part of inflation.

We digress at this point, momentarily, to comment on terminology. In this area, the word "price" is used in surprisingly confusing ways. Parties, commentators, experts, and courts, including the Supreme Court in *Dura*, may use the word "price" to mean the "price at which the stock actually trades," (as we use it) or alternatively, and usually without clarification, the "abnormal" part of the price infused into the stock by fraud. "Value" is also sometimes used with similar lack of clarity. Likewise, "loss," "investment loss," "economic loss," "inflationary loss," and "transaction loss" may also be used indiscriminately. In this article, we use the term: "price" to mean the price at which a stock actually trades; "inflationary component" or "inflation" to mean the part of the price infused with fraud; "investment loss" to mean the difference between the price actually paid for the stock and the price at which it is sold (or the price on a measurement date required by law); and "inflationary loss" to mean the loss due to the fraud (measured by inflation on the day of purchase minus inflation on the day of sale—or measuring date).[12]

In order to clarify our use of the terms "inflation" and "inflationary component," consider the following example: ABC Corporation announces that its new product sales exceeded analyst and investor expectations by 30% and are projected to continue to do so in the future. Assume that the stock market responds by increasing the stock price to $130 from $100 per share on the announcement, based on heightened expectations for sales (and corresponding firm value) in the future. The announcement was completely false and a product of the company "cooking its books". The $30 increase, which we will assume is entirely attributable to the false announcement, is the "inflationary component."[13] An investor who purchased at the inflated price has paid too much. This

---

[10] As noted, either affirmative misrepresentations or omissions may cause this. For convenience, we do not consistently separately address omissions nor the more unusual situations where fraud is intended to deflate price. Similarly, we use ordinary stock purchases and sales in our examples, not situations such as options or short sales. The economic principles discussed herein apply, however, to these fact patterns as well.

[11] In statistical terms, it may also be called the "abnormal return" or the "residual return."

[12] Legal terminology related to causation is also confusing – "transaction causation" and "loss causation" are actually poorly defined concepts, *see infra* section VII. In some ways, "transaction causation" may be associated with the investment loss and "loss causation" associated with the inflationary loss.

[13] That would be true if it were an uneventful day for the stock market and ABC's industry generally, and if the unexpected positive announcement was the only new material information that occurred on that day. Needless to say, the real world is often, if not always, more ambiguous.

inappropriate over-payment may result in compensable loss, depending upon what happens next, as we discuss below.[14]

Inflation can be introduced into a stock price even without an absolute share price increase. In fact, inflation can be introduced even where there is a price decline.[15] Consider the following two scenarios. First, assume that on Day 1, XYZ Corporation's stock is trading at $100. On Day 2, XYZ reports that its earnings were in fact 50% below expectations and the stock price responds by dropping 50% to a share price of $50. Alternatively, assume that on Day 2, XYZ concealed that the earnings disappointment was so large, and instead falsely reported that the earnings were only 10% below expectations. The stock price drops by ten percent to $90 upon that news. Inflation has still been introduced into the price even though the price has gone down, and an investor who purchases a share on Day 2 has paid $40 too much. Of the $90 price on Day 2, $40 is the inflationary component and $50 is the true value.

We are distinguishing here between "what I lost due to fraud" and "what I lost in the stock market." This often confuses ordinary investors (and sometimes sophisticated ones), who, having lost a bundle, think that a securities fraud case will result in their recovery of every dollar actually lost. Investment loss is not the same as inflationary loss. Many forces cause investment loss as a whole, and securities fraud law is not concerned with recovering an investor's ordinary market losses. Rather, the law is concerned with restoring to investors the inflationary component of price that they paid, which they cannot recoup in the market. Thus, only inflationary losses are legally cognizable. It must be specifically identified and distinguished from the investment loss as a whole, often through statistical and other valuation techniques as we will further address.

## B. Inflationary Loss Occurs Whenever Inflation Cannot Be Recouped

The apparent struggle in securities fraud cases to identify when a relevant loss has occurred is based on 1) confusion of terminology;[16] 2) failure to appreciate or accept the economics underlying the efficient market hypothesis;[17] 3) concerns about the nature of

---

[14] See infra section IV.

[15] See, e.g., In re Bristol Meyers Squibb Sec. Litig., 2005 WL 2007004 (D.N.J. 2005); Nathenson v. Zonagen Inc., 267 F.3d 400, 419 (5th Cir. 2001) ("We also realize that in certain special circumstances public statements falsely stating information which is important to the value of a company's stock traded on an efficient market may affect the price of the stock even though the stock's market price does not soon thereafter change.")

[16] John. C. Coffee, Causation by Presumption: Why the Supreme Court Should Reject Phantom Losses and Reverse Broudo, 60 BUS. LAW. 533 (2005) (hereinafter Coffee, Causation by Presumption). We have addressed the terminology problem and believe clear, consistent definitions can go a long way toward resolving confusion. See supra note 12 and accompanying text.

[17] See Id. at 534; 547 (expressing skepticism that the efficient market theory can be properly understood by jurors and querying whether Basic would be "significantly curtailed.")

the evidentiary proof of loss;[18] and 4) concerns that the scope of potential liability is unfairly broad and must be minimized in every reasonable way.[19]

These concerns can be minimized and met through an understanding of economic concepts. The identification of loss is conceptually simple and straightforward: *inflationary loss occurs whenever an investor who paid too much is unable to get that overpayment back in the marketplace.*[20]

When an investor has paid an inflated price for stock, one of three things can happen. First, she may resell the stock instantly to another buyer who pays her the same inflated price. In that instance, she has not been damaged and has experienced no compensable loss.[21]   Second, she may sell when the inflationary component has been reduced; however, she will not fully recover the over-payment she made. She has experienced an inflationary loss in that instance.   Third, she may sell at a point in time when the inflationary component has actually increased, in which case she has innocently profited from the situation and has not experienced any kind of loss caused by fraud.[22]  Whenever she continues to hold the stock until the inflationary component disappears, or dissipates, in whole or in part, she will not be able to resell and recoup fully the inflation.[23]  In other words, if, and only if, our investor *cannot recoup* the full amount of the overpayment that was infused into the price by fraud, she has experienced an inflationary loss. Her damages are properly measured, then, as the difference between inflation at the time of purchase and inflation at the time of sale.[24]

---

[18] Professors Coffee and Fox have debated this point. *Compare* Coffee, *Causation by Presumption, supra* note 16, *with* Merritt B. Fox, *Demystifying Causation in Fraud on the Market Actions*, 60 Bus. Law. 507 (2005) (hereinafter Fox, *Demystifying Causation*).

[19] Judge Henry Friendly called this a concern over "fraud by hindsight." Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978). Defendants frequently complain that securities fraud litigation is "a restatement [of earnings] in search of a fraud." *See, e.g., In re* Sawtek, Inc. Sec. Litig., 2005 WL 2465041, at *13 (M.D. Fla. 2005). The legitimacy of the complaints about securities fraud litigation in general and class actions in particular is beyond the scope of this review.

[20] Judge Sneed in his concurring opinion in Green v. Occidental Petroleum Corp., 541 F.2d 1335, 1341-46 (9th Cir. 1976) (Sneed, J., concurring) put forward this basic idea, although his language was not as precise as it might have been, which in turn has generated some additional confusion that echoes throughout the subsequent case law. *See, e.g.,* Wool v. Tandem, 818 F.2d 1433, 1436-37 (9th Cir. 1987) (partially adopting and partially criticizing Sneed's concurrence). A useful discussion of the concept is contained in Fox, *Demystifying Causation, supra* n 18, at 515 (explaining that in a fraud on the market case, "[t]he claimed loss – that plaintiff paid too much – flows directly from the misstatement.  If proved true, the resulting damages paid to the plaintiff compensate the plaintiff for that loss and nothing more.")

[21] The Supreme Court said as much in *Dura Pharm., Inc. v. Bouda*, 125 S. Ct. 1627 (2005).  "[A]t the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value." *Id.* at 1631 (emphasis in original).

[22] This is sometimes referred to as "inflationary gain." It can be a distressing concept to investors that one can have an investment loss (actual loss of real dollars) but have sold at a time when the inflationary component in the price has gone up and thus, no fraud recovery is available notwithstanding the disappearance of real dollars.  It is the correct economic analysis, however.

[23] This is not to say that the investor has or should have some duty or obligation to sell at just the right time to recover the inflationary loss; that would be an impossible, unfair expectation even for professional investors.

[24] This damage measure is well recognized. *See, e.g.,* Michael Barclay & Frank C. Torchio, *A Comparison of Trading Models Used for Calculating Aggregate Damages in Securities Litigation*, 64 L. & Contemp. Probs. 105, 106 (2001) (stating: "In general, damages per share are calculated as the artificial inflation when the shares were purchased minus the artificial inflation when the shares were sold."); John Finnerty &

It is apparent, then, that there are two critical issues in examining inflationary loss. First, how is the inflation in the price caused in the first instance?  Second, was the inflation dissipated and how?

### III.  HOW DOES INFLATION OCCUR?

When new, false, and material information enters the market (or true information is withheld), the efficient market hypothesis postulates that an inflationary component will enter into the stock price.[25]  The market will operate on the fraud by valuing the material false information.  If the market did not do so, then fraud would never succeed.

Like oxygen to a fire, market forces are therefore the crux of fraud-on-the-market cases, a necessary condition for the occurrence of the fraud in the first place. The defendant and the market are effectively acting together. Companies intent on wrong doing are setting out to (or expecting to) *induce* a reaction by the market to the false statement or omission. The defendant is trying to and does cause the market to drive up its stock price or prevent it from falling to its true value; either way, the purpose and effect is to cause the market to attribute artificial inflated value to the stock. That market reaction is by definition a foreseeable consequence of fraud. In fact, every day that the company withholds the truth after a false statement has been made, or continues to omit the truth from the market, the company as a practical matter is actively promoting the misrepresentation and inviting the market to price its stock with a fraud component. In other words, because the misrepresentation or omission is incorporated into the valuation process as soon as the new, material false information enters the market, as an economic matter, by definition, the defendants' fraudulent conduct *always* causes artificial inflation to enter the price.[26]

Misrepresentations can occur in countless ways, but the key to materiality is whether the misinformation concerns something that matters to investors.[27]  Companies are in

---

George Pushner, *An Improved Two-Trader Model for Measuring Damages in Securities Fraud Class Actions*, 8 STAN. J. L. BUS. & FIN. 213 (2003) (discussing a damage model that measures damages based on inflation at time of purchase minus inflation at time of sale and allows for "in-and-out" or selling damages); Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. REV. 883, 886 (1990) ("the measure of damages for an investor is simply . . . for plaintiffs who sold their securities before the [final] corrective disclosure, the difference between the price inflation at the time of purchase and the price inflation at the time of sale."). The same measurement is applied to holders of stock through the end of a class period – inflation at the time of purchase minus inflation at the date of measurement. The PSLRA also contains a cap on damages based on a 90-day look back period at the end of a class period. 15 U.S.C. §78u-4(e).  This damages measure is sometimes referred to as the "out of pocket" rule, but that term, too, can be confusing and it is used in different ways. To avoid such confusion, we do not use the term herein.

[25] A classic legal test of whether a market is efficient is stated in Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989). *See also In Re* Polymedica Corp. Sec. Litig., 224 F.R.D. 27 (D. Mass. 2004) (discussing efficient market theory in both legal and economic contexts and of tests for efficiency in any given market).

[26] Meritt B. Fox, *Understanding Dura*, 60 BUS. LAW. 1547, 1547 (2005) (hereinafter Fox, *Understanding Dura*) ("The defendant's misstatement injures the plaintiff not because it caused her to make a purchase that later, ex post, turned out to be a losing transaction, but because, ex ante, it caused her to pay a purchase price that is higher than it would have been but for the misstatement."); Fox *Demystifying Causation, supra* note 18.

[27] Coffee finds the term "material" problematic because a jury may think that "material" simply means "important" in some colloquial sense. Coffee, *Causation by Presumption, supra* note 16, at 541. This is an

constant communication with investors, analysts, their own shareholders, and investment banks.   These companies know what matters most: it's financial parameters and expectations, both qualitative and quantitative. Thus, fraud most often is related to things like statements of earnings per share, revenues, expenses, growth trends, margins, demand, weaknesses in the fundamental health of the company, and similar crucial aspects of company fiscal performance.

The tools that a company may use to commit fraud are, of course, legion and hardly require description, other than to note their creative variety.  Even a tiny sample of post-*Dura* opinions is instructive. Allegations of fraud have included:

- ➢ Exaggerating earnings with inventory schemes;[28]
- ➢ Testing and valuation of goodwill that results in overstated earnings;[29]
- ➢ Heralding product performance and understating product risks;[30]
- ➢ Depressing projections in order to create "upside surprises" in the market;[31]
- ➢ Disguising loans as equity investments;[32]
- ➢ Factoring and securitization of worthless invoices;[33]
- ➢ Concealing declining demand through recognition of revenue for work not yet performed;[34]
- ➢ Overstating oil and natural gas reserves;[35]
- ➢ "Slow-boating" of orders (using very slow delivery methods so that the revenue could be booked upon shipment, even if customers did not want the goods until a later quarter);[36]
- ➢ "Channel stuffing" (inducing customers through price discounts and other concessions to submit purchase orders in advance of when they would otherwise do so) resulting in overstated revenues;[37]
- ➢ Contracting with undisclosed contingencies and kick-backs which mis-state current prospects.[38]

---

evidentiary point to be addressed through expert testimony, jury instructions, judicial oversight, and the common sense of the jury. *Cf.* Notice of Filing of Proposed Rule Change by NASDAQ Relating to Issuer Disclosure of Material Information, 67 Fed. Reg. 51, 306 (Aug. 7, 2002) (giving guidelines for material news).  Mistrust of the jury process also plays a significant role in the argument for stringent pleading standards. *See* Coffee, *Causation by Presumption, supra* note 16.  The high rate of settlement of securities fraud cases is sometimes said to be evidence that frivolous cases and strike suits are frequent, but it may equally signal corporate management's reluctance to allow ordinary folks to decide if they committed fraud and to be exposed to potentially large verdicts.

[28] *In re* Greater PA Carpenters Pension Fund v. Whitehall Jewellers, Inc., 2005 WL 61480 (N.D. Ill.).

[29] *In re* Actema Corp. Sec. Litig., 378 F. Supp. 2d 561 (D.Md. 1005).

[30] *In re* Bristol-Myers Squibb Sec. Litig., 2005 WL 2007004 (D.N.J.).

[31] *In re* IPO Sec. Litig., 2005 WL 1162445 (S.D.N.Y.).

[32] *In re* Parmalat Sec. Litig., 376 F. Supp. 2d 472 (S.D.N.Y. 2005).

[33] *Id.*

[34] *In re* Portal Software Inc. Sec. Litig., 2005 WL 1910923 (N.D. Cal.)

[35] *In re* Royal Dutch/Shell Transport Sec. Litig., 380 F. Supp. 2d 509 (D.N.J. 2005).

[36] *In re* Sawtek Inc. Sec. Litig., 2005 WL 2465041 (M.D. Fla.) (also alleging the creative plan to use a two-hour time difference between its Florida and Costa Rica offices to "extend" its quarter by operating out of Costa Rica for two extra hours after the quarter closed).

[37] *In re* Synovis Life Technologies, Inc. Sec. Litig., 2005 WL 2063870 (D. Minn.).

[38] *In Re* Tellium Inc. Sec. Litig., 2005 WL 1677467 (D.N.J.).

Needless to say, the list could go on and on. The point is that such practices are the tools that enable a company to induce a market reaction that will impound an inflationary component into the stock price.

## IV. How Does Dissipation Occur?

Dissipation of the inflated price component can occur in a variety of ways, as cases have long recognized.[39] The occurrence of dissipation is a foreseeable consequence of fraud—as is inflation. A company that introduces a false component of price into the market knows that the false component will dissipate at some point because, simply put, this is how the market works. The exact means or events of dissipation may not be foreseeable, but that is of little import. A company introduces false information in order to induce a price reaction. At that moment, a company knows that a variety of subsequent circumstances may alter that reaction and cause losses for a subsets of investors. Thus, regardless of the events that trigger the dissipation, the eventual realization of inflationary loss is reasonably foreseeable.

This section discusses how dissipation occurs in an efficient market. Each example is founded on economic principles, practical observation of the activities of the market, and case law.[40] Recall our initial hypothetical: Assume that ABC Corporation announces that its new product sales exceeded analyst and investor expectations by thirty percent and are projected to continue to do so in the future. The announcement was completely false and a product of the company "cooking its books." The goal of the fraud is to mask declining demand and continue reporting growth. The tools the company used were, let us say, accounting improprieties in violation of Generally Accepted Accounting Principles (GAAP) and sham transactions.

### A. The fraud is revealed

The clearest and least controversial way inflation may dissipate is where the truth has been successfully withheld until a moment when the full truth is disclosed. On a single day, the market learns that ABC has used accounting improprieties and sham transactions to cook its books and mask declining demand. The information may come from disclosures by the company, a regulator, or someone else – a knowledgeable informant comes forward; the company issues a mea culpa, in some form or another; the SEC investigates and announces the results; executives are indicted; the important details of the fraud emerge in one way or another. A dramatic and immediate "stock price drop" would typically follow in an efficient market. Coincident with that drop, and assuming there is no further "truth" to be told, all inflation will dissipate as well. At that point, our

---

[39] Gebhardt v. Conagra Foods, Inc., 335 F.3d 824 (8th Cir. 2003); No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d 920 (9th Cir. 2003); Knapp v. Ernst & Whinney, 90 F.3d 1431 (9th Cir. 1996); In re Control Data, 933 F.2d 616, 619 (8th Cir. 1991); In re Dynegy, Inc. Sec. Litig., 2004 WL 2308799 at *46 (S.D. Tex. Oct. 7, 2004); Swack v. Credit Suisse First Boston, 383 F. Supp. 2d 223 (D. Mass. 2004); In re WorldCom, 2003 WL 22420467 at *29 (S.D.N.Y. 2003); Retsky Family Ltd. P'ship v. Price Waterhouse LLP, 1998 WL 774678 (N.D. Ill. Oct. 21, 1998); and In re Blech Sec. Litig., 961 F. Supp. 569, 586 (S.D.N.Y. 1997).

[40] Our examples are not without controversy, especially after Dura Pharm., v. Brouda, 125 S. Ct. 1627 (2005) as elaborated below, see infra section X.

investor can never recoup the inflated price and her inflationary loss is clear. A full and complete revelation of the fraud, in a single blinding moment, is exceedingly rare.[41]

## B.  Improprieties are revealed

Another common situation is revelation of "bad" conduct in a general sense. An investigative reporter, a whistleblower, or an analyst with more information than others may find out that ABC's new product division has violated GAAP. The full impact of the violation and whether it amounts to deliberate wrongdoing is not revealed; yet, if the information is new and sufficiently material, the market will still react by correcting the price and dissipating at least part of the inflation once again.[42]

## C.  Questions or Concerns are Raised

Generalized concerns, short of statements about improprieties, may also reach the market. For example, a newspaper reporter writes about indications that demand for ABC's new products is softer than the company has represented it to be. Alternatively, the company mentions in a morning conference call that sales at the new products division aren't quite as brisk as they had hoped. In either situation the news may result in a market correction of the price and dissipation of the inflationary component of the price.[43]

## D.  True Financial Condition is Revealed

News about the company's true performance, or its failure to reveal wrongdoing can dissipate inflation as well. Issuance of restatements, earnings warnings, or other statements about the true state of the company's financial condition may trigger dissipation.[44] Assume that ABC reports a flat quarter of new product sales. The market will likely re-price the stock downward at that point, including the inflationary component. The fact that no wrongdoing or error has been identified is unimportant; new, material information that is based on a real world occurrence—the company's true

---

[41] A rare example occurred in the case of Cendant Corporation's discovery and disclosures of accounting improprieties between April and October 1998. *In re* Cendant Corp. Inc. Litig., 264 F.3d 201 (3d Cir. 2001). Even then, however, the extent of the fraud was not fully appreciated until late September 1998, roughly five months after the first notice to the market of possible accounting problems and possible restatements. In all events, it seems highly unlikely that "all" of the details and facts of a fraud ever do emerge, even after the rare event of a trial. The point is that, enough emerges to allow the market to readjust to a fair price.

[42] *See, e.g.*, Wool v. Tandem, 818 F.2d 1433, 1435 (9th Cir. 1987) (expressing concern about accounting improprieties).

[43] *See, e.g., In re* Tycom Ltd. Sec. Litig., 2005 WL 2127674 *6 (D.N.H.) (expressing concerns about reduced demand, oversupply, and declining prices).

[44] Examples of this type of adverse occurrence or information include: disappointing levels of revenue or earnings relative to investors' expectations; disclosure of lower than expected prospects for future revenues and earnings, or known problems or weaknesses with respect to the competitive position of the company (in connection with the products or services offered by the company).

performance—has entered the market and the market will react to that.[45]   Our hypothetical investor paid an inflated price, and partial dissipation of the inflated price will have occurred upon the materialization of the risk.[46]   The investor is no longer in a position to recover fully the inflationary price she paid, and therefore, she has suffered an inflationary loss at that point.[47]

## E.  Leakage of information

Dissipation often occurs as the market reacts to recurrent, partial revelations of any of the above-type of information.  This is known as leakage.  Whispers, gossip, rumors, blogs, tips, etc.; any of these may be sources of leaked information, all in advance of the ultimate disclosure of the whole truth.  For example, assume an informed internet blog contains a rumor that a new customer does not like ABC's new product and plans to scale back its orders.[48]   The blogger may be understood to mean that demand is tapering off.  Suppose that someone responds to the blog and says that the customer information is not correct.  The original author may offer additional support for his report.  An analyst may pick up on this concern and get a confirmation or denial from the customer.  Bits and pieces of reports or disclosures may have one meaning to investors initially, but that understanding may be significantly altered by third-party investigations, follow-up news reports, industry announcements, additional company disclosures, and other occurrences.  Thus, inflation in the price of a security may be dissipated over time as a result of a series of partial disclosures or occurrences up until the point that inflation is extinguished.

As one post-*Dura* decision explained:

> There are a variety of ways that inflated value can be dissipated short of corrective disclosures . . . . Dissipation may flow, for example, from 'a growing quiet awareness of the part of certain highly sophisticated market participants-arbitrageurs and sell-side analysts-that previously publicly

---

[45] *See* Jay W. Eisenhofer et al., *Securities fraud, Stock Price Valuation, and Loss Causation: Toward a Corporate Finance-based Theory of Loss Causation*, 59 BUS. LAW. 1419 (2004).  Even relatively small earnings shortfalls can be important to investors.  17 C.F.R. § 211, SEC Staff Accounting Bulletin: No. 99 – Materiality (Aug.12, 1999), *available at* http://www.sec.gov/interps/account/sab99.html.

[46] As we are using the term here, "risk" does not refer to the variability of returns on investment or ordinary market volatility; rather, it refers to a "factor, thing, element, or course involving uncertain danger; a hazard" to the company.

[47] *In re* Daou Sys., Inc., 411 F.3d 1006 (9th Cir. 2005); Greater PA Carpenters Pension Fund v. Whitehall Jewellers, 2005 WL 1563206 (N.D. Ill. Jun. 30 2005) (allegation of purchase time inflation plus pleading that defendant had previously issued false and misleading financial results and thereafter issued two restatements which did not specifically admit the fraud is sufficient to plead loss causation); Retsky Family Ltd. P'ship v. Price Waterhouse LLP, 1998 WL 774678 (N.D. Ill. Oct. 21, 1998) (market correction followed "honest" statement of earnings); *see also* Brief for the United States as Amicus Curiae at 10-11, Dura Pharm., Inc. v. Brouda, 125 S. Ct. 1627 (2005)( Explaining that the artificial inflation will not be reduced or eliminated until the market price reflects the true facts that had been concealed by the fraud. "This will most commonly occur when the truth is revealed in whole or in part through a corrective disclosure.  That, however, is not the only way the fraud may be revealed.  *Events may also effectively disclose the truth*.") (emphasis added).

