Exhibit L

3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DI

--oOo--

In re: ORACLE CORPORATION        Master File No.

SECURITIES LITIGATION            C-01-0988-MJJ (JCS)

_____/ CLASS ACTION

-- TRANSCRIPT DESIGNATED AS CONFIDENTIAL --

Videotaped Deposition of

BJORN I. STEINHOLT, CFA

_____

Monday, July 2, 2007

Reported by:

Leslie Rockwood

CSR No. 3462

Job No. 75264

---

1        INDEX OF EXAMINATION
2                          Page
3  EXAMINATION by Mr. Gibbs         6
4      by Ms. Winkler         202
5
6        INDEX OF EXHIBITS
7  Number    Description         Page
8   1   Expert Report of Bjorn I. Steinholt,    4
         CFA, 5/25/07
9
10  2   Rebuttal Report of Bjorn I. Steinholt,   4
         CFA, 6/22/07
11  3   Oracle Press Release, 3/1/01        37
12  4   Declaration of Bjorn I. Steinholt,      54
         CFA, 8/12/05
13
14  5   Oracle News Release, 3/15/01         54
15
16  6   Oracle Corporation, Highlights from    202
         CSFB Technology Group Conference,
17       Credit Suisse First Boston Corporation
16
17  7   Bloomberg Article, 11/30/00         202
18
                --oOo--
19
20
21
22
23
24
25

---

2

APPEARANCES:

For the Plaintiffs and the Witness:
    Monique C. Winkler
    -and-
    Shawn A. Williams
    -and-
    Daniel J. Pfefferbaum
    Lerach Couglin Stoia Geller
    Rudman & Robbins, LLP
    100 Pine Street, Suite 2600
    San Francisco, California 94111
    (415) 288-4545

For the Defendants:

    Patrick Gibbs
    -and-
    David M. Friedman
    Latham & Watkins, LLP
    140 Scott Drive
    Menlo Park, California 94025-1008
    (650) 328-4600

Also present:  Elizabeth Skev
    Daniel M. Garret, Ph.D.
    Dorian Daley, Esq., Oracle Corporation
    (morning session only)

The Videographer:  Marty Majdoub

---

4

1       BE IT REMEMBERED that on Monday, July 2, 2007,
2   commencing at the hour of 9:09 a.m., at the Law Offices
3   of Latham & Watkins, LLP, 505 Montgomery Street,
4   20th Floor, San Francisco, California, before me, LESLIE
5   ROCKWOOD, a Certified Shorthand Reporter in the State of
6   California, personally appeared
7       BJORN I. STEINHOLT, CFA,
8   called as a witness by the Defendants in the
9   above-entitled action, who, having been duly sworn, by
10  the Certified Shorthand Reporter to tell the truth, the
11  whole truth and nothing but the truth, testified under
12  oath as follows:
13                  --oOo--
14      (Exhibits 1 and 2 marked.)
15      THE VIDEOGRAPHER:  Good morning.  Here
16  begins Videotape Number 1 in the deposition of Bjorn
17  Steinholt in the matter of Oracle Corporation Securities
18  Litigation, Case Number C-01-0988-MJJ.  Today's date is
19  July 2nd, 2007.  The time is 9:09 a.m.
20      This deposition is being taken at
21  505 Montgomery Street, San Francisco, California.  The
22  videographer is Marty Majdoub here on behalf of Esquire
23  Deposition Services, 505 Sansome, Suite 502, San
24  Francisco, California.
25      Would all counsel present please identify

Steinholt, Bjorn | 7/2/2007 7:58:00 PM

5

1 yourselves and state whom you represent.
2     MR. GIBBS: Patrick Gibbs from Latham &
3 Watkins for the defendants.
4     MR. FRIEDMAN: David Friedman of Latham &
5 Watkins for the defendants.
6     MR. GARRETT: Daniel Garrett of Cornerstone
7 Research.
8     MS. DALEY: Dorian Daley, Oracle
9 Corporation.
10     MS. SKEY: Elizabeth Skey for Oracle
11 Corporation.
12     MS. WINKLER: Monique Winkler of Lerach,
13 Coughlin, Stoia, Geller, Rudman & Robbins on behalf of
14 plaintiffs and the witness.
15     MR. WILLIAMS: Shawn Williams, Lerach,
16 Coughlin, on behalf of Plaintiffs and the witness.
17     MR. PFEFFERBAUM: Daniel Pfefferbaum on
18 behalf of Plaintiffs and witness.
19     THE VIDEOGRAPHER: Would the court reporter
20 please swear in the witness.
21     THE REPORTER: Raise your right hand,
22 please, Mr. Steinholt.
23     You do solemnly state that the evidence you
24 shall give in this matter shall be the truth, the whole
25 truth, and nothing but the truth, so help you God.

6

1     THE WITNESS: I do.
2     THE REPORTER: Thank you.
3     EXAMINATION BY MR. GIBBS
4   Q. Good morning, Mr. Steinholt.
5   A. Good morning.
6   Q. My name is Patrick Gibbs; I'm representing Oracle
7 Corporation and the other defendants in this matter.
8   Let me ask you first: Does your opening report
9 identify the number of hours you had spent on this
10 matter up to the time of your report, do you know?
11   A. I do not believe it does.
12   Q. Do you know how many hours you spent on this
13 matter so far?
14   A. I do not know.
15   Q. At paragraph 40 of your opening report, you cite
16 an article by Thorsen, Kaplan and Hakala for the
17 following definition of loss causation, "Loss causation
18 exists whenever fraud leads the stock price to be higher
19 than it should be, the buyer pays too much for the stock
20 and the buyer is unable to recover that overpayment in
21 the marketplace."
22   Is this the definition of loss causation you used
23 in forming your opinions in this case?
24   A. That's -- this is one interpret -- the whole
25 article is an interpretation of Dura, so it goes into a

7

1 legal interpretation of loss causation, which goes one
2 step beyond, you know, what I'm doing. I'm not here to
3 interpret Dura; I'm not here to provide a legal opinion
4 in terms of loss causation, that's not what I'm doing,
5 so I'm not -- but in terms of -- because there is a
6 difference. There is a difference between the way
7 Plaintiffs view loss causation, and there's a difference
8 between how Defendants view loss causation.
9   Q. Why did you cite the Thorsen, Kaplan and Hakala
10 definition in your report?
11   A. Because I cited it to show effectively
12 plaintiffs' view of the legal definition of loss
13 causation.
14   Q. For purposes of forming your opinion on loss
15 causation in this case, did you assume that loss
16 causation exists as long as a shareholder purchases
17 shares at an inflated price and is not able to recover
18 that inflated price in the marketplace?
19   A. As I said before, that goes one step beyond the
20 analysis that I performed.
21   Q. Under your view of loss causation, is there loss
22 causation if the buyer is unable to recover the
23 overpayment in the marketplace because the stock price
24 has dropped for reasons that have nothing to do with the
25 fraud?

8

1   A. Well, it's -- again, there -- we can talk about
2 in specifically to Oracle because I think that may be
3 more beneficial.
4   There are two ways of looking at loss causation
5 from an economic point of view. And from an economic
6 point of view, when you look at loss causation, you look
7 at the economic position where the investor actually
8 ended up, and you compare that to where he would have
9 ended up but for the fraud.
10   In the case of Oracle, for instance, you can use
11 an out-of-pocket measure of calculating damages and
12 out-of-pocket losses, which is effectively looking at
13 overpayment in the share at the time of purchase plus
14 overpayment of the shares at the time of sale.
15   From an economic point of view, you are in a
16 different position; consequently, you can say that there
17 are economic losses. However, you can also look at it
18 differently.
19   Instead of buying 100 shares at an inflated
20 price, you could also assume that you would have made
21 the same dollar investment in which case, under the same
22 set of -- same set of circumstances, you would not have
23 an economic loss. And therein lies a conflict between
24 the way that Defendants view loss causation and
25 Plaintiffs view loss causation.

9

1   Q. And in the case of your opinion, you've used the
2 out-of-pocket measure; is that correct?
3   A. I've used the out-of-pocket measure of damages
4 not to determine whether or not -- you know, in order to
5 measure the damages, but not to determine whether or not
6 there is an economic loss. In other words, people who
7 purchased and sold prior to the disclosure at the very
8 end of the Class Period may have an economic loss using
9 that out-of-pocket measure of damages. But that doesn't
10 necessarily mean that they have -- you know, that the
11 loss causation -- the legal definition of loss causation
12 has been met.
13   Q. Does your damages calculation compute damages for
14 people who sold before the March 1, 2001, announcement?
15   A. I am not (sic) calculated aggregate damages in
16 this particular case, so I have not -- this is the next
17 step in any analysis. I have calculated the per share
18 damages, which is different.
19   Q. For purposes of this case, are you offering an
20 opinion as to whether people who sold their shares
21 before the March 1st, 2001, announcement have suffered
22 economic loss?
23   A. I have not offered an opinion on that in either
24 of my reports.
25   Q. So the opinion you've offered with respect to

10

1 loss causation is only as to economic losses suffered by
2 shareholders who were holding the stock at the time of
3 the March 1, 2001, announcement?
4   A. That's correct. Yes.
5   Q. Okay. Do you know whether the loss causation
6 definition from the Thorsen, Kaplan and Hakala article
7 you cite has ever been endorsed in any academic or
8 scientific literature?
9   A. I just know that that is -- it's a peer-reviewed
10 article, and it is what it is. I have not -- I don't
11 know if it has been endorsed or not endorsed.
12   Q. It's your understanding that the Journal of
13 Business and Securities Law is a peer-reviewed
14 publication?
15   A. That's my understanding, yes.
16   Q. Okay. Do you think it's important in relying on
17 scientific or academic literature that you rely only on
18 peer-reviewed publications and materials?
19   A. I think --
20      MS. WINKLER: Objection. Form.
21      THE WITNESS: I believe that it helps to
22 rely on articles that are peer reviewed. I don't think
23 that one automatically would exclude articles that are
24 not peer reviewed. As a matter of fact, I quote
25 articles that I do not believe are peer reviewed but are

11

1 published by firms generally representing defendants in
2 these type of cases. If the article explains the point
3 I'm trying to make, then I think it's appropriate to
4 include it.
5   Q. BY MR. GIBBS: At paragraph 1 of your opening
6 report, you write that, "Inflated expectations, as well
7 as the price inflation, are then generally reduced
8 either by the company failing to meet the inflated
9 expectations or a specific disclosure of the falsehood
10 or misleading nature of the information."
11      Now, I want to focus your attention on the first
12 of those; in other words, assume that there is no
13 specific disclosure that a prior statement was false.
14      Are you with me?
15   A. Yes.
16   Q. For purposes of your loss causation analysis
17 here, is there loss causation if the company fails to
18 meet the inflated expectations for reasons that have
19 nothing to do with the allegedly false or misleading
20 statements?
21   A. No. I mean, if -- if from an economic point of
22 view, which is the context I discuss loss causation,
23 if -- if missing expectations is something that would
24 have occurred even absent the fraud, then it doesn't
25 relate to the fraud. In other words, the economic

12

1 losses that were suffered by investors would have been
2 the same whether or not the fraud took place or not. So
3 consequently, there -- there would be no loss causation
4 in that -- that scenario.
5   Q. Okay. So you agree that if the company misses
6 the allegedly inflated expectations for reasons having
7 nothing to do with the fraud, the resulting loss would
8 not have been caused by those allegedly false and
9 misleading statements; correct?
10   A. Correct. And -- and again, I mean, the -- what I
11 look at is whether or not this is a price decline -- the
12 resulting price decline, would that have occurred absent
13 the alleged fraud. If this is a price decline that
14 would have occurred absent the alleged fraud, then, you
15 know, it is losses that the investor would have incurred
16 no matter whether -- no matter if the fraud had existed
17 -- whether there was fraud or not.
18   Q. Okay. At paragraph 41, again, of your opening
19 report, you write, "In this case the relevant truth
20 alleged by Plaintiffs was revealed when the company,
21 after the market closed on March 1st, 2001, admitted
22 that it would not meet its previously stated third
23 quarter 2001 guidance."
24      What exactly is the relevant truth that you
25 refer to in that sentence?

13

1    A. The relevant truth in this matter relates to
2  Oracle's inability to sell it's Suite 11i despite the
3  economic downturn, and that revealed quite a bit of
4  information to the market with respect to customers'
5  acceptance of that particular product. And it's similar
6  to what occurred in the first quarter, which also caused
7  the investors to question whether or not the Suite 11i
8  was a product that met the needs of the customers.
9        In addition to that, the disclosure also revealed
10  that the company's prior guidance, which Plaintiffs in
11  this case allege was false and misleading, was wrong;
12  quite clearly they missed it.
13        It also revealed that the company was impacted by
14  the overall economic downturn more significantly than
15  otherwise thought. Previously it was thought that
16  because Suite 11i was a high ROI-type of a product, it
17  would not be impacted by the slowing economy as many
18  other products in the technology industry at that time.
19    Q. The first thing you said when I asked you what
20  was the relevant truth revealed by the March 1st, 2001,
21  announcement was Oracle's inability to sell it's Suite
22  11i products despite the economic downturn.
23        You know that Oracle sold well over $100 million
24  worth of Suite 11i during that quarter; correct?
25    A. Yes. And again this relates to the sales growth

14

1  in applications and the inability of the company to
2  number one, you know, provide sales growth consistent
3  with expectations; and, number two, really disclose a
4  number of additional large customers that had adopted
5  Suite 11i.
6    Q. I'm not sure what you mean by "number two, really
7  disclose a number of additional large companies that had
8  adopted Suite 11i."
9    A. One of the con -- one of the things investors
10  were very concerned about was whether or not -- was
11  reference accounts, for instance. In other words,
12  Oracle's ability to sell it's suite to large companies
13  that can -- could be used as a reference to show that
14  the product actually worked.
15    Q. What was revealed in the March 1, 2001,
16  announcement about reference customers?
17    A. Well, the absence of any reference to any large
18  sales obviously show -- inform the market that, you
19  know, that -- that was not something that the market
20  had, of course, anticipated and hoped that there would
21  be large customers who would sign up to use Suite 11i.
22  And, you know, when that doesn't occur, that's viewed as
23  negative.
24    Q. Where in your opening or rebuttal reports do you
25  discuss reference customers?

15

1    A. Well, it's -- I had to look at my report. I
2  mean --
3    Q. Okay. Well, I can tell you it doesn't. Let me
4  circle back to the --
5    A. Well, I -- I will just disagree with you because
6  I -- I talk about customers' acceptance of Suite 11i and
7  that has to do with whether or not customers actually
8  buy the product, and whether or not large customers
9  actually buy the -- buy the product and that it's --
10  it's the same concept.
11    Q. Okay. Well, when we take our first break, I'm
12  going to ask you to take a look at your report and tell
13  me if you can find the word "reference customers" in
14  there.
15    A. Well, it -- it --
16        MS. WINKLER: Patrick, if you wanted to do
17  that, we're going to do that while we're on the record.
18  We're not going to take a break and have him look at
19  that.
20        If that's your question, we'll sit here and
21  do it while we're on the record.
22        MR. GIBBS: We're not going to do it on the
23  record, if he -- if he's not going to do it during the
24  break. That's fine.
25        THE WITNESS: As -- as -- no. I mean --

16

1  you're -- if you're talking about a specific term,
2  that's one issue. If you're talking about a concept,
3  that's a different thing.
4    Q. BY MR. GIBBS: Okay. The first of the two
5  items -- I just asked you about Item 2, which was
6  reference customers. And the first of those two was
7  sales growth relative to expectations.
8        Do you remember that?
9    A. Yes.
10    Q. Okay. So is it fair to say that with regard to
11  sales of Suite 11i, what the market learned through the
12  March 1st, 2001, announcement was that Oracle's sales
13  growth had been slower than Oracle had forecast for that
14  quarter?
15    A. Definitely. I mean, that was one of the things
16  that was revealed, yes. The specific matrix that you
17  would look at is the growth in the applications, not
18  necessarily Suite 11i, but the growth in applications
19  would, of course, come from Suite 11i.
20    Q. In paragraph 44 of your opening report, you refer
21  to the March 1, 2001, event.
22        Let me just ask you first of all, what is the
23  March 1st, 2001, event? Is that the same as the
24  March 1st, 2001, announcement?
25    A. Yes. The announcement is part of the event, of

17

1 course. The event -- there are more things that are
2 occurring than -- you have announcement, you have a
3 conference call, you have analyst commentary.
4     That's the event. Of course, the announcement
5 itself is the press release.
6     Q. In your view, for purposes of your loss causation
7 opinion, was there anything disclosed during the
8 conference call that was not disclosed in the press
9 release?
10     A. There were more detail in the conference call,
11 yes.
12     Q. Was there anything in particular that you can
13 recall?
14     A. Yes.  I mean Larry Ellison in the conference call
15 was explaining that he had been in on phone calls with
16 customers where customers decided not to purchase their
17 product or delay purchasing their product.  And
18 according to him, the reasons for that was -- the reason
19 that was given to him was that there was a slowdown in
20 the economy.  There's various different information that
21 was disclosed on the conference call.
22     Q. Did you rely in forming your opinions on the
23 transcript of that conference call?
24     A. Yes.  That was one of the things that I reviewed,
25 yes.

18

1     Q. Well, my question is not whether you reviewed it.
2     My question is: Did you rely on it in forming
3 the opinions set forth in your opening report?
4     A. I -- yes.
5     Q. Looking back at paragraph 44, you write, "The
6 March 1, 2001, event substantially revealed the relevant
7 truth regarding Oracle's true performance as alleged in
8 the Complaint and, therefore, ends the Class Period."
9     What do you mean when you say that it
10 substantially revealed the relevant truth?
11     A. It substantially revealed the lack of customer
12 demand for the Suite 11i product.
13     Q. I'm sorry.  I wasn't getting at the relevant
14 truth part of that statement.
15     What I'm asking about is what do you mean by
16 "substantially"?
17     A. Substantial --
18     MS. WINKLER:  I think he answered his --
19 answered your question, Patrick.
20     Q. BY MR. GIBBS:  What does substantially mean?
21     MS. WINKLER:  Objection.  Form.
22     THE WITNESS:  It means that it substantially
23 corrected the misleading perception that existed in the
24 market prior to that time.
25     Q. BY MR. GIBBS:  Did it completely correct it?

19

1     A. I think that there were more information -- more
2 complete information that came out in the days after
3 and, of course, the March 15th announcement, where the
4 company actually announced their third quarter earnings,
5 provided additional information.
6     But what I was looking at was -- I was looking at
7 the economic impact, and the economic impact occurred on
8 March 2nd, 2001.  There was some impact following
9 March 15, 2001.  But in terms of the economic impact, I
10 think that that substantially occurred on March 2nd of
11 2001.
12     Q. So for purposes of your opinions on loss
13 causation and damages, you are offering an opinion as to
14 the economic impact that occurred on March 2nd, 2001,
15 only; is that correct?
16     A. That's -- yes.  And -- in the sense that the only
17 damages that I calculate comes from the price decline on
18 March 2nd of 2001.  I do not calculate any additional
19 damages associated with any subsequent price declines; I
20 don't calculate any damages, you know, prior to
21 March 2nd of 2001.
22     Q. Have you performed any analysis to quantify
23 exactly how much of the relevant truth was revealed by
24 the March 1, 2001, event as opposed to any subsequent
25 events?

20

1     MS. WINKLER:  Objection.  Form.
2     THE WITNESS:  No.  That's kind of an
3 abstract-type of question.  I don't really know -- to
4 me, it was more important to focus on the March 2nd
5 price decline because, in my opinion, it substantially
6 revealed the truth with respect to the allegations in --
7 in this case.
8     Q. BY MR. GIBBS:  And let me just be clear.  You're
9 not offering an opinion about any corrective disclosures
10 or events before March 1st, 2001; is that correct?
11     A. Well, I have opinions, but that is not what
12 drives my damage analysis, no.
13     Q. Okay.  Are you offering an opinion in this case
14 about corrective disclosures or events before
15 March 1st, 2001?
16     MS. WINKLER:  Objection.  Asked and
17 answered.
18     THE WITNESS:  I have looked at it; I have
19 considered it.  But in terms of my opinion, in terms of
20 damages in this case, it is based on the
21 March 2nd, 2001, price decline.
22     Q. BY MR. GIBBS:  Is it your opinion that any part
23 of the relevant truth was revealed before
24 March 1st, 2001?
25     A. Well, if it was, I haven't calculated damages for

21

1  it.
2  Q. Okay. I understand you haven't calculated
3  damages based on that.
4  My question is: Is it your opinion that any part
5  of the relevant truth was revealed before
6  March 1st, 2001?
7  MS. WINKLER: Objection. Asked and
8  answered.
9  THE WITNESS: In my opinion, I haven't --
10  I'm not opining one way or another on that.
11  Q. BY MR. GIBBS: That's my question.
12  Are you offering an opinion that class members
13  suffered any damages due to price declines before the
14  March 1st, 2001, announcement?
15  A. Due to price declines before? No, my damage
16  analysis focuses on the price decline that occurred on
17  March 2nd of 2001.
18  Q. Let me ask you to turn to your rebuttal report,
19  which we've had premarked as Exhibit 2. I'll ask you to
20  take a look at paragraph 13 of your rebuttal report.
21  About a third of the way down that paragraph you
22  write, "The critical issue in this case is whether
23  Oracle internally was aware of the issues that
24  ultimately caused it to miss investors' revenue and
25  earnings expectations, and whether the company had a

22

1  duty to disclose this to investors earlier than it did."
2  Does the question of whether the market was also
3  aware of the issues that ultimately caused Oracle to
4  miss expectations matter to your loss causation
5  analysis?
6  A. In terms of the fraudulent conduct itself,
7  usually that is not revealed. I'm focusing on the
8  economic impact based on revealing the relevant truth.
9  In other words, is it necessary for investors to have
10  known that prior representations made by the company
11  was, you know, false when they were made. I don't think
12  that's necessary.
13  Q. Okay. I don't think I've made my question clear,
14  so let me -- let me make it a little more concrete.
15  You've framed the issue in this case as whether
16  Oracle was aware of the issues that ultimately caused it
17  to miss expectations; correct?
18  A. Correct.
19  Q. And one of the issues the plaintiffs claim to
20  have caused Oracle to ultimately miss expectations would
21  be, broadly stated, problems with Suite 11i; correct?
22  A. That's correct, yes.
23  Q. For purposes of your loss causation analysis,
24  does it matter whether or not the market was already
25  aware of problems with Suite 11i, the same ones the

23

1  plaintiffs claim were not disclosed by Oracle?
2  A. Yes, that would matter, yes. Absolutely.
3  Q. In what way?
4  A. Well, if -- if the market had been fully aware of
5  problems, that would already have been incorporated into the
6  stock price. Consequently, you wouldn't have a price
7  decline as a result of that information.
8  Q. So if the market was aware of the problems with
9  Suite 11i, then any price decline resulting from the
10  March 1, 2001, announcement must have been caused by
11  some other factor?
12  MS. WINKLER: Objection. Form. I think
13  you're misquoting what he said. He said if the market
14  was fully aware.
15  THE WITNESS: Yes. I mean, as a practical
16  matter there's a lot of information out there.
17  Information may be contradictory. Some opinions with
18  respect to the information may be different amongst
19  analysts and may be different amongst investors.
20  And if -- the bottom line is whether or not
21  customers -- whether or not Suite 11i met the needs of
22  the customers in terms of stability, in terms of
23  functionality, in terms of operability, in terms of
24  integration, and so on.
25  So if, in fact, investors had been fully

24

1  aware that Suite 11i did not meet the customers needs,
2  clearly they would not have expected Oracle to increase
3  their growth rate with respect to this product as the
4  company claimed it would, the 75 percent-plus benchmark.
5  Consequently, it wouldn't be a surprise to investors
6  that Oracle would miss their guidance.
7  Q. BY MR. GIBBS: You have not performed a specific
8  analysis to determine exactly what the market knew about
9  problems with Suite 11i before March 1, 2001, have you?
10  A. I have reviewed the publicly available
11  information prior to March 1st of 2001, as part of my
12  analysis, yes.
13  Q. Are those publicly available -- is the publicly
14  available information you reviewed cited in your report?
15  A. Yes. I mean, it's the media and it's in the --
16  it's media and it's the analyst reports.
17  Q. Did you review any materials on the subject of
18  what customers knew about problems with Suite 11i that
19  are not cited in your report?
20  A. That is not analyst reports or media reports?
21  Q. Anything.
22  A. As I sit here, I mean, I -- there may have been.
23  I don't know.
24  Q. What about analyst reports or media reports in
25  forming your opinion about loss causation?

25

1     Did you review any analyst reports or media
2 reports about issues with Suite 11i that are not cited
3 in your report?
4     MS. WINKLER: Objection. Form.
5     THE WITNESS: Regarding -- yeah. There are
6 a lot of reports regarding -- all of the analyst
7 reports, or the vast majority of the analyst reports,
8 will discuss, you know, 11i in some fashion, and
9 specifically in terms of customers' acceptance in terms
10 of future growth of that particular product, and so on.
11 I mean, their -- I mean, it is all relevant information.
12     Q. BY MR. GIBBS: Okay. So if I wanted to know
13 exactly what publicly available information you reviewed
14 that bears on the market analysis of issues with Suite
15 11i, how would I figure that out?
16     MS. WINKLER: Objection. Form.
17     THE WITNESS: You would do the media search.
18 You would do -- and you would look at the analyst
19 reports.
20     Q. BY MR. GIBBS: And how do I know which ones you
21 reviewed?
22     A. Well, it's -- it's the same analyst reports that
23 Mr. James reviewed.
24     Q. Okay. So the -- the -- you reviewed the same
25 ones that you understand Mr. James to have reviewed?

26

1     A. Correct. I may have quoted a couple that he did
2 not include. I think Bluestone -- there was a Bluestone
3 analyst report that he did not include. But there may
4 be some that I quoted that he did not include in his
5 review. But in general, yes. It's the same set of
6 information.
7     Q. Have you performed an analysis of what the market
8 knew about problems with Suite 11i versus what Oracle
9 knew about problems with Suite 11i during the Class
10 Period?
11     A. Well, with respect to what Oracle knew regarding
12 Suite 11i, I rely on Plaintiffs' allegations. And I
13 compare Plaintiffs' allegations in terms of what Oracle
14 knew with what was out there in the marketplace.
15     Q. So setting aside your reliance on Plaintiffs'
16 assumptions, you don't have an opinion as to any
17 difference between what the market knew about problems
18 with Suite 11i during the Class Period and what Oracle
19 knew about Suite 11i during the Class Period; is that
20 correct?
21     MS. WINKLER: Objection. Form.
22 Mischaracterizes the prior testimony.
23     THE WITNESS: If I understand your question
24 correctly, what you're asking me is whether or not I
25 have conducted an independent review of what Oracle knew

27

1 with respect to 11i, you know, through their internal
2 documents or what have you. No, I have not done that.
3     Q. BY MR. GIBBS: At paragraph 46 of your opening
4 report, that's Exhibit 1 to your deposition, you opine
5 -- I'm sorry?
6     -- paragraph 46 of your opening report, you opine
7 that given the statistically significant price decline
8 following the March 1, 2001, announcement, that
9 announcement, in your opinion, "reduced and/or
10 eliminated" the inflation in Oracle's stock price
11 resulting from the alleged false and misleading
12 statements.
13     MS. WINKLER: Objection. Form.
14     Q. BY MR. GIBBS: The first question is: Which is
15 it, did it reduce it or did it eliminate it?
16     MS. WINKLER: Objection. Form.
17     THE WITNESS: For my purposes, it doesn't
18 matter. I only calculated -- let's assume that it only
19 reduced it by 80 percent. I only calculated damages
20 based on this. If -- if -- I did not look at the price
21 movements -- or I did not calculate damages based on any
22 subsequent price movements in the stock price.
23     Q. BY MR. GIBBS: So based on the work you've done,
24 you just don't know right now whether it reduced or
25 completely eliminated the alleged inflation?

