Exhibit O

James, Christopher  7/17/2007  9:05:00 AM

1         IN THE UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3           SAN FRANCISCO DIVISION

4

5    In re ORACLE CORPORATION

6    SECURITIES LITIGATION.

7              Master File No. C-01-0988-MJJ

8    This Document Relates To:

9

10     ALL ACTIONS.

11    _____/

12

13

14           ---o0o---

15    VIDEOTAPED DEPOSITION OF CHRISTOPHER JAMES

16         TUESDAY, JULY 17, 2007

17

            ---o0o---

18

        SHEILA CHASE & ASSOCIATES

19         REPORTING FOR:

        LiveNote World Service

20      221 Main Street, Suite 1250

        San Francisco, California 94105

21        Phone:  (415) 321-2311

          Fax:  (415) 321-2301

22

23

    Reported by:

24    DIANA NOBRIGA, CSR, CRR

    LICENSE NO. 7071

25

1                    I N D E X

2                  INDEX OF EXAMINATION

3                                    PAGE

4    EXAMINATION BY MS. WINKLER                    5

5                    ---o0o---

6                  INDEX OF EXHIBITS

7    DESCRIPTION                          PAGE

8    Exhibit 1   Expert Report of Christopher M.

9             James                    26

10   Exhibit 2   Rebuttal Expert Report of

11            Christopher M. James          26

12   Exhibit 3   Five-page document Bates

13            stamped NDCA-ORCL 360337 through

14            360341                    49

15   Exhibit 4   E-mail dated 17 Jan 2001 from

16            Larry Garnick to Jennifer Minton      83

17   Exhibit 5   Defendants' Response to Plaintiffs'

18            First Set of Requests for

19            Admissions                92

20   Exhibit 6   Oracle, Larry Ellison Conference

21            Call                    105

22   Exhibit 7   Document Bates labeled NDCA-ORCL

23            091467 through 091470        165

24

25

1       BE IT REMEMBERED that on Tuesday, July 17,

2    2007, commencing at the hour of 9:05 a.m., thereof, at

3    the LAW OFFICES OF LERACH, COUGHLIN, STOIA, GELLAR,

4    RUDMAN & ROBBINS, LLP, 100 Pine Street, Suite 2600,

5    San Francisco, California, before me, DIANA NOBRIGA, a

6    Certified Shorthand Reporter in and for the State of

7    California, personally appeared

8       CHRISTOPHER JAMES

9    as a witness by the plaintiffs herein, who, being by me

10   first duly sworn, was thereupon examined and testified

11   as hereinafter set forth.

12        ---o0o---

13   Appearing as counsel on behalf of the Plaintiffs:

14     MONIQUE C. WINKLER, ESQ., moniquew@lerachlaw.com

        SHAWN WILLIAMS, ESQ.,shawnw@lerachlaw.com

15     LERACH, COUGHLIN, STOIA, GELLAR,

        RUDMAN & ROBBINS

16     100 Pine Street, Suite 2600

        San Francisco, CA 94111

17     (415) 288-4545

18

19   Appearing as counsel on behalf of Defendants:

20     DAVID M. FRIEDMAN, ESQ., david.friedman@lw.com

        PATRICK E. GIBBS, ESQ., patrick.gibbs@lw.com

21     LATHAM & WATKINS

        505 Montgomery Street, Suite 1900

22     San Francisco, CA 94111-2562

        (415) 391-0600

23

24   Also Present:  Andrew Roper, Ph.D. Cornerstone Research;

25   Gary Brewer, Videographer

1    VIDEOGRAPHER:  Good morning.  We're going on

2    the record.  Here begins the videotaped deposition of

3    Christopher James, tape one, Volume I, in the matter of

4    In Re Oracle Securities Litigation, U.S. District Court,

5    Northern District of California, san Francisco Division,

6    Master File No. C0-01-0988-MJJ.  Today's date is

7    July 17th, 2007, and the time is 9:05 a.m.  The video

8    operator is Gary Brewer, representing LiveNote World

9    Service, located at 221 Main Street, Suite 1250,

10   San Francisco, California 94105, telephone number, 415

11   321-2300.  The court reporter is Diana Nobriga,

12   reporting on behalf of LiveNote World Service.

13       Today's deposition is taking place on behalf

14   of the plaintiff, and is taking place at 100 Pine

15   Street, San Francisco, California.

16       Counsel, could you please introduce yourselves

17   and state whom you represent.

18       MS. WINKLER:  Monica Winkler of Lerach,

19   Coughlin, Stoia, Geller, Rudman, Robbins, on behalf of

20   plaintiffs.

21       MR. FRIEDMAN:  David Friedman of Latham and

22   Watkins on behalf of the defendants.

23       MR. GIBBS:  Patrick Gibbs, Latham and Watkins,

24   for the defendants.

25       MR. ROPER:  Andrew Roper, Cornerstone, on

1    behalf of defendants.

2         VIDEOGRAPHER:  Would the court reporter please

3    swear in the witness.

4         CHRISTOPHER JAMES,

5    having been duly sworn, testified as follows:

6         EXAMINATION BY MS. WINKLER

7         MS. WINKLER:  Q.  Mr. James, you're not an

8    attorney, are you?

9         A.  No, I'm not.

10        Q.  Are you familiar with the Supreme Court's

11   Decision in Dura Pharmaceuticals?

12        A.  I am.

13        Q.  You're not offering an opinion on whether

14   plaintiffs have adequately pled loss causation under

15   Dura, are you?

16        A.  I'm not offering a legal opinion as to the

17   adequacy of any pleadings.  I am, as my report

18   indicates, providing an opinion as to whether the

19   analysis by Mr. Steinholt is consistent with Dura from

20   an economic perspective.

21        Q.  But you're not offering a legal interpretation

22   of Dura, are you?

23        A.  I have not been asked to offer a legal opinion

24   as to Dura, only as to the economic implications of

25   Dura.

1      Q.   And you're not offering an opinion on whether

2   plaintiffs can prove loss causation under Dura, are you?

3      MR. FRIEDMAN:  Objection; vague.

4      THE WITNESS:  Well, I don't -- I'm not sure

5   what you mean by can.  As my report indicates, I don't

6   believe that Mr. Steinholt has demonstrated the causal

7   link as required under Dura.

8      MS. WINKLER:  Q.  That wasn't my question

9   though.

10      My question was whether you're offering an

11   opinion on whether plaintiffs can prove loss causation

12   under Dura.

13      MR. FRIEDMAN:  Same objection.

14      THE WITNESS:  Well, again, other than the

15   analysis that I've reviewed in this case, I haven't seen

16   any analysis that I would consider to be consistent with

17   a demonstration of loss causation, from an economist's

18   perspective as I understand Dura.

19      MS. WINKLER:  Q.  You don't know, do you, what

20   proof would satisfy this court regarding loss causation?

21      MR. FRIEDMAN:  Same objection.

22      THE WITNESS:  I don't know what is in the

23   court's mind, so I don't know what standard the court

24   has.  If the court applies a standard consistent with my

25   interpretation as an economist of the content of Dura,

1    then I would think that the court would find that loss

2    causation hasn't been demonstrated.

3         MS. WINKLER:  Q.  Have you read this court's

4    December 20th, 2006 order regarding the motion for class

5    certification?

6        A.  I don't believe I have.

7        Q.  Are you aware that Judge Jenkins quoted

8    Mr. Steinholt in his opinion?

9        A.  No.

10       Q.  Are you aware that in the opinion the court

11   held that a corrective disclosure is one way in which a

12   10b plaintiff can demonstrate loss causation, Dura does

13   not, however, state that this is the only way to plead

14   and prove loss causation?

15       A.  That certainly would be -- I haven't read

16   that, but that certainly would be consistent with, as I

17   indicate in my report, from an economic perspective the

18   correct way to look at Dura.  So, that certainly would

19   be not inconsistent -- it would be consistent with my

20   interpretation.

21       Q.  Do you have any idea whether loss causation

22   can be established on the allegations and facts in this

23   case?

24       MR. FRIEDMAN:  Objection; vague.

25       THE WITNESS:  I'm not sure what you mean by

1    can be demonstrated.  I haven't seen that demonstration.

2    I mean, if -- I presume that if there was a potential

3    for that demonstration, it would have been shown to

4    date.

5         But about the possibility, I haven't seen

6    anything that would lead me to conclude that that would

7    be the case.

8         MS. WINKLER:  Q.  Have you reviewed any of

9    Oracle's internal documents?

10       A.  Other than the internal documents that have

11   been cited in other expert reports, I have not engaged

12   in an analysis of the internal documents of Oracle.

13       Q.  Did you review the actual documents cited in

14   the other reports or just review the other reports?

15       A.  Some of the documents I reviewed, others I

16   simply noted their existence.

17       Q.  Which documents did you review?

18       A.  As I sit here, I can't recall.

19       Q.  Which other expert reports did you review?

20       A.  Well, I reviewed the expert reports for the

21   plaintiffs in this case, both their original reports and

22   their rebuttal reports.  I reviewed the expert reports

23   for the defendants, and their rebuttal reports

24       Q.  Did you review all the plaintiffs' expert

25   reports?

1        A.   I believe I did.

2        Q.   How about all of defendants' expert reports?

3        A.   I believe I did.

4        Q.   Do you recall which of the reports you

5    reviewed exhibits that were attached or referenced

6    therein?

7        A.   I certainly recall reviewing the exhibits

8    attached to the Hilliard report.  I'm not sure how you

9    pronounce it, there's been an active debate.  Is it

10   Goedde or Goedde?

11       Q.   Yes.

12       A.   The Goedde report.  I recall reviewing the

13   exhibits in the Regan report.  I reviewed exhibits

14   attached to the O'Bryan report.  Reviewed the exhibits

15   attached to the Steinholt report.  I reviewed the

16   exhibits attached to the Yourdon report.  I reviewed the

17   exhibits attached to the Hubbard report.  As I sit here,

18   that's the list that I recall.

19       Q.   When you say you reviewed the exhibits

20   attached to the reports, is it your testimony that you

21   reviewed all the exhibits attached to those reports or

22   just one or two here and there?

23            MR. FRIEDMAN:  Objection to form.

24            THE WITNESS:  I think I -- I recall

25   reviewing -- because I read all of the reports, all of

1    the exhibits that were attached to those reports.

2         MS. WINKLER:  Q.  Have you read the Ninth

3    Circuit's opinion In Re Daou Systems Inc.'s Securities

4    Litigation?

5       A.  Which one?

6       Q.   In Daou Securities Litigation.

7         MR. FRIEDMAN:  Sometimes referred to as Daou.

8         THE WITNESS:  I may have.  I don't have it in

9    mind as I sit here.

10        MS. WINKLER:  Q.  Do you have any

11   understanding of that opinion?

12      A.  I can take a look at it and refresh my memory,

13   but as I sit here I don't have a recollection of it.

14      Q.   What is your understanding of plaintiffs'

15   allegations in this case?

16      A.  The allegations as they are outlined in the

17   complaint are that -- are in several general categories.

18        First category would be with respect to Suite

19   11i, allegations regarding the lack of integration in

20   interoperability associated with 11i; the allegations as

21   it pertains to what I'll refer to as accounting issues,

22   which is another category of allegations pertaining to

23   the unapplied cash, and in particular the on-account

24   characterization of the unapplied cash and the

25   November 17th accounting entries as it pertains to

1    unapplied cash; and an allegation that those 48,000 plus

2    accounting entries had the impact of allegedly

3    increasing 2Q earnings; the allegations as it pertains

4    to what I'll call the category of forecasting, that

5    Oracle either knew or should have known, it's alleged, a

6    softening in the economy would adversely impact its

7    ability to meet its 3Q earnings numbers.

8        Q.   And you indicated when you started your

9    response to that question that that was your

10   understanding of plaintiffs' allegations as outlined in

11   the complaint?

12       A.   Right.

13       Q.   Do you have any other understanding of

14   plaintiffs' allegations in this case?

15       A.   Well, as I understand it, in addition to, for

16   example, certain days that plaintiffs allege were

17   associated with material misstatements, they have added

18   additional days as part of a response to the second

19   interrogatory.

20          My understanding is that in the context of

21   certain of the accounting issues as it pertains -- as

22   outlined in the Regan report were issues that were not

23   addressed in the original complaint.  So, I'm not sure

24   whether those are correctly part of the allegations or

25   not.

1      Q.   With respect to Suite 11i, you indicated that

2    your understanding was that plaintiffs allege there is a

3    lack of integration in interoperability.  Do you have

4    any other understanding about plaintiffs' allegations

5    with respect to Suite 11i?

6      A.   Yes.  Again, there is -- as I indicated in my

7    report, there is a broader set of allegations as it

8    pertains to issues regarding functionality in the

9    Hilliard report, allegations regarding commercially

10   viable, I think is the term, that 11i would allegedly

11   drive sales, that I think that acceptance was high.

12        So, there are sort of a broader set of less

13   well-specified allegations as it pertains to what I'll

14   call a general area of 11i quality issues.

15     Q.   What is Suite 11i?

16     A.   Suite 11i is a suite of enterprise software

17   applications that range from CRM to ERP to supply chain

18   management.  I think there's over 100 modules in each

19   of -- in both the ERP -- in combination with the ERP and

20   CRM.

21     Q.   Do you know what CRM means?

22     A.   Yes.

23     Q.   What is that?

24     A.   It is the front office part of an enterprise

25   software, so it deals with tracking interactions between

1    customers.  So it is customer resource management is the

2    anonym.

3        Q.   What about ERP, what does that mean?

4        A.   Enterprise resource program.

5        Q.   And are you aware that Oracle claimed that

6    Suite 11i was fully integrated?

7        A.   I believe that it claimed that it was designed

8    to be integrated, that it was designed so that the

9    integration would occur at the -- in terms of the

10   interaction between the modules, as part of the design

11   process at Oracle.

12       Q.   Do you know what it means to say that Suite

13   11i was fully integrated?

14       A.   I'm not here as a technical expert on

15   integration.  As I understand integration, it means that

16   they are designed to use the same database or schema.

17   For example, I think if you take a suite product such as

18   the Microsoft Office suite, those are designed to be

19   integrated and interoperable.

20       Q.   With respect to fully integrated, would it not

21   at a minimum mean that the CRM module was integrated

22   with the ERP module?

23       MR. FRIEDMAN:  Objection to form.

24       THE WITNESS:  I guess -- I think you need to

25   be a little more specific what you mean by fully

1    integrated.  Certainly it is designed to be fully

2    integrated using a common data model or schema.  To the

3    extent that you are using, say, the CRM module in

4    connection with a Legacy system, such as Ford does, you

5    are going to have as part of the process of bringing

6    that software online, you're going to have to integrate

7    it with your Legacy software.

8        Likewise, certainly is the case that you can

9    have systems that are designed for integration, like CRM

10    and ERP, yet situations arise in which there may be

11    difficulties in sort of the communication between the

12    two programs, even though the programs are designed to

13    be fully integrated.

14        MS. WINKLER:  Q.  What do you mean when you

15    say there may be difficulties in the communication

16    between the two programs, referencing CRM and ERP?

17        A.   Let me give you a simple example.  If you

18    tried -- the Microsoft suite is designed, and as

19    indicated, is fully integrated within the various

20    applications.  If you try to cut and paste something

21    from, say, take a table from a certain Excel format and

22    put that table into a PowerPoint presentation, that you

23    may have some difficulties in doing that, even though

24    the systems are designed to be fully integrated with one

25    another.

1      Q.   Would it be important to investors whether

2   Suite 11i was fully integrated?

3      A.   Well, I think certainly the integration

4   aspects of the Suite 11i was important to investors.

5   You see a lot of investor commentary by analysts, as

6   well as, you know, at user conferences and so on,

7   regarding the features of 11i.  And, frankly, discussion

8   with the difficulties that customers are having in terms

9   of implementing 11i, and certain issues with respect to

10  the integration of CRM with ERP.

11     Q.   Do you know what a best-of-breed strategy is?

12     A.   Yes.

13     Q.   What is that?

14     A.   A best-of-breed strategy has to do with trying

15  to develop the best software program, say, for call

16  center automation, best strategy with respect to certain

17  modules within an ERP, or, for example, the entire ERP.

18  So you have certain of the enterprise software

19  companies, such as I2, Ariba, focusing in on a

20  best-of-breed strategy.

21     Q.   What was the benefit from a business point of

22  view of purchasing a suite rather than a best-of-breed

23  solution?

24     MR. FRIEDMAN:  Objection to form.

25     THE WITNESS:  Well, I mean, as I understand it

1    from both my review of the market, the information was

2    in the market, analyst reports and market resources,

3    the -- the advantage of a suite approach as opposed to a

4    best-of-breed was principally in the area of reducing

5    integration costs and the labor involved in getting the

6    CRM program that Siebel has to communicate with the HRM

7    applications that PeopleSoft might have.  So if you're

8    thinking about -- you've got two different data models

9    there that have to be integrated with one another, and

10   that is -- both in the materials I reviewed and my

11   experience indicates that it's -- that's a costly

12   process.

13        Q.   What was the benefit of buying Suite 11i if it

14   was not fully integrated and was not best-of-breed?

15        A.   Well, I'm not sure why you're saying that it

16   was not fully integrated.  I did not indicate that I

17   didn't believe it was fully integrated.  The advantage I

18   believe is that integration costs were substantially

19   less, both as an initial phase and on a going-forward

20   basis.

21        If you were to, say, add a particular module

22   or a set of modules and then subsequently develop

23   those -- add, say, a CRM or a set of CRM modules, that

24   there could be significant costs savings.

25        Q.   I think in response to one of my earlier

1    questions you referenced analysts discussing customer

2    issues with Suite 11i; is that fair?

3        A.  Um-hum.

4        Q.  Did you see that prior to the Class Period?

5        A.  Yes.

6        Q.  And you discussed that in your report;

7    correct?

8        A.  I believe that I -- in Exhibit 6, it's about

9    30 pages of -- both in the body of the report and in

10   Exhibit 6, is about 30 pages of I think illustrative

11   quotes from analysts and market participants concerning

12   quality and product characteristics as it pertains to

13   11i.

14       Q.  Right now I'm specifically referencing reports

15   from prior to the Class Period.  Why did you include

16   that commentary in your report?

17       A.  For a couple of reasons.  One is part of the

18   analysis that I undertook, and one of the things that I

19   thought was a significant and, I think, important

20   omission in the Steinholt analysis was a systematic

21   analysis of what the total mix of information was at

22   various points in time, both as of the beginning of the

23   Class Period -- in order to get a fix on what the total

24   mix of information is at the beginning of the Class

25   Period I need to look at sort of what the mix of

1    information is prior to the Class Period.  That was one

2    reason.

3         The second reason is as I understand it, there

4    is certain allegations specifically with respect to,

5    say, the Hilliard report where he looks at, I think,

6    May 24th, 2000, and I believe a couple of dates, one in

7    September of 2000, and argues or indicates that those

8    may have been dates in which there were alleged

9    misstatements.

10        Q.  With respect to the Hilliard report, do you

11   know whether the report connects those alleged

12   misstatements you referenced up to statements that were

13   actually made during the Class Period?

14        MR. FRIEDMAN:  Objection to form, vague.

15        THE WITNESS:  I'm not -- I don't understand

16   what you mean.

17        MS. WINKLER:  Q.  You referenced several pre

18   Class Period statements in the Hilliard report; is that

19   fair?

20        A.  Yes.

21        Q.  Do you know whether the Hilliard report

22   actually connects those statements up to statements

23   about Suite 11i that were made during the Class Period?

24        MR. FRIEDMAN:  Same objection.

25        THE WITNESS:  I would have to go back and

1   look.  Certainly the -- I would have to go back and take

2   a look as to whether he makes that connection.

3        My understanding is -- I would have to look at

4   the report.

5        MS. WINKLER:  Q.  And were those the only two

6   reasons?  You referenced a mix of information prior to

7   the Class Period in the Hilliard report in response to

8   my question.  Why did you include the pre Class Period

9   commentary in your report?  Do you have any other

10  reasons?

11       A.  I think a basic reason would be simply

12  background information.  You go back to 1999 when the,

13  you know, Oracle application user group meeting where it

14  is announced the suite approach is going to be taken,

15  to, you know, the introduction of the suite product in

16  May of 2000.  I think it's important to look at that in

17  the context of both how people were evaluating the

18  product, how impressions were being formed and what was

19  in the total mix of information.

20       Q.  Do you know which release of suite 11i the pre

21  Class Period reports, specifically the September,

22  October and November 2000 analyst reports referenced?

23       A.  Well, 3i -- 11i.3 is released in January, and

24  I think 4 is released in June.  So they are going to

25  be -- I don't recall if they are 1 or 2, but it would be

1    the pre 3 release.  Obviously the May one would be the

2    first release.

3        Q.   Are you aware that Oracle's application number

4    came in -- application numbers came in lower than they

5    were expected to for Oracle's first fiscal quarter for

6    2001?

7            MR. FRIEDMAN:  Objection to form; vague.  I

8    assume you mean revenue.

9            THE WITNESS:  Can I have the question back,

10   please.

11           MS. WINKLER:  Sure.  Would you read my

12   question back, please.

13           (Record read as follows:  QUESTION:  Are you

14           aware that Oracle's application number came

15           in -- application numbers came in lower than

16           they were expected to for Oracle's first fiscal

17           quarter for 2001?)

18           THE WITNESS:  I'm going to presume you mean

19   the revenue numbers?

20           MS. WINKLER:  Q.  Sure.

21       A.   Sure, meaning yes?

22       Q.   Yes, you can presume that.

23       A.   Well, I'm -- I'm aware that the -- I'm not

24   sure that they came in under guidance.  Certainly there

25   is commentary about both the strength of the

1    applications -- I think they come in at around 42

2    percent.  And there were some analysts who registered

3    some disappointment with the 42 percent over what they

4    had been forecasting.  Other analysts were very pleased

5    with the apps numbers.

6        Q.   Did you encounter any representations by

7    Oracle that the bugs and the problems with the initial

8    releases that were referenced in the pre Class Period

9    reports had, in fact, been solved?

10        MR. FRIEDMAN:  Objection; overbroad.

11        THE WITNESS:  I don't know what you mean by

12    the bugs being solved.  Clearly there were patches that

13    were put in place.  And those patches would be both for,

14    you know -- both in response to TARs -- and those TARs

15    may relate to bugs or other aspects of the program.  So

16    in a new program release, it is my understanding, is

17    that there are a number of patches that typically are

18    done.  So I'm not --

19        MS. WINKLER:  Q.  My question was did you

20    encounter any representations by Oracle that -- let's

21    take out bugs -- that the problems with the initial

22    releases that were referenced in the pre Class Period

23    reports that you cite had been solved?

