COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
MARK SOLOMON (151949)
DOUGLAS R. BRITTON (188769)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
marks@csgrr.com
dougb@csgrr.com
       – and –
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
ELI R. GREENSTEIN (217945)
DANIEL J. PFEFFERBAUM (248631)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@csgrr.com
willowr@csgrr.com
elig@csgrr.com
dpfefferbaum@csgrr.com

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION | )<br>)<br>) | Master File No. C-01-0988-SI |
| | ) | CLASS ACTION |
| This Document Relates To: | )<br>)<br>) | PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' REVISED MOTION FOR SUMMARY JUDGMENT |
| ALL ACTIONS. | )<br>) | |

DATE:       January 9, 2009
TIME:       9:00 a.m.
CTRM:      The Honorable Susan Illston

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..................................................................................................1

II.  ARGUMENT .......................................................................................................1

A.  The Adverse Inferences Should Be Applied Broadly................................1

B.  Plaintiffs Have Established Genuine Issues of Material Fact on the
Material Falsity of Oracle's 2Q01 Financial Results.................................2

  1.  Defendants Intentionally Manufactured $20 Million in Fictitious
Earnings After 2Q01 Closed.........................................................4

  2.  Evidence Surrounding Oracle's 2002 Clean Up Demonstrates
Defendants' Fraudulent Intent .....................................................7

  3.  Defendants' Improper Swap Deal with HP ...............................8

C.  The Allegations Pertaining to the $20 Million in Debit Memo Bad Debt
Transfers Are Not "New" or "Unpled".....................................................9

D.  The Overstatement of 2Q01 Results Was Material .................................10

E.  Defendants Knew Their 11i Statements Were False ...............................12

  1.  11i Was Not Integrated and Interoperable Out of the Box, Nor Was
It Designed and Engineered to Be, and Was Not Tested.........15

  2.  Suite 11i's Lack of Integration and Poor Quality Caused
Demonstration Failures and Lost Sales.....................................18

  3.  Oracle Engineers' Report Confirms Falsity of 11i Statements –
Suite 11i Not Fully Integrated...................................................19

  4.  Suite 11i Did Not Work in Every Language as Represented and It
Hurt Sales.................................................................................20

  5.  Suite 11i Simply Did Not "Work" as Represented, Did Not Save
Customers Money and Was Costly to Implement .....................21

  6.  Oracle's Internal 11i Implementation Caused Part of the 3Q01
Shortfall and Plaintiffs' Economic Loss Due to Defects.........22

F.  There Was No Reasonable Basis for Oracle's Forecasts.......................23

  1.  The Major Economic Change Facing Oracle Rendered Its 3Q01
Forecasts Unreasonable ............................................................25

  2.  The Change in Product Mix and 11i Defects Rendered Oracle's
3Q01 Forecasts Unreasonable...................................................27

1

2                                                                              **Page**

3              3.     Ellison's Directive to Increase Risk in Oracle's Forecast Rendered
                      It Unreasonable .................................................................................28
4
        G.     Defendants Knew Facts that Seriously Undermined the Accuracy of
5              Oracle's External Forecast ............................................................................29

6              1.     Actual Results Seriously Undermined Oracle's External Forecast ..........30

7              2.     Division Level Indicators Seriously Undermined Oracle's External
                      Forecast .................................................................................................31
8
               3.     Pipeline Growth Seriously Undermined Oracle's External Forecast ........35
9
        H.     Defendants' "Cautionary" Statements Were Not Meaningful ..............................36
10
        I.     Defendants' Economy Statements Were Not Forward Looking ..........................38
11
        J.     Defendants Knew or Recklessly Disregarded that Their Economy
12             Statements Were False and Misleading ................................................................40

13      K.     The Insiders' Sales Establish Scienter ..................................................................42

14      L.     The Delaware Derivative Case Is Irrelevant .........................................................44

15      M.     The Facts Presented Support a Jury Finding of Loss Causation...........................44

16      N.     Adverse Inferences Further Defeat Defendants' Motion.......................................50

17  III.    CONCLUSION.................................................................................................................50

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Akiona v. United States*,
    938 F.2d 158 (9th Cir. 1991) ............................................................1

*Aldrige v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002)...........................................................6, 8

*Buskey v. Boston Mkt. Corp.*,
    No. 04-CV 2193 (SJ), 2006 U.S. Dist. LEXIS 65756
    (E.D.N.Y. Aug. 17, 2006) .............................................................50

*Byrnie v. Town of Cromwell Bd. of Educ.*,
    243 F.3d 93 (2d Cir. 2001).........................................................1, 50

*Constr. Laborers Pension Trust of Greater St. Louis v.
Neurocrine Biosciences, Inc.*,
    No. 07CV1111-IEG-RBB, 2008 U.S. Dist. LEXIS 38899
    (S.D. Cal. May 13, 2008) ..........................................................40, 41

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)..................................................................44, 47

*Gebhardt v. ConAgra Foods, Inc.*,
    335 F.3d 824 (8th Cir. 2003) ..........................................................11

*Harris v. Ivax Corp.*,
    182 F.3d 799 (11th Cir. 1999) ........................................................40

*Helwig v. Vencor, Inc.*,
    251 F.3d 540 (6th Cir. 2001) ...............................................23, 37, 42

*Heng Chan v. Triple 8 Palace, Inc.*,
    No. 03 Civ. 6048 (GEL), 2006 U.S. Dist. LEXIS 15780
    (S.D.N.Y. Mar. 31, 2006) ..............................................................50

*In re Amylin Pharms., Inc. Sec. Litig.*,
    No. 01cv1455 BTM (NLS), 2003 U.S. Dist. LEXIS 7667
    (S.D. Cal. May 1, 2003)......................................................37, 38, 40

*In re Boeing Sec. Litig.*,
    40 F. Supp. 2d 1160 (W.D. Wash. 1998)........................................40

*In re Connetics Corp. Sec. Litig.*,
    542 F. Supp. 2d 996 (N.D. Cal. 2008) ...........................................39

Page

*In re Connetics Corp. Sec. Litig.*,
    No. C 07-02940 SI, 2008 WL 3842938
    (N.D. Cal. Aug. 14, 2008)...................................................................................23

*In re CV Therapeutics Sec. Litig.*,
    No. C 03-03709 SI, 2004 U.S. Dist. LEXIS 17419
    (N.D. Cal. Aug. 5, 2004).............................................................................38, 39

*In re Daou Sys.*,
    411 F.3d 1006 (9th Cir. 2005), *cert. denied*,
    546 U.S. 1172 (2006) ........................................................................ *passim*

*In re Dura Pharms., Inc. Sec. Litig.*,
    452 F. Supp. 2d 1005 (S.D. Cal. 2006)...............................................39, 45, 47

*In re FirstEnergy Corp. Sec. Litig.*,
    316 F. Supp. 2d 581 (N.D. Ohio 2004).............................................................42

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ...................................................................45, 49

*In re Immune Response Sec. Litig.*,
    375 F. Supp. 2d 983 (S.D. Cal. 2005).............................................................37

*In re Impax Labs., Inc. Sec. Litig.*,
    No. C04-04802 JW, 2007 U.S. Dist. LEXIS 52356
    (N.D. Cal. July 18, 2007)..............................................................................47

*In re InterMune, Inc. Sec. Litig.*,
    No. C 03-2954 SI, 2004 U.S. Dist. LEXIS 15382
    (N.D. Cal. July 30, 2004)..............................................................................38

*In re JDS Uniphase Corp. Sec. Litig.*,
    No. C 02-1486 CW, 2007 WL 2429593
    (N.D. Cal. Aug. 24, 2007).............................................................................42

*In re Lattice Semiconductor Corp. Sec. Litig.*,
    No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262
    (D. Or. Jan. 3, 2006) ...................................................................................39

*In re LDK Solar Sec. Litig.*,
    No. C 07-05182 WHA, 2008 U.S. Dist. LEXIS 42425
    (N.D. Cal. May 29, 2008) ..........................................................................6, 38

*In re LeapFrog Enters., Inc. Sec. Litig.*,
    527 F. Supp. 2d 1033 (N.D. Cal. 2007) .........................................................40

**Page**

*In re Loewen Group Inc. Sec. Litig.*,
    395 F. Supp. 2d 211 (E.D. Pa. 2005) ...............................................................47

*In re Motorola Sec. Litig.*,
    505 F. Supp. 2d 501 (N.D. Ill. 2007) ...............................................................45

*In re Oracle Corp. Derivative Litig.*,
    867 A.2d 904 (Del. Ch. 2004)................................................................35, 44

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)......................................................................8

*In re Secure Computing Corp. Sec. Litig.*,
    120 F. Supp. 2d 810 (N.D. Cal. 2000) ...............................................................39

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
    266 F. Supp. 2d 1150 (C.D. Cal. 2003) ...............................................................38

*In re Skechers U.S.A. Sec. Litig.*,
    273 Fed. Appx. 626 (9th Cir. 2008)......................................................................42

*In re U.S. Interactive, Inc. Sec. Litig.*,
    No. 01-CV-522, 2002 U.S. Dist. LEXIS 16009
    (E.D. Pa. Aug. 23, 2002)......................................................................40

*Kaplan v. Rose*,
    49 F.3d 1363 (9th Cir. 1994) ...............................................................43

*Knightsbridge Mktg. v. Promociones Y Proyectos, S.A.*,
    728 F.2d 572 (1st Cir. 1984)......................................................................1

*Kronisch v. United States*,
    150 F.3d 112 (2d Cir. N.Y. 1998)......................................................................50

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ...............................................................45

*Morgan v. AXT, Inc.*,
    No. C04-4362 MJJ, 2005 U.S. Dist. LEXIS 42346
    (N.D. Cal. Sept. 23, 2005) ...............................................................36

*Morgan v. U.S. Xpress, Inc.*,
    No. 4:03-cv-88 (CAR), 2006 U.S. Dist. LEXIS 36195
    (M.D. Ga. June 2, 2006)......................................................................50

**Page**

*Mosaid Techs. Inc. v. Samsung Elecs. Co.*,
224 F.R.D. 595, *aff'd*, 348 F. Supp. 2d 332 (D.N.J. 2004)...................................................1

*Nathenson v. Zonagen Inc.*,
267 F.3d 400 (5th Cir. 2001) .........................................................................................8

*No. 84 Employer-Teamster Joint Counsel Pension Trust Fund v. Am. West*,
320 F.3d 920 (9th Cir. 2003) ...............................................................................38, 43

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ...................................................................................42

*Nursing Home Pension Fund v. Oracle Corp.*,
242 F. Supp. 2d 671 (N.D. Cal. 2002) .................................................................37, 39

*Nursing Home Pension Fund v. Oracle Corp.*,
No. C01-00988 MJJ, 2006 U.S. Dist. LEXIS 94470
(N.D. Cal. Dec. 20, 2006) ..........................................................................................47

*Pelletier v. Magnusson*,
195 F. Supp. 2d 214 (D. Me. 2002) ...........................................................................50

*Provenz v. Miller*,
102 F.3d 1478 (9th Cir. 1996) .....................................................................10, 23, 37

*Robbins v. Koger Props.*,
116 F.3d 1441 (11th Cir. 1997) ............................................................................44, 45

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)........................................................................................38

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ......................................................................................39

*Scott v. IBM Corp.*,
No. 98-4092 (JBS), 2000 U.S. Dist. LEXIS 17979
(D.N.J. Nov. 29, 2000)................................................................................................50

*SEC v. Phan*,
500 F.3d 895 (9th Cir. 2007) ......................................................................................10

*SEC v. Talbot*,
530 F.3d 1085 (9th Cir. 2008) ....................................................................................10

                                                                            **Page**

*Smith v. Borg-Warner Auto. Diversified Transmission Prods. Corp.*,
     No. IP98-1609-C-T/G, 2000 U.S. Dist. LEXIS 10200
     (S.D. Ind. July 19, 2000) ................................................................................................50

*Stanton v. Nat'l R.R. Passenger Corp.*,
     849 F. Supp. 1524 (M.D. Ala. 1994) ..............................................................................50

*Stavros v. Exelon Corp.*,
     266 F. Supp. 2d 833 (N.D. Ill. 2003) ..............................................................................42


**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
     §78j(b) ..............................................................................................................................40
     §78u-4(b)(4) ......................................................................................................................44
     §78u-5(c)(1)(B) ................................................................................................................37

17 C.F.R.
     §230.144(e) ......................................................................................................................42

SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150 (1999) ..........................................11

1   **I.      INTRODUCTION**

2           Defendants have no entitlement to summary judgment, except against them.  Consistent with

3   plaintiffs' allegations, there are abundant facts, either indisputably in plaintiffs' favor or that, at a

4   minimum, are reasonably disputed, that prove plaintiffs' case.  None militate in defendants' favor.

5   **II.     ARGUMENT**

6           **A.      The Adverse Inferences Should Be Applied Broadly**

7           Ellison's destruction of thousands of emails and over a hundred hours of taped interviews,

8   was wholesale and willful.  The adverse inferences should not be limited to Ellison's knowledge.

9   Rather, they should be to the effect that the destroyed evidence contained additional information that

10  was adverse to defendants.  Because, as the Court has found, "it would be quite difficult for plaintiffs

11  to demonstrate how they were harmed by evidence to which they do not have access," and because

12  "the Court [will] presume[] that any additional emails that plaintiffs did not receive could have

13  supported plaintiffs' claims" (9/2/08 Order (Dkt. #1478) at 8:2-5, 9:3-7, 9:24-10:6), defendants'

14  limited interpretation must be rejected.  A party who destroys relevant evidence is "more likely to

15  have been threatened" by that evidence.  *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991).

16  Courts presume that a party who "prevented production did so out of the well-founded fear that the

17  contents would harm him."  *Knightsbridge Mktg. v. Promociones Y Proyectos, S.A.*, 728 F.2d 572,

18  575 (1st Cir. 1984).  For this reason, courts have rejected the very limitation urged by defendants:

19              Cromwell argues that even if Byrnie is entitled to an adverse inference, such an
                inference must be limited to giving the greatest weight possible to other existing
20              evidence favorable to [the party who destroyed the evidence].  However, the rule
                offered by Cromwell rewards those most thorough in the art of document shredding
21              since as the existing evidence of unlawful behavior dwindles, the deterrent force of
                the threat of an adverse inference fades as well.

22  *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 110 (2d Cir. 2001); *Mosaid Techs. Inc. v.*

23  *Samsung Elecs. Co.*, 224 F.R.D. 595, 600, *aff'd*, 348 F. Supp. 2d 332 (D.N.J. 2004) ("there is no

24  basis for allowing the inference only if the evidence before the jurors is insufficient to establish a

25  fact.  Were that the case, defendants' spoliation would be rewarded rather than punished").

26          Ellison's e-mails and the *Softwar* interviews are the most direct contemporary evidence not

27  only of Ellison's knowledge, but also of the facts he knew.  The wholesale destruction of this

28

evidence was not an accident.  Ellison is an experienced and sophisticated litigant.  He has destroyed highly relevant evidence throughout this litigation.  The inference must be that the destroyed material contained additional evidence adverse to defendants.

**B.     Plaintiffs Have Established Genuine Issues of Material Fact on the Material Falsity of Oracle's 2Q01 Financial Results**

On December 14, 2000, Oracle falsely reported EPS results of $0.11 per share for 2Q01, and 66% growth in sales of Suite 11i applications, purporting to beat Wall Street analysts' estimates by $0.01 per share.  Exs. 1 at 1-2; 105.[1]  Defendants fraudulently manufactured $0.01 per share and over $40 million in phony revenue and earnings by: (i) intentionally converting illegally withheld "customer overpayments" to revenue and income and applying the money to fictitious "debit memo" invoices to make them look like real sales; and (ii) booking an improper roundtrip "swap" deal with Hewlett Packard after 2Q01 closed.   Ex. 1, ¶¶19-41, 62-133.   Without these accounting manipulations, Oracle would have reported only $0.10 per share and 54% applications growth and would not have beat Wall Street expectations.  Ex. 1, ¶¶39, 62.

Leading up to 2Q01 Oracle had unlawfully accumulated a slush fund of approximately $100 million or more in "unapplied cash" mostly from customer overpayments and duplicate payments, $70 million of which was in a liability account called "***[Account] 25005 Customer Overpayments***."[2]  Exs. 1, ¶¶4-13; 409.   Despite the fact that unapplied cash in Account 25005 was generally "something that [is] flagged to be refunded to a customer, payable to a customer" (Ex. B at 97:9-19), Oracle improperly kept the money and did not refund it unless the customer discovered it and requested the money back.  Ex. LLL 126:15-25, 128:17-129:12.  Oracle also improperly tried to keep money that belonged to customers even ***after*** a requested refund.  Exs. E at 66:7-24 ("[A]t times those [refund] requests would be put on hold for long periods of time, and the money would not go back to the client."); 47 at 1895745 ("We actually have the unapplied cash.  We never booked the order but the customer paid.  We want to book it or try to get upper management to agree that we

---

[1]     All "Ex." or "Exs." references are to the Declaration of Shawn A. Williams filed herewith.

[2]     All emphasis is added and citations are omitted throughout unless otherwise noted.

1  should keep this money.").  Oracle's accumulation and concealment of customer overpayments was

2  deliberate and well known to defendants.  Ex. 1, ¶¶3-41.[3]

3          Oracle concealed its improper use of customer overpayments by using end-of-the-quarter

4  "clean up drills" and "auto-adjustments" to sweep unapplied cash from Account 25005 into a reserve

5  account called "***Account 12601***" that Oracle used to manipulate earnings.  Ex. 1, ¶¶11, 20.[4]  Three

6  weeks before the close of 2Q01, Oracle employees were instructed to "resolve as many unapplied

7  items before the end of the quarter" to "help" Oracle achieve its quarterly earnings goals – "Since we

8  are approaching the end of the quarter, we would like to resolve these items as quickly as possible.

9  If there is no response by ***November 20, 2000***, we will review the items and ***place them in our***

10 ***reserve account***."  Ex. 27 at 3042910 (emphasis added and in original).

