COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
MARK SOLOMON (151949)
DOUGLAS R. BRITTON (188769)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
marks@csgrr.com
dougb@csgrr.com
     – and –
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
ELI R. GREENSTEIN (217945)
DANIEL J. PFEFFERBAUM (248631)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@csgrr.com
willowr@csgrr.com
elig@csgrr.com
dpfefferbaum@csgrr.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION | Master File No. C-01-0988-SI |
| | CLASS ACTION |
| This Document Relates To:<br><br>ALL ACTIONS. | DECLARATION OF ALAN G. GOEDDE (COMBINING PREVIOUS GOEDDE DECLARATIONS) IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' REVISED MOTION FOR SUMMARY JUDGMENT |
| | DATE:  January 9, 2009<br>TIME:   9:00 a.m.<br>CTRM:  The Honorable Susan Illston |

I, ALAN G. GOEDDE, declare as follows:

1.     I submit this declaration in support of Plaintiffs' Opposition to Defendants' Revised Motion for Summary Judgment and to combine the two declarations that I filed in support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment and in response to the Rebuttal Declaration of George Foster. Those declarations, which are attached hereto as Exhibits A and B, were filed to supplement certain of the analyses outlined in the expert reports that I submitted on behalf of plaintiffs in this case. I have personal knowledge of the facts set forth below, or where I do not have personal knowledge, I am informed and believe the stated facts to be true and correct.

2.     I am a Vice President at Freeman & Mills, Inc. I have been retained as an expert witness by plaintiffs in this action. I submitted the Expert Report of Alan G. Goedde, Ph.D., on May 25, 2007 and the Rebuttal Expert Report of Alan G. Goedde, Ph.D., on June 22, 2007. I was deposed by counsel for Oracle in this action on July 11, 2007.

3.     During the course of my deposition, counsel for Oracle queried me on my calculation of pipeline conversion rates using constant dollar licensing revenue information from Oracle's 3Q FY00 Upside Reports, which formed the basis of the calculations set forth in Exhibit 4 to my Rebuttal Report. In that exhibit, I demonstrated that Ms. Minton's upside adjustments were based on the pipeline conversion ratios that Oracle had achieved in the same period for the prior year. As I explained in my deposition, Exhibit 4 revealed that the prior year conversion rate and the Potential Forecast conversion rate generally mirrored each other in every quarter between 3Q FY00 and 3Q FY01. This analysis supported my opinion that the prior year conversion rate was the basis for Ms. Minton's Potential Forecast and therefore Oracle's guidance in 3Q FY01.

4.     In Exhibit 4 to my Rebuttal Report, I used data from Oracle's 3Q FY00 Upside Reports to perform my calculation for the historical pipeline conversion ratio from that quarter as it appeared to represent the most accurate information concerning Oracle's pipeline in that quarter. But as discussed in my deposition, there appears to have been an error in my calculation because of the differences in the FY00 Upside Reports and FY01 Upside Reports, which are attributable to differing budget rates in each year. After my deposition, I recalculated the pipeline conversion rates for 3Q FY00 using constant dollar licensing revenue information from Oracle's 3Q FY01 Upside

Reports (rather than 3Q FY00 Upside Reports).  This analysis is reflected in Exhibit C of this declaration.  The results continue to support my opinions.  In fact, the revised analysis reveals an even closer correlation between the historical pipeline conversion rate in 3Q FY00 and the Potential Forecast conversion rates that Oracle used for the Potential Forecast in 3Q FY01.  This data supports my opinion that the prior year conversion rate was the basis for Ms. Minton's Potential Forecast and therefore Oracle's guidance in 3Q FY01.

