1   LATHAM & WATKINS LLP                LATHAM & WATKINS LLP
      Peter A. Wald (SBN 85705)            Sean M. Berkowitz (*pro hac vice*)
2   505 Montgomery Street, Suite 2000   233 South Wacker Drive, Suite 5800
    San Francisco, CA 94111-2562        Chicago, IL 60606
3   Telephone: (415) 391-0600           Telephone: (312) 876-7700
    Facsimile: (415) 395-8095           Facsimile: (312) 993-9767
4   E-mail: peter.wald@lw.com           E-mail: sean.berkowitz@lw.com

5   LATHAM & WATKINS LLP
      Patrick E. Gibbs (SBN 183174)
6   140 Scott Drive
    Menlo Park, CA 94025
7   Telephone: (650) 328-4600
    Facsimile: (650) 463-2600
8   E-mail: patrick.gibbs@lw.com

9   Attorneys for Defendants ORACLE CORPORATION, LAWRENCE
    J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON
10

11  ORACLE CORPORATION
      Dorian Daley (SBN 129049)
      James C. Maroulis (SBN 208316)
12  500 Oracle Parkway
    Mailstop 5OP7
13  Redwood Shores, CA 94065
    Telephone: (650) 506-5200
14  Facsimile: (650) 506-7114
    E-mail: jim.maroulis@oracle.com
15
    Attorneys for Defendant ORACLE CORPORATION
16

17                    UNITED STATES DISTRICT COURT
18        NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION
19

20  In re ORACLE CORPORATION            Master File No. C-01-0988-SI
    SECURITIES LITIGATION               (Consolidated)
21                                      CLASS ACTION
22  _____
                                        DEFENDANT ELLISON'S OPPOSITION
23  This Document Relates To:           TO PLAINTIFFS' MOTION FOR
                                        SUMMARY JUDGMENT UNDER
24  ALL ACTIONS.                        SECTION 20A

25                                      Judge:   Honorable Susan Illston
                                        Date:    January 9, 2009
26                                      Time:    9:00 a.m.

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**TABLE OF CONTENTS**

Page

I.      SUMMARY OF ARGUMENT ................................................................................. 1

II.     LEGAL STANDARD FOR SUMMARY JUDGMENT ................................................ 4

III.    THE ELEMENTS REQUIRED UNDER SECTION 20A ............................................ 4

IV.     ELLISON DID NOT POSSESS MATERIAL NONPUBLIC
        INFORMATION WHEN HE SOLD ORACLE STOCK BETWEEN
        JANUARY 22 AND 31, 2001 ................................................................................. 5

        A.      The Legal Standard For Materiality ............................................................ 5

        B.      Oracle's Internal Forecast Supported Public Guidance When
                Ellison Traded ........................................................................................... 6

        C.      Plaintiffs Have Failed To Show That Intra-Quarter Data Indicated
                A "Substantial Likelihood" Of An "Extreme Departure" From
                Public Guidance ......................................................................................... 6

                1.      The January 17, 2001 Flash Report ................................................ 7

                2.      Oracle's Pipeline Data .................................................................... 8

        D.      None Of Plaintiffs' Allegations Regarding Oracle's Internal
                Forecasting Process Demonstrates That Oracle Lacked A
                "Reasonable Basis" For Its 3Q01 Public Guidance .................................... 10

                1.      Oracle's 3Q01 Potential Projection Was Not Based On A
                        Mechanical Application Of The 3Q00 Conversion Rate To
                        The 3Q01 Pipeline ........................................................................ 11

                2.      The Purported "Major Economic Change" Did Not Render
                        Oracle's Forecasts "Unreasonable" ............................................... 13

                3.      The Alleged "Directive" By Ellison Did Not Render
                        Oracle's Forecasts "Unreasonable" ............................................... 16

                4.      The Product Mix In Oracle's Pipeline Did Not Render
                        Oracle's Forecasts "Unreasonable" ............................................... 18

        E.      Neither Plaintiffs' Suite 11i Nor Accounting Allegations
                Demonstrates That Oracle Lacked A "Reasonable Basis" For Its
                3Q01 Public Guidance ............................................................................... 19

                1.      Plaintiffs' Suite 11i Allegations Are Meritless .............................. 19

                2.      Plaintiffs' Accounting Allegations Are Meritless .......................... 22

                        a.      Plaintiffs' Accounting Allegations Have Nothing to
                                Do With Oracle's 3Q01 Guidance .................................... 23

b.     Plaintiffs' New Accounting Allegations Are Immaterial ............................................................ 24

c.     Plaintiffs' New Accounting Allegations Are Unsupported and Unsupportable........................... 25

(1)    The HP Transaction ....................................... 25

(2)    The Bad Debt Transfers ................................. 27

V.     PLAINTIFFS HAVE NOT SHOWN THAT ELLISON ACTED WITH SCIENTER ................................................................................ 27

A.     Plaintiffs Must Prove Specific Intent To Establish Liability For A 20A Claim............................................................................. 27

B.     Plaintiffs Have Not Established That Ellison Was "Aware" of Material Non-Public Information ...................................... 29

C.     The Undisputed Facts Are Inconsistent With A Finding That Ellison Traded "On The Basis Of" Any Material Non-Public Information .......................................................................... 29

1.     The Undisputed Facts Demonstrate A "Credible And Wholly Innocent" Explanation For Ellison's Sales ............................ 31

2.     Ellison Did Not "Suddenly Deviate" From A Plan To Sell In April........................................................................ 32

VI.    PLAINTIFFS CANNOT PROVE AN INDEPENDENT VIOLATION OF THE SECURITIES EXCHANGE ACT ................................................ 33

A.     Plaintiffs Cannot Rely On Ellison's Trading To Establish A "Predicate" Exchange Act Violation ...................................... 33

B.     Plaintiffs Have Not Demonstrated Loss Causation ........................... 34

1.     Loss Causation Requires Disclosure Of The "Relevant Truth".......................................................................... 34

2.     The "Relevant Truth" Means The Specific Facts That Plaintiffs Claim Were Concealed........................................ 35

3.     There Was No "Direct Disclosure" Of The "Relevant Truth".......................................................................... 36

a.     The Effect Of The Economy On Oracle's Business During 3Q01 ........................................ 36

b.     The Basis For Oracle's 3Q01 Guidance ...................... 37

c.     Alleged "Problems With Suite 11i"........................... 38

d.     Oracle's 2Q01 Results ............................................... 38

4.   There Was No "Indirect Disclosure" Of The "Relevant Truth".................................................................................... 38

a.   Analysts Uniformly Understood Oracle's Announcement To Reflect A Sharp And Sudden Industry-Wide Downturn........................................... 39

b.   Subsequent Industry Events Proved The Analysts Correct.................................................................................. 42

5.   Plaintiffs Have Failed To Adduce Evidence Attributing A Specific Portion Of The March 2, 2001 Stock Drop To Disclosure Of The Alleged Fraud (Disaggregation)............................... 43

VII.   PLAINTIFFS' REQUESTED ADVERSE INFERENCE IS INAPPROPRIATE ................................................................................ 45

A.   Plaintiffs' Proposed Scope For The Adverse Inference Based On Ellison's Emails And The *Softwar* Materials Is Grossly Overbroad ................. 45

1.   Plaintiffs Improperly Request Inferences On Issues Outside The Scope Of The Order................................................................. 46

2.   Plaintiffs Improperly Request Inferences Regarding The Underlying Facts As Opposed To Ellison's Knowledge ....................... 48

B.   Plaintiffs Are Not Entitled To An Adverse Inference Based On Symonds' Invocation Of The Fifth Amendment ............................... 50

VIII.   CONCLUSION........................................................................................ 50

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

ELLISON'S OPP. TO PLS.' MSJ AGAINST ELLISON
Master File No. C-01-0988-SI

1

# TABLE OF AUTHORITIES

2

**Page**

3

### CASES

4    *Bird v. Glacier Elec. Coop., Inc.*,
     255 F.3d 1136 (9th Cir. 2001) ............................................................. 4

5

6    *Brodsky v. Yahoo!, Inc.*,
     No. C 08-02150 CW, 2008 WL 4531815 (N.D. Cal. Oct. 7, 2008) .............................. 35, 38

7    *Calexico Warehouse, Inc. v. Neufeld*,
     259 F. Supp. 2d 1067 (S.D. Cal. 2002) .................................................... 4

8

9    *Carpe v. Aquila, Inc.*,
     No. 02-0388-CV-W-FJG, 2005 WL 1138833 (W.D. Mo. Mar. 23, 2005) ........................... 44

10    *Dura Pharms., Inc. v. Broudo*,
     544 U.S. 336 (2005) ....................................................... 34, 35, 36, 43

11

12    *Glaser v. Enzo Biochem, Inc.*,
     464 F.3d 474 (4th Cir. 2007) ............................................................ 35

13    *Hamilton v. Signature Flight Support Corp.*,
     2005 U.S. Dist. LEXIS 40088 (N.D. Cal. Dec. 20, 2005) .............................. 46, 47, 48, 49

14

15    *In re Able Labs. Sec. Litig.*,
     2008 U.S. Dist. LEXIS 23538 (D.N.J. Mar. 24, 2008) ..................................... 34

16    *In re Adobe Sys., Inc. Sec. Litig.*,
     787 F. Supp. 912 (N.D. Cal. 1992) ........................................................ 5

17

18    *In re Citric Acid Litigation*,
     996 F. Supp. 951 (N.D. Cal. 1998) ....................................................... 50

19    *In re Connectics Corp. Sec. Litig.*,
     No. C 07-02940 SI, 2008 WL 3842938 (N.D. Cal. Aug. 14, 2008) ........................ 5, 33, 34

20

21    *In re Daou Sys., Inc.*,
     411 F.3d 1006 (9th Cir. 2005) ........................................................... 34

22    *In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
     258 F. Supp. 2d 576 (S.D. Tex. 2003) .................................................... 33

23

24    *In re Gilead Sciences Sec. Litig.*,
     536 F.3d 1049 (9th Cir. 2008) ........................................................... 34

25    *In re IKON Office Solutions, Inc. Sec. Litig.*,
     131 F. Supp. 2d 680 (E.D. Pa. 2001) ............................................. 35, 36, 39, 43

26

27    *In re Impac Mortg. Holdings, Inc. Sec. Litig,*,
     544 F. Supp. 2d 1083 (C.D. Cal. 2008) ................................................... 37

28

*In re Imperial Credit Indus., Inc. Sec. Litig.*,
   252 F. Supp. 1005 (C.D. Cal. 2003) ........................................................................ 44

*In re Intelligroup Sec. Litig.*,
   527 F. Supp. 2d 262 (D.N.J. 2007) .......................................................................... 35

*In re JDS Uniphase Corp. Sec. Litig.*,
   No. C 02-1486 CW, 2007 U.S. Dist. LEXIS 76936 (N.D. Cal. Sept. 27, 2007) ................. 33

*In re Odyssey Healthcare, Inc. Sec. Litig.*,
   424 F. Supp. 2d 880 (N.D. Tex. 2005) ..................................................................... 36

*In re Omnicom Group, Inc. Sec. Litig.*,
   541 F. Supp. 2d 546 (S.D.N.Y. 2008) ........................................................... 35, 43, 44, 45

*In re Oracle Corp. Deriv. Litig.*,
   867 A.2d 904, 906 (Del. Ch. 2004), *aff'd* No. 561, 2004 (Del. Apr. 14, 2005) ........... passim

*In re Oracle Corp. Sec. Litig.*,
   380 F. 3d 1226, 1231-32 (9th Cir. 2004) .................................................................. 20

*In re TECO Energy, Inc. Sec. Litig.*,
   No. 8:04-CV-1948-T-27 EAJ, 2006 WL 845161 (M.D. Fla. Mar. 30, 2006) ...................... 36

*In re VeriFone Sec. Litig.*,
   11 F.3d 865 (9th Cir. 1993) .................................................................................. 33

*In re Williams Sec. Litig.*,
   496 F. Supp. 2d 1195 (N.D. Okla. 2007) ......................................................... 43, 44, 45

*In re Zonagen Sec. Litig.*,
   322 F. Supp. 2d 764 (S.D. Tex. 2003) ............................................................ 43, 44, 45

*Johnson v. Aljian*,
   490 F.3d 778 (9th Cir. 2007) ........................................................................... 5, 33

*Kaplan v. Rose*,
   49 F.3d 1363 (9th Cir. 1994) ............................................................................... 32

*Keithley v. The Home Store.com, Inc.*,
   No. C-03-04447 (EDL), 2008 U.S. Dist. LEXIS 61741 (N.D. Cal. Aug. 12,
   2008) ....................................................................................................... 46, 48

*Kontos v. Kontos*,
   968 F. Supp. 400 (D. Ind. 1997) .......................................................................... 50

*Lattanzio v. Deloitte & Touche LLP*,
   476 F.3d 147 (2d Cir. 2007) ............................................................................... 43

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161, 173 (2d Cir. 2005) ..................................................................... 35, 40

*Lewis v. Telephone Empl. Credit Union*,
   87 F.3d 1537 (9th Cir. 1996) ......................................................................... 45, 49

*LiButti v. United States,*
    107 F.3d 110 (2d Cir. 1997)................................................................................50

*Lipton v. Pathogenesis Corp.,*
    284 F.3d 1027 (9th Cir. 2002) ...............................................................................5

*McCabe v. Ernst & Young, LLP,*
    494 F.3d 418 (3d Cir. 2007)........................................................................35, 38

*McKowan Lowe & Co., Ltd. v. Jasmine, Ltd.,*
    No. Civ. 94-5522 RBK, 2005 WL 1541062 (D.N.J. June 30, 2005), *aff'd*, 231
    Fed. Appx. 216 (3d Cir. 2007)......................................................................passim

*Metzler Investment GMBH v. Corinthian Colleges,*
    540 F.3d 1049 (9th Cir. 2008) ................................................34, 35, 36, 38

*Oscar Private Equity Inv. v. Allegiance Telecom, Inc.,*
    487 F.3d 261 (5th Cir. 2007)......................................................................45, 46

*Ray v. Citigroup Global Markets, Inc.,*
    482 F.3d 991 (7th Cir. 2007) ...............................................................................40

*Robbins v. Kroger Properties, Inc.,*
    116 F.3d 1441 (11th Cir. 1997)..................................................................35, 43

*Rudy-Glanzer v. Glanzer,*
    232 F.3d 1258 (9th Cir. 2000) ............................................................................50

*Ryan v. Flowserve Corp.,*
    245 F. Supp. 2d 560 (N.D. Tex. 2007) ...........................................................passim

*Shaw v. Digital Equip. Corp.,*
    82 F.3d 1194 (1st Cir. 1996).............................................................................5, 8

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,*
    128 S.Ct. 761 (2008)............................................................................................34

*Tricontinental Indus., Ltd. v. PriceWaterhouseCoopers, LLP,*
    475 F.3d 824 (7th Cir. 2007) ......................................................................35, 36

*U.S. v. O'Hagan,*
    521 U.S. 642 (1997)............................................................................................33

*Zubulake v. UBS Warburg LLC,*
    229 F.R.D. 422 (S.D.N.Y. 2004) ..........................................................46, 48, 49

## STATUTES

15 U.S.C. § 78t-1(a) ................................................................................................4

15 U.S.C. § 78u-4(b)(1)(B)....................................................................................35

## RULES

17 C.F.R. §240.10b-5-1 ..................................................................................28, 30

17 C.F.R. §240.10b-5-1(a) ........................................................................................ 33

17 C.F.R. §240.10b-5-1(b) ........................................................................................ 28

17 C.F.R. §240.10b-5-1(c) .................................................................................. 30, 33

**OTHER AUTHORITIES**

Carol B. Swanson, *Insider Trading Madness:  Rule 10b5-1 and the Death of Scienter*, 52 Kan. L. Rev. 147, 204 (2003) ............................................................... 28

Selective Disclosure and Insider Trading, Exchange Act Release No. 43154, 2000 SEC LEXIS 1672 ................................................................................................... 29

Stuart Sinai, *A Challenge to the Validity of Rule 10b5-1*, 30 Sec. Reg. L.J. 261 (2002) ................................................................................................................... 28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

vii

ELLISON'S OPP. TO PLS.' MSJ AGAINST ELLISON
Master File No. C-01-0988-SI

# I.    SUMMARY OF ARGUMENT

Larry Ellison sold just over 2% of his Oracle stock in January 2001.  When those sales were made, Oracle's internal forecasts projected that Oracle was on track to achieve its public guidance for 3Q01—and enjoy yet another record quarter.  At the time, Ellison had options to purchase over 22 million Oracle shares that would expire in seven months, with just three trading windows left in which to exercise them.  Ellison thus faced the risk of losing half a billion dollars if during any one of those trading windows he came into possession of material nonpublic information (*e.g.*, a major acquisition or merger), preventing him from exercising those options.

Given this risk, Philip Simon, Ellison's financial advisor, advised Ellison to exercise the options.  Simon also recommended that Ellison sell additional shares to pay down debt.  Heeding this advice, in January 2001 Ellison directed Simon to exercise the options and sell a total of 40 million shares of Oracle stock.  In so doing, Ellison placed a number of restrictions on the sales that are wholly inconsistent with Plaintiffs' claim that he sold to avoid an impending stock drop.  Ellison capped the daily volume for his trades, imposed a price floor, and declined to sell any shares in February, though he had been cleared to do so.  As a result, Ellison sold only 29 million of the 40 million shares that he and Simon originally had planned to sell—just 2% of the over 1.39 billion Oracle shares and options that Ellison held at the time.

In evaluating nearly identical insider trading allegations against Ellison, the Delaware Chancery Court looked at the same stock sales, applied the federal standard for "material nonpublic information," examined the same internal financial information known to Ellison when he sold, and granted summary judgment in Ellison's favor.  The Court concluded that "no rational trier of fact could find that . . . Ellison . . . possessed material, nonpublic financial information as of the time of [his] trades[.]"  *In re Oracle Corp. Deriv. Litig.*, 867 A.2d 904, 906 (Del. Ch. 2004), *aff'd* No. 561, 2004 (Del. Apr. 14, 2005).  Remarkably, Plaintiffs' motion here never even mentions the Chancery Court's decision.  But four years after that decision, and despite massive discovery in this case, Plaintiffs are unable to set forth facts sufficient to sustain their claims at summary judgment.  Given the complete failure of proof on every element of Plaintiffs' Section 20A claim, this Court should enter summary judgment for Defendants.

