COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
MARK SOLOMON (151949)
DOUGLAS R. BRITTON (188769)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
marks@csgrr.com
dougb@csgrr.com
        – and –
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
ELI R. GREENSTEIN (217945)
DANIEL J. PFEFFERBAUM (248631)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@csgrr.com
willowr@csgrr.com
elig@csgrr.com
dpfefferbaum@csgrr.com

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Master File No. C-01-0988-SI<br><br>CLASS ACTION<br><br>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND TESTIMONY OF BROOKS L. HILLIARD<br><br>DATE:          January 9, 2009<br>TIME:          9:00 a.m.<br>COURTROOM:  The Honorable Susan Illston |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................................1

II.   ARGUMENT ........................................................................................................3

  A.   Legal Standard ...........................................................................................3

  B.   Hilliard Is Qualified to Offer an Expert Opinion on the Issues Related to
        Suite 11i Software......................................................................................4

  C.   Hilliard's Declaration and Testimony Is Based on a Foundation of
        Relevant Facts and Data.............................................................................6

      1.   Defendants' Attempt to Label the Evidence Relied upon by
            Hilliard as "Anecdotal" Misinterprets the Case Law and
            Mischaracterizes the Evidence....................................................9

      2.   Hilliard Appropriately Reviewed and Considered All Evidence in
            an Impartial Manner...................................................................11

      3.   Hilliard's Opinions Have a Sufficient Basis...............................13

      4.   Installing and Implementing the Software Was a Red Herring .................16

  D.   Hilliard Utilized a Reliable Methodology Under Fed. R. Evid. 702 .....................17

      1.   Hilliard Employed Industry Accepted Standards and Practices in
            Forming His Opinions................................................................19

      2.   Hilliard Found Defendants' Statements that Suite 11i Was
            "Designed" or "Engineered" to Have Certain Functionality Were
            Misleading..................................................................................22

      3.   The Number of Function Points in Suite 11i and the Size of the
            Software Does Not Undermine Hilliard's Opinion ...................22

      4.   Defendants Have Held Out Suite 11i as a "Revolutionary" Product
            Rendering any Comparative Analysis Inherently Flawed .........................23

  E.   Hilliard's 26 Years of Experience Will Assist the Trier of Fact............................23

III.   CONCLUSION...................................................................................................25

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**CASES**

4

*Beech Aircraft Corp. v. Rainey*,
    488 U.S. 153 (1988) ...................................................................................................3

5

6

*Breidor v. Sears, Roebuck & Co.*,
    722 F.2d 1134 (3rd Cir. 1983) ..................................................................................9

7

*Cavallo v. Star Enter.*,
    892 F. Supp. 756 (E.D. Va. 1995),
    *aff'd in pertinent part*, 100 F.3d 1150 (4th Cir. 1996) .......................................10

8

9

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ........................................................................................ *passim*

10

*Groobert v. President & Dirs. of Georgetown College*,
    219 F. Supp. 2d 1 (D.D.C. 2002) .......................................................................1, 17

11

*Hangarter v. Provident Life & Accident Ins. Co.*,
    373 F.3d 998 (9th Cir. Cal. 2004) .....................................................................5, 17

12

13

*In re Silicone Gel Breast Implants Prods. Liab. Litig.*,
    318 F. Supp. 2d 879 (C.D. Cal. 2004) .....................................................................9

14

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ........................................................................................ *passim*

15

16

*Laisure-Radke v. Par Pharm., Inc.*,
    No. C03-3654RSM, 2006 U.S. Dist. LEXIS 22700
    (W.D. Wash. Mar. 27, 2006) ....................................................................................5

17

18

*McLean v. 988011 Ontario, Ltd.*,
    224 F.3d 797 (6th Cir. 2000) ....................................................................................6

19

*Moss v. Ole S. Real Estate, Inc.*,
    933 F.2d 1300 (5th Cir. 1991) ................................................................................14

20

21

*Pipitone v. Biomatrix, Inc.*,
    288 F.3d 239 (5th Cir. 2002) ..............................................................................6, 19

22

*Recreational Devs. of Phoenix, Inc v. City of Phoenix*,
    220 F. Supp. 2d 1054 (D. Ariz. 2002),
    *aff'd*, No. 02-16890, 2003 U.S. App. LEXIS 21145
    (9th Cir. Oct. 17, 2003) ............................................................................................9

23

24

25

*Sea-Land Serv., Inc. v. Lozen Int'l, LLC*,
    285 F.3d 808 (9th Cir. 2002) ..................................................................................15

26

*Siharath v. Sandoz Pharms. Corp.*,
    131 F. Supp. 2d 1347 (N.D. Ga. 2001),
    *aff'd*, 295 F.3d 1194 (11th Cir. 2002) ...................................................................10

27

28

Page

*Thomas v. Newton Int'l Enters.*,
    42 F.3d 1266 (9th Cir. 1994) ...........................................................2, 4, 6, 17

*United States v. Abonce-Barrera*,
    257 F.3d 959 (9th Cir. 2001) ...........................................................11

*United States v. Downing*,
    753 F.2d 1224 (3d Cir. 1985)...........................................................23

*United States v. Freeman*,
    498 F.3d 893 (9th Cir. 2007) ...........................................................16

*United States v. Garcia*,
    7 F.3d 885 (9th Cir. 1993) ...........................................................5

*United States v. Hankey*,
    203 F.3d 1160 (9th Cir. Cal. 2000)...........................................................2

*United States v. Safavian*,
    435 F. Supp. 2d 36 (D.D.C. 2006) ...........................................................15

*United States v. Thompson*,
    No. 05-50801, 2007 U.S. App. LEXIS 17355
    (9th Cir. July 16, 2007) ...........................................................11

*United States  v. Wells*,
    162 Fed. Appx. 754 (9th Cir. 2006)...........................................................14

*United States v. Williams*,
    No. 04-4267, 2007 WL 1643197
    (3d Cir. June 7, 2007) ...........................................................4, 21

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78j(b)...........................................................3

Federal Rules of Evidence
    Rule 401 ...........................................................23
    Rule 702...........................................................*passim*
    Rule 703...........................................................13, 14
    Rule 801(d)(2)(B) ...........................................................15
    Rule 801(d)(2)...........................................................15
    Rule 803(6) ...........................................................15

**SECONDARY AUTHORITIES**

4-702 *Weinstein's Fed. Evid.*, §702.05 (Matthew Bender & Co. (2008)) ...................6, 9

*American Heritage Dictionary* (4th ed. 2004) ...........................................................9

1

2                                                                                          **Page**

3   *Estimating Software Costs: Bringing Realism to Estimating*

4   (2d ed. McGraw Hill, 2007)..................................................................................................22

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **I.        INTRODUCTION**

2            Defendants' motion to exclude the expert opinions of Brooks L. Hilliard ("Hilliard") is

3    nothing more than an outline of defendants' talking points for cross-examination at trial.  Defendants

4    do not like Hilliard's opinion, however, this is not a basis to exclude his testimony and opinions.

5    Hilliard's opinions are admissible under the Federal Rules of Evidence ("FRE") and *Daubert v.*

6    *Merrell Dow Pharms., Inc*., 509 U.S. 579 (1993).  Indeed, by their silence, defendants concede that

7    Hilliard is a expert in his field and thus he is a qualified expert within the meaning of FRE 702.  *See*

8    §II.B, *infra*.  Hilliard has been an information technology ("IT") and management consultant for 26

9    years, has evaluated and implemented complex business computer software and holds degrees from

10   the Massachusetts Institute of Technology and Harvard Business School.  Exhibit 1 at 1 (Declaration

11   of Brooks L. Hilliard CMC CCP, dated May 25, 2007);[1] *Groobert v. President & Dirs. of*

12   *Georgetown College*, 219 F. Supp. 2d 1, 7 (D.D.C. 2002) (citing *Kumho Tire Co. v. Carmichael*, 526

13   U.S. 137, 149 (1999)) ("[P]ersonal experience can be a reliable and valid basis for expert testimony.

14   This is particularly true with non-scientific testimony . . . . ").  Hilliard has been engaged in more

15   than 100 legal disputes and testified to "representations very similar to those made by Oracle

16   regarding Oracle 11i, and whether or not the systems involved did or did not perform as

17   represented."  Ex. 1 at 61.  Hilliard's opinions are based on his undisputed expertise and his

18   extensive review of the record in this case.  Defendants obfuscate Hilliard's opinions in an

19   unfounded attempt to bar his relevant expert testimony.  Hilliard offers ***three*** relevant and reliable

20   opinions that will be helpful to a jury concerning statements made by defendants between December

21   14, 2000 and March 1, 2001 (the "Class Period") about Oracle's ("Oracle") E-Business Suite 11i

22   ("Suite 11i").  Hilliard opines that:

23            (1)    Defendants knew or should have known that their representations to investors
                    concerning the "functionality of the Oracle 11i E-Business Suite (and the component
24                  software modules comprising it)" were false;

25   _____

26   [1]      All exhibit references are to the Declaration of Shawn A. Williams in Support of Plaintiffs'
     Opposition to Defendants' Motion to Exclude Declarations and Testimony of Brooks L. Hilliard,
27   filed concurrently herewith.

