# EXHIBIT 439

RECEIVED
ORACLE CORPORATION
LEGAL DEPARTMENT

SEP 16 2002

Calendared: _____

File: _____

**FILED**

SEP 1 1 2002

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

NURSING HOME PENSION FUND, et al.,

      Plaintiffs,

  v.

ORACLE CORPORATION, et al.,

      Defendants.

No. C 01-0988 MJJ

**ORDER GRANTING DEFENDANT'S
MOTION TO DISMISS**

### INTRODUCTION[1]

Pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), Defendants Oracle Corporation and Lawrence J. Ellison (collectively "Oracle") move this Court to dismiss Plaintiffs' First Amended Consolidated Complaint ("FACC") for failure to state a claim upon which relief can be granted. Specifically, Oracle's motion requires the Court to decide if Plaintiffs' FACC meets the heightened pleading requirements of Rules 8(a)(2) and 9(b) as amplified by the Private Securities Litigation ("PSLRA"), Section 10(b) of the Securities Exchange Act, and Rule 10b-5 promulgated thereunder. After having carefully considered the papers, and arguments of counsel, and for the reasons set forth below, the Court finds that Plaintiffs' FACC is deficient and fails to conform to the Rules 8(a)(2) and 9(b) and the heightened pleading requirements of the PSLRA.

---

[1] With one exception, the Court judicially notices all of the parties' requests. The Court does not judicially notice Plaintiffs' Exhibit 5x because it is not "capable of accurate determination." Fed.R.Evid. 201(b)(2). The Court cannot determine what company the document relates to, what information the unlabeled columns contain, or where the documents originated from. The Court judicially notices Oracles' Exhibit R for the purpose of establishing Oracle's share price on particular days.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

## BACKGROUND

This motion arises from a complaint alleging securities fraud in violation of Section 10(b) of the Securities Exchange Act, and Rule 10b-5 promulgated thereunder. The complaint is brought on behalf of a class of private and public investors who purchased Oracle stock between December 15, 2000 and March 1, 2001. The complaint alleges that during that period (the Class Period), Oracle and its top executives, Chief Executive Officer (CEO) Ellison, Chief Financial Officer (CFO) Henley, and Executive Vice President Sanderson, made false and misleading statements concerning Oracle's projected third quarter earnings. Oracle designs and sells software for business information management. Oracle has enjoyed market-share leadership in database management systems since the 1980s. In response to the market's need for fully integrated software applications, Oracle developed the 11i Suite to enable companies to manage financial manufacturing, sales, logistics, e-commerce and supplier components of its business in a single software package rather than buying separate software for each function.

The bulk of Plaintiffs' allegations center on alleged problems with the implementation of the 11i Suite. Plaintiffs allege that Oracle, through executives Ellison, Henley and Sanderson, made several misrepresentations about the overall viability and efficiency of the 11i Suite. Specifically, Plaintiffs allege that in the spring of 2000, Ellison and others began marketing the 11i Suite as fully integrated and interoperable software that obviated the need for businesses to buy and integrate a number of separate applications. However, Plaintiffs claim that the software was anything but integrated and interoperable. Plaintiffs allege that Oracle knew that its statements concerning the interoperability of the 11i Suite were false because Ellison and other company executives were aware of the product's massive defects. Plaintiffs claim that Oracle was astutely aware of the falsity of its statements because the product was met with strong customer dissatisfaction and required substantial programming adjustments and systems integration to work. Plaintiffs allege that on December 15, 2000, January 5 and 8, and February 13, 2001, Ellison and Sanderson made false statements about the financial savings Oracle enjoyed as a result of using the 11i Suite internally. Plaintiffs allege that Ellison and Sanderson knew that their statements to the public concerning the savings claim was false because the product was "always down" and that it did not work within the company. Plaintiffs

2

United States District Court

For the Northern District of California

1    attempt to substantiate these claims by offering the statements of three employee witnesses who

2    allege that the Ellison and Sanderson's statements concerning the savings claim were knowingly

3    false when made.

4        Plaintiffs allege that Oracle falsely assured investors that demand for the 11i Suite, Oracle's

5    flagship software product, was so strong that the slowing economy would not impair Oracle's

6    projected financial growth. Plaintiffs allege that on February 9, 2001, Oracle falsely insisted that

7    the "slowdown is going to provide new opportunities for Oracle." Plaintiffs also claim that on

8    February 13, 2001, Sanderson and another Oracle Vice President, Roberts, denied speculation that

9    Oracle would fall short of its 3Q01 projections, falsely claiming that its sales pipeline[2] for

10    applications and database products "have never been stronger." Plaintiffs claim that these alleged

11    false statements were often coupled with Oracle's lofty growth projections attributing the strength

12    of its pipeline to demand for its applications and database products, namely the 11i Suite. Plaintiffs

13    allege that Oracle knew that its statements projecting software applications growth of 75%,

14    earnings per share (EPS) growth of $0.12, and revenues of $2.9 billion for 3Q01 were false when

15    made because applications and 11i Suite sales had steadily diminished since "early summer 2000."

