# EXHIBIT 440

CONFIDENTIAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

--oOo--


In re:  ORACLE CORPORATION          Master File No.
SECURITIES LITIGATION                C-01-0988-MJJ (JCS)
_____/     CLASS ACTION






-- TRANSCRIPT DESIGNATED AS CONFIDENTIAL --


Videotaped Deposition of

D. PAUL REGAN, CPA, CFE

_____

Monday, July 9, 2007




Reported by:
Leslie Rockwood

CSR No. 3462

Job No. 75266

CONFIDENTIAL

1   expert, when you say that some financial statements were

2   materially misstated, you don't have to say whether

3   they're quantitatively misstated or qualitatively

4   misstated.  It's not a determination that one needs to

5   make.  But I think I did make a quantitative as well as

6   qualitative determination.  And for at least those

7   paragraphs and sections that I cited.  So I think it's

8   a -- it's a misstatement of my expert report.

9        Q.  BY MR. GLENNON:  What was the impact of the

10  $20 million bad debt adjustment at the end of the second

11  quarter on Oracle's net income after taxes?

12       A.  You're talking about the debit memo?

13       Q.  No, I'm talking about the bad debt

14  adjustment.

15            MR. GREENSTEIN:  Objection.  Form.

16            THE WITNESS:  The debit memo bad debt

17  adjustments.  I mean there's two $20 million adjustments.

18  HP is a $20 million adjustment.  So if you asked me a

19  question --

20       Q.  BY MR. GLENNON:  Well, I'm talking about the

21  bad debt reserve adjustment.

22       A.  It's calculated on page 21.  And it's

23  12.9 million.  And it increased earnings per share by one

24  penny.

25       Q.  Well, would it have increased earnings per

CONFIDENTIAL

1    share by one penny or would it have increased earnings

2    per share of .22 of a cent?

3              MR. GREENSTEIN:  Objection.  Form.

4              THE WITNESS:  It increased earnings per share

5    by portion of a cent, which has the effect of increasing

6    earnings per share from 10 cents to 11 cents.

7        Q.  BY MR. GLENNON:  Once EPS crosses 10.5, isn't

8    Oracle required under GAAP to round that cent up?

9              MR. GREENSTEIN:  Objection.  Form.

10             THE WITNESS:  That's certainly the custom and

11   practice in the issuance of financial statements.

12       Q.  BY MR. GLENNON:  What percentage of the net

13   income did the impact of the bad debt -- let me start

14   that question over again.

15             The $12.9 million increase in the net income

16   that you just referenced, what percentage of Oracle's

17   overall net income for the quarter did that represent?

18       A.  It's a little over 2 percent.

19       Q.  Of the $20 million that was released into

20   revenue, what percentage of Oracle's quarterly revenues

21   did that $20 million represent?

22             MR. GREENSTEIN:  Objection.  Form.

23             THE WITNESS:  Rounds to -- it's less than

24   1 percent.

25       Q.  BY MR. GLENNON:  Mr. Regan, would you agree

CONFIDENTIAL

1  with me that had the bad debt transfers never occurred

2  and had the subsequent adjustment never occurred in the

3  second quarter of fiscal year 2001, Oracle still would

4  have reported EPS of 10 cents?

5            MR. GREENSTEIN:  Objection.  Form.

6            THE WITNESS:  Well, I don't know what they

7  would have done.  But assuming they wouldn't have

8  utilized some other element in the absence of any other

9  element of -- to be used, they would have reported EPS of

10  10 cents.

11       Q.  BY MR. GLENNON:  Well, let's take it a

12  slightly different way.  If you were to reverse the

13  adjustment out of revenue, would Oracle still have

14  reported EPS of 10 cents in the second quarter of fiscal

15  year 2001?

16            MR. GREENSTEIN:  Objection.  Form.

17            THE WITNESS:  Well, I think it's complicated

18  by the fact that the HP transaction, because the HP

19  transaction also brings it over 10.5, which rounds to 11.

20  So you have to -- in getting to your answer, you have to

21  eliminate both HP and the bad debt writeoff.

