# EXHIBIT 461

1

```
 1    page
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                         -oOo-
 4    IN RE
      ORACLE CORPORATION
 5    SECURITIES LITIGATION
                   MASTER FILE NO.
 6                 C-01-0988-MJJ
 7    This Document Relates To:
 8       ALL ACTIONS
 9       _____/
10
11
                         -oOo-
12
                     CONFIDENTIAL
13
      VIDEOTAPED DEPOSITION OF CAROLYN BALKENHOL
14
                 September 12, 2006
15
                         -oOo-
16
17          SHEILA CHASE & ASSOCIATES
                  REPORTING FOR:
18            LiveNote World Service
              221 Main Street, Suite 1250
19            San Francisco, CA 94105
              Telephone: (415) 321-2300
20            Fax: (415) 321-2301
21                       -oOo-
22
23    Reported by:
      KELLIE A. ZOLLARS, CSR, RPR, CRR
24    CSR License No. 5735
25
```

2

```
 1                  I N D E X
 2            INDEX OF EXAMINATION
 3                             PAGE
 4    EXAMINATION BY:
 5       MR. SOLOMON            11
 6       "AFTERNOON SESSION"          89
 7
 8                  -oOo-
 9            INDEX OF EXHIBITS
10    CAROLYN BALKENHOL   DESCRIPTION      PAGE
11    EXHIBIT 1   E-mail to Mr. Ellison from
                  Mr. Simon dated 12/17/19 (sic),
12                1 page, Control No. 294177    19
13    EXHIBIT 2   E-mail to Mr. Ellison from
                  Mr. Simon dated 3/27/2000,
14                2 pages, Control No. 294179
                  - 294180                      22
15
      EXHIBIT 3   E-mail to Mr. Ellison from
16                Mr. Simon dated 4/7/2000,
                  2 pages, Control No. 294188
17                - 294189                      25
18    EXHIBIT 4   E-mail to Ms. Balkenhol from
                  Mr. Simon dated 4/10/2000
19                Control No. 042795 - 042796   28
20    EXHIBIT 5   E-mail exchange dated 4/10/2000,
                  3 pages, Control No. 609712
21                - 609714                      29
22    EXHIBIT 6   E-mail exchange dated 4/11/2000,
                  5 pages, Control No. 01468
23                - 01472                       32
24    EXHIBIT 7   E-mail exchange dated 4/11/2000
                  to 4/14/2000, 3 pages, Control
25                No. 042801 - 042803           35
```

76

```
 1    EXHIBIT 8   E-mail to Mr. Ellison from
                  Mr. Simon dated 6/5/2000,
 2                1 page, Control No. 042804    37
 3    EXHIBIT 9   E-mail exchange dated
                  10/17/2000, 1 page, Control
 4                No. 294197                    40
 5    EXHIBIT 10  E-mail dated 12/18/2000, 1 page,
                  Control No. 014048            45
 6
 7    EXHIBIT 11  E-mail exchange dated 12/18/2000,
                  2 pages, Control No. 145744
 8                - 145745                      47
 9    EXHIBIT 12  E-mail exchange dated 12/18/2000,
                  2 pages, Control No. 294199
10                - 294200                      48
11    EXHIBIT 13  E-mail exchange dated 12/18/2000,
                  2 pages, Control No. 042809
12                - 042810                      53
13    EXHIBIT 14  E-mail to Ms. Balkenhol from
                  Mr. Simon dated 1/22/2000, 1 page,
14                Control No. 396943            57
15    EXHIBIT 15  E-mail dated 1/22/2000, 1 page,
                  Control No. 042818            61
16    EXHIBIT 16  E-mail exchange dated 1/23/200
                  (sic) and 1/23/01, 1 page,
17                Control No. 042840            64
18    EXHIBIT 17  E-mail exchange between
                  Ms. Balkenhol and Mr. Simon
19                dated 1/23/2001, 2 pages,
                  Control No. 014151 - 014152   65
20
21    EXHIBIT 18  E-mail exchange dated 1/24/2001,
                  3 pages, Control No. 609893
22                - 609885                      66
23    EXHIBIT 19  E-mail exchange dated 1/24/2001,
                  3 pages, Control No. 101540
24                - 101542                      67
25    //
```

3

77

```
 1    EXHIBIT 20  E-mail to Mr. Ellison from
                  Mr. Simon, dated 1/24/2001,
 2                2 pages, Control No. 101543
                  - 101544                      69
 3
 4    EXHIBIT 21  E-mail to Ms. Balkenhol from
                  Mr. Simon dated 1/24/01, 1 page,
 5                Control No. 0023490           69
 6    EXHIBIT 22  E-mail to Ms. Balkenhol from
                  Mr. Simon, dated 1/25/2001,
 7                1 page, Control No. 014054    70
 8    EXHIBIT 23  E-mail to Ms. Clarke from
                  Mr. Simon dated 1/26/2001,
 9                2 pages, Control No. 014055
                  - 014056                      71
10    EXHIBIT 24  E-mail to Ms. Balkenhol from
                  Mr. Simon dated 1/26/2001,
11                1 page, Control No. 014057    72
12    EXHIBIT 25  E-mail exchange dated 1/26/2001,
                  2 pages, Control No. 294216
13                - 294217                      73
14    EXHIBIT 26  E-mail exchange dated
                  1/29/2001, 2 pages
15                Control No. 014058 - 014059   74
16    EXHIBIT 27  E-mail exchange dated
                  1/29/2001, 1 page
17                Control No. 042835            75
18    EXHIBIT 28  E-mail to Ms. Balkenhol and
                  Ms. Bachman from Mr. Simon
19                dated 1/29/2001, 1 page,
                  Control No. 280983            76
20
21    EXHIBIT 29  E-mail to Ms. Balkenhol from
                  Mr. Simon dated 1/29/2001,
                  1 page, Control No. 042839    77
```

Balkenhol, Carolyn  9/12/2006  9:15:00 AM

4

```
22      EXHIBIT 30   E-mail to Mr. Ellison from
23                   Mr. Simon, dated 1/29/2001,
                     1 page, Control No. 014062        79
24
25      //
 1      EXHIBIT 31   E-mail to Ms. Balkenhol from
 2                   Mr. Simon, dated 1/30/2001,
                     1 page, Control No. 014065        79
 3      EXHIBIT 32   E-mail to Ms. Clarke from
                     Mr. Simon dated 1/30/2001,
 4                   1 page, Control No. 280984        80
 5      EXHIBIT 33   E-mail to Mr. Ellison from
                     Mr. Simon dated 1/31/2001,
 6                   2 pages, Control No. 014066
                     - 014067                          81
 7
 8      EXHIBIT 34   E-mail exchange between
                     Ms. Balkenhol and Mr. Simon
 9                   dated 2/1/01, 3 pages,
                     Control No. 294261 - 294263       82
10      EXHIBIT 35   E-mail exchange between
                     Ms. Balkenhol and Mr. Simon
11                   dated 22701, 2 pages,
                     Control No. 294269 - 294270       82
12
13      EXHIBIT 36   E-mail to Ms. Balkenhol from
                     Mr. Simon dated 3/8/01, 2 pages,
                     Control No. 300656 - 300657       85
14
15      EXHIBIT 37   E-mail to Ms. Glass from
                     Ms. Catz dated 4/5/01, 1 page,
                     Control No. 148625                87
16
17      EXHIBIT 38   E-mail to Mr. Ellison from
                     2 pages, Control No. 101545
18                   - 101546                          88
19      EXHIBIT 39   E-mail to Mr. Sanderson from
                     Mr. Bodsworth regarding POSCO,
20                   dated August 11, 2000, 4 pages,
                     Control No. 013665 - 013668       94
21
22      EXHIBIT 40   E-mail to Mr. Ellison from
                     Mr. Ygge dated 9/14/2000, 1 page,
                     Control No. 014073                95
23
24      EXHIBIT 41   E-mail to Mr. Ellison from
                     Mr. Summers dated 11/13/2000,
```

5

```
                     1 page, Control No. 018756        97
16


17


18


19


20


25
```

6

```
 1      EXHIBIT 42   E-mail to Ms. Hutchinson from
 2                   Mr. Ellison dated 11/22/2000,
 3                   1 page, Control No. 014100        98
        EXHIBIT 43   E-mail to Ms. Balkenhol,
 4                   Mr. Fuller, and Mr. Miller
                     from Mr. Wohl dated 12/4/2000,
 5                   1 page, Control No. 052474       107
 6      EXHIBIT 44   E-mail exchange dated 12/11/2000
                     and 12/12/2000, 3 pages,
 7                   Control No. 063405 - 063407      109
 8      EXHIBIT 45   E-mail to Mr. Ryoo from
                     Mr. Ellison dated 12/19/2000,
 9                   1 page, Control No. 014074       111
10      EXHIBIT 46   E-mail to Mr. Roberts and
                     Ms. Balkenhol from
11                   Mr. Ellison dated 1/5/2001,
                     2 pages, Control No. 014075
12                   - 014076                         111
13      EXHIBIT 47   E-mail exchange dated 1/4/2001
                     and 1/5/2001, with draft letter
14                   attached, 2 pages, Control No.
                     219294 - 219295                  112
15      EXHIBIT 48   E-mail exchange dated December
                     2000 through January 2001 to
16                   5 pages, Control No. 039324
                     - 039328                         115
17
18      EXHIBIT 49   E-mail exchange dated
                     January 10 and January 11,
19                   3 pages, Control No. 035280      117
20      EXHIBIT 50   E-mail exchange dated January 28
                     and January 29, 2001, 3 pages,
21                   Control No. 1007 1722            119
22      EXHIBIT 51   E-mail to Ms. Balkenhol from
                     Ms. Catz dated 3/02/2001,
23                   1 page, Control No. 227927
24                   - 227939                         120
25
```

7

```
 1      EXHIBIT 52   E-mail exchange dated 12/6/01
                     and 12/7/01, 1 page,
 2                   Control No. 1001 1722            122
 3      EXHIBIT 53   E-mail exchange with various
                     dates in May 2002, 2 pages,
 4                   Control No. 059839 - 059842      123
        EXHIBIT 54   Document entitled "E2 Interview
 5                   Memorandum of Carolyn Balkenhol,"
                     15 pages, Control No. 296385,
 6                   - 296399                         125
 7      EXHIBIT 55   E-mail exchange dated 10/05/2000
                     and 10/06/2000, 2 pages,
 8                   Control No. 026987 - 026988      150
 9      EXHIBIT 56   Document entitled "BusMeetings,"
                     4 page, Control No. 098462
10                   - 098464                         153
11      EXHIBIT 57   Document entitled "PersCalls,"
                     3 pages, Control No. 098465      158
12      EXHIBIT 58   Listing of business calls,
13                   3 pages, Control No. 098458
                     - 098460                         160
14      EXHIBIT 59   Listing of Business Questions,
15
                     1 page, Control No. 098461       161
16
        EXHIBIT 60   Listing entitled "Urgent,"
17                   1 page, Control No. 098457       161
18      EXHIBIT 61   Custom Calendar Report, 7 pages,
                     Control No. 042760 - 042766      162
19
        EXHIBIT 62   E-mail exchange dated 5/15/2000
20                   and 6/28/2000, 3 pages, Control
                     No. 056427 - 056429              170
21
        EXHIBIT 63   E-mail to Chris Balkenhol from
22                   Carolyn Balkenhol dated 8/19/2000,
                     1 page, Control No. 265592       172
23
        EXHIBIT 64   E-mail exchange dated 8/28/2000,
24                   1 page, Control No. 151481       172
25      //
```

Balkenhol, Carolyn  9/12/2006  9:15:00 AM

8

```
1    EXHIBIT 65   E-mail to Hannes Sandmeier,
              Sacco Lee, Andy Goreing from
2              Mr. Balkenhol, dated 9/16/2000,
              1 page, Control No. 265694        173
3
     EXHIBIT 66   E-mail exchange dated 10/31/2000,
4              5 pages, Control No. 265945 -
              265949                         175
5
     EXHIBIT 67   E-mail exchange dated 12/28/2000,
6              5 pages, Control No. 145827
              - 145831                       176
7
     EXHIBIT 68   E-mail to Mr. Ellison from
8              Mr. Simon dated May 3, 2002,
              2 pages, Control No. 612086
9              - 612087                      178
10   EXHIBIT 69   E-mail exchange between
              Mr. Ellison and Ms. Balkenhol,
11             dated 4/19/2000, 2 pages      185
12                   -oOo-
13
14
15
16
17
18
19
20
21
22
23
24
25
```

9

```
1          BE IT REMEMBERED THAT, pursuant to the laws
2    pertaining to the taking and use of depositions, and on
3    Tuesday, September 12, 2006, commencing at the hour of 9:15
4    a.m. thereof, at the offices of LERACH COUGHLIN STOIA
5    GELLER RUDMAN & ROBBINS LLP, 100 Pine Street, Suite 2600,
6    San Francisco, California, before me, KELLIE A. ZOLLARS,
7    CSR No. 5735, a Certified Shorthand Reporter in and for the
8    State of California, the following proceedings took place:
9                   -oOo-
10   Appearing as counsel on behalf of Plaintiff:
11        LAW OFFICES of LERACH COUGHLIN STOIA GELLER
          RUDMAN & ROBBINS LLP
12        By:  MARK SOLOMON, ATTORNEY AT LAW
              STACEY M. KAPLAN, ATTORNEY AT LAW
13        655 West Broadway, Suite 1900
          San Diego, California 92101-3301
14        Tel: (619) 231-1058
15   Appearing as counsel on behalf of Defendants and the
     witness:
16
          LAW OFFICES OF LATHAM & WATKINS
17        By:  PATRICK E. GIBBS, ATTORNEY AT LAW
              ANDREW FARTHING, ATTORNEY AT LAW
18        140 Scott Drive
          Menlo Park, California 94025
19        Tel: (650) 328-4600
20   Appearing as counsel on behalf of Oracle Corporation:
21        ORACLE CORPORATION
          By:  DORIAN DALEY
22              VICE PRESIDENT, LEGAL
              ASSOCIATE GENERAL COUNSEL
23              LITIGATION, TRADEMARK & COPYRIGHT GROUP
          500 Oracle Parkway, M/S 5op762
24        Redwood Shores, California 94065
25   Also present:  Gary Brewer, Videographer
```

10

```
1                   -oOo-
2          CAROLYN BALKENHOL
3    having been first duly sworn to
4    tell the truth, the whole truth
5    and nothing but the truth, was
6    thereupon examined and testified
7    as is hereinafter set forth:
8                   -oOo-
9    THE VIDEOGRAPHER:  Good morning.  We're going on the
10   record.  Here marks the beginning of Videotape 1 in the
11   deposition of Carolyn Balkenhol in the matter of In Re
12   Oracle Corporation Securities Litigation in the United
13   States District Court, Northern District of California.
14   Case No. C-01-0988-MJJ.  Today's date is September 12th,
15   2006, and the time on the monitor is 9:15 a.m.
16         The video operator today is Gary Brewer,
17   representing LiveNote World Service, located at 221 Main
18   Street, Suite 1250, San Francisco, California 94105.  Phone
19   number (415) 321-2300.  The court reporter is Kellie
20   Zollars, reporting on behalf of LiveNote World Service.
21   Today's deposition is being taken on behalf of the
22   plaintiff; and is taking place at 100 Pine Street,
23   San Francisco, California.
24         Counsel, please introduce yourselves and state
25   whom you represent.
```

11

```
1    MR. SOLOMON:  Mark Solomon representing plaintiffs.
2    MS. KAPLAN:  Stacey Kaplan representing plaintiffs.
3    MR. GIBBS:  Patrick Gibbs from Latham & Watkins for
4    defendants and Ms. Balkenhol.
5    MR. FARTHING:  Andrew Farthing from Latham & Watkins
6    for defendants and the witness.
7    MS. DALEY:  Dorian Daley for Oracle Corporation.
8    THE VIDEOGRAPHER:  Would the court reporter please
9    swear in the witness.
10   (Witness sworn.)
11                   -oOo-
12              EXAMINATION
13   BY MR. SOLOMON:
14   Q.  Good morning, Ms. Balkenhol.
15   A.  Good morning.
16   Q.  As you heard, my name is Mark Solomon, and I
17   represent the plaintiffs in a securities fraud class
18   action.  Do you understand?
19   A.  Yes.
20   Q.  Have you been deposed before?
21   A.  Yes.
22   Q.  In what cases have you been deposed?
23   A.  In a brokerage commission dispute about a boat
24   that Larry bought.
25   Q.  That's the only time?
```

12

1   A.  No.

2   Q.  Okay.  What other occasions?

3   A.  I was deposed in an SEC inquiry.

4   Q.  And going back to the brokerage dispute, when was

5   the deposition in the brokerage dispute roughly?

6   A.  Uhm, 1997, maybe 1998.  I'm not certain.

7   Q.  And the SEC inquiry?

8   A.  Earlier this year.

9   Q.  And any other occasions?

10   A.  No.

11   Q.  With respect to the SEC inquiry, was it an

12   interview or formal deposition?

13   A.  It was an interview -- two separate occasions, one

14   interview and one formal deposition.

15   Q.  And with respect to the brokerage dispute, was it

16   a formal deposition?

17   A.  Yes.

18   Q.  So you know the format --

19   A.  Yes.

20   Q.  I should -- just want to let you know if you want

21   a break, feel free to ask.  If you don't understand what

22   I'm saying, feel free to tell me that.

23       The deposition should be concluded today.  I

24   expect that it will be.  I hope that it will be.  And we'll

25   try and be as efficient as we can.

13

1   A.  Okay.  Thank you.

2   Q.  What is your position?

3   A.  Executive assistant.

4   Q.  To?

5   A.  Larry Ellison.

6   Q.  Okay.  How long have you had that position?

7   A.  With various titles but essentially the same

8   position since 1992.

9   Q.  Okay.  And how did you get the position?

10   A.  I applied for an opening that was, I believe,

11   Assistant, Office of the President, at the time working for

12   his then assistant.

13   Q.  Okay.

14       You say you applied.  What prompted you to apply?

15   A.  A friend, I think, told me about the job opening.

16   Q.  And what had been -- just back up, just give me,

17   first of all, your school and your college education first

18   of all.

19   A.  I have a Bachelor of Science in mechanical

20   engineering from Stanford University.

21   Q.  After -- when did you graduate?

22   A.  1990.

23   Q.  And after you graduated what did you do?

24   A.  I worked as an engineer at Ford Aerospace, which

25   was subsequently purchased by Loral Corporation.

14

1   Q.  Okay.  And when did you stop working there?

2   A.  1992.

3   Q.  When you applied for this position?

4   A.  Yes.

5   Q.  And did you first meet Mr. Ellison in 1992?

6   A.  Yes.

7   Q.  And it was in 1992, just to be clear, that you

8   started in your current position?

9   A.  The job has changed slightly over time.  I

10   originally worked for his assistant so I reported directly

11   to her.

12   Q.  Who was that?  Sorry.

13   A.  Her name is Jenny Overstreet.  Then she left in

14   1996, and I began reporting directly to Mr. Ellison.

15   Q.  In your role reporting to Jenny Overstreet what

16   was -- what were your duties?

17   A.  Mainly secretarial sort of duties.  Answering the

18   telephones, handling incoming mail, general

19   responsibilities assigned to me by Jenny.  I also designed

20   and did an employee newsletter.  Those were the basic

21   responsibilities.

22   Q.  And then how did that change after Miss Overstreet

23   left?

24   A.  After she left I then handled Larry's calendar --

25   there are some -- there were other folks in the office so

15

1   at various times we handled the calendar.  But handled the

2   calendar then primary responsibility for his schedule

3   and the liaison between him and the outside world

4   primarily.

5   Q.  Okay.

6       How many people report directly to Mr. Ellison?

7   A.  Right now?

8   Q.  Uh-huh.

9   A.  Probably -- I have to think.  Maybe seven.  Seven

10   or eight.

11   Q.  The time frame I'm going to be focusing on for

12   most of the day is going to be calendar 2001 -- sorry,

13   calendar 2000 and early 2001.  You say seven people report

14   directly to him now.  Was that the same in calendar 2000

15   and early 2001?

16   A.  I don't know for sure, but it would be roughly the

17   same.

18   Q.  And please identify the seven.

19   A.  That I can think of right now?

20   Q.  Or roughly seven that you've talked about.

21   A.  Currently or in calendar year --

22   Q.  I'd like both, actually.

23   A.  Okay.  Right now there's Safra Catz, Charles

24   Phillips, Edward Skreben, Chuck Rosewatt, John Wookey,

25   Larry Lynde, and I report to him.

Balkenhol, Carolyn  9/12/2006  9:15:00 AM

16

1   Q.  Okay.  And in 2000, 2001?
2   A.  The names would have been the same with the
3   exception of Charles -- Charles Phillips I don't think was
4   there.  Ray Lane I believe was there.  John Wookey would
5   not have reported to him, Ron Wohl would have.  And Mark
6   Berrenechea.  And I don't believe that Edward Skreben
7   reported directly to him at that time.
8   Q.  Okay.
9       Does Mr. Ellison have other executive assistants
10  other than yourself?
11  A.  Yes.
12  Q.  And, again, same thing, who are they now, who were
13  they in 2000, 2001?
14  A.  Now they -- well, they report to me so two -- two
15  of them now handle his -- handle some of his stuff.  Andrea
16  Nordeman and Joyce Higashi.  In the time period Joyce
17  Higashi may have been handling this, I'm not certain.
18  Q.  Just -- so you think back in those days it would
19  be just you and Joyce Higashi?
20  A.  I believe so.  I'm not 100 percent sure.
21  Q.  And these other assistants do not report directly
22  to Mr. Ellison --
23  A.  No.
24  Q.  -- they report to you; and you, in turn, report to
25  Mr. Ellison?

17

1   A.  Yes.
2   Q.  Have you utilized your engineering qualifications
3   at all since you've been at Oracle?
4   A.  Sure.
5   Q.  In what way?
6   A.  Problem solving.
7   Q.  Can you just describe what sort of problems?
8   A.  Well, just using my logic, logical training to see
9   things as they're coming in and synthesize information.
10  Q.  Okay.  Did you have any role in the development of
11  the 11i product?
12  A.  No.
13  Q.  Did you problem solve at all with respect to 11i?
14  A.  No.  Not in any product way.
15  Q.  You say not in a product way.  Are there other
16  ways in which you resolved issues relating to 11i?
17  MR. GIBBS:  Objection.  Vague.
18  THE WITNESS:  So I answer?
19  MR. GIBBS:  You can answer.
20  THE WITNESS:  Yeah.
21  MR. GIBBS:  If you can.
22  THE WITNESS:  I don't -- with regard to specific
23  product issues I would not have been involved.
24  BY MR. SOLOMON:
25  Q.  Okay.  Did you interact with customers -- now I am

18

1   in the 2000, 2001 time frame.  Did you interact with
2   customers concerning 11i in that time frame?
3   A.  In that time frame.  I don't remember.
4   Q.  Okay.  Have you read the complaint in this
5   litigation?
6   A.  No.
7   Q.  Do you have an understanding what the litigation
8   is about?
9   A.  I believe I have a general understanding.
10  Q.  Share that understanding, please.
11  A.  That the defendants falsely provided information
12  to the market in advance of what ended up being a bad
13  quarter.
14  Q.  And do you understand there's an insider selling
15  component to the case?
16  A.  Yes.
17  Q.  And what's your understanding of that component?
18  A.  That the claim is that Larry had information and
19  traded on that, and material nonpublic information.
20  Q.  You became aware in 2000 that Mr. Ellison had a
21  large number of options that were to expire in August of
22  2001; is that right?
23  A.  So I'm -- what I remember at that time?
24  Q.  Correct.
25  A.  I don't.  I don't know when I became aware of

19

1   that.
2   Q.  Okay.  You do remember -- you know that you became
3   aware of that fact, you're just not sure when; is that
4   right?
5   A.  Well, certainly since this -- the information has
6   been in the lawsuit.  So, yes, I am aware of it now.
7   Q.  Okay.  Did you review any documents in preparation
8   for this deposition?
9   A.  No.
10  Q.  Have you prepared for this deposition in any way?
11  A.  Yes.
12  Q.  How have you prepared?
13  A.  I met with my lawyers yesterday.
14  Q.  Okay.  But you didn't look at any documents?
15  A.  No.
16  Q.  Were you asked to review any documents?
17  A.  No.
18  MR. SOLOMON:  Let's have this marked as the first
19  exhibit.  We're going to have marked as the first exhibit a
20  document produced by the defendants in this litigation with
21  a control number 294177.
22      And what's going to happen, the court reporter
23  will let you have a look at it, and I'll ask you questions
24  once you've had a chance to look it over.
25      (Exhibit 1 was marked for identification.)

20

1   THE WITNESS:  Thank you.

2        Okay.

3   BY MR. SOLOMON:

4   Q.  Okay.  Do you recognize this e-mail?

5   A.  I don't.

6   Q.  You'll see that it's dated 12/17, then it says

7   "19."  I believe that means 1999 from the context.  And

8   it's addressed to Larry Ellison from Philip Simon, and a

9   copy is to you.  Do you see that?

