# EXHIBIT 5

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF CALIFORNIA
 3
                            )
 4   In re ORACLE CORPORATION      )
     SECURITIES LITIGATION      ) Master File No.
 5   _____)
                            ) C-01-0988-MJJ
 6   THIS DOCUMENT RELATES TO:      )
                            )
 7      ALL ACTIONS.        )
     _____)
 8
 9
10              CONFIDENTIAL
11
12               VOLUME I
13   VIDEOTAPED DEPOSITION OF EDWARD J. SANDERSON, JR
14           Tuesday, July 25, 2006
15
16   VIDEOTRACK LLC
          Reporting For:
17
18          LiveNote World Service
          221 Main Street, Suite 1250
19        San Francisco, California  94105
             Phone: (415) 321-2300
20             Fax: (415) 321-2301
21
22
23
24   REPORTED BY: KAE F. GERNANDT
          CSR No. 5342
25
```

2

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF CALIFORNIA
 3
                            )
 4   In re ORACLE CORPORATION      )
     SECURITIES LITIGATION      ) Master File No.
 5   _____)
                            ) C-01-0988-MJJ
 6   THIS DOCUMENT RELATES TO:      )
                            )
 7      ALL ACTIONS.        )
     _____)
 8
 9
10      CONFIDENTIAL VIDEOTAPED DEPOSITION of EDWARD J.
11   SANDERSON, JR., Volume I, defendant herein, taken by
12   plaintiff pursuant to the applicable rules of the
13   Federal Rules of Civil Procedure on TUESDAY,
14   JULY 25, 2006, before me, Kae F. Gernandt, CSR No.
15   5342, beginning at 9:05 a.m. and ending at 5:57 p.m.
16   at 655 West Broadway, Suite 1900, in the City of
17   San Diego, County of San Diego, State of California.
18
19
20
21
22
23
24
25
```

3

```
 1                APPEARANCES
 2   For the Plaintiffs:
 3   LERACH, COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS
     BY:  SHAWN A. WILLIAMS
 4       JENNIFER IRVINE
         MONIQUE C. WINKLER  (afternoon session)
 5       100 Pine Street, Suite 2600
         San Francisco, California  94111
 6       (415) 288-4545
 7   swilliams@lerachlaw.com   moniquew@lerachlaw.com
 8   LERACH, COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS
     BY:  STACEY KAPLAN
 9       655 West Broadway, Suite 1900
         San Diego, California  92101-3301
10       (619) 231-1058
11   For Oracle Corporation and the individual
     defendants:
12   LATHAM & WATKINS
     BY:  PATRICK E. GIBBS
13       140 Scott Drive
         Menlo Park, California  94025-1008
14       (650) 328-4600
         patrick.gibbs@lw.com
15
     LATHAM & WATKINS
16   BY:  KYRA G. BUSBY
         505 Montgomery Street, Suite 2000
17       San Francisco, California  94111-2562
         (415) 391-0600
18       kyra.busby@lw.com
19   JAMES C. MAROULIS
         Oracle Corporation
20       500 Oracle Parkway, M/S 5OP7
         Redwood Shores, California  94065
21       (650) 506-4517
22   Also in Attendance:
         DEBORAH L. BURK, CLVS, Videographer, VideoTrack LLC
23       401 West "A" Street, Suite 135
         San Diego, California  92101
24       (619) 234-1990
25       Sara Holloway
```

4

```
 1                I N D E X
 2   WITNESS
 3   EDWARD J. SANDERSON, JR.
 4
 5   EXAMINATION BY                    PAGE
 6   Mr. Williams .................................  10
 7
 8
 9        EXHIBITS MARKED FOR IDENTIFICATION
10   EXHIBIT NO.   DESCRIPTION          PAGE
11   Exhibit 1    E-mail string dated 10/4/00    60
                  between Sandy Sanderson, Don
12                Klaiss and Valerie Borthwick
                  (NDCA-ORCL 056045-056048)
13
14   Exhibit 2    E-mail string dated 10/12/00   64
                  with information re
15                Ingersoll-Rand (NDCA-ORCL
                  039546-039551)
16   Exhibit 3    E-mail string dated 10/2000 re  83
                  Ford supply chain status
17                (NDCA-ORCL 169718-169720)
18   Exhibit 4    E-mail dated 10/21/00 re 11.5.1  90
                  vs. 11.5.2 confusion (NDCA-ORCL
19                056049-056050)
20   Exhibit 5    E-mail dated 10/13/00 re Field   99
                  Project Feedback Needed on 11i
21                Training & New Apps (NDCA-ORCL
                  056051-056054)
22
     Exhibit 6    E-mail dated 2/6/01 re GE       142
23                strategy (NDCA-ORCL 143064)
24   Exhibit 7    E-mail dated 3/11/01 re         149
                  Consulting - Food for Thought
25                (NDCA-ORCL 099861)
```

5

| | EXHIBITS MARKED FOR IDENTIFICATION | |
|---|---|---|
| EXHIBIT NO. | DESCRIPTION | PAGE |
| Exhibit 8 | E-mail string dated 3/01 re Beckman Update (NDCA-ORCL 101535-101537) | 152 |
| Exhibit 9 | E-mail string dated 3/01 re Daily CRM Escalated and Strategic Implementations report (NDCA-ORCL 054235-054244) | 167 |
| Exhibit 10 | E-mail string dated 7/01 re GE Aircraft APS Status/Background (NDCA-ORCL 056341-056347) | 196 |
| Exhibit 11 | E-mail string dated 7/00 re SC CEO Desk Call (NDCA-ORCL 101654-101656) | 207 |
| Exhibit 12 | E-mail string dated 8/00 re CRM Demos (NDCA-ORCL 620365-620371) | 212 |
| Exhibit 13 | E-mail string dated 2/1/01 re OPI Demonstration Environment/Product Issues (NDCA-ORCL 061313-061315) | 230 |
| Exhibit 14 | E-mail string dated 11/00 re CRM Rollout Date (NDCA-ORCL 020704-020706) | 264 |
| Exhibit 15 | E-mail string dated 12/00 re First Q3 Forecast Data (NDCA-ORCL 028582-028583) | 266 |

| | EXHIBITS REFERRED TO | |
|---|---|---|
| EXHIBIT NO. | DESCRIPTION | PAGE |
| Exhibit 1 | (DeCesare) E-mail string dated 2/01 re OPI Demonstration Environment/Product Issues (NDCA-ORCL 296485-296486) | 223 |

7

| | EXHIBITS REFERRED TO, Continued | |
|---|---|---|
| EXHIBIT NO. | DESCRIPTION | PAGE |
| Exhibit 10 | (Klaiss) E-mail string dated 10/4/00 between Sandy Sanderson, Don Klaiss and Valerie Borthwick (NDCA-ORCL 056045) | 54 |
| Exhibit 10 | (Borthwick) E-mail string dated 11/01 re 11i Migration Update 18-Jan-01 (NDCA-ORCL 056213-056214) | 284 |
| Exhibit 11 | (Wohl) E-mail dated 12/9/00 re Internal Upgrade Decision (NDCA-ORCL 012385) | 278 |
| Exhibit 12 | (Hamel) E-mail string dated 3/01 re ADS Demo Stats - Q3 General Business US (NDCA-ORCL 063462-063464) | 240 |
| Exhibit 14 | (Roberts) E-mail string dated 1/01 re Hudson's Bay Escalation (NDCA-ORCL 052475-052478) | 129 |
| Exhibit 15 | (Jarvis) E-mail string dated 3/01 re Papa Johns Information (NDCA-ORCL 121704-121707) | 159 |
| Exhibit 15 | (Fitzpatrick) E-mail string dated 1/01 re Majors Application Demo Update (NDCA-ORCL 063415-063416) | 218 |
| Exhibit 15 | (Hamel) E-mail string dated 4/01 re ADS Demo Feedback for Week Ending April 13 (NDCA-ORCL 061370-061373) | 241 |
| Exhibit 17 | (Unknown) FY 02 Consulting Budget Review dated 4/3/01 (NDCA-ORCL 159545-159575) | 181 |

6

| | EXHIBITS REFERRED TO, Continued | |
|---|---|---|
| EXHIBIT NO. | DESCRIPTION | PAGE |
| Exhibit 2 | (Block) E-mail string between Sandy Sanderson and Keith Block (NDCA-ORCL 152033.0001-152033.0002) | 73 |
| Exhibit 4 | (Cochran) E-mail string dated 11/00 re Successful Customer Implementation Announcements (NDCA-ORCL 101671-101673) | 112 |
| Exhibit 5 | (Roberts) E-mail string dated 12/00 re Critical Account Concession Request for Paxar Corporation (NDCA-ORCL 039330-039332) | 121 |
| Exhibit 6 | (Wohl) E-mail dated 12/4/00 re WEBREQS is Flaky (NDCA-ORCL 052474) | 279 |
| Exhibit 6 | (Scott) E-mail string dated 1/01 re Agenda for Exec ISD Checkpoint Call (NDCA-ORCL 219741-219746) | 281 |
| Exhibit 7 | (Block) E-mail string dated 1/01 re Go Live with Confidence (NDCA-ORCL 026981-026982) | 125 |
| Exhibit 8 | (Klaiss) E-mail string dated 7/01 re ERP CRM Integration Testing (NDCA-ORCL 056440-056442) | 242 |
| Exhibit 8 | (Godwin) E-mail string dated 1/01 re Oracle Internal Upgrading to R11i this Weekend (NDCA-ORCL 078388-078390) | 281 |
| Exhibit 9 | (Cullivan) E-mail dated 20/26/00 re issues report for the Dialogs with attachments (NDCA-ORCL 617453-617462) | 107 |

8

| | EXHIBITS REFERRED TO, Continued | |
|---|---|---|
| EXHIBIT NO. | DESCRIPTION | PAGE |
| Exhibit 17 | (Borthwick) E-mail dated 6/11/01 re Board Meeting Input with attachments (NDCA-ORCL 131696-131702) | 191 |
| Exhibit 18 | (Kendig) Package titled "E-Business Suite 11i" (NDCA-ORCL 621416-621449) | 199 |
| Exhibit 18 | (Block) E-mail string dated 1/01 re Projects 11i Upgrade Status 29-Jan-01 (NDCA-ORCL 034382-034383) | 286 |
| Exhibit 20 | (Hamel) E-mail string dated 3/28/01 re BG 11i Escalations (NDCA-ORCL 094069-094070) | 173 |
| Exhibit 21 | (Roberts) E-mail string dated 3/01 re Majors Demo Update | 236 |
| Exhibit 22 | (Fitzpatrick) E-mail string dated 2/1/01 re OPI Demonstration Environment/Product Issues (NDCA-ORCL 0617970-617974) | 233 |
| Exhibit 23 | (Block) E-mail string dated 3/23/01 re Paxar (NDCA-ORCL 278125-178127) | 165 |
| Exhibit 25 | (Roberts) E-mail string dated 6/01 re CRM Business Update - My Feedback (NDCA-ORCL 162213, 162215-162216) | 187 |
| Exhibit 30 | (Wohl) E-mail string dated 3/01 re Forrester: Negative on 11i (NDCA-ORCL 063478-063480) | 175 |
| Exhibit 39 | (Wohl) E-mail string dated 2/01 re GE Payroll & Benefits Update (NDCA-ORCL 063438-063439) | 147 |

9

1  SAN DIEGO, CALIFORNIA, TUESDAY, JULY 25, 2006
2  9:05 A.M.
3
4  THE VIDEOGRAPHER:  Here begins the videotaped
5  deposition of Edward Sanderson, Tape 1, Volume I in
6  the matter of in re Oracle securities litigation in
7  the United States District Court, Northern District
8  of California, Case No. C-01-0988-MJJ.
9  Today's date is July 25th, 2006, and
10  it is now 9:05 a.m.  The video operator today is
11  Deborah L. Burk of VideoTrack, representing LiveNote
12  World Service, located at 221 Main Street,
13  Suite 1250, San Francisco, California, 94105.
14  Telephone number, area code (415) 321-2300.  The
15  court reporter is Kae Gernandt, reporting on behalf
16  of LiveNote World Service.
17  Today's deposition is being taken at
18  Lerach, Coughlin, Stoia & Geller, located at
19  655 West Broadway, Suite 1900, San Diego,
20  California.
21  Please be aware that the video and audio
22  recording will take place at all times throughout
23  this deposition unless all counsel agree to go off
24  the record, at which time, I will announce the time
25  that we're going off the record, and the recording

10

1  devices will then be stopped.
2  Would counsel please introduce
3  yourselves and state who you represent.
4  MR. WILLIAMS:  Shawn Williams, Lerach,
5  Coughlin, Stoia, Geller, Rudman & Robbins.  I also
6  have with me Stacey Caplan and Jennifer Irvine, also
7  of Lerach Coughlin, and Sara Holloway, a summer law
8  clerk with Lerach Coughlin.
9  MR. GIBBS:  Patrick Gibbs from Latham &
10  Watkins on behalf of all defendants.
11  MS. BUSBY:  Kyra Busby, Latham & Watkins, on
12  behalf of the defendants.
13  MR. MAROULIS:  James Maroulis from Oracle
14  Corporation for defendant Oracle Corporation.
15  THE VIDEOGRAPHER:  Would the court reporter
16  please swear in the deponent.
17
18  EDWARD J. SANDERSON, JR.,
19  defendant herein, being first duly sworn, testifies
20  as follows:
21
22  EXAMINATION BY MR. WILLIAMS:
23  Q.  Good morning, Mr. Sanderson.
24  A.  Good morning.
25  Q.  Can you just state your full and

11

1  complete name for the record, please?
2  A.  Edward Jennings Sanderson, Jr.
3  Q.  People call you Sandy?
4  A.  Yes, that's right.
5  Q.  How long have they called you Sandy?
6  A.  Since college.
7  Q.  You've had your deposition taken before?
8  A.  Yes, I have.
9  Q.  So, you kind of have a general
10  understanding of how this process is going to work
11  today?
12  A.  I do, but it would be helpful, Shawn, if
13  there are any, quote, rules that you'd like to make
14  sure we follow, I'd love to hear them.
15  Q.  Okay.  The court reporter, sitting to
16  your right, is going to take down everything that's
17  said in this room today.  Unfortunately, she can't
18  record head nods and hand gestures.  So, if I ask
19  you a question, I'm going to ask you to respond
20  audibly.  Okay?
21  A.  Right.
22  Q.  All right.  She's also going to take
23  down counsel's objections, my comments.  So, I'm
24  going to ask you to try not to speak over me or
25  anyone else in the room.

12

1  A.  Right.
2  Q.  Sometimes --
3  A.  I'll do my best.
4  Q.  -- it becomes somewhat conversational,
5  and we want to try to avoid talking over one
6  another.  Okay?  You understand that?
7  A.  I do.
8  Q.  Okay.  You understand you're under oath,
9  and even though we're in a relatively informal
10  setting, the oath that you have taken is the same
11  oath you would take in a court of law.  Do you --
12  A.  Absolutely.
13  Q.  -- understand that?
14  We'll take several breaks today.  My
15  expectation is that we'll take one around every hour
16  or so, but at any time, if you'd like to take a
17  break, just let me know, and we can take a break.
18  A.  Great.
19  Q.  One caveat to that, if I'm in the middle
20  of a question or in the middle of a line of
21  questioning, I may want to complete that --
22  A.  Sure.
23  Q.  -- question or line before we take a
24  break.  You understand?
25  A.  Sure.  I do.

13

1  Q.  I'm going to ask you several questions
2  today.  I'll try to be as clear as possible.
3  There's no doubt that sometimes I won't be as clear
4  as I want to be, but if you don't understand a
5  question, just ask me to repeat it or clarify, and
6  I'll be glad to do so.  You understand?
7     A.  Will do.
8     Q.  Okay.  Throughout the deposition,
9  Mr. Gibbs will very likely object to several, many
10  or all of my questions.  Okay.  He's allowed to do
11  that.  However, if he objects to any of my
12  questions, you still will have to answer the
13  question unless he specifically instructs you not to
14  answer the question.  You understand that?
15     A.  I understand.
16     Q.  Okay.  Is there any reason why you can't
17  give your full and complete testimony today?
18     A.  No.
19     Q.  Are you on any medication that would
20  impact your ability to recall facts in 2000, 2001?
21     A.  No medication.  Obviously, there's a
22  five-year time lapse.
23     Q.  Sure.  I understand that.
24        At the end of your testimony, you'll
25  have an opportunity to review what we talked about

14

1  and make any minor corrections if you think that's
2  necessary.  So, you don't have to be absolutely
3  perfect today, but you won't be able to make big,
4  substantive changes.  You understand that?
5     A.  I understand.
6     Q.  You said you've had your deposition
7  taken before.  I assume that's more than once.
8     A.  Yes, correct.
9     Q.  Okay.  How many times?
10     A.  Three times.
11     Q.  And were you a party in any of the
12  depositions that you sat for?
13     A.  No.
14     Q.  Okay.  When was the last time you had
15  your deposition taken?
16     A.  March 2004.
17     Q.  Okay.  And that was related to Oracle?
18     A.  Yes, correct.
19     Q.  Prior to March of '04, do you recall
20  when -- the time before that you sat for a
21  deposition?
22     A.  I don't, but I would say it was probably
23  within a year of that.
24     Q.  Okay.  And was that in relationship to
25  Oracle Corporation?

15

1     A.  It did relate to Oracle, yes, correct.
2     Q.  Okay.  And there was at least one more
3  time before that?
4     A.  Correct.
5     Q.  And when was that?
6     A.  Probably about 1997.
7     Q.  '97.  Related to Oracle?
8     A.  No.
9     Q.  But you weren't a party to that action?
10     A.  No.
11     Q.  How long have you known that you would
12  testify in this action?
13     A.  This specific date?
14     Q.  Not this specific date.  This action.
15     A.  I don't recall.
16     Q.  Okay.
17     A.  I would say a year maybe.
18     Q.  Okay.  Have you done anything to prepare
19  for your deposition today?
20     A.  Yes.
21     Q.  What have you done?
22     A.  I met yesterday for about four hours
23  with the attorneys to my left and one other attorney
24  from Latham & Watkins.
25     Q.  Okay.  So, Mr. Gibbs, Miss Busby and

16

1  Mr. Maroulis?
2     A.  Correct.
3     Q.  And what was the name of the other
4  attorney?
5     A.  It was Michele Kyrouz.
6     Q.  And was that here in San Diego?
7     A.  Correct.
8     Q.  Where was that?
9     A.  At the Latham & Watkins office in
10  Del Mar area.
11     Q.  Okay.  And that was for about four
12  hours?
13     A.  Correct.
14     Q.  Okay.  Prior to yesterday, did you do
15  anything to prepare for your deposition?
16     A.  No.
17     Q.  And so, during the time -- well, you
18  learned maybe a year ago that you'd have to testify
19  in this case and didn't do anything until
20  yesterday --
21     A.  Correct.
22     Q.  -- right?
23        Did you have conversations with your
24  attorneys about the substance of the deposition
25  before yesterday?

17

1      A.  No.
2      Q.  Okay.  So, yesterday did you review any
3  documents in preparation for your deposition?
4      A.  Yes.
5      Q.  Okay.  And what would you say the volume
6  of documents that you reviewed was?
7      A.  Do you mean number?
8      Q.  Sure.
9      A.  Maybe ten.
10      Q.  Ten documents, okay.  And appreciating
11  that there is a significant time lag between the
12  events we're going to talk about today, did any of
13  the documents that you reviewed yesterday refresh
14  your recollection about events in 2000 or 2001?
15      A.  Not events, no.
16      Q.  Did the review of those documents
17  refresh your recollection about any occurrences or
18  subject matters occurring during 2000 and 2001?
19      MR. GIBBS:  Objection.  Vague, compound.
20      THE WITNESS:  Yeah, I remember seeing some
21  performance numbers --
22      MR. WILLIAMS:  Uh-huh.
23      THE WITNESS:  -- that Oracle achieved that I
24  achieved.
25  / / /

18

1  BY MR. WILLIAMS:
2      Q.  Helped you remember things happening
3  back then?
4      A.  No.  No, it was more a question -- I
5  remember a specific question, what was my revenue in
6  the previous year for the third quarter.
7      Q.  Okay.  And what was that recollection?
8      A.  That I didn't recall.  That's why I
9  asked to see the numbers.
10      Q.  Right.  And that's what I'm -- that's
11  what I'm getting at.  Once you saw the documents,
12  did they refresh your recollection about those facts
13  that you've just indicated to me?
14      A.  No.
15      Q.  No.  Okay.
16      So, you started working at Oracle
17  somewhere in '94, '95?
18      A.  July of 1995.
19      Q.  Okay.  And you started as a senior vice
20  president?
21      A.  Correct.
22      Q.  Of Consulting?
23      A.  Correct.
24      Q.  And what was the geographic area of your
25  responsibilities at that time?

19

1      A.  I had consulting for the Americas, which
2  entailed U.S., Canada and Latin America.
3      Q.  Okay.  And just generally, can you
4  describe what the consulting organization did in
5  that period?
6      A.  Oracle Consulting focused on the -- on
7  projects related to Oracle products.  And the reason
8  I differentiate that, other consulting firms might
9  do other kind of products, SAP, PeopleSoft, that
10  kind of thing.  But we focused exclusively on Oracle
11  products, applications and database.  And it would
12  be, Shawn, anywhere from the planning or feasibility
13  in using the products to the implementation of those
14  products.
15      Q.  And as -- well, as the years went by,
16  say, into 1999, did the scope of what the consulting
17  organization did at Oracle change from what you've
18  just described to me?
19      A.  As I recall, only slightly, and we did
20  more front-end feasibility work as time went on as
21  opposed to strict implementation.
22      Q.  Okay.  Just quickly describe for me what
23  you mean by "feasibility work."
24      A.  We would meet with a client, various
25  members of the client, and understand what their

20

1  business issues were in a particular area.  And then
2  we would use their input to help assess the fit for
3  our product or how best to implement our products.
4  That would be an example of feasibility --
5      Q.  Okay.
6      A.  -- I guess.
7      Q.  I'm sorry.  Over that same period of
8  time, between 1995 and, say, 2000, your
9  responsibilities changed, though, right?
10      A.  Correct.
11      Q.  And can you describe how your
12  responsibilities changed?
13      A.  It --
14      Q.  Let me withdraw that.  That's a little
15  broad.  Okay.
16      Were you promoted from senior vice
17  president after 1995?
18      A.  Correct.
19      Q.  To what?
20      A.  Executive vice president.
21      Q.  And when did that happen?
22      A.  I don't recall.
23      Q.  Okay.  It was before 2000, right?
24      A.  My recollection would have been that it
25  happened sometime in 2000.

21

1  Q.  Okay.  And so, between '95 and 2000, you
2  remained a senior vice president?
3  A.  As I recall.
4  Q.  All right.  And you were responsible for
5  the Americas throughout that entire period, at least
6  for consulting?
7  A.  For consulting.
8  Q.  Okay.  And in that period prior to you
9  being promoted to an executive vice president,
10  were -- did your responsibilities change?
11  A.  Yes.  They changed in two ways.  One is
12  after I'd been with Oracle for a couple of years, we
13  started to verticalize some of our consulting,
14  meaning becoming more and more industry focused.
15  And as we did that, some of those
16  practices were removed from my responsibility and
17  given to others.  That was relatively minor impact
18  as far as a P&L, managing a P&L.  And then I also
19  took over responsibility for all of Latin America,
20  which would be sales and consulting.
21  Q.  When you say "sales," are you talking
22  about license sales?
23  A.  Correct, for Latin America.
24  Q.  All right.  I'm going to do the best
25  that I can to make the differentiation between

22

1  license sales and consulting sales throughout the
2  day.
3  A.  Great.
4  Q.  But if it looks like I'm ever kind of
5  meshing the two, just correct me.  Okay?
6  A.  I will.
7  Q.  Okay.  So, at some point between 1995
8  and 2000, you had license responsibility or --
9  license sales responsibility?
10  A.  Correct.
11  Q.  And do you have an idea when that
12  occurred?
13  A.  I believe it was around 1998 that I took
14  on Latin America sales.
15  Q.  Okay.  Between 1995 and 1998, who were
16  you reporting to as the senior vice president?
17  A.  I initially reported to Robert Shaw.
18  Q.  All right.
19  A.  And then we made some organizational
20  changes in the company, and I reported to a
21  gentleman by the name of Barry Ariko, A-r-i-k-o.
22  And then I reported to Ray Lane, who was
23  the president of the company during that -- and I
24  believe it was about that time period, Shawn, that
25  I -- and it -- and it moved through those three in

23

1  the order that I gave you.
2  Q.  Okay.  And so, moving up to, say, the
3  summer of 2000 --
4  A.  Uh-huh.
5  Q.  -- that's when Ray Lane left, correct?
6  A.  Correct.
7  Q.  And your responsibilities broadened --
8  A.  Correct.
9  Q.  -- somewhat then?
10  A.  Correct.
11  Q.  And is that approximately the time you
12  were promoted to an executive vice president?
13  A.  I don't recall.  It may have been
14  slightly earlier than that.
15  Q.  Okay.  And you took on -- well,
16  withdrawn.
17  What is Oracle Product Industries, as
18  you know it?
19  A.  I'm not sure that it exists today.  It
20  may.  What it was when I assumed responsibility for
21  Oracle Product Industries, or OPI, if I can use that
22  acronym, in the summer of 2000, it was part of our
23  industry-focus effort.
24  And it focused on a subset of industries
25  in the marketplace, and it was largely around

24

1  discrete and process manufacturing.  So, it would be
2  industries such as automotive, aerospace and
3  defense, packaged goods, consumer packaged goods
4  companies, examples like that.
5  Q.  And you took over OPI from Ray Lane?
6  A.  No.  I took it over from Frank Varasano.
7  Q.  Well, when Ray Lane left, did you have
8  any additional responsibilities upon his departure?
9  A.  Yes.  And just for clarification,
10  Shawn -- I think I understand your question -- Frank
11  reported in to Ray, running OPI.  When Ray left,
12  Larry asked me to take on responsibilities for OPI,
13  so Frank reported in to me at that point.
14  Q.  Okay.  So, you took on Ray's
15  responsibilities of OPI?
16  A.  Correct.
17  Q.  All right.  And -- okay.  And you were
18  an executive vice president around that time?
19  A.  Correct.
20  Q.  And you reported directly to Larry
21  Ellison once you became an executive vice president;
22  is that fair?
23  A.  I reported to Larry as an executive vice
24  president.  I don't recall whether I was made EVP
25  for a period of time, reporting in to Ray first.  I

25

1  don't remember if it was coincident when I reported
2  to Larry.
3       Q.  Okay.  Well, let's talk about, after Ray
4  left, you were reporting directly to Larry
5  Ellison --
6       A.  Correct.
7       Q.  -- right?
8           And Frank Varasano was reporting up to
9  you?
10      A.  Yes.
11      Q.  And he was a senior vice president?
12      A.  I don't recall whether he was a senior
13 vice president or an executive vice president.
14      Q.  Okay.  And during that period, were you
15 attending weekly executive committee meetings?
16      A.  The period -- you say "that period,"
17 which period are you talking about?
18      Q.  Let me clarify for you.  Right now I'm
19 talking about once Ray Lane left --
20      A.  Uh-huh.
21      Q.  -- and you took over OPI.
22      A.  Yes.
23      Q.  So, summer of 2000?
24      A.  Yes.
25      Q.  And you were attending weekly executive

26

1  committee meetings?
2       A.  Yes.  They tended to be weekly -- I
3  mean, scheduled weekly.  That didn't mean they
4  always happened.  We may have had some event going
5  on in the company, trade show or something like
6  that, or Larry may have been traveling and
7  unavailable, something like that.  And we wouldn't
8  have an executive committee meeting at those
9  points --
10      Q.  Sure.  I understand.
11      A.  -- in time.
12      Q.  But generally -- well, you would attend
13 those meetings?
14      A.  Yes.
15      Q.  Where was your office in the summer and
16 fall of 2000?
17      A.  In Redwood Shores, Oracle headquarters.
18      Q.  Okay.  And did -- well, withdrawn.
19          So, you attended those executive
20 committee meetings live when you could?
21      A.  Correct.
22      Q.  Okay.  And when -- if you were
23 traveling, you would attend them by phone?
24      A.  Correct.
25      Q.  Did you have videoconference back then?

27

1       A.  I smile because it sounds like it was a
2  long time ago.  I believe we had those facilities,
3  but I never participated in videoconferencing.  It
4  was always by phone, as you suggest.
5       Q.  And during the summer and fall of 2000,
6  how did you -- well, withdrawn.
7           How many people were reporting directly
8  to you after July of 2000, after Ray Lane left and
9  you took over OPI?
10      A.  As I recall, it was about 6- to 7,000
11 people.
12      Q.  Reporting directly to you?
13      A.  Oh, I'm sorry.  Total in -- I'm talking
14 about total in my businesses.  Direct to me -- and
15 tell me the time frame again.
16      Q.  I'm talking about after July of 2001,
17 once you took over Ray Lane's position.
18      MR. GIBBS:  Objection.  Misstates his
19 testimony.
20      THE WITNESS:  Probably about five.
21 BY MR. WILLIAMS:
22      Q.  Five people.  And why don't you just
23 tell me who those people were at the time.
24      A.  Keith Block, who was running consulting
25 for U.S. and Canada; Frank Varasano, who was running

28

1  OPI sales and consulting; Sebastian Gunningham --
2  it's like Cunningham but with a "G," Gunningham --
3  who ran Latin America.  And I had an operations
4  manager or vice president, Rich Blotner,
5  B-l-o-t-n-e-r, and I probably had one more person in
6  some sort of staff role, as I recall.
7       Q.  Okay.
8       A.  That's to my best of my recollection.
9       Q.  Okay.  Richard Blotner, he was an
10 operations guy?
11      A.  Correct.
12      Q.  And was he responsible for all the
13 operations under you, or did he have a geographic
14 responsibility?
15      A.  When you say "operations," how do you
16 define "operations"?
17      Q.  Did you use the word "operations"?
18      A.  I didn't.
19      Q.  No?  Okay.  Well, let me withdraw the
20 question.  And why don't you describe Richard
21 Blotner's responsibilities for me.
22      A.  He was my VP of operations, but it
23 was -- sometimes operations -- the reason I asked or
24 the clarification, operations can mean somebody
25 who's truly in a P&L responsibility, and they've got

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

29

1    responsibility for the operations of the business.
2          The operations in our case meant it was
3    a staff role, and he reviewed contracts that were
4    being proposed. For example, if we submitted a
5    proposal or wanted to submit a proposal to a client
6    for product, Rich would review that proposal for me
7    to make sure that -- to his best ability that we
8    were complying with Oracle practices, revenue
9    recognition standards, good deal business sense,
10   those kinds of things.
11         Q. Okay. So, he didn't have any P&L
12   finance responsibilities?
13         A. No.
14         Q. Okay. Did you have someone in your
15   organization that did that for you?
16         A. I had somebody do it for me, Shawn. But
17   they did not report to me.
18         Q. Okay.
19         A. I did have a director of finance, and
20   that was Jim English.
21         Q. Okay.
22         A. But Jim reported solid line up through
23   the finance organization.
24         Q. Okay. All right. Did -- I always
25   mispronounce this person's name -- Ivgen Guner ever

30

1    work for you in that same position?
2          A. As a point of clarification, she never
3    worked for me --
4          Q. Okay.
5          A. -- but she did, as I recall, when I
6    first took over OPI, she was the finance director
7    that was assigned to my organization.
8          Q. Okay. That's fine. So, with respect to
9    Mr. Blotner, again, I don't know if you answered my
10   question as to whether or not he had a geographic
11   responsibility.
12         A. I did. And the answer was no.
13         Q. No. Okay.
14         A. Let me take a step back, Shawn. I'm
15   sorry. When you say did he have a geographic
16   responsibility, he didn't have any kind of P&L
17   geographic responsibility in that regard. The fact
18   that he worked for me, he covered the same territory
19   that I had responsibility for, which was U.S., it
20   was OPI sales and Latin America sales.
21         So, he -- I just want to be clear on
22   what you mean by -- or what I mean by "geography."
23   He didn't have any P&L responsibility, but he
24   basically overlapped, helping me in the areas that I
25   had responsibility for.

31

1          Q. Okay. At some point, did you have
2    worldwide consulting responsibilities?
3          A. I hesitate in answering and not because
4    I don't recall. I did have responsibility for a
5    worldwide organization in consulting called Service
6    Lines, and this would be methodology, training.
7    Service lines might be like, for example, financial
8    applications to help make sure that we were driving
9    competence, lessons learned, knowledge capital,
10   throughout the world. And I did that largely in a
11   facilitating basis. I didn't have direct
12   responsibility, for example -- I did not have direct
13   responsibility for EMEA Consulting.
14         Q. Well, the clarification that you've made
15   for me, when you -- back then when you described
16   your responsibilities at Oracle, did you describe it
17   as the person in charge of worldwide consulting?
18         A. No.
19         Q. Okay. So, if you can recall, do you
20   know how you may have described it?
21         A. I had consulting for Canada, U.S. and
22   Latin America.
23         Q. Okay. So --
24         A. I'm sorry, Shawn. Just to be clear on
25   that, and later on, I took OPI on. So, when I took

32

1    OPI on, I took on OPI consulting, and I did not have
2    responsibility for consulting within what we called
3    Oracle Services Industries, OSI. It was run by Jay
4    Nussbaum. And Jay had his own consulting
5    organization that addressed the financial services
6    market, utilities and the federal government, as I
7    recall. That was probably the bulk -- and
8    telecommunications.
9          Q. Now, when you say you were responsible
10   for service lines, methodology, training, what are
11   you referring to specifically?
12         A. That's -- I can give you some examples.
13   In methodology, there are different ways to
14   implement an application so that a customer gets
15   business value out of it. Over time there's become
16   an industry practice on the right way to do it.
17         An example, you plan the engagement,
18   engagement being the actual implementation, for
19   example. You do the design work where you marry the
20   client's requirements to the actual software. And
21   then the implementation, where you actually do the
22   coding and setting parameters in the software.
23         Also, in that implementation phase is
24   where you test, where you train and where you
25   convert the client's existing data, as appropriate,

33

1  over to the new application. And so, that process I
2  just described, there is a methodology.
3          And we had a methodology at Oracle on
4  how to do that that adhered to generally
5  practiced -- or complied with -- generally with
6  industry practices. But because we only did Oracle,
7  we were able to tailor it even more specifically to
8  Oracle products to help the teams that were
9  implementing which oftentimes consisted of Oracle
10  Consulting, it might be third parties, it would --
11  the client -- so that they get the best benefit of
12  the methodology as it relates to our practice.
13      Q.  Okay.
14      A.  So, that's what I mean by "methodology."
15      Q.  All right.
16      A.  In service lines, we -- how you
17  structure a general ledger, the chart of accounts,
18  is a very specific thing. Chart of accounts
19  meaning, like, debits and credits and the different
20  expense categories that you'd have, that kind of
21  thing.
22          Over time you would learn -- I mean, a
23  team would learn how best to do that. And so, we
24  put a lot of emphasis on capturing that knowledge so
25  that -- and extracting it from that team, as long as

34

1  it wasn't confidential/proprietary to a specific
2  client -- and so that the next consulting team can
3  use that information.
4          And so, that would be the kind of thing
5  that Service Lines would do. And we might do it
6  around the different applications. The example I
7  gave would be around financial applications. It
8  could also be around database. There's such things
9  as backup and recovery. So that if the lights dim,
10  then all of a sudden your computer took a hit,
11  that -- and data was lost, you'd have the ability to
12  make sure that you recovered the data.
13          So, there were practices such as that
14  that we would capture and codify and so that other
15  teams could use it. So, that's examples of what
16  Service Lines would do.
17          In training, that it might be training
18  around our software, how it works. It might be
19  training on the methodology that we use at Oracle
20  that I just described earlier to implement.
21      Q.  So -- and you had primary
22  responsibilities for all those three areas, at least
23  within the geographic scope of what you described to
24  me?
25      MR. GIBBS: Objection. Vague.

