# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

MASTER FILE NO. C-01-0988-SI

LOCAL 144 NURSING HOME PENSION FUND, UFCW LOCAL 56 RETAIL MEAT
PENSION FUND, DRIFTON FINANCE CORPORATION, AND ROBERT D.
SAWYER, et al.

vs.

ORACLE CORPORATION, LAWRENCE J. ELLISON, JEFFREY O. HENLEY,
EDWARD J. SANDERSON

EXPERT REPORT

OF

D. PAUL REGAN, CPA, CFE

Initially Submitted:  MAY 25, 2007
Sworn:  OCTOBER 16, 2008

**Introduction**

The opinions expressed in this report are my present opinions subject to the following reservations.   Amendments or additions to this report may be required as a result of developments prior to or at trial, including, but not limited to, the discovery of new evidence, expert discovery, and the testimony of any other witness in deposition or at trial.

## I.       The Nature of My Assignment

I have been retained, through my employer, Hemming Morse, Inc. ("HMI"), by Lerach Coughlin Stoia Geller Rudman & Robbins LLP, counsel for Plaintiffs, Local 144 Nursing Home Pension Fund, et al, to provide expert testimony regarding whether Oracle's revenue and earnings for the quarterly period ended November 30, 2000 ("2QFY01") were presented in accordance with Generally Accepted Accounting Principles ("GAAP"), and whether Oracle's financial statements were materially misstated.  Specifically, I have been asked to address the following:

1. Oracle's accounting for unapplied cash and customer overpayments,[1] the use of unapplied cash within its Bad Debt Reserve, the relationship of the November 2000 Debit Memos to Oracle's unapplied cash activity in Q2FY01, and the related revenue and earnings impact.[2]

2. Oracle's recognition of $19.9 million in revenue and pre-tax earnings on November 30, 2000 as a result of a transaction with Hewlett Packard ("HP").

## II.      Summary of Opinions

Oracle's financial statements for the quarterly period ended November 30, 2000 were not presented in accordance with GAAP.  Specifically, Oracle:

---

[1] The term customer overpayment includes instances of duplicate payments of an invoice, payments on amounts that were credited, paid amounts where all or portion of the arrangement was cancelled, payments of unnecessary tax, and other instances where customers paid Oracle in an amount that exceeded its related obligation.  Certain terms used herein are further defined in Appendix 1, a glossary from Oracle's Account's Receivable User's Guide.

[2] Oracle's fiscal year ends on May 31st.  November 30th represents the final date of Oracle's second fiscal quarter.  In this report, I have referred to the three months ended November 30, 2000 as "2QFY01."

1. Improperly utilized a series of debit memos to "apply" unapplied cash. These debit memos helped conceal Oracle's use of customer overpayments to overstate its Bad Debt Reserve by at least $20 million. The overstatement of the Bad Debt Reserve was eliminated by improperly increasing revenue and pre-tax earnings in the same amount in 2QFY01. This conduct enabled Oracle to overstate its Q2FY01 diluted earnings-per-share ("EPS") by $.01.

2. Improperly recognized $19.9 million in revenue and pre-tax earnings on November 30, 2000 as a result of a transaction with HP that failed to meet the criteria needed for this revenue to be properly recognized by Oracle. This conduct also enabled Oracle to overstate its Q2FY01 EPS by $.01.

3. Overstated its reported earnings-per-share of $0.11. Oracle's actual EPS should not have included the effects of the overstatement of earnings related to the transfer of customer overpayments into its Bad Debt Reserve, and separately the earnings related to the HP transaction. If Oracle had excluded either one of these transactions from its reported revenue and earnings, its EPS would have been $0.10.

4. Overstated its Customer Advances and Unearned Revenue by including customer overpayments and other unapplied cash in this balance. These amounts were a liability, such as Accounts Payable, that Oracle owed to its customers.

<u>Summary of Expert Qualifications</u>

1. I am a Certified Public Accountant, licensed in the State of California, and a Certified Fraud Examiner. I am currently the President and Chairman of Hemming Morse, Inc., CPAs, Litigation and Forensic Consultants, a 95 person accounting firm. Until July of 2004, I was the Director in charge of its litigation and forensic consulting practice. I had performed that responsibility for more than 29 years. My work in the accounting profession includes experience as an auditor and as a consultant. My expert qualifications, including my testimony in the last four years and the publications I have authored, are described in **Exhibit A** to this report.

2. I have been a Certified Public Accountant continuously since 1970.  During these years I have worked on more than 500 complex litigation matters.  Many of these have required an extensive analysis and determination of whether financial statements were presented in accordance with GAAP, including whether revenue was properly recognized in particular periods of those financial statements.   I have performed these analyses for large and small companies in the private sector, as well as for public companies.  These analyses have involved financial statements of entities across a diverse range of industries, including high technology, software, and leasing companies.  I have testified as an expert in more than 70 trials and arbitrations and in more than 125 depositions.  These cases were generally in state and federal courts in the United States.

3. I am a member of the California Society of Certified Public Accountants ("CalCPA").  I have served on its statewide Litigation Services Steering Committee since 1990 and I was its Chair during 2004 / 2005.  This Steering Committee provides guidance to the more than 800 members of its four Operating Sections – (1) Business Valuation, (2) Economic Damages, (3) Fraud and (4) Family Law.  For two and one-half years (through August of 1998), I was Chair of its 250-member Economic Damages Section.  I served as Chair of the 28,000-member CalCPA during 2004 / 2005.

4. The American Institute of Certified Public Accountants ("AICPA") has a national Forensic and Litigation Services Subcommittee ("FLSS") (formerly the Litigation and Dispute Resolution Subcommittee ("LDRS")).  From 1998 until July of 2001, I served as one of the nine members of this national committee.  The FLSS oversees and provides guidance to the AICPA's 330,000 members in their practice as it relates to litigation consulting and dispute resolution.  The FLSS also provides guidance and supervision to its subcommittees, which include Economic Damages, of which I was its Chairperson from 1999 to July 2001.  I am presently a member of the AICPA's governing council.

5. My firm is being compensated for my review and analysis in this matter at my standard hourly rate, which is currently $525 per hour. Others have assisted me in my work and my firm is being compensated for their work at their standard hourly rates.

### III.   Evidence Considered

In undertaking my assignment, I have considered information from a variety of sources, each of which is of a type that is reasonably relied upon by experts in my field.  A detailed listing of these sources is identified in **Exhibit B** to this report.

I have also relied upon my own professional judgment and expertise gathered during the almost 40 years I have been practicing public accounting and the more than 35 years that I have analyzed the accounting for financial transactions, the presentation of transactions in financial statements in accordance with GAAP, audits of financial statements, and transactions that are the subject of legal disputes.

### IV.   Detail of Opinions Regarding Oracle's Improper Accounting for Unapplied Cash and Customer Overpayments Associated with Debit Memos

1. For Q2FY01, Oracle inflated its revenue, which resulted in a material overstatement of earnings;

   - As a result of Oracle's improper transfer of customer overpayments, it's Bad Debt Reserve was inflated by at least $20 million in 2QFY01.

   - Based on this improper excess, Oracle improperly recorded a $20 million reduction to the balance of its Bad Debt Reserve.  The reduction of the Bad Debt Reserve resulted in a $20 million increase to Oracle's reported revenue and pre-tax earnings in 2Q01.

   - The $20 million increase enabled Oracle to report 2QFY01 earnings-per-share of $0.11.  If Oracle had reported earnings that were consistent with GAAP, its EPS would have been $0.10.

2. The 46,881 debit memos that Oracle processed during 2QFY01 allowed Oracle to conceal overpayments and unapplied cash from customers, and facilitated Oracle's improper transfer of customer overpayments to the Bad Debt Reserve.

- Receipts that were in the Bad Debt Reserve *and* "On Account" were outstanding and therefore available to Oracle collections personnel as potential credits or refunds to customers.  However, receipts that were "Applied" were not available to Oracle staff for potential credits or refunds to customers.

- The debit memo invoices which caused the cash receipts to become "Applied" were not bona-fide invoices, and Oracle's customers did not intend for their payments to be applied to the debit memos.  Oracle did not tell its customers about the debit memo invoices, and took steps to conceal and misrepresent them.

3. Oracle improperly classified customer overpayments and other unapplied cash receipts in its reported balance of Customer Advances and Unearned Revenue.

**The Problem of the Unapplied Cash Accumulation at Oracle**

4. At the beginning of 2QFY01, Oracle had accumulated at least $144 million of cash receipts from its customers that it was unable to apply to an invoice (*see* table in paragraph 9).[3]  Oracle attributed the majority of the unapplied cash to the following situations: a) the receipt is to be refunded; b) there is not enough information to determine where the receipt belonged; or c) the receipt pertains to a financed transaction or belongs in a GL account.[4]  One of Oracle's Collections Managers testified that this "large" balance of unapplied cash was a "very, very large problem, the biggest problem that anybody in collections or accounts receivable had."[5]  Jeff Henley, Oracle's Chief Financial Officer, acknowledged the Company's prior problems with unapplied cash.[6]

---

[3] Deposition of Michael Quinn, April 18, 2006, 158:11-18, "Q. And that's what you were testifying to earlier today, right, that there was a challenge due to accumulating cash partly from customer overpayments in Oracle's unapplied cash account, right? [A] The problem was an accumulation of items in unapplied cash."

[4] NDCA-ORCL 1885992-6020 at 1885996, Oracle memo entitled, "12018/25005 Reconciliation Project, Documentation of procedures, findings, and recommendations."

[5] Deposition of Ian Hatada, October 5, 2006, 78:20-25-79:9 "[A] Yes, it was large from the time I got there to the time I left. [Q] …I think you characterized it as a 'problem;' right? A. It was a very, very large problem, the biggest problem that anybody in collections or accounts receivable had."

[6] Deposition of Jeffrey Henley, November 16, 2006, 465:7-21"Q. And what was the cause of those problems?  A. Again, my recollection, as best I can tell, I think, was that the group over there that was in that department started falling behind and was not – were not staying up on top of the work, and it had – **there was a similar problem when I joined the company many years ago, which we cleaned up. And so I was disappointed when I found out about it because here we were repeating sins of the past many years later.**  Q. And were there no internal controls in place  to ensure that that didn't happen again?  A. Again, there were a lot more controls in the company

5. A significant cause of the balance of unapplied cash was overpayments made by Oracle's customers. This situation was acknowledged by Oracle in its naming of account 25005 as "Customer Overpayments." These customer overpayments resulted from a variety of circumstances that were enabled by Oracle itself, and included:

- Oracle had a practice to <u>not</u> send credit memos[7] or account statements to its customers, unless those documents were explicitly requested by the customer.[8,&9] Oracle's practice caused customers to often be unaware of outstanding credits, resulting in overpayments.[10]

- Oracle's policy was to not issue a refund unless the customer made a specific request for one.[11] Even if the customer made such a request, Oracle would often deny the customer a refund if the customer had any other receivables outstanding or if Oracle had previously written off amounts as bad debt (typically via a credit memo).[12,13&14]

---

over the years, but – and certainly in the revenue recognition area, a number of controls. But in this case, there was a collections department, there was a manager, and **I don't think there was adequate supervision.** So there was some that – while there were controls, they fell behind." (Emphasis added.)

[7] *See* Deposition of Tom Williams, June 7, 2006, 155:4-7. *See also* Williams Deposition, Ex. 4 at NDCA-ORCL 048663. Oracle's manual entitled *Oracle Receivable User's Guide*, Release 105C, March 1997, Volume I, defines a Credit Memo as "A document which partially or fully reverses an original invoice. You can create credit memos through the Receivables, Enter Credit Memos form, or through AutoInvoice." In other words, a Credit Memo is typically used to partially or fully offset the balances of outstanding or future invoices, or is utilized by the customer to obtain a refund, and generally results in a reduction to accounts receivable and revenue.

[8] Deposition of Greg Myers, May 23, 2006, 75:19-21, "We generally don't send statements to our customers unless they request them."

[9] PLF-ORC 000133, "Can we consider sending the Customers the system generated Credit Memos? <u>Our practice of not sending Credit Memos</u> makes account reconciliation extremely difficult. We send the invoice and often send a rebill, but <u>we never send the Credit Memo</u> that clears the original invoice and validates the rebill." (Emphasis added.)

[10] NDCA-ORCL 1895745, e-mail from Molly Littlefield, "We actually have the unapplied cash. We never booked the order but the customer paid. We want to book it or try to get upper management to agree that we should keep this money."

[11] Deposition of Raul Campos, March 28, 2006 126:15-25, "Q. Right. So – so once you did that – once you did some research and found that there was nothing – in circumstances where you found there was nothing to apply it to did you refund the customers? A. If the customer would request a refund. Q. What about if a customer didn't request a refund? A. It would remain unapplied. Q. Did you call customers to tell them, 'Hey, you have money unapplied. Do you want it back?' A. No." *See also* 128:17-129:12, "Q. And did you or anyone at Oracle send letters to the customers saying, 'Hey, there are these items associated with you that are in our Unapplied Account?' …A. I did not personally send any letters out and to my knowledge nobody else did either. Q. Did you call customers and tell them that they had money in On Account that is available for refund or anything like that? A. No. Q. Do you know if anyone else did at Oracle? A. Not to my knowledge."

[12] *See* Deposition of Ian Hatada, October 5, 2006, 64:23-68:20, including for example, "At times we – we had to put together a request to the Accounts Receivable Department to refund, and at times those requests would be put on

6.  The use of the systematic practices described above caused Oracle's customers to pay duplicate and erroneous invoice amounts.[15] The unapplied cash from customer overpayments were amounts Oracle owed to its customers. These cash receipts were not amounts earned by Oracle, and it was not entitled to keep these funds. However, Oracle's policies inhibited the refund process, and in November 2000 it covered up the audit trail within its internal records used to track customer overpayments (see discussion below regarding the November 2000 Debit Memo invoices).

7.  Customers that learned of Oracle's practice to not refund overpayments found it unacceptable. For example, one of its customers, Household, wrote to Oracle:

> Two weeks ago we determined that an additional $178,346.77 in Household International and its affiliates' funds [were] being held by Oracle, but Household had not been previously advised.…Oracle's continued retention of Household funds, without communication as to the reason for the delay, is unacceptable.[16]

**Oracle's Misclassification of Customer Overpayments and Other Unapplied Cash**

8.  Oracle had an obligation to either apply the unapplied cash to existing accounts receivable, or acting jointly with its customers, seek an appropriate alternative resolution of the overpayment. For example, Oracle and the customer could have determined that the payment would be applied to another outstanding invoice or that the cash should be

---

hold for long periods of time, and the money would not go back to the client. Q. Okay. So was it determined that an item of unapplied cash needed to be refunded but the process was never implemented so the money never got refunded? Is that correct? [A] True. Q. Even though the collectors determined that it was the customer's money and should go back to the customer, it was never refunded; was it? A. True. Q. And that happened multiple times; didn't it? [A] Yes." *See also*, 139:6-11, "It happened when Quinn had – advised us not to refund anything that was revenue impacting, and it happened when we got farther in to the project and found that there were a lot of items that truly needed to be refunded, and Tom Williams shut off the – the whole refunding of the project."

[13] NDCA-ORCL 1886317, e-mail from Molly Littlefield to various Oracle personnel entitled "Re: [Fwd: REFUND REQUEST/GE Power]," "All, I agree we should not rush into the refund at this point, but I wanted to just add a couple of points. I believe the research that is provided on the refund is correct and we owe the customer this money."

[14] NDCA-ORCL 1865593-600, an Oracle representative provided Verizon a list of unapplied cash in response to an inquiry from a Verizon internal auditor. Littlefield responded, "We probably should not have given them the list of unapplied but since we did we need to make them prove to us that the money is theirs." Littlefield further responded, "[t]hey should be providing us the reasons for refunding. We should not be researching for them. If they want a refund then make them prove to us why? Maybe I am missing something here but if they want the money shouldn't they tell us why?"

[15] *See* detailed reports supporting customer refunds, for example, NDCA-ORCL 1722665-82. This report specifies a number of different origins for amounts that were refunded (*see* "Reason" column).

[16] HI000111.

refunded to the customer.    In the unlikely event that Oracle was ultimately unable to determine how to apply a particular payment that it received from a customer or that a refund was appropriate, it had a legal obligation to escheat the funds to the appropriate government entity.[17]

9. There were at least three general ledger accounts where Oracle maintained the unapplied cash from customer receipts.  During 2QFY01, the balance of unapplied cash decreased $49.9 million (see table below):

---

[17] *See* for example NCDA-ORCL 1895998-99.  This letter from Oracle to JDS Uniphase ("JDS") in August 2004 indicates that Oracle was holding unapplied cash receipts from JDS.  Oracle provided JDS with three options as follows: "[1] Our Records Indicate that the Credits are in Error (Oracle should adjust their records as needed), [2] Issue a Refund of the Above Amount, or [3] Apply Above Amounts to Current Outstanding Invoices." JDS indicated that it desired a refund.  This letter indicates that Oracle understood the appropriate alternatives to employ to resolve the customer overpayments, including that it did not have a unilateral right to offset the overpayments against other amounts of its choosing, or to apply customer overpayments to debit memos as it did in November 2000.  Finally, this letter indicated that if Oracle did not receive a timely response to the letter, it would escheat the money to the state of California.  The individual states have laws requiring amounts to be escheated after certain periods of time that such payments are unclaimed.

| Account Name | Account # | Q2 Beginning Balance | Q2 Ending Balance | Change |
|---|---|---|---|---|
| Unapplied Cash | 12018[18] | $86.3M | $64.6M | $(21.8)M |
| Bad Debt Write Offs | 12601[19] | (15.7) | 4.4 | 20.0 |
| Customer Overpayments | 25005[20] | 73.6 | 25.4 | (48.2) |
| **Total** | | **$144.2M** | **$94.4M** | **$(49.9)M** |

10. For the reasons described below, Oracle's usage of both the 12601 and 25005 accounts was improper. In addition, the 12018 account should not have been utilized as an account to indefinitely retain payments from customers that Oracle was not able to assign to proper invoices.

11. I have also reviewed certain evidence to suggest that these balances of unapplied cash may have been larger. However, Oracle appears to have conducted "routine 'Q-end unapplied clean up' drills," in which it reduced unapplied cash by applying the receipts to other invoices without adequate review. [21]

*Customer overpayments and other unapplied cash receipts were improperly included in the 12601 account*

12. It was improper under GAAP to include unapplied cash in the 12601 account because that account was a component of Oracle's Bad Debt Reserve.[22&23]   Oracle did not have

---

[18] AA 000035, Accounts Receivable Variation Analysis as of November 30, 2000.

[19] NDCA-ORCL 1610987, Bad Debt Reserve Reconciliation Q2FY01.  This account also was utilized for Bad Debt Write-offs, which offset the unapplied cash.  *See also* NDCA-ORCL 104764-65 (identical to NDCA-ORCL 313945-46 below – 12601 Reserve Activity).  This document identifies that, in total, the 12601 account included $29.2 million of unapplied cash ($24.356 million from June to November 2000 per 104764 and $4.875 million prior to that time per 104765).  As of November 30, 2000, $20.8 million of this unapplied cash was transferred into the account during Q2FY01 (*see* discussion below).  A total of $8.4 million of unapplied cash had been transferred into the account in earlier periods.  Since the fluctuation of the account in the quarter was approximately equal to the total amount of transfers during Q2FY01, it appears that Oracle did not increase its Bad Debt Write-offs during the quarter, and the only significant impact was from the transfer of unapplied cash.

[20] AA 000040, Unearned Revenue Variation Analysis.

[21] NDCA-ORCL 1856278.  E-mail from David Tejeda, an Oracle collections representative, noting "The application that I made to invoice 6057195 is definitely a misapplication.  I'm not big on intentionally misapplying funds.  However, being a Feb. 2001 application, I'm pretty sure I was involved in one of our routine 'Q-end unapplied clean up' drills, as we used to do on the final months of each Q back then.  Please do unapply this payment, as I'm 99% sure it doesn't belong to invoice 6057195."  (Emphasis added.)

[22] NDCA-ORCL 1610987, Bad Debt Reserve Reconciliation for Q2FY01 showing the inclusion of the 12601 account as a component of the Bad Debt Reserve.

rights of ownership with respect to the customer overpayments.  Therefore, it was not entitled to use these amounts to offset credit losses from unrelated transactions.

13. GAAP notes that the accounting for the impairment of an asset, such as accounts receivable, requires an accrual (i.e., a charge) to the income statement.[24]  Oracle's accounting for unapplied cash within the Bad Debt Reserve was inconsistent with GAAP and its own policy because there was no related charge to the income statement.[25]  The unapplied cash was either applicable to existing accounts receivable, in which case the amounts should have remained in 12018, or the amounts had been mistakenly remitted by Oracle's customers, and should have been included in an accounts payable account to be refunded to these customers.

*Customer overpayments and other unapplied cash were improperly presented in Customer Advances and Unearned Revenue*

14. Oracle's inclusion of unapplied cash in its 25005 account as a component of reported Customer Advances and Unearned Revenue was also improper.[26]  GAAP describes Unearned Revenues as "deposits and prepayments received for goods or services <u>to be provided</u>."[27]  Therefore, Oracle's balance sheet classification improperly represented that the amounts contained within 25005 would ultimately be recorded as revenue.  This was inaccurate because the unapplied cash was not future revenue, but instead represented amounts that should have been applied to the corresponding accounts receivable balance or returned to Oracle's customers.

---

[23] Deposition of Michael Quinn (Oracle's senior Credit & Collections executive), April 18, 2006, 197:12-24, "Q. And 12601, that was the number for an accounts receivable reserve? A.  Yes. Q.   And prior to November of 2002, money was being transferred between 25005 and 12601, right?  A.  That's my understanding, yes.  Q.   And those transfers impacted Oracle's balance sheet, right?  A.  Yes.  Q. And in what way?  A. It increased the reserve balance that was in the – that GL account, 12601."

[24] Statement of Financial Accounting Standards (FAS) No. 5 "Accounting for Contingencies," ¶ 8 "An estimated loss from a loss contingency . . . shall be <u>accrued</u> by a *charge to income*."  (Emphasis added.)  *See also*, ¶74, "The accrual of some loss contingencies may result in recording the impairment of the value of an asset rather than in recording a liability, for example, accruals for expropriation of assets or uncollectible receivables."

[25] *See* Chan Deposition Ex. 19, NDCA-ORCL 140467-78 at 68-69, Oracle's Credit Memo and Write-off and Bad Debt and Credit Reserve Policy.

[26] AA 000040, Variation Analysis as of November 30, 2000.

[27] Emphasis added.  *See* FASB Statement of Financial Accounting Concepts ("FASCON") No. 6 ¶ 197, "Elements of Financial Statements," which states, "Deposits and prepayments received for goods or services to be provided – 'unearned revenues,' such as subscriptions or rent collected in advance – likewise qualify as liabilities under the definition because an entity is required to provide goods or services to those who have paid in advance."

15. Furthermore, Oracle personnel have testified that the amounts within the 25005 "Customer Overpayments" account had generally been flagged for customer refund.[28] Therefore, the unapplied cash included within the Customer Overpayments account, and in particular all of the unapplied cash attributable to customer refunds, represented a <u>liability</u> of Oracle to its customers.   In my opinion, Oracle's accounting for unapplied cash as Customer Advances and Unearned Revenue misclassified this obligation.[29]

*Unapplied cash should have been included in Accounts Payable*

16. Accounts Payable is a liability.   In my opinion, at a minimum, Oracle should have reported unapplied cash receipts held in its 12601 and 25005 accounts within its reported balance of Accounts Payable.   Notably, when Oracle did issue customer refunds the payment was processed through account 20002, which was within Accounts Payable.[30]

17. This opinion is consistent with Oracle's "Unapplied Cash Clean-up" that began in October 2002.   At that time, Oracle refunded at least 117 unapplied cash receipts totaling approximately at least $5.1 million million to customers that had been improperly transferred to the 12601 account in connection with 2QFY01.[31]   Many of these refunds did not take place until Oracle's fiscal 2004.[32]   *See* further discussion below.

18. It is also worthwhile to note that Oracle sought to avoid providing its customers with refunds of their overpayments.   As part of this effort, Oracle offset customer overpayments against unrelated outstanding receivables.   Oracle also reversed prior credit

---

[28] Deposition of Michael Quinn, April 18, 2006, 97:9-19, "What's the difference between unapplied cash that would be in the liability account and unapplied cash that would be in an accounts receivable account?  A.  Generally speaking, it would be – the items in 25005 would be – actually, I'm sorry.  Let me answer the question.  The amounts that would be in a liability account would be generally something that are flagged to be refunded to a customer, payable to a customer."

[29] FASCON No. 6 ¶ 196, "Most liabilities presently included in financial statements qualify as liabilities under the definition in paragraph 35 because they require an entity to sacrifice assets in the future. Thus, accounts and notes payable, wages and salaries payable, long-term debt, interest and dividends payable, and similar requirements to pay cash so obviously qualify as liabilities that they need no further comment."

[30] NDCA-ORCL 1885992-6020 at 1885999, Oracle memo entitled, "12018/25005 Reconciliation Project, Documentation of procedures, findings, and recommendations."  *See also* Deposition of Michael Quinn, April 18, 2006, 102:2-6; Deposition of Gary Matuszak, August 1, 2006, 195:19-196:8, 197:17-198:13.

[31] NDCA-ORCL 1646567-70.  Number of cash receipts; *see* p.69, line 37, column F, totaling 117.  Amount; *see* p.67, line 16, column F, totaling $5,135,672.

[32] NDCA-ORCL 1624272, NDCA-ORCL 1534642-701; NDCA-ORCL 1058909, Debit Memo Script Output.

memos provided to customers, and applied the overpayments to fictitious revenue from "adjusted-up" invoices.[33&34]   This offsetting of assets and liabilities (such as another receivable and the liability to the customer for the overpayment) is improper except where a right of setoff exists.[35]   In my opinion, Oracle did not appear to have a right to offset.[36]

### Oracle's Improper Use of Debit Memos, Customer Overpayments and Other Unapplied Cash to Misstate Its Financial Statements in 2QFY01

19. During 2QFY01, Oracle used its unapplied cash and customer overpayments for improper purposes in order to inflate its financial results.  To do this, Oracle recorded accounting entries that enabled it to account for $19.4 million of the unapplied cash as if these amounts were truly Oracle's assets.[37&38]   These accounting entries transferred

---

[33] In 2002, Oracle's reversal of the November 2000 Debit Memos resulted in more than $50 million of additional unapplied cash from customer overpayments, which Oracle had to "resolve" (*see* discussion below regarding the Unapplied Cash Clean-up).  One method utilized by Oracle involved the reversal of credit memos and then applying customer overpayments to the "adjusted up" invoices.  Specifically, if a credit memo had been previously issued to the customer, Oracle would reverse that credit memo, and simultaneously create an "adjusted-up" invoice by improperly assuming the original credit memo was in error.  This "adjusted-up" invoice was not sent to the customer, but was improperly created for the purpose of applying the customer overpayment to complete the reversal of the previous credit memo.  *See* Deposition of Ian Hatada, October 5, 2006, 93:20-94:17, "Typically we only adjusted up invoices if there was a credit memo on them….When – you know, as long as there was a credit memo done on the invoice, you could adjust up the invoice and take away the credit memo to apply…. [Q] So you reverse the previous credit memo that was applied that reduced the invoice; right?  A. Correct.  Q.  And how would you reverse a credit memo?  A. It would be a – a request to accounts receivable to reverse the credit, so, therefore, now the credit is no longer on the invoice, there's an outstanding amount.  It matches the amount that's in the unapplied, and, like I said, it was at that point a wash once you applied it."
[34] NDCA-ORCL 1889364-69, e-mail from Lilly Hao to Molly Littlefield.  Littlefield wrote "I think all the highlighted invoices for Pioneer should be adjusted up.  We have plenty of unapplied cash to pay for this money.  Once they are adjusted up I can easily apply money.  However, in some cases the customers have taken credits for these items and I think if we adjust them up to their normal dollar amount and I can apply the cash and then go back to them and tell them that the credits they took were not valid."
[35] APB Opinion No. 10, Omnibus Opinion – 1966, ¶ 7.
[36] FASB Interpretation (FIN) No. 39:  Offsetting of Amounts Related to Certain Contracts (an interpretation of APB Opinion No. 10 and FASB Statement No. 105).  GAAP notes that offsetting is only appropriate when all of the following conditions are met: 1) Each of two parties owes the other determinable amounts; 2) The reporting party has the right to set off the amount owed with the amount owed by other party; 3) The reporting party intends to set off; and 4) The right of setoff is legally enforceable.  In this case, Oracle included the unapplied cash in the 12601 or 25005 accounts when it could not determine how to apply the payment.  Accordingly, Oracle did not meet the criteria for offsetting.
[37] NDCA-ORCL 313945-46, supporting schedule to the "Report of the Special Litigation Committee of the Board of Directors of Oracle Corporation," Volume 1, November 22, 2002.  The total amount of the transfers to 12601 in 2QFY01 was $20.8 million.  However, as discussed below, Oracle calculated its Bad Debt Reserve as of the month immediately prior to quarter-end, which in this case was 10/31/00.  Therefore, for purposes of assessing the impact of the transfer of customer overpayments on Oracle's 2QFY01 earnings, it is necessary to determine the total

unapplied cash out of the Customer Overpayments account 25005 and into account 12601, which as noted above was a component of Oracle's Bad Debt Reserve. As a result, these transfers (each of which was associated with a debit memo) also impacted revenue (*see* further discussion below).[39]

20. In total, during August and October of 2000, more than 1,900 customer overpayments were transferred by Oracle from the Customer Overpayments account to its Bad Debt Reserve.[40] This amount is specific to the transfers from the 25005 account in Q2FY01, however, I have reviewed evidence that indicates Oracle improperly accounted for other unapplied cash in this reserve account.[41&42]

21. As described above, Oracle misclassified customer overpayments in Account 25005 and Account 12601 (i.e. Unearned Revenue and the Bad Debt Reserve). However, the

---

transfer activity in the three months ended 10/31/00. These transfers totaled $19.4 million as follows; August 2000 - $3,562,206 and October 2000 - $15,819,640. The addition of these amounts to 12601 in these periods is validated elsewhere. *See* for example NDCA-ORCL 1607481, which is an Oracle document entitled "On Account/Receipt Write-off Summary."

