# EXHIBIT 7



**NDCA-ORCL-440829.xls Properties**

General | Summary | Statistics | Contents | Custom

Created:    Tuesday, November 02, 1999 4:37:29 PM
Modified:   Saturday, June 22, 2002 11:11:28 AM
Accessed:   Monday, September 10, 2007 9:45:11 AM
Printed:    Friday, December 01, 2000 3:43:11 PM

Last saved by:    Jennifer Minton
Revision number:
Total editing time:

OK          Cancel

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

NDCA-ORCL 440830

**TOTAL COMPANY - Q2 FY01 FORECAST**

ORACLE

**$ in Thousands at Actual Rates**

| | Q2 FY00 Actuals | Q2 FY01 Forecast — Forecast | Q2 FY01 Forecast — Upside | Q2 FY01 Forecast — Potential | Q2 Forecast vs PY % | Q2 Potential Growth % | YTD Actuals | YTD FY01 — Forecast | YTD FY01 — Upside | YTD FY01 — Potential | YTD Potential Growth % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | | | |
| License | $ 866,783 | $ 1,035,494 | $ 53,132 | $ 1,088,626 | 17% | 22.76% | $ 1,501,998 | $ 1,820,571 | $ 53,132 | $ 1,873,703 | 25% |
| Consulting | 578,651 | 540,942 | 2,000 | 542,942 | -7% | -6% | 1,155,132 | 1,067,733 | - | 1,069,733 | -7% |
| Support | 720,603 | 859,788 | 16,340 | 876,128 | 19% | 22% | 1,387,656 | 1,698,777 | 16,340 | 1,715,117 | 24% |
| Education | 132,605 | 123,890 | 1,700 | 125,590 | -7% | -5% | 249,721 | 225,184 | 1,700 | 226,884 | -9% |
| Other | 2,773 | 7,684 | - | 7,684 | 177% | 177% | 10,497 | 16,922 | | 16,922 | 61% |
| Other Non-Distribution | 468 | (485) | - | (485) | -204% | -204% | 1,387 | | | | -100% |
| **Total Revenues** | $ 2,321,883 | $ 2,567,313 | $ 73,172 | $ 2,640,485 | 11% | 14% | $ 4,306,400 | $ 4,829,188 | $ 73,172 | $ 4,902,360 | 14% |
| **Expenses** | | | | | | | | | | | |
| License | $ 469,296 | $ 479,699 | $ 265 | $ 479,964 | 2% | 2% | $ 893,627 | $ 893,753 | $ 265 | $ 894,018 | 0% |
| Consulting | 436,449 | 429,207 | - | 429,207 | 2% | 2% | 896,933 | 830,000 | - | 830,000 | 7% |
| Support | 191,358 | 159,976 | (1,780) | 158,196 | 16% | 17% | 367,838 | 314,953 | (1,780) | 313,173 | 15% |
| Education | 81,399 | 71,570 | - | 71,570 | 12% | 12% | 161,352 | 142,695 | - | 142,695 | 11% |
| Other | 12,918 | 18,725 | - | 18,725 | -45% | -45% | 26,193 | 32,331 | | 32,331 | -23% |
| Marketing | 82,501 | 111,279 | (7,000) | 104,279 | -35% | -26% | 161,628 | 202,345 | (7,000) | 195,345 | -21% |
| Global Alliances | 9,375 | 8,668 | - | 8,668 | 8% | 8% | 22,434 | 23,288 | | 23,288 | |
| G&A | 85,518 | 77,887 | - | 77,887 | 9% | 9% | 172,157 | 151,210 | | 151,210 | 12% |
| Development & IT | 271,365 | 287,777 | (3,000) | 284,777 | -6% | -5% | 532,634 | 552,782 | (3,000) | 549,782 | -3% |
| Information Technology | 64,585 | 70,961 | - | 70,961 | -10% | -10% | 125,126 | 139,253 | | 139,253 | |
| Corporate | 17,511 | 27,744 | - | 27,744 | -58% | -58% | 27,444 | 48,085 | | 48,085 | -75% |
| Corporate Accruals | (15,301) | (3,848) | (25,000) | (28,848) | nm | -89% | (39,726) | (12,330) | (25,000) | (37,330) | 6% |
| **Total Operating Expenses** | $ 1,726,972 | $ 1,739,643 | $ (36,515) | $ 1,703,128 | -1% | 1% | $ 3,348,041 | $ 3,315,567 | $ (36,515) | $ 3,282,052 | 2% |
| **Operating Income** | 594,911 | 827,670 | 109,687 | 937,357 | 39% | 58% | 958,359 | 1,510,621 | 109,687 | 1,620,308 | 69% |
| **Operating Margin %** | 26% | 32% | | 35% | | | 22% | 31% | | 33% | |
| Other (Income)/Expense | (1,688) | (15,646) | - | (15,646) | nm | 827% | (5,794) | (93,506) | | (93,506) | 1514% |
| Investment (Gains)/Minority Loss (1 | 5,083 | 11,587 | | 11,587 | | | 8,428 | (3,846) | | (3,846) | 146% |
| **Pre-Tax Income** | $ 591,515 | $ 831,729 | $ 109,687 | $ 941,416 | 41% | 59% | $ 955,724 | $ 1,607,973 | $ 109,687 | $ 1,717,660 | 80% |
| **Pre-Tax Margin %** | 25% | 32% | nm | 36% | | | 22% | 33% | | 35% | |
| Tax Rate | 35.0% | 35.5% | 35.5% | 35.5% | | | 35.0% | 35.5% | 35.5% | 35.5% | |
| Tax Provision | 207,030 | 295,264 | 38,930 | 334,203 | -43% | -61% | 334,504 | 570,830 | 38,930 | 609,760 | |
| **Net Income** | $ 384,485 | $ 535,465 | $ 70,748 | $ 607,213 | 40% | 58% | $ 621,221 | $ 1,037,142 | $ 70,748 | $ 1,107,891 | 78% |
| Weighted Average Shares | 6,012,600 | 5,874,180 | 5,874,180 | 5,874,180 | -2% | -2% | 5,988,702 | 5,930,335 | 5,930,335 | 5,930,335 | |
| **Earnings Per Share** | 6.4c | 9.3c | 1.2c | 10.3c | 43% | 62% | 10.4c | 17.5c | 1.2c | 18.7c | |
| Market Expectation | | | | 18.0c | | | | | | | |
| **Memo:** | | | | | | | | | | | |
| Consulting | $ 578,651 | $ 540,942 | $ 2,000 | $ 542,942 | -7% | -6% | | | | | |
| Support | 720,603 | 859,788 | 16,340 | 876,128 | 19% | 22% | | | | | |
| Education | 132,605 | 123,890 | 1,700 | 125,590 | -7% | -5% | | | | | |
| Other | 2,773 | 7,684 | - | 7,684 | 177% | 177% | | | | | |
| **Total Services Revenues** | $ 1,434,632 | $ 1,532,304 | $ 20,040 | $ 1,552,344 | 7% | 8% | | | | | |

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

| Corporate Adjustments | License | Support | Education | Consulting | Total |
|---|---|---|---|---|---|
| Int'l Revenue Transfers | $  7,000 | | $      - | $      - | $  7,000 |
| US Bad Debt Adjustment | 11,600 | 4,600 | 600 | 3,200 | 20,000 |
| Management Judgment | (3,500) | - | | | (3,500) |
| Total | $  15,100 | $  4,600 | $      600 | $  3,200 | $23,500 |

**License By Product**

| | | | |
|---|---|---|---|
| **Technology** | 807,928 | 76% | 11,476 |
| **ERP** | 205,443 | 19% | 2,918 |
| **CRM** | 49,677 | 5% | 706 |
| **Total** | 1,063,047 | 100% | 15,100 |

**Bad Debt Give Back**          **Bad Debt Adjustment**   $20,000

| | | |
|---|---|---|
| | License | 58% |
| | Support | 23% |
| | Education | 3% |
| | Consulting | 16% |
| Total  $      - | Total | 100% |

**Management Judgment**

Total  $      -

Corp Adj 6/22/2002

NDCA-ORCL 440832

# EXHIBIT 8

---

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

# CASE NO. C-01-0988-MJJ

| | |
|---|---|
| **In re ORACLE CORPORATION**<br>**SECURITIES LITIGATION** | ) |
| | ) |
| | ) |
| **This Document Relates to:** | ) |
| | ) |
| **ALL ACTIONS.** | ) |

---

## Rebuttal Expert Report of J. Duross O'Bryan, CPA

**Dated: June 22, 2007**

# TABLE OF CONTENTS

I.   INTRODUCTION

II.  OVERVIEW OF MR. REGAN'S OPINIONS

III. SUMMARY OF DEFICIENCIES IN MR. REGAN'S EXPERT REPORT

    A. MR. REGAN OFFERS NO OPINION ON THE FINANCIAL STATEMENT IMPACT OF THE 46,000-PLUS DEBIT MEMOS

    B. MR. REGAN OFFERS UNFOUNDED OPINIONS, THAT ARE UNSUPPORTED BY THE EVIDENCE, ON ISSUES THAT PLAINTIFFS DID NOT RAISE IN THE COMPLAINT

    C. MR. REGAN FAILS TO ESTABLISH THAT EITHER THE BAD DEBT TRANSFERS OR THE HP TRANSACTIONS – OR BOTH COMBINED – WERE MATERIAL TO ORACLE'S FINANCIAL STATEMENTS

    D. MR. REGAN DOES NOT ATTEMPT TO LINK THESE UNPLED ISSUES TO ORACLE'S THIRD QUARTER FINANCIAL RESULTS OR THE DECLINE IN ORACLE'S STOCK PRICE

IV.  MR. REGAN FAILS TO OFFER ANY OPINIONS ON THE ONLY ACCOUNTING CLAIM ALLEGED IN THE COMPLAINT

V.   MR. REGAN'S OPINIONS REGARDING ORACLE'S ACCOUNTING PRACTICES, WHICH UNDERPIN HIS OPINIONS RELATING TO THE BAD DEBT TRANSFERS, ARE FUNDAMENTALLY FLAWED

    A. MR. REGAN HAS MISCHARACTERIZED THE NATURE AND EXTENT OF UNAPPLIED CASH

    B. MR. REGAN HAS MISCHARACTERIZED ORACLE'S PRACTICES REGARDING CREDIT MEMOS AND REFUNDS

        1. CREDIT MEMOS

        2. REFUNDS

    C. THE DEBIT MEMOS DID NOT "CONCEAL" CUSTOMER OVERPAYMENTS

VI.  MR. REGAN'S OPINIONS REGARDING THE TRANSFERS OF UNAPPLIED CASH ARE UNSUPPORTED

    A. PLAINTIFFS' CLAIMS REGARDING THE BAD DEBT TRANSFERS WERE NOT ALLEGED IN THE COMPLAINT

    B. THE "ON ACCOUNT" DESIGNATION WAS NOT A "STEP IN THE PROCESS" TO MOVE UNAPPLIED CASH

    C. ORACLE'S REMEDIAL EFFORTS AIMED AT RESOLVING THE BAD DEBT TRANSFERS WERE APPROPRIATE

     D.  THE EFFECT ON THE SECOND QUARTER FINANCIAL STATEMENTS WAS NOT MATERIAL

VII.    MR. REGAN'S OPINIONS REGARDING THE HEWLETT-PACKARD TRANSACTIONS ARE BASELESS

     A.  THE HP TRANSACTIONS WERE NOT ALLEGED IN THE COMPLAINT AND WERE NOT A PROPER SUBJECT OF FACT DISCOVERY
     B.  BACKGROUND OF THE HP TRANSACTIONS
     C.  THE NOVEMBER 30 TRANSACTIONS WERE NOT IMPROPER "SWAPS"
         1.  ORACLE RECEIVED SUBSTANTIAL ECONOMIC BENEFITS AS A RESULT OF THE HP SERVER PURCHASE AGREEMENT
         2.  HP RECEIVED SUBSTANTIAL ECONOMIC BENEFITS AS A RESULT OF THE CRM LICENSE AGREEMENT
         3.  MR. REGAN INCORRECTLY ASSUMES THAT THE NOVEMBER 30 TRANSACTIONS WERE "NONMONETARY" TRANSACTIONS
     D.  ORACLE PROPERLY RECORDED REVENUE ON THE CRM LICENSE AGREEMENT IN ACCORDANCE WITH SOP 97-2
         1.  PERSUASIVE EVIDENCE OF AN ARRANGEMENT EXISTED
         2.  DELIVERY HAD OCCURRED
         3.  ORACLE'S FEES WERE FIXED OR DETERMINABLE, AND COLLECTIBILITY WAS PROBABLE
     E.  THE EFFECT ON THE SECOND QUARTER FINANCIAL STATEMENTS WAS NOT MATERIAL

VIII.   CONCLUSIONS

IX.    QUALIFICATION

# I.    INTRODUCTION

I have been asked to review and analyze the opinions offered by D. Paul Regan in his Expert Report dated May 25, 2007.   Although I have reviewed and respond below in detail to the opinions and assumptions Mr. Regan makes in his Expert Report, I note at the outset that Mr. Regan's opinions appear not to relate to the accounting claims raised by Plaintiffs in their Revised Second Amended Complaint dated December 9, 2002 (the "Complaint").   Plaintiffs' accounting allegations, as set forth in the Complaint, focus exclusively on the purported financial statement impact of Oracle's creation of more than 46,000 debit memos on November 17, 2000. In his Expert Report, however, Mr. Regan expressly refuses to offer an opinion "about the total financial statement impact of the transactions relating to all $692 million from the 46,881 debit memo transactions in Q2FY01."[1] In fact, Mr. Regan acknowledges that he is "uncertain" about the financial statement impact of these debit memos.[2] By failing to offer an opinion on this critical issue, Plaintiffs have abandoned the only accounting allegation pled in the Complaint. Accordingly, Mr. Regan's Expert Report is more significant for opinions that he does not provide, than for those that he does offer.

Instead of addressing Plaintiffs' debit memo allegations, Mr. Regan offers several opinions about accounting issues that were not alleged by Plaintiffs in the Complaint, but which I understand Plaintiffs detailed, to a certain extent, in their Second Supplemental Responses to Defendants' Second Set of Interrogatories to Plaintiffs dated January 31, 2007 (the "Supplemental Interrogatory Responses").   These issues concern certain transfers of unapplied cash to Oracle's bad debt reserve and transactions that Oracle entered into with Hewlett-Packard ("HP") in the

---

[1] *See* Expert Report of D. Paul Regan ("Expert Report"), at p. 31.

[2] *See id,* at p. 34.

second quarter of fiscal year 2001. As I noted in my Opening Report, the significance of Plaintiffs' failure to allege these issues in their Complaint – like their failure to offer any expert opinions on the only accounting issue pled in this case – is a legal matter. However, I understand that discovery related to the HP transactions was not responsive under any of the discovery orders pertaining to the accounting issue in this case. I further understand that the Special Master charged with refereeing discovery disputes ruled that evidence pertaining to Oracle's recognition of revenue from Oracle's sale of licenses to HP in the second quarter of fiscal year 2001 was not a proper subject of fact discovery.[3] Nevertheless, Mr. Regan cites the lack of "evidence" surrounding Oracle's sale of licenses to HP as support for his opinion that Oracle improperly recognized revenue on the last day of the second quarter of fiscal year 2001.[4]

In any event, Mr. Regan's opinions concerning Plaintiffs' newly-styled accounting assertions are incorrect. Even if the transfers of unapplied cash into the bad debt reserve and the HP transactions (i) were alleged in the Complaint, (ii) both were the proper subject of fact discovery, and (iii) required adjustment from an accounting perspective, I would not modify the opinions in my Opening Report. Whether viewed individually or in the aggregate, these allegations do not give rise to a material misstatement in the financial statements for the second quarter of fiscal year 2001, and nothing in Mr. Regan's Expert Report proves otherwise. Indeed, Mr. Regan barely addresses the concept of materiality in his Expert Report.[5] Equally noteworthy, any accounting impact of the bad debt transfers or the HP transactions would be reflected in Oracle's financial statements for the second quarter of fiscal year 2001, and I have seen no evidence to suggest that they would have had any impact on Oracle's financial results in third quarter of fiscal year 2001.

---

[3] *See* Telephonic Conference at Hewlett Packard Deposition, June 30, 2006, 16:8-17:6.

[4] *See id.*, at pp. 43, 52-53 and 57.

[5] *See id.*, at pp. 21-22.

## II.   OVERVIEW OF MR. REGAN'S OPINIONS

Mr. Regan opines that Oracle's financial statements for the second quarter of fiscal year 2001 were not presented in accordance with Generally Accepted Accounting Principles ("GAAP").[6] He then makes a series of other general opinions which he believes supports this primary opinion:

- Oracle "improperly utilized a series of debit memos to 'apply' unapplied cash," and "conceal(ed) Oracle's use of customer overpayments to overstate its Bad Debt Reserve by at least $20 million.  The overstatement of the Bad Debt Reserve was eliminated by improperly increasing revenue and pre-tax earnings in the same amount in 2QFY01."[7]

- Oracle "overstated its Customer Advances and Unearned Revenue by including customer overpayments and other unapplied cash in this balance."[8]

- Oracle "improperly recognized $19.9 million in revenue and pre-tax earnings on November 30, 2000 as a result of a transaction with HP that failed to meet the criteria needed for this revenue to be properly recognized by Oracle."[9]

- Oracle "overstated its reported earnings-per-share of $0.11," as a result of these two alleged accounting issues.[10]

---

[6] *See id.*, at p. 1.

[7] *See id.*, at p. 2.

[8] *See id.*

[9] *See id.*

[10] *See id.*

3

### III.   SUMMARY OF DEFICIENCIES IN MR. REGAN'S EXPERT REPORT

### A.   MR. REGAN OFFERS NO OPINION ON THE FINANCIAL STATEMENT IMPACT OF THE 46,000-PLUS DEBIT MEMOS

Mr. Regan does not offer an opinion about the financial statement impact of the "transactions relating to all $692 million from the 46,881 debit memo transactions in Q2FY01."[11]  As Plaintiffs' accounting expert, his failure to opine on this issue is surprising, since there is clear, compelling and undisputed evidence (as detailed in my Opening Report) that the November 17, 2000 debit memos were created as part of a process that involved three simultaneous and offsetting debits and credits in the same amount to the same account.  As such, these debit memos did not, and could not, impact Oracle's second quarter financial statements.  By refusing to opine on the financial statement impact of the 46,000-plus debit memos, Mr. Regan fails to provide expert testimony on the *only* accounting allegation pled in the Complaint, *i.e.*, that Oracle erroneously recorded more than $228 million in revenue in the second quarter of fiscal year 2001 through the accounting for over 46,000 "phony invoice" debit memos.[12]

### B.   MR. REGAN OFFERS UNFOUNDED OPINIONS, THAT ARE UNSUPPORTED BY THE EVIDENCE, ON ISSUES THAT PLAINTIFFS DID NOT RAISE IN THE COMPLAINT

As noted above, the Complaint did not raise any accounting claims related to the transfers of unapplied cash to the bad debt reserve or Oracle's transactions with HP during the second quarter of fiscal year 2001.  I understand that Plaintiffs provided detail for these allegations in their Supplemental Interrogatory Responses earlier this year, well after discovery was substantially complete.  Nevertheless, Mr. Regan devotes almost all of his Expert Report to these issues.

---

[11] *See id.,* at p. 31.
[12] *See* Complaint, at paragraph 8.

4

Based upon my review of the evidence, I believe that Mr. Regan's opinions on these two previously-unpled issues lack any factual support.

## C.    MR. REGAN FAILS TO ESTABLISH THAT EITHER THE BAD DEBT TRANSFERS OR THE HP TRANSACTIONS – OR BOTH COMBINED – WERE MATERIAL TO ORACLE'S FINANCIAL STATEMENTS

Even if the entire $20 million in transfers to the bad debt reserve required adjustment from an accounting perspective (which, as discussed in my Opening Report, many transfers did not), any impact on Oracle's financial statements in the second quarter of fiscal year 2001 still would not be material from either a quantitative or qualitative standpoint. Similarly, assuming for argument's sake that the entire $19.9 million in revenue recognized from Oracle's sale of Customer Relationship Management ("CRM") licenses to HP was recognized erroneously, any impact on Oracle's financial statements would not have been material. Giving Plaintiffs the benefit of the doubt, and assuming that *both* the bad debt transfers and the decision to recognize revenue from the sale of licenses to HP in the second quarter were erroneous, the combined impact on Oracle's financial statements in the second quarter of fiscal year 2001 still would not give rise to a material misstatement of revenue, pre-tax earnings, net income or earnings per share.

As set forth below, under Staff Accounting Bulletin No. 99 ("SAB 99"), a matter is material if there is a "substantial likelihood that the...fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available...."[13] Mr. Regan ignores entirely seven qualitative factors that are typically considered in evaluating materiality,[14] and he misapplies the other two factors. Furthermore, Mr. Regan fails to consider the "total mix"

---

[13] *See* Staff Accounting Bulletin No. 99 – Materiality (citing *TSC Industries v. Northway, Inc.,* 426 U.S. 438 (1976), and *Basic, Inc. v. Levinson*, 485 U.S. 224 (1998)).

[14] *See id.*

of information, as SAB 99 recommends, and he provides no support for his belief that there would have been a "substantial likelihood" that the allegations (if true) would have "significantly altered the 'total mix' of information" as viewed by a reasonable investor.