[48] As to the impact of the Internet, *see infra* note 65.

available fact, which for a time seemed unimportant, were in fact inconsistent with the misstatements."[49]

Timing may also matter. At times, unexpectedly good or bad news can leak into the market before a formal announcement. In our hypothetical, ABC may formally announce a quarter of flat sales. However, the "conversation" described above (among market participants in the days and weeks before the announcement) may have already impacted the stock price.[50] As a result of this phenomenon, ABC's announcement may have little or no apparent impact on share price because the dissipating effect of the announcement will have already occurred and been absorbed.[51]

---

[49] Order Granting Class Plaintiffs' Motion for Final Approval of Plan of Allocation, Sept. 14, 2005, at 8, *In re* Broadcom Corp. Sec. Litig. (C.D. Cal. 2005) (unpublished) (quoting Merritt Fox). *See also* Swack v. Credit Suisse First Boston, 383 F. Supp. 2d 223, 243-44 (D. Mass. 2004):

> The point to be pled and proven is that the stock price declined as the market learned the truth; the amount of decline attributable to the market's change from deceived to knowing is the measure of the plaintiff's loss. But the cases cited [including Emergent Capital] are perfectly consistent with the possibility that the market learned the truth gradually, and in advance of the defendant's eventual disclosure . . . . The plaintiff must, indeed, plead that the price declined as the truth emerged, but she need not allege that it happened on a single day.

*See also* Fogarazzo v. Lehman Bros., Inc., 341 F. Supp. 2d 274, 292 (S.D.N.Y. 2004) ("plaintiffs here have alleged a number of events that operated, essentially, as disclosures or market corrections;" ultimate disclosure eventually was made by defendant); Danis v. USN Commc'ns, Inc., 73 F. Supp. 2d 923, 943 (N.D. Ill. 1999) ("the market responded to and 'corrected' the price of USN stock over the better part of a year as bits and pieces of negative information became available and it became apparent that USN was not capable of performing as originally represented.")

[50] Princeton economics professor Burton G. Malkiel, *A Random Walk Down Wall Street* 192-93 (2003) reports, "[r]esearch indicates that, on average, stock prices react well in advance of unexpectedly good or unexpectedly bad earnings reports." This is also discussed in Sankarshan Acharya, *Value of Latent Information: Alternative Event Study Methods*, 48 J. FIN., 1 at 363-85 Mar. 1993): Other similar findings on the market's anticipation of earnings events can be found in Stanley G. Eakins et al., *Earnings Forecasts and Institutional Demand for Common Stock*, 14 J. APPLIED BUS. RESEARCH, 1, January 1997, at 57 (discussing the effect of whispers on earnings expectations relative to analyst earnings expectation numbers); *see also* Paul H. Malesta & Rex Thompson, *Partially Anticipated Events: A Model of Stock Price Reactions with an Application to Corporate Acquisitions*, 14 J. FIN. ECON., at 237-50 (1985); John Y. Campbell et al., *The Econometrics of Financial Markets*, 166 (1997).

[51] Gebhardt v. Conagra Foods, Inc., 335 F.3d 824 (8th Cir. 2003). On February 13, 2001, Conagra issued an earnings warning and lowered earnings expectations for the company. *Id.* at 827. The division that allegedly had been previously overstating its earnings was a significant component of the forecast earnings shortfall. *Id.* The share price fell swiftly and significantly from $24.86 per share to $20.01 per share as a result of this earnings warning. *Id.* On May 23, 2001, the company announced restatements of earnings for 1998, 1999 and 2000. *Id.* Investors' expectations had already been reduced and inflation remained in the stock price. *Id.* The further reduction in the stock price upon disclosure of the restatements was only $0.57 per share. *Id.* The defendants argued and the district court concluded based on the small price reaction that the information was not material. *Id.* at 831. The 8th Circuit overruled the district court, noting, in part, that the share price had already fallen prior to the restatement and refusing at the motion to dismiss stage "to attach dispositive significance to the stock's price movements absent sufficient facts and expert testimony, which cannot be considered at this procedural juncture, to put this information in its proper context." *Id.* at 832.

### F. Market Forces Operating on the Fraud

The concept of "market forces operating on a fraud," and causing dissipation of inflation has not been well-explained in the case law and has caused needless confusion. It is rooted in thirty-year old legal precedent, sound economic theory, and, as an added bonus, courts accept it. Nevertheless, it is controversial after *Dura*. It arises in the context of whether inflationary loss can precede *any* disclosure of information related to the fraud. It is critical to keep in mind that this source of dissipation does not stand alone. A disclosure of truth, partial or otherwise, is always a necessary predicate to the analysis (and, of course, a necessary predicated to anyone filing a lawsuit).

Judge Sneed discussed this concept in his well-known concurring opinion in Green v. Occidental Petroleum Corp.,[52] which was later adopted by the Ninth Circuit in Wool v. Tandem.[53] Sneed explained that the inflationary component of the price may, as with the non-inflationary component, go up or down depending upon what market and industry forces are doing that day. To illustrate, assume an investor purchases on the day that the false announcement by ABC has caused the share price to increase by thirty percent. The next day, the industry in which ABC operates experiences an overall decline due to the introduction of unexpected, new and superior technology. That decline will be reflected in ABC's stock price, and the inflationary component of that price will go down along with the true component of the price. It would make little sense to postulate that only the "true" component of the price would be affected. If the investor sells on that day, she has not fully recouped the inflationary price, and has suffered an inflationary loss due to the fraud. As elaborated below, all manner of events, including news about occurrences that are not specific to ABC or its industry (for example, weather-related catastrophes) can dissipate inflation.[54]

To be more specific, market forces and industry forces can cause significant changes in share prices as a result of, among other things, changes in market interest rates, levels of risk aversion, forecasts of future inflation rates and economic growth rates, and forecasts of industry measures such as demand, profit levels, and required rates of return. All of these changes alter investors' estimates of future earnings and growth, both of which drive the share price. Customarily, analysts evaluate share price based on multiples of earnings per share.[55] The multiple at which a company's share price is set is

---

[52] 541 F.2d 1335, 1341-46 (9th Cir. 1976) (Sneed, J., concurring).

[53] 818 F.2d 1433, 1436-37 (9th Cir. 1986).

[54] *See, e.g.,* Fogarrazo v. Lehman Bros., Inc., 341 F. Supp. 2d 274, 292 (S.D.N.Y. 2004):

> [I]nflated stock prices can lead to a loss in one of two ways. First, there can be an external correction to the market, such as a corrective disclosure . . . . Second, there can be a market correction, where ordinary market forces affect the rate of artificial inflation. If, for example, the normal functioning of the securities market causes the inflationary effect to dissipate over time, a customer who buys and sells at inflated prices will still suffer a loss based on the inflated price at the time of purchase so long as the price was less inflated at the time of sale.

One court has opined that this concept applies only in market manipulation cases, but there is questionable economic basis for that distinction. *See In re* IPO Sec. Litig., 383 F. Supp. 2d 566, 2005 WL 743440 at *7 (S.D.N.Y. 2005).

[55] We use "earnings" for simplicity as a proxy for the various measures that analysts use (i.e., operating earnings, earnings after taxes, cash flow, free cash flow, forward earnings, trailing earnings and other relevant measures of corporate performance per share). Moreover, finance theory includes the use of

a function of the market and industry forces just identified, the quality of the company's reported earnings, and the company's unique position within its product and service markets.[56]

The following example will illustrate how these forces interact. Assume ABC misrepresents and reports earnings per share of $0.80 when ABC's earnings per share were actually $0.40. Based on the reported $0.80 per share, analysts project earnings of $1.00 for the upcoming twelve-month period; they are assuming a growth rate of 25%. However, if they had known the true $0.40 figure, they would have used that figure in calculating their projections and they would have arrived at a figure for the next year of $0.50 per share. Assume that the multiple analysts ordinarily apply 20 times the projected earnings per share (20 times the $1.00 projection = $20 per share). Had the truth been known, ABC would have been valued at 20 times $0.50 ($10 per share). In other words, the share price has within it $10.00 worth of inflation caused by the misrepresentation.

Now, to understand specifically the effect of market or industry forces on the price, assume that analysts foresee an industry-wide slowdown that causes them to decide that 20 is too high a multiple and that a more appropriate multiple is 10. The stock price would then fall from $20.00 per share to $10.00 per share. The inflation in the stock price likewise would fall proportionally from $10.00 per share to $5.00 per share. Thus, market and industry forces have clearly operated on the inflationary component of the price.

## G. Collapse of the Company

Another situation where dissipation of inflation occurs is when a company collapses; however, there is great controversy as to whether this would constitute a compensable loss where the business was wiped out by circumstances that did not have a direct connection to the fraud. For example, suppose that the initial fraud caused inflation, but the dissipation occurred due to weather or other catastrophe that left the plaintiff unable to recoup the inflationary price.

Assume an investor pays $100 for a share of XYZ and XYZ is inflating its earnings by 100%. If the truth were known, the share price would have been only $50 at the time of purchase. Suppose further that XYZ's operations are virtually destroyed by a hurricane and the company is forced to seek bankruptcy protection. The share price falls to zero after the bankruptcy filing. The remaining assets are sold for less than the amount of liabilities. After that, the bankruptcy trustee finds out about and discloses that XYZ had fraudulently overstated its earnings. If there had been no fraud, the investor would have purchased the share at $50 and sold at $0 and experienced a $50 investment loss. But in fact, the investor paid $100, sold at $0, and has experienced an investment loss of $100. The inflationary component of that loss is $50 because she cannot recoup the overpayment in the market.

In this situation the initial inflation was not shown or even supported by proof of a subsequent drop in stock price. Rather, it is the trustee's discovery that XYZ was

---

discount rates to calculate present value of projected earnings, but again, that level of detail is unnecessary for our purposes.

[56] *See, e.g.*, STEPHEN A. ROSS ET AL., CORPORATE FINANCE 121-39 (3d ed. 1993).

inflating its earnings that establishes prior inflation. And the trustee's discovery occurred after the stock price had already fallen to zero. Thus, the absence of a stock price reaction to a revelation of fraud does not mean there was no inflation and does not mean that there was no dissipation of the inflationary component of price.

## H. Interplay of Dissipating and Inflating Events and Manipulation of Market Reaction

Dissipation will not necessarily happen without impediment. A company seeking to cover up fraud may attempt to control market reactions by issuing disclaimers or making additional false statements. It may deliberately let some of the truth out, little by little, in anticipation of market reactions and in order to stay ahead of them.[57]   If the company decides at some point to reveal the fraud, it might make the announcement at the same time as it announces other bad news, and then blame any ensuing drop in the stock price drop on that. Sometimes, dissipating and inflating moments may occur simultaneously. For example, an investigative report about allegations of "cooking the books" will often contain statements from the company denying the allegations and offering further assurances. The market may react by treating the various statements as balancing each other out. Alternatively, one may be given more weight than the other.[58]

The potential for manipulation is, therefore, quite high. This potential is higher still if the courts use adjudicative rules that ignore the reality that the market itself is a necessary instrument in fraud-on-the-market cases. If a newspaper reports that ABC has been overstating its earnings and has been misleading investors. This news (if uncontested and from a credible source) would cause a significant decline in the common shares and

---

[57] If this sounds like a "market manipulation" concept—it is. "Market manipulation" under the Securities Exchange Act of 1934, 15 U.S.C. 78(j)(b) 10(b)5-a and 10(b)5-c, is a term of art referring to practices such as wash sales, matched order, or rigged prices. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 (1976). Nonetheless, as an economic matter, a 10b-5(b) defendant has inherently counted on market forces to react to and affect price. Thus, when the company makes contradictory announcements or leaks information in order to "guide the stock down gently," it is effectively manipulating the market to accomplish its goals. Those who work in this area, including the authors, are not surprised when discovery turns up internal company documents in which management explicitly states it intends to engage in this practice. Defendants may be motivated by either short-term incentive to prop up their share price (for example, to personally sell some shares before the truth is revealed; to allow the company to raise capital at more favorable terms; to avoid being terminated; or to realize immediate bonuses). The company may hope to forestall the day of reckoning by effectively "covering up" the foreseeable economic losses that will eventually result from the fraud.

[58] The market will assess disclosures and announcements differently, depending upon a variety of factors. Molly Mercer, *How Do Investors Assess the Credibility of Management Disclosures?*, ACCT. HORIZONS, Sept. 1, 2004, at 185 et seq.:

> Why are some management disclosures more credible than others? [A] disclosure's credibility is influenced by: [1] Situational incentives at the time of the disclosure; [2] management's credibility; [3] the degree of external and internal assurance; [4] various characteristics of the disclosure, including its precision, venue, timing, amount of supporting information, and inherent plausibility."   Moreover, "[m]anagement disclosures vary in their degree of precision. For example, management's earnings forecasts appear as precise point estimates, less precise range estimates, or even more vague one-sided maximum or minimum estimates. Several authors argue that imprecise disclosures signal management's uncertainty and will be viewed as less credible than more precise disclosures.

would dissipate inflation. However, ABC, its accountants, and certain security analysts may deny the allegations in the news report and seek to minimize the importance of the alleged improprieties. The dissipating effect would be muted and the two conflicting pieces of information may well offset each other. Suppose the decline in share price in this example was statistically insignificant, falling from $40 to $39. Unless courts recognize the interplay of these forces, the company could argue that the news report constituted a public disclosure—invoke the "truth on the market" defense—and then assert that the misrepresentations were not material in the first instance because the decline was not significant. Yet, the company has clearly diluted the market's reaction.[59]

The potential for manipulation can intensify. Suppose two quarters later, ABC reports disappointing quarterly financial results. The company lowers its future earnings guidance, and the common share price then falls from $39 to $30. The company continues to dispute the allegations of accounting impropriety, but it would, nevertheless, be actually dissipating inflation by revealing the "true" prospects for the company. If ABC finally issues an earnings restatement six months later, the stock price is unlikely to react at all because the news is not surprising and little or no inflation remains to be dissipated. Suppose the stock price falls at that point from $25 to $24.50 per share (a 2% decline). If sued, the company could argue that disclosure of the restatement was the *only* corrective disclosure, and that there was no resulting statistically significant decline in the stock price when that happened. Therefore, as the argument goes, the initial misrepresentation was immaterial.

Economic and legal principles should recognize that inflating and dissipating events took place throughout this time frame and should rely on statistical studies and other techniques to tease out and untangle the impacts of the allegations, the disclaimers, the true information, and the ultimate admission of impropriety. This would permit determination and quantification of loss.

To sum up the principles discussed in this section, as one court aptly stated:

> [I]nflated stock prices can lead to a loss in one of two ways. First, there can be an external correction to the market, such as a corrective disclosure. Once the fraud is revealed, it no longer taints the stock price and the artificial inflation disappears. The result is a sale at true value, causing a loss based on the inflated price at the time of purchase. Second, there can be a market correction, where ordinary market forces affect the rate of artificial inflation. If, for example, the normal functioning of the securities market causes the inflationary effect to dissipate over time, a customer who buys and sells at inflated prices will still suffer a loss based on the inflated price at the time of purchase so long as the price was *less* inflated at the time of sale.[60]

In every case, then, a disclosure of some type of truth will trigger the lawsuit. Pre-disclosure occurrences such as leakage, news about company performance, honest statements by the company that reveal true risks, and market forces operating on the

---

[59] *See, e.g.,* Berry v. Valence Tech. Inc., 175 F.3d 699 (9th Cir. 1999).
[60] *In re* IPO Sec. Litig., 297 F. Supp 2d 668, 673 (S.D.N.Y. 2003) (Emphasis added). It is not clear whether the court views this analysis to have survived *Dura*.

fraud must also be considered to determine whether inflationary losses were caused to investors at all points in time along the way.

## V. EVENT STUDIES DEMONSTRATE INFLATION AND DISSIPATION

What techniques will allow identification of inflation and dissipation at all relevant times? As in any other case, proof will consist of facts that appeal to the logic and common sense of the jury; scientific studies; and expert opinion. The first, again, will be as varied as the facts and circumstances of any case. In some instances, materiality and falsehood, as well as the impact on stock price, may be so clear and obvious that the jury needs to hear little else. However, it is overwhelmingly common for inflation and dissipation to be assessed through econometrics (particularly an event study) and supported by expert testimony.

Forensic experts agree generally on the techniques to be used to show inflation and dissipation in stock prices. The gold standard, which is accepted by both courts and economists, is the event study. Other tools such as valuation analyses often aid the event study.[61] An event study is an examination of the association between news about a company (good, bad, or neutral) and stock price movements. The researcher is examining whether the association between news and share price movements is strong enough to support an inference of, among other things, causation. If price movements are found that are unexplained by the "market model" and are statistically significant, either individually or collectively, a causal connection between the event in question and price movements is established.[62] The study will separate out the effects of company-specific news on the stock price from the effects of market or industry forces on the price, thereby identifying the "true" price and the inflationary component thereof. Typically, event studies work backward from what is ultimately determined to be a fair price, after dissipation of inflation, to determine how much inflation was contained in the price due to fraud during the relevant time frame all the way back to the beginning.[63]

---

[61] *In re* Imperial Credit Indus., Inc., 252 F. Supp. 2d 1005, 1014 (C.D. Cal. 2003); *In re* Gaming Lottery Sec. Litig., 2000 WL 340897 at *1 (S.D.N.Y. Feb. 16, 2000); RMED Int'l., Inc. v. Sloan's Supermarkets, Inc., 2000 WL 310352 at *6 (S.D.N.Y. Mar. 24, 2000), *aff'd* 2000 WL 420458 (S.D.N.Y. Apr. 8, 2000); *In re* Oracle Sec. Litig., 829 F. Supp. 1176, 1181 (N.D. Cal. 1993).

[62] Statistical significance has more than one meaning and is not a talismanic term, however. See David H. Kaye & David A. Freedman, *Reference Guide on Statistics*, *in* FED. JUD. CNTR., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 83, 123-27 (2d ed. 2000) (discussing practical significance); ALAN STUART ET AL., KENDALL'S ADVANCED THEORY OF STATISTICS, VOLUME 2A: CLASSICAL INFERENCE & THE LINEAR MODEL 193 (6th ed. 1999) (explaining "[t]his numerical convenience [rule of thumb criteria for statistical significance] has persisted long beyond its hour of need."); LAWRENCE LAPIN, STATISTICS FOR MODERN BUSINESS DECISIONS 186 (1978) ("A decision rule must be chosen that will provide a lower probability of the more serious error . . . . He [(the decision-maker)] should therefore be wary of setting *Alpha* [the criteria for significance] and *Beta* at arbitrary or traditional levels."); DONALD A. BERRY & BERNARD W. LINDGREN, STATISTICS: THEORY AND METHODS 423-27 (2d ed. 1996) (arguing against a fixed criteria for statistical significance and for considerations of practical significance).

[63] The underlying principle is that if truth had been disclosed timely, the stock price adjustments that occurred at the end would have occurred over time and earlier in time. Cornell & Morgan, *supra* note 24; John Koslow, *Estimating Aggregate Damages in Class Action Litigation Under Rule 10b-5 for Purposes of Settlement*, 59 FORDHAM L. REV. 811, 819-25 (1991); Janet Cooper Alexander, *The Value of Bad News in Securities Class Actions*, 41 UCLA L. REV. 1421, 1426-27 (1994); FINNERTY & PUSHNER, *supra* note 24, at 8-11; 1195-98 (discussing adjustment of corrective events over time using a "comparable-stock index that

An event study can be thought of as involving three interrelated stages.[64] The first is review of all available public information, on a qualitative basis, to identify what investors would find "material." This stage is guided by economic principles, literature, and the experience of the researcher. This information can come from analysts' reports, press releases, securities filings, news articles (newspapers and daily publications, as well as more general publications), and Internet bulletin board postings to the extent they appear to represent informed investors' perceptions.[65]

The second stage of the study involves identification of the relevant market and guideline (or peer group companies) and the construction of a "market model." How the relevant market moved is compared to the movement of the stock. How the peer companies' stock moved is compared to the subject as well. The result of the second stage of the analysis is a market model that predicts the daily return of the security based on the daily returns of an appropriate mix of market indices and an industry index.

In the third stage of the analysis, the security's returns on identified event days or series of days are analyzed by looking at what the market and industry indices predicted and what the security actually did. Put another way, these statistical techniques separate out the impact of market and industry forces on the price so that the impact of all company-specific news (including news relating to the fraud) is isolated.

In an event study, inflating and dissipating price movements are identified in percentage terms.[66] Backcasting establishes what percentage of the stock price was unaffected by fraud, or in other words, the "true value," typically expressed as a percentage of the trading price. Use of percentages in event studies to assess the significance of price movements is routine, just as it is in tracking stock price movements in the market. Stock prices react in percentage terms and it is correct as a matter of economics to use percentage terms to examine those reactions.[67] In addition, the

---

recognizes both industry and market-wide influences," and adjustment for "firm-specific factors that can be directly attributed to company announcements that are not related to the fraud" using the "backwardation" approach based on percentage returns not absolute dollar changes).

[64] We refer to various "stages" for simplification; protocols are set *a priori* and regressions and other processes in each stage may be run simultaneously. Event studies can vary in practice, including differences in assumptions and levels of investigation and, consequently, different event studies can result in significantly different levels of precision. However, all event studies tend to include event identification, a market index choice, and a statistical analysis of the events of interest. See, for example, M. Laurentius Marais & Katherine Schipper, *Event Study Methods: Detecting and Measuring the Security Price Effects of Disclosures and Interventions*, *in* ROMAN L. WEIL ET AL., LITIGATION SERVICES HANDBOOK: THE ROLE OF THE FINANCIAL EXPERT, 2005 CUMULATIVE SUPPLEMENT 17A (3d ed. 2005) (discussing event study methods and the use of event study methodology in litigation). Hereinafter we use the term "event" in a technical sense to mean the entry of information into the marketplace that is new and potentially material. We are not using it in the colloquial sense of something that takes place or an occurrence.

[65] See Werner Antweiler & Murray Frank, *Is All That Talk Just Noise? The Information Content of Internet Stock Message Boards*, 59 J. FIN., 3, June 2004 at 1259-1294 (Noting that, "[w]e find that stock messages help predict market volatility. Their effect of stock returns is statistically significant but economically small.")

[66] This is also known as the residual returns method. Cornell & Morgan, *supra* note 24, at 899-900; Koslow, *supra* note 63, at 819-25; Alexander, *supra* note 63, at 1426-27; FINNERTY & PUSHNER, *supra* note 24, at 8-11 (using "backwardization" approach based on percentage returns).

[67] To the lay jury, the fact that stock prices are tracked in percentage terms and all experts on both sides of the fence use percentages in conducting event studies is probably a sufficient basis for understanding why this technique is used. But there are also technical reasons for it. Extensive literature exists, particularly with respect to option pricing, regarding modeling publicly traded security price movements as a "jump-

researcher may consider making certain adjustments, the technicalities of which are set out in the footnote for the mathematically inclined.[68]

The event study is therefore premised on analyzing whether there are statistically significant price movements in reaction to company specific news, market forces, and industry forces. However, analysis of a single day may not tell the whole story in some situations. Common situations, as noted above, are: (1) where the dissipating impact of bad news is muted by prior leakage; (2) where the dissipating impact of leakage is itself muted by confounding inflationary events such as denials by management; and (3) omissions cases, where had the truth been known, the price would have dropped, and statistically significant price increases will therefore not be manifest.

To address these situations, event studies may consider "event windows" or several days over time, looking at joint statistical significance. In other words, if there are bits and pieces of bad news that cumulate over time, the aggregate effect will need to be considered.[69] A day where movement is not statistically significant may be part of a

---

diffusion process." A jump-diffusion process is one where stock prices move with a "random walk" composed of small movements in the stock price over time, coupled with sudden jumps up or down in the price series that are observed and associated with identified events. *See, e.g.,* Clive W.J. Granger, *The Present and Future of Empirical Finance,* 61 FIN. ANALYSTS J., 4, July/August 2005 at 15-18 (discussing jump-diffusion processes in the context of modeling security price movements and security returns); CAROL ALEXANDER, MARKET MODELS: A GUIDE TO FINANCIAL DATA ANALYSIS 66-67; 286-87; 320-22; 430-31; 440-42 (2001) (discussing the use of the natural log transformation to capture the diffusion process and events to control for jumps in stock prices at specific points in time); PHILIP HANS FRANSES, TIME SERIES MODELS FOR BUSINESS AND ECONOMIC FORECASTING 128-30 (1998) (discussing the need to control for sudden changes in stock prices); RUEY S. TSAY, ANALYSIS OF FINANCIAL TIME SERIES 16 (2002) (showing returns based on daily log returns and percentage returns); *Id.* at 244 (discussing a "jump diffusion model proposed by Kou (2000)" to model stock price movements); Javier F. Navas, *Calculation of Volatility in a Jump-Diffusion Model,* J. DERIVATIVES, December 2003 (discussing the portion of volatility related to jumps).