28

1     MS. WINKLER: Objection. Form.
2     THE WITNESS: For my purposes, I only
3 calculated damages based on that particular price
4 decline. So for my purposes, it doesn't matter. If you
5 want to say it completely eliminated inflation or it
6 reduced inflation, I come up with the same damage number
7 either way.
8     Q. BY MR. GIBBS: So because you didn't calculate
9 damages on the basis of any other price decline, you
10 didn't calculate whether the March 1 announcement
11 completely eliminated or just reduced the inflation; is
12 that fair?
13     MS. WINKLER: Objection. Form. Asked and
14 answered.
15     THE WITNESS: No. I don't think it's fair
16 because I did review -- I did analyze and I did look at
17 the price movements following that particular
18 disclosure. In particular, I was interested to see
19 whether or not there was a price increase that might
20 mitigate damages.
21     There was no price increase mitigating
22 damages following the March 15th disclosure of the third
23 quarter earnings. But I did not -- I did not calculate
24 additional damages for the price between -- decline that
25 was there.

29

1    Q. BY MR. GIBBS: Okay. Let me try asking it a
2  different way.
3        By what percentage did the March 1, 2001,
4  announcement reduce the alleged inflation of the price
5  of Oracle stock?
6        MS. WINKLER: Objection. Form.
7        THE WITNESS: It's -- I mean, for my
8  purposes, it would reduce the entire inflation. I mean,
9  that -- because I don't have any more inflation. I --
10  my deflation, by definition, comes from that price
11  decline. I mean, that's the only thing I focused on so
12  it would be 100 percent.
13        But that doesn't mean that that there
14  could -- that there possibly -- that that was a full
15  disclosure of everything. It's not the same thing. But
16  for my purposes and for my purposes in calculating
17  damages, that was the only thing I calculated damages
18  for.
19    Q. BY MR. GIBBS: Are you offering an opinion to the
20  effect that the March 1, 2001, announcement was not full
21  disclosure?
22    A. It wasn't the complete disclosure.
23    Q. And what's the basis for that?
24    A. Because the disclosure itself states that more
25  details will follow later on.

30

1    Q. Let me try it a different way.
2        Are you offering an opinion to the effect that
3  the March 1, 2001, announcement eliminated less than 100
4  percent of the alleged inflation of the price of Oracle
5  stock?
6        MS. WINKLER: Objection. Form. Asked and
7  answered.
8        THE WITNESS: I'm not opining on it one way
9  or the other because it's not relevant to my analysis.
10    Q. BY MR. GIBBS: By itself, an event study doesn't
11  tell you what caused the price decline; correct?
12    A. By itself?
13    Q. By itself.
14    A. Well, the event study itself -- let me just
15  explain what it does tell you. It does provide you with
16  some evidence whether or not the price decline was
17  caused by market or industry factors versus
18  company-specific factors. So when you have a
19  statistically significant price decline, such as this,
20  you would have to look at a company-specific -- some
21  company-specific factors to explain that price decline.
22    Q. But the event study by itself doesn't tell you
23  which particular company-specific information caused the
24  price drop; is that correct?
25        MS. WINKLER: Objection. Form. Asked and

31

1  answered.
2        THE WITNESS: The event study deals with the
3  numbers, and in terms of the information itself, that's
4  separate. You have to look at the actual information
5  that was disclosed.
6        And in this particular case I don't think
7  there is a disagreement in terms of what caused the
8  price decline. It was that Oracle missed third quarter
9  revenues and earnings expectations; that's why the price
10  declined.
11    Q. BY MR. GIBBS: So is that a "no" to my question?
12        MS. WINKLER: Objection. Form. Asked and
13  answered. Argumentative.
14        THE WITNESS: I think I answered your
15  question the best I could.
16    Q. BY MR. GIBBS: Let me try it this way.
17        If you did nothing other than the event study,
18  you would not know which company-specific information
19  had caused the price to decline, would you?
20        MS. WINKLER: Objection. Form. Asked and
21  answered.
22        THE WITNESS: If you did not -- the event
23  study does not incorporate -- the new -- well, the event
24  study itself, there are two components to it. If you
25  are just talking about the statistical analysis, just

32

1  the numbers, that's one thing.
2        But the event study itself also incorporates
3  the new company-specific information that was disclosed
4  on that day. That's -- that is the event -- that's the
5  event that I was analyzing.
6        So I already have -- you know, you define
7  the event and then you analyze the price decline. In
8  this particular case, the event is Oracle missing, you
9  know, their -- their third quarter -- missing third
10  quarter expectations. And what you do with that -- you
11  know, you're going to analyze that event and then you go
12  to the numbers. And you see -- well, you know, is there
13  any evidence to support that this event caused a price
14  decline in the stock. In this case, yes, there is.
15    Q. BY MR. GIBBS: Let me be a little more precise.
16        The fact that there is a statistically
17  significant price decline at the 95 percent level of
18  certainty, doesn't tell you which specific
19  company-specific information caused the decline;
20  correct?
21        MS. WINKLER: Objection. Form.
22        THE WITNESS: Again, if you're talking about
23  an event analysis, you have to analyze the event as
24  well. That's where I think we're kind of missing each
25  other.

33

1    But if you just talk about the numbers, the
2 regression, the regression does not -- you know, the
3 regression itself is just based on numbers, you know.
4 There's no information -- I mean, the statistical
5 significant price decline will be statistically
6 significant whether or not there is new information or
7 whether or not there is information or no information
8 and so on. It's just the regression analysis, but
9 that's only one component of the event analysis.
10    Q. BY MR. GIBBS: That's why I particularized it to
11 the statistics.
12    And just to be clear, the statistically
13 significant price decline tells you that there's a very
14 small likelihood that the price decline was caused by
15 something other than information specific to Oracle;
16 correct?
17    MS. WINKLER: Objection. Form.
18    THE WITNESS: It -- it tells you that it's
19 unlikely -- the price decline that's statistically
20 significant is a price decline that is unlikely to have
21 occurred simply by chance. In other words, there is
22 something, some information there that's specific to --
23 to the company that caused the -- that's the inference
24 that you would draw by just looking at the numbers.
25    But when you're talking about an event

34

1 analysis -- you know, an event analysis, the first part
2 of any event analysis is, you know, you define the
3 event. You know, what is the event, what is it that
4 you're testing for? Well, in this case, what you're
5 testing for is -- is Oracle missing their third quarter
6 earnings.
7    Q. BY MR. GIBBS: So as I've said, paragraph 46 says
8 that given the highly statistically significant price
9 decline, it's your opinion that this disclosure reduced
10 and/or eliminated the inflation in Oracle's common stock
11 resulting from the alleged false and misleading
12 statements and omissions.
13    So if the regression analysis, the statistics, by
14 themselves, don't tell you what specific information has
15 caused the decline, how did you go about reaching the
16 opinion you've articulated in paragraph 46 that, given
17 that price decline, the announcement reduced and/or
18 eliminated the inflation resulting from the specific
19 allegedly false and misleading statements?
20    A. Because the regression analysis is only one part
21 of the event analysis. And the event that I was testing
22 for in this particular -- in this particular case, was
23 whether or not the information disclosed on that day --
24 this is the ending of the Class Period, this is -- you
25 know, this is the critical day to analyze. And what I

35

1 wanted to see is whether or not the statistics supported
2 the position that there was new material and information
3 disclosed on that day that would give rise to economic
4 damages in this particular case. And in this case,
5 the -- my analysis supported that.
6    Q. Did you perform any quantitative analysis to
7 determine whether any portion of the price decline that
8 you observed on March 2nd, 2001, was the result of
9 information that was not related to the alleged false
10 and misleading statements?
11    MS. WINKLER: Objection. Form.
12    THE WITNESS: When I was looking at the
13 disclosure, I didn't find any new information that would
14 not be related to the allegation in this matter. So
15 there wasn't anything.
16    And another thing is that, you know, this is
17 a statistically significant price decline at the
18 ninety -- 99 percent level. You know, it had to have
19 been something substantial. I think that in this
20 particular case, I don't think of -- I don't know of any
21 information other than the earnings missed on that day
22 that could have explained this price decline.
23    Q. BY MR. GIBBS: But when you say you didn't find
24 any new information that would not be related to the
25 allegations, in order to make that link, that the

36

1 earnings missed was related to the allegations, you had
2 to rely, in part, on assumptions about what the
3 plaintiffs would be able to prove; correct?
4    A. Yes, absolutely. Plaintiffs' case in this case,
5 you know --
6    Q. I want to talk about them in particular, and
7 that's where I'm going next.
8    A. Sure.
9    Q. So I -- I just wanted to understand your prior
10 answer, that it relies in part on some assumptions. So
11 now let's talk about the particulars.
12    A. Sure.
13    Q. The March 1st, 2001, announcement does not say
14 anything explicitly about the quality or functionality
15 of Oracle's Suite 11i products; correct?
16    A. I don't think that is -- there is
17 information -- as an investor, when you look at
18 information, you try to -- try to find -- you try to
19 look at the piece of information, analyze it and see
20 what is reasonable to conclude with respect to this
21 information. The fact of the matter is that this
22 disclosure revealed that customers was not buying Suite
23 11i at the level that the company had led investors to
24 believe.
25    Q. Okay. My question is not what conclusions

37

1  investors might have reached on the basis of this
2  disclosure. I'm really just asking about the text of
3  the disclosure itself and what was explicitly disclosed.
4      So why don't we mark the press release itself as
5  Exhibit 3, and I'll ask you to take a look at it,
6  please.
7      (Exhibit 3 marked.)
8      Q. BY MR. GIBBS: Have you had a chance to take a
9  look at it?
10     A. Yes.
11     Q. Okay. And, again, my question is not what
12  investors might have concluded from learning the
13  information set forth in the press release. My question
14  is just what the press release actually says.
15     And my question is: This March 1st, 2001, press
16  release does not say anything expressly about the
17  quality or functionality of Oracle's Suite 11i products;
18  right?
19     MS. WINKLER: Objection. Form. Asked and
20  answered.
21         Patrick, if you want, he can read what the
22  press release says to you, but he's already answered
23  your question.
24     Q. BY MR. GIBBS: Are you going to answer the
25  question?

38

1      A. Yes, I -- I can answer the question. I mean,
2  in -- what the press release says is that license
3  revenues grew approximately 6 percent. With respect to
4  11i, the specific issue that you are raising, it states
5  that the application revenues and -- revenue growth is
6  estimated at approximately 50 percent.
7      And that is substantially below where the company
8  guided -- the company's guidance of 75 percent-plus.
9  Okay. The March 1, 2001, press release doesn't directly
10  correct or contradict any of the statements Defendants
11  made during the Class Period about the quality or
12  functionality of Oracle's Suite 11i products, does it?
13     A. I believe it does.
14     Q. Where?
15     A. It -- the failure of applications to grow at 75
16  percent-plus, the failure of applications to make up any
17  shortfall in Oracle's other business due to the economic
18  downturn is directly contradicted by this information.
19     Q. Expressly?
20     A. Well, I don't -- I can just tell you what's in
21  here. You know, it is what it is.
22     Q. Well, let me understand what you mean then.
23     A. You can't -- I mean, you can characterize it
24  however you want. But, I mean, the press release is
25  whatever the press release is.

39

1      Q. It is.
2      A. Yeah.
3      Q. And you have just testified that the application
4  sales growth number reported -- I'm not exactly sure
5  what you said. Let me try that again.
6      I asked you whether the press release directly
7  contradicted any statements that Defendants made about
8  the quality or functionality of Suite 11i during the
9  Class Period. And you referred to the disclosure of the
10  license growth numbers generally and the application's
11  license growth number. And I took you to be saying that
12  those growth numbers contradict the statements about the
13  product quality and functionality.
14      Is that a fair understanding?
15     MS. WINKLER: Objection. Form.
16     THE WITNESS: Well, I can be more specific
17  if you'd like. The reason that Suite 11i was expected
18  to generate 75 percent-plus growth and the reason why it
19  was expected to mitigate the impact of the overall
20  economy at the time was because investors believed that
21  these -- this software was a so-called high ROI-type of
22  a software. In other words, that there -- that when the
23  company decided whether or not to buy the product or
24  not, they did a cost-benefit analysis.
25      That cost-benefit analysis is based on the

40

1  benefit of that software. In other words, it has to
2  provide a certain benefit, and one of the benefit, of
3  course, is that according to Oracle, once that -- you
4  wouldn't need any system integration. And
5  consequently, -- and there are a lot of cost savings
6  with respect to the company, -- uh, with respect to this
7  particular product.
8      Now, if that is true, you know, you would
9  expect this product, if it has the functionality, if
10  it's a stable product and if it's fully integrated and
11  so on, if -- you know, if it runs with CRM and ERP and
12  all of these things together, you would expect that
13  particular number -- that the sales and the demand for
14  the product to be quite high because of these particular
15  benefits that this product has that the best-of-breed
16  products would not have.
17      And this number here (indicating), what that
18  tells me, is that Oracle has problems selling this
19  particular product. And the reason -- I mean, if -- if
20  the benefits are what Oracle previously had stated, and
21  if all of the problems that they went through after the
22  first release all of a sudden had been solved, then you
23  wouldn't expect this particular -- then you would expect
24  the company to show substantial growth in applications.
25  And the company just didn't do so.

41

1    Q. BY MR. GIBBS: 25 percent growth is not
2  substantial?
3    A. In the -- in this market, no. This was a new
4  market to Oracle. They represented that they had a
5  product that was much better than their competitors.
6  And the growth rate was expected to be substantially
7  greater than 25 percent. And let me add to that.
8       In the first quarter when Oracle reported a
9  growth of 43 percent, which is greater than 25 percent,
10 the same thing happened, the price declined. And all of
11 these questions arose with respect to the functionality
12 of -- of the product.
13   Q. You're not offering an opinion, are you, that if
14 the product was as Oracle represented it to be, there's
15 no way Oracle could have missed its forecast?
16      MS. WINKLER: Objection. Form.
17      THE WITNESS: That there is no way Oracle
18 would have missed the forecast? It's not something I've
19 considered. I think if it was as represented, quite
20 frankly, I would have a hard time believing that they
21 wouldn't meet their forecasts, quite frankly.
22      I mean, the benefit, I was listening to
23 Larry Ellison at -- in Arizona on November 29th
24 providing, you know, the benefit, you know, that -- you
25 know, explaining, you know, the benefit of a fully

42

1  integrated suite that did not require system
2  integration. And it's difficult to believe that such a
3  product, had it worked, would not generate substantial
4  sales.
5    Q. BY MR. GIBBS: Did you perform any kind of
6  quantitative analysis to eliminate the possibility that
7  Oracle could have missed its forecasts for reasons
8  other than the product failing to meet the
9  representations the company made?
10   A. The -- I assume that Plaintiffs' allegations are
11 true in this matter. Now, could it have -- could it be
12 possible that all of a sudden the last few days of the
13 quarter all of these customers decided, "Well, you know,
14 it works, it's going to save us a ton of money but
15 really we don't really want to save all of this money.
16 We're not going to buy the product."
17      Could that have happened? I haven't performed
18 that analysis.
19   Q. Let's talk about what you've assumed about the
20 plaintiffs' allegations and what they will prove.
21      What exactly have you assumed the plaintiffs will
22 prove about the relationship between statements about
23 Suite 11i and the earnings miss -- the third quarter
24 2001 earnings miss?
25   A. There isn't -- there are many -- just focusing on

43

1  Suite 11i?
2    Q. Yes.
3    A. Yes.
4    Q. I assume you're headed for paragraph 8 of your
5  opening report?
6    A. Paragraph 7.
7    Q. Paragraph 7?
8    A. Well, I mean paragraph 8.
9    Q. Take a look at paragraph 8. I think that's the
10 one that's specific to Suite 11i.
11   A. Yes. Those are specific assumptions with respect
12 to -- with respect to 11i, the application suite. And I
13 think the key issue in this particular case is that
14 Oracle represented that they had a product that for all
15 intents and purposes worked. And when I say "worked," I
16 mean worked as a suite.
17      In other words, they had CRM and ERP, and all of
18 these applications working together. And that it didn't
19 require any additional system integration. And so, you
20 know -- so that is, you know, generally what I have
21 assumed, that those statements were false.
22      That, in fact, one of the things that Larry
23 Ellison, for instance, were stating was that there is no
24 risk with respect to system integration if you buy this
25 particular product because it's already fully integrated

44

1  and so on. You buy the product; you install it on your
2  computer, that takes three, four hours. And then you
3  spend six months in, you know, getting all of the
4  processes to work and then you go live after six months,
5  but it required no system integration. And I think that
6  that is -- that is the key misrepresentation.
7    Q. The assumptions you made about the allegations
8  that Plaintiffs would ultimately prove at trial, those
9  allegations are the ones identified in paragraph 8 of
10 your opening report?
11   A. That's correct, yes.
12   Q. Okay. I want to focus on one down towards the
13 end of the paragraph where you say quote -- well, let me
14 back up.
15      This paragraph has several sentences that start
16 with "Plaintiffs allege..." and then other paragraphs
17 just state facts, like, "In reality, Suite 11i was beset
18 with severe technical problems and defects..." and it
19 goes on.
20      I understood this paragraph to be describing the
21 plaintiffs' allegations that you assume Plaintiffs will
22 prove.
23   A. That is correct, yes.
24   Q. So you're not actually offering factual or
25 opinion testimony that Suite 11i was beset with

45

1  technical difficulties?
2     A. Correct. It just ended up being kind of
3  repetitive.
4     Q. Understood. So one of the things you have
5  assumed Plaintiffs will prove is "these problems caused
6  customers to delay and/or forego planned purchases with
7  Oracle."
8        Do you see that?
9     A. Correct, yes.
10    Q. Did you make any assumptions about how many
11 customers delayed or declined planned purchases of
12 Oracle during the third quarter?
13       MS. WINKLER: Objection. Form.
14       THE WITNESS: How many customers? I do not
15 know, but I -- but that's -- I mean, obviously, that is
16 my understanding of why the company missed it's third
17 quarter earnings.
18    Q. BY MR. GIBBS: I understand you don't know. I'm
19 just trying to get a little more detail around the
20 assumption you made for purposes of your analysis.
21       Did you make any assumption at all about the
22 number of customers that delayed or declined planned
23 purchases of Oracle?
24       MS. WINKLER: Objection. Form. Asked and
25 answered.

46

1        THE WITNESS: Not other than what I just
2  said. I mean, the assumption, obviously, is that that
3  is why the company missed third quarter earnings.
4     Q. BY MR. GIBBS: Okay. And let's get to the -- to
5  the why. In your view -- strike that.
6        For purposes of your analysis, what have you
7  assumed the plaintiffs will need to prove in order to
8  show that it was these problems you referred to that
9  caused the Q3 guidance miss?
10       MS. WINKLER: Objection. Form.
11       THE WITNESS: I have just assumed that they
12 will prove it; I haven't made any assumptions in terms
13 of how they will prove their case. That's beyond the
14 scope of my analysis.
15    Q. BY MR. GIBBS: So you haven't made any
16 assumptions about the facts the plaintiffs have to
17 prove. You've just assumed that they will prove, as a
18 legal matter, that these problems with Suite 11i caused
19 the miss; is that fair?
20       MS. WINKLER: Objection. Form.
21       THE WITNESS: Yes, correct.
22    Q. BY MR. GIBBS: And is the same true of paragraph
23 18 of your rebuttal report? You also discuss there some
24 of the assumptions you've made. I'm focusing on the
25 sentence that begins on page 9 with "First, the real

47

1  issue..."
2        And just to clarify, I assume where you write,
3  "And thus strong applications sales growth," you meant
4  to write "weak applications sales growth"; is that
5  right? Or --
6     A. That's -- yes. That's --
7     Q. Or is it lack of customer acceptance and, thus,
8  lack of strong application sales growth? Same thing
9  either way, basically.
10    A. Same thing either way, yes.
11    Q. When you say that lack of customer acceptance of
12 Suite 11i was "one reason" why Oracle failed to meet
13 it's expectations, you haven't made any assumptions
14 about what facts Plaintiffs would need to prove in order
15 to show that this lack of customer acceptance was one
16 reason for the earnings miss?
17    A. All of my assumptions are explained in my -- you
18 know, in my paragraphs dealing with the assumptions. I
19 have no assumptions beyond those assumptions. You
20 know -- you know, I obviously have an understanding of
21 what they intend to prove, but I haven't made any
22 assumptions with respect to that. I just assume that
23 they will prove that case.
24    Q. Okay. And again, the -- this sentence says,
25 "First, the real issue is whether, as Plaintiffs allege,

48

1  lack of customer acceptance of Suite 11i and, thus,
2  strong application sales growth, was one reason why
3  Oracle failed to meet investors' revenue and earnings
4  expectations," and it goes on.
5        Does it matter for purposes of your analysis what
6  is the reason for the lack of customer acceptance?
7     A. What is the reason is for lack of customer
8  acceptance? Well, I mean it matters to me whether or
9  not it relates to the allegations or not.
10       From a theoretical point of view, let's say that
11 somebody introduced a product that was superior to 11i
12 at the same time and that the reason that people did not
13 buy 11i was that they all, all of a sudden shifted and
14 bought this superior product. Then it wouldn't be
15 linked to Plaintiffs' allegations; it would be some
16 other factors that caused it, in which case, I think, my
17 analysis would have to change and consider that.
18    Q. Okay. And I take it the same is true of the
19 statement in the last sentence of this paragraph 18 in
20 your rebuttal, "For my purposes, I have assumed the
21 plaintiffs will be able to prove their allegations that
22 Oracle knew, but concealed, that customer acceptance of
23 Suite 11i was lacking due, at least in part, to the
24 problems discussed above"?
25    A. Yes.

49

1    MS. WINKLER: Objection. Form.
2    Q. BY MR. GIBBS: That's your point about the link
3 between the allegations and the alleged lack of customer
4 acceptance?
5    MS. WINKLER: Objection. Form.
6    THE WITNESS: Yes. There has to be a link
7 between why they missed earnings and, you know,
8 Plaintiffs' allegations, yes.
9    Q. BY MR. GIBBS: Just sticking with that same
10 paragraph, you say, "Second, analysts were, in fact,
11 concerned that a portion of the revenue earnings miss
12 was due to a lack of acceptance of the company's
13 E-Business applications."
14    What does that have to do with your loss
15 causation analysis?
16    A. Can you point me to exactly --
17    Q. Yeah. It's near the top of that page, the
18 sentence that begins with "Second."
19    A. What has that to -- got to do with loss
20 causation?
21    Q. Yes. Was --
22    A. I think it really has more to do with the ability
23 of Plaintiffs to prove their case and that is that, you
24 know, the version of what occurred is consistent with,
25 you know, the view of that particular -- those

50

1 particular analysts. I mean, in terms of loss
2 causation, my assumption -- it doesn't really have
3 anything to do with my assumption. My assumptions are
4 still that they will prove their case.
5    Q. Okay. And following on that, is the sentence
6 that says, "Third, while analysts were aware of
7 anecdotal accounts of problems with Suite 11i, they
8 would not have a full understanding of it's impact on
9 Oracle's results."
10    And again, you haven't offered an opinion as to
11 the degree to which the market was or was not fully
12 aware of the problems with Suite 11i.
13    You're relying on the plaintiffs to prove that
14 the market was not fully aware of the problems with
15 Suite 11i; correct?
16    MS. WINKLER: Objection. Form.
17    THE WITNESS: It's -- well, I view it a
18 little bit different. I mean, it's -- I'm looking for
19 them to prove the link between, you know -- I'm
20 looking -- I'm looking at the price decline. And the
21 price decline reflects what the investors did not
22 already know, obviously, because otherwise it would
23 already have been reflected in the stock price.
24    So it's a portion of the -- what they did
25 not already understand is reflected in the stock price.

51

1 To the extent they had some concerns and so on, that
2 would have already been reflected in -- in the stock
3 price. So I'm just focusing on the additional
4 information that the March 1st, 2001, price -- 2001
5 announcement, what the additional information was
6 disclosed on March 1st, 2001.
7    Q. BY MR. GIBBS: And it's that information that
8 would have caused the loss, in your opinion?
9    A. It's that -- it's that information that would
10 have caused the price decline.
11    Q. What's the basis for your assertion that analysts
12 would not have had a full understanding of the impact of
13 problems with Suite 11i on Oracle's results?
14    A. Twofold: Number one, I never saw any analysts
15 that fully and credibly discussed these problems that,
16 in fact, the suites really, at the beginning of the
17 Class Period, for instance, that the suites actually
18 still did not work together with the ERP and the CRM,
19 working together, and so on.
20    And also even the analysts that talked about
21 particular issues still thought that the product was
22 sufficiently functioned -- well, functioned sufficiently
23 and was sufficiently stable that the company would, you
24 know, meet expectations in terms of the third quarter.
25    Q. So are you saying that analysts didn't fully

52

1 understand the impact of problems with Suite 11i on
2 Oracle's results because they didn't predict the
3 results?
4    MS. WINKLER: Objection. Form.
5    THE WITNESS: Because they didn't predict
6 the results? I don't think that they thought that
7 customers would, in large part, delay purchase because
8 of all of -- because of the severity of the problems
9 with 11i. I don't think so.
10    If -- to me, this case, there -- the -- it
11 starts on December 14th when Ellison, on conference
12 call, effectively states that, well, there's been a lot
13 of discussions, but whether we can deliver a workable
14 product with functionality and so on that will be
15 accepted by -- by our customers. And -- and I'm
16 paraphrasing, but his -- his statement was that they
17 had, at that point in time, that product; in other
18 words, that the product at that point worked with all of
19 the parts fully integrated and so on.
20    And I don't think that investors understood
21 that the product fundamentally didn't work. There still
22 was risks, substantial risks, associated with this
23 product just to get it to work.
24    Q. BY MR. GIBBS: And that, again, is based on the
25 assumptions of what Plaintiffs will prove?