24        A.   I think that that statement is really too

25    broad for me to answer.  I'm aware that, certainly,

1   there were issues that they were trying to address, say,

2   with respect to release 3 in terms of addressing

3   complaints about -- which were in the marketplace, about

4   system stability issues and other implementation-related

5   issues.

6       Q.   So are you saying that you encountered public

7   statements by Oracle that they had addressed issues with

8   release 3?

9       A.   I think they had tried to address certain

10  issues with release 3.  I don't recall any pronouncement

11  by Oracle that says that we -- you know, we have solved

12  all implementation issues and we don't expect to have

13  any more TARs.  That would not be a realistic

14  expectation.

15      Q.   Do you recall a representation by Oracle that

16  the question was no longer whether Oracle would be able

17  to deliver the suite, but that Oracle had, in fact,

18  delivered the suite?

19      A.   I remember that.  I don't think there is any

20  question that Oracle delivered the suite.  I mean, if

21  you look at apps sales in Q2 and Q3 and beyond, you've

22  got literally hundreds of millions of dollars in apps

23  sales.  You go from 45 live in November to over 300 in

24  May of 2001.  I think that would be an indication that

25  they have delivered a suite.

1       Q.   When you say you remember that, when was that

2   statement made with respect to delivering the suite?

3       A.   Well, I believe they began delivering the

4   product in May of 2000.

5       Q.   You're not answering my question.  I asked you

6   if you recall the representation by Oracle that the

7   question would no longer be whether Oracle would be able

8   to deliver the suite, but that Oracle had, in fact,

9   delivered the suite.  And you said, "I remember that."

10  Is that fair?

11      A.   Yeah, I don't recall the specific date of

12  that -- of that statement.

13      Q.   Do you cite that statement anywhere in your

14  reports?

15      A.   I would have to review my report to determine

16  that.

17      Q.   Did you find any reference to implementation

18  problems or bugs relating to Suite 11i in any analyst

19  reports in December of 2000?

20      A.   Sure.

21      Q.   What were those?

22      A.   Well, I recall one discussion, I believe it

23  was in the context of a Morgan Stanley conference, in

24  which it was a luncheon involving analysts and the

25  some -- a representative from GE power.  And the

1    questions regarding sort of implementation issues that

2    had been encountered by GE power.  There were a number

3    of others that I recall.

4        Q.  Do you cite that Morgan Stanley conference in

5    your report?

6        A.  I believe I do.

7        Q.  And what was the date of that Morgan Stanley

8    conference?

9        MR. FRIEDMAN:  Can we mark it and start

10    looking at it?

11        MS. WINKLER:  There is no reason.  I'm just

12    asking if he recalls.

13        THE WITNESS:  You know, there is over 30 pages

14    of references in Exhibit 6, so as I sit here, I don't

15    recall the specific date.  I could look at the document

16    and refresh my memory.

17        MS. WINKLER:  Q.  Is it fair that the majority

18    of those references are pre Class Period?

19        A.  The majority of the --

20        Q.  The reference in the 30 pages are pre Class

21    Period?

22        MR. FRIEDMAN:  If you want to flip through it,

23    go right ahead.

24        THE WITNESS:  You know, I know that the number

25    of them are pre Class Period, but there are certainly a

1    number of reports that are with -- during the Class

2    Period, and I believe there's some that are subsequent

3    to the Class Period.

4         But I haven't counted up, nor would I think

5    there would be any reason to, to sort of determine

6    whether it is 30 or 40 percent or 50 percent.

7         MS. WINKLER:  Q.  Did you find any reference

8    to implementation problems or bugs relating to Suite 11i

9    analysts' reports in January of 2001?

10        A.   Yes.

11        Q.   And what were those?

12        A.   I think, as it indicates here, let's just go

13   to it --

14        MS. WINKLER:  Why don't we go ahead and mark

15   your -- I'm going to go ahead and mark your reports.

16        THE WITNESS:  Sure.

17        MS. WINKLER:  Q.  Mr. James, you're looking at

18   a couple things you have in front of you.  What are

19   those documents?

20        A.   These are -- I anticipated you asking me a

21   question about my report, and these are bound copies of

22   both the original report and the rebuttal report with

23   tabs that make identifying the exhibits a little easier.

24        Q.   And other than tabs, are those clean copies of

25   your reports?

1      A.  I believe so.  I don't -- I didn't mark in

2    them, and I don't see any markings in them.

3          MS. WINKLER:  I'm going to have the court

4    reporter mark as Exhibits 1 and 2 your opening report

5    and your rebuttal report.

6          MR. FRIEDMAN:  I would like him to use the

7    official ones, so if that's going to be the ones --

8          THE WITNESS:  I'm happy to donate these to

9    you, if you'd like.

10         MS. WINKLER:  I will mark the copies.  If you

11    want to look at the copies, that's fine.

12              (Exhibit 1 marked for

13                identification.)

14              (Exhibit 2 marked for

15                identification.)

16         THE WITNESS:  So is there a question pending?

17         MS. WINKLER:  I'm trying to look back and see.

18      Q.  I was asking you about reference to any

19    implementation problems or bugs relating to Suite 11i in

20    analyst reports in January 2001.  Did you see any of

21    those?

22      A.  There is a number of analysts' reports as it

23    pertains to 11i in January, beginning with January 1 and

24    going through -- the last one that I reference is

25    January the 25th.

1      Q.   And are you looking at one of the exhibits to

2   your report?

3      A.   Yes.  As I indicated in response to the

4   question you gave me just a moment ago, Exhibit 6 of my

5   report, which is --

6      Q.   That's your opening report?

7      A.   It is entitled my expert report.

8      Q.   Okay.

9      A.   And has been labeled Exhibit 1.  Has roughly

10   around 30 pages of quotes from analysts, public press

11   and industry sources.

12      Q.   And I think you've just told me that you --

13   your report includes reference to analyst reports

14   ranging from -- in January 2001, ranging from

15   January 1st to January 25th?

16      A.   Right.

17      Q.   My question was did you encounter any reports

18   referencing problems or bugs with Suite 11i?

19      A.   Yeah.  I mean, for example, January 17th, I

20   think this is in reference to -- it is around this time

21   that release 3 is out.  There is an Interactive Week

22   from ZDWire, "The features are aimed at presenting large

23   companies with fully integrated offerings that can be

24   expanded as they move more of their operations online.

25   The focus on integration is also seen as a step by

1    Oracle to stem some of the criticism it has faced over

2    lack of features and functionality in an e-procurement

3    offering as compared to the platform of chief rival

4    Ariba.  Oracle's latest product release is clearly aimed

5    at showing it can play the integration game as better

6    than its competitors."

7         Q.   Do you view that as referencing implementation

8    problems or bugs with Suite 11i?

9         A.   I think it is certainly getting at one of the

10   issues I think, which was the degree -- the comparison

11   between best-of-breed and Oracle and what the relative

12   advantages and disadvantages of best-of-breed versus a

13   suite approach is.

14        Q.   And what specifically in that report

15   references implementation problems or bugs with Suite

16   11i?

17        A.   Well, this is more to do with -- and I think

18   it is one of the implementation issues that some people

19   addressed, and Ellison addressed this in some of his

20   comments, was the -- not so much -- the question of

21   integration had to do in part with certain gaps within

22   the software in terms of -- and by gaps, I mean certain

23   functionality that when compared to best-in-breed may

24   not be as fully -- what's the right word -- that the

25   product attributes with respect to the suite may not

1    stack up as well as the product attributes as it

2    pertains to best-of-breed in a particular operating

3    module.

4         Q.   Can you just point me to where you see that in

5    this report?

6         A.   Well, "The focus on integration is also seen

7    as a step by Oracle to stem some of the criticism it has

8    faced over the lack of features and functionality in its

9    e-procurement offering as compared to platform chief

10   rival Ariba and Commerce One."

11        Q.   That sentence you just read me does not

12   reference Suite 11i; does it?

13        A.   Well, I have to look at the whole article.

14   But it says fully integrated offerings that can be

15   expanded as they move more of their operations online,

16   that would be a statement as it pertains to a suite

17   approach.  And the Oracle Applications at this point in

18   time are a suite-based application.  So I don't see in

19   this specific quote a reference to specifically 11i, but

20   clearly the product that is being referenced here is

21   Oracle's product, and its product in the applications

22   area at this point in time is 11i.

23        Q.   Now you switched sentences.  The sentence you

24   initially read me, and about which I asked you whether

25   there was any reference to Suite 11i, was the second

1    sentence appearing on page 18 of 30.  In that second

2    sentence there is no reference to Suite 11i; is there?

3        A.   Second sentence?

4        Q.   The sentence beginning with "The focus on

5    integration."

6        A.   Okay.  So you're looking at the second

7    sentence in the quote that I was looking at, not the

8    second sentence on page 18?

9        Q.   That's correct.  The sentence that you had

10   previously read aloud to me in response to my question?

11       A.   And your question is again?

12       Q.   Is there any reference to Suite 11i in that

13   sentence?

14       MR. FRIEDMAN:  Explicitly?

15       THE WITNESS:  Again, I would say that

16   procurement offering, and you're talking about

17   integration and a comparison to its chief rivals, Ariba

18   and Commerce One, their best-of-breed at this point in

19   time, in its application-related offerings, are in the

20   context of 11i.

21       MS. WINKLER:  Q.  And is there a criticism

22   here of Suite 11i, or is there a criticism simply of the

23   e-procurement offering?

24       A.   I'm not sure I understand.  If there is a

25   criticism over lack of features and functionality within

1     a particular module of 11i, that would -- I would view

2     that as a potential criticism of an aspect of 11i.

3          Q.   In any other of the reports that you reference

4     from January of 2001, do you find any reference to

5     implementation problems or bugs relating to Suite 11i?

6          A.   Let me take a look.  There is discussion about

7     the product attributes.  I don't see in any of the other

8     reports that I cite to, with respect to the cites,

9     criticisms of 11i.

10          I mean -- I guess the ones that are bracketing

11     January, there's obviously a comment in -- by AMR in

12     December the 26th about they brought the product to the

13     market too soon, they have significant quality issues.

14          Q.   I'm just focusing on January.

15          A.   January; okay.  I'd have to review these

16     articles in their entirety.  My skimming of them as it

17     pertains here is a description of the product quality.

18     I don't see anything that is, other than what I mention,

19     specific criticisms as it pertains to, as you refer to,

20     quality issues.

21          Q.   Is it reasonable to conclude that the absence

22     of such commentary was attributable to the fact that

23     analysts believed the problems, the quality of problems

24     with Suite 11i had been resolved in the new releases?

25          MR. FRIEDMAN:  Objection; vague.

1          THE WITNESS:  First, with respect to the lack

2     of any reference other than the one we just talked about

3     with respect to the quotes from these articles, I would

4     have to go back to the articles before -- and review

5     them in their entirety before I would agree with that

6     characterization.

7          But then if you look -- for example, you

8     wanted me to look specifically at January, if we go into

9     February, you will see commentary by analysts regarding

10    the functionality, and product quality issues in

11    January -- in February, which would indicate to me that

12    certainly they believed that the version 3 is now

13    generally available and it's an improvement over the

14    prior versions, which is kind of what I would expect

15    from a new version of a software program.

16         But it doesn't indicate -- I don't think these

17    commentaries indicate to me that the 11i.3 has no

18    residual product quality issues, nor would I expect

19    there to be an absence of product quality issues.

20         MS. WINKLER:  Q.  Who selected --

21         A.   Just again, because it's a new software

22    program that's being implemented by -- I think there

23    were over -- at this point in time, roughly 1,500

24    customers implementing the program at the time.

25         Q.   Who selected the quotes that appear in your

1    Exhibit 6?

2        A.  I did.

3        Q.   What is your understanding of plaintiffs'

4    allegations relating to the second quarter fiscal 2001

5    results?

6        A.   Again, as I indicated to you, my understanding

7    is their contention that -- in the complaint it focuses

8    on the unapplied cash and certain accounting entries

9    that occurred around November 17th with respect to the

10   unapplied cash accounts and the -- and particularly

11   those unapplied cash accounts with the on-account flag

12   associated with them.

13         And the original allegation I believe was that

14   the effect of basically I believe it was simultaneously

15   debiting or crediting those accounts was to affect

16   revenues by I think it was $238 million.

17       Q.   Does it matter to you whether Oracle should

18   have reported earnings of 10 cents per share rather than

19   11 cents per share for the second fiscal quarter of

20   2001?

21       A.   Does it matter to me?

22       Q.   Does it matter to your opinion?

23       A.   It matters to my opinion in the sense that I

24   have considered the plaintiffs' allegations as it

25   pertains to the 10 cents versus 11 cents.

1          Now you're moving off the complaint; right?

2    Because the complaint contends that the reported number

3    should have been eight and a half -- 8.5 cents or 8.3

4    cents.

5        Q.   I can repeat my question for you.  Does it

6    matter to you or your opinion whether Oracle should have

7    reported earnings of 10 cents per share rather than 11

8    cents per share?

9        A.   Again, I think it is something that I

10   considered in forming my opinion.  I mean, if you're

11   asking -- I see nothing that indicates to me that the

12   miss, for example, on March -- that was announced on

13   March 1st is linked to any of the allegations as it

14   pertains to the Q2 accounting issues.

15         So, for my opinion as it pertains to the

16   causal connection between the price change and the

17   earnings miss, I don't see that if they should have

18   reported 10 versus 11 cents, that that impacts that

19   decision in any way.

20       Q.   So you're saying that the fact that Oracle

21   reported more earnings than it should have for the

22   second fiscal quarter of 2001 doesn't have any impact on

23   your opinion in your report?

24         MR. FRIEDMAN:  Objection to form.

25   Mischaracterizes his testimony.

1          THE WITNESS:  That's not what I indicated.

2     You asked:  Does it matter whether Oracle should have

3     reported 10 cents versus 11 cents to your opinion.

4          And I was giving you the response to that, it

5     pertains to my opinion regarding the loss causation.

6     There is no causal link between the 2Q earnings, as I

7     see it, and any curative disclosure as it pertains to

8     3/1.

9          So, while I haven't seen any indication that

10    they should have reported the earnings number as alleged

11    in the complaint or some other earnings number, I also

12    don't see that that's linked in any way to the

13    disclosure that was made.

14         There was no disclosure on 3/1 regarding

15    issues as it pertains to unapplied cash.

16         MS. WINKLER:  Q.  So it doesn't matter to your

17    opinion regarding loss causation?

18    A.   Well, in the context I just answered the

19    question, I think that I've indicated to you with

20    respect to that specific aspect of my opinion, I don't

21    think it does matter.

22    Q.   Does it matter to any other aspects of your

23    opinion?

24         MR. FRIEDMAN:  Objection; form, vague.

25         THE WITNESS:  I don't think it matters as to

1    the materiality issue.  So I don't -- I don't see

2    that -- whether there was 10 cents or 11 cents is sort

3    of a fundamental component of the opinions that I'm

4    rendering here.

5        MS. WINKLER:  Q.  So it doesn't matter to the

6    materiality aspect, doesn't matter to the loss causation

7    aspect, doesn't matter to any other aspect of your

8    opinion?

9        MR. FRIEDMAN:  Objection; mischaracterizes his

10   testimony.

11       THE WITNESS:  Other than what I've just

12   described, I don't have anything more to add.

13       MS. WINKLER:  Q.  Do you have an understanding

14   of what earnings investors expected Oracle to report in

15   the second fiscal quarter of 2001?

16       MR. FRIEDMAN:  Objection; vague.

17       THE WITNESS:  What earnings they expected?  I

18   think that there is -- I believe the guidance was at 10

19   cents.  So it would -- I can't answer that question

20   without more specificity.

21       MS. WINKLER:  Q.  Do you know --

22       A.  Certainly at the time that the guidance was

23   provided, 10 cents.  I saw investor -- analyst reports

24   that indicated I think as high as 12 cents and as low as

25   10 cents.  I believe the -- that's my recollection.

1      Q.   Do you know the difference between

2    expectations and consensus estimates?

3      A.   Without more, no.  Consensus estimates are the

4    mean estimate from analysts.  And oftentimes people look

5    at the consensus estimate as being reflective of the

6    market's estimate.  Certainly there can be analysts that

7    vary from the consensus, and individual investors that

8    may vary from the consensus.

9      Q.   Do you know the term whisper number, referring

10   to -- strike that.

11        Do you know the term whisper number?

12     A.   It is not one that gets a lot of academic

13   focus.  It is referred to typically as sort of a

14   suggested number that an analyst might reference prior

15   to an earnings release.  So, you know, you may have

16   somebody saying, you know, I think based on what I've

17   seen throughout the quarter that they may do 10 or 12

18   cents, or they may do 10 cents.

19     Q.   Do you know if there was a whisper number with

20   respect to Oracle's second quarter '01?

21     A.   I don't think that -- I think you need to be

22   careful when you're saying a whisper number or the

23   whisper number.  I don't know that there was a whisper

24   number or the whisper number.

25     Q.   Were there any whisper numbers?

1      A.  I certainly recall seeing analyst reports that

2    talk about where they think Oracle will come in on.

3    But -- I would have to go back and take a look at the

4    analyst reports in more detail to determine what the

5    distribution of expectations was prior to the earnings

6    announcement

7      Q.  Do you recall any specifics regarding what

8    analysts thought Oracle would come in on?

9      A.  Again, I -- my recollection is a distribution.

10   I think I recall seeing a 12 cent reference, I may have

11   seen a 10 cent reference.

12     Q.  Do you know that Oracle had a history of

13   beating the consensus estimates?

14     A.  I know that --

15        MR. FRIEDMAN:  Let me interpose an objection

16   as to vague.

17        THE WITNESS:  They had a history of beating

18   the consensus estimate?

19        MS. WINKLER:  Q.  Yes.

20     A.  I don't know that they had a history of

21   beating the consensus estimate.  I would have to go back

22   and look.  I mean, I think that, my recollection is that

23   there were occasions in which they beat their guidance

24   estimate.

25        I know that there was I think one occasion

1    that I can recall in which they met it.  I recall

2    seeing -- and so there was variability around that.  I

3    think they generally beat their guidance by varying

4    amounts, but not -- that was not always the case.

5         Q.   Would a history of generally beating guidance

6    impact investors' expectations?

7         A.   It would depend on the circumstances and what

8    was in the total mix of information at various points in

9    time.

10          So, for example, wouldn't surprise me to see a

11   company that, say, comes in with 3 or 4 cents better

12   than guidance, and that performance being viewed with

13   disappointment by investors.  It wouldn't also surprise

14   me to see sort of -- and that disappointment being

15   reflected in, say, a negative stock return on the day

16   that the earnings announcement is made, or finding a

17   similar price reaction or even a smaller price reaction

18   on days in which the company just meets expectations.

19          It would again depend on the mix of

20   information at the time, the economic conditions, and,

21   frankly, the nature of the earnings performance.

22        Q.   Looking specifically at Oracle, would Oracle's

23   history of generally beating guidance -- or did Oracle's

24   history of generally beating guidance impact investors'

25   expectations for the second quarter of 2001?

1          MR. FRIEDMAN:  Objection; vague.

2          THE WITNESS:  Their expectations regarding --

3    I think investors' expectations were formed by their

4    perceptions of how Oracle in the context of the economy

5    and its competition was doing.

6          I think that if you wanted to sort of look at

7    whether that -- a particular earnings number in the

8    context of what else is disclosed in the context of

9    disclosing that earnings number is significant to

10   investors, simply -- one thing you could look at is the

11   price reaction of the company's stock to that

12   announcement.

13          Can we take a short break?

14          MS. WINKLER:  Sure.

15          VIDEOGRAPHER:  Going off the record.  The time

16   is 10:01 a.m.

17              (Recess, 10:01 a.m. - 10:11 a.m.)

18          VIDEOGRAPHER:  We are back on the record.  The

19   time is 10:11 a.m.

20          MS. WINKLER:  Q.  Before we took a break, in

21   response to one of my questions regarding the January

22   2001 analyst reports, you indicated they had 1,500 live

23   customers at that time.  Do you recall that testimony?

24     A.   That's not what I said.

25          MR. FRIEDMAN:  Objection.

1          MS. WINKLER:  Q.  What was your testimony?

2          A.   As I indicated, I believe I said between the

3    fall of 2000 and May of 2001 they went from 45 to

4    somewhere other than 300 live.  I think that there was

5    reference -- I saw a reference to others in the

6    implementation process, and I think that's where the

7    thousand came from.

8          Q.   The 1,500 came from?

9          A.   I'm sorry, 1,500, yes.

10         Q.   What does it mean to be a live customer?

11         A.   My understanding of what it means to be a live

12   customer is to have the software up and running at a

13   point in time.

14         Q.   What do you mean when you say software up and

15   running?

16         A.   I'm not sure how to explain it any better.

17   Live meaning that you are utilizing the software and its

18   business applications.

19         Q.   Did Oracle consider someone to be live if they

20   had one module of Suite 11i up and running?

21         A.   I would have to go back and look.  Certainly

22   that is a possibility.

23         Q.   You don't have any understanding here?

24         A.   I don't think in terms of 11i, just to be

25   clear, I don't think that the reference to live

1   customers had to do with customers using every module

2   within 11i.

3       Q.   Did it have to do with customers using more

4   than one module of 11i or simply just one module?

5       A.   My understanding is that the approach was, and

6   what customers were doing, was adopting a particular

7   module or a group of modules over time, and that that

8   reference had to do with customers utilizing one or more

9   modules as it pertains to 11i.

10      Q.   So going back to my prior question, did Oracle

11  consider someone to be live if they were -- if they had

12  implemented and were running a single module of Suite

13  11i?

14      MR. FRIEDMAN:  Objection; asked and answered.

15      THE WITNESS:  I would have to go back and

16  look.  That may be the case.  I don't have that in my

17  head right now.

18      MS. WINKLER:  Q.  Did you see a reference to

19  that in any of the other expert reports you read?

20      A.   Yes.  I recall seeing that.  What I recall

21  most clearly is the discussion both with analysts in the

22  context of conference calls and in certain analyst

23  reports as it pertains to discussions with customers

24  that -- you know, it was not a situation in which the

25  expectation was, is that customers would, or were they

1   buying all or most of the modules in ERP and CRM and

2   going live with those, that it was an incremental

3   process of adding modules over time.

4       Q.  Did you see any analyst reports explaining

5   what it meant to be a live customer on Suite 11i?

6       A.  I would have to go back and look.  I don't

7   recall sort of looking at the analyst reports with that

8   terminology in mind.