11         In mid-November 2000, Oracle attempted to conceal and "clean up" this large amount of

12 customer money by generating thousands of phony invoices called "debit memos" that looked

13 virtually identical to real invoices.  Exs. 1, ¶¶24-29, 47-54; 428-429 (example debit memos).  Oracle

14 applied the customer overpayments to the fake "debit memo" invoices to make it appear as if the

15 overpayments were legitimate sales.  *Id*.; *see also* Exs. 412-413.  Documents created by Oracle's

16 own "Unapplied Cash Specialist" confirm that the "debit memos" were customer overpayments that

17 should be refunded.  Exs. 38, 39 ("***All invoices that start with '550' are actually debit memo #'s.***

18 ***These were created to clean up our unapplied account at the time.  They were more than likely***

19

---

20 [3]     Henley testified that "there was a similar problem when I joined the company . . . so I was
disappointed when I found out about it because here we were repeating sins of the past many years
21 later." Ex. H at 465:7-21.  Oracle Collections Manager Hatada testified that Oracle's huge balance
of customer overpayments was a "very, very large problem, the biggest problem that anybody in
22 collections or accounts receivable had." Exs. E at 78:20-79:9; 27 at 3042910; 29 at 1607434-37; I at
198:8-14  ("The unapplied cash account.  I was aware of it being a big problem.").

23

24 [4]     *See also* Ex. B at 205:20-206:1 ("Q. Is that the only account that the auto adjustments would
impact?  A. Other than the unapplied account because ***it would be taken out of the unapplied***
25 ***account and put into the bad debt reserve account***.  Q. Bad debt reserve account.  A. ***The 12601***.");
*see also id*. at 212:15-18 (Q. ***Was Oracle doing these auto adjustments prior to May of 2001?***
26 A. ***Yes***.").   After plaintiffs filed their accounting allegations on October 11, 2002, Oracle
suspiciously attempted to shut off the auto-adjustment process.  Ex. 2 at 2 ("Greg, please confirm
27 that ALL ability to move anything to 12601 via On Account or creating a Misc receipt write off ***has***
***been turned off***.").

28

*overpayments*.").  Plaintiffs' accounting expert, D. Paul Regan, concluded that the creation of the fictitious "debit memo" invoices and the corresponding "clean up" of the funds in mid-November 2000 allowed Oracle to manipulate the customer funds used to inflate 2Q01 earnings. Ex. 1, ¶¶3-54.

### 1.    Defendants Intentionally Manufactured $20 Million in Fictitious Earnings After 2Q01 Closed

Defendants intentionally manipulated Oracle's earnings *after* 2Q01 closed by "adjusting" its bad debt reserve to convert $20 million in customer overpayments from "Account 12601" directly to revenue and earnings. Exs. 1, ¶¶19-39; 3 at 20; 4 at 1610858-859, 1610987 (showing adjustment of $20 million); A at 70:10-14.  It is undisputed that the $20 million used to inflate Oracle's earnings was transferred from Oracle's "Customer Overpayments" account (Account 25005) to its bad debt reserve (Account 12601) during 2Q01.  Exs. 1, ¶19; A at 146; 408; 4 at 1610987.  It is also undisputed that the entire $20 million in overpayments were applied to fictitious "debit memo" invoices during 2Q01. Ex. 1, ¶¶19-29.

Defendants' accounting expert, J. Duross O'Bryan, conceded that the $20 million transfer went directly to Oracle's income. Exs. A at 146:13-147:6 ("[Oracle] individuals made decisions to transfer from 25005 to 12601. *That went right into income, actually went into reserve that went into income*."); 3 at 20 ("*$20.1 million of unapplied cash had been transferred to the bad debt reserve during the second quarter of fiscal year 2001*."); A at 70:10-14 (same).[5]  O'Bryan also admitted that any improper transfers from Account 25005 to Account 12601 *would violate GAAP*." Ex. 3 at 6. O'Bryan admitted that if the $20 million transfer did *not* occur, Oracle's EPS results for

---

[5]    Oracle's former Vice President of Revenue Accounting Americas, Michael Quinn, admitted that Oracle's transfers of customer overpayments to the reserve impacted revenue and earnings. Ex. B at 227:25-228:11 ("Q. Did the process of taking unapplied cash to the reserve impact revenue in any of the eight quarters prior to October 2002?  A. Yes."). Tom Williams, Oracle's Vice President of Finance Operations, admitted the same. Exs. 5 at 313783; C at 125:11-18, 177:5-15 (admitting that 2Q01 transfer relating to debit memo from customer K-force was improper). Williams testified that Oracle would only adjust the bad debt reserve if the change needed was "significant." Ex. C at 124:21-125:3. Minton confirmed that Oracle's process of adjusting the bad debt reserve impacted Oracle's revenue account. Ex. EEE at 142:13-143:12, 143:17-144:10, 216:13-217:2. Former Oracle Collections Manager Hatada testified that the revenue impact was "major." Ex. E at 153:16-154:5. Internal Oracle documents confirm the same. Exs. 4 at 1610987; 6 at 140468-69, 140474; 7 at 440832.

1  2Q01 would have been $0.10 rather than $0.11.  Ex. 3 at 38.  Plaintiffs' accounting expert found that

2  the entire $20 million was improper.  *See* Ex. 1, ¶¶31-39.[6]

3       Defendants were aware of these accounting manipulations.  On November 27, 2000, three

4  days before the close of 2Q01, defendants received the final 2Q01 forecasting report ("Upside

5  Report"), showing that actual earnings were forecasted at only $0.09 per share, with a "potential"

6  number of only 10.34 cents per share, or $0.10 when rounded.  Ex. 30 at 1532779.  On December 1,

7  2000, the day *after* 2Q01 closed, Oracle's Upside Report confirmed that Oracle was still short.  Ex. 7

8  at 440830.  On December 4, 2000, defendants held their last 2Q01 EC meeting and circulated the

9  "[EC] Worldwide Forecast . . . Management Summary," which again confirmed that Oracle had only

10  earned $0.10 per share for 2Q01.  Exs. 205; 193 at 208835-36.  Another Upside Report dated

11  December 5, 2000, revealed that Oracle's EPS "potential" was only ***10.22 cents***, tens of millions

12  short of $0.11.  Ex. 407.  On December 8, 2000, the Company's "final version of the Bad Debt

13  Analysis" was emailed to the EC revealing the improper $20 million "adjustment" to the bad debt

14  reserve, which falsified earnings to get to $0.11.  Ex. 4 at 1610987.  Ellison and Henley admit that

15  they received and reviewed Upside Reports each week during the quarter.  Exs. H at 179:15-19,

16  397:24-398:12; 31, ¶¶3-4, 31; 32, ¶¶3-5; GG at 127-129; EEE at 105:1-107:5; K at 25:23-26:24,

17  38:1-40:20; 193 at 208835.  Thus, Ellison and Henley were well aware, five days *after* 2Q01 closed,

18  that Oracle manufactured false earnings in order to report $0.11.

19       Defendants' assertions that plaintiffs' accounting expert "did not offer an opinion on the

20  financial statement impact of the debit memos," is "not qualified" and "did not review the relevant

21  records" are both false and improper.  *See* Defendants' Revised Motion for Summary Judgment

22  ("Motion" or "Mot.") at 4, 19, 38.  Defendants did not file ***any*** *Daubert* challenge to Mr. Regan's

---

[6]   Defendants only attempt to challenge $2 million of the $20 million in improper debit memo transfer transactions, but their analysis is based on pure speculation. Ex. 3 at 32-33.  At deposition, O'Bryan conceded that the propriety of $500,000 of the $2 million was "not conclusive."  Ex. F at 202:19-203:14 ("A. [T]he notes were not conclusive for me, nor did I see any other type of support. . . . ***We put that in the bucket of could be.  Q. Could be.  So you can't definitely say that $500,000 of transfers was proper, correct?  A. That's correct***.").  His opinion on the other $1.5 million was similarly unfounded, and he could not cite any documents to support his speculation.  *Id.* at 177:3-202:9.

1    qualifications as an expert, the foundation of his opinions, his methodology, or the reliability of his

2    opinion.  Mr. Regan's unchallenged opinion combined with the evidence cited herein, establishes a

3    genuine dispute of fact on both falsity and scienter for Oracle's 2Q01 results.[7]

4              Oracle also cannot meet its burden on summary judgment by claiming that its 2Q01 results

5    were "reviewed by two independent auditing firms" and "never have been corrected or restated."

6    Mot. at 37.  *See In re LDK Solar Sec. Litig.*, No. C 07-05182 WHA, 2008 U.S. Dist. LEXIS 42425,

7    at *31-*32 (N.D. Cal. May 29, 2008); *Aldrige v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002).

8    In fact, Oracle did "correct" and reverse the $20 million in debit memo transactions *after* plaintiffs

9    filed their accounting allegations on October 11, 2002.  Exs. 9; A at 154:7-11 ("So, if in the second

10   Q they were applying the 25005 to the 12601, that's recording income.  If – then remember during

11   October/November [2002] time frame *they reversed all of that.  It all went out of reserve.  It*

12   *reduced revenue, basically, by that $20 million*."); Exs. 3 at 20, 34-35 ("On November 8, 2002,

13   *Oracle reversed the processing of the November 17, 2000 debit memo*, thus switching the receipt

14   status from 'Applied' back to 'Unapplied.'"); 1, ¶¶42-45; 44 ("step-by-step" guide to reversing debit

15   memos).  These facts create a genuine dispute concerning falsity and scienter.[8]

16

17

18

---

19   [7]       Defendants' submission of self-serving declarations claiming lack of "contemporaneous

20   knowledge" of the accounting fraud does not establish an absence of a genuine issue of fact.  Mot. at
     39-40.   The overwhelming evidentiary record contradicts the declarations, as set forth above.

21   Further, notably missing is any declaration from Oracle's controller Minton, who prepared the
     Upside Reports, signed the false 2Q01 results with Ellison and Henley, attended the EC meeting

22   with defendants on December 4, 2000, and later tried to conceal her role in the fraud.  *See* §II.B.2.,
     *infra*.

23   [8]       Defendants never told their auditor Arthur Andersen LLP ("Andersen") about the debit
     memo transactions.   Indeed, the only two Andersen witnesses in the case had absolutely no

24   knowledge of the debit memo transactions or the false transfers and admitted they "would have liked
     to have known about it while we were out doing our review and audit work."  Exs. P at 315:7-316:6,

25   322:10-323:21, 272:8-23, 304:23-305:16; HHH at 251:24-252.  Ernst & Young LLP ("E&Y")
     learned years after the fact that $5 million in improper transfers occurred in 3Q01 but never

26   reviewed the bad debt transfers or Account 12601 for *2Q01*.  Exs. 414 at 296433; BB at 179:18-22
     ("Q:  Do you know if Ernst & Young in the course of its review or engagement related to the debit

27   memo transactions ever looked at the transfers to Account 12601?  A:  No, I don't recall that
     specifically.  No.").

28

---

1

2.    **Evidence Surrounding Oracle's 2002 Clean Up Demonstrates Defendants' Fraudulent Intent**

2

3    Immediately after plaintiffs filed their debit memo accounting allegations, Oracle held a

4    flurry of special meetings to devise a plan to "clean up" the "on account problem" (the "2002 Clean

5    Up"), and to make sure the improper transactions "never happened again."  Exs. 2; 1, ¶¶42-46.

6    Oracle Manager Hatada, who attended the meetings, testified that:

7    [A.]    Well, the first . . . the first meeting that we had to actually give us a . . . short overview as to what we were about to get involved with was that the unapplied that we were looking at currently or at that time, there was *a lot more in*

8    *the reserve that we were going to have to try to resolve because of a specific lawsuit that, you know, that we had money that we shouldn't have had* . . . .

9    [Q.]    *And were those the items, as far as you know, that resulted from*

10    *creation of debit memos previously*?

11    [A.]    *I believe that was one of the reasons that Mike Quinn and Greg Myers had given us*.  [Ex. E at 128:8-129:2, 257:24-263:23, 307:5-11.]

12    The 2002 Clean Up was part of Oracle's attempt to "help Oracle" clean up the debit memos

13    and the "problem with the unapplied cash" raised in plaintiffs' lawsuit.  *Id*. at 38:13-39:9, 113:18-

14    114:7, 264:8-265:6.[9]  In fact, Oracle's top officers were involved in the 2002 Clean Up.  *Id*. at 266:2-

15    21, 104:25-106:3 (Henley involved).  Minton completely fabricated a story about her role in the

16    2002 Clean Up by initially testifying that she was "not involved in the investigation" and "[did] not

17    know of any details of the investigation" because "*I was told – I think it was appropriate for legal*

18    *to keep me uninvolved in the investigation*."  Ex. FFF at 162:18-163:3, 174:23-175:19.  Minton

19    later changed her story and claimed she knew the "results" of the 2002 Clean Up but was "not

20    involved in the actual underlying investigation itself."  Ex. GGG at 278:15-279:20.  This testimony

21

22

23

---

24    [9]    During the 2002 Clean Up, Oracle affirmatively attempted to conceal overpayments from

25    customers and alter the accounting history even when it knew the money should be refunded.  Ex. 1, ¶5 nn.10-14; Ex. 47 at 1895745 ("We actually have the unapplied cash.  We never booked the order

26    but the customer paid.  We want to book it or try to get upper management to agree that we should keep this money.").  Shockingly, one Oracle e-mail suggested fraud: "If this isn't enough to close out

27    the [purchase order], *could it end up in a fire under mysterious circumstances*?"  Exs. 47 at 1895745; 48 at 1886317; 49 at 1865593.

28

1    was patently false.  Evidence shows Minton was substantially involved.[10]  Defendants' attempted

2    cover up of Oracle's accounting misconduct is further circumstantial evidence of defendants'

3    scienter.[11]

4                    **3.        Defendants' Improper Swap Deal with HP**

5            Oracle's improper recognition of $20 million in revenue from the HP transaction after 2Q01

6    closed rendered its $0.11 EPS and 66% applications growth materially false.  Defendants knew that

7    the $20 million was an undisclosed and improper *quid pro quo* – Oracle had to pay $30 million for

8    HP hardware that was not properly accounted for in 2Q01.  Ex. 1, ¶¶62-134.  In fact, an Oracle e-

9    mail confirmed that "***they don't need ALL the license users right now [so] they are hedging on***

10   ***how big an order they will do until they see how much production hardware Oracle comes back***

11   ***with***."  Ex. 60 at 055957.  And Sanderson openly questioned the integrity of the deal: "***THE REAL***

12   ***STORY*** . . .  ***Is this the way we are going to do deals.  Each has to buy something [from each***

13   ***other]!***"  Exs. K at 521:6-523:11; 63 at 020839; N at 59:17-21, 62:3-6.[12]

14           The HP deal was knowingly improper for additional reasons: (i) the deal was not signed and

15   executed until after midnight on the last day of 2Q01 (Exs. 1, ¶¶100-101; 180 at 260105, 260118,

16   _____

17   [10]      Exs. H at 437:1-6, 451:10-17; 50 at 313792 ("Henley additionally said that **he expected**
18   **Minton and Williams** to get to the bottom of the issue and take any necessary action to resolve it.");
     51 at 1727980 ("I have also tried to summarize the open questions ***Jennifer had from our meeting***
19   ***earlier this week . . . .  Jennifer has initiated a project to cover our work in this area . . . .  Jennifer***
     ***would like to meet next week on our progress***."); *see also* Exs. 47 at 1895745; 52 at 1733103-05; 53
20   at 1886329; 187 at 1892686-87; 54 at 1885840-41 (Minton's approval regarding scope of 2002
     Clean Up).

21   [11]      It is well established law that pre- or post-CP evidence is admissible to show liability and
22   scienter.  Indeed, Judge Infante held that documents related to the 2002 Clean Up were relevant to
     both liability and scienter during the CP.  Ex. 410 at 19.  *See also In re Scholastic Corp. Sec. Litig.*,
23   252 F.3d 63, 72 (2d Cir. 2001) (pre- and post-CP information may "confirm" defendants' scienter
     during CP); *Aldridge*, 284 F.3d at 81; *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 425 (5th Cir. 2001).
24   Defendants' attempt to cover up accounting improprieties is not surprising given that Oracle was
     subject to an SEC Consent Decree enjoining it from misstating its financial results.  Ex. 20 at 3-4.

25   [12]      On the last day of 2Q01, EVP George Roberts wrote: "I understand Larry [Ellison] and Carly
26   [Fiorina] are discussing their purchase of our products this quarter *if we commit* to purchase $20M-
     $30M of their product over the next 18-24 months."  Exs. 57 at 025018; 58 at 028736; 60 at 055958;
27   61 at 020850-51; 62 at HP00020 ("These licenses were bought as an 'incentive' for Oracle to help us
     increase HP's revenue.").

28

260120-21); 181 at 259035-038; 183 at 257416 ("***This is a reapproval request for a Q2 deal that didn't close***."); (ii) Oracle had to agree to $30 million in cash purchases or a cancellation fee before HP would commit (Exs. 1, ¶¶123-125; 57); and (iii) Oracle never delivered the product and functionality promised (Exs. 1, ¶¶111-117).[13]  Further, Oracle concealed key information from its auditor, including evidence of the reciprocal commitments and concessions. *See* Exs. 59 at 020845; P at 328:21-330:5, 332:7-334:1, 338:19-340:21, 343:20-25.   These facts preclude summary judgment on falsity and scienter for Oracle's 2Q01 results.

### C. The Allegations Pertaining to the $20 Million in Debit Memo Bad Debt Transfers Are Not "New" or "Unpled"

Defendants' assertion that plaintiffs' accounting allegations are "new" and "unpled" is hard to take seriously. Mot. at 36-37. ***Six years ago***, after plaintiffs learned that defendants were trying to cover up their 2Q01 accounting manipulations (*see* §II.B.2., *supra*), plaintiffs filed an *Ex Parte* Application laying out the fictitious "debit memo" invoices scheme and Oracle's manipulation of its bad debt reserve to inflate 2Q01 earnings. Exs. 10-11.[14]  Plaintiffs subsequently filed the operative Complaint, which alleged that defendants "improperly recognized revenue from past customer credits and ***overpayments it had held in reserve*** without informing its customers." Ex. 12, ¶8. Plaintiffs also alleged that Oracle applied the customer money to fictitious "debit memo" invoices in November 2000, which was "indeed money that had been '***on reserve' in Oracle's 'On Account***.'" Ex. 12, ¶41(a). Plaintiffs later explained to the Court:  "***The monies that were applied to the debit memos came from the bad debt reserve, which is where the unapplied cash went to when it came***

---

[13]     Ellison, Henley and Oracle's Board of Directors held a "Special Meeting" on the last day of 2Q01 to specifically "authorize" the HP transaction, which it knew was contingent upon Oracle's $30 million purchase from HP. Ex. 64 at 044458.  Numerous documents and deposition testimony confirm that defendant Ellison was personally involved in negotiating the deal. Exs. O at 112:6-8; K at 503:2-5; N at 60:23-61:1, 62:10-13 ("[A]ll the players that are involved in this.  This is something that Sandy knew about, it's something that Larry knew directly about . . . .").