5.  Given defendants' denial that the historical pipeline conversion rate formed the basis of Ms. Minton's Potential Forecast, I performed an additional analysis to test the correlation between the historical pipeline conversion ratio and Ms. Minton's Potential Forecast.  *See* Ex. A, ¶5.  This analysis led to a disagreement between me and defendants' expert Dr. George Foster regarding whether seasonality and year-over-year growth explained my original results and not the forecast process employed by Jennifer Minton.  Dr. Foster raised these issues in the Rebuttal Declaration of George Foster ("Foster Rebuttal Declaration") (Docket No. 1241, Ex. 5).  In response, I performed an additional analysis designed to address Dr. Foster's issues.  *See* Ex. B, ¶¶21-33.  As I explained in the November 6, 2007 Declaration of Alan G. Goedde in Response to the Rebuttal Declaration of George Foster, that supplemental analysis independently supported my original opinion that the prior year's Pipeline conversion rate formed the basis of the Potential Forecast.  *Id.*, ¶33.  Given that my supplemental analysis resolves Dr. Foster's concerns, I intend to rely on that analysis to support my opinion at trial.  For convenience, I repeat in ¶¶6-18 of this declaration that analysis, which was described in ¶¶21-33 of my November 6, 2007 declaration.  *See* Ex. B.

**Analysis of the Correlation between Minton's Forecast Conversion Rate and the Prior Year Conversion Rate**

6.  To address Professor Foster's allegations that seasonal patterns and year-over-year growth in Oracle's license sales are responsible for the statistical significance of my results, I use a regression analysis that further corrects for these trends (in addition to Ms. Minton's use of the conversion rate from the identical week of the identical quarter from the prior year as a result of seasonality in Oracle's business, as I have discussed above).

7. I use what is commonly called an error correction model to correct for these trends. Error correction models are an accepted method of controlling for trends related to seasonality, time and other characteristics that appear in time series data, particularly when each of the variables in a regression is a time series. Hence, an error correction model is useful to further remove trends in both the Potential Forecast's conversion rate and the prior year's conversion rate. The error correction model adjusts for several factors affecting a regression analysis: time trends, seasonality and long term effects.

> The notion of an "Error Correction Model" (ECM) is considered to be a very powerful organizing principle in applied econometrics and has been applied widely.[1]

8. First, time trends are taken into account by reformulating the variables using a procedure called first differences, which defendants accept as a reliable method. Foster Rebuttal Declaration, ¶33. This process involves taking sequential differences between individual observations of each variable. The purpose is to eliminate time trends in variables which can obscure the causal relationship being tested by the regression. In this case I am using a regression analysis to test the causal relationship between the prior year's conversion rate and the Potential Forecast conversion rate.

9. The method of using first differences to remove time trends can be explained in the following example. I have listed below a series of numbers, such that the *only* relationship between them is that they are sequential over time. The first differences method creates a new series of numbers by subtracting each sequential number from its preceding value. Since the only relationship between these numbers is their sequence over time, the first differences method removes the time trend and reveals that the numbers are identical.

---

[1] *See, e.g.*, 5, No. 1 George Alogoskoufis & and Ron Smith, "On Error Correction Models: Specification, Interpretation, Estimation," *Journal of Econ. Surveys* (1991).

DECL OF ALAN G. GOEDDE (COMBINING PREVIOUS GOEDDE DECLS) IN SUPPORT OF
PLTFS' OPPOS TO DEFS' REVISED MOTION FOR SUMMARY JUDGMENT - C-01-0988-SI          - 3 -

EXAMPLE OF USING FIRST DIFFERENCES

| Week | Value | First Difference [(week 2-week 1), etc.] |
|---|---|---|
| Week 1 | 1 | – |
| Week 2 | 2 | 1 |
| Week 3 | 3 | 1 |
| Week 4 | 4 | 1 |
| Week 5 | 5 | 1 |

10. Similarly, using the first differences of the Potential Forecast conversion rate and the first differences of the prior year's conversion rate removes, or greatly reduces, the trends over time which can cause errors in a regression analysis. First differences is a commonly used statistical technique to eliminate, or greatly reduce the effect of time trends in a regression (more commonly known as autocorrelation).[2]

11. The second element of an error correction model involves a recognition that decisions made in the real world may be influenced by information from a time in the past when a similar decision was made. It makes sense to consider that current business decisions are based on knowledge acquired in the past. The forecast conversion rate includes the level of judgment Ms. Minton applies to reach her forecast.[3] One would expect that the judgment applied in any week could be partially explained by the judgment applied in prior weeks. Effects such as seasonality are well known to Oracle and it makes sense that Ms. Minton would consider these effects in developing her forecast. To account for these influences, while avoiding the time trends described above, the first differences of the prior week's Potential Forecast conversion rate is included as a variable to explain the first differences of the current Potential Forecast conversion rate.