**First,** Plaintiffs have not shown that when Ellison traded he was in possession of *material* nonpublic information.  It is undisputed that Oracle's internal forecasts supported the public guidance that was announced on December 14, 2000, and continued to support that guidance throughout the period during which Ellison traded.  None of the intra-quarter data that Plaintiffs cite suggested *any* deviation from Oracle's guidance—much less the "substantial likelihood" of an "extreme departure" from guidance that is required to prove such data "material."  Faced with this undisputed evidence, Plaintiffs now claim that Ellison should have disregarded Oracle's forecasting process because it had become "unreliable" in 3Q01 (despite seven consecutive quarters of success)—due to alleged "changes" in market circumstances and in the forecasting process itself.  20A MSJ at 3-20, 35-39.  But plaintiffs have simply invented most of these alleged "changes" in a transparent effort to circumvent the Chancery Court's findings—and in any event, have failed to meet their burden of showing that any of them so undermined Oracle's forecasting process that its public guidance lacked a "reasonable basis."

**Second**, Plaintiffs have not shown that Ellison traded with scienter because they have not shown he was aware that information in his possession was "material," *i.e.*, suggested the "substantial likelihood" of an "extreme departure" from Oracle's public guidance.  Oracle's internal forecasts clearly supported its public guidance throughout the period of Ellison's trades, and there is zero evidence that Ellison believed Oracle was going to miss its guidance until the very end of the quarter—when unbeknownst to Ellison and other market participants, the United States economy entered a recession.  Furthermore, the undisputed evidence shows that Ellison had wholly innocent reasons for selling stock in January 2001—namely, to exercise more than half a billion dollars worth of stock options before they expired, in order to pay taxes and retire debt.  Where, as here, there is rebuttal evidence of an innocent reason for selling stock, those sales do not support an inference of scienter.

**Third,** Plaintiffs cannot establish the predicate Section 10(b) violation that is necessary to sustain their Section 20A claim.  As discussed in Defendants' Motion for Summary Judgment, Plaintiffs' predicate Section 10(b) claim fails on several grounds.  This failure is most clear on the element of loss causation.  There is no evidence that Oracle's stock price declined on March

2, 2001 because the market learned of and reacted to disclosure of the "relevant truth"—*i.e.*, the specific facts Plaintiffs claim were fraudulently concealed.  On the contrary, Oracle told the market that its earnings miss was the result of many deals falling through at the very end of the quarter, due to mounting customer concerns about the economy—not because Oracle's guidance lacked a reasonable basis, and not because of problems with Suite 11i or Oracle's accounting for its 2Q01 results.  Market analysts uniformly interpreted Oracle's announcement not as a disclosure of what Plaintiffs claim is the "relevant truth," but as a sign that the enterprise software industry had entered into a sharp and sudden downturn—an understanding that was confirmed in the ensuing weeks as dozens of other enterprise software companies missed or lowered their own guidance.  Indeed, in November 2001—six months after the end of Oracle's 3Q01—the National Bureau of Economic Research ("NBER") confirmed that the United States economy had entered into a recession in March 2001.  Plaintiffs' complete failure of proof on loss causation entitles Defendants to summary judgment on each of Plaintiffs' claims, including Section 20A.

**Finally,** the Court's September 2, 2008 Order ("Order") granting Plaintiffs an adverse inference does not save their Section 20A claim.  In its Order, the Court ruled that the loss of Ellison's e-mails and *Softwar* materials would give rise to an inference that he had "knowledge" regarding several issues—namely, problems with Oracle's forecasting model, the effect of the economy on Oracle's business, and problems with Suite 11i.  But nothing in the Order suggests that Plaintiffs can use the inference to simply make up facts that do not otherwise appear in the massive evidentiary record compiled here.  Nor would such an inference be justified under the case law, which requires that sanctions be carefully tailored to eliminate actual prejudice while assuring that cases are resolved on their merits.  Here, at most, Plaintiffs may have lost evidence that Ellison was aware of certain facts, but there is no basis to conclude that Plaintiffs lost any unique evidence about any alleged problems with Oracle's forecasting model, the effect of the economy on Oracle's business, or problems with Suite 11i.  Thus, although the inference may relieve Plaintiffs of showing that Ellison was aware of facts they can otherwise prove regarding those issues, the burden remains on Plaintiffs to prove the underlying facts—and to demonstrate

1  that those facts support their Section 20A claim.  This Plaintiffs cannot do, as their ubiquitous

2  reliance on the "adverse inference" to fill numerous gaps in their case powerfully attests.

3      In sum, Plaintiffs' Motion exposes several key failures of proof on their Section 20A

4  claim.  As such, not only should it be denied, but summary judgment should be entered against

5  Plaintiffs on this claim.

6  **II.      LEGAL STANDARD FOR SUMMARY JUDGMENT**[1]

7      In seeking summary judgment, Plaintiffs must demonstrate that undisputed material facts

8  entitle them to judgment as a matter of law.  *Calexico Warehouse, Inc. v. Neufeld*, 259 F. Supp.

9  2d 1067, 1075 (S.D. Cal. 2002).  If Plaintiffs fail to meet this burden, their motion must be

10  denied.  *Id.*  In fact, because the record shows that there are no genuine issues of material fact,

11  and that Defendants are entitled to judgment as a matter of law, this Court may enter summary

12  judgment against Plaintiffs.  *See Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1152 (9th Cir.

13  2001); *see also generally* Defendants' Motion for Summary Judgment ("DMSJ").

14  **III.     THE ELEMENTS REQUIRED UNDER SECTION 20A**

15      Section 20A of the Securities Exchange Act of 1934 ("Exchange Act") provides:

16      Any person who violates any provision of this title or the rules or regulations
17      thereunder by purchasing or selling a security while in possession of material,
        nonpublic information shall be liable in an action in any court of competent
18      jurisdiction to any person who, contemporaneously with the purchase or sale of
        securities that is the subject of such violation, has purchased (where such
19      violation is based on a sale of securities) or sold (where such violation is based on
        a purchase of securities) securities of the same class.

20  15 U.S.C. § 78t-1(a).  Thus, to prevail under Section 20A, Plaintiffs must prove that (1) Ellison

21  possessed material nonpublic information when he sold Oracle stock between January 22 and

22  January 31, 2001; (2) Ellison acted with scienter; (3) Plaintiffs traded "contemporaneously" with

23  Ellison; and (4) Ellison committed an "independent" violation of the Exchange Act.  *See*

24

---

25  [1] All Exhibits cited herein are true and correct copies of exhibits attached to the Guner (Exs. 1-28) (Dkt. No. 1184), Bicho (Exs. 29-40) (Dkt. No. 1186), Deal (Exs. 42-43) (Dkt. No. 1188),
26  Anthony (Exs. 44-53) (Dkt. No. 1192), Harrison (Exs. 41, 51, 54-245) (Dkt. No. 1193), Coyle (Exs. 251-322, Ex. 362) (Dkt. No. 1225), Busby (Exs. 323-361) (Dkt. No. 1237), Tate (Exs. 363-
27  393) (Dkt. No. 1243), Fortney (Exs. 394-429) (Dkt. No. 1525), O'Bryan (Exs. 1-2) (Dkt. No. 1504), James (Exs. 1-2) (Dkt. No. 1505), and Yourdon (Exs. 1-2) (Dkt. No. 1501) declarations,
28  the *concurrently-filed* Farthing declaration (Exs. 430-462), or Plaintiffs' exhibits in support of their Motion ("PX __").

1  *Johnson v. Aljian*, 490 F.3d 778, 781 (9th Cir. 2007); *Lipton v. Pathogenesis Corp.*, 284 F.3d

2  1027, 1035 n.15 (9th Cir. 2002).  Plaintiffs have failed to establish any of these elements.[2]

3  **IV.     ELLISON DID NOT POSSESS MATERIAL NONPUBLIC INFORMATION**
4  **        WHEN HE SOLD ORACLE STOCK BETWEEN JANUARY 22 AND 31, 2001**

5      **A.     The Legal Standard For Materiality**

6        Plaintiffs claim that when Ellison sold Oracle stock between January 22 and 31, 2001, he

7  possessed "material non-public information" indicating that Oracle would not meet its 3Q01

8  public guidance.  20A MSJ at 1-2.  In advancing this claim, Plaintiffs fail to cite—let alone

9  discuss—a single case analyzing the key question of what constitutes "material nonpublic"

10  information, in the context of a missed forecast claim.  Having failed to address the applicable

11  legal standard, Plaintiffs cannot show that they are entitled to a judgment as a matter of law.

12        Two related legal standards apply to Plaintiffs' claims.  First, the claim that Ellison

13  "knew" Oracle's December 14 guidance was false when given is evaluated under *In re Adobe*

14  *Sys., Inc. Sec. Litig.*, 787 F. Supp. 912, 916-17 (N.D. Cal. 1992).  Under *Adobe*, Ellison did not

15  possess material nonpublic information regarding Oracle's 3Q01 guidance unless he was aware

16  of facts showing that Oracle had no "reasonable basis" for that guidance, or of facts "tending

17  seriously to undermine" it.  *See id.* at 916-17.  Second, the claim that Ellison received material

18  nonpublic information about the quarter after Oracle issued its guidance—so-called "intra-

19  quarter data"—is subject to the standard set forth in *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194,

20  1210 (1st Cir. 1996).  Under that standard, intra-quarter data is not material unless it creates a

21  "substantial likelihood" of an "extreme departure" from announced guidance.  *See id.*

22

23  [2] Contrary to Plaintiffs' arguments, 20A MSJ at 30 n.16, lead Plaintiffs Kuehmichel and Chu
both purchased their Oracle stock on January 23, 2001.  PX 106 at MORSTAN 0102 (noting that
24  Chu's Oracle shares were "acquired" on "01/23/01").  *Compare id*. at MORSTAN 0101 (noting
the Oracle shares were purchased at $31.75) *with* RJN Ex. 1 (noting that Oracle did not trade at
25  $31.75 on January 26th).  Thus, the only date on which any of the lead Plaintiffs could have
traded with Ellison was January 23, 2001.  As this Court has held, a single instance of purported
26  contemporaneous trading is insufficient to sustain a Section 20A claim.  *In re Connectics Corp.*
*Sec. Litig.*, No. C 07-02940 SI, 2008 WL 3842938, at *12 (N.D. Cal. Aug. 14, 2008) (dismissing
27  § 20A claim as to Higgins even though complaint contained "one allegation of contemporaneous
trading" against him).  And there is no evidence that any lead plaintiff traded contemporaneously
28  with Henley.  Accordingly, summary judgment on this claim should be entered in favor of both
Ellison and Henley.  *See id.* at *13-14.

**B.      Oracle's Internal Forecast Supported Public Guidance When Ellison Traded**

Plaintiffs simply ignore the central undisputed fact in this case.  Both before and during the period when Ellison sold stock, Oracle's internal forecast projected that Oracle would meet or exceed its public guidance.  DMSJ at 6-16.  Indeed, from the time Oracle issued its guidance on December 14, 2000, up to and including the time Ellison finished trading at the end of January 2001, Oracle's internal forecast—the "Potential" or "Potential Projection" in the "Upside Report"—predicted EPS above or in line with Oracle's public guidance:

| Date | December 11 | December 25 | January 15 | January 22 | January 29 |
|---|---|---|---|---|---|
| EPS[3] | 13 cents | 13 cents | 12 cents | 12 cents | 12 cents |

These projections were based on an internal forecasting process that had proven to be highly accurate, albeit conservative.  In each of the seven quarters preceding 3Q01, Oracle's final results either met or exceeded the Potential Projection, as well as its public guidance or analysts' consensus estimates.  Ex. 42.  It is not surprising, then, that in considering a state law insider trading claim based on Ellison's January 2001 stock sales, Vice Chancellor Strine granted summary judgment for Ellison, finding "no rational trier of fact" could conclude that Ellison possessed material nonpublic information indicating that Oracle would miss its 3Q01 guidance when he traded.  *Oracle Deriv.*, 867 A.2d at 904.  The Chancery Court found that Oracle's 3Q01 miss was "unprecedented," that the "bottom fell out" in the last few days of the quarter, and that there was no evidence that Ellison or anyone else at Oracle "saw it coming."  *Id.* at 851-52.

**C.      Plaintiffs Have Failed To Show That Intra-Quarter Data Indicated A "Substantial Likelihood" Of An "Extreme Departure" From Public Guidance**

Plaintiffs argue that when Ellison sold stock in January 2001, he was aware of material nonpublic information in the form of "actual sales and pipeline data" from the first month of the quarter.  20A MSJ at 32-35.  In granting summary judgment for Ellison, Vice Chancellor Strine analyzed precisely the same "actual sales and pipeline data" and concluded that no rational trier of fact could find this information "material."  *Oracle Deriv.*, 867 A.2d at 943-48.  Plaintiffs

---

[3] Exs. 1-4, 394 (all figures rounded per Oracle's disclosed practice).

1   offer no reason for this Court to reach a different conclusion.

2               **1.**        **The January 17, 2001 Flash Report**

3          Plaintiffs claim that the January 17, 2001 Flash Report, which showed preliminary actual

4   results for December 2000, reflected material nonpublic information because it showed "negative

5   growth rates" in the U.S. license sales divisions.  20A MSJ at 31-34.  Indeed, Plaintiffs argue,

6   without any evidentiary support, that Ellison decided to sell his stock because he was concerned

7   about the sales figures in the Flash Report.  20A MSJ at 1.

8          Despite Plaintiffs' attempts to characterize the January 17 Flash Report as "bad news,"

9   the undisputed evidence proves exactly the opposite:  Oracle's December 2000 results were in

10  line with its public guidance and with its results in prior quarters—when Oracle had *met* its

11  revenue targets.  The January 17 Flash Report showed that, as compared to the same period a

12  year earlier, Oracle's license revenue in December had grown by 35%—far better than the 25%

13  growth publicly projected for the full quarter.  Ex. 9 at 306579.  The Report also showed that

14  December license revenue equaled 19% of Oracle's full 3Q01 license revenue guidance,

15  compared to 16% and 19% of quarterly license revenue represented by December sales in 3Q00

16  and 3Q99, respectively.  *Id.* at 306577.  Plaintiffs cite no evidence that anyone at Oracle thought

17  these results suggested a shortfall in overall results for the quarter.  *See* DMSJ at 10-11.

18         Nonetheless, Plaintiffs argue that the Flash Report raised a red flag because U.S. license

19  revenue *would have shown* "negative growth" if the Company had not closed a $60 million deal

20  with Covisint, the largest deal in Oracle's history.  Ex. 9 at 306577-78.  The Chancery Court

21  rejected this very argument:  "As much as they would like to imagine otherwise, [Plaintiffs] need

22  to accept that the Covisint transaction occurred and that it generated real revenue that counted

23  towards Oracle's achievement of the [public guidance]."  *Oracle Deriv.*, 867 A.2d at 946; *see*

24  *also* Ex. 323 at 316:15-25.

25         As the Chancery Court also explained, "the December 2000 results are precisely the sort

26  of intra-quarter data that courts have considered immaterial, as they did not create any substantial

27  likelihood that Oracle would fall short of the Market Estimates."  *Oracle Deriv.*, 867 A.2d at

28  948.  Indeed, because Oracle earns the majority of its quarterly license revenue in the final week

of a given quarter (the so-called "hockey stick" effect), Ellison and other insiders thought the first month's revenues were "by no means an accurate predictor" of results for the quarter. Ex. 323 at 292:17-294:6; *see also* Ex. 324 at 365:23-366:8. It is precisely because such intra-quarter data are not useful in predicting quarterly results that *Shaw* sets such a high bar for "materiality": under *Shaw*, the intra-quarter data in the January 17 Flash Report was not material because it did not create a "substantial likelihood" of an "extreme departure" from Oracle's public guidance. If it showed anything at all, it showed that Oracle's December revenues were better than the prior year (19% of guidance, instead of 16%), reflected a growth rate that exceeded public guidance (35% vs. 25%), and included a very large deal (Covisint).

### 2.  Oracle's Pipeline Data

Plaintiffs also claim that Ellison possessed material nonpublic information because he knew that Oracle's pipeline *growth* had declined from 52% at the beginning of December to 34% by the end of December. *See* 20A MSJ at 34-35.[4] Plaintiffs characterize this as a "collapse" in the pipeline. *See id.* The Chancery Court rejected this argument as well, characterizing it as coming "very close to failing the straight face test" and "nowhere near avoiding summary judgment" for defendants because Oracle's pipeline data did not indicate "some substantial likelihood that the quarter would turn out to be an extreme departure from publicly known trends" or projections. *Oracle Deriv.*, 867 A.2d at 944; *Shaw*, 82 F.3d at 1210.

Plaintiffs' repeated claim that Oracle's pipeline "collapsed" during 3Q01 is contrary to the undisputed evidence and rests on the absurd notion that Ellison should have been concerned about 34% growth in the pipeline—a strong rate of growth by any measure, and far more than the 25% overall license growth Oracle had projected for the quarter. *See* 20A MSJ at 34-35. In fact, as the evidence plainly shows, Oracle's executives *expected* the pipeline to decline from the 52% growth rate reflected in the December 11, 2000 Pipeline Report—because decreases in pipeline growth over the course of a given quarter were a normal part of Oracle's business. Ex. 327 at 48, Table 9 (showing Oracle's pipeline growth rates dropped in the first two months of

---

[4] Plaintiffs' reference to pipeline data from February 2001 is irrelevant, since Ellison's last sale occurred on January 31. *See* 20A MSJ at 1, 23. In fact, Oracle's pipeline growth exceeded its guidance of 25% license growth before and during Ellison's trades. Exs. 3-4, 12, 394.

1  1Q01 and 2Q01, but Oracle met its forecast in each of those quarters).  In part for that reason,

2  Henley announced guidance on December 14, 2000 that was "more conservative" than the

3  December 11 pipeline figures might have implied.  Ex. 71 at 354:3-355:3.  Because the forecast

4  was based on an assumption that the 52% pipeline growth rate would decline, it is little wonder

5  that Plaintiffs have found no evidence that anyone at Oracle believed the decrease from 52% to

6  34% pipeline growth would prevent Oracle from meeting its 25% growth rate guidance.

7          Furthermore, Oracle executives testified that changes in pipeline growth during the

8  quarter were not used as a forecasting measure.[5]  *See* Ex. 324 at 384:6-15; Ex. 329 at 334:14-24;

9  *see also Oracle Deriv.*, 867 A.2d at 952.  As Henley explained, "the pipelines typically come

10 down over the course of a quarter because deals slip and so forth … [s]o you wouldn't expect the

11 pipeline to be as large at the end of January as it is . . . starting out in December, for instance."