28

1     (2)    Defendants knew or should have known that their statements that Suite 11i's "component parts were fully integrated and interoperable 'out-of-the-box'" were false; and

3     (3)    Suite 11i was "so unstable and unsupportable, and its performance was so inferior that the product could not be considered of commercial quality."

Ex. 1 at 4-5.

What defendants object to is testimony that will assist the jury – testimony that explains why defendants' statements regarding Suite 11i were false.  Defendants do not dispute that Hilliard possesses specialized knowledge; what they protest is plaintiffs' expert explaining (based on his specialized knowledge) how and why defendants' statements were false.  Hilliard's opinions are the product of a reliable, experience-based review of the documentary evidence produced in this litigation, a method which has been upheld as reliable where, as in the instant situation, the opinion offered is based on a non-scientific methodology.  *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. Cal. 2000); *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266 (9th Cir. 1994).  After careful review of defendants' and third-party document productions and transcripts, and based on his 26 years of experience, Hilliard offered his opinions.  In contrast to defendants' own expert Edward Yourdon (who limited his inquiry to a review of technical documentation), Hilliard reviewed all the relevant evidence in this litigation, including the contemporaneous documents and communications of Oracle employees and their customers, and the testimony of defendants and those employees most knowledgeable of Suite 11i.  Applying his experience and expertise, Hilliard was able to reliably determine that defendants knew or should have known that their statements to investors were false and/or misleading.

In forming his opinions, Hilliard employed the same standardized methodology he uses as an IT and management consultant, adapted for the litigation environment.  Indeed, in evaluating defendants' statements regarding Suite 11i, Hilliard applied his expertise to interpret the technical language contained in the evidence.  Where Hilliard defined terms like "fully integrated" and "commercial quality" he did so in a manner consistent not only with industry standards, but with definitions offered by high-level Oracle employees, and Oracle's own expert Yourdon.

1    Defendants make no credible attacks on the expert analysis that Hilliard performed, but

2    instead quibble – without merit – that Hilliard should have performed a different analysis.

3    Defendants attempt to re-cast Hilliard's report as one solely about the "quality" of Suite 11i and then

4    falsely claim that software quality can only be measured in terms of defects ("bugs") per function

5    point.[2] But this is not a products liability case or a dispute between a customer and Oracle about the

6    implementation of software.  While defendants would like to characterize plaintiffs' Suite 11i claims

7    as claims about bug counts, there is not a single statement at issue which discusses bug counts.

8    Hilliard uses his expertise to opine about defendants' actual statements during the Class Period.

9    Defendants' other attacks on Hilliard's report are equally groundless.  For instance,

10    defendants argue that Hilliard should have performed a comparative analysis between Suite 11i and

11    other software during the Class Period, but defendants told investors that Suite 11i was a

12    revolutionary product and not comparable to anything on the market.  Defendants also contend that

13    Hilliard offers the opinion of a lay person and failed to apply his expertise, when, in fact, he explains

14    in detail the application of his expertise.  Defendants' arguments reflect the shortcomings of their

15    own expert who inexplicably limited his findings concerning the accuracy of defendants' statements

16    only to individuals with extensive IT backgrounds.

17    Hilliard's declaration and testimony are not only reliable, they are relevant to the litigation

18    and will assist the trier of fact in understanding defendants' statements concerning Suite 11i,

19    including explaining software terminology and technical evidence, along with assisting the jury in

20    deciding falsity and scienter under §10(b) of the Securities Exchange Act of 1934.

21    **II.    ARGUMENT**

22       **A.    Legal Standard**

23    The admissibility of expert testimony is governed by FRE 702, which captures the "liberal

24    thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion

25    testimony."  *Daubert*, 509 U.S. at 588 (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169

26    ───────────────────

27    [2]    A function point is a unit of measurement for determining the size of software.  *See* §II.D.1.

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD - C-01-0988-SI                              - 3 -

(1988)).[3]  The trial courts act as gatekeepers in determining whether to admit expert testimony. *Kumho*, 526 U.S. at 141; *Daubert*, 509 U.S. at 589.  To be admissible under FRE 702, an expert must be qualified, his testimony must be reliable and his testimony must be helpful to the trier of fact.  Reliable expert testimony must be:  (1) based upon sufficient facts or data; (2) the product of reliable principles and methods; and (3) the application of the principles and methods reliable to the facts of the case.  FRE 702.  However, "[u]nder the liberal *Daubert* standard, the plaintiffs do not have to prove to the judge by a preponderance of the evidence that their expert's testimony is correct, they must only show that it is reliable.  The requirement of reliability is lower than the standard of correctness." *United States v. Williams*, No. 04-4267, 2007 WL 1643197, at *3 (3d Cir. June 7, 2007).  Expert opinion testimony is reliable if the knowledge underlying it "ha[s] a reliable basis in the knowledge and experience of [the relevant] discipline."  *Kumho*, 526 U.S. at 148 (quoting *Daubert*, 509 U.S. at 592).

### B.  Hilliard Is Qualified to Offer an Expert Opinion on the Issues Related to Suite 11i Software

A witness may be qualified as an expert if he possesses specialized "knowledge, skill, experience, training, or education."  FRE 702.  The qualification standard under FRE 702 is to be applied liberally.  *Thomas*, 42 F.3d at 1269.  The Advisory Committee notes to FRE 702 further emphasize that FRE 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert.  *Id.* at 1269-70.  In particular, the committee notes provide:  "the test of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience."  FRE 702, Advisory Committee notes.

Importantly, defendants do not challenge whether Hilliard is a qualified expert.  Indeed, Hilliard has extensive litigation experience as an expert witness.  He has been engaged by both customers and vendors in "more than 100 legal disputes," the most common type relating to "the implementation and/or performance of various enterprise software products."  Ex. 1 at 2.  Hilliard

---

[3]      All emphasis has been added and internal citations and quotations omitted, unless otherwise indicated.

1   has "been qualified as an expert in both federal and state courts, and testified in ***more than two***

2   ***dozen lawsuits*** dealing with issues relating to representations very similar to those made by Oracle

3   regarding Oracle 11*i*, and whether or not the systems involved did or did not perform as

4   represented." *Id.* at 61.

5       Hilliard is further qualified by his professional experience; he has been an IT and

6   management consultant for 26 years. *Id*. at 1.  He is one of only 15 professionals in the world to be

7   both a Certified Management Consultant and Certified Computing Professional.  *Id*.  As a consultant,

8   he has assisted more than 200 entities in the "evaluation, selection and implementation of business

9   computer software to perform enterprise-wide computing functions . . . of comparable functionality

10  and complexity to those in the Oracle E-Business Suite 11*i*."  *Id*.  Hilliard is additionally qualified by

11  his educational attainment.  He holds a Baccalaureate degree in Mechanical Engineering from the

12  Massachusetts Institute of Technology and an M.B.A. from Harvard Business School.  *Id*.  Hilliard

13  also has been a lecturer on issues relating to computer systems and programming for the Arizona

14  State University School of Business, and has taught seminars for the American Management

15  Association.  *Id*.  Prior to becoming a consultant, Hilliard held positions at several major computer

16  companies in the areas of product design and software development.  *Id*. at 2.

17      Hilliard's litigation and professional experience, combined with his education, leave no doubt

18  that he is sufficiently qualified as an expert under FRE 702.[4]  *Laisure-Radke v. Par Pharm., Inc.*, No.

19  C03-3654RSM, 2006 U.S. Dist. LEXIS 22700, at *8-*9 (W.D. Wash. Mar. 27, 2006) (citing *United*

20  *States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993)).  ("There is no question that experience-based

21  expert testimony is admissible.  Indeed, the Ninth Circuit Court of Appeals has held that any

22  allegations of lack of particularized expertise . . . goes to the weight accorded to the testimony, not

23  its admissibility.").  On this basis alone, Hilliard's opinion should be deemed reliable.  *Hangarter v.*

24  *Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. Cal. 2004) (quoting FRE 702

25  Advisory Committee notes) ("In certain fields, experience is the predominant, if not sole, basis for a

26

27  [4]      Defendants' discussion of the qualifications of Randall Jensen has no bearing on the admissibility of Hilliard's opinions.

28

great deal of reliable expert testimony."); *see also Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002) (explaining that "an expert [may] draw [his] conclusion[s] from a set of observations based on extensive and specialized experience").