16    Plaintiffs seek to substantiate these claims with four witnesses who claim that Oracle knew that the

17    statements of its executives during the Class Period were false when made because Henley,

18    Ellison, and Sanderson were all aware of internal reports, and informed through its pipeline

19    databases, that there was "a severe and continuous decline in product sales from June 2000 to

20    March 2001." Plaintiffs allege that the market relied on the alleged false statements, and that the

21    price of Oracle's stock was thereby kept artificially high. Plaintiffs claim that when Oracle

22    announced on March 1, 2001 that revenue and earnings per share were lower in 3Q01 than it had

23    predicted, the stock price dropped accordingly.[3] Plaintiffs claim that Ellison and Henley

24    fraudulently benefitted from the artificially inflated stock by selling $925 million worth of Oracle

25

26      [2] A sales pipeline is a system Oracle uses to aggregate sales personnel estimates. The pipeline contains an estimate of the date and dollar amount of each sale.

27      [3] On March 1, 2001, Oracle announced its 3Q01 results: (1) $2.7 billion in revenue (as opposed
28    to its projected $2.9 billion); (3) EPS growth of 10 cents per share (as opposed to its projected 12 cents); and (3) applications growth of 25% (as opposed to its projected 75%). As a result of the announcements, Oracle stock dropped from $19.375 to $16.875 the following day.

1   stock two months before the announcement of its 3Q01 earnings.

2           Plaintiffs filed this action alleging securities fraud in violation of Section 10(b) of the

3   Securities Exchange Act and Rule 10b-5 promulgated thereunder by the Securities and Exchange

4   Commission (SEC). Oracle and Ellison now move to dismiss pursuant to Federal Rule of Civil

5   Procedure 12(b)(6) for failure to state a claim.  While Plaintiffs have added twice as many

6   confidential witnesses, the FACC suffers from the same deficiencies in proof as the original

7   complaint. In its order of March 14, 2002 ("Order"), this Court highlighted those deficiencies by

8   analyzing several example paragraphs of the original complaint and measured them against the

9   heightened pleading standards of the PSLRA.  The Court will, again, follow this same format in

10  analyzing the FACC.  The Court begins its analysis by laying out the legal standards in operation

11  here.

**LEGAL STANDARDS**

13  **Rule 12(b)(6)**

14          A court may dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for

15  either lack of a cognizable legal theory or the pleading of insufficient facts under a cognizable legal

16  theory. Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-34 (9th Cir. 1984).  When

17  deciding upon a motion to dismiss for failure to state a claim upon which relief can be granted

18  pursuant to FRCP 12(b)(6), a court must take all of the material allegations in plaintiff's complaint

19  as true, and construe them in the light most favorable to plaintiff.  Parks School of Business, Inc. v.

20  Symington, 51 F.3d 1480, 1484 (9th Cir. 1995).  Moreover, a complaint should not be dismissed

21  unless a plaintiff could prove no set of facts in support of his claim that would entitle him to relief.

22  Id.

23          Review is limited to the contents in the complaint.  Allarcom Pay Television, Ltd. v.

24  General Instrument Corp., 69 F.3d 381, 385 (9th Cir.1995).  When matters outside the pleading are

25  present to and not excluded by the court, the motion to dismiss is converted into one for summary

26  judgment.  Where such a conversion takes place, all parties must be given an opportunity to

27  present all material made pertinent to such a motion by Rule 56.  See Fed.R.Civ.P. 12(b).

28  However, matters properly presented to the court may be considered as part of the motion to

4

*United States District Court*
*For the Northern District of California*

1  dismiss.  See Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n. 19 (9th

2  Cir.1989).  Where a plaintiff fails to attach to the complaint documents referred to in the complaint

3  the documents on which it is premised, a defendant may attach to the motion to dismiss documents

4  referred to in the complaint to show that they do not support plaintiff's claim.  See Branch v.

5  Tunnell, 14 F.3d 449, 44 (9th Cir. 1994), cert denied, 512 U.S. 1219 (1997).  Thus, the district

6  court may consider full texts of documents the complaint quotes only in part.  See In re Stac

7  Electronics Securities Litigation, 89 F.3d 1399, 1405 n.4 (1996), cert denied, 520 U.S. 1103

8  (1997).  This rule precludes plaintiffs "from surviving a Rule 12(b)(6) motion by deliberately

9  omitting references to documents upon which their claims are based." Parrino v. FHP, Inc., 146

10  F.3d 699, 705 (9th Cir. 1998).

11  **Section 10(b) and Rule 10b-5**

12          Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful "to use or

13  employ in connection with the purchase or sale of any security registered on a nation securities

14  exchange or any security not so registered, any manipulative or deceptive device or contrivance in

15  contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).

16          Rule 10b-5 makes it unlawful for any person to use interstate commerce

17          (a)     To employ any device, scheme, or artifice to defraud.
18          (b)     To make any untrue statement of material fact or to omit a state a material fact or
                    to omit to state a material fact necessary in order to make the statements made, in the light
                    of the circumstances under which they were made, not misleading, or
19          (c)     To engage in any act, practice, or course of business which operates or would
                    operate as a fraud or deceit upon any person, in connection with the purchase or sale of any
20                  security.