22       Q.  BY MR. GLENNON:  Let's put HP aside for a

23  second.  Let's just focus on the bad debt adjustment.  If

24  you were to reverse the $20 million release at the end of

25  the second quarter, would that bring Oracle down to below

128

CONFIDENTIAL

1    10 cents of EPS?

2           MR. GREENSTEIN:  Objection.  Form.

3           THE WITNESS:  No, because the HP transaction

4    would have brought it over.

5           Q.  BY MR. GLENNON:  If you would have reversed

6    both.

7           A.  Yes, it would have -- absent any other

8    transaction, it would have reflected EPS of 10 cents.

9           Q.  In other words, if you reverse both the bad

10   debt reserve and the HP transaction, Oracle still would

11   have posted EPS or reported EPS of 10 cents in the second

12   quarter of fiscal year 2001; is that correct?

13          A.  Yes.

14          Q.  And you agree with me that in the second

15   quarter of fiscal year 2001, consensus estimates of EPS

16   for Oracle was 10 cents?

17          MR. GREENSTEIN:  Objection.  Form.

18          THE WITNESS:  That's my understanding.

19          Q.  BY MR. GLENNON:  So you're not arguing that

20   the bad debt transfers concealed a earnings miss,

21   consensus earnings miss?

22          MR. GREENSTEIN:  Sorry, Objection.  Form.

23          THE WITNESS:  I don't argue that.  But it

24   presents a consensus earnings, a beat of consensus

25   earnings which, for Oracle, appears to have been a

CONFIDENTIAL

1    significant presentation to the investment community.

2        Q.  BY MR. GLENNON:  In paragraph --

3        A.  In other words, when you're assessing the

4    significance of a particular item, you assess it in the

5    context of what's important to users of financial

6    statements, and you look at the historical facts and

7    factors that are important to users of financial

8    statements for the particular company.  And for a company

9    like Oracle, beating consensus estimates and meeting

10   consensus estimates can be significantly different, and

11   it happens that it is significantly different for Oracle

12   in that time frame.

13       Q.  And you've undertaken that analysis to

14   determine that there is a statistically significant

15   difference between meeting and beating earnings

16   expectations as of the second quarter of fiscal year

17   2001?

18           MR. GREENSTEIN:  Objection.  Form.

19           THE WITNESS:  I didn't look at it from a

20   statistical perspective, but what I looked at was for the

21   prior I think nine or ten quarters, when Oracle announced

22   that it met consensus estimates, the reception in the

23   investment community was not enthusiastic.  But when it

24   exceeded the consensus estimates, the reception tended to

25   be very favorable.  So that it -- that becomes

130

1          MR. GREENSTEIN:  Same objections.

2          THE WITNESS:  I'm not aware that they

3   objected to the recognition.  I don't know that they

4   reached a separate conclusion that this is reported in

5   accordance with GAAP.  Based upon the information that

6   they see and were presented to them and had the

7   opportunity to see, I don't see that they disagreed with

8   it.

9          Q.  BY MR. GLENNON:  Do you think Oracle's

10  recognition of revenue on the HP transaction was

11  fraudulent?

12         MR. GREENSTEIN:  Objection.  Form.

13         THE WITNESS:  I don't -- I don't -- I've said

14  a couple of times today I don't testify about intent.

15  And I think intent is -- is integral to the word fraud.

16  There needs to be an intent to mislead.

17         I'll testify about facts and circumstances

18  that are consistent with an attempt to mislead, but I

19  tend not to -- I don't know that I've ever reached a

20  conclusion that something was fraud or had a fraudulent

21  intent.  I'll indicate that there's factors that are

22  consistent with fraud.

23         Q.  BY MR. GLENNON:  Taking a look at Exhibit 10,

24  the top 20 license contract revenue recognition review.

25  Do you identify any specific errors in Andersen's review

1    conclusions in your opening report?

2         MR. GREENSTEIN:  Same objection.  He didn't

3    have the document.

4         MR. GLENNON:  He said he had the document and

5    that he reviewed it before.

6         MR. GREENSTEIN:  Okay.  Well, this was

7    produced on June 22nd.