10  A.  Yes.

11  Q.  And you don't remember receiving a copy of this

12  e-mail?

13  A.  No.

14  Q.  You'll see it says, "Dear Larry" it starts at the

15  top, "Just following up on your brief discussion with

16  Carolyn re Oracle stock options and planned year end option

17  exercise."  Do you see that?

18  A.  Yes.

19  Q.  Do you recall a discussion as referenced here with

20  Mr. Ellison concerning his stock options?

21  A.  No, I don't.

22  Q.  You're not saying you didn't have a discussion,

23  you just don't recall --

24  A.  I don't recall.

25  Q.  -- is that right?

21

1        Just generally, do you have any recollection of

2   dealing with the issue of Mr. Ellison's stock options at

3   all?

4   A.  At that time?  I don't remember any specifics from

5   that time.

6   Q.  Okay.

7        Do you know how much in terms of proceeds he

8   realized from the sale of his stock in January of 2001?

9   A.  No, I don't.

10  Q.  No idea?

11  A.  No idea.

12  Q.  You know who Philip Simon is?

13  A.  Yes.

14  Q.  And he's Larry Ellison's personal financial

15  advisor?  Is that a fair description?

16  A.  Yes.

17  Q.  And back in the end of 1999 and 2000, were you in

18  regular contact with Mr. Simon?

19  A.  Yes, I believe so.

20  Q.  And in that time frame, end of 1999, calendar

21  2000, early 2001, with what regularity did you communicate

22  with Mr. Simon?

23  A.  I would just be guessing.  A couple times a

24  week maybe.

25  Q.  Now, in your position as Mr. Ellison's executive

22

1   assistant are you -- do you confine your work just to

2   Oracle work?  Or is your role -- is your role larger than

3   just helping him with Oracle duties?

4        MR. GIBBS:  Objection.  Vague.  And compound and vague

5   as to time.

6        MR. SOLOMON:  You can still answer.

7        THE WITNESS:  Are you talking about now, or are you

8   talking about then?

9        MR. SOLOMON:  I'm talking about then.

10       THE WITNESS:  Then there -- the line between personal

11  and business is, as with anyone, fluid.  I did handle some

12  personal matters for him at the time.

13  BY MR. SOLOMON:

14  Q.  And is it fair to say that most of the stuff that

15  you'd have been talking to Mr. Simon about would be

16  personal versus Oracle business?

17  A.  Yes.

18       MR. SOLOMON:  Have marked as the next exhibit a

19  document produced by defendants in the litigation with

20  control numbers 294179 and -180.

21       (Exhibit 2 was marked for identification.)

22       THE WITNESS:  Thank you.

23       Okay.

24  BY MR. SOLOMON:

25  Q.  Do you recognize these exchanges?

23

1   A.  I don't recognize them.

2   Q.  You'll see that they're dated March 27, 2000, and

3   they are communications among Larry Ellison, Philip Simon

4   and yourself?

5   A.  Yes.  Larry doesn't communicate though, right?

6   It's between Philip and me.

7   Q.  Correct.  Correct.  Yes.

8        If you go on to the second page, it says, "At 1:36

9   on 3/24 - O800, you wrote:" and then it says, "In order to

10  do our Oracle budgeting, I need to estimate how many

11  options Larry will exercise in 2000 - because we take the

12  compensation hit on payroll taxes for the exercise gain.  I

13  know you plan to exercise a big chunk so I need to estimate

14  what he'll actually exercise.  It will likely end up being

15  the bulk of our FY01 budget."  And a Smiley Face and then

16  "Carolyn."  Do you see that?

17  A.  Yes, I see that.

18  Q.  Do you remember writing that?

19  A.  I don't remember.

20  Q.  But you don't dispute this was a message you sent?

21  A.  I can see that, it's written here.

22  Q.  First of all, what was your role in the budget as

23  that is referred to here?

24  A.  I don't have a big role in budgeting; but for our

25  CEO cost center the -- the -- just as I say here, the bulk

24

1    of the budget is if Larry's exercising stock the
2    corporation pays the associated payroll taxes.
3        Q.  And do you recall wanting to know for budgeting
4    purposes how many options Mr. Ellison was going to exercise
5    in 2000 or 2001?
6        A.  I don't recall specifically at -- from that time.
7        Q.  And do you recall any conversations or
8    communications with Mr. Simon on that topic?
9        A.  No.
10       Q.  Do you recall any conversations that you ever had
11   with Mr. Ellison concerning his exercise of options and
12   sale of stock?
13       A.  No.
14       Q.  Do you know who Deb Lange is?
15       A.  Yes.
16       Q.  Who is she?
17       A.  She used to run our tax department at Oracle.
18       Q.  Okay.  When did she leave?  Did she leave?
19       A.  She has left.
20       Q.  Do you know when she left?
21       A.  It was within the last year.
22       Q.  Do you know why she left?
23       A.  I don't know.
24       Q.  Do you recall interacting with Ms. Lange at all
25   concerning any securities transactions involving

25

1    Mr. Ellison?
2        A.  Not specifically.
3        Q.  Okay.  And again --
4        A.  During the time period.
5        Q.  Okay.  And you say not specifically.  Is there
6    anything that you can share or do you have a blank
7    recollection?
8        A.  I would generally talk to her about that.
9        Q.  And what would be the -- what would you be talking
10   about when you talked to Ms. Lange?
11       A.  Just the same thing, with the goal of letting her
12   know for her tax-planning purposes --
13       Q.  Okay.
14       A.  -- if we knew what Larry was planning to do.
15       Q.  Were there times when there was a conflict between
16   the tax planning for Oracle and the tax planning or other
17   considerations for Mr. Ellison?
18       A.  No.
19       MR. SOLOMON:  Okay.  We'll have marked as the next
20   exhibit a document produced by the defendants in this
21   litigation with the control numbers 294188 and -189.
22       It's too early in the morning.
23       (Exhibit 3 was marked for identification.)
24       THE WITNESS:  Thank you.
25           Yes.

26

page
1        BY MR. SOLOMON:
2        Q.  Okay.  You'll see that this is, or are, e-mail
3    exchanges dated April 7, 2000, involving Larry Ellison,
4    Philip Simon, yourself, Deb Lange, Mr. Cooperman and
5    Ms. Minton; is that correct?
6        A.  Yes, that's what it appears to be.
7        Q.  I'm looking first of all at the bottom e-mail.
8    And having looked at that, do you have any recollection of
9    ever seeing that communication before?
10       A.  I don't recall seeing this.
11       Q.  Okay.
12           You'll see that at the first paragraph -- excuse
13   me, the first paragraph refers to the stock options that
14   we've been talking about.  Do you see that?
15       MR. GIBBS:  First paragraph.
16       THE WITNESS:  Of this -- the bottom e-mail?
17       MR. SOLOMON:  Of the bottom e-mail, yes.
18       THE WITNESS:  Yes.
19       BY MR. SOLOMON:
20       Q.  And the second paragraph says, "We're working
21   proactively with Larry's accountant to figure out the best
22   time to exercise and sell from both a market and a tax
23   standpoint."  Do you see that?
24       A.  Yes, I see that.
25       Q.  And then in the next paragraph there's a

27

1    discussion of whether or not Mr. Ellison could sell
2    directly to Oracle.  Do you see that?
3        A.  I see that.
4        Q.  Do you have any recollection of a suggestion at
5    any time that Mr. Ellison exercise options and sell stock
6    directly to Oracle?
7        A.  No.
8        Q.  Is that a suggestion that concerns you -- would
9    have concerned you at the time?
10       MR. GIBBS:  Objection.  Vague.
11       THE WITNESS:  Would have concerned me like bothered
12   me?  Or concerned me, been one of my matters to deal with?
13   I'm not sure --
14       MR. SOLOMON:  That's a very --
15       THE WITNESS:  -- what you're --
16       MR. SOLOMON:  -- good question.  Both.
17           Would it have bothered you, a suggestion like
18   that?
19       A.  I don't know what I -- I don't recall the
20   suggestion ever coming up so I don't know what I would have
21   thought at the time.
22       Q.  And, then, looking at the top communication, which
23   is to Larry Ellison from Philip Simon, having read that, do
24   you have any recollection of that communication?
25       A.  I don't remember it.

Balkenhol, Carolyn  9/12/2006  9:15:00 AM

28

1    Q.  Okay.
2        You'll see that he says in the first paragraph in
3    part, "Note that if you pick up the $1 billion of option
4    income, Oracle gets an offsetting $1 billion tax
5    deduction."  Do you see that?
6    A.  Yes.
7    Q.  Is that your understanding of the tax effect?
8    MR. GIBBS:  Objection.  Calls for a legal conclusion.
9    BY MR. SOLOMON:
10   Q.  Do you have any --
11   A.  I have no idea.
12   MR. SOLOMON:  Okay.
13       We'll have marked the next document produced by
14   the defendants in this litigation with the control numbers
15   042795 and -796.
16   (Exhibit 4 was marked for identification.)
17   THE WITNESS:  Thank you.
18       Okay.
19   BY MR. SOLOMON:
20   Q.  Okay.  You'll see that the bottom message is one
21   that we've seen earlier.  Right?
22   A.  Yes.
23   Q.  And then there's a message from Mr. Simon to you
24   in the middle of that first page.  And you have no
25   recollection of seeing that either; is that right?

29

1    A.  No, I don't.
2    Q.  And the top message is to Safra.  Do you
3    understand who Safra is?  Safra Catz?
4    A.  Yes.  But it's not to Safra, right?  It's to --
5    Q.  I do apologize.  Copied to?
6    A.  He refers to -- yes.  Yes.
7    Q.  And to Jeff Detwiler.  Who is Jeff Detwiler?
8    A.  He is one of Larry's attorneys.
9    Q.  Is he employed by Oracle?
10   A.  No.
11   Q.  So he's a personal attorney?
12   A.  Yes.
13   Q.  Do you know if he specializes in any particular
14   area for Mr. Ellison?
15   A.  I believe tax.  Tax is one of his areas.
16   Q.  And you'll see there's reference to donations to
17   the Stanford Scholar Program.  Do you recall any suggestion
18   in April of 2000 or thereabouts concerning that donation?
19   A.  I don't.
20   MR. SOLOMON:  Have marked as the next exhibit document
21   produced by the defendants in this litigation with control
22   numbers 609713 and -714.
23   (Exhibit 5 was marked for identification.)
24   MR. GIBBS:  I think you read just the last two pages
25   into the record, at least of what you handed us.  We've got

30

1    712 as well.
2    MR. SOLOMON:  Oh, I see.  I'm sorry.
3    MR. GIBBS:  I just want to bring it up for the record.
4    MR. SOLOMON:  Thank you.  The complete exhibit is
5    609712 through -714.
6    THE WITNESS:  Thank you.
7        Okay.
8    BY MR. SOLOMON:
9    Q.  You'll see that this e-mail -- these e-mail
10   exchanges are dated April 10 of 2000 and they involve Safra
11   Catz, Phil Simon -- Philip Simon, yourself, Catherine Ong,
12   Jeff Detwiler, Mary Lloyd and Andrew Dudnick.  Do you see
13   that?
14   A.  Yes.
15   Q.  Let's just go through the names quickly.  Who is
16   Catherine Ong?
17   A.  She is an accountant who works for Philip.
18   Q.  And Mary Lloyd?
19   A.  Mary Jo also works for Philip.
20   Q.  And Andrew Dudnick?
21   A.  He is one of Larry's attorneys.
22   Q.  Tax attorney?
23   A.  General business attorney.
24   Q.  And having looked at these communications, do you
25   recall having seen these before?

31

1    A.  I don't.
2    Q.  If you go to the second page, in the middle it
3    says, "At 9:43 a.m., 4/10/00 - 0700, you wrote," and the
4    text is, "Also, unrelated, Larry has a ton of options
5    expiring and we need to figure out if he can give them to a
6    foundation or something.  It looks like 1 billion or so,
7    with taxes of 400 million.  I don't know the details but I
8    am working on getting them."  Do you see that?
9    A.  Yes.
10   Q.  You don't remember seeing that message before?
11   A.  No.
12   Q.  And do you remember ever hearing in early 2000
13   there was contemplated the donation by Mr. Ellison of
14   around a billion dollars?
15   A.  I don't.
16   MR. GIBBS:  Objection.  Vague.
17   THE WITNESS:  I don't remember.
18   BY MR. SOLOMON:
19   Q.  Okay.  Have you ever heard of Mr. Ellison
20   contemplating exercising stock options and giving as a
21   result of the -- sorry -- then donating the proceeds to
22   charity?
23   MR. GIBBS:  Objection.  Vague.
24   THE WITNESS:  Not specifically.
25   BY MR. SOLOMON:

32

1    Q.  Okay.  And have you ever heard of a suggestion

2    that Mr. Ellison give around a billion dollars to charity?

3    MR. GIBBS:  Objection.  Vague.

4    THE WITNESS:  I don't think so.

5    BY MR. SOLOMON:

6    Q.  And do you ever recall discussing with Mr. Ellison

7    any suggestion that he give around a billion dollars to

8    charity?

9    A.  I don't.

10    Q.  Or with anybody else?

11    A.  No.

12    MR. GIBBS:  Objection.  Vague.

13    BY MR. SOLOMON:

14    Q.  Who's Barbara Wallace?

15    A.  Barbara Wallace handles the stock plan of Oracle.

16    Q.  And she still does?

17    A.  I believe so.

18    MR. SOLOMON:  I have marked as the next exhibit a

19    document produced in this litigation with the control

20    numbers 01468 through -72.

21    (Exhibit 6 was marked for identification.)

22    MR. SOLOMON:  Can you tell me what number that is,

23    please?

24    THE REPORTER:  Six.

25    THE WITNESS:  Thank you.

33

1    Okay.

2    BY MR. SOLOMON:

3    Q.  And have you seen this document before?

4    A.  No.

5    Q.  And you'll see that the first page is an e-mail

6    dated 11th of April 2000, and it's from Barbara Wallace to

7    Safra Catz and it copies you.  Do you see that?

8    A.  Yes.

9    Q.  And in the middle there it says, "We need Larry's

10    whole option list.  A bunch expires this year and we need

11    to deal with them."  Do you have any recollection of being

12    involved in providing a list of options for Ms. Wallace?

13    MR. GIBBS:  Objection.  Vague.

14    THE WITNESS:  Providing a list to --

15    MR. SOLOMON:  Yes.

16    THE WITNESS:  -- Ms. Wallace?

17    No, she would provide it -- she is the one who

18    would have the list.

19    BY MR. SOLOMON:

20    Q.  Excuse me.  To Ms. Catz?

21    A.  No, I don't.

22    Q.  Do you think you were involved?

23    A.  I don't know.

24    Q.  If you look at the option summary, do you know who

25    would have been responsible for compiling this information?

34

1    A.  Barbara Wallace.

2    Q.  And --

3    A.  Or someone on her team.

4    Q.  And is this option summary, is this a typical form

5    within Oracle?

6    MR. GIBBS:  Objection.  Lack of foundation.

7    THE WITNESS:  It appears to be.  It appears to follow

8    the format that I've seen.

9    BY MR. SOLOMON:

10    Q.  Okay.  Are you involved in any way in the granting

11    of stock options at Oracle?

12    A.  No.

13    I would pass along an approval.  I would be the

14    highway for an approval.  But other than that, no.

15    Q.  All right.

16    You'll see at the end there's a -- on the last

17    page there's a reference to total exercise, total price,

18    and total gain.  Do you see that?

19    A.  Yes.

20    Q.  Do you have an understanding what -- whose stock

21    options that refers to?

22    A.  Well, there's no name on the page; but if you tell

23    me that this document is the complete list of Larry's, then

24    it goes to follow that they would be the summary number for

25    his.

35

1    Q.  And do you recall being aware at any time in 2000

2    that Mr. Ellison had exercisable stock options in excess of

3    $2 billion?

4    A.  No.

5    MR. SOLOMON:  Mark as the next exhibit another

6    document produced in this litigation by defendants with the

7    control numbers 042801 to -803.

8    (Exhibit 7 was marked for identification.)

9    THE REPORTER:  It's No. 7.

10    THE WITNESS:  Thank you.

11    Okay.

12    BY MR. SOLOMON:

13    Q.  All right.  Do you recognize these pages?

14    A.  No.

15    Q.  Don't remember ever seeing them before?

16    A.  No, I don't.

17    Q.  Do you see at the top it's dated 4/14 -- it says

18    "200" but I believe it means 2000, to you from Philip

19    Simon, FYI?

20    Q.  And then at the very bottom it says, "As

21    discussed -- I agree that open market sales are the best

22    way to go."  Do you see that?

23    A.  Yes.

24    Q.  And that comes from someone called Bruce Lange?

36

1    A.  Yes.

2    Q.  Do you know who Bruce Lange is?

3    A.  He was our treasurer.

4    Q.  Is he related to Deb Lange?

5    A.  I believe they were married at one point.

6    Q.  Okay.  Is there a lot of husband-and-wife teams at

7    Oracle?

8    A.  Not a lot, I don't think; but we have a lot of

9    employees so it's hard to say.

10   Q.  Is your husband at Oracle?

11   A.  He was at Oracle.

12   Q.  That's Chris, right?

13   A.  Yes.

14   Q.  It says, "Dan Cooperman wrote" and then we don't

15   know what Dan Cooperman wrote because it's been redacted.

16   Do you see that?

17   A.  Yes.

18   Q.  You don't know what was on these pages, do you?

19   A.  No.

20   Q.  And you don't recall being involved in an issue of

21   whether to go with open market purchases or otherwise?

22   A.  No.

23   MR. GIBBS:  Objection.  Vague.

24   MR. SOLOMON:  Give me a second.

25        I'll mark as the next exhibit a document produced

37

1    by the defendants in this litigation with the control

2    number 042804.

3    (Exhibit 8 was marked for identification.)

4    THE WITNESS:  Thank you.

5        Okay.

6    BY MR. SOLOMON:

7    Q.  Do you recognize this?

8    A.  No.

9    Q.  No recollection of ever seeing it before?

10   A.  No.

11   Q.  Do you have any recollection of any discussion to

12   the effect that a derivative could be created with respect

13   to Mr. Ellison's expiring options to, in effect, extend the

14   expiration date?

15   A.  No, I don't remember.

16   Q.  You have no recollection of that topic ever being

17   raised?

18   A.  No, I don't.

19   Q.  Do you have any recollection of anybody

20   communicating in calendar 2000 that Mr. Ellison's cash

21   position was becoming worrying?

22   MR. GIBBS:  Objection.  Vague.

23   THE WITNESS:  So the question is do I have a memory

24   from 2000 of that?

25   BY MR. SOLOMON:

38

1    Q.  Do you have a memory now of Mr. Ellison's cash

2    position in 2000 being raised as a problem?

3    A.  Yes.

4    Q.  What's your recollection?

5    A.  That he needed -- his loans were very drawn so he

6    needed cash.

7    Q.  Okay.  How did you know that?

8    A.  I was custodian of his stock certificates, so when

9    they needed to be taken to a bank, I would be the one

10   taking them.  So I was aware of the loans.

11   Q.  And so it was as a result of having to transport

12   these stock certificates that you became aware that he had

13   a problem with available cash?

14   A.  I don't know that I would specify exactly when I

15   became aware of it, but it certainly contributed to my

16   awareness of it.

17   Q.  And did you -- you had to take possession of the

18   stock certificates and drive them around.  Did you feel

19   that it was insecure?

20   MR. GIBBS:  Objection.  Vague.

21   THE WITNESS:  I'm not sure I ever thought about it.

22   BY MR. SOLOMON:

23   Q.  I was just wondering what triggered your memory.

24   Was it driving around with a bunch of stock certificates

25   representing hundreds of millions of dollars that you could

39

1    easily lose?  Is that why you remember?

2    A.  No, it was just one of my tasks, so...

3    Q.  Okay.

4        Did you speak to Mr. Simon about Mr. Ellison's

5    cash needs?

6    A.  I don't have a specific recollection of it.

7    Q.  Okay.  So is that -- does that mean you believe

8    you did but you just don't remember?

9    A.  Yes.

10   Q.  Do you know what demands there were on

11   Mr. Ellison's cash in 2000 that caused the need for more

12   cash to be raised?

13   A.  Just his general expenses.

14   Q.  And how would you describe those in 2000, 2001?

15   A.  I'm not sure I know -- remember the specifics

16   of -- you know, it would be household expenses and that

17   sort of thing.

18   Q.  What about the new boat?  Do you have any

19   recollection of a time when Mr. Ellison decided that he

20   wanted a big new boat?

21   A.  I don't remember when it was.

22   Q.  Is the biggest -- is the boat that he currently

23   owns called the Rising Sun?

24   A.  Yes.

25   Q.  Is that right?

40

1    And do you know when Mr. Ellison first became
2    interested in having the Rising Sun built?
3    A.  I don't know.
4    Q.  Do you have -- did you talk to Mr. Ellison around
5    the time of 2000 about the Rising Sun?
6    A.  Not that I can think of.
7    Q.  Do you know who the players were involved in
8    negotiating and ordering the boat?
9    MR. GIBBS:  Objection.  Vague.
10    THE WITNESS:  Not specifically.
11    BY MR. SOLOMON:
12    Q.  Did you have any role in negotiating or otherwise
13    discussing the building of the boat?
14    MR. GIBBS:  Objection.  Vague and compound.
15    THE WITNESS:  I would not have any role in
16    negotiating.  Again, as kind of conduit between people, I
17    may have been involved peripherally.
18    MR. SOLOMON:  Okay.
19    Have marked as the next exhibit a document
20    produced by Oracle with the control number 294197.
21    (Exhibit 9 was marked for identification.)
22    THE REPORTER:  It's No. 9.
23    THE WITNESS:  Thank you.
24    Okay.
25    BY MR. SOLOMON:

41

1    Q.  Okay.  Do you recognize this exchange?
2    A.  I don't.
3    Q.  It appears to be dated October 17, 2000, and it
4    contains communications among Andrew Dudnick, Philip Simon
5    and copying you Mary Jo Lloyd.  Do you see that?
6    A.  Yes.
7    Q.  And the top of the page it says, "Thanks.  I'm
8    getting a bit worried about available cash.  Interest and
9    lifestyle spending is accruing at about $8.5 million per
10    month, then we have the following commitments."  Do you --
11    did you know in 2000 that Mr. Ellison's interest and
12    lifestyle spending amounted to about 8 and a half million
13    dollars a month?
14    A.  I don't remember.
15    Q.  Going through that list of items for which cash
16    appears to be required, the first one is "Arcade Planet,
17    $2.5 million still to be funded shortly."  Do you know what
18    that refers to?
19    A.  It was a -- I think it was a gaming company that
20    he was investing in.
21    Q.  Okay.
22    And do you know if he invested that money?
23    A.  I don't know.
24    Q.  "NICC - $4.5 million to be funded shortly."  Do
25    you see that as item No. 2?

42

1    A.  Yes.
2    Q.  Do you know what that refers to?
3    A.  It was a network computer company, again, that he
4    was funding.
5    Q.  Do you know if he did?
6    A.  I don't know.
7    Q.  And No. 3 is "NetLedger - $10 million to be funded
8    soon."  Do you know what that is?
9    A.  Another startup that he was funding.
10    Q.  Do you know if that happened?
11    A.  I don't know.
12    Q.  No. 4 is "nCUBE - no details yet but suspect will
13    need" -- it looks like $10 million for next three months.
14    Do you see that?
15    A.  Yes.
16    Q.  Do you know what that refers to?
17    A.  It was another company that Larry had funded.
18    Q.  And do you know if that $10 million happened?
19    A.  I don't know.
20    Q.  No. 5 is "Oracle Racing - say $10 - 15 million
21    over the next six months."  Do you know what that refers
22    to?
23    A.  I believe it's the America's Cup racing team.
24    Q.  Okay.  And do you know if that happened?
25    A.  I don't know.