35

1      THE WITNESS: Yes, in the sense that I had
2  somebody reporting to me that had that
3  responsibility. I didn't do that myself --
4      MR. WILLIAMS: I understand.
5      THE WITNESS: -- by any means.
6      MR. WILLIAMS: I understand.
7  BY MR. WILLIAMS:
8      Q.  You described your organization in or
9  around the summer of 2000 to be approximately 7,000
10  people?
11      A.  I -- that's my recollection, but it's
12  something we could clearly verify.
13      Q.  Something like that. And the vast
14  majority of those people, were they consultants or
15  salespeople?
16      MR. GIBBS: Objection. Compound.
17      THE WITNESS: My recollection is that my
18  consulting organization was larger.
19  BY MR. WILLIAMS:
20      Q.  Okay. And the members of the consulting
21  organization, those people were the people who did
22  implementations?
23      A.  Correct.
24      Q.  Okay. And they would do the feasibility
25  portion of -- early portion of an implementation

36

1  and then the ultimate installation and
2  implementation of software?
3      A.  They could. Somebody else, the client,
4  may have done the feasibility study and asked Oracle
5  Consulting to come and do the implementation, or a
6  third party such as Bearing Point may have done
7  the -- I mean, the feasibility, and then Consulting
8  was brought in -- Oracle Consulting was brought in.
9  But we did have the capability in Consulting to do
10  the whole process --
11      Q.  Okay.
12      A.  -- including feasibility.
13      Q.  All right. And so, those consultants
14  doing implementations of Oracle software would
15  follow the standardizations that you just described
16  to me in training, methodology and -- what was the
17  third one of?
18      A.  Service lines.
19      Q.  And service lines, right?
20      A.  Yeah. Yeah, did they follow? That was
21  the intent.
22      Q.  Okay.
23      A.  To my -- we encourage that. You know,
24  with that number of people, some consultant could
25  decide to do something different. But generally,

37

1    yes, consultants use the methodology and service
2    lines --
3        Q.  Sure, that was the expectation.
4        A.  -- I just described.  Yes.
5        Q.  I'm sorry.  I didn't mean to talk over
6    you.
7            The expectation was that they would
8    follow those general parameters that were set by at
9    least people reporting to you, service lines,
10   training and methodology, correct?
11       A.  Correct.
12       Q.  All right.  In the summer of 2000, do
13   you recall -- or withdrawn.
14           In the summer of 2000, who was doing --
15   who was reporting up to you for service lines,
16   methodology and training?
17       A.  As I recall, it was -- it clearly was
18   Valerie Borthwick.
19       Q.  Sure.
20       A.  Valerie, I believe, as I recall, was now
21   reporting in to Keith Block.  There was a time that
22   I had Valerie reporting in to me as well.  But, for
23   example, when I took over OPI, at some point, in
24   order to provide the right kind of management focus
25   and structure, I asked Valerie to report in to

38

1    Keith.
2        Q.  And so, Valerie Borthwick would have the
3    responsibility for all three of those areas?
4        A.  As I recall, yes.
5        Q.  Okay.  And reporting in to Keith Block,
6    and Keith Block reported to you?
7        A.  Correct.
8        Q.  And did you meet with that -- well,
9    withdrawn.
10          How did you communicate with members of
11   your staff in the summer and fall of 2000?  And I'm
12   not talking about the sales consult -- withdrawn.
13          I'm not talking about the consultants on
14   the ground.  I'm talking about your direct reports
15   and maybe their reports under them.
16       MR. GIBBS:  Objection.  Vague, compound.
17       THE WITNESS:  It could be in various forms.
18   And it depends on the topic.  You know, if it was
19   forecasting, then -- I chunk it up this way.  If it
20   was around forecasting -- and I'm talking about
21   sales right now.
22   BY MR. WILLIAMS:
23       Q.  License sales?
24       A.  License sales.
25       Q.  Okay.

39

1        A.  Yeah, and, in fact, any time I use the
2    word "sales," I'll mean license sales --
3        Q.  Okay.
4        A.  -- if that's helpful.
5            In consulting, there is a selling
6    function, you're right, but we tend to use the
7    informal term "sales" meaning license sales.
8            In OPI, as an example, I would have a --
9    it depends on the time of the quarter, but I would
10   have either biweekly or weekly conference calls with
11   folks in sales to tell me what was going on with
12   specific clients, specific deals, and what their
13   forecast was.
14           I might have e-mails with any of my
15   directs and others around specific client
16   opportunities as an example, or giving me background
17   around a GE opportunity as an example.
18           And, certainly, the other two categories
19   would be by phone, and the last category where I'd
20   actually be out visiting with sales or with clients
21   or both around a particular opportunity.
22       Q.  Okay.  And same question with respect to
23   Larry Ellison:  How did you communicate with him in
24   terms of how business was going, at least in your
25   organization?

40

1        MR. GIBBS:  Objection.  Vague.
2        THE WITNESS:  Chunk it up again different
3    ways.  We would certainly have the executive
4    committee meetings, which were generally weekly, as
5    you've pointed out.  And I would oftentimes attend
6    those in person.  I usually tried to work my
7    schedule so that I would do that.  As I recall,
8    those meetings were on Mondays, and so, it was
9    helpful in my workweek -- in planning my workweek,
10   as opposed to being in the middle of the week.
11           I would sometimes communicate via
12   e-mail.  I would sometimes talk with Larry.
13   Oftentimes, if I communicate with Larry on the
14   phone, it was him calling me.  He was calling me as
15   opposed to the other way around.  He was a busy guy.
16           And I only would do that if it was
17   something that I felt was important enough or the
18   situation was such that I should talk to him
19   personally.  A lot of my communication was through
20   Safra.
21   BY MR. WILLIAMS:
22       Q.  Okay.  And with Safra, did you
23   communicate via e-mail or telephone?
24       A.  Sometimes via e-mail, but a lot of times
25   via telephone.  She was always accessible to me and,

41

1  you know, she was at headquarters as well.  And so,
2  a lot of times, it would be by phone.
3      Q.  And your e-mail address in the summer
4  and fall of 2000, do you recall what it was?
5      A.  I don't.
6      Q.  Okay.  Was it Sandy.Sanderson?
7      A.  I was going to say, if I had to guess,
8  it would be Sandy.Sanderson.
9      Q.  Did you have any other e-mail addresses
10  during that period?
11      A.  As I -- I think when -- this was a
12  period of time when e-mail was becoming more
13  fundamental to the business.  And in other words, we
14  were -- e-mail evolved over that time.  And I
15  believe when I first went there, my e-mail address
16  was Edward.Sanderson.
17      Q.  I want to direct your attention to May
18  of 2000.  You're familiar with 11i, right?
19      A.  Yes.
20      Q.  All right.  And what was your --
21  withdrawn.
22          What were your responsibilities at
23  Oracle in or around May of 2000?
24      A.  As I recall, in May of 2000, I had
25  responsibility for consulting, as I've described,

42

1  and Latin America.  I didn't have OPI at that point.
2      Q.  Okay.  And still had responsibility at
3  least -- withdrawn.
4          Someone in your organization still had
5  responsibility for methodology, training and service
6  lines, right?
7      A.  Correct.
8      Q.  And during May of 2000 and the release
9  of 11i, someone in your organization would have
10  those responsibilities as it related to 11i, right?
11      A.  Correct.
12      Q.  And was it still Valerie Borthwick or
13  someone else?
14      A.  It would be Valerie.  Again, she had a
15  pretty large organization, so she had people
16  underneath her who had responsibility for that
17  specifically.
18      Q.  Well, if you can recall, do you remember
19  any of the people that reported directly up to
20  Valerie Borthwick during that time?
21      A.  One would be Brad Scott --
22      Q.  Brad Scott.  Okay.
23      A.  -- in the CRM area.  There was a guy
24  named Tony -- I don't remember his last name -- that
25  used to review consulting bids, I believe, reported

43

1  in to Valerie.  Right now, I don't recall the other
2  people.
3      Q.  Okay.  But during that time, is it fair
4  to say that the consulting organization, at least
5  the consultants that were doing implementations,
6  were going to be trained or were trained on 11i?
7      A.  Correct.
8      Q.  And do you know whether that training
9  took place out in the field, or was it at Redwood
10  Shores?
11      A.  I think the answer is yes.  Both --
12      Q.  Okay.
13      A.  -- at headquarters and out in the field.
14      Q.  All right.  And did you participate in
15  the organization of the training of your
16  consultants?
17      A.  No.
18      Q.  Okay.  And who was responsible for that?
19      A.  Somebody in Valerie's organization.
20      Q.  Okay.  Now, would that also be part of
21  Keith Block's organization at that time?
22      A.  I believe by that time I had asked
23  Valerie to report under -- to go and report under
24  Keith --
25      Q.  Okay.

44

1      A.  -- report to Keith.
2      Q.  Okay.  Before coming to Oracle, you were
3  a consultant for a long time, right?
4      A.  Yes.
5      Q.  Did you ever do software implementations
6  yourself?
7      A.  Yes -- yes.
8      Q.  Okay.  Was that while you were at
9  McKenzie or -- well, did you do it while you were at
10  McKenzie?
11      A.  No.
12      Q.  Okay.  How about when you were with --
13  where did you go after McKenzie?  I don't remember
14  now -- Unisys.
15      A.  I ran an organization that did
16  implementations in a similar kind of role.  I was --
17  I started out at Unisys as a -- as I recall, as a
18  senior vice president and then I became president
19  for a short period of time of the worldwide
20  information services division.
21      Q.  Tell me when it was that you actually
22  did software implementation yourself.
23      A.  After I got out of the Navy which was in
24  1976, I went to work for Arthur Andersen, and I
25  specifically went to work for what is now Accenture.

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

45

1  So, it was that part of that division of Arthur
2  Andersen.  And when I first started at Arthur
3  Andersen, you actually start out as a programmer.
4  And so, I started programming in the basic assembly
5  language, very basic language in 19 -- late 1976,
6  and I stayed there 'til 1988.
7       And during my time, I started out as a
8  programmer, and then I became an analyst, and then I
9  became a project leader.  Then I became a project
10  manager, and then I became a manager that oversaw a
11  lot of projects, and then I became a partner at the
12  firm.
13       Q.  Okay.  So, you weren't doing any
14  implementations of applications back then, were you?
15       A.  Yes.
16       Q.  Okay.  Complex applications like 11i?
17       A.  I personally take the -- exception to
18  the word "complex."  Whether it was robust,
19  comprehensive, integrated is how I would describe
20  it.  Because of --
21       Q.  When you say "it," what are you talking
22  about?
23       A.  "It" being 11i.
24       Q.  Okay.
25       A.  And given that context, by the shear

46

1  fact that it does all that, there's certain
2  complexity with it than a basic application package
3  by VisiCalc was that preceded Excel.
4       Q.  Okay.
5       A.  So, the packages that I implemented back
6  then, by nature, were not integrated.  They might be
7  an accounts payable package or an accounts
8  receivable package or something like that.  And
9  that's the kind of stuff I did at Andersen --
10       Q.  Okay.
11       A.  -- in my early days --
12       Q.  Okay.
13       A.  -- in my early days.
14       Q.  You talked about two different things
15  there.  You said you personally take exception to
16  the term "complex" as it relates to 11i, right?
17       A.  Yeah.  The tag line that you gave to
18  11i --
19       Q.  Okay.
20       A.  -- was complex.
21       Q.  That's fine.
22       A.  I just said, since that's the
23  introduction of 11i, I wouldn't introduce it as
24  complex.
25       Q.  I understand.  That's fine.  But that's

47

1  your personal opinion, not necessarily what Oracle's
2  perception of the application was back then.
3       MR. GIBBS:  Objection.  Lack of foundation.
4       THE WITNESS:  I can't speak for --
5       MR. WILLIAMS:  Right.
6       THE WITNESS:  -- Oracle.
7       MR. WILLIAMS:  I understand.
8       THE WITNESS:  I speak for myself.
9       MR. WILLIAMS:  Right, exactly.
10  BY MR. WILLIAMS:
11       Q.  So, back to May of 2000, the release of
12  11i --
13       A.  Uh-huh.
14       Q.  -- Valerie Borthwick, at least her,
15  responsible for making sure the consultants in your
16  organization were trained on 11i --
17       A.  Correct.
18       Q.  -- right?
19       And do you know if they were given
20  implementation manuals?
21       A.  I don't recall.
22       Q.  Okay.
23       A.  I do know that they were given
24  guidelines and materials to facilitate their ability
25  to implement 11i.

48

1       Q.  Right.  As far as you knew, they
2  followed them?
3       A.  Yes.
4       Q.  Did you have an opinion as to whether or
5  not they were adequately trained back then?
6       A.  I thought the training was very good.
7  One of the challenges that we had with 11i, as any
8  software company has when they launch a significant
9  new release, is -- having training in the product
10  perfectly coordinated and just in the number of
11  people that you can get trained.  So, the first day
12  11i was released, we had some number of people
13  trained, and then over time, more and more people
14  got trained.
15       Q.  Well, you guys weren't waiting until the
16  product was released to train people on it, were
17  you?
18       A.  No, not at all.
19       Q.  Okay.
20       A.  In fact, we had consultants working with
21  Development actually helping test the software.  So,
22  Development organization, under Ron Wohl, got the
23  benefit of that.  And then our consultants got the
24  benefit of seeing the product firsthand.  So, it was
25  a, quote, win-win.  And then those are the

49

1 consultants that we used to go out and do the
2 initial implementations.
3      Q.  So, your -- so -- well, withdraw.
4           There are a lot of documents that I want
5 to show you today, and hopefully you can help me
6 understand what was going on at the time.  Maybe
7 it's a good time to start with that.  Would probably
8 put some context around some of the things that
9 we're talking about.
10          Actually, before I do that, there's some
11 individuals that you've already mentioned.  You told
12 me a little bit about frank Varasano and
13 Miss Borthwick.  There are a few other individuals,
14 I'm hoping you can kind of describe what their
15 responsibilities were before we look at some of the
16 documents.
17     A.  I'd be glad to.
18     Q.  Okay.  Mr. Fikany, what was his first
19 name?
20     A.  John Fikany, F-i-k-a-n-y.  John ran -- I
21 think when I initially took over responsibility for
22 OPI, he was responsible for the Ford account and
23 Covisint.
24     Q.  He was a salesman?
25     A.  Yes, yes.

50

1      Q.  Vice president, area vice president,
2 regional manager?
3      A.  He was either a regional manager or a
4 vice president.
5      Q.  Okay.  Reporting directly to you?
6      A.  He initially reported to Frank Varasano.
7 And then when Frank left, he, as I recall, reported
8 in to me.
9      Q.  Tom Thimot.
10     A.  I'm sorry.  One other thing on John
11 Fikany.  And then over time, I gave him
12 responsibility for all of automotive in Detroit.
13 So, he took on -- John took on responsibilities for
14 GM and DaimlerChrysler, Delphi, and other
15 automotive-related companies.
16     Q.  Okay.  Tom Thimot?
17     A.  Tom Thimot, T-h-i-m-o-t, he ran central
18 for a period of time.  I believe he was running
19 central when I took over OPI sales, central sales,
20 and then he left, my guess is, either late 2000 or
21 early 2001.
22     Q.  Area vice president, regional manager?
23     A.  Area vice president.
24     Q.  Area vice president.  How about Michael
25 DeCesare?

51

1      A.  Michael DeCesare, Mike DeCesare,
2 C-e-s-a-r-e, he was AVP for the west --
3      Q.  Steve --
4      A.  -- west sales.
5      Q.  License sales?
6      A.  License sales.
7      Q.  Okay.  Frank -- I'm sorry.  Steve
8 McLaughlin.
9      A.  Steve was the area vice president for
10 east sales for OPI.
11     Q.  Now, did the area vice presidents report
12 directly up to you, or was there a layer in between
13 them and you?
14     A.  Yeah, initially, they reported to Frank.
15 When Frank left, I had them report up to me.  And
16 then at some point, I moved Sebastian Gunningham
17 from running Latin America to take over OPI sales,
18 and at that point, they reported up to Sebastian.
19     Q.  Okay.  So, you had Steve in the west,
20 Mike in the east?
21     A.  Just the opposite.
22     Q.  The opposite, right.  And --
23     A.  And then Tom Thimot.
24     Q.  -- Tom in central.
25     A.  (The witness nodded his head.)

52

1      Q.  Were there any other area vice
2 presidents reporting up to you in that period?
3      A.  After Tom left, I had -- I had John
4 Fikany -- I think that's when I had John Fikany
5 report to me directly.  And then -- and I don't
6 recall now precisely -- I don't recall how I handled
7 organization when Tom left.
8           I believe I took one or two folks in
9 central that Tom had responsibility for and asked
10 them to report up to me at least for some period of
11 time.
12     Q.  Now, who -- earlier we talked about
13 License having a P&L and Consulting being a little
14 bit different.  Who had responsibility for
15 Consulting P&L in the fall and early winter of
16 2000 -- well, fall 2000, early 2001?
17     A.  And what --
18     MR. GIBBS:  Objection.  Vague.
19     THE WITNESS:  What consulting organization do
20 you mean?
21 BY MR. WILLIAMS:
22     Q.  Well, whatever consulting -- whatever
23 you were responsible for during that period.
24     A.  I -- then the answer would be for
25 consulting for North America, which would be U.S.

53

1  and Canada; and OP -- and after Frank left --
2  Varasano left, OPI Consulting.  So, those three
3  things: U.S., Canada and OPI Consulting reported in
4  to Keith Block.
5      Q.  Okay.
6      A.  Latin America Consulting reported in to
7  Sebastian Gunningham when he was running Latin
8  America.
9      Q.  Was Keith Block's office in Redwood
10  Shores as well?
11      A.  No.
12      Q.  Where was it?
13      A.  Boston.
14      Q.  In Boston, okay.
15          So, you communicated with him by
16  telephone and e-mail?
17      A.  Yes, correct.
18      Q.  As we go through the documents, I'll
19  probably jump around between topics, so just let me
20  know --
21      A.  Okay.
22      Q.  -- if it gets confusing, but I'm sure
23  you probably know this stuff better than I do.
24          I'm going to ask the reporter to mark
25  this document -- I'm sorry.  Withdrawn.

54

1          I'm going to show you what's been
2  previously marked as Klaiss No. 10.
3          Do you know Don Klaiss?
4      A.  Yes, I do.
5      Q.  Okay.  And was he a member of your
6  organization during the period we've been talking
7  about, say, in the summer 2000 into the spring of
8  2001?
9      A.  He did not report to me.
10      Q.  Was he in your organization?
11      A.  No.
12      Q.  Okay.  I'm going to ask you to take a
13  look at what's been previously marked as Klaiss
14  No. 10.  Let me know when you've had a chance to
15  take a look at it.
16      MR. GIBBS:  Just for the record, I want to
17  object.  I don't think the exhibit is complete.
18      MR. WILLIAMS:  Okay.
19      THE WITNESS:  Are there any other documents
20  that go with this?
21      MR. WILLIAMS:  There may or may not be.
22  Well, what's been put in front of you is Bates
23  numbered NDCA-ORCL 056045.
24          If there is another page to it, that's
25  not in front of you right now, but I'm going to ask

55

1  you to take a look at this page and let me know when
2  you're done.
3      THE WITNESS:  Okay.
4  BY MR. WILLIAMS:
5      Q.  Okay.  Do you recognize at least this
6  page of Klaiss No. 10?
7      A.  I don't recall sending this.  I don't
8  recall the e-mail.
9      Q.  But it's an e-mail written by you,
10  right?
11      A.  Correct.
12      Q.  No reason to believe it wasn't written
13  by you, is there?
14      A.  No.
15      Q.  And it's -- at least on the bottom half,
16  it's an e-mail from you to Don Klaiss and Ron Wohl?
17      A.  Yes.
18      Q.  All right.  And do you know what Don
19  Klaiss' responsibilities were in or around October
20  of 2000?
21      A.  As I recall, he had responsibility for
22  development of manufacturing applications.
23      Q.  Okay.  Now, I direct your attention down
24  to the text of your e-mail at the bottom.  See that?
25      A.  Uh-huh.

56

1      Q.  See where it says, "Don and Ron, as I
2  indicated in another e-mail, I will talk to Don
3  about this tomorrow, but I'm very frustrated about
4  this."  You see that?
5      A.  Uh-huh.
6      Q.  And if you go down to the -- well,
7  withdrawn.
8          See in the middle of that paragraph, you
9  write, "The gratitude given was no coverage of costs
10  for the consulting work and now a product APS that
11  does not work very well.  Why can't we deliver
12  product that works?"  What's APS?
13      A.  APS is advanced planning system, I
14  believe.  It's a manufacturing product, and it's the
15  planning module for a manufacturer.
16      Q.  And that module was part of 11i, wasn't
17  it?
18      A.  Yes.
19      Q.  And you go on to say, "This will require
20  another super human effort from consulting."  What
21  do you mean by that?
22      A.  One of the things that Development --
23  they really value consultants participating with
24  them to test the product, anywhere from bringing in
25  real-life experience of people who implement the

57

1    product in real-life to -- it just gives them more
2    arms and legs to test the product. And I was always
3    on Ron Wohl to compensate Consulting for this
4    service. And I was uniformly unsuccessful.
5        Q.  All right.
6        A.  But I always was trying to get him to
7    pay for consulting.
8        Q.  Is that what you were referring to when
9    you said it would require another super human
10   effort --
11       A.  Right.
12       Q.  -- trying to get him to pay?
13       A.  Yes.
14       Q.  All right. And to make things -- you go
15   on to say, "To make things worse, there's no
16   training for a product that was released in May,
17   five months ago." You see that?
18       A.  Uh-huh.
19       Q.  Wasn't training part of your
20   responsibility, or people in your organization?
21       A.  The training -- the initial training
22   that was -- for a product was built by the
23   Development organization.
24       Q.  What do you mean, it was "built" by
25   them?

58

1        A.  They -- the actual training materials
2    initially when prepared for -- prepared by the
3    development organization.
4        Q.  So, you're talking about the materials
5    that would be used to train consultants?
6        A.  Yeah, it would be -- to some degree.
7    The training that you might get out of Development
8    would be how the product worked, what the parameters
9    that are in the new software and how you set those
10   parameters in different situations, that kind of
11   thing.
12           And then in Consulting, we would take
13   that training material and think about, from an
14   implementation phase, when would you set those
15   parameters? Would you do it in the planning phase
16   or would you do it in the implementation? So, we
17   would build on the training they would provide.
18       Q.  So, what you're saying is that, at least
19   here, you're saying in October there was no training
20   materials for this specific application within 11i?
21       MR. GIBBS: Objection. Misstates his
22   testimony.
23       THE WITNESS: That's what the e-mail says,
24   with -- and I give one clarification. You say
25   "application." APS was a very specific module.

59

1        MR. WILLIAMS: Okay. Module.
2        THE WITNESS: Yeah, very specific module.
3        MR. WILLIAMS: That's fine.
4        THE WITNESS: And what it says here is that
5    we didn't have the training we needed.
6    BY MR. WILLIAMS:
7        Q.  Okay. And then you sent this up to
8    Valerie Borthwick?
9        A.  Right.
10       Q.  Do you recall whether or not she
11   responded to this e-mail?
12       A.  No, I don't.
13       MR. WILLIAMS: All right. Why don't we take
14   a short break. I think we've been going about an
15   hour.
16       THE WITNESS: Okay.
17       MR. WILLIAMS: Let's take five or seven
18   minutes.
19       THE WITNESS: Do you want this back?
20       MR. WILLIAMS: No.
21       THE VIDEOGRAPHER: Off the record at
22   10:40 [sic] a.m.
23           (A brief recess was taken.)
24       THE VIDEOGRAPHER: We are back on the record
25   at 10:17 a.m.

60

1        MR. WILLIAMS: I'm going to ask the reporter
2    to mark this document as Sanderson No. 1. It's the
3    complete e-mail that you have in front of you now
4    which was previously marked as Klaiss No. 10. Bates
5    numbers are NDCA-ORCL 056045 through 048. When she
6    marks that, she'll give you an opportunity to review
7    it.
8        THE WITNESS: What should I do with this
9    document?
10       MR. WILLIAMS: Nothing. Just put it to the
11   side.
12           (E-mail string dated 10/4/00 between
13   Sandy Sanderson, Don Klaiss and Valerie Borthwick
14   marked Exhibit 1 for identification.)
15       THE WITNESS: Did you want me to read --
16       MR. WILLIAMS: Yeah. Why don't you go ahead
17   and review, I guess, the second and third pages of
18   that. It kind of completes the series.
19       THE WITNESS: Okay.
20   BY MR. WILLIAMS:
21       Q.  Okay. Now, does what's been marked as
22   Sanderson No. 1 appear to be the complete series of
23   e-mails relating to this topic on October 4th of
24   2000?
25       A.  Shawn, I can say they're related. I

61

1 don't have any basis for saying it's complete.
2 Q. Okay. That's fine. I'm going to ask
3 you to direct your attention to Bates ending 047.
4 A. Uh-huh.
5 Q. And there appears to be an e-mail
6 written by you on the bottom of that page, right?
7 A. I see it. That's correct.
8 Q. And it's directed to a person named Ron.
9 That would appear to be Ron Wohl?
10 A. Correct.
11 Q. Okay. And you write that -- you write
12 to Ron, "I've been sitting through OPI ops reviews
13 the last two days." You see that?
14 A. Uh-huh.
15 Q. Why don't you just quickly describe for
16 me what an ops review is.
17 A. An ops review would typically be done on
18 an area or regional basis, so it could be an area
19 like the East or it could be regional like Texas.
20 And you review the -- the organization,
21 you review -- the organizational structure that you
22 have for the area under review. You would review
23 the -- their financial performance.
24 You would review sales programs that
25 they have ongoing within that area. You would look

62

1 at -- have some sense of their pipeline or who their
2 major customers are that they're pursuing and what
3 kind of deals are they or where do they need help.
4 Do they need help from Development or from me or
5 from some other part of the company.
6 Q. So, the ops reviews, there are your
7 direct reports and maybe additional people just kind
8 of telling you what's happening in their region --
9 A. Yes.
10 Q. -- in the organization of the country,
11 right?
12 A. Yes.
13 Q. And so, somewhere around October 4th
14 or a couple days before that, you were doing the ops
15 reviews for your organization?
16 A. One of my organizations --
17 Q. One of them.
18 A. -- yeah. At least one of them, yeah.
19 Q. And you write, "One issue that's come up
20 is APS references. We all acknowledge that it was
21 only released in May, but I'm not aware of any APS
22 references. Do we have any implemented," which is
23 underlined, "APS reference?"
24 Here, what are you referring to by
25 "implemented"?

63

1 A. Implemented, that it means it's up and
2 running at the customer.
3 Q. Okay. And so, as of sometime early
4 October, you weren't aware of any implemented APS
5 references?
6 A. According to this note, no.
7 Q. Okay. And you further write, "I know
8 about the install problems we've had at Cummins. Is
9 the product ready for prime time?"
10 Are you referring to APS only, or are
11 you referring to 11i as a suite there?
12 A. I can't imagine I was talking about 11i.
13 I'm talking about APS.
14 Q. Okay. All right. APS was supposed to
15 be integrated with other modules of 11i, right?
16 A. Correct.
17 Q. So, APS is not working, the other
18 modules couldn't work with APS at the time, right?
19 MR. GIBBS: Objection. Lack of foundation.
20 THE WITNESS: There would be certain modules
21 that wouldn't work well without APS, but a lot of
22 11i didn't depend on APS at all.
23 MR. WILLIAMS: Okay.
24 THE WITNESS: May I provide some point on
25 "reference"?

64

1 MR. WILLIAMS: If you'd like to say
2 something, go ahead.
3 THE WITNESS: "Reference" means that we've
4 got a customer that gives you a thumbs-up. And one
5 of the issues that you have in implementation is,
6 oftentimes, they take -- can take six months to a
7 year or so to implement. And I think that's why I
8 underscored the word "implemented."
9 BY MR. WILLIAMS:
10 Q. Okay. Meaning up and running?
11 A. Up and running.
12 Q. Meaning that -- fine.
13 I'm going to ask the reporter to mark
14 this document as Sanderson No. 2. It's Bates No.
15 NDCA-ORCL 039546 through 551.
16 (E-mail string dated 10/12/00 with
17 information re Ingersoll-Rand marked Exhibit 2 for
18 identification.)
19 THE WITNESS: Thank you.
20 BY MR. WILLIAMS:
21 Q. I'm going to ask you to just take a look
22 at --
23 A. Sure.
24 Q. -- Sanderson 2. Let me know when you've
25 had a chance to review it.

65

1    A.  Will do.  Okay.
2    Q.  I don't intend to ask you about the
3  entire document --
4    A.  Yeah.
5    Q.  -- but if you'd like me to direct your
6  attention to what I'm interested in, I'll do that.
7  Otherwise, read the whole thing.
8    A.  I just need another minute.
9    Q.  Okay.
10    A.  Okay.  Ready.
11    Q.  Okay.  Do you recognize Sanderson No. 2?
12    A.  No.  I do recall Ingersoll-Rand just a
13  little bit, but I don't recall the e-mail.
14    Q.  Okay.  It wasn't one of the documents
15  you reviewed yesterday, right?
16    A.  No.
17    Q.  All right.  And it appears to be a
18  series of e-mails between members of your staff,
19  then Safra Catz and Larry Ellison, right?
20    A.  Yeah, Safra was copied on the last
21  e-mail.
22    Q.  Okay.  Just directing your attention to,
23  I guess, the bottom of Bates ending 547 over to 548,
24  that is an e-mail from Dan Ackley to several
25  individuals including you, right?

66

1    A.  Correct.
2    Q.  Do you know who Dan Ackley is?
3    A.  No, I don't recall him.
4    Q.  Okay.  But a lot of the cc's in here are
5  members of your organization, like Frank Varasano,
6  Steve McLaughlin and then you?
7    MR. GIBBS:  Objection to the term "a lot."
8    THE WITNESS:  Yeah, I can't say "a lot."
9    MR. WILLIAMS:  I'll withdraw that part of the
10  question.
11    THE WITNESS:  The people that you named:
12  Chuck Linn -- Charles Linn was -- also worked for
13  me.
14    MR. WILLIAMS:  Okay.
15    THE WITNESS:  Okay.
16  BY MR. WILLIAMS:
17    Q.  All right.  And you indicated you don't
18  know who Dan Ackley is, correct?
19    A.  Correct.
20    Q.  Is it possible that he was a consultant
21  in your organization?
22    A.  The fact that I don't recall who he is
23  means he could be in any organization, including
24  mine.
25    Q.  Okay.  Going to the next page, as he

67

1  indicates that he's the account manager for
2  Ingersoll-Rand?
3    A.  Okay.
4    Q.  You see that?
5    A.  Yes.
6    Q.  And going down a little further, he
7  appears to describe the quote, unquote, "situation
8  at Ingersoll-Rand"?
9    A.  Uh-huh.
10    Q.  You see that?  It says, "We're in crisis
11  situation."
12    A.  Uh-huh.
13    Q.  "Ingersoll-Rand believes 11i, CRM and
14  CROM," which is order management, right --
15    A.  Correct.
16    Q.  -- "are not ready for deployment."  See
17  that?
18    A.  I do.
19    Q.  You indicated earlier that you
20  remembered some of the Ingersoll-Rand situation; is
21  that fair?
22    A.  That's correct.
23    Q.  Do you recall them believing that the
24  CRM and order management weren't ready for
25  deployment?

68

1    A.  No, I do not.
2    Q.  I'm going to direct your attention
3  further down the page -- well, in the same section,
4  still describing the situation.  See where it says,
5  "There appears to be little 11i documentation"?
6    A.  Uh-huh.
7    Q.  Okay.  And below that --
8    A.  Yes.
9    Q.  -- Mr. Ackley writes, "There appears to
10  be little 11i training"?
11    A.  Yes, I do.
12    Q.  And the 11i training portion, that was
13  part of what your organization was responsible for,
14  right?
15    A.  Now just as a clarification, Shawn, what
16  I said earlier, and it, the previous e-mail, helped
17  remind me, the initial training was built by
18  Development --
19    Q.  Okay.
20    A.  -- about the product, and then the other
21  part of the training built by Consulting is how to
22  implement the product.  So, it's two pieces of
23  training that go together.
24    Q.  Okay.  Are you able to determine by
25  looking at this e-mail which piece Mr. Ackley is

69

1 referring to?
2         A.  I can't.  I do not know.
3         Q.  But he sends it to you and a couple
4 people in your organization.
5         A.  Correct.
6         Q.  All right.
7         A.  As a point of clarification, he copied
8 me on it.  He copied me on it.  And one other point,
9 you can -- clearly, Dan Ackley is in sales, because
10 when he starts out, he's the account manager for
11 Ingersoll-Rand.  And so, he was providing his
12 perspective on the issue here.
13         Q.  Okay.  And you think he's in license
14 sales?
15         A.  Yes.
16         Q.  Frank Varasano was a license sales
17 person, right?
18         A.  Correct.
19         Q.  It appears that -- withdrawn.
20         If you look at the third line down on
21 Bates ending 48, he writes, "Frank Varasano and I
22 met today with Marv Walrath, CIO of Ingersoll-Rand.
23 It was not a pleasant meeting.  Given the urgency of
24 the situation, Frank asked that I generate this
25 e-mail to you both."  See that?

70

1         A.  Yes, I do.
2         Q.  And Frank was someone who was reporting
3 up to you in October of 2000, right?
4         A.  Correct.
5         Q.  Directing your attention to the previous
6 page, ending 547, top of the page looks like Frank
7 sends an e-mail to Ron Wohl and to you.  At least
8 he's cc'ing you.
9         A.  Correct.
10         Q.  Do you know why he was cc'ing you?
11         A.  Because I was his boss.
12         Q.  Right.  He wanted to make sure you knew
13 what was going on --
14         A.  Uh-huh.
15         Q.  -- right?  And he writes, "I believe
16 your personal involvement in fixing this would be
17 time well spent.  This could be a critical reference
18 for us, but the management team is very frustrated.
19 We're about to lose the CRM opportunity and a lot of
20 additional ERP business because of the situation
21 that Dan summarized in his e-mail."  You see that?
22         A.  Yes, I do.
23         Q.  Now, do you know if he's referring to a
24 license or consulting business?
25         A.  Probably both.

71

1         Q.  And is that because consulting, to some
2 extent, was related to license sales and that once
3 there was a license sale, in many instances, there
4 would be a follow-on consulting project?
5         A.  Correct.
6         Q.  All right.  Just directing your
7 attention to 546, the first page, and it's an e-mail
8 from you to Larry Ellison and Safra Catz, right?
9         A.  Correct.
10         Q.  October 12th, 2000, right?
11         A.  Uh-huh.
12         Q.  And here you become personally
13 involved --
14         A.  Yes, I do.
15         Q.  -- right?
16         A.  Uh-huh.
17         Q.  And you write to Larry, "Please see the
18 e-mail below from our account team at the client.
19 Ingersoll-Rand has been a big supporter of Oracle.
20 This should have been an easy sale."
21         What did you mean when you said
22 "Ingersoll-Rand was a big supporter of Oracle"?
23         A.  They were the big user or had been a big
24 user of Oracle product.
25         Q.  Uh-huh.  Another line down, you say,

72

1 "They're now seriously considering holding off on
2 this DB," which I assume is database, right --
3         A.  Correct.
4         Q.  -- "this quarter because of the APS
5 issue."  Is that right?
6         A.  That's -- that's what it says here,
7 correct.
8         Q.  And they had purchased 11i applications,
9 right?
10         A.  I don't recall whether they had
11 purchased or they were piloting the product.
12         Q.  You think they were piloting the
13 product?
14         A.  They could bring the product -- I don't
15 know.
16         Q.  Okay.
17         A.  I don't know.  They could have been --
18 there's a term "CRP" that's used in here, and that's
19 Conference Room Pilot.  And so, that's what they
20 were trying to do with the product.  And they may
21 have been piloting it.  Most likely, they had bought
22 the product.
23         Q.  Did you know Steve Carrington at
24 Ingersoll-Rand?
25         A.  I -- I don't believe I ever met him.

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

73

1    Q.  And in October of 2000, is it fair to
2  say that at least the second version of 11i had been
3  released, 11i.2?
4    A.  I don't recall.  I don't recall.
5    Q.  I'm going to show you what's been
6  previously marked as Block No. 2.  I'll ask you to
7  take a look at Block No. 2, which is Bates numbered
8  NDCA-ORCL 152033.0001 and 0002.
9    Just let me know when you're done.
10    A.  Sure.
11    Okay.
12    Q.  Okay.  Do you recognize Block No. 2?
13    A.  No, I don't.
14    Q.  Okay.  Not one of the documents you
15  reviewed yesterday?
16    A.  No.
17    Q.  All right.  But you see any dates in
18  that document?
19    A.  I see one.
20    Q.  Where is it?
21    A.  On 0001, about three-quarters of the way
22  down, and it says "2002."
23    Q.  Okay.  But in any of the headers to the
24  e-mail, you can't tell when either of these e-mails
25  were sent or received, right?