[38] In addition, in earlier periods, Oracle had transferred $4.9 million into the Bad Debt Reserve (NDCA-ORCL 313946). These earlier transfers also inflated the Bad Debt Reserve in 2QFY01. NDCA-ORCL 313945-46.

[39] Deposition of Michael Quinn, April 18, 2006, 227:25-228:15. "Did you prepare an update for the audit committee describing the impact of taking the unapplied cash receipts to the reserve to the audit committee? A. I'm assuming I did. I can't recollect actually putting it together….Did the process of taking unapplied cash to the reserve impact revenue in any of the eight quarters prior to October 2002? A. Yes. Q. And in what quarters? A. I don't know. Q. And did you include that in your update? A. Yes."

[40] NDCA-ORCL 1607784-822, Oracle's Miscellaneous Offset Reports for August and October 2000. The August 2000 report includes 517 receipts (end row # 526 minus beginning row #10) and the October 2000 report includes 1387 receipts (end row #1397 minus beginning row #10). Therefore, the total is approximately 1,900.

[41] NDCA-ORCL 3042910, e-mail from Neal Menon to various Oracle personnel dated November 6, 2000 regarding unapplied cash. Menon identified $16.985 million of unapplied cash related to OCC (Oracle Credit Corporation). Although he requests that Oracle's collection personnel assist in the application of this cash, he notes "Since we are approaching the end of the quarter, we would like to resolve these items as quickly as possible. If there is no response by November 20, 2000, we will review the items and place them in our reserve account." (Emphasis added.)

[42] *See* for example, Deposition of Michael Quinn, April 18, 2006, 205:16-206:11, "Q. So these auto adjustments that we were talking about in Quinn No. 5 would increase the bad debt reserve? A. Correct. Q. Is that the only account that the auto adjustments would impact? A. Other than the unapplied account because it would be taken out of the unapplied account and put into the bad debt reserve account. Q. Bad debt reserve account. A. The 12601. Q. So – and what was the purpose of it? A. What was the purpose of what? Q. What was the purpose of these auto adjustments? A. At some point you make an assessment as to how much effort you want to expend on a $25 item or a $250 item that's, you know, 75 days old, just as an example, or 180 days old, and it's to clean up and reduce the number of transactions that are out there sitting in unapplied cash." *See also* the Deposition of Tom Williams, June 7, 2006, 178:19-179:2. "Were there instances at Oracle where unapplied cash would be moved to 12601 for reasons that you have just articulated – either they are small dollar amounts, the difficulty in actually determining the proper placement or proper reconciliation would be too difficult? Were there instances where those monies would be transferred to 12601? A. I believe the answer to that is, yes."

inclusion of the customer overpayments in its Bad Debt Reserve was particularly improper because activity in this account inflated Oracle's reported revenue and earnings. Oracle's transfers of unapplied cash violated Oracle's obligation to return the amounts related to overpayments to its customers and therefore were inconsistent with GAAP. Two years later during Oracle's "Unapplied Cash Clean-Up," (*see* related section of this report below) Oracle reversed this accounting. Michael Quinn instructed Greg Myers, Oracle's Senior Accounts Receivable Manager, to "confirm that ALL ability to move anything to 12601…has been turned off."[43&44]

22. Although this was not the first time that Oracle transferred a portion of the overpayments to its Bad Debt Reserve, the transfers in 2QFY01 were the largest to that date.[45]

23. Oracle preserved at least $24 million of the transferred customer overpayments in the Bad Debt Reserve by marking them "On Account." [46&47]  Oracle began to use the On Account designation as part of the process to move unapplied cash to the 12601 account in August 2000.[48]  The On Account designation in the accounting system was a step in the process to move unapplied cash to the 12601 Account and prevented the money from

---

[43] NDCA-ORCL 1125473-74, e-mail from Michael Quinn to Greg Myers, Tom Williams and others dated October 21, 2002.

[44] The process to move customer overpayments from the 25005 account into the 12601 account required Oracle to record two new cash receipt entries. The first was a negative cash receipt in 25005 to remove the overpayment from that account. The second was a positive cash receipt in 12601. In both cases the offsetting entry was to cash. During the Unapplied Cash Clean-up, it was necessary to reverse both of these entries. NDCA-ORCL 1885992-6020 at 1885998 and 1856020, Oracle memo entitled, "12018/25005 Reconciliation Project, Documentation of procedures, findings, and recommendations."  *See also* NDCA-ORCL 1727952-53, Step-by-Step Guide to Removing Misc Receipts from 12601.

[45] *See* NDCA-ORCL 313945-46, a supporting schedule for SLC Report.

[46] NDCA-ORCL 313945.  The $24 million included the $19.4 million transferred into the Bad Debt Reserve in 2QFY01.

[47] On Account was defined as "Payments where you intentionally apply all or part of the payment amount to a customer without reference to a debit item."  *See Oracle Receivables User's Guide*, Release 10SC, March 1997, Volume I, NDCA-ORCL 048672 and Deposition of Greg Myers, May 23, 2006, 54:10-14.

[48] NDCA-ORCL 1609375-76, November 14, 2002 e-mail from Greg Myers to Terry Elam, in response to the following question from Elam: "When I met with Buzz today he had a question about the 12601 account. He wanted to know when we started using 'On Account' to reclass our unapplied to 12601."  Myers responded, "We started applying receipts to the 12601 account in August 2000 in the form of misc. receipt.  This stopped in December of 2000, and they resumed activity in Feb -01 via a cash receipts placed On Account after the updates were completed to the payment method."  (Emphasis added.)

being refunded to customers.[49]  The On Account status remained attached to the cash receipt until specific action was taken to remove them during the On Account Cleanup in 2QFY01.[50]

*The November 2000 Debit Memo Invoices*

24. In a process that appears to have began in September 2000 and was executed in November 2000,[51] Oracle concealed these customer overpayments in its accounting system.  Oracle did so by "applying" each of the customer overpayments that had been inappropriately transferred to the Bad Debt Reserve to a series of new, but non-customer initiated, debit memo invoices (the "November 2000 Debit Memos").[52]

25. The concealment of the customer overpayments via the November 2000 Debit Memos occurred in a three step process:[53]

   i.     The original cash receipt that had been marked On Account was changed to "Unapplied."[54]  This step was necessary to later enable the customer payment to be "Applied."

   ii.    A debit memo was created for the dollar amount of the cash receipt from the customer overpayment.

   iii.   The Unapplied cash receipt was applied to the debit memo.

---

[49] Deposition of Greg Myers, April 12, 2005, 52:14-53:12, "Q.  Okay, so if a payment was On Account, it could mean that a payment was moved to directly offset an expense account?  A.  Well, the placing of the item On Account was just one step of maybe a couple additional steps.  It's a series of transactions.  So if we're going to – so narrow in on just the placing of the item On Account, that was to reference that the cash really should not be – no future activity should really happen against this payment in relation to moving this money to an open receivable.  I mean, it would – at that time, you know, prior to November 17th, meant as a signal for people in the system that the money – that something additional -- some additional transaction had occurred that meant not to, you know, touch this money, or don't touch this receipt in the way that we would use it for some other purpose."  (Emphasis added.)
[50] Deposition of Greg Myers, April 12, 2005, 76:3-8.
[51] *See* NDCA-ORCL 623757, e-mail from Dianna Ferguson to Sanjay Kumar dated September 20, 2000.
[52] Another $5 million in customer receipts that were transferred to the reserve in November 2000 were also applied to the Debit Memos.  NDCA-ORCL 1607834.
[53] Deposition of Greg Myers, April 12, 2005, 174.
[54] NDCA-ORCL 048682.  Definition of an Unapplied Payment: "The status of a payment for which you can identify the customer, but you have not applied or placed on account all or part of the payment."

26. As a result of the application of the debit memos to these overpayments, the cash receipts from customer overpayments were no longer identifiable as "unapplied" cash receipts.[55] This distinction was important because unapplied cash receipts composed the population of cash receipts normally considered by Oracle's collections personnel.[56] Since the debit memos caused the overpayments to appear to be applied, Oracle's collections personnel were told, in effect, that the customer overpayments had been refunded or applied, and thus were not available to be refunded or applied to any other invoice.[57&58] However, as explained below, when the November 2000 debit memos were reversed as part of the 2002 Unapplied Cash Clean Up, Oracle acknowledged that the money belonged to customers and began issuing refunds in 2003.[59]

27. As an example, an AR Aging Report as of October 31, 2000, which is consistent with the documents contemporaneously utilized by Oracle's collections personnel to resolve unapplied cash,[60] shows 14 payments totaling $178,346.77 from Household Finance that had not been applied.  Thirteen of these payments were dated *on or before* November 1994.[61]  As a result of this unapplied cash, Household's net balance due to Oracle was a negative $157,870.33.  Therefore, Oracle should have provided Household with a refund.  After the application of the debit memo invoices, this same report as of November 30,

---

[55] Deposition of Ian Hatada, October 5, 2006, 127:18-129:2, including "the best description would just be that there was money in an account that was, you know, unapplied money that we had never seen before, and we were going to all of a sudden see and have to resolve."

[56] NDCA-ORCL 1885992-6020 at 1885997, Oracle memo entitled, "12018/25005 Reconciliation Project, Documentation of procedures, findings, and recommendations."  This document notes regarding the reversal of the 12601 unapplied cash amounts "[i]n an attempt to reclassify these items as unapplied and add them back to the population of items being resolved by collections…"

[57] NDCA-ORCL 1731158.  August 1, 2002 e-mail from Raul Campos to numerous Oracle personnel regarding a report entitled "Running Billing Histories," which, in part, identified how Oracle had applied customer payments. These reports would have shown customers that unapplied cash had been applied to debit memos.  "Before you [run] your next Bill History for your customer, please read the following.  Currently there are a ton of 'Debit Memo' #'s pulling up into customer's billing histories that appear to the customer as an invoice….The customer will believe these funds [are] available for a credit or refund, but actually these funds have already been refunded.  In order to prevent duplicate refunds or a lot of unnecessary research for you & me (mostly you), I ask you to do the following: After you run [you] billing History, export the report into excel & remove all of the debit #'s that start with '550' before you send it to the customer."

[58] NDCA-ORCL 1895918-22, "Debit Memos can be very tricky.  Especially all the ones created on Nov 18, 2000…. If we ever sent a customer a billing history these debit memos should never be included on it."

[59] See, *e.g.*, NDCA-ORCL 1722653-64, February 6, 2003 spreadsheet: "Amount to be refunded" at 1722664 is nearly $5 million.

[60] NDCA-ORCL 140457, the Aging report was sent by Oracle's Revenue Accounting Staff to the Collections management team.

[61] NDCA-ORCL 313988.

2000 does not show any of these 14 unapplied payments.  Consequently, these unapplied cash payments from Household were no longer visible because they had been inappropriately applied to debit memos.  As a result, the November 2000 report indicates that *Household owed* Oracle $24,150.85.[62]   This finding is consistent with Oracle's issuance of a refund to Household in May 2002 in the exact amount identified above, $178,346.77.[63]  The impact of the debit memos on the overpayments from Household is discussed in greater detail below.

28. The Household example shows that the November Debit Memos concealed and misrepresented the balance of unapplied cash and customer overpayments improperly withheld by Oracle from its customers.  This example is consistent with Oracle's description of the purpose of the November 2000 Debit Memos to another one of its customers, "All invoices that start with '550' are actually debit memo #'s.  These were created to clean up our unapplied account at that time.  They were more than likely overpayments."[64]

29. As a result of the November 2000 Debit Memos, Oracle prevented customer overpayments from being refunded.  In aggregate, Oracle created 46,881 debit memo invoices.  Ultimately, two years later, the November 2000 Debit Memos related to customer overpayments maintained by Oracle in its Bad Debt Reserve were reversed.

**Oracle's Improper $20 Million Increase to Revenue and Pre-Tax Earnings in 2QFY01**

30. Each time a customer overpayment was transferred to 12601 "Bad Debt Write-offs," its balance was credited.  This credit entry had the effect of increasing Oracle's total Bad Debt Reserve. In fact, Oracle's reconciliation shows that after the 2QFY01 transfers of customer overpayments, the 12601 account actually increased the Bad Debt Reserve (i.e., had a $4.4 million credit balance).  Over the course of 2QFY01, the account had a net

---

[62] NDCA-ORCL 313986.
[63] HI0000001-02.  This check was in the same amount identified above, $178,346.77.
[64] PLF-ORC 001633.  Fax from Raul Campos (Oracle) dated April 5, 2002.

change of $20 million from the end of the prior quarter, which closely tracked the transfer of the overpayments into the account.[65]

31. It is important to note that a bad debt write-off account such as Oracle's 12601 would typically be reflected as a debit balance.[66]  Indeed, Oracle's reserve reconciliation shows that the 12601 account did have a $15.7 million debit balance at the end of 1QFY01, and had had a debit balance for several years until 2QFY01 (*see* chart below of the ending balance of the 12601 account over the 10 quarters ended 2QFY01):



32. This movement of the account balance in 12601 from a debit balance at the end of 1QFY01 to a credit balance at the end of 2QFY01 was a signal of Oracle's improper accounting for customer overpayments.   It was the opposite balance of what an accountant would expect to encounter.   An accountant would expect that an account tracking write-offs of accounts receivable would remain in an overall debit position (i.e.,

---

[65] NDCA-ORCL 1610987, Bad Debt Reserve Reconciliation Q2FY01.
[66] A debit balance would stand in contrast to the other accounts included in Oracle's Bad Debt Reserve calculation. The explanation for this is consistent with the purpose of the account, which is that actual write-offs reduce the balance of the Bad Debt Reserve.

it tracked reductions to the reserve, which was a credit balance).  The Company could then replenish its reserve to the necessary level by crediting against the Bad Debt Write-offs account and debiting revenue as per Oracle's policy (*see* discussion below).

33. Each quarter Oracle prepared a Bad Debt Analysis utilizing a pre-defined methodology to calculate the required total balance of the Bad Debt Reserve.[67]  In 2QFY01, Oracle calculated that the balance of its Bad Debt Reserve needed to be $162.9 million.  This amount agrees to the "final version of the Bad Debt Analysis" that was provided to Williams and Oracle's Chief Accounting Officer, Jennifer Minton on December 8, 2000.[68]  In addition, this amount exactly agrees to the amount of the Bad Debt Reserve schedule included in Oracle's auditors' workpapers.[69]

34. Once the Bad Debt Analysis had been prepared, Oracle accounting personnel have testified that the Bad Debt Reserve was modified on a quarterly basis, and an offsetting accounting entry was recorded to revenue.[70]  This adjustment was recorded to increase or decrease the then-current reserve balance in Oracle's accounting system in line with the amount determined in the Bad Debt Analysis.

35. The table below depicts the calculation made by Oracle for purposes of its 2QFY01 reconciliation of the Bad Debt Reserve:

| $ amounts in millions | Q2FY01 | Ref |
|---|---|---|

---

[67] *See* Chan Deposition Ex. 19, NDCA-ORCL 140467-78 at 140468-69, Oracle's Credit Memo and Write-off and Bad Debt and Credit Reserve Policy.

[68] NDCA-ORCL 1610858-989 at 1610859 and 1610872.  Note that most of these schedules are prepared as of October 31, 2000.  The schedule beginning at NDCA-ORCL 1610871 summarizes the earlier schedules in the package, including Bad Debt Reserve analyses for License (1610861), Consulting (1610863), Support (1610865), Education (1610867) and OCC (Oracle Credit Corporation)/Lease (1610869).

[69] AA 000035, Accounts Receivable Variation Analysis as of November 30, 2000.

[70] Deposition of Jennifer Minton, April 21, 2005,  143:7-12 "And if our bad debt reserve was – if our bad debt reserve was higher than what our requirement analysis told us that we needed, then we would adjust – we would reverse some of the revenues that we had recorded against the reserve during the current quarter."  143:25-144:10, "So I would always estimate a certain amount of revenues that were coming back because we knew that our returns – our monthly returns provision was higher than necessary….I mean, every quarter there is a bad debt reserve analysis."  216:19-25, "We would make a – do a bad debt reserve requirements analysis; and if it turned out that we had sufficient reserves based on our bad debt reserve requirements analysis, which was the same way that we'd reviewed the reserve for years, then the revenue would be given back to the field, and we would allocate it based on the relative revenues. . . ."  *See also* Deposition of Jennifer Minton, July 7, 2006, 184:17-21, "Does that make sense? So we always write off everything against revenue rather than to the reserve…"

| $ amounts in millions | Q2FY01 | Ref |
|---|---|---|
| Balance of Bad Debt Reserve before the Q2FY01 Transfers | $163.5 | A |
| Transfer of Customer Overpayments into Reserve (August and October 2000) | $19.4 | B |
| Balance of Bad Debt Reserve after Transfer: | $182.9 | C |
| Required Reserve Adjustment (Increase to Revenue) | $(20.0) | D |
| Required Reserve per Bad Debt Analysis: | $162.9 | E |

36.  To be clear, at the end of 2QFY01, the balance of Oracle's Bad Debt Reserve was, according to Oracle's accounting, required to be $162.9 million ("E" in the table above). Therefore, Oracle determined that it was necessary to record a $20.0 million adjustment ("D" in the table above) to reduce the reserve, thereby increasing revenue and pre-tax earnings by $20.0 million. The resulting increase to revenue and pre-tax earnings was directly enabled by the $19.4 million transfer of customer overpayments into the Bad Debt Reserve ("B" in the table above).

37.  As presented in the table above, the unadjusted balance of Oracle's Bad Debt Reserve at the end of 2QFY01 was $182.9 million ("C" in the table above).[71] This balance included the $19.4 million increase from the transfer of the cash receipts from customer overpayments.  In other words, without the benefit of the improper transfer of the customer overpayments into the Bad Debt Reserve, Oracle's reserve would have been $163.5 million ($182.9M minus the $19.4M) and no adjustment would have been necessary.[72]

38.  Accordingly, an adjustment was recorded to reduce the balance of the Bad Debt Reserve by $20,000,000.[73]  This adjustment to the Bad Debt Reserve resulted in an increase to reported revenue and pre-tax earnings in an identical amount.[74]

---

[71] NCDA-ORCL 1610987.  Bad Debt Reserve Reconciliation Q2FY01.  Prior to the $20.0 million adjustment the balance of the reserve was $162.9 million plus the $20.0 million.
[72] Deposition of Tom Williams, June 7, 2006, 124:23-125:1-2, "If there was a significant difference between the requirements and the reserve then an adjustment would be booked.  If it was not a significant difference then no adjustment would be booked."
[73] NDCA-ORCL 1610987 and NDCA-ORCL 140463.
[74] Chan Deposition Ex. 19, NDCA-ORCL 140467-78 at 140468-69, Oracle's Credit Memo and Write-off and Bad Debt and Credit Reserve Policy, "We charge both credit memos and write-offs directly against the current periods

**Oracle's Improper Accounting for Customer Overpayments and Unapplied Cash Related to the November 2000 Debit Memos Resulted in an Overstatement of 2QFY01 EPS by $0.01**

39. Oracle improperly reported EPS of $0.11 for 2QFY01.  If Oracle had not made the improper $20.0 million adjustment to the Bad Debt Reserve, it would have reported EPS of $0.10, which would not have enabled Oracle to beat Wall Street expectations.  In other words, Oracle's ability to beat expectations was partly attributable to its non-GAAP accounting for customer overpayments within the Bad Debt Reserve.  The chart below illustrates this impact:

| *Impact of Bad Debt Reserve Adjustment on Q2FY01* | **Net Income ($M's)** | **EPS** |
|---|---|---|
| As Reported by Oracle[75] | $622.8 | $0.11 |
| Reverse Bad Debt Reserve Adjustment (after-tax) [76] | (12.9) | (0.01) |
| GAAP | $609.9 | $0.10 |

40. In a September 1998 speech, then Securities and Exchange Commission ("SEC") Chairman Arthur Levitt noted "I recently read of one major U.S. company, that failed to meet its so-called 'numbers' by one penny, and lost more than six percent of its stock value in one day."[77]  In August 1999, the SEC reiterated that a quantitatively small misstatement of a financial statement item may be material if it "masks a change in earnings or other trends" or if the "misstatement hides a failure to meet analysts' consensus expectations for the enterprise."[78]

---

revenue….Although we also reduce revenues for monthly additions to the bad debt and credit reserve, we avoid double counting…by adjusting the bad debt and credit reserve balance quarterly to its required balance, with a corresponding adjustment, upwards or downwards, to the current quarters revenues." (emphasis added)  See also the journal entry demonstrating the adjustment to review at 140474 of this Oracle document.

[75] Oracle Form 10-Q for the quarter ended November 30, 2000, p.4.

[76] Oracle's effective tax rate in 2QFY01 was 35.5% ($343M/$966M), which was identical to the forecasted rate. After tax, the $20 million adjustment would have contributed approximately $12.9 million to Oracle's reported net income.  Without this adjustment to the Bad Debt Reserve, Oracle's reported net income would have been $609.9 million.  Accordingly, diluted EPS would have been $0.1038 or $0.10 on a rounded basis ($609.9/5,874,987 shares).

[77] Transcript of the "Numbers Game," by Arthur Levitt, NYU Center for Law and Business, New York, N.Y., September 28, 1998.

[78] Staff Accounting Bulletin ("SAB") No. 99 "Materiality" issued August 12, 1999.  *See* Section M (1) – Assessing Materiality.  In addition, SAB 99 notes, "Among other factors, the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material. Consideration of potential market reaction to disclosure of a misstatement is by itself 'too blunt an instrument to be depended on' in considering whether a fact is material.

41. In this case, Oracle's EPS was $0.10, however, it reported EPS of $0.11.  In my opinion, this overstatement of reported EPS was material because it enabled Oracle to beat consensus earnings expectations of $0.10, and demonstrate a "strong" trend of earnings.[79&80]

**Beginning in October 2002, Oracle Conducted an "Unapplied Cash Cleanup" to Reverse the November 2000 Debit Memos, Remove the Improperly Transferred Cash Receipts from the Bad Debt Reserve, and Refund Overpayments to Customers**

42. Ultimately, in October 2002,[81] Oracle began the Unapplied Cash Clean-up. Oracle held a series of meetings to instruct its Collections Managers to "find a home" for tens of millions of dollars in newly unapplied cash and customer overpayments, many of which resulted from the reversal of November 2000 debit memos.[82&83]  Initially, the Unapplied Cleanup developed rapidly:[84]

---

When, however, management or the independent auditor expects (based, for example, on a pattern of market performance) that a known misstatement may result in a significant positive or negative market reaction, that expected reaction should be taken into account when considering whether a misstatement is material."

[79] NDCA-ORCL 005862-65 at 005863, Morgan Stanley, "How Suite It Is," by Charles Phillips, December 15, 2000, "***EPS - Oracle reported fiscal year Q2 2001 earnings per share of $0.11 vs. $0.06 last year and $0.10 consensus number***."  (Emphasis in original.)  Phillips also noted, "Given the Microsoft pre-announcement and generally bad news in the PC sector, the market may have trouble assessing whether Oracle's results are an aberration or a changing of the guard."

[80] NDCA-ORCL 005901-03, Lehman Brothers, "Oracle's Application Business Leads Solid Quarter," by Neil Herman, December 15, 2000, "Yesterday after the close, and contrary to the deep skepticism in the market, Oracle reported strong fiscal second quarter earnings of $0.11 per share, one penny above our and the consensus estimate of $0.10."

[81] Chan Deposition Ex. 12.

[82] Deposition of Ian Hatada, October 5, 2006, 38:24 -39:10, "That's part of my responsibilities as a collections manager, but the biggest thing that I was ever responsible for when it came to unapplied cash was the point of Michael Quinn and Greg Myers getting all of us collections managers together and letting us know that there was a problem with the unapplied cash, and we had a large amount of unapplied cash that was a lot larger than us collections managers had ever seen before, and it was our responsibility as quick as possible to clear this unapplied cash and find a home for this unapplied – the unapplied amounts."  (Emphasis added.)

[83] NDCA-ORCL 1125473-74, Deposition of Molly Venkataramana, April 13, 2005, 225:14-228:1, Deposition of Michael Quinn, April 18, 2006, 224:22-225:7.

[84] Deposition of Ian Hatada, October 5, 2006, 105:1-106:3, including "I'd say once we had that first meeting there was a meeting every couple days to discuss what Mike Quinn or what Jeff Henley wanted us to do moving forward with our action plans."  *See also* Deposition of Ian Hatada, October 10, 2006, 265:20-266:21, including "So did Mike Quinn ever say, 'We need to get these results to Jeff Henley?' [A] Yes, he did."

- On October 14, 2002 and again on October 18, 2002, Oracle called Special Meetings of its Finance and Audit Committee.[85&86]

- On October 21, 2002, Greg Myers wrote to Williams and Quinn that "The ability to move something into 12601 via misc receipt is no longer available to Collections," and that Oracle had instructed its Collections Managers to "stop placing items On Account."[87]

- According to the testimony and documents, the Clean-up also assessed the "revenue impact of the debit memos."[88]

43. The Unapplied Cash Clean-up lasted, at a minimum, until Oracle's FY2006.[89] As part of the Unapplied Cash Clean-up, Oracle removed more than $50 million of cash receipts that had been inappropriately transferred into the Bad Debt Reserve from its Customer Overpayments account, including the transfers made in Q2FY01.[90] Oracle also reversed the November 2000 Debit Memo items that had been applied to the customer overpayments transferred into the 12601 account.[91]

44. The Unapplied Cleanup resulted in a modification of Oracle's historical accounting for a large majority of the $45 million Oracle considered (note it appears that Oracle did not evaluate the entire population).[92] After the unapplied cash receipts were removed from the Bad Debt Reserve,[93] their status was properly restored to "unapplied," which allowed

---

[85] NDCA-ORCL 3042931-33, Minutes of the Special Meeting of the Finance and Audit Committee of the Board of Directors, Oracle Corporation.
[86] NDCA-ORCL 3042933-34, Minutes of the Special Meeting of the Finance and Audit Committee of the Board of Directors, Oracle Corporation (the preliminary results were redacted).
[87] NDCA-ORCL 160921-25.
[88] Deposition of Michael Quinn, April 18, 2006, 227:25 to 228:15 (cited above) and PLF-ORC 000002.
[89] NDCA-ORCL 1886329-30, NDCA-ORCL 1894259, NDCA-ORCL 1846553, Deposition of Ian Hatada, October 10, 2006, 266:23-267:24, Deposition of Molly Venkataramana, April 13, 2006, 304:9-17.
[90] NDCA-ORCL 1646554
[91] NDCA-ORCL 1058909, Debit Memo Script Output.
[92] See for example, NDCA-ORCL 1646553-1647198 at 1646554.  I note that Oracle did not review nearly 9,000 cash receipts under $10,000 for approximately $14.4 million dollars, including more than 2,800 receipts for $4.5 million that appear directly related to the November 2000 Debit Memos.
[93] The removal of these amounts as a component of the Bad Debt Reserve would have had the opposite impact as the initial transfer of these amounts into the 12601 account.  For instance, in 2QFY01, the $19.4 million transfer-in of cash receipts into 12601 facilitated Oracle's adjustment to decrease the Bad Debt Reserve and increase revenue and

Oracle to use the cash for, 1) "hundreds" of customer refunds,[94] 2) escheatment to state governments, 3) application to newly "adjusted up" invoices,[95] or 4) keeping the cash, but reporting it as a contra-asset or liability in Oracle's books and records.[96]

45.  During the Unapplied Cash Cleanup, if Oracle found that a customer had invoices with prior credit memos equal to or greater than the overpayment, Oracle reversed the credit memo(s) by the amount of overpayment.[97&98]   Instead of refunding these customer overpayments, Oracle often "adjusted up" invoices and then applied the unapplied cash. Oracle justified this position, in part, because the overpayments were often for the same amount as credit memos.  However, as noted above, Oracle had a practice to not send credit memos to its customers. I also note that Oracle's process for issuing credit memos required approvals before the credit memo could be processed.[99]   In combination, it is to be expected that overpayments were equal to a credit memo, and Oracle failed to objectively evaluate the propriety of the original credit memo.[100&101]   In my opinion, Oracle did not have an adequate basis to conclude, in late 2002 or thereafter, that the original credit memos had been issued in error.[102]   In this manner, Oracle retained more than $11 million, including $5.3 million of cash receipts that had been transferred to the Bad Debt Reserve by November 30, 2000 (2Q01).[103]

---

pre-tax earnings.  On the other hand, it would have been necessary for Oracle to increase its Bad Debt Reserve and reduce its revenue as a result of the transfer-out of the unapplied cash receipts.