## D.     MR. REGAN DOES NOT ATTEMPT TO LINK THESE UNPLED ISSUES TO ORACLE'S THIRD QUARTER FINANCIAL RESULTS OR THE DECLINE IN ORACLE'S STOCK PRICE

Even if these previously unpled accounting issues resulted in a material misstatement of revenue or net income, such misstatement would be reflected in Oracle's financial statements for the *second quarter* of fiscal year 2001. Nowhere in his report does Mr. Regan attempt to link these events to Oracle's financial statements for the third quarter of fiscal year 2001, or the decline in the Company's stock price following the third quarter earnings miss – to which Plaintiffs attribute their damages.[15] In other words, even if a restatement for the second quarter of fiscal year 2001 were required – which I do not believe to be the case – Mr. Regan offers no evidence suggesting that such restatement would have impacted Oracle's financial performance in subsequent reporting periods.

## IV.    MR. REGAN FAILS TO OFFER ANY OPINIONS ON THE ONLY ACCOUNTING CLAIM ALLEGED IN THE COMPLAINT

In order to justify his failure to offer an opinion on the sole accounting issue pled in this case – whether the debit memos had any financial statement impact – Mr. Regan asserts that Oracle produced script output for only 926 of the 46,000-plus debit memos (which, as I understand, was so limited by the Special Master), and that "Oracle did not provide the full audit trail and source

---

[15] *See* Complaint, paragraphs 17 and 74.

evidence concerning the other $157 million in debit memo transactions."[16]  Mr. Regan also claims that the evidence produced in connection with the script output for the 926 debit memos "appears incomplete."[17]  These excuses are untenable.

Mr. Regan does not need script output for all 46,000-plus debit memos to ascertain their financial statement impact (or, more accurately, lack thereof).  Nor does Mr. Regan need any additional source documents to form an opinion on this issue.  As set forth in my Opening Report, the debit memos were generated by an SQL script that involved simultaneous and offsetting debits and credits in the same amount, to the same account.  These offsetting transactions are consistently displayed in the script output for all 926 debit memos on which discovery has focused in this case.[18]  The 926 debit memos total $534 million of the $692 million sum – *i.e.*, 77% of the total – of the 46,000-plus debit memos.[19]  There is no evidence suggesting that the debit memos that are *not* included in the script output were accounted for any differently, especially considering that all of the debit memos were generated by the same computer script.  Furthermore, the Account Analysis Report with Payable's Detail illustrates that the entire $692 million was both debited and credited to the same account on November 17, 2000.[20]  Moreover, the Sales Journal by GL Account Report establishes that Oracle only recognized approximately $10 million on November 17, 2000.[21]  Thus, as stated in my Opening Report, the evidence is clear and uncontroverted that the November 17, 2000 debit memos had no financial statement impact.

---

[16] *See* Expert Report, at p. 31.  The 926 debit memos consist of 776 debit memos, for which the Court ordered discovery, and an additional 150 debit memos which Plaintiffs themselves selected for purposes of additional discovery.  *See* Order Granting Plaintiffs' Motion to Compel Production of Documents, at 1; Order Granting in Part and Denying in Part Plaintiffs' Motion to Compel Defendants' Production of Accounting Documents, at 17.

[17] *See id.*

[18] *See* NDCA-ORCL 1058909.

[19] *See id.*

[20] *See* NDCA-ORCL 050356-60.

[21] *See* NDCA-ORCL 048989–9207.

In sum, Mr. Regan's refusal to opine on the lack of financial statement impact of the 46,000-plus debit memos on the second quarter of fiscal year 2001 is neither the result of the completeness of the script output nor the adequacy of accounting discovery in this case. I view Mr. Regan's refusal to opine on this particular issue as an acknowledgement that the creation of and accounting for the 46,000-plus debit memos had no financial statement impact.

## V.   MR. REGAN'S OPINIONS REGARDING ORACLE'S ACCOUNTING PRACTICES, WHICH UNDERPIN HIS OPINIONS RELATING TO THE BAD DEBT TRANSFERS, ARE FUNDAMENTALLY FLAWED

Mr. Regan makes a number of broad, conclusory and incorrect assertions regarding Oracle's purported "policies" concerning unapplied cash, customer overpayments and refunds. Specifically, based upon an incomplete understanding of the evidence and Oracle's internal accounting practices, he suggests that Oracle purposefully withheld customer overpayments, refused to issue refunds to its customers and "concealed" these overpayments through the creation of the debit memos.[22] Based upon my review of the evidence Mr. Regan cited, and other documents and deposition testimony in this matter, I believe that these accusations are unfounded.

## A.   MR. REGAN HAS MISCHARACTERIZED THE NATURE AND EXTENT OF UNAPPLIED CASH

Mr. Regan claims that at the beginning of the second quarter of fiscal year 2001, Oracle "had accumulated at least $144 million of cash receipts from its customers that it was unable to apply to an invoice."[23] In reaching this figure, Mr. Regan appears to have simply added three account

---

[22] *See* Expert Report, at pp. 6 and 15.

[23] *See id.*, at p. 5.

balances at the beginning of the second quarter (Accounts 12018, 12601 and 25005),[24] and then he assumes that the sum represented payments that Oracle was "unable to apply" to open invoices. This analysis grossly mischaracterizes the nature of the amounts reflected in these accounts, and greatly exaggerates the extent to which these amounts could not be applied to open invoices.

For instance, Account 12018, "Unapplied Cash," represents amounts that Oracle believes are likely to be applied to the appropriate accounts in a short period of time.[25] There is no evidence that the entire balance of Account 12018 at the beginning of the second quarter of fiscal year 2001 consisted of cash receipts that Oracle was unable to apply to open invoices. In fact, the evidence I have reviewed demonstrates that Oracle was able to (and did) apply significant amounts of unapplied cash to open and unpaid invoices.[26]

Mr. Regan also includes the balance of Account 12601, "Bad Debt Write Offs," in his total of the amount of cash that Oracle allegedly could not apply to open invoices as of the beginning of the second quarter of fiscal year 2001. However, this account principally represents amounts written off as uncollectible.[27] Mr. Regan makes no attempt to differentiate between amounts that were properly written off as uncollectible, and any items of unapplied cash in this account. Furthermore, there is no evidence to suggest that the entire balance of Account 12601 consisted of cash receipts that Oracle was unable to apply to open invoices.

Mr. Regan also includes Account 25005, "Customer Overpayments." This account represents amounts which Oracle still is researching, of which most are expected to be applied against

---

[24] *See id.*, at p. 9.

[25] *See* AA 000005 and AA 000021.

[26] *See* NDCA-ORCL 050356-60 [Oracle Account Analysis Report].

[27] *See* AA 000012.

outstanding invoices in the future.[28,29]  Although this account may have contained some cash receipts that Oracle ultimately could not apply to open invoices during the relevant time period, there is no evidence indicating that the entire balance, as of the beginning of the second quarter of fiscal year 2001, consisted of cash receipts that Oracle was unable to apply.

Thus, by taking the sum of the balances of these three accounts, and treating the sum as unapplied cash that Oracle could not apply to open invoices, Mr. Regan grossly overstates the amount of unapplied cash that Oracle was unable to apply at the time.[30]  Furthermore, Mr. Regan fails to consider the fact that the amount of unapplied cash that Oracle had fluctuated on a daily basis, because even as cash receipts were being applied to open invoices, substantial amounts of new cash payments were being received from Oracle's customers.[31]  By failing to consider these facts, and by assuming that the entire balance of three different accounts consisted of cash that Oracle could not apply to open invoices, Mr. Regan premises his subsequent opinions regarding Oracle's treatment of unapplied cash on an unsupportable foundation.

## B.   MR. REGAN HAS MISCHARACTERIZED ORACLE'S PRACTICES REGARDING CREDIT MEMOS AND REFUNDS

Mr. Regan claims that a "significant cause of the balance of unapplied cash was overpayments made by Oracle's customers."[32]  Mr. Regan describes Oracle's internal policies and "systematic practices" regarding credit memos and the issuance of refunds as the "cause" of these customer

---

[28] *See* Deposition of Gregory Myers, dated April 12, 2005 ("Myers Dep."), at 244:9-11 ("Now, the balance that's sitting in unapplied that we're researching for our customers, that unapplied balance sits in 25005.").

[29] *See* AA 000688 (describing Account 25005 as a "'catch-all' account for all cash receipts company-wide.... The balance of this account consists of items not yet identified to a particular area.").

[30] *See* Expert Report, at pp. 8-9.

[31] *See* NDCA-ORCL 1727982.

[32] *See* Expert Report, at p. 6.

overpayments.[33]  However, he does not quantify the amount of unapplied cash that consisted of customer "overpayments."  Thus, Mr. Regan cannot substantiate his contention that customer overpayments were a "significant cause" of the balance of unapplied cash.[34]

## 1.    CREDIT MEMOS

Mr. Regan claims that Oracle's practice of not sending credit memos to its customers resulted in overpayments because he assumes that Oracle's customers were unaware that the outstanding balance of their invoices had been offset, in full or in part, by credit memos.[35]  However, the very evidence Mr. Regan cites in support of this argument demonstrates that Oracle, in fact, did notify its customers of credits being made to their respective accounts.[36]  Indeed, this same evidence illustrates that Oracle's practices with respect to credit memos were not part of a scheme to induce customer overpayments, but, rather, to reduce customer confusion regarding the meaning of credit memos and their availability for use against other open invoices.[37,38]

---

[33] *See id.,* at pp. 6-7.

[34] Mr. Regan also blames Oracle's practice of sending account statements only to those customers that requested such statements, but he does not describe how such a practice is unusual or contrary to normal business practices of other companies in the industry.  *See id.,* at p. 6.  In addition, Mr. Regan does not explain how such a practice "caused" customer overpayments.

[35] *See id.*

[36] *See* PLF-ORC 000135 ("Since it is not Oracle's practice to send out Credit Memos to our customers, we often tell them to short pay their original invoice by the amount we credit them.").

[37] *See* PLF-ORC 000132 ("One big problem with sending the clients copies of the credit memo's [*sic*] is that they then end up short paying an invoice, from any l.o.b. and when we get to the root of the problem they refer to the 'credit' they were given.").

[38] Mr. Regan also cites an email from Molly Littlefield, *see* NDCA-ORCL 1895745-7, in support of his claim that Oracle's practice of not sending credit memos to customers "caused customers to often be unaware of outstanding credits, resulting in overpayments."  *See* Expert Report, at p. 6.  This email, however, has *nothing* to do with credit memos – in fact, the term "credit memo" does not even appear in the document.  Based upon my review, it appears that the unapplied cash being discussed in that email relates to an order that was paid, but for which an invoice apparently never was booked.

## 2.    *REFUNDS*

Mr. Regan also claims that Oracle's unapplied cash balances resulted from internal policies that "inhibited the refund process."[39] In so doing, however, he misrepresents Oracle's internal accounting policies. During the relevant time period, Oracle issued refunds to customers upon request.[40] This practice, like Oracle's policy of not sending credit memos to customers, appears to have been implemented in an effort to reduce customer confusion that resulted when Oracle sent refunds to customers who did not request them. The evidence suggests that in some instances where Oracle issued a refund to customers who did not specifically request one, customers had no idea why they had received a check from Oracle.[41] Mr. Regan offers no evidence to suggest that this policy was unusual, that it deviated from the practices of other companies in the industry, or that it was inappropriate under GAAP.[42]

In addition, Mr. Regan overlooks a large body of evidence in rendering his opinions about Oracle's unapplied cash practices. Multiple Oracle employees have testified that when confronted with a situation where they had a cash receipt that they could not apply, among the first things they would do was contact the customer and solicit the customer's input on whether the payment should be refunded or applied to open invoices.[43] In fact, of the 926 debit memos

---

[39] *See* Expert Report, at p. 7.

[40] *See* Myers Dep., at 56:5-13 ("How would one determine whether it was going to be a refund once the payment was received? A.    Based upon someone's research that somebody had completed. So, for example, somebody had called the customer, and the customer requested that the money that they had paid us that was open on their – on the record needed to go back to them, they would submit the request to have that refund processed.").

[41] *See* Deposition of Ian Hatada, October 5, 2006 ("Hatada Dep."), at 214:22-215:6 ("Q: Did any customers ever - contact Oracle regarding these refunds and ask, 'Why is this being refunded?' A: Yes. Q: And did you ever talk to any of these customers? A: I answered the phone a couple of times as to 'Hey, we just received this check, and we have no idea why,' and I had to get off the phone and research as to when it was refunded or - why they received it.").

[42] *See* Expert Report, at pp. 6-7.

[43] *See* EY 000250; Deposition of Alexander Bender, dated September 21, 2006, at 224:16-17 ("[T]hey make every effort to contact the customer."); Myers Dep., at 169:22-24 ("[W]e would contact customers

upon which discovery has focused in this case, 277 contained refunds in their accounting histories that predated November 17, 2000, totaling more than $103 million.[44] This evidence – which Mr. Regan ignores – demonstrates that Oracle readily refunded customer payments where appropriate.

Indeed, one of the very transactions upon which Mr. Regan focuses in his Expert Report establishes that Oracle appropriately refunded money, long before the creation of the 46,000-plus debit memos. Mr. Regan points out that Household made a payment to Oracle on November 17, 1994.[45] That same day, Household returned the product and cancelled the order. However, despite the fact that Mr. Regan has seen the screenshot demonstrating that the money had been refunded to Household by a check that cleared on May 4, 1995,[46] Mr. Regan ignores this refund. Instead, Mr. Regan states that Oracle did not refund the money to Household until a second, erroneous refund occurred on May 23, 2002.[47,48] As Mike Quinn observed in a contemporaneous email, the May 23, 2002 refund was issued by mistake and should not have been made.[49,50]

---

and let them know that we had some sort of overpayment.…"); Deposition of Michael Quinn, dated April 18, 2006 ("Quinn Dep."), at 130:17-20 ("Generally speaking, you would call the customer and ask them how they wanted – how they wanted the disposition of that overpayment."); Deposition of Molly Venkataramana, dated April 13, 2006 ("Venkataramana Dep."), at 177:15-18 (Q. "So in researching an item of unapplied cash, the only thing you would do would be to pull the check copy and then contact the customer?" A. "And review the history on the item.").

[44] *See* NDCA-ORCL 1058909.

[45] *See* Expert Report, at p. 29.

[46] *See* NDCA-ORCL 603894.

[47] *See* HI000001-02.

[48] *See* Expert Report, at p. 30.

[49] *See* NDCA-ORCL 614018-614023 [Email from Greg Myers, dated October 31, 2002, containing undated email from Michael Quinn ("Raul and Adam misinterpreted what the 550… [d]ebit memos were for. This should not have been refunded.")].

[50] Mr. Regan cites the Household transaction throughout his Expert Report in support of the proposition that "the November Debit Memos concealed and misrepresented the balance of unapplied cash and customer overpayments improperly withheld by Oracle from its customers" and that "[O]racle's conduct related to its debit memo overpayments from Household…demonstrates the impropriety of its retention of, and accounting for, cash receipts from customer overpayments." *See* Expert Report, at pp. 17 and 27. His opinions in this regard, however, all are premised upon the incorrect assumption that Oracle did not refund Household's money until after November 17, 2000. Because there appears to be sufficient evidence that Oracle, in fact, did issue this refund to Household long before the creation of the 46,000-plus debit memos, all of Mr. Regan's arguments relating to this particular transaction are unsupported and incorrect.

Mr. Regan's contention that "[e]ven if the customer made such a [refund] request, Oracle would

often deny the customer a refund if the customer had any other receivables outstanding or if

Oracle had previously written off amounts as bad debt," is not supported by the evidence upon

which Mr. Regan relies.[51]  For instance, although Mr. Hatada testified that, during late 2002,

Oracle temporarily suspended the practice of issuing refunds,[52] Mr. Hatada conceded that he

could not identify a single refund, customer or dollar amount that Oracle allegedly improperly

withheld.[53]  Furthermore, there is no evidence, including the testimony of Mr. Hatada, to suggest

that Oracle improperly withheld customer refunds prior to November 17, 2000, or at any point

during the second quarter of fiscal year 2001.  Accordingly, because Mr. Hatada's testimony does

not support Mr. Regan's assumptions regarding Oracle's treatment of customer refunds prior to

and including the second quarter of fiscal year 2001, I placed no weight on it.

In the end, to the extent that Oracle had a significant balance of unapplied cash on any given day,

there is no evidence indicating that the cause was the accumulation of customer overpayments

resulting from Oracle's credit memo or refund policies.  The more likely cause is the sheer

volume of cash receipts that Oracle receives on a daily basis.  Oracle recognized $2.6 billion in

revenue globally during the second quarter of fiscal year 2001.[54]  As such, Oracle received

millions of dollars in cash receipts from customers on a daily basis.  The fact that Oracle could

not immediately apply all of these payments upon receipt does not mean that Oracle's policies

---

[51] *See id.*, at pp. 6-7.

[52] *See* Hatada Dep., at 64:25-65:11.

[53] *See id.*, at 501:22-502:4, ("Q. You can't think of a specific instance of customer or dollar amount on the Oracle system that says should be refunded, but, in fact, wasn't refunded; is that correct?  A. Correct.").

[54] *See* Oracle's 10-Q Report, dated January 16, 2001.

were in any way improper, that they caused or contributed to customer overpayments, or that they deviated from industry norms.[55]

## C.   THE DEBIT MEMOS DID NOT "CONCEAL" CUSTOMER OVERPAYMENTS

Mr. Regan claims that Oracle "concealed" customer overpayments by "applying" unapplied cash to a series of debit memo invoices.[56] Mr. Regan's opinions are incorrect and contradicted by the evidence.

As set forth in my Opening Report, Oracle created the 46,000-plus debit memos to remove vestigial "On Account" flags. All of the items that had been placed "On Account" as of November 17, 2000 already had been resolved, primarily through refunds, expense reimbursements, customer stop payments, transfers to lease receivables or transfers into the bad debt reserve. The "On Account" flag was used as a signal to the Accounts Receivable and Collections Departments to "not touch" the flagged receipt.[57]  Thus, unless a collector misunderstood the meaning of the "On Account" flag, he or she would not have viewed the flagged receipt as an overpayment or credit to a customer's account. The flaw in Mr. Regan's reasoning is that he assumes that Oracle's collections personnel understood the "On Account" flag to mean that Oracle was withholding customer overpayments. Therefore, the creation of the

---

[55]  Mr. Regan also opines that unapplied cash receipts held in Accounts 12601 and 25005 should be reported with Accounts Payable.  *See* Expert Report, at p. 11.  However, reporting cash receipts as Accounts Payable, which typically consists of amounts owed to vendors, would result in an overstatement of the balance of Accounts Payable under GAAP.  Most of the cash Oracle received from customers is eventually applied to outstanding invoices or open receivables.  Furthermore, much of the remaining balance of unapplied cash receipts relates either to uncarned advance payments, or amounts which appropriately can be applied to royalty revenue not yet invoiced, expense reimbursements and other items, none of which should be included in Accounts Payable.

[56]  *See id.* at p. 15.

[57]  *See* Myers Dep., at 83:1-4 ("So putting it On Account was an indefinite flag that [*sic*] do not touch this receipt, another transaction has taken place, therefore, this money should not be taken to an open invoice....").

46,000-plus debit memos – which were generated as part of the process through which Oracle removed the "On Account" flags –  could not have "concealed" customer overpayments or credits.

Nor did Oracle "conceal" the fact that it eliminated the "On Account" flags through the creation of the debit memos. Within a day of the creation of the 46,000-plus debit memos, Greg Myers sent an email to various accounting managers explaining the nature and purpose of the debit memos.[58] The debit memos, by design, were visible and readily identifiable to Oracle's Collections Department. The debit memos were run on the same day and were given unique, sequential identifying numbers (*i.e.*, the specially-designed prefix of "55").[59,60] To this day, the debit memos appear throughout Oracle's accounts receivable subledger ("A/R Subledger").[61] For instance, the standard "7-Bucket Aging By Customer" report shows both the debit memos and the "On Account" receipts for each Oracle customer.[62] In addition, the standard "Billing History" report identifies each November 17, 2000 debit memo.[63] In fact, it is precisely because the debit memos appear in Oracle's "Billing History" reports that CW46 and Plaintiffs became aware of the debit memos in the first place.[64]

---

[58] *See* NDCA-ORCL 623787 [Email from Greg Myers to Pam Janakes, Kim McMurdo, Sam Yohannes, John Badovinac, Jean De Luzuriaga, Kathleen Edwards, Julie Chan, Michael Quinn, Adam Hahn and Sanjay Kumar, November 18, 2000].

[59] *See* Myers Dep., at 109:9-11 ("Prior to November 17[th].... we really didn't use debit memos at all."), 189:12-14 ("[T]hey were not normal course of business, they were not, you know, invoices charging customers of any kind, so we wanted to make sure we were able to isolate these."), and 270:1-6 ("Q. And how do you know that it's a debit memo?  A. It's based upon the invoice number, that it has a 5 series number, 55, which was the sequence we used for the debit memos. Also using the description on the line item, it says On Account cleanup for U.S.A. date, would be two indicators that this is a debit memo.").

[60] *See* NDCA-ORCL 049208-050060.

[61] *See* NDCA-ORCL 1058909.

[62] *See* NDCA-ORCL 1198884-1208895.

[63] *See* ORR 000789-803.

[64] *See id.*

16

Notably, as discussed in my Opening Report, there were a number of debit memos that related to cash receipts that previously had been refunded or for which a customer had placed a stop payment on the check.[65] Indeed, as noted above, of the 926 debit memos upon which discovery has focused, 277 contained refunds in their accounting histories that predated November 17, 2000, totaling more than $103 million.[66] Mr. Regan fails to explain how the application of the "On Account" flag against the November 17, 2000 debit memos "concealed" overpayments or amounts that "should have been" refunded to Oracle's customers considering that there was no money associated with these flagged receipts because the cash had been refunded long before the debit memos were created.