[68] Adjustments for compression over time may be made. Compression is equivalent to saying the "bigger they are the harder they fall." The following example illustrates compounding. Suppose two events of equal importance result in a loss of 75% in the share price. The temptation is to divide the percentage drop in half and say that each event accounts for 37.5% of the decline. If one of the events was related to the fraud and one was not, then this simplistic approach would say that the inflation in the share price prior to the event is 37.5%. However, two 37.5% events would combine to only cause a 61% decline in the share price $(1-(1-.375)*(1-.375))$. The individual percentage impact of each event would have to be 50% in order for the total decline after the two events to be 75%. Mathematically, $75\% = 1-(1-.5)*(1-.5)$. Thus 50%, not 37.5%, is the proper measure of the inflation in the share price, prior to the event.

[69] Cornell & Morgan, *supra* note 24, at 905-06. When a fraud is revealed slowly over time, the event study researcher will "extend the observation window surrounding the disclosure date . . . . The window begins far enough in advance of the disclosure for the analyst to be reasonably confident that no significant information leakage has occurred . . . . The window ends at a date when the analyst feels confident that most of the information is publicly available . . .". Princeton economics professor Burton G. Malkiel, *supra* note 50, at 192-93, reports, "[r]esearch indicates that, on average, stock prices react well in advance of unexpectedly good or unexpectedly bad earnings reports." This is also discussed in Acharya, *supra* note 50, at 363-85. Other similar findings on the market's anticipation of earnings events can be found in Eakins, *supra* note 50, at 57 (discussing the effect of whispers on earnings expectations relative to analyst earnings expectation numbers); see also Malesta & Thompson, *supra* note 50, at 237-50; and CAMPBELL ET AL., *supra* note 50, at 166. A general article on event timing and uncertainty is Clifford Ball & Walter Torous, *Investigating Security-Price Performance in the Presence of Event-Date Uncertainty,* 22 J. FIN. ECON. 123-53 (1988). Similarly, Srinivasan Ragothaman & Bruce Bublitz, *An Empirical Analysis of the Impact of Asset Writedown Disclosures on Stockholder Wealth,* 35 QUARTERLY J. BUS. & ECON., 3, Jun. 1996, at 32 state, "[s]pecifying a date when information reaches the market is not always feasible; information can

series of days which, taken together, are highly statistically significant and reveal that, overall, the bits and pieces of information entering the market are having an impact beyond what could otherwise be explained by ordinary market and industry forces. Where these situations are involved, the event study cannot reliably confine itself to whether the stock price dropped significantly on one particular day.[70]

For example, assume the situation above where a news report questions the accuracy of ABC's earnings and ABC denies the report on the same day. If the event study were to look solely at that day, it may very well find no statistically significant price movements because of confounding or offsetting factors. If, however, over the next few days, more news reports pop up raising additional questions about aspects of ABC's accounting, then the event study that looks at the cumulative impact of those several days may show a statistically significant movement.[71]

At the end of the day, an event study can be used to identify what events were inflating and what events were dissipating, and to estimate the "true value" and the "inflationary component" of the stock price at all relevant times. Such a study supports an initial determination of the difference between what the plaintiff paid and what the plaintiff should have paid for the stock. It relies on and presumes the truth of the allegations of the complaint; facts ascertained in discovery; or the actual proof at trial. It then assists in answering whether the market has corrected the price in such a way that investors cannot recoup the initial inflation and therefore have cognizable damages. Specific identification of inability to recoup limits the defendant's liability to losses that it has caused—inflationary losses, rather than investment losses. An event study can support the determination of materiality, causation, and damages.

## VI. VALUATION TECHNIQUES

Event studies need not stand alone, of course. Other techniques may confirm the materiality of a statement, as well as the fact and amount of inflation and dissipation. A valuation study, for example, is a typical way of looking at a company's financials as they were represented, and comparing the represented financials to the "true" financials,

---

reach the market gradually through many sources . . . . Thus, in all prior studies the precise identification of the event date is a problem; the market seems to have alternative sources of information." As "event windows" are expanded, however, the power of the statistical inferences diminishes. Thus, it is important not to extend an event window beyond the period in which the meaning of the information itself appears to be unfolding in the marketplace. Dmitry Krivin, Robert Patton, Erica Rose & David Tabak, *Determination of the Appropriate Event Window Length in Individual Stock Event Studies*, National Economic Research Associates (4 November 2003), Working Paper, available at www.nera.com/publication.asp?p_ID=1287.

[70] *See infra* note 69 and accompanying text.

[71] Further, the event study may extend beyond the single day of bad news. Stock prices tend to continue to "drift" or react to additional clarifying information entering the market after a bad news event. An event that triggers a substantial stock price change, especially a negative change, can cause increased volatility in the days or weeks immediately following that event. Academic literature on this phenomenon in security markets is developing and is well beyond the scope of this paper. [for surveys of the evidence, concepts and methods of modeling changing volatility in financial markets, *see, e.g.*, TSAY, *supra* note 67, at 79-125; CAMPBELL ET AL., *supra* note 50, at 479-98; JAMES DOUGLAS HAMILTON, TIMES SERIES MARKETS 657-76 (2004)]. In other words, movement in the stock price on the day of an extremely negative event is often not the end of the story and the stock price will continue to bounce around for some period thereafter. Such an event introduces greater uncertainty in the valuation of the security and greater investigative efforts on the part of market participants in the following days.

as they should have been. For example, a later restatement may capture the truth, or financials may be constructed based on an exhaustive forensic study of historical accounting treatments. Based on that evidence, an expert can assess the extent to which the key financial metrics were overstated and reliably estimate the difference between the prices at which the stock actually traded and what the price would have been if the truth had been known at relevant points in time.[72]

## VII. HOW DOES THE ECONOMIC ANALYSIS FARE IN THE COURTS?

Given the simplicity of the economics involved, (albeit requiring expert analysis, explanation, and testimony) what has happened in terms of establishing loss in real world securities fraud cases?

In one sense, it is fair to say "not much." Historically, so few of these cases have gone to trial that no well-developed case law regarding the proof of loss exists. Indeed, nearly all of the case law regarding loss has arisen in the context of motions to dismiss, summary judgment, class certification, evidentiary battles (admissibility of expert reports, for example), or settlement (where additional considerations may be in play).[73] Thus, courts have often had to address the adequacy of loss causation and damages issues in a bare-bones context, most often a pleading. This means that concepts of loss have developed somewhat in a vacuum, uninformed by what evidence would actually be required and adduced at the proof stage. While legally, the concepts of loss, causation and damages may involve separate inquiries or concerns, surely the latter does and should inform the former.[74] Yet, here, much of the important legal developments have taken place without being trial-tested.

Courts have plunged into questions of economic loss often on the pleadings or otherwise undeveloped records, becoming deeply mired in "proximate cause." As arcane as any legal concept, proximate cause deals with the twin inquiries of what event in a chain of events can be fairly said to have caused a consequence and what policy choices should be made to fairly limit a defendant's liability.[75] Needless to say, discussions of

---

[72] The results of such quantitative analyses can be expressed as differences or deltas in revenues, operating earnings, cash flows, or other financial measures or metrics that, according to securities analysts, drive share prices for the particular firm at particular points in time. In the context of interpreting events and information, *see* Cornell & Morgan, *supra* note 24, at 894-97 (discussing the construction of an "equivalent disclosure price" as an estimate of the true value based on a "detailed investigation of the facts as they existed at the time of the misrepresentation or omission and at the time of disclosure.")

[73] Another context in which economics might be in play is in the appointment of lead plaintiff. The PSLRA requires that the selection of a lead plaintiff be based on who has the "largest financial interest" in the litigation. 15 U.S.C. § 78u-4(a)(3)(B)(iii). This determination is sometimes made based strictly on looking at investment loss, not inflationary loss. This appears to be so because investment loss is viewed as a suitable proxy for damages in this very early stage of a case, where considerations of efficiency and speed are paramount. *See, e.g.*, HBOC v. McKesson, 97 F. Supp. 2d 993 (N.D. Cal. 1999). Nonetheless, the concept of "largest financial interest" adds yet another element of confusion regarding terminology.

[74] Bruschi v. Brown, 876 F. 2d 1526, 1530-32 (11th Cir. 1989). *See also*, Huddleston v. Herman & MacLean, 640 F.2d 534, 549-56 (5th Cir. 1981). As a theoretical economic matter, however, concepts of materiality, loss causation and damages are all said to involve essentially the same inquiry. Fischel, *Use of Modern Finance Theory*, *supra* note 9.

[75] In the securities area, the policy concern of Congress and the courts is to avoid holding the defendants liable for the full investment loss that plaintiffs' may have experienced in the market. Thus, responsibility is limited solely to the loss caused by fraud and not by other forces. *See* Fox, *Demystifying Causation*,

proximate cause have, ever since *Palsgraf*,[76] been hallmarks of confusion. The same holds true in securities cases. As Prosser stated, "[p]roximate cause remains a tangle and a jungle, a palace of mirrors and a maze."[77]

In these cases, as well as in other contexts, courts have bifurcated the causation question into "transaction causation" and "loss causation." Putting aside whether the bifurcated analysis makes any sense or whether it was derived from appropriate common law principles,[78] the general rule is that the former is "but for" cause (sometimes referred to as "cause in fact") and the latter is "proximate cause." Transaction causation postulates that the investor would not have purchased the stock if the truth had been told. This "but for" cause is said to be a necessary but not a sufficient condition for a finding of causation. The second prong of the bifurcated analysis, "loss causation," postulates that the loss claimed must have been caused by the fraud.[79] The analyses of this element have been poorly framed, focusing on investment loss as a whole (i.e. "why did the stock price decline?") Since it is unarguable that stock prices decline for many reasons, that focus misses the point. Additionally, this type of focus seems to drive the courts toward a discussion of what should be irrelevant concepts like "intervening" or "superseding" cause, as they attempt to figure out whether the fraud played a role in the decline.[80] The right question, again, is whether the decline in price led to the realization of inflationary loss.

Nonetheless, courts have come up with the divergent standards that led to the Supreme Court's grant of certiorari in *Dura*.[81] The Ninth Circuit, which long recognized

---

*supra* note 18; William Prosser, Torts (4th ed. 1971), 236-290. The PSLRA specifically requires that recovery be limited to losses caused by the fraud. 15 USC § 78u-4(b)(4)

[76] Palsgraf v. Long Is. R.R. Co., 248 N.Y. 339, 162 N.E. 99 (N.Y. 1928).

[77] William Prosser, *Proximate Cause in California*, 38 CAL. L. REV. 369, 375 (1950).

[78] *See* Fox, *Demystifying Causation*, *supra* note 18, at 514 (explaining that, "the twin requirements of transaction causation and loss causation fit very poorly with fraud on the market actions"). For other contexts in which the same bifurcated language is used, *see, e.g.*, Martin v. Heinold Commodities, Inc., 643 N.E.2d 734, 746-47 (1994).

[79] Some courts have framed the test as whether the fraud was a "substantial factor" in bringing about the loss (a common formulation of proximate cause in other contexts) or, similarly, whether the fraud was a "substantial contributing factor" even though not "the sole cause of plaintiff's loss." Miller v. Asensio & Co., 364 F.3d 223, 232 (4th Cir. 2004); Semerenko v. Cendant Corp., 223 F.3d 165, 187-87 (3d Cir. 2000); Caremark Inc. v. Coram Healthcare Corp., 113 F.3d 645, 648-49 (7th Cir. 1997). This expression of the test would seem to lead in the right direction, at least to the extent that it suggests that loss causation could properly be found when a price decline resulted in part in an inability to recoup overpayment. To the extent the analysis focuses on investment loss as a whole, it misses the mark.

[80] We say irrelevant because, as we have shown, a foreseeable consequence of securities fraud is that market forces will operate on the fraud and, depending on their direction, will cause investors to experience inflationary losses or gains. With respect to the perplexing variety of language about proximate cause - since we seek a clear vantage point rather than explication of the intricacies of the concept - it is hornbook law that a condition that exists at the time of the tort (here, market forces) or an occurrence that is reasonably foreseeable at the time of the tort (here, market reactions) cannot constitute an intervening or superseding cause that breaks the chain of causation. Stated differently, market reactions are within the scope of the risk that the actor undertakes in the first instance and are foreseeable. *See generally* RESTATEMENT (SECOND) OF TORTS §§ 447; 442B; PROSSER, LAW OF TORTS Ch. 7 (4th ed. 1971).

[81] Our purpose is not to review the history of the splits in the circuits or the background of *Dura* itself, which is widely available, *see, e.g.*, Brief for Petitioner, Dura Pharm., Inc. v. Brouda, 125 S. Ct. 1627 (2005) (No. 03-932), *also available at* http://supreme.lp.findlaw.com/supreme_court/briefs/03-932/03-932.mer.pet.pdf; Brief for Respondent, Dura Pharm., Inc. v. Brouda, 125 S. Ct. 1627 (2005)(No. 03-932),

that "inflation" was key, held that plaintiffs need only state that they paid an artificially high price.[82] It did not, however, couple that standard with any requirement that plaintiffs explain what happened after that (Did the inflation dissipate? What caused the dissipation? Were they unable to recoup the inflationary price?). The Ninth Circuit seemed content to await the evidentiary stage before tackling these issues. Other circuits insisted that "purchase time inflation" allegations are not sufficient, and that such a pleading standard would be too broad. The Third Circuit, for example, noted that this standard might allow plaintiffs to sell with the inflation still incorporated into the price, and in this case, the plaintiff would not have suffered an injury.[83] Thus, disclosures correcting the misrepresentations were required. The Second Circuit announced a standard that focused on what had to be disclosed, rather than on whether inflation and dissipation had been alleged: "The issue 'is whether the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.'" The Court did not specifically indicate what it means by "value" in this context, and it also used the word "loss" imprecisely.[84] Suffice to say, commentators have divergent points of view, as do the courts.[85]

---

*also available at* http://supreme.lp.findlaw.com/supreme_court/briefs/03-932/03-932.mer.resp.pdf; Brief of the United States United States as Amicus Curiae, Dura Pharm., Inc. v. Brouda, 125 S. Ct. 1627 (2005) (No. 03-932), *also available at* http://www.usdoj.gov/osg/briefs/2003/2pet/6invit/2003-0932.pet/ami.inv.pdf.

[82] Dura Pharm., Inc. v. Brouda, 125 S. Ct. 1627 (2005).

[83] Semerenko v. Cendant Corp., 223 F. 3d 165, 185 (3rd Cir. 2000), *cert. denied*, 531 U.S. 1149 (2001); Robbins v. Koger Props., Inc., 116 F.3d 1441, 1448 (11th Cir. 1997).

[84] Lentell v. Merrill Lynch, Co., 396 F.3d 161 (2d Cir. 2005). *Lentell* has been read as establishing a draconian standard for pleading loss causation. *See* Ryan, *Yet Another Bough on the "Judicial Oak": The Second Circuit Clarifies Inquiry Notice and Its Loss Causation Requirement under the PSLRA in Lentell v. Merrill Lynch & Co.,* 79 ST. JOHN'S L. REV. 484, 518. The case can be read, however, as acknowledging that dissipation can be caused in any of the ways we have described, except, perhaps, solely by the operation of market forces on the fraud. *Lentell* did not require that the prior falsehood be disclosed to establish causation; a "concealed risk" had to be disclosed, which would typically be a risk to the company's financial health or its prospects, not a scheme or falsehood per se. Market forces operating on the fraud was recognized, pre-*Lentell*, in lower courts in the Second Circuit, but its current fate there is unclear. *See In re* IPO Sec. Litig., 297 F. Supp 2d 668 (S.D.N.Y. 2003). *But see* IPO Sec. Litig. v. Credit Suisse First Boston, 2005 WL 1162445 (S.D.N.Y.) (citing the materialization of concealed risk language, but holding that post-*Dura*, under *Lentell*, the fraudulent scheme itself has to be disclosed); IPO Sec. Litig. v. Credit Suisse First Boston Corp., 2005 WL 1529659 (S.D.N.Y.) (noting that falsity only needs to be disclosed if the cause of action involves a false opinion in the first instance; otherwise materialization of the concealed condition or event need not involve disclosure of falsity); *Accord,* Teamsters Local 445 Freight Division Pension Fund v. Bombardier Inc., 2005 WL 2148919 (S.D.N.Y.). It is also of note that *Lentell* involved only an analyst's opinion, not an issuer's representation, and the court clearly seemed to think that all material risks of the investment and to the company had been disclosed in any event.

[85] Lefler & Kleidon, *supra* note 24; Lyle Roberts & Paul Chalmers, *Shining a Light or Cursing the Darkness? – The Impact of* Dura Pharmaceuticals., Inc. v. Broudo, 1505 PRACT. LAW. INST. 343 (Sept. 2005); Fox, *Demystifying Causation, supra* note 18; John C. Coffee, *Loss Causation After Dura: Something for Everyone,* N.Y. L. J., May 19, 2005 (hereinafter Coffee, *Something for Everyone*); Alan Schulman & Niki Mendoza, Dura Pharm., Inc. v. Broudo – *The Least of All Evils*, 1505 PRACT. LAW. INST. 271 (Sept. 2005).

## VIII. ALONG COMES *DURA*

Enter *Dura*. Styled as a pleading case, commentators and parties have, nonetheless, hoped that *Dura* would afford the court an opportunity to clarify loss causation concepts in securities fraud litigation. For the most part, the Court declined the invitation, leaving the doctrinal development to the lower courts and leaving the direction of that development wide open.

The Court held that pleading purchase time inflation, without any other statement about causation, was inadequate to satisfy the element of proximate cause, or loss causation, in a securities fraud case.[86] It reiterated the old standard that a plaintiff in a securities fraud case must plead and prove that "misrepresentations (or other fraudulent conduct) proximately caused plaintiff's economic loss."[87]

Beyond that, the Court established a relaxed and undemanding rule, as noted above: A plaintiff should "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."[88] The Court emphasized that it was not deciding any other questions related to proximate cause, loss causation, transaction causation, or damage calculations when it stated, "*[w]e need not and do not consider other proximate cause or loss-related questions*."[89] The Court assuredly did not discuss econometrics, how damages are to be measured, finance theory, or other related subjects, and clearly did not explicitly overrule any of its own or other precedent on those issues.[90] The holding of *Dura* is limited:

> The Court's holding in Dura is extremely narrow. It settles only one issue: We now know that a plaintiff who merely alleges and subsequently establishes, that a positive, materially false misstatement in violation of rule 10b-5 inflated the price she paid for a security has not done enough to establish causation in a fraud on the market case.[91]

As another commentator put it, *Dura* "is a minimalist text, which holds only that payment of an inflated purchase price, without more, does not by itself constitute an actionable economic loss."[92]

Notwithstanding this simplicity, a battleground has emerged. Beleaguered courts have been told that *Dura* means nothing and that *Dura* changes everything. We next

---

[86] Dura Pharm., Inc. v. Brouda, 125 S. Ct. 1627, 1633 (2005).

[87] *Id.*

[88] *Id.* at 1634.

[89] *Id.* at 1633 (emphasis added).

[90] The court was clearly invited to do so. Dura Pharm., Inc. v. Brouda, 125 S. Ct. 1627 (2005).

[91] Fox, *Understanding Dura, supra* note 26.

[92] Coffee, *Something for Everyone, supra* note 85. The Court was dealing with an "apples and oranges" problem. Under the Ninth Circuit's pleading standard, a pleader would allege he paid too much and then that the stock's absolute price had declined, with no explanation of what component of that absolute decline, if any, constituted loss to that investor (inflation "apples" to price "oranges") Without further economic explanation of the linkage between an absolute price decline and dissipation of inflated value, one is left with an "apples to oranges" disconnect. If a pleader shows she paid too much and is unable to recoup that over-payment, (inflation "apples" and dissipation of inflation "apples"), that is the right comparison and the causal link is clear.

explore whether *Dura* intended to or did preclude the application of the econometric and legal principles discussed herein.

## IX.  A *PER SE* RULE OR ON-GOING DEVELOPMENT CONSISTENT WITH ECONOMICS?

One extant proposition is that *Dura* set highly restrictive rules regarding liability, causation, damages calculations and even damages methodologies.[93] The arguments are drawn from the ambiguous dicta of the case and conclude that "truth plus drop" is now the exclusive means of establishing loss.  In other words, loss is shown if—and only if— there is a "corrective disclosure" followed by an immediate price drop.  Every other circumstance in which loss might occur is swept aside.[94]

The argument has been constructed and reconstructed in many sources.[95]  Essentially, it has been derived from what the Court said when it rejected the purchase time inflation pleading standard:

> For one thing, as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value. plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value...Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes it way into the market place, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.[96]

The Supreme Court also quoted the Restatement of Torts 548A which said that a person who "misrepresents the financial condition of a corporation in order to sell its stock becomes liable to a relying purchaser "for the loss" the purchaser sustains "when the facts...become generally known" and "as a result" share value "depreciate[s]."[97]

---

[93] Many permutations that are favorable to the defense have purportedly been discovered in *Dura. See, e.g.,* Lefler & Kleidon, *supra* note 24; *see also* Roberts & Chalmers, *supra* note 85.

[94] It has even been suggested that, without ever mentioning the case, the Supreme Court implicitly overruled parts of Wool v. Tandem, 818 F. 2d 1433, 1437 (9th Cir. 1987), Lefler & Kleidon, *supra* note 23.

[95] *See supra* note 85.

[96] Dura Pharm., Inc. v. Brouda, 125 S. Ct. 1627, 1632 (2005).

[97] RESTATEMENT (SECOND) OF TORTS § 548A(b). In a phrase omitted by the Court, the cited sentence goes on to state that the depreciation of the value of the shares "is the obviously foreseeable result of the facts misrepresented." This is essentially the same causation standard we advocate for: reasonable foreseeability. Yet, neither the Restatement nor the Court dealt with the question of whether, as a matter of economic principle, reaction of market forces on price and therefore on inflation is always foreseeable.

The argument that loss causation must be demonstrated in *every case* by a "corrective disclosure" of "the Truth" couples the Court's illustration of why purchase time inflation does not necessarily always cause loss (which the authors of this article agree) with the court's comment about the "truth" coming out and facts becoming known. The constructed *per se* rule, together with very narrow views of "what is 'truth,'" creates a Platonic paradigm that almost never happens in the real world. It looks like this: Loss causation can be shown only where: (1) alleged fraud inflates the stock price; (2) the alleged fraud is fully disclosed in mirror image language to the market; (3) the stock price drops immediately in an otherwise serene market; (4) that price drop is the only cognizable loss; (5) no matter what else happened before the Truth, no one who sold before the Truth is injured.[98] The price drop defines the loss and is linked to the fraud because, in this paradigm, no other forces are operative. It is a "pure" situation in which, by definition, everything other than the market's evaluation of the fraud has been eliminated.[99]

The Court did not say (or even imply) that "truth, then price drop" was to become the only test of loss causation much less the sine qua non for measuring damages. In addition to its specific disclaimers and simple holding that we discussed above, the very dicta upon which these arguments are based acknowledge that "truth" may "leak" into the market. If that is so, then at the very least "complete revelation of fraud" cannot be the litmus test. This is true because leakage is (by definition) the introduction of bits and pieces of information and therefore must be something short of "the Truth." Moreover, by using the term leakage, the Court also implicitly acknowledged the phenomenon that the market may have anticipated an announcement—thus, the "Truth" may not cause a drop at all. The Court further acknowledged that purchase time inflation "may" play a

---

[98] Traders who sell before full revelation of the truth are sometimes referred to as "in and out" traders, meaning they bought and sold the relevant stock during the class period but prior to "the" disclosure. Whether or not they have experienced loss should depend entirely upon whether the inflationary component of the stock price was lower on the day they sold than on the day they purchased, but under the "truth then drop" standard, they would never have loss. The reasoning is that if loss causation can only be shown by a corrective disclosure followed by a price drop, then prior to the disclosure, the inflation in the price was exactly the same, day after day, every single day of the class period. If the inflationary component was identical from day 1 to the day of "the" disclosure, then all prior sellers automatically must be deemed to have recouped the inflationary component of the price. Notwithstanding the fact that *Dura* contains no such discussion, some have argued that *Dura* must be read to stand for that proposition, Lefler & Kleidon, *supra* note 24, at 294 (stating that *Dura* "expressly precludes any recovery based on stock price declines that occur before the market learned about the fraud.").