53

1  A. It's based on the assumptions that Plaintiffs
2  will prove that, you know, Suite 11i did not work as the
3  company represented.
4  Q. Other than assuming what the plaintiffs will
5  prove as to what caused the third quarter 2001 earnings
6  miss, are you saying that the information the market
7  learned on March 1st, 2001, was that Oracle had missed
8  it's guidance?
9  MS. WINKLER: Objection. Form.
10  THE WITNESS: The information that was
11  learned on March 1st was that Oracle had failed to
12  generate the amount of business, particularly from that
13  application side, first of all to -- to generate the
14  expectations there, and also to offset, you know, the
15  overall impact of the slowing economy on its other
16  business and so on.
17  So, yes, I mean the customer demand was not
18  there. And that was very similar to what happened in
19  the first quarter of -- first fiscal quarter of 2001.
20  MR. GIBBS: We've been going about an hour.
21  I'm moving to a different subject. Time for a
22  five-minute break.
23  MR. WILLIAMS: That's good.
24  THE VIDEOGRAPHER: We are now going off the
25  video record. The time is 10:24 a.m.

54

1  (Recess.)
2  (Exhibits 4 and 5 marked.)
3  THE VIDEOGRAPHER: We are now back on the
4  video record. The time is 10:45 a.m.
5  Q. BY MR. GIBBS: Mr. Steinholt, I want to ask you
6  to take a look again at paragraph 13 of your rebuttal
7  report, which is Exhibit 2 to your deposition. And I'm
8  looking, in particular, at the last sentence of the
9  paragraph, "For my purposes, I assume that Plaintiffs'
10  allegations are true, and, consequently, I concluded
11  that the price decline on March 2nd, 2001, relates
12  directly to Plaintiffs' allegations."
13  It is your assumption that Plaintiffs'
14  allegations, discussed in your reports, are true, that
15  furnishes the link between Plaintiffs' allegations and
16  the March 2nd price decline; is that correct?
17  MS. WINKLER: Objection. Form.
18  THE WITNESS: Yes. I mean, if Plaintiffs'
19  allegations are not true, or they are unable to prove
20  those allegations, then that is obviously, you know,
21  that obviously changes my opinion.
22  Q. BY MR. GIBBS: Well, changes your opinion how?
23  A. Well, if they cannot prove the case, their case,
24  then obviously there are no damages.
25  Q. Okay. Let me ask you to take a look at what

55

1  we've had marked as Exhibit 4, which is a copy of the
2  declaration you submitted in support of Plaintiffs in
3  connection with the class certification motion. And I'm
4  referring in particular to paragraph 6 on page 2 of the
5  declaration.
6  In this paragraph you say, "The methodology used
7  to calculate damages in fraud-on-the-market cases is
8  well-established."
9  And then you go on to describe two steps, the
10  second of which you describe in the following way.
11  "The second step of the damage analysis is to
12  analyze price movements attributable to company-specific
13  events in order to determine if these events are
14  fraud-related or nonfraud-related."
15  Do you see that sentence?
16  A. Yes.
17  Q. It's the determination of whether the events are
18  fraud-related or nonfraud-related that you are
19  essentially relying on Plaintiffs to prove; is that
20  correct?
21  MS. WINKLER: Objection to form.
22  THE WITNESS: I mean, the -- it depends on
23  what Plaintiffs proves whether or not something is
24  fraud-related or not fraud-related, yes.
25  Q. BY MR. GIBBS: Okay. So in other words, here you

56

1  have not done any independent analysis of your own to
2  determine whether or not the price drop is fraud-related
3  or nonfraud-related; correct?
4  MS. WINKLER: Object to the form.
5  THE WITNESS: I think that is incorrect.
6  Q. BY MR. GIBBS: Okay. How so?
7  A. I -- I -- you know, I assume that Plaintiffs will
8  prove their case, and if they prove their case then, in
9  my opinion, you know, that this relates to the fraud.
10  Q. Okay. But that opinion necessarily assumes that
11  Plaintiffs will prove their allegations?
12  A. Yes.
13  Q. Okay. You haven't done any study or analysis to
14  determine what portion of the residual stock price drop
15  that you observed on March 2nd is related separately to
16  each of the categories of allegedly false and misleading
17  statements have you?
18  MS. WINKLER: Objection. Form.
19  THE WITNESS: The -- well, the various false
20  and misleading statements, they are all very much
21  linked. It would be very, very difficult to conduct
22  that analysis, but, no. This is all -- since all of
23  them are related to the fraud, it was not necessary for
24  me to conduct that analysis.
25  Q. BY MR. GIBBS: What happens if a jury concludes,

57

1  for example, that the defendants' statements about Suite
2  11i were true, does that affect your loss causation
3  analysis?
4      A. It could. I mean, the jury could conclude, you
5  know, almost an infinite number of scenarios, and
6  clearly, I have not performed an infinite number of
7  damage analyses in terms of -- of, you know, looking at
8  what possibly Plaintiffs will be able to prove. I have
9  assumed that they will prove all of their allegations.
10     Q. And continuing with the same hypothetical, if a
11 jury were to conclude that the defendants' statements
12 about Suite 11i were true, nothing in your opinions
13 would enable the jury to decide how much of the March
14 2nd price drop is attributable to the things they found
15 to be fraudulent and how much is attributable to the
16 thing they found not to be fraudulent?
17     A. Well, it depend --
18     MS. WINKLER: Objection. Form.
19     THE WITNESS: -- it depends on -- which
20 statements are you specifically talking about now?
21     Q. BY MR. GIBBS: Well, the hypothetical is assuming
22 the plaintiffs -- assuming that the jury concludes that
23 Defendants' statements about Suite 11i are true.
24     A. Which statements?
25     Q. All of them. All of the statements the

58

1  plaintiffs have challenged.
2      A. Well, other than -- it seems to me that all of
3  Plaintiffs' allegations relate to 11i. So it seems to
4  me that you're asking me to assume that a jury comes
5  back and say that Plaintiffs -- I mean, what is
6  remaining in the case? I guess that's my question.
7      Q. Okay. Let me try a different hypothetical.
8      Let's assume the jury concludes that Oracle's
9  second quarter 2001 financial results were correct,
10 rejecting the plaintiffs' claim that those results were
11 materially false and misleading.
12     Are you with me?
13     A. Right.
14     Q. Okay. Does your analysis give the jury any way
15 to apportion the March 2nd stock drop among the
16 statements they have found to be false and misleading
17 and the second quarter 2001 results which they have
18 found to be not misleading or false?
19     MS. WINKLER: Objection. Form.
20     THE WITNESS: You are specifically talking
21 about the second quarter false and misleading -- I mean,
22 it seems to me that you can't parse out the alleged
23 fraud in the manner that you suggest.
24     The statements -- if the statements on the
25 second -- you know, when they announced their second

59

1  quarter, if all of those statements were true, and
2  they're -- it seems to me that that would be, you know,
3  that that would include pretty much the entire case
4  because it would also mean that there were no omissions
5  in terms of, you know, the product quality,
6  functionality, the stability of the product, and all of
7  these other things. So I -- you know, I still don't
8  really understand your hypothetical.
9      Q. BY MR. GIBBS: Well, how about this: Let's
10 assume the jury concludes that it was appropriate for
11 Oracle to recognize revenue on the November 30th, 2000,
12 license agreement with HP.
13     Does that affect your loss causation analysis at
14 all?
15     A. I would -- I would want to consider it. I don't
16 know if it impacts it or not. I mean it's -- currently
17 I assume that all of it is that Plaintiffs will prove
18 all of their -- their entire case.
19     But I mean, the ultimate issue is, you know, you
20 can tell -- you can mislead in five different ways. And
21 whether or not you are misleading four ways, will that
22 change anything? I don't know.
23     I mean, my -- the basis of my analysis is what if
24 the truth had been disclosed? What would be -- where
25 would Oracle's stock have traded?

60

1      So I don't know if it would have impacted it or
2  not. But I would want to know more about it and
3  consider it as opposed to making some rash analysis here
4  on the spot.
5      Q. And would the answer be the same if the jury were
6  to conclude that Oracle did not improperly recognize any
7  of the other categories of revenue in Q2 2001 that the
8  plaintiffs' claim Oracle recognized?
9      MS. WINKLER: Objection to form.
10     THE WITNESS: It's the same issue. You
11 know, there are many ways that the company mislead.
12 But, I mean, overall, the issue is that they concealed
13 the true nature and true prospect of 11i, and that's
14 really what I have focused on.
15     Q. BY MR. GIBBS: So what's your understanding of
16 the relationship between the allegedly improper
17 recognition of revenue from the HP transaction and the
18 true nature and true prospects of 11i?
19     A. Well, the HP transaction was a transaction that
20 enabled the company to report -- my understanding is
21 that they were able to report 11¢ of earnings versus 10¢
22 of earnings. And more importantly that, my
23 understanding is that that impact on the application growth
24 was -- the company was able to report application growth
25 of 66 percent as opposed to 54 percent.

61

1      The application growth, of course, was one of the
2  things that -- that analysts particularly focused on as
3  a significant positive in the quarter.  And so from that
4  point of view, if -- if you take out the HP
5  transactions, you know, the application growth would be
6  in line with expectations, as opposed to significantly
7  beating expectations.
8      Q.  Now, turning back to paragraph 13 of your
9  rebuttal report.  Again, you say you assume the
10  plaintiffs' allegations are true, and, consequently,
11  concluded that the price decline on March 2nd, 2001,
12  "relates directly" to Plaintiffs' allegations.
13      If it's true that the plaintiffs' allegations
14  "relate to" Oracle's failure to meet its Q3 2001
15  guidance, does that show, in your opinion, that the
16  March 1, 2001, announcement reduced and/or eliminated
17  any alleged inflation in Oracle's stock caused by
18  statements about Suite 11i?
19      MS. WINKLER:  Objection.  Form.
20      THE WITNESS:  Could you repeat that
21  question, please.
22      MR. GIBBS:  Read it back, please.
23      (The record was read by the reporter as
24  follows:
25      "QUESTION:  Now, turning back to

62

1      paragraph 13 of your rebuttal report.
2      Again, you say you assume the plaintiffs'
3      allegations are true and, consequently,
4      concluded that the price decline on March
5      2nd, 2001, 'relates directly' to Plaintiffs'
6      allegations.
7          If it's true that the plaintiffs'
8      allegations 'relate to' Oracle's failure to
9      meet its Q3 2001 guidance, does that show,
10      in your opinion..." )
11      THE WITNESS:  Well, the expectations and the
12  guidance is, of course, driven by future prospect of
13  11i, which necessarily means that the product has to
14  work; in other words, it has to be operable, it has to
15  be stable, you know, the components have to work
16  together.  And the benefits, the cost-benefits of the
17  product, has to be there.
18      Q.  BY MR. GIBBS:  Is it your opinion that
19  expectations about Oracle's future growth and it's
20  guidance were driven entirely by the prospects of Suite
21  11i?
22      A.  That was the one thing that changed in terms of
23  the expectations during the beginning of the Class
24  Period.  It was the belief that the company had
25  substantially sold the issues in the first release of

63

1  11i and had significant opportunity to gain market share
2  in the application business.
3      So that is, you know, that is why the stock price
4  increased and that is, you know, in the period prior to
5  the beginning of the Class Period, on the date of the
6  beginning of the Class Period and so on.  So that is the
7  expectations that was driving the increase in the stock
8  price and driving the expectations, yes.
9      Q.  Have you done any quantitative analysis to back
10  up that opinion you just described?
11      A.  Yes.  I mean, it's -- in terms of price
12  increases, that would be a quantitative analysis.  I've
13  looked at price increases that occurred, you know, prior
14  to the beginning of the Class Period relating to
15  representations made by the company that know -- you
16  know, know, the -- know they were ready to effectively
17  -- they had a product that -- that worked and know they
18  were ready to take on the world.  That's me
19  paraphrasing.
20      I've looked at the price increase that occurred
21  following the earnings announcement when they purported
22  substantially greater than expected growth in their
23  application business, yes.  I've looked at that.
24      Q.  The -- you just identified, I think, two price
25  increases that you looked at, or two categories of price

64

1  increases, the second of which, I believe refers to the
2  price increase on December 15th, 2000, following the
3  December 14th conference call; is that correct?
4      A.  That's correct, yes.
5      Q.  But you also referred to looking at price
6  increases that occurred before the beginning of the
7  Class Period?
8      A.  Yes.
9      Q.  Where is that in your report?
10      A.  That is something I did following James's
11  rebuttal report.  One of the things that James did was
12  to -- instead of doing what I did, I look at the price
13  declines and so on.
14      What James kind of was focusing on was price
15  increases and particularly the absence of price
16  increases.  So I would go back and look at that.  He
17  looked at December 5th, my recollection is, and noted
18  the fact that there were no price increase on that day.
19      In my opinion, he should have gone to November
20  30th and look at that price increase, which followed
21  Larry Ellison's -- follows Larry Ellison's presentation
22  in Arizona.  I think it was the First Boston conference
23  there.  And he would have clearly seen a statistically
24  significant price increase.  So, yes, I looked at that.
25      It's a different -- it's different than what I

65

1  did in order to come up with damages, you know, but --
2  but it is, you know, looking at it his way, you know,
3  you would -- actually if you look at the price
4  increases, I think you actually would end up with a
5  greater inflation. But, anyway, yes, I looked at them.
6      Q. So you've identified a price increase on November
7  30th that you looked at.
8      What did you find?
9      A. I find a -- I found a price increase that related
10  to, you know, Larry Ellison's presentation.
11     Q. Okay. Hang on. You found a price increase in
12  absolute terms, the dollar price went up?
13     A. Yeah. The dollar price went up, I think it was
14  $3.00, but, I mean, I -- it's -- you know, I don't have
15  that in front of me.
16     Q. Did you do a regression analysis of that price
17  increase?
18     A. Actually, I didn't even have to do a regression
19  analysis. I'm sitting here without having done a
20  regression analysis, and I'm telling you it's
21  statistically significant.
22     Q. Okay. That's just your judgment?
23     A. That's my judgment and you can test it.
24     Q. Okay. And I think you said that that price
25  increase was related to Larry Ellison's presentation?

66

1      A. Correct.
2      Q. What analysis have you gone through to form that
3  opinion or conclusion?
4      A. Well, it is -- it was attributable to his
5  presentation in the media.
6      Q. What do you mean "attributable"?
7      A. It means that when you read the media, the people
8  talk about the price increase, and the reasons for that
9  price increase was attributable to his presentation at
10  that conference.
11     Q. Do you remember what media you read that
12  attributed the price increase to Mr. Ellison's
13  statements at the conference?
14     A. I certainly know that the Bloomberg article -- a
15  Bloomberg -- November 30th Bloomberg article would
16  certainly attribute the increase to that particular
17  presentation.
18     No. I think it was his First Boston conference,
19  analysts' conference. And, of course, there is also a
20  First Boston analyst report on that day that discusses
21  his presentation.
22     Q. Did the First Boston analyst report also
23  attribute the stock price increase to Mr. Ellison's
24  commentary?
25     A. Well, the analyst report doesn't talk about the

67

1  price increase because it hasn't happened yet.
2      Q. Okay. So did you rely on any other media
3  statements beyond the Bloomberg article as attributing
4  the price increase to Mr. Ellison's comments on
5  November 30th?
6          MS. WINKLER: Objection. Form.
7          THE WITNESS: I didn't -- it wasn't
8  something I relied on. It was something I considered;
9  it's in addition to my analysis. I just wanted to make
10  that clear. And it was something I looked at just to,
11  you know, assess all of the information that James was
12  providing.
13     Now, that said, I also listened to the
14  conference itself, and actually, you know, listened to
15  Ellison's presentation. I listened to the questions and
16  so on.
17     Q. BY MR. GIBBS: But I take it in performing an
18  economic analysis of a stock price increase in an
19  attempt to identify the cause of the increase, you
20  wouldn't normally rely on a Bloomberg article to
21  establish that causal link, would you?
22     A. No. I --
23          MS. WINKLER: Objection. Form.
24          THE WITNESS: -- I would look at the
25  information. And I would look at whether or not this is

68

1  something that's new.
2      Q. BY MR. GIBBS: New compared to what?
3      A. Compared to old.
4      Q. New compared to what was in the market before the
5  presentation, for example?
6      A. Yes. And, I mean I can expand on that if you'd
7  like.
8      Q. Please.
9      A. What happened in this particular case is that
10  Oracle had introduced 11i in May, as you know. In the
11  first quarter of fiscal 2001, they pretty much went
12  through the same problem that they went through
13  March 1st of 2001, for the third quarter, and that is
14  that the application growth was not there.
15     This created a lot of speculations with respect
16  to the product. Does it work? Why are people not
17  buying this product?
18     The growth at that time was, I think it was 42
19  percent in the first quarter of 2001. So there's a lot
20  of -- there's a lot of criticism of the product, about
21  11i. It happens in October and it also occurs in
22  November.
23     At the end of November, there are two things that
24  are important, I think, with respect to, you know, to
25  what the company ended up doing. Number one, investors

69

1 interpret their comments as confirmation that the second
2 quarter would be, you know, would be meeting
3 expectations if not beating expectations.
4       And the second thing had to do with the
5 functionality of the product itself, when -- in the
6 presentation, Larry Ellison would go into the -- how
7 easy it was to install, four hours -- three, four hours
8 it would take to install. You know, the whole process
9 of implementing the company's business on it, which
10 would -- would only be six months and the company would
11 go live.
12       The fact -- or -- his assertion that apparently
13 GE Power had decided to go with 11i to run their
14 business on it. Consequently, if GE Power, which is a
15 large division of GE, if they're running their entire
16 business on it, then pretty much any large company
17 should be able to run their business on it.
18       So the impression was that this was product that
19 was working, and he was talking about the fact that in
20 the next few months he was -- you know, because the
21 product now was working, he would expect to see, you
22 know, significant wins against, you know, the
23 best-of-breed application companies and so on.
24       Clearly, you know, that is new information, it's
25 different information that was in the market prior to --

70

1 in October and in November. And, you know, there's no
2 price when the stock price increased on November 30th.
3    Q. Now, there's no discussion of this First Boston
4 presentation in either your opening or your rebuttal
5 report.
6       So first of all, is it fair for me to assume that
7 you didn't rely on the First Boston conference and the
8 price increase that followed in forming your opinions in
9 this case?
10    A. Correct. I -- when I was -- I considered a lot
11 of information, obviously. But in terms of forming the
12 opinion, I did not use the price increases on November
13 30th and December -- well, I actually did incorporate
14 the December 15 price increase in my analysis. But what
15 I did was -- is what's called back casting. In other
16 words, I started out with the price, Oracle stock price,
17 following -- you know, following the March 1st
18 announcement, and then went backwards in time, as
19 opposed to going the other way around.
20       And I think that that is a better way of doing
21 it. I think that it is, you know, a more
22 conservative -- and that's why I did it that way. So I
23 didn't -- but I didn't -- so I didn't rely on this in
24 order to do my analysis.
25    Q. Now, in your prior answer, you gave considerable

71

1 detail about what Mr. Ellison said at the First Boston
2 conference.
3       Is that detail reflected in the First Boston
4 analyst report that followed the conference, or are you
5 relaying details from having actually listened to the
6 presentation itself?
7    A. Yes. I want to be clear. When I talked about
8 that, it's based upon my memory from actually listening
9 to the conference itself, you know. It is not something
10 -- you know, I don't have the document in front of me,
11 but this is, you know -- you know, my best -- you know,
12 my recollection as best as I can recall as I sit here
13 today. I don't have the benefit of having a transcript
14 in front of me and so on. But -- but anyway...
15    Q. Do you have any understanding as to whether
16 details about what Mr. Ellison said at that conference
17 that are not reflected in the ensuing First Boston
18 analyst report were released into the market somehow?
19       MS. WINKLER: Objection. Form.
20       THE WITNESS: Well, it would have because I
21 listened to it on Bloomberg so -- so it was carried on
22 Bloomberg, the entire 70-minute-plus presentation that
23 asked the same questions. And secondly, you know, this
24 is an investor conference, you know, so -- you know, so,
25 yes.

72

1    Q. BY MR. GIBBS: So this recording that you
2 listened to is not a recording that was produced in this
3 litigation?
4    A. No --
5       MS. WINKLER: Objection. Form.
6    Q. BY MR. GIBBS: Do you know?
7    A. I would imagine it is -- you know, somebody has a
8 copy of it somewhere. But, I mean, I -- I simply went
9 on Bloomberg and -- my own Bloomberg and I just listened
10 to it.
11    Q. When did you do that?
12    A. Following James's report. Although before that,
13 obviously, I was aware of the conference, and I was
14 aware of the price increase. But I thought it was worth
15 taking 70 minutes of my time to actually listen to the
16 specifics of what he -- what he stated.
17    Q. And you did that after Mr. James's opening
18 report?
19       MS. WINKLER: Objection. Asked and
20 answered.
21       THE WITNESS: I think it may have actually
22 -- I don't recall as I sit here, but I think it may have
23 been after the -- it may have been after the first
24 report, or it may have been after the rebuttal.
25    Q. BY MR. GIBBS: Was there a reason you didn't

73

1  include it in your rebuttal report?
2        MS. WINKLER: Objection. Asked and
3  answered.
4        THE WITNESS: Why I did not include it?
5  Q. BY MR. GIBBS: Uh-huh.
6  A. No. I think that his -- I think that his -- I
7  mean, I -- in terms of his analysis on materiality, I
8  think that that's -- you know, my criticism of that
9  particular analysis is in my rebuttal report. In terms
10 of going the next step and looking at the price
11 increases -- the price increases he should have looked
12 at, that is something that I did later on, according to
13 my recollection.
14 Q. But you -- later on meaning before or after your
15 rebuttal report?
16 A. Well, I don't know if it was after I wrote my --
17 it probably was after I submitted my rebuttal report, in
18 terms of listening -- you're talking about specifically,
19 now, listening to the actual presentation.
20       I had some sense of what was in the presentation
21 because I had the media reports, analyst reports and so
22 on. But actually, you're specifically talking about
23 listening to it. I think that the best I can recall
24 that occurred after -- after I submitted my rebuttal
25 report.

74

1  Q. Okay. Now let's set aside listening to the
2  recording of the presentation.
3        Did you review the First Boston analyst report
4  before you submitted your rebuttal report?
5  A. Yeah. I mean, that's part of the analyst reports
6  that I -- that I reviewed.
7  Q. Did you look at any stock price increases prior
8  to the Class Period, other than the November 30th one
9  that we've just been discussing?
10 A. I'm sorry. Did you say price increases or --
11 Q. Correct.
12 A. Price increases. I'm trying to think. I
13 certainly looked at -- nothing comes to mind. But I
14 certainly have looked at all of the price movements and
15 so on. But it is not -- I mean, that is certainly the
16 one that I considered to be the important price increase
17 in the context of this litigation.
18 Q. Now, neither your opening nor your rebuttal
19 report talks about Oracle's first quarter results and
20 the disappointment that you alluded to about
21 application sales. Is there a reason why?
22 A. Because it was not part of my analysis. I -- as
23 I said before -- I mean, my analysis is based on the
24 price decline on March 2nd. And, you know, it's based
25 on what occurred during the Class Period.

75

1        In addition to that, of course, there is a
2  tremendous amount of additional information that, you
3  know, I have considered. And that, obviously, I have
4  looked at, you know, the earnings releases for the year.
5  Q. But do you intend to rely on information
6  surrounding those first quarter results in support of
7  your opinions?
8        MS. WINKLER: Objection. Form.
9        THE WITNESS: No. It's -- my opinions are
10 based on what I have in my report. You know, but
11 obviously, I have considered a lot of additional
12 information. In other words, I don't use the first --
13 the price decline in the first quarter in any way, shape
14 or form, in order to calculate my damages in this case.
15 Q. BY MR. GIBBS: I'm not talking about damages
16 calculation. I'm talking about any portion of your
17 opinions.
18 A. Like materiality opinions or --
19 Q. Uh-huh.
20 A. -- I mean, it's something that I considered but,
21 no. I -- I -- it's -- it's not something I relied on in
22 order to reach my opinions.
23 Q. I'm sorry. You -- you said you did not consider
24 any pre-Class Period price increases other than November
25 30th, that you can recall?

76

1  A. I -- I think that I -- what I stated was that I
2  looked at, you know, the price movements, which would
3  include both price increases and price declines during
4  the period prior to the Class Period, as well as after
5  the Class Period for that matter, in terms of what I
6  thought was important, clearly. I mean, anybody looking
7  at the -- looking at just the stock price chart -- I
8  mean, its November 30th price increases, there's an
9  obvious change in terms of investors' perception on that
10 day.
11 Q. Did you look at what other news entered the
12 market that day?
13 A. I -- yes. And as I sit here right now, I can't
14 -- I don't recall exactly what other news entered the
15 market on that day. But, yeah. I mean, it would -- it
16 would be what I looked at. I would look at -- not
17 just look at this particular story, but I would look at
18 everything that was in the media on that particular day.
19 Q. What steps did you take to make sure that the
20 price increase was not attributable to news, other than
21 the report on Mr. Ellison's comments at the First Boston
22 conference?
23       MS. WINKLER: Objection. Form.
24       THE WITNESS: The steps I took was to look
25 at the media that was available and see if there were

77

1  any other pieces of information that could explain a
2  price increase of this magnitude, and I was unable to
3  find any.
4     Q.  BY MR. GIBBS:  And that was media available with
5  regard to Oracle?
6     A.  Media available with respect to Oracle and
7  analyst reports.  My recollection is -- and I may be
8  wrong, but I think there was only one analyst report and
9  that was one I looked at -- on that particular day.
10    Q.  The First Boston one?
11    A.  Correct, yes.
12    Q.  Other than the Bloomberg article, did you look at
13 any media and/or analyst reports following the stock
14 increase?
15    A.  Yes.
16    Q.  Do you recall what you found there?
17    A.  Yes.  In general, I -- excuse me.
18       In general, I -- I -- I found comments with
19 respect to general comments with respect to management's
20 optimistic presentations.  I think there were more than
21 just one investor presentation, but that is -- but
22 anyway, there were discussions about, you know, the
23 upbeat presentations that the company had made.
24       There were -- in the media, at least to me, it
25 became clear that investors expected Oracle to have a

78

1  very, very good quarter to -- and I think the -- there
2  was some discussion of what's called the "whisper
3  number," which is different from the consensus estimate.
4  The whisper number is more in terms of what the
5  investors expect the earnings to be, as opposed to the
6  consensus, which is the consensus estimates that, you
7  know, are the estimates by the analysts.  And often they
8  lack -- sometimes could be intentional.  They are --
9  they may be different from investors' actual
10 expectations.
11      In this case, of course, Oracle was a company
12 that had a history of beating the consensus estimates so
13 having a strong quarter to mean -- to me would mean that
14 the company would report 11¢, even though my
15 recollection is that I -- I think I even saw somebody
16 talking about a whisper number in the 12-cent range, but
17 I think that was the high-end, and particularly that
18 applications would be strong.
19    Q.  Let me turn your attention to paragraph 44 of
20 your opening report, Exhibit 1 to your deposition.  And
21 as you're looking at it, just for the record, you cite
22 Oracle's March 15, 2001, announcement of actual results
23 for the third quarter of 2001.
24      Other than the percentage of the miss attributed
25 to sales of Suite 11i versus sales of other products,

79

1  the financial results reported in the March 15th, 2001,
2  announcement were the same as the financial results that
3  Oracle pre-announced on March 1st of 2001; correct?
4     A.  My recollection is that is -- that was in
5  line with the -- with pre-announcement with respect to
6  total revenues and -- and earnings.
7     Q.  So what changed between March 1st and March 15th
8  is, on the 15th Oracle announced that database sales
9  were a little bit better than they had announced on
10 March 1st and application sales were worse than they had
11 announced on March 1st; correct?
12    A.  Correct, yes.
13    Q.  Is this March 15, 2001, disclosure relevant to
14 your loss causation analysis?
15       MS. WINKLER:  Objection.  Form.
16       THE WITNESS:  I think it would be relevant
17 in terms of -- in terms to Plaintiffs in terms of their
18 case; in other words, what caused the miss.  You know,
19 was it, in fact, a miss that was caused by a general
20 economic downturn, or was it specific, more specific, in
21 the application business.
22       And it seems to me that this is further
23 evidence that Plaintiffs believes, in order to show
24 their case, that the miss itself was caused
25 predominantly in the application business.