9       Q.  Do you reference any of those in your report?

10      MR. FRIEDMAN:  Objection; vague.

11      THE WITNESS:  I'm sure I reference some of the

12  analyst reports that talk about live customers.  I know

13  that in the -- and I know that in the conference calls

14  there's discussions of live customers.

15      MS. WINKLER:  Q.  Do you reference any analyst

16  reports that discuss what it means to be a live customer

17  on Suite 11i?

18      A.  I would have to go back --

19      MR. FRIEDMAN:  Objection; asked and answered.

20      THE WITNESS:  -- and review the analyst

21  reports with an eye towards identifying that specific

22  term.

23      MS. WINKLER:  Q.  Has someone explained to you

24  what it means to be a live customer on Suite 11i?

25      A.  Have I sat down with somebody and talked about

1    what it means to be live?  No.

2         But, I mean, I've certainly seen reference to

3    that in the materials that I reviewed, and it was my

4    general knowledge of what it means to be live.

5    Q.   So how did you gain your understanding of what

6    it means to be a live customer on Suite 11i?

7    A.   Both by reviewing this and by -- in the

8    context of my normal business relations.

9    Q.   But you can't tell me whether or not Oracle --

10   when Oracle said someone was live on 11i, that meant

11   simply be live on one module or being live on more than

12   one module?

13        MR. FRIEDMAN:  Objection; asked and answered.

14        THE WITNESS:  I can go back and review the

15   documents with an eye towards that.  I have given you

16   what my understanding of what live means, okay.  And

17   again, I can go back and review the documents with an

18   eye towards trying to ascertain in the context of that

19   term what the individual writer means by that.

20        MS. WINKLER:  Q.  But as you sit here today,

21   you can't answer that question.

22   A.   I think I have answered the question.  I have

23   answered the question both in terms of what my

24   understanding of live is and --

25   Q.   Let me pose it one more time then.

1      A.   You need to let me finish answering the

2   question before you interrupt me.

3          You've asked me a specific question about what

4   Oracle meant when it said a customer was live, okay.

5          And I don't really recall a specific reference

6   to Oracle defining that term.  But I could go back and

7   look.

8      Q.   So you don't know, yes or no, when Oracle said

9   we have 300 live customers, if those customers may have

10   simply been running one module of Suite 11i?

11         MR. FRIEDMAN:  Asked and answered.

12         THE WITNESS:  I think I have answered that

13   question.  I've indicated to you that that certainly is

14   a possibility, given, as Oracle described both in

15   analyst conference calls and in the context of

16   presentations at AppsWorld and others that they viewed

17   the implementation of Suite 11i as one that was

18   incremental in nature, that you would -- and one of the

19   virtues of 11i was the ability to add modules in an

20   incremental fashion.

21         MS. WINKLER:  Q.  Did you do any analysis to

22   determine what effect Oracle's stock price -- what

23   effect on Oracle's stock price -- what the effect on

24   Oracle's -- strike that.  Let me start over.

25         Did you do any analysis to determine what the

1    effect on Oracle's stock price would have been had

2    Oracle reported earnings of only 10 cents per share on

3    December 14th, 2000?

4         A.   Had they -- what impact it would have had on

5    their stock price?  So the hypothesis is that instead of

6    reporting 11 cents, it would have reported 10 cents,

7    what impact it would be?

8         It would depend on the context in which they

9    reported 10 cents.  It certainly -- based on my review

10   of the price reaction to their various earnings

11   announcements, 10 cents would be consistent with no

12   significant stock price reaction, or a similar stock

13   price reaction to what was observed on that day.

14        MS. WINKLER:  I'm going to move to strike that

15   answer.

16        Q.   My question was, did you do any analysis?

17        A.   I just described the analysis to you.

18        Q.   You did you do that in creating your opening

19   report in this matter?

20        A.   Sure.  As I indicated in my report, I examined

21   the price reaction on -- associated with the 12/14

22   announcement.

23        Q.   Show me in your report where -- show me in

24   your report where there's an analysis of what effect on

25   Oracle's stock -- what the effect on Oracle's stock

1   price would have been had Oracle reported only 10 cents

2   on December 14th, 2000.

3       A.   I think if you look at footnote 174 there is a

4   discussion here of what impact it would have on the

5   reported earnings, and that the reported earnings -- the

6   effect of a $20 million transfer was being determined

7   improper, that it would have an effect of .0022 or .22

8   cents, that analysts are looking at finer granularity --

9   with finer granularity than whether it's 11 cents or 10

10  cents, okay.  And this really goes to the issue of

11  would, in my opinion, a .22 cent change in the earnings

12  be viewed as material to investors?  Probably not.

13      Q.   What analysis did you perform other than what

14  you state here in footnote 174?

15      A.   Well, I state this, I looked at the price

16  reaction.  I think subsequent to writing this report and

17  really in response to some issues raised by

18  Mr. Steinholt in looking at, say, the Q1 analysis --

19  announcement, I looked back at prior earnings

20  announcements to determine whether there was any sort of

21  identifiable pattern in the price reaction to earnings,

22  being meeting earnings or beating earnings by 1, 2, 3 or

23  4 cents.

24      Q.   You said you looked at the price reaction.

25  What price reaction did you look at?

1       A.   I looked at the price reaction on the day the

2   information would have been available to the market

3   participants.

4       Q.   You looked at the hypothetical price reaction

5   if Oracle had --

6       A.   No.  I looked at the actual price reaction

7   associated with various earnings announcements with an

8   eye towards asking -- testing a particular hypothesis,

9   which was, if it is hypothesized that Oracle would

10  report .22 cents less in earnings, would that lead me to

11  conclude with any degree of certainty that the price

12  reaction would be any different than what we observed on

13  the earnings announcement date, or 12/15, when the

14  information was in the market.

15          And my conclusion was based on the historical

16  relationship between earnings releases and price

17  reactions, there was no reason to believe that that

18  price -- that difference in earnings would have been

19  viewed as material to investors.

20      Q.   Which specific earnings --

21      A.   Particularly if you sort of take it in the

22  context of why that earnings change in the hypothetical

23  would have occurred.

24      Q.   Which specific earnings announcements did you

25  look at?

1      A.   I believe I went back all the way to 1998.

2      Q.   And what was the -- strike that.

3           How many times in which quarters back to 1998

4    did Oracle report earnings less than their guidance?

5      A.   I don't believe that they ever reported

6    earnings less than their guidance.  Now, you recall that

7    the earnings guidance for Q2 was 10 cents.

8      Q.   Are you aware of commentators who believed

9    that even a slight miss by Oracle for its second quarter

10   fiscal 2000 numbers would have caused the stock to

11   decline back to the low to mid 20s?

12     A.   I don't recall a specific commentary.  I would

13   have to look at it.

14          MS. WINKLER:  Have this document marked as

15   Exhibit 3.

16               (Exhibit 3 marked for

17                identification.)

18          MS. WINKLER:  Q.  For the record, this

19   document is Bates labeled NDCA-ORCL 360337 through 41.

20     A.   So you've handed me a document that's --

21     Q.   Have you seen this document before?

22     A.   I may have.  I just -- it would be maybe in

23   some of the press releases.  Remember, there were over

24   3,000 press releases during the Class Period, and

25   commentary.

1      Q.   But you're not sure whether you've seen this

2    before?

3      A.   I wish I could say that I could remember -- my

4    memory was as good as to remember each of more than, if

5    you take some of the pre class stuff, more than 3,000.

6    But, I'm sorry, I don't recall specifically.

7      Q.   I want to direct your attention to the bottom

8    of the first page where after "Walberg:  CMGI," about

9    the third sentence, the documents states, "As far as

10   Oracle is concerned, Larry Ellison has been basically on

11   the airwaves saying that they are going to meet their

12   numbers.  They are going to show very strong growth.  So

13   that puts a lot of pressure on the company.  If they

14   were to in any way disappoint the street at this point,

15   that stock which had a nice recovery bounce could be

16   back trading into the mid to low 20s within the next

17   week, week and a half."

18        Do you see that?

19   A.   Yes.

20      Q.   Do you recall reading such commentary before?

21      A.   I don't recall seeing that.  But it certainly

22   is not inconsistent with the opinion that I just gave

23   you a moment ago, that it puts a lot of pressure on the

24   company to meet their number.  My understanding is that

25   if they had come in at 10 cents or actually more than 10

1    cents, that they would be meeting their number.

2        Q.   So you don't disagree with this statement at

3    the bottom of what's numbered at page 43 that I just

4    read to you?

5        MR. FRIEDMAN:  Objection; vague.  Which part?

6        THE WITNESS:  Well, I think it's -- I mean

7    it's -- it's not -- there's not a great deal of

8    specificity here.  If they were in any way to disappoint

9    the street at this point, the stock which has had a nice

10   recovery could trade back into the mid to low 20s within

11   the next week, week and a half.  Now, this is an opinion

12   of one individual, Mr. Walberg.  And I think that you

13   need to look at this in the context of the mix of

14   information that's available at this time.

15       I think that the market was expecting strong

16   growth and Oracle delivered strong growth.  And it is

17   not -- in the context of had they come in at, say, 10

18   cents would that still constitute strong growth?  Yes, I

19   think it would have constituted strong growth, as I

20   understand the context.

21       MS. WINKLER:  Q.  Going back to my question,

22   my question was, do you disagree with this statement?

23       MR. FRIEDMAN:  Same objections and asked and

24   answered.

25       THE WITNESS:  I think I just described my --

1    the context in which I was basically saying that it's

2    certainly consistent with my view and not inconsistent

3    with the company coming in at 10 cents.

4         MS. WINKLER:  Q.  Traditionally wasn't it true

5    that the third quarter came in 1 cent higher than the

6    second quarter for Oracle?

7         A.  I have heard commentary on that.  That's

8    certainly not how Oracle, it is my understanding, of how

9    they went about determining what their earnings would

10   be.  But I think traditionally the third quarter was

11   viewed as stronger than the second quarter.

12        Q.  You told me that you looked at the numbers

13   back to 1998.  Did you see a pattern there, did the

14   third quarter come in 1 cent stronger than the second

15   quarter with respect to the numbers you looked at?

16        A.  I would have to go back and review that.  I

17   don't recall.  I do recall looking at the question of

18   whether 10 cents or 11 cents would be out of trend with

19   respect to prior quarters, and didn't see any indication

20   that 10 cents would have been, say, out of trend with

21   respect to prior quarters.

22        Q.  Is there anything in your report about your

23   analysis of the numbers back to 1998?

24        A.  No.  This was done really in response to what

25   wasn't in any of Mr. Steinholt's reports, which was

1    going back to earlier quarters to draw some inference

2    regarding how to interpret, in his case, the

3    announcement on 3/1.

4        Q.   You're saying this was done in response to

5    something Mr. Steinholt did or --

6        MR. FRIEDMAN:  Objection; mischaracterizes.

7        THE WITNESS:  Well, he indicated -- neither in

8    his original report or his rebuttal report is there any

9    analysis of, let's say, Q1.  Yet he discusses that in

10   his deposition.

11       I think in response to that being raised, I

12   looked at both that announcement, as well as prior

13   announcements, to get some sense of -- I mean, I had a

14   general familiarity with this from looking at the 10-Ks

15   which they had done over time, but I hadn't really

16   specified -- gone specifically to trying to look at in

17   the context of, you know, an earnings release what the

18   price reaction was, other than during -- at the

19   beginning of the quarter and the end of the quarter as

20   it pertains to the Class Period.

21       MS. WINKLER:  Q.  So you looked at the numbers

22   going back to 1998 in response to something that

23   Mr. Steinholt said during his deposition.

24       A.   Right.

25       Q.   And you hadn't done that prior to reading

1    Mr. Steinholt's deposition or listening to

2    Mr. Steinholt's deposition?

3        A.   No.  I don't recall seeing in his analysis any

4    reference to prior quarters.  By prior quarters, I mean

5    quarters prior to the Class Period.

6        Q.   Do you understand plaintiffs' allegations

7    relating to Oracle's false statements that its results

8    would not be negatively impacted by the slowing economy?

9        A.   Do I understand -- could you restate the

10   question?

11       MS. WINKLER:  Sure.  Could you read the

12   question back for me, please.

13       (Record read as follows:  QUESTION:  Do you

14       understand plaintiffs' allegations relating to

15       Oracle's false statements that its results

16       would not be negatively impacted by the slowing

17       economy?)

18       MR. FRIEDMAN:  Objection; vague.

19       You're asking him to describe plaintiffs'

20   allegations?

21       THE WITNESS:  I'm having trouble with the

22   question.  And the reason I'm having trouble with the

23   question is that while I'm familiar with the

24   allegations, you didn't preface it by allegations.

25       My understanding is, as indicated in my

1    report, that Oracle did indicate that were there to be a

2    significant downturn in economic activity it would be

3    impacted, as is clearly indicated in their 10-K.

4         MS. WINKLER:  Q.  You said you were familiar

5    with plaintiffs' allegations.

6         What's your familiarity with plaintiffs'

7    allegations?

8         A.   My familiarity is taken from reading their

9    reports and looking at the complaint.

10        Q.   And what's your understanding from doing that?

11        A.   Plaintiffs allege that Oracle had knowledge

12   that it was going to be adversely impacted by the

13   economy, and either knowingly or recklessly provided a

14   forecast that didn't fully reflect that.  That's my

15   understanding of their allegation.

16        Q.   Do you have any understanding that Oracle made

17   statements that it would not be impacted by the slowing

18   economy?

19        A.   Well, no.  I see -- I saw statements from

20   Oracle indicating that they didn't see an impact of the

21   slowing economy, but that they indicated that were the

22   economy to take a -- deteriorate significantly, which is

23   my understanding it did in the latter part of February

24   and into March and April, that would impact its

25   business.  And it cautioned investors to be aware of

1    that risk.  And that certainly was in the total mix of

2    information during the Class Period.

3        Q.   You said it was your understanding that the

4    economy deteriorated significantly in the latter part of

5    February.  What do you base that understanding on?

6        A.   Well, a couple of things.  And I think you

7    want to be very careful here.  By the economy I meant

8    the economy as it impacts enterprise software.  You

9    first -- if you look at what analysts' commentary

10   concerning what caused the miss in -- that was announced

11   on 3/1, they indicate a decision at the C level, CIO

12   level and the CEO level, to not go forward with deals

13   that were in the pipeline.  And that was attributed to

14   concerns by CIOs and CEOs regarding the economic

15   activity at the time.

16       Consistent with that view were analysts'

17   channel checks subsequent to March, indicating that --

18   you know, when they check with the customers and there's

19   this ongoing relationship between analysts who are

20   covering a company or the enterprise software and the

21   customers of those businesses, they indicated that, in

22   fact, that's what was occurring.

23       I think you also look at, as I indicate in my

24   report, you know, what happened to the competitors of

25   Oracle from selling enterprise software, okay, both in

1    terms of how the market reacts to Oracle's miss and the

2    implications for its competitors, as well as how they

3    subsequently perform, okay, relative to prior

4    expectations, expectations formed in December and

5    January of 2001.

6        Q.   Let's look at what you did in your report with

7    respect to Oracle's competitors.  I think that's

8    Exhibit 8 of your opening report; is that fair?

9        A.   Well, no.  I think there's a discussion that

10   is broader than Exhibit 8 in my report, but certainly

11   Exhibit 8 is one of the things that touches on how

12   competitors were impacted during this period of February

13   through June of '01.

14       Q.   Looking at Exhibit 8, Microsoft is one of your

15   peer group companies for Oracle; is that correct?

16       A.   That's correct.

17       Q.   Are you aware that Microsoft lowered guidance

18   as a result of the economic slowdown on December 14th of

19   2000?

20       A.   I am aware of -- I'm aware they lowered

21   guidance, and at the time they lowered guidance, they

22   indicated I think it was a 20, 27 percent increase in

23   their enterprise software business.  So they lowered

24   guidance that really had to do with a different sector,

25   the PC sector, and the PC software sector, not as it

1   pertains to enterprise software.

2       Q.   What's your understanding of Microsoft's

3   enterprise software business?

4       A.   In terms of what?

5       Q.   What products do they offer?

6       A.   They offer server-related products, primarily

7   SQL-oriented products.  Their server-based business

8   during this period of time was actually improving and

9   beating expectations relative to its PC software

10   business.

11       Q.   Did they offer any product comparable to Suite

12   11i?

13       A.   I don't think that -- you mean comparable in

14   the sense that -- I mean, they were not offering in the

15   enterprise area a fully integrated suite type of

16   product.  They were offering that sort of an integrated

17   product in the PC market, but not in the -- they were

18   principally in the database market segment, but not in

19   the -- they weren't offering an 11i type of product.

20       Q.   So why was it important to you that

21   Microsoft -- you said a part of Microsoft's enterprise

22   software business.  Why do you say that?

23       A.   Well, because, we're really concerned how the

24   economy was impacting the segments of the market in

25   which Oracle operated.  So, for example, you have -- I

1    think in November and December, either November or

2    December you have a survey by Morgan Stanley of

3    executives, CIOs, in terms of where they see IT

4    spending, okay.

5         And one of the things you see in that survey

6    is that database and enterprise are at the top of their

7    list of enterprise -- in terms of technology spending.

8    And at the bottom of their list is sort of hardware

9    infrastructure.  People are indicating that IT spending

10   was slowing relative to IT spending that had occurred,

11   say, in the prior year.

12        The key question as it pertains to Oracle in

13   its competitor group was how would that impact of a

14   slowdown in IT spending impact their segment of the

15   market.

16        And I think when you point to Microsoft and

17   say they missed, so that must imply something about the

18   softness of the market in which Oracle operates, I said,

19   no, you really need to look more closely at Microsoft

20   and why it revised its guidance downward to understand

21   whether that would be interpreted as something that

22   would put Oracle or other competitors on notice with

23   respect to their market segment.

24     Q.   Was Microsoft competing for the same customers

25   that Oracle was with respect to Suite 11i?

1          A.   Well, again, my recollection is, is that with

2     respect to Microsoft's enterprise products, it is

3     principally in the small to medium, and that is where,

4     at least initially, Oracle was focusing its attention.

5     So Microsoft was identified as a competitor to Oracle in

6     a certain segment of the market.

7          Q.   So the fact that Microsoft lowered their

8     guidance doesn't have any effect at all on your opinion

9     with respect to Oracle and whether they should have --

10         A.   No.  It is something I considered, and to try

11    to understand why they lowered their guidance and what

12    inference one might draw from that particular

13    observation.

14         Certainly in the context of -- you know, if

15    you look at Exhibit 8, you see Microsoft lowering its

16    guidance on 12/15.  In the context of what's going on

17    with the other firms in the enterprise who are more

18    focused on enterprise software -- I mean, you see all

19    the green, Ariba, IBM, I2, Commerce One, Siebel and

20    PeopleSoft.

21         Q.   Does the experience by Microsoft provide any

22    evidence to support your opinion that Oracle's earning

23    miss was the result of a sudden and sharp economic

24    slowdown in the enterprise software industry?

25         A.   I think it is consistent with that.

1    Particularly given the fact that the Microsoft -- how

2    the various segments of the Microsoft business were

3    performing relative to the business segments that Oracle

4    was in.

5        Q.   Where do you see the consistency?

6        A.   I think I just answered that.  If you look at

7    sort of how -- commentary on the Microsoft miss and

8    where it was observing softness in its business, it was

9    not in the market segments that would be sort of

10   associated with Oracle.  It was more in the PC-oriented

11   business.

12       Q.   Which of the peer group companies listed near

13   Exhibit 8 do you consider to be enterprise software

14   companies?

15       MR. FRIEDMAN:  Objection; vague.

16       THE WITNESS:  I think all of these companies

17   listed are companies that are identified by analysts as

18   being peers or competitors to Oracle.

19       Now, the extent to which their businesses

20   overlap the enterprise business of Oracle is going to

21   vary, right.  So you're going to have Microsoft, which

22   has a strong PC presence, you have IBM, whose overlap

23   with Oracle was principally in the database and systems

24   integration area.  But obviously IBM has other business

25   segments.  Then you have what I'll refer to as

1   principally best-of-breed players that are in various

2   aspects of enterprise software, be it CRM, CSM or ERP.

3        MS. WINKLER:  Q.  So do you consider IBM to be

4   an enterprise software company?

5        MR. FRIEDMAN:  Objection; asked and answered.

6        THE WITNESS:  Again, I think I just answered

7   that, that certain aspects of its business are in the

8   enterprise software.

9        MS. WINKLER:  Which aspects of its business?

10        MR. FRIEDMAN:  Objection; asked and answered.

11        THE WITNESS:  I just answered that.  It's in

12   the database -- it's viewed as a major competitor to

13   Oracle in the database.  It certainly is involved in

14   systems integration business through its consulting

15   activities.

16        MS. WINKLER:  Q.  Did IBM offer a product that

17   competed at all or in part with Suite 11i?

18        A.  I don't believe so.  But I would have to go

19   back and look.

20        Q.   Did Siebel miss its earning --

21        A.   Actually, I would say, yes, they did, to be

22   more precise.  Because, again, one of -- IBM was one of

23   the major systems integrators at that point in time, and

24   so it would be competing directly with Oracle in the

25   context of 11i.

1      Q.   As a systems integrator?

2      A.   Yeah, in that aspect of the business.

3      Q.   Siebel missed its earning estimates for first

4    quarter of 2001; didn't it?

5      A.   For first quarter 2001?  No, they met; right?

6      Q.   Is it your understanding that they met?

7      A.   My understanding is they met.  And, remember,

8    they met as of -- so we're looking at -- this is an

9    analysis that looks at consensus estimates at a

10   particular point in time relative to actuals, okay.  So

11   my understanding is they met -- met their consensus

12   estimate for two months before the quarter end.

13        Now, it is indicated here, I think it is

14   correct to indicate that Siebel did miss their Q2.

15     Q.   Did PeopleSoft miss its earnings estimate for

16   1Q '01?

17     A.   No, it didn't.  PeopleSoft was one of the few

18   firms that beat.  But remember, PeopleSoft was coming

19   off of just a horrendous year in 2000.  So -- but it is

20   one that it beat expectations.

21     Q.   How about 2Q '01?

22     A.   PeopleSoft beat again, yeah.  I think prior to

23   that, those two -- prior to Q3 2000, I think there were

24   four or five misses of PeopleSoft in the 2000 period.

25   And I think that had an impact on sort of the degree to

1    which expectations were formed on PeopleSoft.

2        Q.   Does the experience by Siebel during 1Q '01

3    support your opinion that Oracle's miss was a result of

4    a sudden and sharp economic slowdown in the enterprise

5    software industry?