[14]     Plaintiffs alleged that Oracle had a "long-standing practice of inappropriate use of customer's overpayments and unapplied cash by doing so-called 'auto adjustments' of customer overpayments in its Unapplied Cash account and ***applying the money to its bad debt accounts***." Ex. 11, ¶6; *see also, e.g.*, Ex. 10 at 3-7.  Plaintiffs also alleged that "at the end of a month, Oracle would run an 'auto adjustment' that would ***take money out of the Unapplied Cash account and would transfer it to the Reserve for Bad Debt account***," thereby "***inflat[ing] net income***."  Ex. 11, ¶12.

1    *in*." Ex. 13 at 53:10-15.  The Special Master in this case (Hon. Edward Infante (Ret.)) rejected and

2    admonished defendants' attempt to narrow plaintiffs' accounting allegations calling it "ridiculous."

> [D]ocuments relating to transfers of customer overpayments to Oracle's bad debt
> reserve, which could also be linked to the November 17, 2000 debit memos [are]
> relevant to Plaintiffs' allegations.  The new or different evidence cited by Plaintiffs
> . . . , ***reveal a further connection between the debit memos and Oracle's bad debt
> reserve account during the relevant period***.

6    Exs. 410; 15 at 86:11-16 (Judge Infante:  "***I have never seen anyone read a complaint so narrowly***

7    ***as you do.  Rule 26 would be turned on its head if we applied your discovery rulings as you wish to***

8    ***make in this case.  It's just ridiculous.  I'm sorry I have to be so blunt with you***.").[15]  Moreover,

9    plaintiffs detailed the bad debt transfer allegations in their contention interrogatory responses (Ex. 14

10   at 100-01).  It is simply incorrect to suggest that plaintiffs have "abandoned" their accounting

11   allegations.  Mot. at 3.

12       **D.    The Overstatement of 2Q01 Results Was Material**

13       Defendants claim that falsifying Oracle's 2Q01 results from $0.10 to $0.11 to beat Wall

14   Street expectations is not material.  Mot. at 39.  A false statement or omission is material if there is

15   "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the

16   reasonable investor as having significantly altered the "total mix" of information made available.'"

17   *SEC v. Talbot*, 530 F.3d 1085, 1097 (9th Cir. 2008).  Courts generally reserve questions of

18   materiality for the jury.  *SEC v. Phan*, 500 F.3d 895, 908-09 (9th Cir. 2007).  Indeed, "only if

19   materiality is 'so obvious that reasonable minds [could] not differ' is summary judgment

20   appropriate."  *Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996).  Committing accounting

21   manipulations to "manage" earnings is presumptively material.  SEC Staff Accounting Bulletin No.

---

23   [15]    Defendants have also been fully aware of the HP allegations for years of litigation.  They
24   attended hours of depositions of HP and numerous Oracle witnesses discussing the deal, the HP
     allegations were also detailed in plaintiffs' contention interrogatory responses, and defendants'
25   expert provided an opinion on it (albeit an improper and unreliable opinion based on documents
     never produced to plaintiffs).  Exs. 3 at 41-42; MMM (HP deposition); 8 at 25-50; A at 46:16-47:17.
26   Thus, defendants cannot argue prejudice, undue delay, bad faith or dilatory motive in addressing the
     HP allegations at summary judgment.  *See In re JDS Uniphase Corp. Sec. Litig.*, No. 02-cv-01486-
27   CW, slip op. at 11-12 (N.D. Cal. Aug. 24, 2007) (finding that issues not specifically alleged in the
     complaint were part of the case at summary judgment) (Ex. 200).

28

1   99, 64 Fed. Reg. 45150 (1999) (Ex. 18 at 5).   The SEC also rejects a quantitative percentage

2   threshold for determining materiality, finding that "[q]ualitative factors may cause misstatements of

3   quantitatively small amounts to be material."  Ex. 18 at 4.

4          Plaintiffs' expert provided a lengthy materiality analysis concluding that Oracle's financial

5   misstatements were both quantitatively and qualitatively material.  Exs. 1, ¶¶39-41; 19 at 3-9.

6   Oracle's accounting fraud overstated its net income by 4%, its applications growth by 12%, and its

7   EPS by 10% ($0.01).   More importantly, defendants' accounting manipulations allowed Oracle to

8   inflate its results from $0.10 to $0.11 per share to *beat* consensus Wall Street expectations of $0.10

9   per share by a penny, which Ellison admitted was "***the one thing that would make a difference was***

10  ***a quarter that beat expectations***."   Ex. 17 at 431.   In fact, numerous analysts expressly touted

11  Oracle's reporting of "a penny above" consensus expectations.  Exs. 24; 415-418.[16]   Such earnings

12  manipulations are material.  *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 830 (8th Cir. 2003)

13  ("Most investors would consider it significant, no matter what the mix of information available, that

14  a company was not earning as much as it was claiming to earn.   The onus is on the defendants to

15  demonstrate why this assumption should not stand.").

16         The false HP deal was material because, *inter alia*, it was the second largest applications deal

17  in 2Q01, it inflated Oracle's applications growth from 54% to 66%, it provided a customer reference

18  for Suite 11i, and helped Oracle inflate its earnings.  Ex. 19 at 6-7.   Numerous securities analysts

19  touted both the 66% applications growth and the HP deal as material to Oracle's 2Q01 results.[17]

20  _____

21  [16]        Leading up to 2Q01, Oracle had "beat the street" for four quarters in a row, including nine of
    the previous ten quarters.  Ex. A at 290:12-19.  During the single quarter in which Oracle merely
22  "met" Wall Street expectations, Oracle's stock dropped 6% the following trading day.  *Id.* at 290:16-
    291:1.  Thus, the difference between merely "meeting" and "beating" expectations was undoubtedly
23  important to investors.  Ex. 19 at 3-9.  None of the materiality cases cited by defendants addresses a
    situation where a company intentionally inflates its revenue and income with the specific purpose of
24  beating the street by $0.01.  Mot. at 39.

25  [17]        Exs. 21 (Thomas Weisel: "Oracle made up for disappointing applications license sales in Q1
    by posting 66% growth in Q2.  Notable wins at American General, ***Hewlett-Packard*** . . . highlighted
26  solid demand for the company's 11i e-business suite."); 22 at 308891 (Merrill Lynch: "Oracle began
    to show traction again in its applications business, and the company spoke confidently about
27  improving its growth in applications through the remainder of FY01. . . .  [N]ew wins with HP
    (thought to be a $20 mil deal) . . . ."); 23; 24 at 420588.

28

1    Indeed, in an internal email to Ellison and Jeff Henley, four days after the close of 2Q01, Oracle

2    executives admitted: "*Without HP, it would have been different.  The East did not bring in any*

3    *business*."  Ex. 25 at 021389.  Moreover, the Court should infer that the e-mails and tapes destroyed

4    by Ellison were destroyed to conceal material, not immaterial, fraud.

5         **E.    Defendants Knew Their 11i Statements Were False**

6         Days prior to the beginning of the Class Period ("CP"), Ellison spoke at the CSFB investor

7    conference in which he sought to dispel sentiment that even as of five months after the release of

8    Suite 11i, it was still premature, fraught with defects and not working.  Ex. 405.  Ellison made

9    statements assuring investors that 11i was complete, designed and engineered to fit and work

10   together, easily installed, and that Suite 11i would "far and away be the biggest success in the history

11   of [Oracle], much bigger than databases."

12        You can install in a matter of months in the largest and most complex operations.
          All the pieces are there: . . .  And all the pieces fit together . . . .  You engineer the
13        pieces to fit together, they come out of the box, and all the pieces fit together. . . .
          The pieces actually work together.  [Ex. 405 at 12-14, 37-38, 43-44.]
14
          Each of these statements was false, but nevertheless were repeated throughout the CP.
15
          Defendants do not seriously contest that their statements concerning the functionality of Suite
16
     11i were false.[18]  Their failure to specifically identify which false statements they contend plaintiffs
17
     cannot prove should doom their Motion.  Mot. at 34.  The allegations and proof, however, are plain.
18
     Defendants falsely claimed that Suite 11i was fully integrated and interoperable, combining back
19
     office ERP (Enterprise Resource Planning) software with CRM (Customer Relationship
20
     Management) software, and was functional "out-of-the-box."  Defendants told investors that 11i
21
     would drive future applications and database sales, even in a slowing economy, because it was
22
     purportedly pre-integrated, easy and cheap to implement.  According to Ellison, with 11i Oracle
23
     would eliminate competition – "*[w]e'll win every deal*."  Ex. 405 at 39-40.  Defendants' purported
24
     "integration" was material to investors and described as *the feature* that would insulate Oracle from
25
     the economic downturn.  *Id*.  Indeed, according to Oracle, "earnings growth . . . will be fueled by a
26

27   _____

     18      Defendants do not dispute scienter with respect to 11i statements.
28

new suite of Internet-friendly business software dubbed Oracle 11i." Ex. 377 at 141679.  Market analysts agreed stating that "Oracle's premium multiple is driven in large part by the potential growth in its ebusiness applications license fees that augment its mature, yet dominant database business."  Ex. 437.  During the CP, defendants made numerous false statements regarding 11i, including:

- Dec. 14, 2000: "[Y]ou can buy our complete E-Business Suite, where all the pieces are designed and engineered to fit together, and *no system integration is required. It's up and running in months.  You get the savings in months.  It costs you less and it takes less time to install*."  Ex. 26 at 234430.

- Jan. 9, 2001: "The [11i] suite is *pre-integrated and fully interoperable out of the box* . . . ."  Ex. 211.

- Feb. 6, 2001: "[E]very application works in every country, *every major language*, and every major currency."  Ex. 155.

- Feb. 9, 2001: "[E]arnings growth . . . *will be fueled by a new suite of Internet-friendly business software dubbed Oracle 11i*," spokeswoman Jennifer Glass said. "*We haven't changed our projections at all*," Glass said.  "*This slowdown is going to provide new opportunities for Oracle as companies need to streamline and be more strategic about the technology they buy*."  Ex. 377.

- Feb. 13, 2001: "[O]ur applications are written in 23 different languages. . . . *[I]t's basically ERP and CRM all integrated together. . . . [W]e have also taken care of the localization requirements of all these countries around the world* . . . ."  Ex. 156 at 03285.

- Feb. 21, 2001: "*Now the nice thing is it's like Lego blocks*.  Once you have one piece in, the other pieces just snap together.  *There's no systems integration required . . . . You just basically turn it on or snap it together*."  Ex. 438 at 13-14.

Defendants' Motion hardly mentions the false statements that "suite [11i was] pre-integrated and fully interoperable out of the box."  *See* Ex. 12, ¶¶58, 63.  Nor does it mention false statements that Suite 11i was "plug and play" and "up and running in months."  *Id.*, ¶¶50, 68.  Defendants do not address *at all*, specific false statements that Suite 11i, including Oracle's CRM was "complete," that it "work[ed] in every country, in every major language."  *Id.*, ¶63.  Instead, defendants suggest that plaintiffs cannot prove falsity because defendants were just "echoing [a] marketing message."

Mot. at 34.[19]  This Court has disagreed, finding defendants' quality statements regarding 11i to be independently actionable.  *See* Ex. 439 at 11.  Defendants claim that plaintiffs' 11i related evidence is irrelevant arguing that it has nothing to do with whether Suite 11i was pre-integrated when compared to best of breed products.  Mot. at 35.  But, even during the December 20, 2007 hearing at Summary Judgment, when defendants' argument  appeared to have mischaracterized the facts adduced by plaintiffs, Judge Jenkins brought them back to the mark:

> [I]t strikes me that I read their papers just a little differently.  ***I thought they were also asserting that a representation for Mr. Sanderson, where he indicated in the January 2001 time frame that the Suite was preintegrated and fully operable out of the box.  And they tied that to testimony from some of the witnesses like DeCesare some of those individuals who testified that that is not true, it did not operate as integrated out of the box*** . . . .  The best of breed necessity for consultation seems to me . . . ***to be a different assertion than whether or not in a fixed way this product was fully integrated and interoperable out of the box, just plug it in and play***.[20]

Ex. 435 at 33-34.  The evidence that Suite 11i did not function in the manner Oracle represented is unequivocally demonstrated by evidence of failed or failing 11i implementations, deteriorating consulting margins, customer concessions, refunds and threatened lawsuits. Exs. 72, 74, 80, 86, 119.

Defendants' argument that 11i "achieved enormous success" during the CP is contradicted by Ellison's admissions after the CP.  Ex. 117 ("Our top priority is to get Oracle users . . . 'delighted' with the quality and functionality [of] our [11i] CRM products.  Until that happens, I doubt we will achieve success in the market.").  Defendants have also entirely abandoned arguments made in their first motion for summary judgment that reported "live" customers on Suite 11i demonstrated plaintiffs' inability to prove falsity.  *See* 11/9/07 Mot. at 21 (customers "***live***" on 11i grew from 85 to 2000, by the end of the CP).  That's because plaintiffs demonstrated unequivocally that Oracle's

---

[19]  Defendants assert generally that plaintiffs cannot prove that 11i had more bugs than competing products.  But even according to defendants, there were no competing software offerings. Oracle is "***the only vendor***" to offer such a suite of "***tightly integrated*** [applications]," including ERP and CRM.  Exs. 66-67.

[20]  Defendants again incorrectly assert that plaintiffs do not deny that Suite 11i was "'integrated' as compared to 'best of breed' . . . products from different vendors."  Mot. at 34-35.  The evidence shows that in fact 11i simply was not pre-not integrated and fully interoperable as represented and "expose[d] [Oracle's 11i] development environment as 'best of breed' rather than one unified" solution.  Ex. 149 at 069913.

1  many so-called "*live*" customers were in fact experiencing massive 11i defects and demanded

2  refunds or free services from Oracle as a result of 11i defects.  These facts are of course material.

3  Defendants cited to "*live*" customers to convince investors that Suite 11i was functional and selling.

4  The facts were otherwise.  For example at the beginning of the CP, Oracle claimed that ValueVision

5  was "*live*" as of December 13, 2000.  *See* Ex. 73.[21]  But, ValueVision demanded millions in refunds

6  because of 11i defects.  Exs. 74; 114 at 25.  Papa John's was reported publicly "*live*" on 11i.

7  Harrison Decl. (Dkt. #928), Ex. 173.  But, Papa John's implementation cost Oracle $632,000

8  because of 11i defects.  Ex. 114 at 25.  Ingersoll Rand was reported publicly as "*live*."  Harrison

9  Decl. (Dkt. #928), Ex. 173; Ex. 78 at 44; *see also* Ex. 72.  However, Oracle had to pay Ingersoll

10  Rand $2 million due to 11i defects.  Exs. 77; 114 at 24.  Zap Media was reported as "*live*."  Ex. 78 at

11  44.  But, Zap Media implementation cost Oracle $553,000 due to 11i defects.  Ex. 114 at 25; *see also*

12  Ex. 79.  Chipotle Mexican Grill was publicly reported as "*live*."  Ex. 81.  But, Chipotle had massive

13  technical difficulties with 11i, and ordered Oracle not to reference them as a customer "*until the*

14  *'reality meets the hype*.'"  Exs. 80, 103, 104.  In February 2001, UPS was reported as starting to go

15  "live" on 11i Order Management.  Ex. 84.  But even four months later in June 2001, UPS's 11i "OM

16  [Order Management] installation [was] at the point of *meltdown*" because of 11i defects.  *See* Exs.

17  82-83; *see also* Ex. 78 at Ex. 46.  Oracle gave Beckman another "*live*" customer *$1 million* in credits

18  due to 11i defects.  Ex. 116; *see also* Ex. 68.[22]  Defendants' Motion must be denied.

19          **1.**      **11i Was Not Integrated and Interoperable Out of the Box, Nor**
                    **Was It Designed and Engineered to Be, and Was Not Tested**

20         Defendants claimed that because Suite 11i was pre-integrated and operable out of the box, no

21  systems integration would be required.  Ex. 12, ¶¶50, 58, 63.  Yet, Oracle's Area VP DeCesare

22  testified that Suite 11i did *not work out of the box* in part because it was not engineered to work

23

24  _____

25  [21]    Defendants had submitted the Anthony Declaration which purported to have been keeping
track of "live" customers on 11i.  The documents are disputed and the facts defendants assert are

26  demonstrably wrong.  In any event, the Anthony Declaration was filed in connection with a motion
filed in 2007 – not the instant one – and shouldn't be considered at all.

27  [22]    Oracle has no evidence that 11i saved Oracle $1 billion.  *See* Exs. 87-90.

28

1   together.  Ex. N at 234:24-25 ("***It does not operate as integrated out of the box.  That's – that's***

2   ***false***."); *id.* at 237:10-13 ("***There is noting more – more integrated or coordinated about 11i than***

3   ***there was about the previous releases***."); *see id*. at 234:17-235:3, 236:17-237:13, 239:7-10, 252:12-

4   14.  DeCesare also confirmed ***lost sales*** resulting from 11i defects.  *Id.*  Suite 11i modules were also

5   admittedly built by separate organizations,[23] and never fully tested against one another (a critical

6   component of engineering) to determine whether the suite modules actually functioned in an

7   integrated fashion.  Ex. 40 at 295346.  In August 2000, Sergio Giacolletto, in reaction to internal

8   cheerleading about "***live***" customers, demanded to know from Wohl "***precisely*** which modules are

9   running in each customer.  ***We have a hard time to believe they have ERP and CRM running***

10  ***together***."  Ex. 139 (emphasis added and in original).[24]  Wohl confirmed that none were.  *Id.*  Oracle

11  did not fully test for integration and certainly not whether it could do so "***out of the box***" as

12  represented.  Wohl connected integration defects to lack of testing and separate engineering groups,

13  especially the integration points at the boundary between the ERP and CRM modules.  Ex. R at

14  106:14-21 ("In terms of the interaction between the groups, clearly in retrospect as well, just as ***there***

15  ***should have been more testing of the ERP product stand-alone***, there should have been more

16  testing of the CRM product stand-alone, ***there should have been more testing of the boundary***

17  ***points between ERP and CRM*** . . . .").  Lack of testing resulted in the software not being "fully

18  integrated."