---

[2] John Neter, *Applied Statistics* 803-06 (Boston: Allyn and Bacon 1993). There may be instances where it is necessary to consider additional steps to remove time trends. First differences has been shown to be successful in most time series data.

[3] Forecast Conversion Rate = Minton Forecast divided by Pipeline.

12.     A third type of change, according to the error correction model, involves longer term effects such as the effect of the actual value of the Potential Forecast conversion rate in prior periods. For example, the change in the amount of judgment in the Potential Forecast conversion rate could be expected to be influenced by the change in the judgment in the prior week (as discussed above) as well as the actual level of judgment. If Ms. Minton had included a large amount of judgment in a prior period, that might influence her decision-making regarding any changes in the amount of judgment in the current period. Similarly, the level of the prior year's conversion rate is included to test the influence of the conversion rate on Ms. Minton's decision to change the judgment in her forecast. For example, if the actual conversion rate was high in the previous year as a result of seasonal trends or other factors, Ms. Minton may use that information as part of her decision to change the amount of judgment included in her current Potential Forecast conversion rate.

13.     The results in Exhibit D, attached hereto, show that, by far, the most important variable in explaining changes in the Potential Forecast conversion rate is the change in the prior year's conversion rate. A common regression statistic known at the t-statistic of the coefficient of the independent variable is used to assess whether a predictable relationship exists between changes in the prior year's conversion rate and changes in the Potential Forecast conversion rate.

14.     My results show that the t-statistic of 17 is highly significant, indicating that a change in the value of the Potential Forecast conversion rate is highly correlated with a change in the prior year's conversion rate. In fact, the coefficient of this variable (1.072) indicates that the change in the prior year's conversion rate equates to nearly an identical change in the Potential Forecast conversion rate.[4]

15.     A second common regression statistic, the adjusted R Squared, measures the amount of variation in the change in the Potential Forecast conversion rate that is explained by the regression line. My analysis shows that over 82% of the variation in the change in the Potential Forecast conversion rate can be explained by the regression (R Bar**2 = .821 in Exhibit D, attached hereto).

---

[4]     An identical change would be indicated by a coefficient of 1.0.

16. The presence of trends over time is commonly referred to as autocorrelation of the regression residuals. To test for autocorrelation, I calculated the Durbin-Watson statistic. The results indicate that no autocorrelation is present (Durbin-Watson statistic = 1.92).[5]

17. By accounting for the effects of underlying trends, I have isolated the relationship between the changes in the Potential Forecast conversion rate and changes in the prior year's conversion rate. As demonstrated by a P-statistic of 0.0, I can conclude that there is literally a 0% chance that a change in the Potential Forecast conversion rate is uncorrelated with a change in the prior year's conversion rate.

18. The result corroborates my earlier results and the evidence presented by Oracle itself: the prior year's Pipeline conversion rate formed the basis of the Potential Forecast.

19. In both of my expert reports, I explained my opinion that "[i]n Q2 FY01, Larry Ellison directed significant changes to Oracle's forecast process that resulted in more 'risk' being included in future Field Forecasts and rendered Jennifer Minton's upside adjustments unreliable." I based my opinion on several internal Oracle e-mails and the deposition testimony of Larry Ellison explaining that Mr. Ellison changed the forecast process to eliminate what is known as "sandbagging" from Oracle's sales force. "Sandbagging" is a term used to describe a practice by sales representatives and executives of underestimating a forecast to ensure that the forecast can be reached.

20. Based upon my review of defendants' rebuttal expert reports, I learned for the first time that defendants are denying that Oracle's sales force actually followed Mr. Ellison's directive. As I explained in my deposition, this position caused me to perform an additional analysis to determine whether there was any validity to defendants' denial. That additional analysis shows that there is no support for these denials. Exs. E-G. In fact, it confirms that Oracle's U.S. license

---

[5] A Durbin-Watson statistic of more than 1.60 indicates no autocorrelation at the 1.0 percent level of significance, and is applicable in models including a single lagged dependent variable. *See* A.H. Studenmund, *Using Econometrics: A Practical Guide* 615 (Boston: Addison Wesley 4th ed. 2001). *See* 72, No. 1 H. Dezhbakhsh, "The Inappropriate Use of Serial Correlation Tests in Dynamic Linear Models," *Review of Econ. and Statistics* (Feb. 1990), at 131. The analysis also satisfies the Durbin h statistic. *See* Studenmund, *supra* at 616.

divisions actually followed Ellison's directive and added additional risk to the Field Forecast. *Id.* My review of a number of different reports reveals that the U.S. license divisions substantially increased "management judgment" to raise the Field Forecast after Mr. Ellison directed the Field to add more risk to their forecast. *Id.* While these divisions had used "management judgment" in prior quarters, the sudden jump in the size of that judgment after Mr. Ellison's directive supports my reading of the evidence that the Field followed that directive.