12 Ex. 324 at 384:6-15.  Even when, as expected, the pipeline diminished, it still represented a

13 "very healthy growth rate."  Ex. 71 at 354:7-14, 356:17-21 ("it was not a big surprise").

14         Plaintiffs' claim that the so-called "comfort gap" was "smaller than usual" and "had been

15 negative for weeks" is simply irrelevant.  20A MSJ at 34.  Henley testified that he had previously

16 calculated the comfort gap (*i.e.*, the difference between pipeline growth and forecast license

17 revenue growth) and found that it bore no relation to Oracle's results or ability to achieve

18 guidance.  Ex. 330 at 100:17-103:11 (testifying that the comfort gap in prior quarters had ranged

19 from -17% to +13%); *see also* Ex. 42 (demonstrating that Oracle achieved the consensus

20 estimates before 3Q01).  Indeed, Plaintiffs have adduced no evidence that anyone at Oracle

21 considered the "comfort gap" as part of the forecasting process in 3Q01.  *See Oracle Deriv.*, 867

22 A.2d at 944.  Contrary to Plaintiffs' assertion, Ellison did not rely on an analysis of the "comfort

23 gap."  He testified only that he looked at pipeline growth compared with forecasted license

24 growth, to make sure that the former covered the latter (PX F at 86:9-87:9; Ex. 331 at 201:10-

25 202:13) and that there was "[s]till more than enough to make the forecast."  Ex. 323 at 420:23.

26

27 _____

[5] Even if pipeline growth had been used to forecast license revenue, the decline in pipeline growth during 3Q01 would have implied precisely the opposite of what Plaintiffs claim.  The
28 undisputed evidence shows that greater year-over-year revenue growth is actually correlated with more rapidly declining pipeline growth.  Ex. 327 at ¶¶ 108-10.

1    Furthermore, it is undisputed that pipeline growth *exceeded* the projected license growth of 25%

2    throughout the quarter.  *See* Exs. 1-8, 394.  Certainly, this "fact" did not suggest a "substantial

3    likelihood" of an "extreme departure" from public guidance.  *Oracle Deriv.*, 867 A.2d at 944.

4         In any event, it was not a "collapse" in the pipeline that caused the 3Q01 miss; it was an

5    unprecedented drop in Oracle's conversion rate (the percentage of deals in the pipeline that

6    actually closed) at the end of the quarter.  The January 15, 2001 Pipeline Report (the last such

7    report issued before Ellison began trading—and after Plaintiffs' purported pipeline "collapse")

8    showed that if Oracle could convert 51% of its existing $2,691,175,000 pipeline—the same

9    percentage that Oracle had converted from the same point a year earlier—Oracle would exceed

10   the 25% growth rate it had publicly projected by more than $86 million.  Ex. 325 at 008549.  As

11   it turned out, Oracle's final revenues for 3Q01 reflected a conversion rate of just 41% based on

12   the January 15 pipeline.  Ex. 326 at 975976.  This was 13 percentage points lower than the

13   average conversion rate on that date for the preceding seven quarters and seven percentage points

14   lower than any rate *in the preceding two years*.  Ex. 325 at 008556.  Had Oracle matched *any* of

15   its historic conversion rates from that point in the quarter, Oracle would have met its 3Q01

16   guidance.  Plaintiffs have cited no evidence that Ellison or anyone else predicted this dramatic

17   drop in Oracle's conversion rate before the very end of the quarter—long after Ellison's trades.

18   **D.    None Of Plaintiffs' Allegations Regarding Oracle's Internal Forecasting**

19   **Process Demonstrates That Oracle Lacked A "Reasonable Basis" For Its 3Q01 Public Guidance**

20        Because Oracle's internal forecasts unequivocally supported Oracle's guidance

21   throughout the relevant period, in the four years since Vice Chancellor Strine's opinion Plaintiffs

22   have cobbleed together a claim that Ellison was aware of "facts" that rendered Oracle's

23   forecasting process "unreliable."[6]  20A MSJ at 35-38.  Most centrally, Plaintiffs argue that the

24   process for 3Q01 was rendered "unreliable" because it was improperly based on the "mechanical

25   application" of Oracle's 3Q00 "conversion rate" to its 3Q01 pipeline—an application, according

26   to Plaintiffs, that was no longer appropriate because in the period following 3Q00:  (a) there had

27

28   ───────────────────
[6]  Plaintiffs repeatedly argue that certain facts made Oracle's internal forecasting process "unreliable" in 3Q01.  20A MSJ at 3, 5-8, 14, 18-20, 35, 37-38.  They never define this term, tie it to any relevant legal standard, or explain what guidance, if any, Oracle should have provided.

been a "major economic change;" (b) Ellison had changed Oracle's internal forecasting process by directing the field to add more "risk" to the forecast; and (c) the mix of products in Oracle's pipeline had changed to include a higher percentage of applications deals (as opposed to "technology" deals).  *Id.* at 5.  This argument—which is an obvious contrivance designed to address the fundamental flaws in their case identified at great length by the Chancery Court—is at the core of Plaintiffs' case and fails as a matter of undisputed fact at every level.  First and foremost, as a simple matter of grade school mathematics it is clear that Oracle's 3Q01 guidance was *not* based on a "mechanical application" of the 3Q00 "conversion rate" to the 3Q01 pipeline. It is astonishing that Plaintiffs persist in this fiction when it is so easily debunked.  Second, because no such "mechanical application" occurred, Plaintiffs' claims regarding supposed "changes" in the market ("major economic change") and "changes" in Oracle's internal forecasting process (the "directive" and the change in "product mix")—which allegedly rendered the "mechanical application" inappropriate—are irrelevant.  Third, even analyzed on their own terms, there is not a shred of evidence to support Plaintiffs' claim that these "changes" caused Oracle's guidance to lack a "reasonable basis."  As such, none of them is remotely "material."

### 1.   Oracle's 3Q01 Potential Projection Was Not Based On A Mechanical Application Of The 3Q00 Conversion Rate To The 3Q01 Pipeline

Plaintiffs' attack on Oracle's 3Q01 internal forecasting process is based largely on a characterization of that process that is demonstrably false.  Plaintiffs repeatedly assert that Oracle's internal forecast for 3Q01—the Potential or Potential Projection—was generated by "mechanically applying" the "conversion rate" from 3Q00 to the pipeline for 3Q01.  20A MSJ at 4-5, 7-8, 20, 35-37.  The undisputed evidence establishes that this assertion is false.

The term "conversion rate" refers to the percentage of deals, expressed in dollar terms, that Oracle actually closes out of its pipeline during a given quarter—in other words, the total dollar amount of deals closed divided by the total dollar amount of deals in the pipeline at a given point in time.  Ex. 333 at 122:1-24.  Because the size of the pipeline changes over the quarter, the conversion rate for the quarter depends upon the point from which it is measured. *See* Exs. 1-8, 394.  Thus, the conversion rate as measured by the pipeline in week one of the

1    quarter will likely differ from the conversion rate as measured by the pipeline in week six.  The

2    Upside Reports, which reflected Oracle's internal forecast (Potential Projection), also showed

3    (among other things) the conversion rate from the same point in the same quarter the prior

4    year—as well as the conversion rate implied by the Potential Projection (*i.e.*, the conversion rate

5    Oracle would need to achieve in order to meet the Potential Projection).  *E.g.*, Ex. 1 at 213095.

6         Plaintiffs claim that the 3Q01 Potential Projection was generated by mechanically

7    applying the 3Q00 conversion rate to the 3Q01 pipeline.  This claim is simply not true.  The

8    Potential reflected in the December 11, 2000 Upside Report predicted a 3Q01 conversion rate of

9    48%—five percentage points less than the 53% conversion rate Oracle achieved from the same

10    point in 3Q00.  *See* Ex. 1 at 213095.  Moreover, Oracle's public guidance for 3Q01 was *lower*

11    than the Potential Projection:  the Potential projected EPS of 13 cents, but Henley announced

12    guidance of only 12 cents.  *Compare* Ex. 1 at 213092 *with* Ex. 56 at 003222.  To achieve that

13    guidance, Oracle only needed to convert 42% of the pipeline reflected in the December 11, 2000

14    Pipeline Report—a conversion rate *11 percentage points lower* than in 3Q00, and lower than any

15    conversion rate since Oracle's 4Q99.  Ex. 334 at 033550, 033557.

16         Furthermore, data assembled by Plaintiffs' own expert witness conclusively prove that

17    the 3Q01 Potential was *not* based on a "mechanical application" of the 3Q00 conversion rate.

18    Ex. 430.  In fact, Dr. Goedde's data demonstrate:

19        • The Potential Projection does not, at any point, equal what the forecast would have
      been if Oracle had based the 3Q01 Potential on the 3Q00 conversion ratio.  *Id.*

20        • The Potential Projection in the December 11, 2000 Upside Report, which formed the
      basis for the 3Q01 guidance, was nearly $145 million *less* than it would have been if
21          Oracle had mechanically applied the 3Q00 conversion ratio to the 3Q01 pipeline.  *Id.*

22        • Over the course of a year of observations, Oracle's actual Potential Projection—and
      the forecast number that would be yielded by applying the conversion ratio from the
23          same point in the prior year's quarter—differ from one another by an average of more
      than $100 million.  *Id.*

24         The undisputed testimony of Jennifer Minton, who oversaw Oracle's internal forecasting,

25    also proves that Oracle did not derive the Potential by "mechanically applying" a historical

26    conversion rate to the current pipeline.  Instead, Minton testified that she considered a wide

27    range of factors, including:  (1) the status of large deals; (2) the best, forecast and worst case

28    numbers for each division; (3) the conversion ratio from the same quarter in the prior year; (4) an

analysis of the opportunities for the current quarter and the likelihood that they would close, informed by discussions with field personnel; and (5) the "forecasting behaviors" of the people involved—including the degree to which they typically "sandbagged."  Ex. 333 at 122:17-127:24.[7]  Simply put, there is no evidence that the Potential was based on a mechanical application of the 3Q00 conversion rate—and the undisputed evidence proves just the opposite.

### 2.    The Purported "Major Economic Change" Did Not Render Oracle's Forecasts "Unreasonable"

Plaintiffs argue that a "major economic change" between 3Q00 and 3Q01 rendered Oracle's forecasting process "inaccurate" or "unreliable" because Oracle "could not expect to convert as large a percentage of its pipeline in 3Q01 as it had in the boom economy of 3Q00." 20A MSJ at 6-8.  Since Oracle's 3Q01 guidance was not based on an assumption that Oracle would convert the same percentage of its pipeline as in 3Q00, this argument fails on its face.

Taken on its own terms, it fails as well.  First, the claim that there had been a "major economic change" between 3Q00 and 3Q01 is based on a concept that Plaintiffs (with their expert, Dr. Goedde) made up out of thin air.  *See* 20A MSJ at 6-8, 35-36, 45.  The phrase is not a term of art, has no generally accepted meaning among economists, and has no discernable objective definition.  *See* Ex. 332 at 79:6-84:23, 84:24-85:4.  Instead, Dr. Goedde's concept of a "major economic change" is an attempt to seize upon a passage from Ellison's deposition, which Plaintiffs have grossly mischaracterized.  In discussing a passage from *Softwar* to the effect that Oracle's forecasting software systems are not "clairvoyant," Ellison testified that in the event of a "[m]ajor macroeconomic change"—which he defined as "sudden growth in the economy or sudden shrinkage in the economy"—one cannot extrapolate from historical data.  PX D at 384:6-

---

[7]  None of Plaintiffs' citations (*see* 20A MSJ at 5), support their characterization of Oracle's forecasting process.  *See* PX A at 122:3-5 (Minton testifying that the prior year's conversion ratio was "one" of a "variety" of factors); *id.* at 132:11-136:3 (Minton testifying that the only *historical* indicator she used was the prior year's conversion ratio, but making clear that she used a variety of other indicators in her analysis); *id.* at 159:10-17 (Minton testifying that while she would often start with the prior year's conversion ratio, she would "talk to [her finance people in the field] about specific deals that were in the pipe[line], what upside deals were not reflected in the forecast, what the likelihood [was] that those deals might close during the quarter," and then adjust the forecast "up or down" accordingly); PX 12 (excerpt from *Softwar* that describes a feature of the forecasting system and the reports it generates, not how the forecast is derived).

385:7.  As examples, Ellison referred to war in the Middle East or oil rising over $100 per barrel.

PX D at 384:6-385:7.  There is nothing remarkable about the notion that a major world event

might result in a sudden and unexpected economic shrinkage that could affect Oracle's sales.

Nothing in Ellison's testimony suggests, as Plaintiffs claim, that any slowing in the economy

before the beginning of a quarter constitutes a "major economic change," which would render

Oracle entire forecasting process "unreliable."  Ellison never said this (or anything remotely

close), and more importantly, it is not true.

Second, setting aside Plaintiffs' manufactured concept, there also is no evidence that the

factors Plaintiffs characterize as a "major economic change" undercut the otherwise "reasonable

basis" for Oracle's 3Q01 guidance, or, indeed, had any negative effect on Oracle's business.

Plaintiffs' claim of a "major economic change" is based largely on the decline in NASDAQ and

bursting of the dot.com bubble beginning in March 2000.  20A MSJ at 6-8.[8]  But as reflected

below, from 3Q00 through 2Q01, Oracle continued to grow its license revenue at rates consistent

with the 25% growth Oracle projected for 3Q01—notwithstanding precipitous declines in the

NASDAQ and a declining percentage of sales attributable to dot.com customers:[9]

| Quarter | NASDAQ Close at End of Quarter | Change in NASDAQ Since March 1, 2000 | Percentage of Oracle Revenues from Dot.coms | Oracle's Year-Over-Year License Growth |
|---------|--------------------------------|--------------------------------------|---------------------------------------------|----------------------------------------|
| 3Q00 | 4784.08 | -- | 10.63% | 29% |
| 4Q00 | 3400.91 | -29% | 9.56% | 21% |
| 1Q01 | 4206.35 | -12% | 6.61% | 34% |
| 2Q01 | 2597.93 | -46% | 6.01% | 30% |

As is clear from this data, there was no correlation between NASDAQ's performance and

Oracle's sales.  Ex. 335 at ¶¶ 62-64.  While Plaintiffs argue that a decline in Oracle's conversion

rate in 1Q01 and 2Q01 was a red flag (20A MSJ at 7), Oracle's financial results in each of those

---

[8] Plaintiffs also mention a purported reduction in technology spending, lack of financing, and actions by the Federal Reserve in support of their argument that there was a "major economic change."  20A MSJ at 6.  These arguments grossly mischaracterize the record.  In fact, technology spending was expected to *increase* in calendar year 2001, Ex. 336 at 1, and the data published by the Bureau of Economic Analysis and relied upon by the Federal Reserve indicated an *increase* in software sales throughout calendar year 2000.  Ex. 337 at 8.  Moreover, the significant growth projected in Oracle's Upside Reports, *see* DMSJ at 8-14, suggested that Oracle would succeed despite any such obstacles, just as it had done in 1Q01 and 2Q01.

[9] PX 16 at 13, Ex. 4, Ex. 24.

1   quarters was outstanding:  1Q01 net income went up 111% over 1Q00, with license revenues up

2   28% over that same period.  Ex. 21 at 975308.  2Q01 net income went up 62% over 2Q00, with

3   license revenues up 25% and applications revenues up 66%.  Ex. 22 at 975697.  Moreover,

4   because Oracle's forecast was based on a bottoms-up process, where sales and finance personnel

5   in the field projected the likelihood of closing deals in Oracle's pipeline (*see generally* DMSJ at

6   6-8), the decline in the dot.com sector was already "baked into" the 3Q01 forecast.[10]  Ex. 338 at

7   170:21-171:1 (testifying that forecast for database sales was significantly below budget in 3Q01

8   and 4Q01); Ex. 339 (stating that reduced expectations for database sales in General Business

9   were built into the NAS forecast).

10         Plaintiffs also cite notes prepared by Henley in early January 2001, indicating "more

11   economic softening so there is risk of slippage in deals."  20A MSJ at 7.  But in the very same

12   notes, Henley wrote that despite this risk, 3Q01 was looking good because of "stronger than

13   normal [deal] approval activity in December, the Covisant [sic] deal already in, and checks with

14   the 3 U.S. execs saying they aren't as yet hearing of slippage from their managers[.]  Net, net we

15   still feel good about Q3[.]"  Ex. 420.  Thus, Henley was aware of the economic uncertainty and

16   was pressing sales executives to determine if their divisions would continue to stand by their

17   forecasts—which they did.  PX K at 379:5-11 ("I grilled George Roberts and Sandy Sanderson

18   and everybody else about how things were, and they continually came back that they weren't

19   seeing the softness.").  There is no evidence to support Plaintiffs' argument that the softening

20   economy, or the decline in NASDAQ and sales to dot.com customers meant that Oracle's

21   guidance, based on a highly successful internal forecasting process, had no "reasonable basis."

22

23

24

_____

25   [10] Plaintiffs argue that certain sales personnel in NAS "began to voice concern" in December
     about the declining dot.com business, 20A MSJ at 8, but this argument mischaracterizes the
26   record.  The field forecast for NAS stayed the same from December 11, 2000 through the end of
     January.  Exs. 1-4, 394.  First, it is absurd to suggest that a failure to raise a forecast is an
27   indication that the forecast will not be achieved.  Secondly, the author of this document testified
     that as of the end of January he was "still feeling good about [his division's] forecast."  Ex. 369
28   at 257:17-258:8, 271:19-273:17.  Finally, the very document Plaintiffs rely upon is from *April*
     2001—more than two months *after* Ellison completed his sales.  PX 31 at 179335.

3. **The Alleged "Directive" By Ellison Did Not Render Oracle's Forecasts "Unreasonable"**

Plaintiffs claim that before 3Q01, Ellison introduced more "risk" into the forecast by issuing a "directive" that caused the sales force to stop "sandbagging"—that is, the practice of forecasting lower results than sales personnel actually expected to close.  20A MSJ at 5, 18-20, 36.  According to Plaintiffs, this "directive" eliminated the need for the "Upside" adjustments made by Jennifer Minton, making her Potential Projection "unreliable" because it continued to include Upside adjustments.  *Id.*

Again, this argument fails at every level.  First, there is no proof that Ellison ever issued any such "directive."  Plaintiffs deposed dozens of Oracle witnesses who were involved in the sales forecasting process, including three Executive Vice Presidents, two finance directors, and at least six Group or Area Vice Presidents in charge of license sales (not to mention the dozens of "confidential witnesses" cited in Plaintiffs' complaint).  But not a single witness testified that any such "directive" was ever issued, or that they changed their forecasting process accordingly.