### C.   Hilliard's Declaration and Testimony Is Based on a Foundation of Relevant Facts and Data

Foundational reliability requires an expert to show that his opinion is supported by an adequate foundation of relevant facts, data or other opinions.  FRE 702; 4-702 *Weinstein's Fed. Evid.*, §702.05[2][b] (Matthew Bender & Co. (2008)).  Any weakness in the factual basis of an expert's proffered testimony goes to the weight of the evidence, not its admissibility.  *See McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 900-01 (6th Cir. 2000).  Significantly, the Ninth Circuit has found that an expert's review of subpoenaed documents is an accepted methodology.  *Thomas*, 42 F.3d at 1269 (expert's review of subpoenaed documents and photographs of accident site were sufficient to support opinion that accident site was in an extremely unusual and hazardous condition).

Hilliard based his opinions on the sworn deposition testimony of key Oracle employees responsible for the overall development and engineering of Suite 11i and its individual modules. Ex. 1 at 6.  These employees include, ***Lawrence Ellison***, the Company's co-founder, a former software developer and Oracle's CEO since 1977.  *Id*. at 39, 43, 55, 73, 112; Ex. 2 at 56-60.  ***Ron Wohl***, Oracle's EVP and a top executive was responsible for the enterprise resource planning ("ERP") portion of Suite 11i. Ex. 1 at 7 n.5, 26 n.46, 39 n.75, 49, 64, 66, 82.  He "led the group that prepared the design of the product, wrote the code, the documentation, the product management, and all the associated activities involved with bringing out a product to market."  Ex. 3 at 27:24-28:2.  ***Mark Barrenechea***, SVP and a top executive, was responsible for the CRM portion of Suite 11i.  Ex. 1 at 26 n.46, 47 n.76, 50, 78-79.  Barrenechea and Wohl reported directly to Ellison and oversaw the entirety of the development of Suite 11i.  Barrenechea stated, "Between Ron [Wohl] and myself, we embodied application development."  Ex. 4 at 32:16-17.  ***Edward Sanderson***, who was EVP for Oracle Americas Consulting division (Canada, United States and Latin America) and Oracle Product Industries ("OPI") was responsible for Suite 11i implementations at customer sites. Ex. 1 at 14 n.19,

19 n.30, 86; Ex. 5 at 19:3-20:4; 20:20-24:4; 32:19-35:3.  **Charles Kendig**, VP for Quality and Customer Satisfaction, described his role at the Company as "kind of like an ombudsman role, if you will, of if the system doesn't work to the extent that it needs to resolve problems I would get involved" (Ex. 1 at 26 n.47, 58 n.125, 81 n.159; Ex. 6 at 55:6-10).

Hilliard also relied upon the frank admissions of Ellison as detailed in the 2003 biography ***An Intimate Portrait of Larry Ellison and Oracle*** *– Softwar* authored by Matthew Symonds.  *See* Ex. 1 at 31-32, 34, 43, 45, 48, 50, 58-59, 79, 81.  Ellison provided Symonds with "a very high degree of access to both him and Oracle" and Ellison personally wrote ***unedited*** commentary which appears as footnotes throughout the book. Ex. 2 at xi.  In *Softwar*, Ellison admits to significant deficiencies and defects in Suite 11i.  For instance, he stated:  "***The new order management system*** . . . ***hadn't been tested yet***."  Ex. 2 at 192.  "[*O*]*ur stuff needs to not break all the time*."  Ex. 28 at NDCA-ORCL 1529175.  Symonds also interviewed other high-level employees in the process of researching *Softwar*.  For example, Barrenechea stated with respect to Oracle's own internal upgrade to Suite 11i in January 2001, "Everyone except Ron [Wohl] knew that we could not place an order with the new [Order Management] system."  Ex. 2 at 196.  However, Ellison contradicted Barrenechea in a footnote: "Of course Ron knew about the problems with our internal order management implementation."  *Id*.

Hilliard reviewed "thousands" of documents in both hard copy and electronic form as he had electronic access to every Bates-numbered piece of evidence produced in this litigation.  Ex. 8 at 48:11-15.  Attached to Hilliard's extensively referenced report are over 100 contemporaneously created documents and communications, evidencing the facts that helped form the basis of his findings.[5]  Hilliard relied on internal e-mail correspondence between Oracle employees responsible for the development, demonstration and sale of Suite 11i.  These correspondence revealed the defects in Suite 11i functionality.  *See* Ex. 1 at 40 ("Even as of today [June 7, 2001], [version 4 of Oracle 11*i*] which is the first stable release is ***NOT AVAILABLE in local language and we will***

---

[5]      In comparison, Yourdon attaches 150 analyst reports but almost no evidence of actual usage of the software.

1   *only get it between July and October 2001*.") (quoting Ex. 45).  They revealed the lack of full

2   integration and interoperability.  *Id*. at 68 ("*We cannot show what the customer wants to see when*

3   *it comes to the combination of CRM and ERP*.") (quoting Ex. 9); *id*. at 69 ("I think *the products*

4   *have not undergone any form of integration testing and [they are] failing in this area*.") (quoting

5   Ex. 10).  They revealed Suite 11i's instability and poor performance.  *See id*. at 84 ("*No real*

6   *performance testing* . . . The *11.5.2 upgrade CD has been broken until this week*.") (quoting Ex.

7   11); *id*. at 86 ("*We've had to repeatedly advise NT customers to delay go live [and they] are livid*

8   *with us*.") (quoting Ex. 12); *id*. at 88 ("*We are still having very significant problems with the 11i*

9   *roll out of Indirect Procurement*. . . .") (quoting Ex. 13); *see also id*. at 28-31, 40-42, 46-47, 53-55,

10  59, 62, 65, 68-69, 71, 83-86, 88-96, 98, 101, 103-104, 107-109.

11          Hilliard relied on internal Oracle documents, including the July 2001 "GE Medical Systems –

12  Get Well Plan" (Ex. 14 ("*Software quality for initial 11i releases was not what we hoped it would*

13  *be*.")); the "Fiscal 2002 Budget Presentation" of Jeffrey Henley (Ex. 15 ("Critical products

14  (modules) are not implemented in several countries . . . , *creating an incomplete technology*

15  *solution*.")); and the June 2002 "E-Business Suite High Level Requirements Document" (Ex. 16

16  ("*The capabilities to perform an integrated planning [sic] in the E-Business Suite is broken*.")).

17          He also relied on internal e-mails between Oracle employees discussing problems

18  experienced by Suite 11i customers including, Brock Tool (Ex. 17 ("This customer is continuing to

19  have *major problems* with Oracle Order Management . . . .")); Paxar (Ex. 18 ("Paxar's Vice

20  Chairman first expressed his *dissatisfaction with the 11i quality and stability*.")); and Chipotle (Ex.

21  46 ("They are experiencing *major performance problems with 11i* . . . .")); *see also* Ex. 1 at 36, 39,

22  91-92, 97-98, 100, 103-107.

23          Contrary to defendants' insinuation, Hilliard relied on relatively few direct customer

24  complaints to Oracle in forming his opinions.  *See* Defendants' Notice of Motion and Motion to

25  Exclude Declarations and Testimony of Brooks Hilliard ("Defs' Mot.") at 1-3, 5, 17-20.  He did rely

26  on Pepsi ("*Our oracle project has been an unmitigated disaster*."); Ingersoll Rand ("*We have little*

27  *confidence in Oracle's ability to provide a stable working environment*."); and Liberty Mutual

28  ("*The situation here is dire*.").  Ex. 1 at 46, 83, 97 (quoting Exs. 19-21); *see also id*. at 52, 92, 99.

1  Hilliard also relied on analyst reports (Ex. 1 at 43-44 ("Memo to Oracle: Stop Blaming

2  Customers") (quoting Ex. 22)), as well as Oracle's own Special Litigation Committee Report. *Id.* at

3  27 n.49.  And he reviewed the relevant pleadings. *Id.* at 6; Ex. 8 at 44:21-46:8.  The extensive

4  factual record which Hilliard relied on leaves little doubt that Hilliard's report is supported by not

5  just an "adequate" but extensive foundation of relevant facts, data or other opinions. *Weinstein's*

6  *Fed. Evid.* §702.05[2][b].

7  Defendants' suggestion that "Mr. Hilliard asks this court to 'simpl[y] tak[e] [his] word for

8  it,'" that defendants knew or should have known their representations to be false could not be less

9  accurate.[6]  *See* Defs' Mot. at 13.  Regardless, defendants are free to question Hilliard at trial

10  regarding bug counts, the ERP context and customer experiences and let the jury determine the

11  weight of his expert testimony. *Breidor v. Sears, Roebuck & Co.*, 722 F.2d 1134, 1138-39 (3rd Cir.

12  1983) (determinations regarding the weight to be accorded to the evidence relied upon by the

13  proferred expert is within the sole providence of the jury).