21  17 C.F.R. § 240.10b-5

22          To be actionable under section 10(b) and Rule 10b-5, a plaintiff must allege (1) a

23  misrepresentation or omission (2) of material fact (3) made with scienter (4) on which the plaintiff

24  justifiably relied (5) that proximately caused the alleged loss.  See Binder v. Gillespie, 184 F.3d

25  1059, 1063 (9th Cir. 1999).  Additionally, in actions alleging fraud, plaintiffs must state with

26  particularity the circumstance constituting fraud.  Fed.R.Civ.P. 9(b).

27  **Private Securities Litigation**

28          In 1995, Congress enacted the Private Securities Litigation PSLRA (PSLRA) to provide

United States District Court
For the Northern District of California

5

1  "protections to discourage frivolous [securities] litigation." H.R. Conf. Rep. No. 104-369, 104th

2  Cong., 1st Sess. at 32 (1995)) (Nov. 28, 1995). The PSLRA strengthened the pleading

3  requirements of Rules 8(a) and 9(B). Now, actions based on allegations of material misstatements

4  or omissions under the PSLRA must "specify each statement alleged to have been misleading, the

5  reason or reasons why the statement is misleading, and, if an allegation regarding the statement or

6  omission is made on information and belief, the complaint shall state with particularity all facts on

7  which that belief is formed." 15 U.S.C. §78u-4(b)(1).

8      The PSLRA also heightened the pleading threshold for causes of action brought under

9  Section 10(b) and Rule 10b-5. Specifically, the PSLRA imposed strict requirements for pleading

10  scienter. Now, a complaint under the PSLRA must "state with particularity facts giving rise to a

11  strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

12  The Ninth Circuit, in interpreting the PSLRA, has held that "a private securities plaintiff

13  proceeding under the [PSLRA] must plead, in great detail, facts that constitute strong

14  circumstantial evidence of deliberately reckless or conscious misconduct." In re Silicon Graphics

15  Inc., 183 F.3d 970, 974 (9th Cir. 1999). If the complaint does not satisfy the pleading requirements

16  of the PSLRA, the court upon motion by the defendant, must dismiss the complaint. See 15 U.S.C.

17  §78u-4(b)(1).

18                                      **ANALYSIS**

19  **Oracle's Motion to Dismiss**

20      Plaintiffs' FACC alleges that the following statements were false when made: (1) "The

21  economic slowdown isn't hurting Oracle"[4]; (2) Henley's statement that 3Q01 would produce $0.12

22  earnings per share ("EPS"), $2.9 billion in revenues, and 75% and 25% applications and database

23

24  sales, respectively[5]; and (3) "There's no systems integration required," referring to the 11i Suite.[6]

25  Oracle argues that Plaintiffs' FACC should be dismissed because its general statements about the

26

27  ———————————

28      [4]FACC ¶ 22, December 14, 2000
        [5]FACC ¶ 23, December 14, 2000
        [6]FACC ¶¶ 27-28, December 14, 2000

**United States District Court**
For the Northern District of California

impact of the economy and the state of its business are non-actionable, because its statements

concerning the 11i Suite are non-actionable puffery, because the FACC does not meet the

heightened pleading requirements of the PSLRA, and because Defendants Ellison and Henley's

stock sales do not support a strong inference of scienter.  The Court turns first to address the

several arguments raised regarding the actionability of Oracle's 3Q01 statements.

**Statements of Optimism**

    **Bespeaks Caution**

    "By definition, the bespeaks caution doctrine applies only to affirmative, forward-looking

statements," not statements of past or present fact.   In re Stac Electronics Sec. Litig., 89 F.3d

1399, 1408 (9th Cir. 1996).  Additionally, contrary to Plaintiffs' assertions, the bespeaks caution

doctrine is applicable at the motion to dismiss stage.  See In re Worlds of Wonder Sec. Litig., 35

F.3d 1407, 1413 (9th Cir. 1994) ("WOW").[7]  Under the doctrine, "cautionary language, if

sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law."  In

re Donald Trump Casino Sec. Litig., 7 F.3d 357, 372 (3rd Cir. 1993).   To be deemed sufficient,

the Ninth Circuit has held that:

> ... economic projections, estimates of future performance, and similar optimistic
> statements in a prospectus are not actionable when precise cautionary language
> elsewhere in the document adequately discloses the risks involved.  It does not matter
> if the optimistic statements are later to have been inaccurate or based on erroneous
> assumptions when made, provided that the risk disclosure was conspicuous, specific,
> and adequately disclosed the assumptions upon which the optimistic language was
> based.

WOW, 35 F.3d at 1413 (emphasis added); see also In re Donald Trump Casino Sec. Litig., 7 F.3d

at 372 ("To suffice, the cautionary statements must be substantive and tailored to the specific

future projections, estimates or opinions in the prospectus which the plaintiffs challenge").  As

---

[7]Nothing in Fecht v. Price Co., 70 F.3d 1078, 1082 (9th Cir. 1995) or Provenz v. Miller, 102
F.3d 1478 (9th Cir. 1996) alters this conclusion.