8         MR. GLENNON:  You can just have you're

9    standing objection for anything we introduce.

10        MR. GREENSTEIN:  Okay.

11        MR. GLENNON:  And when we mark exhibits, I'll

12   flag stuff that we produced for rebuttal.

13        MR. GREENSTEIN:  That works.

14        THE WITNESS:  My recollection is that I got

15   this document a few days ago.

16        Q.  BY MR. GLENNON:  Okay.

17        A.  And the document indicates to me that Arthur

18   Andersen did something of a review of this contract.

19   There are a lot of issues that are raised, certain

20   representations were made to Arthur Andersen, and certain

21   assumptions were made by Arthur Andersen, which I don't

22   think are warranted, given the other facts and

23   circumstances that we're aware of.

24        And I think I've discussed those as I've

25   talked about the document.

1      Q.  Correct.  And so at the time you wrote your

2  opening report, you didn't have that particular document;

3  is that correct?

4      MR. GREENSTEIN:  Objection.  Asked and

5  answered, argumentative.

6      THE WITNESS:  That's my recollection.

7      Q.  BY MR. GLENNON:  Can I direct your attention

8  to what we've marked as Exhibit 11, please.

9      MR. GREENSTEIN:  I'm going to enter a

10  standing objection.  Same objections to this document.

11  This was produced late.  Also note for the record that an

12  objection to foundation.  A lot of these emails on here

13  don't have dates on them.  So foundation.

14      THE WITNESS:  Okay.  I've got Exhibit 11.

15      Q.  BY MR. GLENNON:  Did you have that document

16  at the time you issued your opening report?

17      MR. GREENSTEIN:  Same objections.

18      THE WITNESS:  Do you know what exhibit this

19  was made to Mr. O'Bryan's rebuttal report?

20      MR. GLENNON:  I can find out for you at a

21  break.

22      MR. GREENSTEIN:  Brian, do you want to

23  represent whether this was or was not produced.

24      MR. GLENNON:  Yeah, I'm happy to.  We

25  produced this with our rebuttal.

1      Q.  So you would agree with me that Oracle's

2   audit committee also reviewed the determination as to

3   Oracle's recognition of revenue on the Hewlett Packard

4   transaction on November 30th, 2000?

5          MR. GREENSTEIN:  Objection.  Foundation.  It

6   looks like this is an Arthur Andersen presentation to the

7   audit committee on January 5th, 2001.

8          THE WITNESS:  It looks as if the audit

9   committee received a presentation of Arthur Andersen and

10   its audit committee dated January 5th, 2001, and within

11   one of the approximately -- one of the many pages

12   included in the presentation is three lines about the HP

13   transaction.

14      Q.  BY MR. GLENNON:  Mr. Regan, is this another

15   document that you didn't have at the time you reached

16   your conclusions in your opening report?

17          MR. GREENSTEIN:  Objection.  Form.

18          THE WITNESS:  That's my recollection.

19      Q.  BY MR. GLENNON:  Mr. Regan, turning your

20   attention to paragraph 83 of your opening report, you

21   reference a 15-day acceptance period?

22      A.  Yes.

23      Q.  In that same paragraph, you reference the

24   fact that several amendments were executed to the SLSA

25   subsequent to its original execution date.  Correct?

CONFIDENTIAL

1    is currently spent on litigation support?

2          A.  I don't call any of my work litigation

3    support.  I call it forensic accounting.  But I, for

4    about 30 years, ran that practice area for my firm, and

5    now -- and it has been for -- since '95 or '96, all of my

6    time is assisting clients in something which is either in

7    dispute or likely to be in dispute.  So I'd characterize

8    that as forensic work.

9          Q.  And what percentage of your time is spent

10   doing forensic work?

11              MR. GREENSTEIN:  Objection.  Form.

12              THE WITNESS:  Well, it's all of my time that

13   I bill to clients, and that tends to be about 1900 to

14   2200 hours a year.

15         Q.  BY MR. GLENNON:  And has it been -- have you

16   spent all of your billable time doing forensic accounting

17   work since 1995; is that correct?