43

1    Q.  No. 6, "New Yacht - $80 million over 3 years; say
2    $20 million funded to date; not sure when next" installment
3    "due."  Do you see that?
4    A.  Yes.
5    Q.  Do you know what that refers to?
6    A.  I assume it refers to Rising Sun.
7    Q.  And do you know if the $80 million over three
8    years happened?
9    A.  I don't know.
10    Q.  It says, "20 million dollars funded to date."  Do
11    you know if that's accurate?
12    A.  I don't know.
13    Q.  Do you remember having an understanding that as of
14    October 2000, Mr. Ellison had already expended significant
15    sums on the Rising Sun?
16    A.  I don't remember.
17    Q.  No. 7 is, is that Katana?  Is that how you say it?
18    A.  Yes.
19    Q.  "Katana refit - $7 million to be paid over next 5
20    months."  Do you know what that refers to?
21    A.  That was another boat he owned.
22    Q.  Do you know if that $7 million was paid over the
23    next five months?
24    A.  I don't know.
25    Q.  The next is EMF - geared up funding - say

44

1   $20 million over the next year."  Do you know what that
2   refers to?
3       A.  The Ellison Medical Foundation.
4       Q.  And do you know if that happened?
5       A.  I don't know.
6       Q.  "Woodside Project" with a lot of question marks.
7   Do you know what that refers to?
8       A.  I don't know for sure, but I assume it's the house
9   he built in Woodside.
10      Q.  And do you have any idea what funds were expended
11  on Woodside in 2000 or 2001?
12      A.  I don't know.
13      Q.  No idea?
14      A.  No idea.
15      Q.  And No. 10, "The Fruit Company - possibly
16  $100 million."  Do you know what that refers to?
17      A.  I don't know.
18      Q.  Have you ever heard Mr. Ellison refer to a company
19  as "the fruit company"?
20      A.  Not that I can recall.
21      Q.  Given the fact that you don't know what "the fruit
22  company" refers to, you don't know if $100 million was
23  expended as referred to here or not; is that fair?
24      A.  No, I don't.
25      MR. SOLOMON:  I've marked as the next exhibit a

45

1   document produced by the defendants with the control number
2   014048.
3       (Exhibit 10 was marked for identification.)
4       THE WITNESS:  Thank you.
5       Okay.
6   BY MR. SOLOMON:
7       Q.  Do you recognize this?
8       A.  I don't.
9       Q.  And this is an e-mail dated Monday, December 18,
10  2000, and it's from Carolyn Balkenhol to Larry Ellison,
11  Deborah Lange, Jennifer Minton and Barbara Wallace.  It
12  says, "Before 2000 ends, Larry will be exercising about
13  $20 million in options that expire in August 2001.  He
14  will..." and then in capitals "...NOT be selling the
15  stock -- just exercising and holding the options.  Please
16  let me know if you need any further information.  Thanks,
17  Carolyn."  You have no recollection of writing that?
18      A.  I don't.
19      Q.  You don't dispute that you wrote it?
20      A.  I see that it's here and that we produced it.
21      Q.  Do you have any recollection of being aware in
22  December of 2000 of Mr. Ellison's intention to exercise $20
23  million in stock options but not sell the stock?
24      A.  I don't remember.
25      Q.  Okay.  Was there -- do you -- could you tell me

46

1   why you said "he will NOT be selling the stock," and then
2   "NOT" is in upper case?  Any reason for that?
3       A.  I don't know why I did it at the time.
4       Q.  Did -- were you aware at the time of any practice
5   by Mr. Ellison one way or another of exercising stock at
6   the end of the year -- exercising options at the end of the
7   year and selling or exercising and not selling?
8       MR. GIBBS:  Objection.  Compound.
9       THE WITNESS:  Yeah.  Can you ask it over for me?
10  BY MR. SOLOMON:
11      Q.  Yeah.
12      Do you remember at the end of 2000 whether
13  Mr. Ellison had any practice at year end of either
14  exercising stock options and selling the stock or
15  exercising stock options and not selling?
16      MR. GIBBS:  Same objection.
17      THE WITNESS:  I don't remember.
18  BY MR. SOLOMON:
19      Q.  And do you have any idea whether or not the sales
20  referred to here are part of Mr. Ellison and Mr. Simon's
21  tax strategy?
22      MR. GIBBS:  Objection.  Misstates the document.
23      THE WITNESS:  Sorry, I don't follow your question.
24  BY MR. SOLOMON:
25      Q.  Do you know if the $20 million options exercise

47

1   referred to here is part of a tax minimization strategy?
2       A.  I don't know.
3       MR. SOLOMON:  I've marked as the next exhibit a
4   document produced by defendants in this litigation with
5   control numbers 145744 and 145745.
6       (Exhibit 11 was marked for identification.)
7       THE WITNESS:  Thank you.
8       Okay.
9   BY MR. SOLOMON:
10      Q.  And have you seen this before?
11      A.  I don't recall seeing it.
12      Q.  Okay.  And you'll see that there's the message we
13  looked at in the prior exhibit at the bottom?
14      A.  Yes.
15      Q.  And again the same date, December 18, 2000.  And
16  there's an additional message, additional communications
17  between Mr. Simon and yourself and Ms. Lange.  Do you see
18  that?
19      A.  Yes.
20      Q.  Does this help refresh your recollection about the
21  stock option exercise being referred to here?
22      A.  No.
23      MR. SOLOMON:  Okay.
24      I've marked as the next exhibit a document
25  produced by the defendants with control numbers 294199 and

Balkenhol, Carolyn  9/12/2006  9:15:00 AM

48

1    -200.
2    (Exhibit 12 was marked for identification.)
3    THE WITNESS:  Thank you.
4        Okay.
5    BY MR. SOLOMON:
6        Q.  Do you recognize these exchanges?
7        A.  I don't.
8        Q.  And you'll see that they are exchanges between you
9    and Mr. Simon and Catherine Ong?
10       A.  Yes.
11       Q.  You see in the message in the middle of the page
12   in the third paragraph, Mr. Simon says in part, if you do
13   tell Larry about this, let him know this real -- this is
14   really a nonevent.  We're just exercising options that
15   would otherwise have to be exercised by next August.  The
16   exercised shares will" -- in capitals -- "NOT be sold so he
17   retains the same economic ownership interest in Oracle,
18   essentially just taking the opportunity to exercise
19   $20 million of options with no or very little income
20   taxation."  Do you see that?
21       A.  Yeah.
22       Q.  In 2000 did you know -- did you communicate with
23   Mr. Ellison concerning his percentage interest in Oracle
24   securities?
25       A.  I don't remember.

49

1        Q.  Do you recall Mr. Ellison being concerned that he
2    not reduce his stake in Oracle securities?
3        A.  I don't remember.
4        Q.  Do you know generally whether Mr. Ellison has an
5    inclination to maximize his holdings of Oracle rather
6    than -- rather than have his stake in the company reduced?
7        A.  Do I have a general -- he loves Oracle.  I mean,
8    he doesn't want to sell generally.
9        Q.  You say -- I think you said he doesn't want to
10   sell generally.  Is that what you said?
11       A.  Uh-huh.
12       Q.  So up until 2000 was that your understanding of
13   Mr. Ellison's inclination, from 1992 to 2000, that he
14   didn't like to sell?
15       A.  Yes.
16       Q.  Okay.  And has that changed since 2000?
17       A.  No.
18       Q.  Okay.
19           And is that something you're just simply aware of,
20   or is it something that's a topic of -- is it something
21   that's been the topic of conversation?
22   MR. GIBBS:  Objection.  Vague.
23   THE WITNESS:  That's not a topic of conversation.
24   BY MR. SOLOMON:
25       Q.  And does Mr. Simon, do you understand, have a

50

1    different view than Mr. Ellison with respect to that issue?
2        A.  I'm not sure what you're asking.
3        Q.  Okay.  You say Mr. Ellison doesn't like to sell.
4    How about Mr. Simon?  Does he like Mr. Ellison selling?
5        A.  He would like to reduce the debt.
6        Q.  And is that an ongoing process?  An ongoing issue?
7    MR. GIBBS:  Objection.  Vague as to time.
8    THE WITNESS:  As far as I understand it, yes.
9    BY MR. SOLOMON:
10       Q.  Okay.  Were you involved in Mr. Ellison's
11   participation in the 10b51 stock plan?
12       A.  Yes.
13       Q.  And what was your involvement?
14       A.  Same thing, sort of intermediary as things were
15   getting set up.
16       Q.  How did it come about that Mr. Ellison decided to
17   engage in that particular plan?
18   MR. GIBBS:  Objection.  Lack of foundation.
19   THE WITNESS:  I don't remember the specifics.
20   BY MR. SOLOMON:
21       Q.  There came a time when Mr. Ellison decided to
22   participate in the plan, right?
23       A.  Yes.
24       Q.  And was that, do you know, a result of his own
25   inclination or was he advised to do that by somebody?

51

1        A.  I believe he was advised.
2        Q.  Do you know who advised him?
3        A.  Philip.
4        Q.  Okay.  And did he advise him, do you know, in one
5    conversation or was this a result of a series of
6    conversations?
7        A.  I --
8    MR. GIBBS:  Objection.  Lack of foundation.
9    THE WITNESS:  I don't know.
10   BY MR. SOLOMON:
11       Q.  So Mr. Ellison at some stage took Mr. Simon's
12   advice and implemented a plan, correct?
13       A.  Yes.
14       Q.  And you were a conduit with respect to the
15   implementation of the plan?
16       A.  Yes.
17       Q.  Was it a one-year plan?
18       A.  I don't know.
19       Q.  Do you know how much stock he sold pursuant to the
20   plan?
21       A.  I don't know.
22       Q.  Do you know how much he realized pursuant to the
23   plan?
24       A.  I don't know.
25       Q.  And do you know if the plan is still in place?

52

1     A.  I don't know.
2     Q.  Okay.
3         Do you know when the plan was in place?
4     A.  I don't.
5     Q.  When it started?
6     A.  I don't know.
7     Q.  Okay.  Was that the only -- this is after 2000, is
8     that right -- excuse me.  Strike that.
9         This is after 2001?
10    MR. GIBBS:  Objection.  Vague.
11    BY MR. SOLOMON:
12    Q.  Was the plan put in place after 2001?
13    A.  I think so.
14    Q.  Okay.  And before that had Mr. Ellison ever had a
15    stock plan in place with the company?
16    MR. GIBBS:  Objection.  Lack of foundation.
17    BY MR. SOLOMON:
18    Q.  Anything similar?
19    A.  I don't know of anything.
20    Q.  Okay.
21        Prior to January of 2001, do you recall any
22    instance in which Mr. Ellison sold a significant amount of
23    Oracle securities?
24    A.  I don't remember.
25    Q.  Okay.

53

1         And when you say you don't remember, you don't
2     remember either when or how much?
3     A.  I don't remember the specifics of any of his
4     selling.
5     MR. SOLOMON:  Mark the next exhibit a document
6     produced by defendants with control numbers 042809 and
7     -810.
8     (Exhibit 13 was marked for identification.)
9     THE REPORTER:  No. 13.
10    MR. SOLOMON:  Let me know if you recognize these.
11    THE WITNESS:  No, I don't.
12    BY MR. SOLOMON:
13    Q.  See they're dated December 18, 2000, and they
14    involve yourself, Mr. Simon, Catherine Ong.  Do you see
15    that?
16    A.  Yes.
17    Q.  Barbara Wallace, excuse me.
18        And you ask -- do you recognize this?
19    A.  I don't.
20    Q.  You don't recall it at all?
21    A.  I don't.
22    Q.  You ask at the bottom, "What's the earliest he can
23    do this?"  And then parens, when does -- "(When does quiet
24    period end)?"  Do you see that?
25    A.  Yes.

54

1     Q.  Do you know what you're referring to?
2     A.  I don't know; but the subject says, "Larry
3     options" so --
4     Q.  Okay.
5         What -- do you know what a quiet period is?
6     A.  A period when he wouldn't be able to trade.
7     Q.  Okay.  What's your understanding of the quiet
8     period at Oracle?
9     A.  Currently or back then?
10    Q.  Back then.
11    A.  I'm not sure I'm aware of what it was back then.
12    Q.  What is it now?
13    A.  I can tell you what it is now.  It extends
14    generally from the last month of the quarter through to the
15    announced -- public announcement of earnings for the
16    quarter.  And, in fact, now I think it extends two trading
17    days beyond that, the public announcement.
18    Q.  Okay.  Was it part of your job at the time, this
19    is in late 2000, to ensure that Mr. Ellison didn't trade
20    during a quiet period?
21    A.  I don't know that I would have said it was part of
22    my job, but I would have been watching that.  Since
23    Philip's not an Oracle employee, he wouldn't be aware of
24    it.
25    Q.  And then it's your understanding, is it, that once

55

1     the quiet period ends, that so long as an Oracle executive
2     was not in possession of material information, then he or
3     she would be free to trade?
4     MR. GIBBS:  Are you asking for a legal conclusion or
5     her understanding?
6     MR. SOLOMON:  Her understanding.
7     THE WITNESS:  Yes.  It is my understanding that if
8     we're out of a quiet period and he didn't have any material
9     nonpublic information.
10    BY MR. SOLOMON:
11    Q.  Now, did you play any role in investigating
12    whether Mr. Ellison was in possession of any nonmaterial
13    information whenever he traded in the past?
14    A.  Not that I remember.
15    Q.  Are there times in the past when you could say
16    Mr. Ellison was not in possession of material information
17    when he traded?
18    A.  I'm sorry, I don't understand what you were
19    asking.
20    Q.  Are there any times in the past when you can say
21    that Mr. Ellison was not in possession of nonpublic adverse
22    information when he traded?
23    MR. GIBBS:  Objection.  Vague.
24    THE WITNESS:  Are there any times when I could say he
25    did not have information?

56

1    MR. SOLOMON:  Yes.

2    Q.  Here's the time when you can say it.

3       Okay.  Are there any occasions that you can think

4  of in the past when Mr. Ellison traded when you can sit

5  here and say he was not in possession of nonpublic adverse

6  information?

7    MR. GIBBS:  Same objection.

8    THE WITNESS:  I don't -- I couldn't say what he has in

9  his head.

10   BY MR. SOLOMON:

11   Q.  That's true.  So you can't?

12   A.  All I can say is what I'm saying because I'm not

13  following your question.  I can't say what he is in

14  possession of or not in possession of.

15   Q.  I don't know how close you are.  Do you understand

16  that?  You know, I don't know how close you are to

17  Mr. Ellison.

18   A.  Yes.  I wouldn't presuppose to say what

19  information he had or didn't have, if that's what you're

20  trying to ask.

21   Q.  Yeah.  Okay.  And in that sense you are not that

22  close, you don't know everything that he knows about the

23  company --

24   A.  Correct.

25   Q.  -- is that correct?

57

1    A.  Correct.

2    Q.  Now, at the end of 2000 did you take a vacation?

3    A.  Uhm, I cannot remember.

4    Q.  Can you tell me whether you remember being absent

5  from Oracle for any period of time at the end of 2000 or

6  the beginning of 2001?  I don't mean weekends.

7    A.  I don't remember specifically.

8    Q.  Okay.  How about Mr. Ellison?  Can you remember

9  whether he was around at the end of 2000, beginning of

10  2001?

11   A.  I don't remember.

12   Q.  How about Mr. Simon?  Do you know if he was

13  around?

14   A.  I don't know.

15   Q.  All right.

16      Do you have any recollection of becoming aware

17  that Mr. Ellison had decided to exercise a significant

18  number of options in January 2001 and sell the stock?

19   A.  I don't remember.

20   MR. SOLOMON:  We'll mark as the next exhibit a

21  document produced by defendants with the control number

22  396943.

23   (Exhibit 14 was marked for identification.)

24   THE WITNESS:  Thank you.

25      Okay.

58

1    BY MR. SOLOMON:

2    Q.  Do you recognize this?

3    A.  I don't.

4    Q.  You'll see it's dated January 22nd, 2001.  It's an

5  e-mail from Mr. Simon to you.

6    A.  Yes.

7    Q.  And does this refresh your recollection in any way

8  concerning Mr. Ellison's exercise of stock options in

9  January of 2001?

10   A.  No.

11   Q.  You'll see that it starts off, "Carolyn - I just

12  got off the phone with Matt Ng," in parens, "(Oracle legal

13  dept).  He wanted to know about Larry's Rule 144 filing and

14  when we expected it to be public.  Dan and Matt spoke about

15  giving Oracle investor relations a heads-up to spin the

16  news, but decided not to do so last Friday."  Do you see

17  that?

18   A.  Yes.

19   Q.  Do you know, first of all, who Dan and Matt are?

20   A.  Matt Ng is in our Oracle Legal Department and Dan,

21  I assume he's talking about Dan Cooperman, who is our

22  general counsel.

23   Q.  Okay.

24      Do you recall being involved in the communication

25  in which spinning the news of Mr. Ellison's sales was

59

1  discussed?

2    A.  I don't remember.

3    Q.  Do you recall being involved in any press release

4  or other disclosure of Mr. Ellison's stock sales?

5    A.  I don't.

6    Q.  Do you know who Joe Lockhart is?

7    A.  Yes.

8    Q.  And who is he?

9    A.  He's former press secretary for President Clinton,

10  I believe, and worked for Oracle for a short period of

11  time.

12   Q.  And do you know if he worked for Oracle at around

13  the time of this e-mail?

14   A.  I don't remember.

15   Q.  Okay.  Do you remember Mr. Lockhart joining the

16  company?

17   A.  Yes, I know he did.

18   Q.  Okay.  And what were the -- how come he joined?

19  Do you know the story?

20   A.  No, I don't.

21   Q.  Do you know who was involved in offering him

22  employment?

23   A.  Well, Larry certainly.

24   Q.  Did Mr. Ellison know him?

25   A.  I don't -- I don't know.

60

```
1     Q.  Okay.  Did you and Mr. Ellison discuss
2   Mr. Lockhart before he was hired?
3     A.  I don't think so.
4     Q.  Okay.  Why was he hired?  Do you know that?
5     A.  I don't know.
6     Q.  Did you interact with Mr. Lockhart while he was
7   there?
8     A.  I think so.
9     Q.  Regularly?
10    A.  I don't remember.  He wasn't there very long I
11  don't think.
12    Q.  Do you remember the topic of your interaction?  Or
13  topics?
14    A.  I -- I don't.
15    Q.  Okay.  Why did he leave?
16    MR. GIBBS:  Objection.  Lack of foundation.
17    THE WITNESS:  I don't know.
18    BY MR. SOLOMON:
19    Q.  Have you heard any rumors?
20    MR. GIBBS:  Objection.  Hearsay.
21    THE WITNESS:  No.
22    BY MR. SOLOMON:
23    Q.  Do you know when he left?
24    A.  I don't.
25    Q.  Do you know if he left happy or unhappy?
```

61

```
1     MR. GIBBS:  Objection.  Lack of foundation.
2     THE WITNESS:  I don't have any reason to believe he
3   left unhappy.
4     BY MR. SOLOMON:
5     Q.  You don't know -- you don't think -- you don't
6   know of any dispute?
7     A.  No.
8     MR. GIBBS:  Mark, is now a good time for a short
9   break?
10    MR. SOLOMON:  Sure.  Ten minutes.
11    THE VIDEOGRAPHER:  Off the record.  The time is 10:35.
12    (Recess taken.)
13    THE VIDEOGRAPHER:  We are back on the record.  The
14  time is 10:51 a.m.
15    MR. SOLOMON:  Okay.  I'll have marked as the next
16  exhibit a document produced by the defendants with a
17  control number 042818.
18    (Exhibit 15 was marked for identification.)
19    THE REPORTER:  It's No. 15.
20    THE WITNESS:  Okay.
21    BY MR. SOLOMON:
22    Q.  And do you recognize this?
23    A.  I don't.
24    Q.  And you have no recollection of receiving it?
25    A.  I don't.
```

62

```
1     Q.  Do you see it's dated 1/22/2000, and it's to you
2   from Mr. Simon?
3     A.  Yes.
4     Q.  Again, in the second paragraph there's a reference
5   to PR.  Do you see that?
6     A.  Yes.
7     Q.  And in part it says, "There's also the question
8   you/Larry need to resolve, whether you want to refer to
9   paying down outstanding debt to justify the sales.  I'd be
10  of a mind not to mention the debt with respect to the
11  options.  I think the expiring options and the associated
12  tax liability says enough.  We could then refer to the debt
13  should Larry sell shares later on."  Do you see that?
14    A.  Yes.
15    Q.  Do you -- does this refresh your recollection
16  concerning the PR discussion around this time?
17    A.  It doesn't.
18    Q.  It says, "There's also the question you/Larry need
19  to resolve."  Do you know whether it was you or Larry that
20  worked on resolving that question?
21    A.  I don't know, but that wouldn't be my decision.
22    Q.  Okay.
23    In other words, aside from the fact that you don't
24  recall the PR discussion, generally it wouldn't be your
25  position to decide one way or the other what PR should be
```

63

```
1   put out?
2     A.  I missed the -- I lost the beginning of the
3   question, I'm sorry.
4     MR. SOLOMON:  Could you just read it back, please.
5     (Record was read by the reporter.)
6     THE WITNESS:  Correct.
7     BY MR. SOLOMON:
8     Q.  Do you have an understanding -- strike that.
9     Have you communicated to Mr. Simon at any time
10  that that's not your job?
11    A.  I don't know.
12    Q.  "3" says in the same e-mail, "I assume you've
13  heard the rumors re Oracle amending its 10-Q."  Do you see
14  that?
15    A.  Yes.
16    Q.  Did you hear the rumors re Oracle amending its
17  10-Q?
18    A.  I don't know.
19    Q.  Again, sitting here, you have no recollection?
20    A.  I don't.
21    Q.  And then it goes on to say, "Oracle apparently
22  issued a press release denying the rumor.  The Dow Jones
23  news wire reports this to explain Oracle's down day."  Do
24  you see that?
25    A.  I do.
```

64

1  Q.  No recollection, though, of that subject matter?
2  A.  No.
3  Q.  Do you have a recollection whether you were at
4  Oracle's offices during this week?  Again, that exhibit is
5  dated January 22, 2000.
6  A.  I don't know.
7  MR. SOLOMON:  So let's mark as the next exhibit a
8  document produced by the defendants in this litigation with
9  the control number 042840.
10  (Exhibit 16 was marked for identification.)
11  THE WITNESS:  Thank you.
12  Okay.
13  BY MR. SOLOMON:
14  Q.  And do you recognize these exchanges?
15  A.  I don't.
16  Q.  No recollection of ever seeing them before?
17  A.  No.
18  Q.  Do you see they're dated January 23, 2000, and
19  they are communications involving you, Mr. Simon and
20  Barbara Wallace?
21  A.  Yes.  But can I ask a question?
22  Q.  You may.
23  A.  The top one has January 23rd, 2000, the other one
24  is 2001.  The next one down.  Are we talking about 2001?
25  Q.  That's pretty weird, isn't it?

65

1  A.  It doesn't have the last digit.  Are we talking
2  about 2001 now?
3  Q.  We are.  We are.
4  Q.  So 2001.
5  Q.  I guess on prior documents we saw documents in
6  2000 without the zero, I think here it should be 1.  That
7  would be consistent, it should be 2001 at the top.
8  A.  Okay.
9  Q.  In any event, does seeing this document refresh
10  any recollection of being involved or being aware of
11  Mr. Ellison's stock option exercises and sales?
12  A.  Not specifically.
13  Q.  Did you have a role with respect to Mr. Ellison's
14  exercise -- strike the question.
15  Let's mark the exhibit.  We'll mark as the next
16  exhibit a document produced by the defendants with the
17  control numbers 014151 and 152.
18  (Exhibit 17 was marked for identification.)
19  THE WITNESS:  Thank you.
20  Okay.
21  BY MR. SOLOMON:
22  Q.  Do you recognize this?
23  A.  No, I don't.
24  Q.  No recollection of ever seeing it before?
25  A.  No.

66

1  Q.  You see it's dated January 23, 2001, and it's a
2  communication between you and Mr. Simon?
3  A.  Yes.
4  Q.  And there's a reference halfway down the page to
5  "Philip B. Simon wrote 5.1 million @ 31.6388."  Do you see
6  that?
7  A.  Yes.
8  Q.  Do you have an understanding what that refers to?
9  A.  I believe this is the stock that Larry sold that
10  date, and that's the average price.
11  Q.  Okay.  And above that it says, "you wrote:  And
12  what was yesterday's?  Thanks, Carolyn."  Right?
13  A.  Yes.
14  Q.  And that's you asking what was sold at what price
15  the day before?  Is that --
16  A.  That's what it appears to be.
17  Q.  And why were you doing that?
18  A.  I don't know.
19  Q.  Because you don't remember doing it?
20  A.  I don't remember doing it.
21  MR. SOLOMON:  Have marked as the next exhibit a
22  document produced by the defendants with the control
23  numbers 609893 to -895.
24  (Exhibit 18 was marked for identification.)
25  THE WITNESS:  Thank you.

67

1  Yes.
2  BY MR. SOLOMON:
3  Q.  Okay.  Do you recognize any of these pages?
4  A.  I don't.
5  Q.  And you don't recall ever seeing any of them
6  before?
7  A.  I don't recall seeing them.
8  Q.  Okay.  And does seeing any of the information on
9  these pages refresh your recollection with respect to the
10  PR surrounding Mr. Ellison's exercise of stock options?
11  A.  It doesn't bring any more specific recollections
12  to my mind.
13  Q.  And just to be sure, you -- is it the case that
14  you don't have any recollection whether you were involved
15  in discussing the PR or not?
16  A.  Correct.  I don't recall whether I was involved.
17  MR. SOLOMON:  Mark as the next exhibit a document
18  produced by the defendants with control numbers 101540 to
19  -542.
20  (Exhibit 19 was marked for identification.)
21  THE WITNESS:  Thank you.
22  Okay.
23  BY MR. SOLOMON:
24  Q.  All right.  Do you recognize this?
25  A.  I don't.