74

1    A.  Well, there's no header with this
2  e-mail.
3    Q.  Right.  I'm just going to direct your
4  attention to the first page, .001.
5    A.  Uh-huh.
6    Q.  In the middle of the page, it looks like
7  Keith Block is sending you an e-mail, right?
8    A.  Yes.
9    Q.  He says, "Sandy, I want to provide some
10  feedback regarding the issues we're facing
11  surrounding release of 11i.  After speaking to my
12  directs, there are two main concerns."
13    Who were Keith Block's directs in the
14  fall of 2000, if you know?
15    A.  Well, one, we don't know if this was
16  written in the fall of 2000.
17    Q.  I'm just asking you a question about the
18  fall of 2000.
19    A.  And who was his directs in the fall of
20  2000?  It could have been Valerie Borthwick, Mark
21  Salser, and then he had a structure which I believe
22  was east, central, west as well.  So, he had
23  somebody responsible for each of those.  Tim Meehan
24  in the east.  I don't remember who was central.  And
25  in the west was Gary Simler.

75

1    Q.  But Keith Block had consulting, right?
2    A.  In this case, for the U.S., correct.
3    Q.  Consulting for the U.S., meaning his
4  people were doing the implementations, right?
5    A.  Not necessarily.  Oracle Consulting was
6  oftentimes involved in implementations, but it could
7  have been -- and they could have been leading the
8  implementation.  It could be that Accenture is doing
9  the implementation, and Oracle Consulting is not
10  involved at all.  So, it varied depending on the
11  client.
12    Q.  Okay.  Was there anything else in the
13  U.S. in the fall of 2000 that was in charge of
14  Oracle consultants that were actually doing
15  implementations?
16    A.  No.  If it was Oracle Consulting in the
17  U.S., Keith would have that responsibility.
18    Q.  Okay.  So, in this e-mail he tells you
19  or he writes to you that after speaking to his
20  directs, there are two main concerns:  Lack of field
21  and customer training, which we've talked about
22  already, right?
23    A.  Uh-huh.
24    Q.  And the quality of the product itself?
25    A.  Right.

76

1    Q.  Do you know what he meant when he
2  said -- or wrote "the quality of the product
3  itself"?
4    A.  He was probably making a general
5  statement about 11i.
6    Q.  Okay.  And he goes on to say, "As far as
7  training goes, while we're hiring as fast as we can,
8  for people new to Oracle, we cannot get them trained
9  due to a lack of availability of courses."
10    What does that mean?
11    A.  That we are trying -- we are hiring new
12  people to Oracle, most likely not skilled in 11i,
13  since it was a new product and they were new to
14  Oracle.  And it's saying there's a lack of
15  availability of courses for those new people.
16    Q.  Were you -- was Oracle Consulting
17  selling consulting services, knowing that its
18  consultants weren't trained on 11i?
19    MR. GIBBS:  Objection.  Misstates the
20  testimony, argumentative.
21    MR. WILLIAMS:  It's not argumentative.  It's
22  a question.
23    MR. GIBBS:  It is argumentative.
24    THE WITNESS:  When you -- I think it
25  requires, Shawn, an understanding about software.

77

1    This was probably one of the most major releases of
2    software ever within the software industry.  And it
3    was comprehensive, it was integrated, and it was
4    large.
5           And when you first launch a product,
6    it's, I'm sure, just as a new practice area in a law
7    firm, you have fewer people that are skilled in it
8    and particularly if it's a growth area.
9           And it's not surprising to me, and I
10   think it would be the case for any software company
11   launching a product, that you're trying to get
12   training, skilled people and the product all at --
13   in sync.  And when you first launch a product,
14   that's not always the case.
15   BY MR. WILLIAMS:
16       Q.  Okay.  Just going a little bit further
17   down --
18       A.  Okay.
19       Q.  -- in Keith's e-mail to you --
20       A.  Uh-huh.
21       Q.  -- he writes, "In addition, we now
22   have -- we now have customers postponing
23   implementation since training's not available.  For
24   example, Yamaha, one of our largest clients in the
25   west, has told us that they are now going to wait

78

1    until 2002 to upgrade to 11i due to lack of training
2    and product quality."
3        A.  Uh-huh.
4        Q.  Okay.  Now, do you recall any client
5    other than Yamaha in the fall of 2000 that was
6    delaying an upgrade to 11i due to product quality
7    and/or training?
8        MR. GIBBS:  Objection.  Lack of foundation,
9    assumes facts not in evidence.
10       THE WITNESS:  I don't recall any
11   specifically.
12   BY MR. WILLIAMS:
13       Q.  Okay.  He further writes, "Another
14   example is Veriad, where when it came to schedule
15   training, the client was told that the training
16   material would be release 11, not 11i."  See that?
17       A.  Yes, I do.
18       Q.  So, in October of 2000, Oracle had not
19   developed even the training material to have its
20   consultants train customers on 11i --
21       MR. GIBBS:  Objection.
22   BY MR. WILLIAMS:
23       Q.  -- is that fair?
24       MR. GIBBS:  Objection.  Lack of foundation,
25   misstates the document.

79

1        THE WITNESS:  You're saying -- was the
2    question, Shawn, that in October 2000, we didn't
3    have the training?  Is that what you're saying?
4        MR. WILLIAMS:  Training material.
5        THE WITNESS:  And what it said here, if I
6    read the e-mail correctly, they were told the
7    soonest that on-site training could be scheduled was
8    October.
9        MR. WILLIAMS:  Okay.
10       THE WITNESS:  So, according to this, if we're
11   talking about 2000 -- and, obviously, we don't have
12   the date on this e-mail -- then it would say, in
13   that case, we would have training in October of
14   2000.
15   BY MR. WILLIAMS:
16       Q.  Okay.  So, at least at the time of this
17   e-mail, Oracle did not have the training materials,
18   at least what Keith Block is writing --
19       MR. GIBBS:  Object.
20   BY MR. WILLIAMS:
21       Q.  -- to train purchasers for 11i?
22       THE WITNESS:  I don't know --
23       MR. GIBBS:  Let me get the objection.  Lack
24   of foundation, misstates the document.
25       THE WITNESS:  I don't know -- I don't recall

80

1    Veriad.
2        MR. WILLIAMS:  Okay.
3        THE WITNESS:  And I don't know what part of
4    11i they were implementing.  So, it's hard for me to
5    comment on what training material was available or
6    not available.
7    BY MR. WILLIAMS:
8        Q.  Understood.  I'm going to ask you to
9    turn to the next page.
10       A.  Okay.
11       Q.  And in the middle of the remainder of
12   the e-mail, he writes to you, "I'm attaching a
13   spreadsheet which provides detailed account
14   information where we have been forced to work at no
15   cost due to product issues."  You see that?
16       A.  Yes, I do.
17       Q.  When he writes "work at no cost," does
18   that mean that consultants are providing services to
19   customers but are not being billed -- and those
20   customers are not being billed for those services?
21       A.  That's correct.
22       Q.  And "product issues" there, is it fair
23   to say he's still referring to 11i, right?
24       A.  Yes.
25       Q.  And then he writes, "In Q1 alone, this

81

1   equated to 1730 days, a North America hit of
2   approximately $3 million." See that?
3       A.  Yes, I do.
4       Q.  Does that mean that in Q1, there were
5   consultants working, and those hours couldn't be
6   billed, and there was a cost to Oracle in Q1 of
7   $3 million?
8       MR. GIBBS:  Objection. Lack of foundation.
9       THE WITNESS:  Ask the question again. I want
10  to make sure I answer it correctly, if you don't
11  mind.
12  BY MR. WILLIAMS:
13      Q.  Does that mean in Q1 there were
14  consultants working, and those hours couldn't be
15  billed, and there was a cost to Oracle in Q1 of
16  $3 million?
17      MR. GIBBS:  Same objection.
18      THE WITNESS:  That's the way I would read it
19  as well. And Q1 would be right after the product
20  was released. And having these kind of issues,
21  while disappointing, was not unusual for us or,
22  again, any major release of a product.
23  BY MR. WILLIAMS:
24      Q.  I understand. Okay. And Keith Block is
25  not referring to the entire company. He's just

82

1   referring to his organization, would that be fair to
2   say, with respect to the 3-million-dollar cost?
3       MR. GIBBS:  Objection. Lack of foundation.
4       THE WITNESS:  He's talking about North
5   America, which would be Canada and U.S. Consulting.
6   BY MR. WILLIAMS:
7       Q.  Okay. And he then writes, "As more
8   license deals are closed, I expect this number to
9   increase for Q2." You see that?
10      A.  Yes, I do.
11      Q.  "Due to the bugs and the number of
12  patches required in some cases, field consulting
13  teams have recommended to clients to wait until the
14  new year until the product shakes out." See that?
15      A.  Yes, I do.
16      Q.  Were you aware that consultants were
17  telling customers not to purchase the 11i until the
18  new year?
19      MR. GIBBS:  Objection. Lack of foundation.
20      THE WITNESS:  I don't recall that generally,
21  and I don't recall this e-mail.
22  BY MR. WILLIAMS:
23      Q.  Okay. But you don't think that Keith
24  was being untruthful when he wrote you this e-mail,
25  was he?

83

1       MR. GIBBS:  Objection. Lack of foundation.
2       THE WITNESS:  If you're asking about Keith's
3   veracity, I never had a question -- a reason to
4   question that.
5       MR. WILLIAMS:  Okay. I'll ask the reporter
6   to mark this document as Sanderson No. 3. It's
7   Bates numbered stamped NDCA-ORCL 169718 through 720.
8       (E-mail string dated 10/2000 re Ford
9   supply chain status marked Exhibit 3 for
10  identification.)
11      THE WITNESS:  Thank you.
12  BY MR. WILLIAMS:
13      Q.  I'm just going to ask you to take a look
14  at that document and let me know when you're done.
15      A.  Okay.
16          Okay.
17      Q.  Okay. You recognize Sanderson No. 3?
18      A.  No, I don't.
19      Q.  Not one of the documents you saw
20  yesterday, right?
21      A.  No, I didn't.
22      Q.  All right. But it appears to be an
23  e-mail at least -- well, a series of e-mails
24  including an October 19th e-mail from John Fikany
25  to you and several other people, right?

84

1       A.  Right.
2       Q.  Okay. And Frank Varasano, he was in
3   your organization, right?
4       A.  Correct.
5       Q.  Charles Linn was?
6       A.  Yes.
7       Q.  How about Nadeem Syed?
8       A.  Nadeem Syed. I don't recall.
9       Q.  Do you recognize any of the other names
10  in the "to" line that were in your organization in
11  October of 2000?
12      A.  No, none that I recall.
13      Q.  Okay. The subject line is "Ford Supply
14  Chain," so I'm assuming that's Ford, the motor
15  company --
16      A.  Correct.
17      Q.  -- right?
18          That's one of the customers that were in
19  your sales organization, right?
20      A.  Correct.
21      Q.  Do you know who Todd Allen is?
22      A.  No, I don't. I wondered that as well
23  when I read it.
24      Q.  Do you know why John Fikany sent you
25  this series of e-mails?

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

85

1       MR. GIBBS: Objection. Lack of foundation,
2   calls for speculation.
3       MR. WILLIAMS: If you know.
4       THE WITNESS: I can only speculate.
5       MR. WILLIAMS: You can speculate.
6       MR. GIBBS: Objection. Calls for
7   speculation.
8       THE WITNESS: That, like a good sales
9   manager, he wanted to -- any information about
10   product, particularly if there were concerns, he
11   wanted it elevated so that that would get addressed
12   so that would make his job of selling product easier
13   and more effective.
14   BY MR. WILLIAMS:
15       Q.  And he was an area vice president,
16   right?
17       A.  I believe so.
18       Q.  Okay. Going down to the -- I guess the
19   bottom third of the page. Todd Allen writes to
20   Mike -- I'm not sure who that Mike is. Well, he
21   writes, "We've been on the calls" -- "We've been on
22   the calls and expressed our concerns during the
23   calls. The problem we're dealing with is that we're
24   getting inconsistent information on a daily basis
25   regarding 11.5.2 release and patches. At this time,

86

1   we've put in every available patch for CRM up to
2   October 17th. This is over 100 CRM patches in
3   every" -- sorry -- "This is over 100 CRM patches in
4   the last two and a half weeks. We still can't get
5   contracts to work."
6       You see that?
7       A.  Yes, I do.
8       Q.  So, it's fair to say that in October of
9   2000, you knew that the CRM applications that were
10   sold to Ford, at least part of it, wasn't working,
11   right?
12       MR. GIBBS: Objection. Lack of foundation,
13   mischaracterizes the document.
14       THE WITNESS: I am copied on an e-mail where
15   that statement was made.
16   BY MR. WILLIAMS:
17       Q.  Ford was one of your largest clients,
18   wasn't it?
19       A.  Yes, it was.
20       Q.  So, it would be fair to say that you
21   knew that Ford was having a difficult time
22   implementing Oracle applications, right?
23       A.  I -- I recall that Ford had issues, yes,
24   I do.
25       Q.  Okay. And the issue that's articulated

87

1   here that the consultants had applied more than
2   100 -- or over 100 CRM patches in the last two and a
3   half weeks is not inconsistent with what you knew,
4   was it?
5       A.  You're asking me, Shawn, to speculate.
6   I can't say whether it was consistent --
7       Q.  Okay.
8       A.  -- or not. I didn't focus on the number
9   of patches. I focused on the fundamental issue of
10   whether the product worked like it was supposed to
11   and what did we need to do to get it there.
12       Q.  All right. And at least as of
13   October 19th, it appears that contracts didn't
14   work.
15       MR. GIBBS: Objection. Lack of foundation,
16   vague.
17       THE WITNESS: Based on this e-mail, it says
18   the contracts module was not working.
19   BY MR. WILLIAMS:
20       Q.  Okay. Let's go down to the next
21   paragraph where Todd writes "CRM organization needs
22   to step up and provide us development resources
23   on-site in Webster, New York. We know that Mark's
24   organization has done this for Ingersoll-Rand and
25   BellSouth, and we need the same attention." See

88

1   that?
2       A.  Yes, I do.
3       Q.  Did you know that the CRM organization
4   had provided on-site resources at Ingersoll-Rand?
5       A.  I don't recall.
6       Q.  Okay. And how about at BellSouth, did
7   you know that?
8       A.  I don't recall. And I probably, for
9   sure, wouldn't know BellSouth because BellSouth was
10   not one of my clients.
11       Q.  Okay. How about Xerox, was Xerox one of
12   your clients?
13       A.  Yes, they were.
14       Q.  Okay. Did you know that Xerox was
15   threatening to write a letter to Larry Ellison
16   asking for their money back?
17       A.  I mean, I see it in his e-mail. I don't
18   recall --
19       Q.  Okay.
20       A.  -- that happening.
21       Q.  All right. Did you know -- well,
22   withdrawn.
23       Looking at the very last sentence of
24   169718, beginning with "They"?
25       A.  Uh-huh.

89

1    Q.  Looks like Todd is referring to Xerox
2  when he writes, "They've also used words like 'your
3  company is two steps away from fraudulent.' If that
4  can't get us some help, I don't know what can."
5         You see that?
6    A.  Yes, I do.
7    Q.  Do you know whether Xerox ever accused
8  Oracle of being fraudulent with respect to the sale
9  of 11i applications?
10    A.  No, I don't.  And we don't know -- my
11  observation is we don't know who within Xerox.  It
12  could have been a coder.
13    Q.  I understand.
14    A.  It could have been somebody -- I don't
15  know who was making that statement.
16    Q.  I understand.  Do you know if you
17  responded to this series of e-mails?
18    A.  No, I don't.
19    Q.  Do you know if you took any action with
20  respect to the situation at Ford in or around
21  October of 2000?
22    MR. GIBBS:  Objection.  Mischaracterizes the
23  document, which clearly talks about Xerox.
24    MR. WILLIAMS:  It talks about Ford.
25    MR. GIBBS:  Ford is in the "re" line.  The

90

1  entire body talks about Xerox.
2    MR. WILLIAMS:  Okay.
3    MR. GIBBS:  You keep asking about Ford.
4    MR. WILLIAMS:  Okay.  Go ahead and answer the
5  question.
6    THE WITNESS:  Would you ask it to me again?
7  BY MR. WILLIAMS:
8    Q.  I'm asking you if you took any action
9  with respect to Ford in or around October of 2000?
10    A.  I can't recall.  I would also say I
11  can't imagine, as a responsible executive in a
12  company, that I didn't do whatever I could to help
13  rectify this situation.
14    Q.  Okay.  Do you know who Mark Keever is?
15    A.  As I recall, he worked for John Fikany,
16  but I don't recall anything more than that.
17    Q.  He was in license sales?
18    A.  Correct.
19    MR. WILLIAMS:  I'm going to ask the reporter
20  to mark this document as Sanderson No. 4.  It is
21  Bates numbered NDCA-ORCL 056049 through 50.
22         (E-mail dated 10/21/00 re 11.5.1 vs.
23    11.5.2 confusion marked Exhibit 4 for
24    identification.)
25    MR. WILLIAMS:  I'll ask you to just take a

91

1  look at it and let me know when you're done.
2         The reporter has told me that she has to
3  change the tape.  I think while he's reviewing the
4  document, we'll change the tape without taking a
5  break.  Is that okay?
6    THE VIDEOGRAPHER:  Off the record at
7  10:59 a.m., and this marks the end of Tape 1.
8         (A brief recess was taken.)
9    THE VIDEOGRAPHER:  This marks the beginning
10  of Videotape No. 2, Volume I, in the deposition of
11  Edward Sanderson.  The time is 11:04 a.m.
12  BY MR. WILLIAMS:
13    Q.  Mr. Sanderson, have you had an
14  opportunity to review number -- Sanderson No. 4?
15    A.  Yes, I have.
16    Q.  Okay.  Do you recognize it?
17    A.  No, I don't.
18    Q.  It's an e-mail from Kevin Glynn to you
19  in or around October 21st of 2000, right?
20    A.  Correct.
21    Q.  And do you know who Kevin Glynn is?
22    A.  Yes.  He was a consultant, and he was in
23  Valerie Borthwick's organization, and he was
24  somebody that Valerie had designated to operate as
25  an intermediary between Consulting and Development.

92

1    Q.  And was it unusual for him to send
2  e-mails directly to you?
3    A.  Periodically, he would give me updates,
4  and I don't recall this one specifically.  But it
5  was not unusual that I get e-mails from a number of
6  people in the company.
7    Q.  Okay.  And so, he sent this e-mail to
8  you, Sergio Giacoletto and Valerie Borthwick, right?
9    A.  Yes.  He sent it to me, copying those
10  other folks, right.
11    Q.  And Sergio ran what?  Europe?
12    A.  Correct.  He ran Europe, Middle East,
13  Africa.
14    Q.  Okay.  So, the body of the e-mail says,
15  "Hi, Sandy, this is the first of two e-mails on the
16  status of 11i."  See that?
17    A.  Yes, I do.
18    Q.  And 11i was the primary applications
19  product that Oracle was selling at the time, right?
20    A.  Correct.
21    Q.  And he indicates, "11.5.2," which is
22  11i, "is causing more confusion than help."  See
23  that?
24    A.  Yes, I do.
25    Q.  And "The CRM Rollup patches just

93

1  released that will not be certified on 11.5.2."  See
2  that?
3       A.  Yes, I do.
4       Q.  What does that mean?
5       MR. GIBBS:  Objection.  Calls for
6  speculation, lack of foundation.
7       THE WITNESS:  Because of the breadth of 11i,
8  you -- Oracle Development would release patches that
9  may apply to one part of 11i but not to another.
10  And what this is saying is the patches that are
11  coming out for CRM were not certified on 11.5.2.
12  So, that was a step that Development was going to
13  have to go through at some point to get those
14  patches to be consistent or certified on 11.5.2.
15  BY MR. WILLIAMS:
16       Q.  Okay.  So, the term "certified" does
17  that have scientific meaning as it's used in this
18  e-mail?
19       MR. GIBBS:  Objection.  Vague, lack of
20  foundation.
21       THE WITNESS:  I'm not sure what "scientific"
22  means.
23  BY MR. WILLIAMS:
24       Q.  Okay.  Well, does it have a
25  technological meaning?

94

1       A.  Does it have a specific meaning?  It
2  would mean that those patches were tested with
3  11.5.2, successfully completed the testing for
4  11.5.2.  And what this is saying is that had not
5  occurred yet.
6       Q.  Okay.  So, down at the next line, he
7  writes "Development EPR," which I'm assuming is
8  ERP --
9       A.  I think you're right.
10       Q.  -- "and CRM is now saying harmonization
11  will occur in 11.5.3, tentatively scheduled for the
12  end of November."  See that?
13       A.  Yes, I do.
14       Q.  And when -- do you know what Kevin Glynn
15  meant when he wrote "harmonization"?
16       A.  Yes.
17       MR. GIBBS:  Objection.  Calls for
18  speculation.
19       THE WITNESS:  That's when the CRP patches
20  will be certified with 11.5.2.
21  BY MR. WILLIAMS:
22       Q.  You mean CRM patches?
23       A.  He's saying ERP and CRM, so it's saying
24  that all -- the different patches that have been
25  released on 11i will be brought together and all

95

1  tested and consistent with each other in 11.5.3.
2       Q.  So, at least in October or as of
3  October 21st of 2000, some ERP and CRM modules,
4  including their patches, had not even been tested in
5  terms of their ability to work together.  Is that
6  fair?
7       MR. GIBBS:  Objection.  That completely
8  misstates his testimony and the document.
9  BY MR. WILLIAMS:
10       Q.  Is that fair?
11       A.  No.  No, I don't interpret that at all.
12  What it's saying is ERP and CRM, when 11i was
13  released, was tested.  Again, because of the
14  significance of the release, you're going to have,
15  in the breadth of the software, because it was the
16  first truly integrated ERP and CRM software.  We
17  called it the EBusiness Suite, and patches were
18  released in some cases on a stand-alone basis as
19  things were discovered.
20       As you might imagine, not every client
21  were -- was implementing the same software at the
22  same time, and so, you would have different patches
23  related to different pieces of the software.
24       Q.  Okay.  Why don't we take a look at the
25  next page.

96

1       A.  Okay.
2       Q.  This appears to be a chart prepared by
3  Kevin Glynn discussing possible client situations
4  and the recommended patching and upgrade, right?
5       A.  Correct.
6       Q.  If you go down to, I guess, the
7  fourth -- one, two, three -- entry where he writes
8  "ERP & CRM 11.5.1 client," see that?
9       A.  Yes, I do.
10       Q.  "Take CRM Rollup patches off Metalink.
11  Do not apply 11.5.2."  See that?
12       A.  Yes, I do.
13       Q.  And isn't it fair to say that he's
14  recommending that clients who are using or purchased
15  ERP and CRM 11.5.1 should not apply 11.5.2?
16       MR. GIBBS:  Objection.  Calls for
17  speculation.
18  BY MR. WILLIAMS:
19       Q.  Isn't that what it says?
20       A.  No.  No, it doesn't.  I mean, that's --
21  I understand your interpretation of that, but I
22  believe your interpretation is wrong.
23       Q.  Okay.
24       A.  What it's saying is when 11.5.1 or any
25  release is made to the product, it doesn't cover the

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

97

1  entire product.  And what he's done, actually very
2  nicely here, is lay out different client situations
3  and then recommending what clients do from a
4  patching and upgrade.
5       What it's saying is, in lieu of using
6  11.5.2, take the CRM Rollup patches out of Metalink
7  and also obtain the other ERP patches from Metalink.
8  So, that was the best path for clients that were at
9  that level.
10      Q.  At the --
11      A.  This is the kind of information that
12  Consulting really benefited from because then the
13  Consulting had this input and knew what the right
14  path was for their client as it relates to Oracle
15  product.
16      Q.  In terms of the right path -- well,
17  withdrawn.
18      Earlier in the same e-mail, he indicated
19  that 11 -- the CRM Rollup patches had not yet been
20  tested on --
21      A.  11.5.2.
22      Q.  -- with 11.5.2.  Right?
23      A.  Right.
24      Q.  And was it or was it not your testimony
25  that because they had not been tested yet on 11.5.2,

98

1  that one could not determine whether or not they
2  would be -- there would be harmonized, meaning that
3  they'd be working together properly at that time?
4      MR. GIBBS:  Objection.  Vague.
5      THE WITNESS:  Yeah, what the e-mail -- what
6  Kevin said in this e-mail on the first page is that
7  they would not be harmonized until 11.5.3.  What
8  he's saying here, specifically on the second page,
9  the fourth item down that you're talking about is,
10  if you try to install 11.5.2 you're going to have
11  problems because it's not been harmonized or
12  integrated or certified yet.
13      So, he's simply telling you -- he's
14  given guidance here for the consultants on the best
15  way to implement the products so you minimize the
16  issues that you're going to have.
17  BY MR. WILLIAMS:
18      Q.  Okay.  Do you know whether 11i.3 was
19  shipped in November of 2000?
20      A.  I don't recall, Shawn.
21      Q.  Had you asked for an update on the
22  status of 11i, or was this something that Kevin
23  Glynn periodically just sent to you as part of his
24  duties?
25      A.  I don't recall.

99

1      MR. WILLIAMS:  Okay.  Ask the reporter to
2  mark this document as Sanderson No -- are we at 5?
3  It's Bates numbered NDCA-ORCL 056051 through 54.
4      (E-mail dated 10/13/00 re Field Project
5  Feedback Needed on 11i Training & New Apps
6  marked Exhibit 5 for identification.)
7  BY MR. WILLIAMS:
8      Q.  Let me know when you're done.
9      A.  Okay.  I'm ready.
10      Q.  Okay.  Who's Heather Williams, do you
11  know?
12      A.  No, I don't.
13      Q.  Okay.  Sanderson No. 5 appears to be an
14  e-mail among people within your organization in or
15  around October 23rd, 2000.  Is that fair?
16      A.  Not completely.
17      Q.  Tell me how that --
18      A.  Paul Pinn, who I believe ran Asia
19  Pacific Consulting, did not report to me.
20      Q.  I didn't ask you if they reported to
21  you.  But they were --
22      A.  They're not in my organization.
23      Q.  Not even in your organization?
24      A.  No, correct.
25      Q.  Okay.  But Kevin Glynn was, right?

100

1      A.  Yes.
2      Q.  And Valerie Borthwick was?
3      A.  Yes.
4      Q.  All right.  And if you go to the last
5  page ending 053 -- I'm sorry.  It's not the last
6  page, but -- sorry, page ending 053 --
7      A.  Uh-huh, yes.
8      Q.  -- see where there's an e-mail from a
9  person by the name of Heather Williams?
10      A.  Yes, I do.
11      Q.  And she writes to the team, "OPI
12  Consulting," that's your organization, right --
13      A.  Yes, correct.
14      Q.  -- "has an opportunity to provide
15  feedback on 11i issues directly to Sandy Sanderson.
16  Sandy has requested feedback on specific experiences
17  that you are having or have faced in working with
18  release 11i in general and new applications such as
19  APS, Order Management, iStore, iProcurement,
20  Balanced Scorecard, CRM, etc., specifically in the
21  training area.  Sandy's looking to take the subset
22  of information from OPI and the Americas directly to
23  Larry early next week."  See that?
24      A.  Yes, I do.
25      Q.  Do you recall making such a request?

101

1    A.  No, I don't.
2    Q.  Okay.  Do you think that you did not
3  make such a request?
4    A.  Shawn, your question was do I recall.
5    Q.  No.  I'm not asking --
6    A.  And my answer was no.
7    Q.  Yeah.  And I'm asking you:  Do you think
8  that you would not have made such a request?
9    A.  Do I think I would not have made --
10  yeah, I probably -- I most likely made that request.
11    Q.  Okay.  And if you go back to Bates
12  ending 51 --
13    A.  Okay.
14    Q.  -- you see where at the top of the page
15  Kevin writes an e-mail to Valerie Borthwick?
16    A.  Uh-huh.
17    Q.  You see that?
18    A.  Yes, I do.
19    Q.  And he writes, "I talk to Chuan Yew on a
20  regular basis.  He's been one of the most harsh
21  critics of CRM and the 11i bug levels.  He has a
22  couple of gem quotes.  'CRM is broken' is a
23  favorite."  See that?
24    A.  Yes, I do.
25    Q.  Do you recall anybody ever telling you

102

1  or making such comments to you that "CRM is broken"
2  in the fall of 2000?
3    A.  No, I don't.
4    Q.  Okay.  Valerie Borthwick provide that
5  information to you or say that she had heard that
6  from members of the consulting staff around the
7  world?
8    A.  I don't recall.
9    Q.  Okay.
10    A.  As you see here, I'm not copied on this
11  e-mail.
12    Q.  I understand.  But your expectation was
13  that you wanted a -- you wanted feedback on 11i
14  issues, right?
15    A.  Right, and this would be one piece of
16  feedback.
17    Q.  Right.  So, do you think that Valerie
18  would have sent this information to you?
19    A.  Whether she sent this specific e-mail, I
20  don't recall.  I'm sure having requested, as
21  indicated here in the e-mail, a document was
22  provided to me that took the input from all the
23  folks that provided feedback.
24    Q.  Do you know whether you got such a
25  document?

103

1    A.  I don't recall.
2    Q.  Did you know Chuan Yew?
3    A.  No, I did not.
4    Q.  Did you know that people in
5  Consulting -- well, withdrawn.
6    I'm going to ask you to turn to Bates
7  ending 052.
8    A.  Okay.
9    Q.  Top of the page, appears that Mr. Yew
10  writes to Heather, "Generally, the new modules are
11  very buggy.  Culprits are APS, OM and CRM.  I think
12  the products have not undergone any form of
13  integration testing and is failing in this area."
14  You see that?
15    A.  Yes, I do.
16    Q.  Did people in your consulting staff
17  indicate to you that they felt that 11i had not
18  undergone any integration testing prior to its
19  release?
20    MR. GIBBS:  Objection.  Lack of foundation.
21    THE WITNESS:  I don't recall being told that,
22  and I know that integration testing had been done
23  with the product.  One of the challenges that
24  Development has is they test the integration of a
25  product within the environment that Development has

104

1  and its specific servers and specific database
2  technology or release.
3    As you get out into the field, one of
4  the challenges that we always had in consulting was
5  you had clients that operated on different hardware,
6  different operating systems, different versions of
7  the database would implement the applications in a
8  different way, that kind of thing.
9    And oftentimes in consulting, once
10  you're out there in the live environment, when
11  you're truly over a period of time testing the
12  product in multiple environments, you find more
13  issues.
14  BY MR. WILLIAMS:
15    Q.  Okay.  You see where Mr. Yew writes, "I
16  also think the patches are not well tested,
17  especially with other modules, to ensure that it
18  does not impact the system."  Do you see that?
19    A.  Yes, I do.
20    Q.  And it also says "Very often the patches
21  break a heck of a lot of other stuff."
22    A.  "A lot of stuff," yes.
23    Q.  I'm sorry.  "A heck of a lot of stuff."
24    Did you know whether 11i patches
25  actually caused other areas of the software not to

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

105

1  work once they were applied?
2       A.  I don't recall that.  What I would point
3  out is I'm sure this was one of the reasons Kevin
4  Glynn wrote Exhibit 4 to help provide clarity to the
5  field on how to implement using this table here
6  because of these kind of issues.
7       Q.  And -- okay.  Further down in the same
8  e-mail almost halfway down the page beginning with
9  the paragraph that says "Patches that are released
10  are not properly tested" --
11      A.  Okay.
12      Q.  -- see that?
13          This is actually a pretty accurate
14  statement when compared with Kevin Glynn's e-mail to
15  you of October 21st, indicating that at least the
16  CRM Rollup patches had not yet been certified on
17  11.5.2, right?
18      MR. GIBBS:  Objection.  Vague, lack of
19  foundation.  That mischaracterizes both documents.
20      THE WITNESS:  Shawn, do you mind asking the
21  question again?  It would help me answer it
22  correctly.
23  BY MR. WILLIAMS:
24      Q.  Okay.  See where Mr. Yew writes,
25  "Patches that are released are not properly tested"?

106

1  See that?
2       A.  Yes, I do.
3       Q.  And that's on October 20 -- well,
4  sometime -- looks like October 21st or sometime
5  shortly before that, right?
6       A.  Correct.
7       Q.  And that's consistent with what
8  Mr. Glynn had written to you on October 21st,
9  indicating to you that the CRM Rollup patches had
10  not been tested on 11.5.2?
11      MR. GIBBS:  Objection.  Vague, lack of
12  foundation, mischaracterizes both documents.
13      THE WITNESS:  There was a couple points --
14      THE REPORTER:  I'm sorry.  I couldn't hear
15  the end of your objection.  I heard, "Vague, lack of
16  foundation."
17      MR. GIBBS:  Mischaracterizes both documents.
18      THE WITNESS:  What Kevin said in his
19  document, which is Exhibit 4, on the 21st of
20  October, is the CRM patches have not been tested and
21  certified with 11.5.2.  That doesn't mean that they
22  haven't been tested.
23  BY MR. WILLIAMS:
24      Q.  Okay.  Do you recall taking some issues
25  raised by consultants to Larry Ellison specifically?

107

1       A.  I don't recall specifically.  I do know
2  that in -- for example, in our executive committee
3  meetings, Larry would periodically ask for feedback
4  on the product in the early implementations out in
5  the field, and that was not an unusual occurrence.
6       Q.  It was not an unusual occurrence for you
7  to provide that information?
8       A.  Either Larry would ask for the
9  information -- I mean, typically that would be a
10  driver for it.  He would want to know how the
11  implications are going out in the field, the early
12  implementations particularly.
13      Q.  Okay.  Let me show you what's been
14  previously marked as Cullivan No. 9, which is Bates
15  numbered NDCA-ORCL 617453 through 462.
16          I'd just ask you to take a look at that
17  document and let me know when you're done.
18          I can direct your attention to the
19  section I'm interested in or you can read the entire
20  thing.
21      A.  Let me just do a quick cursory review.
22      Q.  Okay.
23      A.  Okay.
24      Q.  Okay.  Do you recognize Cullivan No. 9?
25      A.  No, I do not.

108

1       Q.  Okay.  Going to the second page, 617454,
2  it appears to be an agenda for NAS Executive Dialogs
3  in November of 2000, right?
4       A.  Correct.  That's George Roberts'
5  organization.
6       Q.  Right.  And if you go to the next page,
7  at about halfway down the page, it says
8  "Participants confirmed to attend the November 2nd
9  E-Business Suite dialogue."  See that?
10      A.  Yes, I do.
11      Q.  A couple of your reports are listed
12  there:  Keith Block, Valerie Borthwick?
13      A.  Yes, that's correct.
14      Q.  Who's Rudy Corsi?
15      A.  Rudy Corsi was Keith's operations
16  manager as best I recall.
17      Q.  And so -- okay.  Going to the next page,
18  see where it says "CRM Session"?
19      A.  Yes, I do.
20      Q.  And it says, "Main issue:  No live
21  sites."  See that?
22      A.  Yes.
23      Q.  Do you know that in November -- at least
24  as of November 2nd of 2000, that Oracle had no
25  customers live on 11i CRM?

109

1    MR. GIBBS: Objection. Lack of foundation.
2    THE WITNESS: I don't recall that, but it's
3  not surprising.
4    MR. WILLIAMS: And --
5    THE WITNESS: And the reason I say it's not
6  surprising is because of the time that it takes to
7  implement the product even if it was not a
8  newly-released product.
9  BY MR. WILLIAMS:
10    Q.  Okay.  Do you know Tom Sheehan of
11  Entegra?
12    A.  No, I do not.
13    Q.  Have you ever heard of him?
14    A.  No.  I don't recall his name or the
15  company.
16    Q.  Okay.  Ask you to turn your attention to
17  617458.
18    A.  Okay.
19    Q.  Just going down to -- well, withdrawn.
20        See where it says "Joint Development -
21  CRM/ERP"?
22    A.  Yes, I do.
23    Q.  And down where it says "11i Product
24  Issues," see that?
25    A.  Yes, I do.