[94] Venkataramana, April 13, 2006, 250:9-11: Q: "Is it fair to say it was hundreds of refunds?  A: Yes."

[95] As described elsewhere in this report, Oracle increased the outstanding balance of an actual invoice by the amount of the recently unapplied cash, and then applied the cash.  It does not appear that Oracle informed its customers that it was using their cash in this manner.  NDCA-ORCL 1125473-74, NDCA-ORCL 1897651, Deposition of Raul Campos, March 28, 2006, 126:15-127:16.

[96] NDCA-ORCL 1646554, Deposition of Ian Hatada, October 10, 2006, 266:23-267:24; Deposition of Molly Venkataramana, April 13, 2006, 304:9-17.

[97] NDCA-ORCL 1727749-53 at 1727952-53, "Step-by-Step Guide to Removing Misc Receipts from 12601."

[98] According to Molly Venkataramana, "If a credit memo was found to be done incorrectly, and the customer had made a payment on that invoice, then the invoice would be adjusted up."  Deposition of Molly Venkataramana, April 13, 2006, 258:17-19, *see also* 289:4-17, 324:25-325:9.

[99] Approvals are discussed at NDCA-ORCL 140469 and also at PLF-ORC 000085.

[100] Deposition of Molly Venkataramana, April 13, 2006, 261:18-20: "Q: And did you guys discuss why those credit memos were not valid?  A:  I don't believe so, no."[100]

[101] *See* for example, NDCA-ORCL 1486082, comment by "Tyler:" "amt of credit exact amount on account, adjust up and apply. . ."

[102] NDCA-ORCL 1727979-91 at 1727985.  On October 25, 2002, in a summary memo to Minton, Williams and others, Oracle wrote that its process for credit memo approval "does not provide for an audit trail."

[103] NDCA-ORCL 1646567.

46. In my opinion, Oracle's actions during the Unapplied Cash Clean-up acknowledge its improper accounting during 2QFY01, including:

- The transfers of customer overpayments into the Bad Debt Reserve, which generated $20 million of revenue in Q2FY01 (via the removal of these amounts from the Bad Debt Reserve);

- The use of the debit memos to conceal the customer overpayments in the Bad Debt Reserve (via the reversal of the November 2000 Debit Memos); and

- The lack of an appropriate process to refund money (via Oracle's issuance of refunds more than two years after the money had been appropriated in the Bad Debt Reserve).

**Specific Examples of Oracle's Improper Accounting for Unapplied Cash and Use of Debit Memos**

47. I have been provided with a script output that Oracle represents to contain a complete record of its accounting for customer related activity (e.g., invoices, payments, credit memos, and refunds) related to 926 of the November 17, 2000 debit memo invoices (the "Debit Memo Script Output").[104]   I have included below detailed examples of transactions within the Debit Memo Script Output that exhibit Oracle's improper accounting with respect to customer overpayments associated with debit memos.

*The Ameritrade Sevices ("Ameritrade") Overpayment*

48. The following timeline illustrates Oracle's impropriety with respect to Ameritrade:

- On October 22, 1999, Oracle received a cash receipt of $246,514.49 from Ameritrade.  According to Oracle, this receipt was a duplicate payment on invoice #1165172.  Oracle assigned #100958 to this receipt, and put the funds in Acct. 25005 (Customer Overpayments), as "Unapplied."

---

[104] NDCA-ORCL 1058909.  The Debit Memo Script Output includes transactions from September 1986 to May 2006.

- On August 5, 2000, Oracle transferred receipt #100958 from its Customer Overpayments account (25005) to its Bad Debt Reserve (12601).

- On August 25, 2000, Oracle changed the status of receipt #100958 from "Unapplied" (available for refund or credit to the customer) to "On Account" (which signaled Oracle staff to leave the receipt in the reserve).[105]

- On November 17, 2000, Oracle created debit memo invoice 55000390 for $246,514.49, which caused the status of the receipt to change from "On Account" to "Applied."

- On November 8, 2002, Oracle processed Credit Memo #7244611 for $246,514.49, and applied it to Debit Memo 55000390. This reduced the value of the debit memo to $0, and caused cash receipt #100958 for $246,514.49 to become Unapplied and once again, "visible" to Oracle's collections staff.

- On November 24, 2002, Oracle reversed the transfer of the receipt out of its Bad Debt Reserve and back to the Customer Overpayments account.

- In February 2003, Oracle refunded the $246,514.49 it had received in October 1999 to Ameritrade. The refund was approved by Mike Quinn and then by Brad Nelson, as "Duplicate payment of Invoice#1165172-please refund."[106] On February 19, 2003, Oracle created accounts payable invoice #AR5340971 and processed a refund check #1539062 for $246,514.49, which Ameritrade deposited.

*The Kforce.com Overpayment*

49. The following timeline illustrates Oracle's impropriety with respect to Kforce.com:

- In November 1999, one of Oracle's customers, Kforce.com, made an overpayment of $258,241.84.

---

[105] As described above, the receipt was On Account, it was still "visible" by Oracle staff as an outstanding Unapplied receipt.
[106] NDCA-ORCL 1485948-67 at 1485949, line 8.

- October 2000 – amount was transferred *from* Oracle's account 25005 "Customer Overpayments" *to* the Bad Debt Reserve Account 12601.[107]
- November 2000 – the overpayment was applied to a debit memo invoice.
- February 2001 – a portion of the overpayment, $92,333.41, was refunded.
- November 2002 – two years later, the debit memo transaction was reversed, and
- March 2003 – over three years after the payment was received, the remainder of the overpayment amount was finally refunded to Kforce.com as part of the 2002 Unapplied Cash Clean-up.

50. I believe that Oracle's conduct related to Ameritrade and Kforce.com demonstrates its improper mischaracterization of Customer Overpayments in the Bad Debt Reserve, concealment of the overpayments using the November 17, 2000 debit memo invoices, and its improper withholding of customer overpayments.

## **Oracle's Refund to Household Demonstrates the Improper Application of the November 17, 2000 Debit Memos to Cash Receipts from Customer Overpayments**

51. Based upon my review of the Debit Memo Script Output, and other supporting documents, it appears that Oracle's conduct related to debit memo overpayments from Household, one of its customers, demonstrates the impropriety of its retention of, and accounting for, cash receipts from customer overpayments.

## Analysis of Oracle's Accounting for the $76,645 Household Overpayment

52. Oracle withhheld this overpayment for over seven years, until 2002, when persistent efforts by Household were undertaken to finally obtain a refund of its cash. The table below summarizes the sequence of events surrounding the application of a debit memo

---

[107] Oracle personnel have testified that this transfer was improper. *See* Deposition of Tom Williams, June 7, 2006, 177:7-15, "Well, to answer your question – I mean, we went through the one example with the 12601. That was an example of where it should not have moved to 12601. But my assumption is that the collector, probably doing their best, couldn't figure out where it belonged and so transferred it to 12601. Obviously subsequent to that found out that that was not the correct entry. It was restored to unapplied cash and refunds were given to the customer."

on November 17, 2000 to an overpayment received from Household in 1994.[108]  The
letters in the 2nd column (i.e., "A") reference a related section below where the activity on
that particular date is further analyzed.  In those instances when there is no entry in the
table, there was no activity related to that particular event.

| Date | Significant Transaction Events and Oracle's Related Accounting | AR (Asset) *Entry* | AR *Balance* | Customer Over-payments (Liability) *Entry* | Customer Over-payments *Balance* |
|---|---|---|---|---|---|
| 10/26/94 | A – Oracle issues invoice. | $60,180 | $60,180 | | |
| 11/17/94 | B – Household makes a $76,645 payment.  Oracle records the overpayment. | $(60,180) | $0 | $(16,465) | $(16,465) |
| 11/17/94 | C – Household cancels the order.[109] | | | | |
| 1/1/95 | D – Oracle "unapplies" the remaining overpayment due to C. | $60,180 | $60,180 | $(60,180) | $(76,645) |
| 1/31/95 | E – Oracle issues a credit memo, and places the overpayment On Account. | $(60,180) | $0 | $0 | $(76,645) |
| 11/17/00 | F – Oracle "applies" a debit memo to Household's Overpayment.[110] | $0 | $0 | $0 | $(76,645) |
| 5/23/02 | G – Oracle reverses "E" and "F" and issues a refund. | $0 | $0 | $76,645 | $0 |

*A – Oracle Issues Invoice # 498798*

On October 26, 1994 Oracle issued a sales invoice to Household for $60,180,[111] resulting in an
Accounts Receivable balance of $60,180 due from Household. [112]

---

[108] As noted, this table summarizes the net impact of the accounting entries recorded by Oracle.  There were other accounting entries that were recorded to effect these transactions, however, the net accounting for these items remains as presented in the table.
[109] Oracle did not record any accounting entries until it responded to the cancellation in January 1995.
[110] There are a number of entries recorded to apply the Debit Memos to the overpayments, however, the net impact of the Debit Memos on this date is zero.
[111] NDCA-ORCL 776172-73, Invoice.
[112] NDCA-ORCL 1058909.

*B – Household Overpays Invoice # 498798*

Household made a payment on November 17, 1994 in the incorrect amount of $76,645.04.[113] Oracle applied the payment to invoice # 498798.[114]  The remaining unapplied portion of the cash receipt, $16,465.04, was recorded as a balance in the Customer Overpayments account 25005.

*C – Household Returned the Product and Cancelled the Order Underlying Invoice 498798*

Also on November 17, 1994, Household returned the product and cancelled the October 26th transaction.[115]

*D – Oracle Unapplies the Household Overpayment*

On January 1, 1995, pursuant to Household's cancellation of the order, Oracle unapplied the $60,180 payment from Household.  This transaction restored the balance of Accounts Receivable to $60,180, and increased the total Customer Overpayment balances by the same amount. Consequently, at this time, the Debit Memo Script Output demonstrates that the <u>entire</u> $76,645.04 overpayment from Household was recorded within the Customer Overpayments account 25005.

*E – Credit Memo # 528719 is Created to Formally Cancel Invoice # 498798 But Oracle Does Not Refund the Money to Household*

The credit memo formalizing Household's cancellation of the order was created on January 31, 1995.[116] This credit memo reversed the revenue from the October 26, 1994 sale and the related accounts receivable balance.   At this time, Oracle also designated the Household overpayment as On Account, which signaled to Oracle's collections personnel that this amount was not to be utilized.  Consistent with Oracle's practice, I have seen no evidence that Oracle sent this credit

---

[113] NDCA-ORCL 1058909.
[114] NDCA-ORCL 1058909.
[115] *See* Oracle Call Notes at NDCA-ORCL 649588-650316:  "sw MARIE AND this has a rma 2042868 and the prod was returned 11/17, 2 inv already credited (support) Check 67021191 for 76k needs to be returned wil e-mail ar," "per rma #2044580 cust to get full refund and full amt to have sys cm gener ated."
[116] NDCA-ORCL 776162-63.

memo to Household.  At the time this credit memo was issued, Oracle should have refunded the entire receipt, which was an overpayment, to Household.

*F – Oracle Applied Debit Memo #55040598 to the Overpayment from Household.*

According to the script output, from January 1995 to November 2000, the $76,645.04 payment remained designated On Account, and could be seen by Oracle personnel as an unapplied cash payment from Household.  On November 17, 2000, the $76,645.04 balance in the Customer Overpayments account 25005 was applied to debit memo invoice # 55040598.[117]  As described above, after the cash receipt was applied to a debit memo, Oracle's personnel would no longer have been aware of this amount as unapplied and outstanding.[118]

*G – Oracle Reverses Debit Memo #55040598 and Finally Refunds Household's Overpayment*

Household engaged a third-party consultant, Profit Recovery Group ("PRG") to determine whether it had inadvertently made any incorrect overpayments to any of its vendors.  After conducting its research procedures, PRG concluded that Household had made 14 overpayments to Oracle totaling $178,346.77.  The $76,645.04 was identified as one of these overpayments.

PRG's process to obtain a refund included several examples of Oracle's resistance to refunding the cash receipts from the overpayments even though the amounts were maintained in Oracle's Customer Overpayments account.   Household's correspondence regarding this refund process demonstrates its frustration with Oracle (*see* paragraph 7).

Ultimately, the Household refund was approved by Tom Williams, Michael Quinn and others at Oracle.[119]  The date on the refund check provided to Household was May 23, 2002.[120]

Oracle Failed to Provide the SEC with Important Evidence Regarding the Household Refund

---

[117] NDCA-ORCL 776174, Oracle Debit Memo Invoice.
[118] *See* for example, NDCA ORCL 313986-88.  The debit memo invoice on November 17, 2000 caused the overpayment to be removed from the accounts receivable aging report.
[119] NDCA-ORCL 614018-614023.  *See also* e-mail from Tom Williams to Michael Quinn (with cc's) entitled "REFUND: Household Finance ($178,346.77)," NDCA-ORCL 1070329
[120] HI0000001-02.  This check was in the same amount identified above, $178,346.77.

53. In October 2003, Oracle made a presentation to the SEC, which had inquired with the company about allegations in the Second Amended Complaint.  During its presentation to the SEC, Oracle presented evidence that the Household refund related to a corresponding debit memo had occurred on April 27, 1995 and its presentation materials did mention any subsequent refund activity.[121]   The evidence included a "screenshot," showing a check to Household for $76,645.04.  However, according to Oracle's Debit Memo Script Output this refund did not occur.[122]

54. Instead, the Debit Memo Script Output and other evidence, including the May 2002 check, demonstrate that this Household payment was not refunded until May 2002.  During the entirety of the time between January 1995 and May 2002, the overpayment from Household was improperly maintained by Oracle in its Customer Overpayments account 25005.

## Additional Opinions Regarding the November 2000 Debit Memo Transaction

55. Other than my opinions, already expressed above, I do not offer an opinion about the total financial statement impact of the transactions relating to all $692 million from the 46,881[123] debit memo transactions in Q2FY01.

56. The primary reason for this is that Oracle produced a Debit Memo Script Output containing information relating to only 926 debit memos, or about 2% of the total debit memo transactions.  Although the 926 debit memos comprise $535 million (77%) of the $692 million total dollar value of the 2QFY01 debit memo population, Oracle did not produce the full audit trail and source evidence concerning the other $157 million in debit memo transactions.

57. Furthermore, the evidence produced in connection with the 926 debit memos and the Debit Memo Script Output appears incomplete.[124]  For example,

---

[121] NDCA-ORCL 050209, 050221-30, "Presentation to the SEC Staff on Behalf of Oracle Corporation."  NDCA-ORCL 314031, Payment Overview screenshot.

[122] *Id*.  Oracle also provided incomplete information with respect to payments of $45,000 and $25,000 that were refunded to Household in May 2002.

[123] I further note that to the extent it exists, I was unable to review Debit Memo 55041671 because the data was not produced.  *See* NDCA-ORCL 282677.

- As noted above, the 926 debit memos were applied to $535 million of unapplied cash receipts. However, this amount is a subset of Oracle's total cash received on these transactions. The total receipts where some portion was later applied to one of the 926 debit memos exceeded $1.5 billion. Therefore, there is more than $1 billion for which Oracle's script output shows receipt of cash, and their placement into customer overpayments account 25005 as "unapplied" cash, but does not show Oracle's subsequent accounting for this unapplied cash.[125]

- I understand that discovery of transfers from customer overpayments was limited to transfers to account 12601 (Bad Debt Write Offs); however, in the sample of 926 debit memo transactions, there are transfers from customer overpayments to other accounts that impact earnings that I was unable to review sufficiently to reach conclusions as to their propriety.[126]

- There are numerous "one-sided" journal entries (a debit without a corresponding credit or vice-versa).[127]

- Many wire transfers have dates that appear inaccurate.[128] Oracle's former controller, Tom Williams, was unable to provide an explanation for this anomaly.[129]

- Certain apparently relevant tables were excluded from the Debit Memo Script Output, including:[130]

  i. AR_APPROVAL_ACTION_HISTORY (Approval and change history for invoice adjustments);

---

[124] Although the Debit Memo Script Output appears incomplete, it yielded substantial useful information pertaining to the 2QFY01 debit memos. For example, more than half of the transfers to account 12601 and significant details thereof were contained in the Debit Memo Script Output. These general ledger details greatly assisted my review.
[125] NDCA-ORCL 1058909, Debit Memo Script Output.
[126] NDCA-ORCL 1058909. *See*, e.g., Debit Memo 55003311, $223,770 transferred from customer overpayments to Interest Income (Account 60000) on November 5, 2000, Debit Memo 55045661, $100,000 transferred from customer overpayments to Conference Income (Account 53207) on October 1, 2000.
[127] *See* the Ameritrade example above.
[128] *See* Debit Memo 55003501 (KForce.com), which indicates that an incoming wire transfer dated February 3, 2000 was received by Oracle on November 15, 1999.
[129] Deposition of Tom Williams, June 7, 2006, 239:7-17.
[130] *Compare* Elam Deposition Ex. 18 (letter to Judge Infante from Peter Wald, *with* attached declaration of Terry Elam, regarding Oracle general ledger "Public Table List") to NDCA-ORCL 1058909 (Debit Memo Script Output).

    ii.  AR_MEMO_LINES_ALL (Standard memo lines for debit memos, on account credits, debit memo reversals, and chargebacks);

    iii.  GL_BALANCES (Account balances for both detail and summary accounts);

    iv.  GL_JE_LINES (Journal entry lines);

    v.  RA_CUSTOMER_TRX_ALL (Header-level information about debit memos, chargebacks, commitments and credit memos); and

    vi.  RA_CUSTOMER_TRX_LINES_ALL (Invoice, debit memo, chargeback, credit memo and commitment lines).

58. Additionally, I understand that more than 800,000 pages of documents relating to the 2QFY01 debit memos, the transfers of unapplied cash to the bad debt reserve in 2Q01, and the 2002 Unapplied Cash Clean Up were not produced until January and February 2007. At this time, nearly all of the depositions relied upon in my report had already been taken, including Jennifer Minton, Thomas Williams, Michael Quinn, Greg Myers, Molly Venkataramana, Terry Elam, Ryan Roberts, Julie Chan, Jason Sevier, Gary Matuszak, Sanjay Kumar, Raul Campos and Ian Hatada. It is my understanding that plaintiffs were not able to question these witnesses about most of the 800,000 pages of documents relating to the transfers, the financial impact and the ultimate resolution of the debit memo transactions.

59. There are indications of other transactions and documents related to 2QFY01 debit memos that were not made available which would have assisted my review. Set forth below are some examples:

- Documents suggest that there were more than 46,881 relevant debit memos. For instance, a listing of debit memos produced by defendants references at least 48,224 debit memos.[131] This indicates that there are at least several hundred other relevant debit memos I was unable to review, in addition to the approximately 46,000 discussed above.

---

[131] NDCA-ORCL 1482578-5581, NDCA-ORCL 048716, MOT 00078 (Debit Memo 55047106 for $200,000 to Motorola, dated December 21, 2000), PRG 29740 ($200,000 refund recovery in May 2002 from Oracle on behalf of Motorola).

- I understand from plaintiffs' counsel that approximately 2 boxes of Oracle audit and review workpapers from Arthur Andersen were not produced, except for 100 pages. Based on my experience, the sections I would expect to see, but were not produced, include financial reporting and reporting support, revenue, expenses, Arthur Andersen's bad debt review analysis from 1Q01, 2Q01 and 3Q01,[132] portions of accounts receivable, portions of customer advances and unearned revenue accounts payable, contingent liabilities, partner memos, planning and summary engagement memos, and high level workpapers ordinarily found in what auditors know as the "General Binder." These audit and review workpapers, to the extent they exist, may have assisted my review.

60. As part of my analysis and opinions concerning Oracle's accounting for unapplied cash, customer overpayments and debit memos during 2Q01, I reviewed plaintiffs Revised Second Amended Complaint. My understanding is that plaintiffs initially alleged that Oracle improperly recognized revenue and earnings of approximately $228 million in connection with the debit memo transactions in November 2000. My understanding is that plaintiffs' allegation was based in part on a statistical extrapolation performed by a statistical expert. I offer no opinion about that statistical extrapolation, and I do not conclude on the $228 million allegation because of the limitations on the data available for my review, set forth above.

61. As a result, other than my opinions offered above, I am uncertain as to the overall financial statement impact of (1) the 926 debit memo transactions, (2) the 46,000+ 2Q01 debit memo transactions, and (3) which accounts of Oracle, other than account 12601, the 2Q01 debit memos impacted. Because of these uncertainties, I have not reached an opinion regarding the full impact of the 2QFY01 Debit Memos beyond those already expressed in this report.

## V.   Detail of Opinions Regarding Oracle's Improper Accounting for Its Transaction with Hewlett Packard in 2QFY01

62. In my opinion:

---

[132] AA 00035, "see further discussion of reserves at B-15" (B-15 was not produced.)

a. As of November 30, 2000, the HP transaction did not meet the criteria necessary under GAAP for revenue recognition.

b. As a result, in 2QFY01, Oracle's revenue and pre-tax earnings were improperly inflated by $19.9 million.

c. The improper revenue recorded by Oracle on this transaction enabled Oracle to report 2QFY01 EPS of $0.11.  If Oracle had reported earnings that were consistent with GAAP, its EPS would have been $0.10.[133]

**Summary of Oracle's "Round-Trip" Transaction with Hewlett Packard in 2QFY01, and the Improper Recognition of $19.9 million of License Revenue.**

63. As 2QFY01 came to a conclusion on November 30, 2000, Oracle worked with HP in order to close a significant software and hardware "round-trip" or "swap" arrangement. In one of the many e-mails leading up to, and on, the last day of the quarter, Oracle noted "HP confirmed again today they're willing to do a Q2 CRM deal in some amount if we can pull together machine requirements into a binding PO and resolve the development issues we're working on….HP is willing to buy as much CRM from Oracle as we buy in [Hardware], Support and other requirements from HP."[134]

64. In fact, the evidence, including an internal Oracle e-mail below, indicates that HP did not need the software that it purchased from Oracle at that time.

> Sandy/Frank:  HP confirmed today that they will try and pull the CRM portion of the order off providing we deliver what we have outlined in Development and Production systems.  **Since they (HP) don't need ALL the license users right now they are hedging on how big an order they will do until they see how**

---

[133] *See* the discussion of the materiality of this difference in the conclusion regarding the impact of the transfer of the customer overpayments to the Bad Debt Reserve and the related adjustment to Oracle's revenue.

[134] *See* NDCA-ORCL 055958 – Conway Snyder of Oracle, wrote an e-mail to Juan Jones, now Senior Vice President at Oracle, that included certain details leading up to the final execution of the Agreement between HP and Oracle, including the deal being contingent upon Oracle's commitment to purchase HP hardware.  The date of this original e-mail is not available as it pertained to e-mail history existing under an e-mail from Michael DeCesare to Edward Sanderson, Executive Vice President and Kurt Speck dated November 9, 2000. In fact, the e-mail from Snyder was forwarded twice that date to multiple individuals within Oracle including, Sanderson, DeCesare, Rocha, and Roberts.  (Emphasis added.)

**much production hardware Oracle comes back with.  If this turns out to be a large number we could get the entire order.**[135]

65. These negotiations were important to Oracle because as 2QFY01 neared completion, its revenues and EPS were just short of previously forecasted levels.[136]  The contemporaneous evidence demonstrates that the negotiations between the two companies on these arrangements involved their most senior executives including, Larry Ellison, Oracle's CEO and Safra Catz, Executive Vice President of Global Business Practices and Business Development, and Carly Fiorina, HP's CEO.  For example:

- Michael Rocha, Oracle's Executive Vice President, noted in an e-mail to Larry Ellison about Oracle's "25 million dollar opportunity (15m in CRM and 10m in technology)." Rocha wrote "Given the size of our software sales opportunity, you may want to agree that we'll purchase the (HP) hardware."[137]

- Ellison responded to Rocha in an e-mail on October 12, 2000, under the subject "Re: Carly Fiorina Meeting Update:" "Thanks for the update.  I will let you know how it goes. larry."[138]

- Mark Barrenechea wrote on November 11, 2000 to Ellison, Edward Sanderson, Executive Vice President, Micheal DeCesare, Oracle's Vice President of Sales – Western Region and others: "We have an opportunity to move a Q3 15M+ CRM order into Q2.  For this to occur we will need tight coordination between all the needed Oracle parties.  Because of this I am copying all the Oracle executives I believe need to be involved to make this happen….Provided HP has confidence

---

[135] NDCA-ORCL 055957, DeCesare wrote an e-mail dated November 9, 2000 (which included Conway's e-mail noted above) to three Oracle employees, including Sanderson, Frank Varasano, and Kurt Speck discussing the status of Oracle's then potential CRM deal with HP and the deal size being contingent upon Oracle's purchase of HP hardware.  (Emphasis added)

[136] NDCA-ORCL 410399-410415.  I have reviewed a series of forecast documents that appear to have been prepared by Oracle during the process to finalize its reported financial statements for Q2FY01.  These forecast document indicate that Oracle identified "potential" revenue of $2,640.5 million and EPS of $0.10 per share.  Ultimately, Oracle reported revenue of $2,659.5 million and EPS of $0.11 per share.  This difference of $19 million closely approximates the revenue related to the HP transaction recorded on the last day of Oracle's quarter.

[137] *See* NCDA-ORCL 028735-36.  The date of this original e-mail is not available as Oracle did not produce the original e-mail existing under an e-mail from Ellison to Rocha dated October 12, 2000. Ellison's e-mail contained the subject "Re: Carly Fiorina Meeting Update." In the e-mail, Ellison wrote: "Thanks for the update. I will let you know how it (the meeting) goes. larry"

[138] *See* NDCA-ORCL 028735.

that both companies have a common game plan on the development side and HP has confidence that Oracle is stepping up to all the hardware they feel we've already committed to purchase they have committed to move forward on the CRM order.  I believe we will need Larry to speak to Carly after we have the above needed documentation as a final step."[139]

- George Roberts, Oracle's Executive Vice President of North American Sales, wrote on November 30, 2000 to Catz, "I understand Larry (Ellison) and Carly (Fiorina) are discussing <u>their purchase of our products this quarter if we commit to purchase $20M - $30M of their product over the next 18-24 months.</u>"[140]

66. Sometime at the end of November or early December 2000, Oracle entered into the following round-trip arrangements with HP:

- Letter of Agreement (the "Oracle Purchase Commitment");
- Ordering Document and Onsite Support Services Exhibit (collectively the "HP Order Form"); and
- Oracle Lease Agreement (the "HP Term License Agreement").

67. For reasons discussed below, these agreements, unless explicitly noted, are collectively referred to hereafter, as "the HP Agreement."

68. SOP 97-2 provides the primary GAAP applicable to these transactions.[141]  SOP 97-2 states that an arrangement to sell software should not be recognized as revenue until *all* of the following criteria have been met:[142]

   a. Persuasive evidence of an arrangement exists;

   b. Delivery has occurred;

   c. The vendor's fee is fixed or determinable; and

---

[139] *See* NDCA-ORCL 020850-51 (DeCesare Deposition, Ex. 5)
[140] *See* NDCA-ORCL 025018.
[141] The American Institute of Certified Public Accountants' (AICPA) Statement of Position No. 97-2, Software Revenue Recognition (SOP 97-2)
[142] SOP 97-2, ¶8 states: "[R]evenue should be recognized when all of the following criteria are met. (1) Persuasive evidence of an arrangement exists. (2) Delivery has occurred. (3) The vendor's fee is fixed or determinable. (4) Collectibility is probable." This treatment is only appropriate for software that does not require significant production, modification, or customization of software.  This issue is addressed separately, later in this report (*see* paragraph 111).

d.   Collectibility is probable.

69. Pursuant to the HP Agreement, Oracle recognized $19.9 million of revenue on the last day of 2QFY01, November 30, 2000.[143]  This transaction was Oracle's largest revenue transaction in that period.[144]

70. However, as of November 30, 2000, Oracle substantially failed to meet any of the revenue GAAP recognition criteria.  Accordingly, Oracle overstated revenue in the amount of $19.9 million in 2QFY01.  This conclusion is reached, in part by Oracle's improper evaluation of the following accounting issues:

a.   Date references on the transmission of the documents between HP and Oracle, as well as on the documents themselves, indicate that the HP Agreement had not been duly executed as of November 30, 2000. Therefore, persuasive evidence of an arrangement did not exist at November 30, 2000;

b.   The HP Agreement should have been recorded on a "net" basis vs. a "gross" basis.  Oracle should have offset fees totaling approximately $30 million received from HP against the $30 million guaranteed to HP related to the hardware purchases involved in the swap transaction.  In other words, the total agreement fees were fully round-tripped between Oracle and HP, and the transaction accounting should have been netted to $0;

c.   Oracle failed to deliver a fully functional version of 11i product prior to November 30, 2000;[145]

d.   Oracle failed to appropriately consider HP's 15 day acceptance right in evaluating its revenue recognition assessment.  In other words, until December 15, 2000, at the earliest, HP had the right to reject Oracle's software;

---

[143] The remainder of the $29.8 million fees pertained to undelivered services to be provided subsequent to November 30, 2000 was deferred.
[144] *See* NDCA-ORCL 010007
[145] Testimony in this matter indicates that Oracle may never have delivered a functional version of the 11i product to HP.  See discussion at paragraphs 111 through 117 below.

e. Oracle failed to establish vendor specific objective evidence of fair value ("VSOE")[146] for certain undelivered elements under its 11 month term license arrangement with HP, which definitively precluded upfront revenue recognition;

f. Oracle failed to consider $30 million in refund rights included within the HP Agreement in its assessment of collectibilty; and

g. Oracle's subsequent granting of concessions indicated fees paid prior to the concessions were not fixed or determinable at the time of sale.