All of these facts are inconsistent with Mr. Regan's apparent belief that Oracle "concealed" overpayments or amounts that should have been refunded to its customers through the creation of the debit memos. I have seen no evidence to support Mr. Regan's theory that the creation of and accounting for the debit memos "concealed" amounts belonging to Oracle's customers.

## VI.   MR. REGAN'S OPINIONS REGARDING THE TRANSFERS OF UNAPPLIED CASH ARE UNSUPPORTED

Mr. Regan also makes a number of unfounded assertions and unsupportable conclusions regarding certain transfers of unapplied cash into the bad debt reserve during the second quarter of fiscal year 2001. Although I will respond briefly to some of Mr. Regan's points in this regard, his contentions regarding both the cause and effect of the bad debt transfers ultimately are irrelevant. Even if one were to assume that the entire $20 million in transfers into the bad debt

---

[65] For instance, in the Texas Instruments transaction described in my Opening Report, the customer placed a stop payment on the check such that there was no money associated with the "On Account" receipt as of November 17, 2000. Similarly, in the Sprint transaction described in my Opening Report, Oracle had refunded the underlying payment in 1998, such that there was no money associated with the "On Account" receipt as of November 17, 2000.

[66] *See* NDCA-ORCL 1058909.

reserve were reclassified erroneously (which, as discussed in my Opening Report, they were not), the impact of these transfers on Oracle's revenue, net income and earnings per share in the second quarter would not be material, either from a quantitative or qualitative standpoint.

## A. PLAINTIFFS' CLAIMS REGARDING THE BAD DEBT TRANSFERS WERE NOT ALLEGED IN THE COMPLAINT

Plaintiffs did not make any allegations in the Complaint about bad debt transfers in the second quarter of fiscal year 2001. Instead, Plaintiffs' sole accounting allegation pled in the Complaint relates to the creation of and accounting for the 46,000-plus debit memos. As noted above, Mr. Regan refused to offer any opinions on the financial statement impact (or lack thereof), of the 46,000-plus debit memos.

## B. THE "ON ACCOUNT" DESIGNATION WAS NOT A "STEP IN THE PROCESS" TO MOVE UNAPPLIED CASH

Mr. Regan claims that "[t]he On Account designation in the accounting system was a step in the process to move unapplied cash to the 12601 Account...."[67] This statement is demonstrably incorrect. The vast majority of items that were flagged as "On Account," as of November 30, 2000, had nothing to do with Account 12601. Indeed, of the 926 debit memos encompassed within the script output, only 121 transactions – consisting of $10.6 million of the $534 million total of the 926 debit memos – involved transfers into the bad debt reserve in the second quarter of fiscal year 2001.[68] For instance, the transaction with Household Finance, which Mr. Regan features throughout the Expert Report, does not contain any transfers of unapplied cash into (or

---

[67] *See* Expert Report, at p. 15. The evidence Mr. Regan cites as support for this contention illustrates that Oracle did not begin using the "On Account" functionality to transfer money into the bad debt reserve until months after the 46,00-plus debit memos were created. *Id.* (Citing NDCA-ORCL 1609375-76).

[68] *See* NDCA-ORCL 1058909.

18

out of) the bad debt reserve, notwithstanding the fact that Household's payment was placed "On Account."[69] Mr. Regan simply fails to explain how the "On Account" designation "was a step in the process to move unapplied cash to the 12601 Account" considering that the vast majority of the receipts that were flagged "On Account" never touched the bad debt reserve.

Furthermore, the small subset of transactions that *do* contain transfers into the bad debt reserve in their accounting histories also undermine Mr. Regan's conclusion that the "On Account" flag was a "step in the process" to move unapplied cash into the bad debt reserve. For the vast majority of receipts that were transferred to Account 12601, the corresponding flag in the A/R Subledger was not changed to "On Account" until *after* the transfer had taken place.[70] For instance, Mr. Regan analyzes the accounting history for a transaction involving Ameritrade in his Expert Report.[71] According to Mr. Regan's own analysis of that transaction, the transfer to the bad debt reserve occurred on August 5, 2000, while the "On Account" flag was not raised until nearly three weeks later (*i.e.*, August 25, 2000). Thus, there is no way that the "On Account" flag could have been a "step in the process" to move unapplied cash into the bad debt reserve because the transfer already had taken place.

## C.    ORACLE'S REMEDIAL EFFORTS AIMED AT RESOLVING THE BAD DEBT TRANSFERS WERE APPROPRIATE

Mr. Regan attacks the procedures through which Oracle later investigated and resolved transfers of unapplied cash.[72] As discussed in my Opening Report, in October 2002, Oracle identified a potential issue with some of the transfers into its bad debt reserve. At the direction of Oracle's

---

[69] *See* Expert Report, at pp. 7, 16-17 and 27-31.

[70] *See* NDCA-ORCL 1058909.

[71] *See* Expert Report, at pp. 25-26.

[72] *See id.*, at p. 22.

Audit Committee, the accounting and collections groups investigated these transfers and attempted to identify the appropriate treatment of these receipts, to the extent that these payments did not properly belong in the bad debt reserve in the first place.[73] I have not seen any evidence, nor has Mr. Regan identified any evidence, suggesting that the transfers into the bad debt reserve or Oracle's subsequent remedial measures were part of a deliberate effort to manufacture revenue or artificially inflate net income or earnings per share.

Mr. Regan states that the unapplied cash receipts were removed from the bad debt reserve and "properly restored" to the unapplied cash account.[74] This mischaracterizes the nature of the unapplied cash project. Oracle initially took a conservative approach and transferred the money back to Account 25005 as a way to isolate the transferred amounts, *i.e.*, reducing the bad debt reserve and showing the amounts as "Unapplied."[75] Mr. Regan points out that some of the money ultimately was refunded, and some was escheated to the state.[76] What Mr. Regan fails to point out, however, is that at least some of the money properly belonged in the bad debt reserve, and subsequently was returned to the reserve. Moreover, as I pointed out in my Opening Report, I found evidence that at least $2 million of the approximately $10 million in transfers that I analyzed represented an appropriate recognition of earnings as of the second quarter of fiscal year 2001.

---

[73] *See* Declaration of Gregory Myers, dated Nov. 14, 2002, at paragraph 4, ("Earlier this year, I was also involved in an investigation into the disposition of unassigned cash receipts that Oracle's collections staff had, over time, assigned to an accounts receivable reserve known as Account 12601."). *See also* Declaration of Michael Quinn, dated Nov. 14, 2002, paragraph 5, ("Earlier this year, I was personally assigned by Tom Williams to manage an investigation into the proper disposition of unassigned cash receipts that Oracle's collections staff had, over time, assigned to an accounts receivable reserve account known as Account 12601.").

[74] *See* Expert Report, at p. 23.

[75] *See* NDCA-ORCL 1914199-1914286 [Journal Entries Report for account 25005 from November 1, 2002 to November 30, 2002] and NDCA-ORCL 1534024-1534169 [Journal Entries Report for account 12601 from November 1, 2002 to November 30, 2002].

[76] *See* Expert Report, at pp. 23-24.

Mr. Regan also takes issue with the practice of "adjusting up" invoices, claiming that "Oracle did not have an adequate basis to conclude, in late 2002 or thereafter, that the original credit memo had been issued in error."[77]  There is no evidence to support Mr. Regan's opinion.  The personnel who performed the investigation had the Oracle accounting system at their disposal, and were instructed to arrive at a fair resolution of the transfers.[78]  Every witness who has testified about the practice of "adjusting up" invoices has stated, unequivocally, that Oracle would only "adjust up" an invoice where a credit memo had been previously applied against the underlying invoice in error.[79,80]  Although Mr. Regan opines that the employees performing the investigation "adjusted up" invoices without adequate support,[81] he does not identify a single invoice that was improperly "adjusted up."[82]

---

[77] See id., at p. 24.

[78] See NDCA-ORCL 1609379 [Email from Michael Quinn to Ryan Roberts and Greg Myers, "For items in the Miscellaneous Offset Report, August-00 Through September-02, we need to continue to work through each item >$10,000 to determine 1) what should have happened to the cash receipt and 2) make the correction to put it in the right place."].  See also Quinn Dep., at 167:18-21 ("[Y]ou told people in the collections department to determine the proper resolution of Oracle's unapplied cash?  A.  Yes.").

[79] See Venkataramana Dep., at 260:23-261-3 ("Q.  Okay.  And what do you recall about those discussions?  A.  That if the credit memos were found to be erroneous credit memos and should not – the invoices should not have been credit memo'd, to adjust up the invoice."); and 261:21-25 ("Q.  And what do you mean when you say they weren't valid?  A.  We would credit memo it as bad debt.  It was aged to some degree and this many days outstanding, so therefore, we want to credit memo it as bad debt."); Hatada Dep., at 282:11-15 ("[I]f we found a credit memo that was due to bad information given to us, then, therefore, the credit memo was done in error and should be adjusted up in an effort to apply the unapplied cash.").

[80] Mr. Regan's assumption that Oracle personnel "adjusted up" invoices, simply because a credit memo had been issued in an amount equal to or greater than the amount that was transferred to Oracle's bad debt reserve, is also unfounded.  See Expert Report, at pp. 12 and 24.  I found evidence that a number of credit memos issued in amounts equal to or greater than the amounts transferred to Oracle's bad debt reserve, were refunded as part of the unapplied cash project.  This evidence demonstrates that Oracle evaluated the propriety of the original credit memo.  See NDCA-ORCA 1058909  [examples include credit memo 7100288 (refund of $55,010.22 to HRB Management Inc., after credit memo for terminated support), credit memo 7100927 (refund of $52,250 to Smithfield Foods Inc., after credit memo for customer concession) and credit memo 7111910 (refund of $64,000 to City of Seattle, after credit memo for terminated support)].

[81] See Expert Report, at p. 24.

[82] Mr. Regan also opines that Oracle's actions during the "Unapplied Cash Clean-up acknowledge its improper accounting... including the transfers of customer overpayments into the Bad Debt Reserve, which generated $20 million in revenue in Q2FY01."  See id., at p. 25.  As I stated in my Opening Report, to the extent that any money that was transferred to the bad debt reserve could not be matched to a previously written off invoice, such a transfer represented an erroneous reclassification.  However, even if the entire $20 million in transfers were erroneous reclassifications (which they were not), this would not have resulted in a material misstatement in Oracle's second quarter financial statements.

Mr. Regan further opines that the unapplied cash project that commenced in 2002 was an "acknowledgement" of the inappropriate "use of debit memos to conceal the customer overpayments in the Bad Debt Reserve."[83] As discussed above, however, the debit memos did not and could not conceal anything. This is evidenced by the fact that Oracle was able to locate the transfers into the bad debt reserve and resolve them as part of the 2002 unapplied cash project. Moreover, as noted above, the vast majority of the debit memos I have analyzed do not contain transfers into the bad debt reserve in their accounting histories. Thus, it is unclear how the unapplied cash project could serve as an "acknowledgement" of anything improper relating to the creation of and accounting for the debit memos. In my opinion, the 2002 unapplied cash project reflects an effort by Oracle to address and appropriately resolve potential accounting issues immediately after these transfers came to light.[84]

## D.   THE   EFFECT   ON   THE   SECOND   QUARTER   FINANCIAL STATEMENTS WAS NOT MATERIAL

Mr. Regan claims that Oracle's transfers of customer overpayments to the bad debt reserve ultimately resulted in a material overstatement of earnings in the second quarter of fiscal year 2001.[85] Mr. Regan concludes that the alleged earnings overstatement was material "because it enabled Oracle to beat consensus earnings expectations of $0.10, and demonstrate a 'strong' trend of earnings."[86] Mr. Regan's conclusion is incorrect. As I noted in my Opening Report, even if one assumed that the entire $20 million in bad debt transfers in the second quarter were erroneous

---

[83] *See id.*

[84] Mr. Regan also opines that the unapplied cash project "acknowledges" the lack of an appropriate process to refund money. *See id.* As discussed above, I have not seen any evidence to suggest that Oracle's refund policies during the second quarter of fiscal year 2001, or any other period, were inappropriate in any way. To the extent that Oracle issued additional refunds as part of the 2002 unapplied cash project, that may have resulted from earlier erroneous reclassifications of unapplied cash into the bad debt reserve, but that does not undermine the propriety of Oracle's refund practices.

[85] *See id.*, at p. 4.

[86] *See id.*, at p. 22.

reclassifications (which they were not), any resulting misstatement in Oracle's second quarter financial statements would not be material, either from a quantitative or qualitative standpoint under SAB 99. Significantly, Oracle never has restated its second quarter financial statements.

As an initial matter, Mr. Regan does not attempt to establish that any purported misstatement resulting from the bad debt transfers was material to Oracle's financial statements in the second quarter from a quantitative standpoint. Instead, Mr. Regan premises his entire theory of materiality on the idea that the bad debt transfers in the second quarter resulted in a misstatement in Oracle's financial statements that was qualitatively material. Mr. Regan, however, has failed to provide any basis for concluding that the bad debt transfers resulted in a material misstatement from a qualitative perspective.

Mr. Regan attempts to establish qualitative materiality by citing a September 1998 speech by then-Securities and Exchange Commission ("SEC") Chairman Arthur Levitt, in which Mr. Levitt recalled an instance where a company's stock price fell sharply in one day following an earnings miss of one penny.[87] Mr. Regan attempts to bolster his position by referencing one of the qualitative materiality considerations under SAB 99, which is implicated if the "misstatement hides a failure to meet analysts' consensus expectations for the enterprise."[88] Mr. Regan mischaracterizes, or misunderstands, both Mr. Levitt's speech, as well as the SAB 99 materiality consideration cited in his Expert Report. Both Mr. Levitt's comments and SAB 99 address a situation where a company *failed to meet* analysts' consensus expectations. That is not the case here. As I noted in my Opening Report, Oracle still would have met analysts' consensus expectations even if all of the transfers of unapplied cash to the bad debt reserve in the second quarter of fiscal year 2001 were reversed. Put differently, had the bad debt transfers never taken

---

[87] *See* "The 'Numbers Game'" – Remarks by Chairman Arthur Levitt, SEC, September 28, 1998.

[88] *See* Expert Report, at p. 21.

place, such that no corresponding increase in revenue would have occurred in the second quarter, Oracle still would have met consensus expectations of $0.10 earnings per share. Mr. Regan does not provide any authority, under SAB 99 or any other professional guidance, that supports his opinion that a failure to *beat* analysts' consensus expectations would be material from a qualitative perspective.

In addition, as support for his position, Mr. Regan references another materiality consideration from SAB 99, in which a "quantitatively small misstatement of a financial statement item may be material if it 'masks a change in earnings or other trends.'"[89,90] Once again, Mr. Regan has misapplied SAB 99. First, Mr. Regan fails to explain why he used earnings per share as his comparative benchmark, as opposed to earnings, as discussed in SAB 99. Moreover, Mr. Regan fails to explain how the reported earnings per share of $0.11 represented any sort of trend, much less a "strong" trend of earnings, and how it could have "mask[ed] a change in earnings or other trends." Based on my review, in the previous nine fiscal quarters (*i.e.*, from the first quarter of fiscal year 1999 through the first quarter of fiscal year 2001), Oracle either met or beat analysts' consensus expectations. Thus, regardless of whether Oracle reported earnings per share of $0.11 or $0.10 in the second quarter, Oracle's reported earnings per share were consistent with historical trends. Accordingly, Mr. Regan has not demonstrated that the reported $0.11 earnings per share in the second quarter of fiscal year 2001 "mask[ed]" anything.

In sum, Mr. Regan has failed completely to establish that the bad debt transfers in the second quarter resulted in a misstatement in Oracle's financial statements that was material from a qualitative standpoint. Even assuming that the bad debt transfers and the subsequent adjustment

---

[89] *See id.*

[90] Mr. Regan fails to mention the seven other qualitative materiality considerations recommended in SAB 99.

to Oracle's reserve accounts never occurred, and Oracle reported earnings per share of $0.10, rather than $0.11, Oracle still would have met consensus expectations, consistent with prior trends. Accordingly, the impact of the bad debt transfers on Oracle's second quarter financial statements was not material.

## VII.   MR. REGAN'S OPINIONS REGARDING THE HEWLETT-PACKARD TRANSACTIONS ARE BASELESS

### A.   THE HP TRANSACTIONS WERE NOT ALLEGED IN THE COMPLAINT AND WERE NOT A PROPER SUBJECT OF FACT DISCOVERY

Mr. Regan devotes nearly half of his Expert Report to challenging Oracle's recognition of $19.9 million in revenue from Oracle's sale of additional CRM licenses to HP on November 30, 2000.[91] As noted above, the alleged revenue recognition issues pertaining to the license agreement were not alleged in the Complaint. I also understand that the Special Master in this case ruled during the deposition of HP's 30(b)(6) witness that the issue of whether Oracle should have recognized revenue in the second quarter based upon an alleged "barter" or "sham" transaction with HP did not fall within the scope of fact discovery in this case.[92]

---

[91] *See* Expert Report, at pp. 34-63.

[92] *See* Telephonic Conference at Hewlett Packard Deposition, June 30, 2006, 16:8-17:6. As explained below, the transactions that Oracle entered into with HP on November 30, 2000 actually consisted of three different agreements: (1) Oracle's sale of approximately $21 million in additional CRM licenses and additional support to HP; (2) Oracle Credit Corporation's agreement to finance HP's purchase of the additional CRM licenses and support; and (3) Oracle's purchase of approximately $30 million in HP Unix servers. Although Mr. Regan attacks the validity of each of these agreements, and even suggests that Oracle's revenue on the sale of the CRM licenses should be offset, or "netted," against the purchase of the HP servers, the evidence is clear that these are different agreements, and that each provided independent economic benefits for both parties.

Mr. Regan claims that because he "sees no evidence" pertaining to Oracle's decision to recognize this revenue, Oracle must have failed to properly conduct the required analysis under GAAP.[93] However, the fact that Mr. Regan "sees" no such evidence is a function of the limits that the Court placed on discovery, and not because the evidence does not exist. The sale of additional CRM licenses to HP was one of the largest license deals in the second quarter and, as such, it was closely analyzed by Oracle's revenue recognition group and was specifically tested by Oracle's independent auditor, Arthur Andersen LLP ("AA"). Both concluded that it was proper for Oracle to recognize approximately $19.9 million in the second quarter of fiscal year 2001.[94] For the reasons discussed below, I agree with that conclusion.

## B. BACKGROUND OF THE HP TRANSACTIONS

In order to understand the nature of and the reasons behind the November 30, 2000 transactions, it is important to understand the business history between the two companies. Although, the relationship between Oracle and HP goes back many years, one of the more significant events leading up to the November 30, 2000 transactions occurred in August 1999.

On August 30, 1999, the parties entered into the following agreements:

---

[93] *See* Expert Report, at p. 52.

[94] *See* AA 001339-40; NDCA-ORCL 3043085-109; Deposition of Lawrence Ellison, dated September 21, 2006 ("Ellison Dep."), at 508:12-16 ("[O]ur accountants looked at this transaction very, very carefully. They were aware that they were ... we were buying hardware; HP was buying software, and we believe we have accounted for it properly."); Deposition of Edward Sanderson, dated July 26, 2000 ("Sanderson Dep."), at 500:4-8 ("Any deal goes through revenue recognition. It was a group in finance that looked at the deal. And if there was any questions, they went to our accountants, outside accountants, to verify it."); Deposition of Gary Matuszak, dated August 1, 2006 ("Matuszak Dep."), at 169:17-21 ("[M]anagement concluded that it was appropriate to recognize revenue under that license arrangement. And Andersen, after reviewing all the – the evidence that was provided to us, concurred with management's agreement.").

- First, as part of Amendment Three to the 1994 Software License and Services Agreement, HP purchased CRM software licenses from Oracle for approximately $20.1 million.[95]

- Second, HP and Oracle entered into three memoranda of understanding ("MOUs"). The first non-binding MOU established a strategic alliance to "purchase and deploy each others [*sic*] technology within the respective companies" such that there was a "go-to-market plan for HP and Oracle to deliver CRM solutions to the marketplace." The second non-binding MOU detailed a "go-to-market plan for sales and marketing." The third MOU, which is most important for present purposes, required Oracle to move 50% of its production computing environment to HP servers, and provided that "HP would receive orders at a rate of 2-1 over Sun until this is complete."[96]

- Third, Oracle and HP entered into a "Time and Materials Engagement Contract" (the "Engagement Contract") whereby Oracle agreed to assist HP in the implementation of the CRM software. The Engagement Contract was negotiated and bid on separately (earlier in August 1999), and it explicitly stated that (i) the contemplated consulting services were proposed separately from the sale of any program licenses, and (ii) the licenses could be purchased without acquiring any consulting services.[97]

By Fall of 2000, the August 1999 agreements no longer were sufficient. Oracle needed additional servers, and HP believed that Oracle was not making adequate progress in achieving parity with Sun Microsystems ("Sun") servers in the production computing environment.[98] Moreover, HP wanted additional CRM licenses at a larger discount as part of its strategic plan to roll out CRM

---

[95] *See* NDCA-ORCL 3043017-24.
[96] *See* NDCA-ORCL 3043025-39.
[97] *See* NDCA-ORCL 3043052-55.
[98] *See* NDCA-ORCL 014004.

on a global basis.[99]  Because both parties needed something from the other – HP needed the additional licenses and support, and Oracle needed additional servers – the parties negotiated a new set of transactions, leveraging one against the other.