[99] What is more, some argue that the "truth then drop" standard allows for only one methodology for computing damages, sometimes referred to as the "dollar drop" method. One form of that approach looks solely at the inflationary component of the price on the day of disclosure in dollar terms, rather than percentages, and then concludes that is the sole measure of damages. In other words, damages consist only of the dollar decline in price on the day of the disclosure. Proponents reason that no one who sold before that date has damages at all. Taken further, the argument would be that everyone who held on that date or sold that instant suffered a single measurable "dollars and cents" amount of loss. The reasoning in support of this theory is attenuated. First, the "dollar drop" on "the" disclosure day can accurately capture the inflationary component of price only on that one day. But what if the inflationary component has changed over time, which it almost always will? And what if the market and industry had predicted a price increase on the day of disclosure? Would dollar drop on that day capture the entire inflationary loss? Indeed, "dollar drop" proponents admit that economic theory may *demand* that percentage terms be used to measure loss, but declare that *Dura* has overruled economic theory in that regard. Lefler & Kleidon, *supra* note 23.

role in loss. Therefore, it would seem that if a plaintiff can plead and prove that it *does* in fact play such a role, the burden is met and the "truth only" test should be rejected.

The Court also specifically stated that fraud claims could relate to situations where the share's higher price was lower than it would otherwise have been, necessarily implying that a "drop" is not the only operative fact to be examined in determining loss causation. Even the example it used in rejecting purchase time inflation (that the investor might resell at exactly the same inflated price) incorporates the reverse: the investor might resell at a different level of inflation and suffer loss. The implication of these points is that the Court was acknowledging the efficient market hypotheses—not rejecting it. Further, the implication is that the Court recognized that the facts and circumstances of any given case have to be examined under a relatively relaxed standard at the pleading stage in order to determine if loss causation exists.

## X. POST-*DURA* DECISIONS: ANY MORE CLARITY?

So what did the lower courts do immediately after Dura? Did they leave room after *Dura* for the economic principles that ought to be driving the analysis? Or did they get as stuck afterward as before, but in a different bog?

The answer is—both. In the immediate aftermath, courts started focusing on the nature and extent of "corrective disclosures," with an emphasis on the nature, size and immediacy of stock price drops. Some courts have fashioned a per se rule that loss never occurs before "Truth" is revealed. These courts define "Truth" with varying degrees of stringency,[100] scrutinizing "the" disclosure for the extent to which it precisely reverses the prior misrepresentation or confesses to fraud.

This approach has several negative consequences. First, it would deprive persons who actually suffered inflationary loss from any recovery. To be sure, if any price drop prior to "the" corrective disclosure is caused by something other than fraud, those who sold before "the" disclosure are said to have suffered no damages. Yet, as we have shown, people who sold before a disclosure may well have sold after the inflation in their stock has dissipated through the various means other than "Truth" that we have described. However, the operation of the per se rule would mean that once an initial investment has been made, the investor bears the risks of everything that the market may do up until the point that wrongdoing comes to light and notwithstanding the fact that the silent defendant is actively participating in the market reaction on a day to day basis. Thus, under this view, all investors who sell before the fraud is known must bear the risk that the market has operated on the fraud and deprived them of the opportunity to recover all or part of the inflationary component of price. At bottom, this rejects the economic fact

---

[100] Collier v. Asksys Ltd., 2005 WL 1949868, at *13 (D. Conn.) (holding "any losses associated with …pre-revelation [transactions] could not be causally linked to the misstatement and omissions because the truth relating to [the misstatements] had not yet been revealed to the market."); Fraternity Fund., Ltd. v. Beacon Hill Asset Mgmt. LLC, 376 F. Supp. 2d 385 (S.D.N.Y. 2005) (holding that disclosure of prior fraud establishes loss; if purchaser had sold before the "truth" about prior fraud had been told, then no loss); *see also In re* Compuserve Sec. Litig., 386 F. Supp. 2d 913 (E.D. Mich. 2005) (noting that corrective disclosure must "publicly air" the fraud). At one extreme, the defense argued that "the corrective disclosure" must literally be the "linguistic mirror image of the alleged fraud." That extreme was rejected, *In re* Bristol-Myers Squibb Sec. Litig., 2005 WL 2007004 (D.N.J.), but the court did require corrective statements that related fairly directly to the fraud.

that market forces operate on a fraud. Stated differently, this view regards undisclosed fraud as an ordinary market risk that investors are expected to bear. This logic is entirely contrary to the purpose of securities fraud law—to prevent that particular risk from entering into the marketplace in the first instance. It is not something the Supreme Court articulated in *Dura.*

Second, because this approach effectively establishes a presumption of "no loss causation," it gives defendants a wild card. If liability attaches only when disclosure of falsity or wrongdoing occurs and a prior misrepresentation is reversed, the incentive to manipulate information is greatly enhanced. Companies would be affirmatively encouraged to "guide down" expectations in order to mute the impact of fraud. Under this rule, the more successful the company could leak information and slowly let the air out of the "inflation balloon," the better off it would be.[101] This was clearly not sanctioned, nor discussed by the Supreme Court in *Dura.* It is also antithetical to the purpose of the securities laws.

Third, the rule encourages or eventuates in procedural distortions. If plaintiffs must demonstrate that a moment of pure "Truth" happened, courts end up flyspecking the complaint for mirror image language reversing the prior misrepresentations, rather than looking at whether the plaintiff has, in fact, pled material misrepresentations plus scienter. If market declines and their causes must be scrutinized at the pleading stage, courts are making complex economic decisions without the aid of discovery, evidentiary support, or comprehensive understanding of the economics underlying stock price movements. Motions to dismiss are effectively converted into summary judgment motions, and plaintiffs with valid inflationary losses may be inappropriately barred.[102]

On the other hand, the economic principles discussed herein have been given recognition in other courts. Some recognize that disclosures may be required, but need not identify fraud or wrongdoing (Category C). Honest information about the company may be sufficient (Category D above),[103] or leakage of troubling information may be

---

[101] *See In re* Acterna Corp. Sec. Litig., 378 F. Supp. 2d 561 (D. Md. 2005). Another instructive case is D.E. & J.L.P. v. Conaway, 2005 WL 1386448 (6th Cir. June 10, 2005), where plaintiffs sued K-Mart and its auditors alleging that Kmart mislead investors about its expenses, future sales, and inventory. They alleged that the effort to shore up its stock price began to fail in late 2001 and the company had to report that its sales had been flat, and later, sales actually declined. On January 22, 2002, the company filed for bankruptcy and several days later disclosed a whistleblower report that cited serious concerns about its accounting methods and financial results. Restatements and charges attributable to the alleged fraud followed. A class action was filed on behalf of purchasers from May 2001 to January 22, 2002. The lower court dismissed on the ground that plaintiff only pled "purchase time inflation," did not plead that the alleged fraud became known to the market "on any particular day," did not estimate damages, and did not "connect" the alleged fraud with the "ultimate" disclosures and loss. The Sixth Circuit upheld the dismissal, stating that an announcement of bankruptcy followed by a stock price drop, without an allegation that the bankruptcy disclosed the actual prior misrepresentations to the market, was insufficient to meet the "truth then drop" version of the *Dura* test. This decision clearly requires a corrective disclosure unveiling the fraud. Perhaps an event study would have established that materialization of concealed risk began with leakage of information in October, but on the face of the decision, the Court does not appear to have been met with that argument or an explanation that the bankruptcy itself rendered plaintiffs unable to recoup an inflationary component in the price. Hence, the court retreated to the comfort of the *per se* rule.

[102] *See, e.g., In re Acterna Corp.*, 378 F. Supp. 2d 561.

[103] *In re* Daou Sys., Inc., 411 F.3d 1006 (9th Cir. 2005). However, the court also made an observation that there was no revelation of the company's true financial health before a certain date and commented that the stock price drop before that date could not be considered causally related to the fraud. *Id.* This is

enough (Category E).[104] Some have rejected the idea that *Dura* requires "a corrective disclosure at the pleading stage."[105] At least one court has reaffirmed the Sneed concept of market forces operating upon the fraud. This court recognized that traders may suffer loss before any disclosure because inflation was dissipated before that and investors cannot therefore sell at the same inflated price they paid. (Category F).[106]

On the whole, however, these cases shed little light on analysis of loss causation, what it should be, and how it can be shown. To the extent that the courts are stuck in the exclusive paradigm of "truth plus price drop," they are imposing the "Platonic ideal" we identified above, which only remotely reflects the real, "rough and tumble" world of

inconsistent with the economic principles we have discussed and would suggest "in and out" traders might be out of luck, but the court was merely making an observation about language in the complaint, not a definitive ruling on the general subject of in and out traders.

[104] *In re* Greater PA Carpenters Pension Fund v. Whitehall Jewellers Inc., 2005 WL 61480 (N.D. Ill. 2005), the plaintiff pled that Whitehall engaged in various fraudulent transactions to inflate Whitehall's inventory balances, net income and earnings per share and reported the falsely inflated income and earnings figures. *Id.* at *1. On several of these announcements, the stock price dropped. *Id.* at *5. The company ultimately issued two restatements of its financial statements, neither of which revealed the prior falsehoods. *Id.* The stock price did not fall upon these restatements. *Id.* Ultimately, the prior falsehoods were revealed. *Id.* Before *Dura,* the Court held that the plaintiffs had adequately pled loss causation. *Id.* After *Dura,* the defendants argued that dismissal was required because plaintiffs had not pled "truth, then drop." The lower court noted the language of *Dura* that pleading loss causation "is not meant to impose a great burden upon a plaintiff" and that plaintiff had pled leakage and price drops, which sufficed. *In re* JDS Uniphase Corp. Sec. Litig., 2005 WL 1705766 (N.D. Cal. 2005) (alleging there that defendants misrepresented the value of inventory and goodwill, as well as product demand. As JDS made disclosures of its actual financial situation as it related to those three indicators, among others, the stock price fell. There was no disclosure of fraud. The court recognized that disclosure of the company's financial condition, not of the fraudulent scheme, was sufficient.) *See also* Rocker Management LLC v. Lernout & Hauspie Speech Prod., 2005 WL 1366025 (D.N.J., June 8, 2005) (alleging, in a short seller case, that false financial statements inflated the stock, causing plaintiffs injury at the time of cover, were sufficient; court distinguishing inflation at the time of cover from inflation at the time of purchase for purposes of *Dura,* but emphasizes the fact intense nature of the causation inquiry); Zelman v. JDS Uniphase Corp., 376 F. Supp. 2d 956 (N.D. Cal. 2005) (explaining that plaintiff need only allege that defendants' pre-class period misrepresentations had "something to do with" plaintiffs' alleged losses).

[105] In *In re* Parmalat Sec. Litig., 375 F. Supp. 2d 278, 2005 WL 1527674 (S.D.N.Y. 2005), the court held that an allegation that a corrective disclosure caused a price drop is not necessary to pleading loss causation; it is sufficient to allege that a concealed risk materialized when the company experienced a liquidity crisis. The Court reaffirmed that ruling a month later. *In re* Parmalat Securities Litigation, 376 F. Supp. 2d 472 (S.D.N.Y. 2005). *See also* Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 2005 WL 2148919 *12, n 155 (S.D.N.Y.) (holding that materialization of concealed risk allegations are sufficient to plead loss causation; no corrective disclosure needed).

[106] Order Granting Class Plaintiffs' Motion for Final Approval of Plan of Allocation, Sept. 14, 2005, at 8, *In re* Broadcom Corp. Sec. Litig. (C.D. Cal. 2005) (unpublished). The Court approved a Plan of Allocation that allowed claims by "in and out" traders, rejecting the notion that *Dura* had proscribed such recoveries. (All three authors of this article were involved on the plaintiffs' side in the Broadcom case.) In the settlement context, it seems highly likely that until there is definitive precedent in the relevant jurisdiction that no loss ever occurs before "the" disclosure, courts will approve plans that permit claims by "in and out" traders, particularly since defendants typically will want settlements to be as broad as possible. "In and out claims" will sometimes be weighted lower than those of "post-disclosure" sellers, to account for the possibly more difficult proof. *See also In re* Worldcom Sec. Litig., 2005 WL 2293190 (S.D.N.Y.); Maley v. Global Techs. Corp., 186 F. Supp. 2d 358 (S.D.N.Y. 2002); *In re* MicroStrategy, Inc., Sec. Litig., 148 F. Supp. 2d 654, 668 (E.D.Va. 2001); *In re* Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166, 184 (E.D. Pa. 2000); *In re* Sapiens Sec. Litig., No. 94 Civ. 3315 (RPP), 1996 WL 689360, *2 (S.D.N.Y Nov. 27, 1996).

stock market fraud. At the core of the problem, it seems that discussions focus too often on the incorrect loss causation question we identified above: What are all of the forces that caused the stock price to decline? A focus on the decline (the entire investment loss) is mistaken. The correct question to ask is whether the decline allowed inflationary loss to manifest, thereby allowing the fraud component of the price to become unrecoverable in the market.

What generated this misdirected focus? Is it that plaintiffs have tended to plead or ask for their entire investment loss instead of just inflationary losses? Is that the predictable consequence of pleading only "purchase time inflation," without any explanation of the links between the initial fraud, market activity, and recoverable fraud? Is it due to the procedural posture of the cases—since these issues are raised so often at a non-evidentiary stage, have the economics simply not been presented? Do the courts fundamentally distrust jurors and experts, leading them to believe that inflationary loss cannot in fact be reliably demonstrated and, therefore, Rule 12 needs to be harnessed to cut off "trouble at the pass"? Is it because events studies and other financial techniques have not been used in the pleading preparation stage and, so, not much can be said about inflationary loss upon a motion to dismiss? Or is it a policy choice—even if fraud did cause inflationary loss, do courts prefer to confine the evidence to just one kind of proof—the tempting *per se* rule purportedly drawn from *Dura*?

Whatever has caused (no pun intended) the focus to be on investment loss instead of inflationary loss, there exists much room for development of the appropriate rule. A clear exposition of inflationary loss and its interrelationship with damages can actually be found in the case law. It was recognized by Judge Posner of the Seventh Circuit in Movitz v. First National Bank.[107] There, the court considered a breach of contract and breach of fiduciary suit. The buyer had purchased property that the bank had negligently failed to evaluate. The bank failed to let the buyer know that the property was in bad condition. The housing market plummeted, and the buyer lost his entire investment. The buyer sought and proved his entire investment loss at trial, making no effort to separate what he overpaid for the property as a result of the negligence (it was undisputed that the property had some worth, despite the poor condition). The Court of Appeals ruled that the plaintiff had failed to prove that his investment losses were proximately caused by the negligence.

However, Judge Posner (with the benefit of both a full trial and hindsight as to what proof of overpayment loss would look like) recognized that the buyer could have put on testimony about the true value of the property on the date of purchase, assuming the bank had done its job. The buyer could have separately identified the overpayment the buyer made (inflation); proven the market crash that made the overpayment unrecoverable (inability to recoup). Based on this rationale, Posner concluded that the buyer could have recovered that part of the total investment loss.[108]

---

[107] 148 F.3d 760 (7th Cir. 1998).

[108] Posner also discussed securities fraud and opined that when a plaintiff buys stock based on a misrepresentation, and then the market tanks, there is no loss causation because the loss that occurred (investment loss) is not the kind of loss that the securities fraud law intends to prevent. The court cited to its own decision in Bastian v. Petren Res. Corp., 892 F.2d 680, *cert denied*, 496 U.S. 906 (1990). In *Bastian*, which is frequently mis-cited as a fraud on the market case, the Seventh Circuit affirmed the dismissal of a complaint alleging that the defendants' fraudulent statements had induced the plaintiffs to invest in oil and gas limited partnerships that ultimately became worthless, because the complaint did not allege that "the

This is essentially the rule advocated for in this article. Once it is shown that "but for" the misrepresentation the plaintiff would not have overpaid, the loss causation question turns only on inflationary loss. All of the myriad reasons for a price decline become part of the story as to why, or to what extent recoupment is no longer possible (but are not dispositive as to proximate causation).

What about the concern that market forces are beyond the defendant's control, and therefore, defendants may be inappropriately held responsible for ordinary risks against which the law does not insure? If one follows Posner's rule (the same view held by the authors of this article), and focuses on the inflationary loss rather than the investment loss (for which no recovery is available), that concern is not present. After all, the defendant entirely controls its own actions: committing fraud in the first place thereby inflating stock prices; manipulating information and other company conduct; allowing schemes to continue by refraining from truth and thus actively participating in the (on-going) fraud. Those market conditions over which the defendant has no control are nonetheless exactly what allow the fraud to have value and the defendant's responsibility will be limited to that value.

In other words, once a security's price has been inflated by fraud, dissipation of the inflation will ultimately result in loss. Dissipation, whatever its particular trigger or triggers, is not an "intervening" or "superseding" cause of loss or even a "substantial factor" in the loss. Rather, it is a necessary condition of the loss in every instance and a foreseeable consequence of the fraud. As we have demonstrated, the market and its reactions are as necessary to fraud-on-the-market as oxygen to a fire.[109]

## XI. CONCLUSION

So what now? It is apparent that *Dura* did not truly clarify loss causation. The decisions of lower courts, since *Dura*, have also been particularly unrevealing (other than to exhibit a leaning, perhaps, towards the seemingly safe harbor of "truth, then drop"). From the point of view of economics, Inflationary loss clearly should drive the analysis. Instead, it seems to have been lost in the shuffle. So what should parties and courts do?

It would seem that at the pleading stage, a "short and plain" statement is still the standard. After all, the Supreme Court has emphasized that "pleading rules are not meant to impose a great burden upon a plaintiff" and that "some indication" of loss and the causal connection should suffice. The minimal pleading requirement is as follows: (1) pleading the misrepresentations or omissions; (2) pleading that these misrepresentations

---

plaintiffs' loss was due to the defendants' fraud" rather than (for example) "the unexpected drop in oil prices." *Id.* at 684. Interestingly, however, Posner did not discuss in either decision whether the result would have been different, as he said it would have for *Movitiz*, if the securities buyer had sought not the entire investment loss, but only the overpayment that he could no longer recoup (inflationary loss). That is the logical conclusion from both opinions.

[109] This is completely consistent with traditional tort law. Prosser comments that forces will not be considered intervening when they are "caused or set in motion by the operation of the defendants' conduct upon the existing situation—as where his spark ignites gasoline vapor already present...since their origin is not external and independent and they are to be attributed to the defendant himself." PROSSER, *supra* note 80, at 271.

inflated the purchase price; and (3) pleading that the inflated component of the price subsequently dissipated, thereby causing inflationary loss[110]

As a practical matter, however, the Complaint must, in all likelihood, do more than that required pre *Dura*. Although the Court did not hold that loss causation must be pled with particularity,[111] it seems evident that particularity is one protection against dismissal in any case where the pure paradigm cannot be pled. Simply put, if it can be pled, it should be. Where there is something close to a mirror image disclosure of truth to reverse the prior misrepresentation (such as a dramatic stock price drop that market and industry forces are unable to explain) even a stringent court may find it sufficient, at least as to post-disclosure holders and sellers of the stock.[112]

Even in these instances, though, the course of dissipation preceding the final disclosure (which, in turn, precipitated the Complaint) may be much more complex. Investors who bought and sold before the triggering disclosure may have losses and those losses should be pled and recognized by courts. In that case, the facts must be scrutinized to determine whether they fit any of the economic patterns we have described. For example, inflating and dissipating events may have shored up the price or let the inflation out a little at a time. A concealed risk may have materialized. Moreover, even relatively small price drops may translate into significant inflationary loss and those effects must also be examined at the outset because the market may have anticipated a disclosure and dissipated inflation prior to "the Truth." Relying solely on stock price movements, however, will rarely be sufficient to plead loss causation because raw price movements alone mean only investment loss and do not necessarily tell the court or the defendant what the pleader "has in mind" with respect to inflationary loss.

Clear explanations of all of these relevant forces are necessary in the pleading itself— a narrative story of how and when inflation entered the price and how and when it was dissipated, just like the narratives commonly given at length about how the fraud took place. This may be the only safe bet in a post-*Dura* world. Although pleaders are often reluctant to have their hands tied by pleadings that are too detailed, the balance should tilt toward "more not less" when it comes to causation and an explanation of the underlying economics. Defendants, in other words, will be given more than just "some indication" of what is behind the plaintiffs' concept of loss. Courts will benefit greatly by clarification and detail.

In complex cases, it is likely that expert help will be needed at the pleading stage. The court may have to be educated, through the pleadings or through the briefs, about the economic theories underlying the claims. Expert help at the outset of a case is required in

---

[110] But individual damages issues – exactly when did any given plaintiff sell and what would an expert say about whether inflation had been fully dissipated at that time – should be decided at an evidentiary stage, not on the pleadings. See Fox, *Demystifying Causation*, *supra* note 18; *cf.* Semerenko v. Cendant Corp., 223 F.3d 165 (3d Cir. 2000); Zelman v. JDS Uniphase Corp., 376 F. Supp. 2d 956, 973 (N.D. Cal. 2005) (explaining that "the substantiality of the link between misstatement and loss is not a question appropriate for consideration on a motion to dismiss.")

[111] The Supreme Court punted on the point, assuming, for "sake of argument" that particularity was not required. Dura Pharm., Inc. v. Brouda, 125 S. Ct. 1627, 1633 (2005).

[112] Be aware, however, that defense counsel have suggested that even in a clear case of a large stock price drop upon a disclosure of truth, Rule 11 may not be satisfied without an event study having been done to examine the statistical significance of that drop. This is clearly the next battleground for defense counsel. Lefler & Kleidon, *supra* note 23.

other contexts and we believe it is bound to be helpful, if not mandatory, here. Thus, the assistance of accountants, finance professionals, valuation experts, or economists, can confirm the presence of, if not the exact amount or precise changes in, inflationary loss for pleading purposes. A rough and ready review or valuation analysis may suffice in many situations and could likely be done with the aid of analyst reports and other information available in the market. Additionally, an event study of at least modest scope may also be needed, depending upon the facts of the case.

This article has advocated for a broad standard of loss causation rooted in economic theory and common sense. This view is neither endorsed nor precluded by *Dura*. This view accepts the Court's invitation to further explore loss causation. It focuses on the existence of inflationary loss—the only form of loss compensable in these cases. It is not controlled by the question of why the stock price declined, but rather, whether the inflationary loss can be recouped. It results in fair allocation of risk: the defendant bears only the risk of losses caused by having placed fraud into the marketplace; plaintiff bears only the risk of the investment losses that would have occurred in any event and without the fraud. By the same token, a focus on inflationary loss actually requires the precision in pleading loss and loss causation that was absent in *Dura*. It balances plaintiffs' need (in appropriate cases) to proceed to the stage of discovery and proof, as well as the defense need to avoid the *in terrorem* effect of groundless claims. It also offers the courts a clearer standard to apply—one that is grounded in reality.

EXHIBIT 19

Copyright © The Regents of the University of California, 1990.

UCLA Law Review

JUNE, 1990

37 UCLA L. Rev. 883

**LENGTH:** 15788 words

ARTICLE: USING FINANCE THEORY TO MEASURE DAMAGES IN FRAUD ON THE MARKET CASES.

**NAME:** Bradford Cornell * and R. Gregory Morgan **

**BIO:**

* Professor of Finance, Anderson Graduate School of Management, University of California, Los Angeles.

** Visiting Professor, School of Law, University of California, Los Angeles (1988-1989). Partner, Munger, Tolles & Olson, Los Angeles.

The authors thank Judge Frank Easterbrook, Kevin Green, Ben Klein, Myron Scholes, Richard Roll, John Spiegel and Mark Wolfson for their helpful comments. Partial funding was provided by the Security Pacific Research Center at UCLA.

**SUMMARY:**
... In most cases, the plaintiffs' reliance on a misrepresentation is sufficient to establish the causal connection. ... Because the efficient market hypothesis states that the price of a security reflects publicly available information quickly and without bias, the price and value lines converge on the date that the fraud or misrepresentation is disclosed or corrected. ... However, the differences in damage estimates caused by selecting one model over another will almost certainly be small compared to the differences in damage estimates that arise because of arguments about the manner in which a disclosure will affect investor assessments. ... The value line is lower for the comparable index approach because that approach assumes that *all* stock price movements which cannot be explained by the extended market model are due to the fraud. ... As the Court described it, the fraud-on-the-market theory extends both to the plaintiffs' reliance and to the question of the effect of the fraud on market price. ...