80

1     Q.  BY MR. GIBBS:  Okay.  But why did you cite it?
2     A.  Why did I cite it?
3     Q.  Uh-huh.
4     A.  Because that is when they announced their third
5  quarter earnings and in the -- the pre-announcement was,
6  as I explained this morning, was incomplete.  And the
7  company specifically stated that you, know, the full
8  announcement would occur on March 15.  So this is just,
9  you know, to have a completeness in terms of the
10 announcement, you had to include the March 15th.
11    Q.  Your regression analysis shows no statistically
12 significant decrease in the price of Oracle's stock
13 following the March 15, 2001, announcement; correct?
14    A.  I think that's correct, yes.  I have -- let me
15 just take a look at it.
16    Q.  Sure.
17    A.  I think there was a decline the day -- I think
18 the -- I think there was a decline on the -- on
19 March 15th, which may relate to -- you know,
20 anticipating bad news.  But I don't think that on March
21 16th was a statistically significant price decline.  But
22 why don't I just check for the record?
23       MR. GIBBS:  Take your time.  Why don't we go
24 ahead and change the tape?  I think we're running
25 towards the end, so we'll flip the tape quickly while he

81

1  reviews that.
2       THE VIDEOGRAPHER: This is the end of
3  Videotape Number 1. We are now going off the video
4  record. The time is 11:25 a.m.
5       (Recess.)
6       THE VIDEOGRAPHER: This is the beginning of
7  Videotape Number 2. We are now back on the video
8  record. The time is 11:33 a.m.
9    Q. BY MR. GIBBS: Before the break, I was asking you
10  whether your regression analysis showed a statistically
11  significant decrease in the price of Oracle's stock
12  after the March 15th, 2001, disclosure.
13       Have you had a chance to take a look at that?
14    A. Yes, I did. And as I was saying, there was a
15  statistically significant price decline at the 95
16  percent level using one table test on March 15th, but
17  not on March 16th, which is the day following it, which
18  is most likely due to the anticipation of bad -- you
19  know, negative information. That's probably why you
20  have that price decline prior to the announcement.
21    Q. Okay. Have you done any analysis to support your
22  assertion that the price decline on March 15th was most
23  likely due to anticipation of bad or negative
24  information?
25    A. I have not performed any analysis of the price

82

1  decline on the day before. I'm just observing, as I'm
2  sitting here, that there was such a price decline.
3    Q. Okay. Does it mean anything to you that there
4  was no statistical significant decrease in the price of
5  Oracle's stock after the March 15th disclosure?
6       MS. WINKLER: Objection. Form.
7       THE WITNESS: Yes. I mean, in terms of what
8  I was talking about earlier, which has to do with
9  whether or not, you know, inflation was reduced or
10  eliminated and so on. What I wanted to do was to see
11  whether or not there was further decline on March 15th
12  that should also be included in -- in my damage
13  analysis.
14       And even though there is a decline, it was
15  not statistically significant. Even though there is a
16  decline on the day before, I obviously didn't -- I
17  didn't feel comfortable including that into my damage
18  analysis; in other words, the anticipation part because
19  it's a little bit more speculative than actually having
20  it occur following the -- the announcement.
21  Consequently, as a result of that, I only included the
22  price decline that occurred on March 2nd, 2001, in my
23  analysis.
24    Q. BY MR. GIBBS: If the market were particularly
25  concerned about sales of Suite 11i as opposed to

83

1  Oracle's financial results generally, which didn't
2  change in the March 15th announcement, wouldn't you
3  expect a statistically significant decrease in the price
4  of Oracle stock after the March 15th announcement?
5       MS. WINKLER: Objection. Form.
6       THE WITNESS: I don't think so. I mean, I
7  think that the miss that was announced on March 1st was
8  quite substantial with respect to -- to applications.
9  Now, the March 15th is kind of like a -- well, it's good
10  news on the database side, they did better, but it's bad
11  news on the application side.
12       But I think that the key in this case is
13  whether or not the applications was sufficiently
14  functionable, stable, operable, and whether or not CRM
15  and ERP was operating, and that meant the suite really
16  had traction in terms of customer demand.
17       And that was disclosed -- or clearly that
18  was disclosed on March 1st. And it's very similar to
19  the first quarter announcement where Oracle only
20  achieved application growth of 42 percent, and the
21  market interpreted that as a significant negative with
22  respect to the functionality of the suite.
23    Q. BY MR. GIBBS: Is it your opinion that there's no
24  material difference between 50 percent application sales
25  growth and 25 percent application sales growth?

84

1    A. That there's no -- well, it's not linear,
2  that's for sure. In other words, when you start
3  missing, whether or not -- it's kind of -- it's one of
4  those things, if -- let's say that you miss earnings buy
5  a penny, and the stock price declined 10 percent.
6       Does that mean that if the earnings miss was 11¢,
7  that the stock price will decline 110 percent? Of
8  course not.
9       I think that the shift in perception was a shift
10  in terms of the suite product being -- having the
11  benefits that was advocated by Oracle that it was a
12  working product, that they had solved their problems and
13  so on. And the change in attitude was that well, they
14  haven't solved the problem because clearly customers are
15  not buying it at the level that, you know, was expected.
16    Q. But you're not saying that the magnitude of a
17  miss is irrelevant, are you?
18    A. It's not irrelevant because -- but it has to do
19  with meeting expectations. Meeting expectations and it
20  kind of reminds me about the second quarter, for
21  instance, where prior to the second quarter earnings,
22  there were some commentary with respect to what the miss
23  would mean to the company.
24       And the commentary was, for instance, that you
25  know, any slight miss is going to cost the stock price

85

1 to decline substantially. In other words, you see the
2 tip of the iceberg, that doesn't mean that you're
3 completely unaware of what might be underneath, you
4 know, the ocean. You know, there's more to it than
5 that.
6     So I don't think that magnitude is necessarily
7 relevant, but I think that in terms of understanding
8 about the problems, you don't need to have the complete
9 picture in order to put the pieces -- the pieces
10 together.
11     Q. Would it be fair to say if you wanted to evaluate
12 the materiality of something like an earnings miss, you
13 need to know the magnitude of the miss?
14     A. That's something that you would want to know. In
15 this case, the magnitude of the earnings miss was known.
16 It was 2¢.
17     Q. Understood. But to the degree that the magnitude
18 of the miss as to a particular product matters, you
19 would agree that you would want to know the magnitude of
20 the miss as to that particular product; correct?
21     A. In a perfect world, you would want as much
22 information as possible, but we don't live in a perfect
23 world. And the representations made by the company when
24 they announced the March 1st results turned out to be
25 incorrect.

86

1     Q. But is it your testimony that the difference
2 between 50 percent miss in -- I'm sorry.
3     -- 50 percent growth in applications and
4 25 percent growth in applications is not material?
5     MS. WINKLER: Objection. Asked and
6 answered.
7     THE WITNESS: Well, if -- if you, in the --
8 interpret materiality -- did it materially change the
9 mix of information that was out there in terms of
10 looking at the stock price prior to the announcement and
11 stock price after the announcement, I mean, it was not
12 statistically significant. It's not -- I mean, it's a
13 fact.
14     In my opinion, it's -- you know, so it's
15 more evidence to me that people understood, you know,
16 the problems with the applications prior to that point
17 in time rather than -- in other words, they see the tip
18 of the iceberg. Investors understand what the problem
19 really is as opposed to the way that you might look at
20 it, which is that application growth didn't matter. It
21 did matter.
22     Q. BY MR. GIBBS: But the -- so the tip of the
23 iceberg wasn't available before March 1st, 2001; is that
24 your view?
25     MS. WINKLER: Objection. Form.

87

1     THE WITNESS: The tip of the iceberg?
2     Q. BY MR. GIBBS: Uh-huh.
3     A. Well, it depends on what you're talking about in
4 terms of what the tip of the iceberg is. I think that
5 if you're talking about the company missing
6 application -- application expectations, I think that,
7 in large part, investors, as well as analysts, believed
8 that the company would meet those expectations.
9     Q. So with your analogy that once the tip of the
10 iceberg becomes visible, people can reach conclusions
11 about what else might be there, it was the failure to
12 meet the applications forecast that was essentially the
13 tip of the iceberg, in your view?
14     MS. WINKLER: Objection. Form.
15     THE WITNESS: Well, I don't think that
16 investors had complete information on March 1st of 2001.
17 I mean, they just didn't.
18     But in terms of the overall picture, whether
19 or not it was specific to applications and database,
20 because, I mean, database did do better. I mean, it
21 wasn't all negative.
22     You know, the investors seemed to have
23 understood quite well, what the true state of the
24 company was. That's -- in my opinion, is why you did
25 not see any further price deterioration on that point in

88

1 time. It may also -- may also, you know, maybe there
2 was some shift in terms of assigning the blame to --
3 from applications to databases and so on, but, the -- in
4 aggregate, the view did not -- did not change materially
5 from these two -- these two days.
6     Q. BY MR. GIBBS: But you would agree, then, it's at
7 least possible that the lack of a statistically
8 significant price decrease on March 15th signals that
9 the market didn't care whether Oracle's miss was
10 comprised principally on the application side or the
11 database side? They didn't care about the mix.
12     MS. WINKLER: Objection. Form.
13     THE WITNESS: I don't think that it's
14 possible, in this particular case, that investors did
15 not care, you know, whether or not the miss was
16 attributable to applications or other factors. I mean
17 applications was the driving engine -- or was supposed
18 to be the driving engine for this company going forward.
19 I think it would be something that any reasonable
20 investor would have wanted to know as much detail as
21 possible about.
22     Q. BY MR. GIBBS: But you haven't performed any
23 quantitative analysis to determine whether or not the
24 lack of a price reaction to the March 15th announcement
25 reflects the fact that they just assumed what the rest

89

1   of the iceberg looked like, as you've suggested, or,
2   instead, that they just didn't care about the mix
3   between database and applications?
4          MS. WINKLER: Objection. Form.
5          THE WITNESS: Let me just be clear, because
6   I'm not necessarily saying that investors had a complete
7   picture of this prior to that particular announcement.
8          What I'm saying is that the mix -- in terms
9   of the value of the company, they did not value the
10  company differently before -- materially differently
11  before and after. I mean, the decline is not large
12  enough to conclusively -- conclusively conclude that
13  there was a change in the valuation of the company. So
14  there is a positive and there is a negative and -- but,
15  you know, in the big scheme of things, there's not much
16  change in terms of the value of the company.
17      Q. BY MR. GIBBS: Well, it is clear that after the
18  March 15th announcement, investors didn't value the
19  company in a significantly different way because we
20  don't observe a statistically significant price decline.
21  But that doesn't, by itself, tell you why investors
22  didn't value the company differently.
23          It just tells you that the price didn't change;
24  right?
25          MS. WINKLER: Objection. Form.

90

1          THE WITNESS: The regression analysis -- the
2   statistical analysis shows that the value, not
3   necessarily hold a value that -- because they may have
4   changed, you know, their assumptions into their
5   evaluation models and so on, but in terms of the value
6   itself did not change, you know, from March 15th to --
7   to March 16th.
8          Now, if somebody wants to say that that
9   means the application business was no -- you know, that
10  was no more important than the database business, I
11  think that that's incorrect. I think it's inconsistent
12  with, you know, everything I've read about this case.
13  But, I mean that's my opinion.
14      Q. BY MR. GIBBS: But that latter opinion, you've
15  done no statistical or quantitative analysis to support
16  that opinion.
17          That's just your opinion based on what you've
18  read about this case; correct?
19      A. Well, the statistical analysis is the statistical
20  analysis, and -- then what you try to do is to, you
21  know, comment on what that statistical analysis means.
22  And that's what I've done.
23      Q. I want to turn now to Oracle's Q2 2001 results.
24      A. Okay.
25      Q. We've marked previously the March 1, 2001, press

91

1   release as Exhibit 3.
2          The March 1, 2001, press release doesn't say
3   anything expressly about Oracle's second quarter 2001
4   results; correct?
5      A. What exhibit are you talking about?
6      Q. Exhibit 3, the press release. I think it's right
7   on top there?
8      A. And the question was that the press release does
9   not --
10     Q. Does not specifically, explicitly reference
11  Oracle's second quarter 2001 results; correct?
12     A. In general, these press releases would actually
13  have historical financials -- you know, as part of the
14  press release. I don't see that here. But generally,
15  that would be part of -- part of the press release. But
16  the portion that you have here, I think the growth rates
17  and -- I may be wrong, but it seemed like the growth
18  rates are year-over-year growth rates.
19     Q. Let me -- let me ask this a slightly different
20  way because you've referred to the March 1 event,
21  meaning the press release plus the conference call
22  statements, at least.
23          In connection with the March 1, 2001, events, the
24  Q3 2001 financial results that Oracle announced on March
25  1, 2001, don't reflect any change to the financial

92

1   results that Oracle had announced for the second quarter
2   2001; correct?
3          MS. WINKLER: Objection. Form.
4          THE WITNESS: I mean, is there -- whether or
5   not there was a restatement?
6      Q. BY MR. GIBBS: Correct.
7      A. I don't think there was a restatement, no. I
8   mean, they did not -- I don't think the second quarter
9   results have been misstated, no. Ever. I mean, not
10  here or at any point in time.
11     Q. Okay. So the financial results that Oracle
12  announced on March 1, 2001, do not, for example, reflect
13  a reversal of any revenue Oracle recognized in
14  connection with the HP license transaction; correct?
15     A. As I said, to the best of my knowledge, there's
16  no restatement of those results.
17     Q. And the same is true as to the other revenue
18  items that Plaintiffs' claim Oracle improperly
19  recognized for the second quarter 2001; correct?
20         MS. WINKLER: Objection. Form.
21         THE WITNESS: My understanding is that the
22  second quarter has not been restated.
23     Q. BY MR. GIBBS: So in order to opine that the
24  March 1, 2001, event reduced and/or eliminated price
25  inflation caused by alleged false and misleading

93

1    statements about Oracle's second quarter 2001 results,
2    you've assumed that Plaintiffs will prove certain
3    allegations about the second quarter 2001 results;
4    correct?
5         A. Correct, yes.
6            MS. WINKLER: Objection. Form.
7         Q. BY MR. GIBBS: Okay. You have assumed, for
8    example, that Plaintiffs will prove that Oracle should
9    have reported earnings per share of 10¢ as opposed to
10   the 11¢ per share that Oracle actually reported on
11   December 14th, 2001; correct?
12        A. That's correct, yes.
13        Q. And you have also assumed that Plaintiffs will
14   prove that the allegedly false and misleading results
15   for Q2 2001 concealed the issues that later caused
16   Oracle to miss its third quarter guidance; correct?
17           MS. WINKLER: Objection. Form.
18           THE WITNESS: That's correct, yes. I think
19   it's a little bit more than that but --
20        Q. What else did you assume?
21           MS. WINKLER: Objection. Form.
22           THE WITNESS: The -- I think in terms of the
23   second quarter revenues and earnings, I think that it
24   wasn't just that -- you can say concealed it, but it was
25   also part of why investors thought application business

94

1    was gaining traction. And it's also part of why the
2    company's stock price increased in the -- following the
3    second quarter earnings announcement.
4            In other words, you know, that -- the
5    application business, for instance, which was expected
6    to have growth of 50 to 55 percent, my understanding is
7    that in the absence of the HP -- HP transaction, that's
8    actually where -- where the results would come in.
9    However, had -- however, the company reported better
10   than expected application growth of 66 percent, and that
11   is part of why investors believed that the company would
12   do well in the future in terms of, you know, application
13   growth. It was further evidence to investors that Suite
14   11i was gaining traction.
15        Q. BY MR. GIBBS: So was that -- that, together with
16   what I've already articulated, a summary of what the
17   plaintiffs will prove with respect to the Q2 financial
18   results?
19           MS. WINKLER: Objection. Form.
20           THE WITNESS: I think the assumptions are in
21   my report; I don't want to restate or change my
22   assumptions. I mean, my assumptions are what I put in
23   the report.
24        Q. BY MR. GIBBS: Okay. I want to turn now to
25   another category of statements discussed in your

95

1    rebuttal report having to do with the economic downturn
2    and reduced corporate IT spending.
3            You begin your discussion of that issue in your
4    rebuttal report at paragraph 19, page 11.
5            Do you have that in front of you?
6         A. Yes, I do.
7         Q. The first sentence of that paragraph says,
8    "Plaintiffs also allege that Defendants falsely
9    represented the company's sales would not be negatively
10   impacted by the general economic slowdown during the
11   Class Period."
12           Is that an accurate characterization of your
13   understanding of the plaintiffs' allegation in that
14   regard?
15        A. That, in aggregate, yes. The sales would not be
16   impacted.
17        Q. So it's your understanding that with respect to
18   the allegedly false and misleading statements about the
19   impact of the economy, what Oracle and the other
20   defendants said was the economy will not impact Oracle's
21   results for that quarter?
22           MS. WINKLER: Objection. Form.
23           THE WITNESS: Actually, I think it's
24   slightly different than that. I think that clearly, on
25   the second quarter earnings announcement, there were

96

1    some discussion, for instance, about dot com companies
2    and that there would be an impact with respect to that.
3            I think that what the company stated on that
4    conference call was that whatever the slowdown would be
5    in that part of the business, you know, would be made up
6    by the application business. And the reason for that
7    was that having a suite where all of the parts are fully
8    integrated and work together, you know, lowers costs.
9            So if a company, in an economic downturn, is
10   considering reducing spending, this would actually be a
11   product that a company would buy because of the ROI, so
12   to speak, the return on investment, of the project. You
13   know, it was supposedly easy to install, three, four
14   hours. It would take six months to get the processes
15   implemented and so on, and then you would be live.
16           Oracle itself said that it would be saving a
17   billion dollars a year, using its software. So if your
18   objective is to cut costs, you know, a downturn -- in an
19   economic slowdown, you know, could effectively help the
20   company.
21           Now, the company also said that if the
22   economic slowdown was a severe recession or a prolonged
23   recession and so on, then that, of course, would not be
24   the case because now you have a situation where a
25   company is not deciding whether or not to buy or not buy

97

1 the company based on costs. Now you have a situation
2 where a company, they just don't have the money to buy
3 it, you know, in a severe recession.
4 And that is exactly what happened with the
5 dot com companies. You know, they couldn't buy the
6 product. Even if they wanted the product, even if the
7 product worked, they wouldn't, you know, be able to buy
8 the product because they simply do not have the money.
9 Q. BY MR. GIBBS: Is it your testimony that if the
10 product worked as Oracle represented it to be, only a
11 bankrupt company wouldn't buy this product?
12 MS. WINKLER: Objection. Form.
13 THE WITNESS: No.
14 Q. BY MR. GIBBS: So even companies with the means
15 to purchase the product might decide not to purchase it
16 even if it does operate the way Oracle said it did?
17 MS. WINKLER: Objection. Form.
18 THE WITNESS: Yeah. To go back to your
19 previous question, it's an interesting question because
20 I think that when you listen to Larry Ellison, there are
21 certain statements that he made that would lead you to
22 believe that no company, other than a bankrupt company,
23 would pass over this product for, you know, a
24 best-of-breed type of product. But, of course, that
25 is -- I mean, that would be overstating the benefit of

98

1 the product.
2 I think that if the product worked, you
3 certainly would have a lot more traction, and you
4 certainly would have a lot more customer demand. And
5 they certainly would, you know, have better results.
6 Q. BY MR. GIBBS: In paragraph 20 of your rebuttal
7 report, you say that Mr. James appears to ignore that
8 "several other large technology companies" reduced their
9 financial guidance before Oracle did.
10 Which companies are you talking about?
11 MS. WINKLER: Objection. Form. I think
12 that is an inaccurate quotation or even a paraphrase of
13 that sentence.
14 MR. GIBBS: Well, I clearly indicated in the
15 question which part I was quoting. I said, quote,
16 several large technology companies, end quote. And I
17 characterized the rest as having reduced their financial
18 guidance before Oracle did.
19 You have that language in front of you.
20 MS. WINKLER: But you omitted an important
21 part of that sentence.
22 Q. BY MR. GIBBS: You have that sentence in front of
23 you, don't you?
24 A. Yes.
25 Q. My only question is: Who are the several other

99

1 large technology companies you're alluding to there?
2 A. There was a lot of different large technology
3 companies. The ones that come to mind, as I sit here,
4 would, obviously, be companies such as Microsoft who
5 pre-announced on the first day of the -- of the Class
6 Period an -- which is also part of Mr. James' peer
7 group. The other companies, Sun Computer, a lot of PC
8 computer makers like Compaq and so on, they would --
9 that would be included. But I mean, there is a large
10 number of -- of large technology companies. I -- I just
11 haven't memorized them all.
12 Q. Those are the ones that come to mind as you sit
13 here right now?
14 A. Yeah. I mean, there are -- there are many.
15 Q. Okay. You mentioned --
16 A. And I -- I -- I can look at -- I -- I have listed
17 some more, I think, in -- I mean, if -- in -- in -- in
18 my report. But --
19 Q. I -- I have your report.
20 A. Okay.
21 Q. You mentioned Microsoft and the fact that that's
22 in the peer group that -- that Mr. James referred to.
23 Do you have any disagreement with the peer group
24 that Mr. James -- Dr. James put together for purposes of
25 his report?

100

1 A. For purposes of his report? Yeah. I mean, I do
2 have various disagreements.
3 Q. Okay. What are they?
4 A. With it, but -- it -- for instance, if you're
5 looking at what a particular market is doing, it seems
6 to me that you should have a market weighted index as
7 opposed to an equally weighted index. In this
8 particular case, there are a lot of small companies that
9 are giving equal weight to a lot of large companies.
10 I think that in terms of the -- in terms of the
11 -- a lot of these companies are also, what Mr. James
12 also admits is companies that would follow Oracle. In
13 other words, they would look to Oracle for -- he calls
14 Oracle as the bellwether -- bellwether company in the
15 industry, which means that if Oracle moves, these other
16 companies would follow, which is a little bit different
17 than what you really want when you run an event
18 analysis.
19 In other words, you have two different variables.
20 You have an independent variable and you have the
21 dependent variable. And, you know, the independent
22 variable should not be dependent on, you know, the
23 dependent variable, the causal relationships should be
24 opposite.
25 That said, you know, it does -- these are, you

101

1  know, companies that Oracle competed with. You may
2  wonder why, you know, Microsoft is in there because
3  clearly Microsoft, even though it competes in the
4  database portion of -- competes with Oracle on
5  databases, it's -- its thrust of its business is, you
6  know, operating systems and its office suite.
7      You may wonder why IBM is in there. IBM is a big
8  system integrator and so on. But it also competes with
9  Oracle in database space and so on. But, in general, I
10 mean, those are just my general comments on it.
11     Q. Did you perform your own analysis to come up with
12 a separate or different peer group of companies?
13     A. No. I thought that the -- I thought that the
14 index that Oracle's initial expert used was fine for
15 this purpose, and that was to use the NASDAQ 100, which
16 had a -- which have the largest companies and the
17 NASDAQ -- generally, the largest technology companies in
18 NASDAQ. I though that was -- and as I said in my
19 report, I think that that index produces superior result
20 in order to explain Oracle's price movements.
21     Q. Oracle is part of the NASDAQ 100; correct?
22     A. It's one out of 100 companies, yes.
23     Q. Does that affect the results at all?
24     A. It is immaterial.
25     Q. Did you do any quantitative analysis to control

102

1  for that factor?
2      A. It is immaterial, because it's erroneous -- I
3  mean, it's one out of 100 companies.
4      Q. I understand you believe it's immaterial. I just
5  --
6      A. It's -- and also, in terms of if -- let's be
7  clear in terms of what actually happens by including it.
8  And I'm using this index to analyze the price decline in
9  Oracle's stock on March 2nd, no.
10     The difference between the predicted return and
11 the normal -- the predicted return and the actual return
12 would be, you know, would be expected to be greater
13 because by having Oracle -- if Oracle was the only
14 company in the index, it would explain 100 percent of
15 Oracle's stock price. So it works kind of -- it
16 mitigates the impact of -- if anything, it mitigates
17 the -- you know, the residual price that -- price
18 returns. But in my view it's immaterial. Consequently,
19 to the extent I've underestimated damages, you know, I'm
20 willing to live with that.
21     Q. Turning back to your discussion of loss causation
22 as it pertains to what you've referred in your rebuttal
23 report as Suite 11i product issues.
24     MS. WINKLER: Do you have a specific
25 paragraph?