6        MR. FRIEDMAN:  Objection; vague.

7        THE WITNESS:  Is it consistent?

8        MS. WINKLER:  Q.  Does it support your opinion

9    that Oracle's earning miss was the result of a sudden

10   and sharp economic slowdown in the enterprise software

11   industry?

12       A.   I think it is.  I think it is important -- we

13   could go back to the Siebel analyst reports, and my

14   recollection is there is discussion in the Siebel

15   analyst reports about the impact of a slowing economy on

16   Siebel's business.

17       But I don't think that I would look at

18   Exhibit 8 and go -- by individual firms, look at a

19   specific firm and say whether it met, beat or missed is

20   a test of whether there was a sudden economic downturn

21   that adversely affected business.

22       What I would look for is what's happening

23   within the industry.  And to form an opinion of what's

24   happening in the industry, I think you have to look at

25   that in the context of how firms in the industry

1    generally are doing relative to how they have done in

2    the past.

3        Q.   So Siebel's experience during the first

4    quarter of 2001 doesn't support your opinion that

5    Oracle's earning miss was --

6            MR. FRIEDMAN:  Objection; mischaracterizes --

7            MS. WINKLER:  Could I finish my question,

8    please?

9            MR. FRIEDMAN:  I'm sorry.

10           MS. WINKLER:  Q.  So Siebel's experience

11   during the first quarter of 2001 doesn't support your

12   opinion that Oracle's earnings miss was the result of a

13   sudden and sharp economic slowdown in the enterprise

14   software industry?

15           MR. FRIEDMAN:  Objection; mischaracterizes

16   testimony, asked and answered.

17           THE WITNESS:  I think the evidence I've

18   provided in Exhibit 8 and the cite to Siebel is

19   consistent with my view.  And I'm not sure how I could

20   expand on the answer that I gave you just a moment ago.

21           MS. WINKLER:  Q.  How is it consistent with

22   your view?

23       A.   Again, I'm going to refer you back to the

24   testimony that I just gave, is that you look at -- I

25   recall looking at the analyst reports with respect to

1    Siebel that discuss the potential slowing economy and

2    its impact.  But I think the point of Exhibit 8 and the

3    point to keep in mind is when looking at whether there

4    is an industry impact of a slowing economy, one looks at

5    the industry.

6         In any given industry at any given point in

7    time there may be a winner or two, okay.  But what one

8    looks at to form -- to inform oneself about whether

9    there has been a change in industry conditions is to

10   look at the industry.

11   Q.   Let's keep looking at the industry.

12        Does PeopleSoft's experience during the first

13   quarter of 2001 support your opinion that Oracle's

14   earnings miss was the result of a sudden and sharp

15   economic slowdown in the enterprise software industry?

16        MR. FRIEDMAN:  Objection; vague.

17        THE WITNESS:  I give you the same answer I

18   gave a moment ago, which is that certainly in and of

19   itself, PeopleSoft met expectations, expectations that

20   had been formed based upon really a history of

21   relatively poor performance in the 2000 period.

22        Now, I would look at this not in the context

23   of an individual firm, but look at it in the context of

24   the industry as a whole to form an impression and form

25   an opinion as to whether the industry is being adversely

1   impacted.

2       MR. FRIEDMAN:  When you have a moment, I

3   wouldn't mind taking a break.

4       MS. WINKLER:  I just want to finish this line

5   of questioning.

6       Q.   Did BEA Systems miss their earnings estimate

7   for 1Q '01?

8       A.   For 1Q '01?  No, it did not.

9       Q.   Does the experience by BEA Systems during the

10  first quarter of 2001 support your opinion that Oracle's

11  earnings miss was the result of a sudden and sharp

12  economic slowdown in the enterprise software industry?

13      MR. FRIEDMAN:  Objection; asked and answered.

14      THE WITNESS:  I would give you the same answer

15  I gave you a moment ago with respect to PeopleSoft,

16  Siebel, looking at IBM, Ariba, Commerce One, I2.

17      MS. WINKLER:  Q.  Did SAP miss earnings

18  estimates for 1Q '01?

19      A.   1Q '01, SAP.  In the context of this analysis,

20  I can't tell you, because the consensus estimate that is

21  provided in first call has an obvious error in it.  So I

22  can't look at SAP relative to expectations formed at a

23  particular point in time.

24      Now, what I can tell you is that in reviewing

25  the analysts' reports for SAP, when it says it beat

1   expectations, it beat expectations relative to

2   expectations before the earnings announcement.  But

3   those expectations had been revised downward prior to

4   that.  And their beat was principally in not the

5   licensing segment of its business, but in its consulting

6   business.

7       Q.   Does the experience of SAP during the first

8   quarter of 2001 support your opinion that Oracle's

9   earnings miss was the result of a sudden and sharp

10   economic slowdown in the enterprise software industry?

11       A.   Give you the same answer that I gave you with

12   respect to any of the other competitors.  That one looks

13   at the industry and in the context of the industry.

14          Certainly with respect to SAP, the discussion

15   is very clear in the analysts' reports with respect to

16   SAP, that there has been a slowdown in the industry, and

17   it is impacting SAP.

18       Q.   Is that a yes or no?

19          MR. FRIEDMAN:  Objection; asked and answered.

20          THE WITNESS:  I --

21          MR. FRIEDMAN:  And vague.

22          THE WITNESS:  I didn't -- I don't know that

23   you -- you asked me a question, I answered it.

24          MS. WINKLER:  Q.  I asked you a yes or no

25   question.

1          Does the experience by SAP during the first

2     quarter of 2001 support your opinion that Oracle's

3     earnings miss was the result of a sudden and sharp

4     economic slowdown in the enterprise software industry?

5          MR. FRIEDMAN:  Just add the "argumentative"

6     objection to it, now, too.

7          THE WITNESS:  I think I've answered that

8     question.  I would refer you back to my prior testimony.

9          As I indicated to you, the SAP analysis I

10    think is consistent with my -- with this analysis.  I

11    would look at the entire industry in terms of

12    determining whether there's been an industry-wide

13    slowdown.

14          MS. WINKLER:  Q.  So you can't give me a yes

15    or no answer?

16          MR. FRIEDMAN:  Objection; asked and answered,

17    argumentative.

18          THE WITNESS:  I think I have answered your

19    question as well as I can.  I think I've given you a

20    complete and understandable answer.

21          MS. WINKLER:  Q.  Did you know that Ariba

22    declined about 75 percent during the Class Period?

23     A.  Ariba declined in what context?

24          MR. FRIEDMAN:  Objection; vague.

25          MS. WINKLER:  Q.  Ariba's business declined

1    about 75 percent during the Class Period.  Did you know

2    that?

3          MR. FRIEDMAN:  Objection; vague.

4          THE WITNESS:  Its business in terms of its

5    revenue business?

6          MS. WINKLER:  Q.  Yes.

7          A.  I recall seeing that Ariba did relatively

8    poorly during the Class Period.

9          Q.  Did you know that it declined about 75

10   percent?

11         A.  I didn't have a specific number in mind.

12         Q.  Did you know that Commerce One and I2's

13   revenues declined about 50 percent during the Class

14   Period?

15         A.  I don't recall that specific number.  But I do

16   recall the business was off as well.

17         Q.  Wouldn't that be an indication that the

18   economic slowdown or the economic downturn was not as

19   sudden and sharp as suggested by you?

20         A.  No.  I think that what you need to look at

21   here is whether there's new information coming to the

22   marketplace.

23         And I think that as evidence of that

24   information, one looks at, for example, the stock

25   returns of those companies.  Second, how they are doing

1  relative to expectations formed prior to the beginning

2  of the Class Period.

3      Q.   Do you know the answers to those questions

4  with respect to Ariba, Commerce One and I2?

5      A.   I gave you the answer.

6      MR. FRIEDMAN:  Objection; asked and answered.

7      MS. WINKLER:  Q.  How did Ariba do during the

8  Class Period --

9      MR. FRIEDMAN:  Objection; vague --

10     MS. WINKLER:  Q.  -- relative to expectations

11  formed prior to the beginning of Class Period?

12     A.   During the Class Period?  You can look at --

13  what do you mean by during the Class Period?

14         I presume you mean between 12/14 and 3/2?  And

15  if you look at Ariba, this would be during the Class

16  Period, it makes an announcement in Q1 on 1/11/01,

17  beating expectations.

18     MS. WINKLER:  This is probably a good time to

19  take a break now.  We need to change the type.

20     VIDEOGRAPHER:  This is the -- this marks the

21  end of videotape number one, Volume I, in the deposition

22  of Christopher James.  We are going off the record.  The

23  time is 11:00 a.m.

24         (Recess, 11:00 a.m. - 11:12 a.m.)

25     VIDEOGRAPHER:  We are back on the record.

1    This marks the beginning of videotape number two, Volume

2    I, in the deposition of Christopher James.  The time is

3    11:12 a.m.

4         MS. WINKLER:  Q.  How does your analysis

5    address plaintiffs' allegations regarding the issuance

6    of false financial projections?

7         MR. FRIEDMAN:  Objection; vague.

8         THE WITNESS:  I'm not sure what you mean.

9         MS. WINKLER:  Q.  What part of that question

10   don't you understand?

11        A.   There are a number of allegations, as I

12   understand it, in the case.  And I'm not sure which of

13   them you're referring to when you say false financial

14   projections.

15        Q.   Do you not understand what false financial

16   projections means?

17        A.   It could touch on a number of different

18   issues, that's why I'm asking for clarification.

19        Q.   Which issues do you think it could touch on?

20        A.   Certainly, as I understand the allegations, it

21   could touch on the question of whether Oracle -- the

22   impact of a slowing economy on Oracle's business, and it

23   could touch on the fact of whether there was a

24   reasonable basis for the forecast as it pertains to Q3

25   and how -- whether certain statements during the Class

1    Period with respect to Q3 performance were reasonable

2    based on the information that Oracle had.  It could --

3    so it could touch on a number of the issues.

4        Q.   After the end of the third quarter, Oracle

5    declined to give detailed projections or guidance for

6    the fourth quarter; didn't it?

7        A.   That is correct.

8        Q.   Does that fact matter at all to your analysis?

9        A.   It was certainly something I considered.  I

10   think in the context of what had occurred at Oracle,

11   that that's not something that -- that has to do with

12   post class analysis, but it is certainly something I

13   considered in the context of the announcement they made

14   on 3/1.

15       Q.   You say you considered it, but did it play any

16   role in your ultimate decision or ultimate opinion in

17   this case?

18       A.   Well, I think, you know, yes, it did.  It did

19   in the sense that -- my understanding is that the price

20   decline -- my opinion is that the price decline was a

21   result of material new information regarding the

22   economy, and that given sort of the failure of deals to

23   close in the last few days as a result of hesitancy on

24   the part of CIOs, that Oracle believed on a

25   going-forward basis that it lacked sufficient visibility

1    with respect to its Q4 results.

2         Now, what the -- so the specific guidance that

3    was provided -- so they did provide an indication on 3/1

4    of where they thought things would be going

5    directionally in Q4, but not specific numbers.

6    Q.   Didn't Oracle state in the 3/1/2001 conference

7    call that deals were simply pushed out 30 to 60 days?

8    A.   Yes.

9    Q.   If deals were really just pushed out 30 to 60

10   days like they said, why would they have not been able

11   to better forecast Q4?

12        MR. FRIEDMAN:  Objection to form.

13        THE WITNESS:  Pardon me?

14        MS. WINKLER:  Could you read my question back,

15   please.

16        (Record read as follows:  QUESTION:  If deals

17        were really just pushed out 30 to 60 days, why

18        would they have not been able to better

19        forecast Q4?)

20        THE WITNESS:  Well, I mean, I think that

21   you're asking a question of -- in context if -- well,

22   first of all, as of 3/1, okay, that was a preliminary

23   analysis, right.  So you have -- and as they indicate, I

24   think -- you know, Henley is in a car on a conference

25   call in Miami, and they are providing a pre-announcement

1      to earnings.  So it didn't strike me as unusual in that

2      context that they had surprises at the end of the

3      quarter that appear to be a result of the economy.  And

4      that in the context of 3/1 they are not comfortable

5      until they better understand the circumstance of

6      providing additional guidance as it pertains to Q4.

7           MS. WINKLER:  Q.  I don't think you answered

8      my question.

9           My question was, if deals were really pushed

10     out just 30 to 60 days, like Oracle said on that

11     conference call, why is it that they would not have been

12     able to better forecast Q4?

13         A.  For the reasons I just gave you, that if you

14     go to the 3/15, which is -- they have had two weeks to

15     analyze what is going on with respect to their product

16     lines.  They do provide an indication that -- in terms

17     of what they expect directionally with respect to Q4.

18         Q.  Did they give detailed guidance with respect

19     to Q4?

20         A.  I think it's important to keep in mind the

21     distinction between detailed guidance and guidance.

22         They did not provide -- I don't recall seeing

23     in the 3/15 call detailed guidance as it pertains to

24     revenue numbers by product category.  But I would have

25     to go back and look.

1        Q.   On the March 15th call, did Oracle announce

2    that the deals really had not been pushed out 30 to 60

3    days like they had said on the 3/1 call?

4        A.   No.  They indicated that it was a response to

5    a push-back by CIOs.  Their understanding was that deals

6    were being pushed back that was not a result of losing

7    deals to competitors.

8            I mean, I think in the context, if you have a

9    situation in which customers are postponing deals, you

10   have an indication that it may be 30, 60 days, it may be

11   longer.

12       Q.   Did they say it may be longer?

13       A.   I don't recall.

14       Q.   But even with the additional time to analyze

15   what was going on, Oracle still didn't give detailed

16   guidance on the 3/15 call, did they?

17       A.   I would have to go back and review the

18   guidance they provide.  I would just say with respect

19   to, you know, Q4, I simply don't recall the specificity

20   on the 3/15 call.

21       Q.   Was the guidance on the 3/15 call as detailed

22   as the guidance Oracle had given at the end of Q2 with

23   respect to Q3?

24       A.   I would have to --

25           MR. FRIEDMAN:  Objection; asked and answered.

1        THE WITNESS:  I would have to go back and

2    review the transcripts to compare the degree of detail

3    with respect to the forecasts in the Q&A.

4        MS. WINKLER:  Q.  If, in fact, the guidance

5    that Oracle had given for Q4 was much less detailed than

6    what Oracle had given with respect to Q3 prior to the

7    start of Q3, would that have any effect on your opinion?

8        A.  No.  I think that you're looking at trying to

9    forecast what is a substantially different economic

10   environment going forward than you perceive in the end

11   of Q2.

12       Q.   In your opening brief, going back to footnote

13   174, you indicate that you understand some of the bad

14   debt transfers in 2Q '01 were proper; is that fair?

15       A.   What?

16       MR. FRIEDMAN:  Objection; mischaracterizes.

17   The document speaks for itself.

18       MS. WINKLER:  Could you read the question

19   back, please.

20       THE WITNESS:  I simply didn't hear you.

21       MS. WINKLER:  She's going to read it back for

22   me.

23       (Record read as follows:  QUESTION:  In your

24       opening brief, going back to footnote 174, you

25       indicate that you understand some of the bad

1      debt transfers in 2Q '01 were proper; is that

2      fair?)

3          THE WITNESS:  That's not what 174 says.  It

4   says, "I understand that if the 20.1 million in

5   transfers in 2Q had not been made, then Oracle would

6   have earned 10.38 cents per share."

7          MS. WINKLER:  Q.  And what does the next

8   sentence say?

9      A.  "Of course, this presume the full 20.1 in

10  transfers was improper, which I understand not to be the

11  case."

12     Q.  So you understand some of those transfers were

13  proper?

14     A.  I haven't gone to -- my understanding from

15  reviewing the -- and discussing with Mr. O'Bryan that

16  there is -- that he was able to identify certain

17  transactions that in his opinion were proper, okay.

18          And I don't recall specifically the division

19  between the ones that he couldn't determine whether they

20  were proper or improper and ones in which he could

21  affirmatively say they were proper.

22     Q.  So going back to my --

23     A.  So I don't think the inference I would draw

24  from this is that I'm rendering an opinion or providing

25  an opinion about what portion of the 20.1 transfers are

1    in my view proper or improper.

2         Q.   But you do indicate that you understand some

3    of the bad debt transfers in Q2 '01 were proper?

4         A.   That's my understanding, yes.

5         Q.   That's what you indicate here in footnote 174?

6         A.   That's right.

7         Q.   And other than your conversation, I think you

8    said, your conversation with Mr. O'Bryan, on what do you

9    base that understanding?

10        A.   Just that, and reviewing his report.

11        Q.   And did you review what Mr. Regan had to say

12   with respect to that issue?

13        A.   Yes.

14        Q.   So, in effect in this footnote you're just

15   repeating what you've been told by Mr. O'Bryan; is that

16   fair?

17             MR. FRIEDMAN:  Objection; overbroad.  Which

18   portion?

19             MS. WINKLER:  Q.  Let's focus on the sentence,

20   "Of course, this presume that the full $20.1 million in

21   transfers was improper, which I do not understand to be

22   the case."

23        A.   That's correct.

24        Q.   Are you familiar with the Supreme Court's

25   decision in Basic versus Levinson?

1      A.  Yes.

2      Q.  What's your understanding of the holding of

3  that case?

4      A.  As it pertains to?

5      Q.  Let's talk about materiality.

6      A.  That the decision as it pertains to --

7  provides sort of a definition of materiality as it

8  pertains to misstatements or omissions that changed the

9  total mix of information within the marketplace.

10      Q.  You're not offering a legal opinion here on

11  whether the false and misleading statements alleged by

12  plaintiffs are material under Basic, are you?

13      A.  As a legal opinion?  No.  I'm saying that if

14  one wants to look from an economic or financial

15  perspective on materiality, one should do certain things

16  that Mr. Steinholt hasn't done.

17          First of all, familiarize yourself with the

18  total -- the information that is available in the

19  marketplace and determine whether certain statements

20  change in a significant way the total mix of

21  information.

22      Q.  Do you disagree that material information is

23  information a reasonable investor would want to consider

24  prior to making an investment decision?

25      A.  I think that you need to look at whether --

1    you need to go beyond that, that in order to assess it

2    from an economic perspective, you need to look at

3    whether it changes the mix of information in a

4    significant way by altering the market's expectations

5    regarding expected future cash flows.

6        Q.   So you do disagree with that statement?

7        A.   I disagree with a statement in and of itself,

8    that's right, that you can certainly have a situation in

9    which a reasonable investor might view something as

10   significant, but if it doesn't change in a significant

11   way the market's valuation of a company, then I think

12   that that provides an objective measure as to whether

13   the information has changed the total mix of

14   information.

15       Q.   So do you agree a reasonable investor is

16   interested in information that impacts the value of an

17   investment?

18       A.   That's true.  I mean, I'm saying that a

19   reasonable investor would be interested to know or would

20   find informative are really kinds of definitions of

21   materiality that are inherently subjective.

22       Q.   Do you believe that it's reasonable to define

23   the value of an investment generally as the present

24   value of that investment's future cash flow?

25       A.   I think that the general -- generally we think

1    about investments in terms of the value of the present

2    discounted value of the future cash flow; that's

3    correct.

4        Q.   So what is important to investors is

5    information that would impact the future cash flows of

6    that investment; correct?

7        A.   Impact the future cash flows in the investment

8    in a material way.  So I think that you have to take it

9    in the context of having a significant impact on the

10   cash flows on a going-forward basis.

11       Q.   How do you define materiality?

12       A.   As I defined it in my report, you look at

13   whether it has a significant impact on the valuation of

14   the company.

15       Q.   How do you make a determination about whether

16   a misrepresentation is material?

17       A.   Well, I think, again, this is something that I

18   discuss in my report.  You first start off with, if

19   you're talking about a misrepresentation, then you need

20   to have some baseline what the alleged truth is.  So one

21   can look at the statement in the context of what

22   allegedly could or should have been said at various

23   points in time.  That's the first step.

24       The second step would be then to look at

25   whether given an incremental statement relative -- the

1    statement and its incremental impact on the mix of

2    information relative to the alleged truth, first off,

3    whether it is new information, and, second, whether it

4    would be expected to have a material impact on value, a

5    significant impacted on value.

6            MS. WINKLER:  I'm going to ask the reporter to

7    mark this document as the next exhibit.

8                (Exhibit 4 marked for

9                    identification.)

10           MS. WINKLER:  Q.  This document was previously

11   marked as Roberts Exhibit 9, and is Bates labeled for

12   the record as NDCA-ORCL 013382 through 85.

13           Have you seen this document before?

14       A.  I don't recall seeing it.

15       Q.  Do you see the date on this document on the

16   first page, January 17th, 2001?

17       A.  Yes, I see it.

18       Q.  And do you see the recipients of this e-mail

19   from Larry Garnick?

20       A.  Yes.

21       Q.  Do you know whether any of those recipients

22   are defendants in this case?

23       A.  I believe Mr. Ellison and Mr. Henley are.  And

24   I have to look at the complaint whether Mr. Sanderson

25   is, Ms. Minton.

1      Q.  Do you see that it states, "Summarized below

2    are the December fiscal year '01 revenue results for

3    your review.  Please note"?  Do you see that?

4      A.  Please note the following, yeah.

5      Q.  It just says, "Please note," colon?

6      A.  Yes, I see it.

7      Q.  If you could read out loud the first bullet

8    point there.

9      A.  "The license revenue growth was 35 percent in

10    USD, 25 points better than the 10 percent growth we

11    experienced in December FY '00 over December FY '99.

12    However, excluding the $60 million Covisint license

13    deal, the USD growth rate would have been 6 percent.

14    Excluding Covisint, OPI license revenue growth would

15    have been 85 percent."

16      Q.  That's negative 85 percent; is it not?

17      A.  Yes.

18      MR. FRIEDMAN:  Objection to the extent the

19    documents speaks for itself.  It is in parentheses.

20      MS. WINKLER:  Q.  Oracle didn't disclose this

21    information to the market; did it?

22      MR. FRIEDMAN:  Objection as to "this

23    information."  Vague.

24      THE WITNESS:  I don't recall seeing -- well,

25    let's back up.

1       It's got the Covisint deal, that's public

2   information, I believe.  I don't believe -- I don't

3   recall seeing a December revenue growth in the public

4   press, but -- I don't believe I recall seeing that.

5       I'm not sure why -- I just don't recall seeing

6   that.

7       MS. WINKLER:  Q.  Do you see on the fourth

8   bullet point down, the second sentence states,

9   "Excluding Covisint, applications product growth would

10  have been negative 46 percent"?

11  A.  I'm not sure why you would exclude Covisint,

12  but --

13  Q.  Have you seen any information that Oracle

14  disclosed this information to the market, to the

15  investors during the Class Period?