19       Defendants' software expert Yourdon states that "The overall process of software

20  engineering [includes] design/architecture, coding . . . creation of database tables, testing . . .

21  deployment and so forth."  Ex. S at 56:25-57:5.  According to Yourdon, integration bugs, bugs

22  "associated with the interface between components of a system," are found by doing integration

23  _____

24  [23]     Ellison had previously told investors that 11i was built by one team: "[Y]ou should engineer

25  the products to fit together.  You shouldn't build the products separately by separate teams then
    figure out how to make them work together after the fact. . . .  And that's what we did."  Ex. 405 at

26  3-5.

27  [24]     Internal documents show that it was not until the third version of 11i in January 2001 that the
    Company issued their "***first integrated ERP/CRM release***" of 11i.  Exs. 91 at 5; 92 at 028638.

28

1  testing.  *Id.* at 212:11-12.[25]  Ellison admits that Order Management, was not fully tested either.

2  Ex. 17 at 192 ("'***We had just finished a complete rewrite of our order management system. . . .***

3  ***[B]ut it hadn't been tested yet*** . . . .'").  "It hadn't been used anywhere it had just been finished, ***the***

4  ***paint was drying***."  Ex. 146 at 1529167.  Order Management was the "key linkage between [CRM]

5  and [ERP], enabling Oracle to offer the industry's only end-to-end integrated e-business suite."  Ex.

6  67.  Order Management bugs and defects were pervasive in their impact on 11i's functionality.  Ex.

7  201.  As late as July 2001, Oracle was still shipping Suite 11i and patches ***without integration***

8  ***testing***.  Exs. 147-148.  Don Klaiss, in an email, warned of the problem about the Company's

9  inability to test integration: "We do not have a controlled environment where complete integrated

10  systems testing for the whole ERP/CRM suite can take place . . . integrated flows."  Ex. 147 at

11  056441; *see also id.* at 056440 ("***Today's situation is that we cannot test integrated business flows***

12  ***prior to customer shipment.  We are releasing new ERP & CRM Family Packs regularly but do***

13  ***not test them against each other – clearly a bad situation***.");  Ex. 148.  *See also* Exs. 144; W at

14  243:10.

15      The Declaration of Greg Seiden (Ex. 91), which defendants no longer make reference to,

16  should be stricken.  Seiden corroborates admissions of Wohl who testified to the lack of 11i

17  integration and testing, resulting in gaps and poor quality.  *See also* Ex. R at 217-219; *compare* Ex.

18  91, ¶4 ("[M]y team performed high-level quality assurance, or 'QA,' audits to test the

19  integration. . . . ***This . . . was not a substitute for the integration testing*** . . . .").  Wohl testified that

20  "***[O]ur QA . . . procedures didn't work*** . . . ."  Ex. 17 at 203. [26]

21

22

_____

23  [25]      The Declaration of Alan J. Fletcher (Dkt. #1217) actually creates and identifies genuine

24  issues of facts.  Fletcher contradicts evidence that "regression testing" was not done.  *Compare* Exs.
    148-149 (patches being released without being tested in 2001).  Fletcher then conceded that the

25  Company had to buy a "third-party program from Mercury Interactive" to do regression testing.
    Fletcher Decl., ¶17.

26  [26]      On February 6, 2001, Wohl warned Ellison about quality complaints regarding 11i for NT

27  systems ("Some customers may ask us why we didn't withdraw the product from the market once
    we became aware of the problems.").  Ex. 143; *see also* Exs. 140-141.

28

2.      **Suite 11i's Lack of Integration and Poor Quality Caused Demonstration Failures and Lost Sales**

Due to 11i's defects impacting quality, integration and stability, the Company could not even demonstrate a working and fully integrated Suite 11i in order to sell it.  In December 2000, Oracle told investors it had fixed 11i demos ("we got those all ready now").  Ex. 26 at 234436.  Securities analysts reporting on the 2Q01 financial results commented that "functional product demos . . . on the eBusiness Suite should propel growth in the applications division going forward."  Ex. 129 at 308932; *see also* Ex. 26 at 234436.  But that too was false.  Defendants' assertion that plaintiffs have not identified lost deals due to 11i defects is belied by the factual record which is replete with evidence including admissions from top executives that failure to ever demonstrate an integrated suite of 11i resulted in *lost deals* to large customers and compressed conversion ratios.  Sales staff complained internally that: "We cannot show what the customer wants to see when it comes to the combination of CRM and ERP . . . [n]ot only have we *lost deals* in which we were the new player, many *deals have been lost* with installed base customers."  Ex. 122; *see also* Exs. 123-125.  Sales consultants were reportedly "*doing integration work in the field*."  Ex. U at 81:1-6; *see also* Ex. 124 at 013718 ("lack of integration between IP and Purchasing was inconvenient since we could not show the entire flow without using fake data").  In February 2001, Julie Cullivan reported to Sanderson and DeCesare that the Company still could not "[p]rove our EBusiness Suite Integration Story" in demonstrations.  Ex. 127 at 617971; *see also id.* ("*[we] cannot show a complete integrated CRM demo let alone a complete EBiz Suite (CRM/ERP) integrated demo*").

Lost sales due to failing Suite 11i demonstrations continued throughout the CP.  *See* Ex. 131 at 063432 ("[a]nother *deal lost* primarily to demo system performance").  Defendant Henley understood that if 11i application demonstrations "[did] not improve, it [would] *continue to impact our [sales] conversion rate*."  Ex. 133 at 094091; *see also* Ex. H at 400:1-3.  Henley connected the Company's ability to make its 3Q01 forecast to Suite 11i functionality demonstrations stating, "11i is much more stable than it was in Q2 . . . so better demos and number of references should help our apps business in Q3."  Ex. 198.  EVP Roberts confirmed that "*if you can't give a good demo, then you are not going to win as much business*."  Ex. V at 300:16-23, 176:1-5.  Even after the CP, in

April 2001, Oracle still had not fixed integration gaps between ERP and CRM.  Exs. 128, 134, 137;

*see also* Exs. H at 400-402; 138 ("*[W]e have halted the demonstration to Schneiders . . . problems*

*with the functionality of the software, integration between OM and OPM* . . . .").  These facts

create a genuine issue of material fact concerning the falsity of defendants' statements regarding 11i

and connect the misrepresentations to the 3Q01 miss and March 2 stock price decline.

### 3. Oracle Engineers' Report Confirms Falsity of 11i Statements – Suite 11i Not Fully Integrated

Two years after the release of 11i, in 2002, Oracle engineers concluded that 11i's integration

and technical gaps were "so fundamental that, it *exposes [Oracle's] development environment as*

*'best of breed' rather than one [of a] unified software vendor*."  Ex. 149 at 069913.  The report

noted that fixing "Integration Issues" between ERP and CRM was critical for Oracle to "overcome

the lack of integration between the E-Business Suite Modules (ERP/CRM)." *Id*. at 069920; *see also*

*id.* at 069922 ("*The capabilities to perform an integrated planning in the E-Business Suite is*

*broken*."); *id.* at 069925 ("*The integration between HRMS / Payroll and CRM is not complete*.").

Indeed, in 2002, CRM and ERP still lacked a common User Interface in design and functionality.  *Id*.

at 069929 ("Within the different teams (CRM/ERP) the development is drifting in different

directions.  This is the case due to the underlying technology differences . . . but also due to different

approaches in the UI design.").  Ellison admits that: "[N]ot all the pieces [of Oracle 11i] worked

together as well as they could have. . . .  Using that plug [and play] analogy, you know, there would

be the receptacle but no prong in one of the plugs, just – it was a pretty new product. You know, *the*

*plug wasn't complete*."  Ex. J at 534:4-9, 535:14-21.  ValueVision, previously reported as "*live*,"

summed up lack of testing, inability of CRM and ERP to function in an integrated fashion, 11i

defects and lack of interoperability:

> [W]e have been struggling and continue to struggle is with *the stability of the CRM and ERP applications, the level of integration between CRM and ERP*.
>
> *It appears evident that there has been a gross lack of coordination between the CRM and ERP development organizations.  We have identified significant gaps in the integration of the applications* . . . .  [Ex. 74 at 094138.]

Finally, defendant expert Yourdon admittedly never even analyzed whether the suite was integrated in terms of user "interface integration" or "functional integration," each necessary for full integration.  Exs. 202 at 36 n.38; S at 236:17-22, 238:4-7

### 4.   Suite 11i Did Not Work in Every Language as Represented and It Hurt Sales

Oracle said Suite 11i "work[ed]" in "every country and in every language."  Exs. 151 at 4; 155 at 106691; 156 at 03285.  Suite 11i did *not work* in every language, and it hurt sales.  Even at the end of 2Q01, sales staff in Europe, the Middle East, and Africa were unwilling or unable to sell Suite 11i effectively because of product defects and incomplete language translations.  Ex. 152 at 013402 ("*[S]ales people are reluctant to engage to the product problems, lack of references and local language issues. . . .  Hopefully the situation will turn in January once we get 11.5.3 running in local language*.").  A January 21, 2001 e-mail from Giacolletto to Ellison stressed the need to get the language issues in Suite 11i to work in order to "grow revenue."  Ex. 153 at 012422.  On March 15, 2001, the Company reported that EMEA had exceptionally weak 11i application results.  Ex. 203 at 050623.  Even later, 11i still had not been translated into many languages.  Ex. 154 at 162215 ("*R11.5.4 which is the first stable release is NOT AVAILABLE in local language and we will only get it between July and October 2001*.").  Wohl and SVP Cliff Godwin admit that Oracle did not translate every module into every language.  Exs. R at 220:12-15; Y at 136-138.  As demonstrated by an Oracle 2002 High Level Technical Requirements Document, Suite 11i was not built with the architectural capability to work in *every* language.  "[L]ack of Multibyte support across the various front-office systems is going to be a significant impediment to our success in China, Taiwan, Korea and Japan."  Ex. 149 at 069921, 069930.  The document further noted, "*[t]he lack of functionality within projects, for example, severely impacts the ability to successfully deploy a global solution involving projects spanning multiple countries with multiple languages*."  *Id*. at 069938.  Ellison admits that Suite 11i did not in fact work in every language: "I suppose, to make it very precise, it should say every major country. . . .  [Y]ou can take exception that it was general rather than – general and imprecise, and it didn't work . . . ."  Ex. J at 131:9-21.  In any event, defendants no longer contest these claims.

5.      **Suite 11i Simply Did Not "Work" as Represented, Did Not Save Customers Money and Was Costly to Implement**

During the CP, Oracle had **not** "delivered" 11i and it was neither easy to implement nor saving money in a slowing economy.  Before the CP defendant Sanderson knew that Suite 11i quality problems would "**significantly**" hurt sales and had already cost his support division millions in free consulting.  Exs. 107-108.[27]  Customers attempting to implement 11i demanded millions of dollars of concessions from Oracle citing defects and lack of functionality in Suite 11i.  Others throughout the CP lodged complaints ranging from poor quality, lack of testing, and instability to too many bugs.  Liberty Mutual Group, wrote directly to Ellison detailing "basic functionality" flaws with Suite 11i.  Ex. 94 at 018735 ("the bottom line is that we have a product that **does not work**"); Exs. 95-96.  On December 1, 2000, the evidence shows that Xerox, sought recovery because of 11i defects.  Exs. 86 at 169718 ("At this time we have put in every available patch for CRM up to 10/17 (this is over 100 CRM patches in the last 2[-]1/2 weeks!) . . .  Xerox is threatening to write a letter to Larry, and will be asking for their money back."); 114 at 24.  On December 16, 2000, Pepsi Co. wrote Ellison: "**Our Oracle [11i] project has been an unmitigated disaster** . . . ." Ex. 97 at 028799. Appstech.com wrote to Ellison about a failing implementation of Suite 11i ("[W]e ordered R11i Financials. . . .  **We have never been able to implement it and have decided to return it**."). Ex. 98 at 012414. "**We have [also] lost close to $200K so far on our implementation of 11i for Brock Tool**." Ex. 99 at 35244, 035263-64.  Paxar refused to pay nearly $2 million in fees and threatened legal action "after hundreds of patches and a significant number of severity 1 bugs." Exs. 100 at 039327; 75.  News America Marketing purchased 11i in 1Q01. In January 2001, Oracle sales staff admitted "CRM and Order Management are **not integrated as we told them. . . .  Customer is really upset mostly about the lack of integration** . . . ."  Ex. 101 at 615551-552.

---

[27]      BellSouth, another 11i customer, cost Oracle millions in free consulting.  In January, 2001, Bill Baghsaw forwarded Wohl an e-mail describing "6000" 11i CRM patches at BellSouth ("[T]hey do not see how any one could survive without automating this process, . . . in light of how 'broken' 11i is.").  Exs. 109 at 221146; Q at 68:7-70:22.

1    TMP Worldwide wrote to Oracle in January 2001 that Oracle's software was "unavailable."

2    Ex. 102.  On January 25, 2001, Sanderson was told of another failing implementation at Hudson Bay

3    ("We have a product quality problem at Hudson's Bay . . . .  [T]he customer is threatening to: pull

4    out SSE due to product instability and look to Oracle to recover product and implementation costs.").

5    Ex. 112 at 52476.  A post-mortem of 3Q01 by SVP Nugent to Oracle's managers described issues

6    with 11i ("***Our products . . . . Bad News.  11i Quality Issues, Lack of References/Demo Issues***.").

7    Ex. 171 at 179355; *see also* Exs. 120; 195.  In July 2001, Mark Jarvis admitted that customers were

8    ***not*** saving money with 11i: "[U]nless . . . we get 11i customers that actually save money . . . no

9    journalist is going to care. . . .  We are going through a rough patch because 11i did not work . . . ."

10   Exs. 119 at 062223; 121 at 621428.  Mark Barrenechea, writing about 11i conceded: "From 11i.1 to

11   11i.3 CRM – [t]oo many patches, [i]mplementations, too costly, [i]ncomplete, thus complex."  Ex.

12   113 at 070884.  By April 2001, Suite 11i product defects had resulted in a two-point deterioration of

13   Oracle's FY01 margin percentage ***and $21 million*** in unbilled consulting revenue.  Exs. 114; K at

14   186:24-187:10; *see also* Ex. 115.

15         **6.    Oracle's Internal 11i Implementation Caused Part of the 3Q01
               Shortfall and Plaintiffs' Economic Loss Due to Defects**

16

17         Defendants have abandoned their argument that Oracle itself "upgraded to significant

18   portions of the Suite [11i]" supported judgment in their favor.  That's because plaintiffs adduced

19   evidence showing that 11i's OM defects caused Oracle, during the CP, to experience the same

20   technical difficulties experienced by its customers.  In November 2000, Barrenechea, while in

21   preparation for the internal 11i upgrade, wrote an e-mail discussing 11i and the upgrade received by

22   Ellison and Henley stating, "11.5.2 upgrade CD has been broken until this week.  Yup, the 11.5.2

23   CD does not work out of the box for upgrades."  Ex. 85 at 021874.  Barrenechea communicated

24   further about 11i: "***The bug counts are at an 11 week high . . . 18 OM, P1s, 40 P2s . . . no real***

25   ***performance testing***." *Id.* at 024863.  After the fact, Barrenechea stated: "What happened was one

26   of the most dramatic moments I'd seen during my five years at Oracle. . . .  So we upgraded [to 11i],

27   and Oracle went down.  We were down for fourteen days. . . .  At that point I became acutely aware

28   of the customer dissatisfaction . . . ."  Exs. 17 at 196; 157-158.  Oracle's upgrade to Suite 11i left

1   Oracle's financial staff unable to properly track sales of support renewals in the new 11i software.

2   Ex. 160.  On January 24, 2001, Sharon Prosser wrote in an e-mail sent to Wohl: "We are starting to

3   feel the impact across all area(s) of our business (GB, Majors, OPI, OSI) on the forecast because of

4   the reporting limitations with R11i Order Management."  Ex. 161 at 276549.  The lack of

5   functionality caused the Company to lose millions in revenues in 3Q01.  *See, e.g.*, Exs. 164-166.  On

6   February 15, 2001, Minton wrote Barrenechea the following:

> Mark –The support organization missed their Dec and Jan revenue forecast by $20
> million dollars, and are seriously at risk of missing additional support revenue in the
> month of February if we do not get immediate visibility to the status of support
> contracts up for renewal.  ***We cannot afford to miss our revenue forecast this
> quarter*** . . . .  [Ex. 165 at 101417-18.]

10      On February 19, 2001, Henley, in response to a Minton e-mail on the issue, wrote: "Seems

11   like a disaster based on the large drop in support revenue growth for Q3[01]. . . .  We'll need an

12   extraordinary effort until we get caught up – I doubt we can catch up in time for Q3 . . . ."  Ex. 166 at

13   097883.  More importantly, these facts are a direct link to the economic loss on March 2, 2001

14   discussed below.  Oracle admits that: "***[I]t is possible that the implementation of the OKS module

15   of Suite 11i contributed to a shortfall in Support revenue in Q3 FY 2001***."  Ex. 40 at 295356.  With

16   actual knowledge of these facts, on February 20 and 21, 2001, defendants specifically reiterated the

17   Company's revenue and earnings forecast including 75% applications knowing 11i had already

18   likely caused a 3Q01 revenue decline.  Exs. 162-163.  All of Ellison's emails to and from customers,

19   as well as audiotapes of him discussing 11i, have been destroyed from his computers and files.  The

20   Court should infer the destruction was to conceal material problems plaguing 11i and hurting its

21   ability to save Oracle from the economy.

22      **F.**     **There Was No Reasonable Basis for Oracle's Forecasts**

23      A projection is actionable if (1) it is not actually believed, (2) there is no reasonable basis for

24   the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine its

25   accuracy.  *Provenz*, 102 F.3d at 1487; *In re Connetics Corp. Sec. Litig.*, No. C 07-02940 SI, 2008

26   WL 3842938, at *7 (N.D. Cal. Aug. 14, 2008); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 557 (6th Cir.

27   2001).  On December 14, Oracle issued its 3Q01 external forecast: 25% revenue growth, 15%-20%

database growth, 75% applications growth and $0.12 EPS (the "External Forecast"). Ex. 206 at 03218, 03221-22, 03224. Oracle reiterated this external forecast throughout 3Q01. Exs. 207 at Exs. C-D; 208 at 091536; 209 at 091532; 210 at 141677; 211-216; 217 at 03279-80; V at 229:16-230:3, 341:20-343:6; 218.[28] This was an aggressive forecast; growth rates were defined year-over-year, and Oracle's 3Q00 results were extraordinary. Ex. 223 at 005609. Defendants knew that Oracle's forecast had been rendered unreasonable by major changes, and that their internal metrics disclosed that Oracle was being negatively affected by the economy and 11i.