21.  In NAS, with the exception of the last week of the quarter in 3Q FY01, "management judgment" added anywhere from $62.2 million to $129 million to the Field Forecasts. *See* Ex. E. Prior to 3Q FY01, "management judgment" was negative most of the time and never reached higher than $24 million in any quarter dating back to 3Q FY00 except for in the first three weeks of 4Q FY00, the quarter following Oracle's extraordinary performance in 3Q FY00. In those three weeks, NAS added between $60 million and $125 million in judgment, but that judgment collapsed down to $7 million by the middle of the quarter and returned to the negative territory by quarter end. *Id.* In 2Q FY01, NAS increased its "management judgment" from negative $24.6 million at the beginning of the quarter to $21 million after Mr. Ellison's directive. It remained in the $20 million range for most of the quarter thereafter. This upward trend continued through 3Q FY01 and into 4Q FY01. "Management judgment" reached as high as $102.7 million in 4Q FY01 before declining by the end of the quarter. The "management judgment" trends in the NAS division further support my opinion that the Field followed Mr. Ellison's directive.

22.  The records for OSI are far less extensive but reveal the same pattern. Ex. F. The "OSI Forecast Summary Report by Product Category" reports on which I was able to find "management judgment" for OSI reveal dramatically increased amounts after Mr. Ellison's directive. *Id.* Those reports show that OSI added up to $94 million in "management judgment" in 3Q FY01, which was out of line with its prior practice. *Id.* Prior to Ellison's directive, OSI had added zero or negative management judgment (historical reports were apparently only produced for 1Q FY01 and 2Q FY01). *Id.* OSI responded to Mr. Ellison's directive in 2Q FY01 by adding up to $27 million in judgment at the end 2Q FY01. After OSI's $94 million in judgment in 3Q FY01, the OSI division added "management judgment" between $66.1 million and $102.7 million for 4Q FY01 – again out

1  of line with its practice before Mr. Ellison's directive. *Id.* The "management judgment" trends in OSI further support my opinion that the Field followed Mr. Ellison's directive.

23. The same is true for OPI. Ex. G. I understand that Edward Sanderson took over responsibility for OPI in late summer of 2000 during Oracle's 1Q FY01. In 2Q FY01, the first full quarter in which Sanderson had responsibility for that division, the records reveal consistent application of negative "management judgment" prior to Ellison's directive. *Id.* Shortly after that directive, "management judgment" jumped to $19 million and remained positive through the end of the quarter. *Id.* The same is true for 3Q FY01. With the exception of the first week of February 2001, OPI added positive "management judgment" through the entire quarter. *Id.* The first two reports of the quarter (Weeks 2 and 4) reflect "management judgment" for the entire forecast, $160 million and $150 million, respectively, and subsequent reports reflect management judgment as high as $25 million. *Id.* The reports in 4Q FY01 also reveal a consistent pattern of increasing "management judgment." *Id.* The "management judgment" trends in OPI further support my opinion that the Field followed Ellison's directive.

24. Counsel for plaintiffs have also asked me to address Oracle's argument that sequential increases in Gross Domestic Product ("GDP") for fixed investment in software in CY00 purportedly undermines my opinion that Oracle was facing a major macroeconomic change in 3Q FY01. During my deposition, counsel for Oracle presented me with a press release from the Bureau of Economic Analysis ("BEA"), which included GDP data for calendar quarters 4Q CY99 through 4Q CY00. I noted during my deposition that the raw data for each quarter in the software sector increased sequentially, but I testified that counsel was mischaracterizing the release because the data did not reflect the rate of growth in software, which is what I relied upon in forming my opinions. Since my deposition, I have analyzed the data further and note that it supports my opinion that fixed investment in software was decelerating throughout CY00. Ex. H. In fact, the broader measure of fixed investment in equipment and software actually contracted in 4Q CY00, which encompassed the first month of Oracle's 3Q FY01. *Id.*