Plaintiffs also received over 2.1 million pages of documents from 129 custodians at Oracle.  Yet the only documentary "evidence" of this alleged directive is a single email between two lower-level Oracle employees, Patricia McManus and James English.  Nothing in the email suggests that Ellison ever gave the kind of "directive" Plaintiffs claim.  Instead, it discusses "new terminology" regarding the three field forecast numbers reflected in Oracle's systems ("best," "forecast," and "worst").  PX 17.  Notably, Plaintiffs did not bother to depose either McManus or English, and Minton testified that the email reflects the roll-out of a "new application" and the fact that "we wanted to have consistent definitions . . . in part, due to the fact that we had three different sales organizations in North America."  Ex. 341 at 111:13-19.  It is inconceivable that an alleged "directive" from Ellison could have caused hundreds of sales and finance personnel to make a fundamental change in the way they prepared their forecasts (as Plaintiffs claim), and yet be evidenced only by a single email between two employees discussing terminology to be used in connection with the roll-out of a new, internal software application—which on its face never

refers to the purported "directive" that Plaintiffs claim.

In fact, what Plaintiffs are trying to characterize as a "directive" reflects nothing more than an ongoing dialogue through which senior executives were trying to make the forecasts as accurate as possible. Oracle's field forecasts in FY00 were only 84-89% of the Company's actual results—showing that quarterly results were significantly exceeding the field's forecasts and highlighting why Minton's Upside judgment was needed. PX 65 at 151959, 61; Ex. 340 at 151966-67. Minton told her finance personnel that they should work more closely with the sales units to improve forecast accuracy. *See*, *e.g.*, PX 65; Ex. 341 at 103:11-106:11. She then worked more closely with them, through weekly and bi-weekly forecast calls, to understand what deals were likely to close and for how much. Ex. 333 at 178:7-180:5; Ex. 343 at 39:21-42:11. Thus, Minton was aware of the likelihood that any particular deal would close based upon these calls, and adjusted her Upside accordingly. *See* PX A at 159:10-17.[11] Consistent with this effort to improve the accuracy of the forecasts, when asked if he wanted more risk in the forecast, Ellison testified: "No. I've always wanted the forecast to be accurate. You know, I would say slightly conservative but accurate." Ex. 342 at 423:7-12.

Second, there simply is no evidence that any alleged "directive" from Ellison caused Oracle salespeople to stop "sandbagging"—or rendered Minton's Upside adjustments "obsolete" such that Oracle had no "reasonable basis" for its public guidance.[12] Even assuming that salespeople improved the accuracy of their forecasts in 3Q01 (an assumption for which Plaintiffs offer no proof), there is no evidence suggesting that Minton failed to account for this when adding her Upside adjustments to calculate the Potential. In fact, the conservative bias of

---

[11] Minton relied on finance personnel in the field to perform a cross-check on sales managers' forecasts. Ex. 343 at 37:4-7. For Plaintiffs' argument to make sense, Plaintiffs would have to prove that Ellison and the sales force increased the risk in the forecast without Minton or any of her finance personnel becoming aware of it. Indeed, the absurdity of the claim is underscored by the very email upon which Plaintiffs rely in advancing it—which was a communication between two people in Minton's organization.

[12] Nor is there any evidence that any steps actually taken resulted in less "sandbagging" by the sales personnel, or that Ellison or anyone else expected such a result. Ex. 341 at 111:8-19 (Ellison did not believe that getting three separate numbers from the sales divisions, showing a range of possibilities ["best," "forecast," and "worst"], was going to eliminate "personalities" in the forecasting process, much less eliminate "sandbagging" altogether).

Minton's Potential Projections in 3Q01 undercuts any such suggestion:  in eight of nine Upside Reports during 3Q01, the conversion rate implied by the Potential was less than or equal to the conversion rate from the same point in 3Q00.  Ex. 431.  Moreover, in 3Q01, Minton added proportionately less "Upside" to the field forecast than she had in 3Q00.[13]  *See* Foster Decl., Ex. 2 at ¶¶ 52-73. (Dkt. No. 1503).

Third, in their communications with Minton, the field finance personnel did not suggest that there was increased "risk" in their forecast.  Instead, they stood by their forecasts and expressed great confidence in them.  *Compare* Ex. 1 *with* Ex. 4; *see also* PX 30; PX 71; Ex. 432.

### 4.   The Product Mix In Oracle's Pipeline Did Not Render Oracle's Forecasts "Unreasonable"

Finally, Plaintiffs argue that Minton's purported "application of the 3Q00 conversion rate to the 3Q01 pipeline led to an External Forecast with no reasonable basis because Oracle's product mix had changed dramatically."  20A MSJ at 8.  According to Plaintiffs, this undermined the forecast because Oracle had a lower conversion rate for applications deals in the pipeline than for technology deals.  *Id.*  As with Plaintiffs' other attacks on Oracle's forecasting process, this argument fails at the outset because it relies on Plaintiffs' unsupported claim that Minton's forecasts were generated by "mechanically applying" a historical conversion ratio to the then-current 3Q01 pipeline.[14]  In any event, Oracle's pipeline for both kinds of products (applications and technology) was increasing, so the increased percentage of applications deals in the pipeline meant that the pipeline for applications was growing faster than the pipeline for technology—something Ellison, other Oracle executives and analysts would have seen, properly, as a sign of healthy demand for Suite 11i.

Most fundamentally, if Ellison had actually analyzed the pipeline data as Plaintiffs now suggest, the result would have *supported* Oracle's public guidance—not undermined it.

---

[13] As noted in Minton's testimony cited above, *supra* at 12-13 (citing Ex. 333 at 122:17-127:24), her Upside adjustments did much more than simply account for sandbagging.

[14] Oracle began seeing a higher percentage of applications deals in the pipeline in 1Q01 and 2Q01.  If Plaintiffs' claims about the mechanical application of the conversion ratio and the changing product mix were true, then Oracle would have failed to meet expectations in those quarters, too.  In fact, Oracle *exceeded* expectations in both quarters.  Ex. 42.

1   Applying the 3Q00 applications and technology conversion ratios to the 3Q01 applications and

2   technology pipelines in the period leading up to Ellison's trades would have projected total

3   license growth of 26%—above the 25% overall license growth that Oracle actually projected to

4   the market.[15]  Moreover, there is no evidence that anyone at Oracle ever analyzed the Company's

5   quarterly prospects based on applying separate conversion rates to the applications and

6   technology pipelines.[16]

7
    E.      **Neither Plaintiffs' Suite 11i Nor Accounting Allegations Demonstrates That
8            Oracle Lacked A "Reasonable Basis" For Its 3Q01 Public Guidance**

9           Plaintiffs have already lost a motion for partial summary judgment relating to their

10  product and accounting allegations.  Plaintiffs nonetheless discuss Suite 11i and accounting

11  issues at length in their Section 20A motion.  Plaintiffs now claim these allegations are relevant

12  to show that Oracle's 3Q01 forecasting process was "unreliable."  But the evidence Plaintiffs cite

13  does not show that Oracle lacked a reasonable basis for its 3Q01 guidance or that Ellison was

14  aware of facts that seriously undermined that guidance.

15          1.      **Plaintiffs' Suite 11i Allegations Are Meritless**

16          Plaintiffs argue that Ellison sold Oracle stock on the basis of material nonpublic

17  information about Suite 11i that rendered Oracle's 3Q01 public guidance unreasonable.  20A

18  MSJ at 2-3, 10, 11, 13, 38-39.[17]  This is precisely how Plaintiffs have framed this claim from the

19
    ---
20  [15] According to Plaintiffs' expert, as of January 15, 2001 (the last Pipeline Report before
    Ellison's trades), Oracle had an applications pipeline of $975,298,000 and a technology pipeline
    of $1,715,878,000, which converted at rates of 33% and 60%, respectively.  PX 15 at Ex. 7.
21  Performing the multiplication that Plaintiffs now suggest would yield applications revenues of
    $321,848,340 and technology revenues of $1,029,526,800, or total license revenue of
22  $1,351,375,140 and growth of 26%—above Oracle's guidance of 25% total license growth.  Far
    from undercutting Oracle's forecast, Plaintiffs' hindsight analysis actually supports it.

23  [16]  Plaintiffs' use of metrics such as this one, which were never presented to or considered by
    Ellison, is precisely the kind of "fraud by hindsight" that courts have repeatedly rejected.  As the
24  Chancery Court held:  "At best, the plaintiffs have pointed to the existence of financial
    information that might have led a rational insider at Oracle at various points in January 2001 to
25  believe that Oracle might not meet the Market Estimates, if they had thought about the
    information in the manner that the plaintiffs now do (which there is no evidence that Messrs.
26  Ellison or Henley did) and had the benefit of hindsight (which Messrs. Ellison and Henley did
    not)."  *Oracle Deriv.*, 867 A.2d at 907.
27
    [17]  Specifically, Plaintiffs claim that problems with Suite 11i:  (i) "severely affected Oracle's
28  ability to convert its applications pipeline" (20A MSJ at 11); (ii) "caused [Oracle] to lose deals"
    (*id.* at 12); (iii) "made 11i difficult to sell and negatively impacted Oracle's applications

1  beginning:  at the pleading stage, Plaintiffs alleged that, because of problems with Suite 11i, "a

2  number of large deals were either lost or delayed early in the quarter," including four specific

3  deals that totaled $186 million, or "nearly 75% of the total third-quarter shortfall."  *See In re*

4  *Oracle Corp. Sec. Litig.*, 380 F. 3d 1226, 1231-32 (9th Cir. 2004); *see also* RSAC ¶¶ 10, 66(b).

5  These allegations were deemed critical by the Ninth Circuit in reversing Judge Jenkins's

6  dismissal of Plaintiffs' case.  *See Oracle*, 380 F.3d at 1231-32.

7           But Plaintiffs have completely failed to prove these allegations.  *See* DMSJ at 32-36.

8  Plaintiffs have not identified a *single* license deal that was lost or delayed at any time during

9  3Q01 due to problems with Suite 11i—let alone the loss of so many deals that its 3Q01 guidance

10  was rendered "unreasonable."  This failure is not due to any lack of discovery.  Plaintiffs have

11  received over 2.1 million pages of documents from the files of at least 129 custodians at Oracle,

12  deposed more than 70 witnesses (many of whom were Oracle employees involved in Suite 11i

13  sales), issued document subpoenas to over 100 Oracle customers (and received documents from

14  nearly 50 of them), and subpoenaed documents from various market and industry analysts.

15  Farthing Dec. ¶ 33; Exs. 433-437; Ex. 460**.**  Indeed, the record in this case includes document

16  productions from 9 of the 13 customers identified in Plaintiffs' RSAC as having cancelled 3Q01

17  deals due to alleged problems with Suite 11i (RSAC ¶¶ 56(a)-(m)), and from customers involved

18  in two of the four "large deals" cited by the Ninth Circuit.  Ex. 438.[18]  The record also includes

19  depositions of the "confidential witnesses" Plaintiffs cited for their claim that these deals were

20  lost in early 3Q01 because of "the functional instability of 11i."  RSAC ¶ 66(b).  Despite this

21  massive record, Plaintiffs are unable to cite any evidence that a single customer canceled or

22  delayed a deal in 3Q01 due to alleged "problems" with Suite 11i.[19]

23           Moreover, Plaintiffs have not cited any evidence that problems with Suite 11i rendered

24  ────────────────────────────────────────────────────

25  conversion rate" (*id.* at 13); and, indeed, (v) were "preventing Oracle from converting its
    applications pipeline" (*id.* at 39).  *See also id.* (claiming that problems with Suite 11i "cost
    Oracle sales" and were having an "adverse effect . . . on Oracle's applications conversion rate.").

26  [18]  Plaintiffs also subpoenaed the customers involved in the other two "large deals" cited by the
    Ninth Circuit, but these customers did not produce any records and Plaintiffs did not pursue it.

27  [19]  If anything, the evidence produced by Suite 11i customers undercuts these claims.  *See, e.g.*,

28  Ex. 258 at  TIM00006 (indicating potential $2 million Timberland deal slipped due to "weakness
    in the U.S. economy" and other economic factors).

1  Oracle's 3Q01 public guidance "unreasonable."  Plaintiffs cite a hash of emails and other

2  documents discussing various challenges that Oracle faced with its roll-out of Suite 11i—a

3  massive new software product.[20]  *See* 20A MSJ at 9-13, 38-39.  But Plaintiffs do not cite any

4  evidence that these issues had a negative impact on Oracle's internal forecasting process, much

5  less that they indicated a "substantial likelihood of an extreme departure" from Oracle's 3Q01

6  public guidance.  In fact, according to Plaintiffs, Suite 11i suffered from precisely the same

7  "problems" during the first two quarters of Oracle's 2001 fiscal year.  *See* 20A MSJ at 11, 14.

8  Nevertheless, in those two quarters Oracle achieved record applications license revenues, with

9  year-over-year growth figures of 42% and 66%, respectively—as over 3,000 customers licensed

10  Suite 11i products.  *See* Ex. 25 at 973930; Ex. 26 at 976820; Ex. 39 at 025214; Ex. 83 at 035472;

11  Ex. 150 at 420561.  More importantly, in each of the first two quarters of its 2001 fiscal year,

12  Oracle's internal forecasting process yielded an accurate, but conservative, projection of Oracle's

13  final quarterly results:  in each quarter, Oracle's final results far exceeded the Potential

14  Projection made at the beginning of the quarter.  Ex. 42.  Thus, whatever "problems" Oracle was

15  having with Suite 11i in 1Q01 and 2Q01—the very same "problems" that Plaintiffs claim Oracle

16  was having in 3Q01—they did not undermine Oracle's forecasting process.

17  Plaintiffs likewise have no explanation for Suite 11i's continued success after 3Q01.

18  Plaintiffs do not claim that Suite 11i's "problems" disappeared overnight.  On the contrary, in

19  support of their argument that problems with Suite 11i made it virtually impossible to sell,

20  Plaintiffs cite several documents from the three month period following Oracle's 3Q01 miss.

---

[20]  As discussed in Defendants' Motion for Summary Judgment, the vast majority of the "evidence" Plaintiffs cite about Suite 11i is inadmissible.  *See* DMSJ at 36 n.17.  Furthermore, Plaintiffs have wildly mischaracterized the evidence about alleged "problems" with Suite 11i. Although Plaintiffs claim that Suite 11i "did not work," they rely almost entirely on anecdotal evidence of bugs and complaints from customers *who had already bought and were implementing the product*.  20A MSJ at 11.  Plaintiffs' own expert witness conceded that the record in this case does not support any meaningful conclusion about the overall quality of Suite 11i.  *See* Ex. 132 at 38:3-16; *see also* Defs.' Mtn to Excl. Decl. & Test. Of B. Hilliard (Dkt. No. 1499) at 2, 12-13.  Indeed, Plaintiffs' expert agreed that, based upon the discovery record, it was impossible to say whether Suite 11i's quality was better, worse, or the same as, competing products.  *See* Ex. 132 at 29:12-14; 33:22-34:1; 38:3-16, 111:8-112:2.  As Defendants pointed out previously, Plaintiffs' "quality" attack on Suite 11i has failed so completely that they have since denied ever making it.  *Compare* RSAC ¶ 52(s) (alleging that selling Suite 11i was like selling "a car without wheels") *with* Opp. to Defs.' First MSJ (Dkt. No. 1305) at 15 ("Plaintiffs never alleged that 11i was 'defective' like a 'car without wheels.'").

1    *See* PXs 42, 43; *see also* PX 45 (1Q02).  But during that quarter (4Q01), Oracle set yet another

2    record for applications license sales—$338 million.  Ex. 28 at 977287; Ex. 195 at 110953; Ex.

3    196 at 430558.  Oracle's record applications sales in 4Q01 puts the lie to Plaintiffs' claim that

4    undisclosed "problems" with Suite 11i made it impossible for Oracle to sell the product.[21]

5         In fact, the product "problems" that Plaintiffs have cited were a normal part of the

6    software development cycle, to be expected with the release of any software system as large and

7    complex as Suite 11i.  Indeed, before and during 3Q01, the market was well aware of the

8    challenges that Oracle faced in rolling out Suite 11i.  Analysts repeatedly noted that the early

9    releases of Suite 11i had bugs (Ex. 206 at 00162; Ex. 207 at 1; Ex. 140 at 09567; Ex. 208 at

10   419977; Ex. 209 at 3; Ex. 147 at 101612; Ex. 210 at 309148); that Oracle issued a number of

11   patches (Ex. 211 at 307399; Ex. 212 at 1054611; Ex. 154 at 091464); and that various

12   applications had "functional gaps" as compared with "best of breed" alternatives (Ex. 124 at

13   308716; Ex. 215 at 009598; Ex. 245 at 085851).  Other reports relayed conjecture that Suite 11i

14   may have been released "too early" and lacked maturity, described early customers having

15   difficult implementations, and even warned more risk-averse customers to hold off until Suite

16   11i stabilized.  Ex. 216 at 4; Ex. 112 at 019759; Ex. 117 at 009737; Ex. 140 at 009467.  Analysts

17   also discussed the number and quality of Oracle's reference customers.  Ex. 149 at 419950; Ex.

18   353 at 091448.  Market observers expressed no particular surprise or concern over these issues,

19   however—recognizing them as a normal part of the software development process.  *See, e.g.*, Ex.

20   147 at 101612.  This widespread publicity about the very "problems" that Plaintiffs claim Ellison

21   "concealed" eviscerates Plaintiffs' claim that those problems were "non-public."

22             **2.      Plaintiffs' Accounting Allegations Are Meritless**

23        Plaintiffs' accounting claims—which relate solely to 2Q01—were first added in order to

24   remedy a defect in their First Amended Complaint.  The Court had dismissed that complaint

25   _____

26   [21]  Oracle's 4Q01 results likewise undermine Plaintiffs' theory of loss causation.  Plaintiffs claim
     that, through the March 1, 2001 announcement, the market learned the "truth" about Suite 11i—
27   namely, that it "did not work."  20A MSJ at 9-10.  If that were true, then sales of Suite 11i
     should have dried up immediately.  Instead, Oracle sold more applications licenses in 4Q01 than
28   it had ever sold before—a result that is utterly inconsistent with Plaintiffs' claim that on March
     1, 2001, the market learned the "truth" that Suite 11i "did not work."