14  **1.    Defendants' Attempt to Label the Evidence Relied upon by**
   **Hilliard as "Anecdotal" Misinterprets the Case Law and**
15  **Mischaracterizes the Evidence**

16  Hilliard based his opinion on the most relevant and reliable contemporaneously created

17  documents and communications, the majority of which were produced by defendants.   Yet,

18  defendants repeatedly mischaracterize this evidence as "anecdotal," or refer to Hilliard's "anecdotal

19  methodology."[7]  *See* Defs' Mot. at 1-3, 5-7, 11-12.  The evidence relied upon by Hilliard is clearly

20  not "anecdotal" as evidenced by the case law relied on by defendants. *See Recreational Devs. of*

21  *Phoenix, Inc v. City of Phoenix*, 220 F. Supp. 2d 1054, 1061 (D. Ariz. 2002) (anecdotal evidence is

22  "by definition, non-systematic and non-generalizable"), *aff'd*, No. 02-16890, 2003 U.S. App. LEXIS

23

---

24  [6]     Defendants' citation to *In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 318 F. Supp.

25  2d 879, 890 (C.D. Cal. 2004), provides no support for this argument; the expert testimony in that case concerned whether breast implants caused cancer in the deceased wife of the plaintiff. *Id.* at

26  886-89.

27  [7]     "Anecdotal" is defined as "based on casual observations or indications rather than rigorous scientific analysis." *The American Heritage Dictionary* (4th ed. 2004).

28

1  21145 (9th Cir. Oct. 17, 2003); *Cavallo v. Star Enter.*, 892 F. Supp. 756, 765 n. 18 (E.D. Va. 1995)

2  ("[C]ase reports are not reliable scientific evidence of causation, because they simply describe[]

3  reported phenomena without comparison to the rate at which the phenomena occur in the general

4  population or in a defined control group . . . ."), *aff'd in pertinent part*, 100 F.3d 1150 (4th Cir.

5  1996).  These cases demonstrate that courts' concern about anecdotal evidence is based on avoiding

6  "unfounded extrapolation," a situation which is not present in this case.  *Reed*, 2002 WL 32925223,

7  at *15; *see also Siharath v. Sandoz Pharms. Corp.*, 131 F. Supp. 2d 1347, 1373 (N.D. Ga. 2001),

8  *aff'd*, 295 F.3d 1194 (11th Cir. 2002).

9        Hilliard's opinions are supported by an extensive body of evidence, much of which was

10  generated by those Oracle employees closest to, and most knowledgeable about, Suite 11i and its

11  defects.  The statements of these individuals are anything but "casual observations."  *See* n.7, *supra*.

12  For example, Hilliard found that the defendants knew or should have known that their statements

13  regarding support for global operations were false, including the claims that "every application

14  works in every country, every major language, and every major currency" and "our applications are

15  written in 23 different languages."  Ex. 1 at 15 (quoting Exs. 23-24).  Hilliard's opinion is directly

16  supported by Ellison's attempt at his deposition to retract his representation that Suite 11i worked in

17  "every country," in favor of the more limited statement, in "every major country."  Ex. 25 at 130:13-

18  14, 131:17-18.   Hilliard's opinion is also supported by the contemporaneous documentation

19  generated by Oracle's high-level employees.  A January 2001 internal e-mail from EVP for Sales

20  and Consulting in Europe, the Middle East and Africa, Sergio Giacoletto, to Ellison stated that

21  National Language Support "will not be fully translated" until May 2001 and that there were "almost

22  5,000 translation issues to be fixed."  Ex. 1 at 40 (quoting Ex. 26).  Internal documents also reveal

23  that as late as June 6, 2002 certain modules "lack multi-byte support," which Hilliard explained is

24  "required to do the Asian, like Japanese and Chinese Korean, character sets."  Ex. 8 at 214:21-25.[8]

25

26  [8]       It should be noted that this evidence also refutes Yourdon's claim, which was an attempt to
     recast defendants' claims of global support as one of ***capability*** for global support.  The lack of UTF-
27  8 multi-byte support meant that Suite 11i was not even ***capable*** of being translated into certain key
     languages.

28

1   More generally, Hilliard relied on Ellison and Wohl's admissions that Suite 11i was rushed to

2   market and was not adequately tested. Ex. 2 at 189; Ex. 3 at 106:17-21.  The concerns of anecdotal

3   evidence are simply not at issue here because Hilliard is relying on the words the defendants and/or

4   defendants' highest-ranking employees.  This is representative of the extensive support which the

5   factual record provides for all the opinions Hilliard offers in his report.

### 2.   Hilliard Appropriately Reviewed and Considered All Evidence in an Impartial Manner

7   Hilliard performed an impartial and rigorous analysis of the evidence in evaluating

8   defendants' Class Period statements at issue.   Hilliard reviewed all accounts of Suite 11i

9   implementations, but certain evidence – both positive and negative – was not relevant to his inquiry.

10  At his deposition, Hilliard explained:

> I evaluated **all** accounts.  Almost all of the positive accounts I saw dealt with very
> limited implementations that weren't relevant to my opinions because my opinions
> were more focused on the implementations that included the breadth of functionality
> described by Oracle's representations, Mr. Ellison's and the other senior executives
> in the company . . . .

15  Ex. 8 at 59:12-19.  While Suite 11i contained approximately 75 modules, "Oracle listed a customer

16  as 'live' when it had fully implemented at least one module of Suite 11i."  Ex. 29, ¶205 n.277.  A

17  customer implementing, or "live," on just a single module would not utilize the "tight integration" of

18  ERP and CRM which Oracle trumpeted as the hallmark of Suite 11i because integration involves

19  "the ability of modules of Suite 11i to work together and share information."  *See* Ex. 30 at 8.

20  Accordingly, accounts of limited installations were of limited, if any, relevance to whether

21  defendants' statements were false and misleading.

22  Defendants argue that Hilliard excluded data which was inconsistent with his thesis and label

23  his report as biased because he did not look at the data from all "2,500 customers implementing 11i

24  during the Class Period," but cites only 40 difficult implementations.[9]  Defs' Mot. at 16 (quoting

---

25  [9]     "[A]s a general rule, bias is not a permissible reason for the exclusion of expert testimony."
26  *United States v. Thompson*, No. 05-50801, 2007 U.S. App. LEXIS 17355, at *5 (9th Cir. July 16,
    2007); *see also United States v. Abonce-Barrera*, 257 F.3d 959, 965 (9th Cir. 2001) ("Generally,
27  evidence of bias goes toward the credibility of a witness, not his competency to testify, and
    credibility is an issue for the jury.").

28

1   Ex. 27).  As an initial matter, defendants rely on a February 20, 2001 press release for their claim

2   that, 2,500 customers were implementing Suite 11i during the Class Period, but that purported fact is

3   not substantiated by any evidence produced in this litigation.  Ex. 27.  Hilliard did a thorough review

4   of all of the evidence related to Suite 11i which was produced in this case.  *See* §II.C., *supra*

5   (Hilliard had electronic access to all Bates-stamped documents).  The widespread nature of the

6   problems suffered by customers implementing Suite 11i during the Class Period is evidenced by the

7   same February 20, 2001 press release which states that only "180 customers have gone live" on Suite

8   11i.  Ex. 27 at NDCA-ORCL 102009.   Thus, almost 15 customers were struggling through

9   implementation for every one so-called "live" customer on Suite 11i.[10]  Furthermore, defendants'

10  claim that Hilliard only looked at select problematic implementations is undermined by Ellison's

11  admission that "[Suite 11i] was just too hard to install. . . . [T]he customer got in trouble because the

12  installation was too complex . . . ."  Ex. 28 at NDCA-ORCL 1529173.

13          Hilliard was conservative in his approach and excluded evidence of customer problems

14  which supported his opinions where his experience indicated to him that the problem may have been

15  caused by something other than a software defect in Suite 11i.  Ex. 8 at 113:3-144:25, 119:23-

16  122:16.  Hilliard used customer reports as confirmatory of problems detailed in other documentary

17  evidence.[11]  Ex. 8 at 122:5.  Hilliard testified, "[s]o the user experiences in many cases were

18  confirmatory of what was the inevitable result of those things not having been in the product during

19  the class period."  *Id*. at 80:20-23.  For instance, despite the fact that Ellison admitted that Order

20

21  _____

22  [10]     Defendants suggest that the post-Class Period completion of problematic Suite 11i
    installations demonstrates a flaw in Hilliard's analysis.  *See* Defs' Mot. at 17.  Defendants are
23  incorrect and deliberately attempt to steer any debate away from the fact that Hilliard found that
    defendants knew or should have known that their statements were false or misleading when made
24  during the Class Period.  By rushing the defect-ridden Suite 11i to market, Oracle was able to lock in
    customers.  Later claims of stabilization of the software do not make defendants' Class Period
25  statements true, nor should it exonerate their insider trading.  Indeed, the Relevant Time Period for
    production in this case was limited to June 1, 2001.  Ex. 30 at 1.