United States District Court
For the Northern District of California

1 importantly, a motion to dismiss for failure to state a claim will succeed only when the

2 documents containing the defendants' challenged statements include enough cautionary language

3 or risk disclosure that reasonable minds could not disagree that the challenged statements were not

4 misleading. See Fecht v. Price Co., 70 F.3d 1078, 1081 (9th Cir. 1995).

5

6         As an initial matter, the Court finds that the bespeaks caution doctrine does not apply to

7 Oracle's statements that the economy was not hurting its sales or that the 11i Suite required no

8 systems integration, respectively, statements (1) and (3) above, because these statements are

9 statements of present fact. See Trump, 793 F.Supp. 543, 554 (D. N.J. 1992)("the 'bespeaks

10 caution doctrine' applies only to .. cautionary language which directly addresses itself to future

11 projections"). Secondly, although applicable, the bespeaks caution doctrine does not immunize

12 Oracle's future predictions regarding 3Q01 (statement (2) above). Oracle asserts that its Forms 10-

13 Q filed on October 16, 2000 and January 16, 2001, warned investors that quarterly projections

14 might shift significantly at the quarter's end. See Defendants' Request for Judicial Notice,

15 Exhibits B at 14 and C at 17-18. While Oracle's Forms 10-Q cover a broad array of potential

16 reasons for "Uneven Patterns of Quarterly Operating Results and Revenues," id, the provisions

17 within the Forms are not "substantive and tailored to the specific future projection[]" cited above.

18 Trump, 7 F.3d at 371-372. Plaintiffs allege that Oracle's revenue shortfall was, in part, due to

19 problems with the 11i Suite. Although Oracle's prior Forms 10-Q speak generally of "delay or

20 deferral of customer implementations of the Company's software," according to Plaintiffs, by

21 3Q01 these generalized potential risks had become an undeniable  reality. See In re Hi/fn, Inc.,

22 Sec. Litig., 2000 WL 33775286 (N.D. Cal. 2000). Assuming as true Plaintiffs' allegations of

23 Oracle's knowledge of problems with the 11i Suite and fledgling sales, "[t]his Court cannot

24 conclude that a prior and generalized cautionary statement was adequate as a matter of law to

25

26

27

28

United States District Court
For the Northern District of California

protect defendants' later oral statements." Id. Accordingly, for the reasons cited above, this Court finds that the bespeaks caution doctrine does not render Oracle's alleged misrepresentations immaterial as a matter of law.

**Safe Harbor**

The PSLRA states that "[o]n any motion to dismiss based upon [the safe harbor provision of the PSLRA], the courts shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant." 15 U.S.C. § 78u-5(e). The forward-looking statement must be accompanied by an oral statement that "additional information concerning factors that could cause actual result to materially differ from those in the forward-looking statement contained in a readily available written document." See FACC Exhibit 7 at 1-2; see also 15 U.S.C. § 78u-5(c)(2)(B)(i). The accompanying oral statement must refer to a readily available SEC document. See Wenger, 2 F.Supp.2d at 1242. Oracle argues that the cautionary statements made at a December 14, 2000 press conference prior to a discussion where future predictions were expressed, protects its predictive statements made in that same press conference. See Defendants' Motion to Dismiss at 6.

Specifically, Oracle argues that ¶23, wherein Oracle stated that it would enjoy 3Q01 earnings of $0.12 EPS, growth of 75% in application sales, and 20-25% in database sales, is protected by the safe harbor provisions because its Forms 10-K and 10-Q provided "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). Although Oracle's financial projections were very broad, its SEC documents highlight the precise points of contention here. For example in its October 16, 2000 Form 10-Q, Oracle warned investors that

9

"[s]ignificant undetected errors or delays in new products or new versions of a product, expecially in the area of CRM, may affect market acceptance of the Company's products."  <u>See</u> Defendant's Request for Judicial Notice Exh. B at 13.  Oracle also warned investors that "pipeline estimates are necessarily speculative and may not correlate to revenues in a particular quarter," and that contracting patterns make its "quarterly results [ ] difficult to predict until the end of [a] quarter." Id. at 14.  Oracle's Form 10-Q goes on to state that this is because customers tend to delay the closing of substantial license transactions "until the end of a fiscal quarter as a negotiating tactic." Id.  The delays, Oracle warned, "have historically caused and could cause quarterly revenues and net income to fall significantly short of anticipated levels." Id.  These statements raise the question of whether Oracle's risk warnings provided meaningful cautions to offset allege false statements made by Oracle.  The Court finds, however, that these statements present factual issues that are beyond the purview of the instant motion.  Accordingly, this Court declines to apply the PSLRA safe harbor provisions here.