18         A.  Some of the work may be outside of the scope

19   of what would be called forensic.  For example, we

20   sometimes consult with an audit committee about issues

21   which the audit committee is concerned may -- may be

22   subject to a dispute or may be subject to restatement.

23   And we'll provide consulting and assistance to the audit

24   committee to assist them in their role.

25              I -- I bill that as part of my forensic

207

CONFIDENTIAL

1   practice, but somebody can say, well, that's not forensic

2   accounting, it's not involved in litigation, and

3   hopefully, there won't be any.

4           And actually, right now, for the last couple

5   of years, maybe 20 to 30 percent of my work is working

6   with audit committees of large public firms which are

7   concerned about audit and accounting, GAAP and GAAS

8   issues.

9           Q.   Outside of your capacity as a forensic

10  accountant, have you ever had to apply SOP 97-2 in the

11  first instance to a software license agreement?

12          MR. GREENSTEIN:  Objection.  Form.

13          THE WITNESS:  I don't think so.

14          Q.   BY MR. GLENNON:  So you personally have never

15  had to be the person in the first instance to determine

16  whether or not it was proper to recognize revenue on a

17  software license transaction?

18          MR. GREENSTEIN:  Objection.  Form.

19          THE WITNESS:  Not on a 97-2.  I mean, when we

20  sold software as a firm, we would record revenue on our

21  software sales, but it wasn't under 97-2.

22          Q.   BY MR. GLENNON:  Mr. Regan, what would be the

23  net accounting impact be if you simultaneously debited

24  and credited the same account in the same amount?

25          MR. GREENSTEIN:  Objection.  Form.

208

CONFIDENTIAL

1          THE WITNESS:  Well, if that was the only

2     thing you did and there was no other impacts on the

3     underlying computer database, from an accounting

4     perspective, the balance would be unchanged after the

5     debit and the credit, assuming that the debit and the

6     credit were recorded at the same time.

7          Q.  BY MR. GLENNON:  The net accounting impact of

8     that particular transaction would be zero?

9          MR. GREENSTEIN:  Objection.  Form.

10          THE WITNESS:  Assuming they were recorded at

11     the same time and that there were no other factors that

12     impacted the account.

13          MR. GLENNON:  I'd like to have marked as

14     Exhibit 14 a one-page screen shot dated November 17th,

15     2000.

16          MR. WILLIAMS:  The screen shot is dated

17     November 17th, 2000.

18          MR. GLENNON:  Sure.

19          (Exhibit 14 marked.)

20          Q.  BY MR. GLENNON:  Mr. Regan, have you seen

21     this document before?

22          A.  I don't know have a recollection of seeing

23     this document.  It's a screen shot.  I've seen other

24     screen shots.

25          Q.  On the bottom half of the page, under the

209

CONFIDENTIAL

1   column account in the middle there is a number.  Do you

2   see where I'm referring to?

3          A.   I do.

4          Q.   Do you understand that to be account 25005,

5   customer overpayments?

6               MR. GREENSTEIN:  Objection.  Form.

7               THE WITNESS:  Yes.

8          Q.   BY MR. GLENNON:  Is that an account that sits

9   on the liability side of the balance sheet?

10         A.   It does.

11         Q.   Does the same account number appear in both

12  rows?

13              MR. GREENSTEIN:  Objection.  Form.

14              THE WITNESS:  Both rows under the heading

15  account, yes.

16         Q.   BY MR. GLENNON:  Would you agree that the two

17  accounting entries to the same account are offsetting?

18              MR. GREENSTEIN:  Objection.  Form.

19              THE WITNESS:  It appears to be that the debit

20  is $212,850, and the credit is in the same amount.

21         Q.   BY MR. GLENNON:  Do you understand that all

22  46,881 plus debit memos that were created -- let me start

23  that question over again.

24              Do you understand that all 46,000-plus debit

25  memos that were created on November 17th, 2000 were

CONFIDENTIAL

1          THE WITNESS:  And in addition, as I've

2    described earlier, this had had an influence on how

3    particular customer balances were presented within

4    various documents.