Balkenhol, Carolyn  9/12/2006  9:15:00 AM

68

1    Q.  Do you have a recollection of receiving or
2    participating in these exchanges at all?
3    A.  No.
4    Q.  And you'll see that these exchanges are dated
5    Wednesday, January 24, 2001.  And they involve yourself,
6    Mr. Simon, and -- just involving you and Mr. Simon -- and
7    Mr. Lockhart.  Correct?
8    A.  Oh, I didn't notice.
9    Q.  Look at the last page.
10   A.  The same one from the last --
11   Q.  Correct.
12   A.  Yes.
13   Q.  You'll see that the e-mail on the first page,
14   two-thirds of the way down the page, from Mr. Simon to you
15   contains some detail concerning the circumstances of
16   Mr. Ellison's options exercise.  Do you see that?
17   A.  Yes.
18   Q.  And there are some -- there's some fairly detailed
19   information, would you agree?
20   A.  Yes.
21   Q.  Do you have any recollection of receiving or
22   digesting or reviewing any of this information?
23   A.  I don't.
24   Q.  And no recollection of any action, if any, that
25   you took in response to receiving this information?

69

1    A.  No.
2    MR. SOLOMON:  Mark as the next exhibit a document
3    produced by the defendants in this litigation with the
4    control numbers 101543 and -544.
5    (Exhibit 20 was marked for identification.)
6    THE WITNESS:  Thank you.
7    Okay.
8    BY MR. SOLOMON:
9    Q.  And do you recognize this?
10   A.  I don't.
11   Q.  And no recollection of ever seeing it before?
12   A.  No.
13   Q.  You note it's dated January 24th, 2001, and it's
14   from Philip Simon to Mr. Ellison, copying you?
15   A.  Yes.
16   Q.  Does your review of the information in this e-mail
17   refresh your recollection in any way concerning
18   Mr. Ellison's exercise of stock options?
19   A.  As to specifics, no.
20   MR. SOLOMON:  Have marked as the next exhibit another
21   document produced in this litigation with the control
22   number 0023490.
23   (Exhibit 21 was marked for identification.)
24   THE WITNESS:  Thank you.
25   Okay.

70

1    BY MR. SOLOMON:
2    Q.  And do you recognize this?
3    A.  No, I don't.
4    Q.  No recollection of ever seeing or reviewing it?
5    A.  No.
6    Q.  Do you see it's dated, again, Wednesday
7    January 24th, 2001, and it's from Mr. Simon to you?
8    A.  Yes.
9    Q.  And does the information here refresh your
10   recollection in any way concerning Mr. Ellison's exercise
11   of stock options in January 2001?
12   A.  No.  Nothing specific.
13   MR. SOLOMON:  Mark as the next document produced by
14   the defendants in this litigation with the control number
15   014054.
16   (Exhibit 22 was marked for identification.)
17   THE WITNESS:  Thank you.
18   Okay.
19   BY MR. SOLOMON:
20   Q.  Do you recognize this document?
21   A.  I don't.
22   Q.  Do you have any recollection of seeing it before?
23   A.  No.
24   MR. SOLOMON:  I'll mark the next exhibit a document
25   produced by the defendants in this litigation with a

71

1    control number 014055 and -056.
2    (Exhibit 23 was marked for identification.)
3    THE WITNESS:  Thank you.
4    Okay.
5    BY MR. SOLOMON:
6    Q.  Do you recognize this?
7    A.  I don't.
8    Q.  Do you have a recollection of ever seeing it
9    before?
10   A.  No.
11   Q.  It's dated Friday, January 26, 2001, and it's from
12   Philip Simon to Kimberly Clarke at Merrill Lynch, and it
13   copies you.
14   A.  Yes.
15   Q.  And does the information contained in this e-mail
16   refresh your recollection in any way concerning
17   Mr. Ellison's January 2001 stock option exercise?
18   A.  It doesn't.
19   Q.  Okay.
20   You can see at the bottom of the page it appears
21   to refer to you where it says, "Carolyn will pull the
22   certificates from the box and arrange immediate delivery
23   once we begin to sell these lots."  Do you see that?
24   A.  Yes.
25   Q.  Do you believe that reflects the delivery by you

72

1 or possession by you of the stock certificates that you
2 talked about earlier on today?
3      A.  It appears to, but I don't remember getting the
4 certificates and delivering them.
5      MR. SOLOMON:  Mark as the next exhibit a document
6 produced by the defendants with a control number 014057.
7      (Exhibit 24 was marked for identification.)
8      THE WITNESS:  Thank you.
9      Okay.
10     BY MR. SOLOMON:
11     Q.  Do you recognize this?
12     A.  I don't.
13     Q.  Do you have a recollection of seeing it before?
14     A.  No.
15     Q.  You can see it's dated Friday, January 26, 2001,
16 from Philip Simon to you?
17     A.  Yes.
18     Q.  Does -- do the contents refresh your recollection
19 in any way concerning Mr. Ellison's January 2001 stock
20 option exercise?
21     A.  Nothing specific.
22     Q.  Okay.
23     A.  You know, these as a whole, your question is very
24 broad.  As a whole, these remind me that Philip was sending
25 me updates as to what --

73

1      Q.  Okay.
2      A.  -- what was going on.  So there's nothing
3 specific, but it does remind me that he was sending me
4 daily updates.
5      MR. SOLOMON:  Okay.  Thank you.
6      So I'll have marked as the next exhibit another
7 document produced by the defendants in this litigation with
8 the control numbers 294216 and -217.
9      (Exhibit 25 was marked for identification.)
10     THE WITNESS:  Thank you.
11     Yes.
12     BY MR. SOLOMON:
13     Q.  Okay.  Do you recognize this?
14     A.  I don't.
15     Q.  Do you recall ever seeing it before?
16     A.  No.
17     Q.  Do you see that it's dated 26th of January, 2001,
18 and it's from Philip Simon to Dan Cooperman, and it's
19 copying Ms. Clarke and yourself?
20     A.  Yes.
21     Q.  Is that right?
22     Do the contents refresh your recollection
23 concerning Mr. Ellison's exercise of stock options in
24 January 2001?
25     A.  No.

74

1      MR. SOLOMON:  I'll have marked as the next exhibit a
2 document produced by defendants with control numbers 014058
3 and -059.
4      And if we can go off the record while we change
5 tapes.
6      THE VIDEOGRAPHER:  We are going off the record.  The
7 time is 11:18 a.m.  Here marks the end of Videotape 1 in
8 the deposition of Carolyn Balkenhol.
9      (Recess taken.)
10     (Ms. Daley not present.)
11     THE VIDEOGRAPHER:  We're back on the record.  The time
12 is 11:21 a.m.  Here marks the beginning of Videotape 2 in
13 the deposition of Carolyn Balkenhol.
14     (Exhibit 26 was marked for identification.)
15     THE WITNESS:  Thank you.
16     Okay.
17     BY MR. SOLOMON:
18     Q.  Okay.  Do you recognize this?
19     A.  I don't.
20     Q.  No recollection of seeing it before?
21     A.  No.
22     Q.  You'll see that it's dated Monday, January 29th,
23 2001, from Mr. Simon to you?
24     A.  Yes.
25     Q.  And do the contents of these exchanges refresh

75

1 your recollection in any way concerning the exercise by
2 Mr. Ellison of stock options in January of 2001?
3      A.  No.
4      MR. SOLOMON:  And then we'll have marked as the next
5 exhibit a document produced by the defendants in this
6 litigation with control number 042835.
7      (Exhibit 27 was marked for identification.)
8      THE WITNESS:  Thank you.
9      Yes.
10     BY MR. SOLOMON:
11     Q.  Do you recognize this?
12     A.  I don't.
13     Q.  No recollection of seeing it before?
14     A.  No.
15     Q.  Okay.  You'll see that there's a message from --
16 sorry.
17     To set this up, it's dated 1/29/2000 and it's from
18 Philip Simon to you.
19     A.  Yes.
20     Q.  Do you see that?
21     A.  Yes.
22     Q.  There's reference of communication to you from
23 him.  You say, or you appear to say, in capitals "MOST
24 EXCELLENT work, Philip.  You ought to be very proud..."
25 Do you see that?

76

1    A.  Yes.

2    Q.  Do you remember saying that to him?  Or writing

3    that to him?

4    A.  I don't remember.

5    Q.  Do you recall his response, "Thank you, Carolyn.

6    And, yes, I'm very pleased"?

7    A.  I don't remember it.

8    Q.  And does the information here reflect in any --

9    refresh in any way your recollection of Mr. Ellison's

10   exercise of stock options in January 2001?

11   A.  No.

12   MR. SOLOMON:  Have marked as the next exhibit another

13   document produced by the defendants in this litigation with

14   the control number 280983.

15   (Exhibit 28 was marked for identification.)

16   THE WITNESS:  Thank you.

17   Yes.

18   BY MR. SOLOMON:

19   Q.  Okay.  Do you recognize this?

20   A.  I don't.

21   Q.  You have no recollection of ever seeing it before?

22   A.  No.

23   Q.  And it's dated Monday, the 29th of January, 2001,

24   from Philip Simon to you and Sue Bachman.  Do you see that?

25   A.  Yes.


77

1    Q.  Who's Sue Bachman?

2    A.  She also worked in our office at that time.

3    Q.  And did she report to you?

4    A.  She did.

5    Q.  And do the contents refresh your recollection in

6    any way concerning Mr. Ellison's exercise of stock options

7    in January 2001?

8    A.  No.  That reminds me that Sue worked there at the

9    time.

10   Q.  I take it from that that she no longer does?

11   A.  She no longer does.

12   MR. SOLOMON:  Also have marked as the next exhibit a

13   document produced by the defendants with the control number

14   042839.

15   (Exhibit 29 was marked for identification.)

16   THE WITNESS:  Thank you.

17   Okay.

18   BY MR. SOLOMON:

19   Q.  Do you recognize this?

20   A.  I don't.

21   Q.  No recollection of ever seeing it before?

22   A.  No.

23   Q.  Do you see that the second paragraph of the

24   message says, "I'm concerned about publicity as more

25   Rule 144 filings go public.  In case you can't reach me,


78

1    don't hesitate to call Tom Blanchfield and/or Kim at"

2    Merrill Lynch -- that's "ML" -- if you need to make an

3    immediate change to the trading instructions (i.e., to call

4    a halt if Larry changes his mind)."  Do you see that?

5    A.  Yes.

6    Q.  Does that refresh your recollection in any way

7    concerning Mr. Ellison's exercising stock options in

8    January 2001?

9    A.  No.

10   Q.  Next says, "I'm copying Sue on this message in

11   case you're out sick tomorrow morning.  I hope you feel

12   better."  Do you see that?

13   A.  Yes.

14   Q.  Do you remember feeling sick at the end of January

15   2001?

16   A.  No, but I think I was preg--- no, I wasn't

17   pregnant.  Sorry.  Do the math.  No, I don't remember.

18   Q.  All right.

19   Then the P.S. "Did Sue tell you I thought she was

20   getting married?  A very funny misinterpretation by me of

21   one of her emails."  Do you have any idea what that's

22   about?

23   A.  No idea.

24   MR. SOLOMON:  I really was just curious.  I don't

25   think it's particularly pertinent.


79

1    Mark as the next exhibit a document with the --

2    produced by the defendants with the control number 014062.

3    (Exhibit 30 was marked for identification.)

4    THE WITNESS:  Thank you.

5    Okay.

6    BY MR. SOLOMON:

7    Q.  Okay.  Do you recognize this?

8    A.  I don't.

9    Q.  And you don't recall seeing it before?

10   A.  I don't.

11   Q.  It's dated Monday, January 29th, from Philip Simon

12   to Larry Ellison, copying you?

13   A.  Yes.

14   Q.  And do the contents refresh your recollection in

15   any way concerning Mr. Ellison's exercise of stock options

16   in January of 2001?

17   A.  No.

18   MR. SOLOMON:  Mark as the next exhibit a document

19   produced by the defendants with control number 014065.

20   (Exhibit 31 was marked for identification.)

21   THE WITNESS:  Thank you.

22   Yes.

23   BY MR. SOLOMON:

24   Q.  Okay.  Do you recognize this?

25   A.  I don't.

80

1    Q.  Don't recall ever seeing it before?

2    A.  No.

3    Q.  And you'll see it's dated Tuesday, the 30th of

4  January, 2001, from Philip Simon to you?

5    A.  Yes.

6    Q.  And do the contents refresh your recollection in

7  any way concerning Mr. Ellison's exercise of stock options

8  in 2001?

9    A.  No.

10    Q.  And I should be clear.  Ask you does it refresh

11  your recollection of Mr. Ellison selling stock in 2001?

12    A.  Oh.  No.

13    MR. SOLOMON:  Mark as the next exhibit a document

14  produced by defendants with the control number 280984.

15    (Exhibit 32 was marked for identification.)

16    THE WITNESS:  Thank you.

17    Okay.

18    MR. SOLOMON:

19    Q.  Do you recognize this?

20    A.  I don't.

21    Q.  Have you seen it before?

22    You don't recall seeing it before?

23    A.  I don't recall seeing it before.

24    Q.  And it's dated January 30, 2001, and it's from

25  Mr. Simon to Kimberly Clarke, and it copies you and

81

1  Catherine Ong.

2    A.  Yes.

3    Q.  And do the contents refresh your recollection in

4  any way concerning Mr. Ellison's sale of stock in January

5  of 2001?

6    A.  No.

7    MR. SOLOMON:  I'll mark as the next exhibit a document

8  produced by the defendants in this litigation with the

9  control numbers 014066, -67.

10    (Exhibit 33 was marked for identification.)

11    THE WITNESS:  Thank you.

12    Okay.

13    BY MR. SOLOMON:

14    Q.  Do you recognize this?

15    A.  I don't.

16    Q.  You don't recall ever seeing it before?

17    A.  No.

18    Q.  And it's dated Wednesday, January 31, 2001, from

19  Philip Simon to Larry Ellison, copying you?

20    A.  Yes.

21    Q.  And do the contents refresh your recollection in

22  any way concerning Mr. Ellison's exercise of stock options

23  and sales of stock in January of 2001?

24    A.  No.

25    MR. SOLOMON:  Have marked as the next exhibit a

82

1  document produced by the defendants with the control

2  numbers 294261 to -263.

3    (Exhibit 34 was marked for identification.)

4    THE REPORTER:  It's 34.

5    THE WITNESS:  Thank you.

6    Okay.

7    Sorry.  It took me a while to get through it.

8    BY MR. SOLOMON:

9    Q.  I was doing the same thing.

10    Do you recognize it?

11    A.  I don't.

12    Q.  And you don't recall ever seeing it before?

13    A.  No.

14    Q.  And at the top of the page it's dated 2/1,

15  February 1, 2001.  And these are exchanges between you and

16  Philip Simon; is that right?

17    A.  Yes.  That appears to be.

18    Q.  Okay.  And do the contents refresh your

19  recollection in any way concerning Mr. Ellison's exercise

20  of stock options and stock sales in January of 2001?

21    A.  No.

22    MR. SOLOMON:  I'll have marked as the next exhibit a

23  document produced by the defendants in this litigation with

24  the control numbers 294269 and -270.

25    (Exhibit 35 was marked for identification.)

83

1    THE WITNESS:  Thank you.

2    Okay.

3    BY MR. SOLOMON:

4    Q.  Do you recognize this?

5    A.  I don't.

6    Q.  You don't recall ever seeing it before?

7    A.  I don't.

8    Q.  It's dated February 27, 2001, from -- and it

9  reflects exchanges between you and Mr. Simon?

10    A.  Yes, it appears to be.

11    Q.  Do the contents refresh your recollection about

12  any of the events surrounding Mr. Ellison's exercising of

13  stock options and stock sales in January 2001?

14    A.  No.

15    Q.  Did you ever know that it was Philip Simon's

16  contention that Merrill Lynch somehow ripped off Larry

17  Ellison to the tune of over $3 million in connection with

18  his stock transactions of January 2001?

19    A.  No.

20    Q.  Have you -- is that the first time you've heard

21  that?

22    A.  No, I've never heard that before.

23    Q.  If Mr. Simon had that suspicion or belief, would

24  you expect Mr. Simon to communicate it to you?

25    A.  Umm, probably.  But I don't think that -- that's

84

1    not how I interpret what he's saying here.
2        Q.   And, then, that's fair enough.  And as far as you
3    know, he's never suggested that Merrill Lynch somehow acted
4    wrongfully?
5        A.   No.
6        Q.   Is your relationship with Mr. Simon purely
7    business?
8        A.   Mainly.
9        Q.   So what's other than mainly?
10       A.   Are we talking now or back then?
11       Q.   Both.  So -- okay.  So we can take back then and
12   we can take now.
13       A.   Uhm, back then we were also on friendly terms so
14   we had a personal relationship, but --
15       Q.   So it's the same as back then?  Same now as it was
16   back then?
17       A.   Probably not as close personally now as we were
18   back then.
19       Q.   Did something happen to create a rift?
20       A.   We got in an argument about something but --
21       Q.   Okay.  Do you know what the argument was about?
22       A.   I don't remember.
23       Q.   Did you feel somehow that he hadn't protected you
24   sufficiently from Mr. Ellison?
25       A.   Oh, no.

85

1        MR. SOLOMON:  Let's have marked as the next exhibit a
2    document produced by the defendants with the control
3    numbers 300656 and -657.
4        (Exhibit 36 was marked for identification.)
5        THE REPORTER:  It's 36.
6        THE WITNESS:  Thank you.
7        Okay.
8        BY MR. SOLOMON:
9        Q.   Do you recognize this?
10       A.   I don't.
11       Q.   And you don't recall seeing it before?
12       A.   I don't.
13       Q.   It's dated March 8th, 2001.  It's from Philip
14   Simon to you.
15       A.   The top note, yeah.
16       Q.   I was saying at the top.
17       And it attaches communications between Mr. Simon
18   and Mr. Ellison?
19       A.   Yes.
20       Q.   And do the contents refresh your recollection in
21   any way concerning Mr. Ellison's exercise of stock options
22   and sale of stock in 2001?
23       A.   No.
24       Q.   Do you recall in March of 2001 that Oracle's stock
25   declined when Oracle preannounced that it would miss its

86

1    earnings forecast?
2        A.   I don't.
3        Q.   Okay.  Do you recall that in March of 2001 Oracle
4    issued a warning that it was going to miss its forecasted
5    numbers?
6        A.   No.
7        Q.   In your recollection, March of 2001 is just
8    another month in Oracle and nothing special?
9        A.   Yes.
10       Q.   Did you talk to Mr. Ellison at any time in March
11   of 2001 concerning the decrease in Oracle's stock price?
12       A.   Not that I can recall.
13       Q.   Did Mr. Ellison, in March of 2001, express any
14   disappointment or concern that Oracle stock price had
15   declined?
16       A.   I don't remember.
17       Q.   Do you remember Mr. Ellison ever talking to you
18   about Oracle's stock price?
19       A.   No, it's not a conversation we would generally
20   have.
21       Q.   What about between you and Mr. Simon back in those
22   days?  Did the two of you discuss Oracle's stock price at
23   all?
24       A.   I don't think so.
25       MR. SOLOMON:  Okay.  Mark as the next exhibit a

87

1    document produced by the defendants in this litigation with
2    control number 148625.
3        (Exhibit 37 was marked for identification.)
4        THE WITNESS:  Thank you.
5        Yes.
6        BY MR. SOLOMON:
7        Q.   Do you recognize this?
8        A.   No.
9        Q.   No recollection of seeing it before?
10       A.   No.
11       Q.   You'll see it's from Safra Catz dated April 5,
12   2001, to Jennifer Glass, and it cc's you and Stephanie Aas?
13       A.   Yes.
14       Q.   And do the contents reflect (sic) your
15   recollection in any way concerning the events in the third
16   fiscal quarter of 2001?
17       MR. GIBBS:  Did it refresh?  I think you said -- I
18   think you said "reflect."
19       MR. SOLOMON:  Sorry.
20       Q.   Refresh your recollection concerning the events at
21   Oracle in the third fiscal quarter of 2001?
22       A.   No.
23       Q.   And I assume you have no recollection of the
24   grossly inaccurate story that's --
25       A.   No, I don't remember it.

88

1    Q.  -- described here?

2    MR. SOLOMON:  We'll have marked as the next exhibit a

3    document produced by the defendants in this litigation with

4    the control numbers 101545 and -46.

5    (Exhibit 38 was marked for identification.)

6    THE WITNESS:  Thank you.

7    Yes.

8    BY MR. SOLOMON:

9    Q.  Okay.  Do you recognize this?

10   A.  No.

11   Q.  You don't recall seeing it before?

12   A.  No.

13   Q.  I see it's dated Tuesday, March 5th, 2002, from

14   Philip Simon to Larry Ellison, copying you.

15   A.  Yes.

16   MR. SOLOMON:  Okay.

17   Let's go off the record.

18   THE VIDEOGRAPHER:  Off the record.  The time is

19   11:49 a.m.

20   (Lunch recess taken at 11:49, proceedings to resume at

21   12:35.)

22   -oOo-

23

24

25

89

1    AFTERNOON SESSION

2    THE VIDEOGRAPHER:  We are back on the record.  The

3    time is 12:54 p.m.

4    EXAMINATION (RESUMED)

5    BY MR. SOLOMON:

6    Q.  Okay.  Ms. Balkenhol, you testified at the very

7    beginning of the day about two depositions that you've had

8    taken before, one was in connection with a brokerage

9    dispute in connection with a boat back in 1997; is that

10   right?

11   A.  I wouldn't swear to the year, but somewhere around

12   that time.

13   Q.  Okay.  Before 2000?  Is that fair?

14   A.  I think so.

15   Q.  Okay.

16   And can you just describe generally what the

17   dispute was.

18   A.  There was a broker, I believe named Rafferty, with

19   Gilman Yacht Sales, who said he introduced the boat October

20   Rose to Larry.  But it was -- Larry purchased the boat

21   through Merle Wood, and so Merle had the commission.  And I

22   think the lawsuit named Larry and Merle Wood.

23   Q.  Okay.

24   And that case went to trial; is that right?

25   A.  Yes.

90

1    Q.  Did you testify at trial as well?

2    A.  Yes.

3    Q.  And the other deposition was, you said, by the

4    SEC?  Taken by the SEC?

5    A.  Yes.

6    Q.  Was that, you said, about a year ago?

7    A.  No, it was this past year.  In this year.

8    Q.  Okay.  When this year?

9    A.  June.

10   Q.  Okay.

11   And what did that concern?

12   A.  The paperwork all says "The Matter Of Seibel

13   Systems."

14   Q.  And what testimony did you provide?

15   A.  It was questions regarding my husband's trading in

16   Seibel Systems stock.

17   Q.  Okay.

18   And does your husband work at Seibel?

19   A.  No.  He worked at Oracle.

20   Q.  And Oracle purchased Seibel?

21   A.  Yes.

22   Q.  And then he continued to work where?

23   A.  He continued to work at Oracle.

24   Q.  Okay.  Gotcha.  Okay.

25   Is he still there?

91

1    A.  No.

2    Q.  Is that an insiders trading investigation?

3    A.  Uhm, it -- the paperwork does not say that, but

4    the questions are regarding Chris's trades while I was an

5    insider.

6    Q.  Okay.  Anybody else's trades in issue?

7    A.  They have not asked me about anyone else's trades.

8    Q.  Okay.  Do you understand that your husband is a

9    target of the SEC?

10   MR. GIBBS:  Objection.  Calls for a legal conclusion.

11   THE WITNESS:  I'm not sure that the term "target"

12   means.  The paperwork doesn't specify my name or his name,

13   but the questions are about his trades.

14   BY MR. SOLOMON:

15   Q.  Okay.  Has anybody else given testimony in that

16   matter that you know of?

17   A.  My husband, Chris, was also deposed.

18   Q.  Anybody else from Oracle?

19   A.  Not to my knowledge.

20   Q.  And would these trades have been trades that

21   Mr. Cooperman would have been involved in approving or not

22   approving?

23   A.  No.  They were Seibel stock.

24   Q.  And you gave an interview prior to giving a

25   deposition --

92

1    A.  Yes.

2    Q.  -- is that right?

3        And when was that?

4    A.  That was January of 2006.

5    Q.  And as far as you know, Mr. Ellison hasn't been

6    involved in this particular issue?

7    A.  No.

8    Q.  Is he aware of it?

9    A.  He is aware of it insofar as I needed to let them

10   know about the scheduling and things like that.

11   Q.  All right.

12       Have you discussed your testimony today or your

13   prospective testimony today with anybody?  Other than your

14   lawyers.

15   A.  Again, with the office, insofar as I needed to let

16   them know where I was going; but not in any detail.

17   Q.  Have you had any conversations with Mr. Ellison

18   about your, uhm, testimony in this case?

19   A.  I don't -- I don't think I even told him I was

20   being deposed.  I don't think I have discussed it with him.

21   Q.  Is there a reason why you haven't told him that?

22   A.  It's not relevant to him.

23   Q.  Is this litigation just a minor nuisance to him?

24   A.  No.  I mean in terms of my scheduling, whether I'm

25   there today or not there today, that's -- he wouldn't care.

93

1    Q.  You have an office in Redwood Shores; is that

2    right?