110

1    Q.  It says, No. 1, "Product quality in 11i
2  both for CRM and ERP is causing problems with
3  customers trying to implement."  See that?
4    A.  Yes, I do.
5    Q.  Did you know that product quality in 11i
6  both for CRM and ERP was causing problems with
7  customers trying to implement in or around November
8  of 2000?
9    MR. GIBBS: Objection. Vague, lack of
10  foundation.
11    THE WITNESS: I don't recall specifically,
12  but I'm sure I understood it at the time.
13  BY MR. WILLIAMS:
14    Q.  What's a fixed-bid proposal, if you
15  know?
16    A.  Are you talking about consulting?
17    Q.  Yes.
18    A.  A fixed-bid proposal is for a defined
19  scope, which includes what's included and what's not
20  included.  So, you define what's included within the
21  scope, and also you want to define what's not
22  included so there's no question with the customer if
23  they later say, "Well, what about this?"  And for
24  that you specify a price for doing -- a fixed price
25  for doing that work.

111

1    Q.  For consulting work?
2    A.  Yeah.  With the defined scope, yes.
3    Q.  So, it gives, I guess, the consulting
4  organization or -- withdrawn.
5        It gives the customer a definite kind of
6  level of payment for consulting work that's going to
7  be done?
8    A.  It allows them to -- right, to plan
9  within the scope what they're going to pay for for
10  that project.
11    Q.  In the fall of 2000, was Oracle doing
12  fixed-bid proposals for 11i implementations?
13    MR. GIBBS: Objection. Vague and ambiguous.
14    THE WITNESS: I don't recall.
15    MR. WILLIAMS: I think we've been going for
16  about an hour, and I'd like to take a five-minute
17  break if that's okay with you.
18    THE WITNESS: Sure.  That sounds great.
19    THE VIDEOGRAPHER: Off the record at
20  11:33 a.m.
21        (A brief recess was taken.)
22    THE VIDEOGRAPHER: We are back on the record
23  at 11:47 a.m.
24  BY MR. WILLIAMS:
25    Q.  I'm going to show you what's been

112

1  previously marked as Cochran No. 4, and it's Bates
2  numbered NDCA-ORCL 101671 through 673.  Ask you to
3  take a look at it and let me know when you're done.
4    A.  Okay.
5    Q.  Do you recognize what's been marked as
6  Cochran No. 4?
7    A.  No, I do not.
8    Q.  At least part of it is an e-mail from
9  Mark Jarvis to you and several other Oracle
10  executives, right?
11    A.  Correct.
12    Q.  And that's on or around November 8th
13  of 2000?
14    A.  Correct.
15    Q.  Okay.  And do you know Paul Seminara?
16    A.  I do not.
17    Q.  Is he somebody in your organization or
18  somebody that was in your organization?
19    A.  No.  He was in George Roberts'
20  organization.
21    Q.  Okay.  And how can you tell?
22    A.  Because on page 673, at the end, it says
23  he's a regional manager, New York Major Accounts,
24  and George had responsibility for that.
25    Q.  Great.  Did you know that in --

113

1  withdrawn.
2      Who is Mark Jarvis?
3      A.  Mark Jarvis at the time was the head of
4  marketing for the company.
5      Q.  Do you recall in November of 2000 him
6  seeking information about customers who had actually
7  implemented 11i?
8      A.  I do not.
9      Q.  And your organization supported North
10  American sales in terms of consulting; is that fair?
11      A.  Correct.
12      Q.  And do you see this e-mail from Paul
13  Seminara to George Roberts on November 9th?
14      A.  Yes, I do.
15      Q.  Do you know whether or not you
16  ultimately got a copy of this e-mail from -- through
17  some other forward?
18      A.  I don't recall.
19      Q.  And do you see where Paul writes
20  "George, I'm trying to be constructive here, but as
21  you know, we're up to our ears in alligators on 11i
22  implementations." See that?
23      A.  Sure.  Yes.
24      Q.  You see where he further writes, "I
25  believe we need to have a plan to fix the problems

114

1  before we can address the issue of PR"?  See that?
2      A.  Yes, I do.
3      Q.  Did you in November of 2000 share that
4  belief?
5      MR. GIBBS:  Objection.  Vague.
6      THE WITNESS:  I don't recall.
7  BY MR. WILLIAMS:
8      Q.  Okay.  See the next line where he
9  writes, "I have two major 11i customers who are
10  trying to go into production for January 2001 and a
11  third customer who is right behind them.  The
12  stories are all similar." See that?
13      A.  I see that, yes.
14      Q.  Do you know whether or not members of
15  your consulting organization were working with
16  GMP Worldwide trying to get 11i applications
17  implemented in November of 2000?
18      A.  I do not.  It was mentioned that Cap,
19  Gemini, Ernst & Young is the integrator, so they
20  could have well been doing it themselves.
21      Q.  And how about did you know whether
22  anyone in your consulting organization was working
23  with Paxar trying to get their 11i implementation up
24  and running?
25      A.  I don't recall, but the e-mail says

115

1  "OCS," which is Oracle Consulting Services, "is
2  doing the implementation."
3      Q.  Okay.
4      A.  So, it would have been my organization.
5      Q.  And in that same section, it indicates
6  "OCS is doing implementation and a fantastic job
7  under the circumstances. 1700 hours of nonbillable
8  bugs." Do you see that?
9      A.  Yes, I do.
10      Q.  Do you have an understanding of what
11  that means?
12      MR. GIBBS:  Objection.  Calls for
13  speculation.
14      THE WITNESS:  When you say "what that means,"
15  what is "that"?
16      MR. WILLIAMS:  1700 hours of nonbillable
17  bugs.
18      MR. GIBBS:  Same objection.
19      THE WITNESS:  I don't.  It's a -- it was 1700
20  hours of consulting time spent on bugs were issues
21  that could not be charged to the client -- or to the
22  customer.  I don't know what his basis is.  I don't
23  know what his source of information is.
24  BY MR. WILLIAMS:
25      Q.  Okay.  Were you familiar with the

116

1  consulting effort at Paxar in the fall of 2000?
2      A.  I don't recall.
3      Q.  Okay.  And -- well, if your organization
4  was absorbing 1700 hours of nonbillable service, is
5  that something that would be brought to your
6  attention?
7      A.  We would track -- it wouldn't
8  necessarily have it by Paxar, or I might get a
9  report that says, "Here are nonbillable hours," and
10  it might list the customers, that kind of thing.
11  And I might get that information -- I would get that
12  information.  I don't know that I got a specific
13  e-mail around Paxar.
14      Q.  Okay.  See where he further writes, "We
15  have escalated all the way to Ron Wohl, who's been
16  involved directly, but Oracle cannot get the release
17  to be stable"?  See that?
18      A.  Yes, I do.
19      Q.  "They acknowledge our effort thus far,
20  but we have not delivered results.  This is a
21  patient and reasonable customer, and they're right."
22  You see that?
23      A.  Yes, I do.
24      Q.  Do you know whether or not that
25  information was forwarded along to you?

117

1   A. I don't recall.
2   Q. Do you know what a SWAT team is?
3   A. Yes, generally.
4   Q. Can you tell me what that is?
5   A. Are you talking about in this context?
6   Q. Generally, a SWAT team.
7   MR. GIBBS: You mean an actual SWAT team?
8   THE WITNESS: Yeah. Do you --
9   MR. WILLIAMS: Well, I'm talking about the
10  context of Oracle Consulting --
11  MR. GIBBS: Objection. He said in general --
12  MR. WILLIAMS: No. He said in the context of
13  the document.
14  THE WITNESS: In the context of Oracle
15  Consulting or just Oracle in general, a SWAT team
16  would be a team that would consist of members. It
17  would be -- could be from Consulting, it could be
18  from Support, it could be from Product Development.
19  It's just the right people that you bring together
20  to address the issues.
21  BY MR. WILLIAMS:
22  Q. Okay. And did Oracle Consulting in the
23  fall of 2000 have SWAT teams?
24  A. I don't recall. It was not an uncommon
25  practice during the six years that I was at Oracle

118

1   that we periodically would have teams like that to
2   address specific issues.
3   Q. Okay. Just a general question I meant
4   to actually get to before: Can you describe how --
5   in the fall of 2000 and early 2001, how Oracle's
6   support organization worked with the consulting
7   organization, if they worked together at all? What
8   was the relationship between the two organizations?
9   MR. GIBBS: Objection. Vague, lack of
10  foundation.
11  THE WITNESS: The support organization was
12  run by Randy Baker. Randy and I had a good
13  relationship. They and Oracle Consulting had the
14  same objective, "they" being Support. Oracle
15  Consulting had the same objective, and that was
16  making customers successful with their
17  implementations.
18  We clearly had different roles, but I
19  would call it a Venn diagram, and there was some
20  overlap. And some of the procedures that Support
21  would use to help a customer, Consulting would
22  benefit from using them.
23  And, likewise, Oracle Consulting may do
24  something out in the field that they saw that might
25  apply to more than one customer, and they'd feed

119

1   that back to the Support organization so they would
2   have the benefit of that. All in all, I'd say it
3   was a collaborative relationship.
4   BY MR. WILLIAMS:
5   Q. Is it fair to say that once Oracle
6   consultants completed an implementation, then the
7   responsibility of, sort of, maintaining the customer
8   relationship with respect to the functionality of
9   the product would then shift to Support?
10  MR. GIBBS: Objection. Vague.
11  THE WITNESS: I would answer it this way,
12  Shawn: The customer relationship always remained
13  with the account manager, the sales account --
14  license sales account manager.
15  And so, whether Oracle Consulting was
16  there, whether it was an implementation going on or
17  not, that account manager had responsibility. If it
18  was a very specific question around the product,
19  Support organization would do that. If the client
20  had more questions -- you know, more than a few
21  questions or was considering a new implementation
22  whatever, then Oracle Consulting would come back in.
23  BY MR. WILLIAMS:
24  Q. Okay. So, if say, for example, after an
25  implementation, a customer had continued difficulty

120

1   with the functionality of the software, and Oracle
2   had to supply either support or consulting resources
3   to the customer at no cost, did Support and
4   Consulting share expenses, or would that cost be
5   absorbed by one or the other?
6   MR. GIBBS: Objection. Vague, compound.
7   THE WITNESS: It is a bit of a general
8   question. When we sold license to -- a product to a
9   customer, typically what went with that is
10  20 percent of the revenue, the license revenue,
11  would go to Support.
12  So, if it was a million-dollar license
13  deal, $200,000 of revenue would be attached to that
14  as well, and that would go to Support. So, that
15  helped fund Support's role in serving clients.
16  We -- so, support basically was covered
17  in a macro sense. And I say in a macro sense
18  because they had support revenue to support their
19  organization -- to fund their organization.
20  On the consulting side, if we went back
21  in to help a client at -- oftentimes and typically,
22  it was for fee. At times if they were having an
23  issue, we would go in and not charge, at least not
24  initially, until we figured out what the issue is.
25  It could have been product issues. It

121

1  could have been the way that was implemented, if it
2  hadn't been done by Oracle, or even if was done by
3  Oracle Consulting.  It could be that there was an
4  upgrade provided by Support to the product, and the
5  client chose to implement it themselves and may not
6  have done it right, and so, Oracle Consulting might
7  be brought in to help rectify that situation as
8  well.
9      Q.  Oracle Consulting and Oracle Support had
10  separate P&Ls, right?
11     A.  Correct.
12     Q.  All right.  Let me show you what's been
13  previously marked as Roberts No. 5.  It's Bates
14  numbered NDCA-ORCL 039330 through 332.
15         I'll ask you to take a look at it and
16  let me know when you're done.
17     A.  Okay.
18     Q.  Okay.  You recognize Roberts No. 5?
19     A.  No.
20     Q.  But it's an e-mail from Michael Cochran
21  to George Roberts, cc'ing you and others, right?
22     A.  Correct.
23     Q.  Okay.  And it's fair to say that people
24  in your organization were working with Paxar, right?
25     A.  Correct.

122

1      Q.  And in or around December of 2000, it
2  appears that Paxar was still having some of the
3  difficulties implementing the software that were
4  described in -- now I can't remember, but Sanderson
5  number -- was it 5?
6      A.  It was Cochran 4.
7      Q.  I'm sorry.  Cochran 5.
8      A.  Cochran 4.
9      Q.  4.  Is that fair to say?
10     A.  Yes.
11     Q.  And if you take a look at the next page,
12  Bates ending 331 -- actually, you know what.  Go
13  back to the first page.  The e-mail from Michael
14  Cochran starts out, "Victor Heschaft, Paxar's Vice
15  Chairman, has been dealing with an extremely
16  critical 11i implementation.  By all accounts from
17  those involved, this has been very ugly, and we've
18  put the customer through extreme hardship."  You see
19  that?
20     A.  Yes, I do.
21     Q.  Do you recall anything about the
22  implementation at Paxar?
23     A.  No, I don't.
24     Q.  Okay.  Do you know why Michael Cochran
25  may have cc'd you on this e-mail?

123

1      A.  Yes.  Even though it was George Roberts'
2  client, Oracle Consulting was involved, and so, he
3  copied Keith Block, he copied Tim Meehan, who ran
4  Consulting in the east.  And because Keith reports
5  in to me, he copied me as well.
6      Q.  Okay.  And do you know who Nick Mastro
7  is or was?
8      A.  Where do you see that?  I don't --
9      Q.  It's on the next page, bottom of the
10  next page ending 331.
11     A.  No, I don't know that name.
12     Q.  Okay.  Still looking at that same page,
13  in the middle of the page, do you see where it says
14  "Paxar's Contentions"?
15     A.  Yes.
16     Q.  "Paxar is refusing to pay the
17  $1.8 million license fee that was financed through
18  OFC but later assigned to an outside financing
19  source until such time as they go live on the
20  software which is now projected for March of 2001."
21  See that?
22     A.  Yes, I do.
23     Q.  And it's fair to say that you had this
24  information at the time, right?
25     A.  Yes, since I was copied on the e-mail.

124

1      Q.  All right.  And in this e-mail, it
2  appears, again, that OCS had logged 1700 hours of
3  nonbillable time.
4      A.  Just to be clear, it's the same 1700, I
5  think, that was referred to in Cochran 4.  It's not
6  a different 1700 hours.
7      Q.  How can you tell that?
8      A.  Because -- it is some speculation, I
9  acknowledge that, but if you look at Cochran 4 they
10  talk about Paxar.  It was written in approximately
11  the same period, and it mentions in Cochran 4,
12  17 hours of non -- hundred hours of nonbillable
13  hours.  And then in Roberts 5, page 331, down at the
14  bottom under "OCS," it mentions 1700 hours again.
15     Q.  Okay.  And did you know Al Snyder?
16     A.  Can you show me where his name is?  Oh,
17  here it is under "Support."  Yes.  Now, Al Snyder
18  worked for Randy Baker and, I believe, ran Americas
19  Support.
20     Q.  Okay.  And you see where it says "Al
21  Snyder has agreed to fund some support relief to be
22  shared with Sales"?
23     A.  Yes.
24     Q.  Do you know what's meant by "support
25  relief"?

125

1  MR. GIBBS: Objection. Calls for
2  speculation.
3  THE WITNESS: Yeah, it is speculating. But,
4  you know, periodically a client have an issue,
5  and in resolving the issue, Support would -- might
6  JE a dollar amount from Support over to Sales.
7  BY MR. WILLIAMS:
8  Q.  Okay. When you say "JE," you're talking
9  about journal entry?
10  A.  Correct.
11  Q.  And it would be -- withdrawn.
12  Let me show you what's been previously
13  marked as Block No. 7. It's Bates numbered
14  NDCA-ORCL 026981 through 982. I'll ask you just to
15  take a look at that document and let me know when
16  you're done.
17  A.  Sure.
18  Okay.
19  Q.  Okay. Do you recognize Block No. 7?
20  A.  No, I don't.
21  Q.  It appears to be an e-mail from Keith
22  Block to Michael Mayfield, cc'ing you on
23  January 8th of 2001, right?
24  A.  Correct.
25  Q.  And embedded in there is an e-mail from

126

1  Michael Mayfield to Keith and someone by the name of
2  John, right?
3  A.  Yes.
4  Q.  You see where Michael Mayfield -- well,
5  withdrawn.
6  Do you know Michael Mayfield?
7  A.  The name is familiar, but I don't know
8  that I know him.
9  Q.  Okay. How about John Wheeler?
10  A.  Yes.
11  Q.  And how do you know John Wheeler?
12  A.  John Wheeler worked in Jay Nussbaum's
13  consulting organization at one point for quite a
14  while, and that's where I knew him. He actually was
15  in my organization for a brief period of time, but I
16  don't recall what his job was.
17  Q.  Okay. Well, see where Michael Mayfield
18  writes to Keith, "Consulting and Support have both
19  been taxed by crises arising in the final stages of
20  many 11i and CRM implementation projects."
21  You see that?
22  A.  Yes, I do.
23  Q.  Did you disagree with that in January of
24  2001?
25  MR. GIBBS: Objection. Lack of foundation.

127

1  THE WITNESS: No, I wouldn't disagree.
2  Again, as a reminder, it was a large, integrated
3  system, and in the November, December, January
4  timeframe is when a lot of those initial projects --
5  the first implementation of the 11i was being done.
6  BY MR. WILLIAMS:
7  Q.  But a lot of those customers in
8  January -- in those months, November, December and
9  January -- withdrawn.
10  A lot of those customers in November,
11  December of 2000 and January of 2001 were
12  implementing either 11i.2 and .3; isn't that fair?
13  MR. GIBBS: Objection. Lack of foundation.
14  THE WITNESS: I don't -- I don't know.
15  BY MR. WILLIAMS:
16  Q.  Or they had installed patches from 11i.2
17  and 3, right?
18  MR. GIBBS: Objection. Lack of foundation.
19  THE WITNESS: I would speculate that they
20  were installing the most current versions of their
21  particular project. Again, following the kind of
22  outline that Kevin Glynn identified in Sanderson
23  Exhibit 4.
24  Q.  Right. And Sanderson Exhibit 4 is
25  dated -- that's in October e-mail, right?

128

1  A.  Yes.
2  Q.  All right.
3  A.  Was there a significance to the question
4  about that it was in -- but it was an October
5  e-mail?
6  Q.  No.
7  A.  Okay.
8  Q.  Looking at the message from Mayfield to
9  Keith, he also says in the body there in the second
10  paragraph, last sentence, "These delays are
11  frequently due to defects or functional shortcomings
12  in our products." Do you see that?
13  A.  Yes, I do.
14  Q.  You didn't disagree with that either,
15  did you?
16  MR. GIBBS: Objection. Vague, lack of
17  foundation.
18  THE WITNESS: There were issues, but it was a
19  brand-new product. And no matter how good the
20  product is, when we all buy software, we all buy a
21  house, we all buy a car, we always can find things
22  we'd like to see a little bit better.
23  BY MR. WILLIAMS:
24  Q.  Sure. And so, Keith Block forwarded
25  this e-mail -- well, withdrawn.

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

129

1        Keith Block wrote to Mike, "I have a
2   directs meeting at the end of the month in
3   Washington.  Can you attend and present this to my
4   team?"
5        A.  Uh-huh, yes.
6        Q.  And he cc'd you on that?
7        A.  Yes.
8        Q.  All right.  Do you know if that
9   presentation occurred?
10       A.  No, I don't.  I have no reason to
11  believe it didn't.
12       Q.  Okay.  I'll show you what's been
13  previously marked as Roberts No. 14.  It's Bates
14  numbered NDCA-ORCL 052475 through 478.  Ask you to
15  take a look at that and let me know when you're
16  done.
17       A.  Okay.
18       Q.  Okay.  Do you recognize Roberts No. 14?
19       A.  I do not.
20       Q.  Okay.  It's an e-mail from -- well, it's
21  a series of e-mails that you either sent or received
22  or were copied in January of 2001, right?
23       A.  Yes.
24       Q.  And why don't we just go to page ending
25  476.

130

1        A.  Uh-huh.  Yes.
2        Q.  Just a second.  Do you know who Sandy
3   Moffat is or was?
4        A.  I do not.
5        Q.  How about Mark Aboud?
6        A.  I don't.  I don't.
7        Q.  Okay.  Robert Richards?
8        A.  I do not.  I believe they were in the
9   Canadian sales business.
10       Q.  And that was part of your organization
11  at the time?
12       A.  No.
13       Q.  No?  Who ran Canada Consulting?
14       A.  I ran Canada Consulting.  Canada sales
15  business was run by George Roberts.
16       Q.  Okay.  Why don't we go to the next page,
17  477.  And top of the page, it looks like it has
18  Sandy Moffat's title there.  Looks like senior
19  market director Oracle Consulting Canada.
20       A.  Yes.
21       Q.  So, that was within your organization,
22  correct?
23       A.  Correct.
24       Q.  Okay.  Were you familiar with an
25  implementation project at Hudson Bay in January of

131

1   2001?
2        A.  Vaguely.  I remember meeting with an
3   executive from Hudson Bay at an Oracle event.  I
4   believe it was here in San Diego.  But I don't
5   remember much more than that or anything beyond
6   that --
7        Q.  Okay.
8        A.  -- at this point.
9        Q.  All right.  Well, looking at the e-mail
10  from Sandy Moffat to Mark Aboud on Bates ending 476,
11  he writes, "Mark, it's come to my attention this
12  morning that we have a very serious situation at
13  Hudson's Bay.  HBC has put 11i SSE into limited
14  production over the past few weeks."
15            Do you know what SSE is?
16       A.  I'm speculating, but I think it's
17  Self-Serve Expenses.
18       Q.  Right.
19       A.  It's a module or a program within ERP.
20       Q.  Okay.  He further writes, "The
21  implementation is being done by Oracle Consulting
22  and was delayed by a number of weeks due to multiple
23  product issues but has recently limped into limited
24  production use."  See that?
25       A.  Yes, I do.

132

1        Q.  Do you have an understanding what is
2   meant by "limited production use"?
3        A.  Most likely, it means that part of
4   Hudson Bay's employees or some section of Hudson Bay
5   employees were using the product.  It had not been
6   rolled out company-wide.
7        Q.  And I see where he writes, "There are
8   several outstanding issues being worked on by
9   Development, but the most serious is a bug," and it
10  has the number, "that will not allow SSE entry to be
11  split into individual items.  This is an absolute
12  showstopper."  You see that?
13       A.  Yes.  Very specific issue, yes.
14       Q.  Right.  And "absolute showstopper" means
15  that without this being fixed, the application won't
16  work, right?
17            MR. GIBBS:  Objection.  Lack of foundation.
18            THE WITNESS:  In this particular case for
19  Hudson Bay, it was an issue.  It had a very specific
20  bug number associated with it.  I can't say what
21  "showstopper" means.  Obviously, it's a significant
22  issue for that customer at that point in time.
23  BY MR. WILLIAMS:
24       Q.  In fact, if you go down further, Sandy
25  says, "This is a disaster for the project team, and

133

1  the customer's extremely angry." See that?
2      A. Yes, I do.
3      Q. Further down he writes, "Due to the fact
4  that these product issues have set them so far
5  behind, the customer is threatening to pull out SSE
6  due to product instability and look to Oracle to
7  recover product and implementation costs." Do you
8  see that?
9      A. Yes, I do.
10      Q. Do you know whether they did that?
11      A. I do not.
12      Q. He also writes, "Cancel or delay phase 2
13  due to product instability and support levels." See
14  that?
15      A. Yes, I do.
16      Q. Do you know whether they cancelled or
17  delayed Phase 2?
18      A. I do not.
19      Q. He further indicates that there's a PO
20  in place for $2.5 million to complete this project.
21  Revoke their offer to become an 11i showcase
22  reference account until further notice." Do you see
23  that?
24      A. Yes, I do.
25      Q. Do you know whether Hudson Bay revoked

134

1  their offer to become an Oracle 11i showcase
2  reference customer?
3      A. I do not.
4      Q. Finally, it says, "They've also
5  indicated that they will not be too interested in
6  our CRM and Customer Loyalty solutions at this
7  time." See that?
8      A. Yes, I do.
9      Q. He further writes, "All in, it looks
10  like this could potentially cost us $4 million in
11  future business plus anything that they feel they
12  can recover from us." See that?
13      A. Yes.
14      Q. Does that refresh your recollection at
15  all with respect to the Hudson Bay account in
16  January of 2001?
17      MR. GIBBS: Objection. Lack of foundation.
18      THE WITNESS: It does not.
19  BY MR. WILLIAMS:
20      Q. And going to the Bates ending 475, see
21  in the bottom half of the page, Sandy Moffat writes
22  another e-mail to Michel Lozeau?
23      A. Michel Lozeau.
24      Q. Michel Lozeau.
25      A. I'm assuming you know that person.

135

1      Q. Yes.
2      A. It's a guy. He's a French Canadian, and
3  he ran the Canadian Consulting practice at that
4  time.
5      Q. Did he report directly to you?
6      A. No, he did not.
7      Q. Who did he report to?
8      A. To Keith.
9      Q. Keith. You see where Sandy writes, "I'm
10  wondering if we may want to copy Sandy Sanderson on
11  this. Sandy's been asked to talk to HBC at
12  Appsworld and has been sent a briefing document on
13  the account." Do you see that?
14      A. Yes, I do.
15      Q. Were you sent a briefing document on
16  this account?
17      A. I don't recall.
18      Q. Okay. What is a briefing document?
19      A. It would be a document that described
20  who the client is, who the -- you know, the company
21  Hudson Bay is, what their revenues are, what their
22  lines of business are, how they're organized, who
23  the individual is that I'm meeting with, what the
24  opportunities are both on product and on the license
25  and consulting side, history of the company with

136

1  Oracle product, and any issues they might have.
2      Q. So, it's fair to say that if you
3  received this briefing document that you would have
4  gotten a lot of information concerning their
5  implementation problems too, right?
6      A. That typically would be included in a
7  document that, yes.
8      Q. Okay. And it looks like you actually
9  got this e-mail because Michel forwarded it to you,
10  right?
11      A. Yes, that's correct.
12      Q. And then you wrote to Ron Wohl, "Can you
13  please check into this? This client is pro Oracle
14  but the relationship is being challenged with an
15  issue around Self Service Expense." Right?
16      A. Yes.
17      Q. And do you know whether you met with
18  this client at Appsworld in --
19      A. Yes. I indicated in my --
20      Q. I'm sorry. Just let me finish my
21  question.
22      A. Sure.
23      Q. -- in early 2001?
24      A. I can't say it was early 2001. As I
25  said earlier, just a bit earlier in my testimony, I

137

1    do remember meeting with an executive from HBC.
2        Q.  Do you remember who that was?
3        A.  I do not.
4        Q.  Do you remember anything about the
5    conversation?
6        A.  I don't.  I just -- I remember that it
7    was a Canadian client, and I remember the name.
8        Q.  Do you know whether or not Oracle lost
9    any future business with HBC due to problems with
10   the applications implementation issue?
11       A.  I do not.
12       Q.  Do you know where that information could
13   be found?
14       MR. GIBBS:  Objection.  Lack of foundation.
15       THE WITNESS:  Not off the top of my head, no.
16   BY MR. WILLIAMS:
17       Q.  The document refers to Appsworld, I
18   guess in the early part of 2001, right?  At least
19   with respect to you being asked to talk to HBC at
20   Appsworld.
21       A.  Correct.
22       Q.  Describe for me very briefly what
23   Appsworld is.
24       A.  Appsworld is a pretty major event where
25   customers and prospective customers come to hear

138

1    presentations.  And Larry would typically speak at
2    those events.  He'd be a keynote speaker.  We might
3    have a former president speak at it.  We had Bill
4    Clinton speak at one.  We might have the CEO of HP
5    or Scott McNeely from Sun Microsystems speak.  So,
6    it would be that.
7        Then the next level of presentations
8    would be speakers from Oracle.  Heads of Development
9    or the different development groups would speak.  I
10   typically spoke at Appsworld.  We would also have
11   breakout sessions where clients could meet on
12   specific issues -- I mean, specific items around the
13   product.  It might be -- for example, it might be
14   how to implement financial applications.  Or it
15   might even be a specific application even more
16   specific than that.  Those are -- and it typically
17   was well attended.  Some 20,000 people would be a
18   guess and would go over three to five days.
19       Q.  And you said you typically spoke at
20   those --
21       A.  Yes.
22       Q.  -- types of events?
23       And prior to speaking at those events,
24   would you meet with Oracle's Public Relations
25   members or Investor Relations -- people in Public

139

1    Relations or Investor Relations?
2        A.  I don't remember around Appsworld doing
3    that, meeting with those people.  I'd meet with
4    Marketing, but I don't remember specifically meeting
5    with Investor Relations.
6        Q.  Do you know Stephanie Aas?
7        A.  Yes, I remember Stephanie.
8        Q.  And how do you remember her?
9        A.  I remember she was in either PR or
10   Investor Relations.  I don't remember which.  I
11   think it was PR.  And, you know, I mean, that's --
12   she was in that organization.
13       Q.  How about Jennifer Glass?
14       A.  I remember that name as well.
15       Q.  And how do you remember her?
16       A.  In -- being in PR or in charge of PR at
17   Oracle at one point.
18       Q.  And is it fair to say that you would
19   meet with members of Public Relations or Investor
20   Relations prior to speaking to at least analysts?
21       A.  Correct.
22       Q.  And they would prepare presentations for
23   you or help prepare presentations for you?
24       MR. GIBBS:  Objection.  Compound.
25       THE WITNESS:  I don't know if they prepared

140

1    the presentations.  They may have at some of the
2    times.
3    BY MR. WILLIAMS:
4        Q.  But you'd meet with them -- withdrawn.
5        Would they be the ones that set up the
6    meetings with analysts for you?
7        A.  Correct.
8        Q.  And so, they'd tell you the time and
9    date, right?
10       A.  Yeah.  Sometimes I'd make a sweep
11   through -- I say "a sweep."  I might go to New York
12   and meet with several analysts.
13       Q.  And they also briefed you on issues that
14   the analysts were interested in hearing about?
15       A.  Yes.  I mean, you say "issues," I mean
16   it would be matters or topics that they would want
17   to talk about.
18       Q.  Right, topics that they would want to
19   talk about.
20       And they would do that by sending you a
21   list of topics that you should expect to be asked
22   about?
23       A.  I don't remember getting a list.  I
24   can't say they didn't, but I don't recall a list or
25   anything of that nature.  Typically, they would come

141

1   meet with me in an office, and we would talk about
2   the presentation. They would give me some
3   background on the analysts we were going to meet --
4   I was going to meet with, that kind of thing.
5        Q.  When you said you'd go through the
6   presentation, are you talking about, like, maybe a
7   PowerPoint type presentation that somebody prepared
8   for you?
9        A.  Correct.
10       Q.  And did you have someone in your
11  organization that prepared those things for you?
12       A.  It may have been some folks in my
13  organization. It could have been somebody out of
14  Marketing. It could have been somebody out of PR.
15  It could have been an organization that Jeff Henley
16  used in speaking to in some public setting that they
17  would use that presentation or some form of that.
18       Q.  And would you also do those analysts
19  presentations during Appsworld-type events?
20       A.  I don't remember speaking to analysts at
21  Appsworld. I'm not saying I didn't, but I don't
22  remember -- my recollection of analysts is they
23  typically had a fairly big ego, and that meant you
24  went to them and they didn't come to you.
25       Q.  Okay. And was -- when you met with

142

1   analysts, were they at fixed times, or were they at
2   times when maybe Jennifer or Stephanie may say to
3   you, "Hey, we want you to go out and talk to these
4   guys 'cause they have questions about certain
5   topics"?
6        A.  Do you mean fixed times in the sense
7   regularly scheduled times each year --
8        Q.  That's what I meant.
9        A.  -- or time periods? No, I mean, it
10  would be random.
11       Q.  Random?
12       A.  It would be periodic. Yeah,
13  periodically, we would go out and do that.
14       Q.  Okay. So, the timing of the meetings
15  with analysts would be set by either a request by
16  them or a request by PR or Investor Relations?
17       A.  Correct.
18       MR. WILLIAMS:  Okay. I'm going to show
19  you -- hold on a second.
20       I'll ask the reporter to mark this
21  document -- where are we at, Sanderson 6? And it's
22  Bates stamped NDCA-ORCL 143064.
23       (E-mail dated 2/6/01 re GE strategy
24  marked Exhibit 6 for identification.)
25  / / /

143

1   BY MR. WILLIAMS:
2        Q.  I'm going to ask you to take a look at
3   that document and let me know when you're done.
4        A.  Okay.
5        Q.  You recognize Sanderson 6?
6        A.  I don't recognize the e-mail. I
7   remember the issue.
8        Q.  Okay. What do you remember about the
9   issue?
10       A.  What's portrayed in the e-mail, and that
11  was we -- at Oracle, have a list price for a
12  product. And then every time -- or virtually every
13  time we were discounting off that list. GE was a
14  demanding client, and they would leverage their
15  scale with us in the sense that -- if I remember
16  right, this Mastrioni was in a corporate function,
17  so that whenever we were buying product they would
18  remind us of just how large GE was and how important
19  a customer it was to us, as opposed to just working
20  a CIO of one of their divisions. And they wanted --
21  they would want the absolute best discount that we
22  would provide, and we would have to work with them
23  in that regard.
24       The real focus was, what Larry was
25  saying was, they've got a good product. We're doing

144

1   the implementation very quickly for them. Rice -- I
2   can't remember his first name -- who was the CEO of
3   GE Power was very satisfied and -- and -- was very
4   satisfied.
5        As you might imagine, the CEO of
6   GE Power kind of stayed out of the negotiation
7   piece. Mastrioni was in there being the bad guy, so
8   to speak, the one that was the tough negotiator,
9   asking that our price be lower.
10       Q.  Okay. So, Sanderson No. 6 is an e-mail
11  from you to Steve McLaughlin, right?
12       A.  Correct.
13       Q.  In or around February 6th of 2000?
14       A.  Correct.
15       Q.  And it's related to the GE strategy,
16  like you've explained.
17       A.  Right.
18       Q.  Who's Robert Evans, do you know?
19       A.  As I recall, Robert Evans was the
20  account executive, the same as account manager,
21  Shawn. But just because it was GE, more experienced
22  individual that had responsibility for all of our GE
23  business.
24       Q.  Okay. You write to Stephen that "We
25  have strong products, and they are being" -- well,

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

145

1  withdraw.
2         You're actually telling him about a
3  discussion that was had at the executive committee
4  meeting, right, or a recent executive committee
5  meeting?
6         MR. GIBBS: Objection. Lack of foundation.
7         THE REPORTER: I'm sorry?
8         MR. GIBBS: Objection. Lack of foundation.
9         THE WITNESS: What that sentence means, I
10  recall talking about GE at one or more executive
11  committee meetings. Larry was personally involved
12  in working with Rice, the CEO. He would have
13  frequent discussions with him and getting -- and
14  Larry would get the feedback from Rice exactly how
15  the project was going.
16  BY MR. WILLIAMS:
17         Q. Okay. And you write to Steve, "We have
18  strong products, and they're being well received
19  within the GE business. Not surprisingly, Larry
20  cites GE Power as the primary example. We will have
21  a major GE Power plant up and running. Minimal
22  changes to the software within four (that's what
23  Larry says) months." See that?
24         A. Yes, correct.
25         Q. When you write "That's what Larry says,"

146

1  did you not agree with the representation that it
2  was four months?
3         A. No. I didn't -- I hadn't spoken to the
4  project team personally. Four months is an
5  aggressive period of time, and Larry had told me
6  that, and I was passing that on to Steve.
7         Q. Do you know whether or not it was true?
8         A. I don't recall that it wasn't true.
9         Q. You don't recall that it was not true?
10         A. Right. Let me be clear 'cause I always
11  get caught up on double negatives. I have no reason
12  to believe it wasn't true.
13         Q. Okay. And were your -- were members of
14  your consulting staff doing the work, the
15  implementation work, at GE Power?
16         A. We had some involvement from my
17  business, I recall, but it was GE Power in Hungary,
18  and so, that would have involved EMEA Consulting as
19  well. We probably had a blended or virtual team.
20         Q. You also write, "Larry challenged why is
21  our GE Power price for ERP so low? I told him 20
22  million. He does not want to reduce the price to
23  handle GE economic pressures." See that?
24         A. Yes.
25         Q. Was the 20 million you're referring to