71. In light of these observations, the following table summarizes whether amounts due under the HP Agreement met the four GAAP criteria necessary to recognize revenue as of November 30, 2000:

| GAAP Revenue Recognition Criterion | Fail | Pass |
|---|---|---|
| Persuasive evidence of an arrangement exists | X | |
| Delivery has occurred | X | |
| The vendor's fee is fixed or determinable | X | |
| Collectability is probable | X | |

72. It is important to note that any *one* of the failures listed above would have prevented any gross revenue recognition prior to December 1, 2000.  The presence of all of these matters provides further clarity to my opinion that Oracle's recognition of $19.9 million in revenue in 2QFY01 related to the HP Agreement was improper.

**Oracle executes the "swap" agreements with Hewlett Packard**

73. As stated above, Oracle entered into the following round-trip or "swap" arrangements with HP:

- Letter of Agreement (the "Oracle Purchase Commitment");

---

[146] Vendor specific objective evidence of fair value for any contractual element is limited to (i) the price charged when the element is sold separately; or (ii) for an element not yet being sold separately, the price established by management having the relevant authority (it must be probably that the price once established, will not change before the element is sold separately).

- Ordering Document and Onsite Support Services Exhibit (collectively the "HP Order Form"); and

- Oracle Lease Agreement (the "HP Term License Agreement").

74. A description of each is provided below to better highlight Oracle's improper revenue recognition treatment of the HP Agreement.

75. _Oracle Purchase Commitment_– This particular agreement was the subject of discussions between Ellison and Fiorina, among other executives of the companies, late in the evening of November 30, 2000 (_see_ paragraph 64).  In fact, due to its large dollar value, it appears that a Special Meeting was convened to obtain the required approval from the Executive Committee of the Board of Directors of Oracle to enter into this agreement. The Executive Committee consisted of Ellison, Jeff Henley, who was Oracle's Chief Financial Officer, and Donald Lucas.  Lucas did not attend the November 30, 2000 Special Meeting.  Therefore, Ellison represented 50% of the voting authority at the Special Meeting, and the remaining authority was held by Henley.  The Executive Committee delegated relevant authority to Ellison when it gave him an "Approval of Purchase of Hardware and Services." Although Catz was not a member of the Executive Committee, she was present at the meeting on November 30, 2000.[147]  It was important for Oracle to hold this meeting because HP had made it clear that it would not purchase software from Oracle in 2QFY01 without the round-trip purchase of hardware from HP.

76. Among other obligations, this agreement committed Oracle to a non-refundable purchase commitment of $30 million in HP hardware.   Beginning on the effective date of the agreement, if Oracle failed to make hardware purchases of at least $15 million prior to both December 28, 2000 and September 30, 2001, it was required to pay HP a cash "cancellation fee" equal to the purchase volume shortfall for each respective period (not to exceed $15 million – collectively up to $30 million).

---

[147] NDCA-ORCL 044458, Minutes to the Special Meeting of the Executive Committee of the Board of Directors Oracle Corporation, November 30, 2000.  Ellison testified that there was only a "small list" of companies from which Oracle purchased both hardware and services.  Consequently, he believed that this approval related to HP (_see_ Deposition of Larry Ellison, September 21, 2006, 515:10-19).

77. The cancellation fee was structured so that Oracle guaranteed that it would pay HP $30 million, effectively "round-tripping" monies paid by HP to Oracle in connection with its software purchase referred to in paragraph 79. Purchase order deadlines and payment due dates were contractually established for Oracle.  In the absence of meeting these commitments, a cancellation fee would become due. The following table summarizes these dates and amounts:

| Purchase Order Commitment Date | Purchase Payment Date | Cancellation Fee Payable Date | Potential Cancellation Fee |
|---|---|---|---|
| December 28, 2000 | June 15, 2001 | June 30, 2001 | $15,000,000 |
| September 30, 2001 | December 31, 2001 | January 31, 2002 | $15,000,000 |

78. Oracle also made the following other commitments to HP:

    a.  Move 100% of its production data to HP UNIX servers by May 31, 2001;

    b.  Move 100% of its CRM development servers to HP UNIX servers by November 1, 2001;

    c.  Operate all CRM online services, the Oracle Store, the Oracle web-based customer interactions database, the Oracle defect management database, and The Oracle Platinum on HP UNIX services by November 1, 2001;

    d.  Agreed that HP would be the exclusive provider to the Company for these services listed as long as HP provides adequate standards of products and services; and

    e.  Complete a project plan and schedule with HP by January 31, 2001, to provide support to HP in parity with Sun Microsystems for a period of at least 3 years.

79. As elements of the HP Agreement, Oracle was required to determine the fair value of these obligations.  Since it is unlikely that Oracle had ever made similar commitments in the past, it is also unlikely that Oracle could have reasonably established the fair value of these commitments.

80. _The HP Order Form_ – The HP Order Form's stated effective date is November 30, 2000, which was the final day of Oracle's second quarter of fiscal 2001.  The HP Order Form included the following rights granted to HP by Oracle:

   a.    Perpetual rights to a specified amount of seats of the Company's Customer Relationship Management Marketing, Sales, Service and Call Center Software ("CRM");

   b.    License migration rights for certain specified existing licenses previously purchased by HP;

   c.    Rights to one year of  support and update subscription services for both the newly purchased software licenses as well as those migrated under pre-existing arrangements with HP; and

   d.    Rights to Oracle's Premium Technical Support Services, including up to 400 professional support service days to be provided to HP over a one year period.[148]

81. In exchange for these rights, HP was required to pay Oracle approximately $29.8 million. However, there were no payment terms provided within the HP Order Form.  Payment terms are a critical component of the determination that fees are fixed or determinable in accordance with SOP 97-2.

82. This incremental purchase of software, support and services incorporates the terms of the Original Software License and Services Agreement ("Original SLSA") between HP and Oracle.  One of the most important contractual obligations established by the Original SLSA was an Acceptance Period.  Specifically, the Original SLSA stated:

> For each Program License for which delivery is required under this Agreement, Client [HP] shall have a 15 day Acceptance Period, beginning on the Commencement Date, in which to evaluate the

---

[148] NDCA-ORCL 260109-14, Oracle Ordering Document; HP0045-49.

Program.  During the Acceptance Period, Client [HP] may cancel the license by giving written notice to Oracle…[149]

83. While several amendments were executed to the SLSA subsequent to its original execution date, including those under the November 2000 Agreements noted above, none appear to revoke this acceptance right. In regards to acceptance, SOP 97-2 states: "After delivery, if uncertainty exists about customer acceptance of the software, license revenue should not be recognized until acceptance occurs"[150]

84. Therefore, it would not have been appropriate for Oracle to have recognized any revenue under the HP Agreement until the acceptance right had expired on approximately December 15, 2000, or HP had explicitly provided Oracle with its acceptance.  I have seen no evidence to suggest that HP accepted Oracle's software by 2QFY01.

85. *HP Term License Agreement* – This agreement amended the HP Order Form by converting the perpetual license rights to an 11-month term. While the underlying products, support offerings, and services remained the same, HP's rights to the software products were limited to an 11-month term (vs. perpetual rights).  The HP Term License Agreement provided HP with several alternatives at the conclusion of the lease.[151]

86. Software revenue recognition interpretations note that it is not possible to establish VSOE on a term license of less than 1 year.[152]  Specifically, the guidance states: "For time-based software licenses with a duration of one year or less, the fair value of the bundled PCS services is not reliably measured…."  Therefore, since it was not possible for Oracle to establish VSOE, it was improper for Oracle to recognize license fees upfront on

---

[149] NDCA-ORCL 258189.  The Original SLSA provides the following definitions: "Program" is defined as "the computer software in object code form owned or distributed by Oracle and specified on the [HP] Order Forms for which Client [HP] is granted a license pursuant to this Agreement; the applicable Documentation; and Updates"; "Commencement Date" is defined as "the date on which the Programs are delivered to Client [HP], or if no delivery is necessary, the Effective Date set forth on the relevant HP Order Form."  NDCA-ORCL 258187.  Effective Date: February 23, 1994.

[150] SOP 97-2, ¶ 20 (emphasis added).

[151] For example, one of the options enabled HP to reacquire ("revert back to") the perpetual rights stipulated under the HP Order Form (as noted above) in exchange for an additional fee of approximately $2.1 million due December 1, 2001. Other options included a) terminating the agreement and returning the software, b) extend the licenses and services for an additional period, or c) extending the license on a month-to-month basis.

[152] Technical Practice Aids ("TPA") 5100.53, Fair Value of PCS in a Short-Term Time-Based License and Software Revenue Recognition (TPA 53)

November 30, 2000.  In this case, ratable revenue recognition was required, and virtually no time had passed between the time the agreement was executed and the quarter had ended.

87. As noted above, the total fees on the HP Order Form were approximately $29.8 million, however, the relevant payment terms were not defined therein.  Nonetheless, the HP Term License Agreement amended the HP Order Form and provided for Oracle to be paid as follows: [153]

| Due Date | Amount |
|----------|--------|
| Net 30 | $3,000,000 |
| 1-Apr-01 | 13,402,685 |
| 1-Nov-01 | 13,402,685 |
| **Total** | **$29,805,370** |

**Oracle's execution of the arrangements above are concurrent and dependent upon one another and should be accounted for as a single arrangement under GAAP.**

88. Technical Practice Aid 5100.39, *Software Revenue Recognition for Multiple-Element Arrangements*, states that the existence of any of the following factors (which are not all-inclusive) may indicate that a group of contracts should be accounted for as a single arrangement:

---

[153] In light of this amendment, payments due under the HP Term License Agreement and the Oracle Purchase Commitment were due around the same time, indicating that payments due Oracle coincided with the performance of Oracle purchase of hardware under the Oracle Purchase Commitment.  The following table reflects the payment timing of each:

| Due Date | Fees Due Oracle Under Term License Agreement | Potential Cancellation Fee Payable to HP |
|----------|----------------------------------------------|------------------------------------------|
| Net 30 | $3,000,000 | N/A |
| 1-Apr-01 | $13,402,685 | N/A |
| 30-Jun-01 | N/A | $15,000,000 |
| 1-Nov-01 | $13,402,695 | N/A |
| 31-Jan-02 | N/A | $15,000,000 |
| **Totals** | **$29,805,380** | **$30,000,000** |

- The contracts or agreements are negotiated or executed within a short time frame of each other; . . . .

- The fee for one or more contracts or agreements is subject to refund or forfeiture or other concession if another contract is not completed satisfactorily . . . [or]

- Payment terms under one contract or agreement coincide with performance criteria of another contract or agreement.[154]

89. Accordingly, based upon the following key indicators, the HP Agreement between HP and Oracle should be viewed as a single arrangement under GAAP:

|   | Indicators (TPA 39) | Present | Not Present |
|---|---|---|---|
| 1 | The contracts or agreements are negotiated or executed within a short time frame of each other.[155] | X | |
| 2 | The different elements are closely interrelated or interdependent in terms of design, technology, or function. | | X |
| 3 | The fee for one or more contracts or agreements is subject to refund or forfeiture or other concession if another contract is not completed satisfactorily (*see* paragraphs 123 through 133 ). | X | |
| 4 | One or more elements in one contract or agreement are essential to the functionality of an element in another contract. | | X |
| 5 | Payment terms under one contract or agreement coincide with performance criteria of another contract or agreement (*see* paragraph 90). | X | |

90. All of the agreements noted above appear to have been negotiated in contemplation of one another. That is to say, each of the agreements appears to have been and would only have been executed, providing all were signed.

91. Oracle itself noted in its "Revenue Recognition Review" summary of the HP transactions that the agreements were "signed concurrently."[156]   During depositions and within

---

[154] TPA 5100.39.

[155] All agreements appear to have effective dates of either November 30, 2000 or December 1, 2000, indicating they were executed within a short time frame of each other.

various e-mails, Oracle and HP employees further confirmed the inter-dependency of each arrangement:

a. DeCesare, Oracle's Vice President of Sales closest to the negotiations, testified: "HP agreed that they would buy a huge CRM order for us, from Oracle, if in return Oracle flipped all of the production and development systems from Sun over to HP." He further stated that the Oracle Purchase of Oracle licenses was **"absolutely"** dependent upon Oracle moving its development over to HP.[157]

b. In an e-mail to Ellison, Sanderson and Catz, regarding the status of the software license sale, DeCesare noted: "Consistent with Larry's conversations with Carly, HP will expect a purchase order for the following amounts [$20 million]. They will expect this purchase order to be binding and commit Oracle to using the full amounts by the dates we promise."[158]

c. Sanderson, characterized the negotiations in an October 2000 e-mail stating "we have a $25 [million] deal with hp this quarter that is dependent on putting details against larry's commitment [to have 100% of Oracle's data on HP hardware by June 2001]."[159]

d. A copy of the executed Oracle Purchase Commitment contains handwritten notes by Sanderson, stating "THE REAL STORY" and "**Is this the way we are going to do deals.  Each has to buy something [from each other]!**"[160]

e. Testifying as HP's person most knowledgeable about this transaction, Thomas Rathjens stated that the Onsite Support Services Exhibit simply "provides

---

[156] NDCA-ORCL 033958, Oracle USA Q2-FY01 Top 20 License Contracts Revenue Recognition Review.

[157] Deposition of Michael DeCesare, February 16, 2006, 59:18-21; 62:3-6.

[158] *See* NDCA-ORCL 020844, DeCesare Deposition, Ex. 3.  Ultimately, Oracle's purchase commitments were increased to $30 million.  *See* paragraph 77.

[159] *See* NDCA-ORCL 028737-38, Sanderson Deposition, Ex. 32.

[160] *See* NDCA-ORCL 020839 (emphasis added); Edward ("Sandy") Sanderson, Jr. Deposition, July 26, 2006, 521:10-14 wherein Sanderson acknowledges the handwritten notes to be his "Q. You see some handwriting on this document? A. Yes, I do. Q. Do you know whose handwriting it is? A. Looks like mine."

more detail"[161] to the HP Order Form, and the Lease Arrangement meant to convert the HP Order Form to a term license (from a perpetual license).[162]

92. Based upon the contemporaneous execution dates and the evident linked negotiations described above indicating that all agreements would only be executed collectively, the three agreements constitute a single arrangement under GAAP.  Accordingly, as noted above, these agreements are collectively referred to as "the HP Agreement."

**Evidence indicates that the HP Agreement lacked a valid business for HP other than to derive additional revenues.**

93. I have reviewed evidence that indicates that certain products sold under the HP Agreement lacked a valid business purpose.  This pattern suggests that those elements were sold solely to increase revenue.  This evidence includes the following examples:

   a. One HP employee, Sean Hickey, noted in an e-mail discussing a potential $13.1 million write-off of Oracle licenses, that the entire Oracle license purchase was merely an incentive for Oracle to help HP increase its revenue: "There were never any licenses that were purchased in the category of 'Expense category.  **These licenses were bought as an "incentive" for Oracle to help us increase HP's revenue.  They are probably most accurately categorized as a Headquarters SG&A expense, not IT.'"** [163]

   b. Rathjens testified: "I don't know why HP bought additional licenses….  My opinion was we had enough licenses at the time, and did not feel, personally, that we needed additional licenses at that point in time."[164]

94. To support an assertion that a business purpose existed, there is an expectation that the products acquired would be deployed and utilized.  In fact, HP never implemented certain

---

[161] Deposition of Thomas Rathjens, June 30, 2006, 58:12.
[162] Deposition of Thomas Rathjens, June 30, 2006, 60:4-6.
[163] *See* HP 00020, Rathjens Deposition, Ex. 8 (emphasis added).
[164] Deposition of Thomas Rathjens, June 30, 2006, 118:194-21.

significant modules of the software. Rathjens testified to his belief that the Inbound Call Center was never implemented[165] and acknowledged that HP didn't make a reasonable effort to implement the Mobile Sales or Incentive Compensation modules.[166]

95. HP's understanding about the implementation issues was shared by Oracle. In fact, **when Ellison was asked during his deposition whether HP had successfully implemented the software being sold to it by or licensed to it by Oracle in Q2FY01, Ellison stated "I don't believe so."**[167]

96. Also, as discussed above, the HP Agreement required Oracle to pay substantial cancellation fees in the event that the round-trip purchases were not made. The presence of the cancellation fees implied that the parties identified a risk that the products would not be deployed and utilized.

## Persuasive evidence of an arrangement *DOES NOT* exist at November 30, 2000.

97. The first basic criterion that must be met prior to revenue recognition pertains to evidence of an arrangement.[168] The table below addresses the areas where Oracle's accounting failed to appropriately consider GAAP relevant to this criterion:

| NO. | CRITERIA | INDICATE ANSWER | | | |
| | | YES | NO | INDETERMINABLE | REF. |
|---|---|---|---|---|---|
| 1.a | Was the contract duly signed prior to the end of the period? | | | √ | SOP 97-1, ¶17 |
| 1.b | Were reciprocating purchase and sales arrangements identified and properly evaluated? | | √ | | TPA 5100.38 |
| 1.c | Was the HP Agreement properly evaluated as either a monetary or non-monetary exchange under GAAP? | | √ | | APB 29, ¶2; EITF 86-29, ¶7 |

---

[165] Deposition of Thomas Rathjens, June 30, 2006, 76:22.
[166] Deposition of Thomas Rathjens, June 30, 2006, 98:6-10.
[167] Deposition of Larry Ellison, September 21, 2006, 516:20- 517:2.
[168] SOP 97-2, ¶17.

| NO. | CRITERIA | INDICATE ANSWER | | | REF. |
|-----|----------|-----|-----|-----|------|
| | | YES | NO | INDETERMINABLE | |
| 1.d | Given the effective netting of cash between both HP and Oracle (i.e. net boot exchanged < 25% of the fair value of the assets exchanged), was the HP Agreement properly accounted for pursuant to the fair value provisions of TPA 46 and TPA 47? | | √ | | EITF 86-29; ¶ 7; TPA 5100.46; TPA 5100.47; EITF 86-29 |
| 1.e | Did the exchange of assets under the HP Agreement constitute a business purpose to support Oracle's revenue recognition treatment pursuant to the fair value provisions of TPA 47? | | √ | | TPA 5100.47; EITF 86-29 |

98. SOP 97-2 explicitly stipulates:[169]

> Even if all other requirements set forth in this SOP for the recognition of revenue are met (including delivery), revenue should not be recognized on any element of the arrangement unless persuasive evidence of an arrangement exists.

99. Gary Matuszak, Arthur Andersen's lead audit partner on the Oracle engagement and former member of the AICPA task force on initiatives pertaining to SOP 97-2, further acknowledged this revenue recognition requirement specific to Oracle:

> Q. So if there was a case where on the last day of the quarter Oracle did not have a signed contract from a customer for a software license as of the night on the last day of the quarter, would that preclude revenue recognition under the terms of the policy?...
>
> THE WITNESS [Matuszak]: Generally, yes.[170]

100. There is evidence to suggest that the HP Agreement was not duly executed by HP and Oracle until after November 30, 2000. Specifically, despite the fact that certain of the portions of the HP Agreement bear an effective date of November 30, 2000, time

---

[169] SOP 97-2, ¶17.
[170] Gary Matuszak Deposition, August 1, 2006, 71:13-21.

stamped e-mails and faxes near midnight on that date detailing ongoing negotiations, as well as the following data, indicate that various contracts within the HP Agreement were not duly executed by such date:

a.  While including a stated effective quote expiration date of November 30, 2000,  the Onsite Support Services Exhibit to the HP Order Form,  contains a footer that notes "***HP onsite support 12/1/2000.***"  This date, typed into the agreement, indicates that the contract was not printed until December 1, 2000. Furthermore, the actual signatures on the contract are made without reference to a date and the only other indicators of the actual contract execution date are two fax dates and time stamps across the top and bottom of the signature page. Each show a date of December 1, 2000 and come from the same two fax machines noted below in paragraph 100b, HP HMCS and DMD.[171]

b.  The HP Order Form denotes a handwritten effective date of November 30, 2000.  However, the signature page contains the following fax header date and time stamps indicating the actual dual execution date of the HP Order Form may have been December 1, 2000 and not November 30, 2000 as was necessary to support Oracle's recognize recognition:[172]

(i)      November 30, 2000 at 11:53p.m. from the "Oracle Legal" fax machine;

(ii)     December 1, 2000 (the beginning of Oracle's fiscal Q3'2000) at 1:06 a.m. from the "HP HMCS" fax machine; and

(iii)    December 1, 2000 at 1:39a.m. from the "DMD" labeled fax machine.

c.  The HP Term License Agreement is silent as to the effective date of the arrangement.  Both signatures on the agreement are made without reference to a date.  In fact, the only indicators of the actual contract execution date are two fax date and time stamps across the top and bottom of the signature page

---

[171] *See* NDCA-ORCL 260009.
[172] *See* NDCA-ORCL 260004.

of the arrangement.  Each show a date of December 1, 2000 and come from the same two fax machines noted above in paragraph 100b, HP HMCS and DMD.[173]

101.    Based upon the information above, it appears that the HP Agreement was duly executed, **at the earliest**, on December 1, 2000.  Accordingly, it does not appear that persuasive evidence of an arrangement existed at November 30, 2000.  As a result, and without considering any other factors, no revenue should have been recognized until pervasive evidence of an arrangement existed. This would result in the reduction of $19.9 million in revenues for Oracle's 2QFY01.

**Oracle's revenue recognition analysis does not adequately support "gross" accounting.**

102.    As discussed in paragraph 92, the HP Agreement should be accounted for as a single arrangement. This treatment includes the round-trip payments of approximately $30 million **to and from** Oracle and HP.

103.    In May 2001, the SEC released a speech regarding revenue recognition in which it provided guidance to registrants related to the accounting for cross-payments and complex customer arrangements. Specifically, the SEC noted the following:

a.    "The [SEC] staff is concerned when it appears Company A has taken $1 million out of its left pocket only to receive that $1 million back in its right pocket, and wants to record the $1 million received in revenue."

b.    "The [SEC] staff questions how these types of 'round trip' arrangements result in revenue, and whether, in substance, they are sham transactions engineered solely to inflate the revenue line in the income statement."

c.    "[T]he company and its auditor should consider whether it is appropriate to report the related cash flows, revenues and costs on a gross or net basis."

---

[173] *See* NDCA-ORCL 260012.

104.     Oracle recorded the round-tripped monies due under the HP Agreement (approximately $30 million) as revenue or deferred revenue on a "gross" basis, assuming that approach to be appropriate under GAAP. However, I have seen no evidence to suggest that Oracle conducted an analysis pertaining to whether this accounting treatment was appropriate under GAAP.  Accordingly, I have conducted such an analysis below.

105.     To determine whether revenues should be reported on a "gross" or "net" basis, Oracle would have first determined whether the HP Agreement constituted a monetary or nonmonetary transaction under APB 29 and EITF 86-29.[174]

106.     However, irrespective of this determiniation, both APB 29 and EITF 86-29 clarify that Oracle should have accounted for the exchange using "fair value."

> Accounting for nonmonetary transactions should be based on the fair values of the assets (or services) involved which is the same basis as that used in monetary transactions.[175]

107.     This concept is expanded upon in TPA 47, which is specifically applicable to software vendors such as Oracle.  In order for Oracle to have properly recorded the exchange on a gross basis, this TPA states:

- The exchange should be recorded at <u>fair value</u> provided that the transaction has a <u>business purpose</u>;

- Fair value can be determined within reasonable limits (i.e., VSOE of software given up, or the value of the technology/products received, as if the software vendor had received or paid cash);[176] and

---

[174] Specifically, EITF 86-29 states: "The Task Force discussed an exchange of nonmonetary assets that would otherwise be based on recorded amounts but that also involves monetary consideration (boot) [i.e. cash exchanged, etc.].  The task force reached a consensus that the transaction should be considered monetary (rather than nonmonetary) if the boot is significant, and agreed that "significant" should be defined as at least 25 percent of the fair value of the exchange.  As a monetary transaction, both parties would record the exchange at fair value.  If the boot in a transaction is less than 25 percent, the pro rata gain recognition guidance in paragraph 22 of Opinion 29 should be applied by the receiver of boot, and the payer of boot would not recognize a gain.  The Task Force acknowledged that the ability to satisfactorily measure fair value is a prerequisite to the use of fair value."

[175] See APB 29, ¶18.

[176] VSOE (Vendor-Specific Objective Evidence of fair value) is defined in paragraph 10 of SOP 97-2 as either: (i) "The price charged when the same element is sold separately;" or (ii) "For an element not yet being sold separately, the price established by management having the relevant authority; it must be probable that the price, once established, will not change before the separate introduction of the element into the marketplace."

- The products received in the exchange are expected, at the time of the exchange, to be deployed and utilized, and the value ascribed to the transaction reasonably reflects such expected use.

108.    I have not identified evidence to suggest that the <u>fair value</u> of the assets exchanged pursuant to the HP Agreement was determined in accordance with GAAP. Specifically:

    a.  I have seen no evidence that Oracle had established VSOE (fair value) of its software, postcontract customer support ("PCS"), services, and other commitments sold/offered to HP in accordance with TPA 47.

    b.  I have seen no evidence that Oracle determined the fair value of those assets to be purchased from HP.

109.    As noted in paragraph 93, there are several indicators to suggest that HP did not need the software it purchased from Oracle and the only reason HP executed the HP Agreement was to generate additional revenue.    Therefore, there are real questions whether this transaction had a legitimate <u>business purpose</u>.

110.    In consideration of the fact that fair value does not appear to have been established, and the indication that a valid business purpose for the products exchanged under the HP Agreement did not exist, the gross basis of accounting applied by Oracle to the HP transaction, is not supportable under GAAP.

## The delivery criterion *DOES NOT* appear to have been met at November 30, 2000.

111. The second basic criterion that must be met prior to revenue recognition pertains to delivery.[177]   The table below addresses the areas where Oracle's accounting failed to appropriately consider GAAP as it relates to delivery:

---

[177] SOP 97-2, ¶ 18.

| NO. | CRITERIA | INDICATE ANSWER | | | |
|---|---|---|---|---|---|
| | | YES | NO | INDETERMINABLE | REF. |
| 2.a | Has a fully functional software product, not requiring significant modification or customization, been delivered? | | √ | | SOP 97-2, ¶¶7-8, 22 |
| 2.b | If the contract is subject to customer acceptance, have acceptance criteria been met? | | √ | | SOP 97-2, ¶20 |
| 2.c | For all other elements (PCS, services, etc.) of the arrangement that have not been delivered as of the end of the period, does vendor specific objective evidence of fair value (VSOE) exist? | | √ | | SOP 97-2, ¶¶10, 12; TPA 5100.53 |
| 2.d | If VSOE does not exist for any undelivered element, has the Company appropriately deferred all revenue until that element is delivered or over the period in which an undelivered service or PCS element is delivered? | | √ | | SOP 97-2, ¶12; TPA 5100.53 |

112. Prior to the execution of the HP Agreement, there is evidence that suggests the products previously licensed by HP had not effectively been implemented into production. This fact is relevant because additional seats of these same products as well as newly released software were purchased under the HP Agreement.  Karen Montague of HP noted in an e-mail attachment to various HP employees, including Rathjens:

> [Several] CRM products have had significant delays due to quality issues that precluded HP from utilizing these applications in FY [Fiscal Year]'01 and into FY'02…
>
> **OTS** – Product lacked forecasting as well as the universal working queue linkage was non-functional.  HP used sales online telesales rep. Applications. 0% usage in FY'01

**Marketing** – Many show stopper[178] patches are still outstanding. Product is still in pilot due to delay Ion bug fixes due to quality issues. 0% usage in FY'01

**Mobile Sales** – Lack of wireless connectivity and poor security on disconnect mode caused delay in product rollout. 0% usage in FY'01…

**Call Center** – 0% usage in FY'01 due to poor quality[179]

113. There is further evidence demonstrating that Oracle's software required significant customization prior to its implementation. For example, DeCesare commented on the significant level of effort required in connection with implementing Oracle's Software stating:

> [W]hen I sold an application deal, for the most part, it took between three and five service dollars to every one license dollar, and those service dollars were to configure, integrate and **customize.**[180]

114. Oracle released its E-Business Suite 11i (which included CRM) to the marketplace in May 2000. At that time it was touted by the Company as an "out-of-the-box solution that manages the entire life-cycle of the 'campaign-to-order' process."[181] Nonetheless, certain testimony and e-mails indicate that the software delivered to HP as of November 30, 2000 may have required significant production, modification or customization of the software. For instance,

    a. DeCesare testified: "[CRM] products were heavily over marketed.… I read through the complaint and look [sic] at that statement by Mark Barrenechea in there. It's not factual. It's not true. It does not operate as integrated out of the box. That's – that's false…Customers like HP…were furious after they started implementations. There's you know, quite a – quite a few examples of that."[182]

---

[178] DeCesare testified that a "showstopper" was "a piece of functionally that the customer requires that isn't currently in the product. *See* footnote 188.
[179] *See* HP 00074.
[180] Deposition of Michael DeCesare, February 16, 2006, 48: 19-23 (emphasis added).
[181] NDCA-ORCL 020894-96, PR Newswire; Oracle Equips Marketers With Tools Needed for E-Business Success, May 24, 2000.
[182] Deposition of Michael DeCesare, February 16, 2006, 234:15-25 and 235:1-5 (emphasis added).

b. DeCesare, further testified: "**the functionality [HP] believed the product was supposed to have – it just fundamentally didn't have**…. Like HP was having problems about support-to-sales-force automation, marketing-to-sales-force automation and those types of things, in addition to problems with the rest of the ERP…. [T]he statement that it [Oracle 11i] is completely integrated out of the box is, in my opinion a false statement…. The concerns the customer is having were **lack of functionality in the CRM** and potential integration issues to the ERP side…. **I'm talking about things that were advertised as functionality that just didn't work in the product**."[183]

c. Rathjens, HP's 30b6 witness testified: "some of the software [modules purchased in the November 2000 CRM deal] was more mature than other modules…. [Others] lacked the functionality that HP stakeholders felt they needed to deploy it."[184]

d. Rathjens further acknowledged that Oracle's software required significant fixes and customizations: "[W]e had thousands things we were tracking, probably in the nature of 20,000…. [T]housands of bugs, thousands of change requests, thousands of configurations."[185]

e. In fact, in an e-mail from Julie Cullivan, Sales Consulting Director, to Sanderson, dated January 31, 2001, three months subsequent to the purported delivery of the CRM software to HP, specified that the product lines ordered by HP were still functionally deficient.[186]

---

[183] Deposition of Michael DeCesare, February 16, 2006, 257:19-20, 259:4-8, 262:10-12, 266:23-25, 267:3-4 (emphasis added).