After weeks of negotiations, the parties executed several agreements on November 30, 2000. Specifically, the parties agreed to the following:

- Oracle agreed to purchase $30 million in HP Unix servers, and increased its commitment to move 100% of its production data and CRM development servers to HP servers by November 1, 2001 (the "HP Server Purchase Agreement").[100]

- HP agreed to purchase approximately $21 million in additional "Application User" licenses at a 60% discount, as well as additional support (the "CRM License Agreement").[101]

- HP financed the CRM License Agreement through Oracle Credit Corporation, pursuant to an agreement that obligated HP to make three payments totaling $29.8 million over 11 months and a final, optional $2.1 million payment, due December 1, 2001, to convert the 11-month term of the licenses to perpetual in duration (the "OCC Finance Agreement").[102]

These transactions collectively are referred to herein as the "November 30 Transactions."

---

[99] *See* Deposition of Safra Catz, July 20, 2006 ("Catz Dep."), at 19:20-20:1 ("HP had already bought and was implementing Oracle CRM, but hadn't done their global rollout; and to do it they would have had to buy more software."); Deposition of Thomas Rathjens, 30(b)(6) Hewlett Packard, June 30, 2006 ("Rathjens Dep."), at 37:4-9 ("[D]o you know why HP was considering purchasing these Oracle CRM products? ... I believe HP wanted to consolidate some of their software applications on a global basis.").

[100] *See* NDCA-ORCL 021378-021381; HP 00001-03; and NDCA-ORCL 3043118.

[101] In addition, the parties agreed to incorporate – or migrate – certain licenses and support services relating to the August 30, 1999 agreement into the CRM License Agreement. *See* HP 00030-35.

[102] *See* HP00050.

## C.   THE NOVEMBER 30 TRANSACTIONS WERE NOT IMPROPER "SWAPS"

Mr. Regan claims that the November 30 Transactions were improper "swap" or "round trip" transactions.[103] Mr. Regan also cites accounting guidance relating to nonmonetary transactions to support his opinion that the financial impact of these transactions should be offset, thus preventing Oracle from recognizing any revenue on the CRM License Agreement. Mr. Regan's conclusions regarding the nature of these transactions, however, are incorrect.[104]

Noticeably absent from Mr. Regan's Expert Report is any definition of the term "round trip" transaction.[105,106] Thus, I obtained two examples of transactions from the relevant time period that the SEC considered to be "round trip" transactions:

---

[103] *See* Expert Report, at p. 35.

[104] Mr. Regan cites Training Practice Aid ("TPA") 5100.39 in support of his opinion that the November 30 Transactions should be accounted for as a single arrangement. Mr. Regan's reliance on TPA 5100.39 is misplaced. Based upon my review of TPA 5100.39, this guidance relates to one company making more than one sale to another company, such as selling the same product to two separate business units. The November 30 Transactions are not contemplated by TPA 5100.39, and thus, I do not believe that this accounting guidance applies to these transactions.

[105] Mr. Regan's failure to define "round trip" in this context is peculiar, considering that he wrote an article entitled "Revenue Recognition," published in California CPA, on September 1, 2003, in which he described a "round trip" transaction. In that article Mr. Regan states:

> Some companies have recognized revenue for the sale of a product or services in "round-trip" transactions. These involve two companies that exchange advertising for advertising or when inventory is exchanged for barter credits between the parties. Such transactions may lack substance and fair value may not be determinable. For example, companies A and B exchange rights to advertise on each other's websites and both exchange $1 million in cash. Should both entities record an equal amount of revenue... EITF 99-17 provides the answer. Recognize $1 million of revenue if the fair value of advertising surrendered is $1 million based on the entity's historical practice of receiving cash, marketable securities or other consideration readily convertible to cash with other unrelated parties.

The November 30 Transactions obviously do not involve "advertising for advertising" or "inventory for barter credits," as described in Mr. Regan's article. More importantly, the November 30 Transactions are not "round trip" transactions, even under Mr. Regan's definition, because each agreement had economic substance and the fair values were determinable because each party paid cash for the respective products.

- *QuadraMed*[107] – During 1998 and 1999, QuadraMed fraudulently inflated its revenue by essentially paying for the purchase of its own products, in transactions with another software developer that had no independent means of paying for QuadraMed's products. As result of these sales, QuadraMed recorded revenue but never obtained any economic benefit from the transactions, which violated GAAP. QuadraMed's recognition of revenue further violated GAAP because the collectibility for the transactions was not probable absent financial assistance from QuadraMed.

- *Arsin*[108] – In January 2000, Arsin agreed to purchase software licenses from Unify Corporation ("Unify"). However, Arsin did not have the funds to pay for the software licenses. Arsin and Unify agreed to amend an earlier Funded Development Agreement (the "FDA"), to provide funds to Arsin, which Arsin used to pay for the software licenses. However, the amended FDA was a sham transaction, because no technical work was performed under the agreement. In April 2000, Arsin separately agreed to purchase additional products from Unify, but it did not have sufficient funds to pay for these products. Unify wired Arsin the funds, which Arsin used to pay for the additional products. The SEC concluded that Unify violated GAAP by recording revenue for these transactions, because Unify received no economic benefit from the transaction, and Arsin could not have paid for Unify's software absent financial assistance from Unify.

---

[106] Although Mr. Regan references a speech released by the SEC in 2001 as support for his opinion that the November 30 Transactions should be viewed as a single transaction, he fails to explain how a speech dated in 2001 could impact or provide guidance with respect to the proper accounting for a transaction in November 2000. *See* Expert Report, at p. 51, "Speech by SEC Staff: Revenue Recognition," Remarks by Lynn E. Turner, May 31, 2001, USC SEC and Financial Reporting Institute.

[107] *See* SEC Administrative Proceeding in Re: Quadramed Corporation, File No. 3-11472, April 30, 2004.

[108] *See* SEC Administrative Proceeding in Re: Arsin Corporation and Danis Yadegar-Mooshiabadi, File No. 3-11188, July 17, 2003; Litigation Release No. 17522, *SEC v. Reza Mikailli, Gary F. Pado and Unify Corporation*, No. C022426 RS, May 20, 2002.

The underlying theme in both of these SEC enforcement actions is that reciprocal transactions are considered "round-trip" or "swap" transactions if they involve one company essentially paying for its revenue, and not receiving any economic benefit in return. Under these circumstances, the SEC views the recognition of revenue to be a violation of GAAP.

1. *ORACLE RECEIVED SUBSTANTIAL ECONOMIC BENEFITS AS A RESULT OF THE HP SERVER PURCHASE AGREEMENT*

The HP Server Purchase Agreement allowed Oracle to build upon an important and profitable strategic business alliance with HP, through which both companies realized benefits.[109] As part of this strategic business alliance, Oracle committed to move its production data and CRM development environments to HP Unix servers. This, in turn, allowed both Oracle and HP to better market their products to other companies using HP servers.[110]

---

[109] *See* Ellison Dep., at 115:9-13 ("I certainly knew about a general expectation. HP certainly would like to sell us hardware. In a general sense, they are always trying to sell us more hardware and we were always trying to sell the software."); Catz Dep., at 19:16-23 ("Oracle was already buying a lot of products, and Oracle wanted HP to be the big CRM reference.... And Oracle was already very much trying to have an alternative to Sun, which was our entire platform."); Deposition of Michael DeCesare, February 16, 2006 ("DeCesare Dep."), at 66:14-21 ("All of the engineers that built the CRM products would build it on HP. They – they would log in, like you're on a PC here, to an HP server instead of a Sun server, which is a very desirable thing for a hardware company because that means the first release comes out on their hardware. It doesn't have to be ported. And then it would get ported to Sun and all the other hardware platforms that were out there."), 75:9-17 ("[T]his was a deal that wasn't just as simple as them buying software from us. There was... heavy involvement from the alliance team that managed the relationship.... Getting HP to use the – to get Oracle to use HP's products was very attractive to both alliance teams as well, because it furthered the partnership."), and 118:5-7 ("Q. Do you know whether or not the intent was to use HP... as a reference? A. Oh, yeah. Most definitely. When a customer implements software, if they have a good experience, they'll say good things, and if they have a bad experience, they will sometimes say bad.").

[110] *See* Rathjens Dep., at 165:24-166:9 ("Q. And was – was this reference selling part of the Oracle-HP agreement to run Oracle software on HP servers? A. They were different in nature. And some were related to CRM – some were, you know, where CRM had a one hour slot to talk to a customer that is there all day. But in general, it was to – with Oracle it was to show HP and Oracle's partnership in that the Oracle software worked very well on HP hardware."), and 134:18-135:9 ("Q. If you could look to the second bullet point there. The second – it says 'focus on '99 licenses only. This is due to Oracle's belief that the '2000' licenses were part of a larger win-win business deal.' Do you know what they are referring to here? A. I think the larger win-win business was to sell more HP hardware, where other CRM customers would be putting their – the Oracle CRM software and other Oracle software on HP hardware. So I think the larger win-win business is jointly selling HP hardware and Oracle software."); see also "Oracle and HP Celebrate Successful CRM Relationship" press release, February 21, 2001, ("Oracle... and Hewlett-Packard... today announced that their joint CRM sales efforts have resulted in more than 40 leading global

Moreover, the evidence demonstrates that Oracle needed additional servers at the time,[111] and Oracle believed that HP built superior servers compared to alternative suppliers.[112] Oracle also received discounts of 50% and 55% off the list price for the HP Unix servers.[113] Oracle's independent auditor discussed Oracle's decision to purchase the servers from HP with Tom Williams, who was in charge of Oracle's revenue recognition group at the time.[114] Mr. Williams explained that Oracle needed this equipment for its development and production departments. Oracle's Executive Committee met and specifically discussed the HP Server Purchase Agreement, and concluded that the purchase of the additional servers was in the best interests of Oracle and its shareholders.[115] The purchase of the HP servers also represented a step forward in terms of Oracle's desire to reduce its dependence upon Sun servers. Indeed, Oracle had purchased $70 million in Sun servers in the previous five quarters alone.[116] Thus, based upon this evidence, I believe that Oracle received substantial economic benefits from the HP Server Purchase Agreement.

---

customers. In addition to these customer successes, the relationship has also resulted in HP and Oracle both successfully implementing these joint solutions internally and realizing significant cost savings and customer satisfaction.").

[111] *See* Deposition of Michael Rocha, April 7, 2006 ("Rocha Dep."), at 206:10-23 ("I'm referring to the fact that we – to build the products – again, I was responsible at this time for porting and joint development and testing, and all that stuff, on the various hardware platforms. One of those platforms was HP. And I'm saying here that we need hardware to do our job, and HP wants us to buy the hardware. And so it's kind of – I'm basically saying it's your call as to whether we pay for it – you know, we pay for it, or we essentially try to go back to them and say this is part of a partnership. And a partnership organized around sort of building products together. So the statement, "We need it," is essentially in reference to the hardware."), and Deposition of Jason Sevier, June 28, 2006, at 113:10-25 ("[H]ypothetically, if Oracle would purchase the hardware and we, through audit testing, believed that the purchase was valid, meaning Oracle has a specific plan, they have identified the hardware that's being replaced, that needs to be replaced, and they have specifically earmarked it in the budget, then hypothetically, based on that fact set, you would look at that and say it's a valid business purpose, so there is no revenue implication. But if it was just extra stuff that was going to sit around in some supply room because they really didn't need it, it would call into question the revenue."); *see* NDCA-ORCL 028735-736 [Email from Michael Rocha to Larry Ellison, about October 12, 2000 ("[Y]ou may want to agree that we'll purchase the hardware. We need it.")].

[112] *See* NDCA-ORCL 3043132-33.

[113] *See* HP 00001-2.

[114] *See* AA 001339-40.

[115] *See* NDCA-ORCL 3043132-33.

[116] *See* AA 001339-40.

2.    *HP RECEIVED SUBSTANTIAL ECONOMIC BENEFITS AS A RESULT OF THE*
      *CRM LICENSE AGREEMENT*

The evidence also demonstrates that HP received substantial economic benefits from the CRM

License Agreement. A contemporaneous press release suggests that HP was satisfied overall with

the CRM software.[117]  Moreover, HP negotiated a steeper discount (*i.e.*, 60%) off the fees it

traditionally paid for CRM licenses, which resulted in overall savings of $11.5 million.[118]  HP

also extended for two years an option to exchange any migrated licenses for any other existing

licenses for a set fee.[119]  In addition, HP obtained the services of two onsite support analysts,

which were included in the support costs.[120]  Although Mr. Regan claims that HP did not need all

of the licenses it acquired on November 30, it is not unusual for software companies to purchase

additional software or licenses based upon anticipated need.[121]  In fact, it was precisely because

HP purchased the additional licenses, which HP planned on using in connection with a scheduled

global roll out of CRM,[122] that HP was able to obtain the steeper discount.[123]  In addition, HP was

able to use its purchase of additional CRM licenses as leverage to broker a simultaneous

agreement through which Oracle committed to move 100% of its production data and its CRM

development environments to HP servers. This was a significant development for HP because it

---

[117]  *See* NDCA-ORCL 3043152-55; *see also* "Oracle Q2 Customer Additions Drive Growth in Applications and Database Software" press release, December 14, 2000 ("Having experienced success with its current implementation of Oracle Sales Online, HP... is extending its use of the customer relationship management applications of the Oracle E-Business suite. 'Oracle Sales Online is helping us achieve greater efficiencies in our sales management process,' said Philip May, General Manager of the Oracle business unit at HP. 'The initial implementation has given us a consolidated view of customer interactions across the company and helped to improve contact management.'").

[118]  *See* HP 00015-16. The fact that the parties negotiated for larger discounts is counterintuitive with a round trip transaction. If the transaction truly were a "round trip" transaction, with no economic benefit, the parties simply would have recorded the transaction at full value.

[119]  *See id.*

[120]  *See id.*

[121]  *See id.*; *see also* DeCesare Dep., at 63:4-7 ("Every software company tries to go out and license customers for what they look like, not for what they will be using in the first month or year."); and Sanderson Dep., at 499:12-15 ("And so, companies would look at not only what their current needs are but their projected needs, and so, sometimes companies would buy on that base.").

[122]  *See* "HP Boosts CRM With Oracle," by DSstar, August 1, 2000, Vol.4 No. 31.

[123]  *See* HP 00016.

allowed HP to market its servers as the environment in which CRM was developed.[124]  Indeed, HP suggests that, as a result of these transactions with Oracle, its market share would increase by 5%, which it valued at approximately $325 million in incremental sales *in the first year*, not including related services revenue.[125]

Mr. Regan contends that HP "never implemented certain significant modules of the software."[126] This allegation, even if true, is irrelevant.  On September 3, 2001, HP and Compaq announced a definitive merger agreement. [127]  Compaq was in process of implementing Seibel's CRM solution.[128] After the merger was completed, Compaq's Chief Technology Officer assumed an equivalent position at HP, and decided to implement Seibel's CRM at the merged company.[129]  In any event, whether HP opted to implement some or all of the licenses as of September 2001 has nothing to do with whether HP received an economic benefit from the CRM License Agreement as of November 30, 2000.[130]

---

[124] *See* DeCesare Dep., at 66:6-20 ("There was a second commit, which was to move the entire CRM development platform to HP as well... people would now develop on HP instead of Sun.  Q.  And what do you mean when you say "develop on HP"?  A.   All of the engineers that built the CRM products would build it on HP... which is a very desirable thing for a hardware company because that means the first release comes out on their hardware.  It doesn't have to be ported.").

[125] *See* HP 00015-16.

[126] *See* Expert Report, at pp. 47-48.

[127] *See* Hewlett-Packard Press Release, "Hewlett-Packard and Compaq agree to merge, creating $87 billion global technology leader," September 3, 2001.

[128] *See* Rathjens Dep., at 77:17-20 ("[W]e merged with Compaq, who was using Seibel software in the CRM space; and a decision was made to consolidate on the Seibel software rather than the Oracle software.").

[129] *See* Compaq Annual Report 2000, p. 68, and Hewlett-Packard Annual Report 2002, p. 177.  Shane V. Robison, Compaq's Senior Vice President, Technology and Chief Technology Officer in 2000, became HP Chief Technology and Strategy Officer in 2002.

[130] As a practical matter, whether HP received an economic benefit from the purchase of the additional CRM licenses ultimately is beside the point.  The real issue is whether Oracle received an economic benefit from the purchase of the HP servers.  Mr. Regan's references to emails in which HP employees speculate about HP's purported motivations for purchasing the additional CRM licenses – months after the agreement was executed by HP – do not undermine Oracle's decision to recognize revenue on the sale of the additional licenses in the second quarter of fiscal year 2001.  *See* Expert Report, at p. 47.

Thus, the November 30 Transactions – which, as discussed above, involved intensive negotiations and steep discounts – clearly are distinguishable from the transactions discussed in *Quadramed* and *Arsin*. Furthermore, while each party effectively used its willingness to enter into one agreement as negotiating leverage for the other agreement, this does not mean that the transactions were improper "swaps," or that Oracle did not receive an economic benefit from the HP Server Purchase Agreement. Mr. Regan's opinions, to the extent they suggest otherwise, are incorrect.

3.    *MR. REGAN INCORRECTLY ASSUMES THAT THE NOVEMBER 30 TRANSACTIONS WERE "NONMONETARY" TRANSACTIONS*

Mr. Regan attempts to bolster his argument that the November 30 Transactions constituted "round trip" or "swap" transactions by describing the two agreements as a single "non-monetary transaction." Citing APB 29,[131] EITF 86-29[132] and TPA 5100.47,[133] Mr. Regan states that the HP Server Purchase Agreement and the CRM License Agreement should be netted and recorded at a $0 value and, thus, that Oracle should not have recognized any revenue on the sale of the additional CRM licenses.[134] The literature upon which Mr. Regan relies in making this argument, however, is inapplicable:

- APB 29 applies to exchanges of nonmonetary assets, where nonmonetary is defined as "assets and liabilities other than monetary ones" and monetary assets are defined as "amounts...fixed in terms of units of currency...examples are cash." The HP Server Purchase Agreement and the CRM License Agreement both required the payment of cash.[135]

---

[131] *See* Accounting Principles Board ("APB") Opinion 29:  Accounting for Nonmonetary Transactions.

[132] *See* Emerging Issues Task Force ("EITF") 86-29:  Nonmonetary Transactions:  Magnitude of Boot and the Exceptions to the Use of Fair Value.

[133] *See* TPA 5100.47, Nonmonetary Exchanges of Software (Part II).

[134] *See* Expert Report, at pp. 38, 52-53.

[135] *See* NDCA-ORCL 3043110-115 and HP 00001-02.

- EITF 86-29 applies to nonmonetary exchanges where the products being exchanged are in the same line of business and the product being received (in this case, by Oracle) will be resold in the marketplace. Here, the licenses and the servers were not in the same line of business, and there is no evidence that Oracle intended to resell the HP servers. Indeed, the HP Server Purchase Agreement specifically provides that "[p]roducts ordered under the blanket purchase order are for Oracle's internal use only and are not for resale."[136]

- TPA 5100.47 applies to nonmonetary exchanges of software licenses. The November 2000 Transactions, as discussed above, did not involve the exchange of software licenses.

Notably, Mr. Regan does not cite EITF 99-19,[137] which represents the appropriate method for determining whether a transaction should be recorded on a gross versus net basis. As Mr. Regan explained in an article he published on September 1, 2003,[138] sales may be recorded on a gross basis if a party satisfies the following seven "indicators:" (i) the party is responsible to the customer for satisfaction, (ii) the party maintains general inventory risk, (iii) the party has reasonable latitude in establishing price, (iv) the party exercises discretion in selecting suppliers, (v) the party is involved in the determination of product or service specifications, (vi) the party has physical loss inventory risk, and (vii) the party has credit risk in the event of nonpayment. I have reviewed each of these considerations and, to the extent these indicators apply to the CRM License Agreement (not every indicator is applicable), Oracle satisfied these requirements. Thus, I have found no support for Mr. Regan's conclusion that the agreements should have been recorded on a net basis.

---

[136] *See* HP 00001.

[137] *See* EITF 99-19, Reporting Revenue Gross as a Principal versus Net as an Agent.

[138] *See* Regan, "Revenue Recognition," California CPA, September 1, 2003.

## D.   ORACLE PROPERLY RECORDED REVENUE ON THE CRM LICENSE AGREEMENT IN ACCORDANCE WITH SOP 97-2

Mr. Regan claims that Oracle "substantially failed to meet any of the revenue GAAP recognition criteria," which, for the CRM License Agreement, is provided by SOP 97-2.[139,140]  SOP 97-2 sets forth a detailed protocol for recognizing revenue in software license transactions.  This guidance provides that revenue for a sale of software licenses should not be recognized until the following criteria are met:

- Persuasive evidence of an arrangement exists;
- Delivery has occurred;
- Fees are fixed or determinable; and
- Collectibility is probable.

Although I will discuss each of the elements of SOP 97-2 below, I note that SOP 97-2 allows companies to exercise a certain degree of business judgment in how the elements ultimately are analyzed and applied.  As such, reasonable minds may differ.  That said, Oracle's decision to recognize $19.9 million in revenue on November 30, 2000 was reviewed and approved by Oracle's revenue recognition group,[141] specifically tested by AA[142] and featured in a presentation that AA gave to Oracle's Audit Committee.[143]  Each of these entities concluded that it was

---

[139] *See* AICPA Statement of Position 97-2, "Software Revenue Recognition."  The guidance provided by SOP 97-2 is consistent with that provided by SAB 101, "Revenue Recognition in Financial Statements."

[140] *See* Expert Report, at p. 38.

[141] *See* NDCA-ORCL 3043085-109 [USA Revenue Accounting Contract Review Checklist for Order 6346665]; Ellison Dep., at 508:12-16 ("[O]ur accountants looked at this transaction very, very carefully.  They were aware that... we were buying hardware; HP was buying software, and we believe that we accounted for it properly.")

[142] *See* AA 001339-40; Matuszak Dep., at 169:17-21 ("[M]anagement concluded that it was appropriate to recognize revenue under that license arrangement.  And Anderson, after reviewing all the... evidence that was provided to us, concurred with management's agreement.")