**TEXT:**

[*883] INTRODUCTION

In *Basic, Inc. v. Levinson*  n1 , the Supreme Court accepted the proposition that the fraud-on-the-market theory satisfies the reliance element of a Rule 10b-5  n2 class action. To prevail on a Rule 10b-5 claim, plaintiffs must show some form of causal connection between the violation of the Rule -- typically a misrepresentation or omission of a material fact -- and the plaintiffs' injuries. In most cases, the plaintiffs' reliance on a misrepresentation is sufficient to establish the causal connection. The fraud-on-the-market theory posits that, unless the defendant can show otherwise,

[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price.

Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action.  n3

[*884]  The Court's acceptance of the fraud-on-the-market theory and the efficient market hypothesis on which it is based are as pertinent to the calculation of damages as to the presumption of reliance. Yet, the Court in *Basic* declined to address damage questions,  n4 and few fraud-on-the-market cases have gone to judgment.  n5 There is, therefore, little established law on how damages should be calculated for a defrauded class of investors in actively traded securities.  n6

[*885]  The most common method of calculating damages in Rule 10b-5 cases is the out-of-pocket measure.  n7 This test fixes recovery as the difference between the purchase price and the value of the security at the date of purchase less the difference between the sale price and the value of the security at the date of sale. In his concurring opinion in *Green v. Occidental Petroleum Corp.*,  n8 Judge Sneed outlined the following commonly cited procedure  n9 for calculating out-of-pocket damages:

[I]t becomes necessary to establish, for the period between the date of the misrepresentations and the date of disclosure, data which when arranged on a chart will form, on the one hand, a "price line" and, on the other hand, a "value line." The price line will reflect, among other things, the effect of the corporate defendant's wrongful conduct. The establishment of these two lines will enable each class member purchaser who has not disposed of his stock prior to disclosure of the misrepresentations to compute his damages by simply subtracting the true value of his stock on the date of his purchase from the price he paid therefor. Fixing the value line for the entire period involved in this case is obviously a more difficult and complex task than would be establishing the price at the date of disclosure of the misrepresentations and the price at all relevant dates prior to disclosure. However . . . the briefs and oral argument suggest that establishing the required value line is practicable.  n10

[*886]  Judge Sneed's procedure is illustrated in Figure 1. Time is depicted on the horizontal axis, and dollars per share are shown on the vertical axis. The price line and the value line coincide before a fraud or misrepresentation begins. Failure to disseminate information, or the dissemination of false or misleading information, then leads to an artificial inflation in the price of the security.  n11 Because the efficient market hypothesis states that the price of a security reflects publicly available information quickly and without bias, the price and value lines converge on the date that the fraud or misrepresentation is disclosed or corrected.  n12 Once one calculates the value line, the measure of damages for an investor is simply the difference between the price and the value on the date of purchase, or, for plaintiffs who sold their securities before the corrective disclosure, the difference between the price inflation at the time of purchase and the price inflation at the time of sale.  n13 If the inflation at the time of sale equals or exceeds the inflation level on the purchase date, the investor has recouped his loss from the marketplace and has no claim for recovery of damages.

Calculating a value line is, therefore, equivalent to measuring damages. One method for constructing the value line is the market  [*887]  [SEE ILLUSTRATION IN ORIGINAL]  [*888]  model of finance theory.  n14 As Professor Fischel observes, calculating the value line by analyzing asset value, earnings data, and other similar information is inherently speculative. The market model approach attempts to place the value line on firmer ground by calculating the value line on the basis of security price data adjusted for movements in the market and the industry.

This Article evaluates the market model approach and analyzes the legal questions which that approach raises. Unlike scholarship in the field that seeks to identify a damage rule which produces socially optimal incentives,  n15 this Article focuses on applying the out-of-pocket measure described by Judge Green and analyzing the issues that arise when finance theory is applied to the rule.  n16

Part I addresses the threshold problem of determining the date on which the price line and value line converge. This assessment is difficult because by the time misrepresentations and omissions are disclosed, other information unrelated to the fraud is also likely to have affected the market price. Part II turns to problems that arise when the

market model is used to calculate the value line backwards in time from the disclosure date. Two damage questions raised by *Basic* are then considered in Part III: the allocation of the burden of proof and the possibility of mitigating damages by rebuting the fraud-on-the market presumption. Part III suggests that the hardest problem in using finance theory to measure damages is not the mechanics of measurement, for which finance theory is well-equipped, but the remaining uncertainty over whether it has, in fact, measured the effect of the fraud rather than the effect of unrelated information.

[*889] I. DEFINING THE DATE OF DISCLOSURE

As Figure 1 illustrates, the value line is calculated backwards in time from the date that the misrepresentation or omission is disclosed. In the hypothetical examples that the courts and commentators discuss, there is generally little uncertainty about the date of disclosure. Professor Fischel, for instance, considers a chemical company which, in a 1975 filing, reported that it would have to spend $ 100 million to comply with environmental regulations over the next decade. n17 In another public filing, three years later, the firm revised its cost estimate upward to $ 1 billion. In this instance, the date of disclosure is clearly the day of the second public filing. Judge Sneed offers a similar example in *Green v. Occidental Petroleum Corp.:* n18 Corporation C reports the discovery of X barrels of oil when, in fact, it discovered no oil at all. The disclosure date is the date on which the falsity of the report is revealed.

Most actual 10b-5 claims, however, consist of a series of exaggerations, omissions, and misleading statements which are corrected, or merely revealed for what they are, in a series of subsequent statements that convey additional information as well. Rarely is one outright lie revealed through one correction.

A. *Over- and Under-Disclosure*

Consider *Basic.* Beginning in September 1976, representatives of Basic met with and telephoned representatives of Combustion Engineering, Inc. regarding the possibility of a merger. n19 During 1977 and 1978, however, Basic made several public statements denying any participation in merger negotiations. Yet on December 18, 1978, Basic suddenly asked the New York Stock Exchange to suspend trading in its shares. The next day, Basic's board endorsed Combustion's offer of $ 46 for its common stock and publicly announced the offer on the following day.

By December 20, Basic's previous denials of merger negotiations had been revealed as false, n20 but there was also what may be termed "over-disclosure" of the fraud. The December 20 disclosure was more than corrective of the prior information because what Basic [*890] had failed to disclose earlier was that there *were* talks regarding a possible merger. By the close of trading on December 20, the market price of Basic's stock reflected the information that Basic had signed a merger agreement, not just the information that talks had occurred.

In this respect, *Basic* is not unique. In *Elkind v. Liggett & Myers, Inc.,* n21 officers of defendant Liggett & Myers tipped security analysts that there was trouble in various divisions at the company and that, in a week or so, Liggett would take an unprecedented step by issuing a press release about its earnings. On these facts, the district court held that Liggett was liable to a class of securities purchasers from July 11, 1972, when the officers of Liggett tipped the inside information, to July 18, 1972, when Liggett made the public announcement.

The *Liggett* court further ruled that the measure of damages was the difference between the price each member of the class actually paid for Liggett stock and the price at which Liggett stock would have sold if the officers of Liggett had publicly disclosed the tipped information. To specify the price at which the stock would have sold, the court chose the stock price in effect after the public announcement. Although the public announcement on July 18 and the content of the tips discovered during subsequent deposition testimony were similar in nature, they were not identical. The tips informed analysts that Ligget would issue an unprecedented press release about earnings and that earnings would be down; the actual release stated the exact earnings figures and explained the reason for the decline. n22 Consequently, it is unclear whether the stock price after the public announcement equalled the price at which the stock would have sold if the officers of Liggett had publicly disclosed the tipped information at the time of the tips. The disclosure of the

fuller and more specific press-release information may have caused a greater drop in price than the public release of the more tentative tipped information would have or did cause. n23 As in *Basic*, the [*891] stock price on the disclosure date reflected more information than just a correction of prior statements.

Yet cases in which a company announces "A" and then announces strictly "A is not true" are rare. More commonly, the fraud is characterized by an exaggeration, overstatement, or omission, rather than by an outright lie. In *Garfinkel v. Memory Metals, Inc.*, n24 for example, in February 1986, the corporation allegedly issued press releases announcing new products, enormous potential sales, production contracts with major companies, and substantial expected profits. In September 1986, the company issued another press release acknowledging that it had no orders for any new products and that none of its production contracts actually required customers to purchase products. While the second release almost completely negated the first, even here, there is not a perfect match between the original claims and the curative statements. The company's announcement that it had entered into production contracts was true, but was misleading because it omitted the fact that the contracts did not require purchases. The market's reaction to the latter announcement was not necessarily identical to the reaction it would have had to an announcement of a contract that established some relationship between the corporation and the major companies, albeit not a purchase order.

When the fraud consists of an exaggeration or overstatement, it is difficult to determine when corrective disclosure occurs. Consider, for instance, an extension of Fischel's example. Suppose that in 1975, when the company announced that compliance costs would be $ 100 million, management had a minority report which concluded that compliance costs would be $ 1 billion. Assume, furthermore, that management estimated there was a fifty percent chance that the minority report was correct. Nonetheless, management chose to bury the report and publicly announce that the compliance costs would be $ 100 million. n25

In this extended example, when management revealed in 1978 that compliance costs would be $ 1 billion, the stock price adjusted to reflect that fact. From the standpoint of the initial misrepresentation, [*892] however, the public admission that compliance costs would be $ 1 billion amounted to over-disclosure. The only thing that management knew in 1975 was that there was a fifty percent chance that compliance costs would be that high. If the misrepresentation had been disclosed at the outset, the stock price would have adjusted to reflect the fifty percent probability. Accordingly, the stock price would have been a good deal higher (adjusted for market and industry movements) than it was in 1978 when the market knew for certain that compliance costs would be $ 1 billion. In this example, however, we implicitly assume that no corrective disclosure was made by any source other than the company. The company's second statement was over-disclosure, but at least it served to designate when the disclosure of the initial statement was revealed as a misrepresentation or omission.

The analysis is further complicated if there is a series of exaggerations, misstatements, and omissions, rather than one isolated misrepresentation followed by a series of revelations. This is illustrated by the Washington Public Power Supply System (WPPSS) litigation. n26 WPPSS was created in 1957 to acquire, construct, operate, and own plants and facilities for the generation and transmission of electric power. Between March 1, 1977 and March 17, 1981, WPPSS, in conjunction with eighty-eight participating utilities in Washington and other states, sold tax-exempt bonds with a face value of $ 2.25 billion to finance the construction of two nuclear power plants, referred to as Projects Nos. 4 and 5.

The Official Statements n27 described two sources of funds for bond payments: income from the sale of electric power produced by Projects Nos. 4 and 5, and funds from the general revenues of the participating utilities. The utilities had agreed with WPPSS that they would unconditionally repay WPPSS for the construction costs irrespective of whether Projects Nos. 4 and 5 were completed and operated.

As it turned out, there were massive cost overruns, the projects were terminated, and legal challenges to the Participants Agreements arose. n28 In 1983, the Washington Supreme Court ruled that [*893] the agreements were unenforceable because the participating utilities lacked the authority to offer such sweeping guarantees on the bonds. n29 With the plants uncompleted, and with no funds from the participating utilities forthcoming, WPPSS defaulted on the $ 2.25 billion of Project 4 and 5 bonds. As a result of the default, bond purchasers filed a class action suit alleging

that at the time of the bond issues, WPPSS and the participating utilities failed to disclose significant risks regarding budgets overruns, shortfalls in the demand for power, and the economic ability and legal authority of the utilities to pay for a dry hole.

As with the extended Fischel example, the WPPSS fraud consisted of the failure to disclose *risks,* not known events. Focusing on the budget issue, for instance, there was clearly over-disclosure by the time the plants were terminated. But at what point prior to that was the market adequately informed of the risk of cost overruns? This question is particularly difficult to answer because there is no analogue to the fifty percent probabilities assumed to be known in the previous example. The litigants disagreed not only about when disclosure occured, but also about what the defendants knew at the time the bonds were issued and, therefore, about what risks the defendants should have disclosed at that time.

Even if there were a clear disclosure date for the budget fraud, the problem in the *WPPSS* litigation would remain unsolved. The plaintiffs alleged that there were misrepresentations regarding five different risks. Only after all five risks were disclosed would the market be properly informed. Unfortunately, information regarding the various risks did not reach the market simultaneously. Most of the information about the ability to pay became available after the projects were terminated. Just prior to termination, therefore, one risk, cost overruns, was over-disclosed, while another risk, the ability of the utilities to pay for a dry hole, was still under-disclosed. There was not one day on which *all* of the undisclosed risks, and *only* those risks, were disclosed.

In the *WPPSS* example, it is relatively easy to determine when WPPSS should have disclosed the risks. WPPSS should have disclosed the risks in the disclosure documents at the time it sold the bonds. In other cases, the question regarding the appropriate disclosure date may be more difficult. Sometimes, the corporation disputes [*894] having any affirmative obligation to disclose an event or a risk. The facts of *Backman v. Polaroid Corp.* n30 are illustrative of this situation. Several months after introducing a much advertised new product, Polaroid accurately disclosed in an SEC filing that cost of sales for the product was higher than expected. Because Polaroid otherwise was enjoying record earnings, Polaroid did not emphasize this product in its report; for example, Polaroid did not disclose that the number of units sold was lower than expected. Subsequent internal reports showed Polaroid's management that the number of units sold continued to be disappointing. Polaroid quietly discontinued production and later accurately announced that the product had not been profitable. Polaroid's stock dropped substantially in response to the announcement. n31

In response to a 10b-5 class action, Polaroid argued "that it never uttered any misleading statements or engaged in any other conduct that would trigger a duty to disclose." n32 The appellate court affirmed a jury finding that Polaroid's SEC filing *"became* misleading in light of the subsequent information." n33 But exactly when the filing became misleading is unclear. *Backman v. Polaroid Corp.* illustrates that in some cases the parties may dispute not only the disclosure that should have been made and the date on which the misrepresentation or omission was revealed, but also the date on which accurate disclosure should have been made in the first place.

B. *Equivalent Disclosure*

A potential solution to the problem illustrated by these examples is the construction of an equivalent disclosure price. The equivalent disclosure price is the price at which the security would have traded if the omitted and misrepresented information -- and *only* that information -- were accurately disclosed at the start of the class period. To calculate the equivalent disclosure price, one must precisely determine the information that was omitted or misrepresented. Second, one must estimate the impact on security prices of the disclosure of that information, and only that information. As *Basic* and *Liggett & Myers* illustrate, only in rare circumstances does the second step simply involve observing the market price of the security on a date by which all elements of the fraud have been revealed because, by that time, the market price has been affected by [*895] more information than just the information misrepresented or omitted.

To illustrate the equivalent disclosure price and its potential difficulties, consider the facts of *Basic* again. Suppose

that without disclosure of merger talks the price of Basic stock would be $ 15 3/4 (as it was on September 1, 1976), and if a merger agreement were disclosed, the price would be $ 44 3/8 (as it was on December 19, 1978). In addition, suppose that if investors had known that talks with Combustion Engineering were in progress, they would have concluded that the probability of a merger was fifty percent. Under these circumstances, the stock would have jumped to approximately $ 30 if it were disclosed that talks were in progress. n34 Therefore, the equivalent disclosure price is $ 30.

In *Basic* there was no day when the stock price equalled the equivalent disclosure price. The company went straight from denying the existence of the talks to announcing a signed merger agreement. Thus, there was a jump from under-disclosure to a condition of what may be called over-disclosure without informing the market of the misrepresentation and only the misrepresentation.

The *Basic* example illustrates the key problem with calculating the equivalent disclosure price. In order to calculate the equivalent disclosure price, one must estimate how disclosure of the omitted or misrepresented information would affect investor beliefs regarding the magnitude of future cash payouts on the security and the likelihood of receiving those payments. In the *Basic* example, this investor probability assessment was calculated by assuming that if talks had been disclosed, the market would have concluded that there was a fifty percent chance of a merger and also would have concluded that the expected merger price was about $ 45. Both of these assumptions are highly debatable. It would not be unreasonable to assume that if Basic had disclosed the talks, the market would have attached only a twenty percent probability to a merger and would have expected the merger price to be at a premium of twenty-five percent over the current market price, or $ 19.70. Under these assumptions, the equivalent disclosure price would be approximately [*896] $ 16.50, instead of $ 30. n35 While the efficient market hypothesis predicts that market assessments will be fair and unbiased in reaction to a disclosure, it does not offer a way to determine what those assessments will be.

The Supreme Court wrestled with the problem of investor probability assessments in *Basic*. The Court ruled that whether the untrue denial of merger talks violated Rule 10b-5 depended on whether the merger discussions were material, which, in turn, depended on the impact the disclosure would have had on investor assessments of the probability of a merger. n36 The Court emphasized that in making such an assessment, "materiality" 'will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'" n37 The court concluded that "[w]hether merger discussions in any particular case are material therefore depends on the facts." n38 In making this statement, the Supreme Court recognized that one can draw inferences about investor probability assessment only in the context of the detailed facts of each specific case. No formulaic approach provided by finance theory, or any other theory, can replace a detailed analysis of the facts.

The facts must also be examined to determine how investors' assessments of future cash payouts would change in response to a disclosure. However, the differences in damage estimates caused by selecting one model over another will almost certainly be small compared to the differences in damage estimates that arise because of arguments about the manner in which a disclosure will affect investor assessments. Regardless of the financial economic model used, n39 sound estimates of the effect of accurate disclosure on investors [*897] can be made only after the facts of the event, as they existed at the time of the misrepresentation or omission, are determined. Thus, an estimate on which litigants can agree is likely only when the litigants can agree, or at least stipulate to, a set of facts.

In summary, one can unambiguously define the disclosure date and the associated disclosure price only in simple situations. In most circumstances, the parties must conduct financial analysis to determine the price at which the security would have traded had the misrepresented or omitted information, and only that information, been disclosed. Such an analysis further requires estimating how investor beliefs will respond to hypothetical disclosures. Although financial economic theory provides detailed procedures for calculating prices *given* investor assessments, it is of little aid in determining how investor beliefs will respond to specific disclosures. Estimating investor assessments requires a detailed investigation of the facts as they existed at the time of the misrepresentation or omission and at the time of disclosure. n40

II.  CALCULATING THE VALUE LINE

To focus on the value line, this Article puts aside the problems discussed in the previous section and assumes that the disclosure date and the disclosure price are known.  There are two related ways in which the market model of finance theory can be used to calculate the value line.  The first approach is to develop a comparable index which approximates what the returns on the security would have been had the fraud not occurred.  The second approach is to use an event study procedure which treats the fraud-related disclosures as events and substitutes the predicted return on the event days.

A.  *The Comparable Index Approach*

The procedure for constructing the comparable index is as follows:

[*898]  1.  Collect return data for the securities in question, the market, and the industry for a period during which the fraud does not affect the returns.  n41

2.  Estimate the extended market model, as Equation 1: Security return = a + b(Market return) + c(Industry return).  When estimating Equation 1, it is important to select a sample period during which the fraud does not affect the normal relation between the security, the market, and the industry.  n42

3.  Beginning with the disclosure date and working backwards, substitute the observed returns on the market and the industry into Equation 1 to claculate the predicted returns on the security had the fraud not occurred.  Given the predicted returns, the value line is computed backwards in time according to the formula set forth in Equation 2: Value($t$-1) = Value($t$) / (1 + Predicted return($t$-1)).

The procedure is illustrated in Table 1.  The price of the security on the disclosure date of June 10, 1990 is assumed to be $ 100, and the extended market model is assumed to be Security return .002 + .8(Market return) + .25(Industry return).  This is Equation 3.

The second and third columns of Table I contain the market model returns and industry returns for the five days preceding June 10, 1990.  Substituting these returns into Equation 3 gives the predicted returns shown in column four.  On June 10, the price of the security shown in column five equals the security value, shown in column six.  On days preceding June 10, the value line is calculated backwards in time using the predicted returns in column four.

[*899]  TABLE 1

CALCULATING THE VALUE LINE USING THE COMPARABLE INDEX APPROACH

THE EXTENDED MARKET MODEL

SECURITY RETURN = .002 + .8 X

(MARKET RETURN) + .25 X (INDUSTRY RETURN)

| Date | Market Return | Industry Return | Predicted Return | Security Price | Security Value |
|------|--------------|-----------------|------------------|----------------|----------------|
| June 5 | -4.00% | -2.00% | -3.50% | $ 125.00 | $ 98.86 |
| June 6 | 3.00% | 2.50% | 3.23% | $ 112.00 | $ 95.40 |
| June 7 | 2.00% | 2.00% | 2.30% | $ 102.00 | $ 98.47 |
| June 8 | 2.00% | 3.00% | 2.55% | $ 98.00 | $ 100.74 |
| June 9 | 3.00% | -4.00% | -3.20% | $ 99.50 | $ 103.31 |

37 UCLA L. Rev. 883, *899

| Date | Market Return | Industry Return | Predicted Return | Security Price | Security Value |
|------|------|------|------|------|------|
| June 10 | | | | $ 100.00 | $ 100.00 |

### B. The Event Study Approach

The event study approach assumes that the price and the value of the security move in tandem except on days when fraud-related information is disclosed.  n43 On days when fraud-related information is revealed, the value line is calculated from the predicted return.  The event study approach proceeds as follows:

1.  Collect the data and estimate the extended market model as was done in steps one and two of the comparable index approach.

2.  Construct, in the following fashion, a time series of daily returns, as if the fraud had not occurred: if no fraud-related information is disclosed, set the return for that day equal to the actual return on the security; if fraud-related information is disclosed, or there is evidence that such information is leaking into the market, set the return for that day equal to the return on the security predicted by the market model.

3.  Use the series of returns constructed in step two to calculate the value line backwards in time according to the formula set out as Equation 4:

Value($t$-1) = Value($t$) / (1 + Constructed return($t$-1)).

The procedure is illustrated in Table 2.  For each day in the nine-day class period, column two shows whether there was a [*900] fraud-related disclosure.  The predicted return in column five is calculated by substituting the market return (column three) and the industry return (column four) into the extended market model given at the top of the table.  The value line is calculated backwards in time using the actual returns for days when there are no disclosures, and using the predicted returns on days when there are fraud-related disclosures.

TABLE 2

CALCULATING THE VALUE LINE USING THE EVENT STUDY APPROACH

THE EXTENDED MARKET MODEL

SECURITY RETURN = .002 + .8 - (MARKET RETURN) + .25 - (INDUSTRY RETURN)

| Date | Disc | Market Return | Industry Return | Predicted Return | Actual Return | Security Price | Security Value |
|------|------|------|------|------|------|------|------|
| June, 1 | No | -0.60% | -1.00% | -0.53% | -1.76% | $ 128.00 | |
| June, 2 | No | 0.12% | 0.50% | 0.42% | 0.60% | $ 125.00 | $ 103.01 |
| June, 3 | No | 2.40% | 1.90% | 2.60% | 0.40% | $ 126.50 | $ 103.63 |
| June, 4 | No | -0.90% | -1.00% | -0.77% | -1.57% | $ 127.00 | $ 104.04 |
| June, 5 | Yes | -4.00% | -2.00% | -3.50% | -10.40% | $ 125.00 | $ 102.40 |
| June, 6 | Yes | 3.00% | 2.50% | 3.23% | -8.93% | $ 112.00 | $ 98.81 |
| June, 7 | No | 2.00% | 2.00% | 2.30% | -3.02% | $ 102.00 | $ 102.00 |
| June, 8 | No | 2.00% | 3.00% | 2.55% | 1.53% | $ 98.00 | $ 98.00 |
| June, 9 | No | -3.00% | -4.00% | -3.20% | 0.50% | $ 99.50 | $ 99.50 |
| June, 10 | | | | | | $ 100.00 | $ 100.00 |

### C. A Critique and Comparison of the Comparable Index and Event Study Approaches

Neither Fischel nor Leas adequately distinguishes between the two approaches.  n44 This may be because the two approaches are virtually identical for simple frauds which are unexpectedly disclosed on identifiable days.  n45 Consider Fischel's original example in which there is an initial misrepresentation of environmental compliance costs and one subsequent disclosure without any prior leakage of information.  n46 As Figure 2 illustrates, the gap between the price line and the value line that arises on the initial disclosure date is the same for both approaches. [SEE ILLUSTRATION IN ORIGINAL]

On days when there are no disclosures, however, the two value lines differ.  The comparable index approach calculates the value line from returns predicted by the market model; the event study approach uses the actual returns on the security.  Because actual returns differ from predicted returns by random error, which reflects firm-specific developments, the two lines are not identical.  n47 Ex-ante, the expected damages are the same using either approach because the expected value of the actual return is equal to the predicted return. Ex-post, however, the damage estimates will differ because of the random error.