103

1      MR. GIBBS: Yeah. It starts at paragraph
2  17, page 9. What I want to ask you about is footnote 6
3  on page 10.
4      Q. BY MR. GIBBS: In your rebuttal, you cite the
5  March 16th, 2001, CIBC World Markets report, which
6  refers to -- it refers to the analysts' understanding
7  that customers still desire best-of-breed solutions
8  designed with the customer in mind versus a suite that
9  may not be customizable or offering specific
10 industry-centric features.
11     Do you have an understanding as to whether, prior
12 to the Class Period, the market understood that Oracle
13 was offering a suite product as opposed to a
14 best-of-breed product?
15     A. They did.
16     Q. And is it your understanding that before the
17 Class Period and during the Class Period, the market
18 understood that some customers might prefer suites and
19 some might prefer best-of-breed, no matter how good the
20 suite is?
21     MS. WINKLER: Objection. Form.
22     THE WITNESS: It -- listening to Larry
23 Ellison, you know, it's -- he makes a very, very
24 powerful sales pitch, why that -- why, you know, you
25 would want to go with a suite as opposed to

104

1  best-of-breed. But, you know, clearly, I mean, there
2  are other issues involved that could cause companies to
3  go with a best-of-breed solution.
4      Q. BY MR. GIBBS: Well, let's posit as a
5  hypothetical, that customers didn't purchase Suite 11i
6  during the third quarter of 2001 because they simply
7  preferred a best-of-breed approach as opposed to because
8  they had concerns about the quality or functionality or
9  integration of Suite 11i.
10     Would that undercut your opinion with regard to
11 loss causation?
12     MS. WINKLER: Objection. Form.
13     THE WITNESS: Well, let's just examine the
14 problems with that hypothetical. My understanding in
15 terms of -- and -- is that it -- the customers who
16 delayed purchases were not customers who did not want
17 the suite versus a best-of-breed solution.
18     If you want the best-of-breed solution, you
19 wouldn't be in the pipeline. You wouldn't be one of the
20 companies that Oracle would be talking to in order to
21 facilitate a sale. You wouldn't be one of those
22 companies that Larry Ellison says had approval from
23 mid-management, you know, to sign the deal, and then
24 this was delayed later on by the CFO or CEO. So it is
25 just a hypothetical that I think is inconsistent with

105

1   the facts.
2     Q. BY MR. GIBBS: Okay. But I didn't think you were
3   offering an opinion as to what the facts are regarding
4   the reasons customers delayed or cancelled purchases?
5     MS. WINKLER: Objection. Form. Is that a
6   question?
7     THE WITNESS: I look at the facts in terms
8   of why they were looking -- why they were delaying. I
9   mean, I thought that that was what was implied by your
10  question. I thought that you were actually asking me to
11  go in that direction.
12    Q. BY MR. GIBBS: No, no. You've assumed that the
13  plaintiffs will prove a certain set of facts about the
14  reasons customers decided to either delay or cancel
15  purchases of Suite 11i.
16    I'm asking you if you assume a different set of
17  facts, assume the plaintiffs don't prove that customers
18  delayed or cancelled purchases because of perceived
19  problems with Suite 11i, but instead, just out of a
20  general reference to have best-of-breed products as
21  opposed to a suite, does that affect your loss causation
22  analysis?
23    And I'm -- I don't really care whether you think
24  that hypothetical is likely or not. I'm just asking you
25  to assume those facts as a counter factual to the

106

1   assumption you've made about the plaintiffs proving
2   their case. Tell me whether it affects your loss
3   causation analysis.
4     MS. WINKLER: Objection. Form.
5     THE WITNESS: If Plaintiffs are unable to
6   prove their case, yes, it does impact the loss
7   causation. I have assumed that they will be able to
8   prove their case.
9    Q. BY MR. GIBBS: You also cite a March 16, 2001,
10  Bank of America securities analyst's report in which the
11  analyst suggests that some lost sales or disappointing
12  results may be a result of the product set not reaching
13  a competitive level of functionality relative to
14  best-of-breed factors.
15    Do you have any understanding as to whether the
16  market was aware, either before or during the Class
17  Period, that Suite 11i didn't offer the same depth of
18  functionality as best-of-breed products?
19    A. Well, in terms of -- it would be a remarkable --
20  well, I'm sure there were a lot of different opinions in
21  terms of what level of functionality, you know, various
22  applications that Oracle had compared to best-of-breed
23  applications. And you know, I -- I don't think that
24  they had a full understanding of it because, I mean,
25  that's part of the allegations here in terms of, you

107

1   know, the suite as a complete product.
2    I don't think that they had a full understanding
3   of -- of, you know, the problems and issues that existed
4   about 11i, if that is your question. I mean I am not
5   even sure if I'm answering your question.
6    Q. I'm not either. Let me ask it a different way.
7    Do you have an understanding as to whether the
8   market, before and during the Class Period, believed
9   that Oracle's Suite 11i modules offered exactly the same
10  depth of functionality as the competing best-of-breed
11  products?
12     MS. WINKLER: Objection --
13    Q. BY MR. GIBBS: First, whether -- just whether --
14  do you have an understanding one way or another?
15    A. Yes. I think that if you're talking about
16  specific applications, the best-of-breed is generally
17  the best -- the best with respect to that particular
18  application. So I don't think that Oracle would
19  necessarily concede that their product did not, you
20  know, was not -- did not offer 100 percent the same, you
21  know, functionality as the best-of-breed.
22    But I think -- you know, I read 70 percent, 80 --
23  I think Oracle -- I think Larry Ellison talking
24  about, Well, if I gave you 80 percent of what
25  best-of-breed provide, you really should go with me. "I

108

1   give you what you need, not what you want," I think his
2   exact words were.
3    Q. And I think this is clear, but I want to ask it a
4   different way to make sure.
5    Independently of the assumptions you make about
6   the plaintiffs proving the case, you're not offering an
7   opinion as to what specifically caused Oracle to miss
8   its third quarter 2001 guidance; is that correct?
9    A. That is correct. I mean -- yes. I mean, I
10  haven't looked at internal documents, and I don't know
11  what deals did not go through and so on.
12    Q. Okay. I want to turn back to the price decrease
13  that you observed on March 2nd, 2001.
14    If the loss on March 2nd -- sorry.
15    If the price decline on March 2nd was due to
16  issues that were specific to Suite 11i, would you expect
17  to see a residual price decrease for Oracle's
18  competitors as well?
19    A. On -- well, you would expect it the way that it
20  was announced, certainly you would expect other
21  companies to follow it. If it was specifically
22  announced that it was unique to Oracle and it would not
23  impact these other companies, then you would not see a
24  -- a price decline in the other companies.
25    Q. Okay. So when you --

109

1    A. Necessarily.
2    Q. So when you say you --
3    A. There's an overall risk issue here, too, because
4  you know, when you have what James, you know, discusses
5  as, you know, the bellwether, you know, the bellwether
6  company, the company whose product is providing
7  up-to-the-hour information about, you know, sales all
8  around the world, when they are that wrong, you know,
9  they're -- there is a lot of risks, you know, to other
10  companies, as well from an investor's point of view.
11    If, in this environment, Oracle can be so wrong,
12  what about these other companies?  So I'm not surprised
13  that other companies declined.
14    Q. When you said you would expect other companies to
15  decline the way it was announced, I take it you mean
16  that that doesn't surprise you, in part, because in the
17  announcement, Oracle attributed the miss to general
18  economic factors as opposed to something specific to
19  Oracle; is that correct?
20    MS. WINKLER:  Objection.  Form.
21    THE WITNESS:  The announcement itself is an
22  incomplete announcement.  So when you -- when you have
23  an incomplete announcement, what generally happens is
24  that investors view it in the most negative light, which
25  means that -- negative light because they figure that,

110

1  well, if there was a positive spin on it, or it was some
2  -- you know, so they view it in the most negative light.
3  And the most negative light in terms of these other
4  application -- or these other enterprise software
5  companies and so on, it would be obviously that, yes.
6    Oracle was just blindsided here.  It
7  happened in -- whether it was four days or five days,
8  you know, this is -- there is a significant risk that
9  this would impact our company as well.
10    Q. BY MR. GIBBS:  What's the basis of your statement
11  that when you have an incomplete announcement what
12  generally happens is that investors generally view it in
13  the most negative light?
14    A. Because it increases the risk.  More information
15  decreases the risk because you are more informed; the
16  less information that you have increases risk.  And the
17  way that risk work is the more -- you risk your
18  investments, you know -- you know, it presses the price
19  and vice versus.
20    Q. Okay.  And I don't mean this to be pejorative but
21  that, to me, sounds like a theoretical answer to the
22  question of whether why an incomplete disclosure might
23  be viewed in the most negative light.
24    My question is:  Have you done any quantitative
25  analysis to confirm that hypothesis?

111

1    MS. WINKLER:  Objection.  Form.
2    THE WITNESS:  I have performed no
3  quantitative analysis to analyze your hypothetical
4  because I really didn't know about it until you asked me
5  the question.
6    Q. BY MR. GIBBS:  If your hypothesis is correct, and
7  the market viewed the March 1 announcement in the worst
8  possible light because it was incomplete --
9    A. Right.
10    Q. -- and therefore, believe there was at least
11  significant risk that Oracle's announcement information
12  shadows bad things for other companies in the industry,
13  what would you expect to happen on March 15th when
14  Oracle announces 25 percent applications growth as
15  opposed to 50 percent applications growth?  Would you
16  expect that to have any impact on competitor stock
17  prices?
18    MS. WINKLER:  Objection.  Form.
19    THE WITNESS:  I don't -- I don't think that
20  that necessarily means that there aren't economic issues
21  at play that could impact other companies.  I mean, I
22  think that investors, in general, took wait-and-see
23  attitude in terms of this -- these particular companies.
24    Q. BY MR. GIBBS:  But --
25    A. It is not -- no.  I don't think that the stock

112

1  price would increase.  In the -- you know, I don't think
2  that companies -- companies looked at -- you know, I
3  don't think investors in Microsoft, for instance, would
4  look at Oracle and say, Oh, wow.  It's -- it's -- you
5  have this issue here in application growth and -- and,
6  you know, the database growth.
7    I mean, it didn't change the -- you know, it
8  didn't change the value of Oracle, you know.  I don't
9  see why this information would significantly impact its
10  competitors who effectively followed Oracle.
11    Q. I think you suggested because the March 1
12  announcement was incomplete, investors might view it in
13  the worst possible light and infer risk to other
14  companies in the industry.
15    If the March 15th announcement was at least more
16  complete, wouldn't you expect that more complete
17  announcement to have an impact on stock prices of other
18  companies in the industry?
19    MS. WINKLER:  Objection.  Form.
20    THE WITNESS:  No.  I think that what
21  happened is that people in general -- I mean, first of
22  all, you know, it's -- you're asking the question as if
23  this information for each of these companies was the
24  only information out there with respect to these
25  companies.  It is not -- there's a lot of different

113

1  information out there with respect to these various --
2  various companies. And in order to assess each company
3  and so on, you really have to look at each company
4  individually.
5       Look at -- I mean, why did Ariba continue to
6  decline following March 1st and following, you know,
7  March 15th? Well, it had severe problems. You know, it
8  declined, you know, 75 percent during the Class Period.
9  And it, you know, it -- so I mean it wasn't, you know,
10 the March 1st announcement wasn't, you know, a big
11 revelation in terms of investors in terms of Ariba.
12      If you look at Microsoft and IBM, I think
13 that there were significantly greater issues that
14 were -- were important -- important to them. I think
15 it's wrong to suggest that additional information that
16 didn't even cause a statistically significant price
17 movement in Oracle somehow should have caused a
18 statistically significant price increase in its
19 competitor. I think it's a very, very superficial
20 analysis.
21      Q. BY MR. GIBBS: You didn't conduct any
22 quantitative analysis into the performance of any of
23 Oracle's competitors following the March 1st, 2001,
24 event did you?
25      A. I've looked at it, I mean, particularly since,

114

1  you know, Mr. James, you know, performed his analysis.
2  You know, I noted that PeopleSoft, for instance did
3  rebound quite a bit. You know, I've looked at the
4  price -- declines during the Class Period versus, you
5  know, the price declines following the Class Period.
6  And, you know, for all of these companies and so on.
7       I think they have to -- I think they -- you have
8  to analyze these companies on a company-specific basis
9  because there are just too many variables, you know,
10 with each company. And, you know, when one company goes
11 up, the other one goes down so the index may look like
12 it's flat, but that's not really the story here. You
13 know, there's a reason why some companies decline and
14 other companies increase.
15      Q. Haven't you also suggested, though, that Oracle
16 should have seen the bad results coming because other
17 companies had pre-announced?
18      MS. WINKLER: Objection. Form.
19      THE WITNESS: That has to do with the issue
20 with respect to the economy and that is one of the
21 assumptions. And I think that there are other
22 individuals who are talking about the forecasting and
23 assumptions with respect to the economy.
24      Q. BY MR. GIBBS: Okay. And just to be clear, you
25 said that in response to some of what was in Dr. James's

115

1  reports, you've looked at the performance of some of
2  Oracle's competitors.
3       But just to be clear, I assume because there's no
4  such analysis in either of your reports that that's not
5  something you relied upon in forming your opinions;
6  correct?
7       A. No, that is not.
8       Q. Okay. And other than items that you've already
9  mentioned, do you recall anything else that you noted in
10 looking at the performance of some of Oracle's
11 competitors that you thought was inconsistent with
12 Dr. James's analysis?
13      MS. WINKLER: Objection. Form.
14      THE WITNESS: Yeah. I mean, I think if you
15 are going to do the analysis that Mr. Jame -- James did
16 perform, you know, you have to look at these companies
17 individually and, you know, then you can make, you know,
18 you can make, you know, conclusions based on that. I
19 don't think you can really make much conclusions on what
20 he provided.
21      Q. BY MR. GIBBS: Anything else you can think of,
22 specific pieces of information that you noted that you
23 thought were inconsistent with Dr. James's analysis?
24      A. Not as I sit --
25      MS. WINKLER: Objection. Form.

116

1       THE WITNESS: Not as I sit here right now.
2       MR. GIBBS: This is probably a decent time
3  for a break, if you guys want to do lunch now, and get
4  back as quickly as you can.
5       MS. WINKLER: That's fine.
6       (Discussion off the record.)
7       THE VIDEOGRAPHER: We are now going off the
8  video record. The time is 12:27 p.m.
9       (Lunch recess from 12:27 p.m. to 1:39 p.m.)
10      THE VIDEOGRAPHER: We are now back on the
11 video record. The time is 1:39 p.m.
12      Q. BY MR. GIBBS: Welcome back, Mr. Steinholt. I
13 understand during the lunch break you did some
14 investigation into the number of hours you spent working
15 on this assignment?
16      A. That's correct, yes.
17      Q. Do you have that information?
18      A. Approximately 225 hours.
19      Q. Do you know how much of that was before the
20 submission of your initial report?
21      A. I'm thinking back to when we added it up. I
22 think it was like 80 or 90 hours prior to the initial
23 report. And then it would be 50 to 60, roughly, for the
24 rebuttal, and then the remainder would be subsequent to
25 that.

117

1    Q. Okay. Thank you.
2       Referring you back to the stock price drop on
3  March 2nd of 2001, did you do an analysis -- what the
4  market perceived to be the reason for Oracle missing
5  it's guidance that quarter?
6       MS. WINKLER: Objection. Form.
7       THE WITNESS: I reviewed the media and
8  discussions of media. And, I mean, that's pretty much
9  what I did.
10    Q. BY MR. GIBBS: Okay. But there's no discussion
11  -- well, strike that.
12      You cite a couple of post-March 1 analyst reports
13  discussing the miss.
14      I take it you're saying you reviewed more than
15  the two or so that are cited in your report; correct?
16    A. Correct. I mean, I -- there is -- there are a
17  lot of analyst reports and there are a lot of media
18  reports. And the analyst reports may focus on some
19  things, media reports on other things and so on.
20  Ultimately, of course, it's what investors thought that
21  would be relevant to that particular question. Of
22  course, they do not really write reports explaining
23  their thinking in terms of, you know, why they decided
24  to sell following the announcement.
25    Q. Other than as articulated in your rebuttal

118

1  report, do you disagree with Chris James's analysis of
2  what analysts attributed the earnings miss to?
3    A. I think the analysts' reports speak for
4  themselves; I think the media reports speak for
5  themselves. I mean, I don't think that it is -- I mean,
6  it is what it is. I mean, the text is there and so on.
7  And, I don't have anything to particularly add to those
8  analyst reports.
9      I haven't, you know, tried to get into the minds
10  of the analysts in terms of why did they write this and
11  that and the other. I think the miss speaks for itself.
12    Q. In the course of forming your opinion on loss
13  causation, did you make any assumptions with regard to
14  Oracle's statements that it had saved a billion dollars
15  using its applications?
16    A. It's not a specific assumption; all the
17  assumptions that I relied on are in my report. Of
18  course, the billion dollars savings, it's part of the
19  story, but, you know, I don't -- I didn't make any
20  particular assumptions with respect to it.
21    Q. Okay. I want to turn now to your opinion on
22  materiality. And I'm going to start by asking you some
23  questions about your opening report, the section on
24  materiality starts at page 12, paragraph 28.
25      The first question has to do with the language

119

1  you quote from the Supreme Court's basic decision. At
2  paragraph 28 you write that a fact is material if -- and
3  the first quote is, "there is a substantial likelihood
4  that a reasonable shareholder would consider it
5  important" in making an investment decision, or it would
6  have significantly altered the total mix of information
7  made available.
8      Is this the test you've applied here for
9  forming -- for purposes of forming your opinions on
10  materiality?
11    A. I look at both, yes.
12    Q. Okay. But at least as it's articulated here in
13  paragraph 28 of your report, it's a disjunctive test.
14  If either of the two enumerated conditions are present
15  it's material.
16      Is that how you've applied the test?
17    A. Well, there's no conflict here. It's just that
18  you cannot necessarily test materiality based on price
19  movements. You can only test materiality based on price
20  movement if the information is new. So either for -- and
21  by the way, when I talk about the materiality of it, I'm
22  talking about the materiality of the misrepresentations;
23  in other words, you would look at the difference between
24  what was represented versus what the truth is.
25    Q. Understood. And I wasn't actually getting to any

120

1  analysis of price movements. I didn't understand either
2  of these two conditions to be necessarily tied to
3  movements in the stock price.
4    A. Well, if you have an omissions, for example, if
5  the omission -- if it was revealed, would not cause the
6  stock price to move, then I would consider that to be
7  immaterial. Consequently, I do think that you have to
8  tie it to, you know, the value of the company to the
9  stock price.
10    Q. I understand. And in the case of an omission,
11  because it hasn't been disclosed, you don't have an
12  observable price reaction at the time of the omission in
13  order to reach that conclusion; correct?
14    A. Correct, yes. Exactly.
15    Q. But there are other ways of assessing whether or
16  not an omitted fact, had it been disclosed, would have
17  significantly altered the total mix of information;
18  correct?
19    A. Well, the other way, if you're referring -- the
20  other way is to assess whether or not it -- which is
21  more subjective, is to look at whether or not it is
22  something that would have impacted the value of the
23  company, you know. And in other words, if the value of
24  the company is generally -- you know, the present value
25  of the future cash flow, so then you would have to look

121

1  at the information. Well, if the true information had
2  been disclosed, would that have impacted the future cash
3  flow of the company?
4      Q. Uh-huh. And I thought I heard you say earlier
5  that in the case of a misrepresentation to assess
6  materiality you need to look both at what was said and
7  what was true?
8          MS. WINKLER: Objection. Form.
9      Q. BY MR. GIBBS: Is that fair?
10         MS. WINKLER: Objection. Form.
11         THE WITNESS: That's fair, yes.
12     Q. BY MR. GIBBS: And the question you'd essentially
13 be asking is, if the true facts had been revealed, would
14 that have impacted the value of the company?
15     A. Correct, yes.
16     Q. But is it the case in applying the materiality
17 standard that you've applied here, that it's enough to
18 render something material as long as you conclude that
19 there is a substantial likelihood that a reasonable
20 shareholder would consider it important?
21     A. Are you talking about enough in terms of from a
22 legal point of view or --
23     Q. Well, I'm just trying to figure out how you went
24 about thinking about materiality. I appreciate that
25 you're not offering a legal opinion, but I'm just trying

122

1  to understand how you analyzed it for purposes of your
2  opinion. So just understand I'm not asking you what the
3  legal test for materiality. I'm just trying to
4  understand exactly how you analyzed the issue for
5  purposes of your report.
6          So what I'm trying to get at is: Did you
7  consider something to be material if you believed that
8  there was a substantial likelihood that a reasonable
9  shareholder would consider it important without going on
10 to consider whether the undisclosed facts would have
11 significantly altered the total mix of information
12 available?
13         MS. WINKLER: Objection. Form.
14         THE WITNESS: And the total mix -- yeah.
15 That's a different analysis. In terms of the -- whether
16 or not the information altered the total mix of
17 information available would be a different type of
18 analysis.
19     Q. BY MR. GIBBS: Separate from determining whether
20 there's a substantial likelihood that a reasonable
21 investor would want to know?
22     A. Correct. In other words, if a lie is told on Day
23 One and it causes the stock price to increase, you know,
24 by a statistical significant margin, let's say, $5.00.
25 And then three days later the same lie is told again,

123

1  you wouldn't have another $5.00 increase in the stock
2  price because the information would already incorporate
3  the lie. But that doesn't mean that the lie is not
4  material.
5      Q. Let me turn then to paragraph 31 of your opening
6  report. And I'm not going to walk through the subject
7  matters right now but as I understand paragraph 31 you
8  essentially identify several subject matters that were
9  in your opinion "key issues reasonable investors would
10 look for in the earnings announcement and assess prior
11 to making investment decisions regarding Oracle."
12         Is that language in front of you?
13     A. Paragraph 31, yes.
14     Q. Correct. And the subject matters that you
15 identify as these key issues are Oracle's second quarter
16 2001 earnings and growth, customer acceptance of its new
17 Suite 11i, the impact on Oracle of the slowing economy.
18         Is it your opinion that each of those subject
19 matters referred to there was material? In other words,
20 you say these are key issues reasonable investors would
21 look for?
22     A. (Witness nods head.)
23     Q. Are you with that language intending to suggest
24 an opinion that these issues are material?
25         MS. WINKLER: Objection. Form.

124

1          THE WITNESS: The -- yeah. Let me be
2  specific. If I'm to forecast the future cash flow of
3  Oracle and you know one of the things -- or some of the
4  key things that I would focus on are these particular
5  issues here, so it -- it is issues that goes into my
6  forecast of this company's future cash flows. So that's
7  why these -- this type of information would be material
8  to me, would be important to me --
9      Q. BY MR. GIBBS: Okay.
10     A. -- as an investor.
11     Q. Other than noting the fact that each of those
12 categories of information could affect future cash
13 flows, did you go through any other type of analysis to
14 conclude that those issues are material?
15     A. I'm not -- I don't really know what you mean by
16 any other type of analyses. Are you referring to any
17 specific analyses?
18     Q. No. I'm just trying to make sure I fully
19 understand how you reached the conclusion that these
20 issues -- categories of information are material. And
21 so let me just -- let me try it a different way.
22         I understood you to say that these three subject
23 matters are material because each of them could impact
24 the company's ability to generate future cash flows; is
25 that fair?

125

1     A. Yes. That's fair.
2     Q. Okay. At least in paragraph 31, though, you
3  don't identify any specific statements by any of the
4  defendants regarding any of these subject matters;
5  correct?
6     A. In paragraph 31, no. I'm talking about the
7  subject matter being material based on -- obviously,
8  based on my review of the information, the media, the
9  analyst reports and so on, but these were the key
10 issues, in my opinion, that investors focused on.
11    Q. And would you agree that just because a
12 particular subject matter is material doesn't
13 necessarily mean that anything a company says about that
14 subject matter is material? Would you agree with that?
15    A. Yes, correct. That's why I -- what I was
16 explaining before and that is that you know it has to,
17 you know, impact, you know, the -- it has to impact
18 valuation of the company -- I mean, in order for it by
19 itself to be -- to be material.
20    Q. All right. So, for example, if Oracle
21 incorrectly reported an additional $10.00 of revenue for
22 Q2 2001, that level of misstatement wouldn't qualify as
23 material, would it?
24    MS. WINKLER: Objection. Form.
25    Q. BY MR. GIBBS: A $10.00 mistake?

126

1     A. I cannot imagine that a $10.00 mistake in revenue
2  would cause any change in investors', you know, cash
3  flow models. So, no, it would not be material.
4     Q. For purposes of your materiality opinion, at
5  least in your report, I don't see a discussion of each
6  of the specific allegedly false and misleading
7  statements and a discussion as to whether each of them
8  is material.
9     Am I missing something?
10    A. No --
11    MS. WINKLER: Objection. Form.
12    THE WITNESS: -- in my analysis when I look
13 at these things -- for instance, when I look at
14 misrepresentations with respect to 11i, I think it's --
15 it is really one issue. But there is different ways
16 of -- of misrepresenting, you know, the functionality of
17 the product, whether or not it is fully integrated,
18 whether CRM is fully working, whether ERP -- whether
19 there is customers' acceptance of this product, whether
20 or not it's a viable product basically, you know.
21    And so there are different ways of telling
22 that story to investors. And I didn't, you know, look
23 at every sentence uttered by any of the defendants and
24 look at it on a stand-alone basis. Defendant so and so
25 said this. Okay. Is that by itself material?

127

1     And I mean, there are tons of different
2  things that are said just in the conference call, for
3  instance. How did he answer this question? Well, is
4  that material? How did he answer that? So there's a
5  limit, you know, in terms of when you have an issue like
6  this, you know, whether or not it makes sense to break
7  it down.
8     The issue to me is whether or not the -- you
9  know, whether or not it related to the big picture
10 because, of course, the customer acceptance of 11i and
11 future prospect of the company, whether or not it
12 related to that, I didn't think it was necessary for me
13 to parse it out in terms of every statement or every,
14 you know, misrepresentation.
15    Q. BY MR. GIBBS: We discussed earlier the idea that
16 in assessing whether a misstatement is material you'd
17 need to know both what was said, the misstatement, and
18 also what was true; correct?
19    A. That's correct.
20    Q. So with regard to statements talking about the
21 integration and interoperability of Suite 11i, for
22 example, you haven't performed an independent analysis
23 of what was true about the software's characteristics
24 and capabilities have you?
25    A. I have assumed that Plaintiffs' allegations with

128

1  respect to the state of the software is true and that
2  they will prove that at trial.
3     Q. And those would be the same allegations that you
4  refer to in paragraph 8 of your opening report?
5     A. I think it's a section; I don't think it's
6  necessarily a paragraph --
7     Q. Fair enough. It's the Section 3 which is marked
8  "Assumptions." That's essentially --
9     A. Correct.
10    Q. -- a description of what you assumed they would
11 prove?
12    A. Correct. Yes.
13    Q. And we discussed that in connection with your
14 loss causation opinion.
15    That's also true as to the materiality opinion?
16    MS. WINKLER: Objection. Form.
17    THE WITNESS: In terms of whether or not
18 misrepresentations were material, yes.
19    Q. BY MR. GIBBS: Okay. But I think you also said
20 that to be material it needs to bear on the future value
21 of the company or -- let me say that again.
22    To be material it needs to bear on the value of
23 the company; fair statement?
24    A. Yes -- I mean, the reason that you, you know,
25 have this reasonable investor standard is that what does

129

1  a reasonable investor care about? And a reasonable
2  investor cares about the value of their investment.
3      Q. So hypothetically, a misrepresentation about the
4  product's features and functions that doesn't bear on
5  the value of the company would not be material; fair?
6          MS. WINKLER: Objection. Form.
7          THE WITNESS: If it was something that did
8  not impact its ability to sell the product or had no
9  impact on the future prospect of, you know, of the
10  company's profitability and so on, you know, there could
11  be different features. If it doesn't enter -- if it's
12  something with respect to the product that, you know,
13  customers do not care about, it's not going to impact,
14  you know, their buying decision with respect to, you
15  know, that particular issue.
16          But generally, if it is important to the
17  customer, then it is something that relate to customer
18  demand, and it's something that relate to how successful
19  the product can be sold, and it relates to, you know,
20  the future cash flow of the company.
21      Q. BY MR. GIBBS: If I'm understanding you
22  correctly, though, you are assuming, for purposes of
23  your opinion, that Plaintiffs are going to show
24  misstatements about the product that impacted customer
25  acceptance of the product.