16      MR. FRIEDMAN:  Same objections; vague.

17      THE WITNESS:  I don't recall seeing Oracle

18  providing, say, monthly updates in terms of revenue

19  growth.

20      MS. WINKLER:  Q.  Would you consider this

21  information to be material to investors?

22      MR. FRIEDMAN:  Objection; vague.

23      THE WITNESS:  First of all, if it's -- I mean,

24  I don't know whether it was disclosed or not.  Second, I

25  don't know that in the context it would necessarily be

1    material.

2         Remember that the context of their forecast,

3    the majority of their revenues are realized in the last

4    month of the quarter, and the lasts few days.  So

5    deviations would not necessarily -- even if one were to

6    assume these are deviations, which it is not clear from

7    this document that they are, that those would be viewed

8    as material.

9         MS. WINKLER:  Q.  In response to my question

10   you first -- about whether you would consider this

11   information to be material, you stated, "I don't know

12   whether it was disclosed or not."

13        What does that have to do with the

14   materiality?

15        A.  Well, if it were disclosed, then I could

16   assess the impact of this -- whether or not it was

17   viewed by the market as being material, okay.

18        My understanding is, is that Oracle was not,

19   as many companies do not, provide sort of monthly or

20   weekly updates in terms of their revenue stream.

21        But, you know, again I don't -- I can't look

22   at this document and say that this would lead me or the

23   market to view the prospects for Oracle in the third --

24   in Q3 to be materially different than what the market

25   was believing at the time.

1      Q.   But you can't look at this document and say

2    that the market wouldn't have viewed this information as

3    being material; can you?

4          MR. FRIEDMAN:  Objection; vague.

5          THE WITNESS:  In other words, you wanted me to

6    look at this document and based on this document

7    determine whether it would be material to the market or

8    not?  Without knowing more, I don't think I can do that.

9    I mean, I would look to whether on the basis -- based on

10   this document whether Oracle had a reasonable basis for

11   concluding whether it would meet its forecast, whether

12   this would change the expectations of investors going

13   forward.

14          It doesn't appear to me that, for example,

15   that this indicates that they are off track in any way

16   to meet their expectations.  I certainly haven't seen

17   any analysis by, for example, Mr. Goedde that would

18   indicate that this would move the earnings number from a

19   particular, say, 12 cents to 10 cents or something like

20   that.

21          MS. WINKLER:  Q.  So you're saying that you

22   don't think investors would have been concerned about

23   the fact that Oracle's applications growth rates were

24   negative, excluding Covisint in December of 2000?

25          MR. FRIEDMAN:  Objection; argumentative.

1        THE WITNESS:  I think they would be -- they

2    are concerned about, as they always were, with Oracle's

3    growth rates, as well as its other aspects of its

4    performance.

5        Oracle did not -- and investors, my

6    recollection is, were not expecting to be provided with

7    monthly updates in terms of Oracle's revenues.  I look

8    at this, and it says that they are 25 points better than

9    the 10 percent experienced in FY 2000.

10       MS. WINKLER:  Q.  Investors' expectations of

11   whether or not they are going to receive monthly updates

12   has nothing to do with whether this information is

13   material though, does it?

14       A.  Oh, sure.  Because you're going to look at it

15   in the context of what your expectations are.

16       Q.  We're talking about expectations of whether or

17   not you get a monthly update, not expectations of

18   financial results.

19       A.  I'm not sure I understand your question.  If

20   I'm an investor looking at Oracle, what I would have to

21   look at here is -- remember, analysts are doing their

22   own channel checks.  They are aware of the business

23   prospects of Oracle on an ongoing basis.

24       If Oracle has a practice of not providing

25   revenue updates on a monthly basis, and recognizing that

1    their quarter is back-end loaded, it is not clear from

2    looking at this document to me that investors would view

3    this information to be materially positive or materially

4    negative, or have no material impact.

5        Q.   So what you're saying is you can't say either

6    way?

7        A.   No, I can't.

8        Q.   From your prior response, are you indicating

9    that Oracle's practice or lack of practice of providing

10   monthly updates affects whether this information is

11   material?

12       A.   Sure.  I mean, if you had Oracle periodically

13   providing monthly updates, and then you're representing

14   to me that they didn't provide this to the market, would

15   that might be viewed as something that the market might

16   consider important?  Yeah.  But they didn't have a

17   process of or a program of revealing this information,

18   so I don't see that it in and of itself is necessarily

19   material.

20       Q.   So aside from whether they had a practice or

21   not of giving monthly updates, you don't think that it

22   would have been material to -- strike that.

23           Just focusing on the negative applications

24   product growth rates and license growth rates --

25       A.   Why would you just focus on the negative --

1    Q.   Can I finish my question, please?

2    A.   I thought you were done.

3    Q.   Did you understand that to be a question?

4    A.   Yes.

5    Q.   Well, it wasn't; and I'm not finished.

6         Just focusing on the negative applications

7    product growth rates and license growth rates, you can't

8    say whether or not that information would be material to

9    investors --

10        MR. FRIEDMAN:  Objection to form.

11        MS. WINKLER:  Q.  -- would have been material

12   to investors as of January 17th, 2001?

13        MR. FRIEDMAN:  Sorry for cutting you off.

14   Objections to form, vague.

15        THE WITNESS:  Just so I'm understanding, you

16   want me to focus just on a part of this document?

17        MS. WINKLER:  Q.  What other part of this

18   document is there?

19        MR. FRIEDMAN:  There's four pages of the

20   document.  Which part --

21        MS. WINKLER:  Q.  Do you see anything in this

22   document about whether or not Oracle provided monthly

23   updates?

24    A.   That's not your question, is it?

25    Q.   That is my question now.

1      A.  Well, why don't you tell me what your question

2   is now.

3      Q.  Sure.

4      A.  Because you got two questions on the table.

5      Q.  Do you see anything in this document about

6   whether --

7          MR. GIBBS:  Let him finish his answer before

8   you start your next question.

9          MS. WINKLER:  Q.  -- about Oracle providing

10  monthly updates?

11     A.  That wasn't your prior question.  I don't

12  see anything --

13     Q.  I'm the one who's asking the questions.  That

14  is my question now.

15         MR. GIBBS:  Hey, hey, hey, let him finish.

16         MR. WILLIAMS:  He's going to defend the

17  deposition.  And nothing improper is happening here.

18  She's clarifying the question and --

19         MS. WINKLER:  I can change my question when I

20  want to change my question.

21         MR. WILLIAMS:   -- he's trying to answer.

22         MR. GIBBS:  She's cutting him off repeatedly

23  and she's --

24         MR. WILLIAMS:  You almost jumped out of your

25  chair, Patrick; come on.

1          MR. GIBBS: -- taking a completely

2     inappropriate tone.  She's taking a completely

3     inappropriate tone, and she's cutting him off.

4          MR. WILLIAMS:  I think when we listen to the

5     audio, the only person that's taking an inappropriate

6     tone is you.  And if the video was on you, you almost

7     climbed up on the table.  It is not that serious.

8          MR. FRIEDMAN:  Why don't you ask the current

9     question.

10          MS. WINKLER:  Q.  My question is, do you see

11     anything in this document about whether or not Oracle

12     provided monthly updates?

13     A.  Let me take a look at the document in its

14     entirety.  And I presume by your question you mean

15     monthly updates to the market?

16     Q.  That's correct.

17     A.  There is no indication to me that Oracle

18     provided this information to the market, or whether it

19     was Oracle's practice of providing monthly updates to

20     the market.

21          MS. WINKLER:  I want to have marked as the

22     next exhibit, Exhibit 5.

23               (Exhibit 5 marked for

24                identification.)

25          MS. WINKLER:  Q.  Have you seen this document

1    before?

2        A.   I don't recall.

3        Q.   For the record, this document is Defendants'

4    Response to Plaintiffs' First Set of Requests for

5    Admissions.  I want to direct your attention to the

6    third page of the document, which is numbered 2 at the

7    bottom.  And I will ask you to --

8        A.   I don't mean to -- I'm not interrupting you.

9    I can't hear what you said.  Response to Request No. 2?

10       Q.   I was just indicating the title to the

11   document.

12           I want to direct your attention to the page

13   that's numbered 2 at the bottom.

14       A.   Okay.

15       Q.   And if you will see at the top of that page,

16   it appears, "Request for Admission No. 1."  Do you see

17   that?

18       A.   Yes.

19       Q.   Do you see at the end of the response to

20   Request No. 1 the response states, "Defendants admit

21   that on December 11th, 2000 Oracle's sales pipeline

22   growth for 3Q '01 was 52 percent in constant dollars;

23   and on December 25th, 2000, Oracle's sales pipeline

24   growth for 3Q '01 was 34 percent in constant dollars"?

25       A.   Right.

1      Q.   Did Oracle disclose this information to the

2   market?

3      A.   My understanding is that Oracle -- I don't

4   recall seeing anything that indicated that Oracle

5   provided monthly pipeline sales -- sales pipeline growth

6   numbers to the marketplace.

7      Q.   Was this information -- would you consider

8   this information to be material?

9      A.   Its monthly sales pipeline?

10      Q.   Yes.

11      A.   That would depend.

12      Q.   The decrease in the pipeline that's

13   represented by the response to Request No. 1?

14      A.   Not necessarily.

15      Q.   Can you explain what you mean by not

16   necessarily?

17      A.   Sure.  Given, if -- as is my understanding,

18   given the pipeline growth at this point in time, and

19   given the nature of the revenue streams, was Oracle in a

20   position to -- would it have changed expectations

21   materially concerning the 3Q results.  If at that point

22   in time given the mix of information it wouldn't change

23   materially the 3Q results or results going forward, then

24   I wouldn't view it as material.

25      Q.   And do you know the answer to that question?

1      A.   My understanding from reviewing Mr. or

2   Dr. Hubbard's report is that based on this information,

3   the upside report on which the forecasts were based was

4   indicating that Oracle would still make the forecasted

5   12 cent number.

6           I know we've been at it for less than an hour,

7   but I need to take a short break.  I apologize.

8           MS. WINKLER:  Sure.

9           VIDEOGRAPHER:  Off the record.  The time is

10   11:46 a.m.

11           (Recess, 11:46 a.m. - 11:56 a.m.)

12           VIDEOGRAPHER:  We are back on the record.  The

13   time is 11:56 a.m.

14           MS. WINKLER:  Q.  Going back to defendants'

15   admission that Oracle's sales pipeline growth for 3Q '01

16   declined from 52 percent to 34 percent from December

17   11th, 2000 to December 25th, 2000, are you saying that

18   if Oracle had known its pipeline declined by this amount

19   in January of 2001, that that would not have been

20   material?

21           MR. FRIEDMAN:  Objection; mischaracterizes

22   testimony.

23           THE WITNESS:  As I indicated when I answered

24   that question, is that -- I mean, I think the question

25   for purposes of determining materiality would be, would

1    this have impacted investors' valuations.

2         In the context as I understand it that the

3    forecasts plus upside at this point in time was such

4    that Oracle believed it could -- would meet its

5    expectation -- the guidance that it provided of 12

6    cents, and that, you know, whether this particular piece

7    of internal information would be material to investors

8    would be, I think, dependent upon how it would change

9    their expectations regarding future cash flows.

10        I've seen evidence that indicates that with

11   respect to the reasonableness of the 12 cent forecast at

12   this point in time, given what was in the pipeline, that

13   that was a reasonable forecast.

14        So based on that, I don't see that this would

15   necessarily be material.

16        MS. WINKLER:  Q.  You're aware that after

17   that, within 3Q '01, Oracle told investors that the

18   pipeline had never been stronger; aren't you?

19        A.  I recall seeing that, yes.

20        Q.  Given that representation, does that change

21   your view on materiality of the negative pipeline growth

22   in December?

23        A.  No.

24        Q.  Going back to Exhibit 4, are you saying that

25   if in January of 2001 Oracle knew that but for this one

1   unusual deal, applications products growth would have

2   been negative 46 percent, that would not have been

3   material?

4       MR. FRIEDMAN:  Objection; mischaracterizes

5   testimony, asked and answered.

6       THE WITNESS:  Well, you're characterizing this

7   as an unusual deal.  And, I mean, the market is aware of

8   this deal and has taken the deal in the context -- into

9   consideration in the context of looking at coming up

10  with a forecast of what market participants think Oracle

11  can do.

12      MS. WINKLER:  Q.  What do you know about the

13  Covisint deal?

14      A.   Covisint deal was a $60 million licensing deal

15  designed basically to provide enterprise software to

16  integrate with I believe it is the motor vehicle

17  industry.

18      Q.   Do you know when that deal closed?

19      A.   I believe it closed in the third quarter.

20      Q.   Do you know when in the third quarter that

21  deal closed?

22      A.   At the very beginning; my understanding.

23      Q.   Do you know whether Covisint ever actually

24  used Oracle's Suite 11i?

25      A.   I haven't gone back to look at that.

1     Q.   Do you know whether anyone within Oracle ever

2     characterized the Covisint deal as an unusual or outlier

3     deal?

4     A.   I think -- I don't know that they've

5     characterized it as an outlier or -- unusual deal?  It's

6     certainly a large deal.  I think that's correct.

7     Q.   Do you know whether anyone at Oracle advocated

8     that Covisint should be removed when considering the

9     growth rates?

10    A.   I don't know.  My recollection is they

11    considered the Covisint transaction in the context of

12    providing guidance.

13    Q.   But you haven't seen any document indicating

14    that certain individuals within Oracle thought that

15    Covisint shouldn't be considered?

16    MR. FRIEDMAN:  Objection; asked and answered.

17    THE WITNESS:  It would depend on what context

18    they were trying to determine whether to include or

19    exclude the Covisint deal.

20    MS. WINKLER:  Q.  My question was, had you

21    seen any documents that reflected that?

22    A.   I don't recall seeing any.

23    Q.    If a misrepresentation results in a stock

24    price that is higher than if the truth was disclosed,

25    does that not mean that the misrepresentation was

1    material?

2        A.   I think that you need to be more precise and

3    expand on the characterization before I would say --

4        Q.   Can you answer the question?  I'm sorry, I

5    didn't mean to interrupt.

6        A.   I think that it would depend on the

7    circumstances, but I think you need more than that

8    before I could determine whether it was, in fact,

9    material or not.

10       Q.   If investors expect a company to report

11   earnings of $1 per share, but earnings were only 50

12   cents per share, would falsely reporting $1 per share be

13   a material misrepresentation?

14       A.   It potentially could be.  It would again

15   depend on the circumstances.  But that certainly could

16   potentially be material.

17       Q.   How would you go about determining whether

18   that was material?

19       A.   In a couple of ways.  One is to look at share

20   price reaction when the -- a similar difference is

21   observed in a similar set of context.

22          So, in other words, you asked the question of

23   whether a 50 cent change in earnings expectations would

24   have a material impact on the value of the stock.  One

25   would look at if there is at some point in time a

1   curative disclosure, that, you know, we're not at a

2   dollar, we're at 50 cents, that is linked in a causal

3   way to the prior misstatement, then that would be

4   another way.

5       Q.   If on March 1st, 2001 Oracle had falsely

6   prenounced (sic) results in line with investors'

7   expectations so that there was not a significant price

8   movement following the announcement, would that false

9   representation have been material?

10      A.   Could I have the recorder read that back?

11  It's a detailed question.

12       MS. WINKLER:  Sure.

13       (Record read as follows:  QUESTION:  If on

14       March 1st, 2001 Oracle had falsely preannounced

15       results in line with investors' expectations so

16       that there was not a significant price movement

17       following the announcement, would that false

18       representation have been material?)

19       MS. WINKLER:  I think that should have been

20   "falsely prenounced results."

21       THE WITNESS:  I'm sorry, could -- why don't

22   you ask the question again.

23       MS. WINKLER:  Q.  If on March 1st, 2001,

24   Oracle had falsely prenounced results in line with

25   investors' expectations so that there was not a

1   significant price movement following that announcement,

2   would that false misrepresentation have been material?

3       A.   So had Oracle done something different in the

4   exact environment in which it had a -- that existed as

5   of 3/1, then I would say that -- I mean, it is my

6   opinion that the price decline on 3/2 is a result of

7   Oracle's announcing that it missed its earnings number

8   because of a deterioration in the economy.

9           If what Oracle was saying is everything,

10  except that instead of missing, we meet, then I would

11  need to know how they are meeting before I could

12  determine whether the market would view that as

13  materially different than what was being announced.

14          Certainly if you're holding everything else

15  constant, okay, and you're just changing or meeting, as

16  opposed to not meeting, and you're saying the same

17  economic conditions, that seems to be a hypothetical

18  that's internally inconsistent.  Because you couldn't be

19  disclosing the market conditions and their impact on you

20  without also disclosing what impact it has on your

21  earnings.

22          But certainly would I view a 2 cent -- meeting

23  expectations versus missing expectations by 2 cents

24  potentially material?  Certainly I would.  But I would

25  have to do the kinds of analysis that I've just

1    described to you about what's changing in the nature of

2    the announcement, what implications does it have for how

3    investors view cash flows on a going-forward basis.

4        Q.   The first event that you analyzed for

5    materiality was December 5th, 2000, regarding Ellison's

6    comments about the cost benefits of Suite 11i; is that

7    correct?

8        A.   I believe that is -- if I could turn to

9    Exhibit 7.  It is not one of the first complaint days --

10   I don't recall whether it is one of the first -- yes, it

11   is.  It is the first day in the plaintiffs' contention

12   responses.

13       Q.   And you concluded that that information was

14   either not new or not material; is that correct?

15       A.   Well, yes, that's correct.

16       Q.   In formulating that opinion, did you consider

17   any previous comments by Ellison regarding the cost

18   benefits of Suite 11i or the benefits of Suite 11i

19   general?

20       A.   Yes.

21       Q.   What comments?

22       A.   Well, as we talked about earlier when we were

23   referring to Exhibit 6, and you had asked why did you

24   look at information prior to the class, and I indicated,

25   well, I was trying to understand both the background as

1    well as determining whether certain information was into

2    the market prior to particular points in time in the

3    Class Period.  So one of the things I did was look at

4    press releases and analyst reports in the pre Class

5    Period.

6        Q.   And my question was specifically directed at

7    comments by Larry Ellison.  Do you recall reviewing any

8    of those?

9        A.   Yes, I did.

10       Q.   What comments were those?

11       A.   Well, I recall reviewing the comments he had

12   at the Credit Suisse, comments that were made in the

13   summer and comments that were made at OAUG conferences,

14   that's O-A-U-G.

15       Q.   You stated you recalled reviewing the comments

16   he had at the Credit Suisse.  What are you referring to?

17       A.   There's -- it was reported in Bloomberg, his

18   comments at a Credit Suisse conference, I believe it was

19   on the 29th of November.

20       Q.   Have you listened to those comments?

21       A.   I have.

22       Q.   Are you aware that at the November 29th, 2000

23   CSFB investor conference, Ellison claimed that Suite 11i

24   was complete and integrated and could support any large

25   company?

1      A.  I think -- my recollection, he said it is

2   designed to be integrated.  I don't recall him using the

3   word interoperable, but certainly indicated that the

4   design features were such that it would require no

5   additional systems integration as it pertained to the

6   suite modules.

7      Q.  Do you recall that he said the suite was

8   complete and integrated?

9      A.  I believe he said it was designed to be

10  complete and integrated, is my recollection of what he

11  said.

12     Q.  When did you listen to that investor

13  conference?

14     A.  Yesterday.

15     Q.  Had you listened to it previously?

16     A.  No.  I had seen commentary and discussion of

17  it, but I hadn't listened to it.

18     Q.  So you hadn't considered that Ellison's

19  comments made during that conference in formulating your

20  opinions in this case, other than how they had been

21  reported?

22     A.  And discussed in the financial press, yes.

23     Q.  When were those discussions in the financial

24  press?

25     A.  At -- there is a Bloomberg article, I believe,

1    on 11/30.  There is a Credit Suisse analyst report on

2    11/30.

3        Q.   Do you reference those in your report?

4        A.   I don't know that -- I reference what I've

5    relied on.  My understanding is the focus on 11/30

6    really has -- while I reviewed that, the focus on 11/30

7    was really in response to some comments made by

8    Mr. Steinholt that were not in his report or his

9    rebuttal report, that he referred to in his deposition.

10       Q.   So my question was, did you reference the

11   Bloomberg or Credit Suisse analyst reports in your

12   report?

13       A.   I believe the Bloomberg I did.  Credit Suisse,

14   I looked at it.  I don't recall -- I don't know that

15   it's listed in terms of relied upon.  Certainly

16   something I considered.  With respect to the Bloomberg,

17   I'd have to go back and look.

18       Q.   Let me know when you've had an opportunity to

19   look and see if you've referenced those.

20       A.   I'm not -- I don't see it referenced in the

21   materials relied upon.

22       MS. WINKLER:  I'm going to have the court

23   reporter mark this as Exhibit 6.

24            (Exhibit 6 marked for

25             identification.)

1          MS. WINKLER:  Actually I'm going to append

2      something to the back of that, if I could.

3          Q.   Showing you what's been marked as Exhibit 6.

4      And I'll represent to you that this is a certified

5      transcript of the November 30th, 2000 Ellison talk at

6      the CSFB investor conference.

7          A.   Okay.

8          Q.   Do you recall whether Mr. Ellison discussed

9      GE?

10         A.   Yes.

11         Q.   What do you recall about Mr. Ellison's

12     discussion of GE?

13         A.   I believe he had indicated that GE in one of

14     the divisions, I believe -- I don't know that he

15     referred to GE power in particular, but he referred to

16     GE, was in the process of implementing certain modules

17     with respect to Suite 11i.

18             He talks about GE in the context of they are

19     the type of organization which would find the aspects,

20     the design aspects of Suite 11i particularly attractive.

21             I also think he makes reference to his

22     admiration for Jack Welch, he believes it is a well-run

23     organization.

24         Q.   Do you know whether any new information was

25     disclosed by defendants during this November 29th, 2000

1    investor conference?

2         MR. FRIEDMAN:  Objection; overbroad.

3         THE WITNESS:  You know, as I reviewed it, it

4    didn't strike me that in terms of the aspects of the

5    product that there was new information -- information

6    that was substantially different from what I had seen in

7    prior press reports.

8         Certainly there is an enthusiasm and a

9    salesmanship of Ellison that, you know, is apparent in

10   the audio version that one wouldn't see on the written

11   version.

12        MS. WINKLER:  Q.  In your opening rebuttal

13   reports, which are Exhibit 1 and 2 here, you don't have

14   any indication that you analyzed the price increase in

15   Oracle's stock following this presentation; do you?

16        A.   No.  It was not identified either in the

17   plaintiffs' original complaint or in the context of the

18   interrogatories as the date that they viewed as

19   material.