Oracle's External Forecast was based on the Potential, which was calculated by adding "upside" to the field forecast to account for "sandbagg[ing]." *See* Exs. 225 at §II.A.; FFF at 101:8-18; EEE at 104:15-105:11, 123:14-125:4, 126:7-15. The upside (and Potential) was based on a simple extrapolation – Minton applied the prior year's historical conversion ratio to the current year's quarterly pipeline. Exs. 17 at 226 FN; J at 384:6-385:7; 17 at 211 (***Ellison:* "'*Our sales-forecasting system tells us how many deals are in the pipeline and multiplies their value by a historic close rate*.'"); 226 at 132078-79 (***Minton***: "***to determine what the true forecast was [Jeff and I applied] historical conversion rates to the pipeline***"); Declaration of Alan G. Goedde, filed herewith ("Goedde Decl."), ¶¶5-18.

Defendants knew that the extrapolated Potential (and resulting External Forecast) was unreasonable because of major changes facing Oracle in 3Q01.[29] Exs. 17 at 226 ("Our forecasting does statistical extrapolations based on historic trends. If something that's outside our mathematical model of the business changes . . . our forecasting becomes inaccurate."); J at 384:6-385:7 (a major

---

[28]     Henley has denied, falsely, that he ever reiterated external forecasts. Ex. H at 144:16-145:13; *but see* Exs. 212-214; 216; 219 at 14, ¶¶125 & 147; H at 239:5-259:20; 221-222.

[29]     Minton testified that she extrapolated without adjusting for these changes. Exs. J at 19:17-19; EEE at 135:7-136:12.

economic change means "you can't extrapolate anymore"); *see also* Exs. G at 86:10-16; PP at 95:12-96:7.[30]  In particular, defendants knew that: (1) a major economic change was affecting Oracle; (2) the pipeline contained a higher percentage of applications (with lower conversion rates and product problems); (3) Ellison changed the forecast process in 2Q01 by adding risk; and (4) Oracle's External Forecast was based on fraudulent 2Q01 results.  *See* §II.B.-D.; Exs. EEE at 122:1-24; 17 at 211, 226 FN; J at 384:6-385:7; 224; 207 at Ex. B; 229 at 2-65 & Exs. 6-7; 230 at 4-8; 231; Goedde Decl., ¶¶5-18.

### 1.  The Major Economic Change Facing Oracle Rendered Its 3Q01 Forecasts Unreasonable

Ellison knew that a major economic change would render Oracle's forecast unreasonable. Exs. 17 at 226; J at 384:6-385:7.  Oracle was facing just that in 3Q01.  Exs. 229 at 2-65 & Exs. 6-7; 230 at 4-8.  In 3Q00, Oracle took advantage of frenzied technology spending and new dot.com customers, increasing sales to unprecedented levels and exceeding its 3Q00 forecast substantially. Exs. 17 at 184-85; 230 at 4-8 & Ex. 5; 232; 233 at 0122080; 234 at 1917; EEE at 85:16-17; 229 at 2-65 & Exs. 6-7; SS at 163:2-8; V at 313:15-315:13; 235 at 180188.[31]  By 3Q01, however, the NASDAQ had collapsed, the dot.com bubble had burst, and technology spending was down considerably.  Exs. 230 at 4-8 & Ex. 6; 237 at 1053564; 238 at 2-3; 229 at 2-65; 239 at 13; 240; 241 at 350284-87, 350302; V at 315:6-13; 235 at 180188.  Minton noted in early January 2001 that "the general macroeconomic environment was suffering" and Henley wrote on January 4, 2001 (the day he sold shares for $32.3 million) that "***all data*** since the [December 14 earnings] call ***point to more***

---

[30]     *See also* Exs. 224 at 609541 ("Minton explained that prior to Q3 of FY 2001, Oracle thought that it could model out its business, but with the current economic downturn, no analytical models can predict one quarter to the next."); FFF at 123:18-126:19.

[31]     Defendants knew that Oracle's stellar 3Q00 led to difficult growth comparisons for 3Q01, unlike the comparisons in 1Q01 and 2Q01.  Exs. 236; SS at 176:10-179:10.

1    *economic softening* so there is risk of slippage in deals."  Exs. FFF at 223:14-18; 242-243.

2    Sanderson identified the "dotcom falloff" as a "*major macroeconomic event*" that was likely

3    discussed at EMC meetings.  Ex. KK at 88:5-17.  Indeed, Oracle has claimed that there was a

4    recession by December 2000.[32]  Ex. 251 at 120:2-123:3.

5          Defendants knew that Oracle was converting fewer opportunities into sales in FY01 than it

6    had in FY00 – the conversion rates had declined year-over-year in 1Q01 and 2Q01 by 11% and 8%,

7    respectively.  Ex. 228 at 27.  This was amplified in 3Q01 by the application of these rates to a $3

8    billion pipeline – a 10% decline meant a loss of $300 million in revenue.  Ex. 230 at Ex. 10.  Ellison

9    testified that in a downturn, companies require more approvals, resulting in slowed or cancelled

10   deals and making pipeline hard to convert.  Ex. HH at 245:18-247:4.  Defendants also knew that

11   Oracle's dot.com business was projecting to lose $70 million in revenue, year-over-year.  Ex. 230

12   at 5.  Ellison testified: "you're absolutely right that our dot-com business was certainly off by

13   [3Q01]" and this "put a lot of pressure on [Oracle's] database" for 3Q01 because Oracle had a "very,

14   very high hurdle.  So for the business to grow, it meant that we had to overcome the fact that a lot of

15   our dot-com companies – customer, our ex-customers, were gone."  Exs. GG at 178:9-179:1; HH at

16   255:21-256:21, 385:10-22.  Defendants knew that Oracle was facing a major economic change and

17   could not expect to convert as much of its pipeline in 3Q01 as it had in the boom economy of 3Q00.

18   Exs. 17 at 226, 287; J at 384:5-385:7; 224; 237 at 1053564; FFF at 223:14-18; 242; I at 26:13-

19   27:21,179:5-20; EE at 18:1-25:10, 35:4-14, 94:17-95:5, 108:25-109:8; TT at 92:15-95:11, 102:1-

---

[32]      Cisco and Sun, which defendants tracked as proxies for Oracle's business, were also faltering in 3Q01 and pre-announced lower earnings expectations as a result of the economy.  Exs. 244 (Henley: "Cisco and Sun have said they are seeing [a slowdown] so I don't know why we wouldn't too."); 245; 17 at 157 FN; 246 at 156724.0001; 247; 237 at 1053564; 248.  In 3Q01, defendants spoke with executives at both companies regarding the health of their businesses.  Ex. 249 at 609422-23.  Sun pre-announced on January 19 (the day that Ellison first instructed his financial advisor to sell 40 million shares) and Cisco pre-announced even earlier.  Exs. 237 at 1053564; 247-248; GG at 69:1-70:3; LL at 59:15-60:6; 250 at 300606.

1    105:2; QQ at 57:3-61:8.  Defendants also knew that Oracle's External Forecast was based on the

2    assumption that it would.  Exs. 226 at 132079-80; 17 at 211, 226; J at 384:6-385:7; 224.[33]

3            **2.      The Change in Product Mix and 11i Defects Rendered Oracle's
                       3Q01 Forecasts Unreasonable**

4

5            When Oracle issued its 3Q01 External Forecast, the percentage of applications in its pipeline

6    had jumped 13% from 3Q00 (from 29% to 42%).  Its forecast also included more applications:

7    31.5% of the 3Q01 forecast compared to 18.6% of 3Q00 license revenues.  Exs. 229 at 85-86 &

8    Exs. 6 & 7.  Defendants knew that applications had a much lower conversion ratio (38.7%) than

9    technology (63.3%).  *Id*. at 85-86 & Ex. 7; Ex. 252 at 609246.  Ellison admitted that Oracle's sales

10   force "was not very good at selling applications."  Exs. 17 at 114 FN, 173; 252 at 609246.[34]  Given

11   these facts, defendants knew that application of the 3Q00 conversion rate to the heavily applications-

12   weighted 3Q01 pipeline rendered the Potential unreasonable.  Exs. 17 at 226; Goedde Decl., ¶¶5-18;

13   229 at 85-87; J at 19:15-19.  Also, Oracle's new applications were beset by defects, further affecting

14   Oracle's ability to convert its pipeline at historical rates.  *See* §II.E.; Exs. 253-255; J at 171:24-

15   177:10, 640:12-21; 17 at 189, 192, 194-96, 202-03, 424; Q at 68:7-74:13; 256 at 039325.  The

16   resulting lack of references impeded Oracle's ability to convert its applications pipeline because, as

17   Ellison put it, "[t]he first year of selling [11i] was the hardest year.  It's difficult to sell without

18

19

20

21   _____

22   [33]      Defendants' argument that a repeat of historical conversion ratios would have resulted in
     revenues exceeding Oracle's External Forecast is unavailing.  Mot. at 9.  First, during parts of 3Q01,

23   Oracle was actually forecasting to convert a higher percentage of deals than it had in the boom
     economy of 3Q00.  Goedde Decl., Ex. C.  Defendants also knew that using historical conversion

24   rates to predict revenue was unreasonable in times of major change.  Ex. 17 at 226.

25   [34]      Oracle's database was easier to sell because it had few competitors and could secure approval
     at the technology staff and CIO level, whereas its "relatively new" applications business competed

26   with the industry leaders and required approval by the CEO and CFO (increasing the likelihood that
     a deal would not close on time).  Exs. 253 at 609246; 17 at 114-16.  And, in 3Q01, "[t]he Oracle

27   sales force wasn't used to dealing with senior management, nor did it have the expertise about . . .
     what functionality was likely to be most important to [applications customers]."  Ex. 17 at 115.

28

customer references."  Exs. 257 at 153367; 258; 17 at 239, 249; J at 251:1-16; V at 105:6-17, 237:13-238:1, 353:18-354:15; 259 at 179355.[35]

### 3.    Ellison's Directive to Increase Risk in Oracle's Forecast Rendered It Unreasonable

In 2Q01, Ellison directed the Field to add risk (and amount) to its forecast.  As a result, defendants knew that Minton's $160 million 3Q01 upside adjustment was no longer necessary.  Exs. 230 at Ex. 11; 231.  Ellison's directive, designed to eliminate sandbagging, rendered that upside (historically applied to do the same) obsolete.  Exs. 231; FFF at 101:8-18, 123:14-125:4.  In 2Q01, for the first time, field finance directors reported directly to Minton.  Exs. 265; FF at 139:20-141:24. On October 4-5, 2000, Minton assigned directors Patricia McManus and James English to prepare training *for all of the North America divisions* for Oracle's new forecasting system, OSO.  Ex. 265. Specifically, they were to work with Ellison to determine new forecasting methodology for that training.  *Id.*  On October 6, 2000, McManus e-mailed English:

> Recently Larry has changed the way he is interpreting our forecast. . . .  This is a change from our current thinking in that *our forecast has not usually had a significant amount of judgment*.  It was the amount that you believed you could deliver at a minimum.  That emphasis has shifted . . . and *now our forecast is a number that includes more risk than in the past*.  [Ex. 231 at 203683.]

*See also* Exs. 271; J at 423:20-425:1.  Minton e-mailed EVPs to pass on the directive: "Larry [Ellison] made it clear that he wants everyone to submit realistic forecasts – he is not interested in 'commit' numbers."  Exs. 266 at 151961-62; FFF at 105:10-21.[36]  Numerous executives, including

---

[35]    Defendants also knew that Oracle could not demonstrate 11i and that the Field was reluctant to sell CRM due to instability, further impacting Oracle's ability to convert its pipeline.  Exs. J at 68:6-74:17, 105:2-8; V at 76:19-78:9, 79:14-80:8, 80:24-81:7, 91:5-8, 175:19-176:5, 300:11-23, 328:19-329:18; Exs. 260-264.

[36]    Oracle's budgeting process (30% growth target for FY01) also played a role in setting targets for the Field.  Mot. at 6; Exs. 227 at 79-80; 228 at 13; G at 81:9-23; PP at 96:13-15; 267; 268; QQ at 27:18-28:6, 33:5-36:2.  Ellison increased the U.S. budget targets by 25%-30% through a "replan" only weeks before 3Q01.  Exs. 269-270.  The directive, which instructed the Field to include deals

Sanderson (OPI) and Nussbaum (OSI), forwarded this e-mail chain and discussed methods for implementing Ellison's directive.  Exs. 231, 271-272.  Minton testified that she did not take the directive into account when adding upside to the Field Forecast in 3Q01 even though this directive took effect before 3Q01 – "[w]e will incorporate this [change] in our OSO 11i training that is tentatively scheduled the week of 10/23."  Exs. 231; J at 19:15-19; 265.[37]  Defendants ignore Ellison's directive and their experts' sole response is, inexplicably, that they do not believe it was adhered to despite a wealth of evidence to the contrary.  Exs. G at 61:18-66:23; 228 at 34-37; PP at 116:3-119:2, 125:9-130:11, 147:6-23; 266, 231, 271-272 (Sanderson: directive is "sensitive infor[mation]" that should not be forwarded).  Not surprisingly, after the directive, the management judgment in each U.S. division skyrocketed.  Goedde Decl., ¶¶19-23.

## G.  Defendants Knew Facts that Seriously Undermined the Accuracy of Oracle's External Forecast

The very indicators that Ellison testified he was aware of and relied upon (actual sales and pipeline data) seriously undermined the accuracy of Oracle's External Forecast.  Exs. HH at 268:5-13, 279:1-11; GG at 76:25-77:16, 113:25-114:25, 115:1-116:19, 122:1-25, 127:24-129:25, 143:12-144:3, 144:18-128:2, 156:4-159:21; 17 at 179-80, 285, 287; 276 at 84-85.  Given their receipt of weekly reports and attendance at the weekly EMC meetings, Henley and Sanderson also knew this.  Exs. K at 333:22-334:1, 466:20-467:19, 551:1-553:18; II at 64:15-65:20, 114:5-116:10, 116:25-

---

that they previously would not have felt comfortable including, made Oracle's process even more "top-down."  Exs. 231; PP at 56:15-57:4; 229 at §V.D.2.b.

[37]  The move to OSO inflated Oracle's pipeline.  Exs. K at 270:2-14; CCC at 226:5-227:25; SS at 48:9-19.  As a result, Minton applied her unreasonable conversion analysis in 3Q01 to a pipeline that Henley testified was "too good to be true."  Ex. H at 354:15-355:3.  This overstated pipeline, which defendants touted in December 2000 as a reason for their belief in the strength of Oracle's business, was actually caused by the move to OSO, which increased the 3Q01 pipeline by adding deals that the Field would previously not have felt comfortable including.  Exs. 273; K at 270:2-14; 225 at §II.A.4.; CCC at 226:5-227:25.  Henley testified (and defendants admit) that this overstated pipeline (not the other major changes) was the reason for an External Forecast of $0.12 EPS instead of the $0.128 Potential.  Ex. H at 354:3-14.

1   118:9, 120:4-13, 222:18-223:24; KK at 40:7-42:23, 43:7-44:25, 72:7-73:12, 74:8-78:3, 88:5-17; V at

2   72:17-73:15.

3          1.       **Actual Results Seriously Undermined Oracle's External**

4                   **Forecast**

5          December 2000 actual results informed defendants that Oracle was being negatively affected

6   by the economy and 11i and seriously undermined the accuracy of Oracle's unreasonable External

7   Forecast.  Exs. 277-278; GG at 76:25-77:12; II at 222:18-223:4.  On January 17, 2001, defendants

8   received the Flash Report with Oracle's actual results for December 2000.  Exs. 277-278.  It

9   disclosed that NAS and OSI had revenue growth of ***negative*** 24% and ***negative*** 81%, respectively,[38]

10  and that Oracle Product Industries ("OPI") had growth of ***negative*** 85% excluding Covisint.[39]  *Id.*

11  Accordingly, by January 17, defendants knew that each U.S. division (50% of license revenues) had

12  negative growth trends.  *Id.*  The Flash Report also informed defendants that the U.S. divisions had

13  sold virtually no applications and insufficient database, excluding Covisint.  *Id.*  Although its U.S.

14  divisions were ***forecasting $323 million*** (excluding Covisint) in applications, in December, they ***sold***

15  ***less than $1.3 million in applications*** ($805,000 of CRM and $458,000 of ERP, excluding Covisint)

16  – ***negative*** 92% growth.  *Id.*  The U.S. divisions had ***negative*** 33% growth in database (***negative***

17  44%, excluding Covisint).  *Id.*  By January 17, defendants knew of the negative trends that

18  accounted for Oracle's shortfall.  *Id.*  The Flash Report also disclosed that, excluding Covisint, total

19

20

21  _____

22  [38]        Ellison testified that adverse actual results in one of Oracle's license divisions after the first

23  month of a quarter (his example was Europe, which accounts for a lower percentage of revenue than
    NAS and OSI) would prevent him from trading.  Exs. GG at 43:12-44:6; 277; 230 at Ex. 24; *see,*

24  *e.g.*, Exs. 232, 274, 279.  Within 36 hours of receiving these adverse results for OSI and NAS for the
    first month of 3Q01, Ellison instructed his financial advisor to unload 40 million shares.  Exs. GG at

25  69:1-70:3, 76:25-77:12; LL at 59:15-60:6; 250 at 300606.

26  [39]        Covisint was a $60 million applications deal that was the largest transaction in Oracle's
    history.  It was removed from the Flash Report analysis because its size and one-time nature skewed

27  Oracle's trends.  Exs. GGG at 312:2-313:4; 280 at 2, ¶9.  Defendants testified that removing
    Covisint was proper to analyze trends.  Exs. J at 436:13-437:6; II at 216:25-218:23.

28

company license growth was 1% (external forecast was 25%) and total applications growth was *negative* 46% (external forecast was 75%).  *Id.*  According to Henley, the Flash Report disclosed that Oracle was "off to a slow start irrespect [sic] – you know, excluding Covisint."  Ex. II at 226:6-7.