25. The data shows that fixed investment for software peaked just after Oracle's 3Q FY00 and declined consistently thereafter until it fell sharply at the beginning of Oracle's 3Q FY01. *Id.*

DECL OF ALAN G. GOEDDE (COMBINING PREVIOUS GOEDDE DECLS) IN SUPPORT OF
PLTFS' OPPOS TO DEFS' REVISED MOTION FOR SUMMARY JUDGMENT - C-01-0988-SI     - 8 -

1  The rate of growth for fixed investment in software dropped from nearly 7% in 1Q CY00 to just
2  2.9% in 4Q CY00. The data also reveals that the broader measure of fixed investment in equipment
3  and software declined from 5% growth in 1Q CY00 to negative 1.6% in 4Q CY00. This data
4  supports my opinion that Oracle was facing a major macroeconomic change in 3Q FY01. I have
5  attached as Exhibits I and J to this declaration relevant excerpts of the BEA releases that form the
6  basis of this analysis. Exhibit I is the relevant part of the BEA release dated January 31, 2001, which
7  provided quarterly data from 4Q CY99 through 4Q CY00. Exhibit J is the relevant part of the BEA
8  release dated September 28, 2000, which provided quarterly data back to 2Q CY99.

9    26.    Exhibits C through H to this declaration are true and correct summaries of
10  voluminous writings pursuant to Federal Rule of Evidence 1006. The exhibits to my expert reports
11  also present true and correct summaries of voluminous writings. The source data for these exhibits
12  consist of writings too voluminous to be conveniently examined by the Court.

13    I declare under penalty of perjury under the laws of the United States of America that the
14  foregoing is true and correct. Executed this 16th day of November, 2008, at
15  Los Angeles, _____, California.

17                                              ALAN G. GOEDDE

19  Document1
20  S:\CasesSD\Oracle3\DEC00055662_Goedde Decl.doc

DECL OF ALAN G. GOEDDE (COMBINING PREVIOUS GOEDDE DECLS) IN SUPPORT OF
PLTFS' OPPOS TO DEFS' REVISED MOTION FOR SUMMARY JUDGMENT - C-01-0988-SI     - 9 -

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I further certify that I caused this document to be forwarded to the following designated Internet site at: http://securities.csgrr.com/.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 17, 2008.

      s/ DOUGLAS R. BRITTON
DOUGLAS R. BRITTON

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  dougb@csgrr.com

# Mailing Information for a Case 3:01-cv-00988-SI

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jennie@libertylaw.com

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Doug Britton**
  dougb@csgrr.com,jillk@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Joy Ann Bull**
  JOYB@csgrr.com

- **Dorian Estelle Daley**
  dorian.daley@oracle.com

- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,svdocket@lw.com,zoila.aurora@lw.com

- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com

- **Tera Marie Heintz**
  theintz@morganlewis.com,eeberline@morganlewis.com

- **Stacey Marie Kaplan**
  SKaplan@csgrr.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com,sf_filings@hbsslaw.com

- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com,#sfdocket@lw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **William S. Lerach**
  e_file_sd@lerachlaw.com

- **James C. Maroulis**
  jim.maroulis@oracle.com

- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com

- **Brian P Murray**
  bmurray@murrayfrank.com

- **Shinyung Oh**
  shinyungoh@paulhastings.com

- **Dawn S. Pittman**
  dpittman@morganlewis.com

- **Willow E. Radcliffe**
  willowr@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Mark Solomon**

marks@csgrr.com,e_file_sf@csgrr.com,sholloway@csgrr.com,e_file_sd@csgrr.com

- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com,aelishb@csgrr.com

- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Corey D. Holzer
Holzer Holzer & Cannon LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

Raymond Lane
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

PRG-Schultz USA, Inc.
Paul Hastings Janofsky & Walker LLP
55 Second Street
24th Floor
San Francisco, CA 94105

Darren Jay Robbins
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

Sanna Rachel Singer
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111

Monique C. Winkler
Coughlin Stoia Geller Rudman & Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111
```