1    because, among other things, Plaintiffs failed to plead facts suggesting that it was unreasonable

2    for Oracle to expect strong sales of Suite 11i in 3Q01—given the Company's success in the first

3    two quarters after Suite 11i's release.  Ex. 439 at 18-19.  In an attempt to overcome this problem,

4    Plaintiffs amended their complaint to allege that Defendants had concealed a massive slowdown

5    in Suite 11i sales during 2Q01 by manufacturing "over $228 million" in revenue through the

6    creation of 46,000-plus debit memos.  RSAC at ¶ 36.  After two years of accounting-related

7    discovery—including over 20 depositions and over a million pages of accounting-related

8    documents—Plaintiffs have *abandoned* this claim.[22]  In its place, Plaintiffs have attempted to

9    assert two new (and unpled) claims:  namely, that Oracle overstated its 2Q01 results by:  (1)

10   improperly recognizing $20 million in revenue on a license deal with Hewlett-Packard ("HP"),

11   and (2) inappropriately transferring $20 million to a bad debt reserve account.  Thus, what began

12   as a claim that Defendants knew Oracle would not meet its 3Q01 guidance because it had to

13   manufacture over a quarter billion dollars in revenue during 2Q01, has now devolved into an

14   assertion that Ellison knew Oracle's 3Q01 guidance was "unreliable" because of two alleged,

15   unrelated accounting errors—which together constitute a tiny (and clearly immaterial) fraction of

16   Oracle's 2Q01 revenue.  20A MSJ at 2; *see also id.* at 5, 14-18, 36-37.

17
             a.       *Plaintiffs' Accounting Allegations Have Nothing to Do With*
18                    *Oracle's 3Q01 Guidance*

19          As an initial matter, Plaintiffs' argument makes no sense.  Even assuming that Oracle

20   should not have recognized the revenue from these transactions (an assumption not supported by

21   the evidence), there is no reason why that fact would have undermined the internal forecasting

22   process on which Oracle's 3Q01 guidance was based.  As Plaintiffs admit, even without the

23   additional $40 million in revenue from the HP deal and the bad debt transfers, Oracle would

24   have achieved 2Q01 EPS of 10 cents.  Ex. 440 at 129:9-23. That is the very same EPS number

25   that Oracle's internal forecast had projected at the beginning of 2Q01 (after rounding, per

26   Oracle's policy).  Ex. 42.  Thus, even without the alleged misstatement of Oracle's 2Q01 results,

27

28   ───────────────
     [22] Indeed, even their accounting expert conceded that the debit memos had no financial statement
     or revenue impact.  Ex. 440 at 208:22-209:12, 213:11-20, 214:24-215:19, 219:14-220:12.

1   Oracle would have met its internal forecast.  Plaintiffs do not explain why the alleged inflation of

2   Oracle's 2Q01 results, which caused the company to *exceed* its internal forecast, would have

3   suggested that Oracle's internal forecasting process was "unreliable;"  if anything, it would

4   suggest that Oracle's forecasting process was highly accurate.

5          Alternatively, Plaintiffs have argued that Oracle's 2Q01 results were an "additional

6   basis" for the 3Q01 forecast, and that Oracle needed to report 11 cents EPS for 2Q01 in order to

7   "credibly" project 12 cents EPS for 3Q01—but there is no evidence to support either assertion.

8   During the December 14, 2000 call, CFO Jeff Henley noted that the projected EPS for 3Q01 was

9   consistent with past third quarters because it was a penny higher than the preceding quarter.  Ex.

10  56 at 3222; PX K at 343:6-20.  But that does not come close to establishing that the 2Q01 results

11  formed the "basis" for Oracle's 3Q01 guidance.  The undisputed facts show that the 3Q01

12  guidance was based on a rigorous, bottoms-up internal forecasting process.  *See supra* at 5-6, 12.

13  Moreover, Oracle did not need to report 11 cents EPS for 2Q01 "in order to" "credibly" project

14  12 cents EPS for 3Q01; even before Oracle reported its 2Q01 results, analysts were projecting

15  that Oracle would achieve 12 cents EPS for 3Q01 (James Dec., Ex. 2 at ¶ 21 (Dkt. No. 1505),

16  Ex. 2)—even though, at the time, those analysts were projecting only 10 cents EPS for 2Q01.

17  O'Bryan Decl., Ex. 2 at 51 (Dkt. No. 1504); Ex. 440 at 129:14-18.  There simply is no basis for

18  Plaintiffs' claim that Oracle's 3Q01 guidance was "dependent" on its ability to report 11 cents

19  EPS for 2Q01.

20          b.    *Plaintiffs' New Accounting Allegations Are Immaterial*

21          Setting aside the lack of any connection between Oracle's 2Q01 results and its 3Q01

22  guidance, there is no evidence that Oracle's 2Q01 results were materially misstated.  Even

23  assuming Plaintiffs' claims were true (they are not), Oracle's 2Q01 revenue would have been

24  overstated by $40 million—roughly 1.5% of the $2.66 billion in revenue that Oracle reported for

25  2Q01.  Ex. 161 at 143471; O'Bryan Decl., Ex. 2 at 51 (Dkt. No. 1504); Ex. 227 at 127:19-24.

26  Courts routinely hold that alleged misstatements of this magnitude are immaterial as a matter of

27  law.  *See* DMSJ at 39 (citing cases).  Nor can Plaintiffs establish materiality by relying upon any

28  purported change in Oracle's EPS for 2Q01.  Even assuming that both the bad debt transfers *and*

1   the HP transaction were improper, Oracle's EPS was overstated by less than half a cent (O'Bryan

2   Decl. Ex. 1 at 38; and O'Bryan Decl. Ex. 2 at 51; Ex. 440: 126:9-127:11, 127:19-24), and Oracle

3   would have met its guidance (Ex. 42) and consensus earnings expectations for 2Q01 even

4   without the revenue from these two transactions.  O'Bryan Decl. Ex. 2 at 51; Ex. 440 at 129:9-

5   18.  Courts have found that similarly insignificant changes in reported EPS are immaterial as a

6   matter of law.  *See* DMSJ at 39.

7                    c.      *Plaintiffs' New Accounting Allegations Are Unsupported and
                             Unsupportable*
8

9           Most fundamentally, Plaintiffs' newly-contrived accounting claims are meritless.

10  Oracle's 2Q01 financial statements were reviewed by two independent accounting firms, and

11  have never been restated or corrected.  O'Bryan Decl. Ex. 1 at 41 (Dkt. No. 1504); Ex. 386 at

12  122:14-123:21; PX J at 209:1-214:24; Ex. 427 at 081753.[23]  In fact, no one other than Plaintiffs

13  and their expert has ever suggested that Oracle's 2Q01 financial statements were materially false.

14  There is no evidence to support Plaintiffs' claim that Oracle overstated its 2Q01 results.

15                           **(1)      The HP Transaction**

16          Plaintiffs first claim that Oracle improperly inflated its 2Q01 financial statements and

17  applications growth by engaging in an improper "swap" transaction with HP.  *See* 20A MSJ at

18  14-15.[24]  A "swap" or "round trip" transaction involves a reciprocal deal in which a company

19  essentially pays for its revenue by purchasing something that it does not need, and from which it

20  receives no economic benefit.  O'Bryan Decl. Ex. 2, at 29-32 (Dkt. No. 1504).  Plaintiffs cannot

21  cite a shred of evidence suggesting that Oracle purchased servers it did not need in 2Q01, and did

22  not benefit from their purchase.  On the contrary, the undisputed evidence shows that Oracle

23  needed servers, believed that HP built a superior product at the time, and used the servers that it

24

25  [23]  In fact, Oracle extensively analyzed the 2Q01 bad debt transfers in Fall 2002, as part of the
    "Unapplied Cash Project."  Oracle's independent auditor reviewed the results of the 2002
26  Unapplied Cash Project, and concluded that there was no material impact for fiscal year 2001.
    O'Bryan Decl. Ex. 1, at 41; PX J at 209:1-214:24; Ex. PX M at 283:10-284:9, 284:21-285:4,
27  285:17-286:4; Ex. PX K at 452:12-453:7.

28  [24]  The background and specific terms of these transactions are set forth in Exhibit 2 of the
    O'Bryan Decl., Ex. 2 at 25-28.

1    purchased.  *Id.* at 31-32; PX I at 628:25-629:7; PX K at 318:13-319:20; Ex. 403 206:5-23; Ex.

2    441 at 3043132-33; Ex. 442 at AA 001340.  This is the end of the inquiry.

3            Moreover, Oracle's recognition of revenue on the software licenses that it sold HP in

4    2Q01 complied entirely with GAAP.[25]  Oracle and HP executed a license agreement before

5    midnight on November 30, 2000 (O'Bryan Decl. Ex. 2 at 37-40 [Dkt. No. 1504]; Ex. 426 at

6    260113; Ex. 443 at 3043126-27; Ex. 442 at AA 001340; Ex. 444 at 3043084; Ex. 445 at 79:8-

7    15); the software was shipped to HP on November 30, 2000 (O'Bryan Decl. Ex. 2, at 40-48; Ex.

8    404 at 3043129; Ex. 446 at 3043130-31); the fees were fixed in a written finance agreement

9    (O'Bryan Decl. Ex. 2, at 48-50; Ex. 426 at 260121; Ex. 442 at AA 001340; Ex. 447 at 3043085;

10   Ex. 427 at 081755); and HP was a creditworthy customer so collectability was probable

11   (O'Bryan Decl. Ex. 2 at 48-50).  Oracle's recognition of revenue on this transaction was

12   reviewed and approved by Oracle's internal revenue recognition specialists, its outside auditor,

13   and the Finance and Audit Committee.  O'Bryan Decl. Ex. 2, at 37-38; Ex. 447 at 3043085-109;

14   Ex. 235 at 325:2-326:6; Ex. 236 at 169:2-21; Ex. 442 at AA 001339-40; Ex. 427 at 081755.[26]

15           Furthermore, Ellison specifically confirmed that he "was not aware of any reason why

16   Oracle should not recognize any revenue relating to the transaction with H-P[,]" because he

17   "understood that this transaction had been reviewed by Oracle's internal Revenue Recognition

18   group and its outside, independent auditors, each of [which] signed off on the recognition of the

19   revenue."  Ellison Decl., at ¶ 30 (Dkt. No. 1218).  As Ellison testified, "our accountants looked at

20   this transaction very, very carefully[;] [w]e were buying hardware; HP was buying software, and

21

22   [25] Under the relevant accounting literature (*i.e.*, SOP 97-2), four criteria must be satisfied before
     revenue can be recognized:  (1) persuasive evidence of an arrangement exists; (2) delivery has
23   occurred; (3) the fees are fixed or determinable; and (4) collectability is probable.  O'Bryan
     Decl. Ex. 2, at 37.

24   [26] The only person to suggest that the HP transaction was improper is Plaintiffs' accounting
     expert (Regan), who claimed he saw "no evidence" that Oracle complied with the applicable
25   accounting literature.  However, Regan saw no such evidence because Special Master Infante
     held that the HP transaction was not a proper subject of fact discovery.  Ex. 448 at 15:24-16:6,
26   16:25-17:8.  In any event, Regan admitted that he never personally applied the relevant
     accounting standards, and therefore, is not qualified to opine on the proper accounting for this
27   transaction.  Ex. 440 at 208:9-21.  Furthermore, Regan admitted that he formed his opinions
     without reviewing the most critical documents, including Oracle's internal revenue recognition
28   checklist, the auditor's workpapers and the Audit Committee presentation.  *Id.* at 172:6-12,
     184:14-185:6, 190:1-18.

1    we believe we have accounted for it properly." Ex. PX D at 507:10-16; DMSJ at 39-40.

2                    **(2)    The Bad Debt Transfers**

3            Plaintiffs further claim that Oracle transferred "at least $20 million of [] customer

4    overpayments to a secret fund contained in one of Oracle's reserve accounts, dubbed 'Account

5    12601' which was used to manipulate Oracle's revenue and earnings." 20A MSJ at 17.[27]

6    However, Plaintiffs offer no *evidence* that all (or even some appreciable number) of the 2Q01

7    bad debt transfers were improper.  Plaintiffs' accounting expert admitted that he performed *no*

8    analysis to determine whether any of the bad debt transfers were improper, or could be

9    recognized as revenue in 2Q01.  Ex. 264 at 233:21-234:3.[28]  Furthermore, there is no evidence

10   that Ellison was even aware of the bad debt transfers at the time of his trades.  Indeed, Ellison

11   confirmed that he had no knowledge of the bad debt transfers, nor did he have any reason to

12   believe that Oracle's 2Q01 financial statements were materially misstated.  Ellison Decl., at ¶¶

13   27, 29 (Dkt. No. 1218); DMSJ at 39.[29]  This evidence is unrebutted, and it defeats any claim that

14   Ellison traded on the basis of material nonpublic information regarding Oracle's 2Q01 results.

15   **V.      PLAINTIFFS HAVE NOT SHOWN THAT ELLISON ACTED WITH SCIENTER**

16           **A.      Plaintiffs Must Prove Specific Intent To Establish Liability For A 20A Claim**

17           In order to establish liability under Section 20A, Plaintiffs must satisfy Section 10(b)'s

18   scienter requirement—that is, "a mental state embracing intent to deceive, manipulate, or

19   defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *Santa Fe Indus., Inc. v.*

20

21

22   _____

23   [27]  Plaintiffs' reference to a "secret account" is specious.  Account 12601 is a bad debt reserve
     account that is plainly listed on Oracle's accounting documents, and is (and was) reviewed and
     audited by Oracle's outside auditors.  Ex. 449 at AA 000028; Ex. 462 at AA00035-38.

24   [28] Defendants' accounting expert (O'Bryan) analyzed a subset of the bad debt transfers, and
25   determined that at least $2 million (of the $10.6 million on which discovery focused) were
     properly recorded as revenue.  O'Bryan Decl. Ex. 1, at 4, 32-36, 38; Ex. 263 at 136:2-16.  As to
26   the remaining transfers, there was not enough data in the record to reach a conclusion.  O'Bryan
     Decl., Ex. 1 at 32-36.

27   [29]  There is no way Ellison *could have known* about the bad debt transfers at the time of his
     trades because the accounting and finance professionals below him did not even become aware
28   of the bad debt transfers until Fall 2002.  PX K at 451:1-452:5; PX B at 157:4-18; Ex. 450 at
     179:3-10.

1  *Green*, 430 U.S. 462, 473 (1977).[30]  Rule 10b5-1 does not dictate a different result.  In

2  addressing concerns that Rule 10b5-1 might have eliminated Section 10(b)'s long-standing

3  scienter requirement, the SEC has made clear that "[s]cienter remains a necessary element for

4  liability under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Rule 10b5-1

5  does not change this."  Selective Disclosure and Insider Trading, Exchange Act Release No.

6  43154, 2000 SEC LEXIS 1672, at *78 (Aug. 15, 2000) (citing *Ernst*).

7        To establish the required "intent to deceive, manipulate, or defraud," Plaintiffs must

8  show:  (1) that the information Ellison possessed was material and nonpublic; (2) that Ellison

9  *was aware* that the information he possessed was material and nonpublic;[31] *and* (3) that the

10  material nonpublic information played a *causal* role in Ellison's decision to sell Oracle stock.

11  *See* 17 C.F.R. §240.10b-5-1(b) (predicating insider trading liability on a finding that the person

12  was "aware" of the material nonpublic information when the person sold stock); *SEC v. Lipson*,

13  278 F.3d 656, 660 (7th Cir. 2002) (plaintiff has the "burden of persuading the jury that [the

14  insider]'s trades had been influenced by the inside information that he possessed—the burden, in

15  other words, of proving that inside information had played a causal role in [the insider]'s

16  decision to sell the shares in the amount, and when, he did."); *SEC v. Healthsouth Corp.*, 261 F.

17  Supp. 2d 1298, 1319 (N.D. Ala. 2003) (establishing intent requires plaintiff to demonstrate

18  "proof not only that the defendant traded on the basis of material non-public information but also

19  that in doing so he knew or should have known that he was breaching a fiduciary duty") (*citing*

20  *SEC v. Unifund SAL*, 910 F.2d 1028, 1039 (2d Cir. 1990)); *see also Dirks v. SEC*, 463 U.S. 646,

21  660 (1983).  Plaintiffs have failed to establish any of these necessary elements.

22

23

---

24  [30] *See also Lipton*, 284 F.3d at 1035 n.15 ("Scienter is an essential element of a § 10(b) or Rule
25  10b-5 claim.  And to prevail on their claims for violations of § 20(a) and § 20A, plaintiffs must
   first allege a violation of § 10(b) or Rule 10b-5.  Absent pleading scienter with particularity,
   there can be no liability in this case."); *In re King Pharms., Inc.*, No. 2:03-CV-77, 2004 WL
26  5043539, at *3 (E.D. Tenn. Aug. 11, 2004).

27  [31]  The SEC has described "awareness" as "a commonly used and well-defined English word
   meaning  'having knowledge; conscious; cognizant.'").  Selective Disclosure and Insider
28  Trading, 2000 SEC LEXIS 1672, at *79 n.105.  The SEC has also asserted that "awareness" is
   better understood than "knowing possession."  *Id.*

**B.      Plaintiffs Have Not Established That Ellison Was "Aware" of Material Non-Public Information**

As an initial matter, Plaintiffs have failed to establish that the information Ellison possessed was either "material" or "nonpublic" at the time he traded. *Supra* at 5-27.  That should end the inquiry, and Plaintiffs' summary judgment motion should be denied on that basis alone.  Even if Plaintiffs could satisfy that burden, they still would need to satisfy Section 10(b)'s scienter requirement; imposing liability based merely on the possession of material information, without more, would be tantamount to imposing strict liability.  In order for the scienter element to have meaning, Plaintiffs must prove that Ellison *was aware* that the information he possessed was "material."  Absent such a showing, Plaintiffs cannot demonstrate that Ellison had the requisite intent to deceive the purchasers of his stock—by intentionally withholding the material information when he made the decision to trade.  *See* Selective Disclosure and Insider Trading, 2000 SEC LEXIS 1672, at *79 (noting the SEC's belief that the "awareness" standard reflects "the common sense notion that a trader who is aware of inside information when making a trading decision *inevitably* makes use of the information").

The undisputed facts show that Ellison reasonably believed Oracle would achieve its public guidance when he traded.  *See* DMSJ at 6-16; Ellison Decl., at ¶¶ 4-5, 14 (Dkt. No. 1218). Oracle's internal forecasts supported that guidance throughout the relevant period, and there simply is *no* evidence that Ellison thought Oracle was going to miss its guidance when he sold. Given this, there is no evidence suggesting Ellison was aware that the information he possessed was "material" in the sense required by *Adobe* (no "reasonable basis" for public guidance) or *Shaw* (intra-quarter data suggesting a "substantial likelihood" of an "extreme departure" from public guidance).  Since Ellison was not *aware* that the information he possessed was material, he *inevitably* did not make use of that information.  By definition, he did not have the requisite "mental state embracing intent to deceive, manipulate, or defraud."  *Ernst*, 425 U.S. at 193 n.12.