26  [11]     Hilliard's use of customer reports in a "confirmatory" manner demonstrates the impartial
    nature of his work and addresses arguments that defendants raise about the reliability of customer
27  reports.  *See* Defs' Mot. at 16 n.10.

28
    PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
    TESTIMONY OF BROOKS HILLIARD - C-01-0988-SI                                                - 12 -

1   Management was placed into Suite 11i without adequate testing, Hilliard continued to look for

2   alternative explanations for customer problems (*see* Ex. 1 at 31-37):

> Sometimes you can just tell from the description that even though it's an order management problem, it wasn't caused by a software defect. And if that was the case, I disregarded that.

5   Ex. 8 at 122:12-16. Consistent with his conservative approach, and based on his own experience,

6   Hilliard approached appraisals from people in marketing with "a certain level of skepticism." *Id*. at

7   56:25-57:1. He explained:

> Salesmen, and in particular marketing people – and I was a marketing person – and people involved in implementations have a predilection to give a positive spin to what . . . they're doing or what they're seeing or what they're expecting.

10  *Id*. at 57:2-6. High-level Oracle employees were also skeptical of glowing appraisals from

11  marketing. For example, the EVP for EMEA expressed disbelief that a new implementation actually

12  used CRM and ERP (and the director of product planning for application development confirmed the

13  disbelief was warranted, "I'm not aware of any customers live on CRM at this time."). *See* Ex. 32.

14  Hilliard excluded those accounts that conflicted with other, more reliable accounts. "There were

15  certainly instances of third-party accounts that were not reliable. Because they were conflicting

16  accounts of the same situations giving different appraisals." Ex. 8 at 56:13-17. Hilliard was also

17  able to view customer and marketing accounts in light of later evidence. In sum, Hilliard carefully

18  reviewed all of the evidence to find those accounts, whether positive or negative, which were the

19  most reliable, responsive and relevant to his inquiry. Any arguments defendants have regarding the

20  data relied upon by Hilliard can be made on cross-examination.

21               **3.        Hilliard's Opinions Have a Sufficient Basis**

22          Defendants' attacks on the evidence that Hilliard relied upon are baseless. Hilliard relied

23  primarily upon evidence created and produced by defendants – thus their efforts to discredit this

24  evidence is an attack on the reliability of their own employees and customers. The majority of the

25  evidence relied upon by Hilliard is admissible and to the extent that Hilliard relied on hearsay, he did

26  so in a manner consistent with experts in his field. FRE 703 ("If of a type reasonably relied upon by

27  experts in the particular field in forming opinions [] the facts or data need not be admissible.").

28  Furthermore, contrary to defendants' claims, Hilliard relied on very few direct customer complaints

1   in forming his opinion, refuting defendants' claim that the "vast majority" of the data relied upon

2   were customer trouble reports.  *See* §II.C., *supra*; Defs' Mot. at 2, 18; *see also United States  v.*

3   *Wells*, 162 Fed. Appx. 754, 756 (9th Cir. 2006) ("An expert may base an opinion on inadmissible

4   evidence, including hearsay, of a kind that experts in the field regularly consult."); *Moss v. Ole S.*

5   *Real Estate, Inc*., 933 F.2d 1300 (5th Cir. 1991) (inadmissible reports containing hearsay are

6   generally permitted under FRE 703).  Further, defendants' contention that an expert cannot rely on

7   trouble reports, such as TARs, as confirmatory evidence is unsupported by defendants' citations.

8   Defs' Mot. at 19:18-23.  Yourdon, in fact, would rely on customer complaints to see whether the

9   software was operating as designed as set forth below.  Jensen speaks only to the sole use of TARs

10  as an initial matter in diagnosing software problems prospectively.  He does not address the

11  propriety of Hilliard's use of TARs or other evidence in formulating Hilliard's opinions.

12  Additionally, contrary to defendants' insinuation, Hilliard does account for the fact that not all TARs,

13  for example, are bugs.  Ex. 1 at 107-08.

14          Effectively acknowledging that FRE 703 allows Hilliard as an expert witness to rely on

15  hearsay in performing his analysis, defendants contend that experts in the management and

16  consulting field do not use customer input in forming their conclusions.  Defendants' contention is

17  contradicted by their own expert, Yourdon, who stated that to see beyond the architecture and design

18  of Suite 11i, "[he] had to look at actual implementations ***and reports from customers to see whether***

19  ***it was operating as designed***."[12]  Ex. 34 at 230:4-12.  Hilliard used customer complaints for just this

20  purpose – *i.e.* to confirm that the software was performing consistent with the admissions of

21

22

---

23  [12]     Defendants further attempt to undermine Hilliard's opinions because he did not speak to
    customers or attend product demonstrations in the process of drafting his report.  *See* Defs' Mot. at

24  15.  Defendants' attacks are baseless.  First, much of this evidence is unavailable as Hilliard drafted
    his report approximately six years after the relevant period (June 1, 2000-June 1, 2001).  Many

25  customers have since gone out of business or are no longer using the relevant software, and the demo
    system is no longer available.  Second, Hilliard used more reliable sources of information in forming

26  his opinion: the admissions of defendants in their depositions; the book *Softwar* annotated by Ellison
    himself; defendants' contemporaneous internal communications with each other; the

27  contemporaneous communications between defendants and Oracle's customers; and finally, the
    complaints of customers.

28

1  defendants, including that it was too difficult to install, not adequately tested and did not perform in

2  an integrated fashion.

3     Hilliard also relied on many internal communications between Oracle employees discussing,

4  concerning and remedying problems experienced by customers.  These communications, produced in

5  the course of this litigation, are admissible as admissions by a party opponent under FRE 801(d)(2)

6  or as business records under FRE 803(6).  *See, e.g.*, Exs. 17-18, 46; *see also* Ex. 1 at 36, 39, 91-92,

7  97-98, 100, 103-107.

8     Defendants also manifested a belief in the truth of the many of the customer complaints – as

9  evidenced by their subsequent efforts to redress them – and thus these documents constitute

10  defendants' adoptive admissions under FRE 801(d)(2)(B).  *See United States v. Safavian*, 435 F.

11  Supp. 2d 36 (D.D.C. 2006); *Sea-Land Serv., Inc. v. Lozen Int'l, LLC*, 285 F.3d 808 (9th Cir. 2002).

12  For instance, Hilliard quotes an e-mail from customer Ingersoll Rand to their account manager at

13  Oracle, complaining of implementation and stability problems.  Ex. 1 at 83 (citing Ex. 20).  The

14  subsequent chain of e-mails, which details defendants' extensive response and efforts to solve the

15  matter, including establishing a "war room" to coordinate their efforts, manifests their belief in the

16  truth of the customers' complaint.  *Id.*  The same is true of the complaints of Pepsi and Liberty

17  Mutual discussed in §II.C., *supra*.  Furthermore, these documents need not be presented to prove the

18  truth of the matter asserted therein, but are used to demonstrate that defendants had knowledge of

19  customers' problematic experiences.  As such, they are subject to the hearsay exception.

20     Further, Hilliard based his opinions on the affirmative representations made by high-level

21  Oracle executives that Suite 11i was not adequately tested.  *See* Ex. 1 at 65-66 (quoting an e-mail

22  from D. Campbell to D. Klaiss explaining: "'At this time, we do not have a controlled environment

23  where complete integrated systems testing for the whole ERP/CRM suite can take place.'"); Exs. 35-

24  36 (subsequent e-mail from Klaiss to Barrenechea and Wohl attaching Campbell's e-mail and

25  adding: "Today's situation is that we cannot test integrated business flows prior to customer

26  shipment.").  What little integration testing that was performed was described by Oracle employees

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD - C-01-0988-SI                                    - 15 -

1   as "limited 'rifle shot' tests" and "rifle shot through the system,"[13] and described by Hilliard as not

2   "any substantive testing that anyone knowledgeable about testing would consider to be a real test

3   regarding integration." Ex. 36; Ex. 8 at 160.  Hilliard is further supported by the admission of Wohl,

4   who stated:

5           [T]here should have been more testing of the CRM product stand-alone, there should
            have been more testing of the boundary points between ERP and CRM, and there
6           should have been better . . . coordination of the processes.

7   Ex. 3 at 106:17-21.  Ellison admitted not only that Suite 11i was rushed to market and "should have

8   delayed . . . even longer," but that "[Order Management] hadn't been tested." Ex. 2 at 189, 192.

9   Oracle's SVP for Applications Technology, Cliff Godwin, admitted that "no single person" had been

10  assigned the responsibility for integration testing.  Ex. 37 at 32-33.  This was confirmed by the

11  testimony of Oracle's VP of Application Integration, Greg Seiden.  Ex. 38 at 65, 67-68, 79.  Clearly,

12  defendants' claim that Hilliard relied solely on an absence of evidence regarding testing is false.