### Puffery

Oracle argues that many of its statements that the economy had not yet injured its business in 3Q01 is non-actionable puffery.  For example, Oracle argues that statements that Oracle's business was "strong," "robust," "sustained" and "astounding" are too vague to be actionable.  <u>See</u> FACC ¶¶ 23, 36, 42 (a)-(c).  "'Projections and general expressions of optimism may be actionable' under federal securities laws."  <u>In re Apple Computer Sec. Litig.</u>, 886 F.2d 1109, 1113 (9th Cir. 1989) (citation omitted).  A forecast may be actionable only if the following factors are found: (1) the statement is not genuinely believed, (2) there is not a reasonable foundation for the belief, or (3) the speaker is aware of undisclosed facts that tend to undermine the accuracy of the projection. <u>See</u> <u>id</u>.  Assuming the truth of Plaintiffs' allegations that Oracle knew from internal reports that it

would not be able to meet its 3Q01 projections, Oracle either did not believe in the alleged statements or it was aware of undisclosed fact that tended to undermine the accuracy of its statements. See Hi/fn, 2000 WL at *6. Accordingly, this Court finds that Oracle's forecasts regarding 3Q01 were not mere puffery and can be actionable. See id.

Oracle's statements that the 11i Suite is "pre-integrated and fully interoperable out of the box," and that "no systems integration is required" are also actionable. FACC ¶¶ 29, 36. Plaintiffs allege that the Oracle knew that the 11i Suite was not fully interoperable and that it was riddled with bugs. Assuming them to be true, Plaintiffs allegations suggest that Oracle was aware of undisclosed facts that tend to undermine the accuracy of its projections. See In re Apple Computer Sec. Litig., 886 F.2d at 1113. Accordingly, this Court finds that Oracle's statements regarding the 11i Suite are also actionable.

**Paraphrased Statements**

For the second time, Plaintiffs include analysts reports with paraphrased statements of what Ellison or Henley allegedly said. This Court's prior admonitions carry the same force here. No additional analysis is required. Paragraphs 36, 39, 42(a), (b), and 49 are non-actionable. The Court now turns to address the pleading defects of the FACC.

**Pleading Standards and Scienter**

Oracle contends that Plaintiffs have failed to plead particular facts that Oracle had actual knowledge at the time the challenged statements were false when made. Federal Rule of Civil Procedure 9(b) provides that

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed.R.Civ.P. 9(b)

11

In a securities action, a plaintiff complies with Rule 9(b) if he alleges the time, place, and content of the alleged fraud, and the "circumstances indicating falseness" or "the manner in which [the] representations [or omissions] at issue were false and misleading." In re GlenFed Sec. Litig., 42 F.3d 1541, 1544 (9th Cir. 1994). "To allege falsity, a plaintiff should point to contemporaneous, inconsistent statements by defendants or show that information available showed different results from what was predicted. See id. at 1549. With respect to scienter,

> "a private securities plaintiff proceeding under the [PSLRA] must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct ... [Averment of p]articular facts giving rise to a strong inference of deliberate recklessness, at a minimum, is required to satisfy the heightened pleading standard under the [PSLRA]."

In re Silicon Graphics, Inc., Sec. Litig., 183 F.3d 970, 974 (9th Cir. 1999).

The Court finds that Plaintiffs' FACC does not meet these standards. Plaintiffs' central allegations assert that Oracle, throughout 3Q01, predicted that its 3Q01 earnings would be 12 cents per share, and that revenue from applications and database sales and from other parts of the business would increase by certain percentages. See FACC ¶¶ 23, 42, 48, 49. Plaintiffs allege that these and similar statements regarding Oracle's 3Q01 projections were false when made because Oracle knew from its internal databases that overall sales were dwindling.

### Negative Internal Reports

Plaintiffs contend through several confidential witnesses that Oracle had access to a global database (Oracle Sales Online) which monitored and forecasted all sales of products and consulting services and provided up-to-the-minute information. Thus, Plaintiffs, argue, Oracle knew that it could not meet its 3Q01 projections because the database pipeline showed that sales were drying up. Several problems exist with Plaintiffs' negative internal report theory. Although Plaintiffs have added allegations from several new confidential witnesses that span the continent and

12

Canada, these witnesses fail to provide the particularized factual showing that would establish the falsity of any statements or that any speaker actually knew that a statement was false.

For example, in ¶ 25, Plaintiffs assert that by December 2000, Oracle knew that sales were in serious decline due to the slowing economy. Plaintiffs assert that

> ... because the database disclosed the declining sales, Ellison and Sanderson knew that the economy was severely affecting sales and revenues, and that the pipeline was suffering from the lack of new sales.