5          You know, you had another question.

6    Q.   BY MR. GLENNON:  Did all 46,881 debit memos

7    move miscellaneous unapplied payments from accounts

8    receivable into the allowance for bad debts?

9          MR. GREENSTEIN:  Objection.  Form.

10         THE WITNESS:  That's not my understanding.

11   Q.   BY MR. GLENNON:  I'd like to focus on the

12   three sets of journal entries that were recorded on

13   November 17th, 2000.

14         MR. GREENSTEIN:  Objection.

15   Q.   BY MR. GLENNON:  Are you familiar with these

16   accounting entries?

17         MR. GREENSTEIN:  Objection.  That lacks

18   foundation.

19         THE WITNESS:  I think we've talked about them

20   on page 15.

21   Q.   BY MR. GLENNON:  I'd like to talk about the

22   net accounting impact of these three sets of journal

23   entries on November 17th standing alone, putting aside

24   whatever transfers may happen before November 17th and

25   whatever refunds may happen after November 17th.  I'd

212

CONFIDENTIAL

```
 1    like to talk about the three sets of journal entries that
 2    Oracle recorded on November 17th, 2000.
 3                Do you understand?
 4                MR. GREENSTEIN:  Objection.  Foundation,
 5    vague and ambiguous, calls for speculation, incomplete
 6    hypothetical.
 7                THE WITNESS:  I understand you want to talk
 8    about the three entries?
 9         Q.  BY MR. GLENNON:  As of November 17th, 2000.
10         A.  Yes.
11         Q.  Mr. Regan, do you understand that the three
12    sets of journal entries that were recorded to account
13    25005 on November 17th, 2000, as of November 17th, 2000,
14    netted to zero?
15                MR. GREENSTEIN:  Objection.  Form.
16                THE WITNESS:  It's my understanding that if
17    you were to just look at those six debits and credits and
18    you ignored all of the other things that we've discussed
19    that's in my report here today, those six debits and
20    credits result in a zero impact on account 25005.
21         Q.  BY MR. GLENNON:  So the creation of an
22    accounting for the 46,881 debit memos standing alone nets
23    to zero as of November 17th, 2000; is that correct?
24                MR. GREENSTEIN:  Objection.  Misstates
25    testimony, foundation, vague and ambiguous, incomplete
```

CONFIDENTIAL

1    hypothetical.

2          THE WITNESS:  Well, I don't think we're here

3    to look at just what happened on November 17 and just

4    within account 25005.  We're here to talk about movement

5    of unapplied cash from customers out of a liability

6    account and into a reserve for bad debt and have -- and

7    certain impacts which the debit memo process had on the

8    visibility and the transparency and the behavior of

9    the -- of Oracle and its collectors.  We're looking at

10    that entire -- at that entire process and journey, not

11    just with respect to these six debits and credits.

12         Q.  BY MR. GLENNON:  My question just relates to

13    these six debits and credits, and you can answer a

14    hypothetical question as plaintiffs' accounting expert.

15          So my question is, the creation of an

16    accounting for the 46,881 standing alone nets to zero as

17    of November 17th, 2000; correct?

18          MR. GREENSTEIN:  Objection.  Incomplete

19    hypothetical, lacks foundation, vague and ambiguous,

20    asked and answered.

21          THE WITNESS:  They weren't made for the

22    purpose of standing alone and for the fact that they

23    added to zero.

24         Q.  BY MR. GLENNON:  I'm going to ask my question

25    again.  The creation of an accounting for the 46,881

214

CONFIDENTIAL

1   debit memos standing alone nets to zero as of

2   November 17, 2000; correct?

3           MR. GREENSTEIN:  Asked and answered several

4   times.

5           THE WITNESS:  Yeah, as I answered when you

6   had me look at what's been marked as Exhibit 14, there is

7   a debit of $212,850 to account 25005, and there is a

8   credit to account 25005.  And a debit decreases the

9   account by that number, and a credit increases the

10  account by that number, and the net effect after you

11  consider both of those entries is zero.

12          Q.  BY MR. GLENNON:  And is it your understanding

13  that all 46,881 debit memos that were created on

14  November 17, 2000 were created with the same journal

15  entries?