3    A.  Yes.

4    Q.  Does Mr. Ellison?

5    A.  Yes.

6    Q.  And do you see him on a daily basis when he's

7    around?  I mean --

8    A.  If he comes into the office, yes.

9    Q.  How much of his time is spent in the office

10   roughly?

11   A.  Generally speaking, he is at the office all day

12   Monday, and Tuesday through Thursday afternoons for product

13   meetings.

14   Q.  Okay.  All right.

15       Have you ever heard of a company called Telia?  Or

16   Telia?  T-e-l-i-a?

17   A.  It sounds vaguely familiar.

18   Q.  A Swedish company?

19   A.  If I were guessing, I'd say it's a

20   telecommunications company in Europe.  I didn't know where.

21   Q.  Do you have any recollection of any issues that

22   Telia had with respect to any Oracle product?

23   A.  No.

24   MR. SOLOMON:  We'll mark the next exhibit, a document

25   with the control numbers 013665 through -668.

94

1    (Exhibit 39 was marked for identification.)

2    THE REPORTER:  It's 39.

3    THE WITNESS:  Thank you.

4    Okay.

5    BY MR. SOLOMON:

6    Q.  Have you ever seen this before?

7    A.  I don't remember ever seeing it.

8    Q.  Okay.  You'll see there's a reference halfway down

9    the first page to you, I believe.  It says, "On advice from

10   both" you -- "from both of you I am not contacting Carolyn

11   directly on this, but would ask that you both ask her to

12   set this meeting up."  Do you see that reference?

13   A.  Yes.

14   Q.  Do you recall setting up a meeting as reflected

15   here?

16   A.  No, I don't.

17   Q.  Who is Vincent Bosworth?  "Bodsworth."  Excuse me.

18   A.  I don't know.  The name isn't familiar to me.

19   Q.  And do you know Mr. Ryoo?

20   A.  No.

21   Q.  Do you have any recollection of that name?

22   A.  No.

23   Q.  Have you heard of the company POSCO, P-O-S-C-O?

24   A.  Yes.

25   Q.  And what's POSCO?

95

1    A.  I just know they're a large Korean customer.

2    Q.  Do you recall ever being made aware of complaints

3    they had with the implementation of 11i?

4    A.  No, I actually thought they were one of our big

5    success stories.

6    Q.  And do you know if and when -- well, first of all,

7    this is the first time that you've seen anything reflecting

8    dissatisfaction by that company; is that right?

9    A.  This -- this e-mail that you're showing me now?

10   Q.  Yes.  Correct.

11   A.  Yes.  I don't recall ever seeing anything

12   suggesting that POSCO was not satisfied.

13   MR. SOLOMON:  Okay.

14       Let's have marked as next exhibit a document

15   produced by the defendants in this litigation with the

16   control number 014073.

17   (Exhibit 40 was marked for identification.)

18   THE WITNESS:  Thank you.

19   Okay.

20   BY MR. SOLOMON:

21   Q.  Do you recognize this?

22   A.  I don't.

23   Q.  You don't recall ever having seen it before?

24   A.  No.

25   Q.  I see that it's dated the 14th of September, 2000,

96

1   and the subject is Telia; and I won't try and pronounce the
2   rest of the Swedish name.
3       A. Uh-huh.  Yes.
4       Q. There's a reference -- it appears to be from an
5   Oracle employee in Sweden to Larry, correct?
6       A. Yes, that's how it appears.  Oh, actually -- yes,
7   he says he's sales director.
8       Q. And after thanking Mr. Ellison for calling Lars,
9   it goes on to say, "I understand from Carolyn that it was a
10  bit embarrassing because Mr. Kark was not updated of the
11  ERP/CRM evaluation and that is the problem."
12      Do you see that?
13      A. Yes, I do see that.
14      Q. Do you recall this slight embarrassment occurring?
15      A. No.
16      Q. Do you recall being involved in resolving any
17  concern reflected here?
18      A. No.
19      Q. Do you know whether Telia in Sweden ended up as
20  satisfied 11i customers?
21      A. I don't know.
22      Q. Do you remember that they had -- they reported to
23  Oracle that they had significant problems with 11i?
24      A. No, I don't.
25      Q. What about Liberty Mutual?  Do you recall being

97

1   involved with a customer called Liberty Mutual in late
2   2000?
3       A. No.
4       Q. Do you have any recollection whether or not they
5   were 11i customers?
6       A. I don't know.
7       Q. So you don't have any recollection whether or not
8   they were satisfied or dissatisfied customers?
9       A. No, I don't.
10      MR. SOLOMON:  Mark as the next exhibit a document
11  produced by the defendants with the control number 018756.
12      (Exhibit 41 was marked for identification.)
13      THE WITNESS:  Thank you.
14      Okay.
15      BY MR. SOLOMON:
16      Q. Do you recognize this?
17      A. No.
18      Q. And you don't recall ever having seen it before?
19      A. No.
20      Q. Do you see that it's dated the 13th of November,
21  2000, and it's from Joel Summers to Larry Ellison, copying
22  you?
23      A. Yes.
24      Q. Do you know who Joel Summers is?
25      A. Joel Summers was the head of our HR product.

98

1       Q. Okay.  Do the contents here reflect -- refresh any
2   recollection you have concerning Liberty Mutual and 11i?
3       A. No.
4       Q. You'll see that in the second paragraph, halfway
5   through that paragraph it says in part, "I will know more
6   on this subject when they return the detailed
7   implementation status questionnaire that I sent them
8   today."  Do you see that?
9       A. Yes.
10      Q. In late 2000 was there a document created at
11  Oracle called an implementation status questionnaire?
12      A. I don't know.
13      Q. Is this the first time you've ever seen reference
14  to it?
15      A. Yes.  I -- I haven't heard about it.
16      MR. SOLOMON:  Counsel, it's my understanding that we
17  haven't received implementation status questionnaires.  If
18  that is the case, I ask that they be produced.
19      MR. GIBBS:  We'll take it under advisement.  I think
20  you're building a lot of assumptions into that request
21  but --
22      MR. SOLOMON:  I'll mark as the next exhibit a document
23  produced by the defendants in this litigation with the
24  control number 014109.
25      (Exhibit 42 was marked for identification.)

99

1       THE WITNESS:  Thank you.
2       Okay.
3       BY MR. SOLOMON:
4       Q. Do you recognize this?
5       A. I don't.
6       Q. You don't recall ever having seen it before?
7       A. No.
8       Q. You'll see that it's dated Wednesday,
9   November 22nd, 2000, and it's from Larry Ellison to Alison
10  Hutchinson.  Do you see that?
11      A. Yes.
12      Q. First of all, this is, as I said, November 2000.
13  Do you have an understanding whether -- or knowledge
14  whether Larry Ellison would have written -- typed this in,
15  this e-mail, himself or would you have done it or someone
16  else?
17      A. Uhm, I don't know about this one specifically.
18      Q. All right.
19      Did Mr. Ellison typically write letters to
20  customers himself?
21      MR. GIBBS:  Letters or e-mails?
22      MR. SOLOMON:  Write e-mails.  Fair enough.
23      Q. Did he typically write e-mails in a letter format
24  himself?
25      A. Uhm, he might.  More often somebody would draft

100

1    something for him.  But he might send it himself.  Cut and
2    paste from.
3        Q.  With this, and I appreciate you don't know, what
4    would your best guess be?  Would he have written this
5    himself or do you expect someone else would have done it?
6        MR. GIBBS:  Objection.  Calls for speculation.  Answer
7    if you can.
8        THE WITNESS:  It's not -- it doesn't seem like his
9    writing style so -- but that's not to say he wouldn't
10   have -- if somebody forwarded it to him and said would you
11   send this note, that he wouldn't send it himself.
12   BY MR. SOLOMON:
13       Q.  Could you have written this?
14       A.  Yes, it's possible.  Based on a draft from, again,
15   somebody who was close to the account.
16       Q.  Did you have access to Mr. Ellison's own e-mail?
17       A.  In the time period or?
18       Q.  Yes.  Yes.
19       A.  I don't generally have access to his e-mail.
20       Q.  Okay.  But did you in this time frame?  Late 2000,
21   early 2001?
22       A.  I don't know specifically.  From time to time in
23   the -- over the course of 14 years, there I have had his
24   password for discreet periods of time on occasion to send a
25   specific e-mail.  Maybe three or four times.

101

1        Q.  Okay.  Okay.
2            And his password tends to change, is that right?
3    He doesn't keep the same password?
4        A.  I don't know.  He's given it to me one piece at a
5    time a few times, so I assume he changes it afterward.
6        Q.  Okay.  And this e-mail address is
7    larryellison@oracle.com, right?
8        A.  Yes.
9        Q.  What other e-mail addresses does Mr. Ellison have?
10       A.  That's the only one that I know of.  At some point
11   our nomenclature changed where it was -- he was
12   lellison@us.oracle.com, and at some point we went to a
13   single instance and it changed to this so --
14       Q.  Okay.  Is he party to any other e-mail boxes?  Is
15   he an addressee on any other e-mail boxes at Oracle other
16   than larryellison@oracle.com?
17       MR. GIBBS:  Objection.  Vague.
18       THE WITNESS:  I'm not sure.
19   MR. SOLOMON:
20       Q.  Do you have departmental e-mail boxes at Oracle?
21       A.  No.
22       Q.  You don't?
23       A.  I guess I'm -- I'm saying no because I've never
24   heard of anything like that.  We each have our own
25   individual e-mail addresses.

102

1        Q.  Okay.  And have you ever heard, for example, of an
2    e-mail address such as hqapp?
3        A.  Oh, yes, yes, yes, yes.  So there are approval --
4    a few approval accounts.  So that there is a Larry approval
5    account, and this hqapp is for approvals that are handled
6    by a specific organization.
7        Q.  Okay.  Did you say "a Larry approval account"?
8        A.  Yes.  And the -- I'm trying to think of the name
9    of it.  At one point it was -- it was reqapps@Oracle.com.
10   And I think now it's -- I think it's larry.ellison_appr.
11   I'm not 100 percent certain of that.
12       Q.  Okay.  How long has he had those addresses?
13       A.  Now, he -- I need to clarify.  Those addresses
14   exist, but he doesn't have the passwords to those.  Those
15   are managed by me and the other folks in our office.  Those
16   two approval -- well, it's one approval account, the name
17   of which changed.
18       Q.  Okay.  So how long has he had those -- how long
19   has he been an addressee or a member of that e-mail box?
20       MR. GIBBS:  Objection.  Vague.
21       THE WITNESS:  I'm not sure how long they've existed.
22   It's an effort to not have to have approvals go into his
23   personal e-mail account, so I don't have to have e-mail
24   address.
25   BY MR. SOLOMON:

103

1        Q.  Okay.  So that's -- now, what about
2    anzapp_au@oracle.com?  Do you know what that means?
3        A.  The AU would probably mean Australia.
4        Q.  Okay.
5        A.  What was the beginning part of it?
6        Q.  Anzapp?
7        A.  Probably stands for Australia New Zealand
8    Approvals.
9        Q.  Okay.  Would Mr. Ellison be a party to that e-mail
10   address?
11       A.  No.
12       Q.  Okay.  What about rvmgrhlp@usoracle.com?
13       A.  Say again.  rvm?
14       Q.  Rvmgrhlp.
15       A.  I have no idea.  I could guess but --
16       Q.  What's your best guess, please?
17       A.  The "hlp" is probably help, and the "rvm" is
18   probably somebody's initials.
19       Q.  Okay.
20           As far as you know, Mr. Ellison has nothing to do
21   with that e-mail address?
22       A.  No.  No.
23       Q.  What about cag@usoracle.com?
24       A.  No idea.
25       Q.  Okay.  And crmopxqa_us@oracle.com?

104

1    A.  Again, I'd be guessing.  I'm not familiar with any
2    of these.
3    Q.  What's your best guess at that?
4    A.  It's c-r-m-o-p-s?
5    Q.  Yes.
6    A.  What was the end of it?
7    Q.  xqa underscore.
8    A.  My guess would be CRM operations QA.
9    Q.  Do you know if Mr. Ellison was a party to that
10   e-mail address?
11   A.  No, I can't imagine he was.
12   Q.  And what about revrec_US@oracle.com?
13   A.  I assume that's the revenue recognition team.  And
14   he wouldn't have anything to do with that.
15   Q.  Okay.  And what about nasinfo_US@oracle?
16   A.  Probably North America sales information.
17   Again -- is that an e-mail address or mailing list?
18   Q.  Yes.  It says -- well, I don't know.
19   Nasinfo_us@oracle.com.
20   A.  I'm sure it's some sort of North America sales.
21   Q.  With respect to the e-mail boxes that we've just
22   been talking about, would e-mails to recipients in those
23   e-mail boxes automatically be sent to their own personal
24   e-mail boxes?
25   MR. GIBBS:  Objection.  Vague.  Compound.  Lacks

105

1    foundation.
2    THE WITNESS:  The only address of those with which I'm
3    familiar, the list that you're talking about, not the two
4    approval e-mail addresses --
5    MR. SOLOMON:  Sure.
6    THE WITNESS:  -- is hqapp.  And it is its own -- at
7    least speaking currently, I believe it is its own e-mail
8    address, that the members of the team can log into that
9    e-mail address.  It -- to my knowledge it does not forward
10   from that to any of them.  They would log in -- log into
11   it.
12   BY MR. SOLOMON:
13   Q.  Okay.  And there wouldn't be any automatic
14   copying?
15   A.  No, I don't think so.
16   Q.  Okay.
17   Perhaps you could tell me what you know, if
18   anything, about the following addresses:
19   Apps -- apps-devmgrs@oracle -- @us.oracle.com.
20   A.  I would guess that would be application
21   development managers.  That sounds more like a mailing list
22   to me.
23   Q.  Okay.
24   Is there -- how do you know if it's a mailing
25   address or an e-mail box?

106

1    A.  I don't know for sure.  I'm literally guessing on
2    these but --
3    Q.  Okay.  And what about crm -- well, excuse me, I
4    don't want to repeat myself.
5    What about apps-dev-mcus@oracle.com.
6    A.  "mc" may be management committee.
7    Q.  Do you know if that's a list, a distribution list
8    or --
9    A.  I have no idea.
10   Q.  What about rvmgrhlp@us.oracle.com?
11   A.  That's the same one we talked about before, right?
12   Sounds like a "help" at the end, but I'm not --
13   Q.  Okay.
14   A.  -- the initials are not --
15   Q.  Okay.
16   A.  I would assume those are somebody's initials at
17   the beginning, but I don't know.
18   Q.  Okay.
19   And what about naavp@us.oracle.com?
20   A.  naavp?
21   Q.  naavp.
22   A.  No idea.
23   NA, I guess North America; but I don't...
24   Q.  So with respect to hqapp, it would not be the case
25   if someone had their own personal e-mail address and was

107

1    also a party to that e-mail address, the hqapps, it's not
2    the case that because an e-mail comes from one e-mail box,
3    that it necessarily is reflected in the other e-mail boxes?
4    MR. GIBBS:  Objection.  Vague.
5    THE WITNESS:  I don't know.  Because it's not my
6    e-mail address.  I was just giving you my best
7    understanding.
8    BY MR. SOLOMON:
9    Q.  Okay.  And your best understanding is that it
10   would not --
11   A.  That it's just an e-mail address like yours and
12   mine that they just can log into.
13   Q.  That's good.
14   Okay.
15   Did you experience any frustration with the
16   internal implementation of 11i at Oracle?
17   A.  I don't remember.
18   MR. SOLOMON:  Okay.
19   I'll have marked the next exhibit a document with
20   a control number 052474.
21   (Exhibit 43 was marked for identification.)
22   THE WITNESS:  Thank you.
23   Okay.
24   BY MR. SOLOMON:
25   Q.  Okay.  Do you recognize this?

Balkenhol, Carolyn  9/12/2006  9:15:00 AM

108

1  A. I don't recognize it.

2  Q. Any recollection of seeing it before?

3  A. No.

4  Q. Okay. And you'll see that it's dated the 4th of

5  December, 2000, and the subject is "WEBREQS is flaky."

6  A. Yes.

7  Q. What's WEBREQS?

8  A. I assume I'm referring to our online approval

9  workflow product.

10  Q. Okay. And you wrote "Let me know when it's

11  working, and I'll try to do approvals. Until then, I can't

12  tolerate it. Right now, it's booting me out when I click

13  on items in the worklist -- only SOME items" -- "SOME" is

14  in capitals. And then in capitals, "SOMETIMES let's me

15  review something -- sometimes in mid-approval it boots me

16  out -- your session is no longer valid -- and makes me log

17  in again. Sometimes it lets me log back in, sometimes not.

18  This is enough to make me go INSANE," capital, "Really."

19  Does that refresh your recollection as to whether or not

20  you experienced any frustration with the internal

21  implementation of is 11i at Oracle?

22  A. No.

23  Q. Did -- was the WEBREQS application in the 11i

24  upgrade?

25  A. I don't know what -- what version it was at this

109

1  point.

2  Q. Okay. Do you believe that this reflects

3  implementation of 11i technology?

4  A. I don't have any way of knowing that.

5  MR. SOLOMON: I've marked as the next exhibit a

6  document produced by the defendants in this litigation with

7  control numbers 063405 to -407.

8  (Exhibit 44 was marked for identification.)

9  THE REPORTER: It's 44.

10  THE WITNESS: Thank you.

11  Okay.

12  BY MR. SOLOMON:

13  Q. Okay. Do you recognize this?

14  A. I don't.

15  Q. Don't recall having seen this at all before?

16  A. No.

17  Q. Is your name on the distribution list?

18  A. I am on -- not on the primary --

19  Q. Okay.

20  A. -- note. I'm on the initial note that just

21  reminds people about the call.

22  Q. And that's where it says "cwuesten"?

23  A. Yes.

24  Q. Is that the correct spelling?

25  A. This is my -- this is prior to changing

110

1  nomenclatures. And my maiden name was Wuestenberg, so my

2  old e-mail address was cwuesten.

3  Q. Gotcha.

4  Did you keep e-mail addresses -- did you have two

5  e-mail addresses for a while or was it sequential?

6  A. I don't know exactly how it went at Oracle. I

7  think for a time if people used your old e-mail address it

8  would forward to your new one, but I don't know exactly how

9  they handled it.

10  Q. And you'll see that the document call -- talks

11  about generally a G.E. conference call?

12  A. Yes.

13  Q. And G.E. is an Oracle customer?

14  A. Yes.

15  Q. And do you remember being involved in setting up a

16  conference call as reflected here?

17  A. Not this one specifically.

18  Q. And you'll see that Kevin Miller wrote, "This is

19  likely going to be a rough call with the upgrade issues

20  they've encountered." Do you see that?

21  A. Yes.

22  Q. Do you recall there being a rough call with G.E.

23  at the end of 2000?

24  A. No.

25  Q. Do you recall any communications or exchanges with

111

1  G.E. in late 2000 or early 2001?

2  A. No.

3  MR. SOLOMON: So I've marked as the next exhibit a

4  document with the control number 014074.

5  (Exhibit 45 was marked for identification.)

6  THE WITNESS: Thank you.

7  Okay.

8  BY MR. SOLOMON:

9  Q. Okay. Have you ever seen this before?

10  A. I don't recall seeing it.

11  Q. Okay. Does this refresh your recollection in any

12  way concerning POSCO and its implementation of 11i?

13  A. No.

14  MR. SOLOMON: I've marked as the next exhibit a

15  document produced by the defendants with the control number

16  014075 and -76.

17  (Exhibit 46 was marked for identification.)

18  THE WITNESS: Thank you.

19  Yes.

20  BY MR. SOLOMON:

21  Q. Okay. Do you recognize these pages?

22  A. No.

23  Q. Okay. You'll see that it's -- first page is dated

24  Friday, January 5th, 2001, and it's from Larry Ellison to

25  George Roberts and you?

112

```
1       A.  Yes.
2       Q.  And his message is, "Here it is.  Lets (sic) get
3   it out today.  larry."  Do you see that?
4       A.  Yes.
5       Q.  And he's attached a draft letter to American
6   Greetings.  Do you see that?
7       A.  Yes.
8       Q.  Were you involved in preparing this letter to
9   American Greetings?
10      A.  I don't think so.
11      Q.  Okay.
12          Are you familiar in any way with the proposal
13  that's set forth there?
14      A.  No.
15      MR. SOLOMON:  And let's have marked as the next
16  exhibit another document produced by the defendants with
17  the control numbers 219294 to -296.
18      (Exhibit 47 was marked for identification.)
19      THE WITNESS:  Thank you.
20          Okay.
21      BY MR. SOLOMON:
22      Q.  Do you recognize this?
23      A.  No.
24      Q.  You don't recall having seen these pages or this
25  text before?
```

113

```
1       A.  No.
2       Q.  You'll see that it's dated January 5th, 2001.  At
3   the top it's from Safra Catz to you; and below that there
4   are communications among yourself, Sergio Giacoletto,
5   Andrew Derrer, Michele Delvaux, and Juan Rada, "Rada."  Do
6   you see that?
7       A.  Rada.  Yes.
8       Q.  First of all, who's Juan Rada?
9       A.  I believe he works for Sergio in Europe.
10      Q.  And there is an e-mail to you from Juan which
11  talks about the attached draft letter being a letter that's
12  going to be going from Larry, presumably Larry Ellison, to
13  Alison Hutchinson.  Is that your understanding?
14      A.  Yes, that's how it appears.  That he's proposing
15  that Larry send that.
16      Q.  Right.  It says in part, "A meeting around the
17  15th-16th of January is critical as Barclays want to review
18  the situation on January 19th at the next board meeting and
19  they might decide to re-visit alternative software
20  providers."  Do you see that?
21      A.  Yes.
22      Q.  Were you aware of this issue with Barclays in
23  January of 2001?
24      A.  Was I aware of it at the time?
25      Q.  Yes.
```

114

```
1       A.  Assuming I got this e-mail, yes.
2       Q.  But you don't remember?
3       A.  I don't remember.
4       Q.  Okay.
5          And it goes on to say, "This is even more critical
6   as yesterday we informed them that our, in quotes, 'get
7   well plan' has slipped significantly."  Do you see that?
8       A.  Yes.
9       Q.  What was the get well plan?
10      A.  I don't know.
11      Q.  And again, you don't remember today knowing that
12  the get well plan had slipped significantly in January
13  2001, but you would have known it in January 2001?  Is that
14  your testimony?
15      A.  If I received this e-mail, then, yes, I would have
16  read it.
17      Q.  Then it says, "I suggest that Larry takes the
18  initiative and fix, for example, the 15th or 16th of
19  January.  This will be a clear signal to Barclays and will
20  preempt any moves ahead of the Board meeting."  Do you see
21  that?
22      A.  Yes.
23      Q.  Do you know if Mr. Ellison did, in fact,
24  participate in the meeting as suggested here?
25      A.  I don't know.
```

115

```
1       Q.  And you then, apparently, at the top write to
2   Safra Catz and simply ask "Opinion?"  Right?
3       A.  Yes.
4       Q.  What were you looking for in terms of an opinion?
5       A.  I don't remember what I was thinking at the time.
6       MR. SOLOMON:  Okay.
7          I've produced (sic) as the next exhibit a
8   document produced by the defendants in this litigation with
9   the control numbers 039324 to -328.
10      (Exhibit 48 was marked for identification.)
11      THE WITNESS:  Thank you.
12          Okay.
13      BY MR. SOLOMON:
14      Q.  Recognize it?
15      A.  No.
16      Q.  Do you recall ever seeing any of the contents
17  before?
18      A.  No, I don't.
19      Q.  It's dated Friday, January 25th, 2001, and on the
20  second page -- excuse me -- on the first page it's dated
21  January 5th, 2001, and it involves exchanges among Michael
22  Cochran and Anil Vora at the bottom.
23      A.  Yes.
24      Q.  And attached on the next page are e-mail exchanges
25  involving George Roberts, Larry Ellison, Ron Wohl -- a
```

116

1   number of others including yourself.  Do you see that?
2       A.  Yes.
3       Q.  Do you know what Paxar is?
4       A.  Not independent of this e-mail.
5       Q.  Okay.  So having looked at the e-mail, you see the
6   name Paxar; and up until seeing that name -- until seeing
7   it here, you wouldn't have recognized it?
8       A.  No, I would not.
9       Q.  And you presumably are unaware of any 11i
10  implementation concerns that Paxar had?
11      A.  I was unaware of any.
12      Q.  Until you just read this?
13      A.  Yes.
14      Q.  And you don't remember being aware in 2001?
15      A.  No.
16      Q.  Can you tell me anything about the resolution, if
17  there was a resolution, of the issues raised by Paxar?
18      A.  I don't know.
19      Q.  Do you have any sense of how much money in 2000
20  and 2001 it cost Oracle to provide either free consulting
21  or other concessions to customers who were experiencing 11i
22  problems?
23      A.  No.
24      Q.  Were you aware during that time frame?  Would that
25  be a statistic you'd be aware of?