147

1  here the consulting portion?
2         A. No. That would have been license sales.
3         Q. The license. And what did you mean when
4  you referred to "GE economic pressures"?
5         A. Putting pressure on us to reduce our
6  price.
7         MR. WILLIAMS: Let me show you what's been
8  previously marked as Wohl No. 39. It's Bates
9  numbered NDCA-ORCL 063438 and 39.
10         THE WITNESS: Okay.
11  BY MR. WILLIAMS:
12         Q. Okay. Do you recognize Wohl No. 39?
13         A. I do not.
14         Q. It's a series of e-mails between you and
15  senior management and other members of Oracle staff,
16  correct?
17         A. Yes.
18         Q. The latest one being February 19, 2001,
19  e-mail from you to Ron Wohl?
20         A. Uh-huh. Yes.
21         Q. Do you know Gray Reiner?
22         A. Gary Reiner. It should say "Gary." I
23  didn't -- I don't know him, but I know at that point
24  he reported directly to Jack Welsh.
25         Q. And was Tony Kender a person in your

148

1  organization?
2         A. No. He was in George Roberts'
3  organization and had responsibility for payroll and
4  benefit application, sales.
5         Q. Do you know why Tony Kender sent this
6  letter e-mail to you, the February 16th e-mail?
7         A. Yeah. This was somewhat of a unique
8  situation. I had responsibility ultimately for GE
9  in all our applications and technology sales there
10  except one, and that was HR and benefits. And Tony
11  Kender was brought in to sell HR and benefits.
12         So, he actually reported in to George
13  Roberts' organization, so George's organization,
14  through Tony, would sell directly into GE for HR and
15  payroll. But because it was my account, I'm sure
16  that's why I was copied.
17         Q. And it appears that Gary Reiner and GE
18  are thinking about buying PeopleSoft HR, right?
19         A. Yes.
20         Q. And do you know whether they actually
21  did buy PeopleSoft HR?
22         A. I don't recall.
23         Q. Did they buy Oracle HR?
24         A. I don't recall. It was a very typical
25  tactic of GE to leverage Oracle with another -- or

149

1 put Oracle up against another company like that.
2    Q. Well, PeopleSoft was a major competitor
3 at the time, wasn't it?
4    A. Yeah, they were. And -- but it was not
5 unusual for them to do that and negotiate a deal and
6 then play one off the other.
7    MR. WILLIAMS: I'm going to ask the reporter
8 to mark this document as Sanderson No. 7. It's
9 Bates numbered 099861 with the NDCA-ORCL prefix.
10       (E-mail dated 3/11/01 re Consulting -
11 Food for Thought marked Exhibit 7 for
12 identification.)
13 BY MR. WILLIAMS:
14    Q. Ask you to just take a look at that
15 document and let me know when you're done. It's a
16 little off topic, but . . .
17    A. Okay.
18    Q. Sebastian Gunningham reported to you in
19 March of 2001?
20    A. Correct.
21    Q. And Exhibit No. 7 is an e-mail from him
22 to you on March 11th?
23    A. Yes. This is when he was running Latin
24 America sales and consulting.
25    Q. Okay. He writes to you, "Sandy, I came

150

1 away last week with some concern about our
2 consulting business. I think we're going to hit a
3 wall very soon. Some feedback from the GMM Week
4 senior salespeople. I'll tell you where most of
5 this came from when we speak." See that?
6    A. Yes.
7    Q. What's GMM Week?
8    A. Global Manager Meeting Week. We would
9 bring in probably the top 200 managers from around
10 the world for a week. I say "we." Larry would do
11 that.
12    Q. Larry. You see where he writes -- well,
13 withdrawn.
14    Then he goes on to write, "OCS should be
15 halved. OCS is the inhibitor to our partner
16 program. OCS will be the last to adjust their cost
17 structure for fixed price. OCS does not want to do
18 FFs." See that?
19    A. Correct.
20    Q. What are FFs?
21    A. I assume he means fixed-fee bids or
22 fixed-price bids.
23    Q. All right. And that's because --
24    A. Oh, no, no, no. I don't -- I don't
25 know. I can think of something else as well. I

151

1 don't know what FFs is.
2    Q. Do you have an idea? Do you have a
3 guess?
4    A. Either fixed price --
5    MR. GIBBS: Objection. Calls for
6 speculation.
7    THE WITNESS: Yeah, I'm speculating. Either
8 fixed price, or we had a specific way to implement
9 our applications very quickly, typically for very
10 small customers, called Fast Forward. And that
11 would be the other thing that FF stands for.
12 BY MR. WILLIAMS:
13    Q. Do you know what he meant when he wrote
14 "OCS is the inhibitor to our partner program"?
15    A. Yes.
16    Q. What does that mean?
17    A. We had this delicate balance at Oracle
18 of -- of selling our license -- or selling our
19 products and getting them implemented correctly with
20 Oracle Consulting and with other companies such as,
21 at that time, Price Waterhouse, which is now IBM
22 Consulting; Bearing Point; Accenture; Cap, Gemini,
23 Ernst & Young, et cetera.
24    And the -- and there is a natural
25 competitive challenge between those organizations

152

1 and Oracle Consulting. And what Sebastian is
2 arguing here is -- what he's talking about is Oracle
3 Consulting was aggressive when it went after
4 implementations, and that would inhibit our partners
5 working with Oracle Consulting or selling Oracle
6 product potentially.
7    MR. WILLIAMS: I'll ask the reporter to mark
8 this document as Sanderson No. 8. It's Bates
9 numbered NDCA-ORCL 101535 through 537.
10       (E-mail string dated 3/01 re Beckman
11 Update marked Exhibit 8 for identification.)
12    MR. WILLIAMS: Just let me know when you're
13 done.
14    THE WITNESS: Okay. Okay.
15 BY MR. WILLIAMS:
16    Q. Do you recognize Sanderson 8?
17    A. No, I do not.
18    Q. It's a series of e-mails between you and
19 members of Oracle staff in March of 2001, right?
20    A. Correct.
21    Q. And regarding a customer Beckman?
22    A. Correct.
23    Q. Is that Beckman Coulter?
24    A. I believe it is.
25    Q. And did you know that Beckman Coulter

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

153

1   had difficulty implementing 11i applications?
2        MR. GIBBS: Objection. Lack of foundation.
3        You can answer.
4        THE WITNESS: I vaguely remember something.
5   I don't remember the specifics.
6   BY MR. WILLIAMS:
7        Q.  What do you remember generally?
8        A.  I just mean that I -- I remember there
9   were questions about it, and I remember talking to
10  Max about it, Max Hill, who was my regional manager
11  for Southern California who had responsibility for
12  Beckman.
13       Q.  But you don't remember the discussion?
14       A.  No.
15       Q.  And this is kind of one of those areas I
16  was trying to get at earlier in terms of the
17  relationship between Consulting and Support.
18       A.  Uh-huh.  Yes.
19       Q.  You know Michael Rocha, right?
20       A.  Yes, I do.
21       Q.  And did he run Support in March of 2001?
22       A.  To the best of my recollection, he did.
23       Q.  Okay.  Looking at the bottom of 535, you
24  write to -- can't tell who it's to, but my guess is
25  that it's to either Michael Rocha, Dick Sellers,

155

1   it was fairly rare.
2        And they were on site helping that
3   client be successful.  And what they were saying
4   here is -- what I was acknowledging is that Support
5   was not going to charge for that on-site support.
6        Q.  And you also indicate that, "Our hope
7   that this and the commitments being made by
8   Consulting will keep the client from taking legal
9   action."  What commitments had Consulting made to
10  Beckman Coulter in or around March of 2001?
11       A.  I don't recall, but if I said
12  "commitment from Consulting, it would have entailed
13  something to do with putting skilled resources in
14  place to help them work through whatever the issues
15  were.
16       Q.  Very likely, at the cost of Oracle?
17       MR. GIBBS: Objection. Lack of foundation.
18       THE WITNESS: It would be speculation on my
19  part.  I -- I'd say there's a reasonable probability
20  that's the case.
21  BY MR. WILLIAMS:
22       Q.  Okay.  And did you know -- withdrawn.
23       Well, you knew there was at least some
24  chance at this point that Beckman Coulter was going
25  to take legal action against Oracle?

154

1   people in Support.
2        And you write, "As we have discussed, we
3   need to get on this client quickly.  I'm not sure
4   how there could have been confusion on which
5   account.  This has been a burning issue for a number
6   of weeks.  Also I appreciate you [sic] commitment to
7   absorb the cost for the onsite support until
8   September and delay the support payment until
9   September.  Our hope that this and the commitment
10  being made by Consulting will keep the client from
11  taking legal action."  See that?
12       A.  Yes, I do.
13       Q.  What did you mean when you wrote "I
14  appreciate you," your, "commitment to absorb the
15  cost for onsite support"?
16       A.  I agree with you that I think this was
17  from me to one of the two individuals you mention in
18  Support.  And I believe what Support had done here
19  was commit to foregoing a portion of their
20  support -- the cost of their onsite support.
21       So, in other words, Support typically
22  doesn't work on site at a customer.  And they
23  work in Redwood Shores and do it through -- via
24  telephone and other electronic communications.
25  Periodically, they would go on site.  As I recall,

156

1        A.  That's what the e-mail says.  I don't
2   recall that specifically or any context for that.
3        Q.  Do you know if they actually took legal
4   action against Oracle?
5        A.  I don't recall any, but I don't recall
6   specifically.
7        Q.  Do you know whether there were customers
8   in the 2000, 2001 time frame that did in fact take
9   legal action against Oracle with respect to their
10  implementation of 11i?
11       A.  I don't recall any.
12       Q.  If customers did take legal action
13  against Oracle with respect to their implementation
14  of 11i, is that something that you would have known
15  at the time?
16       A.  Absolutely.
17       MR. GIBBS: Objection. Calls for
18  speculation.
19       THE WITNESS: I'm sorry.
20  BY MR. WILLIAMS:
21       Q.  Absolutely?  And why is that?
22       A.  Because I cared about my customers.  And
23  if it got to the point that they took legal action,
24  I would know it ahead of time, that they were
25  considering that and they, in fact, took it.  And I

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

157

1  don't recall any client doing that, any customer.
2      Q.  And you -- is it fair to say that you
3  would do what you can to kind of make the customer
4  happy before it got to that point --
5      A.  Correct.
6      Q.  -- is that fair?
7      Kind of like what's -- at least what
8  seems to be depicted in Sanderson No. 8?
9      A.  That's correct.
10     Q.  All right.  You see where Michael Rocha
11  writes to Max Hill, the top portion of the e-mail in
12  the second paragraph, he says, "Anyway, we want to
13  do what's right here.  The customer hasn't been able
14  to implement a portion of the application because of
15  product issues.  We're willing to work with you
16  guys" t-p --
17     A.  I think it's "to."
18     Q.  -- or "to make them whole by providing
19  services at no charge."  See that?
20     A.  Yes, I do.
21     I think this highlights a question you
22  had earlier, Shawn, about Support and Consulting
23  working together, and I think that's a good example
24  of that happening.
25     Q.  So, Support would make a commitment

158

1  possibly, and Consulting may make a commitment in
2  order to make the customer happy?
3      A.  Yeah.  It -- it didn't always happen
4  that way.  In fact, as I recall, it was typically --
5  that was not typically the case, but it was not
6  unusual.
7      MR. WILLIAMS:  Maybe this is a good time to
8  take a break.
9      MR. GIBBS:  Sounds good.
10     THE VIDEOGRAPHER:  Off the record at
11  12:56 p.m., and this marks the end of Videotape No.
12  2, Volume I, in the deposition of Edward Sanderson.
13     (Lunch recess taken at 12:56 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

159

1  SAN DIEGO, CALIFORNIA, TUESDAY, JULY 25, 2006
2  1:50 P.M.
3
4      THE VIDEOGRAPHER:  We are back on the record
5  at 1:50 p.m., and this marks the beginning of Tape 3
6  of Volume I of the deposition of Edward Sanderson.
7      At this time I'd like to note for the
8  record additional attendees who have made an
9  appearance via the LiveNote stream service during
10  this morning's session.  These individuals are
11  Jennie Anderson, Willow Radcliffe and Keith Mautner,
12  all with the firm of Lerach Coughlin.  Thank you.
13     MR. WILLIAMS:  Just for the record, Monique
14  Winkler is present at the deposition on behalf of
15  plaintiffs.
16  BY MR. WILLIAMS:
17     Q.  Mr. Sanderson, I'm going to show you
18  what's been previously marked as Jarvis No. 15.
19  It's Bates numbered NDCA-ORCL 121704 through 707.
20     Just ask you to take a look at it and
21  let me know when you're done.
22     A.  Okay.
23     Q.  Okay.  Do you recognize Jarvis No. 15?
24     A.  I do not.
25     Q.  It's an e-mail from Larry Ellison to

160

1  George Roberts, cc'ing you, right?
2      A.  Me, along with a number of other people,
3  correct.
4      Q.  Right.  Forwarding an e-mail regarding
5  Papa John's?
6      A.  Correct.
7      Q.  In the fall of 2000 and the early part
8  of 2001, did you have members of your consulting
9  staff working on a Papa John's implementation?
10     A.  I -- as I recall, we had some level of
11  involvement, yes.
12     Q.  I'm sorry.  You had some --
13     A.  Some level of involvement.  Oracle
14  Consulting was involved, as validated by this series
15  of e-mails.
16     Q.  Where do you see that validation?
17     A.  Page 121706 under "Action Plan," the
18  very first sentence.
19     Q.  Okay.  And looking at the first page
20  where Larry Ellison writes, "Okay.  I want all
21  escalated customers to belong to Development
22  managers," did you know what he meant by the phrase
23  "escalated customers"?
24     A.  These would be customers that -- that
25  were getting the most attention within Oracle around

161

1  the product, and he wanted a product development
2  manager to be responsible for each of those
3  customers.
4     Q.  And why were they getting the most
5  attention?
6     A.  Typically, because there were issues
7  around their implementation of their product.
8     Q.  They were having some difficulty
9  implementing --
10    A.  Correct.
11    Q.  -- 11i?
12    Okay.  And did you have someone in your
13  organization responsible for monitoring escalated
14  customers?
15    A.  No.  We tend -- as I recall -- well, I
16  say "no."  In Valerie Borthwick's organization
17  under, for example, Kevin Glynn, who ran the
18  applications global service line, he would track
19  those, and then we would have the folks in the
20  applications service lines be involved with those
21  escalated customers.
22    Q.  Do you recall -- well, withdrawn.
23    See where Larry writes, "We will meet on
24  this Wednesday to review every escalated customer
25  and every product quality rating"?  See that?

162

1    A.  Yes, I do.
2    Q.  Do you recall being present at that
3  meeting?
4    A.  No, I do not.
5    Q.  Okay.  Do you think you were there?
6    A.  I'm not convinced I am because what --
7  it goes on with the second sentence after that, he
8  talks about the Thursday applications meetings.  And
9  so, I don't know who is "we."  It could well have
10  been, since Larry was not only the chairman/CEO but
11  head of Development, he may have been holding --
12  saying he was going to hold a meeting within
13  Development on these accounts.
14    Q.  Okay.  Going down to the bottom part of
15  the document, there's an e-mail from George
16  Roberts --
17    A.  Yes.
18    Q.  -- right?
19    And he writes, at least the second or
20  third sentence in, "Over the last several years,
21  we've enjoyed a chuckle or two as we read headlines
22  on our competitors' clients and their inability to
23  implement the software they bought from them."  See
24  that?
25    A.  Yes.

163

1    Q.  It also says, "We have avoided all of
2  this ink in the press, but that may be about to come
3  to an end.  I have six situations like this or more
4  depending on the day of the week.  I don't have all
5  the answers for this, but it's time to get more
6  focused and organized on this situation as well as
7  the rest of them from NAS, OPI and OSI."  See that?
8    A.  Yes, I do.
9    Q.  Do you know what accounts in OPI he may
10  have been referring to here?
11    A.  No, I do not.
12    Q.  But it's true that OPI did have
13  implementations that were, at the very least,
14  difficult in this period of time, March of 2001,
15  right?
16    A.  Yes.  We've referred to a couple of them
17  during this deposition.
18    Q.  Do you recall whether or not you or
19  members of the executive staff paid more attention
20  to these situations after, say, March of --
21  March 23rd, 2001?
22    A.  Whether we paid more attention --
23    Q.  Uh-huh.
24    A.  -- after -- what's the significance of
25  March 23rd?

164

1    Q.  Well, that's just the date of this
2  e-mail.
3    A.  No.  If there was an issue with a
4  customer, as soon as it was brought to my attention,
5  I paid attention to it, regardless of the date.
6    Q.  Did you know whether Larry Ellison
7  became more involved in those escalated-type
8  customers after March 23rd, 2001?
9    MR. GIBBS:  Objection.  Lack of foundation.
10    THE WITNESS:  Do I know if Larry became more
11  involved with those escalated customers after
12  March 23rd?  Is that the question?
13    MR. WILLIAMS:  Yes, it is.
14    THE WITNESS:  I don't recall.  I mean, I
15  would say they -- clearly, in his e-mail here, he's
16  putting interest on it, and it became a priority
17  topic within the -- the products leadership meeting.
18  BY MR. WILLIAMS:
19    Q.  Were you at those product leadership
20  meetings?
21    A.  I was not.  Nor was I invited.
22    Q.  Was anyone from your team involved in
23  those meetings?
24    A.  No.
25    Q.  Let me show you what's been --

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

165

1    A.  None that I recall.
2    Q.  Okay.  Let me show you what's been
3  previously marked as Block 23.  It's on an issue
4  that we've talked about a little bit already.  It's
5  Bates numbered NDCA-ORCL 278125 through 127.  Just
6  ask you to take a look at that e-mail and let me
7  know when you're done.
8    A.  Okay.
9    Q.  Okay.  This appears to be an e-mail from
10  Keith Block to Ron Wohl on or around Friday
11  March 23rd, 2001, right?
12    A.  Correct.
13    Q.  And discussing Paxar that you and I have
14  discussed a little bit today, right?
15    A.  Several times.
16    Q.  If you look at 278127, I think that's
17  the page you're looking at right now --
18    A.  Yeah.
19    Q.  -- it appears that Keith writes to Ron,
20  "I understand that Tim spoke with Don regarding help
21  in funding the upgrade (third each for Sales,
22  Consulting, Development) and was turned down.  Ron,
23  my team has already eaten 1.5 million on product
24  quality issues in this account."  See that?
25    A.  Yes, I do.

166

1    Q.  Do you know what Keith was referring to
2  when he -- when he refers to "product quality
3  issues"?
4    MR. GIBBS:  Objection.  Calls for
5  speculation.
6    THE WITNESS:  I would imagine it's related to
7  the 1700 hours that was referenced in previous
8  documents.
9    BY MR. WILLIAMS:
10    Q.  Right.  But I'm specifically talking
11  about the phrase "product quality issues."  Do you
12  know what he means by that?
13    A.  I think he's using -- no, I --
14    MR. GIBBS:  Same objection.  Sorry.
15    THE WITNESS:  My apologies.
16    No, I don't know what he's talking about
17  other than I think you can conclude by going back to
18  the two Paxar documents we've looked at that we
19  could get some sense of what that is.
20    BY MR. WILLIAMS:
21    Q.  Right.  Related to 11i?
22    A.  Related to specific applications within
23  11i, correct --
24    Q.  Right.
25    A.  -- for that client, Paxar.

167

1    Q.  Right.  Now, do you know what the
2  entire -- well, withdrawn.
3    Do you know the aggregate of costs that
4  were absorbed by Sales, Consulting and Development
5  with respect to Paxar alone on the quality issues?
6    A.  I do not.
7    Q.  But at least from this e-mail, it looks
8  like 1.5 million was absorbed by Consulting alone?
9    MR. GIBBS:  Objection.  Lack of foundation.
10    THE WITNESS:  Based on what it says here, is
11  Consulting has eaten 1.5 million --
12    MR. WILLIAMS:  Right.
13    THE WITNESS:  -- and so, that would be the
14  consulting cost for Paxar --
15    MR. WILLIAMS:  Right.
16    THE WITNESS:  -- nonbillable time.
17    MR. WILLIAMS:  I'm going to ask the reporter
18  to mark this document as Sanderson No. 9.  It's
19  Bates numbered NDCA-ORCL 054235 through 244.
20    (E-mail string dated 3/01 re Daily CRM
21  Escalated and Strategic Implementations report
22  marked Exhibit 9 for identification.)
23    BY MR. WILLIAMS:
24    Q.  Just ask you to take a look at that
25  document and let me know when you're done.

168

1    A.  Okay.
2    Okay.
3    Q.  Okay.  Do you recognize Sanderson No. 9?
4    A.  No, I do not.
5    Q.  It appears to be a report sent to you
6  and several others from David Williamson on or
7  around March 27th of 2001, right?
8    A.  That's correct.
9    Q.  And it's titled a "CRM Escalated and
10  Strategic Implementations Report"?
11    A.  Yes.
12    Q.  Do you know David Williamson?
13    A.  No, I do not.
14    Q.  Do you know why he sent this report to
15  you as well as others?
16    MR. GIBBS:  Objection.  Calls for
17  speculation.
18    THE WITNESS:  My speculation is that it was a
19  direct result of Larry Ellison's e-mail of the
20  23rd of March, which was Jarvis 15 -- Exhibit
21  Jarvis 15, where he said he wanted escalated
22  customers to be discussed at the product meeting,
23  and this was probably an outcome of that.
24    BY MR. WILLIAMS:
25    Q.  Right.  But you weren't at the product

169

1  meetings, right?
2      A.  No.
3      Q.  But this report appears to only relate
4  to CRM, right?  At least that's the title.
5      A.  I'd have to study each page if you'd
6  like me to do that.  I don't --
7      Q.  I don't want you to do that.
8      A.  Okay.
9      Q.  Why don't you just take a look at the
10  very top of Bates ending 235, the e-mail from Safra
11  to Ron.
12      A.  Okay.
13      Q.  Can you read that for me?
14      A.  Yeah.  "Is there some ERP" -- "Is there
15  -- "Is there some ERP escalated list?"
16      Q.  Do you know what a "hot escalation" is?
17      A.  I can't recall if there -- if there is a
18  difference or what the significance is of hot
19  escalation versus escalated.
20      Q.  Uh-huh.  You testified earlier that you
21  don't think you had any of your consultants at
22  BellSouth, right?
23      A.  That's correct.
24      Q.  How about Celulares Telefonica?  Yes?
25  It's in Latin America.

170

1      A.  I -- we probably had some people from my
2  consulting group involved.  It still could have
3  easily -- and I don't know the answer.  It could
4  have also been out of OSI since they had
5  responsibility for telecommunications clients.
6      Q.  How about Franklin Covey?
7      A.  I don't recall that one.
8      Q.  Toshiba Medical Systems?
9      A.  I do not believe so.  And one of the
10  reasons is, it says "EMEA" here, and it talks about
11  the Dutch marketplace.
12      Q.  Okay.  And would you say the same with
13  Tyco, EMEA?
14      A.  Correct.
15      Q.  How about Videojet?
16      A.  I don't recall.
17      Q.  Okay.  Wincor, looks like another EMEA?
18      A.  Right.
19      Q.  How about Xerox GMO?
20      A.  I believe that was mine.
21      Q.  That was yours?
22      A.  Yeah.  I fell under my organization.
23      Q.  What's GMO, do you know?
24      A.  I don't recall.
25      Q.  See on the next page where -- withdrawn.

171

1      Q.  Do you know who Dave El-Ani is?
2      A.  No, I don't.
3      Q.  How about Phil Tate?
4      A.  The name is vaguely familiar.  It says
5  "OSS."  That would be Oracle Support.
6      Q.  Uh-huh.  Now, do you know -- well,
7  withdrawn.
8          See just under Phil Tate's name, the
9  report goes on to kind of indicate a special report?
10      A.  Yes, I do.
11      Q.  Do you know what refers to or means?
12      A.  That category, no, I do not.
13      Q.  Were any of these customers listed in
14  this special report section within -- well,
15  withdrawn.
16          Do you know whether any members of your
17  consulting staff were working on implementations at
18  customer sites with respect to any of these
19  customers listed in this Special Report section?
20      A.  If Hitachi on page 242 -- if that's
21  U.S., that would have been in my organization.  And
22  there's possibly some others here, Shawn.  For
23  example, Xerox Omnifax.  Lexmark, I'm not sure if
24  that's Lexmark Japan or if that's Lexmark USA.  I
25  don't know.  I don't recall specifically.

172

1      Q.  Value Vision wasn't one of yours?
2      A.  I put that in another category -- I
3  mean, that same category.  It could have been, and I
4  don't recall it.
5      Q.  Who do you think would know that
6  information?
7      A.  I would suggest that any of these people
8  that are listed on here that you see on page 244
9  where it says "Project Contacts."
10      Q.  What did you do with these escalated
11  reports when you received them?
12      MR. GIBBS:  Objection.  Lack of foundation.
13      THE WITNESS:  I would follow up -- if they
14  got to this point, we had consulting resources all
15  over the accounts that we were responsible for,
16  unless for some reason it was being done by another
17  implementor, a third-party implementor, and they
18  chose not to have us involved.  But we would have
19  resources on it, and I would get periodic updates on
20  the customers that were mine on how the projects
21  were going.
22  BY MR. WILLIAMS:
23      Q.  Who would you get those updates from?
24      A.  It might be Keith Block or I would call
25  the consulting practice director to find out how the

173

1   project's going.
2        Q.  And the practice director, that's the
3   person who would be actually at the site?
4        A.  It was either somebody at the site or
5   somebody that was -- somebody senior like Tim Meehan
6   that reported in to Keith Block that he would be
7   close enough to it.  And he would be knowledgeable
8   of what was going on, and I would talk to them.
9        I think this report is an example of the
10  focus that we put on the accounts that were at issue
11  to make sure they got the right attention.
12       Q.  At least with respect to CRM?
13       A.  Right, for CRM.
14       Q.  I'm going to show you what's been
15  previously marked as Hamel No. 20.  It's Bates
16  numbered 094069 through 70.
17       A.  Okay.
18       Q.  Have you seen this document before?
19       A.  I don't recall it, and I also see that I
20  was not copied on the e-mail.
21       Q.  And with respect to the subject line, it
22  says "GB 11i Escalations."  Do you think that means
23  General Business?
24       A.  I do.
25       Q.  And do you see anyone in the "to" or

174

1   "cc" line that was in your organization?
2        A.  None that I recall.
3        Q.  And see where -- do you know Ken Hamel?
4        A.  The name is familiar, but I don't know
5   that I knew him.
6        Q.  And if you take a glance at the list of
7   customers on this document, do you recognize any of
8   those customers as ones that your organization was
9   doing implementation on?
10       A.  As I scan the list, a lot of times in
11  General Business, we had third-party implementors.
12  These tended to be smaller companies, and oftentimes
13  the implementation were done by other companies and
14  not Oracle Consulting.
15       Bimbo Bakeries, which is, I believe -- I
16  may be wrong, but I believe is -- they were in
17  Mexico.  And it's actually a fairly large bakery.
18  My guess is this was an implementation probably
19  somewhere in Texas where they had a bakery, and we
20  may have been involved in that.  But to answer your
21  question definitively, I don't recognize any of
22  these as customers that we had in Consulting.
23       Q.  And --
24       A.  It's also been a long period of time.
25       Q.  I show you what's been previously marked

175

1   as Wohl No. 30, which is Bates numbered 063478
2   through 480 with the prefix of NDCA-ORCL.
3        Take a look at this document and let me
4   know when you're done.
5        A.  Okay.
6        Q.  Have you seen Wohl 30 prior to today?
7        A.  Not that I recall.
8        Q.  Have you seen -- withdrawn.
9        Do you know Chuck Phillips?
10       A.  Yes, I do.
11       Q.  How do you know him?
12       A.  I knew him when he was an analyst for
13  Morgan Stanley.  I would periodically meet with him.
14       Q.  And do you know whether or not you met
15  with him in January 2001?
16       A.  I do not.
17       Q.  Would it be unusual for you to meet with
18  him in January of 2001?
19       A.  I don't understand the question.
20       Q.  Okay.  If you -- withdrawn.
21       As far as you know, was he covering
22  Oracle in January 2001?
23       A.  As far as I know, he -- that was one of
24  the software companies that he tracked.
25       Q.  And you said you periodically met with

176

1   him?
2        A.  Yeah.  I probably met with him, as I
3   recall, two or three times while I was at Oracle.
4        Q.  At Oracle or at a Morgan Stanley?
5        A.  The time I remember specifically was at
6   Oracle.  He used to come out and visit Redwood
7   Shores.
8        THE REPORTER:  I'm sorry?  Visit?
9        THE WITNESS:  Would visit Redwood Shores.
10  Redwood, one word, Shores, the headquarters of
11  Oracle.
12  BY MR. WILLIAMS:
13       Q.  And you would talk about, I guess, the
14  business, right?
15       A.  Right.
16       Q.  Directing your attention to on or around
17  March 26th, 2001, you see where, at least in this
18  document, Mark Jarvis writes to Safra Catz, Mark
19  Barrenechea, Ron Wohl about apparent negative
20  article by Forrester?  I think it's in the subject
21  line.
22       A.  Yeah.  I think where it came from was
23  Chuck had sent some comments that were made by
24  Forrester.  And that's -- but I don't believe in
25  Mark Jarvis' article it specifically talks -- I

177

1    mean, his e-mail, it specifically talks about
2    Forrester.
3         Q.  Right.  But see the subject line where
4    it says "Re: forward, forward, forward: Forrester,
5    Negative on 11i"?
6         A.  Yes, I do.  I see that.
7         Q.  You see the first part of the e-mail, it
8    says, "We're being hit on all sides by the press on
9    11i quality.  The bugs in the software (generally
10   quoted as more than 5,000) started a flurry of press
11   articles about how IBM's approach of integration is
12   better than our approach of soup to nuts"?  You see
13   that?
14        A.  Yes, I do.
15        Q.  Had you heard that Oracle 11i was
16   rumored to have had more than 5,000 bugs?
17        A.  I don't recall.
18        Q.  Did you know in or around March of 2001
19   that there were several negative articles regarding
20   the quality of 11i?
21        MR. GIBBS:  Objection.  Lack of foundation.
22        THE WITNESS:  I don't recall.
23   BY MR. WILLIAMS:
24        Q.  Okay.  Did anyone ever ask you to
25   provide any comments that would be forwarded to the

178

1    press regarding the quality of 11i in the spring of
2    2001?
3         A.  I don't recall being specifically asked
4    to do that or doing it.
5         Q.  Okay.  Did you ever get any e-mails from
6    Chuck Phillips or anyone else outside of the company
7    regarding the quality of 11i products or software?
8         A.  E-mails from outside the company?
9         Q.  Outside the company.
10        A.  I don't recall any.
11        Q.  You see where -- I'm going to ask you to
12   turn to the next page.  Looks like the top of the
13   page is an e-mail from Chuck Phillips to Safra Catz.
14   See that?
15        A.  Yes, I do.
16        Q.  Down in the middle of the e-mail, he
17   writes, "But I'm hearing it from multiple sources,
18   including the user groups and Oracle employees,
19   about the stability of the product.  I think it's
20   improved since much of this was written, but not
21   many people know that, and all the early adopters
22   have plenty of horror stories they willingly share
23   with whomever may call.  It's worth deploying
24   corporate-level consulting resources to get them
25   happy ASAP to turn them into proponents instead of

179

1    critics."  Do you see that?
2         A.  Yes, I do.
3         Q.  Safra Catz ever forward this e-mail to
4    you or indicate to you what Chuck Phillips had
5    communicated to her?
6         A.  I don't recall her ever doing that, but
7    I think by -- and I'm speculating.  But when I look
8    at the e-mail which was Sanderson Exhibit 9 that
9    listed escalated accounts, Safra knew that we were
10   tracking escalated customers and putting all our
11   energy behind taking care of those to get them on
12   the right path.
13        Q.  Did you talk to Safra about it, about
14   that?
15        A.  About?
16        Q.  About tracking customers to get them on
17   the right path.
18        A.  Not so much about tracking customers
19   because that was process-driven.  What I would talk
20   to Safra about, it might be a specific customer
21   where there was concern, and I would update her or
22   get her input on a particular issue around that
23   subject -- I mean, around that customer.
24        Q.  You'd call her up or she would call you?
25        A.  Both.

180

1         Q.  Both.  You see where, the next sentence,
2    Chuck Phillips writes, "A few of the reps I spoke
3    with don't have the confidence to push CRM because
4    of the quality issues in the past."  See that?
5         A.  Yes, I do.
6         Q.  And where -- well, withdrawn.
7         In March of 2001 or February,
8    March 2001, were any of your consulting reps
9    indicating to you that they didn't have the
10   confidence to either sell or install Oracle CRM?
11        A.  No, I don't recall that.  Oracle
12   Consulting's rule was, once the product had been
13   sold to the customer, was to implement.  They
14   weren't asked whether they felt whether they wanted
15   to do it or not.  So, their responsibility -- excuse
16   me -- was to make it happen.
17        Q.  Well, isn't it true that Keith Block had
18   indicated to you that some of the consultants were
19   waiting on clients to wait to upgrade to 11i because
20   of the product problems?
21        A.  You showed me that e-mail earlier.  I
22   don't recall that.
23        Q.  You don't recall hearing -- well, the
24   e-mail was sent to you.  He told you that fact,
25   right?