[184] Deposition of Thomas Rathjens, June 30, 2006, 84:7-9, 85:15-16.

[185] Deposition of Thomas Rathjens, June 30, 2006, 101:21-22, 102:1-2.

[186] *See* NDCA-ORCL 296486. (1) E-mail Center – "E-mail Center scenarios do not consistently work nor can you even get them to all work together;" (2) Call Center – "Call Center Intelligence data and breadth of reports is inadequate;" (3) Telesales – "Screenpops only work with Customer Care – should work with Telesales…;" (4) Service – "Service only supports that a customer is calling about one, non-configured product [and]…does not recognize parties to a service contract, it only validates against the end customer of an install base product;" and (5) CRM (in general) – "Customers set up in CRM app do not always work or show up in ERP [and]…CANNOT SHOW A COMPLETE INTEGRATED CRM DEMO LET ALONE A COMPLETE EBIZ SUITE (CRM/ERP) INTEGRATED DEMO."

f.   In another e-mail dated November 16, 2001, nearly 1 year following the effective date of the 2000 contract, Karen Montague of HP noted that the software was still not functioning properly [187]

115. On November 28, 2000, just two days prior to the purported delivery date, DeCesare noted: "HP has a critical go live in April 2001.  There have been 14 show stoppers that HP has raised of commitments Oracle needs to make to ensure those dates do not slip." DeCesare testified that a "showstopper" was "[a] piece of functionality that the customer requires that isn't currently in the product."[188] Rathjens of HP also affirmed this definition, testifying that a "showstopper" was "[s]ome piece of functionality that we wanted to see incorporated into the software."[189]

116. Based upon this understanding, the existence of even a single showstopper indicates that significant functionality did not exist in the product. Given that this e-mail was sent just two days prior to the purported effective date of the HP Agreement, it is unlikely that all 14 showstoppers had been delivered by November 30, 2000.

117. I have seen no evidence to suggest that Oracle considered these functionality shortfalls prior to the recognition of $19.9 million of revenue on November 30, 2000.  In light of the "showstoppers," the apparent complex integration and customization required and other functionality deficiencies, Oracle's upfront revenue recognition treatment was not in compliance with GAAP.

**The HP Agreement included a Term License, wherein certain undelivered elements lacked VSOE, therefore precluding the upfront recognition of revenue at November 30, 2000.**

---

[187] *See* HP 00062- 63.  (1) Regarding Telesales or OTS – "HP was having enough trouble getting the OTS software to work and decided to limit the OTS functionality to move into production in FY01 to just passing leads from OMO to OSO.  HP does not believe that the software will be ready until the 11.5.6 release is available fro Oracle and put into production at HP," (2) Regarding Inbound Call Center licenses – "Oracle did not deliver contractually on the licenses HP purchased, which were targeted for implementation by call center agents in conjunction with Sales Online," and (3) Regarding Sales Reps or OSO & Mobile Sales – "HP was informed in September'01 that the Mobile licenses do not include "wireless".  HP and Oracle have been discussing, throughout the year, wireless access because HP understood that the 9,045 Mobile licenses HP purchased [including those under the Agreement] included wireless."
[188] Deposition of Michael DeCesare, February 16, 2006, 72: 13-14.
[189] Deposition of Thomas Rathjens, June 30, 2006, 90: 22-23.

118. If VSOE does not exist for the allocation of revenue to the various elements of the arrangement, <u>all</u> revenue from the arrangement should be deferred until the earlier of the point at which, (a) such sufficient vendor-specific objective evidence does exist or (b) all elements of the arrangement have been delivered.[190]

119. There are certain instances wherein VSOE may not be established under GAAP. Specifically TPA 53 indicates that it is not possible to measure VSOE for term licenses with a duration of one year or less.[191]

120. The HP Agreement between Oracle and HP was an 11-month term license.  Bundled with that license were certain PCS service offerings.  As noted in paragraph 119, VSOE of fair value cannot be established for term licenses 1 year or less. Therefore, the total arrangement fee should have been recognized ratably over the license term, providing all other revenue recognition criteria had been satisfied.

121. Accordingly, I have concluded that the entirety of Oracle's upfront recognition of nearly $19.9 million as of November 30, 2000 was not in compliance with GAAP.

**The fixed or determinable and collectability criteria *DO NOT* appear to have been met at November 30, 2000.**

122. The table addresses the considerations under GAAP relevant to the evaluation of whether fees are collectible and fixed or determinable to substantiate revenue recognition applied:

**INDICATE ANSWER**

---

[190] SOP 97-2,¶12 makes the following relevant exception to this guidance: "If the only undelivered element is PCS, the entire fee should be recognized ratably [over the PCS period]."

[191] "For time-based [term] software licenses with a duration of one year or less, the fair value [VSOE] of the bundled PCS services is not reliably measured by reference to a PCS renewal rate.  The short time frame during which any unspecified upgrade provided under the PCS [postcontract customer support] agreement can be used by the licensee creates a circumstance whereby one cannot objectively demonstrate the VSOE of fair value of the licensee's right to unspecified upgrades.  Though a PCS service element may not be of significant value when it is provided in a short duration time-based license, SOP 97-2 does not provide for an exception from its provision that VSOE of fair value is required for each element of a multiple-element arrangement.  Consequently, when there is no VSOE of the fair value of PCS services included (bundled) in a multiple-element arrangement, even if the arrangement provides a short duration time-based software license, the total arrangement fee would be recognized under paragraph 12 [i.e. the entire fee should be recognized ratably over the license term]...."

| NO. | CRITERIA | YES | NO | INDETERMINABLE | REF. |
|-----|----------|-----|-----|----------------|------|
| 3 | ARE ALL PAYMENTS RECOGNIZED AS REVENUE CONSIDERED, COLLECTIBLE, FIXED OR DETERMINABLE IN ACCORDANCE WITH RELEVANT GAAP? | | √ | | SOP 97-2, ¶26 |
| 3.a | If a significant portion of the software license fee due after expiration of the license or more than 12 months after delivery, does the Company support its ability to successfully collect such fees without making concessions? | | √ | | SOP 97-2, ¶¶28-29 |
| 3.b | If any fees attributable to delivered elements are subject to forfeiture, refund, or other concession has the Company properly demonstrated its ability to meet the collectability criteria? | | √ | | SOP 97-2, ¶14 |

**Fees due under the HP Agreement appear to be subject to forfeiture or refund may not be deemed collectable under GAAP**

123. SOP 97-2 paragraph 14 states: "No portion of the fee (including amounts otherwise allocated to delivered elements) meets the criterion of collectability if the portion of the fee allocable to delivered elements is subject to forfeiture, refund, or other concession if any of the undelivered elements are not delivered.  In order for the revenue related to an arrangement to be considered not subject to forfeiture, refund, or other concession, management must intend not to provide refunds or concessions that are not required under the provisions of the arrangement."

124. All fees initially allocated to the term software license element and recognized at November 30, 2000 appear subject to forfeiture and/or refund. This is the result of the following two contractual terms under the HP Agreement:

a.  All fees due under the HP Agreement are cancellable as stipulated under the acceptance provisions within the Original SLSA.

b.  Oracle's binding commitment to pay $30 million to HP, regardless of whether it purchases HP products and services, may constitute an effective right of refund. If for example, Oracle does not purchase any hardware from HP through December 31, 2001, Oracle would be required to pay HP a "cancellation fee" of $30 million, in exchange, Oracle would receive zero value.

125. Based upon these provisions, to assert that fees recognized prior to November 30, 2000 are collectible would likely be inappropriate under GAAP.

**Fees due under the HP Agreement appear to be subject to concession and may not be deemed fixed or determinable under GAAP**

126. In addition to these collectability concerns, concessions granted before and after November 30, 2000 raise questions around the fixed or determinable nature of the fees due under the HP Agreement. SOP 97-2 paragraphs 27-28 state:

> Because a product's continuing value may be reduced due to the subsequent introduction of enhanced products by the vendor or its competitors, the possibility that the vendor still may provide a refund or concession to a credit-worthy customer to liquidate outstanding amounts due under the original terms of the arrangement increases as payment terms become longer.
>
> For the reason cited in paragraph 27, *any* extended payment terms in a software licensing arrangement may indicate that the fee is not fixed or determinable.

127. Under the HP Agreement, fees due Oracle were payable over an approximate 11 month period. While Oracle's standard payment terms are not defined within its 2001 Form 10-K, the existence of concessions granted subsequent to November 30, 2000 indicate fees due under the arrangement may not have been fixed or determinable.

128. As noted in paragraph 102 above, HP experienced various implementation problems with certain of the 1999 purchased CRM software. In an e-mail dated November 28, 2000,

DeCesare attaches an HP/Oracle Partnership Agreement wherein the following was noted:

> Over the past 8 weeks Oracle (Mike Decesare) and HP (Phil May....) have been working on a series of concessions that has been requested by HP before they move forward on the purchase of the additional CRM licenses….  Karen Montague currently has the order document.  Highlights include…[$]921K has been deducted from the support [fee] to accommodate all the support related concessions HP raised….  An additional [$]828K has been deducted from the consulting services to accommodate all the consulting relate[d] concessions HP raised…[192]

129. The existence of past concessions, particularly with the same customer may be a strong indication that concession risk exists. Affirming the validity of this concession risk at November 30, 2000, in connection with the HP Agreement, nearly 13 months subsequent to its purported execution date, Oracle added the following programs to the 2000 HP Order Form free of charge:

| Perpetual Licenses: | Quantity | Not Included in HP Agreement** |
|---|---|---|
| *Internet Application Server Enterprise Edition Options:* | | |
| - Wireless Option | 9,826 | |
| | | |
| *Oracle E-Business Suite - Marketing:* | | |
| - Advanced Marketing Online | 1,375 | |
| - Marketing Intelligence | 1,375 | X |
| | | |
| *Oracle E-Business Suite - Sales:* | | |
| - TeleSales | 2,637 | |
| - Wireless Option for Sales | 9,826 | X |
| - Partners Online | 5,500 | X |
| - Sales Intelligence | 11,256 | X |
| | | |
| *Oracle E-Business Suite - Service:* | | |
| - Service Intelliigence | 1,650 | X |
| - Customer Intelligence | 85,000 | X |
| | | |
| *Application Technologies Interaction Center:* | | |

---

[192] *See* NDCA-ORCL 020845.

| Perpetual Licenses: | Quantity | Not Included in HP Agreement** |
|---|---|---|
| - Interaction Center Intelligence | 2,000 | X |
| | | |
| ** Marks in this column indicate new modules not part of the original HP Agreement | | |

130.     As noted in the table above, many of these rights not only expanded the number of licenses to products Oracle sold HP under the original HP Order Form, they also granted rights to newly specified modules not sold to HP.

131.     One specific instance of this involves the rights granted HP to the newly added Partner Online licenses. Rathjens of HP testimony elaborates on the granting of such rights subsequent November 30, 2000:

> [Other unspecified HP employees] and I felt that the Partner Online licenses [seats conceded] were part of the Oracle Sales Online licenses. And when Oracle came out with a new module called Partner Online[193], I felt we were entitled to – to those licenses and should not be paying additional license fees for those.[194]

132.     There is a key distinction to be made here in that granting rights to previously undelivered, newly specified modules (vs. modules specified under the original HP Order Form) free of charge, demonstrates that the fee committed to at November 30, 2000 was committed to assuming such modules would be delivered. Ironically, in a summary prepared by HP in connection with the ongoing implementation issues of Oracle's products, the following was noted:

> In November '00 Oracle Purchase[d] Partner Online (POL) licenses, which was verbally communicated to HP by Oracle to be included in Oracle's Sales Online product…The nature of the negotiation was that HP had purchased enough POL licenses to license the HP enterprise![195]

133. Given the underlying concession risk and the subsequent realization of these concessions, fees due under the original Order Form were not fixed or determinable.  Accordingly,

---

[193] Partner Online is purported to have been available during the winter of 2000/2001, subsequent to November 30, 2000.  *See* Rathjens Deposition, Ex. 9; HP 00008-12.
[194] Deposition of Thomas Rathjens, June 30, 2006, 113:18-22.
[195] *See* HP 00063.

revenue from such fees should have been deferred at November 30, 2000 until the earlier of the point at which (a) VSOE exists for all undelivered modules or (b) all modules have been delivered.

134. Based upon both the right of refund and concession risk at November 30, 2000, fees due Oracle appeared neither collectability or fixed or determinable as defined under SOP 97-2 at November 30, 2000. Accordingly, no revenue should have been recorded in accordance with GAAP.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 16th day of October, 2008, at San Francisco, California

Respectfully Submitted:

Signature:  _____

D. Paul Regan, CPA, CFE

# APPENDIX 1

## *Glossary*

Applied –  Payment in which you record the entire amount as settlement for one or more debit items.[196]

Credit memo – A document which partially or fully reverses an original invoice.[197]

Debit memo – Debit that you assign to your customer for additional charges that you want to collect.  You may want to charge your customers for unearned discounts taken, additional freight charges, taxes, and finance charges.[198]

Invoice – A document that you create in Oracle Receivables that lists amounts owed for the purchases of goods or services.  This document also lists any tax and freight charges.[199]

On Account  –  Payments where you intentionally apply all or part of the payment amount to a customer without reference to a debit item.  On account examples include prepayments and deposits.[200]

Unapplied payment – The status of a payment for which you can identify the customer, but you have not applied or placed on account all or part of the payment.  For example, you receive a check for $1,200 and you pay an open debit item for $1,000.  The remaining $200 is unapplied until you either apply the payment to a debit item or place the amount On Account.[201]

Unidentified payment – The status of a payment for which the customer is unknown.  Receivables retains unidentified payments for you to process further.[202]

---

[196] NDCA-ORCL 048663-83, Oracle Receivables User's Guide, Release 10SC, March 1997, Glossary at 048658.
[197] *Id*. at 048663.
[198] *Id*. at 048665.
[199] *Id*. at 048670.
[200] *Id*. at 048672.
[201] *Id*. at 048682.
[202] *Id*. at 048682.

# EXHIBIT 2

**From:** MICHAEL.QUINN [MICHAEL.QUINN@oracle.com]
**Sent:** Monday, October 21, 2002 7:24 AM
**To:** ryan.roberts@oracle.com; greg.myers@oracle.com
**Cc:** thomas.williams@oracle.com; michael.quinn@oracle.com
**Subject:** Re: Unapplied Cash Project

Ryan, Greg,

Below is the action plan for addressing the problems surrounding the unapplied cash issues that you guys worked on last week.

There are three deliverables:

- We need to provide an update to the Audit Committee (a subcommittee of Oracle's Board of Directors) in regards to what Revenue Impact this process of taking unapplied cash receipts to the reserve will have on our financial statements. In addition, we need to provide what impact this process has had on revenue in each of the last 8 quarters. The update will be provided to the Audit Committee THIS WEDNESDAY.
- We need to clean up the ENTIRE problem prior to the end of October by moving cash receipts to the proper buckets (unapplied, customer overpayments, or on account), as appropriate
- We need to establish new policies and procedures to ensure this never happens again

What needs to be done:

- For items currently "On Account," we need to continue to work through each item >$10,000 to determine 1) what should have happened to the cash reciept and 2) make the correction to put it in the right place. This comprises 523 items, totalling $18.5m, which represents approximately 72% of the $25.8m in On Account. THIS MUST BE DONE BY END OF DAY TUESDAY.
- For items in the "Reciepts Write Off All" tab of the spreadsheet titled "12601_Detail", we need to review each item over $10,000 to determine 1) what should have happened to the cash reciept and 2) make the correction to put it in the right place. This comprises 149 Items, totalling $3.6m, which represents approximately 60% of the $6.3m in Receipts Write Off. THIS MUST BE DONE BY END OF DAY TUESDAY.
- For items in the Miscellaneous Offset Report, August-00 Through September-02. we need to continue to work through each item >$10,000 to determine 1) what should have happened to the cash reciept and 2) make the correction to put it in the right place. I do not have the full report (Greg please send to this group), however based upon looking at the August, October and November reports in the 12601_Detail spreadsheet, this should cover over 80% of the total.

Greg, for the Miscellaneous Offset Report, I need you to add the Date the item was moved to 12601. We need to be able to accumulate the error by quarter. Please rerun the report to provide the date. Ryan, this should not stop work on these items, we can add the date once the new report is available.

Ryan, for each of the items bulleted above, we need to focus 100% today and tomorrow on

Δ π EXHIBIT 12
Deponent Chen
Date 5/19/06 Rptr.
WWW.DEPOBOOK.COM

getting through ALL of this work. I like what you did on the items >$100k, we should continue to follow this method. I have attached a revised version of that spreadsheet to include a couple additional columns and some formatting. Please incorporate those columns and their contents into your work. I have attached that spreadsheet titled as "Greater than 100k in 1260151 Version 3."

Greg, please confirm that ALL ability to move anything to 12601 via On Account or creating a Misc reciept write off has been turned off.

Greg, as we discussed this weekend, please look into the ins and outs in Activity Detail in the 12601_Detail spreadsheet. In many instances, there are two negative numbers (are these debits or credits?) and one positive of equal amounts. Please research and provide an explanation of the accounting involved.

Thanks for your help in this. If you have any questions, lets discuss immediately.

Mike

# EXHIBIT 3

---

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

## CASE NO. C-01-0988-MJJ

| | |
|---|---|
| In re ORACLE CORPORATION<br>SECURITIES LITIGATION | ) |
| | ) |
| | ) |
| This Document Relates to: | ) |
| | ) |
| ALL ACTIONS. | ) |

---

**J. Duross O'Bryan, CPA**

**EXPERT WITNESS REPORT IN ACCORDANCE WITH RULE 26**

**Dated: May 25, 2007**

# TABLE OF CONTENTS

I.     INTRODUCTION AND QUALIFICATIONS

II.    SUMMARY OF OPINIONS

III.   BACKGROUND

    A.  PLAINTIFFS' ALLEGATIONS
    B.  ORACLE'S BUSINESS
    C.  ORACLE'S ACCOUNTS RECEIVABLE PROCEDURES
    D.  ORACLE'S DECISION TO STANDARDIZE ITS USE OF "ON ACCOUNT"
        FLAGS
    E.  ORACLE'S TRANSFERS OF UNAPPLIED CASH

IV.    THE LAWSUIT

    A.  SOURCES OF PLAINTIFFS' ALLEGATIONS
    B.  ERNST & YOUNG IS HIRED BY ORACLE'S AUDIT COMMITTEE
    C.  PRESENTATION TO THE SEC
    D.  SUBSET OF DEBIT MEMOS ORDERED FOR DISCOVERY PURPOSES
    E.  ORACLE'S ANALYSIS OF TRANSFERS OF UNAPPLIED CASH

V.     KEY PROCEDURES PERFORMED RELATED TO DEBIT MEMOS

    A.  REVIEW OF VARIOUS ACCOUNTING REPORTS AND DOCUMENTS
    B.  REVIEW OF CUSTOMER ADVANCES AND UNEARNED REVENUE TRENDS
    C.  REVIEW OF CASE FILINGS AND TESTIMONY
    D.  REVIEW OF AGREED UPON PROCEDURES PERFORMED BY EY

VI.    KEY PROCEDURES PERFORMED RELATED TO TRANSFERS OF UNAPPLIED
      CASH

    A.  REVIEW SUBSET OF UNAPPLIED CASH TRANSFERS
    B.  MATERIALITY
    C.  REVIEW OF CASE FILINGS AND TESTIMONY
    D.  REVIEW OF WORK PERFORMED BY EY

VII.   REVIEW OF HEWLETT-PACKARD TRANSACTION

VIII.  CONCLUSIONS

IX.    QUALIFICATION

APPENDICES

## I.    INTRODUCTION AND QUALIFICATIONS

Oracle Corporation (the "Company" or "Oracle") and its Counsel have engaged me to opine on certain financial and accounting issues raised in the Plaintiffs' Revised Second Amended Complaint dated December 9, 2002 (the "Complaint"). These issues relate to the accounting and financial statement impact of the Company's creation of more than 46,000 debit memos on November 17, 2000.

I have also been asked to opine on several financial and accounting issues not raised by Plaintiffs in the Complaint, but which Plaintiffs subsequently detailed in their Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs dated January 31, 2007 (the "Supplemental Interrogatory Responses"). These issues relate to certain transfers of unapplied cash to Oracle's bad debt reserve and a transaction Oracle entered into with Hewlett-Packard ("HP") in the second quarter of fiscal year 2001. I understand that the significance of Plaintiffs' failure to identify these issues in their Complaint is a legal matter. In addressing these unpled accounting issues, I am expressing no opinion about the legal significance of Plaintiffs' failure to allege these issues in the Complaint.

I have been a licensed Certified Public Accountant ("CPA") for 29 years. During this period, I have participated in over 200 separate engagements involving accounting issues, including financial statement audits and forensic accounting investigations and accounting expert testimony. My experience has included engagements involving companies ranging in size from thousands to billions of dollars in assets and/or revenues. I have experience in numerous industries including hi-tech, software development and distribution, manufacturing, oil and gas,

1

educational supplies and publishing, banking and retail, among others. I have extensive experience and have offered opinions on accounting issues in public and private company settings, performing audits and other accounting engagements in connection with private placement memoranda, initial public offering documents, U.S. Securities and Exchange Commission ("SEC") Comment letters, Form 10-K, Form 10-Q and other related filings.

I am currently a Managing Director in the Financial Advisory Services practice of AlixPartners, LLP ("AlixPartners"). I have been with AlixPartners since February of 2003. My current business address is 515 South Flower St., Suite 3050, Los Angeles, California 90071. My duties include those of Managing Director-In-Charge for the Los Angeles office of AlixPartners. My client responsibilities include, but are not limited to, performing detailed analysis to provide expert accounting testimony, consulting on financial and accounting matters, economic damages, professional standard of care engagements, reorganization/bankruptcy matters and forensic accounting/fraud and SEC investigations.

Prior to joining AlixPartners, I was a Partner in PricewaterhouseCoopers LLP ("PwC"), formerly Coopers & Lybrand LLP ("C&L"), for approximately 16 years. In 1995, I became the Partner-In-Charge of the Financial Advisory Services ("FAS") practice for the Western Region of C&L. In 1998, I became the Partner-in-Charge of the New York Metro Region FAS practice for PwC and served in that capacity until December 31, 1999. On January 1, 2000, I became the Partner-In-Charge of the FAS practice for PwC's Los Angeles office and the Partner-In-Charge of the Dispute Analysis and Investigations practice for the Western Region of PwC.

My curriculum vitae is attached as Appendix A to this report. In addition, I have attached as Appendix B a listing of my testifying experience over the last four years. The time I spend on this

matter is being billed to Oracle at the rate of $485 per hour. Colleagues of mine at AlixPartners have assisted me with this engagement. Their time is being billed to Oracle at rates between $350 and $410 per hour.

I have reviewed the Complaint, certain deposition transcripts, various documents and other information produced in the litigation, correspondence, legal filings and professional literature and guidance in preparing this report. In addition, my staff and I have conducted extensive accounting research. The documents upon which I have relied in forming my opinion are listed in Appendix C.

## II.    SUMMARY OF OPINIONS

Based upon a thorough review and analysis of all of the information referred to herein, together with my knowledge of the issues and Generally Accepted Accounting Principles ("GAAP") promulgated by, among others, the Financial Accounting Standards Board and the SEC, and my more than 29 years of professional auditing, accounting and consulting experience, I have reached the following opinions regarding the allegations made in the Complaint:

1. For each of the over 46,000 electronic receipt records that had an "On Account" flag in Oracle's Accounts Receivable Subledger, Oracle recorded three journal entries on November 17, 2000, which had simultaneous and offsetting debits and credits to the same account, for the exact same amount.

2. Oracle's creation of and accounting for the over 46,000 debit memos processed on November 17, 2000 did not affect its financial statements in the second quarter of fiscal year 2001, or any other accounting period.

3

3. Oracle's creation of and accounting for these debit memos did not result in any revenue being recognized, and had zero impact on the income statement and balance sheet.

4. Oracle's creation of and accounting for these debit memos did not violate GAAP.

With respect to the previously unpled issues detailed by Plaintiffs in the Supplemental Interrogatory Responses, it appears that Plaintiffs are challenging certain transfers of unapplied cash to Oracle's bad debt reserve in the second quarter of fiscal year 2001. In addition, Plaintiffs appear to be challenging a transaction with HP during the second quarter of fiscal year 2001. With respect to the transfers, I note that at least some of the activity related to these transfers and the subsequent analysis of those transfers by Oracle appear to occur outside the class period identified in the Complaint. Nevertheless, I have reached the following opinions regarding these unpled allegations:

1. Even if one assumes that all of the approximately $20 million in transfers to Oracle's bad debt reserve during the second quarter of fiscal year 2001 were improper, the effect of those transfers was immaterial to Oracle's reported financial statements for the second quarter of fiscal year 2001.

2. As detailed herein, at least $2 million of the transfers -- of the approximately $10.6 million for which we were able to conduct a detailed analysis -- either were properly made to Oracle's bad debt reserve or should have been previously recorded as revenue.

3. Based upon my review of the evidence, I believe that Oracle's decision to recognize revenue from the HP transaction was appropriate.

4

## III.   **BACKGROUND**

### A.   **PLAINTIFFS' ALLEGATIONS**

Per Paragraphs 35-43 of the Complaint, the class action Plaintiffs, those persons who purchased the publicly traded securities of Oracle between December 14, 2000 and March 1, 2001, claim that the directors of the Company caused Oracle to erroneously record more than $228 million in revenue in the second quarter of Oracle's fiscal year 2001, ending November 30, 2000, in order to mask an alleged economic downturn in Oracle's business.[1]  Based on information purportedly provided by confidential witnesses, Plaintiffs allege that certain amounts, listed as "On Account" within Oracle's accounts receivable software application were recognized as revenue by virtue of processing over 46,000 allegedly "phony invoice" debit memos.[2]  In other words, Plaintiffs' allegations, if true, suggest that Oracle recorded revenue it had not yet earned, which would be a violation of GAAP.[3]

Plaintiffs also purportedly rely upon statistical estimations made by Dr. M. Laurentius Marais, who analyzed a sample of 760 Oracle debit memos.[4]  Plaintiffs claim that Dr. Marais identified a reasonable basis to conclude that the estimated value of the more than 46,000 debit memos would be greater than $228 million.[5]  Plaintiffs further attempt to corroborate the information from certain confidential witnesses and Dr. Marais by noting that Oracle's reported balance in its

---

[1] *See* Complaint, at ¶¶ 36, 43.

[2] *Id.* at ¶¶ 36-38.

[3] *Id.* at ¶ 42.

[4] *Id.* at ¶ 39.

[5] *Id.* at ¶ 40.

Customer Advances and Unearned Revenue account declined by $215 million between the first and second quarters of its fiscal year 2001.[6]

In addition to the debit memo allegations in the Complaint, Plaintiffs make reference to other purported accounting issues in recent written discovery responses. In their Supplemental Interrogatory Responses, Plaintiffs claim that Oracle improperly used customer overpayments to increase its bad debt reserve, thereby materially inflating reported results of operations in its second quarter of fiscal year 2001 financial statements.[7] These claims, if true, would violate GAAP. Plaintiffs also challenge Oracle's recognition of revenue from a transaction with HP during the second quarter of fiscal year 2001.

## B.  ORACLE'S BUSINESS

In its fiscal year 2001 annual report, Oracle described itself as the world's leading supplier of software for business information management. Founded in 1977, the Company developed, manufactured, marketed and distributed computer software that helped corporations manage and grow their businesses.

As further discussed in the fiscal year 2001 annual report, the Company's software products were categorized into two broad areas: systems software and business applications software. Systems software was a complete Internet platform for developing and deploying applications on the Internet and on corporate intranets. System software products included database management

---

[6] *Id.* at ¶ 41.

[7] *See* Robert D. Sawyer's Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs ("Sawyer Response"), at 21, 89; 1199 S.E.I.U. Greater New York Pension Fund's Third Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs, at 21-22, 90; Drifton Finance Corporation's Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs, at 21, 89.

software, application server software and developmental tools.   Business applications software automated the performance of business processes for customer relationship management, supply chain management, financial management, project management and human resource management.