[143] *See* NDCA-ORCL 261911 and NDCA-ORCL 081755.

appropriate under SOP 97-2 for Oracle to recognize this revenue on the CRM License Agreement in the second quarter. As explained below, I agree with that conclusion.

## 1. PERSUASIVE EVIDENCE OF AN ARRANGEMENT EXISTED

Paragraph 17 of SOP 97-2 states that revenue should not be recognized on any element of an arrangement unless persuasive evidence of an arrangement exists.[144] In this case, there is a clear, complete and executed software license agreement, dated November 30, 2000.[145] Thus, to the extent that Mr. Regan does not see persuasive evidence of an arrangement, it is because Plaintiffs did not get discovery on this issue.

Mr. Regan challenges whether the agreement was executed in the second quarter based upon a series of facsimile header date and time stamps.[146] According to Mr. Regan, some of these date and time stamps appear to suggest that at least some copies of certain deal documents may have been faxed after midnight, on December 1, 2000, and therefore in the third quarter. Other facsimile header stamps, however, suggest that the agreement was executed at 11:53 p.m. on November 30, 2000.[147]

Mr. Regan is not the first person to raise concerns about the date and time stamps on the facsimile header. Oracle's independent auditor also noted this anomaly and asked Shelley Curtis – then

---

[144] Generally, for two companies which have conducted business in the past, one looks at how these arrangements were formalized in the past to determine whether persuasive evidence of an arrangement exists. With respect to Oracle and HP, the parties' prior arrangements have been formalized in a variety of ways, including contracts and binding and non-binding MOUs. SOP 97-2 states that in situations where the vendor does not always rely upon signed contracts, "the vendor should have other forms of evidence to document the transaction."

[145] See HP 00034.

[146] See Expert Report, at pp. 49-51.

[147] See NDCA-ORCL 260113.

Assistant General Counsel at Oracle – about the precise time when she executed this agreement.[148] In response to this inquiry, Mrs. Curtis stated:[149]

1) Loren Mahon witnessed that signatures of both parties were obtained before midnight as she was present in the area where David Jinnett was working and he took the documents to her. I am advised that other members of Sales Support also witnessed that – either Loren of [sic] David can provide those names to you, if needed.

2) David Jinnett faxed the HP signed signature pages to me, which I then countersigned and faxed back to him and the fax machine date stamped on the signature pages faxed by Commercial Legal was before midnight – it was 11:53. Legal Assistant Mark Hong watched me sign, then he handled faxing back to David Jinnett, so he is also a witness.

3) If needed, I'm sure that Mr. May and his people at HP would also be happy to testify as to when he signed and faxed.

4) My husband can testify as well, since I left my Oracle office immediately after midnight and drove home, reaching my home in Sunnyvale at approximately 12:35, so I was neither negotiating nor signing after midnight.

Notably, Ms. Curtis stated that HP already had signed the agreement when she received the fax, and that she signed and faxed the fully-executed agreement to HP at 11:53 p.m. Thus, I have

---

[148] *See* AA 001339-40.

[149] *See* NDCA-ORCL 3043126-128.

found persuasive evidence that an arrangement existed as of November 30, 2000. Accordingly, the decision to recognize revenue satisfies the first prong of SOP 97-2.[150]

## 2    DELIVERY HAD OCCURRED

Paragraph 18 of SOP 97-2 states that revenue should not be recognized on a transaction until the product has been delivered. Mr. Regan generally asserts three bases for contending that the delivery element of SOP 97-2 was not satisfied by the end of the second quarter of fiscal year 2001.[151] First, Mr. Regan cites the existence of a 15-day acceptance period in the 1994 Software License Service Agreement ("SLSA"). Second, Mr. Regan claims that Oracle failed to obtain vendor specific objective evidence ("VSOE") of fair value for the elements of the HP transaction. Third, Mr. Regan cites the existence of 14 "show stoppers," and he argues that the software was not "fully functional."[152] As discussed in greater detail below, each of these arguments fails.[153]

HP accepted the software upon delivery. Mr. Regan claims that it was improper for Oracle to recognize revenue on November 30, 2000, because HP had a 15-day acceptance period during which it could have rejected the software.[154] Notably, the CRM License Agreement does not

---

[150] The timing of the execution of the CRM License Agreement is consistent with an email sent by Michael DeCesare, one of the Oracle employees who negotiated the sale of the additional CRM licenses. At 7:59 a.m., on November 30, 2000, Mr. DeCesare sent an email to Larry Ellison, Safra Catz and others, stating: "HP is in!! [F]or over 21M in CRM license. Thanks to everyone, Mike." The timing of this email suggests that the parties may actually have reached an agreement in principle much earlier in the day. See NDCA-ORCL 3043084.

[151] See Expert Report, at p. 38.

[152] See id., at p. 57.

[153] There is no question that physical delivery of the software occurred on November 30, 2000, as required by GAAP. According to Paragraph 21 of SOP 97-2, revenue for an arrangement to use multiple copies of a software product should be recognized upon delivery of the first copy or product master. According to documents from Oracle's shipping and manufacturing division, the physical CD Pack, which contained the software for which HP was purchasing additional licenses, was shipped from Oracle's warehouse before 8:43 p.m., on November 30, 2000. The terms of shipment were "FOB Shipping." See NDCA-ORCL 3043129-131 [Computer screen shots of shipping details for Waybill 1Z8668200224636442].

[154] See Expert Report, at p. 42-43.

contain a 15-day acceptance period. It does, however, reference the original SLSA, which included a 15-day acceptance window.[155] In making this argument, Mr. Regan failed to recognize that the 15-day acceptance period was eliminated in Amendment Three to the SLSA, which Oracle and HP executed in August 1999, as part of HP's initial purchase of CRM licenses. Paragraph B.5 of Amendment Three to the SLSA provides that "[t]he Programs shall be deemed to be accepted by Customer on delivery."[156] There is no corresponding 15-day acceptance period in Amendment Three to the SLSA or, as noted above, in the CRM License Agreement. Thus, HP was deemed to have accepted the software when it was delivered on November 30, 2000.[157]

Oracle established a reasonable fair value of the elements of the CRM License Agreement. Mr. Regan challenges Oracle's recognition of revenue on the grounds that he "sees no evidence" that Oracle established the fair value of the elements of the software license agreement.[158] However, I have seen sufficient evidence that Oracle, in fact, did reasonably establish the fair value for (i) the new software licenses, (ii) the undelivered support services related to the new licenses, (iii) the migrated support, and (iv) the onsite technical support services, as follows:

> (1) *New License User Fees* ($21,331,122) – Based upon the evidence, it appears that HP received a 60% discount on the new license fees.[159] Using that 60% discount, the Oracle E-Business Global Price List, dated November 10, 2000 (the

---

[155] *See* NDCA-ORCL 258186-258218.

[156] *See* NDCA-ORCL 3043017-3043024 [Amendment Three to the SLSA, August 30, 1999].

[157] Even if the 15-day acceptance period applied, however, this provision still did not prevent Oracle from recognizing revenue on the sale of the licenses on November 30, 2000. According to TPA 5100.67, if uncertainty exists about a customer's acceptance of software, license revenue should not be recognized until acceptance occurs. However, a software vendor can recognize revenue before formal customer acceptance occurs where, among other things, the length of the acceptance period is short and the individual customer never has invoked the acceptance provision or revoked delivery in prior dealings. In this case, there is no evidence that HP ever invoked the 15-day acceptance period or rejected past deliveries. Thus, even if the 15-day acceptance period applied, it was appropriate under GAAP for Oracle to recognize revenue on November 30, 2000, based upon Oracle's historical experience with HP.

[158] *See* Expert Report, at pp. 57-58.

[159] *See* NDCA-ORCL 3043085-109.

41

"Price List"),[160] and the number of user licenses purchased in the CRM License Agreement,[161] I was able to recalculate the $21.3 million fee that Oracle recognized as revenue at the end of the second quarter. This establishes that the user licenses were assigned an appropriate fair value.

(2) *Product Support related to New Licenses* ($4,692,847) – Based upon the Price List and the evidence pertaining to the CRM License Agreement, the product support and upgrade subscription rights should have been valued at 22% of the newly-purchased license fees.[162] Using these figures, I was able to recalculate the $4.69 million in product support. Again, this verifies that the product support on new licenses was assigned an appropriate fair value.

(3) *Product Support related to Migrated Licenses* ($3,250,300) – Certain product support was transferred from the August 1999 purchase agreement to the November 30, 2000 agreement.[163] This product support covered the period from September 1, 2000 to August 31, 2001. I have studied the evidence and considered both the annual support fee increases, as well as any subsequent concessions.[164] Taking all of this information into consideration, I have estimated that a fair value of the product support for the migrated licenses is $3,121,000, which should have been deferred.[165] Oracle assigned a fair value of the migrated license support of $2,979,000, which was deferred. The $142,000 difference between the fair value I estimated for the support for the migrated

---

[160] *See* NDCA-ORCL 3043134-51.

[161] *See* NDCA-ORCL 260109-10.

[162] *See* NDCA-ORCL 3043134-51.

[163] *See* HP 00030-35.

[164] *See* NDCA-ORCL 020845-46.

[165] *See* NDCA-ORCL 3043103.

licenses and the amount Oracle actually deferred is immaterial. In any event, it is clear that Oracle, in fact, did assign fair value to the support for the migrated licenses.

(4) *OnSite Technical Support Services* ($549,700) – According to the OnSite Support Services Exhibit, Oracle agreed to provide 3,200 hours of technical support, for a fee of $549,700,[166] which represented a weighted average fee of $170 per hour. Oracle's revenue recognition group reviewed these fees and concluded that the fees were consistent with Oracle's support services standard pricing.[167,168] As such, there is sufficient evidence that Oracle assigned a fair value to the onsite technical support services.

Thus, I have found sufficient evidence that Oracle reasonably allocated the fair value, to the various elements of the CRM License Agreement, based upon vendor specific objective evidence.[169,170,171,172]

---

[166] *See* HP 00045-49.

[167] *See* NDCA-ORCL 3043085-109 [USA Revenue Accounting Contract Review Checklist for Order 6346665]. *See also* AA 001339.

[168] See NDCA-ORCL 234898 [email chain which included request for onsite services for McGraw Hill, with a proposed valued of $137,500 for 100 days of onsite support, which represented a weighted average fee of $170 per hour.]

[169] *See id.*

[170] *See* Matuszak Dep., at 150:20-151:8 ("Would you look at whether the contracts, the revenue... license contracts met the requirements of SOP 97-2? A. Yes."), and 150:24-151:8 ("Q. So, you would go through the process of the four elements: Whether arrangement existed, delivery, the fee was fixed and determinable, and whether collectability [*sic*] was reasonably assured? You'd go through that with respect to whatever amount of deals that you deemed proper during the quarter; right? A. We – we would review or conclude each of those four requirements under SOP 97-2.").

[171] In addition, Mr. Regan states that fair value for support cannot be measured for a contract with terms of one year or less. *See* Expert Report, at p. 58. Mr. Regan states that under TPA 5100.53, "it is not possible to measure VSOE for term licenses with a duration of one year or less." This literature, however, was issued in response to a situation where a short-term license featured a post-license support service renewal option. The November 30, 2000 license agreement does not contain any support service renewal option. Thus, the guidance cited by Mr. Regan is not applicable.

There is no evidence that the software required "significant production, modification or customization" as of November 30, 2000.  Mr. Regan challenges the CRM software that Oracle previously licensed to HP in August 1999 as not being "fully functional."[173]  The accounting literature, however, does not require software to be "fully functional" before revenue can be recognized on a license agreement.  Pursuant to Paragraph 7 of SOP 97-2, revenue on an arrangement should be deferred, and accounted for as a long-term construction contract, if the product requires "significant production, modification, or customization of software."  Thus, the accounting literature does not require a vendor to defer revenue simply because a product might contain "bugs."[174,175]  The issue, therefore, is whether there is any evidence to suggest that the software licensed under the August 1999 agreements required significant production, modification or customization as of November 30, 2000.  Mr. Regan has provided no such evidence.

During the relevant time period, Oracle's revenue recognition group adhered to an internal policy that software that was included on the Price List did not require significant production,

---

[172]  Mr. Regan also states that Oracle should have established fair value for various parts of the HP Server Purchase Agreement.  *See* Expert Report, at p. 41.  As discussed above, the HP Server Purchase Agreement is a separate agreement from the CRM License Agreement.  As such, I believe it would be inappropriate to assess fair value for the various pieces of a separate agreement that is not a part of the arrangement being evaluated under SOP 97-2.

[173]  *See id.*, at p. 38.

[174]  *See* SOP 97-2, the Glossary defines Post Customer Support as including "correction of errors (bug fixing or debugging)."  Thus, GAAP anticipates that software will be sold with some "bugs," which will be resolved later.

[175]  Based upon the evidence I have reviewed, it appears that "bugs" are inherent in virtually all new software releases.  *See* Deposition of Mark Jarvis, May 30, 2006, at 168:10 ("Every product has bugs."); Deposition of Keith Block, May 3, 2006, at 74:21-23 ("You know, with any new release of software there is always going to be challenges around the product, new features, functions, so."); Rocha Dep., 212:14-16 ("I have a general recollection, and the general recollection was there was bugs just like every software that's ever gone out of a software lab.").  Thus, if technology companies were required to defer revenue until all "bugs" are resolved – as Mr. Regan seems to suggest – these companies may never be able to recognize revenue on new product releases.

modification and customization for purposes of SOP 97-2.[176]  Oracle considered a product to be sufficiently market ready for revenue recognition purposes when it was included on the Price List.[177]  At that point, the software already had been through beta testing and quality control checks.[178]  Oracle's independent auditors accepted this benchmark as an appropriate indication of the product's functionality for purposes of SOP 97-2.  As noted above, all of the software contemplated by the CRM License Agreement was included on the Price List.

The crux of Mr. Regan's argument appears to be that Oracle should have deferred all or some portion of the revenue recognized on November 30, 2000 because of the existence of 14 so-called "show stoppers."[179]  Notably, I have seen no evidence that anyone, other than Mr. Regan, has suggested that these 14 show stoppers impacted product sales or revenue recognition.  Although Mr. Regan claims that "the existence of even a single showstopper indicates significant functionality did not exist in the product," he fails to articulate the extent to which these show stoppers required additional production, modification or customization of the software.[180]  In fact, 1,800 HP sales representatives had gone "live" with at least some modules of CRM software by early November 2000, and the implementation was ongoing.[181]  Thus, the existence of the 14 show stoppers did not prevent HP from using the software by November 2000.

---

[176] *See* Matuszak Dep., at 171:19-172:15, ("[P]art of our procedures on the quarterly revenue would be to look at the products that were licensed and shipped under the agreement and to see if they were part of the currently available list of products.... Q. What if they weren't part of the currently available list of products?  A. If a product is not available, it can't be shipped.  If a product cannot be shipped, it cannot be recorded as revenue."; and 184:24-185:5, "[W]e looked to see whether the product was on the currently available product list, which meant that it went through the company's normal QA testing, including beta testing and other testing with customers before it was released in final version.").

[177] *See* NDCA-ORCL 3043134-51.

[178] *See* Matuszak Dep., at 184:24-185:5; *see also* DeCesare Dep., at 224:23-225:5 ("Q:  Do you know whether and what sorts of testing Oracle did before it released a product?  ...A:  So it went through, you know, development.  Then the code was frozen.  It went through regression testing.  Then it went through porting.  It was a very rigorous – fairly arduous process.").

[179] *See* Expert Report, at p. 57.

[180] *See id.*

[181] *See* NDCA-ORCL 020850-51.

Relying upon these so-called show stoppers, Mr. Regan makes a number of unsupported assumptions based upon very limited data. The only documents cited in Mr. Regan's Expert Report that contain any detail of the show stoppers – or any other implementation issues HP apparently experienced – are dated months after November 30, 2000.[182] Thus, even assuming the CRM software required "significant production, modification or customization," as Mr. Regan suggests, he has not cited any evidence indicating that Oracle was aware this fact prior at the time it recognized revenue on the CRM License Agreement.

Moreover, Mr. Regan's assumes that when Michael DeCesare testified that a show stopper is "functionality that the customer requires," this meant functionality that was agreed to and included in the core product, as opposed to additional products or features customers may want in the future.[183],[184] Mr. Regan's assumption in this regard, however, is undercut by the deposition testimony of Thomas Rathjens, HP's 30(b)(6) witness. When asked whether the 14 show

---

[182] Mr. Regan cites only one document dated before November 30, 2000, that even mentions the 14 show stoppers. *See* NDCA-ORCL 020844. That document, however, does not describe the show stoppers, nor does it state that the CRM software required "significant production, modification or customization." Moreover, that document specifically states that the 14 show stoppers had "nothing to do" with the CRM License Agreement, and that the HP project manager was using the leverage of the CRM License Agreement "to get more attention from Oracle development." *Id.*

[183] Based upon my review of the deposition testimony in this case, it appears that the term "show stopper" can mean a variety of different things. *See* Deposition of Alan Fletcher, April 6, 2005, at 110:21-22 ("Show stopper was not a scientifically captured term. It was purely anecdotal."); Deposition of Sukumar Rathnam, May 18, 2006, at 126:2-8 ("Again, show stopper used by different software teams, different companies could be used in slightly different ways. There's no sort of formal precise definition that, you know, everyone in software development would agree on what a show stopper is, but I have a general notion of what a show stopper is, could be."). *See also* Rebuttal Expert Report of Edward Yourdon, dated June 22, 2007, at pp. 93-94.

[184] Later in his deposition, Mr. DeCesare provided a very different explanation of the 14 "show stoppers." Mr. DeCesare describes the 14 show stoppers in connection with a transaction purportedly involving The Gap. Given his reference to 14 show stoppers, however, it appears that his reference to The Gap may have been in error, and he may have intended to say HP. Either way, Mr. DeCesare's own testimony illustrates the variety of meanings attributable to the term "show stopper." *See* DeCesare Dep., at 233:1-15 ("Well, in the context of the Gap – I mean the Gap was saying there's 14 showstoppers – they hadn't – they hadn't bought the software yet. . . . [W]hat they meant was that there were showstoppers, meaning there were things that they felt as requirements that in their analysis of the tool it didn't do. Nothing to do with a P1, P2, or P3. They wouldn't have discovered that until they thought it did something and tried to implement it and realizes that it didn't. . . . Very different things. One's presales. One's post sales.").

stoppers represented functionality that was promised as part of the CRM licenses purchased on November 30, 2000, Mr. Rathjens responded: "I don't believe so because in November of 2000 we did not have the detail as to what was in the software and what was not." [185,186]

The 14 show stoppers cited by Mr. Regan may relate to additional product or features HP wanted Oracle to develop in the future. Based upon my review of the Rebuttal Expert Report of Edward Yourdon, I understand that it is common for large customers to pressure software vendors to develop specific features and functions and include them in future releases.[187]  In fact, Mr. Rathjens testified that HP had lobbied Oracle to include specific features and functionality in future releases.[188] However, whatever the nature of the 14 show stoppers, it does not appear from the evidence I have reviewed that they were necessary for the CRM software to function as agreed upon. The CRM License Agreement itself makes no mention of the show stoppers, nor is there any evidence indicating that the agreement was contingent upon Oracle addressing or resolving these issues. To the contrary, internal correspondence from Oracle employees who participated in the negotiations leading up to the CRM License Agreement described the show

---

[185] *See* Rathjens Dep., at 91:4-6; *see also id.* at  91:23-92:4 ("Q. [W]ith respect to the software that was purchased in November of 2000, ... was there functionality that HP thought would be part of the software that wasn't?  A. I think different people within HP had different expectations.")

[186] The fact that HP may have had some difficulty implementing certain modules of the CRM software does not mean the software required additional production, modification or customization. Indeed, Mr. Rathjens testified that it was very difficult to deploy software in HP's environment, that part of the delay was due to making the software function to meet HP stakeholder's acceptance criteria, and that "HP was aware that the software was being developed and some modules of the Oracle CRM software – some modules were more developed than others."  *Id.*, 72:22-24.  Indeed, Mr. Rathjens stated that HP purchased the CRM software with the understanding that additional functionality would be added later.  *Id.*, at 75:1-19 and 93:3-7.

[187] *See* Rebuttal Report of Edward Yourdon, dated June 22, 2007, at pp. 93-94.

[188] *See* Rathjens Dep., at 75:15-23 ("We had lots of dialogue, discussion, and process to get our requested changes into the Oracle software done by Oracle development that we expected to see in the software products at a further point in time....   And that was a big premise on which we purchased the software. That Oracle would continue to develop it to meet HP's needs.").

stoppers – much like HP's 30(b)(6) witness – as having "nothing to do" with HP's purchase of additional CRM licenses.[189,190]

Thus, I have seen no evidence that the software associated with the licenses sold as part of the CRM License Agreement required additional production, modification or customization as of November 30, 2000. Nor is there evidence that the CRM License Agreement was contingent upon Oracle addressing or resolving the 14 show stoppers. Because the evidence demonstrates that the show stoppers had nothing to do with the CRM License Agreement, I believe that Mr. Regan's arguments are unfounded.

3.   *ORACLE'S FEES WERE FIXED OR DETERMINABLE, AND COLLECTIBILITY WAS PROBABLE*

Paragraph 26 of SOP 97-2 requires that a vendor's fee be fixed and determinable, and that collectibility be probable, before revenue can be recognized on a software license arrangement. Mr. Regan contends that this requirement for revenue recognition was not satisfied for two reasons.[191] First, Mr. Regan claims that the fees due under the agreement were not fixed and determinable because the final payment was not due until a year later.[192] Second, Mr. Regan claims that the fees due under the agreement were not fixed and determinable because the

---

[189] *See* NDCA-ORCL 020844.