In many situations, this apparently minor distinction between the two approaches can lead to large differences in the estimated value lines. Consider again an extension of Fischel's example in [*903] which there are three subsequent disclosures instead of one. First, the company says its initial estimate of $ 100 million might be wrong. Next, it says that compliance costs may be as high as $ 350 million. Finally, it announces that the compliance costs will be $ 1 billion. Assume that during the period when the company was withholding information about compliance costs, it was experiencing other widely known difficulties, such as rising manufacturing costs and a falling demand for its products. Such a confluence of events is likely to be common in situations in which fraud is alleged. Presumably the fraud occurs, at least in part, because the company wants to mitigate the impact of bad news.

Following each of the three disclosures, the price of the company's stock falls, as shown by the price line in Figure 3. Figure 3 also shows value lines calculated using the comparable index approach and the event study approach. For simplicity it is assumed that the comparable index remains unchanged during the period. The value line is lower for the comparable index approach because that approach assumes that *all* stock price movements which cannot be explained by the extended market model are due to the fraud. The event study approach, on the other hand, attributes only the declines on the disclosure dates to the fraud. Because the stock price was dropping throughout the period, the damages are larger for the comparable index approach.

The trouble with the comparable index approach, as Finkelstein, Fischel, Easterbrook, and Leas all recognize,  n48 is that it attributes any decline in the security price that is not due to movements in the market or the industry to disclosure of the fraud. If the disclosure of a fraud is associated with the release of other company-specific bad news, the comparable index approach will overestimate the true damages. In *Blackie v. Barack,*  n49 for instance, the company released restatements of allegedly falsified financial reports at the same time that it reported record losses. Thus, the decline in the stock price reflected both the disclosure of original misrepresentations and the release of bad news unrelated to the fraud. By attributing the entire drop to disclosure of the fraud, the comparable index approach overstates the damages.

The event study approach solves this problem by substituting predicted returns for actual returns only on disclosure dates. Unfortunately, the event study procedure will be biased if there is leakage [*904] [SEE ILLUSTRATION IN ORIGINAL] [*905] of information. By the time a public announcement occurs, often the market price already reflects some of the information contained in the announcement.  n50 This prior information leak means that the difference between the predicted return and the actual return, commonly called the residual return, does not properly measure the economic impact of the disclosure. As a result, a value line which substitutes predicted returns for actual returns only on disclosure days will understate damages.

Malatesta and Thompson have defined the relation between the economic impact of an event and the disclosure-day

residual as:

Economic impact = (The disclosure-day residual) / ($p[2] - p[1]$) (equation 5) where,

$p[1]$ = the market's assessment of the probability that the event would occur, or had occurred, prior to the disclosure (for instance, the market's assessment of the probability that compliance costs would be $ 1 billion before the public admission); and

$p[2]$ = the market's assessment of the probability that the event would occur, or had occurred, after the disclosure ($p[2]$ is typically less than one because of the possibility that the disclosure is incorrect or misleading). n51

The Malatesta and Thompson formulation makes it clear that if information leaks out in advance, so that $p[1]$ is close to one at the time of a public announcement, the residual will understate the economic importance of the underlying event. n52

In a number of cases, $p[1]$ has approached one because of leaks. In *WPPSS,* n53 for example, from the first bond issue in March 1977 until the ultimate default on the bonds, a slow flow of increasingly [*906] negative news fueled a rising tide of doubts and rumors. However, only a few dramatic announcements were associated with large residual returns. n54 There was a similar situation in *Elkind v. Liggett & Myers, Inc.,* n55 in which Liggett's officers tipped security analysts that Liggett would issue an earnings release in a week. By the time Liggett issued the release, the market price already reflected part of the information contained in the release because of the leaks. n56 Similarly, in *Basic* the stock price and volume rose during periods of active negotiations between Basic and Combustion Engineering despite the denials of merger talks. n57

The foregoing examples show that for a fraud which is revealed slowly over time, the event study approach is likely to significantly understate the true damages. One way to reduce this bias is to extend the observation window surrounding the disclosure date. Instead of using the predicted return on the disclosure date alone, the predicted returns are substituted for actual returns over the observation window. The window begins far enough in advance of the disclosure for the analyst to be reasonably confident that no significant information leakage has occurred (so that $p[1]$ is close to zero). The window ends at a date when the analyst feels confident that most of the information is publicly available (so that $p[2]$ is close to one). The comparable index approach is a limiting case in which the observation window is expanded to cover the entire class period.

The length of the window depends on the facts of each specific case. In situations in which the disclosure is clearly unanticipated, an observation window of a day or two is long enough. For example, in September 1988, Regina Company officials assured analysts that sales for the quarter were on target, but one week later announced that sales for the quarter would be substantially lower than expected. n58 Regina Company shares fell fifty-nine percent on the day of the announcement. n59 Such an abrupt decline in response to a disclosure suggests using a one day window. Conversely, in a case [*907] such as *WPPSS,* in which there is a continuous leakage of information, it may be necessary to use the comparable index approach.

When a fraud involves several interrelated misrepresentations, the calculation of the value line for secured or guaranteed debt securities introduces yet another difficulty. Consider a simplified version of the *WPPSS* litigation in which there were two misrepresentations: that the projects would be completed on budget, and that the participating utilities had the authority to pay for a dry hole. Attorneys for the construction companies might argue that by the time the plants were terminated, all aspects of the budget fraud, for which their clients would be liable, had been disclosed. To determine the damages attributable to the budget fraud, the attorneys might present a value line calculated backwards in time from the termination date using the comparable index approach as shown in Figure 4.

Based on this value line, it appears that the damage caused by the budget fraud is minimal. From the beginning of the class period through termination, the price line and the value line move closely together. It is not until the authority of the participating utilities is called into question that the bond price drops significantly. A second value line,

calculated from the date on which the Washington Supreme Court ruled that the utilities lacked the authority to make payments on the bonds, shows large damages, but attorneys for the construction companies would argue that these damages are due to the authority fraud for which their clients are not liable.

This interpretation of the value line creates a paradox. Assume that the sequence of events is reversed so that the bond guarantee is voided while the market is still confident that the projects will be completed on budget. In that case, the price decline on the date of the court ruling would be small because bondholders presume they will be paid from the projects' revenue. Not until the plants are terminated will the bond prices collapse. Under this scenario, a value line calculated from the date of the court ruling indicates that the damages caused by the authority fraud are minimal while a value line calculated from the date of termination shows massive damages are associated with the budget fraud.

The *WPPSS* example illustrates the general point that whenever two seemingly solvent parties guarantee a debt, bad news about the financial condition of one guarantor will have limited impact on the market value of the debt as long as confidence in the other guarantor is high. Subsequent bad news about the second guarantor will cause the price of the debt to collapse. In a situation in which fraud [*908] [SEE ILLUSTRATION IN ORIGINAL] [*909] is alleged as to both guarantors, however, it is neither reasonable nor fair to suggest that essentially all of the damage was caused by fraud relating to the guarantor whose problems were disclosed last.

In this situation, finance theory does not provide a procedure for dividing the total damages among the various guarantors. Finance theory does make clear, however, that when there are interrelated frauds, separate value lines cannot be constructed as shown in Figure 4. Instead the total damage must be estimated using one value calculated backwards from the time at which all elements of the fraud have been effectively disclosed. n60 Other criteria must then be used to apportion the total damage among the defendants.

When there are multiple frauds and several guarantors, application of the event study approach is likely to be especially hazardous. Because the bond prices will remain largely constant until the final fraud is disclosed, residual returns observed prior to the final disclosure will fail to measure accurately the economic importance of earlier announcements.

One final problem arises, particularly in the case of the event study approach. If only events associated with fraud-related *disclosures* are included when calculating the value line backward in time, the value line typically will remain above the price line no matter how far back in time the calculation proceeds. This produces the paradoxical result that the price of the stock was less than its true value even before the fraud conceivably could have begun. The explanation for this paradox is that the price line and value line will converge at the start of the fraud only if both fraud-related disclosures and the fraud itself are included as events. In the case of fraud involving misrepresentations, the problem can be solved by substituting predicted returns for actual returns on the days that the fraudulent statements were initially made as well as on the days that the fraud was disclosed. Unfortunately, frauds frequently involve a failure to disclose information, and it is obviously difficult to isolate the days on which a firm *failed* to disclose information. Nonetheless, as Figure 5 illustrates, excluding days on which a firm failed to disclose information will produce a price line which remains above the value line indefinitely in the backward calculation.

Figure 5 also provides insight into the circumstances under which failure to include the days on which the fraud occurred will [*910] [SEE ILLUSTRATION IN ORIGINAL] [*911] produce a significant bias in the estimate of damages. If the fraud occurs on one day at the beginning of the class period so that the gap between the value line and the price line appears immediately, the bias will be small because only investors who purchased the securities in the first few days of the class period are affected by the error. However, if the fraud consists of a series of omissions and misrepresentations so that the gap between the price line and the value line widens slowly, the inflation will be overstated for a much larger group of purchasers.

The comparable index approach largely eliminates the bias problem because the predicted return is substituted for the actual return on all days, not just event days. Thus, days on which the fraud occurs and days on which it is disclosed

are both automatically included. This inclusion of fraud and disclosure does not, however, assure that the price line and the value line will converge on the day the fraud began because the assumption on which the analysis is based, that the actual return equals the predicted return had the fraud not occurred, is only an approximation that depends on the accuracy of the market model.

## III. FINANCE THEORY AND LEGAL ANALYSIS

The previous two sections have demonstrated that there is no finance theory formula for measuring damages into which the facts of all cases can be substituted. Although the market model does provide a general procedure for computing damages, the procedure is not free of the speculative elements, criticized by Fischel, which arise when damages are estimated by directly appraising asset value. n61 Calculation of the equivalent disclosure price requires an estimate of how investor assessments, and thereby security prices, would respond to hypothetical disclosures. As *WPPSS* and other examples illustrate, this calculation opens the door to differing opinions about what should have been disclosed, when it should have been disclosed, when it was disclosed, and how investors would have responded to various disclosures that were not made. The calculation of the value line opens the same door. Both the comparable index approach and the event study approach are potentially biased although the extent of the bias depends on the specific facts of the case.

Despite these drawbacks, finance theory is still immensely useful for measuring damages in fraud-on-the-market cases because it [*912] provides a general framework for attacking the problem. Even if litigants cannot agree on the equivalent disclosure price, or on whether the comparable index or event study approach should be used, finance theory still provides a common terminology which serves to focus the debate and organize the facts. Finance theory also provides a basic set of concepts whose acceptance and application is likely to widen the settlement range. n62 Finally, the efficient market view that prices respond quickly and without bias to new information rules out a wide variety of interpretations regarding the reaction of security prices to fraud-related disclosures. n63

Despite these benefits, some lawyers and judges resist the application of finance theory to the assessment of damages. Justice White, dissenting in *Basic,* expressed a common and fundamental concern, stating, "[c]onfusion and contradiction in court rulings are inevitable when traditional legal analysis is replaced with economic theorization by the federal courts." n64 He was particularly worried about the practical problems for judges, noting that "with no staff economists, no experts schooled in the 'efficient-capital-market hypothesis,' [and] no ability to test the validity of empirical market studies, we are not well equipped to embrace novel constructions of a statute based on contemporary microeconomic theory." n65

No doubt Justice White's recognition that the Court's opinion in *Basic* implied more than it held underlay his concern about that opinion. Strictly speaking, the Court merely ruled that the lower courts did not err in adopting a rebuttable presumption that the class plaintiffs relied on misrepresentations. From this perspective, the presumption is just a handy procedural device to reconcile the demands of a federal class action -- that common questions of reliance predominate over individual questions n66 -- with the demands of [*913] a Rule 10b-5 action -- that the plaintiffs have relied upon the misrepresentation in order to recover. n67

Although the Court purported to end its analysis there, n68 Justice White properly saw through the Court's disclaimer. The issues of reliance and damages are closely related, particularly under the assumption driving the fraud-on-the-market theory -- that "'[t]he market is acting as the unpaid agent of the investor, informing him that, given all the information available to it, the value of the stock is worth the market price.'" n69 The Court has adopted this assumption. n70 While the Court avoided directly addressing the damages issue, much of its discussion of reliance is relevant to the question of damages. Justice White, however, recognized that "answers to the question of the proper measure of damages in a fraud-on-the-market case are essential for proper implementation of the fraud-on-the-market presumption." n71 In his most cutting remark, he concluded that, "the Court, I fear, embarks on a course that it does not genuinely understand, giving rise to consequences it cannot foresee." n72

This section addresses two consequences of the course on which the Court embarked in *Basic*. Both follow from the market model of damage calculations discussed above. Section A addresses the effect that language in *Basic* and pre-*Basic* fraud-on-the-market cases may have on allocating the burden of proof of damages. The burden of proof is particularly significant, even decisive, in considering the differences between the comparable index and the event study approaches to calculating the value line. Section B addresses the Court's suggestion in *Basic* that the presumption of reliance may be rebutted and also discusses how this suggestion affects defendants' trial strategies.

A. *The Burden of Proving Damages*

As discussed in Part II, both the comparable index approach and the event study approach for calculating the value line are potentially biased. The first tends to overestimate damages by attributing [*914] the entire decline in market price to disclosure of the fraud while the second tends to underestimate damages by attributing any drop other than that on the disclosure date to causes other than the fraud. Given this dichotomy, the allocation of the burden of proving damages is significant. The party with the burden of showing the cause of residual returns not explained by the comparable index or event study approach bears a heavy burden. The allocation of the burden will influence judgments on damages and, perhaps more importantly, negotiating strengths in settlement discussions.

The significance the *Basic* court attributed to the question of proving damages is ambiguous. While the Court did not purport to address any question other than proof of reliance, one can interpret the Court's language to extend beyond reliance to proof of damage. As the Court described it, the fraud-on-the-market theory extends both to the plaintiffs' reliance and to the question of the effect of the fraud on market price.

The Court described and adopted the presumption that the lower courts in *Basic* had used, stating,

The courts below accepted a presumption, created by the fraud-on-the-market theory and subject to rebuttal by [Basic], that persons who had traded Basic shares had done so in reliance on the integrity of the price set by the market, *but because of [Basic's] material misrepresentations that price had been fraudulently depressed.* n73

This language suggests that the fraud-on-the-market presumption is in fact two presumptions: one, that the plaintiffs relied on the market price, and two, that the fraud affected the market price. Taken at face value, these presumptions do more than relieve plaintiffs of the burden of proving direct, subjective reliance on the misrepresentation. One could interpret these presumptions to relieve the plaintiffs of the burden of proving that a misrepresentation of material fact affected the market price. Reading this language literally, effect on the market price is presumed.

Although the Court never expressly stated that plaintiffs are relieved of the obligation to plead and prove that the fraud affected market price, other statements in *Basic* are consistent with a literal reading. The Court began its discussion of fraud-on-the-market by quoting *Peil v. Speiser:* n74 "[I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . *Misleading* [*915] *statements will therefore defraud purchasers . . . .*" n75 The Court referred to empirical studies suggesting that "the market price of shares traded on well-developed markets reflects all publicly available information, *and, hence, any material misrepresentations.*" n76 As to how defendants might rebut this presumption, the Court suggested that defendants can do so by showing "that the misrepresentation in fact did not lead to a distortion of price . . . ." n77 Thus, it is the defendant's burden to disprove distortion: "Any showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff . . . will be sufficient to rebut the presumption of reliance." n78 For example, the Court suggested that defendants could show that the market makers knew the truth so the market price did not reflect the fraud, or that the truth credibly entered the market and dissipated the effects of the misstatements. n79 These examples directly affect the question of whether the fraud affected market price and place the burden on the defendant to show that the fraud did not affect the market price. n80

The question regarding the burden of proving damages is clearly one of the "confusions and contradictions" that

Justice White foresaw in *Basic*.  n81 It would be surprising if the Court really meant that plaintiffs could end their case simply by showing materiality, and without any attempt to present the kind of market model evidence described in this Article.  Some plaintiffs have read *Basic* this way, but have not prevailed.  In *Bastian v. Petren Resources Corp.*,  n82 the district court dismissed a fraud-on-the-market complaint in part because "although plaintiffs have sufficiently pled 'transaction causation' -- that the nondisclosures 'caused' plaintiffs [*916] to invest in Petren A and Petren B -- they have not pled 'loss causation' -- that the nondisclosed information 'caused' the subsequent decline in the value of the partnership interests."  n83 The plaintiffs moved for reconsideration arguing that under *Basic*, "they are entitled to proceed with their section 10(b) claim without having to allege a causal connection between defendants' alleged misrepresentations and the decline in value of the securities they purchased."  n84 In denying the motion, the court explained that as it read *Basic*, "The [Supreme] Court merely elaborated on the requirements for proving 'transaction causation' -- that is, causation-in-fact between a misrepresentation and an investor's decision to purchase or sell a security."  n85

*Bastian* suggests that plaintiffs after *Basic* still bear a burden of showing that the fraud affected the market price.  n86 Yet some pre-*Basic* fraud-on-the-market cases suggest otherwise.  In *Blackie v. Barrack*,  n87 for example, the Ninth Circuit stated:

We think causation is adequately established in the impersonal stock exchange context by proof of purchase and of the materiality of misrepresentations, without direct proof of reliance.  *Materiality circumstantially establishes the reliance of some market traders and hence the inflation in the stock price* -- when the purchase is made the causational chain between defendant's conduct and plaintiff's loss is sufficiently established to make out a prima facie case.  n88

Additional use of the fraud-on-the-market theory may clarify the plaintiffs' remaining burden as to damages.  Assuming, however, that the *Bastian* court correctly read *Basic*, and that plaintiffs still must present some evidence that the fraud affected market price, there remains the question of how precisely plaintiffs need to explain movements in market prices.  One alternative is for plaintiffs to satisfy their burden by presenting market model evidence of the type described in Part II and to shift the burden to defendants to prove that any part of the market price movement and residual returns resulted from causes unrelated to the fraud.  At the least, *Basic*'s language, particularly regarding rebuttal evidence, suggests [*917] such an allocation of the burden is appropriate.  If that allocation tends to result in overestimates of damages under the comparable index approach, courts may be willing to invoke policies underlying federal securities laws to justify overestimates rather than underestimates.  n89

B.  *Rebutting the Presumption of Reliance*

After *Basic*, defendants in fraud-on-the-market cases face a strategic choice: they can attack the efficient market hypothesis, either as a general matter or as applied to the securities in their case, or they can embrace the hypothesis as a means of rebutting the presumption of reliance.  A brief review of the context in which *Basic* and the other fraud-on-the-market cases are reported, and the Supreme Court's discussion of rebuttal, puts the defendants' choice in perspective.

*Basic* and the other fraud-on-the-market cases arose in the context of certifying the plaintiff class or classes.  If the courts had required each plaintiff in the classes to present individual evidence of personal, direct reliance on the misrepresentation, the plaintiffs would not have met the requirements for federal class actions because individual questions of reliance would have predominated over common questions.  Without class certification, the plaintiffs' cases would have been significantly more difficult for various procedural and cost reasons.  In *Basic*, the fraud-on-the-market theory of reliance turned individual questions of reliance into a common question  n90 and thereby allowed class certification.  Defendants, of course, argued against the fraud-on-the-market theory and the efficient market hypothesis on which it is based, in order to keep the reliance question individual, thereby preventing class certification.  The defendants lost that argument in *Basic*.  n91

That argument against presumed reliance fails, however, only if the securities at issue are traded on "an open and

developed market." n92 The *Basic* Court did not elucidate the meaning of "open and developed" or address how courts might determine whether a market [*918] is "open and developed." Defendants may argue that individual questions of reliance predominate because the market for the securities at issue is not efficient, or "open and developed," and the court, therefore, cannot assume reliance. This argument reflects the same litigation strategy that defendants pursued before *Basic,* the goal of which is to defeat class certification.

Reported cases since *Basic* suggest that defendants are still making this argument, but are losing. n93 On its face, it is difficult to sustain this argument in cases involving securities of large, widely followed, exchange-listed companies, absent some evidence of manipulation or interference with normal market operations. Even with securities of smaller companies or markets, the argument may be unpersuasive. For example, in *Harman v. LyphoMed, Inc.,* n94 the defendants argued that *Basic* was inapposite and the fraud-on-the-market theory of reliance inappropriate because the securities were traded in the over-the-counter market, not on a stock exchange. The plaintiffs, on the other hand, countered with evidence that the average weekly trading volume exceeded one million shares, that the stock had several market makers and over a dozen securities analysts following it, and that the company was eligible to use an S-3 registration statement. n95

Whatever "open and developed" meant to the Supreme Court in *Basic,* the *Harman* court concluded that the plaintiffs had sufficiently alleged market efficiency to allow class certification. n96 *Harman* and other post-*Basic* cases suggest that an allegation of market efficiency suffices for class certification and that defendants' attempts to prove the market less than "open and developed" must await evidentiary stages of the litigation subsequent to class certification. n97

[*919] If defendants are unlikely to prevail by arguing against market efficiency at the class certification stage, they may be better advised to consider embracing the fraud-on-the-market theory rather than continuing to resist it. The opportunity to rebut the *Basic* presumption means that defendants may be able to turn the efficient market hypothesis to their advantage. In *Basic,* the Court stated,

if [Basic] could show that the "market makers" were privy to the truth about the merger discussions here with Combustion, and thus that the market price would not have been affected by their misrepresentations, the causal connection could be broken . . . . Similarly, if, despite [Basic's] allegedly fraudulent attempt to manipulate market price, news of the merger discussions credibly entered the market and dissipated the effects of the misstatements, those who traded Basic shares after the corrective statements would have no direct or indirect connection with the fraud. n98

Given the possibility of rebuttal and the courts' unwillingness to address market efficiency at class certification, defendants' strategic choice may be to argue that the market was indeed efficient. An efficient market will reflect all available information in securities pricing, including information from nonissuer sources that questions, contradicts, or corrects the issuer's misrepresentation. That plaintiffs can rely on a misrepresentation conveyed to them by the market through the market price does not mean that the market believes and reflects all information it receives. If the available information includes other information touching on the subject of the fraud, the market price may reflect an assessment of that other information. *Basic* provides the clearest example of such an assessment. Although Basic's denials may have depressed prices in the short term, over the course of two years of negotiations between Basic and Combustion Engineering, the market seems not to have believed Basic's denials. In short, whether or not a fraud has been cured by third party information, without a disclosure by the defendant, is a key factual issue in rebutting claims of fraud-on-the-market.

It has been clear since *Blackie v. Barrack* n99 that the fraud-on-the-market theory and efficient market hypothesis can work against, as well as for, plaintiffs. Until recently, however, the clarity has been in theory, not in court results. In *Blackie,* the Ninth Circuit [*920] described possible rebuttal evidence, but expressed doubt that the opportunity to rebut the presumption of reliance would substantially reduce a defendant's liability in the open market fraud context. n100

Two recent courts have expressly based judgments for defendants on the conclusion that the defendants had rebutted the fraud-on-the-market presumption. In both In re *Apple Computer Securities Litigation* n101 and In re *Convergent Technologies Securities Litigation,* n102 courts awarded defendants summary judgments partly because the market price of securities reflected information from the press, securities analysts, and other nonissuer sources.

In *Apple Computer,* defendant Apple Computer and its officers made numerous optimistic statements about a new product, thereby allegedly inflating the market price. n103 The Ninth Circuit largely affirmed the district court's summary judgment for the defendants. After reviewing the numerous optimistic statements, along with equally numerous, more conservative or even pessimistic statements by the press and securities analysts, the court held, "Provided that they have credibly entered the market through other means, the facts allegedly omitted by the defendant would already be reflected [*921] in the stock's price; the mechanism through which the market discovered the facts in question is not crucial." n104 Since materiality is a highly fact-specific inquiry, the court reviewed each alleged misstatement or omission and each alleged corrective third party statement, concluding that the allegedly misstated or omitted information had been "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insiders' one-sided representations." n105

In reaching this judgment, the Ninth Circuit needed to address the plaintiffs' argument that "the investment community pays special attention to the statements of corporate management." n106 The *Convergent Technologies* court, addressing this same argument, found that the press' and security analysts' statements supplemented the risk disclosures already made by the corporate defendants. n107 The court concluded that the third-party information was as much a part of the total mix of available information as were the corporate statements. n108

Unlike the *Apple Computer* and *Convergent Technologies* courts, other courts adopting the fraud-on-the-market theory of reliance do not seem to understand fully the implications of the theory. For example, in In re *Western Union Securities Litigation,* n109 a plaintiff class alleged that Western Union's annual report and other documents misrepresented the company's financial condition, thereby artificially inflating the market price of Western Union common shares. Relying on *Basic,* Western Union argued that "during the period of alleged misrepresentation . . . the company released other, accurate information about ongoing changes in the various product markets in which Western Union conducted its business," n110 and "the true state of the company and the markets in which it interacted was being reported by the national media." n111 In short, Western Union's argument was, as expressed in *Basic,* that [*922] accurate information "credibly entered the market and dissipated the effects of the misstatements." n112

Unfortunately, the court in *Western Union* failed to recognize that the efficient market hypothesis was equally relevant to Western Union's rebuttal argument. The court accepted the plaintiffs' allegations that the market price had conveyed to them the alleged misrepresentations in the annual reports even though the plaintiffs had not read the annual report. n113 The court rejected, however, Western Union's argument that other, accurate information was also available and therefore reflected in the market price. Rather than assuming, as the court had done with the plaintiffs, that the market price would reflect the available information, the court stated, "[e]ven if some curative information were available to the public, that would not eliminate the alleged misrepresentations. . . . Furthermore, the true issue here involved is whether false statements or misleading omissions were made by the defendants in contravention of federal securities laws." n114 The court concluded that other information, regardless of its accuracy, was irrelevant unless the individual plaintiffs themselves actually knew about it. n115 Thus, the court found that the plaintiffs could have relied on misrepresentations of which they were ignorant, but their claims of damage were not mitigated by accurate information unless they personally knew it.