130

1          And it's that impact on customer acceptance that,
2  in your view, renders those statements about the product
3  material; is that fair?
4          MS. WINKLER: Objection. Form.
5          THE WITNESS: That its impact -- it's kind
6  of -- it's whether or not the product is viable from a,
7  you know, from an investment point of view. In other
8  words, if you have the product that is not fully
9  integrated and needs a lot of work to get this, you
10  know, maybe you should go to Sandhill Road and get a
11  venture capitalist to invest in your idea.
12          But in this particular case, you know, it
13  was represented as a viable product that was fully
14  integrated that had all of these particular
15  characteristics, so no issue as to, you know, how much
16  of this can you sell.
17      Q. BY MR. GIBBS: Well you referred a couple times
18  to a viable product.
19          You understand, don't you, that Oracle sold
20  several hundred million dollars' worth of the product
21  before, during and immediately after the Class Period;
22  correct?
23          MS. WINKLER: Objection. Form.
24          THE WITNESS: Correct. And when I talk
25  about the viable product, I'm talking about -- when I

131

1  talk about viable product, product, in this particular
2  context, means the suite. And I think that Oracle was
3  very careful in differentiating its application product
4  as a suite product which, in my view, means that you
5  would have fully integrated -- fully integrated
6  applications, which means the ERP and CRM would be fully
7  integrated so it would all work.
8          So I mean that's a whole point of the suite
9  that, you know, you -- you have low cost of
10  installation, you have very short implementation period
11  and then, you know, when you start running -- running
12  your applications on it, you know, you have all of these
13  cost savings because of the efficiency of the product.
14      Q. BY MR. GIBBS: And all of that, to your
15  understanding, bears on customers' acceptance of the
16  product?
17          MS. WINKLER: Objection. Form.
18          THE WITNESS: Different customers may have
19  different needs. If you have a fully integrated suite
20  that Oracle claimed that they had, then, you know, the
21  potential customers -- I mean the potential companies
22  that would be interested in your product is
23  significantly greater than, let's say, somebody who just
24  wanted one particular application -- or, you know, just
25  a few applications and one little task, you know, in

132

1  some division somewhere.
2          Being fully integrated just open up the
3  market and that's why that is so critical for this
4  particular -- this particular product. And that's why
5  you know when you make representations that GE Powers
6  can run their entire operation on this -- and if this
7  large company can do it, then it satisfies, you know,
8  the needs of a large group of companies, if that is not
9  true -- if it is just the market is really a lot
10  smaller, it's only for businesses that can run, you
11  know, specific, you know, applications that they like
12  and so on but it doesn't -- it's not fully integrated,
13  that's a totally different issue. And that's why that
14  is important to investors.
15      Q. BY MR. GIBBS: Is it your view that investors
16  were expecting that Oracle would sell Suite 11i
17  predominantly to customers using the entire suite?
18      A. It depends on what you mean by "the entire
19  suite," because you have a lot of different
20  applications, and clearly not all of the applications
21  might necessarily be something that a particular
22  customer want. But I do think that in terms of
23  total what is suite, at a minimum I think you have to
24  have the ERP integrated with the CRM so, you know, if --
25  at least have those modules integrated in order to call

133

1    it an integrate suite. My understanding is that they
2    had problems doing that.
3        Q. In discussing the Plaintiffs' allegations about
4    Suite 11i-related statements, you say in a couple of
5    different places that the defendants misrepresented --
6    allegedly misrepresented the level of customer
7    acceptance of Suite 11i?
8        A. Correct.
9            MS. WINKLER: Patrick, are you referring to
10   a specific part of the --
11           MR. GIBBS: Not right now.
12       Q. BY MR. GIBBS: Are you familiar with what I'm
13   talking about?
14       A. I think that this -- the topic that we've been
15   discussing relates to customer acceptance. You can also
16   use different terms. I think I just used, you know, the
17   size of the market, the market opportunity, when it was
18   first introduced in May of 2000 -- you know, Morgan
19   Stanley, in their analyst report, talked about the
20   market opportunity was five times greater that of the
21   databases.
22           And in order to be able to sell to this market,
23   you know, you had to have a certain minimum level at
24   least of integration whereby -- whereby the key modules
25   of the enterprise software, at a minimum, is integrated.

134

1        Q. What specific allegedly false and misleading
2    statements did the defendants make to your understanding
3    about customer acceptance of Suite 11i?
4            MS. WINKLER: Objection. Form.
5            THE WITNESS: I think that statements
6    relating to the Suite 11i getting traction, that they
7    had this large product line -- I'm sorry.
8            -- a pipeline, statements relating to growth
9    expectations. I think there are numerous statements
10   like that that relates to customer acceptance.
11       Q. BY MR. GIBBS: Any others that specifically come
12   to mind?
13       A. Not as I sit here. But I mean, there are -- it
14   -- I mean, there are just numerous statements.
15       Q. By itself does the statement that this suite is
16   integrated expressly address whether or not there is
17   currently customer acceptance of it?
18           MS. WINKLER: Objection. Form.
19           THE WITNESS: That it is integrated? I
20   think that you have to do -- all of these statements
21   have to be viewed together. That's why I think that,
22   you know, you have to have the different components. It
23   does work together.
24           Clearly a suite that is fully integrated
25   will have a larger market. There will be more customers

135

1    interested in a suite that's fully integrated, one that
2    kind of have to be sold more on the, you know, as single
3    application.
4        Q. BY MR. GIBBS: What's the basis for your
5    statement that clearly a suite that is fully integrated
6    will have a larger market?
7        A. Because that was the strategy of Oracle. The
8    strategy of Oracle was to put customers on Suite 11i --
9    put all of the applications on Suite 11i, have it all be
10   integrated because that way you didn't have to spend
11   money after you bought the software on system
12   integration. I mean, that was the whole selling point
13   of the Suite 11i so I'm just reiterating what the
14   company itself stated.
15       Q. Do you have an understanding as to whether or not
16   there was debate in the analysts' community over whether
17   Oracle's suite strategy was a good one?
18           MS. WINKLER: Objection. Form.
19           THE WITNESS: There is -- there certainly
20   was debate in terms of whether or not it was a good one,
21   whether or not they would capture the market share
22   that -- that it -- you know, claimed it would capture.
23   But I think that debate was always -- you know, it was
24   always based on, you know, that they actually had a
25   product that was fully integrated.

136

1            But even if it was fully integrated, you
2    know, there are -- you know, at some companies may not
3    buy -- and this is what we talked about earlier today.
4    I mean, if -- you know, some companies may have very
5    strong customer -- or strong relationship with some of
6    the other application vendors and they may want to stick
7    with, you know, that particular application. If you are
8    going to do so, well, then maybe the suite is not for
9    you.
10       Q. BY MR. GIBBS: And do you have an understanding
11   that some financial analysts believed that the market
12   for an integrated suite of products may actually be
13   smaller than the market for best-of-breed separate
14   products?
15       A. Which analysts are you specifically referring to?
16       Q. I'm just asking if you have an understanding. If
17   you don't recall anything, that's fine.
18       A. No. I recall a lot of different discussions
19   about that particular issue. Particularly prior to
20   Larry Ellison's November 29th presentation, there were a
21   lot of discussions with respect to the suite versus the
22   best-of-breed. And I think that his presentation
23   probably was in response to some of these analysts'
24   reports.
25       Q. And would the existence of debate in the

137

1  marketplace about the size of the market for integrated
2  suites of products affect your view of the materiality
3  of statements to the effect that it was as integrated
4  suite?
5        MS. WINKLER: Objection. Form.
6        THE WITNESS: In terms of the materiality?
7  Q. BY MR. GIBBS: Uh-huh.
8  A. It could if, in fact, the corrective
9  disclosure -- you know, if you don't have a -- you know,
10  when the truth is disclosed -- relevant truth is
11  disclosed, if it's already in the market and there's no
12  price reaction to it, yes, that would obviously impact
13  my analysis and I would say there were no damages.
14  Q. So if it turned out that Oracle was just wrong
15  when it said, "We think the market opportunity is bigger
16  for an integrated suite," and instead it just turns out
17  that the customers prefer best-of-breed regardless of
18  how good your suite is, that would impact your view as
19  to whether or not the integration of the suite were
20  material; correct?
21        MS. WINKLER: Objection. Form.
22        THE WITNESS: If they were just wrong on it?
23  Again, I mean, that's just flat in the face of the facts
24  here because, I mean, that's why, in my opinion, what I
25  did makes a lot more sense when you analyze everything

138

1  together. And if you analyze everything together, you
2  do have companies saying that it has the pipeline, it is
3  gaining traction.
4        And I don't think that you can just
5  separate, you know, one statement and analyze
6  materiality, you know, just on that. And let me give
7  you an example.
8        In the accounting -- for instance,
9  accountants very often particularly -- very often use
10  like a threshold. Well, if it impacts revenues by
11  5 percent, that's a threshold or earnings by 5 percent.
12  That's a threshold of materiality.
13        Well, what if you have two deals, you know,
14  of each impacting earnings by 3 percent each. In
15  combination the two things are material; it meets the
16  materiality threshold. But when you look at it
17  independently, well, it doesn't meet that particular
18  materiality threshold. That's why when you look at
19  materiality, in my opinion, you have to look at the
20  totality of the misrepresentations.
21  Q. BY MR. GIBBS: We discussed the fact that in
22  forming your opinion with regard to materiality you've
23  assumed that the Plaintiffs will succeed in proving the
24  allegations that you discuss in the report.
25        And that that proof will include a showing that

139

1  the true facts impacted the value of the company;
2  correct?
3        MS. WINKLER: Objection. Form.
4        THE WITNESS: That the true facts
5  impacted -- that they are going to show that the true
6  facts --
7  Q. BY MR. GIBBS: Uh-huh.
8  A. No. I think that they have to prove the
9  assumptions in my -- you know, they have to prove -- you
10  know, prove the assumptions that I rely on in order to,
11  you know, conduct my analysis.
12  Q. But that includes some proof that the undisclosed
13  true facts actually have an impact on the value of the
14  company; correct?
15        MS. WINKLER: Objection. Form.
16        THE WITNESS: Well, I mean, I provide that
17  opinion because I look at the stock price reaction, as I
18  just said, on March 2nd to see whether or not it has an
19  impact on the stock price. When you have an omission,
20  you know, you do not have a stock increase. But what
21  you can do is look at the price decline following the
22  dissemination of that information and see whether or not
23  it impacts the stock price. So -- so I mean it would be
24  material.
25  Q. BY MR. GIBBS: Okay. But in -- and in the

140

1  context of statements about the performance or
2  functionality of Suite 11i, the analysis you've just
3  described of looking at the stock price impact upon
4  disclosure requires an assumption that the Plaintiffs
5  will prove that the undisclosed proof about Suite 11i
6  product problems caused the miss?
7        MS. WINKLER: Objection. Form.
8        THE WITNESS: I think I specifically state
9  that -- I mean, there has to be -- and we discussed this
10  when we were just discussing loss causation. If, in
11  fact, the earnings miss was caused by something
12  unrelated to their allegations, well, then, there
13  wouldn't be loss causation.
14  Q. BY MR. GIBBS: Understood. Is it fair to say
15  then that your materiality opinion essentially flows
16  from your loss causation opinion?
17        MS. WINKLER: Objection. Form.
18        THE WITNESS: It is related to the loss
19  causation opinion, yes. And the quantification of
20  damages is -- I mean, it's all related.
21  Q. BY MR. GIBBS: Well, understood. But the -- as
22  you point out in the case of an omission, we don't have
23  an observable stock price impact at the time of the
24  omission in order to say, "Okay. This undisclosed fact
25  caused the stock price to go down."

141

1      I think you've said, though, that you've looked
2  at the stock price movement at the time of disclosure
3  and that indicates that the undisclosed information was
4  material; correct?
5      MS. WINKLER: Objection. Form.
6      THE WITNESS: That is consistent with my
7  materiality opinion. And if it had not been consistent
8  with my materiality opinion -- in other words, when the
9  truth was disclosed that there was no price movement,
10  for instance, well, you know, then it would be
11  inconsistent, and, you know, you would have to go back
12  and see whether or not some of their allegations may be
13  incorrect.
14      I don't think that the materiality of the
15  subject matter -- it wouldn't be that -- it wouldn't be
16  material. It would be more likely that the information
17  already was in the market, that that would be the reason
18  why the stock price did not decline when the truth was
19  revealed.
20      Q. BY MR. GIBBS: For purposes of assessing the
21  materiality of any category of statements, have you done
22  any quantitative analysis other than looking to the
23  stock price decline on March 2nd of 2001?
24      MS. WINKLER: Objection. Form.
25      THE WITNESS: Yes. I mean, I looked at the

142

1  stock increase on December 15th of 2000.
2      Q. BY MR. GIBBS: Okay. Anything else?
3      A. Quantitatively?
4      Q. Yes.
5      A. Well, I mean, as I observed, obviously, that
6  there is a significant price increase on November 30th
7  of 2000. We, you know, discussed that at length this
8  morning.
9      Q. But as we discussed that, that wasn't part of
10  your forming your opinion as expressed in the reports;
11  correct?
12      A. That was something I looked at in order to
13  determine whether or not it was consistent with my
14  opinion.
15      Q. I want to ask you a few questions about the third
16  quarter 2001 forecast and then subsequent statements
17  that you say maintain the alleged price inflation.
18      First of all, as to the initial forecast itself,
19  what did you assume to be the truth? In other words,
20  Oracle said, We're going to have revenue in the
21  following amount. We're going to have growth in the
22  following amount and EPS in the following amount. So
23  that's the alleged misstatement.
24      What did you assume to be the truth at the point
25  in time?

143

1      MS. WINKLER: Objection. Form.
2      THE WITNESS: Well, I assume that there is
3  not a reasonable basis for making that particular
4  forecast.
5      Q. BY MR. GIBBS: Anything beyond that?
6      A. In terms of what I assumed I -- I mean, again,
7  you know, I can talk about it in greater detail, but in
8  terms of what the assumptions are, you know, what's in
9  my report. But looking at those assumptions -- for
10  instance, one of the things that I am assuming is that
11  Oracle would report a 10¢ a share for the second quarter
12  of fiscal 2001. The basis for their 12-cent second
13  quarter earnings -- estimate earnings, per share
14  estimate that you are specifically asking me about was
15  supported by Jeff Henley on the conference court (sic)
16  by stating that, Well, traditionally, the third quarter
17  is slightly better than the second quarter and looking
18  at the past three years sequentially, you know, it has
19  been up by one penny. Consequently, you know, they
20  thought that they would be able to make 12¢.
21      Well, if they had reported 10¢ using the same
22  logic, then it obviously -- the explication would be 11¢
23  for the third quarter of fiscal 2001.
24      Q. Did you assume for purposes of assessing the
25  materiality of the initial December 14th, 2000, forecast

144

1  that the true facts were -- would have been to forecast
2  11¢ a share?
3      MS. WINKLER: Objection. Form.
4      THE WITNESS: Not -- I did not assume
5  anything other than what is in my assumption page.
6  However, I'm explaining to you why I thought it was
7  important and why it would have been important to
8  investors. It certainly would have been important to
9  the -- to the -- you know, to Oracle's CFO, apparently,
10  if that is the logic for his 12¢ per share earning
11  sentiment.
12      Q. BY MR. GIBBS: But we talked about the concept
13  that in order to judge the materiality of a misstatement
14  you look both at the misstatement itself and then at
15  what's true. For example, if Oracle made its forecast
16  and that forecast was incorrect by a material amount --
17  let's use the revenue assumption again. They forecast
18  revenue $10.00 higher than they had support for.
19      That wouldn't be a material misstatement, would
20  it?
21      MS. WINKLER: Objection. Form.
22      THE WITNESS: Whenever you -- whenever the
23  forecast error, as you pointed out in the question, is
24  immaterial, that would not be a material statement.
25      Q. BY MR. GIBBS: Okay. So in order to know whether

145

1  the incorrect forecast is material, you need to know
2  what's true, by how much is it incorrect; right?
3      MS. WINKLER: Objection. Form.
4      THE WITNESS: Correct. And that is why, for
5  the purpose of my analysis, I have assumed that the
6  company should have reported 10¢ a share for the second
7  quarter of 2001.
8      Q. BY MR. GIBBS: But does that necessarily imply
9  that they should have forecast 11¢ a share for the third
10  quarter?
11      A. It means that they should have reported that.
12  And whether or not the company would have forecast
13  11 shares or -- or 11¢ per share or 12¢ per share, I
14  don't know. I'm just saying that the reason they -- for
15  them, as explained in the conference call, was that
16  for -- the reasoning for forecasting 12¢ was that they
17  thought that there would be a sequential increase in
18  earnings of a penny per share. So if they use the same
19  reasoning, well, it logically would follow that it would
20  be -- they would forecast 11¢ per share.
21      But that's not assumption that I have made. It
22  is -- you know, I can't -- you know, I don't know what
23  they would have forecast. I do assume, however, that
24  they did not have a reasonable basis for making the
25  forecast they did, which is, you know, 12¢ with the

146

1  75 percent application growth and the 15 to 20 percent
2  database growth.
3      Q. What does it mean to say they don't have a
4  reasonable basis?
5      A. Well, for the purposes of my analysis, it is
6  something that, you know, it's not supported by, you
7  know, the information that was known by Oracle
8  internally.
9      Q. Okay. Does that mean they need to know they're
10  going to miss it?
11      A. You don't know the future. You never know the
12  future but you have to have a reasonable basis.
13      And the reasonable basis, in this case, seemed to
14  be that they have a strong pipeline and that they have
15  traction for their Suite 11i, you know, product.
16  However, if those things are false, then the foundation
17  on which the forecast is made is not there and that
18  makes the projections unreasonable.
19      Q. So, for purposes of the initial forecast on
20  December 14th, 2000, you've assumed, for materiality
21  purposes, that Oracle didn't have a reasonable basis for
22  that forecast.
23      Did you make any other additional or different
24  assumptions about what information Oracle had at the
25  time of the subsequent statements you refer to and

147

1  characterize as reaffirming guidance --
2      MS. WINKLER: Objection.
3      Q. BY MR. GIBBS: -- or was the assumption
4  essentially the same for those ensuing statements?
5      MS. WINKLER: Objection. Form.
6      THE WITNESS: Again, my assumptions are
7  what's in the report in terms of the -- and, you know, I
8  have made no changes to those assumptions as, you know,
9  things progressed. And there maybe -- I mean, you know,
10  if -- there may have been a change and there may not
11  have been a change. I don't know. I haven't made any
12  assumptions one way or another.
13      Q. BY MR. GIBBS: Have you made any assumptions or
14  determinations as to whether Oracle's state of knowledge
15  changed over time about the reasonableness of the
16  forecast?
17      MS. WINKLER: Objection.
18      Q. BY MR. GIBBS: Or does it not matter to your
19  analysis?
20      A. I base my analysis on my assumptions, and I have
21  not conducted any, you know, any specific independent
22  analysis of Oracle and what they knew, when they knew it
23  and so on, based on both these internal documents and so
24  on.
25      Q. Is the same thing true as to statements regarding

148

1  the impact of the economy on Oracle?
2      MS. WINKLER: Objection. Form.
3      THE WITNESS: Same thing in terms of me
4  looking at internal documents?
5      Q. BY MR. GIBBS: Correct.
6      A. As I said, I mean, I have not looked at a host of
7  internal documents to, you know, figure out what the
8  company knew in terms of -- in terms of the economy. I
9  mean, that's information that was obviously not publicly
10  known; it was only known to Oracle. And I think that
11  you need to do a comprehensive analysis of that, which,
12  obviously, I have not performed.
13      Q. So on the question of whether Oracle's state of
14  knowledge regarding the impact of the economy on its
15  business that quarter, you don't have an opinion one way
16  or another as to whether or not that state of knowledge
17  changed over time?
18      MS. WINKLER: Objection. Form. Asked and
19  answered.
20      THE WITNESS: That it changed over time?
21      Q. BY MR. GIBBS: Uh-huh.
22      A. Again, I have not reviewed the internal documents
23  to figure out what Oracle knew at what point in time
24  internally with respect to the impact of the question on
25  their business.

149

1    Q. In paragraph 38 of your opening report, you
2 conclude the paragraph by saying, "In my opinion, these
3 statements acted to maintain the inflation in Oracle's
4 stock price."
5        Do you have that language in front of you?
6    A. Correct.
7    Q. What's the basis for your opinion that these
8 statements acted to maintain inflation in Oracle's stock
9 price?
10   A. They acted to maintain -- let me just make sure I
11 have --
12   Q. Sure.
13   A. We are talking about the statements in paragraph
14 36 and 37. Is that what we're talking about?
15   Q. It appears that way to me.
16   A. In terms of these particular statements, I think
17 that one of the things that is constant is their
18 guidance in terms of their forecast. And that the
19 economy, you know, they had not, you know, the economy
20 had not caused them to change their -- their forecast.
21 So by maintaining their -- the forecast that they
22 provided at the beginning of the Class Period this --
23 this would also maintain any inflation in the stock
24 price resulting from -- from the allegedly false and
25 misleading financial projections provided at the

150

1 beginning of the Class Period.
2    Q. And so the reference to the inflation is the
3 inflation that you discuss in paragraph 35 just leading
4 into those paragraphs?
5    A. I would see what I discussed in paragraph 5.
6    Q. Uh-huh.
7    A. I think in paragraph 35 -- actually, paragraph 35
8 specifically discusses the price increase in Oracle's
9 stock price following the second quarter earnings
10 announcement. So it only has one component of it.
11 There's also, of course, in the -- you know, if the
12 truth had been disclosed at that point in time, you
13 know, according to my analysis, it would have declined.
14 Consequently, the inflation is greater than just the
15 price increase on that day.
16   Q. You mentioned that one of the assumptions
17 supporting your assessment of the materiality of the Q3
18 forecast is that Oracle should have reported 10¢ a share
19 EPS for the previous quarter as opposed to 11¢ a share;
20 correct?
21   A. That's correct.
22   Q. And again, I'm going to ask you to consider an
23 alternative hypothesis.
24       What if Oracle's second quarter 2001 reported EPS
25 was correct? Does that change your assessment of the

151

1 materiality of the Q3 2001 forecast?
2    A. The materiality of -- of the forecast?
3    Q. I appreciate that. We're talking about the
4 materiality of the alleged misstatement, not the
5 forecast, per se, so that's helpful.
6        So again, for purposes of my hypothetical, assume
7 that Oracle correctly reported 11¢ per share earnings
8 for the second quarter 2001.
9        Does that change your assessment of the
10 materiality of the alleged misstatement in Oracle's Q3
11 2001 forecast?
12   A. Well, the earnings announcement was one piece of
13 information that the investor used in order to assess
14 the future prospect of Oracle. It by no means was the
15 entirety of the information available that was used by
16 investors to forecast, you know, the future prospect of
17 the company and, specifically, the future prospect with
18 respect to 11i.
19       And that's what I was talking about this morning.
20 You know -- you can misrepresent and mislead, you know,
21 five different ways. But what if you take one of them
22 out of it? Does the four remaining still mislead
23 investors? It's something that I would like to consider
24 some more before I would make an opinion about it.
25       MR. GIBBS: All right. We need a new tape

152

1 and I'm going to switch subjects anyway. So why don't
2 we just take five real quickly?
3        THE WITNESS: Okay. Thank you.
4        THE VIDEOGRAPHER: This is the end of
5 Videotape Number 2. We are now going off the video
6 record. The time is 2:35 p.m.
7        (Recess.)
8        (Mr. Williams no longer present.)
9        THE VIDEOGRAPHER: This is the beginning of
10 Videotape Number 3. We are now back on the video
11 record. The time is 2:48 p.m.
12 BY MR. GIBBS: Before we move on to a different subject,
13 I just want to clarify something.
14 It's not your understanding, is it, that Oracle, in
15 putting together it's forecast for Q3 2001, just added a
16 penny to the Q2 2001 results; correct?
17   A. I have not, you know, looked at internal
18 documents to -- to figure out what Oracle did. So, you
19 know, I have no knowledge, one way or in the other, what
20 went -- what they did in order to come up with their
21 12¢ -- my comment was more -- 12¢ earnings per share
22 estimate. My comment was simply on what was stated on
23 the conference call.
24   Q. Okay. Now, I want to turn our attention to the
25 price increase that you observed in Oracle's stock on

153

1     December 15th of 2000.
2          First of all, you found a statistically
3     significant price increase in Oracle stock on
4     December 15th; correct?
5          A. That's correct, yes.
6          Q. You write, and this is -- let me find the page
7     for you. This is -- carries over from page 17 to
8     page 18 of your opening report; it's in paragraph 35.
9          You write, "In my opinion, absent the allegedly
10    inflated earnings reported and false third quarter 2001
11    guidance, Oracle's stock price would not have increased
12    as it did on December 15th, 2001, following the second
13    quarter earnings announcement."
14         Am I correct in understanding that you have
15    attributed the entire residual price increase on
16    December 15th to the two items referenced in that
17    sentence I just read?
18         A. What I've done is to look at information that was
19    -- all of the information that was revealed on that day,
20    and there are positives and there are negatives and so
21    on. But in terms of information that was significant to
22    investors at -- caused the stock price to increase, I
23    attributed attribute that to application growth and
24    outlook for application.
25         Q. How did you go about determining that it's those

154

1     two items that are significant to investors?
2          A. I don't know if -- now, you're talking about two
3     items. I don't really distinguish the two items. I'm
4     looking at where the company -- I'm looking at what
5     investors focused on at that point in time. And what
6     everybody was looking at, you know, what the -- based on
7     my review of the report and so on, investors were very
8     focused on application -- the application growth.
9          And one of the reasons is that, you know, in the
10    past couple of weeks, Oracle's stock price had increased
11    quite significantly as a result of statements made by --
12    by the company, specifically relating to application
13    growth. Investors were expecting a strong second
14    quarter, and -- and application -- application growth is
15    -- was the primary thing that, based on my review of the
16    analyst reports and commentary, that investors -- that
17    they looked at.
18         Q. So your opinion that it was the allegedly
19    inflated earnings reported for the second quarter and
20    the allegedly false third quarter 2001 guidance that
21    caused the residual price increase on the 15th, that's
22    based on your review of various materials indicating
23    that investors viewed applications growth as an
24    important factor in Oracle's future prospects; is that
25    fair?