20        Q.   Are you aware that any of the key

21   representations plaintiffs allege were false were made

22   during this November 29th, 2000 investor conference?

23        A.   Well, I think if you're looking at the

24   allegations in the complaint, and since the complaint

25   doesn't look at this as a date in which there is a

1     material misstatement, then the complaint -- the

2     allegations in the complaint must rely on other dates,

3     not this date.

4         Q.   And my question was whether you were aware if

5     any of the key representations plaintiffs allege were

6     false were made during this November 29th, 2000 investor

7     conference?

8         A.   And I believe I answered the question, is that

9     certainly it references issues that plaintiffs allege

10    are false in the complaint, but the complaint is relying

11    on other statements and not the statements on 11/29.

12        Q.   Isn't it true that on November 29th, Ellison

13    and/or Mr. Henley signaled to investors that the second

14    quarter fiscal 2001 would be strong?

15        A.   I don't know that they signaled to investors

16    that -- that is one inference that I've seen in an

17    analyst report, signaling that Q2 would be strong.  But

18    I don't recall any indication from reviewing

19    Mr. Ellison's comments, Mr. Henley's comments that they

20    provided additional guidance with respect to Q2.

21        Q.   Would you consider this day to be an important

22    one to analyze the stock price increase following?

23        MR. FRIEDMAN:  Objection; vague.

24        THE WITNESS:  I would just note that

25    plaintiffs haven't in part of their reports viewed it as

1  a date that was significant for determining materiality.

2  It is prior to the Class Period.  I don't -- it

3  doesn't -- it is not apparent to me that that, just on

4  the face of it, that that would be a date that would be

5  important for determining the materiality of alleged

6  misstatements.

7      MS. WINKLER:  Q.  So your answer is, no, you

8  would not consider this to be an important date to

9  analyze?

10      MR. FRIEDMAN:  Objection; asked and answered,

11  argumentative.

12      THE WITNESS:  I'll stand by my answer.

13      MS. WINKLER:  Q.  You indicated that you

14  listened to this conference call; correct?

15      A.  Yes.

16      Q.  What, if any, additional information would you

17  need to know to know whether this would be an important

18  date to analyze the stock increase following?

19      MR. FRIEDMAN:  Objection; vague.

20      THE WITNESS:  For what purpose?  I mean, I

21  looked at dates during the Class Period and before,

22  which have been identified by plaintiffs as alleging

23  certain statements were false or misleading at various

24  points in time.  And that was the focus of my analysis

25  on the basis of arguing that -- on the basis of the

1    plaintiffs' contention that certain days were days in

2    which there was material information provided to the

3    market that was false or misleading.

4         MS. WINKLER:  Q.  And I understand that you

5    didn't analyze the stock price increase following this

6    analyst conference.  But my question was directed at

7    whether you would need any additional information to

8    determine whether it would be important to analyze the

9    stock price following the conference.

10        MR. FRIEDMAN:  Objection to form and asked and

11   answered.

12        THE WITNESS:  I mean, I would -- I would

13   analyze it in the context of the allegations as they

14   pertain to this litigation.  My understanding is that

15   plaintiffs have alleged certain statements were made

16   that were false and misleading and have identified dates

17   in which those statements were made.  As part of my

18   analysis I've looked at whether on those dates there is

19   a significant price movement or whether it changed the

20   total mix of information.

21        Now, if you're -- if you're suggesting that

22   there is, as apparently Mr. Steinholt does, that there

23   are additional dates that they may want to consider,

24   then I would take that into consideration in forming

25   whatever testimony I might provide at trial.

1          MS. WINKLER:  Q.  Have you been asked to

2     analyze the stock price increase following this analyst

3     conference?

4          A.   I have looked at the price change on 11/30.

5          Q.   What was your conclusion?

6          A.   That the price is based on utilizing, say, the

7     model suggested by Steinholt, that the price increase is

8     statistically significant.

9          Q.   Earlier I think you testified that you looked

10    at information going back to 1998.  Why wouldn't you

11    have looked at the stock price increase following this

12    investor conference?

13         A.   For the reasons I've just given you, that --

14    remember what I'm doing, is that you have made

15    allegations regarding certain material misstatements.

16    This is not one of the allegations that you have made.

17         Q.   And we haven't made any allegations going back

18    to 1998, but you looked at that information?

19         A.   Because I did so in the context of responding

20    to a particular -- something again that was not in the

21    complaint or the interrogatories, with respect to the

22    similarity or lack thereof between prior earnings

23    announcements and the earnings announcements that were

24    identified in the complaint.

25         MR. FRIEDMAN:  I'm just going to interpose an

1    objection, a little belated, argumentative and asked and

2    answered.

3         MS. WINKLER:  Q.  Is it your opinion that the

4    new information disclosed after the market closed on

5    December 14th, 2000 did not cause the price increase in

6    Oracle's stock price on December 15th, 2001?

7         MR. FRIEDMAN:  Objection; vague.

8         THE WITNESS:  You mean -- there is no, as I

9    indicated in my report, no statistically significant

10   price increase using conventional methods of assessing

11   statistical significance.

12        MS. WINKLER:  Q.  Do you believe Mr.

13   Steinholt's event analysis that demonstrates that this

14   price increase was statistically significant is

15   incorrect?

16        A.   I don't think he has the proper scientific

17   basis for doing that.  I mean he -- in order to utilize

18   a one-tailed test one has to have a prior, prior to

19   looking at the returns, for using a one-tail as opposed

20   to a more conventional statistical test, which is a

21   two-tail test.

22        Based upon -- as I understand his deposition

23   testimony, that the 11/30 discussion provided the market

24   with an update as to what might be expected on 12/14, it

25   seems to me like there is no reason to believe that I

1    would -- should -- based on sort of the historical

2    relationship between earnings announcements and stock

3    returns, there is no reason that I would a priori

4    utilize a one-tailed test.

5        And if you use a one-tailed test, okay, and I

6    think use of a more appropriate model, as I believe mine

7    is, I don't see statistical significance.  I won't

8    debate the fact that there is statistical significance

9    as measured by a one-tailed test using the Steinholt

10   model.  I mean, that's a calculation.

11       Q.   Other than your criticism of the fact that

12   he -- is that your only criticism that he used a

13   one-tailed test?

14       A.   I think my criticism is really two fold.

15   First is, he hasn't tried to isolate certain -- the

16   impact of certain allegations -- back up.

17       My first criticism is really one of the lack

18   of any discussion as to priors concerning why a

19   one-tailed test might be appropriate.

20       A second criticism is, even putting that

21   aside, there is -- when you look at -- there is a number

22   of things that were announced and information conveyed

23   to the market on 12/14.  And as part of that, there were

24   earnings, there was revenue growth, there were cost

25   savings.  And he hasn't attempted to parse out the

1    various aspects of that announcement in trying to

2    identify, if he assumes there is a price increase, what

3    that price increase is attributable to.

4         Q.   Do you have an opinion as to what caused

5    Oracle's stock price to increases on December 15th?

6         A.   I think there is evidence that indicates that

7    Oracle did much better than expected with respect to its

8    expense savings.  Its revenue growth was, you know,

9    within the bounds that analysts had expected and what

10   the company was guiding to at the beginning of the

11   quarter.

12        Q.   So is it your opinion that it was attributable

13   to the expense savings?

14        A.   I think that that is certainly one factor that

15   contributed to it.  And I would note that Mr. Steinholt

16   hasn't done an analysis to try to isolate the parts of

17   the announcement that are attributable to what he

18   alleges to be misstatements, and done that kind of

19   parsing out, but in particular relative to parsing it

20   out relative to what could or should have been said at

21   that point in time.

22        Q.   Are you aware that plaintiffs allege that

23   operating margins were inflated as a result of the --

24        A.   I understand.  But operating margin inflated

25   as a result of the unapplied cash, that's not going to

1    affect the expense number.

2        Q.  My question, which you didn't let me finish

3    was, whether you were aware of that.  And I take it you

4    were?

5        A.  Yes.  I'm sorry if I interrupted you.  I

6    wasn't aware that I was.

7        MR. FRIEDMAN:  Nor was I, for what it's worth.

8        MS. WINKLER:  Q.  Going back to your

9    statistical analysis versus Mr. Steinholt's analysis

10   with respect to the December 15th price increase, what

11   objective criteria would you use to assess which

12   statistical analysis was a better one?

13       A.  By --

14       MR. FRIEDMAN:  Objection; vague.

15       THE WITNESS:  By formulating -- I mean, there

16   is an active debate within the statistics, academia

17   within practitioners within -- within the science of

18   statistical analysis as to the appropriateness of a

19   one-tailed test as opposed to a two-tailed test.  And if

20   you have a strong prior as to what you expect the

21   outcome to be, and you formulate the test based on that

22   prior, then it may be appropriate to use a one-tailed

23   test.

24       And if you're hypothesizing that Superman is

25   stronger than the average person, okay, then that may

1    lend itself to a one-tailed test, as opposed to

2    Superman's strength is no different than the average

3    person.

4         Now, some classical statisticians would say,

5    yeah, but the hypothesis that you have formulated that

6    Superman is stronger than the average person is

7    presupposing the outcome; right.  So there is no reason

8    that I see to have a prior as to what the price reaction

9    would be on a particular day, and, in particular, what

10   the price reaction would be given the plaintiffs'

11   contentions regarding the significance of the 11/30

12   conference call.

13        MS. WINKLER:  Q.  My question was regarding

14   objective criteria that one would use to assess the

15   statistical analysis.  My understanding of your answer

16   is that you've given me none.

17        MR. FRIEDMAN:  I think that he answered the

18   question.

19        THE WITNESS:  I think you misunderstood my

20   answer, because I think I gave you both the

21   conceptual --

22        MS. WINKLER:  Q.  I wasn't asking for the

23   conceptual.

24        A.  You need to let me finish.  -- the conceptual

25   basis for determining scientifically whether to use a

1    one- or a two-tailed test.  And, second, in the context

2    of evaluating 12/14, 12/15, whether there was any reason

3    to apply that conceptual base.  And I concluded there

4    was none.

5        Q.  Do you disagree that the application growth

6    was the key metric that investors were looking at --

7            MR. FRIEDMAN:  Objection; vague.

8            THE WITNESS:  I'm not sure --

9            MS. WINKLER:  Let me finish that question.

10           MR. FRIEDMAN:  I apologize.

11           MS. WINKLER:  Q.  Wasn't the application

12   growth -- strike that.

13           Do you disagree that the real reason for the

14   increase in Oracle's stock price on December 15th, 2000

15   was that Oracle reported significantly higher

16   application growth for the second fiscal quarter 2001?

17           MR. FRIEDMAN:  Objection; vague and assumes

18   facts.

19           THE WITNESS:  I think that has not been

20   established for the reasons I gave you just a moment

21   ago, that in the context of -- first of all, there was

22   not, based on what I would say a standard statistical

23   test, a significant price increase.

24           Putting aside that, if one were to employ the

25   Steinholt model and the one-tailed test, and conclude

1    based on that a statistically significant increase, then

2    the second step hasn't been -- the third steps haven't

3    been done, and the first -- and the second and third

4    step would be to parse out what is new information with

5    respect to, say, the earnings announcement, okay.  And

6    then, third, in terms of determining materiality of

7    statements as it pertains to, say, forecast, one would

8    have to look at what is being alleged could or should

9    have been said at that point in time.

10       MS. WINKLER:  Q.  And my question was whether

11   you disagree the real reason for the price increase on

12   December 15th, 2000 was that Oracle reported

13   significantly higher applications growth for the second

14   fiscal quarter.

15       MR. FRIEDMAN:  Objection; asked and answered,

16   and now getting argumentative.

17       THE WITNESS:  I think my response was directed

18   at there's been no scientific evidence that indicates

19   that that was the reason why, for the reasons that I

20   gave you.  And there certainly is other information

21   coming to the market at that point in time in terms of

22   expense savings and profitability arising from expense

23   savings that could also -- could be responsible for the

24   price change, if one were to determine that it was

25   statistically significant.

1         MS. WINKLER:  Q.  So what you're telling me is

2    you can't answer my question?

3         A.  I think I've answered your question now twice

4    in a thorough and complete way.

5         Q.  It was, in fact, a simple yes or no question,

6    which was, and I will repeat it one more time, do you

7    disagree that the real reason for the increase in

8    Oracle's stock price on December 15th, 2000 was the fact

9    that Oracle reported significantly higher applications

10   growth for the second fiscal quarter?

11        MR. FRIEDMAN:  I'm going to interpose the same

12   objections; argumentative, assumes facts.  And he's

13   answered it twice now.

14        If he wants to give an answer.

15        THE WITNESS:  I think that a reasonable read

16   of the last two answers that I've given you say that

17   there is no scientific basis for that conclusion, okay.

18   Which means that I cannot agree with that, okay.  And

19   I'm not sure that one could, based on the answers that

20   I've given you, draw any other inference than the

21   inference I've just explained to you.

22        MS. WINKLER:  Q.  Are you familiar with

23   Oracle's results for the first fiscal quarter of 2001?

24        A.  I am.

25        Q.  Are you aware that database was strong that

1    quarter, operation margins expanded and applications

2    were down?

3        A.   I don't believe applications were down.

4        Q.   Did applications meet the expected growth

5    rate?

6        A.   I recall various analyst commentaries, I

7    believe some thought that the number would come in more

8    than 42 percent, others believed it was at 42 percent.

9        Q.   So did applications meet the expected growth

10   rate?

11       MR. FRIEDMAN:  Objection; vague.

12       THE WITNESS:  Again, I think with respect to

13   whose expectations?

14       I have to go back and take a look at the

15   specific analyst expectations before I can answer that

16   question.

17       MS. WINKLER:  Q.  So you don't know whether

18   the applications number met the expected growth rate?

19       A.   You're saying the expected growth rate.  And

20   I've given you my recollection, is that the applications

21   number came in slightly below certain analysts'

22   expectations, but was viewed strong by other analysts.

23       Q.   Oracle's stock price went down after those

24   results were announced; didn't it?

25       A.   I don't believe that Oracle's stock price was

1    down in a statistically significant way.

2        Q.   Have you performed that analysis?

3        A.   I have looked at that, yes.

4        Q.   And why did you look at that when you didn't

5    look -- when you didn't do an analysis after the

6    November 30th -- the November 29th investor conference?

7        MR. FRIEDMAN:  Objection; mischaracterizes the

8    testimony.

9        THE WITNESS:  Well, I have indicated that I've

10   done that, and it is in response, to again, if you read

11   Mr. Steinholt's reports and your pleadings in this case,

12   there is no reference to the first quarter earnings

13   announcement, okay.  And I analyzed the stock price

14   performance in the context of the allegations in the

15   complaint and the second interrogatory response.

16       MS. WINKLER:  Q.  When did you analyze the

17   stock price decrease after the first quarter?

18       A.   Well, there is no statistically significant

19   stock price decrease using traditional measures of

20   statistical significance.  And I did that after the

21   Steinholt deposition in response to new information that

22   he was considering, although he indicated in his

23   deposition that it was not important for the formulation

24   of his opinion.

25       MS. WINKLER:  Now is probably a good time to

1     take a lunch break.

2           VIDEOGRAPHER:  We are going off the record.

3     The time is 12:37 p.m.  This marks the end of videotape

4     number two, Volume I, in the deposition of Christopher

5     James.

6                 (Lunch recess, 12:37 p.m. - 1:46 p.m.)

7           VIDEOGRAPHER:  We are back on the record.  The

8     time is 1:46 p.m.  Here marks the beginning of videotape

9     number three, Volume I, in the deposition of Christopher

10    James.

11          MS. WINKLER:  Q.  Are you familiar with the

12    out-of-pocket measure of damages?

13       A.  Yes.

14       Q.  Can you explain what that is?

15       A.  An out-of-pocket measure of damages looks at

16    whether -- looks at the price at purchase relative to

17    the price at sale.

18          So one of the requirements in terms of, as I

19    understand it, from the PSLRA, is that an investor

20    experienced an out-of-pocket loss, the price at sale was

21    lower than the price at purchase.

22       Q.  Do you have any criticisms regarding using the

23    out-of-pocket measure of damages in this case?

24       A.  In this case?  Well, I think that, as I

25    understand Mr. Steinholt, who is looking at a measure of

1    damages which is inflation at purchase relative to

2    inflation at sale, using a constant band, and as I

3    indicate in my report, I think that's inconsistent with

4    the direction in Dura to isolate and remove industry and

5    market-wide factors.

6        Q.   Do you have an alternative methodology other

7    than the out-of-pocket measure of damages to calculate

8    damages here?

9        A.   I don't -- I would disagree with your notion

10   that he's -- I mean, I think that an alternative measure

11   of damages would be to look at the price drop on the day

12   of the announcement, isolating out the nonfraud-related

13   price changes from the alleged fraud-related price

14   changes and to use that as a measure, again, limiting it

15   to those investors who had suffered an out-of-pocket

16   loss in the sense that their purchase price was greater

17   than the sales price.

18       Q.   This morning you briefly touched upon some

19   work that you had done since your rebuttal report, which

20   I believe you testified was in response to

21   Mr. Steinholt's testimony; is that fair?

22       A.   Just to be clear, the work I did is in

23   response to his deposition testimony, yes.

24       Q.   Have you performed any other work since your

25   rebuttal report?

1       MR. FRIEDMAN:  Objection; vague.

2       THE WITNESS:  I don't believe -- well, I've

3   reviewed the transcript of Mr. Steinholt's deposition

4   and did analyses -- as I sit here, the two analyses that

5   I can recall -- three, actually, analyses.

6       One is to look at and review the audio of the

7   November 30th and the analysts' commentary around that

8   particular day to -- he does refer to the Q1 earnings

9   announcement.  And so I reviewed that, as well as

10  analysts' discussion around that.

11      I looked at prior earnings announcements and

12  price reactions to prior earnings announcements.

13      And as I sit here, I think that's the only

14  other work that I have done in the context of -- only

15  new analyses that I've done since I wrote my rebuttal

16  report.

17      MS. WINKLER:  Q.  I think this morning you

18  mentioned that in the context of the November 29th CSFB

19  investor conference, you had reviewed a Bloomberg report

20  and a CSFB report; is that fair?

21      A.  I reviewed a number of reports, and I may have

22  reviewed -- I recall reviewing some of those, but not

23  relying on them.  So the materials that I've cited in my

24  report I relied on in forming my opinion, not all the

25  materials that I reviewed.

1    Q.   What I'm primarily focusing on now is the work

2    that you've just described to me that you've done since

3    your rebuttal report.

4         What I would like to know is what analyst

5    reports you reviewed in connection with looking at the

6    November 29th CSFB conference.

7    A.   Well, I remember seeing the CF First Boston.

8    I may have reviewed a Goldman Sachs report.  But I

9    really don't have -- those are the ones that I recall.

10   I reviewed a number of analysts' reports.  There may be

11   others, but those are the ones I can recall as I sit

12   here.

13   Q.   Do you recall the date of the Goldman Sachs

14   report you reviewed?

15   A.   I don't, I'm sorry.

16   Q.   Was that report cited in either your opening

17   report or rebuttal report?

18   A.   It wouldn't have been cited as relied upon,

19   because, again, I was responding to analyses done by

20   Mr. Steinholt or statements identified in the complaint

21   or interrogatories.  And my recollection is November

22   29th/30th was not one of those days.

23   Q.   But you did testify this morning that you

24   analyzed the mix of information in the market prior to

25   the Class Period; didn't you?

1     A.   Oh, yeah.  And I may have looked at those in

2   the context of that review, but I didn't rely on them

3   for the reasons I gave you.

4     Q.   You also said that you looked at the Q1

5   earnings announcement in your work that you did after

6   your rebuttal report.

7     A.   Right.

8     Q.   What analyst reports did you review in

9   connection with doing that?

10     A.   I know there was one Goldman Sachs report.

11   There may have been others.  I just -- I recall

12   specifically a Goldman and Sachs.  But there were

13   others, I just can't recall what they were.

14     Q.   Do you recall any of the earnings

15   announcements -- I mean, strike that.

16        Do you recall any of the analyst reports you

17   looked at in connection with looking at prior earnings

18   announcements?

19        MR. FRIEDMAN:  Objection; vague.

20        THE WITNESS:  I don't have a specific analyst

21   report in mind in the context of those -- I'm answering

22   that with respect to earnings announcements other than

23   the Q1 and the earnings announcements in the Class

24   Period.

25        MS. WINKLER:  Q.  Based upon the work that

1    you've performed since your rebuttal, have you changed

2    any of your opinions stated in your initial rebuttal

3    report?

4        A.   No.

5        Q.   Have you documented the work that you

6    performed since your rebuttal in any way?

7            MR. FRIEDMAN:  Objection; vague.

8            THE WITNESS:  I haven't drafted, for example,

9    a supplemental rebuttal report.

10           MS. WINKLER:  Q.  Have you documented, for

11   example, the analysts' reports you reviewed in any way?

12       A.   I haven't -- I mean, I have access to them.  I

13   haven't written -- I don't have a log of the analyst

14   reports.

15       Q.   Would you be able to recreate the analyst

16   reports you looked at, if you needed to?

17       A.   Sure, yeah.

18       Q.   Has the work that you performed since your

19   rebuttal report been communicated to your attorneys in

20   any manner, other than verbally?

21           MR. FRIEDMAN:  Objection; it calls for

22   documents and things outside the scope of the

23   stipulation.

24           I mean, do you want to ask that question?  Do

25   you want to read it back?

1        MS. WINKLER:  It is a yes or no question.

2        MR. FRIEDMAN:  You can answer the question.  I

3    make the objection based on the stip.

4        THE WITNESS:  I have communicated my findings

5    and results to --

6        MS. WINKLER:  Q.  In any way other than

7    verbally?  Yes or no?

8        MR. FRIEDMAN:  I think she's asking if you

9    have written anything to me, yes or no, since after the

10   rebuttal.

11       THE WITNESS:  No.

12       MS. WINKLER:  Q.  Based on the work you

13   performed since your rebuttal reports, do you have

14   anything more you want to add to your opening or

15   rebuttal reports sitting here today?

16       A.  No.  Although I guess I would reserve the

17   right to, if there is another -- if there is additional

18   analysis that is provided by Mr. Steinholt, or if he's

19   going to use that in the analyses that he conducted for

20   purposes of his opinion, I imagine I would want to be in

21   a position to respond to that.  But beyond that, no.

22       Q.   Have you determined that there was any

23   information disclosed on December 14th, 2000 that was

24   unrelated to the alleged fraud that was material?