On February 8, 2001, defendants received the Flash Report with January actual results.  Exs. 281-282.  It disclosed that Oracle's U.S. divisions still had negative growth trends.  NAS and OSI had revenue growth of *negative* 33% and *negative* 17%, respectively.  *Id.*  Excluding Covisint, OPI had growth of *negative* 63%, total license revenue growth was just 8% (compared to a 25% external forecast) and the U.S. divisions *had sold just $16.6 million in applications compared to a forecast of $323 million* (*negative* 26% applications growth).  *Id.*  Oracle's U.S. divisions had database growth of *negative* 29% and, excluding Covisint, *negative* 34%.  *Id.*[40]

### 2. Division Level Indicators Seriously Undermined Oracle's External Forecast

Throughout 3Q01, defendants knew of severe problems in Oracle's largest license division, which accounted for at least $106 million of Oracle's miss.  Exs. 234 at 01917; 232; 286 at 2990.  At the outset of 3Q01, defendants knew that NAS's pipeline was inadequate to meet targets because "NAS results took off last year in Q3" (largely due to dot.com sales, which had disappeared by 3Q01).  Exs. 236; OO at 33:19-34:21; 283; SS at 173:10-15; VV at 53:5-18; 284 at 033449; V at 291:8-292:6, 293:12-23.  NAS noted, however, that "[g]iven the past trends, [NAS] should add incremental Pipe during the next three weeks."  Ex. 283.  By January 11, NAS reported that "[t]he Pipe has not grown as [NAS] had anticipated.  We're actually slightly down from December end reporting."  Ex. 240.  Defendants also knew from the outset of 3Q01 that NAS's pipeline contained no big deals.  Henley noted this in early December and received updates in December and January

---

[40]     According to Ray Lane, the flash reports informed defendants that Oracle was not on track.  Ex. 280, ¶¶6-12.  Dr. Goedde establishes that a standard forecast analysis would have disclosed to defendants that Oracle was not on track.  Ex. 230 at 28-35 & Exs. 14-19.

1   that NAS's pipeline still had few big deals (just one above $5 million).  Exs. 236, 240; 299 at

2   610124; II at 214:2-19.  NAS told defendants that this was problematic because big deals had

3   allowed NAS to make its numbers in 1Q01 and 2Q01 (with less difficult comparisons).  Exs. 236,

4   240.  Defendants also learned at EMC meetings that AVPs in NAS "Beg[an] to Voice Concern" in

5   December and were "Reluctant to Raise Their Forecast" in January as "Deals Beg[an] to Shrink &

6   Get Delayed" Ex. 259 at 179337.  NAS AVPs reported a "Sluggish Economic Outlook" where the

7   "Focus [is] on Profits" and "Reduc[ing] . . . Costs" and CIOs on a "Shorter Leash" with CEOs more

8   involved in purchasing decisions.  Exs. 241 at 350284-85; WW at 133:13-141:7, 146:6-18, 155:8-

9   157:1, 206:10-208:3; NN at 161:16-162:25, 163:9-17.  On January 11, NAS's finance director

10  reported:

11

12          3.      Drop in Technology.  As reflected in the softening Pipe, both GB and
13          Majors see a slow down in both Q3 and Q4.  GB's dot com bubble has burst . . . .
            Majors sees a slow down in spend along with smaller deal sizes.  Also, the change in
14          the ASP model for Generic Tech hosting lic's coupled with the dot com crash is
            impacting projected Tech results in that segment.  [Ex. 240.]
15

16  Minton received this e-mail and Ellison knew these facts.  *Id.*; Ex.  J at 429:8-432:5.

17          NAS's stellar 3Q00 results resulted largely from dot.com sales.  In 3Q00, dot.coms made up

18  36% of NAS's revenues (74.6% of GB's).  Exs. 300 at 131789; 230 at Ex. 5.  But in early January,

19  NAS managers reported that larger dot.coms had already acquired Oracle's database so they were

20  attempting to sell to smaller dot.coms, which were quickly disappearing.  Exs. 241; OO at 78:7-79:1,

21  86:21-88:11, 94:7-94:24; NN at 114:13-21, 166:23-167:17, 195:3-199:7; VV at 54:2-55:5, 69:23-

22  70:24.  By January 29, NAS forecasted dramatically lower dot.com sales – $41 million (3% of

23  revenues) compared to $111.5 million (11%) one year earlier.  Exs. 240; 301; 230 at Ex. 5; V at

24  48:9-23, 151:5-152:3, 188:24-189:8; NN at 197:5-199:7, 206:10-208:3; VV at 48:13-23, 61:20-62:6;

25  SS at 206:6-14, 212:2-17.  This amounted to negative 54% growth for 3Q01 in NAS's dot.com and

26  ASP technology revenue.  Ex. 301.  In total, NAS projected **negative** 6% growth in technology for

27

28

3Q01.  *Id.*  Henley admitted that this evidenced the dot.com fallout was having a "progressively more negative impact" on Oracle than in prior quarters.  Ex. JJ at 308:3-311:9.

These adverse facts manifested themselves in dismal performance in December and January. NAS's license revenue growth was ***negative*** 24% in December 2000 and ***negative*** 35% for the first two months of 3Q01.  Exs. 277-278, 281-282.  As of January 15, 2001, NAS had reported only $1.4 million in total sales for the month to date, for a total of $31.4 million for the quarter to date (its forecast was $360 million).  Exs. 302 at 038498-99; 232; 274 at 440114.

In 3Q01, defendants knew of OSI's severe problems, which accounted for at least $67 million of Oracle's miss.  Exs. 234 at 01917; 232; 286 at 2990.  In early 3Q01 defendants knew that OSI's technology pipeline was, according to Henley, down "a lot."  Exs. 299 at 610124; II at 214:2-215:16.  OSI's technology pipeline continued to fall throughout the quarter.  *See* Exs. 299 at 610124; II at 214:2-19.  By December 25, 2001, its applications pipeline had also plunged by $200 million. Exs. 232, 288.  In 3Q01, despite its negative pipeline growth, OSI's revenue growth was forecasted as high as 32%.  Exs. 285-298.  Ellison testified that this was "incautious."  Ex. GG at 86:21-87:5.

OSI's verticals were also forecasting to convert their pipelines at rates far higher the 30%-40% rate that Nussbaum testified was reasonable – over 60% for much of December and January and as high as 132% (forecasting more revenue than was in the pipeline).  Exs. 303 at 096158; 304 at 096175; Q at 36:2-6.  On January 18, Sarah Kopp (OSI finance director) informed defendants that conversion rates across the board in OSI were above 50%.  Ex. 305.  Oracle has produced only the first page of this two-page e-mail discussing OSI's problems.

Defendants knew that OSI was coming nowhere near these unreasonable forecasted conversion rates.  OSI had revenue growth of ***negative*** 84% for December and ***negative*** 17% for the first two months, combined.  Exs. 277; 281-282; 278.  It booked just $22.7 million in December and January, compared to a forecast of $73.6 million for those two months (and $225 million for the

quarter).  Exs. 306 at 323593; 281; 232; 274 at 440114.  By February 13, OSI had booked just $34 million (and its field was committing to just $120 million), which Nussbaum said caused "everyone [to have] great anxiety."  Exs. Q at 66:16-67:11; 307 at 095912; 308.  On January 18, OSI's field was forecasting just $134 million (with $180 million best case), compared to a Potential of $225 million.  Exs. 305; 232; 274.  The $91 million difference was Nussbaum's management judgment, which defendants knew was unrealistic.  Ex. 305.  They knew that $91 million in judgment was uncharacteristically high, even for Nussbaum, who was known as an aggressive forecaster.  Exs. 280, ¶17; KK at 170:25-171:13; Goedde Decl., ¶22.  Prior to 3Q01 (and Ellison's directive), Nussbaum had applied minimal or no judgment.  Goedde Decl., ¶22.  According to Ray Lane, the $91 million in judgment and the reliance on large deals, especially BellSouth, would have raised red flags.  Ex. 280, ¶17.

Defendants knew that large deals would not save OSI.  Henley noted concern at the beginning of 3Q01 because all of OSI's upside was in telecom (the telecom "bubble burst" was becoming public).  Exs. 299 at 610124; II at 209:19-210:23, 214:2-215:16; 309-312.  On January 18, Kopp e-mailed Minton that OSI would make its forecast only if "*none*" of its large opportunities dropped out.  Ex. 305.  Defendants knew that Nussbaum was relying heavily on deals with the University of Texas and Capital One (which Kopp told defendants "MUST close" for OSI to make its forecast) and deals in the troublesome telecom industry.  Exs. 305; 299 at 610124; II at 214:2-215:16; 313 at 293931, 293938.  In January, defendants knew that almost all of these deals had fallen out or were "long-shots" that were "not likely to close."  Exs. 315; J at 373:22-376:5; 305; 312; 314 at 293931; 316 at 090542; 317-320; 321 at 252257; 322 at 156558.0001; 323-326; 327 at 081828; UU at 118:10-119:3, 150:14-153:23; Q at 58:1-7, 66:16-69:1, 77:19-78:2; XX at 153:24-154:2; TT at 153:18-154:4; QQ at 44:25-45:6; 299 at 610124.

Indicators in OPI also informed defendants of the dismal state of Oracle's U.S. license business. Excluding Covisint, OPI grew *negative* 85% in December and *negative* 63% for the first two months of 3Q01. Exs. 277-278, 281-282. Without Covisint, OPI had booked just $2.6 million in license revenue in December and, as of January 26, *no license revenue in January 2001*. Exs. 277; 328 at 039193. Not surprisingly, OPI informed defendants on January 17 that it was seeing client delays on decisions and had "a lot of pipe at challenging clients." Ex. 329. OPI further evidenced the negative trends in Oracle's U.S. divisions. Also, Oracle's projected expenses rose throughout December and January, in contrast to declines in prior quarters. Ex. 230 at 41 & Ex. 23.

Oracle's 4Q01 forecast also rebuts defendants' claim that they expected to miraculously cure Oracle's dismal start with a strong February performance. Throughout 3Q01, the Field was forecasting 4Q01 revenue growth far below Oracle's targets. For example, on January 15, 2001, OSI and OPI forecasted 4Q01 growth of *negative* 7% and *negative* 16%, respectively. Ex. 330 at 099014. Only NAS forecasted positive growth, but its 4Q01 forecast had just decreased by $65 million. *Id*. In total, the U.S. divisions forecasted just 3% growth for 4Q01 (target was 30%). *Id*. The 4Q01 forecasts remained low and defendants were alerted to them throughout 3Q01. Exs. 331 at 089102; 332 at 078857; 333 at 078990; 334 at 080066; 335 at 079232. Judge Strine relied on defendants' false assertions that, in 3Q01, Oracle's 4Q01 forecasts were strong. *In re Oracle Corp. Derivative Litig.*, 867 A.2d 904, 943 (Del. Ch. 2004). Plaintiffs there did not direct him to the 3Q01 U.S. division forecasts for 4Q01, which clearly evidenced the deterioration of Oracle's U.S. license business. The 4Q01 forecasts were a strong indication that Oracle's problems were deep seated and that the divisions did not expect business to strengthen as the quarter or the year progressed.

### 3. Pipeline Growth Seriously Undermined Oracle's External Forecast

In 3Q01, defendants knew that pipeline growth seriously undermined Oracle's External Forecast. Exs. GG at 113:25-114:3, 122:1-15; HH at 252:4-10, 286:15-18; II at 64:15-65:20; H at

261:10-15; J at 457:8-17; KK at 43:7-44:23; 232; 274-275; 279; 286; 288; 292-298; 336-338.  Year-over-year pipeline growth, while as high as 52% in Week 1, dropped precipitously to 34% (by $328 million) by December 25.  Exs. 286, 288.  Defendants knew by December 25 that Oracle's sales opportunities were evaporating.  The pipeline collapse continued throughout 3Q01, decreasing $544 million by February 5 and $807 million for the entire quarter ($600 million from applications).  Ex. 230 at Ex. 20.  In contrast, the 3Q00 pipeline increased $69 million in December and January and lost only $340 million for the entire quarter.  *Id.*  Historically, Oracle's pipeline tended to increase in the quarter before declining at the end, and even those end-of-quarter declines were nowhere near the size of the declines throughout 3Q01.  *Id.*  The uncharacteristic decline in 3Q01 indicated that more deals were being lost.  Defendants, who touted Oracle's "astounding pipeline" to analysts as evidence of the strength of Oracle's business, knew throughout 3Q01 that Oracle's pipeline growth seriously undermined Oracle's External Forecast.  Exs. 206 at 03224; 210 at 141677; 339 at 005787; 340 at 141677.[41]  Also, the Court should infer that defendants destroyed the emails and interviews to conceal material adverse information regarding problems with Oracle's forecasting process and the effect of the economy and 11i on Oracle's business.

### H.    Defendants' "Cautionary" Statements Were Not Meaningful

The PSLRA's safe harbor does not apply unless a forward-looking statement is accompanied by ***meaningful*** cautionary statements.  *Morgan v. AXT, Inc.*, No. C04-4362 MJJ, 2005 U.S. Dist. LEXIS 42346, at *18-*19 (N.D. Cal. Sept. 23, 2005).   Vague or boilerplate disclaimers are

---

[41]    Additionally, Oracle's "comfort gap," the difference between forecasted revenue growth and pipeline growth, was uncharacteristically narrow in 3Q01.  Ex. 230 at 35 & Ex. 30.  Defendants knew that between December 25 and January 29, the gap was never higher than 4% and was negative half the time.  *Id.*; Exs. HH at 417:18-421:22; II at 103:14-104:25; KK at 44:11-45:23; 232; 285; 286; 288; 274-275; 279.  Oracle had a negative gap only once prior to 3Q01 and an average gap of 13.4%.  *Id.*  Ellison stated, "as long as the pipeline growth is greater than . . . the revenue growth, you should be able to meet your numbers" and that a negative gap was problematic because it would be "incautious to . . . forecast sales growth without underlying pipeline growth."  Exs. GG at 86:21-87:5; HH at 420:12-14.

1    insufficient.  *In re Amylin Pharms., Inc. Sec. Litig.*, No. 01cv1455 BTM (NLS), 2003 U.S. Dist.

2    LEXIS 7667, at *20 (S.D. Cal. May 1, 2003).  "'The cautionary statements must be precise and

3    directly address . . . the defendants' future projections.'"  *In re Immune Response Sec. Litig.*, 375 F.

4    Supp. 2d 983, 1033 (S.D. Cal. 2005); *Helwig*, 251 F.3d at 559.  "[T]he cautionary statement must

5    discredit the alleged misrepresentations to such an extent that 'the risk of real deception drops to

6    nil.'"  *Immune*, 375 F. Supp. 2d at 1033.  Defendants' cautions were not meaningful.[42]  While

7    Henley noted during the December 14 conference call that a "recession . . . could have some

8    impact," he dedicated his talk to persuading investors that Oracle would not be impacted because it

9    was "in a sector, I think, that is, you know, much more immune to economic issues."  Mot. Ex. 56 at

10   003218-19.  Instead of meaningfully cautioning investors, Henley's statements led them to believe

11   that Oracle was not being affected by the economy.  Defendants also point to select statements in

12   seven pages of risk disclosures in Oracle's Form 10-Q referencing various general possibilities that

13   "may" or "could" adversely affect Oracle's business "if" they happened.  Mot. at 25-26; Mot. Ex.

14   160 at 24182-83, 24185.  But these general disclosures of contingent risks clearly did not discredit

15   defendants' false or misleading forecast to such an extent that risk of deception dropped close to nil.

16   *Immune*, 375 F. Supp. 2d at 1033.[43]

---

[42]    Whether defendants' cautionary language was meaningful should not be resolved at summary judgment.  *See Provenz*, 102 F.3d at 1493.  Additionally, this Court already held that whether Oracle's disclosures were meaningful raised a fact question.  *Nursing Home Pension Fund v. Oracle Corp.*, 242 F. Supp. 671, 679 (N.D. Cal. 2002).  That fact question remains.  Judge Jenkins reiterated this belief at the December 2007 summary judgment hearing.  Ex. 435 at 16:6-14 ("[defendants' cautionary language] may not be specific enough so that, as the case law indicates, that cautionary language really reduced the risk of the investor to nil").

[43]    In addition, Oracle's reiteration of its External Forecast and continued positive statements to the market after its boilerplate risk disclosures rendered them even more meaningless.  *See* §II.F., *supra*.  These reiterations are not protected by the safe harbor both because defendants knew that they were false and misleading and because they were not identified as a forward-looking statement or accompanied by meaningful cautions.  15 U.S.C. §78u-5(c)(1)(B).  As defendants have admitted, reiterations of external forecasts must be accompanied by cautionary language.  Mot. at 25 n.11.

Furthermore, because the risks about which they supposedly warned had already materialized, Oracle's risk disclosures cannot qualify as meaningful cautions that offset defendants' false statements.[44] *In re CV Therapeutics Sec. Litig.*, No. C 03-03709 SI, 2004 U.S. Dist. LEXIS 17419, at *34 (N.D. Cal. Aug. 5, 2004) ("even if the statements were construed as forward-looking, the warnings accompanying the statements fail to shield the statements from liability, since they did not indicate that the Company already knew that the FDA harbored serious doubts about Raxena . . . the use of the word 'may' was misleading"); *Amylin*, 2003 U.S. Dist. LEXIS 7667, at *20; *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1165 (C.D. Cal. 2003) ("accompanying cautionary language can only be meaningful if it either states the belief of the speaker that it is false or misleading or, at the very least, clearly articulates the reasons why it is false or misleading"); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).[45]

## I.      Defendants' Economy Statements Were Not Forward Looking

Faced with clear evidence that the economy was negatively affecting Oracle, defendants have recently beaten a hasty retreat and now attempt to shield the economy statements behind the PSLRA's safe harbor.  But defendants have already admitted that their economy statements are not protected by the safe harbor.  11/9/07 Mot. (Dkt. #1406) at 32 ("Unlike Oracle's 3Q01 projections,

---

[44]    Oracle's warnings that its hockey-stick pattern of revenue "could cause quarterly revenues and net income to fall significantly short of anticipated levels" (Mot. Ex. 160 at 24185) fails for another reason – it is not what caused the miss.  Oracle missed its External Forecast for two reasons: (1) Oracle's forecast produced an unreasonable External Forecast as a result of major changes; and (2) Oracle's U.S. license business had experienced adverse results throughout 2Q01 and 3Q01 (not just in the last month or last few days of 3Q01).  §§II.F.-G., *supra*.