**C.      The Undisputed Facts Are Inconsistent With A Finding That Ellison Traded "On The Basis Of" Any Material Non-Public Information**

Even if Plaintiffs could demonstrate that Ellison possessed information he knew to be

1   material and nonpublic at the time of his trades (which they cannot), they also must demonstrate

2   a causal connection between Ellison's awareness of the alleged information and his trading.  *See*

3   *Lipson*, 278 F.3d at 660 (approving jury instruction that:  "[i]f you conclude that the trades . . .

4   would have occurred on the same dates and involving the same amounts of stock regardless of

5   whether [defendant] possessed the inside information . . ., then you should find that [defendant]

6   did not use the inside information in selling [stock].").  Indeed, Rule 10b5-1 itself recognizes this

7   causation requirement.  That rule contains an affirmative defense specifically excusing from

8   liability a defendant who trades while aware of material nonpublic information—provided

9   certain circumstances are established.  17 C.F.R. § 240.10b5-1(c).

10          While acknowledging this aspect of the Rule's import, Plaintiffs incorrectly suggest that

11   the specific affirmative defenses delineated in 10b5-1(c) are exclusive, and therefore that Ellison

12   cannot rebut the presumption that he used material information in his possession when he traded.

13   20A MSJ at 31 n.18.  However, the Rule itself—while recognizing the need to establish

14   causation before liability may be imposed—does not state that the affirmative defenses listed in

15   Rule 10b5-1 are exclusive.  In considering this issue, Judge Posner suggested that the specific

16   defense outlined in Rule 10b5-1(c) is not exclusive, and that the application of 10b5-1 would not

17   change the defense of nonuse.  *Lipson*, 278 F.3d at 660.  In other words, even after the adoption

18   of Rule 10b5-1, an insider trading defendant can defeat liability by negating any causal

19   connection between his awareness of material nonpublic information and his decision to sell.  *Id.*

20   (approving jury instruction that provided a defense for proof that defendant would have traded

21   regardless of whether he possessed the material non-public information, and noting that such an

22   instruction simply provided an affirmative defense similar to Rule 10b5-1(c)).

23          Plaintiffs argue in favor of a "strong presumption" that a person who is aware of material

24   non-public information necessarily trades "on the basis of" that information.  *See* 20A MSJ at 31

25   (relying on *Johnson v. Aljian*, 394 F.Supp.2d 1184, 1198-99 (C.D. Cal. 2004)).  Plaintiffs go on

26   to argue that under Rule 10b5-1, that presumption can be overcome only through a 10b5-1

27   trading plan.  20A MSJ at 31 n.18.  Taken together, these arguments are tantamount to a claim

28   that strict liability should be imposed, absent adoption of a trading plan that meets the

1    requirements of the Rule.[32]  But as set forth above, the Rule itself does not actually establish an

2    exclusive "safe harbor."  Thus, even if such a presumption exists,[33] Ellison can and does

3    overcome any such presumption because the unrebutted facts demonstrate that he would have

4    sold his stock regardless of any material information he possessed.  *Lipson*, 278 F.3d at 660; *see*

5    *also In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989) (no jury question of

6    scienter, in light of defendants' "credible and wholly innocent explanations for the stock sales").

## 1. The Undisputed Facts Demonstrate A "Credible And Wholly Innocent" Explanation For Ellison's Sales

9        Plaintiffs cannot establish that Ellison traded "on the basis of" material nonpublic

10   information because the undisputed facts show a "credible and wholly innocent" explanation for

11   his sales.  *See Lipson*, 278 F.3d at 661 (defendant's production of "some evidence" that he did

12   not use the material nonpublic information was "enough to satisfy his burden of production and

13   thus require the jury to decide whether to infer from the inside information and the timing of the

14   trades whether his decision on when and how much to sell was indeed influenced by the

15   information").  On the advice of his financial advisor, Ellison sold Oracle stock in January 2001

16   because he had over half a billion dollars worth of stock options due to expire August 1, 2001—

17   and only three trading windows left in which to exercise them.  *See* Ellison Decl., at ¶¶ 6, 8-9

18   (Dkt. No. 1218); *Oracle Deriv.*, 867 A.2d at 954-55.  Once he decided to sell the shares obtained

19   through the expiring options, Ellison determined (again, at the urging of his advisor) to sell

20   additional shares in order to pay down more debt.  Ellison Decl., at ¶¶ 9-10.  But Ellison placed

21   restrictions on his sales that are irreconcilable with any suggestion that he was bailing out of

22   Oracle's stock to avoid an expected price decline:  he capped the percentage of daily volume for

23   his trades, imposed a floor on the price at which the shares could be sold (because he did not feel

---

24

25   [32] To the extent Rule 10b5-1 permits a plaintiff to prevail on an insider trading claim by merely showing awareness of material nonpublic information, and without showing an "intent to deceive, manipulate or defraud," the rule would exceed the SEC's authority pursuant to Section

26   10(b) and would therefore be invalid.  *See, e.g.*, Carol B. Swanson, *Insider Trading Madness: Rule 10b5-1 and the Death of Scienter*, 52 KAN. L. REV. 147, 204 (2003); Stuart Sinai, *A*

27   *Challenge to the Validity of Rule 10b5-1*, 30 SEC. REG. L.J. 261 (2002).

28   [33] The Ninth Circuit has explicitly left open the question of whether such a presumption applies in a civil case.  *U.S. v. Smith*, 155 F.3d 1051, 1069 n.27 (9th Cir. 1998).

1   sales below $30 per share would fairly value Oracle's stock), and declined to sell shares during

2   early February, notwithstanding clearance to do so. *Id.* ¶ 11.  As a result, Ellison sold only 29

3   million of the 40 million shares that he and his advisor had decided to sell—or just more than 2%

4   of his total Oracle holdings. *Id.* ¶ 13; Ex. 187 at 164:1-24, 174:10-24, 180:8-19, 202:19-24; Ex.

5   188.  Under *Apple*, Ellison's "credible and wholly innocent explanation" for his sales, together

6   with his voluntary restrictions on them, undercuts any inference of scienter as a matter of law.

7   886 F.2d at 1117.[34]

8        The Ninth Circuit's analysis of Ellison's trades at the pleading stage does not change this

9   analysis.  Drawing all inferences in Plaintiffs' favor, the Ninth Circuit held that Ellison's sales

10   were "suspicious."[35]  But given the procedural posture, the Ninth Circuit did not have before it

11   the unrebutted evidence explaining the reasons for Ellison's sales.  *Oracle*, 380 F.3d at 1232.  In

12   the face of these uncontested facts, holding that Ellison's sales were suspicious as a matter of law

13   merely because of the dollar amount involved would be tantamount to inferring fraudulent intent

14   based solely on wealth.

15        **2.    Ellison Did Not "Suddenly Deviate" From A Plan To Sell In April**

16        Plaintiffs attempt to buttress their argument that Ellison acted with scienter by arguing

17   that he had a "plan" to sell in April 2001, and that he "suddenly deviated" from that plan in order

18   to "unload early" in January 2001.  20A MSJ at 20, 24-25.  This is yet another fiction,

19   unsupported by the evidence.  Indeed, the very use of the word "unload" is absurd, given that

20   Ellison sold barely more than 2% of his Oracle holdings.  Both Ellison and Simon testified that

21   neither of them had ever planned to exercise the options in April 2001.  Ex. 342 at 486:3-487:20,

22   495:16-496:20; Ex. 359 at 122:11-19, 130:7-136:17.  Their testimony is also consistent with the

23   ---

24   [34] The Ninth Circuit's subsequent decision in *Kaplan v. Rose*, 49 F.3d 1363 (9th Cir. 1994), does not undermine the standard articulated in *Apple*, and does not suggest a different outcome here. In *Kaplan*, the court held that the individual defendants' explanations for their sales were not

25   "wholly innocent," because the two defendants sold two-thirds and 100% of their stock, and one of them sold because he wanted to retire.  *See id.* at 1379-80.  Ellison, who remained CEO of

26   Oracle, sold just 2% of his Oracle holdings.

27   [35]  Plaintiffs wrongly argue that because "Ellison sold 16.34% of the maximum allowed by SEC Rule 144 (178 million shares) … [h]is sales support a finding of scienter."  20A MSJ at 43.
   *Contra In re Skechers U.S.A., Inc. Sec. Litig.*, No. CV 03-02094 PA, 2004 WL 1080174, at *9-

28   *10 (C.D. Cal. May 7, 2004) (holding that the fact that defendants sold "*95% of the shares they were permitted to sell under [SEC] Rule 144*" did *not* support a strong inference of scienter).

1    record, which indicates that Ellison would exercise his options *no later than* April 2001.  PX 96.

2         Plaintiffs base their "sell in April" theory on a January 10, 2001 e-mail to Simon from

3    Deborah Lange, an executive in Oracle's tax department, about whom Ellison testified:  "I don't

4    think I've ever had a private conversation with Deb Lange in my life."  Ex. 342 at 487:12-20

5    ("Q.  Did you tell [Lange] that it was your intention of—selling and exercising your stock in

6    April of 2001?  A.  No.").  Simon testified that Lange's email did not reflect any plan on

7    Ellison's part to sell in April, but rather suggested that *Lange* would have preferred for Ellison to

8    exercise his options during Oracle's FY 2001—meaning no later than April 2001 (because the

9    window for insider sales would have been closed in May, Oracle's fiscal year-end)—in order to

10   optimize *Oracle's* tax deductions.  Ex. 359 at 134:3-16.  Although Lange was on Plaintiffs'

11   witness list, they elected not to depose her on this issue, no doubt because they knew her

12   testimony would not support their claim.  Ex. 360 at Attachment A.  Plaintiffs' theory about

13   Ellison's plan is thus based on a hearsay email from an individual with no personal knowledge of

14   Ellison's intent, and is contrary to all admissible evidence in the record.  Ellison did not

15   "suddenly deviate" from a plan to sell in April 2001 because there never was any such "plan."

16   **VI.   PLAINTIFFS CANNOT PROVE AN INDEPENDENT VIOLATION OF THE
          SECURITIES EXCHANGE ACT**

17

18        **A.   Plaintiffs Cannot Rely On Ellison's Trading To Establish A "Predicate"
              Exchange Act Violation**

19        "Claims under Section 20A are derivative and therefore require an independent violation

20   of the Exchange Act."  *Johnson*, 490 F.3d at 781; *Connectics*, 2008 WL 3842938, at *15.[36]

21   Thus, in order to prove the predicate for their Section 20A claim, Plaintiffs must prove that

22   Ellison violated Section 10(b) and Rule 10b-5 through one or more of the purportedly false

23   statements or omissions alleged in the complaint.  *See* RSAC at ¶¶ 86-93.  They must show, in

24   other words:  "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

25   connection between the misrepresentation or omission and the purchase or sale of a security; (4)

26

27   [36] *See also U.S. v. O'Hagan*, 521 U.S. 642, 666 n.11 (1997); *In re Enron Corp. Sec., Deriv. &
     ERISA Litig.*, 258 F. Supp. 2d 576, 600-01 (S.D. Tex. 2003); *In re VeriFone Sec. Litig.*, 11 F.3d
28   865, 870 (9th Cir. 1993); *but see In re JDS Uniphase Corp. Sec. Litig.*, No. C 02-1486 CW, 2007
     U.S. Dist. LEXIS 76936, at *12-15 (N.D. Cal. Sept. 27, 2007).

1    reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."

2    *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S.Ct. 761, 768 (2008) (citing *Dura*

3    *Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)); DMSJ at 20, 40.[37]

4        Plaintiffs' motion does not even attempt to prove a false statement or omission by

5    Ellison, and instead relies on Ellison's trades as the purported "predicate" violation. *See* 20A

6    MSJ at 30 n17. As such, Plaintiffs have not established an "independent" violation of the

7    Exchange Act, and their motion must be denied. *See Connectics*, 542 F.Supp.2d at 1010, 1013-

8    14. Moreover, for the reasons set forth in Defendants' Motion for Summary Judgment (Dkt. No.

9    1524), Plaintiffs have failed to meet their burden on several elements of their Section 10(b)

10    claim, most especially on the element of loss causation. *See also* DMSJ at 40-50.

11        **B.**      **Plaintiffs Have Not Demonstrated Loss Causation**

12          **1.**      **Loss Causation Requires Disclosure Of The "Relevant Truth"**

13        Plaintiffs concede that they bear the burden of proving loss causation. 20A MSJ at 44

14    (citing *Dura*, 544 U.S. at 346). Revealingly, though, Plaintiffs do not discuss any of the myriad

15    cases explaining what *evidence* is necessary to meet this burden. 20A MSJ at 44-46. Under

16    *Dura*, Plaintiffs must prove that Oracle's stock price dropped because the "relevant truth"—the

17    facts that Plaintiffs claim were concealed by the alleged fraud—became "generally known."

18    *Dura*, 544 U.S. at 344. Thus, "[l]oss causation requires disclosure." *McKowan Lowe & Co.,*

19    *Ltd. v. Jasmine, Ltd.*, No. Civ. 94-5522 RBK, 2005 WL 1541062, at *9 (D.N.J. June 30, 2005),

20    *aff'd*, 231 Fed. Appx. 216 (3d Cir. 2007); *see also Metzler Investment GMBH v. Corinthian*

21    *Colleges*, 540 F.3d 1049, 1063-64 (9th Cir. 2008) (noting that "the complaint must allege that the

22    practices that the plaintiff contends are fraudulent were revealed to the market and caused the

23    resulting losses."); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005); *In re Gilead*

24    *Sciences Sec. Litig.*, 536 F.3d 1049, 1058 (9th Cir. 2008). Absent such disclosure, there is no

25

26    [37] These are the elements of a claim under Rule 10b-5(b). Claims under Rule 10b-5(a) or (c)
require a plaintiff to prove the last five of these elements, and substitutes the required showing of

27    a material misstatement or omission for one of fraudulent conduct. *In re Able Labs. Sec. Litig.*,
No. 05-2681 (JAG), 2008 U.S. Dist. LEXIS 23538, at *67 (D.N.J. Mar. 24, 2008); *see also*

28    *Johnson*, 394 F. Supp. 2d at 1203 (requiring plaintiff to demonstrate transaction causation and
loss causation to state a claim under Section 20A).

1  basis for concluding that a shareholder's loss was caused by the alleged fraud—as opposed to the

2  other "tangle of factors" that can affect a company's stock price.[38]  *Dura*, 544 U.S. at 343.

3  Thus, without evidence that the "relevant truth" was disclosed to the market, Plaintiffs

4  cannot establish loss causation, and Defendants (not Plaintiffs) are entitled to judgment as a

5  matter of law.  *See Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1448 (11th Cir. 1997)

6  (reversing jury verdict for plaintiff based on lack of evidence that loss was caused by misstated

7  cash flow figures where, at the time the stock price dropped, "the investing public continued to

8  believe that KPI's 1988, 1989, and 1990 cash flow figures were correct"); DMSJ at 40-49; *see*

9  *also In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008) (granting

10  summary judgment on loss causation grounds); *Ryan v. Flowserve Corp.*, 245 F. Supp. 2d 560,

11  578 (N.D. Tex. 2007) (same); *McKowan*, 2005 WL 1541062, at *9 (same); *In re IKON Office*

12  *Solutions, Inc. Sec. Litig.*, 131 F. Supp. 2d 680, 691 (E.D. Pa. 2001) (same).

13         **2.**      **The "Relevant Truth" Means The Specific Facts That Plaintiffs Claim**
14                    **Were Concealed**

15  Because loss causation requires disclosure of the "relevant" truth, the litmus test is

16  whether the market became aware of the very facts that Plaintiffs claim Ellison concealed.  *See*,

17  *e.g.*, *Metzler*, 540 F.3d at 1063; *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d Cir.

18  2007) ("[T]he plaintiff must show that the defendant misrepresented or omitted the very facts

19  that were a substantial factor in causing the plaintiff's economic loss."); *Tricontinental Indus.*,

20  *Ltd. v. PriceWaterhouseCoopers, LLP*, 475 F.3d 824, 843-44 (7th Cir. 2007); *Brodsky v. Yahoo!*,

21  *Inc.*, No. C 08-02150 CW, 2008 WL 4531815, at *12 (N.D. Cal. Oct. 7, 2008); *In re Intelligroup*

22  *Sec. Litig.*, 527 F. Supp. 2d 262, 326 (D.N.J. 2007).  Plaintiffs thus cannot show loss causation

23  by recharacterizing the "relevant truth" as, in essence, Oracle's overall financial health or the

24  prospects for Suite 11i.  *See Metzler*, 540 F.3d at 1063 ("Plaintiffs adequately pled loss causation

25  in *Daou* because their complaint alleged that the market learned of and reacted to th[e] fraud, as

26  opposed to merely reacting to reports of the defendant's poor financial health generally."); *see*

27

28  [38]  Other Circuits have reached the same conclusion.  *See*, *e.g.*, *Glaser v. Enzo Biochem, Inc.*, 464 F.3d 474, 479 (4th Cir. 2007); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).

1   *also Flowserve*, 245 F.R.D. at 573-74; *see also In re TECO Energy, Inc. Sec. Litig.*, No. 8:04-

2   CV-1948-T-27 EAJ, 2006 WL 845161, at *4 (M.D. Fla. Mar. 30, 2006); *IKON*, 131 F. Supp. 2d

3   at 689-90; *In re Odyssey Healthcare, Inc. Sec. Litig.*, 424 F. Supp. 2d 880, 888 (N.D. Tex. 2005).

4   Instead, having survived a pleadings challenge under the Reform Act by identifying specific

5   statements they claim were false (15 U.S.C. § 78u-4(b)(1)(B)), Plaintiffs must prove that the

6   market became aware of the "true facts" that those statements allegedly concealed. *See*, *e.g.*,

7   *Tricontinental*, 475 F.3d at 843-44.