13  Defs' Mot. at 20-21; Ex. 8 at 160:12-16.

14              **4.      Installing and Implementing the Software Was a Red Herring**

15          Installing and implementing the software is not a pre-requisite for offering a relevant and

16  reliable opinion in this case.  Hilliard offers a detailed explanation of the factors he considered in

17  deciding not to install, implement and test the Suite 11i software produced by defendants.  Ex. 1 at 6-

18  8.  The software fills approximately 300 CDs and is designed to have hundreds of options which can

19  _____

20  [13]     Defendants audaciously misrepresent the content of the same e-mail exchange which Hilliard
    relies upon to support their position that "Oracle did perform integration testing of Suite 11i prior to
21  release." Defs' Mot. at 20 n.14.  While defendants' counsel (but tellingly not defendants' expert)
    attempts to use the post-Class Period statement that: "This testing will be beyond integration testing
22  which may be a rifle shot through the system," to support their claim that Oracle properly performed
    integration testing, Hilliard's more thorough, reliable and experienced analysis reveals that *Oracle*
23  *sought to avoid "rifle shot" testing post Class Period*.  Ex. 36 at NDCA-ORCL 056440.  This is
    confirmed in the very same e-mail conversation: "[T]here is really a need for a more thorough and
24  repeatable set of tests that can prove that all of the integrated flows . . . work completely through
    the entire system." *Id.*  This provides an excellent example of how Hilliard used his expertise to
25  interpret the jargon of software developers and IT professionals in forming his opinions.  Indeed,
    courts have recognized that experts can reliably interpret specialized language based on experience
26  and methodology. *See United States v. Freeman*, 498 F.3d 893, 899-02 (9th Cir. 2007) (finding
    "drug jargon" to be a subject for expert testimony and the detective's interpretations admissible
27  based on his experience and methodology).

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD - C-01-0988-SI                                              - 16 -

be configured into thousands of permutations.  *Id.*  The size and complexity of Suite 11i made effective testing prohibitive as evidenced by Oracle's inability to properly test Suite 11i for nearly one year after release.  *Id.* at 65.  Even using round-the-clock testing:

> [Hilliard] concluded that such a test could not provide more valid information regarding the characteristics of the Oracle 11*i* product or how it operated as **compared to its documentation than what was already available in the contemporaneous documentation of actual Oracle 11i use and experience of Oracle's sales, consulting and development organizations before, during and after the Class Period**. . . .

*Id.* at 7.  Most telling, however, is the fact that Yourdon, expert for Oracle – **the vendor of the software** – did not install, implement or test the software.[14]  Ex. 34 at 40:12-16.

### D.    Hilliard Utilized a Reliable Methodology Under Fed. R. Evid. 702

"[P]ersonal experience can be a reliable and valid basis for expert testimony.  This is **particularly true with non-scientific testimony** . . . ."  *Groobert*, 219 F. Supp. 2d at 7 (citing *Kumho*, 526 U.S. at 149); *see also Hangarter*, 373 F.3d at 1017-19 (permitting an expert to testify on insurance industry standards because of the witness's knowledge of and experience within the insurance industry).  Where expert testimony is not based in scientific expertise, but rather in technical knowledge, skill or experience, the *Daubert* factors are difficult, if not impossible to apply.[15]  *Kumho*, 526 U.S. at 150.  While scientific conclusions must be linked in some fashion to the scientific method, non-scientific testimony need only be linked to somebody of specialized knowledge or skills, and years of experience provide that link.  *Thomas*, 42 F.3d at 1270. Ultimately, the court's gatekeeping function must ensure that an expert witness "employs in the

---

[14]      Defendants attempt a sleight of hand by equating the use of the Suite 11i software with a review of the Suite 11i documentation in an effort to avoid discrediting their own expert. Defs' Mot. at 1 ("[Hilliard] did not study the suite 11i software or its technical documentation").  Plaintiffs note, once again, that the documentation reviewed by Yourdon in forming his opinions represented only the **desired** or **intended** structure of Suite 11i and such a review would not capture the effect of the **thousands** of software defects experienced by end-users.

[15]      *Daubert* offers a list of non-exclusive, non-mandatory factors bearing on the determination of reliability: (1) whether the theory or technique will be, can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error experienced in the application of the particular theory or technique; and (4) the degree of acceptance of the theory or technique in the relevant scientific community, *i.e.*, widespread versus minimal.  *Daubert*, 509 U.S. at 593-94.

1    courtroom the same level of intellectual rigor that characterizes the practice of an expert in the

2    relevant field." *Kumho*, 526 U.S. at 152.

3         Hilliard used the same rigorous and standardized methodology in forming his opinions in this

4    case that he uses as an IT and management consultant, with adjustments for the fact that expert

5    assignments occur after the fact, whereas his consulting work is done prospectively. Ex. 1 at 9 n.8;

6    Ex. 8 at 34:13-14. Hilliard stated at his deposition: "Now, the process that I use in expert

7    engagements is essentially the same as the process that I use and that literally hundreds or thousands

8    of other IT consultants use in the selection of software." Ex. 8 at 35:4-7. This involved: (a) defining

9    the needs of the client (*id*. at 34:23-35:14); (b) identifying potential vendors (*id*. at 35:8-9); and (c)

10    evaluating the suitability of the vendor's software to the client's needs (*id*. at 35:8-10).[16] Ultimately,

11    based upon extensive contemporaneous evidence produced in this litigation, Hilliard evaluated

12    whether Suite 11i performed as defendants claimed during the Class Period. Hilliard stated:

13
14         I look at the vendor qualifications, I look at the software reliability, I look at references, I look at . . . demonstrations of the software. I talk to users of the software in the consulting environment.

15
16         In the litigation environment, I look at those exact same types of issues. ***However, in the litigation environment, I have to look at them through the documentation of them rather than . . . being able to do them prospectively by talking to the individuals***. . . .

17
18    *Id*. at 36:5-14. "[T]he gatekeeping inquiry must be tied to the facts of a particular case." *Kumho*,

19    526 U.S. at 150. Here, Hilliard has employed, in the context of litigation, his consulting

20    methodology in reviewing "thousands" of pieces of documentary evidence. Ex. 8 at 47:11-15.

21    Defendants argue that Hilliard's process is not repeatable, but this is incorrect.[17] Defs' Mot. at 15

22

23    [16]    The final steps which Hilliard mentions, contracting and implementation, are not relevant to the litigation context. *Id*. at 34:25-35:3.

24
25
26
27    [17]    First, defendants take Hilliard's testimony out of context. The testimony indicates that the documents he reviewed and took into account are found in the database of Bates-numbered documents produced in this litigation. Ex. 8 at 46:21-47:3. Additionally, Hilliard's report clearly indicates that he had electronic access to the entire database of Bates-numbered documents and his report details line by line the documents he relied on. Ex. 6 at 1. Further, not only does his report, but also his testimony, evidence that Hilliard considered documents such as customers who were purportedly satisfied with Suite 11i. Moreover, pursuant to the Stipulation Regarding Expert Discovery, dated February 6, 2007, "the parties agree that other data or information that may have

28

n.9.  An expert of similar educational and professional experience could repeat Hilliard's analysis by evaluating each and every piece of evidence relevant to Suite 11i produced in the litigation. Moreover, defendants' argument misses the fact that Hilliard did not employ a scientific test but applied his years of relevant experience in reviewing the documentary evidence to form his opinions.

### 1.    Hilliard Employed Industry Accepted Standards and Practices in Forming His Opinions

Defendants claim that Hilliard cannot cite a source for the "industry-accepted guidelines" which he utilized in drafting his report.[18]  However, as Hilliard demonstrates, those with extensive software experience apply the same standards which Hilliard applied in forming his opinions.  *See, e.g.*, Ex. 8 at 35:4-7; Ex. 7 at 9, 63-64.  Furthermore, courts have acknowledged that certain expert testimony is not the subject of extensive writings.  *See Kumho*, 526 U.S. at 151 ("It might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review . . . . ");  *see also Pipitone*, 288 F.3d at 246.

The definitions employed by Hilliard are consistent with those used by Yourdon and defendants.  For instance, Hilliard and Yourdon agree on their definitions of integration.  Hilliard states:

> I do not dispute Yourdon's definitions and characteristics, indeed they are not that different from the definition of integration offered in my declaration dated 25 May 2007 and the Oracle employee definitions quoted therein. . . .