Nowhere in the FACC do Plaintiffs point out what "the database disclosed." Id. As this Court stated above, "[t]o allege falsity, a plaintiff should ... show that information available [to defendants] showed different results from what was predicted." In re GlenFed Sec. Litig., 42 F.3d at 1549. Although Plaintiffs contend that several confidential witnesses (CW's 1-4, 6, 16, 19, 28, 31, 32, 36 and 44) had access to Oracle's comprehensive, global database, Oracle Sales Online, and knew that the database contained references to every sales opportunity, its amount and its progress to closing, the FACC does not allege overall sales figures, revenue or pipeline figures. However, none of these confidential witnesses offer any information that would prove any statement false when made. As this Court has previously stated in dismissing Plaintiffs' initial complaint, Plaintiffs fail to "allege what the reports in the OASIS database said nor d[id] Plaintiffs provide any other basis from which the Court could infer knowing falsity." Order at 9. Providing the Court with information that Sanderson or Ellison had access to "up to the minute" global roll-ups without providing what the details actually were cannot satisfy the pleading requirements of the PSLRA. Nor does the fact that these confidential witnesses, from their knowledge of the several regional, national, or global databases, thought that sales "went dead," "fizzled out," "dried up," and "stopped" establish that Ellison, Sanderson or Henley knew of this information or thought the same thoughts.

13

Paragraph 24 provides another example of the deficiencies in Plaintiffs' negative internal report theory.  In ¶ 24, Plaintiffs assert that the accounts of at least

> 15 sales and consulting personnel from various departments and regions within the Company confirms that, in truth, the impact of the slowing economy had dramatically slowed all segments of Oracle's business, including sales of database applications and therefore would adversely impact the 3Q01 revenue and earning forecasts upon which those sales depended.

Although Plaintiffs allege that these confidential witnesses' accounts show that slowing economy affected all segments of Oracle's business, Plaintiffs' witnesses shed light on only limited sectors of Oracle's business.  For example, CW 21 was a former Senior Consultant in Southern California;  CW 16 was a former Staff Consultant in California; CW 43 was a former Senior Technical Consultant in Toronto; CW 9 was responsible for sales to higher education customers in the southeast region of the United States; and CW 22 was a Senior Consulting Director in the Bay.  As alleged in the FACC, Plaintiffs' witnesses do not account for sufficient sectors of Oracle's business line throughout the United States nor do the confidential witnesses speak to activity occurring on various levels on the higher end of Oracle's hierarchical chain, as most witnesses were only regionally or locally affiliated.  Thus, Plaintiffs' witnesses do not provide an accurate enough picture to make a determination with respect to what Oracle knew during relevant periods.

Plaintiffs suggest that although the confidential witness accounts alone are insufficient, viewed collectively they support a strong inference of scienter.  Plaintiffs again rely on Bourjaily v. United States, 483 U.S. 171, 179-80 (1987).  The Court rejected this argument in its Order.  However, even assuming that this Court viewed the allegations of the confidential witnesses as a whole, their allegations still do not sufficiently plead fraud.  Plaintiffs confidential witnesses do not state what Oracle's company-wide revenue figures were at any one time.  Nor do the confidential witnesses say what any company-wide pipeline figure was at any time.  While the confidential

14

witnesses "corroborate" one another, corroboration alone, notwithstanding the allegations, fail to establish a strong inference of scienter. See In re Silicon Graphics, Inc., Sec. Litig., 183 F.3d 970, 974 (9th Cir. 1999).[8] Reliance on confidential witnesses without facts to establish that Ellison knew the same information that anonymous sales persons knew at the time he made any of his alleged false statements, in no way sets forth the manner in which the misrepresentations or omissions at issue were false and misleading. See In re GlenFed Sec. Litig., 42 F.3d at 1544 (9th Cir. 1994).

Plaintiffs' FACC is analogous to the pleading in Kane v. Madge Networks, N.V., 2000 WL 33208116 * 1):

> Plaintiffs fail to match up even one negative internal report with any specific statement of the defendants. [ ] All the complaint does is allege that the individual defendants were "hands-on managers" who received information through "e-mail, teleconferences, and meetings." [ ] The complaint even attempts to turn the presences of a fax machine in a conference room into evidence of scienter. [ ] All these allegations do is show that defendants *could* have learned of information contradicting their public statements, not that they actually *did* learn such information (or that they were deliberately reckless to the falsity of their statements.)

Id. at *9.

Plaintiffs' FACC, through its several confidential witnesses, asserts nothing more than that Oracle had access to global databases that provided real-time updates regarding sales. Plaintiffs fail to "place in context the significance" of the statements of confidential witnesses with "Oracle's overall financial picture." Order at 11. This cannot support a strong inference of scienter, nor can it plead fraud with particularity.

[I]f a plaintiff is to rely on the existence of reports as a means of establishing knowledge,

---

[8] "a private securities plaintiff proceeding under the [PSLRA] must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct ... [Averment of p]articular facts giving rise to a strong inference of deliberate recklessness, at a minimum, is required to satisfy the heightened pleading standard under the [PSLRA]."

15

she must "include adequate corroborating details," such as [ ] "who drafted them, [ ] which officers received them," and "an adequate description of their contents." [ ] The reason for requiring such detail [I] that "every sophisticated corporation uses some kind of internal reporting system reflecting earlier forecasts," and that allowing a plaintiff "to go forward with a case based on general allegations of 'negative internal' reports would expose all those companies to securities litigation whenever their stock prices dropped.

In re Vantive Sec. Litig., 283 F.3d 1079, 1087-88 (9th Cir. 2002).