16          MR. GREENSTEIN:  Objection.  Foundation,

17  speculation.

18          THE WITNESS:  The amounts differed, but the

19  form of the entries were the same.

20          Q.  BY MR. GLENNON:  So your testimony is that

21  the creation of an accounting for the 46,881 debit memos

22  standing alone nets to zero as of November 17, 2000;

23  right?

24          MR. GREENSTEIN:  Objection.  Asked and

25  answered several times, incomplete hypothetical, lacks

215

CONFIDENTIAL

1    foundation, speculation.

2            THE WITNESS:  I think the creation of and

3    accounting for, you need to look at the total journey

4    from, you know, and the total impact on Oracle's

5    financial statements as a result of this process that it

6    went through in the fall of 2000.

7        Q.  BY MR. GLENNON:  I'm going to keep asking

8    this question until I get an answer.  I need to know the

9    net accounting impact as of November 17th, 2000, of the

10   creation of and accounting for the 46,881 debit memos.

11           MR. GREENSTEIN:  Hold on.  Hold on.

12           Objection.  Argumentative.  He's answered

13   that question at least four times.  I'm going to make the

14   same objections.

15           THE WITNESS:  If by your question you're

16   asking in Exhibit 14 is the liability account increased

17   by an amount and decreased by the same amount so that the

18   effect on the account of these two entries at the moment

19   before and the moment after this is recorded, and ignore

20   all other issues that we've discussed today, yes, that's

21   the net effect.

22       Q.  BY MR. GLENNON:  The net effect of the

23   creation of 46,881 debit memos as of November 17th, 2000

24   is zero; correct?

25           MR. GREENSTEIN:  Objection.  Asked and

CONFIDENTIAL

1    same question over and over until we get to seven hours,

2    then.

3              MR. GLENNON:  And if he keeps refusing to

4    answer, I'm going to go --

5              MR. WILLIAMS:  He already gave you the

6    answer.  Why don't we call the Court right now and you

7    can read the Court the record right now.

8              MR. GLENNON:  I'd rather get an answer and

9    move on.  I really would rather just get an answer and

10   move on.

11        Q.  Mr. Regan, I'm trying to determine and trying

12   to get an answer from you about the net accounting impact

13   of the creation of and accounting for the debit memos as

14   of November 17th, 2000.

15             My question to you again is:  Did the

16   creation of an accounting for the 46,881 debit memos as

17   of November 17th, 2000, net to zero?

18             MR. GREENSTEIN:  Same objections.  If you

19   want to answer the same.

20             THE WITNESS:  Well, maybe your question by

21   including the word -- the words "creation of," I may not

22   understand what you mean by "creation of" --

23        Q.  BY MR. GLENNON:  Would you like me to ask the

24   question without "creation of"?

25             MR. GREENSTEIN:  Objection.  Form.

CONFIDENTIAL

1          THE WITNESS:  Yes, because when you say

2     "creation of," it seems to me that I need to consider the

3     whole journey that we're talking about here that's in my

4     report for, you know, 30 or 40 pages.

5          Q.  BY MR. GLENNON:  Fair enough.

6          A.  In that journey, we've discussed it for many

7     hours today, and you know my opinion with respect to that

8     journey is a lot different than the question you're

9     asking.

10          Q.  Sure.

11          A.  So "creation of," in my mind, takes me

12     through the journey.  And we've talked about that for

13     probably four hours today.

14          Q.  Did the accounting for the 46,000 debit memos

15     as of November 17th, 2000 net to zero?

16          MR. GREENSTEIN:  Same objections.  Asked and

17     answered.

18          THE WITNESS:  Again, assuming you're asking

19     me about the debits and credits on November 17, my

20     understanding is that the debits total a number and the

21     credits totalled the same number, and the debits are to

22     the same account as the credits so that at the end of

23     November 17, 2000, the account is not changed.

24          Q.  BY MR. GLENNON:  Are you aware of any of the

25     46,881 debit memos that were accounted for any

219

CONFIDENTIAL

1  differently than what you just described?