117

1       A.  No.
2       MR. SOLOMON:  We'll have marked as the next exhibit
3   another document produced by the defendants with the
4   control numbers 035280 through -282.
5       (Exhibit 49 was marked for identification.)
6       THE WITNESS:  Thank you.
7           Okay.
8       BY MR. SOLOMON:
9       Q.  Do you recognize this?
10      A.  No.
11      Q.  You don't recall ever having seen any of it
12  before?
13      A.  No.
14      Q.  You'll see that it contains e-mail exchanges among
15  Safra Catz, Mark Berrenechea, and Erich Winkler.  On the
16  second page you'll see there are a number of people's
17  e-mail addresses including yours.  Do you see that at
18  the --
19      A.  Yes.
20      Q.  -- bottom?
21          Were you aware in or around January 11, 2001, that
22  Mr. Berrenechea was still writing code, as appears to be
23  reflected here?
24      A.  Oh, that's not how I interpret this.
25      Q.  Okay.  How do you interpret this?

118

1       A.  Mark sends the -- assuming that this is as it
2   appears, Mark sends an agenda for the applications meeting
3   to all the people attending.
4       Q.  Uh-huh.
5       A.  To which Ron responds that he and his folks are
6   not going to participate.  And Mark is just making a
7   smart-aleck reply, smart-aleck comment to whomever it goes
8   to, Safra presumably, about how Ron's not coming.  So I
9   interpret that as Mark being smart alecky and saying Ron's
10  still coding.
11      Q.  So when he says, "Mark Berrenechea wrote" 'Can you
12  say I am still coding"?
13      A.  He's making a smart-aleck remark, as I interpret
14  it, about Ron.
15      Q.  Got it.
16          So let's put it another way.  Was Ron Wohl still
17  writing code in January of 2001?
18      MR. GIBBS:  Objection.  Vague.
19      (Ms. Daley rejoins proceedings.)
20      THE WITNESS:  I don't have any way of knowing that.
21      BY MR. SOLOMON:
22      Q.  And the "I am so pissed" reference, did you ever
23  discuss with Safra Catz around January of 2001 her upset
24  concerning these issues?
25      A.  I don't remember.

119

1       Q.  Did you discuss this with Larry Ellison?
2       A.  I don't remember, but I don't have any reason to
3   think I would have.
4       MR. SOLOMON:  I'll mark as the next exhibit a document
5   produced by the defendants with the control numbers 059876
6   to -879.
7       (Exhibit 50 was marked for identification.)
8       THE REPORTER:  It's No. 50.
9       THE WITNESS:  Thank you.
10          Okay.
11      BY MR. SOLOMON:
12      Q.  Do you recognize these exchanges?
13      A.  No.
14      Q.  You don't recall having seen them before?
15      A.  No, I don't.
16      Q.  You'll see that on the second page of the document
17  down towards the bottom there's reference that reads,
18  "However, CIO is not happy with Oracle at present."  Do you
19  see that?
20      A.  Yes.
21      Q.  And there's a list of problems that have been
22  reported with respect to 11i.  Do you see that?
23      A.  I see the list of problems.  They don't all.
24      Q.  Some of which include 11i?  Is that fair?
25      A.  Yes, according to this.

120

1    Q.  Were you aware, as of the beginning of 2002, that

2  this customer was experiencing these problems?

3    A.  No.

4    Q.  Were you involved in setting up the roundtable --

5  CEO roundtable meetings that Mr. Ellison used to host?  Do

6  you know what I'm talking about?

7    A.  In what period of time?

8    Q.  Again, the time frame is 2000, 2001.

9    A.  I'm not sure, but probably got involved at some

10  level.

11    Q.  Were they monthly, do you know?

12    A.  I don't think so.

13    Q.  Do you know what frequency?

14    A.  I don't know.

15    Q.  Did you attend any of them?

16    A.  I don't think so.

17  MR. SOLOMON:  Okay.

18    I've marked as the next exhibit a document

19  produced by the defendants in this litigation with the

20  control numbers 227927 through -939.

21  (Exhibit 51 was marked for identification.)

22  THE WITNESS:  Thank you.

23    Okay.

24  BY MR. SOLOMON:

25    Q.  Do you recognize this?

121

1    A.  No.

2    Q.  Do you recall seeing any of the contents before?

3    A.  No.

4    Q.  You'll see on the first page it's from Safra Catz

5  to you?

6    A.  Yes.

7    Q.  And it appears to forward the Papa John's e-mail,

8  Papa John's e-mails and correspondence.

9    A.  Yes.  But it's all kind of confusing to me.

10  Because I think maybe what she's saying is this last page,

11  "put George on the call list."

12    Q.  Okay.

13    A.  But I'm not positive.

14    Q.  Gotcha.

15    I guess my question is were you aware in early

16  2001 that Papa John's was reporting problems with

17  implementing 11i?

18    A.  Do I now remember being aware of it?  No.

19    Q.  Okay.

20    And if you go to what has control No. 227934 at

21  the bottom.

22    A.  Uh-huh.  Yes.

23    Q.  You'll see there's a paragraph entitled "Current

24  Situation."

25    A.  Yes.

122

1    Q.  Do the contents of that paragraph refresh your

2  recollection in any way concerning the problems that Papa

3  John's was experiencing?

4    A.  No.

5    Q.  Have you heard of Rockford Corporation?

6    A.  It doesn't sound familiar to me.

7    Q.  Rockford, R-o-c-k-f-o-r-d.

8    A.  It doesn't sound familiar.

9  MR. SOLOMON:  Let's mark this next exhibit a document

10  produced by the defendants with the control No. 100172.

11  (Exhibit 52 was marked for identification.)

12  THE WITNESS:  Thank you.

13    Okay.

14  BY MR. SOLOMON:

15    Q.  Do you recognize this?

16    A.  No.

17    Q.  You haven't seen it before?  Don't recall seeing

18  it before at least, correct?

19    A.  No, I don't.

20    Q.  And does it refresh your recollection concerning

21  events or -- excuse me.  Does it refresh any recollection

22  concerning Rockford's implementation of 11i?

23    A.  No.

24  MR. GIBBS:  Objection.  Lack of foundation.

25  BY MR. SOLOMON:

123

1    Q.  Does -- do you recall any complaint letter

2  emanating from Rockford Corporation?

3    A.  No.

4  MR. SOLOMON:  Have marked as the next exhibit another

5  document produced by Oracle, the defendants, with the

6  control numbers 059839 through -842.

7  (Exhibit 53 was marked for identification.)

8  THE WITNESS:  Thank you.

9    Okay.

10  BY MR. SOLOMON:

11    Q.  Do you recognize any of this?

12    A.  No.

13    Q.  Don't recall ever seeing the contents before?

14    A.  No.

15    Q.  And you'll see on the first page it's dated

16  May 22nd, 2002, from Susan Marks to you.  Do you see that?

17    A.  Yes.

18    Q.  And then there's -- below that, dated May 15,

19  2002, are e-mail exchanges involving, among others, Susan

20  Marks, Lisa Pope, Joyce Higashi, George Roberts, Ron Wohl,

21  Evelyn Low, Elizabeth Hornberger.  Do you see that?

22    A.  Yes.

23    Q.  Who is Elizabeth Hornberger?

24    A.  She was George Roberts' assistant.

25    Q.  And Evelyn Low?

124

1      A.  Evelyn was Ron's assistant.
2      Q.  If you go to the third page of the exhibit,
3  there's a reference to NCR a quarter of the way down the
4  page, "Howard Lance, president of NCR."  Do you see that?
5      A.  Yes.
6      Q.  Do you know who Howard Lance is?
7      A.  No.
8      Q.  Do you know what NCR is?
9      A.  No.
10      Q.  Do you see there's a reference to product issues
11  causing a go-live date in Australia to slip.  Do you see
12  those?
13      A.  Yes.
14      Q.  Do you know anything about that?
15      A.  No, I don't.
16      Q.  Have you ever heard of a company called Mastec?
17      A.  It doesn't sound familiar to me.
18      Q.  M-a-s-t-e-c?
19      A.  No.
20      MR. SOLOMON:  Okay.  Let's take a ten-minute break.
21  Off the record.
22      THE VIDEOGRAPHER:  We are going off the record.  The
23  time is 2:09 p.m.  Here marks the end of Videotape No. 2 in
24  the deposition of Carolyn Balkenhol.
25      (Recess taken.)

125

1      THE VIDEOGRAPHER:  We are back on the record.  The
2  time is 2:26 p.m.  Here marks the beginning of Videotape 3
3  in the deposition of Carolyn Balkenhol.
4      MR. SOLOMON:  Okay.  We'll have marked as the next
5  exhibit a document produced by the defendants with the
6  control numbers 296385 through -399.
7      (Exhibit 54 was marked for identification.)
8      THE WITNESS:  Thank you.
9      Okay.
10      BY MR. SOLOMON:
11      Q.  Okay.  Do you recognize this?
12      A.  No.
13      Q.  Have you ever -- you've never seen it before?
14      A.  No, I have not.
15      Q.  You were interviewed by the Special Litigation
16  Committee in connection with the derivative lawsuit,
17  correct?
18      A.  Yes, I -- well, I don't know -- I couldn't be sure
19  if it was with the derivative, but I was interviewed by the
20  Special Litigation Committee.
21      Q.  You've had a chance to review this?
22      A.  Just in my scan of it now.
23      Q.  All right.  And is this accurate?
24      A.  Without --
25      MR. GIBBS:  Objection.  Vague.  Compound.

126

1      Answer if you can.
2      THE WITNESS:  Without going point by point, it is
3  generally accurate as I remember.
4      BY MR. SOLOMON:
5      Q.  Are there any inaccuracies that you can comment
6  upon?
7      A.  I saw some as I went through.  But I didn't mark
8  them.
9      Q.  Okay.  I hate to put you through the exercise, but
10  if you could let me know --
11      A.  Okay.
12      Q.  -- if you can identify --
13      A.  The NASA space station on the first page, it
14  wasn't.  It was actually an end effector to build a space
15  station, it wasn't the space station itself.
16      Q.  Okay.
17      A.  We don't refer to executive assistants as personal
18  assistants.
19      Q.  Okay.
20      A.  We refer to them as executive assistants.
21      Q.  Okay.
22      A.  Those were the most obvious, very blatant errors
23  that I saw.
24      Q.  Okay.  If we go to page 3.
25      A.  Yes.

127

1      Q.  Looking at the section on e-mail sent to Ellison?
2      A.  Yes.
3      Q.  There's a footnote there.  It says, "Balkenhol
4  recalled being out of the office for three days and
5  receiving 260 e-mails during that time.  She speculated
6  that Ellison receives more e-mails than she does given that
7  anyone can figure out his e-mail address."  Did you say
8  that to the Special Litigation Committee?
9      A.  I don't remember.
10      Q.  Does it seem accurate to you?
11      MR. GIBBS:  Accurate that she speculated that?
12      BY MR. SOLOMON:
13      Q.  Does it seem accurate that you would have made
14  that speculation?
15      A.  It's possible.
16      Q.  Okay.  Does it appear accurate that you received
17  260 e-mails in the three days you were out?
18      A.  I don't remember at that time how many e-mails I
19  got.
20      Q.  Now, in that paragraph it says, "For example,
21  Ellison annually proposes a list of employee option grants
22  to Catz."  Do you see that?
23      A.  Yes.
24      Q.  Is that accurate?
25      A.  I'm not sure that is entirely accurate.

128

1  Q.  Can you pinpoint what may be inaccurate?

2  A.  I just don't know that it's that consistent, that

3  that's exactly how it happens.

4  Q.  Okay.  So I'm now on the next page.  "E-mails Sent

5  From Ellison."

6  A.  Yes.

7  Q.  It says that you implement many of the e-mail

8  communications from Ellison, and I'm assuming from that

9  that -- well, first of all, let's ask the question:  Is

10  that right?

11  MR. GIBBS:  Objection.  Vague.

12  BY MR. SOLOMON:

13  Q.  Do you implement many e-mail communications from

14  Ellison?

15  A.  We're talking about at the time?

16  Q.  Yes, we are.

17  A.  I don't remember -- I'm not sure what I mean --

18  what they mean by many and --

19  Q.  Okay.

20  It says, "In addition, while Ellison usually

21  responds to his own e-mails, he occasionally asks Balkenhol

22  to send a responsive e-mail on his behalf or to draft an

23  e-mail response on his behalf and send it to him for his

24  review so that he can sign it out."  Is that accurate?

25  A.  Yes.

129

1  Q.  "He does not dictate letters or e-mail."  Is that

2  accurate?

3  A.  Back then?

4  Q.  Yes.

5  A.  I'm not sure of the timing.  I can think of maybe

6  one time when he has said send an e-mail that -- you know,

7  but that's if he's in the car and I'm at e-mail.  I'm on

8  e-mail.

9  Q.  Now, to page 7, which is 296392.  It's headed

10  "Ellison's Practices."  And sub a., "E-mail."  "The

11  Committee learned from Ellison that he deletes his e-mail

12  file at the end of each day."  Do you know if that's true?

13  A.  I don't even know what that means.  His e-mail

14  file.  I'm not sure what they -- what they mean.

15  Q.  You have no knowledge of Mr. Ellison deleting his

16  e-mail file on a daily basis?

17  A.  No, I don't know what he does.

18  Q.  Then it goes on to say, "The Committee has also

19  learned that Ellison purges his deleted e-mails folder

20  before Oracle runs its internal back-up system, which would

21  save e-mails that he would have deleted."  Do you have any

22  knowledge of that?

23  A.  No, I don't.

24  Q.  "Requesting Company Financial Information."  Do

25  you see that?

130

1  A.  Yes.

2  Q.  It says, "Balkenhol stated that if Ellison wants

3  information on Oracle's financial performance, he would

4  contact Henley, Minton, Catz or Roberts directly, he would

5  not go through her."  Do you see that?  Is that accurate?

6  A.  I don't know why Roberts would be included in

7  there.  If assuming that refers to George Roberts, he's in

8  sales so...but Jeff Henley was our CFO, and Jennifer Minton

9  was controller; so, yes, I would imagine that's accurate.

10  Q.  Okay.  "c. Receiving Company Financial

11  Information."  "Balkenhol recalled that Ellison receives

12  the Executive Committee Meeting reports before each Monday

13  EMC call."  Is that accurate?

14  A.  Yes, generally.

15  Q.  "She said that the reports are distributed to the

16  rest of the Executive Committee at the Monday meeting and

17  that company practice after each meeting is to shred the

18  documents."  Is that accurate?

19  A.  I don't know that I would say company practice.

20  If there are reports left in the boardroom, then we in our

21  office would shred what was there.

22  Q.  Do you have a shredder in your office?

23  A.  In our -- yes, in our -- the area where our

24  offices are.

25  Here's another error, actually.

131

1  Q.  Yes, please tell me.

2  A.  In part "d. Balkenhol stated that someone in

3  investor relations" --

4  Q.  Yes?

5  A.  -- that would more likely be public relations.

6  Q.  Okay.  There's a distinction between investor

7  relations and public relations?

8  A.  Yes.

9  Q.  And they're different departments?

10  A.  Yes.

11  Q.  Is one geared to one particular aspect of the

12  company and one's geared to another?  Can you describe it

13  to me.

14  A.  Investor relations deals with investors and

15  reports up through the finance organization, and -- or at

16  the time did.  And public relations reports up through

17  marketing and would deal with the press.

18  Q.  Do you know what OSO is?

19  A.  I think it's Oracle Sales Online.

20  Q.  Okay.  And what is the function of OSO?

21  MR. GIBBS:  Objection.  Lack of foundation.

22  THE WITNESS:  I have a very vague knowledge, but I

23  don't myself use it so --

24  BY MR. SOLOMON:

25  Q.  What's your vague knowledge?

132

1  A. I think it's our sales for our online sales tool.
2  Q. But you don't use it so you can't testify as to
3  its capabilities; is that right?
4  A. No, I've never used it.
5  Q. "Relationship with Phil Simon" is on page 8 of the
6  documents. Control number is 296393. "Balkenhol -- excuse
7  me, "has a close working relationship with Philip Simon."
8  Is it fair to say it was truer then than it is now?
9  A. Yes. Though I wouldn't say we have a nonclose
10  relationship, we just don't have -- we don't have as much
11  to talk about.
12  Q. It goes on to say, "Both Balkenhol and Simon have
13  significant authority from Ellison and they rely on one
14  another for the other's guidance about decisions involving
15  Ellison's finances."
16  A. As of the time.
17  Q. As of the time.
18  A. Yes.
19  Q. "Neither" -- I am skipping a sentence. It goes on
20  to say, "Neither Balkenhol nor Simon calls the other
21  regarding Oracle matters; they rely on each other's
22  guidance about Ellison's personal matters." Is that true?
23  A. Yes. The only time that Oracle would be involved
24  with something with Philip would be this overlap where he's
25  selling stock and there's some corporate involvement.

133

1  Q. It says, "Simon typically communicates to Ellison
2  through Balkenhol." Is that true?
3  A. At the time, yes. I believe so.
4  Q. It goes on to say, "Simon prefers to communicate
5  directly with Ellison infrequently so that he commands
6  Ellison's full attention when he decides to contact him
7  directly." Is that true?
8  A. I don't know what Philip -- you know, this is
9  regarding Philip's preference. I couldn't speak to that.
10  Q. He never expressed it to you or shared it with
11  you?
12  A. No, I don't think so.
13  Q. I'm looking now on page 9, control number 296364.
14  A third of the way down the page there's a sentence that
15  reads, "Balkenhol recalled being relieved when Ellison
16  decided to exercise and sell these options because she knew
17  Simon was anxious to have Ellison exercise the options
18  before they expired and pay down some of his bank debt."
19  Is that true?
20  A. I'm not sure that I was relieved because of how
21  Philip would feel, but it was good to have the debt paid
22  down.
23  Q. It's always good to have debt paid down.
24  A. Exactly.
25  Q. "Balkenhol never discussed with Ellison his

134

1  motivations for trading, she only arranged his
2  communications with Simon or relay updates from Simon to
3  Ellison." I think he meant "relayed," but is that
4  accurate?
5  A. From what I remember, yes.
6  Q. And now we're looking at the section below sub
7  "a., Balkenhol's December 18, 2000 E-Mail." Down at the
8  bottom it refers to your speculation. So, "she speculated
9  that either (1) at the time, either Ellison or Simon took
10  the position that Ellison would exercise and hold his
11  options, or (2) she might have inadvertently typed the
12  wrong dates on the e-mail because Ellison was out of town
13  on vacation for the remainder of December 2000." Is that
14  accurate?
15  A. I don't remember.
16  Q. Does seeing this refresh any recollection that
17  Mr. Ellison was out of town at the end of December?
18  A. It doesn't. I see that it says that, but I don't
19  remember whether he was or wasn't.
20  Q. Okay. Then there's a reference to your trading
21  history. You'd been granted some Oracle stock options in
22  the past; is that right?
23  A. Yes.
24  Q. Have you ever purchased Oracle stock on the open
25  market?

135

1  A. I myself have not. I don't know if my husband
2  has. But I don't believe so.
3  Q. Okay.
4  When did your husband start at Oracle?
5  A. I think January of 2000.
6  Q. Now, it says here that you recall selling some
7  Oracle stock in 1994 in order to pay for a new house. Do
8  you see that?
9  A. Yes.
10  Q. Is that accurate?
11  A. I don't remember.
12  Q. Then it says, "In March of 2001 and again in late
13  2001, they sold more stock, but she could not recall their
14  motivations for these sales." Is that accurate?
15  A. I don't -- I don't remember.
16  Q. Now, on the 11 -- page 11, which is control number
17  296396, there's a sentence that reads, "Although she was
18  aware that Oracle historically booked most of its deals in
19  the final days of the quarter, Balkenhol had never heard
20  the term 'hockey-stick effect' used to describe the
21  phenomenon." Do you see that?
22  A. Yes, I --
23  Q. Is that accurate?
24  A. I don't remember hearing hockey-stick effect.
25  Q. Okay.

Balkenhol, Carolyn  9/12/2006  9:15:00 AM

136

1     Then the next paragraph reads, "Balkenhol stated
2  that the final days of the quarter are currently less
3  frantic than the final days of Q3 of FY01.  She explained
4  that Ray Lane, former president of the company, was a big
5  proponent of closing most deals in the last...days of the
6  quarter.  However, since Lane's resignation in the summer
7  of 2000, Oracle has been slowly moving away from that
8  method of selling."  Do you see that?
9     A.  Yes.
10    Q.  Is that accurate?
11    A.  There are different pieces of it.  I don't
12  remember -- I don't remember the final days of Q3 of FY01,
13  but it is true that Ray liked to -- liked the quarter end
14  frantic activity.
15    Q.  You apparently singled out Ray Lane.  Are there
16  other individuals -- were there other individuals at Oracle
17  who shared that same philosophy?
18    A.  I don't know.
19    Q.  Were you friendly with Ray Lane when he was with
20  the company?
21    A.  Yes.
22    Q.  Did you stay in touch with him after he left?
23    A.  No.
24    Q.  Do you know if he was fired or not?
25    A.  No.

137

1     Q.  You don't know one way or the other?
2     A.  I don't know.
3     Q.  Did you witness exchanges between Mr. Ellison and
4  Mr. Lane?
5     MR. GIBBS:  Objection.  Vague.
6     THE WITNESS:  Over the course of time, sure, I saw
7  them talk all the time.
8     BY MR. SOLOMON:
9     Q.  Okay.  And were there heated exchanges at all
10  prior to his departure?
11    A.  I don't recall any heated exchanges between the
12  two of them.
13    Q.  Did you ever hear of an investigation by the
14  finance and audit committee into Mr. Nussbaum's selling
15  practices?
16    A.  No.
17    Q.  So, as you sit here, you have no knowledge of any
18  such investigation?
19    A.  No.
20    Q.  Okay.
21       "Q3 of FY01."  It says, "Balkenhol explained that
22  Q3 of FY01 was 'unremarkable' in her mind and that she
23  would remember if the mood in the Executive Suite was
24  anything other than optimistic."  Do you see that?
25    A.  Yes.

138

1     Q.  Is that accurate?
2     A.  Yes, it's accurate.  I don't remember anything
3  remarkable about it.
4     Q.  Okay.  And you don't consider a billion dollars of
5  stock sales remarkable?
6     MR. GIBBS:  Objection.  Argumentative.
7     MR. SOLOMON:  You can answer.
8     THE WITNESS:  But this is talking about Q3.  I would
9  not -- I would not connect Larry's stock sales with the
10  quarter.  If we're talking about Q3, I'd assume we're
11  talking about Oracle and Oracle sales.
12    BY MR. SOLOMON:
13    Q.  Okay.  And what about the earnings miss and the
14  stock price decline?  Would that not be a remarkable event
15  for Q3 of '01?
16    A.  But that wouldn't be in Q3, right?  I mean, this
17  is talking about the quarter itself, and the announcement
18  would be after the quarter.
19    Q.  Okay.
20    A.  So I'm talking about the quarter itself.
21    Q.  Okay.
22       And why do you separate out the selling from
23  describing what the quarter was like?
24    MR. GIBBS:  Objection.  Vague.
25    THE WITNESS:  Because if we're -- if they're asking

139

1  about how the quarter is progressing, what Larry was doing
2  would have been his own personal finances, wouldn't be any
3  more relevant than what I'm -- you know, what I or any
4  other shareholder is doing.  So I assume when they're
5  talking about the quarter, they're asking about sales and
6  Oracle business.
7     BY MR. SOLOMON:
8     Q.  And do you remember whether that is exactly how
9  they asked the question?
10    A.  I don't remember.
11    Q.  "She stated that Ellison is" constantly (sic)
12  "optimistic about Oracle's prospects despite the state of
13  the economy."  Is that accurate?
14    A.  I'm not sure what I would have said about the
15  economy; but, yes, Larry is always optimistic about Oracle.
16    Q.  So whether he has negative news or not, negative
17  information, he's always optimistic?
18    MR. GIBBS:  Objection.  Argumentative.
19    THE WITNESS:  I guess I don't -- I'm not sure what you
20  mean.  He believes in Oracle.  He always believes in
21  Oracle.
22    BY MR. SOLOMON:
23    Q.  Since -- next line says, "According to Balkenhol,
24  only very recently has Ellison adopted a more conservative
25  attitude toward the company due to the economy."  Is that

Balkenhol, Carolyn  9/12/2006  9:15:00 AM

140

1  accurate?
2      A.  I'm not even sure what that means.
3      Q.  And since you don't know what it means, you can't
4  say whether it's accurate or not?
5      A.  Yeah.  I'm not sure what they're trying to say.
6      Q.  Now, you say, "According to Balkenhol" -- I'm
7  going over to the next page, page 12 at the top -- "if
8  Oracle management knew that the company was going to miss
9  its numbers, Henley would have disclosed that information
10  to the public.'  Do you see that?
11      A.  Yes.
12      Q.  Now, you're stating your belief that Mr. Henley
13  wouldn't engage in securities fraud; is that right?
14      MR. GIBBS:  Objection.  Argumentative.
15      THE WITNESS:  I don't know what I was thinking at the
16  time; but, yes, that's -- appears to me that I'm saying
17  Jeff always would have been honest about what was
18  happening.
19      BY MR. SOLOMON:
20      Q.  Are you aware that he sold stock in January of
21  2001?
22      A.  No.
23      Q.  Just skipping a few lines, "Balkenhol did not
24  recall any discussions attributing the shortfall to a
25  specific problem within the company.  When asked about the

141

1  Covisint deal, Balkenhol recalled the deal but did not
2  remember any details about it."
3      A.  Yes.
4      Q.  Is that accurate?
5      A.  Yes.
6      Q.  And do you today recall any of the details about
7  the Covisint -- or "Covisint" -- or however it's
8  pronounced -- deal?
9      A.  No.  I just remember that Covisint was one that
10  was in play.
11      Q.  Was Mr. Ellison excited about the Covisint deal?
12      A.  I don't remember.
13      Q.  Is Mr. Ellison excitable?
14      A.  I would not call him excitable.
15      Q.  What would you call him?
16      A.  In what?  Can you narrow it for me?  What do you
17  mean?
18      Q.  Is he very calm in the work context?  If not
19  excitable, I'm going to the other extreme now.
20      A.  I don't know that I've ever thought about it.
21      Q.  Is he a tough boss?
22      A.  Uhm, I wouldn't call him tough.
23      Q.  Is he fair?
24      A.  Yes.
25      Q.  Now, on Ellison's Q3 FY01 calendar" it says,

142

1  "Balkenhol was asked to review her calendar of Ellison's
2  schedule during Q3 of FY01."  Then it says, "Ellison was
3  away on vacation for the Christmas holidays."  I expect you
4  don't recall that?
5      A.  I don't.
6      Q.  It goes on to say, "On January 8, 2001, Ellison
7  attended the quarterly board meeting at Oracle's
8  headquarters in Redwood Shores and had normal business
9  meetings and speaking engagements until January 21, when he
10  spent a few days on his boat."  Is that accurate?
11      A.  I don't remember.
12      Q.  Then it says, "After returning to Redwood Shores,
13  Ellison spent the remainder of January at customer visits
14  and product meetings."  Is that accurate?
15      A.  I don't remember.
16      Q.  It goes on to say, "On February 2, Ellison had a
17  meeting with The GAP about a possible deal."  Is that
18  accurate?
19      A.  I don't remember.
20      Q.  Okay.  On February -- it goes on to say, "On
21  February 6, Ellison hosted a CEO roundtable."  Is that
22  accurate?
23      A.  I don't remember that either.
24      Q.  "On February 7th Ellison went to New York and then
25  on to London."  Do you know if that's accurate?