181

```
1      A.   That's -- as documented in the e-mail,
2   correct.
3      Q.   Okay.
4      A.   Not that I -- and I'm saying I don't
5   recall that today.
6      Q.   I understand.
7      A.   Okay.
8      MR. GIBBS:  When you move to a new exhibit,
9   you mind --
10     MR. WILLIAMS:  I'm sorry?
11     MR. GIBBS:  When you move to a new exhibit,
12  do you mind if we take a very short break?
13     MR. WILLIAMS:  We can do it now if you like.
14     THE VIDEOGRAPHER:  Off the record at
15  2:25 p.m.
16     (A brief recess was taken.)
17     THE VIDEOGRAPHER:  We are back on the record
18  at 2:30 p.m.
19  BY MR. WILLIAMS:
20     Q.   I show you what's been marked as
21  Exhibit No. 17, although I think it's Borthwick 17,
22  but let me just put the Bates number on the record,
23  which is NDCA-ORCL 159545 through 575.  Take a look
24  at that and let me know when you're done.
25     A.   Okay.
```

182

```
1      Q.   Do you recognize what's been previously
2   marked as Exhibit 17?
3      A.   No, specifically.  But I know it was
4   part of a preparation for the budget.
5      Q.   The Fiscal '02 Consulting Budget, just
6   your organization, right?
7      A.   Yes.
8      Q.   Do you --
9      A.   What I do know, I don't believe it
10  included Latin America Consulting, and it probably
11  included OPI Consulting.
12     Q.   Okay.  Did you -- well, it's the
13  Fiscal '02 Consulting Budget Review, right?
14     A.   Yes.
15     Q.   And did you create this presentation?
16     A.   No.  I'm sure I had input to it, but it
17  was prepared by others.
18     Q.   Okay.  And others in your organization?
19     A.   Correct.
20     Q.   And just turning your attention to Bates
21  ending 567.
22     A.   Okay.
23     Q.   And -- well, do you know who you gave
24  this presentation to?  Was it to Larry Ellison?
25     A.   That's what it was intended for.  I
```

183

```
1   don't recall whether we walked through it with Larry
2   or not.
3      Q.   What do you mean?
4      A.   I don't know if, when we met with Larry,
5   whether we had a chance to present it or not.
6      Q.   I see.
7      A.   Larry decides what you present and what
8   you don't present.
9      Q.   Well, here you and your organization
10  indicate that "Adverse business conditions will
11  continue to challenge us," I guess Consulting, "in
12  fiscal '02" --
13     A.   Correct.
14     Q.   -- right?  And what did you mean when
15  you wrote "Uncertainty around the economy"?
16     MR. GIBBS:  Objection.  Lack of foundation.
17     THE WITNESS:  I don't recall.
18  BY MR. WILLIAMS:
19     Q.   All right.  And how about the dot-com
20  crisis?
21     MR. GIBBS:  Same objection.
22     THE WITNESS:  What it means here, based on
23  the sub-bullet is we had some accounts receivable
24  write-offs from customers because they were going
25  into bankruptcy.
```

184

```
1   BY MR. WILLIAMS:
2      Q.   And that had begun in the first half of
3   2000, hadn't it, first half of calendar 2000?
4      A.   I don't recall specifically.
5      Q.   And the next -- the next bullet point,
6   Product Issues, "21 million in fiscal '01," seems to
7   indicate that your organization absorbed $21 million
8   of costs related to product issues in the fiscal
9   year of '01, right?
10     MR. GIBBS:  Objection.  Lack of foundation.
11     THE WITNESS:  Yes, that's what it says here.
12  BY MR. WILLIAMS:
13     Q.   And that -- but it doesn't have a
14  breakdown by quarter?
15     A.   No, it doesn't.
16     Q.   And this $21 million is just for
17  Consulting, right?  This doesn't include some of the
18  support relief that we talked about earlier, right?
19     A.   Right.  On average, about $2 million a
20  month with a new product, correct.
21     Q.   I'm sorry?
22     A.   About on an average of $2 million a
23  month for a new product, that's correct.
24     Q.   What do you mean?
25     A.   11i was a new product that we had
```

185

1  introduced.  The 21 million divided by 12 is
2  approximately $2 million a month.
3       Q.  Oh, that's what you're -- okay.
4       A.  Yeah.
5       Q.  All right.  But in the first quarter of
6  fiscal '01, 11i hadn't been -- hadn't yet been
7  released, right?
8       A.  First quarter of '01, which would have
9  been June of 2000 --
10      Q.  That's right.  So, it had been, right.
11  Okay.
12      A.  -- it had been introduced.
13      Q.  My mistake.
14          What are CPG settlements?
15      A.  It's consumer packaged goods.  It's
16  companies that produce consumer products, and so,
17  food companies, food manufacturers, et cetera.  And
18  we had developed a separate set of products separate
19  from 11i, where we integrated different vendor
20  products or interfaced different products together
21  and produced a CPG solution.  And it ended up being
22  not a huge success, and, as you can see here, we had
23  settlements of $6 million.
24      Q.  Okay.  When you refer to "settlements"
25  in the document, does that mean that legal action

186

1  was indeed brought by these customers, and the
2  company settled out of court, or does it simply mean
3  that there was an issue that you settled?
4       MR. GIBBS:  Objection.  Lack of foundation.
5       THE WITNESS:  As I told you earlier, I don't
6  recall any legal settlements.  This is most likely
7  settlements with the customer.
8  BY MR. WILLIAMS:
9       Q.  Okay.  I'll ask you to turn your
10  attention to Bates ending 569.  It looks like the
11  total for fiscal '01 related to release 11i product
12  issues was 21 million.
13      A.  Correct.
14      Q.  It appears that it's estimated, though,
15  because 4Q had not yet been concluded as of the date
16  of this document, which is April 3rd of 2001,
17  right?
18      A.  Correct.
19      Q.  Do you know what the total was for
20  fiscal '01 for 11i product issues?
21      A.  The actual number?
22      Q.  Yeah.
23      A.  No, I don't.
24      Q.  The title of this page says "Release 11i
25  Product Issues had a large impact year to date,

187

1  further negotiations and settlements are ongoing."
2  What's meant by "large impact"?
3       A.  Remember, this is a budget document, and
4  it's a negotiation document, as far as what your
5  revenue and margin and margin percentage was going
6  to be for the next year.
7           And I think -- I don't recall that
8  comment specifically, "large impact," but I think
9  you can see the fact was that it impacted us by
10  $21 million in unbilled revenue.
11      Q.  Okay.  I'm going to show you what's been
12  previously marked as Roberts No. 25.  It's Bates
13  numbered NDCA-ORCL 162213.  Actually, there appears
14  to be a page missing, 14 is missing, but it goes on
15  to have 15 and 16.
16          Just take a look at this document and
17  let me know when you're done.
18          For the record, I think that 14 just has
19  the Vcard information on it, but we'll double-check
20  to make sure that there's nothing material missing
21  from the document.
22      A.  Okay.
23      Q.  Okay.  You recognize Roberts No. 25?
24      A.  No, I do not.
25      Q.  All right.  Appears to be an e-mail that

188

1  Sergio Giacoletto sent to Mark Barrenechea, cc'ing
2  you among others, right?
3       A.  Correct.
4       Q.  In June 2001?
5       A.  Correct.
6       Q.  And the -- I guess it looks like Sergio
7  is responding to an e-mail that Mark sent earlier,
8  right?
9       A.  Correct.
10      Q.  And if you look at 162215, Mark appears
11  to write or break down -- break down the financials
12  for different areas of the company.  See that?
13      A.  I do.  Just as a clarification, I think
14  it's what you meant, Shawn.  You say "financials."
15  It shows the revenue for CRM.
16      Q.  CRM alone?
17      A.  It would be my guess.
18      Q.  And it appears that Sergio responds.
19  See where he says, "Mark, I also [sic] disappointed
20  by the results"?  See that at the --
21      A.  Yes, I do.
22      Q.  "I also disappointed by the results,
23  but, as you know, we had six to nine months of
24  product issues which caused loss of confidence by
25  sales, partners, analysts and customers."  Do you

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

189

1  see that?
2      A.  Yes, I do.
3      Q.  You didn't disagree with that statement
4  by Sergio, did you?
5      A.  I don't recall.  I -- I don't recall.
6      Q.  As you sit here today, do you disagree
7  that there were months of product issues in fiscal
8  2001 which caused the loss of confidence by Oracle
9  salespeople, its partners, analysts and customers?
10     A.  Generally speaking, that's right.  We
11  launched a brand-new product, and it was
12  challenging.  It was a challenging period.
13     Q.  And you see where he writes, "Even as of
14  today, release 11.5.4, which is the first stable
15  release, is not available in local language, and we
16  will only get it between July and October 2001"?
17  See that?
18     A.  Yes.
19     Q.  You didn't disagree that 11.5.4 was the
20  first stable release, did you?
21     A.  I don't recall.
22     Q.  And do you have any reason to believe
23  that Sergio's view of -- of the stability of 11i or
24  11.5.4 was inaccurate?
25     A.  Shawn, you're asking me to recall

190

1  something that is over five years ago.  And to say
2  do I have any reason to agree or disagree with it, I
3  think, is somewhat of an unfair question.
4          I mean, I -- I think the product in
5  Europe was a little bit different than the U.S.
6  because of the nature of the language that was
7  associated with it.  And if I had to speculate, I'd
8  probably say that we were more stable more quickly
9  in the U.S. because the language that it was
10  developed for was the English -- U.S. English, not
11  U.K. English.
12     Q.  Well, if you don't recall, you can just
13  say you don't recall.
14     A.  I don't recall.
15     Q.  I'm not trying to trick you or anything.
16     A.  Okay.  I don't recall.
17     Q.  You see where he writes that -- again,
18  the same sentence, "Even as of today, release
19  11.5.4, which is the first stable release, is not
20  available in local language"?  Did you know whether
21  or not as of June 2001 11i was available in European
22  local languages?
23     A.  I don't recall that.  I don't recall.
24     Q.  Do you recall -- withdrawn.
25         Do you know whether this issue was

191

1  discussed at executive committee meetings in June of
2  2000, specifically the issue of the availability of
3  11i in European local language?
4      A.  I don't recall discussing that at the
5  executive committee.  It was not unusual that when
6  you released a new product that other languages for
7  other countries would come at a later date.
8      Q.  You see that Sergio writes "not
9  available" in capital letters.  Did you know why?
10     A.  Sergio's got a big sales number that he
11  has to achieve, revenue number.  And he is going to
12  do everything he can to make sure he's got the
13  product that he needs.  If he doesn't, he's going to
14  make sure Larry knows that so that when negotiations
15  for revenue targets are understood that Sergio's got
16  something like this to point to.
17     Q.  Okay.  Great.  I'm going to show you
18  what's been previously marked as Borthwick No. 17.
19  It's Bates numbered NDCA-ORCL 131696 through 702.
20  I'll ask you to take a look at this document and let
21  me know when you're done.
22     A.  Okay.
23     Q.  Okay.  You recognize what's been
24  previously marked as Borthwick No. 17?
25     A.  I do not.

192

1      Q.  Okay.  Appears to be an e-mail from
2  Ivgen Guner to Keith Block and Valerie Borthwick,
3  right?
4      A.  Correct.
5      Q.  Both in your organization?
6      A.  No -- yes.  I'm sorry.  Correct.
7      Q.  Right.  And it's in June of 2001,
8  actually, June 11th, 2001, right?
9      A.  Correct.
10     Q.  Subject line is the board meeting input?
11     A.  Correct.
12     Q.  All right.  And Ivgen is asking Valerie
13  and Keith to go over his PowerPoint presentation
14  with you before they give it to Jeff Henley; is that
15  fair?
16     A.  That's what it says here, correct.
17     Q.  And the name of it is actually the
18  "Sanderson PowerPoint", right, the file?
19     A.  Yes.
20     Q.  And was it customary for Keith and
21  Valerie to help prepare presentations for the
22  consulting organization for either Larry Ellison and
23  Jeff Henley or the board of directors?
24     A.  Yes.  The only qualification I give,
25  Shawn, is for the board of directors, not directly,

193

1 but just as you said, you know, for Larry or for
2 Jeff to present.  Or if I ever presented to the
3 board, they would help do that.
4       Q.   Right.  Did you present to the board of
5 directors in fiscal 2000, 2001?
6       A.   No.  I did in fiscal 2000.
7       Q.   2000.  On what topic?
8       A.   FY -- or 2000 and -- you may recall
9 there was a technical issue that the industry was
10 facing with the year 2000, and the board asked me to
11 present about what we were doing as a company to
12 prepare for that, if any clients had issues with it.
13 It ended up being a nonissue.
14       Q.   Okay.  I'm going to ask you to turn to
15 Bates ending 699.
16       A.   Okay.
17       Q.   You see "Fiscal '01 Performance vs.
18 Plan"?
19       A.   Yes.
20       Q.   See that?  Second bullet point, "11i
21 E-Business Suite instability issues"?
22       A.   Yes.
23       Q.   "Took one full year to stabilize"?
24       A.   Yes.
25       Q.   Is that consistent with your

194

1 understanding?
2       A.   That would be consistent, yes.
3       Q.   It's also somewhat consistent with
4 Sergio Giacoletto's comment we just talked about in
5 term of six to nine months of product issues and
6 11.5.4 being the first stable release, isn't it?
7       A.   I can't respond on the 11.5.4 because I
8 don't remember.  It's a very specific number, and we
9 had different releases of the product, and I don't
10 recall.
11       Q.   Okay.
12       A.   What I generally recall is it took us a
13 period of time to stabilize the new product, and,
14 you know, one year is probably a good general
15 statement.
16       Q.   Okay.  Which would have been somewhere
17 around May of 2001, right?
18       A.   Correct.
19       Q.   I'm going to ask you to turn to Bates
20 ending 1701.
21       A.   Okay.
22       Q.   With respect to the consulting business,
23 you say or -- withdrawn.
24            With respect to the consulting business
25 here, the challenges for the consulting business for

195

1 fiscal '02 is -- one issue is CRM quality; is that
2 fair?
3       A.   I see that on the page, yes.
4       Q.   What does that mean to you?
5       A.   I don't recall.
6       Q.   Do you have a general understanding what
7 software quality would mean to software consulting
8 doing implementations.
9       A.   Do I have a general understanding of
10 what software quality means to -- of course I do.
11       Q.   That's all I'm trying to get from you.
12       A.   I understand what the term "software
13 quality" means.
14       Q.   Okay.
15       A.   What does "CRM quality" mean here in
16 June of 2001?  I don't recall.
17       Q.   Okay.  What is your general
18 understanding of what "software quality" means then?
19       A.   Whether the product works as advertised.
20       Q.   Okay.  And --
21       A.   Actually, it's whether the software
22 works according to the documentation --
23       Q.   Right.
24       A.   -- for the product.
25            MR. WILLIAMS:  I'm going to ask the reporter

196

1 to mark this document as Sanderson No. 10.
2 Sanderson No. 10 is Bates numbered NDCA-ORCL 056341
3 through 347.
4            (E-mail string dated 7/01 re GE Aircraft
5 APS Status/Background (NDCA-ORCL 056341-056347)
6 marked Exhibit 10 for identification.)
7            THE WITNESS:  I'm ready.
8 BY MR. WILLIAMS:
9       Q.   Okay.  Do you recognize Exhibit -- well,
10 Sanderson No. 10?
11       A.   I do not.
12       Q.   Okay.  Appears to be a series of e-mails
13 that you were either copied on or received.
14       A.   I believe out of this I was copied on
15 one of the e-mails, the one that Sebastian sent to
16 me --
17       Q.   Okay.
18       A.   -- on the 16th of July.
19       Q.   Actually, he sent it to you rather than
20 copying you, right?
21       A.   That's correct.
22       Q.   And forwarding e-mails behind it?
23       A.   That's correct.
24       Q.   And one of the e-mails was from Robert
25 Evans to Sebastian Gunningham, Maria Victoria Brio,

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

197

1  Steve McLaughlin, who's in your organization, right?
2      A.  Correct.
3      Q.  Do you know Maria Victoria Brio?
4      A.  I don't know who that is.
5      Q.  Okay.  But the subject matter is GE,
6  right?
7      A.  Correct.
8      Q.  And you indicated earlier that GE was
9  pretty much your client except for HR, right?
10      A.  It fell into my organization, correct.
11      Q.  Right.  And so, Sebastian writes to you
12  on July 16th that GE doesn't want to pay the more
13  than 3.2 million in cost overruns, right?
14      A.  Correct.
15      Q.  Do you know what he's referring to
16  there?
17      A.  I don't.  I didn't read the e-mail line
18  for line.  I did see where we did a fixed-price bid
19  and, as I read it, that we exceeded that fixed-price
20  bid.  And, not surprisingly, GE is coming back
21  saying "It was a fixed-price bid, and it cost
22  $3.2 million more.  And that's your nickel, Oracle,
23  not ours.  Or your responsibility, Oracle, not
24  ours."
25      Q.  Right.  And you wouldn't bill them for

198

1  anything above the fixed price if it's a fixed-price
2  bid, right?
3      A.  Right.  I mean, if you tried to bill it,
4  they would ignore it anyway.  But -- that's not
5  quite true.  If you would go back in situations like
6  this or others and you would -- if you had an
7  overrun, you could still go back to the client if
8  you had a justification.  And a justification might
9  be that they asked for additional functionality that
10  wasn't within the scope, and so, you would try to
11  negotiate that.
12      Q.  You don't know whether or not that
13  occurred here, do you?
14      A.  No.  I'm just saying -- no.  The obvious
15  thing here is we exceeded the fixed-price contract
16  by $3.2 million.
17      Q.  Okay.  See on the top of 342 where it
18  says, "GE has not requested funding from Oracle for
19  GE overrun estimated at 25 million"?  Response to
20  this, "Primarily due to GE shortcomings and HW
21  planning, e.g., backup system"?
22      A.  Right.
23      Q.  Do you know what that refers to?
24      A.  Yeah.  HW would be hardware planning.
25  And when you do -- so, it's hardware planning, for

199

1  example, the backup system for the new application.
2          When you do projects like this, you
3  know, whether it's Oracle Consulting or another
4  third party that's doing it, you are doing it hand
5  in hand with the client typically.  And so, GE had
6  put resources to this project as well, which was
7  pretty typical of our engagements.
8      Q.  Do you know Charles Kendig?
9      A.  Do you have a title there for him?
10      Q.  I don't know.  I'll just show it to you.
11  I'm going to show you what's been marked as Kendig
12  No. 18, and the Bates number is NDCA-ORCL 621416
13  through 621449.  And I'll ask the same question, if
14  you know Charles Kendig.
15      A.  I don't recall him.  I'm trying to
16  remember, Shawn.  The name is somewhat familiar, but
17  I don't recall.  And his title doesn't ring a bell.
18  As I go through here, if I see something that
19  reminds me, I'll let you know.
20      Q.  Okay.
21      A.  Do we know what the date of this
22  document is?
23      Q.  We don't know.
24      A.  We know that it's at least May 4th,
25  2003.  You see that?

200

1      Q.  Well, why don't you tell me what you're
2  looking at.
3      A.  Look at page 1435, and it's a screen
4  printout.  And it has the date that it was last
5  modified.  It was April 4th, 2003.  Excuse me.
6          MR. GIBBS:  One could also read the Kendig
7  deposition.
8          MR. WILLIAMS:  Excuse me?
9          MR. GIBBS:  I said one could also read the
10  Kendig deposition.
11          MR. WILLIAMS:  We can have him read it if
12  that's what you'd like.
13          MR. GIBBS:  No.  I'm just pointing out that
14  that's in the record.
15  BY MR. WILLIAMS:
16      Q.  I take it you don't know Charles Kendig,
17  right?
18      A.  I still don't recall him, yes, right.
19      Q.  I'm going to ask you to turn your
20  attention to Bates ending 422.
21      A.  Okay.
22      Q.  I guess you could look at this page and
23  determine that this document was created sometime
24  after or during June 2003 since it indicates the
25  current 11i release, right, down on the bottom,

201

1   11i.9?
2        A.   Right.  Long after I had left before --
3   a couple years before then.
4        Q.   Sure.  Looks to be -- document appears
5   to be backward looking.
6        A.   Backward and forward, correct.
7        Q.   Backward and forward, correct.
8             And at least here, it indicates that
9   11i.4 was released in June of 2001; is that fair?
10       A.   Correct.
11       Q.   And if you turn to Bates ending 425, see
12   where it indicates "Approximately 85 percent of our
13   customers working with 11i.  11i.9 shipments as of
14   January 2004," right?
15       A.   Yes.
16       Q.   I guess he's indicating that, at least
17   as of that date, the vast majority of customers
18   would be using .9, right?
19       A.   I'm reading the same thing as you are on
20   the page, correct.
21       Q.   I'm sorry.  And looking at -- going to
22   428, it talks about the 11i history.  Says "Initial
23   11i implementations were troubled.  Product quality
24   and completeness feel" -- well, "product quality and
25   completeness."  Is that consistent with your

202

1   recollection of initial 11i implementations?
2        MR. GIBBS:  Objection.  Lack of foundation,
3   calls for speculation.
4        THE WITNESS:  Yeah, as we discussed today, we
5   had a number of issues when we first released the
6   brand-new product, correct.
7   BY MR. WILLIAMS:
8        Q.   Okay.  And see how he talks about
9   calendar year 2001?
10       A.   Yes.
11       Q.   Says "Spent reacting to the issues one
12   by one."  See that?
13       A.   Yes, I do.
14       Q.   See just under that a "big quality black
15   eye for Oracle"?
16       A.   Yes, I do.
17       Q.   During calendar year 2001, at least
18   until you left Oracle, did you believe that the
19   experiences with implementation of 11i had created a
20   quality black eye for Oracle in that period?
21       A.   I'd suggest you talk to Charles Kendig.
22   I understand you deposed him based on what my
23   counsel just said.  So, he's the one that wrote it.
24   I suggest you ask him about it.
25       Q.   I'm asking you a question, whether or

203

1   not you believed that the experiences with
2   implementations of 11i created a quality black eye
3   for Oracle in that period.
4        A.   I think our financial performance during
5   that year demonstrates that we didn't have a black
6   eye.  I think my financial performance, as I
7   recall, was actually quite good.
8             So, if that's a measure, which is a
9   bottom-line measure -- it's not subjective, it's not
10  qualitative, it's quantitive -- I think the
11  numbers -- we could easily look at the numbers, and
12  I think they speak for themselves.
13       Q.   Sure, I understand that.  I was asking
14  you about quality, though.  I wasn't asking you
15  about --
16       A.   The quality, you have to measure -- so,
17  it's a measure of how do you measure quality?
18       Q.   Okay.
19       A.   Okay.  And a way to measure quality is
20  what is your financial performance?  What is your
21  growth in the marketplace?  That's ultimately how
22  you can measure it.  Could it have been better?  Of
23  course.
24            Every major implementation -- I mean,
25  major product release from a software vendor every

204

1   time could have been better.  And it's the same case
2   here.
3        Q.   Okay.  So, would you change your answer
4   then with respect to your previous statement that
5   quality meant whether or not the software was
6   performing as represented in its documentation?
7        A.   I mean, that's certainly a measure too.
8   I -- it's not a question of how do you measure -- I
9   mean, it is a question in the end of how do you
10  measure quality.  Here he's concluded "quality black
11  eye for Oracle."
12            I'm actually encouraged by this
13  statement because it shows the candor that was used
14  within Oracle around our product.  We didn't kid
15  ourselves.  We took it very seriously.  We did not
16  try to finesse things.  We were honest and direct
17  with each other.  I wouldn't call it a black eye.
18       Q.   So, you disagree with how he
19  represents --
20       A.   Could it have been saw -- yes, it could
21  have been better, yeah.  Was our financial
22  performance pretty darn good?  Yeah.
23       Q.   Was Business Online, or BOL, part of 11i
24  or was it functioning on 11i software in fiscal '01?
25       A.   Business Online, it was during '01.  I

205

1   don't specifically remember when it was released,
2   and I can't remember specifically -- I mean, to that
3   point, whether it was released coincident with 11i,
4   before or after.  But it was a relatively new
5   offering from Oracle in the time just before I left.
6       Q.  Can you describe for me what it was?
7       A.  Business Online was recognizing that --
8   the opportunity that customers may opt not to
9   install the software themselves but have the
10  software run by a third party to the customer -- in
11  this case, that third party was Oracle -- and that
12  they would actually run the applications for the
13  customer.
14      As patches came out, as updates to the
15  software came out, Business Online would
16  automatically apply that for the customer so the
17  customer didn't have to have the skills or put the
18  resources to doing something like that.
19      Q.  Kind of like a -- so, Oracle was
20  basically hosting the environment?
21      A.  That's a good way to put it.  Yes.
22      Q.  But was Oracle hosting the environment
23  with 11i generally?
24      A.  You mean through BOL?
25      Q.  Yeah.

206

1       A.  Yeah.  I think it was an offering for
2   customers to do that, yes.
3       Q.  And it was hosted over the Internet, or
4   the communications would be over the Internet; is
5   that fair?  Since it's Business Online, I was
6   assuming that it's the Internet.
7       A.  Yeah, I don't think it actually is over
8   the Internet technically.  I think it was over a
9   specific network dedicated to that client between
10  the client -- that customer, or client -- I use
11  those terms interchangeably -- and Oracle BOL.
12      Q.  But the environment would be -- well,
13  withdrawn.
14      A.  It would be Internet-like, to your
15  point, but I don't think it was over technically the
16  Internet that we all operate on.
17      Q.  So, would there -- one would not or
18  should not expect communication-type issues that you
19  might experience trying to connect over the
20  Internet?
21      A.  Yeah, you do.  The Internet is a
22  network.  And the network that they may have -- they
23  may have, for example, what they call a T-1 line,
24  which was a dedicated telecommunications line
25  between Oracle and a customer.

207

1       And, sure, you could have challenges --
2   they're both networks.  They're both using routers
3   and servers and that kind of thing.
4       MR. WILLIAMS:  I want to take a short break
5   if that's okay.
6       THE WITNESS:  Okay.
7       THE VIDEOGRAPHER:  Off the record at
8   3:17 p.m.
9       (A brief recess was taken.)
10      THE VIDEOGRAPHER:  We're back on the record
11  at 3:28 p.m.
12      MR. WILLIAMS:  I'm going to ask the reporter
13  to mark this as Sanderson No. -- I think we're at
14  11.
15      (E-mail string dated 7/00 re SC CEO Desk
16  Call marked Exhibit 11 for identification.)
17      THE WITNESS:  Thank you.
18      MR. WILLIAMS:  It's Bates numbered NDCA-ORCL
19  101654 through 656.
20  BY MR. WILLIAMS:
21      Q.  I'll just ask you to take a look at it
22  and let me know when you're done.
23      A.  You know that the right side of this
24  e-mail has been cut off?
25      Q.  Yeah.  And that's the way it was

208

1   produced to us.
2       A.  Okay.
3       MR. WILLIAMS:  If you guys have a complete
4   e-mail and you could produce it --
5       MR. GIBBS:  I think it was produced in the
6   complete form.  I think it was produced in that
7   form.
8       MR. WILLIAMS:  My understanding is this is
9   how it was produced.  So --
10      MR. GIBBS:  Well, I don't have it with me.
11      MR. WILLIAMS:  Huh?
12      MR. GIBBS:  I don't have it with me.
13      THE WITNESS:  Okay.
14  BY MR. WILLIAMS:
15      Q.  You recognize the document?
16      A.  I do not.
17      Q.  It's an e-mail in or around July 30th,
18  2000 -- or, actually, a couple of e-mails between
19  you, George Roberts and other members of Oracle
20  staff.
21      A.  Correct.
22      Q.  And if you look at Bates ending 655,
23  George Roberts sends you an e-mail, along with Safra
24  Catz, Ron Wohl and Mark Barrenechea, stating, "We're
25  having challenges with the 11i demo system that's

209

1    costing us Q1 business." You see that?
2        A. Yes, I do.
3        Q. And did you understand that to mean that
4    because Oracle was unable to show a complete
5    demonstration of 11i that certain business was
6    not -- was either not being captured or lost?
7        MR. GIBBS: Objection. Lack of foundation.
8        THE WITNESS: What -- I don't recall the
9    e-mail, but I do recall the issue. And I remember
10   that right after we launched 11i that the demo
11   system, which is a completely separate system
12   because it has to operate in a closed-demonstration
13   environment, that there were issues with it as well.
14   BY MR. WILLIAMS:
15       Q. Okay. I just want to see if I can get
16   an answer to the question. Did you understand
17   George Roberts' e-mail to mean that because Oracle
18   was unable to show a complete demonstration of 11i
19   that certain business was either not being captured
20   or lost?
21       MR. GIBBS: Objection. Lack of foundation.
22       THE WITNESS: I don't recall, sitting here,
23   any specific business that we lost. That said,
24   clearly, having issues with the demo system didn't
25   help.

210

1    BY MR. WILLIAMS:
2        Q. Well, what he told you was that "We're
3    having challenges with the 11i demo system, and that
4    is costing us Q1 business."
5        A. And that's George Roberts writing
6    that --
7        Q. Right.
8        A. -- and I would suggest you talk to
9    George about that.
10       Q. I was asking what your understanding
11   of the e-mail he sent to you was.
12       A. Oh.
13       MR. GIBBS: Objection. Asked and answered.
14       THE WITNESS: You're asking me to valid -- to
15   confirm that's what -- that the words say what they
16   mean?
17   BY MR. WILLIAMS:
18       Q. No. Did you have a different
19   understanding of what those words mean?
20       MR. GIBBS: At the time?
21       MR. WILLIAMS: At the time.
22       MR. GIBBS: He said he doesn't remember.
23       THE WITNESS: I don't recall specifically
24   about the demo system other than the fact I did say
25   that I do recall having issues with it. We had

211

1    issues with the demonstration system for 11i.
2    BY MR. WILLIAMS:
3        Q. Okay. So, you don't recall what those
4    words meant at the time?
5        A. George is saying that he -- he is having
6    problems that's costing Q1 business because of the
7    demo system. That was George's statement. I don't
8    recall any specific customers that we lost or that
9    were impacted by the demo system. I'm not saying
10   there wasn't. I just don't recall any.
11       Q. Okay. Just looking at 654, you respond
12   to George asking him if he got -- well, specifically
13   you say, "George, did you get any reaction from
14   Larry or Safra on the e-mail he sent," right?
15       A. Yes.
16       Q. Do you know if he responded to you?
17       A. I don't recall.
18       Q. And you didn't indicate in here that you
19   were unclear about what he meant about "the 11i demo
20   system that's costing us Q1 business," right?
21       MR. GIBBS: Objection. Argumentative.
22       THE WITNESS: You want an answer to that?
23       MR. WILLIAMS: Yeah.
24       THE WITNESS: Restate the question, please.
25   / / /

212

1    BY MR. WILLIAMS:
2        Q. Question is: You didn't indicate in
3    your e-mail that you were unclear about what he
4    meant when he wrote "the 11i demo system is costing
5    us Q1 business"?
6        A. Yes.
7        MR. GIBBS: Objection. Argumentative.
8        THE WITNESS: In this sentence -- I mean, in
9    my reply, which is a phrase and a sentence, I did
10   not comment on anything regarding his statement
11   about the 11i demo system costing Q1 business.
12       MR. WILLIAMS: Okay.
13       THE WITNESS: I made no comment.
14       MR. WILLIAMS: Okay. I want to ask the
15   reporter to mark this document as Sanderson No.
16   12 -- I'm sorry. 11. Are we at 12? And it's Bates
17   numbered NDCA-ORCL 620365 through 371.
18       (E-mail string dated 8/00 re CRM Demos
19   marked Exhibit 12 for identification.)
20       THE WITNESS: Okay.
21   BY MR. WILLIAMS:
22       Q. Okay. Do you recognize Sanderson
23   No. 12?
24       A. No, I do not.
25       Q. And it's a series of e-mails, one of

213

1   which is an August 2nd, 2000, e-mail from Frank
2   Varasano to you; is that fair?  If you look at the
3   first page, it's right in the middle of the page.
4   I'm sorry.  From Peter Mauel to Frank and you?
5       A.  Correct.
6       Q.  And cc'ing some other people in your
7   organization, Mike DeCesare, Steve McLaughlin, Tom
8   Thimot, right?
9       A.  Correct.
10      Q.  And who is Peter Mauel?
11      A.  I remember it was pronounced "mall."
12      Q.  "Mall," okay.
13      A.  That would be helpful for both of us.
14          I can deduce from the e-mail that Peter
15  worked for Frank Varasano in OPI and was probably
16  part of Bill Lay's group.  Bill reported in to Frank
17  Varasano.
18      Q.  Okay.  And this August 2000 was right
19  around the time that you had taken over OPI after --
20      A.  Ray left.
21      Q.  -- Ray left, right?
22      A.  Yeah.
23      Q.  And so, Peter writes to you and Frank,
24  "In regard to the state of our CRM demo instance, I
25  would say that there are really two issues that

214

1   challenge the field."
2           Is he referring to the license field or
3   the consulting field, if you know?
4       A.  He would be referring to license.
5       Q.  License.  'Cause the first -- if you go
6   to the next page, he says, "Limited functionality of
7   the Mini ADS environment and data preclude the SCs
8   from presenting effective demonstrations."
9           Those are sales consultants, right?
10      A.  Correct.
11      Q.  And he goes on to say a couple lines
12  down, "But the real complaint is the fact that
13  Oracle releases the 11i product in May and two
14  months later SCs are still unable to show a full
15  suite of CRM 'live.'  This impacts all new and
16  existing clients."  See that?
17      A.  Yes, I do.
18      Q.  Did you have a reaction to that, if you
19  recall, at the time?
20      A.  Yeah, I don't recall a specific action,
21  although I remember being concerned that our demo
22  environment wasn't effective and that there were a
23  number of issues that we had to deal with.
24      Q.  Right.  Because the demo environment, if
25  it's not working properly, it impacts the company's

215

1   ability to sell the product, right?
2       A.  Correct.
3       Q.  And if you go down on the same page, he
4   says, "To summarize, this is impact on all our key
5   accounts and opportunities, for example, Apple, HP,
6   EMC, Ingersoll-Rand, Motorola, Compaq, Sun, GE,
7   Sears, Pepsi, Xerox, et al."  Right?
8       A.  Yes.
9       Q.  And some of those customers, like
10  Ingersoll-Rand and Xerox, were customers who
11  ultimately bought 11i but had very difficult times
12  implementing the product; isn't that correct?
13      MR. GIBBS:  Objection.  Lack of foundation.
14      THE WITNESS:  We know that Ingersoll-Rand had
15  issues.  Who else did you mention?
16      MR. WILLIAMS:  Xerox.
17      THE WITNESS:  Xerox had some issues, yes.
18  BY MR. WILLIAMS:
19      Q.  Uh-huh.  And if you go down to the
20  bottom, there's an e-mail from you on July 30th,
21  right, to Frank Varasano --
22      A.  Uh-huh.
23      Q.  -- right?
24          And you write, "We're facing the same
25  kind of issues in OPI."

216

1       A.  No.  I'm sorry to correct you.  It says,
2   "Are we facing the same kind of issues?"
3       Q.  I'm sorry.  I apologize.  "Are we facing
4   the same kind of issues in OPI?  It would be good to
5   go united front with Majors.  Can we have someone
6   work with Gayle Fitzpatrick?"
7           Did anyone let you know whether or not
8   you were experiencing the same issues in OPI?  I
9   guess that's what Mr. Mauel was indicating to you in
10  the later e-mail, right?
11      A.  Yeah, I think -- when I sent that e-mail
12  to Frank on the 30th of July, I was asking him
13  "Are we facing the same issues?"
14      Q.  Right.
15      A.  And then subsequent to that, Peter Mauel
16  responded back with detail about the issues that we
17  were having with the demo environment --
18      Q.  Right.
19      A.  -- specific to CRM.
20      Q.  Right.  Okay.  And on July 28th,
21  George Roberts had actually forwarded you some
22  information saying, "George, this is the status
23  update on the CRM demo.  We'll be sending it every
24  Friday.  It's critical that this environment become
25  stable."  Maybe it says "stabilized."  I don't know.

217

1   Right?
2       A.  Yes.
3       Q.  Did you know Gayle Fitzpatrick?
4       A.  Yes, I did.
5       Q.  And what was her position, if you know,
6   in or around the summer of 2000?
7       A.  I wrote in here in an e-mail in the top
8   of page 367 where I say "Gayle heads up SC," which
9   is the sales consulting organization for Majors,
10  which would have been -- she worked for George
11  Roberts.
12      Q.  Okay.  And if you go to -- well,
13  withdrawn.
14          On the bottom of 67, it looks like Gayle
15  is summarizing the CRM demo update, right?
16      A.  Yes.
17      Q.  It goes on for several pages?
18      A.  Correct.
19      Q.  All right.  And then on the very last
20  page, 620371, she writes, "The demo situation has
21  become the bottleneck in our pursuit of CRM
22  opportunities."  See that?
23      A.  Yes, I do.
24      Q.  That's -- would you say that that was
25  consistent with George Roberts' statement that the

218

1   demo instances was --
2       A.  Yes.
3       Q.  -- causing him to lose business --
4       A.  Yes.
5       Q.  -- in Q1?
6       A.  It was impacting his ability to sell the
7   product, yes.
8       MR. WILLIAMS:  Are you about to hand me that?
9       THE VIDEOGRAPHER:  Not for a few more
10  minutes.
11  BY MR. WILLIAMS:
12      Q.  Let me show you what's been previously
13  marked as Fitzpatrick No. 15.  It's Bates numbered
14  NDCA-ORCL 063415, 416.
15      A.  Okay.
16      Q.  Okay.  You recognize Fitzpatrick 15?
17      A.  I do not.
18      Q.  Okay.  And it appears to be a Majors
19  applications update that was forwarded to you by
20  e-mail in or around January 18th of 2001; is that
21  fair?
22      A.  It's a Majors application demo update.
23  If you said "demo," I'm sorry, I missed it.
24      Q.  That's what I meant to say, "demo
25  update."