In addition to computer software products, the Company offered its customers a wide range of consulting, education and support services.   Oracle also offered its business applications as an online service to customers who chose not to install their own applications.

## C.   ORACLE'S ACCOUNTS RECEIVABLE PROCEDURES

During the relevant time period, Oracle used a separate Accounts Receivable software application (the "A/R Subledger") to, among other things, track the receipt of cash, as well as how that cash was applied to invoices.   In general, checks or wire transfers sent from customers to Oracle were received in "lock boxes," and temporarily recorded to a liability account, entitled "Customer Advances and Overpayments" ("Account 25005").[8]   These receipts were initially flagged in the A/R Subledger as "Unapplied" cash.[9]   If Oracle's systems or Accounts Receivable and Collections Departments were able to match the receipt against an open or unpaid invoice for goods and/or services rendered, the amount initially posted to Account 25005 would be reclassified to the appropriate customer's account receivable balance signifying a proper payment,

---

[8] *See* Deposition of Greg Myers, dated Apr. 12, 2005 ("Myers Dep.") at 26:17-23 ("Generally customers would make a payment to one of two different [bank] lock boxes...and then those banks would send us a file of the payments that were received...and we would take the file sent from the bank and upload it into our accounts receivable module.").

[9] *See* Deposition of Alexander Bender, dated Sept. 21, 2006 ("Bender Dep.") at 93:25-94:4 ("Oracle...would upload lockbox information from a bank...and it would initially be a debit to cash, a credit to the 25005 account....").

7

and the receipt flag in the A/R Subledger would be changed from "Unapplied" to "Applied."[10] Most of Oracle's cash receipts were processed and applied in this manner.

However, not all cash receipts could be matched to outstanding invoices.[11] For instance, some companies prepaid certain service contracts, before Oracle had issued invoices over the course of the respective contract.[12] In these cases, Oracle would not apply the cash payments until an invoice for the respective period's service had been issued, thus leaving the payment in Account 25005 as "Unapplied" until the invoice was processed, and the payment could be applied to the invoice.[13]

Sometimes, Oracle received cash that did not apply to an outstanding customer invoice for goods and services.[14] Examples of these types of cash receipts include cash received from customers for subleased office space, rental space at Oracle Open World trade shows, duplicate payments or overpayments for an invoice, and cash received from current and former employees for such items as reimbursements and COBRA continuation payments.[15] Additionally, customers occasionally put a "stop payment" on a check or wire transfer, which meant that while the credit

---

[10] See Myers Dep. at 98:6-8 ("I use the term applied to mean that the -- that the payment, the receipt has been applied or has netted down the receivable that -- that was referenced in the invoice. So, you know, debit, cash, credit, unapplied cash, as the invoice is determined where that unapplied needs to go, that invoice would be applied in the system to that payment.").

[11] Deposition of Michael Quinn, dated Apr. 18, 2006 ("Quinn Dep.") at 250:12-14 ("The unapplied cash account is the account that includes all the cash payments from customers that have not been applied to invoices.").

[12] Deposition of Thomas Williams, dated Jun. 7, 2007 ("Williams Dep.") at 64:16-19 ("I believe there was a listing of customer receipts that could... include customer deposits.").

[13] Myers Dep. at 92:16-21 (stating that items would stay in unapplied cash until they were resolved).

[14] See id. at 76:17-19; Deposition of Molly Venkataramana, dated Apr. 13, 2006 ("Venkataramana Dep.") at 107-108:24-17

[15] See Venkataramana Dep. at 107:24-108:17.

8

balance in Account 25005 might still be listed as "Unapplied," the amount was not really a cash receipt that could be used.[16]

Once Oracle's Collections Department determined the appropriate disposition of a receipt, and the disposition was not an application to a customer invoice, the collectors generally did several things. First, they processed a journal entry with offsetting debits and credits to Account 25005, which changed the receipt flag in the A/R Subledger from "Unapplied" to "On Account."[17]   This change in flag status was important because it signified to the Accounts Receivable and Collections Departments that the receipt should not be applied to an open invoice.[18]  The change of the status from "Unapplied" to "On Account," which was accomplished by recording a debit and a credit to Account 25005 for the exact same amount, did not change the balance of Account 25005.[19]

Second, a journal entry was posted to reclassify the credit amount in Account 25005 to the appropriate account, such as to Accounts Payable in the case of a customer refund.[20]  However, even though the disposition of the cash receipt had been resolved through these journal entries,

---

[16] Myers Dep. at 76:12-13 ("For example a customer had made a duplicate payment but caught the duplicate prior to it clearing their bank and they put a stop payment on that check....").

[17] Id. at 77:19-21 ("[T]he first step was that the accounts receivable analyst would have placed the item into an On Account status....").

[18] Declaration of Greg Myers, dated Jun. 6, 2006 ("Myers Decl.") at ¶ 25. ("[T]he 'on account' flag at that time was utilized by Oracle Accounts Receivable Analysts to notify other employees that the disposition of the amount had been identified and the amount could not be utilized for another purpose.").

[19] Myers Dep. at 91:4-7 ("The next step they would take, the accounts receivable analyst would move the cash from status unapplied to status of On Account. That generates net, net, no accounting impact, 25005, 25005 debit, credit.").

[20] Id. at 87:9-15.

the "On Account" flag remained within the A/R Subledger, in Account 25005, in some cases for many years.[21]

While the "On Account" flag originally was intended to designate a credit to a customer's account, as noted above, Oracle actually used the flag for another purpose.[22] Within the United States, Oracle used the "On Account" flag to signal to the Accounts Receivable and Collections Departments that the credit balance in Account 25005 had been or would be used for a purpose other than the satisfaction of an invoice.[23] Over the years, a substantial number of "On Account" flags accumulated.

## D.   ORACLE'S DECISION TO STANDARDIZE ITS USE OF "ON ACCOUNT" FLAGS

In May 2000, the Company released Suite 11i, which was to be implemented by Oracle on a global basis. In advance of this implementation, Oracle analyzed its accounting practices to ensure that each department was following global "best practices."[24] Oracle determined that the

---

[21] *See id.* at 87:3-9 ("The On Account items would be sitting in 25005, but the thing with On Account in the examples I discussed is that there was generally a separate entry that cleared the item out of – though it still sat in On Account as far as the flag, from an accounting perspective, there was an offsetting debit that cleared that credit from sitting in Oracle's balance sheet.").

[22] Williams Dep. 167:8-2 ("[O]n account is you give me $1,000 and you say, 'I haven't bought product yet,' or, 'I am prepaying $500 for an invoice that it outstanding,' and it gets applied.... This wasn't the way that on-account was being used at Oracle.... They used on-account for something other than what is defined here.").

[23] Myers Dep. 83:1-5 ("So putting it On Account was an indefinite flag that [*sic*] do not touch this receipt, another transaction has taken place, therefore, this money should not be taken to an open invoice....").

[24] Declaration of Michael Quinn, dated Nov. 4, 2002 ("Quinn Dec.") at ¶ 4. ("In 2000 my staff participated in the conversion of Oracle's accounts receivable and other related systems over to Oracle's new 11i applications. As part of that conversion it was determined that the previous functionality of assigning on account notations... was no longer required.").

10

domestic use of "On Account" receipt flags was different from the practice of other territories, and that those differences should be reconciled prior to Suite 11i's implementation.[25]

Furthermore, as noted above, thousands of "On Account" flags had accumulated within Oracle's A/R Subledger over the years.[26] Even though these flags were maintained in the A/R Subledger (with no financial statement impact) to provide an audit trail for the resolution of all receipts, there was concern that these remnant "On Account" flags could cause confusion with Oracle's customers, as well as its Collections Department staff, who might mistakenly believe that these "On Account" amounts represented payments that could be applied against open and unpaid invoices.[27] As such, the Accounts Receivable Department decided that the "On Account" flags, which, as discussed above, had no financial statement impact, should be eliminated within the A/R Subledger in anticipation of the roll-out of Suite 11i.[28]

The Accounts Receivable Department instructed Oracle's Information Technology ("IT") Department to create a software program to address the accumulated "On Account" flags.[29] The IT Department worked for two months to develop a Structured Query Language ("SQL") software program, which was designed to accomplish the standardization in a manner that would have no accounting impact whatsoever, through three simultaneous steps:

---

[25] Myers Decl. at ¶ 5 ("Oracle decided to remove the 'on account' flag... in anticipation of the Company-wide software upgrade.").

[26] *See* NDCA-ORCL 1473340-41 [Email from S. Kumar to K. Bhat, dated Sept. 20, 2000] (reflecting a total of 44,029 "on account" designations).

[27] *See* Myers Dep. at 129:23-130:21.

[28] *See id.* at 110:8-10 ("[W]e would not use On Account as a process going forward once we went to 11i and we started standardizing our processes.").

[29] *See* NDCA-ORCL 1473340-41 [Email from S. Kumar to K. Bhat, dated Sept. 20, 2000] ("Receipts with 'On Account' transaction for refunds should off set [*sic*] by creating a debit memo in AR. Following was the two step solution proposed by product development: a) create debit memos for all old data sitting in AR for refunds b) apply these debit memos to receipts which has [*sic*] 'On Account' entries.... Because of the volume of the data, it is not possible to do debit memo [*sic*] manually through [*sic*] application screen, so there must be some sort of the script need [*sic*] to be written to achieve a) and b).").



**Step One** – Submit an entry,[30] which would switch the receipt flag in the A/R Subledger from "On Account" to "Unapplied"[31]:

| 25005 - Customer Advances & Overpayments | | | | Cash Receipt Flag Status | |
|---|---|---|---|---|---|
| Debit | Credit | | | | |
| $10,000 | $10,000 | | | "On Account" ⟶ "Unapplied" | |

**Step Two** – Generate a debit memo in the A/R Subledger, again through the use of offsetting entries to Account 25005. The receipt flag in the A/R Subledger remained as "Unapplied"[32]:

| 25005 - Customer Advances & Overpayments | | | | Cash Receipt Flag Status | |
|---|---|---|---|---|---|
| Debit | Credit | | | | |
| $10,000 | $10,000 | | | "Unapplied" (debit memo created) | |

**Step Three** – Submit a final entry, which applies the amount for which the receipt flag had been changed to "Unapplied" in Step One, to the debit memo created in Step Two. This changed the receipt flag from "Unapplied" to "Applied"[33]:

| 25005 - Customer Advances & Overpayments | | | | Cash Receipt Flag Status | |
|---|---|---|---|---|---|
| Debit | Credit | | | | |
| $10,000 | $10,000 | | | "Unapplied" ⟶ "Applied" (against new debit memo) | |

---

[30] For purposes of illustration, we assumed a transaction relating to an "On Account" balance of $10,000.

[31] Myers Dep. at 143:3-8 ("So the first step was to move the item from On Account to unapplied. And again, that generated a debit/credit in 25005. No accounting impact, no different than when we applied it to On Account, a debit/credit to 25005….").

[32] *Id.* at 143:9-14 ("The second step was to create the debit memos in the system…. And by raising the debit memos in the system, we debited and credited 25005 as well. So no accounting impact, no net accounting impact by the debit memos being raised.").

[33] *Id.* at 143:15-21 ("Then the third step was to apply the items that were previously On Account, now sitting in unapplied, to the debit memos, such that now the items that were On Account were now in applied status to these open debit memos. And when we did the applications of the unapplied to the debit memos, again, debit/credit 25005, no accounting entries….").

For each of the three steps, the corresponding journal entries reflect simultaneous offsetting debits and credits to the same Account 25005. *As offsetting debits and credits for the same amount were posted to the same account, which was a liability account and not a revenue account, there necessarily could be no impact to the balance sheet or income statement.*[34]

The IT Department tested the SQL program to ensure that there would be no balance sheet or income statement impact.[35] Once their testing was complete, the IT Department ran the SQL program on or about November 17, 2000, and in the process systematically generated over 46,000 sequentially numbered debit memos, which corresponded to the approximately $692 million of cash receipt records that previously had been flagged "On Account."[36] These 46,000-plus debit memos appear throughout Oracle's Accounts Receivable system, and in several reports that are used by the Company and were occasionally provided to customers upon request.[37]

Gregory Myers, who supervised the creation of the debit memos, correctly indicated that there was no income statement or balance sheet effect from the creation of the debit memos on

---

[34] Williams Dep. at 80:11-16 ("I knew that when they processed those debit memos one of the first things that Greg [Myers] told me is that they booked an equal and offsetting debit and credit through 25005. So by definition it did not affect the balance sheet and could not have affected the income statement."); Quinn Dep. at 168:17-19 ("Greg Myers did his 46,000 debit memos that had no accounting impact [and] cleaned out the on account item,... freed it up to use it for its intended purpose....").

[35] *See* NDCA-ORCL 048716-18 [Email from S. Kumar to G. Myers, dated Nov. 14, 2000] ("I ran the job to create the debit memos on [*sic*] test system [*sic*] a couple times....").

[36] *See* NDCA-ORCL 005006 [Oracle Transaction Register listing 46,000-plus debit memos totaling $692 million].

[37] *See id.; see also* NDCA-ORCL 0123157 [Account Analysis Report with Payable's Detail showing entries of offsetting credits and debits totaling $692 million]; *see also* NDCA-ORCL 0127994-128107, 0127995 [sample screen shot for Household Finance debit memo, number 55043990].

13

November 17, 2000; the creation of the debit memos merely assisted in the removal of the "On Account" receipt flag.[38]

## E.    ORACLE'S TRANSFERS OF UNAPPLIED CASH

As noted above, during the relevant time period, not all cash received by Oracle could be applied to open and unpaid invoices. Many times, amounts were paid to Oracle without corresponding remittance information.[39] Without a remittance advice, or some other supporting documentation, it was difficult for a collector to determine how the payment should be applied.[40]

If a cash receipt remained unapplied for an extended period of time, and the Collections Department exhausted its various resolution procedures, the Collections Department sometimes concluded that the unapplied cash related *not* to an existing invoice, but to one which may have previously been written off.[41] Accordingly, beginning as far back as 1998, some receivables were written off to the bad debt reserve.[42]

---

[38] Myers Dep. at 143:21-23 ("So at the end of the day, all we really did was move the status from On Account to a debit memo with no accounting impact.").

[39] *Id.* at 72:10-13 ("[T]he customer makes a payment to Oracle Corp. and they don't reference any information that we can use in order to determine where those funds or that payment should be applied.").

[40] *Id.* at 93:6-13 ("[T]he payment comes in, we don't know where to apply the cash to... the next step would be to call the customer and request information as to where they wanted it to go or what invoice or receivable they wanted it applied to.").

[41] Williams Dep. at 212:6-10 ("I believe that at some point if you have done everything you can to try and identify it then you are going to have to dispose of that item similar to how you have to dispose of an invoice. Eventually you write it off."); *id.* at 176:17-22 ("I can say that if there was an unapplied cash item that was $150 and it had been there for two years, you know, we should just write it off because the reality is that, like the $150 invoice that we were writing off from that same customer as they aged out....").

[42] *See* NDCA-ORCL 104764-65 [spreadsheet entitled "12601 Activity" showing transfers into account 12601 between June 1998 and August 2002].

14

The bad debt reserve was used to estimate the amount of Oracle's receivables that Oracle ultimately would not collect,[43] and was used to offset the debit balance of Accounts Receivable, as reflected on Oracle's financial statements.[44]

To the extent that unapplied cash can be linked to an invoice that previously has been written off as uncollectible, the movement of that cash from the unapplied cash account to the bad debt reserve does not violate GAAP.[45]   However, to the extent that unapplied cash cannot be specifically matched to either a previously written-off receivable, or some other item that should have already been recognized as income (e.g., licensing royalties), Oracle's transfers to its bad debt reserve are considered to be erroneous reclassifications.[46]

## IV.    THE LAWSUIT

### A.    SOURCES OF PLAINTIFFS' ALLEGATIONS

Plaintiffs added their accounting-based allegations to the Complaint in Fall 2002.  Some of the allegations are attributed to a confidential witness, CW49, a former Oracle employee who is currently the target of a criminal proceeding concerning purported embezzlement at Oracle, and who invoked the Fifth Amendment and refused to testify in this case.  Other allegations are

---

[43] Myers Decl. at ¶ 27 ("Oracle has historically used bad debt reserve accounts (including Account 12601, during the relevant time period) to estimate the amount of Oracle's accounts receivable that will prove to be uncollectible.").

[44] *See* Deposition of Jason Sevier, dated Jun. 28, 2006 ("Sevier Dep.") at 186:9-11 ("The first process is the allowance is set up, so you debit expense and you credit allowance for doubtful accounts."); *see also* Deposition of Gary Matuszak, dated Aug. 1, 2006 ("Matuszak Dep.") at 137:11-19.

[45] *See* Williams Dep. 178:11-17 ("[T]here were items that were…written off the company's books, charge taken against revenues that were subsequently found out to be in unapplied cash.  The appropriate entry in that particular instance would, in fact, be to restore revenue, which is effectively what you do when you move it through 12601.").

[46] *See* Accounting Principles Board ("APB") Opinion No. 10, *Omnibus Opinion*, 1966 at ¶ 7 ("It is a general principle of accounting that the offsetting of assets and liabilities in the balance sheet is improper except where a right of setoff exists.").

15

purportedly based on another confidential witness, CW46, a former financial analyst for a global recovery audit and cost containment company, but who never worked for Oracle.[47] In this capacity, CW46's role was to work for Oracle's customers in an effort to seek reimbursement of possible overpayments. If CW46 could convince Oracle that a payment was an overpayment that needed to be refunded to a customer, CW46's employer earned a contingent fee, based on the amount of the alleged overpayments being refunded.[48] More recently, CW46 earned $200 per hour working as a paid consultant for Plaintiffs' Counsel, with responsibilities related solely to this matter.[49]

Plaintiffs allege that CW46 reported, based on a review of 760 debit memos, that Oracle's reported revenue and earnings for the second quarter of fiscal year 2001 were false when made, as a result of the improper conversion of more than $228 million of "On Account" cash to revenue in the same period. Some of CW46's allegations are summarized below:

- Oracle did not refund customer overpayments;
- Oracle created debit memos, which had the same financial impact as an actual invoice for a real product sale; and
- Oracle cleared these debit memos by using non-refunded customer overpayments.

Plaintiffs provided Dr. Marais with the 760 debit memos noted above, and asked him to determine if any statistically-valid inference could be made from these debit memos, such that a total dollar amount could be attached to the 46,000-plus debit memos processed on November 17,

---

[47] See Complaint, at ¶ 8; Deposition of CW46, dated Jun. 24, 2006 ("CW46 Dep.") at 66:5-6.

[48] Deposition of David Cochenour, dated Mar. 6, 2006 ("Cochenour Dep.") at 79:17 ("Typically we get a negotiated percentage of the economic benefit that the client got from our work.").

[49] CW46 Dep. at 51:13-23, 52:11-21.

2000.[50] Per the Complaint, Plaintiffs characterize Dr. Marais as having estimated that the total dollar value of the more than 46,000 debit memos was at least $228 million.

As will be discussed in a later section, these allegations have no merit.

## B.     ERNST & YOUNG IS HIRED BY ORACLE'S AUDIT COMMITTEE

Ernst & Young LLP ("EY") was hired in 2002 to replace Arthur Andersen LLP ("AA") as Oracle's external financial statement auditors. At the request of the Audit Committee of Oracle's Board of Directors (the "Audit Committee"), EY performed a series of agreed upon procedures related to the November 17, 2000 debit memo project, which included the following:[51]

- EY reviewed the Plaintiffs' allegations in the Complaint.
- EY interviewed Gregory Myers regarding how the debit memo transactions were processed by Oracle.
- EY obtained an electronic listing of the more than 46,000 debit memos.
- EY reviewed the details relating to 145 debit memos greater than $500,000, and 55 arbitrarily-chosen debit memos between $1,000 and $500,000; EY found no financial statement impact from these selected debit memos.
- EY created three test transactions in Oracle's system with the same accounting distribution lines as the debit memos, noting that no amount was recorded to revenue.
- EY reviewed general ledger analysis reports, related to Account 25005, for the month of November 2000, as well as domestic reconciliations for Account 25005 for November

---

[50] Deposition of Dr. M. Laurentius Marais, dated Sept. 12, 2006 ("Marais Dep.") at 91:15-93:10; *see also* Complaint, at ¶ 39.

[51] *See* EY000143-6 [EY Agreed Upon Procedures Memo].

17

and August of 2000, and found no amounts recorded to revenue related to the debit memos, as well as no unusual reconciling items.

- EY obtained and read Oracle's Corporate and Accounting policy related to unapplied cash and refunds.

- EY reviewed the Company's analysis of the Customer Advances and Unearned Revenue account[52] for the previous nine quarters, and found that the decline in the second quarter fiscal year 2001 balance was consistent with the Company's historical trends.

As noted above, EY found no evidence that any revenue, or any other financial statement impact, was recorded as a result of the November 17, 2000 debit memo project.

## C.    PRESENTATION TO THE SEC

At the request of the SEC, Oracle made a presentation in October 2003 regarding Plaintiffs' allegations made in Paragraphs 36-43 of the Complaint.[53]  Since this presentation was made, I am aware of no other action having been taken by the SEC regarding these allegations.  As such, it is reasonable to conclude that the SEC did not find merit in Plaintiffs' allegations and was satisfied with Oracle's response to these allegations with respect to the accounting treatment of these debit memos.

## D.    SUBSET OF DEBIT MEMOS ORDERED FOR DISCOVERY PURPOSES

In response to the Court's October 19, 2005 Order, Oracle produced hundreds of thousands of pages of documentation related to the 776 debit memos generated for electronic receipt records greater than $100,000.  This production included a script output, which was designed by Oracle's

---

[52] This financial statement account incorporates amounts contained within Account 25005, plus cash received for revenue not yet earned, as of the respective financial statement date.

[53] *See* NDCA-ORCL 971461-971507.

IT Department to compile a step-by-step audit trail for each transaction which contained a debit memo, using data from Oracle's accounting system.[54] These 776 debit memos comprise roughly $528.2 million, or about 76% of the total value of the November 17, 2000 debit memos.[55] In addition, Plaintiffs have received, in accordance with the Court's July 17, 2006 Order, similar information and documents related to an additional subset of 150 debit memos selected by Plaintiffs, which represents another $6.6 million, or about 1% of the total value of the November 17, 2000 debit memos.[56]

Therefore, Oracle has produced script output and related documents for at least 926 debit memos (i.e., 776 plus 150), accounting for about $534.8 million, or 77% of the total value of the November 17, 2000 debit memos. Our work in connection with these 926 debit memos, will be discussed in a later section.

## E.    ORACLE'S ANALYSIS OF TRANSFERS OF UNAPPLIED CASH

Following the filing of the Complaint, and in connection with its investigation into Plaintiffs' allegations concerning debit memos and unapplied cash generally, in the Fall of 2002 Oracle discovered that certain unapplied cash amounts had been transferred to the bad debt reserve.[57] These transfers occurred independently of and prior to the creation of the 46,000 plus debit

---

[54] Myers Decl. at ¶ 14 ("The script output lays out, step-by-step, the accounting treatment of each debit memo covered by the Court's October 19, 2005 Order....").

[55] Id. at ¶ 8 ("There are 776 debit memos in excess of $100,000; these debit memos account for $528 million of the $692 million total of the debit memos created on November 17, 2000.").

[56] See Declaration of Judy Hui, dated Nov. 13, 2006, at ¶¶ 3-11.

[57] Quinn Decl. at ¶ 5 ("Earlier this year, I was personally assigned by Tom Williams to manage an investigation into the proper disposition of unassigned cash receipts that Oracle's collections staff had, over time, assigned to an accounts receivable reserve account known as Account 12601."); Myers Decl. at ¶ 4 ("Earlier this year, I was also involved in an investigation into the disposition of unassigned cash receipts that Oracle's collections staff had, over time, assigned to an accounts receivable reserve known as Account 12601.").

memos which, as noted above, were created via simultaneous and offsetting debits and credits to Account 25005.[58] Oracle's Accounts Receivable Department, in collaboration with its Collections Department, learned that $20.1 million of unapplied cash had been transferred to the bad debt reserve during the second quarter of fiscal year 2001.[59] As a precautionary initial step, Oracle reversed these transfers from the bad debt reserve account back to the unapplied cash account. Thereafter, Oracle tasked the Collections and Accounts Receivable Departments with researching many of the transfers, to ascertain whether the transfers were properly made during the second quarter of fiscal year 2001.[60]

\* \* \* \*

The following three sections relate to key procedures performed related to the November 17, 2000 debit memos, the transfers of unapplied cash during the second quarter of fiscal year 2001, and Oracle's transaction with HP during the second quarter of fiscal year 2001.

## V.    KEY PROCEDURES PERFORMED RELATED TO DEBIT MEMOS

I performed numerous independent procedures in order to arrive at my opinions that a) Oracle processed over 46,000 sets of journal entries on November 17, 2000, with debits and credits to the exact same account in the exact same amount, b) this process did not result in any revenue

---

[58] Williams Dep. at 149:11-19 ("The debit memos had no effect on the company's financial statements. The debit and credit went exactly the same place, 25005....Separate from that was an additional issue which is, 'Okay. Have things moved out of 25005 to 12601?'").

[59] See NDCA-ORCL 104764-65 [spreadsheet entitled "12601 Activity" showing transfers into account 12601 between June 1998 and August 2002].

[60] See Venkataramana Dep. at 231-232:25-3 (stating that Myers and Quinn explained to lower-level employees the need to address the unapplied cash that was transferred from Account 12601 back into Account 25005); Williams Dep. at 215:1-3 ("[I]f there was an error made in moving something from 25005 to 12601 we put it back where it belonged.").

20

being recorded, c) this process did not impact any part of the financial statements, and d) this process did not violate GAAP.

## A.    REVIEW OF VARIOUS ACCOUNTING REPORTS AND DOCUMENTS

*Review of Summary Reports*

I reviewed various accounting system reports produced by Oracle, for the purpose of understanding the total impact of the November 17, 2000 accounting entries. The first report I reviewed was a Transaction Register, which listed all debit memos generated for that day. I found that the 46,000-plus debit memos added up to over $692 million. I inspected the Account Analysis Report, and noted that on November 17, 2000, there was a debit to Account 25005 of $692,396,224.73, and a credit to Account 25005 for the exact same amount. As a result, it would be impossible from an accounting perspective for the debit memos to have any impact on the financial statements, or to any income statement or balance sheet account.

I also reviewed a Sales Journal by GL Account Report, which listed all revenue recorded in the general ledger for November 17, 2000. I found that only $10.1 million of revenue was recorded on November 17, 2000. If Plaintiffs' allegations were to be believed, then I would have expected revenue recorded on that day to be at least $228 million (and, more likely, $692 million as the sum total of the debit memos), which did not happen.

*Review of Sample "On Account" Transactions*

I then reviewed Oracle-produced source documentation related to two of the larger debit memo transactions, in order to understand how, on a detailed level, the "On Account" receipt flag was initially generated and eventually removed through the November 17, 2000 debit memo project.

Based on my review of the source documentation, including the aforementioned script output for these debit memos, I noted the following:

*Debit Memo 55003965, related to Texas Instruments, for $4,847,389:*

- The Company issued a March 31, 1998 invoice to Texas Instruments for $4,847,389.[61]

- This invoice was paid by Texas Instruments on May 1, 1998.[62]

- Texas Instruments submitted a duplicate payment on May 26, 1998, resulting in a general ledger entry recognizing a cash receipt. This duplicate payment was recorded as "Unapplied" within Oracle's A/R Subledger, since the first payment had already been applied to the invoice in full.[63]

- Texas Instruments immediately recognized that this was a duplicate payment and issued a "stop payment" with its bank on the same day. As such, the duplicate payment never actually cleared through Oracle's lock box account.[64] Once Oracle was notified of the "stop payment," the Collections Department staff changed the receipt flag within Oracle's A/R Subledger to "On Account." The "On Account" flag signaled to other collectors that this amount had been accounted for and should not be used for the satisfaction of an invoice. In fact, the script output for this transaction includes contemporaneous comments from Oracle personnel that "there should be a stop payment on this check."

---

[61] *See* NDCA-ORCL 050391-92.

[62] *See* NDCA-ORCL 597773 [bank statement from May 1, 1998 showing receipt of cash, not listed separately but within the lockbox amount of $7,065,243.72].

[63] *See* NDCA-ORCL 531500 [bank statement from May 26, 1998 showing duplicate receipt of cash, not listed separately but included within the lockbox amount of $114,124,259.09].

[64] *See* NDCA-ORCL 139191 [bank statement from May 29, 1998 showing a stop payment of $4,847,389].

- On June 6, 1998, Oracle recorded a journal entry to reverse the initial receipt of the duplicate Texas Instrument payment, effectively eliminating any financial statement impact from the duplicate payment. However, even though the duplicate payment had been resolved by June 1998, the "On Account" flag remained in the A/R Subledger until November 17, 2000.

- On November 17, 2000, Oracle processed a debit memo to remove the "On Account" flag within its A/R Subledger.[65]

Since Oracle never actually received the cash in question, Plaintiffs' contention that Oracle improperly converted this "On Account" receipt to revenue is incorrect.

*Debit Memo 55008470, related to Sprint Communications, for $2,582,382:*

- The Company issued three invoices to Sprint Communications – on September 23, 1997 for $1,233[66]; on April 9, 1998 for $1,260[67]; on May 31, 1998 for $2,582,382.[68]

- These invoices were paid by Sprint Communications on one combined remittance, for $2,584,875, on July 1, 1998.[69]

- Sprint Communications submitted a duplicate payment for the third invoice, in the amount of $2,582,382, on August 12, 1998, resulting in a general ledger entry recognizing a cash receipt. This duplicate payment was recorded as "Unapplied"

---

[65] *See* NDCA-ORCL 531517.