[190] As noted above, in attacking the functionality of Oracle's CRM software, Mr. Regan relies heavily upon internal HP correspondence generated nearly a year after the CRM License Agreement was executed, *see* Expert Report, at pp. 54-57. Tellingly, these documents were created as part of HP's efforts to develop a negotiation strategy to obtain additional consulting services. Considering the adversarial context in which these documents were created, there is some question whether they represent a fair portrayal of CRM's functionality as of November 30, 2000. Regardless, they do not suggest that the CRM software for which HP purchased additional licenses in November 2000 required significant production, modification or customization, as described within SOP 97-2. It is clear that Oracle did not view the software as requiring such upgrades prior to recognizing revenue on the sale of CRM licenses, considering that at the time Oracle entered into the CRM License Agreement, a number of customers – including HP – already had gone "live" with CRM software or various CRM modules. *See* NDCA-ORCL 020728-020730.

[191] *See* Expert Report, at pp. 58-59.

[192] *See id,* at p. 59.

payments due under the license agreement purportedly were subject to forfeiture, refund or other concession.[193]   As discussed below, I believe that Mr. Regan's opinions in this regard are incorrect.

The fees due under the CRM License Agreement were fixed and determinable.  HP financed the CRM License Agreement through the OCC Finance Agreement, an 11-month lease agreement that gave HP the option of converting the term licenses into perpetual licenses for an additional payment of $2.1 million, due on December 1, 2001.[194]  Notwithstanding the fact that the final payment was optional, and due a year and one day after the agreement was executed, Oracle's fees nonetheless were fixed and determinable as of November 30, 2000.  Oracle and its external auditors considered the possibility that HP would exercise its option on December 1, 2001 to convert the term licenses into perpetual licenses a virtual certainty.[195]  Over 90% of the total lease payments were due within the first 11 months.  In other words, HP could have paid $29.8 million for an 11-month software license, or HP could have opted to make the final payment under the lease agreement and obtained a perpetual license for an additional $2.1 million.  Given the circumstances, Oracle and its external auditors viewed the final payment as a bargain purchase option and, thus, treated the license agreement as perpetual in nature as of November 30, 2000.  Because Oracle and its external auditors viewed the HP transaction as a perpetual license agreement, it was appropriate for Oracle to recognize the license fees on November 30, 2000.

The fees due under the CRM License Agreement were not subject to "forfeiture, refund or other concession."  As an initial matter, there is nothing in the CRM License Agreement which grants HP any forfeiture, refund or other concession rights.   To the contrary, the CRM License

---

[193] *See id.*

[194] *See* HP 00050-51.

[195] *See* AA 001339-40.

Agreement expressly provides that "[a]ll fees due under this Ordering Document shall be non-cancellable and the sums paid nonrefundable, except as provided in the Agreement."[196]

Mr. Regan cites an email that references certain concessions that Oracle previously granted to HP relating to consulting and support services covered by the August 1999 agreements.[197] The fact that Oracle granted HP a concession on one occasion in the past is insufficient, standing alone, to require Oracle to defer the recognition of revenue based upon the potential risk for future concessions. More importantly, the prior concession involved (i) consulting, which, as discussed above, was part of a separate contract, and (ii) services, which were deferred under the CRM License Agreement anyway. Thus, this prior concession does not establish that the license payments due under the OCC Finance Agreement were subject to forfeiture, refund or other concession.[198]

Thus, I have seen sufficient evidence that Oracle's fees were fixed or determinable, and collectibility was probable as of November 30, 2000.

## E. THE EFFECT ON THE SECOND QUARTER FINANCIAL STATEMENTS WAS NOT MATERIAL

For all of the reasons discussed above, I believe Oracle's decision to recognize revenue for the licenses it sold to HP on November 30, 2000 was appropriate under GAAP. However, even

---

[196] *See* HP 00032. The "Agreement" referenced in the CRM License Agreement is the SLSA. As discussed above, the Third Amendment to the SLSA eliminated the 15-day acceptance period, and provided that programs shall be deemed to be accepted by customer on delivery. Moreover, Amendment Three to the SLSA also provided that "[a]ll fees due under this Amendment Three shall be due and payable net 30 days from date of invoice, and shall be non-cancelable and the subs paid nonrefundable."

[197] *See* Expert Report, at p. 61.

[198] Mr. Regan also claims that Oracle's fees were cancellable pursuant to the 15-day acceptance period under the 1994 SLSA. *See* Expert Report, at pp. 59-60. As discussed above, however, this provision was eliminated as part of the Amendment Three to the SLSA.

assuming that Oracle's decision to recognize revenue on this transaction during the second quarter of fiscal year 2001 was incorrect, any resulting misstatement in Oracle's financial statements would be immaterial, from either a quantitative and qualitative standpoint. Had Oracle deferred the entire license fee due under the CRM License Agreement, Oracle still would have reported earnings per share of $0.10, consistent with analysts' consensus expectations. Mr. Regan has identified no support to suggest that meeting consensus expectations, versus exceeding such expectations, renders any such misstatement in Oracle's reported earnings per share material.

Furthermore, even assuming that both the transfers to the bad debt reserve *and* the revenue recognized on the CRM License Agreement required adjustment, any corresponding misstatement in Oracle's second quarter financial statements would not be material from either a quantitative or qualitative perspective. In other words, even if Oracle's second quarter revenue was reduced by $40 million (representing the approximately $20 million adjustment to the bad debt reserve and the approximately $20 million in revenue recognized on the HP transaction), Oracle would have reported earnings per share of $0.10, consistent with analysts' consensus expectations. This $40 million represents only 1.5% of Oracle's total revenue, and 4% of Oracle's net income after taxes, in the second quarter of fiscal year 2001. Thus, giving Plaintiffs every benefit of the doubt, I have seen no evidence to suggest that Oracle's financial statements for the second quarter of fiscal year 2001 were materially misstated.

## VIII.  CONCLUSIONS

I have seen no evidence indicating that Oracle's financial statements in the second quarter of fiscal year 2001 were materially misstated. I have seen no evidence to suggest that any of the issues raised in Mr. Regan's Expert Report, even if true, had any impact on Oracle's financial

performance in the third quarter of fiscal year 2001, or that they caused or contributed to the third quarter earnings miss.   To the extent that Mr. Regan suggests otherwise, his opinions are unfounded, incorrect and should not be relied upon.

## IX.    QUALIFICATION

I reserve the right to supplement and/or amend my opinions as necessary as additional documents or information is made available for my review.   I may independently, or be asked by counsel to create exhibits after the issuance of this report.    These exhibits may then be used as demonstratives during trial.   I will be available for further comment on my opinions contained herein at my deposition at some point in the future.   Further, in support of my opinions, I may also use any of the previously produced documents referred to in the body of this report or in any Exhibit hereto.

Very truly yours,

*This report has been prepared by:*

J. Duross O'Bryan, Managing Director

# EXHIBIT 9

0000143_1292244.xls

| A | 0-999 | | 1,000-2,999 | | 3,000-9,999 | | 10,000-99,999 | | >100,000 | | Total | | Total Reviewed | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Count | Value | Count | Value | Count | Value | Count | Value | Count | Value | Count | Value | Value | % |
| Receipts Still On Account | 2,217 | $772,056 | 1,305 | $2,391,945 | 746 | $4,119,237 | 492 | $12,618,039 | 31 | $5,944,594 | 4,791 | $25,845,871 | $18,562,633 | 72% |
| Receipt Write Off All | 1,934 | $323,748 | 493 | $926,902 | 244 | $1,354,266 | 149 | $3,647,307 | 0 | $0 | 2,820 | $6,252,223 | $3,647,307 | 58% |
| Miscellaneous Receipts O/S | 990 | $284,562 | 557 | $1,088,964 | 381 | $2,155,416 | 321 | $8,829,224 | 45 | $10,133,123 | 2,294 | $22,510,879 | $18,362,347 | 84% |
| Miscellaneous Receipts Pre 6/00 | 617 | $189,518 | 165 | $294,556 | 99 | $514,738 | 48 | $1,789,690 | 13 | $2,195,163 | 942 | $ 4,983,665 | $3,994,853 | 80% |
| Total | 5,758 | $1,669,874 | 2,520 | $4,621,967 | 1,470 | $8,143,657 | 1,010 | $26,884,260 | 89 | $18,272,880 | 10,647 | $59,592,638 | $45,157,140 | 76% |

| | | | | |
|---|---|---|---|---|
| Total | 8,278 | 6,291,842 | 1,470 | 7,628,919 |

Total exposure for Credits through August 31, 2002          1,059   45,157,140

59,392,638

Less - Reductions to Misc receipts through August 31, 2002
Less - August adds not considered in reserve add backs          (1,962,806)
Less - items less than $3,000 - assumed to offset adjustments   (7,628,219)
                                                                (6,291,842)
Sub-total                                                       43,799,781
Less - non revenue impacting found to date                        (41,325)
Revised exposure -- as of November 20, 2002                     43,758,456

Review Summary

Page 1

Confidential - Pursuant To Protective Order

NDCA-ORCL 1646554

# EXHIBIT 10

1  MILBERG WEISS BERSHAD
     HYNES & LERACH LLP
2  WILLIAM S. LERACH (68581)
     MARK SOLOMON (151949)
3  DOUGLAS R. BRITTON (188769)
     401 B Street, Suite 1700
4  San Diego, CA 92101
     Telephone: 619/231-1058
5  619/231-7423 (fax)
          - and -
6  SANFORD SVETCOV (36561)
     SHAWN A. WILLIAMS (213113)
7  100 Pine Street, Suite 2600
     San Francisco, CA 94111
8  Telephone: 415/288-4545
     415/288-4534 (fax)
9
     Lead Counsel for Plaintiffs
10

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13
     In re ORACLE CORPORATION SECURITIES )  Master File No. C-01-0988-MJJ
14  LITIGATION                            )
     ——————————————————————   )  CLASS ACTION
15                                         )
     This Document Relates To:             )  PLAINTIFFS' *EX PARTE* APPLICATION
16                                         )  FOR AN ORDER ENJOINING
          ALL ACTIONS.                     )  DEFENDANTS TO CEASE ALTERING
17  ——————————————————————   )  EVIDENCE, DIRECTING DEFENDANTS
                                            )  TO PRESERVE EVIDENCE AND
18                                            GRANTING PLAINTIFFS
                                              PARTICULARIZED DISCOVERY TO
19                                            PRESERVE EVIDENCE

20                                            DATE:      N/A
                                              TIME:      N/A
21                                            DEPT:      Honorable Martin J. Jenkins

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   SUMMARY OF PLAINTIFFS' ALLEGATIONS OF ACCOUNTING FRAUD . . . . 2

      A.    Oracle Improperly Converted $228 Million of Customer Overpayments
            and Falsely Reported It as 2Q01 Revenue . . . . . . . . . . . . . . . . . . . 2

      B.    Plaintiffs' Allegations Have Now Been Confirmed by an Oracle Employee
            Who Has Also Warned of Imminent Destruction of Evidence . . . . . . . . . . 3

            1.    A New Witness and Former Oracle Manager Confirms the SAC . . . . 3

            2.    New Witnesses Warn of Destruction, Alteration or Spoliation of
                  Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      C.    Internal Oracle Documents Corroborate Witness Reports . . . . . . . . . . . 6

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.    The Facts Justify an Order to Preserve Evidence . . . . . . . . . . . . . . . 7

      B.    Particularized Discovery is Warranted By the Facts . . . . . . . . . . . . . 9

            1.    Deposition Witnesses . . . . . . . . . . . . . . . . . . . . . . . . 9

            2.    Deposition Topics . . . . . . . . . . . . . . . . . . . . . . . . . 9

            3.    Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

1

# TABLE OF AUTHORITIES

2

**CASES**                                                                                                  **Page**

3

*In re Flir Sys., Inc. Sec. Litig.,*
4          [2000-2001 Transfer Binder], Fed. Sec. L. Rep.
           (CCH) ¶91,308 (D. Or. 2000)   . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
5

*In re Pacific Gateway Exch., Inc. Sec. Litig.,*
6          No. C 00-1211 PJH (JL), 2001 U.S. Dist. LEXIS 18433
           (N.D. Cal. Oct. 15, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
7

*Powers v. Eichen,*
8      961 F. Supp. 233 (S.D. Cal. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 8

9   *SG Cowen Sec. Corp. v. United States District Court*
        *for the Northern District of California,*
10      189 F.3d 909 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

11  *Vezzetti v. Remec, Inc.,*
        No. 99CV0796L (JAH), 2001 U.S. Dist. LEXIS 10462
12      (S.D. Cal. July 20, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

13  **STATUTES , RULES AND REGULATIONS**

14  15 U.S.C.
        §78u-4(b)(3)(C)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
15      §78u-4(b)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 10

16  Federal Rules of Civil Procedure
        30(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

17

18

19

20

21

22

23

24

25

26

27

28

1    Plaintiffs bring this *ex parte* motion pursuant to Civil Local Rules 7-10(a), 65-1(a), and the

2  Private Securities Litigation Reform Act of 1995 ("PSLRA") (15 U.S.C. §78u-4(b)(3)(B)), seeking

3  an order directing defendant Oracle Corp. ("Oracle" or the "Company") to (1) cease and desist the

4  destruction or alteration of evidence; (2) answer particularized discovery to determine the extent of

5  the alteration of documents and the extent of the loss of evidence; (3) take all necessary measures

6  to preserve the integrity of all documents (including electronic communications); and (4) give the

7  Court an accounting of such measures.

8    This extraordinary relief is warranted because plaintiffs have recently learned from a former

9  Oracle manager, in contact with current Oracle employees, that after plaintiffs filed their Second

10  Amended Class Action Complaint for Violation of the Federal Securities Laws ("SAC") on October

11  11, 2002, Oracle initiated destruction or alteration of electronic evidence that would support

12  plaintiffs' allegations of accounting fraud.

13  **I.    INTRODUCTION**

14    This is a securities fraud class action on behalf of persons who purchased the publicly traded

15  securities of Oracle between December 14, 2000 and March 1, 2001 (the "Class Period").  The

16  October 11, 2002 SAC includes new allegations of serious accounting irregularities within Oracle

17  that resulted in the overstatement of the Company's 2Q01 revenues by approximately $228 million.

18    The allegations of accounting fraud, on their own, reveal massive and deliberate conversion

19  of unearned revenue in violation of Generally Accepted Accounting Principles ("GAAP").  These

20  allegations also provide context for plaintiffs' allegations that defendants' statements during the Class

21  Period that Oracle was not being hurt by the slowing economy, and that Oracle would continue to

22  enjoy sequential earnings growth and would report 3Q01 of $0.12 earnings per share ("EPS"), were

23  false when made.  In addition, the overstatement of $228 million in revenue explains Oracle's

24  purported financial success in the two quarters following the release of its faltering 11i suite of

25  software.

26    Since October 11, 2002, new witnesses have disclosed facts confirming the allegations of the

27  SAC. More importantly, a former employee has disclosed that Oracle has already begun to destroy

28  evidence critical to plaintiffs' claims.  Specifically, plaintiffs have been informed that Oracle has

1  directed Mike Quinn, an Oracle manager in charge of revenue recognition, and members of the

2  Company's cash collections staff and accounts receivable staff to hurriedly adjust invoices, refund

3  cash and "clean up the On Account problem" alleged in the SAC. In furtherance of this clean-up,

4  the Company has revived an old database consisting of customer receipts relevant to plaintiffs'

5  allegations, retrieved data from that database, and plans to shut it down again when the alterations

6  are completed. Some or all of that alteration may already have been accomplished.

7      In light of the foregoing facts and the details provided below, plaintiffs seek an Order from

8  the Court enjoining Oracle to cease altering evidence, directing Oracle to preserve evidence, and

9  allowing plaintiffs limited particularized discovery aimed at ensuring that evidence is preserved or

10  recovered if recently altered.

11  **II.     SUMMARY OF PLAINTIFFS' ALLEGATIONS OF ACCOUNTING
          FRAUD**

12

13          **A.      Oracle Improperly Converted $228 Million of Customer
                   Overpayments and Falsely Reported It as 2Q01 Revenue**

14      The SAC alleges that Oracle overstated its 2Q01 revenues by more than $228 million. ¶36.[1]

15  In support of their allegations of falsity, plaintiffs submit the first-hand confidential witness account

16  of a former financial analyst ("CW46") for a global recovery audit firm responsible for servicing its

17  clients, some of whom are Oracle customers. ¶27(tt). CW46 reviewed invoices, purchase orders

18  and shipping documents on behalf of his/her clients to uncover payment errors and recover

19  inadvertent payments. Specifically, based on analysis by CW46, plaintiffs allege that between 1991-

20  2001 at least 16 Oracle customers had inadvertently overpaid Oracle invoices, but that Oracle did

21  not inform its customers of overpayment or refund their money. Instead, Oracle maintained a fund

22  of its customer overpayments as unapplied cash on account. ¶36(c).

23      Plaintiffs also allege that on November 17, 2000, in a series of approximately 46,000

24  transactions, Oracle converted $228 million of such customer overpayments held in its unapplied

25  cash account to revenue by creating phony sales invoices called "debit memos" and clearing the debit

26  memos with money held in the unapplied cash account. ¶¶35-43. CW46 reviewed 760 of these

27

28  [1]     All "¶" references are to the SAC.

PLAINTIFFS' EX PARTE APPL FOR AN ORDER DIRECTING DEF TO PRESERVE
EVIDENCE & GRANTING PARTICULARIZED DISCOVERY- C-01-0988-MJJ                    - 2 -

1  November 17 transactions, each with varying dollar amounts. The dollar value totaled $14.5 million.

2  ¶37(a).

3       Plaintiffs further allege that Oracle credit collections analysts confirmed the issuance of the

4  phony debit memos and said they were created to "clean up [Oracle's] unapplied account" consisting

5  of customer overpayments. ¶37. A former Oracle credit collections analyst, CW48, corroborated

6  that on November 17, 2000 the Company executed a huge sweep of old cash, all with debit memos.

7  ¶38(f).

8       In addition, plaintiffs allege that a named statistics expert analyzed the 760 transactions

9  uncovered by CW46 and determined that they provide a sufficient and reasonable sample to infer

10  that the population of transactions exceeds 46,000 and the average dollar value of the transaction

11  exceeds $4,970.  Thus, the total value of the broader population exceeds $228 million. ¶¶39-40.

12      **B.**    **Plaintiffs' Allegations Have Now Been Confirmed by an Oracle**
13            **Employee Who Has Also Warned of Imminent Destruction of Evidence**

14          **1.**    **A New Witness and Former Oracle Manager Confirms the SAC**

15

16       Subsequent to the filing of their SAC, on October 25, 2002, plaintiffs interviewed CW49,

17  a former Oracle manager for cash collections.  CW49 was responsible for all Oracle collections

18  activity for the United States and reported to Mike Quinn, who was responsible for revenue

19  recognition at the Company, and reported to Jennifer Minton, Oracle's Senior Vice President of

20  Finance and Operations.  CW49 corroborated plaintiffs' allegations of improper conversion of

21  customer overpayments.  CW49 further confirmed that Oracle routinely accumulated customer

22  overpayments, that customers were not informed of those overpayments and that Oracle held

23  customer overpayments in its "unapplied cash account."  In addition, CW49 reported that in 2Q01

24  ending November 30, 2000, Senior Accounts Receivable Manager Greg Meyers had been directed

25  by Jennifer Minton, Oracle's Senior Vice President of Finance and Operations, to "clean up" the

26  unapplied cash accounts.  According to CW49, Meyers did so by ordering the issuance of debit

27  memos which were essentially "fictitious invoices" and that Mike Quinn, who was in charge of all

28  revenue recognition at Oracle, applied the money from the unapplied account to revenue.

1       CW49 also confirmed that on November 17, 2000, 46,800 "debit memos" were created and

2  $230 million in unapplied cash was moved from Oracle's unapplied cash account.  Thus, CW49

3  independently corroborated the analysis of plaintiffs' statistics expert.  CW49 further related that

4  some of the critical documents tracking the unapplied cash transactions are the Activity Balance

5  Account sheets which exist for each customer and the Billing Histories of each customer (similar

6  to the excerpts attached as Exs. 40 and 41 to the Corrected Appendix to the SAC).

7        2.    **New Witnesses Warn of Destruction, Alteration or Spoliation of Evidence**

8

9       In a follow-up interview, on October 31, 2002, CW49 reported that a former colleague and

10  current Oracle employee contacted him and stated that, since the filing of the SAC, Oracle had also

11  assembled an "On Account Team" directed by Mike Quinn to solve the "On Account" issue.  CW49

12  reported that Quinn has put in place an "action plan" that would imminently alter certain electronic

13  transactions and customer invoices which would otherwise have supported plaintiffs' claims.  The

14  plan resulted in a flurry of meetings and messages directed by Quinn between October 21, 2001 and

15  October 30, 2001.  The purpose of the plan was to direct cash collections personnel and accounts

16  receivable personnel to clean up the debit memos that were created in November 2000, plus any

17  debit memos created between 1998 to the present which were above $15,000.  Notes from some of

18  those meetings given to CW49 by Oracle employees state:

19      October 21 Monday:  Mgr meeting – explanation of on account problem and company's suit to pay back money. *Saying not rev[enue] recognized and everything will be okay.*[2]  Lawsuit holds no water because this is a recent issue.

20

21      October 22 Tuesday:  Quinn sends ss [spreadsheet] to mgrs be cut up [amongst] mgmt team to resolve items that had been reserved.  Create a plan to resolve and get out of reserve by Friday. *Collections meets with AR to agree how to adjust up invoices and how to send over details.*

22

23      October 23 Wednesday:  Collections mgrs breakup workload amongst staff and tell them to finish by cob [close of business].  SS [spreadsheet] sent to Quinn who sends back with his notes and says this isn't good enough.  These explanations will not due [sic].  Quinn meets with mgrs and lights into them.