The *Western Union* court missed the efficient market hypothesis' implication that price reflects *all* available public information. As Fischel plainly stated,

If plaintiffs suffer an injury when there has been a fraud-on-the-market, regardless of whether they are aware of the alleged fraudulent conduct . . . it also follows that they have not suffered an injury when the market price has not been artificially inflated -- when there has been no fraud-on-the-market. n116

[*923]  This discussion of defendants' strategic choices illustrates that finance theory can be useful in fraud-on-the-market cases despite the difficulties and limitations described in Parts II and III of this Article. Empirical studies notwithstanding, many litigants, lawyers, and judges are unmoved by the efficient market hypothesis. Plaintiffs have already embraced the efficient market hypothesis in creating the fraud-on-the-market theory of reliance because of the advantages it provides in supporting class certification. Defendants are more likely than plaintiffs to resist the hypothesis, both before *Basic* as well as after.  n117 If defendants continue to convince courts of the implications of the hypothesis for rebuttal evidence, as in In re *Apple Computer* and In re *Convergent Technologies,* defendants may become more accepting of fraud-on-the-market theory and the efficient market hypothesis.

CONCLUSION

Finance theory is useful for measuring damages in fraud-on-the-market class actions. Just as the presumption of reliance enables courts to process multiple claims in one action, the price line value line approach of the market model is a tool that facilitates the measurement of loss as a result of many different market transactions. But the limits of the explanatory power of the model must be understood. Part II of this Article demonstrates that substantial factual analysis must precede the use of the model. Without a detailed understanding of the information misrepresented or omitted, the information eventually revealed, the differences between those sets of information, and the other information available to the market, litigants and lawyers cannot be confident that what the market model measures is really the economic effect of the fraud. Part II shows that different calculations of the value line may over- or [*924]  under-estimate damages because both the comparable index approach and the event study approach involve potential bias. The extent of this bias again depends on the facts of the case; it cannot be determined by financial economic theorizing. Because finance theory does not provide a formulaic solution to the problem of measuring damages, the allocation of the burden of proof is important, as discussed in Part III. Though plaintiffs have to date used finance theory more to their advantage, defendants may find that it benefits them as well, particularly as the courts become more familiar with all the implications of the theory.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Business & Corporate LawMergers & AcquisitionsGeneral OverviewContracts LawDefensesGeneral OverviewSecurities LawLiabilitySecurities Exchange Act of 1934 ActionsImplied Private Rights of ActionElements of ProofRelianceGeneral Overview

**FOOTNOTES:**

n1. 485 U.S. 224 (1988).

n2. 17 C.F.R. § 240.10b-5 (1989).

n3. *Basic,* 485 U.S. at 247. As the Court explained,

The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentation.

*Id.* at 241-42 (quoting Peil v. Speiser, 806 F.2d 1154, 1160-61 (3d Cir. 1986)).

n4. *Id.* at 248 n.28.  *But see id.* at 254 n.5 (White, J., dissenting).

n5. Most commercial litigation settles before judgment.  In a securities class action, the scope of damages provides a sharp incentive for defendants to settle.  Backman v. Polaroid Corp., 893 F.2d 1405 (1st Cir. 1990) illustrates the risk to Rule 10b-5 defendants if they let the case go to the jury.  An objective reading of the facts reveals a very weak claim that Polaroid's disclosure was misleading, or if the claim was misleading, that Polaroid acted with scienter.  The stringent requirement for reversal after judgment constrained the appellate court to affirm a jury verdict for the class plaintiffs.  *Id.* at 1416 n.7.  The court ruled this way despite its repeated suggestion that it would hold otherwise on the facts.  *Id.* at 1414-15.  *See also* A. JACOBS, SECURITIES FRAUD § 8.6(612) (certification of the plaintiff class

is, of course, a critical point in class litigation.  If a class is not certified, the suit is almost always dropped with nothing or modest amount for the individual plaintiffs. . . . If a class is certified, the case is usually settled but for a much larger amount that provides some benefit for each class member.).

n6. The extensive legal literature on fraud-on-the-market discusses whether fraud-on-the-market should be adopted as a legal standard for proving the reliance requirement, but does not discuss how damages should be measured if the standard is adopted.  *E.g.,* Black, *Fraud on the Market: A Criticism of Dispensing with Reliance Requirements in Certain Open Market Transactions,* 62 N.C.L. REV. 435 (1984); Note, *Panzier v. Wolf: An Extension of the Fraud-on-the-Market Theory of Liability Under SEC Rule 10b-5,* 32 CATH. U.L. REV. 695 (1983); Note, *Fraud on the Market: An Emerging Theory of Recovery Under SEC Rule 10b-5,* 50 GEO. WASH. L. REV. 627 (1982); Note, *The Fraud on the Market Theory: Efficient Markets and the Defenses to an Implied 10b-5 Action,* 70 IOWA L. REV. 975 (1985).  There is also a great deal of literature on the various measures of damages, *see, e.g.,* R. CLARK, CORPORATE LAW §§ 8.10.7, .11.3 (1986); Matheson, *Corporate Disclosure Obligations and the Parameters of Rule 10b-5: Basic v. Levinson and Beyond,* 14 J. CORP. L. 1 (1988), but little literature about how damages are actually proved in fraud-on-the-market cases.  Papers that discuss the role of finance theory in measuring damages include Easterbrook & Fischel, *Optimal Damages in Securities Cases,* 52 U. CHI. L. REV. 611 (1985); Fischel, *Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities,* 38 BUS. LAW. 1 (1982); Note, *Rule 10b-5 Damage Computation: Application of Financial Theory to Determine Net Economic Loss,* 51 FORDHAM L. REV. 838 (1983) [hereinafter FINKELSTEIN FORDHAM NOTE]; Note, *The Measure of Damages in Rule 10b-5 Cases Involving Actively Traded Securities,* 26 STAN. L. REV. 371 (1974) [hereinafter LEAS STANFORD NOTE].

n7. Blackie v. Barrack, 524 F.2d 891, 909 (9th Cir. 1975), *cert. denied,* 429 U.S. 816 (1976) ("out of pocket loss is the ordinary standard in a 10b-5 suit") (citations omitted); Jacobs, *The Measure of Damages in Rule 10b-5 Cases,* 65 GEO. L.J. 1093, 1099 (1977).

n8. 541 F.2d 1335, 1341 (9th Cir. 1976).

n9. *See, e.g., In re* LTV Sec. Litig., 88 F.R.D. 134 (N.D. Tex. 1980):

In the language of that analysis [in *Green v. Occidental Petroleum Corp.*], this court's certification proceeds on the assumption that damages will be determined by the out-of-pocket measure.  It follows that the creation of a "value line" is essential to the maintenance of the class.  If anything is currently the rule of damages under 10b-5, it is the out-of-pocket award.

*Id.* at 148 (citation omitted).  *See also,* Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436-37 (9th Cir.

1987); Huddleston v. Herman & MacLean, 640 F.2d 534, 556 (5th Cir. 1981), *aff'd in part and rev'd in part,* 459 U.S. 375 (1983). Another fraud-on-the-market case that adopts the out-of-pocket measure, although without reference to *Green,* is Harris v. Union Elec. Co., 787 F.2d 355, 367 (8th Cir.), *cert. denied,* 479 U.S. 823 (1986).

n10. 541 F.2d at 1344 (Sneed, J., concurring). This value line-price line comparison is also relevant, suggests Judge Sneed, to measuring the damages of plaintiffs who purchase securities during the period when the misrepresentation affects the market, but who resell the securities before corrective disclosure. Judge Sneed's discernment of the different positions of plaintiffs by the time of a lawsuit suggests, as does the language quoted in the text, that he perceived some of the difficulties of measuring damages in fraud-on-the-market cases. Some other courts have not perceived those difficulties. In the first appellate endorsement of fraud-on-the-market, for example, the Ninth Circuit stated, "we are confident that should the class prevail the amount of price inflation during the period can be charted and the process of computing individual damages will be virtually a mechanical task." *Blackie,* 524 F.2d at 905.

n11. That is the more common factual situation in fraud-on-the-market cases. For simplicity, we use that assumption throughout this Article but with the signs reversed; all the comments and conclusions hold when the fraud leads to artificial deflation in security prices. *Basic* is an example of the reverse case, in which a misrepresentation (the denial of negotiations regarding a possible merger) allegedly caused the Basic stock to trade at a price below its true value.

n12. This is actually the semi-strong form of the efficient market hypothesis. For a further discussion of the hypothesis and definitions of its different forms, see Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work,* 25 J. FIN. 383 (1970). Although coming close to accepting the semi-strong form of the efficient market hypothesis, the Supreme Court stated, "[f]or purposes of accepting the presumption of reliance in this case, we need only believe that market professionals generally consider most publicly announced material statements about companies, thereby affecting stock prices." *Basic,* 485 U.S. 246 n.24. On this point, see R. CLARK, *supra* note 6, § 8.10.5. The Court stated further, "we do not intend conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Basic,* 485 U.S. at 248 n.28. In this Article, we accept the position, consistent with the efficient market hypothesis, that the price line and value line converge on the disclosure date absent contrary probative evidence. Part of our purpose is to show that this conclusion is merely the beginning of the analysis.

n13. The net loss calculated in this fashion does not include interest. This Article does not address whether or not the court should add lost interest to the damage calculations.

n14. *See, e.g.,* Fischel, *supra* note 6; FORDHAM NOTE, *supra* note 6; and STANFORD NOTE, *supra* note 6.

n15. *See* Easterbrook & Fischel, *supra* note 6.

n16. For two reasons, our primary concern is with conceptual and legal issues, rather than with financial and statistical ones. First, the financial and statistical problems that arise are not unique to the calculation of the value line; they are generic problems that others have investigated extensively. The finance literature on this subject is tremendous. References to major papers on specific topics are provided in subsequent footnotes. Second, major disagreements between litigants regarding damages are more likely to arise because of conceptual problems over the application of the value line rather than over technical issues regarding its derivation. If the

litigants' debate can be reduced to the question of how to measure the market portfolio or how to estimate Beta, settlement is probably near.

n17. Fischel, *supra* note 6, at 1.

n18. 541 F.2d 1335, 1345 n.6 (9th Cir. 1976).

n19. *Basic,* 485 U.S. at 227.

n20. The court of appeals concluded that Basic's denials were misleading as to material facts. Levinson v. Basic, Inc., 786 F.2d 741, 747 (6th Cir. 1986), *vacated,* 485 U.S. 224 (1988). The Supreme Court remanded the case to the lower courts for further consideration in light of its discussion of the materiality of merger negotiations.

n21. 472 F. Supp. 123 (S.D.N.Y. 1978), *aff'd in part and rev'd in part,* 635 F.2d 156 (2d Cir. 1980). We cite *Liggett & Myers* for its facts, not its law. The facts clearly illustrate the problem of calculating damages during a class period even though the Second Circuit reversed the district court's judgment on the materiality and scienter of the tips and the measurement of damages (out-of-pocket versus other measures).

n22. 472 F. Supp. at 125, 128.

n23. The court chose the *lowest* stock price in the eight days following the July 18 announcement, on the ground that it takes time for investors to become apprised of new information. This decision is not consistent with the efficient market hypothesis underlying the fraud-on-the-market theory. The efficient market hypothesis implies that the market price should reflect the information in the announcement no later than the close of trading on July 19, the day that the *Wall Street Journal* published an article about the press release.

n24. 695 F. Supp. 1397 (D. Conn. 1988).

n25. We assume the plaintiff could prove that management acted with scienter. We also assume that a report putting a 50% probability on the dramatically higher estimate of costs is material.

n26. *In re* Washington Pub. Power Supply Sys. Sec. Litig., 650 F. Supp. 1346 (W.D. Wash. 1986).

n27. The Official Statements were the disclosure documents that accompanied the bond offerings.

n28. The Participants Agreements were a group of documents that detailed the responsibilities of each of the 88 public utilities that was party to the Washington Public Power Supply System. More importantly, the Participants Agreements stated that 88 utilities would be liable to pay the interest and principal on the WPPSS bonds even if the construction projects were never completed.

n29. Chemical Bank v. Washington Pub. Power Supply Sys., 99 Wash. 2d 772, 666 P.2d 329 (Wash. 1983).

n30. 893 F.2d 1405 (5th Cir. 1990).

n31. *Id.* at 1408-09.

n32. *Id.* at 1410.

n33. *Id.* at 1432 (emphasis in original).

n34. For simplicity, this Article assumes risk neutral valuation, which implies that the stock price is given by the expected value relation $E(v) = pX + (1-p)Y$, where p is the probability of a merger, X is the stock price if a merger occurs, and Y is the stock price absent a merger offer. Substituting a 50% probability merger and prices of $ 44 3/8 with a merger and $ 15 3/4 without a merger into the expected value equation produces an indicated stock price of $ 30. Thus, the appropriate price for the stock, given the 50% probability, is (1/2 x 15 3/4) + (1/2 x 44 3/8) or about $ 30.

n35. Applying the expected value equation $E(v)=pX + (1-p)Y$ with p=20%, X=$ 19.70, and Y=$ 15.75 gives an indicated stock price of approximately $ 16.50. (1/5 x 5/4(15 3/4)) + (4/5 x (15 3/4)) = 16.5375 or approximately 16.50.

n36. *Basic,* 485 U.S. at 238-41.

n37. *Id.* at 238-39 (quoting SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 841 (2d Cir. 1968), *cert. denied,* 394 U.S. 976 (1969)).

n38. *Id.*

n39. Several alternative financial economic models estimate the equivalent disclosure price. The *Basic* example employed a simple risk-neutral model so that the change in value following the disclosure equalled the present value of the expected change in cash flow. Some situations may require more sophisticated models. These models are developed in Bogue & Roll, *Capital Budgeting of Risky Projects with Imperfect Markets for Physical Capital,* 29 J. FIN. 601 (1974); Fama, *Risk-adjusted Discount Rates and Capital Budgeting Under Uncertainty,* 5 J. FIN. ECON. 3 (1977); Gehr, *Risk-Adjusted Capital Budgeting Using Arbitrage,* 10 FIN. MGMT. 14 (1981); Myers & Turnbull, *Capital Budgeting and the Capital Asset Pricing Model: Good News and Bad News,* 32 J. FIN. 321 (1977).

n40. Dicta in *Elkind v. Liggett & Myers* suggests that a court is more likely to side with the plaintiff in a debate regarding the equivalent disclosure price. "Since Liggett's wrongdoing has made difficult a more precise proof of damages, it must bear the risk of uncertainty created by its conduct." 472 F. Supp. 123, 132 (S.D.N.Y. 1978), *rev'd,* 635 F.2d 156 (2d Cir. 1980).

n41. The index approach assumes that all parties to the litigation agree on how to measure the market and the industry. *See* Roll, *A Critique of the Asset Pricing Theory's tests,* 5 J. FIN. ECON. 129 (1977) for an analysis of this problem. The approach also assumes that the industry variable includes all systematic factors

that affect the security's return other than the market. Though several such industry variables may be used in practice, for expositional purposes, only one is used here. For a discussion of multifactor models, see Chen, Roll & Ross, *Economic Forces and the Stock Market: Testing the APT and Alternative Theories,* 59 J. BUS. 383 (1986).

n42. This assumes that litigants agree on the form of the model and on how to estimate the parameters. In practice, debate may arise about issues such as adding other explanatory variables, choosing the sample period, and using daily, weekly, or monthly returns. For a discussion of these and related issues, see Roll, *supra* note 41; Scholes & Williams, *Estimating betas from Nonsynchronous Data,* 5 J. FIN. ECON. 309 (1977). In some situations it is assumed that but for the fraud, the company would track its industry so that a = b = 0 and c = 1.

n43. The event study method was developed in Fama, Fisher, Jensen & Roll, *The Adjustment of Stock Prices to New Information,* 10 INT'L ECON. REV. 1 (1969). For a discussion of its application to legal and regulatory problems, see Schwert, *Using Financial Data to Measure the Effects of Regulation,* 24 J.L. & ECON. 121 (1981).

n44. *See* Fischel, *supra* note 6; and LEAS STANFORD NOTE, *supra* note 6.

n45. Easterbrook & Fischel, *supra* note 6, are clearly aware of this problem, but they do not consider its implications for the two approaches.

n46. Fischel, *supra* note 6, at 1.

n47. Actual returns and predicted returns will differ by more than random error if the model used to calculate predicted returns is not properly specified. In most situations, errors in the daily predicted returns caused by improper specification will be small relative to random errors caused by firm-specific factors. Over longer periods of time, though, misspecification errors cumulate and become more important. Thus, proper specification of the model is more important when using the comparable index approach than when using the event study approach.

n48. FINKELSTEIN FORDHAM NOTE, *supra* note 6; Fischel, *supra* note 6; Easterbrook & Fischel, *supra* note 6; and LEAS STANFORD NOTE, *supra* note 6.

n49. 524 F.2d 891, 894 (9th Cir. 1975), *cert. denied,* 429 U.S. 816 (1976).

n50. For instance, Jarrell found that the price of target companies ran up almost 30% on average, relative to the predictions of the market model, before the first announcement of a merger or tender offer. Jarrell, *Stock Trading Before the Announcement of Tender Offers: Insider Trading or Market Anticipation* 5 J. LAW ECON. & ORG. 225 (1989).

n51. Malatesta & Thompson, *Partially Anticipated Events: A Model of Stock Price Reactions with an Application to Corporate Acquisitions,* 14 J. FIN. ECON. 237, 240 (1985).

37 UCLA L. Rev. 883, *924

n52. For example, there were almost no large residuals for a portfolio of bank stocks on days when information about the Latin American debt crisis was publicly announced. This may be attributable to the characterization of the crisis by a slow accumulation of bad news and not by a few unexpected announcements. Cornell & Shapiro, *The Reaction of Bank Stock Prices to the International Debt Crisis,* 10 J. BANKING & FIN. 55 (1986).

n53. *In re* Washington Pub. Power Supply Sys. Sec. Litig., 650 F. Supp. 1346, 1349 (W.D. Wash. 1986).

n54. The analysis of announcements and residual returns was performed by Brad Cornell in his capacity as an expert witness for a class of plaintiffs in the WPPSS litigation.

n55. 472 F. Supp. 123 (S.D.N.Y. 1978), *aff'd in part and rev'd in part,* 683 F. 2d 156 (2d Cir. 1980).

n56. *Id.* at 128.

n57. The facts are best stated in the Sixth Circuit's Opinion. Levinson v. Basic, Inc., 786 F.2d 741 (6th Cir. 1986), *vacated,* 485 U.S. 224 (1988).

n58. *Regina's Shares Plunge 58.8% in Heavy Trading,* Wall St. J., Sept. 22, 1988, at 4, col. 3.

n59. *Id.*

n60. As noted in the previous section, the disclosure date is particularly difficult to define when there are multiple interrelated frauds because one element of the fraud may be overdisclosed before information about another element is available.

n61. Fischel, *supra* note 6, at 17.

n62. The difference between the lowest offer a plaintiff would accept and the highest offer a defendant would make is defined as the settlement range. The narrower the settlement range, therefore, the more likely a settlement. For a more detailed discussion of this concept, see Miller, *Some Agency Problems in Settlement,* 16 J. LEGAL STUD. 189, 191-93 (1987).

n63. *Compare In re* LTV Sec. Litig., 88 F.R.D. 134, 140 (N.D. Tex. 1980) (the court, consistent with the efficient market hypothesis, cut off the class period at the date of the suspension of trading) *with* Elkind v. Liggett & Myers, Inc., 472 F. Supp. 123, 129 (S.D.N.Y. 1978), *aff'd in part and rev'd in part,* 635 F.2d 156 (2d Cir. 1980) (the court, inconsistent with the hypothesis, measured damages based on the market price several days after disclosure of the fraud).

n64. *Basic,* 485 U.S. 224, 252 (1988) (White, J., concurring in part and dissenting in part).

n65. *Id.* at 253 (White, J., concurring in part and dissenting in part).

n66. FED. R. CIV. P. 23(a)(2), (b)(3) require that common questions in a class action predominate over individual questions in a class action. *Id.* at 242.

n67. *See* Note, *The Reliance Requirement in Private Actions Under SEC Rule 10b-5,* 88 HARV. L. REV. 584, 584 n.3 (1975); *see also The Supreme Court 1987 Term: Leading Cases,* 102 HARV. L. REV. 143, 340-49 (1988).

n68. *Basic,* 485 U.S. at 248 n.28.

n69. *Id.* at 244 (quoting *In re* LTV Sec. Litig., 88 F.R.D. 134, 143 (N.D. Tex. 1980)).

n70. *Id.*

n71. *Id.* at 254 n.5 (White, J., concurring in part and dissenting in part).

n72. *Id.* at 254 (White, J., concurring in part and dissenting in part).

n73. *Id.* at 245 (emphasis added).

n74. 806 F.2d 1154 (3d Cir. 1986).

n75. *Basic,* 485 U.S. at 246 (emphasis added) (quoting Peil v. Speiser, 806 F.2d 1154, 1160-61 (3d Cir. 1986)).

n76. *Id.* at 246 (emphasis added) (referring to empirical studies cited in *In re* LTV Sec. Litig., 88 F.R.D. 134, 144 (N.D. Tex. 1980); in Fischel, *supra* note 6, at 4 n.9; and in Dennis, *Materiality and the Efficient Capital Market Model: A Recipe for the Total Mix,* 25 WM. & MARY L. REV. 373, 374-381 & n.1 (1984)).

n77. *Id.,* 485 U.S. at 248.

n78. *Id.*

n79. *Id.*

n80. The issue of what, exactly, is presumed in the presumption of reliance has lurked within the fraud-on-the-market theory since its beginnings. Perhaps it is because fraud-on-the-market is typically discussed at the class certification stage and so few cases go to judgment that the issue has not been aired more fully. The issue was raised in Note, *supra* note 67, at 592-96, which *Blackie v. Barrack* and other pre-*Basic* cases cited.

n81. *Basic,* 485 U.S. at 252 (White, J., concurring in part and dissenting in part).

n82. 681 F. Supp. 530, 533 (N.D. Ill. 1988).

n83. *Id.* at 533.

n84. Bastian v. Petren Resources Corp., 682 F. Supp. 956, 956-57 (N.D. Ill. 1988).

n85. *Id.* at 957.

n86. *Id.  See also* Flamm v. Everstadt, 814 F.2d 1169, 1180 (7th Cir.), *cert. denied,* 484 U.S. 853 (1987) (the Seventh Circuit's pre-*Basic* statement that a plaintiff must "show that the price he received had been diminished by the omission of which he complains").

n87. 524 F.2d 891 (9th Cir. 1975), *cert. denied,* 429 U.S. 816 (1976).

n88. *Id.* at 906 (emphasis added).

n89. *See Blackie,* 524 F.2d at 907 n.22 ("that purpose [of liberally construing section 10(b)] may be served only by allowing an overinclusive recovery to a defrauded class if the unavailability of the class device renders the alternative a grossly underinclusive recovery").

n90. The plaintiffs' allegations and proof are set forth in *Basic,* 485 U.S. at 248 n.27.

n91. *Id.* at 241-245.

n92. This is the phrase used in Peil v. Speiser, 806 F.2d 1154, 1161 (3d Cir. 1986), and adopted in *Basic* to describe the type of market in which the fraud-on-the-market theory applies. *Basic* also referred to "well-developed markets," an "impersonal, well-developed market," an "impersonal, efficient market," and, in one last flurry, "a well-developed, efficient, and information-hungry market."

n93. *See, e.g.,* Harman v. LyphoMed, Inc., 122 F.R.D. 522 (N.D. Ill. 1988); Garfinkel v. Memory Metals, Inc., 695 F. Supp. 1397, 1405 (D. Conn. 1988); A & J Deutscher Family Fund v. Bullard, [1988-1989 Transfer Binder] Fed. Sec. L. Rep. (CCH) P94,121, at 91,274 (C.D. Cal. 1988).

n94. 122 F.R.D. 522 (N.D. Ill. 1988).

n95. An S-3 registration statement allows streamlined disclosure in public securities offerings by companies that are large enough and whose securities are sufficiently traded and followed so that the market may be presumed, under the efficient market hypothesis, to contain historical information already.  *See* SEC Securities Act Release 6383, 47 Fed. Reg. 11,380 (1982).

n96. *Harman,* 122 F.R.D. at 525.

n97. *See Basic,* 485 U.S. at 248-249; cases cited *supra* note 93. At this point the Court noted "a certain incongruity between the assumption that Basic shares are traded on a well-developed, efficient, and information-hungry market, and the allegation that such a market could remain misinformed, and its valuation of Basic shares depressed, for 14 months on the basis of the three public statements." *Basic,* 485 U.S. at 249 n.29.

n98. *Basic,* 485 U.S. at 248-49 (footnotes omitted).

n99. 524 F.2d 891 (9th Cir. 1975), *cert. denied,* 429 U.S. 816 (1976).

n100. *Id.* at 906 n.22; *see also* Flamm v. Eberstadt, 814 F.2d 1169, 1180 (7th Cir. 1987) ("The logic of this [fraud-on-the-market] approach, however, implies that for widely traded securities *only* fraud-on-the-market will establish entitlement to relief. Fraud-on-the-plaintiff won't do -- not when the market price itself was unaffected and therefore 'right.'"); *accord* Teamsters Locals v. Angelo, 762 F.2d 522, 530 (7th Cir. 1985) ("The investor cannot ask a court to focus on the lie and ignore the remaining pieces of information already available to him (or, in the case of a publicly traded security, already available to others and reflected in the price of the security)."). If nothing else, defendants will want to rely on market efficiency for the purpose of cutting off the class period. For example, LTV announced on July 17, 1978 that trading in its securities would be suspended for ten days because of possible adjustments to inventories on its books. *In re* LTV Sec. Litig., 88 F.R.D. 134, 148 (N.D. Tex. 1980). LTV subsequently announced a restatement of earnings that reduced previously announced financial results. The plaintiffs argued that the class should include those who traded after the suspension of trading but before the restatement of earnings. The court ended the class period on the suspension date, explaining,

Plaintiffs' heavy dependence upon the "fraud on the market" theory cuts against them. It is the sensitivity of the open market and its ability to sort the data bits into mosaics of value that underpins any validity of the fraud on the market theory. No one contends this market turned stone deaf on July 17, 1978.