155

1          A. Yes. Analysts looked at application growth, and,
2     as I said before, Oracle beat expectations with respect
3     to application growth. My recollection is that
4     investors expected between 50 to 55 percent application
5     growth, came in at 66 percent. So they -- they beat the
6     application growth quite substantially.
7          They also, you know, discussed various -- you
8     know, the pipeline was strong and this, that and the
9     other. But I think that, in terms of the new
10    information at that point in time, related to the
11    numbers relating to application growth, and the
12    inferences that investors would have drawn from that
13    with respect to application growth in the future.
14         Q. So you mentioned that you don't really think of
15    these as two things. The sentence I read to you refers
16    to the allegedly inflated earnings reported for the
17    second quarter and the allegedly false guidance for the
18    third quarter.
19         You don't view those as two separate things;
20    correct?
21         A. Well, I think that in terms of the specific
22    statement, I think that it is, is the guidance with
23    respect to application -- I mean, it all relates to
24    application growth and the future. That's the common
25    thing that both these things have, and that is, you

156

1     know, what is going to happen in terms of applications
2     in the future.
3          And I think it was very important for Oracle, at
4     that point in time, to show that they actually had
5     growth in applications. It's one thing to say that, you
6     know, you are going to be -- that you are going to
7     achieve certain milestones. It's a different thing to
8     meet them, and in this case, significantly beat that
9     particular milestone. And that provides an investor
10    with a certain comfort with respect to the future -- you
11    know, with respect to the -- Oracle's ability to meet
12    the numbers in -- in the future.
13         Q. You didn't try to quantify or allocate the
14    December 15th price increase between the Q2 results and
15    the Q3 forecast, did you?
16         MS. WINKLER: Objection. Form.
17         THE WITNESS: Again, I view it as more as
18    one thing. It all relates to the future expectations
19    with respect to the application growth. Consequently,
20    no, I did not do any type of allocation.
21         Q. BY MR. GIBBS: So if a jury were to conclude that
22    Oracle's Q2 2001 results were correct, would you say,
23    nonetheless, that 100 percent of the price inflation you
24    observe on December 15th is attributable to the Q3
25    forecast?

157

1     MS. WINKLER: Objection. Form.
2     THE WITNESS: Well, you have to remember
3   that -- that the driving force in my analysis is
4   actually the price decline. I -- I do what's called
5   back casting, which basically means that inflation --
6   the damages are derived from the actual price decline at
7   the very end. It is not derived from the pricing
8   increase. But, you know, if -- if facts changes in
9   terms of what Plaintiffs will be able to prove, it's
10  something I'd like to consider.
11    Q. BY MR. GIBBS: I understand that -- that for
12  purposes of calculating damages you used the price
13  decline on March 2nd.
14    I understood you to have used the price increase
15  on December 15th to support your opinion about the
16  materiality of certain statements; is that fair?
17    A. That's correct, yes.
18    Q. Okay. And in that regard, if a jury were to
19  conclude that Oracle's Q2 2001 results were correct,
20  would that change your conclusion about what caused the
21  residual price increase on December 15th?
22    MS. WINKLER: Objection. Form. Asked and
23  answered.
24    THE WITNESS: In terms of my materiality
25  conclusion, no. I -- no. I mean, this was --

158

1   application growth was material to -- to investors, and
2   I think that that price increase demonstrates that, in
3   fact, the application growth was important to investors
4   regardless of what the jury conclude. And a jury may --
5   I mean, I make no judgment on the jury one way or in
6   another, but it's not relevant to -- to my economic
7   analysis of what was important to investors.
8     Q. BY MR. GIBBS: Set aside for now the stock price
9   increase on December 15th of 2000.
10    As a general matter, is it your view that a
11  reduction in a company's cost structure can positively
12  impact it's value?
13    A. It could, yes.
14    Q. Is it your understanding that during the December
15  14, 2000, conference call, Oracle announced reductions
16  in its operating cost structure?
17    A. Yes, they did.
18    Q. But you didn't attribute any of the residual
19  price increase on the 15th to that announcement;
20  correct?
21    A. No. I mean, in terms of looking at that
22  particular issue, or I look at it in totality.
23  There were a lot of different items, positive and
24  negative, and you could attribute, you know, well, this
25  would have caused a little bit increase, this is a

159

1   little bit of decrease, and so on. And, you know,
2   database sales, for instance, were a little bit lower.
3   And so maybe that was a negative, you know, maybe the
4   improved margin was a positive and so on.
5     But there was another issue there with respect to
6   the operating margins and that is, you know, what
7   investors expected. It was not unusual during this
8   period of time for Oracle to be these type of estimates.
9     First of all, the margin expansion started many,
10  many quarters ago. I think that they had double-digit
11  margin expansions for the previous four quarters, so to
12  have double-digit margin expansion was not something
13  that was, you know -- you know, unexpected.
14    The other thing is that I think the operating
15  margins themselves -- my recollection is that it was
16  probably at 36 percent; you can correct me if I'm wrong.
17  But that is still below the target for the year. The
18  target for the year that Oracle had was 40 percent. And
19  Oracle was in the process of moving towards a target.
20  So it's still below, you know, target. It's
21  still operating margins below what Microsoft had, for
22  instance, which, my recollection is, that they were
23  actually above the 40's.
24    The other thing, and that is important to
25  consider in terms of operating margins, is how important

160

1   is it to investors relative to applications. For
2   instance, if you go to the first quarter, for instance,
3   they also had this margin expansion; they also had
4   positive -- they also had positive growth in their
5   database business. But the one thing that was negative
6   was the growth in application business.
7     Now, you can look at that, observe that and come
8   to some conclusion in terms of, you know, how does the
9   investors interpret that information? And the stock
10  price, of course, declined because application was the
11  driving thing for this particular -- for this particular
12  stock. So you have to consider all of these things in
13  evaluating the issue of margin expansion.
14    Q. Did you analyze whether the market anticipated
15  the second quarter results that Oracle announced on
16  December 14th?
17    A. Yes. I looked at whether or not they anticipated
18  the second quarter results. And, by the way, on the
19  margin issue, there was just one thing I just wanted to
20  say, and that is one of the allegations in this case has
21  to do with overpayments and using overpayments.
22    And when you look at -- when you take the
23  operating margins and drop it down to -- to the
24  earnings, the margins, the net margins, of course, are
25  being impacted. The operating margins are also being

161

1    impacted by the alleged fraud so it's not as if the
2    operating margins itself is just separated from the
3    alleged fraud. But, in any event, the -- I did look at
4    the commentary prior to the second quarter earnings and,
5    you know, what investors expected.
6        Q. And what did they expect?
7        A. Based on my review, investors expected a strong
8    second quarter. The so-called whisper number probably
9    was at 11¢, that's probably what the expectation was.
10   The consensus estimate by analysts was 10¢. I did see
11   some -- in one media report, I recall seeing some
12   whisper number of 12¢, even. But certainly, you know,
13   investors were expecting a very strong quarter.
14       Q. Okay. So you suggested that the margin
15   improvement may not have been material because the
16   market may have anticipated it, but I think I heard you
17   say that the market was anticipating strong second
18   quarter results, as well.
19       So why are those two things different?
20       MS. WINKLER: Objection. Form.
21       THE WITNESS: I don't know if you -- did I
22   say that -- you're saying that I said that margins were
23   not important to investors. I think it was important to
24   investor. I think that's what you have to focus on, is
25   whether or not there was a driving force for significant

162

1    change in the price. I don't think it was.
2        Q. BY MR. GIBBS: Okay. I appreciate that
3    clarification. You're right. That was the issue we
4    were talking about, but I'm still confused as to why the
5    two issues are treated differently.
6        I understand you to have concluded that the
7    margin improvements, in your view, were not responsible
8    for the price increase, and one reason you gave me for
9    that conclusion is that you think investors, to some
10   extent, expected the margin improvement. It sounds like
11   there is also some indication that investors anticipated
12   very strong results for the second quarter.
13       Why does that not undercut the conclusion that
14   these strong results reported for the quarter caused the
15   December 15th price increase?
16       MS. WINKLER: Objection. Form.
17       THE WITNESS: Good. And the distinction I'm
18   making is the distinction between reporting 11¢ and
19   reporting 66 percent growth, net application. So if --
20   I think you're correct in -- in -- you know, that is
21   investors and -- you know, I agree with you that
22   investors did, in fact, expect a strong quarter. They
23   probably expected 11¢, which is what the company
24   reported. But the growth in applications, they did not
25   expect 66 percent application growth.

163

1        To the best that I can figure, the
2    expectation -- the consensus expectation probably was
3    around 50 to 55 percent; 66 percent is significantly
4    greater than that. And because application business was
5    so important to the future of this company, that's why I
6    attribute the price increase to that application
7    business.
8        Q. BY MR. GIBBS: Okay. So the difference between
9    66 percent, on the one hand, and 50 to 55 is significant
10   in this context?
11       A. In this context?
12       Q. Uh-huh.
13       A. Yes. I mean, in -- you can look at the first
14   quarter announcement to see what the miss is, and you
15   can -- you can also look at -- you know, you can see
16   what happens when companies miss, and you can see what
17   happens when a company exceeds expectations with respect
18   to application growth.
19       But even more important than that, you can review
20   pretty much -- you can review the analyst reports, and I
21   think that that 66 percent growth number was one of
22   those numbers that, you know, very often was in the
23   headline of the analyst reports and so on. It was one
24   of the key issues that analysts discussed because it was
25   the most important, you know, part of the earnings

164

1    release and that is, you know, the application.
2        How is -- how are applications doing in the
3    quarter? Is there any support for this notion that the
4    company is gaining traction in the application business?
5        And, you know, the 66 percent growth number
6    provides that type of refirm -- that type of support for
7    Oracle's story.
8        Q. What about the Q3 forecast? Do you know whether
9    before the December 14th, 2000, call, the market had any
10   expectations about what Oracle's Q3 2001 results would
11   be?
12       MS. WINKLER: Objection. Form.
13       THE WITNESS: I think that the market, in
14   general, had roughly, in terms of -- when you say the
15   forecast, are we talking about the 12¢?
16       Q. BY MR. GIBBS: Yes.
17       A. Yes. I think it was the same. My recollect --
18   there may have been some analysts that increased it
19   to -- I think there was some that increased it to 13¢,
20   but in terms of the consensus, when you take the average
21   of everything, I think it ended up being 12¢.
22       Q. And if the -- and that's before the December 14th
23   call; correct?
24       A. Correct. It actually goes back until -- I think
25   it goes back actually prior to -- prior to -- it goes

165

1    back to November, even. I mean, it goes very, very far
2    back. I don't think that analysts changed that third
3    quarter -- that third quarter estimate very frequently.
4        Q. So if the consensus estimate before the December
5    14th, 2000, call was 12¢ a share, does that undercut
6    your conclusion that the Q3 forecast of 12¢ a share that
7    Oracle gave on December 14th caused the stock price
8    increase that you observed on the 15th?
9        A. No. Because as I said before, number one, I'm
10   not focusing on the 11¢ per share number itself. I'm
11   focusing on what is communicated with the growth in the
12   applications.
13       And another thing is that there are two aspects
14   in terms of value. One aspect is the future cash flows,
15   and the other aspect is the riskiness of these cash
16   flows.
17       Now, the riskiness of the cash flows are
18   significantly less if you have a product that's fully
19   integrated, that works, that have the different modules,
20   whether it's CRM or ERP, working together. So the
21   riskiness of it is significantly less if you can
22   demonstrate that -- that a product actually works.
23       Q. At footnote 4 of your rebuttal report, and that
24   is on page 5, you cite an article by David Tabak,
25   T-A-B-A-K, and Frederick Dunbar, D-U-N-B-A-R. Let me

166

1    know when you have that in front of you.
2        A. Frederick -- oh, yeah. Exhibit B?
3        Q. Yes.
4        A. Yeah. Okay. Yeah, I've got it.
5        Q. Did -- and that article talks about event
6    studies.
7        Did the views expressed in that article inform
8    your event study analysis of the December 15th price
9    increase?
10       A. I don't understand the question. Did this
11   article inform my events study?
12       Q. Yes.
13       A. What do you mean "inform"?
14       Q. Well, let me -- let me ask you a specific
15   question.
16       In Section 19.2, they write that the stock price
17   impacts of an event can reveal the effects on future
18   cash flows if four conditions are met.
19       A. It's at 19.2, okay.
20       Q. And the conditions they identify are the event is
21   well-defined -- is a well-defined news item or series of
22   items, the times that the news reaches the market is
23   known, there's no reason to believe the market
24   anticipated the news, and it's possible to isolate the
25   effect of the news from the market industry and other

167

1    firm-specific factors affecting the firm's stock price.
2        Did you review that portion of this article?
3        A. I did not specifically review that portion, but I
4    don't have a problem with it.
5        Q. Okay. You agree with those four factors?
6        A. I agree with the four -- I mean, I don't have any
7    -- I don't take an issue with any of these particular
8    factors.
9        Q. Okay. In your view, were each of those four
10   conditions met with respect to the December 14th
11   announcement?
12       A. Well, it's a little bit different because -- but,
13   you know, I -- generally what you would do in an events
14   study is to first, you know, focus on the -- define the
15   event. The event in this particular case is, you know,
16   the false and misleading statement that was disclosed on
17   December 15th.
18       However, I went the next step and that is have an
19   opinion in terms of -- because there were a lot of new
20   information that was disclosed on that day, and that is
21   to isolate which portion of -- of the information that
22   was disclosed on that day that I attributed the price
23   increase to. In other words, I don't think that there
24   is an inconsistency in terms of attributing the price
25   increase to the earnings release, but that is not all I

168

1    did in order to conclude that it was the growth in
2    application that caused the increase -- or the
3    information relating to applications that caused the
4    increase in the stock price on that day.
5        Q. What else did you do?
6        A. That's what I've -- we've been discussing, and
7    that is to review analyst reports, review what investors
8    were focused on and look at what was the driving
9    factors. What were the factors? What is the type of
10   information that drove Oracle's stock price?
11       Q. Let me turn now to your damages calculation, your
12   shared damages calculation.
13       A. Okay.
14       Q. You didn't calculate aggregate damages; correct?
15       A. That is --
16       MS. WINKLER: Objection. Asked and
17   answered.
18       THE WITNESS: That is correct, yes.
19   Q. BY MR. GIBBS: Why not?
20       A. In order to calculate aggregate damages, you had
21   to have more data than was available in this particular
22   case. I've been in cases where I've provided an opinion
23   on aggregate damages where I have such data available.
24   In this case, I just do not have enough data, either
25   from institutions or from other sources, to calculate

169

1    aggregate damages.
2        Q. What data was missing?
3        A. Well, if I had information in terms of shares
4    purchased during this time period, I certainly could
5    have calculated the aggregate damages, but the publicly
6    available data -- information does not provide that
7    information for the specific time period.
8        Q. And you're not offering an opinion as to damages
9    suffered by someone who sold shares before the March 1,
10   2001, miss; correct?
11       A. I have no opinion one way or in the other, you
12   know, I haven't -- you know, I just focus on damages per
13   share.
14       Q. Okay. And in doing that, you mentioned that you
15   used a back casting approach; correct?
16       A. That's correct, yes.
17       Q. And that involved the creation of a value line?
18       A. Correct.
19       Q. Is it your opinion that the value line you've
20   calculated represents the true value of Oracle's stock
21   price that contains no effect of the alleged fraud?
22       A. Yes. It's -- the objective of the value line is
23   to calculate the price where the stock would trade
24   absent the alleged fraud, yes.
25       Q. And then at paragraph 53 of your opening report,

170

1    you write, "The value line was then calculated using the
2    predicted returns for the fraud-related days (December
3    15th, 2000, through March 2nd, 2001), and the actual
4    returns for all other days as discussed above."
5        Do you see that language?
6        A. Yes, I do see that language. And that is
7    consistent with the academic articles that I provided as
8    support.
9        Q. Okay. So it's December 15th, 2000, through March
10   2nd, 2001, not "and"?
11       MS. WINKLER: Objection. Form.
12       THE WITNESS: Well, the inflation would
13   start following the -- in terms of when the Class Period
14   starts. I'm not quite -- you know, you would have to
15   look in the Complaint exactly the date that they
16   started. I think it probably -- yeah. It would include
17   December 15th.
18       Q. BY MR. GIBBS: Okay. And your report calculates
19   inflation on December 14th, as well; is that correct?
20       A. There is -- yes. I mean, you have inflation on
21   that particular day. I don't know if that day should be
22   included or not. In the Complaint, it appears as if 14
23   is included. It seems to me, at the same time, that
24   logically it should start -- if it starts with the
25   earnings announcement, that it really should start on

171

1    December 15th. But that's beyond -- I mean, I don't
2    know. I mean, you --
3        Q. Where did the inflation number come from that
4    your report reflects for December 14th, how is that
5    number calculated?
6        A. Correct. That's the back casting methodology.
7    It takes up inflation that was created from -- by the
8    December 15th, 2000, announcement. Whatever is
9    remaining in terms of inflation is there. And if the
10   Class Period had started, for instance, on November
11   30th, I would have kept that inflation that's on -- on
12   December 14th, and I would have started the whole thing
13   on November 30th.
14       Q. So it's an arithmetic calculation. It's just the
15   inflation that you calculate at the end of the -- the
16   inflation you calculate using the March 2nd price drop
17   minus the inflation that you calculated on December
18   15th.
19       What's left over is what you've attributed as
20   inflation on December 14th; is that correct?
21       A. Yes.
22       MS. WINKLER: Objection. Form.
23       Q. BY MR. GIBBS: It's just a matter of subtraction?
24       A. It's a matter of -- well, actually, I -- the way
25   that I -- I calculate a value line so inflation actually

172

1    flows from the value line. It's the difference between
2    the price less the value line.
3        Effectively, what happens mathematically is that
4    you do get inflation that represents -- and that is
5    constant on a percentage basis. I mean, that's just a
6    mathematical reality during -- you know, from
7    December 15th through the end. And you would also have
8    the same inflation ribbon, you know, if -- let's just
9    assume that the Class Period started on November 30th
10   through December 14th.
11       Q. On that issue, your inflation amount goes from
12   11.32 percent -- if you want to open Exhibit I, you
13   might want to. I'm going to ask you some questions
14   about that.
15       Your inflation amount goes from 11.32 percent on
16   12/14 to 17.44 percent on 12/15, which is an increase of
17   6.13 percent.
18       Are you with me so far?
19       A. I don't see those numbers here, but I assume you
20   have calculated them and that's what they are.
21       Q. I do, too. You show a residual return, however,
22   of 7.18 percent? And that's from Exhibit I, taking the
23   positive 3.86 actual return minus the predicted return
24   of negative 3.31?
25       A. I'm sorry. What do you do now? You're in -- on

173

1    Exhibit I.
2        Q. Exhibit I, and we're looking at the residual
3    return on the 15th.
4        A. The residual on the 15th -- oh, the 7.18?
5        Q. Uh-huh.
6        A. Right.
7        Q. Why is there a difference between the -- let me
8    start over again.
9            The inflation that you show on 12/14 and then the
10   inflation that you show on 12/15 reflects an increase of
11   6.13 percent.
12           Why is that different from the 7.18 percent
13   residual return?
14           MS. WINKLER: Objection. Form.
15           THE WITNESS: I -- I'm not -- I think I
16   understand what the question is so let me answer it.
17   And then -- because it's -- I know you're sitting there
18   with some percentages that I do not have in front of me.
19   And so, again, there's -- this whole analysis flows from
20   the calculation of the value line and there are
21   different ways of -- you know, I'm not trying to
22   calculate, per se, inflation per share.
23           And I'm doing it based on an out-of-pocket
24   measure of damages. And you can get different results
25   as a result of that. I can -- I'm trying to think. The

174

1    actual -- if you want to know more -- maybe I should
2    just refer to one of the papers I have because it kind
3    of addresses a little bit of that particular issue.
4            I think you -- we were talking about the
5    materiality of -- the materiality report. You know, I
6    -- you know, instead of -- it's a little bit complicated
7    and so instead of me trying to explain it, let me just
8    reference you to where to go to get the answer.
9            If you look at footnote 28 in the
10   Materiality and Magnitude of Advanced Studies in the
11   Courtroom, it talks about how you can actually come up
12   with using different assumptions and so on. You can
13   actually come up with a different inflation level using
14   different methodologies. And even -- and both of them
15   may be valid from an economic point of view, but it's
16   based on different assumptions.
17       Q. BY MR. GIBBS: Okay. You used what's often
18   referred to as a constant percentage approach to
19   calculating per share damages; correct?
20       A. I prefer to use the value line approach.
21       Q. Okay. But you expressed the -- the difference
22   between price and value in terms of percentage; correct?
23       A. Yes. I mean, what happens is that the value line
24   approach, if -- not always, but in most cases when it
25   relates to issues such as this, will result in using

175

1    this particular methodology and -- that I'm using, will
2    result in, you know, what some refer to as a constant
3    percentage ribbon, yes.
4        Q. Are you aware of any scientific or academic
5    literature that endorses the use of this constant
6    percentage approach?
7        A. I -- yes. I mean, I -- I provided two articles
8    that, you know, has support for this particular
9    methodology.
10       Q. Is one of those the Thorsen, Kaplan and Hakala
11   article?
12       A. No.
13       Q. Okay. Which ones are the ones that endorse the
14   constant percentage approach?
15       A. Well, I -- let me see if I have this. I think it
16   was an appendix to my original report. In footnote 9 of
17   my original report and in footnote 8 of my original
18   report, I cite two articles and I use the same
19   methodology as proposed in these two articles. And
20   obviously, when you do this type of -- I mean, it's just
21   a mathematical -- you know -- you know, it's just
22   mathematical -- I mean, it ends up being on a percentage
23   basis.
24       Q. Can you think of any other academic or scientific
25   literature that endorses the percentage approach, other

176

1    than the two cited in footnotes 8 and 9 of your opening
2    report?
3        A. Actually, cited in these articles, one is a
4    reference manual for how to calculate damages in these
5    cases. So cited in those articles are, you know,
6    numerous article in terms of the academic support for
7    this particular methodology.
8        Q. Okay. Anything more recent than 2001?
9        A. No. I think they must have been so good that
10   nobody cared to update the articles.
11       Q. At paragraph 52 of your opening report, towards
12   the bottom -- I'm sorry.
13           -- towards the middle, really, you say -- let me
14   know when you're there.
15       A. Yes, I'm here.
16       Q. Okay. Towards the middle of the paragraph, very
17   center, you say, "Had defendants provided complete and
18   truthful disclosures during the Class Period, this would
19   have been incorporated into Oracle's stock price from
20   the very beginning of the Class Period, and Oracle's
21   stock price would not have declined as it did when the
22   relevant truth was revealed on March 1st, 2001."
23           Do you have that language in front of you?
24       A. Yes.
25       Q. Does your damages calculation assume that Oracle

177

1  could have announced on 12/14/2000, exactly what it
2  ended up announcing on March 1st, 2001?
3          MS. WINKLER: Objection. Form.
4          THE WITNESS: Well, if the information that
5  was available on March 16th was available on
6  December 15th of 2000, then the stock price of Oracle
7  would be substantially different than -- because, you
8  know, we know what the stock price was on March 2nd of
9  2001; it was $16-and-change. So if all of that
10  information had been known earlier on, well, we know
11  what -- you know, how investors value that information.
12  They valued the company at $16-and-change.
13          So, no, I do not assume that everything that
14  was known on March 2nd would have been known in March --
15  no, on December -- the first day of the Class Period.
16  What I'm looking at is the incremental, you know,
17  difference, which is actually the price decline. That's
18  what I'm looking at.
19      Q. BY MR. GIBBS: If I understand your calculations
20  correctly, though, you have calculated a residual return
21  based on the March 2nd, 2001, stock drop of negative
22  16.68 percent; is that correct?
23      A. What exhibit are you on now?
24      Q. Good question.
25          MR. FRIEDMAN: Look at Exhibit H.

178

1          MR. GIBBS: Exhibit H?
2          THE WITNESS: And we're looking at the price
3  decline on March 2nd, which is $16.68, yes.
4      Q. BY MR. GIBBS: If I understand your damages
5  methodology correctly, you have attributed that entire
6  residual price decline to the alleged fraud?
7      A. In other words, what I'm saying is that if the
8  truth had been disclosed with respect to the problems
9  with 11i, you know, that there wouldn't have been --
10  this price decline would not have occurred because the
11  shortfall of the product would already have been known
12  in the market.
13      Q. Understood. And I'm -- what I'm getting is the
14  fact that you've attributed 100 percent of that decline
15  to the fraud allegations. In other words, you're
16  leaving out the possibility that some amount of that
17  decline had something to do with factors other than
18  fraud.
19          Is that a fair characterization of your opinion?
20          MS. WINKLER: Objection. Form.
21          THE WITNESS: Not really, because, I mean,
22  what I -- what I do is I look at what the market and
23  industry did at that point in time, and I exclude that
24  from my, you know, from the price decline. And then I
25  look at what the company-specific portion is that is

179

1  remaining, and based on -- you know, this is what we
2  discussed earlier on. And that is, you know, well,
3  what's the driving force here, you know -- you know, was
4  the shortfall caused by -- or the shortfall caused by
5  factors that relate to the alleged fraud or not. And if
6  it is, yes, that is the component that, you know, you
7  would use in order to calculate damages.
8      Q. BY MR. GIBBS: Okay. I do understand that
9  through your regression analysis you have removed market
10  factors and industry factors. And -- but just -- I want
11  to clarify one thing.
12          You've removed industry factors, in your view, by
13  using the NASDAQ 100 index; correct?
14      A. I reviewed, yeah, market and industry factors,
15  yes. I mean, the NASDAQ 100 includes large technology
16  companies and, obviously, you know, would have been
17  impacted by the downturn in the technology market and so
18  on. But it's not as focused as James's index, for
19  instance.
20      Q. Understood. And what you're left with after
21  having removed market and industry factors is a
22  calculation of a stock price decline attributable to
23  Oracle-specific information; correct?
24      A. That's correct, yes.
25      Q. And you have concluded that 100 percent of the

180

1  Oracle-specific information that caused that residual
2  price drop was related to fraud; correct?
3      A. This -- yes. I mean, this damage analysis looks
4  at the entire company-specific portion of that price
5  decline as relating to the alleged fraud in this matter.
6  Now, you know, after -- as the trial progresses and so
7  on, if somebody would attribute 50 percent to it or 20
8  percent or 75 percent, sure, you know, I mean, that's --
9  you know, you can use different percentages and so on,
10  depending how the facts shape up at the trial. But, I
11  mean, for this purpose and assuming that Plaintiffs can
12  prove all of their allegations, you know, you would use
13  the entire company-specific portion of the price.
14      Q. So the conclusion for now, that 100 percent of
15  the residual decline after taking into account market
16  and industry factors is attributed to the fraud, is
17  based on the assumption that Plaintiffs will essentially
18  prove their liability case in the way you've described
19  it in your reports?
20      A. Yes. That is -- I base my analysis on their
21  assumption, yes. On the assumption that was provided to
22  me by Plaintiffs, yes.
23      Q. If the residual price drop on March 2nd was
24  16.68, why is the inflation you've calculated during the
25  Class Period 17.44?