25       A.   I think I've answered that question when you

1    asked me about my opinion as to whether the -- meeting

2    the -- or the 11 cent earnings number was material new

3    information and whether the growth in apps came in -- it

4    was associated with a price change.

5         First of all, let me be clear, I don't -- I

6    think if you use accepted statistical methodology, I

7    don't think you can reject the hypothesis that there was

8    no price change.

9         But, second, I think that there is certainly

10   other information that is not part of the allegations

11   that was potentially material to investors, including

12   the expense material that I talked about in my report

13   and described in the context of the answer that I gave

14   you before.

15   Q.   Have you made a determination that the expense

16   material that you referred to was material?

17   A.   I think it's potentially material.  Again, I

18   think one of the problems I have in terms of measuring

19   the materiality in the context of plaintiffs' allegation

20   is that plaintiffs haven't specified what they believe

21   to be the truth as of that particular point in time.

22        So when you're looking at materiality of a

23   particular alleged misstatement or statement, one needs

24   to look at the statement in the context of what could or

25   should have been said at that particular point in time.

1      Q.   Going back to my prior question, is there

2    anything other than the expense that you believe was

3    unrelated to the alleged fraud that was disclosed on

4    December 14th, 2000?

5      A.   Oh, I think that certainly the earnings that

6    were reported and the guidance provided could be

7    unrelated to the alleged fraud.

8      Q.   Do you think the earnings and the guidance

9    were material?

10     A.   Again --

11       MR. FRIEDMAN:  Objection; asked and answered.

12       THE WITNESS:  As I indicated before, and I

13    refer you to my prior testimony, that I don't see

14    evidence that they were material in terms of a change in

15    the stock price or changing the total mix of

16    information.

17        I would say that what is lacking in Mr.

18    Steinholt's -- he basically ignores the materiality

19    issue by failing to formulate a hypothesis with respect

20    to what the alleged -- what should have or could have

21    been said at that particular point in time relative to

22    what was conveyed to the market.

23       MS. WINKLER:  Q.  What's more important to

24    investors, operating margins or operating expenses?

25     A.   I would think that the expense number is --

1    margin is just a percentage number.

2         I think what investors care about is cash

3    flows.  And I think cash flows are more directly linked

4    to operating expense number than a margin number.

5         Q.   How do you define loss causation?

6         A.   As I indicated today, earlier, I look at loss

7    causation by a loss caused or connected to the curative

8    disclosure as it pertains to the alleged fraud.

9         So, for example, I would look at a loss caused

10   by, say, an earnings miss that is linked to a particular

11   allegation.  I would not, say, look at losses caused by

12   industry or market factors or factors unrelated to the

13   allegation or allegations.

14        Q.   Is there not loss causation simply if there is

15   a loss that would not have occurred absent the alleged

16   fraud?

17        A.   I think that -- no.  I think that in terms

18   of -- as I understand loss causation, one needs to

19   isolate and identify a loss that is caused in some way

20   by a curative disclosure, either a direct or indirect

21   curative disclosure.

22        And by indirect, I would mean a disclosure

23   that is related to and causally linked to the alleged

24   fraud.

25        Q.   If a company represents that it is close to

1    obtaining a significant new customer who would be

2    expected to double earnings in the future, the stock

3    price then increases to reflect this information,

4    insider sells stock, then the company announces the

5    customer changed its mind and the stock plummets, is

6    there loss causation even though there is no disclosure

7    that the initial representation was false?

8        A.   Well, I mean, certainly that's not a fact

9    scenario that applies to this case.  You're saying that

10   the market forms an expectation regarding a sale to a

11   particular customer, and the -- then subsequently the

12   company indicates that it is not going to sell the

13   product to that customer, and that's associated with a

14   significant price drop, and it is ascertained that no

15   intervening economic or other factors other than the

16   fact that the company knew at the time that it made the

17   statement that it would never sell to that particular

18   customer?

19       I would think that that would be something

20   that would be linked to -- if you could establish the

21   materiality of the statement at the time it was made,

22   and demonstrate that it was false at the time that it

23   was made, and that the reason for the lack of sale to

24   the customer has nothing to do with intervening events,

25   but is simply a playing out of that false

1    misrepresentation, then I would say that that would be

2    something that I would consider in the context of a loss

3    causation.

4        Q.   What do you mean when you say you would

5    consider it in the context of a loss causation?

6        A.   You are giving me a hypothetical that -- I

7    need to study it in more depth than 30 seconds.  But

8    certainly that would be something that in my mind would

9    touch on the fraud either directly or indirectly.

10       Q.   How about if a company starts to report twice

11   its actual earnings, increasing investors' expectations

12   regarding future earnings, the stock price then

13   increases and insiders sell stock, then the company

14   starts to report its actual earnings, causing the stock

15   price to decline, is there loss causation even though

16   there is no disclosure that the previous earnings were

17   false?

18       MR. FRIEDMAN:  Objection; vague and ambiguous,

19   confusing.

20       THE WITNESS:  I'm not sure why -- I'm not sure

21   I understand your hypothetical.  I don't know that there

22   is -- in terms of determining loss causation whether

23   there's -- it is not -- I'm not sure that it's relevant

24   to have an intervening insider sale or purchase.

25       So your hypothetical is one in which the

1    company is providing expectations about earnings growth,

2    and it subsequently reports lower earnings than the

3    market expected based upon its previous statements?

4    That may or may not be a loss causation.  If, for

5    example, a loss causally linked to the fraud.  For

6    example, if the company were to miss its earning --

7    its -- the expected earnings of the market and the price

8    were to decline for reasons that were unrelated to the

9    alleged fraud, then I don't think that that would be a

10   curative disclosure as to the fraud.

11         MS. WINKLER:  Q.  What if a company introduces

12   new software and falsely claims that the software has

13   significant benefits over existing software that would

14   generate substantial sales, the stock price then

15   increases, insiders sell stock, then the company later

16   reveals that the sales were far below prior

17   representations, is there loss causation there even

18   though there is no disclosure that the software did not

19   have the claimed benefits and, therefore, should not

20   have been expected to generate substantial sales growth?

21         MR. FRIEDMAN:  Objection; incomplete

22   hypothetical.

23         THE WITNESS:  Again, I think I would have to

24   go back -- that certainly is not a hypothetical that

25   fits the current case.

1              And, again, it would be -- so you're

2      hypothesizing that a company has a software product that

3      it is enthusiastic about and -- I guess at the first

4      level lots of companies are enthusiastic about their

5      products as they are introduced.

6              One of the roles of analysts in the

7      marketplace is to look at the characteristics and

8      attributes of the product and interview customers and to

9      determine the functionality of that product for purposes

10     of whether it's reasonable to assume that the product

11     will be successful.

12             Lots of products -- lots of companies may miss

13     their earnings guidance for reasons that -- I don't know

14     that I would say that an earnings miss in that context

15     would necessarily be causally linked to the product

16     quality claims without knowing more.

17             MS. WINKLER:  Q.  What if a company makes

18     false and misleading statements that inflate the stock

19     price, and then to eliminate the inflation simply

20     reduces guidance without disclosing that any of the

21     prior representations were false and misleading, is

22     there a loss causation there?

23             MR. FRIEDMAN:  Same objection; incomplete

24     hypothetical.

25             THE WITNESS:  First of all, I don't think

1    that's a hypothetical that's consistent with the facts

2    in this case as I understand it.

3         I think you need more than that.  There is

4    lots of reasons why companies, again, may not have

5    earnings consistent with prior market expectations, that

6    earnings miss may be totally unrelated to the

7    allegations.

8         I mean, I think what you need to do is to

9    first establish that the allegations were material, that

10   they changed the total mix of information, by

11   establishing, you know, what should or could have been

12   said at various points in time and compare it to what

13   was said, and then to look at and analyze the reasons

14   for the subsequent performance and to determine whether

15   that subsequent performance is linked in a causal way to

16   the prior allegations.

17        MS. WINKLER:  Q.  Is it your opinion that the

18   March 1st earnings miss was the result of a sudden and

19   sharp economic slowdown in the enterprise software

20   industry?

21        A.  Yes.

22        Q.   Did the March 1st announcement provide the

23   market with any new material information regarding

24   Oracle's applications?

25        A.  Well, sure.  I mean, it provided information

1    to the market regarding Oracle's applications in the

2    context of the then current economic conditions.

3        Q.   What was that information?

4        A.   Well, you have -- I'm sorry.

5        MR. FRIEDMAN:  I didn't say anything.  I don't

6    think I did.

7         Do you want to read the question back?

8        THE WITNESS:  Yeah, why don't you.

9        (Record read as follows:  QUESTION:  Did the

10       March 1st announcement provide the market with

11       any new material information regarding Oracle's

12       applications?  What was that information?)

13       THE WITNESS:  Well, I think the announcement

14   required -- provided the market with what I would view

15   material new information regarding both the applications

16   business as well as Oracle's other businesses and how

17   they were faring in the then current economic

18   environment.

19       MS. WINKLER:  Q.  And what was the new

20   information regarding how the applications business was

21   faring in the then current economic environment?

22       A.   Well, I think it is clear to me that the

23   market and market participants were concerned about the

24   earnings miss and what it conveyed in terms of future

25   business prospects in the then current economic

1   environment.

2       If you look at analysts' commentary at this

3   point in time, they understood that the quarter was

4   back-end loaded, and more back-end loaded than was --

5   might previously have been the case.

6       Oracle is reporting the results, okay, for

7   that quarter.  It's telling the market what -- how their

8   products perform, both database and apps, in the context

9   of what's new information regarding economic conditions

10  and how they are affecting enterprise software

11  companies.  And it is that -- and I arrive at that

12  conclusion for the reasons I gave in my report by

13  looking at such things as the competitors' response, how

14  analysts revise their estimates for both Oracle and

15  competitors, how competitors subsequently did in the

16  context of the changed economic environment.

17      Q.   Are you aware that in a December 15th, 2000

18  Bloomberg interview, Ellison stated, "The economic

19  slowdown isn't hurting Oracle because the company has

20  spent the past three years updating its product line to

21  focus on software that helps companies use the Internet

22  to cut costs and boost efficiency"?

23      A.   I recall seeing that Bloomberg, I don't recall

24  those specific words.  If you have it, I can review it

25  to refresh my recollection.

1      Q.   With respect to that statement, did Oracle's

2   March 1st, 2001 announcement reveal any new information?

3      A.   With respect to that statement?

4      Q.   I can read the statement again, if you'd like.

5      A.   My understanding of what the statement says is

6   as you've relayed it to me, and if you had a copy of it,

7   I could review it.  But the statement as I understood

8   you to say it was we don't see the impact of the economy

9   on our business as of -- what was it?  January?

10      Q.   Why don't I -- I will read the statement again

11   for you.  December 15th, 2000, "The economic slowdown

12   isn't hurting Oracle because the company has spent the

13   past three years updating its product line to focus on

14   software that helps companies use the internet to cut

15   costs and boost efficiency."

16      A.   Right.

17      Q.   My question is, did Oracle's March 1st, 2001

18   announcement reveal any new information relating to that

19   statement?

20      A.   Yes.  I think as it relates to that statement,

21   the economic environment was different in February --

22   late February and March than it was in December, number

23   one.

24          Number two, that statement was made in the

25   context of Oracle's statements that it was not immune to

1    the economy, okay.

2        As a result, there is a disclosure of a risk,

3    a known risk at that point time, in December.  And I

4    view what is occurring in March as the outcome, okay, of

5    a known risk.

6        In other words, there was uncertainty as to

7    whether Oracle would be impacted or not, and Oracle's

8    statements, as I understand that statement in context

9    was:  We don't see that we're being impacted currently.

10        It is not a statement that:  We would never be

11    impacted.

12        And certainly the statements that Oracle made

13    were to the contrary, that they would be impacted if

14    there were a sudden and severe decline in economic

15    activity.

16    Q.   Are you aware of any statements that Oracle

17    made prior to March 1st, 2001 indicating that it would

18    not be impacted by a sudden decline in the economy?

19    A.   Am I aware of any statements that Oracle made

20    that said they were not going to be impacted by a

21    decline in economic activity?

22    Q.   By a sudden decline in the economy.

23    A.   I don't recall them saying that.  I don't

24    recall any specific statements.  I recall statements

25    indicating that like any business there were risks of

1    their business associated with a slowdown in economic

2    activity.

3         And that's not only statements that were in

4    their 10-K, but statements that were reiterated by and

5    discussed by analysts as late as late February.

6    Q.   Are you aware that during a December 15th,

7    2000 radio Wall Street interview, Defendant Henley

8    stated that, "If they" -- referring to Oracle's

9    customers -- "have to slow down on discretionary

10   spending, it's not going to be on E-Business"?

11   A.   When was this?

12   Q.   December 15th, 2000.

13   A.   You know, I recall again something to the

14   effect -- I don't recall the specific Henley statements.

15   I recall commentary, and it may be the Henley

16   statements, that while there was a slowdown in IT

17   spending -- and this comes out in the Morgan Stanley

18   survey and other surveys that were done at the time --

19   the impact was not expected to be substantial in the

20   enterprise software business given the fact that it was

21   perceived to be a high ROA -- ROI business at the time.

22   Q.   Did the March 1st, 2001 announcement reveal

23   any new information relating to the statement that I

24   read to you, which was, "If they" -- referring to

25   Oracle's customers -- "have to slow down on

1   discretionary spending, it's not going to be on

2   E-Business"?

3        A.   I think it did by looking at both Oracle and

4   its competitors, that, first of all, the magnitude of

5   the slowdown, I think, was unanticipated.  And, second,

6   that -- and there is analyst reports in February, I

7   believe in January, and coincident with December,

8   talking about, well, you know, we understand that that's

9   a view, that it's a high ROA.  But then again, there is

10  the notion that when you're talking about a, for

11  example, a suite approach versus a best-in-breed, you're

12  thinking -- you can think in terms of, you know, do I

13  want to do that implementation now, or is that something

14  that I can push off into subsequent quarters given the

15  economic slowdown.

16       So that was a risk that was known.  And while

17  it had a high ROI associated with it, it also had a

18  significant up-front investment that was potentially

19  postponable.

20       Q.   I'm going to ask you that question again, and

21  perhaps it's simply I didn't understand what you thought

22  was new there.

23       But what new information was revealed by the

24  March 1st, 2001 announcement as it related to that

25  statement?

1      MR. FRIEDMAN:  It's been asked and answered.

2      THE WITNESS:  I thought I answered the

3   question.  I was trying to make a distinction between a

4   view of the likely benefits and costs associated with a

5   new investment in an economic environment of December

6   and what the prospective impact of, say, a slowdown

7   would be, and the realization of, first of all, a more

8   significant slowdown, okay, in the context of the

9   enterprise software.

10      So the statements in December about it may be

11   an attractive proposition to invest in enterprise

12   software given it has a high, relatively high ROA --

13   ROI, I'm sorry.  And that's certainly consistent with

14   what CIOs and other senior executives were saying about

15   their perception of enterprise software in the context

16   of a slowing environment.

17      When the environment slows more quickly than

18   anticipated, then you get the realization of the risk

19   that Oracle had conveyed to the market in December,

20   okay, and had been discussed by analysts, it was in the

21   total mix of information, which is, you know, even a

22   high ROI investment isn't immune to economic downturns.

23   And that's what you're observing.

24      MS. WINKLER:  Q.  Are you aware that during

25   the December 14th, 2000 conference call, defendant

1    Ellison stated with respect to Suite 11i that it was up

2    and running in months, you get the savings in months, it

3    costs you less, and it takes you less time to install?

4        A.   Than best-of-breed?

5        Q.   Is that your understanding of the context in

6    which that statement was designated?

7        A.   As I understand the context of his statement,

8    is that he's looking at the suite concept relative to

9    best-of-breed and saying, given it is designed to be

10   integrated that it is -- while there are implementation

11   costs and significant implementation costs, okay, the

12   integration associated with that product is likely to be

13   less expensive than best-of-breed.

14       Q.   Let's focus on the first two sentence there,

15   where Ellison says, "It is up and running in months, you

16   get the savings in months," do you take that to be a

17   comparison with best-of-breed?

18       A.   Yes.

19       Q.   What about that indicates to you that he's

20   comparing it to best-of-breed?

21       A.   Well, again, I think if you look at it in the

22   context of his other statements, and he's -- you know,

23   he's consistent, at least in my view, in his description

24   of the attributes and the potential drawbacks of his

25   product relative to other competitive products in the

1    marketplace.

2         His -- his view is, and he indicates this,

3    actually in the November 29th discussion as well, is

4    that, you know, "I might be wrong, okay, I might be --

5    people might have a different view, but in my view it

6    is -- has significant cost savings relative to

7    best-of-breed, integration costs are going to be lower,

8    okay."

9         He's not representing there are no

10   implementation costs or implementation may not be a very

11   costly process.

12        But I think his comparison is with respect to

13   the competitor products, which are best-of-breed.

14   Q.   When he says it is up and running in months,

15   where do you get that there's a comparison there?

16   A.   Well, I was referring to the latter part of

17   the statement, not the --

18   Q.   And I specifically asked you about the first

19   two sentences, "It is up and running in months, you get

20   the savings in months."  Where do you see a comparison

21   in those two sentence with respect to best-of-breed?

22   A.   I see with respect to the savings, with

23   respect to best-of-breed, and the attributes of the

24   software.  With respect to up and running in months,

25   okay, I mean, I think in -- my understanding is in the

1    context of the implementation process vis-a-vis having

2    to integrate with new software, that's in the context

3    which he said it before, with respect to that statement

4    I would have to look at the entire transcript to

5    determine what, in fact, he's saying it with respect to

6    best-of-breed.

7        Q.   When Ellison says the Suite 11i software is up

8    and running in months, do you think that's somehow

9    dependent upon how best-of-breed software functions?

10       MR. FRIEDMAN:  Objection to the form.

11       THE WITNESS:  I think it would be evaluated by

12   market participants, as it was, looking at the analysts'

13   reports and market commentary in the context of the

14   product and in the process by which products like that

15   are implemented.

16       MS. WINKLER:  Q.  And so you think that that

17   means that the statement it is up and running in months

18   is dependent upon how best-of-breed software functions?

19       MR. FRIEDMAN:  Objection; asked and answered.

20       THE WITNESS:  I think it is in the context of

21   what the implementation process for products like Suite

22   11i and the competitors, what it takes to get them up

23   and running.

24           And, you know, there is -- there is a lot of

25   discussion by market participants, analysts, in talking

1    with customers, in trying to understand the relative

2    advantages and disadvantages of Suite 11i relative to

3    the competitive products.

4         And one of the things that was being focused

5    on was the relative advantage of Suite 11i as it

6    pertains to integration costs, implementation process

7    and the like.

8         MS. WINKLER:  Q.  So is it your testimony that

9    investors couldn't rely upon Ellison's statement that

10   Suite 11i would be up and running in months?

11     A.   That they could?

12     Q.   Could not.

13        MR. FRIEDMAN:  Objection; argumentative.

14        THE WITNESS:  I think investors would

15   certainly take that in the context of other things they

16   understood about the product and factor it in as part of

17   the total mix of information.

18        MS. WINKLER:  Q.  Do you think the March 1st,

19   2001 announcement revealed any new information relating

20   to Ellison's statements, "It is up and running in

21   months, you get the savings in months"?

22     A.   I don't believe the market reaction to 3/2 was

23   in any way related to the allegations regarding the

24   functionality or quality of the product.

25        You don't see any change in analysts'

1    assessments with respect to the product quality relative

2    to the competitive products in the marketplace,

3    coincident with the earnings announcement.

4        Q.   My specific question was, did the announcement

5    reveal any new information relating to that statement?

6        A.   I don't think the announcement had conveyed

7    any new information as it pertains to that statement.  I

8    don't recall seeing in the announcement or in the

9    subsequent conference call any discussion about that

10   statement.

11       Q.   Would you have to, in order to have loss

12   causation here?

13       A.   Well, I think you would have to -- if you're

14   going to argue that a statement was material, when the

15   statement is -- you'd first want to know, again, and I

16   indicated this another time, what is the truth at

17   various points in time relative to what's being said.

18   And, second, look at what happens to the value when the

19   truth is revealed.

20          Now, the March 1st announcement as it pertains

21   to third quarter results didn't provide any information

22   as it pertains to that aspect of quality, nor did the

23   announcement of the earnings disappointment lead

24   investors to conclude something different about product

25   quality relative to what they believed prior to that.

1          I don't see any analyst saying this puts us on

2     notice there are substantial product quality issues

3     where the implementation process is much longer than

4     hitherto expected.

5          Q.   Have you spoken to any investors regarding

6     what they understood from the March 1st, 2000

7     announcement?

8          A.   No.  I relied on the commentary of analysts

9     and -- of market analysts and news commentary.

10          Q.   Did you rely on the company's explanation?

11          A.   That's one of the things I considered.

12          Q.   Do you think the market believes everything

13     that the company tells it?

14          A.   No.  To the contrary.  And the evidence is

15     fairly clear here that the analysts and market

16     participants did their own independent research to

17     determine and assess both quality of the product,

18     traction in the marketplace and the like.

19          Q.   If plaintiffs can prove that Oracle was behind

20     plan, behind their forecast as of January 2001, would

21     that affect your opinion in any way?

22          MR. FRIEDMAN:  Objection; vague.

23          THE WITNESS:  Behind their forecast as of

24     when?

25          MS. WINKLER:  Q.  As of January 2001.

1      A.   Would it affect my opinion?  I would need to

2    know more before I could determine whether it affected

3    my opinion or not.

4      Q.   What more would you need to know to make that

5    determination?

6      A.   As I understand, there is a forecast and

7    potential.  The potential is what guidance is provided

8    on.  I think there is a great deal of uncertainty as

9    to -- as was recognized in the market about Oracle or

10    any company's ability to make its forecast.

11         If there is evidence that indicates -- say,

12    for example, an internal report that would say, you

13    know, we think we might be at 11.4 as opposed to 12

14    cents, but if the company believed that and there was

15    reason to believe that they would still be able to make

16    their numbers, that may not -- that would not

17    necessarily impact my opinion at all.

18      Q.   So if plaintiffs could prove that Oracle was

19    behind plan both with respect to the potential and the

20    forecast as of January 2001, would that change your

21    opinion?

22      A.   Without knowing more, not necessarily.

23      Q.   Do you need a restatement or an explicit

24    disclosure of accounting fraud in order to have damages

25    in this case?

1      A.   Well, there has been no restatement.  So your

2    question is?

3      Q.   Do you need a restatement or an explicit

4    disclosure of accounting fraud in order to have damages

5    in this case?

6      A.   No, I don't think you need a restatement -- I

7    mean, you need a curative disclosure that touches on the

8    accounting allegations.  And I haven't seen that

9    connection.