[45]    The Ninth Circuit is clear – making a projection with actual knowledge that it is false or misleading will "except[] statements from the safe harbor rule altogether."  *No. 84 Employer-Teamster Joint Counsel Pension Trust Fund v. Am. West*, 320 F.3d 920, 937 n.15 (9th Cir. 2003); *In re InterMune, Inc. Sec. Litig.*, No. C 03-2954 SI, 2004 U.S. Dist. LEXIS 15382, at *15 (N.D. Cal. July 30, 2004) ("To the extent that a statement is forward-looking and is not based on the most accurate information available to defendants, it would not be protected by the general safe harbor provision."); *LDK Solar*, 2008 U.S. Dist. LEXIS 42425, at *45-*46; *SeeBeyond*, 266 F. Supp. 2d at 1165 (safe harbor does not give a defendant a "license to lie" because "'[i]f the forward-looking statement is made with actual knowledge that it is false or misleading,' the accompanying cautionary language must disclose that it is false or misleading").

1  [defendants' statements about the current effect of the economy] were not forward-looking

2  statements, and therefore are not subject to the Safe Harbor's 'actual knowledge' standard."). This

3  Court has also found that defendants' economy statements were statements of present fact. *Nursing*

4  *Home Pension Fund*, 242 F. Supp. 2d at 678 ("Oracle's statements that the economy was not hurting

5  its sales . . . are statements of present fact."); Ex. 435 at 16:17-25 ("I think everybody agrees these

6  are not forward-looking statements.").

7         Undeterred by these clear findings and admissions, defendants now blurt that the economy

8  statements were forward looking because they are inseparable from Oracle's 3Q01 External

9  Forecast.[46]  Defendants' argument is belied by the statements themselves.  Throughout 3Q01,

10  defendants repeatedly told the market that the economy was not affecting Oracle *at that time*.  Mot.

11  Ex. 162 at 141652; Mot. Ex. 163 at 141660-61; Mot. Ex. 164 at 141658; Exs. 209 at 091532; 208 at

12  091536.  These are, on their face, statements of present fact.  *CV Therapeutics*, 2004 U.S. Dist.

13  LEXIS 17419, at *33-*34 ("The fact that defendants used those inadequately disclosed historical

14  facts to support unsound projections does not shield their alleged misrepresentations as forward-

15  looking statements.").[47]

16         Defendants' argument also defies logic.  Under their view, any fact that relates to a

17  company's future earning potential is forward-looking – an argument that has been flatly rejected:

18       Defendants argue that the statements in the July 21 press release describing Boeing 's
   then current production problems are covered by the safe harbor because they are

19       assumptions underlying their forward-looking statements. The Court rejects this
   argument. Assumptions entitled to safe harbor protection must be just that:

20

21  [46]  Defendants' argument that statements regarding the economy were tied to reiterations of

22  guidance directly contradicts Henley's testimony.  Mot. at 29-30.  Although defendants repeatedly
   told the market in 3Q01 that Oracle was seeing no effect from the economy, Henley has testified that

23  he *never* reiterated Oracle's guidance, let alone in 3Q01.  §II.F.

24  [47]  *See also In re Lattice Semiconductor Corp. Sec. Litig.*, No. CV04-1255-AA, 2006 U.S. Dist.
   LEXIS 262, at *45 (D. Or. Jan. 3, 2006) ("The statement that 'sales growth was accelerating,'

25  though, is specific, and the complaint states a reason why it is false: that sales growth was not
   accelerating.  The statement is material and descriptive of historical fact, rather than forward

26  looking.") (citing *Ronconi v. Larkin*, 253 F.3d 423, 430-31 (9th Cir. 2001)).  *In re Connetics Corp.
   Sec. Litig.*, 542 F. Supp. 2d 996, 1007 (N.D. Cal. 2008) (statements of present or historical facts are

27  not forward looking); *In re Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1034 (S.D. Cal.
   2006); *In re Secure Computing Corp. Sec. Litig.*, 120 F. Supp. 2d 810, 818 (N.D. Cal. 2000).

28

1
2
3

> assumptions underlying projections and expectations. The statements at issue here, which concern present production problems, are not assumptions, they are present facts. To interpret the safe harbor protection of underlying assumptions in the manner suggested by the defendants would allow the exception to swallow the rule. Virtually any factual assertion by a business entity would be subject to safe harbor protection.

4    *In re Boeing Sec. Litig.*, 40 F. Supp. 2d 1160, 1169 (W.D. Wash. 1998).  To avoid this result, courts

5    have held that a statement is forward-looking only if "the truth or falsity of the statement cannot be

6    discerned until some point in time after the statement is made." *In re LeapFrog Enters., Inc. Sec.*

7    *Litig.*, 527 F. Supp. 2d 1033, 1046 (N.D. Cal. 2007) (citing *Harris v. Ivax Corp.*, 182 F.3d 799, 805

8    (11th Cir. 1999)).[48]  Defendants' argument in their last motion that the economy statements were

9    true, ***at the time they were made***, based on internal indicators that defendants claim supported them,

10   undermines their new argument.  11/9/07 Mot. (Dkt. #1406) at 29-32.  As discussed below, there is

11   ample evidence that the economy statements were false and misleading when made.[49]

12           **J.     Defendants Knew or Recklessly Disregarded that Their Economy**
                       **Statements Were False and Misleading**

13
            A discrepancy between a statement and the true state of affairs renders a statement

14
15   misleading for purposes of §10(b).  *In re Daou Sys.*, 411 F.3d 1006, 1020 (9th Cir. 2005), *cert.*

16

---

17   [48]     Defendants' reliance on *Harris* is without merit.  In *Harris*, the 11th Circuit held that a
18   statement that "'the challenges unique to this period in our history are now behind us'" was forward
     looking because the two paragraphs prior to the statement had discussed the "challenges" in detail
19   and made clear that the company was "anticipat[ing] improvements in business conditions," but that
     those improvements had not yet occurred.  182 F.3d at 805.  It was therefore impossible to tell
20   whether the statement was false when made because the events had not yet occurred.  *Id.*  In contrast,
     the court in *Harris* specifically found that observed facts such as "'prices have continued to decline'"
21   and "'customer re-orders remain depressed'" are not "'assumptions'" and, thus, are not forward-
     looking statements.  *Id.* at 806.  *See Amylin Pharms.*, 2003 U.S. Dist. LEXIS 7667, at *16-*17
22   (distinguishing *Harris* because "[a]ssertions of present or historical fact are not 'assumptions'"); *In*
     *re U.S. Interactive, Inc. Sec. Litig.*, No. 01-CV-522, 2002 U.S. Dist. LEXIS 16009, at *50-*56 (E.D.
23   Pa. Aug. 23, 2002) ("*Harris* distinguishes between observed facts and assumptions").  *See also*
     *Constr. Laborers Pension Trust of Greater St. Louis v. Neurocrine Biosciences, Inc.*, No.
24   07CV1111-IEG-RBB, 2008 U.S. Dist. LEXIS 38899, at *36-*38 (S.D. Cal. May 13, 2008) (citing
     *LeapFrog Enters.*, 527 F. Supp. 2d at 1046).

25   [49]     That analysts reported that "the full impact of the current macro environment may not be
26   evident until the end of the quarter" merely demonstrates defendants' fraud.  Mot. at 29-30.  Unlike
     defendants, they did not have access to internal data indicating that the economy was negatively
27   affecting Oracle.  As a result, investors had to wait until the end of 3Q01 for Oracle's earnings
     report.  The only way investors could know the truth prior to the end of 3Q01 was if Oracle, like
     Cisco and Sun, pre-announced the negative trends that defendants were seeing.  §II.F.1.

28

---

*denied*, 546 U.S. 1172 (2006).  Throughout 3Q01, defendants told investors that Oracle "ha[d] yet to see macro-related weakness in its business," yet, as discussed in detail in §§II.F.1. and II.G.1.-3., defendants knew throughout 3Q01 that the slowing economy ***was*** impacting Oracle's business.  Exs. 206, 216, 341-342; 343 at Ex. A; 339.  Before defendants' December 14, 2001 misrepresentations, Oracle had lost millions in revenue from the dot.com implosion, its FY01 conversion ratios had declined sharply and its U.S. divisions were reporting adverse information.  *See* §§II.F.1. & II.G.1.-3., *supra*.  NAS reported that its pipeline was inadequate and big deals (which had driven results in 1Q01 and 2Q01) were virtually nonexistent.  *Id*.  OSI's pipeline was "down a lot" at the beginning of 3Q01 and included long-shot deals in troubled sectors.  *Id*.  Defendants knew all of these facts when they told investors that the economy was having "no" impact on Oracle's business.  *Id*.[50]

The metrics relied on by defendants worsened after December 14, even as they repeated their false and misleading tale.  §II.G.1.-3., *supra*.  The pipeline collapsed by $328 million by December 25 and continued to plummet throughout 3Q01.  §II.G.3., *supra*.  By the beginning of January, NAS reported that its pipeline had fallen (it was expected to increase) and its dot.com bubble had "burst." §II.G.2.  NAS AVPs began to voice concern in December and NAS reported that it was seeing a "slow down in spend," a "softening Pipe" and that deals were shrinking and getting delayed.  *Id*. OSI reported that its applications pipeline had collapsed (by $200 million) and defendants knew that most of its "must" close large deals had fallen out or were "not likely to close."  *Id*.  Negative 3Q01 reports from each U.S. division caused Minton to reduce her upside by uncharacteristically high amounts (from $159.5 million to $0).  Ex. 230 at Ex. 11.  The collapsing pipeline caused Oracle to forecast growth rates ***greater*** at times than Oracle's pipeline growth – highly unusual historically.

---

[50]     Defendants rely almost exclusively on the 3Q01 Potential in bootstrap fashion to argue that Oracle was not currently feeling the effect of the economic slowdown, however, as discussed in §II.F.1.-3., defendants knew that Oracle's 3Q01 forecast was unreasonable and unreliable as a result of external and internal changes, including the economic slowdown.

1    Ex. 230 at Ex. 13.  For December and January, every U.S. division reported severe negative growth

2    trends and nearly non-existent actual revenues.  §II.G.1., *supra*.  Finally, in 3Q01, Oracle's field

3    forecasts, which were inflated as a result of the directive, were still projecting negative or non-

4    existent growth for 4Q01.  Ex. 230 at Ex. 12.

5        **K.       The Insiders' Sales Establish Scienter**

6        Ellison's independently actionable sales support an inference of scienter.[51]  *See* Ex. 225 at

7    §III.D.  *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir.

8    2004).  Ellison's trades were dramatically out of line with his trading history – he had not sold for

9    five years – and were suspicious in amount as Ellison sold a "truly astronomical" 29 million shares

10   for proceeds of $895 million.[52]  *Id.* at 1232; Exs. 344; GG at 28:2-4; 345.  Ellison's trades were also

11   suspiciously timed.  He decided to unload early (before January 19, every indication was that he

12   would sell in April or August 2001), only 36 hours after receiving the Flash Report (in addition to a

13   myriad of other negative information) – making him one of the last investors to sell Oracle stock

14   above $30 per share.  *See* Exs. 225 at §II.C.; GG at 33:2-5, 69:1-70:3; LL at 59:15-60:6; 250 at

15   300606, 300609; 277; 346-350; 351 at 092603, 092608; 352 at 050621-24, 050655-56; 353 at

16   038232; 354-355; 441 at 170568-09.  Ellison's use of proceeds – to pay for a $100 million home and

17

18

19

20

21   _____

22   [51]      Suspicious trading is relevant evidence of actual knowledge.  *In re Skechers U.S.A. Sec.
     Litig.*, 273 Fed. Appx. 626, 630 (9th Cir. 2008) ("allegations of insider trading contribute to the

23   overall picture that Defendants had actual knowledge of the true state of Skechers' financial health at
     the time they made allegedly false statements"); *Helwig*, 251 F.3d at 552; *Stavros v. Exelon Corp.*,

24   266 F. Supp. 2d 833, 850 (N.D. Ill. 2003); *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581,
     596-99 (N.D. Ohio 2004).  *In re JDS Uniphase Corp. Sec. Litig.*, No. C 02-1486 CW, 2007 WL

25   2429593, at *18 (N.D. Cal. Aug. 24, 2007), cited by defendants, merely holds that sales, "standing
     alone," are insufficient to create a triable issue of fact.  Mot. at 27 n.13.

26   [52]      Ellison's massive trading must also be viewed in light of SEC rules.  Ellison sold 16.34% of

27   the maximum allowed by SEC Rule 144 and authorized up to 22.47% of that maximum.  Exs. 250;
     344; GG at 50:5-52:20; LL at 65:4-67:19; 17 C.F.R. §230.144(e).

28

1  a $250 million yacht – also compels a finding that he acted with scienter.  Exs. 17 at 485-86, 369-

2  370; 356 at 318, 323; HH at 353:24-354:8; *Kaplan v. Rose*, 49 F.3d 1363 (9th Cir. 1994).

3          Defendants' argument that a lack of sales by other Oracle executives negates scienter fails.

4  Mot. at 49 n.28.  The Ninth Circuit rejected this argument in *American West*, 320 F.3d at 944.

5  Moreover, many Oracle executives either sold stock in January 2001 or had plans to do so.  Henley

6  sold a million Oracle shares for proceeds of $32 million on January 4, 2001, when he knew of

7  adverse information regarding Oracle's products and financial condition, that its 2Q01 earnings were

8  false and that its 3Q01 External Forecast was unreasonable.  Ex. 243; *see* §II.B.-J., *supra*; *see also*

9  Exs. 357 at 017086; 358 at 6.  Nussbaum and Giacoletto also sold stock in 3Q01 and Minton,

10 Sanderson, Catz, and Daniel Cooperman all had plans to sell in January 2001.  Exs. 359 at 609547-

11 48; 360 at 611349; CCC at 196:20-197:21, 198:15-24, 209:22-210:18; AAA at 105:24-119:13; ZZ at

12 23:15-25:20; 361-364; DDD at 204:9-210:1; 365 at 297312; 366-368; BBB at 230:1-244:25; 369 at

13 609420-421; 370-372.  Cooperman and Catz did not sell in late January (Cooperman had already

14 sold 5,000 shares on January 4, 2001 and had plans to sell more) because they discovered material

15 adverse information (according to Catz, that Ellison had suddenly decided to trade) and both Minton

16 and defendant Sanderson planned to trade because of the declining economy.  *Id*.  These planned

17 sales (either consummated or abandoned) by most of Oracle's top executives establish scienter.[53]

---

[53]     Defendants' use of Oracle's 3Q01 repurchase program also establishes scienter.  In 3Q01,
defendants caused Oracle to repurchase 12.6 million ($350 million) of its shares to drive up or
stabilize its stock price.  Exs. 373 at 140861; 374; BBB at 270:13-23; H at 289:11-294:15; 375.
Repurchases in 3Q01 were clustered just prior to and during defendants' sales to allow them to sell
at higher prices. Ex. 376. Defendants also used Oracle's 3Q01 repurchases to mitigate negative
information, for example, after publicity regarding Ellison's sales and negative February 9, 2001
press coverage caused the stock price to decline. *Id.*; Exs. 377-379.  In fact, as defendants reassured
the market and reiterated Oracle's External Forecast on February 8 and 9, 2001, they caused Oracle
to repurchase almost three million shares of stock for $69 million.  Exs. 374, 376-379.

1

2 **L.      The Delaware Derivative Case Is Irrelevant**

3          The Delaware action has no precedential value or *res judicata* impact on this case as a matter

4 of law, and the facts, claims, arguments, and legal standards are markedly different.  *See* Mot. at 1, 3,

5 8, 10, 12, 17-18 (citing *Oracle Corp.*, 867 A.2d at 905).  The Delaware action involved an extremely

6 narrow issue under Delaware state law – whether defendants "breached their fiduciary duty of

7 loyalty to the company" by selling stock while in possession of adverse inside information.  *Oracle*

8 *Derivative*, 867 A.2d at 905; Ex. 251 at 212:22-24 ("[T]his is not our case . . . . ***We're not saying***

9 ***anything about the truth of falsity of these statements***, Your Honor.").  Oracle's counsel admitted

10 that their case involved "[d]ifferent issues" than the federal case. Ex. 251 at 9:10-11.  The Delaware

11 plaintiffs made no allegations regarding Oracle's fraudulent 2Q01 results.  Nor did they make

12 allegations concerning problems with Suite 11i – Judge Strine expressly held that "***this***

13 ***opinion . . . does not dilate on the facts relating to [11i] products***."  *Oracle Corp.*, 867 A.2d at 915

14 n.26.  Defendants withheld any and all *Softwar* related materials from plaintiffs in the derivative

15 case, including Ellison's admission in the book that Oracle's forecasting process become becomes

16 inaccurate in times of change.  In fact, the Delaware plaintiffs did not attack the reasonableness of

17 the Potential on any basis, including Ellison's directive in 2Q01 to add more risk.  Finally, the

18 Delaware Plaintiffs did not expose defendants' spoliation and, as a result, did not have the adverse

19 inferences from that evidence destruction.  Simply put, the Delaware action is irrelevant.

20 **M.      The Facts Presented Support a Jury Finding of Loss Causation**

21          "A private plaintiff who claims securities fraud must prove that the defendants' fraud caused

22 an economic loss."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-44 (2005) (15 U.S.C. §78u-

23 4(b)(4)).  To prove loss causation, the plaintiff must demonstrate a causal connection between the

24 deceptive acts that form the basis for the claim of securities fraud and the injury suffered by

25 plaintiffs.  *See Daou*, 411 F.3d at 1026 (citing *Dura*, 544 U.S. at 344-45).  A plaintiff need not show

26 "that a misrepresentation was the ***sole*** reason for the investment's decline in value" in order to

27 establish loss causation.  *See Robbins v. Koger Props.*, 116 F.3d 1441, 1447 n.5 (11th Cir. 1997).

28 "[A]s long as the misrepresentation is ***one*** substantial cause of the investment's decline in value,

other contributing forces will not bar recovery under the loss causation requirement" but will play a

1    role "in determining recoverable damages." *Id.  Accord In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049

2    (9th Cir. 2008) (citing *Daou*, 411 F.3d at 1006).[54]  Plaintiffs need only present enough evidence from

3    which a reasonable jury could conclude that the [disclosure] caused the decline.  *In re Motorola Sec.*

4    *Litig.*, 505 F. Supp. 2d 501, 551 (N.D. Ill. 2007).