8              **3.      There Was No "Direct Disclosure" Of The "Relevant Truth"**

9              *Dura* and its progeny make clear that a securities fraud plaintiff generally can establish

10  the required disclosure—*i.e.*, market awareness—in one of two ways.  First, a plaintiff can show

11  that the market learned the "relevant truth" through a direct disclosure, *i.e.*, a disclosure that

12  expressly reveals a "truth" that the defendant concealed through the fraud.  *Dura*, 544 U.S. at

13  342-43; *Metzler*, 540 F.3d at 1063.  Alternatively, a plaintiff can show that the market learned

14  the "relevant truth" indirectly, *i.e.*, through the disclosure of new information that does not

15  expressly correct a prior misstatement, but which establishes the falsity of prior statements.

16  *Metzler*, 540 F.3d at 1064.  In the case of a so-called "indirect" disclosure, the plaintiff must

17  prove that the market "recognized a relationship" between the event disclosed and the

18  fraudulently concealed information.  *Flowserve*, 245 F.R.D. at 579; *McKowan*, 2005 WL

19  1541062, at *8-9.  Thus, while Plaintiffs do not necessarily need to identify a "mirror image"

20  corrective disclosure, they must produce evidence that the market learned of and reacted to

21  revelation of the "relevant truth."  *Dura*, 544 U.S. at 344.

22             Plaintiffs claim their loss was triggered by Oracle's March 1, 2001 announcement of the

23  3Q01 miss.  20A MSJ at 44-45.  But that announcement, which occurred through a press release

24  and a conference call with analysts on March 1, 2001, did not directly or indirectly disclose any

25  of the four categories of "facts" that they claim Ellison concealed.  Exs. 30 and 393.

26                     a.      *The Effect Of The Economy On Oracle's Business During 3Q01*

27             Plaintiffs claim Ellison concealed the fact that the economy had been adversely affecting

28  Oracle "throughout the Class Period."  20A MSJ at 45.  But Oracle did not tell the market on

1   March 1 that the economy had been adversely affecting it throughout 3Q01.  On the contrary,

2   Oracle disclosed that customers had canceled or delayed large numbers of deals in the last few

3   days of the quarter due to concerns about the economy.  Ex. 30 at 442139 ("License growth was

4   strong in the first two months of Q3, and our internal sales forecast looked good up until the last

5   few days of the quarter . . . .  However, a substantial number of our customers decided to delay

6   their IT spending based on the economic slowdown in the United States."); Ex. 393 at 419802.

7   The March 1 disclosure, in fact, largely repeated what Defendants had been telling the markets

8   until the very end of 3Q01—thus refuting any suggestion that it revealed the "relevant truth."

9   *See In re Impac Mortg. Holdings, Inc. Sec. Litig,*, 544 F. Supp. 2d 1083, 1102 n.13 (C.D. Cal.

10  2008) (no loss causation where the alleged "corrective disclosure" merely "repeated the alleged

11  misrepresentations."); *Flowserve*, 245 F.R.D. at 572 (same).

12      Plaintiffs simply ignore the facts that Oracle actually disclosed to the market on March 1,

13  2001, and instead repeat the "facts" that they claim Ellison concealed.  20A MSJ at 45.  But

14  "[s]uch evidence that was never disclosed to the public would not produce market reaction,

15  analyst commentary, and harm to investors . . . ."  *Flowserve*, 245 F.R.D. at 575.  In short,

16  Plaintiffs run from their loss causation burden—tacitly acknowledging their inability to meet it.

17                    b.   *The Basis For Oracle's 3Q01 Guidance*

18      Plaintiffs also claim that Ellison concealed the "fact" that Oracle had no "reasonable

19  basis" for its 3Q01 public guidance.  20A MSJ at 45.  But Oracle did not disclose this "fact" on

20  March 1, 2001.  Oracle disclosed only that it had missed its 3Q01 guidance—not that it had no

21  "reasonable basis" for that guidance in the first place.  In fact, in announcing the miss, Oracle's

22  executives stressed that the miss had only become apparent in the last few days of the quarter.

23  *See* Ex. 393 at 419802 ("Going in to as late as last Friday we still felt very good about our

24  quarter and then on Friday we started to see a few cracks."); *id.* at 419809 ("And we really didn't

25  see it in our business until the last few days as these approvals made it up the management

26  chain.").  Again, Plaintiffs ignore the facts that Oracle actually disclosed on March 1, 2001, and

27  instead simply repeat the "facts" that they claim Ellison concealed.  20A MSJ at 45.

28

1                  c.      *Alleged "Problems With Suite 11i"*

2          Plaintiffs also claim that Ellison concealed "problems" with Suite 11i.  20A MSJ at 45.

3   But in announcing the miss, Oracle did not reveal any previously undisclosed "problems" with

4   Suite 11i, nor did it suggest that such "problems" caused the miss.  In fact, there is no discussion

5   at all of problems with Suite 11i.  Ex. 30; Ex. 393.  On the contrary, in explaining the miss,

6   Oracle and its executives stressed that it was not caused by losses to competitors:  "These were

7   not deals that we lost competitively.  These were not deals where they decided not to buy.  These

8   are literally deferrals because of economic uncertainty."  Ex. 393 at 419816-17; *see also id.* at

9   419807-08, 419810.  Thus, far from suggesting a lack of customer demand because of

10  "problems" with Suite 11i, Oracle and its executives told the market that customers still wanted

11  to buy Suite 11i—but had delayed their purchases at the last minute due to economic uncertainty.

12  *Id.* at 419812; *see also id.* at 419815.  Plaintiffs cannot (and do not) argue otherwise.

13                 d.      *Oracle's 2Q01 Results*

14         Finally, Plaintiffs claim that Ellison concealed the "fact" that Oracle's 2Q01 results had

15  been improperly inflated.  20A MSJ at 45.  Again, the March 1, 2001 announcement said nothing

16  about Oracle's 2Q01 results, and certainly did not reveal that those results had been inflated (as

17  Plaintiffs now claim) by the HP transaction or the bad debt transfers.[39]  Because the March 1,

18  2001 announcement plainly did not disclose any misstatement of Oracle's 2Q01 financial

19  results—results that have never been restated or corrected—Plaintiffs cannot demonstrate loss

20  causation with respect to their accounting allegations.  *See Metzler*, 540 F.3d at 1063; *McCabe*,

21  494 F.3d at 426; *Brodsky*, 2008 WL 4531815, at *12.

22         **4.      There Was No "Indirect Disclosure" Of The "Relevant Truth"**

23         Nor is there any evidence that the market learned the "relevant truth" indirectly.  The

24  touchstone for determining whether Oracle's earnings miss reflected an indirect disclosure of the

---

25  [39]  Clearly recognizing that no alleged misstatement of Oracle's 2Q01 results has ever been
26  disclosed, Plaintiffs try to redefine the "relevant truth" in a way that conflates the allegedly false
    2Q01 results with the allegedly concealed "problems with Suite 11i."  20A MSJ at 46-47.
27  Because loss causation requires proof that the market became aware of the specific facts that
    were allegedly concealed, these two categories of "facts" must be analyzed separately.  Plaintiffs
28  must show that the market learned the "truth" about Oracle's 2Q01 results, and must show
    separately that the market learned "truth" about Suite 11i.  They can do neither.

1    relevant truth is evidence of what the market believed caused that miss.  *See Flowserve*, 245

2    F.R.D. at 579; *McKowan*, 2005 WL 1541062, at *8-9.  Courts uniformly consider market analyst

3    reports as evidence of how the market understood a given disclosure.  *See, e.g.*, *Flowserve*, 245

4    F.R.D. at 573; *IKON*, 131 F. Supp. 2d at 689.  Here, to prove loss causation, Plaintiffs must show

5    that the market understood Oracle's earnings shortfall as a revelation that:  (a) the economy had

6    been adversely affecting Oracle's business since the beginning of 3Q01; (b) Oracle's public

7    guidance had no reasonable basis; (c) the complained-of problems with Suite 11i caused lost

8    sales; or (d) Oracle's 2Q01 earnings figures were inaccurate.  Yet, the evidence shows that the

9    market analysts said none of these things in analyzing Oracle's earnings announcement.

a.    *Analysts Uniformly Understood Oracle's Announcement To Reflect A Sharp And Sudden Industry-Wide Downturn*

12   Market analysts uniformly understood Oracle's 3Q01 miss not as the disclosure of a

13   fraud at Oracle, but as evidence that the entire industry had entered into a sharp and sudden

14   downturn due to economic concerns.  On March 2, 2001, for example, a Banc of America analyst

15   wrote that Oracle's "[d]eal closure rates in the U.S. were clearly plagued at the eleventh hour"

16   and concluded that "economic 'shock' is badly impairing demand in the software e-business

17   sector."  Ex. 406 at 02688.  The analyst went on to write:

18          To reiterate our point of view:  e-business software vendors are insulated but not
19          at all immune from economic slowing, particularly as a rapid and volatile
            macroeconomic slowing such as we are now experiencing is perceived as a
20          'shock' by Global 1000 executives.

21   *Id.* at 0268-69.  That same day, a Morgan Stanley analyst wrote:

22          Other software companies have to be concerned and will likely see something in
            March.  Oracle has a strong product line, is well positioned with customer[]
            references and couldn't get quite enough deals done.  Most other software
23          companies are in far weaker positions from a product and positioning perspective.

24   Ex. 407 at 091349.  And an analyst at Salomon Smith Barney wrote:

25          If Oracle is seeing a deferral of this magnitude, we believe the Company's
            shortfall is an omen for other names in our universe.  Given that Oracle has a
26          February-quarter end, and the slow down only began to affect the company during
            the latter portion of February, we believe other applications vendors may face
27          difficulty in March and could have a hard time meeting expectations.

28   Ex. 410 at 091362.  Other analysts voiced similar views.  Ex. 409 at 091385.

1    Consistent with their view that Oracle's 3Q01 miss heralded a downturn in the entire

2    sector, in response to Oracle's March 1 announcement analysts revised their models and

3    downgraded their ratings not just for Oracle, but for the entire enterprise software industry.  Ex.

4    407 at 091348 (downgrading ratings for BEA Systems, Commerce One, Computer Associates,

5    E.piphany, i2 Technologies, Informatica, PurchasePro, Siebel, SeeBeyond, TeleTech, TIBCO,

6    Veritas, Vignette and webMethods); *see also* Exs. 451-457.  Not surprisingly, on the first trading

7    day after Oracle's March 1, 2001 announcement, it was not just Oracle's stock that went down;

8    every one of Oracle's enterprise software competitors saw its stock price decline as well.  *See*

9    James Decl. Ex. 1 at ¶ 61 (Dkt. No. 1505).  Clearly, the market understood Oracle's March 1,

10   2001 announcement to reflect new information not just about Oracle, but about the industry as a

11   whole.[40]  *See Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007)

12   (affirming grant of summary judgment for defendants where plaintiffs failed to refute evidence

13   that loss was the result of market forces that impacted competitors); *Lentell*, 396 F.3d at 174.

14   In the face of these analyst reports uniformly attributing Oracle's miss to a sharp and

15   sudden downturn in the industry, Plaintiffs cite no evidence that the market understood the miss

16   as revealing the facts they claim Ellison concealed.  They cite no evidence that the market

17   understood the March 1 announcement as a disclosure that the economy had been hurting

18   Oracle's business throughout 3Q01, or as a revelation that there had been no "reasonable basis"

19   for Oracle's 3Q01 guidance.  To the contrary, analysts uniformly accepted Oracle's explanation

20   that it did not see any negative effect from the economy until the very end of its 3Q01.[41]  And

21   there is no evidence that the market understood the March 1 announcement as a revelation that

22   Oracle's 2Q01 results had been misstated.[42]  Plaintiffs do not cite a single analyst who concluded

23

---

24   [40]  Absent new information about the market or the industry, the odds that all of these companies
     would see their stock price decline on the same day is less than 1%.  James Decl., Ex. 1 at ¶ 61

25   (Dkt. No. 1505).

26   [41]  *E.g.*, Ex. 406 at BOA 02690 (BofA:  "A great percentage of sales occur in the third month of
     each quarter, with a surprisingly high percentage in the final days. … We continue to believe

27   (and Oracle's shortfall seems to bear this out) that at the 11th hour, in an uncertain economy,
     some technology buyers will defer their purchases."); *see also* Ex. 407 at 091349; Ex. 408 at 2;

28   Ex. 410 at 91361.

     [42]  Indeed, it took Plaintiffs' counsel years to think up these accounting theories.

1    that Oracle's 3Q01 miss was in any way related to Oracle's 2Q01 results.  *See Flowserve*, 245

2    F.R.D. at 573 ("[T]he collective silence by analysts in 2002 is noticeably deafening.").

3         With regard to Suite 11i, Plaintiffs quote a single analyst report in support of their claim

4    that "analysts specifically attributed the miss to problems with Suite 11i."  20A MSJ at 46.  But

5    the report itself says no such thing.  After suggesting the possibility that Oracle's 3Q01 miss may

6    have been caused in part by the fact that Suite 11i did not have as much "functionality" as

7    competing best of breed solutions, the report went on to note that the real test of this hypothesis

8    would be the results reported by Oracle's competitors in the coming weeks:  "The litmus test for

9    Oracle's competitors is in 15-30 days when applications software companies report their March

10   quarters.  *If results are weak, it's probably good news for Oracle (Oracle's apps weakness is due*

11   *more to industry weakness); if they're strong, it's bad news (apps business is losing share)*."  Ex.

12   PX 113 at BOA02710 (emphasis added).  As the undisputed facts establish, Oracle's competitors

13   lowered or missed their own guidance in the weeks following Oracle's March 1 announcement,

14   thus demonstrating (even according to the analyst Plaintiffs quote) that Oracle's miss was not

15   driven by problems with Suite 11i, but by the market-wide downturn.  *See* Exs. 413-417.

16        In any event, the specific issue identified by this analyst—the relative "functionality" of

17   Suite 11i compared with competing "best of breed" solutions—has nothing to do with the alleged

18   "quality problems" that Plaintiffs claim Ellison concealed.  The term "functionality" in this

19   context refers to the depth and breadth of features and functions in the software. Exs. 91-93.  The

20   fact that these best of breed or "point" solutions offered deeper functionality was hardly a secret

21   to the market.  *See*, *e.g.*, Ex. 98; Ex. 118; Ex. 215; Ex. 245.  In fact, in making the case for Suite

22   11i, Ellison and others candidly acknowledged that Suite 11i did not have the same depth of

23   functionality as best of breed or "point" solutions, but argued that the benefits of buying an

24   integrated suite of products from one vendor outweighed the difference in functionality.  *See* Ex.

25   101 at 306992; Ex. 122.  And in Oracle's 2Q01 Form 10-Q, the Company explicitly warned that

26   Suite 11i sales were subject to the risk that customers may be dissatisfied with the product's

27   functionality.  See Ex. 160 at 024183-84.  Thus, even if the hypothesis of the BofA report had

28   turned out to be correct, it would not suggest that the market understood Oracle's miss to have

1    revealed some "truth" that Ellison is alleged to have concealed; if anything, the BofA report

2    identified a risk that Oracle had long since disclosed to the market.

3              The only other "evidence" Plaintiffs cite for their claim that "analysts" attributed the miss

4    to "problems with Suite 11i" is a quote from the text of *Softwar*, written by Matthew Symonds

5    long after the end of Oracle's 3Q01.  In it, Symonds asserts:

6              It didn't take a genius to see that not everything that was going on could be
               explained by the weakening economy and edgy CEOs waiting for 'visibility' to
7              return.  For anyone who wanted to see, there was mounting evidence that it wasn't
               only the economy that prospective Oracle applications customers wanted to see
8              stabilize.

9    PX 12 at 201.  This statement by Symonds is both hearsay and rank speculation.  Symonds does

10   not identify any alleged "mounting evidence," nor is there any indication that Symonds had any

11   idea what really caused Oracle to miss its 3Q01 guidance.  And in any event, Symonds' musings

12   about Oracle's 3Q01 miss, several years after the fact, are completely irrelevant to what the

13   market understood about Oracle's March 1, 2001 disclosure *at the time it was made*.  As such, it

14   is irrelevant to the loss causation question presented:  what caused Oracle's stock price to drop

15   on March 2, 2001?  Symonds' uninformed speculation, moreover, is inconsistent with the

16   conclusions drawn by knowledgeable market analysts at the time, who uniformly attributed the

17   miss to a downturn in the entire enterprise applications sector, as well as with subsequent

18   disclosures by Oracle's competitors, which made clear that the analysts were correct.  Indeed, as

19   set forth above, the undisputed evidence shows that Symonds' uninformed speculation was

20   simply incorrect:  after years of discovery Plaintiffs have developed no evidence that undisclosed

21   quality "problems" with Suite 11i caused any 3Q01 sales to be lost or delayed at all.

22                    b.    *Subsequent Industry Events Proved The Analysts Correct*

23             The analysts, as it turned out, were correct about the industry downturn.  In the weeks

24   following Oracle's March 1, 2001 announcement, dozens of software companies either lowered

25   or missed their guidance.  Thus, for example, in April 2001, a Morgan Stanley analyst counted

26   54 negative software company preannouncements, with an average revenue shortfall of 20%

27   (nearly three times the size of Oracle's revenue miss).  Ex. 408 at 2.  As analysts noted at the

28   time, Oracle simply had the misfortune of announcing its quarter earlier than other software

1    companies due to its February quarter end.  *See* Ex. 395 at 2.  Indeed, although no one knew it at

2    the time, the NBER concluded in November 2001 that the United States economy had entered

3    into a recession in March 2001.  Ex. 400.  Thus, the customers who canceled deals with Oracle

4    and its competitors in late February turned out to be leading indicators of this broader recession.

5           Because there is no evidence that the market learned the "relevant truth" directly or

6    indirectly, Defendants, not Plaintiffs, are entitled to judgment as a matter of law.  *See Omnicom,*

7    541 F. Supp. 2d at 552; *Flowserve*, 245 F.R.D. at 571-73; *McKowan*, 2005 WL 1541062, at *9-

8    11; *IKON*, 131 F. Supp. 2d at 688-91; *cf. Robbins*, 116 F.3d at 1448.

9           **5.      Plaintiffs Have Failed To Adduce Evidence Attributing A Specific**
                    **Portion Of The March 2, 2001 Stock Drop To Disclosure Of The**
10                  **Alleged Fraud (Disaggregation)**

11          Alternatively, even if Plaintiffs were able to show that a "relevant truth" was disclosed on

12   March 1, 2001, their Section 20A claim nevertheless fails because they have offered no evidence

13   to distinguish the stock price effect of the alleged fraud from the "tangle of [other] factors" that

14   affected the price of Oracle's stock price on March 2, 2001.  *Dura*, 544 U.S. at 343.  As the

15   Supreme Court has explained, the "logical link between [an] inflated share price" resulting from

16   an alleged fraud "and any later economic loss is not invariably strong" because a reduced share

17   price may reflect, not the revelation of the "relevant truth," but instead "changed economic

18   circumstances, changed investor expectations, new industry-specific or firm-specific facts,

19   conditions or other events . . . ."  *Dura*, 544 U.S. at 342-43.  Thus, to prove loss causation,

20   Plaintiffs must offer evidence from which a reasonable jury could find that some specific portion

21   of the March 2, 2001 stock price decline was caused by fraud, as opposed to other factors.