Ex. 39 at 5; *see also* Ex. 1, §5.2; Ex. 40 at 36.  Hilliard and defendants also employ a very similar definition of commercial quality which requires a piece of software to "provide a level of reliability and functionality suitable for commercial usage for the purposes it is promoted and sold to perform." Ex. 1 at 77-78; Ex. 8 at 194:20-195-3.  Hilliard stated that this definition was "vetted . . . with many of [his] peers."  Ex. 8 at 194:23-24.  Hilliard's definition is substantiated by the fact that Oracle's

---

been considered by a Testifying Expert **but was not relied on** by the Testifying Expert in forming her or his opinions **need not be disclosed or produced**."  Ex. 48 at 2.

[18]    Defendants hint that the guidelines which Hilliard was seeking were found in Capers Jones' books and detailed by defendants' expert Yourdon.  *Id*. at 14 n.7.  This is ironic because the minimal analysis Yourdon undertook was completely insensitive to any software defects, as discussed further in this section.  In no way did Yourdon employ or base his findings on Jones' metrics.

1   own CRM Chief Barrenechea stated that commercially viable software is "***tested***, . . . it's

2   functionally complete, documented.  It's in a position to be sold, in a position for customers to go

3   live on."  Ex. 4 at 233:23-25.

4          Hilliard specifically identifies the elements of commercial quality, evaluating each

5   individually.  Defendants cannot refute Hilliard's opinions on Suite 11i's instability, unacceptable

6   customer support, and performance deficiencies.  *See* Ex. 1, §§5.3.1-5.3.3.  Defendants' assertion

7   that "Mr. Hilliard believes that all of Defendants' statements . . . must have been false because

8   customers were experiencing to many bugs" blatantly mischaracterizes and ignores the rigorous and

9   reliable methodology which Hilliard applied in forming his opinions.  Defs' Mot. at 3.  The evidence

10  supports both Hilliard's and Barrenechea's similar definitions of commercial quality because Ellison

11  and Wohl admit that Suite 11i was inadequately tested before it was released, and Ellison himself

12  stated, more than a year after release, that "Until [users are delighted with Suite 11i] I doubt we will

13  achieve success in the market."  Ex. 1 at 92 n.197 (quoting Ex. 47).

14         The test for quality endorsed by defendants is irrelevant because – as defendants are aware –

15  no party to this litigation knows the number of bugs in, or the size of, Suite 11i:

16         [I]n order to analyze software quality in a reliable and principled way, it is necessary
           to understand several factors, including (1) the size of the software, (2) the actual
17         quantity and type of errors experienced by the users of the software as a class (3) the
           performance (including actual quantity and type of errors) of software of a similar
18         class and size.

19  Defs' Mot. at 10-11 (citing Ex. 40, §VI.5.; Ex. 41 at 32:13-23, 33:12-25).[19]  At this point in the

20  litigation, it is undisputed that neither party knows with any degree of accuracy either the size of

21  Suite 11i or the number of defects the software contained.  Ex. 42 at Conclusion Nos. 1, 4; Ex. 41 at

22  21:1-25.  Data for the relevant product class – *i.e.*, ERP/CRM suites – is proprietary and confidential.

23  Ex. 8 at 95:3-11.  Furthermore, defendants told investors that Suite 11i was a revolutionary product

24

25  [19]    Defendants suggest that because "Plaintiffs offer no basis to contest this analytical
        framework put forward in Mr. Jones' books and described by Mr. Yourdon" that plaintiffs must
26      accept it as the rule.  Defs' Mot. at 11.  This is ludicrous.  Yourdon is free to define his inquiry in
        this manner.  However, if he does so, he must be excluded because it is conclusively established that
27      no party can determine either the size of Suite 11i or the number of defects with any level of
        accuracy.

28

1    and not comparable to anything else on the market.  Ex. 33, *see also* §II.D.4, *infra*.  Caper Jones'

2    metrics do nothing to undermine the reliable methodology used by Hilliard.  Furthermore, Yourdon

3    offers no "comparative" or "quality" analysis which would be bolstered by defendants' claims that it

4    is a necessary element to reliable expert testimony.

5         Indeed, Yourdon undertook an analysis of technical documentation alone which was

6    completely non-responsive to the level of defects in Suite 11i.  Ex. 34 at 230:4-12.  Yourdon

7    explained, it is "***look[ing] at actual implementations and reports from customers***" which would

8    have allowed him "to see whether it was operating as designed."  *Id*.  Thus, it is the exact evidence

9    which defendants label as "anecdotal" and "unreliable" in their motion to exclude Hilliard which

10   defendants' expert Yourdon states is ***necessary to determine whether the software "operat[ed] as***

11   ***designed***."  Defs' Mot. at 1-3, 5-7, 11-12, 18-20.

12        Defendants spend almost six pages quarreling with analyses that Hilliard did not perform,

13   including a "comparative analysis of Suite 11i's quality" or taking into account the "ERP context"

14   when considering "quality."  *See id*. at 6-13.  None of these arguments supports defendants' claim

15   that Hilliard should be excluded ***because they do nothing to undermine Hilliard's qualifications,***

16   ***the reliability or relevance of the opinions which he does offer***.[20]  Contrary to defendants' claims,

17   "[t]he judge does not have to determine that [an expert's] methods are necessarily the best grounds

18   to ascertain certain facts, but only that the evidence presented will help the trier of fact."  *Williams*,

19

20

---

21   [20]        Where it was appropriate, Hilliard took into account the "ERP context."  For instance,
22   defendants represented that Suite 11i could be implemented "in a matter of days rather than months"
     which Hilliard interpreted appropriately given the typical installation times for ERP/CRM software
23   suites (Ex. 33 at NDCA-ORCL 014907):

24        [I]t would not be reasonable to interpret this as meaning 30 days or less.  Instead I
          interpreted it to mean some period of time – quoted in days – that is considerably
25        shorter than the minimum amount of time that is has historically taken to implement
          such applications.

26   Ex. 1 at 16.  As Hilliard states about his methodology: "As is my normal practice, I have taken care
27   to apply my expertise related to the computer industry customs and practices and accepted standards
     of care ***relevant to this matter in an objective manner***."  *Id*. at 9.

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD - C-01-0988-SI                                          - 21 -

1   2007 WL 1643197, at *3.  It is up to a jury to weigh the evidence relied upon by the proffered

2   expert.  *Breider*, 722 F.3d at 1138-39.

### 2. Hilliard Found Defendants' Statements that Suite 11i Was "Designed" or "Engineered" to Have Certain Functionality Were Misleading

5   Defendants also suggest that Hilliard "does not contest that Suite 11i was designed to include

6   all the 'functionality' that Defendants represented; he merely contends that, for various reasons, the

7   software 'did not work.'" Defs' Mot. at 4 (quoting Ex. 1 at 62).  First, defendants mince Hilliard's

8   opinions.  Hilliard does not "***merely contend[]***" that the software did not work.  It is Oracle's own

9   high-level employees who contend that it does not work: In August, 2001, Chief Marketing Officer

10  M. Jarvis wrote, "[w]e are going through a rough patch ***because 11i did not work*** . . . and ***we pissed***

11  ***off a lot of customers***." Ex. 1 at 62 (quoting Ex. 43).  Second, Hilliard states "[t]he relevant issue is

12  not what engineering goals may or may not have been set for the software, ***but whether the product***

13  ***did what it was represented to do***." *Id.* at 38.  Thus, he concluded based on the application of his

14  expertise to the relevant evidence in this case, that the statement that Suite 11i "is integrated" is

15  false, and found the statement that Suite 11i "is designed [or engineered] to be integrated" to be

16  misleading.  *Id.* at 75.  "The reason the second statement was misleading was that it broadly and

17  falsely implied that the 'Oracle 11i is integrated' statement was true." *Id.*

### 3. The Number of Function Points in Suite 11i and the Size of the Software Does Not Undermine Hilliard's Opinion

19  Hilliard's "opinion on the quality of the Oracle 11*i* product is based on the ***severity and the***

20  ***criticality*** of the software defects (*i.e.*, bugs) in the Oracle 11*i* software, not on the sheer number of

21  such defects alone." *Id.* at 79.  Defendants introduce Jones, the author of *Estimating Software Costs:*

22  *Bringing Realism to Estimating* (2d ed. McGraw Hill, 2007), to much fanfare, but he has neither

23  been designated as an expert in this case nor given any testimony.  Defs' Mot. at 9.  Defendants use

24  Jones to attempt to substantiate their claim that Suite 11i has 250,000 or 267,000 function points.

25  Ex. 40 at 31.  Defendants are contradicted by Randall Jensen, whose primary opinion here is that a

26  reliable count of function points must come from a counter certified by the International Function

27  Point Users Group.  Ex. 42 at Conclusion No. 1.  As to Jones' estimates of defects per function

1   point, Jensen states that Jones' numbers are "coarse . . . really crude" tools for estimating.  *See* Ex.

2   41 at 44:13-21.  Jones himself states that his "rules of thumb are ***not*** accurate . . . and should ***not*** be

3   used for contracts, bids, or serious business purposes."  Ex. 44 at 101 (emphasis is original).