Despite the deficiencies cited above, Plaintiffs' contend that "it is reasonable to conclude that the declining sales reported by witnesses were reflected in the global database" and that Ellison or Henley's 3Q01 predictive statements were necessarily rendered false. See FACC ¶ 41. Plaintiffs ask this Court to infer the very thing that must be proven. If Plaintiffs seek to establish that Ellison or Henley knew their predictive statements to be false when made, they must provide "an adequate" description of the contents of the negative reports. Plaintiffs also would also have to provide this Court with information showing that as of a specific date Oracle knew about a specific amount or volume of sales. Then, Plaintiffs would have to demonstrate that Oracle's knowledge of the sales volume would have made its predictive statements false when made. Plaintiffs could accomplish this by comparing the specific sales volume figures with prior quarters or some other comparative factor. This Court has no such numbers to work with. While the FACC's confidential witnesses provide information regarding regional sales figures ( for example, ¶¶ 25(a), (b), (d), (f), (h), (I)), "Plaintiffs fail to establish that the sales portfolio[s] [of these witnesses] w[ere] [ ] company-wide portfolio[s]. In other words, Plaintiffs do not demonstrate that the sales information [in the aggregate] was of a magnitude that would, of necessity, be a fact with respect to Ellison's 3Q01 projections." Order at 9 n4. "To allege falsity, a plaintiff should point to contemporaneous, inconsistent statements by defendants or show that information available showed different results from what was predicted." In re GlenFed Sec. Litig., 42 F.3d at 1549.

16

Plaintiffs' FACC does not.

### Lost Deals

The FACC is also deficient because it attempt to prove the "negative internal report" theory with several accounts from confidential witnesses regarding lost deals -- deals that either did not close prior to 3Q01 or were abandoned altogether.   For example, in ¶ 25(h), CW 32, a former Oracle Senior Sales Consultant for 11i sales, reported that a $10 million deal did not close.   CW 8 identifies several deals that Oracle allegedly expected to close between July 2000 and March 2001 that did not close, including deals with Federal Express, Mutual of Omaha, Fosters Beer, Telecom New Zealand and GE in New York.

While Plaintiffs' allegations demonstrate that several deals did not close within the class period, these facts do not prove Oracle's projections false when made because the allegations do not go on to elucidate how many deals remained in the pipeline.   Moreover, as Oracle correctly notes, Plaintiffs do not allege how much of the revenue from any of these thwarted deals was forecast to recognized in 3Q01.   Oracle could very well have been justified in makings it 3Q01 predictions.   This Court does not know because the information required to make that determination has not been provided.   Such short sided pleadings do not present "circumstances indicating falseness."   In re GlenFed Sec. Litig., 42 F.3d at 1544.

### Product Defect Allegations

The FACC also fails to state a claim because Plaintiffs do not demonstrate how their product defect allegations relate to the challenged 3Q01 predictive statements.   Plaintiffs contend that "[t]his is a fraud case in which false assurances about the declining economy and false claims about product integration are intertwined, and served as a basis for false forecasts about applications revenue growth."   See Plaintiffs' Opposition at 17:16-18.   Although Plaintiffs have

17

included several paragraphs regarding the functionality of the 11i Suite, Plaintiffs do not establish how Oracle's alleged difficulty implementing the 11i Suite affected the revenue projections made prior to the close of 3Q01.  Plaintiffs' 11i Suite allegations fall under the weight of the FACC's failure to allege any contemporaneous, hard facts relating to a company-wide financial picture that would render Oracle's company-wide projections false, as discussed above.  Acknowledging after the fact that the shortfall in 11i applications sales growth accounted for nearly half ($101 million), of the $203 million revenue shortfall does not help here when Plaintiffs have not established that Oracle knew of hard, contemporaneous and contradictory facts when it made its 3Q01 projections.

Additionally, the FACC does not set forth how the product quality allegations, namely the customer relationship management module (CRM) (see ¶¶ 29(a)-(f), (h)-(I), (k)-(l), (o)), relates to 11i.  As Oracle points out, the CRM is one of many modules of the 11i Suite.  See Defendants' Motion to Dismiss 22:11-14.  The FACC does not establish how the alleged defects in the CRM affected sales of the 11 Suite or how it affected Oracle's business as a whole.

Finally, and most importantly, Plaintiffs' FACC fails to account for Oracle's financial success in the two quarters which immediately followed the release of the 11i Suite.  The first quarter following the release of the 11i Suite (the first quarter of Oracle's fiscal year 2001(beginning June 1, 2000)) was successful in that revenues reached $2.2 billion, with earnings at 8 cents per share.  The second quarter following the release was even more successful than the first, with earnings at 11 cents per share, beating Oracle's own forecasts by one cent.  However, Plaintiffs contend that the 11i Suite did not work, was virtually unsellable from its introduction and that the product defects led to Oracle's third quarter shortfall.  Essentially, Plaintiffs argue that although most of the alleged defects in the 11i Suite occurred during two successful quarters which followed the product's introduction, these same defects are attributable to Oracle's missed 3Q01

United States District Court
For the Northern District of California

predictions and therefore establishes that Oracle knew that its 3Q01 predictive statements were false when made. Yet, Plaintiffs have not plead anything that would have made it unreasonable for Oracle to expect that the financial success it enjoyed during the two quarters following the product's release (despite the alleged product defect claims) would also obtain in 3Q01. Accordingly, Plaintiffs' 11i Suite arguments (see Plaintiffs' Opposition at 14-16) do not carry the day. For the foregoing reasons, the Court finds that the FACC fails to plead fraud with particularity and that the facts articulated in it do not give rise to a strong inference of scienter.