2          MR. GREENSTEIN:  Objection.  Form.

3          THE WITNESS:  I see some uncertainty as to

4  whether or not the numbers 46,000 or something in the

5  48,000 range.  The ones that I've seen are similar to --

6  are essentially the same as what you see on Exhibit 14.

7      Q.  BY MR. GLENNON:  Have you identified any

8  debit memo that had accounting that's different than

9  what's reflected on Exhibit 14?

10          MR. GREENSTEIN:  Objection.  Form.

11          THE WITNESS:  I haven't seen any -- any that

12  differ.

13      Q.  BY MR. GLENNON:  I want to go back to an

14  issue we were discussing a little bit earlier today, but

15  I'm going to do a little better job with my hypothetical.

16  Let's assume all other circumstances are unchanged,

17  whatever transfers have gone into 12601 during the second

18  quarter have gone into 12601, whatever money had been

19  refunded had been refunded.  What is the financial

20  statement impact as of the second quarter fiscal year

21  2001 if the debit memos aren't created?

22          MR. GREENSTEIN:  Objection.  Calls for

23  speculation, incomplete hypothetical, lacks foundation,

24  vague.

25          THE WITNESS:  Well, I really don't know

220

CONFIDENTIAL

1   because it depends upon what Oracle chooses to do with --

2   with the payments which have been moved in -- at very

3   large amounts, historically high amounts, into the

4   allowance for bad debts.  Or did Oracle choose, instead

5   of moving it to the allowance for bad debts, did it

6   choose to refund those monies to the customers.

7          You really need to know what -- what else

8   happens as a result of the decision not to report debit

9   balance.

10          Q.  BY MR. GLENNON:  So is your testimony --

11          A.  Does this mean the air-conditioning is

12   finally going to come on in this room?

13          MR. RAWLINSON:  I'd like to warn you guy, we

14   tried this yesterday about the same time, too, and it

15   just got hotter.

16          Q.  BY MR. GLENNON:  Is it your testimony that

17   you can't opine on the financial statement impact of the

18   second quarter 2001 if the debit -- let me start that

19   question over again.

20          Is it your testimony that you can't give an

21   opinion on what the financial statement impact would be

22   in the second quarter of fiscal year 2001 had the debit

23   memos not been created?

24          MR. GREENSTEIN:  Objection.  Form.

25          THE WITNESS:  That's correct.  I would need

221

CONFIDENTIAL

1    think Mr. O'Bryan has analyzed it, and he's come up with

2    what might be approximately a million five, which he

3    thinks may not have been customer overpayments.

4         Q.  BY MR. GLENNON:  Do you have a dollar amount

5    of transfers in the bad debt reserve in the second

6    quarter of fiscal year 2001 that you believe were

7    customer overpayments?

8         MR. GREENSTEIN:  Objection.  Form.  Asked and

9    answered.

10        THE WITNESS:  No, and I don't know that

11   that's a relevant calculation.  I mean, if somebody goes

12   through and in 2007 decides that they figured out that

13   $5,000 really wasn't a customer overpayment, and that

14   that determination was made in 2004, that doesn't tell me

15   that the entry transferring from customer overpayments an

16   amount in the year 2000 into the bad debt reserve was

17   right.

18        I mean, that's a subsequent event which is

19   not relevant to the propriety of the movement of the cash

20   from the customer overpayment account to the bad debt

21   reserve.

22        Q.  BY MR. GLENNON:  Have you made a

23   determination as to how much of the transfers into the

24   bad debt reserve during the second quarter of fiscal year

25   2001 could have been properly recognized as revenue in

232

CONFIDENTIAL

1    the second quarter of fiscal year 2001?

2              MR. GREENSTEIN:  Objection.  Form, calls for

3    speculation, foundation, assumes facts, asked and

4    answered.

5              THE WITNESS:  You mean if Oracle identified

6    in the second quarter of 2001 that this was in fact a

7    royalty payment, could they have moved that from customer

8    overpayments account by debiting that account and

9    crediting royalty income?  I haven't determined how much

10   Oracle could have made such entries for because they

11   didn't do that kind of an analysis in 2000.