143

1      A.  I don't know.
2      Q.  Is it fair to say you can't confirm any of the
3  details in that paragraph?
4      A.  Yes, that's fair.
5      Q.  With respect to -- I'm now on page 13, control
6  number is 296398.  It's a reference to e-mail review.
7      A.  Yes.
8      Q.  And the last sentence reads, "Regarding e-mails
9  from Phil Simon, she reiterated that she was copied on them
10  for informational purposes, but she did not keep a file of
11  those e-mails."  Do you see that?
12      A.  Yes.
13      Q.  Let's just talk about your own e-mail address for
14  a little bit.  Did you have a practice of deleting e-mails
15  on any regular basis?
16      A.  Back then my general practice is to delete them
17  unless I need to keep them for some other purpose.
18      Q.  Okay.  And when you say your practice is to delete
19  them, is that just throughout the day?
20      A.  Yes.
21      Q.  And are there types of e-mail that you typically
22  do not delete?
23      A.  Yes.  I would not delete something that was
24  pending an action from me, where I needed to reveiew it,
25  or something that had backup for a meeting that was going

144

1  to be taking place.  An approval that I felt the approval
2  needed to be retained or documents being retained as
3  requested by the legal department.
4      Q.  And do you have more than one e-mail address?
5      A.  No.  Well, the approval accounts I would generally
6  consider to be my -- my e-mail addresses.
7      Q.  Okay.  So there would be two addresses?
8      A.  Because I -- yes.  So the approval account, which
9  would be accessed by me; or at the time, I guess, Susan
10  Marks, to pull the e-mails out of there to review with
11  Larry.
12      Q.  Okay.  And is it right that by definition those
13  approval accounts would only be utilized by people within
14  Oracle?
15      A.  Yes.
16      Q.  Have you seen occasions when nonapproval-type
17  e-mails have nonetheless been sent to the approval account
18  e-mail?
19      A.  Not that I can recall.  They're pretty obscure
20  e-mail addresses, you'd have to try pretty hard to find
21  them.
22      Q.  And was there a time when you received an
23  instruction to preserve documents in connection with this
24  litigation?
25      A.  I don't recall specifically, but I certainly

145

1  receive them periodically based on whatever litigation or
2  whatever proceedings are going on.
3      Q.  And have you preserved, since March of 2001, all
4  of the documents that you had in your possession that
5  concerned the second half of 2000 and the beginning of 2001
6  at Oracle?
7      MR. GIBBS:  Objection.  Lack of foundation.
8      THE WITNESS:  I don't recall specifically, but if I
9  received the notice from the legal department with the
10  document retention request, then I would certainly have
11  gone through and retained any e-mails that I needed to
12  retain.
13      BY MR. SOLOMON:
14      Q.  Is that the sort of thing you're diligent about?
15      A.  Yes.
16      Q.  And what about Mr. Ellison's conduct in response
17  to preservation instructions?  Were you involved at all?
18      A.  The only piece of it that I would be involved in
19  would be sending something down to the house for people to
20  see if there are any hard copy documents that were
21  responsive to send those to us.
22      Q.  And do you know if in the context of this
23  litigation you went and sent someone to his house to get
24  hard copy documents?
25      A.  I don't remember specifically, but that would be

146

1  my practice.
2      Q.  Okay.  Would there be a record of that, if you did
3  that?  Would there be some way we could ascertain that?
4      A.  I don't know.
5      Q.  And what about his various computers?  Would you
6  be involved in ensuring that computer information was
7  preserved?
8      A.  I don't remember specifically back in -- back in
9  2000, 2001; but generally, yes.
10      Q.  Do you know what computers other than the computer
11  in his office he has?
12      MR. GIBBS:  Now?
13      MR. SOLOMON:  Then.  Thank you.
14      THE WITNESS:  At that time?  He would certainly have
15  had a computer at home, and I believe he had a computer in
16  his San Francisco house.  Beyond that I'm not certain.
17      BY MR. SOLOMON:
18      Q.  Does he have properties overseas?
19      A.  No.  None that I know of.
20      Q.  Other than floating ones.
21      And he has computers on his boats?
22      A.  In 2000 is the time period, right?  I believe he
23  would have a computer on the boat, but I don't remember --
24  I don't remember which boat.
25      Q.  Okay.  And, again, you don't have any recollection

147

1  of what was done in this case with respect to computers --
2      A.  No, I don't.
3      Q.  Suite 11i.  It says, "Balkenhol could not recall
4  any specific problems with Suite 11i."  Is that right?
5      A.  Yes.
6      Q.  Then it goes on to say, "She typically receives
7  phone calls from both satisfied and unsatisfied customers
8  about all of Oracle's products."  Do you see that?
9      A.  Yes.
10      Q.  Is that right?
11      A.  Yes.
12      Q.  Did you receive phone calls from unsatisfied
13  customers concerning 11i?
14      MR. GIBBS:  Objection.  Vague.
15      THE WITNESS:  I don't remember any specific phone
16  calls.
17      BY MR. SOLOMON:
18      Q.  Okay.  So, again, it's not you're saying there
19  weren't or there were, you just don't recall?  Is that
20  fair?
21      A.  Yes.
22      Q.  It goes on to say, "Balkenhol stated that analysts
23  are always quick to report a product does not work properly
24  and that their opinions were the only strongly negative
25  opinions about Suite 11i that she has ever heard."  Do you

148

1   see that?
2   A.  Yes.
3   Q.  Did you say that?
4   A.  I don't remember saying that.
5   Q.  Did you follow up at the time what analysts were
6   saying about 11i?
7   A.  I don't know.  I don't think so.  I would have
8   seen reports as they crossed my desk, but I wouldn't have
9   studied them.
10   Q.  "$1 Billion Savings" is the next heading; and it
11   says, "Balkenhol recalled $1 Billion Savings campaign."  Is
12   that true, you recalled it?
13   A.  I do.  I do remember the campaign.
14   Q.  On the page -- I'm skipping a sentence.  It says,
15   "Balkenhol was not aware of any substantive study on the
16   $1 Billion Savings."  Is that right?
17   A.  Yes.  I'm not aware of any.
18   Q.  Were you involved in any way in ascertaining what
19   savings were attributable to the implementation of 11i at
20   Oracle?
21   A.  No.
22   Q.  And do you have any personal knowledge whether or
23   not that $1 Billion Savings statement was accurate?
24   A.  No.
25   Q.  "Final Thoughts."  "Balkenhol summarized her role

149

1   as the nuts and bolts of Ellison's day-to-day professional
2   life."  Is that right?
3   A.  Yes.  Back then.  Right?  We're talking about --
4   Q.  "She described herself as efficient and effective
5   in this role."  Did you do that?
6   A.  I don't remember saying that, but --
7   Q.  "She was confident she'd remember if any
8   remarkable or unusual circumstances occurred during Q3 of
9   FY01."  Is that right?
10   A.  Yes, I believe so.
11   Q.  Does Mr. Ellison get involved in negotiating
12   deals -- strike that.
13       In the time frame calendar 2000 and early 2001,
14   was Mr. Ellison involved in negotiating deals with Oracle's
15   customers?
16   A.  I don't believe so.
17   Q.  And what's the basis for you not believing so?
18   A.  Because Safra's a better negotiator.
19   Q.  I didn't quite -- because Safra?
20   A.  Because Safra is a better negotiator.
21   Q.  So are you saying, then, that after Safra arrived
22   he negotiated less?
23   MR. GIBBS:  Objection.  Lacks foundation.
24   THE WITNESS:  I don't believe Larry ever negotiated
25   very much.

150

1   BY MR. SOLOMON:
2   Q.  Do you recall any instances when he did?
3   A.  No.
4   MR. SOLOMON:  Okay.  Let's take a five-minute break.
5   Go off the record, please.
6   THE VIDEOGRAPHER:  Off the record.  The time is
7   3:12 p.m.
8   (Recess taken.)
9   THE VIDEOGRAPHER:  We are back on the record.  The
10   time is 3:23 p.m.
11   MR. SOLOMON:  Thank you.
12       We'll have marked as the next exhibit a document
13   produced by the defendants with the control numbers 026987
14   and -88.
15   (Exhibit 55 was marked for identification.)
16   THE REPORTER:  It's 55.
17   THE WITNESS:  Thank you.
18       Okay.
19   BY MR. SOLOMON:
20   Q.  Do you recognize these pages?
21   A.  I don't.
22   Q.  You don't recall ever seeing these exchanges
23   before?
24   A.  No.
25   Q.  You'll see that there's a message on the bottom of

151

1   the first page "Get me off the sales distribution lists."
2   Do you see that?
3   A.  Yes.
4   Q.  Dated October 5th, 2000, from Larry Ellison to
5   you.
6   A.  Yes.
7   Q.  And he says, "Get me off the sales distribution
8   lists."  Do you know what he's referring to?
9   A.  I don't recall, but I think what he's -- I think
10   he is on one of these distribution lists that this person
11   Mary sends the note to.  So either "allsales_us" or
12   "sales_us" or "ww_sales_us."  And he doesn't want to be on
13   those lists anymore so he doesn't.
14   Q.  Is it fair to say that as of the date of this,
15   which is the 5th of October, 2000, that then Mr. Ellison
16   was a recipient of e-mails that were addressed to those
17   e-mail addresses?
18   MR. GIBBS:  Objection.  Compound.
19   THE WITNESS:  I couldn't say that for certain; but
20   looking at it, it appears as though he's on at least one of
21   these lists to which he's sending this note.
22   BY MR. SOLOMON:
23   Q.  Okay.  And you then write to Rudolph -- Obispo?
24   A.  Yes.
25   Q.  And to Sue Bachman and Joyce Higashi, correct?

152

1    A.  Yes.  That's what it looks like.
2    Q.  And you say, "Can you do this?  If not, can you at
3    least get me a list of all the distribution lists Larry's
4    on, and descriptions of each, so I can get him off those he
5    doesn't want."  Do you see that?
6    A.  Yes.
7    Q.  Did you get a response to your request for a list?
8    A.  I don't remember.
9    Q.  Okay.
10       And do you remember whether or not his instruction
11   was carried out?
12   A.  I don't.
13   Q.  And, obviously, since you don't, you couldn't tell
14   me when?
15   A.  Correct.
16   Q.  Do you know if these e-mail addresses were
17   searched in connection with this litigation to find
18   documents that Larry Ellison would have seen?
19       MR. GIBBS:  Objection.  Lacks foundation.
20       THE WITNESS:  I don't believe that these are e-mail
21   addresses.  I believe that these are distribution lists,
22   which are comprised of a series of e-mail addresses such
23   that when you send an e-mail to it, it sends the e-mail out
24   to a group of people.
25       BY MR. SOLOMON:

153

1    Q.  Okay.  And then where would it be received?
2    A.  The individuals who are on that list.
3    Q.  Would receive the e-mails in their own individual
4    e-mail box?  Is that what you're saying?
5    A.  Yes.
6    Q.  So, for example, when Mr. Ellison says, "get me
7    off the list," he is talking about lists that would have
8    him as a distributee but any e-mail would go to his
9    personal e-mail box?
10   A.  Yes, that's the way I read this e-mail.
11       MR. SOLOMON:  I'm going to mark as the next exhibit a
12   document produced by the defendants in this litigation with
13   control numbers 098462 to -64.
14       (Exhibit 56 was marked for identification.)
15       THE WITNESS:  Thank you.
16       Okay.
17       BY MR. SOLOMON:
18   Q.  Do you recognize this?
19   A.  I'm sorry?
20   Q.  Do you recognize this?
21   A.  I do.
22   Q.  That's a first.
23       What is this?
24   A.  I believe that it is a document in VMS that we
25   used to keep with our list of things to ask Larry --

154

1    Q.  Okay.  And VMS is?
2    A.  -- about business meetings.
3    Q.  Sorry.  And VMS is?
4    A.  A very old operating system.
5    Q.  And who would make the entries that I see here?
6    A.  I'm not sure at the time, but most likely me and
7    any other assistants who were there at the time.  I think
8    it was probably Joyce and -- end of 2000.  Joyce, maybe
9    Sue, but most likely me.
10   Q.  And how do you decide what goes onto this list?
11   A.  Uhm, putting myself back in the time, it would be
12   a question that I needed to ask Larry.
13   Q.  Okay.  And this seems to -- at least as part of
14   the document appears -- well, it starts on page 1, the last
15   page I've given you is page 3, and it runs from the
16   beginning of January '00 through the end of February '01.
17   First of all, is this comprehensive?  In other words, is
18   there a document that -- is this part of a document or is
19   it an entire document?
20       MR. GIBBS:  Objection.  Lack of foundation.
21       THE WITNESS:  I don't remember when we -- when we
22   started using this file, and I don't remember when we ended
23   using this file.
24       MR. SOLOMON:  Okay.
25       THE WITNESS:  When we stopped using this file.

155

1        MR. SOLOMON:  Okay.
2    Q.  Do you know Carly Fiorina?
3    A.  I don't know her personally, but I know her name.
4    Q.  Have you spoken to her on the phone?
5    A.  If so, just incidentally in transferring her to
6    Larry.
7    Q.  Okay.  Is she a personal friend of Mr. Ellison's,
8    do you know?
9    A.  Not to my knowledge.
10   Q.  Are you aware of what business dealings he had
11   with Ms. Fiorina?
12       MR. GIBBS:  Objection.  Vague.
13       THE WITNESS:  Not specifically.
14       BY MR. SOLOMON:
15   Q.  Okay.  Do you have an understanding generally of
16   what business dealings he had with her?
17       MR. GIBBS:  Objection.  Vague.
18       THE WITNESS:  Generally, HP is a customer of Oracle's
19   and Oracle's a customer of HP's.
20       BY MR. SOLOMON:
21   Q.  Do you know what Oracle purchases from HP?
22   A.  Again, not specifically.  But hardware presumably.
23   Q.  Do you know -- and, again, this is the time frame
24   of end of 2000 and beginning of 2001 what HP was purchasing
25   from Oracle?

156

1      A.  No.
2      Q.  Do you remember dealing with Carly Fiorina in that
3   time frame at all?
4      A.  No.
5      Q.  Do you know the company BellSouth?
6      A.  Yes.
7      Q.  And in the same time frame, late 2000, early 2001,
8   do you have any recollection of BellSouth's relationship
9   with Oracle?
10      A.  Not specifically.
11      Q.  Do you know if BellSouth was implementing 11i?
12      A.  I don't know.
13      Q.  And since you don't know, you wouldn't know if
14   they were happy or a dissatisfied customer at that time; is
15   that fair?
16      A.  Correct.
17      Q.  On the third page --
18      A.  Yes.
19      Q.  -- there's a reference to Philip at the top
20   December -- Oh.  "Philip needs to meet with you late in
21   January - 1 hour lunchable?"  Do you see that?
22      A.  Yes.
23      Q.  Goes on to say, "Re:  running out of room on loans
24   and strategy for exercising Oracle options that expire next
25   year -- need money to pay withholding on them."  Do you see

157

1   that?
2      A.  Yes.
3      Q.  Do you remember writing that?
4      A.  I don't.
5      Q.  Do you know if Mr. Simon had the lunch in late
6   January that's contemplated here?
7      A.  I don't know.
8      Q.  Further down the page there's a reference again to
9   the 25th of January, '01.  It reads as follows:  "George
10   would like you to meet with PWC senior partners about suite
11   versus integration.  JHenley supports.  George sent a
12   compelling e-mail about asking PWC how often they get sued
13   with/best of breed."  Do you see that?
14      A.  Yes.
15      Q.  Do you remember writing that?
16      A.  I don't.
17      Q.  Do you know if Mr. Ellison met with PWC Partners
18   as indicated here?
19      A.  I don't know.
20      Q.  And do you know -- did you see this e-mail that's
21   referred to here?
22      A.  I don't know.
23      Q.  Because it says, "George sent a compelling e-mail
24   about asking PWC Partners how often they get sued/best of
25   breed."  You have no recollection?

158

1      A.  I don't recall it.
2      Q.  Next reference is to a CEO roundtable in the
3   Caribbean.  Do you know if that took place?
4      A.  I don't know.
5      Q.  Next reference, the 30th of January, '01, "GAP
6   meeting Friday -- in SF -- 2:00 p.m. to 4:00 p.m. okay?
7   Carl to drive?  You have Stanford dinner at 6:30 p.m. if
8   you want to talk to Hennessy before reception, etc."  Do
9   you see that?
10      A.  Yes.
11      Q.  Do you know if the GAP meeting referred to there
12   went ahead of schedule?
13      A.  I don't know.
14      MR. SOLOMON:  I'll next mark a document produced by
15   the defendants in this litigation with control numbers
16   098465.
17      THE WITNESS:  Thank you.
18      (Exhibit 57 was marked for identification.)
19      THE WITNESS:  Thank you.
20         Okay.
21   BY MR. SOLOMON:
22      Q.  Okay.  Do you recognize this?
23      A.  Yes.
24      Q.  And what is it?
25      A.  It appears to be a printout of a corresponding

159

1   list with personal calls --
2      Q.  Right.
3      A.  -- as opposed to business calls.
4      Q.  And does this indicate that he got one personal
5   call that entire year?
6      A.  No.
7      Q.  And the reason I say that is looking at the
8   document you looked at before, there's three pages that
9   seem to span just over a calendar year and here there's one
10   page with one call.  I'm just curious.  Can you explain
11   that?
12      A.  No.  Again, I don't remember when we started using
13   it and when we stopped using it.  But he certainly receives
14   more business calls than personal calls.
15      Q.  Right.  And do you know if any information's been
16   deleted from here?  In other words, would this have had
17   more information at any one time?
18      MR. GIBBS:  Objection.  Lack of foundation.
19      THE WITNESS:  I don't have any idea.
20   BY MR. SOLOMON:
21      Q.  Okay.  And the reference is the 10th of January,
22   '00, "Philip Simon re:  New bank line Deutsche vs.
23   JP Morgan."  Do you have any idea what that refers to?
24      A.  I don't recall it, but I assume that he's opening
25   up a new bank line and trying to decide between Deutsche

160

1    Bank and JP Morgan.

2    Q.  But you have no personal recollection --

3    A.  No, I don't.

4    MR. SOLOMON:  I'll mark as the next exhibit documents

5    produced in this litigation with the numbers 098458 and

6    2460 (sic).

7    (Exhibit 58 was marked for identification.)

8    THE WITNESS:  Thank you.

9    Okay.

10    BY MR. SOLOMON:

11    Q.  Do you recognize this?

12    A.  Yes.

13    Q.  What's this?

14    A.  A similar list.  This one with business calls

15    again that we kept in a VMS file.

16    Q.  Okay.  And having looked at it, do the contents

17    refresh your recollection concerning any of the events in

18    2000 and early 2001?

19    MR. GIBBS:  Objection.  Vague and compound.

20    THE WITNESS:  Generally, but nothing specific.

21    BY MR. SOLOMON:

22    Q.  And just to be clear, this would have been, you

23    believe, you detailing what you considered to be

24    significant calls for Mr. Ellison?

25    A.  Not exactly.  The calls -- me keeping a list of

161

1    what I needed to ask Larry about.

2    Q.  Okay.

3    A.  With regard to business calls.

4    MR. SOLOMON:  Okay.

5    Have marked as the next exhibit a document

6    produced by the defendants with the control number 098461.

7    (Exhibit 59 was marked for identification.)

8    THE WITNESS:  Thank you.

9    Yes.

10    BY MR. SOLOMON:

11    Q.  Do you recognize this?

12    A.  Yes.

13    Q.  What is it?

14    A.  A similar list, a file kept on VMS with business

15    questions to ask Larry.

16    Q.  And, again, this is something that you would have

17    prepared, you believe?

18    A.  Yes.

19    MR. SOLOMON:  Okay.

20    We'll have marked as the next exhibit a document

21    produced by the defendants with a control number 098547

22    (sic).

23    MR. GIBBS:  Did you say 547 or --

24    MR. SOLOMON:  I meant to say, at least, 457.

25    (Exhibit 60 was marked for identification.)

162

1    THE WITNESS:  Thank you.

2    Okay.

3    BY MR. SOLOMON:

4    Q.  Do you recognize this?

5    A.  Yes.

6    Q.  What is this?

7    A.  Another file that we kept on VMS.  This one

8    regarding things -- it appears things I thought were

9    urgent.

10    Q.  Okay.  And would you then make a point of giving

11    Mr. Ellison the list itself containing urgent matters, or

12    would you read from this list when you communicated to

13    Mr. Ellison?

14    A.  I would generally ask him verbally.

15    MR. SOLOMON:  Okay.

16    I've marked as the next exhibit a document

17    produced by the defendants with the control numbers 042760

18    through -66.

19    (Exhibit 61 was marked for identification.)

20    THE WITNESS:  Thank you.

21    Okay.

22    BY MR. SOLOMON:

23    Q.  Do you recognize this?

24    A.  Not this specifically; but the general format,

25    yes.

163

1    Q.  Okay.

2    And did you create this, or any of it?

3    A.  I don't remember creating it, but I -- it looks

4    like I did.

5    Q.  Okay.  Was this a report the type of which you

6    prepared regularly?

7    A.  No.

8    Q.  Do you know why this was prepared?

9    A.  No.

10    Q.  Okay.  "Custom Calendar Report."  Why does it say

11    "Custom Calendar Report"?

12    MR. GIBBS:  Objection.  Lack of foundation.

13    THE WITNESS:  This is just a printout from -- I

14    believe this is a printout from within our online calendar

15    program.

16    MR. SOLOMON:  Okay.

17    THE WITNESS:  That is printing the items on his

18    calendar from the 1st of December in 2000 to the end of

19    February in 2001.

20    BY MR. SOLOMON:

21    Q.  Okay.  And can you just describe to me how these

22    entries would have found their way into the document.