219

1       A.  Okay.
2       Q.  Forwarded to you in or around
3   January 18, 2001, right?
4       A.  Yes.
5       Q.  And as far as you knew, the demo
6   environment was still impacting Oracle's business in
7   January of 2001; isn't that right?
8       A.  I don't recall specifically.  I do see
9   here in George's note at the bottom of 415, it says,
10  "There's been good progress on some of the issues."
11      Q.  Uh-huh.
12      A.  And it talked about installing an ISDN
13  line to help with the connectivity.
14      Q.  Uh-huh.
15      A.  So, if you're asking me to characterize
16  it, I'd say that, yes, we're still having problems
17  with the demo but that the situation had improved.
18      Q.  Okay.  And on January 18th of 2001,
19  George Roberts sent you and Ron Wohl, Mark
20  Barrenechea and Gayle Fitzpatrick a note saying,
21  "Just wanted to update you on the demo systems and
22  lingering issues.  Sandy, are your teams seeing the
23  same?"  See that?
24      A.  Yes, I do.
25      Q.  Okay.  Do you know whether or not in

220

1   January of 2001, OPI and/or your consulting
2   organizations were still dealing with challenges
3   with respect to the demonstration system?
4       A.  Just one point of clarification, on --
5   Consulting typically wasn't involved with a demo.
6   The SCs, or sales consultants, report in to the
7   sales organization.  So, Consulting typically didn't
8   get involved with that.  I don't -- I don't recall.
9       Q.  Okay.
10      A.  I don't recall.
11      Q.  So, part of the forward down at the
12  bottom of the page that you had mentioned a few
13  moments ago, I think that's an e-mail from Gayle
14  Fitzpatrick to George Roberts, right?
15      A.  Good point.  Yes.  I think I said George
16  said that, but you're correct.
17      Q.  And at the very last sentence on that
18  page, she writes, "We're still faced with some
19  challenges in the following areas.  1, system
20  performance, and 2, product integration and
21  stability.  The system stability and performance
22  issues still result in poor showing in front of the
23  customer.  We need to be able to demonstrate that
24  our E-Business solution and architecture is better
25  performing than our competitors, particularly those

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

221

1  who bring their own servers."
2      A.  Right.
3      Q.  Do you see that?
4      A.  Yes, I do.
5      Q.  Do you know what she meant or at the
6  time do you -- withdrawn.
7          Do you know what she meant when she said
8  that one of the challenges that the company was
9  still facing was product integration and stability?
10     MR. GIBBS:  Objection.  Lack of foundation,
11  calls for speculation.
12     THE WITNESS:  She touches on it later that in
13  part -- at least in part answers the question where
14  she says that our competitors bring their own
15  servers.  One of the things that we tried to do with
16  the 11i demo environment -- let me take a step back.
17         The way we used to demo our product is
18  we'd bring in a PC or our own server and demo.  So,
19  it was a stand-alone demo.  What we decided to do or
20  where the decision was made by Larry and the
21  development team was the demo environment would be a
22  hosted environment like you were talking about
23  earlier and that you would access it remotely
24  through the network.
25         And that was one of the issues that we

222

1  had, and that was a competitive issue for us.
2  Around -- and that would affect probably, at least
3  in part, the stability issue.  Because if you're
4  going over the network -- and it applies in the
5  second paragraph there that we tried to do some
6  things to improve the stability.
7          Gayle is -- was the head of the SC
8  organization.  It was directly involved in selling a
9  product, and if there was any issues around product
10  integration, she was going to highlight that.
11  Whether it was large or small, she was going to
12  highlight it 'cause she wanted to have a perfect
13  demo environment, as any of us would have.
14  BY MR. WILLIAMS:
15     Q.  Sure.  But part of the problem, as you
16  know, was related to the software itself being
17  unstable; isn't that right?
18     MR. GIBBS:  Objection.  Lack of foundation.
19     THE WITNESS:  This was written in
20  January 2001, and so, yes, we were still -- we had
21  released it in May, so we were still having
22  stability issues to some degree at that point,
23  correct.
24     MR. WILLIAMS:  Okay.  I'm going to ask the
25  reporter -- I'm sorry.  Withdrawn.

223

1          I'm going to show you what's been
2  previously marked as DeCesare No. 3 [sic].
3          The videographer is telling me that she
4  needs to change the tape.  Maybe you can just review
5  the document while she changes the tape.
6      THE VIDEOGRAPHER:  Off the record at
7  3:52 p.m., and this marks the end of Tape No. 3 in
8  Volume I of the deposition of Edward Sanderson.
9          (Discussion held off the record.)
10     THE VIDEOGRAPHER:  We are back on the record
11  at 3:56 p.m., and this marks the beginning of
12  Videotape No. 4 in Volume I of the deposition of
13  Edward Sanderson.
14  BY MR. WILLIAMS:
15     Q.  Have you had a chance to review that
16  document?
17     A.  I have.
18     Q.  And do you recognize it?
19     A.  I don't recognize the e-mail.  I do
20  remember asking Julie Cullivan, who I believe was
21  the head of the SC organization in OPI West, working
22  for Mike DeCesare -- I asked her to collect
23  information around the demos and being very specific
24  so that I could provide that feedback to Ron and
25  Mark.

224

1      Q.  Okay.  Well, DeCesare No. 3 is at least
2  in part an e-mail from you to Ron Wohl and Mark
3  Barrenechea cc'ing George Roberts, forwarding an
4  e-mail from Julie Cullivan to you and other members
5  of OPI; is that fair?
6      A.  It certainly includes some members of
7  OPI.  I don't know who some of these other people
8  are.
9      Q.  Okay.  And so, as you indicated, it
10  appears that you asked Julie to kind of summarize
11  OPI's experiences with demos somewhere in January of
12  2001?
13     A.  I believe I asked her to summarize what
14  OPI West's experience was with the product.
15     Q.  And what is your belief based upon,
16  information in the document or is that just your
17  recollection?
18     A.  Because Julie Cullivan ran OPI -- the SC
19  organization for OPI West.  She didn't run the SC
20  organization for all of OPI.
21     Q.  Did anyone run the SC organization for
22  all of OPI?
23     A.  The answer is no, formally.  I was
24  trying to think if there was a way informally we did
25  it.  I don't recall.

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

225

1   Q.  Okay.  Now, is there -- as you sit here
2   today and reviewing this document, is there any way
3   that someone would understand that this
4   summarization by Julie Cullivan only relates to OPI
5   West?  And I ask because your e-mail to Ron and Mark
6   says, "I know that George consolidated his team's
7   feedback on demos.  Below are the issues we're
8   seeing in OPI."
9   A.  I'll stand corrected because of that
10  statement and also because Julie copied the folks
11  like Steve and Tom Thimot.  So, it probably was
12  OPI -- all of OPI feedback.
13  Q.  Okay.  So, she writes to you on
14  January 31st of 2001 that "The consistent themes
15  continue to be poor performance, inability to prove
16  our E-Business Suite integration story and product
17  stability and quality issues," right?
18  A.  That's what I read, yes.
19  Q.  And at least at the time, you had an
20  understanding of what she meant by those general --
21  A.  Yes.
22  Q.  -- terms, right?
23  A.  Yes.
24  Q.  And at the time you thought that this
25  information was not good as you passed it along to

226

1   Ron and Mark, right?
2   A.  No.  I was going to do everything I
3   could wherever there was an issue around product or
4   demo to make sure that Ron and Mark understand about
5   it -- understand it so they treated it as a high
6   priority.
7   Q.  Okay.  So, when you write or --
8   withdrawn.
9       When you wrote to Ron and Mark, "I know
10  that George consolidated his team's feedback on the
11  demo.  Below are the issues we're seeing in OPI.
12  Please don't shoot the messenger on this," you were
13  really just trying to get their attention there?
14  A.  Yeah.  And just for clarification, when
15  I say "don't shoot the messenger," you know, I was
16  talking about Julie because I wanted -- and not me
17  but Julie.
18      Because Julie, as all SCs did, would
19  work with the Development organization, and I wanted
20  Development to treat her just as well the day after
21  as they did the day before this memo was written.
22  Q.  Okay.  Because this was not positive
23  information?
24  A.  No.
25  Q.  Okay.  And she specifically talks about

227

1   Order Management and Configuration down at the
2   bottom of the page, right?
3   A.  Yes.
4   Q.  And she says "Order Management continues
5   to be very buggy and slow," right?
6   A.  Yeah.  One comment I'd make on "slow,"
7   if you notice up there in the second paragraph in
8   her e-mail to me, she talks about doing the --
9   demonstrating the applications via phone line.
10  We've all dialed into the Internet via phone line.
11  And so, one of the things I remember helping us was
12  getting a dedicated line, high-speed line, to be
13  able to do these demos.  We still had issues.
14      But I'm just pointing out to where she
15  refers to "slow" in a couple of places, it at least
16  was in part due to trying to do demos via the phone
17  line for a pretty comprehensive application.
18  Q.  Okay.  But with respect to OM continuing
19  to be very buggy, that had nothing to do with the
20  phone line?
21  A.  No.
22  MR. GIBBS:  Just for the record -- I'm sorry
23  to interrupt -- but you've referred to this as, I
24  think, as DeCesare 3.  It's DeCesare 1.
25  MR. WILLIAMS:  Oh, I'm sorry.  Thank you.

228

1   MR. GIBBS:  It indicates it's three pages.
2   MR. WILLIAMS:  Three pages, right.  I
3   apologize for that.  Thank you.
4   BY MR. WILLIAMS:
5   Q.  On the next page, she writes with
6   specifics concerning CRM, she says, "Cannot show a
7   complete integrated CRM demo let alone a complete
8   E-Business Suite, ERM/ERP integrated demo."
9       So, she's talking about two issues
10  there, right?  I mean, she's not able to show -- or
11  at least OPI's not able to show ERP working with
12  CRM, and she's not able to show CRM modules working
13  with one another?
14  A.  Correct.
15  Q.  And so, we're talking about -- this is
16  February, so it's, what, seven and a half months
17  later after the release of the product,
18  approximately?
19  A.  June, July, August, September, October,
20  November, December.
21  Q.  Maybe a little longer.
22  A.  Correct.
23  Q.  And down about, you know, another
24  quarter of the way down from there, she indicates
25  that "E-mail Center scenarios do not consistently

229

1  work nor can you even get them all to work
2  together," right?
3       A.  That's a very specific functionality
4  within CRM.
5       Q.  Right.  But it kind of goes to the
6  integration issue, doesn't it, with the CRM modules
7  both functionalities working together?
8       A.  I think she's pointing out there that
9  there's a specific functionality within CRM that
10  wasn't working correctly in the demo environment.  I
11  don't know that it says anything about integration.
12  In that specific case, I think it's just talking
13  about APs of functionality.
14       Q.  Okay.  About six or seven lines down
15  further, she says, "Order Capture is not integrated
16  enough for quote or order tracking.  Cannot enter a
17  price, configure an order, create or contract, query
18  an order, et cetera."  See that?
19       A.  Yes, I do.
20       Q.  Order Capture is part of the CRM module;
21  is that right?
22       A.  Yes.
23       Q.  So, that's an integration issue with
24  respect to CRM modules being able to communicate
25  with one another?

230

1       A.  This is saying --
2       MR. GIBBS:  Objection.  Lack of foundation.
3       THE WITNESS:  Sorry.  This is saying in the
4  demo environment, you're right, that functionality
5  didn't -- wasn't integrated like it needed to be.
6  BY MR. WILLIAMS:
7       Q.  Okay.  And she just enlists a whole host
8  of things?
9       A.  Right, which is what I asked her to do,
10  to be very specific, because one of the issues we
11  had -- Ron had is if you spoke in generalizations,
12  he didn't handle that very well.  He wanted
13  specifics.
14       MR. WILLIAMS:  All right.  Maybe this will
15  help a little bit.  I'm going to ask the reporter to
16  mark this document as Sanderson No. 13, and it's
17  Bates numbered NDCA-ORCL 061313 through 315.
18       (E-mail string dated 2/1/01 re OPI
19  Demonstration Environment/Product Issues
20  marked Exhibit 13 for identification.)
21       THE WITNESS:  Okay.
22  BY MR. WILLIAMS:
23       Q.  Okay.  Do you recognize Sanderson
24  No. 13?
25       A.  No, but a good part of it is the same

231

1  e-mail we just previously talked about.
2       Q.  Right.  And the top part of it is an
3  e-mail from you to Julie Cullivan regarding her --
4       A.  Correct.
5       Q.  -- summary of the demo environments in
6  OPI, right?
7       A.  That's correct.
8       Q.  And you say, "Wow.  I've sent this to
9  Ron and Mark.  I know this may cause some pain, but
10  they need to hear this."  See that?
11       A.  Yes, I do.
12       Q.  And that's pretty consistent with what
13  you told me before that, you know, this wasn't
14  really good news.
15       A.  No.  But when I say "cause some pain,"
16  what I was -- there was a real concern among the SCs
17  just generally that they have to work with
18  Development, closely with Development, and
19  Development, being human beings, may react
20  negatively to somebody that's being critical of
21  them.  And so, when I talk about here "I know this
22  may cause some pain," I meant some pain for her
23  because she was clear -- she was so specific --
24       Q.  Right.
25       A.  -- but they need to hear this.

232

1       Q.  Okay.  And -- right.  "I know this may
2  cause some pain, but they need to hear this."
3       And you also write, "let's hope this
4  gets them motivated to fix these issues," right?
5       A.  Yes.
6       Q.  Do you know how Jeff Henley got this
7  document?  Did you bcc him on this e-mail?
8       MR. GIBBS:  Objection.  Lack of foundation.
9  BY MR. WILLIAMS:
10       Q.  Well, withdrawn.  Do you see Jeff
11  Henley's name on the top left-hand corner of this
12  e-mail?
13       A.  Yeah.  I don't know how he got it.  I
14  didn't play that game.  If I wanted Jeff to send it,
15  I would have -- I mean seen it, I would have sent it
16  to him.  When I say "I didn't play that game," I
17  didn't -- I didn't do much bcc'ing.  I didn't play
18  that game.
19       Q.  Okay.  Now, did you have SCs reporting
20  up through your organization as well?  Were there
21  SCs in OPI?
22       A.  Yeah, SCs in OPI reported in to Frank
23  Varasano when Frank was running OPI.  When he left,
24  I can't remember now who they reported to.  And then
25  when Sebastian Gunningham took over OPI, they

233

1  reported up through him.
2      I don't remember what the specific
3  structure underneath was for SCs, but there was
4  somebody that -- I'm sorry.  I'll take a step back.
5      The SC organization reported up through
6  East, Central, West and OPI.  So, whoever the AVP
7  was in OPI, the -- whoever was in charge of SCs
8  reported up to that area of vice president.
9      Q.  So, each sales, I guess, AVP had their
10  own kind of geographic organization, and everyone
11  had SCs working with them --
12      A.  Yes.
13      Q.  -- to, I guess, facilitate sales?
14      A.  Yeah.
15      Q.  All right.  I'm going to show you what's
16  been previously marked as Fitzpatrick No. 22.  Just
17  going to ask you to take a look at the top section
18  of that.  It's Bates numbered NDCA-ORCL 617970
19  through 974.  Let me know when you're done.
20      A.  I'm ready.
21      Q.  Okay.  It appears to me -- well,
22  withdrawn.
23      Fitzpatrick No. 22 appears to be the
24  same OPI demonstration e-mail or information we've
25  been talking about, with the top section being a

234

1  February 5th, 2001 e-mail from Gayle Fitzpatrick
2  to George Roberts, right?
3      A.  Correct.
4      Q.  And she says in this e-mail to George,
5  "The note outlining the specific issues from OPI are
6  some of the same demo issues that we have also seen
7  in Majors," right?
8      A.  Yes.
9      Q.  And she also describes the top three as
10  being performance, product quality/stability and the
11  ability to show a complete integrated E-business
12  Suite solution, right?
13      A.  That's right.  That's what it says.
14      Q.  She also -- I'm sorry.
15      THE REPORTER:  I'm sorry.  Your answer?
16  BY MR. WILLIAMS:
17      Q.  She also writes, "I would also say that
18  right now more than 50 percent of an SC's time is
19  spent resolving or working around demo/environment
20  issues versus sales-related activities."  See that?
21      A.  Yes, I do.
22      Q.  Was that the experience that the OPI
23  salespeople were communicating to you?
24      A.  I don't remember percentage of time, but
25  you want your SCs spending 100 percent of their time

235

1  around sales.  You want them to spend zero time
2  around resolving or working around demo environment
3  issues.
4      As a matter of course, you're going to
5  have some of those anyway, but that would be -- you
6  certainly don't want 50 percent.  You want to get it
7  as small as possible.
8      Q.  And would you say that if SCs were
9  spending 50 percent of their time on demo issues
10  that it would have a negative impact on sales?
11      MR. GIBBS:  Objection.  Calls for
12  speculation, lack of foundation.
13      THE WITNESS:  Shawn, I'm sorry.  Say that one
14  again.
15  BY MR. WILLIAMS:
16      Q.  Would you say that if SCs were spending
17  50 percent of their time on demonstration issues, as
18  we've discussed over the last couple hours, that
19  that would have a negative impact on their ability
20  to facilitate sales?
21      MR. GIBBS:  Objection.  Calls for
22  speculation, lack of foundation, incomplete
23  hypothetical.
24      THE WITNESS:  Yes.  As I indicated, if
25  they're not spending 100 percent or a majority of

236

1  their time towards sales, that's going to have an
2  impact on their ability in the sales cycle.
3  BY MR. WILLIAMS:
4      Q.  Okay.  I'm going to show you what's been
5  previously marked as Roberts No. 21, which is
6  NDCA-ORCL 094090 through 93.  I'll ask you to just
7  take a look at Roberts 21 and let me know when
8  you're done.
9      A.  Okay.
10      Q.  Okay.  Do you recognize Roberts No. 21?
11      A.  No, I do not.
12      Q.  Okay.  I'm going to ask you to turn to
13  Bates No. 091.  Actually, the bottom of the first
14  page rolling over to the next page.
15      See on the March 19th, 2001, e-mail at
16  the bottom of the page, it says, "George Roberts
17  wrote"?
18      A.  Yes.
19      Q.  And then there's some text there, right?
20  See that?
21      A.  Yes.
22      Q.  And then at the bottom of that text, it
23  says, "Sandy and Jay, is the experience for your
24  team similar"?
25      A.  Yes.

237

1  Q.  See that?
2      That suggests that the e-mail was sent
3  to you and Jay Nussbaum; is that correct?
4  A.  That's correct.
5  Q.  But I don't see a header for you or Jay
6  in this e-mail.
7  A.  Correct.
8  Q.  All right.  In any event, I want to talk
9  about the March 2001 -- March 19th, 2001, e-mail
10  that George Roberts appeared to send to you and Jay.
11  Okay?
12     See where he writes, "Here's the latest
13  on ADS from Majors.  While 11.5.3 looks more
14  complete to the field, performance does not appear
15  to have improved.  This quarter we have to perform
16  flawlessly to maximize our revenues and margins.  If
17  this does not improve, it will continue to impact
18  our conversion rate."  See that?
19  A.  Yes, I do.
20  Q.  And at the time, you understood that the
21  demonstration systems or the problems with it were
22  having a negative impact on the ability -- on the
23  company's ability to execute sales; is that right?
24  MR. GIBBS:  Objection.  Lacks foundation.
25  THE WITNESS:  Yeah, it certainly didn't help.

238

1  BY MR. WILLIAMS:
2  Q.  And it impacted -- at least George is
3  saying it was "continuing to impact our conversion
4  rate."  See that?
5  A.  Yes.
6  Q.  And you didn't disagree with that, did
7  you?
8  MR. GIBBS:  Objection.  Lack of foundation.
9  THE WITNESS:  You know, I don't recall.
10  MR. WILLIAMS:  Okay.
11  THE WITNESS:  I don't recall.
12  BY MR. WILLIAMS:
13  Q.  Sitting here today, would you disagree
14  with that statement?
15  A.  You mean five years and four months
16  later?
17  Q.  Yeah.
18  A.  Did I disagree --
19  Q.  I can rephrase the question.
20  A.  Okay.  Why don't you do that.
21  Q.  I'm just asking you:  Sitting here
22  today --
23  A.  Yeah.
24  Q.  -- would you disagree with what George
25  Roberts is indicating here, that if the

239

1  demonstration environment does not improve that it
2  would continue to impact conversion rates?
3  A.  I know that it would -- if your demo
4  environment -- and ADS stands for Application Demo
5  System -- if it's not working like you need, it's
6  going to impact your conversion rate.
7      Now, continue?  Did that continue from
8  last quarter, from the last year, from last week?  I
9  don't know.  And five years and four months later, I
10  can't say.
11  Q.  Looking at the first page, 090, Jeff
12  Henley responds to George Roberts, and he writes,
13  "This is excellent.  You should continue to publish
14  these every week until they get fixed.  When you see
15  all the names of prospects, it's really sickening.
16  Hopefully Larry will get sick as well and put more
17  pressure on getting this fixed."  See that?
18  A.  Yes, of course.
19  Q.  All right.  And if you go to the next
20  page, it appears that Gayle Fitzpatrick forwarded
21  George Roberts' information about -- well, update on
22  demonstrations.  You see that?
23  A.  Correct.
24  Q.  And it includes do-overs, demos impacted
25  due to performance, and feedback on 11.5.3, right?

240

1  A.  Correct.
2  Q.  Do you know whether in March of 2001 the
3  issues surrounding the demonstrations or
4  difficulties doing demonstrations was discussed
5  among the executive committee at the weekly or
6  sometimes weekly executive staff meetings?
7  A.  I don't remember.
8  Q.  Okay.  I'm going to show you what's been
9  previously marked as Hamel No. 12.  It's Bates
10  numbered NDCA-ORCL 063462 through 464.
11     Just take a look at it and let me know
12  when you're done.
13  A.  Okay.
14  Q.  Do you recognize Hamel No. 12?
15  A.  No, I do not.
16  Q.  All right.  Is it fair to say that it is
17  an e-mail from George Roberts to Larry Ellison,
18  Safra Catz, Ken Hamel, Ron Wohl, you, Ed Sanderson,
19  and Mark Barrenechea, Jay Nussbaum and Jeff Henley?
20  A.  Yes.
21  Q.  All right.  And he writes, "Looks like
22  General Business is experiencing the same challenges
23  as Majors.  Sandy, Jay, is it any different for OPI
24  and OSI?"  Do you see that?
25  A.  Yes, I do.

241

1    Q.  Do you know whether or not it was
2  different for your organization?
3    A.  I don't recall.
4    Q.  Okay.  I show you what's been previously
5  marked as Hamel No. 15.  It's Bates numbered
6  NDCA-ORCL 061370 through 373.
7    A.  Okay.
8    Q.  You recognize Hamel No. 15?
9    A.  No, I do not.
10    Q.  And it's an e-mail from George Roberts
11  to several individuals, including you, on or around
12  April 19th of 2001, right?
13    A.  Yes.
14    Q.  And it's to Larry Ellison as well.  And
15  George Roberts writes, "Larry" -- well, withdrawn.
16        Subject line is the "ADS Demo Feedback
17  for the Week Ending April 13th."  See that?
18    A.  Yes.
19    Q.  Were you getting these every week?
20    A.  I don't recall.
21    Q.  George writes to Larry, "The scores for
22  General Business demos for last week, they're not
23  heading in the right direction yet.  Performance and
24  product issues continue to injure us every day."  Do
25  you see that?

242

1    A.  Yes, I do.
2    Q.  Were you guys experiencing anything
3  different in OPI?
4    A.  I don't recall what our numbers were for
5  OPI.
6    Q.  Okay.  I'm going to show you what's been
7  previously marked as Klaiss No. 8.  It's Bates
8  numbered NDCA-ORCL 056440 through 442.
9        Just take a look at that and let me know
10  when you're done.
11    A.  Okay.
12    Q.  Okay.  Do you recognize Klaiss No. 8?
13    A.  I do not.
14    Q.  You weren't cc'd or copied on this
15  e-mail at all, right?  Doesn't appear to be at
16  least.
17    A.  No.
18    Q.  But you know Don Klaiss, right?
19    A.  Yes, I know Don Klaiss.
20    Q.  Okay.  And you know, obviously, Ron Wohl
21  and Mark Barrenechea?
22    A.  Correct.
23    Q.  Do you see -- do you know Drew Campbell?
24    A.  The name's familiar, but I don't
25  remember him specifically.

243

1    Q.  Okay.  See at the bottom of the first
2  page he sends an e-mail to Don and Ron, apparently
3  Don Klaiss and Ron Wohl.
4    A.  Right.
5    Q.  And he says, "FYI, I'm sending you a
6  copy of Hema's" -- I can't read the next word; I
7  think it's "e-mail" --
8    A.  Right.
9    Q.  -- "regarding the need for a test
10  environment for integrated CRM/ERP suite."  See
11  that?
12    A.  Yes.
13    Q.  He indicates, "At this time we do not
14  have a controlled environment where completed
15  integrated systems testing for the whole ERP/CRM
16  suite can take place.  The ADS environments are the
17  only place where all of the code comes together, but
18  they are too dated for systems testing of developing
19  releases."  See that?
20    A.  Yes, I do.
21    Q.  All right.  Going back to the first
22  page, Don Klaiss writes to Mark Barrenechea and Ron
23  Wohl regard -- the subject line is "ERP CRM
24  Integration Testing."  He writes --
25    A.  Wait.  I'm sorry.  Where did you --

244

1    Q.  I'm sorry.  First page.
2    A.  Okay.
3    Q.  It looks --
4    A.  Where is Don -- Mark Barrenechea sending
5  something?
6    Q.  No.  I'm sorry if I'm unclear.  It
7  says -- looks like Don Klaiss is sending an e-mail
8  to Mark Barrenechea --
9    A.  Okay.
10    Q.  -- at the very top of the page.
11    A.  Yeah.
12    Q.  David Williamson, Alan Fletcher and Ron
13  Wohl.
14    A.  Okay.
15    Q.  Mark Barrenechea was head of CRM
16  Development, right?
17    A.  Correct.
18    Q.  And Ron Wohl was head of ERP
19  Development, at least for some period?
20    A.  Correct.
21    Q.  And Don writes "Mark, Alan and David, we
22  need to get" -- I can't read that.  I think it says
23  "CRM products into the TST115 integration testing
24  environment."  You see that?
25    A.  Yes, I do.

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

245

1   Q.  Do you know what the TST115 integration
2   testing environment was?
3   A.  No, I don't.
4   Q.  I can't read that first word in the next
5   sentence.  Can you?
6   A.  I --
7   Q.  I think it may say "Today's situation."
8   A.  I don't know.  Yeah, it's difficult to
9   read, you're correct.
10   Q.  "Situation is that we cannot test
11   integrated business flows prior," it appears to be,
12   "to customer shipment."  Would you agree with that?
13   A.  That's what it appears to be.
14   Q.  "We are releasing new ERP and CRM Family
15   Packs --" I can't read the next word.
16   A.  I think the word is "regularly."
17   Q.  Okay, "regularly."  "But do not test
18   them against each other.  Clearly a bad situation."
19   See that?
20   A.  Yes, I do.
21   Q.  Did you know that the company was
22   shipping ERP and CRM Family Packs without testing
23   them against --
24   MR. GIBBS:  Objection.
25   / / /

246

1   BY MR. WILLIAMS:
2   Q.  -- against each other?
3   MR. GIBBS:  Objection.  Lacks foundation.
4   THE WITNESS:  I did not.  I did not.
5   BY MR. WILLIAMS:
6   Q.  And that was in June -- July of 2001,
7   right, that e-mail?
8   A.  Correct.
9   MR. WILLIAMS:  It's a good time for a break.
10   For me it is.
11   THE WITNESS:  I'm ready to keep going, but if
12   you want to take a break --
13   MR. WILLIAMS:  I actually need to take a
14   break.
15   THE WITNESS:  Okay.
16   THE VIDEOGRAPHER:  Off the record at
17   4:33 p.m.
18   (A brief recess was taken.)
19   THE VIDEOGRAPHER:  We are back on the record
20   at 4:46 p.m.
21   BY MR. WILLIAMS:
22   Q.  Mr. Sanderson, is it fair to say that
23   sometime in fiscal 2001 Oracle internally upgraded
24   to 11i?
25   A.  I recall us upgrading to 11i.  I don't

247

1   remember the specific time frame.  But it would
2   be -- since we released it in May of 2000, it
3   probably was 2001, fiscal 2001.
4   Q.  What, if anything, did you or OPI do to
5   prepare for the upgrade and how it would impact your
6   business?
7   A.  I know there's some things on the
8   consulting side that we had to prepare for that.  I
9   don't remember specifically.  For me personally, the
10   new systems didn't impact my day-to-day.
11   Q.  When you say "personally," you're really
12   referring to you, not your organization?
13   A.  Me personally, correct.
14   Q.  Do you have a recollection of how it
15   would impact your organization?
16   A.  We -- I remember that OSO was brought
17   online, which was Oracle SalesOnline, and we asked
18   the sales force to start putting in -- their
19   pipeline into OSO.  And I remember that they did
20   that, but I don't remember -- I don't remember that
21   changing and being a big impact for us.
22   Q.  Was -- well, why don't you describe for
23   me what OSO was.  We haven't talked about that
24   today.  Since you raised it, maybe it's a good time
25   to talk about it.

248

1   A.  It's Oracle SalesOnline.  As I recall,
2   you could enter in prospective opportunities,
3   client -- customer opportunities.  You could specify
4   dollar amount, probability percentage, which you
5   could update over time.  You would indicate the
6   dollar split between applications and technology.  I
7   believe you could even -- I believe you indicated
8   within applications, for example, what applications
9   did it apply that were being projected, that kind of
10   information.
11   Q.  And that was a CRM-type application?
12   A.  It was a CRM module, right.
13   Q.  And Oracle began using it -- well, the
14   OSO when, do you remember?
15   A.  No.  But it certainly is factual.  I
16   think you have got documents that show when it was
17   being used.  I don't recall specifically.
18   Q.  Okay.  But you recall using it at least
19   toward the end of your tenure?
20   A.  Yeah.  But I didn't -- as I said, for me
21   personally, I didn't use it a lot because I had
22   other sources of information that I used that we had
23   in place, everybody understood, and I tended to
24   focus on that.
25   Q.  What sources of information --

249

1   A.  It's the --
2   Q.  -- are you talking about?
3   A.  -- forecasting information that we use
4  for OPI, for example.
5   Q.  That's what I'm trying to understand.
6  What type of information are you talking about that
7  was separate from OSO?
8   A.  Well, I know you have the documents for
9  OPI, so you have that information already.  It's
10  information that shows, for example, worst case,
11  most likely and best case; information by client --
12  I mean, per customer, by region, by area.
13   Q.  Are you talking about some of the
14  documents that you may have seen yesterday?
15   A.  Yeah.  And they are ones that I would
16  assume if I've seen them, you've seen them.
17   Q.  Okay.  But I don't know what you looked
18  at yesterday.
19   A.  I just described one of the documents --
20   Q.  Okay.
21   A.  -- that shows worst case, most likely
22  and best case.
23   Q.  Okay.  Did they have a name?
24   A.  They might.  I -- if we look at one, I
25  can look at the top and see if there's a name there.

250

1  But I just call them -- I mean, I referred to them
2  as my forecast spreadsheets is how I remember them
3  today.
4   Q.  Okay.  But they're different from OSO?
5   A.  Yeah.
6   Q.  Who created them?
7   A.  Some combination of the field and
8  finance.
9   Q.  When you say "the field," are you
10  referring to people in the sales organization --
11  your OPI sales, license sales?
12   A.  Yeah.
13   Q.  And would that be just regional
14  managers, AVPs?
15   A.  It was probably prepared by either
16  operations managers or finance people in the field
17  that would capture the information from the account
18  reps working with the regional manager, the AVP, and
19  would categorize or segment the deals in the three
20  categories that I just described.
21   Q.  Okay.  And it's kind of like in an
22  Excel-type spreadsheet?
23   A.  It was an Excel spreadsheet.
24   Q.  Were you the only person who those
25  documents rolled up to, or did all the AVPs and

251

1  regional managers get the information that you're
2  talking about?
3   A.  They got it as well.
4   Q.  Okay.  And it was circulated by, I
5  guess, the -- I guess, field-level finance?
6   A.  It was put together, and then the
7  finance director that reported to me would take that
8  information and consolidate it so that I would have
9  forecast information for east, central and west
10  within OPI.
11   Q.  Was that Richard Blotner?
12   A.  No.  That was -- initially Ivgen Guner
13  and then Jim English.
14   Q.  And Jim English, okay.
15     So, they would gather that information
16  from the field, roll it up to you, and then you'd
17  circulate it back out to the field?
18   A.  Yes, but I'm not sure in the way you're
19  implying.  We would have them put it together, and
20  then when I was going to have either my biweekly or
21  weekly forecast call, that was the basis for the
22  discussion.
23   Q.  Okay.  And so -- and that -- so, the --
24  withdrawn.
25     So, your biweekly call or your weekly

252

1  call would be initiated by whom?
2   A.  We had standing day and time each
3  week -- or, I mean, at the beginning of the quarter,
4  it was biweekly, and then in the -- towards the end
5  of the quarter, it was weekly.
6     And they were standing dates and times
7  that we did these, and they were published, and
8  everybody understood what they were.  I say
9  "published," I think knew, for example, Monday at
10  9:00 a.m. was going to be a forecast call.
11   Q.  And the people that would be
12  participating in the call would all get maybe an
13  e-mail with the spreadsheet that you're talking
14  about?
15   A.  I would -- you'd have to talk to Jim
16  English.  I don't know how it was distributed to
17  them.  I know that, in fact, that they had the
18  information 'cause we used that document to review
19  the forecasts on each forecast call.
20   Q.  And I just -- I'm pausing because I just
21  want to make sure I understand.
22     Are you saying that your people in OPI
23  did not use Oracle SalesOnline, OSO?
24     MR. GIBBS:  Objection.  Misstates the
25  testimony.

253

1    MR. WILLIAMS: It's a question. I'm asking.
2    THE WITNESS: No, they did use it.
3    MR. WILLIAMS: Okay.
4    THE WITNESS: Okay. And I would periodically
5  use it as well.
6    MR. WILLIAMS: Okay.
7    THE WITNESS: I had something that I had been
8  using that was tried and proven, that I continued to
9  use even after OSO was launched. So, I'd
10  periodically use OSO. I'd refer to OSO to go in if
11  I wanted to see some information on a particular
12  deal that I may not have. I could do right there at
13  my desk. I could go online and look at it. But
14  when it came to forecast calls, I used my forecast
15  spreadsheets.
16  BY MR. WILLIAMS:
17    Q. Okay. That's something that you hadn't
18  said before, that -- so, are you saying that you
19  only used the forecast spreadsheets for the calls?
20    A. Versus what?
21    Q. Well, at some point you had to give
22  forecasts to Larry Ellison and Jeff Henley, right?
23    A. And then when I had to give that
24  information, Jim English would take our forecasts.
25  We agree what our forecast was, whether it was, you

254

1  know, for that week, for example. And then Jim
2  English would feed the Oracle applications that fed
3  the information up to Henley and Jennifer Minton and
4  Larry, Safra, that kind of thing.
5    Q. So, you got to bear with me because you
6  were there. I wasn't. So, I'm trying to
7  understand --
8    A. That's fine.
9    Q. -- how it worked. Okay?
10    A. I'll be glad to explain.
11    Q. So, when you -- Jim English would feed
12  what application?
13    A. I don't recall the names of the Oracle
14  applications specifically.
15    Q. But you knew that after -- let me
16  withdraw.
17    So, Jim English would kind of, you know,
18  talk to the AVPs, the regional managers and people
19  in the field and put together a spreadsheet for you
20  based on that information?
21    A. No. It's not "kind of." There was
22  never any "kind of" done. What happened was the
23  regional -- the account -- the area vice presidents
24  would have their own forecast calls and get the
25  input -- I say "forecast calls." I don't know

255

1  exactly how they did it. I don't recall that.
2    But they would talk with each of their
3  account managers and regional managers and get their
4  forecasts for their respective areas. Either their
5  operations manager or their finance person -- and I
6  don't recall which -- would then take that
7  information and put that into the spreadsheet -- the
8  forecast spreadsheet. And Jim English would
9  capture -- take that information and then share it
10  with me, and then I would use that for the forecast
11  calls with the AVPs.
12    Q. You recall being interviewed by Oracle's
13  special litigation committee a few years ago?
14    A. Yes.
15    Q. Okay. And do you recall telling them
16  with regard to OPI forecasting that "The field
17  agents enter their data into Oracle SalesOnline
18  system, OSO, which is a data consolidation database.
19  Then the OPI regional managers, who each manage
20  several accounts, impose their judgment onto those
21  numbers to create a forecast. The forecasting
22  numbers then travel up the ranks of the organization
23  from the area vice presidents to Sanderson, with
24  each manager's judgment being imposed at every
25  level. Finally Sanderson made a final adjustment

256

1  and substituted the OPI forecast" -- I'm sorry --
2  "submitted the OPI forecast to Jennifer Minton, who
3  would make her upside adjustment on the OPI number.
4  Sanderson confirmed that he followed this practice
5  during Q3 of fiscal 2001."
6    Do you recall telling the members of the
7  special committee that in sum and substance?
8    A. Yeah. We've not talked about judgment.
9  I think it's a good description. The one thing you
10  said -- it's a small detail. It was, like, the
11  second to last sentence. Did you say "Sanderson
12  provided that to Jennifer Minton"?
13    Q. It says, "Finally Sanderson made a final
14  adjustment and submitted the OPI forecast to
15  Jennifer Minton, who would make her upside
16  adjustments on the OPI number. Sanderson confirmed
17  that he followed this practice during Q3 of fiscal
18  2001."
19    A. The correction I would make there,
20  because I believe this is an attorney that is
21  interpreting my comments -- right? As opposed to my
22  deposition.
23    Q. Sure.
24    A. So, it's an interview note.
25    Q. Uh-huh.