[66] *See* NDCA-ORCL 535815 [invoice]; NDCA-ORCL 535818-20 [order documents].

[67] *See* NDCA-ORCL 535814 [invoice]; NDCA-ORCL 535872-73 [order documents].

[68] *See* NDCA-ORCL 535816 [invoice]; NDCA-ORCL 535830-71 [order documents].

[69] *See* NDCA-ORCL 597890 [bank statement from July 1, 1998 showing receipt of funds, not listed separately but included within the lockbox amount of $4,723,086].

23

within Oracle's A/R Subledger, since the first payment had already been applied to the third invoice in full.

- On September 25, 1998, Oracle's Collections Department staff recognized the existence of the duplicate payment, and changed the receipt flag to "On Account" within the A/R Subledger. In fact, the script output for this transaction includes contemporaneous comments from Oracle personnel demonstrating that this was a duplicate payment, and that a refund should be issued.

- On October 10, 1998, Oracle recorded a general ledger entry reflecting that a refund check for the duplicate payment was sent to Sprint Communications,[70] thereby eliminating any financial statement impact from the duplicate payment. However, the "On Account" flag remained in the A/R Subledger until November 17, 2000.

- On November 17, 2000, Oracle processed a debit memo to remove the "On Account" flag within its A/R Subledger.[71]

Since Oracle refunded the duplicate payment in question in October 1998, over two years before the debit memos were created, Plaintiffs' contention that Oracle improperly converted this "On Account" receipt to revenue is incorrect.

*Review of Script Output and Source Documents*

I also reviewed script output for each of the 926 debit memos, created in response to the Court's orders and Plaintiffs' requests, as noted above, to confirm my understanding of how the transactions in question were posted to Oracle's general ledger. I found that that the three

---

[70] *See* PLF-ORC 000775; NDCA-ORCL 535793 [bank statement from Oct. 29, 1998 showing refund].

[71] *See* NDCA-ORCL 535817.

simultaneous, offsetting standardization steps, as noted in an earlier section, functioned as designed and intended. That is, I found the three sets of transactions for each debit memo removed the "On Account" flag, and did not result in any revenue recognition, nor did they result in any impact to any financial statement account, and therefore did not violate GAAP.

From these 926 debit memos, I then randomly chose a subset of 60 debit memos[72] to review the actual source documents relating to each transaction.[73] I found no evidence that revenue was recorded as a result of the November 17, 2000 debit memo project.

## B.   REVIEW OF CUSTOMER ADVANCES AND UNEARNED REVENUE TRENDS

I reviewed a listing of Oracle's reported balances of Customer Advances and Unearned Revenues, for the first and second quarters of fiscal years 1997 through 2002, detailed as follows ($ in millions):[74]

| Fiscal Year | First Quarter | Second Quarter | % Change |
|---|---|---|---|
| 1997 | $    475 | $    444 | (6.5%) |
| 1998 | 694 | 616 | (11.2%) |
| 1999 | 956 | 800 | (16.3%) |
| 2000 | 1,090 | 925 | (15.1%) |
| **2001** | **1,270** | **1,054** | **(17.0%)** |
| 2002 | 1,367 | 1,085 | (20.6%) |

As evident above, the 17% decline for the second quarter of fiscal year 2001 is consistent with the percentage changes for the second quarters of prior fiscal years, as well as for fiscal year 2002. If

---

[72] Not including the Texas Instruments and Sprint Communications debit memos detailed above.

[73] The sample size of 60 was sufficient to confirm my understanding of how debit memos were processed.

[74] *See* EY000147.

25

Plaintiffs' allegations were to be believed, I would not have expected to see similar declines in the second quarter balances for the other fiscal years, which there clearly are.

Further, had the debit memos resulted in the recognition of revenue such that they caused a corresponding reduction in the Customer Advances and Unearned Revenues account in the second quarter, that reduction would be commensurate with the sum total of the debit memos. Stated differently, if Plaintiffs' claim had any merit, the reduction in this account balance would not have been $216 million, but instead $692 million. As Plaintiffs point out in the Complaint, however, the reduction in Customer Advances and Unearned Revenues in the second quarter of fiscal year 2001 was less than three times the sum total of the 46,000-plus debit memos.

## C.    REVIEW OF CASE FILINGS AND TESTIMONY

I reviewed the Complaint, the declarations and depositions of certain Oracle personnel (including Oracle personnel with knowledge of the accounting issues) and all of the other documents listed in Appendix C. Based on my review of these documents, there is no evidence that any revenue had been recorded, or even that any general ledger account had been impacted on a net basis, as a result of the November 17, 2000 debit memo project.

In addition, I reviewed the deposition transcripts and related exhibits for the two witnesses upon whom Plaintiffs' appear to rely for most of their allegations, CW46 and Dr. Marais. As noted above, CW49 refused to testify.

*Accounting-based allegations made by CW46:*

I reviewed CW46's deposition transcript, as well as a findings report that appears to have been prepared by CW46, in order to evaluate his/her accounting-based allegations.  As for his/her sworn testimony, I noted the following:

- CW46 conceded that he/she had no first-hand knowledge of how Oracle posted accounting entries to its general ledger, nor how Oracle recognized revenue.[75]

- CW46 conceded that he/she did not know, or did not speak with, anyone from Oracle who had participated in the November 2000 debit memo process.[76]

- CW46 is not a CPA, and does not appear to have ever worked as an accountant responsible for posting entries to a general ledger.[77]

- When presented with an actual general ledger transaction stemming from one of the November 2000 debit memos, CW46 failed to recognize that the debit and credit amounts were posted to the same identical general ledger account, and instead incorrectly insisted that the transaction resulted in revenue being generated within Oracle's accounting system.[78]

- CW46 conceded that the recording of a debit and credit to the same account for the exact same amount would result in a net zero impact on that account.[79]

- CW46's incorrect assumption that debit memos were accounted for in the same manner as unpaid invoices is based solely on an Oracle accounting software instruction manual that he/she downloaded from the Internet.[80]

---

[75] CW46 Dep. at 85:16-22; 114:24-116:1.

[76] *Id.* at 156:18-157:20.

[77] *Id.* at 59:18-21.

[78] *Id.* at 98:1-110:10.

[79] *Id.* at 98:1-8.

[80] *Id.* at 88-4-25.

27

- CW46 worked at a global recovery audit and cost containment company that was paid contingent fees based on the amounts recovered for its clients.[81]   Thereafter, CW46 worked as a paid consultant for Plaintiffs' Counsel, at the rate of $200 per hour.[82]

As for the written report apparently prepared with the assistance of CW46, I noted the following:

- CW46 had purportedly reviewed 149 debit memo transactions at the time of this report, with one being for what appears to be a $909,728 cancelled check.  Even though CW46 points out that funds were never received, he/she still contends that the related debit memo somehow generated revenue.[83]  This is in direct contradiction of his/her primary allegation that Oracle booked revenue related to customer overpayments.  CW46 does not attempt to reconcile this significant inconsistency.

- CW46 claims that Oracle imposed a series of institutional "roadblocks" to prevent its customers from recovering funds owed to them, providing Oracle with the opportunity to claim these funds as its own revenue.[84]  CW46 does not appear to have produced any documentation to support this series of allegations.  Furthermore, as noted above, CW46 never worked at Oracle.

Based on my review, CW46's allegation that Oracle improperly recognized revenue, as a direct result of the November 17, 2000 debit memo project, is unfounded and incorrect.  I found no evidence to support his/her allegation.  On the contrary, I found overwhelming evidence, as noted above, confirming that no revenue was generated through this process.  As noted above, even when presented with evidence which directly refuted his/her allegations, CW46 was unable to

---

[81] *Id.* at 80:19-24.

[82] *Id.* at 51:13-23, 52:13-21.

[83] *See* MAR004391.

[84] *See* MAR004395-401.

recognize that the transaction in question was being made to the same general ledger account, and therefore could have had no revenue or financial statement impact.

Considering that CW46's prior employer was paid contingent fees based on successful recoveries of possible overpayments from Oracle, and that CW46 worked as a paid consultant of Plaintiffs' Counsel on this matter, CW46 may not be completely objective in making these allegations. In summary, based on the lack of evidence supporting these allegations, coupled with his/her apparent lack of training and experience as it relates to general ledger accounting, it is my professional opinion that no reliance should be placed on CW46's allegations.

*Statistical Estimation of Debit Memos by Dr. Marais:*

I reviewed Dr. Marais' deposition transcript, in order to evaluate his allegations related to the statistical estimation of the 46,000-plus debit memos. Notably, Plaintiffs engaged Dr. Marais to opine only on the narrow issue of the total amount of the 46,000-plus debit memos. Thus, nothing in his testimony is relevant to the issue of whether the debit memos had any financial statement impact. Regarding the narrow issue upon which Dr. Marais opined, as explained below, his testimony has been rendered both wrong and irrelevant because the sum total of the debit memos is known (i.e., $692 million). As for his sworn testimony, I noted the following:

- Dr. Marais conceded that, if the total population of debit memos were known (which it is), then his estimations would be irrelevant.[85]

- Dr. Marais indicated that the sample population was heavily skewed by a few very large debit memos, and as such, would have required a sample size of at least 10,000 observations before he could safely rely on the mathematics underlying a statistically-

---

[85] Marais Dep. at 89:2-100:1.

valid estimation.[86]  Notably, Dr. Marais looked at data from only 760 debit memos, not 10,000.

- Dr. Marais indicated that he applied a $100,000 cap on the 13 largest debit memos, which had the effect of lowering the skewness of the 760 debit memos to such a degree that a statistically-based estimation could be made.[87]

Since the population of the more than 46,000 debit memos is known, we know that the total amount of debit memos processed on November 17, 2000 was $692 million.  As acknowledged by Dr. Marais, if he had the data for the total population of debit memos, his estimations would be irrelevant.

Even still, based on my review, it appears that Plaintiffs mischaracterized Dr. Marais' work, and should not have relied upon his findings in the first place.  It appears that Dr. Marais arbitrarily manipulated the data from the sample of 760 debit memos in order to achieve, in his opinion, a statistically-valid estimation.  Other than indicating that the process of truncating certain sample outliers is a commonly used practice by statisticians, I found no evidence that Dr. Marais had any factual foundation or support to cap those 13 largest debit memos, or why he chose to use a cap of $100,000.

As such, Plaintiffs should not have placed any reliance on Dr. Marais' findings, either as a basis for estimating the total value of the more than 46,000 debit memos, or as a basis for corroborating the decline in Oracle's Customer Overpayments and Unearned Revenue account in the second quarter of fiscal year 2001.  However, it appears that Plaintiffs did rely on Dr. Marais' findings,

---

[86] *Id.* at 177:6-178:2, 204:8-17.

[87] *Id.* at 177:24-180:14.

and compounded this error by not indicating in the Complaint that Dr. Marais' findings were a direct result of his arbitrary data manipulation. When presented with the portion of the Complaint attributed to him, Dr. Marais failed to correct Plaintiffs' factual oversight in characterizing his findings.[88]

## D.      REVIEW OF AGREED UPON PROCEDURES PERFORMED BY EY

I reviewed the work performed by EY related to its agreed upon procedures. I also reviewed the deposition of EY's then-senior manager on the engagement, as it relates to the agreed upon procedures work performed. I found that EY's conclusions were consistent with my own, and that EY did not find any independent evidence that revenue had been recorded resulting from the November 17, 2000 debit memo project.

## VI.     KEY PROCEDURES PERFORMED RELATED TO TRANSFERS OF UNAPPLIED CASH

In order to arrive at my opinions that Oracle's transfer of unapplied cash to bad debt reserve during the second quarter fiscal year 2001 was not material to its financial statements, and some of these transfers either properly were made or should have been recorded as revenue, I performed numerous independent procedures, and reviewed, among other things, a number of documents and other materials produced in this matter, as summarized below.

---

[88] *Id.* at 173:18-174:3.

## A.    REVIEW OF SUBSET OF UNAPPLIED CASH TRANSFERS

As noted above, Oracle generated script output for 926 debit memos processed on November 17, 2000, in response to certain Court orders. I reviewed the script output for the 926 debit memos, to determine which of the transactions that had debit memos in their accounting histories also had a transfer to the bad debt reserve within their audit trail. Within the accounting histories of the transactions relating to the 926 debit memos, I found 121 transfers to the bad debt reserve during the second quarter of fiscal year 2001. These 121 transfers accounted for approximately $10.6 million of the $20.1 million transferred to bad debt reserve during this quarter. Notably, for the reasons discussed above, the creation of the debit memos on November 17, 2000 did not move any dollar amounts to or from Oracle's bad debt reserve. Indeed, all of these transfers occurred prior to November 17, 2000, when the 46,000-plus debit memos were created.

I then reviewed the script output and various documents related to a number of these transactions, in order to understand, on a detailed level, how:  a) the balance of unapplied cash originated; b) the balance was then transferred to bad debt reserve; and c) the balance was later reconciled by Oracle as being properly recorded as revenue.

Based on my independent review, I noted the following:

- Of the $10.6 million in transfers subject to my review, almost $700,000 of unapplied cash transferred to bad debt reserve during the second quarter of fiscal year 2001 related to certain royalties paid to Oracle. These amounts should have been recorded directly to revenue at the time payments were received, but were not. Therefore, insofar as the result of the transfer of these amounts had a positive impact on income, that impact was appropriate.

32

- In addition, over $800,000 of other transfers to the bad debt reserve during this period were appropriate, in that Oracle had already reduced its revenues for certain open and unpaid invoices, either all or in part, through the use of credit memos and/or inclusion in Oracle's general bad debt reserve as of the second quarter of fiscal year 2001.

My independent review included analyzing available source documentation, which served to confirm my understanding of each respective transaction. In addition to these above amounts, I found some evidence which suggests that at least another $500,000 of these transfers were appropriate, although the evidence relating to these transfers is not as complete as the evidence I reviewed in connection with the $1.5 million in transfers noted above. Thus, I believe there is evidence that at least $2.0 million of the $10.6 million transfers capable of review were appropriate.

By way of example, the following represents chronological details supporting one of the royalty payments and one payment related to a previously credited invoice:

*Unapplied Cash Transfer of $176,487, related to Structural Dynamics Research:*

- On May 31, 2000, a payment of $176,487 from Structural Dynamics Research was recorded. The balance could not immediately be applied to an open and unpaid invoice.
- On October 1, 2000, this balance was transferred to the bad debt reserve.
- On October 5, 2000, the receipt flag within Account 25005 for this balance was switched to "On Account."

33

- On November 17, 2000, Oracle processed a debit memo to remove the "On Account" flag within its A/R Subledger.[89]

- On November 2, 2002, Oracle reversed the unapplied cash transfer and moved the credit balance from the bad debt reserve back to Account 25005.

- On November 8, 2002, Oracle reversed the processing of the November 17, 2000 debit memo, thus switching the receipt status from "Applied" back to "Unapplied."[90]

- In November 2002, as part of Oracle's investigation of the bad debt transfers, the collectors' notes indicate, "Needs to go to Royalties Gigi to be booked."[91]

- On August 11, 2003, Oracle processed invoices totaling $176,487 to recognize previously unrecorded royalty revenues,[92] based on a royalty statement provided by Structural Dynamics Research.[93]

Since revenue should have been recorded related to the payment as far back as May 2000, but was not, any allegation that this transfer did not reflect a proper recognition of Oracle's revenue and net earnings is incorrect.

*Unapplied Cash Transfer of $91,254, related to Caltrans:*

- On May 31, 2000, Oracle recorded an invoice for $242,400, relating to onsite services for an expected period of May 31, 2000 through May 30, 2001.[94]

---

[89] *See* NDCA-ORCL 471528.

[90] *See* NDCA-ORCL 471529.

[91] *See* NDCA-ORCL 1623795-4264.

[92] *See* NDCA-ORCL 471519-27.

[93] *See* NDCA-ORCL 471502-07.

[94] *See* NDCA-ORCL 776634.

34

- On August 18, 2000, a payment of $112,464 was received from Caltrans. The balance could not be applied to an open and unpaid invoice.

- On August 24, 2000, Oracle recorded a credit memo of $242,400, effectively providing a full concession related to the May 31, 2000 invoice, despite being well into the expected service period.[95]

- On September 22, 2000, Oracle applied $14,850 to fully satisfy an open and unpaid invoice, leaving an unapplied cash balance of $97,614.[96]

- On November 5, 2000, a balance of $91,254 was transferred to the bad debt reserve, leaving an unapplied cash balance of $3,180.

- On November 10, 2000, Oracle applied $3,180 to fully satisfy an open and unpaid invoice, fully applying the August 18, 2000 cash receipt.[97]

- On November 13, 2000, the receipt flag within Account 25005 for this balance was switched to "On Account."

- On November 17, 2000, Oracle processed a debit memo to remove the "On Account" flag within its A/R Subledger.[98]

- On November 11, 2002, Oracle reversed the processing of the November 17, 2000 debit memo, thus switching the receipt status from "Applied" back to "Unapplied."[99]

- On November 24, 2002, Oracle reversed the unapplied cash transfer, thereby moving the credit balance from the bad debt reserve back to Account 25005.

---

[95] *See* NDCA-ORCL 776635.

[96] *See* NDCA-ORCL 776636.

[97] *See* NDCA-ORCL 776638.

[98] *See* NDCA-ORCL 776637.

[99] *See* NDCA-ORCL 776633.

- In November 2002, as part of Oracle's investigation of the bad debt transfers, the collectors' notes state "Rebill one of the concessions for the amount in reserve stating that too much of concession was given to customer due to the customer sending in a payment for $91K."[100]

- On January 31, 2003, Oracle reinstated the $91,254 amount to the original May 31, 2000 invoice, following its research and conclusion that excessive concessions were made to Caltrans.

Since revenue was understated related to this payment as far back as August 2000, any allegation that this transfer did not reflect a proper recognition of Oracle's revenue and net earnings is incorrect.

## B. MATERIALITY

According to Accounting Principles Board Opinion No. 20, if a company discovers that an accounting error was made after the issuance of financial statements, it must determine whether the financial statements would be materially misstated absent correction of the error. If the error is determined to be material, the company needs to restate its prior financial statements, and disclose the nature of the error and its impact on the financial statements.[101]

According to SEC Staff Accounting Bulletin 99 ("SAB 99"), it is important for a company to assess materiality from both a quantitative and qualitative perspective. In defining materiality,

---

[100] *See* NDCA-ORCL 1623795-4264.

[101] *See* APB Opinion 20, 1971.

SAB 99 refers to the following excerpt from the Statement of Financial Accounting Concepts No. 2, as published by the Financial Accounting Standards Board:

> "The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item."

SAB 99 also refers to a Supreme Court decision, which held that a fact was material if there is "a substantial likelihood that the...fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[102]

As a preliminary matter, I note that the $20.1 million in transfers were solely a second quarter of fiscal year 2001 event, and had no accounting impact in the third quarter of fiscal year 2001.

Assessing the issue from a quantitative perspective, we start with the following reported second quarter Net Income and Earnings Per Share, from Oracle's fiscal year 2001 10-K report:

|  | In $000s |
|---|---|
| Net Income | $ 622,812 |
| Shares Outstanding – Diluted | 5,874,987 |
| Earnings Per Share | $ 0.1060 |
| Reported As (Rounded) | $ 0.11 |

---

[102] SAB 99 (citing *TSC Industries v. Northway, Inc.* 426 U.S. 438, 449 (1976), and *Basic, Inc. v. Levinson,* 485 U.S. 224 (1998)).

As noted earlier, $20.1 million of unapplied cash was transferred to the bad debt reserve during this quarter. Notwithstanding the above examples -- which establish that at least $2 million of the $10.6 million in transfers to the bad debt reserve either were properly made or should have previously been recorded as revenue -- if we make the most conservative assumption, that the entire amount of the transfers represents an accounting error, this would represent roughly a $13.0 million overstatement in Net Income, after taking into account an incremental tax rate of 35.5%.[103] As such, Net Income and Earnings Per Share would be adjusted as follows:

|  | In $000s |
| --- | --- |
| Net Income | $ 609,812 |
| Shares Outstanding – Diluted | 5,874,987 |
| Earnings Per Share | $  0.1038 |
| Reported As (Rounded) | $     0.10 |

The conservative adjustment used above would merit only a 2% reduction in reported Net Income. This adjustment would reduce the Earnings Per Share calculation by just two-tenths of a cent. As such, this adjustment is not material from a quantitative sense, and I do not believe it would have influenced the users of Oracle's financial statements.

Further, I note that in the second quarter of fiscal year 2001, Oracle reported revenue of $2.66 billion.[104] Even if the entire $20.1 million in transfers to the bad debt reserve during the second quarter of fiscal year 2001 were improper -- which they were not -- any resulting revenue

---

[103] Calculated from Oracle's 10-Q Report, dated January 16, 2001.

[104] *See* Oracle's Form 10-Q for the quarter ending November 30, 2000.

from the transfers would constitute less than 1% (approximately .75%) of reported revenue for the quarter.

Assessing the issue from a qualitative perspective, SAB 99 lists a number of considerations, detailed below, which "may render material a quantitatively small misstatement of a financial statement item." I reviewed each of these considerations, noting the following:

- *Whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision in the estimate –* The bad debt reserve is clearly an estimate, based on the likelihood of ultimate collections. As noted in a previous section, the challenges inherent in applying cash, accompanied by incomplete remittance information, make it less likely that precise measurements could be obtained.

- *Whether the misstatement masks a change in earning or other trends –* I found no evidence of this issue.

- *Whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise –* The consensus analyst earnings opinion regarding the second quarter fiscal year 2001 was $0.10 per share.[105] As noted above, even if the full $20.1 million were deemed to have been transferred improperly, the Earnings Per Share would decrease to $0.1038 per share, which would still meet analysts' consensus expectations.

- *Whether the misstatement changes a loss into income or vice versa –* I found no evidence of this issue.

- *Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's*

---

[105] *See* Beartlein, L. "Update 2-Oracle Profits Come in Just Ahead of Expectation" (Reuters December 14, 2000) ("An average of analyst estimates called for earnings of 10 cents per share, according to a survey by First Call/Thompson Financial").

*operations or profitability* – The unapplied cash likely resulted from all of Oracle's operations, as opposed to a singular segment or other significant portion of the business.

- *Whether the misstatement affects the registrant's compliance with regulatory requirements* – I found no evidence of this issue.

- *Whether the misstatement affects the registrant's compliance with loan covenants or other contractual requirements* – I found no evidence of this issue.

- *Whether the misstatement has the effect of increasing management's compensation* – I found no evidence of this issue.

- *Whether the misstatement involves concealment of an unlawful transaction* – There is no evidence that suggests that an orchestrated attempt to unfairly inflate the results of operations existed. Furthermore, there is no evidence that suggests that Oracle attempted to conceal these transactions. On the contrary, Oracle preserved these transfers within its A/R Subledger.

In short, I found no evidence, from a qualitative or quantitative perspective, that Oracle's transfers to its bad debt reserve would be considered material, with respect to its reported second quarter fiscal year 2001 financial statements. In the absence of any quantitative or qualitative evidence, I do not believe that the judgment of a reasonable investor would have changed.

## C.    REVIEW OF CASE FILINGS AND TESTIMONY

I reviewed the Complaint, the declarations and certain depositions of Oracle personnel (including personnel who had knowledge of the accounting issues) and all of the other documents listed in Appendix C. Based on my review of these documents, I found no evidence that the Defendants had ordered the Company to transfer unapplied cash to the bad debt reserve, or any evidence that

40

any of Oracle's senior management was even aware of the transfers to the bad debt reserve when made.

## D.    REVIEW OF WORK PERFORMED BY EY

As noted above, EY was hired to replace AA as the external auditors of Oracle in April of 2002. EY was made aware of the transfers to the bad debt reserve.[106] Based on my understanding of Generally Accepted Auditing Standards, promulgated by the American Institute of Certified Public Accountants, and my years of experience in performing financial statement audits, EY had to consider whether the transfers to Oracle's bad debt reserve during second quarter fiscal year 2001 created a material misstatement in Oracle's past financial statements. If that had been true, Oracle would have been required to restate its past financial statements.

There have been no such restatements. Furthermore, during Oracle's investigation into these transfers, EY informed the Company's Audit Committee that no audit adjustments were necessary.[107] As such, EY concluded that these transfers from unapplied cash to bad debt reserve did not have a material impact to past financial statements.

## VII.   REVIEW OF HEWLETT-PACKARD TRANSACTION

In the Supplemental Interrogatory Responses, Plaintiffs suggest that the HP transaction, whereby HP purchased software licenses and services from Oracle, had "little economic value" and

---

[106] *See* Deposition of Jennifer Minton, dated Sept. 25, 2006 ("Minton Dep.") at 283:22-24, 285:20-286:4; *see also* Deposition of Jeffrey Henley, dated Nov. 16, 2006, at 452:21-453:7.

[107] *See* NDCA-ORCL 3043015; *see also* Minton Dep. at 284:25-285:4.

allowed Oracle to achieve earnings per share of $0.11 in the second quarter of fiscal year 2001.[108]
Plaintiffs have not offered any evidence to support this statement, and instead merely point out
that the sale occurred on the last day of the quarter and that Oracle had also agreed to purchase
product from HP.[109] I understand that HP purchased these additional software licenses so that it
could complete a global roll-out of Oracle's Customer Relationship Management software.[110] I
note that AA, Oracle's prior financial statement auditors, specifically looked at the HP transaction
from a revenue recognition perspective, and even discussed it with Oracle's Audit Committee on
January 5, 2001.[111] AA did not recommend that any adjustment be made to the accounting for the
HP transaction.[112] Based upon the foregoing, I do not believe that there was anything improper in
Oracle's recognition of revenue from the HP transaction.

## VIII.   CONCLUSIONS

Based on my review of the documentation produced in this matter, I found that Plaintiffs'
allegations that the November 17, 2000 debit memo project resulted in more than $228 million of
revenue erroneously recorded in Oracle's financial statements during the second quarter of fiscal
year 2001 are unfounded and incorrect. On the contrary, I found overwhelming evidence to

---

[108] *See* Sawyer Response, at 17; 1199 S.E.I.U. Greater New York Pension Fund's Third Supplemental
Responses to Defendants' Second Set of Interrogatories to Plaintiffs, at 18; Drifton Finance Corporation's
Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs, at 18.

[109] *See* Sawyer Response, at 17, 46-47; 1199 S.E.I.U. Greater New York Pension Fund's Third
Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs, at 18, 47-48; Drifton
Finance Corporation's Second Supplemental Responses to Defendants' Second Set of Interrogatories to
Plaintiffs, at 18, 46-47.

[110] Deposition of Safra Catz, dated Jul. 20, 2006, at 19-20:23-1 ("At the same time HP had already bought
and was implementing Oracle CRM, but hadn't done their global rollout; and to do it they would have to
buy more software.").

[111] *See* AA000027-34.

[112] Matuszak Dep. 169:17-21 ("[M]anagement concluded that it was appropriate to recognize revenue under
the license arrangement. And Andersen, after reviewing all the…evidence that was provided to us,
concurred with management's agreement.").

42

support the opinion that the Company's removal of these "On Account" receipt flags, and the creation of the associated debit memos had no impact on Oracle's financial statements, and therefore did not violate GAAP.

I also found evidence demonstrating that some of the transfers of unapplied cash to bad debt reserve in second quarter of fiscal year 2001 were appropriate, and that some of the unapplied cash should have been previously recorded as income. Nevertheless, even if one assumed that all of these transfers were improper, the effect of those transfers to Oracle's reported financial statement for that period is not material. In addition, I found no evidence that Oracle's senior management was involved with or even knew about the transfers to the bad debt reserve when made.

Finally, I do not believe that there was anything improper in Oracle's recognition of revenue from the HP transaction.

## IX.   QUALIFICATION

I reserve the right to supplement and/or amend my opinions as necessary as additional documents or information is made available for my review. I may independently, or be asked by counsel to create exhibits after the issuance of this report. These exhibits may then be used as demonstratives during trial. I will be available for further comment on my opinions contained herein at my deposition at some point in the future. Further, in support of my opinions, I may also use any of the previously produced documents referred to in the body of this report or in any Exhibit hereto.



Very truly yours,

*This report has been prepared by:*

J. Duross O'Bryan, Managing Director

# EXHIBIT 4



**From:** Tammy Pinnick
**Sent:** Fri, 08 Dec 2000 00:53:16 GMT
**To:** Jennifer Minton; Williams; Thomas
**CC:**
**BCC:**
**Subject:** Bad Debt

Jennifer and Tom,

Here is the final version of the Bad Debt Analysis.