24

25

26        *Quinn* wants to figure out why the items were reserved and *can't tell if the item was a revenue impact or not.  Will not refund any item that impacts revenue, adjust up invoice for revenue impacting items.*

27

28  —————————

[2]    Here, as elsewhere, emphasis is added and citations are omitted unless otherwise noted.

[October 24, 25, 28, 29: Oracle prohibited all collections personnel from making outbound calls but instead work on Quinn action items.]

October 30 Wednesday: Quinn sent back ss [spreadsheet] with items that needed additional cleanup and staff began working on. Collections mgrs meet and agreed upon all notes to be sent to Quinn.

(A copy of these notes is attached as Exhibit A to the Declaration of Ken Keatly in Support of Plaintiffs' *Ex Parte* Application for an Order Enjoining Defendants to Cease Altering Evidence, Directing Defendants to Preserve Evidence and Granting Plaintiffs Particularized Discovery to Preserve Evidence ("Keatly Decl.")).

Among the evidence alterations reported by the current employee to CW49, one includes the deletion of historical transaction notes pertaining to Oracle customers who have made overpayments. The change would be executed by logging into the 11i "accounts receivable workbench" application, pulling up the "receipts/receipts," form and deleting the historical receipts notes input by a credit corrections analyst concerning the last transaction on specified accounts. Thus, for example, if the last receipt note for Oracle client Eli Lilly indicated "Move to On Account," Oracle intends to delete that historical note and change it to indicate "refund customer" or something to a similar effect. According to CW49, these receipt notes only retain the last note taken on the account, the historical notes evidencing improper revenue recognition will not be retrievable.

The Oracle employee informed CW49 of a second specific measure Oracle intended to take which would alter documents relevant to plaintiffs' allegations. In order to create the appearance that customer payments were accurately applied, CW49 reported that defendants planned to review all invoices for specific customers which had been previously written off as bad debts. Defendants will then upwardly adjust those invoices and apply an overpayment check on hand to that purportedly adjusted invoice. This action would thus create the false appearance that Oracle had properly applied overpayments to an open invoice. Because the specific customer would not know of the written off bad debt, nor of the overpayments in Oracle's unapplied account, those alterations can be made without contacting customers and only Oracle would be privy to information regarding the alterations.

1    CW49 also learned from speaking with the Oracle current employee that the following are

2  some Oracle employees involved in carrying out the action plan of cleaning up the unapplied cash

3  and debit memos:

4            Ann Maria Adao              Sam Johannes
             Justin Backs               Sajam Kumar
5            Krithika Bhat              Molly Littlefield
             Raul Campos                Neil Menon
6            Joan de la Crux            Greg Meyers
             Omid Fardanesh             Mike Quinn
7            Ian Hatada                 Ryan Roberts
             Kim Henderson

8
         C.    **Internal Oracle Documents Corroborate Witness Reports**
9
         In addition to Exhibit A (the meeting notes), the following documents, Exhibits B-D attached
10
    to the Keatly Decl., obtained by plaintiffs support information disclosed by CW49 and establish that
11
    the Company has in fact taken and continues to take measures that are likely compromising the
12
    integrity of relevant evidence and confirm that the Company has already revived an old database
13
    confirming customer receipts.
14
         Exhibit B is an e-mail from Ryan Roberts to several Oracle managers, each in charge of what
15
    appear to be separate teams. The e-mail states:
16
              Attached is our new working list. I have broken it out from the list and sorted
17       by dollar (so I could get back the ones we have not yet worked on). They are listed
         out for you by your name. Please do not resort these. *I have to get them back in the*
18       *same order I am sending them to you.* Each of you has between 50-52 items. Feel
         free to meet with your teams tonight or tomorrow morning to get them assigned.
19       *Let's do the same quality work on these that we have done with the others.* My
         goal is to be done by 4:30 tomorrow so we can get the In Focus and go over them.
20       Once complete, I will forward to Mike and let him know *we are ready to take action.*

21  (Emphasis in original and added).

22       Exhibit C is an e-mail from Omid Fardanesh to Kim Henderson, Oracle's Senior Systems

23  Analyst for North America Finance and Operations. The e-mail confirms that the Company is doing

24  a reconciliation of its "On Account" records and has reactivated the "query component of the old

25  Proforma site" to complete the project:

26            *Here in Collections we are doing a reconciliation of our "On Account"*
         *which consists of Receipts we have received.* The problem we are running into some
27       of the Checks reference a PFR number. I know that recently we deactivated the site
         that allowed us to search on a PFR number to find out why the [Pro]forma was done.
28

*I am hoping to see if there is any way we can get access to that data even if possible to reactivate the site for a week or so till we are done with this project.*

In response, Henderson wrote that she had reactivated the database but would only leave it active until November 1, 2002:

> Hi Omid –
> I've reactivated the query component of the old Proforma site. I had to restart our old database that had the proforma table in it. I will leave it up until Friday, November 1st and then shut it down again. *I do not want to leave the old database up one second longer than it needs to be.*

Exhibit D is an e-mail from Mike Quinn to Greg Meyers confirming that Meyers has disabled the ability to move customer receipts "On Account" to its 12601 account:

> Greg, please confirm that ALL ability to move anything to 12601 via On Account or creating a Misc receipt write off has been turned off.

> Greg, as we discussed this weekend, please look into the ins and outs in Activity Detail in the 12601_Detail spreadsheet. In many instances, there are two negative numbers (are these debits or credits?) and one positive of equal amounts. Please research and provide an explanation of the accounting involved.

## III.   ARGUMENT

### A.   The Facts Justify an Order to Preserve Evidence

15 U.S.C. §78u-4(b)(3)(B) provides in relevant part:
In any private action arising under this title, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of a party that particularized discovery is necessary to *preserve evidence* or to prevent undue prejudice to that party.

Although the stay provision was intended to prevent unnecessary imposition of discovery costs on defendants, the PSLRA also imposes a duty on any party to a securities class action with actual notice of the allegations in a complaint to preserve all relevant evidence in its custody or control and thus makes it "illegal for a party who receives actual notice of the litigation to destroy or alter evidence." *Powers v. Eichen,* 961 F. Supp. 233, 236 (S.D. Cal. 1997); 15 U.S.C. §78u-4(b)(3)(C)(1). Accordingly, the statute also provides a means to obtain relief from the stay where "'particularized discovery is necessary to preserve evidence or prevent undue prejudice to a party.'" *See SG Cowen Sec. Corp. v. United States District Court for the Northern District of California,* 189 F.3d 909, 911-13 (9th Cir. 1999).

1    Consistent with that provision, courts have allowed discovery to proceed in a limited fashion
2  where a party has made a showing that evidence may be lost or destroyed resulting in prejudice to
3  that party. In *In re Pacific Gateway Exch., Inc. Sec. Litig.*, No. C 00-1211 PJH (JL), 2001 U.S. Dist.
4  LEXIS 18433 (N.D. Cal. Oct. 15, 2001), Judge Hamilton found that personal computers of Pacific
5  Gateway employees may have been reformatted or reprogrammed in such a way that would
6  overwrite or erase relevant data from their hard drives and granted a partial lifting of the stay of
7  discovery and allowed plaintiff to take Rule 30(b)(6) depositions of the custodian of records, serve
8  preservation subpoenas, and image computer laptops. *Id.*; *see also Blumenthal v. Glinsky*, C-01-
9  01474-WHA, Order Granting Plaintiff's Motion to Seek Particularized Discovery Prior to
10  Appointment of Lead Plaintiff (N.D. Cal. May 1, 2001) (permitting plaintiffs to take discovery upon
11  a showing that documents relevant to Northpoint Communications, Inc. would be sold or destroyed
12  pursuant to events occurring in its bankruptcy proceedings) (attached hereto as Exhibit 1).

13    In *Newby v. Enron Corp.*, No. H-01-3624, pending in the Northern District of Texas,
14  plaintiffs asserted that Arthur Andersen, Enron Corp.'s ("Enron") outside auditor, had disposed of
15  significant electronic and paper documents relevant to Enron's engagement in violating the PSLRA
16  mandate to preserve evidence, and sought particularized discovery aimed at preserving and
17  recovering evidence. The court lifted the stay of discovery and allowed plaintiffs to take depositions
18  limited to issues of document and data retention, storage, deletion, and restoration.   Order
19  Prohibiting the Destruction of Evidence, Granting Limited Discovery, and Providing Other Relief
20  Regarding Arthur Andersen, No. H-01-3624 (N.D. Tex. Jan. 23, 2002) (attached hEreto as Exhibit
21  2).

22    Other courts have also lifted the PSLRA discovery stay to ensure the preservation of evidence
23  when circumstances suggest that documents may be lost or destroyed. In *In re Flir Sys., Inc. Sec.
24  Litig.*, [2000-2001 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶91,308 (D. Or. 2000), plaintiffs sought
25  to lift the discovery stay to depose a third party witness said to have information relating to improper
26  accounting practices alleged in plaintiffs' complaint. The witness had previously refused to disclose
27  information because defendant threatened to sue if he did so.   The court found that defendants'
28  efforts to silence the witness would result in undue prejudice and granted plaintiffs' motion. *See also*

PLAINTIFFS' EX PARTE APPL FOR AN ORDER DIRECTING DEF TO PRESERVE
EVIDENCE & GRANTING PARTICULARIZED DISCOVERY- C-01-0988-MJJ                     - 8 -

1 | *Vezzetti v. Remec, Inc.*, No. 99CV0796L (JAH), 2001 U.S. Dist. LEXIS 10462 (S.D. Cal. July 20,

2 | 2001) (granting plaintiffs' *ex parte* application for leave to serve document production subpoenas on

3 | non-parties).

4 | **B.     Particularized Discovery Is Warranted by the Facts**

5 | In this case, immediate relief is necessary to ensure the preservation of documents critical

6 | to plaintiffs' proof, discovery of what has been done to date that would have deleted or compromised

7 | the integrity of those documents, and recovery, if possible, of any lost or destroyed evidence.

8 | Plaintiffs have asserted specific exceptional circumstances under which a lift of the automatic stay

9 | is warranted to preserve evidence and avoid undue prejudice.   Thus, pursuant to 15 U.S.C.

10 | §78u-4(b)(3)(B) and Civil Local Rules 7-10(a) and 65-1(a), plaintiffs respectfully request that the

11 | Court issue an order directing Oracle (a) to cease and desist all conduct which would alter relevant

12 | evidence; (b) to answer particularized discovery aimed at preserving and recovering evidence; and

13 | (c) to order Oracle to provide the Court with an immediate accounting of the steps taken to preserve

14 | evidence or to alter or destroy evidence.

15 | **1.     Deposition Witnesses**

16 |
| Ann Maria Adao | Sam Johannes |
| Justin Backs | Sajam Kumar |
| Krithika Bhat | Molly Littlefield |
| Raul Campos | Neil Menon |
| Joan de la Cruz | Greg Meyers |
| Omid Fardenesh | Mike Quinn |
| Ian Hatada | Ryan Roberts |
| Kim Henderson | |

20 | **2.     Deposition Topics**

21 |

22 | (a)     The identity of any and all individual measures taken to preserve documents, including electronic data, concerning Oracle's unapplied cash, debit memos, and customer overpayments.

23 |

24 | (b)     Location of all electronic and paper documents and correspondence relating to customer invoices and overpayments.

25 | (c)     Identity of all individuals involved in creating and applying debit memos to unapplied cash in November 2000.

26 |

27 | (d)     Any and all "projects" or measures taken between October 11, 2002 to the present to reconcile Oracle's "On Account," or "unapplied cash."

28 |

1    (e)    Any measures taken between October 11, 2002 to the present related to refunding customers, adjusting customer invoices, or adjusting credit analyst notes for all customers.

2

3    (f)    Identify and produce a Person Most Knowledgeable ("PMK") of all computer systems, including a description of hardware, operating systems and software, used by Oracle to generate, store, restore or retrieve electronic data and documents, including electronic mail including,

4    but not limited to, systems in Oracle's finance and operations department, collections, and accounts receivable department.

5

(g)    All processes and procedures involved in the creation, storage, retention,
6    restoration and retrieval of electronic data and documents, including electronic mail.

7    (h)    The description, number, and location of media upon which electronic data and documents, including electronic mail, were and currently are stored or maintained

8    .

(i)    All steps undertaken to preserve documents after this lawsuit commenced and
9    after October 11, 2002, including the preservation of hard-copy documents, electronic documents, files and hard drives of employees who have since left the Company.

10

(j)    Identify and produce a PMK of Oracle's "on account," its "unapplied cash"
11    account, its "reserve" account, its "12601" account, and its "5160101" refund account.

12    (k)    Identify and produce a PMK of Oracle's pro forma site.

13    (l)    Identify and produce a PMK of Oracle's past and current document preservation policies.

14

**3.    Documents**
15

(a)    All correspondence (including electronic) between and among the members
16    of the credit collections group and accounts receivable, including, but not limited to, the individuals described above from October 11, 2002 to the present.

17

(b)    Any and all documents and communications generated between October 11,
18    2002 - present concerning November 17, 2000 debit memos.

19    (c)    All documents and communications relating to all transactions in the Company's 25005 account between November 1, 2000 – November 30, 2000 and October 11, 2002 -
20    present.

21    (d)    All documents relating to transactions in the Company's 12601 account between November 1, 2000 – March 30, 2001 and October 1, 2002 – present.

22

(e)    All documents and communications relating to any "On Account" clean up
23    or reconciliation of Oracle's On Account between October 1, 2002 – present.

24    (f)    All documents and communications concerning any "receipt write offs" of 5160101 refunds from October 11, 2002 – present.

25

(g)    All documents and communications containing the reactivation of Oracle's
26    pro forma site.

27    (h)    All documents and communications concerning Oracle's customer activity detail 12601 spreadsheets.

28

1           (i)    All documents including electronic concerning any meetings between
2 members of Oracle's Collections Group and Oracle's Accounts Receivable Group from October 11,
2002 - present.

3 **IV.    CONCLUSION**

4      For the foregoing reasons, the relief requested should be granted to ensure the preservation

5 of evidence as required by the PSLRA.

6 DATED: November 11, 2002           Respectfully submitted,

7                              MILBERG WEISS BERSHAD
8                               HYNES & LERACH LLP
                             SANFORD SVETCOV
9                              SHAWN A. WILLIAMS

10

11                                SHAWN A. WILLIAMS

12                              100 Pine Street, Suite 2600
                             San Francisco, CA 94111
13                              Telephone: 415/288-4545
14                              415/288-4534 (fax)

15                              MILBERG WEISS BERSHAD
                             HYNES & LERACH LLP
16                              WILLIAM S. LERACH
                             MARK SOLOMON
17                              DOUGLAS R. BRITTON
                             401 B Street, Suite 1700
18                              San Diego, CA 92101
                             Telephone: 619/231-1058
19                              619/231-7423 (fax)

20                            Lead Counsel for Plaintiffs

21

22

23

24

25

26

27

28

# Exhibit 1

Received

MAY 0 2 2001

Milberg Weiss

FILED

2001 MAY -1  PM 3: 34

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

FRANK BLUMENTHAL, On Behalf of Himself
and All Others Similarly Situated,

        Plaintiff,

v.

MICHAEL P. GLINSKY and ELIZABETH A.
FETTER,

        Defendants.

No. C 01-01474 WHA

ORDER GRANTING PLAINTIFF'S
MOTION TO SEEK PARTICULARIZED
DISCOVERY PRIOR TO
APPOINTMENT OF LEAD PLAINTIFF

On April 13, Judge Thomas E. Carlson of the United States Bankruptcy Court for the
Northern District of California granted an *ex parte* motion in the bankruptcy case *In re
NorthPoint Communication Group, Inc.*, No. 01-30127-TEC, brought by plaintiffs in this case
to seek "relief from the provisions of 11 U.S.C. 362(a) to seek discovery against NorthPoint as
a non-party in *Blumenthal* action or against NorthPoint as a non-party to any consolidated
action that includes the *Blumenthal* action, subject to any limitations on such discovery deemed
appropriate by the court with jurisdiction over the *Blumenthal* action or any consolidated
action." Plaintiffs have now moved this Court for permission to take such discovery and to
obtain relief from the anti-discovery provisions of the Private Securities Litigation Reform Act
of 1995. 15 U.S.C. 78u-4(b)(3)(B). Good cause having been shown, the Court PERMITS the
requested discovery so long as it is conducted under the aegis of the bankruptcy court and under
Judge Carlson's supervision.



Plaintiff's counsel are advised that the advance discovery being taken by counsel for Mr. Blumenthal will not necessarily aid them with respect to the selection of lead plaintiff and lead counsel and, correspondingly, that counsel should not necessarily expect to be reimbursed for their time spent on the discovery.

**IT IS SO ORDERED.**

Dated: May 1, 2001.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

2

dt

United States District Court
for the
Northern District of California
May 1, 2001

* * CERTIFICATE OF SERVICE * *

Case Number:3:01-cv-01474

Blumenthal

vs

Glinsky

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Northern District of California.

That on  May 1, 2001, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office
c ivery receptacle located in the Clerk's office.

        Reed R. Kathrein, Esq.
        Milberg Weiss Bershad Hynes & Lerach LLP
        100 Pine Street
        Ste 2600
        San Francisco, CA  94111

        William S. Lerach, Esq.
        Milberg Weiss Bershad Hynes & Lerach LLP
        600 W Broadway Ste 1800
        One America Plaza
        San Diego, CA  92101

        Darren J. Robbins, Esq.
        Milberg Weiss Bershad Hynes & Lerach LLP
        600 W Broadway Ste 1800
        One America Plaza
        San Diego, CA  92101

        Andrew L. Barroway, Esq.
        Schiffrin & Barroway LLP
        Three Bala Plaza East
        Suite 400
        Bala Cynwyd, PA  19004

        David Kessler, Esq.

Schiffrin & Barroway LLP
Three Bala Plaz  East
Suite 400
Bala Cynwyd, PA   19004

Richard W. Wieking, Clerk

BY: _____
Deputy Clerk

# Exhibit 2

United States Courts
Southern District of Texas
ENTERED

**JAN 2 3 2002**

Michael N. Milby, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| MARK NEWBY, et al., Individually and On Behalf of All Others Similarly Situated, | Civil Action No. H-01-3624 (Consolidated) |
| Plaintiffs, | <u>CLASS ACTION</u> |
| vs. | |
| ENRON CORP., et al., | |
| Defendants | |

## ORDER PROHIBITING THE DESTRUCTION OF EVIDENCE, GRANTING LIMITED DISCOVERY, AND PROVIDING OTHER RELIEF REGARDING ARTHUR ANDERSON

IT IS HEREBY ORDERED:

(1) Arthur Andersen shall segregate, preserve and protect all writings, recordings, and electronically stored material (FRE 1001) in its possession, custody or control concerning Enron Corporation, including but not limited to, documents, correspondence, e-mails or other communications or evidence related to audit examinations, quarterly reviews, tax-related services, or consulting engagements on behalf of enron Corporation, or any Enron-related entities. Enron-related entities shall include Special Purpose Entities and any affiliates, subsidiaries, partnerships, or joint ventures in which, to Arthur Andersen's knowledge, Enron Corporation or any Enron-related entity participated (hereinafter collectively "Enron-related entities") (all such materials and evidence collectively to be referred to as "Enron-related Materials"). Arthur Andersen shall also preserve and protect all writings, recordings and electronically stored material relating to Arthur Andersen's



destruction or deletion of Enron-related materials, to Arthur Andersen's investigation of the destruction or deletion of Enron-related materials by or at the discretion of Arthur Andersen employees or agents, and to Arthur Andersen's efforts to recover or reconstruct Enron-related materials which had been previously destroyed, discarded or deleted.

(2)     Arthur Andersen shall report to the Court and to whomever is appointed as lead plaintiff(s) and lead counsel, within 20 days of entry of this order, the following:

(a)     By category or subject matter, the Enron-related materials currently in Arthur Andersen's possession, custody or control;

(b)     The steps taken to protect, preserve and segregate Enron-related materials;

(c)     The efforts taken to identify specific Enron-related materials that were destroyed or deleted by document type, category or subject matter as appropriate;

(d)     The efforts to find, identify, recover, reconstruct and/or recreate any Enron-related materials which were destroyed or deleted or are otherwise missing from Arthur Andersen's physical or electronic files;

(e)     The documents and/or the categories of documents that were destroyed that have now been recovered, reconstructed and/or recreated by electronic means or otherwise, including the current location of such materials and the manner in which such materials were recovered, reconstructed or recreated;

(f)     The efforts made to find, identify, recover, reconstruct and/or recreate files in the personal possession of Arthur Andersen's former or present employees.

(3)     The PSLRA discovery stay is lifted for the limited purpose of allowing Plaintiffs' counsel to conduct depositions of the following Arthur Andersen-related individuals.  These

depositions may be noticed immediately, but shall not be taken until immediately following the

filing and service of the report referenced in Paragraph 2.

      (a)    Thomas H. Bauer, Partner, Houston.  Placed on administrative leave.

      (b)    David B. Duncan, Lead Partner in Charge of the Enron engagement, Houston.  Fired on 1/15/02.

      (c)    Michael M. Lowther, former partner, Houston.  Placed on administrative leave.

      (d)    Michael C. Odom, former risk management partner, Houston.  Was sent e-mail by Nancy Temple, an Anderson lawyer, and "reminded" of "documentation and retention policy."  Placed on administrative leave.

      (e)    Stephen Goddard, Jr., former managing partner, Houston.  Placed on administrative leave.

      (f)    Nancy Temple, author of October 12, 2001 e-mail regarding destruction of documents.

Each deposition shall last up to eight (8) hours and be limited to document and data retention,

storage, removal, deletion, destruction, and attempts to restore or recover deleted or destroyed

materials.  No documents need be produced in connection with these depositions.  These depositions

will not preclude further depositions of these individuals when documents relating to Arthur

Andersen's destruction of evidence is made available to Plaintiffs' counsel, or as is otherwise

ordered by the Court.

    (4)    Arthur Andersen will update the Court and whoever is appointed as lead counsel as

to Items 2(a)-(f), on a periodic basis, as agreed to by the parties or as ordered by the Court.

    (5)    Within five (5) days of the entry of this Order (or at such other time as the parties may

agree), Arthur Andersen will make its expert available to the experts retained by plaintiff(s) for the

purpose of enabling such experts to conduct their own evaluation of Arthur Andersen's efforts with

respect to the matters referred to in Paragraph 2 above.  Within ten (10) days of the entry of this Order, Plaintiffs' counsel (accompanied by their experts) will be permitted to make a thorough inspection of the four (4) Arthur Andersen document storage facilities identified by counsel for Arthur Andersen at the January 22, 2002 hearing, to enable Plaintiffs' counsel to satisfy themselves as to the security and safety of the evidence stored at those locations. If there are additional evidence storage facilities of Arthur Andersen, a similar inspection of each of them shall take place.

(6) Nothing herein shall be construed to require Arthur Andersen to undertake any action that is inconsistent with or will interfere with or impede any governmental investigation.

(7) The rights of all parties to seek additional information are preserved.

(8) Nothing reported by any party pursuant to or in connection with this Order shall constitute a waiver of the attorney-client work product or any other applicable privilege.

(9) Arthur Andersen shall distribute a copy of this Order to all Arthur Andersen partners promptly upon its entry.

Signed at Houston, Texas, this 23rd day of January, 2002.


                                        MELINDA HARMON
                                        UNITED STATES DISTRICT JUDGE

## DECLARATION OF SERVICE BY FACSIMILE

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of Alameda, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 100 Pine Street, Suite 2600, San Francisco, California 94111.

2.      That on November 11, 2002, declarant served by facsimile the PLAINTIFFS' *EX PARTE* APPLICATION FOR AN ORDER ENJOINING DEFENDANTS TO CEASE ALTERING EVIDENCE, DIRECTING DEFENDANTS TO PRESERVE EVIDENCE AND GRANTING PLAINTIFFS PARTICULARIZED DISCOVERY TO PRESERVE EVIDENCE to the parties listed on the attached Service List.

3.      That there is a regular communication by facsimile between the place of origin and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 11th day of November, 2002 at San Francisco, California.

Mary Grace Halatsis

G:\CASES\Oracle3\GC80442.brf

PLAINTIFFS' EX PARTE APPL FOR AN ORDER DIRECTING DEF TO PRESERVE
EVIDENCE & GRANTING PARTICULARIZED DISCOVERY- C-01-0988-MJJ

# EXHIBIT 11

1   MILBERG WEISS BERSHAD
      HYNES & LERACH LLP
2   WILLIAM S. LERACH (68581)
     MARK SOLOMON (151949)
3   DOUGLAS R. BRITTON (188769)
     401 B Street, Suite 1700
4   San Diego, CA  92101
     Telephone:  619/231-1058
5   619/231-7423 (fax)
            - and -
6   SANFORD SVETCOV (36561)
     SHAWN A. WILLIAMS (213113)
7   100 Pine Street, Suite 2600
     San Francisco, CA  94111
8   Telephone:  415/288-4545
     415/288-4534 (fax)
9
     Lead Counsel for Plaintiffs
10

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13
     In re ORACLE CORPORATION SECURITIES )   Master File No. C-01-0988-MJJ
14   LITIGATION                           )
                                          )
15                                        )   CLASS ACTION
     This Document Relates To:            )
16                                        )   DECLARATION OF KEN KEATLY IN
       ALL ACTIONS.                       )   SUPPORT OF PLAINTIFFS' *EX PARTE*
17   _____)   APPLICATION FOR AN ORDER
                                              ENJOINING DEFENDANTS TO CEASE
18                                            ALTERING EVIDENCE, DIRECTING
                                              DEFENDANTS TO PRESERVE
19                                            EVIDENCE AND GRANTING
                                              PLAINTIFFS PARTICULARIZED
20                                            DISCOVERY TO PRESERVE EVIDENCE

21                                            DATE:        N/A
                                              TIME:        N/A
22                                            DEPT:        Honorable Martin J. Jenkins

23

24

25

26

27

28

1    I, Ken Keatly, declare as follows:

2    1.    I am an employee of L. R. Hodges & Associates, Ltd. ("LRH&A"), Solana Beach,

3    California, San Diego County.  LRH&A is a private investigative agency duly licensed by the

4    California State Bureau of Security and Investigative Services.  LRH&A has been hired by Milberg

5    Weiss Bershad Hynes & Lerach LLP to investigate facts related to *In re Oracle Corporation*

6    *Securities Litigation*, Master File No. C-01-0988-MJJ (N.D. Cal.).  I have personal knowledge of the

7    facts set forth below and, if called as a witness, could and would competently testify thereto.

8    2.    On October 3, 2002, I contacted a former Oracle manager of cash collections, CW49,

9    by telephone and explained that the nature of my call was related to matters occurring at Oracle

10   Corporation during calendar years 2000 and 2001.  I then briefly described some of the issues and

11   claims alleged in the above-captioned case.  CW49 expressed his/her interest in having a

12   conversation, but that he/she would have to schedule another time to do so.

13   3.    Between October 3, 2002 and October 25, 2002, I made several attempts to again

14   contact CW49 without success.  On October 25, 2002, CW49 contacted me via telephone and

15   expressed his willingness to speak with me at that time.  During our conversation, CW49 indicated

16   that he was employed at Oracle before, during, and after the Class Period (December 14, 2000 -

17   March 1, 2001) and was a manager of cash collections for the United States.  CW49 also stated that

18   during his tenure at Oracle he reported to Mike Quinn who was in charge of all revenue recognition

19   at Oracle, who reported to Jennifer Minton, Oracle's Senior Vice President of Finance.

20   4.    CW49 further stated that during the Class Period Oracle had a long-standing problem

21   of accumulating cash from customer overpayments and that in any given quarter Oracle had

22   approximately $130 million in unapplied cash in its Unapplied Cash account.  CW49 further stated

23   that some of the overpayments in the Unapplied Cash account were several years old.

24   5.    CW49 further stated that Oracle customers were ignorant of the existence of the

25   unapplied cash, because Oracle would only refund overpayments to customers upon a written request

26   by the customer.

27   6.    CW49 stated that during the Class Period Oracle also had a long-standing practice of

28   inappropriate use of customer's overpayments and unapplied cash by doing so-called "auto

DECLARATION OF KEN KEATLY IN SUPPORT OF PLAINTIFFS' *EX PARTE*
APPLICATION- C-01-0988-MJJ                                                                    - 1 -

1  adjustments" of customer overpayments in its Unapplied Cash account and applying the money to its
2  bad debt accounts, thereby lowering the Company's reported bad debt.

3        7.      CW49 further stated that during Oracle's 2Q01 ending November 2000, Senior
4  Accounts Receivable Manager Greg Meyers had been under pressure from Jennifer Minton, Oracle's
5  Senior Vice President of Finance and Operations, to "clean up" the unapplied cash accounts and with
6  the approval of Mike Quinn who was in charge of revenue recognition at the Company and Tom
7  Williams, a former Controller at Oracle who, at the time, was serving as a consultant to Minton,
8  created "debit memos" or "fictitious invoices," which resulted in approximately $40 million in
9  customer overpayments in its unapplied cash account being booked as revenue.

10       8.      CW49 further stated that at that time he expressed his concern about recognizing
11  revenue on the basis of unapplied cash to his superiors, including Quinn.  Quinn responded that
12  CW49 should not worry about the matter because it was none of CW49's concern.

13       9.      On October 31, 2002, I met with CW49 face-to-face at the offices of Milberg Weiss
14  Bershad Hynes & Lerach LLP ("Milberg Weiss") in San Francisco, California.  Present at that
15  meeting were attorneys from Milberg Weiss – Mark Solomon (via teleconference), Shawn Williams
16  and Ronald Hoffman, of counsel to Milberg Weiss.

17       10.     During that meeting, CW49 again stated that Oracle's policy of not returning
18  overpayments to customers resulted in the accumulation of unapplied cash. CW49 further stated that
19  the Company "solved" this problem by creating "debit memos" or phony invoices then applying
20  customers' unapplied cash to those invoices and booking it as revenue in 2Q01 ending November 30,
21  2000. In addition, CW49 stated that 46,800 items totaling $230 million had been applied as revenue
22  on November 17, 2000.

23       11.     CW49 also stated that among the 42 collections analysts in the Collections
24  Department, Raul Campos and Neil Menon at varying times were dedicated to managing the
25  Unapplied Cash account.  In addition, CW49 stated that he had obtained and brought certain
26  documents with him to the meeting and that he was willing, on his own volition, to share them with
27  me.

28

1       12.    CW49 again explained that in addition to booking unapplied cash as revenue, Oracle

2 had used the unapplied cash as a way of reducing its bad debt in order to inflate reported earnings on

3 its income statement.  CW49 explained that at the end of a month, Oracle would run an "auto-

4 adjustment" that would take money out of the Unapplied Cash account and would transfer it to the

5 Reserve for Bad Debt account.  CW49 said that by debiting the Unapplied Cash account Oracle would

6 decrease the amount in that account on the Balance Sheet.  CW49 explained that the balancing entry

7 is a credit to the Bad Debt Expense account, which decreases Bad Debt Expense (on the Income

8 Statement), and the reduction in expense inflates net income.

9       13.    CW49 then stated that Oracle knew that people had become suspicious about the

10 Unapplied Cash account.  CW49 stated that he had recently had additional conversations with a

11 former colleague who is currently an Oracle employee.  CW49 then stated that the former colleague

12 informed him/her that Oracle has directed personnel in the collections department to alter electronic

13 records, that once altered will appear as though the unapplied cash had not been booked as revenue

14 in November 2000.  The former colleague told CW49 that the internal goal is to clean up all debit

15 memos that were issued from 1998 forward that are above $15,000.

16       14.    In addition, CW49 stated that during the conversation the former colleague indicated

17 that there had been a meeting to direct cash collection personnel to begin cleaning up debit memos

18 that were issued in November 2000.  The former colleague also informed CW49 that while the cash

19 collections department was directed to clean up the debit memos, they were told that they would not

20 handle any other matters except cleaning up the unapplied cash and it would have to be done in a very

21 short period of time.

22       15.    CW49 gave plaintiffs a typewritten timeline of meetings at the Company between

23 October 21-30, reported to him by this former colleague, attached hereto as Exhibit A.

24       16.    The current employee further informed CW49 that the Company was in the process

25 of defining five approaches it would take on the debit memos issued in November of 2000.  One of

26 the five methods would be to log onto Oracle's 11i accounts receivable "workbench" application and

27 pull up the "receipts/receipts" form and then to delete from the historical receipt notes that describe

28 the last transaction for a particular entry.  CW49 explained that if the last receipt note for the Oracle

1  customer indicated "move to On Account" that it would be possible to delete the historical note and

2  change it to say "refund customer."

3      17.    Another method that the former colleague informed CW49 was being utilized involved

4  Oracle reviewing all invoices for a specific customer which had previously been written off as a bad

5  debt and then upwardly adjusting those invoices and applying overpayments to the adjusted invoice.

6      18.    A third method related by this former colleague which was being contemplated by

7  Oracle is to erase the debit memo altogether.

8      19.    CW49 also stated that critical documents and reports that track the unapplied cash

9  issue are the Activity Balance Account reports and Billing History, each of which exists for all

10  customers.

11      20.    The former colleague further informed CW49 that among the 31 cash collectors and

12  five managers in cash collections, 75% of the cash collections department is doing nothing but this

13  "clean-up" project.

14      21.    CW49 also gave me a stack of documents which were approximately two inches thick

15  which included Exhibits A-D to this Declaration.

16      22.    Attached are true and correct copies of the following exhibits:

17  Exhibit A:    Typewritten notes from meetings conducted within Oracle between
                     October 21, 2002 and October 30, 2002;
18

19  Exhibit B:    E-mail correspondence between Oracle's Senior Systems Analyst and
                     Omid Farendesh which suggest that they were in the process of doing a
20                   reconciliation of their "On Account" records, and that in order to do so,
                     the company has revised an old database;

21  Exhibit C:    E-mail from Ryan Roberts which appears to confirm a distribution of
22                   items to be worked on by teams in the Collections Department to be
                     forwarded to Mike Quinn for action to be taken; and

23  Exhibit D:    E-mail from Mike Quinn to Greg Myers which appears to confirm that
24                   the ability to move monies through the "On Account" had been disabled.

25      I declare under penalty of perjury under the laws of the State of California that the foregoing

is true and correct. Executed this 11th day of November 2002, at San Diego California.
26

27  _Ken Keat_

28                                        KEN KEATLY

DECLARATION OF KEN KEATLY IN SUPPORT OF PLAINTIFFS' *EX PARTE*
APPLICATION- C-01 0988-MJJ                                                    - 4 -



October      21      Monday         Mgr meeting - explination of on account problem and company's suite to pay back money.  Saying not rev recognized and everything will be okay.  Lawsuit holds no water because this is a recent issue

October      22      Tuesday        Quinn sends ss to mgrs be cut up amoungts mgt team to resolve items that had been reserved.  Create a plan to resolve and get out of reserve by Friday. Collections meets with AR to aggree how to adjust up invoices and how to send over details

October      23      Wednesday      Collections mgrs breakup workload amoungst staff and tell them to finish by cob.  SS sent to quinn who sends back with his notes and says this isn't good enough. These explanitions will not due.  Quinn meets with mgrs and lights into them.
                     Quinn wants to figure out why the items where reserved and can't tell if the item was a revenue impact or not.  Will not refund any item that impacts revenue, adjust up invoice for revenue impacting items.

October      24      Thursday       No calls, collectors work all day on clean up (majority of staff)

October      25      Friday   No calls, collectors work all day on clean up (majority of staff)

October      26      Saturday       N/A

October      27      Sunday         N/A

October      28      Monday         System down resolving items off of ss.  No calls, collectors work all day on clean up (majority of staff)
October      29      Tuesday        No calls, collectors work all day on clean up (majority of staff)

October      30      Wednesday      Quinn sent back ss with items that needed additional cleanup and staff began working on.  Collections mgrs meet and aggreed upon all notes to be sent to quinn
October      31      Thursday

                     mgrs meet everyday to review ss notes and quality to pass to quinn
                     mgrs consistantly meet to review notes and cleanup so mike will approve
                     . refund, adjust up invoice, obtain hard copy from iron myt, rebill
                     revenue impact or none impacting

                     no one on ones
                     no collections calls
                     just responding to inbound calls

**From:** Omid Fardanesh <Omid.Fardanesh@oracle.com>                    Thu 6:43 PM
**Subject:**[Fwd: PFR]
    **To:** "Backs,Justin" <JuSTIN.BACKS@oracle.com>,
        "Adao,Anne Marie" <ANNE.MARIE.ADAO@oracle.com>,
        "Hatada,Ian" <IAN.HATADA@oracle.com>,
        "littlefield,Molly" <MOLLY.LITTLEFIELD@oracle.com>,
        "Roberts,Ryan" <RYAN.ROBERTS@oracle.com>

REDACTED

---

**From:** Kim Henderson <kim.henderson@oracle.com>                    Thu 6:30 PM
**Subject:** Re: PFR
    **To:** Omid Fardanesh <Omid.Fardanesh@oracle.com>

Hi Omid-

I've reactivated the query component of the old Proforma site.  I had to
restart our old database that had the proforma table in it.  I will leave it
up until Friday, November 1st and then shut it down again.  I do not want to
leave the old database up one second longer than it needs to be.  This is
because I don't want people to become confused and begin inputting
information into the old database believing it is production again.  It
could be a nightmare!

To get to the query (the images don't work), navigate to
http://revenue-management.us.oracle.com/html/ar/proforma_complete_query.html.

If you complete your project ahead of time, please let me know.

Thank you,

Kim

Omid Fardanesh wrote:

> Hi Kim,
>
> Here in Collections we are doing a reconciliation for our "On Account"
> which consist of Receipts we have received. The problem we are running
> into some of the Checks reference a PFR number.  I know that recently we
> deactivated the site that allowed us to search on a PFR number to find
> out why the Performa was done.  I am hoping to see if there is any way
> we can get access to that data even if possible to reactivate the site
> for a week or so till we are done with this project.
>
> Please let me know what you can do.
> Thanks,
> Omid

Kimberly Henderson <kim.henderson@oracle.com>
Senior Systems Analyst
North America Finance & Operations
ORACLE

 

**From:** Ryan Roberts <Ryan.Roberts@oracle.com>                    Tue 2:24 PM
**Subject:** New List
    **To:** "Hatada,Ian" <IAN.HATADA@oracle.com>, "Backs,Justin" <JUSTIN.BACKS@oracle.com>,
       "Fardanesh,Omid" <OMID.FARDANESH@oracle.com>,
       "littlefield,Molly" <MOLLY.LITTLEFIELD@oracle.com>,
       "Adao,Anne Marie" <ANNE.MARIE.ADAO@oracle.com>

Attached is our new working list. I have broken it out from the list and sorted by dollar (so I could get back to the ones we have not yet worked on). They are listed out for you by your name. Please do not resort these. **I have to get them back in the same order I am sending them to you.** Each of you has between 50-52 items. Feel free to meet with your teams tonight or tomorrow morning to get them assigned. Let's do the same quality work on these that we have done with the others. My goal is to be done by 4:30 tomorrow so we can get the In Focus and go over them. Once complete, I will forward to Mike and let him know we are ready to take action. If you have questions, let me know.

Thanks,

Ry



| | Name: Manager workbook for project completion.xls |
|---|---|
| Manager workbook for project completion.xls | Type: EXCEL File (application/msexcel) |
| | Encoding: base64 |
| | Download Status: Not downloaded with message |

Ryan Roberts <Ryan.Roberts@oracle.com>


REDACTED

 

Greg, please confirm that ALL ability to move anything to 12601 via On Account or creating a Misc reciept write off has br   turned off.

Greg, as we discussed this weekend, please look into the ins and outs in Activity Detail in the 12601_Detail spreadsheet. In many instances, there are two negative numbers (are these debits or credits?) and one positive of equal amounts.  Please research and provide an explanation of the accounting involved.

Thanks for your help in this.  If you have any questions, lets discuss immediately.

Mike

| | Name: Greater_Than_100K in 1260151 Version 3.xls |
|---|---|
| Greater_Than_100K in 1260151_Version 3.xls | Type: Microsoft Excel Worksheet (application/vnd.ms-excel) |
| | Encoding: base64 |
| | Download Status: Not downloaded with message |

REDACTED

1

## DECLARATION OF SERVICE BY FACSIMILE

2

I, the undersigned, declare:

3

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States

4

and a resident of the County of Alameda, over the age of 18 years, and not a party to or interest in the

5

within action; that declarant's business address is 100 Pine Street, Suite 2600, San Francisco,

6

California 94111.

7

2.      That on November 11, 2002, declarant served by facsimile the DECLARATION OF

8

KEN KEATLY IN SUPPORT OF PLAINTIFFS' *EX PARTE* APPLICATION FOR AN ORDER

9

ENJOINING DEFENDANTS TO CEASE ALTERING EVIDENCE, DIRECTING DEFENDANTS

10

TO PRESERVE EVIDENCE AND GRANTING PLAINTIFFS PARTICULARIZED DISCOVERY

11

TO PRESERVE EVIDENCE to the parties listed on the attached Service List.

12

3.      That there is a regular communication by facsimile between the place of origin and

13

the places so addressed.

14

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 11th

15

day of November, 2002 at San Francisco, California.

16

17

18                                                          Mary Grace Halatsis

19

20

21

22

23

24

25

26

27

28   G:\CASES\Oracle3\MGH80152.dec

DECLARATION OF KEN KEATLY IN SUPPORT OF PLAINTIFFS' *EX PARTE*
APPLICATION- C-01-0988-MJJ                                                         - 6 -

ORACLE III (LEAD)
Service List - 11/11/02
Page   1


COUNSEL FOR PLAINTIFF(S)

Shawn A. Williams
MILBERG WEISS BERSHAD HYNES &
  LERACH LLP
100 Pine Street, Suite 2600
San Francisco, CA  94111-5238
  415/288-4545
  415/288-4534 (fax)

William S. Lerach
Mark Solomon
Douglas R. Britton
MILBERG WEISS BERSHAD HYNES &
  LERACH LLP
401 B Street, Suite 1700
San Diego, CA  92101-5050
  619/231-1058
  619/231-7423 (fax)


COUNSEL FOR DEFENDANTS

Alan N. Salpeter
Javier H. Rubinstein
MAYER, BROWN, ROWE & MAW
190 South LaSalle Street
Chicago, IL  60603-3441
  312/782-0600
  312/701-7711 (fax)

Steven O. Kramer
Jamie E. Wrage
MAYER, BROWN, ROWE & MAW
350 South Grand Avenue
Suite 2500
Los Angeles, CA  90071-1503
  213/229-9500
  213/625-0248 (fax)

Donald M. Falk*
MAYER, BROWN, ROWE & MAW
555 College Avenue
Palo Alto, CA  94306
  650/331-2000
  650/331-2060 (fax)

Lauren G. Segal*
ORACLE CORPORATION
500 Oracle Parkway
Mail Stop 50P7
Redwood City, CA  94065
  650/506-5200
  650/506-7114 (fax)


* Denotes via personal service