*Id.*

n101. 886 F.2d 1109 (9th Cir. 1989).

n102. 721 F. Supp. 1133 (N.D. Cal. 1988).

n103. *Apple Computer,* 886 F.2d at 1114. According to the court, "[t]he most closely controverted issue in this case is whether the defendants' optimistic statements . . . are shielded from liability because of the press' documentation of the relevant risks." *Id.*

n104. *Id.*

n105. *Id.* at 1116.

n106. *Id.* The Ninth Circuit found sufficient evidence in the record of "the press' intense, sustained focus" on Apple's products and their risks to remove any argument that the market price reflected only or unevenly the defendants' statements.

n107. *Convergent Technologies,* 721 F. Supp. at 1139.

n108. *Id.*

n109. 120 F.R.D. 629 (D.N.J. 1988).

n110. *Id.* at 638.

n111. *Id.*

n112. *Id.* Western Union's rebuttal argument was an alternative argument. The court rejected Western Union's various arguments against class certification.

n113. *Id.* ("In an efficient market, where the price of a company's stock is determined by the available material information regarding the company and its business, such misrepresentations are said to artificially inflate the market price.").

n114. *Id.*

n115. *Id.* ("It is unreasonable to charge prospective stock purchasers with access to every bit of information which could have some impact on their decision.").

n116. Fischel, *supra* note 6, at 12-13. A pre-*Basic* example of the same problem is Grossman v. Waste Management, Inc., 589 F. Supp. 395 (N.D. Ill. 1984). The plaintiff argued that he relied on advice of his investment manager, who relied on market price. The court held that reliance on market price by the advisor would suffice. *Id.* at 403-06. When the defendant argued that the market had access to information about the allegedly misrepresented facts, the court rejected the argument because there was no evidence that the advisor personally knew about the other information. *See also* Deutscher Family Fund v. Bullard, [1988-1989 Transfer Binder] Fed. Sec. L. Rep. (CCH) P94,121, at 91,274 (C.D. Cal. 1988). *Compare Western Union, Grossman,* and *Deutscher Family Fund with* Jaroslawicz v. Engelhard Corp., 21 Sec. Reg. & L. Rep. (BNA) No. 84-3641 588-89 (D.C.N.J. Apr. 5, 1989). When the defendant Engelhard sought to introduce 26 securities analysts' reports touching on the subject of alleged misrepresentations, the plaintiffs moved to exclude those reports on the ground that the reports were "superfluous" under the fraud-on-the-market theory. The court denied the motion to exclude, stating that "the pre-class reports are relevant to what the 'market makers' knew."

n117. The defendants in Deutscher Family Fund v. Bullard, [1988-1989 Transfer Binder] Fed. Sec. L. Rep. (CCH) P94,121, at 91,272, argued that market efficiency reflected accurate, mitigating information in the market price, but, argued in the alternative that the market for the security at issue was not efficient and that "an increasing body of literature challenges the efficient market hypothesis."

# EXHIBIT 20

This book is printed on acid-free paper. ⊛

Copyright © 2001 by John Wiley & Sons, Inc. All rights reserved.

Published simultaneously in Canada.

No part of this publication may be reproduced, stored in a retrieval system or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning or otherwise, except as permitted under Sections 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the Publisher, or authorization through payment of the appropriate per-copy fee to the Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400, fax (978) 750-4744. Requests to the Publisher for permission should be addressed to the Permissions Department, John Wiley & Sons, Inc., 605 Third Avenue, New York, NY 10158-0012, (212) 850-6011, fax (212) 850-6008, E-Mail: PERMREQ@WILEY.COM.

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other expert assistance is required, the services of a competent professional person should be sought.

*Library of Congress Cataloging-in-Publication Data:*
Litigation services handbook : the role of the financial expert / [edited by] Roman L. Weil, Michael J. Wagner, Peter B. Frank.—3rd ed.
    p. cm.
  Includes index.
  ISBN 0-471-40309-1 (cloth : alk. paper)
  1. Forensic accounting—United States. 2. Evidence, Expert—United States. I. Weil, Roman L. II. Wagner, Michael J., 1948- III. Frank, Peter B.
  KF8968.15 .L57 2001
347.73′67—dc21                            00-054555

Printed in the United States of America.

10 9 8 7 6 5 4 3

CHAPTER **17**

# SECURITIES ACT VIOLATIONS: ESTIMATION OF DAMAGES

**Nicholas I. Crew, PhD**
**Patrick G. Goshtigian, CFA, MBA**
**Marnie A. Moore, MBA**
**Atulya Sarin, PhD**

### CONTENTS

17.1 Introduction   17.1

17.2 Federal Securities Acts   17.2
   (a) Securities Act of 1933   17.2
   (b) Securities Exchange Act of 1934   17.2
   (c) Securities Litigation Reform Act of 1995   17.3

17.3 Alternative Damages Measures   17.5
   (a) Section 11 of the 1933 Act   17.6
   (b) Section 12 of the 1933 Act   17.6
   (c) Section 9 of the 1934 Act   17.6
   (d) Section 16 of the 1934 Act   17.6
   (e) Section 10(b) of the 1934 Act and Rule 10b-5   17.6
   (f) Section 21D(e) of the 1995 Act (Limitation on Damages)   17.9

17.4 Estimating a Security's True Value   17.9
   (a) Constructing a Value Line   17.10

   (b) Implementation Issues in Using Regression Analysis to Estimate Damages   17.12
   (c) Errors in Examining the Effect of Litigation-Related Events   17.15

17.5 Damages Methodology   17.15
   (a) Estimating the Number of Damages Shares   17.15
   (b) Extensions of the Basic Model   17.20

NOTES   17.21

LIST OF CASES   17.22

BIBLIOGRAPHY   17.23

**17.1 INTRODUCTION.** This chapter discusses estimation of damages for equities under the Federal Securities Acts. The chapter first presents the portions of the Acts relevant to damages calculations and reviews the legal measure of damages prescribed by these Acts. The chapter then examines the two major concerns of damages estimation in security fraud cases: First, how to calculate the value of the

---

The authors revised this chapter from its predecessor in the previous edition (Chapter 44, *Litigation Services Handbook*, Second Edition). The authors of the earlier chapter were Harinda de Silva, Nancy Lo, and Tara Nells.

**(f) Section 21D(e) of the 1995 Act (Limitation on Damages).**  Plaintiffs and defendants have presented numerous variations of damages partly attributed to the stock price fluctuating widely for a period of time following the curative disclosure. Section 21D(e) of the 1995 Reform Act seeks to reduce the variation of damages by allowing a look-back period. Section 21D(e) stipulates that damages may not exceed "the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market."[42]

**17.4   ESTIMATING A SECURITY'S TRUE VALUE.**  To implement the out-of-pocket measure, analysts must estimate the security's true value absent the fraud or misrepresentation. To do this, they have developed financial valuation models that employ publicly available information.

The analyst must estimate the security's true value for the plaintiffs' class period, which typically extends from the date a fraud or misrepresentation occurs to the date the company makes a final curative public disclosure. During the class period, a plaintiff buys the stock at "too high" a price in a buyer's suit, and sells the stock at "too low" a price in a seller's suit. Examples of buyers' suits include 10b-5 claims in which the plaintiff alleges that it purchased stock at an inflated price owing to the company's concealment of material, adverse information—such as low expected earnings or a decline in the value of investment assets. Examples of a sellers' suit include 10b-5 claims in which the plaintiff alleges that it sold stock at a depressed price because of the company's failure to disclose material, positive information—such as an impending merger agreement or a large natural resource discovery.

Plaintiffs' class periods vary in length from a few days to several years. Plaintiffs may allege single or multiple occurrences of fraud or misrepresentation. A simple case may involve a single incident of fraud lasting only a few days before the company issues a corrective public disclosure. More complicated cases may involve multiple occurrences of fraud or misrepresentation over several years with partial disclosures of curative information and a final corrective disclosure at the end of the class period.

In theory, a true-value line represents the path that a stock price would have followed absent the alleged fraud. The difference between the actual stock price and the true value on a given day represents the amount of excess or shortfall in that day's price that is due to the alleged fraud and is referred to as inflation. In Exhibit 17-1, investors who purchased shares in the class period and still held shares at the end of the class period would be damaged by the amount of inflation at the time of purchase. In Exhibit 17-2, investors who purchased shares before the class period and sold shares during the class period are damaged by the amount of "negative" inflation. However, because the true-value line is unknown and must be estimated with a valuation model, some of the difference between the actual stock-price line and the estimated true-value line may result from nonfraud–related events the valuation model did not capture.

17 • 10    SECURITIES ACT VIOLATIONS: ESTIMATION OF DAMAGES



**Exhibit 17-1.   Example of a Simple Fraud in Which the Company Makes a Material, Positive Misrepresentation at Beginning of Class Period. (For illustrative purposes, actual prices and true-value line have been smoothed.)**



**Exhibit 17-2.   Inflation in a Seller's Suit. (For illustrative purposes, actual prices and true-value line have been smoothed.)**

**(a) Constructing a Value Line.**   One might think first to estimate the true value of a security from the bottom up (i.e., using accounting information such as asset value, earnings data, and other data that relates accounting information to share prices). Fischel (1982) noted, however, that such information is inherently speculative. Instead, economists have developed statistical techniques to control for factors such as the market, industry, and firm specific factors that likely influence a stock's

price. In the following sections, we explain methods that analysts can use to control for these factors and estimate the value line.

*(i) Market-Wide Information.* To account for economy-wide information, experts commonly use the *market model* approach. The market model of finance theory (Fama, 1976), based on the capital asset pricing model (CAPM; Sharpe, 1964; Lintner, 1965), provides a reasonable basis for estimating a value line in many securities litigation cases. The market model statistically relates the returns on a stock to the returns on a broad-based portfolio of stocks (i.e., the market) through the following equation:

$$R_{i,t} = \alpha + \beta \cdot R_{m,t} + \epsilon_t, \tag{1}$$

where $R_{i,t}$ is the total return on the stock, and $R_{m,t}$ is the total return of the market index.[43] Common measures of the market include the Standard & Poor's 500 stock index and the NYSE composite index, market-value–weighted indexes composed of, respectively, 500 leading listed and over-the-counter stocks and all New York Stock Exchange–listed stocks.

The parameters of the model (which the analysis will estimate) are $\alpha$ and $\beta$.[44] The coefficient beta ($\beta$) measures the systematic risk of a stock (i.e., risk that one cannot diversify away by holding a broad-based portfolio of stocks). Beta represents the average percentage change in return on the stock for a one percent change in return on the market index. Thus, stocks with risk similar to the market have betas equal to one, while stocks that are more sensitive to market fluctuations have higher betas and stocks that are less sensitive to market fluctuations have lower betas. See Section 17.4(b) and Chapter 7 for more discussion on regression analysis.

In equation (1), $\epsilon_t$ (the residual term) represents the residual risk. This is the portion of the security's daily price change remaining unexplained by changes in the broad market and results, generally, from company-specific events.

The courts have recognized the use of a market index to exclude losses resulting from external market forces (Kaufman, 1992, Ch. 9, p. 27).[45] In other words, the plaintiff's recovery cannot exceed the losses caused by the fraud or misrepresentation, so will exclude losses created by market risk acceptable to the plaintiffs on an ex ante basis. The analysis should also exclude losses caused by factors unrelated to the fraud, when the market index does not adequately reflect those losses. The following sections discuss some of these factors.

*(ii) Industry-wide Information.* In addition to market-wide information, the effects of industry-wide information, such as technological innovations, changes in demand, the level of competition within the industry, and regulatory announcements, can affect stock prices. An extension of the market model, known as a *factor model*, can capture the effects of this industry-wide information. A factor model may include returns of a relevant industry index and the market return as dependant variables. For example, a two-factor model of returns could be:

$$R_{i,t} = \alpha + \beta_1 \cdot R_{m,t} + \beta_2 R_{Ind,t} + \epsilon_t \tag{2}$$

where $R_{Ind,t}$ is the industry return. In some cases, the analysis could include returns of additional factors, such as other industries or sub-industries. As in the single factor market model, the residual term $\epsilon_t$ represents the portion of the security's return which the model's factors cannot explain and, in a well-specified model, results from firm-specific information and events.

*(iii) Firm-Specific Information and Event Analysis.*  As discussed above, in addition to general factors, various firm-specific events such as contract awards, patent filings, product announcements, partnership arrangements, strikes, and earnings affect an individual security's prices. The residual term $\epsilon_t$ in equations (1) and (2) captures these effects. The analysis can measure the effects of this information from the security's residual daily price changes obtained from the market model. This technique is called an *event analysis* or *event study.* Cornell and Morgan (1990, 903–904) propose the event-study approach to estimate the value line. On disclosure dates only, this approach replaces actual returns with returns estimated from a market model. The declines on the disclosure dates are thereby limited to those attributable to the fraud. Cornell and Morgan, however, note that this approach will understate damages if additional information leaks on nondisclosure dates.

Research indicates that security prices respond rapidly to the announcement of new information. Stock prices capture the effect of new information within hours (if not minutes) of the announcement of news. Given the speed with which a security price adjusts for new information, an event analysis focuses on the residual daily price change on the day of the newswire release. An event study may include one or both of the adjacent days if the analyst believes a leak occurred, or if the release of information came after the close of trading. In many cases, analysts should examine intraday security price movements. Event analysis permits one to identify which residual daily price changes are significant in the statistical sense that they exceed normal fluctuations for the security. This identification provides a basis for assessing which events likely have materially affected the security's price. As a result, event analysis usually can explain most of the significant residual daily price changes (that market and industry information cannot explain).

Next, the analysis separates the litigation-related price effects of firm-specific information from other causes of price change. Simultaneous announcements can create a major difficulty in extracting these separate effects. Supporting materials, such as analysts' reports and news articles, often can help assess the relative importance attached to information. By using the market model to account for market and industry information, and event analysis to identify the material firm-specific events, one can obtain an unbiased assessment of the effects of litigation-related events on a per share basis. (See Chapter 7, Section 7.6(e) for discussion of indicator variables, which is the technique to implement event studies.)

**(b) Implementation Issues in Using Regression Analysis to Estimate Damages.**  Implementing the linear regression model for estimating a stock's true value requires that the analyst address the following issues.

*(i) Data Periodicity.*  Securities cases typically use daily rates of return. Analysts can use daily data for popular market indexes and actively traded common stocks to construct industry indexes. When one cannot obtain a daily index for a particular asset class because of data limitations, one may appropriately estimate a weekly or monthly model, and modify the results to calculate daily damages estimates.

*(ii) Which Data Period to Use in the Estimation—Preclass Period, Within-Class Period, or Post-class Period?*  In selecting an appropriate sample period, we exclude the plaintiff's class period (i.e., from the date of the fraud to its disclosure), as well as other time periods when the fraud has tainted prices. For example, uncertainty related to po-

tential securities litigation may affect stock prices in the postclass period. Thus, whereas analysts commonly use data from the preclass period for estimating a true value line, including data from the postclass period depends on how disclosure of the fraud may have affected stock prices.

*(iii) How Many Observations to Include in the Sample Period?*   The analyst should consider the trade-off between including a sufficient number of observations for statistically reliable parameter estimates and using a shorter sample period to reduce the effect caused by changes, if any, in parameters over time. Changes in a company's operating or financial policy—such as selling off or purchasing a business line or increasing the debt ratio—or changes in regulatory policies that affect the company may cause the parameters of the market model or factor model to change over time. The possibility of a change in the statistical relationship between the returns on the stock and returns on the independent variables over time suggests that the models may under- or overstate damages, particularly if a structural change occurs within the plaintiffs' class period. This problem increases in importance for securities cases involving longer class periods of several months or years.

*(iv) Whether to Backcast or Forecast the Value Line?*   The analysis estimates the true return on the stock during the class period by substituting the actual values of the index variables along with the estimated parameters into equation (1) or (2). This yields a predicted return absent the fraud or misrepresentation. The analysis then uses this estimated true return to estimate the true price (the true-value line).

Two basic approaches for using the true returns to obtain the value line are *backcasting* and *forecasting*. The forecasting method obtains the value line from the true returns by forecasting prices forward using the security's actual reported price the day before the class period starts. Since this price comes from a period before the class period, it reflects no effects of fraud or misrepresentation. Thus, using the clean price on the day prior to the start of the class period, equation (3) provides the estimate of the true-value on the first day of the class period, denoted by $P_1$:

$$P_1 = P_0(1 + R_1),  \tag{3}$$

where $P_0$ is the security's price the day before the class period starts, $R_1$ is the true return on day 1 of the class period.[46] The estimate of the true-value on the second day of the class period, denoted by $P_2$, is:

$$P_2 = P_1(1 + R_2),  \tag{4}$$

where $P_1$ is the price obtained from equation (3) above.

Similarly, for the remaining days, the estimate of the true value at time $t$ is

$$P_t = P_{t-1}(1 + R_t).  \tag{5}$$

With backcasting, the true-value line results from working backwards using the true returns and the security's actual price on the day after the class period ends. This price contains no effect of fraud and misrepresentations because the class period, by definition, ends with full disclosure. Equation (6) gives the (estimated) true value on the last day of the class period, denoted by $P_T$:

$$P_T = \frac{P_{T+1}}{(1 + R_{T+1})},  \tag{6}$$

where $P_{T+1}$ is the security's price the day after the class period ends, and $R_{T+1}$ is the security's true return. Once the analysis computes $P_T$, that price and $R_T$ imply the price $P_T-1$ and so, using the recursive backcasting relationship:

$$P_{t-1} = \frac{P_t}{(1 + R_t)}. \tag{7}$$

Both backcasting and forecasting present potential problems to consider. One can use the forecasting model to predict $P_{T+1}$ (the price the day after the class period ends) with the forecasting equation:

$$P_{T+1} = P_T(1 + R_{T+1}). \tag{8}$$

Only by chance will that estimate of the true price $P_{T+1}$ equal the actual reported price on the day after the class period ends. Similarly, if the analysis uses $P_1$ and $R_1$ to estimate $P_0$ (the true price on the day before the class period starts) with the backcasting equation, only by chance will the estimated true price equal the actual reported price. In other words, by simply backcasting and forecasting without other adjustments, the model will provide estimates of true values inconsistent with observed prices outside of the class period. This can lead to misestimates of damages. In particular, multiple occurrences of fraud throughout the class period make backcasting inappropriate for estimating the value line. Exhibit 17-3 illustrates how a backcasted value line incorrectly attributes the full value of the fraud to the beginning of the class period, overstating damages.

The event analysis approach can help address these problems by examining days on which the difference in the actual price and true price differs and ascertaining whether these changes relate to fraud or other events. A chronology of relevant events, using publicly available data sources such as news releases and analysts' reports, can enable the expert to decide whether to adjust the value line to account for nonfraud related company-specific events.



**Exhibit 17-3.   An Example of How Backcasted Value Line May Overstate Damages When Multiple Concealments of Material, Negative Information Occur During the Class Period**

**(c) Errors in Examining the Effect of Litigation-Related Events.**   Failure to remove all factors that affect share price can over- or underestimate the affect of litigation-related events. An overestimate results from erroneously concluding that litigation-related information had a price effect, when in fact some other event caused the price change. Overestimates are present in every securities case because large price declines precipitate securities litigation and such declines can result from many causes, which become difficult to isolate. Hence, the plaintiff may opt to include losses unrelated to the cause of action but also indistinguishable from those that are related. Underestimates can arise when other events obscure the price effects of litigation-related information. They could lead one to erroneously conclude there was no price effect, when in fact there was one. In these cases, much of the price decline results from unfavorable economy-wide, industry-wide, or nonlitigation related, firm-specific information. Analysis can detect such effects, not detectable in the raw prices, after it removes the effects of other factors.

**17.5   DAMAGES METHODOLOGY.**   Once analysts have established the value-line, they have measured total damages to the class. For a class action suit involving buyers, damages per share equal the difference between the actual purchase price and the true purchase price absent the fraud (given by the true-value line) less the difference between the true sales price (again given by the true-value line) and the actual sales price. Mathematically, one can express this as

$$(P_B - \hat{P}_B) - (P_S - \hat{P}_s), \tag{9}$$

where $P_B$ is the class member's actual purchase price, $\hat{P}_S$ is the true price on the date of purchase, $P_S$ is the actual sale price on the date of sale, $\hat{P}_S$ and is the true price on the date of sale. The first term in this expression represents the loss incurred from purchasing the security at an inflated price. The second term offsets these damages with the gain (if any) from selling the security at an inflated price.

For class action suits involving sellers where the fraud depressed or pushed down the stock price, one can rewrite equation (9) as

$$(\hat{P}_S - P_S) - (\hat{P}_B - P_B). \tag{9'}$$

In this equation, damages is the loss from selling the security at an alleged deflated price offset by any gains from purchasing the security at a price less than the true value. Total damages for a member of a class equals the damages per share multiplied by the number of shares traded by that member. Total damages incurred by the class are the sum of damages incurred by each class member.

Although this describes how to theoretically calculate damages, in practice, it requires knowledge of the exact trading behavior and shares traded by each class member. Because trades frequently occur in street name (i.e., the broker's name), identifying the trading patterns of individual security owners is costly, usually impossible. Hence, analysts must use a model to estimate the number of damaged shares.

## (a) Estimating the Number of Damaged Shares

*(i) Introduction to the Basic Model.*   Analysts can estimate the number of damaged shares with a proportional trading model or a variant of it. Employing some simplifying