181

1    A. That's actually similar to the question that you
2  asked me earlier, where I pointed to -- my recollection
3  was it was footnote 28 of the paper, that it was
4  attached -- the materiality paper. And it depends --
5  the way that they explain it is it depends on, you know,
6  what you -- what do you take out first? Do you take the
7  market component out first or do you take the company
8  component out first or not?
9        I would have explained it a little bit different
10  because it really relates to whether or not --
11  whether -- to your assumption whether or not you're
12  doing a value line where the assumption is that an
13  investor would have purchased the same number of shares,
14  or if you do an analysis where you assume that that
15  investor would have invested the same dollar amount in
16  the stock price.
17        The out-of-pocket measure of damages and the
18  value line approach assumes when calculating damages
19  that the investors -- you know, looks at the economic
20  impact assuming that the investors would have purchased
21  the exact same number of shares. So that's why there is
22  a difference, but it's also explained in that footnote
23  we discussed.
24    Q. Is there a particular reason for selecting the
25  assumption that investors would have purchased the same

182

1  number of shares as opposed to the same dollar amount
2  worth of shares?
3    A. Well, it is -- well, first of all, the articles
4  that I -- that I provided that discusses a value line
5  approach -- and when you do a value line approach, that
6  is the way that you calculate it. In terms of you know,
7  an alternative approach which would be that investors
8  would have, you know, invested the same amount, you
9  could do that, but it is not one that is commonly used
10  in these type of -- these type of cases.
11    Q. And just following up on the notion that you've
12  attributed 100 percent of the residual price decline on
13  March 2nd to fraud-related factors, I take it you have
14  not attempted to allocate that residual price decline on
15  March 2nd among the various categories of misstatements,
16  like statements about the economy, statements about
17  integration of Suite 11i, or the Q3 2001 forecast, as
18  three examples; correct?
19        MS. WINKLER: Objection. Form.
20        THE WITNESS: I believe that the -- well, I
21  mean, I believe that the company-specific price
22  decline -- I mean, I haven't allocated any specific
23  portion to these particular allegations as I think they
24  are -- kind of relate to the same type of issues, and
25  it's kind of similar things that we discussed before

183

1  today.
2    Q. BY MR. GIBBS: So if a jury were to find, for
3  example, that Suite 11i was integrated, so all those
4  statements about Suite 11i being integrated were true,
5  would that affect your damages calculation?
6        MS. WINKLER: Objection. Form.
7        THE WITNESS: When you say "integrated," you
8  mean fully integrated, that their CRM and ERP is fully
9  integrated and it works as a suite?
10    Q. BY MR. GIBBS: Yes.
11    A. I think that that is something I would have to
12  consider.
13    Q. But there's no way to know from the work you've
14  done so far whether and to what extent that would reduce
15  your damages calculation?
16    A. If you're talking about product that's fully
17  integrated CRM and ERP, yes. I mean, that is something
18  that I would want to consider in greater detail, yes.
19    Q. The same is true of the other categories of
20  statements that I've described.
21        You haven't separately considered them to decide
22  or analyze whether your damages calculation would change
23  if a jury rejected one or more of those theories or
24  categories of statements?
25        MS. WINKLER: Objection. Form.

184

1        THE WITNESS: Yes. I mean, there -- from a
2  practical point of view, there are just too many
3  different outcomes, you know, they can reject A and B
4  and -- I mean, and -- I mean, there are so many
5  different statements and so on.
6        It's from a practical point of view, I don't
7  think that, you know, you could -- I don't think it
8  would be worthwhile, at this point in time, to speculate
9  as to what the jury might or might not do.
10    Q. BY MR. GIBBS: Okay. As you sit here today, if
11  you needed to do that, do you know how you would?
12        MS. WINKLER: Objection. Form.
13        THE WITNESS: Again, that would require some
14  thought, too, in terms of what the methodology would be
15  because, you know, you're -- in this area, you work with
16  imperfect information. Consequently, you would have to
17  look at what -- what data is available and what is the
18  best data to use in order to -- to determine, you know
19  -- to come up with an answer.
20    Q. BY MR. GIBBS: And as we discussed, you have
21  expressed the residual price drop on March 2nd, 2001,
22  and by residual means having excluded market and
23  industry factors; correct?
24    A. Correct. That -- it's the portion of the price
25  decline that is left over, it's net of market in

185

1  industry, yes.
2      Q. We've been talking about that as expressed in
3  terms of a percentage.
4      A. Correct, yes.
5      Q. That percentage is derived from an absolute
6  dollar amount residual price decline on March 2nd;
7  correct?
8      A. No. It's not derived from an absolute -- that
9  would require me to focus on the dollar -- I mean, it is
10  -- the process is that first you determine what the
11  value is, and then, number two, the second step of the
12  process is to come up with inflation, which is the
13  difference between the price and the value.
14     Q. Understood. And derived is probably too strong a
15  word.
16         In calculating that percentage, you start with a
17  dollar drop that occurred on March 2nd, excluding market
18  and industry factors; correct?
19     A. I actually -- no. I mean, the -- you look at the
20  percentage price decline. That's -- that is why, you
21  know, we looked at percentages. All effective studies
22  in this field are return-based. In other words, they
23  look at percentage changes. Nobody look at dollar
24  changes when they analyze the stock prices. That's why
25  everything I do is return-based; it's based on

186

1  percentages.
2      Q. Okay. Let me --
3      A. So we don't go first to dollars and then
4  translate that into percentages. What we do is to look
5  at, you know, the percentage returns, and we analyze the
6  percentage returns.
7      Q. Okay. Oracle's stock dropped by a dollar on
8  March 2nd; correct?
9      A. Correct.
10     Q. And your regression, in your opinion, shows that
11  some portion of that drop was attributable to market and
12  industry factors and some portion is attributable
13  Oracle-specific information; correct?
14     A. Correct. I mean, I distinguish between the two.
15     Q. And for the portion that reflects Oracle-specific
16  information, could express that in terms of a dollar
17  drop on March 2nd; correct, the residual dollar drop on
18  March 2nd?
19     A. Yes. I mean, what you could do is to look at
20  that dollar drop, which is also -- which is kind of an
21  alternative way of looking at damages, which, I think,
22  is where you're going with this.
23     Q. I'm trying.
24     A. To speed it up up. You're looking at -- because
25  there are two different ways of calculating --

187

1  potentially calculating damages from an economic point
2  of view, and one is to look at the dollar drop at the
3  very end and the other one is to look at inflation at
4  the time of purchase.
5      Q. Okay. So is there a reason for selecting the
6  percentage basis as opposed to the dollar drop basis, in
7  your view?
8      A. Yeah. I mean, is there a reason to look at
9  inflation at the time of purchase versus the dollar
10  drop? Yes, there is a reason for that.
11     Q. What's the reason?
12     A. It is because that is the out-of-pocket measure
13  of damages, that is the reason. If you -- if you -- for
14  instance, let's be specific in terms of this particular
15  case.
16         If you -- if investors' losses was purely
17  measured by the price decline, the dollar price decline,
18  well, then it wouldn't matter -- and let's assume that
19  it doesn't matter what inflation was. The only thing
20  that matters is that there was a price decline.
21         In that case, all investors, whether you
22  purchased prior to the Class Period or in the Class
23  Period, you know, would be entitled to damages; it's
24  just based on that price decline. However, the way the
25  law has evolved in this area is that, you know, you look

188

1  at inflation at the time of purchase is one of the
2  components you look at in arriving at calculating
3  damages.
4      Q. But in the example you just gave, if someone
5  purchased before the misrepresentations were made, they
6  weren't affected by that.
7      A. They weren't affected by it at the time they
8  purchased it, but they were affected by it at the time
9  the price decline occurred.
10     Q. That's true; whether those would be damages, I
11  guess, is a legal issue, but --
12     A. Well, I mean -- I mean, I don't think that they
13  have damages because I use an out-of-pocket measure of
14  damages. But, I mean, what I'm explaining to you, it is
15  because there is no inflation at the time that they
16  purchased their shares.
17         Now, if you're telling me that I should ignore
18  the inflation-type methodology, that inflation at the
19  time of purchase is irrelevant, the only thing that's
20  relevant is the price decline, well, you know, that's
21  kind of inconsistent with the law and inconsistent with
22  the way that these things -- these damage analysis are
23  conducted.
24     Q. What's the law you refer to?
25     A. Well, my understanding is that you have a Class

189

1  Period and if there is not inflation at the time of the
2  purchase -- you know, if you didn't purchase during --
3  during the Class Period, you don't have a case. And,
4  presumably, that is predicated on the fact that there is
5  no inflation at the time of purchase if you purchase
6  prior to the Class Period.
7      There's actually pretty good -- pretty
8  interesting paper on that particular topic. It is -- if
9  you look at Exhibit A of my rebuttal report, I quoted it
10 for a completely different reason. But it's kind of --
11 it's kind of relevant to this particular issue, whether
12 or not you measure damages based on the dollar price
13 decline or whether or not you measure it based on
14 inflation per share, because one of the things that
15 invariably happen is that, you know, you have a
16 consistent -- if you're using inflation methodology, you
17 have consistent methodology that you use in every case.
18     What defendants generally -- and from an economic
19 point of view, this makes sense as a comprehensive way
20 of doing it, from an economic view it makes sense. What
21 defendants generally argue is that no, you have to take
22 the lesser of the two; in other words, when you look at
23 the price decline if that -- if the price decline, the
24 dollar price decline is less than inflation, well, then
25 you use -- then you use the dollar price decline.

190

1      However, if inflation is less than the dollar
2  price decline, well, then they switch, then they
3  flip-flop and say, well, then, you know, you have you
4  have to use the inflation. Now, there's no economic
5  basis for doing so; it's all based on the law. And it's
6  beyond the scope of what I do, and legally, it may or
7  may not be true.
8      But the conclusion of this -- of this paper is
9  that while this methodology of doing the minimum of the
10 inflation and the price decline, the conclusion is that
11 while this may be unfair to Plaintiffs, laws are not
12 always designed to be fair.
13     Now, maybe there is a law that says that you have
14 to only -- that you can only use the price decline, in
15 which case -- hey, you know, it's the same event
16 analysis and you have the price decline in this
17 particular case that I have estimated based on my event
18 analysis. But that is beyond the scope of my -- beyond
19 the scope of my opinions.
20 Q. Okay. I want to follow up on something you said
21 during the prior answer but it's deep in there.
22     You said something to the effect that there's no
23 economic basis for doing so. And I don't know whether
24 you were talking about no economic basis for using the
25 dollar drop measure or no economic basis for choosing

191

1  between percentage-based and dollar drop-based.
2      Which of those did you mean?
3      MS. WINKLER: Objection. Form.
4      THE WITNESS: Good question. There is an
5  economic basis for doing either. You can argue either,
6  you know, because it's based on the assumption that you
7  put into it which is whether or not you use -- you know,
8  you assume that the same number of shares would have
9  been purchased absent the alleged fraud, or if you
10 assume that, you know, the same dollar amount would have
11 been purchased.
12     But what is not part of the economic
13 analysis is this notion that you have to look at
14 which yields -- which results in the lesser damages and
15 automatically pick the lower damage number. Now, that
16 is a legal issue and that has to do with, you know, loss
17 causation and so on.
18 Q. BY MR. GIBBS: Okay. So -- but from an economic
19 standpoint, either way is an economically valid way of
20 measuring the loss experienced by shareholders?
21 A. Yes. But I want to just add to that, that if you
22 do use the dollar drop methodology and if, in fact,
23 inflation at the time of purchase is relevant, then, as
24 explained actually on page 13 of this report, then
25 purchasers prior to the Class Period would also be

192

1  entitled to damages. It specifically states that
2  limiting damages to the amount of overpayment -- in
3  other words, using my methodology prevents pre-Class
4  Period purchasers from having a claim. So, you know,
5  in -- so that is one of the reasons, you know, why my
6  methodology is consistent with the way that these things
7  are conducted, you know, generally.
8  Q. Okay. I don't have too much more on this but I
9  do -- I want to ask you to -- whether you have a
10 reaction to something.
11     Using the methodology you have used, the damages
12 per share could increase from one day to another day
13 even though there's no fraud-related event between those
14 two days, there's no disclosure of the fraud, there's no
15 additional fraudulent statement. And so, for example, I
16 picked January 31st and February 1st of 2001. The
17 damages per share increases by 16¢ per share, but as far
18 as I can tell nothing fraud-related happened between
19 those two prices.
20     So why is it that the defendants should be liable
21 for that 16¢ increase in the damages? They didn't do
22 anything.
23     MS. WINKLER: Objection. Form.
24     THE WITNESS: Well, you know, for each day,
25 you have a value. They are liable for the difference

193

1    between the price and the value on that particular day.
2         And so, you know, if -- as the price
3    changes, the inflation would change. And consequently,
4    you know, if you're using an out-of-pocket measure of
5    damages that is the result of it.
6    Q. BY MR. GIBBS: But you would agree with me,
7    though, that there's no loss causation until the
8    corrective event happens; correct?
9         MS. WINKLER: Objection. Form.
10        THE WITNESS: I have only looked at loss
11   causation relating to the -- to the corrective event,
12   that is correct.
13        The question that we are discussing right
14   now, how do you measure damages, and that is: Do you
15   measure damages by the amount that you've overpaid, or
16   do you measure damages by an actual price decline on
17   March 2nd?
18   Q. BY MR. GIBBS: Okay. Let me turn to your
19   calculation of damages under Section 20A.
20   A. Okay.
21        MS. WINKLER: Patrick, we've been going
22   about an hour.
23        MR. GIBBS: Oh, do you want to take --
24        MS. WINKLER: Do you need --
25        MR. GIBBS: That would be fine.

194

1         MS. WINKLER: Yeah. It would be good to
2    take a break.
3         THE VIDEOGRAPHER: We are now going off the
4    video record. The time is 3:55 p.m.
5         (Recess.)
6         (Daniel Pfefferbaum no longer present.)
7         THE VIDEOGRAPHER: We are now back on the
8    video record. The time is 4:07 p.m.
9    Q. BY MR. GIBBS: Okay. Before the break, I was
10   about to start asking about your calculation of
11   Section 20A damages.
12        You've calculated damages under Section 20A using
13   two different methodologies, one of which is just
14   applying your inflation amount for the days on which
15   shares were sold by the 20A defendants; correct?
16   A. That's correct, yes.
17   Q. And the other is based on the difference between
18   the actual sales price at which the 20A defendants sold
19   their stock and the average closing price for March
20   16th, 2001, through April 30th, 2001; correct?
21   A. That's correct, yes.
22   Q. How did you pick that time period?
23   A. My understanding is that that was the window --
24   if they were to wait until they actually disclosed third
25   quarter until they sold, this is the window that they

195

1    had to -- they could use to sell the shares. That's my
2    understanding. So I -- I wouldn't know exactly which
3    day they would -- the shares would have been sold so I
4    used an average.
5    Q. But I'm trying to understand where -- where did
6    the understanding that that was the window come from?
7    A. I asked the attorneys, the plaintiffs' attorneys.
8    Q. Did March 16th have anything to do with the
9    March 15th announcement or something else?
10   A. Yes. I mean, you know, you -- you wouldn't trade
11   prior to the earnings announcement because, you know,
12   you're -- you know, the window would not be open.
13   Q. So you mean -- I'm sorry. You mean the -- the
14   trading window under Oracle's standard insider trading
15   policy?
16   A. Yes. Although I -- that wasn't -- I assumed that
17   to be true but I think that, you know -- you know, I'm
18   pretty certain that they would not be able to trade
19   during March 2nd through March 15th, but I specifically
20   asked, you know, in terms of the trading window where
21   they could trade. And my understanding is that is the
22   trading window where they could trade.
23   Q. Okay. So -- well, why two weeks, roughly two
24   weeks, any particular reason?
25   A. I looked at the average stock price during the

196

1    entire period because I -- you know, you don't know
2    exactly when they would have sold their shares. I
3    thought, then, the average -- if this is the measure --
4    if this is the correct measure of damages, then an
5    average would make sense.
6    Q. I understand why you used an average as opposed
7    to daily amounts, but I'm trying to get at why an
8    average over the course of two weeks?
9    A. An average over the course of two weeks?
10   Because --
11   Q. Why two weeks and not some other period? Oh, I'm
12   sorry, I'm sorry. Yeah. It's late in the day.
13        It's not two weeks; it's six weeks.
14   A. Yeah. My understanding is that that is the
15   entire trading window.
16   Q. Okay. You didn't do any analysis of your own to
17   pick those dates.
18        You essentially got the trading information from
19   Plaintiffs' counsel?
20   A. Correct, correct.
21   Q. Why not just use the price -- closing price on
22   March 2nd?
23   A. The closing price on March 2nd? My understanding
24   is that they could not have traded on March 2nd.
25   Q. Okay. Did you do any analysis to insure that

197

```
1    factors, other than the fraud -- let me start over.
2        The price dropped in March 2nd -- I'll start over
3    again.
4        The average closing price that you've used to
5    calculate these damages is lower than the closing price
6    on March 2nd; correct?
7    A. That's correct, yes.
8    Q. Okay. So did you take any steps to determine
9    whether the decrease in price from March 2nd through
10   this period resulted from factors other than the fraud?
11   A. No. Because this analysis is -- I think
12   determined an avoidance of loss analysis so it's a
13   different type of an analysis than these other types of
14   analyses. My understanding is that this is the
15   appropriate methodology in order to calculate the
16   avoidance of loss, whether or not the loss is
17   fraud-related or nonfraud-related.
18   Q. What's the basis for your understanding that this
19   is the methodology, did you review any academic
20   literature?
21   A. No. I -- I -- my understanding with respect to
22   the appropriate way of calculating 20A damages comes
23   from Plaintiffs' counsel.
24   Q. Okay. Similar questions about the drop in the
25   price from the date the insiders sold but before the
```

198

```
1    March 1, 2001, disclosure.
2        I take it, given the methodology you were told to
3    apply, it doesn't matter that the stock price dropped
4    between the time the 20A defendants sold and March 1,
5    2001, for factors having nothing to do with the fraud;
6    is that correct?
7        MS. WINKLER: Objection. Objection. Form.
8        THE WITNESS: My understanding of that
9    analysis is that it's the difference between the price
10   you sell the shares and the value on the date that --
11   that you sell the shares. So that is derived from my,
12   you know, my event analysis, the damages per share
13   analysis. So, you know, the -- when -- you know, public
14   investors overpaid for their shares by whatever the
15   damages per share number is and what occurred subsequent
16   to that, my understanding is irrelevant to this
17   particular calculation.
18   Q. BY MR. GIBBS: Well, I was actually trying to
19   focus on the loss avoidance calculation.
20   A. Oh, okay. I'm sorry.
21   Q. I take it from what you've told me, though, for
22   purposes of your loss avoidance damages calculation, it
23   doesn't matter that the stock price dropped from the
24   date of the defendants' sale to March 1st, before the
25   disclosure event -- corrective event; correct?
```

199

```
1    A. It doesn't matter that it dropped? The only
2    thing that matters are the average price and the price
3    that the insiders sold their shares at. And, you know,
4    the -- you know, it's -- I think maybe what you're
5    asking me, you know, is whether or not this price
6    decline, the difference between those two numbers,
7    whether or not it was fraud-related or not, does that
8    matter to my calculation, and the answer is no.
9    Q. Okay. Is it your view, though, that the fraud
10   enabled the 20A defendants -- the alleged fraud, enabled
11   the 20A defendants to avoid that stock drop between the
12   date of their last sale and March 1st, 2001?
13       MS. WINKLER: Objection. Form.
14       THE WITNESS: Yeah. I have no opinion one
15   way or another with respect to this. This is pretty
16   much a mechanical calculation from my point of view.
17   Q. BY MR. GIBBS: Okay. We've talked about some of
18   your critiques of Chris James's work.
19       Are your criticisms of Professor James' opening
20   report set forth fully in your rebuttal?
21   A. Yes. I mean, it is what I've discussed today and
22   what I have, you know, included in the rebuttal report,
23   yes.
24   Q. Okay. And we've talked about some criticisms you
25   have of Professor James's rebuttal report, as well. And
```

200

```
1    I'm sure you can't remember everything you said here
2    today in that regard.
3        But as you sit here right now, can you think of
4    any particular criticisms you have of Professor James's
5    rebuttal report that we haven't discussed?
6    A. As I sit here right now, no.
7    Q. We talked about some work that you did in
8    connection with the November 30th increase in Oracle
9    stock price.
10       Have you done any other additional work since you
11   completed your rebuttal report?
12       That's not very precise. Let me -- let me try
13   that again.
14       I understand you probably prepared for your
15   deposition.
16   A. (Witness nods head.)
17   Q. I'm trying to get at whether you did any new
18   analytical work after preparing your rebuttal work,
19   other than the work you did relating to the November
20   30th price increase?
21   A. No. I mean, the -- I -- I reviewed a lot of -- I
22   reviewed the documents all over again and the stock
23   prices all over again. And, in terms of analytical
24   work, you know, I did look at -- and I discussed that
25   earlier today. I looked at, you know, the -- the price
```

201

1  movements of the individual stocks that Mr. James
2  included in his peer group index and so on. But --
3      Q. Nothing else you can think of as you sit here?
4      A. Nothing else in terms of analytical work. It has
5  been predominantly review of, you know, media, analysts
6  in combination with, you know, stock prices and things
7  like that.
8      Q. Do you have plans to do any additional specific
9  analytical work before you testify in this case?
10     A. Not other than what I have discussed today and --
11 I mean, and what I have previously done, no.
12     Q. Okay. Have you ever been an employee of the
13 Milberg Weiss firm?
14     A. No, I have not.
15     Q. Have you ever been an employee of the Lerach
16 Coughlin firm?
17     A. No, I have not.
18     MR. GIBBS: Just take two seconds. I don't
19 want to go off the record.
20     (Interruption in proceedings.)
21     MR. GIBBS: Okay. I have no further
22 questions.
23     THE WITNESS: Okay. Thank you.
24     MS. WINKLER: I am probably going to have a
25 few. I want to take just a real quick break, and I

203

1  conference; is that correct?
2      A. That's correct, yes.
3      Q. I'm going to show you what's been marked as
4  Exhibits 6 and 7 and ask you to take a look at those.
5      A. Exhibit 6 is the Credit Suisse First Boston
6  analyst report that I was referring to this morning.
7  And that stated that Larry Ellison and Jeffrey Henley
8  made several positive and upbeat presentations on
9  Wednesday, November 29th, and it goes on in the next
10 page to summarize issues and so on that was discussed at
11 that conference.
12     Q. And do you recognize Exhibit 7?
13     A. Exhibit 7 is the Bloomberg article that I was
14 referencing earlier this morning. And because it's
15 after the market closed, it also talks about the
16 increase in Oracle's share price of $3.63 and attributes
17 that to yesterday's comments from Ellison and Henley.
18     MS. WINKLER: That's all the questions I
19 have.
20     MR. GIBBS: I have nothing.
21     THE VIDEOGRAPHER: Okay. This concludes
22 today's proceedings. The number of video tapes used was
23 three.
24     We are now going off the video record. The
25 time is 4:28 p.m. Thank you.

202

1  won't be long.
2      MR. GIBBS: Okay.
3      THE VIDEOGRAPHER: We are now going off the
4  video record. The time is 4:19 p.m.
5      (Recess.)
6      (Exhibits 6 and 7 marked.)
7      THE VIDEOGRAPHER: We are now back on the
8  video record. The time is 4:25 p.m.
9
10     EXAMINATION BY MS. WINKLER
11     Q. Good afternoon, Mr. Steinholt.
12     A. Good afternoon.
13     Q. I have just a few questions for you this
14 afternoon.
15     In response to questioning this morning, you
16 discussed a November 29th, 2000, First Boston investor
17 conference; correct?
18     A. That's correct, yes.
19     Q. And you also discussed that you had listened to
20 the audio of that conference on Bloomberg; is that
21 correct?
22     A. That's correct. There's a 70-plus minute audio
23 on Bloomberg, and I listened to it, yes.
24     Q. And this morning you also discussed that analysts
25 and/or media reports had covered that investor

204

1  (The deposition concluded at 4:28 p.m.)
2      --oOo--

Steinholt, Bjorn I | 7/2/2007 7:58:00 PM

205

| | |
|---|---|
| 1 | CASE TITLE:      In Re:  Oracle Securities |
| 2 | DATE OF DEPOSITION:  July 2, 2007 |
| 3 | REFERENCE NO.:     75264 |
| 4 | |
| 5 | |
| 6 | Please be advised I have read the foregoing deposition, |
| 7 | and I hereby state there are: |
| 8 | (Check one) |
| 9 | _____ NO CORRECTIONS |
| 10 | _____ CORRECTIONS ATTACHED |
| 11 | |
| 12 | |
| 13 | |
| 14 | _____ |
| | Bjorn I. Steinholt, CFA |
| 15 | |
| 16 | _____ |
| | Date Signed |
| 17 | |
| 18 | --oOo-- |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

207

| | |
|---|---|
| 1 | REPORTER'S CERTIFICATE |
| 2 | I certify that the witness in the forgoing |
| 3 | deposition, |
| 4 | BJORN I. STEINHOLT, CFA |
| 5 | was me by duly sworn to tell the truth, the whole truth |
| 6 | and nothing but the truth in the within-entitled cause; |
| 7 | that said deposition was taken at the time and place |
| 8 | herein named; that the testimony of said witness was |
| 9 | reported by me, a duly certified shorthand reporter and |
| 10 | a disinterested person, and was thereafter transcribed |
| 11 | under my direction into typewriting. |
| 12 | I further certify that I am not of counsel or |
| 13 | attorney for either or any of the parties to said |
| 14 | deposition, nor in any way interested in the outcome of |
| 15 | the cause named in said caption. |
| 16 | Dated July 3, 2007. |
| 17 | |
| 18 | |
| 19 | |
| | _____ |
| 20 | Leslie Rockwood |
| | Certified Shorthand Reporter |
| | State of California |
| 21 | Certificate No. 3462 |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

206

| | |
|---|---|
| 1 | DEPONENT'S CHANGES OR CORRECTIONS |
| 2 | |
| 3 | Note: If you are adding to your testimony, print the |
| 4 | exact words you want to add.  If you are deleting from |
| 5 | your testimony, print the exact words you want to |
| 6 | delete.  Specify with "add" or "delete" and sign this |
| 7 | form. |
| 8 | DEPOSITION OF:  Bjorn I. Steinholt (Ref# 75264) |
| 9 | CASE:      In Re:  Oracle Securities |
| 10 | DATE OF DEPO:  July 2, 2007 |
| 11 | Page  Line  CHANGE/ADD/DELETE |
| 12 | ____ ____ _____ |
| 13 | ____ ____ _____ |
| 14 | ____ ____ _____ |
| 15 | ____ ____ _____ |
| 16 | ____ ____ _____ |
| 17 | ____ ____ _____ |
| 18 | ____ ____ _____ |
| 19 | ____ ____ _____ |
| 20 | ____ ____ _____ |
| 21 | ____ ____ _____ |
| 22 | ____ ____ _____ |
| 23 | ____ ____ _____ |
| 24 | ____ ____ _____ |
| 25 | Deponent's Signature_____Date_____ |