10       But I don't -- it is not my view that in a

11   case in which there is accounting allegations, that

12   accounting wasn't done in accordance to GAAP or

13   whatever, that necessarily requires a restatement to be

14   the curative disclosure.

15     Q.   In what form do you think that curative

16   disclosure needs to take, if not in the form of a

17   restatement?

18     A.   As I described to you when you asked a similar

19   question, it would have to be -- I will give you a

20   hypothetical.

21       If, for example, there is an allegation that

22   revenue wasn't recognized in accordance with GAAP, and

23   the allegation is that revenue was moved into Q1 of this

24   hypothetical company and it should have been in Q2, and

25   but for the revenue that was moved there is no change in

1   economic conditions, there is no other aspects of the

2   company's business that has changed, there is a miss in

3   Q2 that wouldn't have occurred but for the revenue

4   recognition issue, then that might be something that is

5   causally linked to the accounting allegations that might

6   lead me to conclude, and I would need to investigate it

7   further, a loss caused by the alleged fraud.

8       Q.   Even though there may have been no restatement

9   in your hypothetical?

10      A.   Even though there had not been any restatement

11  in my hypothetical.

12          Now, obviously, that hypothetical is not one

13  that reflects the facts and circumstances of this case.

14      Q.   If a company lies when it makes a so-called

15  corrective disclosure, in other words, it lies about the

16  reasons for a stock price decline or decline in

17  revenues, do you need a subsequent admission by the

18  company that it was not being truthful in its corrective

19  disclosure in order for it to be damaged under the

20  federal securities laws?

21      A.   It would depend what the allegation of fraud

22  is.

23          MR. FRIEDMAN:  I'm going to object on the

24  grounds it calls for a legal conclusion.

25          MS. WINKLER:  Q.  Do you know what the legal

1    standard is for a truth of the market defense?

2         MR. FRIEDMAN:  Same thing, same objection.

3         THE WITNESS:  I have a layman's understanding

4    of it.

5         MS. WINKLER:  Q.  So you're not offering an

6    opinion here whether defendants are able to satisfy the

7    legal standard?

8         A.  I think that was one of the first questions

9    you asked me today.

10        Q.  It actually wasn't with respect to the truth

11   of the market defense.

12        A.  I was going to finish the answer by saying,

13   I'm not here to provide you with legal conclusions, or a

14   legal opinion as to what the pleading standards are.

15            When you get to a convenient breaking point.

16        MS. WINKLER:  We could probably do that now.

17   That would be fine.

18        VIDEOGRAPHER:  Going off the record.  The time

19   is 2:37 p.m.

20            (Recess, 2:37 p.m. - 2:53 p.m.)

21        VIDEOGRAPHER:  We are back on the record.  The

22   time is 5:53 p.m. -- I'm sorry, 2:53 p.m.

23        MS. WINKLER:  Q.  Was the information

24   disclosed on March 1st that the database revenue growth

25   was estimated to be flat to slightly negative new

James, Christopher  7/17/2007  9:05:00 AM

1    information?

2        A.   Yes.  I think that my recollection is that the

3    analysts' forecasts and guidance were at above that

4    number.

5        Q.   Did you review the reports submitted by

6    defendants' other experts before they were finalized?

7            MR. FRIEDMAN:  I'm going to just interpose an

8    objection to the extent it calls for information

9    protected by the stipulation.

10           THE WITNESS:  I had discussions.  I don't

11   recall -- I don't recall.  I had discussions, I may have

12   reviewed one.

13           MS. WINKLER:  Q.  You mentioned this morning

14   or earlier today discussions with Mr. O'Bryan.  Did you

15   talk to any of the other experts?

16       A.   Yes.

17           MR. FRIEDMAN:  Same objections.

18           MS. WINKLER:  Q.  Have you been qualified by a

19   court as a damages expert before?

20       A.   Yes.

21       Q.   How many times?

22       A.   In securities cases, I'm going to presume

23   that -- I have never been disqualified, and I'm not sure

24   how the process of qualification goes.  I have

25   testified, and my testimony has been accepted by a court

1    in securities cases in trials, I believe, one, two,

2    three, four -- six or seven times.

3        Q.   If you will turn to Exhibit 2 of your opening

4    report, which I think is Exhibit 1.  Can you just direct

5    me to those cases?

6        A.   KA Investments versus Number Nine Visual

7    Technologies.

8        Q.   And that was not a class action case, was it?

9        A.   I'm not sure.

10       Q.   Any additional cases?

11       A.   In terms of courtroom testimony?

12       Q.   Yes.

13       A.   Texas First National Bank versus Kenneth Wu.

14   In the WorldCom Securities Litigation, I did not testify

15   at trial, although I was -- the case I believe settled

16   the day before I was to testify.

17       In terms of securities cases, in terms of the

18   last four years, those are the only two that are on the

19   list.

20       Q.   Was Texas First National Bank a class action

21   case?

22       A.   I don't believe it was.

23       Q.   Has your opinion ever been excluded by a court

24   on any grounds?

25       A.   Not that I'm aware of.

1    Q.  Did you testify in a trial last week?

2    A.  I did.

3    Q.  What case was that?

4    A.  Sterling Savings.

5    Q.  The first one that appears on Exhibit 2?

6    A.  Yes.  In Spokane, Washington.  A securities

7  case.

8    Q.  Who did you testify on behalf of in that case?

9    A.  Sterling Savings, the plaintiff.

10    Q.  And what was your area of expertise that was

11  the focus of that testimony?

12    A.  Financial economics, corporate finance,

13  management of commercial banks and thrift institutions.

14    Q.  Were there any damages issues in that case?

15    A.  Yes.

16    Q.  Did you testify with respect to the damages

17  issues?

18    A.  I did.

19    Q.  Has that trial been completed?

20    A.  I hope so.

21    Q.  Do you know whether it has been?

22    A.  I believe -- I'm not sure.

23    Q.  Was it a jury trial?

24    A.  No.  It was a bench trial.  Court of Federal

25  Claims.

1        The reason I'm not sure it's been completed is

2    that I believe there's final oral arguments and some

3    other things.  So I don't know that the trial is

4    completed.

5        Q.   So to your knowledge, the court hasn't issued

6    a verdict in that case?

7        A.   No.  My understanding is that one is not

8    expected for quite awhile.

9        Q.   Have you published any papers concerning

10   damages in securities cases?

11       A.   I've published a number of papers that sort of

12   use methodologies that have been -- are used in damage

13   calculations, and -- but I have not published an article

14   as it pertains to damages.

15       Q.   Which of the articles that you published use

16   methodologies?

17       A.   A number of my published papers look at the

18   information content of certain either corporate

19   financials or the impact of information disclosures on

20   the valuation of the firm and its securities.

21       Q.   Can you point me to any of those papers that

22   appear in your CV --

23       A.   Sure.

24       Q.   -- attached to your report.

25       A.   Probably the first one would be An Analysis of

1    Intra-Industry Differences in the Effect of Regulation.

2    An Analysis of the Impact of Deposit Rate Ceilings on

3    the Market Values of Thrift Institutions, Journal of

4    Finance, 1982.

5         Certainly the Market Evidence on the Effective

6    Maturity of Assets and Liabilities, Journal of Money,

7    Credit and Banking.

8         Journal of Finance, 1984, The Effects of

9    Interest Rate Changes on Common Stock Returns.

10        1987, Returns to Acquirers and Competition in

11   the Acquisition Market, Journal of Political Economy.

12        Sort of -- I think A VARMA Analysis of Causal

13   Relations Between Stock Returns, Real Output and Nominal

14   Interest Rates.

15        The information -- 1983, The Information

16   Content of Distressed Restructurings Involving Public

17   and Private Debt Claims, that's Journal of Financial

18   Economics.

19        Journal of Corporate Financial, Asset Sales by

20   Financially Distressed Firms.

21        Journal of Finance, 1996, Bank Debit

22   Restructurings and the Composition of Exchange Offers in

23   Financial Distress.

24        Where Do Merger Gains Come From?  Bank Mergers

25   from the Perspective of Insiders and Outsiders, General

1    Financial Economics, May 2001.

2         Do Banks Provide Financial Slack, Journal of

3    Finance, 2002.

4         Journal of Financial Economics, 2006, The

5    Strength of Analyst Coverage Following IPOs.

6         The paper under current research, which is now

7    in revision, which is The Information Content of Bank

8    Loan Covenants.

9    Q.  Okay.

10   A.  I can go through the other papers and

11   publications.

12   Q.  That's probably sufficient.

13   A.  Okay.

14   Q.  Do you have any other cases where you're

15   currently expected to testify at trial?

16   A.  Yes.

17   Q.  Which cases?  Are those listed in your report?

18        MR. FRIEDMAN:  You can answer to the extent

19   you've been disclosed.

20        THE WITNESS:  I will limit it to the cases for

21   which I have been designated as an expert and been

22   disclosed.

23        What's not listed here would be WR Grace,

24   ERISA litigation.

25        MS. WINKLER:  Q.  Why is that not listed on

1    your --

2        A.   I haven't been deposed.

3        Q.   You haven't even been deposed.  My question

4    was, are there any cases on here in which you're

5    currently expected to testify?

6        A.   Oh, on here.  I thought you meant any other

7    cases in general.

8            I believe Barry Van Roden, et al. versus

9    Genzyme Corporation.  There is a number of AOL Time

10   Warner -- no.  I believe those -- the ones listed have

11   settled.  I don't know what the status of Adams Golf is

12   or the Enron Securities Litigation.

13       Q.   Forgive me if I'm -- you're now talking about

14   cases that appear on this list?

15       A.   That's what I thought you asked me.

16       Q.   Yes.  So do you have any dates scheduled in

17   any of those cases where you're actually set to testify

18   at trial?

19       A.   No.

20       Q.   Did anyone assist you in writing your reports?

21       A.   Yes.

22       Q.   Who was that?

23       A.   Well, I was assisted in producing my report by

24   certain individuals at Cornerstone Research.

25       Q.   Is that true of your opening report and your

James, Christopher  7/17/2007  9:05:00 AM

1   rebuttal report?

2       A.   Yes.

3       Q.   And who were those individuals that assisted

4   you?

5       A.   Andrew Roper, Dan Garrett, Cindy Zollinger,

6   Hermann Tribukait.  Pardon the mispronunciation.  I'm

7   not sure how to pronounce it.

8       Q.   Any other people at Cornerstone other than the

9   four individuals you just named?

10      A.   No.  I think that's -- the group that assisted

11  me.

12      Q.   What role did they take in assisting you in

13  writing your report?

14          MR. FRIEDMAN:  I'm going to just interpose an

15  objection to the extent it calls for information limited

16  by the stipulation.

17          THE WITNESS:  There was a large amount of

18  information that needed to be compiled and organized so

19  that I could draft my report, and they assisted me in

20  both compiling and assembling that information and

21  analyzing the data.

22          So I would give them, for example, a specific

23  task, which is, give you an example, what are the firms

24  that are identified in analyst reports over a particular

25  period of time who are designated as peers or

1    competitors to Oracle, that type of thing.

2        MS. WINKLER:  Q.  Did they assist you in any

3    of the work that you've done since issuing your rebuttal

4    report?

5        A.   Yes.  But in the same kind of context.  For

6    example, I wanted to listen to the Ellison conference

7    call, so was assisted in getting the Bloomberg terminal

8    and listening to it, that type of thing.

9        Q.   Has any court ever criticized any of your

10   opinions?

11       MR. FRIEDMAN:  Objection; vague.

12       THE WITNESS:  I certainly -- I don't know

13   that -- there are certain -- in the Court of Federal

14   Claims there have been certain cases in which the courts

15   have -- have not accepted my opinion because of the

16   method for evaluating damages that are viewed to be

17   appropriate in the context of a breach of contract.

18       So, for example, in the Winstar litigation,

19   and I was working for the plaintiffs, there were several

20   measures of damages that -- expectancy, restitution,

21   reliance, lost profits.  And early on in those cases we

22   provided -- I provided certain reports that touched on

23   all of those measures.

24       I think the court has now focused on one or

25   two measures within that group that is the preferred

1    measure of damage for this type of breach, which is the

2    damage measure that I proposed and testified to in the

3    LaSalle Talman case, and recently testified to in the

4    Spokane litigation, which is a cost of -- actual cost of

5    replacement.

6        MS. WINKLER:  Q.  You mentioned the Winstar

7    litigation.  Are there any other cases where the court

8    criticized your opinions?

9        A.  No.

10       Q.  Have you been retained by Oracle either

11   directly or through its lawyers in any other litigation?

12       A.  No.

13       Q.  Have you been retained by the Latham and

14   Watkins firm in any other litigation?

15       A.  Yes.

16       Q.  Are those cases listed on your Exhibit 2?

17       A.  No.

18       Q.  Is that current work that you're performing

19   for Latham and Watkins?

20       A.  I'm performing it for a particular client for

21   Latham and Watkins.  I don't know that I've been

22   retained by Latham and Watkins.  I believe I was

23   retained by the client.

24       Q.  Are you able to disclose those clients?

25       MR. FRIEDMAN:  Objection to the extent it

1    mischaracterizes testimony.

2         THE WITNESS:  I believe my -- that it is

3    subject to a protective order, but I'm not certain.

4         MS. WINKLER:  Q.  How many other cases have

5    you been retained by Latham and Watkins or a client of

6    Latham and Watkins?

7         MR. FRIEDMAN:  Objection; vague.

8         THE WITNESS:  I --

9         MR. FRIEDMAN:  There's a lot of clients of

10   Latham.

11        THE WITNESS:  Pardon me?

12        MR. FRIEDMAN:  No worries.

13        THE WITNESS:  As I sit here, I don't recall

14   another retention.

15        MS. WINKLER:  Q.  I'm sorry?

16     A.  I don't recall any other instances as I sit

17   here.

18        MS. WINKLER:  I'm going to take a short break.

19   I think I will probably be able to wrap up after this

20   break, but I'll have a few more questions.

21        VIDEOGRAPHER:  Off the record.  The time is

22   3:11 p.m.

23            (Recess, 3:11 p.m. - 3:22 p.m.)

24        VIDEOGRAPHER:  We're back on the record.  The

25   time is 3:22 p.m.

1          MS. WINKLER:  Q.  Do you intend to offer any

2     opinions at trial that you haven't testified to here

3     today or that are not included in either of your

4     reports?

5          MR. FRIEDMAN:  Objection to the extent it was

6     already asked and answered.

7          THE WITNESS:  My reports and I think there are

8     areas that you've covered in my deposition are the areas

9     that I expect, if asked, to testify to at court.

10          MS. WINKLER:  Q.  And at this point you don't

11     expect to testify to any other areas?

12          MR. FRIEDMAN:  Same objection.

13          THE WITNESS:  I don't believe so.

14          MS. WINKLER:  Q.  You testified earlier that

15     Oracle had indicated that it was not immune to an

16     economic downturn; correct?

17     A.   That's correct.

18          MS. WINKLER:  I'm going to ask the court

19     reporter to mark this document as the next exhibit.  For

20     the record the document is Bates labeled NDCA-ORCL

21     091467 through 70.

22               (Exhibit 7 marked for

23                identification.)

24          MS. WINKLER:  Q.  Have you seen this document

25     before?

1          MR. FRIEDMAN:  Take a while to familiarize

2    yourself with it.

3          THE WITNESS:  Have I seen this document

4    before?

5          MS. WINKLER:  Q.  Yes.

6      A.  I believe so.  Let me just check something.  I

7    believe I've seen it.

8      Q.   Did you rely on it in either of your reports?

9      A.   That's what I'm looking at, is whether it is

10    listed as one of the reports I relied on.

11          It is not listed in the set of reports that I

12    relied on.  There is other Robbie Stephens reports, but

13    I don't -- I didn't cite to this one.

14      Q.   Isn't it true that on February 21st, 2001,

15    Defendant Henley told the market that he does not expect

16    the slowing economy, barring a serious rescission, to

17    significantly impact results over the near term?

18      A.   On what day?

19      Q.   February 21st, 2001.

20          MR. FRIEDMAN:  Are you asking what the

21    document says?

22          THE WITNESS:  Did he say that on the 21st?

23          MS. WINKLER:  Q.  That was my question.

24      A.   I don't believe he said it on the 21st.

25      Q.   When did you believe he said it?

1        A.   I don't know that he said it.  It says here,

2    "At an analyst briefing on Tuesday evening, CFO Jeff

3    Henley maintained his positive outlook and guidance of

4    75 percent year-over-year growth in apps and 15 to 20

5    percent growth in database.  Henley does not expect the

6    slowing economy, barring a serious recession, to

7    significantly impact the results over the near-term."

8        Q.   And that statement appears in this document,

9    which is Exhibit 7; correct?

10       A.   That's right.

11       Q.   And what do you understand Exhibit 7 to be?

12       A.   It is -- appears to be an analyst report

13   talking about the Oracle AppsWorld User Conference.

14       Q.   And that report is dated February 21st, 2001;

15   correct?

16       A.   That's correct.

17       Q.   And that report is issued by Robinson

18   Stephens?

19       A.   It appears to be.

20       Q.   And you didn't cite this report in your -- in

21   either of your reports in this matter; did you?

22       A.   No.  I don't believe it's in the reports

23   referenced, although from my review, it doesn't appear

24   to be different, substantially different from -- and it

25   wouldn't cause me to change my view as to the analyst

1    commentary at the time.

2        Q.   How do you interpret the phrase near-term?

3        A.   How do I interpret it?  In the -- typically

4    near-term is in the six-month to one-year time frame.

5        Q.   Did you see any evidence in the record that

6    the economy suddenly retracted in the last week of

7    February of 2001?

8        A.   Pardon me?

9        Q.   Did you see any evidence in the record that

10   the economy suddenly retracted in the last week of

11   February 2001?

12       MR. FRIEDMAN:  Objection; vague.

13       THE WITNESS:  Did I see in the record evidence

14   that the economy contracted?  Yes.

15       If one looks at, for example, the analyst

16   commentary on that particular point in time, if one

17   looks at the revision of forecasts that analysts made at

18   that particular point in time, based on my discussion

19   and review of the Hubbard report and the dating of the

20   recession, all of that would be consistent with a

21   decline in the economic activity that was around the end

22   of February, first part of March.

23       MS. WINKLER:  Q.  Analyst commentary you

24   referred to, is that commentary on only Oracle or on

25   other companies?

1    A.   Oh, it is on Oracle and other companies.  You

2    take a look, for example, B of A, in the context of its

3    reports in early March, it lowers its estimates for all

4    of the firms that it is covering in the enterprise

5    software.

6        So CIBC, I believe, Credit Suisse, a number of

7    analysts made changes in their estimates of earnings for

8    firms within this industry right around the first part

9    of March.

10    Q.   Is that evidenced in the record in this case?

11    A.   Is that evidence in the record?  Yes.

12    Q.   Where is that evidenced in the record?

13    A.   Where is it in the record?

14        MR. FRIEDMAN:  I assume you're referring to

15    his report?

16        MS. WINKLER:  Yes.

17        THE WITNESS:  I have extensive discussion of

18    analyst commentary as of the -- turn to page 40, 41.  I

19    will actually -- if you look at from pages -- certainly

20    awareness of vulnerability to economic factors and the

21    back-end loaded characteristic of Oracle's business is

22    discussed prior to page 29.  And then in section 9 of

23    the report, which is a discussion of the information

24    content of the March 1st announcement and its March 2nd

25    price reaction.  And following through to page roughly

1    45, actually, and beyond, are all a discussion and

2    analysis of the implications of a slowing economy to

3    both Oracle's business and its competitors' business.

4          MS. WINKLER:  Q.  Is any of that information

5    dated in the last week of February 2001?

6          A.   The information in the last week of --

7    February of 2001, there is -- I know that there is a

8    number of comments in the last week in February as it

9    pertains to the analysts' interactions with customers as

10   part of the AppsWorld conference.

11         I think there was a couple of comments that I

12   recall with respect to, you know, the degree of

13   uncertainty that existed, which was substantial.  And

14   the idea that that uncertainty would resolve by looking

15   at the last several days of the quarter, the last week

16   of the quarter in terms of how much business was booked.

17         Q.   But didn't Henley say that Oracle wouldn't be

18   impacted by that in the near-term?

19         A.   Well, I think what he says is --

20         MR. FRIEDMAN:  Objection to the extent it

21   mischaracterizes the document and prior testimony.

22         THE WITNESS:  "Henley does not expect that the

23   slowing economy, barring a serious recession, to

24   significantly impact results over the near-term."

25         That's what's been communicated in the Robbie

1    Stephens report.

2         MS. WINKLER:  Q.  Is it your testimony a

3    serious recession happened after February 21st, 2001?

4         A.   I think as it pertains to Oracle's and its

5    competitors' business, yes, that there was a

6    significant, unexpected drop in business in the last

7    part of the quarter.

8         MS. WINKLER:  I think that's all the questions

9    that I have.

10        THE WITNESS:  Thank you.

11        MR. FRIEDMAN:  We're done.

12        MS. WINKLER:  Thank you.

13        VIDEOGRAPHER:  This is the end of videotape

14   number three, Volume I, in the deposition of Christopher

15   James.  The original videotapes will be retained by

16   LiveNote World Service.  Going off the record, the time

17   on the monitor is 3:34 p.m.

18        (Whereupon, at 3:34 p.m. the deposition of

19   CHRISTOPHER JAMES was adjourned.)

20

21        I declare under penalty of perjury that the

22   foregoing is true and correct.

23

24   Dated:_____  _____

                         CHRISTOPHER JAMES

25

James, Christopher  7/17/2007  9:05:00 AM

1    STATE OF CALIFORNIA        )

2                              )

3    COUNTY OF ALAMEDA          )

4         I, DIANA NOBRIGA, hereby certify that the

5    witness in the foregoing deposition was by me duly sworn

6    to testify to the truth, the whole truth, and nothing

7    but the truth in the within-entitled cause; that said

8    deposition was taken at the time and place therein

9    stated; that the testimony of said witness was reported

10   by me, a Certified Shorthand Reporter and disinterested

11   person, and was thereafter transcribed into typewriting,

12   and that the pertinent provisions of the applicable code

13   or rules of civil procedure relating to the notification

14   of the witness and counsel for the parties hereto of the

15   availability of the original transcript of the

16   deposition for reading, correcting and signing have been

17   met.

18        And I further certify that I am not of counsel

19   or attorney for either or any of the parties to said

20   deposition, nor in any way interested in the outcome of

21   the cause named in said action.

22   DATED: _____

23

24        _____

25        DIANA  NOBRIGA, CSR NO. 7071