5        Here, the evidence both directly and indirectly connects the March 1, 2001 disclosure to the

6    March 2 stock price decline (plaintiffs' economic loss) to the alleged claims.  On December 14,

7    2000, Oracle announced 2Q01 (false) revenues and earnings results – overstating earnings by a

8    penny – with false projections of $0.12 EPS, 25% license growth, and 75% application growth with

9    respect to 3Q01.  Ex. 105.  Oracle reported falsely that it had ***earned*** $0.11 per share for 2Q01 and

10   achieved 66% applications [11i] growth – beating analysts expectations for both earnings and

11   applications sales.  Exs. 26, 105.  By doing so, defendants succeeded in masking the negative impact

12   upon Oracle of the declining economy and problems with 11i.  In addition to the false 2Q01

13   financials and having no reasonable basis for the growth forecasts discussed *supra* at §II.B. and

14   §II.F., Henley expressly connected the false $0.12 EPS forecast on the false report of $0.11 for 2Q01

15   earnings ("[H]istorically, the third quarter is slightly better than the second quarter. . . .  So I would

16   assume, 12 cents would be a reasonable number . . . .").  Ex. 26 at 234427.

17       Oracle was able to report 2Q01 11i applications growth of 66% because of the fraudulent

18   swap transaction with HP discussed above at §II.B.3.  Ex. 129.  The false 2Q01 applications report

19   of 11i growth in conjunction with the false statements that Suite 11i was functional, preintegrated

20   and interoperable – poised to save customers money and boost overall sales in a slowing economy –

21   was material to investors and caused a statistically significant price increase on December 15.  Ex.

22   168 at 17.  Ellison piled it on by stating people were "buying [11i], everywhere."  Ex. 26 at 234434.

23   Investors directly tied these false claims of 11i functionality to the 2Q01 applications growth report

24   and 3Q01 forecast.  *See* Exs. 129; 415 at 2 ("We anticipate the [11i] applications division will

25

26   [54]  As evidenced by the Ninth Circuit's August 11, 2008 opinion in *Gilead*, the Ninth Circuit's
     August 26, 2008 opinion in *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir.
27   2008), did not alter the pleading or proof standards on the issue of loss causation articulated in *Dura*
     and followed by *Daou*.

28

1   continue to accelerate . . . .  We are under the impression that the first version had considerable bugs

2   and the most recent version is really gaining traction.").  *See also* Ex. 170 at 420588 ("Applications

3   license growth of 66% solidly outpaced Street expectations in the 50-60% range.   The

4   ***outperformance should also allay concerns about the viability of Oracle's applications business***

5   ***and the relative immaturity of release*** 11i . . . .).[55]

6          The true facts were revealed on March 1, 2001, in an Oracle press release reporting only

7   $0.10 per share, the economy had hurt sales and 11i applications growth was dismal, only 50%

8   rather than 75%.  Ex. 196.  The March 1, 2001 investor conference call disclosed the negative effects

9   of 11i and the economy that were masked by Oracle's false 2Q01 earnings and 3Q01 statements, and

10  also that the Company did not know when 11i sales would recover.  Ex. 351.   The disclosures

11  communicated to investors that issues concerning the functionality, *i.e.*, bugs and lack of stability of

12  Suite 11i which had entered the marketplace during Oracle's 1Q01 and 2Q01, had not in fact been

13  cured as defendants had reported at the end of 2Q01.  Exs. 129, 170.  The facts show the 11i defects

14  and failure to demonstrate 11i cost sales and negatively impacted conversion ratios.   Ellison's

15  destruction of all of his emails and audiotapes discussing 11i support this common sense conclusion.

16  Ex. 225 at 47; *see also* Ex. 440 at 4-13, 24.  In addition, and contrary to defendants' assurances that

17  the economy was not affecting the Company, the March 1 disclosures specifically attributed the

18  shortfall to the slowing economy, further evidencing that Suite 11i had not driven sales that allowed

19  Oracle to weather the slowing economy.  *See* Exs. 196, 203.  Oracle's stock price suffered an

20  immediate and statistically significant decline from $21.38 to $16.88.  Exs. 168, ¶43; 169.

21          Defendants contend that the March 1 announcement did not connect the shortfall to false

22  2Q01 financial statements.  Mot. at 47.  However, the falsely reported $0.11 EPS for 2Q01 was

23

24  [55]       *See also* Exs. 173 at 154522-24 (12/15/00 "Picture Perfect Q2: FY01 Should Even Convert
25  the Skeptics . . . .   [A]pplications revenue of $279 million also exceeded our expectations of $252
    million.  We believe these results were solidly better than published expectations and should ***be***
26  ***strong enough to convince the skeptics that ORCL's products business is capable of greatness. . . .***
    ***We expect ORCL's applications revenue to grow at a healthy pace as ORCL continues to***
27  ***penetrate its installed base of applications customers . . . and also attracts new customers with its***
    ***integrated 'one stop shop' value proposition*** . . . ."); Harrison Decl. (Dkt. #928), Ex. 173.

28

1    undisputedly the false basis for 3Q01 projections of $0.12 EPS and masked the negative effects

2    caused by 11i problems and the declining economy.  Ex. 26 at 23447.  *In re Impax Labs., Inc. Sec.*

3    *Litig.*, No. C04-04802 JW, 2007 U.S. Dist. LEXIS 52356, at *17 (N.D. Cal. July 18, 2007) (finding

4    that the Impax's announcement of lower than expected financial results **was** indeed sufficient to infer

5    the markets understanding that the forecast miss was connected to the accuracy of the Company's

6    prior financial statements).  And this Court has rejected defendants' argument that the March 1

7    disclosure must mirror the allegations of the Complaint.  *Nursing Home Pension Fund v. Oracle*

8    *Corp.*, No. C01-00988 MJJ, 2006 U.S. Dist. LEXIS 94470, at *36 (N.D. Cal. Dec. 20, 2006).[56]

9         Defendants say there is no evidence that the market ever associated their economy statements

10   or 11i integration interoperability or quality problems with the miss.  Mot. at 46.  However, news

11   reports on March 2, 2001 (which defendants ignore) confirmed that investor reaction (and stock

12   price decline) to the March 1 disclosure was connected to the misrepresentations.  Ex. 436.  The

13   *Wall Street Journal* reported that Oracle's "***reasons*** for the shortfall were at least as troubling to

14   analysts as its magnitude," in part because Ellison had only days earlier said to thousands of people

15   that 11i sales were "'tak[ing] off.'"

16            ***The reasons for the shortfall were at least as troubling to analysts as its***
         ***magnitude***. . . .  While database sales have been slowing at Oracle for many quarters,
17       analysts were surprised by the abruptness of the latest downturn.  ***Oracle also said its***
         ***line of application software likely grew 50% in the quarter, well below earlier***
18       ***predictions that the business might grow by 75%-100%. . . .  Last week in New***
         ***Orleans, in fact, the company hosted thousands of customers for a trade show that***
19       ***highlighted its application business***.  ***At the show, Oracle Chief Executive Larry***
         ***Ellison gave a bullish assessment of the application business, saying it was "really***
20       ***starting to take off***."  [*Id.*]

21        On March 2, 2001, UBS Warburg issued a report on the Company's pre-announcement tying

22   the earnings miss directly ***to defects and gaps in Suite 11i applications*** and stated that it could not

23   identify a single customer that had "gone live" on a fully integrated Suite 11i.  Ex. 426.  UBS also

24   _____

25   [56]    Defendants' argument that there was no corrective disclosure regarding the 2Q01 financial
     results is the same argument that this Court rejected two years ago.  *See Nursing Home Pension*
26   *Fund*, 2006 U.S. Dist. LEXIS 94470, at *35 (finding that consistent with *Dura*, a "corrective
     disclosure [is not required] to properly plead or prove loss causation") (citing *Dura*, 544 U.S. at 342-
27   43); *In re Loewen Group Inc. Sec. Litig.*, 395 F. Supp. 2d 211, 218 (E.D. Pa. 2005)).

28

found it "particularly puzzling to attribute a $200M shortfall to the last couple of days of the quarter to a change in the economic environment."  *Id.* at 2.

> *We also believe that the weakness in Oracle's applications business is because the company's applications are not yet ready for prime time. . . . [L]ast week, we learned that over 200 patches had been developed for the CRM product for the latest version*. . . .  Although Feedback from these customers suggested that they were impressed with the idea of a fully integrated suite, *we were unable to find any that had fully integrated and gone live on the suite*.  [*Id.* at 3.]

The UBS report is consistent with plaintiffs' overwhelming proof which demonstrates that Oracle had not, in fact, before or during the CP, implemented a full suite of working Suite 11i software anywhere.  Remarkably, on the first day of the CP, Ellison had falsely claimed that: "*We've got customers live on the whole E-Business Suite in 30-90 days*."  Ex. 26 at 234437.  The defendants claim that market analysts did not connect the loss to the defects in 11i is simply incorrect.  Indeed, post-CP email among Oracle's public relations staff confirmed that Oracle itself believed that the market views its miss as related to 11i quality failures.  Ex. 420 ("*[W]e have seen several stories recently in the US that link our lower than expected [11i] apps sales to quality issues with 11i.*").

Notwithstanding their March 1, 2001 admission that the economy "did us in," in truth, the impact of the slowing economy was known and evident to defendants at the beginning of the CP and confirmed in January 2001 (prior to Ellison's stock sales) with reports that OSI and NAS had experienced sharp negative growth and made virtually no sales in the first month of the quarter.  *See* §II.G.2., *supra*.  Apart from this direct evidence, defendants ignore facts publicly directly linking false statements about the economy and the purported prowess of 11i to the March 1, 2001 disclosure ultimate stock price decline.  On March 2, 2001, the *Los Angeles Times* noted that Oracle's March 1, 2001 announcement had sent its shares down 21%.  Ex. 419.  The article contrasted the disclosure to earlier boasting by Ellison that Oracle was not being hurt by the slowing economy because of 11i's functionality and efficiencies:

> Redwood City, Calif.-based Oracle is one of the last major technology companies to reduce forecasts because of slowing economic growth.  In December, the company said it wasn't being hurt by the slowdown *because corporations were buying its applications software to cut costs and boost efficiency*.  [*Id.*]

1    Defendants further ignore direct evidence of 11i defects to the miss and plaintiffs' economic

2    loss, including lost deals, as a result of failed demonstrations and defects impacting the internal

3    implementation. *See supra* at §II.E.2. During the December 20, 2007 hearing, the court recognized

4    the linkage between the lost deals due to 11i demonstration failures and explained to defendants

5    plaintiffs' evidence and argument was indeed that the evidence was corroborative that it had to be

6    part of the earnings miss. Ex. 435 at 113-22, 173-74. Similarly, at the same hearing, defendants

7    admitted what they could not deny, that the internal implementation of Suite 11i OKS module

8    caused part of the earnings miss. *Id.* at 210-11. Defendants don't even mention these facts now.

9    What's more, defendants' expert Christopher James agrees with plaintiffs that the ***new***

10   information revealed by Oracle on March 1, 2001, caused the stock price decline:

11       A:    I would view material new information ***regarding both the applications***
12       ***business as well as Oracle's other businesses and how they were faring in the then***
         ***current economic environment***.

13       Q.    And what was the new information regarding how the applications business
         was faring . . . ?

14       A.    I think ***it is clear to me that the market and market participants were***
15       ***concerned about the earnings miss and what it conveyed in terms of future***
         ***business prospects in the then current economic environment***. [Ex. AA at 137:14-
         138:1.]

16   Finally, in a tectonic shift, defendants' Motion argues that their new contentions are

17   consistent with the Ninth Circuit's opinion in *Gilead*. Mot. at 47. Defendants had previously rested

18   the weight of their loss causation argument on the district court's opinion in *Gilead* stating: "*Da[o]u*,

19   Your Honor, is completely consistent with this Court's ruling in *Gilead* and with our motion for

20   summary judgment and the reason why the plaintiffs cannot survive on loss causation." Ex. 435 at

21   27:13-16. We now know through the reversal of that opinion by the Ninth Circuit, that the District

22   Court opinion was not consistent with *Daou* nor was defendants' argument. *See Gilead*, 563 F.3d at

23   1057. Frankly, defendants are and have been all over the map, but still cannot demonstrate the

24   absence of a genuine issue of fact that it was defendants' misrepresentations and fraudulent conduct

25   that caused plaintiffs' economic loss.

26

27

28

**N.      Adverse Inferences Further Defeat Defendants' Motion**

The adverse inferences resulting from defendants' willful spoliation further requires the denial of summary judgment.  In *Kronisch*, the Second Circuit held that "where the innocent party has produced some (not insubstantial) evidence in support of his claim, the intentional destruction of relevant evidence by the opposing party may push a claim that might not otherwise survive summary judgment over the line.  In the absence of such a result, . . .  the purposes of the adverse inference are eviscerated."  *Kronisch v. United States*, 150 F.3d 112, 124-30 (2d Cir. N.Y. 1998).  "Otherwise, innocent parties meant to benefit from the adverse inference against offending parties would receive no benefit at all, having been deprived of evidence that may have been crucial to making their case, and yet being held to precisely the same standard of proof before they may present their case to a jury."  *Id.*[57]  The adverse inferences arising from defendants' spoliation only strengthen plaintiffs' motion for summary judgment or, at the very least, create genuine issues of material fact.

**III.     CONCLUSION**

For all of the reasons set forth above, defendants' Motion must be denied.

DATED:  November 17, 2008                    Respectfully submitted,


_____
                    s/ MARK SOLOMON
                              MARK SOLOMON

---

[57]      *See also Byrnie*, 243 F.3d at 107-11; *Pelletier v. Magnusson*, 195 F. Supp. 2d 214, 234-37 (D. Me. 2002); *Buskey v. Boston Mkt. Corp.,* No. 04-CV 2193 (SJ), 2006 U.S. Dist. LEXIS 65756, at *23-*26 (E.D.N.Y. Aug. 17, 2006); *Scott v. IBM Corp.*, No. 98-4092 (JBS), 2000 U.S. Dist. LEXIS 17979 (D.N.J. Nov. 29, 2000) (citing its earlier opinion in *Scott*, 196 F.R.D. 233, 249 (D.N.J. 2000) ("Plaintiff, as the party opposing summary judgment, is entitled to all favorable inferences from these circumstances, including the inference that the defendant's destruction of the decisionmaking document was intentional because the information was adverse to defendant's position.")); *Morgan v. U.S. Xpress, Inc.*, No. 4:03-cv-88 (CAR), 2006 U.S. Dist. LEXIS 36195, at *14-*17 (M.D. Ga. June 2, 2006); *Smith v. Borg-Warner Auto. Diversified Transmission Prods. Corp.*, No. IP98-1609-C-T/G, 2000 U.S. Dist. LEXIS 10200, at *29-*33 (S.D. Ind. July 19, 2000); *Heng Chan v. Triple 8 Palace, Inc.*, No. 03 Civ. 6048 (GEL), 2006 U.S. Dist. LEXIS 15780 (S.D.N.Y. Mar. 31, 2006); *Stanton v. Nat'l R.R. Passenger Corp.*, 849 F. Supp. 1524, 1528 (M.D. Ala. 1994).

1

2         COUGHLIN STOIA GELLER
          RUDMAN & ROBBINS LLP

3         MARK SOLOMON
         DOUGLAS R. BRITTON

4         655 West Broadway, Suite 1900
         San Diego, CA  92101

5         Telephone:  619/231-1058
         619/231-7423 (fax)

6         COUGHLIN STOIA GELLER
          RUDMAN & ROBBINS LLP

7         SHAWN A. WILLIAMS
         WILLOW E. RADCLIFFE

8         ELI R. GREENSTEIN
         DANIEL J. PFEFFERBAUM

9         100 Pine Street, Suite 2600
         San Francisco, CA  94111

10        Telephone:  415/288-4545
        415/288-4534 (fax)

11

12        COUGHLIN STOIA GELLER
         RUDMAN & ROBBINS LLP

13        STACEY M. KAPLAN
        9601 Wilshire Blvd., Suite 510

14        Los Angeles, CA  90210
        Telephone:  310/859-3100

15        310/278-2148 (fax)

16        Lead Counsel for Plaintiffs

S:\CasesSD\Oracle3\BRF00055666_Opp Rev. MSJ.doc

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on November 17, 2008, I electronically filed the foregoing with the

3

Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5

mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6

participants indicated on the attached Manual Notice List.

7

I further certify that I caused this document to be forwarded to the following designated

8

Internet site at:  http://securities.csgrr.com/.

9

I certify under penalty of perjury under the laws of the United States of America that the

10

foregoing is true and correct.  Executed on November 17, 2008.

11

12

  s/ MARK SOLOMON
MARK SOLOMON

13

14

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP

15

655 West Broadway, Suite 1900
San Diego, CA  92101-3301

16

Telephone:  619/231-1058
619/231-7423 (fax)

17

18

E-mail:  marks@csgrr.com

19

20

21

22

23

24

25

26

27

28

## Mailing Information for a Case 3:01-cv-00988-SI

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jennie@libertylaw.com

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Doug Britton**
  dougb@csgrr.com,jillk@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Joy Ann Bull**
  JOYB@csgrr.com

- **Dorian Estelle Daley**
  dorian.daley@oracle.com

- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,svdocket@lw.com,zoila.aurora@lw.com

- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com

- **Tera Marie Heintz**
  theintz@morganlewis.com,eeberline@morganlewis.com

- **Stacey Marie Kaplan**
  SKaplan@csgrr.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com,sf_filings@hbsslaw.com

- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com,#sfdocket@lw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **William S. Lerach**
  e_file_sd@lerachlaw.com

- **James C. Maroulis**
  jim.maroulis@oracle.com

- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com

- **Brian P Murray**
  bmurray@murrayfrank.com

- **Shinyung Oh**
  shinyungoh@paulhastings.com

- **Dawn S. Pittman**
  dpittman@morganlewis.com

- **Willow E. Radcliffe**
  willowr@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Mark Solomon**

marks@csgrr.com,e_file_sf@csgrr.com,sholloway@csgrr.com,e_file_sd@csgrr.com

- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com,aelishb@csgrr.com

- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Corey D. Holzer**
Holzer Holzer & Cannon LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

**Raymond Lane**
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

**PRG-Schultz USA, Inc.**
Paul Hastings Janofsky & Walker LLP
55 Second Street
24th Floor
San Francisco, CA 94105

**Darren Jay Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

**Sanna Rachel Singer**
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111

**Monique C. Winkler**
Coughlin Stoia Geller Rudman & Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111