22   *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007); *Omnicom*, 541 F. Supp.

23   2d at 554 (granting summary judgment for lack of evidence from which jury could "determine

24   whether the alleged fraud caused any portion of Plaintiffs' loss"); *In re Williams Sec. Litig.*, 496

25   F. Supp. 2d 1195, 1266 (N.D. Okla. 2007) (same); *In re Zonagen Sec. Litig.*, 322 F. Supp. 2d

26   764, 781-82 (S.D. Tex. 2003).

27          As noted above, Oracle's March 1, 2001 announcement revealed information unrelated to

28   any alleged fraud at Oracle.  James Decl., at ¶¶ 57-69 (Dkt. No. 1505).  Following Oracle's

1   announcement, *all* of Oracle's competitors' stock prices declined—not the result one would

2   expect if Oracle's stock drop had been caused solely by the disclosure of fraud at Oracle (and

3   certainly not what one would expect if the market had attributed the miss to problems with Suite

4   11i).  In fact, market analysts at the time uniformly attributed Oracle's miss to a sharp and

5   sudden downturn in the enterprise software sector as a whole.  And, in fact, most of Oracle's

6   competitors went on to lower or miss their own guidance, citing the same factors as Oracle.  Exs.

7   413-417; James Decl. at Ex. 1, at ¶ 69.  It is thus beyond dispute that the March 2, 2001 stock

8   drop was caused—at least in part—by factors that were not unique to Oracle.

9        At a minimum, then, Plaintiffs must produce evidence from which a reasonable jury

10   could find that some portion of the March 2 stock drop was caused by factors specific to Oracle,

11   as opposed to the market learning new information about the industry.  *See In re Imperial Credit*

12   *Indus., Inc. Sec. Litig.*, 252 F. Supp. 1005, 1016 (C.D. Cal. 2003); *Carpe v. Aquila, Inc.*, No. 02-

13   0388-CV-W-FJG, 2005 WL 1138833, at *4-5, *8 (W.D. Mo. Mar. 23, 2005).  But the only

14   evidence Plaintiffs have produced in that regard is an event study performed by their loss

15   causation expert, Steinholt.  Ex. 458.  As explained in Oracle's motion to exclude Steinholt's

16   testimony, Steinholt's event study is defective because it does not even purport to eliminate the

17   effects of industry forces on Oracle's stock price.  Steinholt *Daubert* (Dkt. No. 1521) at 5-6.

18   Instead, Steinholt performed a regression that analyzed the relationship between Oracle's stock

19   price movements and the NASDAQ-100—a *market* index, not an *industry* index.  *Id.*  It includes

20   a number of companies that have nothing to do with Oracle's industry—companies such as

21   eBay, Starbucks, and Bed Bath & Beyond.  *Id.*  Because Steinholt's event study does not

22   eliminate industry effects, and Plaintiffs have produced no other evidence from which a jury

23   could find that a specific portion of the March 2 drop was caused by factors specific to Oracle, as

24   opposed to the enterprise software industry generally, Plaintiffs cannot prove loss causation.

25        Even as to any Oracle-specific portion of the March 2 stock drop, Plaintiffs must produce

26   evidence that at least some portion of the stock price decline was caused by fraud as opposed to

27   non-fraud factors.  *Omnicom*, 541 F. Supp. 2d at 554; *Williams*, 496 F. Supp. 2d at 1266, 1295;

28   *Zonagen*, 322 F. Supp. 2d at 781-82.  But again, Plaintiffs' only "evidence" here is the opinion of

1   Steinholt, who admitted that he did not disaggregate these "non fraud" factors because he

2   "assumed" Plaintiffs' claims were true, and that the entire stock price decline was attributable to

3   disclosure of the alleged fraud.  Ex. 418 at ¶ 13; Dkt. No. 1521 at 7.  This is not enough.

4   *Omnicom*, 541 F. Supp. 2d at 554; *Williams*, 496 F. Supp. 2d at 1266, 1295; *Zonagen*, 322 F.

5   Supp. 2d at 781-82; *Oscar Private Equity Inv. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 271

6   (5th Cir. 2007).  Because Plaintiffs have failed to come forward with evidence from which a jury

7   could ascribe some portion of the loss to the fraud, Defendants are entitled to judgment as a

8   matter of law.  *Id.*

9   **VII.   PLAINTIFFS' REQUESTED ADVERSE INFERENCE IS INAPPROPRIATE**

10         This Court's September 2, 2008 Order ("Order") granted Plaintiffs' motion for sanctions

11   only with regard to Ellison's email files and the *Softwar* materials.  Order at 8-12.  The Court

12   granted an inference that these materials "would demonstrate *Ellison's knowledge of*, among

13   other things, problems with Suite 11i, the effects of the economy on Oracle's business, and

14   problems with defendants' forecasting model."  *Id.* at 12 (emphasis added).  The Court did *not*

15   hold that the inference would establish the underlying facts themselves, and certainly not facts

16   unsupported anywhere else in the record.  Furthermore, the Court noted that the inference

17   granted "will not" assist Plaintiffs with regard to every element of their claims, including loss

18   causation.  *Id.*  Contrary to the Order, Plaintiffs now seek to use the adverse inference as an all-

19   purpose gap filler to supply proof where there is none (and where none ever existed).  The record

20   in this case does not come close to justifying the virtually limitless inferences that Plaintiffs have

21   proposed in an attempt to salvage their claims.

22         **A.   Plaintiffs' Proposed Scope For The Adverse Inference Based On Ellison's
                    Emails And The *Softwar* Materials Is Grossly Overbroad**

23

24         Evidentiary sanctions must be "carefully fashioned" to avoid "unduly interfer[ing] with

25   [a party]'s ability to produce relevant evidence."  *Lewis v. Telephone Empl. Credit Union*, 87

26   F.3d 1537, 1558 (9th Cir. 1996).  They should be "narrowly tailor[ed]" to the circumstances of a

27   given case and not "go beyond what is necessary to cure the prejudice" caused by the spoliation.

28   *Keithley v. The Home Store.com, Inc.*, No. C-03-04447 (EDL), 2008 U.S. Dist. LEXIS 61741, at

1  *3, *10, *51-54 (N.D. Cal. Aug. 12, 2008).  The party seeking sanctions is not entitled to rely on

2  "pure speculation as to the content" of lost materials, but rather must provide extrinsic evidence

3  that the lost materials "would have been unfavorable to the spoliator."  *Hamilton v. Signature*

4  *Flight Support Corp.*, No. C 05-0490 CW, 2005 U.S. Dist. LEXIS 40088, at *23-24 (N.D. Cal.

5  Dec. 20, 2005); s*ee also Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 426-29, 437 (S.D.N.Y.

6  2004).  The scope of the inferences Plaintiffs propose here are grossly overbroad and plainly

7  contrary to the Order.

8              **1.      Plaintiffs Improperly Request Inferences On Issues Outside The**
                        **Scope Of The Order**

9

10             Despite the Court's ruling that the inference "will not assist" Plaintiffs in demonstrating

11  the element of loss causation (Order at 12), Plaintiffs request an inference on that very issue.

12  20A MSJ at 47.  The request itself is telling, as it makes clear just how completely Plaintiffs have

13  failed to adduce evidence of loss causation.  In any event, there is no basis for an adverse

14  inference on loss causation.  As courts have recognized, proof of loss causation is "drawn from

15  public data and public filings."  *Oscar*, 487 F.3d at 267; *see also Flowserve*, 245 F.R.D. at 575

16  n.27.  In fact, because loss causation depends on (a) what information was disclosed to the

17  market, and (b) how the market understood the disclosures (*see supra* at 39), there is no way that

18  any loss causation evidence could have been "spoliated."

19             Plaintiffs argue that Ellison's emails would have contained evidence to show why

20  specific deals did not close in 3Q01.  20A MSJ at 47.  But as courts have recognized, facts that

21  were not disclosed to the market do not show loss causation.  *Flowserve*, 245 F.R.D. at 575.

22  Here, there is not a shred of evidence that the market understood Oracle's March 1, 2001

23  announcement as a revelation that previously undisclosed "problems with Suite 11i" caused the

24  miss.  And in any event, Plaintiffs have offered no reason to believe that Ellison's emails would

25  have contained evidence, unavailable from any other source, that deals were lost or delayed due

26  to problems with Suite 11i.  As noted above (*see supra* at 20), Plaintiffs have obtained massive

27  amounts of discovery from a huge number of separate sources, both inside and outside Oracle,

28  and they have not been able to identify a single deal that was lost or delayed in 3Q01 due to

1   product problems.  The fact that Ellison uses email and was involved in some of the deals that

2   failed to close in 3Q01 does not come close to justifying an adverse inference regarding the

3   reasons deals were lost or delayed.[43]  *See Hamilton*, 2005 U.S. Dist. LEXIS 40088, at *23-24.

4         Plaintiffs also seek adverse inferences regarding their accounting claims, despite the

5   Court's ruling that there had been no spoliation of materials relating to those claims (Order at

6   12), and despite the lack of any finding in the Order that Ellison's emails or the *Softwar* materials

7   would have been helpful to Plaintiffs with regard to Oracle's 2Q01 financial statements.  20A

8   MSJ at 14-18.  Plaintiffs' request for an adverse inference sanction on the HP transaction is

9   particularly baseless:  Special Master Infante specifically held that the HP transaction was not a

10  proper subject of fact discovery.  Ex. 448 at 15:24-16:6, 16:25-17:8.  Thus, Plaintiffs were never

11  even entitled to documents relating to the HP transaction, and there can be no finding of

12  "spoliation" as to such documents.  More broadly, Plaintiffs have not cited any evidence

13  suggesting that Ellison ever communicated with anyone by email about the *accounting* for the

14  HP transaction *or* the bad debt transfers, let alone that any such emails were lost or destroyed at a

15  time when he had a duty to preserve them.  The fact that Ellison discussed the importance of

16  "beating the street" with Symonds (20A MSJ at 18) does not suggest, in any way, that the

17  *Softwar* materials would have contained any information about either the HP transaction or the

18  bad debt transfers in 2Q01.

19        Finally, Plaintiffs request an adverse inference regarding Ellison's sale of Oracle stock in

20  January 2001 (20A MSJ at 27), even though there is no reference to this issue in the Order, and

21  even though Plaintiffs have not cited any evidence that any materials relating to Ellison's trading

22  were lost or destroyed at a time when they should have been preserved.  In fact, in one of the

23  *Softwar* transcripts that was produced to Plaintiffs, Ellison told Symonds that he sold stock in

24  January 2001 because his options were due to expire soon, which is precisely what Symonds

25  reported in the book.  Ex. PX 12  at 201-202, 251; Ex. 459 at 1529285.

26  _____

27  [43]  Oracle's response to Plaintiffs' interrogatories (20A MSJ at 47, n.23) does not support the
    requested inference.  Plaintiffs asked Oracle to identify the reasons *given by the customer* for the
    failure to close the deal in 3Q01.  *See* PX 119 at 23.  That Oracle only had this information for

28  some of the deals lost during February 2001 does not come close to proving that any documents
    relevant to this issue were lost or destroyed at a time when there was a duty to preserve them.

1   Plaintiffs have not pointed to any evidence that Ellison's emails regarding his January

2   2001 trades would have been unfavorable to him.  *See Hamilton*, 2005 U.S. Dist. LEXIS 40088,

3   at *23-24; *Zubulake*, 229 F.R.D. at 437.  Rather, the record evidence negates any such inference.

4   Communications about Ellison's trades were largely between his financial advisor and his

5   assistant, both of whom testified about the January 2001 trades, and relevant emails from both

6   were produced to Plaintiffs.  *See* PX T, *passim*; Ex. 461, *passim*; Ex. 433.  Both corroborated

7   Ellison's version of events, and there is not a shred of evidence in the record that undercuts their

8   testimony or Ellison's testimony about the reasons Ellison sold Oracle stock in January 2001.

9   **2.      Plaintiffs Improperly Request Inferences Regarding The Underlying
          Facts As Opposed To Ellison's Knowledge**

10

11   Plaintiffs also suggest that the adverse inferences should establish the *existence* of

12   unfavorable underlying facts.  Indeed, Plaintiffs seek to fill every evidentiary gap in their case by

13   citing to the adverse inference ruling as "evidence."  *See, e.g.*, 20A MSJ at 8, 13, 14, 18, 19, 24,

14   27, 31, 33, 34, 35, 38, 39, 40, 42, 44, 48, 49, 50.  Such a sanction would be closer to issue

15   sanctions (on essentially every issue), and indeed would be tantamount to the kind of terminating

16   sanctions that this Court has already rejected.  Order at 6-7.

17   As discussed in Defendants' own Motion for Summary Judgment, the adverse inference

18   should serve only to establish Ellison's *knowledge* of facts Plaintiffs are otherwise able to prove

19   regarding the issues identified in the Order.  *See* Order at 8-12; DMSJ at 21-24.  This is not only

20   in keeping with the Order (*see id.* at 12), but also with case law requiring that such sanctions be

21   "narrowly tailored" to go no further than necessary, in order to redress the harm caused by the

22   spoliation.  *See Keithley*, 2008 U.S. Dist. LEXIS 61741, at *3, *10, *51-54.  Here, where the

23   record includes 2.1 million pages of documents from 129 custodians, and 134 depositions, an

24   adverse inference arising from the alleged loss of a single person's emails, and some number of

25   interview recordings or transcripts (much of which was incorporated into a published book)

26   cannot support the boundless inference Plaintiffs seek.  Lacking any extrinsic evidence about the

27   contents of the allegedly lost materials, Plaintiffs cannot use the inference to invent "facts" that

28   otherwise are completely absent from the massive discovery record.  *See* DMSJ at 21-24.

1       Nowhere is this more stark than in the context of Plaintiffs' claim that Ellison issued a

2   "directive" before 3Q01, which undermined Oracle's internal forecasting process.  20A MSJ at

3   18-19, 36.  According to Plaintiffs, this "directive" fundamentally changed the way that Oracle's

4   entire sales force—many hundreds of people—went about forecasting quarterly results.  *Id.*  But

5   despite having received documents and/or testimony from dozens of Oracle witnesses involved

6   in the forecasting process, Plaintiffs have not adduced any evidence that this "directive" was ever

7   made, much less that it rendered Oracle's internal forecasting process "unreasonable."  *See supra*

8   at 15-18.  There has been no finding (and certainly there has been no showing) that documents

9   from the files of any Oracle employee other than Ellison were lost or destroyed when they should

10  have been preserved.  *Id.*  Thus, in seeking an adverse inference regarding the alleged

11  "directive," Plaintiffs are asking the Court to conclude, without any extrinsic proof, that:  (1)

12  Ellison's emails or the *Softwar* materials included evidence that would have proven the existence

13  of such a "directive," and (2) such evidence was available *only* from Ellison's emails or the

14  *Softwar* materials, because no evidence of the "directive" or its alleged effect on Oracle's

15  internal forecasting process was found in the files of any other Oracle custodian.

16      Plaintiffs' request with respect to the "directive" is merely the most egregious example of

17  their overreaching.  The same flaw underlies each of Plaintiffs' requests that the Court grant an

18  adverse inference not just as to Ellison's "knowledge" (as the Order provides), but also as to the

19  underlying facts themselves.  *See* 20A MSJ at 8, 13, 14, 18, 19, 24, 27, 31, 33, 34, 35, 38, 39, 40,

20  42, 44.  In each case, Plaintiffs are asking the Court to infer facts about subjects and events that

21  necessarily would have involved countless Oracle employees.  But they do so based solely on the

22  loss of Ellison's emails and the *Softwar* materials—without any extrinsic proof that those

23  materials would have included evidence harmful to Ellison with regard to those subjects and

24  events, and despite the fact that no other evidence in the discovery record supports Plaintiffs'

25  theory.  *See id.*  There is no factual or legal basis for the proposed inferences that Plaintiffs seek,

26  and any such inferences would be disproportionate to the harm that has been found, unfair to

27  Ellison and the other Defendants, and contrary to law.  *See Hamilton*, 2005 U.S. Dist. LEXIS

28  40088, at *22-24; *Lewis*, 87 F.3d at 1558; *Zubulake*, 229 F.R.D. at 426-28, 437; DMSJ at 21-24.

**B.      Plaintiffs Are Not Entitled To An Adverse Inference Based On Symonds'
Invocation Of The Fifth Amendment**

The record also does not support Plaintiffs' request for an additional adverse inference
against Ellison with respect to "all of the claims in this litigation" based on *Softwar* author
Matthew Symonds' invocation of the Fifth Amendment.  20A MSJ at 50 n.25.  As an initial
matter, Plaintiffs made this same request as part of their motion for sanctions.  As such, the
request was denied when, in the Order, the Court granted that motion in part, but otherwise
denied it without granting any inference on this basis.  Order at *passim*.

In any event, Symonds is not a party to this litigation, nor does he have anything like the
kind of close relationship courts have held sufficient to grant an inference against a party based
on a non-party's invocation of the Fifth Amendment.  *See, e.g.*, *LiButti v. United States,* 107 F.3d
110, 120-125 (2d Cir. 1997); *Kontos v. Kontos*, 968 F. Supp. 400, 406-409 (D. Ind. 1997); *see
also Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000).  Moreover, such
an inference is inappropriate where, as here, there is any doubt about the witness' motivation for
refusing to testify, *see Kontos*, 968 F. Supp. at 408, and is not allowed at all when, as here, the
witness declines to answer *any* questions, not just those that may have implicated the witness.  *In
re Citric Acid Litigation*, 996 F. Supp. 951, 961 (N.D. Cal. 1998).  Plaintiffs' request for an
adverse inference based on Symonds' decision to invoke the Fifth Amendment should be denied.

## VIII.   CONCLUSION

For the foregoing reasons, Ellison respectfully requests that Plaintiffs' Motion be denied,
and that summary judgment be entered in his favor on Plaintiffs' Section 20A claim.

Dated:  November 17, 2008                    Respectfully submitted,


                                             LATHAM & WATKINS LLP


                                             By:___/s/Patrick E. Gibbs____
                                                 Patrick E. Gibbs
                                                 Attorneys for Defendants