4   Because neither function points nor defects have been reliably counted, Jones is irrelevant to this

5   litigation.  However, the inapplicability of Jones' metrics have no effect on the reliability of

6   Hilliard's opinions that defendants knew or should have known that their statements were false.

7          **4.      Defendants Have Held Out Suite 11i as a "Revolutionary"**
               **Product Rendering any Comparative Analysis Inherently**
8              **Flawed**

9          Defendants' own representations that Suite 11i was a revolutionary product render any

10  comparative analysis they now claim Hilliard should have performed unreliable.  Defs' Mot. at 7-8.

11  "Oracle is the only vendor to offer a fully integrated and comprehensive suite of e-Business

12  applications."  Ex. 33 at NDCA-ORCL 014907.  Barrenechea stated "the Oracle E-business Suite is

13  the only one that combines tightly integrated ERP and CRM."  *Id.* at NDCA-ORCL 014908.

14  Defendants' expert, Yourdon, admitted to not being aware of any comparable product in existence in

15  the marketplace from June 2000 to June 2001: "I'm not aware of any [other vendor] that offered or

16  provided, [sic] marketed the extent of CRM and ERP products integrated together into one product

17  during that period of time."  Ex. 34 at 67:25-68:19.  Defendants cannot have it both ways – they

18  cannot tell investors that Suite 11i is revolutionary during the Class Period but then insist that it be

19  compared to other software in the litigation context.  Any suggestion that a comparative analysis

20  would yield meaningful results, or is a basis for excluding Hillard, is without merit.

21      **E.      Hilliard's 26 Years of Experience Will Assist the Trier of Fact**

22          An expert witness must provide testimony which "will assist the trier of fact to understand

23  the evidence or determine a fact in issue."  FRE 702.  "This condition goes primarily to relevance.

24  Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-

25  helpful."  *Daubert*, 509 U.S. at 591; *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)).

26  FRE 401 defines relevant evidence as that which has "any tendency to make the existence of any fact

27  that is of consequent to the determination of the action more probable or less probable than it would

28  be without the evidence."  FRE 401.  Despite defendants' deliberate efforts to misread Hilliard's

1   declaration and deposition testimony, his opinions are clearly articulated and will assist the trier of

2   fact in this litigation.

3        Defendants grossly mischaracterize Hilliard's declaration and deposition testimony.  They

4   claim that "he evaluated the evidence not as a technical expert, but as a person with no expertise in

5   the software field."  Defs' Mot. at 17.  **This is patently false**.  Hilliard applied his 26 years of

6   experience to the evidence in this case: "I have taken care to apply my expertise related to the

7   computer industry customs and practices and accepted standards of care relevant to this matter in an

8   objective manner."  Ex. 1 at 9.  There is simply no evidence to suggest that Hilliard approached this

9   engagement as a lay person.  It runs antithetical to his very assignment as an expert in this litigation

10  and his educational and professional background.

11       Hilliard used his expertise to evaluate whether the representations made to investors by

12  defendants regarding Suite 11i were false and/or misleading.  He states:

13       So I was looking at [the veracity of defendants' claims about Suite 11i] not from the
         perspective of someone in the IT industry or from a customer, but from the
14       perspective to those people to whom that statement was made . . . .

15  Ex. 8 at 228:24-229:5.  This was necessary because this case is a securities class action where at

16  issue is the falsity of statements made to a class of purchasers of Oracle's stock.  Defendants are

17  simply trying to confuse the issue because Yourdon inexplicably narrowed his findings to "IT

18  Professionals."[21]  Hilliard appropriately offers an expert's opinion, whereby he applied his 26 years

19  of experience to the evidence and concludes that defendants knew or should have known that the

20  statements they made to lay investors were false or misleading.  Contrary to defendants instructions,

21  Hilliard is not attempting to place himself in the position of a lay person or attempting to interpret

22  evidence as a lay person.  A reading of his report, whereby he sets forth in detail his analysis of the

23  _____

24  [21]   Indeed, defendants' claims are reflective of problems Yourdon encountered when he limited
25  his findings only to "IT professionals."  *See, e.g.*, Ex. 40, ¶¶146, 160, 177, 181.  Hilliard's report
    does not suffer from the same defects.  Though Yourdon found defendants' statements not to be false
26  or misleading, he was forced to limit his findings only to investors who were IT professionals, *i.e.*,
    "people who had a background and education in the field of computer hardware or software, and
27  most likely people who were employed by or somehow directly involved in companies that provide
    computer products and services."  Ex. 34 at 30:23-31:4; *see also id*. at 37:2-7.

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD - C-01-0988-SI                                              - 24 -

1   evidence and explains the technical jargon used within that evidence, belies defendants' thinly veiled

2   attempt to discredit his expertise.  In sum, it is clear that Hilliard properly applied his expertise to the

3   facts in this litigation and offered the opinion that defendants' statements were false and misleading

4   to the investing public.

5          Defendants seek to exclude Hilliard's opinions for the very reason that they go to the heart of

6   key issues in this case: how and why defendants' statements regarding Suite 11i were false –

7   information that will assist a jury.  Further, technical terms and references permeate the evidence in

8   this case related to Suite 11i – terms which Hilliard explains based on his specialized knowledge.

9   *See, e.g.*, Ex. 1 at 26 n.47 (defining "go live"); at 63-64 (defining "integration"); at 77-79 (defining

10  "commercial quality").  Explanation of software terms requires specialized knowledge to interpret

11  and will be helpful to clarify the Suite 11i statements at issue in this litigation.

12  **III.     CONCLUSION**

13         For the foregoing reasons, plaintiffs respectfully request that the Court deny defendants'

14  motion.

15  DATED:  November 17, 2008              Respectfully submitted,

16                                        COUGHLIN STOIA GELLER
                                            RUDMAN & ROBBINS LLP
17                                        SHAWN A. WILLIAMS
                                          WILLOW E. RADCLIFFE
18                                        ELI R. GREENSTEIN
                                          DANIEL J. PFEFFERBAUM

19

20                                                   /s Shawn A. Williams
21                                        _____
                                              SHAWN A. WILLIAMS

22                                        100 Pine Street, Suite 2600
                                          San Francisco, CA  94111
23                                        Telephone:  415/288-4545
                                          415/288-4534 (fax)

24

25

26

27

28

1

2

3

4

5

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
MARK SOLOMON
DOUGLAS R. BRITTON
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

6

7

8

9

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
STACEY M. KAPLAN
9601 Wilshire Blvd., Suite 510
Los Angeles, CA  90210
Telephone:  310/859-3100
310/278-2148 (fax)

10

Lead Counsel for Plaintiffs

11

S:\CasesSD\Oracle3\OPP00055647_Hilliard.doc

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE DECLARATIONS AND
TESTIMONY OF BROOKS HILLIARD - C-01-0988-SI

CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I further certify that I caused this document to be forwarded to the following designated Internet site at:  http://securities.csgrr.com/.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on November 17, 2008.

s/ Shawn A. Williams
SHAWN A. WILLIAMS
COUGHLIN STOIA GELLER
          RUDMAN & ROBBINS LLP
100 Pine Street, 26th Floor
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail: shawnw@csgrr.com

# Mailing Information for a Case 3:01-cv-00988-SI

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jennie@libertylaw.com

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Doug Britton**
  dougb@csgrr.com,jillk@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_s

- **Joy Ann Bull**
  JOYB@csgrr.com

- **Dorian Estelle Daley**
  dorian.daley@oracle.com

- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,svdocket@lw.com,zoila.aurora@lw.com

- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com

- **Tera Marie Heintz**
  theintz@morganlewis.com,eeberline@morganlewis.com

- **Stacey Marie Kaplan**
  SKaplan@csgrr.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com,sf_filings@hbsslaw.com

- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com,#sfdocket@lw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **William S. Lerach**
  e_file_sd@lerachlaw.com

- **James C. Maroulis**
  jim.maroulis@oracle.com

- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com

- **Brian P Murray**
  bmurray@murrayfrank.com

- **Shinyung Oh**
  shinyungoh@paulhastings.com

- **Dawn S. Pittman**
  dpittman@morganlewis.com

- **Willow E. Radcliffe**
  willowr@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Mark Solomon**
  marks@csgrr.com,e_file_sf@csgrr.com,sholloway@csgrr.com,e_file_sd@csgrr.com

- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,e_file_sf@csgrr.c

- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com

# Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Corey D. Holzer**
Holzer Holzer & Cannon LLC

1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

**Raymond Lane**
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

**PRG-Schultz USA, Inc.**
Paul Hastings Janofsky & Walker LLP
55 Second Street
24th Floor
San Francisco, CA 94105

**Darren Jay Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

**Sanna Rachel Singer**
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111

**Monique C. Winkler**
Coughlin Stoia Geller Rudman & Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111