**Stock Sales**

Plaintiffs' argument that the fact that Oracle executives reiterated strong sales, revenue and earnings growth (¶¶ 113-115) only five days prior to disclosing its 3Q01 results is flawed because the paragraphs do not contain any misrepresentation but only paraphrased analysts' reports, which the Court has found insufficient for purposes of pleading securities fraud. The timing of the allegedly false statements "may prove relevant when considered in conjunction with specific information indicating conscious behavior or knowledge of falsity. By itself, however, it does not create a strong presumption of deliberate recklessness." Autodesk, 132 F.Supp.2d at 844. Similarly, Plaintiffs claim that Ellison and Henley's stock trades prior to the March 1 announcement provide a strong inference of scienter is unpersuasive. "'Only unusual' or 'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter." Silicon Graphics, 183 F.3d at 986. Courts consider (1) the amount and percentage of shares sold by insiders, (2) the timing of the sales, and (3) whether the sales were consistent with the insider's prior trading history." Id. Additionally, percentages of a trader's total portfolio becomes more significant in cases where insider trading is the only circumstance left in the case to show scienter. Id. at 987-88. Plaintiffs allege that defendants Ellison and Henley's stock sales totaling $925

million shortly after "inflating" the stock with alleged falsehoods provides additional stronger

inference of scienter and a motive for fraud. In the Ninth Circuit, stock sales alone ("motive and

opportunity") cannot provide a strong basis for scienter. In re Splash, 160 F.Supp.2d 1059, 1081

(N.D. Cal. 2001). Moreover, Plaintiffs claim that the timing of Ellison and Henley's stock trades

were highly suspicious is unpersuasive. "[I]nsider trading is suspicious only when it is

'dramatically out of line with prior trading practice at times calculated to maximize the personal

benefit from undisclosed inside information." Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir.

1991).

Plaintiffs allegations are not borne out by the facts. First, Plaintiffs have not proven that

Ellison or Henley was aware of any undisclosed inside information. Second, Plaintiffs do not

provide the Court with any information about Henley's prior trading. Third, Plaintiffs cannot get

around the fact that Ellison sold only 2.1% of his holdings, retaining approximately 98% of his

holdings and Henley sold only 7% of his holdings. Thus, both Ellison and Henley "incurred the

same large losses as did the Plaintiffs." Worlds of Wonder, 35 F.3d at 1425. Additionally, neither

defendants sales were sold at suspicious times, both occurring two months prior to Oracle's

announcement of its third quarter results. Therefore, because both Ellison and Henley "retained

the vast majority of [their] holdings and none of the sales occurred at suspicious times, such as

immediately before a negative announcement," the Court finds that Ellison and Henley's stock

trades do not support a strong inference of scienter. Wenger, 2 F.Supp.2d at 1251.

## CONCLUSION

"Taken as a whole, [P]laintiffs do not meet the stringent pleading standard of Silicon

Graphics. None of [P]laintiffs' allegations provide the critical details necessary to support an

inference" that Oracle was aware of any facts that would compromise its predictive statements."

Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1038 (9th Cir. 2002).  Nor does that FACC allege

particularized facts that could lead this Court to infer that Oracle's predictive statements artificially

inflated its stock price.  See id.  As such, Oracle's motion to dismiss for failure to state a claim

under Federal Rule of Civil Procedure 12(b)(6) is GRANTED, without prejudice.  Plaintiffs shall

file an amended complaint within thirty (30) days of this Order.[9] [10]

**IT IS SO ORDERED.**

Dated: September 6,  2002

MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

---

[9]Because they rely upon the facts and theory discussed in the body of this Order, Plaintiffs second and third causes of action fall under the weight of this Court's disposition of Plaintiffs' primary cause of action.

[10]Also before this Court is Oracle's motion to stay discovery in the state derivative action captioned The Oracle Cases, Judicial Council Coordination Proceeding No. 4180, currently pending before the Honorable John G. Schwartz, Superior Court of California, County of San Mateo. The motion was brought pursuant to 15 U.S.C. § 78u-4(b)(3)(D), which provides that federal district courts, upon a proper showing, may stay discovery in private state actions as necessary in aid of its jurisdiction or to protect its judgments. See 15 U.S.C. § 78u-4(b)(3)(D). However, Oracle's motion to stay is premised on the fact that the discovery is stayed in the instant action pursuant to PSLRA's automatic stay of discovery, which is triggered during the pendency of any motion to dismiss. Oracle's motion to stay is now moot as Oracle's motion to dismiss is granted.

21