12             And doing it in 2003 doesn't make the absence

13   of doing it in 2000 correct.  In other words, the fact

14   that as it turns out they think maybe they had $50,000 as

15   a royalty payment and they shouldn't have transferred

16   customer overpayments into the bad debt reserve doesn't

17   make the transfer in 2000 correct.  It's not relevant to

18   the discussion.

19        Q.  But my question is:  Is did you calculate a

20   number -- let me start that question over again.

21             Did you conduct an independent analysis to

22   determine how much of those transfers could have properly

23   been recognized as revenue in the second quarter of

24   fiscal year 2001?

25             MR. GREENSTEIN:  Same objections.  Asked and

233

CONFIDENTIAL

1    answered.

2              THE WITNESS:  No, I would consider that a

3    useless exercise.  When Oracle makes an entry and moves

4    money out of its customer overpayments accounts and puts

5    it in a bad debt reserve, it has to have a proper basis

6    for doing it then, not three years later.  Or seven years

7    later, if I were to do it now.

8              Q.  BY MR. GLENNON:  Mr. Regan, I only have a

9    couple of areas that I want to close the loop on.

10             Going back to the HP transaction that we were

11   discussing earlier, do you know whether that particular

12   transaction was subsequently reversed in the third

13   quarter of fiscal year 2001?

14             A.  I don't have a recollection of that.

15             Q.  Let me ask this:  Did Oracle's determination

16   to recognize revenue on the CRM license sale to HP on

17   November 30th, 2000 have any impact on Oracle's third

18   quarter of fiscal year 2001 financial statements?

19             MR. GREENSTEIN:  Objection.  Form.

20             THE WITNESS:  Yes.

21             Q.  BY MR. GLENNON:  What was that impact?

22             A.  Well, it -- one, it wasn't a sale.  It was

23   recorded as a sale.  And it doesn't appear that it

24   occurred in the second quarter of 2001, and to the extent

25   that it would have been recorded -- to the extent that it

CONFIDENTIAL

1   could have been recorded ratably in -- over the course of

2   the 11 months of the license agreement, that would be

3   revenue that would be recorded in the third quarter and

4   not in the second quarter.

5        Q.   BY MR. GLENNON:   So it arguably would have

6   increased Oracle's revenues in the third quarter of

7   fiscal year 2001; is that what you're saying?

8             MR. GREENSTEIN:   Objection.  Form.

9             THE WITNESS:   What quarter did you say it

10  would increase revenue on?

11       Q.   BY MR. GLENNON:   Under your hypothetical --

12  let me start that question over again.

13            We'll do two hypotheticals here.   The first

14  one, assume the recognition of revenue was proper as of

15  November 30th, 2000.   Oracle's recognition of

16  $19.9 million was proper on November 30th, 2000.   Would

17  that have had any impact on Oracle's financial statements

18  in the third quarter of fiscal year 2001?

19            MR. GREENSTEIN:   Objection.  Form.

20            THE WITNESS:   Yes.

21       Q.   BY MR. GLENNON:   And what would that impact

22  be?

23       A.   If one determined that it was appropriate to

24  recognize revenue over the license period, then in Q3,

25  revenue would have been recorded in Q3 rather than all of

```
 1              REPORTER'S CERTIFICATE
 2       I certify that the witness in the forgoing
 3  deposition,
 4
 5  was by me duly sworn to tell the truth, the whole truth
 6  and nothing but the truth in the within-entitled cause;
 7  that said deposition was taken at the time and place
 8  herein named; that the testimony of said witness was
 9  reported by me, a duly certified shorthand reporter and
10  a disinterested person, and was thereafter transcribed
11  under my direction into typewriting.
12       I further certify that I am not of counsel or
13  attorney for either or any of the parties to said
14  deposition, nor in any way interested in the outcome of
15  the cause named in said caption.
16       Dated
17
18
19       Leslie Rockwood
20       Leslie Rockwood
         Certified Shorthand Reporter
         State of California
21       Certificate No. 3462
22
23
24
25
```

Esquire Deposition Services
1801 I Street, Sacramento. Ca   916-448-0505