23    A.  They would all exist on the -- on the calendar,

24    and I'm just printing it -- assuming I did it, which I

25    think I did, I am printing it in itinerary format so it

164

1    just lists all the items on the calendar.
2        Q.  Is this something that you prepared and added to
3    as you went along?
4        MR. GIBBS:  Objection.  Vague.
5        THE WITNESS:  No, I don't think so.
6        BY MR. SOLOMON:
7        Q.  I guess what I'm trying to get at is as of the
8    first date, Friday, December the 1st, 2000, were the events
9    that are then described for January and, I guess, February
10   already scheduled?
11       A.  Yes.  It appears to me as -- there's no date on
12   the bottom of this, but it appears to me as though I'm
13   printing a report, presumably at the request of somebody,
14   for everything that was on the calendar during those dates
15   and that it's after the fact.
16       MR. SOLOMON:  Got you.
17       THE WITNESS:  Although, actually, that's an
18   assumption.  I don't know if it's after the fact or at some
19   given time in that period.
20       MR. SOLOMON:  Okay.
21       Q.  I'm looking at the third page of the document,
22   which has the control number 042762.
23       A.  Yes.
24       Q.  I know it's hard to read, but it appears that it
25   reflects that from Thursday, December the 21st, through the

165

1    new year that Mr. Ellison was in Mexico.  Is that what it
2    appears to be to you?
3        A.  Yes, that's what the calendar reflects.
4        Q.  And does that refresh your recollection in any way
5    as to where Mr. Ellison was at the end of December,
6    beginning of January?
7        A.  No.
8        Q.  Do you know where he was in Mexico?
9        A.  I don't know.
10       Q.  Do you know when the Mexico trip was first
11   scheduled?
12       A.  No.
13       Q.  Again, it's a little difficult but it appears to
14   reflect -- and I'm looking at the fourth page of the
15   document now --
16       A.  Yes.
17       Q.  It appears to reflect that on Wednesday,
18   January 3rd, 2001, Mr. Ellison was back in the country.
19   Does that appear to be the case to you?
20       A.  It appears as though there's a tools meeting
21   scheduled on that date.
22       Q.  These personal meetings, could any of these
23   personal meetings be with Mr. Simon?  Is that how you would
24   describe the meeting with Mr. Simon if he had one?
25       A.  Yes, but if this had been printed in response to a

166

1    document request that included anything to do with stock
2    trades --
3        Q.  Got you.
4        A.  -- then I would not have indicated it as a
5    personal meeting.
6        Q.  Are you saying, then, it's your belief that this
7    document was created for this litigation?  It wasn't a
8    document that existed and then was produced to us?
9        MR. GIBBS:  Objection.  Misstates her testimony.
10   Answer if you can.
11       THE WITNESS:  I would not, as a general rule, carry
12   around something like this.  So it wouldn't -- because the
13   calendar is online so that's how I would use the calendar.
14   So printing a report of the calendar, it produces on paper
15   what exists online.
16       BY MR. SOLOMON:
17       Q.  Okay.  But this wasn't created for any special
18   purpose, litigation purpose?  This would have been maybe
19   printed for that purpose, but it wasn't created for that
20   purpose?
21       A.  I don't know, but -- if I printed it, it would be
22   printing whatever existed on the calendar at that time.
23       Q.  This appears to reflect that until January the
24   20th Mr. Ellison was in the country conducting business; is
25   that fair?

167

1        A.  It appears as though he has meetings scheduled
2    January 3rd through the 12th -- I'm sorry.  No.  It keeps
3    going.  Sorry.  Through the 20th.
4        Q.  Okay.
5        A.  Though I'm a little puzzled by the fact that I
6    say -- it appears as though he's in Chicago on the 20th but
7    I don't show any flight to Chicago, so that's a little
8    puzzling.
9        Q.  Because, typically, there would be a flight number
10   and a time or something like that?
11       A.  I would assume I'd do something.
12       Q.  Okay.  What is the TPG board at the top of this
13   page?  Do you know what TPG refers to?
14       A.  No.
15       Q.  Okay.
16       Sorry.  If you can just go back a page, I'm
17   looking at the entry for Thursday, the 15th.  There's a
18   reference of 1:30 p.m. to 2:00 p.m., Sergio.  Would that be
19   Sergio Giacoletto?
20       A.  Sorry.  It looks like -- is that the 18th?
21       Q.  I believe that's --
22       A.  I think the 15th is Monday.  It looks like the one
23   above it --
24       Q.  Yes, you're right.
25       A.  -- is Monday, the 15th, so --

168

1    Q.  I apologize.  Yes, it is the 18th.  Thursday, the
2    18th.
3        A.  Yes.  Sergio would refer to Sergio Giacoletto, I
4    assume.
5        Q.  Then it says "at HQ."  Would that mean at
6    Redwood --
7        A.  Yes.
8        Q.  That reflects a scheduled meeting?
9        A.  Yes, that what it appears to show.
10       Q.  Then at the top of that page is a reference to
11   calling POSCO.  Do you recall we came across POSCO earlier
12   today?
13       A.  Yes.
14       Q.  Do you know if that call went forward?
15       A.  I can't say for sure.
16       Q.  Okay.
17           Okay.  Then back on to the following page, the
18   control number 042765 --
19       A.  Yes.
20       Q.  -- appears to reflect that from Sunday the 21st of
21   January, certainly through the Tuesday, Mr. Ellison was in
22   Mexico.  Is that right?
23       A.  Uhm, I -- it appears that way.  The GE Power call,
24   because it's not an in-person meeting, I suppose he could
25   have still been in Mexico.  I don't know.

169

1        Q.  Okay.
2            And what about where it says for Thursday and
3    Friday personal meetings?  Does that indicate that he's no
4    longer in Mexico?
5        A.  I would think so, but I'm not sure.
6        Q.  The reference for Monday, the 29th of January, to
7    the EMC, is that the Executive --
8        A.  Management Committee.
9        Q.  -- Management Committee?
10       A.  Yes.
11       Q.  And what does the PDM stand for?
12       A.  That stood for Product Development Management
13   Committee.
14       Q.  And that would indicate that Mr. Ellison was in
15   California attending those meetings on that date?
16       A.  That's how I would -- what I would assume.
17       Q.  Okay.  The reference to Tuesday, at the bottom of
18   the page, where it says, "Barclays B2B and CVC."  What does
19   the CVC stand for?
20       A.  At that time customer visit center.  I think now
21   it's called the corporate visit center.
22       Q.  So that reflects that representatives from
23   Barclays will be meeting Mr. Ellison in the CVC?
24       A.  Yes, that's what I would assume.
25       Q.  Then for the Wednesday, which I think is the

170

1    31st --
2        A.  31st.
3        Q.  -- there's a reference to Joe Lockhart at ATH.  Is
4    that at Atherton?
5        A.  That would be how I'd write Atherton.  At his
6    Atherton home.
7        Q.  Okay.  And do you know if that meeting went
8    forward?
9        A.  I don't know.
10       Q.  Okay.  And then you don't know, of course, what
11   was below the part that has been redacted, do you?
12       A.  No.
13       MR. SOLOMON:  I would ask Counsel to produce this page
14   in unredacted format.  I'm not quite sure what the
15   justification is for that.
16           I'm confident you heard me so you don't have to
17   answer.
18       MR. GIBBS:  I heard.
19       MR. SOLOMON:  Have marked as the next exhibit a
20   document with the -- produced by defendants with the
21   control numbers 056247 to 249.
22       (Exhibit 62 was marked for identification.)
23       THE WITNESS:  Thank you.
24           Okay.
25   BY MR. SOLOMON:

171

1        Q.  Okay.  Do you recognize this?
2        A.  No.
3        Q.  And do you have any recollection of seeing it
4    before?
5        A.  No.
6        Q.  And the front page is dated Wednesday the 28th of
7    June, 2000; and it's an e-mail communication which includes
8    Chris Balkenhol, which is your husband; is that right?
9        A.  Yes.
10       Q.  And the subject is called "BellSouth in Crisis."
11   Do you see that?
12       A.  Yes.
13       Q.  And on the next page of the exhibit there is an
14   e-mail from Mr. Balkenhol to a number of people at Oracle
15   starting with Mark Berrenechea.  Do you see that?
16       A.  Yes.
17       Q.  And have you seen this message before now?
18       A.  No, I haven't.
19       Q.  Did you hear in 2000 of the BellSouth deal being
20   referred to as "BellSouth in crisis"?
21       A.  No, I don't remember that.
22       Q.  Did you have conversations in 2000 with your
23   husband concerning the status of the BellSouth project?
24       A.  Not that I can remember.
25       MR. SOLOMON:  I've marked as the next exhibit a

172

1  document produced by the defendants in this litigation with
2  the control number 265592.
3      (Exhibit 63 was marked for identification.)
4      THE WITNESS:  Thank you.
5  BY MR. SOLOMON:
6      Q.  Won't take long to review at least.
7      A.  Okay.
8      Q.  Do you recognize this?
9      A.  I don't.
10     Q.  Okay.  I think this is all we have.
11         It says, "Forwarded Comms presentation."  Do you
12  know what that refers to?
13     A.  I don't.
14     MR. SOLOMON:  We've marked as the next exhibit a
15  document produced by the defendants in this litigation with
16  the control number 151481.
17     (Exhibit 64 was marked for identification.)
18     THE WITNESS:  Thank you.
19         Okay.
20  BY MR. SOLOMON:
21     Q.  Do you recognize this?
22     A.  No.
23     Q.  No recollection of seeing it before?
24     A.  No.
25     Q.  Do you know who Frank Dremus is?

173

1         Sorry.  Fran Dremus?
2      A.  I think Fran Dremus was an executive at BellSouth.
3      Q.  Do you have any recollection of discussing
4  BellSouth with Jay Nussbaum in 2000 or 2001?
5      A.  No.  I have vague recollection of scheduling stuff
6  like this, but nothing specific.
7      MR. SOLOMON:  I'll have marked as the next exhibit a
8  document introduced by the defendants in this litigation
9  with the control number 265694.
10     (Exhibit 65 was marked for identification.)
11     THE WITNESS:  Thank you.
12         Okay.
13  BY MR. SOLOMON:
14     Q.  Do you recognize this?
15     A.  No.
16     Q.  It's from Chris Balkenhol to Hannes Sandmeier
17  Sacco, Lee, Andy Goreson (sic).  Do you know those
18  people -- or Goreing.  Do you know those people?
19     A.  I know a couple of them.
20     Q.  Are they Oracle employees?
21     A.  I know that Hannes is or was.  I'm not sure
22  whether they are now.  And Andy Goreing is or was.  And
23  Maria Del Arroz is.
24     Q.  It says, "Forwarded Urgent! Re:  DOM1151 Access
25  For Sales 4 Comms For ALLTELL."  Do you know -- have any

174

1  idea what that refers to?
2      A.  No.
3      Q.  Then there's a reference "thanks," and it says
4  "Carolyn Balkenhol wrote."  Do you have any idea what that
5  refers to?
6      A.  No.  On these e-mails --
7      Q.  Uh-huh.
8      A.  -- the only thing I can think of is that because
9  we have the same last name and the same first initial, if
10  people put in "cbalkenhol" and they might think they're
11  getting Chris, they might get me.  So it's possible I would
12  get something that was obviously not intended for me, which
13  I would subsequently forward to him.
14     Q.  Gotcha.  Okay.
15         Did your husband interact with Mr. Ellison
16  personally?
17     A.  Not very much I don't think.
18     Q.  What was your husband, Mr. Balkenhol -- what was
19  his role with respect to BellSouth, do you know?
20     A.  I know that at one point he was traveling to
21  BellSouth, but I don't know -- I don't remember what his
22  role was at that point.
23     Q.  Okay.  And correct me if I'm wrong, but you
24  avoided -- the two of you avoided at that time discussing
25  Oracle business?  Is that true or not?

175

1      A.  We generally try not to discuss Oracle business.
2      MR. SOLOMON:  I'll have marked as the next exhibit a
3  document produced by the defendants with the control
4  numbers 265945 through -949.
5      (Exhibit 66 was marked for identification.)
6      THE WITNESS:  Thank you.
7         Okay.
8  BY MR. SOLOMON:
9      Q.  Do you recognize this?
10     A.  No.
11     Q.  See at the top it says, "Hannes Sandmeier wrote,
12  'Chris, do you plan to attend this visit on Thursday?
13  Since only the CTO and AM will be here, we will do it in my
14  office.  Thanks, Hannes."  Do you see that?
15     A.  Yes.
16     Q.  Then at the top it says, "Unless I'm called into
17  Larry's meeting at that time, I'll be there."  Do you see
18  that?
19     A.  Yes.
20     Q.  Do you have any basis for understanding that Larry
21  that refers to is Larry Ellison?
22     A.  Yes.
23     Q.  And is your husband, Chris, saying unless he's
24  pulled into a meeting with Larry Ellison, he'll be there?
25     MR. GIBBS:  Objection.  Lack of foundation.

176

1     THE WITNESS: I can't tell that from this because it
2   doesn't have any header that says who it is.
3     MR. SOLOMON: Okay.
4     Q.  And, then, just to close out, you have no
5   recollection of your husband, Mr. Balkenhol, discussing
6   with Mr. Ellison at any time the BellSouth crisis?
7     MR. GIBBS: Objection. Lack of foundation.
8     THE WITNESS: I don't have any way of knowing whether
9   the two of them ever discussed it.
10     MR. SOLOMON: Okay. Let's go off the record.
11     Are you changing tapes?
12     THE VIDEOGRAPHER: Yes.
13     MR. SOLOMON: We'll take five minutes.
14     THE VIDEOGRAPHER: We're going off the record. It's
15   4:20. Here marks the end of Videotape 3 in the deposition
16   of Carolyn Balkenhol.
17     (Recess taken.)
18     THE VIDEOGRAPHER: We are back on the record. The
19   time is 4:34 p.m. Here marks the beginning of Videotape
20   No. 4 in the deposition of Carolyn Balkenhol.
21     MR. SOLOMON: We'll have marked as the next exhibit a
22   document produced by defendants in this litigation with the
23   control numbers 145827 through -831.
24     (Exhibit 67 was marked for identification.)
25     THE WITNESS: Thank you.

177

1     Okay.
2   BY MR. SOLOMON:
3     Q.  And do you recognize this?
4     A.  I don't.
5     Q.  Let's see. On the first page it has a subject
6   line which says, "FYI FW Clariion Disk Immediate Removal."
7   Do you see that?
8     A.  Yes.
9     Q.  Do you have any understanding what that refers to?
10     A.  Only from what I read here.
11     Q.  Okay. And what's your understanding from what
12   you've read?
13     A.  It appears as though we have a piece of EMC
14   hardware that -- that needs to be paid for. And that EMC
15   is threatening to pull it out.
16     Q.  Do you recall dealing with this issue at all?
17     A.  No.
18     Q.  And I've noticed on the first page it appears that
19   your husband is a recipient?
20     A.  No. And, actually, I was just noticing the same
21   thing. Earlier when we spoke about whether I had an
22   alternate e-mail address. I think that this is also an
23   alias for me.
24     Q.  C --
25     A.  When I came to Oracle my name was Wuestenberg, so

178

1   people who knew me then would have figured out that e-mail
2   address for me. But this was my -- would, I think, have
3   alias to cwuesten.
4     Q.  Got it.
5     A.  So this cwuesten is me.
6     MR. SOLOMON: Okay. I got you.
7     Okay.
8     I'll mark as the next exhibit another document
9   produced in this litigation with the control numbers 612086
10   to -87.
11     (Exhibit 68 was marked for identification.)
12     THE WITNESS: Thank you.
13     Okay.
14   BY MR. SOLOMON:
15     Q.  Do you recognize this?
16     A.  No.
17     Q.  Have you no recollection of ever seeing it before?
18     A.  I have a vague recollection of seeing it.
19     Q.  When do you think you saw it?
20     A.  I don't remember, but I assume I saw it at the
21   time.
22     Q.  Okay. It's dated, as you see, Friday, May 3rd,
23   2002, and it's from Philip Simon to Larry Ellison, and it
24   copies you?
25     A.  Yes.

179

1     Q.  Did you discuss this e-mail with Mr. Simon?
2     A.  I don't remember discussing it with him.
3     Q.  Did you discuss it with Mr. Ellison?
4     A.  I don't think I discussed it with Larry.
5     Q.  Do you believe that this was in any way the
6   impetus behind Mr. Ellison participating in the 10b51 plan?
7     MR. GIBBS: Objection. Lack of foundation.
8     THE WITNESS: I don't know.
9   BY MR. SOLOMON:
10     Q.  Did you share Mr. Simon's concerns about
11   Mr. Ellison's spending?
12     A.  I don't know that I would say I had concerns about
13   his spending.
14     Q.  Did you have concerns?
15     A.  The debt seemed large to me.
16     Q.  Did you read the recent press reports that are
17   wrote about this and other e-mails?
18     A.  Recent press reports about this e-mail? Oh, I
19   recall there was a series of articles about big spenders or
20   something. I don't remember when that was.
21     Q.  Okay. Was that upsetting to you that that made
22   the press?
23     A.  I'm not sure I had a feeling about it one way or
24   the other.
25     Q.  How about Mr. Ellison? Was it upsetting to

Balkenhol, Carolyn  9/12/2006  9:15:00 AM

180

1 Mr. Ellison?
2     A.  I don't know what he thought about it.
3     Q.  Do you know how it came about that Mayer, Brown &
4 Platt was fired?
5     A.  I don't know anything about it.
6     Q.  Okay.  Did you know they were?
7     A.  No.
8     Q.  Do you know who they are?
9     A.  I think I know one of the attorneys at Mayer
10 Brown.
11     Q.  Who's that?
12     A.  Javier.  Is that at Mayer, Brown?
13     Q.  Yes.  Rubenstein.  Javier Rubenstein?
14     A.  Yes.
15     Q.  And do you know him as a result of this
16 litigation?
17     A.  Yes.
18     Q.  Or the related litigation?
19     A.  Yes.  They're all a blur, but yes.
20     Q.  When you received a preservation instruction in
21 this case, did you act on it to preserve your documents?
22     A.  Again, I don't remember specifically receiving it
23 or acting on it.
24     Q.  Okay.
25     A.  But as a general rule, if and when I receive them

181

1 I do act on them and preserve appropriately.
2     Q.  Did you in any way act to preserve Mr. Ellison's
3 documents with respect to this litigation?
4     A.  I don't remember specifically, but it would have
5 been my practice to make sure that somebody down at the
6 house looked for any hard copy documents that he might
7 have.  Which he generally would not, but just to be sure.
8     Q.  And did you speak to any lawyers either within or
9 outside Oracle concerning the preservation of documents in
10 this case?
11     A.  I don't remember.
12     Q.  Okay.  Was there a lawyer that -- in particular at
13 Oracle, within Oracle, that oversaw the collection,
14 preservation and production of documents in this
15 litigation?
16     MR. GIBBS:  Objection.  Lack of foundation.
17     THE WITNESS:  I don't remember.
18 BY MR. SOLOMON:
19     Q.  Do you recall whether Mr. Cooperman was at all
20 involved in the issue of document preservation in this
21 litigation?
22     MR. GIBBS:  Objection.  Lack of foundation.
23     THE WITNESS:  I don't remember the specifics of who
24 would have sent the e-mail.
25 BY MR. SOLOMON:

182

1     Q.  Okay.  So just to close it out, you don't know if
2 it was Mr. Cooperman, Ms. Daley, or Ms. Seigel?
3     A.  No, I don't.
4     Q.  And you have no recollection of any particular
5 interactions with any of those individuals concerning
6 document preservation in this case?
7     A.  No.
8         At the time, right?
9         You're talking about at the time?  No.
10     Q.  And you don't know if any physical documents were
11 located at Mr. Ellison's house?
12     A.  I don't remember.
13     Q.  Okay.  We're going to take a two-minute break.
14 Stay comfortable if you are comfortable, then we'll have
15 about five minutes, and then we'll be done.
16     THE VIDEOGRAPHER:  Off the record.  The time is
17 4:45 p.m.
18     (Recess taken.)
19     THE VIDEOGRAPHER:  We are back on the record.  The
20 time is 4:50 p.m.
21 BY MR. SOLOMON:
22     Q.  Have you ever heard Mr. Ellison tell a lie?
23     A.  Uhm, I can't think of hearing him tell a lie.
24     Q.  Have you ever heard of him, other than in this
25 litigation, being accused of telling a lie?

183

1     A.  Uhm, the press, I think, reports of him being
2 untruthful.
3     Q.  Okay.  Over the years, right?  Is that what you
4 mean when you say that?
5     A.  Yes.
6     Q.  Or were you thinking of a particular --
7     A.  I can't think of any specifics, but yes.
8     Q.  Have you ever witnessed Mr. Ellison being
9 misleading?
10     A.  Not that I can think of.
11     Q.  How about Ms. Safra Catz?  Have you ever heard her
12 tell a lie?
13     A.  I can't think of a time when I've heard her tell a
14 lie.
15     Q.  Mr. Sanderson?
16         Do you know who I mean when I say Mr. Sanderson?
17     A.  Sandy Sanderson.  You're asking the same question
18 have I ever heard him --
19     Q.  Same question, yes.
20     A.  Have I ever heard him tell a lie?  No, not that I
21 know of.
22     Q.  And Mr. Henley?
23     A.  No.
24     Q.  Okay.  Have you ever been accused of illegal
25 securities transactions?

Balkenhol, Carolyn  9/12/2006  9:15:00 AM

184

1       A.  I'm not sure how to answer that.  The fact that
2   I'm being asked questions, I don't -- no accusation has
3   been made.  I don't know, I'm not a lawyer so I don't --
4       Q.  Okay.
5           Is it your understanding that the position of the
6   SEC is that you provided your husband with some information
7   on which he then engaged in a securities transaction?
8       MR. GIBBS:  Objection.  Lack of foundation.  Lack of
9   personal knowledge.
10      THE WITNESS:  I --
11      MR. GIBBS:  Also totally irrelevant.
12      THE WITNESS:  I don't know what they're -- what
13  they're assuming or what their contention is.  I haven't
14  been told.
15      MR. SOLOMON:  Okay.
16      Q.  What amount of money is in issue?
17      MR. GIBBS:  That's totally irrelevant, Mark.
18      MR. SOLOMON:  Do you know how much money is at issue?
19      MR. GIBBS:  Totally irrelevant.
20      THE WITNESS:  I don't.  I saw documents in my
21  deposition, but I don't know -- I don't know what the
22  amounts are.
23      MR. SOLOMON:  Okay.
24          Have you, in your experience at Oracle, ever
25  witnessed a time when information that had been put out to

185

1   the market by Oracle generally was either misleading or
2   untruthful?
3       A.  No, I can't think of a time when we've put forth
4   something misleading.
5       (Exhibit 69 was marked for identification.)
6       THE WITNESS:  Thank you.
7       THE VIDEOGRAPHER:  Sorry, someone's got something on
8   them.
9           The signal when it interrupts the audio to that
10  level is --
11      THE WITNESS:  Is it still going?
12      THE VIDEOGRAPHER:  No, not at the moment.  But just
13  continue; and if it comes up, we'll have to go off for a
14  moment and figure out where it's coming from.
15      THE WITNESS:  Okay.
16  BY MR. SOLOMON:
17      Q.  Do you recognize this?
18      A.  Not specifically.
19      Q.  This involves e-mail exchanges between you and
20  Larry Ellison; is that right?
21      A.  It appears to be, yes.
22      Q.  And there's a forwarding of a message between
23  Mr. Ellison or communication between Mr. Ellison and
24  Mr. Kark?
25      A.  Yes.  That's what it appears to be.

186

1       Q.  Mr. Ellison, on the front page says, "This is not
2   Roland."  Do you see that?
3       A.  Yes.
4       Q.  Do you know who he's referring to?
5       A.  I think that this -- I bring up Roland.  I think
6   he must be the account rep.
7       Q.  And then you say that no matter how rude you are
8   "in real life and to stupid people calling about
9   approvals," then you go on to say you are "PERFECTLY polite
10  and presentable to executives.  They all love me."  Right?
11      A.  Yes, I see that.
12      Q.  Is that true?
13          You don't have to answer.
14      A.  I'm much less rude now than I used to be.
15      Q.  Was there an event that changed your demeanor?
16      A.  No.  Nothing in particular.
17      Q.  Okay.  There are some issues with respect to
18  documents.  The lawyers are disputing whether all the
19  documents that should have been produced have been
20  produced.  Subject to that, I'm finished with my
21  questioning and thank you for your testimony.
22          If all documents are produced and if the Court
23  permits and if there are documents that relate to you, I
24  might have to continue.
25      A.  Okay.

187

1       Q.  Otherwise, thank you.
2       THE VIDEOGRAPHER:  Okay.  This is the end of
3   Videotape 4, Volume I, in the deposition of Carolyn
4   Balkenhol.  The original videotapes will be retained by
5   LiveNote World Service.  Going off the record, the time is
6   4:58 p.m.
7       (At 4:58 p.m. the deposition proceedings concluded.)
8                           -oOo-
9
10
11
12
13          CAROLYN BALKENHOL
14
15

Balkenhol, Carolyn  9/12/2006  9:15:00 AM

188

1    STATE OF CALIFORNIA )

2    COUNTY OF SAN MATEO )

3          I hereby certify that the witness in the foregoing

4    deposition, CAROLYN BALKENHOL, was by me duly sworn to

5    testify to the truth, the whole truth, and nothing but the

6    truth, in the within-entitled cause; that said deposition

7    was taken at the time and place herein named; that the

8    deposition is a true record of the witness's testimony as

9    reported by me, a duly certified shorthand reporter and a

10   disinterested person, and was thereafter transcribed into

11   typewriting by computer.

12          I further certify that I am not interested in the

13   outcome of the said action, nor connected with, nor related

14   to any of the parties in said action, nor to their

15   respective counsel.

16          IN WITNESS WHEREOF, I have hereunto set my hand

17   this 26th day of September, 2006.

18

19

20          _____

21          KELLIE A. ZOLLARS, CSR No. 5735

22          STATE OF CALIFORNIA

23

24

25