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

257

1     A.  The one correction I'd make to all of
2  that, all of it is fine with the exception that
3  Sanderson didn't turn it -- give it to Jennifer
4  Minton.  Jim English would feed that information to
5  Jennifer Minton.
6     Q.  Okay.  Now --
7     A.  But I think the process you described
8  there is -- is as I recall.
9     Q.  Okay.  I didn't read or describe
10  anything about any Excel spreadsheets, though.
11     A.  It was -- the way that we capture
12  judgment, for example, use the term "judgment," I
13  would capture that in that spreadsheet.
14     Q.  Okay.
15     A.  That was one of the ways that I used
16  that spreadsheet.
17     Q.  Okay.  I think your testimony was -- and
18  correct me if I'm wrong -- that Jim English would go
19  out and get information from the field, put it into
20  an Excel spreadsheet, I guess show it to you, and
21  then that spreadsheet would be what you used for the
22  forecast calls.
23        And what the special committee recorded
24  from what you told them was that you explained that
25  the agents -- the field agents enter their data into

258

1  Oracle SalesOnline.
2     A.  Right.  Yeah.  And I'm trying to
3  remember from a long time ago.  But the way you just
4  described it in there is correct.  At some point,
5  that -- the way you just read in that testimony,
6  with that one clarification --
7     Q.  Sure.
8     A.  -- that I just made regarding Jennifer
9  Minton and how she got the information.  The field
10  put the data into OSO, just as you described.  All
11  of that's correct.  That went to the regional
12  managers, and the regional managers would apply
13  judgment.  And then the AVPs would review it and
14  apply their judgment.
15        At some point in that process,
16  information was also put into the spreadsheet that I
17  used so that I could hold my weekly or biweekly
18  forecast calls.
19     Q.  Now, the judgment that the regional
20  managers would put in, was that in the -- in OSO?
21     A.  I don't recall.
22     Q.  And the judgment that the AVPs would
23  include, was that in OSO?
24     A.  I don't recall.
25     Q.  Now, did Jim English take the

259

1  information -- well, withdrawn.
2        Did Jim English take information from
3  OSO to put into your spreadsheet?
4     A.  I don't know how Jim English
5  specifically did it.  I don't recall.
6     Q.  Should I from -- well, withdrawn.
7        Going forward from right now, should I
8  disregard what you said about the spreadsheet
9  because I feel like it's going to impact everything
10  we talk about from now on because I'm not -- I don't
11  quite understand it as it relates to what you told
12  the special committee.
13     A.  There's nothing secretive about it, and
14  it was not something I withheld from anybody.  I
15  mean -- and it's standard practice.  I mean, it's --
16  I mean, standard practice.  I mean, it's not
17  uncommon to track worst case, most likely and best
18  case.  I just found that having it all consolidated
19  on a spreadsheet in the way that I liked to look at
20  the information was very helpful.
21     Q.  I think -- that's fine.  I'm just trying
22  to understand, as I review these documents, should I
23  be looking at OSO or should I be looking at your
24  spreadsheets?
25     A.  They should be consistent.  I'm just

260

1  telling you what I used as a senior manager in the
2  company to do my forecasts.
3     Q.  But they would only be consistent if Jim
4  English was drawing his information from OSO to
5  create your spreadsheet.
6     A.  You should ask Jim English if he did
7  that.  I don't know how he did that.
8     Q.  Well, he reported to you, didn't he?
9     A.  No, he didn't.  As we talked about
10  earlier in this deposition this morning, Finance is
11  a solid line up through Finance.  So, he did not
12  report to me.  He was my designated Finance
13  director, but he did not report to me.
14        MR. MAROULIS:  My apologies for the
15  interruption.  I need to leave.
16        (Mr. Maroulis leaves the deposition
17  room).
18        THE WITNESS:  OSO gives you the capability,
19  as I recall, to export data out of OSO if you want
20  to do some sort of analysis that's different than a
21  standard report in OSO.  And you can export it, for
22  example, to an Excel spreadsheet.
23  BY MR. WILLIAMS:
24     Q.  So that if Jim wanted to do that, he
25  could?

261

1    A.  Yeah.
2    Q.  So -- and you don't know whether or not
3  that's what he did in order to create your -- the --
4  your forecast call spreadsheet?
5    A.  Yeah, I don't remember today how he
6  specifically created those spreadsheets, what the
7  process was that he went through.
8    Q.  Okay.  You told the special committee
9  that you held forecast calls with AVPs at least
10  every other week or something like that; is that
11  correct?
12    A.  Yeah.  It was every other week at the
13  beginning of the quarter, and then it became weekly
14  in the last month of the quarter.
15    Q.  Okay.  Why did you hold those calls with
16  the AVPs rather than, say, the regional managers?
17    A.  Sometimes I'd have the regional managers
18  on or sometimes even the account manager.  But the
19  people that were required to be on it as a regular
20  practice were the AVPs.
21    Q.  And why is that?
22    A.  Why did I have my AVPs on my forecast
23  call?
24    Q.  Why was it that those were the only
25  people that were required to be on the call?

262

1    A.  It -- versus who?
2    Q.  Well, we were just talking about
3  regional managers.  And you said, well, sometimes
4  you had the regional managers on the --
5    A.  Sometimes I --
6    Q.  Just a minute.  Sometimes you had the
7  regional managers on the call --
8    A.  Uh-huh.
9    Q.  -- but AVPs were the only ones that were
10  required to be on the call?
11    A.  As a standard practice --
12    Q.  Right.
13    A.  -- weekly as a standing practice --
14    Q.  Okay.
15    A.  -- AVPs were on the call.  It was not
16  unusual that regional managers or account managers
17  for specific deals would also be on the call.
18    Q.  Would you say that you communicated more
19  frequently with the AVPs than regional managers?
20    A.  Probably in volume.  But if it was --
21  you know, is the deal we're pursuing in GE?  Then I
22  would communicate with regional managers, sometimes
23  even account managers -- I mean, not sometimes.  I
24  would also communicate with account managers.  When
25  I'd go visit accounts, go visit customers or

263

1  prospects, oftentimes I did that with the account
2  manager.  So, I also had that form of input as well.
3    Q.  So, in terms of when you say "in
4  volume," what do you mean?  You actually spoke with
5  them more frequently but not necessarily -- well,
6  withdrawn.
7        I just want to understand what you meant
8  when you said, "Well, in volume, yes."
9    A.  Because the AVPs -- I'm talking about
10  the time when they reported to me.
11    Q.  Right.
12    A.  I tended to communicate with people that
13  report to me more frequently than people that do not
14  report to me.  That's what I meant by "volume."
15    Q.  Okay.  We got a little off track there,
16  and I was beginning to talk about the internal
17  upgrade.
18    A.  Okay.
19    Q.  I kind of want to get back on that --
20    A.  Okay.
21    Q.  -- and we'll talk about OSO, I'm sure, a
22  little bit more tomorrow.
23    A.  Okay.
24    Q.  So, you -- as far as you recall, the
25  upgrade occurred sometime in 2001 --

264

1    A.  Right.
2    Q.  -- right?
3        I'm going to ask the reporter to mark
4  this document as Sanderson No. 14.  It's Bates
5  numbered 020704 through 706 and with the NDCA-ORCL
6  prefix.
7        (E-mail string dated 11/00 re CRM
8  Rollout Date marked Exhibit 14 for identification.)
9        THE WITNESS:  Okay.
10  BY MR. WILLIAMS:
11    Q.  Do you recognize the document?
12    A.  I don't recall it specifically, no.
13    Q.  Okay.  It's an e-mail from Mark
14  Barrenechea to several people of the executive staff
15  including you, right, on November 5th, 2000?
16    A.  Correct, along with a number of other
17  people.
18    Q.  Right, a number of people.
19        And it appears to be a summary of the
20  upcoming CRM rollout --
21    A.  Correct.
22    Q.  -- is that fair?
23    A.  Yes.
24    Q.  If you go to page, I guess, ending 705,
25  I guess on the top of the page it's a list of target

265

1  dates for specific applications that are going to be
2  upgraded, right?
3      A.  Right, because it was done over a period
4  of time.
5      Q.  All right.  And so, do you know whether
6  or not these were the first upgrades, or had
7  upgrades been executed prior to November 5th,
8  2000?
9      A.  I don't.  I don't know whether we had
10  rolled out financials, for example, earlier.  I
11  don't know if financials, which is part of ERP, was
12  rolled out earlier.
13      Q.  Okay.  And No. 6 says "Contracts, live
14  with ERP 11i."
15      A.  Right.
16      Q.  See that?
17      A.  Yes.
18      Q.  Do you know whether that's the same 11i
19  contracts module that customers had difficulty
20  implementing we talked about earlier today?
21      A.  I would assume so, that it's the same
22  application.
23      MR. WILLIAMS:  I'll ask the reporter to mark
24  this document as Sanderson No. 15.  It's Bates
25  numbered NDCA-ORCL 028582, 583.

266

1      (E-mail string dated 12/00 re First Q3
2  Forecast Data marked Exhibit 15 for identification.)
3      THE WITNESS:  Okay.
4  BY MR. WILLIAMS:
5      Q.  You recognize the document?
6      A.  I do not.
7      Q.  Okay.  It's an e-mail from Mark
8  Barrenechea again, to you, cc'ing -- and to several
9  other people, cc'ing to Jennifer Minton, Jeff
10  Henley, Frank Varasano, Safra Catz and Larry
11  Ellison, right?
12      A.  Right.
13      Q.  And it's related to Q3 forecast and the
14  pipeline, right?
15      A.  Yeah, I believe what it's really about
16  is the conversion from 11.0.3 to 11i applications,
17  OSO specifically.
18      Q.  Right.  So, the e-mail on the first page
19  ending 582 states -- at least on the bottom, Mark
20  Barrenechea writes "By Tuesday, December 5th,
21  please ensure your teams have completed updating
22  their Q3 pipeline forecast data within Oracle
23  SalesOnline."
24      A.  Right.
25      Q.  And then do you know why that was

267

1  necessary or why Mark Barrenechea requested that?
2      A.  Yeah.  We were converting to OSO, 11i
3  OSO, and you need to -- he's just saying make sure
4  all your data is accurate in 11.0.3 because there
5  was going to be a period of time, as he said here,
6  hopefully it's December 13th, that you'd be
7  without a system while it was being upgraded, which
8  is a standard practice in any company.
9      Q.  Does he say "accurate" or does he say
10  "updated"?
11      MR. GIBBS:  You mean what's the word on the
12  page?
13      MR. WILLIAMS:  Uh-huh.
14      THE WITNESS:  The word says "update."
15      MR. WILLIAMS:  Right.
16      THE WITNESS:  What's the significance of
17  "accurate" versus "update"?
18  BY MR. WILLIAMS:
19      Q.  I just want to make sure that that's
20  what he said.  He didn't say "accurate."  He said
21  "update," right?
22      A.  I think that's a picky point, but --
23      Q.  Okay.
24      A.  -- he has on the document "update."
25  You'd like to think, if somebody's updating it,

268

1  they're going to be putting the most accurate data
2  at that point.  I hope they're not putting in
3  inaccurate data.
4      Q.  Well, what kind of data would be used to
5  update the Oracle SalesOnline?
6      A.  When he talks, for example, here of
7  updating Q3 pipeline?
8      Q.  Right.
9      A.  It might be adding new customers.  It
10  might be removing customers -- I mean, prospects is
11  really what --
12      Q.  Sure.
13      A.  -- or prospective deals.  It could be
14  adding deals, taking away deals, changing the size
15  of the deals, changing the mix of the deals between
16  applications and database, and within applications
17  what they are.  Those kinds of things.  So, making
18  sure that it best reflects your pipeline at that
19  point in time.
20      Q.  And do you know whether or not in
21  December of -- or in the months prior whether the
22  manner or the types of prospective deals that were
23  input into Oracle SalesOnline had changed from prior
24  practices?
25      A.  Oh, the manner in which?

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

269

1    Q.  Or the type.
2        MR. GIBBS:  Objection.  Compound.
3        THE WITNESS:  What I recall is that the
4    information was similar.  The format was different
5    to some degree.  Oracle SalesOnline was an online
6    system.  I don't remember if the previous system was
7    a batch system, for example.  I don't recall.  But
8    it's the same basic information it was -- but now
9    using OSO.
10   BY MR. WILLIAMS:
11       Q.  Now, isn't it true that in the summer or
12   early fall of 2000, Larry Ellison asked you and the
13   other executive vice presidents to make sure that
14   their teams were including more accurate information
15   in Oracle SalesOnline or in the pipeline as opposed
16   to sort of sandbagging?
17       MR. GIBBS:  Objection.  Lack of foundation.
18       THE WITNESS:  I believe what you're talking
19   about, Shawn, is -- and in the end, I would describe
20   them as two different things.
21   BY MR. WILLIAMS:
22       Q.  Describe what as two different things?
23       A.  What you just described:  What's in the
24   pipeline and being more accurate and not
25   sandbagging.

270

1    Q.  Okay.
2    A.  The -- one thing that we all wanted,
3    Larry -- I remember Larry asking for it, and I was
4    after it as well, is sometimes there is a reluctance
5    of a salesperson to put a deal into OSO or into the
6    sales pipeline because, as soon as they did that,
7    somebody is going to start asking them questions
8    about it.  And they may conclude in their mind
9    somewhere that the deal hadn't matured enough in the
10   process to do that.
11       So, I -- I actually made it a point as
12   well that I wanted our sales reps to make sure they
13   were putting all deals into the -- into OSO.  It
14   wasn't -- if they were working on it, it went in.
15       Q.  Was that before or after Larry had asked
16   for people to include more information in Oracle
17   SalesOnline or in the pipeline?
18       A.  As I recall, it was right about the same
19   time.  And I can't remember if Larry was the impetus
20   for that or it was because I took over OPI that I
21   was the impetus.
22       Q.  Okay.
23       A.  You made a point about sandbagging.
24       Q.  Sure.
25       A.  Sandbagging was typically associated --

271

1    that term was typically associated with somebody's
2    forecast and whether they were being too
3    conservative in their forecast.  That's why I was
4    saying I felt it was two different things.
5    Sandbagging related to forecast and then having your
6    pipeline current was something different.
7        Q.  Okay.  Well, tell me -- well, okay.
8    I just want to be careful with the terms
9    that I use in asking the questions because I think
10   there you just said "having the pipeline current"
11   and I think that, based on what you've told me in
12   the last minute or two -- are you referring to
13   the pipeline including deals that previously a
14   salesperson may not have thought it was mature
15   enough to include into the pipeline?
16       A.  Ask the question one more time just to
17   make sure I give you a good answer.
18       Q.  When you say "keeping the pipeline
19   current," are you -- does that mean that your
20   expectation at the time was that salespeople would
21   include deals in the pipeline -- I'm sorry -- yeah,
22   in the pipeline, that prior to this, you know, you
23   taking over OPI or Larry Ellison's --
24       A.  Right.
25       Q.  -- comments, they may not have included

272

1    because the deal was not mature enough in their view
2    to include in the pipeline?
3        A.  To some degree, yes, and some degree,
4    no.  And let me explain so I'm not confusing.  One
5    of the things that OSO did is gave global
6    visibility.  Larry, for example, could sit in his
7    office or at home and go on OSO and see what the
8    pipeline was in OPI.  He could see what the pipeline
9    was for a particular account manager.  He could do
10   that around the world.
11       So, we did make it initiative -- before
12   it didn't -- the pipeline didn't have as much
13   visibility like that, that anybody could go take a
14   look at it.  That was one of the benefits of 11i:
15   It gave you that global visibility.
16       Q.  When you say "before" --
17       A.  Well, under like 11.0.3.  Yeah, like
18   before 11i.
19       Q.  So, are you saying that before the
20   December upgrade, that that database was
21   unavailable, that global view was unavailable?
22       A.  Yeah.  Yes, because, one, as I -- I
23   don't recall it being online access.  But one of the
24   issues we also had is EMEA had its database of OS --
25   you know, that it captured sales opportunities, and

273

1 they may even have had more than one database. For
2 example, U.K may have had a database separate from
3 the French database, separate from the U.S.
4 database, separate from George Roberts' OSO, you
5 know, sales database. One of the things that OSO
6 did was create one database that captured all of
7 that sales information worldwide.
8      Q.  Now --
9      A.  It was a real advantage of the product.
10     Q.  Was OSO in use prior to December of
11 2000?
12     A.  I don't recall. I think we've got some
13 memos here and probably other information that would
14 tell us that.
15     Q.  All right. Back to my previous question
16 about the pipeline being current.
17     A.  Yeah.
18     Q.  You made a comment that prior to some
19 date, some salespeople wouldn't include deals in the
20 pipeline because they may not have believed the deal
21 was mature enough.
22     A.  Yeah. Now, we're also talking about a
23 very, very small percentage of the deals. I mean,
24 this was a random, unusual occurrence. I just
25 wanted a standard practice, if a sales rep was

274

1 working on anything, any client -- any customer
2 opportunity or a prospective opportunity, that was
3 in OSO.
4      In the end, I think we're making a much
5 bigger deal of it than it was. It -- instead of
6 capturing 99 deals, we now captured 100 deals when I
7 gave that mandate. I just wanted to make sure we
8 captured it.
9      Q.  And that occurred when, right around the
10 time you started, you took over OPI?
11     A.  Yeah, and I don't remember specifically.
12 And, again, as we rolled out OSO, I could sit down,
13 I could go online right at my desk or when I was
14 traveling and go online. I could go into OSO, and I
15 could see what Max Hill, who's one of the regional
16 managers we talked about earlier, I could go see
17 what his deals are. I could see what he's saying is
18 the latest around Bechtel -- or Beckman, as an
19 example.
20     And it gave us a lot -- all of us a lot
21 more visibility. It gave Finance more visibility.
22 It gave Larry more visibility. It gave me more
23 visibility to my respective areas of responsibility.
24     Q.  Okay. And that's fine. We're talking
25 about and you're telling me about OSO, but I just

275

1 want to make sure that I've buttoned down this --
2 what is going into the pipeline issue, keeping the
3 pipeline current.
4      A.  Yeah.
5      Q.  So, are you saying that when Larry, in
6 the summer or early fall of 2000, said that he
7 wanted everything in the pipeline, that necessarily
8 included deals that prior to that time salespeople
9 may not think that the deal had matured enough to be
10 included in the pipeline?
11     A.  Yeah -- I'll say it again. I think,
12 one, we're making a big deal out of nothing. Number
13 two is we had 99 -- as an example, we had 99 deals
14 in there. This mandate now got us to 100. Not 150,
15 not 200. On the margin, it would give us a deal or
16 two more that I could have visibility to.
17     Typically, just so you know, if the
18 sales rep didn't feel it was mature enough to put
19 into the pipeline, if it was a debate in their mind,
20 it was not a deal that I was going to spend any time
21 on anyway because I wanted to spend my time and my
22 management's time around deals that were substantive
23 and had real opportunities to close that quarter.
24     Q.  Okay. One of the things you testified
25 to earlier was that Oracle SalesOnline allowed you

276

1 to put in win probability, right?
2      A.  Yes.
3      Q.  Okay. And that ranged from, what, 10 to
4 100?
5      A.  I don't remember what the mechanism was,
6 whether it was one to ten or whether it was a
7 percentage, but it was something -- it is something
8 like that.
9      Q.  Something low to high?
10     A.  Yeah, and it's some numerical -- to your
11 point, it's some sort of numerical assessment.
12     Q.  Right. So, would you say -- say, for
13 instance, it's 10 to 100, just hypothetically.
14 Would you say a probability of 10 would be a deal
15 that wasn't quite mature?
16     MR. GIBBS: Objection. Lack of foundation,
17 vague.
18     THE WITNESS: If we say 10 to 100, is it all
19 right to use percentages and say that's 10 percent?
20     MR. WILLIAMS: Sure.
21     THE WITNESS: So, 10 percent could mean a
22 number of different things. It could mean that it's
23 very early in the cycle.
24 BY MR. WILLIAMS:
25     Q.  Meaning not mature?

277

1    A.   Yes.  I think it's -- we could decide
2   what "mature" is.  We could have a discussion around
3   that.  But it's very early in the cycle.
4          It could be that it was a higher
5   probability and then, for some reason, it went back
6   down to 10 percent.  So, it may have been a very
7   mature deal that new information -- the client
8   decided not to buy our product or the client decided
9   internally because of their own financial or capital
10  constraints that they were going to delay this into
11  the future.  So, we could have a deal that we
12  thought was 70 or 80 percent that moves back to
13  10 percent.  Very mature deal but moved back to
14  10 percent.
15    Q.   So, and sometimes if it's mature, it
16  could almost mean that the deal is dead?
17    MR. GIBBS:  Objection.  Vague, lacks
18  foundation.
19    THE WITNESS:  The more you understood about
20  the deal -- and there's lots of things that you
21  understand around a deal -- the more accurate you
22  could give a percentage probability that that deal
23  was going to close.
24  BY MR. WILLIAMS:
25    Q.   Or not.

278

1    A.   I think the fact that I say percentage
2   that the deal is going to close means there's an "or
3   not" in there.
4    Q.   Okay.  Actually, it means or not for the
5   quarter, though; isn't that fair?
6    A.   What I don't remember is in a percentage
7   did it have the quarter in there as well.  I just
8   don't recall after these number of years.  It could
9   be a probability, and it may have also -- you would
10  indicate the quarter that it was going to close.
11    Q.   Okay.  Give me a moment, please.
12         I'll show you what's been previously
13  marked as Wohl No. 11.  It's Bates numbered
14  NDCA-ORCL 012385.
15    A.   Okay.
16    Q.   Do you recognize the document?
17    A.   No, I do not.
18    Q.   Okay.  And do you -- well, it appears to
19  be an e-mail from Larry Ellison to Ron Wohl and an
20  exchange of e-mails between them and others, right?
21    A.   Correct.
22    Q.   In December 2000, December 9th?
23    A.   Right.
24    Q.   Okay.  And did you know that the
25  internal upgrade in December of 2000 had been

279

1   delayed?
2    A.   I don't recall.  You mean for two weeks
3   so that we could take the benefit of the New Year's
4   weekend to do it when volumes were slower?  Is that
5   your question?
6    Q.   Well, for any reason, do you know
7   whether it was delayed?
8    A.   No, I don't recall that.  It's not
9   unusual, though.
10    Q.   Why not?
11    A.   I think if someone was experienced in
12  information systems, they would understand the point
13  that it's not unusual that you might delay an
14  implementation or conversion to a new system.  I
15  think that's a base knowledge that somebody would
16  have.
17         The fact that it was two weeks, I
18  thought Ron, reading this e-mail, did a nice job of
19  explaining that waiting until New Year's weekend,
20  when people wouldn't be working, wouldn't be putting
21  transactions into the system, probably made a lot of
22  sense.
23    Q.   Right.  Let me show you what's been
24  previously marked as Wohl No. 6.  It's Bates
25  numbered 052474.

280

1    A.   Okay.
2    Q.   Do you recognize the document?
3    A.   No, I do not.
4    Q.   Do you know Carolyn Balkenhol?
5    A.   Yes, I do.
6    Q.   Who was she?
7    A.   She is Larry's assistant.  And one of
8   the things that she did for Larry is -- at least
9   then was play some sort of operations role and would
10  review -- I don't know if it was deals or it could
11  be that she was being asked to review requests for a
12  new laptop.  I think that's typical.  Those were the
13  kinds of things that she would review.
14    Q.   What is WEBREQS, did you know?
15    A.   It was a web-based requisition software,
16  but I don't remember much beyond that.
17    Q.   Was it part of 11i?
18    A.   I don't recall specifically.
19    Q.   Do you know Kevin Miller?
20    A.   Yes, I remember Kevin.
21    Q.   And who was he?
22    A.   He was the development manager reporting
23  in -- he was in Ron Wohl's organization that was
24  responsible for our procurement portion of the
25  E-Business Suite.

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

281

1    Q.  That iProcurement?
2    A.  IProcurement would be a piece of it, but
3  I believe they were other pieces to procurement as
4  well.
5    Q.  And that was WEBREQS would be part of
6  that, wouldn't it?
7    A.  Logically speaking, yes.
8    Q.  Were any of the consultants on your
9  staff participating in the internal upgrade?
10    A.  I don't recall.
11    Q.  Let me show you what's been marked as
12  Godwin No. 8. Ask you to take a look at it and let
13  me know when you're done.
14    A.  Okay.
15    Okay.
16    Q.  Do you recognize this document?
17    A.  No, I do not.
18    Q.  And the bottom half of the document, the
19  e-mail from Ron Wohl to several people on
20  December 30th of 2000, see that?
21    A.  Yes, I do.  I don't think, just as a
22  point, I'm obviously not included on it, and none of
23  my folks are that I recognize.
24    Q.  Okay.  I show you what's been previously
25  marked as Scott No. 6.  It's Bates numbered

282

1  NDCA-ORCL 219741 to 746.
2    A.  Okay.
3    Q.  Do you recognize the document?
4    A.  No, I don't.
5    Q.  It's an e-mail from Brad Scott to you on
6  or around January 15 of 2001, right?
7    A.  Right.
8    Q.  And if you go to the Bates ending
9  219744, there's an e-mail there from Sharon Prosser
10  in the middle of the page.
11    A.  Yes.
12    Q.  Who is Sharon Prosser?
13    A.  I don't know.
14    Q.  And she's sending an e-mail to you about
15  the forecast call for Monday, right?
16    A.  When you say "for the forecast call," I
17  think she's saying that it's more focused on the
18  status of a product called OTS.  And that's really
19  the substance of the product.  It just says "Per the
20  forecast call on Monday."
21    Q.  Okay.  So --
22    A.  I don't think it's related to the --
23    Q.  This is a Tuesday, so maybe she's
24  referring to the previous day?
25    A.  Yeah, could be.

283

1    Q.  Okay.  And do you know what OTS was or
2  is?
3    A.  No.  I was trying to remember.
4    Q.  Is it Oracle 11i telesales or something
5  along those lines?
6    A.  It could be.  As I said, I don't recall.
7  I don't recall.
8    Q.  And do you know who the Erica is that
9  she's referring to?
10    A.  Yeah.  Erica did run telesales for Latin
11  America, yeah.
12    Q.  And so, she says that "I've been
13  speaking with Erica regarding her experience in
14  Latin America."  Is LAD Latin America Division or
15  something like that?
16    A.  Correct.
17    Q.  "Downtime days are projected at a total
18  of $4 million loss in revenue, so we're being
19  cautious."  What is she referring to there?
20    MR. GIBBS:  Objection.  Lack of foundation,
21  calls for speculation.
22    THE WITNESS:  My speculation is that when LAD
23  converted to this OTS system, that they were down
24  for a period of time which resulted in $4 million of
25  loss in revenue.  In other words, they probably had

284

1  a day or some number like that, day or two, where
2  they weren't able to take telesales order, and it
3  was a 4 million loss.  That doesn't mean, by the
4  way, it wasn't captured later on when the system
5  came back up.
6  BY MR. WILLIAMS:
7    Q.  Do you know whether or not it was?
8    A.  I don't.  I also know that it -- I mean,
9  I don't know that it didn't.
10    Q.  I'm sorry.  Say that again.
11    A.  You asked do I know that it happened.
12    Q.  Okay.
13    A.  The answer is no.  I also know that I
14  don't know that it didn't happen.
15    Q.  Okay.  I'm going to show you what's been
16  marked as Borthwick No. 10.  It's Bates numbered
17  NDCA-ORCL 056213 through 214.
18    A.  Okay.
19    Q.  Okay.  Do you recognize the document?
20    A.  No, I do not.
21    Q.  And at least the bottom half of the
22  first page is an e-mail from Saran Kopp to Jim
23  English, who's one of your operations -- was your
24  operations person, right?
25    A.  No.

285

1    Q.   Or assigned to you?
2    A.   He was my finance director assigned to
3    me.
4    Q.   I'm sorry.  Finance director.
5         And Keith Block, Valerie Borthwick, Mark
6    Salser, John Wheeler, Steve Perkins, all in your
7    organization?
8    A.   No.  Block, Borthwick, Salser were.
9    Wheeler was in OSI.  Perkins was in OSI.
10   Q.   All -- OSI Consulting?
11   A.   No.  I believe -- well, Wheeler, I
12   believe, was in OSI Consulting reporting to Jay
13   Nussbaum.  Steve Perkins was a head of sales --
14   financial services sales -- license sales for Jay
15   Nussbaum.
16   Q.   You see where he writes -- Sarah Kopp
17   writes, "To address the issue of consultant's
18   accessing the incorrect expense entry screen, IT-ERP
19   are removing duplicate responsibilities from anyone
20   who currently holds both U.S. expense reporting and
21   U.S. expense reporting with Projects so that they
22   are forced to use the Projects entry screen."  You
23   see that?
24   A.   Uh-huh.
25   Q.   Do you know what she is talking about as

286

1    it relates to 11i migration update?
2    A.   I do not.
3    Q.   Do you know whether the time and expense
4    module of 11i was one that the consultants had a
5    difficult time updating or using?
6    A.   I don't.  What they are talking about
7    here is expense entries, so that would be, like,
8    out-of-pocket expenses for consultants.
9    Q.   Out-of-pocket?
10   A.   Expenses for consultants.  Hotels, cars.
11   Q.   I show you what's been marked as Block
12   No. 18.  It's Bates numbered 034382 and 383.
13   I'm going to ask you to take a look at it and let me
14   know when you're done.
15   A.   Okay.
16   Q.   Another update from Sarah Kopp to you
17   and others, and a few of those were in the
18   consulting organization, right?
19   A.   Correct.
20   Q.   In on around January 29th of 2001?
21   A.   Correct.
22   Q.   And it's regarding "Projects 11i Upgrade
23   Status."
24   A.   Uh-huh.
25   Q.   Right.  And Projects is the application

287

1    for out-of-pocket expenses for consultants?
2    A.   Projects was capturing time and
3    expense -- or is capturing time and expense.  So,
4    it's a project-control system that is a part of 11i.
5    Q.   And she's indicating that -- well,
6    withdrawn.
7         She says the "Most significant issues,
8    in order of importance:  No. 1, Self-Service
9    Applications.  The applications (Self-Service Time
10   and Expense) have been down since 10:00 a.m. today.
11   Operational impact:  Not able to enter time in order
12   to calculate labor revenue or rebill expenses.  We
13   risk falling behind again like we have in the last
14   two weeks."
15        Do you know what she's referring to
16   here?
17   A.   She's referring to the self-service
18   application that was down since 10:00 a.m. that day.
19   Is that answering your question?
20   Q.   Well, what I'm asking really is what she
21   means by the "Operational impact:  Not able to enter
22   time in order to calculate labor revenue."
23   A.   I think what she's saying is, since
24   10:00 a.m. that day, consultants were not able to
25   enter their time into the system or their expenses.

288

1    Q.   And that impacts what Oracle can bill
2    customers in the quarter, right?
3         MR. GIBBS:  Objection.  Lacks foundation.
4         THE WITNESS:  At that specific point.  But as
5    soon as it comes back up, then you go ahead and put
6    your time in then.  It just means that if a
7    consultant tried to enter their time in sometime
8    that day after 10:00 a.m., they couldn't.  That
9    doesn't mean the next day if it was back up, they
10   couldn't put in the time that they meant to put in
11   the day before.
12        MR. WILLIAMS:  Sure.  I understand that.
13        THE WITNESS:  So, does it have any kind of
14   lasting impact or significant impact on revenue if
15   it was down for a short period of time, if in fact
16   it was?  No.
17   BY MR. WILLIAMS:
18   Q.   Well, doesn't it impact what Oracle
19   could, for example, invoice that day?
20   A.   Yeah, but you could go the next day.
21   This was not the end of the quarter.  This is the
22   29th of January.
23   Q.   I'm not making a big point about it.
24   I'm just asking if it would impact that.
25   A.   Yeah, but I mean -- yeah, they couldn't

Sanderson, Jr., Edward J  7/25/2006  9:05:00 AM

289

1   bill during that time it was down.
2       Q.  Right.
3       A.  That doesn't mean, as soon as it came
4   back up --
5       Q.  -- you couldn't bill?
6       A.  -- you couldn't bill.
7       Q.  Right.  But you don't know how long it
8   was down, right?
9       A.  No.
10      Q.  And, in fact, she indicates that "We
11  risk falling behind like we have during the last two
12  weeks," right?
13      A.  Uh-huh.
14      Q.  And --
15      A.  To be clear, I don't recall ever hearing
16  that we weren't able to bill consulting revenue or
17  expenses because the system was down sometime during
18  that period of time.  That would have been elevated
19  to me.  I would have -- I would have made it a huge
20  issue if we had our backs against the wall, and I
21  don't recall that ever happening.
22      Q.  Okay.  Just going down to No. 3 on the
23  first page of the document, "Project Accounting."
24      A.  Yes.
25      Q.  WIP, I guess, that means work in

290

1   progress?
2       A.  Yeah, either work in progress or work in
3   process.
4       Q.  Okay.  "Utilization reports are
5   incorrect.  Operational impact:  Managers are unable
6   to view current status of projects."
7       A.  Uh-huh.
8       Q.  Do you recall that being an issue with
9   respect to the internal upgrade of 11i?
10      A.  I don't.
11      Q.  How about, "No. 2, Self-Service
12  Applications:  Week ending date issue; consultants
13  unable to override default date.  Operational
14  impact:  Not able to enter time in the appropriate
15  dates and frustrated end users or transaction
16  controls needed to be set.  Estimated resolution:
17  This is being worked on.  Time could be entered via
18  preapproved form."
19          Do you know what the preapproved form is
20  that she's referring to?
21      A.  No, but it sounds like it's a form that
22  you could complete that would accomplish the same
23  thing but was probably more manual than being able
24  to do it online.
25      Q.  Online, okay.

291

1       A.  There was a work-around.
2       Q.  Did you have a Blackberry back in 2001?
3       A.  I had one for a brief period of time,
4   but I don't know how long.
5       MR. WILLIAMS:  All right.  I'm going to stop
6   here for today.
7       THE WITNESS:  Okay.
8       MR. WILLIAMS:  I've hit the seven-hour mark,
9   and we'll just pick it up tomorrow morning.
10      THE WITNESS:  Sounds good.
11      THE VIDEOGRAPHER:  This marks the end of
12  Videotape No. 4 of Volume I of the deposition of
13  Edward Sanderson.  The original videotapes will be
14  retained by LiveNote World Service.
15          Going off the record.  The time on the
16  monitor is now 5:57 p.m.
17      (Deposition adjourned at 5:57 p.m.)
18                  * * * * *
19
20
21
22
23
24
25

292

1           I declare under penalty of perjury that
2   the foregoing is true and correct; that I have read
3   my deposition and have made the necessary
4   corrections, additions or changes to my answers that
5   I deem necessary.
6           Executed on this _____ day of
7   _____, 2006.
8
9
10      _____
        EDWARD J. SANDERSON, JR.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

293

```
 1
 2
 3        REPORTER'S CERTIFICATE
 4
 5        I, KAE F. GERNANDT, a Certified
 6    Shorthand Reporter for the State of California, do
 7    hereby certify:
 8        That the witness in the foregoing
 9    deposition was by me duly sworn; that the deposition
10    was then taken before me at the time and place
11    herein set forth; that the testimony and proceedings
12    were reported by me stenographically and were
13    transcribed through computerized transcription under
14    my direction; and the foregoing is a true and
15    correct record of the testimony and proceedings
16    taken at that time.
17        IN WITNESS WHEREOF, I have subscribed my
18    name this 2nd day of August, 2006.
19
20
21
22    _____
23        Kae F. Gernandt, CSR No. 5342
24
25
```

REPORTER'S CERTIFICATE


     I, KAE F. GERNANDT, a Certified Shorthand

Reporter for the State of California, do hereby certify:

     That the witness in the foregoing deposition

was by me duly sworn; that the deposition was then taken

before me at the time and place herein set forth; that

the testimony and proceedings were reported by me

stenographically and were transcribed through

computerized transcription under my direction; and the

foregoing is a true and correct record of the testimony

and proceedings taken at that time.

     IN WITNESS WHEREOF, I have subscribed my

name this 2nd day of August, 2006.




                             _____

                 Kae F. Gernandt, CSR No. 5342