Tammy

NDCA-ORCL 1610859

0CO0063_545587.xls

## BAD DEBT RESERVE RECONCILIATION
### Q2 FY01

| | | Beginning | September-00 | | October-00 | | November-00 | | Ending |
|---|---|---|---|---|---|---|---|---|---|
| | | Balance | Activity | Balance | Activity | Balance | Activity | Res. Adj. | Balance |
| DR (CR) | | | | | | | | | |
| 12600 | Bad Debt Recoveries | (3,213,957) | (95,469) | (3,309,426) | (213,365) | (3,522,791) | (156,487) | | (3,679,278) |
| 12601 | Bad Debt Write-offs | 15,652,331 | 461,686 | 16,114,017 | 15,673,113 | 440,874 | (4,836,191) | | (4,395,317) |
| 12604 | Reserve or Uncollectible | (82,779,800) | (70,427,286) | (153,207,086) | (6,151,718) | (159,358,804) | (14,946,135) | 20,000,000 | (154,304,939) |
| 12607 | Reserve or Uncollectible - License | | 66,983,141 | 66,983,141 | 7,915,497 | 74,898,638 | 5,031,320 | | 79,929,958 |
| 12610 | Reserve or Uncollectible - Support | (27,402,354) | 924,453 | (26,477,901) | (2,567,263) | (29,045,164) | (6,586,202) | | (35,631,366) |
| 12620 | Reserve or Uncollectible - Consulting | (36,318,019) | (2,774,958) | (39,092,977) | (3,981,977) | (43,074,954) | 581,117 | | (42,493,837) |
| 12630 | Reserve or Uncollectible - Education | (2,210,674) | (681,969) | (2,892,643) | (318,572) | (3,211,215) | 866,652 | | (2,344,563) |
| | Total Reserve | (136,272,474) | (5,610,401) | (141,882,875) | (20,990,541) | (162,873,415) | (20,045,927) | 20,000,000 | (162,919,342) |

1212, 1213, 1216 rec

Confidential - Pursuant To Protective Order

NDCA-ORCL 1610987

# EXHIBIT 5

1

#1 Interview Memorandum
of Thomas Williams (Interview 3)
11/12/02



EXHIBIT NO. 4

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

## THIRD INTERVIEW OF TOM WILLIAMS

On Tuesday, November 12, 2002, counsel to the Special Litigation Committee of Oracle Corporation (George Newcombe, James Kreissman, Harrison Frahn, and Peter Dennin of Simpson Thacher & Bartlett) conducted a further follow-up interview of Tom Williams, Vice President of Finance Operations of Oracle Corporation, by telephone. The interview lasted approximately one and one-half hours. That phone interview was followed by another meeting, at Williams' office in Rocklin, California, between Williams and Frahn on Wednesday, November 13, that lasted approximately one and one-half hours. What follows is a summary of the interviews, with impressions of counsel. It is not, and does not purport to be, a verbatim account of what was said.

### Background

Williams' background is set forth in the memorandum describing his first interview on August 5, 2002.

### Williams' Reaction to the Allegations In the Ex Parte Application

The Committee's counsel discussed with Williams the claims in the California Class Action Plaintiffs' *Ex Parte* Application for Discovery filed on November 11, 2002. Mr. Newcombe informed Williams that the plaintiffs allege that Oracle had used its unapplied cash as a way of reducing its bad debt in order to inflate reported earnings on its income statement. Williams stated that in FY 2001, he had no knowledge that anyone at Oracle had ever moved any unapplied cash into the bad debt reserve account. He stated that in October 2002, in the process of investigating the debit memo allegations in the Second Amended Class Action Complaint ("SAC"), which Williams characterized as false and baseless, he had learned from Mike Quinn and Greg Myers, who were responsible for conducting the investigation, that certain persons in Oracle's Collections Department had, apparently on an *ad hoc* basis over time, moved certain

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

items from Oracle's unapplied cash account to its bad debt reserve account.   He further stated that the Company is in the process in investigating this past practice.  Williams then explained what he had learned from this ongoing investigation.

**Relevant Aspects of Oracle's Bad Debt Reserve**

Williams described in general Oracle's process of establishing its allowance for uncollectible accounts, commonly known as a bad debt reserve.  Williams explained that, as a general matter, the purpose of the bad debt reserve is to estimate the amount of Oracle's accounts receivable that Oracle will not ultimately collect.  Williams stated that the level of the bad debt reserve is based on historical trends for the Company, both in terms of sales and collections, as well as current economic trends.  For example, if Oracle's currents sales are $100,000, and it has experienced an inability in the past to collect on 1% of its sales, it could determine that an appropriate reserve was $1,000.

Williams explained that, based on the historical analysis, the reserve level may be adjusted upward or downward.  Williams stated that an upward adjustment in the reserve is reflected by a corresponding increase in bad debt expense.  Increasing bad debt expense, Williams stated, has the effect of decreasing income.  Conversely, a downward adjustment in the reserve decreases bad debt expense, thus increasing income.

Williams stated that Oracle's Accounts Receivables ("A/R") Department adjusted the bad debt reserve every quarter.  Williams said that the determination of the appropriate level for the bad debt reserve for the US subsidiary (Oracle's largest) was done each quarter at the end of the second month of the quarter.  Williams explained that it was necessary to make the determination a month ahead of the quarter close because of the size of the company and the number of accounts.  Thus, Williams explained that for the reserve level established in Q3 FY 2001, Oracle made the calculation based upon the balances in its accounts as of January 31,

**CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER**

3

2001. The calculation included January 2001, as well as November and December 2000. Williams explained that any changes to the accounts after January 31, 2001 would be reflected in the reserve calculation for Q4 FY 2001.

**Account 12601**

Williams stated that one of the components in calculating Oracle's bad debt reserve was an account entitled Bad Debt Write-Offs, Account 12601. Williams explained that during the course of a quarter, there would be debits and credits to this account. Williams explained that a debit to this account could occur when Oracle wrote-off a "small dollar" invoice.[1] The accounting on such an invoice would be as follows, starting with the creation of the invoice:

**Step One – Accounting When Invoice Generated:**

| A/R 12008 | | Revenue 31000 |
|---|---|---|
| 1,000 | | 1,000 |

Williams stated that as time passed and Oracle failed to collect on the invoice, there would come a point when Oracle deemed the invoice to be uncollectible. Williams explained that Oracle had a matrix showing the time periods that Oracle would wait before writing off an invoice. Under this matrix, Williams explained, the larger the amount of the invoice, the longer Oracle would wait before writing it off. The write-off was done automatically, pursuant to this matrix, for invoices less than $3,000. The accounting entries on the write-off would be as follows:

**Step Two – Accounting When Invoice Written Off:**

| A/R 12008 | | Bad Debt Write-off 12601 |
|---|---|---|
| 1,000 | | 1,000 |

---

[1] Williams explained that larger invoices were written-off in a different fashion that involved a debit to revenue instead.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

4

Thus, after the write-off, the Accounts Receivable balance is zero. Williams explained that revenue is unaffected because Oracle does these write-offs on the allowance method, so that the write-off is taken into account in establishing the reserve. The debits to this account potentially increase bad debt expense when Oracle calculates its reserve.

Williams also explained that Oracle had moved certain cash receipts to Account 12601. These receipts were entered on the credit side of the account.

These credits potentially decrease bad debt expense when Oracle calculates its reserve. Thus, Williams explained, if there is a net credit balance in 12601 for the quarter, potentially less bad debt expense will be incurred if Oracle decides that it has to increase its reserve. The less bad debt expense required, the smaller the expenses, and therefore income is correspondingly higher. In this way, Williams explained, the transfers from unapplied cash to 12601 could potentially have the effect of making income larger than it would have been without the transfers.

Mr. Kreissman stated that plaintiffs had further alleged that at the end of every month, Oracle would run an "auto adjustment" that would take money out of the unapplied cash account and would transfer it to the bad debt reserve. Williams stated that to his knowledge, this had not occurred in FY 2001. Williams said that Oracle had run an auto-adjustment for receipts only once, in January 2002.

**Transfers From Unapplied Cash to 12601**

Williams stated that one of the sources of the credits to 12601 were unapplied cash receipts from Account 25005. As Williams had noted earlier, he learned of these transfers following the allegations in the SAC. Williams said that the transfers appeared to have been managed by Adam Hahn, who in 2000 was the head of Collections. Williams said that the

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 313781

5

transfers were accomplished by designating the cash receipt as "on account," then executing a miscellaneous cash receipt to move the funds from 25005 to 12601.

Williams stated that he did not believe that there was any improper or unethical motive behind the transactions. He explained that the basis for these transfers was Oracle's experience with unapplied cash receipts. Williams said that Oracle receives cash receipts that, after the passage of a certain amount of time, it cannot match to a specific invoice. These receipts are classified as "unapplied." Williams stated that Oracle's Accounts Receivable department instructs its Collections Analysts to ask customers to apply any of their "unapplied" receipts to any of the customer's open invoices. If the customer chooses to apply the receipt to an open invoice, the receipt becomes "applied." If the customer asked that the "unapplied" receipt be returned, Oracle would refund it. If, instead, the receipt was neither applied to an open invoice nor refunded, it remained "unapplied."

Williams explained that these "unapplied" receipts accumulated in Account 25005 over time. At some point, Williams stated, Oracle would reach a judgment that it was not going to match particular receipts to any invoice. Oracle would also conclude, after some point, that the receipts were not overpayments because no customer had asked for them to be returned. Williams said that, in all likelihood, some of the receipts matched up to prior invoices that had been mistakenly written off. However, to find the right explanation for why the receipt had not been applied, or why no customer was demanding it back, would be expensive, in terms of the time of Collections Analysts and the lost opportunities of having them pursue collections. Williams said that the principle underlying the transfers would be that on average and over time, the size of the unapplied receipts would match the size of the invoices written off, so that the net effect was the same even though the company did not go through the potentially expensive process of matching the specific invoices and receipts at issue. Thus, Williams explained that it

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

6

appeared that, under Hahn's direction, Oracle had moved certain cash receipts to 12601 to offset invoices that it had previously written off pursuant to the process described above.

Williams also noted that one of the purposes of his investigation of these transfers was to match receipts transferred to 12601 to invoices that had previously been written off. Williams said that the investigation was ongoing. However, based on the preliminary work performed to date, it appeared that approximately 40% of the transfers matched written-off invoices. Williams stated that it appears that the other transfers should have remained in account 25005 as unapplied cash. Williams said that if his review confirms that this result is correct, Oracle will reverse the transactions and take any necessary charges. He stated that he could not contemplate any scenario where this would necessitate a restatement of a prior period.

### Amounts of the Transfers

Williams stated that he had reviewed the amounts of the transfers by quarters. Williams said that in Q3 FY 2001, the total amount of the transfers from 25005 to 12601 was $5.03 million. Williams also noted that in January 2001, the last month for which these transfers could have affected the reserve level for Q3, the flow was not from 25005 to 12601, but rather the opposite: out of 12601 and into 25005. Williams explained that this flow could have occurred as Oracle realized at the time that there were receipts that had incorrectly been transferred to 12601, and took steps to reverse them.

Williams stated that he believed that the aggregate amount of the transfers in the two-year period from August 2000 to August 2002 was approximately $48 million, and that there appeared to have been a much smaller level of transfers from mid-1998 to August 2000. Williams said that he had prepared a spreadsheet that he would share with the Committee showing the transfers from 25005 to 12601 from August 2000 to August 2002.

### Alteration or Destruction of Oracle documents

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 313783

7

Mr. Frahn informed Williams that plaintiffs had alleged that Oracle was in the process of destroying and/or wrongfully altering documents concerning Plaintiffs' allegations of accounting fraud. Williams stated that to his knowledge, no documents related to Plaintiffs' allegations were being destroyed. Williams further stated that he had never instructed anyone at Oracle to destroy or modify any documents and had never heard that anyone at Oracle had issued such a directive.

Mr. Frahn also inquired about Plaintiffs' allegations that Oracle was "upwardly adjust[ing]" invoices. *See Ex Parte* Application at 5. Williams stated that for those receipts matching invoices that had previously been written off, Oracle was applying the receipt to the invoice. He explained that by doing so, Oracle's receipt transaction history would match its customers' payment history. Williams also stated that this matching process would generate complete accounting entries, without altering or erasing the earlier entries. Williams explained that there is always a full audit trail preserved by the accounting system. Williams explained that even if a transaction is reversed, there will always be a clear audit trail.

With regard to plaintiffs' claims about deletions of the historical notes field, Williams observed that the notes field retained only the most recent entry. He also stated that the notes field had no accounting significance, and was merely a field to give a short description of the status of the last contact with the customer. Williams stated that even though it was theoretically possible that the field could change, Myers had created an Excel spreadsheet that captured all of the comments in this field as they existed before the review began.

G.M.N.
J.G.K.
H.J.F. IV

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 313784

# EXHIBIT 6



# CREDIT MEMO AND WRITE-OFF AND
# BAD DEBT AND CREDIT RESERVE POLICY

## POLICY

*Remove invoices from Oracle's accounts receivable trial balance when collection efforts have ceased, or we determine that a receivable is legally uncollectible.*

*Record monthly provisions for bad debts and credit and returns allowances ("bad debt and credit reserve") based on prior historical experience. Determine the bad debt and credit reserve requirements quarterly, and adjust the revenue as appropriate.*

## PURPOSE

This policy ensures we promptly reflect uncollectible transactions in Oracle's accounting records and that we adequately provide for future bad debt write-offs and credit memos against current accounts receivable based on historic experience and in accordance with generally accepted accounting principles.

This policy applies to Oracle worldwide. Where individual roles are mentioned in this policy, they refer to the Oracle U.S. organization; international subsidiaries should substitute individuals as appropriate to their organizational structures.

## RESPONSIBILITY

### FINANCE DIRECTOR OR SENIOR DIRECTOR of USA REVENUE ACCOUNTING

Credit Memos and Write-Offs
Establishes credit memo and write-off approval requirements.

Bad Debt and Credit Reserve
Verifies adequacy of overall bad debt and credit memo provisions and related reserve.

Register the approved "Aging Category Reserve Percentages" (see policy for definition) with Internal Audit once the Divisional Finance VP and the Corporate Controller have approved them. Also, obtain approval for and register changes to these percentages.

### REVENUE ACCOUNTING MANAGER

Credit Memos and Write-Offs
- Monitors the level of credit memo and write-off activity.
- Verifies credit memo and write-off requests are appropriately documented, approved and processed.
- Summarizes and reports credit memo and write-off activity periodically for management review.

---

ORACLE
CONFIDENTIAL



NDCA-ORCL 140467

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER

Bad Debt and Credit Reserve
- Calculates and records general provisions for bad debts and credit memos monthly.
- Identifies and records specific provisions for bad debts and credit memos at least quarterly.
- Assesses overall adequacy of general bad debt and credit memo reserve, and adjusts quarterly.

## COLLECTORS

Credit Memos and Write-Offs
Request credit memos and write-offs and obtain required supporting documentation and approvals.

Bad Debt and Credit Reserve
Review outstanding invoices and quantify the amount to be specifically reserved for those receivables.

## GUIDELINES

### CREDIT MEMOS

We record a credit memo when we determine that a receivable is legally uncollectible, for example:

> The customer did not make a legally binding commitment and revenue should not have been recorded in the first place;

> The customer returned the product pursuant to a contractual right of return or after Oracle issues the customer a Return Materials Authorization (RMA) number;

> The invoice was issued in error or is incorrect; or

> Oracle has decided to not collect the invoice to maintain good customer/partner relationships.

### WRITE-OFFS

We record a write-off when we have exhausted our collection efforts without success on a receivable that is legally collectible (for example, due to bankruptcy).

### ACCOUNTING ENTRY

The accounting entry to record a write-off or a credit memo is the same:

**Debit** -- Revenues

**Credit** -- Accounts Receivable

We charge both credit memos and write-offs directly against the current period's revenue to provide greater visibility and reporting of credit memo and write-off activity.  Although we also

---

Oracle Corporation Financial Policies
Effective Date:  October 22, 2001

ORACLE
CONFIDENTIAL

NDCA-ORCL 140468

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER

reduce revenues for monthly additions to the bad debt and credit reserve, we avoid double counting credit memos and write-offs (and building up excessive reserves) by adjusting the bad debt and credit reserve balance quarterly to its required ending balance, with a corresponding adjustment, upwards or downwards, to the current quarter's revenues. The adjustment should be recorded based on the last three-months revenue by LOB.

If previously credit memoed or written-off items are subsequently collected, credit the collections to revenues to reverse the effect of the original credit memo or write-off. Ensure the LOB that was affected by the original credit memo or write-off is being credited for the subsequent collection.

Invoices that are in litigation should be reserved at the time Oracle Legal gets involved to enforce payment. Debit revenue at the cost center level and credit the Reserve for Uncollectible Accounts.

## REPORTING

We track credit memos and write-offs by type (for example, product return, billing error, sales tax/VAT adjustment, system error, bankruptcy, etc.). We summarize and report credit memo and write-off activity quarterly to identify trends for management attention and to adjust the credit memo and write-off reserve. The most appropriate place to track this information is by using the reason codes available in Oracle AR. If this information is not available, it is possible to use two sub accounts to the various LOB revenue accounts to ensure the data is captured timely.

## APPROVALS

Discretionary Credit Memos require approval from the appropriate LOB management level that manages the respective revenue. Approval requirements follow the spending limits established in the **Spending Policy**. All discretionary credit memos over $100,000 require HQAPP approvals. Discretionary credit memos do not include error corrections such as correcting duplicate invoicing, use of incorrect billing address, incorrect data entry, etc.

The Finance Director may write off invoices $2,000 or below that have been outstanding for over 12 months if collection efforts have been exhausted.

## BAD DEBT PROVISION

Base the general bad debt provision on historical write-off experience applied to current month revenues. Historic write-off information should be obtained quarterly from the above mentioned quarterly reports.

If historical write-off experience is not currently available, the minimum monthly bad debt provision is 1% of total revenues and should be recorded as a debit to bad debt expense.

## CREDIT MEMO PROVISION

Base the general credit memo provision on historical credit memo experience applied to current month revenues. Historic credit memo information should be obtained quarterly from the above mentioned quarterly reports.

ORACLE
CONFIDENTIAL

NDCA-ORCL 140469

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER



If historical credit memo experience is not currently available, the minimum monthly credit memo provision is 1% of total revenues and should be recorded as a debit to revenues.

**ORACLE
CONFIDENTIAL**

**NDCA-ORCL 140470**

**CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER**

## BAD DEBT AND CREDIT RESERVE ADEQUACY ANALYSIS



Review the adequacy of the bad debt and credit reserve at least quarterly. Use the 4-step approach stated below. Please refer to Attachment 1 for an illustration of the reserve calculation.

### Step 1: Accounts Receivable Aging Report

Segregate receivables by the following aging categories: current, 1-30 days past due, 31-60 days past due, 61-90 days past due, 91-180 days past due, 181-360 days past due, and > 360 days past due. Unearned revenue in AR should not be included in this calculation.

### Step 2: Specific Reserve Analysis

Select all significant past due receivables for specific analysis. The definition of significant needs to be determined on an country by country level, but at a minimum, all invoices in excess of $100k should be considered significant. Review the status of these receivables individually with the collectors to obtain the current collections status of each item. If the invoice is deemed unlikely to collect, reserve 100% of the invoice amount.

Sum the individual reserves. This is the calculated specific reserve needed.

### Step 3: General Reserve Analysis

Step 3a.) Add up the receivables specifically reviewed in Step 2 by aging category and deduct these totals from the total AR aging numbers identified in Step 1. This "revised" aging report constitutes the base numbers used for calculating the general reserve.

Step 3b.) Multiply the total remaining balance by aging category by an "Aging Category Reserve Percentage" to establish the general reserve. To determine the Aging Category Reserve Percentages applicable for the subsidiary, use historic write-off and credit memo experience. It is important to note that the Aging Category Reserve Percentages must be approved by both the Divisional VP and the Corporate Controller. Once approved, register the information with Internal Audit via intaud_us. Attachment 1 has used the percentages used by the US for illustrative purposes; however, these numbers might not be applicable to all subsidiaries.

### Step 4: Review Total Reserve

The final step is to add the specific reserve identified in Step 2 with the general reserve calculated in Step 3. This is the total bad debt and credit reserve required for the specific accounting period.

Record any increase or decrease in the required reserves as calculated above directly to revenues. See Attachment 2 for an example.

**ORACLE
CONFIDENTIAL**

NDCA-ORCL 140471

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER



## DEFINITIONS

### AGING CATEGORY RESERVE PERCENTAGES

The percentages used to establish the general reserve. This percentage should be developed by using historic data for prior periods write off and bad debt experience. Each aging category (current, 1-30 days past due, etc.) would require a different figure to properly reflect the likelihood of collection per category.

### BAD DEBT WRITE-OFF

Removing a legally collectible receivable from Oracle's accounting records by recording a reversal to revenue. Bad debt write-offs are generally due solely to customer credit problems.

The historical level of bad debt write-offs as a percentage of historical revenues are used to determine the level of bad debt provisions recorded each period.

### CREDIT MEMO

Removing a receivable from Oracle's accounting records by recording a reversal to revenue. A credit memo is processed when the receivable is deemed not to be legally collectible.

The historical level of credit memos as a percentage of historical revenues are used to determine the level of credit memo provisions recorded each period.

### PROVISION

Charging current period income in anticipation of the effect of a future event (for example, a credit memo) resulting from current period transactions. The bad debt provision is recorded to bad debt expense and the credit memo provision is recorded as a reduction to revenue.

### RESERVE

The bad debt and credit memo reserve, named Reserve for Uncollectible Accounts in Oracle's Standard Chart of Accounts represents the total anticipated future credit memos and write-offs of accounts receivable at any given point in time. It is subtracted from receivables in the presentation of the balance sheet.

## EXCEPTIONS

There are no exceptions to this policy.

## QUESTIONS

Address questions regarding this policy to the Corporate Controller.

Oracle Corporation Financial Policies
Effective Date: October 22, 2001

ORACLE
CONFIDENTIAL

NDCA-ORCL 140472

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER

# ATTACHMENT 1

**STEP 1**

| Aging Category | | Total | Current | 1-30 days | 31-60 days | 61-90 days | 91-180 days | 181-360 days | > 360 days |
|---|---|---|---|---|---|---|---|---|---|
| AR Balance at Month End | | 3,600,000 | 2,000,000 | 1,000,000 | 500,000 | 200,000 | 50,000 | 30,000 | 20,000 |

**STEP 2**

| Customer | Reserve Amount | Total | Current | 1-30 days | 31-60 days | 61-90 days | 91-180 days | 181-360 days | > 360 days |
|---|---|---|---|---|---|---|---|---|---|
| NoWayWePay | 600,000 | 400,000 | | | 400,000 | | | | |
| SetYouLater | 100,000 | 100,000 | | | | 100,000 | | | |
| SeriousDotCom | 15,000 | 15,000 | | | | | | | 15,000 |

**STEP 3a**

| AR Identified for Specific Reserve in Step 2 | Total | Current | 1-30 days | 31-60 days | 61-90 days | 91-180 days | 181-360 days | > 360 days |
|---|---|---|---|---|---|---|---|---|
| | 515,000 | 0 | 0 | 400,000 | 100,000 | 0 | 0 | 15,000 |

**STEP 3b**

| | Total | Current | 1-30 days | 31-60 days | 61-90 days | 91-180 days | 181-360 days | > 360 days |
|---|---|---|---|---|---|---|---|---|
| Total AR after Specific Reserve (AR Balance) | 3,085,000 | 2,000,000 | 1,000,000 | 100,000 | 100,000 | 50,000 | 30,000 | 5,000 |
| Aging Category Reserve Percentages (1) | | 2% | 2% | 3% | 10% | 20% | 50% | 85% |
| General Reserve by Aging Category | 102,250 | 40,000 | 20,000 | 3,000 | 10,000 | 10,000 | 15,000 | 4,250 |

**STEP 4**

**Notes:**
(1) The reserve percentages used in this example are for illustrative purposes only and may not apply to the economic environment in all subsidiaries.

BAD DEBT AND CREDIT RESERVE

Oracle Corporation Financial Policies
Effective Date: October 22, 2001

ORACLE
CONFIDENTIAL

NDCA-ORCL 140473

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER

## ATTACHMENT 2

This example shows the journal entries related to establishing and adjusting the reserve as well as the booking of the individual credit memos and write offs.  The adjustment of General and Specific Reserve should be adjusted on a quarterly basis.

### Assumptions for Year X1:

| | | |
|---|---|---|
| Historical bad debt experience: | 1% | |
| Historical sales return experience: | 1% | |
| Revenue for Year X1: | $100,000 | |

Sales activities during the period:

| | | | |
|---|---|---|---|
| Dr | Accounts Receivables | 100,000 | |
| | Cr  Revenue | | 100,000 |

Accounting entry to establish the reserve during the period:

| | | | |
|---|---|---|---|
| Dr | Bad Debt Expense | 1,000 | |
| Dr | Revenue | | 1,000 |
| | Cr  Reserve for uncollectible accounts | | 2,000 |

### Subsequent Period Activity

| | | |
|---|---|---|
| Deals reversed due to bankruptcies: | $500 | |
| Deals reversed due to billing errors, etc.: | $2,000 | |

Accounting entry to reflect the actual credit memo and write-off activity (during the period):

| | | | |
|---|---|---|---|
| Dr | Revenues | 2,500 | |
| | Cr  Accounts receivables | | 2,500 |

Accounting entry to adjust the reserve at the end of the period:

| | | | |
|---|---|---|---|
| Dr | Reserve for uncollectible accounts | 2,000 | |
| | Cr  Revenues | | 2,000 |

Oracle Corporation Financial Policies
Effective Date: October 22, 2001

ORACLE
CONFIDENTIAL

NDCA-ORCL 140474

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER

## Assumptions for Year X2:

Historical bad debt experience:    .5% ($500/$100,000)
Historical sales return experience:  2.0% ($2,000/$100,000)
Revenue for Year X2:        $120,000
General and Specific Reserve required at the end of the period by using
the 4-step approach: $3,200

Sales activities during the period:

| Dr | Accounts Receivables | | 120,000 | |
|---|---|---|---|---|
| | Cr | Revenue | | 120,000 |

Accounting entry to establish the reserve:

| Dr | Bad Debt Expense | | 600 | |
|---|---|---|---|---|
| Dr | Revenue (sales return provision) | | 2,400 | |
| | Cr | Reserve for uncollectible accounts | | 3,000 |

Accounting entry to increase the reserve to calculated level:

| Dr | Revenue (sales return provision) | | 200 | |
|---|---|---|---|---|
| | Cr | Reserve for uncollectible accounts | | 200 |

## Subsequent Period Activity

Deals reversed due to bankruptcies:    $1,000
Deals reversed due to billing errors, etc.:  $1,000

Accounting entry to reflect the activity and to adjust the reserve:

| Dr | Revenues | | 2,000 | |
|---|---|---|---|---|
| | Cr | Accounts receivables | | 2,000 |
| Dr | Reserve for uncollectible accounts | 3,200 | | |
| | Cr | Revenues | | | 3,200 |

## Cumulative Activity in the GL:

| Deals booked: | $220,000 |
|---|---|
| Bankruptcies: | <1,500> |
| Returns, errors: | <3,000> |
| Cash collected: | $215,500 |

| Total Revenue: | $217,100 |
|---|---|
| Bad Debt Expense: | 1,600 |
| Net Income | $215,500 |

ORACLE
CONFIDENTIAL

NDCA-ORCL 140475

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER

Oracle Corporation Financial Policies
Effective Date:  October 22, 2001

**ORACLE
CONFIDENTIAL**

NDCA-ORCL 140476

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER



## Statement of Recent Changes to:
## Credit Memo and Write-off & Bad Debt and Credit Reserve Policy

| Effective Date | Description of Change |
|---|---|
| 10/22/2001 | The "Bad Debt and Credit Reserve Policy" and the "Credit Memo and Write-off Policy" have been revised and combined into one policy. The following are highlights of the major changes but it is recommended to read the new policy in its entirety.<br><br>**ACCOUNTING**<br>The accounting entry to record a write-off or a credit memo is the same:<br><br>      Debit -- Revenues<br>           Credit -- Accounts Receivable<br><br>We charge both credit memos and write-offs directly against the current period's revenue to provide greater visibility and reporting of credit memo and write-off activity. Although we also reduce revenues for monthly additions to the bad debt and credit reserve, we avoid double counting credit memos and write-offs (and building up excessive reserves) by adjusting the bad debt and credit reserve balance quarterly to its required ending balance, with a corresponding adjustment, upwards or downwards, to the current quarter's revenues. The adjustment should be recorded based on the last three-months revenue by LOB.<br><br>If previously credit memoed or written-off items are subsequently collected, credit the collections to revenues to reverse the effect of the original credit memo or write-off. Ensure the LOB that was affected by the original credit memo or write-off is being credited for the subsequent collection.<br><br>Invoices that are in litigation should be reserved at the time Oracle Legal gets involved to enforce payment. Debit revenue at the cost center level and credit the Reserve for Uncollectible Accounts.<br><br>**APPROVALS**<br>Discretionary Credit Memos require approval from the appropriate LOB management level that manages the respective revenue. Approval requirements follow the spending limits established in the **Spending Policy**. All discretionary credit memos over $100,000 require HQAPP approvals. Discretionary credit memos do not include error corrections such as correcting duplicate invoicing, use of incorrect billing address, incorrect data entry, etc. |

Oracle Financial Policy Statement of Recent Changes

ORACLE
CONFIDENTIAL

NDCA-ORCL 140477

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER

 

## Statement of Recent Changes to:
## Credit Memo and Write-off & Bad Debt and Credit
## Reserve Policy

| | |
|---|---|
| | The Finance Director may write off invoices $2,000 or below that have been outstanding for over 12 months if collection efforts have been exhausted.<br><br>**BAD DEBT AND CREDIT RESERVE ANALYSIS**<br>Review the adequacy of the bad debt and credit reserve at least quarterly. Use the 4-step approach described in the policy. |

Oracle Financial Policy Statement of Recent Changes

ORACLE
CONFIDENTIAL

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER